**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS**

# APPENDIX

INDEX

| | | |
|---|---|---|
| A | | Alice Penrod April 27, 2023 Dep |
| B | | Amatullah Contractor July 20, 2022 Dep |
| C | | Bexar County Jacquelyn Callanen April 4, 2022 Dep. |
| D | | Bexar County Jacquelyn Callanen April 20, 2022 Dep. |
| E | | Bexar County Jacquelyn Callanen February 28, 2023 Dep. |
| F | | Cameron County Remi Garza May 9, 2022 Dep. |
| G | | Dallas County EA April 29, 2022 Dep. |
| H | | Dallas County Michael Scarpello April 13, 2023 Dep. |
| I | | Dallas County Michael Scarpello May 4, 2022 Dep. |
| J | | Dallas County Tacoma Phillips April 13, 2023 Dep. |
| K | | Douglas Kruse May 3, 2022 Dep. |
| L | | Pls' Expert, Dr. Douglas L. Kruse, February 28, 2022 Report) at 11 |
| M | | El Paso County Lisa Wise April 13, 2022 Dep.) at 184:4–184:13 |
| N | | El Paso County Lisa Wise April 15, 2023 Dep.) at 234:22–235:8 |
| O | | El Paso County Lisa Wise April 18, 2023 Dep.) at 71:19–71:23 |
| P | | Harris County Isabel Longoria April 20, 2022 Dep.) at 67:7–70:3 |
| Q | | Harris County Jennifer Colvin March 21, 2023 Dep.) at 45:7–46:24 |
| R | | Harris County Lauren Smith March 21, 2022 Dep.) at 13:21–17:17 |
| S | | United States Expert, Dr. Eitan Hersh, February 10, 2023 Report) at 7 |
| T | | Hidalgo County Hilda Salinas April 20, 2023 Depo) at 31:16–32:17 |
| U | | Yvonne Ramón April 21, 2022 Dep.) at 153:8–155:19 |
| V | | Hidalgo County Yvonne Ramon May 10, 2022 Dep.) at 236:18–236:21 |
| W | | Janet Eickmeyer June 13, 2022 Dep.) at 23:4–23:10 |
| X | | Julie Espinoza June 9, 2022 Dep.) at 50:7–50:12, 93:23–94:2 |
| Y | | Kara Ayers May 10, 2022 Dep.) at 173:22 |
| Z | | Keith Ingram March 28, 2023 |
| AA | | Michelle Brown April 23, 2022 Dep.) at 184:21–185:3 |
| BB | | Nancy Crowther June 17, 2022 Dep.) at 50:16–21, 117:2–21 |
| CC | | OCA-GH Deborah Chen March 28, 2022 Dep.) at 231:3–231:17 |
| DD | | Pamiel Gaskin June 29, 2022 Dep.) at 20:22-24:24 |
| EE | | Rep. John Bucy August 9, 2022 Dep.) at 158:20 – 160:2 |
| FF | | REVUP Bob Kafka April 7, 2022 Dep.) at 107:15–109:5 |
| GG | | Sadia Tirmizi May 8, 2023 Dep.) at 51:5–51:11 |
| HH | | Teri Saltzman July 15, 2022 Dep.) at 24:22–25:3 |
| II | | The Arc of Texas Jennifer Martinez April 12, 2022 Dep.) at 63:7–63:11, 90:10–90:15, 91:23–92:23, 93:8–93:21, 94:7–15 |
| JJ | | Toby Cole June 28, 2022 Dep.) at 25:24-26:1 |
| KK | | Travis County Rebecca Guerrero May 11, 2022 Dep.) at 51:16–51:18 |
| | | |

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

### STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX A

Page 1

```
              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF TEXAS
                 SAN ANTONIO DIVISION
LA UNIÓN DEL PUEBLO          §
ENTERO, ET AL.,              § CASE NO. 5:21-CV-844-XR
     PLAINTIFFS,             § [LEAD CASE]
                             §
V.                           §
                             §
GREGORY W. ABBOTT, ET AL.,   §
     DEFENDANTS.             §

OCA-GREATER HOUSTON, ET      §
AL.,                         § CASE NO. 1:21-CV-780-XR
     PLAINTIFFS,             §
                             §
V.                           §
                             §
JANE NELSON, ET AL,.         §
     DEFENDANTS.             §
HOUSTON AREA URBAN LEAGUE,   §
ET AL.,                      § CASE NO. 5:21-CV-848-XR
     PLAINTIFFS,             §
                             §
V.                           §
                             §
GREGORY WAYNE ABBOTT, ET     §
AL.,                         §
     DEFENDANTS.             §
LULAC TEXAS, ET AL.,         §
     PLAINTIFFS,             § CASE NO. 1:21-CV-0786-XR
                             §
V.                           §
                             §
JANE NELSON, ET AL.,         §
     DEFENDANTS.             §
                             §

MI FAMILIA VOTA, ET AL.,     §
     PLAINTIFFS,             § CASE NO. 5:21-CV-0920-XR
                             §
V.                           §
                             §
GREG ABBOTT, ET AL.,         §
     DEFENDANTS.             §
```



## Page 2

1  UNITED STATES OF AMERICA, §
       PLAINTIFF,     § CASE NO. 5:21-CV-1085-XR
2                     §
   V.                 §
3                     §
   THE STATE OF TEXAS, ET §
4  AL.,               §
       DEFENDANTS     §
5
6
   *********************************************************
7
8      ORAL AND VIDEOTAPED DEPOSITION OF
9
       ALICE PENROD
10
11     APRIL 27, 2023
12
   *********************************************************
13
14     ORAL AND VIDEOTAPED DEPOSITION OF ALICE PENROD,
15 PRODUCED AS A WITNESS AT THE INSTANCE OF THE STATE'S
16 DEFENDANTS, WAS TAKEN IN THE ABOVE-STYLED AND -NUMBERED
17 CAUSE ON THE 27TH DAY OF APRIL, 2023, FROM 10:03 A.M. TO
18 12:24 P.M., BEFORE KAREN A. GONZALEZ, COMMISSIONED
19 NOTARY, IN AND FOR THE STATE OF TEXAS, REPORTED REMOTELY
20 BY MACHINE SHORTHAND, REMOTELY FROM DALLAS COUNTY,
21 TEXAS, PURSUANT TO THE TEXAS RULES OF CIVIL PROCEDURE,
22 THE TEXAS SUPREME COURT EMERGENCY ORDER REGARDING THE
23 COVID-19 STATE OF DISASTER AND THE PROVISIONS STATED ON
24 THE RECORD OR ATTACHED HERETO.
25

## Page 3

1          A P P E A R A N C E S
2
3  FOR THE DEFENDANTS:
      MR. ZACHARY BERG (VIA ZOOM)
4     OFFICE OF THE ATTORNEY GENERAL
      P.O. BOX 12548 (MC-009)
5     AUSTIN, TEXAS 78711-2548
      TELEPHONE:  (512) 463-2100
6     E-MAIL:   ZACHARY.BERG@OAG.TEXAS.GOV
7  FOR THE PLAINTIFF:
      MR. NOAH BARON (VIA ZOOM)
8     ELIAS LAW GROUP
      250 MASSACHUSETTS AVENUE NORTHWEST
9     SUITE 400
      WASHINGTON, DC 20001
10    TELEPHONE:  (202) 968-4556
      E-MAIL:    NBARON@ELIAS.LAW
11
12 ALSO PRESENT:
13    MR. HAMDON - VIDEOGRAPHER
      MR. STEPHEN KENNY
14    MR. KEVIN ZHEN
      MR. MARCOS MOCINE
15    MS. JOSEPHINE RAMIREZ
16
17
18
19
20
21
22
23
24
25

## Page 4

1          I N D E X
2
3  APPEARANCES . . . . . . . . . . . . . . . .     2
4  SWORN STATEMENT OF ALICE PENROD
5     DIRECT EXAMINATION BY MR. BERG . . . . .     6
6     CROSS-EXAMINATION BY MR. BARON . . . . .    75
7  CHANGES AND SIGNATURE . . . . . . . . . . .    81
8  JURAT . . . . . . . . . . . . . . . . . .      82
9  REPORTER'S CERTIFICATE. . . . . . . . . . .    83
10
11
12
13        E X H I B I T
14 NO.   DESCRIPTION              PAGE
15 A    LULAC PLAINTIFFS' SEVENTH SUPPLEMENTAL RULE
16 26(A)(1) INITIAL DISCLOSURES. . . . . . . . . . . 11
17
18
19
20
21
22
23
24
25

## Page 5

1        REPORTED REMOTELY FROM DALLAS COUNTY, TEXAS
2          P R O C E E D I N G S
3
4
5        THE VIDEOGRAPHER:  WE ARE NOW ON THE RECORD.
6  THIS BEGINS VIDEO NUMBER ONE IN THE
7  DEPOSITION OF ALICE PENROD IN THE MATTER OF LA UNIÓN DEL
8  PUEBLO ENTERO, ET AL., VERSUS STATE OF TEXAS, ET AL.
9        TODAY IS THURSDAY APRIL 27, 2023, AND THE
10 TIME IS 10:03 A.M.
11       COUNSEL AND ALL PARTIES PRESENT WILL BE
12 NOTED ON THE STENOGRAPHIC RECORD.
13       WILL THE COURT REPORTER PLEASE SWEAR IN THE
14 WITNESS.
15       THE REPORTER:  YES.
16       MS. ALICE PENROD, IF YOU COULD PLEASE RAISE
17 YOUR RIGHT HAND.
18       (WITNESS SWORN.)
19       THE WITNESS:  I DO.
20       THE REPORTER:  THANK YOU.
21       I AM READY WHEN ALL PARTIES ARE READY.
22
23       ALICE PENROD,
24 HAVING BEEN FIRST DULY SWORN, WAS EXAMINED
25       AND TESTIFIED AS FOLLOWS:



Page 34

1  APPLICATION FOR BALLOT BY MAIL IN 2022?
2      A. NO.
3      Q. DO YOU RECALL HOW YOU APPLIED TO VOTE BY MAIL-IN
4  2022?
5      A. I BELIEVE I APPLIED ONLINE.
6      Q. AND AFTER YOU APPLIED ONLINE, DID YOU HAVE TO
7  PRINT ANYTHING OUT?
8      A. I THINK I HAD TO PRINT SOMETHING AND MAIL IT IN.
9      Q. AND YOU DID NOT HAVE ANY ISSUES WITH THAT
10 PROCESS?
11     A. NO.
12         MR. BARON:  OBJECT TO FORM.
13         YOU CAN ANSWER.
14     A. NO.
15     Q. (BY MR. BERG)  OTHER THAN THE MARCH 1ST, 2022,
16 PRIMARY, DID YOU HAVE ANY ISSUES VOTING IN EITHER 2022
17 OR 2023?
18         MR. BARON:  OBJECT TO FORM.
19         YOU CAN ANSWER.
20     A. WHEN I VOTED IN THE GENERAL ELECTION, I WAS NOT
21 AWARE THAT WE NEEDED TO BRING IN OUR MAIL-IN BALLOT,
22 BECAUSE APPARENTLY WE HAD -- WE HAD, I GUESS, WHEN WE
23 APPLIED FOR THE BALLOTS THEY MAILED TO US THE PRIMARY
24 AND THE GENERAL WAS SENT TO US, I DON'T KNOW.  IF THEY
25 AUTOMATICALLY -- I DIDN'T HAVE TO DO IT AGAIN, I GUESS,

Page 35

1  WAS WHAT I'M TRYING TO SAY, WHEN WE VOTED IN THE GENERAL
2  ELECTION, IT JUST CAME TO THE HOUSE.  WE HAD ALREADY
3  MADE THE DECISION TO GO IN-PERSON.  WE WERE NOT AWARE --
4  I WAS NOT AWARE THAT I NEEDED TO TAKE MY MAIL-IN BALLOT
5  THAT I HAD NOT USED WITH ME TO THE POLLING PLACE.  SO
6  WHEN WE GOT TO THE POLLING PLACE WE HAD TO GO TO A DESK
7  WHERE THE ELECTION OFFICER HAD TO CALL THE MAIN ELECTION
8  OFFICER TO VERIFY THAT WE HAD GOTTEN A MAIL-IN BALLOT,
9  THAT WE HADN'T MAILED IT BACK IN, AND WE WERE ABLE TO
10 VOTE IN-PERSON.  SO THAT WAS A LEARNING EXPERIENCE.
11     Q. (BY MR. BERG)  SO WHEN YOU WENT TO VOTE IN-PERSON
12 FOR THE NOVEMBER 2022 ELECTION WITH YOUR HUSBAND, AND
13 YOUR MOTHER, SOMEONE IN THE ELECTION'S OFFICE TOLD YOU
14 THAT THERE WAS AN ISSUE BECAUSE YOU DIDN'T HAVE YOUR
15 MAIL-IN BALLOT WITH YOU; IS THAT CORRECT?
16     A. RIGHT.  RIGHT.  THEY HAD TO MAKE PHONE CALLS
17 FIRST TO MAKE SURE THAT IT WAS -- THAT WE COULD VOTE.
18 THEY HAD IT ON RECORD THAT WE WERE GOING TO VOTE
19 IN-PERSON.
20     Q. DID YOU HAVE TO SURRENDER YOUR BALLOT, OR DID
21 THEY JUST HAVE TO MAKE CALLS?
22     A. THEY JUST HAD TO MAKE PHONE CALLS.
23     Q. DO YOU KNOW WHO THEY WERE CALLING?
24     A. I ASSUME IT WAS THE RECENT CHAIR OR SOMEBODY, YOU
25 KNOW, THE MAIN -- THE MAIN PEOPLE IN CHARGE OF VOTING.

Page 36

1  I DON'T KNOW WHO THEY CALLED FOR -- SPECIFICALLY.
2      Q. AFTER THEY --
3      A. BUT WE GOT TO SIT THERE FOR AWHILE WHILE SHE MADE
4  THE PHONE CALL.
5      Q. AFTER THE PHONE CALL, WERE YOU ABLE TO VOTE BY
6  REGULAR BALLOT?  OR DID YOU HAVE TO USE A PROVISION
7  BALLOT?
8      A. REGULAR BALLOT, I THINK, I'M ASSUMING.  IT WAS
9  THE ONE THAT THEY GAVE US, SO...
10     Q. AND ONCE THEY GAVE YOU THE PHYSICAL BALLOT AT THE
11 VOTING LOCATION WERE YOU ABLE TO SUCCESSFULLY VOTE?
12     A. YES.
13     Q. DID YOU HAVE ANY ISSUE VOTING IN EITHER THE
14 MAY 7TH, 2022, ELECTION OR THE MAY 24TH PRIMARY RUNOFF?
15         MR. BARON:  OBJECT TO FORM.
16         YOU CAN ANSWER.
17     A. NO.
18     Q. (BY MR. BERG)  AND YOU -- SORRY, DID YOU HAVE
19 MORE?
20     A. NO.  I WAS THINKING DATES IN MY HEAD.
21     Q. AND YOU HAVEN'T HAD ANY ISSUES VOTING IN 2023
22 YET; IS THAT CORRECT?
23     A. THAT'S CORRECT.
24         MR. BARON:  OBJECT TO FORM.
25         YOU CAN ANSWER.

Page 37

1      A. THAT'S CORRECT, 'CAUSE I HAVEN'T VOTED YET.
2      Q. (BY MR. BERG)  SO WOULD IT BE A CORRECT SUMMARY
3  TO SAY THAT OTHER THAN YOUR 2022 PRIMARY VOTE, THE ONLY
4  ISSUE AT VOTING WAS IN THE 2022 GENERAL ELECTION WHEN
5  YOU VOTED IN-PERSON; IS THAT CORRECT?
6          MR. BARON:  OBJECT TO FORM.
7          YOU CAN ANSWER.
8      A. SO I DID HAVE ISSUES VOTING BY MAIL-IN THE
9  PRIMARY OF 2022.
10     Q. (BY MR. BERG)  OKAY.  WE'LL GET TO THAT --
11     A. BUT I --
12     Q. WHY --
13     A. BUT I DID NOT HAVE ANY ISSUES OTHER THAN, YOU
14 KNOW, HAVING TO MAKE ARRANGEMENTS TO TAKE MY MOTHER DOWN
15 WITH US TO VOTE, 'CAUSE WE NO LONGER TRUSTED THE MAIL-IN
16 BALLOTS, YOU KNOW.  STANDING IN THE RAIN, GETTING THERE
17 EARLY, YOU KNOW?  TRYING TO MAKE SURE THAT WE DIDN'T
18 HAVE HER STANDING TOO LONG.  AND THEN, YOU KNOW, HAVING
19 TO BE PULLED ASIDE AND PHONE CALLS MADE BECAUSE WE
20 DIDN'T BRING OUR BALLOT, WHICH WE DIDN'T KNOW WE WERE
21 SUPPOSED TO.  SO YOU KNOW IT WASN'T -- IT WASN'T JUST A
22 PIECE OF CAKE TO GO IN AND VOTE IN-PERSON, IT WAS -- IT
23 TOOK PLANNING, AND TIME.  AND -- SO I WOULD CALL THAT A
24 LITTLE MORE DIFFICULT THAN JUST BEING ABLE TO WALK IN
25 AND, YOU KNOW, STAND IN LINE, VOTE, AND LEAVE.



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX B

```
 1                UNITED STATES DISTRICT COURT
                           FOR THE
 2                  WESTERN DISTRICT OF TEXAS

 3
    LA UNION DEL PUEBLO       §
 4  ENTERO, ET AL.           §
                             §
 5        Plaintiff          §
                             §  Civil Action No.
 6  V.                       §  5:21-cv-00844-XR
                             §
 7  GREGORY W. ABBOTT, ET    §
    AL.                      §
 8        Defendant.         §

 9

10

11                   ORAL DEPOSITION OF

12                  AMATULLAH CONTRACTOR

13                     JULY 20, 2022

14

15

16        ORAL DEPOSITION OF AMATULLAH CONTRACTOR, produced

17  as a witness at the instance of the Defendant and duly

18  sworn, was taken in the above styled and numbered cause

19  on Wednesday, July 20, 2022, from 10:26 a.m. to

20  1:13 p.m., before DONNA QUALLS, Notary Public in and for

21  the State of Texas, reported by computerized stenotype

22  machine, at the offices of the Texas Justice Center,

23  4900 Fournace Place, Houston, Texas, pursuant to the

24  Federal Rules of Civil Procedure and any provisions

25  stated on the record or attached hereto.
```



Amatullah Contractor

July 20, 2022
Pages 14 to 17

Page 14

1  Q. Okay. Thank you.
2     I guess, let's talk about your voting
3  background in particular.
4     Are you registered to vote?
5  A. Yes.
6  Q. And how long have you been registered to vote?
7  A. I registered to vote in 2016.
8  Q. And where are you registered to vote?
9  A. The address? At --
10  Q. The county, yes.
11  A. Oh, in Harris County.
12  Q. And how frequently would you say you vote?
13  A. I vote quite frequently, but I have missed a
14  few votes.
15  Q. Have you voted -- strike that.
16     Since you registered in 2016, have you
17  always been registered in Harris County?
18  A. Yes.
19  Q. And have you voted in person in Travis County?
20     MS. CHEN: Objection.
21     MR. WASSDORF: Oh. Harris County. Thank
22  you.
23  Q. (BY MR. WASSDORF) Let me repeat that. Have
24  you ever voted in person in Harris County?
25  A. Yes.

Page 15

1  Q. Have you ever voted by mail in Harris County?
2  A. No.
3  Q. Have you ever applied to vote by mail?
4  A. No.
5  Q. Have you ever used an assistor to vote?
6  A. No.
7  Q. Have you ever provided assistance to a voter?
8  A. Yes.
9  Q. I'll just make a note. We'll come back to
10  that.
11     Have you ever requested an accommodation
12  when voting?
13  A. Could you please define "accommodation"?
14  Q. I guess beyond assistor that would be an
15  interpreter or requesting the assistance of an election
16  worker.
17  A. No.
18  Q. Did you vote in 2020?
19  A. Yes.
20  Q. In which election?
21  A. In the 2020 primary election, in the 2020
22  primary runoff elections, and the 2020 general election.
23  Q. And what about in 2022?
24  A. I voted in the March 1st primary election.
25  Q. There was also a primary runoff election and a

Page 16

1  local and constitutional amendment election. Did you
2  vote in either of those?
3  A. I did not.
4  Q. Which party's primary did you vote in?
5  A. I voted in the Democratic primary.
6  Q. Have you voted in the Texas Democratic
7  primaries before?
8  A. Yes.
9  Q. Roughly, how many times?
10  A. Two times.
11  Q. Did you experience any difficulties when you
12  voted in the March 2022 primary?
13  A. Personally, I -- when I was going to vote, I
14  did not experience difficulties.
15  Q. What about in any of the elections in which you
16  voted in 2020? Did you experience any difficulties
17  there?
18  A. No.
19  Q. Have you been able to vote successfully every
20  time you have attempted to vote?
21  A. Yes.
22  Q. Before we get to SB 1 itself, let me follow up
23  about your political involvement more generally. You've
24  already spoken about Emgage.
25     Are you involved with any other advocacy

Page 17

1  groups?
2  A. No.
3  Q. Have you ever publically endorsed a political
4  candidate?
5  A. Could you clarify by endorse?
6  Q. Have you ever publicly announced that you
7  support a particular political candidate?
8  A. Yes.
9  Q. Who would that be?
10  A. There -- I do not recall all of them, but on --
11  I am -- I think I -- I believe that I have publically
12  endorsed Beto O'Rourke and Lema Barazi who ran for
13  judge. Ben Chou for Precinct 4 commissioner. Those are
14  the names that I recall currently.
15  Q. And are they all Democrats?
16  A. Yes.
17  Q. Have you ever endorsed a Republican candidate?
18  A. No.
19  Q. Have you ever publicly endorsed a ballot
20  measure or other proposal?
21  A. I don't recall doing so, no.
22  Q. Your current employer, remind me who that is
23  again.
24  A. Grassroots Analytics.
25  Q. And what do they do?



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
|     *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
|     *Defendants.* | § | |

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX C

Transcript of the Testimony of

**Jacquelyn Callanen**

**Date:**

April 04, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Jacquelyn Callanen

April 04, 2022
Pages 98 to 101

Page 98

1    Q.  If they want to change that Election Code to
2  prevent fraud, do you think they have to actually have
3  proof of actual fraud before they do that or is trying
4  to prevent it okay?
5         MS. CUBRIEL:  Objection, form.
6         THE WITNESS:  I don't know how to answer
7  that.
8    Q.  (By Mr. Jeff White) But you would you agree the
9  legislature, it is their purview to modify the Election
10 Code?
11   A.  Correct.
12   Q.  I believe you said that in the climate we are
13 in now, you are getting a lot of reports of suspected
14 fraud; is that correct?
15   A.  Correct.
16   Q.  And if people think fraud is occurring, does
17 that affect their competence in the elections
18 themselves?
19        MS. CUBRIEL:  Objection, form.
20        THE WITNESS:  That is what it feels like.
21   Q.  (By Mr. Jeff White) So if people think fraud is
22 occurring and have lower confidence in the elections, do
23 you think putting in additional procedures to try to
24 prevent fraud, conserve to improve the competence of the
25 voters?

Page 99

1         MS. CUBRIEL:  Objection, form.
2         THE WITNESS:  If it is done in a timely
3  manner.
4    Q.  (By Mr. Jeff White) And following up on that --
5  strike that.  You don't think SB-1 making changes to a
6  large 2022 primary was enough time for you to implement;
7  is that correct?
8    A.  Correct.
9    Q.  If SB-1 had allotted Bexar County more time to
10 implement it before it went into effect for an election,
11 could it have been done better?
12   A.  Yes.
13   Q.  And do you think that because you didn't have a
14 lot of time, that there were issues?
15   A.  Yes.
16   Q.  And the issues created by that lag of time did
17 not create confidence; is that correct?
18   A.  Correct.
19        MS. CUBRIEL:  When you get to a good
20 stopping point, I think it would be a good time for
21 another break.
22   Q.  (By Mr. Jeff White) Okay.  But if you had more
23 time to implement SB-1, do you think it could have been
24 more effective at improving voter confidence?
25        MS. CUBRIEL:  Objection, form.

Page 100

1         THE WITNESS:  Yes.
2         MR. JEFF WHITE:  We can take a quick break
3  now.
4         VIDEOGRAPHER:  The time is 11:42 a.m.  We
5  are off the record.
6         (Recess taken)
7         VIDEOGRAPHER:  The time is 12:00 p.m. and
8  we are back on the record.
9    Q.  (By Mr. Jeff White) Ms. Callanen, Jackie, I
10 just wanted to quickly talk about -- we had previously
11 talked about some of the improvements in SB-1.  And
12 there was one topic I wanted to ask you about that I
13 don't think came up.  Didn't SB-1 extend early voting
14 hours?
15   A.  Excuse me.  Yes, it did.  It is up until I
16 think 10:00 o'clock but here in Bexar County.  I mean
17 like I didn't -- I don't want to say I dismissed that
18 part but we have always been ahead of the curve.  We
19 have always had our 10 hour days and our 12 hour days so
20 I sort of skipped that part of it.
21   Q.  Are you aware that it also extended mandatory
22 hours for early voting to smaller counties?
23   A.  Yes.
24   Q.  And do you view that as an improvement in SB-1?
25   A.  I would say so.

Page 101

1    Q.  And are you aware of the provision in SB-1 --
2  strike that.  Prior to SB-1, are you aware that the
3  Election Code protected workers who needed time off from
4  work on election day?
5    A.  Yes, sir.
6    Q.  And are you aware of SB-1 changing that
7  provision?
8    A.  I think it -- yes, yes, because I think it
9  extended it now to early voting.  They could have the
10 time off during early voting.  Prior to that, I think it
11 was just election day.
12   Q.  Would you view that as something that made it
13 easier to vote?
14   A.  Yes and no.  I mean I am split on that because
15 I believe with our 10 hours a day and with our weekend
16 availability, that there would be enough time for
17 someone to go.
18   Q.  So what you are saying is that the early voting
19 hours that you offer in Bexar County make it pretty easy
20 for someone to vote if they want to during the early
21 period?
22   A.  Yes, sir.
23   Q.  So we briefly touched on this issue of how you
24 got ready, maybe not briefly, how you have been
25 implementing the changes in SB-1.  And I just kind of

Page 102

1 wanted to step back and kind of talk a little bit more
2 about the training that you had to do to implement it.
3 So we may have talked about this before.  But what
4 training did you receive from the Secretary of State's
5 office?
6     A.  I think we had webinars available to us and
7 some advisories that would come down.
8     Q.  And did they -- strike that.  Did the Secretary
9 of State's office cover all of the changes in SB-1 that
10 were relevant to you as Bexar County administrator?
11    A.  I would say yes, but again, with reservations.
12    Q.  What are the reservations?
13    A.  There were so many thing ins SB-1.  There were
14 so many pieces and parts to it that I am sure we haven't
15 discovered everything yet.
16    Q.  So on your own end for the county, I think you
17 said that you had to do your own training; correct?
18    A.  Correct.
19    Q.  And who did you have to train?
20    A.  Well, we have internal staff we have to train
21 and then our 1200 workers that we have to train so it is
22 an on-going thing.  The temps that come in have to have
23 training so it is quite, quite a lot.
24    Q.  And what changes in SB-1 were the hardest to
25 train them to implement?

Page 103

1     A.  The by-mail process definitely.
2     Q.  And why is that?
3     A.  Again, as we have talked about, with the number
4 of rejections that we had and the number of steps we had
5 to take so that we could handle our by-mail voters and
6 the actions in the time that we normally handled them.
7 So it put a push to it.
8     Q.  And in addition to training, did you have to
9 implement new processes and procedures?
10    A.  Absolutely.
11    Q.  So what kind of processes and procedures do you
12 maintain as election administrator?
13    A.  I would say pick one.  The one we had to -- and
14 I think I alluded to it earlier -- was that with the --
15 the necessity to have parts of our office under 24 hour
16 video surveillance, that was quite a last minute, I mean
17 again, emergency kind of thing.  As I said before, the
18 wheels of county government go very slowly.
19          And we were still living with it because
20 not only did the video 24 hours a day, seven days a week
21 streaming -- and I can't believe I am saying this -- but
22 the only way we did it was to have it up on YouTube.
23 And unbeknownst to myself, as we were getting into the
24 planning stages and with my technical support people,
25 YouTube only allows you to stream for 12 hours and then

Page 104

1 you have to stop and then you have to restart.  Well,
2 that sounds fine.  But now, all of a sudden, I have a
3 staff member and we have to get a special computer that
4 we had to hurry up and buy so that they could go online
5 and stop and start it.  And so it just was an added
6 burden to these people whether, you know, it is like oh,
7 my God, I forgot, setting alarms, handing off the
8 computer so see who could do it because one person
9 wasn't going to step up til midnight each night.
10 However, it was just a complication.
11    Q.  And when you implemented these processes, are
12 they documented in written form?
13    A.  The instructions on the YouTube is yes.
14    Q.  What about for other changes in SB-1, do you
15 have procedure documents that kind of --
16    A.  Incomplete ones, incomplete ones.  We had
17 fantastic -- really proud of the documentations.  But
18 because of all of the changes and as we have learned
19 through time, that when you set a process up, you have
20 to live a process before you can document a process
21 because what looks good on paper may not work in
22 reality.  And so we are still at that point right now
23 because we just came off of the March election.
24    Q.  So are these procedural documents that are
25 maintained at your office on the computer?

Page 105

1     A.  Yes, sir.
2     Q.  And you are those based on what happened in
3 March 2022?
4     A.  We are now, yes, sir.
5     Q.  And so in addition to SB-1, at the same time,
6 we just had restricting in Texas.  How does that impact
7 your ability to implement in changes in SB-1?
8     A.  The restricting came down so late we all know.
9 And I think just, you know, as we have been sitting here
10 just all of us talking about what had happened and the
11 pandemic and how it changed our lives and, you know, it
12 was easy to sit at home and say and hear on the news
13 that there were supply chain problems.  There were
14 supply chain problems.  It hit us really hard.
15          The redistricting came along and it was
16 months later than normal.  As you heard me say before,
17 we always sent our cards out November 15th to
18 December 15th every odd year.  And this year, we were
19 all still in the throws of redistricting when it was
20 time to mail out our cards.  So now we have the perfect
21 storm because we are changing districts, we are changing
22 voter registration cards.  We need to get our voter
23 registration cards in the hands of our voters who are
24 going to vote in the primary.  And we all ran up against
25 a wall that there was absolutely no blue paper to

Jacquelyn Callanen                                    April 04, 2022
                                                      Pages 106 to 109

Page 106

1 vote -- to print our voter registration cards, our
2 1,194,000 voter registration cards.
3          And it makes you crazy when you have it
4 ready and you call and we don't have the paper yet, we
5 don't have the paper yet, we don't have the paper yet.
6 And now we are into January, January 15th, we don't have
7 the paper yet.
8          And then one day, you get this call and
9 you have this bright spot that your vendor says, we know
10 the paper is in a warehouse in New Jersey.  Our blue
11 paper was printed in Slovakia.  So it is on
12 a boat from Slovakia and it is now in a warehouse in New
13 Jersey.  And so now we are waiting for our paper to get
14 to San Antonio.  That is where our vendor is.  And we
15 wait and we wait and we wait.
16          So our voter registration cards were
17 mailed out the first week of February, which as you can
18 imagine, was the perfect storm.  Because now we are in
19 the throws of SB-1 with rejecting applications.  People
20 were getting their new cards.  They are calling to tell
21 us like we had the discussion before, that I got this
22 card, these people don't live here.  So just for a
23 management situation, it was the perfect storm.
24          But the voters had their cards in time to
25 vote in the registration, you know, the primary with

Page 107

1 their registration cards.  We are still working through
2 the return voter registration cards and sending out the
3 confirmation cards, getting all of that done.
4          And again, when redistricting occurs, Nina
5 and I can smile because we have been down this road -- I
6 think this will be our third one which was very nice.
7 But a lot of the voters have no idea that their district
8 has been moved.  And so they go to the polls in the
9 primary and then they are fighting with our election
10 judges because they know that they vote in this district
11 and why are they giving them this ballot and they are
12 given them the wrong ballot.  It just sort of snowballs.
13    Q.   So did the restricting effort, did that --
14 strike that.  Was your ability to send out these
15 registration cards to voters in February, did that
16 impact the time available for those voters to request
17 mail-in ballots?
18    A.   No, it was on a different track.  It was on a
19 collision course but it did not affect them.
20    Q.   Why did it not affect that?
21    A.   Like again, they are separate processes.  The
22 difference -- and when I said it was a perfect storm is
23 when some of our voters received their ballot at home,
24 after we had got through the process, then they were
25 calling because they were unfamiliar with the people

Page 108

1 that were on their ballot.  They had always been in this
2 district and why did we sent them a ballot with this
3 name on it, that we were wrong.  So we had to finesse
4 that and explain to them that yes, the census was --
5 because of the pandemic, the census wasn't done in a
6 timely fashion, restricting wasn't done in a timely
7 fashion, and so on and so forth.
8    Q.   So I think I understand.  So when they request
9 a mail-in ballot, it doesn't matter what is on the
10 ballot at that time; is that correct?  Strike that.
11          Is it correct to say that a voter can
12 request to receive a mail-in ballot before the
13 redistricting process is complete?
14    A.   Yes, sure, depending on whenever.  I mean in
15 2010 I think it was, it took years for us to get through
16 the legal parameters.
17    Q.   But when they ask for they mail-in ballot, they
18 are not specifying what ballot that they want to return;
19 is that correct?
20    A.   Correct.
21    Q.   So if the restricting boundaries changed after
22 they send in the request, when it is time to send them
23 the ballot, you send them the correct ballot?
24    A.   We send them the correct one, yes, sir.
25    Q.   So is that how these were on separate tracks

Page 109

1 and they weren't affected by this delay of blue paper?
2    A.   Correct.
3    Q.   Do you know if some voters rely on receiving
4 the registration card before they ask for a mail-in
5 ballot?
6    A.   Absolutely.
7    Q.   So for those voters, would getting that late
8 have made them apply for the mail-in ballot late?
9    A.   No.  Well, because when they called and said
10 where is my registration card, you know, then we had to
11 explain to them this and this and this.  So no, they
12 knew the had to get their applications in.
13    Q.   What was the deadline for requesting a mail-in
14 ballot for the March primary?
15    A.   February 18th.
16    Q.   So if they were waiting for that card to do it,
17 they would have missed out; correct?
18    A.   Correct.
19    Q.   So these individuals who didn't get the card,
20 you said some of them called in to ask you why?
21    A.   Yes.
22    Q.   So would those individuals have applied for the
23 mail-in ballot later than usual?
24    A.   No.  Again, I don't -- I don't -- when they
25 called, we were speaking to them and telling them to get

Jacquelyn Callanen                                          April 04, 2022
                                                            Pages 198 to 201

Page 198

1  provisions in the Election Code?
2      A.  No, not really.
3      Q.  Do you remember when we talked about new
4  requirements on individuals who bring multiple people to
5  the polling place?
6      A.  Yes.
7      Q.  And what is that new requirement?
8      A.  If someone brings more than seven people in a
9  van as campaigns are like to do, there is a form that
10 now must be filled out by the driver where you get the
11 name and address of the organization, and then the names
12 of the people who are in the car or van.  And as I said,
13 I think I said earlier I know we had two of those forms
14 filled out in this March election.
15     Q.  Were there any issues with people who weren't
16 willing to sign the form?
17     A.  I don't know.  Again, I don't -- I couldn't
18 tell you that.  We had not had our debriefing from our
19 election officials yet.
20     Q.  So could you get what was marked Exhibit 7,
21 please, and I will try to find a page and can you look
22 at page 50 of that exhibit.  It is marked on the bottom.
23     A.  Yes, sir.
24     Q.  And do you see on that page, line 18, can you
25 read that?

Page 199

1      A.  Where I am I?  Assistance to the voters, yes,
2  sir.
3      Q.  Now, could you please turn to page 52?
4      A.  52, yes, sir.
5      Q.  At line two, do you see where it says Section
6  64.0322?
7      A.  Yes, sir, submission of a form by the
8  assistant.
9      Q.  Are you familiar with this provision in SB-1?
10     A.  Yes.  I mean it hasn't -- I don't think it
11 is -- in my opinion, it hasn't changed from the form we
12 had been using before other than to say that the person
13 is going to swear that they haven't been paid to be the
14 assistant.  But the oath of assistance has always been
15 there.  Obviously before, for the voter's protection
16 before any person other than the voter can step up to
17 the booth, they had to fill out an oath of assistance
18 that they are in fact assisting that voter.  So this
19 didn't change things a whole lot.
20     Q.  So based on your experience, would you
21 characterize this assistance oath and form to be minor
22 changes in SB-1?
23     A.  Yes.
24     Q.  Did you see any issues during the March primary
25 due to the requirements of this assistant form?

Page 200

1      A.  No.  This was, again, this was on the carrier
2  envelope and the assistant envelope.  And so it was
3  there prior to this.  They have just added that -- I
4  think they put in that part that you are not receiving
5  compensation.
6      Q.  And do assistants have to fill out this form if
7  they assist a voter in person at an election site as
8  well?
9      A.  Absolutely, yes, sir.
10     Q.  And did you have any issues during the March
11 primary with assistants completing the form?
12     A.  No, sir.  I mean it has been standard.
13     Q.  Do you have elections officials who are able to
14 assist voters?
15     A.  Absolutely.
16     Q.  And how do they assist them?
17     A.  Again, when the election officials get there in
18 the morning, they have -- now they have three oaths that
19 they have to take.  They take the constitutional oath,
20 they take the oath of office.  And then as a
21 recommendation from us, we have all of the election
22 officials first thing in the morning take the oath of
23 assistance.  And so they sign that and put that away.
24 Because then any voter may ask for assistance from the
25 elections staff and that would take two people going

Page 201

1  over to the booth.  But sometimes people don't want a
2  close relative or somebody to know how they are voting
3  so they will ask the election staff.
4          And so once the election staff has signed
5  that, they don't have to sign it for each and every
6  voter.  But a personal assistant for a particular voter
7  must sign that oath before they are eligible to go over
8  to the booth with the voter.
9      Q.  And are your elections officials able to help
10 voters who may not be able to read or speak English?
11     A.  Yes, sir.
12     Q.  And can you explain that?
13     A.  Again, that is interpreters.  And we are
14 required by law here in the State of Texas to have a
15 Spanish speaking person available at every one of our
16 poll sites.  They -- after each of the census, we
17 receive a printout from the State of Texas telling us
18 what languages may have risen to the threshold of the
19 five percent in any precinct.  Here in Bexar County, we
20 are only required to have Spanish.  My understanding is
21 like Harris has seven languages.  Tarrant has four.  So
22 we have just English and Spanish.
23     Q.  You are just required to have Spanish; is that
24 correct?
25     A.  Yes, absolutely, we are required.

Jacquelyn Callanen

April 04, 2022
Pages 202 to 205

Page 202

1    Q.   Do you have any elections officials who are
2 able to provide translations-S to the languages other
3 than Spanish?
4    A.   No.
5    Q.   Are there typically people requiring
6 translations for other languages in Bexar County?
7    A.   Not to our knowledge, no.  The one -- I should
8 say the one thing we do have is American Sign Language.
9 We offer for the disabled community, we have a system
10 set up at the polls where at certain polls, they have
11 the opportunity to actually look on a computer and ask
12 questions.  And we have a company that is available to
13 offer assistance in American Sign Language.  So it goes
14 back and forth so that person can be helped.
15          We have I think two polls that actually
16 have someone who does American Sign Language.  And at
17 the rest of them, we have a system set up where they can
18 call our office and we will help the judge help the
19 person.
20    Q.   And in this election, did you have any reports
21 of people who required assistance but weren't able to
22 obtain it?
23    A.   No, not to my knowledge.
24    Q.   Has that been an issue in the past?
25    A.   No, it has not.  It really hasn't because we

Page 203

1 abide by it and we are blessed here in San Antonio that
2 so many people speak Spanish, that it is not hard to
3 have a Spanish speaker at each of our polls.
4    Q.   And as far as the carrier envelope that
5 required sisters to fill out a portion of that as well;
6 correct?
7    A.   Correct.
8    Q.   Did you run into issues with that when you were
9 receiving and counting the ballots?
10    A.   Again, that is up to the early ballot board.
11 That is not something that we -- that our office does.
12    Q.   So you wouldn't be able to speak to any issues
13 that might have been in the March primary with the oaths
14 of the sisters on carrying envelopes; is that correct?
15    A.   Correct.
16    Q.   Ms. Callanen, can you take Exhibit 7?  And this
17 one is going to be at the front of it.  Can you turn to
18 page four, please?
19    A.   Uh-huh.
20    Q.   And can you please read the title on line 22?
21    A.   Section 1.0022, reasonable accommodation or
22 modification.
23    Q.   Are you familiar with this provision of the
24 Election Code?
25    A.   Absolutely.

Page 204

1    Q.   What does it mean to you?
2    A.   Well, again, I can state in Bexar County, our
3 voters are just so nice, they really are.  Again, years
4 ago, and in fact, I think it was Representative Diego
5 Bernal pushed, in my opinion, unnecessary but we have a
6 posting that says for voters who need additional
7 assistance or whatever, they may move to the front of
8 the line.  But here in Bexar County, I mean it is not
9 like being in HEB and cutting in a line.  They are very
10 nice and very accommodating for a voter who would need
11 extra assistance.
12          And so at all poll sites, we have this
13 sign for accommodation that the voters can move to the
14 front of the line.  And as I spoke before, we also have
15 these signs out front that talk to the curbside voting,
16 that if you need accommodations to that, you would ask
17 for assistance.
18    Q.   So if a voter requires accommodations, are you
19 able to modify some of the normal procedures?
20    A.   Yes, absolutely.  And again, because we are in
21 Texas, every one of our election units, our voting units
22 is ADA accessible.  Prior to, we only had to have one
23 ADA accessible unit.  But with this system, every one of
24 these units are accessible.  And we either have headsets
25 that we can provide but a lot of is voters just bring

Page 205

1 their own and they plug them into the jack.  And then
2 they have an audible ballot read to them.  So that is at
3 every single poll site.
4    Q.   So you track when voters request accommodations
5 at the poll site?
6    A.   No, sir, we do not.
7    Q.   So you don't have any numbers on the types of
8 accommodations from this election or the past?
9    A.   No, sir, we do not.
10    Q.   Is it your experience though when voters
11 request accommodations, that your elections officials
12 are available?  Let me strike that.  Is it your
13 experience when voters in Bexar County request
14 modifications, that you are able to provide for that?
15    A.   Yes, I mean if you would go to like most of our
16 poll sites, you will see that there is at least one of
17 the units sort of set to the side with a chair in front
18 of it so that if someone needs to sit down or is going
19 to take longer.  So they have even developed all of
20 those policies in-house.
21    Q.   And can you look at Exhibit 7 again?  And
22 please turn to page 54.
23    A.   Yes, sir.
24    Q.   And can you read the lines 23 through 25?
25    A.   Yes.  A person commits an offense if the

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
|     *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
|     *Defendants.* | § | |

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX D

Transcript of the Testimony of

**Jacquelyn Callanen**

**Date:**

April 20, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Jacquelyn Callanen

April 20, 2022
Pages 30 to 33

Page 30

1  secretary of state.
2     A.  Correct.
3     Q.  Prior to SB-1, in what ways did the secretary
4  of state's office insure that counties were following
5  the same election procedures?
6     A.  Again, we have a yearly law seminar that is
7  hosted in Austin where all 254 counties go and hear the
8  same presentations and all of that.  And it is held in
9  July.  It is either the last week of July or the first
10 week of August.  And so from that point on, we have --
11 if anything is changing, if we have new forms, if we
12 have new directives, we have from that July or August to
13 prepare for the November election.  This didn't happen
14 because SB-1 came out of the third session after all of
15 this had gone on.  And it was on a short turnaround
16 where it became effective in December.  And the
17 secretary of state's office and us didn't have the lead
18 time that we normally would have had.
19        And again, that is an internal problem.
20 We did not project that, you know, to the voters.  But
21 that was another huge sense of frustration from our
22 office.  Because you know, forms and changes and paper
23 shortages and design of the envelopes, I mean everything
24 was going to be new.  And it didn't magically appear.
25    Q.  Let's unpack that a little bit because I wanted

Page 31

1  to focus a little bit on prior to Senate Bill 1, how the
2  secretary of state's office would insure uniformity
3  among the counties.
4     A.  Absolutely.
5     Q.  So you testified that election law seminars
6  were one way where this would happen?
7     A.  Yes.
8     Q.  What would happen at these seminars?
9     A.  They were like in lecture form.  The attorneys
10 would all -- they have their subject expert in each of
11 the areas and they would put on their presentation, if
12 anything had changed and what to expect and numbers.
13 And you know, then we would have an open dialogue back
14 and forth and question and answer sessions.
15        And then we would breakdown by election
16 systems, there is the two systems in Texas.  And so one
17 afternoon, then we would breakdown and the people who
18 had ES&S would go these and people who had Hart went to
19 these.  And again, that was just for a balance.  If any
20 of the forms had changed or if the equipment had been
21 updated, what we were going to do for maintenance for
22 the PMs, all of that kind of stuff.  So it was very
23 educational.  But that was for one afternoon.  These
24 sessions were for three days.
25    Q.  Got it.  Okay.  I want to move on to talking

Page 32

1  about some instances of voter fraud that you testified
2  about last time and I just want to ask some clarifying
3  questions, sort of get a sense of more specifics about
4  what you were talking about.  And I wanted to start with
5  you had testified about your concerns with campaigns
6  bringing vans of people to vote.  Do you recall that?
7     A.  Yes, sir.
8     Q.  Is it fair to say that your concern was that
9  voting under these circumstances -- actually, strike
10 that.  Is it fair to say your concern was that vans of
11 people were being brought to vote curbside?
12    A.  Yes.
13    Q.  And was your concern that voting under those
14 circumstances wasn't private?
15    A.  Correct.
16    Q.  And why wasn't voting private under those
17 circumstances?
18    A.  Because the driver would not exit -- the van
19 would not exit the van.  And so there has to be a
20 dialogue between the election official and the voter
21 themselves one on one.  And especially like in the
22 primary, they have to ask the voter which ballot they
23 would like.  They don't ask them are you a Democrat or
24 Republican.  They ask which ballot would you like to
25 vote today?  So all of that was open to the world so to

Page 33

1  speak.
2     Q.  And I think you testified last time that you
3  were concerned that the person driving the van was
4  forcing people to vote a certain way?
5     A.  Yes.
6     Q.  So how often did this happen?
7     A.  I can't speak to how often it happened but I
8  can speak to the locations that it happened at.
9     Q.  Let me --
10    A.  No.  So I can't -- you know, we are getting
11 a -- because of SB-1, we are going to have a better
12 handle on the number seven and the driver because that
13 is a new form that has to be filled out.  But prior to
14 that, we didn't have that.
15    Q.  So let me ask it a different way.  How did you
16 hear about this issue of vans full of people and
17 potential conversations?
18    A.  The election officials would alert us to that
19 point.
20    Q.  Which election officials?
21    A.  Like the early voting judges.  And I mean I am
22 not belittling sort of but the first time we would hear
23 about it is when we set up an election, there has to be
24 a judge, an alternate and a clerk.  So we base our
25 equipment, we base our staffing, we vote -- base the

Jacquelyn Callanen

April 20, 2022
Pages 34 to 37

Page 34

1 supplies on like the prior like election. So we will
2 start out with the staffing at, like I said, let's use
3 Las Palmas because that is where it happens.
4          So they start early voting and there is a
5 total of four people at that poll, an election judge, an
6 alternate and two clerks. And that's sufficient. But
7 now when the van pulls up, it takes two of the election
8 officials to go out to the van because that is how the
9 election code is written. You send two people. And
10 when there is numerous people in the van, you need those
11 two people.
12          And so the election officials would call
13 and say I need to add more staff because today we had X
14 number and I needed this, you know, I need more. So of
15 course we allot more. We say sure, go ahead and do --
16 we are taking care of you. But again, that is how we
17 are alerted to this and we have certain parts of town
18 that we know this occurs at.
19    Q.   Do you know of any instances where somebody was
20 forced to vote a certain way that they didn't want to?
21    A.   No.
22          MS. HUNKER: Objection, form.
23    Q.   (By Mr. White) Do you know of any criminal
24 charges arising from any of these activities?
25          MS. HUNKER: Objection, form.

Page 35

1          THE WITNESS: No, not in the drive-up
2 ones, no.
3    Q.   (By Mr. White) You said you testified a moment
4 ago that this happened at Las Palmas?
5    A.   Uh-huh.
6    Q.   What was Las Palmas?
7    A.   It is a public library. We use it for early
8 voting and election day. If it is an early voting site,
9 we will keep it open on election day because our voters
10 like it. I mean they go there for early voting. And so
11 if we, for some reason, don't open that site, boy, do we
12 hear about it. So if it is an early voting site, it
13 will be an election day site.
14    Q.   Were you alerted to any instances of potential
15 privacy issues of voters in vans at polling sites other
16 than Las Palmas?
17    A.   Yes, yes.
18    Q.   Which polling sites were those?
19    A.   The three that come to mind right away is we
20 have Las Palmas and we have Shavano Park which is a
21 little suburb here that does a huge curbside, curbside
22 voting. And then we have McCreless Library. Those are
23 the top three.
24    Q.   Okay. And did you hear about any instances at
25 other sites besides those three or those are just the

Page 36

1 three that come to mind?
2    A.   Those are the top three. I mean we have
3 curbside voting everywhere but it is the ones that bring
4 the vans. You know, I mean again, normally, the
5 curbside voting is when the car pulls up, it is usually
6 just one person voting. You know, and so that is
7 handled in the normal way. I mean if it is just one
8 car, they know how much. But it is when they get these
9 groups that it takes and inordinate amount of time.
10    Q.   And when you were -- when election officials
11 alerted you about these activities, what did you do with
12 that information?
13    A.   Again, we gave them extra staffing.
14    Q.   Did you report anything to law enforcement?
15    A.   No.
16    Q.   And why not?
17    A.   Again, it was not first-hand for me.
18    Q.   And one other -- sorry. Strike that. Do you
19 know who was operating the vans that you were concerned
20 about?
21    A.   I know one.
22    Q.   Do you know who was that?
23    A.   Should I give the name?
24    Q.   Yes, please.
25    A.   Jose Gallegos.

Page 37

1    Q.   And who is Jose Gallegos?
2    A.   I don't know what organization he works with or
3 for. He has been in politics for a long time now. He
4 has run for office. But like I said, lately, probably
5 these last four or five years, it has been his job, his
6 passion, you know, to bring as many people in to vote.
7    Q.   Okay. So --
8    A.   And then talks to vote in a specific way.
9    Q.   Got it. I didn't mean to talk over you. So
10 Jose Gallegos, when he is operating these vans, he is
11 not a candidate himself?
12    A.   Not at that, no, no. He doesn't do it when he
13 is a candidate.
14    Q.   Is he working on behalf of a particular
15 campaign or anything like that?
16    A.   I would say so but I have no direct knowledge
17 of that.
18    Q.   Have election officials told you that he is
19 working on behalf of a particular campaign?
20    A.   Just that he is with the Democratic party. I
21 don't know what the campaign is. But it has gotten so
22 pervasive over the years, that -- and I mean over the
23 years, this has gone on for many years, that we had to
24 retire the judge from Las Palmas because the judge --
25 Jose Gallegos was very very comfortable with the judge

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900        San Antonio, Texas 78232
210-697-3400                                                      210-697-3408

Jacquelyn Callanen

April 20, 2022
Pages 302 to 305

Page 302

1 election code.  We make the accommodations for the
2 disabled.  We make the accommodation for, you know, the
3 senior citizen that may need the assistant.  We make the
4 accommodation for the voters who are going to vote
5 curbside.  But the election code is silent on what do we
6 do with their assistant?
7        You know, do we help the person here and
8 they move to the front of the line, but then we tell
9 their assistant they are able bodied and they have to go
10 to the back of the line?  That is one of the questions
11 where we are just like this.  And the code needs to make
12 accommodations for the person who is helping them.
13    Q.   And have you received any guidance from the
14 secretary of state's office to help you figure that out?
15    A.   No.
16    Q.   Is there anywhere on the vote by mail
17 application that indicates that an individual can
18 request an accommodation to any of the requirements?
19    A.   It is on there for a witness.  It is on there
20 for assistant.  So but, you know, if they take the time
21 to read the insert that we give them and the information
22 that is on the ballot, they would have that answer.
23    Q.   Okay.  Let's turn to voting assistance.  If an
24 individual who needed assistance beyond what is provided
25 by the oath actually -- sorry.  Scratch that.  Do you

Page 303

1 have written policies, practices and procedures
2 regarding the Americans with Disabilities Act?
3    A.   Yes.
4    Q.   Do the policies contain policies, practices or
5 procedures for handling requests for reasonable
6 modifications?
7    A.   Yes.
8    Q.   And do they contain policies, practices or
9 procedures for denying requests for reasonable
10 modifications?
11    A.   I don't think so.  No, I mean it is a positive.
12 It is why -- the accommodations and the how to, it
13 doesn't say don't do this.
14    Q.   Okay.  And does it -- do the policies contain
15 policies, practices or procedures for avoiding
16 discrimination based on disability?
17    A.   I think there is a statement in the ADA.
18    Q.   Do you know what it says?
19    A.   That says you don't discriminate.  I think
20 there is a blanket statement in there.
21    Q.   But does it tell you like how to figure out
22 what discrimination, what --
23    A.   No.
24    Q.   Okay.  What discrimination against the disabled
25 person looks like?

Page 304

1    A.   No.
2    Q.   And do the policies contain policies, practices
3 or procedures for handling grievances or complaints
4 regarding the ADA?
5    A.   I don't know.  I don't know.
6    Q.   Okay.  Has the policy or policies been updated
7 since December 1st, 2021?
8    A.   I don't think so.  I don't -- I don't know.
9    Q.   And is there any reference to the assistor oath
10 in the policy?
11    A.   I don't know specifically.
12    Q.   Is there any reference to voting by mail in the
13 policy?
14    A.   Just that it is available, that it is an
15 available option, yes.
16    Q.   Does your office have an elections ADA
17 coordinator?
18    A.   No.
19    Q.   Who in your office is responsible for
20 monitoring compliance with the ADA?
21    A.   I am.
22    Q.   Okay.  How can a voter with a disability
23 request a modification from your office?
24    A.   We have it set up.  The main modification
25 obviously for the disabled is we have -- the system we

Page 305

1 have the ES&S system.  We have every one of our voting
2 units is ADA compliant.  They can bring their own
3 headsets.  It has accommodations which I think is
4 fantastic.  You push a button and it makes the text
5 huge, you know, for vision.
6        Again, we have -- we have headsets to
7 provide but most of the people bring their own.  And our
8 units all have a jack in them where once the jack goes
9 in, it will read the ballot to them which is a really
10 really good thing.
11        We have a contract with Deaf Link here in
12 town for American sign language.  And you know, our deaf
13 community does that.  We also have a location, usually
14 it is over by SAC where we have ASL people on the staff.
15 And so that community knows to go there.  So we have
16 done a number of things and plus the huge curbside.
17    Q.   Okay.  And what election rules can a voter with
18 a disability request a modification for?
19    A.   I don't understand rules.  I don't understand
20 what you are asking.
21    Q.   If there is an election -- if there is an
22 election rule that a voter with a disability feels that
23 it can't, you know, it needs an accommodation for, can
24 they ask to be -- can they ask for a modification from a
25 specific rule?

Jacquelyn Callanen

April 20, 2022
Pages 306 to 309

Page 306

1    A.  I am confused.  I'm sorry.  I am confused by
2  the question.
3    Q.  Okay.  Scratch it then.  What are your -- what
4  are your offices policies, practices and procedures for
5  reviewing and responding to requests for reasonable
6  modifications for voters with disabilities?
7    A.  Again, I mean I think I stated before we do the
8  training with our officials.  We work with our ADA
9  groups.  We bring the people in so that they speak to
10  the officials, you know, from service dogs to people in
11  wheelchairs to people, you know, with canes, vision,
12  hearing.
13    Q.  I'm sorry to cut you off but I just want to
14  direct you a little more.  We are short on time.  Is
15  there like an official policy or it is kind of like you
16  react on like an ad hoc basis?
17    A.  Right, the officials would be the 411.
18    Q.  Okay.  On what time line can your office
19  receive, evaluate and provide a reasonable modification
20  to a voter with a disability?
21    A.  Again, we haven't because we have all of these
22  accommodations at every one of our sites.  And so that
23  has never -- we have -- I have never taken a call in the
24  office that said I am going to go here.  Can you make
25  sure this is -- we haven't had that.

Page 307

1    Q.  Okay.  And do you have any written policy or
2  guidance on how to handling requests from voters with
3  disabilities for changes or modifications to the voting
4  procedures outlined in the Texas Election Code?
5    A.  Absolutely.
6    Q.  What are they?
7    A.  I am one of their strong supporters.  And we
8  have written and I know there is -- I know there is
9  lawsuits up in Dallas somewhere that I have been
10  questioned for.  Because working with the disability
11  community and working with -- we have a process already
12  in hand for our military voters that can vote by email,
13  that we can email the ballot out to them.  You know,
14  they can vote it on their computer and they can send it
15  back to us.
16       And we are trying to get this to the
17  disability community.  And we have begged, you know,
18  begged, borrowed and pleaded and we have written papers
19  and letters of support and everything to the
20  legislature, you know, to secretary of state's office
21  through an administrative rule so that our disabled
22  community can use screen scrapers.  They can take that
23  ballot and vote it.  That hasn't happened yet but it is
24  working its way through.  And we are in -- we are very
25  very in the middle of that.

Page 308

1    Q.  Okay.  And has your office modified your
2  policies, practices and procedures since the enactment
3  of SB-1?
4    A.  No.
5    Q.  Okay.  Are your existing policies, practices
6  and procedures prior to SB-1 sufficient to insure
7  compliance with the ADA?
8    A.  Yes.
9       MS. SISCO:  Okay.  Can I get another time
10  check?  Sorry.  Can we go off the record for a second?
11  Sorry.
12       VIDEOGRAPHER:  The time is 6:06 p.m.  We
13  are off the record.
14       (Recess taken)
15       VIDEOGRAPHER:  The time is 6:09 p.m.  We
16  are back on the record.
17    Q.  (By Ms. Sisco) Okay.  Ms. Callenan, have you
18  made inquiries to the Texas Secretary of State regarding
19  problems related to voting access for persons with
20  disabilities?
21    A.  Yes.
22    Q.  And have you made inquiries to the Texas
23  Secretary of State about providing modifications to
24  election policies, practices and procedures for voters
25  with disabilities?

Page 309

1    A.  Yes.
2       MS. HUNKER:  Objection, form.
3    Q.  (By Ms. Sisco) Have you made inquiries to the
4  Texas Secretary of State about whether you can make a
5  change to voting and election policies and procedures
6  for a voter with a disability?
7    A.  Yes.
8       MS. HUNKER:  Objection, form.
9    Q.  (By Ms. Sisco) Were you allowed to do it?
10    A.  No.
11    Q.  Was their response provided in written or oral
12  format?
13    A.  Oral.
14    Q.  Does the secretary of state provide -- actually
15  scratch that.  On your inquiry regarding modifications
16  to the election policies, practices and procedures, have
17  those inquiries been related to requests by individual
18  voters?
19    A.  Yes.
20    Q.  What was the outcome of that inquiry or
21  request?
22    A.  Again, my understanding is that it is working
23  its way through the court system.
24    Q.  Okay.  It is in process.
25    A.  Yes, it is in process.

Page 326

1   A.  Yes.
2   Q.  Thank you.  We can put this aside for now.  So
3 very early in the deposition, you were talking with
4 Mr. Graham about applications to vote by mail.
5 Specifically, when a family member would call you asking
6 for multiple mail-in ballot applications as opposed to
7 their own individual application.  Do you remember that
8 conversation, Mr. Callenan?
9   A.  Yes, ma'am.
10   Q.  And I believe you said that people were irate
11 with the changes; is that right?
12   A.  Yes.
13   Q.  Have you found that voters tend to react
14 negatively when there are changes to election laws?
15   A.  Absolutely.
16   Q.  And so voters being irate about this change is
17 not too unusual when it comes to changes in the election
18 code; is that correct?
19   A.  I think it is human nature, yes.
20   Q.  And people calm down once they know the rules;
21 is that right?
22   A.  The majority, yes, ma'am.
23   Q.  And I believe you had mentioned that one of the
24 reasons people were upset was the hype surrounding SB-1;
25 did I --

Page 327

1   A.  Yes, ma'am.
2   Q.  What did you mean by hype?
3   A.  Dare I use the word the hysteria that the media
4 stirred up?
5   Q.  And so is it your belief that people were irate
6 about the hysteria surrounding SB-1 and this provision
7 in particular as opposed to the actual provision itself?
8   A.  Yes.
9   Q.  You gave an example of when a mother called
10 about getting a vote by mail application for her son.
11 Do you remember that conversation?
12   A.  Absolutely.
13   Q.  And you said you could not issue the
14 application for a mail-in ballot to the mother for the
15 son; is that correct?
16   A.  Correct.
17   Q.  Do you know if the mother was able to obtain an
18 application to vote by mail for her son at a later time?
19   A.  No, I do not know.
20   Q.  You do not know?
21   A.  Right, I do not know.
22   Q.  Did that mother request an accommodation?  Let
23 me take a step back.  You had mentioned that during the
24 phone call, the mother explained that her son was
25 paralyzed.

Page 328

1   A.  Yes.
2   Q.  Her son therefore had a disability; correct?
3   A.  Correct.
4   Q.  Did she at any point request an accommodation
5 on account of her son's disability?
6   A.  No.
7   Q.  I want to turn to talk about ballot delivery
8 locations and ballot delivery in person of mail-in
9 ballot locations.
10   A.  Okay.
11   Q.  The option of delivering your ballot in person
12 is relatively new in Texas; is that correct?
13   A.  No, ma'am.  You were able -- we have been able
14 for years and years to deliver your mail ballot in
15 person on election day to the main -- to our office.
16   Q.  And do you remember what year that was?
17   A.  No, ma'am.  I'm sorry.  I don't.  It has been
18 for quite a while.
19   Q.  Do you remember if it has been in the last
20 decade?
21   A.  Yes, I am sure it has been.
22   Q.  So the rule was you can hand in your mail-in
23 ballot on election day; correct?
24   A.  Yes.
25   Q.  And it had to be at the early voting clerk's

Page 329

1 office; correct?
2   A.  Correct.
3   Q.  You have never had multiple ballot locations in
4 Bexar County; correct?
5   A.  Correct.
6   Q.  And November 2020 was the first election where
7 voters could hand deliver ballots before election day;
8 correct?
9   A.  Correct.
10   Q.  And that was entirely because of the governor's
11 proclamation; correct?
12   A.  Correct, for COVID.
13   Q.  Yes, in response to COVID.
14   A.  Yes, ma'am.
15   Q.  That proclamation has since abated.
16   A.  Correct.
17   Q.  You also stated that the existence of multiple
18 ballot locations in Harris County caused anger in Bexar
19 County because you did not have multiple locations;
20 correct?
21   A.  Correct.
22   Q.  You did not have multiple locations because you
23 were unable to under the law; is that right?
24   A.  Absolutely.
25   Q.  And so this was -- the existence of a voting

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX E

Jacquelyn Callanen                                    February 28, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3
   LA UNION DEL PUEBLO        )
 4 ENTERO, ET AL.,            )
                             )
 5         Plaintiffs,        )
                             ) Case No. 5:21-CV-844-XR
 6 vs.                        )
                             )
 7 GREGORY W. ABBOTT, ET AL.,)
                             )
 8         Defendants.        )
   _____)
 9 OCA-GREATER HOUSTON,       )
   ET AL.,                    )
10                            )
           Plaintiffs,        )
11                            ) Case No. 1:21-CV-780-XR
   vs.                        )
12                            )
   JANE NELSON, ET AL.,       )
13                            )
           Defendants.        )
14 _____)
   HOUSTON JUSTICE, ET AL.,   )
15                            )
           Plaintiffs,        )
16                            ) Case No. 5:21-CV-848-XR
   vs.                        )
17                            )
   GREGORY WAYNE ABBOTT,      )
18 ET AL.,                    )
                             )
19         Defendants.        )
   _____)
20 LULAC TEXAS, ET AL.,       )
                             )
21         Plaintiffs,        )
                             ) Case No. 1:21-CV-0786-XR
22 vs.                        )
                             )
23 JANE NELSON, ET AL.,       )
                             )
24         Defendants.        )
   _____)
25 MI FAMILIA VOTA, ET AL.,   )
                             )
```



Jacquelyn Callanen

February 28, 2023
Pages 2 to 5

## Page 2

```
 1              Plaintiffs,    )
                               )
 2    vs.                      )
                               ) Case No. 5:21-CV-0920-XR
 3    GREG ABBOTT, ET AL.,     )
                               )
 4         Defendants.         )
      _____  )
 5    UNITED STATES OF AMERICA, )
                               )
 6         Plaintiff,          )
                               )
 7    vs.                      )
                               ) Case No. 5:21-CV-1085-XR
 8    THE STATE OF TEXAS,      )
      ET AL.,                  )
 9                             )
           Defendants.         )
10    _____  )
11
12    **************************************
13         ORAL AND VIDEOTAPED DEPOSITION OF
14              JACQUELYN CALLANEN
15               FEBRUARY 28, 2023
16    **************************************
17
18         THE ORAL AND VIDEOTAPED DEPOSITION of
19    JACQUELYN CALLANEN, produced as a witness at the
20    instance of the Defendant, and duly sworn, was taken
21    in the above styled and numbered cause on Tuesday,
22    the 28th day of February, 2023 from 9:10 a.m. to
23    3:51 p.m., before PAMELA SUE PETERSON, Certified
24    Shorthand Reporter in and for the State of Texas,
25    reported by stenographic and computer-aided
```

## Page 3

```
 1    transcription, at the Office of the Texas Attorney
 2    General, Weston Centre, 112 East Pecan Street,
 3    3rd Floor, San Antonio, Texas 78205, pursuant to the
 4    Federal Rules of Civil Procedure and the provisions
 5    stated on the record or attached hereto.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1    APPEARANCES OF COUNSEL:
 2    For Plaintiff HOUSTON JUSTICE, HOUSTON AREA URBAN
      LEAGUE, DELTA SIGMA BETA SORORITY, INC., THE ARC OF
 3    TEXAS, MI FAMILIA VOTA, MARLA LOPEZ, MARLIN LOPEZ,
      PAUL RUTLEDGE, JEFFREY LAMAR CLEMENS:
 4
      NAACP LEGAL DEFENSE FUND
 5    BY:  VICTOR GENECIN, ESQUIRE
      40 Rector Street
 6    5th floor
      New York, New York 10006
 7    (929) 388-9246
      vgenecin@naacpldf.org
 8
 9    For Defendant GREGORY W. ABBOTT AND JANE NELSON, ET
      AL:
10
      KEN PAXTON, ATTORNEY GENERAL OF TEXAS
11    OFFICE OF THE ATTORNEY GENERAL
      BY:  DAVID BRYANT, ESQUIRE
12         KATHLEEN T. HUNKER, ESQUIRE (Via Zoom
      Videoconference)
13    P.O. Box 12548
      Austin, Texas 78711-2548
14    (512) 936-2275
      david.bryant@oag.texas.gov
15
16    For Defendant UNITED STATES OF AMERICA:
17    U.S. DEPARTMENT OF JUSTICE
      CIVIL RIGHTS DIVISION
18    BY:  DANA PAIKOWSKY, ESQUIRE
      Robert F. Kennedy Building
19    950 Pennsylvania Avenue NW
      Washington, District of Columbia 20530
20    (202) 353-5225
      dana.paikowsky@usdoj.gov
21
22
23
24
25
```

## Page 5

```
 1    APPEARANCES OF COUNSEL (Continued):
 2    For Witness JACQUELYN F. CALLANEN, CERA:
 3    JOE D. GONZALES, CRIMINAL DISTRICT ATTORNEY
      OFFICE OF BEXAR COUNTY CRIMINAL DISTRICT ATTORNEY
 4    BY:  LISA V. CUBRIEL, ESQUIRE
      Paul Elizondo Tower
 5    101 West Nueva
      7th Floor
 6    San Antonio, Texas 78205-3030
      (210) 335-2142
 7    lisa.cubriel@bexar.org
 8    Also Present:
 9
      JACQUELYN F. CALLANEN, CERA
10         Witness
11    JULIA R. LONGORIA (Via Zoom Videoconference)
           Mexican American Legal Defense and Educational
12         Fund, Inc.
13    CAROLINE LEBAL (Via Zoom Videoconference)
      NATALIE FELSEN (Via Zoom Videoconference)
14         Cooley, LLP
           On behalf of El Paso County Elections
15         Administrator Lisa Wise
16    MARINA EISNER (Via Zoom Videoconference)
           States United Democracy Center
17
      LOUIS J. CAPOZZI (Via Zoom Videoconference)
18         Jones Day
           On behalf of intervenors
19
      KEVIN ZHEN (Via Zoom Videoconference)
20         Fried, Frank, Harris, Shriver & Jacobson, LLP
           On behalf of LUPE Plaintiffs
21
      JOSEPHINE RAMIREZ SOLIS (Via Zoom Videoconference)
22         Office of Criminal District Attorney
           Hidalgo County
23         On behalf of Hidalgo County Elections
           Administrator
24
      GABE HODGE (Via Zoom Videoconference)
25         Observer
```



Page 74

1 that we held, and I know this isn't going to sound
2 right, in the course of the last few years, because
3 of legislative changes, the number of election
4 officials, elections administrators, the turnover has
5 been astronomical. There's been almost, like, a
6 50 percent turnover, and a number of the counties
7 in -- in 2022 had new -- new people, new -- new
8 elections administrators.
9      And so, the -- most of the conference was
10 as -- like, the secretary of state would -- would be
11 making a presentation. The after part where you're
12 allowed to, you know, negotiate, you can speak -- ask
13 questions and all that, was taken up by the new --
14 new people, as -- as it should be.
15      But again, it's not going to come out
16 right, sir. I'm sorry. But they didn't have the
17 information to dig deeper and ask a deeper question.
18 So, we came away frustrated because we had a lot of
19 questions that we did not get answered.
20      Q.   When you say "we," are you referring to
21 Bexar County or to the more experienced --
22      A.   The big boys. The big boys. Yes, sir.
23      Q.   -- election administrators?
24      A.   Yes, sir.
25      Q.   The latter?

Page 75

1      A.   The latter, please. Yeah.
2      Q.   Did anything that the poll watchers did
3 in -- in Bexar County in connection with the
4 November '22 general election increase wait line --
5 wait times?
6      A.   Not to my knowledge.
7      Q.   Did anything that the poll watchers did in
8 Bexar County in connection with the -- the October
9 and November 2022 general elections delay any
10 openings at polling places?
11      A.   Again, not to my knowledge.
12      Q.   Okay. In Bexar County, were there any
13 changes in the training or selection of election
14 judges, officials or poll workers for the general
15 election in 2022 as opposed to the -- the primaries
16 and other elections in the first half of 2022?
17      A.   Yes, sir.
18      Q.   Could you describe what those changes were.
19      A.   You're going to get me in trouble.
20      Q.   I don't mean to.
21      A.   Yes, sir. There was a change in leadership
22 at the Republican party of Bexar -- the local Bexar
23 County Republican party after the primary. And with
24 the new chairman and the people that he brought in,
25 for instance, you heard me speak about the partisan

Page 76

1 people in the early ballot board that -- that have
2 run that, he removed everyone who had been there for
3 the prior 10 years and knew the policy and put in all
4 new people.
5      With the election officials, we have, as
6 you heard me say, you know, three people, four
7 people, five people, and the party gets to appoint
8 the election officials, and we train them and certify
9 them and assign them by writ.
10      And the chairman on the November election
11 was placing his own people in those poll sites even
12 though we had assigned people there. And so, there
13 was a lot of confusion because our appointed, legally
14 writ -- the judges were there had people calling them
15 saying -- and showing up on election morning saying,
16 I'm the judge. And it was like, who appointed you?
17 Well, you know, I have from Bexar County one,
18 Republican party, they sent me here, so.
19      And as far as, like I said, the early
20 ballot board, that was another, I don't know what
21 other word to say besides stress because we knew we
22 had a job to do. We knew it was new policies, and
23 now we had new people who didn't even experience it
24 as it had been in the past.
25      Q.   Did any of that confusion or stress that

Page 77

1 you just described have any effect on the experience
2 of the voters in Bexar County, so far as you know?
3      A.   Hopefully, no.
4      Q.   Were you able to fully staff the polling
5 places for the November 2022 general elections in
6 Bexar County?
7      A.   Yes, sir.
8      Q.   Okay. Are you aware of any individuals who
9 were not able to get voter -- voting assistance that
10 they wanted or needed in connection with the '22 --
11 '22 general election in Bexar County?
12      A.   There is -- is a -- there is a group,
13 and -- and as you heard me say before, we work with
14 the disability community. And we have a contract
15 with a company called Deaf Link, D-E-A-F, L-I-N-K,
16 that is American Sign Language, and we have laptops
17 that we can, you know, push a button and -- and
18 someone's there.
19      And this organize -- an organizer in the
20 November election for early voting wanted us to have
21 an American Sign Language person at every poll, which
22 we -- we could not do it. That was an impossibility.
23 And so, using the federal law of accommodations, we
24 worked diligently with the deaf community and they
25 would call and make appointments.



Jacquelyn Callanen                                    February 28, 2023
                                                      Pages 78 to 81

Page 78

1      And I had staff members who would be taking
2   the laptop out and meeting them at an assigned time
3   and point. Did we hit all of those? Were -- I mean,
4   I -- did -- again, I -- I don't know their structure
5   as far as how they notified everyone to --
6      Q.  When you refer to "their structure" --
7      A.  The deaf community.
8      Q.  -- to "their structure," are you talking
9   about --
10     A.  The deaf community.
11     Q.  Okay.
12     A.  Or again, this woman, Kay Chiodo, who is
13  the president of Deaf Link, I'm not sure how they --
14  but -- but again, you know, could I say is -- there
15  probably was someone who did not get to take
16  advantage of it. I don't know that, but my heart
17  tells me that.
18     Q.  Okay. Aside from that situation, are you
19  aware of any individuals who were not able to get
20  assistance that they wanted or needed in connection
21  with the November of 2022 general election in
22  Bexar County?
23     A.  Not to my knowledge.
24     Q.  Did Bexar County comply fully with the
25  provisions of SB-1 with respect to voter assistance

Page 79

1   in connection with the November of 2022 general
2   election?
3      A.  Yes.
4      Q.  I think you had some testimony in one of
5   your earlier depositions about the requirement of
6   affidavits when people arrive at the polling place
7   with seven or more people in a vehicle. Do you
8   recall that testimony?
9      A.  Absolutely.
10     Q.  Did that occur in connection with the
11  November 2022 general election?
12     A.  Yes, it did, sir.
13     Q.  What do you know about the procedures that
14  were followed in those instances?
15     A.  I have two affidavits that were signed
16  and -- and -- and brought in from that election. But
17  there were numerous questions from my election
18  officials in asking about, well, you know, Jackie
19  drove the van and there were two people there, and
20  then 15 minutes later Jackie came back with another
21  two people. Does that count then as the seven? And
22  so we said, no, that it should be seven and one.
23         And so, it was -- you know, there -- it
24  just has to be finessed a little bit. We need a
25  little bit more direction.

Page 80

1      MS. CUBRIEL: I'm sorry. I need to
2   interject. I just saw a text from my assistant that
3   Jackie's mic is muted. Are there --
4      THE VIDEOGRAPHER: We got -- it's unmuted
5   now.
6      MS. CUBRIEL: Okay. I'm sorry. I just saw
7   that. I was like, oh, my God. Okay.
8      THE WITNESS: Oh, God. We just did that
9   last half hour with my --
10     MS. CUBRIEL: Okay. I --
11     MR. BRYANT: The court reporter's got it.
12     MS. CUBRIEL: I know, but I know what it's
13  like to be on Zoom and to be feeling helpless.
14     MR. BRYANT: Yes.
15     MS. CUBRIEL: Okay. Are you able to see
16  when the chat messages are --
17     THE VIDEOGRAPHER: Would you like to take a
18  quick break?
19     MR. BRYANT: Okay. Let's take a quick
20  break.
21     THE VIDEOGRAPHER: The time is 11:02 a.m.
22  and we are off the record.
23     (Off-the-record discussion.)
24     THE VIDEOGRAPHER: Time is 11:03 a.m. and
25  we are on the record.

Page 81

1      Q.  BY MR. BRYANT: Miss Callanen, you
2   testified that there were two affidavits provided to
3   your office by folks who were required to do so
4   because they had brought seven or more people to the
5   polls in connection with the November 2022 general
6   election in Bexar County; is that right?
7      A.  Correct.
8      Q.  Were there any instances in which
9   affidavits should have been provided but you didn't
10  get cooperation?
11     A.  Not to my knowledge.
12     Q.  Okay. Did Bexar County fully comply in
13  connection with that November of 2022 general
14  election with the requirements of SB-1 on that
15  subject of affidavits?
16     A.  Yes, sir. In training, uh-huh.
17     Q.  Did Bexar County receive any requests for
18  accommodations by persons with disability in
19  collection -- in connection with the November of 2022
20  general election beyond what you've already testified
21  to?
22     A.  Yes. Yes, sir.
23     Q.  Could you describe what occurred in that
24  regard.
25     MS. CUBRIEL: Answer if you know.



Jacquelyn Callanen

February 28, 2023
Pages 82 to 85

Page 82

1    THE WITNESS: Okay. Well, the -- the
2 visually impaired had filed a lawsuit asking for the
3 same accommodations that we have with the military.
4 We have a very robust military vote -- voting
5 population. And the federal government permits us to
6 e-mail their ballots to them. And if they're in a
7 hostile fire zone, they may e-mail them back.
8    And the visually impaired have petitioned
9 the district court to allow us to e-mail ballots to
10 them so that in the comfort of their home, they can
11 use their own screen scrapers or sip-and-puffs,
12 whatever they would need, to be able to mark their
13 ballot to have it as a fillable PDF, and then it
14 could be printed off and so they could actually be
15 voting in private without any assistance.
16    And my understanding is, due to the
17 timeliness, the judge chose three of those people out
18 of that organization for us to e-mail them their
19 ballots, and so we did this. We -- we had their
20 names and we e-mailed their ballots to them as a
21 pilot.
22    It was not a hundred percent success. The
23 screen scrapers -- my understanding, the screen
24 scrapers work with one type of PDF, but the fillable
25 PDF is -- is another. So, we went back after the

Page 83

1 election, they did successfully vote. They e-mailed
2 their ballots. They printed them. They mailed them
3 back to us. And so they did, in fact, vote.
4    But the judge has, I don't want to say -- I
5 use the phrase, kicked the can down the road until
6 March to come back and reevaluate where this will go,
7 but then knowing that that will be too late for us to
8 institute it for May.
9    Q. BY MR. BRYANT: All right. Were there any
10 other instances in which the accommodations were
11 requested for persons with disabilities in connection
12 with the 2022 general election in Bexar County beyond
13 what you've already testified about?
14    A. No. I mean, we -- we have -- I think we
15 talked about it, sir, earlier about the curbside
16 voting. And we --
17    Q. Yes, ma'am.
18    A. -- we have units, like big tablets that --
19 that they vote on in their car and -- and again,
20 that's a very, very readily accessible, very, very
21 well-promoted and very, very well-attended part of
22 our voters.
23    Q. Okay. To the best of your knowledge, did
24 Bexar County comply with the provisions of SB-1
25 relating to accomodations for voters in connection

Page 84

1 with the general election in 2022?
2    A. Yes, sir.
3    Q. You mentioned the military voters. Were
4 there any military voters whose votes were rejected
5 in connection with the 2022 general election by
6 Bexar County?
7    A. Yes, sir.
8    Q. Could you describe what occurred in that
9 regard.
10    A. Again, to my -- to my knowledge, and I do
11 not have a number, with the military ballots, they
12 are required to put a -- it's called a signature
13 sheet and -- and they must sign it with a wet
14 signature and -- and enclose it with their ballot.
15 So that -- again, we don't know how far that ballot's
16 coming, so there's no signature on the outside again.
17    And so, they -- they have the opportunity
18 to insert it inside. And the organization, the early
19 ballot board, when they open that ballot, if that
20 signature sheet is not in there, then they reject
21 that ballot. And so, there were some that did not
22 have the signature sheet in it. I don't know how
23 many.
24    Q. In those instances, was there an effort
25 made to cure or otherwise allow those military voters

Page 85

1 to vote?
2    A. Yes. Again, that group was able to e-mail
3 them, to send in a signature sheet.
4    Q. And to what extent was that done?
5    A. I don't know.
6    Q. Okay. Do you know whether there were any
7 military voters who ultimately were unable to cast
8 their ballot in Bexar County in connection with the
9 2022 general election?
10    A. I know there were some rejected.
11    Q. Okay. And not cured?
12    A. Correct.
13    Q. Okay. There's technology, I understand,
14 that is used in connection with mail-in ballots
15 that's referred to as Votracker [sic]. Are you
16 familiar with that?
17    A. Yes, sir.
18    Q. Did the Votracker [sic] -- Votracker [sic]
19 technology work properly with respect to Bexar County
20 voters in the -- connection with the general election
21 in 2022, to the best of your knowledge?
22    A. Our local ballot tracker worked.
23    Q. Did Bexar County synch, S-Y-N-C-H --
24    A. You got it.
25    Q. -- its system with TEAM's in the last half



MAGNA
LEGAL SERVICES

Page 102

1    Q.  Was voter turnout in the general election
2  in 2022 also affected as compared with 2020 by the --
3  the change in the circumstances with respect to
4  COVID?
5        MS. CUBRIEL: Objection; form.
6        THE WITNESS: No, not in the whole turnout,
7  but in the methodology of it, it -- COVID affected
8  it. I -- I firmly believe that that's why we saw so
9  many mail ballots, the 124,000 and our in-person
10 numbers were down, but we still had a high --
11 presidential years are always a higher ye- -- higher
12 turnout.
13    Q.  BY MR. BRYANT: Okay. I'm -- I'm not sure
14 the question you answered was the one I had in my
15 mind, so let me ask to try to clarify it. Do you
16 believe that one of the reasons that you had a lower
17 turnout in 2022 was that COVID was not an issue?
18        MS. CUBRIEL: Objection; form.
19    Q.  BY MR. BRYANT: Or that perhaps the
20 existence of COVID affected voter's behavior and
21 propensity to vote in 2020?
22        MS. CUBRIEL: Objection; form.
23        THE WITNESS: No.
24    Q.  BY MR. BRYANT: Did I understand your
25 testimony to be that you believe that the number of

Page 103

1  mail-in ballots spiked up in 2020 because of COVID?
2    A.  Yes, sir.
3    Q.  Do you expect a similar spike in the next
4  presidential election in 2024?
5        MS. CUBRIEL: Objection; form.
6        THE WITNESS: Not that high. But, I mean,
7  it'll obviously be higher than 40 that we have now.
8    Q.  BY MR. BRYANT: In the connection with the
9  2020 general election, was accommodation requested by
10 any voter of Bexar County as to any of the
11 requirements of SB-1?
12    A.  I'm not sure I understand.
13    Q.  Such as voter assistance or only with
14 respect to what you already testified to, which was
15 visual impairment, hearing impairment?
16        MS. PAIKOWSKY: Objection to the extent
17 that this is asking a question about outside the
18 scope of the 2022 election.
19    Q.  BY MR. BRYANT: Yeah. And I want to make
20 it clear I'm asking about the 2022 general election.
21 Was there -- were there any other requests for
22 accommodations as to disabilities that were because
23 of any requirements that SB-1 imposed for the first
24 time?
25        MS. CUBRIEL: Objection; form.

Page 104

1        THE WITNESS: Not to my knowledge.
2    Q.  BY MR. BRYANT: Okay.
3        MR. BRYANT: I'll pass the witness at this
4  time and reserve my remaining time until after other
5  counsel have had an opportunity to ask their
6  questions. And I would also ask if anyone plans to
7  take a lunch break and if so, when you would like to
8  do so.
9        MS. CUBRIEL: We could go off the record to
10 discuss lunch break.
11        MR. BRYANT: Okay. Let's go off the
12 record.
13        THE VIDEOGRAPHER: Time is 11:50 a.m. and
14 we are off the record.
15        (At 11:50 a.m., a luncheon recess
16         was taken, the deposition to be
17         resumed at 12:20 p.m.)
18
19        AFTERNOON SESSION
20        (At 12:23 p.m., the deposition was resumed,
21         the same persons being present.)
22        THE VIDEOGRAPHER: The time is 12:23 p.m.
23 and we are on the record.
24
25

Page 105

1              EXAMINATION
2  BY MS. PAIKOWSKY:
3    Q.  Good afternoon, Miss Callanen.
4    A.  Good afternoon.
5    Q.  Did I get it right?
6    A.  Yes, you did. I'm proud of you.
7    Q.  Perfect. My name is Dana Paikowsky and I
8  am an attorney for the United States, as you know.
9  So, I know we've talked a lot about some of the voter
10 education efforts you did in the November 2022
11 election. And I don't want to go over anything we've
12 already talked about.
13        But was there any specific proactive voter
14 education around SB-1's identification number
15 provisions that your office did in the 2022 general
16 election that we did not already talk about?
17    A.  No.
18    Q.  When your office was doing these voter
19 education efforts, did you seek feedback or approval
20 from the secretary of state's office?
21    A.  No.
22    Q.  And -- okay. So, going back to the insert.
23 Has your office communicated with the secretary of
24 state's office about the insert?
25    A.  I think we -- we -- we talked once and I --



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS**

# APPENDIX F

Transcript of the Testimony of

**Remi Garza**

**Date:**

May 09, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY WAYNE ABBOTT

Remi Garza

May 09, 2022
Pages 202 to 205

Page 202

1 more generally, that Senate Bill 1 will prevent them
2 from finding transportation to a polling center or
3 polling place?
4    A    I'm sorry, could you repeat the question?
5    Q    Uh-huh.  Have you heard from voters more
6 generally that Senate Bill -- their concern is that
7 Senate Bill 1 would prevent them from being able to find
8 transportation to a polling place?
9    A    No.
10    Q    Have you had any issues on the March primary or
11 the May 7th election with respect to this provision?
12    A    No.
13    Q    Have you had any concerns raised about this
14 provision on either election?
15    A    No.
16    Q    Do you have any policies or procedures in place
17 for what would occur if the person transporting voters
18 to poll locations refuses to assist voters?
19    A    They wouldn't be allowed to assist the voters.
20    Q    So the voters would still be able to vote, but
21 the individual would not be able to assist; is that
22 fair?
23    A    Yes.
24    Q    And have you heard of any instances of an
25 individual refusing to sign a form?

Page 203

1    A    No.
2    Q    Have you heard any incidents of an individual
3 being reluctant to sign a form?
4    A    No.
5    Q    All right.  Then let's turn to Subsection 6.03,
6 which is starts at the bottom of 51 and continues on to
7 the next page.
8    A    Yes.
9    Q    And this is not in Section 64.032 of the
10 election code, correct?
11    A    Yes.
12    Q    And the title is omission of form by
13 assistance?
14    A    Yes.
15    Q    This says that:
16        "A person, other than an election officer,
17 who assists a voter in accordance with this chapter is
18 required to complete a form stating:
19        "1.  The name and address of the person
20 assisting the voter.
21        "2.  The relationship to the voter of the
22 person assisting the voter; and
23        "3.  Whether the person assisting the
24 voter received or accepted any form of compensation or
25 other benefit from a candidate, campaign, or political

Page 204

1 committee?"
2        Did I read that correctly?
3    A    Yes.
4    Q    Now, prior to this provision being enacted, did
5 you have any concerns regarding voters receiving
6 assistance from candidate, campaign, or political
7 committee?
8    A    No.
9    Q    And are you aware of any voter who could not
10 find the assister of their choice because of the
11 requirement that the assister fill out a form?
12    A    No.
13    Q    Have you heard of any particular voter who was
14 unable to vote because their assister of choice was
15 unable or refused to complete the form provided by this
16 Section SB14?
17    A    No.
18    Q    Are you aware of an individual who refused to
19 fill out the form who otherwise would be an assister to
20 a voter?
21    A    No.
22    Q    Have you ever heard of an individual in the
23 last two elections who were reluctant to sign the form
24 and otherwise be an assister to voters?
25    A    No.

Page 205

1    Q    Have you received any complaints from voters or
2 have you received any phone calls from voters about
3 voicing any concern that this requirement of an assister
4 filling out a form would prevent them from being able to
5 find an assister?
6    A    Not that I'm aware of.
7    Q    Do you have any problems or concerns with
8 respect to this section during the May 7th election or
9 March primary?
10    A    No.
11    Q    Did you have any concerns -- let me strike that
12 question.
13        Were you at any point confused about what
14 was required from Cameron County with respect to this
15 provision?
16    A    No.
17    Q    And do you have forms available at each polling
18 site?
19    A    Yes.
20    Q    In addition, are election officers available to
21 assist the voters at each polling location?
22    A    Yes.
23    Q    And with respect with that assistant, are there
24 individuals from poll locations who speak both English
25 and Spanish?

Page 206

1   A   Yes.

2   Q   Do you provide any other assistance in any
3 other languages besides English and Spanish at poll
4 locations?

5   A   No.

6   Q   Have you received any requests from voters to
7 have available someone who can speak in an alternative
8 language besides English or Spanish?

9   A   No.

10   Q   If we look at Subsection (b), it says:

11        "The Secretary of State shall prescribe
12 the form required by this section.  The form must be
13 incorporated into the official carrier envelope if the
14 voter is voting an early ballot by mail and receive
15 assistance under Section 86.010, or must be submitted to
16 an election officer at the time the voter casts a ballot
17 if the voter is voting at the polling place or under
18 Section 64.009"

19        Is that correct?

20   A   Yes.

21   Q   Have you had any problems or concerns with
22 respect to this particular section or subsection in the
23 March primary or May 7th election?

24   A   Other than just general complaints as to the
25 length, no.

Page 207

1   Q   What did you mean about the length?

2   A   The oath itself is very long.  It takes a long
3 time for people to repeat it after the presiding judge.

4   Q   So outside of the length of the oath, you
5 received no other complaints?

6   A   That's correct.

7   Q   Okay.  We're about to discuss the oath in a
8 moment, so let's move now to Section to 6.04.

9   A   Okay.

10   Q   And so this amends Section 64.034 of the Texas
11 Election Code; is that correct?

12   A   Yes.

13   Q   And then the first part reads:

14        "A person, other than an election officer,
15 selected to provide assistance to a voter must take the
16 following oath, administered by an election officer at
17 the polling place before providing assistance."

18        Did I read that correctly?

19   A   Yes.

20   Q   And the language that was inserted was
21 clarifying that an election officer did not have to take
22 the oath; is that correct?

23   A   Correct.

24   Q   Prior to SB1, did election officers in Cameron
25 County take the oath?

Page 208

1   A   We recommended that they do it in the morning.

2   Q   Does this clarify to your office that they do
3 did not need to do that; is that correct?

4   A   That's correct.  We are still doing it.

5   Q   As a precaution?

6   A   Yes.

7   Q   Then we move to the oath itself.  It reads:

8        "I swear or affirm under penalty of
9 perjury that the voter I assisted represented to me they
10 are eligible to receive assistance.  I will not suggest
11 by word, sign, or gesture how the voter should vote.  I
12 will confine my assistance to reading the ballot to the
13 voter, directing the voter to read the ballot, marking
14 the voter's ballot, or directing the voter to mark the
15 ballot."

16        Have I read that portion correctly?

17   A   Yes.

18   Q   It continues:

19        "I will prepare the voter's ballot as the
20 voter directs.  I did not pressure or coerce the voter
21 into choosing me to provide assistance.  I am not the
22 voter's employer, an agent of the voter's employer, or
23 an officer or agent of a labor union to which the voter
24 belongs."

25        "I will not communicate information about

Page 209

1 how the voter has voted to another person.  And I
2 understand that if assistance is provided to a voter who
3 is not eligible for assistance, the voter's ballot may
4 not be counted."

5        Did I read that correctly?

6   A   Yes.

7   Q   So let's look at the beginning.  Let's look at
8 the language that was added.  So in line 26, it adds:
9 "Under the penalty of perjury."

10        Did I read that correctly?

11   A   Yes.

12   Q   Are you aware of whether or not a person who
13 took the oath prior to this was also subject to perjury?

14   A   I would think so.

15   Q   So is your belief that a person who took the
16 oath prior to SB1 would have been subject to perjury had
17 they violated the oath; is that correct?

18   A   It could have been, but ..

19   Q   Is it your belief?

20   A   It's my belief, yes.

21   Q   And then it continues with:

22        "The voter I am assisting represented to
23 me they are eligible to receive assistance."

24        Texas already limited, or I should say
25 Texas state and federal law already limited certain

Remi Garza

May 09, 2022
Pages 234 to 237

Page 234

1  Q   So this would be enforced by the district
2 attorney or county attorney's office criminal division;
3 is that right?
4  A   Yes.
5  Q   And you haven't spoken to them about how they
1 could enforce or interpret this particular section?
2  A   I have not.
3  Q   With respect to the other provisions of the
4 election code created or amended criminal offense, have
5 you spoken to the district attorney's office or the
6 count attorney's office, criminal division about how
7 they would enforce those provisions?
8  A   No, I have not.
9  Q   Did any voter -- to your knowledge, was any
0 voter not able to obtain the assister of choice because
1 of this particular section?
2  A   Not that I'm aware of.
3  Q   And to your knowledge, was any voter unable to
4 vote because of this particular section?
5  A   Not that I'm aware.
6  Q   And to your knowledge, did any person who would
7 have assisted a voter decide not to assist a voter
8 because of this particular section?
9  A   Not that I am aware of.
0  Q   And has any voter raised concerns regarding

Page 235

1 this particular section?
2  A   Not to me.
3  Q   And have any assisters raised concerns
4 regarding this particular election provision?
5  A   Not to me.
1  Q   And has any advocacy worker or third-party
2 organization raised concerns about this particular
3 provision?
4  A   Not that I'm aware of.
5  Q   Okay.  So you're not aware of any concerns or
6 complaints from voters, assisters, or advocacy workers,
7 correct, regarding this particular section?
8  A   Not that they complained to me.  I don't know
9 if they've done it in other places.
0  Q   But not to your knowledge?
1  A   But not to my knowledge.
2  Q   And you're not aware of complaints that have
3 been received by Cameron County Elections Office?
4  A   I'm not aware of any that have been received by
5 our office.
6  Q   Did you have any concerns regarding this
7 particular section?
8  A   No.
9  Q   I want to jump to Section 1.022.  I'm sorry,
0 it's Section 1.08, and it amends Section 1.022 of the

Page 236

1 election code.  It starts on page 4.
2  A   Yes.
3  Q   And do you see where it says reasonable
4 accommodation or modification?
5  A   Yes.
1  Q   It states:
2     "The provision of this code may not be
3 interpreted to prohibit or limit the right of a
4 qualified individual with a disability from requesting a
5 reasonable accommodation or modification to any election
6 standard, practice, or procedure mandated by law or rule
7 that the individual is entitled to request under federal
8 or state law."
9     Did I read that correctly?
0  A   Yes.
1  Q   Did you understand this provision as clarifying
2 that a voter may request an accommodation of any
3 election practice or requirement if they had a qualified
4 disability?
5  A   Yes.
6  Q   And would your office provide a reasonable
7 accommodation if one was so requested?
8  A   To the best of my ability, yes.
9  Q   And has any voter requested an accommodation
0 with respect to the provisions of SB1?

Page 237

1  A   Not that I am aware of.
2  Q   If a voter requested an accommodation to a
3 specific requirement of SB1, how would you make a
4 determination of whether to provide reasonable
5 accommodation?
1  A   It would be -- it would be dependent on the
2 nature of the request.  And we would probably contact
3 the county attorneys and the Secretary of State's office
4 to see if we had the discretion to make the
5 accommodation.
6  Q   But you would do so, to the best of your
7 ability, correct?
8  A   Yes.
9     MS. HUNKER:  Can we go off the record for
0 five minutes?  I need to look at my notes.
1     THE VIDEOGRAPHER:  Going off the record.
2 Time is 4:30 p.m.
3     (Break taken.)
4     THE VIDEOGRAPHER:  We are on the record.
5 Time is 4:44 p.m.
6  Q   (BY MS. HUNKER) So there was one section I had
7 gotten forgotten to go over.  If you can turn to Section
8 6.02 on page 51.  It starts on line 17.
9  A   Yes.
0  Q   Do you see where it says, "this amends Section

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX G

Transcript of the Testimony of

# The Office of the Dallas County Elections Administrator

## Date:

April 29, 2022

## Case:

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Page 122

1 assistance?
2     A.   No, I do not.
3     Q.   So the only way we could figure out that number
4 would be to go back through the envelopes; is that
5 right?
6     A.   Yes.
7     Q.   Okay.  That sounds time-consuming.
8     A.   Yes.
9     Q.   And now let me ask you about the application
10 for ballot by mail.  If a voter receives assistance in
11 filling out the application for ballot by mail, do you
12 keep track of that number anywhere?
13     A.   No.
14     Q.   Okay.
15     A.   No, we do not keep track, but what I can say
16 is:  If a application come into our office and the --
17 they have a witness here (indicating), but they didn't
18 sign, then we send them that notice to the voter that
19 it's not signed; or if they signed it down here and
20 didn't fill out the information, then we send a notice
21 (indicating) to that, but...
22     Q.   So only in a situation where you can tell that
23 somebody provided assistance, but they didn't fill out
24 the paperwork --
25     A.   If it's --

Page 123

1     Q.   -- correctly?
2     A.   -- incomplete, yes.
3     Q.   Okay.  Do you send out mail ballots in Spanish?
4     A.   If it's requ- -- if it's requested, yes.
5     Q.   Is your mail ballot bilingual in the sense
6 that --
7     A.   Well, let me --
8     Q.   -- it has English and Spanish?
9     A.   I'm sorry.  Rephrase that.  Let me say:  Are
10 you asking the ballot or the mail ballot?
11     Q.   So let me ask you first about the mai- -- the
12 ballot, itself.
13     A.   The ballot, itself?
14     Q.   Is the ballot bilingual, or does it kind --
15     A.   Trilingual.
16     Q.   It's trilingual.
17     A.   English, Spanish and Vietnamese now.
18     Q.   Okay.  And so the mail ballot has all three of
19 those languages on it?
20     A.   The ballot has it, yes.
21     Q.   Okay.  Now, for application for ballot by mail,
22 if somebody is Spanish-speaking --
23     A.   Yes.
24     Q.   -- how could they make sure that you send them
25 a Spanish language application for ballot by mail?

Page 124

1     A.   Either they can call us on the phone and ask --
2 request -- that person requesting for their ballot, can
3 request a Spanish version of the ballot; or if it's a
4 Vietnamese, they can call and request that; or they can
5 submit a court request to us in writing, and they can
6 also state that in writing, asking for that.
7     Q.   If someone calls your -- your mail voting
8 group --
9     A.   Uh-huh.
10     Q.   -- and they're just speaking Spanish on the
11 phone --
12     A.   Uh-huh.
13     Q.   -- what would -- how would you handle that
14 call?
15     A.   Well, two ways, through the prompts in the
16 system they call, we have a Spanish version.  If they
17 say, I would like to speak to a Spanish speaker, then
18 they can still like that and then the phone call will go
19 to a Spanish-speaker.
20         If not, if we do get that call, then they'll
21 ask us -- either speak to us in English or ask if they
22 speak to someone in Spanish, and then we'll transfer
23 that call to the person who's speaking Spanish.
24     Q.   Between you and the eight people that work with
25 you --

Page 125

1     A.   Uh-huh.
2     Q.   -- in the mail-ballot group, do you have any
3 Spanish speakers?
4     A.   Yes.
5     Q.   Do you have any Vietnamese speakers?
6     A.   In my department, no.  But in the office, yes,
7 we have one.
8     Q.   Are the language prompts in your system yet for
9 someone to call Dallas County Elections and get a prompt
10 for -- if you need to speak -- if you need to hear this
11 message in Vietnamese, press whatever?
12     A.   I do not know.
13     Q.   Because it's new?
14     A.   It's new.
15     Q.   Okay.
16     A.   It may be.  I just don't know.
17     Q.   I want to ask you now about guidance from the
18 Secretary of State's office during this process,
19 starting January 1 of 2022.
20     A.   Okay.
21     Q.   Was there a time when your office was making
22 decisions about how to implement the new ID number
23 matching requirements and you had not yet received
24 guidance from the Secretary of State's office?
25     A.   Yes.

The Office of the Dallas County Elections Administrator

April 29, 2022
Pages 154 to 157

Page 154

1    Q.  And is this always the way that you interpreted
2 the law?
3         MS. HUNKER:  Objection, form.
4    A.  Yes.
5    Q.  (By Ms. Bender)  Okay.  So, again, throughout
6 the entire time that you were processing ballots for the
7 March 2022 primary --
8    A.  (Witness moves head up and down.)
9    Q.  -- you would accept it if the driver's license
10 number was incorrect, but the Social Security number was
11 correct?
12   A.  Yes.
13        MS. BENDER:  Okay.  That's all of my
14 questions.  Thank you.
15        THE WITNESS:  Thank you.
16        THE REPORTER:  Just a second.
17        EXAMINATION
18 BY MS. CAI:
19   Q.  Hello, Ms. Phillips.
20        MS. CAI:  Oh.  Go ahead.
21   A.  Hi.
22        MS. PERALES:  One second, please.  One
23 second, please.
24        THE REPORTER:  Okay.  And who is this,
25 please?

Page 155

1         MS. CAI:  My name is Sophia Cai, and I'm
2 representing the OCA Plaintiffs.
3         MS. PERALES:  Slow down for one second.
4 Can you just say that more slowly?
5         MS. CAI:  Of course.  My name is Sophia
6 Cai, spelled S-o-p-h-i-a.  Last name, Cai, C-a-i.
7         THE REPORTER:  Okay.  And you're
8 representing who?
9         MS. CAI:  The OCA-Greater Houston
10 Plaintiffs.
11        THE REPORTER:  Okay.  Thank you.
12        Okay.  Thank you.
13        MS. CAI:  Great.
14   Q.  (By Ms. Cai)  Hi, Ms. Phillips.  Thank you --
15   A.  Hi.
16   Q.  -- for bearing with us.  I just have a few
17 questions for you.
18        You testified earlier that you didn't know off
19 the top of your head the number of people who submitted
20 an application for ballot by mail that was incomplete
21 because you could not verify their ID number.
22        Even without that exact number off the top of
23 your head, do you know whether the number of ABBMs that
24 were rejected in the March primary was greater than in
25 past years?

Page 156

1         MS. HUNKER:  Objection, form.
2    A.  Yes, it was greater.
3    Q.  (By Ms. Cai)  What accounts for that greater
4 number of rejections?
5         MS. HUNKER:  Objection, form.
6    A.  The new requirements, the missing driver's
7 license or the missing Social Security numbers.
8    Q.  (By Ms. Cai)  Do you have reason to believe
9 that some individuals whose applications for ballot by
10 mail or mail ballots are being rejected -- excuse me --
11 that have been rejected are, in fact, eligible voters
12 who made errors while filing -- filling out their ID
13 numbers?
14        MS. HUNKER:  Objection, form.
15   A.  Yes.
16   Q.  (By Ms. Cai)  Are you or your office concerned
17 by the greater number of rejected applications for
18 ballot by mail or mail ballots in the March primary?
19        MS. HUNKER:  Objection, form.
20   A.  Yes.
21   Q.  (By Ms. Cai)  Why are you concerned?
22   A.  Because voters before the SB 1 law were able to
23 vote and cast their ballots, and ballots counted.
24   Q.  Have you or your office conveyed that concern
25 to the Secretary of State?

Page 157

1    A.  I have not; but my office -- some people in my
2 office probably have, yes.
3    Q.  Do you know what they have said?
4    A.  No, I don't.
5    Q.  Have you or your office conveyed that same
6 concern to other election officials?
7         MS. HUNKER:  Objection, form.
8    A.  Probably so.  I do not know.
9    Q.  (By Ms. Cai)  Have you personally conveyed that
10 concern to anyone?
11   A.  No.
12   Q.  Turning to SB 1 requirements next, are you
13 aware that SB 1 adds additional requirements in order to
14 register to vote by mail or to actually vote by mail?
15        MS. HUNKER:  Objection, form.
16   A.  Repeat that again.
17   Q.  (By Ms. Cai)  This probably been covered,
18 but is it correct that you are aware that SB 1 adds
19 requirements to register to vote by mail or to actually
20 vote by mail?
21   A.  Yes.
22        MS. HUNKER:  Objection, form.
23   Q.  (By Ms. Cai)  Is a registered voter with a
24 disability able to get a modification or accommodation
25 to the ID requirement for voting by mail?

Page 158

1          MS. HUNKER:  Objection, form.
2     A.   No.
3     Q.   (By Ms. Cai)  So even if they request an
4 accommodation or a modification, a voter with disability
5 would not be able to have any different rules apply to
6 them for the ID requirement?
7          MS. HUNKER:  Objection, form.
8     A.   No, not to my knowledge.
9     Q.   (By Ms. Cai)  Have you received any requests
10 from voters with disabilities for any sort of
11 accommodation or modification to the ID requirement in
12 the March primary?
13    A.   No, not to my kno- -- not to my knowledge.
14    Q.   Who would a voter with a disability go to
15 to make such a request for their application for vote by
16 mail or their mail ballot?
17    A.   They would request the application from my
18 office, the Mail Ballot Office with Dallas County.
19    Q.   If they wanted some sort of accommodation or
20 modification so that they could vote by mail, would they
21 be able to ask somebody in your office for such
22 accommodation or modification?
23    A.   What type of accommodation or modification are
24 we asking about?
25    Q.   Any type.  It might vary by the type of

Page 159

1 disability a person has.  Would they be able to ask for,
2 for instance, assistance filling out their ID number?
3     A.   If a voter is in our office, come to our office
4 at the counter and asks for help with assisting with
5 filling out their application, yes, we can help them
6 fill out their application.
7     Q.   Would they be able to request any other sorts
8 of modifications or accommodations?
9     A.   What modification are we asking about?
10    Q.   It would likely depend on the voter, but can
11 you think of any examples of people who have asked for
12 any assistance?
13    A.   No one has asked for any assistance or
14 modifications in our office, so I wouldn't know which
15 one you are referring to.
16    Q.   Have they called in or written in for any such
17 modifications?
18    A.   I have not received any, not to my knowledge.
19         MS. CAI:  Okay.  Thank you very much,
20 Ms. Phillips.  That's all my questions.
21         THE WITNESS:  Thank you.
22         THE REPORTER:  Just a second, please.
23 Okay.  Thank you.
24         MS. HUNKER:  Does any other Plaintiff
25 group want to ask questions before I begin?

Page 160

1          Hearing none.
2               EXAMINATION
3 BY MS. HUNKER:
4     Q.   Hi, Ms. Phillips.  How with you?
5     A.   I'm okay.  How are you?
6     Q.   My name is Kathleen Hunker.  I represent the
7 State Defendants in this matter.  I'm going to ask a few
8 questions, mostly in response to what Plaintiffs have
9 asked.  Because of that, I'm going to be jumping around
10 a little bit with respect to topics.  If at any point
11 you're confused or you don't follow when I transition to
12 topics, will you please let me know?
13    A.   Okay.
14    Q.   And I will be more than willing to either lay a
15 greater foundation or to rephrase the question.  Okay?
16    A.   Okay.
17    Q.   Also if you don't understand any of my
18 questions or you think you need additional
19 clarification, please let me know; and I'm happy to do
20 so.  Okay?
21    A.   Okay.
22    Q.   Excellent.  So I'm going to start with the last
23 topic of conversation, which was regarding the ADA
24 accommodation.  I believe Plaintiffs' Counsel for
25 OCA-Greater Houston, asked you a few questions on that,

Page 161

1 correct?
2     A.   Yes.
3     Q.   And you had mentioned that no one had come into
4 your office asking a -- for assistance or an
5 accommodation with respect to the ID requirements; is
6 that correct?
7     A.   Correct, not to my knowledge.
8     Q.   Okay.  So when she was asking about whether or
9 not your office would accommodate, you don't have a
10 policy in place about the accommodation; is that
11 correct?
12    A.   That is correct.
13    Q.   And that would only be decided once you
14 actually received a request; is that right?
15    A.   Yes.
16    Q.   And I think you had mentioned that if somebody
17 came in requesting assistance, you would do your best to
18 aid them; is that correct?
19    A.   Yes.
20    Q.   You also spoke with Counsel regarding
21 communications with the Secretary of State's office, and
22 so let me get a little bit of clarification there.
23         You have not contacted the Secretary of State's
24 office regarding SB 1, is that right?  And when I say
25 "you" in this case, I'm referring to you as an

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                Pages 282 to 285

Page 282

1          MS. BENDER:  This is --
2          THE REPORTER:  Okay.  Thank you.
3          MS. BENDER:  This is Brady.  No questions
4 at this time.  Thank you.
5          EXAMINATION
6 BY MS. CAI:
7    Q.   Hello, Ms. Scarpello.  This is Sophia Cai on
8 behalf of the OC Plaintiffs
9    A.   I'm sorry.  I can't hear.
10   Q.   I was just going to ask you if you could hear
11 me okay.
12        How is this?
13   A.   That's better.
14   Q.   Great.  I'll just reintroduce myself.  My name
15 is Sophia Cai on behalf of the OCA Plaintiffs.
16        First I just wanted to ask you a few questions
17 about matching voters who apply for a ballot by mail.
18   A.   Okay.
19   Q.   If an individual applies to vote by mail, but
20 is not a registered voter, will their application for
21 ballot by mail be approved?
22   A.   If they apply to vote by mail, but they are not
23 a registered voter, no.
24   Q.   And that was also true prior to SB 1; is that
25 correct?

Page 283

1    A.   That's correct.
2    Q.   Put another way, everyone who successfully
3 applies for a ballot by mail has already registered to
4 vote in the county; is that right?
5          MS. HUNKER:  Objection, form.
6          (The lights go out in the room.)
7          THE REPORTER:  Can we go --
8    A.   I think we might pause.
9          THE REPORTER:  -- off the record, please?
10 Can we go off the record for a second, please?
11         THE VIDEOGRAPHER:  Going off the record at
12 6:51 p.m.
13         (Discussion off the record.)
14         THE VIDEOGRAPHER:  Okay.  We're back on
15 the record.  The time is 6:52 p.m.
16   Q.   I'll just reask my most recent question.  How's
17 that?
18        Everyone who successfully applies for a ballot
19 by mail has already registered to vote in the county?
20         MS. HUNKER:  Objection, form.
21   A.   That -- that's correct.
22   Q.   Prior to SB 1, how did your office check to see
23 if an individual applying to vote by mail was a
24 registered voter?
25   A.   They checked the voter registration, the VEMACS

Page 284

1 voter registration system.
2    Q.   And was that system meant to ensure that the
3 individuals were already registered?
4    A.   Yes.
5    Q.   Prior to SB 1 being granted an application for
6 ballot by mail, what would happen next?
7    A.   The vote by mail ballot would be sent.
8    Q.   Would the voter be assigned a unique
9 identification number?
10   A.   Yes.
11   Q.   And would that identification number be
12 associated with the ballot sent to the voter?
13   A.   Yes.  Not --
14   Q.   So --
15   A.   -- to the -- not to the ballot, but to the
16 ballot carrier envelope.
17   Q.   Okay.  I see.  Thank you for that
18 clarification.
19        So someone who successfully voted by mail would
20 then have to return that specific ballot envelope issue
21 to them, not any ballot envelope?
22   A.   That's correct.
23   Q.   Prior to SB 1, what information was the voter
24 required to include on the carrier envelope or ballot
25 envelope?

Page 285

1    A.   I believe their name, address.  I can't recall
2 all the specifics, but most likely, the name, address.
3    Q.   Okay.  And was the voter required to sign the
4 carrier envelope?
5    A.   Yes.
6    Q.   Was there a process in place to make sure that
7 the signature matched the voter signature on file?
8    A.   Yes.  There's the Signature Verification
9 Committee that compares the signature of the -- on the
10 carrier envelope to the signature on the application, as
11 well as they -- they have the ability to check other
12 signatures within the voter registration system.
13   Q.   And just to clarify, that answer also applies
14 prior to SB 1 --
15   A.   Yes.
16   Q.   -- is that correct?
17   A.   Yes.
18   Q.   Thank you.  Okay.  Next I want to ask you some
19 questions about voters with disabilities.
20        Are you familiar with your office's obligations
21 under the Americans with Disabilities Act or ADA?
22   A.   I'm -- I'm vaguely familiar, yes.
23   Q.   And what do you understand those obligations to
24 be?
25   A.   Most importantly, it's to provide voting

Page 286

1 locations that have been -- that are ADA compliant,
2 basically.
3      Q.  Does your office have written ADA policies or
4 procedures?
5      A.  No, we don't.
6      Q.  So these are -- how are they communicated to
7 your employees or poll watchers?
8      A.  The -- the polling places, the county has
9 traditional polling places (indicating) that they've
10 been using for years, and those polling places, we -- in
11 earlier testimony, someone testified -- Revi testified
12 that those polling places were, when we moved to
13 countywide vote centers, they used those same polling
14 places.
15      In August of 2021, I proposed that we take a
16 look at those polling places in an effort to reinspect
17 them and to get the votes in our advisory committee to
18 look at the official locations of the county so that we
19 could modernize or be more compliant with ADA, as well
20 as other practical locations, you know, aspects of
21 those -- how many we have, where they're located and do
22 a deep dive in -- in the placement and quality of our
23 polling places.  But because of redistricting that was
24 taking place at the time, that effort was delayed; and
25 we will take that up again in June of this year.

Page 287

1      Q.  And when you say "accessible polling places,"
2 what do you mean by that?
3      A.  There's -- when there's -- when a polling place
4 is contemplated for use, there are checklists that we go
5 through where you -- you know, best practices call for a
6 checklist to inspect a location.  You -- you're --
7 there's a whole laundry list of things that make a
8 location ADA compliant:  ramps, pressure on the doors
9 (indicating), the types of knobs, access to drinking
10 fountains.  I mean, it's a very comprehensive list that,
11 basically, gives a grade to a location for ADA
12 compliance.
13      Q.  It sounds like you're very familiar with this
14 list, but if it's not written down anywhere, how do the
15 various locations go through this checklist?
16      A.  There -- there were the -- there were
17 inspections in 2019, and so we do have records of those
18 locations.  I just think that -- that we need to pay a
19 little bit better attention to the results of those
20 inspections and upgrade or eliminate those that are not
21 in compliance because I think we have some that are not
22 as compliant as they need to be.
23      Q.  That makes a lot of sense.  Thank you for that
24 on an accessibility point.
25      Broadly speaking, is your understanding that

Page 288

1 individuals with disabilities can, within reason, ask
2 for modifications or accommodations so that they can
3 vote?
4      A.  Yes.
5      Q.  And does your office have policies for sort of
6 changing the typical voting procedures, if needed, for
7 voters with disabilities to vote?
8      A.  Yes.  But I mean, number one, there's curbside
9 voting for people with disabilities; but there's also
10 certain procedures prescribed by the State that allow
11 preferential treatment to those who come into a polling
12 place (indicating), you know.  They get to cut the line,
13 if you will.  And so that's -- that's also allowed.
14      Q.  And so aside from this sort of cutting-the-line
15 feature, who has the authority to decide whether or not
16 to grant a voter's request for a reasonable modification
17 based on their disability?
18      A.  I believe Texas law gives that authority to the
19 presiding judge at a location.
20      Q.  And so would a person with a disability just
21 sort of ask at the location and then it would go to the
22 judge; how would that procedure work?
23      A.  Yes, they would ask at the location.
24      Q.  And that's the final say whether or not they
25 can have that modification?

Page 289

1      A.  Yes.  That's --
2           MS. HUNKER:  Objection, form.
3      A.  That's the -- in Texas, the presiding judge has
4 the last say as opposed to the Elections Administrator,
5 like in other states that I've been in.
6      Q.  (By Ms. Cai)  So how are either the election
7 judge you speak of or any of the employees or poll
8 workers who might be asked on a modification, what are
9 they trained to do when deciding whether that
10 modification is reasonable?
11      A.  We provide them with the language, as it's laid
12 out in the Texas Election Code; and there's certain
13 signage that's required.  And then we provide them with
14 that mater- -- the training materials and signage that
15 tell them if and when someone should have that
16 preferential treatment.
17      Q.  What are some of the asked-for modification
18 that's not on this list?
19           MS. HUNKER:  Objection, form.
20      A.  I'm not sure I understand the question.
21      Q.  (By Ms. Cai)  Let me rephrase.  What kinds of
22 modifications or changes to the typical voting
23 procedures would be allowed to be provided?
24      A.  The curbside voting, as well as the
25 preferential treatment when it comes to lines inside the

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                           Pages 290 to 293

Page 290

1 polling place.
2    Q.  Okay.  And those are the only two you can think
3 of --
4    A.  That's the only --
5    Q.  -- off the top of your head?
6    A.  Off the top of my head, yes.
7    Q.  So to give a sort of comparable
8 example of something different, earlier today you
9 discussed the oath requirement of SB 1.
10   A.  (Witness moves head up and down.)
11   Q.  So what would you do if a voter with a
12 disability asked for their assistor to answer questions
13 or provide assistance beyond what the vote allows?
14        MS. HUNKER:  Objection, form.
15   A.  I think that -- that's a situational question.
16 I mean, if on Election Day we got a call from a -- an
17 election judge asking for, you know, telling us that
18 someone was asking for an accommodation, we would look
19 and see what that -- what they are asking for and we
20 would provide our recommendation and we'd do our
21 research, talk to our attorneys, talk to the Secretary
22 of State, et cetera, and find out what our -- what our
23 options are, if any, to offer to that voter.
24   Q.  (By Ms. Cai)  So would you do that procedure
25 for any question that an election judge called you with?

Page 291

1    A.  Yes.
2    Q.  So, for instance, if a voter with a disability
3 can't see where to put their ID on a mail ballot and you
4 got a call about that, you would then do the same
5 procedure?
6    A.  If -- if the -- I mean, it's kind of a
7 hypothetical, you know, a very generic --
8    Q.  Of course.
9    A.  -- hypothetical.  I mean, if -- if the -- if
10 the law is not clear, if the election's advisories that
11 have been promulgated by the Secretary of State are not
12 clear, then we would do that escalation procedure to
13 see, you know, what our options are.
14   Q.  Okay.  So the general sense is if there's not a
15 clear-cut answer, you would talk to your attorneys or
16 the Secretary of State to see whether that modification
17 could be provided for a voter with a disability in real
18 time?
19   A.  Yes.
20   Q.  And same question for the care procedure.
21 Let's say somebody with a disability has their ballot or
22 ballot -- final application rejected, but they can't
23 drive and, therefore, cannot go in person to carry their
24 ballot.
25        Would you consider granting a request for a

Page 292

1 modification so that their ballot could be cured in a
2 different way than is specifically, provided for by
3 SB 1?
4        MS. HUNKER:  Objection, form.
5    A.  I think that it's hard for me to speculate on,
6 you know, a vague hypothetical.  You know, I -- these --
7 these -- like I said before, this would be handled on a
8 case-by-case basis with, you know, true, you know,
9 facts.  And it would be a fact-based decision.
10   Q.  That makes a lot of sense.  Thank you.
11   A.  Uh-huh.
12   Q.  Has -- so moving away from hypotheticals,
13 then --
14   A.  Okay.
15   Q.  -- has your office received requests for
16 regional (phonetics) modifications for changes in voting
17 procedures from voters with disabilities post enactment
18 of SB 1?
19   A.  No, I don't believe so.
20   Q.  Okay.  I have one last set of questions about
21 the voter identification requirements.
22        After SB 1, does your office advise mail ballot
23 voters to provide both their Social Security number and
24 driver's license numbers?
25   A.  Yes.  After -- in February of 2022, as we were

Page 293

1 having a high rejection rate, we went to extraordinary
2 measures to try to educate the public, and we got -- I
3 think we got an allotment of $87,000 from the
4 Commissioners Court where we reached out directly to
5 voters who had rejected mail ballot applications.
6        We did some radio ads.  We did some Facebook
7 educational efforts to try to, number one, help people
8 who had already had rejected mail ballots or rejected
9 applications, as well as preventing those problems from
10 happening.  So, yes, you know, we do what we can to try
11 to prevent and solve the problem once it occurs.
12   Q.  So, to be clear, the recommendation to put both
13 the Social Security number and driver's license number
14 began around February; is that correct?
15   A.  Yes.
16   Q.  And you may have already answered this, but why
17 did you start advising to put both numbers?
18   A.  We kind of used the tag line, "When in doubt,
19 fill them both out," and -- because it's just, you know,
20 to be as safe as possible to try to get both of those
21 numbers down with the idea that someone is -- is likely
22 to have one of those two numbers on their voter
23 registration record.
24   Q.  So, in the circumstances where an individual
25 puts down only their driver's license number on their

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX H

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


LA UNIÓN DEL PUEBLO ENTERO,  *
et al.,                      *
        Plaintiffs,          *
                             *
v.                           *  Civil Action No.
                             *  5:21-cv-844 (XR)
STATE OF TEXAS, et al.,      *
        Defendants.          *



*******************************************************

ORAL AND VIDEOTAPED 30(b)(6) DEPOSITION OF
THE DALLAS COUNTY ELECTIONS ADMINISTRATOR
THROUGH ITS DESIGNATED REPRESENTATIVE,
MICHAEL SCARPELLO
APRIL 13, 2023

*******************************************************



DEPOSITION of MICHAEL SCARPELLO,

produced as a witness at the instance of the

Plaintiffs, and duly sworn, was taken in the

above-styled and numbered cause on the 13th day of

April, 2023, from 10:20 a.m. to 2:25 p.m., before

Christy R. Sievert, CSR, RPR, in and for the State

of Texas, reported by machine shorthand, at the

offices of the Dallas County Records Building, 500

Elm Street, Dallas, Texas, pursuant to the Federal

Rules of Civil Procedure and the provisions stated

on the record or attached hereto.

50

1  a training?
2      A.  I assume they do because they have to
3  present a certificate that says they have attended
4  that training.  And I believe there is also a local
5  training by the local parties.
6      Q.  The poll watcher training comes from the
7  Secretary of State; is that right?
8      A.  That's correct.
9      Q.  Do you know whether the poll watcher has to
10  take a test at the end of the Secretary of State
11  training?
12      A.  I believe there is a quiz.  I've never
13  taken the training, so I don't know.
14      Q.  For the 2022 general election, did any
15  reports by poll watchers provide information you
16  needed to conclude that there was voter fraud
17  occurring in any polling place?
18      A.  No.
19      Q.  In your view, did the new liberties
20  provided poll watchers in the polling place make
21  voting more difficult for voters?
22          MS. HUNKER:  Objection; form.
23      A.  I don't -- I can't say.
24          MS. PERALES:  One of my office people
25  got very excited and stapled all the copies of this

51

1  exhibit together.  So I have to remove the staple.
2          We are going to mark this Exhibit 3.
3          (Exhibit No. 3 marked.)
4  BY MS. PERALES:
5      Q.  I'm handing you what has been marked
6  Deposition Exhibit 3.  If you will, look with me in
7  the top left-hand corner, will you observe with me
8  that this form was promulgated in January of 2022?
9      A.  Yes.
10          MS. PERALES:  I am going to hand you
11  what has been marked Deposition Exhibit No. 4.
12          (Exhibit No. 4 marked.)
13  BY MS. PERALES:
14      Q.  If you notice in the top left-hand corner,
15  this form was promulgated in July of 2022.  Do you
16  see that?
17      A.  Yes.
18      Q.  Do you recognize Exhibit 3 as the oath of
19  assistance form prescribed by the Texas Secretary of
20  State beginning in January of 2022 and until July of
21  2022?
22      A.  Yes.
23      Q.  And do you recognize Exhibit 4 as the oath
24  of assistance form prescribed by the Texas Secretary
25  of State beginning in July of 2022?

52

1      A.  Yes.
2      Q.  Were you aware that there had been a court
3  ruling invalidating, in part, the SB1 provisions on
4  limiting voter assistance?
5      A.  I'm vaguely familiar with it, yes.
6      Q.  Would you agree with me that under the new
7  oath of assistance, which is Exhibit 4, that the
8  oath of the person assisting the voter is still made
9  under penalty of perjury where it says at the
10  beginning, "I swear or affirm under penalty of
11  perjury"?
12      A.  Yes.
13      Q.  Okay.  Would you agree with me that in the
14  new form, the assister still says, still on the
15  first line, "The voter I am assisting represented to
16  me that they are eligible to receive assistance"?
17      A.  I'm sorry, can you repeat the question?
18      Q.  Yes.  On Exhibit 4, would you agree with me
19  that the oath of assistance contains the language,
20  "The voter I am assisting represented to me that
21  they are eligible to receive assistance"?
22      A.  Which line are you on?  I'm sorry.
23      Q.  Right under the big words "Oath of
24  Assistance."
25      A.  Okay.  Yes.

53

1      Q.  And it starts with, "Oath of person
2  assisting voter. . ."
3      A.  Yes.
4      Q.  After "Penalty of perjury" --
5      A.  Uh-huh.
6      Q.  -- does it say, "the voter I am assisting
7  represented to me that they are eligible to receive
8  assistance"?
9      A.  Yes.
10      Q.  Do you notice on the second line there is
11  still language, "I did not pressure or coerce the
12  voter into choosing me to provide assistance"?
13      A.  Yes.
14      Q.  And then finally, before the Spanish part,
15  does the assister have to swear, "I understand that
16  if assistance is provided to a voter who is not
17  eligible for assistance, the voter's ballot may not
18  be counted"?
19          That's the third line from the top over on
20  the far right.
21      A.  Yes.
22      Q.  Were there polling places in the 2022
23  general election in Dallas County where you did not
24  have a Spanish speaking poll worker?
25      A.  In 2022?

54

1    Q.  In 2022 general election.
2    A.  I believe we had a Spanish speaker in every
3    polling place.
4    Q.  Okay.  Were there some polling places in
5    the 2022 general election where you did not have a
6    Vietnamese speaker?
7    A.  Yes.
8    Q.  In those instances, how did you -- what
9    service did you provide for a Vietnamese speaking
10   voter?
11   A.  So we became -- a new requirement in
12   December of last year for our Vietnamese, and we
13   began our recruitment and focused those that we did
14   recruit in highly -- where there was a lot of
15   Vietnamese speakers.  The Vietnamese speakers tend
16   to want to go to just a handful of locations.  And
17   at those locations, I think we had -- there was as
18   many as five interpreters at one location in
19   particular.
20        But in addition to that, to have broad
21   coverage, we found an application on the -- the
22   phones that I mentioned that the judge has, on this
23   application, you can press the button to get to the
24   service where you get a live operator who speaks --
25   I think it provides up to 40 different languages.

55

1    And that -- one of those being Vietnamese.  So we
2    did have broad coverage at all of our locations
3    since we weren't able to recruit in such a short
4    period of time Vietnamese speakers everywhere.
5    Q.  Did you keep any records about how many of
6    your poll workers used the app for Vietnamese?
7    A.  There are records, but I don't recall -- I
8    don't know the numbers.
9    Q.  Last year when I was taking this
10   deposition, I believe it was Ms. Phillips said that
11   when you call the elections administrator office,
12   you can select in the menu to speak to someone in
13   Spanish.  And I was wondering if you had anything
14   similar in your phone menu at the office for someone
15   who wants to speak to a worker in Vietnamese?
16   A.  Yes.
17   Q.  As part of your phone menu now?
18   A.  Yes.
19   Q.  Do you have a Vietnamese speaker in your
20   office, then, who takes those calls?
21   A.  Yes, we do.
22   Q.  It is correct that you provide applications
23   for ballot by mail and mail ballot materials in
24   Spanish, yes?
25   A.  Yes.

56

1    Q.  Do you provide an application for ballot by
2    mail in Vietnamese?
3    A.  Yes.
4    Q.  Do you provide mail ballot materials in
5    Vietnamese?
6    A.  Yes.
7    Q.  How would someone request an application
8    for ballot by mail be sent to them in Vietnamese?
9    A.  They can call, e-mail, fax, come in person,
10   write a personal -- a letter, snail mail.
11   Q.  Which would arrive in Vietnamese and I
12   guess promptly be delivered to your Vietnamese
13   speaker?
14   A.  Correct.
15   Q.  Okay.  Did you experience any problems of
16   voter fraud associated with individuals providing
17   assistance to voters in the polling place in the
18   2022 general election?
19   A.  No.
20        MS. HUNKER:  Objection; form.
21        MS. PERALES:  Did you catch that
22   answer from the witness?
23        THE STENOGRAPHER:  Yes.
24   BY MS. PERALES:
25   Q.  Do you know whether your office made any

57

1    changes in its training materials for poll workers
2    given the change in the oath of assistance form from
3    the primary to the general election?
4    A.  I don't recall.
5    Q.  And just to -- just to be clearer about
6    that, you will notice, if you look at Exhibit 3,
7    which is the old form, that on the second line of
8    the oath on the old form, the second line down, it
9    says, "I will confine my assistance to reading the
10   ballot to the voter, directing the voter to read the
11   ballot, marking the voter's ballot, or directing the
12   voter to mark the ballot."
13        Do you see that language?
14   A.  Yes.
15   Q.  That's the language that you will not find
16   in Exhibit 4?
17   A.  Right.
18   Q.  So did you have any communications with
19   your poll workers to tell them or inform them, look,
20   the assister used to have to swear to confine their
21   assistance, but now they don't have to swear to
22   confine their assistance that way?
23   A.  I don't recall, but I assume, you know,
24   there's always a -- the trainers always try to point
25   out different -- new laws, and so my assumption is

122

1  was unable to do so because of SB1?
2     A.  Yes.
3     Q.  And which incident was that?
4     A.  I believe there's -- the way you phrased
5  it, that there's a lot of poll watchers who wanted
6  to remove people but weren't able to.  That doesn't
7  necessarily mean that they were entitled to remove
8  them.
9     Q.  Okay.
10    A.  So I think that was quite -- quite
11 frequent.
12    Q.  Okay.  That's a good distinction to make.
13          MR. STOOL:  I'm sorry, can I request
14 one clarification?  I think he said poll watchers
15 wanted to remove people.
16          MS. HUNKER:  I think he did.
17    A.  Poll worker.
18 BY MS. HUNKER:
19    Q.  I think you meant poll worker?
20    A.  Poll worker.
21    Q.  You had discussed earlier that the
22 Secretary of State's office provides training to
23 poll watchers.  Correct?
24    A.  Yes.
25    Q.  Have you had the opportunity to review the

123

1  materials for that training?
2     A.  I browsed through them.  I did not take the
3  class.
4     Q.  That was going to be my next question.
5          And do you have an opinion on the quality
6  of the training materials in the course?
7     A.  No.
8     Q.  In your experience, did the poll watchers
9  who undergo the training have a better sense of
10 their responsibilities and limitations than poll
11 watchers who did not attend the training in
12 elections prior?
13    A.  I don't know.
14    Q.  We can put SB1 aside for now.
15          You're aware on occasion voters will ask
16 assistance to vote, correct?
17    A.  Yes.
18    Q.  And you're also aware that when a voter
19 requests assistance to vote, a voter can be provided
20 assistance by the election workers at the polling
21 location, correct?
22    A.  Yes.
23    Q.  You're unaware of any incidents in the
24 November 2022 general election where an election
25 worker refused to assist a voter after the voter

124

1  requested assistance; is that right?
2     A.  Not that I'm aware.
3     Q.  Voters can also request assistance from a
4  third party, a person of their choice, correct?
5     A.  Correct.
6     Q.  You're not aware of any voter who was
7  unable to obtain assistance from the person of their
8  choice, correct?
9     A.  Correct.
10    Q.  You're not aware of any incident in the
11 November 2022 general election where a third party
12 refused to assist a voter after the voter requested
13 their assistance?
14    A.  No, I'm not.
15    Q.  Are you aware of any instance where a voter
16 was unable to receive voting assistance?
17    A.  No.
18    Q.  Are you aware of any individual who refused
19 to transport seven or more individuals to a polling
20 location for curbside because of a requirement that
21 they fill out the forms stipulated?
22    A.  I'm not aware.
23    Q.  And you're not aware of any voter who was
24 unable to find transportation to the polls because
25 of the requirement that a person who transports

125

1  seven or more people to a polling place via curbside
2  fill out the forms stipulated?
3     A.  I'm not aware.
4     Q.  Would you agree that Harris -- I'm sorry --
5  would you agree that Dallas County works to ensure
6  that its voting program is accessible to voters with
7  disabilities?
8     A.  Yes.
9     Q.  Would you agree with me that Dallas County
10 takes its responsibilities under the ADA seriously?
11    A.  Yes.
12    Q.  And you are aware that voters with
13 disabilities have the option of requesting
14 accomodation or change to the normal voting
15 procedures?
16    A.  Yes.
17    Q.  To your knowledge, did your office receive
18 any requests for accomodation regarding any of the
19 provisions in SB1?
20    A.  Can you elaborate?
21    Q.  Sure.  To your knowledge, did your office
22 receive any requests for accomodation regarding the
23 requirement that mail-in voters put their Social
24 Security number or ID number on their application
25 for ballot by mail?

126

1   A.   No.
2   Q.   To your knowledge, did your office receive
3   any requests for accommodation regarding the
4   requirement that mail-in voters put their Social
5   Security or ID number on their ballot by mail?
6   A.   No.
7   Q.   To your knowledge, did your office receive
8   any requests for accomodation regarding the
9   vote-by-mail cure process?
10   A.   I'm not aware.  I think those last series
11   of questions are best asked of other people.
12   Q.   And would that be Ms. Phillips?
13   A.   Ms. Phillips, as well as ballot board
14   members, early voting ballot board.
15   Q.   To your knowledge, did your office receive
16   any requests for accommodation regarding the oath
17   that assisters must provide when providing
18   assistance?
19   A.   No.
20   Q.   Do voters have the option of filling out
21   something like a disability complaint form in
22   connection with an election?
23   A.   There are complaint forms at every location
24   for -- that voters can fill out for any reason.
25   Q.   To your knowledge, did any of the

127

1   complaints address the requirements implemented
2   through SB1?  We'll start specifically with the
3   requirement that mail-in voters put their ID number
4   or Social Security number on either their
5   application or ballot by mail or their ballot?
6   A.   A complaint form would typically be filled
7   out at a polling place as opposed to vote by mail
8   might be submitted some other way, by e-mail, et
9   cetera, phone call.  And so there's most likely some
10   complaints about that.
11   Q.   To your knowledge, did any of the
12   complaints that you received address any of the
13   voting assistance provisions in SB1?
14   A.   No.
15   Q.   And is the person to ask about the
16   complaints regarding mail-in voting, to the extent
17   they exist, would that be Ms. Phillips as well?
18   A.   Ms. Phillips would be the best person, yes.
19   Q.   Do you recall talking with counsel about
20   advocacy groups who contact with you about concerns
21   over Senate Bill 1's impact on voters with
22   disability?
23   A.   Yes.
24   Q.   Which groups were these, if you recall?
25   A.   There's an organization called "Dallas

128

1   Votes," "March to the Polls."  And those are kind of
2   umbrella organizations, that -- there's multiple
3   organizations that participate, as well as League of
4   Women Voters, et cetera.
5   Q.   And what were the specific concerns they
6   raised?
7   A.   Well, some of the concerns were expressed
8   during the negotiations to get to SB1 prior to its
9   final passage, and then less so after -- afterwards
10   Q.   And so when you were mentioning the
11   advocacy groups in your discussion with counsel,
12   were you referring to concerns that were raised
13   prior to the SB1's passage?
14   A.   Both prior to and afterwards.
15   Q.   And what were the concerns that were raised
16   after SB1's passage?
17   A.   Through several of the challenged
18   provisions.
19   Q.   Has any voter with a disability contacted
20   you, that SB1 made it more difficult to vote?
21   A.   No.
22   Q.   And has any poll worker contacted you, that
23   SB1 made it more difficult to voters with
24   disabilities to vote?
25   A.   No.

129

1   Q.   So the next set of questions I want to ask
2   you are somewhat in response to counsel's discussion
3   on mail-in voting.  I understand that this is also
4   covered by Ms. Phillips.  So at any point, if you
5   think my question is more appropriate for her,
6   please let me know.
7   A.   Okay.
8   Q.   When a carrier envelope arrives, does your
9   office open the flap to determine whether or not an
10   ID number was included?
11   A.   Yes.
12   Q.   And does your office attempt to match that
13   number with a voter registration record at that
14   time?
15   A.   I believe so.
16   Q.   And do you know how your office contacts
17   the voter at that moment if they realize it's either
18   a missing ID number or a mismatch?
19   A.   Ms. Phillips can answer these questions
20   better.
21   Q.   Do voters still fail to provide a
22   signature?
23   A.   Yes.
24   Q.   Do you recall discussing with counsel
25   turnout from mail voters in 2022?

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX I

Transcript of the Testimony of

# Michael Scarpello

## Date:

May 04, 2022

## Case:

LA UNION DEL PUEBLO ENTERO et al. vs GREGORY W. ABBOTT

Michael Scarpello

May 04, 2022
Pages 74 to 77

Page 74

1  an hour.
2      Q.  And so I take it that increasing the financial
3  incentives for county workers was an effort to get more
4  people to be willing to work at the polls?
5      A.  Correct.
6      Q.  Has it been successful?
7      A.  Yes.
8      Q.  How do you have the funding to increase
9  financial incentives for county workers to work at the
10  polls?
11      A.  We go to Commissioners Court and ask for that
12  funding.
13      Q.  It's a local funding, it's not --
14      A.  Yes.
15      Q.  -- from the Secretary of State?
16      A.  Correct.
17      Q.  All right.  I think we've been going longer
18  than I realized, and now might be a good time for a
19  break if you're amenable?
20      A.  Yes.
21          VIDEOGRAPHER:  We're off record at 11:52.
22          (Off the record.)
23          VIDEOGRAPHER:  We are back on record at
24  12:26.
25      Q.  (BY MR. THOMPSON)  Okay.  Mr. Scarpello, we

Page 75

1  just took a bit of a break for your counsel to confer
2  with the federal government.  While we're waiting on
3  that, we'll talk about some other stuff.
4          Are you familiar with the oath that
5  people providing -- that certain people providing
6  assistance to voters must take?
7      A.  Yes.
8      Q.  How did that oath work before SB 1?
9      A.  Well, there was an oath that was required to
10  be taken, and now there is a different oath that's
11  required to be taken, with different verbiage.
12      Q.  Who administers the oath?
13      A.  The -- the poll worker.
14      Q.  And do you know what set of people have to
15  take the oath?
16      A.  The person providing assistance.
17      Q.  And so correct me if I'm wrong.
18          My recollection is a voter can ask for
19  assistance at a polling place, right?
20      A.  Yes.
21      Q.  And that voter could receive assistance from
22  an election worker who works at the polling place,
23  right?
24      A.  Correct.
25      Q.  But the voter also has the option of seeking

Page 76

1  assistance from a third party, correct?
2      A.  Correct.
3      Q.  Now, if the voter opts to get assistance from
4  an election worker who's already working at the polling
5  place, that election worker doesn't have to take the
6  oath, correct?
7      A.  I believe they take an oath at the beginning
8  of the day.  They -- they don't have to take one for
9  every in -- individual, they take one for the day for --
10  for anyone that they -- that they help assist throughout
11  the day.
12      Q.  Okay.  And is it the same oath?
13      A.  Yes, I believe so.
14      Q.  Now, if the voter opts for assistance from a
15  third party, that third party then takes the oath
16  immediately before assisting the voter, correct?
17      A.  Correct.
18      Q.  Are you aware of any instance in which someone
19  was at a polling place intending to provide assistance,
20  but refused to take the oath?
21      A.  I'm not aware.
22      Q.  Are you aware of any instance in which someone
23  was at a polling place intending to take -- to provide
24  assistance, but objected to the content of the oath?
25      A.  I'm not aware.

Page 77

1      Q.  Are you aware of any voter who has not been
2  able to vote, because he could not find an assistant to
3  help?
4      A.  Not that I'm aware of.
5      Q.  Are you aware of any voter who has ever not
6  been able to vote because, even though he had an
7  assistant, the assistant did not provide sufficient
8  assistance to allow the voter to vote?
9      A.  I'm not aware.
10      Q.  Are you aware that the Election Code prohibits
11  counting a ballot if the voter was not eligible for
12  assistance, but received assistance?
13      A.  I believe under SB 1 that's the -- the current
14  law.
15      Q.  Are you aware of any ballots that have not
16  been counted because of unauthorized assistance?
17      A.  No.
18      Q.  Are you aware of anyone ever requesting an
19  accommodation related to the oath?
20      A.  I'm not sure what you mean by that.
21      Q.  Sure.  Have you heard of the Americans with
22  Disabilities Act?
23      A.  Yes.
24      Q.  Do people sometimes ask the Dallas County
25  Elections Department for an accommodation based on a

Michael Scarpello

May 04, 2022
Pages 78 to 81

Page 78

1  disability?
2      A.  Sometimes a -- a poll -- a poll watch -- a ju
3  -- election judge will push a person to the front of a
4  line at a polling place, based off of their disability:
5  age, et cetera, and that, as prescribed by Texas state
6  law, gives that judge that authority to do so.
7      Q.  Can you think of any other instances in which
8  a voter has requested an accommodation based on
9  disability?
10     A.  I -- not that I'm aware.
11     Q.  Are you aware of any instances in which the
12  Dallas County Elections Department has denied a request
13  for an accommodation related to voting?
14     A.  Not that I'm aware.
15     Q.  Do you know whether SB 1 says anything about
16  election workers granting accommodation requests based
17  on disability?
18     A.  Not that I'm aware.
19         MR. THOMPSON:  Oh, and Counsel, if you
20  receive a phone call or anything, just interrupt me and
21  let me know.
22         MR. STOOL:  Okay.  I'm hoping, yeah.  I
23  will do so, thank you.
24         MR. THOMPSON:  Just mark this as Exhibit
25  9.

Page 79

1         (Defendant's Exhibit No. 9 was marked for
2  identification.)
3         MS. PERALES:  Was there an 8?
4         MR. THOMPSON:  I thought there was.
5         MS. PERALES:  It may have just --
6         MR. SCHUETTE:  Yeah, he --
7         MS. PERALES:  -- been that I didn't have
8  a copy.
9         MR. SCHUETTE:  8 was --
10        MR. THOMPSON:  You are welcome --
11        MS. PERALES:  Okay.  Thank you.
12        MR. THOMPSON:  -- to have a copy if you
13  didn't --
14        MS. PERALES:  No, I have 8.  I have 8, I
15  just put it in the wrong place.  I'm sorry.
16        MR. THOMPSON:  Oh, okay.
17        MS. PERALES:  That was my fault.
18        MR. THOMPSON:  Not a problem at all.
19        And --
20        THE WITNESS:  Oh, yes.
21        MR. THOMPSON:  -- for -- for anyone who
22  is curious, I will represent that Exhibit 9 is a copy of
23  SB 1.
24     Q.  (BY MR. THOMPSON)  Mr. Scarpello, have you
25  seen SB 1 before?

Page 80

1      A.  Yes.
2      Q.  Does this appear to be a copy of the Act?
3      A.  Yes.
4      Q.  Would you please flip to Page No. 4?
5      A.  Okay.
6      Q.  Now, I don't know if you know how these Acts
7  are organized, you probably do, but there's --
8      A.  Yes.
9      Q.  -- a section of SB 1, Section 1.08, which adds
10  section 1.022 of the Election Code, do you see that?
11     A.  Yes.
12     Q.  Okay.  I'm just going to read it, and I'll ask
13  you to confirm that I've read it correctly.
14        "Section 1.022, Reasonable Accommodation
15  or Modification.  A provision of this code may not be
16  interpreted to prohibit or limit the right of a
17  qualified individual with a disability from requesting a
18  reasonable  accommodation or modification to any
19  election standard,  practice, or procedure mandated by
20  law or rule that the individual is entitled to request
21  under federal or state law", and the quote ended on
22  Page 5, do you see that?
23     A.  Yes.
24     Q.  Were you familiar with that provision before I
25  read it?

Page 81

1      A.  Yeah.  And you've -- you've refreshed my
2  memory on this.
3      Q.  Okay.  So what is your understanding of how
4  SB 1 affects your ability to grant accommodations
5  requested on the basis of disability?
6      A.  I don't believe we got an interpretation on
7  this section from the Secretary of State.  In -- in
8  other words, it -- it seems fairly vague to me, and I
9  don't know quite how to interpret it.
10     Q.  Sure.  And I'm not trying to put you in a box
11  or anything, but can you tell me --
12     A.  Uh-huh.
13     Q.  -- what about it is vague, or what part you're
14  unsure about?
15     A.  I don't know what a reasonable -- I don't know
16  an  example of a reasonable accommodation, what it
17  might, what it might need -- mean, under this particular
18  section.
19     Q.  You mean that it's not obvious what sorts of
20  accommodations would be reasonable, and what sorts
21  wouldn't be reasonable, is that what you mean?
22     A.  Yes.  And -- and -- and examples of -- of --
23  of a circ -- a hypothetical that would -- would kind of
24  lay out what would be reasonable, what would not be
25  reasonable, et cetera.

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX K

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


LA UNIÓN DEL PUEBLO ENTERO,   *
et al.,                       *
        Plaintiffs,           *
                              *
v.                            *   Civil Action No.
                              *   5:21-cv-844 (XR)
STATE OF TEXAS, et al.,       *
        Defendants.           *



*******************************************************

    ORAL AND VIDEOTAPED 30(b)(6) DEPOSITION OF
     THE DALLAS COUNTY ELECTIONS ADMINISTRATOR
      THROUGH ITS DESIGNATED REPRESENTATIVE,
                 TACOMA PHILLIPS
                 APRIL 13, 2023

*******************************************************



            DEPOSITION of TACOMA PHILLIPS,

produced as a witness at the instance of the

Plaintiffs, and duly sworn, was taken in the

above-styled and numbered cause on the 13th day of

April, 2023, from 3:20 p.m. to 6:28 p.m., before

Christy R. Sievert, CSR, RPR, in and for the State

of Texas, reported by machine shorthand, at the

offices of the Dallas County Records Building, 500

Elm Street, Dallas, Texas, pursuant to the Federal

Rules of Civil Procedure and the provisions stated

on the record or attached hereto.

Tacoma Phillips - 4/13/2023

94

1  they notice a defect, they will hand it to the early
2  voting ballot board?
3      A.  Correct.
4      Q.  And once a ballot has been accepted by the
5  signature verification committee, that decision
6  cannot be changed by the early voting ballot board;
7  is that correct?
8      A.  That is correct.
9      Q.  Let's move on to the early voting ballot
10 board.  How does the early voting ballot board, to
11 your knowledge, contact the voter?
12     A.  To my knowledge, they contact the voter by
13 mail, phone and e-mail also.  And I believe the
14 e-mail voters are the UOCAVA voters.
15     Q.  I was actually going to ask you that.  If
16 you contacted UOCAVA voters -- when I say "you," I
17 mean the early voting ballot board, contact UOCAVA
18 voters via e-mail?
19     A.  They contact them via e-mail, yes.
20     Q.  And does your office recommend to voters
21 that they put down their phone number or e-mail
22 address on their either application for ballot by
23 mail or carrier envelope?
24     A.  Yes.
25     Q.  In the event that the carrier envelope does

96

1  know, period?
2      A.  I do not want to speak on what the ballot
3  board -- the process of how long they take because I
4  honestly don't know.
5      Q.  Fair enough.
6          So UOCAVA voters, they can cure a missing
7  or mismatched ID number by resubmitting a signature
8  sheet; is that correct?
9      A.  That is correct.
10     Q.  And they can submit that signature sheet
11 via e-mail; is that correct?
12     A.  That is correct.
13     Q.  And so a UOCAVA voter can receive the
14 notice of defect by e-mail and cure by e-mail; is
15 that correct?
16     A.  Yes, that's correct.  Only UOCAVA voters,
17 unfortunately.
18     Q.  At any time, did your office deliver the
19 carrier envelope to the voter in person?
20     A.  What kind of carrier envelope?
21     Q.  So if a voter had a mismatched -- had a
22 defect on their carrier envelope, would -- was there
23 any situation where you would go to where the voter
24 was to have them cure the ballot?
25     A.  Not to my knowledge.  We have not sent --

95

1  not have a phone number or e-mail, does the early
2  voting ballot board look at the application for
3  ballot by mail to determine whether the phone number
4  or e-mail address would be found there?
5      A.  The ballot board does go -- look at the
6  voter registration system to see if they have it on
7  their voter registration application, to contact the
8  voter, yes.
9      Q.  And can a voter's registration file have a
10 phone number or e-mail address even if for that
11 election the voter did not include their phone or
12 phone number on the application for ballot by mail?
13     A.  Say that again.
14     Q.  Sure.  Let's say the voter did not include
15 their phone number or e-mail address on the
16 application for ballot by mail or the carrier
17 envelope.  Can the early voting ballot board access
18 the voter's registration file and see if the number
19 was provided at a different time?
20     A.  Yes.
21     Q.  Do you know how fast the early voting
22 ballot board sends notice of defects from the time
23 they receive the ballots?
24     A.  I do not know.
25     Q.  Do you have an estimate or you just don't

97

1  hand delivered a carrier envelope to the voter, no.
2  A defective carrier envelope to the voter, no.
3      Q.  Did you receive any request for
4  accommodation from a voter with a disability that
5  you bring the carrier envelope to where the voter is
6  that they can cure?
7      A.  Not to my knowledge.  All that information
8  would go through the ballot board.
9      Q.  And so that would be information the ballot
10 board would have, not you?
11     A.  The ballot board would have.  Because the
12 ballot board is the one who is -- who is rejecting
13 the carrier envelope.  So all that information is
14 going through them.
15     Q.  Do you recall talking to counsel about
16 voters who put their VuID down as opposed to putting
17 down their driver's license or Social Security
18 number?
19     A.  Yes.
20     Q.  Did you observe that voters put their --
21 actually put their VuID in less frequently during
22 the November 2022 general election as compared to
23 the primary or May local election?
24     A.  It was about the same.
25     Q.  So I want to talk to you a little bit about

110

1    A.  Do we calculate rejection rates?  No, we do
2  not calculate rejection rates.  Do we have where we
3  can calculate the rejection rates?  Yes, we do.  Is
4  it broken down more the rejection rates?  Yes,
5  because it's added more rejection rates into the
6  system.  So, yes, we do have more now.  If that's
7  what you're asking.
8  BY MS. HUNKER:
9    Q.  Okay.  I think I was probably asking
10  something slightly different.
11    A.  Okay.
12    Q.  But let me see if I can think of how to
13  rephrase the question.
14    A.  Okay.
15    Q.  How about this.  In 2018 or 2020, would you
16  be able to determine what the reason for the
17  rejection was?
18    A.  Yes.
19    Q.  Okay.  What additional information do you
20  collect now as compared to the previous elections?
21    A.  Well, if -- the additional information we
22  have now will be the added Texas driver's license
23  and Social Security now, rejection rates.
24    Q.  Okay.  Has your office conducted any type
25  of analysis on whether rejection rates for reasons

111

1  other than the ID requirement have gone up in 2022
2  compared to 2020 or 2018?
3    A.  No.
4    Q.  So I have a few questions for you that
5  Mr. Scarpello indicated you would have better
6  awareness of.
7    A.  Okay.
8    Q.  To your knowledge, did your office receive
9  any requests for accommodation regarding the
10  requirement that mail-in voters put their Social
11  Security or ID number on their application for
12  ballot by mail?
13    A.  Okay.  Ask that again.
14    Q.  Sure.  To your knowledge, did your office
15  receive any requests for accommodation regarding the
16  requirement that mail-in voters put their Social
17  Security or ID number on their application for
18  ballot by mail?
19    A.  Accommodations?  What kind of
20  accommodations?
21    Q.  Accommodation -- well, let me start with a
22  different question, then.
23    Are you aware that voters with
24  disabilities have the option of requesting
25  accommodation or change the normal voting procedure?

112

1    A.  No.
2    Q.  Are you aware if your office received any
3  requests for accomodation from a voter with
4  disability to amend or somehow change the
5  requirement that mail-in voters put their Social
6  Security number or ID number on their application
7  for ballot by mail?
8    A.  No.
9    Q.  To your knowledge, did your office receive
10  any requests for accommodation with a voter with
11  disability to change or amend the normal procedures
12  regarding the requirement that mail-in voters put
13  their Social Security number or ID number on their
14  ballot by mail?
15    A.  No.
16    Q.  To your knowledge, did your office receive
17  any requests for accommodation from a voter with
18  disability asking for a change or amendment to the
19  procedures relating to the cure process for
20  application for ballot by mail?
21    A.  No, not to my knowledge.
22    Q.  To your knowledge -- actually, strike that
23  question.
24    Do you recall talking to counsel about
25  some of the staff burden related to processing

113

1  mail-in ballots or application for ballot by mail?
2    A.  Yes.
3    Q.  Was the staff burden higher in May 2022 as
4  compared to May 2023, this current election year?
5    A.  No.
6    Q.  Was it about the same?
7    A.  Yes, it was about the same.  Just no --
8  just no higher, lower.  It's still the same process.
9  We process everything the same.  If we get an -- if
10  we get a thousand applications or a hundred
11  applications, all of them are still processed the
12  same.
13    Q.  And do you know how much of that burden is
14  related to the tracking, the ballot tracking as
15  compared to the other parts of the mail balloting
16  process?
17    A.  What do you mean by "ballot tracking"?
18    Q.  So data entry.
19    A.  Data -- data entry on the. . .
20    Q.  The ballot -- either the application for
21  ballot by mail or the carrier envelopes.
22    A.  Okay.  I'm still not understanding.
23    Q.  Sure.  I guess I'm trying to get a sense of
24  what that staff is doing.  And so I'm curious if any
25  of that staff that you were talking about, the

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX L

Transcript of the Testimony of

# Douglas Kruse

**Date:**

May 03, 2022

**Case:**

LA UNIoN DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Douglas Kruse                                                    May 03, 2022
                                                        Pages 114 to 117

Page 114

1  three percentage points.
2      Q.  And so that's a measurement that Texas does better
3  than the national average.  Is that correct?
4      A.  Yes.  And I'm not sure if it's a statistically
5  significant difference.  I'd have to do that test.  I haven't
6  done that specific test but at least according to this
7  estimate, our best guess is that Texas is doing better than the
8  rest of the country.
9      Q.  And have you analyzed why Texas is doing better than
10 the rest of the country with respect to the voter registration
11 rate?
12     A.  No, I haven't analyzed that.  As I say, it could be
13 a -- it could be within the margin of error, and I suspect
14 there's a good chance it is.
15     Q.  And so you see a sizable gap between the eligible
16 citizens who are registered to vote versus the number who
17 actually voted.  Is that correct?
18     A.  Yes.
19     Q.  In Texas?
20     A.  Yes, yes.
21     Q.  And so, what factors lead to the disparity between
22 people being able to register to vote with disabilities but
23 people not being able to vote itself?
24     A.  I think a big factor is that you may register only --
25 it's possible you may register only once in your life.  You

Page 115

1  could have registered decades ago, like when you first became
2  eligible to vote at age 18.  And if you have done that once,
3  you may not have had a disability at that point.  Decades
4  later, you have a disability and you're still registered, but
5  you may encounter a lot of barriers associated with voting as a
6  person with a disability at that point.
7      So I think age really plays into this.  The
8  registration you do only once or every time you move, which is
9  pretty infrequent for most people; whereas voting is something
10 you do, ideally, every election.  There's a lot more -- a lot
11 more effort and potential barriers encountered in voting every
12 election than there is with that one time of registering.
13     Q.  And so this number count, these numbers come before
14 the adoption of SB 1.  Correct?
15     A.  Correct.
16     Q.  And have you assessed what provisions of Texas law
17 before SB 1, impose obstacles to voting that were that would
18 account for the difference?
19     A.  I am sorry.  Say that again?  What provisions?
20     Q.  What provisions of Texas law before SB 1 would impose
21 obstacles to voting that would account for the difference?  I
22 was wondering if you had assessed that at all.
23     A.  I have not done specific analysis of Texas.  We have
24 looked at state policies in general.  Particularly in our
25 measure of American elections study, we looked at the -- how

Page 116

1  state policies on the excuse being required for an absentee
2  ballot affects a turnout relative to states where no excuse is
3  required, or everyone votes by mail.  And we found that there
4  was a -- there was an effect to the no excuse in the old vote
5  by mail systems, that disability turnout was relatively higher
6  in those states than in states like Texas where an excuse was
7  required.
8      Our interpretation of that is when an excuse is
9  required, people with disabilities have to mark on an official
10 form that they have a disability.  As we just discussed,
11 there's a stigma to saying you have a disability, and putting
12 you have a disability on official government form is something
13 that a lot of people don't want to do.  It appears to dissuade
14 people with disabilities from applying if they are forced to
15 say that they have a disability in applying for an absentee
16 ballot.  So that's what -- when we looked at the effects of
17 these policies overall in the -- in the country -- but the
18 specific answer your question, though, is no, we haven't
19 specifically analyzed Texas.
20     Q.  And so, you haven't analyzed Texas and the one
21 practice that you've identified, specifically, nationwide had
22 to do with excused versus non-excused mail-in voting.  Is that
23 right?
24     A.  Yes.  We actually also in that study looked at the
25 availability of assistive technology -- assistive accessible

Page 117

1  voting machines, and how that varies by state.  And we did not
2  find, interestingly, an effect of that on disability turnout
3  which we attribute to the fact that a lot of people with
4  disabilities weren't aware -- aren't aware that there are
5  accessible machines available.
6      And oftentimes, we have plenty of media reports of
7  the election officials not knowing how to set up the accessible
8  machines.  So there are several possible reasons why that did
9  not show up as a significant variable.  But that's -- those two
10 variables are the ones we looked at in terms of state
11 policies -- policies that differ by state.
12     Q.  And SB 1 does not affect excuse or not excuse mail-in
13 voting.  Is that correct?
14     A.  Correct.
15     Q.  It doesn't change the qualifications of who can vote
16 by mail.  Is that right?
17     A.  Correct.
18     Q.  And it doesn't change the availability of accessible
19 machines to individuals with disabilities.  Is that correct?
20     A.  Correct.
21     Q.  So, let's jump to paragraph 64.
22     A.  Okay.
23     Q.  It says, "The importance of variation across
24 different types of disability is shown in the voting figures.
25 Broken down by type of disability, national voter participation

Douglas Kruse

May 03, 2022
Pages 118 to 121

Page 118

1  in 2020 was lowest among people with difficulty dressing or
2  bathing, cognitive impairments, and difficulty going outside
3  alone, but participation was also low among those with visual
4  impairments or difficulty walking or climbing stairs." Did I
5  read that correctly?
6      A.  Yes.
7      Q.  And this goes back, I think, to what we were saying
8  before about the varied nature of disabilities.  Is that right?
9      A.  Right.
10      Q.  And so, have you -- in terms of accommodating these
11  different types of disabilities, would that be a fact specific
12  analysis?
13      A.  As we discussed, each person may be unique in the
14  particular configuration.  They have abilities and
15  circumstances, so that would make it fact specific.  But there
16  are a lot of commonalities.  We know, for example, that people
17  with visual impairments benefited greatly from -- well, first
18  of all, from large ballots -- having large, easy to read
19  ballots, or having magnifying glasses -- just a simple measure,
20  magnifying glasses, and from having accessible voting machines.
21  If they're totally blind, they need an accessible voting
22  machine with headphones and so forth, so they can -- they can
23  operate, so they can vote independently and confidentially.  So
24  my point is, that there are these commonalities that we know
25  there are certain practices that are relevant to people with a

Page 119

1  particular type of disability.
2      Q.  So is it fair to say then there are certain
3  commonalities, but to make the final determination of how to
4  provide a reasonable accommodation require fact specific
5  analysis?
6      A.  For a particular individual, a particular reasonable
7  accommodation, yes.  It has to be tailored to the person.
8      Q.  And let's look at paragraph number five.  You see --
9      A.  I'm sorry.  You mean 65?
10      Q.  Yeah, 65.
11      A.  65.  Okay.
12      Q.  You say, "Research indicates that several factors
13  contribute to the disability participation gap including lower
14  levels of education and income, lower feelings of political
15  efficacy among people with disabilities, and greater social
16  isolation that reduces the likelihood of being recruited to
17  vote by friends, neighbors, or colleagues."  Did I read that
18  correctly?
19      A.  Yes.
20      Q.  Then you continue, "These factors do not, however,
21  fully explain the disability gap in participation."  Did I read
22  that correctly?
23      A.  Yes.
24      Q.  Then it finally continues, "Part of the remaining gap
25  and participation can be traced to lower turnout due to prior

Page 120

1  difficulties voting."  Did I read that correctly?
2      A.  Yes.
3      Q.  Now, when you use this phrase at the end, "part of
4  the remaining gap in participation can be traced to lower
5  turnout due to prior difficulties in voting", so in this case,
6  you're talking about an individual who had tried to vote but
7  was unable?
8      A.  I need to be clear on this.  We have not been able to
9  track individuals from election to election.  We hope to be
10  doing that with the next election with our most recent EAC
11  survey.  However, we do find that people who have difficulties
12  in voting, that's a strong predictor of negative feelings of
13  external efficacy -- lower feelings of external efficacy and
14  external efficacy.  Local efficacy is the belief that the
15  system is responsive.  So people who face difficulties are less
16  likely to feel that the system is responsive to people like
17  them.
18          In turn, that feeling, that negative efficacy, is
19  related to lower turnout.  So just to be clear, we're not
20  tracking specific people here but we are tracking the
21  attitudes and how those are related to -- how the difficulty in
22  turnout predicts lower feelings of efficacy and lower feelings
23  of efficacy -- I'm sorry -- difficulties in voting predict
24  lower turnout -- difficulties in voting predict lower feelings
25  of efficacy, and lower feelings of efficacy predict lower

Page 121

1  turnout; if I said that correctly.  I hope I did.
2      Q.  I think you did.  I hope.
3      A.  Okay.
4      Q.  And so just to clarify, you gave a pretty long and
5  factual answer, that you do not trace voters from election to
6  election, but you hope to do so in the future.  Is that
7  correct?
8      A.  Yes.  We are greatly looking forward to doing that.
9  That will be a -- that will be a wonderful methodological
10  advance.
11      Q.  And so your opinions and observations that articulate
12  in report are not based on any study that tracked voters from
13  election to election.  Is that correct?
14      A.  That is correct.
15      Q.  Now, you often hear the phrase enthusiasm gap when it
16  comes to voting, and is this sort of what you're getting at in
17  this paragraph, that there's an enthusiasm gap for a variety of
18  different reasons among individuals with disabilities versus
19  those without?
20      A.  There have been several surveys looking at the
21  interest of people with disabilities in elections, and
22  interestingly, people with disabilities tend to express -- tend
23  to say they follow election news just as much as people without
24  disabilities and they would like to vote just as much as people
25  without disabilities; however, they end up not voting as much

Douglas Kruse                                                    May 03, 2022
                                                         Pages 162 to 165

Page 162

1    A.  Yes.
2    Q.  Okay.  So this provision simply states that the
3  application vote by mail should have a place to enter the
4  information required under section 84.  Correct?
5    A.  Right.
6    Q.  Is it your position that section 5.03 impedes voters
7  with disabilities, or that it is instead the requirement itself
8  that impedes voters with disability?  If you need me to make
9  the distinction clearer, let me know.
10   A.  Yeah.  Can you make that distinction clearer?
11   Q.  Yes.  So, section 5.03 simply says that there should
12 be a space provided for the number on the application.  It does
13 not actually require the information.  And so my question for
14 you is simply having the space for the identifying information,
15 would that be a barrier to voters with disabilities?
16   A.  You say it doesn't require the information, but it
17 says the space for entering the information required under
18 Section 84.002 1A, so it would seem to be a requirement.
19   Q.  Okay.  Is it your position --
20   A.  It's not an optional space.
21   Q.  So let's say the information was not required under
22 Section 84.002 1A of the Texas election code, would simply
23 having a space on the ballot -- or on the application impede
24 voters with disabilities?
25   A.  If it is not required to -- if it's totally optional

Page 163

1  to have that information, then that would not seem to be an
2  impediment.  No.
3    Q.  And so let's look at Section 5.06.  This starts on
4  page 38.  Let me know when you have it in front of you.
5    A.  Okay.  I've got it.
6    Q.  Okay.  And it says, "Ballots Sent to Applicants."
7  Correct?
8    A.  Yes.
9    Q.  Okay.  I'm going to read it out loud.  "An election
10 judge may permit a person to whom an early voting ballot has
11 been sent who cancels the person's application for a ballot to
12 be voted by mail in accordance with Section 84.032 but fails to
13 return the ballot to be voted by mail to the early voting
14 clerk, deputy early voting clerk, or presiding judge as
15 provided by that section to vote only a provisional ballot
16 under Section 63.01."  Did I read that correctly?
17   A.  Right.  63.011.  Right.
18   Q.  And can you please tell me how this particular
19 section impedes voters with different disabilities?
20   A.  This particular provision that you just read, would
21 seem to be a pretty rare circumstance that someone who gets an
22 early voting ballot but then says, "Nope, I'm not going to vote
23 by early voting ballot."  If they don't send it back, then they
24 can vote on the provisional ballot.  That would seem to be a
25 very rare circumstance.  I don't think -- I don't have any

Page 164

1  knowledge of whether people with disabilities are more or less
2  likely to cancel an application after they've -- after they've
3  received an early voting ballot.  So no, I don't know that
4  that -- I don't have any knowledge about how that would -- how
5  that would play out.
6    Q.  Okay.  So you don't have any information that you
7  articulate in your report that would suggest that section 5.06
8  impedes voters with disabilities in voting.  Is that correct?
9    A.  No, that is not correct.
10   Q.  Please clarify.  I misheard?
11   A.  The -- oh, I'm sorry.  Yeah, 5.06 by itself, I don't
12 have -- I think -- I don't have any particular information
13 about how that would pose a problem.  I think in conjunction
14 with the other restrictions on voting by mail, that those
15 combined can create some barriers to people with disabilities.
16 But taking that one in isolation, I can't say definitively that
17 that will establish a significant barrier.
18   Q.  Okay.  So you said a lot right there and I want to
19 see if I can hone it down at its core.  You don't allege in
20 your report or have information in your report that section
21 5.06 taken as an individual provision impedes voters with
22 disabilities in their ability to vote.  Is that correct?
23   A.  I don't have knowledge that people with disabilities
24 are more likely to cancel an application once they make it.  As
25 I said, it seems to me like this would be pretty, pretty

Page 165

1  for any voter to request one, receive one, and then say, "Oops,
2  I changed my mind.  I'm going to go vote in-person."  That
3  would seem like a pretty, pretty unlikely situation.
4    Q.  Okay.  So you don't have any evidence that this would
5  impede voting disabilities?
6    A.  No, I don't have any evidence on this one.  No.
7    Q.  And are you aware of -- you're not aware of how
8  frequently this situation occurs.  Correct?
9    A.  Correct.
10   Q.  And you're not aware of if election judges, prior to
11 SB 1, were uncertain if they could allow voters who failed to
12 return their mail in ballot to vote at all.  Is that correct?
13   A.  Right.  Yes.
14   Q.  And so, you don't know if this was to address a
15 problem of election judges turning away voters because they
16 canceled their mail-in ballot application but failed to return
17 their mail-in ballot.  Is that correct?
18   A.  That's correct.
19   Q.  Let's look at section 5.07.  Do you have it in front
20 of you?  It's on the same page and then goes into the next one,
21 as well.
22   A.  Yes, I do.
23   Q.  Can you please articulate to me how this particular
24 provision impedes voters with disabilities and their ability to
25 vote?

Douglas Kruse

May 03, 2022
Pages 182 to 185

Page 182

1  ballot to vote by mail.  I was wondering if that was the same
2  here where section 5.12, the injury stems from its interactions
3  with the other provisions, as opposed to section 5.12 on its
4  own?
5      A.  Yes, I think that's right.  It's a problem that the
6  rejection rate is going to be higher as a result of SB 1, and
7  the options for remedying those defects are inadequate for many
8  people with disabilities.
9      Q.  Okay.  And so it's the inadequacy of the cure process
10  as with respect to the requirements, and not the cure process
11  itself that you object to.  Is that correct?
12      MS. SWEREN-BECKER:  Objection to form.  Misstates
13  testimony.
14      A.  It's -- together these provisions are setting up new
15  barriers.  The options to correct, I say, are inadequate.  So
16  overall, taken together, these provisions are creating greater
17  barriers, greater costs, for people with disabilities and
18  exercising the right to vote.
19      MS. SWEREN-BECKER:  Kathleen, if and when you're
20  prepared to move past section five, I think we'd like to take a
21  break.  I don't know where you are.
22      MS. HUNKER:  Yeah, no, that's good.  I only have a
23  few questions with respect to this section and then we'll
24  probably wrap up by talking about section six and seven.
25      MS. SWEREN-BECKER:  Okay.

Page 183

1      Q.  (BY MS. HUNKER)  And so, it says "This section
2  applies to an early voting ballot voted by mail."  And then it
3  gives a couple of options:  (1) for which the voter did not
4  sign the carrier envelope certificate; (2) for which it cannot
5  immediately be determined whether the signature on the carrier
6  envelope certificate is that of the voter; (3) missing any
7  required statement of residence; (4) missing information or
8  containing incorrect information required under Section
9  84.002(a) (l-a) or; (5) containing incomplete information with
10  respect to a witness."  Do you see that?
11      A.  Yes.
12      Q.  And did I read that roughly correctly?
13      A.  Yes.
14      Q.  Okay.  And so you see how only number four pertains
15  to the numerical number requirements that we were discussing
16  earlier?  Would you agree with that?
17      A.  Right.  Sure.
18      Q.  And so, the other characterizations or defects are
19  not -- were not created by SB 1, or at least not the provisions
20  that you are here to discuss.  Is that correct?
21      A.  Well, they're underlined here.  They're being -- it
22  would appear that they're being added.  I don't see the -- what
23  was being subtracted here.
24      Q.  So this is actually a new section.  However, for
25  instance, that the voter is required to sign the carrier

Page 184

1  envelope is -- that requirement is in a different chapter of
2  the election code.
3      A.  Okay.  Well, this is creating a -- not just one new
4  requirement, it's creating five requirements.  So if a person's
5  signature was faulty -- as I read it, if a person's signature
6  is faulty, or they're missing their statement of residence, or
7  they're missing information required under section 8.402, or so
8  forth and so on.  So it seemed to be five requirements and any
9  one of them would cause the ballot to be rejected, if I'm
10  reading that correctly.
11      Q.  Okay.  So you're not aware that Texas required voters
12  to sign the carrier envelope certificate.  Is that correct?
13      MS. SWEREN-BECKER:  Objection to form.
14      A.  Yeah.  I'm not surprised that they would.  I
15  certainly signed mine in New Jersey and that would seem pretty
16  straightforward -- a straightforward thing to do.
17      Q.  (BY MS. HUNKER)  And so, you're not aware that prior
18  to SB 1, that it was required the signature match?
19      A.  No, I'm not aware of that.
20      Q.  Okay.
21      A.  It seems to be new requirements as written here.  I'm
22  just reading the legislation -- the plain language.
23      Q.  I can represent to you that these four were not new
24  requirements, but I don't think it's worth the time to go
25  through each chapter of the election code, so we can move on.

Page 185

1      A.  Okay.  All right.
2      MS. HUNKER:  I think we could take a break then.
3      MS. SWEREN-BECKER:  All right.  Let's go off the
4  record.
5      COURT REPORTER:  We are off the record at 4:56 p.m.
6      (Recess was taken.)
7      COURT REPORTER:  We are on the record at 5:20 p.m.
8      Q.  (BY MS. HUNKER)  Dr. Kruse, looking back at section
9  5.10, you did not talk to any Texas voters, or Texas voters
10  with disabilities about section 5.10.  Correct?
11      A.  That's correct.
12      Q.  And the same is true of section 5.12?
13      A.  That's correct.
14      Q.  And you didn't talk to any election departments of
15  the county about these provisions.  Is that correct?
16      A.  That's correct.
17      Q.  And you didn't talk to them about the implementation
18  of these provisions.  Is that correct?
19      A.  That's correct.
20      Q.  And you haven't talked to the Secretary of State's
21  office.  Is that correct?
22      A.  That's correct.
23      Q.  And you don't know of any specific person with a
24  disability who could not vote because of sections 5.02, 5.03,
25  5.06, 5.07, 5.10, 5.12.  Is that correct?

Douglas Kruse                                                      May 03, 2022
                                                            Pages 186 to 189

Page 186

1    A.  No, I'm relying on the large survey data.  I'm not
2  aware of any specific person.
3    Q.  Okay.  Let's look then at section 6.01.
4    A.  Okay.
5    Q.  And this is on page 50.  And then it says, "A person
6  who simultaneously assists seven or more voters, voting under
7  this section by providing the voters with transportation to the
8  polling place must complete and sign a form."  Did I read that
9  part correctly?
10    A.  Yes.
11    Q.  And so how does this impede a voter with disabilities
12  ability to vote?
13    A.  First of all, I think it's very -- we don't have
14  direct data on how people are transported to the polls.  I
15  think it's very likely that people with disabilities will be
16  disproportionately represented among groups of seven or more
17  being taken to the polls because people with disabilities are
18  more likely to live alone, they're more likely to face
19  transportation problems; so I think they're more likely to be
20  represented in that group.  The barrier that this creates is, I
21  believe, it would make drivers leery or nervous about voting --
22  about taking someone to the polling place.
23        Let me just give an example.  My mother lives in a
24  senior apartment complex in Omaha, Nebraska.  She has a -- they
25  have a bus driver who takes them to shop once a week.  If this

Page 187

1  bus driver -- and I don't know that he does this -- but if this
2  bus driver were to take someone to the polls under the -- under
3  SB 1, he might be nervous about signing a form like this,
4  because it would appear from my reading of it that if the
5  person does provide assistance to anyone, then that person
6  would be subject to the assisters oath, and there'd be a
7  question as to whether they would run afoul of the language
8  about providing only the assistance in reading or marking a
9  ballot.
10        Say that an assister -- I'm sorry -- say that a
11  driver takes people to a polling place and lets them off.  If
12  that driver just drives away, fine, but poor old, you know,
13  Miss Beasley is having a struggle getting into the polling
14  place, so the driver goes and helps her in.  Well, then he has
15  to take the oath, and it may be the type of assistance he gave
16  her in navigating the polling place violates what's allowed
17  under SB 1.
18        So, all of that is to say that I can see a driver who
19  understands this law to be concerned about what he's opening --
20  he or she is opening himself or herself up to.  So that's why I
21  think there could be some reluctance of drivers to do this.
22    Q.  So you don't have any direct data on how many voters
23  with disabilities -- what percentage of voters with
24  disabilities are provided -- are transported to the polls in
25  groups of seven or more.  Is that correct?

Page 188

1    A.  That's correct.  I don't have any data set that has
2  information on how people are transported to the polls in
3  general, whether it's seven or under.
4    Q.  Okay.  And so you don't know how frequently that
5  occurs in Texas.  Is that correct?
6    A.  That's correct.
7    Q.  And did your research actually study on whether
8  requiring drivers to fill out a form will reduce the number of
9  drivers available?
10    A.  No.
11    Q.  And so you don't assess that with using any metrics
12  in the report.  Is that correct?
13    A.  That's correct.  I cannot put a number to it because
14  there just isn't data on that.
15    Q.  Okay.  And so it's your hypothesis that voters will
16  be -- certain drivers will be leery of signing a registration
17  form.  Is that correct?
18    A.  It's my reasonable expectation based on the
19  transportation and social isolation barriers faced by people
20  with disabilities, that they would be more likely to be using
21  this -- using a transportation loaded with seven or more
22  people.
23    Q.  So my question was a little different.  My question
24  was talking about the driver.
25    A.  Oh, okay.  Right.

Page 189

1    Q.  And so you are -- I mean, I don't want to use the
2  word speculating but you're hypothesizing that your -- that
3  drivers would be less likely to drive a voter because of a
4  requirement that they sign their name?
5    A.  Yes.  I am putting myself in the place of a driver
6  and thinking about what kinds of worries I might have about
7  signing this form.
8    Q.  But you don't have any specific data backing that up.
9  Is that correct?
10    A.  That's correct.
11    Q.  And you also said that you thought a person might be
12  leery because it would require them to sign the oath.  Is that
13  correct?
14    A.  Yes.
15    Q.  And is it your understanding --
16    A.  But --
17    Q.  I'm sorry.  I didn't realize you were --
18    A.  But that -- if they -- from my reading of it, if they
19  simply took someone to the polling place and let them out the
20  door, go on with you, go have a good time voting, then they
21  wouldn't be liable; but so many people with disabilities,
22  elderly people, need help getting inside.  So once that starts
23  the -- I think they would be leery about being subjected to the
24  assisters oath, and the proper and improper forms of
25  assistance.

Page 190

1    Q.   And we discussed that before, that you interpreted
2    voting assistance as incorporating all elements of voting
3    assistance, including, like, helping the individual into the
4    location.  Correct?
5    A.   Yes.
6    Q.   And that was based off of your reading of the text?
7    A.   My reading of the text, yes.
8    Q.   It wasn't based on any other source but just the
9    text.  Is that right?
10   A.   Correct.
11   Q.   All right.  Let's -- and have you spoken to any
12   drivers in Texas who were dissuaded from transporting groups of
13   seven or more people with disabilities because of SB 1, the
14   revision in particular?
15   A.   No.
16   Q.   And have you spoken to any voters with disabilities
17   who are unable to find transportation to the polls because of
18   section 6.01?
19   A.   No.
20   Q.   Okay.  Let's turn to section 6.04.
21   A.   Okay.
22   Q.   This is the oath, which begins on page 52.  We had
23   already discussed a bit where you derived your interpretation
24   from, so I'm not going to belabor that again.  I just have a
25   couple of questions with respect to how you describe

Page 191

1    assistance.  So in paragraph 100 of your report -- do you have
2    that in front of you?
3    A.   I do.  Yes.
4    Q.   This is the second sentence, "Because the law does
5    not define everything that could constitute assistance, voters
6    with disabilities, as well as assisters, will be unsure of what
7    assistance is allowed and voters may be reluctant to make use
8    of assistance, even when it's available for fear of violating
9    the law."  Did I read that correctly?
10   A.   Yes.
11   Q.   "This does not allow the assister to explain the
12   voting process and choices."  Did I read that correctly?
13   A.   Yes.
14   Q.   Okay.  So when you said the voters may be reluctant,
15   you're not relying on any particular studies.  Is that correct?
16   A.   That's correct.
17   Q.   And you don't have any data that analyzes whether
18   voters would be reluctant to assist a voter because of the
19   oath.  Is that correct?
20   A.   That's correct.
21   Q.   And you haven't spoken to any individual who was
22   contemplating becoming an assister in Texas and decided not to
23   because of you.  Is that correct?
24   A.   That's correct.
25   Q.   And you haven't spoken to any voter in Texas who was

Page 192

1    unable to find assistance to vote because of the oath.  Is that
2    correct?
3    A.   That's correct.
4    Q.   Okay.  Now, you use the sentence, "This does not
5    allow the assister to explain the voting process and choices."
6    What do you mean by explaining the choices?
7    A.   That here's -- here's the people lined up in
8    different columns, here is candidate A, candidate B, candidate
9    C.  For someone who may have, in particular, a cognitive or
10   developmental disability, knowing how the rows and columns work
11   may be a little confusing.  So explaining what choices you
12   have, you know, you pick one person in row A, one person row B,
13   for example; or one person in column A, column C, depending on
14   how it's set up.  Yeah, I think -- that's what I'm talking
15   about.
16   Q.   Okay.  So you're talking about the mechanism of
17   voting as opposed to the substance of, let's say, the
18   proposition or the candidates that are being presented for the
19   voting.  Is that correct?
20   A.   Yes.  That sounds -- I'm just talking about the
21   explaining of the mechanisms.
22   Q.   Okay.  And so later on when you say, "In my expert
23   opinion, this is likely to interfere with people with
24   disabilities ability to vote, in particular for the 1,082,500
25   Texans with cognitive impairments who are eligible to vote and

Page 193

1    other people with developmental disabilities who benefit from
2    assistance in making informed choices in important areas of
3    life."  When you use the term "informed choices", are you
4    talking about the same -- is this basically a synonym of what
5    you were talking about before about explaining choices?
6    A.   No.  Here I'm talking about some of the substance
7    that people will want to know.  Here I'm thinking particularly
8    of ballot propositions.  What does this mean?  People may be
9    unclear about how something is worded, especially if it's not
10   worded in a very simple way.  And someone who knows the person
11   can easily say, "Oh, here's what that means.  Here's how to
12   understand it," and that can be a valuable form of assistance.
13          And as I said before in my testimony, that can
14   facilitate the exercise of autonomy.  It can help people
15   understand better what their choices are, so they make a better
16   informed choice.
17   Q.   Okay.  So in this case, you're actually talking about
18   explaining the substance of the provision itself -- of the
19   proposition itself?
20   A.   In this case, yes.
21   Q.   And have you given any thought of what safeguards
22   will be necessary to ensure that the person stopped at simply
23   explaining what the proposition is, as opposed to weighting one
24   way or the other how that person should vote?
25   A.   I think the main safeguard is that the person be a

Douglas Kruse

May 03, 2022
Pages 202 to 205

Page 202

1  the likelihood of people to assist, but it can only go in one
2  direction. It's hard to put a number to how far that will --
3  well, what the size of the magnitude of that effect will be.
4      Q.   Okay. And in your experience as an economist, have
5  you seen where compensation can change incentives?
6      A.   Sure.
7      Q.   And have you identified any individual who was unable
8  to provide -- unable to secure their assister of choice as a
9  result of section 6.03 or section 6.05?
10     A.   No, this is too new.
11     Q.   Okay and you haven't identified any assister that
12 would have provided assistance but for sections 6.03 and 6.05.
13 Is that correct?
14     A.   Right.
15     Q.   Let's move on to section 6.06. Let me know when
16 you've arrived.
17     A.   I'm there.
18     Q.   Okay. And so, this one says, "A person commits an
19 offense if the person compensates or offers to compensate
20 another person for assisting voters as provided by section
21 86.010." Is that correct?
22     A.   Yes.
23     Q.   Then it says, "Solicits, receives, or accepts
24 compensation for an activity described by subdivision one." Is
25 that correct?

Page 203

1      A.   Yes.
2      Q.   And then it offers the purpose of this section
3  compensation means an economic benefit as defined by section
4  38.01 of the penal code. Is that correct?
5      A.   Yes.
6      Q.   And then it says below, "This section does not apply
7  if the person assisting a voter is an attendant or caregiver
8  previously known to the voters." Is that correct?
9      A.   Yes.
10     Q.   Okay. And so this section does not apply to somebody
11 who gives consistent care to an individual with disabilities
12 and just happens as part of those responsibilities to aid in
13 the individual's voting. Is that correct?
14         MS. SWEREN-BECKER: Objection to form. Calls for
15 legal conclusion.
16     A.   It does not apply to aid attendants and caregivers.
17     Q.   (BY MS. HUNKER) And so if you look at paragraph 104,
18 of your report, I'm going to draw your attention to the second
19 sentence. "While attendants and caregivers are exempt, this
20 section will prevent friends, neighbors, and other non-family
21 members from assisting people with disabilities if they receive
22 any type of economic benefit." Did I read that correctly?
23     A.   Yes.
24     Q.   Okay. Now, the term "economic benefit", you haven't
25 looked at the penal code to see how that was defined there,

Page 204

1  have you?
2      A.   It seems to be any type of compensation and economic
3  benefit as defined by section 38. It would -- I did look at
4  that briefly. It seemed to be very broadly defined.
5      Q.   Okay. And did you look at it before you wrote your
6  report?
7      A.   Yes.
8      Q.   Okay. And so this -- does your research indicate how
9  many friends, neighbors and family members receive economic
10 benefits for aiding somebody in voting?
11     A.   No, my research does not indicate that. I know there
12 are examples. Actually, can I tell you what went through my
13 mind when I read this provision? I was thinking about some
14 years ago, when Lisa Schur and I were presenting some of our
15 disability and voting results to a group here in New Jersey. A
16 woman came up to me afterwards -- came up to us, and a very
17 sweet elderly lady said, "I loved your talk. And I just want
18 to tell you when you were talking about social isolation, a few
19 years ago, my friends and I -- I was talking to my friends and
20 I said, 'Are you going to vote?' They said, 'No, no, it's too
21 much hassle.' And I said, 'Well, let's all go together. Let's
22 go together and then let's go out for ice cream afterwards."
23 And they did. Okay. They had a fun time. They got their
24 little stickers and went out for ice cream. What if the other
25 three women had bought her ice cream as a result of her

Page 205

1  driving? That would be an economic benefit as far as I can
2  tell.
3      Q.   Okay. And so under your interpretation of law,
4  giving someone ice cream after they've helped you vote would be
5  considered -- would fall into this provision. Is that correct?
6      A.   Yes, I think so.
7      Q.   Okay. And so when you were coming to this
8  interpretation, you based it off the text of the statute. Is
9  that right?
10     A.   Yes.
11     Q.   And you haven't -- you didn't reference any other
12 sources to come to this interpretation. Is that correct?
13     A.   Correct.
14     Q.   And so you didn't speak with the Secretary of State's
15 office. Is that right?
16     A.   Right. I did not ask the Secretary of State about
17 the ice cream issue.
18     Q.   And you have -- well, about the interpretation of
19 this section in general.
20     A.   Right, right.
21     Q.   And you haven't spoken to any of the county district
22 attorneys on the interpretation of this provision, have you?
23     A.   Correct.
24     Q.   And you haven't spoken to the Office of Attorney
25 General in Texas regarding the interpretations of this

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900      San Antonio, Texas 78232
210-697-3400                                                    210-697-3408

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br>_Plaintiffs,_<br><br>v.<br><br>GREGORY W. ABBOTT, et al.,<br>_Defendants._ | 5:21-cv-0844-XR |
| OCA-GREATER HOUSTON, et al.,<br>_Plaintiffs,_<br><br>v.<br><br>TEXAS SECRETARY OF STATE JOHN SCOTT,<br>et al.,<br>_Defendants._ | 1:21-cv-0780-XR |
| HOUSTON JUSTICE, et al.,<br>_Plaintiffs,_<br><br>v.<br><br>GREGORY WAYNE ABBOTT, et al.,<br>_Defendants._ | 5:21-cv-0848-XR |
| LULAC TEXAS, et al.,<br>_Plaintiffs,_<br><br>v.<br><br>JOHN SCOTT, et al.,<br>_Defendants._ | 1:21-cv-0786-XR |
| MI FAMILIA VOTA, et al.,<br>_Plaintiffs,_<br><br>v.<br><br>GREG ABBOTT, et al.,<br>_Defendants._ | 5:21-cv-0920-XR |

| UNITED STATES OF AMERICA, | |
|---|---|
| *Plaintiff*, | |
| v. | 5:21-cv-1085-XR |
| STATE OF TEXAS, et al., | |
| *Defendants*. | |

**Expert Report of Professor Douglas L. Kruse, Ph.D.**

**Distinguished Professor**
**Rutgers School of Management and Labor Relations**
**Co-Director, Program for Disability Research**
**94 Rockafeller Road**
**New Brunswick, N.J. 08903**

On Behalf of Plaintiffs in *La Unión Del Pueblo Entero, et. al. v. Abbott, et al.; Houston Area Urban League, et al. v. Abbott, et al.; and OCA-Greater Houston, et al. v. Esparza, et al.*, Case No. 5:21-cv-844(XR)

February 28, 2022

## Declaration of Professor Douglas L. Kruse, Ph.D.

I, Douglas Kruse, do hereby declare as follows:

I have been retained to act as an expert witness for the Plaintiffs in the above-captioned action.

Attached hereto as Exhibit A is a true and accurate copy of my February 28, 2022 Report in support of Plaintiffs' case, and the exhibits attached thereto (collectively, my "report").

My report describes the primary data and other information I considered in forming my opinions.

My CV is attached as Appendix A to my report, and sets forth my qualifications and all publications I have authored in the past 10 years.

Within the last four years, I have not provided reports as an expert witness or court monitor in any cases.

I am compensated for work on my report at a rate of $200 per hour.

I respectfully adopt and incorporate into this Declaration my report, which describes the testimony I am offering in support of Plaintiffs' case.

I understand and intend that my report is to be presented to the Court with the same weight and consequences as if I had stated the report orally, under oath, in a court of law. I declare under penalty of perjury that the foregoing is true and correct.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

I am aware that discovery in this case is ongoing, and I reserve the right to continue to supplement the foregoing report in light of additional facts, testimony, and/or materials that may come to light.

Executed this February 28, 2022, in Mercer County, New Jersey.

Douglas L. Kruse, Ph.D.

2

Report on Texas voting lawsuit
February 28, 2022

# PURPOSE OF ENGAGEMENT

**1.**　　I have been retained by Plaintiffs in *La Union Del Pueblo Entero, et al. v. Abbott, et al.; Houston Area Urban League, et al. v. Abbott, et al.*; and *OCA-Greater Houston, et al. v. Esparza, et al.*, Consolidated Case No. 5:21-cv-844 (W.D. Tex.) to provide my expert opinions on issues related to the ways in which SB 1 erects barriers that harm voters with disabilities by impeding their access to voting in the State of Texas.

# QUALIFICATIONS

**2.**　　I am currently a Distinguished Professor in the School of Management and Labor Relations at Rutgers University. I have been a Research Associate at the National Bureau of Economic Research in Cambridge, Massachusetts since 1995, and a Research Fellow at the IZA Institute of Labor Economics in Bonn, Germany since 2016. In 2013-14, I served as a Senior Economist at the Council of Economic Advisers in the Executive Office of the President in Washington, D.C.

**3.**　　I received my Bachelor's Degree in Economics from Harvard University in 1981, my Master's Degree in Economics and Certification in Public Policy Analysis and Program Evaluation from the University of Nebraska-Lincoln in 1983, and my Ph.D. in Economics from Harvard University in 1988.

**4.**　　At Rutgers I am Co-Director of the Program for Disability Research, and am Associate Director of the Institute for the Study of Employee Ownership and Profit Sharing. I have also served as our school's Associate Dean of Academic Affairs, and as Ph.D. Director where I oversaw Ph.D. students in their coursework, exams, and dissertations.

**5.**　　My research focuses on two areas: 1) economic, social, and political inclusion of people with disabilities, with a focus on the relationship of disability to employment and political participation, and 2) the causes, consequences, and implications of employee ownership and profit sharing plans.

**6.**　　I have authored, co-authored, or edited 14 books, along with 123 journal articles or book chapters, and 22 reports. The book publishers include Cambridge University Press, University of Chicago Press, and Yale University Press among others. Four of the books and 40 of the articles and book chapters have been published within the past 10 years. My research has been cited over 12,000 times according to Google Scholar.

**7.**　　I have substantial expertise on the topic of voting among people with disabilities. I have been principal investigator (PI) or Co-PI on four grant-funded national post-election surveys on the voting experiences of people with and without disabilities. Two of these surveys were funded by the U.S. Election Assistance Commission. Following the release of key results, the data were further analyzed with results published in peer-reviewed journals; one of these articles received a major award from the Western Political Science Association. In addition to these

4

surveys, I have analyzed U.S. Census microdata after each election since 2008 and co-authored fact sheets with detailed analyses of disability and voter turnout in each election, along with pre-election fact sheets projecting the number of eligible voters with disabilities in 2016 and 2020. The most recent fact sheet analyzing the 2020 election was jointly released with the U.S. Election Assistance Commission.

**8.**     My professional service includes being Associate Editor of the British Journal of Industrial Relations from 2011 to 2021, and Associate Editor of the Journal of Participation and Employee Ownership from 2017 to the present.  My service to society includes being a member of the President's Committee on Employment of People with Disabilities from 1998 to 2000, and a member of the State Rehabilitation Advisory Council, New Jersey Division of Vocational Rehabilitation from 1999 to 2013.

**9.**     I have testified four times before Congress on my economic research.

**10.**     I have been PI or Co-PI on 24 grants with total funding of $16.4 million.  Currently I am PI or Co-PI on four disability-related grants, including two 5-year grants for centers funded by the National Institute on Disability, Independent Living, and Rehabilitation Research in the U.S. Department of Health and Human Services.

# EXECUTIVE SUMMARY

**11.**     The U.S. Department of Justice–charged with enforcing and interpreting the Americans with Disabilities Act (ADA)–has explained:

> Voting is one of our nation's most fundamental rights and a hallmark of our democracy. Yet for too long, many people with disabilities have been excluded from this core aspect of citizenship.  People with intellectual or mental health disabilities have been prevented from voting because of prejudicial assumptions about their capabilities.  People who use wheelchairs or other mobility aids, such as walkers, have been unable to enter the polling place to cast their ballot because there was no ramp.  People who are blind or have low vision could not cast their vote because the ballot was completely inaccessible to them.[1]

**12.**     This report finds that:

**13.**     Voting eligible people with disabilities vote at lower rates than those without disabilities, vote by mail significantly more often than those without disabilities, and experience barriers to voting—both in person and by mail—more frequently than people without disabilities.

**14.**     At least 3 million voting-eligible Texans have disabilities.

**15.**     Voting-eligible citizens in Texas with disabilities face a myriad of barriers in accessing voting stemming from high rates of needing assistance in activities of daily living, higher

---

[1] *The Americans with Disabilities Act and Other Federal Laws Protecting the Rights of Voters with Disabilities*, U.S. DEPARTMENT OF JUSTICE, October 10, 2014, https://www.ada.gov/ada_voting/ada_voting_ta.htm.

likelihood of living alone, lower likelihood of having a vehicle they can drive, other barriers to travel, lower likelihood of internet access, and lower average education levels compared to those without disabilities. Voting-eligible disabled citizens in Texas are more socially isolated which limits their support networks for assistance in voting.  They also must contend with well-documented social stigma that both reflects and reinforces their social isolation and increases the barriers to obtaining necessary resources and assistance in exercising the right to vote.

**16.**     Only 59.4% of voting-eligible people with disabilities in Texas voted in 2020, compared to 64.5% of those without disabilities.  The 5.1 percentage point gap is well outside the statistical margin of error, so we can be highly confident of a true gap in the population.

**17.**     Among Texas voters in 2020, 30.2% of people with disabilities and 8.2% of people without disabilities voted using a mail ballot.

**18.**     While specific data on voting difficulties by disability status are not available in Texas, national data show a high rate of voting difficulties among people with disabilities. In 2020, 21.3% of in-person voters with disabilities either required assistance or had difficulties in voting, which is almost twice the 11.9% rate among voters without disabilities. There was also a disability gap among mail voters, where 14.0% of voters with disabilities either required assistance or had difficulties in voting compared to 3.2% of voters without disabilities.

**19.**     Based on these findings, and in my expert opinion, several provisions of SB 1 will pose barriers to Texas citizens with disabilities who wish to exercise their right to vote.

**20.**     Sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12 place restrictions on mail voting for applications and correcting rejected applications that will burden many people with disabilities who find it less difficult to vote by mail due to their disabilities.

**21.**     Section 6.01 requires any person other than a close relative who simultaneously drives seven or more voters to the polls for curbside voting to complete and sign a form stating their name and address and whether they only provided transportation assistance or also assistance with voting.  This new requirement will create additional barriers for voters with disabilities who rely on group transportation to vote curbside.  Because many people with disabilities face transportation barriers and social isolation, this new requirement will make it harder for some people with disabilities to find people willing to provide transportation assistance.

**22.**     Section 6.04 adds language to the assistor oath which substantially restricts the types of assistance that can be given, which will burden people with disabilities who, because of their disabilities, need assistance to vote.  There are many types of assistance people with disabilities need that go beyond the assistance permitted by SB 1. Because many people with disabilities will need this assistance, this restriction will interfere with many people's ability to vote.

**23.**     Sections 6.03 and 6.05 create extra requirements for assistors to document their relationship to the voter and whether they received any compensation or benefit from a candidate, campaign, or political committee. Because people with disabilities are far more likely to use curbside voting and many people with disabilities need voting assistance, this will create an extra barrier to voting for some people with disabilities in finding people willing to provide assistance. It will also increase the likelihood that a voter's ballot will be rejected, either due to a

clerical error because they had inadequate assistance, or a mistake in the documentation of the assistance they did receive.

**24.**     Section 6.06 makes it a crime to compensate (or offer, solicit, receive, or accept compensation for) someone for helping a voter vote by mail. While there is an exception for previously known attendants or caregivers, this section will prohibit people with disabilities from getting assistance from a substantial number of people who they may have routinely turned to, including close friends or neighbors. It will also prohibit people with disabilities from getting assistance from staff or volunteers with community or nonpartisan civic engagement organizations that routinely provide voting support to the disability community.

**25.**     Section 7.04 makes it a crime    to receive any form of compensation or    benefit for collecting another voter's mail ballot. It also criminalizes in-person interaction with a voter about a specific candidate or measure, in the physical presence of a ballot, while receiving any form of compensation or benefit.  This provision will impose barriers on    people with disabilities who require assistance to vote, who live alone and face transportation barriers, and who may benefit from assistance while continuing to vote independently.

**26.**     In sum, in my expert opinion, these provisions of SB 1 will harm a significant number of Texans with disabilities and impose new barriers to them in exercising the right to vote.

# DEFINITION OF DISABILITY

**27.**     The ADA protects all those with a substantial limitation in one or more major life activities. The U.S. Department of Justice has explained:

> The term 'substantially limits' shall be construed  broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA…The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence.[2]

# INTERPRETING THE DATA

**28.**     This report presents an overview of the prevalence and characteristics of people with disabilities, drawing on analysis of six nationally representative surveys.  Three of these surveys are conducted by the U.S. Census Bureau:  the American Community Survey (ACS), the Survey of Income and Program Participation SSA Supplement (SIPP), and the Current Population Survey Voting and Registration Supplement (CPS).[3] The other three surveys are the National

---

[2] *Questions and Answers about the Department of Justice's Notice of Proposed Rulemaking to Implement the Americans with Disabilities Act Amendments Act of 2008*, U.S. DEPARTMENT OF JUSTICE, January 30, 2014, https://www.ada.gov/nprm_adaaa/adaaa-nprm-qa.htm.

[3] *See American Community Survey*, UNITED STATES CENSUS BUREAU, https://www.census.gov/programs-surveys/cps/about/supplemental-surveys.html (last visited 2/28/2022) (the relevant supplemental surveys are the Social Security Administration Supplement and Voter Registration Supplement, in addition to the general survey).

Household Travel Survey (NHTS) conducted by the Federal Highway Administration, the Survey of the Performance of American Elections (SPAE) conducted by the Caltech/MIT Voting Technology Project, and the Disability and Voting Accessibility Survey (DVAS) sponsored by the U.S. Election Assistance Commission and conducted by Rutgers University and SSRS Inc.[4] Each of these surveys has a large sample and uses a combination of methods to obtain information on a wide range of population characteristics.  Responding households are chosen randomly, and any differences from known values in the population are corrected using statistical weights in order to ensure the final sample is representative of the population.

**29.**     I rely on ACS data where the measures are available, because this dataset: i) has a much larger sample size ensuring estimates with smaller margins of error, and ii) is more comprehensive by including residents living in group quarters, unlike the SIPP, CPS, and NHTS. Group quarters are categorized in ACS into either "institutional" settings (nursing homes, mental hospitals, and correctional facilities) or "non-institutional" settings (college dorms, military barracks, group homes, missions, and shelters).  As will be explained below, people with disabilities are both significantly more likely than those without disabilities to be living by themselves when living in the community, and are also more likely to be living in institutional group quarters.  To the extent that people with disabilities in institutional group quarters have more severe disabilities and face greater barriers, the CPS, SIPP, and NHTS will underreport the disparities faced by people with disabilities overall.

**30.**     The ACS and CPS have measures of both age and citizenship, so I limit the samples to the voting-eligible population (citizens age 18 or older).  The DVAS includes only the voting-eligible population, and the SPAE includes only registered voters.  The SIPP and NHTS have age but not citizenship measures, so estimates from those surveys are based on the voting-age population (age 18 or older).

**31.**     The ACS and CPS measure disability using six questions.  Four of the questions measure impairments (vision, hearing, cognitive, and mobility), and two of the questions measure activity limitations (difficulty dressing or bathing, and difficulty going outside alone).  These questions were chosen after extensive cognitive research by the Census Bureau, using interviews and focus groups to ascertain how respondents understood and interpreted the survey questions, to maximize the likelihood that answers to the final chosen questions would reflect accurate reporting of disabilities rather than alternative understandings of the questions.[5]  SIPP uses a more extensive set of over 100 questions to derive its disability measure.  The DVAS measures

---

[4] *National Household Travel Survey, U.S. Department of Transportation*, FEDERAL HIGHWAY ADMINISTRATION, https://nhts.ornl.gov/ (last visited 2/28/2022); *Survey of the Performance of American Elections*, MIT ELECTION LAB, https://electionlab.mit.edu/research/projects/survey-performance-american-elections (last visited 2/28/2022); *U.S. Election Assistance Commission Study on Disability and Voting in the 2020 Elections*, https://www.eac.gov/election-officials/us-election-assistance-commission-study-disability-and-voting-accessibility-2020 (last visited 2/28/2022).

[5] Kristen Miller and Theresa J. Demaio, *Report of Cognitive Research on Proposed ACS Disability Questions*, US CENSUS BUREAU, August 28, 2006, https://www.census.gov/library/working-papers/2006/adrm/ssm2006-06.html.

disability using the six ACS and CPS questions plus a seventh broader question, whereas the NHTS and SPAE each use one general question to measure disability.

**32.**     An important note is that the six questions used by the ACS and CPS are likely to capture only a portion of the full disability population (as defined by the broad ADA definition described above).  One issue is that people might underreport disabling conditions, as found in research comparing subjective reports to objective reports of health conditions.[6]  A second important issue is that measuring disability is made difficult by the wide variation in types of disability (e.g., hearing, vision, mobility, cognitive, developmental, chronic illnesses, and others) and the severity of disabilities (e.g., whether the condition causes a major or mild limitation in life activities).  Asking about all types of disabilities is not feasible in a survey, and due to the wide variation it is inevitable that any set of questions will miss some disabilities.  The six standard Census questions are likely to undercount speech impairments and learning disabilities, as well as mental illnesses such as depression and bipolar disorder.  They may also undercount people with episodic conditions that wax and wane such as epilepsy, Lupus, and Multiple Sclerosis, and conditions like cancer, long-COVID, or back problems that cause pain or fatigue. The Census surveys nonetheless provide a valuable window on a large portion of the disability population.  Because the six questions are likely to undercount certain types of disabilities, I also present results from a more extensive set of disability questions used in a SIPP module in 2014.  These more extensive questions have not been used in any major survey since 2014.  Due to the greater number of questions that cover a broader range of disabilities, the SIPP is likely to be a more comprehensive portrait of the disability population, although it has the drawback that it excludes people in institutional group quarters and does not have a citizenship measure as noted above.

**33.**     In this report I focus on the population of people with disabilities living in Texas.  The ACS has a large sample size of 127,398 for Texas, while the SIPP and CPS have smaller samples of 1,569 and 4,290.  The NHTS has a sample size of 44,040 for Texas.  These sample sizes are more than the standard sample size of 1,000 used to obtain reliable estimates within large populations.  Due to the smaller samples in SIPP and CPS, in several breakdowns I complement the Texas numbers from those surveys with numbers for the overall U.S., plus estimates of the significance of any differences between the U.S. and Texas samples.  The SPAE and DVAS have good samples for national estimates but do not have large enough samples within Texas for meaningful analysis, so I only present national figures from those surveys.

**34.**     In a number of places, I compare results between people with and without disabilities, showing that people with disabilities face economic and social disparities and higher rates of voting difficulties that are linked to lower voter participation.  These disparities are maintained when holding constant the effects of demographic characteristics (race, ethnicity, gender, age, and educational attainment).  The effects of disability may be even greater than indicated by the simple difference between people with and without disabilities, because voters without disabilities may face many other non-disability-related difficulties, such as language barriers.

**35.**     All estimates presented in this report use survey weights to ensure the sample is representative of the disability population on key characteristics.  Due to the pandemic possibly

---

[6] Michael Baker, Mark Stabile, and Catherine Deri, *What do self-reported, objective, measures of health measure?*, 39 J. HUMAN RESOURCES 1067 (2004).

affecting survey responses, the Census Bureau issued the 2020 ACS data with experimental weights, which I use in this report.  To ensure the results did not change substantially due to the pandemic, I have also made comparisons to the 2019 ACS data.  The results of this comparison (not reported here but available on request) are very similar on all key variables between 2019 and 2020.

**36.**     In short, the Census surveys do a reasonable job of providing a portrait of a large portion of the disability population, and are extensively used by scholars in peer-reviewed research on the status of people with disabilities.  To the extent that they undercount people with disabilities, they will undercount the number of people who face disability-related disparities and challenges in voting and other important activities.

# OVERVIEW: PREVALENCE AND GENERAL CHARACTERISTICS OF PEOPLE WITH DISABILITIES AND IMPLICATIONS FOR VOTING ACCESS

## Summary

**37.**     In order to fully understand the extensive barriers people with disabilities face in accessing their fundamental right to vote, it is critical to provide an overview of the general barriers people with disabilities face in their daily lives and how each of these factors can impact access to voting. People with disabilities are likely to face a myriad of barriers in exercising the right to vote.  These barriers can stem from a number of disability-related issues, including the need for assistance in activities of daily living, increased likelihood of living alone, lower likelihood of having a vehicle one can drive, other barriers to traveling, lower likelihood of internet access, and lower levels of education.  In addition, the lower economic status of people with disabilities, reflected in lower incomes and higher poverty rates, creates challenges in exercising the right to vote.  For example, people with disabilities are less likely to have the money to buy computers or own their own vehicles, making it harder to access information or get to election offices and polling sites. The social stigma many people with disabilities experience further compounds the difficulties they face in accessing voting.

## Overall Prevalence and Types of Disability

**38.**     Both ACS and SIPP data can be used to provide estimates of the number of people with disabilities in Texas. The ACS uses only 6 questions so is a more conservative estimate, while the SIPP disability measure is based on over 100 questions and is a more expansive estimate. Based on the 2020 ACS 6-question measure, Table 1 shows that 15.6% of voting-eligible people in Texas have disabilities, representing 3 million people. Based on the SIPP survey's more extensive set of disability questions, 30.5% of voting-age people in Texas have disabilities, representing 5.6 million people when applied to 2020 population numbers.[7]  The range of 3 to

---

[7] The 5.6 million figure assumes that the proportion of adults with disabilities in Texas using the SIPP measure did not change between 2014 and 2020, and that among all Texans with

5.6 million people reflects differences in whether disability is measured more narrowly or broadly.  Two important points about this range are:  1) both numbers indicate that a substantial portion of Texans have disabilities; and 2) when the narrower ACS measure is used, this is likely to result in conservative estimates of the number of people who face disability-related disparities.

**39.**     Whether one uses the narrower or broader measure, disability prevalence is projected to grow as the overall population ages in the next few decades.[8]

**40.**     As shown in Table 1, a breakdown of ACS data by disability type shows that the Texas population of citizens with disabilities includes (the categories may overlap):

- 1,604,700 people with mobility impairments,

- 1,082,500 with cognitive impairments,

- 875,900 with hearing impairments,

-  638,500 with vision impairments,

- 596,300 with difficulty dressing or bathing, and

- 1,127,500 with difficulty going outside alone due to a physical or mental condition.

**41.**     Table 1 also shows the margin of error for each estimate, reflecting the potential for sampling error.  The margin of error of 0.3% around the disability prevalence estimate of 15.6% means that there is a 95% probability that the true population value lies within plus or minus 0.3% of the estimate, or between 15.3% and 15.9%.

**42.**     These numbers are very similar to those from before the onset of the pandemic in 2020. In 2019, the ACS data indicate that 15.6% of the Texas adult citizen population and 16.4% of the U.S. adult citizen populations had disabilities.

**43.**     The SIPP survey provides a more detailed look at variation in disabling conditions in Texas.  As shown in Table 2, more than 10% of the Texas population has difficulty with physical activities of walking, climbing stairs, lifting, standing, pushing or pulling, and crouching.  More than one-eighth (13.4%) have difficulty with one or more basic activities of daily living such as getting into a bed or chair, taking a bath or shower, eating, preparing meals, or using a telephone. Applied to 2020 Texas population figures, 2.4 million Texans have difficulty with one or more

---

disabilities age 18 or older, the percent who are eligible citizens matches the percent in the 2020 ACS (93.9%).

[8] *Ageing and Disability*, UNITED NATIONS DEPARTMENT OF ECONOMIC AND SOCIAL AFFAIRS, last visited 2/28/2022, https://www.un.org/development/desa/disabilities/disability-and-ageing.html#:~:text=Currently%2C%20it%20is%20estimated%20that,experience%20moderate%20to%20severe%20disability.

activities of daily living.  The abilities needed for several of these activities are also needed in the act of voting, both in person and by mail.

**Demographic Characteristics**

**44.**     The prevalence of disability in Texas is markedly higher among Native Americans, Black people, older people, and those with lower levels of education.  The 2020 ACS data in Table 3 show that:

- Black people (17.9%) and Native Americans (17.8%) are more likely to have disabilities, compared to white non-Hispanic (16.3%) people. While the overall rate of disability (14.2%) is lower among Hispanic/Latinx citizens than among non-Hispanic/Latinx citizens overall, this is largely due to their younger average age that is linked to lower disability rates.  When broken down by age group, the rate of disability is significantly higher among Hispanic/Latinx citizens in every age group except for the youngest (18-34).[9]  As a consequence, Hispanic/Latinx citizens are likely to face disparities linked both to disability and to their Hispanic/Latinx heritage.  Similarly, the higher rates of disability among Black citizens means that they are likely to face disparities linked both to disability and to race.

- The disability rate climbs strongly with age, from 7.7% among those aged 18-34 to 70.3% among those aged 85 or older.

- The disability rate declines strongly as the rate of education rises, from 28.1% among those without a high school degree to 9.4% among those with a graduate degree.

**45.**     The relationship between education and disability reflects causality in both directions.  Disability can limit education due to barriers that people with disabilities often encounter in furthering their education, such as lack of a correct diagnosis or appropriate accommodations, especially for poorer children.  Education also has an impact on disability: it can open up jobs with safer working conditions that are less likely to lead to disability, and provide higher incomes that increase access to health services and assistive technology that help people cope with potentially disabling conditions.

**46.**     The estimated total number of voting-eligible people with disabilities in Texas is 1,551,800 among women, 1,472,400 among men, 1,533,400 among white non-Hispanic/Latinx people, 428,300 among Black non-Hispanic/Latinx people, and 881,800 among Hispanic/Latinx people.  Compared to pre-pandemic 2019 data, the percentages and numbers of people with disabilities in Texas are very similar between 2019 and 2020.

**Economic Status**

---

[9] The rates of disability for Hispanic/Latinx compared to white non-Hispanic people are 6.9% compared to 8.0% among those age 18-34, 9.9% compared to 8.2% among those age 35-49, 18.8% compared to 14.9% among those age 50-64, and 42.5% compared to 35.0% among those age 65 or older.

**47.** People with disabilities in Texas have very low employment rates and high poverty rates. As shown in Table 4, only 40.1% of working-age (18-34) Texans with disabilities were employed in 2020, which is just over half the rate of people without disabilities (74.2%). Among all ages, people with disabilities were almost twice as likely to live in poverty (18.0% compared to 9.2%). They were also much more likely to receive income from Social Security (47.4% compared to 13.3%), reflecting both disability and retirement income provided through Social Security. In part due to their low incomes, 20.3% receive public assistance income or food stamps, and 26.5% receive health care coverage through Medicaid or another low-income plan, compared to 10.3% and 6.1% (respectively) of people without disabilities. Additional breakdowns show that this pattern is very similar between Texas and the U.S. as a whole, and between 2019 and 2020.

**Living Situation and Need for Assistance**

**48.** People with disabilities in Texas are more likely to live alone and be unmarried, and a large portion need assistance with activities of daily living. From the 2020 ACS data shown in Table 4:

- People with disabilities are significantly more likely than people without disabilities to live alone—that is, not living with others either in the community or in institutional group quarters (20.8% compared to 12.3%).

- They are less likely to be currently married with a spouse present (42.8% compared to 52.4%), and more likely to be separated or divorced (19.4% compared to 12.1%) or widowed (14.4% compared to 3.4%) while not being currently married.

- They are four times more likely than people without disabilities to live in institutional group quarters (4.7% compared to 1.1% are in nursing homes, mental hospitals, or correctional facilities).

**49.** These patterns of disparities are very similar between Texas and the entire U.S.

**50.** People with disabilities are also more likely to need assistance with activities of daily living, which are measured only in SIPP. Because the 2014 SIPP sample has only 566 Texans with disabilities, I also provide numbers for the full U.S. sample of 10,003. From the data shown in Table 5, close to two-fifths of people with disabilities (41.2% in Texas and 37.4% in the U.S.) need assistance with one or more activities, with especially high rates for going outside of the home for errands (25.5% in Texas), accessing the Internet (15.2%), doing light housework (13.7%), keeping track of money (12.0%), and preparing meals (11.0%).

**51.** Applied to the 2020 Texas population, this indicates that close to 2.3 million Texas citizens age 18 or older need assistance with one or more daily activities.

**52.** Because a large number of people with disabilities live alone, many who need assistance must rely on non-household members. Over one-third (34.9%, or an estimated 1.9 million in 2020) of Texans with disabilities receive assistance in daily activities from family members, 4.0% (220,000) from friends or neighbors, 4.0% (220,000) from paid help, 1.4% (79,000) from

13

partners or companions,  1.4% (78,000) from other non-relatives, with a total of 10.6% (589,000) from any non-relative (these categories overlap as individuals may receive help from more than one person).

**53.**     The above characteristics create greater challenges to voting for many people with disabilities, particularly when they need assistance and find it difficult to arrange such assistance due to their higher likelihood of living alone and greater social isolation.

<u>**Computer and Internet Access**</u>

**54.**     Due in part to their lower average incomes, people with disabilities in Texas are less likely to have internet access.  From the 2020 ACS data shown in Table 6:

- Among Texas citizens with disabilities eligible to vote, 84.5% live in homes with internet access, compared to 95.2% for people without disabilities.

- Translated into absolute numbers, an estimated 460,600 citizens with disabilities who are eligible to vote in Texas live in homes without internet access.

**55.**     These digital gaps also show up when looking at individual rather than household access to the internet.  Further data from the Census Bureau's 2019 Current Population Survey Computer and Internet Use Supplement show that:

- People with disabilities in Texas are less likely to use the internet at home (60.1% compared to 78.9% of people without disabilities).

- This gap is not decreased by adding in internet access outside the home.  Considering all forms of internet access, 60.5% of people with disabilities use the internet in any location compared to 82.3% of people without disabilities.

- Translated into absolute numbers, an estimated 823,200 Texas citizens with disabilities do not use the internet either inside or outside the home.

- The disability gaps are not explained by age differences between people with and without disabilities.  While older people are less likely to access the internet, Table 5 shows that large disability gaps exist within each age group.

- While the 2019 survey has a limited sample of Texans with disabilities, the disability gaps in each measure are outside of the margin of error.

**56.**     These disability gaps in computer and internet access can impact the ability of citizens with disabilities to obtain necessary resources for voting.  Not having internet access can make it more difficult to:  a) register to vote; b) find out how and where to vote, particularly if polling places have been changed;  c) gather information on candidates and issues in order to make informed decisions in voting; and d) cure issues with mail-in ballot applications.  These difficulties create special problems when voting information is only provided in an online format.

**Transportation**

57.     People with disabilities face transportation barriers.  Based on the 2017 National Household Travel Survey, 1.8 million Texans age 18 or older have travel-limiting disabilities, defined as "a temporary or permanent condition or handicap that makes it difficult to travel outside of the home."  The rate of travel-limiting disability in Texas was 10.0% among those age 18 or older.  Several findings shown in Table 7 are:

- Texans with disabilities were four times more likely to live in zero-vehicle households (14.4% compared to 3.0% of Texans without disabilities).

- Texans with disabilities took fewer average trips per day (2.3 compared to 3.5) and were more likely to take no trips in a day (40.0% compared to 15.8%).

- Texans with disabilities are less likely to be drivers than are those without disabilities (59.6% compared to 93.0%).

- Texans with disabilities were slightly more likely to use public transportation (12.6% compared to 8.8% among Texans without disabilities).

- Texans with disabilities did not make up for transportation barriers by using ride-hailing services such as taxis or Uber (only 2.6% did so in the past month compared to 8.8% of Texans without disabilities) or by relying on online purchases (only 31.5% did so compared to 54.2% of Texans without disabilities.).

- Over half (53.6%) of Texans with disabilities agreed that travel is a financial burden, compared to only 39.6% of those without disabilities.

58.     These results are supported when employing a broader disability measure using national data.  As also shown in Table 7, the 2020 Disability and Voting Accessibility Survey (DVAS), shows that only 69.6% of people with disabilities can drive their own or a family vehicle, compared to 90.0% of people without disabilities.  People with disabilities were also more likely than those without disabilities to say they faced transportation problems "very often" or "always" (5.6% compared to 2.9%).

59.     Transportation difficulties can have a negative impact on voting as research finds a significantly higher likelihood of voting among those who have a vehicle they can drive.[10]

**Social Isolation, Stigma, and Bias**

60.     The lower employment levels, greater likelihood of living alone, lower internet access, and transportation barriers among people with disabilities documented above all contribute to social isolation.  The greater social isolation of people with disabilities is also evidenced in their

---

[10] Lisa Schur, Todd Shields, Douglas Kruse, & Kay Schriner, *Enabling Democracy: Disability and Voter Turnout.* 55 POLITICAL RESEARCH QUARTERLY 167 (2002).

lower likelihood of socializing with friends, relatives, or neighbors.[11]  This social isolation limits the support network upon which people with disabilities may rely for assistance with fundamental daily activities, including accessing the right to vote.

**61.**      The social isolation is reflected in, and reinforced by, the well-documented stigma attached to disability that continues to be manifested in attitudinal studies of the general population.[12]  These attitudes toward people with disabilities impact all areas of an individual's life.  The stigma attached to disability may impact the perception of a person's abilities that do not align with reality. This can impact the ability of people with disabilities to vote by, for example, making people (particularly those outside of their families) less willing to assist them with voting, and can also result in people with disabilities themselves being less willing to ask for assistance when needed.

# VOTING BARRIERS FACING PEOPLE WITH DISABILITIES

## Voter Participation

**62.**      People with disabilities in Texas and nationwide are less likely to vote than their non-disabled counterparts. Data from the Current Population Survey Voting and Registration Supplement, conducted by the Census Bureau every two years following national elections, show that 71.9% of eligible citizens with disabilities in Texas were registered to vote in 2020, and 59.4% voted, compared to 71.2% and 64.5% of citizens without disabilities respectively.  These numbers show that citizens with disabilities in Texas had a similar registration rate as those without disabilities (within the margin of error), but they were 5.2 points less likely to vote, and the voting gap is outside the margin of error.  In the U.S. as a whole, people with disabilities were 3.0 points less likely to be registered to vote, and 5.7 points less likely to vote, and the larger U.S. sample means that we are at least 99.9% confident that there is a true participation gap in the population.  These figures are provided in Table 8.  Similar disability participation

---

[11] Harris Interactive, *The ADA: 20 Years Later*, KESSLER FOUNDATION AND THE NATIONAL ORGANIZATION ON DISABILITY at 15-16, July 2010, http://www.advancingstates.org/hcbs/article/ada-20-years-later-2010-survey-americans-disabilities.

[12] Fatima Jackson-Best and Nancy Edwards, *Stigma and intersectionality: a systematic review of systematic reviews across HIV/AIDS, mental illness, and physical disability*, 18 BMC PUBLIC HEALTH 919 (2018); Barbara Muzzatti, *Attitudes towards disability: beliefs, emotive reactions, and behaviors by non disabled persons*, 35 GIORNALE ITALIANO DI PSICOLOGIA 313 (2008); Katarina Scior, *Public awareness, attitudes and beliefs regarding intellectual disability:  A systematic review*, 32 RESEARCH IN DEVELOPMENTAL DISABILITIES 2164 (2011)*;* Denise Thompson, Karen Fisher, Christiane Purcal, Chris Deeming, and Pooja Sawrikar, *Community attitudes to people with disability: Scoping project No. 39.*, DISABILITY STUDIES AND RESEARCH CENTRE, UNIVERSITY OF NEW SOUTH WALES (2011); Harold Yuker, *Attitudes toward Persons with Disabilities, Springer* (1st Ed. 1988).

gaps at the national level are found in all of the 13 studies going back to the 1992 elections, which use differing samples and definitions of disability.[13]

63.     In both the Texas and overall U.S. samples, the disability voting gap is larger than the disability registration gap, indicating that lower voting among people with disabilities cannot be explained by lower registration rates.

64.     The importance of variation across different types of disability is shown in the voting figures.  Broken down by type of disability, national voter participation in 2020 was lowest among people with difficulty dressing or bathing (49.4%), cognitive impairments (50.7%), and difficulty going outside alone (51.6%), but participation was also low among those with visual impairments (59.2%) or difficulty walking or climbing stairs (60.4%).  These numbers are drawn from Table 9.

65.     Research indicates that several factors contribute to the disability participation gap, including lower levels of education and income, lower feelings of political efficacy among people with disabilities, and greater social isolation that reduces the likelihood of being recruited to vote by friends, neighbors, or colleagues. These factors do not, however, fully explain the disability gap in participation.[14]  Part of the remaining gap in participation can be traced to lower turnout due to prior difficulties in voting.[15]

66.     An important note is that voter participation can vary substantially across elections for citizens both with and without disabilities.  An increase in participation in an election among people with disabilities does not necessarily indicate the absence of continued voting barriers that discourage participation.

**Voting method**

67.     Each voting method can present access barriers to people with different types of disabilities.  Voting by mail can be an attractive option for people with mobility impairments, transportation problems, or other issues that make it hard to leave one's home.  This is particularly relevant to the 10.0% of Texans who report travel-limiting disabilities as shown in Table 7, and the 8.3% of Texans who have difficulty walking or climbing stairs and 5.8% of Texans who have difficulty going outside alone, as shown in Table 1.  The 3.3% of voting-

---

[13] Summarized in Lisa Schur & Meera Adya, *Sidelined or Mainstreamed? Political Participation and Attitudes of People with Disabilities in the United States*, 93 SOCIAL SCIENCE QUARTERLY 811 (2012).

[14] Lisa Schur, Todd Shields, Douglas Kruse, & Kay Schriner, *Enabling Democracy: Disability and Voter Turnout. 55* POLITICAL RESEARCH QUARTERLY 167 (2002); Lisa Schur, Todd Shields, & Kay Schriner, *Generational cohorts, group membership, and political participation by people with disabilities,* 58 POLITICAL RESEARCH QUARTERLY 487 (2005); and Lisa Schur & Meera Adya, *Sidelined or Mainstreamed? Political Participation and Attitudes of People with Disabilities in the United States,* 93 SOCIAL SCIENCE QUARTERLY 811 (2012).

[15] Lisa Schur, Mason Ameri, and Meera Adya, *Disability, Voter Turnout, and Polling Place Accessibility*, 98 SOCIAL SCIENCE QUARTERLY 1374 (2017).

eligible Texans with vision impairments, however, may not be able to vote independently with a mail ballot, and may need polling places where they can vote independently with an accessible machine required by the 2002 Help America Vote Act (HAVA).

**68.**     Overall, people with disabilities are much more likely to vote by mail.  Among Texas voters in 2020, 30.2% of people with disabilities and 8.2% of people without disabilities voted using a mail ballot, producing a gap of 22.0%, as shown in Table 8.  Voting by mail was less likely in Texas than in the entire U.S. for people both with and without disabilities, but the disability gap was larger.  The percentages of people with and without disabilities who voted by mail in the full U.S. were 53.2% and 41.9% respectively, producing a gap of 11.3%.  The rate of voting by mail is high across all of the major disability types, as shown in Table 9.  For many people with mobility restrictions, transportation barriers, and difficulty standing in long lines, voting by mail is effectively the only option they have to vote.

**69.**     Voting by mail increased in 2020 due to the pandemic.  Differences by disability status, however, existed before the pandemic.  In the 2016 general election, Texas voters with disabilities were more than three times as likely as voters without disabilities to vote by mail (19.8% compared to 6.0%).

## **Barriers to In-Person Voting**

**70.**     As noted above, the disability gap in voter participation is not fully explained by standard predictors of participation.  Voting barriers appear to play a role, as voter participation is lower when voting is more time-consuming and difficult.  People with disabilities can face extra barriers in:

- Finding or getting to the polling place, particularly for those facing transportation barriers as described above.

- Getting inside the polling place, particularly for those in wheelchairs or with visual impairments.

- Standing in line, particularly for those with chronic illnesses or health conditions that limit their endurance.

- Being prevented from voting by poll workers, particularly for those who appear to have a cognitive disability.

- Reading or seeing the ballot, particularly for those with cognitive or vision impairments.

- Understanding how to vote or use the equipment, particularly for those with cognitive, vision, or upper arm mobility impairments.

- Communicating with poll workers, particularly for those with hearing, speech, or cognitive impairments.

- Writing on the ballot, particularly for those with impairments limiting upper body mobility.

- Physically operating the voting machine, particularly for those with vision impairments or impairments limiting upper body mobility.

**71.**     There is empirical evidence on a number of these factors.  Barriers in finding or getting to polling places have been shown to lower voter participation among people in general.[16] These barriers can be greater for people with disabilities:  one study found substantially lower voter participation among people with mobility limitations in areas with streets in poor condition.[17]

**72.**     Analysis of the nationally representative Survey of the Performance of American Elections (SPAE) conducted following the 2020 elections shows that 1.2% of all registered voters with disabilities said they did not vote because "I tried to vote, but was not allowed to when I tried" compared to 0.3% of people without disabilities.[18]  In addition, 1.4% of registered voters with disabilities in the U.S. reported they did not vote due to long lines at the polls, compared to 0.3% of those without disabilities.   Taken together, these results indicate that a substantial portion of the 5.7 point national disability gap in voter participation (from Table 9) can be accounted for by a greater likelihood that registered voters with disabilities said they were not allowed to vote or were dissuaded by the long lines.

**73.**     In the 2020 DVAS, over one-sixth (18.0%) of people with disabilities who voted at a polling place or election office reported at least one or more barriers, which was almost twice the rate of voters without disabilities (9.8%). The rate of barriers was especially high among those with cognitive impairments (30.0%) and those needing help with daily activities (24.8%).

**74.**     Specific barriers are listed in Table 10.  The most common polling place barriers people with disabilities faced were difficulty waiting in line (7.4% among all polling place voters with disabilities), difficulty reading or seeing the ballot (3.8% ), and getting inside the polling place (3.2%).  These problems were especially likely among those with vision and mobility impairments, and those needing help in daily activities.[19]

---

[16] Henry E. Brady & John E. McNulty, *Turning out to vote: The costs of finding and getting to the polling place*, 105 AMERICAN POLITICAL SCIENCE REVIEW 115 (2011).

[17] Philippa Clarke, Jennifer Ailshire, Els Nieuwenhuijsen, Marijke de Kleijn–de Vrankrijker, *Participation among adults with disability: The role of the urban environment*, 72 SOCIAL SCIENCE & MEDICINE 1674 (2011).

[18] The figures in this paragraph are derived from analysis in *Survey of the Performance of American Elections*, MIT ELECTION DATA + SCIENCE LAB, https://electionlab.mit.edu/research/projects/survey-performance-american-elections, last visited 2/28/2022. The data contain responses from 18,200 people registered to vote.

No further information is available on what respondents meant by saying they were "not allowed to vote." This could indicate legal barriers such as having their eligibility challenged, having a mail ballot rejected, not having proper ID, or being at the wrong polling place.

[19] *See* Thad E. Hall & R. Michael Alvarez, *Defining the Barriers to Political Participation for Individuals with Disabilities,* THE INFORMATION TECHNOLOGY AND INNOVATION FOUNDATION,

**75.**     News reports provide examples from across the country of several of these barriers in voting at polling places:

- Liam Dougherty, who has a progressive muscular disability, has had problems getting inside polling places, waiting in line due to bladder control issues, and having poll workers not know how to lower the machine to reach his wheelchair.[20]

- Elizabeth Clay, who is missing her right leg, has difficulty navigating city streets and getting to her polling place.[21]

- Xian Horn, who has cerebral palsy, found the wheelchair-accessible entrance of her polling place blocked by trash cans.[22]

- Emily Ladau, who has Larsen syndrome which affects bone development, found the accessible entrance to her polling place locked, and had to rely on her father to go in through the main entrance to ask a poll worker to open the door.[23]

- LouAnn Blake, who is blind, found that poll workers did not know how to set up the audio ballot technology at her voting location.[24]

- Kathy Hoell, a wheelchair user with a brain injury, was initially denied permission to vote because poll workers told her she is not "smart enough," and has had poll workers lead her to stairs she could not climb and prevented her from using an accessible voting machine because they had not turned it on.[25]

---

May 14, 2012, https://elections.itif.org/reports/AVTI-001-Hall-Alvarez-2012.pdf (describing problems of polling place access, reading the ballot, and understanding the voting process among focus group participants with disabilities in Los Angeles in 2010).

[20] Michaela Winberg, *'I'm not included here': People with disabilities face barriers to voting in Philly and beyond*, WHYY, October 15, 2020, https://whyy.org/articles/voting-while-disabled-presents-challenges-for-philadelphians/.

[21] *Id.*

[22] Maggie Astor, *'A Failed System': What It's Like to Vote With a Disability During a Pandemic*, NEW YORK TIMES, September 25, 2020.

[23] *Id.*

[24] Jeanine Santucci, *30 years after the ADA, access to voting for people with disabilities is still an issue*, USA TODAY, July 26, 2020.

[25] Matt Vasilogambros, *How Voters With Disabilities Are Blocked From the Ballot Box*, PEW TRUSTS, February 1, 2018, https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2018/02/01/how-voters-with-disabilities-are-blocked-from-the-ballot-box.

76.     In addition, anonymous reports from voters with disabilities collected around the country by a disability organization regarding voter experiences in the 2020 election included[26]:

- "I could not turn on the screen"

- "No headsets were available"

- "Headsets available, did not work"

- "Poll worker did not know how to turn on the audio features"

- "Poll worker did not know how to make the sound louder or softer"

- "I did not know how to 'go back' or change who or what I voted for"

- "Had error message and could not vote"

- "Had to vote in person because I did not get my mail-in or absentee ballot"

- "Could not understand my ballot"

77.     Barriers to polling place access in Texas were identified in settlements since  2015 between the Justice Department and Harris, Nueces, Galveston, and McLennan counties, which included "steep ramps, gaps in sidewalks and walkways, and locked gates along the route barring pedestrian access."[27]

**Barriers to Voting With a Mail Ballot**

78.     Potential barriers to voting with a mail ballot include:

- Complicated instructions in applying for a mail ballot

---

[26] *Experience Survey Results: Power of the Disability Vote*, SABE GOVOTER PROJECT, 2021, https://www.sabeusa.org/wp-content/uploads/2021/10/SABE-GoVoter-2020-Survey-Report.pdf.
[27] *Justice Department Reaches Agreement with Harris County, Texas, to Ensure Polling Place Accessibility for Voters with Disabilities*, US DEPARTMENT OF JUSTICE, March 12, 2019, https://www.justice.gov/opa/pr/justice-department-reaches-agreement-harris-county-texas-ensure-polling-place-accessibility; *Settlement Agreement Between the United States of America and Nueces County Texas Under the Americans with Disabilities Act* at §H, https://www.ada.gov/nueces_co_tx_pca/nueces_co_tx_sa.html; *Settlement Agreement Between the United States of America and Galveston County, Texas Under the Americans with Disabilities Act* at Attachment E, available at https://www.ada.gov/galveston_tx_pca/galveston_tx_sa.html; *Settlement Agreement Between the United States of America and McLennan County, Texas Under the Americans with Disabilities Act* at Attachment E, available at: https://www.ada.gov/mclennan_pca/mclennan_sa.html.

- Application requirements to identify as a person with a disability, which many people with significant impairments are reluctant to do due to disability stigma noted above

- The requirement to apply for a mail ballot in every election

- Difficulty reading or seeing the ballot, particularly for people with visual impairments

- Difficulty understanding the ballot or how to fill it out, particularly for people with cognitive or developmental disabilities

- Difficulty filling out the ballot or placing it in an envelope, particularly for people with limited dexterity

- Difficulty taking the ballot to a mailbox, a drop box, or an election office, particularly for people with mobility impairments or difficulty going outside alone

- Postage expense in mailing the ballot in locations where stamps are required to return a ballot

**79.**     In the 2020 DVAS survey, the overall rate of difficulty in voting with a mail ballot was 5.4% among voters with disabilities. The rate was especially high among those with visual impairments (22.1%) who expressed the most difficulties with reading and filling out the ballot, as shown in Table 11.

**80.**     Barriers to voting by mail are exemplified in the following anecdotal cases from across the country:

- Jack Dougherty voted by mail in 2020 after many experiences of barriers to voting at a polling place.  Due to dexterity issues, he said he had difficulty in filling out the bubbles on the mail ballot and writing his name and address on the correct lines.[28]

- Katie Maunder, who is blind, said she could not have filled out her mail ballot without her mother's help.[29]

- Sheryl Grossman has Bloom syndrome, a genetic disorder that weakens her immune system and causes cognitive disabilities.  She cannot safely go to a polling place or allow anyone into her home, and cannot complete a mail ballot, so she had to tape her mail ballot to her door with a list of choices and watch as election officials filled out and sealed the ballot.[30]

---

[28] Michaela Winberg, *'I'm not included here': People with disabilities face barriers to voting in Philly and beyond*, WHYY, October 15, 2020, https://whyy.org/articles/voting-while-disabled-presents-challenges-for-philadelphians/.

[29] *Id.*

[30] Maggie Astor, *'A Failed System': What It's Like to Vote With a Disability During a Pandemic*, NEW YORK TIMES, September 25, 2020.

- Joanne Wolf, who has multiple sclerosis and cannot write by hand or sign a mail ballot, had her ballot with a signature stamp rejected twice.[31]

**81.**     In addition, anonymous reports from voters with disabilities collected by a disability organization regarding voter experiences with mail ballots in the 2020 election included a number of barriers that included[32]:

- "I had to ask for help."

- "I had problems understanding how to complete the ballot."

- "I had problems mailing my ballot."

- "I had to pay postage."

**82.**     Experiencing these types of difficulties predicts attitudes among people with disabilities that discourage voting in the future.[33]


**Need for Assistance in Voting**

**83.**     As described earlier, about two-fifths of people with disabilities need assistance with one or more activities of daily living.  Many people who need assistance with activities of daily living will also need voting assistance, since voting requires functional abilities that are often needed to perform activities of daily living (for example, manual dexterity needed for getting dressed or preparing meals is also needed in operating most voting machines).  In the 2020 DVAS, 6.2% of people with disabilities who voted at a polling place reported needing assistance in voting, compared to 3.7% of those without disabilities.[34]  Among those who voted by mail, 10.5% of people with disabilities reported needing assistance in doing so, compared to 1.1% of voters without disabilities.[35]  The greater gap in assistance needed in mail voting is likely due to the greater likelihood of severe disability among those who vote by mail.

**84.**     Among people with disabilities who needed assistance in voting in a polling place, such assistance was most commonly provided by election officials (54%), family members (19%), and home aides (6%).  Among those who needed assistance in voting with a mail ballot, such assistance was most commonly provided by family members living with the voter (56%), family

---

[31] *Id.*

[32] *Experience Survey Results: Power of the Disability Vote*, SABE GoVoter Project, 2021, https://www.sabeusa.org/wp-content/uploads/2021/10/SABE-GoVoter-2020-Survey-Report.pdf.

[33] Lisa Schur, Mason Ameri, and Meera Adya, *Disability, Voter Turnout, and Polling Place Accessibility*, 98 Social Science Quarterly 1374 (2017).

[34] The difference of 2.7 points is within the 3.1 point margin of error.

[35] The difference of 9.4 points is outside the 3.5 point margin of error.

members not living with the voter (19%), friends or neighbors (8%), home aides (7%), or other non-relatives (6%).

**85.**   People with disabilities are less likely to be able to vote independently (without assistance) with no difficulties.  The 2020 DVAS found that over one-fifth (21.3%) of in-person voters with disabilities either required assistance or had difficulties in voting, which is almost twice the 11.9% rate among voters without disabilities.  There was also a disability gap among mail voters, where 14.0% of voters with disabilities either required assistance or had difficulties in voting compared to 3.2% of voters without disabilities.

**86.**   As described earlier, Texans with disabilities are more likely than those without disabilities to live in institutional group quarters such as nursing homes and assisted living settings.  Those in institutions generally have more severe disabilities that are more likely to require assistance in voting and daily activities.  There is, however, tremendous variation in registration and voting procedures, staff attitudes, and likelihood of voting among nursing homes and assisted living settings; one study found that residents who wanted to vote were unable to do so at nearly one-third of sites, and that staff and administrator attitudes were a critical factor.[36]

**87.**   Assistance in voting is about more than just driving someone to the polls or helping them with the physical act of marking a ballot.  People with mental health disabilities may require and receive assistance in various aspects of the voting process that in no way suggest the assistor is "voting for" the person with a disability or exercising improper influence over the voter.  A substantial literature supports the idea that people with cognitive disabilities, including intellectual and developmental disabilities, can make important decisions such as voting while relying on trusted assistors in executing those decisions.[37]  Such assistance can "facilitate the exercise of autonomy" for individuals with certain neurological or cognitive conditions.[38] In the context of voting, this assistance often involves more than just reading the ballot aloud and helping people to mark it.

---

[36] Jason H.T. Karlawish et al., *Identifying the barriers and challenges to voting by residents in nursing homes and assisted living settings*, 20 J. AGING SOC. POLICY 65 (2008).

[37] *Id*.; Raymond Raad, Jason Karlawish, & Paul S. Appelbaum, *The capacity to vote of persons with serious mental illness*, 60 PSYCHIATRIC SERVICES 624 (2009); Jason H. Karlawish et al, *Addressing the ethical, legal, and social issues raised by voting by persons with dementia*, 292 JAMA 1345 (2004); Andrew Peterson, Jason Karlawish, and Emily Largent, *Supported Decision Making With People at the Margins of Autonomy*, 21 AM. J. BIOETHICS 4 (2021).

[38] Andrew Peterson, Jason Karlawish, and Emily Largent, *Supported Decision Making With People at the Margins of Autonomy*, 21 AM. J. BIOETHICS 4 (2021).

# SB 1 IMPOSES BARRIERS ON TEXAS VOTERS WITH DISABILITIES THAT WILL MAKE IT HARDER FOR THEM TO VOTE AND MAY PREVENT SOME FROM VOTING ALTOGETHER

88.    The above findings are relevant to an analysis of the likely effects of SB 1 on the ability to vote among people with disabilities.  Drawing on these data and my knowledge of the voting needs of people with disabilities, it is my opinion  that SB 1 will impose barriers to voting on Texans with disabilities. The following provisions of SB 1 make it harder for Texans with disabilities to vote and may prevent some from voting altogether:

## Sections 5.02, 5.03, 5.06,  5.07, 5.10, and 5.12

89.    These sections impose new requirements to vote by mail.  They now require voters to provide the number on their Texas driver's license, Texas election identification certificate, or Texas personal ID card on both their mail-in ballot applications and on the ballot carrier envelopes used to return their ballot. If the voter has not been issued one of these numbers, the voter may instead provide the last four digits of their Social Security number. If the voter has not been issued any of these numbers, the voter may sign a statement indicating that they have never been issued one of these numbers.  The law further provides that if the information the voter provides does not "identify the same voter identified" on the voter's registration application, then the mail-in ballot application and/or ballot in the voter's carrier envelope must be rejected.  SB 1 provides that a voter may be notified by phone or e-mail of the defect and that the voter may request to have the voter's application to vote by mail canceled or go to the voting clerk's office in person to correct the defect or go through an online curing process. There are several relevant research findings regarding the likely impact of these provisions on voters with disabilities:

90.    Texas voters with disabilities were almost four times as likely as those without disabilities to vote by mail in 2020 (30.2% compared to 8.2%), so these additional requirements to be able to vote by mail, and the critical consequences if the ID number they provide does not match the ID number with which they registered, are likely to have a significant negative impact on many voters with disabilities.

91.    Remembering how one recorded ID information on a registration application is likely to be difficult for many people with disabilities. Because disability correlates with age, it may have been a long time since they first registered and many of them may have difficulty remembering what ID information they presented for their initial registration. As noted above, an estimated 1,082,500 eligible voters in Texas have cognitive disabilities, which are measured as difficulty in concentrating, remembering, or making decisions. The records or identifying documents may be held by family members or facility staff, and may not be readily available to people with disabilities.  The staff in congregate settings may be unwilling or uninterested in helping people with disabilities get the correct information; as noted, research has found that staff attitudes are

key determinants of whether residents have the necessary information for voting.[39] Though SB 1 permits a voter to "make a statement" that they have not been issued any of the permissible identification numbers, a voter cannot make a statement indicating that they have been issued one of these numbers but do not know the number or do not have access to it or cannot provide the number for some other reason.

92.     Among those whose applications are initially rejected, it is likely that correcting the information will be difficult for many people with disabilities. Whether attempting to remedy this in person or online, it is unclear how a voter who does not know these numbers will be able to cure the defect. Further, voters who are voting by mail due to a disability may be unable to go in person to cure the defect for the same reason they did not vote in person.

93.     The online curing option may not help voters who are unable to cure in person because, as discussed above, people with disabilities have lower levels of internet access: a full 15% of Texans with disabilities living in the community (not in group quarters) do not have internet access in their homes, compared to only 5% of those without disabilities.[40] The gap is larger among those age 65 or older, where 40% of Texans with disabilities compared to 18% of those without disabilities do not have internet access. Even those with internet access may be limited by inaccessible websites. A 2020 report found that 98% of all websites are not fully accessible to people with disabilities.[41] Since 15% of Texans with disabilities do not have access to the internet at their homes, it is my opinion they will be disenfranchised by this provision since many will not be able to cure in person either.

94.     Indeed, as has already been reported, as of February 25, 2022, election officials in the most populous Texas counties have rejected roughly 30% of the absentee ballots they have received largely because voters did not include their driver's license number or Social Security number, or the numbers they put down did not match what officials had on file–new provisions imposed by SB 1. As reported, this rate of rejection represents a significant increase from past elections, including 2020, when the statewide rejection rate of absentee ballots was less than 1% for the general election. In 2020, officials rejected 8,304 absentee ballots in Texas out of nearly a million votes across the state. This year, that number has already been surpassed in just two counties.[42] As reported by the *New York Times*:

> But with voting by mail limited to elderly and disabled voters, the concern that
> initially rejected ballots will disenfranchise voters has grown. Guillermina

---

[39] Jason H.T. Karlawish et al., *Identifying the barriers and challenges to voting by residents in nursing homes and assisted living settings*, 20 J. AGING SOC. POLICY 65 (2008).

[40] The ACS does not measure internet access for those living in institutional or non-institutional group quarters.

[41] Ruderman Family Foundation, *98% of Websites Fail to Comply With Accessibility for People With Disabilities,* ICT SOLUTIONS & EDUCATION MAGAZINE, https://isemag.com/2020/11/telecom-98-percent-of-websites-fail-to-comply-with-accessibility-requirements-for-people-with-disabilities/, last visited 2/28/22.

[42] Nick Corasantini, *Ballot Rejections in Texas Spike After New Voting Law*, NEW YORK TIMES, Feb. 25, 2022, https://www.nytimes.com/2022/02/25/us/politics/texas-primary-ballot-rejections.html.

Nevárez lives at home in the Maverick County border region with her husband, Alfonso Nevárez Sr., and her 98-year-old mother, who is disabled and recovering from a recent surgery. In all three of their ballots, they missed the field to include their identification information, presuming that since their ballot application had been accepted they were free to cast their ballot. "We didn't look at the fine print," said Ms. Nevárez, who is also the mother of a former Democratic state representative. "And there's so much of it, the fine print." She corrected the three ballots and sent them back by mail. She is hoping that the information is correct — because of her mother's condition, they cannot go in person to fix any issues. "It is very upsetting," Ms. Nevárez said.[43]

95.     I conclude with a reasonable degree of certainty, based on the above data, that Texans with disabilities are four times more likely to vote by mail, more likely to have difficulty accessing the requisite ID numbers and ensuring the numbers on the application and envelope match, and less likely to be able to access the curing process online or in person. As such, the new barriers imposed by Sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12 will make it harder for people with disabilities to vote. Therefore, I conclude that these sections will cause some Texans with disabilities to be disenfranchised and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1.

# **SECTION 6.01**

96.     This section requires any person other than a close relative who simultaneously drives seven or more voters to the polls for curbside voting to complete and sign a form stating their name and address and whether they only provided transportation assistance or also assistance with voting.  There are several research findings relevant to this section's impact on voters with disabilities.

97.     As discussed above, voters with disabilities are more likely to face transportation barriers than people without disabilities. Among all Texans of voting age, 10% report a disability that limits travel.  Texans with disabilities are four times more likely to live in a zero-vehicle household (14.4% compared to 3.0%) and are less likely to be drivers (59.6% compared to 93.0%).  Further, 5.8% of Texans have difficulty going outside alone, representing 1.1 million people. Voters with disabilities are also more likely to be socially isolated, and more likely to live alone. Because curbside voting is only available to certain voters who are far more likely to have a disability and people with disabilities are more likely to face transportation barriers and social isolation, it is my opinion that additional barriers to providing assistance in the form of group transportation for curbside voting will burden voters with disabilities.

98.     I can conclude with reasonable certainty, based on the above data, that Texans with disabilities are more likely to face transportation barriers, more likely to live alone, and more likely to be socially isolated. As such, the barriers imposed by Section 6.01 on providing group transportation to the polls for curbside voting will make it harder for some Texans with disabilities to vote. Therefore, I conclude that Section 6.01 will cause some Texans with

---

[43] *Id.*

disabilities to be disenfranchised, and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1.

# <u>SECTION 6.04</u>

**99.**     This section adds language to the assistor oath, substantially restricting the amount of assistance that can be given by anyone except an election officer.  This will make voting more difficult for many people with disabilities.  Texas data show that 41.2% of people with disabilities need assistance in one or more daily activities. National data show that 6.2% of people with disabilities who voted in a polling place required assistance, and 10.5% of voters with disabilities who voted with a mail ballot required assistance.

**100.**     This section limits the type of assistance that can be given by an assistor to reading or marking the ballot, or directing the voter to read or mark the ballot.  Because the law does not define everything that could constitute assistance, voters with disabilities as well as assistors will be unsure of what assistance is allowed, and voters may be reluctant to make use of assistance even when it is available for fear of violating the law. This does not allow the assistor to explain the voting process and choices.  In my expert opinion, this is likely to interfere with people with disabilities' ability to vote, in particular for the 1,082,500 Texans with cognitive impairments who are eligible to vote, and other people with neurological and developmental disabilities who benefit from assistance in making informed choices in important areas of life. Some examples of valuable voting assistance that arguably go beyond the narrow definition of assistance in the oath include:

- Using an American Sign Language interpreter to interpret the ballot to someone who is deaf and does not read written English fluently. ASL and English are different languages with different syntax and grammar. ASL sometimes requires a signed explanation and interpretation of key terms and concepts.

- Reminding someone with memory issues from a Traumatic Brain Injury about how to use his or her marked sample ballot to refresh recollection about how he or she wanted to vote.

- Using simple plain language to help someone with cognitive or developmental disabilities understand the voting process. This can include answering the voter's questions about the voting process or the ballot.

- Helping someone with a mobility or cognitive disability navigate the physical polling place to find the information they need, speak to the poll workers, and get to the voting booth.

- Helping someone with Autism Spectrum Disorder cope with stressful voting lines, noises, sensations, or lights. This may include implementing calming strategies to support the person so that he or she votes without triggering feelings of being overwhelmed.

- Helping someone with a visual impairment set up and use the accessible voting machine. This may include setting up the headphones or troubleshooting technical issues that arise while the voter is voting and helping the voter deliver his or her paper ballot to the ballot counter.

- Helping a person with an anxiety disorder cope with the anxiety of a possibly new and stressful situation of navigating the voting technology and process. This may include verbal reassurance that the person marked the ballot in the manner he or she intended.

101.    I conclude with a reasonable degree of certainty, based on the above data, that a large number of Texans with disabilities need assistance with voting and that many of them depend on receiving such assistance. I also conclude that it is highly likely that many Texans with disabilities will find it difficult or impossible to obtain the assistance they require given the restrictions imposed by section 6.04. Therefore, I conclude that section 6.04 will cause some Texans with disabilities to be disenfranchised, and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1.

# SECTIONS 6.03 AND 6.05

102.    These sections create extra requirements for assistors to document their relationship to the voter and whether they received any compensation or benefit from a candidate, campaign, or political committee. These sections will make it more likely that the ballot of a person with a disability is rejected because of a clerical error or a minor mistake by the person providing assistance.  These sections may also make it more difficult for people with disabilities to find assistance at all. As noted above, many people with disabilities are socially isolated and may have a hard time finding someone to assist them. One-fifth of voters with disabilities who needed voting assistance in 2020 reported receiving it from people who were not family or household members.  Due to the higher need for assistance with voting among people with disabilities, this provision creates an extra barrier to voting for some people with disabilities.

103.    I conclude with a reasonable degree of certainty, based on the above data, that a large number of Texans with disabilities need assistance with voting and that many of them depend on receiving such assistance from people other than family members. I also conclude that it is highly likely that many Texans with disabilities will find it difficult or impossible to find needed assistance because of sections 6.03 and 6.05 requirements of additional forms and statements. Therefore, I conclude that sections 6.03 and 6.05 will cause some Texans with disabilities to be disenfranchised, and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1.

# SECTION 6.06

104.    This section criminalizes the provision of assistance by any person who solicits, receives, or accepts compensation for helping a voter with their mail ballot unless the assistor is an attendant or caregiver. While attendants and caregivers are exempt, this section will prevent friends, neighbors, and other non-family members from assisting people with disabilities if they receive any type of economic benefit. It will also prohibit people with disabilities from getting

help from community or nonpartisan civic engagement organizations that routinely provide voting support to the disability community. The 2020 DVAS study showed that just under one-fifth (18.1%) of people providing assistance to voters with disabilities with voting by mail were friends, neighbors, or other non-relatives apart from home aides.  In my expert opinion, this provision will discourage well-meaning assistors from providing that assistance, because any type of compensation or thank you, such as reimbursement for gas, could be construed as violating the law. This will restrict the ability to obtain assistance for a substantial number of people with disabilities.

**105.**    Voters with disabilities are also more likely to be socially isolated, and more likely to live alone. It is thus very possible that a worker or volunteer with a community or civic engagement organization, a neighbor, a friend, or another non-family member may be the best and only option to assist them with voting by mail.

**106.**    I conclude with a reasonable degree of certainty, based on the above data, that a number of Texans with disabilities need assistance with voting their mail ballots and that some of them depend on receiving such assistance from people other than previously known attendants or caregivers. Therefore I conclude that Section 6.06 will cause some Texans with disabilities to be disenfranchised, and a further number to face significant difficulties in voting that they would not.

# SECTION 7.04

**107.**    This section limits "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." It also makes it a crime for any person to receive compensation or other benefit for collecting another voter's ballot. As noted above, many voters with disabilities require assistance in voting, and restrictions on in-person interactions will limit their ability to obtain needed assistance.  Such interaction may be of particular benefit to voters with cognitive impairments and developmental disabilities who may have difficulty understanding the issues and voting process but, as described above, have the right to vote.  Finding assistance may be especially difficult for many people with disabilities given their higher likelihood of living alone, and lower rate of socializing as documented above.  It is very possible that someone connected to a campaign (possibly the person who assists them regularly) may be the best and only option to assist them with voting.  Even if they are assisted by someone working or volunteering with a campaign, this does not imply that their vote will be influenced by that person.  As noted above, assisted decision making can "facilitate the exercise of autonomy" for people with certain conditions.[44]  The assisted voter must approve the vote before it is filed.

**108.**    In addition, people with mobility limitations may not be able to personally deliver their ballots to mailboxes, and they may not have a close family or household member or lawful assistant to do so. Restricting the individuals who can help with this process will create extra difficulties for these voters in delivering their ballot.

---

[44] Andrew Peterson, Jason Karlawish, and Emily Largent, *Supported Decision Making With People at the Margins of Autonomy*, 21 AM. J. BIOETHICS 4 (2021)

**109.**     I conclude with a reasonable degree of certainty, based on the above data that a large number of Texans with disabilities need assistance with voting their mail ballots and that some of them depend on receiving such assistance from persons other than a close family or household member or lawful assistant. Therefore I conclude that Section 7.04 will cause some Texans with disabilities to be disenfranchised, and a further number to face significant difficulties in voting that they would not otherwise face but for SB 1.

# CONCLUSION

**110.**     In sum, in my opinion, based on reasonable certainty, these provisions of SB 1 will create an extra burden in voting for a significant number of people with disabilities across the state of Texas and may prevent some from voting altogether.  As documented above, people with disabilities already face many social and economic disparities that impact their ability to vote, including a high rate of needing assistance in activities of daily living, higher likelihood of living alone, lower likelihood of driving or travel in general, lower likelihood of internet access, and lower economic resources compared to those without disabilities.  They also must contend with well-documented social stigma that both reflects and reinforces their social isolation and increases the difficulty of obtaining necessary resources and assistance in exercising the right to vote.  The number of barriers voters with disabilities face in Texas  help explain why voting-eligible Texans with disabilities were 5.1 percentage points less likely than those without disabilities to vote in 2020.  SB 1 creates extra voting barriers for many Texans with disabilities, making it more burdensome for them to exercise their right to vote. Media reports have already demonstrated that people with disabilities are facing new barriers related to SB 1.[45] In my opinion, SB 1 will cause some Texans with disabilities to be disenfranchised entirely and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1.

---

[45] *See* Juana Summers and Barbara Sprunt, *Texas election workers provide practical and emotional support to confused voters*, NATIONAL PUBLIC RADIO, Feb. 7, 2022, https://www.npr.org/2022/02/27/1082821390/texas-election-workers-provide-practical-and-emotional-support-to-confused-voter;%20; *see also* Nick Corasaniti, *Ballot Rejections in Texas Spike After New Voting Law*, NY TIMES, Feb. 25, 2022, https://www.nytimes.com/2022/02/25/us/politics/texas-primary-ballot-rejections.html.

**Table 1:  Disability Prevalence in Texas Using Census Definition, 2020**

**Figures are for Texas citizens age 18 or older.**

| | Number<br>(1) | % of adult citizens<br>(2) | Margin of error (+/-)<br>(3) |
|---|---|---|---|
| **Total citizens age 18 or older** | 19,425,500 | 100.0% | |
| **No disability** | 16,401,300 | 84.4% | 0.3% |
| **Disability** | 3,024,200 | 15.6% | 0.3% |
| | | | |
| **Type of disability** | | | |
| **Hearing impairment** | 875,900 | 4.5% | 0.1% |
| **Vision impairment** | 638,500 | 3.3% | 0.1% |
| **Cognitive impairment** | 1,082,500 | 5.6% | 0.2% |
| **Mobility impairment** | 1,604,700 | 8.3% | 0.2% |
| **Difficulty with dressing or bathing** | 596,300 | 3.1% | 0.1% |
| **Difficulty going outside home alone** | 1,127,500 | 5.8% | 0.2% |
| | | | |
| **Sample size** | 127,398 | | |

Based on analysis of U.S. Census Bureau's 2020 American Community Survey microdata.  A disability is defined as having one or more of the six conditions listed.  See https://www.census.gov/topics/health/disability/guidance/data-collection-acs.html.

The margin of error is based on a 95% confidence interval.

**Table 2: Disability Prevalence Using More Expansive Definition**
Figures represent percent of Texas adults age 18 or older

| | Percent (1) | Margin of error (+/-) (2) |
|---|---|---|
| **Any disability** | 30.5% | 2.4% |
| | | |
| **Hearing impairment** | 6.3% | 1.2% |
| **Vision impairment** | 4.7% | 1.1% |
| **Speech impairment** | 2.1% | 0.7% |
| **Difficulty with physical activities:** | | |
| **Walking 3 blocks** | 13.5% | 1.7% |
| **Climbing stairs** | 12.7% | 1.6% |
| **Lifting** | 9.3% | 1.4% |
| **Grasping** | 4.3% | 1.0% |
| **Standing^** | 15.9% | 1.8% |
| **Pushing/pulling^** | 12.9% | 1.7% |
| **Sitting^** | 8.2% | 1.4% |
| **Crouching^** | 19.3% | 2.0% |
| **Reaching^** | 7.9% | 1.3% |
| **Difficulty with activities of daily living due to physical or mental condition:** | | |
| **Any of above** | 13.4% | 1.7% |
| **Getting around inside home** | 1.7% | 0.6% |
| **Going outside home for errands** | 8.3% | 1.4% |
| **Getting in bed or chair** | 4.3% | 1.0% |
| **Taking bath or shower** | 4.5% | 1.0% |
| **Getting dressed** | 3.0% | 0.8% |
| **Eating** | 0.7% | 0.4% |
| **Using toilet** | 1.7% | 0.6% |
| **Keeping track of money** | 4.7% | 1.1% |
| **Preparing meals** | 4.1% | 0.9% |
| **Doing light housework** | 5.0% | 1.0% |
| **Taking medicine** | 3.8% | 1.0% |
| **Using telephone** | 1.3% | 0.5% |
| **Mental or cognitive impairment:** | | |
| **Learning disability** | 4.3% | 1.1% |
| **Alzheimer's, senility, or dementia** | 3.4% | 0.9% |
| **Intellectual disability** | 1.7% | 0.7% |
| **Developmental disability** | 0.7% | 0.5% |
| **Other mental/emotional condition** | 4.4% | 1.1% |
| **Sample size** | 1,569 | |

^ These conditions were not included as part of the expanded disability definition but are reported here to illustrate the range of limitations faced by people with disabilities. Based on analysis of 2014 Survey of Income and Program Participation SSA Supplement microdata.  Discussion of the disability definition and fuller results for entire U.S. are in https://www.census.gov/library/publications/2018/demo/p70-152.html. The margin of error is based on a 95% confidence interval.

**Table 3: Disability and Demographic Characteristics in Texas, 2020**

**Figures are for Texas citizens age 18 or older.**

| | Total with disability (1) | Total with no disability (2) | % with disability (3) | Margin of error (+/-) (4) |
|---|---|---|---|---|
| **Total citizens age 18 or older** | 3,024,200 | 16,401,300 | 15.6% | 0.3% |
| **Female** | 1,551,800 | 8,385,000 | 15.6% | 0.4% |
| **Male** | 1,472,400 | 8,016,300 | 15.5% | 0.4% |
| **Asian** | 60,400 | 707,000 | 7.9% | 1.1% |
| **Black non-Hispanic/Latinx** | 428,300 | 1,963,400 | 17.9% | 0.9% |
| **Hispanic/Latinx** | 881,800 | 5,312,000 | 14.2% | 0.5% |
| **Native American/Alaskan** | 8,600 | 39,700 | 17.8% | 4.3% |
| **White non-Hispanic/Latinx** | 1,533,400 | 7,851,200 | 16.3% | 0.4% |
| **Other race/ethnicity** | 111,600 | 528,000 | 17.4% | 1.5% |
| **Age 18-34** | 487,600 | 5,874,500 | 7.7% | 0.4% |
| **Age 35-49** | 445,800 | 4,468,800 | 9.1% | 0.4% |
| **Age 50-64** | 761,000 | 3,732,800 | 16.9% | 0.6% |
| **Age 65-74** | 601,700 | 1,591,700 | 27.4% | 0.9% |
| **Age 75-84** | 460,600 | 620,300 | 42.6% | 1.4% |
| **Age 85+** | 267,500 | 113,200 | 70.3% | 2.2% |
| **No HS degree** | 583,000 | 1,488,100 | 28.1% | 1.0% |
| **HS degree** | 948,100 | 3,988,500 | 19.2% | 0.6% |
| **Some college, no degree** | 720,300 | 4,025,800 | 15.2% | 0.5% |
| **Associate's degree** | 212,200 | 1,335,200 | 13.7% | 0.9% |
| **Bachelor's degree** | 360,000 | 3,633,600 | 9.0% | 0.4% |
| **Graduate degree** | 200,600 | 1,930,100 | 9.4% | 0.6% |
| **Overall sample size** | 23,590 | 103,808 | | |

Based on analysis of U.S. Census Bureau's 2020 American Community Survey microdata.
The margin of error is based on a 95% confidence interval.

34

**Table 4:  Economic Status and Living Situation of People with Disabilities**

Figures are for Texas citizens age 18 or older.

| | Disability | No disability | Disability gap | Margin of error on gap (+/-) | |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | |
| **Employed if working age (18-64)** | 40.1% | 74.2% | -34.0% | 1.3% | * |
| **In poverty** | 18.0% | 9.2% | 8.9% | 0.8% | * |
| **Social Security income** | 47.4% | 13.3% | 34.0% | 0.9% | * |
| **Public assistance income or food stamps** | 20.3% | 10.3% | 10.0% | 0.8% | * |
| **Medicaid or other low-income health plan** | 26.5% | 6.1% | 20.4% | 0.8% | * |
| **Living situation** | | | | | |
|     **Live alone** | 20.8% | 12.3% | 8.6% | 0.8% | * |
|     **Live with others, not in group quarters** | 73.3% | 85.6% | -12.3% | 0.8% | * |
|     **Noninstitutional group quarters^** | 1.2% | 1.1% | 0.2% | 0.1% | |
|     **Institutional group quarters^^** | 4.7% | 1.1% | 3.6% | 0.2% | * |
| **Marital status** | | | | | |
|     **Married, spouse present** | 42.8% | 52.4% | -9.6% | 1.0% | * |
|     **Separated/divorced** | 19.4% | 12.1% | 7.3% | 0.8% | * |
|     **Widowed** | 14.4% | 3.4% | 11.0% | 0.6% | * |
|     **Never married** | 23.4% | 32.1% | -8.8% | 0.9% | * |
| **Sample size** | 9,609 | 23,590 | 103,808 | | |

* Disability gap is outside 95% margin of error.
^ College dorm, military barracks, group home, mission, or shelter
^^  Nursing home, mental hospital, or correctional facility
Based on analysis of Census Bureau's 2020 American Community Survey microdata.

**Table 5:  Need for Assistance in Disability Population**

Figures represent percent of disability population age 18 or older.

| | Texas (1) | Margin of error (+/-) (2) | United States (3) | Margin of error (+/-) (4) |
|---|---|---|---|---|
| **Any help needed with activities of daily living** | 41.2% | 4.5% | 37.4% | 1.1% |
| **Need help with:** | | | | |
| **Getting around inside home** | 3.5% | 1.5% | 3.8% | 0.4% |
| **Going outside home for errands** | 25.5% | 4.0% | 21.2% | 1.0% |
| **Getting in bed or chair** | 7.5% | 2.3% | 7.2% | 0.6% |
| **Taking bath or shower** | 9.4% | 2.5% | 8.6% | 0.7% |
| **Getting dressed** | 6.6% | 2.1% | 6.9% | 0.6% |
| **Walking** | 7.9% | 2.3% | 8.2% | 0.6% |
| **Eating** | 0.5% | 0.5% | 1.3% | 0.3% |
| **Using toilet** | 3.4% | 1.7% | 3.3% | 0.4% |
| **Keeping track of money** | 12.0% | 2.9% | 12.2% | 0.8% |
| **Preparing meals** | 11.0% | 2.7% | 12.0% | 0.8% |
| **Doing light housework** | 13.7% | 2.9% | 15.4% | 0.8% |
| **Taking medicine** | 9.7% | 2.8% | 8.8% | 0.7% |
| **Accessing Internet** | 15.2% | 3.1% | 13.4% | 0.8% |
| | | | | |
| **Help provided by^:** | | | | |
| **Family members** | 34.9% | 4.3% | 30.7% | 1.1% |
| **Friends or neighbors** | 4.0% | 1.8% | 4.0% | 0.5% |
| **Paid help** | 4.0% | 1.6% | 4.2% | 0.5% |
| **Partner or companion** | 1.4% | 1.1% | 1.3% | 0.3% |
| **Other non-relative** | 1.4% | 1.0% | 1.9% | 0.3% |
| **Any non-family member** | 10.6% | 2.7% | 10.7% | 0.7% |
| | | | | |
| **Sample size** | 566 | | | |

Based on analysis of 2014 Survey of Income and Program Participation SSA Supplement microdata.  See Table 2 for prevalence figures using this definition of disability.  Fuller results for entire U.S. are in https://www.census.gov/library/publications/2018/demo/p70-152.html.

The margin of error is based on a 95% confidence interval.
^ The categories overlap as the individual may have received help from more than one person.

**Table 6:  Computer and Internet Access by Disability Status in Texas**

**Figures are for Texas citizens age 18 or older.**

| | Disability | No disability | Disability gap | Margin of error on gap (+/-) | |
|---|---|---|---|---|---|
| | **(1)** | **(2)** | **(3)** | **(4)** | |
| **Home has internet access, 2020** | | | | | |
| **All** | 84.8% | 95.2% | -10.4% | 0.7% | * |
| **Age 18-64** | 90.4% | 96.3% | -5.9% | 0.8% | * |
| **Age 65 or older** | 60.5% | 82.3% | -21.8% | 1.3% | * |
| **Individual uses internet at home, 2019** | | | | | |
| **All** | 60.1% | 78.9% | -18.8% | 4.5% | * |
| **Age 18-64** | 68.0% | 80.8% | -12.8% | 6.4% | * |
| **Age 65 or older** | 68.9% | 84.4% | -15.5% | 6.3% | * |
| **Individual uses internet at home or elsewhere, 2019** | | | | | |
| **All** | 60.5% | 82.3% | -21.8% | 4.4% | * |
| **Age 18-64** | 53.1% | 67.9% | -14.8% | 6.8% | * |
| **Age 65 or older** | 53.1% | 70.4% | -17.3% | 6.8% | * |
| **Sample size** | | | | | |
| **2020 data** | 19,465 | 96,970 | | | |
| **2019 data** | 535 | 3,906 | | | |

* Disability gap is outside 95% margin of error.

Home internet access figures are based on analysis of Census Bureau's 2020 American Community Survey microdata, and individual internet use is based on analysis of November 2019 Current Population Survey Computer and Internet Use Supplement microdata.

**Table 7: Transportation and Disability**

| | All (1) | Disability (2) | No disability (3) | Disability gap (4) | |
|---|---|---|---|---|---|
| **Data for Texans age 18 or older^** | | | | | |
| Have travel-limiting disability | 10.0% | 100.0% | 0.0% | | |
| Live in zero-vehicle household | | 14.4% | 3.0% | 11.4% | * |
| Average trips per day | | 2.3 | 3.5 | -1.2 | * |
| No trips in a day | | 40.0% | 15.8% | 0.2 | * |
| Driver | | 59.6% | 93.0% | -0.3 | * |
| Public transportation in past 30 days | | 12.6% | 8.8% | 3.8% | * |
| Used ride-hailing in past 30 days | | 2.6% | 8.8% | -6.2% | * |
| Average online purchases for delivery in past month | | 31.5% | 54.2% | -22.7% | * |
| Agree that travel is a financial burden | | 53.3% | 39.6% | 13.7% | * |
| **National data from 2020 survey with broader disability measure^^** | | | | | |
| Can drive own or family vehicle | | 69.6% | 90.0% | -20.4% | * |
| Most often use for basic transportation: | | | | | |
| Own or family vehicle | | 82.7% | 93.3% | -10.7% | * |
| Someone else's vehicle | | 6.4% | 1.8% | 4.7% | * |
| Taxi or rideshare | | 3.2% | 0.5% | 2.7% | * |
| Para-transit | | 1.3% | 0.2% | 1.1% | * |
| Other public transportation | | 4.9% | 3.0% | 1.9% | |
| Other | | 1.5% | 1.2% | 0.3% | |
| Have transportation problems "very often" or "always" | | 5.6% | 2.9% | 2.6% | * |
| **Sample size** | | 1,768 | 787 | | |

^ From analysis of 2017 National Highway Travel Survey data at https://nhts.ornl.gov/

^^ From https://www.eac.gov/election-officials/us-election-assistance-commission-study-disability-and-voting-accessibility-2020, Table 31

**Table 8: Voting and Disability in 2020**

| | Texas | | | | United States | | | |
| | No disability (1) | Any disability (2) | Disability gap (3) | Margin of error on gap (+/-) (4) | No disability (5) | Any disability (6) | Disability gap (7) | Margin of error on gap (+/-) (8) |
|---|---|---|---|---|---|---|---|---|
| Among all eligible to vote: | | | | | | | | |
|    Registered to vote | 71.2% | 71.9% | 0.7% | 4.2% | 73.0% | 70.1% | -3.0% | 1.1% * |
|    Voted | 64.5% | 59.4% | -5.2% | 4.6% * | 67.5% | 61.8% | -5.7% | 1.1% * |
| | | | | | | | | |
| Method if voted: | | | | | | | | |
|    In person on election day | 14.2% | 9.5% | -4.7% | 3.6% * | 31.2% | 25.8% | -5.4% | 1.3% * |
|    Early in person | 77.6% | 60.2% | -17.5% | 5.7% * | 26.9% | 21.0% | -5.8% | 1.2% * |
|    Mail ballot | 8.2% | 30.2% | 22.0% | 5.2% * | 41.9% | 53.2% | 11.3% | 1.5% * |
| | | | | | | | | |
| Sample size | 3,745 | 545 | | | 70,898 | 11,000 | | |

\* Disability gap is outside 95% margin of error.
Based on analysis of 2020 Current Population Survey Voting and Registration Supplement microdata.

**Table 9: Voting by Disability Type in 2020**

All figures are for entire United States

| | No disability (1) | Any disability (2) | | Hearing impairment (3) | | Vision impairment (4) | | Cognitive impairment (5) | | Mobility impairment (6) | | Difficulty dressing or bathing (7) | | Difficulty going outside alone (8) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Among all eligible to vote:** | | | | | | | | | | | | | | | |
| **Registered to vote** | 73.0% | 70.1% | * | 76.2% | * | 67.4% | * | 61.6% | * | 69.4% | * | 61.9% | * | 61.8% | * |
| **Voted** | 67.5% | 61.8% | * | 68.5% | | 59.2% | * | 50.7% | * | 60.4% | * | 49.4% | * | 51.6% | * |
| **Method if voted:** | | | | | | | | | | | | | | | |
| **In person on election day** | 31.2% | 25.8% | * | 25.4% | * | 24.6% | * | 26.4% | * | 25.0% | * | 23.4% | * | 23.0% | * |
| **Early in person** | 26.9% | 21.0% | * | 22.0% | * | 22.0% | * | 19.3% | * | 19.4% | * | 14.4% | * | 16.7% | * |
| **Mail ballot** | 41.9% | 53.2% | * | 52.6% | * | 53.3% | * | 54.2% | * | 55.7% | * | 62.1% | * | 60.2% | * |
| **Sample size** | 70,898 | 11,000 | | 3,633 | | 1,466 | | 3,315 | | 6,255 | | 1,689 | | 3,769 | |

* Disability gap is outside 95% margin of error.
Based on analysis of 2020 Current Population Survey Voting and Registration Supplement microdata.

**Table 10:  In-Person Voting Difficulties by Disability Type in 2020**

| Types of voting difficulties | No disability (1) | Any disability (2) | | Hearing impairment (3) | Visual impairment (4) | | Cognitive impairment (5) | | Mobility impairment (6) | | No need for help in daily activities (7) | | Need help in daily activities (8) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Any difficulty in voting in person at polling place or election office | 9.8% | 18.0% | * | 19.3% | 23.5% | | 30.0% | * * | 17.2% | * | 15.2% | | 24.8% | * |
| 1.  Difficulty in finding or getting to the polling place | 2.3% | 1.4% | | 1.0% | 3.8% | | 3.6% | | 1.2% | | 0.8% | | 3.1% | |
| 2.  Difficulty in getting inside the polling place (for example, steps) | 0.4% | 3.2% | * | 1.6% | 1.1% | | 2.4% | | 5.1% | * | 2.1% | | 6.0% | * |
| 3.  Difficulty waiting in line | 6.2% | 7.4% | | 8.5% | 1.4% | * | 11.2% | | 5.1% | | 7.1% | | 8.1% | |
| 4.  Difficulty reading or seeing the ballot | 0.0% | 3.8% | * | 4.1% | 20.5% | * | 7.4% | * | 5.2% | * | 1.5% | * | 9.7% | * |
| 5.  Difficulty understanding how to vote or use the voting equipment | 2.9% | 2.7% | | 0.9% | 2.2% | | 3.5% | | 2.9% | | 2.6% | | 2.9% | |
| 6.  Difficulty communicating with poll workers or other officials at the polling place | 0.6% | 2.1% | | 3.2% | 1.1% | | 2.5% | | 2.6% | | 1.3% | | 3.8% | |
| 7.  Difficulty writing on the ballot | 0.0% | 1.2% | * | 0.9% | 1.2% | | 2.3% | | 2.2% | | 0.5% | | 3.2% | |
| 8.  Difficulty operating the voting machine | 0.9% | 1.0% | | 1.0% | 4.1% | | 1.5% | | 0.0% | | 0.9% | | 1.2% | |
| 9.  Other type of difficulty in voting | 0.3% | 1.8% | * | 4.0% | 2.2% | | 4.3% | | 1.2% | | 1.7% | | 2.0% | |
| Sample size | 371 | 697 | | 124 | 72 | | 139 | | 298 | | 506 | | 189 | |

* Difference from non-disability sample is outside 95% margin of error
From 2020 Election Assistance Commission survey with results reported at https://www.eac.gov/election-officials/us-election-assistance-commission-study-disability-and-voting-accessibility-2020, Table 8.

**Table 11:  Specific Mail Voting Difficulties by Disability Type in 2020**

| Types of mail voting difficulties | No disability (1) | Any disability (2) | | Hearing impairment (3) | Visual impairment (4) | | Cognitive impairment (5) | Mobility impairment (6) | | No need for help in daily activities (7) | Need help in daily activities (8) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Any difficulty receiving, returning, reading, understanding, or filling out ballot | 2.1% | 5.4% | * | 5.1% | 22.1% | * | 6.3% | 6.4% | * | 3.8% | 8.9% | * |
| Any difficulty reading, understanding, or filling out ballot | 0.7% | 2.3% | | 1.6% | 7.9% | * | 2.5% | 2.5% | | 1.8% | 3.3% | |
| Difficulty reading mail ballot | 0.0% | 1.4% | * | 1.6% | 5.7% | * | 1.9% | 1.2% | | 1.0% | 2.3% | |
| Difficulty understanding mail ballot | 0.4% | 0.4% | | 0.0% | 0.0% | | 0.0% | 0.4% | | 0.3% | 0.5% | |
| Difficulty filling out mail ballot | 0.0% | 0.8% | | 0.0% | 2.2% | | 0.6% | 1.3% | | 0.4% | 1.7% | |
| Other difficulty completing mail ballot | 0.4% | 0.1% | | 0.0% | 0.0% | | 0.0% | 0.3% | | 0.2% | 0.0% | |
| Difficulty receiving mail ballot | 1.7% | 1.9% | | 2.5% | 5.9% | | 3.0% | 1.9% | | 1.7% | 2.5% | |
| Difficulty returning mail ballot | 0.0% | 0.7% | * | 1.6% | 6.7% | | 2.0% | 0.9% | * | 0.2% | 1.9% | |
| Sample size | 319 | 797 | | 119 | 75 | | 155 | 398 | | 526 | 267 | |

\* Difference from non-disability sample is outside 95% margin of error
From 2020 Election Assistance Commission survey with results reported at https://www.eac.gov/election-officials/us-election-assistance-commission-study-disability-and-voting-accessibility-2020, Table 11.

# **<u>EXHIBIT A</u>**

CURRICULUM VITAE

Douglas L. Kruse

ADDRESSES:

School of Management and Labor Relations        34 Wilson Road
Rutgers University                                               Princeton, N.J.  08540
94 Rockafeller Road                                          609-924-3422
New Brunswick, N.J. 08903
(848) 445-5991
E-mail:  dkruse@smlr.rutgers.edu


EDUCATION:

Harvard University, Cambridge, Massachusetts.
        Ph.D. in Economics, June, 1988.

        Major fields:  Labor Economics, Comparative Economic Systems.
        Minor fields:  Applied Econometrics, Industrial Organization.
        Dissertation topic:  Empirical test of Weitzman profit-sharing theory, and effect of
                profit sharing on productivity and growth.

University of Nebraska-Lincoln, Lincoln, Nebraska.
        M.A. in Economics, August 1983.
        Certification in Public Policy Analysis and Program
                Evaluation, 1983.
        Fields: Public Policy, Field Research, Comparative Economic Systems.

Harvard University, Cambridge, Massachusetts.
        B.A. in Economics, June 1981, Magna Cum Laude.


EMPLOYMENT:

Distinguished Professor, July 2014-present; Professor, July 2000-June 2014; Associate
        Professor, July 1994-June 2000; Assistant Professor, July 1988-June 1994; Dept. of
        Human Resource Management, School of Management and Labor Relations, Rutgers
        University.  Member of the Graduate Faculties in Economics, Labor and Employment
        Relations, and Human Resource Management.

Associate Dean for Academic Affairs, School of Management and Labor Relations, Rutgers
        University, 2017-2018.

Senior Economist, Council of Economic Advisers, Executive Office of the President,
Washington, D.C., September 2013-August 2014.
Teaching Assistant, 9/86-5/88, Dept. of Economics, Harvard University.
Labor Economics, Econometrics, Comparative Economic Systems, and
Labor Thesis Advising.

Economic Development Consultant, 5/83-9/84, Department of Economic Development,

State of Nebraska, Lincoln, Nebraska.

OTHER POSITIONS:

National Bureau of Economic Research (Cambridge, Massachusetts), Research Associate,
September 1995-present, Faculty Research Fellow, September 1990-August 1995.

IZA Institute of Labor Economics (Bonn, Germany), Research Fellow, March 2016-present.

Associate Editor, British Journal of Industrial Relations, January 2011-June 2021.

Associate Editor, Journal of Participation and Employee Ownership, January 2017-present.

Editorial Board member, Human Resource Management Journal, January 2017-present.

Member, Transition Team for a Stronger and Fairer Economy, New Jersey Governor-elect
Phil Murphy, November 2017-January 2018.

President, International Association for the Economics of Participation, 2012-2014; Vice-
President, 2010-2012.

Co-director, Program for Disability Research, School of Management and Labor Relations,
Rutgers University, January 2005-present.

Director, Ph.D. Program in Industrial Relations and Human Resources, School of
Management and Labor Relations, Rutgers University July 2007-June 2013.

President's Committee on Employment of People with Disabilities, Subcommittee on
Employment Disability Concerns (Washington, D.C.), January 1998-December 2000.

New Jersey State Rehabilitation Council, October 1999-June 2013.

BOOKS:

How Did Employee Ownership Firms Weather the Past Two Recessions?  Kalamazoo, MI: W.E. Upjohn Institute for Employment Research, 2017.  By Fidan Kurtulus and Douglas Kruse.

Sharing Ownership, Profits, and Decision-making in the 21st Century, Volume 14 in the series "Advances in the Economic Analysis of Participatory and Labor-managed Firms."  Bingley, UK: Emerald Publishing, 2013.  Edited by Douglas Kruse.

People with Disabilities: Sidelined or Mainstreamed?  Cambridge, England: Cambridge University Press, 2013.  By Lisa Schur, Douglas Kruse, and Peter Blanck.

   Reviewed in British Journal of Industrial Relations, Industrial and Labor Relations Review, and Journal of Occupational Rehabilitation.

The Citizen's Share: Putting Ownership Back Into Democracy.  New Haven, CN:  Yale University Press, 2013.  By Joseph Blasi, Richard Freeman, and Douglas Kruse.

   Reviewed in Administrative Science Quarterly, Journal of American History, and Contemporary Sociology.

Shared Capitalism at Work: Employee Ownership, Profit Sharing, Gainsharing, and Broad-based Stock Options.  Chicago:  University of Chicago Press, 2010.  Edited by Douglas Kruse, Richard Freeman, and Joseph Blasi.

   Reviewed in Industrial and Labor Relations Review and Economic Record.

In the Company of Owners: The Truth About Stock Options (And Why Every Employee Should Have Them).  New York:  Basic Books, 2003.  By Joseph Blasi, Douglas Kruse, and Aaron Bernstein.

   Named a "Noteworthy Book in Industrial Relations and Labor Economics, 2003," by Princeton University Industrial Relations Section.
   Named as one of the top 10 business books of 2003 by Business Week.
   Reviewed in Academy of Management Perspectives, Library Journal, and Journal of Moral Education.

A Working Nation: Workers, Work, and Government in the New Economy.  New York: Russell Sage Foundation, 2000.  By David T. Ellwood, Rebecca M. Blank, Joseph Blasi, Douglas Kruse, William A. Niskanen, and Karen Lynn-Dyson.

   Reviewed in Journal of Economic Literature, Industrial and Labor Relations Review, Journal of Social Policy, and Monthly Labor Review.

Stock Options, Corporate Performance, and Organizational Change. Oakland, CA: National Center for Employee Ownership, 2000. By Joseph Blasi, Douglas Kruse, James Sesil, Maya Kroumova, and Ryan Weeden.

Meeting Future Workforce Needs.  Menomonie, WI: University of Wisconsin-Stout, 1999. By Thomas Jennings, Steve Fusco, George Erickcek, Stacey Floyd, Chip Kenney, Douglas Kruse, Rob McInnes, Paul Mulka, Darlene Robbins, Martin Sicker, and Duane Watson.

Spinal Cord Injury:  An Analysis of Medical and Social Costs.  New York:  Demos Publications, 1998.  By Monroe Berkowitz, Paul O'Leary, Douglas Kruse, and Carol Harvey.

Kremlin Capitalism: The Privatization of the Russian Economy. Ithaca, NY:  Cornell University Press, 1997.  By Joseph Blasi, Maya Kroumova, and Douglas Kruse.

Chinese translation published by Shanghai Far East Publishers in 2000.

Reviewed in Annals of the American Academy of Political and Social Science, Australian Journal of International Affairs, British Journal of Sociology, Business and the Contemporary World, Business History, Business Week, Choice, Europe-Asia Studies, Economics of Transition, Fortune, Journal of East-West Business, Journal of Political Ecology, Library Journal, New York Review of Books, Review of Political Economy, Russian Review, Slavic Review, Social Science Journal, Washington Monthly, and World Today.

Profit Sharing: Does It Make A Difference?  Kalamazoo, MI:  W.E. Upjohn Institute for Employment Research, 1993.  By Douglas Kruse.

Awarded "Richard A. Lester Prize for Outstanding Book in Industrial Relations and Labor Economics, 1993," by Princeton University Industrial Relations Section.

Reviewed in Journal of Economic Literature, Journal of Comparative Economics, Industrial and Labor Relations Review, Relations Industrielles.

The New Owners:  The Mass Emergence of Employee Ownership in Public Companies and What it Means to American Business. New York:  HarperCollins, 1991.  By Joseph Blasi and Douglas Kruse.

Russian translation published by Delo Publishers (Moscow) in 1995.

Named a "Noteworthy Book in Industrial Relations and Labor Economics, 1991," by Princeton University Industrial Relations Section.

Reviewed in Journal of Economic Literature, British Journal of Industrial Relations, Administrative Science Quarterly, Economic and Industrial Democracy.

Employee Ownership and Employee Attitudes:  Two Case Studies.

48

Norwood, Pennsylvania:  Norwood Editions, 1984. By Douglas Kruse.

Reviewed in <u>British Journal of Industrial Relations</u>, <u>California Management Review</u>, <u>Economic and Industrial Democracy</u>.

## PUBLISHED ARTICLES AND CHAPTERS:

<u>Disability</u>

"Disability and precarious work."  Forthcoming in <u>Oxford Handbook on the Sociology of Disability</u>, Oxford University Press, 2022.  By Lisa Schur and Douglas Kruse.
**111.**

"Disability and Remote Work During the Pandemic with Implications for Cancer Survivors," <u>Journal of Cancer Survivorship,</u> forthcoming.  By Douglas Kruse, So Ri Park, Yana Rodgers, and Lisa Schur.

"COVID-19 and Employment Losses for Workers with Disabilities: An Intersectional Approach," forthcoming in Sophie Hennekam, Joy Beatty, and Mukta Kulkarni, eds., <u>Handbook of Disability and Management</u>, DeGruyter, 2022.  By Lisa Schur, Yana van der Meulen Rodgers, and Douglas Kruse, February 2021.

"Disability and influence in job interviews," <u>International Journal of Conflict Management</u>, forthcoming.  By Mason Ameri, Terri Kurtzberg, Lisa Schur, and Douglas Kruse.

"Qualitative Examination of Voting Empowerment and Participation Among People Living with Traumatic Brain Injury,"  <u>Archives of Physical Medicine and Rehabilitation</u>, forthcoming.  By Flora McConnell Hammond, Christine Davis, Mark Hirsch, Julia Snow, Martha Kropf, Lisa Schur, Douglas Kruse, and Andrew Ball.

"Telework after COVID: A "silver lining" for workers with disabilities?" <u>Journal of Occupational Rehabilitation</u> Vol. 30, no. 4, 2020: 521-536.  By Lisa Schur, Mason Ameri, and Douglas Kruse.

"No Room at the Inn?  Disability Access in the New Sharing Economy," <u>Academy of Management Discoveries,</u> August 2020, 6(2): 176-205.  By Mason Ameri, Sean Rogers, Lisa Schur, and Douglas Kruse.

**112.**  "Disability in the Unionized Workplace."  In Susanne Bruyere, ed., <u>Employment and Disability: Issues, Innovations, and Opportunities</u>.  Ithaca, NY:  Cornell University Press, 2019.  By Mason Ameri, Mohammad Ali, Lisa Schur, and Douglas Kruse.

"Why Do Workers with Disabilities Earn Less?  Occupational Ability Requirements and Disability Discrimination." <u>British Journal of Industrial Relations</u> Vol. 56, No. 4,

December 2018, pp. 798-834.  By Douglas Kruse, Lisa Schur, Sean Rogers, Mason Ameri.

"The Disability Employment Puzzle: A Field Experiment on Employer Hiring Behavior," ILR Review Vol. 71, No. 2, March 2018, pp. 329-364. By Mason Ameri, Lisa Schur, Meera Adya, Scott Bentley, Patrick McKay, and Douglas Kruse.

"Disability at Work: A Look Back and Forward," Journal of Occupational Rehabilitation, Vol. 57, No. 4, December 2017, pp. 482-497.  By Lisa Schur, Kyongji Han, Andrea Kim, Mason Ameri, Meera Adya, Peter Blanck, and Douglas Kruse.

"Are Workers with Disabilities More Likely to be Displaced?"  International Journal of Human Resource Management, Vol. 27, No. 14 (2016): 1550-1579.  By Sophie Mitra and Douglas Kruse.

"Disability and Election Policies and Practices," in Barry C. Burden & Charles Stewart, eds., The Measure of American Elections.  Cambridge, England: Cambridge University Press, 2014. By Lisa Schur and Douglas Kruse.

"Accommodating Workers with and Without Disabilities," Human Resource Management, Vol. 53, No. 4, July/August 2014, pp. 593-621.  By Lisa Schur, Lisa Nishii, Meera Adya, Douglas Kruse, Susanne Bruyere, and Peter Blanck.

"Assessing Voting Competence and Political Knowledge: Comparing Individuals with Traumatic Brain Injuries and 'Average' College Students," Election Law Journal. Vol. 11, No. 2, 2012, pp. 52-69.  By Jessica N. Link, Martha Kropf, Mark Alexander Hirsch, Flora M. Hammond, Jason Karlawish, Lisa Schur, Douglas Kruse, Christine S. Davis.

 "Projecting Potential Demand for Workers with Disabilities," Monthly Labor Review, Vol. 133, No. 10, October 2010.  By Douglas Kruse, Lisa Schur, and Mohammed Ali.

"Is Disability Disabling in All Workplaces?  Workplace Disparities and Corporate Culture," Industrial Relations, Vol. 48, No. 3, July 2009, pp. 381-410.  By Lisa Schur, Douglas Kruse, Joseph Blasi, and Peter Blanck.

 "Corporate Culture and the Employment of People with Disabilities," Behavioral Sciences and the Law, Vol. 23, 2005, pp. 3-20.  By Lisa Schur, Douglas Kruse, and Peter Blanck.

 "Calibrating the Impact of the ADA's Employment Provisions," Stanford Law and Policy Review, Vol. 14.2, 2003, pp. 267-290.  By Peter Blanck, Lisa Schur, Douglas Kruse, Susan Schwochau, and Chen Song.

"Disability and Employment: Symposium Introduction," Industrial Relations, Vol. 42, No. 1, January 2003.  By Douglas Kruse and Thomas Hale.

"Employment of People with Disabilities Following the ADA," Industrial Relations, Vol. 42, No. 1, January 2003, pp. 31-66.  By Douglas Kruse and Lisa Schur.

"Does the Definition Affect the Outcome?  Employment of People with Disabilities Under Alternative Disability Definitions," in David Stapleton and Richard Burkhauser, eds., Why the Decline in Employment of People with Disabilities: A Policy Puzzle. Kalamazoo, MI:  W.E.  Upjohn Institute for Employment Research, 2003, pp. 279-300.  By Douglas Kruse and Lisa Schur.

"Enabling Democracy:  Disability and Voter Turnout," Political Research Quarterly, Vol. 55, No. 1, March 2002, pp. 167-190.  By Lisa Schur, Todd Shields, Douglas Kruse, and Kay Schriner.

> Awarded prize by the Western Political Science Association as the best article published in the journal in 2002.

"What Affects Voter Turnout?  Lessons from Citizens with Disabilities," Social Science Quarterly, Vol. 81, No. 2, June 2000, pp. 571-587.  By Lisa Schur and Douglas Kruse.

"Persons with Disabilities:  Demographic, Income, and Health Care Characteristics," Monthly Labor Review, Vol. 121, No. 9, September 1998, pp. 13-22. By Douglas Kruse.

"The Role of Computer Skills in Employment and Earnings Following a Spinal Cord Injury," Proceedings of the CSUN Conference on Technology and Persons with Disabilities, Los Angeles, CA, March 1997.  By Douglas Kruse, Alan Krueger, and Susan Drastal.

"Computer Use, Computer Training, and Employment Outcomes Among People with Spinal Cord Injuries," Spine, Vol. 21, No. 7, April 1996, pp. 891-896.  By Douglas Kruse, Alan Krueger, and Susan Drastal.

Employee Ownership, Profit Sharing, and Stock Options

"Why Profit Sharing is Essential for Building Middle-class Incomes and Wealth," in Ray Boshara and Ida Rademacher, eds., The Future of Building Wealth: Brief Essays on the Best Ideas to Build Wealth—for Everyone.  St. Louis, MO:  Federal Reserve Bank of St. Louis and Aspen Institute, 2021, pp. 435-440.

"Guest editorial: New research on the impact of COVID-19 on employee-owned firms and the racial wealth gap in the context of the research literature", Journal of Participation and Employee Ownership, Vol. 4 No. 2 (2021), pp. 89-91. https://doi.org/10.1108/JPEO-09-2021-030.  By Blasi, J., Kruse, D. and Weltmann, D.

51

"The response of majority employee-owned firms during the pandemic compared to other firms," *Journal of Participation and Employee Ownership,* Vol. 4 No. 2  (2021), pp. 92-101. https://doi.org/10.1108/JPEO-09-2021-0014.  By Blasi, J., Kruse, D., & Weltmann, D.

"Race and gender wealth equity and the role of employee share ownership," Journal of Participation and Employee Ownership, Vol. 4 No. 2, pp. 116-135. https://doi.org/10.1108/JPEO-08-2021-0008. By Weissbourd, J., Conway, M., Klein, J., Chang, Y., Kruse, D., Hoover, M., Leverett, T., McKinley, J. & Trenholm, Z.

"Do Employee Share Owners Face Too Much Financial Risk?  Analysis of the Survey of Consumer Finances, forthcoming, https://doi.org/10.1177/00197939211007394.   By Douglas Kruse, Joseph Blasi, Dan Weltmann, Saehee Kang, Jung Ook Kim, and William Castellano.

"Aligning Interests to Leverage a Racially Diverse Workforce: The Effects of Racial Diversity on Firm-Level Outcomes Under the Use of Broad-Based Stock Options," Organization Science, forthcoming. By Han, J. H.**,** Shin, D.-J., Castellano, W. G., Konrad, A. M., Kruse, D. L., & Blasi, J. R..

"Where does profit sharing work best? A meta-regression analysis," British Journal of Industrial Relations, 58(2), 2020, pp. 364-395.  By Hristos Doucouliagos, Patrice Laroche, Douglas L. Kruse, and T.D. Stanley.

"The State of ESOPs: What's Past Is Prologue: Introduction to the Special Issue on Employee Ownership, Policy, and New Data," Journal of Participation and Employee Ownership, Volume 2, Issue 3, Fall 2019.  By Joseph Blasi, Dan Weltmann, and Douglas Kruse.

"Broad-based Employee Stock Ownership: What Makes It Effective in the Management of Human Resources: Introduction to the Special Issue," Human Resource Management, Volume 58, Issue 6, November-December 2019, 567-584.  By Frank Mullins, Dan Weltmann, Douglas Kruse, and Joseph Blasi.

 "An Empirical Analysis of the Relationship between Employee Ownership and Employment Stability in the US: 1999–2011," British Journal of Industrial Relations, Vol. 56, No. 2, June 2018, pp. 245-291.  By Fidan Kurtulus and Douglas Kruse.

"Shared Capitalism in the U.S.: Evaluation and Future Policies."  In Jonathan Michie, Joseph Blasi, and Carlo Borzaga, eds., Oxford Handbook of Mutual, Cooperative and Co-owned Businesses.  Oxford: Oxford University Press, 2017, pp. 361-373. By Joseph R. Blasi and Douglas L. Kruse

"An American Historical Perspective on Employee Ownership."  In Jonathan Michie, Joseph Blasi, and Carlo Borzaga, eds., Oxford Handbook of Mutual, Cooperative and Co-owned Businesses.  Oxford: Oxford University Press, 2017, pp. 114-130.  By Joseph R. Blasi and Douglas L. Kruse.

"What does the U.S. Research Show about Worker Ownership?"  In Jonathan Michie, Joseph Blasi, and Carlo Borzaga, eds., Oxford Handbook of Mutual, Cooperative and Co-owned Businesses.  Oxford: Oxford University Press, 2017, pp. 211-226.  By Joseph R. Blasi, Richard Freeman, and Douglas L. Kruse

"Broad-based Employee Stock Ownership and Profit-Sharing:  History, Evidence, and Policy Implications," Journal of Participation and Employee Ownership, Vol. 1, No. 1, 2018, 38-60.  By Joseph R. Blasi, Douglas L. Kruse, and Richard Freeman.


 "Having a Stake: Evidence and Implications for Broad-based Employee Stock Ownership and Profit Sharing" Policy Brief, February 2017. Third Way, Washington, D.C. http://www.thirdway.org/report/having-a-stake-evidence-and-implications-for-broad-based-employee-stock-ownership-and-profit-sharing.  By Joseph R. Blasi, Douglas L. Kruse, and Richard Freeman.

"Does Employee Ownership Improve Performance?" IZA World of Labor, December 2016, http://wol.iza.org/articles/does-employee-ownership-improve-performance;

"Do Broad-based Employee Ownership, Profit Sharing, and Stock Options Help the Best Firms Do Even Better?" British Journal of Industrial Relations, Vol. 54, No. 1, March 2016, pp. 55-82.  By Joseph Blasi, Richard Freeman, and Douglas Kruse.

 "Anti-shirking effects of group incentives and human-capital-enhancing HR practices." Advances in the Economic Analysis of Participatory and Labor-Managed Firms, 16: 199-221, 2015.  By Andrea Kim, Kyongji Han, Joseph R. Blasi, and Douglas L. Kruse.

"Does Employee Ownership Affect Attitudes and Behaviors?  The Role of Selection, Status, and Size of Stake."  Advances in the Economic Analysis of Participatory and Labor-Managed Firms, 16: 251-277, 2015.  By Dan Weltmann, Joseph Blasi, and Douglas Kruse.

 "Employee Stock Ownership and Profit Sharing in the New Era of Financialization and Inequality in the Distribution of Capital Income," in Christian Weller, ed., Inequality, Uncertainty, and Opportunity: The Varied and Growing Role of Finance in Labor

Relations.  Champaign, IL: Labor and Employment Relations Association, 2015, pp. 225-246.  By Joseph Blasi, Richard Freeman, and Douglas Kruse.

"Involvement work systems and operational effectiveness: Exploring the moderating effect of national power distance." Journal of International Business Studies Vol. 46, No. 3, 2014: 332-354. By Yuan Jiang, Saba Colakoglu, David P. Lepak, Joseph R. Blasi, and Douglas L. Kruse.

> Awarded the 2016 International HRM Scholarly Research Award, Human Resources Division, Academy of Management.

"Group Incentives and Financial Performance: The Moderating Role of Innovation," Human Resource Management Journal, Vol. 24, No. 1, 2014, 77-94.  By Rhokeun Park and Douglas Kruse.

"Firm Survival and Performance in Privately-held ESOP Companies," in Douglas Kruse, ed., Sharing Ownership, Profits, and Decision-making in the 21st Century, Volume 14 in the series "Advances in the Economic Analysis of Participatory and Labor-managed Firms." Bingley, UK:  Emerald Publishing, 2013.  By Joseph Blasi, Douglas Kruse, and Dan Weltmann.

"Employee share ownership and profit sharing in different institutional contexts," International Journal of Human Resource Management, Vol. 23, No. 8, 2012 pp. 1513-1518.  By Erik Poutsma, Joseph Blasi, and Douglas Kruse.

"An Empirical Analysis of Risk Preferences, Compensation Risk, and Employee Outcomes," in Ed Carberry, ed., Employee Ownership and Shared Capitalism: New Directions in Research Ithaca, NY:  Cornell University Press, 2011.  By Fidan Ana Kurtulus, Douglas L. Kruse, and Joseph R. Blasi.

"Solidarity and Sharing: Unions and Shared Capitalism," in Ed Carberry, ed., Employee Ownership and Shared Capitalism: New Directions in Research Ithaca, NY:  Cornell University Press, 2011.  By John E. McCarthy, Paula Voos, Adrienne.E. Eaton, Douglas L. Kruse, and Joseph R. Blasi.

"Worker Attitudes Toward Employee Ownership, Profit Sharing, and Variable Pay," in Advances in the Economic Analysis of Participatory and Self-managed Firms, Volume 12, edited by Jed DeVaro.  Bingley, UK:  Emerald Publishing, 2011, pp. 143-168. By Fidan Ana Kurtulus, Douglas Kruse, and Joseph Blasi.

"Employee stock ownership and diversification," Annals of Operations Research, April 2010, Vol. 176, No. 1, pp. 95-107.  By Harry Markowitz, Joseph Blasi, and Douglas Kruse.

"Employee involvement and group incentives in manufacturing companies: a multi-level analysis," <u>Human Resource Management Journal</u>, Vol. 20, No. 3, 2010, pp. 227-243. By Rhokeun Park, Eileen Appelbaum, and Douglas Kruse.

"Shared Capitalism in the U.S. Economy: Prevalence, Characteristics, and Employee Views of Financial Participation in Enterprises," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., <u>Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options</u> (Chicago, IL: University of Chicago Press, 2010, pp. 41-76).  By Douglas Kruse, Joseph Blasi, and Rhokeun Park.

"Worker Responses to Shirking under Shared Capitalism," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., <u>Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options</u> (Chicago, IL: University of Chicago Press, 2010, pp. 77-104).  By Richard Freeman, Douglas Kruse and Joseph Blasi.

"Risk and Lack of Diversification Under Employee Ownership and Shared Capitalism," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., <u>Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options</u> (Chicago, IL: University of Chicago Press, 2010, pp. 105-138).  By Joseph Blasi, Douglas Kruse, and Harry Markowitz.

"Creating a Bigger Pie?  The Effects of Employee Ownership, Profit Sharing, and Stock Options on Workplace Performance," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., <u>Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options</u> (Chicago, IL: University of Chicago Press, 2010, pp. 139-166). By Joseph Blasi, Richard Freeman, Chris Mackin, and Douglas Kruse.

"Who Has a Better Idea? Innovation, Shared Capitalism, and HR Policies," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., <u>Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options</u> (Chicago, IL: University of Chicago Press, 2010, pp. 225-256).  By Erika Harden, Douglas Kruse, and Joseph Blasi.

"Do Workers Gain by Sharing? Employee Outcomes Under Employee Ownership, Profit Sharing, and Broad-based Stock Options," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., <u>Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options</u> (Chicago, IL: University of Chicago Press, 2010, pp. 257-290). By Douglas Kruse, Richard Freeman, and Joseph Blasi.

"Show Me the Money: Does Shared Capitalism Share the Wealth?" in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., <u>Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options</u> (Chicago, IL:

University of Chicago Press, 2010, pp. 351-376).  By Robert Buchele, Douglas Kruse, Loren Rodgers, and Adria Scharf.

 "Labor Practices and Outcomes Across Countries: Analysis of a Single Multinational Firm," in <u>International Differences in the Business Practices and Productivity of Firms</u>, edited by Richard Freeman and Kathryn Shaw.  Chicago: University of Chicago Press, 2009, pp. 105-136.  By Richard Freeman, Douglas Kruse, and Joseph Blasi.

 "The Same Yet Different: Worker Reports on Labor Practices and Outcomes in a Single Firm Across Countries," <u>Labour Economics</u>, August 2008, Vol. 15, No. 4, pp. 750-71.  By Richard Freeman, Douglas Kruse, and Joseph Blasi.

 "Broad-based Employee Stock Options in the United States: Company Performance and Characteristics," <u>Management Revue</u>, Vol. 18, No. 2, 2007, pp. 5-22.  By James Sesil, Maya Kroumova, Douglas Kruse, and Joseph Blasi.

 "The Changing Nature of Worker Ownership, Stock Options, and Profit Sharing in Corporate America," in <u>The New American Workplace</u>, edited by Edward Lawler and James O'Toole.  Palgrave Macmillan Publishers, 2006.  By Joseph Blasi, Douglas Kruse, and Richard Freeman.

"Are Diversification and Employee Ownership Incompatible?" <u>The Journal of Employee Ownership Law and Finance</u>, Vol. 18, No. 4, Fall 2006.  By Joseph Blasi and Douglas Kruse.

"Employee Ownership in the 2002 General Social Survey," <u>The Journal of Employee Ownership Law and Finance</u>, Vol. 18, No. 3, Summer 2006.  By Joseph Blasi and Douglas Kruse.

 "The Political Economy of Employee Ownership in the United States: From Economic Democracy to Industrial Democracy?" <u>International Review of Sociology</u>, January 2006.  By Joseph Blasi and Douglas Kruse.

 "Motivating Employee Owners in ESOP Firms: Human Resource Policies and Company Performance," in Virginie Perotin and Andrew Robinson, eds., <u>Advances in the Economic Analysis of Participatory and Self-managed Firms</u>, Vol. 8.  Greenwich, CN: JAI Press, 2004.  By Douglas Kruse, Richard Freeman, Joseph Blasi, Robert Buchele, Adria Scharf, Loren Rodgers, and Christopher Mackin.

 "Does Employee Ownership Enhance Firm Survival?" in Virginie Perotin and Andrew Robinson, eds., <u>Advances in the Economic Analysis of Participatory and Self-managed Firms</u>, Vol. 8.  Greenwich, CN:  JAI Press, 2004.  By Rhokeun Park, Douglas Kruse, and James Sesil.

"The Effects of Restructuring Charges on Employer Contributions to Profit Sharing Plans," Journal of Accounting and Public Policy, Vol. 23, 2004, pp. 247-278.  By Scott Jackson, Elaine Mauldin, William Wilcox, and Douglas Kruse.

"Employee Stock Ownership," in Carl E. Van Horn and Herbert A. Schaffner, eds., Work in America: An Encyclopedia of History, Policy, and Society.  Santa Barbara, CA: ABC Clio, 2004, pp. 178-181.  By Joseph Blasi and Douglas Kruse.

"An Assessment of Employee Ownership In The United States With Implications For The EU," International Journal of Human Resource Management, September 2003.  By Joseph Blasi, Douglas Kruse, James Sesil, and Maya Kroumova.

"Motivating Employee Owners in ESOP Firms: Human Resource Policies and Company Performance," Proceedings of the 55th Annual Meeting, Industrial Relations Research Association, January 2003, pp. 307-317.  By Douglas Kruse, Richard Freeman, Joseph Blasi, Robert Buchele, Adria Scharf, Loren Rodgers, and Christopher Mackin.

"Sharing Ownership via Employee Stock Ownership," in Laixiang Sun, ed., Ownership and Governance of Enterprises: Recent Innovative Developments.  New York:  Palgrave MacMillan, 2003, pp. 96-123.  By James Sesil, Douglas Kruse, and Joseph Blasi.

"Research Evidence on the Prevalence and Effects of Employee Ownership," Journal of Employee Ownership Law and Finance, Vol. 14, No. 4, Fall 2002, pp. 65-90.  By Douglas Kruse.

"Broad-based Employee Stock Options in High-Technology Firms: Company Performance Effects," British Journal of Industrial Relations, Vol. 40, No. 2, June 2002, pp. 273-294.  By James Sesil, Maya Kroumova, Joseph Blasi, and Douglas Kruse.

"Broad-based Stock Option Programs: A Union-Nonunion Comparison," in David Lewin, ed.,  Advances in Industrial and Labor Relations.  Greenwich, CN:  JAI Press, 2002.  By Maya Kroumova, James Sesil, Douglas Kruse, and Joseph Blasi.

"Worker Ownership, Participation and Control: Toward a Theoretical Model," in Michael J. Handel, ed., Sociology of Organizations: Classic, Contemporary and Critical Readings.  Thousand Oaks, Ca.: Sage Publications, 2002.    By William Foote Whyte, Joseph Blasi, and Douglas Kruse.

"Broad-based Employee Stock Options in High-Technology Firms: Company Performance Effects," Proceedings of the Global Human Resource Management Conference, June 2001. By James Sesil, Maya Kroumova, Joseph Blasi, and Douglas Kruse.

"Employee Equity: Employee versus Owner Issues in Organizations," in Cary L. Cooper and Denise M. Rousseau, eds., Trends in Organizational Behavior, Volume 8.  New York and London: John Wiley & Sons, April 2001. By Joseph Blasi and Douglas Kruse.

"Is Employee Ownership An Unstable Form?  Or A Stabilizing Force?" in Margaret Blair and Thomas Kochan, eds., The New Relationship: Human Capital in the American Corporation.  Washington, D.C.: Brookings Institution, 2000. By Margaret Blair, Douglas Kruse, and Joseph Blasi.

"Broad-Based Stock Options and Company Performance: What the Research Tells Us," Journal of Employee Ownership Law and Finance, Vol. 12, No. 3, Summer 2000.  By Joseph Blasi, Douglas Kruse, James Sesil, and Maya Kroumova.

"Decentralisation of Bargaining Systems and Financial Participation: A Comparative Analysis of Italy, UK, and the US," Lavoro e Relazioni Industriali, Summer 1999, No. 1, pp. 1-41. By Alessandra Del Boca, Douglas Kruse, and Andrew Pendleton.

"Giving Employees an Ownership Stake," Brookings Review, Fall 1999, Vol. 17, No. 4, pp. 23-26. By Margaret Blair and Douglas Kruse.

"Public Opinion Polls on Employee Ownership and Profit Sharing," Journal of Employee Ownership Law and Finance, Vol. 11, No. 3, Summer 1999, pp. 3-25.  By Douglas Kruse and Joseph Blasi.

"Profit Sharing and the Demand for Low-Skill Workers," in Richard Freeman and Peter Gottschalk, eds., Generating Jobs: Increasing the Demand for Low-Skill Workers. New York:  Russell Sage Foundation, 1998, pp. 105-153. By Douglas Kruse.

"Employee Ownership, Employee Attitudes, and Firm Performance: A Review of the Evidence," in Daniel J.B. Mitchell, David Lewin, and Mahmood Zaidi, eds., Handbook of Human Resource Management.  Greenwich, CN: JAI Press, 1997, pp. 113-151. By Douglas Kruse and Joseph Blasi.

   Reprinted in Samuel Estreicher, ed., Employee Representation in the Emerging Workplace: Alternatives/Supplements to Collective Bargaining (Boston: Kluwer Law International, 1998), pp. 581-626.

"Financial Returns of Public ESOP Companies:  Investor Effects vs. Manager Effects," Financial Analysts Journal, Vol. 52, No. 4, Summer 1996, pp. 51-61.  By Michael Conte, Joseph Blasi, Douglas Kruse, and Rama Jampani.

"Why Do Firms Adopt Profit Sharing and Employee Ownership Plans?" British Journal of Industrial Relations, Vol. 34, No. 4, December 1996, pp. 515-38. By Douglas Kruse.

"Employee Stock Ownership and Corporate Performance Among Public Companies," Industrial and Labor Relations Review, Vol. 50, No. 1, October 1996, pp. 60-79.  By Joseph Blasi, Michael Conte, and Douglas Kruse.

"Employee Ownership Through 401(k) Plans: The NCEO-Rutgers University Study," Journal of Employee Ownership Law and Finance, Vol 8, No. 4, Fall 1996, pp. 13-32. By Susan Prolman and Douglas Kruse.

"The Impact of Financial Participation on Employee and Firm Performance," Corporate Effectiveness and Human Resource Practices, Conference Proceedings, Institute of Labor and Industrial Relations, University of Illinois, October 1996, pp. 423-463.  By Douglas Kruse and Joseph Blasi.

"Profit Sharing and Public Policy," Journal of Economic Issues, Vol. 28, No. 2, June 1994. By Douglas Kruse.

Reprinted in Basque journal Economiaz: Revista Vasca de Economia, Numero 33, 3er Cuatrimestre, 1995.

"Employees and Managers as Shareholders," Human Resource Planning, Vol. 17, No. 4, 1994, pp. 31-40. By Joseph Blasi, Douglas Kruse, and James Gasaway.

"Employee Ownership and Participation: Trends, Problems, and Policy Options," Journal of Employee Ownership Law and Finance.  Vol 5, No. 2, Spring 1993, pp. 41-73. By Joseph Blasi and Douglas Kruse.

"The New Owners: Stock Price Performance for Public Companies with Significant Employee Ownership,"  Journal of Employee Ownership Law and Finance, Vol. 4, No. 3, Summer 1992, pp. 95-130.  By Joseph Blasi, Michael Conte, and Douglas Kruse.

"Profit Sharing and Productivity:  Microeconomic Evidence from the United States," Economic Journal, Vol. 102, No. 410, Jan. 1992, pp. 24-36. By Douglas Kruse.

"Employee Ownership," in Peter Newman, Murray Milgate, and John Eatwell, eds., The New Palgrave Dictionary of Money and Finance.  London:  MacMillan Press Ltd., 1992, pp. 759-761. By Joseph Blasi and Douglas Kruse.

"Profit Sharing in the 1980's: Disguised Wages or a Fundamentally Different Form of Compensation?" in Randall Eberts and Erica Groshen, eds., Structural Changes in U.S. Labor Markets: Causes and Consequences.  Armonk, NY:  M.E. Sharpe, 1992. By Douglas Kruse.

"ESOPs, Profit Sharing, and Other Contingent Compensation Plans: How Do They Affect Corporate Performance?"  Financial Management, Winter 1991, pp. 91-100.  By Michael Conte and Douglas Kruse.

"The Role of Profit Sharing in Employee Compensation," <u>Commentary</u> (journal of the National University of Singapore), Vol. 9, No. 1/2, November 1991.  By Douglas Kruse and James Chelius.

"Strategic Problems and Tactical Promise: Unions and Employee Ownership," <u>Labor Law Journal</u>, Vol. 42, No. 8, August 1991, pp. 498-507. By Joseph Blasi and Douglas Kruse.

"Employee Ownership: Opportunities for Unions," <u>Work Place Topics</u>, Vol. 2, No. 1, July 1991, pp. 1-22.  By Joseph Blasi and Douglas Kruse.

"The New Owners: Employee Ownership in Public Companies," <u>Journal of Employee Ownership Law and Finance</u>, Vol III, No. 3, Summer 1991, pp. 129-152.  By Joseph Blasi and Douglas Kruse

"Profit Sharing and Employment Variability:  Microeconomic Evidence on the Weitzman Theory," <u>Industrial and Labor Relations Review</u>, Vol. 44, No. 3, April 1991, pp. 437-453. By Douglas Kruse.

> Reprinted in Morris Kleiner, ed., <u>Industrial Relations: Institutions and Organizational Performance</u> (Hampshire, England: Dartmouth, 1994).

"Profit Sharing and Productivity," in Alan Blinder, ed., <u>Paying For Productivity: A Look at the Evidence</u>.  Washington, D.C.:  Brookings Institution, 1990.  By Martin Weitzman and Douglas Kruse.

> Reprinted in Louis Putterman and Randy Kroszner, eds., <u>The Economic Nature of the Firm</u>, 1996.

<u>Other topics</u>

"Effects of Leader Networking Behaviors and Vertical Faultlines on Support for Innovation," *Small Group Research*, 2020, 51(5), 616-650.  By Chung, Y., Jiang, Y., Blasi, J. R., & Kruse, D. L.

"Worksite Segregation and Performance-Related Attitudes," <u>Work and Occupations</u>, February 2010; vol. 37, No. 1, pp. 45-72.  By Niki Dickerson, Lisa Schur, Douglas Kruse, and Joseph Blasi.

"High Performance Work Practices at Century's End: Incidence, Diffusion, Industry Group Differences and the Economic Environment, <u>Industrial Relations</u>, Vol. 45, No. 4, October 2006, pp. 547-578.  By Joseph Blasi and Douglas Kruse.

"The New Employee/Employer Relationship," in David Ellwood et al., <u>Working Nation: Workers, Work, and Government in the New Economy</u>.  New York:  Russell Sage Foundation, 2000.  By Douglas Kruse and Joseph Blasi.

> Reprinted in Samuel Estreicher, ed., <u>Global Competition and the American Employment Landscape: As We Enter the 21st Century</u> (Boston: Kluwer Law International, 2001).

"Illegal Child Labor in the United States: Prevalence and Characteristics," <u>Industrial and Labor Relations Review</u>, Vol. 54, No. 1, October 2000, pp. 17-40.  By Douglas Kruse and Douglas Mahony.

"Flexible Work Hours and Labor Productivity: Some Evidence from the Pharmaceutical Industry," <u>Industrial Relations</u>, Vol. 35, No. 1, January 1996, pp. 123-139.  By Edward Shepard, Thomas Clifton, and Douglas Kruse.

"Pension Substitution in the 1980's:  Why the Shift Toward Defined Contribution Plans?" <u>Industrial Relations</u>, Vol. 34, No. 2, April 1995, pp. 218-241. By Douglas Kruse.

"Gender Differences in Attitudes Toward Unions," <u>Industrial and Labor Relations Review</u>, Vol. 46, No. 1, October 1992, pp. 89-102.  By Lisa Schur and Douglas Kruse.

"Supervision, Working Conditions, and the Employer Size-Wage Effect," <u>Industrial Relations</u>, Vol. 31, No. 2, Spring 1991, pp. 229-249. By Douglas Kruse.

"Displaced versus Disadvantaged Workers:  Policy Issues and Research Questions," in John Addison, ed., <u>Job Displacement: Consequences and Implications for Policy</u>. Detroit, MI:  Wayne State University Press, 1991. By Douglas Kruse.

"The Economic Implications of Employment Rights and Practices in the U.S.," <u>Journal of Comparative Economics</u>, Vol. 14, September 1990, pp. 221-253. By Douglas Kruse.

"International Trade and the Labor Market Experience of Displaced Workers," <u>Industrial and Labor Relations Review</u>, Vol. 41, No. 3, April 1988, pp. 402-417. By Douglas Kruse.

"Industrial Policy at the State Level in the United States," <u>Journal of Economic Issues</u>, XIX:2, June 1985.  By F. Gregory Hayden, Douglas Kruse, and Steven Williams.

"Small Business Financing:  A Survey of the Experiences and Attitudes of Nebraska Small Business Owners," <u>Proceedings of the Small Business Institute Directors' Association Conference, 1984</u>, February 1984, pp. 125-138.  By Douglas Kruse, Steve Williams and F. Gregory Hayden.


BOOK REVIEWS AND MISCELLANY:

"Foreword," <u>Institutional Analysis and Praxis: The Social Fabric Matrix Approach</u>, Tara Natarajan, Wolfram Elsner, and Scott Fullwiler, eds. (New York: Springer, 2009), pp. vii-viii.

"Commentary on 'The Economic and Social Impacts of Telework' by Sean Doherty et al.," <u>Telework: The New Workplace of the 21st Century</u>.  Washington, D.C.: U.S. Department of Labor, 2000, pp. 98-102.

"<u>The Ownership Solution: Towards a Shared Capitalism for the 21st Century</u>: A Review," <u>Economic Analysis: The Journal of Enterprise and Participation</u>, Vol. 2, No. 1, 1999, pp. 70-72.

"<u>America's Agenda: Rebuilding Economic Strength</u>: A Review," <u>Journal of Comparative Economics</u>, Vol. 19, No. 1, August 1994, pp. 122-124.

"<u>Pensions and the Economy</u>:  A Review," <u>Industrial and Labor Relations Review</u>, Vol. 46, No. 3, July 1993.

"<u>Three Worlds of Labor Economics</u>:  A Review." <u>Journal of Economic Issues</u>, XXIV:3, September 1990.

"<u>Workers' Self-Management in the United States</u>:  A Review." <u>Journal of Economic Issues</u>, XIX:3, September 1985.

"<u>Workplace Democracy and Social Change</u>:  A Review." <u>Journal of Economic Issues</u>, XVII:4, December 1983.


CONGRESSIONAL TESTIMONY:

"Research on Stock Options," Testimony before the U.S. House of Representatives, Committee on Financial Services, Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises, April 21, 2004.

"Research Evidence on Prevalence and Effects of Employee Ownership," Testimony before the Subcommittee on Employer-Employee Relations, Committee on Education and the Workforce, U.S. House of Representatives, February 13, 2002.

"Profit Sharing and Gainsharing," Testimony before U.S. House of Representatives Committee on Small Business, Subcommittee on Regulation, Business Opportunities, and Technology, July 15, 1994.

"Testimony before the House Subcommittee on Economic Stabilization," <u>The National Entrepreneurship Act: Hearing before the Subcommittee on Economic Stabilization of</u>

the Committee on Banking, Finance, and Urban Affairs.  May 15, 1984, Serial No. 98-92. Washington, D.C.:  Government Printing Office, 1984.

REPORTS:

Disability and Voting Accessibility in the 2020 Elections: Final Report on Survey Results Submitted to the Election Assistance Commission.  February 2021.  By Lisa Schur and Douglas Kruse.

Projecting the Number of Eligible Voters with Disabilities in the November 2020 Elections, September 2020.  By Lisa Schur and Douglas Kruse.

Fact sheet: Elected Officials with Disabilities, September 2019.  By Lisa Schur and Douglas Kruse.

Fact sheet:  Disability and Voter Turnout in the 2018 Elections, July 2019.  By Lisa Schur and Douglas Kruse.

Fact sheet:  Disability and Voter Turnout in the 2016 Elections, August 2017.  By Lisa Schur and Douglas Kruse.

Projecting the Number of Eligible Voters with Disabilities in the November 2016 Elections, September 2016.  By Lisa Schur and Douglas Kruse.

Disability, Voter Turnout, and Voting Difficulties in the 2012 Elections, report submitted to the U.S. Election Assistance Commission, June 2013.  By Lisa Schur, Meera Adya, and Douglas Kruse.

Fact sheet:  Disability and Voter Turnout in the 2010 Elections, August 2011.  By Lisa Schur and Douglas Kruse.

Inclusive Capitalism for the American Workforce: Reaping the Rewards of Economic Growth through Broad-based Employee Ownership and Profit Sharing.  Center for American Progress, March 2011.  By Richard B. Freeman, Joseph R. Blasi, and Douglas L. Kruse.

Fact sheet:  Disability and Voter Turnout in the 2008 Elections, August 2009.  By Lisa Schur and Douglas Kruse.

Shared Capitalism, Employee Attitudes, and Company Outcomes:  An Analysis of the Great Place to Work Dataset, 2006-2008, submitted to the Sloan Foundation, December 2009.  By Joseph Blasi, Douglas Kruse, and Richard Freeman.

Employment of People with Disabilities: Report to the National Council on Disability, May 2007.  By Douglas Kruse (Principal Investigator) with James Schmeling, Meera Adya,

Carol Harvey, Todd Honeycutt, William Myhill, Cynthia Smith, M.A., Michael Morris, and Peter Blanck.

Assessment of Test Questions to Identify Disability Status: Report to the Bureau of Labor Statistics, January 2004.  By Douglas Kruse.

Theoretical Study on Stock Options in Small and Medium Enterprises, Report to the Enterprise-Directorate General, Commission of the European Communities, October 2002.  By Andrew Pendleton, Joseph Blasi, Douglas Kruse, Erik Poutsma, and James Sesil.

Non-standard Work Arrangements and Disability Income, Report to the Disability Research Institute, University of Illinois Urbana-Champaign, August 2002.  By Lisa Schur and Douglas Kruse.

Empowerment Through Civic Participation: A Study of the Political Behavior of Citizens with Disabilities, Report to the Rutgers Disability Research Consortium and N.J. Developmental Disabilities Council, March 1999.  By Douglas Kruse, Lisa Schur, Kay Schriner, and Todd Shields.

Disability and Employment: Characteristics of Employed and Non-employed People with Disabilities, Report to the Office of Policy, U.S. Department of Labor, September 1997.  By Douglas Kruse.

Disability, Employment, and Earnings in the Dawn of the Computer Age, Report to the Rutgers Disability Research Consortium and the N.J. Developmental Disabilities Council, October 1995.  By Douglas Kruse, Alan Krueger, and Susan Drastal.

ESOPs, Profit Sharing, and Gainsharing in Airlines and High-Technology Industries, Report to the U.S. Department of Labor, March 1995. By Linda Bell and Douglas Kruse.

Characteristics of Nebraska Migrants:  Data from the 1980 Census.  Lincoln, NE: Department of Economic Development, State of Nebraska, September 1984.

Equity Capital and Nebraska Small Businesses.  Lincoln, NE: Policy Research Office, State of Nebraska, 1984.  By F. Gregory Hayden, Douglas Kruse, and Steve Williams.

Nebraska Socioeconomic Indicators.  Lincoln, NE:  State of Nebraska, May 1984.  By Steve Williams and Douglas Kruse.


WORKING PAPERS AND CURRENT RESEARCH:

"See Me, Not the Disability: Field Experiments on Disability, Veteran, and Gender Status in Hiring Outcomes." By Mason Ameri, Lisa Schur, Meera Adya, and Douglas Kruse. October 2019.

"Disability and the Unionized Workplace," IZA Discussion Paper No. 12258, March 2019. By Mason Ameri, Mohammad Ali, Lisa Schur, and Douglas L. Kruse.

"Do Employee Share Owners Face Too Much Financial Risk?" IZA Discussion Paper No. 12303, April 2019. By Douglas Kruse, Joseph Blasi, Dan Weltmann, Saehee Kang, Jung Ook Kim, and William Castellano.

"Where does profit sharing work best? A meta-analysis on the role of unions, culture, and values," IZA Discussion Paper No. 11617, June 2018. By Hristos Doucouliagos, Patrice Laroche, Douglas L. Kruse, and T.D. Stanley.

"The Disability Employment Puzzle: A Field Experiment on Employer Hiring Behavior." By Mason Ameri, Lisa Schur, Meera Adya, Scott Bentley, Patrick McKay, Douglas Kruse. Working Paper No. 21560, National Bureau of Economic Research, Cambridge, MA, September, 2015. Published in ILR Review.

"Show Me the Money: Does Shared Capitalism Share the Wealth?" NBER Working Paper 14830, April 2009. By Robert Buchele, Douglas Kruse, Loren Rodgers, and Adria Scharf. Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Shared Capitalism in the U.S. Economy: Prevalence, Characteristics, and Employee Views of Financial Participation in Enterprises," NBER Working Paper 14225, August 2008. By Douglas Kruse, Joseph Blasi, and Rhokeun Park. Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Who Has a Better Idea? Innovation, Shared Capitalism, and HR Policies," NBER Working Paper 14234, August 2008. By Erika Harden, Douglas Kruse, and Joseph Blasi. Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Creating a Bigger Pie? The Effects of Employee Ownership, Profit Sharing, and Stock Options on Workplace Performance," NBER Working Paper 14230, August 2008. By Joseph Blasi, Richard Freeman, Chris Mackin, and Douglas Kruse. Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Do Workers Gain by Sharing? Employee Outcomes Under Employee Ownership, Profit Sharing, and Broad-based Stock Options," NBER Working Paper 14233, August 2008. By Douglas Kruse, Richard Freeman, and Joseph Blasi. Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Worker Responses to Shirking under Shared Capitalism," NBER Working Paper 14227, August 2008.  By Richard Freeman, Douglas Kruse and Joseph Blasi.  Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Risk and Lack of Diversification Under Employee Ownership and Shared Capitalism," NBER Working Paper 14229, August 2008.  By Joseph Blasi, Douglas Kruse, and Harry Markowitz.  Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Motivating Employee-Owners in ESOP Firms:  Human Resource Policies and Company Performance," National Bureau of Economic Research Working Paper Number 10177, January 2004.  By Douglas Kruse, Richard Freeman, Joseph Blasi, Robert Buchele, Adria Scharf, Loren Rodgers, and Chris Mackin.

"Economic Democracy or Just Another Risk for Workers?  Reviewing the Evidence on Employee Ownership and Profit Sharing," presented at Columbia conference "Democracy, Participation, and Development," May 1999.

"Telecommuting and Home-based Work: Differences by Disability Status," November 1998.  By Douglas Kruse and MaryAnne Hyland.

"Labor Market Effects of Spinal Cord Injuries in the Dawn of the Computer Age," National Bureau of Economic Research Working Paper No. 5302, October 1995.  By Alan Krueger and Douglas Kruse.

GRANTS AND CONTRACTS:

Disability and Voting Accessibility in the 2020 Elections.  Lisa Schur and Douglas Kruse.  This $318,000 contract from the U.S. Election Assistance Commission funded a post-election national survey of 2569 people on disability and voting in the 2020 elections.  Report was delivered February 17, 2021.

Disability Inclusive Employment Policy RRTC (Rehabilitation Research and Training Center).  Douglas Kruse, Lisa Schur, Mason Ameri, and Yana Rodgers.  Funded by U.S. Department of Health and Human Services.  Project period 2020-2025.  Center is based at Syracuse with Rutgers and Harvard as partners.  Doug Kruse is PI on the Rutgers subaward of $943,000, and co-PI on the overall award of $4,375,000 based at Syracuse.

Disability and Assistive Technology.  Douglas Kruse, Lisa Schur, Mason Ameri, and Hazel-Anne Johnson.  "SFW-HTF-RL: Collaborative Research: Future of Work for People with Disabilities – Physical and Cognitive Training Through Perceptive and Adaptive Soft (PECASO) Wearable Robots." Funded by National Science Foundation.  Project period 2020-2024.  Project is based at CUNY with Rutgers as partner.  Doug Kruse is

PI on the Rutgers subaward of $619,279, and co-PI on the overall award of $1,884,010 based at CUNY.

Employee Ownership and Employment Stability.  Co-PI with Fidan Kurtulus for $40,000 grant from W.E. Upjohn Institute for Employment Research, 2012-2014.  We examined public employee ownership firms over the 1999-2011 period, analyzing their employment stability and survival during the two recessions. The results were published in a book in 2014.

Disability Discrimination and Job Requirements.  Co-PI for $200,000 grant from Employment Policy Rehabilitation Research and Training Center, based at University of New Hampshire and funded by National Institute on Disability and Rehabilitation Research, 2010-2015.  This project matches data on disability earnings gaps by occupation to data on occupational job tasks and ability requirements, examining whether disability earnings gaps are limited to occupations in which an impairment should limit productivity, or instead also exist in occupations where impairments do not limit productivity, which would support the idea that discrimination is at work.

Organizational Practices and Disability.  Co-investigator for $500,000 grant from the Office of Disability Employment Policy, U.S. Department of Labor, 2006-2007.  A consortium of Rutgers, Cornell, and Syracuse researchers worked with three other research partners and six companies to study how corporate policies and practices, and manager and co-worker attitudes, can limit or facilitate employment opportunities for people with disabilities.  The researchers developed case study standards and methodology, and then applied them in six case studies. The information from the case studies will provide lessons about what works in diverse settings, helping companies develop "best practices" for employing people with disabilities and providing a platform for ongoing benchmarking and self-evaluation.

Disability and Demand-side Employment Placement Models.  Co-investigator for $2.5 million grant in collaboration with Syracuse University and the University of Illinois, 2006-2011, from the National Institute on Disability and Rehabilitation Research, U.S. Dept. of Education.  This establishes a 5-year center to study factors affecting employer demand for people with disabilities.  The Rutgers projects include studies on contingent work, worker displacement, and 10-year projections of demand for specific abilities.

Desired and Actual Work Arrangements Among People with Disabilities.  Principal investigator for $51,350 in grants for putting disability questions on the 2006 General Social Survey.  In combination with two work modules (the Work Orientation module and the Quality of Work Life module), these data provide the first representative estimates of desired work arrangements among both employed and non-employed people with disabilities, and the attitudes and experiences of employed people with disabilities.

Shared Capitalism: Co-investigator with Richard Freeman, Joseph Blasi, and Chris Mackin for $650,000 grant from Russell Sage Foundation and Rockefeller Foundation, September 2000-December 2006.  We did case studies of 14 U.S. companies with various forms of employee ownership, stock options, and profit sharing, with surveys from 41,000 employees.  For nationally-representative data, we sponsored questions on the 2002 and 2006 General Social Surveys regarding attitudes toward and experience with employee ownership and profit sharing.  Results will form the basis of a conference, several articles, and a book.

Design of Disability Questions for Current Population Survey:  Principal investigator for $102,500 grant from Presidential Task Force on Employment of Adults with Disabilities, August 2001-December 2002.  I worked with the Bureau of Labor Statistics, under a Presidential Executive Order, to design disability questions for the monthly population survey of the federal government.

Disability Research Institute:  Co-investigator for 5-year cooperative agreement with Social Security Administration to do research on employment and disability income among people with disabilities.  One project with Lisa Schur, funded by a $54,000 grant, analyzed the prevalence and trends of alternative work arrangements among people with disabilities over the 1992-2000 period, and legal issues facing workers with disabilities in such arrangements.

Empowerment Through Civic Participation: A Study of the Political Behavior of Citizens with Disabilities: Co-investigator for $102,500 in grants from the New Jersey Developmental Disabilities Council, National Institute on Disability and Rehabilitation Research, Presidential Task Force on Employment of Adults with Disabilities, and Rutgers School of Management and Labor Relations for national surveys following the November 1998 and 2000 elections.   The 2000 survey had 1000 respondents and the 1998 survey had 1240 respondents, with 500 respondents with disabilities in 2000 and 700 respondents with disabilities in 1998.  The project, done with collaborators Lisa Schur (Rutgers), Kay Schriner, and Todd Shields (U. of Arkansas), compared people with and without disabilities in levels and determinants of voter turnout and other forms of political participation.

Survival and Growth of Private ESOP Firms:  Co-investigator with Joseph Blasi for $20,000 grant from ESOP Foundation, National Center for Employee Ownership, and Foundation for Enterprise Development, May, 2000-December, 2000.  This project uses 1983-99 longitudinal Dun & Bradstreet data for 3010 firms to investigate the relative survival and growth patterns of ESOP vs. non-ESOP firms.

<u>Disability and Employment</u>:  Principal investigator for $25,000 grant from U.S. Department of Labor, 1997.  I analyzed Survey of Income and Program Participation dataset to construct baseline information for evaluating likely impacts of policy proposals to encourage employment among people with disabilities.  The report provides portraits of employed and non-employed people with disabilities, and comparisons to the general population, with respect to demographic characteristics, personal and household income sources and amounts, health care insurance and utilization, and employment characteristics of the employed.

<u>Disability, Employment, and Computer Use</u>:  Co-investigator, with Alan Krueger of Princeton University, for $100,000 grant from Rutgers Disability Research Consortium and Princeton Industrial Relations Section.  We analyzed employment patterns among mobility-impaired individuals, and the extent to which computer technologies have affected the employability and earnings power of such individuals.

<u>ESOPs, Profit Sharing, and Gainsharing in Airlines and High-Technology Industries</u>:  Co-investigator, with Linda Bell of Haverford College, for $25,000 grant from U.S. Department of Labor to collect and analyze survey data from publicly-held firms in airlines and high-technology industries, 1995.

<u>The Productivity and Stability Theories of Profit Sharing</u>:  Principal investigator for $47,000 grant from W.E. Upjohn Institute for Employment Research to study profit sharing in publicly-held companies.  Published in Upjohn book in 1993.

PRESENTATIONS:

"Disability and Voting Accessibility in the 2020 Elections."  Presentation to American Council on the Blind, February 22, 2021, with Lisa Schur.

"Disability and Voting Accessibility in the 2020 Elections."  Presentation to U.S. Election Assistance Commission, February 17, 2021, with Lisa Schur.

"Disability and Voting: What Does the Research Say?" Presentation with Lisa Schur for "POWER: The Disability Vote" webinar, sponsored by American Association of People with Disabilities and REV UP! Campaign, June 22, 2020.

"Disability and Voting." Presentation with Lisa Schur for "Protecting the Right to Vote for People with Disabilities" webinar, sponsored by Leadership Conference On Civil and Human Rights, and National Disability Rights Network, May 21, 2020.

"Understanding Support for Employee Ownership," New Jersey/New York Center for Employee Ownership, Rutgers University, October 29, 2019.

"Where does profit sharing work best? A meta-analysis on the role of unions, culture, and values," International Association for the Economics of Participation conference, University of Ljubljana, Slovenia, July 2018.

"Where does profit sharing work best? A meta-analysis on the role of unions, culture, and values," Beyster Symposium, LaJolla, CA, June 2018.

"Employee Ownership: A Look at the Evidence," Vermont Employee Ownership Center, University of Vermont, Burlington, VT, June 2018.

"Disability and Employment," Sciences Po, St. Germain-en-Laye, Paris, France, March 16, 2018.

"Citizenship and Disability," Sciences Po, St. Germain-en-Laye, France, March 12, 2018.

"Tying Employee Rewards to Company Performance through Employee Ownership and Profit Sharing," University of Pennsylvania, July 2017.

"Do Employee Owners Face Too Much Financial Risk? Analysis of the Survey of Consumer Finances," International Association for the Economics of Participation, Copenhagen, Denmark, July 2016.

"Do Employee Owners Face Too Much Financial Risk? Analysis of the Survey of Consumer Finances," Beyster Symposium, LaJolla, CA, June 2016.

"The Disability Employment Puzzle: A Field Experiment on Employer Hiring Behavior," World Bank, January 13, 2016, with Mason Ameri and Lisa Schur.

"The Impact of Employee Stock Ownership and Profit Sharing for Low Income Families: The Rutgers University Kellogg Foundation Research Project," Kelso Workshop, Rutgers University, January 11, 2016.

"The Disability Employment Puzzle: A Field Experiment on Employer Hiring Behavior," NBER Summer Institute on Law and Economics, July, 2015, with Mason Ameri and Lisa Schur.

"How Did Employee Ownership Firms Weather the Last Two Recessions? Employee Ownership and Employment Stability in the U.S.: 1999-2010," Beyster Symposum, University of California-San Diego, January 2015, with Fidan Kurtulus.

70

"Survey Results on Polling Place Accessibility in the 2012 Elections," U.S. Election Assistance Commission, Washington, D.C., May 9, 2013

"Differentiating the Truly Great Place to Work Companies From the Good Companies," Beyster Mid-year Fellows Workshop, Rutgers University, February 2013.

"Shared Capitalism," Keynote Address, International Association for the Economic of Participation, Paris, France, July 2010.

"The Effects of Accommodations on the Employment of People with Disabilities," Jacobus ten Broek Symposium, National Federation of the Blind, Baltimore, MD, April 15, 2011.

"Research Overview for Discussion of CPS Disability Supplement," U.S. Bureau of Labor Statistics, Washington, D.C., October 19, 2010

"Does Shared Capitalism Help the Best Firms Do Even Better?" Centre for Economic Performance, London School of Economics, May 26, 2011.

"Shared Capitalism, Corporate Culture, and Performance," Beyster Institute, University of California-San Diego, July 2009.

"Disability at Work:  Job Characteristics and Attitudes of Employees with Disabilities," Labor and Employment Relations Association annual conference, San Francisco, CA, January 2009.

"Disability and Employment: Building a Research Agenda," Interagency Committee on Disability Research, Subcommittee on Employment, Washington, D.C., June 2008.

"Shared Capitalism Research Project," Organizational Dynamics, University of Pennsylvania, May 2008.

"Building Inclusive Organizations for Employees with Disabilities," School of Management and Labor Relations, Rutgers University, May 2008.

"Disability and Voter Turnout," University of North Carolina-Charlotte and Carolinas Rehabilitation Center, April 2008.  With Lisa Schur.

"Worker Responses to Shirking," M.I.T. Sloan School of Management, November 2007. With Richard Freeman and Joseph Blasi.

"Corporate Culture and the Experiences of Employees with Disabilities," Society of Industrial and Organizational Psychology, Dallas, TX, May 2006.  With Lisa Schur.

"Shared Capitalism in the U.S. Economy: Prevalence, Characteristics, and Employee Views of Financial Participation in Enterprises," NBER/Russell Sage Conference on Shared Capitalism, New York, NY, October 2006.

"Do Workers Gain by Sharing? Employee Outcomes Under Employee Ownership, Profit Sharing, and Broad-based Stock Options," NBER/Russell Sage Conference on Shared Capitalism, New York, NY, October 2006.

"Risk: Is It Economic Democracy, or Just Another Risk for Workers? Employee Attitudes Toward Risk-Sharing and Financial Participation in Company Rewards," October 2006.

"Motivating Employee-Owners in ESOP Firms:  Human Resource Policies and Company Performance," Industrial Relations Research Association, January 2004.

"Non-standard Work Arrangements and Disability Income," Disability Research Institute, Washington, D.C., June 5-6, 2002.  With Lisa Schur.

"Research Evidence on Prevalence and Effects of Employee Ownership," National Bureau of Economic Research, Cambridge, MA, April 12, 2002.

"Changes in the Workforce: Trends and Implications for Employment Law and Collective Bargaining," Industrial Relations Research Association, New Jersey chapter, April 1, 2002.  With Lisa Schur.

"Does the Definition Affect the Outcome?  Employment Trends Under Alternative Measures of Disability," Employment & Disability Policy Institute sponsored by Cornell University, Washington, D.C., October 2001.

"Non-standard Work Arrangements and Disability Income," Disability Research Institute, University of Illinois at Urbana-Champaign, April 26, 2001.

"Comments on 'The Economic and Social Impacts of Telework'," Conference on Telework, U.S. Department of Labor, New Orleans, LA, October 2000.

"Telecommuting and Home-based Work: Differences by Disability Status," Cornell Summer Institute on Disability and Employment Policy, Ithaca, NY, July 2000.

"Disability and Voter Turnout," presented to President's Committee on Employment of People with Disabilities, Subcommittee on Employee Disability Concerns, Washington, D.C., January 2000.

"Employment and Participation Among People with Disabilities," presented to European Union High Level Group on Disability, Washington, D.C., October 1999.

"Polling Place Accessibility for People with Disabilities," National Task Force on Elections Accessibility, Washington, D.C., June 1999, with Lisa Schur.

"Telecommuting and Home-based Work: Differences by Disability Status," Society for Disability Studies, Washington, D.C., May 1999.

"Economic Democracy or Just Another Risk for Workers?  Reviewing the Evidence on Employee Ownership and Profit Sharing," Conference on Democracy, Participation, and Development, Columbia, NY, April 1999.

"Telecommuting and Home-based Work: Differences by Disability Status," President's Committee on Employment of People with Disabilities, Washington, D.C., January 1999.

"The New Employee/Employer Relationship," Aspen Institute's Domestic Strategy Group, Aspen, Colorado, July 1998.

"The Wealth and Income Consequences of Employee Ownership," paper by Peter Kardas et al., presented at NBER conference "Shared Capitalism: Mapping the Research Agenda," Washington, D.C., May 1998.

"Is Employee Ownership an Unstable Form?  Or a Stabilizing Force?" MIT-Brookings Conference on Corporations and Human Capital, Dedham, MA, January, 1998.

"Employment Policies for the 21st Century," Social Security Administration conference on "Employment Post the Americans with Disabilities Act," Washington, D.C., November 1997.

"What Affects Voter Turnout?  Lessons from Citizens with Disabilities," Society for Disability Studies, Minneapolis, MN, May 1997, with Lisa Schur.

"Profit Sharing and the Demand for Low-Skill Workers," Federal Reserve Bank of Dallas, April 1997.

"The Role of Computer Skills in Employment and Earnings Following a Spinal Cord Injury," Conference on Technology and Persons with Disability, California State University-Northridge, Los Angeles, CA, March 1997.

"What Affects Voter Turnout?  Lessons from Citizens with Disabilities," Southern Political Science Association, Atlanta, GA, November 1996, with Lisa Schur.

"Disability, Employment, and Computer Use," American Spinal Injury Association, Seattle, WA, April 1996.

"Labor Market Effects of Spinal Cord Injuries in the Dawn of the Computer Age," Dept. of Economics, University of Maryland, Towson, MD, April 1996.

"Profit Sharing and Employee Ownership:  Review of the Issues and Research," Industrial Relations Research Association, San Francisco, CA, January 1996.

"Profit Sharing, Employee Ownership, and Corporate Governance," Seminar on Corporate Governance, Columbia University Law School, November 1995.

"Labor Market Effects of Spinal Cord Injuries in the Dawn of the Computer Age," National Bureau of Economic Research, Cambridge, MA, July 1995.

"Employee Ownership and Profit Sharing in the U.S. and Europe," Chinese State Commission for Restructuring the Economic System, New York, NY, July 1995.

"Profit Sharing and the Demand for Low-Skill Workers," Demand-Side Strategies for the Low-Wage Labor Market conference, Russell Sage Foundation, New York, NY, June 1995.

"Profit Sharing and Public Policy," Association for Evolutionary Economics, New York, NY, January 1994.

"Does Profit Sharing Affect Productivity?" Dept. of Economics, Columbia University, New York, NY, October 1993.

"Does Profit Sharing Affect Productivity?" National Bureau of Economic Research, Cambridge, MA, July 1993.

"Does Profit Sharing Affect Productivity?" Cornell University, Ithaca, NY, May 1993.

"Does Profit Sharing Affect Productivity?" Eastern Economics Association, Washington, D.C., March 1993.

"Profit Sharing, Productivity, and Employment Stability," U.S. Department of Labor, Pension and Welfare Benefits Administration, Washington, D.C., March 1990.

"Policy Implications of Profit Sharing," paper delivered at Society for the Advancement of Socio-Economics, Washington D.C., March 1990.

"Profit Sharing in the 1980's:  Disguised Wages or a Fundamentally Different Form of Compensation?" paper delivered at Wage Structure Conference, Federal Reserve Bank of Cleveland, November 1989.

"Profit Sharing and Productivity" (with Martin Weitzman), paper delivered at Brookings Institution conference on worker compensation and productivity, Washington, D.C., March 1989.

"The Economic Implications of Employment Rights and Practices in the United States," paper delivered at AEA/ACES Annual Meeting, New York, December 1988.

"Small Business Financing: A Survey of the Experiences and Attitudes of Nebraska Small Business Owners," with F. Gregory Hayden and Steven Williams, Small Business Institute Directors Association, February 1984, Denver, Colorado.

"The Effect of Employee Ownership on Desires for Participation," Western Social Science Association, April 1982, Denver, Colorado.


SERVICE TO PROFESSION:

Editor, British Journal of Industrial Relations, January 2011- June 2021.

Associate Editor, Journal of Participation and Employee Ownership, 2017-present.

Guest co-editor, special issue on Employee Ownership, Human Resource Management, 2018.

Co-chair, Awards Committee, Labor and Employment Relations Association, 2015-2018.

Member, Board of Reviewers, Industrial Relations, 1993-2004.

Recognized by Industrial and Labor Relations Review as one of its "most productive reviewers" over the 1995-99 period.

Referee for
    Academy of Management Journal
    American Economic Review
    American Journal of Industrial Medicine
    British Journal of Industrial Relations
    Canadian Journal of Economics
    Comparative Economic Studies
    The Economic Journal
    Human Resource Management
    Industrial and Labor Relations Review
    Industrial Relations
    Journal of Comparative Economics
    Journal of Disability Policy Studies
    Journal of Economics and Business
    Journal of Economic Behavior and Organization
    Journal of Economic Issues
    Journal of Labor Economics
    The Milbank Quarterly
    Organization Science

Policy Studies Journal
Quarterly Journal of Economics
Review of Economics and Statistics
Social Science Quarterly


SERVICE TO GOVERNMENT:

Member, Transition Team for a Stronger and Fairer Economy, New Jersey Governor-elect
Phil Murphy, November 2017-January 2018.

Member of State Rehabilitation Advisory Council, New Jersey Division of Vocational
Rehabilitation, 1999-2013.

Report prepared for National Council on Disability, Employment of People with
Disabilities, May 2007.

Member of Advisory Committee for the Disability Statistics Center, Cornell University,
2004-2009.

Member of Blue Ribbon Expert Advisory Panel for the ADA Impact Study, funded by the
National Council on Disability, 2004-2005.

Member of Advisory Committee for the Rehabilitation Research and Training Center for
Economic Research on Employment Policy for Persons with Disabilities, Cornell
University, 1998-2004.

Member of President's Committee on Employment of People with Disabilities,
Subcommittee on Employment Disability Concerns, 1998-2000.

Consultant on designing Behavioral Risk Factor Surveillance System questions to identify
environmental barriers facing people with disabilities, conducted by Craig Hospital
(Denver, CO) with funding by Centers for Disease Control, 1998.

Consultant on designing and writing vocational rehabilitation book about labor market
prospects for people with disabilities, Rehabilitation Services Administration, 1998-
99.

Data prepared at request of Joint Economic Committee of the U.S. Congress, on employer
stock and 401(k) plans, August 1998.

Report prepared for U.S. Department of Labor, Office of Policy, Disability and
Employment: Characteristics of Employed and Non-employed People with
Disabilities, September 1997.

Report prepared for U.S. Department of Labor, Office of the American Workplace, ESOPs, Profit Sharing, and Gainsharing in Airlines and High-Technology Industries, with Linda Bell, 1995.

Referee for National Science Foundation grant proposals, 1995, 1999.

Testimony before the Subcommittee on Employer-Employee Relations, Committee on Education and the Workforce, U.S. House of Representatives, concerning employee ownership and retirement security, February 13, 2002.

Testimony before U.S. House of Representatives Committee on Small Business, Subcommittee on Regulation, Business Opportunities, and Technology (Ron Wyden, Chair), concerning bill to provide incentives for profit-sharing and gainsharing plans, July 15, 1994.

Testimony before U.S. House of Representatives Committee on Banking, Finance, and

Urban Affairs, Subcommittee on Economic Stabilization (Charles Schumer, Chair), concerning

"The National Entrepreneurship Act," May 15, 1984.

SERVICE TO RUTGERS UNIVERSITY:

Associate Dean for Academic Affairs, School of Management and Labor Relations, Rutgers University (July 2017-December 2018)
Director, Ph.D. Program in Industrial Relations and Human Resources, School of Management and Labor Relations, Rutgers University (July 2007-June 2013)
New Brunswick Faculty Council representative (2014-2017)
Advisory Committee on Instructional Computing member (2001-2005)
University Research Council member (1998-2012)
Faculty mentoring committee member for Jasmine Feng (2016-present), Saunjuhi Verma (2015-present), Janice Fine (2007-2012), Saul Rubinstein (1996-2002), Stan Gully, (2000-2005), Ryan Smith (1995-2000), Marlene Kim (1993-1999), Barbara Rau (1995-1997), and Kirsten Wever (1997-1999).
Dissertation committee chair for Eric Schulz (1997), Rhokeun Park (2007), Andrea Kim (2013), Mason Ameri (2017), and Saehee Kang (current).
Dissertation committee member for Michael Zigarelli (1995), James Gasaway (1999), Maya Kroumova (1999), Douglas Mahony (2001), Haejin Kim (2003), Sean Way (2004), Saba Colakoglu (2008), and Dan Weltmann (2017).
Master's thesis committee chair for Sean Way (2001) and Rhokeun Park (2003)
Ph.D. Policy Committee, School of Management and Labor Relations (1995-1998, 2000-2005)
Library Committee, School of Management and Labor Relations (1988-1993, 1997-1998)
Admissions Committee (1989-1990, 1991-1992)

Health and Safety Committee, School of Management and Labor Relations (1989-1990)
Several faculty recruitment committees (1991-present)


AFFILIATIONS:

American Economic Association
Association for Comparative Economic Studies
Association for Evolutionary Economics
Labor and Employment Relations Association
Royal Economic Society
Society for Disability Studies

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,        §
     *Plaintiffs,*                               §
                                                §
*v.*                                        §   Case No. 5:21-cv-844-XR
                                                §
GREGORY W. ABBOTT, et al.,                  §
     *Defendants.*                              §

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX M

Transcript of the Testimony of

# Lisa Wise

**Date:**

April 13, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO et al. vs GREGORY W. ABBOTT

Lisa Wise                                                    April 13, 2022
                                                            Pages 178 to 181

Page 178

1  system.
2      Q.  Would that be in the vote history section of
3  it?
4          MS. SPECTOR:  Objection, vague.
5      A.  The vote history, basic, no.  The vote history
6  would just say ballot voted by mail.  The ballot by mail
7  module may have a way to have what they had to cure for,
8  I just I don't remember if it does or not.
9      Q.  (BY MR. WHITE)  So you -- there is a module in
10 your registration system for ballots voted by mail that
11 tracks whether they were cured?
12         MS. SPECTOR:  Objection, vague.
13     A.  Whether they were accepted, and then I don't
14 know if it breaks it down that they eventually were --
15 that they were cured, that they're a second, basically a
16 second attempt with a ballot.
17     Q.  (BY MR. WHITE)  Is that information something
18 you communicate to the Secretary of State's Office?
19         MS. SPECTOR:  Objection, vague.
20     A.  I don't know if the cured number is in the
21 report to the SOS.  I don't know that off the top of my
22 --
23     Q.  (BY MR. WHITE)  It may be just something for
24 El Paso County purposes?
25     A.  That we keep for ourselves, just to know are

Page 179

1  people coming in and curing, or doing it by mail or
2  however.
3      Q.  And do you believe you produced that
4  information in this litigation?
5      A.  I believe so.
6      Q.  And if there is an issue identified with the
7  signature matching on a voted ballot, is the option of
8  cancelling and voting in person also available to the
9  voter?
10         MS. SPECTOR:  Objection, vague.
11     A.  Yes.  We can con -- the signature verification
12 or Ballot Board can contact them and let them know that
13 they can cancel and go vote in person, I believe.
14     Q.  (BY MR. WHITE)  Do you know if anybody did
15 that in the March primary?
16     A.  I don't know off the top of my head if -- if
17 they did.
18     Q.  And it the voter able to come into in person
19 and cure a signature match issue after Election Day?
20     A.  Yeah.  In person until the end of the -- the
21 cure period, which is, for provisionals, if they are
22 informed, and they are going to come in person, by the
23 -- they can come in person until that Monday at the
24 close of business; the mail has to be in, I believe, the
25 same time as the ballots.

Page 180

1      Q.  So when you refer to "that Monday," is that
2  the six --
3      A.  I'm sorry, yes.
4      Q.  -- six days after Election Day?
5      A.  Yes.  It is, six days after Election Day.
6      Q.  And do you know, in the March primary, if
7  anybody came in after Election Day in person to correct
8  signature match issues?
9      A.  A signature match issue, I don't know.  I
10 don't know, I'm sorry.
11     Q.  So it's -- it's true to say that there's
12 multiple options for somebody to correct a problem with
13 the signature matching process, is that correct?
14     A.  Yes.
15     Q.  And that's a new option under SB 1, correct?
16         MS. SPECTOR:  Objection, calls for legal
17 conclusion.
18     A.  Yes.
19         MR. JEFF WHITE:  Has it been about an
20 hour?
21         MS. SPECTOR:  Close to.
22         MR. JEFF WHITE:  Why don't we take
23 another break for the -- for the ...
24         VIDEOGRAPHER:  We are off record at 3:19
25 p.m.

Page 181

1          (Off the record.)
2          VIDEOGRAPHER:  We are back on record at
3  3:36 p.m.
4      Q.  (BY MR. WHITE)  So Ms. Wise, I want to jump
5  back to something we touched on earlier, and I -- I -- I
6  wanted to talk about one more topic on voter assistance,
7  and here it might help to reference Exhibit 3, SB 1,
8  again, so I direct you to Page 4 and Line 20, if you
9  could let me know when you're there?
10     A.  Yes, I'm here.
11     Q.  So in Exhibit 3, Page 4, Line 20 do you see
12 where it says "Section 1.08"?
13     A.  Yes.
14     Q.  And can you just read the -- the section, it's
15 pretty short, that starts at Line 22 on that page?
16     A.  "Reasonable accommodation or modification.  A
17 provision of this code may not be interpreted to
18 prohibit or limit the right of a qualified individual
19 with a disability from requesting a reasonable
20 accommodation or modification to any election standard,
21 practice, or procedure mandated by law or rule that the
22 individual is entitled to request under federal or state
23 law."
24     Q.  Are you familiar with this provision?
25     A.  I'm familiar with its inclusion in the law.

Lisa Wise

April 13, 2022
Pages 182 to 185

Page 182

1    Q.   And how does it affect what you do as an
2    election administrator?
3         MS. SPECTOR:  Objection, calls for legal
4    conclusion.
5    A.   I don't know that we've had a request to alter
6    that -- that something that would qualify under that, so
7    I don't know if I have the answer to that.
8    Q.   (BY MR. WHITE)  Are you referring to in this
9    election or in prior elections?
10        MS. SPECTOR:  Objection, vague.
11   A.   I need to double check before I speak, but I
12   believe this election we didn't have -- didn't have
13   anything that would fall under that.
14   Q.   (BY MR. WHITE)  So in the past, before SB 1,
15   would you receive request for modification of voting
16   procedures for disabled voters?
17   A.   We may receive a request for -- and I don't
18   know if this would qualify -- but for someone to maybe
19   be able to move up to the front, which I -- of the line,
20   which is something that changed just recently, if that
21   would qualify; providing the audio ballot, which we do,
22   for voters who may be visually impaired.
23        We also were requested a modification to
24   a screen on the poll pad.  It's basically a adhesive
25   screen that allows -- it's like a signature screen for

Page 183

1    visually impaired to find the signature line and the
2    party choices box with Braille, so that they can sign
3    that and fill that out independently.  We worked with
4    them and created that.  Those are the things that I can
5    think of off the top of my head, if that's -- if they
6    qualify under that.
7    Q.   Yeah.  So even before SB 1, did you have the
8    authority to modify procedures to accommodate the
9    disabled?
10        MS. SPECTOR:  Objection, calls for legal
11   conclusion, vague.
12   A.   I believe so.
13   Q.   (BY MR. WHITE)  And do you have a procedure
14   for those requests to make modifications?
15        MS. SPECTOR:  Objection, vague.
16   A.   Generally, they would just call our office and
17   I would speak with them, depending on what it was.  In
18   those situations I just worked with the request, to see
19   if they were able -- if they were able to be com -- to
20   -- to do, and, if they were, then we did.
21   Q.   (BY MR. WHITE)  Do you recall any requests for
22   modification that you simply couldn't implement?
23   A.   I believe there was one that we put in the
24   production documents, where somebody wanted the ballot
25   choices to be read as A, B, or C instead of 1, 2, 3, and

Page 184

1    the audio ballot is already programmed to read what's on
2    the screen, so in that example, that was something we
3    could not change.
4    Q.   But, generally, when a request for
5    accommodation is made, is it your practice to try to
6    make that accommodation?
7    A.   Yes, if it's possible.
8    Q.   And is that true after SB 1 as well?
9         MS. SPECTOR:  Objection, vague.
10   A.   I don't know if we've had a request since
11   then, so that's hard to speak to, but I can say that
12   yes, I would still try as hard as I could to -- to work
13   with them.
14   Q.   (BY MR. WHITE)  Did SB 1 make it harder for
15   you to accommodate disabled voters?
16        MS. SPECTOR:  Objection, vague, calls for
17   legal conclusion
18   A.   That's hard to say.  If -- if there were, you
19   know, voters who marked disability on the ballot by mail
20   application, if they were rejected.  For in-person
21   voting, the assistance oath has more information
22   required on that, however we didn't have any issues with
23   that this election.  So as of right now, just maybe the
24   ballot by mail with the -- for the disability community
25   that requested.

Page 185

1    Q.   (BY MR. WHITE)  And -- and when you're
2    referring to the ballot by mail, is your concern there
3    that you actually don't know whether they had a problem
4    or not?
5    A.   Just that I know that there's a -- that
6    there's a portion of ballot by mail that's specific, you
7    know, a population that is disabled community, and I
8    don't -- I don't know if they were, I guess yeah,
9    disproportionately affected by that --
10   Q.   Is that because --
11   A.   -- more work.
12   Q.   Is that because --
13   A.   Sorry.
14   Q.   -- they are voting by mail, and you don't see
15   what's happening on that end?
16        MS. SPECTOR:  Objection, vague, calls for
17   speculation.
18   A.   Yeah.  That part of it is difficult, but I
19   still know that they would have marked disability on the
20   reason for why they voted by mail.
21   Q.   (BY MR. WHITE)  But you can't say whether SB 1
22   made it harder for somebody voting by mail who needs
23   assistance to complete the voting process than before SB
24   1?
25        MS. SPECTOR:  Objection, calls for

Lisa Wise                                                              April 13, 2022
                                                                  Pages 186 to 189

Page 186

1  speculation.
2      A.  I cannot say for sure, yes.
3      Q.  (BY MR. WHITE)  And -- and with respect to
4  in-person voting, did S -- strike that.
5          Based on the March 2022 primary and your
6  first election cycle implementing SB 1, was it more
7  difficult for you to accommodate voters who voted in
8  person?
9          MS. SPECTOR:  Objection, vague.
10     A.  I don't believe so.
11     Q.  (BY MR. WHITE)  Are you aware of the changes
12  to the permissible methods of in-person voting made in
13  SB 1?
14         MS. SPECTOR:  Object to form.
15     A.  Can you clarify that?  I'm sorry.
16     Q.  (BY MR. WHITE)  Sure.  So again I think it
17  might help --
18     A.  Okay.
19     Q.  -- if we refer to Exhibit 3, SB 1, and if you
20  could go to Page 14 of that document at Line 18, do you
21  see on that Line 18 on Page 14 where it says "Section
22  3.04"?
23     A.  Yes.
24     Q.  And it's pretty short, can you read that?
25     A.  The Line 18?

Page 187

1      Q.  Yes.
2      A.  "Section 3.04.  Election 43.031(b) Election
3  Code is amended to read as follows: -- sorry, "Section
4  43."
5      Q.  And I guess I should have said Line 20 to 22
6  then.
7      A.  Okay.
8      Q.  My apologies.
9      A.  That's no problem.
10         "Each polling place shall be located
11  inside a building.  No voter may cast a vote from inside
12  a motor vehicle unless the voter meets the requirements
13  of Section 64.009."
14     Q.  Are you familiar with Section 64.009 of the
15  Election Code?
16     A.  Yes.
17     Q.  And what does that Section 6. -- 64.009 cover?
18     A.  It --
19         MS. SPECTOR:  Object --
20         THE WITNESS:  I'm sorry.
21         MS. SPECTOR:  Object to form.
22         Go ahead.
23     A.  Discusses curbside voting.
24     Q.  (BY MR. WHITE)  And who is allowed to vote
25  curbside under the Election Code in Section 64.009?

Page 188

1          MS. SPECTOR:  Objection, calls for legal
2  conclusion.
3      A.  I believe it's anyone who -- who ha --
4  believes that entering the polling site may cause
5  themselves or others harm or injury.
6      Q.  (BY MR. WHITE)  And so did this change in SB 1
7  Section 3.04 change any of the voting procedures that
8  you've used in El Paso County?
9          MS. SPECTOR:  Object to form.
10     A.  No.
11     Q.  (BY MR. WHITE)  Prior to SB 1, did you allow
12  individuals to vote from inside a motor vehicle if they
13  weren't permitted to under Sec -- Section 64.009 of the
14  Election Code?
15         MS. SPECTOR:  Object to form.
16     A.  No.
17     Q.  (BY MR. WHITE)  So Section 3.04 of SB 1 didn't
18  affect the voting procedures that you use in El Paso
19  County, correct?
20         MS. SPECTOR:  Object to form.
21     A.  Correct.
22     Q.  (BY MR. WHITE)  So can you go to Page 19 of
23  Exhibit 3, and at Line 9 do you see where it says
24  "Section 3.12"?
25     A.  Yes.

Page 189

1      Q.  And if you could, do you see at Line 13 where
2  "inside" is underlined and "at" is in brackets and
3  crossed through?
4      A.  Yes.
5      Q.  And are you familiar with this change?
6      A.  Yes.
7      Q.  And what do you understand Section 3.12 of
8  SB 1 to change?
9          MS. SPECTOR:  Objection, calls for legal
10  conclusion.
11     A.  That the polling site must be inside of the
12  building.
13     Q.  (BY MR. WHITE)  And I believe we talked about
14  this earlier, prior to SB 1 did you have polling
15  locations outside of a building?
16         MS. SPECTOR:  Object to form.
17     A.  No.
18     Q.  (BY MR. WHITE)  So did this Section 3.12 of
19  SB 1 change any voting procedures in El Paso County?
20         MS. SPECTOR:  Object to form.
21     A.  No.
22     Q.  (BY MR. WHITE)  So if we just go down on that
23  same Page 19, do you see where it says "Section 3.13" at
24  Line 19?
25     A.  I'm sorry, lane -- Line 19?  Yes.

Lisa Wise

April 13, 2022
Pages 190 to 193

Page 190

1    Q.  Do you see where it says "Section 3.13" there?
2    A.  Yes.
3    Q.  And if you go to Line 24 through 25, do you
4  see where "inside" is underlined?
5    A.  Yes.
6    Q.  And then "building" is underlined on Line 25
7  and then "stationary structure" is in brackets and
8  crossed out?
9    A.  Yes.
10   Q.  So what is your understanding of Section 3.13
11  of SB 1?
12           MS. SPECTOR:  Objection, calls for legal
13  conclusion.
14   A.  That the polling place must be inside the
15  building.
16   Q.  (BY MR. WHITE)  And what about the portion on
17  Line 25 that crosses through "stationary structure", do
18  you know what that means?
19           MS. SPECTOR:  Objection, calls for legal
20  conclusion.
21   A.  I don't know the exact definition of that, no.
22   Q.  (BY MR. WHITE)  Okay.  Then I'll direct you to
23  Line 26, can you read the line that starts Line 26, and
24  I believe it carries over to the second line on Page 20?
25   A.  "The polling place may not be located in a

Page 191

1  movable structure in the general election for state and
2  county officers, general primary election, or runoff
3  primary election."
4    Q.  So prior to SB 1 in El Paso County, did you
5  have any polling places in movable structures?
6           MS. SPECTOR:  Objection, vague.
7    A.  I -- I -- I don't believe so, but I want to
8  say that sometimes at our school locations they may put
9  us in one of those portables, so I don't know if that
10  qualifies or not, but so we have used the portables.
11   Q.  (BY MR. WHITE)  As an election administrator,
12  would you consider a portable to a -- to be a building?
13           MS. SPECTOR:  Objection, calls for legal
14  conclusion.
15   A.  I have, yes, so yes.
16   Q.  (BY MR. WHITE)  So as El Paso County elections
17  administrator, did Section 313 -- 3.13 of SB 1 change
18  your practices in this March primary?
19           MS. SPECTOR:  Object to form.
20   A.  No.
21   Q.  (BY MR. WHITE)  So in Exhibit 3 can you now
22  turn to Page 30, Line 10, and do you see on that Line 10
23  on Page 30 where it says "Section 4.12"?
24   A.  Yes.
25   Q.  And can you go down to Line 21 through 27?

Page 192

1    A.  Yes.
2    Q.  And can you just read those lines, please?
3    A.  "A-2, an in-person delivery of a marked ballot
4  voted under this chapter must be received by an election
5  official at the time of delivery.  The receiving
6  official shall record the voter's name, signature, and
7  type of identification provided under Section 63.0101 on
8  a roster prescribed by the Secretary of State.  The
9  receiving official shall attest on the roster that the
10  delivery  complies with this section."
11   Q.  Are you familiar with that provision of SB 1?
12   A.  Yes.
13   Q.  Does this relate to in-person delivery of
14  ballots by mail?
15           MS. SPECTOR:  Object to form.
16   A.  Yes.
17   Q.  (BY MR. WHITE)  Is this a process that you
18  were implementing before SB 1?
19   A.  Yes.
20   Q.  So did this section of SB 1 require any
21  changes to election procedures in El Paso County?
22   A.  No.
23   Q.  So now also in Exhibit 3 can you go to Page
24  16, please, and on Line 14 do you see where it says
25  "Section 3.09"?

Page 193

1    A.  Yes.
2    Q.  And if you go to Line 16, do you see where it
3  says "Section 85.005.  Regular days and hours for
4  voting"?
5    A.  Yes.
6    Q.  Are you familiar with the changes in this
7  section under SB 1?
8    A.  Yes.
9    Q.  So did SB 1 increase the early voting period?
10           MS. SPECTOR:  Objection, calls for legal
11  conclusion.
12   A.  (No verbal response.)
13   Q.  (BY MR. WHITE)  Let me strike that question.
14   A.  Okay.
15   Q.  Let me start over.
16           Under SB 1, is early voting expanded to
17  smaller counties?
18           MS. SPECTOR:  Objection, calls for legal
19  conclusion.
20   A.  Early voting expanded to smaller counties?
21   Q.  (BY MR. WHITE)  Yes.  Is that the -- all
22  right, strike that and let me be -- start over.
23   A.  I'm sorry, yeah.  Thank you, sorry.
24   Q.  Let's go to Line 23 on Page 16 of Exhibit 3.
25   A.  Okay.

Lisa Wise
April 13, 2022
Pages 194 to 197

Page 194

1    Q.   I believe it starts after the comma on Line
2  22, do you see where it says, "except that voting may
3  not be conducted earlier than 6 a.m. or later than 10
4  p.m."?
5    A.   Yes.
6    Q.   Are you familiar with that change in SB 1?
7    A.   Yes.
8    Q.   And what does that change in SB 1 do?
9        MS. SPECTOR:  Objection, calls for legal
10 conclusion.
11   A.   It tightens the hours on when we would be able
12 to have early voting in the future.
13   Q.   (BY MR. WHITE)  So prior to SB 1, during the
14 early voting period did any polling places in El Paso
15 County open before 6 a.m.?
16   A.   No.
17   Q.   And prior to SB 1, did any early voting
18 locations in El Paso County stay open after 10 p.m.?
19   A.   We had a closing time of 10; however, we had a
20 line, so we did process, obviously, until it was done.
21   Q.   Were any of the official closing times, when
22 somebody had to be in line prior to SB 1, later than 10
23 p.m.?
24   A.   No.
25   Q.   So did this limitation in Section 3.09 of SB 1

Page 195

1  of 6 a.m. to 10 p.m. for early voting cut the number of
2  hours that you had used for early voting in prior
3  elections?
4        MS. SPECTOR:  Object to form.
5    A.   No.
6    Q.   (BY MR. WHITE)  And can you go over to Page
7  17, the first line of Exhibit 3?
8    A.   Yes.
9    Q.   And in that first line do you see where "nine"
10 is underlined and in brackets "eight" is crossed out?
11   A.   Yes.
12   Q.   Are you familiar with that change?
13   A.   Yes.
14   Q.   And what do you understand that change to do?
15   A.   That during the weekday for the early voting
16 period, that we must have the site open for at least
17 nine hours.
18   Q.   And prior to SB 1, you were only required to
19 have it open for eight hours, correct?
20   A.   Correct.
21   Q.   So this change in SB 1 requires more hours for
22 early voting, at a minimum?
23       MS. SPECTOR:  Objection, calls for legal
24 conclusion.
25   A.   Correct.

Page 196

1    Q.   (BY MR. WHITE)  So now I will go down starting
2  at Line 4 to Line 5 on Page 17 of Exhibit 3, do you see
3  that line?
4    A.   Yes.
5    Q.   And do you see where on Line 5 "four" is
6  underlined and "three" is in brackets and crossed
7  through?
8    A.   Yes.
9    Q.   Are you familiar with that change?
10   A.   Yes.
11   Q.   And so what does that change in SB 1 do?
12   A.   Requires that an entity -- I'm sorry, a
13 territory with fewer than 1000 registered voters remain
14 open for voting during early voting at least four hours
15 each day.
16   Q.   So that provision would not affect El Paso
17 County, correct?
18   A.   Correct.
19   Q.   That affects smaller counties?
20   A.   Yes.
21       MS. SPECTOR:  Objection --
22       THE WITNESS:  Sorry.
23       MS. SPECTOR:  -- calls for legal
24 conclusion.
25       Go ahead, it's okay.

Page 197

1    A.   Yes.
2    Q.   (BY MR. WHITE)  And that provision would
3  expand by from three to four hours, the minimum number
4  of hours of early voting on weekdays in those smaller
5  counties, correct?
6        MS. SPECTOR:  Objection, calls for legal
7  conclusion.
8    A.   Yes.
9    Q.   (BY MR. WHITE)  So is this another one that
10 actually expands the opportunity to vote early?
11       MS. SPECTOR:  Objection, calls for legal
12 conclusion.
13   A.   Yes.
14   Q.   (BY MR. WHITE)  And on Page 17 of Exhibit 3 at
15 Line 8, do you see where "55,000" is underlined and
16 "100,000" is in brackets and crossed out?
17   A.   Yes.
18   Q.   And starting at Line 10 on that same page, do
19 you see where it says, "at the main early voting polling
20 place for at least 12 hours on each weekday of the last
21 week of the early voting period"?
22   A.   I do.
23   Q.   And do you understand what this provision of
24 SB 1 does?
25       MS. SPECTOR:  Objection, calls for legal

Page 198

1 conclusion.
2    A.  Yes.
3    Q.  (BY MR. WHITE)  And what's that?
4         MS. SPECTOR:  Objection, calls for legal
5 conclusion.
6    A.  It requires counties with 55,000 or more
7 population to keep the site open for 12 hours on each
8 weekday of the last week of the early voting period, the
9 main site.
10    Q.  (BY MR. WHITE)  And this wouldn't affect El
11 Paso County, would it?
12         MS. SPECTOR:  Objection, vague.
13    A.  No.
14    Q.  (BY MR. WHITE)  El Paso County has more than
15 55,000 --
16    A.  Yes.
17    Q.  -- correct?
18    A.  Yes.
19    Q.  So does this provision add this minimum
20 requirement of 12 hours to smaller counties?
21         MS. SPECTOR:  Objection, calls for legal
22 conclusion.
23    A.  Yes.
24    Q.  (BY MR. WHITE)  So is this another provision
25 of SB 1 that expands voting opportunities?

Page 199

1         MS. SPECTOR:  Object to form.
2    A.  Yes.
3    Q.  (BY MR. WHITE)  And on Page 17 of Exhibit 3,
4 can you go to Line 23?
5    A.  Yes.
6    Q.  Do you see where it says, "A voter who has not
7 voted before the scheduled time for closing a polling
8 place is entitled to vote after that time if the voter
9 is in line at the polling place by closing time"?
10    A.  Yes.
11    Q.  Are you familiar with this provision of SB 1?
12    A.  Yes.
13    Q.  And what does this provision of SB 1 do?
14    A.  That if you were in line before the location
15 was scheduled to close, that you are able to vote, no
16 matter if it's one hour, two hours, three hours.  If you
17 are in line, then you will be processed.
18    Q.  And this is applicable to the early voting
19 period, correct?
20    A.  Correct.
21         MS. SPECTOR:  Objection, calls for legal
22 --
23         THE WITNESS:  I'm sorry.
24         MS. SPECTOR:  -- conclusion.
25         It's okay.

Page 200

1    A.  Yes.
2    Q.  (BY MR. WHITE)  Was that a requirement prior
3 to SB 1?
4         MS. SPECTOR:  Objection, calls for legal
5 conclusion.
6    A.  I don't believe so.
7    Q.  (BY MR. WHITE)  Was it a requirement for
8 Election Day prior to SB 1?
9         MS. SPECTOR:  Objection, calls for legal
10 conclusion.
11    A.  Yes.
12    Q.  (BY MR. WHITE)  So SB 1 took the requirement
13 of letting people who are in line when the polls close,
14 letting them complete their voting on Election Day, and
15 applied that to the early voting period as well?
16         MS. SPECTOR:  Same objection.
17    A.  Yes.
18    Q.  (BY MR. WHITE)  And so does that make it
19 easier to vote during the early voting period?
20         MS. SPECTOR:  Object to form.
21    A.  It gives more hours.
22    Q.  (BY MR. WHITE)  And in El Paso County, were
23 you letting people who were in line to vote at the end
24 of the -- the day during the early voting period, did
25 you let all of them vote?

Page 201

1         MS. SPECTOR:  Object to form.
2    A.  Yes.
3    Q.  (BY MR. WHITE)  And you did that prior to
4 SB 1?
5    A.  Yes.
6         MS. SPECTOR:  Yeah, go ahead.
7    A.  Yes.
8    Q.  (BY MR. WHITE)  So this didn't affect El Paso
9 County, is that correct?
10         MS. SPECTOR:  Object to form.
11    A.  Correct.
12    Q.  (BY MR. WHITE)  But it could have made it
13 easier for people who arrived late during early voting
14 to vote in other counties, correct?
15         MS. SPECTOR:  Object to form.
16    A.  Yes.
17    Q.  (BY MR. WHITE)  All right.  Can you turn to
18 Page 18 of Exhibit 3 --
19    A.  Yes.
20    Q.  -- please?
21         And at Line 8 do you see where it says,
22 "Section 3.10"?
23    A.  Yes.
24    Q.  And at Line 14 do you see Subsection (e)?
25    A.  Yes.

Page 202

1    Q.   And on Line 15 through 16 do you see where it
2  has "55,000" underlined, "100,000" in brackets and
3  crossed out?
4    A.   Yes.
5    Q.   So does this change make this section
6  applicable to counties in Texas with smaller
7  populations?
8         MS. SPECTOR:   Objection, calls for legal
9  conclusion.
10   A.   Yes.
11   Q.   (BY MR. WHITE)   And if you go to Line 18
12  through Line 19 --
13   A.   Yes.
14   Q.   -- do you see where it says -- strike that.
15       Where at Line 17 through Line 19 on Page
16  18 of Exhibit 3, do you see where it says, "at the main
17  early voting polling place to be conducted on the last
18  Saturday of the early voting period for at least 12
19  hours"?
20   A.   Yes.
21   Q.   So what is that requirement?
22       MS. SPECTOR:   Objection, calls for legal
23  conclusion.
24   A.   Stating that the main early voting location on
25  -- on the final Saturday of er -- during the early

Page 203

1  voting period must be open for 12 hours for voters.
2    Q.   (BY MR. WHITE)   Was that a requirement before
3  SB 1?
4         MS. SPECTOR:   Objection, calls for legal
5  conclusion.
6    A.   No.
7    Q.   (BY MR. WHITE)   So is that another expansion
8  of opportunities to vote early --
9         MS. SPECTOR:   Objection --
10   Q.   (BY MR. WHITE)   -- resulting from SB 1?
11        MS. SPECTOR:   Sorry.
12             Object to form.
13   A.   An expansion on the hours for early voting,
14  yes.
15   Q.   (BY MR. WHITE)   And at Line 21 on Page 18, do
16  you see where "six" is underlined, "five" is in brackets
17  and crossed out?
18   A.   Yes.
19   Q.   And what does that change in SB 1 do?
20        MS. SPECTOR:   Objection, calls for legal
21  conclusion.
22   A.   It adds a Sunday requirement for the early
23  voting period for at least six hours.
24   Q.   (BY MR. WHITE)   And before SB 1, that
25  requirement was five hours, correct?

Page 204

1         MS. SPECTOR:   Objection, calls for legal
2  conclusion.
3    A.   Yes.
4    Q.   (BY MR. WHITE)   So this is another example of
5  SB 1 increasing the opportunities to vote early?
6         MS. SPECTOR:   Object to form.
7    A.   Increasing the hours, yes.
8    Q.   (BY MR. WHITE)   And if you look at Line 22
9  through 23 on Page 18 of Exhibit 3, do you see that
10  underlined portion of the sentence?
11   A.   Yes.
12   Q.   Do you see where it says, "voting may not be
13  conducted earlier than 9 a.m. or later than 10 p.m."?
14   A.   Yes.
15   Q.   And what voting period is that limiting?
16        MS. SPECTOR:   Objection, calls for legal
17  conclusion.
18   A.   The Sunday hour voting during the last week of
19  early voting.
20   Q.   (BY MR. WHITE)   And prior to SB 1, on the last
21  Sunday of early voting, did you ever have polling places
22  that were open before 9 a.m.?
23   A.   We may have had a location or two that was
24  open at eight.  I don't remember right off the top of my
25  head, but I do remember having some locations, I -- I

Page 205

1  believe, eight to five in previous elections.
2    Q.   Is that information maintained on your
3  website?
4    A.   Yes.
5    Q.   And where would that be?
6    A.   Our website, which is epcountyvotes.com, there
7  is a tab that says "More", "Election Archives", and then
8  it lists each election each year.  Under that, there
9  would be early voting, depending on what election you
10  want, early voting station and hours.
11   Q.   And prior to SB 1, on the last Sunday of early
12  voting did you ever have polling places open past 10
13  p.m.?
14   A.   No.
15   Q.   And I think I skipped over one, so if we go
16  back up to Line 18 through 19, do you see those lines?
17   A.   Yes.
18   Q.   It's -- do you see where underlined it says,
19  "on the last Saturday of the early voting period for at
20  least 12 hours", and then that's followed by, "except
21  that voting may not be conducted earlier than 6 a.m. or
22  later than 10 p.m."?
23   A.   Yes.
24   Q.   So prior to SB 1, on the last Saturday of the
25  early voting period, did you have any polling places

Lisa Wise

Page 206

1  opening before 6 a.m.?
2      A.  No.
3      Q.  And on that same day of the early voting
4  period, the last Saturday did you have any polling
5  places, prior to SB 1, that are -- that were open past
6  10 p.m.?
7      A.  No.
8      Q.  So that provision didn't affect El Paso County
9  elections, did it?
10         MS. SPECTOR:  Objection to form.
11     A.  No.
12     Q.  (BY MR. WHITE)  So I'm going to have you jump
13  to the further in the back of Exhibit 3 to Page 57, if
14  you would go there, please?
15         And at Line 1 do you see where it says,
16  "Section 7.02"?
17     A.  Yes.
18     Q.  Are you familiar with this section?
19     A.  Yes.
20     Q.  And what do you understand this section to do?
21         MS. SPECTOR:  Objection, calls for legal
22  conclusion.
23     A.  Require employers to allow their employees to
24  leave to vote, take time off to vote on Election Day or
25  during the early voting period.

Page 207

1      Q.  (BY MR. WHITE)  And were -- did this cover the
2  early voting period prior to SB 1?
3         MS. SPECTOR:  Object to form.
4      A.  No.
5      Q.  (BY MR. WHITE)  So does this make it easier
6  for voters to get off of work to vote during the early
7  voting period?
8         MS. SPECTOR:  Object to form.
9      A.  Legally, yes, it does.
10     Q.  (BY MR. WHITE)  So would you agree that
11  there's provisions in SB 1 that make early voting
12  easier?
13         MS. SPECTOR:  Object to form.
14     A.  There are provisions in SB 1 that make early
15  voting easier, yes.
16     Q.  (BY MR. WHITE)  So Ms. Wise, in elections in
17  the past, are you aware of any allegations of fraud
18  conducted in El Paso County?
19         MS. SPECTOR:  Object to form, and I'm
20  going to instruct you not to answer to the extent it
21  involved confidential information regarding
22  investigations.
23     A.  No.
24     Q.  (BY MR. WHITE)  Do you believe attempted fraud
25  occurs in El Paso County?

Page 208

1      A.  I believe there may be small, isolated
2  incidences; however, in my experience, I have not seen
3  any widespread fraud.
4      Q.  Have -- have you received allegations of fraud
5  happening in El Paso County?
6         MS. SPECTOR:  You can answer the
7  question, but I think just don't disclose the content of
8  any ongoing investigations.
9      A.  Yes, I have.
10     Q.  (BY MR. WHITE)  And what is the nature of
11  those allegations of fraud?
12         MS. SPECTOR:  Same instruction.
13     A.  I don't know what I'm at liberty to really
14  say.
15         MS. SPECTOR:  I'll instruct you not to
16  answer regarding any ongoing investigations.  You can
17  talk about other --
18         THE WITNESS:  Okay.
19         MS. SPECTOR:  -- things.
20         THE WITNESS:  Okay.
21     A.  We may have somebody who calls and says so and
22  so either doesn't live at that location, I -- anymore,
23  something like that.  They didn't have the correct ID,
24  something like that, allegations like that, but when we
25  look into it, generally, there was either an error on a

Page 209

1  poll worker's part or a confusion by a voter, not an
2  intent, generally, to defraud.
3      Q.  (BY MR. WHITE)  Does the FBI have an election
4  fraud unit in El Paso, Texas?
5      A.  Yes.
6      Q.  Do you work with that unit?
7      A.  I do.
8      Q.  And how long have you been working with them?
9      A.  Since 2016.
10     Q.  And is that work related to allegations of
11  election fraud?
12     A.  Not just allegations.  Basically, they
13  contacted us in 2016 and said --
14         MS. SPECTOR:  Hold on one second.  I'm
15  going to give you the same instruction.
16         THE WITNESS:  Okay.
17         MS. SPECTOR:  Yeah.  You understand not
18  to disclose the --
19         THE WITNESS:  Yes.
20     A.  That we're here if something comes up, we're
21  here if you need us.  We meet with them before any
22  elections where there's federal races on the ballot and
23  discuss things that may come up; not necessarily fraud,
24  but if there's concern over something like aggressive
25  electioneering or anything like that, we've discussed in

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,            §
    *Plaintiffs,*            §
             §
*v.*            §            Case No. 5:21-cv-844-XR
             §
GREGORY W. ABBOTT, et al.,            §
    *Defendants.*            §

---

**STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS**

# APPENDIX N

Transcript of the Testimony of

# Lisa Wise

**Date:**

April 15, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO et al. vs GREGORY W. ABBOTT

Lisa Wise

April 15, 2022
Pages 54 to 57

Page 54

1            MS. SPECTOR:  Object to form.
2       A.  We received many calls with -- with those
3  requests.
4       Q.  (BY MS. PERALES)  And did you require that
5  other voter, that second voter, to also get on the phone
6  and make the request?
7            MS. SPECTOR:  Object to form.
8       A.  Our policy was yes, to require another verbal
9  request.
10       Q.  (BY MS. PERALES)  So after SB 1 went into
11  effect, your office required -- or your office -- your
12  office required, for example, if one spouse wanted to
13  request an ABBM for themselves and for their spouse, you
14  required that other spouse to get on the phone and make
15  the request as well?
16            MS. SPECTOR:  Object to form.
17       A.  Yes.
18       Q.  (BY MS. PERALES)  Did you ever have a
19  situation where a voter told you that they needed to
20  make the request on behalf of another individual,
21  because that individual could not make the request
22  themselves?
23            MS. SPECTOR:  Object to form.
24       A.  We had one request where the wife was next to
25  the husband.  He had -- he was bedridden and had no use

Page 55

1  of his vocal cords.  They took the information from her.
2  I was satisfied that he was wanting the ballot by mail,
3  so we did send the request in that isolated incident.
4       Q.  (BY MS. PERALES)  Okay.  In your view, was it
5  a reasonable practice to send, proactively, applications
6  for ballot by mail to voters over age 65 who had
7  previously submitted an application for ballot by mail
8  and indicated they wanted ballots throughout the year?
9       A.  Yes.
10       Q.  And would you agree with me that a voter over
11  age 65 is categorically eligible to vote by mail?
12            MS. SPECTOR:  Object to form, calls for
13  legal conclusion.
14       A.  Yes.
15       Q.  (BY MS. PERALES)  So returning back to the
16  year 2020, would it be correct to say then that that
17  year you sent applications for ballot by mail twice,
18  first in January and then later in the year, as you were
19  getting closer to the general election?
20            MS. SPECTOR:  Object to form.
21       A.  We did.
22       Q.  (BY MS. PERALES)  And would it be correct to
23  say then that none of the voters that you proactively
24  sent applications for ballot by mail would receive those
25  from you, proactively, in the year 2022?

Page 56

1            MS. SPECTOR:  Object to form.
2       A.  Correct.
3       Q.  (BY MS. PERALES)  I'd like to shift now to
4  voting with assistance, and I'd like to take first
5  in-person voting.
6            Based on your familiarity with the
7  conduct of elections, are there voters who come to vote
8  in person, but bring someone with them to help them with
9  the voting process?
10       A.  Yes.
11       Q.  Can you give me some examples of the needs of
12  those voters who are bringing assistors with them?
13            MS. SPECTOR:  Object to form.
14       A.  We've had people who are visually impaired and
15  maybe don't want the -- to use the audio ballot, and
16  they need someone to help read the -- the ballot for
17  them.  We have had people who maybe speak a language
18  that isn't Spanish, and would like some -- would like
19  their spouse or child who speaks Vietnamese to come in
20  with them.
21            We have, I mean, assistance all the way
22  down to maybe a curbside voter, obviously, in person
23  that needs -- is unable to enter the polling site.
24  Those are the -- the biggest ones, assisted -- assists
25  with reading or translation, basically.

Page 57

1       Q.  (BY MS. PERALES)  Do you have some voters who
2  are Spanish-speaking and limited-English-proficient, and
3  they come with their own trusted person to vote at the
4  polling place?
5            MS. SPECTOR:  Object to form.
6       A.  Yes.
7       Q.  (BY MS. PERALES)  And you mentioned that
8  somebody might be blind but prefer to use the assistor
9  as opposed to an audio ballot, is that right?
10       A.  Yes.
11       Q.  And might that also be the case, for example,
12  for somebody who doesn't hear or communicates in sign
13  language, where they might want to bring their own
14  person to assist and help them with the voting process?
15            MS. SPECTOR:  Object to form.
16       A.  Yes.
17       Q.  (BY MS. PERALES)  Is it fair to say that
18  voters who need assistance will rely on their assistors
19  for more than just reading and marking the ballot, for
20  example, navigating, physically navigating the polling
21  place?
22            MS. SPECTOR:  Object to form.
23       A.  Yes.
24       Q.  (BY MS. PERALES)  So a voter, for example, who
25  is older might come with their adult child, and lean on

Lisa Wise

April 15, 2022
Pages 58 to 61

Page 58

1  that person as they are walking through the polling
2  place, is that right?
3         MS. SPECTOR: Object to form.
4     A.  Yes, I've seen that before.
5     Q.  (BY MS. PERALES)  Might a voter also, for
6  example who uses sign language, bring an assistor to
7  help that voter communicate with poll workers as they're
8  checking in to vote?
9         MS. SPECTOR: Object to form.
10    A.  Yes.
11    Q.  (BY MS. PERALES)  And similarly with respect
12  to a limited-English-proficient voter, for example who
13  speaks Vietnamese, that voter might bring a trusted
14  friend or an adult child to speak on their behalf when
15  interacting with poll workers, is that correct, during
16  the sign-in process, for example?
17        MS. SPECTOR: Object to form.
18    A.  Yes.
19    Q.  (BY MS. PERALES)  And might a limited-English-
20  proficient voter also rely on their assistor to help
21  explain to them how to use the voting equipment as the
22  poll worker is explaining how to use the poll -- the --
23  the voting equipment?
24        MS. SPECTOR: Object to form.
25    A.  Yes.

Page 59

1     Q.  (BY MS. PERALES)  We've talked about assistors
2  being family members, but can an assistor also be a
3  neighbor or a trusted friend?
4         MS. SPECTOR: Object to form.
5     A.  Yes.
6     Q.  (BY MS. PERALES)  And do you understand that
7  the assistor could be anybody, as long as they're not an
8  employer, a representative of an employer, a union rep
9  or an agent of the union?
10        MS. SPECTOR: Object to form.
11    A.  Yes.
12    Q.  (BY MS. PERALES)  Have you ever seen a
13  situation where a voter is assisted by a fellow church
14  member, or a fellow member of a body of worship?
15        MS. SPECTOR: Object to form.
16    A.  I have not.
17    Q.  (BY MS. PERALES)  Are you familiar with the
18  term Souls to the Polls?
19        MS. SPECTOR: Object to form.
20    A.  I am.
21    Q.  (BY MS. PERALES)  What's your understanding of
22  that?
23    A.  That it's generally an action by a church or
24  synagogue, some religious location or body, that
25  encourages and may even assist voters who need to vote,

Page 60

1  whether it be rides, whether it be an assistor, and --
2  and a lot of times it may happen after church on Sunday,
3  they go in kind of a community church activity.
4     Q.  Are you aware of that ever happening in El
5  Paso County?
6         MS. SPECTOR: Object to form.
7     A.  I'm not.
8     Q.  (BY MS. PERALES)  Are you aware of churches in
9  a less formal way, providing rides to parishioners to
10  the polls, so that they can vote?
11        MS. SPECTOR: Object to form.
12    A.  I honestly have not seen that here in El Paso
13  County.
14    Q.  (BY MS. PERALES)  So now switching away from
15  churches to nonprofit get-out-the-vote organizations,
16  not campaigns or political parties or candidates, but
17  nonpartisan get-out-the-vote operations -- have you ever
18  seen those types of operations offer rides to voters to
19  the polls?
20        MS. SPECTOR: Object to form.
21    A.  Yes.
22    Q.  (BY MS. PERALES)  Have you seen that in terms
23  of rides to individual voters, or rides to groups of
24  voters or both?
25        MS. SPECTOR: Object to form, compound.

Page 61

1     A.  I've seen the offer by organizations; however,
2  I haven't seen the actual, like, the implementation of
3  that, and so I don't know if it was specific, if they
4  were picking up a bunch of people, or if they were just
5  picking up individuals.
6     Q.  (BY MS. PERALES)  Tell me about what you saw
7  in terms of an offer, how -- how did you see it?
8         Did you see it as an announcement, a
9  flyer, something else?
10    A.  I --
11        MS. SPECTOR: Object --
12        THE WITNESS: I'm sorry.
13        MS. SPECTOR: Sorry.
14        Object to form.
15        Go ahead.
16    A.  I've seen it so the -- I'm thinking about the
17  League of Women Voters right now, they have what they
18  call the Voters Guide, and on there was an offer, if you
19  need a ride to the poll, contact us; on their Facebook
20  same thing, if you need a ride, contact us.  It --
21  that's -- that's what I'm using as the basis for that.
22    Q.  (BY MS. PERALES)  Are you aware of any
23  nonpartisan organizations providing voter assistance to
24  voters as the polling place?
25        MS. SPECTOR: Object to form.

Lisa Wise

April 15, 2022
Pages 226 to 229

Page 226

1  something that may be a piece of what we do.
2      Q.  What do you mean, send it out?
3          MS. SPECTOR:  Objection to form.
4      A.  It's -- what she did was she -- it was, like,
5  an op-ed piece.
6      Q.  (BY MR. GRAHAM WHITE)  Oh, I see.
7      A.  So she sent it to, like, the local paper.  If
8  they'll run it, we'll send it, but we'll see if -- if
9  that's -- once we're done getting it, tweaking it and
10  deciding what we want to do, if they'll do that or not.
11     Q.  Okay.  Are you aware of any other instances
12  where the Secretary of State's Office has forward --
13  forwarded you op-eds like this?
14         MS. SPECTOR:  Objection to form.
15     A.  No, I don't believe so.
16     Q.  (BY MR. GRAHAM WHITE)  Okay.  Just a couple
17  more questions.
18         Earlier, you were asked about
19  accommodations for voters with disabilities, how -- how
20  does a voter request a reasonable accommodation in El
21  Paso County?
22         MS. SPECTOR:  Objection to form.
23     A.  Could you give me an example of what -- what
24  you would consider, like, the reasonable accommodation?
25     Q.  (BY MR. GRAHAM WHITE)  What would you consider

Page 227

1  a reasonable accommodation?
2          MS. SPECTOR:  Objection to form.
3      A.  So -- okay.  So, I mean, if -- if there is
4  ever an issue with a polling site, if there is ever an
5  issue with they need help or assistance, then if it's
6  something that I can handle right away, I'll handle it.
7          But if it's something that -- let's say
8  we had a call for -- an example is we had a complaint
9  from one of our east side annex locations.  A voter
10  complained that the door was too heavy, that it did not
11  comply with ADA.  This person that was in a wheelchair
12  said the -- the door is way too heavy, there is no way I
13  can open it.  It was a county facility.
14         I basically called our county admin, I
15  said this is what they're saying, I don't know if we --
16  we have a county ADA coordinator, not an elections ADA
17  coordinator.  She went out there, she said yeah, it's
18  measuring too heavy, and they -- they fixed it, you --
19  basically within 24 hours.
20         So if -- if that's -- if that's one, then
21  that's an example.  If I can handle it relatively
22  quickly, then the process is you call us and I'll begin
23  handling it.  If it's not a county facility, it's a
24  little bit harder.
25     Q.  (BY MR. GRAHAM WHITE)  Okay.  Yeah.  So that

Page 228

1  was my question, more about, like, the process.
2          So, typically, what will happen is a
3  voter, if a voter requests some sort of accommodation
4  they will call your office, and that's how your -- will
5  handle it?
6      A.  That's, yes.  There is also an ADA -- an ADA
7  process through the county, where they may count -- call
8  the county admin, but then I'm guessing, depending on
9  what the -- what the request looks like, they would
10  contact me and say this is -- is this something that we
11  can handle now, or is this something that has to go,
12  basically, through Facilities or something like that?
13  And then she would direct it, if it was something that
14  was going to take longer, then our county administrator
15  --
16     Q.  Yeah.
17     A.  -- then it was something where I could just --
18  let's get Facilities to our building and fix it.
19     Q.  Got it.  And just to clarify some of the --
20  the pronouns --
21     A.  I'm sorry.
22     Q.  -- there -- no, no, no problem.
23          So a voter could potentially contact the
24  county ADA official --
25     A.  Yes.

Page 229

1      Q.  -- and that --
2      A.  So you would -- the form goes on the county
3  admin, it's on the county administrator's -- the county
4  general page, but there is an ADA coordinator that then
5  would be notified by the county administrator if there
6  was an issue that we needed that couldn't be remedied
7  with just a quick something where they just go out and
8  do it.
9      Q.  So if there was an accommodation relating to
10  voting that the county official would need your help
11  with, that person would then contact you?
12         MS. SPECTOR:  Objection to form.
13     A.  Yes.
14     Q.  (BY MR. GRAHAM WHITE)  Okay.  And your
15  office's website -- sorry, strike that.
16         You mentioned that the county website
17  would potentially have a form that voters can fill out
18  about this?
19         MS. SPECTOR:  Objection to form.
20     A.  There is an election complaint form, and then
21  there is an ADA, like, concern form on the county's
22  website.
23     Q.  (BY MR. GRAHAM WHITE)  Does your office have a
24  similar form for election-related accommodations?
25         MS. SPECTOR:  Objection to form.

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900      San Antonio, Texas 78232
210-697-3400                                                    210-697-3408

Lisa Wise                                                    April 15, 2022
                                                            Pages 230 to 233

Page 230

1    A.  We have election complaint form, but I don't
2  specific ADA.
3    Q.  (BY MR. GRAHAM WHITE)  Okay.  How far in
4  advance does a voter have to request an accommodation
5  for you to be able to accommodate it?
6          MS. SPECTOR:  Objection to form.
7    A.  It depends on the accommodation.
8    Q.  (BY MR. GRAHAM WHITE)  Okay.
9    A.  So if -- if -- if it's a phys -- it's
10  something to do with the physical space of a county-
11  owned facility, we can usually handle that within 24
12  hours.  I mean, it's -- if it doesn't take, like, an out
13  -- a build-out of something.
14          If it's something where it's a facility
15  that we don't own, a mall that's serving as an early
16  voting site, we could -- we would try and do what we
17  could, but again, I don't know if that would be
18  something that would happen immediately.  We haven't had
19  that, we haven't had that happen.
20    Q.  And who decides whether a request for an
21  accommodation is appropriate?
22          MS. SPECTOR:  Objection to form.
23    A.  Generally, it's been me.
24    Q.  (BY MR. GRAHAM WHITE)  It's you?  Okay.
25          MR. GRAHAM WHITE:  Can we go off the

Page 231

1  record for just a minute?
2          VIDEOGRAPHER:  We are off record at 3:49
3  p.m.
4          (Off the record.)
5          VIDEOGRAPHER:  We're back on record at
6  3:55 p.m.
7    Q.  (BY MR. GRAHAM WHITE)  Ms. Wise, thank you.
8          MR. GRAHAM WHITE:  I don't have any
9  further questions, so I will pass the witness to counsel
10  for the United States.
11          DIRECT EXAMINATION
12  BY MR. MALHI:
13    Q.  Hi Ms. Wise, can you hear me?
14          MS. PERALES:  Yes, we can hear you.
15    A.  Yes.
16    Q.  (BY MR. MALHI)  Hi Ms. Wise, my name is Jaywin
17  Singh Malhi, and I am appearing today as counsel for the
18  United States.  I recognize that you've had a long,
19  couple of days, a marathon couple of days, and I don't
20  mean to pile on too long and prolong this much longer,
21  but I do have a few topics that I wanted to run through
22  with you, with a variety of questions about that --
23          MS. SPECTOR:  Jaywin?
24    Q.  (BY MR. MALHI)  -- so --
25          MS. SPECTOR:  Jaywin?  This is Kelsey,

Page 232

1  hi, good to see you.  You can't see me.  We -- yeah,
2  we're in the same class.  Do you know about how long you
3  are planning to take with her?  Because she has had two
4  really long days.
5          MR. MALHI:  I think under 30 minutes.
6          MS. SPECTOR:  Okay.  Okay.  Go ahead.
7          MR. MALHI:  Yeah.  I -- I'll try to keep
8  it shorter.  I -- I -- I appreciate the question.
9    Q.  (BY MR. MALHI)  Ms. Wise, shall we jump --
10  jump right in?
11          Are you ready to go?
12    A.  I'm ready.
13          MS. SPECTOR:  You can face that way.
14    Q.  (BY MR. MALHI)  Great.  I'd like to pick up
15  where Mr. White earlier today, just now, left off, and
16  it's -- I want to talk about reasonable accommodations.
17          I think yesterday in your conversation
18  with Mr. Jeff White, you had mentioned a few reasonable
19  accommodations that came to the top of your mind that
20  you've provided in the past, can you remind me again
21  what those reasonable accommodations that you've
22  provided in the past have been?
23          MS. SPECTOR:  Objection to form.
24    A.  Are you asking about the things like the poll
25  pad adjustment, or I am not sure exactly what you mean

Page 233

1  by -- what you're referring --
2    Q.  (BY MR. MALHI)  Okay.
3    A.  -- to.
4    Q.  I think the two things that came to mind that
5  I heard yesterday was, one, about some sort of Braille
6  kind of adapting tool for the poll pad, and something
7  about, you know, jumping ahead of the line due to a
8  medical condition.
9          I just wanted to hear about any other
10  sorts of reasonable accommodations that have come up in
11  the past and your county has provided?
12    A.  Okay.  Yes.
13          MS. SPECTOR:  Objection to form.  Go
14  ahead.
15    A.  Okay.  So yeah, the one -- the one you're
16  talking about was the Braille.  We worked with the El
17  Paso Council of the Blind to come up with a -- a sheet
18  to go over the screens on our poll pads so that
19  visually-impaired voters could read the poll pad
20  language in  Braille and then know where to sign.
21          We also did the -- I just spoke with
22  Mr. White about the location where the door was too
23  heavy, and we adjusted that.  We had, we actually had a
24  concern at our warehouse where we were doing all the
25  training, this was not brought up by an attendee of the

Lisa Wise

Page 234

1  poll worker trainings, but that the ramp was too steep,
2  so we built a new ramp.
3         We've had -- when we had the Disability
4  Rights Texas come out and review all of our sites, they
5  basically provided any site that they thought was not
6  compliant with two options, one would be a quick fix,
7  and one would be a more detailed fix.
8         So it may be something like if the
9  parking space was not actually painted, you know, if you
10 couldn't see the paint well enough on a handicapped
11 spot, to go out and repaint it.  That might -- it -- we
12 ranged from that to -- to moving locations,  to
13 regrading a parking lot.
14        Whatever was in that report, we -- it
15 varied from the quick fix, and we did some for the --
16 the more detailed ones, things like that.
17    Q.  Understood.  And about how common are these
18 sorts of requests for reasonable accommodations in the
19 elections?
20        MS. SPECTOR:  Objection to form.
21    A.  In my experience in this office, pretty rare.
22    Q.  (BY MR. MALHI)  Understood.  You mentioned
23 that you had not -- in your conversation with Mr. White
24 yesterday, you mentioned you didn't receive any such
25 requests for the March 2022 primary, when was the last

Page 235

1  time you received such a request?
2         MS. SPECTOR:  Objection to form.
3    A.  The -- the re -- the latest request was the
4  one that we worked on with the El Paso Council of the
5  Blind for the -- for the sheets for the poll pads, and
6  that came, I believe, last -- last year, and so we
7  worked through that, and that was the most recent one I
8  can remember.
9    Q.  (BY MR. MALHI)  And now when you're actually
10 providing those reasonable accommodations, the -- the
11 election staff that provides that -- that -- that sort
12 of accommodation, is there any sort of training you
13 provide to them on how to actually provide the
14 accommodation?
15        MS. SPECTOR:  Objection to form.
16    A.  The only training that we -- that we did
17 provide, what came from Disability Rights Texas and El
18 Paso Council of the Blind, where they covered how to
19 possibly, like, lead someone in if they're visually-
20 impaired, where to -- you know, where to make sure
21 you're careful to place your hands, how to make sure
22 we're using the audio ballot, how to use the sip-and-
23 puff on our machine.
24        A couple of things to look for on, like,
25 width of a door, thinking when we go out to look at

Page 236

1  polling sites, could this fit a wheelchair, would
2  someone be able to turn around, things like that we
3  received from Disability Rights Texas.  But as far as
4  the -- the county, specific, no.
5    Q.  (BY MR. MALHI)  And now kind of going
6  backwards a little bit, the actual -- before you
7  actually provide the reasonable accommodation, you
8  mentioned that sometimes you are the decision-maker,
9  sometimes it could be someone else is the decision-
10 maker, is there any training you provide to the actual
11 decision-makers who have to decide whether to provide
12 the accommodations or not?
13        MS. SPECTOR:  Object to form.
14    A.  The county has an ADA coordinator, so they've
15 obviously been trained.  So if -- let's say I had a
16 complaint about the door handle, she went out there, she
17 -- she knows how heavy it can be by law, measured it,
18 thought that it was too heavy, and then fixed it.
19    Q.  (BY MR. MALHI)  Understood.  Now during your
20 conversation with Ms. Perales earlier today, you
21 discussed various forms of assisting voters that go
22 beyond reading, or marking a ballot or directing a voter
23 to do the same.
24        Based on your understanding of the law,
25 if a reasonable accommodation request asks to have an

Page 237

1  assistor help a voter, is that assistor required to take
2  the assistor oath set forth in SB 1?
3         MR. JEFFREY WHITE:  Objection, form.
4         MS. SPECTOR:  Objection, calls for legal
5  conclusion.
6    A.  Yes.
7    Q.  (BY MR. MALHI)  Now, based on your
8  understanding of the law, again, is that still the case
9  if the assistor provides reasonable accommodations that
10 go beyond reading, or marking a ballot or directing the
11 voter to do the same?
12        MS. SPECTOR:  Objection, calls for legal
13 conclusion.
14    A.  I don't know that I have the answer to that.
15 That would be -- that would be an example where I would
16 contact my county attorneys and ask for their opinion or
17 input on it.
18    Q.  (BY MR. MALHI)  Understood.  Now, earlier
19 today with Ms. Perales you also touched on training
20 you've  received from the Secretary of State as to
21 reasonable accommodations, generally, have you received
22 any guidance from the sec -- so not just training, but
23 any sort of formal guidance from the Secretary of State
24 about providing reasonable accommodations to voters with
25 disabilities?

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| Defendants. | § | |

---

**STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS**

# APPENDIX O

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE WESTERN DISTRICT OF TEXAS

3               SAN ANTONIO DIVISION

4   LA UNION DEL PUEBLO            )
    ENTERO, et al.,                )
5                                  )
                Plaintiffs,        )
6                                  )
    vs.                            )
7                                  ) NO. 5:21-cv-844-XR
    GREGORY W. ABBOTT, et al.,     )
8                                  )
                Defendants.
9   -----------------------------------

10      ORAL AND VIDEOTAPED DEPOSITION OF

11                 LISA WISE

12              April 18, 2023

13            (REMOTELY REPORTED)

14      -----------------------------------

15      The Oral and Videotaped Deposition of LISA WISE,

16  produced as a witness at the instance of the defendant,

17  and duly sworn, was taken in the above-styled and

18  numbered cause on the 18th of April, 2023 from 9:13 a.m.

19  to 3:27 p.m., in and for the State of Texas, reported by

20  machine shorthand, conducted El Paso County Courthouse

21  500 E. San Antonio, 5th Floor, Suite 503 El Paso, Texas

22  79901, pursuant to the Federal Rules of Civil Procedure

23  and the provisions stated on the record or attached

24  hereto.

25



Lisa Wise                                                         April 18, 2023
                                                                 Pages 70 to 73

Page 70

1 General Election regarding the ID number requirement as
2 compared to the previous?
3          MS. LEBEL:  Object to form.
4     A.  I did, but, again, I think a lot of those
5 voters had already seen it in March, and so they had
6 already -- had the -- they knew what identifier they
7 needed put on -- or they put in an identifier in March
8 that we now had on file.  So there was less confusion.
9     Q.  (BY MS. HUNKER)  And you included an insert
10 with the ballot materials, correct?
11    A.  Yes.
12    Q.  Did you make any changes to that insert for the
13 November 2022 General Election as compared to the
14 primaries?
15    A.  I don't believe so.
16    Q.  And did your office engage in any voter
17 education --
18          MS. LEBEL:  Object to form.
19    Q.  (BY MS. HUNKER)  -- for the November 2022
20 General Election?
21    A.  We -- we did, but it wasn't -- we didn't have,
22 like, a media package, but we did do things on social
23 media, interviews.  Anytime we were out in public at --
24 doing voter registration drives or speaking to groups,
25 we discussed the -- the ID requirement, making sure they

Page 71

1 understood the -- that we were asking them to fill both
2 out.
3     Q.  Is it fair to say then that you incorporated
4 voter education about the ID requirement into your
5 normal voter education practices and procedures?
6     A.  Yes.
7     Q.  Does your office have any way for a voter with
8 a disability to file a complaint about accessibility
9 during the General Election?
10    A.  I mean, we have things on our website as far
11 as, like, a form, if there's any complaint.  It doesn't
12 specifically mention accessibility.  But they could fill
13 that out, they could call our office if we have any
14 issues.  I believe that's how we usually get any -- any
15 calls from voters, anything like that.
16    Q.  And did you receive any ADA complaints
17 regarding the November 2022 General Election?
18    A.  I don't believe so.
19    Q.  Would you agree that El Paso County works to
20 ensure that its voting program is accessible to voters
21 with disabilities?
22          MS. LEBEL:  Object to form.
23    A.  Yes.
24    Q.  (BY MS. HUNKER)  Would you agree with me that
25 El Paso County takes its responsibilities under the ADA

Page 72

1 seriously?
2          MS. LEBEL:  Object to form.
3     A.  Yes.
4     Q.  (BY MS. HUNKER)  And you're aware that voters
5 with disabilities have the option of requesting an
6 accommodation or change in the normal voting procedures,
7 correct?
8     A.  Yes.
9     Q.  To your knowledge, did your office receive any
10 request for accomodation regarding any of the provisions
11 in SB1?
12    A.  I don't believe so.
13    Q.  To your knowledge, did your office receive any
14 requests for accommodation regarding the requirement
15 that mail-in voters put their Social Security number or
16 Texas ID number on their application for ballot by mail?
17    A.  Did we receive a request for accommodation on
18 that?  I mean, I don't believe so.  I mean, we had
19 people asking questions about that and things like that,
20 but I don't remember anyone asking for an accommodation
21 on that.
22    Q.  To your knowledge, did your office receive any
23 request for accomodation regarding the requirement that
24 mail-in voters put their Social Security number or Texas
25 ID number on their ballot by mail?

Page 73

1     A.  I don't believe so.
2     Q.  To your knowledge, did your office receive any
3 request for accommodation regarding the requirement that
4 assisters take an oath before assisting a voter?
5     A.  No.
6     Q.  To your knowledge, did your office receive any
7 request for accommodation regarding any of the
8 procedures related to voting assistance for the
9 November 2022 General Election?
10         MS. LEBEL:  Object to form.
11    A.  I mean, I don't know if this would be relevant
12 to that, but, I mean, we will have sometimes a voter who
13 the poll workers let come to the front of the line if
14 they have some -- if they have the need, obviously, that
15 they're not able to stand in line.  If we have a voter
16 that comes in, we've had before, with, like, an oxygen
17 tank, obviously they're usually moved to the front or
18 they are moved to the front.
19         So we have those situations every election,
20 a couple.  But as far as someone calling me and asking
21 for that or something, no, those are handled generally
22 on-site.
23    Q.  (BY MS. HUNKER)  And to your knowledge, did
24 your office receive any requests for accommodation
25 regarding the cure process for ballots by mail?



Lisa Wise

April 18, 2023
Pages 74 to 77

Page 74

1          MS. LEBEL:  Object to form.
2    A.  No.
3    Q.  (BY MS. HUNKER)  How many full-time employees
4  are in your office?
5    A.  Currently, there's 17 besides myself.  So 18
6  with me included.
7    Q.  And how many do you hire before an election?
8          MS. LEBEL:  Object to form.
9    A.  I apologize.
10         Depends on the election.  As far as temps?
11  Is that what you mean?
12    Q.  (BY MS. HUNKER)  Yes.
13    A.  Okay.  On a small election, it may be 8 to 10.
14  On a large election, it -- it could be 25.
15    Q.  And how many temporary workers did your office
16  hire leading up to the November 2022 General Election?
17    A.  Sorry.  I'm thinking in my mind.  I believe 12.
18    Q.  Is that typical for a general mid-term
19  election?
20         MS. LEBEL:  Object to form.  This is beyond
21  the scope of the deposition.
22    A.  I think -- I would say more, we would do around
23  10.  Maybe a couple more this time.
24    Q.  (BY MS. HUNKER)  Did your office receive any
25  communications from the Department of Justice regarding

Page 75

1  an alleged incident of voter fraud that was conducted in
2  connection with the November 2022 General Election?
3          MR. STEWART:  I just want to object on the
4  basis of investigative privilege, to the extent an
5  investigation is ongoing.
6          I'm not instructing the witness not to
7  answer, I'm just putting that objection on the record.
8          MS. HUNKER:  And to clarify, I'm not going
9  to get into the substance of any violations.  I just
10  want to know whether or not a violation occurred or a
11  communication occurred.
12    A.  No.
13    Q.  (BY MS. HUNKER)  Did your office receive any
14  communication from the Department of Homeland Security
15  regarding any alleged incident of voter fraud in
16  connection with the November 8th, 2022 General Election?
17          MR. STEWART:  Same objection.
18    A.  No.
19    Q.  (BY MS. HUNKER)  Did your office receive any
20  communication from the Department of State regarding an
21  alleged incident of voter fraud in connection with the
22  November 8th, 2022 General Election?
23          MR. STEWART:  Same objection.
24    A.  No.
25    Q.  (BY MS. HUNKER)  Did your office receive any

Page 76

1  communication from the United States Department of
2  Justice regarding any alleged violation of federal law?
3          MR. STEWART:  Same objection.
4          MS. LEBEL:  Object to form.
5    A.  No.
6    Q.  (BY MS. HUNKER)  Did your office receive any
7  communication from the Department of Homeland Security
8  regarding any alleged violation of federal law in
9  connection with November 8th, 2022 General Election?
10         MR. STEWART:  Same objection.
11         MS. LEBEL:  Object to form.
12    A.  No.
13    Q.  (BY MS. HUNKER)  Did your office receive any
14  communications from the Department of State regarding an
15  alleged violation of federal law in connection with the
16  November 8th, 2022 General Election?
17         MR. STEWART:  Same objection.
18         MS. LEBEL:  Object to form.
19    A.  No.
20    Q.  (BY MS. HUNKER)  Did your office contact the
21  Department of Justice regarding any alleged incident of
22  voter fraud in connection with the November 8th, 2022
23  General Election?
24         MS. LEBEL:  Object to form.
25         MR. STEWART:  Same objection.

Page 77

1    A.  No.
2    Q.  (BY MS. HUNKER)  Did your office contact the
3  Department of Homeland Security regarding any alleged
4  incident of voter fraud in connection with the November
5  8th, 2022 General Election?
6          MR. STEWART:  Same objection.
7          MS. LEBEL:  Object to form.
8    A.  No.
9    Q.  (BY MS. HUNKER)  And did your office contact
10  the Department of State regarding any alleged voter
11  fraud conducted in connection with the November 8th,
12  2022 General Election?
13         MR. STEWART:  Same objection.
14         MS. LEBEL:  Object to form.
15    A.  No.
16    Q.  (BY MS. HUNKER)  Did your office report any
17  alleged incident of voter fraud to the County District
18  Attorney in connection with the November 8th, 2022
19  General Election?
20         MS. LEBEL:  Object to form and object on
21  the basis of investigation privilege.
22    A.  So do I answer?  The answer is no.
23    Q.  (BY MS. HUNKER)  Don't give me any substantive
24  details --
25    A.  Okay.  The answer is no.  The answer is no.



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX P

Transcript of the Testimony of

**Isabel Longoria**


**Date:**

April 20, 2022


**Case:**

LA UNION DEL PUEBLO ENTERO V. GREGORY W. ABBOTT

Isabel Longoria

April 20, 2022
Pages 18 to 21

Page 18

1   A.  Yes.
2   Q.  If you want to flip back past the congressional races,
3 just a couple pages, you will find the results for the Democratic
4 primary for governor.  Do you see that?  It's page 5 of 59.
5   A.  Yes.
6   Q.  And similarly, the number of ballots cast for the
7 election is shown as 167,982; right?
8   A.  Correct.
9   Q.  So based on this information, is it fair to say that
10 Harris County had more voters participate in the 2022 democratic
11 primary than the 2018 Democratic primary?
12   A.  It would appear comparing the reports in front of me
13 that about, if I'm doing my math right, 200 more people
14 participated in the '22 Democratic primary than in the 2018.
15   Q.  Great.  We can set that maybe a little aside.  Now
16 let's do the corresponding one for the Republicans results.  Ms.
17 Longoria, I'm handing you Exhibit 3.
18      (Exhibit Longoria 3 is marked for identification.)
19      THE WITNESS:  Is it all right if I toss these on
20 the floor?
21      MR. THOMPSON:  Sure.
22      MR. FOMBONNE:  Yeah.
23      THE WITNESS:  It doesn't matter where I keep them?
24      MR. FOMBONNE:  No.
25      THE WITNESS:  Okay.

Page 19

1      MR. FOMBONNE:  I can put them together for you in
2 a nice pile.
3      MR. THOMPSON:  It's possible you'll want to refer
4 to them later, so you can keep them handy, but --
5      THE WITNESS:  Okay.  Gotcha.  All right.
6 (BY MR. THOMPSON:)
7   Q.  Ms. Longoria, do you have Exhibit 3 in front of you?
8   A.  Yes.
9   Q.  Is it labeled, "Republican Party Cumulative - Official,
10 Harris County, Texas - Primary Election March 6, 2018"?
11   A.  Yes.
12   Q.  Does this appear to be a report corresponding to the
13 previous exhibit we looked at?
14   A.  I can reasonably assume so.
15   Q.  And so this appears to show the official results for
16 the Republican primary in 2018 in Harris County; is that right?
17   A.  Correct.
18   Q.  Now, if we similarly look at the number of ballots for
19 the statewide races just as we did on the previous exhibit, we
20 see that there were 156,387 ballots cast in the 2018 Republican
21 primary in Harris County; is that right?
22   A.  Yes.
23   Q.  And so confirming your memory from before, this shows
24 that Harris County had more voters participate in the 2022
25 Republican primary than in the 2018 Republican primary; correct?

Page 20

1   A.  It would appear that -- roughly, it looks like 32,000 -
2 33,000 more Republican voters in the 2022 primary than in the
3 2018 primary.
4   Q.  Do you know what the Americans with Disabilities Act
5 is?
6   A.  Yes.
7   Q.  What is your understanding of what that is?
8   A.  Broadly legislation that was passed to help support
9 individuals in the United States who have long term or short-term
10 disabilities engage in different activities.
11   Q.  Do you understand the ADA to prohibit discrimination
12 against people with disabilities?
13   A.  Yes.
14   Q.  Do you understand the ADA to require certain
15 accommodations for people with disabilities?
16   A.  Yes.
17   Q.  Do you know what the Rehabilitation Act is?
18   A.  No.
19   Q.  Does the Harris County Elections Administrator's Office
20 comply with the Americans with Disabilities Act?
21      MR. FOMBONNE:  Objection to form, objection.
22      Now you can answer.
23 (BY MR. THOMPSON:)
24   A.  Yes.
25   Q.  If I refer to the Americans with Disabilities Act as

Page 21

1 the ADA for short, will you know what I mean?
2   A.  Yes.
3   Q.  Ms. Longoria, I'm going to hand you Exhibit 4 which is
4 labeled "Notice to Voters with Disabilities."
5      (Exhibit Longoria 4 is marked for identification.)
6 (BY MR. THOMPSON:)
7   Q.  Ms. Longoria, can you see Exhibit 4 in front of you?
8   A.  Yes.
9   Q.  Do you recognize this as a notice from Harris County to
10 voters with disabilities?
11   A.  Yes.
12   Q.  Have you seen this document before?
13   A.  Yes.
14   Q.  And as the second sentence itself says, "Harris County
15 Elections Department has a grievance procedure providing for
16 prompt and equitable resolution of complaints alleging actions
17 prohibited by the ADA."  Did I read that correctly?
18   A.  Yes.
19   Q.  And it refers to a -- in the second paragraph a
20 disability complaint form.  Do you see that?
21   A.  Yes.
22   Q.  I'll hand you Exhibit five 5, which is labeled
23 "Disability Complaint Form."  Can you see Exhibit 5?
24   A.  Yes.
25      (Exhibit Longoria 5 is marked for identification.)

Isabel Longoria

April 20, 2022
Pages 22 to 25

Page 22

1 (BY MR. THOMPSON:)
2    Q.   Do you recognize that as the disability complaint form
3 from the Harris County website?
4    A.   I'll note that although it seems the printer kind of
5 missed a couple characters, I think I can reasonably assume that
6 this is from the harrisvotes.org website.
7    Q.   Thank you.  You appear to be correct that the printer
8 did not print out the letter "I" in the URL at the bottom of the
9 page which is not a computer error I've seen before.  Do you
10 understand this form to be the disability complaint form referred
11 to in the notice to voters with disabilities?
12    A.   Yes.
13    Q.   Does your office receive complaints through this
14 complaint form from the Harris County website?
15    A.   Yes.
16    Q.   What happens when your office receives a complaint
17 through that form?
18    A.   I believe this -- if I remember correctly, this form
19 autogenerates an email to an ADA email inbox that members of our
20 ADA team or division then review and investigate as appropriate
21 for the claims made in the form.
22    Q.   You just referred to I guess ADA team?  Is that the
23 proper term for me to use?
24    A.   Yes.
25    Q.   Okay.  How many members are there on the ADA team in

Page 23

1 the Harris County Elections Administrator's Office?
2    A.   If I remember correctly, there are about four full-time
3 employees and another dozen or so of temporary employees.
4    Q.   So what do they do when they receive the email that you
5 refer to being generated from the complaint form?
6    A.   The ADA coordinator is tasked with following up with
7 the person who made the complaint, gathering more information if
8 appropriate, investigating those claims, be them about an
9 election location, election worker, whatever they may be, and
10 then taking appropriate corrective action as needed and also
11 logging that complaint to report to the Department of Justice.
12    Q.   Are these procedures designed to ensure that Harris
13 County complies with the ADA?
14    A.   These procedures are designed to comply with the
15 Department of Justice lawsuit regarding ADA accessibility in
16 Harris County.
17    Q.   Does Harris County -- excuse me -- does the ADA team
18 have a goal of compliance with the ADA?
19    A.   Yes.
20    Q.   What else does the Harris County Elections
21 Administrator's Office do to ensure that it complies with the
22 ADA?
23    A.   Could you help focus the question.
24    Q.   Sure.  An example:  Does the Harris County Elections
25 Administrator's Office have a training program or trains

Page 24

1 employees about ADA compliance?
2    A.   Yes.
3    Q.   Does it have a process by which people can request
4 accommodations?
5         MR. FOMBONNE:  Objection to form.
6 (BY MR. THOMPSON:)
7    A.   Yes.
8         MR. THOMPSON:  What's the objection?
9         MR. FOMBONNE:  Accommodations for what?  I think I
10 know what you were asking.
11         MR. THOMPSON:  Yeah.
12         MR. FOMBONNE:  I was trying to help you.
13         MR. THOMPSON:  No, no.  You're fair.
14 (BY MR. THOMPSON:)
15    Q.   If a person with a disability wanted to request an
16 accommodation from the Harris County Elections Administrator's
17 Office, how would that person do it?
18    Q.   Can you help focus who you're referring to as "person"
19 in this?
20         MR. FOMBONNE:  Yeah.  Actually, that same
21 objection.
22 (BY MR. THOMPSON:)
23    Q.   Let's start with the voters.  If a person who wants to
24 vote and has a disability wants to request an accommodation, is
25 there a process that that person would use in Harris County?

Page 25

1    A.   Yes.  A voter can call our office, email our office, or
2 appear in our office in person and request for the election of
3 question whatever accommodation they would like or feel is
4 appropriate to help them vote using our voting equipment and
5 machines.
6    Q.   And what does your office do in response to those
7 requests?
8    A.   We comply with those requests.
9    Q.   Do you always grant accommodations that are requested?
10    A.   I cannot think of a moment where we have not.
11    Q.   Who decides whether a request for an accommodation will
12 be granted or denied?
13    A.   The ADA team reviews the request and depending on what
14 it is, they may or may not need to, you know, ask for additional
15 resources to comply, but the ADA team.
16    Q.   And so far as you're aware, the ADA team has never
17 decided to deny a request for an accommodation from a voter
18 requesting an accommodation related to a disability to vote?
19    A.   Not that I'm aware of.
20    Q.   To your knowledge, did anyone request an accommodation
21 related to voting in the March 2022 primary elections?
22    A.   Yes.
23    Q.   Can you list the accommodations requested that you're
24 aware of?
25    A.   I can't remember the specific voters' names or dates,

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900       San Antonio, Texas 78232
210-697-3400                                                     210-697-3408

Isabel Longoria

April 20, 2022
Pages 26 to 29

Page 26

1 but as I remember, the voting machines we have allow for
2 connections of adaptive devices in order to use the machines for
3 things called puffers or different joysticks.  Voters who visited
4 the different locations may have asked the judge who then called
5 the ADA division to ensure that their adaptive devices be those
6 puffers, joysticks, et cetera, could be connected to the election
7 machines, which they were and then allowed to be used.
8     Q.   Just so I understand what you're talking about, is a
9 puffer a device that helps someone who cannot use his hands
10 operate a voting machine?
11    A.   I believe a puffer is a device that can be manipulated
12 through the use of a puff of air from your mouth in order to
13 manipulate a mechanical device that then connects to an
14 electronic device.
15    Q.   And the other adaptive devices that you were
16 describing, in what situations would a voter need to use those?
17    A.   Similarly, if for different physical restraints that an
18 individual might have, they may need to use adaptive joysticks,
19 mechanical devices if they are unable to use the touchscreen on
20 our voting machine or unable to use our wheel and button system
21 that attaches to those voting machines.
22    Q.   Okay.  So you've mentioned multiple requests for
23 accommodations from voters with disabilities relating to the use
24 of adaptive devices being connected to voting machines for in-
25 person voting.  Are you aware of any other requests for

Page 27

1 accommodations related to voting in the March 2022 primary
2 elections?
3     A.   Yes.
4     Q.   And what are those?
5     A.   Individuals who needed to submit a form to our office
6 regarding mail ballot voting would have needed to appear in
7 person.  Some individuals requested that they be able to email
8 those forms in, and, you know, we were not able to allow that,
9 but if they were able to appear in person, we could accommodate
10 them.
11    Q.   What forms were at issue in these requests?
12    A.   If an individual needs to cure their mail ballot and it
13 was deficient because they didn't include an ID number, in the
14 cure period, the only way that they can cure that form is two
15 ways:  Either go online to the Secretary of State's website.  If
16 they can't access that, then they would have to appear in person
17 at the local office.
18    Q.   And how many voters requested an accommodation related
19 to submitting this form?
20    A.   I don't remember exactly off the top of my head how
21 many calls we received.
22    Q.   Can you ballpark an estimate?  Like fewer than ten?
23 More than a million?
24    A.   More than a dozen.
25    Q.   Fewer than a hundred?

Page 28

1     A.   I know it's definitely more than a dozen.  I don't know
2 what the upper limit is right now.
3     Q.   Would you have forms -- excuse me.  Would you have
4 records revealing that number somewhere?
5     A.   Yes.  We would -- we maintain call logs of people who
6 call to the office that may or may not have notes about what
7 their requests were.
8     Q.   So if we wanted to know the number of people who
9 requested that kind of accommodation, would the best way to
10 figure it out be to review those call logs and read the notes
11 included there?
12    A.   Yes.
13    Q.   So I want to make sure I understand kind of how this
14 form process works.  It sounds like you're saying kind of the
15 normal process without an accommodation is to either submit the
16 form online using a state website or to appear in person at a
17 local Harris County office; is that correct?
18    A.   Can you clarify your question.
19    Q.   Sure.  As I understood your previous testimony, you
20 were talking about situations in which a voter or a would-be
21 voter wants to cure a problem related to an ID number listed on a
22 mail-in ballot.  Is that what you were talking about?
23    A.   Yes.
24    Q.   And when a would-be voter wants to go through that cure
25 process, there are two options without any requested

Page 29

1 accommodations; is that right?
2     A.   Yes.
3     Q.   One of those options is to submit a form using a state
4 website online; is that correct?
5     A.   No.
6     Q.   Could you help me understand what I misunderstood
7 there.
8     A.   Not necessarily that there's a form.  The secretary of
9 state maintains a mail ballot tracking and curing website by
10 which individuals if they have the appropriate ID numbers can
11 access that website, update, or confirm their information.  That
12 website then generates an email or form that our office receives
13 on behalf of that voter.
14    Q.   Okay.  So talking still about the cure process you
15 referred to earlier, the first option is to use an official state
16 website; is that right?
17    A.   Sure.
18    Q.   And the second option is to appear in person at a local
19 Harris County office; is that right?
20    A.   At the main Harris County office, only one office.
21    Q.   Okay.  Now, as I understand your previous testimony,
22 you were saying that some voters wanted to be able to go through
23 the cure process using some third option; is that right?
24    A.   No.  Not that they want to, but that their only way to
25 do it would be able -- would -- the two ways -- the two ways

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900      San Antonio, Texas 78232
210-697-3400                                                    210-697-3408

Isabel Longoria

April 20, 2022
Pages 34 to 37

Page 34

1  Elections Administrator's Office who'd be able to provide that
2  testimony; can you?
3          MR. FOMBONNE:  Form.
4  (BY MR. THOMPSON:)
5      A.  It's a double negative.  I would be able to piece
6  together that information over time, but I can't tell you in this
7  moment exactly the number of percentage of voters who would have
8  ultimately cured their ballot.
9      Q.  How would you piece together that information over
10  time?
11      A.  As you shared earlier, by going through the call logs,
12  seeing which voters are associated with those call logs, and then
13  cross-referencing which of those voters ultimately cured or did
14  not cure their mail ballot.
15      Q.  Thank you for explaining that.  I'm sure it was simpler
16  to you than it was to me.
17      A.  No.  I'm just trying to be accurate to your questions.
18      Q.  So we've talked about two types of accommodation
19  requests so far.  We've talked about the adaptive devices
20  connected to voting machines, and we've talked about the cure
21  process for mail-in ballots.  Are there any other requests for
22  accommodation of which you were aware related to voting in the
23  March 2022 primary elections?
24      A.  No.
25      Q.  Earlier you asked me a clarifying question about who

Page 35

1  was requesting accommodations, and we specified that we're
2  talking about voters.  Now, let's talk about nonvoters.  So
3  considering first, assistance, people who provide assistance
4  under the election code, are you aware of any requests for
5  accommodations from people who provide assistance under the
6  election code?
7      A.  I'm not aware, no.
8      Q.  Are you aware of any requests for accommodations from
9  poll watchers?
10      A.  No.
11      Q.  Are you aware of any requests for accommodations from
12  poll workers?
13      A.  Yes.
14      Q.  Could you explain those requests to me.
15      A.  As I remember it, in order to receive training from the
16  election office, poll workers have requested, for example, ASL
17  interpreters or Zoom trainings with text or captions at the
18  bottoms so that those who are hearing impaired may be able to
19  follow along with the instruction provided in those election
20  training courses.
21      Q.  Any other requests for accommodations from poll
22  workers?
23      A.  If it can be classified as such, generally, individuals
24  who because of different maybe physical restrictions may need
25  jobs at the election sites that require perhaps sitting for

Page 36

1  longer periods of time, accommodations in their workspace
2  regarding chairs or tables or job functions.  Perhaps because of
3  their limitations, they may not be able to work outside as
4  greeters, so they prefer jobs that are inside.  Generally, making
5  sure that the tasks that they are tasked with are reasonable for
6  their limitations.
7      Q.  Any others?
8      A.  No.
9      Q.  Was the Harris County Elections Administrator's Office
10  able to grant the requested accommodations from poll workers?
11      A.  Yes.
12      Q.  You don't think there were any that were denied for
13  poll workers?
14      A.  Not by our office.
15      Q.  I want to follow up on something we talked about --
16  well, first, let me close this out.  I'm sorry.  Are there any
17  other requests for accommodations for people with disabilities
18  related to the March 2022 primary elections that you're aware of
19  that we have not discussed yet today?
20      A.  For voters?
21      Q.  No.  For anybody.
22      A.  Yes.
23      Q.  What are they?
24      A.  For employees, employees in our office have through the
25  Harris County Human Resources Department requested reasonable

Page 37

1  accommodations to complete their jobs, such as adaptive devices
2  to read computer screens, again, duties that they can perform
3  based on their certain limitations, be it on election night or
4  throughout the early voting period, similar types of
5  accommodations which we absolutely provide to our workers.
6      Q.  Okay.  Anything besides those?
7      A.  No.
8      Q.  Now I want to go back to where we were talking about
9  the cure process for mail ballots.  At one point in your
10  testimony, it seemed like you were saying that your office has
11  never denied a request for an accommodation for a voter with
12  disability.  Do you remember that?
13      A.  I believe I said when voting in person.
14      Q.  Okay.  So that's a good clarification.  I may have
15  missed that before.  Your previous testimony about -- well, let
16  me just -- forget the previous testimony.  I'll ask it again to
17  make sure I have it right.  The Harris County Elections
18  Administrator's Office, to your knowledge, has never denied a
19  request for an accommodation for a voter with a disability
20  related to in-person voting; is that correct?
21      A.  Yeah, absent from knowing all infinite possibilities,
22  yes, generally, yes.
23      Q.  You're not aware of any situations in which your office
24  has denied a request for an accommodation by a voter with
25  disabilities led to in-person voting; right?

Page 38

1   A.  Correct.

2   Q.  And the only requests from voters with disabilities for

3   accommodations related to voting that you're aware of that have

4   been denied relate to the cure process for mail ballots; is that

5   correct?

6   A.  It's more accurate to say that the only accommodations

7   for voters with disabilities that we are not allowed by law to

8   provide is for voters who are carrying their mail ballot.

9   Q.  So I think I understand that what you're trying to say

10  is you felt compelled by law to reach that outcome, but I have to

11  make sure that there aren't any other situations where you denied

12  a request where you didn't feel compelled.  So I'm going to try

13  and reformulate the question a little bit.

14  A.  Okay.

15  Q.  The only situations in which your office has not

16  granted a request for an accommodation to a voter with a

17  disability related to voting are in the context of the cure

18  process for a mail ballot; correct?

19  A.  I think that's fair to say, yes.

20  Q.  And the reason your office didn't grant those requests

21  for accommodation is because your office believed that SB1

22  prohibited it from granting those accommodations; is that

23  correct?

24  A.  Yes.

25  Q.  Are you familiar with section 1.08 of SB1?

Page 39

1   A.  You'll have to pull up the text.

2       Will, can I put Exhibits 4 and 5 aside now?

3   A.  (Nods head affirmatively.)

4   A.  All right.

5   Q.  Ms. Longoria, I'm going to hand you Exhibit 6, which is

6   another lengthy one.  It's the text of SB1.

7       (Exhibit Longoria 6 is marked for identification.)

8   (BY MR. THOMPSON:)

9   Q.  Ms. Longoria, can you see Exhibit 6 in front of you?

10  A.  Yes.

11  Q.  Do you see in the top right-hand corner it says, "S.B.

12  No. 1"?

13  A.  Yes.

14  Q.  And then just below that it says, "An Act relating to

15  election integrity and security, including by preventing fraud in

16  the conduct of elections in this state; increasing criminal

17  penalties; creating criminal offences"?

18  A.  Yes.

19  Q.  I'm going to ask you to turn to section 1.022, which is

20  -- it begins on the bottom of page 4 of this exhibit.

21  A.  (Complies.)  Okay.

22  Q.  I'm sorry.  To clarify that, for the record, it is

23  section 1.08 of SB1 which codifies section 1.022 of the Texas

24  Election Code.  Do you see that?

25  A.  Yes.  Give me one moment.  I'm going to tear this thing

Page 40

1   apart to read it better.  I'm -- go ahead.

2   Q.  I'm going to read the provision to you and I'll ask you

3   to confirm that I've read it correctly.

4   A.  Okay.

5   Q.  Section 1.022, "Reasonable accommodation or

6   modification.  A provision of this code may not be interpreted to

7   prohibit or limit the right of a qualified individual with a

8   disability from requesting a reasonable accommodation or

9   modification to any election standard, practice, or procedure

10  mandated by law or rule that the individual is entitled to

11  request under federal or state law."  Did I read that correctly?

12  A.  Yes.

13  Q.  Before you looked at this exhibit, were you aware of

14  section 1.08 of SB1?

15  A.  Yes.

16  Q.  What is your understanding of that provision?

17  A.  That this law can't be interpreted to limit the right

18  of a qualified individual with a disability from reasonable

19  access to voting, more or less.

20  Q.  If you concluded that a voter was entitled to an

21  accommodation under the ADA but that the requested accommodation

22  otherwise would violate SB1, do you have an understanding of what

23  effect section 1.08 of SB1 would have?

24      MR. FOMBONNE:  I'll instruct you not to answer to

25  the extent it will reveal any privileged communications with your

Page 41

1   counsel, but otherwise you can answer.

2   (BY MR. THOMPSON:)

3   A.  Would you mind repeating that question.

4   Q.  Do you have an understanding of what effect this

5   provision, section 1.08 of SB1, or section 1.022 of the election

6   code, would have in a situation where you concluded that a voter

7   was entitled to an accommodation under the ADA, but that the

8   requested accommodation was otherwise inconsistent with SB1?

9       MR. FOMBONNE:  Same instruction.

10  (BY MR. THOMPSON:)

11  A.  I'm still getting lost in the question.  So I'm going

12  to repeat it.  Are you asking me if I understand if this

13  provision is not met, what that would mean?

14  Q.  I don't think that's the question.  I'll try again.

15      MR. FOMBONNE:  Yeah.

16  (BY MR. THOMPSON:)

17  Q.  I want you to think about a situation in which you

18  would conclude that the ADA entitles the voter to an

19  accommodation, but that the requested accommodation is

20  inconsistent with some provision of SB1.  Does that part make

21  sense?

22  A.  Yes.

23  Q.  Would you provide the accommodation in that situation?

24  A.  I would --

25      MR. FOMBONNE:  Same instruction.

Isabel Longoria

April 20, 2022
Pages 42 to 45

Page 42

1 (BY MR. THOMPSON:)
2    A.  I would find myself in such a conflict that I would
3 need to request advice from the county attorney or secretary of
4 state just like I previously have.
5    Q.  Do you have an understanding -- I'm sorry.  What was
6 the word you used?  Conflict?
7    A.  That if there was a conflict between being able to
8 provide that accommodation as requested versus SB1 not allowing
9 my office to provide that accommodation, I would need to seek
10 advice from the secretary of state and county attorney as best I
11 appropriate.
12    Q.  Okay.  So if you found an apparent conflict between ADA
13 and SB1 --
14    A.  Yes.
15    Q.  -- what effect, if any, would section 1.08 of SB1 have
16 on your decision?
17         MR. FOMBONNE:  Same instruction.
18 (BY MR. THOMPSON:)
19    A.  It would -- as I did, I called the secretary of state,
20 and it would cause me to call the secretary of state and county
21 attorney to ask for guidance on which provision essentially takes
22 precedent if there's conflicting provisions in this law.
23    Q.  Okay.  Now, it sounds like you may have already
24 answered this, but have you, in fact, found yourself in this
25 situation?

Page 43

1    A.  Yes.
2    Q.  Can you describe the situation in which you thought
3 there was an apparent conflict between the ADA and SB1.
4    A.  Yes.  And as I mentioned earlier in my testimony, for
5 voters who need to cure their mail ballot and to just cut ahead
6 right, SB1 has new provisions that require ID in the curing
7 process for mail ballots.  For those individuals who need an
8 accommodation that is not the form online and that is not
9 appearing in person, I would assume our office would be directed
10 to provide that accommodation, but I was told by the secretary of
11 state to not provide those accommodations.
12    Q.  Please tell me about this communication with the
13 secretary of state's office.
14    A.  I believe it was in August at the State Conference of
15 Elections Administrators.  The secretary of state's office, I
16 believe it was Keith Ingram and Christina Adkins, took questions
17 from the crowd, and the crowd being a crowd of elections
18 administrators, there for their professional conference,
19 regarding provisions of Senate Bill 1 and how they were to be
20 implemented and what questions we as election officials had in
21 that forum, I in that moment specifically raised this conflict in
22 front of the group and asked for directions and stated that I
23 believed that because of the reasonable -- this section point --
24 I don't -- this reasonable accommodation provision, that we were
25 compelled by law regardless of other provisions of SB1 to provide

Page 44

1 accommodations to voters.  And I was instructed by the secretary
2 of state at that time as were the rest of the election officials
3 that to the extent -- basically, I was instructed that they were
4 aware of this provision, but that they felt that other sections
5 of Senate Bill 1 superseded this provision including the cure
6 process for mail ballots which I raised specifically.
7    Q.  Do you remember the precise wording of your question?
8    A.  My precise wording was, if I remember correctly, "SB1
9 contains a provision saying that reasonable accommodations must
10 be made to voters with disabilities so that they can't be held --
11 you know, that their rights to vote must be upheld.  Isn't it
12 true that, especially for the curing mail ballot process,
13 individuals wouldn't be able to cure in person?  By definition of
14 having to request a mail ballot, they've already ceded that
15 point.  What do you want us to do in that situation where we
16 cannot provide accommodations per the law?  Doesn't that hurt
17 voters with disabilities?"
18    Q.  And who answered your question if anyone?
19    A.  I believe it was Keith Ingram.
20    Q.  And do you remember as precisely as you can what he
21 said in response?
22    A.  I believe he said that he was aware of that provision
23 and that the secretary of state's office would come out with
24 direction later on for the timing.  That conference was in
25 August, and so the provision -- I can't remember if the law had

Page 45

1 been passed at that point or they were still working on
2 direction.  But he seemed to annotate that -- or he seemed to
3 hint that they were aware of the provision and that direction
4 would come out at a later time.
5    Q.  So he didn't provide an answer one way or the other at
6 the conference?
7    A.  He I would say punted the question to say he was aware
8 of the provision and that direction would come out at a later
9 time.
10    Q.  Okay.  Did direction come out at a later time?
11    A.  Advisories and trainings came out at a later time about
12 Senate Bill 1 broadly, yes.
13    Q.  Did you interpret any of the direction that came at a
14 later time to answer the precise question you had asked at the
15 conference?
16    A.  When raising those advisories or trainings and asking
17 again if individuals -- how individuals with -- sorry -- how
18 individuals wishing to cure their mail ballot, what options were
19 available to them?  As I understand it, the secretary of state
20 has made it clear in those advisories and those trainings that
21 individuals can access the state website if they're able to
22 access it, individuals can appear in person ahead of -- well, you
23 know, individuals can mail back their envelope before the cure
24 process, and then in that cure process they can appear in person.
25 I think recently, if I'm not mistaken, two days ago or yesterday,

Isabel Longoria

April 20, 2022
Pages 46 to 49

Page 46

1  an advisory came out saying to the effect that maybe offices
2  would be allowed to deliver those carrier envelopes directly to
3  voters.  But that was two days ago and not before the March
4  primary.
5      Q.  Okay.  I'm going to try and go untie my order here.
6      A.  Yeah, yeah.  Sorry.  Yeah.
7      Q.  There's a communication from the secretary of state's
8  office that you think happened in the last couple days; right?
9      A.  Yes.
10     Q.  What is the name of that communication or how could we
11 identify it?
12     A.  I believe it's broadly, you know, an advisory
13 pertaining to updated procedures regarding the mail ballot cure
14 process.
15     Q.  You think it's an election advisory?
16     A.  Yes.
17     Q.  Okay.  I think election advisories usually have numbers
18 kind of as part of their title.  Do you know the number of this
19 election advisory?
20     A.  Oh, boy.  No, not off the top of my head.
21     Q.  Okay.  But your best understanding sitting here today
22 is that you're referring to an election advisory issued sometime
23 around April 18, 2022 or April 19, 2022?
24     A.  Yes.  I'm very certain it was in the last 48 hours.
25     Q.  Okay.  And the election advisory from the last 48 hours

Page 47

1  provided the secretary of state's position on accommodations
2  required by the ADA that would otherwise violate SB1; is that
3  correct?
4      A.  I apologize.  No.  The advisory updates, procedures,
5  forms regarding the mail ballot cure process.  It generally
6  updates all provisions regarding forms and procedures of the mail
7  ballot cure process.
8      Q.  Okay.  So the election advisory from the last 48 hours
9  talks about the mail ballot cure process; correct?
10     A.  Yes.
11     Q.  Does it mention the ADA?
12     A.  I can't remember if it mentions the ADA specifically.
13     Q.  Does it mention requests for accommodations related to
14 disabilities?
15     A.  I can't remember if it says, you know, exactly the
16 words accommodations and disabilities.
17     Q.  Do you understand it to be discussing an option that
18 you could use for voters who have requested accommodations due to
19 disabilities related to the mail ballot cure process?
20     A.  I understand that as it gives directions, it says that
21 one possibility for offices, were they able to, would be to hand
22 deliver these forms to voters.
23     Q.  That's it?
24     A.  As in if an individual was unable to appear in person
25 in our office, an election office, should they have the

Page 48

1  resources, could then hand deliver these materials to a voter at
2  their home or residence.
3      A.  So earlier when we were talking about the cure process,
4  we talked about two options, one was online and the other was for
5  the voter to appear in person at the Harris County Elections
6  Administrator's Office; is that right?
7      A.  Yes.
8      Q.  And this recent election advisory from the past 48
9  hours discusses a third option; is that correct?
10     A.  Yes.
11     Q.  And the third option is for someone from the Harris
12 County Elections Administrator's Office to go see the voter in
13 person with a form the voter can fill out?
14     A.  Yes.
15     Q.  Earlier we discussed requests for accommodation related
16 to the mail ballot cure process during the March 2022 primary
17 elections.  Do remember that?
18     A.  Yes.
19     Q.  Would this third option from the secretary of state's
20 recent election advisory have been a way to grant those requests
21 for accommodation?
22     A.  It would have been an option available to the office.
23 Yes.
24     Q.  It's something that would have been possible for your
25 office to do?

Page 49

1      A.  No.
2      Q.  Why not?
3      A.  There are thousands of mail ballot voters in Harris
4  County and we would have to examine our staff capacity, our time
5  capacity to be able to visit voters at their home in order to
6  provide this option because this option wasn't relegated
7  specifically to voters with disabilities, if I remember
8  correctly.  This would be an option that we could use for any
9  voter.  And so in an effort to apply that standard equally, the
10 question would be whether or not we have the resources to engage
11 in that option reasonably in Harris County.
12     Q.  So if I understand your testimony correctly, it's
13 physically possible to do.  It just might be prohibitively
14 expensive to provide that option to everybody; right?
15     A.  Not just cost, but the logistics of, yes, hiring those
16 people, organizing those people, organizing that program,
17 checking that program, training those people.  Cost is not the
18 only prohibitive factor.
19     Q.  So I'll reframe the question to make it broader.
20     A.  Sure.
21     Q.  If I understand your testimony correctly, it would be
22 physically possible to use this third option laid out by the
23 secretary of state's election advisory, but it might be
24 prohibitively difficult or expensive for your office to provide
25 that option to everyone; is that fair?

Isabel Longoria                                       April 20, 2022
                                                      Pages 50 to 53

Page 50

1    A.   Yes.  Yes.  Sorry for cutting you off.  Yes.
2         MR. FOMBONNE:  And we've been going on I think
3    over an hour.  I don't know if you're at like a breaking point, a
4    natural breaking point coming up.  I don't know if you need a
5    break, Isabel, or --
6         MR. THOMPSON:  I'm perfectly fine taking a break
7    if you'd like.
8         THE WITNESS:  You're good?  Yeah, I don't want to
9    cut you off if you're on your questions.  Okay.  Thank you.
10        THE VIDEOGRAPHER:  Off the record at 10:26.
11        (Off the record from 10:26 a.m. to 10:34 a.m.)
12        THE VIDEOGRAPHER:  The time is 10:34.
13   (BY MR. THOMPSON:)
14    Q.   All right.  Welcome back, Ms. Longoria.  When we broke
15   we were discussing potential difficulties and expenses of
16   providing what we'd call the third option for the mail ballot
17   cure process.  Do you remember that?
18    A.   Yes.
19    Q.   And the third option was recently laid out in a
20   secretary of state election advisory; correct?
21    A.   Yes.
22    Q.   And the third option would involve somebody who works
23   for the elections administrator's office visiting a potential
24   voter in person to provide a form for use in the cure process; is
25   that correct?

Page 51

1    A.   Yes.
2    Q.   I believe you were testifying about the difficulties
3    and expenses your office would face if you provided that option
4    to everyone going through the cure process; is that correct?
5    A.   Yes.
6    Q.   Would the difficulties and expenses be lessened if you
7    provided the option only to voters who are entitled to disability
8    -- excuse me.  Scratch that.  Would the difficulty and expenses
9    be lessened if your office provided that option only to voters
10   who are entitled to accommodations for disabilities?
11    A.   I think yes.
12    Q.   Earlier we discussed that during the March 2022 primary
13   you think there were roughly a dozen people or so who requested
14   accommodations related to the mail ballot cure process; is that
15   correct?
16    A.   At least a dozen, yes.
17    Q.   Would it be prohibitively difficult or expensive for
18   your office to provide the third option as an accommodation to
19   the number of people who requested disability accommodations
20   related to the mail ballot cure process during the 2022 primary
21   elections?
22    A.   Yes.
23    Q.   Please explain that answer.
24    A.   At the time that these accommodations are needed,
25   during the curing process, the six days after election day, we're

Page 52

1    also going through the provisional cure process, provisional
2    processing, canvass period, certification period, tallying, and
3    counting period as appropriate and conducting so many functions,
4    especially with the mail ballot and voter registration teams,
5    that it would be -- I would have to make a very careful analysis
6    of the number of people who were out in the field delivering
7    these letters versus in the office being able to perform these
8    time-sensitive functions.
9    Q.   So when you say you need to provide analysis, is it
10   fair to say you would need to do that analysis in order to figure
11   out whether it'd be feasible?
12    A.   Yes.
13    Q.   So sitting here today, you're not -- you're not sure
14   whether it'd be feasible; right?
15    A.   Having just learned about this in two days, I think it
16   would be highly contextual dependent upon the accommodation
17   requested, the time period that it was requested, and the other
18   functions that we're statutorily obligated to perform in that
19   time period as well.
20    Q.   Yeah, I understand you learned about this recently.
21    A.   Yeah, yeah.
22    Q.   I'm not trying to suggest that you have to know the
23   answer already.  Would it be more feasible if you had extra
24   funding, for example?
25    A.   Yes.

Page 53

1    Q.   Who provides the funding for your office?
2    A.   Harris County Commissioners Court approves the budget
3    for the elections administration office.
4    Q.   Does that money come from local taxes, for example?
5    A.   It comes from Harris County, whatever methods they have
6    of getting money.
7    Q.   Okay.  We were some time ago going through the
8    communications you received from the secretary of state's office
9    regarding the cure process and the one that was latest in time
10   was this election advisory from either April 18, 2022 or April
11   19, 2020.  Do you remember that?
12    A.   Yes.
13    Q.   But I believe you said there were other communications
14   from the secretary of state's office that you thought were
15   relevant to your ability to provide accommodations to voters who
16   requested accommodations related to the cure process; is that
17   correct?
18    A.   I'll clarify.  There were other advisories that came
19   out about the implementations of Senate Bill 1, including the
20   cure process, not that I can remember specifically designated
21   towards voters with disabilities of providing accommodations.
22    Q.   Thank you for that clarification.
23    Q.   Were all of the communications that you're referring to
24   election advisories?
25    A.   No.

Isabel Longoria

April 20, 2022
Pages 62 to 65

Page 62

1 assistants or the interpreters that need to take an oath. But it
2 would be reasonable to assume that if I remember correctly, one
3 of them needs to administer an oath or take an oath.
4    Q.   Regardless of who has to take the oath, are you aware
5 of an oath related to either assistance or interpretation under
6 the election code?
7    A.   Yes.
8    Q.   And what is your understanding of that oath?
9    A.   That the assistant who has been requested by the voter
10 or assigned by the voter must generally take an oath, and I can't
11 remember the exact wording, to essentially say, you know, they
12 won't -- I believe that they will assist the voter directly as
13 the voter wants without influencing the voter's ultimate decision
14 in voting.
15    Q.   And we discussed earlier how a voter can either receive
16 assistance from election workers or someone of his choosing; is
17 that right?
18    A.   Yes.
19    Q.   And the election workers don't have to take the oath;
20 correct?
21    A.   I can't remember specifically if the election workers
22 have to take the oath or not. I'll clarify: Election workers do
23 have to take an oath in performing their duty as an election
24 worker. I cannot remember if they have to then take another oath
25 if they are the requested assistant by the voter.

Page 63

1    Q.   The oath you know about, what is the content of that
2 oath?
3    A.   The oath generally says that those election workers
4 will perform the duties of, you know, the election code and will
5 promise not to violate the law, you know, otherwise generally
6 assist voters without influencing the outcome of an election.
7    Q.   Are you aware of any complaints that your office has
8 received related to the oath that people providing assistance
9 take?
10    A.   Complaints or -- can you clarify?
11    Q.   Has anyone ever complained to your office, to the best
12 of your knowledge, about the oath related to providing
13 assistance?
14    A.   No.
15    Q.   Are you aware of anyone ever objecting to the content
16 of the oath before taking it?
17    A.   I personally am not, no.
18    Q.   Are you aware of anyone ever refusing to take the oath?
19    A.   No.
20    Q.   Are you aware of any voter who has not been able to
21 vote because he could not find someone to provide assistance?
22    A.   Provide assistance? No.
23    Q.   Are you aware of any voter who's ever not been able to
24 vote because he could not get adequate assistance from someone
25 providing assistance?

Page 64

1    A.   No.
2    Q.   Are you aware that the election code prohibits counting
3 a ballot if the voter who cast the ballot was not eligible for
4 the assistance he received?
5    A.   No.
6    Q.   To the best of your knowledge, has your office ever not
7 counted a ballot because of unauthorized assistance?
8    A.   Can you repeat the question, please.
9    Q.   To the best of your knowledge, has your office ever not
10 counted a ballot because of unauthorized assistance?
11    A.   I'm getting lost in the double negative, so I'll
12 respond. I don't believe we have ever counted a ballot, to the
13 best of my knowledge, that we knew about whether the assistance
14 was allowed or not.
15    Q.   I think we probably got lost, so I'm going to try
16 again.
17    A.   Okay. Go ahead.
18    Q.   Are there situations in which your office does not
19 count a ballot as an effective ballot that contributes to the
20 vote totals?
21    A.   Yes.
22    Q.   Has your office ever not counted a ballot in that way
23 because of the voter receiving unauthorized assistance?
24    A.   Not to my knowledge.
25    Q.   Are you aware of any requests for accommodations

Page 65

1 related to disabilities and the oath?
2         MR. FOMBONNE: Objection to form.
3 (BY MR. THOMPSON:)
4    A.   Disabilities and the oath. I don't think so, no.
5         MR. THOMPSON: What was objection?
6         MR. FOMBONNE: It was vague and confusing.
7 (BY MR. THOMPSON:)
8    Q.   Are you aware of any requests for accommodation from a
9 voter with a disability where the accommodation requested related
10 to concerns about the oath?
11    A.   No.
12    Q.   Are you aware of any requests for an accommodation from
13 a person who would like to provide assistance?
14    A.   No.
15    Q.   Are you aware of any requests for accommodation related
16 to the types of assistance that are provided?
17    A.   Say that one again.
18    Q.   Are you aware of any requests for accommodation related
19 to the types of assistance that are provided?
20    A.   Request for accommodations for the type of assistance
21 that are provided. Request for accommodation is a type of
22 assistance -- can you clarify that question a bit more.
23    Q.   Sure.
24    A.   Yeah.
25    Q.   Let me try and make it clear. So you understand that

Isabel Longoria

April 20, 2022
Pages 66 to 69

Page 66

1 sometimes someone with a disability who wants there to be a
2 change in your normal procedures; right?
3    A.   Yes.
4    Q.   And we call that a request for an accommodation; right?
5    A.   Yes.
6    Q.   And there are sort of normal rules and procedures
7 related to what types of assistance can be provided; correct?
8    A.   Sure, yes.
9    Q.   Are you aware of any request for accommodation that
10 relate to the types of assistance that are provided?
11    A.   If you can clarify what you mean by when you say by
12 "the types of assistance." That's --
13    Q.   Sure. Let me give you an example.
14    A.   Sure.
15    Q.   Has anyone ever asked your office for an accommodation,
16 saying, "I know that your normal rules allow only assistance with
17 reading and marking the ballot, but I would like to receive
18 assistance in some other way because of my disability."
19    A.   Because of a disability? No.
20    Q.   Have you received requests for accommodation -- sorry.
21 Let me -- strike that. Based on the clarification I just gave,
22 do you now know what I mean by types of assistance provided?
23    A.   Yes.
24    Q.   And I think your testimony is you're not aware of any
25 requests for accommodation that would alter the types of

Page 67

1 assistance that can be provided; is that correct?
2    A.   Correct.
3    Q.   And you said that there were no such requests that you
4 were aware of related to accommodations by reason of disability;
5 is that correct?
6    A.   Yes.
7    Q.   Are you aware of any requests for accommodation related
8 to the types of assistance provided on grounds other than
9 disability?
10    A.   Yes.
11    Q.   What are those grounds?
12    A.   Language assistance for individuals who, for example,
13 speak Korean. We are allowed to provide translators or
14 interpreters by law who can speak English, Spanish, Chinese, or
15 Vietnamese at our voting locations, but they would have to seek
16 assistance from someone else who could speak that language. So,
17 Korean, for example, is not one that we provide voting materials
18 in, but that voter may want assistance in their language, and in
19 doing so being able to read or understand what is on the ballot.
20 And it is understanding what is on the ballot in their language,
21 native language, that would not constitute, as I understand it,
22 strictly, marking or reading the ballot.
23    Q.   The type of assistance being requested in the situation
24 you're describing is -- would it be accurate to call it
25 translating from English to Korean?

Page 68

1    A.   Yes.
2    Q.   So the requests for accommodation that you're referring
3 to on grounds other than disability are based on getting an
4 accurate translation from the language the ballot is printed in
5 into the native language of the voter; is that fair?
6    A.   Yes.
7    Q.   Has Harris County been able to grant those requests for
8 accommodation?
9    A.   Sorry. I need to -- I need to rollback that answer.
10 If I'm understanding your question, now that we're fleshing it
11 out, there are voters who request assistance from election
12 workers who have asked election workers who is this candidate,
13 what is this position, what is this ballot matter, and have
14 requested assistance from election workers in interpreting what
15 is on the ballot. So those election workers know and are trained
16 not to provide that assistance by law.
17    Q.   So I want to make sure I understand --
18    A.   Yeah.
19    Q.   -- what scenario you're talking about. Are you
20 referring to situations which a voter says, "What are the
21 positions of candidate John Smith? I want to figure out whether
22 I should vote for him"?
23    A.   Uh-huh (affirmative response). Usually, it pertains to
24 bond language. But yes, you know, what is this bond language?
25 What does this bond pertain to?

Page 69

1    Q.   And the voters are requesting more than what you might
2 call a translation from the bond language into Korean?
3    A.   But that specific example is not limited to just a
4 language or translation issue. I am now remembering as we're
5 going through these examples, that voters have requested
6 assistance from election workers or others in understanding what
7 is on the ballot regardless of what language it's in.
8    Q.   Does Harris County provide assistance in the form of
9 translation when it is requested?
10    A.   Yes.
11    Q.   But you're saying Harris County doesn't provide the
12 assistance that goes beyond translating the ballot?
13    A.   By law, election workers are not allowed to provide any
14 assistance in regards to translating directly what is on the
15 ballot.
16    Q.   So we've talked about assistance provided by the
17 election workers who are at the polling place. Now I want to ask
18 you about the assistance provided by third parties. And you may
19 remember earlier we discussed that voters can request assistance
20 from a person of their choice; right?
21    A.   Yes.
22    Q.   Has Harris County ever prohibited a third-party
23 assistant from translating a ballot for a voter?
24    A.   Has Harris County ever prohibited -- no.
25    Q.   And to the best of your knowledge, has Harris County

Isabel Longoria

April 20, 2022
Pages 70 to 73

Page 70

1 ever prohibited a third-party assistant from providing assistance
2 that goes beyond translation?
3     A.   It -- no.
4     Q.   To the best of your knowledge, has Harris County ever
5 prohibited any third-party assistant from providing any
6 assistance at all in a polling place?
7     A.   To clarify, it's the election workers, not Harris
8 County, but yes.
9     Q.   Sorry.  So there are two things I need to clarify
10 there.  The election workers work for Harris County; right?
11     A.   No.
12     Q.   Are they volunteers for Harris County?
13     A.   No.
14     Q.   Who are the election workers?
15     A.   During the early voting period, the election workers
16 are essentially deputized individuals of the election office.
17 During the election day period, those election workers work for
18 the election judge who is technically a district judge and
19 independent of Harris County, though they follow the Texas
20 election laws and are organized by our office.  So especially on
21 election day, election workers and election judges essentially
22 act independently of Harris County.
23     Q.   Okay.  So during the early voting period, the election
24 workers work for the Harris County Elections Administrator's
25 Office; right?

Page 71

1     A.   Yes.
2     Q.   And that's part of Harris County; right?
3     A.   True, yes.
4     Q.   On election day, the election workers you say work for
5 the election judge; right?
6     A.   Yes.
7     Q.   That's an election judge in Harris County; right?
8     A.   Yes.
9     Q.   For all the previous questions related to Harris
10 County, would your answers change at all based on the
11 clarification of who election workers work for?
12     A.   Yes.
13     Q.   Which ones?
14     A.   Harris -- broadly, Harris County employees, employees
15 of my office, are not at these election sites making these
16 decisions or prohibiting assistants from doing anything.  It
17 might be election clerks or election workers that have taken such
18 actions in the past.
19     Q.   Are you aware of any election workers in Harris County
20 who have prohibited any third-party assistant from providing any
21 kind of assistance?
22     A.   Yes.
23     Q.   Please give me those examples.
24     A.   If I remember correctly, the prime example that comes
25 to memory is in the March 2022 primary.  There was a voter -- a

Page 72

1 voter who requested that a third-party assistant, their mother,
2 be their assistant for voting, and I believe it was at the
3 Tomball voting location.  The election judge at the time shared
4 that she did not believe that voter needed assistance from their
5 mother and that election workers -- that election judge or the
6 election worker would be able to assist the voter if needed.  The
7 voters then reported to us in an ADA grievance, that they felt
8 that that was not correct, and we took corrective matter --
9 action against that election judge to let them know they could
10 not deny an election -- a voter who had expressed to us they
11 needed assistance the ability to choose between a third-party
12 assistant versus election worker assistant.
13     Q.   And, so, the corrective action, you discussed with a
14 communication to the election judge?
15     A.   Yes.
16     Q.   Was there any other corrective action?
17     A.   Corrective action being a retraining, a write-up, and a
18 note in that judge's file of the incorrect manner in which they
19 approached that situation.
20     Q.   Did the voter in question ultimately receive the
21 assistance she wanted?
22     A.   I can't remember exactly what assistance he did or did
23 not receive, but I know he was dissatisfied in his voting
24 experience.  I just can't remember the exact details of what he
25 did or did not receive.

Page 73

1     Q.   Was the voter in question ultimately able to cast a
2 ballot?
3     A.   I believe so, yes.
4     Q.   Are you aware of any other examples in which someone
5 working at a polling place in Harris County has prohibited
6 someone from providing assistance requested by a voter?
7     A.   I can't remember specific cases, but I know generally
8 in elections cases have come up or issues have come up where
9 again voters have assistants and election workers or poll
10 watchers will interrupt about the translating assistant; for
11 example, a voter needing or using an assistant to translate a
12 ballot in another language and the election worker saying, you
13 know, "You've got to speak English.  Don't provide that kind of
14 assistance."  You know, "you've got to speak English."  Voters
15 have reported to us when election clerks are outside the bounds
16 in trying to or attempting to prohibit an assistant from
17 providing the appropriate help.
18     Q.   When did those incidents occur?
19     A.   I can't remember a specific case.  Generally, in the
20 time that I've been an elections administrator over the last year
21 and a half there have been cases that came up.
22     Q.   And what did you do in response to those incidents?
23     A.   When the voters or other election clerks report those
24 incidences to us, we investigate by calling the election clerks
25 or election judges in question, gathering information on what

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,   §
    *Plaintiffs,*   §
       §
*v.*   §   Case No. 5:21-cv-844-XR
       §
GREGORY W. ABBOTT, et al.,   §
    *Defendants.*   §

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX Q

Jennifer Colvin                                          March 21, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3

    LA UNION DEL PUEBLO          §
 4  ENTERO, et al.,              §
          Plaintiffs,            §
 5                               §
    v.                           §   Case No. 5:21-cv-844-XR
 6                               §
    GREGORY W. ABBOTT, et        §
 7  al.,                         §
          Defendants,            §
 8                               §
    _____  §
 9                               §
    OCA-GREATER HOUSTON, et      §
10  al.,                         §
          Plaintiffs,            §
11                               §
    v.                           §   Case No. 1:21-cv-780-XR
12                               §
    JANE NELSON, et. al.,        §
13        Defendants,            §
                                 §
14  _____  §
                                 §
15  HOUSTON JUSTICE, et          §
    al.,                         §
16        Plaintiffs,            §
                                 §
17  v.                           §   Case No. 5:21-cv-848-XR
                                 §
18  GREGORY WAYNE ABBOTT,        §
    et al.,                      §
19        Defendants,            §
                                 §
20  _____  §
                                 §
21  LULAC Texas, et al.,         §
          Plaintiffs,            §
22                               §
    v.                           §   Case No. 1:21-cv-0786-XR
23                               §
    JANE NELSON, et al.,         §
24        Defendants,            §
                                 §
25  _____  §
```



Jennifer Colvin

March 21, 2023
Pages 2 to 5

## Page 2

```
 1   MI FAMILIA VOTA, et      §
     al.,                     §
 2        Plaintiffs,         §
                              §
 3   v.                       §  Case No. 5:21-cv-0920-XR
                              §
 4   GREG ABBOTT, et al.,     §
          Defendants.         §
 5
 6
 7
 8
 9           ORAL AND VIDEOTAPED DEPOSITION OF
10                     JENNIFER COLVIN
11                     MARCH 21, 2023
12
13
14
15        ORAL AND VIDEOTAPED DEPOSITION OF JENNIFER COLVIN,
16   produced as a witness at the instance of the Defendants
17   and duly sworn, was taken in the above styled and
18   numbered cause on Tuesday, March 21, 2023, from
19   12:20 p.m. to 3:43 p.m., before DONNA QUALLS, Notary
20   Public in and for the State of Texas, reported by
21   computerized stenotype machine, at the offices of Harris
22   County Attorney's Office, 1019 Congress Street, 15th
23   Floor, Houston, Texas, pursuant to the Federal Rules of
24   Civil Procedure, and any provisions stated on the record
25   or attached hereto.
```

## Page 3

```
 1            A P P E A R A N C E S
 2
 3   FOR THE HARRIS COUNTY ELECTIONS ADMINISTRATOR:
        SAMEER S. BIRRING
 4      TIFFANY BINGHAM
        OFFICE OF THE HARRIS COUNTY ATTORNEY CHRISTIAN
 5      D. MENEFEE
        1019 Congress, 15th Floor
 6      Houston, Texas  77002
        (713) 274-5142
 7      sameer.birring@harriscountytx.gov
 8   FOR THE HOUSTON AREA URBAN LEAGUE (HAUL) PLAINTIFFS:
        JENNIFER A. HOLMES
 9      NAACP Legal Defense and Educational Fund, Inc.
        700 14th Street N.W., Suite 600
10      Washington, District of Columbia  20005
        (347) 573-0197
11      jholmes@naacpldf.org
12
     FOR THE UNITED STATES:
13      DANA PAIKOWSKY
        U.S. DEPARTMENT OF JUSTICE
14      950 Pennsylvania Avenue, NW
        Washington, District of Columbia  20530
15      (202) 353-5225
        dana.paikowsky@usdoj.gov
16
17   FOR THE STATE DEFENDANTS:
        KATHLEEN T. HUNKER
18      OFFICE OF THE ATTORNEY GENERAL
        P.O. BOX 12548 (MC-009)
19      AUSTIN, TEXAS  78711-2548
        (512) 463-2100
20      kathleen.hunker@oag.texas.gov
21
     Also Present:
22      STEPHEN KENNY (Via Zoom)
        BRADLEY PROWANT (Via Zoom)
23      BREANNA WILLIAMS, NAACP (Via Zoom)
        CARRIE LEBEL (Via Zoom)
24      GERMAINE HABELL (Via Zoom)
        JOHN GORE, GOP (Via Zoom)
25      JOHN SULLIVAN BAKER, DOJ (Via Zoom)
```

## Page 4

```
 1   LEIGH TOGNETTI (Via Zoom)
     LISA CUBRIEL, BEXAR COUNTY (Via Zoom)
 2   LUCIA ROMANO (Via Zoom)
     MIKE STEWART, DOJ (Via Zoom)
 3   URUJ SHEIKH, LDF (Via Zoom)
     ZACHARY DOLLING, TCRP, OCA (Via Zoom)
 4   REGGIE WRIGHT, THE VIDEOGRAPHER
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1                      INDEX
 2                                              PAGE
 3
     Appearances...................................   3
 4
 5   JENNIFER COLVIN
 6   Examination by Ms. Hunker.....................   7
     Examination by Ms. Paikowsky..................  47
 7   Examination by Ms. Holmes.....................  74
     Further Examination by Ms. Hunker.............  92
 8
 9   Corrections & Signature....................... 104
10
     Reporter's Certificate........................ 106
11
12                  EXHIBIT INDEX
13
     NUMBER       DESCRIPTION                     PAGE
14   Exhibit 11   Election reconciliation          24
                  official totals
15   Exhibit 12   Defendant Harris County          38
                  Elections Administrator,
16                Clifford Tatum's responses and
                  objections to state defendants'
17                second set of interrogatories,
                  and third set of requests for
18                Production
     Exhibit 13   Ballot insert                    41
19   Exhibit 14   Ballot insert                    53
     Exhibit 15   Call log spreadsheet             77
20   Exhibit 16   Harris County Elections          89
                  Administrator, Clifford Tatum's
21                supplemental responses to state
                  defendants' second set of
22                interrogatories
23
24
25
```



Jennifer Colvin                                     March 21, 2023
                                                    Pages 42 to 45

Page 42

1    Q.  Is this different than the insert that you
2  included in the either primary elections or the runoff?
3    A.  It is --
4    Q.  And --
5    A.  Similar but different.
6    Q.  And what differences were made?
7    A.  We added a visual.  Like the section where
8  the -- this is the actual part of the ballot they have
9  to fill out; so they can reference it to the envelope.
10    Q.  And did you get any feedback from voters about
11  the change?
12    A.  No.
13    Q.  And if you turn the page over, you'll notice
14  that it is in a different language, correct?
15    A.  Correct.
16    Q.  And I believe you included inserts in -- you
17  had inserts for four different languages; is that right?
18    A.  Correct.
19    Q.  And that would have been English, Spanish,
20  Vietnamese, and Chinese; is that right?
21    A.  That's correct.
22    Q.  Did you provide inserts in any other language?
23    A.  Other than the four?
24    Q.  Yes.
25    A.  No.

Page 43

1    Q.  Did any other counties contact you about
2  replicating or getting information about the inserts?
3    A.  No.
4    Q.  And did you get this approved by the secretary
5  of state's office?
6    A.  Not that I'm aware of.  Our outreach team
7  created this one.
8    Q.  You can put that aside.
9        Did you find it easier to implement the
10  previsions in SB1 in the November 2022 general election
11  with respect to ballots by mail as compared to the
12  primary?
13        MS. HOLMES:  Objection to form.
14        MS. HUNKER:  You can answer.
15    A.  It was the same.
16    Q.  (BY MS. HUNKER)  Okay.  Now, we had discussed
17  the mail ballot rejection rate.  Have you looked at the
18  mail ballot rejection rates for previous general
19  elections?
20    A.  I have in the past.  Not recently.
21    Q.  Okay.  Were they -- if you're aware, were they
22  measured using the same metrics?
23        MS. BINGHAM:  Object to form.
24    A.  Can you explain the question?
25    Q.  (BY MS. HUNKER)  Yeah.  So did you use the same

Page 44

1  methodology in determining the mail ballot rejection
2  rate in previous elections as this election?
3    A.  I would say yes.
4    Q.  And was this something your office did
5  routinely after each election?
6    A.  I can only speak for how long I've been here.
7  Yes, we've done it in the past couple of elections.
8        MR. BIRRING:  Kathleen, can we go off the
9  record for a second?
10        MS. HUNKER:  Sure.
11        MR. BIRRING:  I think we have --
12        THE VIDEOGRAPHER:  We are going off the
13  record at 1:06 p.m.
14        (Recess from 1:06 p.m. to 1:08 p.m.)
15        THE VIDEOGRAPHER:  We are back on the
16  record at 1:08 p.m.
17    Q.  (BY MS. HUNKER)  Ms. Colvin, we had spoken a
18  little bit about the fact that your county is an off
19  county -- offline county; is that correct?
20    A.  Correct.
21    Q.  Okay.  Back in the March primary, many counties
22  had experienced difficulty syncing their county's
23  database with the TEAM's database.  Was that something
24  Harris County experienced?
25    A.  I can't answer that.

Page 45

1    Q.  Okay.  Did you...
2    A.  That's a different department.
3    Q.  Okay.  Do you know if you were able to -- when
4  you were checking the numbers, was able to access the
5  TEAM's system, if needed?
6    A.  Yes.
7    Q.  And so I had asked a couple of questions
8  regarding accommodation for disabilities with the last
9  witness, but she had mentioned she thought you would be
10  a better person with respect to the vote by mail.  And
11  so I'm going to ask these questions.  If you do not know
12  the answer, just state so.
13        You are aware --
14    A.  Oh --
15    Q.  -- voters with disabilities have the option of
16  requesting an accommodation or change to normal voting
17  procedures, correct?
18    A.  Correct.
19    Q.  To your knowledge, did your office receive any
20  requests for accommodation regarding the requirement
21  that mail-in voters put their social security number or
22  ID number on the application for ballot by mail?
23    A.  We did have some voters that couldn't come into
24  the building.  So we would take a clipboard and go out
25  to them.



Jennifer Colvin

March 21, 2023
Pages 46 to 49

Page 46

1    Q.  And so I know there's an option for the county
2  to go to the voter cure the vote in -- in person; is
3  that correct?
4    A.  Correct.
5    Q.  And your county utilized that option; is that
6  right?
7    A.  Yes, at our facility.  We didn't go to their
8  house.
9    Q.  Can you clarify?
10    A.  The voter would come to our facility, and we
11  would go out to their car.  We wouldn't drive to their
12  house.
13    Q.  Okay.  And was that the only request for
14  accommodation you received regarding the requirement
15  that mail-in voters put their social security number or
16  ID number on their application for ballot by mail?
17    A.  Yes.
18    Q.  And you were able to accommodate that request?
19    A.  Yes.
20    Q.  To your knowledge, did you receive any request
21  for accommodation regarding the requirement that mail-in
22  voters put their social security number or ID number on
23  their application for ballot by mail?
24    A.  No.
25    Q.  Did your office receive any complaints from

Page 47

1  voters with disabilities about the vote-by-mail
2  requirement?
3    A.  First --
4        (Simultaneously speaking.)
5    MS. HOLMES:  Objection to form.
6    A.  I don't know.  It could be in the call logs.
7    Q.  (BY MS. HUNKER)  Okay.
8        MS. HUNKER:  I think I'm ready to pass the
9  witness.  We can go off the record.
10        MS. BINGHAM:  Let's go off the record.
11        THE VIDEOGRAPHER:  We are going off the
12  record at 1:12 p.m.
13        (Recess from 1:12 p.m. to 2:09 p.m.)
14        THE VIDEOGRAPHER:  We are on the record at
15  2:09 p.m.
16        MS. PAIKOWSKY:  Did you have additional
17  questions?
18        MS. HUNKER:  I can ask them after you.
19        MS. PAIKOWSKY:  After me.  Okay.
20        MS. HOLMES:  Did we unmute the Zoom?
21        THE WITNESS:  Yes.
22        MR. BIRRING:  You can minimize it if it
23  gets distracting, Jennifer.  Yeah, then you don't have
24  to see everybody else.
25        EXAMINATION

Page 48

1  BY MS. PAIKOWSKY:
2    Q.  Good afternoon, Ms. Colvin.
3    A.  Hello.
4    Q.  My name is Dana Paikowsky.  I am with the
5  Department of Justice, and I'm going to pick up on the
6  thread of asking you some questioning about mail voting
7  during the November 2022 general election.  So to begin,
8  during the last deposition, the person who testified on
9  behalf of the Harris County election officials -- or
10  Election Administrator's Office testified that voters
11  had difficulty with SB1's mail ballot identification
12  requirement.
13        Was that still true during the
14  November 2022 general election?
15        MS. HUNKER:  Objection; form.  Lack of
16  foundation.
17    A.  Voters still did have issues as far as
18  providing the ID.  They would forget to put it on there,
19  or they didn't feel comfortable providing it even though
20  it was covered.
21    Q.  (BY MS. PAIKOWSKY)  Did any voters -- strike
22  that.
23        Were any voters confused -- sorry.  Strike
24  that.
25        Do you have any reason to believe that

Page 49

1  voters were confused by SB1's mail ballot identification
2  provision during the November '21 -- November 2002
3  general election period?
4    A.  Yes.
5    Q.  And what gave you that impression?
6    A.  Because they would not realize that they need
7  to put it on there.  They feel like, if they put it on
8  their application, they didn't need to include it on the
9  ballot or vice versa.  They didn't feel like they needed
10  to include it on both.
11    Q.  Did any voters have difficulty during the
12  November 2022 general election with which ID they needed
13  to provide on either their ABBM or carrier envelope?
14    A.  Can you clarify your question?
15    Q.  Yes.  So did any voters have difficulty
16  either -- I'm sorry.  Scratch that.  Withdrawn.
17        So during the November 2022 general
18  election, did any voters have difficulty complying with
19  the identif- -- mail ballot identification requirement
20  because they put down the wrong ID number?
21    A.  We did have voters put down the wrong --
22  they -- what do you mean by wrong ID?  Let me clarify
23  that first.
24    Q.  What do you mean by wrong ID?
25    A.  Okay.  Wrong ID to me means they gave us the



Jennifer Colvin

March 21, 2023
Pages 78 to 81

Page 78

1  numbers on the bottom so that you'll see it's not
2  sequential. So you can see the parts that I have
3  excerpted it according to where the page numbers jump
4  around.
5        Do you recognize -- looking at the -- the
6  first couple of pages, do recognize this document?
7     A. From looking at the information on it, looks
8  like it's our call log.
9     Q. Okay. And are you -- or is your department
10 involved in maintaining the call log?
11    A. We enter data on the call log.
12    Q. To orient you, the spreadsheet doesn't fit on a
13 single page because there's a lot of columns. So the
14 first -- the rows cut across four pages. So if you look
15 at the first four pages --
16    A. That's one.
17    Q. -- you'll see the first row goes across all
18 first four pages from Columns A through R.
19        Does that make sense?
20    A. (Nonverbal response.)
21    Q. Would you agree with how I've described --
22 described it?
23    A. So it's through page 8.
24    Q. The Columns A through R --
25    A. Okay.

Page 79

1     Q. -- go from pages 1 through 4. Does that look
2  correct?
3     A. Oh, hold on. Sorry. I jumped a page.
4        Correct.
5     Q. Are you familiar with the headings used in
6  this -- in the call log?
7     A. From looking at them, yes.
8     Q. Sure. So in Column A, it says "election
9  period." And what do these numbers mean in the column?
10    A. That's the election code.
11    Q. Okay. And do you, off the top of your head,
12 know what the code 5722 refers to?
13    A. I would say the primary. No, that's the May
14 entity election.
15    Q. Okay. And how about the code -- other codes
16 that are in this document are Code 522. Do you know
17 what that refers to?
18    A. Yes. That's the primary.
19    Q. All right. Code 622?
20    A. Would be the runoff for the entity election.
21    Q. Code 6282? Oh, I'm sorry. If you're not sure,
22 please tell me.
23    A. Yeah.
24    Q. I don't want you to guess.
25    A. I don't want to guess, yes. Don't let me

Page 80

1  guess.
2     Q. Okay. Just tell me if you don't know --
3     A. Okay.
4     Q. -- or if you do know. Code 6282?
5     A. I don't know.
6     Q. Okay. Code 1122?
7     A. November.
8     Q. Okay. Thank you. In Column G the header is
9  "issue question." What does this column represent?
10    A. From looking at it, what department the problem
11 of -- the caller is calling about.
12    Q. Okay. Is it the department or the issue that
13 the caller is calling about -- about?
14    A. The issue. Not detail, though. It's not
15 detailed. I guess the details would be under
16 description.
17    Q. Okay. And I see in Column G some of the
18 entrees say "VBM-General," "VBM-Ballots," "VBM-Apps."
19        Do you see that?
20    A. Uh-huh.
21    Q. Does that refer to issues related to vote by
22 mail?
23    A. Yes.
24    Q. Okay. I'd like to ask you about just a couple
25 of descriptions in the call log.

Page 81

1     A. Okay.
2     Q. Exhibit 15. So if you turn to page 4111. It's
3  near the end.
4     A. Okay.
5     Q. Do you see the third to last row, Row 28620?
6     A. Yes.
7     Q. And this describes a voter who called upset --
8  or I'll say a person who called upset because he has
9  received a VBM correction letter for no TDL, last four
10 off SSN. "He stated that he cannot come in due to his
11 disability and wants to know how he can correct it.
12 Gave number and attempted to transfer to VBM department
13 for answers, but no one ever answered. Suggested
14 e-mailing caller's concern to them, and he" -- and I
15 apologize. It's cut off. The last word is "agreed."
16        Are you aware of issues where a voter had
17 their -- their vote-by-mail ballot rejected but couldn't
18 come in to cure because of limitations due to a
19 disability?
20    A. Some of our clerks mentioned -- I don't have
21 details but that they were able to walk the voters
22 through how to cure online. That helped a lot of our
23 voters that couldn't physically come into the office.
24    Q. And was there any option for a voter who
25 couldn't physically come into the office to cure and



Jennifer Colvin

March 21, 2023
Pages 82 to 85

Page 82

1  also was unable to access the online cure function?
2      A.  No.
3      Q.  Were you aware of any voters with disabilities
4  who asked for a -- an accommodation during the cure
5  process to enable them to not come into the office but
6  also not use the online cure function?
7      A.  I'm aware of voters that came up to the office
8  but couldn't come inside the office, yes.  And we would
9  go out and meet them with a clipboard and have them do
10  the cure form.
11      Q.  During her deposition the last year, the -- the
12  former elections administrator testified that -- that,
13  during the March primary, she had received requests for
14  accommodations for voters who were seeking to cure their
15  ballot but were unable to come to the office and unable
16  to go online.
17          Are you familiar with that at all?
18      A.  No.
19      Q.  Okay.  And did you receive anything like that
20  for the November 2022 election?
21      A.  No.  Not me personally, no.
22      Q.  Okay.  Can I ask you to turn to page 931 in
23  this document.
24      A.  (Witness complies.)
25      Q.  Do you see Row 6672?

Page 83

1      A.  Yes.
2      Q.  Okay.  And that states that the caller was
3  upset due to a -- "due to carrier envelope defect
4  letter.  And she stated she put her TDL and last four of
5  SSN on it and don't understand why it was rejected for a
6  third time.  Transferred to Desiree with VBM department
7  for answers."
8          Did I read that correctly?
9      A.  Yes.
10      Q.  Were you aware of any voters who had their
11  ballots rejected -- their ballot by mail rejected
12  multiple times due to ID issues?
13      A.  I'm aware --
14          MS. HUNKER:  Objection; form.
15      A.  I'm aware of instances where we -- at the -- we
16  would mail the ballot back to the voter because they
17  didn't include their ID, and they would mail it back
18  without the ID again.  And that's when they would be
19  switched to an E-7 status which allowed them the six
20  days to cure.  But we would call them and e-mail them
21  and mail them another letter stating you still didn't
22  provide your ID or they provide mixmatch ID.  They
23  provided one, and we didn't have it in our system.
24      Q.  (BY MS. HOLMES)  So sometimes the rejection
25  would happen more than once and you have to send it back

Page 84

1  multiple times; is that correct?
2      A.  Correct.
3      Q.  You mentioned the E- -- E-7 system?
4      A.  Yes.
5      Q.  What is that?
6      A.  That's a rejection code for the State.
7      Q.  And what does it indicate?
8      A.  E-7 means it's -- once the early voting ballot
9  board convenes and there's not enough time for the voter
10  to cure via mail -- I mean, for us to send the ballot
11  back to the voter to cure, we send them a letter in
12  place of the ballot.
13      Q.  Are there particular codes that stand for
14  rejections related to SB1's ID requirement?
15      A.  Yes.  E3 and E7.
16      Q.  Okay.  And those were due -- used during the
17  November 2022 election?
18      A.  Yes.
19      Q.  Were those the same codes used in the primary?
20      A.  In the primary, the code was R-1.  And my
21  apologies.  I'm drawing a blank.  But there was another
22  code.  The State changed the codes to E-3 and E-7.
23      Q.  Got it.
24      A.  -- from R-1.  And there was another one.  I'm
25  sorry.  I just -- I'm drawing a blank on the other code.

Page 85

1      Q.  That's okay.  It's not a memory test.  But,
2  yes, the code did change.
3          Okay.  In Exhibit 15, the call log, can you
4  turn to page 3183, please.
5      A.  (Witness complies.)
6          MS. PAIKOWSKY:  Can you repeat the number?
7          MS. HOLMES:  Oh, 3183.
8          MS. PAIKOWSKY:  Thank you.
9      Q.  (BY MS. HOLMES)  And let me just ask,
10  Ms. Colvin, in the call log, is each row a -- a separate
11  contact to your office, if you know?
12      A.  Can you elaborate.
13      Q.  Oh, sure.  I guess my question is -- there's a
14  lot of rows in this spreadsheet.
15      A.  Right.
16      Q.  And I'm wondering if each row represents a
17  separate time that a person contacted the Harris County
18  Elections Office --
19      A.  Yes.
20      Q.  -- with a voting question.
21          So back to page 3183.
22      A.  Uh-huh.
23      Q.  If you look at Row 22904, do you see?
24      A.  Yes.
25      Q.  All right.  It says that the caller "was



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,           §
    *Plaintiffs,*                                        §
                                                §
*v.*                                                  §   Case No. 5:21-cv-844-XR
                                                §
GREGORY W. ABBOTT, et al.,                    §
    *Defendants.*                                        §

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX R

Lauren Smith                                              March 21, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3

    LA UNION DEL PUEBLO         §
 4  ENTERO, et al.,             §
          Plaintiffs,           §
 5                              §
    v.                          §    Case No. 5:21-cv-844-XR
 6                              §
    GREGORY W. ABBOTT, et       §
 7  al.,                        §
          Defendants.           §
 8  _____   §
                                §
 9                              §
    OCA-GREATER HOUSTON, et     §
10  al.,                        §
          Plaintiffs,           §
11                              §
    v.                          §    Case No. 1:21-cv-780-XR
12                              §
    JANE NELSON, et. al.,       §
13        Defendants,           §
                                §
14  _____   §
                                §
15  HOUSTON JUSTICE, et         §
    al.,                        §
16        Plaintiffs,           §
                                §
17  v.                          §    Case No. 5:21-cv-848-XR
                                §
18  GREGORY WAYNE ABBOTT,       §
    et al.,                     §
19        Defendants,           §
                                §
20  _____   §
                                §
21  LULAC Texas, et al.,        §
          Plaintiffs,           §
22                              §
    v.                          §    Case No. 1:21-cv-0786-XR
23                              §
    JANE NELSON, et al.,        §
24        Defendants,           §
                                §
25  _____   §
```



Lauren Smith

## Page 2

```
1   MI FAMILIA VOTA, et        §
    al.,                       §
2        Plaintiffs,           §
                               §
3   v.                         §   Case No. 5:21-cv-0920-XR
                               §
4   GREG ABBOTT, et al.,       §
         Defendants.           §
5
6
7
8           ORAL AND VIDEOTAPED DEPOSITION OF
9                   LAUREN SMITH
10                  MARCH 21, 2023
11
12
13
14
15       ORAL AND VIDEOTAPED DEPOSITION OF LAUREN SMITH,
16  produced as a witness at the instance of the Defendants
17  and duly sworn, was taken in the above styled and
18  numbered cause on Tuesday, March 21, 2023, from 9:33
19  a.m. to 12:07 p.m., before DONNA QUALLS, Notary Public
20  in and for the State of Texas, reported by computerized
21  stenotype machine, at the offices of Harris County
22  Attorney's Office, 1019 Congress Street, 15th Floor,
23  Houston, Texas, pursuant to the Federal Rules of Civil
24  Procedure, and any provisions stated on the record or
25  attached hereto.
```

## Page 3

```
1           A P P E A R A N C E S
2
3   FOR THE HARRIS COUNTY ELECTIONS ADMINISTRATOR:
        SAMEER S. BIRRING
4       TIFFANY BINGHAM
        OFFICE OF THE HARRIS COUNTY ATTORNEY CHRISTIAN
    D. MENEFEE
5       1019 Congress, 15th Floor
        Houston, Texas  77002
6       (713) 274-5142
        sameer.birring@harriscountytx.gov
7
8   FOR THE HOUSTON AREA URBAN LEAGUE (HAUL) PLAINTIFFS:
        JENNIFER A. HOLMES
9       NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
        700 14th Street N.W., Suite 600
10      Washington, District of Columbia  20005
        (347) 573-0197
11      jholmes@naacpldf.org
12
    FOR THE UNITED STATES:
13      DANA PAIKOWSKY
        U.S. DEPARTMENT OF JUSTICE
14      950 Pennsylvania Avenue, NW
        Washington, District of Columbia  20530
15      (202) 353-5225
        dana.paikowsky@usdoj.gov
16
17  FOR THE STATE DEFENDANTS:
        KATHLEEN T. HUNKER
18      OFFICE OF THE ATTORNEY GENERAL
        P.O. BOX 12548 (MC-009)
19      AUSTIN, TEXAS  78711-2548
        (512) 463-2100
20      kathleen.hunker@oag.texas.gov
21
    Also Present:
22      STEPHEN KENNY (Via Zoom)
        BRADLEY PROWANT (Via Zoom)
23      BREANNA WILLIAMS, NAACP (Via Zoom)
        CARRIE LEBEL (Via Zoom)
24      GERMAINE HABELL (Via Zoom)
        JOHN GORE, GOP (Via Zoom)
25      JOHN SULLIVAN BAKER, DOJ (Via Zoom)
```

## Page 4

```
1   LEIGH TOGNETTI (Via Zoom)
    LISA CUBRIEL, BEXAR COUNTY (Via Zoom)
2   LUCIA ROMANO (Via Zoom)
    MIKE STEWART, DOJ (Via Zoom)
3   URUJ SHEIKH, LDF (Via Zoom)
    ZACHARY DOLLING, TCRP, OCA (Via Zoom)
4   REGGIE WRIGHT, THE VIDEOGRAPHER
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
1                       INDEX
2                                               PAGE
3
    Appearances...................................    3
4
5   LAUREN SMITH
6   Examination by Ms. Hunker.....................    6
    Examination by Ms. Holmes.....................   62
7   Further Examination by Ms. Hunker.............   80
8
    Corrections & Signature.......................   88
9
10  Reporter's Certificate........................   90
11
                    EXHIBIT INDEX
12
13  NUMBER    DESCRIPTION                         PAGE
    Exhibit 1   Deposition notice                  10
14  Exhibit 2   Notice to voters with              14
                disabilities
15  Exhibit 3   Complaint form                     19
    Exhibit 4   Postelection report from the       23
16              Elections Administrator's
                Office for the November 2022
17              election
    Exhibit 5   November 8, 2022 general and       30
18              special elections early voting
                schedule
19  Exhibit 6   KHOU 11 article                    50
    Exhibit 7   KHOU 11 article                    53
20  Exhibit 8   Information of person that         75
                provided transportation to
21              seven or more voters
    Exhibit 9   Information of person that         75
22              provided transportation to
                seven or more voters for
23              curbside voting
    Exhibit 10  Harris County election manual      82
24
25
```



Lauren Smith

March 21, 2023
Pages 10 to 13

Page 10

1     A.  Uh-huh.
2     Q.  Also, if you hear an objection from counsel,
3  that is typically for the Court to decide at a later
4  date.  I, therefore, ask that you go ahead and answer
5  the question unless you were instructed otherwise by
6  your counsel.
7        You understand?
8     A.  I do.
9     Q.  Now, I'm obliged to ask the following
10  questions:
11        Have you consumed any alcohol today?
12     A.  No.
13     Q.  Have you consumed any drugs today?
14     A.  No.
15     Q.  Are you aware of anything that would affect
16  your ability to testify truthfully and accurately today?
17     A.  No.
18     Q.  And you haven't brought any documents with you
19  today, correct?
20     A.  No.
21     Q.  Now I'm going to introduce our first exhibit.
22        (Exhibit No. 1 was marked.)
23     Q.  (BY MS. HUNKER)  Ms. Smith, do you have the
24  document in front of you?
25     A.  I do.

Page 11

1     Q.  And I want you to turn the page over.
2     A.  (Witness complies.)
3     Q.  Have you seen this document before?
4     A.  Have I -- no -- I don't know.  Have I?  I've
5  seen a lot of documents.
6     Q.  Okay.  That's fair enough.
7        Can you look at the title where it says
8  "State's Defendants' Amended Notice of Intent to Take
9  Oral and Videotaped Deposition of the Office of the
10  Harris County Elections Administrator, Pursuant to
11  Rule 30(b)(6)"?
12     A.  Yes, I've seen this.
13     Q.  And did I read that correctly?
14     A.  Yes.
15     Q.  And if we turn the page a couple of times,
16  you're going to get to where it says "Topics for
17  Examination."
18     A.  Okay.
19     Q.  Do you understand that you are here pursuant to
20  this notice?
21     A.  Yes.
22     Q.  And do you understand that the Office of Harris
23  County Elections Administrator has designated you to
24  provide testimony on its behalf on certain topics?
25     A.  Yes.

Page 12

1     Q.  And do you understand that your answers here
2  today are binding on the organization?
3     A.  Yes.
4     Q.  Now, an e-mail I received from your counsel
5  last night said that you were going to be testifying on
6  Topics 16, 17, 20, 22 in part, 25, and 26.  For the
7  topics that you are designated, I understand that
8  sometimes it's more of a spectrum than as opposed to
9  discrete categories.  So if anytime the questions veer
10  into territory that you think are best left to another
11  designee, please just let me know.
12     A.  Okay.
13     Q.  How did you prepare for today's deposition?
14     A.  With numerous deposition preps- -- with my --
15  our counsel.
16     Q.  Okay.  And did you meet with anybody else
17  besides counsel?
18     A.  No, ma'am.
19     Q.  And how many times did you meet with counsel,
20  if you recall?
21     A.  Three.
22     Q.  And do you know roughly how long those prep
23  sessions would have lasted?
24     A.  Roughly an hour each.
25     Q.  Did you review any documents in preparation for

Page 13

1  today's deposition?
2     A.  Other than our internal documents that we
3  submitted to y'all, no.
4     Q.  Okay.  Did you review Senate Bill 1 for today's
5  deposition?
6     A.  Yes.
7     Q.  When was the last time you familiarized
8  yourself with the provisions of SB1?
9     A.  I mean, I reference it often, so over the last,
10  you know, two and a half years, several times.
11     Q.  And did you review any election advisories
12  prior to this deposition?
13     A.  No, ma'am.
14     Q.  When was the last time you would've reviewed
15  some of the advice -- the advisories issued by the
16  secretary of state's office regarding Senate Bill 1?
17     A.  I can't recall.
18     Q.  Did you review any of the written discovery
19  that Harris County produced in this case?
20     A.  Yes.
21     Q.  Are you prepared to testify on the topics for
22  which you've been designated?
23     A.  Yes.
24     Q.  So let's start with Topic 16.  It reads "Your
25  policies, practices, and procedures for voters with



Lauren Smith                                                March 21, 2023
                                                            Pages 14 to 17

Page 14

1  disabilities to request changes, accommodations, or
2  modifications to the voting procedures outlined in the
3  Texas Election Code during the November 8, 2022, General
4  Election."
5          Did I read that correctly?
6  A.  Yes, ma'am.
7  Q.  Has Harris County implemented any new policies
8  with respect to voters with disabilities in the -- since
9  end of May 2022?
10  A.  New policies, no.
11  Q.  Has Harris County introduced any new procedures
12  for voters with disabilities and how Harris County
13  treats voters with disabilities since May of 2022?
14  A.  No.
15  Q.  I'm going to introduce our second exhibit.
16      (Exhibit No. 2 was marked.)
17  Q.  (BY MS. HUNKER)  Do you have the exhibit in
18  front of you?
19  A.  I do.
20  Q.  Do you recognize this exhibit?
21  A.  I do.
22  Q.  And what is the exhibit?
23  A.  It's the notice to voters with disabilities.
24  Q.  And what is the purpose of this document?
25  A.  It's a form required by the secretary of state

Page 15

1  for us to post in all active voting centers as well.
2  And it lists our -- the ADA requirements and how a voter
3  with disabilities can distribute a -- or complete and
4  distribute a disability complaint form to our office
5  should they have one.
6  Q.  And this is the notice that was issued by your
7  particular office; is that correct?
8  A.  Yes.  We produced this.
9  Q.  So turning to the first paragraph, it reads:
10  "The Americans with Disabilities Act requires that
11  Harris County voting program be accessible to
12  individuals with disabilities.  Harris County Elections
13  Department has a grievance procedure providing for
14  prompt and equitable resolution of complaints alleging
15  actions prohibited by the ADA."
16      Did I read that correctly?
17  A.  Yes.
18  Q.  Then if we move to the next paragraph, it
19  begins with "If you or a person with a disability has
20  encountered obstacles to voting or has been
21  discriminated against in violation of the ADA, you can
22  file a complaint using the Disability Complaint Form."
23      Did I read that correctly?
24  A.  Yes.
25  Q.  Does Harris County work to ensure that its

Page 16

1  voting program is accessible to voters with
2  disabilities?
3  A.  Yes.
4  Q.  And can you maybe give me a short summary of
5  steps that Harris County took to ensure that the 2022
6  general election was accessible to voters with
7  disabilities?
8  A.  It's quite broad.  We -- on the have top level
9  we have our accessibility department that maintains our
10  vote centers in terms of insuring that their
11  architectural barriers are rectified, should we find
12  any.  We have a subject mattic -- matter expert and a
13  team of surveyors that survey each of our vote centers
14  that we intend to use for the upcoming election,
15  whatever election that might be, with a very extensive
16  checklist.  And again, architectural barriers being kind
17  of top level there as well as connectivity, internal
18  room sizes, et cetera.
19      And once those surveys are reviewed for
20  subject matter experts, then we -- in order to -- if --
21  if the vote center is found noncompliant as it pertains
22  to the American -- Americans with Disabilities Act, then
23  we make a plan for each of those vote centers with
24  temporary remediations whether they be ramps, cones,
25  doorstops, plates, et cetera, alternate entrance and

Page 17

1  exits.  And that is again -- is -- is reviewed and
2  approved.
3      And so those remediations are planned for
4  each of those vote centers.  Additionally, our machines
5  that we have, our Duo-Gos for curbside voting for our
6  voters with disabilities, are implemented on -- during
7  early voting and Election Day.  And then our, you know,
8  we have our interpreter iPads.  We have our interpreter
9  requests.  So there's -- there's a myriad of things that
10  we're able to implement for voters with disabilities.
11  Q.  Would you agree me that Harris County takes its
12  responsibilities under the ADA seriously?
13  A.  Yes.
14  Q.  And would you agree with me that Harris County
15  has been successful in ensuring that its voting program
16  is accessible to voters with disabilities?
17  A.  I do.
18  Q.  Did any voter submit a disability complaint
19  form for the November 2022 general election?
20  A.  Yes.
21  Q.  And generally, what were the substance of these
22  complaints?
23  A.  There was three, and they were provided in
24  our -- the spreadsheet with our complaint forms.
25  Unfortunately, I don't know them off the top of my head,



Lauren Smith

March 21, 2023
Pages 18 to 21

Page 18

1 but there were three, I believe within that document.
2         MS. HUNKER:  And, Counsel, just for
3 clarification, do you know when that document was
4 produced?
5         MR. BIRRING:  I don't think we have
6 produced that one.
7         MS. BINGHAM:  No, that's the -- that's the
8 call log.
9         MR. BIRRING:  No, no.  This is a separate
10 one.  This is the ADA complaint form.
11         MS. BINGHAM:  Oh.
12         MR. BIRRING:  It's a spreadsheet, and I
13 think there were three.  I think I have it.  I might
14 have it.  Should we go off the record?
15         MS. HUNKER:  Yeah, can we go off the
16 record?
17         MR. BIRRING:  Yeah, let's go off the record
18 for a second.
19         THE VIDEOGRAPHER:  We are going off the
20 record at 9:47 a.m.
21         (Recess from 9:47 a.m. to 9:56 a.m.)
22         THE VIDEOGRAPHER:  We are back on the
23 record at 9:56 a.m.
24     Q.  (BY MS. HUNKER)  So, Ms. Smith, during the
25 break, your counsel provided me a electronic copy of the

Page 19

1 complaint form you had just mentioned.  I believe he
2 also showed you a copy as well; is that correct?
3     A.  Yes.
4     Q.  And we are going to be waiting for the printout
5 to be submitted as an exhibit.  But to save time, you
6 and I are going to discuss the electronic version which
7 will be identical.
8         Is that understood?
9     A.  That's correct, yes.
10     Q.  And this will be Exhibit 3.
11         (Exhibit No. 3 was marked.)
12     Q.  (BY MS. HUNKER)  And so you had said you
13 received three complaints through the disability
14 complaint form for the November 2022 general election;
15 is that right?
16     A.  That's correct.
17     Q.  And so I'm just going to quickly talk about the
18 description of the complaints.  It seems one of the
19 complaints involved a judge asking the voter to leave
20 the service dog with her while he voted; is that
21 correct?
22     A.  That's correct.
23     Q.  And then the second involved an issue regarding
24 the court control with voting room setup, and that was
25 later addressed by a tech; is that correct?

Page 20

1     A.  That's correct.
2     Q.  And the third one had to do with a father
3 assisting his son to vote; is that correct?
4     A.  That's correct.
5     Q.  To your knowledge, did any of these complaints
6 address the requirements through SB1?
7     A.  The one where the father was helping his son,
8 that would pertain to our oath of assistance or the oath
9 of assistance.
10     Q.  And do you recall what the controversy in that
11 case was?
12     A.  Not to the specifics.  But the judge had
13 confusion on what an assistant -- what the definition of
14 an assistant was as it relates to the SOS form or the
15 form -- the updated form, I should say.
16     Q.  Okay.  And it says here that the election judge
17 was advised that the son is eligible to vote because he
18 is registered and was also advised to allow the father
19 to assist; is that correct?
20     A.  Correct.  The judge has the opportunity to call
21 in to our ADA line to receive information as -- as it
22 regards to -- to any ADA policies.
23     Q.  And so in this case, are you aware if the
24 father was in fact able to assist the son?
25     A.  Yes, he was.

Page 21

1     Q.  And just to -- let me know if I'm misstating
2 what you had said.  But it sounded as if the dispute was
3 over what it meant for voter assistance.
4     A.  Correct.  The definition of a voter assistant,
5 yes.
6     Q.  And so outside of the, I guess, submission
7 regarding voting assistance, did any of the other
8 complaints address requirements or provisions of SB1?
9     A.  No.
10     Q.  And so you received no complaints, disability
11 complaint forms, regarding mail-in ballot requirements;
12 is that correct?
13     A.  Mail-in ballot -- I'm not designated to talk
14 about mail-in ballots.
15     Q.  I'm simply asking if you received any complaint
16 forms that were -- with respect to voters with
17 disabilities having a problem or concern regarding
18 mail-in ballots?
19     A.  I'm sorry.  No, I didn't -- we did not receive
20 a complaint form regarding mail-in ballot -- ballots
21 from voters with disabilities.
22     Q.  Thank you.
23     A.  Sorry.
24     Q.  And you're aware that voters with disabilities
25 have the option of requesting an accommodation or change



Lauren Smith

March 21, 2023
Pages 22 to 25

Page 22

1  to the normal voting procedure, correct?
2      A.  Yes.
3      Q.  Generally, do you know if there were any
4  accommodations requested during the 2022 general
5  election?
6      A.  Specifically, we -- no.  But we -- our -- well,
7  that's not true.  We have our requests for our
8  interpreters, the SIS interpreters.  But largely
9  specifically, no, I don't -- not any specific requests.
10     Q.  To your knowledge, did your office receive any
11 request for accommodation regarding any of the
12 provisions in SB1?
13     A.  No.
14     Q.  To your knowledge, did your office receive any
15 requests for accommodation regarding the requirement
16 that mail-in voters put their social security number or
17 ID number on their application for ballot by mail?
18     A.  No.
19     Q.  To your knowledge, did your office receive any
20 request for accommodation regarding the requirement that
21 mail-in voters put their social security number or ID
22 number on their ballot by mail?
23     A.  No.
24     Q.  Thank you.  I'm going to introduce our fourth
25 exhibit.

Page 23

1          (Exhibit No. 4 was marked.)
2      Q.  (BY MS. HUNKER)  And as a heads up, we're going
3  to be going back to this particular exhibit a couple of
4  times.
5          THE WITNESS:  Thank you.
6      A.  Okay.
7      Q.  (BY MS. HUNKER)  Do you have the exhibit in
8  front of you?
9      A.  I do.
10     Q.  Do you recognize this exhibit?
11     A.  I do.
12     Q.  What is it?
13     A.  This is the public postelec- -- the
14 postelection report from the Elections Administration --
15 Administrator's Office for the November 2022
16 election.
17     Q.  Okay.  And so, the opening sentence of this
18 report reads:  "The Post Election Report includes an
19 overview of the Election Administrator's Office planning
20 and execution of the November 8th, 2022, General
21 Election including Early Voting and Election Day
22 operations, media and community outreach activities.
23 Election Day operations, election night tabulation, and
24 a post-election day analysis from election judges,
25 election workers, and senior EAO staff."

Page 24

1          Did I read that sentence correctly?
2      A.  Yes.
3      Q.  To your understanding, is that a fair
4  description of the report?
5      A.  Yes.
6      Q.  To your knowledge, has Harris County ever
7  before issued a postelection report of this nature for
8  previous elections?
9      A.  Yes.
10     Q.  Are these also available publicly?
11     A.  I would assume.  I don't know.
12     Q.  And did you have any role in crafting this
13 particular postelection report?
14     A.  Yes.
15     Q.  And what was your role?
16     A.  As it pertains to vote centers, polling
17 locations, counts, anything -- our election night
18 operations, Election Day operations, probably some of
19 the planning and execution.
20     Q.  So I'm going to read the next two para- -- two
21 more paragraphs and ask a couple of questions.  If you
22 do not know the answer to these questions, just please
23 let me know.
24     A.  Okay.
25     Q.  So I want to turn to the second paragraph.  It

Page 25

1  reads:  "The EAO normally submits an election survey to
2  all judges and clerks seeking feedback on the election
3  process and potential training and curriculum topics for
4  future elections.  However, in the interest of
5  confirming and better understanding certain events and
6  problems reported in the media on Election Day and
7  after, including paper ballot issues and opening and
8  closing problems, the EAO recruitment staff expedited
9  its post-election assessment."
10         Did I read that correctly?
11     A.  Yes.
12     Q.  And EAO in this report means Elections
13 Administrator's Office, correct?
14     A.  Correct.
15     Q.  Turning to the next paragraph, the second
16 sentence reads:  Through an expedited evaluation
17 process, the EAO has created this preliminary report of
18 successes and challenges for review and implementation
19 for the next election cycle.  Standard practice would
20 require the EAO to take approximately 90 to 120 days to
21 compile a final report of this magnitude; however, given
22 the level of stakeholder interest and inquiry, the EAO
23 believed it important to provide its preliminary
24 observations as quickly as possible without jeopardizing
25 the integrity of the data and the process."



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS**

# APPENDIX S

**Second Supplement to**

**Report on Identification Number Requirements for Mail Balloting under SB 1**

*United States v. Texas*

**United States District Court for the Western District of Texas**

_____

**Eitan Hersh**
**Associate Professor**
**Department of Political Science**
**Tufts University**
**Medford, MA**

**February 3, 2023**

## I.      Abstract

1.  This report contains three analyses. First, using new data supplied to me in January 2023,
    I calculate the number of registered voters in Texas whose registration records indicate
    that they could have a mail ballot application or carrier envelope rejected on account of
    identification verification requirements imposed by Senate Bill 1 ("SB 1"). My analysis
    shows similar results as in two prior expert reports that I have filed in this case. I find that
    1 in 7 Texans can accurately and completely fill out a mail ballot application and the
    application could still be rejected on account of SB 1's verification procedures.

2.  Second, I conduct an analysis of rejected mail ballots during the first federal election held
    since the passage of SB 1, the November 2022 election. Among other findings, I show
    that the overwhelming majority (more than 80%) of rejected mail ballots were rejected on
    account of SB 1 identification rules.

3.   Third, I analyze the behavior in the November election of individuals who I have flagged
    as having records that could lead to mail ballot rejections. Those deemed at risk have a
    significantly lower rate of successfully voting by mail than the general population.

## II.     Replication of Previous Analyses and Meta-Analysis

4.  In a February 28, 2022 report ("Initial Report"), I described a methodology for evaluating
    the number of Texans who were particularly vulnerable to having a mail ballot
    application rejected on account of identification verification rules in SB 1. For several
    reasons, a registered voter could fill out a mail ballot application (or mail ballot carrier
    envelope) correctly but the materials would be rejected by election officials:

a.  Many Texans have multiple identification numbers because they have multiple Department of Public Safety IDs ("DPS IDs"). But Texas only stores up to one DPS ID Number on its list of registered voters (the Texas Election Administration System, or "TEAM"). If a registrant lists a correct DPS ID number on mail ballot materials but not the number that happens to be listed in TEAM, the voter's mail ballot or mail ballot application will be rejected.

b.  Some Texans are listed on TEAM without a DPS ID Number. Many of these individuals do in fact have DPS IDs. They are instructed by the language in the mail ballot application and on the carrier envelope to list only their DPS ID when filling out mail ballot forms. However, because their DPS ID Number is absent from TEAM, their materials will be rejected.

c.  Administrative records are not perfect. Tens of thousands of Texans are listed on TEAM with typos in their Social Security numbers ("SSN") and/or their DPS ID numbers. When a registered voter fills out a mail ballot application (or ballot carrier envelope) correctly, the material will be rejected on account of these administrative typos.

5.  In my Initial Report, I established a methodology for linking TEAM records to DPS records in order to count the number of individuals who might have their materials rejected. In addition to explaining the methodology, I was able to test the validity of the methodology. I reported that 1 in 7 registered voters in Texas could have their mail ballot materials rejected on account of SB 1 even if they followed instructions correctly. I concluded that "Texas's databases are simply not well-suited to SB 1's demands" (Paragraph 114). On account of incomplete records as well as typos and other

inconsistencies across state databases, the law can prevent citizens from voting. I conducted subgroup analyses to show that the affected population includes many senior citizens, Texans living overseas, disabled veterans and homebound citizens, all of whom rely on mail voting more than the general population.

6. In a May 4, 2022 supplemental report ("First Supplemental Report"), in addition to some new analyses, I replicated the analysis described above with updated DPS and TEAM records. Whereas DPS and TEAM data in the Initial Report were produced in January 2022, data in the First Supplemental Report were produced by the State in March and April 2022. The results were substantively the same.

7. In January of 2023, I received yet another update to DPS and TEAM records. The DPS records were drawn in December of 2022, and the TEAM records were compiled in early January 2023.

8. In Appendix A to this report, I describe the details of this additional replication with the new data from December 2022/January 2023. In Table A, here, I provide the top-line summary statistics from that analysis and place the results in context, alongside results from the Initial Report and First Supplemental Report.

**TABLE A: Summary of Results from Three Analyses of DPS and TEAM Records**

| | Initial Report | First Suppl. Report | Second Suppl. Report |
|---|---|---|---|
| | **February 2022** | **May 2022** | **January 2023** |
| No DPS ID in TEAM; Possesses DPS ID | 276,405 | 209,137 | 189,095 |
| One DPS ID in TEAM; Possesses Multiple DPS IDs | 2,213,676 | 2,392,733 | 2,394,435 |
| Typo/Inconsistent SSN4 in DPS vs TEAM | 44,444 | 44,915 | 44,353 |
| Typo/Inconsistent DPS ID in DPS vs TEAM | 68,190 | 74,897 | 62,461 |
| **Total Issues** | **2,602,715** | **2,721,682** | **2,690,344** |
| **Total TEAM Records** | **17,026,054** | **17,330,189** | **17,451,752** |
| **Issues/Total (Percent)** | **15.3%** | **15.7%** | **15.4%** |

9. As the first line of data in Table A shows, the results indicate a decline in the number of individuals who are listed in TEAM without a DPS ID Number but who do in fact possess a DPS ID Number. The number went from 276,000 when I first ran the analysis a year ago to 209,000 a few months later, to 189,000 in the current analysis.

10. During the same period, the number of Texas registered voters who are listed in DPS with more than one DPS ID number has increased from 2,214,000 to 2,393,000 to 2,394,000. As noted in the Initial Report, according to SB 1, a voter may use a current or expired ID in filling out mail ballot materials, but TEAM only stores zero or one ID number per registered voter.

11. The number of typos or other data errors in the storage of Social Security numbers (specifically in the last four digits of the Social Security numbers ("SSN4")) is nearly exactly the same across the three analyses. The number of typos or errors in DPS ID numbers went from 68,000 to 75,000 and then down to 62,000. The last rows of Table A summarize the total number of issues and divides these by the total number of TEAM

records. The analysis was performed three times over the course of twelve months with three different snapshots of Texas administrative data. The results are consistent, with 15-16% of records affected by issues that might lead to ballot materials being rejected on account of SB 1 requirements, even with voters dutifully following mail ballot instructions.

### III.    Analysis of November 2022 Federal Election

12. In this section, I analyze mail ballot data from the November 2022 federal election. First, I measure the consistency between statistics reported by Texas and the January 3, 2023 data transmitted to me regarding participation in the November election. Then, I report three key findings.

     a. I estimate that the initial mail ballot rejection rate in Texas at 4.1%. This is higher than the final rejection rate of 2.7% that Texas has reported.

     b. I estimate that over 80% of rejected mail ballots are rejected on SB 1 grounds. I count 5 Federal Post Card Application ("FPCA") voters—military and overseas voters—whose ballots were rejected on SB 1 grounds.

     c. I estimate that more than 50% of individuals who are flagged for having a mail ballot rejected due to SB 1 did not end up voting in the November election, either by mail or in person.

13. According to the website of the Texas Secretary of State, in the November 2022 election, 7,775,713 votes were cast in person and 359,526 ballots were cast by mail.[1] [2] The count of 359,526 mail ballots submitted is higher than 345,697, which is the count provided by state officials to the media.[3] It is also higher than 345,679, which is the count disclosed by Texas in court documentation in January 2023.[4]

14. In the January 2023 TEAM database I received, there are 8,178,445 voter history records associated with the November 8, 2022 election. However, about 70,000 of these records are instances of registrants who are listed on more than one line of the TEAM database, for instance a line representing that they requested a mail ballot but another line representing that they actually voted in person.

15. In order to gauge turnout as it is represented in the TEAM records, I retain only the most recent voter history record for each registrant, by selecting the date listed as most recently

---

[1] See "November 08, 2022 GENERAL ELECTION Cumulative Totals Thru Close of Business November 08, 2022" https://earlyvoting.texas-election.com/Elections/getElectionEVDates.do. The counts as reported by Texas here are dynamic and are regularly updated. The counts listed reflect numbers as of January 30, 2022. The mail ballots in this tabulation come from county numbers and appear to reflect ballots submitted rather than ballots officially counted. This is evidenced by the fact that the state website records ballots submitted as early as October 2, 2022, a date prior to when signature verification committees began to meet and review mail ballots. For information on the timeline for reviewing ballots, see: "Early Voting Ballot Board & Signature Verification Committee, Handbook for Election Judges and Clerks 2022," Texas Secretary of State Elections Division. See Page 9: "A [signature verification] committee may not begin operating before the 20th day before election day." https://www.sos.state.tx.us/elections/forms/ballot-board-handbook.pdf.

[2] Note that there is more than one way to tabulate voter turnout. For instance, elsewhere on its website, the Texas Secretary of State's office refers to ballots counted in the gubernatorial election (the highest office on the ballot in 2022) as its voter turnout. See Texas Secretary of State, "Turnout and Voter Registration Figures (1970-current)," https://www.sos.texas.gov/elections/historical/70-92.shtml. For matching turnout statistic in gubernatorial election, see Texas Secretary of State, "Official Canvas Report," Page 8, https://results.texas-election.com/static/data/Reports/47009/OfficialCanvassReport.pdf?v=1673559121148.

[3] Ashley Lopez, "Despite Mail Voting Changes, Ballot Rejections Remain Relatively Low in 2022 Midterms," NPR, January 13, 2023.

[4] See "State Defendants' Supplemental Objections and Responses to the United States' Second Set of Interrogatories," Page 13, *United States v. Texas*, January 19, 2023.

updated. After this procedure, all in-person ballots cast (election day ballots and early ballots, including provisional ballots) yield a tally of 7,775,194. This number is nearly identical to the count of 7,775,713 in-person ballots received according on the State's website as referenced above. Since the website is continuously updated but the voter file I received is static and dated January 3rd, it is expected that the number counted on the website would be slightly higher than tabulated based on the static voter file. Note that some of these ballots (5,901 of them) have a code indicating that they were ultimately rejected. Nearly all the others (7,768,874) have a code indicating that they were accepted. The remaining 419 records have neither an accepted nor rejected code.[5]

16. 378,487 other records have a code associated with a mail ballot. Nearly all of these have one of the following "ballot status" codes:

**TABLE B: Ballot Status Codes of Mail Ballot Records in November 2022 Election**

| CODE | Definition | Count |
|------|------------|-------|
| **AB** | Absentee ballot received | 1,492 |
| **AC** | Absentee ballot cancelled by voter | 16,420 |
| **AM** | Absentee ballot mailed | 29,719 |
| **AV** | Absentee ballot accepted | 322,423 |
| **AX** | Absentee ballot rejected | 8,366 |
| **RB** | Absentee ballot returned by PO | 20 |
| **(No Code)** | | 47 |

17. Of these records, the total ballots submitted are those with codes AB (Absentee ballot received), AV (absentee ballot accepted), and AX (absentee ballot rejected). These sum

---

[5] The method of voting is defined by a field in the database called "ballot type." The rejected/accepted status comes from a different field, called "ballot status". For in-person ballot types, 7,768,874 have a code of "A" (accepted); 5,901 have a code of "R" (rejected); and 419 have no code.

to 332,281.[6] The other codes reflect ballots that either never reached the voter (returned by Post Office) or were received by the voter but the voter never mailed back the ballot or else cancelled the request.

18. This number (332,281) is lower than the other counts mentioned above, both in public reports (345,697 ballots received) and in the State's count on its website (359,526 ballots received). One possible explanation for the discrepancy is if those sources include in their counts ballots that were cancelled by voters. Adding in these 16,420 records would bring the voter file count up to 348,701. However, based on the codes and definitions made available to me, I will count ballots submitted as only those that have the codes of AB, AV, or AX.

19. According to the January 2023 data, there are 18,187 records listed with a reason that a ballot was rejected. Of these, 13,638 were mail ballot rejections. About 40% of records that indicate a reason for a mail ballot being rejected have a status code that indicates the ballot was accepted. Presumably, these are cases in which a ballot was initially rejected but eventually cured and accepted. Of all the mail ballot rejections, 11,430 (83.8%) have a code indicating that identification verification was the reason for the rejection.[7] With 13,638 rejections and 332,281 mail ballots submitted, the rejection rate is estimated as 4.1%. This number is higher than the publicly reported rate of 2.7%.[8]

---

[6] If one calculates this number without removing the duplicate voters listed in TEAM, as described above, the total count of submitted ballots would nevertheless be quite similar: 332,885.

[7] These codes are: IS, ISR, EVBIS, EVBISR, EVCIS, EVCISR, and ISF. The first two of these codes are identified in Defendant's disclosed document STATE057755. The remaining codes are identified by county disclosed documents, such as Dallas County document, MS016221.

[8] According to NPR, 9,348 of 345,697 mail ballots were rejected. These numbers are based on "NPR inquiries with state officials." Ashley Lopez, "Despite mail voting changes, ballot rejections remain relatively low in 2022 midterms," NPR, January 13, 2023

20. Among those with rejected ballots include 5 individuals who use Federal Post Card Applications, which are voter registration forms used by members of the military, their families, and American citizens who are residing overseas.

21. Of the 11,430 records indicating voters who were rejected on SB 1 grounds, less than half of them (44.4%) are associated with a registrant whose record also shows that they were able to vote either by mail or in person. Most (55.6%) failed to vote successfully following their ballot being rejected.

22. If one calculates the rate of rejected ballots as those that appear as uncured in the TEAM file, the rejection rate would be lower than 4.1%. For example, of all 13,638 records listed with a reason that a mail ballot was rejected, 8,306 show no indication that the registrant successfully voted, whether by curing the mail ballot or cancelling the mail ballot and voting in person. If we divide 8,306 by the sum of 8,306 and 322,423 (the number of successful mail votes), then the uncured/uncanceled rejection rate would be 2.5%, which is close to the rejection rate of 2.7% reported by the State. Such a calculation does not take into account those voters who, in order to resolve a rejection attributable to SB 1, needed to vote in person rather than by mail.

23. The analysis above suggests a mail ballot rejection rate of 4.1% and an uncured/uncanceled rejection rate of 2.5%. However, estimates of rejection rates must be observed with caution, as some cured ballots may have had their codes in TEAM overridden once they were cured. According to Kristi Hart, the State's Director of Election Administration and Voter Registration, TEAM records that are rejected but eventually cured would have the rejection flag overridden.[9] At the same time, in some

---

[9] Deposition transcript of Kristi Hart, Director of Election Administration and Voter Registration, Office of Texas Secretary of State, Pages 133-135, *United States v. Texas*, June 30, 2022.

cases registrants have multiple records on TEAM, one indicating a rejection and one an accepted form. Thus, from the TEAM data alone, it is not possible to offer a definitive account of the number of ballots rejected and cured. The numbers reported here reflect what can be discerned with the available data.

24. In comparison to the March 2022 primary, which was the first election held under SB 1 rules, two facts are apparent. First, the rejection rate reported in the March 1, 2022 state primary was higher than in November; 12% of ballots were reportedly rejected in March.[10] Second, a smaller share of voters who cast ballots did so by mail in November 2022 (4.4% according to the State's reporting) compared to the share in March 2022 (5.6%).[11]

## IV.    Relationship between Records Flagged and Mail Voting in 2022 Election

25. The first part of the analysis in this report showed that 15% of Texas registered voters could have a problem voting by mail on account of SB 1. The second part of the analysis showed that some 4% of mail voters had ballots rejected on account of SB 1 identification rules. Here, I will briefly put these two analyses in context of one another.

26. As I noted in my First Supplemental Report, a useful analogy to the problems identified here is that of a hospital that has poor record-keeping practices. Suppose the hospital had incorrect records for 15% of the population. In any one year, few people go to the hospital, so it isn't the case that 15% of the total public will be mistreated by the hospital on account of poor record-keeping. But when those in that 15% "at-risk" population

---

[10] Robert Garrett, "Rejection of Texans' Mail Ballots Decline Markedly from the Big Surge in March Primary", *Dallas Morning News*, Dec 23, 2022.
[11] https://earlyvoting.texas-election.com/Elections/getElectionDetails.do.

suddenly need to visit the hospital, they may be inconvenienced or harmed on account of the record-keeping. The analogy is helpful because it clarifies that while there is a large pool of citizens at risk of having a problem, most will not be confronted with that problem in any one election year.

27. Consider the 2.7 million records of registrants whose data demonstrate a possible barrier to meeting SB 1 requirements. I merge these with the records of individuals who requested a mail ballot in November 2022. Of all the 2.7 million registrants with record issues, 28,437 requested a mail ballot. It is not surprising that only a small percent of these 2.7 million voters requested a mail ballot, as only about 2% of all registered voters in Texas voted by mail in the November election.[12] Among those 28,437 registrants who tried to cast a mail ballot, 6,380—or 22.44%—never cast a successful mail ballot. These registrants include those rejected due to SB 1 and those rejected for reasons other than SB 1, as well as those who never returned their ballot or returned their ballot late. In comparison, among those registrants who are not in the "at risk" pool of the 2.7 million voters, only 16.17% of them who began the mail voting process never cast a successful mail ballot (a statistically significant six percentage-point difference, $p < .0001$). Again, this baseline of 16.17% includes those whose mail ballot applications or ballots are rejected for reasons unrelated to SB1 as well as individuals who do not end up returning a mail ballot at all or returning it late. The fact that the subpopulation of 2.7 million has a

---

[12] According to Texas, in November 2022, there were approximately 346,000 mail voters and 17,672,000 registrants, so 2% of all registrants cast a mail ballot.  This figure represents the percentage of all *registered voters* who cast mail ballots in November 2022, rather than the percentage of *voters who cast ballots* in the November 2022 election who did so by mail, as discussed in Paragraph 24.  For mail ballot estimates, see above. For registration counts, see: https://www.sos.texas.gov/elections/historical/70-92.shtml.

much higher rate of non-voting by mail *conditional on requesting a ballot* is likely to be related to SB 1 requirements.

**V.      Conclusion**

28. In this analysis, I have replicated my main analysis for the second time. The analysis shows (as it has shown twice before) that about 15% of registration records in Texas could have an issue with the SB 1 identification verification rule if the registrant was to apply to vote by mail. Second, I have shown that while only 2% of registrants voted by mail in the 2022 general election, more than 11,000 ballots were rejected on account of SB 1 identification issues. Most of the individuals who submitted those rejected ballots did not successfully vote, either by mail or in-person. Third, I have shown that "at-risk" registrants who tried to cast a ballot by mail in the 2022 general election were significantly less likely to successfully vote by mail than individuals who are not in the pool of the 2.7 million "at-risk" registrants.


I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct to the best of my knowledge.


DATED this 3rd Day of February, 2023.

_____

Eitan Hersh

## APPENDIX A: REPLICATION OF ANALYSIS USING DEC 2022/JAN 2023
## VERSIONS OF DATA

**A. Databases**

1. <u>DPS</u>. The updated DPS database I received is dated December 17, 2022. The database contains 37,377,423 records, an increase of almost a million records from the 36,417,304 records identified in the March 2022 data I analyzed in my prior supplemental report. As in the versions previously analyzed, the December 2022 version of the data has complete or nearly complete records in all fields of interest (e.g., name, date of birth, address, gender) except that 5% of records are not populated with Social Security numbers, which was also the case in the prior versions. Table 1 below updates Table 1 of my Initial Report with the new data.

2. The percent of DPS records with missing SSNs has declined from 5.02% in the Initial Report to 4.98% in the First Supplemental Report, to 4.85% here. The percent of records missing a *unique* SSN9 (i.e., the number of SSNs associated with more than one DPS ID Number) has increased from 21.6% to 27.5% here (the First Supplementary Report had this rate even higher, at 28.7%).

**TABLE 1: Rate of Missing Information in DPS**

| | |
|---|---:|
| Missing SSN | 4.85% |
| Missing unique SSN9 | 27.49 |
| Missing First Name | 0.00 |
| Missing Last Name | 0.00 |
| Missing Birthdate | 0.00 |
| Missing M/F Gender | 0.00 |
| Missing Street Number | 0.03 |
| Missing ZIP Code | 0.00 |
| **TOTAL IN DATABASE** | 37,377,423 |

3. <u>TEAM</u>. The updated version of TEAM records is dated January 3, 2023. The TEAM data was transmitted to me as a single data file. (In prior transmissions, the data had been stored by county in separate files). Registered voters can be listed on many lines within the file. For instance, Texas counts 28,868 registered voters in Anderson County as of January 2023.[13] In the January 2023 TEAM export I received, there are 57,459 rows of registrants in Anderson County. Different rows show different interactions that registrants have had with the election system. I processed the data so that each person, represented by their Voter Unique Identification Number (VUID), is listed one time. Specifically, I observed the dates labeled "ballot_last_updated" and retained the most recent date for each registrant. I also retained registrants who had no date listed in this field.

4. After the de-duplication process, the January 2023 TEAM file consists of **17,451,752** records. I sought to confirm that this number is close to the State's official reporting. According to the Secretary of State's website, as of January 2023, there were **17,450,474** registered Texas voters. Given the typical fluctuation in registration numbers, a difference of less than 0.01% suggests the data I have been given by the State is consistent with the State's publicly reported information.

**B. Data Quality Checks in the TEAM Voter Records**

5. I performed the same set of data quality checks as described in my prior reports. Tables 2 and 3 offer summary statistics on key fields of interest. In the updated data, 2.27% of records are missing SSN (compared 2.52% in March 2022 and 2.34% in January 2022).

---

[13] https://www.sos.state.tx.us/elections/historical/jan2023.shtml

In the January 2023 data, 2.62% are missing a DPS ID Number (compared to 2.85% in April 2022 and 3.16% in January 2022).

6.  The numbers are all similar to those in my previous reports, with one exception. In the January 2023 data as well as the January 2022 data, less than 1% of records are missing street number and ZIP code. In the March 2022 data, over 20% of the records were missing this information.

**TABLE 2: Rates of Missing Information in TEAM**

| | |
|---|---|
| Missing SSN | 2.27% |
| Missing Unique SSN9 | 5.86 |
| Missing First Name | 0.00 |
| Missing Last Name | 0.00 |
| Missing Birthdate | 0.01 |
| Missing M/F Gender | 3.65 |
| Missing Street Number | 0.07 |
| Missing ZIP Code | 0.03 |
| **TOTAL IN DATABASE** | 17,451,752 |

**TABLE 3: Summary of Field Completeness in TEAM**

| | | |
|---|---|---|
| **TOTAL Records in TEAM analysis** | **17,451,752** | |
| **Records with unique SSN9** | 16,428,895 | 94.14% |
| **Records with SSN4** | 17,056,442 | 97.73 |
| **Records with DPS ID Number** | 16,994,311 | 97.38 |
| **Records lacking SSN4 and DPS ID No.** | 93,208 | 0.53 |

**C.  Methodology**

7.  The methodology employed is the same as in my Initial Report. See Paragraphs 50-73 in that report for a detailed explanation. My goal is to look up each registered voter in the

DPS database and determine if the registered voter has one (or more) DPS ID Numbers listed, and to see if there are typos or other inconsistencies between the DPS ID Numbers and SSN4s listed on TEAM versus those listed on the DPS Database. I create three linkage fields to connect the TEAM and DPS databases together. The first field is the nine-digit Social Security number (SSN9). The second field is the combination of name (First and Last) and date of birth. I call this linkage field "ND" for Name + Date of Birth. The third field, a combination of Address (Street Number and ZIP code) + Date of Birth + Gender, I call "ADG". Table 4 (a replica of Table 6 from my Initial Report) illustrates the three linking fields with an example of a fictional registered voter named John Smith.

**TABLE 4: Summary of Fields Used in Linking TEAM Database to DPS Database**

| Field Name | Explanation | "John Smith" example |
|---|---|---|
| SSN9 | 9-digit Social Security number | "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" |
| ND | First name + Last name + Date of birth | "JOHNSMITH1976-07-04" |
| ADG | Address + Date of birth + Gender | "655782051976-07-04M" |

8. As in the prior reports, in addition to calculating statistics for the whole population of registered voters, I also look at several subpopulations, including registrants over 65, registrants who voted in 2020, registrants who have homebound/disabled veteran statuses, and registrants who are listed with specific codes in TEAM signaling that they have applied using Federal Post Card Application (FPCA) registration forms, which are voter registration forms used by members of the military, their families, and Americans who are residing overseas. I refer to these as FPCA voters. In the April report, I did a separate analysis of "voluntary surrender" designations in DPS records, but I concluded, based on disclosures from Texas, that these designations did not contain sufficient information to determine if the citizen holding a surrendered card would or would not be

able to use the ID card for the purposes of mail voting. Accordingly, I do not repeat the analysis of surrendered licenses here.

**D. Linkage Part I: TEAM Records with missing DPS ID Numbers**

9. I divide the analysis into two parts. First, I examine individuals whose TEAM records do not show any DPS ID Number. Second, I examine individuals whose TEAM records do show a DPS ID Number.

10. Out of 17,451,752 records in TEAM, 457,441 do not have a DPS ID Number listed in the voter registration records. If any of these individuals actually has a DPS ID Number, they are instructed by the mail ballot forms to include that DPS ID Number (and *only* that identification number). But SB 1 requires these forms—the application and the ballot carrier envelope—to be rejected because the DPS ID Number is not listed within registration records.

**TABLE 5: TEAM records by Presence/Absence of Unique SSN9 and DPS ID Number**

|  |  | Unique SSN9 | | |
| --- | --- | --- | --- | --- |
|  |  | Present | Absent | TOTAL |
| **DPS ID** | Present | 16,340,755 | 653,556 | 16,994,311 |
| **Number** | Absent | 88,140 | 369,301 | 457,441 |

11. I link the 457,441 individuals who do not have DPS ID Numbers recorded in TEAM to the DPS database using the SSN, ND, and ADG linkage fields.

12. I first link by SSN9. Of the 457,441 individuals without a DPS ID Number in TEAM, 88,140 have a unique SSN9 listed (as noted in Table 5). Of those, 71.42% match to the DPS database by their SSN9. A total of 64.81% of the records match to a single DPS ID Number, and 6.61% link to multiple DPS ID Numbers.

13. I next link these individuals based on ND. As noted in Table 5, most individuals who lack

DPS ID Numbers on TEAM also lack an SSN9. However, nearly all of the records have a

unique ND combination. Of the 457,441 lacking a DPS ID Number on TEAM, 449,224

(98.2%) have a unique ND. Of those who have a unique ND, 23.72% match to a single

DPS record and 4.22% match to multiple DPS records.

14. I next link these individuals based on ADG. Of 457,441 records lacking a DPS ID

Number on TEAM, 401,073 (87.68%) have a unique ADG. Of those with a unique ADG,

26.81% match to a single DPS record and 3.48% match to multiple DPS records.

**TABLE 6: Results of Linking TEAM to DPS Records for TEAM Records without a
DPS ID Number listed**

|      | No Match to DPS | Single Match to DPS | Multiple Match to DPS | Attempted to Match |
|------|-----------------|---------------------|-----------------------|--------------------|
| **SSN9** | 28.58%  | 64.81% | 6.61% | 88,140  |
| **ND**   | 72.06   | 23.72  | 4.22  | 449,224 |
| **ADG**  | 69.70   | 26.81  | 3.48  | 401,073 |
| **Any**  | 58.36   | 36.25  | 5.39  | 454,073 |

15. Table 6 summarizes the analysis of records that do not have a DPS ID Number listed on

the TEAM voter file. Each of the first three rows summarizes a linkage between TEAM

and DPS based on SSN9, ND, and ADG, respectively. For instance, the first row shows

that I attempted to match 88,140 records in TEAM based on SSN9. This reflects the

number of TEAM records without a DPS ID Number that include a unique SSN9. Of

those, 28.58% did not match to DPS. The others did match.

16. The bottom row of Table 6 provides the overall summary for the TEAM records lacking

a DPS ID Number. Of the 457,441 total records lacking a DPS ID Number, I attempted to

link 454,073 (99.26%) to the DPS database. (The other 0.74% did not have a unique or

complete value for SSN9, ND, or ADG). Of the individuals I attempted to find on DPS, 42% matched to a DPS record. That amounts to 189,095 registered voters. These individuals possess a DPS ID Number and therefore are instructed by Texas's mail ballot forms to list their DPS ID Number (and only their DPS ID Number) on their mail ballot forms. However, if they follow those instructions and list only that DPS ID Number, SB 1 requires their ballot applications, and their ballots, to be rejected because the number is not listed on TEAM.

17. <u>Subpopulations:</u> Of the 189,095 individuals who match to DPS and have a DPS ID Number even though no such number is listed on TEAM,

- 74,982 are over age 65

- 52,157 voted in the 2020 election

- 28,152 are over 65 AND voted in the 2020 election

- 1,475 have FPCA statuses

- 391 individuals matched to DPS records indicating homebound status or disabled veteran status.

These numbers show that many active voters who are eligible to vote by mail under Texas law are listed in TEAM without DPS ID Numbers but do in fact possess DPS ID Numbers.

18. <u>Typos in Social Security Number.</u> Among registrants who lack a DPS ID Number recorded on TEAM but who match to a record in DPS based on ND or ADG, I compare the SSN4 as recorded on the two databases. I find that 3,431 individuals who appear on both databases have discrepancies in their SSN4s. If the DPS records of SSN are correct, then these 3,431 cases result from inaccuracies on TEAM. They would cause election

20

officials to reject mail ballot forms from citizens who include their correct SSN4 on the forms. A voter may include an SSN4 on ballot materials as a precautionary measure based on supplemental instructions from election administrators.[14]

### E.  Linkage Part II: TEAM Records Listed with DPS ID Numbers

19. I now turn to the analysis of the 16,994,311 records in which a DPS ID Number is listed in the TEAM databases. As noted above in Table 5, 96.2% of these records have a unique SSN9 associated with them. I first link these records to DPS by matching on SSN9. Of 16,340,755 records with a unique SSN9 on TEAM, 99.71% match to a record in DPS. However, 16.34% of the records match to more than one DPS ID Number.

20. Next, I link records based on the ND combination, as described in Paragraph 11 above. The ND combination is unique for 16,869,025 individuals who have a DPS ID Number listed on TEAM. Of these, 97.66% match to a record in DPS. However, 15.89% match to more than one DPS ID Number.

21. Next, I link records based on the ADG combination. The ADG combination is unique for 16,316,427 individuals who have a DPS ID Number listed on TEAM. Of these, 85.19% match to a record in DPS. However, 11.01% match to more than one DPS ID Number.

**TABLE 7: Results of Linking TEAM to DPS Records for TEAM Records with a DPS ID Number listed**

|  | No Match to DPS | Single Match to DPS | Multiple Match to DPS | Attempted to Match |
|---|---|---|---|---|
| **SSN9** | 0.29% | 83.36% | 16.34% | 16,340,755 |
| **ND** | 2.34 | 81.76 | 15.89 | 16,869,025 |
| **ADG** | 14.81 | 74.19 | 11.01 | 16,316,427 |

---

[14] See discussion of the State's instructions in my Initial Report, Footnote 4, and in First Supplemental Report, Paragraphs 50-55.

| Any | 0.82 | 85.07 | 14.10 | 16,980,669 |

22. Table 7 summarizes the analysis of records with a DPS ID Number on the voter file. Consider the bottom row. Of the 16,994,311 records in TEAM listed with a DPS ID Number, I attempted to link 16,980,669 (99.92%) of them to the DPS database. The remaining 0.08% did not have a unique or complete record on SSN, ND, and ADG. Of these 16,980,669 records, 99.18% matched to a record in DPS. However, many of them are listed more than once on DPS, with multiple ID numbers. These 14.10% of records sum up to 2,394,435 records. That is, for 2.4 million Texas registered voters who have a DPS ID Number listed, they may put a correct DPS ID Number on their mail ballot application form but nevertheless have their application (or their ballot envelope) rejected because the DPS ID Number they write down, while correct, happens not to be the DPS ID Number recorded on the TEAM file.

23. The 2.4 million figure may be an underestimate. Many DPS ID holders are listed not just with one DPS ID Number but they have alternative ID numbers stored as "AKA DL/ID Numbers." Of the TEAM records that linked to a *single* DPS ID Number, 1,407,010 of them linked to a record that listed alternative ID numbers in the "AKA DL/ID Number" field. During her April 20, 2022 deposition, Sheri Gibson, chief of the Texas DPS driver's license division, explained that these AKA DL/ID numbers are identification numbers associated with the ID holder that are either erroneous or originate from a prior version of the State's license system. If registrants use these alternative identification numbers when submitting a mail ballot application or mail ballot, they will also have their forms rejected because the AKA DL/ID Numbers are not the identification numbers on the voter registration records that are associated with these

registrants. Because some AKA ID Numbers are considered by DPS to be erroneous or otherwise invalid (i.e., not just "expired," which does not impact validity for SB 1 purposes), in order to perform a conservative analysis, I focus here on registered voters who have multiple DPS ID Numbers exclusive of the AKA DL/ID Numbers.

24. <u>Subpopulations:</u> Of the 2,394,435 individuals who match to multiple DPS ID Numbers,

- 174,880 are over age 65

- 1,073,661 voted in the 2020 election

- 91,469 are over 65 AND voted in the 2020 election

- 1,325 have FPCA status

- 5,279 individuals matched to DPS records indicating homebound status or disabled veteran status.

These numbers show that many active voters who are eligible to vote by mail under Texas law are listed in TEAM with a DPS ID Number but possess multiple DPS ID Numbers. If they list a DPS ID Number other than the one that happens to be recorded in TEAM, SB 1 requires their mail ballot forms to be rejected.

25. <u>Typos in Social Security Number</u>. Looking just at the last 4 digits of Social Security numbers, I calculate the number of individuals in TEAM who match to records in DPS based on ND and ADG, but whose TEAM records show a different SSN4 than is shown on DPS. There are 40,922 individuals who appear on DPS with different SSN4s than shown on TEAM. If the DPS database is correct and these individuals mark down their correct SSN4 on a mail ballot application, then their application will be rejected because of incorrectly recorded data in TEAM.

    a.  <u>Subpopulations:</u> Of the 40,922 individuals whose SSN4s listed on TEAM do not match the SSN4s listed in the DPS database

- 14,945 are over age 65

- 25,795 voted in the 2020 election

- 10,294 are over 65 AND voted in the 2020 election

- 100 have FPCA status

- 110 individuals matched to DPS records indicating homebound status or disabled veteran status.

These numbers show that many active voters who are eligible to vote by mail under Texas law are listed in TEAM with an SSN4 that is inconsistent with the SSN4 listed in the DPS database.

26. <u>Typos in DPS ID Numbers.</u> Just as there are discrepancies between the SSNs listed in TEAM and the corresponding SSNs listed in DPS, there are also discrepancies in DPS ID Numbers. Using the methodology for calculating these discrepancies that was explained in my Initial Report, I calculate that 62,461 individuals have a DPS ID Number in TEAM that does not match any DPS ID Number in the DPS database.

    a.  <u>Subpopulations:</u> Of the 62,461 individuals on TEAM who match to DPS on SSN9, ND, and ADG, but have DPS ID Numbers that do not correspond to the DPS database,

- 14,602 are over age 65

- 27,441 voted in the 2020 election

- 9,006 are over 65 AND voted in the 2020 election

- 75 have FPCA status

- 359 individuals matched to DPS records indicating homebound status or disabled veteran status.

**F. Summary of Results from Updated Analysis**

27. To comply with the identification verification requirements in SB 1, registered voters who have a DPS ID are instructed to record their ID number on a mail ballot application and again when submitting a mail ballot. If they do not have an ID number, they must record their SSN4. The analysis from the updated TEAM and DPS files show the following:

    a. **189,095** registered voters are not listed in TEAM with a DPS ID, but they do have a DPS ID. Official forms instruct these individuals to list only their DPS ID, but if they do so, their ballot or ballot application will be rejected.

        i. Of these, **74,982** are over 65 years old, **28,152** of whom voted in the most recent presidential election.

        ii. Of these, **1,475** have FPCA status or are listed as disabled veterans or as homebound citizens.

    b. **2,394,435** individuals who are listed on TEAM with an associated DPS ID have more than one DPS ID Number. If they happen to write down a DPS ID number that is correct but is not the DPS ID number recorded in TEAM, their ballot or ballot application will be rejected.

        i. Of these, **174,880** are over 65 years old, **91,469** of whom voted in the most recent presidential election.

        ii. Of these, **5,279** have FPCA status or are listed as disabled veterans or as homebound citizens.

    c.   **44,353** individuals have SSN4s listed in their TEAM records that do not match the SSN4s listed in the DPS database.

    d.   At least **62,461** individuals who are listed on TEAM registration records with a DPS ID Number do not show the same DPS ID Number listed in the DPS database.

28. Altogether, **2.7 million** registered voters in Texas (out of 17.5 million) are at an increased risk of having a mail ballot or mail ballot application rejected due to identification number requirements in SB 1. These numbers do not include individuals who have misplaced or surrendered their IDs or who mis-enter information on a mail ballot form. These 2.7 million individuals can correctly fill out their forms, but their applications and ballots would be rejected nonetheless.

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,               §
   *Plaintiffs,*                    §
                                                   §
*v.*                                               §   Case No. 5:21-cv-844-XR
                                                   §
GREGORY W. ABBOTT, et al.,                         §
   *Defendants.*                     §
                                                   §

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX T

Hilda Salinas                                           April 20, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3

 4   LA UNION DEL PUEBLO ENTERO,    )(
     et al.                         )(
 5            Plaintiffs            )(
                                    )(
 6   VS.                            )(    CASE NO.
                                    )(    5:21-cv-844-XR
 7                                  )(    (LEAD CASE)
     GREGORY W. ABBOTT, et al.      )(
 8            Defendants            )(
     _____
 9
      OCA-GREATER HOUSTON, et al.   )(
10            Plaintiffs            )(
                                    )(    CASE NO.
11   VS.                            )(    1:21-cv-780-XR
                                    )(
12   JANE NELSON, et al.            )(
              Defendants            )(
13   _____

14   HOUSTON AREA URBAN LEAGUE,     )(
     et al.                         )(
15            Plaintiffs            )(
                                    )(    CASE NO.
16   VS.                            )(    5:21-cv-848-XR
                                    )(
17   GREGORY WAYNE ABBOTT, et al.   )(
              Defendants            )(
18   _____

19   LULAC TEXAS, et al.            )(
              Plaintiffs            )(
20                                  )(
                                    )(    CASE NO.
21   VS.                            )(    1:21-cv-0786-XR
                                    )(
22   JANE NELSON, et al.            )(
              Defendants            )(
23   _____

24

25
```



Hilda Salinas

April 20, 2023
Pages 2 to 5

---

### Page 2

```
1
2    MIFAMILIA VOTA, et al.      )(
          Plaintiffs           )(
3                              )(  CASE NO.
     VS.                       )(  5:21-cv-0920-XR
4                              )(
     GREG ABBOTT, et al.       )(
5         Defendants           )(
6    _____
     UNITED STATES OF AMERICA  )(
7         Plaintiff            )(
                               )(  CASE NO.
8    VS.                       )(  5:21-cv-1085-XR
                               )(
9    THE STATE OF TEXAS, et al.)(
          Defendants           )(
10   _____
11
            ORAL AND VIDEOTAPED DEPOSITION OF
12               HILDA ANN SALINAS
                  APRIL 20, 2023
13   _____
14
15
16
17        ORAL AND VIDEOTAPED DEPOSITION OF HILDA ANN
18   SALINAS, OFFICE OF THE HIDALGO COUNTY ELECTION
19   ADMINISTRATOR, produced as a witness at the instance of
20   the State Defendants, taken in the above-styled and
21   numbered cause on APRIL 20, 2023, between the hours of
22   9:32 a.m. to 12:08 p.m. at the Office of Texas Attorney
23   General, Child Support Division, Pharr Regional Office,
24   3508 North Jackson Road, Suite 100, Pharr, Texas, and
25   1:32 p.m. to 4:55 p.m. at Bryant & Stingley, Inc., 1305
```

### Page 3

```
1    East Nolana, Suite D, McAllen, Texas, reported
2    stenographically by DONNA McCOWN, Certified Court
3    Reporter No. 6625, in and for the State of Texas,
4    pursuant to the Federal Rules of Civil Procedure and
5    any provisions stated on the record or attached
6    therein.
7              APPEARANCES
          COUNSEL FOR STATE DEFENDANTS:
8
          AMY S. HILTON
9         OFFICE OF THE TEXAS ATTORNEY GENERAL
          P.O. Box 12548
10        Austin, Texas, 78711-2548
11   COUNSEL FOR HIDALGO COUNTY ELECTIONS ADMINISTRATOR:
12        JOSEPHINE RAMIREZ SOLIS
          LEIGH ANN TOGNETTI
13        HIDALGO COUNTY DISTRICT ATTORNEY'S OFFICE
          100 East Cano Street
14        Edinburg, Texas  78539
15   COUNSEL FOR TRAVIS COUNTY DEFENDANTS:
16        TONY NELSON, via Zoom
          TRAVIS COUNTY ATTORNEY'S OFFICE
17        P.O. Box 1748
          Austin, Texas  78767
18
     COUNSEL FOR BEXAR COUNTY ELECTIONS ADMINISTRATOR:
19
          LISA CUBRIEL, via Zoom
20        BEXAR COUNTY DISTRICT ATTORNEY'S OFFICE
          101 West Nueva, 7th Floor
21        San Antonio, Texas  78205
22   COUNSEL FOR EL PASO COUNTY ELECTIONS ADMINISTRATOR:
23        GERMAINE HABELL, via Zoom
          COOLEY LLP
24        Wells Fargo Center, South Tower
          355 South Grand Avenue, Suite 900
25        Los Angeles, California  90071-1560
```

### Page 4

```
1    COUNSEL FOR INTERVENOR DEFENDANTS:
2         STEPHEN KENNY, via Zoom
          JONES DAY
3         51 Louisiana Avenue, NW
          Washington, DC  20001
4
     COUNSEL FOR PLAINTIFFS HOUSTON AREA URBAN LEAGUE,
5    et al.:
6         VICTOR GENECIN, via Zoom
          NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
7         40 Rector Street, 5th Floor
          New York, New York 10006
8
     COUNSEL FOR PLAINTIFF UNITED STATES OF AMERICA:
9
          MICHAEL STEWART, via Zoom
10        U.S. DEPARTMENT OF JUSTICE
          950 Pennsylvania Avenue NW, 4CON 8th Floor
11        Washington, DC  20530
12   COUNSEL FOR PLAINTIFFS LA UNION DEL PUEBLO ENTERO,
     et al.:
13
          NINA PERALES
14        JULIA LONGORIA, via Zoom
          MALDEF
15        110 Broadway, Suite 300
          San Antonio, Texas  78205
16
     ALSO PRESENT:
17        Mark Longoria, Videographer
          Abigail Young, via Zoom
18
19
20
21
22
23
24
25
```

### Page 5

```
1                    INDEX
2                                           PAGE
     Appearances ...........................   2
3
     HILDA ANN SALINAS
4    Examination by Ms. Hilton .............   6
     Examination by Ms. Perales ............  65
5    Examination by Mr. Stewart ............ 137
     Examination by Mr. Genecin ............ 162
6    Examination by Ms. Hilton ............. 191
     Examination by Mr. Stewart ............ 198
7
     Errata Sheet/Signature Page ........... 201
8
     Reporter's Certificate ................ 203
9
     Attached to the end of the transcript:  Stipulations
10
11                  EXHIBITS
     NUMBER  DESCRIPTION                      PAGE
12
13     1     Notice of Deposition ...........  10
14     2     Responses and Objections to State
             Defendants' Requests for Admission and
15           Interrogatories ................  56
16     3     Responses and Objections to LULAC's
             Interrogatories ................  94
17     4     Hidalgo County Absentee Rejection Letter
             List ........................... 102
18
19     5     Elections Operations Department Election
             Workers Training ............... 116
20     6     Affidavit, Patricia Correa ..... 134
21     7     Hidalgo County Ballot by Mail List ...... 142
22         REQUESTED DOCUMENTS/INFORMATION
     NUMBER  DESCRIPTION                      PAGE
23
24     1     What JAR stands for ............ 190
       2     Other files used to prepare the machines
25           for election ................... 190
```



Hilda Salinas

April 20, 2023
Pages 30 to 33

Page 30

1    A. I don't know anybody personally, but I do know
2  that it did happen.
3    Q. In the November 2022?
4    A. Yes.
5    Q. Okay. Are you aware of any individual who
6  refused to transport seven or more people to a polling
7  location because of the requirement to fill out the
8  form stipulated by the election code?
9    A. No.
10    Q. And so you're not aware of any voter who was
11  unable to find transportation to the polls because of
12  the requirement that a person who transports seven or
13  more people to a polling place fill out the form
14  stipulated in the election code?
15    A. No, ma'am.
16    Q. Okay. So -- sorry. So that would be correct,
17  you're not aware?
18    A. No, I'm not aware.
19    Q. Thank you. It gets a little bit -- gets a
20  little bit mixed up there.
21       Did Hidalgo County receive any complaints
22  from any voters during November 2022 election related
23  to a disability?
24    A. Related to a disability, no.
25    Q. And I believe you testified to this earlier,

Page 31

1  but Hidalgo County works to ensure that its voting
2  program is accessible to voters with disabilities,
3  correct?
4    A. Correct.
5    Q. And you're aware that voters with disabilities
6  have the option of requesting an accommodation or a
7  change to the normal voting procedures; is that right?
8    A. Yes.
9    Q. Were any accommodations requested in the
10  November 2022 election?
11    A. None were.
12    Q. I'm sorry. Say that again.
13    A. None were requested.
14    Q. None were. Okay. Thank you.
15    A. Huh-uh.
16    Q. To your knowledge, did your office receive any
17  requests for accommodation regarding any of the
18  provisions in SB 1?
19    A. No.
20    Q. To your knowledge, did your office receive any
21  requests for accommodation regarding the requirement
22  that mail-in voters put their Social Security or ID
23  number on their application for ballot by mail?
24    A. Can you repeat that?
25    Q. Yes. Did your office receive any requests for

Page 32

1  accommodation regarding the requirement that mail-in
2  voters put their Social Security or ID number on their
3  application for ballot by mail?
4    A. No.
5    Q. Did your office receive any requests for
6  accommodation regarding the requirement that mail-in
7  voters put their Social Security or ID number on their
8  ballot by mail?
9    A. No.
10    Q. And so it would be correct to say that Hidalgo
11  County did not receive a request from a voter with a
12  disability to amend any of the procedures related to
13  mail-in voter requirements?
14    A. No. To my knowledge, no.
15    Q. Okay. Sorry. So it would be correct to say
16  that there were no requests to amend the procedures?
17    A. No requests to amend.
18    Q. Okay. Are you aware of any voters with
19  disabilities whose application to vote by mail in the
20  November 2022 election were rejected?
21    A. If somebody with a disability --
22    Q. Uh-huh.
23    A. -- had their application for ballot by mail
24  rejected? I'm not aware of any.
25    Q. Okay. And are you aware of any voters with

Page 33

1  disabilities whose mail-in ballots were rejected?
2    A. I -- I don't know. I would have to see the
3  information.
4    Q. Okay. Okay. Let's talk a little bit more
5  about mail-in voting. Would you consider Hidalgo
6  County's mail-in early voting program a success for
7  November 2022?
8    A. Mail-in early voting program a success? In
9  what terms do you mean?
10    Q. Well, we can just go through some more specific
11  questions. But would you consider the mail-in ballots
12  for the November 2022 election, would you consider the
13  way that Hidalgo County administered that successful?
14    A. Well, it's through the ballot board. But I
15  would say that it's successful.
16    Q. And I just want to pick up. You made a
17  distinction there between Hidalgo County and the ballot
18  board. Could you just describe for the record the
19  relationship between the election administrator of
20  Hidalgo County and the early voting ballot board and
21  their different responsibilities.
22    A. Okay. Well, the early voting ballot board is
23  brought in, you know, only to handle and process the
24  ballots that do come in, you know, to the Hidalgo
25  County Elections Department.



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,            §
     *Plaintiffs,*                                    §
                                               §
*v.*                                           §            Case No. 5:21-cv-844-XR
                                               §
GREGORY W. ABBOTT, et al.,                     §
     *Defendants.*                                   §

---

### STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX U

Transcript of the Testimony of

# Yvonne Ramon

## Date:

April 21, 2022

## Case:

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Yvonne Ramon

Page 78

1 you see that?

2    A. Yes.

3    Q. We also have a signature from the Secretary of

4 State. Do you see that?

5    A. Yes.

6    Q. Do you have any reason to dispute that this is

7 a true and accurate copy of Senate Bill 1 that was

8 passed and signed into law?

9    A. I do not.

10    Q. Okay. Let me ask you this. Are you familiar

11 with how signed legislation reads with regard to what

12 the various markings mean?

13    A. I have a good understanding, I believe.

14    Q. Okay. Well, let me ask you this. So if I flip

15 over to Page 2 of the document, do you see that some

16 portions of Senate Bill 1 are underlined?

17    A. Yes.

18    Q. What's your understanding of what the

19 underlining means?

20    A. That has been added to the exiting law.

21    Q. Okay. And if I flip over to, for instance,

22 Page 4, do you see that at Line 19, there are areas that

23 are struck through?

24    A. Yes.

25    Q. What is your understanding of what the strike

Page 79

1 through of a word means?

2    A. That has been removed from existing law.

3    Q. Okay. What is your understanding of the

4 language that has no marking?

5    A. That it was existing and will stay.

6    Q. Okay. Do you see at -- on Page 1 at Line 9,

7 and I'll just -- for purposes of reference, do you see

8 the left-hand column on Senate Bill 1?

9    A. Yes.

10    Q. And do you see that it goes from one through --

11 up to 27 lines, but this one has 24?

12    A. Yes.

13    Q. I'll be referencing those lines when I'm trying

14 to direct you to areas of the bill. Do you understand

15 that?

16    A. Yes.

17    Q. Do you see where it says Line 9?

18    A. Yes.

19    Q. And next to that, Section 1.02?

20    A. Yes.

21    Q. Can I get you to read Section 1.02 for me?

22    A. Yes. Purpose, the purpose of this act is to

23 exercise the legislature's constitutional authority

24 under Section 4, Article VI, Texas Constitution, to make

25 all laws necessary to detect and punish fraud.

Page 80

1    Q. Okay. You don't dispute that that was the

2 purpose as laid out in the bill, right?

3    A. That's correct.

4    Q. Okay. And if we go down to Section 1.03 at

5 (4), Line 22, it reads, The reforms to the election laws

6 of this state made by this act are not intended to

7 impair the right of free suffrage guaranteed to the

8 people of Texas by the United States and Texas

9 Constitutions, but are enacted solely to prevent fraud

10 in the electoral process and ensure that all legally

11 cast ballots are counted. Integral to the right to vote

12 is the assurance of voter access and the right for all

13 votes legally cast to be counted. Did I read that

14 correctly?

15    A. Yes.

16    Q. All right. And you would agree with that

17 statement, right?

18    A. Yes.

19        MS. RAMIREZ: Object to form.

20    Q. (BY MR. HUDSON) Okay. And you agree that the

21 Texas legislator has authority to prescribe laws

22 governing elections in Texas, right?

23    A. Yes.

24    Q. And you would agree that the legislator's

25 authority to prescribe laws to prevent election fraud in

Page 81

1 Texas, right?

2        MS. RAMIREZ: Object to form.

3    A. Yes.

4    Q. (BY MR. HUDSON) And you would agree that the

5 legislator has the authority to pass election laws to

6 guarantee uniformity in Texas elections, right?

7    A. Yes.

8    Q. Okay. You would also agree that the

9 legislature has the authority to pass laws that, for

10 instance, protect disabled voters' right to vote?

11    A. Yes.

12    Q. Okay. Well, let's look at one provision that

13 discusses that. If you go over to Page 4 at Line 22.

14    A. Yes.

15    Q. Do you see where it says, Reasonable

16 Accommodation or Modification?

17    A. Yes.

18    Q. Now, we discuss previously that provisions that

19 are underlined are provisions that are added; is that

20 right?

21    A. Yes.

22    Q. What is your understanding of what

23 Section 1.022 ad -- adds to Texas Election Law?

24    A. That when a section of the law requires a

25 certain act of some sort, that a person who is disabled

Yvonne Ramon

Page 82

1 is able to ask for an accommodation to -- to make voting
2 easier.
3    Q. Okay. So that is now codified in Texas law,
4 right?
5    A. Yes.
6    Q. Let me ask you, do you deal with accommodations
7 for people with disabilities --
8    A. Yes.
9    Q. -- as you've run elections in Hidalgo County?
10    A. Yes.
11    Q. Tell me how that process works.
12    A. We have employees that specifically work at
13 procuring our polling locations, for example, and their
14 job entails going to a poll location before it's
15 selected and working with the ADA compliance laws to
16 make sure that it's accessible. And if -- these are
17 buildings that are public buildings and do not belong to
18 the county, some of them, so if there are needs to
19 create temporary measures to assist voters who may, in
20 fact, have handicap or are disabled in some way, that we
21 would be able to help them, if they do decide to walk
22 into a poll location, which they have a right to.
23    Q. Would it be fair to say that as the election
24 administrator for Hidalgo County, one of your jobs is to
25 make sure that voting complies with federal disability

Page 83

1 law?
2    A. Yes.
3         MS. RAMIREZ: Object to form.
4    Q. (BY MR. HUDSON) And you're also required to
5 make sure that elections that you oversee comply with
6 state disability law?
7    A. Yes.
8         MS. RAMIREZ: Object to form.
9    Q. (BY MR. HUDSON) To the extent that -- well,
10 let me ask you this. Are you familiar with anyone ever
11 having requested what's referred to as a reasonable
12 accommodation?
13         MS. RAMIREZ: Object to form.
14    A. I am not aware that someone has requested a
15 reasonable accomodation.
16    Q. (BY MR. HUDSON) Okay. Do you know what the
17 term reasonable accommodation means in the context of
18 disability rights?
19    A. I wouldn't be able to define it.
20    Q. Okay. Let me ask you this. Let's suppose
21 someone with a disability came to your office and said
22 that one of your processes for voting was impossible for
23 them on account of a disability. Would you modify that
24 process for them so that they could vote?
25         MS. RAMIREZ: Object to form.

Page 84

1    A. If it -- if it was under the umbrella of the
2 code of elections, we would work with the -- with the
3 voter, with the disability, to see how we could work
4 together.
5    Q. (BY MR. HUDSON) Okay. Do you understand that
6 you're required, as election administrator, to make sure
7 that people with disabilities, to the extent that they
8 need accommodations, receive them, right?
9    A. Yes.
10    Q. Okay. And when I refer to accommodations, do
11 you know what I'm talking about?
12    A. The -- a change in the procedure so that a
13 person is able to do what he or she needs to do in
14 voting.
15    Q. Okay. Now, Section 1.022 reads, The Reasonable
16 Accommodation Or Modification, a provision of this code,
17 referring to the Texas Election Code, may not be
18 interpreted to prohibit or limit the right of a
19 qualified individual with a disability from requesting a
20 reasonable accommodation or modification to any election
21 standard, practice, or procedure mandated by law or rule
22 that the individual is entitled to request under federal
23 or state law. Did I read that correctly?
24    A. Yes.
25    Q. Okay. So you understand that not only has

Page 85

1 Senate Bill 1 added 1.022 as a complication, it also
2 refers to making sure that any person who needs an
3 accommodation is able to get that to any provision of
4 the Texas Election Code?
5         MS. RAMIREZ: Object to form.
6    A. So what is your question? That I understand
7 that this states that?
8    Q. (BY MR. HUDSON) Yes.
9    A. I see that, yes.
10    Q. Okay. You don't disagree with that, do you?
11    A. No.
12    Q. Okay. Have you ever denied an accommodation to
13 a person with a disability who has sought one from -- or
14 during a voting in Hidalgo County?
15    A. There was an instance where a blind person
16 asked for a braille ballot, paper ballot, and we do not
17 have braille paper ballots.
18    Q. Did the Secretary of State's office tell you
19 not to create braille ballots?
20    A. The Secretary of State's office, because I did
21 call, this was a while back, said the law does not
22 mandate that you provide one, so you don't have to
23 provide one.
24    Q. Okay.
25    A. I wouldn't even begin to know how to provide

Yvonne Ramon

April 21, 2022
Pages 86 to 89

Page 86

1 one, but --
2      Q.  Who did you talk to from the Secretary of
3 State's office who told you that?
4      A.  I don't remember.  It's been many years that
5 that request came to my office.  I probably had been the
6 elections administrator for just a few years.
7      Q.  Okay.
8      A.  It's been that long.
9      Q.  Let me ask you this.  If a blind voter came to
10 your office now and asked for a braille ballot, what
11 would you do?
12      A.  We would --
13          MS. RAMIREZ:  Object to form.
14      A.  -- not be able to provide one because Hidalgo
15 County does not have braille paper ballots.
16      Q.  (BY MR. HUDSON)  Well, would you do anything to
17 help that blind voter who asked for a braille ballot
18 vote?
19      A.  We would provide accommodation.  There are
20 always accommodations that are available to a person.
21      Q.  The voter that you're referring to from several
22 years back, did you ultimately help that blind voter to
23 vote?
24      A.  Yes.
25      Q.  Okay.  So they were able to vote in Hidalgo

Page 87

1 County?
2      A.  Yes.
3      Q.  Are you aware of anybody in Hidalgo County
4 who's been unable to vote on account of a disability?
5      A.  I'm not aware.
6      Q.  Okay.  Does that include the March 22
7 primaries?
8      A.  Yes.
9      Q.  Do you see it as part of your role as elections
10 administrator to promote public confidence in voting?
11      A.  Yes.
12      Q.  How do you do that?
13      A.  Number one, through communication.  We make
14 ourselves available.  We answer all calls.  We do our
15 best to help the voter understand and answer any
16 question that he or she may have to the best of our
17 ability.  We are public, people know who we are.
18          As I said, we are big on press releases, on
19 talking with the media, on being at Commissioners Court
20 and giving updates so that people know who we are and
21 that we're there to help them in any way that we are
22 able to.
23      Q.  So it's important to you that Hidalgo voters
24 have confidence in the -- in the voting process?
25      A.  Yes.

Page 88

1      Q.  You would agree that the legislature has just
2 as much an interest as you in ensuring public confidence
3 in voting?
4          MS. RAMIREZ:  Object to form.
5      A.  I -- I would hope that they would, yes.
6      Q.  (BY MR. HUDSON)  Okay.  Take a look at
7 Defendant's 2 for me, again, on Page 1.  At Line 16, it
8 reads, (2) Fraud in elections threatens the stability of
9 a constitutional democracy by undermining public
10 confidence in the legitimacy of public officers chosen
11 by election.  Did I read that correctly?
12      A.  Yes.
13      Q.  It goes on to read, (3), Reforms are needed to
14 the election laws of this state to ensure that fraud
15 does not undermine the public confidence in the
16 electoral process.  Did I read that correctly?
17      A.  Yes.
18      Q.  Okay.  Now, you mentioned some of the reasons
19 that you understood the legislature to have passed
20 Senate Bill 1 included fraud, concerns, as well as
21 concerns and uniformity, right?
22      A.  Yes.
23      Q.  Would you agree with me that public confidence
24 in elections is also another reason?
25          MS. RAMIREZ:  Object to form.

Page 89

1      A.  Yes.
2      Q.  (BY MR. HUDSON)  Okay.  Now, for the 1 --
3 Section 1.04, which is over on Page 2.  At Line 11,
4 again, this is from State Defendant's 2, Section 1.04,
5 Chapter 1, Election Code, is amended by adding Section
6 1.0015 to reads as follows.  Section 1.0015, Legislative
7 Intent.  It is the intent of the legislature that the
8 application of this code and the conduct of elections be
9 uniform and consistent throughout this state to reduce
10 the likelihood of fraud in the conduct of elections,
11 protect the secrecy of the ballot, promote voter access,
12 and ensure all legally cast ballots are counted.  Did I
13 read that correctly?
14      A.  Yes.
15      Q.  Okay.  Would you agree with me that based on
16 that paragraph, secrecy of the ballot, promoting voter
17 access, and ensuring legally casts ballots are counted,
18 are also reasons that the legislature provided in the
19 body of Senate Bill 1 for having passed the bill?
20      A.  That was their intent.
21      Q.  You don't disagree with that, do you?
22      A.  No.
23      Q.  Okay.  Do you think any provisions in Senate
24 Bill 1 made it easier for people to vote?
25      A.  I already mentioned the cure period, which is

Yvonne Ramon

April 21, 2022
Pages 150 to 153

Page 150

1  has changed, so -- but prior to Senate Bill 1.
2           As soon as the second week of early vote,
3  so we bring them in because there are various processes
4  that I can speak to if you want me to after this.  So
5  they start to meet early enough, and -- and then they
6  make the determination.  It's the early voting ballot
7  board, not my office, that makes the determination to
8  accept or reject a carrier envelope with the ballot that
9  is inside.
10     Q.  Have you ever served as a member of a early
11  voting ballot board?
12     A.  I have not.
13     Q.  Have you ever witnessed an early voting ballot
14  board processing mail-in ballots?
15     A.  When I started, I did, and as per the Election
16  Code, I am not involved.  It is the early voting ballot
17  board, the members who are part of the ballot board that
18  make these determinations, not mine.  So I have a person
19  who is in charge of and over -- and helping in
20  overseeing because the law does allow a tabulator, is in
21  a sense it's called because we have to help them.
22  But -- but basically, that's the extent of our
23  involvement.
24     Q.  Does the Hidalgo County Elections
25  Administrator's office assist in any way with cure

Page 151

1  process for --
2     A.  Yes.
3     Q.  -- carrier envelopes?
4     A.  Yes, we do.  When the ballot board has advised
5  us that there is a ballot to be cured, then we do create
6  a list and that voter comes to our office, and we then
7  set the process for curing and assisting the voter to
8  cure the ballot, and then that ballot carrier/envelope
9  is returned to ballot board.
10     Q.  So you do have a process in place to cure
11  defective mail ballots?
12     A.  Yes.
13     Q.  All right.  Have you used that process prior to
14  Senate Bill 1?
15     A.  No.  There was no curing of the -- of the
16  carrier envelope.  Once it's with ballot board, that --
17  those laws were completely different from now.
18     Q.  And so since Senate Bill 1, you don't have this
19  cure process?
20     Q.  Yes.
21     Q.  Have you used the cure process since the
22  passage of Senate Bill 1?
23     A.  Yes.
24     Q.  Was it effective in your opinion?
25     A.  I believe for being the first time it was, yes.

Page 152

1     Q.  Okay.  Do you have any idea of the number of
2  mail ballots that were cured through the process that
3  you put in place under Senate Bill 1?
4     A.  I do.
5     Q.  What's the number?
6     A.  95.
7     Q.  Okay.  So it's 95 voters that prior to Senate
8  Bill 1 would have their ballots rejected?
9     A.  Yes.
10     Q.  Okay.  To your understanding, what is the
11  method for matching identification numbers on a carrier
12  envelope at a ballot -- a mail ballot?
13     A.  So the process has changed from when senate
14  bill was enacted on December the 2nd to now.
15     Q.  Well -- well, let's start with the before time
16  if we can.  So can you walk the Court through the
17  process for examining a mail ballot by the early voting
18  ballot board prior to the passage of Senate Bill 1?
19     A.  So the -- the process is quite extensive
20  because the law requires that once the application has
21  been reviewed and deemed to be a qualified voter to vote
22  by mail, there is -- and I don't want to call it a kit,
23  but there -- there are envelopes that are created,
24  pocket envelopes that now hold that application in place
25  while the carrier envelope, which has various pieces, is

Page 153

1  sent to the voter.
2           Then when that carrier envelope is
3  returned, then it's matched up with the application,
4  because prior to Senate Bill 1, what needed to be
5  matched were the signatures, the signatures on the
6  application and the signature on the back of the carrier
7  envelope.
8     Q.  Now, let's talk about that for a moment.  So
9  prior to Senate Bill 1, the only way to marry up an
10  application and a ballot was by looking at the
11  signature, right?
12     A.  Yes.
13     Q.  Okay.  Do you know if Hidalgo County had ever
14  been sued over the signature match requirements prior to
15  passage of Senate Bill 1?
16     A.  Not to my knowledge.
17     Q.  Okay.  Let me ask you, in -- in your opinion,
18  do you think the signature match is the best way to
19  match ballots and applications?
20          MR. WHITE:  Objection; form.
21          MS. RAMIREZ:  Object to form.
22     A.  It's my opinion, not the law, but I don't
23  believe it is.  I -- I always have wanted there to be a
24  new signature on file every so many years.  I don't know
25  what that length of time would be, but we see the

Yvonne Ramon

April 21, 2022
Pages 154 to 157

Page 154

1 elderly especially that registered at a young age whose
2 signature is no longer the same signature.
3          Mine isn't the same signature now that
4 they're voting by mail. So that in and of itself was a
5 difficult process sometimes.
6     Q. (BY MR. HUDSON) Okay. Now, under Senate Bill
7 1, you have the signature, but you also have the
8 alternative of the identification numbers, right?
9     A. Yes.
10    Q. Assuming that somebody doesn't get a second
11 driver's license, are they going to have the same
12 driver's license number throughout their voting history
13 in Hidalgo County?
14          MS. RAMIREZ: Object to form.
15    A. Yes.
16    Q. (BY MR. HUDSON) What about Social Security
17 numbers? Are you aware of anybody getting a different
18 Social Security number over the course of their
19 lifetime?
20    A. I am not aware. I don't know that process.
21    Q. Okay. So if someone were, for instance, to use
22 a Social Security number as opposed to a signature, in
23 your experience and in your opinion, you would assume
24 that that Social Security number belonged to the person
25 who used it, right?

Page 155

1     A. Yes.
2     Q. Okay. Do you think that that's a more
3 effective way to match ballots and applications?
4          MR. WHITE: Objection; form.
5          MS. RAMIREZ: Object to form.
6     A. It is effective. It doesn't -- this Senate
7 Bill 1 does not exclude the signature, because if there
8 is no signature on that carrier envelope, it is also
9 rejected.
10    Q. (BY MR. HUDSON) Uh-huh.
11    A. But it is not the bate -- primary basis for the
12 acceptance of that carrier envelope.
13    Q. Okay. Do you think that the identification
14 number system is superior to the signature match system?
15          MR. WHITE: Objection; form.
16    A. As we have -- as we have worked with the
17 Secretary of State to -- to work out all the bumps and
18 bruises along the way, eventually we hope that it will
19 be a more effective way.
20    Q. (BY MR. HUDSON) Okay.
21    A. To begin with, it was difficult.
22    Q. Okay. Why was it difficult?
23    A. Because -- because not all IDs were in offline
24 county, which is a Hidalgo County databases. The
25 Secretary of State has the official data -- database,

Page 156

1 which is called Team, and they work with DPS directly
2 and they upload to Team, but we had to work out to the
3 process of also uploading to the offline counties.
4     Q. Well, let's explain to the court what you mean
5 by offline county. So can you describe what that term
6 means, offline --
7     A. Yes.
8     Q. -- so that the judge understands?
9     A. Yes. So as I mentioned, the official voter
10 registration database is called Team, and it is managed
11 by the Secretary of State's office. They have a whole
12 department on this.
13          So when we are an offline county, and if
14 this was before my time that I came in, we were already
15 deemed an offline county. Apparently at that time, the
16 Secretary of State's team division was not strong enough
17 to handle all 254 counties.
18          So the larger counties broke away and, in
19 fact, we pay for a voter registration vendor while Team
20 is still providing that service to the counties that are
21 with them, I believe at no cost still. I'm not sure
22 because I'm not an online county.
23          Regardless, every day we have to submit to
24 the State whatever has been processed. So every day
25 there is an upload to the State, and we work very hard

Page 157

1 at synchronizing our data so that both Team and our
2 vems, is our vendor under VOTEC, databases are
3 synchronized and the same.
4     Q. Okay. So if that it's clear, when you say
5 offline, what you're referring to is your offline from
6 the Teams database?
7     A. Yes. And we -- they, that are online, actually
8 go into the team portal and set up their election. We
9 also do that, but as an upload --
10    Q. Okay.
11    A. -- when it comes to voter records.
12    Q. Now, the third-party vendor that Hidalgo County
13 uses to manage its voter registration information, does
14 that synchronize with the Team database operated by the
15 Texas Secretary of State?
16    A. We do. We utilize their software, but we are
17 the ones that have to synchronize with the state, not
18 our vendor.
19    Q. Okay.
20    A. We manage our -- our software.
21    Q. So Hidalgo County has access to the Team
22 database --
23    A. Yes.
24    Q. -- to identify voter identification numbers,
25 right?

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| Defendants. | § | |

---

### STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX V

Transcript of the Testimony of

# Yvonne Ramon

## Date:

May 10, 2022

## Case:

LA UNION DEL PUEBLO ENTERO vs STATE OF TEXAS

Yvonne Ramon

May 10, 2022
Pages 234 to 237

Page 234

1 although she doesn't drive anymore, so then we had to
2 fill out the form to update the record to put that on in
3 order to be able to do the tracker.
4         I have not gone to see her this week, so
5 we've not tried it yet. Because we got her mail ballot
6 that did come in for the runoff starting on Monday. But
7 I would like to try it to see.
8         Another issue that we had was that every
9 cell required -- for example, if I was going to pull 108
10 South 10th Avenue, 109 Tab, South Tab, Avenue.
11         And if you don't realize this, you are
12 typing the whole address.
13         And so, you know, there were just some of
14 those types of issues that had me go back and tap, tap,
15 tap, and erase and delete, and trying it out for myself.
16 So those were my experiences with my elderly mother that
17 I assist her with her voting process.
18    Q   And you mentioned earlier today in your
19 questioning with Mr. White that you had served on an
20 advisory committee for the Secretary of State's office;
21 is that correct?
22    A   Yes.
23    Q   Have you shared these particular concerns or
24 issues you've noted with the ballot tracker website in
25 the course of those meetings with the Secretary of

Page 235

1 State's office?
2         MR. HERBERT: Objection, form.
3    A   Yes.
4    Q   When exactly did you share these with them?
5    A   It had to have been during the -- during the
6 primary because that's when my mother had received her
7 ballot and it had -- I, myself, had sent it back and I
8 wrote in that I was assisting her in that.
9         And then trying to track her ballot to see
10 where it was, had it been received, had it not? I had
11 those issues, and I did. Just like I said, the link
12 only said poll worker training on the poll watcher.
13         So we are able to help each other out
14 during this advisory committee to point things out that
15 maybe had been overlooked because there was so much --
16 so much change.
17    Q   To your knowledge, has the Secretary of State's
18 office fixed those issues you identified in the course
19 of the March '22 primary with respect to the ballot
20 tracker website?
21         MR. HERBERT: Objection, form.
22    A   I don't know because this last week that we had
23 the advisory committee meeting, it was short. And I
24 didn't think to bring that up. I want to try it, I
25 guess, with my mother before saying anything.

Page 236

1    Q   (BY MR. MALHI) Understood. I just have a
2 couple more questions. I think the first one that comes
3 to mind is, can you share any other sort of -- that we
4 haven't discussed already, any sort of feedback you
5 received from voters about difficulties voting since SB1
6 went into effect?
7         MR. HERBERT: Objection, form.
8    A   Difficulty voting in general or difficulty
9 specific to what?
10    Q   (BY MR. SINGH) I can be more specific.
11         So have you heard any feedback from voters
12 about difficulties with mail ballot voting with respect
13 to the ID number requirements?
14         MR. HERBERT: Objection, form.
15    A   I have not myself. But, again, this would be
16 something that I would have to specifically ask my
17 division manager.
18    Q   (BY MR. SINGH) Are you aware of any voters in
19 your county who have been unable to receive reasonable
20 accommodations?
21    A   I am not.
22    Q   At this point I think I'm fairly confident I
23 have exhausted my questions. But we have been going to
24 for about an hour. So why don't we take a break. I
25 will review my notes and make sure that is the case.

Page 237

1 And if so, I will pass you on to the next questioner.
2 Does that work?
3    A   Yes.
4         MR. SINGH: Great. So let's just take a
5 five-minute break. So 3:31 Central, we can come back on
6 the record.
7         THE VIDEOGRAPHER: Going off the record.
8 The time is 3:26 p.m.
9         (Break taken.)
10         THE VIDEOGRAPHER: We are back on the
11 record. Time is 3:34 p.m. Central Time.
12         MR. SINGH: Ms. Ramon, I have no further
13 questions. I will take a moment to thank you for being
14 with us here today, also thanks for your service.
15         Our elections administrators are unsung
16 heroes in our system. So thanks so much for your time
17 and all the work you do.
18         I will now pass you to our next counsel
19 here, Ms. Lorenzo-Giguere.
20         EXAMINATION
21    Q   (BY MS. LORENZO-GIGUERE) Good afternoon,
22 Ms. Ramon.
23    A   Good afternoon.
24    Q   I'm Susana Lorenzo-Giguere. I'm an attorney
25 with the OCA Greater Houston plaintiffs.

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX W

Transcript of the Testimony of

# Janet Eickmeyer

**Date:**

June 13, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Janet Eickmeyer

June 13, 2022
Pages 22 to 25

Page 22

1    Q.   And you're currently registered to vote in
2  Dallas County?
3    A.   Yes.
4    Q.   And have you been registered to vote in Dallas
5  County that entire period?
6    A.   Yes.
7    Q.   I hate to ask this, but you identified that
8  time period based on your age, what's your birth date?
9    A.   Year, or?
10   Q.   Well, just your birth date in general, I mean
11 yeah, including the year, the whole thing?
12   A.   February 13, 1950.
13   Q.   Same age as my mom.
14        So do you vote frequently?
15   A.   When I know about the candidates, yes.
16   Q.   Have you ever voted in person in Dallas
17 County?
18   A.   Yes.
19   Q.   Have you ever voted by mail in Dallas County?
20   A.   Yes.
21   Q.   Approximately, how many times do you think
22 you've voted by mail?
23   A.   I started voting by mail, I think with COVID,
24 so for the past, I guess, two and a half years, three
25 years, maybe, or -- I'm guessing.

Page 23

1    Q.   What is the reason that you're eligible to
2  vote by mail over?
3    A.   I'm over 65.
4    Q.   Do you have any disability that would enable
5  you to vote by mail?
6    A.   No.
7    Q.   Have you ever requested an accommodation or
8  used an assistor to vote?
9        MS. HARRIS:  Objection, form.
10   A.   I don't know what that is.
11   Q.   (BY MR. WASSDORF)  Okay.  So would it be fair
12 to say that you're somewhat familiar with the voting
13 practices for Dallas County?
14   A.   Somewhat.
15   Q.   Did you vote in the 2020 election?
16   A.   Yes.
17   Q.   And how -- how did you vote, by what
18 mechanism?
19   A.   In 2020, as I recall, we voted by mail.  We
20 may have voted, let's see, primary -- I'm -- I don't
21 recall exactly when we started voting by mail, but 2020,
22 seems like COVID was in full bloom, so everything was
23 shut down in March.  I guess that's when the primary
24 was, so probably by mail.
25   Q.   And did you vote in 2022 as well?

Page 24

1    A.   Yes.
2    Q.   And how did you vote in the 2022 election?
3    A.   By mail.
4    Q.   I guess there have actually been a couple
5  elections so far in 2022, so let me get a little bit
6  more specific.
7        Did you vote in the March 1st primary
8  election?
9    A.   Yes.
10   Q.   Which party?
11   A.   Democratic.
12   Q.   So I believe you said that you voted by mail
13 in that election, is that correct?
14   A.   Yes.
15   Q.   So I'm going to hand you what I've marked as
16 Exhibit 2.
17        (Defendant's Exhibit No. 2 was marked for
18 identification.)
19   Q.   (BY MR. WASSDORF)  Do you recognize this
20 document at all?
21   A.   Yes, I guess.  I haven't seen it.  I didn't
22 recall what I had written back then --
23   Q.   So what --
24   A.   -- but yes.
25   Q.   -- is this?

Page 25

1    A.   Pardon?
2    Q.   Could -- could you tell us what this is?
3    A.   On the League of Women Voters website they had
4  a, seems like a, among other information about upcoming
5  meetings, and so forth.  They said did you have
6  difficulty voting?  And click on to respond.  And then
7  they had a place where you could respond to that, so I
8  -- after some frustration, I did.
9    Q.   And let me read this here.
10        So it says, "Your Election Experience,
11 poor; Voting Experience" and it -- you replied, "I voted
12 by mail and can't determine whether my ballot was
13 counted.  Dallas County is supposed to be calling me
14 back, but the SOS website says I'm not even registered",
15 and then it has your name and phone number", did I read
16 that correctly there?
17   A.   Yes.
18   Q.   So what -- what made your election experience
19 poor?
20        MS. HARRIS:  Objection, form.
21   A.   Soon after the first of the year, when it was
22 possible, I downloaded the application for voting by
23 mail from, I guess it's the Dallas County.  I don't even
24 know what entity the application was for absentee -- an
25 absentee ballot to vote in the primary.  And I filled it

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,        §
    *Plaintiffs,*                              §
                                              §
*v.*                                        §        Case No. 5:21-cv-844-XR
                                              §
GREGORY W. ABBOTT, et al.,                  §
    *Defendants.*                             §

---

**STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS**

# APPENDIX X

Transcript of the Testimony of

# Julie Espinoza

**Date:**

June 09, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Julie Espinoza

June 09, 2022
Pages 46 to 49

Page 46

1    Q.  And let's revisit that.  We'll come and talk
2  about that more.  I just want to make sure I understand
3  the full sort of story of this -- this first election
4  after Senate Bill 1 was enacted.
5        Did you -- why didn't you reach out to the
6  election administrator when your mail-in ballot did not
7  arrive?
8    A.  I wanted to see how this was going to work.
9  And as a last resort, I know that I would do research to
10 figure out where to go in person to vote.  But at that
11 time, my mom was in hospice; and so after work, I was
12 always hurrying to get to see her.  And so I didn't take
13 the time at the last minute -- I waited 'til the last
14 minute thinking it's going to show up.  The ballot's
15 going to show up.  It never did.
16       But I just -- I chose hurrying to see my
17 mom instead of figuring out where to go to McKinney and
18 what to tell them and how to vote.  In other words, I
19 just -- I was just too short on time, and it wasn't
20 working.
21   Q.  I'm sorry.  Just to clarify, what wasn't
22 working?
23   A.  Getting the ballot by mail.
24   Q.  Okay.  So you had said that, you know, had you
25 not had all of these sort of personal tribulations that

Page 47

1  you were dealing with, your -- your mom's health, that
2  you had looked up where you would have needed to have
3  gone --
4        (Simultaneously speaking.)
5    A.  I would have.
6    Q.  (BY MR. HERBERT)  -- to vote by mail and -- to
7  vote in person in -- in McKinney; is that right?
8    A.  I would have.  But I also would have checked
9  out is that legal for my husband to go.  Because, again,
10 he would have been assisting me in that building with --
11 with getting to the right person.  So I would have
12 checked out is that legal still.  I believe -- I hope
13 that that would have been okay.
14   Q.  Okay.  But you never looked that up; is that
15 right?
16   A.  No.
17   Q.  Okay.  Just clarifying.  Sorry.
18   A.  No.  I was just very distracted with the
19 hospice thing.
20   Q.  Okay.  Let's -- I'm going to introduce another
21 exhibit.  I'm going to drop it in the chat.  I'm marking
22 it as Exhibit 3.
23       (Exhibit No. 3 was marked.)
24   Q.  (BY MR. HERBERT)  Let me know when you've
25 downloaded that and pulled that up.

Page 48

1    A.  Okay.  I've got it pulled up.
2    Q.  Okay.  This is a page on the Collin County
3  website.  At the top, it's entitled "Voting For People
4  With Disabilities."
5        Is that right?
6    A.  Yes.
7    Q.  And the first sentence in the first paragraph
8  reads:  "Curbside voting is available for persons unable
9  to enter the polling place."
10       Did I read that correctly?
11   A.  Yes.
12   Q.  So you would agree that curbside voting is
13 available in Collin County, right?
14   A.  It is.
15   Q.  Let's look at the second paragraph.
16       And the first sentence of the second
17 paragraph reads:  "All polling places used by the Collin
18 County Elections Office are accessible."
19       Did I read that right?
20   A.  Yes.
21   Q.  The final sentence of that second paragraph
22 reads:  "All have wheelchair accessible voting
23 machines."
24       Is that right?
25   A.  That's what they say.

Page 49

1    Q.  So you would agree that polling places in
2  Collin County are also accessible; is that right?
3        MS. HARRIS:  Objection -- objection; calls
4  for a legal conclusion.
5    A.  Are you asking me if I know that every single
6  polling site is accessible?  Or are you asking me if
7  this is saying that?
8    Q.  (BY MR. HERBERT)  I'm asking that you would
9  agree that Collin County makes its voting locations, its
10 polling places accessible?
11       MS. HARRIS:  Objection; form.  Objection;
12 calls for a legal conclusion.
13   A.  I believe they try.  But I know that some sites
14 may not be as accessible as others.
15   Q.  (BY MR. HERBERT)  Okay.  Let's look at another
16 exhibit which I'm going to drop into the chat and I am
17 marking as Exhibit 4.
18       (Exhibit No. 4 was marked.)
19   Q.  (BY MR. HERBERT)  Let me know when you have
20 that up.
21   A.  It's open.
22   Q.  Okay.  So this is another page from the Collin
23 County website, and at the top, it's entitled
24 "Elections."
25       Is that right?

Julie Espinoza

1    A.  Yes.
2    Q.  And at the top of the page -- or rather in the
3  middle of the page, it also lists the e-mail and the
4  phone number for the Collin County elections department.
5        Do you see that?
6    A.  Yes.
7    Q.  Have you ever contacted the Collin County
8  elections department to seek a voting accommodation?
9    A.  No.
10    Q.  Have you ever contacted them to ask about
11  accessibility at the polling places?
12    A.  No.
13    Q.  Have you ever called them to ask about curbside
14  voting at polling places?
15    A.  I have called them about the curbside voting.
16    Q.  Okay.  So you have contacted the Collin County
17  elections department before; is that right?
18    A.  Yes.  Yes.
19    Q.  Okay.  And when did you contact them about the
20  curbside voting?
21    A.  I would say, when it first came out, I went to
22  several different polling locations.  I drove around,
23  making sure that they had the -- the signs up that
24  curbside voting was available.  And there were some
25  locations that didn't have the signs.  They weren't set

1  up for that.  So I contacted Collin County to let them
2  know which sites were not ready for that.
3    Q.  Was that the only time that you ever contacted
4  the Collin County elections department?
5    A.  Yes.
6    Q.  After you contacted them, what did they say?
7    A.  It was reported, and that's all I know.
8    Q.  Do you know if the locations that you were
9  calling to report were later made accessible for
10  curbside voting?
11      MS. HARRIS:  Objection; form.
12    A.  I believe they were, but I don't know how many
13  hours it took.
14    Q.  (BY MR. HERBERT)  When you say you don't know
15  how many hours it took, what do you mean?
16    A.  Well, when that report is made, every hour
17  counts.  Voters are -- are, you know, going away without
18  that available.  So it needed to be corrected that day.
19  It needed to be correctly -- corrected as quickly as
20  possible so that they didn't lose voters.  I don't know
21  in each location how long that took.
22    Q.  Okay.  Do you know if in each location the
23  correction was made that day?
24      MS. HARRIS:  Objection; form.
25    A.  I would have to research that.  It's been five

1  years.  But I did check on that to see.  The report -- a
2  report is made for each county on that.
3    Q.  (BY MR. HERBERT)  Okay.  So I was going to -- I
4  was going to ask when was this?
5    A.  I would say about five years ago.
6    Q.  Okay.  So that was the only time that you
7  contacted the Collin County elections department?
8    A.  I believe so.
9    Q.  Okay.  So I know that we already talked about
10  this a little bit, but I just want to make sure I have a
11  full -- full picture.
12      Generally speaking, can you run me through
13  the sort of challenges that you face as a result of your
14  disability when you go to vote?
15    A.  When I go to vote, it needs to be adequate
16  accessible parking spaces that have the right terrain to
17  get up to the correct building.  Help with getting in
18  the door.  Help with getting the wheelchair out.
19  Getting pushed up to the door.  Getting registered with
20  the person at the front.  And then making sure that the
21  voting machine is within my range of motion.
22    Q.  Okay.  Thank you.
23      And before the enactment of SB 1, these
24  challenges did not prevent you from voting; is that
25  right?

1    A.  No, not at all.
2    Q.  Okay.  Before the enactment of SB 1, did you
3  ever have an application to vote by mail rejected?
4    A.  I've -- I've had applications before Senate
5  Bill 1.  I've never had one rejected.
6    Q.  Did you ever have a mail-in ballot of yours
7  rejected before SB 1?
8    A.  No.
9    Q.  Before SB 1, were you ever denied assistance at
10  the polls?
11    A.  I was not ever denied.  They've always been
12  very accommodating.  But, typically, they do rely on my
13  husband to help figure out how to lower the machine or
14  moving the machine over.  I mean, one time, there was no
15  lower table.  So he stood there and held it within my
16  range of motion, you know.
17    Q.  Before SB 1, did you ever request an
18  accommodation?
19      MS. HARRIS:  Objection; form.
20    A.  They allowed my husband to do what was needed
21  while he was there.  So I was not officially requesting
22  it.  We'd just go in and do what we do, and they see it,
23  and they're okay with it.
24    Q.  (BY MR. HERBERT)  So you had mentioned that
25  you're familiar with Ms. Amy Litzsinger and

Page 90

1          MS. HARRIS:  Objection; form.  Calls for a
2    legal conclusion.
3          A.  I'm -- the way I see it, without being a
4    lawyer, no, it does not.
5          Q.  (BY MR. HERBERT)  Sorry.  That's not quite my
6    question.  I -- I'm asking not how you see it but rather
7    what I'm trying to understand is whether you -- well,
8    strike that.  Let me -- let me rephrase.
9              Based on this statement from the director
10   of the elections division of the Texas Secretary of
11   State -- I'm not asking what your personal
12   interpretation is, but do you understand that the
13   secretary of state's office's position is that Senate
14   Bill 1 does not foreclose these sorts of physical
15   assistants at the polls?
16         MS. HARRIS:  Objection; form.  Calls for a
17   legal conclusion.
18         A.  I do not see that.
19         Q.  (BY MR. HERBERT)  Okay.  I'm going to introduce
20   one more new exhibit which I'm going to mark as Exhibit
21   No. 9 and I'm dropping into the chat.
22             (Exhibit No. 9 was marked.)
23         Q.  (BY MR. HERBERT)  And I promise you that I will
24   try to make this the last exhibit that we -- that we
25   look through, or at least the last new exhibit that we

Page 91

1    look through.
2              So let me know when you have that up, if
3    you wouldn't mind.
4          A.  It is open.
5          Q.  Okay.  So this is a copy of the Texas Election
6    Code, specifically Chapter 1.
7              Did I represent that accurately?  You can
8    see at the top.
9          A.  Yes.
10         Q.  Okay.  Let's flip to the last section of this
11   chapter which is on the very last page, page 14.
12         A.  Okay.
13         Q.  This section reads -- or rather the -- the
14   title of this section reads:  "Section 1.022.
15   Reasonable Accommodation or Modification."
16             Did I read that right?
17         A.  Yes.
18         Q.  Okay.  And the section itself reads:  "A
19   provision of this code may not be interpreted to
20   prohibit or limit the right of a qualified individual
21   with a disability from requesting a reasonable
22   accommodation or modification to any election standard,
23   practice, or procedure mandated by law or rule that the
24   individual is entitled to request under federal or state
25   law."

Page 92

1          Did I read that accurately?
2          A.  Yes.
3          Q.  Were you aware that Texas's election law
4    prohibits election authorities from denying a voter a
5    reasonable accommodation?
6          MS. HARRIS:  Objection; calls for a legal
7    conclusion.
8          A.  I question that under Senate Bill 1.
9          Q.  (BY MR. HERBERT)  What's the basis for your
10   questioning of that?
11         A.  I don't believe they will allow me an
12   accommodation if they deem it not to fit under their
13   list of accommodations.  And --
14         Q.  So just so I make sure I'm understanding -- oh,
15   I'm sorry.  I didn't mean to interrupt you,
16   Ms. Espinoza.
17         A.  Basically, what you've shown me is they will
18   allow for a specific type accommodation.  That's it.
19   And that's not the type accommodation I need.
20         Q.  So just so I'm understanding, and please
21   correct me if I'm wrong, is it the case that you
22   believe -- strike that.
23             Do you believe that Senate Bill 1 overrides
24   this reasonable accommodation provision in the Texas
25   Election Code?

Page 93

1          MS. HARRIS:  Objection; calls for a legal
2    conclusion.
3          A.  I do not know.
4          Q.  (BY MR. HERBERT)  Okay.  Let me try and
5    rephrase it a little differently.
6              Do you believe that even despite this
7    provision, this law in the Texas Election Code that
8    requires reasonable accommodations, do you believe that
9    Senate Bill 1 somehow reverses that?
10         MS. HARRIS:  Objection; form.  Calls for a
11   legal conclusion.
12         A.  Yes.
13         Q.  (BY MR. HERBERT)  Okay.
14         A.  I'm afraid it might override it.
15         Q.  Okay.  Have you ever been denied a reasonable
16   accommodation?
17         A.  Let me think.
18             When voting?
19         MS. HARRIS:  Objection; calls for a legal
20   conclusion.
21         Q.  (BY MR. HERBERT)  Yes, when voting.
22         A.  How far back do you want me to go?
23         Q.  Well, let's just start in general.
24             Can -- can you recall any time in which you
25   requested a reasonable accommodation to vote and you

Julie Espinoza

June 09, 2022
Pages 94 to 97

Page 94

1  were denied it?

2     A. No.

3     Q. Okay. So is it the case that -- strike that.

4        So is your harm from SB 1 really just about

5  not being able to receive assistance at the polls that

6  you need?

7        MS. HARRIS: Objection; form. Calls for a

8  legal conclusion.

9     A. No.

10    Q. (BY MR. HERBERT) What else is it about?

11    A. It is about feeling threatened with criminal

12  charges for anybody that might assist me and not knowing

13  how to stop that from happening when I'm there

14  physically voting.

15    Q. So you're concerned that others might face

16  criminal charges?

17    A. Yes, very concerned. Very, very concerned.

18        (Simultaneously speaking.)

19    A. I'm not -- I'm not going to risk that.

20    Q. (BY MR. HERBERT) How does this harm you?

21    A. It's horrible to think of somebody helping you

22  facing criminal charges. I find that unacceptable. I

23  depend upon help from others. I'm not going to risk

24  them.

25    Q. So is it a -- is it a moral concern, then?

Page 95

1        MS. HARRIS: Objection; form.

2     A. Yes.

3     Q. (BY MR. HERBERT) Okay.

4     A. And a civil concern. I feel like my civil

5  rights to go in and just vote like I used to, they've

6  been -- they've been taken away. They are -- it's

7  cloudy. It's very cloudy.

8     Q. Now, when you say that, are you saying that

9  you're not able -- your -- your husband is not able to

10  serve as an assister for you?

11        MS. HARRIS: Objection; calls for a legal

12  conclusion.

13    A. I don't believe he can.

14    Q. (BY MR. HERBERT) So is that -- is that what

15  you mean by you are not able to vote?

16    A. If I'm not able to have an attendant when I am

17  there physically, helping me with what I need to do,

18  then I am not able to vote.

19    Q. If someone other than your husband were able to

20  provide assistance that you need at the -- at the polls,

21  would that --

22    A. No. I would --

23        (Simultaneously speaking.)

24    Q. (BY MR. HERBERT) Would SB 1 still harm you?

25    A. Yes.

Page 96

1        MS. HARRIS: Objection; calls for a legal

2  conclusion.

3     A. I would still be putting them at risk.

4     Q. (BY MR. HERBERT) Okay. And what do you

5  understand the nature of the criminal charges or the

6  nature of the risk that your husband or others who would

7  help you at the poll would face under SB 1?

8        (Simultaneously speaking.)

9        MS. HARRIS: Objection; form. Calls for a

10  legal conclusion.

11    A. I do not know -- I do not know what the charges

12  would be, the dollar amount. But I know there would be

13  fees. I don't know if there would be anything on their

14  record. I don't know if they would have to show up at

15  city hall. I don't know what it -- burden it would put

16  on them. But I know it would not be pleasant, and I

17  would probably lose an attendant.

18    Q. (BY MR. HERBERT) Are you concerned only about

19  the oath that assisters have to take in order to help

20  you at the polls?

21        MS. HARRIS: Objection; calls for a legal

22  conclusion.

23    A. No.

24    Q. (BY MR. HERBERT) What else are you concerned

25  about?

Page 97

1     A. The whole experience. The poll watchers'

2  treatment of the attendant -- what if there is an

3  argument with the poll watcher? What happens then?

4  How -- how far can it go? I mean, people are emotional

5  enough at the polls. Let's not start a discussion about

6  whether or not they can help me go in and vote. And I

7  just don't know how far it can go.

8        And what if the attendant disagrees or -- I

9  just -- I don't know how far -- I don't know how much

10  the experience -- how extreme it will be.

11        I wasn't concerned about the oath. I was

12  concerned about what if the attendant wanted to help me

13  anyhow and an argument broke out?

14    Q. Okay. So it's not so much the oath that you're

15  concerned with. It's the other elements of SB 1.

16        Is that right?

17        MS. HARRIS: Objection; form.

18    A. Yes. It's about whether or not they will be

19  allowed to help me, and if they're not, what will

20  happen.

21    Q. (BY MR. HERBERT) Do you believe that someone

22  helping you vote needs to be compensated in order to

23  receive the -- the assistance that you need?

24    A. You mean do I have to pay them?

25    Q. No, not necessarily.

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,                §
  *Plaintiffs,*                                                      §
                §
*v.*                                                                                   §  Case No. 5:21-cv-844-XR
                §
GREGORY W. ABBOTT, et al.,                              §
  *Defendants.*                                                   §

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX Y

Transcript of the Testimony of

# Kara Ayers

## Date:

May 10, 2022

## Case:

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Page 170

1    talked about this already, but you would agree there
2    already was an oath in Texas law, correct?
3              MS. PAIKOWSKY: Objection. Form.
4    BY MR. SWEETEN:
5         Q.   For assistors?
6              MS. PAIKOWSKY: Objection. Form.
7              THE WITNESS: I've looked at the part that
8         wasn't underlined, and concluded, you know, as
9         we've discussed, there was already something in
10        place. I'm not sure if it was an oath or not.
11   BY MR. SWEETEN:
12        Q.   Is your opinion -- just to understand it,
13   is your opinion that no oath should ever be required
14   of an assistor?
15             MS. PAIKOWSKY: Objection. Form.
16             THE WITNESS: I really wasn't asked to
17        consider that. I was asked to consider what we
18        have before us with the current oath.
19   BY MR. SWEETEN:
20        Q.   Do you -- do you believe that a voter who
21   is getting assistance should be able to express his
22   or her own opinion and vote in the way that they want
23   to?
24             MS. PAIKOWSKY: Objection. Form.
25             THE WITNESS: I think all voters should be

Page 171

1         able to vote the way that they want, including
2         those who get assistance.
3    BY MR. SWEETEN:
4         Q.   And you believe it would be wrong, right,
5    to -- for an assistor to manipulate someone with a
6    disabilities vote?
7              MS. PAIKOWSKY: Objection. Form.
8              THE WITNESS: It would be wrong to
9         manipulate anyone's vote, including a voter with
10        a disability.
11   BY MR. SWEETEN:
12        Q.   Now, on the bottom of page 12, top of 13,
13   you say, "Per SB1's revised oath, assistors are
14   prohibited from answering questions posed by the
15   voter." Did I read that correctly?
16        A.   Yes, you did.
17        Q.   Do you know if a poll worker in Texas,
18   under the Texas election code, is prohibited from
19   answering questions posed by the voter?
20        A.   I'm not sure how that relates to this
21   question about assistors, or this statement about
22   assistors. Are those two things connected?
23        Q.   I'm asking -- I mean, I'll have her read
24   back the question, if you want to hear it.
25             MR. SWEETEN: Madam Court Reporter, can

Page 172

1    you read the question back to Dr. Ayers, please.
2              (Whereupon the Court Reporter read the
3         previous requested question.)
4              THE WITNESS: I think that's very broad.
5         I don't know for sure.
6    BY MR. SWEETEN:
7         Q.   Okay. One question I didn't ask is, in
8    providing this report, did you reach out to any
9    person that had served as an assistor to a Texas
10   voter?
11        A.   I'm familiar with assistors. Some of them
12   partake in the SABE development, the advisory council
13   that I sit on. I have also done some training for
14   assistors and voters with disabilities that have
15   included a national sample. So I'm not sure if -- if
16   Texas assistors were or were not part of the
17   training. But I did not reach out to an individual
18   assistor to ask them questions about this report.
19        Q.   Here you say in your report, "I have
20   concluded" -- and we're at the -- we're in the middle
21   of paragraph 28.
22             "I have concluded that a threat of
23   criminalization will result in less -- not more --
24   interest and commitment from potential assistors to
25   learn and understand how they can effectively and

Page 173

1    appropriately assist a voter with a disability."
2              Did I read that correctly?
3         A.   Yes, you did.
4         Q.   Now, you've told me that -- you've sort
5    of -- you've expressed today, and in this report,
6    your qualitative opinion. I'm going to ask a
7    quantitative question.
8              What -- how many voters -- how many
9    assistors do you believe, or have expressed to you,
10   that -- Texas assistors have expressed to you that
11   they can effectively -- that they will no longer have
12   interest in assisting a voter as a result of the
13   oath?
14             MS. PAIKOWSKY: Objection. Form.
15             THE WITNESS: My threshold would be more
16        than one. So again, I don't have exact -- I
17        don't think it's possible to have exact numbers.
18        I don't think there would be an exact source of
19        accurate nature.
20             But my approach to issues like this,
21        because disability is often hampered by the idea
22        of -- well, it's not many people. So I, you
23        know, try to factor in instances, even if it's
24        not a significant number to some people. To the
25        people that are left out, it is significant.

Kara Ayers                                                    May 10, 2022
                                                             Pages 174 to 177

Page 174

BY MR. SWEETEN:
1
2    Q.  As you were writing this report, how many
3  Texas assistors expressed to you that, "Gosh, as a
4  result of this oath, I'm not helping a disabled
5  person again"?
6        MS. PAIKOWSKY:  Object to form.
7        THE WITNESS:  Well, it was -- you know, as
8  we were preparing for this, it was not yet in
9  place in its final form, and with primary.  So
10  I -- I think there will be time that we'll have
11  to learn from that experience.
12       What I could do is look to similar
13  instances, where a threat of criminal
14  consequences is made should a person make a
15  mistake, even inadvertently, and can conclude
16  that it would deter at least some people.
17       MR. SWEETEN:  Okay.  Objection.
18  Nonresponsive.
19  BY MR. SWEETEN:
20   Q.  My question was, how many Texas assistors
21  have said that "As a result of SB1's oath provision,
22  I'm not going to help disabled people anymore"?
23   A.  I have not interviewed Texas assistors
24  since it was implemented.
25   Q.  You agree that it is -- "It is paramount

Page 175

1  that voters with disabilities cast ballots that
2  reflect their choices," right?
3        MS. PAIKOWSKY:  Objection.  Form.
4  BY MR. SWEETEN:
5    Q.  That's what you say in paragraph 32.
6  Right?
7        MS. PAIKOWSKY:  Objection to form.
8        THE WITNESS:  Were you reading a section
9  of paragraph 32 or --
10  BY MR. SWEETEN:
11   Q.  Well, I can read it again.
12   A.  Yes.
13   Q.  There's a sentence in the middle that
14  says, "The restrictions on asking and answering
15  questions precludes assistors from effectively
16  assisting certain people with disabilities to vote."
17       Then you say, "It is paramount that voters
18  with disabilities cast ballots that reflect their
19  choices."
20       Did I read that correctly?
21   A.  You did, yes.
22   Q.  Okay.  And you agree that -- that if a
23  disabled person's going to vote, that they should be
24  able to express their choices.  Right?  We can agree
25  on that.

Page 176

1        MS. PAIKOWSKY:  Objection.  Form.
2        THE WITNESS:  I think if anyone's going to
3  vote, they should be able to express their
4  choices.  And disability often gets in the way
5  of voting.
6  BY MR. SWEETEN:
7    Q.  All right.  Is your plan to be -- to
8  travel to Texas for the -- for the trial of this
9  case?
10   A.  Yes, if --
11   Q.  If asked?
12   A.  -- you'd like to have me.
13   Q.  They'd have to ask you.
14   A.  Yeah.
15   Q.  They're paying your freight, so . . .
16       Okay.  Dr. Ayers, I think I'm finished.
17       MR. SWEETEN:  I'll go ahead and pass the
18  witness.
19       MS. PAIKOWSKY:  I think at this time we're
20  going to take maybe a 15-minute break, if that's
21  okay?  Around 20?
22       MR. SWEETEN:  So you're going to have
23  questions for the witness?
24       MS. PAIKOWSKY:  Just a few.
25       MR. SWEETEN:  Okay, okay.  Got it.  All

Page 177

1  right.
2        VIDEOGRAPHER:  Off the record at 15:05.
3  (A recess transpired from 3:05 p.m. until
4  3:14 p.m.)
5        VIDEOGRAPHER:  On the record at 15:14.
6            EXAMINATION
7  BY MS. PAIKOWSKY:
8    Q.  Dr. Ayers, I heard you testify earlier
9  today that we met between four and six times in
10  preparation for this deposition.  And I just want to
11  make sure you understood the question.
12       You know, thinking specifically about the
13  meetings that we had to prepare substantively for
14  this deposition, how many times would you say we had
15  met?
16   A.  For this deposition?
17   Q.  For this deposition.
18   A.  Just once, yesterday.  Our prep session
19  yesterday.
20   Q.  And when you were discussing earlier what
21  you were asked to give your expert opinion on, were
22  you asked to conduct original research in this
23  report?
24   A.  I was not at any point asked to conduct
25  original research.

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,           §
     *Plaintiffs,*                               §
                                                §
*v.*                                          §        Case No. 5:21-cv-844-XR
                                                §
GREGORY W. ABBOTT, et al.,                     §
     *Defendants.*                              §

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX Z

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION
     LA UNION DEL PUEBLO ENTERO,      )
 3   et al.,                          )
                      Plaintiffs,     )
 4       vs.                          )Civil Action No.
     STATE OF TEXAS, et al.,          )5:21-cv-844(XR)
 5                    Defendants.     )(Consolidated Cases)

 6
                     ------------------------
 7                      ORAL DEPOSITION OF
                         KEITH INGRAM
 8                       March 28, 2023
                           Volume 1
 9                   ------------------------

10

11        ORAL 30(b)(1) DEPOSITION OF KEITH INGRAM, Volume

12   1, produced as a witness at the instance of the

13   Plaintiffs, and duly sworn, was taken in the

14   above-styled and numbered cause on March 28, 2023, from

15   9:15 a.m. to 4:18 p.m., before Dana Shapiro, CSR, in

16   and for the State of Illinois, reported by machine

17   shorthand, at 209 W. 14th Street, Austin, Texas 78701,

18   pursuant to the Federal Rules of Civil Procedure and

19   any provisions stated on the record or attached

20   hereto.

21

22

23

24

25
```



Keith Ingram                                                   March 28, 2023
                                                                    Page 2

```
 1              A P P E A R A N C E S

 2

 3    FOR PLAINTIFFS OCA/REVUP TEXAS (via ZOOM):

 4    MS. LUCIA ROMANO
      DISABILITY RIGHTS TEXAS
 5    1500 McGowen, Suite 100
      Houston, Texas 77004
 6    713-974-7691
      lromano@disabilityrightstx.org
 7         -and-
      MS. COURTNEY LUTHER
 8    DISABILITY RIGHTS TEXAS
      2222 West Braker Lane
 9    Austin, Texas 78758
      512-454-4816
10    cluther@disabilityrightstx.org

11    FOR INTERVENOR-DEFENDANTS HARRIS COUNTY REPUBLICAN
      PARTY, DALLAS COUNTY REPUBLICAN PARTY, REPUBLICAN
12    NATIONAL COMMITTEE, NATIONAL REPUBLICAN SENATORIAL
      COMMITTEE AND NATIONAL REPUBLICAN CONGRESSIONAL
13    COMMITTEE (appeared via ZOOM):

14    MR. STEPHEN J. KENNY
      JONES DAY
15    51 Lousiana Avenue, NW
      Washington, D.C. 20001
16    202-879-3939
      skenny@jonesday.com
17
      FOR PLAINTIFFS HOUSTON AREA URBAN LEAGUE; DELTA SIGMA
18    THETA SORORITY, INC.; THE ARC OF TEXAS; AND JEFFREY
      LAMAR CLEMMONS (appeared via ZOOM):
19
      MS. KATHRYN SADASIVAN
20    MR. VICTOR GENECIN
      MS. URUJ SHEIKH
21    NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
      40 Rector Street, Fifth Floor
22    New York, New York 10006
      212-965-2200
23    ksadasivan@naacpldf.org
      vgenecin@naacpldf.org
24    usheikh@naaacpldf.org

25
```



```
 1        A P P E A R A N C E S (continued):

 2   FOR PLAINTIFFS LA UNION DEL PUEBLO ENTERO SOUTHWEST
     VOTER REGISTRATION EDUCATION PROJECT:
 3
     MS. NINA PERALES
 4   MS. JULIA R. LONGORIA(via ZOOM)
     MS. FATIMA L. MENENDEZ(via ZOOM)
 5   MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND
     110 Broadway, Suite 300
 6   San Antonio, Texas 78205
     210-224-5476
 7   nperales@maldef.org
     jlongoria@maldef.org
 8   fmenendez@maldef.org
            -and-
 9   MR. JASON KANTERMAN (via ZOOM)
     MR. KEVIN ZHEN (via ZOOM)
10   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
     One New York Plaza
11   New York, New York 10004
     212-859-8519
12   Jason.Kanterman@friedfrank.com
     Kevin.Zhen@friedfrank.com
13
     FOR PLAINTIFFS LULAC, TEXAS, VOTO LATINO, TEXAS
14   ALLIANCE FOR RETIRED AMERICANS, TEXAS AFT (via ZOOM):

15   MS. MARISA O'GARA
     ELIAS LAW GROUP LLP
16   250 Massachusetts Avenue, NW, Suite 400
     Washington, D.C. 20001
17   202-968-4490
     mogara@elias.law
18

19   FOR THE UNITED STATES:

20   MR. JUSTIN BENNETT(via ZOOM)
     MR. RICHARD A. DELLHEIM
21   MR. MICHAEL E. STEWART
     U.S. DEPARTMENT OF JUSTICE
22   CIVIL RIGHTS DIVISION
     950 Pennsylvania Avenue, NW
23   Washington, D.C. 20530
     800-253-3931
24   Justin.Bennett@usdoj.gov
     Richard.Dellheim@usdoj.gov
25   Michael.Stewart3@usdoj.gov
```



```
 1              A P P E A R A N C E S (continued):

 2                   -and-
     MR. DANIEL J. FREEMAN
 3   U.S. DEPARTMENT OF JUSTICE
     CIVIL RIGHTS DIVISION
 4   4 Constitution Square (4CON)
     150 M Street, N.E./8.143
 5   Washington, D.C. 20530
     202-305-4355
 6   Daniel.Freeman@usdoj.gov

 7   FOR DEFENDANTS THE STATE OF TEXAS, GREG ABBOTT, IN HIS
     OFFICIAL CAPACITY AS GOVERNOR OF TEXAS, JANE NELSON, IN
 8   HER OFFICIAL CAPACITY OF THE TEXAS SECRETARY OF STATE,
     WARREN K. PAXTON, IN HIS OFFICIAL CAPACITY AS THE TEXAS
 9   ATTORNEY GENERAL:

10   MS. KATHLEEN HUNKER
     MR. ETHAN SZUMANSKI
11   OFFICE OF THE ATTORNEY GENERAL
     P.O. Box 12548
12   Austin, Texas 78711-2548
     512-463-2100
13   kathleen.hunker@oag.texas.gov
     ethan.szumanski@oag.texas.gov
14
     FOR OFFICE OF THE TEXAS SECRETARY OF STATE:
15
     MR. ADAM BITTER
16   OFFICE OF THE SECRETARY OF STATE
     Capitol Building, Rm 1E.8
17   P.O Box 12697
     Austin, Texas 78711-2697
18   512-475-2813
     abitter@sos.texas.gov
19
     FOR DEFENDANT LISA WISE, IN HER OFFICIAL CAPACITY AS
20   THE EL PASO COUNTY ELECTIONS ADMINISTRATOR (via ZOOM):

21   MR. GERMAINE HABELL
     COOLEY LLP
22   Wells Fargo Center, South Tower
     355 South Grand Avenue, Suite 900
23   Los Angeles, California 90071-1560
     213-561-3227
24   ghabell@cooley.com

25
```



 1            A P P E A R A N C E S (continued):

 2   FOR DEFENDANTS BEXAR COUNTY ELECTIONS ADMINISTRATOR,
     JACQUELYN CALLANEN AND BEXAR COUNTY DISTRICT ATTORNEY
 3   JOE D. GONZALES (via ZOOM):

 4   MS. LISA V. CUBRIEL
     ASSISTANT DISTRICT ATTORNEY-CIVIL SECTION
 5   BEXAR COUNTY DISTRICT ATTORNEY'S OFFICE
     7th Floor Paul Elizondo Tower
 6   101 West Nueva
     San Antonio, Texas 78205-3030
 7   210-335-2142
     Lisa.Cubriel@bexar.org
 8
     FOR PLAINTIFF MI FAMILIA VOTA (via ZOOM):
 9
     MS. COURTNEY HOSTETLER
10   FREE SPEECH FOR PEOPLE
     1320 Centre Street, #405
11   Newton, Massachusetts 02459
     617-249-3015
12   chostetler@freespeechforpeople.org

13   FOR DEFENDANTS CLIFFORD TATUM, IN HIS OFFICIAL CAPACITY
     AS HARRIS COUNTY ELECTIONS ADMINISTRATOR (via ZOOM):
14
     MR. SAMEER S. BIRRING
15   SENIOR ASSISTANT COUNTY ATTORNEY
     OFFICE OF THE HARRIS COUNTY ATTORNEY
16   1019 Congress Plaza, 15th Floor
     Houston, Texas 77002
17   713-274-5101
     Sameer.Birring@harriscountytx.gov
18
     FOR DEFENDANT HIDALGO COUNTY ELECTIONS ADMINISTRATOR
19   DELIA GARZA (via ZOOM):

20   MS. LEIGH ANN TOGNETTI
     ASSISTANT DISTRICT ATTORNEY
21   100 East Cano, First Floor
     Hidalgo County Courthouse Annex III
22   Edinburg, Texas 78539
     956-292-7609
23   leigh.tognetti@da.co.hidalgo.tx.us

24
     ALSO PRESENT (via ZOOM):
25   MS. MORGAN HUMPHREY
     MS. SAMANTHA KOBOR



1                          INDEX

2                                              PAGE
   Appearances....................................2-5
3  KEITH INGRAM VOLUME 1
         Examination by MR. FREEMAN...............8
4        Examination by MS. PERALES..............145
         Examination by MR. GENECIN.............184
5  Signature and Changes.........................219
   Reporter's Certificate........................221
6
                          EXHIBITS
7  NO.                 DESCRIPTION          PAGE
   No. 1             Interrogatories        27
8  No. 2         absentee ballot mail form  39
   No. 3               email                44
9  No. 4               email                48
   No. 5           carrier envelope         50
10 No. 6           secrecy envelope         53
   No. 7               email                57
11 No. 8        voter instruction sheet     58
   No. 9               email                60
12 No. 10          signature sheet          62
   No. 11          presentation             65
13 No. 12         votetexas.gov page        72
   No. 13             portal                73
14 No. 14             email                 76
   No. 15 voter registration application    82
15 No. 16    notice of rejected application 93
   No. 17    notice of rejected application 93
16 No. 18         texas.gov page            96
   No. 19         texas.gov page            97
17 No. 20             email                 100
   No. 21            NPR story              116
18 No. 22             email                 124
   No. 23             email                 145
19 No. 24             email                 148
   No. 25              SB 1                 149
20

21

22

23

24

25



```
 1                     (WHEREUPON, the witness was duly

 2                     sworn.)

 3                     KEITH INGRAM,

 4    called as a witness herein, having been first duly

 5    sworn, was examined and testified as follows:

 6                     EXAMINATION

 7    BY MR. FREEMAN:

 8         Q.     My name is Dan Freeman.  This is the

 9    general election deposition of Mr. Keith Ingram in the

10    matter of La Union Del Pueblo Entero v. Abbott, U.S.

11    District Court for the Western District of Texas,

12    docket No. 5:21-cv-844.

13                 Again, as you know, my name is Dan Freeman.

14    I represent the United States in this matter.  With me

15    here today are Mr. Richard Dellheim and Mr. Mike

16    Stewart.  And I will let everyone else introduce

17    themselves.

18         MS. PERALES:  Nina Perales for Plaintiffs LUPE,

19    L-U-P-E, et al.

20         MS. HUNKER:  Kathleen Hunker and Ethan Szumanski

21    representing the State Defendants along with individual

22    legislators for the purposes of legislative privilege

23    to the extent it's raised today.  With me is Adam

24    Bitter, General Counsel for The Office of the Texas

25    Secretary of State.
```



1      MR. FREEMAN: If those who are on Zoom who intend

2   to ask questions could introduce themselves as well.

3      MR. GENECIN:  This is Victor Genecin,

4   G-E-N-E-C-I-N, of NAACP LDF for the HAUL Plaintiffs.  I

5   do intend to ask questions.

6      MR. FREEMAN:  Anyone else on Zoom who intends to

7   ask questions today?

8      MR. FREEMAN: Thank you very much.  I will ask

9   those who are on Zoom to please put themselves on mute

10   when you are not speaking.  I will ask everyone else in

11   the room to just remember to please silence your cell

12   phones.

13   BY MR. FREEMAN:

14      Q.    Mr. Ingram, I know you have been deposed

15   many times in this matter and others. We do need to go

16   through a few quick ground rules for the record.  The

17   deposition will proceed as a question and answer.  The

18   court reporter will be recording my questions and your

19   answers so it's important for both of us to articulate

20   rather than gesture.  Do you understand?

21      A.    I understand.

22      Q.    The purpose of the deposition is to obtain

23   your full testimony regarding your opinions -- or

24   excuse me -- your knowledge with respect to the matters

25   in this case.  So I need you to provide full and



```
 1   complete answers.  Do you understand?
 2         A.    I do.
 3         Q.    I may not always be clear.  If you don't
 4   understand, will you please ask me to restate the
 5   question in a clear manner?
 6         A.    I will.
 7         Q.    If you need a break, will you let me know
 8   and we'll finish the question and see about a break?
 9         A.    Sure.
10         Q.    If you need coffee -- I see you already
11   have water -- please let me know between questions, and
12   we will see about getting you some.  Okay?
13         A.    Okay.
14         Q.    If you want to talk to your attorney,
15   that's fine, but if there is a question pending or you
16   are in the middle of an answer, let's finish up the
17   answer first and then you can talk with your attorney.
18   Will that work?
19         A.    Sure.
20         Q.    Sometimes you will remember things later in
21   the day.  If that happens, let me know while it's on
22   your mind and we can add to the record.  Will you do
23   that?
24         A.    I will.
25         Q.    I will give you a chance to do that towards
```



 1   the end as well.

 2              Sometimes after we have been talking for

 3   awhile, you realize a prior answer was not entirely

 4   accurate.  If you realize that, will you let me know so

 5   we can correct the record?

 6        A.     I will.

 7        Q.     Sometimes while you are answering, you may

 8   think of a document that will help you remember or help

 9   you answer more accurately.  If you do, will you let me

10   know?

11        A.     I will.

12        Q.     We may have the document here.  If not, we

13   may be able to help you get it.  I see that you also

14   have a copy of the Election Laws of Texas 2022 edition

15   in front of you.  Can I ask you, do you intend to

16   refresh your recollection, if need be?

17        A.     If need be, yes, sir.

18        Q.     Mandatory question.  Are you on any

19   medication or drugs of any kind that might make it

20   difficult for you to answer or understand my questions?

21        A.     I'm not.

22        Q.     Is there any other reason you can think of

23   why you would not be able to answer my questions fully

24   and accurately?

25        A.     Seasonal allergies are making my throat



```
 1    dry, but that's about it.
 2         Q.    Well, we'll make sure you have enough
 3    water.  We can take breaks if need be.  If truly
 4    necessarily, we'll make a Claritin run.
 5               Last thing.  I want to remind you that you
 6    are under oath and subject to federal penalties for
 7    giving false or misleading testimony.  So it's
 8    important to answer my questions truthfully, accurately
 9    and completely.  Do you understand?
10         A.    I do.
11         Q.    Any questions so far?
12         A.    No, sir.
13         Q.    All right.  Just for the record, are you
14    represented by counsel here today?
15         A.    I am.
16         Q.    Who is that?
17         A.    Kathleen Hunker, and Adam Bitter is our
18    general counsel for our agency.
19         Q.    Without going into the substance of any
20    discussions you had with counsel, what did you do to
21    prepare for this deposition?
22         A.    Did meet with Kathleen and Ethan a couple
23    of times, and reviewed some documents.
24         Q.    What were those documents?
25         A.    They were our answers to discovery, I
```



1  believe, the most recent set of discovery questions,

2  interrogatories, request for production, request for

3  admission.  I also reviewed our results from the

4  comparison that we did in December after the general

5  election in '22.  So that we tried to harvest more

6  driver's license numbers.  And I looked at the

7  spreadsheet for the mail ballot rejection rates for all

8  of the elections in '22 including the general.

9          Q.     Do you know --

10         A.     Then a few mass emails that we sent over

11 the summer.

12         Q.     Do you know if that spreadsheet from mail

13 ballot rejection rates has been produced in this

14 litigation?

15         A.     As far as I know it was, yes.

16         MS. HUNKER:  It was.

17 BY MR. FREEMAN:

18         Q.     Was anyone else present besides Kathleen

19 and Ethan during sessions?

20         A.     In the first session, Adam Bitter was

21 there.  The next two Zena was there as deputy general

22 counsel.

23         Q.     I see.  Thank you.

24                Did you bring any documents with you here

25 today besides the Election Laws of Texas Manual?



1        A.      I did not.

2        Q.      Did you speak with anyone else about your

3    deposition today outside of your immediate family?

4        A.      I did.  I talked to Christina Adkins in our

5    office, I talked to Kristi Hart, and I talked to Donna

6    Davidson at the Republican Party of Texas.

7        Q.      What did you discuss with Ms. Davidson?

8        A.      The same thing that I talked to Christina

9    about.  There was an incident with regard to a poll

10   watcher in Northern Hidalgo County.  For the life of me

11   I can't remember any details, neither could Christina,

12   and neither could Donna.

13       Q.      Anything else?

14       A.      That's it.

15       Q.      Okay.  So since we last spoke in April of

16   2022 has your role in the office of the Texas Secretary

17   of State changed?

18       A.      It has.

19       Q.      What's your current title?

20       A.      I'm not sure what the title is.  I think

21   it's project manager or special projects.  I have been

22   designated to work on one project.

23       Q.      What's that project?

24       A.      The project is potentially replacing the

25   ERIC system that we have that we're currently using to



 1    use to compare voter registrations across state lines.

 2         Q.      What was the impetus for your change in

 3    role?

 4         A.      We had an organizational hearing at the

 5    Texas house for the House Elections Committee on March

 6    10 or March 9, and then the Secretary was not pleased.

 7    She thought that my exchange with Representative

 8    Swanson was indicator that maybe it would be good for

 9    her and for me to change roles.

10         Q.      What was the impetus for the creation of

11    the role that you are now in?

12         A.      Well, we have been discussing -- there is

13    legislation that would require us to leave the ERIC

14    system, Electronic Registration Information Center, and

15    if any of that passes then we still have a law, legal

16    obligation to compare voter roles across state lines.

17    So we have a need to figure out what comes next if

18    ERIC -- if we have to withdraw from ERIC.

19         Q.      In your new role do you report to the

20    acting director of the elections division?

21         A.      Yes.

22         Q.      That's Ms. Adkins?

23         A.      It is.

24         Q.      In your new role will you have any role in

25    the implementation of SB 1's mail voting requirements



```
 1   in future elections?
 2         A.    I will not.  I might be asked for advice.
 3   I might be asked for research, but that would be the
 4   limit of it.
 5         Q.    So at this time would it be fair to say
 6   that your knowledge concerning implementation of SB 1's
 7   mail voting requirements is strictly looking back at
 8   past elections, and not looking forward as to planned
 9   changes?
10         MS. HUNKER:  Objection, form.
11   BY THE WITNESS:
12         A.    I would agree with that.
13   BY MR. FREEMAN:
14         Q.    Would it be fair to say you do not have
15   personal knowledge about future improvements to
16   implementation of SB 1?
17         MS. HUNKER:  Objection, form.
18   BY THE WITNESS:
19         A.    Well, I don't know what you mean by
20   improvements.  I know that, you know, we are always
21   planning and preparing for the next election.  That
22   began immediately after November 2022 we began
23   preparing for 2024.  And so obviously I'm aware of
24   those discussions.
25   BY MR. FREEMAN:
```



1    Q.    Okay.  Are you no longer a part of the

2  discussions in terms of planning for the next election

3  and implementation of SB 1?

4    A.    Well, I don't know because right now it's

5  all legislation all of the time.  We will pick up the

6  planning discussion again this summer.

7    Q.    Well, you guessed my next topic.  Did you

8  testify before the Texas Legislature in the interim

9  between the third special session of the 87th leg and

10  the opening of the 88th Texas legislature?

11    A.    I don't remember.  Did we have an interim

12  hearing and house selections?  I know there was one

13  scheduled in Senate State of Affairs, but they

14  cancelled, so I don't know.  I don't know if I had a

15  house -- can you tell me if I did?

16    Q.    I don't know.

17    A.    I don't think we had an interim hearing.

18    Q.    So not to your knowledge?

19    A.    Not to my knowledge.

20    Q.    Just to close the loop.  Did you help any

21  other staff of the elections division prepare for

22  testimony during the interim between the 87th

23  legislature and the opening of the 88th?

24    A.    No.

25    Q.    Are you aware of any other instances when



1 staff of the elections division testified before the

2 Texas Legislator between 87th Legislature and opening

3 of the 88th?

4          A.     I'm not.

5          Q.     Since the opening of 88th Texas Legislator,

6 have you testified before any committee of Texas House

7 or Texas Senate?

8          A.     I have.

9          Q.     Which committee?

10          A.     House elections.

11          Q.     That's it?

12          A.     That's it.

13          Q.     Was that on March 9 you said?

14          A.     It was.

15          Q.     Was that the only time you testified?

16          A.     It was.

17          Q.     Since the opening of the 88th Texas

18 Legislature, have any other staff of the elections

19 division testified before any committee of the Texas

20 House or Texas Senate?

21          A.     Yes, Christina Adkins has.

22          Q.     Which committee?

23          A.     House Elections and Senate State Affairs,

24 and I believe that she was called up in the House.

25 There is a special committee on security.  I don't know



1    if she was called up in that.  There was elections bill

2    there, but I don't know if she actually had to testify.

3        Q.     What's a sec -- did you -- sorry.

4        A.     Oh, she did have to testify.  It was on

5    Tuesday, that's right.  Tuesday a week ago.

6        Q.     Did you help her prepare for any of those

7    committee hearings?

8        A.     We discussed some of the bills that were

9    going to get heard at some of those hearings just

10   generally.

11       Q.     Did any of those bills impact or modify the

12   provisions of SB 1?

13       A.     Yes.

14       Q.     Which one is that?

15       A.     Well, it's not a direct impact on SB 1.  It

16   was more modification of House Bill 1382 in the regular

17   session of last time, but it was a Bucy bill and house

18   elections that modifies the requirements for accessing

19   the ballot tracker.

20       Q.     Is that HB 357?

21       A.     I don't know.

22       Q.     Anything else?

23       A.     I think that might be it.

24       Q.     What's a Secretary of State clean up bill?

25       A.     That's usually we will have a bill with



```
 1   some suggested small tweaks and changes throughout the
 2   election code to make it more harmonious or to get rid
 3   of obsolete language.  We don't have a clean up bill
 4   this time.
 5        Q.     Getting ahead of me, which is helpful.
 6               At any time did you expect to testify on
 7   March 16 before the House Elections Committee?
 8        A.     No.
 9        Q.     Let's turn to March 9 hearing.  During your
10   testimony before the House Elections Committee on March
11   9, did you testify concerning the statewide mail ballot
12   rejection rate in Texas; do you recall?
13        A.     I did.
14        Q.     Did you say that it was under 3 percent?
15        A.     I did for the general election, yes.
16        Q.     Am I correct this figure represents only
17   final rejections of mail ballots?
18        A.     That's correct.
19        Q.     Does it exclude those that were rejected,
20   then cured?
21        A.     It does.
22        Q.     Does it exclude those that were rejected,
23   then cancelled?
24        MS. HUNKER:  Objection, form.
25   BY THE WITNESS:
```



1    A.    You mean if a voter decided to vote in
2 person and cancelled the mail ballot?

3    Q.    Yes.

4    A.    I don't know.

5    Q.    Do you know if it excludes any other forms
6 of rejections?

7    A.    It shouldn't.  I mean ballots that came in
8 late aren't technically rejected, they are just late.

9    Q.    Did you testify to the notion that you
10 expected that the number of statewide mail ballot
11 rejections would continue to improve as you go forward
12 in implementation of SB 1?

13    A.    That's my belief.

14    Q.    What's your basis for that belief?

15    A.    The trend that we've got so far, and past
16 experience.

17    Q.    Why do you expect that the trend will
18 necessarily continue?

19    A.    Because voters get more used to it and
20 ballot boards get more used to it as it goes through
21 election, continuous elections.

22    Q.    With respect to voters, are there a
23 different set of voters in every election that are
24 eligible to vote by mail in Texas?

25    A.    Well, yes, I presume so.



1          Q.     New voters turned 65?

2          A.     But there is overlap as well.  People that

3     voted by mail continue to vote by mail.

4          Q.     Will the new voters who are eligible have

5     had an opportunity to learn about the process?

6          A.     Well, they will learn about it as they vote

7     by mail for the first time.

8          Q.     But the first time they won't have had

9     experience or a learning curve?

10         MS. HUNKER:  Objection, form.

11    BY THE WITNESS:

12         A.     They have peers who experience and a

13    learning curve.  They talk to each other at Sunday

14    school, they talk to each other at church, and at the

15    rotary club.  So the fact is that the experience of all

16    of the voters increases even as new voters vote by

17    mail.

18    BY MR. FREEMAN:

19         Q.     With respect to the ballot boards, were

20    there errors of any kind by the ballot boards that

21    contributed to the rejection rate in the November

22    general election?

23         A.     I don't know for sure because, you know,

24    obviously we are not on the ground other than in a few

25    counties observing the ballot boards.  Anecdotally I



 1  heard some ballot boards weren't comparing signatures

 2  at all, and some ballot boards were still giving

 3  rigorous examination of signatures.  So those two

 4  things probably offset each other.

 5       Q.    So what further learning by the ballot

 6  boards do you expect will contribute to reductions of

 7  the mail ballot rejection rate?

 8       A.    We have been training -- doing direct

 9  trainings for ballot boards for a couple years now and

10  we will continue that.  And in the context of that

11  training, we talk about the rebuttable presumption

12  that's in place after SB 1.

13            So, you know, if a signature -- if a voter

14  has a number on their carrier envelope that matches a

15  number in voter registration record, and then there is

16  a rebuttal presumption that signatures are of the same

17  voter.  Of course we know as lawyers rebuttal

18  presumption means it shifts the burden of proof.  Well,

19  ballot boards don't think that way.  But they do need

20  to understand the signatures are starting from a

21  position of you've got to accept it unless there is

22  evidence to reject it.  So that doesn't mean you don't

23  look at the signature at all.  It doesn't mean you do

24  the same level of comparison that you would have done

25  before.



1    Q.    Is there any learning by the ballot boards

2 that you think you anticipate will lead to reductions

3 in rejections based on the driver's license numbers or

4 Social Security number requirement of SB 1?

5    A.    Yes, I think as the ballot boards get more

6 used to this they will accord the number the

7 appropriate way.  The number is designed to take the

8 place of a less objective measure, which is the

9 signature.  So they -- as they rely on the number and

10 then give the signature the weight it's supposed to

11 have and only overcome it if there is some sort of

12 evidence to overcome it then I think more ballots will

13 get accepted.

14    Q.    Were some ballot boards not recording the

15 information the appropriate way.

16    A.    No.  They weren't giving it the weight it's

17 supposed to be given.

18    Q.    I see. Any rejection -- just so I'm clear.

19 Any reduction in the mail ballot rejection rate based

20 on learning from the ballot boards will be related to

21 this signature, and not a reduction in rejections for

22 failure to match a number for the driver's license

23 field or Social Security number field?

24    MS. HUNKER:  Objection, form.

25 BY THE WITNESS:



1      A.      That is not exactly true, but because they

2  also have to integrate the early voting clerk process

3  from 86011D.  From previous law, not SB 1, early voting

4  clerk has the ability to intervene if a voter has some

5  sort of facial compliance issue on their carrier

6  envelope.  What we have discussed with counties and

7  with ballot boards is that if a ballot board sees

8  something that could be corrected by the early voting

9  clerk, they can pass that carrier envelope back to the

10  early voting clerk.  You know, something like missed

11  number or mismatched number.  Then the early voting

12  clerk can have either a personal trip to the voter or a

13  telephone call to the voter, email to the voter.  They

14  can do all of those things that the ballot board can't

15  necessarily do.  They have more flexibility in talking

16  to the voters and curing the problem.

17            So as we communicate that to the ballot

18  boards, I expect that there is going to be more of a

19  shift from the ballot board whenever they have got a

20  preliminary rejection back to the early voting clerks

21  because the early voting clerks has more flexibility in

22  dealing with that preliminary rejection and getting the

23  voter successfully in place with the vote.  So they

24  want to make sure that that happens.  And so I think

25  that's going to increase over time as well.



1      Q.      Are you aware of any counties where the

2  early voting clerks were not engaged in this

3  preliminary review of SB 1 compliance?

4      A.      Well, I don't know if early voting clerks

5  are aware that they can do that.  It's something that

6  we wanted to make sure that they understood, that

7  really the general election in '22 was the first time

8  we had a full fledged effort into educating with regard

9  to that.  And so we expect that that education will

10 penetrate more as we go from election to election in

11 the future.

12     Q.      Certainly early voting clerks in large

13 counties were engaged in this effort throughout the

14 November 2022 general election period, correct?

15     A.      I don't know if every large county, but I

16 would assume the larger counties, they are more plugged

17 into our advice.  And so yes, generally I would agree

18 with that.

19     Q.      Any improvement in terms of the actions

20 early voting clerk be mostly concentrated in smaller

21 counties; is that right?

22     MS. HUNKER:  Objection, form.

23 BY THE WITNESS:

24     A.      Most of the counties in Texas are smaller

25 counties.  We need to penetrate to the smaller



```
 1   counties.  That's the whole goal of our office's

 2   education program.

 3   BY MR. FREEMAN:

 4        Q.    Most of the voters are in the larger

 5   counties?

 6        MS. HUNKER:  Objection, form.

 7   BY THE WITNESS:

 8        A.    Agree with that.

 9   BY MR. FREEMAN:

10        Q.    Do you expect that rejections based on the

11   mail ballot provisions of SB 1 will ever go away

12   entirely?

13        A.    I think that, you know, rejections happen

14   for all kinds of reasons.  There is always going to be

15   rejections in an election, yes.

16        Q.    Has your office responded to any legislator

17   request for a county by county breakdown of November

18   2022 rejection rates?

19        A.    Yes.

20        Q.    Have you produced that document in this

21   litigation?

22        A.    We have.

23        Q.    Did you testify in the March 9 hearing that

24   you do not know the breakdown of the reasons for mail

25   ballot rejections in November 2022 election?
```



```
 1        A.    We know what the counties have told us.
 2   Experience indicates that's not entirely accurate.  If
 3   you wanted more accurate assessment of the reasons you
 4   would need to talk to the counties.
 5        Q.    Did you pull together that information for
 6   any legislators after the hearing?
 7        A.    Did not.
 8        Q.    Did you testify at the March 9 hearing that
 9   a county's inserts and mail ballot packages were
10   helpful in reducing mail ballot rejection based on SB
11   1?
12        A.    I did.
13        Q.    To your knowledge, how many counties
14   included inserts of this type into mail ballot
15   packages?
16        A.    I don't know.  A lot.  Most.  I don't know.
17   It's not something we have any oversight over.  It's
18   something we can suggest.
19        MR. FREEMAN:  If we could mark this document as
20   Exhibit 1.
21                    (WHEREUPON, a certain document was
22                    marked Deposition Exhibit No. 1,
23                    for identification, as of 3/28/23.)
24   BY MR. FREEMAN:
25        Q.    Mr. Ingram, what's this document?
```



1      A.     It's answers to interrogatories, most

2  recent set.

3      Q.     Is this one of the documents that you

4  reviewed in preparation for your deposition?

5      A.     It is.

6      Q.     If you could turn to page 4, the answer to

7  interrogatory No. 11 on to page five.  Does this

8  refresh your recollection as to which counties included

9  supplemental materials in the mail ballot package?

10      A.     This question asked about ones we reviewed.

11  So these are the ones we reviewed.  That's not the only

12  ones that used an insert.  I know Travis did.  I know

13  Bastrop did.  We talked to them about it.

14      Q.     How many did your office review?

15      A.     The four that are in answer to that

16  interrogatory that we know of.

17      Q.     How many additional counties are you aware

18  of that included supplements in the mail ballot

19  package?

20      A.     It's a lot.  I mean I don't know.

21      Q.     You said Travis, Bastrop.  How many others?

22      A.     Chambers, Houston.  I mean there is a lot,

23  Fannin.  A lot of counties did this.  This was --

24  Potter.  I mean I don't know.  We don't ask them.  We

25  don't take a survey.  We don't, you know, get them.



1   This was something that we talked about as a good

2   practice.  I'm sure a lot of counties did it.  I don't

3   have any idea how many.

4        MS. HUNKER:  Dan, I want to clarify for the

5   record this is his 30(b)(1) individual deposition,

6   correct?

7        MR. FREEMAN:  Yes.  That was just to refresh his

8   recollection.

9        MS. HUNKER:  I wanted to make sure he was

10  speaking on behalf of himself in this deposition as

11  opposed to the Office of the Secretary of State.

12       MR. FREEMAN:  Understood.

13  BY MR. FREEMAN:

14       Q.    What characteristics of these inserts made

15  them helpful to voters?

16       A.    You know, I don't know all of the

17  characteristics of all of the inserts because obviously

18  we didn't look at them all.  But the ones we did see

19  were brightly colored either blue or green or orange,

20  they were smaller than the rest of the papers so they

21  had a tendency to fall out of the packet whenever you

22  pulled it out of the envelope.  So that drew attention

23  to them as well.

24       Q.    What information did they convey that was

25  useful to the voters?



1          A.      That you need --

2          MS. HUNKER:  Objection, form.

3   BY THE WITNESS:

4          A.      You need to be sure and put identification

5   number under the flap of the envelope, and they would

6   have a picture of the boxes at the top of the carrier

7   envelope on the back where they are covered up when you

8   put the flap down so they could see those boxes, see

9   what they looked like, and get reminded they needed to

10  fill one of them out.

11  BY MR. FREEMAN:

12         Q.      Did these inserts suggest that voters

13  include both a driver's license number and Social

14  Security number if they had them?

15         A.      I don't know.  We told counties they could

16  suggest that as a possibility, but they couldn't

17  require it.

18         Q.      Was that suggestion something that you

19  considered to be helpful to the voters?

20         A.      Absolutely, yes.  We strongly suggested

21  they do suggest it to their voters.  But make sure that

22  your voters know it's not required to put both, but

23  they increase their chance of success if they do.

24         Q.      Did you also testify before the house

25  committee on elections on March 9 that putting the



```
 1   resident's address in the ballot tracker log-in was
 2   keeping voters out?
 3        A.     Yes.
 4        Q.     Did you suggest that the legislator enact
 5   legislation that would replace resident's address with
 6   date of birth in the log-in requirements?
 7        A.     I did.
 8        Q.     Is this the only change that you
 9   recommended with respect to the mail voting provisions
10   of SB 1?
11        A.     I don't know what you mean by that
12   question.  In the hearing, yes.
13        Q.     Have you suggested any other changes in
14   other venues?
15        A.     Yes.
16        Q.     What changes have you suggested?
17        A.     It's our belief that the correction
18   process, the corrective action procedure needs to have
19   a standardized date where anybody who's correcting a
20   mail ballot has that date by which to fix it.  The way
21   the current law is, if the early voting clerks send
22   back the mail ballot to the voter the voter has until
23   7:00 p.m. on election day to get that back.  And if a
24   ballot board sends a collective action notice to a
25   voter, they have until six days after the election to
```



 1 come in person and fix it.  So we want to match those

 2 two dates up, and we also believe that ballot boards

 3 need more time on the front end, more days to meet.  So

 4 we suggested that change.  And there is one other

 5 thing.  I know there is three.  I can never remember

 6 the third.

 7          Q.    Well, if you remember later.

 8          A.    I will.

 9          Q.    Thank you very much.

10                This is the type of thing that's going to

11 bother you.

12          A.    It is going to bother me. Our other

13 suggestion is have them where they can just mail back

14 the corrective action form and where the ballot doesn't

15 ever leave the voting clerk's office.  If the voter

16 sends it in right now, the early voting clerk has the

17 option of sending the ballot back to the voter.  The

18 early voting ballot board has the option of sending the

19 ballot back to the voter.  We would like to take that

20 away and keep the ballot in the office and just send a

21 corrective action form and have them be able to mail it

22 back instead of deliver it in person.

23          Q.    Is that the existing correction process for

24 FPCA voters?

25          A.    Yes, sort of.  I mean an FPCA voter can



1    send a new signature sheet.  So yes, it's kind of like

2    that, but it's a different form.  Since FPCA voters

3    have the ability to do a signature sheet in the first

4    place, they have more flexibility.

5         Q.    Did a bill to replace resident's address

6    with date of birth in the ballot tracker come before

7    the House Elections Committee on March 16?

8         A.    It wasn't exactly what the bill language

9    did.  The bill language made the DL or social optional,

10   you know, pick one or the other instead of both and add

11   date of birth and take away resident's address.

12        Q.    Who testified on behalf of the Office of

13   the Secretary of State on that bill?

14        A.    Christina Adkins.

15        Q.    Do you know if Ms. Adkins testified for the

16   bill or merely on the bill?

17        A.    We are never for or against legislation.

18   It's not our office's role.  We are resource witness to

19   answer any questions about the implementation that they

20   might have.

21        Q.    If your office favors the substantive

22   provisions of a bill you are still merely on the bill

23   rather than for the bill?

24        A.    Our office doesn't officially favor

25   anything.



 1        Q.     So the changes that you suggest, the three

 2   changes to SB 1?

 3        A.     Well, three changes to SB 1, one to the

 4   ballot tracker, so four changes.

 5        Q.     How would you describe those if they are

 6   sort of suggestions coming out of your office, but you

 7   are never for a bill?  How does that fit?

 8        A.     It's our office's role to advise on

 9   technical implementation process.  And any time you

10   have got a new thing like a corrective ballot,

11   corrective action procedure for mail ballots, you are

12   going to have some kinks in it that need to be worked

13   out.  It's our office's role to point out those kinks

14   and suggest ways to work those out.

15               Whenever we implemented annual ballots by

16   mail, the first law was House Bill 666 in 2013.  It was

17   about this long, and it just said that a voter can ask

18   one time for all of the ballots by mail.  So there were

19   so many things.  That was the hardest thing we've ever

20   had to implement before SB 1.  It was so complicated.

21   The next session there was a bigger -- much bigger bill

22   to correct that process and make it more uniform.  And

23   then there was another bill the next session.  So any

24   time that there is a big change like that you expect

25   there is going to be some need to correct the



1    implementation to make it more smooth.  And that's our

2    office's role to suggest those changes.  Not that they

3    were for or against them.  If you want to make a

4    change, here's something you might think about.

5         Q.    Thank you for clarifying.  I appreciate it.

6               Would you say then that during your time in

7    the elections division at the Office of the Secretary

8    of State, SB 1 has been the hardest bill to implement?

9         A.    It was by far the most comprehensive set of

10   changes we ever had.  It was every single form, every

11   single bit of educational material, every outline,

12   every everything had to change.

13        Q.    Going back to the March 9 hearing.  Did you

14   testify that statewide there were 163 ballots rejected

15   based on SB 1 requirements for voters who did not have

16   either a Social Security number or a driver's license

17   number in the system?

18        A.    I did.

19        Q.    Were those ballots or were those ballot

20   requests?

21        A.    Those were ballots.

22        Q.    How did those voters get ballots sent to

23   them if they didn't have driver's license numbers or

24   Social Security numbers in the system?

25        A.    That I don't know.  You would have to talk



1   to the counties.

2        Q.     With respect to the voter who lacked

3   driver's license or Social Security number information

4   in their voter registration files, what purpose do the

5   mail ballots provisions of SB 1 serve?

6        MS. HUNKER:  Objection, form.

7   BY THE WITNESS:

8        A.     The same as they serve for any other

9   person, which is to identify the voter.

10  BY MR. FREEMAN:

11       Q.     Is it possible for SB 1 to serve that

12  purpose if the voter doesn't have a driver's license

13  number or Social Security number on file?

14       A.     Sure.

15       Q.     How would that happen?

16       A.     They put one on file as part of the

17  corrective action process.

18       Q.     So absent the voter taking further action

19  to supplement their registration file, can it serve any

20  purpose?

21       A.     Absolutely.  It serves the purposes of

22  making them supplement their voter registration file so

23  we have a more complete file.  That helps us with all

24  kinds of matching on our list maintenance.  It serves a

25  purpose, absolutely.



1    Q.    With respect to voters who do not currently

2  have a driver's license number or Social Security

3  number on file, is there any connection between those

4  numbers and the voter's qualifications to vote in Texas

5  elections?

6    MS. HUNKER:  Objection, form.

7  BY THE WITNESS:

8    A.    Well, I mean obviously to vote successfully

9  they are going to have produce an ID when they vote in

10 person, and they are going to have to do the same thing

11 when they vote by mail.

12 BY MR. FREEMAN:

13   Q.    Not produce an ID, but produce a number?

14   A.    Produce an ID.

15   Q.    When they vote by mail?

16   A.    That's right, that's what the number is

17 it's an ID number.

18   Q.    Sorry.  When you say ID I thought you meant

19 like a copy of a card.

20         With respect to a voter who does not have a

21 Social Security number or driver's license number on

22 file, is there any connection between that number and

23 establishing the voter's identity prior to any

24 supplementation of their registration record?

25   A.    I'm not sure I understand that question.



1      Q.     Well, if they don't have a driver's license

2  number or Social Security number on record, is there a

3  connection between the voter providing that number and

4  the voter establishing their identity?

5      A.     Yes.

6      Q.     Does the voter establish their identity

7  when they submit a mail ballot request with their

8  driver's license number if the driver's license number

9  isn't on TEAM?

10     MS. HUNKER:  Objection, form, asked and answered.

11  BY THE WITNESS:

12     A.     I don't know what you are getting at.  Yes.

13  BY MR. FREEMAN:

14     Q.     So switching gears, and we don't need to

15  take a break yet, that's good.

16          How long did you serve as director of the

17  elections division in the Office of the Texas Secretary

18  of State?

19     A.     11 years, two months, five days.

20     Q.     Based on your experience would you agree --

21     A.     Not that I was counting.

22     Q.     Based on your experience, would you agree

23  that a form provided to voters should be designed so

24  that a voter who follows the instructions will have the

25  form accepted?



1        MS. HUNKER:  Objection, form.

2   BY THE WITNESS:

3        A.    Yes, that's true. That's the goal of the

4   form.

5   BY MR. FREEMAN:

6        Q.    Since the May 2022 runoff, did the Office

7   of the Secretary of State make any changes to the

8   absentee ballot by mail application?

9        A.    We changed several forms.  I'm pretty sure

10  the application if it's got an oath of assistance on it

11  it changed, yes.

12       MR. FREEMAN:  Mark this as Exhibit 2.

13                    (WHEREUPON, a certain document was

14                    marked Deposition Exhibit No. 2,

15                    for identification, as of 3/28/23.)

16  BY MR. FREEMAN:

17       Q.    Mr. Ingram, is this the current absentee

18  ballot by mail form?  I will represent to you this

19  form, I don't believe the date is on it, but it's the

20  form that's currently on your website and it's dated

21  December 9, 2021.

22       A.    Yes.  I mean it looks like it, yes.

23       Q.    Okay.  This form is still in effect, the

24  form that's on the website?

25       A.    It is.



1    Q.    Any current plans to alter the form?

2    A.    No.

3    Q.    Has your office considered altering the

4  form since it was issued?

5    A.    No, not this form.

6    Q.    Why not?

7    A.    There is not a need to.

8    Q.    Is there a statutory reason this form could

9  not inform voters that they may provide both a Texas

10  driver's license number and a partial Social Security

11  number?

12    MS. HUNKER:  Objection, form.

13  BY THE WITNESS:

14    A.    It's not what the law says.  The form

15  outlines the law.

16  BY MR. FREEMAN:

17    Q.    Okay.  And so if the form outlines the law,

18  is it not allowed for the form to inform voters that

19  they may provide both numbers?

20    A.    Not on the form.  It's not the law.

21    Q.    Understood.

22    Has your office suggested any kind of

23  amendments to SB 1 that would permit including that

24  information on this form?

25    A.    No.  There is plenty of outside channels



```
1    that emphasize that point.
2         Q.    So is it not necessary to your mind?
3         A.    Agree with that.
4         Q.    This form does clarify that the Texas
5    driver's license number is not your voter registration
6    VUID number, correct?
7         A.    Agree.
8         Q.    Is that in the law --
9         MS. HUNKER:  Objection, form.
10   BY MR. FREEMAN:
11        Q.    -- that clarification?
12        A.    Well, it's in the law is Texas election
13   identification certificate number.  People think that
14   means their voter registration number.
15        Q.    Why is it permissible to include this
16   clarification and not the clarification that a voter
17   may include both numbers if they wish?
18        A.    Because if we did that you would be sitting
19   there asking me questions about why we are requiring
20   people to do something the law doesn't require.  That
21   would be a different lawsuit, but it would still be a
22   lawsuit.
23        Q.    Do other forms promulgated by your office
24   include a red box around required information
25   frequently omitted by voters?
```



1          A.      The carrier envelope does.

2          Q.      Is this a reason why this form doesn't have

3    a red box around the SB 1 identification number

4    requirements?

5          A.      It's not needed.

6          Q.      Why is it not needed?

7          A.      Because the application can just be redone

8    any time.  It's a much less formal document.  It's not

9    the vote.

10         Q.      Can it be redone if it's rejected -- strike

11   that.

12                 Can it be redone if the voter does not

13   become aware of the rejection until after the ballot

14   application deadline?

15         MS. HUNKER:  Objection, form.

16   BY THE WITNESS:

17         A.      It can't.  But the voter can vote in person

18   at that point.  They have still complete ability to

19   vote.

20   BY MR. FREEMAN:

21         Q.      Just to confirm.  During the 2022 general

22   election, did your office continue to advise election

23   administrators not to apply a hierarchy between DPS

24   numbers and Social Security numbers when determining

25   whether this form meets SB 1 requirements and identify



1    the correct voter?

2            A.      I lost your thread there.

3            Q.      Just confirming.  During the 2022 general,

4    did your office continue to tell local election

5    administrators, county clerks they didn't need to apply

6    a hierarchy between the DPS number and the SSN when

7    they were determining whether an ABBM adequately

8    identifies a voter for SB 1 purposes?

9            A.      Absolutely.

10           Q.      From an election administration

11   perspective, during the 2022 general election did the

12   language on this form directing voters to give their

13   SSN for quote, if you do not have a Texas driver's

14   license, Texas personal identification number or a

15   Texas election identification certificate number, serve

16   a purpose?

17           MS. HUNKER:  Objection, form.

18   BY THE WITNESS:

19           A.      It follows the law.

20   BY MR. FREEMAN:

21           Q.      What is the purpose of the law in stating

22   that --

23           MS. HUNKER:  Objection, form.

24   BY MR. FREEMAN:

25           Q.      -- to your knowledge?



```
 1        A.      You would have to ask the legislature that
 2   question.
 3        Q.      Fair enough.
 4        MR. FREEMAN:   We can mark this as Exhibit 3.
 5                       (WHEREUPON, a certain document was
 6                       marked Deposition Exhibit No. 3,
 7                       for identification, as of 3/28/23.)
 8   BY MR. FREEMAN:
 9        Q.      Before we turn to Exhibit 3 can I ask one
10   more question about the form marked as Exhibit 2.
11   Regardless of what the legislature's intention is, are
12   you able to identify a valid election administration
13   purpose for including the language beginning, if you do
14   not have a Texas driver's license on the ABBM form?
15        MS. HUNKER:   Objection, form.
16   BY THE WITNESS:
17        A.      The election administration purpose is to
18   accurately state the law on the form.
19   BY MR. FREEMAN:
20        Q.      Nothing else?
21        A.      That's it.
22        Q.      Mr. Ingram, what's the document that has
23   been marked as Exhibit 3?
24        A.      It looks like an email.
25        Q.      If you go to the last page.  Just take a
```



1  look at that real quickly.  The email from Ms.

2  Oehlschlager.

3       A.     Okay.

4       Q.     Am I correct that Ms. Oehlschlager wrote

5  that because her mother followed the directions on the

6  ABBM and nonetheless did not receive her mail ballot,

7  this is an error in the application for a ballot by

8  mail?

9       A.     I'm not sure exactly what she is trying to

10 say here.  I don't understand the issue with it.

11      Q.     Well, if I'm correct, Ms. Oehlschlager's

12 mother submitted her driver's license number, and the

13 county said she should have used the last four numbers

14 of her Social Security rather than her driver's license

15 number; is that your understanding of this email?

16      A.     That I think is what she is trying to say,

17 yes.

18      Q.     Do you agree that because she followed the

19 instructions on the form and provided her driver's

20 license number rather than her Social, and did not

21 receive a ballot, that the error is in the application?

22      MS. HUNKER:  Objection, form.

23 BY MR. FREEMAN:

24      Q.     The form itself?

25      A.     No, I do not agree with that.



1        Q.      Why not?

2        A.      Because that's not the problem.  The

3   problem is she didn't put a number that was in her

4   voter registration record.

5        Q.      Did she provide the number that the form

6   instructed her to provide?

7        A.      I don't know. It could be that the number

8   was wrong.  I don't know what the problem is.  I would

9   have to talk to Hector County to find out why they

10  rejected this.

11       Q.      It at least appears from the email that

12  they rejected it because she provided her driver's

13  license number rather than her Social, correct?

14       A.      That's what she says.

15       Q.      If an ABBM is rejected rather than a mail

16  ballot, that rejection is not included in the mail

17  ballot rejection rate that you conveyed to the

18  legislature, correct?

19       A.      I agree with that.

20       Q.      If Ms. Oehlschlager provided her driver's

21  license number, and only her Social Security number was

22  on file and her ABBM was rejected as a result, that's

23  not her fault in terms of why the ABBM was rejected,

24  correct?

25       MS. HUNKER:  Objection, form.



 1   BY THE WITNESS:

 2        A.      Well, I mean if she doesn't put a number

 3   that's in her voter registration record then she either

 4   needs to supplement her voter registration record or

 5   supply a different number.

 6   BY MR. FREEMAN:

 7        Q.      Did she do anything wrong in completing the

 8   ABBM?

 9        MS. HUNKER:  Objection, form.

10   BY THE WITNESS:

11        A.      She didn't identify herself with a number

12   from her record.

13   BY MR. FREEMAN:

14        Q.      Was there a way for her to know prior to

15   submitting this form which number was in her record?

16        A.      No.  I mean she could call and ask or she

17   could fix it after the fact.

18        Q.      Do you instruct local officials to tell

19   voters which number is on their file if they call and

20   ask before submitting mail ballot materials?

21        A.      That's something they can do, yes,

22   absolutely.

23        MS. PERALES:  Objection, non-responsive.

24   BY MR. FREEMAN:

25        Q.      Do you instruct them it's something they



1    may do?

2         MS. HUNKER:  Objection, form.

3    BY THE WITNESS:

4         A.    We don't have to instruct them they can do

5    that.  They can answer voter questions.  They answer

6    voter questions all the time.

7         MS. PERALES:  Objection, non-responsive.

8    BY MR. FREEMAN:

9         Q.    Let's turn to another voter email.  If we

10   could mark this as Exhibit 4.

11                        (WHEREUPON, a certain document was

12                        marked Deposition Exhibit No. 4,

13                        for identification, as of 3/28/23.)

14   BY MR. FREEMAN:

15        Q.    Mr. Ingram, what's this document?

16        A.    This looks like an email.

17        Q.    If you go to the email or the original

18   email Ms. Martin sent, can you describe the problem

19   that Ms. Martin's daughter experienced in the 2022

20   general election?

21        A.    That she doesn't have both numbers on her

22   file apparently.

23        Q.    Did Ms. Martin's daughter submit her

24   driver's license number, but only her Social Security

25   number was on file?



```
 1        A.     That's apparently what Comal County

 2   informed them.

 3        Q.     Am I correct that this is the same problem

 4   that Ms. Oehlschlager experienced?

 5        MS. HUNKER:  Objection, form.

 6   BY THE WITNESS:

 7        A.     I don't know that.

 8   BY MR. FREEMAN:

 9        Q.     At least the same problem that Ms.

10   Oehlschlager represented to your office that she

11   experienced?

12        A.     It was her mother that experienced it, but

13   yes.

14        Q.     Am I correct that Ms. Martin describes the

15   ABBM form as very misleading?

16        A.     I don't know.  I haven't gotten to that

17   part yet.

18        Q.     In the first paragraph, couple sentences

19   in, beginning with, "first of all," does she describe

20   the application as very misleading?

21        MS. HUNKER:  Objection, form.

22   BY THE WITNESS:

23        A.     She says those words, yes.

24   BY MR. FREEMAN:

25        Q.     And for the record do you agree?
```



1        A.      No.

2        Q.      Do you consider the rejection of Ms.

3    Martin's daughter's ABBM to be her daughter's fault?

4        A.      I don't know what your interest in

5    assessing fault is.   I'm not going to say it's

6    anybody's fault.

7        Q.      Is the ABMM designed to maximize the

8    likelihood a voter who follows the instructions will

9    have the form accepted?

10       A.      I don't know.   It follows the law.

11       Q.      Going about an hour.   Do you want to take a

12   break for a minute or are you okay?

13       A.      I'm fine.

14       Q.      Since the May 2022 runoff -- we're changing

15   gears.   Did the Office of the Secretary of State make

16   any changes to the mail ballot carrier envelope?

17       A.      Yes.

18       MR. FREEMAN:   We can mark this as Exhibit 5.

19                       (WHEREUPON, a certain document was

20                       marked Deposition Exhibit No. 5,

21                       for identification, as of 3/28/23.)

22   BY MR. FREEMAN:

23       Q.      Mr. Ingram, what's this document?

24       A.      Well, it's an 8 1/2 x 11 copy of pieces of

25   a carrier envelope.



1 Q. Is this the up-to-date version of the
2 carrier envelope?

3 A. It looks like it.

4 Q. What changes were made during the general
5 election period?

6 A. We put a red box around the numbers and we
7 changed the oath of office.

8 Q. Did your staff consider any further changes
9 to the mail ballot carrier envelope during the general
10 election period?

11 A. We did not.

12 Q. Why not?

13 A. There wasn't a need.

14 Q. Did your office have any concerns about the
15 red box being fully accessible to voters with any kinds
16 of disabilities?

17 A. No.

18 Q. Is there an issue with the red type and
19 voters with disabilities?

20 A. I understand that to be the case, yes.

21 Q. What's the issue?

22 A. There's some people with some kinds of
23 visual impairments don't see it.

24 Q. Would it be helpful to Texas voters if the
25 mail ballot carrier envelope itself informed voters



 1   that they may provide both a Texas driver's number and

 2   Social Security number?

 3        MS. HUNKER:  Objection, form.

 4   BY THE WITNESS:

 5        A.    That's not the law.

 6   BY MR. FREEMAN:

 7        Q.    Would it be helpful if it did?

 8        A.    Doesn't matter if it's helpful or not.

 9        MS. HUNKER:  Objection.

10   BY THE WITNESS:

11        A.    It's not the law.  We can't suggest to

12   voters that both numbers are required. We can suggest

13   to voters that they go ahead and voluntarily use both

14   numbers, and that they increase their chances of

15   success if they do, and we can hound that message big,

16   but we can't make any suggestion on the official form

17   that both numbers are required.

18   BY MR. FREEMAN:

19        Q.    Just so I understand it.  Why can you not

20   say it's optional on the form?

21        A.    Because that's not the law.

22        Q.    Okay.  Are there any current plans to alter

23   the carrier envelope?

24        A.    If the law changes we will change the

25   carrier envelope.



```
 1             MR. FREEMAN:  On to Exhibit 6.
 2                         (WHEREUPON, a certain document was
 3                         marked Deposition Exhibit No. 6,
 4                         for identification, as of 3/28/23.)
 5      BY MR. FREEMAN:
 6             Q.     Mr. Ingram, what's this document?
 7             A.     This is the secrecy envelope that's put
 8      inside of the carrier envelope that contains the voter
 9      ballot.  So copy of the front and back of it.
10             Q.     Is this up to date?
11             A.     Yes.
12             Q.     What changes were made during the general
13      election period to this document?
14             A.     I don't know what specific changes were
15      made.  It looks like it was modified in July of '22,
16      but I don't know what changed.
17             Q.     Were the assistants instructions changed?
18             A.     Well, it has to be, but the oath is not on
19      here, so I don't know why we would change it.
20             Q.     Any other changes you are able to identify?
21             A.     Yes, it's No. 2 on the instruction to
22      assistants that's what changed.
23             Q.     Paragraph 2 under instructions states that,
24      "A voter must provide one of the following numbers,"
25      correct?
```



```
1          A.      Yes.

2          Q.      Paragraph two also includes the sentence

3    "If a voter has not been issued one of these numbers, a

4    voter must check the box --" strike that.  I'm sorry.

5                  Paragraph 2 also includes a sentence

6    beginning, "If a voter has not been issued one of these

7    numbers, voter may give the last four digits of his/her

8    Social Security number; is that correct?

9          A.      That's right.

10         Q.      One of these numbers in that sentence

11   refers to a Texas driver's license number; is that

12   right?

13         A.      Texas DL, Personal Identification Card,

14   Election Identification Certificate.

15         Q.      Thank you.

16                 Do you agree this indicates to the voter

17   that the voter may give the four digit Social Security

18   number only if they lack a Texas driver's license

19   number, ID Card or Election Identification Certificate?

20         MS. HUNKER:  Objection, form.

21   BY THE WITNESS:

22         A.      I agree that the instruction tracks the

23   law.

24         MR. FREEMAN: I'm going to object as

25   non-responsive.
```



1   BY MR. FREEMAN:

2       Q.    My question was whether this indicates to

3   the voter that the voter may give the partial Social

4   only if they lack a DPS ID?

5       MS. HUNKER:  Objection, from.

6   BY THE WITNESS:

7       A.    That's what it says, but it follows the

8   law.  The form follows the law.

9   BY MR. FREEMAN:

10      Q.    Got it.

11            Just again so I understand, I assume the

12  answer is the same as the last form.  But is there a

13  statutory reason that the instructions here could not

14  inform the voter they may provide both a Texas driver's

15  license number, and partial Social?

16      A.    That's not the law.

17      Q.    Even if it's not the law that a voter may

18  provide both, does that fact prevent you from adding

19  language on instructions informing voters of their

20  option to provide both?

21      A.    I think I have told you before that forms

22  are a road map to the law.  They are not helpful hints.

23  Helpful hints are something outside of the forms.

24  Helpful hints we can do a voter education campaign.  We

25  don't put helpful hints on forms unless it's just



```
 1   really really necessary, you know.  I can think on the

 2   candidate application, you know, it's very important

 3   that candidate fill out every single blank on that

 4   application.  There are a couple of blanks that are

 5   optional.  We have made it very clear in the form that

 6   those blanks are optional because we have an obligation

 7   to track the law with regard to forms.

 8        Q.     Who decides what's really really necessary

 9   when it comes to including hints in a form?

10        A.     Well, the hints track the law as well.

11   That's my whole point.  That the legislature has made

12   that decision.  Whenever they make a blank on a

13   candidate application optional, then we need to put

14   optional in parentheses next to that information so

15   that the candidate knows the law says this is an

16   optional blank even though everything on here is

17   otherwise required.  That's the legislature is the one

18   that makes the law.  The form tracks the law.  If the

19   legislature thinks we need to put a hint on there

20   that's what we do.

21        Q.     Could you put optional for voters who

22   include a driver's license number next to the blank for

23   the Social?

24        MS. HUNKER:  Objection, form.

25   BY THE WITNESS:
```



1    A.    That's not what the law says.  We have to
2  track the law.
3  BY MR. FREEMAN:
4    Q.    Okay.  Did your office consider any further
5  changes to these instructions on Exhibit 6 during the
6  general election period?
7    A.    No, just what was necessary because of the
8  litigation.
9    Q.    Do you have any current plans to alter
10  these instructions?
11    A.    We do not.
12    MR. FREEMAN:  Mark this as Exhibit 7.
13                  (WHEREUPON, a certain document was
14                  marked Deposition Exhibit No. 7,
15                  for identification, as of 3/28/23.)
16  BY MR. FREEMAN:
17    Q.    Mr. Ingram, what's this document?
18    A.    It appears to be an email.
19    Q.    Is it from a Ms. Susan Johnson to the
20  elections office?
21    A.    It is.
22    Q.    Did Ms. Johnson ask whether she would be
23  penalized if she put more than one type of ID?
24    A.    That's the question.
25    Q.    Did your office direct her to the list of



```
 1   early voting clerks rather than offering a substantive
 2   response?
 3           A.      We did.
 4           Q.      Why was that?
 5           A.      I don't know.
 6           Q.      Is that the standard procedure in your
 7   office when voters pose questions regarding how to
 8   successfully complete a form?
 9           A.      I would have thought we could answer this
10   question.  I don't know why we directed them to early
11   voting clerk.
12           Q.      Okay.  Another form for you Exhibit 8.
13                   (WHEREUPON, a certain document was
14                   marked Deposition Exhibit No. 8,
15                   for identification, as of 3/28/23.)
16   BY MR. FREEMAN:
17           Q.      Mr. Ingram, what's this document?
18           A.      This is the voter information voter
19   instruction sheet.
20           Q.      Does this go in --
21           A.      That goes in a mail ballot packet.
22           Q.      Thank you.  Is this form up to date?
23           A.      Yes.
24           Q.      No changes were made during the election
25   period?
```



 1        A.      I agree with that.

 2        Q.      Why not?

 3        A.      No need.

 4        Q.      We previously discussed some of the useful

 5   elements of county inserts.  Does this instruction

 6   sheet share any of those useful elements?

 7        MS. HUNKER:  Objection, form.

 8   BY THE WITNESS:

 9        A.      Well, I don't know what color a county

10   prints it on, but as it looks here in Exhibit 8 it's

11   black and white.

12   BY MR. FREEMAN:

13        Q.      Is it small and designed to fall out of the

14   packet?

15        A.      No.

16        Q.      Does it inform a voter that they have the

17   option of including both a Texas driver's license

18   number and a partial Social?

19        A.      No.

20        Q.      Why not?

21        A.      Because it's not the law.

22        Q.      This is not a form they fill out.  It's an

23   instruction sheet.  I wanted to understand if the same

24   set of rules apply.

25        A.      The instructions are part of the form.



1       Q.      Okay.  Thank you.

2       MR. FREEMAN:  We can mark this as Exhibit 9.

3                    (WHEREUPON, a certain document was

4                    marked Deposition Exhibit No. 9,

5                    for identification, as of 3/28/23.)

6  BY MR. FREEMAN:

7       Q.      What's this document?

8       A.      It's an email exchange.

9       Q.      If you could go to the third page, the

10  final paragraph can you describe the problem Ms.

11  Pfluger had in a 2022 election?

12       A.      Yes.

13       Q.      What's the problem that Ms. Pfluger had?

14       A.      She says she was rejected because she

15  didn't include the DL under the flap.

16       Q.      Am I correct Ms. Pfluger compliments the

17  instructions on the Secretary of State's website?

18       A.      Yes.

19       Q.      Does Ms. Pfluger raise concerns about the

20  absence of similar instructions on the carrier

21  envelope?

22       A.      She said the voter should be reminded

23  before the carrier envelope is sealed they need to

24  provide this information.

25       Q.      Go back to the third page.  Did she say,



 1   "Your website clearly indicates this change, and

 2   provides excellent instructions of what's required.

 3   I'm concerned that not enough voters will see this

 4   information before voting by mail."

 5              Is that right?

 6        A.    That's what she says.  We hear that form of

 7   argument a lot.  I saw that, but I don't know if those

 8   other dummies will see it.  We hear that argument a

 9   lot.

10        Q.    Am I right that limitations in the law

11   itself preclude your office from providing similar

12   instructions that are on your website on the form

13   itself?

14        MS. HUNKER:  Objection, form.

15   BY THE WITNESS:

16        A.    I agree the form is a road map to the law.

17   BY MR. FREEMAN:

18        Q.    Your website provides additional

19   information beyond what's in the law, correct?

20        MS. HUNKER:  Objection, form.

21   BY THE WITNESS:

22        A.    Sometimes.

23   BY MR. FREEMAN:

24        Q.    Does it provide additional information with

25   respect to how to comply with the mail ballot



1   provisions of SB 1?

2        A.    We try to say things in a more English and

3   flowing manner.

4        MR. FREEMAN: I think it's a good time to take a

5   quick break.

6                         (WHEREUPON, a recess was had.)

7   BY MR. FREEMAN:

8        Q.    Mr. Ingram, since the May 2022 runoff, did

9   The Office of the Secretary of State make any changes

10  to the FPCA signature sheet?

11       A.    Yes.

12       MR. FREEMAN: Mark this as Exhibit 10.

13                         (WHEREUPON, a certain document was

14                         marked Deposition Exhibit No. 10,

15                         for identification, as of 3/28/23.)

16  BY MR. FREEMAN:

17       Q.    Mr. Ingram, what's this document?

18       A.    This is the signature sheet for voters from

19  overseas or military who's domestic or oversees.

20       Q.    Is this the up-to-date version of that

21  form?

22       A.    It is.

23       Q.    What changes were made during the general

24  election period?

25       A.    The oath language was changed.



1        Q.      That's all?

2        A.      That's it.

3        Q.      Did you or your staff consider any further

4   changes to the FPCA signature sheet during the general

5   election period?

6        A.      We did not.

7        Q.      Why not?

8        A.      There was no need.

9        Q.      Is there a statutory reason, just to

10  confirm, that the FPCA signature sheet could not inform

11  military overseas voters that they may provide both a

12  Texas driver's license number and a four digit Social?

13       A.      That's not required by the law.

14       Q.      Just to close the loop, if it's not

15  required by the law it can't be on this form, correct?

16       MS. HUNKER:  Objection, form.

17  BY THE WITNESS:

18       A.      The form is a map to the law.

19  BY MR. FREEMAN:

20       Q.      Any current plans to alter the signature

21  sheet?

22       A.      No.

23       Q.      Are you aware of how many FPCA voters had

24  their ballot rejected during the 2022 general election

25  because of SB 1 requirements related to numbers



1    associated with the voter registration record?

2          A.     I don't know.

3          Q.     Are you aware of how many active duty

4    members of the military had their ballots rejected

5    during the 2022 general because of SB 1 number

6    requirements?

7          A.     I don't know.

8          Q.     Do you have any practical basis to believe

9    that any rejected ballots submitted by FPCA voters were

10   not returned by eligible Texas voters who were who they

11   said they were?

12         MS. HUNKER:  Objection, form.

13   BY THE WITNESS:

14         A.     I'm sorry.  I don't understand the

15   question.

16   BY MR. FREEMAN:

17         Q.     Do you have any reason to believe that any

18   FPCA voters -- strike that.

19                Do you have any reason to believe that any

20   FPCA ballots that were rejected due to SB 1 were

21   submitted by individuals who were not eligible Texas

22   voters?

23         MS. HUNKER:  Objection, form.

24   BY THE WITNESS:

25         A.     I don't know.



1    BY MR. FREEMAN:

2         Q.    Do you have any future plans to address

3    ballot rejections among active duty military

4    specifically?

5         A.    Not other than, you know, the what we are

6    going to do with ballot boards, educate them on the

7    early voting process and their opportunities there.

8         Q.    My colleague intends to address training

9    conducted by The Office of the Secretary of State

10   during Rule 30(b)(6) deposition, but I have a few quick

11   questions about updates to the training prior to the

12   end of last year.  So if we could mark this document as

13   Exhibit 11 I promise we will only talk about a few

14   pages.

15                        (WHEREUPON, a certain document was

16                        marked Deposition Exhibit No. 11,

17                        for identification, as of 3/28/23.)

18   BY MR. FREEMAN:

19        Q.    Mr. Ingram, what's this document?

20        A.    It appears to be a presentation on ballot

21   by mail.

22        Q.    Is this the most recent presentation on

23   ballot by mail that your office has provided?

24        A.    I believe so.  I mean what I find on those

25   power points is the date that it's printed is the date



1  that shows up on here.  So it's not really a very

2  useful guide.  But as far as I know, we didn't change

3  our guidance or instructions in our presentations

4  throughout the '22 year.

5       Q.    It's from the election law seminar.  Do you

6  know when that was held?

7       A.    I don't.  It was in July or August.

8       Q.    Okay.  Did you participate in the drafting

9  of this document?

10      A.    I did review it, yes.

11      Q.    So others drafted, but you reviewed after

12  it had been drafted; would that be right?

13      A.    That's correct.

14      Q.    Did you give the training based on this

15  document?

16      A.    No, sir.

17      Q.    Who did?

18      A.    I don't remember, maybe Heidi Martinez.

19      Q.    Who is Ms. Martinez?

20      A.    She is one of our staff attorneys.

21      Q.    Does this presentation -- are you aware of

22  whether this presentation instructed local clerks to

23  inform voters upon request whether they had a driver's

24  license or SSN on file?

25      A.    As I stated before, we don't have to tell



 1  them to do that.  That's something they do, they answer

 2  voter's questions.

 3       Q.    Just to be clear, they -- you don't train

 4  them to do that, that's just something you expect them

 5  to do?

 6       MS. HUNKER:  Objection, form.

 7  BY THE WITNESS:

 8       A.    I expect county election officials to

 9  answer voter questions, yes, I do.

10  BY MR. FREEMAN:

11       Q.    Including that question?

12       A.    Yes, including that question very much so.

13       Q.    Turning to page 31.  What are the matters

14  set on page 31?

15       A.    The best practices when reviewing an

16  application for ballot by mail.

17       Q.    So this is the review conducted by the

18  early voting clerk?

19       A.    Early voting clerk is the one who reviews

20  applications for ballot by mail, yes.

21       Q.    The early voting clerk has to look up the

22  registration status of the voter as part of that

23  process?

24       A.    That's correct.

25       Q.    And do you suggest as part of that training



1    how they should look up the voter registration status

2    of an applicant?

3         A.    No.

4         Q.    Do you have an understanding of how they

5    typically go about doing that?

6         A.    They either use TEAM or they use their

7    local system.  And some off-line counties use TEAM for

8    this.

9         Q.    What information do they plug in when they

10   are trying to pull up the registration status like

11   name?

12        A.    Well, I mean if you're using TEAM you can

13   search by voter name.  That's probably the way they do

14   it.  They are limited to their county.

15        Q.    If we turn to page 32.  What are the

16   matters set out here?

17        A.    This talks about the new law.

18        Q.    This is talking about looking up

19   identification numbers; is that correct?

20        A.    That's correct.

21        Q.    That is separate from looking up

22   registration status?

23        A.    It's part of the registration status.

24        Q.    But it's --

25        A.    That's what it says at the last sentence



1  you talk to the voter registrar to confirm the voter

2  registration and status.

3       Q.    But am I correct that the numbers provided

4  here, driver's license, Social Security number, they

5  are not used to look up the voter, they are used to

6  confirm the voter; is that correct?

7       A.    They are used to make sure the voter has

8  properly identified themself on the application, yes.

9       Q.    Those numbers are not used to find the

10 voter in TEAM as part of the ABBM processing, correct?

11      A.    No, sir.  I mean not usually.  I guess they

12 could look it up by DL number if they wanted to.

13      Q.    Do you have any understanding as to

14 whether -- strike that.

15           Do you instruct local officials to do that?

16      MS. HUNKER:  Objection, form.

17 BY THE WITNESS:

18      A.    We don't tell them how they use TEAM.  All

19 of the fields are available to look up anything they

20 want to look up.

21 BY MR. FREEMAN:

22      Q.    Are you aware of any local officials using

23 the Texas driver's license number or Social Security

24 number to look up a voter as part of the initial

25 determination of their registration status?



```
 1        A.      If that's the way they do it's the way we

 2   do.  We don't know about it.

 3        Q.      You don't know about it personally?

 4        A.      That's right.  Or as an office that's not

 5   something we get into.

 6        Q.      Okay.

 7        A.      We tell them how to do a voter search.

 8        Q.      Turn to page 40.  You look at pages 40, 41

 9   and 42.  What are the matters set out on these pages in

10   the presentation?

11        A.      They are talking about the new law, the

12   requirement for a number on the carrier envelope.

13        Q.      Is there any information here about how the

14   numbers are to be used in the mail voting process other

15   than as a basis for rejection of a mail ballot?

16        A.      That's not what this says.  I don't know

17   why would you say -- what are you asking?

18        Q.      I'm asking if there is any information here

19   about how the numbers are to be used in the mail voting

20   process other than as a basis to confirm voter identity

21   or reject the ballot?

22        MS. HUNKER:  Objection, form.

23   BY THE WITNESS:

24        A.      They are supposed to look up the number

25   provided by the voter to see if it's in the voter
```



1   registration record.  I don't know.

2   BY MR. FREEMAN:

3        Q.    Is there any information here about using

4   the number to look up the voter in the first instance

5   as opposed to using the record that has already been

6   pulled up with other information to confirm that the

7   Texas driver's license number and Social Security

8   number line up?

9        A.    Again, how they look up a voter is how they

10  look up a voter.  We don't get into that.

11       Q.    I have to ask you a few questions about the

12  ballot tracker.  When we last met last year we

13  discussed the log-in requirements of the mail ballot

14  tracker. We talked a little bit about it here today as

15  well.  Have there been any changes thus far to the

16  log-in requirements for the ballot tracker since we met

17  in April of last year?

18       A.    There have not.

19       Q.    Does The Office of Secretary of State have

20  the ability to change these log-in requirements absent

21  changes to the election code?

22       A.    We do not.

23       Q.    Do you know if the ballot tracker log-in

24  page provides information as to how to add information

25  to a voter TEAM record if the voter doesn't have a TDL



1   and SSN on file?

2          A.      I don't know.  We were talking about

3   putting a notice on there.  I don't remember if it's

4   there or not.

5          MR. FREEMAN:  We can mark this as Exhibit 12.

6                        (WHEREUPON, a certain document was

7                        marked Deposition Exhibit No. 12,

8                        for identification, as of 3/28/23.)

9   BY MR. FREEMAN:

10         Q.      What's Exhibit 12?

11         A.      It's appears to be a page from

12  votetexas.gov.

13         Q.      Does this inform voters how to use the

14  ballot tracker?

15         A.      That's what it's for, yes, sir.

16         Q.      Does it inform them how to fill in missing

17  information if they don't have both a TDL and SSN on

18  their TEAM file?

19         A.      I don't think we talk about it here, no.

20         Q.      To your knowledge, it's not on the log-in

21  page for the ballot tracker either, is it?

22         A.      The My Voter portal I'm thinking has a link

23  to texas.gov if you want to add numbers.

24         MR. FREEMAN: Given it's just for the purpose of

25  refreshing, Kathleen, would you object to me using the



```
 1   image of the My Voter portal on an electronic device

 2   without submitting it as an exhibit?

 3        MS. HUNKER:  I do not as you represent that you

 4   will submit a printout of that as an exhibit?

 5        MR. FREEMAN:  Happy to do that.  Let's leave a

 6   hole for Exhibit 13.  We will just use a copy of my

 7   voter portal.

 8        MS. HUNKER:  Though I would like the witness to

 9   confirm that the portal on the phone would be the same

10   as if --

11                    (WHEREUPON, a certain document was

12                    marked Deposition Exhibit No. 13,

13                    for identification, as of 3/28/23.)

14   BY THE WITNESS:

15        A.    It's not.  Over on the left-hand side --

16   there we go.  See that need to change your name or

17   address, the link that's the link to texas.gov.  The

18   log on to texas.gov it adds both their numbers.

19   BY MR. FREEMAN:

20        Q.    It asks need to change your name or

21   address.  Does it also ask or does it indicate anywhere

22   that that same form can be used to add a driver's

23   license number or a Social Security number?

24        A.    When you get to that link it says, "If you

25   are here to add your numbers, this is what you do."
```



1    Q.    On the ballot tracker web page, however,

2  does it indicate that the need to change your name or

3  address page is also the means by which you can add a

4  driver's license or Social Security number?

5    A.    I don't think so.

6    MS. HUNKER:  Just to clarify, we have somebody

7  designated as 30(b)6) to talk about voter education

8  that includes the website from texas.gov.

9    MR. FREEMAN:  This is a topic we discussed at his

10  prior deposition so I'm just updating.

11  BY MR. FREEMAN:

12    Q.    Currently does the off of -- prior to your

13  no longer being elections director, had you developed

14  any plans to provide additional information on the

15  ballot tracker website to voters who attempt and fail

16  to log in to the tracker as to how to add driver's

17  license or Social Security number information to their

18  TEAM record?

19    A.    I don't know.  We might.

20    Q.    Well, in the past when you were the

21  elections director, had you developed plans to do that?

22    A.    We talk about all of those kind of things,

23  yes.

24    Q.    Why did you decide not to do that at least

25  thus far?



```
 1        A.      It just hasn't come up as a thing to do
 2   yet.
 3        Q.      Are you aware of any public efforts during
 4   the 2022 general election period to communicate to
 5   voters who have an ABBM or carrier envelope rejected
 6   because of SB 1 the means by which they can add
 7   information to their TEAM record, any public voter ad
 8   campaigns on that specific subject?
 9        MS. HUNKER:  Objection, form.
10   BY THE WITNESS:
11        A.      I don't know.  I don't know if that was
12   specifically addressed in the campaign.  You would have
13   to talk about Sam about that.  It's something our
14   office has communicated to county election officials to
15   communicate to voters.
16   BY MR. FREEMAN:
17        Q.      When did your office communicate that to
18   county election officials?
19        A.      Any meeting we had with them in '22.  Texas
20   Association of Election Administrators meeting in
21   January, the county clerks, whenever we met with them
22   down in Galveston, our summer seminar.  Any chance we
23   had that's what we talked about how to tell voters to
24   fix the issues.
25        Q.      When you say the issues, these are the
```



 1   issues caused by SB 1 for voters who don't have

 2   complete information on their team file; is that right?

 3        A.     No.   Any problem with their mail ballot, if

 4   they didn't sign it, if they didn't fill out a state of

 5   residence, any problem.   There is lots of problems that

 6   would result in a rejection of a mail ballot or the

 7   application, and we told them how to fix the issues.

 8        Q.     That includes issues --

 9        A.     Subset --

10        Q.     -- ruling from SB 1?

11        A.     The subset identification requirements.

12   They didn't successfully complete those.

13        MR. FREEMAN:  We can mark this as Exhibit 14.

14                    (WHEREUPON, a certain document was

15                    marked Deposition Exhibit No. 14,

16                    for identification, as of 3/28/23.)

17   BY MR. FREEMAN:

18        Q.     What's this document?

19        A.     It appears to be an email from Colleen

20   Stadnik and a response.

21        Q.     Did Ms. Stadnik send this email asking for

22   help correcting the driver's license information on her

23   ballot envelope?

24        A.     She wants to know how to find the

25   corrective action form.



```
1          Q.     But she was told her ballot was -- that was
2    missing a driver's license number; is that right?
3          A.     That's right.
4          Q.     What time did she send that email?
5          A.     She sent it on November 10 apparently.
6          Q.     When did your office respond?
7          A.     November 14.
8          Q.     At what time?
9          A.     5:54.
10         Q.     When were corrections to ballots missing
11   driver's license numbers due after the November 2022
12   general election?
13         A.     The sixth day.
14         Q.     Was November 14 the sixth day?
15         A.     I believe so.
16         Q.     Were they due by 7:00 p.m.?
17         A.     I don't know about 7:00 p.m.  I thought we
18   talked about until midnight.
19         Q.     Is that only possible if a clerk's office
20   is open until midnight?
21         A.     No.
22         Q.     How would they submit a corrective action
23   form if the clerk's office is closed?
24         A.     They don't have to do a corrective action
25   form.  They had to go to votetexas.gov and confirm
```



1   their numbers are correct on there.  That produces a

2   task on the dashboard of the county that this one has

3   been corrected.

4        Q.     Did your office inform this voter, "You

5   must deliver the completed corrective action form in

6   person to the early voting clerk's office by the end of

7   business today"?

8        A.     It says or.

9        Q.     So the first information it does not say or

10  would you agree then it subsequently says or?

11       MS. HUNKER:  Objection, form.

12  BY THE WITNESS:

13       A.     It says, "You make correct missing or

14  incorrect personal ID numbers through the vote ballot

15  tracker or by votetexas.gov or by delivering a

16  corrective action form."

17  BY MR. FREEMAN:

18       Q.     Right.  But first it says, "The county

19  should have sent you a notice with the corrective

20  action form on the back.  You must deliver the

21  completed corrective action form in person to the early

22  voting clerk's office by the end of business today,

23  Monday, November 14, 2022," isn't that right?

24       A.     Then it gives alternative.

25       Q.     Yes.  But with regards to the -- with



1   regards to specific information requested by the voter

2   on how to submit a corrective action form, your office

3   provided that information at 5:55 p.m., and instructed

4   the voter to submit the form by close of business that

5   same day; is that correct?

6        MS. HUNKER:  Objection, form.

7   BY THE WITNESS:

8        A.     I'm not going to agree with that

9   characterization.  That's not what it says.  It says

10  what it says.

11  BY MR. FREEMAN:

12       Q.     Was that your office's typical practice in

13  terms of their ability to respond to requests for

14  assistance regarding ballot corrections?

15       MS. HUNKER:  Objection, form.

16  BY MR. FREEMAN:

17       Q.     To not be able to respond until the day

18  that the corrective action forms were due?

19       MS. HUNKER:  Same objection.  Objection.

20  BY THE WITNESS:

21       A.     The responses were made when they were

22  made.  You can go back and look at all of the emails if

23  you want to.

24  BY MR. FREEMAN:

25       Q.     Was there a volume of responses such that



1    it was difficult for your office to respond more

2    quickly than by the day the corrective action forms

3    were due?

4          A.    Our response time is within 24 hours.  This

5    is an exception of that.

6          Q.    When do those exceptions occur?

7          A.    I don't know.  When they occur that's what

8    makes it an exception.

9          Q.    I'm just trying to understand, you know, if

10   you have a typical practice, but there are exceptions.

11   Is there a set of circumstances when you typically view

12   or experience those exceptions?

13         A.    Our goal, our practice, our policy is to

14   respond to email and phone calls within 24 hours.

15         Q.    Okay.  Do you know how many exceptions

16   occurred in the November 2022 general?

17         A.    I do not.

18         Q.    Do you know if this voter was

19   disenfranchised by SB 1?

20         MS. HUNKER:  Objection, form.

21   BY THE WITNESS:

22         A.    I have no idea.

23   BY MR. FREEMAN:

24         Q.    We previously discussed a number of ways

25   that a voter can update their TEAM record after the



1  close of registration so they may successfully submit

2  an ABBM.  Prior to the November 2022 general could a

3  voter submit a new voter registration form after the

4  close of registration?

5       A.     Yes.

6       Q.     Could they submit a copy of their driver's

7  license and their ID card with the ABBM?

8       A.     They could.

9       Q.     Did they visit texas.gov to provide

10 information already in DPS databases to TEAM?

11      A.     That's correct.

12      Q.     Was there anything else?

13      A.     Those are the ways, I think.

14      Q.     Is there any indication on the Texas voter

15 registration form that was in use at the time that it

16 can be used to add missing information to a voter

17 registration record as opposed to changing an existing

18 name or address?

19      A.     No, there is not anything special about it.

20 It could be used for that purpose.

21      Q.     Is there any indication on the form itself

22 that it can be used for that purpose?

23      A.     There is a form -- form says it could be

24 used to change your record, yes.

25      Q.     Well, let's mark this --



1      A.      There is one of the boxes that says update

2  existing record, isn't there?  Isn't that one of the

3  boxes on the form?  I think so.

4      MR. FREEMAN:  Let's use this as Exhibit 15.

5                      (WHEREUPON, a certain document was

6                      marked Deposition Exhibit No. 15,

7                      for identification, as of 3/28/23.)

8  BY MR. FREEMAN:

9      Q.      What's this document?

10      A.      It's a copy of voter registration

11  application.

12      Q.      In box one this indicates it can be used as

13  a new application to change address, name or other

14  information or to request replacement card, correct?

15      A.      That's correct.

16      Q.      It does not indicate it can be used to add

17  missing information; is that right?

18      MS. HUNKER:  Objection, form.

19  BY THE WITNESS:

20      A.      What do you think change other information

21  means?

22  BY MR. FREEMAN:

23      Q.      I would -- well, when you see --

24      MR. FREEMAN: You know what, I'm going to object

25  to that as non-responsive and ask again.



1    BY MR. FREEMAN:

2         Q.    It does not indicate that you can add

3    missing information on this form, correct?

4         MS. HUNKER:  Objection, form.

5    BY THE WITNESS:

6         A.    I disagree.  It says you can change other

7    information, and that includes updating.

8    BY MR. FREEMAN:

9         Q.    If a voter submits a voter registration

10   application to add missing information to a voter

11   registration record, would your office or the local

12   registrars run a live check on the driver's license

13   number or Social Security number?

14        A.    Probably.

15        Q.    Do you know for certain?

16        A.    I don't.  But it wouldn't be our office.  I

17   mean our office is the one that does it, but the county

18   would do the live check.

19        Q.    Is there anything other than the live check

20   which may or may not occur that is used to verify the

21   authenticity of the driver's license number or Social

22   Security number being submitted?

23        A.    No.

24        Q.    So if a voter submits a voter registration

25   application that provides the same information as the



1  ABBM and a driver's license number or Social Security

2  number signed and submitted, correct, is there any

3  differential in the information on this voter

4  registration application from the information being

5  submitted on the ABBM?

6       A.     Yes, there is quite a lot of difference.

7       Q.     What's the difference?

8       A.     On ABBM you have your name, address, and

9  date of birth.  Here you have got a lot more than that.

10      Q.     Name, address, date of birth, Texas

11  driver's license number or Social, what else is present

12  here?

13      A.     "Are you a U.S. citizen?  Will you be 18 or

14  of age on or before election day?  I understand that

15  giving false information to procure a voter

16  registration is perjury and a crime under State and

17  Federal law.  Conviction of this crime may result in

18  imprisonment up to one year in jail, a fine of 4,000.

19  Please read actual three statements to affirm before

20  signing.  I'm a resident of the county, and a U.S.

21  citizen.  I have not been finally convicted of a felony

22  or if a felon I have concluded all of my punishment

23  including any term of incarceration, parole,

24  supervision, a period of probation or I have been

25  pardoned, and I have not been determined by a final



1    judgment of a court exercising probate jurisdiction to

2    be totally mentally incapacitated or partially mentally

3    incapacitated without the right to vote."

4         Q.     But a voter who has previously registered

5    has already provided all of that information, correct?

6         A.     Yes.

7         Q.     So if a voter has to submit this voter

8    registration application and then submit to ABBM, they

9    are providing the same information they provided before

10   plus the driver's license number so that they can

11   provide the same information that they have provided

12   before plus a driver's license number on an ABBM; is

13   that right?

14        MS. HUNKER:  Objection, form.

15   BY THE WITNESS:

16        A.     The difference is they are signing under a

17   statement that says affirming on penalty of perjury the

18   accuracy of the information in this voter registration

19   document.

20   BY MR. FREEMAN:

21        Q.     If you go back to ABBM here, they are also

22   filing under penalty of criminal law that the

23   information on the APBM is accurate, correct?

24        A.     I understand giving false information on

25   this application is a crime.



1    Q.    Okay.

2    A.    Then the voter registration application, "I

3    understand that giving false information to procure

4    voter registration is perjury and a crime under State

5    and Federal law.  Conviction of this crime may result

6    in imprisonment up to one year in jail, a fine of 4,000

7    or both.  Please read all three statements to affirm

8    before signing.  I'm a resident, I've not been finally

9    convicted, I'm not mentally incapacitated."

10   Q.    More details?

11   A.    That's different.

12   Q.    I understand it's different.  But it's a

13   crime to submit false on information on an ABBM,

14   correct?

15   A.    Agreed.  It's a crime to put false

16   information on any government document.

17   Q.    To be clear, when a voter submits -- a

18   registered voter submits a new voter registration

19   application for purpose of adding a driver's license

20   number and a Social Security number, they are

21   submitting the same name, address information, date of

22   birth, and signature on the voter registration

23   application that they do on the ABBM with slightly

24   different language concerning crime, and concerning

25   qualifications, correct?



1        MS. HUNKER:  Objection, form.

2   BY THE WITNESS:

3        A.     No.  I will reject that characterization.

4   Slightly different.  It's not slightly different.  It's

5   much more explicit.

6   BY MR. FREEMAN:

7        Q.     With additional, more explicit information

8   on the voter registration?

9        A.     You can characterize it in that way.

10   That's the only way I would say.  It's a different

11   form, different affirmant of perjury.

12        Q.     In order to add the driver's license number

13   or Social Security number information using a Texas

14   voter registration application, a voter is submitting

15   the same name, address, date of birth, and driver's

16   license or Social Security number information that's on

17   the ABBM as well; is that correct?

18        MS. HUNKER:  Objection, form, asked and answered.

19   BY MR. FREEMAN:

20        Q.     You may answer.

21        A.     I'm not going to answer that again.

22        Q.     You may answer.

23        A.     I'm not going to answer it again.

24        Q.     Sir?

25        A.     You are going to tell me what I'm going to



 1   do?

 2        Q.     You are under oath and required to answer

 3   questions in a deposition, sir.

 4        A.     I have --

 5        MS. HUNKER:  He's answered this question multiple

 6   times in different ways.

 7   BY THE WITNESS:

 8        A.     I haven't answered it the way you like it,

 9   but I have answered it.

10   BY MR. FREEMAN:

11        Q.     I'm trying to cut out the part of the

12   question that you don't like so that we can get a clean

13   record.  So I would appreciate if you would answer my

14   question.

15        A.     Cutting out something that makes it a

16   different answer is not going to be acceptable to me.

17   My answer comes in all of the context.

18        Q.     The voter registration application asks a

19   voter for last name and first name, correct?

20        A.     The voter registration application asks for

21   what it asks for.  It asks for a lot more than that.

22        Q.     One of the things that the voter

23   registration application asks for is voter last name

24   and first name, correct?

25        A.     You can read the form for yourself.  That's



```
 1    what it says.
 2            Q.      We are in a deposition, sir.
 3            A.      So.
 4            Q.      I ask questions.
 5            A.      I hear you.
 6            Q.      You answer them.
 7            A.      I am answering.
 8            Q.      That was not the answer to my question.
 9            A.      It was.
10            Q.      Does the voter registration application ask
11    for a voter's last name and first name?
12            A.      The voter registration application asks for
13    a voter's last name and first name and a lot of other
14    information.
15            Q.      Thank you.  Does the voter registration
16    application ask for a voter's residence address?
17            A.      The voter registration application asks for
18    what it asks for.  One of those things is a residence
19    address, but there is a lot of other things it asks for
20    as well.
21            Q.      Does the voter registration application ask
22    for the voter's date of birth?
23            A.      The voter registration application asks for
24    the date of birth along with a lot of other
25    information.
```



1    Q.    Does the ABBM ask for the voter's last

2  name, first name, residence address, date of birth, and

3  other information as well?

4    A.    The voter registration or the voter

5  application for ballot by mail asks for what it asks

6  for.  It asks for those things plus some other stuff,

7  yes.

8    Q.    Do both documents ask for a driver's

9  license or a driver's license number or Social Security

10  number?

11    A.    Both of them are required to put the ID

12  number on there, one or the other.  They are not the

13  same document.  They are not the same application.

14  They have different purposes, and they have different

15  statements with regard to perjury.

16    Q.    Both documents required must be signed

17  under penalty of -- must be signed with certification

18  as to accuracy under penalty of criminal prosecution?

19    A.    Both of them have different statements

20  about what the penalty is with regard to signing false

21  information.

22    Q.    But they are both signed under penalty of

23  some criminal prosecution for providing false

24  information; is that correct?

25    A.    They are both signed with whatever their



 1  statement is on the particular document.

 2        Q.     But if a voter does not have driver's

 3  license information and Social Security number

 4  information on their voter registration record, one of

 5  the ways they can fix that is by first submitting the

 6  voter registration application, and then submitting

 7  ABBM with the exact same information on it plus a

 8  signature under somewhat different language; is that

 9  correct?

10        MS. HUNKER:  Objection, form.

11  BY THE WITNESS:

12        A.     Definitely not going to agree with that,

13  sir.

14  BY MR. FREEMAN:

15        Q.     Why?

16        A.     Because voter registration has a different

17  purpose.  Number two, it doesn't have to be done

18  before, it can be done afterward.

19        Q.     Then the voter would have to submit a new

20  ABBM; is that correct?

21        A.     That's not correct.

22        Q.     But they would have to do both; is that

23  correct?

24        MS. HUNKER:  Objection, form.

25  BY THE WITNESS:



1          A.      They have to have a number on the

2     application for ballot by mail that's in their voter

3     registration record.

4     BY MR. FREEMAN:

5          Q.      One of the ways they can add that is by

6     submitting a form, a Texas voter registration form,

7     correct?

8          A.      That's what we have discussed way early on.

9          Q.      Right.

10         MS. HUNKER:  Dan, can we take a quick five-minute

11    break?

12         MR. FREEMAN: Sure.

13                    (WHEREUPON, a recess was had.)

14    BY MR. FREEMAN:

15         Q.      Mr. Ingram, was there any publicly

16    available information in the general election period

17    indicating that a voter could submit a copy of their

18    driver's license or ID card with their ABBM to address

19    the SB 1 ID number requirement?

20         A.      Not that I know of.  You would have to ask

21    Sam to make for sure, but I don't think that was part

22    of our campaign.

23         Q.      Do you know if there was any indication on

24    Texas.gov during this period that the website could be

25    used to update voter registration information other



1  than name and address?

2       A.    I don't think so.  I mean by website are

3  you talking about Texas.gov?

4       Q.    Yes.

5       A.    Okay.

6       MR. FREEMAN:  We can mark this as Exhibit 16.

7                    (WHEREUPON, a certain document was

8                    marked Deposition Exhibit No. 16,

9                    for identification, as of 3/28/23.)

10  BY MR. FREEMAN:

11       Q.    Mr. Ingram, what's this document?

12       A.    This is a notice of rejected application

13  for ballot by mail for missing or incorrect personal ID

14  number.

15       Q.    Was this the version of the form that was

16  in use in the November general election?

17       A.    I believe so, yes.

18       Q.    I apologize.  I had intended to provide you

19  with form 6-4, which is a different notice of rejected

20  application for ballot by mail.  If we hold Exhibit 17

21  for that, and I will show that to you on this laptop.

22                    (WHEREUPON, a certain document was

23                    marked Deposition Exhibit No. 17,

24                    for identification, as of 3/28/23.)

25  BY MR. FREEMAN:



1      Q.      What's form 6-4?

2      A.      It's a notice of rejected application of

3   ballot by the mail that says required ID number is not

4   in your record.

5      Q.      So that's a different notice of rejection

6   application for ballot by mail from form 6-3.  Is it

7   specific for folks who don't have anything on their

8   TEAM record; is that right?

9      A.      Well, whatever they put on their

10  application for ballot by mail is not in their record.

11     Q.      Okay.  So it's not just folks who have

12  nothing, it's also for folks who put something and it

13  didn't match; is that right?

14     A.      It didn't -- if it didn't match because

15  it's incorrect, they get the other form.  If it didn't

16  match because there is nothing there, they get this

17  form.

18     Q.      Okay.  Great.  Was this form in use in

19  November 2022?

20     A.      It was.

21     Q.      Does it state there are only two ways to

22  add the required numbers?

23     A.      That's correct.

24     Q.      Do you have any intention to update this

25  form to tell voters they can mail in a copy -- strike



 1   that.

 2           Did you ever discuss with your colleagues

 3   updating this form to inform voters that they can mail

 4   in a copy of their Texas driver's license with their

 5   ABBM to update?

 6       A.    No.  We got that question as a county who

 7   received a copy of DL and what do we do with this, so

 8   we answered that question.  It was never going to be us

 9   telling a voter that they have to mail in a copy of

10   their DL.

11       Q.    The form only directs voters to go to

12   Texas.gov generally, not to a specific page on that

13   website; is that correct?

14       MS. HUNKER:  Objection, form.

15   BY THE WITNESS:

16       A.    It says you can update your voter

17   registration record at Texas.gov.

18   BY MR. FREEMAN:

19       Q.    Not like

20   Texas.gov/updateyourvoterregistrationrecord?

21       A.    Well, during the election season, Texas had

22   change your name and address on your voter registration

23   on front and center on the front page on Texas.gov.

24       MR. FREEMAN:  If we could mark this as Exhibit

25   18.



```
 1                           (WHEREUPON, a certain document was
 2                           marked Deposition Exhibit No. 18,
 3                           for identification, as of 3/28/23.)
 4    BY MR. FREEMAN:
 5         Q.      Before we do will -- to your knowledge,
 6    will Texas.gov continue to have the update your name
 7    and address information on the home page during every
 8    election season moving forward?
 9         MS. HUNKER:  Objection, form.
10    BY THE WITNESS:
11         A.      So we coordinate with DIR, Department of
12    Information Resources, they are the ones who run the
13    Texas.gov page, and we coordinate with them about when
14    we would like that message to be prominent.
15    BY MR. FREEMAN:
16         Q.      What's document Exhibit 18?
17         A.      Well, it's a page that's on Texas.gov.
18         Q.      Is this the page on which voters can update
19    their name and address?
20         A.      Yes.
21         Q.      Is this -- do you know if this is a current
22    page that's in use?
23         A.      I don't know.  I mean if it is there is
24    different information one more page in.
25         Q.      Well, I think I have that page as well.
```



MAGNA
LEGAL SERVICES

1    But on this page is there any indication that this

2    website can be used to update Texas driver's license

3    number or Social Security number information on a voter

4    registration record?

5         MS. HUNKER:  Objection, form.

6    BY THE WITNESS:

7         A.     There is not any indication of that on this

8    page, no.

9         MR. FREEMAN:  Mark this as Exhibit No. 19.

10                       (WHEREUPON, a certain document was

11                       marked Deposition Exhibit No. 19,

12                       for identification, as of 3/28/23.)

13   BY MR. FREEMAN:

14        Q.     What's Exhibit 19?

15        A.     This is the identity management page for

16   the Texas.gov.

17        Q.     Is this the other page that you were

18   thinking of?

19        A.     No.

20        Q.     Do you know if this is the current page

21   that's in use on Texas.gov?

22        A.     For identity management, yes.

23        Q.     This is the page that's used to update a

24   voter's name and address, correct?

25        A.     This is for voter registration changes



1   through Texas.gov.

2       Q.      Is this the page that voters would use to

3   update their Texas driver's license number or Social

4   Security number on their voter file?

5       A.      If they wanted to add to voter file this

6   was the one that replaces zero, no value with a number.

7       Q.      Is there any indication on this website

8   that this is the page that can be used to update Texas

9   driver's license number or Social Security number on

10  voter registration record?

11      A.      No.  But if you fill this out, the next

12  page in says, "If your purpose is to update your voter

13  record with your numbers you have done it so log out.

14  You are finished."

15      Q.      Okay.  In some are there any instructions

16  prior --

17      A.      Act of logging in supplies no values.

18      Q.      Understood.  In some are there any

19  instructions on Texas.gov prior to logging in that this

20  site may be used to add a Texas driver's license number

21  or Social Security number to voter registration

22  records?

23      A.      I don't think so.

24      Q.      We previously discussed a number of ways

25  voters can add or correct identification numbers on a



1  ballot envelope or FCPA signature sheet.  Is there any

2  change in those procedures since May of 2022?

3      A.    There is not.

4      Q.    So I'm clear, a voter can correct on the

5  envelope or signature sheet and send it back, they can

6  hand return the envelope or they can cancel the mail

7  ballot and vote in person; is that right?

8      A.    Those are some of the options.

9      Q.    What are the other options?

10     A.    They can correct the ballot tracker and add

11 numbers to Texas.gov.

12     Q.    But if a mail ballot has been sent back to

13 them, they have to physically return the ballot; is

14 that right?

15     A.    They have to physically return a ballot,

16 yes.

17     Q.    They can only correct on the ballot tracker

18 if the early voting ballot board has retained the

19 ballot; is that right?

20     MS. HUNKER:  Objection, form.

21 BY THE WITNESS:

22     A.    Well, if they've got the ballot they've got

23 to get it back, but they can also correct the

24 information on the ballot tracker.  Those are not

25 mutually exclusive.



 1  BY MR. FREEMAN:

 2       Q.    The ballot tracker is only accessible to

 3  voters who have both a Texas driver's license number

 4  and a Social Security number on their TEAM file,

 5  correct?

 6       A.    Right.

 7       Q.    As of right now?

 8       A.    That's correct.  Which is over 96 percent

 9  of voters.

10       Q.    Mr. Ingram, do you recall when we met back

11  in April of 2022 that we discussed whether a single

12  voter could be issued more than one DPS number?

13       A.    Yes.

14       Q.    Do you recall whether you knew at the time

15  whether DPS had in fact issued multiple numbers to

16  particular individuals over the course of their

17  lifetime?

18       A.    If I didn't say that's a DPS question I am

19  saying it now, it's a DPS question.

20       Q.    Do you know whether DPS has done that in

21  the past?

22       A.    To my knowledge, you get one number.

23       Q.    I have some document I'm hoping can clear

24  this up.  We can mark this as Exhibit 19.

25                      (WHEREUPON, a certain document was



```
 1                          marked Deposition Exhibit No. 20,
 2                          for identification, as of 3/28/23.)
 3          MR. FREEMAN:   This is 20.
 4   BY MR. FREEMAN:
 5          Q.     What's this document?
 6          A.     It appears to be an email exchange with
 7   Mr. or Mrs. Mickey Marvins and our office.
 8          Q.     If you go to the original email on page 3
 9   what's the problem that Ms. Marvins describes.
10          A.     That she got an ID to replace her driver's
11   license, and the ID number wasn't in her voter record.
12          Q.     As a result, her friend who had this
13   experience had a problem getting an absentee ballot
14   because the number on her DPS identification was
15   different when she went from a driver's license to an
16   ID card; is that right?
17          A.     Agree with that.  Just in case you are
18   wondering, that's not inconsistent with what I said.
19   You get one number.  You surrender your DL and you get
20   the ID number.  I don't want you under the impression
21   you got two numbers.  You got one number.  It just
22   changed.
23          Q.     I see.  Okay.  Bit of a clarification.
24          A.     I want to make sure we are clear.
25          Q.     Over the course of a lifetime, is what I
```



 1  asked before, a voter can be issued more than one ID

 2  number by DPS; is that correct?

 3        A.     If you change from one form of ID to

 4  another then yes.

 5        Q.     When did you first become aware of that

 6  fact?

 7        A.     I have always known that.  I don't know --

 8  it's not a strange or unusual piece of information.  I

 9  went to Arkansas, I had to surrender my driver's

10  license.  I came back, I had to surrender my Arkansas

11  license.

12        Q.     Am I correct that SB 1 permits voters to

13  submit a driver's license number that is expired,

14  correct?

15        A.     That's correct.

16        Q.     Even if I have surrendered my driver's

17  license number, if that's the number -- if I have

18  surrendered my driver's license and gotten an ID, if my

19  driver's license is still on file with TEAM, I can vote

20  using the number on my driver's license; is that right?

21        A.     You can for up to four years for a person

22  under 70.  Then for a person over 70 it can be expired

23  for however long you need it.

24        Q.     Are you sure that's the rule for SB 1 and

25  not for the voter ID?



```
 1        A.      It's the same.  It incorporates 63101 into

 2   mail ballots.

 3        Q.      In any case, has your office taken any

 4   actions to address issues created by voters who have

 5   and hold DPS ID number on file and who have received a

 6   new DPS ID number on a new form of ID?

 7        A.      That's voter responsibility to update their

 8   information in TEAM.  And they can do that very

 9   conveniently, they are at DPS, say, "Use this

10   information to update my voter record."  They just have

11   to check yes on a box.

12        MR. FREEMAN:  Off the record for a moment.

13                    (WHEREUPON, a discussion was had

14                    off the record.)

15   BY MR. FREEMAN:

16        Q.      Has your office done anything to address

17   the issue of voters who submit the number of old

18   identification that's no longer the number on TEAM, but

19   remains valid for SB 1 purposes?

20        A.      I don't know what that question means.

21        Q.      Sure.  Let's say a voter had a driver's

22   license, surrenders it, gets an ID card and does update

23   TEAM with the ID card number -- thumbs up from the

24   witness -- but then they submit their old driver's

25   license number because they are concerned or
```



 1   misunderstand and think that's what they have to

 2   submit.  Has your office done anything to address that

 3   specific scenario?

 4        A.    You would have to talk to Sam about our

 5   education campaign.  But, you know, what we tell voters

 6   if they call our office is that they need to use

 7   whatever is currently in their voter registration, and

 8   that's why we encourage them to use both numbers so

 9   that if one of them hits they are good.

10        Q.    Is a voter able, to your knowledge, to call

11   their local clerk or election administrator and ask

12   specifically what number is on their registration

13   record?

14        A.    Of course.

15        Q.    So I could call and say what's the driver's

16   license on my registration record and then fill that in

17   on an ABBM?

18        A.    Sure.

19        MS. HUNKER:  Objection, form.

20   BY THE WITNESS:

21        A.    It would go through some questions to

22   validate that it's you and not some vote harvester

23   trying to steal your vote, but yes.

24   BY MR. FREEMAN:

25        Q.    What questions would they use?



1      A.      I don't know.  Whatever the county uses

2  whenever they validate someone's identity on the phone.

3      Q.      Any information that isn't also on the

4  ABBM?

5      A.      Well, it's information that would be in

6  their voter record.

7      Q.      But it's information that was on the

8  application prior to SB 1, right, name, date of birth,

9  address, things like that, correct?

10      A.      That's correct.

11      Q.      In theory if a voter -- strike that.

12              So if an individual wanted to cast an ABBM

13  in someone else's name, the only security addition

14  created by SB 1 is the driver's license number or a

15  Social Security number, correct?

16      MS. HUNKER:  Objection, form.

17  BY THE WITNESS:

18      A.      Well, I mean signature still counts.

19  BY MR. FREEMAN:

20      Q.      Sure.  That was pre -- signature counted

21  pre-SB 1, right?

22      A.      Agreed.

23      Q.      In fact, it's easier to meet the signature

24  requirement after SB 1?

25      A.      Agreed.



1    Q.    All the voter needs to do to get that

2    driver's license number is to call the clerk with

3    pre-SB 1 information and ask for which driver's license

4    number is on file, no?

5         MS. HUNKER:  Objection, form.

6    BY THE WITNESS:

7         A.    No.

8    BY MR. FREEMAN:

9         Q.    Why not?

10        A.    Because they can call and ask, "What do I

11   have on file?"  They will say DL or SSN or both.

12        Q.    What if they say what number is on file?

13        A.    If the voter -- then I would imagine, I

14   don't know because I'm not a county, but if I was a

15   county voter registrar I would say, "What driver's

16   license number -- what's your driver's license number?"

17   They would look and say, "Yup that's what you got."

18        Q.    Okay.  Thank you for that clarification.

19             How many DPS ID numbers can be associated

20   with a voter's TEAM record?

21        A.    One.

22        Q.    Has there been any discussion, to your

23   knowledge, of adding a field to TEAM so that additional

24   driver's license numbers could be listed?

25        A.    That's something that we have recently



 1  discussed to think about the next iteration of TEAM,

 2  and whether or not they want to have another field for

 3  an ID number.  That decision has not been made yet.

 4      Q.    What's the stage of the procurement process

 5  for the next iteration of TEAM at this point?

 6      A.    We are going through the drafting of the

 7  RFP, RFO, whatever we are calling it.

 8      Q.    Do you know when that will be complete?

 9      A.    Soon.  If I had my way it would have been

10  two weeks ago.

11      Q.    To be clear, if a voter has been issued

12  multiple DPS numbers and provides a DPS ID number

13  different from the one listed in TEAM on an ABBM and

14  does not also provide a Social Security number, that

15  ABBM will be rejected, correct?

16      A.    If they don't provide a number that's in

17  their voter registration record they will be rejected,

18  yes, at least temporarily.

19      Q.    Same thing on mail ballot?

20      A.    Same thing on mail ballot.

21      Q.    Would you agree a duly registered voter

22  whose ballot was rejected under these circumstances was

23  not at fault?

24      MS. HUNKER:  Objection, form.

25  BY THE WITNESS:



1     A.     I'm not going to get into assignment of

2 fault.

3 BY MR. FREEMAN:

4     Q.     Do you know if the fact that DPS has issued

5 multiple ID numbers to the same individuals over their

6 lifetimes has led to the rejection of mail ballot

7 materials under SB 1?

8     MS. HUNKER:  Objection, form.

9 BY THE WITNESS:

10     A.     It's my understanding that's happened at

11 least in Bexar County because I have a member of the

12 ballot board who has been coming up here for the

13 election meetings because of it.

14 BY MR. FREEMAN:

15     Q.     Have you conducted any further inquiry into

16 the extent to which such voters have had their mail

17 ballot materials rejected?

18     A.     Just what she says.

19     Q.     Is there anything else that could have been

20 done for voters who have multiple DPS ID numbers to

21 ensure their ballots are counted?

22     A.     I don't know how to answer that question.

23     Q.     I don't run an elections office.  I'm

24 asking if you know of anything else that could have

25 been done by your office to help those voters?



1          A.     I don't know how to answer that question.

2          Q.     Okay.  Is there anything else that the

3    voter could have done if they have an old number on

4    TEAM and submit number on their new ID card or vice

5    versa?

6          A.     Well, the voter has the responsibility to

7    make sure their information in the voter registration

8    record is correct and accurate and updated.  The voter

9    bears that responsibility.

10         Q.     Do you know how many registered voters in

11   Texas have been issued multiple numbers in their

12   lifetimes?

13         A.     I do not.

14         Q.     Do you know how many ABBM or mail ballots

15   have been rejected on account of the voters submitting

16   a correct DPS ID number that was not listed on TEAM?

17         A.     I don't.

18         Q.     Have there been any actions taken by your

19   office other than in-filling driver's license numbers

20   as part of the HB2515 process to address the absence of

21   driver's license numbers or up-to-date driver's license

22   numbers on voter registration records?

23         A.     We have made sure we have got a pipeline

24   from Texas.gov so that we can capture that log-in

25   information whenever someone logs in to fill in the



 1  values for us.

 2       Q.    Anything else?

 3       A.    That's not an unsubstantial thing.

 4       Q.    Understood.  Is there anything else so I

 5  have your full testimony?

 6       A.    I mean we have told the voters they need to

 7  use both.  We told voters the way they can add numbers

 8  if they want to add numbers.

 9       Q.    Anything else?

10       A.    That's it, I think.

11       MS. HUNKER:  I know we took a short break before,

12  but sort of a good place to take five if that's all

13  right?

14       MS. HUNKER:  Yes.

15                      (WHEREUPON, a recess was had.)

16       MR. FREEMAN:  Back on the record.

17  BY MR. FREEMAN:

18       Q.    Mr. Ingram, to the extent you know, what

19  was the final mail ballot rejection rate in the 2022

20  primarily?

21       A.    You know, it's obviously two different

22  primaries, and there were different -- democrats were

23  higher than the republicans, but I believe the

24  composite rate was under 13 percent, under 12.8, 12.7,

25  something like that.



1    Q.    Do you know what the rate in the democratic

2    primary was?

3    A.    No.  I think it was a little over 13 maybe.

4    Q.    It's not a quiz.  It's all right.

5    A.    We can look it up.

6    Q.    So the republican rate was a little bit

7    lower than that?

8    A.    It was a little under 12.

9    Q.    In the primary runoff, do you know what the

10   aggregate rate was?

11   A.    Right at 12 percent.

12   Q.    The democratic runoff, do you know what the

13   rate was then?

14   A.    I don't.

15   Q.    Was the democratic rate higher than the

16   republican rate in the primary runoff as well?

17   A.    I think in the runoff it went the other

18   way.  I just have to go look and make sure, but it was

19   close.

20   Q.    Then we already discussed, but just so we

21   have it here, what was the final rejection rate in the

22   2022 general election?

23   A.    2.7 percent.

24   Q.    Based on your knowledge and experience, how

25   do these figures compare, 2.7 for 13 or so to the rate



1  of mail ballot impersonation in Texas elections before

2  passage of SB 1?

3       MS. HUNKER:  Objection, form.

4  BY THE WITNESS:

5       A.     I have no idea what the rate of mail ballot

6  impersonation is or ever has been.

7  BY MR. FREEMAN:

8       Q.     After serving for over a decade as the

9  director of elections for the State of Texas, do you

10 know whether or not 2.7 percent of mail ballots cast in

11 elections pre-SB 1 were actually cast by individuals

12 other than the registered voter on whose behalf the

13 ballots were cast?

14      MS. HUNKER:  Objection, form.

15 BY THE WITNESS:

16      A.     The rejection rate of 1 to 3 percent is

17 historically what it's always been.  So we are back in

18 the zone.  One of the reasons for rejection is that the

19 mail ballot was not signed by the voter.  It was signed

20 by somebody other than the voter.  The voter was not

21 the one who signed the carrier and the application.

22 BY MR. FREEMAN:

23      Q.     So that wasn't the answer to my question.

24 My question was, to your knowledge, were 2.7 percent or

25 more of mail ballots cast in any statewide election in



```
 1   Texas fraudulent because they were cast by someone
 2   else?
 3          MS. HUNKER:  Objection, form.
 4   BY THE WITNESS:
 5          A.    Again, I don't know how many were
 6   fraudulent because they were cast by somebody else.  I
 7   know ballot boards reject mail ballots because the
 8   voter was not the one who signed them.
 9   BY MR. FREEMAN:
10          Q.    Do you have any basis to believe based on
11   your knowledge and experience that over 2 percent of
12   mail ballots in any statewide election were cast by
13   someone other than the voter in whose name the ballot
14   was cast?
15          A.    Again, I don't know the answer to that
16   question.  The answer I have got is rejection, and
17   rejection because they're not the same person is the
18   most common rejection reason.
19          Q.    Because they are not the same person or
20   because they didn't sign?
21          A.    Because they are not the voter.  The
22   signatures don't match.
23          Q.    When a signature doesn't match -- strike
24   that.
25                If an election administrator or ballot
```



1   board has reason to believe that voter fraud has

2   occurred, are they required to refer that for criminal

3   prosecution?

4        A.     They are not required to.  They are

5   required to report mail ballots that are rejected for

6   signature mismatch to the Attorney General's Office.

7        Q.     Do you know how many of those signature

8   mismatches have led to successful prosecutions for mail

9   ballot impersonation?

10       A.     I do not.  That's a question for the

11  Attorney General's Office.

12       Q.     Do you personally in your work as an

13  election administrator statewide presume all signature

14  mismatches are incidents of mail ballot impersonation?

15       MS. HUNKER:  Objection, form.

16  BY THE WITNESS:

17       A.     Signature mismatch is what we colloquially

18  say.  But the standard is, were the application and

19  carrier envelope signed by the voter?  That's the

20  standard.  If they are rejected because the signatures

21  don't match, they are rejected really because they are

22  not made by the voter or the ballot board can't

23  determine that they were made by the voter.

24  BY MR. FREEMAN:

25       Q.     But can't determine is very different from



 1 | an affirmative determination of voter impersonation,

 2 | correct?

 3 |      A.    I don't know that they are that different.

 4 | I mean if there is doubt then there is doubt.

 5 |      Q.    So you said that rejection at 2.7 percent

 6 | was back in the zone.  Is there any statewide federal

 7 | election that has had rejection over 2 1/2 percent

 8 | other than the 2022 election in your time as election

 9 | administrator?

10 |      A.    I don't know.  You would have to go back

11 | and look at the data on the AC's website.  I don't

12 | know.

13 |      Q.    But when you say 1 to 3 percent is back in

14 | the zone, when were those 3 percent elections?

15 |      A.    That's just the general idea that I have in

16 | my head of mail ballot rejection rates.

17 |      Q.    Okay.  But how did you develop that general

18 | idea in your head?

19 |      A.    Over time.  It's obviously higher in

20 | primaries because there is more reasons to fail in

21 | primaries.

22 |      Q.    What are those reasons just so we know?

23 |      A.    The extra reasons are that you don't on

24 | your application submit a party reference.  You are not

25 | going to get a primary ballot if you don't submit a



```
 1   party preference because they don't know which one to

 2   send you.  Obviously people get applications sent to

 3   them by campaigns and political parties, and they will

 4   often keep sending in every application they get even

 5   if it's change in their primary preference from one to

 6   the other.  So a lot of them come in late because they

 7   didn't get a ballot sent to them on time because they

 8   kept changing what they wanted.

 9        Q.    What would you consider in the zone for a

10   primary election?

11        A.    I don't have a sense for that.  I know it's

12   more because there is many more issues that can come

13   up.

14        Q.    Okay.  Can we all agree the decline in mail

15   ballot rejection rates from the primary to the primary

16   runoff to general is a good thing?

17        A.    Absolutely.

18        Q.    There are many factors that contributed to

19   that decline?

20        A.    Agreed.

21        MR. FREEMAN:  If we could mark this as Exhibit

22   21.

23                       (WHEREUPON, a certain document was

24                       marked Deposition Exhibit No. 21,

25                       for identification, as of 3/28/23.)
```



1    BY MR. FREEMAN:

2        Q.    What's this document?

3        A.    It appears to be an NPR printout of a

4    story.

5        Q.    It's a story about ballot rejections in

6    Texas?

7        A.    That's what it looks like, yes, sir.

8        Q.    I ask you to start by turning to page 3.

9    For the record he's been mentioned a few times, but who

10   is Sam Taylor?

11       A.    Sam Taylor is Assistant Secretary of State

12   for Communications.

13       Q.    Did you work with Mr. Taylor to develop any

14   talking points or answers regarding mail ballot

15   rejection rates in the 2022 general?

16       A.    It's not exactly how it works.  Sam usually

17   asks our side of the street for information, then he

18   crafts his own talking points.

19       Q.    Did you contribute information that he used

20   to craft talking points regarding mail ballot rejection

21   rates in the 2022 general?

22       A.    So the numbers are the numbers.  I mean so

23   the numbers were most important in determining what

24   talking point he was going to have.

25       Q.    Did you contribute any other information?



```
 1        A.      You know, we are on the county advisory
 2   call every other week, and Sam usually is on those
 3   calls as well.  So he hears the information and
 4   feedback we get at the same time we get it, and we
 5   collaborate based on that information.
 6        Q.      Would you agree that in this article Sam
 7   Taylor attributes the decrease in mail ballot rejection
 8   rates to several different items?
 9        A.      Yes.
10        Q.      So starting on page 3, Mr. Taylor
11   contributes the decrease in mail ballot rejections in
12   part to updates to the return ballot in some counties;
13   is that right?
14        A.      Agreed to the carrier envelope
15   specifically, but.
16        Q.      Do you agree with what Mr. Taylor said
17   there?
18        A.      Yes.
19        Q.      Was this simply the addition of a red box
20   on the carrier envelope?
21        A.      Yes.
22        Q.      Any other updates to the return ballot?
23        A.      To the carrier envelope, I don't think so.
24        Q.      That applied in all 254 counties; is that
25   right?
```



1    A.    No.  I mean -- so we updated the carrier

2    envelope with the red box, but a lot of counties had

3    stock from the primary, and so they are still using

4    their own stock.  They didn't have to purchase new

5    carrier envelopes because we put a red box.  Not all

6    counties used the red box one.

7         Q.    Do you know how many counties continue to

8    use the old version of the envelope?

9         A.    I have no idea.

10        Q.    Did counties have to use the same envelope

11   for all voters in a given election or could they use a

12   mix of the old and new stock over the course of the

13   election?

14        A.    They could use a mix if they needed to,

15   sure.

16        Q.    Okay.  Do you expect any further gains in

17   reducing mail ballot rejection due to updates on the

18   carrier envelope?

19        A.    I don't know.  Depends on what laws do or

20   do not change in this legislative session.

21        Q.    Absent further legislative change, do you

22   expect further gains in reducing mail ballot rejection

23   due to updates to the carrier envelope?

24        A.    No.

25        Q.    Does Mr. Taylor attribute the decrease to



1    additional voter information included in mail ballots

2    by local officials?

3         A.      I agree with that.

4         Q.      Do you agree with Mr. Taylor's position

5    there?

6         A.      I do.

7         Q.      We already discussed this to some extent.

8    But is this referring to the inserts that we discussed

9    previously?

10        A.      That's correct.

11        Q.      Anything besides the inserts that we

12   discussed previously?

13        A.      Well, whatever other information counties

14   might have put in.  We don't have any ability to

15   control what goes into the mail ballot instructions.

16   So the counties can add to that if they want to.

17        Q.      Do you know right now if any additional

18   counties or other local officials intend to include

19   additional voter information in mail ballot

20   envelopes --

21        A.      I would expect --

22        Q.      -- in future elections who didn't in the

23   November general?

24        A.      I would expect counties that haven't added

25   an insert probably will as the information propagates



1   amongst themselves.

2       Q.    Do you know if there were any large

3   counties who didn't include an insert previously?

4       A.    I think you have asked me that question.  I

5   don't know what they did or didn't include.

6       Q.    Do you expect substantial further

7   reductions in mail ballot rejections due to inclusion

8   of additional voter registration in mail ballot

9   envelopes?

10      A.    In the counties that haven't added an

11  insert, if they do add an insert, yes, it will help, I

12  think.

13      Q.    But you don't know which counties those

14  are?

15      A.    I do not.

16      Q.    Could it be that all counties did include

17  inserts previously?

18      A.    It could be, but it's very doubtful.

19      Q.    Did Mr. Taylor also attribute the decrease

20  in mail ballot rejections to the voter education

21  campaign?

22      A.    He did.

23      Q.    Do you agree with that point?

24      A.    I do.

25      Q.    Do you know how much of the voter education



 1   campaigns were earned media versus paid media?

 2        A.    I don't.  That's a Sam question.

 3        Q.    Again, my colleague is going to be speaking

 4   with Mr. Taylor about some of these issues in greater

 5   detail.  But, to your knowledge, what were the

 6   effective forms of voter education conducted by the

 7   Office of the Secretary of State to bring down ballot

 8   rejection rates in the general election period?

 9        MS. HUNKER:  Objection, form.

10   BY THE WITNESS:

11        A.    Yes.  Effectiveness of the campaign is not

12   my area.

13   BY MR. FREEMAN:

14        Q.    Okay.  So you don't have any knowledge

15   about effectiveness in general?

16        A.    I don't.

17        Q.    Do you know if the Office of the Secretary

18   of State intends to conduct different forms of voter

19   education concerning SB 1 requirements in the future?

20        A.    You know, we will do another request for

21   proposal for ideas from vendors about the voter

22   education campaign for '24 and we will see what they

23   come up with.

24        Q.    Do you know if your office intends to

25   conduct a greater quantity of voter education



1    concerning SB 1 mail ballot requirements in the future?

2          A.     Depends upon whether or not we get more

3    money.  You know, the initial drafts of the budget

4    include more money for that purpose.  So yes, we would

5    be spending more.

6          Q.     Did the legislator provide less for their

7    education funding in 2022 than they did in 2020?

8          A.     Yes.

9          Q.     So would the budget that you are seeing

10   just be a restoration to presidential cycle levels?

11         MS. HUNKER:  Objection, form.

12   BY THE WITNESS:

13         A.     That's what we ask for in LAR.  I think

14   they are going beyond that.  We will see.

15   BY MR. FREEMAN:

16         Q.     How much media attention did ABBM and

17   ballot rejection in the March 2022 primary receive?

18         A.     How much?

19         Q.     Uh-huh.

20         A.     I don't know.  I don't know.  I have no way

21   of quantifying that.

22         Q.     Was there a lot?

23         A.     There was -- there were quite a few

24   stories, yes.

25         Q.     By comparison, how much media attention did



1 ballot rejections and ABBM rejections in November

2 receive?

3      A.    Not as much.

4      Q.    So would you agree that that's a decrease

5 in sort of free media educating voters?

6      MS. HUNKER:  Objection, form.

7 BY THE WITNESS:

8      A.    No.

9 BY MR. FREEMAN:

10      Q.    Why not?

11      A.    Because the free media that educate voters

12 is usually done locally at the county level with the

13 county election administrator having a news story

14 before early voting or during the ballot by mail time

15 period.  Whether that increased or decreased I have no

16 idea.  That has nothing to do with reporting on

17 rejection rates in November of 2022.

18      Q.    You don't think that voters became aware of

19 these requirements based on stories about the problems?

20      A.    I don't know how they became aware of it,

21 but those public interest stories that occur when mail

22 balloting begins are the way that I think a lot of

23 voters learn about it.  We will see.

24      MR. FREEMAN:  If we can mark this as Exhibit 22.

25                   (WHEREUPON, a certain document was



```
 1                      marked Deposition Exhibit No. 22,

 2                      for identification, as of 3/28/23.)

 3    BY MR. FREEMAN:

 4         Q.     What's this document?

 5         A.     It's a mass email.

 6         Q.     Sent by?

 7         A.     Me.

 8         Q.     To?

 9         A.     County election officials.

10         Q.     What are you asking them to do in this

11    email?

12         A.     Consider trying to place an opinion piece

13    in their local newspapers.

14         Q.     Is this something you have done previously?

15         A.     No.

16         Q.     Why did you do it --

17         A.     I take it back.  We have definitely offered

18    templates for opinion pieces that they could use in

19    local newspapers before.

20         Q.     Had you asked them --

21         A.     What's new is taking an example from a

22    particular county and saying, "Here's one.  Use this."

23    We have -- generally when we've done templates in the

24    past and offered them to counties, we have just drafted

25    a template ourselves.
```



1     Q.     Okay.  How often in the past did you
2   provide templates for op-eds?
3     A.     I don't know.  Several times.  It's -- what
4   we have done them for is the ID requirements.  The ID
5   requirements when they changed for photo ID, and they
6   changed again in 2017 --
7     Q.     So --
8     A.     -- or 2016.
9     Q.     -- for SB 14 the voter ID law, the change
10  to voter ID law, and SB 1, those are the three times
11  you can recall?
12    A.     That we have tried to use this form of
13  communication to get the counties to propagate
14  something, yes.  I mean we offer templates to the
15  counties for everything every year, every election
16  year, but the ones that we specifically drafted, you
17  know, for part of voter education were usually ID
18  related.
19    Q.     Do you know whether any other election
20  administrators or officials were able to place op-eds
21  about these requirements after this email went out?
22    A.     I don't know.
23    Q.     So you can't -- can you identify any other
24  counties that did manage to place op-eds?
25    A.     I don't know.



1    Q.    Do you intend to submit templates or

2  examples to county officials about SB 1 ID requirements

3  again in the future?

4    A.    Sure.

5    Q.    Do you expect newspapers to be receptive to

6  op-eds when the requirements are no longer new?

7    A.    It's not just the op-eds.  It's also

8  talking to them about how to approach their local news

9  media and getting a story placed.  It's also handouts

10  and colorful material they can use to give to the

11  voters.  So it's a full fledged campaign that Sam would

12  know more about than I do.

13    Q.    Do you expect newspapers to be as receptive

14  to similar op-eds in the future when the requirements

15  are no longer new?

16    MS. HUNKER:  Objection, form.

17  BY THE WITNESS:

18    A.    Sure.

19  BY MR. FREEMAN:

20    Q.    Why is that?

21    A.    Because they are always hungry for content.

22  Local news needs content.  This is good content for

23  them.  They like it.

24    Q.    Do you expect substantial further

25  reductions in mail ballot rejections due to voter



1    education?

2         A.    I don't know.  I mean I think as voters

3    talk amongst themselves it's going to get better, yes.

4    I don't know if it's substantial.  You say substantial

5    reductions.  I don't know about that.

6         Q.    Does your office have plans to reach

7    different voters from those reached previously by voter

8    education efforts on SB 1?

9         MS. HUNKER:  Objection, form.

10   BY THE WITNESS:

11        A.    That again is going to be part of the

12   request for proposal.  Depends on how much money the

13   legislature gives us.

14   BY MR. FREEMAN:

15        Q.    Do you have any knowledge of targeted plans

16   to reach voters who didn't understand prior voter

17   registration efforts?

18        A.    No.  I mean part of every education

19   campaign is the feedback loop.  And, you know,

20   determination of what can be done better next time.

21   But again, that's all done by the communications team

22   and the vendor.

23        Q.    Going back to Exhibit 21.  Did Mr. Taylor

24   attribute the decrease in voters -- strike that.

25             Did Mr. Taylor attribute the decrease in



1   mail ballot rejection rates to voters getting used to

2   SB 1 requirements?

3          A.     Yes.

4          Q.     Do you agree --

5          A.     He said that, you know, one of the things

6   we have always expected was that the voters would get

7   used to it.

8          Q.     Do you agree?

9          A.     Absolutely.

10         Q.     If a voter had their ballot rejected, they

11  failed to cure, correct?

12         A.     If it's finally rejected, yes.

13         Q.     So the cure process affords a voter an

14  additional opportunity code to comply with SB 1

15  requirements during a single election; is that right?

16         MS. HUNKER:  Objection, form.

17  BY THE WITNESS:

18         A.     If that was the reason for the initial

19  rejection or notice of defect.

20  BY MR. FREEMAN:

21         Q.     Would you agree then that even when

22  presented with multiple opportunities to comply with SB

23  1, each final rejection represents a voter who failed

24  to learn and comply even with multiple opportunities?

25         MS. HUNKER:  Objection, form.



1  BY THE WITNESS:

2      A.    Sometimes the clock runs out on folks.

3  But, you know, I don't know what you are trying to get

4  at.  But you are assuming that the rejections were all

5  because of SB 1.  That's not a safe assumption.  There

6  are lots of reasons why mail ballots get rejected.  If

7  you want to know the list, you should go to a county

8  and ask them.

9  BY MR. FREEMAN:

10     Q.    Let's just bracket to SB 1 rejections.  And

11 say with respect to SB 1 rejections, because of the

12 cure opportunity, everyone has multiple chances to get

13 down their voter information, right, their ID numbers?

14     A.    I don't necessarily agree with that because

15 again the clock runs out.

16     Q.    But prior to the clock running out, there

17 is supposed to be an opportunity to cure, correct?

18     A.    If they got notice before the clock ran

19 out.

20     Q.    Some voters get notice after the clock runs

21 out?

22     A.    That's right.

23     Q.    With respect to the voters who did get

24 notice before the clock ran out, many of them had a

25 second opportunity, and nonetheless failed to get the



1  information required by SB 1 on to their ballot,

2  correct?

3       A.    Maybe.  Maybe they decided not to.  Maybe

4  they deeded to cancel their mail ballot and vote in

5  person.  You know, I don't know what happened with

6  those.

7       Q.    In light of the cure opportunity, why do

8  you expect that yet more exposure to the SB 1

9  requirements would continue to drive down rejection

10  rates?

11       A.    Because as people learn about something and

12  talk about it amongst themselves they get better at it.

13  It's just a fact.

14       Q.    In each new election cycle, do a new batch

15  of voters turn 65?

16       A.    We have talked about that before.

17       Q.    We have.  They won't have to get used to SB

18  1 mail ballot requirements?

19       MS. HUNKER:  Objection, form.

20  BY THE WITNESS:

21       A.    No.  But they would have heard about it

22  from their peers.

23  BY MR. FREEMAN:

24       Q.    Have additional trainings of state and

25  local election officials helped to reduce ballot



1   rejection rates between the March primary and November

2   general?

3         A.      Yes.

4         Q.      What's the county election seminar?

5         A.      That's a seminar that we do every year for

6   county election officials to teach them about election

7   law requirements and how to implement them in their

8   county.

9         Q.      When was the county election seminar in

10  2021?

11        A.      I don't remember.

12        Q.      Was it before --

13        A.      July or August.

14        Q.      So before SB 1 was passed?

15        A.      In '21, yes.

16        Q.      When was the seminar in '22?

17        A.      July or August.

18        Q.      After the March primary, before the

19  November general, correct?

20        A.      Agree with that.

21        Q.      So based on your experience as director of

22  elections, during the 2022 election cycle do you do

23  most -- sorry.  Did most county election officials

24  understand the SB 1 acceptance and cure process during

25  the November 2022 general?



1          A.     I don't know.  That's a hard question.  I

2    don't know what they hear.  I only know what we say.

3    We had an election official email us a question in

4    2017, 2017, four years after photo ID requirements were

5    in place, asking if photo ID was required for voting.

6          Q.     That was after there had been --

7          A.     No.

8          Q.     -- a decision by the Federal court saying

9    that the original law violated the Voting Rights Act,

10   right?

11         A.     She was asking if photo ID was required at

12   all.  She didn't have any clue.  She had been in office

13   the whole four years.  She had been to our seminars,

14   read our materials, I presume.  I don't know.  But I'm

15   saying I don't have any control at all over what the

16   counties hear and how they interpret it.

17         Q.     Are you aware of any ballot rejection in

18   the November general that resulted from misapplication

19   of SB 1 by local officials?

20         A.     Any what?

21         Q.     Ballot rejections, mail ballot rejections

22   in November that resulted -- that were the result of

23   misapplication of SB 1 by local officials?

24         A.     I think we have talked about the

25   misapplication of the signature requirement after the



1   introduction of rebuttal presumption.

2       Q.    I mean the rejection of mail ballots based

3   on the driver's license or Social Security number

4   requirements?

5       A.    I don't know how you can separate the two.

6   The driver's license and Social Security number being

7   in the voter's record is supposed to create a

8   rebuttable presumption that the signatures are of the

9   voter.  So that signature comparison requirement, that

10  the degree of scrutiny that's applied to the signatures

11  part and parcel of SB 1 requirements.  If the

12  signatures were overanalyzed even though the number

13  already matched the number in their system, then that

14  results in a rejection because of a mistake by the

15  ballot board.

16      Q.    Okay.  Are you aware of any rejections of

17  ballots for failure to put a driver's license number,

18  Social Security number on the carrier envelope that

19  matches TEAM where the rejection was a result of

20  misapplication of SB 1 by local officials?

21      A.    So a voter puts a number on the envelope,

22  that number is in their TEAM record, and they still

23  rejected it --

24      Q.    Any rejection --

25      A.    -- because of that?



Keith Ingram

March 28, 2023
Page 135

1       Q.     Are you aware of any rejection of a mail
2   ballot based on the number requirements because of some
3   kind of error by a local official?
4       MS. HUNKER:  Objection, form.
5   BY THE WITNESS:
6       A.     I have already told you what I know about
7   rebuttable presumption not being evenly applied.
8   BY MR. FREEMAN:
9       Q.     Separate from the rebuttable presumption,
10  just the number requirements?
11      A.     I don't even know how that would be.  I
12  don't know what you are talking about.
13      Q.     Okay.  Let's try and ask in a way that
14  works for you then.
15             Just a yes/no requirement, you have to have
16  a number that matches TEAM, driver's license number,
17  Social Security number, that requirement standing
18  alone, that sort of bar to acceptance, are you aware of
19  any rejection based on that bar to acceptance the
20  ballot where the rejection was a result of a
21  misapplication of SB 1 by local officials?
22      MS. HUNKER:  Objection, form.
23  BY THE WITNESS:
24      A.     I don't even know how that would be.  I
25  don't know what you are talking about.



1  BY MR. FREEMAN:

2      Q.    Are you aware of any instances where the

3  official rejected a mail ballot where a voter had put

4  down their SSN, and had a driver's license number, and

5  SSN on TEAM and they applied the hierarchy, for

6  example, and shouldn't have, would that be an error by

7  a local official in applying SB 1 to the numbers?

8      MS. HUNKER:  Objection, form.

9  BY THE WITNESS:

10     A.    I'm not aware of anything like that

11 happening.  What we've told them is if the number that

12 the voter puts is in the record, they are supposed to

13 accept it.  I'm not aware of any county rejecting it

14 with a number in the record.  That would be crazy.

15 BY MR. FREEMAN:

16     Q.    Good.  Are you aware of any other similar

17 types of errors by local officials where they rejected

18 a ballot and they shouldn't have in relation to the

19 numbers themselves?

20     A.    No.

21     Q.    Okay.  Would you agree then you don't

22 expect any substantial further rejection or further

23 reductions in mail ballot rejections based on the

24 numbers alone from training of local officials --

25     MS. HUNKER:  Objection, form.



1    BY MR. FREEMAN:

2         Q.      -- not based on signature?

3         A.      No, I wouldn't agree with that at all.

4    Because we also train ballot boards now.  We do

5    webinars for the ballot boards themselves.  Ballot

6    boards themselves are the ones who make the call

7    whether to accept or reject.  Now I'm not aware of a

8    ballot board rejecting a carrier envelope because

9    somebody had a number and they should have used the

10   other number.  That's crazy talk.  But there are a lot

11   of ballot boards who either didn't give the signatures

12   any weight at all or gave them too much weight and then

13   rejected even though the number was in the system.  So

14   that's the part that we are going to work on educating

15   and correcting.

16        Q.      But nothing related to the numbers standing

17   alone and not in relation to signatures?

18        A.      Again, I don't know what that means.  I

19   don't know how you would do that.

20        Q.      Okay.  Are there any other reasons why mail

21   ballot rejection rates decreased from the March primary

22   to the November general that we haven't talked about?

23        A.      You know, I just think -- I mean Sam calls

24   it getting used to, but it's a process of permeating

25   the side geist.  You know what I mean? It's something



1  that filters into people's consciousness over time,

2  that that is something that I don't know if we just

3  call it getting used to it.  But whatever it is it gets

4  better over time, the requirements.

5      Q.    Mr. Ingram, do you know what share of

6  voters cast ballots by mail in November of 2022?

7      A.    I did think of another reason they get

8  better over time.  It's because our data gets better

9  over time.  You know, the more voters that update their

10 information with one of the numbers, the better we are

11 going to have.  If they make the ballot tracker easier

12 to access, that's an easier way to correct the defect.

13     Q.    Do you know how many voters added driver's

14 license numbers or Social Security numbers to their

15 voter registration file using Texas.gov during the

16 general election period?

17     A.    I don't know.  I know we had over 40,000

18 people update their registration using Texas.gov.  I

19 don't know how many of those were numbers only.

20     Q.    A lot could have been address changes?

21     A.    A lot could have been address changes and a

22 lot of them could have been numbers.  I don't know how

23 many of each there are.

24     Q.    You are not getting new registrants who

25 don't provide either a driver's license number or



1    Social Security number anymore into the system; is that

2    right?

3         A.    Well --

4         MS. HUNKER:  Objection, form.

5    BY THE WITNESS:

6         A.    -- they've got the opportunity to have

7    registration without either one of the numbers.

8    BY MR. FREEMAN:

9         Q.    Other than the very small fraction of

10   people who check that box, you are not getting --

11   everyone is providing either a driver's license number

12   or a Social Security number on their voter registration

13   applications now, correct?

14        A.    There is a box for them, but there is also

15   a box for "I don't have either one of those."

16        Q.    Do you know how many folks that you

17   register with the box that says, "I don't have a

18   driver's license number or Social"?

19        A.    I don't.  I'd agree with you it would be a

20   small number.

21        Q.    Prior to Helping America Vote Act, you

22   could register without a driver's license number or

23   Social?

24        A.    I don't know if you could in Texas.  I know

25   there was a period of time a long time ago.  But before



1  the Help America Vote Act you had to have one of those.

2  I think we required the full nine, not the last four.

3  Help America Vote Act made us reduce it to the last

4  four only.

5      Q.    Okay.  But you are not getting a large

6  influx of additional voters now with no SSN, no DL?

7      A.    Agree with that.

8      Q.    And so attempts to add information are not

9  going to make further substantial changes in the future

10  because you have that for most of them already, right?

11      A.    Well, I mean that's the whole issue, right?

12  We have got less than half a percent who have neither

13  one of those numbers in the record, right.  Only if

14  that half of a percent tries to vote by mail and then

15  adds the number, will we get it, but that does happen,

16  and we will work on that last 93,800 folks to get them

17  a number.

18      Q.    What are you doing affirmatively to work to

19  get them a number?

20      A.    Well, what I talked about.  We have changed

21  Texas.gov where we get no value supplied to us if

22  anybody logs on to us.  We are telling voters if they

23  have their application rejected for lack of a number in

24  the system that's how you add the numbers to your

25  record.  I mean I don't know how else you would do it.



1  The voter has to take responsibility to do that

2  themselves.  They have a mechanism for doing it

3  electronically or they can fill out a paper

4  application.  But over time as they try to vote by

5  mail, that number is going to decrease.  It will not

6  get bigger.

7       Q.    Did you see substantial movement in that

8  number between the March primary and the November

9  general?

10      A.    Not then, no.  We didn't check then.

11      Q.    You didn't check to see how many people had

12  no driver's license number and no Social Security

13  number?

14      A.    That's right.  We had already checked it at

15  the end of '21.  And then we added as many as we could

16  so we knew what the number was going into the end of

17  the year, and we did it at the end of December '22?

18      Q.    What was the change from the end of '21 to

19  the end of '22?

20      A.    I don't know.  I have got the end of '22

21  numbers in my head, but I don't remember what they are.

22  I mean before we did anything at all, we had about a

23  million records that didn't have a driver's license,

24  and a million that didn't have a Social, right.  We

25  had, I don't know, 160,000 that didn't have either one.



 1   At the end of '22 we have got 389 that have a DL, but
 2   no Social, and we have got 298 that have a Social but
 3   no DL.  We have got 93,000 that don't have either one.
 4        Q.    Do you expect substantial further changes
 5   in decreasing that -- those numbers moving forward?
 6        MS. HUNKER:  Objection, form.
 7   BY THE WITNESS:
 8        A.    I don't know what you mean by substantial.
 9   I expect that the numbers are going to decrease over
10   time.  They are never going to get bigger than they are
11   now.  They will decrease.
12   BY MR. FREEMAN:
13        Q.    Okay.  Did the rate at which they
14   decreased -- strike that.
15             Did the share of numbers that you
16   decreased -- you know what, we will move on then.
17             Mr. Ingram, do you know what share of
18   voters cast ballots by mail in November of '22?
19        A.    I don't.
20        Q.    Do you know if it was greater or lessor
21   than the share that cast ballots by mail in November of
22   2018?
23        A.    I don't know.  I think it would probably be
24   comparable number to 2018. It was less than 2020.
25        Q.    Do you know whether turnout in general was



1 | higher in 2022 or lower in 2018?

2 |     A.    I don't remember.  They were both quite a

3 | lot higher than normal mid-term elections, but I think

4 | '22 may have been a little less.

5 |     Q.    To your knowledge, did March 2022 ballot

6 | rejection deter some eligible voters from trying to

7 | vote by mail in November?

8 |     A.    No idea.

9 |     Q.    Did any election administrators or clerks

10 | indicate to you that voters were concerned about mail

11 | ballot rejection in November of 2022?

12 |     A.    Well, as you can see from the email, voters

13 | aren't shy about expressing directly to us.  I don't

14 | know if we have to rely on county officials for that.

15 |     Q.    Did any county officials indicate to you

16 | that voters were concerned in November of 2022 about

17 | ballot rejection?

18 |     A.    Not any more than normal.

19 |     Q.    What's normal in terms of those types of

20 | concerns?

21 |     A.    Well, I mean whenever you send mail ballots

22 | you are relying on the post office and you are relying

23 | on whatever else.  There is always trepidation until

24 | you get confirmed that your ballot was accepted.

25 |     Q.    Are these concerns valid?



```
1         A.     Sure.  Absolutely.

2         Q.     Do you trust the post office?  We already

3  discussed concerns that were raised with your office

4  directly about rejection of mail ballots.  Were these

5  concerns valid?

6         A.     I don't know.

7         MR. FREEMAN:  Take a break for a minute.

8                     (WHEREUPON, a recess was had.)

9  BY MR. FREEMAN:

10        Q.     Thank you, Mr. Ingram. I will pass you to

11 Ms. Perales.  But I think we all need a lunch break

12 before then.

13        A.     Great.

14                    (WHEREUPON, a recess was had.)

15                    EXAMINATION

16 BY MS. PERALES:

17        Q.     We are back on the record.  Mr. Ingram, my

18 name is Nina Perales and I represent the LUPE

19 Plaintiffs.  I'm with MALDEF.  We know each other,

20 don't we?

21        A.     We do.

22        Q.     We have met in the past usually at the

23 legislature?

24        A.     Agreed.

25        Q.     Yes.  You have been to so many more
```



1    hearings than I have, much to your credit.

2              I am going to endeavor not to tread the

3    same ground as Mr. Freeman did, but if that means that

4    from time to time I'm pausing or flipping pages

5    forward, it's only because I'm trying to make sure I

6    don't re-ask any questions that are in my outline.  I

7    hope you don't take it as me trying to delay or

8    anything.  If I'm quiet, I'm skipping questions.  How

9    about that?

10       A.     That's fine.  Yes.

11       Q.     Thank you.  Thank you.  Just a few more

12   emails to go over with you along the same lines of

13   emails that Mr. Freeman went over with you?

14       A.     Okay.

15       Q.     I'm going to mark those.

16       MS. PERALES:  Can we mark this one, please.

17                      (WHEREUPON, a certain document was

18                      marked Deposition Exhibit No. 23,

19                      for identification, as of 3/28/23.)

20   BY MS. PERALES:

21       Q.     Mr. Ingram, can you identify this document?

22       A.     It looks like an email to our office from

23   Barry Brandt, and the response.

24       Q.     Was it an email to -- well, it says the

25   email is addressed to elections internet.  Is that the



1    elections division of the Texas Secretary of State?

2         A.    It is.

3         Q.    Then there is -- is there at the very top

4    of the document a response from the Texas Elections --

5    Texas Secretary of State Elections Division?

6         A.    Agree with that.

7         Q.    It seems to be coming from an

8    administrative group and the CC line is elections

9    internet.  Do you know who actually sent this email?

10        A.    I don't.  I don't.

11        Q.    Do you have an A.T. Montgomery?

12        A.    We do have an Andre Montgomery.

13        Q.    I noticed in among the letters there is an

14   A.T., then the beginning of the name Montgomery.  Would

15   it be fair to say that the person who sent the email,

16   Barry Brandt, is expressing that he was having a

17   problem -- well, he says he was having a problem with

18   registration, but he also says that he and his wife

19   sent in the form with an a SSN but not a license

20   number.  Then he's talking about ballot processing.  Do

21   you see that there?

22        A.    I do.

23        Q.    He says that he received confirmation that

24   he was registered to vote, but that also received a

25   notice saying he didn't provide the required



1   information; is that right?

2          A.     Right.

3          Q.     I notice that the response from the

4   Secretary of State mentioned both getting a ballot and

5   registering to vote because perhaps there was some

6   confusion on the part of the voter about being --

7   whether or not to -- whether or not his and his wife's

8   ballots were processed.  Did you see that there?

9          A.     I agree with that.

10         Q.     Do you know whether this was identified by

11  the Secretary of State as an issue involving providing

12  an ID number for email voting?

13         A.     I don't know.  The voter doesn't know what

14  they are really talking about.  Our response covers

15  both because we don't know what they are talking about.

16         Q.     Okay.  There were some mentions in here

17  about ballot by mail TEAM in the email.  I wasn't

18  sure --

19         A.     Right.

20         Q.     -- if you understood perhaps more.

21         A.     I don't.  I mean I know if somebody

22  registered to vote and supplied their last four of SSN

23  of course they would be registered.  It wouldn't be

24  rejected.  So that obviously wasn't a voter

25  registration.  Then he says they received a notice that



1    their application for registration had been reviewed

2    and included all of the information.  So I have no idea

3    what's going on with this fellow.  We would have to

4    look him up to even begin to have an idea.  Call up the

5    county, figure out what county it is.

6         Q.    He even included what might be his and his

7    wife's VUID numbers there at the very end, didn't he?

8         A.    He did.  Which indicates he's registered to

9    vote.  So really this doesn't make very much sense.

10        Q.    Okay.  Thank you.

11        MS. PERALES:  Can we mark this one, please.

12                    (WHEREUPON, a certain document was

13                    marked Deposition Exhibit No. 24,

14                    for identification, as of 3/28/23.)

15   BY MS. PERALES:

16        Q.    Mr. Ingram, can you identify this email?

17        A.    Yes, it appears to be an email from Susan

18   Johnson to our office.  And we did talk about this one

19   earlier.

20        Q.    Did you?

21        A.    Yes.

22        Q.    Okay.  I will put it aside.

23        A.    We can talk about it again, but it's

24   already in the stack.

25        Q.    So we did mark it, but we are not going to



```
 1   discuss it if you have already discussed it.

 2              I'd like to ask you some questions about SB

 3   1 that are not related to mail ballots?

 4        A.    Okay.

 5        Q.    I think what might make the most sense is

 6   to go ahead and mark SB 1 just so that you have it for

 7   reference.

 8        A.    Okay.

 9        Q.    Because I understand that it's kind of

10   spread out all over the election code, and I don't want

11   to make you have to look it up that way.

12        A.    Sure.

13        Q.    Let's go ahead and mark that as No. 25.

14                      (WHEREUPON, a certain document was

15                      marked Deposition Exhibit No. 25,

16                      for identification, as of 3/28/23.)

17   BY MS. PERALES:

18        Q.    If you would turn with me to section 2.04.

19        MS. HUNKER:  Nina, for clarity of the record, can

20   you confirm this is the enrolled version?

21        MS. PERALES:  I can confirm it's the enrolled

22   version.

23        MS. HUNKER:  Thank you.

24        MS. PERALES:  What I'm thinking about is whether

25   I want to go over it now or in the next portion of the
```



 1   deposition.  Let me think about this.  I think we might

 2   put it aside.  Don't laugh at me, Dan.  I'm thinking my

 3   way through it as I go.

 4   BY MS. PERALES:

 5        Q.    I think, Mr. Ingram, I'm going to -- it is

 6   the enrolled, and I can confirm that for you even

 7   though it's not signed on the back, but I think I

 8   should probably save that so I don't have to ask you

 9   the questions twice, first as Keith Ingram, and then

10   later as the Secretary of State if that's okay with

11   you?

12        A.    Sure.

13        Q.    I said out loud that Dan was laughing at

14   me.  Now he's worried about the record.

15              I have some questions for you about voter

16   assistance.

17        A.    Okay.

18        Q.    Some of which I will ask of the Secretary

19   of State's office, but I do have a few Keith Ingram

20   questions about voter assistance.

21              I will ask you to turn to Exhibit 25

22   section 6.04, I believe.  Would you agree with me that

23   SB 1 section 6.04 modifies the oath that a voter

24   assistor takes when they help a voter in the polling

25   place?



```
 1          A.      Agree with that.

 2          Q.      There are other provisions that modified

 3   the oath of assistants that an assistor would complete

 4   on a mail ballot; is that correct?

 5          A.      Yes.

 6          Q.      So if you go to the top of page 53 with me.

 7   And we see starting in line two and ending with line

 8   four, would it be fair to say that SB 1 added to the

 9   assistor oath the following language, quote, reading

10   the ballot to the voter, directing the voter to read

11   the ballot, marking the voter's ballot or directing the

12   voter to mark the ballot, unquote.

13          A.      Agreed.

14          Q.      When SB 1 was enacted, it's correct that

15   the Secretary of State's Office changed the voter

16   assistance oath form to include this additional

17   language; is that correct?

18          A.      Agreed, and to strike the language that was

19   stricken in law.

20          Q.      Yes.  There are some other additions and

21   strike out as well.  But I just wanted to stick with

22   the language that follows confining the assistance of

23   the assistor?

24          A.      Agreed.

25          Q.      You also incorporated this confining
```



1    language with the mail ballot assistor oath as well,

2    correct?

3            A.      Yes.

4            Q.      Then at a certain point in time the

5    Secretary of State modified the assistance form again;

6    is that correct?

7            A.      That's correct.

8            Q.      Would it be fair to say that happened after

9    the 2022 primary election?

10           A.      Yes, it happened in June of '22.  The

11   change happened in July, but the order from the court

12   requiring the change happened in June.

13           Q.      When you say order of the court, is that

14   the order of the District Court Judge Pitman in the

15   litigation known as Organization of Chinese Americans?

16           A.      I agree it's that case.  I think of it as

17   the Mallika Das case.

18           Q.      Ms. Mallika Das was the original first

19   plaintiff, correct?

20           A.      That's right.

21           Q.      She passed away during the course of the

22   litigation?

23           A.      She did.

24           Q.      Then the group that we call as shorthand

25   OCA, Organization of Chinese Americans, they continued



 1   the case, correct?

 2        A.    They did.

 3        Q.    That case went up to the Federal Circuit

 4   and then came back down, correct?

 5        A.    It did.

 6        Q.    And would it be fair to say that it was the

 7   District Court's opinion in 2018 in validating portions

 8   of the election code on voter assistance at that time

 9   that went up to the Fifth Circuit and was affirmed?

10        MS. HUNKER:  Objection, form.

11   BY THE WITNESS:

12        A.    Agreed that the Fifth Circuit said this

13   order was a little too broad, and told him to narrow

14   it, but basically.

15   BY MS. PERALES:

16        Q.    The language -- strike that.

17              The order from the court that -- the

18   District Court that was upheld had to do with the scope

19   of assistance that could be given by a voter assistor,

20   correct?

21        A.    Agreed that it included interpretation.

22        Q.    Yes.  So in July of 2022 as you mentioned

23   when the Secretary of State modified the assistance

24   oath form it was in response to a later order of Judge

25   Pitman in the OCA case, correct?



1          A.      That's correct.

2          Q.      That later order had to do with

3     invalidating language that had been put in by SB 1,

4     correct?

5          A.      Agreed.

6          Q.      And that language was invalidated, and you

7     modified the form both for the in-person voter

8     assistance as well as on the mail ballot, correct?

9          A.      That's correct.  And the signature sheet

10    for FPCA voters.

11         Q.      Would you agree with me that the language

12    that Judge Pitman invalidated was the language that you

13    and I reviewed a little bit earlier on page 53 of this

14    exhibit where the assistor says they will confine their

15    assistance to quote, reading the ballot to the voter,

16    directing the voter to read the ballot, marking the

17    voter's ballot or directing the voter to mark the

18    ballot, unquote?

19         MS. HUNKER:  Objection, form.

20    BY THE WITNESS:

21         A.      Agreed.  Yes.

22    BY MS. PERALES:

23         Q.      And that order of Judge Pitman came down

24    approximately June 6 of 2022, correct?

25         A.      That's my recollection, yes, ma'am.



1     Q.     How did you learn of the June 6, 2022

2  decision by Judge Pitman, which went to this language

3  in the oath that had been added by SB 1?

4     MS. HUNKER:  I'm going to object on

5  attorney-client grounds and advise my client to only

6  answer the question to the extent it doesn't get into

7  the substance of any attorney-client privilege.

8  BY MS. PERALES:

9     Q.     You could answer if it didn't involve

10  having a conversation with your attorney.

11     A.     Right.  Well, what about an email from my

12  attorney?

13     Q.     That counts as attorney-client.

14     A.     That's what I think.  I don't know how to

15  answer that question.

16     Q.     Okay.  I figured since you are an attorney

17  yourself, that you might have been on some distribution

18  list or something where you learned about it otherwise?

19     A.     No, it got sent to us by the lawyers.

20     Q.     Then I won't ask any more about that.

21          Had you been following the impact of Judge

22  Pitman's 2018 decision on the scope of voter assistance

23  in your job as the director of elections?

24     A.     Sure.

25     Q.     It would effect how the election judges or



1   poll workers conduct voting in the polling place,

2   correct?

3           A.      That's right.

4           Q.      To some degree, although it might not have

5   been visible to you, it would effect how people might

6   offer assistance in the mail ballot process?

7           A.      Agreed.  Yes.  The thing that changed is we

8   used to have a qualification for interpreter that they

9   had to be registered voter of the county where they

10  were interpreting, and voter assistant obviously didn't

11  have that limitation.  It could be anybody of the

12  voter's choosing except for their boss or their labor

13  union.  The court's order in 2018 said that

14  interpretation is assistance, a form of assistance, and

15  it needs to have the same standard so you can't require

16  it be a limited registered voter of the county.  So

17  that's what changed.  And of course we implemented that

18  order.

19          Q.      An elegantly succinct summary of the

20  court's ruling.

21                  Did you also understand Judge Pitman's 2018

22  ruling and the Fifth Circuit's affirmant to mean that

23  assistance was broad enough to encompass more activity

24  than just reading or marking the ballot?  For example,

25  it would include interpretation, but it might also



1   include other acts that could assist a voter in casting

2   a ballot, like helping them physically navigate the

3   polling place?

4           MS. HUNKER:  Objection, form.

5   BY THE WITNESS:

6           A.      Right.  I don't know.  That wasn't the

7   focus of the Court's order, but obviously the assistant

8   has to assist the voter in mobility if that's what they

9   need in order for them to vote.  That's not anything

10  that's ever been in question.  What was in question was

11  interpretation.

12  BY MS. PERALES:

13          Q.      Specifically in that case.  But did you

14  notice language in that case that said that the act of

15  voting encompasses a range of activities and thus might

16  imply a range of types of assistance?

17          A.      Agreed with that.

18          MS. HUNKER:  Objection, form.

19  BY THE WITNESS:

20          A.      This language didn't change that fact.

21  BY MS. PERALES:

22          Q.      So --

23          A.      The language in SB 1 that we are talking

24  about didn't change the facts that assistance

25  encompasses all of the forms of assistance a voter



 1   needs to get to the poll, get to the booth, get out of

 2   the polls.

 3        Q.     In your view, that's how you understood it?

 4        A.     That's how I understood it.  That's how we

 5   implemented it.

 6        Q.     It's also possible though that if somebody

 7   had to sign a form under oath saying that they would

 8   confine their assistance to reading and marking the

 9   ballot, that that assistor, who is a member of the

10   public, would know -- not necessarily need special

11   training, might think they had to limit their

12   assistance to just those acts?

13        MS. HUNKER:  Objection, form.

14   BY THE WITNESS:

15        A.     I don't know if that ever happened.  We

16   didn't get any questions about it.  If we had gotten

17   the question about it we said obviously whatever the

18   voter needs to vote successfully you can assist with.

19   BY MS. PERALES:

20        Q.     That question would have come from a poll

21   worker or an election judge or county election

22   official?

23        A.     Or a voter who needed an assistant or

24   assistant.  We get calls from all of those folks.

25        Q.     You mentioned you weren't sure if it ever



1  happened.  Would it be fair to say your office never

2  received any queries of that sort?

3          A.    I don't believe we did, but we could have

4  gotten one or two I don't know about.

5          Q.    I'm trying to figure out the best way to

6  ask this question.  When SB 1 was moving through the

7  2021 legislative sessions, and of course in the regular

8  session, it had a different number, right?

9          A.    Yes, it did.

10         Q.    HB 6, SB 7.  So there were predecessor bill

11 numbers to what ultimately got passed as SB 1.  But as

12 SB 1 was moving through the 2021 legislative session,

13 did you think that the language in SB 1 section 6.04

14 might run contrary to Judge Pitman's decision in the

15 OCA case?

16         A.    It never entered our mind that it was

17 changing the scope of assistance.

18         Q.    So would it be fair to say then you never

19 raised that concern to any legislator who might have

20 sought your view?

21         A.    I agree with that.  This is not something

22 we raised.

23         Q.    When Judge Pitman decided in June of 2022

24 that the language that SB 1 added to the oath was

25 almost indistinguishable from the language that he had



1  invalidated in the prior version of the election code,

2  and then he said that that language could not go

3  forward from SB 1, were you surprised?

4       MS. HUNKER:  Objection, form.

5  BY THE WITNESS:

6       A.    I don't know if I was surprised.  I mean

7  disappointed, because I didn't think it changed

8  anything, but happy to take it out if that's what he

9  thinks.

10 BY MS. PERALES:

11      Q.    Did you have any sense that Judge Pitman

12 might decide that the language from SB 1 which tracks

13 so closely with the invalidated provisions in the

14 election code might be problematic?

15      MS. HUNKER:  Objection, form.

16 BY THE WITNESS:

17      A.    Again, never entered our mind it was

18 changing the scope of assistance.

19 BY MS. PERALES:

20      Q.    Besides changing the forms in the summer of

21 2022, in July of 2022, and by the forms I mean the oath

22 of assistance for in-person assisting and for mail

23 ballot assistance, what additional steps did you

24 remember your office taking to implement Judge Pitman's

25 June 2022 order?



1      A.      So we sent out a mass email with a revised

2  oath of assistance forms in July, and then we sent a

3  follow-up email after that where we had changed

4  everything else that had the oath of assistance on it.

5      Q.      Do you remember getting any questions

6  either from election administrators or election workers

7  or the public about this change in the oath of

8  assistance?

9      A.      We did get questions from election

10 officials, but the questions were not regarding the

11 substance.  The questions were, "Can I use the old

12 stock of the form?"  So we made sure to tell everybody

13 that you can use old stock, but you have to redact the

14 offending language from the Judge's order.  So where it

15 starts with, "I will confine," that since had to be

16 redacted either with Sharpie or White Out or some

17 sticker or some kind of way.

18     Q.      When you say where it starts with, "I will

19 confine," you are pointing to line two of page 53 of

20 Exhibit 25?

21     A.      That's correct.  I'm sorry.

22     Q.      Thank you.

23             Did you get any questions about the

24 permissible scope of assistance activities for either

25 in-person or mail voting after the 2022 primary?



Keith Ingram                                              March 28, 2023
                                                         Page 162

 1          A.      No.   Again, that's never been an issue so
 2    it never was.
 3          Q.      Would you say it's largely handled by the
 4    counties?
 5          A.      I would say that the counties are the ones
 6    who deal with it directly, but our office is the one
 7    teaching them.   We didn't teach this as a change.
 8          Q.      But you did amend the form?
 9          A.      We did.
10          Q.      Because SB 1 required it?
11          A.      The law changed, the words change, but the
12    scope of assistance was substantively the same.
13          Q.      That was the way you understood it?
14          A.      That was the way we understood it.
15          Q.      I have a clarifying question for you.
16    Prior to HAVA, the Help America Vote Act, there wasn't
17    a requirement on Federal forms for a voter to provide
18    either their driver's license number or the last four
19    of their Social; is that correct?
20          A.      I agree with that.
21          Q.      You had mentioned earlier in the
22    deposition, and this is what I wanted to follow up on,
23    that Texas prior to HAVA did require a voter registrant
24    to put a Social Security number; is that correct?
25          A.      I'm not sure.   I would have to go back and



1   look at the form.  I know that we have registrations

2   from before HAVA that have full nine Social, and DL.

3   We have had those for a long time before HB2512.  They

4   were part of the voter registration system that I

5   inherited when I began this job in January of 2012.  At

6   that point we had about six million full nines, and the

7   only we way would have gotten them is from a voter

8   registration application.

9        Q.     In my mind I was trying to figure out how

10  you could have voters who didn't have either a social

11  or a driver's license if they are registered to vote,

12  but they didn't have either of those numbers on file

13  with the county.  Is it possibly the case that there

14  was a time period where folks could register to vote

15  without the full nine?

16       A.     I agree with that, yes, absolutely.

17       Q.     Do you think that's where this group was

18  coming from that has neither a driver's license or a

19  Social in their record?

20       A.     I do, and also ones without date of birth.

21       Q.     Yes.

22              So these would necessarily have been people

23  who registered prior to 2012 and possibly even earlier

24  than that?

25       A.     I agree they would have registered to vote



 1    sometime after January of '66 whenever the voter

 2    registration system came into play.  And, you know,

 3    sometime between then and the '90s, you know.  I have

 4    one of my employees in my -- former employees in my

 5    office who registered to vote in the '60s.  She's got

 6    neither number on her record.

 7         Q.    Would it also be true that that person

 8    would have had to not move from one county to another?

 9         A.    Well, there would have to have been no

10    changes, that's right.  So she would have still lived

11    in the same place which, you know, her mother's house

12    is where she is registered to vote.  That's where she

13    still has mail.

14         Q.    Would it be fair to say that folks who

15    registered that long ago are a good number of them

16    might also be eligible to vote by mail because they are

17    over age 65?

18         MS. HUNKER:  Objection, form.

19    BY THE WITNESS:

20         A.    I would agree with that.  Like I mentioned

21    before, we have got about half a percent of the voter

22    records that don't have either number in them.  And in

23    the last election, November of '22, we had 163 mail

24    ballots that were rejected for not having a number.

25    And so that's half of a half percent.  So the numbers



1  don't exactly match up the way you would expect them

2  to, but that's because people voted in-person.  Some

3  portion of them obviously are deceased.  We don't have

4  a record.  We don't have a way to match their record

5  and get them to move from the roles unless the family

6  notifies us they are deceased.

7  BY MS. PERALES:

8      Q.    Did you say earlier about 93,000 people

9  appear in your database as having neither Social or

10  driver's license number?

11     A.    About 93,800, close to 94,000, but not

12  quite.

13     Q.    But the number of -- now, when you mention

14  the 163, that's tied to the number of mail ballots that

15  have been marked as rejected because of some failure to

16  provide an ID number; is that right?

17     A.    No.  They were rejected specifically

18  because there was a number provided by the voter, but

19  there wasn't a number in their record.

20     Q.    Okay.  Got it.

21     A.    That's what's reported to us by the

22  counties.  That's the best information we have.  I

23  don't want to be giving the impression it's 100 percent

24  accurate.

25     Q.    Thank you.



1           In your position as director of elections,

2    would it be fair to say that you frequently testified

3    before the legislature as a resource witness on

4    election related bills?

5           A.    Yes.

6           Q.    That's probably how the public knows you

7    best is that you were at so many of these hearings and

8    testifying on bills, right?

9           A.    I don't know how they know me, but they do

10   know me.

11          Q.    Yes.  Well, now with video they can watch

12   you from Amarillo and still see you testify on election

13   bills?

14          A.    That's correct.

15          Q.    In addition to testifying in public

16   hearings, would it be fair to say that you also

17   provided advice to either committees or individual

18   legislators about bill language?

19          A.    Agree with that.

20          Q.    Would it be fair to say that you offered

21   proposed language for bills to achieve what a

22   particular legislator or committee chair might want to

23   accomplish?

24          A.    Agreed that's one of the things that we try

25   to do.  If they have a goal and they don't have the



 1    exact verbiage that they want to use, then we try to

 2    provide that for them if we can, if they ask for it.

 3         Q.    Is it the case also that legislators have

 4    asked you whether certain language that they have in

 5    mind would essentially work in the real world under the

 6    view of your office The Secretary of State?

 7         A.    Agree that's one of the thing -- one of the

 8    advice areas that we give.

 9         Q.    Is it the case that sometimes you might get

10    bill language from another source and pass that along

11    to legislators?

12         A.    Not usually, no.

13         Q.    Did you ever receive proposed bill language

14    or proposals from Alan Vera that you passed along to

15    legislators?

16         A.    I don't think so.

17         Q.    You don't ever remember saying in one of

18    the hearing rooms that you had gotten language from

19    Alan Vera and passed it along to legislators for a

20    bill?

21         A.    I mean if a legislator asked for Alan's

22    language we would give it to him if we had it.

23         Q.    I'm going to catch up with myself.  Can you

24    tell me who is Alan Vera?

25         A.    Alan Vera is the chairman of the Ballot



 1   Security Committee in Harris County Republican Party.

 2        Q.      That title is a mouthful.  You got it just

 3   right.

 4        A.      I have heard it a bunch of times.

 5        Q.      Let's say for the last session, 2021

 6   session when we saw HB 6, SB 7, SB 1 moving along,

 7   approximately how many times did Alan Vera communicate

 8   with you by any means?

 9        A.      About those bills in particular?  Not

10   often.

11        Q.      Would you say every week?

12        A.      Well, I mean I would see him every week at

13   the elections committee, sometimes at state affairs,

14   but we didn't talk about SB 1 or SB 7 every week.  I

15   didn't talk to him about substantive legislation very

16   often at all.

17        Q.      Would it be fair to say that he emailed you

18   from time to time with suggestions on substantive

19   legislation?

20        A.      He definitely emails, but rarely.  It's not

21   an everyday occurrence.

22        Q.      Would he sometimes, as they say, button

23   hole you in the hallways and try to talk to you about

24   legislation or proposals touching on some of the

25   sections of SB 1?



1        A.      Occasionally, yes.

2        Q.      Do you ever remember asking Mr. Vera for a

3   copy of his poll watcher training presentation that he

4   does over there in Harris County?

5        A.      He volunteered it.

6        Q.      Did you at some point acquiesce and end up

7   having him send it to you?

8        A.      My standard answer when anybody wants to

9   send something is, "Please send it.  I look forward to

10  reading it."  I never would say the opposite.

11       Q.      Do you ever recall getting any other types

12  of documents that Mr. Vera would send to you or to your

13  office?

14       A.      He corresponds with us, yes.  I don't know

15  what you are talking about in particular, but yes.

16       Q.      In addition to emailing you and catching

17  you in the hall for conversation or in the committee

18  room, would Mr. Vera ever call you or other people in

19  your office to your recollection?

20       A.      Yes.

21       Q.      He would call to make suggestions about

22  legislation; is that right?

23       A.      If he called me and made a suggestion about

24  legislation, I would refer him to the bill office.  I

25  wouldn't purport to carry his water ever.



1      Q.      Would he sometimes though want to engage

2   you on substantive proposals?

3      A.      I don't know what you mean.  I mean people

4   often try to engage us.  They -- I think of it as them

5   working the ref.  They see us as the referee, they try

6   to work the ref.  Alan Vera is one of those people that

7   does that.

8      Q.      Would it be fair to say then he would have

9   specific ideas in mind of how he, let's say,

10  substantive proposals that he had in mind that maybe he

11  would want to see added either as an amendment or as a

12  committee substitute and he might want to talk to you

13  about it in case you would have the ear of someone

14  else?

15      MS. HUNKER:  Objection, form.

16  BY THE WITNESS:

17      A.      I never purported to carry his water.  I

18  want to make that very clear.  He never demanded that

19  we talk to a legislator on his behalf because he's

20  perfectly capable of going to their offices himself.

21  That's not the way that worked.  The way that worked is

22  I'm advocating for this or that, will it work?  He

23  asked us the same kind of questions that legislators

24  ask.  Generally he already thought it would work so

25  it's not even a question that he would ask.



 1  BY MS. PERALES:

 2       Q.     So I'm definitely not trying to get you to

 3  say that you personally advocated for his proposal.

 4  Not asking so much about what Keith Ingram did with

 5  information, but I'm asking more about from the Alan

 6  Vera side of things.  Would he send you things?  Would

 7  he approach you with substantive proposals that he had

 8  in mind?

 9       A.     Maybe.  I can't think of anything.  But

10  that's just not the way it works for him and us.

11       Q.     I know there is this other part of Alan

12  Vera where he might have been trying to get you to

13  follow up on complaints about, you know, irregularities

14  he wanted you to follow up.  I definitely am not asking

15  about that so much as I'm asking about the legislative

16  advocacy he was doing.

17       A.     I understand.  But he's a very capable

18  advocate on his own behalf with legislators.  He

19  doesn't need us to help him with that.

20       Q.     When you -- okay.  Now we are going to

21  leave Alan Vera behind.  I'm not going to ask you more

22  Alan Vera questions.

23              When you would communicate with

24  legislators, committee chairs or staff, is it fair to

25  say that you might have that communication by email?



1        A.      Agreed.

2        Q.      Would it be fair to say that that

3    communication might also happen by telephone?

4        A.      Agreed.

5        Q.      Would it also happen by text?

6        A.      Occasionally, but mostly by phone.

7        Q.      The communication might involve -- well,

8    no.  Scratch that.

9                Would it be fair to say that you provided

10   feedback to legislators or staff with respect to either

11   SB 1 or its predecessor bills?

12       A.      When requested, sure.

13       Q.      But you did get those requests and you did

14   provide that feedback for this bill SB 1?

15       A.      Sure.  And SB 7 and HP 6 before it.

16       Q.      Okay.  Did you provide any feedback prior

17   to the bills initially being introduced into the

18   regular session of 2021?

19       A.      I don't believe so.

20       Q.      So did you have any involvement in the

21   formation or drafting of these bills prior to their

22   introduction for the 2021 regular?

23       A.      We did not.  Not that I know of.

24       Q.      It was more, here's the bill, and then you

25   would be asked to come and testify on it?



1        A.      Yes.

2        Q.      So then just to be clear, you were not

3   approached by legislators or staff who said, we have

4   this idea for what we want to accomplish in the 2021

5   session, and we -- how would you, the Secretary of

6   State or Mr. Ingram, advise us to accomplish that?

7        A.      Not beforehand, no.

8        Q.      Would you ever find yourself in a situation

9   where you might be having a conversation with a

10  legislator or staff and you would be saying, "This is

11  going to make things really difficult for counties"?

12  Would you ever provide that kind of practical advice?

13       A.      Sure.

14       Q.      Did you do that for SB 1?

15       A.      I did.

16       Q.      What was that advice?

17       A.      There was the part about -- the wording

18  changed over time, but the part that said that a number

19  on the voter registration application had to be

20  provided by the voter for a mail ballot application or

21  a mail ballot.  And we were trying our best to get them

22  to not say that, to say a voter -- number in their

23  record, voter registration record number instead of on

24  their application because we didn't want voters to be

25  confused into thinking they had to use whatever number



```
 1    they originally registered to vote with, and that's not
 2    the case.  We have got both numbers for most voters
 3    because we have worked real hard to get them.  That's
 4    not necessary.  It's just going to confuse things
 5    because the way we are going to implement this law is
 6    if they have got a number in the record we are going to
 7    tell the early voting ballot board and the early voting
 8    clerk to accept them.
 9         Q.    When you say a number on the voter
10    registration, do you mean the VUID?
11         A.    No, I mean a number that was supplied by
12    the voter when they originally registered to vote.  So
13    if they gave their last four, chances are we have got
14    the full nine now.  If they gave their driver's
15    license, probably we have the Social Security now as
16    well.  So we didn't want the language to tie the number
17    that they had to provide as identification for their
18    mail ballot process to be tied to the application
19    because that was going to confuse voters because it's
20    not true.  We were going to look at whatever number is
21    in their record.
22         Q.    I see.  So you were advising that as long
23    as the voter provided a number that could be found in
24    their record by the county, that it shouldn't
25    necessarily have to match what was on the original
```



1  registration form?

2       A.     That's right.  We wanted to make that

3  change.  We talked about that in at least one committee

4  hearing.  I followed a tax assessor who made the same

5  point.

6       Q.     Was that change ultimately made?

7       A.     I think it was in one place and it wasn't

8  in another.  So I think we still have some of that

9  voter registration application language in here, but we

10 have just maneuvered our way around it.

11      Q.     Give me any other example that you have of

12 advice that you offered around SB 1 and its provisions

13 to legislators?

14      A.     There were three provisions in SB 7 and

15 later in SB 1 that we felt were very problematic for

16 Texas elections that were an absolute show stopper,

17 train wreck, will kill Texas elections.  The first one

18 was that any communication between the voting system

19 vendor and our office was public information per se no

20 exceptions.  I said if y'all do that then source code

21 is out there for bad guys.  You cannot keep this

22 without an exception.  Ultimately exception was put in

23 for critical infrastructure and proprietary

24 information.  That one was solved.  The second one

25 was --



1          Q.      How about phones in polling places?

2          A.      Uh-uh. The second one was like that, but it

3     said that anything that's done on a central account

4     computer has to be logged with a key logger.  So it was

5     going to require that we voluntarily insert a virus on

6     our central account computers that of course has not

7     been certified and would not be certified because it's

8     a virus.  And so we absolutely said you can't do that.

9     What you need -- if you are talking about audit logs,

10    we already have audit logs.  Here's what an audit log

11    looks like.  It's complete.  It tells who did it and

12    what they did and when they did it.  You don't need to

13    add to an audit log, but we don't have audit log

14    requirements in the law.  If you would put a

15    legislative history with the amendment.  So Chairman

16    Glick is the one that offered this amendment, and she

17    did make this clear what they were talking about with

18    that was an audit log.  Okay.  Great.  We got that one

19    solved.

20              The third one was write ones media

21    requirement a/k/a WOMR.  So the write ones media

22    requirement is what they had in the bill and still have

23    is a requirement that any device or system used in

24    central count cannot be capable of reading a thumb

25    drive or optical scan disk that can be written more



1     than once.  There is no such thing.  There never will

2     be such a thing.  Such a thing is a flying car.  I told

3     them you are going to kill Texas elections and make us

4     go back to hand counted ballots if you keep that

5     provision.  The best I can do is get it kicked until

6     September 26 effective date.  So those were the three

7     provisions that I was red in the face talking about.

8          Q.     How about some of the other provisions?  I

9     mentioned allowing poll watchers to use video recording

10    in polling places.  Did you provide feedback on that?

11         A.     I don't think we were ever asked about

12    that.

13         Q.     Okay.  Of course I'm searching my mind

14    because there were a lot of twists and turns on the

15    legislation as it moved through the sessions. Were

16    there any -- was there any feedback that you provided

17    besides everything that you have just mentioned that

18    the legislator did not resolve to your satisfaction?  I

19    know you mentioned in the last example you got at least

20    an effective date to 2026.  So there can be an effort

21    to do an amendment before it goes into effect I

22    presume?

23         A.     Agreed.

24         Q.     Was there anything you raised as a concern

25    that ended up in SB 1 even though you were concerned



1  about it?

2      A.    No, the three concerns that we raised were

3  those three things.  We got them either resolved or

4  delayed.

5      Q.    One more question that popped into my head.

6  There was language originally in SB 1 talked about how

7  a poll watcher couldn't be removed unless they violated

8  the election code.  But it didn't say anything about

9  being able to remove a poll watcher for violating, for

10 example, the penal code?

11     A.    Right.

12     Q.    Do you recall having any conversations with

13 the committee about that?

14     A.    Yes, but that was on the record at a

15 hearing where I remember Representative Bucy and I had

16 a pretty good colloquy about that.

17     Q.    Can you think of any other conversations

18 that were not in the public eye that related to

19 provisions, for example, that you might understand

20 being challenged in this lawsuit?

21     A.    No.

22     MS. PERALES: I don't know how long we have been

23 on, but it would be helpful for me to take a quick

24 break.

25     MS. HUNKER:  Sure.



1                    (WHEREUPON, a recess was had.)

2    BY MS. PERALES:

3         Q.    Mr. Ingram, the last set of questions that

4    I have for you are about your change in job position.

5    I want to follow up on some things that you said at the

6    very beginning of the deposition regarding a March 9,

7    2023 hearing that you testified at.  Do you recall

8    mentioning a March 9, 2023 hearing?

9         A.    Yes.

10        Q.    You mentioned an exchange with, I believe,

11   it's Representative Swanson; is that correct?

12        A.    That's correct.

13        Q.    Can you tell me what specifically in the

14   exchange led to the Secretary of State being not

15   pleased?

16        A.    It was the fact that I was frustrated with

17   Representative Swanson for mischaracterizing my prior

18   testimony.

19        Q.    Can you -- was it then what you said or how

20   you said it or some combination?

21        A.    It was more how I said it than what I said.

22   The fact that I was getting frustrated meant that maybe

23   11 sessions is or 11 years 6 sessions you have had

24   enough in front of the legislature because one thing

25   you have got to do is keep your cool.



1    Q.    In what way did Representative Swanson

2  mischaracterize your testimony when she was speaking

3  out loud there?

4    A.    Sure.  My previous exchange with

5  Representative DeAyala was to the effect that this

6  notwithstanding the challenges that the Harris County

7  election had in '22, that November general election was

8  the best one they had had since they had an election

9  administrator.  Representative Swanson took that to

10  mean that I was saying the election in 2022 in Harris

11  County was good.  When in fact I was just saying it was

12  the best one they had since they had an EA, which in

13  fact is a very low bar.  That's the one I wanted to

14  make with Representative Swanson.  I cut her off and I

15  was a little short and that was my mistake.

16    Q.    Do you -- were you -- when you were

17  speaking though were you making accurate statements

18  regarding the election in Harris County?

19    MS. HUNKER:  Objection, form.

20  BY THE WITNESS:

21    A.    I believe so.

22  BY MS. PERALES:

23    Q.    Do you think your change in job roles was

24  in any way a reaction to your having said that the 2022

25  general election in Harris County was the best one they



1    have had since they got an EA?

2         MS. HUNKER:  Objection, form.

3    BY THE WITNESS:

4         A.    I don't think it was that so much as my

5    reaction to Representative Swanson.  I mean the whole

6    idea was, "Keith, you have done your time.  You have

7    served well.  You know, if you are going to get

8    frustrated we can't take that chance. And obviously you

9    are at a point in your career where it's a short fuse

10   and we can't take the chance."  So it's not like it was

11   a punishment or anything like that.  It's, "We want to

12   protect you and we want to protect our office if you

13   are going to be having trouble staying under control."

14        Q.    In your new role will you still respond to

15   questions from county election administrators about how

16   to administer elections?

17        A.    I'm not sure exactly what position.  I mean

18   how I'm going to do with the phones.  That's yet

19   undetermined.

20        Q.    Do you know if you will be responding to

21   any email inquiries from county election

22   administrators?

23        A.    Probably not.

24        Q.    Do you know if you will be doing any

25   trainings of county election officials?



1    A.    If I do it will be related to the voter

2  cross-check system.

3    Q.    Do you know if you will be providing any

4  legal analysis or legal interpretation of election code

5  for The Secretary of State?

6    A.    If requested, sure.  They have mentioned

7  they would like me to do some research projects.

8    Q.    Prior to March of 2023, did Ms. Christina

9  Adkins report to you?

10    A.    She did.

11    Q.    You mentioned earlier in the deposition you

12  will now report to her?

13    A.    That's correct.

14    Q.    Is your position still described as

15  director for Secretary of State?

16    A.    I do not believe so.  I'm not sure if I'm

17  project manager or an attorney five, but something

18  other than a director four.

19    Q.    Do you know if there has been any change in

20  your annual salary?

21    A.    It should stay the same.

22    Q.    Will your new duties turn in part on

23  whether the Texas legislature enacts new legislation in

24  this current session?

25    A.    Sort of, but not really.  The sort of that



```
 1    is that, you know, assuming that they pass legislation

 2    that makes the withdrawal from ERIC, which makes the

 3    need more pressing.  But either way with ERIC losing

 4    members we need to fill those gaps.  So probably there

 5    needs to be a supplemental system no matter what.

 6         Q.    Very clearly explained.  Thank you.  I

 7    think I understood what you said.  It's a complicated

 8    topic.

 9         A.    Agreed.

10         MS. PERALES:  I believe that I'm done.  I will

11    pass the witness.  I think the next attorney is Victor

12    Genecin if he's there.  Shows him on screen.

13         MS. PERALES:  Victor, are you there?

14         MR. GENECIN: I'm here.

15                        EXAMINATION

16    BY MR. GENECIN:

17         Q.    I believe I'm unmuted.  Let's just see.

18    Yes, I can either turn on the screen.  Can you see me?

19         A.    I can.

20         Q.    Very good.  So, Mr. Ingram, my name is

21    Victor Genecin.  I'm with NAACP LDF.  We represent the

22    Houston Area Urban League Plaintiffs here.  I don't

23    believe you and I have ever met, have we?

24         A.    I don't believe so, no, sir.

25         Q.    I'm sorry not to be able to meet you today
```



1  in person.  Like Ms. Perales, if I go quiet it's

2  because I'm eliminating questions from my outline.

3  Unlike Ms. Perales if I suddenly start swearing, you

4  should know it's not about you, it's about trying to

5  make the technology work because I have got exhibits I

6  would like to show you and I'm not convinced that I can

7  do that properly.  But to start I just have a few

8  questions.

9              First of all, during the 2022 general

10 election was any data collected by the State concerning

11 the race of voters?

12     A.     No.

13     Q.     How about concerning the ethnicity of

14 voters?

15     A.     No.

16     Q.     Am I correct that the State does not

17 collect any such data?

18     A.     Agreed.

19     Q.     Turning to what happens after elections.

20 Does your office conduct any of what I would call after

21 action reports or after action meetings in which you

22 get together with either people in your office or with

23 the counties to discuss issues or problems they

24 encountered during the election?

25     A.     Yes, we do.  We do a version of that



1    internally as well as with county advisory group.

2         Q.    Who are the members of your county advisory

3    group?

4         A.    I will forget some.  It's better if I just

5    provide a list later then try to recall them off the

6    top of my head.

7         Q.    Why don't we do this.  We will leave a

8    blank in the transcript here and we can fill that in

9    with your list.  How's that?

10        A.

11               That's fine.  It's about 30 some odd

12    counties.

13        Q.    In terms of people with whom you meet

14    internally after an election to conduct an after action

15    group, who are those people?

16        A.    It is our attorneys as well as our election

17    trainers.

18        Q.    In what form does that internal after

19    election review take?

20        MS. HUNKER:  Objection, form.

21    BY THE WITNESS:

22        A.    It's just a meeting in the conference room

23    and some people appear on TEAMS.

24    BY MR. GENECIN:

25        Q.    So it's a meeting, people talk?



Keith Ingram                                      March 28, 2023
                                                       Page 186

1          A.      That's right.

2          Q.      Are there written reports collected?

3          A.      No.

4          Q.      Are minutes taken at the meeting?

5          A.      No.

6          Q.      Is anyone in the meeting taking notes?

7          A.      Not usually.  I mean there is sort of

8    action items.

9          Q.      So there are action items that come out of

10   the meeting?

11         A.      Usually.

12         Q.      Do you circulate those internally?

13         A.      No.

14         Q.      Who has the action items?

15         A.      Well, historically it's been Christina

16   Adkins.

17         Q.      Have Ms. Adkins' items coming out of the

18   2022 general election been produced to us?

19         A.      It's not a document to produce.  It's -- I

20   don't know.  I doubt it.

21         Q.      It's not a document?

22         A.      No.  I mean --

23         Q.      Is there a list of items?

24         A.      I don't know.  I mean it's on a yellow note

25   pad if it's anything.  There is not any formal document



1    produced.

2         Q.     For the record, we will request that those

3    list of action items in whatever form they may be even

4    if they are scribbled on a yellow note pad.  We will do

5    our best to see if we can read them.

6              Mr. Ingram, let me ask this.  With regard

7    to your meeting with your counties -- and what do you

8    call that group?

9         A.     The county advisory group.

10        Q.     In terms of your after election meeting

11   with the county advisory group, how does that meeting

12   take place?

13        A.     That's a phone call or I guess it's a

14   Webex.

15        Q.     In that meeting is there a discussion of

16   what happened during the election?

17        A.     Sure.

18        Q.     People raise problems, right?

19        A.     Sometimes, yes.

20        Q.     People share lessons learned?

21        A.     Usually, yes.

22        Q.     Does anybody compile notes of what went on

23   in that meeting?

24        A.     Sometimes.

25        Q.     How about with regard to the 2022 election?



1      A.     I don't know.  I mean we have had several

2  county advisory calls since that election.

3      Q.     Who would know if there are notes about

4  what happened in the 2022 election?

5      A.     Well, anybody that's participating in the

6  meeting.

7      Q.     So we would learn that from the list you

8  provide?

9      A.     Well, the people on that list know whether

10  they kept notes or not.

11      Q.     Are you aware of any notes being

12  circulated?

13      A.     No.

14      Q.     Are the meetings with the county advisory

15  are those the same or different than the meetings that

16  you hold with events that are called the county

17  information calls?

18      A.     I don't know what a county information call

19  is.

20      Q.     Well, you indicated earlier in your

21  testimony, maybe I got the words wrong, that you had a

22  meeting every other week with the counties?

23      A.     We have a meeting every other week with our

24  county advisory group.

25      Q.     Okay.  So it's the county advisory group



1  you meet with every other week?

2      A.      Agree with that.  It's not a rigid

3  schedule.  It bows and flexes as we have legislative

4  sessions and holidays.

5      Q.      I guess in the run up to elections it may

6  happen a little more frequently?

7      A.      Usually it kind of goes the other way as we

8  get close to an election.

9      Q.      What's the content of your meeting with the

10  county advisory group?

11      A.      Depends upon what we have to talk about.

12  Usually the format of meeting is that we start out with

13  a topic or two that we think that they need to know

14  about, and we want to solicit feedback on, and then

15  open the floor up to whatever they want to bring up.

16      Q.      Is there an agenda for the meetings with

17  the county advisory group?

18      A.      That's what I mean.  Usually we start off

19  with a couple things we want to talk about and those

20  are listed on one slide, that that's the meeting.

21      Q.      Have the slides of your office's

22  presentations to the county advisory group been

23  produced?

24      A.      I don't know that any of them are relevant

25  to anything in this case.



1          MR. GENECIN: Well, I will just ask that the

2     record reflect the request for the production of any

3     slides shown to the county advisory group between May

4     of 2022 and today's date.

5     BY MR. GENECIN:

6          Q.     Other than the slide that's put up it at

7     the beginning of the meeting with the county advisory

8     group, is there any other form of agenda that's

9     circulated in advance of meeting?

10         A.     No, not usually.

11         Q.     So the first part of the meeting you have

12    described which is presentation from Secretary of

13    State's Office concerning whatever your office wants to

14    present.  What's the next part of the meeting?

15         A.     Well, you have mischaracterized the first

16    part.  The first part often is things we want feedback

17    on specifically.  So it's not a presentation.  It's a

18    solicitation of feedback usually directed, you know, to

19    a topic, but then there is an open mic, anybody can

20    bring up anything that's on their mind.

21         Q.     So in terms of the feedback that you

22    request, have you requested feedback from the county

23    advisory group concerning specific sections of SB 1?

24         A.     We wouldn't characterize it that way.

25         Q.     How would you characterize it?



 1       A.      Well, if we want feedback on the corrective

 2   action procedure and how to improve it, we would ask

 3   the counties, "What did you think of the corrective

 4   action procedure?  How would you improve it?"  It's not

 5   an SB 1 related thing, it's a corrective action

 6   procedure question.

 7       Q.      So if I understand correctly, you open the

 8   meeting with a request for feedback about a topic or

 9   topics that the Secretary of State's Office is looking

10   for feedback about; is that right?

11       A.      Sometimes.  And sometimes it is more of a

12   presentation.  This is what we are planning to do.  But

13   even if it's that.  It's this is what we are planning

14   to do.  Can you think of anything else we need to do or

15   anything we need to take off of this list?  You know,

16   it's talking about webinars that are upcoming.  It's

17   talking about all kinds of things that we are planning

18   to train on and produce for the counties, documents

19   that we are producing.  All kinds of things that

20   involve election administration that involve election

21   administration that we have and advisory group so that

22   we can bounce it off them before we send it to the

23   whole list of counties.

24       Q.      Is there anybody within the the Secretary

25   of State's Office who takes notes during the meeting



 1   for the county advisory group?

 2          A.      Sometimes, yes.

 3          Q.      Who is that person or are those people?

 4          A.      There is usually notes that are taken by

 5   Lena Proft, one of our staff attorneys, and Alexa Bump

 6   Kemper, one of our trainers, but they are not on every

 7   call.

 8          Q.      Now, if neither of them is on the call how

 9   do you record the feedback that you have obtained from

10   the counsel advisory group?

11          A.      We don't.

12          Q.      Well, I will request the production of any

13   notes taken during the county advisory group meetings

14   between May of 2022 and the present.  I will ask that

15   those be produced as well.

16                  Do you have an understanding, Mr. Ingram,

17   of when the counties assemble the packets of materials

18   that their election judges are going to need during an

19   election?

20          A.      Well, I don't know what you mean by

21   assemble.

22          Q.      Am I correct that in order to do his or her

23   job, an election judge needs certain materials?

24          A.      Agreed.

25          Q.      And that those include a handbook and whole



 1   variety of forms?

 2        A.     Agreed.

 3        Q.     There are other materials as well an

 4   election judge is going to need in order to perform

 5   their duties?

 6        A.     There is different signs and stuff for the

 7   polling place, yes, sir.

 8        Q.     When do the election administrators put

 9   those materials together for each election judge?

10        MS. HUNKER:  Objection, form.

11   BY THE WITNESS:

12        A.     That's not a question that we answer.  You

13   would have to ask the county that.

14   BY MR. GENECIN:

15        Q.     Do you have an understanding of when they

16   do it by?

17        MS. HUNKER:  Objection, form.

18   BY THE WITNESS:

19        A.     They do it before election day.

20   BY MR. GENECIN:

21        Q.     I understand that.  I expect they do it

22   before early voting as well; is that right?

23        A.     Well, for the early voting locations, sure,

24   but there is a lot fewer early voting locations than

25   there are election day places.



1    Q.    Have any of the counties discussed with you

2    the issue of how much lead time they need to have their

3    packets together for their election judges in advance

4    of elections?

5    A.    It's not usually counties that are asking

6    that question.  It's usually print vendors.

7    Q.    And have the print vendors discussed that

8    issue?

9    A.    Sure.

10   Q.    What have they said to you?

11   A.    They need to have the list of forms by

12   July.

13   Q.    By July, that would be for a November

14   election; is that right?

15   A.    For a November election by July at the

16   latest.  They prefer it earlier than that.

17   Q.    Do you attempt to avoid changes after you

18   have gotten the list of forms out to the print vendors?

19   A.    Yes.

20   Q.    In the event that you have got a change

21   that's got to be made, what do you do to make sure that

22   the counties and election judges know that a form

23   they've got has been replaced with something else?

24   A.    We send a mass email.

25   Q.    Now, are you familiar with the term wet



1  signature?

2       A.      Yes.

3       Q.      What does it mean?

4       A.      It means the signature from an ink pen on a

5  paper.

6       Q.      Are there documents that are required under

7  the election code to have a wet signature?

8       MS. HUNKER:  Objection, form.

9  BY THE WITNESS:

10      A.      Yes.

11  BY MR. GENECIN:

12      Q.      Are you able to tell me what those

13  documents are?

14      A.      Well, anything that's a voter registration

15  form, there is several different documents that are

16  actually voter registration forms such as a statement

17  of residence, a provisional ballot, and a voter

18  registration application.

19      Q.      Any others that you can think of?

20      A.      Application for ballot by mail.

21      Q.      In the case of an application for ballot by

22  mail, although that document can be submitted initially

23  by fax or by email, the applicant has to follow it up

24  with a hard copy, right?

25      MS. HUNKER:  Objection, form.



```
1   BY THE WITNESS:

2       A.    Agreed, unless it's an FPCA.  Those can be

3   sent electronically.

4   BY MR. GENECIN:

5       Q.    To your knowledge, are there any documents

6   that are required by the election code to be signed but

7   might need not have a wet signature on them?

8       A.    Sure.

9       MS. HUNKER:  Objection, form.

10  BY MR. GENECIN:

11      Q.    What are those documents?

12      A.    It's just about everything else. 1007 of

13  the election code says unless it's otherwise specified

14  anything required can be sent electronically or by fax.

15      Q.    Now, you remember at the very beginning of

16  your testimony this morning you said that in

17  preparation for your testimony today you reviewed

18  spreadsheets of ballot rejections?

19      A.    Agreed.

20      Q.    What are the names of those spreadsheets?

21  What are they called?

22      A.    I have no idea.

23      Q.    How do you know what they were?

24      A.    Well, because I can look at them and see

25  what's in them.  It's one excel spreadsheet with
```



 1  several pages for different elections.

 2       Q.      You testified that parts of that document

 3  were produced.  Do you know which parts were produced?

 4       A.      That's not what I said, sir.

 5       Q.      Then I'm sorry.  If it's not what you said,

 6  please correct me.

 7       A.      The whole thing has been produced as far as

 8  I know.

 9       Q.      What information is shown on the

10  spreadsheet that you reviewed in preparation for your

11  testimony?

12       A.      The ballot rejection rates by county for

13  each of the elections held in 2022, the democratic and

14  republican primary elections, the constitutional

15  amendment election in May, the primary runoffs for

16  democrats and republicans in May, and the general

17  election in November.

18       Q.      You also testified this morning that you

19  spoke with Ms. Davidson of the republican party of

20  Texas?

21       A.      Agree with that.

22       Q.      You said that was to ask her about an

23  incident involving a poll watcher in North Hidalgo

24  County?

25       A.      That's correct.



1          Q.      Why did you speak particularly to Ms.
2   Davidson?
3          A.      Because she is one of the ones that I
4   called with regard to the original incident back in
5   October of '22.
6          Q.      And how do you know that she is one of the
7   ones you called?
8          A.      Because I remember.
9          Q.      Do you remember calling her?  Do you have
10  any kind of note or memo about the content of your call
11  with her?
12         A.      I do not.  I looked for it.  I didn't find
13  it.
14         Q.      Do you remember speaking with anybody else
15  about this particular incident?
16         A.      Sure.  I talked to people in our executive
17  office as well as Christina.
18         Q.      What do you remember about that incident?
19         A.      Just what I have already told you, there
20  was an issue with the poll watcher, but I don't
21  remember the nature of the issue.
22         Q.      So you remember there was an issue with a
23  poll watcher, you remember calling Ms. Davidson about
24  it, you remember speaking with some other people about
25  it, but you don't remember what the issue was?



1        A.      That's correct.   I remember Ms. Davidson

2   whenever I talked to her, I talked to her a couple of

3   times or three times about this incident.   She

4   mentioned that there was an early voting clerk in

5   Weslaco or maybe Pharr that was she thought being

6   problematic in some way.   I don't remember what it was.

7   I also talked to -- so I talked to Gloria, who was the

8   acting elections administrator for Hidalgo County about

9   that, and that both issues were successfully resolved.

10        Q.      Does your office have any written record of

11   either of those issues?

12        A.      We do not.

13        Q.      Do you recall during either early voting

14   before the November election of 2022 or in connection

15   with the November 2022 general election any other

16   problems with poll watchers?

17        A.      There was an incident in Dallas County

18   where a poll watcher was asked to show ID and they

19   refused to do so and it escalated so that both sides,

20   both the poll watcher and the election judge, called

21   the sheriff's office.

22        Q.      Do you remember anything else about that

23   incident?

24        A.      No.

25        Q.      Do you remember what happened after the



1   sheriff's office was called?

2          A.      Well, we were contacted and we were asked

3   whether they needed to show ID, and said the law

4   doesn't require it.  The election judge or early voting

5   clerk allowed the poll watcher to enter the polling

6   location.

7          Q.      The matter was resolved?

8          A.      The matter was resolved.

9          Q.      Do you have any written record of that?

10         A.      Not that I know of, no, sir.

11         Q.      Do you have -- do you have any recollection

12  of any other issues involving poll watchers during the

13  November 2022 election?

14         A.      Do you mean issues with the poll watcher

15  interacting with election officials?

16         Q.      Any complaints about the behavior of poll

17  watchers?

18         A.      Yes, there weren't any.  I don't remember

19  anything, but it would have been whatever is normal in

20  an election.

21         Q.      What's normal in an election?

22         A.      Normally we have a few reports where the

23  poll watchers and the election officials have a

24  disagreement about what can and can't be viewed or how

25  close people can be.



1        Q.      Does your office keep any records of any

2   such disputes or complaints?

3        A.      No.  I do remember that in November of '22

4   the number of those complaints was much decreased.  We

5   attributed that to our required poll watcher training

6   that was put in place by SB 1.

7        Q.      Now, you testified that late ballots are

8   not classified as rejections, they are just late; do

9   you recall that testimony?

10       A.      I do.

11       Q.      Are any records kept of ballots by mail

12  that are received too late to be counted?

13       A.      Well, the records for the election

14  including the late mail ballots are preserved for 22

15  months.  So the counties have them.

16       Q.      The counties have those late mail ballots?

17       A.      If they received them, yes.

18       Q.      Are those -- the mail ballots, do we know

19  how many of them there were in the 2022 election?

20       A.      It's not -- that's not a number that's kept

21  anywhere.  That's not a number that's recorded.  I

22  think some counties if they are received pretty early

23  on before the canvas or whatever do classify them as

24  rejected, do send a rejection notice that your ballot

25  was received after the deadline.  But there is not a



1  legal requirement they do it, and not all counties do

2  it.  There is no time period during which they are

3  supposed to do it.

4      Q.    Are there any statistics at all concerning

5  ballots that are received too late to be counted?

6      A.    The counties would have those.

7      Q.    If there are any?

8      A.    If there are any.

9      Q.    You said this morning that breakdown county

10  by county of rejected ballots has been produced in this

11  litigation.  I would ask you, do you know what that

12  county by county breakdown of rejections is called?

13      MS. HUNKER:  Objection, form, asked and answered.

14  BY THE WITNESS:

15      A.    You just asked me that question.  I don't

16  know the name of it.

17  BY MR. GENECIN:

18      Q.    Do you know how it is done?  How do you

19  prepare -- how does your office prepare the county by

20  county breakdown of rejections?

21      A.    I don't know how it's prepared.

22      Q.    Do you know what the data is that's the

23  basis for it?

24      A.    The information inputted into TEAM from the

25  counties.



1   Q.   So would it be fair to say each county puts

2   into TEAM the number of rejections of mail-in ballots

3   that it performed?

4   A.   Not exactly not that way.  They --

5   Q.   How does --

6   A.   They are required to record when an

7   application for a ballot by mail is received, action

8   taken on that application for ballot by mail, when the

9   mail ballot is mailed to the voter, and when the mail

10   ballot is received from the voter, and whether or not

11   it is ultimately accepted or rejected.  So we in TEAM

12   can run a report for the number that are rejected by

13   county.  The county doesn't do that work.  TEAM does

14   that work for us.

15   Q.   Would it be fair to say that the

16   spreadsheet that you talked about is a spreadsheet that

17   shows information that's been pulled from TEAM?

18   A.   Agree with that.

19   Q.   You told us a little bit earlier today that

20   some voters get notice of defects in their ballot by

21   mail after the clock has run out.  Do you recall that

22   testimony?

23   A.   I do.

24   Q.   Can you tell us how it would happen that

25   they would get the notice of the defects too late for



1    them to cure?

2         MS. HUNKER:   Objection, form.

3    BY THE WITNESS:

4         A.     For instance, I heard from Starr County in

5    the general election in November of '22 that their

6    ballot board was planning to send the notice of defect

7    after their last ballot meeting, which would happen

8    after the deadline for curing mail ballots.  I informed

9    the election administrator in Starr County that was not

10   acceptable, and that they needed to get those notice of

11   defects right now so that the voter might have a chance

12   to fix the problem.

13   BY MR. GENECIN:

14        Q.     When you say right now, when was that

15   conversation taking place?

16        A.     It was shortly after the election, maybe on

17   Wednesday or Thursday.

18        Q.     How much time at that point did the voters

19   have left to cure?

20        A.     Until Monday.

21        Q.     To your knowledge, did they have to get

22   those out right now as you asked them to?

23        A.     As far as I know.  But I don't have any way

24   to check.

25        Q.     Can you describe to me any other ways that



1  voters would get notice of defects after the clock has

2  run out?

3       A.    Well, the post office delays the delivery

4  then they got it late.

5       Q.    Is there any way to know how many voters

6  got notice of defects too late to cure?

7       A.    No idea.

8       Q.    I take it the thing that's knowable is when

9  notice was sent to voters of the defects in their

10  ballots; is that right?

11       MS. HUNKER:  Objection, form.

12  BY THE WITNESS:

13       A.    It's knowable by the counties.  It's not

14  knowable by our office.

15  BY MR. GENECIN:

16       Q.    Is that one of the pieces of information

17  that's sent to TEAM?

18       A.    No.

19       Q.    The counties are not required to enter into

20  TEAM any information concerning the date on which a

21  ballot was rejected?

22       A.    That's not what I said, sir.  Don't twist

23  my words.

24       Q.    Please.  I'm not trying to twist your

25  words.  I'm trying to understand this.  You have been



 1 | doing this a long time.  I haven't.  I'm just trying to

 2 | understand.

 3 |         Are the counties required to enter the date

 4 | of rejection of a ballot into TEAM?

 5 |     A.    Yes.

 6 |     MS. HUNKER:  Objection, form.

 7 | BY MR. GENECIN:

 8 |     Q.    And so are the counties required to enter

 9 | the date of notification to the voter of the rejection

10 | of their ballot into TEAM?

11 |     MS. HUNKER:  Objection, form.

12 | BY THE WITNESS:

13 |     A.    I want to make sure we are communicating

14 | here.  Rejection to me means a final rejection after

15 | the time period for cure has elapsed. What we are

16 | talking about I think is notice of defect before there

17 | is a finality to it, right?

18 | BY MR. GENECIN:

19 |     Q.    Right.  Thank you for the correction.

20 |     A.    So the notice of defect status is not

21 | entered into the ballot tracker.

22 |     Q.    Okay.

23 |     A.    The interim stages are not kept.

24 |     Q.    So it's not possible to reconstruct from

25 | TEAM what those interim stages were?



```
 1        A.      Agreed.

 2        Q.      Right.  Or what efforts were made, if any,

 3   to notify the voter that his or her ballot could be

 4   cured?

 5        A.      Agreed.

 6        Q.      Now, you also spoke earlier today about

 7   concept of not trusting the post office?

 8        A.      Agreed.

 9        Q.      I would ask you why in your view should

10   voters not trust the post office?

11        MS. HUNKER:  Objection, form.

12   BY THE WITNESS:

13        A.      The post office is suffering under budget

14   constraints that have grown worse and worse and worse

15   over time such that their service delivery times where

16   they guarantee delivery by a certain date have

17   increased and gotten longer and longer and longer.

18   That means that their expected time of delivery, the

19   first class mail is now five to seven days.  And just

20   because that's their service delivery time, doesn't

21   mean that's what they always do.  Sometimes it takes a

22   lot longer than that.

23   BY MR. GENECIN:

24        Q.      I guess it would be fair to say in a

25   situation where there are short deadlines it's hard to
```



```
 1   have confidence that people will receive notices by

 2   mail?

 3          A.     I would say -- --

 4          MS. HUNKER:  Objection, form.

 5   BY THE WITNESS:

 6          A.     I would say by mail is sort of the last

 7   choice if you want to have actual notice.  The best

 8   idea is for ballot boards to meet earlier and to send

 9   notice earlier.

10   BY MR. GENECIN:

11          Q.     I think you said earlier today that 93,800

12   Texas voters have either a driver's license or a Social

13   Security number on file; is that right?

14          A.     In their voter registration record.

15          Q.     And what percentage is that 93,800 people?

16   What percentage is that of the total of electorate in

17   Texas?

18          A.     It's roughly half a percent.

19          Q.     How many registered voters all together

20   does Texas have on the RULES?

21          A.     About 17 1/2 million, give or take.

22          Q.     For the 2022 general election did your

23   office hire temporary staff?

24          A.     We did not.

25          Q.     In connection with the enactment of SB 1
```



```
 1  and in order to comply with it did your office add
 2  staff?
 3         A.     We did not.
 4         Q.     Did your office acquire additional
 5  equipment of any kind in connection with the enactment
 6  of SB 1 in order to comply with it?
 7         A.     We did not.
 8         Q.     Did you require additional equipment for
 9  the 2022 general election?
10         MS. HUNKER:  Objection, form.
11  BY THE WITNESS:
12         A.     We did not.
13  BY MR. GENECIN:
14         Q.     Did your office maintain a hotline for
15  complaints during the 2022 general election?
16         A.     Can we back up one second.  One thing that
17  we did to comply with SB 1 is it's not an acquiring of
18  new equipment, but we did expand the capability of
19  Texas.gov to be able to register voters electronically
20  into a new county.  So it's not acquisition of new
21  equipment, but it is new capability of existing
22  equipment so that voters could update their
23  registration electronically into new counties.  It's a
24  version of electronic voter registration for people who
25  are registered to vote.
```



```
 1        Q.      Did that expansion of capacity of existing

 2   equipment require the assistance of software engineers

 3   or other technical people?

 4        A.      It's something that we did with the

 5   Department of Information Resources and their vendor

 6   Deloitte.  Deloitte would be the one who had to

 7   actually hire any technical people to perform the

 8   change.

 9        Q.      Do you know what that project cost?

10        MS. HUNKER:  Objection, form.

11   BY THE WITNESS:

12        A.      Roughly 100,000.  But because we spent that

13   money there were more voter registrations that were

14   done electronically, which meant that we didn't have to

15   hire temporary workers to sort paper applications,

16   which is what we have had to do before every other

17   general election since I have been in this job.

18   BY MR. GENECIN:

19        Q.      Turning to complaints.  Did your office

20   maintain a hotline for complaints during the general

21   election in 2022?

22        A.      We have a hotline for anything the public

23   wants to talk to us about.

24        Q.      Who staffs that hotline?

25        A.      We do.
```



```
 1        Q.      Are the calls to that hotline recorded in
 2   any way?
 3        A.      They are not.
 4        Q.      Is any written record kept of those calls?
 5        A.      There is not.
 6        Q.      Focusing specifically on complaints related
 7   to the election.  Do you keep a written record of
 8   those?
 9        A.      So I don't know what you mean by
10   complaints.  You mean if somebody calls to complain
11   that a poll worker was rude to them, there won't be a
12   record of that.  But if they send in an election log
13   complaint that says the poll worker was rude to me, we
14   will have a record of that.  We do maintain a log of
15   election log complaints that we receive before an
16   election, during election, after election, but people
17   who phone call, we don't keep a record of those.
18        Q.      So when you say an election log complaint,
19   is that done on a specific form or is that just a
20   complaint in writing?
21        A.      Before SB 1 it was on a specific form.
22   After SB 1 the form can be anything that's in writing.
23        Q.      So people can send you emails, they can
24   send you letters?
25        A.      They can and they do.
```



1       Q.     Do they send you texts?

2       A.     Not usually.

3       Q.     Okay.  The email and letters are saved; is

4    that right?

5       A.     They are and there is a log kept of those.

6       Q.     Who keeps that log?

7       A.     My assistant or my former assistant, Kate

8    Fisher.

9       Q.     We will request that that log for period of

10   the 2022 general election be produced.

11      A.     Sir, with the caveat that we still get

12   complaints about the '22 election.

13      Q.     Well, I guess what we will do is we will

14   request that the log to date be produced.

15      A.     Okay.

16      Q.     Can you tell me approximately how many

17   complaints you received in connection with the 2022

18   general election?

19      A.     I don't have that number at hand.

20      Q.     Are you able to approximate it?

21      A.     No.

22      Q.     It doesn't matter because you will produce

23   the log and we will see the exact number.

24      A.     Yes, I would rather you do that because I

25   don't know.  I know it's been a lot.  I know there is a



 1   lot that haven't been reviewed yet so.

 2        MS. HUNKER:  For clarification of the record, I

 3   believe this complaint log at least an earlier version

 4   was produced.  To the extent that the complaint logs

 5   are produced, there would probably some redactions due

 6   to investigator privilege.  Any type of referrals that

 7   would have been forwarded to the Attorney General's

 8   Office that are currently being processed would still

 9   fall under that privilege.

10        MR. GENECIN:  Thanks very much for that

11   clarification.

12   BY MR. GENECIN:

13        Q.     Let me ask this.  Does the log reflect

14   receipt of complaints or does it -- or are entries made

15   only when the complaints have been resolved in some

16   way?

17        A.     It has received as well as resolution.

18        Q.     Would you know how many complaints of

19   fraudulent activity?  Do you know how many complaints

20   concerning fraudulent activity your office received in

21   connection with the general election for 2022?

22        MS. HUNKER:  Objection, form.

23   BY THE WITNESS:

24        A.     I do not as we sit here today.

25   BY MR. GENECIN:



1        Q.    Do you know as of today approximately how

2    many referrals your office has made to the Attorney

3    General for fraudulent activities in connection with

4    the 2022 general election?

5        MS. HUNKER:  Objection, form.

6    BY THE WITNESS:

7        A.    I do not.

8    BY MR. GENECIN:

9        Q.    Can you tell me approximately?

10       A.    I don't know.  I don't want to guess.

11       Q.    Are you aware, sir, of any fraudulent

12   activity that you believe was reduced in the 2022

13   general election compared with the 2018 general

14   election as a result of any section of SB 1?

15       MS. HUNKER:  Objection, form.

16   BY THE WITNESS:

17       A.    Yes, I don't know.

18       MR. GENECIN: I'd like to take just a brief break

19   if it's a good time.

20       MS. HUNKER:  That works.

21                    (WHEREUPON, a recess was had.)

22   BY MR. GENECIN:

23       Q.    So, Mr. Ingram, does the -- well, not does.

24   I will withdraw that.

25                    For the 2022 general election, did the



1   Texas Secretary of State track rejections of

2   applications for ballots by mail?

3       A.    We had the capacity to do so if the

4   counties entered the information.  What we found is

5   that not all counties were entering the application

6   information.

7       Q.    What counties were not entering?  Do you

8   have a way of knowing which counties were and were not

9   entering that information?

10      A.    I can't think of a good way to get that

11  information.  We don't know if we don't have because

12  there wasn't any or because they didn't enter it.

13      Q.    How did you find out there were counties

14  not entering this information?

15      A.    Because they are entering ballot by mail

16  information without an application information.

17      Q.    Was it your understanding that the counties

18  were supposed to enter the application information?

19      A.    Yes.

20      Q.    What efforts, if any, did your office

21  undertake to contact those counties that were not

22  entering the information to say we need that

23  information to be entered?

24      A.    Well, we would call them.

25      Q.    Do you have a list of the counties that did



1   not provide the information?

2        A.    Not that I know of.  We might have had a

3   list at the time, but we don't now.

4        Q.    Is there a report you could run in -- from

5   TEAM that would show length for certain counties for

6   the applications for ballot by mail?

7        A.    I don't know.  I don't think so, but maybe.

8        Q.    In connection with the 2022 general

9   election, did the Texas Secretary of State's Office

10  track rejections of ballots in the general election?

11       MS. HUNKER:  Objection, form.

12  BY THE WITNESS:

13       A.    So we were required by House Bill 1382 in

14  regular session as modfied by SB 1 to have in place a

15  method for ballots to be tracked by voters, and the

16  activity with regard to those ballots to be tracked by

17  voters.

18  BY MR. GENECIN:

19       Q.    Is that the information that you provided

20  to voters, is that -- is it possible to collect that

21  information statistically to see numbers of rejections?

22       A.    Well, we have what information was put into

23  the tracker by the counties.

24       Q.    Does TEAM include a field for counties to

25  input the reason code for the rejection and application



 1  for ballot by mail?

 2      MS. HUNKER:  Objection, form.

 3  BY THE WITNESS:

 4      A.    Yes.

 5  BY MR. GENECIN:

 6      Q.    Does TEAM include a field for counties to

 7  input a reason code for the rejection of a ballot

 8  itself?

 9      MS. HUNKER:  Objection, form.

10  BY THE WITNESS:

11      A.    Yes.

12  BY MR. GENECIN:

13      Q.    Does the Secretary of State's Office put

14  out a guide instructing the counties which reason code

15  to use for these rejections?

16      A.    We have trainings and we have manuals for

17  the usage of team, yes, sir.

18      Q.    To your knowledge, has your office produced

19  the manual with the reason codes for rejections of

20  ABBM, application for ballot by mail?

21      A.    Yes.  By publishing I mean it's on our TEAM

22  doc share website.

23      MS. HUNKER:  For clarification of the record,

24  there are some manuals and training materials for TEAM

25  that can only be produced to the United States when



Keith Ingram

```
 1   requested because of the protective order and the

 2   agreement to extent it shows the infrastructure of TEAM

 3   that could lead to a compromise in the integrity of

 4   that system.

 5          MR. GENECIN:  With that I will reserve the

 6   remainder of my questions for the 30(b)(6) deposition

 7   and pass the witness.

 8          MS. HUNKER:  Are there any other Plaintiff groups

 9   on the Zoom that have questions for the witness?  Are

10   there any other parties on Zoom that have questions for

11   the witness?

12                State Defendants will reserve any questions

13   for trial.  We can close out the deposition.  We would

14   ask to read and sign.

15               (Deposition concluded at 4:18 p.m.)

16

17

18

19

20

21

22

23

24

25
```



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,           §
    *Plaintiffs,*                                §
                                              §
*v.*                                          §   Case No. 5:21-cv-844-XR
                                              §
GREGORY W. ABBOTT, et al.,                    §
    *Defendants.*                              §

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX AA

Transcript of the Testimony of

# Michelle  Brown

**Date:**

April 23, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Michelle Brown

April 23, 2022
Pages 182 to 185

---

Page 182

1    Q.  Okay.  Do you know if -- do you know if
2  African American turnout has -- between March of
3  2018 and March 2022 has increased or decreased?
4    A.  According to things I have read, I believe
5  so.
6    Q.  It has increased or decreased?
7    A.  Increased.
8    Q.  Okay.  And so --
9         MR. GENECIN:  I'm sorry, I didn't --
10  I'm not sure I understood the question.  It's
11  increased when -- relative to when?
12         MR. SWEETEN:  Well, I said in the --
13    A.  Before.
14         MR. SWEETEN:  I said from 2018 to
15  2022.
16  BY MR. SWEETEN:
17    Q.  So March, we just had the election in
18  March.  It's your testimony that black turnout has
19  increased in those four years?
20    A.  I said I believe it has.
21    Q.  Okay.  And were there any instances in the
22  March election of members of Delta Sigma Theta
23  having any -- having any problems voting?
24    A.  In which election?
25    Q.  March, the one just a month and a half ago.

---

Page 183

1    A.  When you say "problems voting," what are
2  you referring to?
3    Q.  In barriers to voting.
4    A.  Barriers?
5    Q.  That you were told of or that Delta Sigma
6  Theta is aware of.
7    A.  Just that all of the options that they
8  had -- were able to take -- partake in previously
9  were not there.
10    Q.  Okay.  Were there any -- was anybody unable
11  to vote in March that you heard about from your --
12  from Delta Sigma Theta in March of 2022?
13    A.  I can't attest to who, but possibly they
14  were.  You mean members of Delta or --
15    Q.  Members of Delta, uh-huh.
16    A.  Not to my knowledge.
17    Q.  Okay.  Are you aware of any specific -- do
18  you have any specific anecdotal cases of somebody
19  being unable to vote in the March '22 --
20    A.  No, I don't.
21    Q.  Let me just finish -- March 1, 2022,
22  primary, you don't -- you're not -- let me ask it
23  again.  Sorry.
24    A.  I'm sorry.
25    Q.  You don't have any specific instances, that

---

Page 184

1  you're aware of, of somebody being unable to vote in
2  the March 1st, 2022, primary, correct?
3    A.  Not to my knowledge.
4    Q.  Okay.  Thank you.
5         Are you aware of any complaints regarding
6  long -- long wait times at polling locations in
7  March of 2022 specifically?
8    A.  Not specifically, not without going back
9  and reviewing the information we have collected.
10    Q.  Okay.  Are those members of Delta Sigma
11  Theta who are -- who are employees -- so I'm talking
12  about the president, the -- for example, in the
13  executive administration or -- let me ask, are you a
14  paid --
15    A.  We don't -- our national headquarter staff
16  is paid only.
17    Q.  Okay.  Do you know if those are salaries or
18  if those are hourly?
19    A.  It's probably a combination.  I can't be
20  quite sure.
21    Q.  Okay.  Has any member of Delta Sigma Theta
22  requested any sort of reasonable accommodation --
23  ask it a different way.
24         Specific factual question.  Are you aware
25  of any Delta Sigma Theta member who requested a

---

Page 185

1  reasonable accommodation in the March 1, 2022,
2  primary and was denied that accommodation?
3    A.  I'm not aware.
4         MR. SWEETEN:  Okay.  Okay.  I think
5  I'm getting close, so why don't we take a quick
6  break and then I may be able to finish.  Okay.
7         THE VIDEOGRAPHER:  We are off the
8  record at 3:22 p.m.
9         (Break taken, 3:22 p.m. to 3:37 p.m.)
10         THE VIDEOGRAPHER:  We are back on the
11  record at 3:37 p.m.
12  BY MR. SWEETEN:
13    Q.  Okay.  I want to ask a few questions about
14  SB1 as a whole.  I've asked you these about each of
15  the specific provisions.  But as you're sitting
16  here, is there anything in the text of SB1 itself --
17  and I'm talking about the text, so facially -- that
18  expressly mentions race?  Is there anything that
19  specifically mentions race?
20    A.  That specifically uses the word "race"?
21    Q.  Yes.
22    A.  No.
23    Q.  Is there anything that discusses ethnicity?
24    A.  When it talks -- no.
25    Q.  Okay.  Is there --

---

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS**

# APPENDIX BB

Transcript of the Testimony of

# Nancy Crowther

## Date:

June 17, 2022

## Case:

La Union Del Pueblo Entero vs Gregory W. Abbott

Nancy Crowther

June 17, 2022
Pages 46 to 49

Page 46

1 polling place.
2 Q. And did that happen during the November 2020
3 general election?
4 A. Well, you heard the story on that one.
5 Q. Oh, that's right. So it did not happen in the
6 November 2020 -- November election, right? The issue of
7 not being able to get through doors because no one was
8 at the door to see you?
9 A. Well, finding the location of the white box, I
10 think would be equivalent --
11 Q. Okay.
12 A. -- to not being able to get into a building,
13 because sitting in a line of cars while you're in a
14 wheelchair is rather intimidating, but...
15 Q. I imagine so, and I didn't mean to make any
16 statement about that. I just meant to say I'm --
17 A. You're right.
18 Q. -- trying to talk, specifically, just about the
19 door issue. And we can talk about all of those, but the
20 door issue didn't happen in the 2020 election --
21 A. Correct.
22 Q. Did it happen in the July 2020 Democratic primary
23 runoff?
24 A. July 2020? No.
25 Q. Did it happen any other times in 2020?

Page 47

1 A. I don't believe so, because there were a few of
2 the elections, as I stated earlier, that I didn't vote
3 in because of COVID.
4 Q. But you did vote in the March 2020 Democratic
5 primary, correct?
6 A. Yes.
7 Q. Okay. And you voted in person, right?
8 A. Yes.
9 Q. Did you face that issue of door access in the
10 2020 March Democratic primary?
11 A. I don't believe so.
12 Q. Okay. So just to sum up, you faced door-access
13 issues in the March 2022 primary, and you also faced
14 door-access issues in the November 2021 constitutional
15 amendment election, correct?
16 A. Correct.
17 Q. Okay. So Senate Bill 1 did not have any affect
18 on whether or not you faced door-access issues, correct?
19 A. In what way?
20 Q. Senate Bill 1 was not in effect during the time
21 of the November 2021 constitutional amendment election,
22 and it was in effect during the time of the March 2022
23 Democratic primary, so Senate Bill 1 did not affect any
24 door-access issues, correct?
25 A. I had electric doors at that primary, so doors

Page 48

1 weren't an issue.
2 Q. Okay. So if we look back to Exhibit 4, which is
3 in front of you, and you flip to the second page -- it's
4 printed on both sides -- you'll see a header that reads,
5 "Voters with Disabilities/Curbside Voting."
6 Do you see that?
7 A. Yes.
8 Q. Okay. The first paragraph reads, "Voters who are
9 physically unable to enter the polling location without
10 assistance or likelihood of injury to the voter's health
11 may ask the presiding election official to allow them to
12 vote outside the polling location. The election officer
13 will deliver a ballot to the voter at the polling place,
14 entrance, or curb."
15 And then it cites TEC Section 64.009.
16 Did I read that accurately?
17 A. You did.
18 Q. The second paragraph, right below that, reads,
19 "Voters who are planning to vote curbside are encouraged
20 to contact us upon their arrival at the polling
21 location. Call 512-238-VOTE -- in parentheses, 8683 --
22 or 512-854-4996."
23 Did I read that correctly?
24 A. Yes.
25 Q. Okay. So you'd agree that curbside voting is

Page 49

1 available in Travis County, right?
2 A. In my opinion? I know that curbside voting, in
3 my history, was providing people the access to voting
4 within the vehicle, and so I'm not sure if they're
5 saying this is outside the vehicle or not.
6 So that's my clarification issue that I would
7 have, but otherwise, if that's what it's stating, that
8 people can vote inside or outside their vehicle -- it's
9 not clarified there, unless it's in that section of the
10 TEC. I don't know.
11 Q. Okay. Have you ever called the polling location
12 or -- strike that --
13 Have you ever called a polling location about
14 curbside voting?
15 A. No.
16 Q. If you look to the next page, there's another
17 heading called, "Receiving assistance at the polls."
18 Do you see that?
19 A. Yes.
20 Q. It reads, "You're entitled to receive assistance
21 if you cannot read or write or if you have a physical
22 disability that prevents you from reading or marking the
23 ballot. You may be assisted by a person of your choice
24 who is not your union representative or employer. Under
25 certain circumstances, election workers are also

Nancy Crowther

June 17, 2022
Pages 50 to 53

Page 50

1  available upon request to assist you."
2      Did I read that correctly?
3  A. Yes.
4  Q. Okay. And if you flip back to the first page, at
5  the very top of the page, in the upper right-hand
6  corner, there is a phone number listed, correct?
7      In the top right-hand corner in the black bar at
8  the top of the right page --
9  A. Okay.
10  Q. -- there's a phone number listed, correct?
11  A. Yes.
12  Q. Have you ever called this phone number?
13  A. No.
14  Q. Have you ever called the Travis County Clerk?
15  A. No.
16  Q. Have you ever asked the Travis County Clerk for
17  assistance at the polls?
18  A. No.
19  Q. Have you ever called the Travis County Clerk for
20  an accommodation?
21  A. No.
22  Q. Okay. I'm going to introduce one more exhibit,
23  which I will mark as Exhibit 5?
24      So, this is a notice posted on the Travis County
25  Clerk website. Do you see at the top of the page, where

Page 51

1  it reads, "Notice to voters with disabilities"?
2      (Exhibit 5 marked.)
3  A. Yes.
4  Q. (BY MR. HERBERT) And in the first box, the first
5  two sentences read as follows: "The Americans with
6  Disabilities Act, ADA, requires that Travis County's
7  elections be accessible to individuals with
8  disabilities. For any complaints regarding
9  accessibility, the Travis County Elections Division has
10  a plan of action to promptly resolve any complaints
11  received."
12      Did I read that correctly?
13  A. Yes.
14  Q. Now, in the bottom right-hand conner -- in the
15  bottom right-hand box of this notice, it reads as
16  follows: "ADA coordinator, Tim Moore" -- and then it
17  includes, below that, a phone number and an e-mail
18  address.
19      Did I represent that accurately?
20  A. Yes.
21  Q. Have you ever reached out to the Travis County
22  Elections Division about accessibility?
23  A. Way prior to 2020.
24  Q. Okay.
25  A. Several decades. I worked with them on

Page 52

1  implementing ADA requirements, so I have vast knowledge,
2  and I don't need to speak with Mr. Moore. I dealt with
3  Dana Dubois directly.
4  Q. And when was that? You said a long time before
5  2020; is that right?
6  A. Yes.
7  Q. Okay. And you -- just to be clear, you never
8  called or contacted Mr. Tim Moore, the ADA coordinator,
9  right?
10  A. No.
11  Q. Okay. Let's talk about SB1.
12      Do you contend that SB1 has harmed you?
13  A. I don't feel like I have full knowledge -- or I
14  haven't read the whole bill to understand it. I'm not a
15  lawyer.
16  Q. Some might say that to be a good thing.
17  A. Yeah. There are jokes about that.
18      But to the basic knowledge, I know that it
19  would -- because of my disability that is progressive, I
20  will need more and more help, and the help that I will
21  be needing is going to be going through more, I want to
22  say, threatening issues that could -- how should I say
23  this? It could jeopardize the relationship with my
24  attendant because of the, What you can do; what you
25  can't do. If you instinctively pick up a ballot and

Page 53

1  it's not in the rule to pick up the ballot off the
2  floor, you know, those types of things, I would be
3  mortified for them if they were to get in trouble just
4  for helping me.
5  Q. So your concern is about the future effect of
6  Senate Bill 1 on your ability to vote, correct?
7  A. Yes.
8  Q. Has Senate Bill 1 thus far affected your ability
9  to vote?
10  A. Not to my knowledge. If I had not done any -- I
11  haven't tried any mail-in voting or whatever else they
12  asked for in SB1 that I know of.
13  Q. Okay. Before we move on and go more in depth, do
14  you have any personal knowledge of anyone else for whom
15  SB1 has affected their ability to vote? Or are the --
16  only personal knowledge you have about yourself?
17  A. My own knowledge is all I have right now.
18  Q. Okay. So just to be clear, you do not have any
19  personal knowledge about anybody other than yourself who
20  has been affected by SB1 for the ability to vote,
21  correct?
22  A. I would have to say, yes.
23  Q. Okay. And also, just to be clear, you do not
24  have any reason to believe that Senate Bill 1 affected
25  your ability to vote in the March 2022 primary only,

Nancy Crowther

June 17, 2022
Pages 114 to 117

Page 114

1 attendants drove you to the polls in the March 20 --
2 pardon me -- in the May 2022 Democratic primary runoff
3 election, right?
4    A.  Yes.
5    Q.  Okay.  And SB1 was in effect at that time,
6 correct?
7    A.  Yes.
8    Q.  Okay.  So the act of driving you to the polls,
9 SB1 did not affect your ability -- or the ability of
10 your attendants to do that; is that right?
11    A.  Correct.
12    Q.  Okay.  Now, you had mentioned that SB1 affected
13 your ability to find poll locations, right?
14    A.  Yes.
15    Q.  You had just said that, I believe?
16    A.  Yes.
17    Q.  Could you tell me a little bit about that?
18    A.  There used to be a lot of polling places that
19 were very close to me, within blocks.  I mean, three
20 different locations where I could just roll and be more
21 independent.  And now I either have to take a bus to it
22 or have my attendant drive.  And on that particular one,
23 I believe it was at that school recreation center, we
24 had to drive, because there wasn't any bus service.  So
25 those are three main ways for me to get to my voting

Page 115

1 location.
2    Q.  Okay.  So you're saying that you noticed that
3 there are fewer polling locations near you; is that
4 right?
5    A.  Yes.
6    Q.  And when did you first notice that?
7    A.  Almost -- it seems like it was pretty immediate,
8 let's see, 2021.
9    Q.  The November 2021 election?
10    A.  I think so, yeah.
11    Q.  Okay.  And that's when you first noticed it?
12    A.  Yeah.
13    Q.  Did you notice it in the -- you did not notice
14 that issue in the November 2020 primary; is that
15 right -- pardon me -- I'm sorry.  Strike that -- let me
16 rephrase.
17       You did not notice that in the November 2020
18 general election; is that right?  Or did you notice it
19 then, too?
20    A.  No, because I took -- based on where I was, I
21 went to the polling place that I knew was there.  If I
22 was at home, then the ones that are closest to my home
23 were no longer available.
24    Q.  Okay.  I'm going to introduce another exhibit,
25 which I will mark as Exhibit No. 11.

Page 116

1       This is a copy of the Texas Election Code,
2 specifically Chapter 11, and I would like you to look at
3 the very last section, which is on the very last page.
4 So you can literally just flip it all over, because it
5 is double-sided.
6       Do you see the top line, where it reads,
7 "Section 1.022, Reasonable Accomodation or
8 Modification"?
9       (Exhibit 11 marked.)
10    A.  Uh-huh.
11    Q.  (BY MR. HERBERT)  Okay.  This section reads, "A
12 provision of this code may not be interpreted to
13 prohibit or limit the right of a qualified individual
14 with a disability from requesting a reasonable
15 accommodation or modification to any election standard
16 practice or procedure mandated by law or rule that the
17 individual is entitled to request under federal or state
18 law."
19       Did I read that accurately?
20    A.  Yes.
21    Q.  Did you know that Texas's election law prohibits
22 election authorities from denying voters reasonable
23 accommodations?
24       MS. SIFUENTES-DAVIS:  Objection, form.
25    A.  It may prohibit them.  It doesn't mean it doesn't

Page 117

1 happen.
2    Q.  (BY MR. HERBERT)  Have you yourself ever been
3 denied an accommodation that you requested?
4    A.  When you're outside the building, it's hard to
5 make an accommodation request.  Think about it.  Because
6 if I can't get into a building -- but I think they've
7 been fairly reasonable in helping or modifying.
8    Q.  Okay.  So just to be clear -- and this is not to
9 skirt the point that you just raised, because I will ask
10 about that, but you have not been denied reasonable
11 accommodation requests before, have you?
12       MS. SIFUENTES-DAVIS:  Objection, form.
13    A.  I haven't asked for one.
14    Q.  (BY MR. HERBERT)  Okay.  You have not asked?
15    A.  I've only asked for the piece to come off the end
16 of the voting machine.
17    Q.  Okay.  And that was not denied, was it?
18    A.  No.
19    Q.  Okay.  And have you ever called to request a
20 reasonable accommodation?
21    A.  No.
22    Q.  Okay.  Have you ever relied on somebody else to
23 distribute or give to you an application to vote by
24 mail, or have you just gone online and gotten it
25 yourself?

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,           §
     *Plaintiffs,*                                §
                                               §
*v.*                                          §   Case No. 5:21-cv-844-XR
                                               §
GREGORY W. ABBOTT, et al.,                    §
     *Defendants.*                                §

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX CC

Transcript of the Testimony of

# Deborah Chen

### Date:

March 28, 2022

### Case:

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Deborah Chen

Page 230

1    A. -- would directly impact --
2    Q. Have any of your members --
3    A. -- people's ability to vote.
4    Q. Sorry. I thought you were done.
5    A. Sorry.
6    Q. Have any of your members requested an
7 accommodation from either a local election official or a
8 state official?
9         MR. DOLLING: Objection; calls for a legal
10 conclusion.
11        You can answer.
12   A. Does that accommodation include like if they go
13 to a -- a voting location and they are going to the --
14 the shorter mail -- or ballot machine or they're doing
15 curbside voting? Does that what your --
16   Q. (BY MS. HUNKER) It can.
17   A. Is that what you mean?
18   Q. Let me ask a more specific question.
19   A. Yes.
20   Q. Which of your members have requested an
21 accommodation for one of the provisions in SB 1 as a
22 result of their disability?
23        MR. DOLLING: Objection; calls for a legal
24 conclusion.
25        You can answer.

Page 231

1    A. I'm sorry. I don't know how to answer that. I
2 don't totally understand the question.
3    Q. (BY MS. HUNKER) Are you aware of -- are you
4 aware of any member who requested an accommodation to
5 circumvent or get an exception for one of the provisions
6 in SB 1?
7         MR. DOLLING: Objection; calls for legal
8 conclusion.
9         You can answer.
10   A. I don't know of any member who has requested an
11 accommodation. I'm not actually aware that an
12 accommodation can be requested.
13   Q. (BY MS. HUNKER) So you're not aware of any?
14   A. Correct.
15   Q. Okay. And so you're not aware if any request
16 for accommodation was denied, presumably?
17   A. Correct.
18   Q. And OCA-Greater Houston hasn't contacted a
19 local election official on behalf of a member seeking an
20 accommodation for one of SB 1's provisions, correct?
21   A. Correct, we have not.
22   Q. And that same answer would be for secretary of
23 state or the governor's office?
24   A. Correct.
25   Q. And the same, you haven't contacted the Texas

Page 232

1 Attorney General's Office, correct?
2    A. Correct.
3    Q. Do you contend that is the secretary of state
4 responsible for providing accommodations to voters?
5         (Simultaneously speaking.)
6         MR. DOLLING: Object -- objection; calls
7 for a legal conclusion.
8    A. I -- I don't know.
9    Q. (BY MS. HUNKER) Okay. Do you contend it is
10 the responsibility of the governor to provide an
11 accommodation?
12        MR. DOLLING: Objection; calls for a legal
13 conclusion.
14        You can answer.
15   A. I don't know if the governor's powers extend to
16 that level of minutia.
17   Q. (BY MS. HUNKER) Okay. And do you contend it
18 is the attorney general's responsibility to provide an
19 accommodation?
20        MR. DOLLING: Objection; calls for a legal
21 conclusion.
22        You can answer.
23   A. I also do not know.
24   Q. (BY MS. HUNKER) Okay. I'm going to quickly
25 bring up Exhibit 9.

Page 233

1         (Exhibit No. 9 was marked.)
2    Q. (BY MS. HUNKER) Specifically, we're going to
3 turn the page. Well, actually, let me quickly ask
4 you -- this is Election Code Title 1, Chapter 1.
5         Do you agree with my summary of what this
6 document is?
7    A. Title 1, Chapter 1, yes.
8    Q. And if we turn to the last section on the
9 second page, it says "Section 1.002 [sic]. Reasonable
10 accommodation or modification. A provision of this code
11 may not be interpreted to prohibit or limit the right of
12 a qualified individual with a disability from requesting
13 a reasonable accommodation or modification to any
14 election standard, practice, procedure mandated by law
15 or rule that the individual is entitled to request under
16 federal or state law."
17        Did I read that correctly?
18   A. Yes.
19   Q. Were you or OCA-Greater Houston aware of this
20 provision before today?
21   A. This specific line?
22   Q. Yes.
23   A. No. I don't have it handy in my memory.
24   Q. All right. And so you weren't aware of it when
25 you filed lawsuits?

Deborah Chen                                                    March 28, 2022
                                                               Pages 234 to 237

Page 234

1    A. I'm sorry.  What?
2    Q. You weren't aware of it when you filed this
3  particular lawsuit?
4    A. I think we were aware of the general code, but
5  could I quote specific lines?  No.
6    Q. Okay.  Were you aware that Texas election law
7  prohibits election authorities from denying a voter a
8  reasonable accommodation to any election standard,
9  practice, or procedure even if it was mandated by law?
10       MR. DOLLING: Objection; calls for a legal
11 conclusion.
12       You can answer.
13   A. I don't know how to answer that.
14   Q. (BY MS. HUNKER) So you were -- were you aware
15 of it?  The answer is no?  The answer can be no.
16       Were you aware that Texas's law prohibits
17 election authorities from denying a voter a reasonable
18 accommodation to any election standard, practice, or
19 procedure even if mandated by law?
20       MR. DOLLING: Objection; calls for a legal
21 conclusion.
22       You can answer.
23   A. I don't know how to answer that.
24   Q. (BY MS. HUNKER) Okay.  What is the basis for
25 OCA-Greater's Houston [sic] belief that its members'

Page 235

1  request for an accommodation would be denied?
2        MR. DOLLING: Objection; calls for
3  speculation.
4        You can answer.
5    A. I'm not aware of any provision that gives you a
6  process or a procedure for how you can request an
7  accommodation in a way that is not something that would
8  cost a lot of money or time.
9    Q. (BY MS. HUNKER) So you're simply not aware of
10 what the accommodation process would be.  Is that your
11 answer?
12   A. No.  I'm saying that I don't believe one
13 exists.
14       (Simultaneously speaking.)
15   A. There's nothing that's stated in SB 1 that says
16 that -- as far as I can remember right now, of all the
17 provisions that we've talked about today, nowhere in
18 there does it state "But if you need an accommodation,
19 here's where you go" or "Here's what you do."
20   Q. (BY MS. HUNKER) Isn't that -- isn't that what
21 Chapter 1 just said?
22   A. No.  That simply says that they have the right
23 and they're entitled to request.  It does not state how
24 or where.
25   Q. So your basis for the belief that request for

Page 236

1  accommodation would be denied is that you don't think
2  that the process exists?
3        MR. DOLLING: Objection.
4    A. I don't --
5        MR. DOLLING: Mischaracterizes testimony.
6        You can answer.
7    A. I don't totally understand this question of my
8  basis.  I'm not stating I have a -- I have not stated I
9  have a basis or that I am stating a claim that some kind
10 of request for modification would be denied.  That's not
11 what I've asserted.
12   Q. (BY MS. HUNKER) So you're not --
13   A. What I'm stating and what the lawsuit states is
14 the way SB 1 is written, on its face, it provides
15 opportunities to prevent people from being able to vote,
16 to prevent us as an organization to be able to provide
17 information and assistance.
18       There's literally nowhere in there where we
19 have said -- or -- or rather where SB 1 says "But if you
20 want accommodation, here's" -- "here's how you" --
21 "here's how you go do that."  And that's not what we're
22 asserting.
23   Q. But you're aware that members request
24 accommodation regarding, let's say, access to a
25 certain -- a certain voting machine because of a

Page 237

1  disability, correct?
2    A. Those are two entirely different issues.
3    Q. It's the same process.
4    A. No, it's not.
5    Q. Why not?
6    A. Because one, if a member were to show up at a
7  voting location, it is that precinct judge's
8  responsibility or the poll clerks who work there to be
9  able to say, "Do you need an accommodation?"  Right?  If
10 someone comes up rolling in with a wheelchair, then the
11 natural assumption of that poll clerk, they may not
12 verbalize it, but they will naturally direct that person
13 to the machine that is short enough or low enough for
14 that person to use it.
15       That is completely separate from the
16 language of the law as written on its face.  Nowhere
17 here does it say "This is the process if you need some
18 kind of accommodation."  So I'm -- I'm sorry.  I'm not
19 quite understanding why this is even being asked.
20   Q. Are you aware that SB 1 simply amends the
21 election code; and so, therefore, other provisions of
22 the election code also control, correct?
23       MR. DOLLING: Objection; calls for legal
24 conclusion.
25       You can answer.

Deborah Chen

March 28, 2022
Pages 238 to 241

Page 238

1    A. I'm -- I would guesstimate that different parts
2 of the code should apply and work with -- in concert
3 with each other. Whether or not they actually do that,
4 I think isn't -- ultimately, it's still drafted by
5 people.
6    Q. (BY MS. HUNKER) Okay.
7    A. So there's still room for parts to contradict.
8    Q. So you haven't looked at whether or not an
9 accommodation would be accepted, correct? You haven't
10 done any research into that?
11    A. I haven't felt the need to.
12    Q. And you haven't done any research into whether
13 or not there is an accommodation process that's been set
14 up?
15    A. No. I have not needed to.
16    Q. I am going to introduce Exhibit No. 10.
17        (Exhibit No. 10 was marked.)
18    Q. (BY MS. HUNKER) Do you recognize this
19 document?
20    A. Yes.
21    Q. What is it?
22    A. It is a statement made by one of our staff
23 members after working on the exit survey on election day
24 for the March 1st primaries.
25    Q. This document was produced to my office last

Page 239

1 week by your counsel.
2        Is Laura Floyd a member of OCA-Greater
3 Houston?
4    A. I believe so.
5    Q. And so she's also a volunteer?
6    A. She is a paid staff person. I do not know if
7 she has renewed her membership to a voting member.
8 But she is -- she would be considered a member, it's
9 just a matter of whether she votes or not.
10    Q. So you don't know if she's a voting member but
11 you believe that she is a member generally, a non- --
12    A. Yes. She's been a -- a longtime volunteer and
13 recently joined us as staff last year.
14    Q. And how did you acquire the exit poll
15 statement?
16    A. This was e-mailed to me by Laura Floyd.
17    Q. Okay. Did you solicit it?
18    A. I don't know what you mean by "solicit."
19    Q. Did you ask her to -- to send you exit poll
20 statements, or is this something she did on her own?
21    A. This is something that she typed on her own
22 that she had told me she was going to do on election
23 day.
24    Q. Uh-huh.
25    A. So I did follow-up and ask her when I --

Page 240

1 when -- has it been sent, when was it going to be sent.
2    Q. And is this the only election poll survey
3 statement in OCA-Greater Houston's possession?
4    A. Yes.
5    Q. When you say "yes," do you mean yes for Laura
6 Floyd specifically or all election poll survey
7 statements?
8    A. All the election survey -- exit -- I'm sorry.
9        All the exit poll surveys that were
10 conducted on that day, I did not make a copy. I
11 submitted everything to AALDEF to compile. So I don't
12 remember if somebody else, a voter, had, like, filled
13 out a form or not on that day.
14    Q. Okay. So you don't --
15    A. So this is the only one in -- in my possession.
16    Q. That's -- this is the -- that's what I'm
17 seeking clarification.
18        This is the only exit poll survey statement
19 in OCA-Greater Houston's custody, care, or control; is
20 that correct?
21    A. Correct.
22    Q. However, you received other statements,
23 correct?
24    A. I don't know off the top of my head.
25    Q. Would it be safe to assume you may have since

Page 241

1 it was a primary election? Or do you usually receive
2 more than one?
3    A. You know, that totally varies, depending on the
4 election cycle, depending on the individual voters.
5 Sometimes voters are not willing to fill something out.
6 They don't want to leave their name or contact
7 information, and so they -- they don't even though they
8 may have said there was a problem. Other times, people
9 are willing to -- to fill something out.
10        This was a statement by a staff person.
11    Q. And this was submitted on March 1st, 2022,
12 correct?
13    A. No. This was sent later. The date on there is
14 just identifying the date of the election and the date
15 that this happened.
16    Q. Okay. Thank you for the clarification.
17        And what was her role at this polling
18 location?
19    A. She was a site supervisor for the exit survey
20 that we were conducting at this particular location.
21    Q. And what would she be doing in that capacity?
22    A. Essentially, asking people as they came out,
23 within -- and when they, you know, finished voting or as
24 they were going into voting, "Would you please," you
25 know, "consider filling out an exit survey? We're here

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,        §
    *Plaintiffs,*        §
            §
*v.*        §        Case No. 5:21-cv-844-XR
            §
GREGORY W. ABBOTT, et al.,        §
    *Defendants.*        §

---

**STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS**

# APPENDIX DD

Transcript of the Testimony of

# Pamiel Gaskin

## Date:

June 29, 2022

## Case:

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Page 18

1  during the special session. Do you understand that,
2  ma'am?
3    A.   I understand that.
4    Q.   Okay. Thank you.
5         Now, do you understand that the
6  United States and OCA Greater Houston are plaintiffs
7  in this case?
8    A.   I don't know what OCA Houston is.
9    Q.   Okay. I'll move on. It's not
10  important.
11        Do you understand that you were
12  disclosed as a potential witness in this case?
13    A.   I do understand that.
14    Q.   Do you know why that was done?
15    A.   Because I had some issues with my
16  attempts to -- to receive my application for a
17  mail-in ballot.
18    Q.   Any other reasons that you're aware of?
19    A.   No.
20    Q.   Okay. Now, I'm glad that you mentioned
21  that, ma'am, because I do want to talk about that a
22  little bit. But I have a few preliminary questions
23  first.
24    A.   Okay.
25    Q.   Now, are you registered to vote?

Page 19

1    A.   I am.
2    Q.   Where?
3    A.   Fort Bend County.
4    Q.   Fort Bend County.
5         Have you ever always been registered
6  there?
7    A.   Well, since I lived there in -- since 46
8  years.
9    Q.   Have you ever been registered anywhere
10  else?
11    A.   I was registered in Harris County prior
12  to that.
13    Q.   Harris County.
14    A.   And Galveston County prior to that.
15    Q.   And Galveston County. Okay.
16        And I think I remember reading some
17  great story about the first time that you registered
18  to vote in Galveston County. I think your father
19  drove you to get registered there, something like
20  that?
21    A.   He did.
22    Q.   Tell me a little bit about that.
23    A.   You had to be 21 to vote at that time.
24    Q.   Okay.
25    A.   My birthday is in March; so I was in

Page 20

1  school. He called me. He said, "For your birthday,
2  I'm going to come get you. Give me your schedule,
3  your class schedule, and I'm going to come get you
4  and get you registered to vote."
5         So I told him what my class schedule
6  was. He showed up on a Thursday afternoon, about 1
7  o'clock. Drove me back to Galveston County.
8         That morning -- next morning took me
9  to register to vote, and drove me back to Austin
10  that afternoon so I could go to my 1 o'clock class.
11    Q.   That's great.
12        Do you remember what class it was?
13    A.   No. No. No. I'm 75. That was -- I
14  was 21 then.
15    Q.   Sometimes when you've got great stories
16  like that, you remember random details, that sort of
17  thing.
18    A.   That's not a detail I remember.
19    Q.   Well, that's a long drive from Austin to
20  Galveston.
21    A.   Yeah.
22    Q.   Now, you said that you voted in the
23  March 2022 primary; correct?
24    A.   I did.
25    Q.   Okay. Now, I understand you had some

Page 21

1  trouble voting in that election; correct?
2    A.   I did.
3    Q.   Now, in your own words, can you tell me
4  about what happened.
5    A.   Sure. In Texas you have to apply every
6  year for a mail-in ballot. So part of my just
7  general housekeeping is that I take care of those
8  types of things the first week of the month --
9    Q.   Okay.
10    A.   -- of January.
11        So on or about January 3rd, I pulled
12  out -- I went to Fort Bend County's website. Pulled
13  down the application to vote by mail for both me and
14  my husband. Pulled them down. Filled them out. We
15  signed them. Well -- and I mailed it in. Mailed
16  them in.
17        And about ten days later, I got a
18  letter saying that, through no fault of mine, my
19  application had been rejected.
20        So I called the election office and
21  spoke with Veronica -- Veronica Fernandez, who is
22  the early voting clerk. They don't have -- it's not
23  a big office. And she said I had used the wrong
24  form.
25        I said, "Well, Veronica, I got the

Pamiel Gaskin

Page 22

1  form from you guys."
2       She said, "Well, the Secretary of
3  State didn't send us the right forms in time, and we
4  didn't populate the correct form until around the
5  6th of January."
6       I said. "Okay. Is the correct form
7  there now?"
8       She said, "Yes."
9       So I pulled the correct form down.
10  Filled it out. Mailed it in. And I had just -- it
11  was -- this was on the 13th.
12       On the 20th, I had just finished a
13  League of Women Voters activity, and I was on my way
14  home. And Veronica called me and said, "Don't shoot
15  the messenger. Your application has been rejected."
16       I said, "For what?"
17       She said, "You didn't put the
18  correct ID on your application."
19       I said, "Veronica, what do you mean
20  I didn't put the right ID? It asks for my driver's
21  license number, and that's what I put on there."
22       She says, "Well" --
23       I said, "What was I supposed to put
24  on it?"
25       She said, "Well, I can't tell you,

Page 23

1  because if I do, I could go to jail because of the
2  new law."
3       And I said, "Well, obviously since
4  you're only asking for two things, it must be my
5  Social Security number." I said, "What number is
6  it?"
7       And she said, "It's the number you
8  use when -- the ID you used when you first
9  registered to vote that's in your voter record
10  here."
11       And I said, "Well, Veronica, I
12  registered to vote 46 years ago in this county.
13  What" -- so I said, "Okay. It could only be one of
14  two things, since you're only asking for two things.
15       "So is it my -- if I tell you what
16  it is, can you confirm that?"
17       She said, "Yes, I can do that."
18       I said, "Okay. Is it my Social
19  Security number?"
20       She said, "Yes, it is."
21       I said, "Thank you very much."
22       I pulled down another form. And
23  this time, leaving nothing to chance, everywhere
24  there was a blank, even on the optional information,
25  I filled it all in, and mailed it back on the 14th.

Page 24

1       And on the 28th of January -- no,
2  the 31st of January, I got my ballots in the mail.
3  28 days, three tries.
4       Q.   And then you submitted those ballots
5  correctly --
6       A.   I did.
7       Q.   -- correct? Yeah.
8       And did you track those ballots
9  after you submitted them?
10       A.   I did.
11       Q.   Where did you track them?
12       A.   On ballot tracker. You go to the County
13  site, and it's a little thing you click on that says
14  "Track my ballot."
15       Q.   And I guess it lets you know once the
16  ballot's been accepted?
17       A.   It tells you. You can see when it was
18  saved; you can see when it was accepted; and you can
19  see -- they use a funny term for it being processed.
20  And I don't remember what it is. But you can tell
21  when it's being processed.
22       Q.   And your and your husband's votes were
23  eventually processed; correct?
24       A.   Yes, they were.
25       Q.   Okay. Well, thank you for explaining

Page 25

1  that to me. I want to ask a few questions just so I
2  make sure I understand all of the details of it.
3       So when your first -- your first
4  application that was rejected, you received a notice
5  in the mail from the County; correct?
6       A.   Uh-huh.
7       Q.   And that first form was rejected because
8  you had inadvertently used the wrong form; correct?
9       A.   No. I didn't inadvertently use the
10  wrong form, because that would tend to -- I used the
11  form that the County provided, and it was the wrong
12  form.
13       Q.   Yes.
14       A.   It wasn't inadvertent on my part. I
15  didn't have a choice either/or.
16       Q.   You used the only form that was on the
17  website?
18       A.   I used the only form that was available
19  to me, yes.
20       Q.   And the form that was available to you
21  was incorrect?
22       A.   That is correct.
23       Q.   Okay. You don't think the County
24  purposely kept the old form on the website, do you?
25       A.   No.

Page 50

1    A.    I think they're trying to make it harder
2  for African-Americans; for Hispanic-surnamed
3  individuals.
4    Q.    (BY MR. DiSORBO)  Any other races or
5  ethnicities?
6    A.    Maybe some -- some other immigrant
7  categories who have been naturalized citizens with a
8  right to vote.
9    Q.    So now let's talk about places.
10          When you meant -- strike that.
11          When you were saying certain types
12  of folks who live in certain places like urban
13  places, what did you mean, ma'am?
14    A.    Well, all I can do is look at the
15  actions that were taken and draw my -- my own
16  conclusions.
17          When Harris County, which is the
18  largest county in Texas, when the actions of the
19  legislature were to stop drive-through voting, which
20  made it convenient for people.  They stopped a lot
21  of the innovations that were made in Harris County.
22  They picked on Harris County.  And other counties
23  were doing some of the same things, but they sued
24  Harris County because Harris County has a very large
25  Democratic-leaning base of people -- of voters.

Page 51

1    Q.    And so do you think that some of those
2  measures were intended to -- do you think some of
3  those measures were partisan?  That is, you're --
4    A.    Yes.
5    Q.    -- in the sense that they were designed
6  to favor one party over another?
7          MS. HARRIS:  Objection; form.
8    A.    That's my opinion.
9    Q.    (BY MR. DiSORBO)  Okay.  Now, you
10  mentioned drive-through voting in Harris County.
11  It's your understanding that SB1 prohibits
12  drive-through voting; is that correct, ma'am?
13    A.    Uh-huh.
14    Q.    Okay.  Any other innovations, as you
15  say, that you're talking about?
16    A.    I think -- the one that I find is
17  particularly burdensome for people in a county as
18  large physically as Harris County is the limitation
19  on drop boxes, that Harris County is going to
20  have -- has the same -- can have the same number of
21  drop boxes as Deaf Smith County or Brazoria County.
22          So a person in the far north --
23  northeast Harris County would probably have to drive
24  50 miles for a drop boxes, whereas if you take some
25  little-bitty, tiny county, they may only have to

Page 52

1  drive three blocks.
2    Q.    Folks can mail their ballots in, though;
3  right?
4    A.    If you are one of four categories.
5  Everybody can't mail their ballot in.  The only
6  people who can mail a ballot in are if you're 65 and
7  older; if you're incarcerated; if you are disabled;
8  or -- let's see --
9    Q.    Pregnant.
10    A.    Yeah.  They added that.  Within three
11  weeks of delivery on either side.
12    Q.    Something like that.  Yeah.
13    A.    Yes.  Yes.
14    Q.    They recently added that; right?
15    A.    Yeah.  That's in SB1.
16    Q.    Yeah.
17    A.    Yeah.  So everybody -- you can't say
18  that everybody can mail their ballots in.  They
19  can't.
20    Q.    The folks who are eligible to vote
21  absentee can mail their ballots in?
22    A.    Can mail.  That is correct.
23    Q.    Okay.  So far as measures that you think
24  were designed to affect urban areas, we've got
25  drive-through voting, drop boxes.  Anything else,

Page 53

1  ma'am?
2    A.    I'm sure there are, but right now,
3  they're not coming to mind.
4    Q.    None that you can remember sitting right
5  here?
6    A.    Right.
7    Q.    Okay.  So you're registered in Fort Bend
8  County; right?
9    A.    Uh-huh.
10    Q.    Did they have drive-through voting in
11  2020?
12    A.    No.
13    Q.    So you've never voted via drive-through,
14  have you?
15    A.    No.
16    Q.    Do you know anybody who has?
17    A.    I know people in Harris County who voted
18  drive-through.
19    Q.    Yes, ma'am.  That's what I meant.
20    A.    Now, there is in the voting
21  provisions -- but it's been there; it was before
22  SB1 -- curbside voting.  And you can -- if you're
23  disabled or whatever, you can drive up to the -- to
24  the voting location.  And someone can go and take
25  your ID to the election judge, and they will bring a

Pamiel Gaskin

June 29, 2022
Pages 54 to 57

Page 54

1  machine out to the car.
2      Q.  Yes, ma'am.  And that helps --
3      A.  But that is not drive-through voting.
4  That's curbside voting for disabled people.
5      Q.  Yes, ma'am.
6          And there's still curbside voting;
7  is that right?
8      A.  Yes.
9      Q.  And that helps disabled folks; right?
10     A.  And that's a good thing.
11     Q.  Yes, ma'am.
12     A.  That's a good thing.
13     Q.  So --
14         MS. HARRIS:  I know we've been going
15     about an hour.  Is this -- I just want to
16     check in if folks need a break.
17         See how you're doing also.  Are you
18     okay?  Are you doing okay?
19         THE WITNESS:  I'm okay for a little
20     while.
21         MR. DiSORBO:  So I'm happy to defer
22     to you, ma'am.
23     Q.  (BY MR. DiSORBO)  So I want to talk a
24  little bit about drive-through voting and drop
25  boxes.  And you may not know much about this, but

Page 55

1  you may.  I'll also ask it about drop boxes.
2          Do you know folks who submitted
3  their ballots via drop box before?
4      A.  No.
5      Q.  Okay.  So let's talk just about
6  drive-through voting, then, because you told me that
7  you know some folks who used drive-through voting in
8  2020; is that right?
9      A.  Uh-huh.
10     Q.  Okay.  Do you know if any of those folks
11  voted in 2022?
12     A.  I'm sure -- well, no, I don't know --
13     Q.  You don't know?
14     A.  -- if somebody voted.  No.
15     Q.  Okay.  You don't keep in touch with any
16  of those particular folks?
17     A.  I keep in touch with all my friends, but
18  I don't ask them -- I don't know if somebody voted.
19     Q.  Okay.  Do you think they probably voted
20  by some other means?
21         MS. HARRIS:  Objection; form.
22     A.  I think they voted.
23     Q.  (BY MR. DiSORBO)  Okay.  Now -- so we
24  talked about -- I want to understand a little bit
25  better why you think SB1 discriminates against

Page 56

1  African-Americans, Hispanics, and some other folks.
2  Specifically I want to understand a little bit
3  better what provisions you think do that.
4          So we talked about the mail-in
5  voting identification requirement; we talked about
6  drive-through voting and about drop boxes.
7          Are there any other provisions that
8  you think are discriminatory?
9          MS. HARRIS:  Objection; form.
10     A.  I don't know.
11     Q.  (BY MR. DiSORBO)  None that you can
12  think of sitting right here?
13     A.  None that I can think of sitting right
14  here, no.
15     Q.  Okay.  Now, let's talk about the mail-in
16  ballot application, and then we'll talk about some
17  of the other ones too.
18     Why do you think -- strike that.
19  Let's make sure we are talking about the same thing
20  here.
21          So for mail-in ballots, you've got
22  to submit an application to get a mail-in ballot; is
23  that right?
24     A.  That's correct.
25     Q.  And on is that ballot, you got to put

Page 57

1  your identification number; is that right?
2      A.  Uh-huh.
3      Q.  Now, why is it you think that's
4  discriminatory?
5          MS. HARRIS:  Objection; form.  Calls
6     for a legal conclusion.
7      A.  Why do I think it's discriminatory?
8      Q.  (BY MR. DiSORBO)  Yes, ma'am.
9      A.  I don't think it's discriminatory.  I
10  think it's unnecessary.
11     Q.  Okay.  Now, let's talk about drop boxes.
12          What's your understanding of how the
13  drop boxes works, ma'am?
14     A.  My understanding is that if you have a
15  mail-in ballot, you can go to a drop box and drop it
16  in.
17     Q.  Okay.  That's not discriminatory, is it?
18          MS. HARRIS:  Objection; form.
19     A.  It could be.
20     Q.  (BY MR. DiSORBO)  Now, how so?
21     A.  Well, if you -- it could discriminate
22  against those who don't have reasonable access to
23  the drop boxes.  If you've got to drive 50 miles,
24  that's discriminatory.
25     Q.  And so you -- okay.  So --

Pamiel Gaskin

June 29, 2022
Pages 82 to 85

Page 82

1    Q.   Okay.  I thought you were talking about
2  a different form.
3         So if I understand it correctly,
4  when you give voter assistance, you have to fill out
5  a form that says "I didn't receive compensation for
6  helping this person vote"?
7    A.   You have to check little box on the
8  ballot.
9    Q.   Okay.  My apologies.  That's what I was
10  talking about.
11    A.   That's on the voting -- on the ballot
12  form.
13    Q.   Okay.  That's what I was talking about.
14         And that box says that "I didn't
15  receive any compensation from a candidate or a
16  campaign --
17    A.   That is correct.
18    Q.   -- for my assistance"; is that right?
19         Do you have any problem checking
20  that box?
21         MS. HARRIS:  Objection; form.
22    A.   When I help my husband?
23    Q.   (BY MR. DiSORBO)  Yes, ma'am.
24    A.   No.  No.
25    Q.   Do you think that campaigns or

Page 83

1  candidates should be allowed to pay people to assist
2  others to vote?
3         MS. HARRIS:  Objection; form.
4    A.   I don't know.  I haven't thought about
5  it, actually.
6    Q.   (BY MR. DiSORBO)  Okay.  So my
7  understanding is -- for why you might not want that
8  is that either the person giving the assistance or
9  the voter might feel pressured to support the
10  candidate or campaign who was paying for the
11  assistance.  Does that make sense?
12         MS. HARRIS:  Objection; form.
13    A.   I don't know.
14    Q.   (BY MR. DiSORBO)  You don't know?
15    A.   No.
16    Q.   Okay.  You've never received any
17  compensation for helping your --
18    A.   No.
19    Q.   -- husband?
20         Okay.  Have you ever had any trouble
21  assisting your husband voting?
22    A.   Like what?
23    Q.   You've always been able to -- let me see
24  if I can ask you this way.
25         You've always been able to fill out

Page 84

1  the form for him; is that right?
2    A.   Are you talking about an application to
3  vote or to vote because I assist him at the polling
4  place, you know, in the few times we have voted in
5  person?
6    Q.   I'll ask you about both, but I'll ask
7  you about mail first.
8         So when your husband votes via
9  absentee, have you ever had any trouble helping fill
10  out the form for him?
11    A.   No.
12    Q.   And then when you vote in person, ever
13  had any trouble helping him fill out the ballot?
14    A.   No.
15    Q.   Do you think that state law should
16  guarantee disabled folks reasonable accommodations
17  to vote if they need one?
18         MS. HARRIS:  Objection; form.
19    A.   Yes, I do.
20    Q.   (BY MR. DiSORBO)  It would be a good
21  thing if it did that?
22    A.   Absolutely.
23    Q.   So I want to mention a few other SB1
24  provisions -- well, I just want to talk about it
25  more generally.

Page 85

1         So I want to make sure in my head
2  I'm keeping track of the different things we've
3  talked about.  So we've got mail-in ballots and the
4  identification requirements.  We've got 24-hour
5  voting.  We've got drive-through voting.  We've got
6  drop boxes.  And is it fair to say that you think
7  those -- that you oppose those SB1 provisions?
8         MS. HARRIS:  Objection; form.
9    A.   What provisions?
10    Q.   (BY MR. DiSORBO)  The mail-in ballot,
11  24 -- mail-in identification, 24-hour voting,
12  drive-through, and drop boxes.
13         MS. HARRIS:  Objection; form.
14    A.   I'm not sure that I would say -- I mean,
15  you're making a very global statement here.
16    Q.   (BY MR. DiSORBO)  Okay.
17    A.   And I'm not a global person.  Okay?  So
18  you want to take them one at a time?
19    Q.   Sure.  Yeah.  So let's start with the
20  mail-in identification requirement.  You don't
21  support that requirement, do you, ma'am?
22    A.   No.
23    Q.   Okay.  And so let's talk about 24-hour
24  voting next.  You don't support the prohibition of
25  24-hour voting, do you, ma'am?

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al., §
    *Plaintiffs,* §
§
*v.* § Case No. 5:21-cv-844-XR
§
GREGORY W. ABBOTT, et al., §
    *Defendants.* §

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX EE

Transcript of the Testimony of

# John Bucy III

## Date:

August 09, 2022

## Case:

LA UNION DEL PUEBLO ENTERO V. GREGORY W. ABBOTT

John Bucy III

Page 66

1 amendment was included in SB1?

2     A   I'd have to check.  I think language changed multiple

3 times throughout SB1 on this provision.

4     Q   Okay.  I want to look at others that you got passed.

5 So we're still talking about Senate Bill 7 and the regular

6 session of the 87th Legislature.  You also -- you also

7 introduced Amendment Number 9, which I'll hand you now as

8 Exhibit Number 20.

9     A   Okay.

10     Q   And here you've got a Section 4.09 regarding Internet

11 posting, and can you describe what your intent was with respect

12 to this amendment, Representative Bucy?

13     A   A quick scan, I believe this is legislation around

14 transparency by posting election information on a website to

15 make it easier for voters to figure out details about an

16 election.

17     Q   Okay.  And you added language in Section 4.09 here

18 that did just that; right?

19     A   Yes.

20     Q   And you would agree with me that the Republican

21 legislature on the floor of the House adopted your Amendment

22 Number 9 and it was made part of SB7 until such time as SB7

23 died following the quorum; correct?

24     A   I agree that we adopted in the House that day.

25 Unfortunately the Senate in the conference committee stripped a

Page 67

1 lot of things.  I don't remember where this falls into that.

2     Q   Okay.  But nevertheless, you were successful in

3 getting this amended -- this amendment as made part of Senate

4 Bill 7 on May 7, 2021.

5     A   Correct.

6     Q   All right.  Let's look at one more amendment, number

7 -- two more amendments.  Amendment Number 11.

8     A   Okay.

9     Q   Okay.  Exhibit 21.

10     A   Okay.

11     Q   And here you introduced an amendment that says --

12 that added -- it says:  Amend CSSB 7, House committee printing,

13 Page 13, Lines 14 and 15, by striking, False information that

14 was entered on the form by the judge, and substituting,

15 Information that the judge entered on the form knowing it was

16 false.  Did I read that correctly?

17     A   You did.

18     Q   What were you doing with this -- this now Amendment

19 11?  What was your purpose?

20     A   I think I'd have to go back and look at the whole

21 context, but what I'm seeing here is just that they had to

22 knowingly put false information, not accidentally put false

23 information.

24     Q   Okay.  So once again you're sort of addressing this

25 mens rea criminal -- criminal-intent requirement and you're

Page 68

1 trying to raise it and make sure that somebody knows that --

2 what they're doing when they do it; right?

3     A   Absolutely.

4     Q   And you would agree with me that the Republican

5 legislature adopted that amendment to SB7 on May 7, 2021;

6 correct?

7     A   I agree that the House did that, yes.

8     Q   The House did.  Okay.  And so now I want to look at

9 your fourth and final amendment, this is Exhibit Number 22, and

10 you can see this is Amendment 12.

11     A   (Reviewing.)

12     Q   So I particularly want to draw your attention to

13 Section 31.017 that is entitled Internet Database of Election

14 Information; right?

15     A   Yes, sir.

16     Q   It says:  The secretary of state shall post on the

17 secretary of state's public Internet website the database

18 containing information provided by each authority responsible

19 for giving notice of an election in this state.  And that it --

20 and the database was required to keep certain information

21 there; correct?

22     A   Yes, sir.

23     Q   Now, this is an amendment.  Why did you propose this

24 amendment, Representative Bucy?

25     A   It's another transparency amendment to make it easier

Page 69

1 for Texas voters to learn about elections, what's going on,

2 who's on the ballot.

3     Q   And when you offered this on the House floor, it was

4 adopted by the House; correct?

5     A   Correct.

6     Q   And that's a Republican House with a Republican

7 speaker, you've got your fourth -- you got four amendments

8 through on SB1; right -- SB7; right?

9     A   That is correct.

10     Q   All right.  Now I want to change horses on you and I

11 want to talk about Senate Bill 1 and ask if you've got some --

12 if you were able to get an amendment adopted on Senate Bill 1

13 in the second legislative session.

14         MR. BRAZIL:  Would that be the second special

15 session?

16         MR. SWEETEN:  Yes, sir, yes, sir.

17 BY MR. SWEETEN (resuming):

18     Q   So -- so this -- I'm going to show you from the Texas

19 Legislature Online from the second special session.

20     A   It was a long summer.

21     Q   It was a long summer.  You were amending quite a bit.

22     A   Yeah.

23     Q   So you can see -- if you look all the way down to

24 Number 11 there --

25     A   Yes.

John Bucy III

Page 70

1    Q   And it says, Bucy; it says, Type, Amendment and
2  Action Adopted, 8/26/2021; right?
3    A   That's correct.
4    Q   Okay.  And this -- this was an amendment about
5  reasonable accommodations or modifications.  So I'm going to
6  let you read that and then I want to talk a little bit about
7  it.
8    A   Okay.
9        COURT REPORTER:  For the record, this is
10  Exhibit 23 and he's now looking at Exhibit 24?
11       MR. SWEETEN:  Yes, looking at 24.  Thank you.
12       COURT REPORTER:  No problem.
13  BY MR. SWEETEN (resuming):
14   Q   Have you had a chance to read the amendment that you
15  offered to SB1 that was adopted?
16   A   Yes, sir.
17   Q   Okay.  Let's -- I'm going to read it to you.  The
18  language that you've added to SB1 says the following,
19  Reasonable Accommodation for Modification.  It says:  A
20  provision of this code may not be interpreted to prohibit or
21  limit the right of a qualified individual with a disability
22  from requesting a reasonable accommodation or modification to
23  any election standard, practice or procedure mandated by law or
24  rule that the individual is entitled to request under federal
25  or state law; correct?

Page 71

1    A   Correct.
2    Q   And -- and the -- the purpose of that amendment was
3  to make sure that SB1 also encompassed other state and federal
4  laws that accommodated those with disabilities; correct?
5    A   That's correct.
6    Q   Who talked with you about this amendment?  Which --
7  were there disability groups and the like?
8    A   Yeah.  Disability Rights Texas, I believe, would be
9  one, if not the one, that really comes to mind and who we met
10  with about this possibly.
11   Q   And who met with them?
12   A   Myself at times or my staff.
13   Q   Okay.  And -- and they proposed Disability Rights
14  Texas proposed this change to SB1; correct?
15   A   I believe that's correct.
16   Q   And you thought it was a commonsense and good
17  provision to add to SB1; correct?
18   A   Correct.
19   Q   And you would agree with me that when you offered
20  that amendment to SB1, it was adopted.
21   A   It was adopted.
22   Q   By the Republican legislature that otherwise passed
23  SB1; correct?
24   A   I think by a bipartisan group.  I'd have to look at
25  the vote breakdown.

Page 72

1    Q   All right.  Who provided the language for the bill,
2  was that Disability Rights Texas?
3    A   I'd have to check with my staff.  Whether they did it
4  or I worked in partnership, I'm not sure.
5    Q   All right.  So I'm going to hand you -- excuse me.
6  I'm going to hand you what we'll mark as Exhibit 25.  And you
7  can see on the front this is the transcription of an
8  audio/video recording of the House Select Committee on
9  Constitutional Rights and Remedies.  Did I describe that page
10  correctly?
11   A   Yes.
12   Q   Now, it's my understanding that chairing this select
13  committee was one Andrew Murr from Junction; correct?
14   A   No.  I believe he was the bill; Trent Ashby was --
15  would've been the chairman.
16   Q   Ashby was the chair, and what was Murr's role in the
17  bill?
18   A   I believe he was the bill author.
19   Q   Okay.
20   A   That's probably what it was.
21   Q   All right.  And so by bill author, you're saying bill
22  author of Senate Bill 1; correct?
23   A   Correct.  I guess bill sponsor.
24   Q   Okay.  So here on -- on Page 7, Chairman Ashby says
25  members were about to lay out Senate Bill 1.  Do you see that?

Page 73

1  Just on the first line.
2    A   Oh, okay.  Yeah, I do.
3    Q   Okay.  And if we can flip over to Page 31, here you
4  -- you're having a colloquy between you and Chair Ashby on Page
5  31.  Do you see that?
6    A   Yes.
7    Q   Okay.  And -- and you say -- you're asking a question
8  of Representative Murr, and you say:  Can you describe what
9  free movement is?  Just to better understand it.
10   A   I do see that.
11   Q   And -- and what was that in relation to,
12  Representative Bucy?
13   A   This would have dealt with poll watchers.
14   Q   Okay.  So we're talking about the issue of poll
15  watchers.  By the way, in your -- I forgot what your title was,
16  but I think you were county chair for the Democratic Party in
17  Williamson County.
18   A   In 2016.
19   Q   In 2016.  So when you were party chair, did you ever
20  utilize poll watchers at the polls?
21   A   We didn't directly, but I think, you know, candidates
22  could, some probably did.  You know, back then, it was
23  something that, you know, if you want to do it, you can sign up
24  and -- and do it.  It -- I've never been a poll watcher at a
25  specific site myself.  I...

John Bucy III                                                    August 09, 2022
                                                                Pages 158 to 161

Page 158

1 two months ago, roughly.
2    Q   And -- and the elections committee had -- was SB1
3 discussed at that hearing?
4    A   To some extent, because we talked about the -- the
5 poll-watcher training.
6    Q   Did you -- were any county election administrators
7 present?  Yes or no or I don't know.
8    A   I believe there were.  I know Chris Davis wasn't
9 there, which I thought was --
10   Q   Okay.
11   A   You know, he -- he had a conflict.
12   Q   So outside of the single hearing that you've had with
13 the elections committee --
14   A   I don't remember any specific conversations outside
15 of that.
16   Q   Representative Bucy, I've got to ask --
17   A   Oh, I'm sorry.
18   Q   -- the whole question.
19   A   Go ahead.  Yeah.
20   Q   That's okay.  All right.  Outside of the hearing that
21 you attended sometime after the passage of SB1, are there --
22 are there any specific county election officials that you've
23 talked to about SB1?  And that's a yes or no.
24   A   Not that I recall.
25   Q   Okay.  A signature verification.  In the old days

Page 159

1 prior to SB1, when you sent in a mail-in ballot, the method
2 that was utilized was signature verification; correct?
3    A   Correct.
4    Q   And that -- that was utilized to determine whether or
5 not the person that sent in the ballot was the -- in fact the
6 person that was registered to vote for that ballot; correct?
7    A   Correct.
8    Q   Okay.  And signature verification was the only method
9 -- mechanism for verifying; correct?
10   A   I'll take your word for it.
11   Q   Okay.  Can you think of any others?
12   A   No, no.
13   Q   Okay.  Now, you would agree that there's some
14 significant issues with signature verification as being a -- a
15 -- an objective verifier; correct?
16   A   I would agree, and we heard from disability groups
17 and senior groups and others with concerns around it.
18   Q   Okay.  And you would agree with me that signatures
19 sometimes change in people's lives.
20   A   Yes.
21   Q   You would agree with me that because of disabilities,
22 signatures can be different than the original signature.
23   A   Yes.
24   Q   Okay.  And you would agree with me that signatures
25 are -- are a far more subjective measure than placing and

Page 160

1 affixing ID numbers on ballots by mail.
2    A   Yes.
3    Q   Okay.  Now, you opposed, though, having -- having
4 verification by ID on ballots by mail; is that correct?
5    A   Voting is a fundamental right, and so adding
6 restrictions that will make it harder, I oppose those, yes.
7    Q   Okay.  So any match of any ID, you opposed.
8    A   I mean, I don't know if that's true.  I -- I'm not
9 sure we -- we -- that was even on the table.  We have some
10 policies and law around voter ID that are set right now, and,
11 in fact, I tried to expand on some of the voter ID.  I had a
12 bill to do that would have allowed, you know, like student IDs,
13 for example, to use, and -- and that was fought back and -- and
14 not passed.  So -- so I don't -- I don't think I would say
15 that.  I just think we want to make sure we're very careful
16 when you add any provisions around our fundamental right to the
17 ballot box.
18   Q   Okay.  Is there any verification system outside of
19 signatures that you advocated for implementing?
20   A   I don't know if it would directly speak to that.
21 I've been very passionate for online voter registration, which
22 I think would lead to better data and therefore better rolls
23 and information around voting because it's put in directly by
24 the individual, it's typed in so there's not -- as you just
25 talked about with signatures, there's not interpretation to

Page 161

1 handwriting, there's not a middle person to -- to deliver it,
2 so that's one area that I fought for that I think would
3 modernize and create safer and more accurate data.
4          MR. SWEETEN:  Okay.  I might have to object as
5 nonresponsive because my question is something different.
6          THE WITNESS:  Oh.
7 BY MR. SWEETEN:  (resuming)
8    Q   My question is:  Did you advocate for any other sort
9 of verification for mail-in ballots?
10   A   Not that I recall at this moment.
11   Q   Can -- are there any that you have in mind right now
12 outside of signature verifications that you believe would
13 improve the system and -- and make sure that those that are
14 sending in the ballots are in fact those who were entitled to
15 cast their ballot?
16   A   I -- I have a bill that would allow for, like,
17 individuals with disability to be able to use -- kind of like
18 we do with the military overseas, send the ballot and therefore
19 they can use their computer to fill it out.  So let's say if
20 they -- if they -- if they're blind, visually challenged, they
21 could use their technology to fill out their ballot and then
22 still send back and -- a specific -- you know, they can still
23 send -- print and send back a paper ballot, but like we do with
24 the military, be able to E-mail that ballot through a secured
25 network that we've been using.  So I've propose that, and that

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,        §
    *Plaintiffs,*        §
            §
*v.*        §        Case No. 5:21-cv-844-XR
            §
GREGORY W. ABBOTT, et al.,        §
    *Defendants.*        §

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX FF

Transcript of the Testimony of

# Bob Kafka

**Date:**

April 07, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Bob Kafka                                                        April 07, 2022
                                                                Pages 106 to 109

Page 106

1 on the parent to do.  And now, not only because of economics,
2 but just, you know, empowerment of women, they are not able to
3 be at home where traditionally.  And so that's why finding
4 attendants is so critical and why, you know, just adding
5 potential for criminal penalty is just another thing to make it
6 more difficult to find an attendant.
7      Q.  Do you know if Mr. Fernandez intends to vote in the
8 May primary?
9      A.  All I can say is that we encourage people -- you
10 know, again, our mission is to promote and get out the vote,
11 you know, whatever his candidate would be.
12     Q.  So at the moment you don't know one way or another
13 whether Mr. Fernandez intends to vote in the May primary?
14     A.  No, not unless he's afraid of me.  And I tell him --
15 I don't know what I would tell him, but I don't know.
16     Q.  Same question but as to Ms. Litzinger.  Do you have
17 any idea one way or another whether Ms. Litzinger intends to
18 vote in the May primary?
19     A.  No.
20     Q.  Do you know whether Mr. Fernandez has had any
21 trouble having an assistant in advance of preparations to vote
22 in the May primary?
23     A.  Only like I said before, the difficulties had just
24 finding an attendant for his personal care.  So I will assume
25 he will have some difficulty with the addition of the SB 1

Page 107

1 criminalization.
2      Q.  Same question but as to Ms. Litzinger.  Do you know
3 whether she's had any difficulties finding an attendant or an
4 assistant to assist her in voting in the May primary on account
5 of Senate Bill 1?
6      A.  Not specifically to the voting, but I know the
7 difficulty finding the attendant in general for her personal
8 care needs.
9      Q.  Do you know if Mr. Fernandez has requested any
10 accommodation from any county election official to assist him
11 in voting in the May primary?
12     A.  I don't know in the May primary.  I do know that he
13 has used an assistant in previous voting.  And so I just don't
14 know specifically what his intentions are for the May runoff.
15     Q.  Let me repeat that question because I think maybe
16 you misheard me.
17         I just asked if Mr. Fernandez, to your
18 knowledge, has requested any accommodation from a county
19 election official to allow him to vote in the May primary.
20     A.  Oh, I do not know.
21     Q.  Same question but as to Ms. Litzinger.  Do you know
22 whether Ms. Litzinger has reached out to any county election
23 official to ask for an accommodation to assist her in voting in
24 the May primary?
25     A.  No.

Page 108

1      Q.  Do you know whether Mr. Fernandez made any request
2 prior to the March primary for accommodations to allow him to
3 vote in the March primary?
4      A.  No.
5      Q.  Do you know whether Ms. Litzinger asked for any
6 accommodations in advance of the March primary of 2022 to allow
7 her to vote in that primary?
8      A.  I do not know.
9      Q.  And so, presumably, you also wouldn't know whether
10 Mr. Fernandez was denied an accommodation?
11     A.  Correct.
12     Q.  You also wouldn't know whether Ms. Litzinger was
13 denied an accommodation, correct?
14     A.  No.  We don't track individual and how they vote or
15 don't vote.
16     Q.  Let's talk about Ms. Halvorson.  Do you know whether
17 Ms. Halvorson voted in the March 22 primary?
18     A.  I do not know.
19     Q.  Do you know whether she intends to vote in the May
20 primary?
21     A.  I do not know.
22     Q.  Do you know whether she had requested an
23 accommodation in advance of the March primary to allow her to
24 vote?
25     A.  I do not know.

Page 109

1      Q.  Do you know whether Ms. Halvorson has requested an
2 accommodation in advance of the May primary that would allow
3 her to vote?
4      A.  I do not know.  And same answer is that we don't
5 track how people vote.
6      Q.  I understand and I don't mean to be tedious about
7 it.  I have just got to have --
8      A.  I know.
9      Q.  -- this for the record.
10     A.  I respect that.
11     Q.  With regard to Ms. Halvorson, do you know if she had
12 any difficulty finding an assistant if she needed one to help
13 her vote in the March 22 primary?
14     A.  No, but I can tell you -- uh, not specific to
15 voting, she is on a respirator 24 hours a day and has had
16 critical difficulty in finding a personal care attendant for
17 months actually.  So, again, I don't know specifically for
18 voting.  But, again, as my answer for all three of those
19 individuals, the idea of finding an attendant today is, you
20 know, very, very -- it is a crisis in the infrastructure of our
21 whole community attendants.
22     Q.  Well, I think you would also agree that that crisis
23 existed before Senate Bill 1, right?
24     A.  Right, but the criminalization in SB 1 only adds to
25 the potential reason they can't find somebody.

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX GG

Sadia Tirmizi                                                           May 08, 2023

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO,      )
et al.,                          )
                                 )
          Plaintiffs,            )
                                 )
V.                               ) Case No. 5:21-cv-844-XR
                                 ) (LEAD CASE)
GREGORY W. ABBOTT, et al.,       )
                                 )
          Defendants.            )
     ------------------------------------------------------------
OCA-GREATER HOUSTON, et al.,     )
                                 )
          Plaintiffs,            )
                                 )
V.                               ) Case No. 1:21-cv-780-XR
                                 )
JANE NELSON, et al.,             )
                                 )
          Defendants.            )
     ------------------------------------------------------------
HOUSTON AREA URBAN LEAGUE,       )
et al.,                          )
                                 )
          Plaintiffs,            )
                                 )
V.                               ) Case No. 5:21-cv-848-XR
                                 )
GREGORY WAYNE ABBOTT, et al.,    )
                                 )
          Defendants.            )
     ------------------------------------------------------------



Sadia Tirmizi

May 08, 2023
Pages 2 to 5

**Page 2**

LULAC TEXAS, et al.,         )
                             )
         Plaintiffs,         )
                             )
V.                           ) Case No. 1:21-cv-0786-XR
                             )
JANE NELSON, et al.,         )
                             )
         Defendants.         )
-------------------------------------------------------
MI FAMILIA VOTA, et al.,     )
                             )
         Plaintiffs,         )
                             )
V.                           ) Case No. 5:21-cv-0920-XR
                             )
GREG ABBOTT, et al.,         )
                             )
         Defendants.         )
-------------------------------------------------------
UNITED STATES OF AMERICA,    )
                             )
         Plaintiff,          )
                             )
V.                           ) Case No. 5:21-cv-1085-XR
                             )
THE STATE OF TEXAS, et al.,  )
                             )
         Defendants.         )
-------------------------------------------------------

**Page 3**

ORAL & VIDEO DEPOSITION OF:


SADIA TIRMIZI


May 8, 2023


---------------------------------------------------

Oral & video deposition of SADIA TIRMIZI, produced as

a witness at the instance of the defendants, and duly

sworn, was taken in the above-styled and numbered cause on

the 8th day of May, 2023, before Patrick Stephens,

Certified Court Reporter, at 209 West 14th Street,

Austin, Texas 78701.

**Page 4**

A P P E A R A N C E S
ON BEHALF OF THE STATE DEFENDANTS:
    AMY S. HILTON, ESQ.
    WILL WASSDORF, ESQ.
    TIFFANY DUNCAN
    Office of the Attorney General
    P.O. Box 12548
    Capitol Station
    Austin, Texas 78711-2548
    Telephone:  (512) 463-2120
    amy.hilton@oag.texas.gov
    will.wassdorf@oag.texas.gov
ON BEHALF OF THE LUPE PLAINTIFFS:
    PATRICK BERRY, ESQ.
    SEAN MORALES-DOYLE, ESQ.
    Brennan Center for Justice
    120 Broadway
    Suite 1750
    New York, New York 10271
    berryp@brennan.law.nyu.edu
    morales-doyles@brennan.law.nyu.edu
ALSO PRESENT:
Reggie Wright, Videographer, Magna Legal Services
scheduling@sawmez.com
ALSO PRESENT VIA ZOOM:
    Charles Gehnrich, LUPE
    Kenneth Broughton
    Leigh Ann Tognetti, Hidalgo County
    Lisa Cubriel, Bexar County
    Stephen Kenny, Jones Day

**Page 5**

1              I N D E X
2  APPEARANCES................................. 04
3  SADIA TIRMIZI
4       Cross-Examination by Ms. Hilton ................ 07
5       Direct Examination by Mr. Berry ................ 55
6
7
8  Reporter's Certificate..................................... 60
9
10
11           E X H I B I T S
12
13 NO.      DESCRIPTION                   PAGE
14 1        Depo Notice                   20
15 2        5th Supp. Responses           23
16 3        Senate Bill 1 (Enrolled)      39
17
18
19
20
21
22
23
24
25



Sadia Tirmizi

May 08, 2023
Pages 50 to 53

Page 50

1    Q    Okay.  Are you aware that before Senate Bill 1 was
2    enacted that there -- the ballot, if there were some defect with
3    it, would not have been returned to the voter for it to be
4    cured?
5    A    I did not know that.
6    Q    Okay.  Are you aware that the Texas Election Code
7    allows an election officer to deliver a ballot to a voter
8    curbside if they are unable to enter the polling place without
9    assistance?
10   A    I've heard of that.
11   Q    Okay.  Is that something that you know one way or the
12   other was being offered at Tarrant County?
13   A    I don't know.  When we pulled up to the election site
14   -- the polling site, I didn't see that as an option, so we just
15   parked and went in.
16   Q    Okay.  Is that an option that either you or your
17   parents have ever exercised before in the past?
18   A    No.
19   Q    Other than your parents, and by extension, your
20   experience in the November 2022 general election, are you aware
21   of any other person requiring voter assistance who had issues
22   voting in -- in the election?
23   A    No.
24   Q    Okay.  Other than your parents' experience, and by
25   extension, your experience, are you aware of any person with

Page 51

1    disabilities who had trouble voting in the November 2022 general
2    election?
3    A    Not personally.
4    Q    Okay.  And were you able to cast a ballot in the
5    November 2022 general election?
6    A    I was.
7    Q    Did you cast it in person or by mail?
8    A    In person.
9    Q    And that was Travis County?
10   A    Correct.
11   Q    With respect to your mom's experience voting in person
12   in Tarrant County, did she -- did any election worker refuse to
13   assist her with voting?
14   A    No.
15   Q    Was the person who assisted her, was that someone that
16   she chose of her own volition?
17   A    No.
18   Q    Okay.  Are you aware that -- that a voter can obtain
19   assistance from a person of their choice?
20   A    I was not aware.
21   Q    Okay.  Did your mom or your dad or you submit any sort
22   of complaint to any entity, any public office, regarding your
23   experience voting and your parents' experience in the November
24   2022 general election?
25   A    I didn't think about it.  In hindsight, I wish I had.

Page 52

1    Q    Are you aware that voters have the option of
2    requesting an accommodation or a change to normal voting
3    procedures?
4    A    I'm not aware.
5    Q    Did you or either of your parents submit a request for
6    accommodation?
7    A    Not other than just a request for a mail-in ballot.
8    Q    Okay.  But not a -- not a request for any sort of
9    special accommodation or change to the normal course of
10   requesting a mail-in ballot.
11   A    No, I didn't realize that was an option.
12        MS. HILTON:  Okay.  I think now would be a good
13   time to take a break so I can kind of see if we can roll through
14   this, if --
15        MR. BERRY:  Okay.
16        MS. HILTON:  -- if that's okay.
17        VIDEOGRAPHER:  We're going off video record at
18   11:38 a.m.
19        (A recess was taken.)
20        VIDEOGRAPHER:  We are back on video record at
21   12:24 p.m.
22   BY MS. HILTON (resuming):
23   Q    Good afternoon.  We're -- I just have a few more
24   questions for you and then we'll -- we'll close out.  First, I
25   want to just summarize what I think your testimony is.  Please

Page 53

1    correct me if I'm wrong, but this is my understanding of the
2    issues that you experienced with your parents' voting in
3    November of 2022:  The first issue was buying stamps for the
4    mail-in ballot for your dad; the second issue I have listed is
5    the assistor in Tarrant County when your mom went to vote in
6    person; the third issue I have is your mom's mail-in ballot
7    being rejected; and then the final issue I have is the signature
8    requirement for your dad's mail-in ballot.  Are there any other
9    things that I've missed in terms of what the issues were with
10   your parents' voting in the 2022 general election?
11   A    No --
12   Q    Okay.
13   A    -- those were it.
14   Q    Okay.  I have some follow-up questions for you about
15   the assistor in -- in Tarrant County.  I know you indicated
16   previously that the distance between you to your mom and the
17   assistor at the booth was approximately between where you are at
18   the table right now and where I am; is that right?
19   A    Yes.
20   Q    Could you identify for the record about how far away
21   that is?
22   A    I'm really bad at that --
23   Q    Okay.
24   A    -- but probably 5-ish feet.
25   Q    Okay.  And how did your mom get this assistor?  Did



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX HH

Transcript of the Testimony of
# Teri Saltzman

## Date:

July 15, 2022

## Case:

LA UNION DEL PUEBLO ENTERO V. GREGORY W. ABBOTT

Teri Saltzman                                              July 15, 2022
                                                          Pages 22 to 25

Page 22

1  influence do you think the national organization has on
2  the REV UP Texas chapter?
3      A   How much influence?  I think it's an education
4  awareness.
5      Q   And who decides what education to share?  The
6  REV UP Texas chapter or the national chapter?
7      A   I would think the national chapter.
8      Q   Do you know where the national chapter is
9  based?
10     A   I am not certain what the -- who the national
11 chapter is.
12     Q   Understood.
13         Okay.  I would like to discuss the passage of
14 SB 1.  Is that all right?
15     A   Yes.
16     Q   Did you meet with any members of the Texas
17 legislature to discuss SB 1 before its passage?
18     A   No.
19     Q   Did you write or speak with any member of the
20 Texas legislature on the subject of SB 1 before or after
21 it passed?
22     A   No.
23     Q   Did you offer any testimony during the public
24 hearings before its passage?
25     A   No.

Page 23

1      Q   So it would be fair to say that you weren't
2  involved in the legislative process regarding the
3  passage of SB 1?
4      A   Yes, that would be fair.
5      Q   Do you think any member of the legislature
6  sought to make the voting process less accessible for
7  folks with disabilities through SB 1?
8      A   No.
9      Q   Can you point to any member of the legislature
10 who you think intended to discriminate against folks
11 with disabilities through SB 1?
12     A   No.
13         MS. DAVIS:  Objection, form.
14     Q   You can answer.
15     A   No.
16     Q   Do you think it would be a good thing if SB 1
17 guaranteed disabled folks the right to have a reasonable
18 accommodation if they need one?
19         MS. DAVIS:  Object to --
20     A   Yes.
21         MS. DAVIS:  -- form.
22     A   Yes.
23     Q   Okay.  I am going to introduce Exhibit B.
24     (EXHIBIT B WAS MARKED.)
25     Q   Okay.  Exhibit B is Chapter 1 of the Texas

Page 24

1  Election Code and I am going to read a selection to you.
2  Is that all right?
3      A   Yes.
4      Q   Election code Title 1 is introductory
5  provisions; Chapter 1, general provisions.  And I am
6  going to go to the last section, Section 1.0122 [sic],
7  Reasonable Accommodation or Modification.
8         "A provision of this code may not be
9  interpreted to prohibit or limit the right of a
10 qualified individual with a disability from requesting a
11 reasonable accommodation or modification to any election
12 standard, practice, or procedure mandated by law or rule
13 that the individual is entitled to request under federal
14 or state law."
15         Ms. Saltzman, were you aware that Texas's
16 election law prohibits election authorities from denying
17 a voter a reasonable accommodation to any election
18 standard, practice, or procedure?
19         MS. DAVIS:  Objection, form.
20     Q   You may answer.
21     A   Yes.
22     Q   Have you ever been denied a reasonable
23 accommodation in Texas?
24     A   No.
25     Q   Are you personally aware of any member of The

Page 25

1  Arc of Texas or REV UP Texas who has had a reasonable
2  accommodation denied?
3      A   No.
4      Q   I would like to discuss your disability for a
5  little bit.  Would that be all right?
6      A   Yes.
7      Q   What is or are the nature of your disability
8  or disabilities?
9      A   I'm legally blind.  I see 2400 in my right eye
10 and count fingers in my left eye.
11     Q   So your left eye is worse than your right eye?
12 Is that --
13     A   Yes.
14     Q   Do you have any other disabilities?
15     A   No.
16     Q   What challenges to major life activities do
17 you face as a result of your legal blindness?
18         MS. DAVIS:  Objection, form.
19     Q   You may answer.
20     A   Being able to read everyday things, being able
21 to read to be able to do my job, be able to drive.  I do
22 not drive.  Just everyday things that you would do with
23 vision.
24     Q   Are you able to do certain things with
25 software or other things which improve your visual

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,           §
  *Plaintiffs,*                                      §
             §
*v.*                                                      §  Case No. 5:21-cv-844-XR
             §
GREGORY W. ABBOTT, et al.,                    §
  *Defendants.*                                    §

---

### STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX II

Transcript of the Testimony of

# Jennifer Martinez

## Date:

April 12, 2022

## Case:

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Jennifer Martinez

April 12, 2022
Pages 58 to 61

Page 58

1 and we are off the record.
2          (Recess.)
3          THE VIDEOGRAPHER:  The time is 11:36 a.m.
4 and we are on the record.
5     Q.  (BY MR. HUDSON)  So you've mentioned supported
6 employment, inclusive education, any other issues that
7 Arc of Texas contends it's not able to handle on account
8 of Senate Bill 1?
9     A.  Mentioned Alex Cogan working criminal justice
10 work and being moved to some voting rights issues as
11 well.
12     Q.  Aside from those three areas, are there any
13 other diversion of resources that Arc of Texas is
14 engaged in on account of Senate Bill1?
15     A.  Communications team, policies team, in those
16 areas, I think is inclusive.  My time right now.
17          MR. HUDSON:  I mean, I didn't designate
18 you.  For the record or anybody reading the transcript
19 of that, I chuckled after it was a joke.  I know we're
20 not supposed to make those at depositions, but --
21     Q.  (BY MR. HUDSON)  I'm gonna hand you what I'm
22 gonna mark as Defendant's 2.  So I'll let you examine
23 that for a second, but for purposes of identification on
24 the record, Defendant's 2 is a copy of UCF 199, which is
25 Plaintiff's Second Amended Complaint to include the Arc

Page 59

1 of Texas.
2          (Exhibit No. 2 marked.)
3          MS. LOPEZ:  Just to clarify, do you need
4 her to look through it right now?
5          MR. HUDSON:  No.  I was gonna -- I'm gonna
6 ask some questions, but I want to give you the
7 opportunity if you want to take a look at it.  I don't
8 want to slow you down.  Some deponents like to look at
9 everything before I start asking questions.  I'll defer
10 to you about what you want to do.
11     A.  I'm fine moving forward.
12     Q.  (BY MR. HUDSON)  Okay.  If you'll go ahead and
13 flip to Page 21 of Defendant's 2 for me.  You see at the
14 top where it has No. 49?
15     A.  Yes.
16     Q.  So -- and you've mentioned a few times today --
17 well, I -- I guess, let me ask this.  I didn't go into
18 your background too much.  Do you have any legal
19 training?
20     A.  I do not.
21     Q.  Do you have any legal education?
22     A.  No.
23     Q.  Okay.  What is the highest level of education
24 you've completed?
25     A.  Masters.

Page 60

1     Q.  And where did you matriculate?
2     A.  Saint Edwards.
3     Q.  And for undergraduate?
4     A.  Texas A & M.
5     Q.  Aside from Texas A & M and Saint Edwards, have
6 you matriculated any other university without completing
7 your degree?
8     A.  No.
9     Q.  Do you have a terminal degree in any field?
10     A.  No.
11     Q.  Paragraph 49 reads, Plaintiff, the Arc of Texas
12 challenges Sections 5.02, 5.03, 5.06, 5.07, 5.10, 6.03,
13 6.04, 6.05, and 6.07 of SB 1.  Did I read that
14 correctly?
15     A.  Yes.
16     Q.  Okay.  The SB 1 reference there, you would
17 agree with me it's the same SB 1 and Senate Bill 1 that
18 we've been referring to throughout the day?
19     A.  Yes.
20     Q.  Are you familiar with the challenged sections
21 in Paragraph 49?
22     A.  Yes.
23     Q.  Are there any sections aside from those cited
24 in Paragraph 49 of Defendant's 2 that the Arc of Texas
25 is challenging through this lawsuit?

Page 61

1     A.  No.
2     Q.  Paragraph 58 on Page 24, please flip there for
3 me, if you would.  Paragraph 58 reads, the Arc of Texas
4 member, Amy Litzinger is harmed by Section 6.03, 6.04,
5 6.05, and 6.07 Senate Bill 1.  Did I read that
6 correctly?
7     A.  Yes.
8     Q.  Okay.  Have you ever met Ms. Litzinger before?
9     A.  I have.
10     Q.  Who is she?
11     A.  She is a Austin native and a great advocate, a
12 great self advocate.
13     Q.  Okay.  And you're bringing suit on her behalf
14 as a member of the Arc of Texas?
15     A.  Yes.
16     Q.  Did you know that she's also a member of Rev Up
17 Texas?
18     A.  That does not surprise me.
19     Q.  Does it surprise you that Rev Up Texas is also
20 bringing suit on her behalf for the exact same
21 provisions that you cited?
22     A.  I -- I don't have any information on Rev Up's.
23     Q.  Do you have any idea whether the harm that you
24 think Ms. Litzinger is suffering in your lawsuit is
25 different from the harm that she says she's suffering in

Jennifer Martinez

April 12, 2022
Pages 62 to 65

Page 62

1 the Rev Up lawsuit?
2     A. I don't have information on that.
3     Q. Okay. Do you know what Ms. Litzinger's
4 disabilities are, if any?
5     A. I -- I'm from reading and she's a quadriplegic
6 cerebral palsy. I -- I do not know that as a person
7 knows her.
8     Q. You would agree with me the Arc of Texas
9 doesn't keep lists of member's disabilities, right?
10     A. Correct.
11     Q. And you don't know whether the office of the
12 Attorney General keeps lists of anyone's disabilities in
13 Texas, right?
14     A. I -- I do not know that.
15     Q. You don't know whether the Secretary of State
16 of Texas' office keeps a list of anyone's disabilities
17 in the state of Texas, right?
18     A. I don't know that.
19     Q. You don't know whether the office of the
20 Governor maintains lists of disabilities for anybody in
21 the State of Texas, right?
22     A. I don't know that.
23     Q. You don't know whether any county elections
24 administrator maintains lists of disabilities, right?
25     A. That's correct.

Page 63

1     Q. You say that Ms. Litzinger is harmed by 6.03,
2 6.04, 6.05, and 6.07; is that right?
3     A. Yes.
4     Q. Are there any other provisions of Senate Bill 1
5 that Arc of Texas contends Ms. Litzinger is harmed by?
6     A. No.
7     Q. Do you know whether Ms. Litzinger has ever
8 requested an accommodation from any elections
9 administrator to discern voting?
10     A. I do not know what accommodation my individual
11 members have asked for.
12     Q. Okay. Do you have any knowledge of what
13 accommodation, if any, Ms. Litzinger would need to vote?
14     A. I would not presume to know what her unique
15 support needs are.
16     Q. That's interesting unique. You would agree
17 with me that disabilities are unique, right?
18     A. Each individual support needs are individual to
19 them, yes.
20     Q. Okay. So what might accommodate one person
21 might not necessarily accommodate another even if they
22 have the same disability, right?
23     A. There's a list of reasonable accommodations
24 that we can expect folks with disabilities to need, but
25 individuals -- I -- I would allow her to speak for

Page 64

1 herself on what needs she has and how we could support
2 her.
3     Q. Would that be true of every person with a
4 disability?
5     A. I can't speak for every person with a
6 disability.
7     Q. Right. I guess, let me ask it another way
8 because I think we're saying the same thing.
9     A. Okay.
10     Q. You would agree with me that you would let
11 every person with a disability speak for themselves on
12 what accommodations they needed, right?
13     A. I think there's a list of likely supports that
14 many individuals with disabilities need. Each
15 individual does have unique needs.
16     Q. Do you know off the top of your head what 6.03,
17 6.04, 6.05, or 6.07 say?
18     A. Off the top of my head, I don't.
19     Q. I'm gonna hand you a copy of what I'm marking
20 as Defendant's 3. Go ahead and take a look at that and
21 let me know when you're ready to discuss it.
22          (Exhibit No. 3 marked.)
23     A. I'm ready.
24     Q. (BY MR. HUDSON) Have you ever personally
25 spoken to Ms. Litzinger?

Page 65

1     A. I have.
2     Q. Have you spoken with Mrs. Litzinger about this
3 lawsuit?
4     A. I have not.
5     Q. Do you know if Ms. Litzinger has agreed to be
6 listed as a person in this lawsuit?
7     A. Yes, she has.
8     Q. On Defendant's 3, who told you Ms. Litzinger's
9 agreed to be listed in this lawsuit?
10     A. My attorneys.
11     Q. Okay. 6.03 that starts on Page 51. I need you
12 to flip there for me.
13     A. I'm sorry what page was that?
14     Q. 51 on Defendant's 3.
15     A. Okay.
16     Q. And actually before I ask you questions about
17 that, can you flip to the last page first, Page 76?
18 Have you ever seen Page 76 before?
19     A. Yes.
20     Q. Okay. What is your understanding of what Page
21 76 represents?
22     A. It's the bill being signed into law.
23     Q. So I'll represent to you that this is a copy of
24 the enrolled and signed version of Senate Bill 1 and the
25 signatures on the back are of the person of the Senate,

Jennifer Martinez

April 12, 2022
Pages 90 to 93

Page 90

1 Mr. Fernandez is making in this case on the same
2 provisions are any different than the claims he's making
3 in the Rev Up lawsuit?
4    A. I do not know that.
5    Q. Have you personally spoken to Mr. Fernandez?
6    A. I have not.
7    Q. Do you know if Mr. Fernandez voted in the March
8 22 primary?
9    A. No.
10    Q. Do you know if Mr. Fernandez needed assistance
11 to vote in the March 22 primary?
12    A. I do not.
13    Q. Do you know whether Mr. Fernandez asked for
14 assistance to vote in March 22 primary?
15    A. No.
16    Q. Do you know if he was unable to acquire
17 assistance to vote in March 22 primary?
18    A. I don't know that.
19    Q. Do you know whether Mr. Fernandez intends to
20 vote in any future elections?
21    A. I -- I don't know that.
22    Q. Okay. Do you know what accommodations, if any,
23 Mr. Fernandez would need to vote on account of
24 Section 6.03 of Senate Bill 1?
25    A. I don't know individual members accommodation

Page 91

1 needs.
2    Q. Okay. Would that answer be the same for
3 Sections 6.4, 6.05, and 6.07?
4    A. Yes.
5    Q. Okay. I'm gonna get you back to Page 25
6 unfortunately I skipped over that. You see
7 Paragraph 59?
8    A. Yes.
9    Q. It says the Arc of Texas member Laura
10 Halvorson's harmed by Section 6.03, 6.04, 6.05 and 6.07
11 of Senate Bill 1, you see that?
12    A. Yes.
13    Q. I'll ask you the same question. Would it
14 surprise you to know that Ms. Halvorson is also listed
15 as an individual by Rev Up as one of their members who's
16 been harmed by the same provisions in their lawsuit?
17    A. No, I'm not surprised.
18    Q. Do you have any idea why the same 3 people are
19 filing or -- or claiming membership in 2 different
20 organizations as being harmed by the same provisions and
21 being listed as members in -- in both those lawsuits?
22    A. I don't know that.
23    Q. I know this is a bit tedious, but I'll ask you
24 the same questions. Do you know whether Ms. Halvorson
25 voted in the March 22 primary?

Page 92

1    A. No.
2    Q. Do you know whether she needed any
3 accommodations to vote in the March 22 primary?
4    A. I do not.
5    Q. Do you know whether she requested assistance to
6 vote in the March 22 primary?
7    A. No.
8    Q. Do you know if she was unable to acquire
9 assistance to vote in the March 22 primary?
10    A. No.
11    Q. What about going forward? Do you know
12 whether -- had Ms. Halvorson intends to vote in any
13 future elections?
14    A. I don't know.
15    Q. Do you know whether she'll need any reasonable
16 accommodations?
17    A. I don't know that.
18    Q. Do you know whether she's ever requested
19 accommodations to vote?
20    A. I don't know.
21    Q. Do you know whether Ms. Halvorson will be
22 requesting assistance to vote in the future?
23    A. I don't know.
24    Q. Okay. Does Arc of Texas know what harm
25 Ms. Halvorson has suffered on account of Section 6.03 of

Page 93

1 Senate Bill 1?
2    A. I -- I don't I can look here to see what she
3 has said, but as a systems advocacy organization, again,
4 we don't look at individual case management issues.
5    Q. Okay. Would that answer be the same for
6 Sections 6.04, 6.05, and 6.07?
7    A. Yes.
8    Q. Okay. And I think I forgot to ask this so I'm
9 gonna take you back through it. Do you know whether
10 Mr. Fernandez has ever requested reasonable
11 accommodations to vote under any federal law?
12    A. I -- I don't know.
13    Q. Same question, but with regard to state?
14    A. I'm unaware of his accommodation needs.
15    Q. What about Ms. Litzinger, do you know if she's
16 ever requested accommodations to vote under any federal
17 law?
18    A. I don't know that.
19    Q. Do you know whether she's requested
20 accommodations to vote under any state law?
21    A. I don't know that.
22    Q. Let's talk about Ms. Pugh, that's Page 27
23 Paragraph 61. Have you ever spoken with Ms. Pugh?
24    A. I have.
25    Q. Okay. Do you have any idea what disabilities

Jennifer Martinez

April 12, 2022
Pages 94 to 97

Page 94

1 afflict Ms. Pugh?
2    A. I -- I don't know her diagnosis, I can see it
3 here, I know that she's in a wheelchair.
4    Q. Did you talk to Ms. Pugh in preparation for
5 your testimony today?
6    A. No.
7    Q. Okay. Do you have any idea whether Ms. Pugh
8 has requested accommodations to vote in Texas?
9    A. I don't.
10    Q. Do you know whether she voted in the March 22
11 primary?
12    A. I don't.
13    Q. Do you know whether she requested assistance to
14 vote in the March 22 primary?
15    A. I don't.
16    Q. Do you know whether she had any difficulty
17 acquiring assistance if she needed it to vote in the
18 March 22 primary?
19    A. I -- I don't know that.
20    Q. Do you know whether Ms. Pugh requested any
21 accommodations to vote in the March 22 primary?
22    A. No.
23    Q. Do you know whether Ms. Pugh intends to ask for
24 assistance to vote in future elections?
25    A. I don't know that.

Page 95

1    Q. Okay. Do you have any idea what harm is
2 specific to Ms. Pugh with regard to Section 6.03 of
3 Senate Bill 1?
4    A. No.
5    Q. Would that answer be the same for Sections
6 6.04, 6.05, and 6.07?
7    A. Yes.
8    Q. With regard to the provisions that are cited in
9 Paragraph 61, again, that's 6.03, 6.04, 6.05, and 6.07
10 of Senate Bill 1, are there any other provisions that
11 Arc of Texas contends have harm to Ms. Pugh?
12    A. No.
13    Q. Has Arc of Texas had to spend any additional
14 money attributable to Senate Bill 1?
15    A. We have a operating budget that is set and we
16 have reallocated resources from other thins to focus on
17 SB 1.
18    Q. So the money's finite you've moved it around as
19 the contingent?
20    A. Yes.
21    Q. Would it be helpful to Arc of Texas if you had
22 a bigger budget?
23    A. Sure.
24    Q. If Arc of Texas -- let's assume Arc of Texas
25 wins this lawsuit and the provisions that you're

Page 96

1 challenging that we've discussed today and that are
2 cited in Paragraph 49 of your live complaint, let's
3 assume the Court enjoin those, would Arc of Texas then
4 have to reconfigure it's training to address the changes
5 resulting from that injunction?
6    A. Yes.
7    Q. How long would it take you to make changes
8 based on any changes from a court?
9    A. It depends on the number of changes, the
10 complexity of those changes, to answer that question.
11    Q. As you sit here right now, would it be fair to
12 say you have -- you don't know.
13    A. I don't know.
14    Q. But it would be fair to say that you would have
15 to move resources to address those changes?
16    A. Yes.
17    Q. Let me get you to flip to Page 90 of
18 Defendant's 2. You see Roman Numeral 8 there on the
19 page?
20    A. Uh-huh.
21    Q. It says allegations of voter fraud in the 2020
22 election are unsupported by the facts and contradicted
23 by comments of the Secretary of State. Did I read that
24 correctly?
25    A. Yes.

Page 97

1    Q. Does Arc of Texas contend that there's never
2 been voter fraud in Texas?
3    A. The Arc of Texas doesn't know that.
4    Q. Okay. You don't have any reason to dispute
5 whether there has been or has not been, right?
6    A. We're not hearing that as a complaint from our
7 membership or concern.
8    Q. Okay. So as you sit here today, you don't have
9 information one way or the other about whether voter
10 fraud has occurred in Texas?
11    A. Our membership has not brought that up as an
12 issue that they're concerned about.
13    Q. So the answer's no, you don't have any
14 information?
15        MS. LOPEZ: Objection. Asked and answered.
16    A. I don't have information from our membership
17 that that's a concern if there is.
18    Q. (BY MR. HUDSON) Okay. Do you have information
19 from anywhere else that voter fraud is or is not a
20 concern in Texas?
21    A. No.
22    Q. If you flip over to Page 91, you see
23 Paragraph 246?
24    A. Yes.
25    Q. Reads, as of April 2021 with over 11.3 million

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,          §
    *Plaintiffs,*                                §
                       §
*v.*                                         §          Case No. 5:21-cv-844-XR
                       §
GREGORY W. ABBOTT, et al.,                    §
    *Defendants.*                             §

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX JJ

Transcript of the Testimony of

# Toby Cole

### Date:

June 28, 2022

### Case:

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Toby Cole                                                           June 28, 2022
                                                                   Pages 22 to 25

Page 22

1  requirement on the voter themselves.
2      A.  It absolutely does.
3      Q.  How so?
4      A.  Because I have to pick the assister.  I have to
5  have an assister that is willing to take this oath, and
6  I have to have an assister that's willing to be subject
7  of prosecution if something of this oath goes amiss.  So
8  absolutely it definitely put an onerous on me.
9      Q.  So can you -- in this provision in the language
10  of the oath, can you point out specifically what
11  sections that you believe harm you?
12      A.  Well, let's -- let's start with "I swear or
13  affirm under penalty of perjury," right?  So when we
14  started my deposition, what did you remind me of?
15      Q.  That you were under oath.
16      A.  That I was under oath under the penalty of
17  perjury, right?  And how many times have you taken a
18  deposition or I've taken a deposition where halfway
19  through the deposition you remind the witness that it is
20  the penalty of perjury and that they can go to jail and
21  that -- and that this is something that could put them
22  in harm's way.  And this is not for those folks to vote.
23  This is so that person can help me.  So, yeah, that
24  right there -- that right there is very difficult.
25      Q.  I mean, do you believe that someone taking this

Page 23

1  oath and taking it on honestly should be fearful of the
2  penalty of perjury?
3      MS. PAIKOWSKY:  Objection; form.
4      A.  I think that Harris County has prosecuted, I
5  think, more people for election -- alleged election
6  violations than maybe one other county in the entire
7  state of Texas in the last five years.  I think anybody
8  who is going to read this needs to be very concerned
9  about whether or not some other person at a later date
10  will say "You violated this oath" because, when we get
11  down to the third sentence or fourth sentence that I
12  imagine we're going to get to, you did something wrong
13  there and so therefore you can go to jail.
14      I think anytime you take an oath that says
15  you're under the penalty of perjury, you better be very
16  serious about what you're doing.
17      Q.  (BY MR. WASSDORF)  Okay.  What's the next
18  section that you believe is harmful?
19      A.  Okay.  "I will not suggest, by word, sign, or
20  gesture, how the voter should vote."  And it kind of
21  goes into "I will confine my assistance to reading the
22  ballot to the voter..." and -- and the rest of that
23  sentence right there.
24      Q.  So do you believe that assisters should be able
25  to suggest how a voter should vote?

Page 24

1      MS. DAVIS:  Objection; form.
2      A.  I'll give you my example.  Before I vote, I do
3  research.  And I can't write those things down.  So I
4  use my assistants like I do in any deposition, like I'm
5  having NaShunda do now.  And so, if it's a short ballot
6  initiative like the Constitutional amendment where
7  there's three, I'll have -- we'll do the research, and
8  I'll have that discussion.  And I'll say, you know,
9  remind me that I'm going "A" on one, "B" on the other,
10  "yes" on this, "no" on that.  Or if I'll have -- if it's
11  something more complicated, I'll have a sample ballot or
12  notes.
13      And then I'll need NaShunda or whoever's
14  with me, will you take the piece of paper?  What am I
15  going to vote on this one?  What am I going to vote on
16  that one?  And when they do that, they're violating this
17  oath.
18      Q.  (BY MR. WASSDORF)  Do you believe that, by
19  reminding you of your previously determined choices,
20  that an assister is violating that provision?
21      A.  It says it right here.  (As read) "I will
22  confine my assistance to reading the ballot to the
23  voter, directing the voter to read the ballot, marking
24  the voter's ballot, or directing the voter to mark the
25  ballot."  That's all they can do.  I don't know how I'm

Page 25

1  going to vote in the next election.
2      Q.  Are you aware that it's the position of the
3  State defendants that under this oath that assisters may
4  still assist voters with disabilities by, for example,
5  reading the voter's notes or otherwise refreshing their
6  recollection?
7      A.  I'm sorry.  You said who's position?
8      Q.  The States's position, the State of Texas.
9      A.  Where is that in writing?  Because it could be
10  your position right now, but it may not be the position
11  of the next person at the AG's office or the next point
12  of emphasis.  So where does it say that?  Because right
13  now the way this is written, I have to vote from memory,
14  and that's not fair.  Or it's not a problem for me, I
15  just have to realize that the people that rely on me for
16  their lives, the jobs that I have for them can get
17  arrested at some point.  So do I put them in that harm's
18  way?
19      Q.  If there were some assurance that the
20  assistance that you're describing is still permitted
21  under SB 1, would you agree that this oath provision
22  does not harm you?
23      MS. DAVIS:  Objection; form.
24      A.  No.  The entire -- the entire idea of having to
25  take an oath under the penalty of perjury for anything

Toby Cole

June 28, 2022
Pages 26 to 29

Page 26

1  is harmful.
2          And I'm not trying to be a smart-ass, but
3  do you see how this is problematic for me?
4      Q.  (BY MR. WASSDORF)  Mr. Cole, I'm not under
5  deposition here.  So...
6      A.  But you are the AG -- you being -- your office,
7  and you'd be the ones that would prosecute the folks
8  that work for me.
9      Q.  I -- I don't believe that's correct, but I'm
10  the one asking the questions.
11      A.  Okay.
12      Q.  Are there any other provisions of the oath that
13  you believe are harmful?
14      A.  "I did not pressure or coerce the voter into
15  choosing me to provide assistance."  This whole "I will
16  not suggest, by word, sign, or gesture, how the voter
17  should vote" is so insulting and so backwards that it's
18  even hard to read.
19      Q.  So do you believe that someone should be
20  allowed to pressure or coerce another individual into
21  voting a certain way?
22      A.  No.  But to believe that, because you have a
23  disability, you're susceptible to being coerced or
24  pressured because there's some reason we're mentally
25  infirm -- I mean, I thought we did away with Jim Crow

Page 27

1  laws a long time ago.  I mean, do we need tests to make
2  sure that the assistant that we choose don't have undue
3  influence?  No one else who votes has to sing something
4  that says whoever drove me -- my wife or whoever else --
5  didn't put pressure on me.  It's just so paternalistic
6  and insulting that it's hard to read.
7      Q.  Do you not believe that there are people out
8  there who would take advantage of their position to
9  pressure or coerce someone with regard to their vote?
10      A.  Are you talking specifically about people with
11  disabilities that we surround ourselves with people that
12  pressure us, that we're not capable of finding people
13  who are resisting the pressure of people that would have
14  us vote?
15      Q.  I think I'm asking more about, you know, the
16  potential assisters.  I mean, there are nefarious people
17  in the world, are there not?
18      A.  Yeah, there are.  There are.
19      Q.  And if someone requires an assister to help
20  them vote, should the State not take steps to ensure
21  that those people aren't taking unfair advantage?
22      MS. PAIKOWSKY:  Objection; form.
23      A.  Did you hear what you just said?  That I need
24  the protection of the State to make sure someone doesn't
25  take advantage of me because I'm disabled.  No, I don't

Page 28

1  need the AG's office to protect me from the people that
2  I hire, the people that I use to take care of my
3  children, that I use to help pay my bills, that I use to
4  practice law, that I use to help represent people that
5  need help.  No, because I don't need you to do it at the
6  voting booth unless you want to show up and do it at a
7  million other places, no.  This is not designed to help
8  protect me.
9          Do you need it?
10      THE REPORTER:  Can we take a break?
11      MR. WASSDORF:  Sure.
12      THE WITNESS:  Yeah.
13      THE REPORTER:  Off the record at 9:56.)
14      (Recess from 9:56 a.m. to 10:05 a.m.)
15      THE REPORTER:  We are back on the record at
16  10:05.
17      Q.  (BY MR. WASSDORF)  So we just talked about the
18  oath provision of Senate Bill 1 which is Section 6.04 of
19  the bill.  Let's go back by a section and look at
20  Section 6.03.  And it starts at the very bottom of
21  page 51, but all of the text is on page 52.
22      A.  Got it.
23      Q.  Why don't you read that section to yourself and
24  let me know when you're finished.
25      A.  (Witness complies.)  Okay.

Page 29

1      Q.  Now, this section mainly requires an individual
2  assisting a voter to identify themselves, their
3  relationship to the voter, and whether they received
4  compensation from a candidate, campaign, or political
5  action committee; is that correct?
6      A.  Yes.
7      Q.  Do you believe that that provision harms you or
8  other voters with disabilities in any way?
9      A.  Yes.
10      Q.  How so?
11      A.  Because why is it any business of the State who
12  helps me?  Why should -- why should the people that help
13  me have to go on record and -- and have their
14  information taken by the secretary of the state?  I mean
15  we don't do that in any other portion of things we do in
16  this world.  So why in this circumstance -- what if --
17  what if I have somebody that's undocumented that helps
18  me?  They can't.  They're not going to help me because,
19  when this occurs, then they can be deported.  So, yeah,
20  absolutely.
21          And I'm sure you're familiar with the fact
22  that we don't have state assistance for people with
23  disabilities.  There's no place of public money where
24  you can go and have people help you.  So you have to
25  find people that can help you.  And so sometimes those

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,        §
      *Plaintiffs,*        §
              §
*v.*        §        Case No. 5:21-cv-844-XR
              §
GREGORY W. ABBOTT, et al.,        §
      *Defendants.*        §

---

## STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## ON PLAINTIFFS' ADA AND REHABILITATION ACT CLAIMS

# APPENDIX KK

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, | ) Civil Action Nos. |
| | ) |
| et al., | ) 5:21-cv-00844-XR |
| | ) |
|     Plaintiff, | ) 1:21-cv-00870-XR |
| | ) |
| vs. | ) 5:21-cv-00848-XR |
| | ) |
| GREGORY W. ABBOTT, et al., | ) 1:21-cv-00786-XR |
| | ) |
|     Defendant. | ) 5:21-cv-00920-XR |
| | ) |
| | ) 5:21-cv-01085-XR |

VIDEOTAPED DEPOSITION

REBECCA GUERRERO

MAY 11, 2022

Reported by

Rebecca Callow, RMR, CRR, RPR

Job No. 051122RG

50

1      I would just like to clarify that I
2  understand that the questions you're asking are
3  based on my knowledge.  But that any questions
4  regarding practices were to be referred to
5  Bridgette Escobedo, who I rely on heavily for that.
6      Q.  And I will be supplementing your answers,
7  of course, by asking her questions during the
8  30(b)(6).
9          And so we were talking a little bit
10 before about some State interests and I had one more
11 to ask you.
12         Do you think the State has an interest
13 in preventing intimidation of voters?
14         THE VIDEOGRAPHER:  Miss, you need to
15 put your mic on.
16     BY MS. HUNKER:
17     Q.  Do you want me to repeat the question?
18     A.  Yes, please.
19     Q.  Do you think the State has an interest in
20 preventing intimidation of voters?
21     A.  Yes.
22     Q.  Do you think the State has an interest in
23 preventing voters from being coerced to vote a
24 certain way?
25     A.  Yes.

51

1      Q.  Now, you had mentioned that you don't plan
2  on redesigning or implementing new policies during
3  your tenure year.
4      A.  Correct.
5      Q.  Okay.  Are there any specific policies in
6  the Travis County Election Division that you think
7  need improvement?
8      A.  At this moment, I cannot speak on
9  improvements.
10     Q.  So the last few questions I want to ask you
11 is regarding the ADA, which is the Americans with
12 Disabilities Act.  Are you familiar with it --
13     A.  Yes.
14     Q.  -- in generality?
15     A.  Yes.
16     Q.  Are you aware if any voters have contacted
17 your office about requesting an accommodation?
18     A.  No.
19     Q.  Would that be something you would be aware
20 of or would that be something that your elections
21 division --
22     A.  The elections division would be notified,
23 and then they would let me know of that as well.
24     Q.  Have you discussed with your -- the head of
25 your election division how you would react if

52

1  someone did request an accommodation for a specific
2  requirement?
3      A.  No.
4      Q.  Do you have a sense if you would do your
5  best to provide a reasonable accommodation if one
6  was requested?
7      A.  Yes.
8      Q.  And you intend to comply to the full extent
9  that is required by federal law.  Correct?
10     A.  Yes.
11     Q.  And you would do your best to ensure to
12 comply with any accommodation that was required
13 under state law.  Is that correct?
14     A.  Yes.
15     Q.  Were there any specific challenges that you
16 faced when coming into this office with respect to
17 elections?
18     A.  Just the understanding of how the operation
19 is run.
20     Q.  And did you note -- observe any hiccups in
21 the office that occurred as a result of having a
22 transition between one county clerk to a new?
23     A.  No.
24         MS. HUNKER:  All right.  With that, I
25 believe I am done and will pass the witness.

53

1          MR. NELSON:  Are there any counsel who
2  are participating via Zoom who wish to ask questions
3  of County Clerk Guerrero at this time?
4          MR. MALHI:  This is Jaywin Singh Malhi
5  on behalf of the United States.  I do not have any
6  questions at this time.
7          MR. NELSON:  Are there any other
8  counsel who are participating by Zoom who have
9  questions of County Clerk Guerrero at this time?
10         Going once ...
11         Going twice ...
12         Going three times ...
13         We will reserve any questions.  And, I
14 believe, unless Ms. Hunker has anything else, we are
15 concluded.
16         THE VIDEOGRAPHER:  We'll go off the
17 record then at 10:11 a.m.
18         (Proceedings concluded at 10:11 a.m.)
19
20
21
22
23
24
25