**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| LA UNION DEL PUEBLO ENTERO, *et al.*, | Case No: 5:21-cv-00844-XR (Consolidated Cases) |
| Plaintiffs, | |
| *v.* | |
| GREGORY W. ABBOTT, *et al.*, | |
| Defendants. | |

**BRIEF OF THE LAWYERS DEMOCRACY FUND
AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS**

*Some parties are presumed to be opposed to the filing of this brief.*

---

Chris K. Gober, TX Bar #24048499
The Gober Group
14425 Falcon Head Blvd.
Building E-100, Suite 226
Austin, TX 78738
Telephone: 512-354-1787
Fax: 877-437-5755
cg@gobergroup.com

Eric Wang, VA Bar #73511*
The Gober Group
1501 Wilson Blvd., Suite 1050
Arlington, VA 22209
Telephone: 202-417-3528
Fax: 877-437-5755
ew@gobergroup.com

*pro hac vice admission pending

**TABLE OF CONTENTS**

STATEMENT OF INTEREST ........................................................................................... 1

SUMMARY OF THE ARGUMENT ................................................................................ 1

ARGUMENT ................................................................................................................... 2

CONCLUSION ............................................................................................................... 36

CERTIFICATE OF SERVICE ...................................................................................... 37

CERTIFICATE OF COMPLIANCE ........................................................................... 38

## STATEMENT OF INTEREST

Lawyers Democracy Fund ("LDF") is a social welfare organization that promotes ethics and legal professionalism in the electoral process. LDF seeks to ensure that all citizens are able to exercise their right to vote and that reasonable, common-sense administrative processes and protections are implemented to prevent the dilution of any citizen's vote or disenfranchisement as a result of administrative error or fraud and to instill public confidence in election procedures and outcomes. LDF provides guidance to public officials interested in reforming their electoral systems, and it also conducts, funds, and publishes research regarding the effectiveness of current election systems and procedures. LDF also periodically engages in public interest litigation to uphold the rule of law and integrity in elections and files briefs as *amicus curiae* in cases where its background, expertise, and national perspective in the field of election law may help illuminate important points for consideration. For these reasons, LDF has an interest in the issues presented in these consolidated cases.

## SUMMARY OF THE ARGUMENT

*Amicus* Lawyers Democracy Fund focuses on several of the claims raised against S.B. 1 by the La Union Del Pueblo Entero ("LUPE") (lead case) and LULAC Texas ("LULAC") (consolidated case no. 1:21-cv-0786-XR) plaintiffs.

These plaintiffs allege that certain provisions in S.B. 1 violate Sections 2 and 208 of the federal Voting Rights Act ("VRA") and/or the First, Fourteenth, and Fifteenth Amendments of the U.S. Constitution. Specifically, plaintiffs allege that the following provisions of S.B. 1 unlawfully infringe the rights of voters and organizations that seek to assist voters:

- § 5.02 requires absentee voters to provide certain identification information when returning their ballots;

- § 7.04 prohibits election officials from sending unsolicited absentee ballot applications to voters;

- § 4.12 eliminates absentee ballot drop boxes;

- § 7.04 prohibits paid political operatives from influencing voters while they are completing their absentee ballots (also known as "vote trafficking" or "vote harvesting");

- §§ 3.09, 3.10 eliminate 24-hour in-person voting;

- §§ 3.04, 3.12, 3.13 prohibit drive-thru voting;

- §§ 4.06, 4.07, 4.09 provide additional protections for poll watchers; and

- §§ 6.03, 6.04 require voters' assistants to provide certain information about themselves and to sign an oath affirming that they will assist voters lawfully.

Far from being extraordinary or unique election measures, LDF's *amicus* brief will showcase the degree to which these provisions of S.B. 1 bring Texas in line with the election laws and practices implemented by many other states for the purpose of safeguarding election integrity and bolstering public confidence in elections.[1]

---

[1] This brief cites and discusses other states' statutes as they were codified around the time of June 2022—soon after S.B. 1 was enacted and went into effect. Due to changes in state laws that are adopted frequently across the country, this brief does not attempt to account for any subsequent changes that other states may have enacted to their election laws. S.B. 1 should not be measured against the moving target of other states' constantly evolving election laws, but rather against how other state laws addressed the issues raised by the complaints at the time S.B. 1 was enacted.

## ARGUMENT

**1.     The Court Should Consider Other States' Election Practices in Evaluating S.B. 1.**

The provisions of S.B. 1 that plaintiffs challenge do not exist in a vacuum. They are intricately interwoven parts of an election administration system carefully calibrated by the Texas legislature to protect the fundamental right to vote while ensuring integrity and uniformity in the process. The U.S. Constitution assigns this responsibility to the state legislature. U.S. CONST. art. I, § 4; *Cf. Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 29 (2020) ("The Constitution provides that state legislatures—not federal judges, not state judges, not state governors, not other state officials—bear primary responsibility for setting election rules.") (Gorsuch & Kavanaugh, JJ., concurring). Accordingly, "the legislature in each state of our federal system possesses the presumptive authority to regulate elections within that state's sovereign territory. This authority stems directly from . . . Article I Section 4 Clause 1 of the Constitution." *Libertarian Party of Virginia v. Alcorn*, 826 F.3d 708, 714 (4th Cir. 2016).

Moreover, the S.B. 1 provisions at issue are fully consistent with the election laws of states across the country. Courts often consider the experiences of other states and the election administration rules fashioned in response to those experiences as a relevant touchstone for judging the necessity and reasonableness of rules in a particular case. For example, in evaluating whether Indiana's voter identification law violated the Fourteenth Amendment, the U.S. Supreme Court surveyed the "different methods of identifying eligible voters at the polls" that states use and noted the "increasing number of States [that] have relied primarily on photo identification." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008); *see also id.* at 222-23 (Souter and Ginsburg, JJ., dissenting) (citing briefs comparing various other states' voter identification laws relative to Indiana's law and *Randall v. Sorrell*, 548 U.S. 230, 253 (2006), in

which the Court compared Vermont's campaign contribution limits with those in other states). Similarly, in evaluating whether Arizona's ban on voters voting outside of their precincts violated the Fifteenth Amendment and VRA Section 2, the Supreme Court looked to other states' election laws and determined that such bans were "widespread" across jurisdictions. *Brnovich v. Democratic National Committee*, 141 S. Ct. 2321, 2345 (2021) (citations omitted). The bottom line is that the procedures in existing use by other states directly support the viability of a state's newly enacted election procedures. And, as a practical matter, this Court could not hold Texas' new election rules unlawful without also casting doubt on the validity of the duly- enacted, longstanding election laws in scores of other states.

In connection with elections for federal office, the U.S. Constitution gives Congress *secondary* authority to "make or alter" the election laws which are, in the first instance, "prescribed in each State by the Legislature thereof." U.S. CONST. art. I, § 4, cl. 1. However, even under the VRA, courts are required to give great deference to election practices when they are used by multiple states. So while the LULAC and LUPE plaintiffs allege key provisions of S.B. 1 violate Section 2 of the VRA, LULAC Second Amend. Compl. Count I, LUPE Second Amend. Compl. Count IV, the widespread use of similar provisions in other states over many decades is support for their lawfulness.

In considering whether Arizona's regulation of absentee ballots violated the VRA, the U.S. Supreme Court recently observed:

> The burdens associated with the rules in widespread use when [Section 2] was adopted are therefore useful in gauging whether the burdens imposed by a challenged rule are sufficient to prevent voting from being equally "open" or furnishing an equal "opportunity" to vote in the sense meant by [Section 2]. Therefore, it is relevant that in 1982 [when Section 2 was last amended] States typically required nearly all voters to cast their ballots in person on election day and allowed only narrow and tightly defined categories of voters to cast absentee ballots.

*Brnovich*, 141 S. Ct. at 2338-39. Such "rules in widespread use" go a long way to showcase how S.B. 1's provisions are lawful under the VRA.

Plaintiffs also allege key provisions of S.B. 1 violate Section 208 of the VRA, LULAC Second Amend. Compl. Count IV, LUPE Second Amend. Compl. Count V, and the Fourteenth Amendment, LULAC Second Amend. Compl. Counts II & III, LUPE Second Amend. Compl. Count II. As the VRA's legislative history indicates, Section 208 was meant to "conform[] to the pattern already in use in many states" in regards to the voter assistance mechanisms the law prescribes. S. Rep. No. 97-417, at 63-64 (1982). And courts often have resolved Fourteenth Amendment claims by comparing a state's election laws to those of other states. *See, e.g., Crawford, supra.*

In sum, this Court should measure the challenged provisions of S.B. 1 against the election practices used in other states. As explained in more detail below, the Texas law is fully consistent with methods used by other states to administer their elections.

**2.      The Challenged S.B. 1 Provisions Are Fully Consistent With Other States' Laws.**

**2.1.      Voter ID Requirement (S.B. 1 § 5.02)**

The LULAC plaintiffs allege S.B. 1 impermissibly requires voters seeking to vote by absentee ballot to either: (i) provide their driver's license or personal identification card number, or the last four digits of their Social Security number; or (ii) declare that the voter has not been issued one of these numbers on their absentee ballot applications. LULAC Second Amend. Compl. ¶¶ 160, 163, 261, Prayer for Relief (c). The LULAC Complaint neglects to mention that S.B. 1 *also* permits a voter to use his or her election identification certificate number. *See* S.B. 1 § 5.02(a)(2)(A). The LULAC plaintiffs characterize the requirement of this common form of

voter information to facilitate the verification of a voter's identity as a "[su]ppressive." *Id.* ¶¶ 160, 163.

It is common practice for states to require voters requesting an absentee ballot to verify their application, such as by signing the application to be compared to the voter's signature on file or by providing identifying information. S.B. 1 requires voters who request an absentee ballot application to verify their application by providing valid identifying information, such as the voter's driver's license number, personal identification number, or the last four digits of their Social Security number. If the voter lacks all of these, S.B. 1 allows them to declare such on the application. Nine other states impose the same, substantially the same, or even stricter identification requirements for absentee/mail ballot applications:

- **Florida**, *see* FLA. STAT. § 101.62(1)(b); *see also League of Women Voters of Fla. v. Lee*, 595 F. Supp. 3d 1042, 1167-1169 (N.D. Fla. 2022) (upholding Florida's identification requirements for mail ballots), *aff'd in part, vacated in part, rev'd in part* on other grounds, *League of Women Voters of Fla. v. Fla. Sec'y of State*, 2023 WL 3108161 (11th Cir. 2023).

- **Georgia**, *see* GA. CODE § 21-2-381(a)(1)(C); Ga. Sec'y of State Application for Georgia Official Absentee Ballot;[2]

- **Iowa**, *see* IOWA CODE § 53.2(4);

- **Kansas**, *see* KAN. STAT. § 25-1122(c);

- **Minnesota**, *see* MINN. STAT. § 203B.04(1)(b);

- **North Carolina**, *see* N.C. GEN. STAT. § 163-230.2(a)(4);

---

[2] https://sos.ga.gov/sites/default/files/2022-03/Absentee_Ballot_Application_20212.pdf (last visited Apr. 28, 2023).

- **Ohio**, *see* OHIO REV. CODE § 3509.03(B)(5);

- **Virginia**, *see* VA. CODE § 24.2-701(C)(1); and

- **Wisconsin**, *see* WIS. STAT. § 6.86(1)(ac); Wis. Elections Comm'n, Wisconsin
  Application for Absentee Ballot (requiring copy of photo ID).[3]

Clearly, S.B. 1 did not set Texas outside common practice in terms of absentee ballot verification requirements. Requiring the voter to provide identifying information to verify their absentee ballot application is not a novel reform, and for this reason S.B. 1 is unremarkable.

Moreover, the standardized "federal post card application" used by military and overseas voters to request an absentee ballot requires each voter to provide his or her Social Security number or driver's license number or state identification number. As the federal instructions explain: "Most states allow you to provide a Driver's License number or the last 4 digits of your SSN. Some states require a full SSN." Federal Voting Assistance Program Federal Post Card Application, Standard Form 76 (2021).[4] S.B. 1 is less stringent than the federal application.

To credit the LULAC plaintiffs' allegation that Texas is engaging in voter "suppress[ion]" by requiring applicants to provide reasonable identifying information would be to conclude that several other states and the federal government are as well. While Texas's requirements exceed the strength of most states' verification requirements for absentee ballot applications, Texas's laws are still well within the norm to advance a widely recognized and important interest in protecting election integrity and fostering public trust in the voting process.

---

[3] https://elections.wi.gov/sites/default/files/legacy/2020-06/EL-121%2520Application%2520for%2520Absentee%2520Ballot%2520%2528rev.%25202020-06%2529.pdf (last visited Apr. 28, 2023).

[4] https://www.fvap.gov/uploads/FVAP/Forms/fpca.pdf (last visited Apr. 28, 2023).

### 2.2.  Unsolicited Absentee Ballot Applications (S.B. 1 § 7.04)

S.B. 1 § 7.04 prohibits election officials from sending unsolicited absentee ballot applications to voters, instead requiring voters to make affirmative requests to vote by absentee ballot. The LULAC plaintiffs challenge this provision. LULAC Second Amend. Compl. ¶¶ 160 (characterizing this as a "Suppressive Provision[]"), 162.

Significantly, for more than two hundred years absentee voting was deemed an exception to the general rule of in-person voting. *See* John C. Fortier & Norman J. Ornstein, *The Absentee Ballot and the Secret Ballot: Challenges for Election Reform*, 36 U. Mich. J.L. Reform 483 (2003). Historically, states experienced numerous problems with absentee voting due to the absence of secrecy, the abuse of absentee voting to commit fraud, and the disenfranchisement of voters due to lost absentee ballots (also known as the "leaky pipe"). *See* Charles Stewart III, *Losing Votes by Mail*, 13 N.Y.U. J. Legis. & Pub. Pol'y 573 (2012) ("[B]est evidence suggests that the pipeline that moves mail ballots between voters and election officials is very leaky."); *see also*, Hans A. von Spakovsky & J. Christian Adams, *America's Hidden Voting Epidemic? Mail Ballot Failures*, Heritage Foundation (Apr. 20, 2020).[5] Where absentee voting took hold, it was almost universally adopted for exceptional classes of voters who were required to submit an affirmative application. *See, e.g.,* PA. CONST. art. VII, § 14 (1985) (allowing electors who are absent for reasons of occupation, physical incapacity, religious observance, or Election Day duties to vote by mail). Yet other very practical problems with universal applications are voter confusion and the failure of some states to maintain accurate pollbooks. *See e.g.*, Andrew Moore, *Absentee Ballot Confusion | Why You're Still Receiving Applications After Voting*, KCENTV

---

[5] https://www.heritage.org/election-integrity/commentary/americas-hidden-voting-epidemic-mail-ballot-failures (last visited Apr. 28, 2023).

(Oct. 1, 2020);[6] Rory Appleton, *More than 223K Mailed Ballots Returned Undelivered in Primary*, Las Vegas Review–Journal (Aug. 14, 2020).[7]

Based on this history, it should come as little surprise that the laws in 33 other states do not authorize or contemplate election officials automatically sending unsolicited absentee/mail ballot applications to voters. *See* ALA. CODE § 17-11-3; ALASKA STAT. § 15.20.081; ARIZ. REV. STAT. § 16-542; CAL. ELEC. CODE § 3001 *et seq*.; CONN. GEN. STAT. § 9-140; 15 DEL. CODE § 5503; FLA. STAT. § 101.62; IDAHO CODE § 34-1002; 10 ILL. COMP. STAT. 5/19-2; IND. CODE § 3-11-4-2; KAN. STAT. § 25-1122; KY. REV. STAT. § 117.085; LA. REV. STAT. § 18:1307; MD. CODE, ELEC. LAW § 9-305; 54 MASS. GEN. LAWS § 89; MICH. COMP. LAWS § 168.759; MO. REV. STAT. § 115.279; MONT. CODE § 13-13-212; NEB. REV. STAT. § 32-941; NEV. REV. STAT. § 293.313; N.J. STAT. § 19:63-3; N.M. STAT. § 1-6-4; N.C. GEN. STAT. § 163-230.2; OHIO REV. CODE § 3509.03; 26 OKLA. STAT. § 14-105; 25 PA. STAT. § 3146.2; R.I. GEN. LAWS § 17-20-2.1; S.D. CODIFIED LAWS § 12-19-2; TENN. CODE § 2-6-202; 17 VT. STAT. § 2532; VA. CODE § 24.2-701; WIS. STAT. § 6.86; WYO. STAT. § 22-9-104.[8]

It is likely that these states' statutes do not explicitly prohibit this practice because legislators would not even have thought to address such an anomaly in statute prior to the 2020 elections, when this phenomenon first arose. *See Texas v. Hollins*, 620 S.W.3d 400, 403 (Tex.

---

[6] https://www.kcentv.com/article/news/local/absentee-ballot-confusion-why-youre-still-receiving-applications-after-voting/500-026338c2-5e88-48e6-abe7-5adb6000ef11 (last visited Apr. 28, 2023).

[7] https://www.reviewjournal.com/news/politics-and-government/clark-county/more-than-223k-mailed-ballots-returned-undelivered-in-primary-2095001/ (last visited Apr. 28, 2023).

[8] States with universal mail voting are excluded in this list since this issue does not apply to such states.

2020) (addressing this novel issue for the first time, the Texas Supreme Court held in a *per curiam* opinion, "We conclude that the Election Code does not authorize the mailing [of absentee ballot applications] proposed by the Harris County Clerk."); Emma Platoff, *Harris County Can't Send Mail-in Ballot Applications to All Registered Voters, Texas Supreme Court Rules*, The Texas Tribune (Oct. 7, 2020).[9] Even during the pandemic-driven extenuating circumstances of the 2020 elections, election officials in only 12 states automatically sent unsolicited absentee/mail ballot applications to voters. Nat'l Conference of State Legislatures, *Absentee and Mail Voting Policies in Effect for the 2020 Election* (Nov. 3, 2020);[10] *see also* Nat'l Assoc. of Sec'ys of State, *Early and Absentee Voting Information for the November 2020 General Election* (Sep. 30, 2020).[11]

Three states, other than Texas, explicitly prohibit election officials from automatically sending unsolicited absentee/mail ballot applications to voters. *See* ARK. CODE § 7-5-409(h); GA. CODE § 21-2-381(a)(1)(C)(ii); IOWA CODE § 53.2(1)(c).[12] Another seven states implicitly prohibit this practice by specifying that election officials may provide absentee ballot

---

[9] https://www.texastribune.org/2020/10/07/harris-county-mail-in-ballot-applications/ (last visited Apr. 28, 2023).

[10] https://web.archive.org/web/20230101032353/https://www.ncsl.org/research/elections-and-campaigns/absentee-and-mail-voting-policies-in-effect-for-the-2020-election.aspx (last visited Apr. 28, 2023).

[11] https://www.nass.org/sites/default/files/surveys/2020-09/nass-fact-sheet-early-absentee-voting-093020.pdf (last visited Apr. 28, 2023). The National Association of Secretaries of State chart only lists ten states as automatically sending out unsolicited absentee/mail ballot applications. This may be because the chart is dated September 30, 2020, and the National Conference of State Legislatures chart (listing 12 states) appears to be more updated.

[12] In Iowa, only "[i]n the event of a public health disaster declared by the governor . . . the general assembly may by resolution direct the state commissioner to send an absentee ballot application to each registered voter." *Id.* § 53.2(1)(d).

applications only in response to an affirmative request from the voter. *See* 21-A ME. REV. STAT. § 753-A(1) (providing for ballot applications "[o]n request"); MINN. STAT. § 203B.04(1)(a) (same); MISS. CODE § 23-15-627 ("absentee ballot applications shall be furnished to a person *only upon [] oral or written request*") (emphasis added); N.H. REV. STAT. § 657:6 ("An application form for an absentee ballot shall be mailed or delivered *to any person who applies therefor* to the secretary of state or to any town or city clerk.") (emphasis added); N.Y. ELEC. LAW § 8-400(2) (describing the "application for an absentee ballot" as "a form *to be obtained*" by the voter) (emphasis added); S.C. CODE § 7-15-330 ("To vote by absentee ballot, a qualified elector or a member of his immediate family *must request an application* to vote by absentee ballot . . .") (emphasis added); W. VA. CODE § 3-3-5(a) (authorizing election officials to provide absentee ballot applications "[u]pon oral or written request").

North Dakota appears to be *the only state* that statutorily authorizes election officials to "make available or distribute the applications [for an absentee ballot], prescribed by the secretary of state, to the public without any specific request being made for the applications." N.D. CENT. CODE § 16.1-07-07. If more state legislatures intended to authorize this practice, this type of explicit language would exist in other states' statutes, but it does not.

With the passage of S.B. 1, Texas remains well within the mainstream of the vast majority of states that do not statutorily authorize, or that prohibit, election officials to send unsolicited absentee ballot applications to voters without their request, leaving the decision in the hands of the voter who may request an absentee ballot if he or she so chooses.

Relatedly, the LULAC plaintiffs allege S.B. 1 impermissibly prohibits public resources from being used to subsidize private organizations' distribution of unsolicited absentee ballot applications. LULAC Second Amend. Compl. ¶ 162. As a preliminary and practical matter, this

restriction places no imposition at all on voters applying to vote by absentee ballot and private organizations such as the LULAC plaintiffs that seek to assist voters with such applications. Specifically, the law otherwise: (i) permits election officials to "provid[e] access to an application to vote by mail from a publicly accessible Internet website"; and (ii) does not prohibit private organizations from reproducing and distributing the application posted on an elections official's website. Preexisting Texas law also permits private organizations to reproduce absentee/mail ballot applications. In fact, Texas law specifies that "[a]n applicant is not required to use an official application form" at all to apply for an absentee/mail ballot. TEX. ELEC. CODE § 84.001(c). The only prohibition this S.B. 1 provision imposes is preventing election officials from doing indirectly, through private organizations, what they may not do directly.[13]

### 2.3.    Absentee Ballot Drop Boxes (S.B. 1 § 4.12)

S.B. 1 statutorily bars the use of unmanned drop boxes for the return of absentee ballots in Texas. The LULAC plaintiffs allege S.B. 1 "effectively eliminate[s] ballot drop boxes" by requiring voted absentee ballots to "be received by an election official at the time of delivery," LULAC Second Amend. Compl. ¶ 164, and that this impermissibly infringes on voting rights, *id*. ¶¶ 252 (characterizing this as a "Suppressive Provision[]"), 261.

---

[13] This Court had issued a preliminary injunction against the part of S.B. 1 Section 7.04 (codified at Tex. Election Code § 276.016(a)(1)) which prohibits election officials from actively *soliciting* voters to apply for mail ballots. Order, *Longoria v. Paxton*, No. 5:21-cv-01223-XR, (W.D. Tex. Feb. 11, 2022). That order was subsequently vacated by the U.S. Court of Appeals for the Fifth Circuit. *Longoria v. Paxton*, No. 22-50110, 2022 WL 2208519 (5th Cir. Jun., 21, 2022). Regardless, those rulings did not affect the rest of the S.B. 1 provision (codified at Tex. Election Code § 276.016(a)(2)-(4)) at issue here: Texas's prohibition against *sending out* unsolicited mail ballots, which is fully consistent with the election laws in other states.

### 2.3.1.  S.B. 1 did not "effectively eliminate[] ballot drop boxes;" rather, it responded to the changed circumstances of the pandemic by making the law's existing implicit prohibition explicit.

At the outset, the LULAC Complaint's claim that S.B. 1 "effectively" bans ballot drop boxes is not redressable: Even if this Court were to rule for LULAC on this point, that still would not permit ballot drop boxes because of another Texas Election Code provision that plaintiffs do not challenge. Indeed, prior to S.B. 1's enactment, Texas law already precluded the use of ballot drop boxes by requiring voters to return their voted absentee ballots in-person and to provide a form of voter identification—a process that is not possible using unmanned ballot drop boxes. *See* TEX. ELEC. CODE § 86.006(a-1); *see also* Jolie McCullough, *Texas Counties Will Be Allowed Only One Drop-Off Location for Mail-In Ballots, State Supreme Court Rules*, The Texas Tribune (Oct. 27, 2020)[14] ("*Texas does not have drop-off boxes for absentee ballots*, as do some other states. Instead, to drop off a mail-in ballot in person at any location, voters must present an approved form of identification to a poll worker . . . .") (emphasis added). Drop boxes were already effectively unlawful; S.B. 1 only made this explicit in response to local election officials who had attempted to use drop boxes for the first time early in the COVID-19 pandemic.

The LULAC complaint does not challenge Texas Election Code § 86.006(a-1), the Texas law effectively banning ballot drop boxes that predates S.B. 1. This Court is "bound by the allegations in the complaint, and [is] not free to speculate" about a claim not specifically made in the complaint. *Macias v. Raul A. (Unknown), Badge No. 153*, 23 F.3d 94, 97 (5th Cir. 1994). Therefore, plaintiffs' challenge to Section 4.12 of S.B. 1 should not be entertained because their claimed "injury [of not being able to deposit marked absentee ballot in drop boxes] will [not] be

---

[14] https://www.texastribune.org/2020/10/27/texas-voting-elections-mail-in-drop-off/ (last visited Apr. 28, 2023).

redressed by a favorable decision" (*i.e.*, a ruling that Section 4.12 is unlawful). *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 181 (2000).

### 2.3.2.   Texas law regarding ballot drop boxes is consistent with other states' election practices.

Even if S.B. 1's supposed effective ban on ballot drop boxes were redressable—it is not—states' use of drop boxes for absentee or mail-in ballots is a recent phenomenon. Pam Fessler, *Ballot Drop Boxes Become Latest Front In Voting Legal Fights*, NPR.org (Aug. 11, 2020)[15] ("In the [2016] presidential election, about 16% of voters nationwide used drop boxes, but they were concentrated in states such as Washington, Oregon and Colorado, where almost all voters cast absentee ballots."). It is illogical to assert that Texas is violating the VRA and the U.S. Constitution simply because it has not adopted a recent voting practice that only a minority of states have adopted. *Brnovich*, 141 S. Ct. at 2338-39 ("the degree to which a voting rule departs from what was standard practice when [VRA] § 2 was amended in 1982 is a relevant consideration . . . We doubt that Congress intended to uproot facially neutral time, place, and manner regulations that have a long pedigree or are in widespread use in the United States.").

Texas is far from alone; the laws in four other states effectively prohibit the use of absentee ballot drop boxes:

- **Alabama** requires absentee voters to "forward [their ballot] by United States mail to the absentee election manager *or hand it to him or her in person*" (emphasis added), ALA. CODE § 17-11-9.

---

[15] https://www.npr.org/2020/08/11/901066396/ballot-drop-boxes-become-latest-front-in-voting-legal-fights (last visited Apr. 28, 2023).

- **Mississippi** requires voted absentee ballots to be "deposit[ed] [] in the post office or some government receptacle provided *for deposit of mail* so that the absent elector's ballot will be *postmarked*." MISS. CODE § 23-15-631(1)(c) (emphasis added); *see also* Emily Wagster Pettus, *Mississippi Unlikely to Ease its Strict Election Laws*, Clarion-Ledger (Apr. 11, 2021)[16] ("Mississippi does not have drop boxes.").

- Similar to the Texas law that preexisted the enactment of S.B. 1, **Oklahoma** also requires voters returning their absentee ballots in person to "provide proof of identity" to election officials. 26 OKLA. STAT. § 14-108(C).

- **Tennessee** does not permit in-person delivery of absentee ballots, but rather provides that the "voter shall [] mail the ballot" and that election officials shall process ballots upon "receipt by mail of the absentee ballot." TENN. CODE § 2-6-202(e), (g); *see also* Tenn. Sec'y of State, Guide to Absentee Voting[17] ("You must return your ballot by mail (USPS, FedEx, UPS, etc.). Hand delivery or handing it to a poll worker during early voting or on Election Day is not permitted.").

Beyond these states, the laws in 23 other states do not statutorily authorize the use of absentee ballot drop boxes. *See* ALASKA STAT. §§ 15.20.061, 15.20.081(e); ARIZ. REV. STAT. § 16-548(A); ARK. CODE § 7-5-411; 15 DEL. CODE § 5507; IDAHO CODE § 34-1005(1); LA. REV. STAT. § 18:1308(B);[18] MD. CODE, ELEC. LAW § 9-309, MD. CODE REGS. § 33.11.03.03, Md. Bd.

---

[16] https://www.clarionledger.com/story/news/politics/2021/04/12/mississippi-strict-election-laws-early-voting-absentee-ballots-analysis/7164366002/ (last visited Apr. 28, 2023).

[17] https://sos.tn.gov/elections/guides/guide-to-absentee-voting (last visited Apr. 28, 2023).

[18] Louisiana effectively prohibits drop boxes for absentee ballots being hand delivered by someone other than the voter, the U.S. Postal Service, or commercial courier. Under such circumstances, "the registrar shall require that the person making such delivery sign a statement,

of Elections, *Instructions for Voting by Mail*;[19] Mo. Rev. Stat. § 115.291(2); Mont. Code § 13-13-201(2)(e); Neb. Rev. Stat. § 32-949(2)(e); N.H. Rev. Stat. § 657:17(I); N.Y. Elec. Law § 8-410; N.C. Gen. Stat. § 163-231(b), (c); N.D. Cent. Code § 16.1-07-09; Ohio Rev. Code § 3509.05(A); Or. Rev. Stat. § 254.470(6)(b); 25 Pa.Stat. § 3146.6a(a); R.I. Gen. Laws § 17-20-23(c); S.C. Code § 7-15-385; S.D. Codified Laws § 12-19-7; W. Va. Code § 3-3-5(f); Wis. Stat. § 6.87(4)(b)(1); Wyo. Stat. § 22-9-113.

Insofar as some of the above-mentioned 23 states may have implemented ballot drop boxes in practice, they are operating under "ambiguous" statutes, with "competing interpretations . . . on this issue [being] reasonable." *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d 345, 360 (Pa. 2020). In *Boockvar*, the Pennsylvania Supreme Court ultimately concluded the Pennsylvania statute permitting voters to "deliver [their mail ballots] in person to [the] county board of election" authorized the use of drop boxes, but only in light of the legislative intent underlying the broader bill enacting this provision into law, which was "to provide electors with options to vote outside of traditional polling places." *Id.* at 361. But as explained above (at 13-14), there is no general mandate under the U.S. Constitution or the VRA for Texas or any other state to provide for voting in this manner. Therefore, even if the Pennsylvania Supreme Court's construction of a Pennsylvania law were controlling on this issue (it is not), absent the particular circumstances in *Boockvar*, these other states are free to ban the use of ballot drop boxes in light of their statutes' silence on this issue. *See*, *e.g.*, *Teigen v.*

---

prepared by the secretary of state, certifying that he has the authorization and consent of the voter to hand deliver the marked ballot." La. Rev. Stat. § 18:1308(B).

[19] https://elections.maryland.gov/elections/2020/20_PP_AB_Instructions%20for%20Mailed%20Ballots_VBM%20ONLY_ENGLISH_FINAL.pdf (last visited Apr. 28, 2023).

*Wisconsin Elections Comm'n*, 976 N.W.2d 519, 525 (Wis. 2022) (holding that "ballot drop boxes are illegal under Wisconsin statutes" where the statute does not specifically authorize their use).

The laws in 22 other states currently authorize ballot drop boxes in statute, and many of these states only did so very recently. *See* CAL. ELEC. CODE § 3025; COLO. REV. STAT. § 1-7.5-107(4)(b)(i)(a); CONN. GEN. STAT. § 9-140b(c); FLA. STAT. § 101.69(2)(a); GA. CODE § 21-2-382; HAW. REV. STAT. § 11-109(d); 10 ILL. COMP. STAT. 5/19-6; IND. CODE § 3-11-10-24(f)-(h); IOWA CODE 53.17(1)(c); KAN. STAT. § 25-1124(a); KY. REV. STAT. § 117.086; 21-A Me. Rev. Stat. § 754-A(D); 54 Mass. Gen. Laws § 92(a); MICH. COMP. LAWS § 168.761d; MINN. STAT. § 203B.082; NEV. REV. STAT. § 293.8861; N.J. REV. STAT. § 19:63-16.1; N.M. STAT. § 1-6-9(E); UTAH CODE § 20A-3a-204(1)(e)(iv)(B); 17 Vt. Stat. § 2543a; VA. CODE § 24.2-707.1; WASH. REV. CODE § 29A.40.170.

Significantly, absentee voters in Texas may still return their ballots by dropping them off at their polling locations or by returning their ballots via U.S. mail or commercial carrier so long as their ballots arrive before the close of polls on Election Day. *See* TEX. ELEC. CODE § 86.006. In sum, S.B. 1's requirement that voters return voted early ballots to an election official, rather than to unmanned drop boxes, is within the mainstream of election administration practices that states have used for many decades.

### 2.4.    "Vote Harvesting" (S.B. 1 § 7.04)

S.B. 1 prohibits paid political operatives from influencing voters and returning absentee ballots for voters because such practices can subject voters to undue influence and ballots to tampering. Plaintiffs challenge the provision prohibiting voter influence. LULAC Second Amend. Compl. Count III, LUPE Second Amend. Compl. ¶ 137-143. Again, the Texas law is consistent with the laws in several other states.

As a preliminary matter, plaintiffs misconstrue the scope of S.B. 1's anti-vote-harvesting provisions by presenting hypotheticals that are contradicted on the face of the statute, claiming that S.B. 1 would "*chill*" or "*deter*" activities such as:

- "Answering a voter's question about a candidate, handing a voter a sample ballot, discussing the merits of a candidate or ballot measure, or simply telling a voter where to park when they arrive to drop off their ballot . . . if a ballot is nearby," LULAC Second Amend. Compl. ¶ 281;

- "voter education and [get out the vote] efforts," *id*. ¶ 283; or

- "a paid campaign worker for a local school bond issue [who] encourages her husband during dinner to support the local school bond issue when he casts his mail ballot while the mail ballot happens to be in the same room," LUPE Second Amend. Compl. ¶ 142.

Notably, plaintiffs do not claim that S.B. 1 would actually prohibit these activities, nor could they. Indeed, on its face, S.B. 1 only prohibits individuals and organizations from providing or receiving "compensation or other benefit" for "in-person interaction" with voters "in the physical presence of an official ballot or a ballot voted by mail, *intended to deliver votes for a specific candidate or measure*" (defined as "vote harvesting services"). S.B. 1 § 7.04 (codified at TEX. ELEC. CODE § 276.015(b), (c)) (emphasis added). In addition, S.B. 1 prohibits "knowingly collect[ing] or posess[ing] a mail ballot or official carrier envelope in connection with vote harvesting services"—a provision which plaintiffs do not appear to challenge. *See id.* (codified at TEX. ELEC. CODE § 276.015(d)).

Stated in plain English, these provisions prohibit individuals being paid to: (i) influence voters into voting a certain way while they are voting their mail ballots (*i.e.*, "interactions that []

directly involve an official ballot or ballot by mail"); and (ii) collecting or delivering completed ballots on behalf of specific candidates or measures. Activities outside of this narrow limitation are permissible under the law. Tellingly, plaintiffs' submissions ignore the fact that S.B. 1's anti-vote-harvesting provisions expressly *do not* apply to any "interactions that do not *directly* involve an official ballot or ballot by mail." *See* TEX. ELEC. CODE § 276.015(e)(3) (emphasis added). Thus, S.B. 1 is entirely consistent with other state laws that address voter coercion in the absentee voting process.

Twelve other states specifically prohibit attempts to influence voters while they are marking their absentee/mail ballots, including several that use statutory language similar to the S.B. 1 language challenged here:

- **Indiana** prohibits any person from "electioneering (as defined in [Ind. Code §] 3-14-3-16) in the presence of a voter whom the person knows possesses an absentee ballot." IND. CODE § 3-11-10-2(b).[20]

- **Maine** provides that, "While the voter is marking the ballot, there may be no communication between the voter and any other individual as to the person or question for which the voter is to vote." 21-A Me. Rev. Stat. § 754-A(B).

---

[20] "Electioneering" includes "making a verbal statement, displaying a written statement indicating support or opposition to a candidate, political party, or public question appearing on the ballot." *Id*. § 3-14-3-16.

- **Maryland** prohibits anyone assisting a voter in voting an absentee ballot from trying to "influence [the voter's] choices." Md. Bd. of Elections, *Mail-in Voting: Information and Instructions for the 2022 Elections* ("Can I have help voting?").[21]

- **Mississippi** prohibits any person witnessing an absentee ballot from "solicit[ing] or advis[ing] [the voter] to vote for any candidate, question or issue." MISS. CODE § 23-15-635(1).

- **Missouri** prohibits "any person who assists a voter [from] in any manner coerc[ing] or initiat[ing] a request or a suggestion that the voter vote for or against or refrain from voting on any question, ticket or candidate." MO. REV. CODE § 115.291(1).

- **Michigan** makes it illegal for "an individual who is assisting an absent voter in marking the ballot to suggest or in any manner attempt to influence the absent voter on how he or she should vote." MICH. COMP. LAWS § 168.764a.

- **New Jersey** prohibits any person from "campaign[ing] or electioneer[ing] on behalf of any candidate" while assisting a voter with voting an absentee ballot. N.J. REV. STAT. § 19:63-16(c).

- **Rhode Island** provides that "witnesses shall hold no communication with the voter, nor the voter with the [] witnesses, as to how the voter is to vote." R.I. GEN. LAWS § 17-20-23(c).

- **South Dakota** provides that those assisting voters with their absentee ballots may not "in the presence of the voter at or before the time of voting, display campaign posters,

---

[21] https://elections.maryland.gov/voting/absentee.html (last visited Apr. 28, 2023). These instructions have the force of law. *See* Md. Code, Election Law, § 9-309, Code of Md. Admin. Regs. § 33.11.03.03.

signs, or other campaign materials or by any like means solicit any votes for or against any person, political party, or position on a question submitted." S.D. CODIFIED LAWS § 12-19-7.2.

- **Utah** provides that those assisting voters with their absentee ballots "may not request, persuade, or otherwise induce the voter to vote for or vote against any particular candidate or issue or release any information regarding the voter's selection." UTAH CODE § 20A-3a-208(3).

- **West Virginia** provides that those assisting voters with their absentee ballots shall "not in any manner request, seek to persuade, or induce the voter to vote any particular ticket or for any particular candidate or for or against any public question." W. VA. CODE § 3-3-6(c).

- **Wisconsin** provides that witnesses may "not solicit or advise the elector to vote for or against any candidate or measure." WIS. STAT. § 6.87(2).

*All* states prohibit, in some form, interference with voters' ability to vote in peace and free from electioneering in the polling place, and such laws have been upheld against the type of First and Fourteenth Amendment claims that the LUPE and LULAC plaintiffs raise against S.B. 1. *See* Nat'l Conference of State Legislatures, *Electioneering Prohibitions* (Apr. 1, 2021);[22] *see also Burson v. Freeman*, 504 U.S. 191 (1992). Texas and the states noted above simply take such voter protection laws and extend them to the mail-ballot context. S.B. 1 puts Texas among the numerous other states that place commonsense limitations on certain particularly invasive types of absentee ballot assistance to prevent improper voter manipulation. To conclude that S.B. 1 is

---

[22] https://www.ncsl.org/research/elections-and-campaigns/electioneering.aspx (last visited Apr. 28, 2023).

violating voters' rights via this voter protection provision is to conclude that all of these other states are as well.[23]

### 2.5.   Prohibition of 24-Hour Early In-Person Voting (S.B. 1 §§ 3.09, 3.10)[24]

S.B. 1 establishes uniform hours for early in-person voting: *6:00 am to 10:00 pm and 9:00 a.m. to 10:00 p.m. on Sundays*. The LULAC plaintiffs claim these hours are unlawfully restrictive. LULAC Second Amend. Compl. ¶¶ 10 (characterizing this as a "Suppressive Provision"), 177-184, 252.

The Texas legislature's provision for 16 hours a day of early voting (13 hours on Sundays) is indeed an outlier, but not in a way that helps plaintiffs' argument. Five states do not even allow all voters to vote early in person, including Alabama, Connecticut, Mississippi, Missouri and New Hampshire. *See* Nat'l Conference of State Legislatures, *Early In-Person*

---

[23] As noted above, the LUPE and LULAC plaintiffs do not appear to challenge S.B. 1's anti-vote-harvesting provision that applies to the physical collection of absentee ballots. However, even if the Court were to construe the complaints to cover that provision, here too, S.B. 1 is entirely consistent with other states' laws (many of which are even more restrictive)— including the Arizona statute upheld by the Supreme Court. *See Brnovich*, 141 S. Ct. at 2346-48; ALA. CODE § 17-11-9; TENN. CODE § 2-6-202(e), (g); ARK. CODE § 7-5-403(a)(4), (6); CAL. ELEC. CODE § 3017(e)(1); COLO. REV. STAT. § 1-7.5-107(b)(I)(B); CONN. GEN. STAT. § 9-140b(a), (b); GA. CODE § 21-2-385(a); 10 ILL. COMP. STAT. 5/9-6; IND. CODE § 3-11-10-1(6); IOWA CODE § 53.33(2), (7); KAN. STAT. § 25-1128(g); KY. REV. STAT. § 117.0861; LA. REV. STAT. § 18:1308(B); 21-A ME. REV. STAT. § 753-B; MD. CODE, ELEC. LAW § 9-307; 54 MASS. GEN. LAWS § 92(a); MICH. COMP. LAWS § 168.764a; MINN. STAT. § 203B.08(1)(b); MISS. CODE § 23-15-631(1)(c); MO. REV. CODE § 115.291(2); NEV. REV. STAT. § 293.353(c); N.H. REV. STAT. § 657:17; N.J. REV. STAT. § 19:63-16(d)(3); N.M. STAT. § 1-6-10.1; N.C. GEN. STAT. § 163-226.3(a)(5); OHIO REV. CODE § 3509.05(A); 26 OKLA. STAT. § 14-101.1; OR. REV. STAT. § 260.695 (13), (14); S.C. CODE § 7-15-385; S.D. CODIFIED LAWS § 12-19-2.2; 17 Vt. Stat. § 2543(f); VA. CODE § 24.2-707(B); W. VA. CODE § 3-3-5(k).

[24] The LUPE plaintiffs voluntarily dismissed their claims regarding these S.B. 1 provisions. ECF No. 613.

*Voting* (May 23, 2022).[25] Of the 45 states that provide for early voting, ten specify the hours that in-person voting is available during the early voting period—many of which are nowhere near as lengthy as what Texas provides, and some of which do not even provide for Sunday voting:

- **Alaska** makes early in-person voting available only during election officials' "business hours" Monday through Friday, between 10:00 a.m. and 4:00 p.m. on Saturdays, and between noon and 4:00 p.m. on Sundays. 6 Alaska Admin. Code § 25.500.

- **Florida** makes early in-person voting available for no more than 12 hours per day. FLA. STAT. § 101.657(1)(d).

- **Louisiana** makes early in-person voting available only during "regular hours from 8:30 a.m. to 6:00 p.m. Monday through Saturday." LA. STAT. § 18:1309(A)(2).

- **Maryland** makes early in-person voting available only "during the hours between 7 a.m. and 8 p.m. each early voting day." MD. CODE, ELEC. LAW § 10-301.1(d)(2).

- **New Mexico** makes early in-person voting available only "during the regular hours and days of business at the county clerk's office and from 10:00 a.m. to 6:00 p.m. on the Saturday immediately prior to the date of the election." N.M. STAT. § 1-6-5.7(A). Moreover, "alternative" early voting locations "*shall* open *no earlier than* 7:00 a.m. and *shall* close *no later than* 9:00 p.m." *Id*. § 1-6-5.7(B)(2) (emphasis added).

- **Oklahoma** makes early in-person voting available only from:

   a. 8 a.m. to 6 p.m. on the Thursday and Friday immediately preceding any election conducted by a county election board,

---

[25] https://www.ncsl.org/research/elections-and-campaigns/early-voting-in-state-elections.aspx (last visited Apr. 28, 2023).

    b.  8 a.m. to 2 p.m. on the Saturday immediately preceding a General Election, Primary Election, Runoff Primary Election or Presidential Preferential Primary Election . . . , and

    c.  8 a.m. to 6 p.m. on the Wednesday immediately preceding a General Election . . . .

26 OKLA. STAT. § 14-115.4(A)(1).

- **South Dakota** makes early in-person voting available only "during [elections officials'] regular office hours up to 5:00 p.m. on the day before the election." S.D. CODIFIED LAWS § 12-19-2.1.

- **Tennessee** makes early in-person voting available generally only for "a minimum of three (3) consecutive hours each weekday including Saturdays *between the hours of eight o'clock a.m. (8:00 a.m.) and six o'clock p.m. (6:00 p.m.)*." TENN. CODE § 2-6-103(a)(1) (emphasis added). For certain elections, the county elections office also "shall remain open *between four-thirty p.m. (4:30 p.m.) and seven o'clock p.m. (7:00 p.m.)*, and on at least one (1) Saturday during the same period the office shall be open *from eight o'clock a.m. (8:00 a.m.) to four o'clock p.m. (4:00 p.m.)*" for early in-person voting. *Id.* § 2-6-103(b)(1) (emphasis added).

- **Virginia** makes early in-person voting available only "during regular business hours" of election officials and for "a minimum of eight hours between the hours of 8:00 a.m. and 5:00 p.m. on the first and second Saturday immediately preceding all elections." VA. CODE § 24.2-701.1(B).

- **West Virginia** makes early in-person voting available "during regular business hours" of elections officials and "from 9:00 a.m. to 5:00 p.m. on Saturdays." W. VA. CODE § 3-3-3(a).

Thus, S.B. 1 affords comparatively generous early voting hours and ranks among the most liberal in the country. *See* Nat'l Conference of State Legislatures, *State Laws Governing Early Voting* (May 23, 2022).[26] It cannot be that Texas is violating the Constitution simply by specifying the hours early in-person voting is available. If Texas is somehow infringing on voters' rights by not allowing 24-hour early in-person voting, then almost every other state is also infringing on voters' rights.

### 2.6.    Elimination of Drive-Thru Voting (S.B. 1 §§ 3.04, 3.12, 3.13)[27]

S.B. 1 bars election officials from offering drive-thru voting, which is where voters drive through a parking lot at a polling location and cast their ballots from their cars. Because drive-thru voting undermines the security of elections, Texas banned this exceedingly rare procedure. The LULAC plaintiffs claim that this provision unlawfully suppresses the franchise. LULAC Second Amend. Compl. ¶¶ 10 (characterizing these as "Suppressive Provisions"), 160 (same), 252, and Prayer for Relief (a), (e). However, there exists no basis for alleging a legal and constitutional right to vote by exotic procedures that few other states have used, and only in extenuating circumstances.

It is important to note at the outset that S.B. 1 does not restrict "curbside voting," a common practice available under preexisting Texas law and which S.B. 1 did not disturb. "Curbside voting" remains available to any "voter [who] is physically unable to enter the polling place without personal assistance or likelihood of injuring the voter's health." *See* Tex. Elec.

---

[26] https://www.ncsl.org/research/elections-and-campaigns/early-voting-in-state-elections.aspx (last visited Apr. 28, 2023).

[27] The LUPE plaintiffs voluntarily dismissed their claims regarding these S.B. 1 provisions. ECF No. 613.

Code § 64.009(a); Tex. Atty. Gen., *Elections Guidance Letter on Drive-Thru Voting* (Oct. 16, 2020);[28] *see also* S.B. 1 § 6.01.

The LULAC plaintiffs allege that it violates the Constitution and the VRA if voters cannot, by right, vote in the same manner that they get their fast food—*i.e.*, by a drive-thru counter. However, as press reports indicate, far from being a constitutional right, drive-thru voting is an exceedingly unusual voting practice that was improvised during the extenuating pandemic-driven circumstances of the 2020 elections in only a handful of states. *See* Audrey Conklin, *Drive-Thru Voting, Ballot Drop-Offs Pop Up in Minnesota, Texas, Other States*, FoxNews.com (Oct. 4, 2020);[29] Meredith Deliso, *Drive-Thru Voting, Wait-Time Technology and More Safety Measures at the Polls this Election*, ABCNews.com (Oct. 24, 2020).[30] Moreover, in several of those states, drive-thru voting was not implemented at a statewide level, creating disparate early voting procedures across the state. *Id.*

It is also important to note that plaintiffs do not challenge S.B. 1's restriction on drive-thru voting only in the existence of a public health crisis. Plaintiffs categorically challenge Texas's restriction of drive-thru voting under *any* circumstance. Surely, banning a voting method that few other states have ever used—and, even then, only under extenuating circumstances—cannot put Texas outside of the mainstream on this issue, nor can a right to drive-thru voting be found under federal law or the Constitution, as plaintiffs allege.

---

[28] https://www.texasattorneygeneral.gov/news/releases/elections-guidance-letter-drive-thru-voting (last visited Apr. 28, 2023).

[29] https://www.foxnews.com/politics/drive-thru-voting-ballot-drop-offs (last visited Apr. 28, 2023).

[30] https://abcnews.go.com/Politics/drive-voting-wait-time-technology-safety-measures-polls/story?id=73694980 (last visited Apr. 28, 2023).

**2.7.    Expanded Protections for Poll Watchers (S.B. 1 §§ 4.06, 4.07, 4.09)[31]**

S.B. 1 established commonsense protections for poll watchers by creating penalties for election officials who wrongly and intentionally interfere with a poll watcher's lawful efforts to observe the process freely and fairly and report any irregularities. The plaintiffs allege that this provision:

- Impermissibly "criminalizes election officers' intentional or knowing refusal to accept [poll watchers] for service, and further criminalizes any action taken 'to obstruct the view of a watcher or distance the watcher from the activity or procedure to be observed in a manner that would make observation not reasonably effective," LULAC Second Amend. Compl. ¶¶ 186, 160, 252, 261, 270, 271, Prayer for Relief (a), (c), (e), (g);

- Creates an "unconstitutionally vague" standard of prohibiting elections workers from taking any action that makes poll watchers' "observation not reasonably effective," LUPE Second Amend. Compl. ¶¶ 127, 301-309, and impermissibly gives poll watchers "'free movement' within polling places," LULAC Second Amend. Compl. ¶¶ 186, 252, 261, 270, 271, Prayer for Relief (a), (c), (e), (g); *see also* LUPE Second Amend. Compl. ¶¶ 122, 218, 219, 222, 231, 243, 256; and

- Impermissibly allows poll watchers to report to election officials "any observed or suspected irregularity or violation of the law in the conduct of the election" without such reports "be[ing] tethered to what Texas law actually permits or prohibits,"

---

[31] The LUPE plaintiffs voluntarily dismissed most of their claims regarding these S.B. 1 provisions, except their allegation that Section 4.07 is unconstitutionally vague. ECF No. 613.

LULAC Second Amend. Compl. ¶¶ 188, 160, 252, 261, 270, 271, Prayer for Relief (a), (c), (e), (g).

Here, too, the S.B. 1 provisions are fully consistent with election laws in numerous other states.

### 2.7.1.   *Criminalizing improper rejection of and interference with poll watchers*

Like Texas, a number of other states prescribe criminal penalties for officials who improperly reject and/or interfere with poll watchers' ability to observe the voting process, many of which have even harsher criminal penalties than the misdemeanor liability S.B. 1 imposed. *See* S.B. 1 §§ 4.06 (codified at TEX. ELEC. CODE § 33.051(g)), 4.09 (codified at *id.* § 33.061(b)).

- **Indiana** makes it a Level 6 felony for election officials and workers to "knowingly: (1) interfere[] with a watcher; [or] (2) prevent[] a watcher from performing the watcher's duties." IND. CODE § 3-14-3-3.

- **Kentucky** makes it a Class A misdemeanor for election officials to refuse to allow poll watchers to "exercise free and full action" or "to have a free and full opportunity to witness the count of the ballots." KY. REV. STAT. § 119.225.

- **New Mexico** makes it a "petty misdemeanor" for "denying a watcher or an election observer, who has presented a written appointment to the precinct board and who is not interfering with the orderly conduct of the election, the right to be present at the polling place or denying a watcher or election observer the right to witness the precinct board in the conduct of its duties." N.M. STAT. § 1-2-30.

- **New York** makes it a felony for "[a]ny election officer who wilfully refuses to accord to any duly accredited watcher . . . any right given him by [law]." N.Y. ELEC. LAW § 17-106.

- **North Dakota** makes it a Class A misdemeanor for anyone, "whether or not acting under color of law," to "intentionally . . . interfere[] with" anyone "acting as" a poll watcher. N.D. CENT. CODE § 12.1-14-02.

- **Pennsylvania** makes it a misdemeanor for "[a]ny member of a county board of elections, judge of election or inspector of election [to] refuse to permit any . . . [poll] watcher" to perform the poll watcher's duties. 25 PA. STAT. § 3506.

Clearly, S.B. 1 does not make Texas an outlier on this issue, and as states move to bolster the transparency of their elections, more states will likely follow this same approach to ensure election officials act fairly.

### 2.7.2. Giving poll watchers "reasonably effective" access and "free movement"

S.B. 1's granting poll watchers free and fair movement to reasonably observe the voting process to ensure integrity and transparency also is not an uncommon license. Like Texas, a number of other states prescribe comparable standards for the level of access that poll watchers are to be given at polling locations:

- **Kentucky**, as noted above, broadly allows poll watchers to "exercise *free and full action*" and "to have a *free and full opportunity* to witness the count of the ballots." KY. REV. STAT. § 119.225 (emphasis added).

- **Colorado** requires election officials to give poll watchers "personal visual access at a *reasonable proximity* to read documents, writings or electronic screens and reasonable proximity to hear election-related discussions between election judges and electors." COLO. CODE REGS. § 8.10.2 (emphasis added).

- **Florida** permits poll watchers to approach voting officials and voting booths as "is *reasonably necessary* to properly perform [their] functions." FLA. STAT. § 101.131(1) (emphasis added).

- **Illinois** permits poll watchers to "view all *reasonably* requested records relating to the conduct of the election." 10 ILL. COMP. STAT. 5/17-23 (emphasis added).

- **Louisiana** broadly provides that "[a] watcher shall be admitted within *all parts* of the polling place during the election day." LA. STAT. § 18:427 (emphasis added).

- **Ohio** broadly provides that poll watchers are "permitted to be *in and about* the applicable polling place during the casting of the ballots and shall be permitted to watch every proceeding of the precinct election officials from the time of the opening until the closing of the polls." OHIO REV. CODE § 3505.21(C) (emphasis added). As the Ohio Secretary of State explains, this statute means that poll watchers "are permitted *to move freely* about the polling location or any area where ballots are being cast, processed, counted, or recounted at a board of elections office." Ohio Sec'y of State, *Election Official Manual* (Aug. 6, 2019)[32] at 7-18 (emphasis added).

- In **Tennessee**, "[p]oll watchers may be present during all proceedings at the polling place governed by this chapter. They may watch and inspect the performance *in and around the polling place* of all duties." TENN. CODE § 2-7-104(c) (emphasis added).

These several states prescribe parameters similar to S.B. 1 and show the degree to which S.B. 1 protects a reasonable grant of access for poll watchers.

---

[32] https://www.ohiosos.gov/globalassets/elections/directives/2019/dir2019-11_eom.pdf (last visited Apr. 28, 2023).

### 2.7.3.  *Providing for poll watchers to report any voting "irregularity"*

S.B. 1 provides for poll watchers to report any voting irregularities and violations of the law to election officials. Like S.B. 1, many other states permit poll watchers to report voting irregularities as well as legal violations:

- **Arkansas** – Arkansas permits any poll watcher to "[c]all to the attention of the election sheriff any occurrence *believed to be an irregularity* or violation of election law." ARK. CODE § 7-5-312(e) (emphasis added).

- **Illinois** – Poll watchers in Illinois may "call to the attention of the judges of election any *incorrect procedure* or apparent violations of this Code." 10 ILL. COMP. STAT. 5/17-23 (emphasis added).

- **Iowa** – Iowa permits poll watchers to "[r]eport *perceived problems* in the precinct to the county auditor." Iowa Sec'y of State, *Poll Watchers Guide* (rev. Jan. 2018)[33] at 3 (emphasis added).

- **Missouri** – In Missouri, "[w]atchers are to observe the counting of the votes and present *any complaint of irregularity* or law violation to the election judges." MO. REV. STAT. § 115.107(2) (emphasis added).

It cannot be said that S.B. 1 allowing poll watchers to report both irregularities and actual violations of the law is terribly uncommon. While only a handful of states express this in statute, the ability of poll watchers to report administrative irregularities is not so far outside of the norm as to make S.B. 1 an unreasonable outlier. Furthermore, there are compelling public policy

---

[33] https://sos.iowa.gov/elections/pdf/pollwatcherguidebook.pdf (last visited Apr. 28, 2023).

reasons to statutorily permit poll watchers to report irregularities and not just violations of the law.

### 2.8.    Disclosure and Oath Requirement for Providing Voting Assistance (S.B. 1 §§ 6.03, 6.04)

Plaintiffs allege S.B. 1 impermissibly:

- "requires assistors to fill out a form stating the assistor's 'relationship to the voter,' and whether the assistor 'received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee,'" LUPE Second Amend. Compl. ¶ 112; *see also id.* ¶¶ 219, 222, 243, 255, 267, 270, 273, 281, 311, 312; LULAC Second Amend. Compl. ¶¶ 172, 160, 252, 261, 270, 271, Prayer for Relief (a), (c), (e), (g); and

- requires assistants to sign an oath "'under penalty of perjury'" that "they will confine their assistance to 'reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot," that "they did not 'pressure' the voter to choose them as the assistor," and that "the voter 'represented to [them] they are eligible to receive assistance.'" LUPE Second Amend. Compl. ¶¶ 108-111 (brackets in the original); LULAC Second Amend. Compl. ¶ 173; *see also* LUPE Second Amend. Compl. ¶¶ 219, 222, 243, 255, 267, 270, 273, 281, 311, 312; LULAC Second Amend. Compl. ¶¶ 160, 252, 261, 270, 271, Prayer for Relief (a), (c), (e), (g).

S.B. 1 enacted commonsense requirements for those who assist voters casting their ballots at a polling location to prevent undue influence and coercion and to maintain the secrecy of the ballot box. Here, once again, S.B. 1 is consistent with the laws in many other states:

- **Arkansas** provides that a voter's assistant "may assist the voter in marking and casting the ballot according to the wishes of the voter *without comment or interpretation*." ARK. CODE § 7-5-310(b)(3), (4)(A)(i) (emphasis added).

- **Colorado** requires a voter's assistant to sign the following "self-affirmation form" under penalty of perjury:

  > I, ...................., certify that I am the individual chosen by the elector to assist the elector in casting a ballot. I further certify that I will not in any way attempt to persuade or induce the elector to vote in a particular manner, nor will I cast the elector's vote other than as directed by the elector I am assisting.

  COLO. REV. STAT. §§ 1-7-111(b), 1-13-104.

- **Florida** requires a voter's assistant to sign the following oath:

  > I, (Print name), have been requested by (print name of elector needing assistance) to provide him or her with assistance to vote. I swear or affirm that I am not the employer, an agent of the employer, or an officer or agent of the union of the voter and that I have not solicited this voter at the polling place or early voting site or within 100 feet of such locations in an effort to provide assistance.

  FLA. STAT. § 101.051(5). "A[ny] person who willfully swears or affirms falsely to" this oath is guilty of a third-degree felony. *Id.* § 104.011(1).

- **Illinois** requires a voter's assistant to "sign an oath, swearing not to influence the voter's choice of candidates, party, or votes in relation to any question on the ballot and to cast the ballot as directed by the voter. The oath shall be prescribed by the State Board of Elections and shall include the penalty for violating this Section. In the voting booth, such person shall mark the ballot as directed by the voter, and *shall thereafter give no information regarding the same.*" 10 ILL. COMP. STAT. 5/17-14 (emphasis added).

33

- **Indiana** requires a voter's assistant to "execute a sworn affidavit" stating that the voter "(1) is a voter with disabilities or is unable to read or write English; and (2) has requested the designated person to assist the voter in voting under this section." IND. CODE § 3-11-9-2(b).

- **Kentucky** requires a voter's assistant to be sworn in by the precinct election clerk "to complete the ballot in accordance with the directions of the voter." KY. REV. STAT. § 117.255(4).

- **Nebraska** requires a voter's assistant to sign the following oath:

  ...., hereby swears that he or she is a friend or relative of ...., a disabled registered voter who requested assistance in casting the ballot, that he or she did enter the voting booth or aid such voter outside of the voting booth and marked the ballot according to the intentions and desires of the registered voter, that he or she has kept the ballot at all times in his or her possession, and that the ballot was duly delivered to the judge of election on this .... day of .... 20 .....

  NEB. REV. STAT. § 32-918(3).

- **New Hampshire** provides that a voter's assistant "shall be sworn, shall mark the ballot as directed by said voter, and *shall thereafter give no information regarding the same*." N.H. REV. STAT. § 659:20 (emphasis added).

- **New York** provides that a voter's assistant:

  shall make an oath before entering the booth that he will not in any manner request, or seek to persuade or induce the voter to vote any particular ticket or for any particular candidate, and that he will not keep or make any memorandum or entry of anything occurring within the booth, and that he will not, directly or indirectly, reveal to any person the name of any candidate voted for by the voter, or which ticket he had voted, or anything occurring within the voting booth, except when required pursuant to law to give testimony as to such a matter in a judicial proceeding.

  N.Y. ELEC. LAW § 8-306(5).

34

- **Oklahoma** requires a voter's assistant "to swear or affirm that the voter's ballots are being voted in accordance with the voter's wishes," is "not the voter's employer or an agent of the voter's employer," and is "not an officer or agent of the voter's union." 26 OKLA. STAT. § 7-123.3; OKLA. ADMIN. CODE § 230:35-5-120.1(3).

- **Rhode Island** requires a voter's assistant to sign a sworn affidavit affirming that he or she was chosen "to provide assistance to [the] voter by reason of either blindness, disability or inability to read or write in the English language on the part of the voter," and "that [he or she is] not the voter's employer, or agent of that employer, or officer or agent of the voter's union." R.I. GEN. LAWS § 17-19-26.1(b). Providing a false affidavit is a felony. *Id.* § 17-9.1-20.

- **West Virginia** requires a voter's assistant to "sign a written oath or affirmation before assisting the voter, stating that he or she will not override the actual preference of the voter being assisted or mislead the voter into voting for someone other than the candidate of the voter's choice. The person assisting the voter shall also swear or affirm that he or she believes that the voter is voting free of intimidation or manipulation." W. VA. CODE § 3-4A-22(b). Providing a false oath is a misdemeanor. *Id.* § 3-9-3(a).

Nothing about S.B. 1 in this regard is novel or unique compared to these other states' laws. S.B. 1's required oath is a reasonable and commonly used requirement to prevent the abuse of vulnerable voters by those who are assisting them in the ballot box and prevents voter assistants from unlawfully using their position to improperly pressure voters' decisions. These similar, lawful safeguards enacted by other states show how S.B. 1 is well within the mainstream.

## CONCLUSION

For the foregoing reasons, Lawyers Democracy Fund respectfully urges the Court to defer to the reasonable "time, place, and manner" rules established by state legislatures to administer open, fair and honest elections and to recognize that Texas has adopted reasonable and widely used measures safeguard the integrity and transparency of its elections and to foster public confidence in the voting process.

Respectfully submitted,

LAWYERS DEMOCRACY FUND

/s/ Chris K. Gober
Chris K. Gober, TX Bar #24048499
The Gober Group
14425 Falcon Head Blvd.
Building E-100, Suite 226
Austin, TX 78738
Telephone: 512-354-1787
Fax: 877-437-5755
cg@gobergroup.com

Eric Wang, VA Bar #73511*
The Gober Group
1501 Wilson Blvd., Suite 1050
Arlington, VA 22209
Telephone: 202-417-3528
Fax: 877-437-5755
ew@gobergroup.com

*pro hac vice admission pending

36

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of May 2023, I electronically filed a true and correct copy of the foregoing BRIEF OF THE LAWYERS DEMOCRACY FUND AS AMICUS CURIAE with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record. Respectfully submitted this 30th day of May, 2023.

<u>/s/ Chris K. Gober</u>
Chris K. Gober, TX Bar #24048499
The Gober Group
14425 Falcon Head Blvd.
Building E-100, Suite 226
Austin, TX 78738
Telephone: 512-354-1787
Fax: 877-437-5755
cg@gobergroup.com

## <u>CERTIFICATE OF COMPLIANCE</u>

I verify that the foregoing brief has been prepared in Times New Roman, 12-point font, double-spaced and otherwise in compliance with Local Rules including CV-7 and CV-10.

<u>/s/ Chris K. Gober</u>
Chris K. Gober, TX Bar #24048499
The Gober Group
14425 Falcon Head Blvd.
Building E-100, Suite 226
Austin, TX 78738
Telephone: 512-354-1787
Fax: 877-437-5755
cg@gobergroup.com