**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

La Unión Del Pueblo Entero, *et al.*,     §
                                          §
                    Plaintiffs            §
                                          §
        v.                                §        No. 5:21-cv-00844-XR
                                          §
Gregory W. Abbott, *et. al.*,             §
                                          §
                    Defendant.            §
                                          §
                                          §

**INTERVENOR-DEFENDANTS' OPPOSITION TO UNITED STATES'**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

Page

ARGUMENT ................................................................................................. 2

I.  THE COURT SHOULD DENY THE UNITED STATES' MOTION FOR
    SUMMARY JUDGMENT ..................................................................... 2

    A.  Sections 5.02 And 5.08 Do Not Deny Anyone The Right To Vote............................ 3

    B.  Sections 5.02 And 5.08 Do Not Affect A Voter Qualification
        Determination ............................................................................ 9

    C.  Sections 5.02 And 5.08 Do Not Relate To Voter Registration Materials.................. 13

    D.  The United States' Various Factual Assertions Are Irrelevant And Wrong.............. 16

CONCLUSION.............................................................................................. 19

CERTIFICATE OF SERVICE ......................................................................... 21

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ala. Ass'n of Realtors v. HHS*,
  141 S. Ct. 2485 (2021) (*per curiam*)....................................................................12

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983)................................................................................................10

*Arcadia, Ohio v. Ohio Power Co.*,
  498 U.S. 73 (1990)..................................................................................................15

*Baker v. Carr*,
  369 U.S. 186 (1962)..................................................................................................5

*Ball v. Chapman*,
  289 A.3d 1 (Pa. 2023)..................................................................................8, 9, 11, 14

*Brnovich v. Democratic Nat'l Comm.*,
  141 S. Ct. 2321 (2021)............................................................................................11

*Circuit City Stores v. Adams*,
  532 U.S. 105 (2001)..........................................................................................14, 15

*Clingman v. Beaver*,
  544 U.S. 581 (2005)................................................................................................11

*County of Los Angeles v. Davis*,
  440 U.S. 625 (1979)..................................................................................................7

*Crawford v. Marion Cnty. Election Bd.*,
  553 U.S. 181 (2008)............................................................................................6, 19

*Diaz v. Cobb*,
  435 F. Supp. 2d 1206 (S.D. Fla. 2006)....................................................................8

*Fla. State Conf. of NAACP v. Browning*,
  522 F.3d 1153 (11th Cir. 2008)..........................................................................4, 16

*Freeman v. Quicken Loans, Inc.*,
  566 U.S. 624 (2012)................................................................................................15

*Friedman v. Snipes*,
  345 F. Supp. 2d 1356 (S.D. Fla. 2004)...............................................................8, 13

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991)................................................................................................12

*Husted v. A. Philip Randolph Inst.*,
    138 S. Ct. 1833 (2018) ................................................................................17

*In re Sinclair*,
    870 F. 2d 1340 (7th Cir. 1989) ...................................................................14

*Jarecki v. G. D. Searle & Co.*,
    367 U.S. 303 (1961) ....................................................................................13

*Kennedy v. Lewis*,
    325 F.2d 210 (5th Cir. 1963) ......................................................................16

*Kennedy v. Lynd*,
    306 F.2d 222 (5th Cir. 1962) ......................................................................16

*League of Women Voters of Ark. v. Thurston*,
    No. 5:20-cv-05174, 2021 WL 5312640 (W.D. Ark. Nov. 15, 2021) .......................8

*Martin v. Crittenden*,
    347 F. Supp. 3d 1302 (N.D. Ga. 2018) ........................................................8

*McDonald v. Bd. of Election Comm'rs of Chicago*,
    394 U.S. 802 (1969) .....................................................................................5

*Migliori v. Cohen*,
    36 F.4th 153 (3d Cir. 2022) .........................................................................7

*Niz-Chavez v. Garland*,
    141 S. Ct. 1474 (2021) ................................................................................19

*Organization for Black Struggle v. Ashcroft*,
    493 F.Supp. 3d 790 (W.D. Mo. 2020) ..........................................................8

*Ritter v. Migliori*,
    142 S. Ct. 1824 (2022) ......................................................................... *passim*

*Rosario v. Rockefeller*,
    410 U.S. 752 (1973) ......................................................................................4

*Schwier v. Cox*,
    340 F.3d 1284 (11th Cir. 2003) ...............................................................4, 6

*Schwier v. Cox*,
    412 F. Supp. 2d 1266 (N.D. Ga. 2005) ........................................................8

*Singh v. Garland*,
    855 F. App'x 958 (5th Cir. 2021) (*per curiam*) ..........................................7

*Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*,
    574 F. Supp. 3d 1260 (N.D. Ga. 2021) ........................................................8

*Tex. Democratic Party v. Abbott,*
    961 F.3d 389 (5th Cir. 2020) ....................................................................5, 6, 18

*Thrasher v. Ill. Republican Party,*
    No. 4:12-cv-4071, 2013 WL 442832 (C.D. Ill. Feb. 5, 2013) ...........................8, 13

*Vote.Org v. Callanen,*
    39 F.4th 297 (5th Cir. 2022) ............................................................... *passim*

*Vote.org v. Ga. State Bd.,*
    No. 1:22-cv-01734, 2023 WL 2432011 (N.D. Ga. Mar. 9, 2023) ...........................8

*Wash. Ass'n of Churches v. Reed,*
    492 F.Supp.2d 1264 (W.D. Wash. 2006)..........................................................8

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001)...................................................................................11

**STATUTES**

52 U.S.C. § 10101(a) ..................................................................... *passim*

Senate Bill 1 ...................................................................................1
    § 5.02...........................................................................3, 4, 18
    § 5.08...........................................................................3, 4, 18

Tex. Elec. Code § 11.002 ................................................................10

Tex. Elec. Code § 13.001 ..................................................................3

Tex. Elec. Code § 13.002 ..............................................................3, 13

Tex. Elec. Code § 18.001 ..................................................................3

Tex. Elec. Code § 65.011 ................................................................12

Tex. Elec. Code § 82.001 ................................................................17

Tex. Elec. Code § 82.002 ............................................................3, 17

Tex. Elec. Code § 82.003 ............................................................3, 17

Tex. Elec. Code § 82.004 ............................................................3, 17

Tex. Elec. Code § 82.007 ..................................................................3

Tex. Elec. Code § 82.008 ..................................................................3

Tex. Elec. Code § 84.032 ................................................................18

Tex. Elec. Code § 86.005 ................................................................12

**OTHER AUTHORITIES**

Declan Chin, *A Deep Dive into Absentee Ballot Rejection in the 2020 General Election*, MIT Elections Blog (Dec. 16, 2021) ........................................................18

Warren M. Christopher, The Constitutionality of the Voting Rights Act of 1965, 18 STAN. L. REV. 1 (1965) ..............................................................................4

Fed. R. Civ. P. 56(a) ..............................................................................................1

J. Fortier & N. Ornstein, *The Absentee Ballot and the Secret Ballot: Challenges for Election Reform*, 36 U. MICH. J OF L. REFORM 483 (2003)................................5

H.R. Rep. No. 88-914, pt. 2 (1963)...........................................................4, 14

*National Voter Registration Application Form for U.S. Citizens*, U.S. Election Assistance Comm'n ....................................................................................14

Voter Registration Application, D.C. Bd. of Elections................................14

Voter Registration, Md. State Bd. of Elections ..........................................13

Voter Registration Application, Pa. Dep't of State.....................................13

Intervenor-Defendants Harris County Republican Party, Dallas County Republican Party, Republican National Committee, National Republican Senatorial Committee, and National Republican Congressional Committee support and seek to uphold free and fair elections for all voters, including the voters of Texas. Intervenor-Defendants therefore respectfully ask the Court to deny the United States' motion for summary judgment and to uphold the Texas Legislature's duly enacted election laws in Senate Bill 1 ("SB 1").

The United States' sole remaining claim is that sections 5.02 and 5.08 of SB 1, which set forth the personal-identification-number requirements for mail-ballot applications and mail ballots, violate the federal materiality provision. 52 U.S.C. § 10101(a)(2)(B). This claim fails as "a matter of law." Fed. R. Civ. P. 56(a). As Intervenor-Defendants have explained in their motion for summary judgment, sections 5.02 and 5.08 do not even *implicate*, let alone violate, the materiality provision. *See* ECF No. 608 at 6–16. The materiality provision prohibits states from refusing to register voters *during the voter-registration process* based upon violations of rules that seek information immaterial to assessing state-law voter qualifications. *See id.* at 6–8. It has no application to the myriad state election laws that have nothing to do with voter registration but instead regulate how voters request, complete, and cast ballots. *See id.*

Under the United States' reading, however, the materiality provision would prohibit states from adopting *any* mandatory paper-based voting rule that requires an individual to supply *any* information not used to determine qualifications to vote. *See* ECF No. 609 at 19–21 & n.6. That reading flatly contradicts the materiality provision's plain text, structure, and history—as three Justices of the Supreme Court and a Fifth Circuit motions panel have already explained. *See Ritter v. Migliori*, 142 S. Ct. 1824, 1824–25 (2022) (Alito, J., dissenting from the denial of the application for stay); *Vote.Org v. Callanen*, 39 F.4th 297, 305 n.6 (5th Cir. 2022). Moreover, the fallacy of

1

the United States' sweeping interpretation is further exposed by the fact that it would jeopardize the "many" state election rules that lie outside the voter-registration context—"including state law[s] concerning protection of voters, prevention of fraud and corrupt practices, and [the] counting of votes." ECF No. 609 at 20 (brackets and internal quotation marks omitted). Congress did not tacitly revolutionize all of American election law in the rarely invoked materiality provision passed decades ago. *See* ECF No. 608 at 14–16.

For all of these reasons, and as explained more fully below, the Court should deny the United States' motion and grant Intervenor-Defendants' motion for summary judgment.

## ARGUMENT

## I. THE COURT SHOULD DENY THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT.

As Intervenor-Defendants already have explained, the United States' materiality-provision challenge to sections 5.02 and 5.08 fails as a matter of law. *See* ECF No. 608 at 6–16. Indeed, the United States' claim flunks at least three essential elements of the materiality provision because sections 5.02 and 5.08 do not (1) "deny the right of any individual to vote," 52 U.S.C. § 10101(a)(2)(B); (2) affect a "determin[ation] whether such individual is qualified under State law to vote," *id.*; or (3) pertain to an "application, registration, or other act requisite to voting," *id.*; *see* ECF No. 608 at 6–16; *Ritter*, 142 S. Ct. at 1824–25 (Alito, J., dissenting from the denial of the application for stay); *Vote.Org*, 39 F.4th at 305 n.6. Each of these failures independently requires summary judgment *against* the United States. *See* ECF No. 608 at 6–16.

The United States offers a series of arguments in an attempt to shoehorn SB 1's personal-identification-number requirements into the narrow sweep of the federal materiality provision. All fail.

A.     *Sections 5.02 And 5.08 Do Not Deny Anyone The Right To Vote.*

SB 1 sections 5.02 and 5.08 do not violate the materiality provision because mandatory application of their personal-identification-number requirements does not "deny the right of any individual to vote in any election."  52 U.S.C. § 10101(a)(2)(B); *see also* ECF No. 608 at 9–11.

An individual possesses the right to vote in Texas when she satisfies state-law qualifications and is added to the voter registration list.  *See* Tex. Elec. Code §§ 13.001–.002, 18.001.  But even after qualifying and successfully registering, a voter "may be unable to cast a vote for any number of reasons," such as showing up to the polls after Election Day, failing to sign or use a secrecy envelope for a mail ballot, attempting to vote for too many candidates for a single office, returning the ballot to the wrong location, or arriving at the wrong polling place.  *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay).  When an individual violates such mandatory election rules, declining to count her ballot does not deny her right to vote.  After all, "[e]ven the most permissive voting rules must contain some requirements, and the failure to follow those rules constitutes the *forfeiture* of the right to vote, not the *denial* of that right."  *Id.* (emphases added).

Neither challenged provision of SB 1 even implicates the right to vote, much less works a "denial" of that right.  By definition, *only* successfully registered voters—*i.e.*, people who already have the right to vote in Texas—can apply for and cast mail ballots.  *See* Tex. Elec. Code §§ 82.001–.004, 82.007–.008 (only "a qualified voter" can apply "for early voting by mail"); *accord* ECF No. 609-1 ¶¶ 21, 195–98.  And noncompliance with sections 5.02 and 5.08 does not trigger prospective disqualification, loss of the right to vote, or removal from the list of eligible voters. *See* ECF No. 608 at 9–11.  To the contrary, an individual who fails to comply with either section 5.02 or section 5.08 remains eligible to vote and can do so in both the present and future elections. In particular, an individual who fails to provide a personal identification number on her mail-ballot

application as required by section 5.02 can (1) cure the faulty application, (2) vote in person in the present election, and (3) vote in future elections. *See id.* at 9. And an individual who fails to provide a personal identification number on her mail ballot as required by section 5.08 can (1) cure the deficient ballot in multiple ways and (2) vote in future elections. *See id.* at 9–10. The materiality provision was enacted only to prevent election officials from keeping individuals off the voter registration list. *See Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008); *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003); H.R. Rep. No. 88-914, pt. 2, at 5 (1963); Warren M. Christopher, The Constitutionality of the Voting Rights Act of 1965, 18 STAN. L. REV. 1, 7 (1965). Because neither section 5.02 nor section 5.08 can affect any voter's registration status, these sections do not implicate, much less violate, the materiality provision. *See* ECF No. 608 at 7–11.

The United States offers three arguments in support of its position that sections 5.02 and 5.08 violate a "statutory right to vote" in the materiality provision. ECF No. 609 at 9. None is persuasive.

*First*, the United States peppers its motion with assertions that sections 5.02 and 5.08 "disenfranchise" voters who do not comply with the personal-identification-number requirements. *See, e.g.*, *id.* at 6. Nothing could be further from the truth: evenhanded, mandatory state voting rules that regulate how individuals cast their ballots do not "disenfranchise" anyone or deny anyone the right to vote, even when such rules require election officials to decline to count a noncompliant ballot. *See, e.g.*, *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay); *Vote.Org*, 39 F.4th at 305 n.6; ECF No. 608 at 7–11; *see also Rosario v. Rockefeller*, 410 U.S. 752, 757 (1973) (application of neutral state-law voting requirements does not "disenfranchise" voters).

4

Nor can the phrase "right to vote" in the materiality provision be read to include a "right" to apply for and cast mail ballots. *But see* ECF No. 609 at 10–11. Congress could not have intended that result: after all, when the materiality provision was enacted in the 1960s, the phrase "right to vote" was commonplace in legal decisions and had a well-established meaning. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 247 (1962) (Douglas, J., concurring) (noting that the "right to vote" was "protected by the judiciary long before that right received … explicit protection it is now accorded" in the civil-rights statutes). And that meaning did *not* include "a claimed right to receive absentee ballots." *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 807 (1969); *see also Tex. Democratic Party v. Abbott*, 961 F.3d 389, 403-06 (5th Cir. 2020) (holding that *McDonald* remains good law on this point). Indeed, when Congress enacted the materiality provision, only one state made mail voting widely available, and the vast majority limited mail voting to particular populations like military members and individuals with disabilities. *See McDonald*, 394 U.S. at 810 & n.9 (cataloguing state practices); *see also* J. Fortier & N. Ornstein, *The Absentee Ballot and the Secret Ballot: Challenges for Election Reform*, 36 U. Mich. J of L. Reform 483, 504–05 (2003).

Perhaps acknowledging this state of the law, the United States concedes that its position contravenes any plain-language, "colloquial," or "constitutional" definition of the "right to vote." ECF No. 609 at 10 n.4. Instead, the United States posits that the materiality provision creates some special "statutory right to vote." *Id.* at 9. Yet the United States does not explain the parameters or contours of that supposed statutory right, much less seek to cabin it. *See id.* at 9–10.

Rather, the United States attempts to bolster its construction by invoking the statutory definition of "vote." *See id.* (citing 52 U.S.C. § 10101(a)(3)(A), (e)). But the materiality provision reaches only denials of the "*right*" to vote—not a state's application of neutral and mandatory rules

that govern the *act* of voting.  52 U.S.C. § 10101(a)(2)(B) (emphasis added); *see* ECF No. 608 at 10–11.  In other words, the question is not whether mandatory application of SB 1's personal-identification-number requirements can result in a ballot not being "counted," as the United States argues.  ECF No. 609 at 9.  The question instead is whether those rules deprive any individual of the *right* to cast a ballot in accordance with state law.  *See* ECF No. 608 at 9–11.  Because sections 5.02 and 5.08 do not prevent (qualified and registered) voters from casting ballots on equal terms with all other voters, they do not violate the materiality provision.  *See id.* at 9–11.

*Second*, the United States' assertion that the "availability of in-person voting" in Texas and SB 1's "cure procedures do not absolve a denial of the statutory right to vote," ECF No. 609 at 11, 13 (capitalization altered), simply begs the question.  In fact, that Texas law provides in-person voting and cure opportunities to voters who fail to comply with sections 5.02 and 5.08 reinforces that there is no denial of the right to vote at all, let alone one to "absolve."  *See* ECF No. 608 at 9–11.  Indeed, there is no denial of the right to vote because sections 5.02 and 5.08 do not "disqualify potential voters" who fail to comply with the personal-identification-number requirements, *Schwier*, 340 F.3d at 1294, but instead "permit[] [such voters] to vote" in the current and future elections, *see Tex. Democratic Party*, 961 F.3d at 404; *see* ECF No. 608 at 9–11.

Moreover, the United States' discussion of the alleged burdens of in-person voting and curing, *see* ECF No. 609 at 11–16, misses the point.  In the first place, the materiality provision does not regulate the burdens of in-person voting or curing or guarantee a right to vote by mail.  In addition, even on the United States' description, Texas's in-person voting and cure procedures are far *less* burdensome than the cure procedures upheld by the Supreme Court in a constitutional right-to-vote case.  *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 199 (2008) (emphasizing that failure to provide photo identification could be cured by "travel[ing] to the

circuit court clerk's office within 10 days to execute the required affidavit"); *but see* ECF No. 609-1 ¶ 206 (hinting such burdens are unlawful). And the proof is in the pudding—even the United States acknowledges that thousands of Texans successfully utilized SB 1's cure procedures during the 2022 General Elections. *See* ECF No. 609-1 ¶ 158.

*Third*, the United States asks the Court to ignore the opinions of three Justices of the U.S. Supreme Court and a Fifth Circuit panel in favor of a handful of opinions that, in its view, support its reading of the "statutory right to vote." ECF No. 609 at 10 n.4 & 11. One of the opinions the United States invokes is the Third Circuit's now-vacated panel decision in *Ritter v. Migliori*. *See* ECF No. 609 at 8–9, 10 n.4, & 11. The Supreme Court's vacatur of that decision stripped it of any "precedential effect." *County of Los Angeles v. Davis*, 440 U.S. 625, 634 n.6 (1979). And declining to follow that decision is especially prudent here. The Third Circuit considered *Ritter* on an expedited basis, *see Migliori v. Cohen*, 36 F.4th 153, 158 (3d Cir. 2022) (noting "expedited appeal"), and did so based on briefing that one panel member faulted for overlooking important arguments, *see id.* at 165–66 (Matey, J., concurring in the judgment). The *Ritter* panel's incomplete and incorrect analysis is simply of no help to the Court. *See Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay).

Moreover, *Ritter*'s overbroad reading of the materiality provision is irreconcilable with the pronouncement of the Fifth Circuit panel in *Vote.Org*. *See* 39 F.4th at 305 n.6. The United States suggests that the vacated, out-of-circuit decision in *Ritter* should be relied upon but that the *non*-vacated *in*-circuit decision in *Vote.Org* should not be. *Compare* ECF No. 609 at 9 n.3, *with id.* at 10 n.4. But even though decisions by motions panels are not formally binding, they are certainly persuasive and a good predictor of what the Fifth Circuit will ultimately hold on the merits. *See, e.g., Singh v. Garland*, 855 F. App'x 958 (5th Cir. 2021) (*per curiam*). Indeed, they are a much

7

*better* predictor of what the Fifth Circuit will hold on the merits than a vacated out-of-circuit opinion.

That leaves only the handful of district court cases cited by the United States.  Several of those cases dealt with materiality-provision claims in the context of state laws regulating voter registration.  *See Schwier v. Cox*, 412 F. Supp. 2d 1266, 1276 (N.D. Ga. 2005) (cited at ECF No. 609 at 22); *Wash. Ass'n of Churches v. Reed*, 492 F.Supp.2d 1264 (W.D. Wash. 2006) (cited at ECF No. 609 at 20); *Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1212 (S.D. Fla. 2006) (cited at ECF No. 609 at 20–21).  Those cases do not help the United States, since—as the United States agrees— sections 5.02 and 5.08 have nothing to do with voter registration.  *See infra* Part I.B.

As for the remaining district court opinions, none reached a final merits decision, and none engaged meaningfully with the plain text of the materiality provision or its essential elements.[1] Moreover, most of the United States' cases predate—and all contravene—more persuasive authority from three Justices of the United States Supreme Court, a unanimous Fifth Circuit panel, and the Pennsylvania Supreme Court.  *See Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay); *Vote.org*, 39 F.4th at 305 n.6; *Ball v. Chapman*, 289 A.3d 1, 37– 39 (Pa. 2023) (opinion of Brobson, J.); *see also Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1370– 71 (S.D. Fla. 2004) (explaining that the materiality provision "was designed to eliminate practices that could encumber an individual's ability to register to vote."); *Thrasher v. Ill. Republican Party*,

---

[1] *See Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018) (temporary restraining order) (cited at ECF No. 609 at 12, 20); *Vote.org v. Ga. State Bd.*, No. 1:22-cv-01734, 2023 WL 2432011 (N.D. Ga. Mar. 9, 2023) (denying motion to dismiss) (cited at ECF No. 609 at 13); *Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260 (N.D. Ga. 2021) (denying motion to dismiss) (cited at ECF No. 609 at 13); *League of Women Voters of Ark. v. Thurston*, No. 5:20-cv-05174, 2021 WL 5312640 (W.D. Ark. Nov. 15, 2021) (denying motion to dismiss) (cited at ECF No. 609 at 11); *Organization for Black Struggle v. Ashcroft*, 493 F.Supp.3d 790, 803 (W.D. Mo. 2020) (rejecting materiality-provision claim) (cited at ECF No. 609 at 11).

No. 4:12-cv-4071, 2013 WL 442832, at *3 (C.D. Ill. Feb. 5, 2013) (the "actual harms the statute protects against" is "discrimination in the registration of voters," and "[c]ourts that have applied the statute have done so in the context of voter registration").[2]  The Court should deny the United States' motion.

B.  *Sections 5.02 And 5.08 Do Not Affect A Voter Qualification Determination.*

Sections 5.02 and 5.08 do not implicate, let alone violate, the materiality provision for another reason: they do not affect a "determin[ation] whether [any] individual is qualified under State law to vote."  52 U.S.C. § 10101(a)(2)(B); *see* ECF No. 608 at 11–12.  The United States agrees that sections 5.02 and 5.08 have nothing to do with voter qualification determinations, pointing out that SB 1's "identification numbers are unrelated to voter qualifications" and "are not used to ensure that voters are qualified to vote or to cast a mail ballot under Texas law."  ECF No. 609 at 1, 5.

That agreement is the end of the matter.  Indeed, by its plain terms, the materiality provision regulates only requirements and practices related to voter qualifications and registration to vote, not the myriad other rules "that must be met in order to cast a ballot that will be counted."  *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay); *see also id.* ("[I]t would be absurd to judge the validity of voting rules based on whether they are material to eligibility.").  In other words, to fall within the narrow scope of the materiality provision, "it is not enough that the error or omission be immaterial *to* whether the individual is qualified to vote; the paper or record must also be used 'in determining' the voter's qualifications."  *Ball*, 289 A.3d at

---

[2] The United States also repeatedly cites this Court's prior opinion denying Texas's motion to dismiss the materiality claims.  That motion devoted only just over three pages to those claims, *see* ECF No. 145 at 10–13, and there is little overlap between those arguments and the ones advanced by Intervenor-Defendants.  In any event, nothing prevents the Court from reconsidering the issues with the aid of more extensive briefing.

38 (opinion of Brobson, J.).  Because sections 5.02 and 5.08 are not used to make qualification

determinations, they fall outside the narrow scope of the materiality provision.  *See* ECF No. 608

at 11–12.

 The United States acknowledges that the materiality provision "distinguishes between the

few prerequisites that one must meet to be 'qualified' to vote" and other state voting laws unrelated

to voter qualification or registration.  ECF No. 609 at 20.  As the United States recognizes, "[t]he

category of qualifications is limited to certain substantive characteristics, like age and citizenship,

that are 'germane to one's ability to participate intelligently in the electoral process.'"  *Id.* (quoting

*Harper v. Va. State Bd. of Elecs.*, 383 U.S. 663, 668 (1996)).  In Texas, those qualifications are

age, U.S. citizenship, mental capacity, lack of felony conviction, and residency.  *See* Tex. Elec.

Code § 11.002.  The United States and Intervenor-Defendants agree: sections 5.02 and 5.08 are

not voter qualification laws.  *See* ECF No. 609 at 1, 5; ECF No. 608 at 11–12.

 Rather, sections 5.02 and 5.08 belong to the second category of laws.  ECF No. 609 at 20.

In the United States' view, that category includes "[a]ll other regulations" of voting, including

"state law[s] concerning 'protection of voters, prevention of fraud and corrupt practices, [and]

counting of votes.'"  *Id.* (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)).  According to the

United States, "[a]lthough such procedural requirements might help officials enforce the states'

qualifications, they are not themselves voter qualifications simply because state law mandates

them."  *Id*.

 That is precisely Intervenor-Defendants' point: state law mandates all kinds of rules that

have nothing to do with voter qualifications or registration.  *See Anderson v. Celebrezze*, 460 U.S.

780, 788 (1983) (distinguishing between state laws that "govern[] the registration and

qualifications of voters, the selection and eligibility of candidates, [and] the voting process itself").

And those rules do not implicate the materiality provision. ECF No. 608 at 8; *see also Ritter*, 142 S. Ct. at 1824–25 (Alito, J., dissenting from the denial of the application for stay); *Vote.Org*, 39 F.4th at 305 n.6. Section 5.02 and 5.08 are precisely such rules, and the materiality provision does not regulate them. *See* ECF No. 608 at 7–13.

The United States takes a puzzling, sweeping, and untenable contrary position. The United States asserts that sections 5.02 and 5.08 *violate* the materiality provision *because* they do not regulate voter qualification determinations. *See* ECF No. 609 at 20–22. That is backwards. It is because sections 5.02 and 5.08 do not regulate voter qualification determinations that they fall *outside* the materiality provision. *See* ECF No. 608 at 7–13.

Indeed, the United States' position would invalidate "[a]ll" state paper-based voting "regulations" unrelated to qualification determinations, including laws "concerning 'protection of voters, prevention of fraud and corrupt practices, and counting of votes.'" ECF No. 609 at 20 (brackets omitted). This "would subject virtually every electoral regulation" related to voting records and papers to the superintendence of the federal materiality provision, "hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." *Clingman v. Beaver*, 544 U.S. 581, 593 (2005). Accordingly, under the United States' reading, "no election law that imposes informational requirements … unrelated to determining voter qualification[s] can survive a [§ 10101(a)(2)(B)] challenge." *Ball*, 289 A.3d at 39 (opinion of Brobson, J.). Even as the Supreme Court has long and repeatedly held that the States have compelling interests in preventing fraud and protecting voters, *see, e.g.*, *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2340 (2021), the United States would transform the materiality provision into a blunt instrument against rules serving those very same interests. Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

11

Yet the United States would have the Court believe that Congress, in the rarely invoked materiality provision, quietly rewrote all of American election law almost sixty years ago.

The United States barely even tries to address the radical implications of its argument—offering a one-sentence footnote asserting that "most electoral regulations fall outside" the scope of the materiality provision because it "only applies to *paperwork* requirements."  ECF No. 609 at 21 n.6 (emphasis added).  That half-hearted reassurance provides no comfort.  After all, *many* paper-based election rules have nothing to do with determining voter qualifications.  *See* ECF No. 608 at 14–15.  Commonplace state-law rules requiring voters to sign mail ballots would be jeopardized.  *See* Tex. Elec. Code. § 86.005(c); ECF No. 608 at 14.  So too would prohibitions on "mark[ing] [a] ballot for more candidates for an office than the number of persons to be elected for that office."  Tex. Elec. Code § 65.011; *see* ECF No. 608 at 14.  Carrier-envelope requirements, pollbook requirements, and voter assistance-forms would also be on the chopping block.  *See id.* at 14–15.  Litigants around the country would surely identify countless other laws that they claim transgress the United States' newly supercharged materiality provision.

This Court should decline the United States' invitation to revolutionize American election law.  Its interpretation is inconsistent with the materiality provision's text, history, and structure. It would lead to absurd results.  It also defies the rule that "alter[ations to] the usual constitutional balance between the States and the Federal Government" must be "unmistakably clear in the language of [a] statute."  *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (internal quotation marks and citation omitted); *see Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (*per curiam*); ECF No. 608 at 15.  And it risks rendering the materiality provision unconstitutional.  *See* ECF No. 15–16.  Rejecting the United States' radical interpretation avoids all those problems.  The Court should deny the United States' motion.

C.      *Sections 5.02 And 5.08 Do Not Relate To Voter Registration Materials.*

Sections 5.02 and 5.08 also do not implicate, let alone violate, the materiality provision because they do not relate to an "application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B); ECF No. 608 at 12–13. The materiality provision applies "only" to documents related to "voter registration specifically," *Vote.Org*, 39 F.4th at 305 n.6, not to mail-ballot applications or mail ballots, *see* ECF No. 608 at 12–13.

The United States offers two arguments to avoid this conclusion, both of which fail. *First*, the United States contends that a mail-ballot application is an "application" within the meaning of the materiality provision. ECF 609 at 19. That is incorrect: the words "registration" and "application" in the materiality provision refer to "voter registration specifically." *Vote.Org*, 39 F.4th at 305 n.6; *see Thrasher*, 2013 WL 442832, at *3 ("Courts that have applied the statute have done so in the context of voter registration ...."); ECF No. 608 at 12–13. Every state has a process—usually called "voter registration"—by which election officials determine whether an individual is eligible to vote. *See, e.g.*, Tex. Elec. Code § 13.002; *accord* ECF No. 609-1 ¶ 7. It is *that* process which the materiality provision regulates. *See, e.g.*, *Friedman*, 345 F. Supp. 2d at 1371 (explaining that the materiality provision does not "apply to the counting of ballots by individuals already deemed qualified to vote"); *Thrasher*, 2013 WL 442832, at *3; *supra* Part I.A.

Thus, naturally, the statutory term "application" refers to that same process. *See Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961) ("[A] word is known by the company it keeps."). Indeed, many States and the U.S. Election Assistance Commission refer to the voter-registration process as an "application."[3] So, too, did Congress in the materiality provision's legislative

_____

[3] *See, e.g.*, *Voter Registration*, Md. State Bd. of Elections ("Voter Registration Application"), elections.maryland.gov/voter_registration/application.html (last visited June 22, 2023); *Voter Registration Application*, Pa. Dep't of State, https://www.pavoterservices.pa.gov/pages/VoterRegistrationApplication.aspx (last visited June 22, 2023);

13

history, which uses the words "registration" and "application" interchangeably to refer only to the voter *registration* process.  *See* H.R. Rep. 88-914 at 2445 (referring to "application to register"); *id.* at 2491 (referring to efforts to "defeat [African-American] registration" by "rejecting [African-American] applications" to vote); *id.* (faulting "registrars" for "rejecting [African-American] application[s]" in voter registration process); *see also In re Sinclair*, 870 F. 2d 1340, 1342 (7th Cir. 1989) (Easterbrook, J.) (endorsing this use of legislative history).  This makes perfect sense: as discussed, voting by mail was exceedingly rare in the 1960s and was not considered to be within "the right to vote."  *Supra* at 4–5.  Congress, therefore, did not intend the materiality provision to reach voting by mail, much less mail-ballot applications.  *See id.*  Instead, it regulated only the voter registration process.  *See id.*

*Second*, the United States claims that sections 5.02 and 5.08 pertain to the statutory phrase "other act requisite to voting."  ECF 609 at 18.  That category is so "broad," the United States asserts, that it refers to *all* "actions that voters must take in order to make their votes effective."  *Id.* (internal quotation marks and citation omitted).  But that move does not work.  The phrase "other act requisite to voting" is a catchall at the end of a list.  52 U.S.C. § 10101(a)(2)(B).  Its meaning is therefore "controlled and defined by reference to the [preceding] enumerated categories"—here, "application" and "registration."  *See Circuit City Stores v. Adams*, 532 U.S. 105, 115 (2001).  Accordingly, the statute's "other act[s] requisite to voting" encompass only the functional equivalents of "application" and "registration"—*i.e.*, the processes used to assess voter qualifications.  *See Ball*, 289 A.3d at 38 n.11 (opinion of Brobson, J.); *see* ECF No. 608 at 13.

---

*Voter           Registration           Application*,     D.C.     Bd.     of     Elections, https://dcboe.org/dcboe/media/PDFFiles/VoterRegForm82020.pdf (last visited June 22, 2023); *National Voter Registration Application Form for U.S. Citizens*, U.S. Election Assistance Comm'n, https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf  (last visited June 6, 2023) ("Voter Registration Application").

Nor does the materiality provision's use of the word "any" support the United States' reading. *See* ECF No. 609 at 12. Courts have not hesitated to apply the *ejusdem generis* canon to narrow catchalls in lists that contain the word "any." *See, e.g., Circuit City Stores*, 532 U.S. at 109 (addressing statute that applied to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." (internal quotation marks and citation omitted)); *Arcadia, Ohio v. Ohio Power Co.*, 498 U.S. 73, 77–78 (1990) (giving narrow meaning to "or any other subject matter").

Yet another canon of construction rebuts the United States' reading: the surplusage cannon. If "other act requisite to voting" sweeps in all "actions that voters must take in order to make their votes effective," ECF No. 609 at 18 (internal quotation marks and citation omitted), then the words "registration" and "application" are superfluous, *cf. Circuit City Stores*, 532 U.S. at 114 (identifying same problem as an "insurmountable textual obstacle" to broad interpretation of a list's "residual phrase"). After all, successfully completing the voter registration process is an "action[] that voters must take in order to make their votes effective." ECF No. 609 at 18. The Court should reject that interpretation and "avoid[]" its attendant superfluity. *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 635 (2012).

By contrast, a sound interpretation avoids this superfluity while still leaving the phrase "or other act requisite to voting" with work to perform. In particular, this language prevents state and local election officials from circumventing the materiality provision on technicalities: Referring to a qualification-determining practice as something *other* than a voter "application" or "registration" does not liberate such officials to disqualify voters for immaterial "error[s] or omission[s]." 52 U.S.C. § 10101(a)(2)(B). In this way, the statute's "or other act requisite to voting" category advances Congress's effort "to counteract state and local government tactics"

that employed "burdensome registration requirements to disenfranchise African-Americans." *Browning*, 522 F.3d at 1173.

The two Fifth Circuit cases that the United States claims confirm its broad construction of the "other act requisite to voting" phrase, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962), and *Kennedy v. Lewis*, 325 F.2d 210, 212 (5th Cir. 1963), have no bearing here.  *See* ECF No. 609 at 18.  Those rulings, issued years before the materiality provision became law, discussed a *different statute*: one governing requests by the United States for state voter records.  *See Lynd*, 306 F.2d at 225; *Kennedy*, 325 F.2d at 211–212.  And nothing in those opinions specified that statute's breadth, or whether it applied in contexts beyond voter registration records.  *Lynd* dealt only with procedural disputes and did not address substantive arguments that certain voter records were beyond the statute's reach.  *See* 306 F.2d at 227–28, 230–31.  And *Lewis* held only that the Federal Government had the right to access voter registration records—the statute's obvious heartland.  *See* 325 F.2d at 211–212.  Neither decision conveys anything useful for this case.  And neither changes the fact that the materiality provision (as its history shows) applies only to "voter registration specifically."  *Vote.Org*, 39 F.4th at 305 n.6; *see* ECF No. 608 at 7–8.  In the end, that simple insight is fatal to the United States' materiality-provision claim because sections 5.02 and 5.08 made *no changes* to Texas's voter registration process.  *See* ECF No. 608 at 12–13.  The Court should deny the United States' motion.

> D.     *The United States' Various Factual Assertions Are Irrelevant And Wrong*.

The United States devotes substantial space to highlighting the supposed consequences of enforcing SB 1's personal-identification-number requirements.  *See* ECF No. 609 at 4–7, 13, 24–25.  In particular, the United States claims that enforcing sections 5.02 and 5.08 will leave "over 2.6 million registered voters . . . particularly vulnerable to disenfranchisement."  *Id.* at 1; *see* ECF No. 609-1 ¶¶ 127–46.  This incendiary claim is both factually misleading and legally irrelevant.

Starting with the facts, the United States overstates the burden on voters associated with SB 1's personal-identification-number requirements.  Its estimate of 2.6 million "particularly vulnerable" voters relates to alleged problems with the Texas Election Administration Management (TEAM) database.  *Id.* at 1.  It is also an exaggeration—for several reasons.  To start, Texas law limits eligibility to vote by mail to voters who are elderly, disabled, incarcerated, or out of state during the voting period.  *See* Tex. Elec. Code § 82.001–.004.  The United States never discloses how many Texas voters are eligible to vote by mail, let alone how many such voters might be affected by the alleged database problems.  *See id.* at 1.

Moreover, the United States deems the vast majority of these voters—around 2.4 million Texans—"vulnerable" merely because they have "only one" of their personal identification numbers recorded in the State's database, raising the risk that they will write down the wrong number.  ECF No. 609 at 1, 3.  Many of those voters, however, will simply remember which identification number they used to register.  *See* ECF No. 608-3 ¶¶ 22, 25(C).  And many voters—as advised by election officials—recorded *both* personal identification numbers and had their ballots counted.  *See id.* ¶ 24; ECF No. 609 at 6.  That widespread, lawful practice mitigates any risk of prejudicial database errors.  *See* ECF No. 608-3 ¶ 24.

Furthermore, Texas has taken and continues to take strenuous efforts to strengthen its database.  *See* Keith Ingram Mar. 2023 Dep. at 109–10 (Ex. A) (discussing, for example, effort to connect voter registration files to Texas.gov); *see also Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1838 (2018) (acknowledging that "about one in eight" voter registrations in the United States have problems).  Texans can also "easily" update their voter registration files to ensure all relevant information is correct.  Keith Ingram March 2023 Dep. at at 103 (Ex. A); *see id.* at 109 ("[T]he voter has the responsibility to make sure their information in the voter registration record

is correct and accurate and updated."); *see* Eitan Hersh April 2023 Dep. at 115 (Ex. B) (acknowledging that point). In addition, anyone who cannot successfully apply for a mail ballot can always vote in person—either during extensive early voting or on Election Day.  Tex. Elec. Code § 84.032; *Tex. Democratic Party*, 961 F.3d at 404 ("Texas permits [such voters] to vote in person; that is the exact opposite of 'absolutely prohibit[ing]' them from doing so.").

The actual mail-ballot rejection rate during the 2022 General Election exposes the United States' factual claims as hyperbolic.  "[O]nly 6,355 mail-in ballots . . . were rejected for a reason relating to identification, and where the voter did not cure the ballot or vote in person."  ECF No. 608-3 ¶ 6.  "That is well less than one out of every one thousand votes statewide."  *Id.*  And every one of those individuals who cast a noncompliant ballot *must have* successfully completed the mail-ballot application, including by providing a correct personal identification number under section 5.02.  *See* SB 1 § 5.02.  Thus, the only individuals whose noncompliant ballots were not counted were those who remembered and supplied the correct number on their mail-ballot application, *see id.*, but not on their mail ballot, *see* SB 1 § 5.08.

In all events, Texas's ultimate rejection rate (accounting for cures) was just 2.7%, *see* Hoekstra Supp. Resp. to Hersh at 3, which is lower—and certainly not substantially higher—than the rate in some other states, such as New York, where the mail-ballot rejection rate during the 2020 General Election was 3.62%, *see* Declan Chin, *A Deep Dive into Absentee Ballot Rejection in the 2020 General Election*, MIT Elections Blog (Dec. 16, 2021), https://elections-blog.mit.edu/articles/deep-dive-absentee-ballot-rejection-2020-general-election.   And there is every reason to expect that Texas's rejection rate will continue to drop as voters become more familiar with SB 1's relatively new rules.  *See id*; Keith Ingram March 2023 Dep. at 20 (Ex. A) (explaining basis for belief "that the number of statewide mail ballot rejections would continue to

improve"). Indeed, several Texas election officials have acknowledged that voter education efforts were successful in lowering the rejection rate in 2022. *See* ECF No. 608 at 6. Those efforts will continue. *See, e.g.*, Callanen Second Dep. at 64–65 (Ex. C) (discussing anticipated 2024 voter education efforts in Bexar County). In short, contrary to the United States' suggestion, a sober examination of the evidence reveals that the sky is not falling in Texas.

But even if the United States' assertions were true, they would be legally irrelevant. The materiality provision does not regulate the State's TEAM database. It applies only to voter-registration rules that seek information that is immaterial to assessing voter eligibility and result in voter registration applications being denied. *See* ECF No. 608 at 7–8; *supra* Part I.A. It is not a general prohibition on States adopting mandatory election rules. Allegations that election rules are unlawful because they resulted in too many rejected ballots may be relevant to other legal claims—like the 14th Amendment right to vote. *See, e.g.*, *Crawford*, 553 U.S. at 190–91. But when it comes to the materiality provision, these are mere "consequentialist" policy appeals that can "play[] no role in [the Court's] decision." *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1486 (2021). Therefore, the Court should assign no weight to the United States' exaggerated claims about the alleged consequences of SB 1's personal-identification-number requirements.

## CONCLUSION

The Court should deny the United States' motion for summary judgment.

Dated: June 23, 2023

Respectfully submitted,

*/s/ John M. Gore*
John M. Gore
E. Stewart Crosland (*pro hac vice*)
Stephen J. Kenny (*pro hac vice*)
Louis J. Capozzi III (*pro hac vice*)
Ryan M. Proctor
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
jmgore@jonesday.com
scrosland@jonesday.com
skenny@jonesday.com
lcapozzi@jonesday.com
rproctor@jonesday.com

*Counsel for Intervenor-Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of this filing to all counsel of record.

*/s/ John M. Gore*