**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| La Unión Del Pueblo Entero, *et al.*, | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | No. 5:21-cv-00844-XR |
| | § | |
| Gregory W. Abbott, *et. al.*, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

**INTERVENOR-DEFENDANTS' OPPOSITION TO OCA PLAINTIFFS'
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

**Page**

ARGUMENT ................................................................................................................ 2

I.     THE COURT SHOULD DENY THE OCA PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT ................................................................................. 2

     A.    Sections 5.02 And 5.08 Do Not Deny Anyone The Right To Vote............................ 2

     B.    Sections 5.02 And 5.08 Do Not Affect A Voter Qualification
Determination ........................................................................................................ 8

CONCLUSION............................................................................................................ 15

CERTIFICATE OF SERVICE ................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Ala. Ass'n of Realtors v. HHS,*
  141 S. Ct. 2485 (2021) (*per curiam*)...................................................................12

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983)..................................................................................................10

*Baker v. Carr,*
  369 U.S. 186 (1962)....................................................................................................4

*Ball v. Chapman,*
  289 A.3d 1 (Pa. 2023).......................................................................................8, 9, 10

*Brnovich v. Democratic Nat'l Comm.,*
  141 S. Ct. 2321 (2021)..............................................................................................10

*Clingman v. Beaver,*
  544 U.S. 581 (2005)..................................................................................................10

*County of Los Angeles v. Davis,*
  440 U.S. 625 (1979)....................................................................................................7

*Crawford v. Marion Cnty. Election Bd.,*
  553 U.S. 181 (2008)...............................................................................................6, 15

*Democratic Exec. Comm. of Fla. v. Detzner,*
  347 F. Supp. 3d 1017 (N.D. Fla. 2018).....................................................................8

*Diaz v. Cobb,*
  435 F. Supp. 2d 1206 (S.D. Fla. 2006) .....................................................................7

*Fla. State Conf. of NAACP v. Browning,*
  522 F.3d 1153 (11th Cir. 2008) .................................................................................4

*Friedman v. Snipes,*
  345 F. Supp. 2d 1356 (S.D. Fla. 2004) .....................................................................8

*Gregory v. Ashcroft,*
  501 U.S. 452 (1991)..................................................................................................12

*Husted v. A. Philip Randolph Inst.,*
  138 S. Ct. 1833 (2018)..............................................................................................13

*League of Women Voters of Ark. v. Thurston,*
  No. 5:20-cv-05174, 2021 WL 5312640 (W.D. Ark. Nov. 15, 2021) ........................8

*Martin v. Crittenden*,
  347 F. Supp. 3d 1302 (N.D. Ga. 2018) ......................................................................8

*Martin v. Kemp*,
  341 F. Supp. 3d 1326 (N.D. Ga. 2018) ......................................................................8

*McDonald v. Bd. of Election Comm'rs*,
  394 U.S. 802 (1969) ...................................................................................................5

*Migliori v. Cohen*,
  36 F.4th 153 (3d Cir. 2022) .......................................................................................7

*Niz-Chavez v. Garland*,
  141 S. Ct. 1474 (2021) .............................................................................................15

*Ritter v. Migliori*,
  142 S. Ct. 1824 (2022) ..................................................................................... *passim*

*Rosario v. Rockefeller*,
  410 U.S. 752 (1973) ...................................................................................................4

*Schwier v. Cox*,
  340 F.3d 1284 (11th Cir. 2003) .........................................................................4, 6, 7

*Schwier v. Cox*,
  439 F.3d 1285 (11th Cir. 2006) .................................................................................7

*SEC v. Life Partners Holdings, Inc.*,
  854 F.3d 765 (5th Cir. 2017) ...................................................................................12

*Singh v. Garland*,
  855 F. App'x 958 (5th Cir. 2021) (*per curiam*) .........................................................7

*Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*,
  574 F. Supp. 3d 1260 (N.D. Ga. 2021) .....................................................................8

*Smiley v. Holm*,
  285 U.S. 355 (1932) .................................................................................................10

*Terrebonne Par. Sch. Bd. v. Mobil Oil Corp.*,
  310 F.3d 870 (5th Cir. 2002) ...................................................................................12

*Tex. Democratic Party v. Abbott*,
  961 F.3d 389 (5th Cir. 2020) ...........................................................................5, 6, 14

*Thrasher v. Ill. Republican Party*,
  No. 4:12-cv-4071, 2013 WL 442832 (C.D. Ill. Feb. 5, 2013) ..................................8

*Vote.Org v. Callanen*,
  39 F.4th 297 (5th Cir. 2022) ............................................................................ *passim*

*Wash. Ass'n of Churches v. Reed,*
    492 F. Supp. 2d 1264 (W.D. Wash. 2006)...........................................................................7

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001)...........................................................................................................11

**STATUTES**

52 U.S.C. § 10101(a)(2)(B) ............................................................................................ *passim*

Senate Bill 1 ............................................................................................................................1
    § 5.02....................................................................................................................3, 4, 11, 14
    § 5.08.......................................................................................................................4, 11, 14

Tex. Elec. Code § 11.002 ........................................................................................................9

Tex. Elec. Code § 13.001 ........................................................................................................3

Tex. Elec. Code § 13.002 ........................................................................................................3

Tex. Elec. Code § 18.001 ........................................................................................................3

Tex. Elec. Code § 65.011 ......................................................................................................11

Tex. Elec. Code § 82.001 ..................................................................................................3, 13

Tex. Elec. Code § 82.002 ..................................................................................................3, 13

Tex. Elec. Code § 82.003 ..................................................................................................3, 13

Tex. Elec. Code § 82.004 ..................................................................................................3, 13

Tex. Elec. Code § 82.007 ........................................................................................................3

Tex. Elec. Code § 82.008 ........................................................................................................3

Tex. Elec. Code § 84.032 ......................................................................................................14

Tex. Elec. Code § 86.005 ......................................................................................................11

**OTHER AUTHORITIES**

Declan Chin, *A Deep Dive into Absentee Ballot Rejection in the 2020 General
    Election*, MIT Elections Blog (Dec. 16, 2021) .................................................................14

Warren M. Christopher, *The Constitutionality of the Voting Rights Act of 1965*,
    18 STAN. L. REV. 1 (1965) ..................................................................................................4

Fed. R. Civ. P. 56(a) ...............................................................................................................1

J. Fortier & N. Ornstein, *The Absentee Ballot and the Secret Ballot: Challenges
    for Election Reform*, 36 U. MICH. J OF L. REFORM 483 (2003) ........................................5

H.R. Rep. No. 88-914, pt. 2 (1963).........................................................................................4

Intervenor-Defendants Harris County Republican Party, Dallas County Republican Party, Republican National Committee, National Republican Senatorial Committee, and National Republican Congressional Committee support and seek to uphold free and fair elections for all voters, including the voters of Texas. Intervenor-Defendants therefore respectfully ask the Court to deny the OCA Plaintiffs' motion for summary judgment and to uphold the Texas Legislature's duly enacted election laws in Senate Bill 1 ("SB 1").

The OCA Plaintiffs' sole claim raised in their motion is that sections 5.02 and 5.08 of SB 1, which set forth the personal-identification-number requirements for mail-ballot applications and mail ballots, violate the federal materiality provision, 52 U.S.C. § 10101(a)(2)(B). This claim fails as "a matter of law." Fed. R. Civ. P. 56(a). As Intervenor-Defendants have explained in their motion for summary judgment, sections 5.02 and 5.08 do not even *implicate*, let alone violate, the materiality provision. *See* ECF No. 608 at 6–16. The materiality provision prohibits states from refusing to register voters *during the voter-registration process* based upon violations of rules that seek information immaterial to assessing state-law voter qualifications. *See id.* at 6–8. It has no application to the myriad state election laws that have nothing to do with voter registration but instead regulate how voters request, complete, and cast ballots. *See id.*

Under the OCA Plaintiffs' reading, however, the materiality provision prohibits states from adopting *any* mandatory paper-based voting rule that requires an individual to supply *any* information not used to determine qualifications to vote. *See* ECF No. 611 at 44–45. That reading flatly contradicts the materiality provision's plain text, structure, and history—as three Justices of the Supreme Court and a Fifth Circuit motions panel have already explained. *See Ritter v. Migliori*, 142 S. Ct. 1824, 1824–25 (2022) (Alito, J., dissenting from the denial of the application for stay); *Vote.Org v. Callanen*, 39 F.4th 297, 305 n.6 (5th Cir. 2022). Moreover, the fallacy of this sweeping

1

interpretation is further exposed by the fact that it would jeopardize "virtually every [paper-based] rule governing how citizens vote." *Id.* Congress did not tacitly revolutionize all of American election law in the rarely invoked materiality provision passed decades ago. *See* ECF No. 608 at 14–16.

For all of these reasons, and as explained more fully below, the Court should deny the OCA Plaintiffs' motion and grant Intervenor-Defendants' motion for summary judgment.

## ARGUMENT

**I.    THE COURT SHOULD DENY THE OCA PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT.**

As Intervenor-Defendants already have explained, the OCA Plaintiffs' materiality-provision challenge to sections 5.02 and 5.08 fails as a matter of law. *See* ECF No. 608 at 6–16. Indeed, the OCA Plaintiffs' claim flunks at least three essential elements of the materiality provision because sections 5.02 and 5.08 do not (1) "deny the right of any individual to vote," 52 U.S.C. § 10101(a)(2)(B); (2) affect a "determin[ation] whether such individual is qualified under State law to vote," *id.*; or (3) pertain to an "application, registration, or other act requisite to voting," *id.*; *see* ECF No. 608 at 6–16; *Ritter*, 142 S. Ct. at 1824–25 (Alito, J., dissenting from the denial of the application for stay); *Vote.Org*, 39 F.4th at 305 n.6. Each of these failures independently requires summary judgment *against* the OCA Plaintiffs.

The OCA Plaintiffs make several arguments why SB 1 falls within the narrow scope of the materiality provision, despite having nothing to do with voter registration or qualifications. All fail.

A.    *Sections 5.02 And 5.08 Do Not Deny Anyone The Right To Vote.*

Sections 5.02 and 5.08 do not violate the materiality provision because mandatory application of the personal-identification-number requirements does not "deny the right of any

2

individual to vote in any election."  52 U.S.C. § 10101(a)(2)(B); *see also* ECF No. 608 at 9–11.

An individual possesses the right to vote in Texas when she satisfies state-law qualifications and is added to the voter registration list.  *See* Tex. Elec. Code §§ 13.001–.002, 18.001.  But even after qualifying and successfully registering, a voter "may be unable to cast a vote for any number of reasons," such as showing up to the polls after Election Day, failing to sign or use a secrecy envelope for a mail ballot, attempting to vote for too many candidates for a single office, returning the ballot to the wrong location, or arriving at the wrong polling place.  *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay).  When an individual violates such mandatory election rules, declining to count her ballot does not deny her right to vote.  After all, "[e]ven the most permissive voting rules must contain some requirements, and the failure to follow those rules constitutes the *forfeiture* of the right to vote, not the *denial* of that right."  *Id.* (emphases added).

Neither challenged provision of SB 1 even implicates the right to vote, much less works a "denial" of that right.  By definition, *only* successfully registered voters—*i.e.*, people with the right to vote in Texas—can apply for and cast mail ballots.  *See* Tex. Elec. Code §§ 82.001–.004, 82.007–.008 (only "a qualified voter" can apply "for early voting by mail"); *accord* ECF No. 611 at 2.  And noncompliance with sections 5.02 and 5.08 does not trigger prospective disqualification, loss of the right to vote, or removal from the list of eligible voters.  *See* ECF No. 608 at 9–11.  To the contrary, an individual who fails to comply with either section 5.02 or 5.08 remains eligible to vote and can do so in both the present and future elections.  In particular, an individual who fails to provide a personal identification number on her mail-ballot application as required by section 5.02 can (1) cure the faulty application, (2) vote in person in the present election, and (3) vote in future elections.  *See id.* at 9.  And an individual who fails to provide a personal identification

number on her mail ballot as required by section 5.08 can (1) cure the deficient ballot in multiple

ways and (2) vote in future elections.  *See id.* at 9–10.  The materiality provision was enacted only

to prevent election officials from keeping individuals off the voter registration list.  *See Fla. State*

*Conf. of NAACP v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008); *Schwier v. Cox*, 340 F.3d

1284, 1294 (11th Cir. 2003); H.R. Rep. No. 88-914, pt. 2, at 5 (1963); Warren M. Christopher, *The*

*Constitutionality of the Voting Rights Act of 1965*, 18 STAN. L. REV. 1, 7 (1965).  Because neither

section 5.02 nor section 5.08 can affect any voter's registration status, these sections do not

implicate, much less violate, the materiality provision.  *See* ECF No. 608 at 7–11.

The OCA Plaintiffs offer three arguments in support of their position that sections 5.02 and

5.08 deny Texans' "right to vote." ECF No. 611 at 43–54.  None is persuasive.

*First*, the OCA Plaintiffs pepper their motion with assertions that voters are

"disenfranchised" by sections 5.02 and 5.08 when they do not comply with the personal-

identification-number requirements.  *See, e.g.*, *id.* at 1.  Nothing could be further from the truth:

evenhanded, mandatory state voting rules that regulate how individuals cast their ballots do not

"disenfranchise" anyone or deny anyone the right to vote, even when such rules require election

officials to decline to count a noncompliant ballot.  *See, e.g.*, *Ritter*, 142 S. Ct. at 1825 (Alito, J.,

dissenting from the denial of the application for stay); *Vote.Org*, 39 F.4th at 305 n.6; ECF No. 608

at 7–11; *see also Rosario v. Rockefeller*, 410 U.S. 752, 757 (1973) (application of neutral state-

law voting requirements does not "disenfranchise" voters).

Nor can the phrase "right to vote" in the materiality provision be read to include a "right"

to apply for and cast mail ballots.  *See* ECF No. 611 at 43, 54.  Congress could not have intended

that result: after all, when the materiality provision was enacted in the 1960s, the phrase "right to

vote" was commonplace in legal decisions and had a well-established meaning.  *See, e.g.*, *Baker*

*v. Carr*, 369 U.S. 186, 247 (1962) (Douglas, J., concurring) (noting that the "right to vote" was "protected by the judiciary long before that right received … explicit protection it is now accorded" in the civil-rights statutes).  And that meaning did *not* include "a claimed right to receive absentee ballots."  *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807 (1969); *see also Tex. Democratic Party v. Abbott*, 961 F.3d 389, 403–06 (5th Cir. 2020) (holding that *McDonald* remains good law on this point).  Indeed, when Congress enacted the materiality provision, only one state made mail voting widely available, and the vast majority limited mail voting to particular populations like military members and individuals with disabilities.  *See McDonald*, 394 U.S. at 810 & n.9 (cataloguing state practices); *see also* J. Fortier & N. Ornstein, *The Absentee Ballot and the Secret Ballot: Challenges for Election Reform*, 36 U. MICH. J OF L. REFORM 483, 504–05 (2003).

The OCA Plaintiffs attempt to bolster their construction by invoking the statutory definition of "vote."  *See* ECF No. 611 at 43, 53–54 (citing 52 U.S.C. § 10101(a)(3)(A), (e)).  But the materiality provision reaches only denials of the "*right*" to vote—not a state's application of neutral and mandatory rules that govern the *act* of voting.  52 U.S.C. § 10101(a)(2)(B) (emphasis added); *see* ECF No. 608 at 10–11.  In other words, the question is not whether mandatory application of SB 1's personal-identification-number requirements can result in a ballot not being "counted," as the OCA Plaintiffs argue.  ECF No. 611 at 54.  The question instead is whether those rules deprive any individual of the *right* to cast a ballot in accordance with state law.  *See* ECF No. 608 at 9–11.  Because sections 5.02 and 5.08 do not prevent (qualified and registered) voters from casting ballots on equal terms with all other voters, they do not violate the materiality provision. *See id*.

*Second*, the OCA Plaintiffs' assertion that the availability of in-person voting and SB 1's

procedures for curing rejections do "not negate the fact that each such rejection violates [the materiality provision]," ECF No. 611 at 53, simply begs the question.  In fact, that Texas law provides in-person voting and cure opportunities to voters who fail to comply with sections 5.02 and 5.08 reinforces that there is no denial of the right to vote at all, let alone one to "negate."  *See* ECF No. 608 at 9–11.  Indeed, there is no denial of the right to vote because sections 5.02 and 5.08 do not "disqualify potential voters" who fail to comply with the personal-identification-number requirements, *Schwier*, 340 F.3d at 1294, but instead "permi[t] [such voters] to vote" in the current and future elections, *see Tex. Democratic Party*, 961 F.3d at 404; ECF No. 608 at 9–11.

Moreover, the OCA Plaintiffs' discussion of the alleged burdens of in-person voting and curing, *see* ECF No. 611 at 18–26, misses the point.  In the first place, the materiality provision does not regulate the burdens of in-person voting or curing or guarantee a right to vote by mail.  In addition, even on the OCA Plaintiffs' description, Texas's in-person voting and cure procedures are far *less* burdensome than cure procedures upheld by the Supreme Court in a constitutional right-to-vote case.  *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 199 (2008) (emphasizing that failure to provide photo identification could be cured by "travel[ing] to the circuit court clerk's office within 10 days to execute the required affidavit").  And the proof is in the pudding—even the OCA Plaintiffs acknowledge that thousands of Texans whose mail-in ballots were rejected for noncompliance with SB 1 successfully voted in person or utilized SB 1's cure procedures during the 2022 General Elections.  *See* ECF No. 611 at 17.

*Third*, the OCA Plaintiffs asks the Court to ignore the opinions of three Justices of the U.S. Supreme Court and a Fifth Circuit panel in favor of a handful of opinions that, in its view, support its interpretation of "denying the right … to vote."  ECF No. 611 at 53 (brackets omitted).  One of the opinions the OCA Plaintiffs invoke is the Third Circuit's now-vacated panel decision in *Ritter*

*v. Migliori*. *See* ECF No. 611 at 44, 52. The Supreme Court's vacatur of that decision stripped it of any "precedential effect." *County of Los Angeles v. Davis*, 440 U.S. 625, 634 n.6 (1979). Declining to follow that decision is especially prudent here. The Third Circuit considered *Ritter* on an expedited basis, *see Migliori v. Cohen*, 36 F.4th 153, 158 (3d Cir. 2022) (noting "expedited appeal"), and did so based on briefing that one panel member faulted for overlooking important arguments, *see id.* at 165–66 (Matey, J., concurring in the judgment). The *Ritter* panel's incomplete and incorrect analysis is simply of no help to the Court. *See Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay).

Moreover, *Ritter*'s overbroad reading of the materiality provision is irreconcilable with the Fifth Circuit's pronouncement in *Vote.Org*. *See* 39 F.4th at 305 n.6. Remarkably, the OCA Plaintiffs entirely ignore this decision. *See* ECF No. 611 at ii. But a published Fifth Circuit motions panel decision is a much better predictor of what that court will hold on the merits than a vacated out-of-circuit opinion. *See Singh v. Garland*, 855 F. App'x 958 (5th Cir. 2021) (*per curiam*) (noting the "persuasive force" of motions panel decisions).

The OCA Plaintiffs also cite several decisions addressing materiality-provision claims in the context of state laws regulating voter registration. *See Schwier v. Cox*, 439 F.3d 1285 (11th Cir. 2006) (cited at ECF No. 611 at 45, 49); *Schwier*, 340 F.3d 1284 (cited at ECF No. 611 at 43); *Diaz v. Cobb*, 435 F. Supp. 2d 1206 (S.D. Fla. 2006) (cited at ECF No. 611 at 45); *Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264 (W.D. Wash. 2006) (cited at ECF No. 611 at 45, 49). Those cases do not help the OCA Plaintiffs, since—as the OCA Plaintiffs agree—sections 5.02 and 5.08 have nothing to do with voter registration. *See infra* Part I.B.

That leaves only a handful of district court opinions. None of these reached a final merits decision, and none engaged meaningfully with the plain text of the materiality provision or its

essential elements.[1]  Moreover, most of the OCA Plaintiffs' cases all predate—and contravene—more persuasive authority from three Justices of the United States Supreme Court, a unanimous Fifth Circuit panel, and the Pennsylvania Supreme Court.  *See Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay); *Vote.org*, 39 F.4th at 305 n.6; *Ball v. Chapman*, 289 A.3d 1, 37–39 (Pa. 2023) (opinion of Brobson, J.); *see also Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1370–71 (S.D. Fla. 2004) (explaining that the materiality provision "was designed to eliminate practices that could encumber an individual's ability to *register* to vote"); *Thrasher v. Ill. Republican Party*, No. 4:12-cv-4071, 2013 WL 442832, at *3 (C.D. Ill. Feb. 5, 2013) (the "actual harms the statute protects against" is "discrimination in the registration of voters," and "[c]ourts that have applied the statute have done so in the context of voter registration").[2]  The Court should deny the OCA Plaintiffs' motion.

> **B.**   *Sections 5.02 And 5.08 Do Not Affect A Voter Qualification Determination.*

Sections 5.02 and 5.08 do not implicate, let alone violate, the materiality provision for another reason: they do not affect a "determin[ation] whether [any] individual is qualified under State law to vote."  52 U.S.C. § 10101(a)(2)(B); *see* ECF No. 608 at 11–12.  The OCA Plaintiffs agree that sections 5.02 and 5.08 have nothing to do with voter qualification determinations,

---

[1] *Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018) (temporary restraining order) (cited at ECF No. 611 at 44); *Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260 (N.D. Ga. 2021) (denying motion to dismiss) (cited at ECF No. 611 at 49–50); *League of Women Voters of Ark. v. Thurston*, No. 5:20-cv-05174, 2021 WL 5312640 (W.D. Ark. Nov. 15, 2021) (denying motion to dismiss) (cited at ECF No. 611 at 43, 50, 53).  Two opinions also dealt with constitutional claims, not the materiality provision.  *See Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017 (N.D. Fla. 2018) (cited at ECF No. 611 at 54); *Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. 2018) (cited at ECF No. 611 at 54).

[2] The OCA Plaintiffs also repeatedly cite this Court's prior opinion denying Texas's motion to dismiss the materiality claims.  That motion devoted only just over three pages to those claims, *see* ECF No. 145 at 10–13, and there is little overlap between those arguments and the ones advanced by Intervenor-Defendants.  In any event, nothing prevents the Court from reconsidering the issues with the aid of more extensive briefing.

pointing out that "whether [a] voter can provide a number that matches the number contained in their voter file has no bearing on whether they are qualified to vote in Texas." ECF No. 611 at 44.

That agreement is the end of the matter. Indeed, by its plain terms, the materiality provision regulates only requirements and practices related to voter qualifications and registration to vote, not the myriad other rules "that must be met in order to cast a ballot that will be counted." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay); *see also id.* ("[I]t would be absurd to judge the validity of voting rules based on whether they are material to eligibility."). In other words, to fall within the narrow scope of the materiality provision, "it is not enough that the error or omission be immaterial *to* whether the individual is qualified to vote; the paper or record must also be used 'in determining' the voter's qualifications." *Ball*, 289 A.3d at 38 (opinion of Brobson, J.). Because sections 5.02 and 5.08 are not used to make qualification determinations, they fall outside the narrow scope of the materiality provision. *See* ECF No. 608 at 11–12.

The OCA Plaintiffs acknowledge that to determine whether a requirement to disclose information is "material" to voter qualifications, "the information required must be compared to state law qualifications to vote." ECF No. 611 at 44. In Texas, those qualifications are age, U.S. citizenship, mental capacity, lack of felony conviction, and residency. *See* Tex. Elec. Code § 11.002. The OCA Plaintiffs and Intervenor-Defendants agree: sections 5.02 and 5.08 are "not material to determining any of these qualifications." *See* ECF No. 611 at 45; ECF No. 608 at 11–12.

Rather, sections 5.02 and 5.08 are simply two instances of countless state election laws dealing with aspects of voting other than voter registration and qualifications. These include laws governing "supervision of voting, protection of voters, prevention of fraud and corrupt practices,"

and "counting of votes," all of which are necessary for a functional voting system. *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (distinguishing between state laws that "govern[] the registration and qualifications of voters, the selection and eligibility of candidates, [and] the voting process itself"). Since these rules have nothing to do with voter qualifications or registration, they do not implicate the materiality provision. ECF No. 608 at 8; *see also Ritter*, 142 S. Ct. at 1824–25 (Alito, J., dissenting from the denial of the application for stay); *Vote.Org*, 39 F.4th at 305 n.6. Sections 5.02 and 5.08 are precisely such rules, so the materiality provision does not regulate them. *See* ECF No. 608 at 7–13.

The OCA Plaintiffs take a puzzling, sweeping, and untenable contrary position. They assert that sections 5.02 and 5.08 *violate* the materiality provision *because* they do not regulate voter qualification determinations. *See* ECF No. 611 at 44–45. That is backwards. It is because sections 5.02 and 5.08 do not regulate voter qualification determinations that they fall *outside* the materiality provision. *See* ECF No. 608 at 7–13.

Strikingly, the OCA Plaintiffs' position "would subject virtually every electoral regulation" related to voting records and papers to the superintendence of the federal materiality provision, "hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes." *Clingman v. Beaver*, 544 U.S. 581, 593 (2005). Indeed, under the their reading, "no election law that imposes informational requirements … unrelated to determining voter qualification[s] can survive a [§ 10101(a)(2)(B)] challenge." *Ball*, 289 A.3d at 39 (opinion of Brobson, J.). Even as the Supreme Court has long and repeatedly held that the States have compelling interests in preventing fraud and protecting voters, *see, e.g.*, *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2340 (2021), the OCA Plaintiffs would transform the materiality provision into a blunt instrument against rules serving those same interests. Congress

10

does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Yet the OCA Plaintiffs would have the Court believe that Congress, in the rarely-invoked materiality provision, quietly rewrote all of American election law almost sixty years ago.

The OCA Plaintiffs' sole attempt to address the radical implications of their position is to suggest—without explanation—that a law that "helps to establish a voter's identity" may be material in determining her qualifications. ECF No. 611 at 45. But there is no principled basis for this halfhearted attempt at a carveout. As the OCA Plaintiffs elsewhere recognize, materiality is defined with reference "to state law qualifications to vote," and satisfaction of sections 5.02 and 5.08's requirements "has no bearing" on whether those qualifications are met. *Id.* at 44. The OCA Plaintiffs even collect a string cite of cases holding that personal-identification information "is not material to determining [voter] qualifications." *See id.* at 45. The OCA Plaintiffs thus cannot avoid the absurd consequence of their reading: that *all* paper-based state laws designed to identify voters and prevent fraud—or indeed, to serve any purpose besides determining voter qualifications—are preempted by the materiality provision, no matter how necessary they may be.

Indeed, if the OCA Plaintiffs prevail, commonplace state-law rules requiring voters to sign mail ballots would be jeopardized. *See* Tex. Elec. Code. § 86.005(c); ECF No. 608 at 14. So too would prohibitions on "mark[ing] [a] ballot for more candidates for an office than the number of persons to be elected for that office." Tex. Elec. Code § 65.011; *see* ECF No. 608 at 14. Carrier-envelope requirements, pollbook requirements, and voter assistance-forms would also be on the chopping block. *See id.* at 14–15. And litigants around the country would surely identify countless other laws that transgress the OCA Plaintiffs' newly supercharged materiality provision.

This Court should decline the OCA Plaintiffs' invitation to revolutionize American election law. Their interpretation is inconsistent with the materiality provision's text, history, and structure.

It leads to absurd results.  It also defies the rule that "alter[ations to] the usual constitutional balance between the States and the Federal Government" must be "unmistakably clear in the language of [a] statute."  *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (internal quotation marks and citation omitted); *see Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (*per curiam*); ECF No. 608 at 15.  And it risks rendering the materiality provision unconstitutional.  *See* ECF No. 15–16.  Rejecting the OCA Plaintiffs' radical interpretation avoids all those problems.  The Court should deny the OCA Plaintiffs' motion.

C.      *Sections 5.02 And 5.08 Do Not Relate To Voter Registration Materials.*

Sections 5.02 and 5.08 also do not implicate, let alone violate, the materiality provision because they do not relate to an "application, registration, or other act requisite to voting."  52 U.S.C. § 10101(a)(2)(B); ECF No. 608 at 12–13.  The materiality provision applies "only" to documents related to "voter registration specifically," *Vote.Org*, 39 F.4th at 305 n.6, not to mail-ballot applications or mail ballots, *see* ECF No. 608 at 12–13.

The OCA Plaintiffs do not grapple with this element of their claim.  Instead, they simply state without argument that "the [application for a ballot by mail] form or the mail ballot carrier envelope" relates to an "application, registration, or other act requisite to voting."  ECF No. 611 at 44.  Such "a conclusory assertion" is "forfeited."  *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 778 n.7 (5th Cir. 2017).  As both the "movant" and the party that "carries the ultimate burden of persuasion" at trial, the OCA Plaintiffs must show that they satisfy "each element" of their claim.  *Terrebonne Par. Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002).  So on the basis of this forfeiture alone, their motion for summary judgment must be denied.

D.      *The OCA Plaintiffs' Various Factual Assertions Are Irrelevant And Wrong.*

The OCA Plaintiffs devotes substantial space to highlighting the supposed consequences of enforcing SB 1's personal-identification-number requirements.  *See* ECF No. 611 at 14–26.  In

particular, the OCA Plaintiffs claim that enforcing sections 5.02 and 5.08 will leave "over 2.6 million registered voters . . . at an increased risk" of not having their vote counted. *Id.* at 10. This incendiary claim is both factually misleading and legally irrelevant.

Starting with the facts, the OCA Plaintiffs overstate the burden on voters associated with SB 1's personal-identification-number requirements. Their estimate of 2.6 million voters facing "increased risk" relates to alleged problems with the Texas Election Administration Management (TEAM) database. *Id.* at 10. It is also an exaggeration—for several reasons. To start, Texas law limits eligibility to vote by mail to voters who are elderly, disabled, incarcerated, or out of state during the voting period. *See* Tex. Elec. Code §§ 82.001–.004. Thus, even according to OCA Plaintiffs' own statistics, the supposedly at-risk population that is eligible to vote by mail is a small fraction of the 2.6 million number. *See id.* at 12.

Moreover, the OCA Plaintiffs deem the vast majority of this population—around 2.4 million Texans—at risk merely because they have "only one" of their personal identification numbers recorded in the State's database, raising the odds that they will write down the wrong number. *See* ECF No. 611 at 10 & n.30 (citing Hersh Feb. 2022 Rep. ¶¶ 5(a)). Many of those voters, however, will simply remember which identification number they registered with. *See* ECF No. 608-3 ¶¶ 22, 25(C). And many voters—as advised by election officials—recorded *both* personal identification numbers and had their ballots counted. *See id.* ¶ 24. That widespread, lawful practice mitigates any risk of prejudicial database errors.

Furthermore, Texas has taken and continues to take strenuous efforts to strengthen its database. *See* Keith Ingram Mar. 2023 Dep. at 109–10 (Ex. A) (discussing, for example, effort to connect voter registration files to Texas.gov); ECF No. 611 at 12 (acknowledging point); *see also Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1838 (2018) (acknowledging that "about one

in eight" voter registrations in the United States have problems).  Texans can also "easily" update their voter registration files to ensure all relevant information is correct.  Keith Ingram March 2023 Dep. at 103 (Ex. A); *see id.* at 109 ("[T]he voter has the responsibility to make sure their information in the voter registration record is correct and accurate and updated."); *see* Eitan Hersh April 2023 Dep. at 115 (Ex. B) (acknowledging that point).  In addition, anyone who cannot successfully apply for a mail ballot can always vote in person—either during extensive early voting or on Election Day.  Tex. Elec. Code § 84.032; *Tex. Democratic Party*, 961 F.3d at 404 ("Texas permits [such voters] to vote in person; that is the exact opposite of absolutely prohibit[ing] them from doing so.").

The actual mail-ballot rejection rate during the 2022 General Election exposes the OCA Plaintiffs' factual claims as hyperbolic.  "[O]nly 6,355 mail-in ballots . . . were rejected for a reason relating to identification, and where the voter did not cure the ballot or vote in person."  ECF No. 608-3 ¶ 6; *see also* ECF No. 611 at 18 n.69.  "That is well less than one out of every one thousand votes statewide."  ECF No. 608-3 ¶ 6.  And as the OCA Plaintiffs recognize, ECF No. 611 at 52, every one of those individuals who cast a noncompliant ballot *must have* successfully completed the mail-ballot application, including by providing a correct personal identification number under section 5.02, *see* SB 1 § 5.02.  Thus, the only individuals whose noncompliant ballots were not counted were those who remembered and supplied the correct number on their mail-ballot application, *see id.*, but not on their mail ballot, *see id.* § 5.08.

In all events, Texas's ultimate rejection rate (accounting for cures) was just 2.7%, *see* Hoekstra Supp. Resp. to Hersh at 3, which is lower—and certainly not substantially higher—than the rate in some other states, such as New York, where the mail-ballot rejection rate during the 2020 General Election was 3.62%, *see* Declan Chin, *A Deep Dive into Absentee Ballot Rejection*

*in the 2020 General Election*, MIT Elections Blog (Dec. 16, 2021), https://elections-blog.mit.edu/articles/deep-dive-absentee-ballot-rejection-2020-general-election.   And there is every reason to expect that Texas's rejection rate will continue to drop as voters become more familiar with SB 1's relatively new rules.  *See id*; Keith Ingram March 2023 Dep. at 20 (Ex. A) (explaining basis for belief "that the number of statewide mail ballot rejections would continue to improve")*.*  Indeed, several Texas election officials have acknowledged that voter education efforts were successful in lowering the rejection rate in 2022.  *See* ECF No. 608 at 6.  Those efforts will continue.  *See, e.g.*, Callanen Second Dep. at 64–65 (Ex. C) (discussing anticipated 2024 voter education efforts in Bexar County).  In short, contrary to the OCA Plaintiffs' suggestion, a sober examination of the evidence reveals that the sky is not falling in Texas.

Even if the OCA Plaintiffs' assertions were true, however, they would be legally irrelevant.  The materiality provision does not regulate the State's TEAM database.  It applies only to voter-registration rules that seek information immaterial to assessing voter eligibility and result in voter registration applications being denied.  *See* ECF No. 608 at 7–8; *supra* Part I.A.  It is not a general prohibition on States adopting mandatory election rules.   Allegations that election rules are unlawful because they resulted in too many rejected ballots may be relevant to other legal claims— like the 14th Amendment right to vote.  *See, e.g.*, *Crawford*, 553 U.S. at 190–91.  But when it comes to the materiality provision, these are mere "consequentialist" policy appeals that can "play[] no role in [the Court's] decision."  *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1486 (2021).  Therefore, the Court should assign no weight to the OCA Plaintiffs' exaggerated claims about the alleged consequences of SB 1's personal-identification-number requirements.

## CONCLUSION

The Court should deny the OCA Plaintiffs' motion for summary judgment.

Dated: June 23, 2023

Respectfully submitted,

*/s/ John M. Gore*
John M. Gore
E. Stewart Crosland (*pro hac vice*)
Stephen J. Kenny (*pro hac vice*)
Louis J. Capozzi III (*pro hac vice*)
Ryan M. Proctor
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
jmgore@jonesday.com
scrosland@jonesday.com
skenny@jonesday.com
lcapozzi@jonesday.com
rproctor@jonesday.com

*Counsel for Intervenor-Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2023, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send notification of this filing to all counsel of record.

*/s/ John M. Gore*

16