1          IN THE UNITED STATES DISTRICT COURT

2            WESTERN DISTRICT OF TEXAS

3               SAN ANTONIO DIVISION

4   LA UNION DEL PUEBLO ENTERO,  :

5   et al.,                      :

6          Plaintiffs,       :  Case No.:

7            VS.              :  5:21-CV-844-XR

8   GREGORY W. ABBOTT, et al.,   :

9          Defendants.       :  Page 1-129

10                        - - -

11            Thursday, April 20, 2023
                          - - -

12

13        Videotaped Deposition of DR. EITAN HERSH

14   was taken at U.S. Department of Justice, 150 M

15   Street, NE, 8th Floor, Washington, DC commencing at

16   10:08 a.m., before Sherry L. Brooks, Certified

17   LiveNote Reporter and Notary Public, in and for the

18   District of Columbia.

19                        - - -

20            MAGNA LEGAL SERVICES

21              WWW.MAGNALS.COM

22



```
 1  A P P E A R A N C E S:

 2

 3  U.S. DEPARTMENT OF JUSTICE
    BY:  DANIEL J. FREEMAN, ESQUIRE
 4       RICHARD DELLHEIM, ESQUIRE
    4 Constitution Square (4CON)
 5  150 M Street, NE/8.143
    Washington, DC  20530
 6  (202) 305-5451
    E-mail:  Daniel.Freeman@usdoj.gov
 7  Representing the Plaintiffs

 8
    OFFICE OF THE ATTORNEY GENERAL OF TEXAS
 9  BY:  DAVID BRYANT, ESQUIRE
    P.O. Box 12548
10  Austin, TX  78711
    (512) 936-2275
11  E-mail:  David.Bryant@oag.Texas.gov
    Representing State Defendants
12

13  JONES DAY
    BY:  STEPHEN J. KENNY, ESQUIRE
14  51 Louisiana Avenue, NW
    Washington, DC  20001
15  (202) 879-3667
    E-mail:  Skenny@jonesday.com
16  Representing Intervenor Defendants

17  ALSO PRESENT:

18       Kim Johnson - Videographer

19  VIA ZOOM

20       Kenneth Broughton - Reed Smith, Haul Defendants

21       Jacqueline Villarreal

22
```



```
 1                      I N D E X

 2                        - - -

 3   TESTIMONY OF:  Eitan Hersh

 4   By Mr. Bryant                              5, 123

 5   By Mr. Freeman                                120

 6

 7

 8

 9

10    P R E V I O U S L Y   M A R K E D   E X H I B I T S

11   EXHIBIT NUMBER      DESCRIPTION           PAGE MARKED

12   Exhibit 1          Curriculum Vitae - Eitan        5

13                       Hersh

14   Exhibit 2          Second Supplement to Report     5

15                       on Identification Number

16                       Requirements for Mail

17                       Balloting Under SB1

18

19

20

21          (Exhibits attached to transcript.)

22                        - - -
```



```
 1                 P R O C E E D I N G S

 2                           - - -

 3              THE VIDEOGRAPHER:  Here begins the video

 4    recorded deposition of Dr. Eitan Hersh taken in the

 5    matter of La Uniï¿½n Del Pueblo Entero, et al. versus

 6    Gregory Abbott, et al., in the U.S. District Court

 7    for the Western District of Texas, Case No.

 8    5:51-CV-00844.

 9              Today's date is April 20th, 2023.  The

10    time is 10:08.  This deposition is being held at 150

11    M Street, Northeast, Washington, DC.

12              The court reporter is Sherry Brooks.  The

13    video camera operator is Kim Johnson, both are on

14    behalf of Magna Legal Services.

15              Will counsel please introduce yourselves

16    and state whom you represent?

17              MR. BRYANT:  My name is David Bryant.  I

18    represent the Office of the Attorney General of Texas

19    and represent the state defendants in this case.

20              MR. FREEMAN:  This is Dan Freeman on

21    behalf of the United States.  With me from the

22    Department of Justice is Richard Dellheim.
```



```
 1            THE VIDEOGRAPHER:  On Zoom?

 2            MR. KENNY:  This is Stephen Kenny, Jones

 3  Day, representing the intervener defendants.

 4            MR. BROUGHTON:  This is Kenneth Broughton

 5  from Reed Smith representing the Haul defendants.

 6            THE VIDEOGRAPHER:  Will the court reporter

 7  please swear in the witness?

 8            *     *     *     *     *

 9  WHEREUPON,

10                    EITAN HERSH

11            after having been first duly sworn, was

12            examined and testified as follows:

13                      - - -

14            (Exhibit Number 1 and 2 were marked for

15  identification and were attached to the deposition.)

16            EXAMINATION BY COUNSEL FOR STATE

17            DEFENDANTS

18            BY MR. BRYANT:

19      Q.    Dr. Hersh, my name is David Bryant.  I'm

20  here on behalf of the state defendants, the state of

21  Texas, in this matter.  And I want to ask you some

22  questions about work that you have done as an expert
```



 1   in connection with this case.

 2             Last evening I received from Mr. Freeman

 3   an updated CV for you, and I believe that that is

 4   marked as Exhibit 1 in front of you.

 5             Could you describe for me the changes that

 6   are in that CV as compared to the previous CV that

 7   was provided to the other parties in this case?

 8       A.    Yes, sir.  So this is my current CV.

 9   Let's see, changes since about last year this time,

10   around then, the trustees of the university I work

11   for promoted me to full professor --

12       Q.    Congratulations.

13       A.    Thank you -- effective this summer at some

14   point.  So that's the first change.

15             On page 2 I've published -- I don't know

16   -- maybe four or so more peer-reviewed research

17   articles on topics including local leadership and

18   community influence, antisemitism, freedom of

19   expression, and the political rule of business

20   leaders.  The top four or five or so are probably new

21   or updated since the last CV.

22             In Section 6, Other Writing, I've



1  published a few months ago an article about "Politics

2  in the Workplace in the Atlantic."

3             In the Section 7, Teaching, I'm teaching a

4  new course this year for the first time on American

5  Conservatism, so that's listed there.

6             Let's see.  I added -- I gave an invited

7  talk at SUNY New Paltz a couple weeks ago actually.

8  And what else?  I have updated consulting and expert

9  witness sections.  So the final section, Section 12,

10 lists court cases in which I've been deposed,

11 including two ones (sic) that I think have happened

12 since I was last deposed in this case.

13    Q.    So on the third page of Exhibit 1 there's

14 -- Number 12 is described as, quote, Expert witness

15 testimony since 2019.

16            Are all of the items listed there ones in

17 which you testified by deposition as opposed to in

18 court?

19    A.    That's correct.  None of the -- as far as

20 I know, none of those cases went to court.  They were

21 all deposed.

22    Q.    Okay.  And have you ever testified as a



 1  witness before any court?

 2      A.    Yes.

 3      Q.    When did you last do that?

 4      A.    I think it was in 2018.

 5      Q.    Okay.  How many times have you done it?

 6      A.    In court, one time.

 7      Q.    And what was that case in approximately

 8  2018 when you testified in court?

 9      A.    The case was called Fish v. Kobach.  It

10  was a federal case in Kansas.  The case was about --

11  I believe it was about providing documentary proof of

12  citizenship when registering to vote, and my

13  testimony was about a couple things.

14          One was about whether noncitizens are

15  registering and voting in Kansas elections and then

16  there was some methodological expertise on surveys

17  and misreporting in surveys and a few other things

18  that came up at trial.

19      Q.    Are you currently providing expert

20  consulting or witness services in other cases in

21  which you've not yet been deposed?

22      A.    Currently, yes, one other case.



 1       Q.    What is that case?

 2             MR. FREEMAN:   I'm going to object to the

 3    extent that those are subject to the limitations on

 4    disclosure of consultants, also to the extent that

 5    those go to something that is confidential under an

 6    employment agreement with respect to a party who is

 7    not present.  That doesn't really provide them an

 8    opportunity to properly object, and it might be

 9    requesting the witness to violate a confidentiality

10    clause in a contract.

11             MR. BRYANT:   Okay.  I certainly don't

12    intend to request a witness to violate a

13    confidentiality obligation he may have.

14             BY MR. BRYANT:

15       Q.    Would answering that question require you

16    to do so?

17       A.    I think so because my role hasn't been

18    disclosed.

19       Q.    Okay.  Is that a voting rights case?

20       A.    It's a voting case, yes.

21       Q.    We're going to look at your second

22    supplement to your report dated February 3rd, 2023.



```
 1  Have you done any additional work related to your

 2  reports since the date of that report?

 3       A.    Yes.

 4       Q.    Could you describe that work?

 5             MR. FREEMAN:   May I get a copy if you're

 6  going to discuss his report?

 7             MR. BRYANT:   Sure.

 8             Daniel, I will apologize that the extra

 9  copies that I have do not have the cover page on

10  them, but I believe it's otherwise intact.

11       A.    Should I answer?

12             BY MR. BRYANT:

13       Q.    Yes.

14       A.    So since writing the report my work

15  amounted to, I think, two things.  One was preparing

16  for this testimony.  I reviewed reports.  I reviewed

17  a rebuttal report from the state's witness.

18             I reviewed some of my computer code.  And

19  then reflecting on one of the interesting points in

20  the rebuttal witness's report, I ran a quick

21  supplementary analysis just to see if the results

22  changed based on something that Dr. Hoekstra
```



 1  mentioned.

 2      Q.    All right.  If I understand your answer

 3  correctly, in preparation for the deposition you

 4  reviewed the various data and other material that was

 5  already part of your previous analyses; is that

 6  right?

 7      A.    Correct.

 8      Q.    And the only thing that you did that was a

 9  new analysis or new work was this quick supplementary

10  analysis that you just referred to?

11      A.    That's right.

12      Q.    And could you describe that supplementary

13  analysis?

14      A.    Sure.  So it referenced the third

15  component in this second supplemental report.  I had

16  looked at whether there was a difference in use of

17  mail voting among people who were in this at-risk

18  pool; that is, the pool of people who through -- who

19  seemed to have -- who I suggested in my reports might

20  have an issue complying with SB1 on account of them

21  having either multiple ID numbers or not having an ID

22  number listed in the voter file and TEAM or having a



 1   typo.

 2            So in the report I looked at whether there

 3   was a difference in use of mail voting depending on

 4   whether one was in that at-risk population and when

 5   -- whether one was not in that at-risk population.

 6            Dr. Hoekstra suggested maybe there are

 7   other reasons why there might be a different

 8   participation rate, so I wanted to do an analysis

 9   where I controlled for some of the key factors, such

10   as county -- age would be the biggest one -- gender,

11   anything that was available that would be a correlate

12   to confirm that my results would be the same

13   controlling for these other factors.

14            Dr. Hoekstra also mentioned that -- a

15   claim, that perhaps those in that at-risk population

16   voted less by mail, but they did not vote less in

17   general, meaning they -- instead of voting by mail

18   they voted in person.

19            And so instead of checking whether -- or

20   in addition to checking whether the at-risk

21   population had a lower mail voting rate, I checked to

22   see whether the at-risk population had an overall



Dr. Eitan Hersh

1  lower turnout rate.  And I find that, indeed, they

2  did and also controlling for those demographic and

3  geographic factors.  So that's the analysis I ran.

4       Q.    Okay.  If you're asked to testify at the

5  trial of this case, do you expect to testify at all

6  about that supplementary analysis that you have done

7  since your February 3rd, 2023 second supplement?

8       A.    Insomuch as -- if it comes up by Dr.

9  Hoekstra, I guess, you know, that this was a

10  criticism, my intuition would be to make sure that I

11  would be able to respond to that criticism and allay

12  the concern that he addressed.

13       Q.    Okay.  On behalf of the state defendants,

14  we'd request a copy of your supplemental analysis and

15  any supporting materials if there's a possibility

16  that those will be used by you at trial.

17            MR. FREEMAN:  And we're happy to provide

18  something by -- there's a supplementation or

19  correction deadline.  We're happy to work with Dr.

20  Hersh to get you something by then.  That's fine.

21            MR. BRYANT:  Okay.

22            BY MR. BRYANT:



1      Q.     Dr. Hersh, have there been any changes in

2   your compensation rate for your work in this case

3   since you began it?

4      A.     No, sir.

5      Q.     Approximately, how much compensation have

6   you billed to date on this matter?

7      A.     I wouldn't be able to give you a good

8   estimate, sir, not off the top of my head anyway.

9   I'm happy to find the data.

10      Q.     And do you have any estimate as to how

11   much you've actually been paid for your work in this

12   case to date?

13      A.     I really don't have an estimate.  It's

14   been going on for over a year now, I guess.

15      Q.     Do you have any estimate as to how much

16   compensation you expect to bill through the trial of

17   this case?

18      A.     I really don't.  In fact, before five

19   minutes ago I didn't know there might be a

20   supplementary analysis to do.

21      Q.     Okay.  You described a little bit earlier

22   in your testimony the preparation that you did for



1  your deposition here today, and I believe one of the

2  things that you said was that you reviewed some

3  computer code in preparation for your deposition.

4          Could you describe more specifically what

5  you did in that regard?

6      A.   Sure.  So I believe as part of each

7  reports -- the sharing of each report with --

8  certainly with my attorneys, I think with defendants

9  as well, I've shared the code.  It's a software

10 program called STATA.  The code is the file of

11 commands that are used to manipulate the data.

12         And so if you can look at the code, you

13 see, you know, all the manipulations that happen that

14 produce all the results.  And so I just looked at the

15 same code file that was, I assume, disclosed to

16 defendants.

17     Q.   Okay.  Do you recall reaching any

18 conclusions as a result of your review of the

19 computer code in preparation for your deposition

20 today?

21     A.   No new conclusions.  It just really

22 reminded me of what the analysis was.



Dr. Eitan Hersh                                        April 20, 2023
                                                          Page 16

```
 1        Q.    Okay.  Now, you've been deposed a number

 2  of times before, and you have counsel present, so I'm

 3  not going to go through a lot of ground rules with

 4  you.

 5              But, obviously, if you have any trouble

 6  understanding my questions or you want me to be more

 7  specific, please feel free to tell me.  If you go

 8  ahead and answer the question, I'll assume that you

 9  do adequately understand me.

10              And, similarly, if you at any time want to

11  take a break -- if there's a question pending, please

12  complete that question.  But, otherwise, feel free to

13  take a break at any time as we -- as we go through

14  our day.

15              About how many times have you been -- have

16  you given a deposition?

17        A.    Maybe seven or so.

18        Q.    Yeah, it's hard to count after a while,

19  doesn't (sic) it?  I know I can't -- I couldn't

20  estimate the number of depositions that I've

21  participated in.

22              Now, do you expect to testify at the trial
```



Dr. Eitan Hersh                                    April 20, 2023
                                                       Page 17

 1  of this case?

 2       A.    If I'm asked to.

 3       Q.    If requested to testify, do you have any

 4  professional opinions that you would expect to

 5  provide in connection with this case?

 6            MR. FREEMAN:  Objection.  Form.

 7       A.    I mean, I assume I would be asked to share

 8  my insights having done the research that is reported

 9  in these three different reports I've written.

10            BY MR. BRYANT:

11       Q.    Okay.  Maybe there's a difference between

12  the term I used, which was a professional opinion, as

13  opposed to insight from work that you have done.

14            Do you recognize any such difference?

15       A.    I'm not sure, so I guess I would say that,

16  you know, I'm a political scientist.  I study

17  elections, that I use, you know, a certain set of

18  methodologies to study elections.  That skill set and

19  expertise is, I assume, why I was asked to be an

20  expert in cases like this one.  That knowledge

21  translates into the report.

22            If you're asking about expertise that is



```
 1  unrelated to the report, I don't see why I'd be asked

 2  to opine on anything not related to the work I've

 3  done for the case.

 4       Q.   I understand that.  And, for example, in

 5  your reports you summarize some conclusions from your

 6  analysis.  In most or all instances you don't go on

 7  to say, and, therefore, I'm of the opinion that X.

 8  That would be a -- the kind of opinion that I'm

 9  asking you about.

10           Do you have any professional opinions of

11  that type that you would be prepared to testify

12  about?

13           MR. FREEMAN:  Objection.  Form.

14       A.   Yeah, I'm struggling a little bit with the

15  hypothetical here.

16           BY MR. BRYANT:

17       Q.   Okay.

18       A.   I think that I draw conclusions and opine

19  based on the conclusions in the report.  You know,

20  for --

21       Q.   Okay.  We'll go down -- I don't mean to

22  cut you off.  Go ahead and finish your answer.
```



 1       A.     I recall -- I don't know if it was in this

 2  report or a previous one -- where I reflect on the

 3  cleanliness of the TEAM file and its ability to be

 4  used to confirm someone's identity in the way that is

 5  being asked through SB1.

 6              So I would say that's, you know, an

 7  opinion formed through the analysis.  I assume that's

 8  the kind of opinion that I would be providing that's,

 9  you know, coming -- flowing from my expertise through

10  the work that I've done on the case.

11       Q.     Okay.  In general this lawsuit concerns a

12  bill that changed voting laws in Texas in 2021 that's

13  referred to as SB1.  And you referred to that bill, I

14  believe, in your various reports.

15              So were you familiar with that piece of

16  legislation that was enacted in Texas?

17       A.     Yes, sir.

18       Q.     And is your work or your opinions related

19  to any aspect of SB1, other than mail-in voting?

20       A.     No.

21       Q.     And did you do any work -- do you have any

22  opinions related to any effect of SB1 on voting by



Dr. Eitan Hersh                                                April 20, 2023
                                                               Page 20

```
 1  any racial groups?
 2       A.    Can you just repeat the question?
 3       Q.    Yeah.  Does your work or do you have
 4  opinions based on your work about the effect, if any,
 5  of SB1 on voting by different racial groups?
 6       A.    No, sir.  That's not an analysis I
 7  conducted.
 8       Q.    And do you have any -- did you do any work
 9  or do you have any opinions based on your work
10  regarding whether or not SB1 was intended to
11  discriminate against any racial group, including
12  Hispanics?
13       A.    I did no analysis on intent.
14       Q.    And so you have no opinions based on your
15  work regarding that subject?
16       A.    Correct.
17       Q.    Okay.  And did you do any work and do you
18  have any opinions on any effects of SB1 on voters
19  with disabilities?
20       A.    Yes, sir.
21       Q.    Could you describe what work you did in
22  that regard?
```



1    A.    Sure.   There were a couple of statuses in

2    the DPS database reflecting those who have DPS

3    identification numbers who are disabled veterans or

4    homebound, and so I did analyses in all the reports

5    about the number of those who have these flags in the

6    DPS system for disability, how many of them appear in

7    my at-risk pool, for example.

8    Q.    Okay.   Did you do any other work on that

9    subject?

10   A.    No.   I believe the homebound and disabled

11   veteran status codes amounts to the work that I did

12   related to disability in this case.

13   Q.    And is all of that reflect -- work and the

14   results of it reflected in your reports that you

15   provided to the parties in this case?

16   A.    Yes, sir.

17   Q.    Okay.   Did you do any work on voters with

18   disabilities who were neither homebound nor disabled

19   veterans?

20   A.    I didn't -- so just to be clear for both

21   this question and the question you asked about like

22   racial groups, obviously, there's a mix of people of



1  different racial groups or different disability

2  statuses who are in -- presumably in like the at-risk

3  pool.

4          But I did not do a specific analysis about

5  race and I didn't do a specific analysis about

6  disability, other than the homebound and disabled

7  veteran statuses.

8      Q.   Okay.  And there would be people, you

9  would expect, of every racial group in the voter

10 population that you would not describe as at-risk; is

11 that correct?

12     A.   That's right.

13     Q.   And, similarly, there could be disabled

14 voters in the portion of the Texas voting population

15 that are not in your category of at-risk voters; is

16 that right?

17     A.   That's right.

18     Q.   Now, have you done any work or do you have

19 any opinions on the extent of vote fraud in Texas

20 either before or after the passage of SB1 or both?

21     A.   Do I have any opinions about it?  Is that

22 your question?



 1      Q.    Professional opinions based on your work.

 2      A.    So I have done a lot of research.  I've

 3 read a lot of scholarly literature on fraud claims,

 4 so I have opinions about the incidents of fraud at a

 5 national level.

 6            And, of course, I've done a couple of

 7 cases in other states that lead me to have views

 8 about the incidents of in-person fraud, noncitizens

 9 trying to vote, people voting in multiple states at

10 the same time, but I didn't do any work in these

11 reports about -- specifically about Texas before and

12 after this law and its relationship to fraud.

13      Q.    And so you don't have any opinions based

14 on your work in this case regarding the extent, if

15 any, of voter fraud in Texas either before or after

16 SB1 or both of them?

17      A.    Well, again, just to make sure we're on

18 the same page, I do have professional opinions about

19 what I know about the incidents of fraud in the

20 country, to the extent that I've done a lot of work

21 on this question.

22            So to the extent that that view carries



 1  into the state of Texas, then I have a professional

 2  opinion about it.  To the extent that you're asking

 3  specifically about did I do an analysis about fraud

 4  in Texas before and after, the answer is no.

 5      Q.   Okay.  Did you do any work or do you have

 6  any opinions about the effectiveness of SB1, if any,

 7  about deterring vote fraud?

 8      A.   So this ties into the last question a bit.

 9  Given what I understand to be an incredibly low rate

10  of the existence of, you know, fraud in U.S.

11  elections, I have an opinion about what SB1 might be

12  able to do in terms of responding to fraud.

13          So I have a professional view about that.

14  But, again, if you're asking about -- did I do an

15  analysis about the incidents of fraud before and

16  after, the answer is no.

17      Q.   Okay.  And is it also true that you can't

18  draw any professional opinions about the

19  effectiveness of SB1 in deterring or detecting fraud

20  based on the work you did in this case?

21          MR. FREEMAN:  Objection.  Form.

22      A.   The opinions that I have about the ability



Dr. Eitan Hersh                                        April 20, 2023
                                                              Page 25

 1   of SB1 to deter fraud comes from my professional

 2   knowledge about the incidents of fraud beyond this

 3   case, but it doesn't come from any reports that I've

 4   done for this case.

 5               BY MR. BRYANT:

 6       Q.    Do you have any understanding of the

 7   purpose or purposes of the Texas legislature in

 8   imposing identification requirements for mail-in

 9   voting in SB1?

10       A.    No.  As I said, I didn't do an intent

11   analysis.

12       Q.    In your testimony earlier and also in your

13   reports you refer to a -- the term "DPS ID."

14               Could you explain for the record what that

15   means?

16       A.    Sure, so Department of Safety

17   Identification.  Typically, a driver's license

18   number.  Those who have driver's licenses have been

19   assigned a driver's license number.  They may have

20   more than one.

21               There's also a couple of other kinds of

22   IDs one might have through DPS that is not a driver's



Dr. Eitan Hersh                                        April 20, 2023
                                                              Page 26

1  license.  So -- but, essentially, the Department of

2  Public Safety has a list of individuals, many listed

3  more than once, with one or more identification

4  number.  Again, typically, a driver's license.

5       Q.    So is it correct that in your reports and

6  in your testimony when you use the term "DPS ID"

7  you're encompassing both Texas driver's licenses and

8  state ID cards issued by the Department of Public

9  Safety in Texas?

10      A.    Yes, sir.

11      Q.    All right.  Could you take a brief look at

12 Exhibit 2 and identify that for the record?

13      A.    Exhibit 2 is a second supplement to my

14 report, so this is the third report that I've written

15 for this case, dated February 3rd, 2023.

16      Q.    Okay.  And on page 2 of that report under

17 the general heading Abstract you describe three types

18 of work or analysis that you did in connection with

19 this case.

20            Let's look first at the one that is

21 indicated as Number 1.  And could you describe

22 generally what that refers to?



```
 1        A.    Sure.  I did an analysis to answer the

 2   question who in Texas, which voters, could fill out a

 3   mail ballot application or a mail ballot carrier

 4   envelope -- mail ballot itself correctly according to

 5   the law, providing the information that was asked of

 6   them, but on account of database issues, essentially,

 7   their form would be rejected.

 8             There were three basic ways a form like

 9   that could be rejected.  Again, this is filled out

10   accurately by the voters, so it's not a problem with

11   the voter messing something up.

12             One is that many Texas voters have DPS ID

13   numbers, but those numbers are not listed in the

14   voter registration system, which I'll refer to as

15   TEAM as an abbreviation.

16             So if they fill out the form, they're

17   asked to fill out that number.  TEAM doesn't have the

18   number listed, so their form is rejected.  That's

19   Number 1.

20             Number 2 is that it turns out that many

21   Texas voters have multiple DPS ID numbers, maybe a

22   driver's license and a separate one for a motorcycle
```



Dr. Eitan Hersh                                          April 20, 2023
                                                         Page 28

1  or they have a -- I don't know totally all the

2  circumstances why so many voters have multiple DPS ID

3  numbers.

4          Maybe someone was a driver and they had a

5  driver's license but then they, you know, got to a

6  place where they weren't driving anymore and they

7  wanted a different kind of ID card.  I'm speculating

8  a little bit on the circumstances, but for whatever

9  the circumstances are, people have multiple ID

10 numbers.

11         According to the form that these voters

12 are asked to fill out, they can fill out any valid or

13 actually expired driver's license number.  But the

14 way that the TEAM database is structured, TEAM only

15 lists up to one DPS ID number.

16         So if the voter happens to list the one

17 that's valid for the purposes of compliance but it's

18 not the one listed by TEAM, their form will also be

19 rejected.

20         And the third category is that for a

21 variety of reasons the TEAM file has lots of typos on

22 social security number and on DPS ID number, you



1  know, a social security number that's off by one

2  digit.  And, again, if the voter does everything

3  right and lists their correct information, they still

4  could be rejected on account of that database error.

5          So this first part of my analysis is

6  providing a methodology for assessing how many voters

7  fall into these categories.  And I concluded similar

8  to analyses done in two previous reports that about

9  one in seven Texas voters have this kind of database

10  profile where they could fill out their forms just

11  perfectly accurately, but they'll still be rejected

12  on account of one of these issues.

13      Q.    Okay.  That's about 15 percent, one in

14  seven?

15      A.    One in seven, that's right.

16      Q.    And is that's -- at least on Exhibit 2,

17  the approximate number that you concluded had this

18  issue?

19      A.    That's right.  15.4 percent, according to

20  the analysis of this report.

21      Q.    Now, in your analysis and in your reports

22  and in your testimony this morning you refer to an



1  application for mail-in ballot or a mail-in ballot

2  being, quote, rejected, unquote.

3            Could you explain what you mean by that

4  term?

5      A.    Sure.  So a voter can request a mail

6  ballot -- just to add more abbreviations to our

7  exercise today -- generally referred to as ABBMs.

8            And that application for a mail ballot

9  under SB1's rules requires the voter to put in their

10  DPS ID number if they have such a number.  And if

11  they don't have such a number, then the last four

12  digits of their social security number.

13            That application is then evaluated by

14  county officials, my understanding is, and if it's

15  not complete for this or other reasons, it's

16  rejected.  The voter is notified there's a -- the

17  voter will not -- without taking further action will

18  not receive a mail ballot.

19            That's sort of the first stage process.

20  And then the second stage process I refer to is, once

21  the voter receives a mail ballot, they're asked again

22  for that same kind of information, their DPS ID



1  number on the carrier envelope, the envelope that

2  carries the mail ballot back to the election office.

3          And, again, if that DPS ID number is not

4  on that carrier envelope, without taking further

5  action -- without the voter taking further action,

6  the ballot will not be counted.

7      Q.    Okay.  Is it fair to say that a ballot or

8  an ABBM can be rejected and then cured so that the

9  voter can, in fact, vote by mail in that election?

10     A.    Depending on the circumstances; for

11 example, when the problem is identified, whether the

12 voter learns about the problem.  It's theoretically

13 possible for the problem to be cured.

14     Q.    And, in fact, your -- I believe your

15 reports indicate that in some instances it is cured;

16 is that right?

17     A.    That's right.

18     Q.    Okay.  And is it also possible that

19 persons whose ABBMs or mail-in ballots are rejected

20 may, nevertheless, vote successfully by going to the

21 polls in person either early voting or on election

22 day?



 1      A.    If they are able to, they could use a

 2  different voting method as an alternative.

 3      Q.    And based on your work and analysis, does

 4  that also occur in Texas?

 5      A.    Yes.

 6      Q.    Okay.  And, of course, we're just talking

 7  about the elections in the first year of the

 8  existence of SB1; is that correct?

 9      A.    I'm trying to remember here.  So the law

10  was passed in what, 2021?

11      Q.    It was passed in approximately October of

12  2021.

13      A.    So, yes, roughly a year.

14      Q.    Okay.  So just to clarify, when you use

15  the term "rejected" with respect to an ABBM or

16  mail-in ballot, that doesn't necessarily mean that

17  that voter did not, in fact, successfully vote in the

18  election?

19      A.    They might have voted by having cured or

20  by voting by a different method.

21      Q.    Okay.  Are you aware of the different ways

22  that a voter whose ABBM was initially rejected could



1  cure that rejection or shortcoming in the number or

2  perhaps a problem in a database, the TEAM's database?

3       A.    I'm aware of some of the possible ways

4  they could do that.

5       Q.    Okay.  What are the ways that you're aware

6  of?

7       A.    So, as far as I know, if the TEAM

8  information, for example, is wrong, you know, it has

9  a typo, has an incorrect merge with DPS numbers, the

10  voter could re-register to vote, I believe.  And the

11  re-registration, if done correctly, would rectify the

12  problem.

13            MR. FREEMAN:  David, none of these

14  questions are going to what is in Dr. Hersh's

15  supplemental report.  Any of them could have been

16  posed regarding his original report.

17            You know, I've let this go for a bit.  But

18  to the extent the questions are not newly relevant to

19  his supplemental report -- they seem to be outside

20  the scope of this deposition.

21            So to the extent that we're sort of

22  getting there, that would be great, but I do want to



 1   sort of make sure that we're on the same page that

 2   this deposition goes only to Dr. Hersh's supplemental

 3   report.

 4              He sat for a lengthy deposition with your

 5   former colleague on the other report.

 6              MR. BRYANT:  Okay, and I appreciate that.

 7              BY MR. BRYANT:

 8   Q.    I intend to ask you about the work and

 9   analysis that is in your second supplemental report,

10   which is focused on the general election that

11   occurred in Texas in November 2022.

12              I may not in all instances have that

13   prefaced to make it clear, but, please -- please

14   consider that part of my question.  And if you have

15   any confusion about it, feel free to ask me to

16   clarify it.

17              So what are the other ways that you're

18   aware of that in connection with the November 2022

19   general election a Texas voter whose ABBM was

20   initially rejected could cure whatever problem caused

21   that rejection?

22   A.    Right.  So it depends -- my understanding



1   is that it depends a lot on what exactly the problem

2   was.  So, for example, if they have a valid -- if

3   they have one valid DPS ID number and they just

4   misread the instructions, they didn't put it on, they

5   can cure it by, I believe, going into a computer

6   system and entering the information, if I'm

7   remembering this correctly.

8           Now, if they have multiple ID numbers,

9   which comes up a lot, then their number is correct

10  but they, again, would have to try multiple times to

11  figure out which ID number is the one that Texas has

12  on file.  And by Texas here, I mean the TEAM records.

13          I think when there's typos or TEAM doesn't

14  have the information, it's not as straightforward, my

15  understanding is not as clear about what exactly the

16  cure process is, other than re-registration.

17      Q.    Are you aware of whether or not a voter

18  could simply call their county election official,

19  talk over the problem, and get the record corrected?

20      A.    So this came up in the last deposition,

21  and it was, I think, quite a confusing set of

22  circumstances that we were imagining because, of



 1   course, if anyone could just call up the election

 2   office and say, I'm Joe Smith at this address; my ID

 3   number is wrong; here is the right ID number, then

 4   that would provide no security to the election system

 5   and it would create all sorts of privacy concerns.

 6          So I'm not exactly sure how this calling

 7   up would work.  But, again, this is not exactly how

 8   the cure process happens.  It's not something I

 9   deeply investigated for this report.

10      Q.   Okay.  And specifically, you don't know

11   whether or not that actually occurs in Texas?

12          MR. FREEMAN:  Objection.  Form.

13      A.   In the last deposition the attorney from

14   the state talked about this process of calling up the

15   counties.  It struck me as quite informal and I'm not

16   clear how it protected the voter's privacy or the

17   security of the elections, but I don't know the

18   details.

19          BY MR. BRYANT:

20      Q.   Well, I'm not asking you about questions

21   that anybody else asked.  I'm just asking about your

22   knowledge.



Dr. Eitan Hersh                                          April 20, 2023
                                                              Page 37

```
 1              And my question is:  Do you have any

 2   knowledge as to whether or not a voter can either by

 3   phone or in person work at and correct a problem that

 4   might be encountered with his or her ABBM or mail-in

 5   ballot?

 6              MR. FREEMAN:  Objection.  Form.

 7        A.    Again, to the extent I learned about this,

 8   I learned about it from our last deposition where

 9   there was a lot of discussion about this.  And I --

10   because it's not central to my report, I didn't spend

11   time figuring that question out.

12              BY MR. BRYANT:

13        Q.    Okay.  And aside from whatever the lawyer

14   who was asking you questions in the deposition may

15   have suggested or told you -- because they weren't

16   testifying -- do you have any knowledge on that

17   subject yourself from your work with the database --

18   databases or otherwise?

19              MR. FREEMAN:  Objection.  Form.

20        A.    So what's obvious from the databases is

21   that there are some individuals who have flags that

22   there was a rejection and then there was also a flag
```



 1  that they successfully voted.

 2          From this, I conclude that some people who

 3  had a problem had their problem cured and were able

 4  to vote, but I don't know from the database itself

 5  why or how someone went through that curing process.

 6          BY MR. BRYANT:

 7  Q.    If I understood your testimony earlier

 8  correctly, it was possible for a Texas voter who

 9  wanted to vote in the November 2022 general election

10  but encountered an initial rejection of a mail-in

11  ballot to provide information online, that would cure

12  that problem by eliminating a typo, providing a

13  different DPS ID number, or in some other way?

14          MR. FREEMAN:  Objection.  Form.

15  A.    No, sir.  My understanding is that in many

16  circumstances correcting something online would not

17  be possible if the voter needed to provide the same

18  information like the last four digits of their social

19  security number or a DPS ID number to log into that

20  system.

21          So if the system is validating the voter

22  based on those numbers but the numbers themselves are



1  wrong, then the voter could not use that online

2  process to cure.

3           BY MR. BRYANT:

4       Q.    Is it your testimony that in some

5  instances it would be possible, but in other

6  instances it would not be possible because of the

7  problem you just described?

8       A.    Yes.  I think in the specific circumstance

9  of someone who just had -- there actually is no

10 database problem like in the at-risk population that

11 I suggested, but another problem, the voter neglected

12 to fill out their form, then I believe they could

13 cure through this online system.

14           Again, in the first report I wrote, I

15 said, you know, there are a lot of reasons why

16 someone might run into trouble voting because of SB1,

17 other than the reasons that I'm studying; for

18 example, a voter error.

19           So that would be a way to cure a voter

20 error, if the voter just neglected to put the ID

21 number on the form.

22           These circumstances are a little deeper



1  because they get to issues with the databases

2  themselves; that is, they are not the fault of the

3  voter; they are the fault of the system.

4          And there you have a different set of

5  circumstances, and I think those are not always as

6  clear about how they would be cured.

7      Q.    I believe you testified that in the TEAM's

8  databases only one DPS ID is listed for each voter at

9  most?

10     A.    That's right, zero or one.

11     Q.    And what's your understanding, if you have

12 one, as to how that DPS ID number gets into the

13 TEAM's database for those who do have a DPS number in

14 the database?

15     A.    I believe there are two ways.  One is on

16 the registration form itself, and then the other is

17 through a merge between the TEAM and DPS, although

18 it's a bit of a mystery to me why there are so many

19 people who are clearly through my analysis shown to

20 be on both files but don't have a DPS ID number on

21 the TEAM file or there are typos.

22          So a typo would make sense if someone is



 1   filling out a registration form that includes their

 2   DPS ID number or something is hand entered into a

 3   computer system.  And that's why you might have a

 4   typo on the TEAM file that's inconsistent with a DPS

 5   file.

 6           Why there are people who are valid voters

 7   with valid driver's licenses who are not listed with

 8   that driver's license number on the TEAM file

 9   suggests that to the extent that the state is merging

10   these databases together they are doing it in an

11   incomplete way.

12       Q.    Okay.  If I understand your testimony

13   correctly, you're aware of two mechanisms that might

14   result in a DPS ID number for a Texas voter being

15   placed into the TEAM's database.  One is when the

16   voter registers the voter provides a DPS ID number;

17   is that right?

18       A.    Yes.

19       Q.    And the second is that apparently there

20   are merges between the DPS ID database and the TEAM's

21   database.  Is that -- did I understand your earlier

22   testimony correctly?



Dr. Eitan Hersh                                          April 20, 2023
                                                              Page 42

```
 1        A.    That's right.  And a subset of this second
 2  category would be people who register through the
 3  motor voter process; that is, people who register
 4  while they're in the process of getting a driver's
 5  license ID or updating a driver's license.
 6        Q.    If a voter registered to vote and provided
 7  a driver's license number that was one or two digits
 8  off, would that incorrect driver's license number be
 9  reflective in the TEAM's database?
10        A.    Can you repeat the question?
11        Q.    Sure.  If a Texas voter, John Smith,
12  registers to vote, is asked to provide his driver's
13  license number, and provides the number but
14  transposes a digit or otherwise makes a minor error
15  in it, would that TEAM's database then inaccurately
16  reflect his Texas driver's license?
17        A.    Yes.
18        Q.    Okay.  So if I understand you correctly,
19  one possible source of discrepancies between the
20  TEAM's database and the DPS database would be if the
21  voter either intentionally or unintentionally does
22  not provide the precisely correct driver's license
```



Dr. Eitan Hersh                                        April 20, 2023
                                                           Page 43

 1  number, when he or she registers?

 2      A.    Yes.   That would be totally

 3  indistinguishable from a clerk entering the

 4  information wrong or the voters having bad penmanship

 5  and it being unclear what the number is.

 6           There are lots of -- these idiosyncratic

 7  reasons why voter registration records on all fields,

 8  the address field, the name field, might have typos

 9  or errors in them.

10      Q.    Do you know or can you estimate how many

11  of the approximately 2.7 million Texas voters who you

12  identified with the term "at-risk" are in that

13  category because they didn't provide an accurate

14  number for their Texas driver's license or ID?

15      A.    So there are about 100,000, 106,000 of the

16  at-risk people who have what seems to be a typo

17  either in their DPS ID number or their last four

18  digits of their social security number.

19           And from the data itself you can't know

20  whether that's administrative problems or a problem,

21  you know, way back whenever the voter registered with

22  a messy handwritten application.  Either way I would



1  say it's a database problem that's sort of distinct

2  from the voter filling out the SB1 form accurately.

3          In other words, what I distinguished

4  before in our conversation was someone who has a typo

5  when they fill out their application form or they

6  neglect because the law is new they didn't -- you

7  know, it says it right on it, but they didn't do it

8  and they don't put their ID number at all.  That's

9  one set of problems.

10          The database problems include situations

11  like the one we're discussing now which is either due

12  to administrative error or a voter error when they

13  registered to vote that there's a database

14  inaccuracy.

15      Q.    Okay.  And let's look at page 5 of your

16  second supplemental report that's Exhibit 2.  You

17  have a table A there.

18      A.    Yes, sir.

19      Q.    Do you have that in front of you?

20      A.    Yes, sir.

21      Q.    So one category that's listed in table A

22  is a Typo/Inconsistent SSN4 in DPS versus TEAM.



1           And your report indicates that there are

2   about 44,000 of those statewide in Texas in the

3   databases as they existed on January 2023.  Am I

4   reading that correctly?

5           A.    Yes, sir.

6           Q.    Okay.  So is it possible that any of those

7   44,000 or so typos or inconsistencies occurred

8   because a voter incorrectly wrote down their social

9   security number?

10          A.    Just to be clear, it's possible that

11  someone's in there because the voter incorrectly

12  wrote down their social security number when they

13  registered, not when participating in a mail ballot

14  procedure.

15          Q.    Okay.  And is it possible that the

16  approximately 62,000 Texas voters statewide who are

17  listed as having a typo or an inconsistent DPS ID in

18  DPS versus in TEAMs are that some of those are voters

19  who incorrectly provided their DPS ID to the

20  Secretary of State when they did their voter

21  registration?

22          A.    Right.  The data -- indistinguishable from



1 the circumstance in which there's an administrative

2 error or poor penmanship or a typo or a mistake from

3 the voter.

4 　　　　　　MR. FREEMAN:  David, I'm going to have to

5 object again because all of these categories existed

6 in the initial report.  This section of the report is

7 a replication of the initial report.

8 　　　　　　To the extent that you have questions

9 about changes in numbers, what the final numbers are,

10 that's fine.  But these categories were established

11 previously and were subject to questioning in the

12 initial deposition, and I believe it's improper for

13 you to be asking questions about what exists in each

14 category at this time.

15 　　　　　　These are all questions your colleague

16 could have asked a year ago.

17 　　　　　　MR. BRYANT:  Well, my questions are about

18 the portion of the report that relates to January

19 2023 that my colleague could not have asked about.

20 　　　　　　(Simultaneously speaking.)

21 　　　　　　MR. BRYANT:  And, in addition, the witness

22 chose to put comparison numbers from prior reports.



 1   I think I'm entitled to ask about those, but your

 2   objection is noted.

 3            MR. FREEMAN:  We've been going for about

 4   an hour.  Would it make sense to take a break?

 5            MR. BRYANT:  That's fine.

 6            THE VIDEOGRAPHER:  Off the record at

 7   11:07.

 8            (A break was taken.)

 9            THE VIDEOGRAPHER:  Back on the record at

10   11:20.

11            BY MR. BRYANT:

12       Q.   Dr. Hersh, in connection with your work in

13   this case, did you interview anybody?

14       A.   No, sir.

15       Q.   Did you obtain any information related to

16   your work in this case from any sources that are not

17   disclosed in the reports that you have written?

18       A.   No, sir.

19       Q.   In connection with your work in this case,

20   did you do any personal observations in Texas?

21       A.   No, sir.

22       Q.   Did you go to Texas in connection with



 1  your work in this case?

 2       A.    Not yet.

 3       Q.    All right.  We're looking at Exhibit 2 and

 4  page 5 thereof.  And if I understand this correctly,

 5  you identified in your work in January 2023 or

 6  thereabouts 2,690,344 total issues out of about 17.45

 7  million records on the TEAM's database; is that

 8  correct?

 9       A.    That's correct.

10       Q.    Okay.  Is it correct that about 90 percent

11  of those were in the second category, which is

12  described as 1 DPS ID in TEAMs possesses multiple DPS

13  IDs?

14       A.    Yes.  Out of 2.7 million issues, 2.4

15  million of them are in that category.

16       Q.    Okay.  And so when you looked at the --

17  when you examined the DPS database there were

18  multiple IDs for voter and only one ID in the TEAM's

19  database; is that right?

20       A.    Correct.

21       Q.    And I think we've established that in many

22  instances the ID in the TEAM's database would be the



Dr. Eitan Hersh                                    April 20, 2023
                                                        Page 49

 1  one that the voter chose to put in their voter

 2  registration materials; is that right?

 3          MR. FREEMAN:  Objection.  Form.

 4      A.    No, sir.  I have no reason to believe -- I

 5  have no reason to have an opinion, I guess, about

 6  what is the predominant ID in the database, where it

 7  comes from, whether it's from Motor Voter or the

 8  voter themselves or which one is the one that is in

 9  the TEAM database.

10          BY MR. BRYANT:

11      Q.    Okay.  So if I understand you correctly,

12  you identified two ways that you know of that the DPS

13  ID number could get into the TEAM's database, either

14  the voter registration form or the merge that would

15  result in an ID from the DPS database being put in

16  the TEAM's database; is that correct?

17      A.    To my best knowledge, yes.

18      Q.    Okay.  But you have no information

19  whatsoever as to whether one of those two methods

20  contributes 95 percent of the numbers on the TEAM's

21  database or 5 percent or any other number in between

22  or on the other side -- on the outside of those



Dr. Eitan Hersh                                         April 20, 2023
                                                        Page 50

 1  numbers; is that correct?

 2      A.    If I were to speculate, I would say that

 3  -- I would guess that most of them probably come from

 4  the process of getting a driver's license or maybe

 5  more recently updating a driver's license, but I --

 6  nothing about the TEAM or DPS data files that I

 7  analyzed in this case provide an indication of the

 8  source.

 9      Q.    And you have no other source of data on

10  that subject?

11      A.    I suppose it might have been in, you know,

12  one of the state's witness deposition transcripts,

13  but I don't recall anything like that.

14      Q.    Okay.  Now, you mentioned that there are

15  periodic merges of the DPS ID database with the

16  TEAM's database; is that correct?

17      A.    That's my understanding.

18      Q.    And what's the source of that

19  understanding?

20      A.    Now we're trying to get stuff in the brain

21  from, you know, a year ago or so ago.  I'm guessing

22  it was maybe in Sherry Gipson's deposition



1  transcript.  Or somewhere in the documents I received

2  in the case there was a discussion maybe about an

3  annual merge or something of that -- of that flavor.

4        Q.    Could it have been from other depositions

5  in this case that you either attended or read a

6  transcript?

7        A.    Yeah.  I didn't attend any depositions,

8  but I did read a couple of transcripts.

9        Q.    Do you recall what transcripts you read

10 that could have provided information that is used in

11 your analyses?

12       A.    Right.  And, again, this is from before

13 the previous deposition, so it's -- which I'm telling

14 you only to convey that this is a long time ago and I

15 don't have it on the top of my head.

16            But I believe I reviewed the transcript

17 deposition -- from the deposition of Ms. Gipson from

18 DPS and from whoever the person is -- I can't

19 remember her name -- who is the data TEAM -- TEAM

20 person, I guess, for the elections division.  That's

21 the only ones I recall.

22       Q.    Okay.  Do you have any understanding as to



1   how often those merges of the DPS ID database and the

2   Secretary of State's TEAMs database occur?

3        A.    So my understanding is that if we're

4   talking about merges that happened through the --

5   what I'll call the Motor Voter process; that is, when

6   you're getting a license or updating a license -- I

7   would assume they happen on an ongoing continuous

8   basis.

9             But I recall -- and from where -- what

10  transcript I don't recall, but I recall something

11  about an annual merging of records that's separate

12  from the Motor Voter process.

13       Q.    And is the Motor Voter process, as you

14  describe, one that would provide information from DPS

15  to the TEAM's database just for the new voters who

16  have provided that information as part of the Motor

17  Voter process?

18       A.    Right, a new voter or someone who is

19  changing their address or -- yeah, I don't know how

20  it would work if someone gets a new kind of ID, for

21  example.

22       Q.    Okay.  Do you have any information as to



 1   when, if at all, a -- one of those merges of the DPS

 2   ID database and the TEAM's database occurred since

 3   SB1 was passed?

 4        A.    No.

 5        Q.    We touched on this earlier, but I want to

 6   be sure I understand it.  I think you described a few

 7   ways that the DPS ID database might have more than

 8   one DPS ID number.  I think one of the ones you

 9   mentioned is a person might have both a driver's

10   license and a motorcycle driver's license; is that

11   correct?

12        A.    That's my speculation.  I did not do a

13   deep investigation about this.  There are some people

14   -- I'll tell you what I did do an investigation

15   about, there are some people who have two forms of

16   ID; that is, like a driver's license and a state ID

17   license.

18             That's not most.  Most people have two of

19   one kind, mostly two of a driver's license type.  And

20   so exactly why they do because they -- now I'm

21   speculating -- they have two different kinds of

22   vehicle licenses or whatever the reason, I don't know



1  why, but they are distinct numbers associated with

2  the same person.

3       Q.    Okay.  And what's the source of your

4  information that was the basis of that answer that

5  most of them --

6       A.    Yeah --

7       Q.    -- have two types of driver's licenses as

8  opposed to a driver's license and an ID?

9       A.    Right.  So the DPS database that I had

10 access to that was -- enabled me to do this whole

11 analysis had the list of the numbers and the personal

12 information like name, social security number, and it

13 did have this flag of what kind of ID it was, whether

14 it was a driver's license number or a state ID

15 number.

16            So I could see that -- oh, my first

17 intuition was oh, maybe a lot of people have two

18 kinds of IDs, and I checked that.  That does happen,

19 but it was mostly this other thing, which is that

20 most -- a lot of people with two different ID numbers

21 in the same category.

22       Q.    In the same category, meaning they're both



 1  driver's licenses?

 2       A.    That's right.

 3       Q.    And did the database indicate what types

 4  of licenses were included in the multiple driver's

 5  license entries?

 6       A.    My recollection is that the export that I

 7  received did not contain that information.

 8       Q.    Do you know whether or not if a voter

 9  holds a commercial driver's license that license

10  number would be -- appear in the DPS ID database?

11       A.    I assume it would, but I don't know.

12       Q.    If someone has a Texas driver's license

13  and then moves out of state for a period of time and

14  then returns to the state after their driver's

15  license is expired and they get a new Texas driver's

16  license, would both the old driver's license and the

17  new driver's license appear in the DPS ID database

18  for that person?

19       A.    I'd have to investigate that.  I don't

20  know.

21       Q.    Do you know, for example, how far

22  historically the DPS database goes back in time to



1  record different kinds of DPS IDs that an individual

2  has?

3       A.    I don't know.

4       Q.    Would it be fair, in your opinion, to say

5  that if someone had an expired driver's license

6  number in the DPS database and a current driver's

7  license in the DPS database, they provided the

8  current driver's license and their voter

9  registration, that they would be likely to use that

10  same current driver's license in an ABBM or a mail-in

11  ballot --

12            MR. FREEMAN:  Objection.

13            BY MR. BRYANT:

14       Q.    -- rather than the old expired one?

15            MR. FREEMAN:  Objection.  Form.

16       A.    So this is a hypothetical situation you're

17  proposing?

18            BY MR. BRYANT:

19       Q.    I think it's real, but it's certainly

20  hypothetical for the purposes of my question.

21       A.    Sure.  So like suppose that, you know, I'm

22  18 and I'm a high school senior and I have a license



1  to drive and I also registered to vote at the home of

2  my parents, then I move away to college, I come back,

3  I get a new license.

4           I'm still a registered voter because I was

5  away for college, and now my TEAM record is

6  associated with the driver's license that I -- that I

7  got -- that I had as a kid, right, when I registered

8  for the first time.

9           So if I'm in that situation, now I'm 25

10  and I've moved back to Texas, I would have no idea

11  off the top of my head whether I should fill out a

12  form with the current driver's license, with the old

13  driver's license.  I would have no idea whether the

14  system updated my driver's license or it retained my

15  old one.

16           From the individual voter perspective, I

17  think, if I'm understanding your hypothetical

18  correctly, I would just have no basis for knowing

19  which of those forms -- which of those ID numbers

20  would be the one that the TEAM database has on file.

21           I think that's the situation you were

22  suggesting.



1     Q.    Well, it's not, but it is a possibility, I

2  would say.  But, you know, for example, there are

3  some people who got a driver's license for a

4  motorcycle when they were too young to vote and then

5  went off to college or maybe the service or worked

6  for 20 years and they come back to Texas and get a

7  new driver's license and register to vote.

8           That would be a possibility where it's --

9  the current driver's license would be reflected in

10  the TEAM's database and they would be likely to use

11  it when they filled out an ABBM; is that correct?

12     A.    Maybe.  I mean, this is -- you know, in my

13  first report I said, you know, the people in the

14  at-risk will have to be lucky to not have a problem,

15  and this is exactly what I'm talking about.  You

16  know, they might guess right and they might guess

17  wrong.

18     Q.    Is there any way that a person who is in

19  Texas who is a Texas voter and is not sure what

20  number is reflected in their current voter

21  registration can find out what it is before they

22  submit an ABBM or mail-in ballot?



1      A.      I believe they could go to their county

2    election office and seek that information.

3      Q.      Another category that is listed in table A

4    on page 5 of Exhibit 2 are those instances in which a

5    voter has no DPS ID in the TEAM's database but has a

6    DPS ID.   That's the top category in table A.

7              What are the reasons why, as you

8    understand it, a person could have a DPS ID in the

9    DPS ID database but not a DPS ID in the TEAM's

10   database?

11             MR. FREEMAN:   I'm going to object again as

12   this line of questioning is improper in this

13   supplemental deposition, the first category which was

14   present in the initial report.

15             This is a replication with updated data

16   provided by the state.   Any of these questions about

17   that category as a general matter could have been

18   asked before, should have been asked before in that

19   complete deposition.

20             And so to the extent that you continue to

21   pose questions about general categories of data in

22   the replication, they are improper.



1          BY MR. BRYANT:

2     Q.    You can go ahead and answer.

3     A.    If I recall -- do I recall? -- I think

4  maybe that years ago there was not the same

5  expectation maybe to list the driver's license number

6  or that was maybe one reason or the merge was

7  different.  I'm not entirely recalling why there are

8  people like that in the file.

9     Q.    Is it your understanding that if a merge,

10  as you described it, between the DPS ID database and

11  the TEAM's database occurred after SB1 was in effect

12  that a person who possessed a DPS ID should have had

13  that DPS ID number entered into the TEAM's database

14  as a result of the merge?

15     A.    Oh, I think the evidence here is clearly

16  that that did not happen.  In other words, this data

17  comes after SB1.  January 2023 is just a couple

18  months ago, and there are plenty of people, almost

19  200,000, who have DPS ID numbers.

20          So it's clearly the same person.  They

21  have the same social security number, same name.

22  They have a DPS ID number.  They're registered



1  voters, but they do not have that ID number

2  associated with their TEAM record.

3      Q.    And do you have any information at all as

4  to why that occurred and the merge did not result in

5  providing a DPS ID number in the TEAM's database for

6  everyone who had a DPS ID number in the DPS ID

7  database?

8      A.    I mean, I guess it's either one of two

9  possibilities.  One is that the state doesn't intend

10  to do that kind of merge or that they did not do a

11  complete job doing it.

12      Q.    So those are guesses --

13          MR. FREEMAN:  Objection.

14          BY MR. BRYANT:

15      Q.    -- reasonable guesses.  Do you have any

16  information as to why that phenomenon is observed?

17          MR. FREEMAN:  Objection.  Form.

18      A.    So just to step back.  I don't think

19  they're guesses.  I think those actually are --

20  collectively cover all of the possibilities.  They

21  either didn't intend to do it or they intended to do

22  it and they didn't do it, so I don't know which



 1  category we're in.

 2           BY MR. BRYANT:

 3      Q.    It appears to me that the -- looking at

 4  the January 2023 number for that category of 189,095

 5  is over 30 percent lower than the comparable number

 6  for February 2022; is that right?

 7      A.    Yeah.  I don't do the percentage like that

 8  in my head as well as you do, but it's a -- compared

 9  to the -- I think you're looking across row 1 there?

10      Q.    Yes, I am.

11      A.    Yes.  And the first time I did this, which

12  was about a year ago, from the third report -- right,

13  there's 276,000 people in that category and now the

14  most recent one is down to 189,000.

15      Q.    Okay.  And I think you observed in Exhibit

16  2 elsewhere that that category the number dropped

17  significantly as compared to the other categories

18  where it didn't drop so significantly or at all.

19           Do you have any information as to why the

20  number for January 2023 in that top category of

21  189,095 is so significantly lower than the comparable

22  number from 11 months earlier?



Dr. Eitan Hersh                                         April 20, 2023
                                                             Page 63

```
 1            MR. FREEMAN:  Objection.  Form.
 2       A.    Again, I don't recall.  I think there was
 3  -- I'm vaguely remembering a discussion of this in
 4  the deposition transcripts of the state leaders
 5  saying they were doing these database merges, but I
 6  don't recall the specifics.
 7            BY MR. BRYANT:
 8       Q.    Okay.  Aside from whatever you may have
 9  read in depositions, do you have any knowledge on
10  that subject?
11       A.    No, sir.
12       Q.    Do you have any reason to believe that
13  similar reductions in the number of people affected
14  by that factor will not continue in the future?
15       A.    Again, lacking sufficient information
16  about why there still are so many people who are in
17  this category, I wouldn't want to presume whether the
18  number is going to grow or shrink over time.
19       Q.    Dr. Hersh, I took a deposition earlier
20  this week of a woman who is a registered Texas voter,
21  lives 10 miles or so from Mexico, and she applied,
22  according to her testimony, for a ballot by mail in
```



 1  connection with the 2022 general election.

 2           And when she did so she put her U.S.

 3  passport number in the form and it was rejected

 4  initially.  If she were a person who is in the group

 5  that you describe as at-risk in your reports, she was

 6  rejected for a reason unrelated to the reasons that

 7  you describe in your reports; is that correct?

 8       A.    That's correct.

 9       Q.    She then testified that she just decided

10  to go in town and vote in person and did so.  Would

11  her vote be reflect -- assuming that she was in the

12  at-risk group, would the fact that she voted in

13  person be reflected in your report anywhere?

14           MR. FREEMAN:  Objection.  Form.

15       A.    In the second part of the report where we

16  talk about -- I talk about people who had a form

17  rejected and then some cured and some didn't, she

18  would be in that category.

19           Although we wouldn't know from the

20  information you've told me so far whether she is in

21  the at-risk or non at-risk pool, because the reason

22  she had a problem was unrelated to the reasons I've



Dr. Eitan Hersh                                          April 20, 2023
                                                         Page 65

 1  assessed here.

 2          BY MR. BRYANT:

 3      Q.    Yeah.  My assumption for the question was

 4  that she was in the at-risk pool because perhaps

 5  there was a discrepancy between her DPS ID, as shown

 6  in its database, and her DP -- her ID as shown in the

 7  TEAM's database.

 8          So did you understand that assumption as

 9  part of the question?

10      A.    I still don't understand it.  In other

11  words, the situation you've described is a person who

12  erroneously entered her passport number instead of

13  her DPS number?

14      Q.    Right, or a social security number.  She

15  had, according to her testimony, a current driver's

16  license and a social security number, but she's used

17  to using her U.S. passport to go across the border

18  into Mexico and she thinks that should be a valid ID

19  for voting.

20      A.    So, again, this is all based on what you

21  were telling me here.

22      Q.    Right.



Dr. Eitan Hersh                                          April 20, 2023
                                                         Page 66

1      A.     But what you're telling me here is a

2 different class of problems that SB1 may have brought

3 on, which is that maybe the form is confusing for

4 someone or maybe some people are tripped up for one

5 reason or another.   That's not the reasons assessed

6 in this part of my -- of my study here.

7      Q.     Is there any way of knowing how many

8 people who are in your 2.7 million at-risk category

9 had an ABBM rejected because they put in a U.S.

10 passport number or put in no number or had some other

11 problem unrelated to their driver's license or ID

12 number?

13      A.     So there are a couple of challenges in

14 answering that question.   One is that the information

15 provided on TEAM about ABBMs and about mail carriers

16 is updated and overridden.

17           So we think -- I think that there are

18 probably cases in which someone had a mail ballot

19 application rejected but then eventually it was

20 cured, or it wasn't cured but time transpired so that

21 there was -- we were out of the time frame of when

22 you could request a ballot.



1          And all of those codes are not necessarily

2    available on the file that I saw, because in a study

3    like this you see one snapshot of the voter file, but

4    actually the voter file is dynamic.  So you don't see

5    every change over time.  That's one challenge.

6          The second challenge is -- the specific

7    question you asked is essentially about do we know

8    exactly why someone's ABBM form or carrier envelope

9    was rejected?  Is it for a reason like they put the

10   passport number or because it was a typo?

11         And we don't have any -- we don't have any

12   information about why anything was rejected, other

13   than a narrow set of categories in TEAM.  But in

14   those narrow set of categories -- for example,

15   there's categories that reflect an incomplete or

16   invalid ID number, but we don't go the next step in

17   the database of knowing why there was an invalid or

18   incomplete ID number.

19   Q.    And so I think my question was -- if not,

20   it will be now -- is there any way to know how many

21   people were in the situation of the witness that I

22   described who assumed there was a discrepancy in the



1  information so that she's in your 2.7 million at-risk

2  but her ABBM is rejected for reasons totally

3  unrelated to the database problems that you've

4  described in your report?

5        A.     Right.  So I think what you're asking --

6  the problem that we're talking about with this

7  person, that she entered the wrong information, is

8  not related.  What a -- as social science would say

9  it's orthogonal to the reasons why someone is in the

10 at-risk pool.

11        So if you were to ask me what is the

12 probability that this person is in the at-risk pool,

13 I would say 15 percent, which is a percent that

14 anyone is in the at-risk pool.

15        So to the extent that someone like that

16 has a problem with a mail ballot being rejected,

17 those problems would be both in the at-risk and the

18 non at-risk pool at a rate of something like 85

19 percent of them in the non at-risk pool, 15 percent

20 in the at-risk pool.

21        That's the basic assumption we would make

22 because the error that you are articulating this



1  person committed has just nothing to do with their

2  status in the at-risk pool or non at-risk pool.

3       Q.    Okay.   I think you're close to answering

4  my question.   You've made an assumption that seems

5  reasonable to me personally.   But aside from that

6  assumption, is there any way for any of us to know

7  whether a particular person whose ABBM was rejected

8  was because of reasons that you would describe as

9  orthogonal to the database problems you just

10  described?

11            MR. FREEMAN:   Objection.   Form.

12       A.    So is there any way to know, other than

13  like logic?

14            BY MR. BRYANT:

15       Q.    Any data that you have seen or are aware

16  of that could give us more information than an

17  assumption?

18       A.    So, again, the data available in these

19  databases provided to me have information about

20  whether people were rejected, whether people applied,

21  and some basic reasons about why they were rejected

22  with a huge caveat that the database is missing



1    information about people whose codes were overridden.

2              Those codes when not overridden do not

3    distinguish someone who is in the situation that

4    you've described -- they put in the wrong number --

5    from the situation that I've described, which is that

6    they put in the right number, but the database is

7    wrong.

8              So the basis for forming the opinion I

9    formed that we just talked about was that there's no

10   logical connection between putting your passport

11   number in the form and being in this at-risk

12   category.

13        Q.    Okay.  I think I understand your answer.

14   Is it correct that there's no way based on the data

15   that exists that you could determine how many such

16   people there were?

17             MR. FREEMAN:  Objection.  Form.

18        A.    Based on the data as opposed to logic, you

19   cannot determine that.

20             BY MR. BRYANT:

21        Q.    Okay.  All right.  In the -- let's imagine

22   a voter who puts in an ABBM but just doesn't include



 1  any numbers.  Would that essentially be the same

 2  situation where you have a rejection of an ABBM for

 3  reasons that have nothing to do with the database

 4  issues that you described?

 5      A.    That's right.  The person that's rejected

 6  on account of the SB1 rules, meaning if SB1 didn't

 7  produce this requirement, that person would not have

 8  been rejected.  So it is on account of SB1, but it is

 9  unrelated to the database rules.

10          Just like, you know, are people who own

11  green pants more likely to be in the at-risk -- well,

12  there's a whole bunch of things, phenomenon in the

13  world, that, again, there's just no logical reason to

14  say that this would be more likely in the at-risk or

15  the non at-risk pool.

16      Q.    Okay.  You touch in your answer on another

17  term that you use in your reports, which is "rejected

18  for SB1 reasons."  Could you explain what you mean by

19  that term?

20      A.    Sure.  So you have a mail ballot

21  application.  The ballot application on account of

22  SB1 requires a voter to put their driver's license



1  number, or in the absence of having a driver's

2  license number, their last four digits of their

3  social security number.

4         If an ABBM or a carrier envelope is

5  rejected on account of that information being

6  incorrect or missing, then I would say it's

7  attributable -- the rejection is attributable to SB1.

8     Q.    Okay.  So someone else might say that the

9  rejection is attributable from the voter not reading

10 the instructions and not attempting to comply with

11 SB1.  Is that an unfair way to look at it?

12        MR. FREEMAN:  Objection.  Form.

13    A.    So it depends on the category.  The

14 categories that I'm assessing here with the at-risk

15 the person has filled out the form exactly correctly

16 and they're rejected on account of SB1.

17        There are other situations maybe like the

18 one you're talking about with the passport person who

19 is rejected on account of SB1, but maybe it's because

20 they didn't follow the directions or had trouble

21 comprehending the instructions or something like

22 that.



Dr. Eitan Hersh                                          April 20, 2023
                                                             Page 73

1              BY MR. BRYANT:

2       Q.     And somebody who just didn't put in a

3  number would be in a similar category?

4              MR. FREEMAN:  Objection.  Form.

5       A.     Someone who didn't put in a number would

6  be rejected because of SB1 reasons, but not the ones

7  that I assess here.

8              BY MR. BRYANT:

9       Q.     Okay.  Now, do you know that -- if there

10  was anything that prevented voters in the November

11  2022 general election from putting in both the DPS ID

12  or driver's license number and the last four of their

13  social security number?

14      A.     Well, yes.  The instructions did not tell

15  them to do that, so if you were just trying to follow

16  the instructions to the point -- I know the

17  experience of filling out government forms and I'm

18  just trying to do the right thing so I don't get, you

19  know, messed up with something.

20             And if you followed the instructions on

21  the form, you'd only fill out one of them if you had

22  a DPS ID number.



1        Q.     Okay.  And when you refer to those

2    instructions, what specifically are you referring to?

3        A.     These are the instructions on the ABBM

4    application and on the carrier envelope.

5        Q.     Have you ever received any information

6    that the Texas Secretary of State and/or the county

7    election officials in some instances communicated or

8    attempted to communicate to Texas voters that they

9    should put both numbers on their ABBMs or mail-in

10   ballots; namely, a DPS driver's license or ID and the

11   last four of their social security number?

12              MR. FREEMAN:  Objection.  Form.

13       A.     I'm aware of that.

14              BY MR. BRYANT:

15       Q.     What do you know about that as to --

16   strike that.

17              What do you know about those

18   communications in connection with the November 2022

19   general election?

20       A.     So my knowledge of those communications

21   predates the November '22 general election.  In my

22   last report, I discuss this at length.  There were --



1  there was, for example, a YouTube video message from

2  the secretary saying what you've just described, that

3  a voter should fill in both their DPS ID number and

4  the last four digits of their social security.

5          I reflected at that time, which was

6  following the first election, the March election,

7  with SB1 that the video from the secretary had

8  something like 500 views on YouTube, four of which

9  were from me, probably a bunch more from attorneys.

10         And I took that to -- I took from that

11 that it was very unpopular -- an unpopular video from

12 the secretary there.

13         And so if I were to weigh the instructions

14 provided by the secretary that one should fill out

15 both with the very clear plain text of instructions

16 to the voters, I would say that it would make a lot

17 of sense for voters to read the instructions in front

18 of them as opposed to somehow magically finding a

19 YouTube video that almost no one has seen.

20    Q.    Aside from the YouTube video you refer to,

21 are you aware of any other communications that were

22 done by the Secretary of State's office in Texas or



1  county election officials in advance of the November

2  2022 general election?

3       A.    In advance of the November '22 general

4  election, I'm not aware.  My understanding was that

5  there were instructions posted online and maybe

6  conveyed to county officials to instruct voters on

7  this front.

8             But, again, as far as I know, the

9  application and mail ballot materials were the same,

10 which has said to voters that they should put in

11 their DPS ID number, and if they don't have a DPS ID

12 number, then to include their last four digits of

13 their social security number.

14      Q.    Do you have any understanding in

15 connection with the November 2022 general election

16 whether -- if someone did put in a DPS driver's

17 license number or ID and the last four of their

18 social security number and they were one of the

19 people who had an issue with this database

20 discrepancy that you've described, whether or not

21 their ABBM or mail-in ballot would be accepted?

22      A.    My understanding from the previous work on



1  this is that there's two circumstances.  One is which

2  -- we're in the first category listed in table A

3  where the person doesn't have a DPS ID number listed.

4  They do have a DPS ID number.

5            They list that one and the county official

6  sees that there's no record of that in TEAM and then

7  they list the four digits of their social and that

8  would be accepted.  That's my understanding.

9            I don't know the much larger category of

10  the person enters two and one of them is actually

11  wrong, according to the state, because it's the wrong

12  DPS ID number.  And it's valid, totally valid, just

13  not the one that they list, or it's totally valid,

14  but there's a typo.

15            That -- I don't know the circumstance in

16  that situation of -- if someone lists one, what

17  appears correct and one appears incorrect, even

18  though both are correct, how that would be treated by

19  a county.

20            MR. BRYANT:  Is this a good time to take a

21  break?

22            MR. FREEMAN:  Sure.



```
 1                  THE VIDEOGRAPHER:  Off the record at

 2      12:05.

 3                  (Whereupon, at 12:05 p.m., a

 4                   luncheon recess was taken.)

 5                              -   -   -

 6                 A F T E R N O O N   S E S S I O N

 7                                        (1:03 p.m.)

 8      Whereupon,

 9                      DR. EITAN HERSH

10      was called for continued examination, and having been

11      previously duly sworn was examined and testified

12      further as follows:

13                  THE VIDEOGRAPHER:  Back on the record at

14      1:03.

15                  EXAMINATION BY COUNSEL FOR STATE

16                  DEFENDANTS CONTINUED

17                  BY MR. BRYANT:

18          Q.    Dr. Hersh, you mentioned in your prior

19      testimony some information from, I believe, somebody

20      in the Texas Secretary of State's office that records

21      of votes that are initially -- or applications that

22      are initially rejected, those records may be
```



1   overridden in some instances.

2           Did I understand that correctly?

3       A.    There are designations on the voter file

4   such as an application received or rejected or a mail

5   ballot received or rejected could be overridden for a

6   variety of reasons if there was a new code relevant,

7   and there was -- I think I cite that in this report

8   actually.

9       Q.    Yeah.  Is that the reference on page 10 to

10  a deposition transcript of Kristi Hart?

11      A.    That's right.

12      Q.    What's your understanding as to whether

13  that practice occurs in every instance in which

14  there's an initial rejection but later a vote, or

15  whether it's done sometimes or rarely?  How

16  consistent a practice is that?

17      A.    My understanding is that it's

18  inconsistent, and that understanding comes from the

19  following, which is clearly in the TEAM records that

20  I saw there were incidences of:  A) people who have

21  both a rejected flag and a successfully voted flag;

22  people who have multiple lines on the spreadsheet,



1  one for being, say, rejected and then one for being

2  accepted -- that's different from the first case,

3  which is the same line of the spreadsheet -- and then

4  we have evidence from Ms. Hart that sometimes the

5  codes are just overridden.

6          So whether it's up to the county or to the

7  individual clerk, there's obviously multiple ways

8  these codes are treated within the database, and I

9  have no way of knowing like what the relative rate is

10 of the different ones.

11     Q.    In all of your work did you speak with or

12 attempt to speak with anybody from the Texas

13 Secretary of State's office?

14     A.    No.

15     Q.    In all your work, did you speak with or

16 attempt to speak with anybody from a Texas County

17 election office?

18     A.    No.

19     Q.    I think somewhere in your report you

20 stated that administrative records are not perfect.

21          Do you recall that?

22     A.    I recall having thought that and said



 1  that.

 2       Q.    That's true in Texas and everywhere else,

 3  right?

 4       A.    Everywhere else I've done any research

 5  that's been true.

 6       Q.    Okay.  And have you ever done an

 7  assessment of any state's mail-in voter ID

 8  requirements other than Texas?

 9            MR. FREEMAN:  Objection.  Form.

10       A.    So I've done other states mail

11  requirements and voter ID requirements, but not mail

12  voter ID requirements.  I think this is the first

13  time.

14            BY MR. BRYANT:

15       Q.    Okay.  In what states have you done

16  studies or analyses of mail-in voting requirements?

17       A.    I think -- let me see here.  I know there

18  was a case in Iowa.  I can't remember the other one,

19  maybe Kentucky.  There was a few cases that were very

20  quick.  There was no deposition regarding mail ballot

21  rules in the 2020 election.

22            Yeah.  So there was two or three states in



1    which I looked at their mail ballot procedures and

2    the timing in which voters had to receive an

3    application, get an application, send back materials,

4    get their ballot.

5            There were a lot of questions surrounding

6    mail ballot issues and the post office in the 2020

7    election, but I don't recall many details about all

8    that.

9       Q.    Okay.  Has any of your work on those two

10   or three instances had any effect on your work and

11   conclusions in this case?

12      A.    Yes, to the extent that, you know, I've

13   developed now expertise in the study of mail voting.

14   I recall, I think, in my second report I did a brief

15   study in this case about the timing of when ballots

16   are sent.

17           One of the concerns one might have about

18   the curing process here is that voters tend to submit

19   mail ballots at essentially the last minute in the

20   last few days before the deadline.  Many voters

21   submit absentee ballot requests close to the

22   deadline.



1          Thinking about those deadlines and making

2   graphs about those deadlines is something I've done

3   in previous cases, and here it's quite relevant

4   because the curing process might take time.  And if

5   voters are submitting ballots near the deadline,

6   there won't be time to cure.

7          Q.    Did your analysis in this case with

8   respect to the November 2022 election include any

9   assessment of how many ballots were rejected because

10  they came in late?

11         A.    No.

12         Q.    Is there any data that was available to

13  you that would have given you information about that

14  had you -- had you wanted to take a look at that?

15         A.    There are dates associated with the

16  receipt of mail ballots, so we could look at those

17  that were received late.

18         Q.    So is that the case in -- with respect to

19  each of the ballots by mail that is received, there's

20  a designation of the date on which it was received by

21  the Texas County election office or by the Texas

22  Secretary of State's office?



 1       A.     Yeah.   I'm not sure who the -- who enters

 2  the date information.   My guess is it's the counties.

 3  But, yeah, there's a date associated with the mail

 4  ballots coming in.

 5       Q.     And you said it was two or three states.

 6  You mentioned Iowa and Kentucky.   Do you recall the

 7  other one, if there was another one?

 8       A.     Iowa for sure was right.   Kentucky I

 9  think, although maybe it's Kansas.   I think it was

10  one of those.   I don't recall.   I'd have to look it

11  up.

12       Q.     It was a case state --

13       A.     What's that?   It was a case state.   Yeah,

14  you know, because I wasn't deposed in those cases, I

15  don't have a recollection of it off the top of my

16  head.

17       Q.     Okay.   You also said that you have done

18  work prior to this case in some matters involving

19  voter ID requirements.   In what instances did you do

20  that?

21       A.     So I was --

22              MR. FREEMAN:   I'm going to have to just



1  object to the extent that any of that work was as a

2  trial consultant and is not subject to disclosure

3  under the Federal Rules.

4        A.    One case that's off the top of my head

5  that is in my CV, happening in the last four years,

6  was this case about -- it was a state case in North

7  Carolina.

8              I'm trying to remember the name of it

9  here.  Holmes v. Moore, 2021.  So that was a voter ID

10 case in North Carolina state court.

11             BY MR. BRYANT:

12       Q.    Okay.  Any others that you recall?

13       A.    Not that I recall off the top of my head.

14       Q.    Now, let's move to the third of your

15 analyses that are discussed in the -- in Exhibit 2,

16 your second supplemental report.

17             If I understood your report correctly with

18 respect to November 2022, there were approximately

19 17.672 million registered voters in Texas at that

20 time.  And I think I'm working from footnote 12 on

21 page 12.

22       A.    Yes, sir.



1    Q.    And there were approximately 346,000

2    voters who cast a vote by mail; is that right?

3    A.    That's right.  As I talk about in the

4    report, the numbers vary a little bit based on what

5    database you're using, but they're all about that,

6    350 or so thousand.

7    Q.    Okay.  And in the -- on the same page in

8    paragraph 27, you state that of the 2.7 million

9    registrants who are termed by you to be at risk,

10   28,437 requested a mail ballot, which is roughly what

11   percentage?

12   A.    It's about a little more than 1 percent.

13   Q.    Okay.  Do you have any understanding as to

14   why the differences exist between the 1 percent

15   figure and the 2 percent figure?

16   A.    Yes.  So this is -- the 28,000 are the

17   people who successfully requested a ballot.  That

18   means they got through the first stage of the ABBM

19   receipt; that is, they successfully -- you know,

20   presumably they were mailed a ballot.

21          So one possible answer to your question is

22   that, you know, a higher percent of them were



1  rejected at that initial ABBM stage.

2       Q.    Okay.   The third sentence of paragraph 27

3  says, quote, Of all the 2.7 million registrants with

4  record issues, 28,437 requested a mail-in ballot,

5  unquote.

6            But it's your testimony now that that does

7  not include any of those who may have requested a

8  mail-in ballot but have not been successful in

9  getting a mail-in ballot?

10      A.    Right.   The -- as we kind of talked about

11 before, a ballot request data has codes that have

12 been overridden, according to Ms. Hart's testimony,

13 including in those presumably may be people who

14 requested a ballot, they were rejected.

15           But then after the period of time was over

16 in which they could request a ballot I don't know

17 whether they were still listed as having the status

18 of having it requested but they didn't get it.

19           For that reason, I focused this analysis

20 on people who successfully requested a ballot.

21 However, as I mentioned about the beginning of our

22 testimony, I did additional analysis on this



1  particular paragraph's data and I looked --

2      Q.    And this is an analysis you refer to that

3  occurred since the date of Exhibit 2?

4      A.    That's right, yeah, just to confirm that

5  if you look at the data from the perspective of those

6  ballot requests that are available as records in the

7  voter file, the results are the same.

8            In other words, there's two ways to look

9  at the pool of people who requested ballots.  The

10 pool of people who tried to request ballots, which is

11 estimated with some error if we assume that the codes

12 are overridden, and the people who successfully

13 requested a ballot, which also has some error.

14           So I looked at it both ways, and this

15 report that we're looking at here I focused on the

16 successfully requested a ballot pool.

17     Q.    Okay.  But for the reasons you stated, you

18 cannot estimate the total number of people who

19 requested a mail-in ballot in the November 2022

20 election?

21           MR. FREEMAN:  Objection.  Form.

22     A.    I can estimate it with the data with this



 1  asterisk, that I think that ABBM request fields is

 2  likely to be estimated itself with error because of

 3  these overridden codes.

 4          One could do that.  I have done it, but

 5  here in this report I use this alternative definition

 6  of people who have requested and received the ballot

 7  or were sent a ballot.

 8          BY MR. BRYANT:

 9      Q.    Okay.  If I understand your report

10  correctly, out of the 2.7 million registered voters

11  who you deem to be at risk, 6,380 never cast a

12  successful mail-in ballot in the November 2022

13  election; is that right?

14      A.    Did you say the 6380, that number?

15      Q.    Yes.

16      A.    Right.

17      Q.    Okay.  Now, does that 6,380 number

18  potentially include people who requested and got a

19  mail-in ballot but for some reason did not cast that

20  mail-in ballot?

21      A.    Yes, both that and this comparisons group

22  include those people.



1    Q.    And would that 6,380 number also include

2    voters who requested and received a mail-in ballot in

3    connection with the November 2022 general election

4    but returned the ballot late?

5    A.    Yes, both that group and the comparison

6    group include people who've returned the ballot late.

7    Q.    When you say comparison group, could you

8    be specific about what you're referring to?

9    A.    Sure.  The key comparison in this

10   paragraph is the comparison between those who are in

11   the at-risk pool, as I've defined it -- that's the

12   28,487 -- and the people who are not in the at-risk

13   pool, everyone else.

14          And in the -- the key comparison is those

15   in the at-risk pool have much lower participation in

16   mail voting, and as I later discovered in all voting,

17   as the non at-risk pool.

18          But both those pool -- well, the at-risk

19   pool and the comparison group, meaning everyone else

20   -- has people in all the kind of categories that

21   you're describing, people who didn't return the

22   ballot or returned it late or have any other



 1  different kind of characteristics.

 2      Q.    Would it have been possible for you to

 3  determine which of the 6,380 in that group never

 4  returned a mail-in ballot for the November 2022

 5  general election?

 6      A.    I think -- is that not what I did?  In

 7  other words, these are the people who didn't vote by

 8  mail ballot.

 9      Q.    I understood it to be these are the people

10  who didn't successfully cast a mail-in ballot.  So,

11  again, my understanding doesn't matter.  Yours does.

12  But that would include people who returned a mail-in

13  ballot but it was rejected for some reason, it would

14  include people who never returned a mail-in ballot,

15  and it would include people who returned a mail-in

16  ballot late; is that correct?

17      A.    Yeah.  The people who didn't return a

18  ballot, you're saying, are -- the people who didn't

19  return a ballot or did not vote successfully may have

20  not voted successfully because they did not return a

21  ballot at all or because they turned it in late or

22  because they had some trouble with the -- following



 1  the rules or they got caught up in some of the SB1

 2  issues that are at question here.

 3            And so the question I think that you're

 4  asking is can you subset to a category of this?

 5      Q.    I'm not trying to make it confusing.  My

 6  understanding is that there are at least those three

 7  components within that 6,380 votes that were never

 8  cast successfully that you just went over.

 9            Are there any others that you can think

10  of?

11      A.    You didn't want to return it, you voted

12  instead in person.

13      Q.    That would probably be somebody who didn't

14  attempt to cast a mail-in ballot?

15            MR. FREEMAN:  Objection to form.

16      A.    No.  Maybe -- I don't know.  It could be

17  that they attempted to and then they got caught up in

18  these ID requirements -- who knows why -- but they

19  voted in person or they could have returned it too

20  late.

21            And so, yeah, we could subset to just the,

22  you know -- here, I did who did a successful mail



 1   ballot.  Later, as I mentioned before, I saw if there

 2   was a difference on who voted at all having --

 3   conditioned on requesting a mail ballot.

 4              So I think that you're asking could we

 5   exclude the people from the analysis who didn't

 6   return a mail ballot at all or who returned one late?

 7   And, yeah, that's an alternative method one could

 8   use.

 9              BY MR. BRANT:

10       Q.    Well, that's not exactly what I asked, but

11   it's -- it's something that I will try to get to.

12              I just asked about the -- can you

13   determine or even estimate the number within the

14   6,380 who never returned a mail-in ballot?

15       A.    I believe I could do that with the data I

16   have available to me.  I can't -- from what's in the

17   report right now this is a different analysis than

18   the one you're suggesting.  So the one you're

19   suggesting is possible, as far as I understand your

20   suggestion.  It's not the one I did here.

21       Q.    Okay.  And is it also true that you could

22   determine but didn't determine the number within the



 1  6,380 who returned their mail-in ballot late and,

 2  therefore, it was not successfully cast?

 3      A.    Right.   I did not deem that to be

 4  necessary, but if -- yeah, but one could do that with

 5  the data I had.

 6      Q.    And then I think I mentioned a third

 7  category that I hadn't fully thought of until your

 8  answer, which is somebody who sent in a mail-in

 9  ballot but for whatever reason then decided to also

10  go vote in person.

11            Would that still be within the 6,380 of

12  people who never cast a successful mail-in ballot?

13            MR. FREEMAN:   Objection to form.

14      A.    Yes.   So the scenario I was imagining

15  wasn't that they sent in the mail ballot, but maybe

16  their mail ballot was rejected or maybe they received

17  it in their home but they didn't vote that way, and

18  they end up going to vote in person.   So that's a

19  different analysis.   I actually did that analysis, as

20  I talked about earlier.

21            BY MR. BRYANT:

22      Q.    Okay.   If somebody in that 6,380 mailed in



1  a mail-in ballot but for whatever reason went ahead

2  and voted in person, would that still be counted in

3  your 6,380 as somebody who never cast a successful

4  mail-in ballot?

5        A.    In this analysis, it would.  That's right.

6        Q.    Okay.  Did you also analyze in connection

7  with the November 2022 general election how many

8  ballots were mail-in ballots that were rejected for

9  reasons related to ID?

10       A.    I did estimate that, yes.

11       Q.    And did you then determine which of those

12 voters did not cure whatever problem caused the

13 rejection and -- or vote in person?

14       A.    I believe so -- yeah, in the previous

15 analysis.  Right.

16       Q.    Okay.  I have that number as being 6,355.

17 But regardless of what I have, how would you

18 calculate that?  And please feel free to take your

19 time.

20             MR. FREEMAN:  David, if you could direct

21 him to the paragraph in his report, that might allow

22 for more accurate testimony.



1          MR. BRYANT:  I will be happy to provide it

2   as soon as I get to it.

3          BY MR. BRYANT:

4     Q.    Okay.  I think that in paragraph 19 on

5   page 9 of Exhibit 2 there is the statement:  "Of all

6   the mail ballot rejections, 11,430 (83.8 percent)

7   have a code indicating that identification

8   verification was the reason for the rejection."

9          And, again, I believe a percentage of

10  those cured the rejection or otherwise managed to

11  vote successfully; is that right?

12    A.    That's right, a percentage of them.  So I

13  think that -- we're looking at paragraph 21.

14          So of this 11,430, which, again, 11,430

15  are mail ballot rejections on account of

16  identification verification.  Of The 11,430, 55.6

17  percent of them failed to vote successfully following

18  their ballot being rejected.

19    Q.    And so if you calculate or estimate the

20  amount that -- of the 11,430 whose records show that

21  they were able to vote either by mail or in person,

22  is that number about 6,355?



 1      A.    So now I think you're doing 44.4 percent

 2   times 11,430?

 3      Q.    Exactly.

 4      A.    That sounds about right.

 5      Q.    Okay.  Now --

 6      A.    Now, we need a calculator to confirm.

 7      Q.    I agree, and all I need is an estimate for

 8   the purpose of this.

 9           MR. FREEMAN:  For the purpose of clarity

10   of the record, 11,430 times 55.6 percent?

11           THE WITNESS:  No, times 44.4.

12           MR. FREEMAN:  Oh, times 44 -- sorry.

13   11,430 times --

14           THE WITNESS:  .444.

15           MR. FREEMAN:  -- is 5,075.

16           THE WITNESS:  5,075.

17           MR. BRYANT:  Uh-oh.  Okay.

18           MR. FREEMAN:  11,430 times .556 is 6,355.

19      A.    Okay.  So the larger number is the one

20   that failed to successfully vote.  The slightly

21   smaller number one is the one who --

22           MR. FREEMAN:  Daniel, rather than having



 1  me testify, why don't I give the witness a

 2  calculator.

 3          MR. BRYANT:  I think you're doing a great

 4  job.

 5          MR. FREEMAN:  But it would be better if

 6  the witness testified.  As much as I'm trying to help

 7  you along, I should not do you that solid.

 8          MR. BRYANT:  He is the expert.

 9      A.    You know I don't want to be replaced by

10  Chat GPT, but I will calculate things myself here.

11          BY MR. BRYANT:

12      Q.    Well, I'm pretty confident you won't be

13  replaced by a lawyer, no matter how learned and

14  esteemed.

15      A.    Okay.  So just to be clear, of these

16  11,430 individuals who were estimated to be rejected

17  in their mail ballots on account of ID requirements,

18  6,355 of them do not have a record that they voted

19  successfully.  And 5,075 of them have a record that

20  they did vote successfully.

21          And to be clear, that successful voting

22  may have been in person or maybe by mail.



1        Q.    Thank you.  So that number of 11,430

2   includes both the registered voters whom you deemed

3   in the at-risk category as well as those who were not

4   in the at-risk category?

5        A.    Yes.

6        Q.    So is it fair to say that out of 8.1

7   million votes that were cast in the November 2022

8   general election a total of 6,355 were mail-in

9   ballots rejected for reasons related to ID

10   requirements and not thereafter successfully cast

11   either by mail or in person?

12       A.    Yes, with the caveat that:  A -- again,

13   because of the overriding of codes we just want to

14   have the caveat that the data might be different if

15   we didn't have the overridden codes.

16             And second of all, that the other people

17   who are listed with such a code were also affected by

18   the law, but not in a way that limited their vote.

19       Q.    Could you explain what you mean in your

20   answer by the term affected by a code, unquote (sic)?

21       A.    Meaning, there seemed to be plenty of

22   people, thousands of people, who had a mail ballot





1  rejected on account of ID rules and might have

2  suffered burdens because of that, but ended up

3  voting.

4       Q.    Okay.  Those would be people in the 5,075

5  group that we discussed earlier?

6       A.    Right.

7       Q.    Okay.  Now, of the 6,355 we've just been

8  discussing, is it possible that some of them were

9  unable or failed to vote successfully because on

10  their -- on a subsequent ballot they made some

11  mistake unrelated to identification?

12       A.    So just to make sure I'm understanding, I

13  think you're posing a scenario in which someone's

14  mail ballot was rejected on account of the ID rules

15  and then maybe they got another mail ballot or tried

16  again and for a reason unrelated to the ID rules

17  failed to vote --

18       Q.    Is that possible?

19       A.    It seems to be possible.

20       Q.    Okay.  Just hypothetically you have

21  somebody whose ballot was rejected because of an ID

22  issue, they fix the ID issue and send it back in, but



1  forgot to sign it.  So is that an example of someone

2  who cured their ID problem but still is in the 6,355

3  who never successfully cast a mail-in ballot --

4              MR. FREEMAN:  Objection.  Form.

5              BY MR. BRYANT:

6      Q.    -- or an in-person ballot, for that

7  matter?

8      A.    Yes.  I don't know if that's an example of

9  someone who is in that set, but it's an example of

10  someone who could be in that set.

11             BY MR. BRYANT:

12      Q.    Right.  And we could think of some --

13  probably some other errors that voters can make that

14  were not related to ID.

15             But would any persons who were not able to

16  vote successfully because their second mail-in ballot

17  contained errors other than ID still be within that

18  -- counted within that 6,355?

19             MR. FREEMAN:  Objection.  There's no

20  question pending.

21      A.    So, again, I think you're just referring

22  to the possibility of multiple problems with a



 1  ballot, one of which is --

 2              BY MR. BRYANT:

 3      Q.    Or a variety of problems, yes.

 4      A.    -- a variety of problems.  One part of

 5  that variety has to do with these ID requirements and

 6  other parts have -- do not with the ID requirements.

 7  And so that would be a person who did not vote, had

 8  an ID requirement.

 9              I think you're questioning or asking about

10  the causal relationship between the ID problem and

11  the eventual vote.

12      Q.    No, I'm not really asking about that.  I

13  was just trying to establish if it is true that of

14  the 6,355 there can be people whose failure

15  ultimately to not cast a successful ballot was

16  because of the -- a defect other than an

17  identification defect in the second ballot they

18  attempted to cast?

19              MR. FREEMAN:  Objection to form.

20      A.    Yes.  That's theoretically possible.

21              BY MR. BRYANT:

22      Q.    Okay.  Do you have any way of knowing



1  whether that occurred or if so how many of the 6,355

2  are accounted for by that possibility?

3      A.    I don't believe there are codes in the

4  voter file that are sufficiently detailed to answer

5  that question.

6      Q.    Well, I think you can answer the question

7  as to whether or not you can calculate it based on

8  the data that you have?

9      A.    Yeah, that's what I mean.  Based on the

10  data that's available, one could not figure that out.

11      Q.    Do you have any opinions about whether

12  absent further law changes the number of people who

13  do not cast a successful mail-in ballot in Texas

14  because of ID issues will increase, stay the same, or

15  decrease?

16      A.    I would guess that the problems would

17  increase based on my knowledge of elections today.

18      Q.    Do you have any basis in the Texas data

19  for that guess --

20           MR. FREEMAN:  Objection to form.

21           BY MR. BRYANT:

22      Q.    -- the Texas data specifically that you've



 1  had access to?

 2      A.    Sure.  Over a period of -- I don't know --

 3  about 12 years or so older people -- specifically

 4  older people have made more use of absentee voting in

 5  Texas.  If you look at the numbers from I think like

 6  2012, there's been an increase in mail ballot usage,

 7  which is consistent across the country.  It's a

 8  fairly popular form of voting, but in Texas the rate

 9  of mail voting is much lower than in some other

10  states.

11      Q.    Specifically by that group or in general

12  or both?

13      A.    In general, certainly by people not in

14  that group.  And so the insight is that because a few

15  people are voting by mail in Texas, people don't

16  necessarily know they have this ID problem that would

17  come up when they do vote by mail.

18          And if you imagine that more people over

19  time in general are going to want to use mail voting,

20  each election more people will be kind of caught up

21  with these issues.  Now, that's on average.

22  Obviously, a smaller percentage of people cast mail



1   ballots in November than did in March 2022.

2            But in general, I think we'll see -- one

3   would expect to see more mail balloting in the future

4   and more people sort of caught up for the first time

5   in a problem with these ID -- ID regulations.

6        Q.   November 2022 was the first time there was

7   a general election in which mail-in voters had to

8   comply with an ID requirement in Texas; is that

9   correct?

10       A.   Yes.

11       Q.   Would you expect that mail-in voters who

12  have had that experience are less likely to have

13  problems in successfully casting mail-in votes in the

14  future?

15       A.   Well, again, so only like 2 percent of

16  registered voters voted by mail.  So the next

17  election will have a lot of people who have never

18  voted by mail.

19            Of the people who voted by mail once, they

20  might resolve their problem or help the state resolve

21  the state's problem, or they might just say, mail

22  voting is just too much of a burden here, you know,



1  the state prefers me to vote in person, so I'll

2  substitute mail for in person.

3           In other words, if you have sort of a

4  hassle with one arm of the government, you might --

5  you might go to another arm.

6      Q.    Another arm it that instance being what?

7      A.    Being in-person voting.

8      Q.    Okay.  In other words, it's still the same

9  county election facility, but a different process?

10     A.    A different process.

11     Q.    Okay.  And so if I understand you

12  correctly, you're saying there are some factors that

13  might make an unsuccessful mail-in -- strike that.

14          There are some factors that make it less

15  likely that the number of successful mail-in votes

16  will go down, some factors that will make it more

17  likely that the number of mail-in voters will go up.

18  And it's a matter of opinion as to which of those are

19  likely to predominate in the future?

20          MR. FREEMAN:  Objection to form.

21     A.    Well, again, I mean, I don't think these

22  are all of equal weight.  You have -- you know, the



1 people -- you know, a heck of a lot of people turn 65

2 over a four-year period, so all of those people for

3 the first time are aged into the -- to one -- the

4 excuse one has to vote by mail.

5          So all of those people are encountering

6 mail voting for the first time under the conditions

7 of being 65 and up.  So that's a big group of new

8 people who are potentially going to encounter

9 problems for the first time every time.  Every

10 election a new crop ages in.

11          And then of the people who have had this

12 experience and are tripped up with these regulations,

13 they might be able to resolve it, in which case, they

14 won't have a problem in the future, or they might

15 substitute in-person voting or just give up on

16 voting.  We don't know exactly what their behavior

17 would be.

18          MR. BRYANT:  I'll tell you what, why don't

19 we take a break?  And I'll see if I can get in a

20 position to finish up.

21          MR. FREEMAN:  Okay.  Great.

22          THE VIDEOGRAPHER:  Off the record at 1:49.



```
 1                (A break was taken.)

 2                THE VIDEOGRAPHER:  We are back on the

 3   record at 2:10.

 4                BY MR. BRYANT:

 5        Q.    Dr. Hersh, let me refer you to Exhibit 2

 6   and paragraph 23 --

 7        A.    I'm there.

 8                BY MR. BRYANT:

 9        Q.    -- in which you discuss a term called,

10   quote, mail-in rejection rate and a term uncured --

11   uncanceled rejection rate.

12                Could you explain for the record what you

13   mean first by mail ballot rejection rate?

14        A.    Sure.  This is the rate as estimated by

15   the available data of any mail ballot that was

16   flagged as rejected.

17        Q.    Would that include ABBMs or only actual

18   mail-in ballots?

19        A.    Only actual mail-in ballots.

20        Q.    And when you say flagged as rejected, do

21   you mean that there was a code indicating rejection

22   in the TEAM's database?
```



MAGNA ▶
LEGAL SERVICES

Dr. Eitan Hersh                                        April 20, 2023
                                                       Page 109

    1        A.    That's right.

    2        Q.    Okay.  And was this rate of 4.1 percent

    3   specifically for the November 2022 general election?

    4        A.    Yes.

    5        Q.    Now, the other term I had mentioned was,

    6   quote, uncured/uncanceled rejection rate of 2.5

    7   percent, unquote.

    8              What did you mean by the term

    9   "uncured/uncanceled rejection rate"?

   10        A.    So this is now people who have the

   11   rejection flag -- I think it's AX is the flag -- and

   12   there's no indication that they have another record

   13   that they voted, or that same record said that they

   14   voted either in person or by mail.

   15              There's a bit of, again, inconsistency in

   16   how this data is stored, so on some records there's

   17   multiple records for a single person.  So that person

   18   will have one record that says it got rejected and

   19   then another record saying they voted in person.  In

   20   other records, it's all on one line.

   21        Q.    And I think you also mentioned in

   22   paragraph 23 the source of uncertainty that we've



1  discussed earlier in the deposition, which is that

2  some cured mail-in ballots may have had their codes

3  in the TEAM's database overridden once they were

4  cured.

5            So how reliable do you think those

6  rejection rates are or can you not estimate that?

7            MR. FREEMAN:   Objection to form.

8       A.    Yes.   In order to estimate that, I think

9  one would have to look at, you know, daily snapshots

10  during this period of an election.  You know, we look

11  at the database today and we look what rejections are

12  and then we look tomorrow, and we can see if someone

13  was changed from a flag of rejection to a flag of

14  accepted.

15           Without that real time kind of snapshots

16  we're left with essentially the final product, which

17  is after the election what does the voter file say?

18  And this is based on that kind of final product, and

19  I don't have a way to estimate with this data how

20  much things would change.

21           I think what I would say is that the --

22  this would be a conservative estimate that I've given



1    of rejection rates because it's essentially the final

2    rejection rate.

3            So all of the -- all of the incompleteness

4    is in one direction, which is to say, if it says

5    rejected and it was rejected, it's not going to be

6    changed now to accepted.  But over the course of an

7    election you can see how a county clerk might have a

8    rejected one and then once it's cured they delete the

9    rejection flag.

10           BY MR. BRYANT:

11       Q.    If a voter had cast a mail-in ballot in

12   that November 2022 election and it was rejected but

13   the voter then went and voted in person successfully,

14   do you have a high level of confidence that the

15   successful in-person vote would be reflected on the

16   TEAM's database?

17       A.    Yes.  The in-person votes are -- have a

18   clear designation and it lines up with what the state

19   was reporting.

20           There seems to be fewer inconsistencies

21   with the in-person, including early in-person voting

22   than with the mail -- the mail voting, which makes



1  sense insomuch as there's a lot of things happening

2  with mail voting with the applications being

3  requested, being received, being rejected, being --

4  there's a lot of steps with mail voting that are not

5  true of the other forms of voting.

6       Q.    Okay.  I think you also calculated the

7  mail-in ballot rejection rate for the 2022 primaries

8  and concluded in Exhibit 2 that the vote -- the

9  mail-in ballot rejection rate in November of 2022 was

10 quite a bit lower; is that correct?

11      A.    That's right.  Here --

12      Q.    I think it's mentioned in paragraph 24.

13      A.    Right.  I do think I calculated that

14 rejection rate in my previous report.  Here, I

15 believe it's just -- I'm just referring to the public

16 reporting of that rejection rate.  Yeah, I'm citing

17 the daily Dallas Morning News with that one of 12

18 percent rejection.

19      Q.    Okay.  So do you have a reason to believe

20 that that comparison is inaccurate?

21      A.    I think it's accurate.

22      Q.    And do you have any understanding as to



1   why the rejection rate was so much lower in November

2   2022 than in the springtime of 2022?

3        A.    I didn't do any kind of research about why

4   that would happen.

5        Q.    Okay.  And nothing in your data would give

6   you an answer to that?

7        A.    An answer to why there's a higher

8   rejection rate in the primary election?

9        Q.    I'd phrase it as to why the rejection rate

10  in November was about a third of what it was in the

11  primary.

12       A.    Yeah, I don't know.  I mean, there's --

13  obviously, there's multiple things going on here.

14  The turnout rate is obviously much higher in the

15  general election than the primary.  It's a different

16  set of voters in the primary election.

17             The mail voting participation rate was

18  higher in the primary, so not only is that -- it's

19  fewer people and more of them are using mail voting

20  in that primary than the general and it's also months

21  later.

22             So it could be that, you know, there was a



1   lot of news about the fact that so many mail ballots

2   were rejected and this, you know, dissuaded some

3   people from voting by mail.  I don't know.  There's a

4   lot of possibilities.

5       Q.    Is it a possibility that there's a

6   learning curve in voters who knew better of the

7   requirements and how to fulfill them in the fall than

8   in the spring of 2022?

9       A.    What I would say is that the kind of

10  problems that I identify in my report would be very

11  hard for a voter to determine because they are

12  problems that originate in database issues as opposed

13  to the voters being careful or something like that.

14          So I don't suspect, at least for the

15  problems that I focus on here, that the learning

16  curve would be particularly helpful.  But on some

17  other issues maybe if people, you know, didn't fill

18  out an ID number at all, maybe there would be a

19  learning curve on that.  But that's really separate

20  from the problems that I'm focused on here.

21      Q.    Is it possible that a Texas voter may have

22  had their mail-in ballot rejected in the spring



1   because of an ID issue, specifically that the

2   driver's license number that they put in did not

3   match what was on the TEAM's record and in the

4   ensuing months they made sure that they were

5   registered with their current driver's license?

6           MR. FREEMAN:  Objection to form.

7      A.     That's possible.

8           BY MR. BRYANT:

9      Q.     Is there any way to determine whether and

10  to what extent that occurred between the primary in

11  March of 2022 and the general election in November of

12  2022?

13     A.     So I'd be interested to know how much

14  overlap there is between the people who used mail

15  ballots in those two elections to what extent those

16  same people are different people.  We could see the

17  people who were rejected, whether they voted by mail

18  again.  We might be able to see whether they changed

19  their -- whether their ID numbers as listed in TEAM

20  changed.

21          So it's possible to maybe get out the

22  question with the data.



 1        Q.    So the -- strike that.

 2              The 12 percent rejection rate that is

 3   referred to in paragraph 24 of Exhibit 2, is that

 4   more comparable to the 4.1 percent rejection rate

 5   than the 2.5 percent uncured/uncanceled rejection

 6   rate?

 7        A.    I don't recall off the top of my head what

 8   -- which of those rates it was.

 9        Q.    Okay.  Assuming we're just going to

10   compare 12 percent and 4.1 percent, the rejection

11   rate in November of 2022 was about a third of what it

12   was in the primaries of 2022.

13              Would you expect that the rejection rate

14   would go further downward in 2023 or 2024?

15              MR. FREEMAN:  Objection to form.

16        A.    So I don't like predicting the future.

17   What I would say is that a key insight here is that

18   if -- A) not that many people are using the mail

19   voting system.  And so the people who are using it

20   one year to the next might be very different.

21              Now, particularly are the non-seniors.

22   You know, if someone's pregnant and having a baby one



 1  year, they're not pregnant and having a baby the next

 2  year maybe.  They only fall into the category once,

 3  so there's a lot of opportunity for new people in the

 4  category -- someone's overseas now but not next year.

 5            There are a lot of opportunities for

 6  people to only encounter the mail voting system for

 7  the first time in any one election.  And to the

 8  extent that there is, in general, a trend towards

 9  more mail voting, you know, I would expect more

10  problems in the future.

11            BY MR. BRYANT:

12      Q.    Rather than less?

13      A.    Rather than less.

14      Q.    Okay.  Do you have any data that tells you

15  what percentage of the mail-in voters in November

16  2022 were encountering mail-in voting for the first

17  time?

18      A.    In the data that was provided to me for

19  this case I don't think it has the mail voting data

20  going back in time, but almost certainly the Texas

21  election administration has that data and we can

22  answer that question.



1    Q.    The primaries in 2022 and the general

2  election in 2022 were also the first times that

3  county and state election officials operated under

4  the procedures of SB1, right?

5    A.    Yes.

6    Q.    Do you have reason to believe that there

7  is also a learning curve for those 254 county

8  election offices in Texas and the Texas Secretary of

9  State in smoothly and correctly handling mail-in

10  ballots or ABBMs?

11    A.    I don't know.  I mean, that really depends

12  on factors like, you know, staff training and

13  professionalism, staff retention.  I would say it's

14  not a great statistic for the learning curve that

15  there's just, you know, almost, what, 200,000 people

16  who definitely have DPS ID numbers but they're not on

17  TEAM.

18        So that seems to me to reflect a lack of a

19  learning curve.  But a learning curve depends, again,

20  on lack of staff turnover, staff training, all sorts

21  of things that I just have no basis for determining

22  whether the learning curve would happen or not.



1        Q.    Do you know how many of those registered

2   voters who did not have DPS ID numbers in the TEAM's

3   database were ones who had voted in recent years?

4        A.    Do I know whether the people who are on

5   TEAM without a DPS ID number but they have a DPS

6   number, had they voted?  Yes, I believe that I did an

7   analysis that showed how many -- well, I guess I did

8   an analysis that showed how many of these at-risk

9   people had recently voted like in the 2020 election,

10   the most recent election.

11             I'm not sure I subsetted --

12        Q.    Did a subset of the 200,000 --

13        A.    Right.

14        Q.    -- or less now?

15        A.    Yeah.  I didn't do that subset.

16             MR. BRYANT:  All right.  I'll pass the

17   witness.  Thank you very much.

18             MR. FREEMAN:  Does counsel for the

19   defendant interveners have any questions for the

20   witness?

21             MR. KENNY:  No, we do not.

22             MR. FREEMAN:  I just have a few quick



 1  follow-up questions then if we're back on our side of

 2  the V.

 3                EXAMINATION BY COUNSEL FOR PLAINTIFFS

 4                BY MR. FREEMAN:

 5       Q.    Dr. Hersh, thank you for your testimony

 6  today.  I just have very quick qualification

 7  questions.

 8                A few different times you talked about

 9  lower mail voting participation rates with respect to

10  comparisons between your at-risk and non at-risk

11  pools.

12                When you said mail voting participation

13  rate, did you mean rate of successfully casting a

14  mail ballot?

15                MR. BRYANT:  Objection to form.

16       A.    Yes, participation in this context means

17  successfully voting in an election.

18                BY MR. FREEMAN:

19       Q.    And when you were talking about how --

20  comparisons between the at-risk and non at-risk pools

21  and whether the combined mail voting and in-person

22  voting participation rates were the same or



1  different, what did you mean by participation rates

2  specifically?

3       A.   So if we look at the at-risk pool and the

4  non at-risk pool and we compare their turnout rate,

5  it's another way of saying participation rate.

6  There's rate of successfully voting.  There's a

7  significant difference in the successful voting rate,

8  a/k/a participation rate, a/k/a turnout of the -- in

9  which the at-risk people are lower -- less likely to

10  turn out.

11       Q.   Okay.  One other quick set of questions.

12  You discussed with Mr. Bryant the notion of a voter

13  who put a mistake or an illegible number on a voter

14  registration form such that the voter was the initial

15  source of an error in the DPS number on TEAM.

16            In that scenario, who then has possession

17  of the records concerning -- that include that

18  erroneous number?

19       A.   So this is at the registration stage we're

20  talking about?

21       Q.   Once the voter has been registered with

22  the erroneous number, who is in possession of the



1    registration data?

2         A.    Right.  So someone registers to vote.

3    They register -- they put a typo or have illegible

4    handwriting such that the DPS ID number that lands in

5    TEAM is inaccurate.

6              So now TEAM, the election authority, the

7    county authority, has possession of the incorrect and

8    correct, if they looked at the other source -- they

9    have in the file the incorrect DPS ID number.

10        Q.    Is it possible for the Secretary of

11   State's office to identify those erroneous DPS

12   numbers in the same manner that you did?

13        A.    Yeah.  They have all my code already.

14   They can find all of them.

15        Q.    And is it possible for the state to

16   correct those errors, even if they originated with

17   the voter?

18        A.    Yes.  If a voter is registered to vote and

19   now the election authority has their name, their

20   social security number, or just their name and

21   address and their birth date and has an erroneous DPS

22   ID number, then if the state were to, as a matter of



1   list maintenance, match their TEAM records to DPS,

2   they would discover that there is a discrepancy and

3   they would be able to correct it.

4        Q.    And in the case of the individuals

5   identified in table A of Exhibit 2 on page 5, to the

6   extent that any of those 189,095 individuals who have

7   no DPS ID in TEAM and possess a DPS ID, is it

8   possible for the state to identify those individuals

9   and import a DPS number into those records?

10       A.    Yes.

11       Q.    Has the state done so?

12       A.    No.

13             MR. FREEMAN:  I have no further questions.

14   I'll reserve the remainder for trial.

15             Is there anyone else on the line who has

16   questions?  Okay.

17             EXAMINATION BY COUNSEL FOR STATE

18             DEFENDANTS

19             BY MR. BRYANT:

20       Q.    I just have a follow-up or two.

21             In Mr. Freeman's questioning of you, you

22   answered a question by saying it would be possible



1   for the state to compare the DPS ID numbers in its

2   database with those in the DPS ID database and

3   identify discrepancies just as you did.

4            Is there anything in the law that requires

5   the Texas Secretary of State to do that, that you

6   know of?

7        A.   I believe there's a general provision in

8   is it NVRA or HAVA that states are expected to keep

9   their records up-to-date and accurate.  There's no,

10  as far as I know, direct provision about how to keep

11  them accurate, but this is a way to keep them

12  accurate.

13       Q.   That is a way to keep them accurate or

14  more accurate?

15       A.   Sure.

16       Q.   Okay.  And does it have an obligation to

17  correct its voter registration records when the voter

18  is the source of the error in the records such as in

19  the example that we've just been discussing?

20       A.   Yeah.  I mean, it sounds like we're

21  getting close to like a legal question about

22  obligation that I'm uncomfortable answering as a



Dr. Eitan Hersh                                    April 20, 2023
                                                   Page 125

 1   nonlawyer.

 2              MR. BRYANT:  Fine.  That's all the

 3   questions I have.

 4              MR. FREEMAN:  I reserve the remainder of

 5   our questions for trial.  Thank you so much, Dr.

 6   Hersh.

 7              THE WITNESS:  Thanks.

 8              THE VIDEOGRAPHER:  And we're off the

 9   record at 2:35.

10              THE REPORTER:  Reading and signing, Mr.

11   Freeman?

12              MR. FREEMAN:  Yes.  Thank you.

13              THE REPORTER:  And would you like a copy,

14   sir?

15              MR. FREEMAN:  Yes, please.  Regular

16   delivery.

17              THE REPORTER:  On the Zoom, who would like

18   a copy of the transcript?

19              MR. KENNY:  Yes.  This is Stephen Kenny.

20   We would like to order a copy of the transcript.

21              THE REPORTER:  And would you like regular

22   delivery? eTran, hardcopy or both?



1              MR. KENNY:  Just regular delivery of an

2    eCopy.

3              (Signature having not been waived, the

4    videotaped deposition of Dr. Eitan Hersh was

5    concluded at 2:35 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22



Dr. Eitan Hersh                                              April 20, 2023
                                                            Page 127

```
 1                    C E R T I F I C A T E

 2

 3           I do hereby certify that I am a Notary
     Public in good standing, that the aforesaid testimony
 4   was taken before me, pursuant to notice, at the time
     and place indicated; that said deponent was by me
 5   duly sworn to tell the truth, the whole truth, and
     nothing but the truth; that the testimony of said
 6   deponent was correctly recorded in machine shorthand
     by me and thereafter transcribed under my supervision
 7   with computer-aided transcription; that the
     deposition is a true and correct record of the
 8   testimony given by the witness; and that I am neither
     of counsel nor kin to any party in said action, nor
 9   interested in the outcome thereof.

10

11           WITNESS my hand and official seal this

12   _____ day of _____, 2023.

13

14              Sherry Brooks

15   _____

16                  Notary Public

17

18

19

20

21

22
```



Dr. Eitan Hersh                                    April 20, 2023
                                                   Page 128

```
 1              INSTRUCTIONS TO WITNESS

 2              Please read your deposition over carefully

 3  and make any necessary corrections.  You should state

 4  the reason in the appropriate space on the errata

 5  sheet for any corrections that are made.

 6              After doing so, please sign the errata

 7  sheet and date it.

 8              You are signing same subject to the

 9  changes you have noted on the errata sheet, which

10  will be attached to your deposition.

11              It is imperative that you return the

12  original errata sheet to the deposing attorney within

13  thirty (30) days of receipt of the deposition

14  transcript by you.  If you fail to do so, the

15  deposition transcript may be deemed to be accurate

16  and may be used in court.

17

18

19

20

21

22
```



Dr. Eitan Hersh

April 20, 2023
Page 129

```
1                  - - - - - - - -

2                    E R R A T A

3                  - - - - - - - -

4    PAGE          LINE              CHANGE
     _____
5
     _____
6
     _____
7
     _____
8
     _____
9
     _____
10
     _____
11
     _____
12
     _____
13
     _____
14
     _____
15
     _____
16
     _____
17
     _____
18
     _____
19
     _____
20
     _____
21
     _____
22   SIGNATURE _____ DATE_____
```



Dr. Eitan Hersh

April 20, 2023
Index: 1..9

---

**1**

**1** 5:14 6:4 7:13 26:21 27:19 48:12 62:9 86:12,14

**10** 63:21 79:9

**100,000** 43:15

**106,000** 43:15

**10:08** 4:10

**11** 62:22

**11,430** 96:6,14,16,20 97:2,10,13, 18 98:16 99:1

**11:07** 47:7

**11:20** 47:10

**12** 7:9,14 85:20,21 104:3 112:17 116:2,10

**12:05** 78:2,3

**15** 29:13 68:13,19

**15.4** 29:19

**150** 4:10

**17.45** 48:6

**17.672** 85:19

**18** 56:22

**189,000** 62:14

**189,095** 62:4,21 123:6

**19** 96:4

**1:03** 78:7,14

**1:49** 107:22

---

**2**

**2** 5:14 6:15 26:12,13,16 27:20 29:16 44:16 48:3 59:4 62:16 85:15 86:15 88:3 96:5 105:15 108:5 112:8 116:3 123:5

**2,690,344** 48:6

**2.4** 48:14

**2.5** 109:6 116:5

**2.7** 43:11 48:14 66:8 68:1 86:8 87:3 89:10

---

**20** 58:6

**200,000** 60:19 118:15 119:12

**2012** 104:6

**2018** 8:4,8

**2019** 7:15

**2020** 81:21 82:6 119:9

**2021** 19:12 32:10,12 85:9

**2022** 34:11,18 38:9 62:6 64:1 73:11 74:18 76:2,15 83:8 85:18 88:19 89:12 90:3 91:4 95:7 99:7 105:1,6 109:3 111:12 112:7,9 113:2 114:8 115:11,12 116:11,12 117:16 118:1,2

**2023** 4:9 9:22 13:7 26:15 45:3 46:19 48:5 60:17 62:4,20 116:14

**2024** 116:14

**20th** 4:9

**21** 96:13

**22** 74:21 76:3

**23** 108:6 109:22

**24** 112:12 116:3

**25** 57:9

**254** 118:7

**27** 86:8 87:2

**276,000** 62:13

**28,000** 86:16

**28,437** 86:10 87:4

**28,487** 90:12

**2:10** 108:3

**2:35** 125:9

---

**3**

**30** 62:5

**346,000** 86:1

**350** 86:6

**3rd** 9:22 13:7 26:15

---

**4**

**4.1** 109:2 116:4,10

**44** 97:12

**44,000** 45:2,7

**44.4** 97:1,11

**444** 97:14

---

**5**

**5** 44:15 48:4 49:21 59:4 123:5

**5,075** 97:15,16 98:19 100:4

**500** 75:8

**55.6** 96:16 97:10

**556** 97:18

**5:51-CV-00844** 4:8

---

**6**

**6** 6:22

**6,355** 95:16 96:22 97:18 98:18 99:8 100:7 101:2,18 102:14 103:1

**6,380** 89:11,17 90:1 91:3 92:7 93:14 94:1,11,22 95:3

**62,000** 45:16

**6380** 89:14

**65** 107:1,7

---

**7**

**7** 7:3

---

**8**

**8.1** 99:6

**83.8** 96:6

**85** 68:18

---

**9**

**9** 96:5



Dr. Eitan Hersh

**90** 48:10

**95** 49:20

---

## A

**a/k/a** 121:8

**ABBM** 31:8 32:15,22 34:19 37:4 56:10 58:11,22 66:9 67:8 68:2 69:7 70:22 71:2 72:4 74:3 76:21 86:18 87:1 89:1

**ABBMS** 30:7 31:19 66:15 74:9 108:17 118:10

**Abbott** 4:6

**abbreviation** 27:15

**abbreviations** 30:6

**ability** 19:3 24:22

**absence** 72:1

**absent** 103:12

**absentee** 82:21 104:4

**Abstract** 26:17

**accepted** 76:21 77:8 80:2 110:14 111:6

**access** 54:10 104:1

**account** 11:20 27:6 29:4,12 71:6, 8,21 72:5,16,19 96:15 98:17 100:1, 14

**accounted** 103:2

**accurate** 43:13 95:22 112:21 124:9,11,12,13,14

**accurately** 27:10 29:11 44:2

**action** 30:17 31:5

**actual** 108:17,19

**add** 30:6

**added** 7:6

**addition** 12:20 46:21

**additional** 10:1 87:22

**address** 36:2 43:8 52:19 122:21

**addressed** 13:12

**adequately** 16:9

**administration** 117:21

**administrative** 43:20 44:12 46:1 80:20

**advance** 76:1,3

**affected** 63:13 99:17,20

**age** 12:10

**aged** 107:3

**ages** 107:10

**agree** 97:7

**agreement** 9:6

**ahead** 16:8 18:22 60:2 95:1

**allay** 13:11

**alternative** 32:2 89:5 93:7

**American** 7:4

**amount** 96:20

**amounted** 10:15

**amounts** 21:11

**analyses** 11:5 21:4 29:8 51:11 81:16 85:15

**analysis** 10:21 11:9,10,13 12:8 13:3,6,14 14:20 15:22 18:6 19:7 20:6,13 22:4,5 24:3,15 25:11 26:18 27:1 29:5,20,21 32:3 34:9 40:19 54:11 83:7 87:19,22 88:2 93:5,17 94:19 95:5,15 119:7,8

**analyze** 95:6

**analyzed** 50:7

**and/or** 74:6

**annual** 51:3 52:11

**answering** 9:15 66:14 69:3 124:22

**antisemitism** 6:18

**anymore** 28:6

**apologize** 10:8

**apparently** 41:19

**appears** 62:3 77:17

**application** 27:3 30:1,8,13 43:22 44:5 66:19 71:21 74:4 76:9 79:4 82:3

**applications** 78:21 112:2

**applied** 63:21 69:20

**approximate** 29:17

**approximately** 8:7 14:5 32:11 43:11 45:16 85:18 86:1

**April** 4:9

**arm** 106:4,5,6

**article** 7:1

**articles** 6:17

**articulating** 68:22

**aspect** 19:19

**assess** 73:7

**assessed** 65:1 66:5

**assessing** 29:6 72:14

**assessment** 81:7 83:9

**assigned** 25:19

**assume** 15:15 16:8 17:7,19 19:7 52:7 55:11 88:11

**assumed** 67:22

**assuming** 64:11 116:9

**assumption** 65:3,8 68:21 69:4,6, 17

**asterisk** 89:1

**at-risk** 11:17 12:4,5,15,20,22 21:7 22:2,10,15 39:10 43:12,16 58:14 64:5,12,21 65:4 66:8 68:1,10,12, 14,17,18,19,20 69:2 70:11 71:11, 14,15 72:14 90:11,12,15,17,18 99:3,4 119:8 120:10,20 121:3,4,9

**Atlantic** 7:2

**attached** 5:15

**attempt** 80:12,16 92:14

**attempted** 74:8 92:17 102:18

**attempting** 72:10

**attend** 51:7

**attended** 51:5

**attorney** 4:18 36:13

**attorneys** 15:8 75:9

**attributable** 72:7,9

**authority** 122:6,7,19

**average** 104:21



**aware** 32:21 33:3,5 34:18 35:17
41:13 69:15 74:13 75:21 76:4

**AX** 109:11

---

**B**

**baby** 116:22 117:1

**back** 31:2 43:21 47:9 55:22 57:2,
10 58:6 61:18 78:13 82:3 100:22
108:2 117:20 120:1

**bad** 43:4

**ballot** 27:3,4 30:1,6,8,18,21 31:2,6,
7 32:16 37:5 38:11 45:13 56:11
58:22 63:22 66:18,22 68:16 71:20,
21 76:9,21 79:5 81:20 82:1,4,6,21
86:10,17,20 87:4,8,9,11,14,16,20
88:6,13,16,19 89:6,7,12,19,20
90:2,4,6,22 91:4,8,10,13,14,16,18,
19,21 92:14 93:1,3,6,14 94:1,9,12,
15,16 95:1,4 96:6,15,18 99:22
100:10,14,15,21 101:3,6,16 102:1,
15,17 103:13 104:6 108:13,15
111:11 112:7,9 114:22 120:14

**balloting** 105:3

**ballots** 31:19 74:10 82:15,19 83:5,
9,16,19 84:4 88:9,10 95:8 98:17
99:9 105:1 108:18,19 110:2 114:1
115:15 118:10

**based** 10:22 18:19 20:4,9,14 23:1,
13 24:20 32:3 38:22 65:20 70:14,
18 86:4 103:7,9,17 110:18

**basic** 27:8 68:21 69:21

**basis** 52:8 54:4 57:18 70:8 103:18
118:21

**began** 14:3

**beginning** 87:21

**begins** 4:3

**behalf** 4:14,21 5:20 13:13

**behavior** 107:16

**big** 107:7

**biggest** 12:10

**bill** 14:16 19:12,13

**billed** 14:6

**birth** 122:21

**bit** 14:21 18:14 24:8 28:8 33:17
40:18 86:4 109:15 112:10

**border** 65:17

**brain** 50:20

**BRANT** 93:9

**break** 16:11,13 47:4,8 77:21
107:19 108:1

**Brooks** 4:12

**brought** 66:2

**Broughton** 5:4

**Bryant** 4:17 5:18,19 9:11,14 10:7,
12 13:21,22 17:10 18:16 25:5 34:6,
7 36:19 37:12 38:6 39:3 46:17,21
47:5,11 49:10 56:13,18 60:1 61:14
62:2 63:7 65:2 69:14 70:20 73:1,8
74:14 77:20 78:17 81:14 85:11
89:8 94:21 96:1,3 97:17 98:3,8,11
101:5,11 102:2,21 103:21 107:18
108:4,8 111:10 115:8 117:11
119:16 120:15 121:12 123:19
125:2

**bunch** 71:12 75:9

**burden** 105:22

**burdens** 100:2

**business** 6:19

---

**C**

**calculate** 95:18 96:19 98:10 103:7

**calculated** 112:6,13

**calculator** 97:6 98:2

**call** 35:18 36:1 52:5

**called** 8:9 15:10 78:10 108:9

**calling** 36:6,14

**camera** 4:13

**card** 28:7

**cards** 26:8

**careful** 114:13

**Carolina** 85:7,10

**carrier** 27:3 31:1,4 67:8 72:4 74:4

**carriers** 66:15

**carries** 23:22 31:2

**case** 4:7,19 6:1,7 7:12 8:7,9,10,22
9:1,19,20 13:5 14:2,12,17 17:1,5
18:3 19:10 21:12,15 23:14 24:20
25:3,4 26:15,19 47:13,16,19 48:1
50:7 51:2,5 80:2 81:18 82:11,15
83:7,18 84:12,13,18 85:4,6,10
107:13 117:19 123:4

**cases** 7:10,20 8:20 17:20 23:7
66:18 81:19 83:3 84:14

**cast** 86:2 89:11,19 91:10 92:8,14
94:2,12 95:3 99:7,10 101:3 102:15,
18 103:13 104:22 111:11

**casting** 105:13 120:13

**categories** 29:7 46:5,10 59:21
62:17 67:13,14,15 72:14 90:20

**category** 22:15 28:20 42:2 43:13
44:21 46:14 48:11,15 54:21,22
59:3,6,13,17 62:1,4,13,16,20 63:17
64:18 66:8 70:12 72:13 73:3 77:2,9
92:4 94:7 99:3,4 117:2,4

**caught** 92:1,17 104:20 105:4

**causal** 102:10

**caused** 34:20 95:12

**caveat** 69:22 99:12,14

**central** 37:10

**challenge** 67:5,6

**challenges** 66:13

**change** 6:14 67:5 110:20

**changed** 10:22 19:12 110:13
111:6 115:18,20

**changing** 52:19

**characteristics** 91:1

**Chat** 98:10

**checked** 12:21 54:18

**checking** 12:19,20

**chose** 46:22 49:1

**circumstance** 39:8 46:1 77:15

**circumstances** 28:2,8,9 31:10
35:22 38:16 39:22 40:5 77:1

**cite** 79:7



MAGNA
LEGAL SERVICES

**citing** 112:16

**citizenship** 8:12

**claim** 12:15

**claims** 23:3

**clarify** 32:14 34:16

**clarity** 97:9

**class** 66:2

**clause** 9:10

**cleanliness** 19:3

**clear** 21:20 34:13 35:15 36:16 40:6 45:10 75:15 98:15,21 111:18

**clerk** 43:3 80:7 111:7

**close** 69:3 82:21 124:21

**code** 10:18 15:3,9,10,12,15,19 79:6 96:7 99:17,20 108:21 122:13

**codes** 21:11 67:1 70:1,2 80:5,8 87:11 88:11 89:3 99:13,15 103:3 110:2

**colleague** 34:5 46:15,19

**collectively** 61:20

**college** 57:2,5 58:5

**combined** 120:21

**commands** 15:11

**commercial** 55:9

**committed** 69:1

**communicate** 74:8

**communicated** 74:7

**communications** 74:18,20 75:21

**community** 6:18

**comparable** 62:5,21 116:4

**compare** 116:10 121:4 124:1

**compared** 6:6 62:8,17

**comparison** 46:22 90:5,7,9,10,14, 19 112:20

**comparisons** 89:21 120:10,20

**compensation** 14:2,5,16

**complete** 16:12 30:15 59:19 61:11

**compliance** 28:17

**comply** 72:10 105:8

**complying** 11:20

**component** 11:15

**components** 92:7

**comprehending** 72:21

**computer** 10:18 15:3,19 35:5 41:3

**concern** 13:12

**concerns** 19:11 36:5 82:17

**conclude** 38:2

**concluded** 29:7,17 112:8

**conclusions** 15:18,21 18:5,18,19 82:11

**conditioned** 93:3

**conditions** 107:6

**conducted** 20:7

**confidence** 111:14

**confident** 98:12

**confidential** 9:5

**confidentiality** 9:9,13

**confirm** 12:12 19:4 88:4 97:6

**confusing** 35:21 66:3 92:5

**confusion** 34:15

**Congratulations** 6:12

**connection** 6:1 17:5 26:18 34:18 47:12,19,22 64:1 70:10 74:18 76:15 90:3 95:6

**Conservatism** 7:5

**conservative** 110:22

**consistent** 79:16 104:7

**consultant** 85:2

**consultants** 9:4

**consulting** 7:8 8:20

**contained** 101:17

**context** 120:16

**continue** 59:20 63:14

**continued** 78:10,16

**continuous** 52:7

**contract** 9:10

**contributes** 49:20

**controlled** 12:9

**controlling** 12:13 13:2

**conversation** 44:4

**convey** 51:14

**conveyed** 76:6

**copies** 10:9

**copy** 10:5 13:14 125:13,18,20

**correct** 7:19 11:7 20:16 22:11 26:5 29:3 32:8 35:9 37:3 42:22 44:8,9, 10,20 49:16 50:1,16 53:11 58:11 64:7,8 70:14 77:17,18 91:16 105:9 112:10 122:8,16 123:3 124:17

**corrected** 35:19

**correcting** 38:16

**correction** 13:19

**correctly** 11:3 27:4 33:11 35:7 38:8 41:13,22 42:18 45:4 48:4 49:11 57:18 72:15 79:2 85:17 89:10 106:12 118:9

**correlate** 12:11

**counsel** 4:15 5:16 16:2 78:15 119:18 120:3 123:17

**count** 16:18

**counted** 31:6 95:2 101:18

**counties** 36:15 84:2

**country** 23:20 104:7

**county** 12:10 30:14 35:18 59:1 74:6 76:1,6 77:5,19 80:6,16 83:21 106:9 111:7 118:3,7 122:7

**couple** 7:7 8:13 21:1 23:6 25:21 51:8 60:17 66:13

**court** 4:6,12 5:6 7:10,18,20 8:1,6,8 85:10

**cover** 10:9 61:20

**create** 36:5

**criticism** 13:10,11

**crop** 107:10

**cure** 33:1 34:20 35:5,16 36:8 38:11 39:2,13,19 83:6 95:12



Dr. Eitan Hersh

April 20, 2023
Index: cured..division

**cured** 31:8,13,15 32:19 38:3 40:6 64:17 66:20 96:10 101:2 110:2,4 111:8

**curing** 38:5 82:18 83:4

**current** 6:8 56:6,8,10 57:12 58:9, 20 65:15 115:5

**curve** 114:6,16,19 118:7,14,19,22

**cut** 18:22

**CV** 6:3,6,8,21 85:5

---

**D**

**daily** 110:9 112:17

**Dallas** 112:17

**Dan** 4:20

**Daniel** 10:8 97:22

**data** 11:4 14:9 15:11 43:19 45:22 50:6,9 51:19 59:15,21 60:16 69:15, 18 70:14,18 83:12 87:11 88:1,5,22 93:15 94:5 99:14 103:8,10,18,22 108:15 109:16 110:19 113:5 115:22 117:14,18,19,21 122:1

**database** 21:2 27:6 28:14 29:4,9 33:2 37:17 38:4 39:10 40:13,14 41:15,20,21 42:9,15,20 44:1,10,13 48:7,17,19,22 49:6,9,13,15,16,21 50:15,16 52:1,2,15 53:2,7 54:9 55:3,10,17,22 56:6,7 57:20 58:10 59:5,9,10 60:10,11,13 61:5,7 63:5 65:6,7 67:17 68:3 69:9,22 70:6 71:3,9 76:19 80:8 86:5 108:22 110:3,11 111:16 114:12 119:3 124:2

**databases** 37:18,20 40:1,8 41:10 45:3 69:19

**date** 4:9 10:2 14:6,12 83:20 84:2,3 88:3 122:21

**dated** 9:22 26:15

**dates** 83:15

**David** 4:17 5:19 33:13 46:4 95:20

**day** 5:3 16:14 31:22

**days** 82:20

**DC** 4:11

**deadline** 13:19 82:20,22 83:5

**deadlines** 83:1,2

**decided** 64:9 94:9

**decrease** 103:15

**deem** 89:11 94:3

**deemed** 99:2

**deep** 53:13

**deeper** 39:22

**deeply** 36:9

**defect** 102:16,17

**defendant** 119:19

**defendants** 4:19 5:3,5,17,20 13:13 15:8,16 78:16 123:18

**defined** 90:11

**definition** 89:5

**Del** 4:5

**delete** 111:8

**delivery** 125:16,22

**Dellheim** 4:22

**demographic** 13:2

**Department** 4:22 25:16 26:1,8

**depending** 12:3 31:10

**depends** 34:22 35:1 72:13 118:11, 19

**deposed** 7:10,12,21 8:21 16:1 84:14

**deposition** 4:4,10 5:15 7:17 11:3 15:1,3,19 16:16 33:20 34:2,4 35:20 36:13 37:8,14 46:12 50:12,22 51:13,17 59:13,19 63:4,19 79:10 81:20 110:1

**depositions** 16:20 51:4,7 63:9

**describe** 6:5 10:4 11:12 15:4 20:21 22:10 26:17,21 52:14 64:5,7 69:8

**describing** 90:21

**designation** 83:20 111:18

**designations** 79:3

**detailed** 103:4

**details** 36:18 82:7

**detecting** 24:19

**deter** 25:1

**determine** 70:15,19 91:3 93:13,22 95:11 114:11 115:9

**determining** 118:21

**deterring** 24:7,19

**developed** 82:13

**difference** 11:16 12:3 17:11,14 93:2 121:7

**differences** 86:14

**digit** 29:2 42:14

**digits** 30:12 38:18 42:7 43:18 72:2 75:4 76:12 77:7

**direct** 95:20 124:10

**direction** 111:4

**directions** 72:20

**disabilities** 20:19 21:18

**disability** 21:6,12 22:1,6

**disabled** 21:3,10,18 22:6,13

**disclosed** 9:18 15:15 47:17

**disclosure** 9:4 85:2

**discover** 123:2

**discovered** 90:16

**discrepancies** 42:19 124:3

**discrepancy** 65:5 67:22 76:20 123:2

**discriminate** 20:11

**discuss** 10:6 74:22 108:9

**discussed** 85:15 100:5 110:1 121:12

**discussing** 44:11 100:8 124:19

**discussion** 37:9 51:2 63:3

**dissuaded** 114:2

**distinct** 44:1 54:1

**distinguish** 70:3

**distinguished** 44:3

**District** 4:6,7

**division** 51:20



**documentary** 8:11

**documents** 51:1

**downward** 116:14

**DP** 65:6

**DPS** 21:2,6 25:13,22 26:6 27:12,21 28:2,15,22 30:10,22 31:3 33:9 35:3 38:13,19 40:8,12,13,17,20 41:2,4, 14,16,20 42:20 43:17 44:22 45:17, 18,19 48:12,17 49:12,15 50:6,15 51:18 52:1,14 53:1,7,8 54:9 55:10, 17,22 56:1,6,7 59:5,6,8,9 60:10,12, 13,19,22 61:5,6 65:5,13 73:11,22 74:10 75:3 76:11,16 77:3,4,12 118:16 119:2,5 121:15 122:4,9,11, 21 123:1,7,9 124:1,2

**draw** 18:18 24:18

**drive** 57:1

**driver** 28:4

**driver's** 25:17,18,19,22 26:4,7 27:22 28:5,13 41:7,8 42:4,5,7,8,12, 16,22 43:14 50:4,5 53:9,10,16,19 54:7,8,14 55:1,4,9,12,14,15,16,17 56:5,6,8,10 57:6,12,13,14 58:3,7,9 60:5 65:15 66:11 71:22 72:1 73:12 74:10 76:16 115:2,5

**driving** 28:6

**drop** 62:18

**dropped** 62:16

**due** 44:11

**duly** 5:11 78:11

**dynamic** 67:4

---

**E**

**earlier** 14:21 25:12 38:7 41:21 53:5 62:22 63:19 94:20 100:5 110:1

**early** 31:21 111:21

**effect** 19:22 20:4 60:11 82:10

**effective** 6:13

**effectiveness** 24:6,19

**effects** 20:18

**Eitan** 4:4 5:10 78:9

**election** 31:2,9,21 32:18 34:10,19 35:18 36:1,4 38:9 59:2 64:1 73:11 74:7,19,21 75:6 76:1,2,4,15 80:17 81:21 82:7 83:8,21 88:20 89:13 90:3 91:5 95:7 99:8 104:20 105:7, 17 106:9 107:10 109:3 110:10,17 111:7,12 113:8,15,16 115:11 117:7,21 118:2,3,8 119:9,10 120:17 122:6,19

**elections** 8:15 17:17,18 24:11 32:7 36:17 51:20 103:17 115:15

**eliminating** 38:12

**employment** 9:6

**enabled** 54:10

**enacted** 19:16

**encompassing** 26:7

**encounter** 107:8 117:6

**encountered** 37:4 38:10

**encountering** 107:5 117:16

**end** 94:18

**ended** 100:2

**ensuing** 115:4

**entered** 41:2 60:13 65:12 68:7

**entering** 35:6 43:3

**Entero** 4:5

**enters** 77:10 84:1

**entitled** 47:1

**entries** 55:5

**envelope** 27:4 31:1,4 67:8 72:4 74:4

**equal** 106:22

**erroneous** 121:18,22 122:11,21

**erroneously** 65:12

**error** 29:4 39:18,20 42:14 44:12 46:2 68:22 88:11,13 89:2 121:15 124:18

**errors** 43:9 101:13,17 122:16

**essentially** 26:1 27:6 67:7 71:1 82:19 110:16 111:1

**establish** 102:13

**established** 46:10 48:21

**esteemed** 98:14

**estimate** 14:8,10,13,15 16:20 43:10 88:18,22 93:13 95:10 96:19 97:7 110:6,8,19,22

**estimated** 88:11 89:2 98:16 108:14

**et al** 4:5,6

**etran** 125:22

**evaluated** 30:13

**evening** 6:2

**eventual** 102:11

**eventually** 66:19

**evidence** 60:15 80:4

**examination** 5:16 78:10,15 120:3 123:17

**examined** 5:12 48:17 78:11

**exclude** 93:5

**excuse** 107:4

**exercise** 30:7

**exhibit** 5:14 6:4 7:13 26:12,13 29:16 44:16 48:3 59:4 62:15 85:15 88:3 96:5 108:5 112:8 116:3 123:5

**exist** 86:14

**existed** 45:3 46:5

**existence** 24:10 32:8

**exists** 46:13 70:15

**expect** 13:5 14:16 16:22 17:4 22:9 105:3,11 116:13 117:9

**expectation** 60:5

**expected** 124:8

**experience** 73:17 105:12 107:12

**expert** 5:22 7:8,14 8:19 17:20 98:8

**expertise** 8:16 17:19,22 19:9 82:13

**expired** 28:13 55:15 56:5,14

**explain** 25:14 30:3 71:18 99:19 108:12

**export** 55:6



Dr. Eitan Hersh

**expression** 6:19

**extent** 9:3,4 22:19 23:14,20,22 24:2 33:18,21 37:7 41:9 46:8 59:20 68:15 82:12 85:1 115:10,15 117:8 123:6

**extra** 10:8

---

**F**

**facility** 106:9

**fact** 14:18 31:9,14 32:17 64:12 114:1

**factor** 63:14

**factors** 12:9,13 13:3 106:12,14,16 118:12

**failed** 96:17 97:20 100:9,17

**failure** 102:14

**fair** 31:7 56:4 99:6

**fairly** 104:8

**fall** 29:7 114:7 117:2

**familiar** 19:15

**fault** 40:2,3

**February** 9:22 13:7 26:15 62:6

**federal** 8:10 85:3

**feel** 16:7,12 34:15 95:18

**fewer** 111:20 113:19

**field** 43:8

**fields** 43:7 89:1

**figure** 35:11 86:15 103:10

**figuring** 37:11

**file** 11:22 15:10,15 19:3 28:21 35:12 40:21 41:4,5,8 57:20 60:8 67:2,3,4 79:3 88:7 103:4 110:17 122:9

**files** 40:20 50:6

**fill** 27:2,16,17 28:12 29:10 39:12 44:5 57:11 73:21 75:3,14 114:17

**filled** 27:9 58:11 72:15

**filling** 41:1 44:2 73:17

**final** 7:9 46:9 110:16,18 111:1

**find** 13:1 14:9 58:21 122:14

**finding** 75:18

**fine** 13:20 46:10 47:5 125:2

**finish** 18:22 107:20

**Fish** 8:9

**fix** 100:22

**flag** 37:22 54:13 79:21 109:11 110:13 111:9

**flagged** 108:16,20

**flags** 21:5 37:21

**flavor** 51:3

**flowing** 19:9

**focus** 114:15

**focused** 34:10 87:19 88:15 114:20

**follow** 72:20 73:15

**follow-up** 120:1 123:20

**footnote** 85:20

**forgot** 101:1

**form** 17:6 18:13 24:21 27:7,8,16,18 28:11,18 36:12 37:6,19 38:14 39:12,21 40:16 41:1 44:2,5 49:3,14 56:15 57:12 61:17 63:1 64:3,14,16 66:3 67:8 69:11 70:11,17 72:12,15 73:4,21 74:12 81:9 88:21 92:15 94:13 101:4 102:19 103:20 104:8 106:20 110:7 115:6 116:15 120:15 121:14

**formed** 19:7 70:9

**forming** 70:8

**forms** 29:10 53:15 57:19 73:17 112:5

**four-year** 107:2

**frame** 66:21

**fraud** 22:19 23:3,4,8,12,15,19 24:3,7,10,12,15,19 25:1,2

**free** 16:7,12 34:15 95:18

**freedom** 6:18

**Freeman** 4:20 6:2 9:2 10:5 13:17 17:6 18:13 24:21 33:13 36:12 37:6, 19 38:14 46:4 47:3 49:3 56:12,15 59:11 61:13,17 63:1 64:14 69:11

70:17 72:12 73:4 74:12 77:22 81:9 84:22 88:21 92:15 94:13 95:20 97:9,12,15,18,22 98:5 101:4,19 102:19 103:20 106:20 107:21 110:7 115:6 116:15 119:18,22 120:4,18 123:13 125:4,11,12,15

**Freeman's** 123:21

**front** 6:4 44:19 75:17 76:7

**fulfill** 114:7

**full** 6:11

**fully** 94:7

**future** 63:14 105:3,14 106:19 107:14 116:16 117:10

---

**G**

**gave** 7:6

**gender** 12:10

**general** 4:18 12:17 19:11 26:17 34:10,19 38:9 59:17,21 64:1 73:11 74:19,21 76:2,3,15 90:3 91:5 95:7 99:8 104:11,13,19 105:2,7 109:3 113:15,20 115:11 117:8 118:1 124:7

**generally** 26:22 30:7

**geographic** 13:3

**Gipson** 51:17

**Gipson's** 50:22

**give** 14:7 69:16 98:1 107:15 113:5

**good** 14:7 77:20

**government** 73:17 106:4

**GPT** 98:10

**graphs** 83:2

**great** 33:22 98:3 107:21 118:14

**green** 71:11

**Gregory** 4:6

**ground** 16:3

**group** 20:11 22:9 64:4,12 89:21 90:5,6,7,19 91:3 100:5 104:11,14 107:7

**groups** 20:1,5 21:22 22:1



**grow** 63:18

**guess** 13:9 14:14 17:15 49:5 50:3 51:20 58:16 61:8 84:2 103:16,19 119:7

**guesses** 61:12,15,19

**guessing** 50:21

**H**

**hand** 41:2

**handling** 118:9

**handwriting** 122:4

**handwritten** 43:22

**happen** 15:13 52:7 54:18 60:16 113:4 118:22

**happened** 7:11 52:4

**happening** 85:5 112:1

**happy** 13:17,19 14:9 96:1

**hard** 16:18 114:11

**hardcopy** 125:22

**Hart** 79:10 80:4

**Hart's** 87:12

**hassle** 106:4

**Haul** 5:5

**HAVA** 124:8

**head** 14:8 51:15 57:11 62:8 84:16 85:4,13 116:7

**heading** 26:17

**heck** 107:1

**held** 4:10

**helpful** 114:16

**Hersh** 4:4 5:10,19 13:20 14:1 47:12 63:19 78:9,18 108:5 120:5 125:6

**Hersh's** 33:14 34:2

**high** 56:22 111:14

**higher** 86:22 113:7,14,18

**Hispanics** 20:12

**historically** 55:22

**Hoekstra** 10:22 12:6,14 13:9

**holds** 55:9

**Holmes** 85:9

**home** 57:1 94:17

**homebound** 21:4,10,18 22:6

**hour** 47:4

**huge** 69:22

**hypothetical** 18:15 56:16,20 57:17

**hypothetically** 100:20

**I**

**ID** 11:21 25:13 26:6,8 27:12,21 28:2,7,9,15,22 30:10,22 31:3 35:3, 8,11 36:2,3 38:13,19 39:20 40:8, 12,20 41:2,14,16,20 42:5 43:14,17 44:8 45:17,19 48:12,18,22 49:6,13, 15 50:15 52:1,20 53:2,7,8,16 54:8, 13,14,20 55:10,17 57:19 59:5,6,8,9 60:10,12,13,19,22 61:1,5,6 65:5,6, 18 66:11 67:16,18 73:11,22 74:10 75:3 76:11,17 77:3,4,12 81:7,11,12 84:19 85:9 92:18 95:9 98:17 99:9 100:1,14,16,21,22 101:2,14,17 102:5,6,8,10 103:14 104:16 105:5, 8 114:18 115:1,19 118:16 119:2,5 122:4,9,22 123:7 124:1,2

**idea** 57:10,13

**identification** 5:15 21:3 25:8,17 26:3 96:7,16 100:11 102:17

**identified** 31:11 43:12 48:5 49:12 123:5

**identify** 26:12 114:10 122:11 123:8 124:3

**identity** 19:4

**idiosyncratic** 43:6

**IDS** 25:22 48:13,18 54:18 56:1

**illegible** 121:13 122:3

**imagine** 70:21 104:18

**imagining** 35:22 94:14

**import** 123:9

**imposing** 25:8

**improper** 46:12 59:12,22

**in-person** 23:8 101:6 106:7 107:15 111:15,17,21 120:21

**inaccuracy** 44:14

**inaccurate** 112:20 122:5

**inaccurately** 42:15

**incidences** 79:20

**incidents** 23:4,8,19 24:15 25:2

**include** 44:10 70:22 76:12 83:8 87:7 89:18,22 90:1,6 91:12,14,15 108:17 121:17

**included** 55:4

**includes** 41:1 99:2

**including** 6:17 7:11 20:11 87:13 111:21

**incomplete** 41:11 67:15,18

**incompleteness** 111:3

**inconsistencies** 45:7 111:20

**inconsistency** 109:15

**inconsistent** 41:4 45:17 79:18

**incorrect** 33:9 42:8 72:6 77:17 122:7,9

**incorrectly** 45:8,11,19

**increase** 103:14,17 104:6

**incredibly** 24:9

**indicating** 96:7 108:21

**indication** 50:7 109:12

**indistinguishable** 43:3 45:22

**individual** 56:1 57:16 80:7

**individuals** 26:2 37:21 98:16 123:4,6,8

**influence** 6:18

**informal** 36:15

**information** 27:5 29:3 30:22 33:8 35:6,14 38:11,18 43:4 47:15 49:18 51:10 52:14,16,22 54:4,12 55:7 59:2 61:3,16 62:19 63:15 64:20 66:14 67:12 68:1,7 69:16,19 70:1 72:5 74:5 78:19 83:13 84:2

**initial** 38:10 46:6,7,12 59:14 79:14



87:1 121:14

initially 32:22 34:20 64:4 78:21,22

insight 17:13 104:14 116:17

insights 17:8

insomuch 13:8 112:1

instance 79:13 106:6

instances 18:6 31:15 34:12 39:5,6 48:22 59:4 74:7 79:1 82:10 84:19

instruct 76:6

instructions 35:4 72:10,21 73:14, 16,20 74:2,3 75:13,15,17 76:5

intact 10:10

intend 9:12 34:8 61:9,21

intended 20:10 61:21

intent 20:13 25:10

intentionally 42:21

interested 115:13

interesting 10:19

intervener 5:3

interveners 119:19

interview 47:13

introduce 4:15

intuition 13:10 54:17

invalid 67:16,17

investigate 55:19

investigated 36:9

investigation 53:13,14

invited 7:6

involving 84:18

Iowa 81:18 84:6,8

issue 11:20 29:18 76:19 100:22 115:1

issued 26:8

issues 27:6 29:12 40:1 48:6,14 71:4 82:6 87:4 92:2 103:14 104:21 114:12,17

items 7:16


                        J

January 45:3 46:18 48:5 60:17 62:4,20

job 61:11 98:4

Joe 36:2

John 42:11

Johnson 4:13

Jones 5:2

Justice 4:22


                        K

Kansas 8:10,15 84:9

Kenneth 5:4

Kenny 5:2 119:21 125:19

Kentucky 81:19 84:6,8

key 12:9 90:9,14 116:17

kid 57:7

Kim 4:13

kind 18:8 19:8 28:7 29:9 30:22 52:20 53:19 54:13 61:10 87:10 90:20 91:1 104:20 110:15,18 113:3 114:9

kinds 25:21 53:21 54:18 56:1

knew 114:6

knowing 57:18 66:7 67:17 80:9 102:22

knowledge 17:20 25:2 36:22 37:2, 16 49:17 63:9 74:20 103:17

Kobach 8:9

Kristi 79:10


                        L

La 4:5

lack 118:18,20

lacking 63:15

lands 122:4

larger 77:9 97:19


late 83:10,17 90:4,6,22 91:16,21 92:20 93:6 94:1

law 23:12 27:5 32:9 44:6 99:18 103:12 124:4

laws 19:12

lawsuit 19:11

lawyer 37:13 98:13

lead 23:7

leaders 6:20 63:4

leadership 6:17

learned 37:7,8 98:13

learning 114:6,15,19 118:7,14,19, 22

learns 31:12

left 110:16

legal 4:14 124:21

legislation 19:16

legislature 25:7

length 74:22

lengthy 34:4

level 23:5 111:14

license 25:17,19 26:1,4 27:22 28:5,13 41:8 42:5,7,8,13,16,22 43:14 50:4,5 52:6 53:10,16,17,19 54:8,14 55:5,9,12,15,16,17 56:5,7, 8,10,22 57:3,6,12,13,14 58:3,7,9 60:5 65:16 66:11 71:22 72:2 73:12 74:10 76:17 115:2,5

licenses 25:18 26:7 41:7 53:22 54:7 55:1,4

limitations 9:3

limited 99:18

lines 79:22 111:18

list 26:2 28:16 54:11 60:5 77:5,7,13 123:1

listed 7:5,16 11:22 26:2 27:13,18 28:18 40:8 41:7 44:21 45:17 59:3 77:2,3 87:17 99:17 115:19

lists 7:10 28:15 29:3 77:16

literature 23:3



MAGNA
LEGAL SERVICES

**lives** 63:21

**local** 6:17

**log** 38:19

**logic** 69:13 70:18

**logical** 70:10 71:13

**long** 51:14

**looked** 11:16 12:2 15:14 48:16
82:1 88:1,14 122:8

**lot** 16:3 23:2,3,20 35:1,9 37:9
39:15 54:17,20 75:16 82:5 105:17
107:1 112:1,4 114:1,4 117:3,5

**lots** 28:21 43:6

**low** 24:9

**lower** 12:21 13:1 62:5,21 90:15
104:9 112:10 113:1 120:9 121:9

**lucky** 58:14

**luncheon** 78:4

---

**M**

**made** 69:4 100:10 104:4 115:4

**magically** 75:18

**Magna** 4:14

**mail** 11:17 12:3,16,17,21 27:3,4
30:5,8,18,21 31:2,9 45:13 63:22
66:15,18 68:16 71:20 76:9 79:4
81:10,11,20 82:1,6,13,19 83:16,19
84:3 86:2,10 90:16 91:8 92:22
93:3,6 94:15,16 96:6,15,21 98:17,
22 99:11,22 100:14,15 104:6,9,15,
17,19,22 105:3,16,18,19,21 106:2
107:4,6 108:13,15 109:14 111:22
112:2,4 113:17,19 114:1,3 115:14,
17 116:18 117:6,9,19 120:9,12,14,
21

**mail-in** 19:19 25:8 30:1 31:19
32:16 37:4 38:10 56:10 58:22 74:9
76:21 81:7,16 87:4,8,9 88:19
89:12,19,20 90:2 91:4,10,12,14,15
92:14 93:14 94:1,8,12 95:1,4,8
99:8 101:3,16 103:13 105:7,11,13
106:13,15,17 108:10,18,19 110:2
111:11 112:7,9 114:22 117:15,16
118:9

**mailed** 86:20 94:22

**maintenance** 123:1

**make** 13:10 23:17 34:1,13 40:22
47:4 68:21 75:16 92:5 100:12
101:13 106:13,14,16

**makes** 42:14 111:22

**making** 83:1

**managed** 96:10

**manipulate** 15:11

**manipulations** 15:13

**manner** 122:12

**March** 75:6 105:1 115:11

**marked** 5:14 6:4

**match** 115:3 123:1

**material** 11:4

**materials** 13:15 49:2 76:9 82:3

**matter** 4:5 5:21 14:6 59:17 91:11
98:13 101:7 106:18 122:22

**matters** 84:18

**meaning** 12:17 54:22 71:6 90:19
99:21

**means** 25:15 86:18 120:16

**mechanisms** 41:13

**mentioned** 11:1 12:14 50:14 53:9
78:18 84:6 87:21 93:1 94:6 109:5,
21 112:12

**merge** 33:9 40:17 49:14 51:3 60:6,
9,14 61:4,10

**merges** 41:20 50:15 52:1,4 53:1
63:5

**merging** 41:9 52:11

**message** 75:1

**messed** 73:19

**messing** 27:11

**messy** 43:22

**method** 32:2,20 93:7

**methodological** 8:16

**methodologies** 17:18

**methodology** 29:6

**methods** 49:19

**Mexico** 63:21 65:18

**miles** 63:21

**million** 43:11 48:7,14,15 66:8 68:1
85:19 86:8 87:3 89:10 99:7

**minor** 42:14

**minute** 82:19

**minutes** 14:19

**misread** 35:4

**misreporting** 8:17

**missing** 69:22 72:6

**mistake** 46:2 100:11 121:13

**mix** 21:22

**months** 7:1 60:18 62:22 113:20
115:4

**Moore** 85:9

**morning** 29:22 112:17

**motor** 42:3 49:7 52:5,12,13,16

**motorcycle** 27:22 53:10 58:4

**move** 57:2 85:14

**moved** 57:10

**moves** 55:13

**multiple** 11:21 23:9 27:21 28:2,9
35:8,10 48:12,18 55:4 79:22 80:7
101:22 109:17 113:13

**mystery** 40:18

---

**N**

**narrow** 67:13,14

**national** 23:5

**necessarily** 32:16 67:1 104:16

**needed** 38:17

**neglect** 44:6

**neglected** 39:11,20

**newly** 33:18

**news** 112:17 114:1

**non-seniors** 116:21

**noncitizens** 8:14 23:8



**nonlawyer** 125:1

**North** 85:6,10

**Northeast** 4:11

**noted** 47:2

**notified** 30:16

**notion** 121:12

**November** 34:11,18 38:9 73:10
74:18,21 76:1,3,15 83:8 85:18
88:19 89:12 90:3 91:4 95:7 99:7
105:1,6 109:3 111:12 112:9 113:1,
10 115:11 116:11 117:15

**number** 5:14 7:14 11:22 16:1,20
21:5 25:18,19 26:4,21 27:17,18,19,
20 28:13,15,22 29:1,17 30:10,11,
12 31:1,3 33:1 35:3,9,11 36:3
38:13,19 39:21 40:12,13,20 41:2,8,
14,16 42:7,8,13 43:1,5,14,17,18
44:8 45:9,12 49:13,21 53:8 54:12,
14,15 55:10 56:6 58:20 60:5,13,21,
22 61:1,5,6 62:4,5,16,20,22 63:13,
18 64:3 65:12,13,14,16 66:10,12
67:10,16,18 70:4,6,11 72:1,2,3
73:3,5,12,13,22 74:11 75:3 76:11,
12,13,17,18 77:3,4,12 88:18 89:14,
17 90:1 93:13,22 95:16 96:22
97:19,21 99:1 103:12 106:15,17
114:18 115:2 119:5,6 121:13,15,
18,22 122:4,9,20,22 123:9

**numbers** 11:21 21:3 27:13,21
28:3,10 33:9 35:8 38:22 46:9,22
49:20 50:1 54:1,11,20 57:19 60:19
71:1 74:9 86:4 104:5 115:19
118:16 119:2 122:12 124:1

**NVRA** 124:8

─────────────────

**O**

**object** 9:2,8 46:5 59:11 85:1

**objection** 17:6 18:13 24:21 36:12
37:6,19 38:14 47:2 49:3 56:12,15
61:13,17 63:1 64:14 69:11 70:17
72:12 73:4 74:12 81:9 88:21 92:15
94:13 101:4,19 102:19 103:20
106:20 110:7 115:6 116:15 120:15

**obligation** 9:13 124:16,22

**observations** 47:20

**observed** 61:16 62:15

**obtain** 47:15

**obvious** 37:20

**occur** 32:4 52:2

**occurred** 34:11 45:7 53:2 60:11
61:4 88:3 103:1 115:10

**occurs** 36:11 79:13

**October** 32:11

**office** 4:18 31:2 36:2 59:2 75:22
78:20 80:13,17 82:6 83:21,22
122:11

**offices** 118:8

**official** 35:18 77:5

**officials** 30:14 74:7 76:1,6 118:3

**older** 104:3,4

**ongoing** 52:7

**online** 38:11,16 39:1,13 76:5

**operated** 118:3

**operator** 4:13

**opine** 18:2,18

**opinion** 17:12 18:7,8 19:7,8 24:2,
11 49:5 56:4 70:8 106:18

**opinions** 17:4 18:10 19:18,22
20:4,9,14,18 22:19,21 23:1,4,13,18
24:6,18,22 103:11

**opportunities** 117:5

**opportunity** 9:8 117:3

**opposed** 7:17 17:13 54:8 70:18
75:18 114:12

**order** 110:8 125:20

**original** 33:16

**originate** 114:12

**originated** 122:16

**orthogonal** 68:9 69:9

**overlap** 115:14

**overridden** 66:16 70:1,2 79:1,5
80:5 87:12 88:12 89:3 99:15 110:3

**overriding** 99:13

**overseas** 117:4

─────────────────

**P**

**p.m.** 78:3,7

**paid** 14:11

**Paltz** 7:7

**pants** 71:11

**paragraph** 86:8 87:2 90:10 95:21
96:4,13 108:6 109:22 112:12 116:3

**paragraph's** 88:1

**parents** 57:2

**part** 11:5 15:6 29:5 34:14 52:16
64:15 65:9 66:6 102:4

**participated** 16:21

**participating** 45:13

**participation** 12:8 90:15 113:17
120:9,12,16,22 121:1,5,8

**parties** 6:7 21:15

**parts** 102:6

**party** 9:6

**pass** 119:16

**passage** 22:20

**passed** 32:10,11 53:3

**passport** 64:3 65:12,17 66:10
67:10 70:10 72:18

**peer-reviewed** 6:16

**pending** 16:11 101:20

**penmanship** 43:4 46:2

**people** 11:17,18 21:22 22:8 23:9
28:9 38:2 40:19 41:6 42:2,3 43:16
53:13,15,18 54:17,20 58:3,13 60:8,
18 62:13 63:13,16 64:16 66:4,8
67:21 69:20 70:1,16 71:10 76:19
79:20,22 86:17 87:13,20 88:9,10,
12,18 89:6,18,22 90:6,12,20,21
91:7,9,12,14,15,17,18 93:5 94:12
99:16,22 100:4 102:14 103:12
104:3,4,13,15,18,20,22 105:4,17,
19 107:1,2,5,8,11 109:10 113:19
114:3,17 115:14,16,17 116:18,19
117:3,6 118:15 119:4,9 121:9

**percent** 29:13,19 48:10 49:20,21
62:5 68:13,19 86:12,14,15,22 96:6,



17 97:1,10 105:15 109:2,7 112:18 116:2,4,5,10

**percentage** 62:7 86:11 96:9,12 104:22 117:15

**perfect** 80:20

**perfectly** 29:11

**period** 55:13 87:15 104:2 107:2 110:10

**periodic** 50:15

**person** 12:18 31:21 37:3 51:18,20 53:9 54:2 55:18 58:18 59:8 60:12, 20 64:4,10,13 65:11 68:7,12 69:1,7 71:5,7 72:15,18 77:3,10 92:12,19 94:10,18 95:2,13 96:21 98:22 99:11 102:7 106:1,2 109:14,17,19 111:13

**personal** 47:20 54:11

**personally** 69:5

**persons** 31:19 101:15

**perspective** 57:16 88:5

**phenomenon** 61:16 71:12

**phone** 37:3

**phrase** 113:9

**piece** 19:15

**place** 28:6

**plain** 75:15

**PLAINTIFFS** 120:3

**plenty** 60:18 99:21

**point** 6:14 73:16

**points** 10:19

**political** 6:19 17:16

**Politics** 7:1

**polls** 31:21

**pool** 11:18 21:7 22:3 64:21 65:4 68:10,12,14,18,19,20 69:2 71:15 88:9,10,16 90:11,13,15,17,18,19 121:3,4

**pools** 120:11,20

**poor** 46:2

**popular** 104:8

**population** 12:4,5,15,21,22 22:10, 14 39:10

**portion** 22:14 46:18

**pose** 59:21

**posed** 33:16

**posing** 100:13

**position** 107:20

**possess** 123:7

**possessed** 60:12

**possesses** 48:12

**possession** 121:16,22 122:7

**possibilities** 61:9,20 114:4

**possibility** 13:15 58:1,8 101:22 103:2 114:5

**post** 82:6

**posted** 76:5

**potentially** 89:18 107:8

**practice** 79:13,16

**precisely** 42:22

**predates** 74:21

**predicting** 116:16

**predominant** 49:6

**predominate** 106:19

**prefaced** 34:13

**prefers** 106:1

**pregnant** 116:22 117:1

**preparation** 11:3 14:22 15:3,19

**prepared** 18:11

**preparing** 10:15

**present** 9:7 16:2 59:14

**presume** 63:17

**pretty** 98:12

**prevented** 73:10

**previous** 6:6 11:5 19:2 29:8 51:13 76:22 83:3 95:14 112:14

**previously** 46:11 78:11

**primaries** 112:7 116:12 118:1

**primary** 113:8,11,15,16,18,20 115:10

**prior** 46:22 78:18 84:18

**privacy** 36:5,16

**probability** 68:12

**problem** 27:10 31:11,12,13 33:2, 12 34:20 35:1,19 37:3 38:3,12 39:7,10,11 43:20 44:1 58:14 64:22 66:11 68:6,16 95:12 101:2 102:10 104:16 105:5,20,21 107:14

**problems** 43:20 44:9,10 66:2 68:3,17 69:9 101:22 102:3,4 103:16 105:13 107:9 114:10,12,15, 20 117:10

**procedure** 45:14

**procedures** 82:1 118:4

**process** 30:19,20 35:16 36:8,14 38:5 39:2 42:3,4 50:4 52:5,12,13, 17 82:18 83:4 106:9,10

**produce** 15:14 71:7

**product** 110:16,18

**professional** 17:4,12 18:10 23:1, 18 24:1,13,18 25:1

**professionalism** 118:13

**professor** 6:11

**profile** 29:10

**program** 15:10

**promoted** 6:11

**proof** 8:11

**properly** 9:8

**proposing** 56:17

**protected** 36:16

**provide** 9:7 13:17 17:5 36:4 38:11, 17 42:12,22 43:13 50:7 52:14 96:1

**provided** 6:7 21:15 42:6 45:19 51:10 52:16 56:7 59:16 66:15 69:19 75:14 117:18

**providing** 8:11,19 19:8 27:5 29:6 38:12 61:5

**provision** 124:7,10

**public** 26:2,8 112:15



**published** 6:15 7:1

**Pueblo** 4:5

**purpose** 25:7 97:8,9

**purposes** 25:7 28:17 56:20

**put** 30:9 35:4 39:20 44:8 46:22
49:1,15 64:2 66:9,10 67:9 70:4,6
71:22 73:2,5 74:9 76:10,16 115:2
121:13 122:3

**puts** 70:22

**putting** 70:10 73:11

---

**Q**

**qualification** 120:6

**question** 9:15 16:8,11,12 20:2
21:21 22:22 23:21 24:8 27:2 34:14
37:1,11 42:10 56:20 65:3,9 66:14
67:7,19 69:4 86:21 92:2,3 101:20
103:5,6 115:22 117:22 123:22
124:21

**questioning** 46:11 59:12 102:9
123:21

**questions** 5:22 16:6 33:14,18
36:20 37:14 46:8,13,15,17 59:16,
21 82:5 119:19 120:1,7 121:11
123:13,16 125:3,5

**quick** 10:20 11:9 81:20 119:22
120:6 121:11

**quote** 7:14 30:2 87:3 108:10 109:6

---

**R**

**race** 22:5

**racial** 20:1,5,11 21:22 22:1,9

**ran** 10:20 13:3

**rarely** 79:15

**rate** 12:8,21 13:1 14:2 24:9 68:18
80:9 104:8 108:10,11,13,14 109:2,
6,9 111:2 112:7,9,14,16 113:1,8,9,
14,17 116:2,4,6,11,13 120:13
121:4,5,6,7,8

**rates** 110:6 111:1 116:8 120:9,22
121:1

**re-register** 33:10

**re-registration** 33:11 35:16

**reaching** 15:17

**read** 23:3 51:5,8,9 63:9 75:17

**reading** 45:4 72:9 125:10

**real** 56:19 110:15

**reason** 49:4,5 53:22 60:6 63:12
64:6,21 66:5 67:9 71:13 87:19
89:19 91:13 94:9 95:1 96:8 100:16
112:19 118:6

**reasonable** 61:15 69:5

**reasons** 12:7 28:21 30:15 39:15,
17 43:7 59:7 64:6,22 66:5 68:2,9
69:8,21 71:3,18 73:6 79:6 88:17
95:9 99:9

**rebuttal** 10:17,20

**recall** 15:17 19:1 50:13 51:9,21
52:9,10 60:3 63:2,6 80:21,22 82:7,
14 84:6,10 85:12,13 116:7

**recalling** 60:7

**receipt** 83:16 86:19

**receive** 30:18 82:2

**received** 6:2 51:1 55:7 74:5 79:4,5
83:17,19,20 89:6 90:2 94:16 112:3

**receives** 30:21

**recent** 62:14 119:3,10

**recently** 50:5 119:9

**recess** 78:4

**recognize** 17:14

**recollection** 55:6 84:15

**record** 25:14 26:12 35:19 47:6,9
56:1 57:5 61:2 77:6 78:1,13 87:4
97:10 98:18,19 107:22 108:3,12
109:12,13,18,19 115:3 125:9

**recorded** 4:4

**records** 35:12 43:7 48:7 52:11
78:20,22 79:19 80:20 88:6 96:20
109:16,17,20 121:17 123:1,9
124:9,17,18

**rectify** 33:11

**reductions** 63:13

**Reed** 5:5

**refer** 25:13 27:14 29:22 30:20 74:1
75:20 88:2 108:5

**reference** 79:9

**referenced** 11:14

**referred** 11:10 19:13 30:7 116:3

**referring** 74:2 90:8 101:21 112:15

**refers** 26:22

**reflect** 19:2 21:13 42:16 64:11
67:15 118:18

**reflected** 21:14 58:9,20 64:13 75:5
111:15

**reflecting** 10:19 21:2

**reflective** 42:9

**regard** 15:5 20:22

**register** 42:2,3 58:7 122:3

**registered** 42:6 43:21 44:13 45:13
57:1,4,7 60:22 63:20 85:19 89:10
99:2 105:16 115:5 119:1 121:21
122:18

**registering** 8:12,15

**registers** 41:16 42:12 43:1 122:2

**registrants** 86:9 87:3

**registration** 27:14 40:16 41:1
43:7 45:21 49:2,14 56:9 58:21
121:14,19 122:1 124:17

**regular** 125:15,21

**regulations** 105:5 107:12

**rejected** 27:7,9,18 28:19 29:4,11
30:2,16 31:8,19 32:15,22 34:20
64:3,6,17 66:9,19 67:9,12 68:2,16
69:7,20,21 71:5,8,17 72:5,16,19
73:6 78:22 79:4,5,21 80:1 83:9
87:1,14 91:13 94:16 95:8 96:18
98:16 99:9 100:1,14,21 108:16,20
109:18 111:5,8,12 112:3 114:2,22
115:17

**rejection** 33:1 34:21 37:22 38:10
71:2 72:7,9 79:14 95:13 96:8,10
108:10,11,13,21 109:6,9,11 110:6,
13 111:1,2,9 112:7,9,14,16,18
113:1,8,9 116:2,4,5,10,13

**rejections** 96:6,15 110:11

**related** 10:1 18:2 19:18,22 21:12



47:15 68:8 95:9 99:9 101:14

**relates** 46:18

**relationship** 23:12 102:10

**relative** 80:9

**relevant** 33:18 79:6 83:3

**reliable** 110:5

**remainder** 123:14 125:4

**remember** 32:9 51:19 81:18 85:8

**remembering** 35:7 63:3

**reminded** 15:22

**repeat** 20:2 42:10

**replaced** 98:9,13

**replication** 46:7 59:15,22

**report** 9:22 10:2,6,14,17,20 11:15
12:2 15:7 17:21 18:1,19 19:2
26:14,16 29:20 33:15,16,19 34:3,5,
9 36:9 37:10 39:14 44:16 45:1
46:6,7,18 58:13 59:14 62:12 64:13,
15 68:4 74:22 79:7 80:19 82:14
85:16,17 86:4 88:15 89:5,9 93:17
95:21 112:14 114:10

**reported** 17:8

**reporter** 4:12 5:6 125:10,13,17,21

**reporting** 111:19 112:16

**reports** 10:2,16 11:19 15:7 17:9
18:5 19:14 21:4,14 23:11 25:3,13
26:5 29:8,21 31:15 46:22 47:17
64:5,7 71:17

**represent** 4:16,18,19

**representing** 5:3,5

**request** 9:12 13:14 30:5 66:22
87:11,16 88:10 89:1

**requested** 17:3 86:10,17 87:4,7,
14,18,20 88:9,13,16,19 89:6,18
90:2 112:3

**requesting** 9:9 93:3

**requests** 82:21 88:6

**require** 9:15

**requirement** 71:7 102:8 105:8

**requirements** 25:8 81:8,11,12,16
84:19 92:18 98:17 99:10 102:5,6

114:7

**requires** 30:9 71:22 124:4

**research** 6:16 17:8 23:2 81:4
113:3

**reserve** 123:14 125:4

**resolve** 105:20 107:13

**respect** 9:6 32:15 83:8,18 85:18
120:9

**respond** 13:11

**responding** 24:12

**result** 15:18 41:14 49:15 60:14
61:4

**results** 10:21 12:12 15:14 21:14
88:7

**retained** 57:14

**retention** 118:13

**return** 90:21 91:17,19,20 92:11
93:6

**returned** 90:4,6,22 91:4,12,14,15
92:19 93:6,14 94:1

**returns** 55:14

**review** 15:18

**reviewed** 10:16,18 11:4 15:2
51:16

**Richard** 4:22

**rights** 9:19

**risk** 86:9 89:11

**role** 9:17

**roughly** 32:13 86:10

**row** 62:9

**rule** 6:19

**rules** 16:3 30:9 71:6,9 81:21 85:3
92:1 100:1,14,16

**run** 39:16

---

**S**

**Safety** 25:16 26:2,9

**sat** 34:4

**SB1** 11:20 19:5,13,19,22 20:5,10,

18 22:20 23:16 24:6,11,19 25:1,9
32:8 39:16 44:2 53:3 60:11,17 66:2
71:6,8,18,22 72:7,11,16,19 73:6
75:7 92:1 118:4

**SB1's** 30:9

**scenario** 94:14 100:13 121:16

**scholarly** 23:3

**school** 56:22

**science** 68:8

**scientist** 17:16

**scope** 33:20

**secretary** 45:20 52:2 74:6 75:2,7,
12,14,22 78:20 80:13 83:22 118:8
122:10 124:5

**section** 6:22 7:3,9 46:6

**sections** 7:9

**security** 28:22 29:1 30:12 36:4,17
38:19 43:18 45:9,12 54:12 60:21
65:14,16 72:3 73:13 74:11 75:4
76:13,18 122:20

**seek** 59:2

**sees** 77:6

**send** 82:3 100:22

**senior** 56:22

**sense** 40:22 47:4 75:17 112:1

**sentence** 87:2

**separate** 27:22 52:11 114:19

**service** 58:5

**services** 4:14 8:20

**set** 17:17,18 35:21 40:4 44:9 67:13,
14 101:9,10 113:16 121:11

**share** 17:7

**shared** 15:9

**sharing** 15:7

**Sherry** 4:12 50:22

**shortcoming** 33:1

**show** 96:20

**showed** 119:7,8

**shown** 40:19 65:5,6



Dr. Eitan Hersh

**shrink** 63:18

**sic** 7:11 16:19 99:20

**side** 49:22 120:1

**sign** 101:1

**significant** 121:7

**significantly** 62:17,18,21

**signing** 125:10

**similar** 29:7 63:13 73:3

**similarly** 16:10 22:13

**simply** 35:18

**simultaneously** 46:20

**single** 109:17

**sir** 6:8 14:4,8 19:17 20:6,20 21:16
26:10 38:15 44:18,20 45:5 47:14,
18,21 49:4 63:11 85:22 125:14

**situation** 56:16 57:9,21 65:11
67:21 70:3,5 71:2 77:16

**situations** 44:10 72:17

**skill** 17:18

**slightly** 97:20

**smaller** 97:21 104:22

**Smith** 5:5 36:2 42:11

**smoothly** 118:9

**snapshot** 67:3

**snapshots** 110:9,15

**social** 28:22 29:1 30:12 38:18
43:18 45:8,12 54:12 60:21 65:14,
16 68:8 72:3 73:13 74:11 75:4
76:13,18 77:7 122:20

**software** 15:9

**solid** 98:7

**someone's** 19:4 45:11 67:8
100:13 116:22 117:4

**sort** 30:19 33:21 34:1 44:1 105:4
106:3

**sorts** 36:5 118:20

**sounds** 97:4 124:20

**source** 42:19 50:8,9,18 54:3
109:22 121:15 122:8 124:18

**sources** 47:16

**speak** 80:11,12,15,16

**speaking** 46:20

**specific** 16:7 22:4,5 39:8 67:6
90:8

**specifically** 15:4 23:11 24:3 36:10
74:2 103:22 104:3,11 109:3 115:1
121:2

**specifics** 63:6

**speculate** 50:2

**speculating** 28:7 53:21

**speculation** 53:12

**spend** 37:10

**spreadsheet** 79:22 80:3

**spring** 114:8,22

**springtime** 113:2

**SSN4** 44:22

**staff** 118:12,13,20

**stage** 30:19,20 86:18 87:1 121:19

**STATA** 15:10

**state** 4:16,19 5:16,20 13:13 24:1
26:8 36:14 41:9 45:20 53:16 54:14
55:13,14 59:16 61:9 63:4 74:6
77:11 78:15 84:12,13 85:6,10 86:8
105:20 106:1 111:18 118:3,9
122:15,22 123:8,11,17 124:1,5

**state's** 10:17 50:12 52:2 75:22
78:20 80:13 81:7 83:22 105:21
122:11

**stated** 80:20 88:17

**statement** 96:5

**states** 4:21 23:7,9 81:10,15,22
84:5 104:10 124:8

**statewide** 45:2,16

**statistic** 118:14

**status** 21:11 69:2 87:17

**statuses** 21:1 22:2,7

**stay** 103:14

**step** 61:18 67:16

**Stephen** 5:2 125:19

**steps** 112:4

**stored** 109:16

**straightforward** 35:14

**Street** 4:11

**strike** 74:16 106:13 116:1

**struck** 36:15

**structured** 28:14

**struggling** 18:14

**studies** 81:16

**study** 17:16,18 66:6 67:2 82:13,15

**studying** 39:17

**stuff** 50:20

**subject** 9:3 20:15 21:9 37:17
46:11 50:10 63:10 85:2

**submit** 58:22 82:18,21

**submitting** 83:5

**subsequent** 100:10

**subset** 42:1 92:4,21 119:12,15

**subsetted** 119:11

**substitute** 106:2 107:15

**successful** 87:8 89:12 92:22
94:12 95:3 98:21 102:15 103:13
106:15 111:15 121:7

**successfully** 31:20 32:17 38:1
79:21 86:17,19 87:20 88:12,16
91:10,19,20 92:8 94:2 96:11,17
97:20 98:19,20 99:10 100:9 101:3,
16 105:13 111:13 120:13,17 121:6

**suffered** 100:2

**sufficient** 63:15

**sufficiently** 103:4

**suggested** 11:19 12:6 37:15
39:11

**suggesting** 57:22 93:18,19

**suggestion** 93:20

**suggests** 41:9

**summarize** 18:5

**summer** 6:13

**SUNY** 7:7



Dr. Eitan Hersh

**supplement** 9:22 13:7 26:13

**supplemental** 11:15 13:14 33:15, 19 34:2,9 44:16 59:13 85:16

**supplementary** 10:21 11:9,12 13:6 14:20

**supplementation** 13:18

**supporting** 13:15

**suppose** 50:11 56:21

**surrounding** 82:5

**surveys** 8:16,17

**suspect** 114:14

**swear** 5:7

**sworn** 5:11 78:11

**system** 21:6 27:14 35:6 36:4 38:20,21 39:13 40:3 41:3 57:14 116:19 117:6

---

**T**

---

**table** 44:17,21 59:3,6 77:2 123:5

**taking** 30:17 31:4,5

**talk** 7:7 35:19 64:16 86:3

**talked** 36:14 70:9 87:10 94:20 120:8

**talking** 32:6 52:4 58:15 68:6 72:18 120:19 121:20

**teaching** 7:3

**TEAM** 11:22 19:3 27:15,17 28:14, 18,21 33:7 35:12,13 40:17,21 41:4, 8 44:22 49:9 50:6 51:19 57:5,20 61:2 66:15 67:13 77:6 79:19 115:19 118:17 119:5 121:15 122:5, 6 123:1,7

**TEAM's** 33:2 40:7,13 41:15,20 42:9,15,20 48:7,18,22 49:13,16,20 50:16 52:15 53:2 58:10 59:5,9 60:11,13 61:5 65:7 108:22 110:3 111:16 115:3 119:2

**TEAMS** 45:18 48:12 52:2

**telling** 51:13 65:21 66:1

**tells** 117:14

**tend** 82:18

**term** 17:12 25:13 26:6 30:4 32:15 43:12 71:17,19 99:20 108:9,10 109:5,8

**termed** 86:9

**terms** 24:12

**testified** 5:12 7:17,22 8:8 40:7 64:9 78:11 98:6

**testify** 13:4,5 16:22 17:3 18:11 98:1

**testifying** 37:16

**testimony** 7:15 8:13 10:16 14:22 25:12 26:6 29:22 38:7 39:4 41:12, 22 63:22 65:15 78:19 87:6,12,22 95:22 120:5

**Texas** 4:7,18 5:21 19:12,16 22:14, 19 23:11,15 24:1,4 25:7 26:7,9 27:2,12,21 29:9 32:4 34:11,19 35:11,12 36:11 38:8 41:14 42:11, 16 43:11,14 45:2,16 47:20,22 55:12,15 57:10 58:6,19 63:20 74:6, 8 75:22 78:20 80:12,16 81:2,8 83:21 85:19 103:13,18,22 104:5,8, 15 105:8 114:21 117:20 118:8 124:5

**text** 75:15

**theoretically** 31:12 102:20

**thereabouts** 48:6

**thereof** 48:4

**thing** 11:8 54:19 73:18

**things** 8:13,17 10:15 15:2 71:12 98:10 110:20 112:1 113:13 118:21

**Thinking** 83:1

**thinks** 65:18

**thought** 80:22 94:7

**thousand** 86:6

**thousands** 99:22

**ties** 24:8

**time** 4:10 6:9 7:4 8:6 16:10,13 23:10 37:11 46:14 51:14 55:13,22 57:8 62:11 63:18 66:20,21 67:5 75:5 77:20 81:13 83:4,6 85:20 87:15 95:19 104:19 105:4,6 107:3, 6,9 110:15 117:7,17,20

**times** 8:5 16:2,15 35:10 97:2,10, 11,12,13,18 118:2 120:8

**timing** 82:2,15

**today** 15:1,20 30:7 103:17 110:11 120:6

**Today's** 4:9

**told** 37:15 64:20

**tomorrow** 110:12

**top** 6:20 14:8 51:15 57:11 59:6 62:20 84:15 85:4,13 116:7

**topics** 6:17

**total** 48:6 88:18 99:8

**totally** 28:1 43:2 68:2 77:12,13

**touch** 71:16

**touched** 53:5

**town** 64:10

**training** 118:12,20

**transcript** 51:1,6,16 52:10 79:10 125:18,20

**transcripts** 50:12 51:8,9 63:4

**translates** 17:21

**transpired** 66:20

**transposes** 42:14

**treated** 77:18 80:8

**trend** 117:8

**trial** 8:18 13:5,16 14:16 16:22 85:2 123:14 125:5

**tripped** 66:4 107:12

**trouble** 16:5 39:16 72:20 91:22

**true** 24:17 81:2,5 93:21 102:13 112:5

**trustees** 6:10

**turn** 107:1 121:10

**turned** 91:21

**turnout** 13:1 113:14 121:4,8

**turnover** 118:20

**turns** 27:20

**type** 18:11 53:19



MAGNA
LEGAL SERVICES

Dr. Eitan Hersh

April 20, 2023
Index: types..work

**types** 26:17 54:7 55:3

**typically** 25:17 26:4

**typo** 12:1 33:9 38:12 40:22 41:4 43:16 44:4 45:17 46:2 67:10 77:14 122:3

**Typo/inconsistent** 44:22

**typos** 28:21 35:13 40:21 43:8 45:7

---

U

**U.S.** 4:6 24:10 64:2 65:17 66:9

**Uh-oh** 97:17

**ultimately** 102:15

**unable** 100:9

**uncanceled** 108:11

**uncertainty** 109:22

**unclear** 43:5

**uncomfortable** 124:22

**uncured** 108:10

**uncured/uncanceled** 109:6,9 116:5

**understand** 11:2 16:9 18:4 24:9 41:12,21 42:18 48:4 49:11 53:6 59:8 65:8,10 70:13 79:2 89:9 93:19 106:11

**understanding** 16:6 25:6 30:14 34:22 35:15 38:15 40:11 50:17,19 51:22 52:3 57:17 60:9 76:4,14,22 77:8 79:12,17,18 86:13 91:11 92:6 100:12 112:22

**understood** 38:7 85:17 91:9

**unfair** 72:11

**unintentionally** 42:21

**United** 4:21

**university** 6:10

**Uniï¿½n** 4:5

**unpopular** 75:11

**unquote** 30:2 87:5 99:20 109:7

**unrelated** 18:1 64:6,22 66:11 68:3 71:9 100:11,16

**unsuccessful** 106:13

**up-to-date** 124:9

**updated** 6:3,21 7:8 57:14 59:15 66:16

**updating** 42:5 50:5 52:6

**usage** 104:6

---

V

**vaguely** 63:3

**valid** 28:12,17 35:2,3 41:6,7 65:18 77:12,13

**validating** 38:21

**variety** 28:21 79:6 102:3,4,5

**vary** 86:4

**vehicle** 53:22

**verification** 96:8,16

**versus** 4:5 44:22 45:18

**veteran** 21:11 22:7

**veterans** 21:3,19

**video** 4:3,13 75:1,7,11,19,20

**view** 23:22 24:13

**views** 23:7 75:8

**violate** 9:9,12

**vote** 8:12 12:16 22:19 23:9 24:7 31:9,20 32:17 33:10 38:4,9 42:6,12 44:13 57:1 58:4,7 64:10,11 79:14 86:2 91:7,19 94:10,17,18 95:13 96:11,17,21 97:20 98:20 99:18 100:9,17 101:16 102:7,11 104:17 106:1 107:4 111:15 112:8 122:2,18

**voted** 12:16,18 32:19 38:1 64:12 79:21 91:20 92:11,19 93:2 95:2 98:18 105:16,18,19 109:13,14,19 111:13 115:17 119:3,6,9

**voter** 11:22 22:9 23:15 27:11,14 28:16 29:2 30:5,9,16,17,21 31:5,9, 12 32:17,22 33:10 34:19 35:17 37:2 38:8,17,21 39:1,11,18,19,20 40:3,8 41:14,16 42:3,6,11,21 43:7, 21 44:2,12 45:8,11,20 46:3 48:18 49:1,7,8,14 52:5,12,13,17,18 55:8 56:8 57:4,16 58:19,20 59:5 63:20 67:3,4 70:22 71:22 72:9 75:3 79:3 81:7,11,12 84:19 85:9 88:7 103:4

110:17 111:11,13 114:11,21 121:12,13,14,21 122:17,18 124:17

**voter's** 36:16

**voters** 20:18 21:17 22:14,15 27:2, 10,12,21 28:2,11 29:6,9 41:6 43:4, 11 45:16,18 52:15 61:1 73:10 74:8 75:16,17 76:6,10 82:2,18,20 83:5 85:19 86:2 89:10 90:2 95:12 99:2 101:13 105:7,11,16 106:17 113:16 114:6,13 117:15 119:2

**votes** 78:21 92:7 99:7 105:13 106:15 111:17

**voting** 8:15 9:19,20 11:17 12:3,17, 21 19:12,19,22 20:5 22:14 23:9 25:9 31:21 32:2,20 39:16 65:19 81:16 82:13 90:16 98:21 100:3 104:4,8,9,15,19 105:22 106:7 107:6,15,16 111:21,22 112:2,4,5 113:17,19 114:3 116:19 117:6,9, 16,19 120:9,12,17,21,22 121:6,7

---

W

**wanted** 12:8 28:7 38:9 83:14

**Washington** 4:11

**ways** 27:8 32:21 33:3,5 34:17 40:15 49:12 53:7 80:7 88:8,14

**week** 63:20

**weeks** 7:7

**weigh** 75:13

**weight** 106:22

**Western** 4:7

**whatsoever** 49:19

**who've** 90:6

**witness's** 10:20

**woman** 63:20

**words** 44:3 60:16 65:11 88:8 91:7 106:3,8

**work** 5:22 6:10 10:1,4,14 11:9 13:19 14:2,11 17:13 18:2 19:10,18, 21 20:3,4,8,9,15,17,21 21:8,11,13, 17 22:18 23:1,10,14,20 24:5,20 26:18 32:3 34:8 36:7 37:3,17 47:12,16,19 48:1,5 52:20 76:22 80:11,15 82:9,10 84:18 85:1



Dr. Eitan Hersh

**worked** 58:5

**working** 85:20

**Workplace** 7:2

**world** 71:13

**writing** 6:22 10:14

**written** 17:9 26:14 47:17

**wrong** 33:8 36:3 39:1 43:4 58:17
68:7 70:4,7 77:11

**wrote** 39:14 45:8,12

----

Y

----

**year** 6:9 7:4 14:14 32:7,13 46:16
50:21 62:12 116:20 117:1,2,4

**years** 58:6 60:4 85:5 104:3 119:3

**young** 58:4

**Youtube** 75:1,8,19,20

----

Z

----

**Zoom** 5:1 125:17

