**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | |
| *Plaintiffs,* | |
| v. | 5:21-cv-844-XR |
| | |
| GREGORY W. ABBOTT, et al., | |
| *Defendants.* | |
| OCA-GREATER HOUSTON, et al., | |
| *Plaintiffs,* | |
| v. | 1:21-cv-0780-XR |
| | |
| JANE NELSON, et al., | |
| *Defendants.* | |

**PLAINTIFFS OCA-GREATER HOUSTON, LEAGUE OF WOMEN VOTERS OF
TEXAS, AND REVUP-TEXAS'S OPPOSITON TO INTERVENOR-DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ......................................................................................................................... 4

I.    SB 1's Matching-Number Requirement Violates the Materiality Provision .......................... 4

    A.    Texas Voters Were Denied the Right to Vote. ..................................................... 5

    B.    The Statute Is Not Limited to Registration and Qualification. ......................... 10

    C.    The ABBM and Mail Ballot Carrier Envelope Are Records or Papers Made Requisite to Voting. .......................................................................................... 14

CONCLUSION .................................................................................................................... 16

# TABLE OF AUTHORITIES

**CASES**

*Ali v. Federal Bureau of Prisons*, 552 U.S. 214 (2008)....................................................................15

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) .......................................................................14

*Brnovich v. Democratic National Committee*, 141 S. Ct. 2321 (2021) ...........................................9

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ...............................................................................12

*Clingman v. Beaver*, 544 U.S. 581 (2005).........................................................................................8

*Common Cause v. Thomsen*, 574 F. Supp. 3d 634 (W.D. Wis. 2021).............................................11

*Ford v. Tennessee Senate*, 2006 WL 8435145 (W.D. Tenn. Feb. 1, 2006).....................................6

*Friedman v. Snipes*, 345 F. Supp. 2d 1356 (S.D. Fla. 2004) .........................................................16

*Gonzaga University v. Doe*, 536 U.S. 273 (2002) ............................................................................5

*Gonzales v. United States*, 520 U.S. 1 (1997) ................................................................................15

*Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) .............................................................................10

*Harrison v. PPG Industries, Inc.*, 446 U.S. 578 (1980) .................................................................15

*Health & Hosp. Corp. of Marion County v. Talevski*, No. 21-806, 2023 WL
      3872515 (U.S. June 8, 2023) ......................................................................................................5

*In re SeaQuest Diving, LP*, 579 F.3d 411 (5th Cir. 2009) .............................................................15

*La Union del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512 (W.D. Tex. 2022)..............3, 6, 7, 12

*La Union del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 388 (W.D. Tex. 2022)............................5

*Lamie v. United States Trustee*, 540 U.S. 526 (2004).............................................................13, 15

*League of Women Voters of Arkansas v. Thurston*, 2021 WL 5312640 (W.D. Ark.
      Nov. 15, 2021) ...........................................................................................................................4

*Loughrin v. United States*, 573 U.S. 351 (2014).............................................................................16

*McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969) ........................8

ii

*Melot v. Bergami*, 970 F.3d 596 (5th Cir. 2020)................................................................6

*Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022), *vacated as moot*, 143 S. Ct. 297
    (2022)..........................................................................................................................6, 11

*Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721 (2003)......................12

*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017)........................................6

*Pennsylvania State Conference of NAACP v. Schmidt*, 2023 WL 3902954 (W.D.
    Pa. June 8, 2023)........................................................................................................3, 4

*Polychrome International Corp. v. Krigger*, 5 F.3d 1522 (3d Cir. 1993) ........................6

*Ritter v. Migliori*, 142 S. Ct. 1824 (2022)...................................................................6, 8

*Ritter v. Migliori*, 143 S. Ct. 297 (2022)........................................................................6

*Rosario v. Rockefeller*, 410 U.S. 752, *reh'g denied*, 411 U.S. 959 (1973) ...................9

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) ...........................................................13

*Tesfamichael v. Gonzales*, 411 F.3d 169 (5th Cir. 2005) ..............................................10

*Texas Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020)...................................8

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) ......................................9

*Tula Rubio v. Lynch*, 787 F.3d 288 (5th Cir. 2015) ......................................................15

*Vote.Org v. Callanen*, 39 F.4th 297 (5th Cir. 2022) .......................................................9

*Washington Association of Churches v. Reed*, 492 F. Supp. 2d 1264 (W.D. Wash.
    2006) ...........................................................................................................................7

**CONSTITUTIONAL PROVISIONS AND STATUTES**

U.S. Const. art. I, § 4.......................................................................................................12

42 U.S.C. § 1983................................................................................................................5

52 U.S.C. § 10101..............................................................................................................5

52 U.S.C. § 10101(a)(2)....................................................................................................12

52 U.S.C. § 10101(a)(2)(B) ...................................................................................... *passim*

52 U.S.C. § 10101(a)(2)(C) ................................................................12

52 U.S.C. §§ 10101(a)(3)(A) ..........................................................3, 6, 12

52 U.S.C. § 10101(e) ..........................................................1, 3, 6, 12, 13

Tex. Elec. Code § 86.001 ...................................................................14

Tex. Elec. Code § 86.008 .....................................................................7

Tex. Elec. Code § 87.041(b)(8) .............................................................14

**OTHER AUTHORITIES**

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal
    Texts (2012) ...........................................................................10

H.R. Rep. No. 88-914 (1963), *reprinted at* 1964 U.S.C.C.A.N. 2391 .........................13

**PRELIMINARY STATEMENT**

Senate Bill 1 ("SB 1") unlawfully burdens Texans' right to vote in multiple ways, as demonstrated by the extensive record compiled in discovery in these consolidated cases. The summary judgment motion of Intervenor-Defendants Harris County Republican Party, Dallas County Republican Party, Republican National Committee, National Republican Senatorial Committee, and National Republican Congressional Committee ("Intervenors" or "the GOP") lacks merit and should be denied.

Plaintiffs OCA-Greater Houston, League of Women Voters of Texas, and REVUP-Texas (collectively, "OCA Plaintiffs") respond to the GOP's challenges to Counts 4, 7, and 8 of their Second Amended Complaint in a consolidated response brief filed jointly with the LUPE Plaintiffs. They write separately here to explain why the GOP's legal arguments regarding Count 1, pursuant to the Materiality Provision of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B), are wrong and cannot serve as a basis for summary judgment. Instead, as explained in detail in OCA Plaintiffs' own summary judgment motion ("OCA MSJ"), ECF No. 611, which OCA Plaintiffs incorporate in full by reference here, the undisputed facts show that SB 1 violates the Materiality Provision.

The Materiality Provision bars states from denying the right to vote based on an "error or omission" on a voting-related "record or paper" that is "not material in determining whether [the voter] is qualified under State law to vote." 52 U.S.C. § 10101(a)(2)(B). The statute capaciously defines voting to include "all action necessary to make a vote effective." *Id.* at § 10101(e). By its terms, the Materiality Provision is specific and straightforward: A state may not refuse to count a

1

person's vote merely because they made an irrelevant error on some piece of required, voting-related paperwork.

As explained in detail in the OCA MSJ, SB 1 violates that prohibition. SB 1 imposes a burdensome, error-prone matching-identification-number requirement (the "matching-number requirement") as part of the mail ballot-related paperwork that mail-in voters must correctly complete on pain of disenfranchisement. Under SB 1, qualified voters must write a putative identification ("ID") number on their mail ballot application that matches the number in their voter registration record in order to have their application approved. And voters must also write a matching number on the carrier envelope containing their mail ballot to have their ballot counted. OCA MSJ at 11–12. But it is undisputed that possessing an ID number is not one of the qualifications to vote in Texas. Indeed, Intervenors openly concede that OCA and USA are "entirely correct" that "the personal identification numbers on an application or mail ballot are 'not material' to determining an individual's qualifications to vote." Intervenors' Br. in Supp of MSJ ("GOP Br."), ECF No. 608, at 13.

Further, it is undisputed that the ID numbers at issue are not actually used to determine voters' identities. OCA MSJ at 46–47. It is also undisputed that the database against which the voter-written number must be matched contains millions of erroneous or missing ID numbers, such that a voter may write their correct ID number and still be disenfranchised for writing a number that does not match. OCA MSJ at 50–52. And it is undisputed that *tens of thousands of Texans have been and will be denied the right to vote* for failure to write a matching number on their mail ballot applications or on their mail ballot carrier envelopes. OCA MSJ at 52.

2

Intervenors' summary judgment submission consists entirely of novel legal theories for why the Materiality Provision does not actually mean what it says, all of which other courts—including this Court—have rejected. *See La Union del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 541 (W.D. Tex. 2022); *see also, e.g.*, *Pennsylvania State Conf. of NAACP v. Schmidt*, 2023 WL 3902954, at *4–7 (W.D. Pa. June 8, 2023) (denying motion to dismiss premised on nearly identical arguments by Republican-Party-affiliated intervenors seeking to prevent counting of mail ballots because of irrelevant paperwork errors). Intervenors argue that refusing to count thousands of ballots does not deny anyone the right to vote, but, as this Court has previously recognized, the statutory text contradicts them by broadly protecting the right to "cast[] a ballot, and hav[e] such ballot counted." 52 U.S.C. §§ 10101(a)(3)(A), 10101(e). They argue that the Materiality Provision applies only to voter registration or qualification, but again the text extends further, to errors or omissions on paperwork "relating to any application, registration, *or other act requisite to voting*." *Id.* § 10101(a)(2)(B) (emphasis added). Completing the matching-number requirement on the ABBM form and the mail ballot carrier envelope form, which under SB 1 is required for a vote to be counted, are clearly "act[s] requisite to voting." Intervenors also repeatedly suggest that applying the Materiality Provision here would threaten sundry unrelated election rules, but in reality, the statute is limited to the scenario where the right to vote is denied solely because of an *immaterial error on some required, voting-related paperwork*. That is precisely what SB 1 does.

Intervenors' motion should be denied.

3

**ARGUMENT**

**I.   SB 1's Matching-Number Requirement Violates the Materiality Provision**

The Materiality Provision prohibits denying "the right of any individual to vote in any election" based on an "error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). The statute applies in specific circumstances: where a person's right to vote is denied based on a minor error or omission on voting-related paperwork, if that error is unrelated to determining a voter's eligibility. *Id.*; *see also, e.g.*, *Pennsylvania State Conf. of NAACP*, 2023 WL 3902954, at *4 (Materiality Provision "prohibits denial of the right to vote based on immaterial mistakes on voting-related paperwork"). It prohibits "state election practices that increase the number of errors or omissions on papers or records related to voting and provide an excuse to disenfranchise otherwise qualified voters." *League of Women Voters of Ark. v. Thurston*, 2021 WL 5312640, at *4 (W.D. Ark. Nov. 15, 2021).

Here, the undisputed facts make plain that, under SB 1, thousands of Texas voters:

> (1) Have been and will be "den[ied] the right . . . to vote" (*i.e.*, because elections officials will reject voters' ABBMs—which for many Texans are a necessary prerequisite to casting an effective vote—or else will reject their mail ballots such that they are not counted),

> (2) because of "an error or omission" (*i.e.*, a failure to write an ID number that successfully matches a number in the voter's file in the voter registration database),

> (3) "on [a] record or paper relating to any application, registration, or other act requisite to voting" (*i.e.*, the ABBM form or the mail ballot carrier envelope, pieces of required, voting-related paperwork),

4

(4) where that error or omission is "not material in determining whether such individual is qualified under State law to vote in such election" (*i.e.*, because whether the voter can provide a number that matches the number contained in their voter file has no bearing on whether they are qualified to vote in Texas).

*See* 52 U.S.C. § 10101; OCA MSJ at 44.

Intervenors' contrary arguments attempt to evade the statute's plain meaning. Each of those arguments fails.[1]

**A. Texas Voters Were Denied the Right to Vote.**

Intervenors first claim (GOP Br. 9–11, 16) that rejecting mail ballot applications or refusing to count thousands of mail ballots cast by registered and qualified Texas voters does not amount to a denial of the right to vote within the meaning of the Materiality Provision. In essence, their argument is that voters' "right" to vote is unharmed even if election officials refuse to count their ballot purely because of some error in filling out the matching-number requirement.

---

[1] In a footnote, Intervenors re-raise their flawed argument that OCA Plaintiffs lack a private right of action to enforce the Materiality Provision. GOP Br. 7 n.2. As Intervenors acknowledge, this Court has already correctly rejected that argument. *Id.*; *see La Union del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 388, 432 (W.D. Tex. 2022). Moreover, even if the Materiality Provision itself did not include an implied private right of action, OCA Plaintiffs would still have a right to sue under Section 1983. *See* Am. Compl., ECF No. 200, at 45–46 (setting forth cause of action under 42 U.S.C. § 1983). A plaintiff proceeding under § 1983 need only show that the federal law includes a private *right*; after that, § 1983 presumptively supplies a remedy. *See, e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284–85 (2002). Here, there can be no doubt that the Materiality Provision safeguards "the right of any individual to vote in any election." 52 U.S.C. § 10101(a)(2)(B); *see LUPE*, 618 F. Supp. 3d at 432 (so holding). And notably, the Supreme Court only this month confirmed that the presumption cannot be rebutted merely by pointing to a parallel government enforcement scheme (as Intervenors do here); rather, "§ 1983 can play its textually prescribed role as a vehicle for enforcing [federal] rights, even alongside a detailed enforcement regime that also protects those interests, so long as § 1983 enforcement is not 'incompatible' with Congress's handiwork." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, No. 21-806, 2023 WL 3872515, at *12 (U.S. June 8, 2023).

This Court has already considered and rejected this argument. As this Court held in denying the State's Motion to Dismiss the USA's materiality claim:

> [T]he preparation and submission of an application to vote by mail, as well as the preparation and submission of a mail ballot carrier envelope, are actions that voters must take in order to make their votes effective. Section 101, as a result, does not only apply when a voter is absolutely prohibited from voting. It also reaches the actions contemplated under sections 5.07 and 5.13.

*La Union del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 541 (W.D. Tex. 2022).

The Court's determination was correct. Intervenor's argument is precluded by the statute's text, which specifically defines voting as "all action necessary to make a vote effective including, but not limited to . . . casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast." 52 U.S.C. §§ 10101(a)(3)(A), 10101(e). The Materiality Provision "by definition includes not only the registration and eligibility to vote, but also the right to have that vote counted." *E.g.*, *Ford v. Tenn. Senate*, 2006 WL 8435145, at *11 (W.D. Tenn. Feb. 1, 2006); *accord Migliori v. Cohen*, 36 F.4th 153, 162 (3d Cir. 2022), *vacated as moot*, 143 S. Ct. 297 (Mem) (2022); *see also OCA-Greater Houston v. Texas*, 867 F.3d 604, 615 (5th Cir. 2017) (interpreting materially identical language in Section 208 of the VRA as extending well beyond "the mechanical act of filling out the ballot sheet").[2] As a matter of plain text, rejecting a

---

[2] In *Migliori*, a unanimous Third Circuit panel, comprised of judges appointed by presidents of both political parties, affirmed the application of the Materiality Provision in the mail ballot context and held that voters who had omitted an immaterial date on mail-ballot related paperwork must have their votes counted. 36 F.4th at 156–57. The candidate seeking to prevent qualified voters' votes from being counted sought a stay in the U.S. Supreme Court, which rejected the stay application over the dissent of three justices, in effect allowing the contested votes to be counted. *Ritter v. Migliori*, 142 S. Ct. 1824 (Mem) (2022). After the votes were counted and election certified, the case became moot. *Migliori* was later vacated as moot in a procedural order, but remains "persuasive" authority. *E.g.*, *Polychrome Int'l Corp. v. Krigger*, 5 F.3d 1522, 1534 (3d Cir. 1993); *see also Melot v. Bergami*, 970 F.3d 596, 599 (5th Cir. 2020) (treating a "thoughtful opinion" from the Tenth Circuit as persuasive even though it had been vacated as moot).

voter's application or "declining to count" their actual mail ballot merely because of an irrelevant paperwork error (GOP Br. 10) *is* denying their "right to vote" under the statute.

Intervenors do not engage with the statutory text; instead, their various arguments ask the Court to ignore it. They claim (at GOP Br. 9–10) that mail ballot voters are not denied the right to vote because they can vote in person if their ABBM or mail ballot is rejected. That argument fails as a matter of law because, having made mail ballot voting available, Texas is not permitted to refuse to count mail ballots solely because of an insignificant paperwork error. Moreover, the particular cure process to which Intervenors point merely allows a voter to re-submit their materials after they are rejected. Tex. Elec. Code § 86.008. Under Intervenors' logic, any paperwork requirement, no matter how immaterial, could be used to deny a voter the right to vote so long as the voter had two chances to provide the immaterial information. Texas could require that voters correctly list the license plate number of their car or the name of their kindergarten teacher or their age in days on their ABBM or mail ballot materials, reject voters' materials for failure to do so, and then avoid application of the Materiality Provision by pointing to the fact that voters may yet be able to comply with the patently immaterial paperwork requirements. That is not how this works: If an error or omission is immaterial, then a voter's application and/or ballot must be *accepted*, not rejected with an invitation to try again or find another way. As this Court has held, the Materiality Provision "does not say that state actors may initially deny the right to vote based on errors or omissions that are not material as long as they institute cure processes." *LUPE*, 604 F. Supp. 3d at 541; *see also Washington Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1266–67, 1271 (W.D. Wash. 2006) (holding ID-number-matching requirement violated

Materiality Provision and determining that it was irrelevant that, in the event of a mismatch, the voter would be provisionally registered to vote and contacted by the county).[3]

And Intervenors' argument also fails as a matter of undisputed fact because the record shows that thousands of qualified voters whose ABBMs and mail ballots were rejected were *not* able to cure the purported matching-number defect or otherwise overcome it by voting in person; rather, for those voters, the refusal to count their votes because of an irrelevant error or omission with respect to the matching number requirement left them disenfranchised. OCA MSJ at 15.

More generally, Intervenors suggest that, if refusing to count qualified voters' ballots because of the matching-number paperwork requirement violates the Materiality Provision, then the statute's reach will be limitless, and numerous other election rules will be "imperil[ed]." GOP Br. 10–11 & 14–15 (citing, *inter alia*, *Ritter v. Migliori*, 142 S. Ct. 1824, 1825 (2022) (Alito, J., dissenting) and *Clingman v. Beaver*, 544 U.S. 581, 593 (2005)). But this straw-man argument ignores the Materiality Provision's actual scope.

The Materiality Provision is not a general prohibition against any and all disenfranchisement; it prohibits disenfranchisement based on an immaterial "error or omission" on a required, voting-related "record or paper." 52 U.S.C. § 10101(a)(2)(B). Denials of the right

---

[3] Intervenors (GOP Br. 9) misplace any reliance on *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802 (1969) and *Tex. Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020). Both cases involved constitutional claims that sought to force the expansion of mail balloting to persons who were ineligible to vote by mail under state law. *McDonald*, 394 U.S. at 807 (prisoners claiming constitutional right "right to receive absentee ballots" where state law provided none); *Abbott*, 961 F.3d at 403–04 (Texas voters who were not over 65 or disabled under state law claiming Equal Protection violation where Texas law "fail[ed] to extend the vote-by-mail privilege to them"). Here, OCA Plaintiffs do not seek to expand or alter the criteria for who may vote by mail; rather, they seek only to ensure that, whatever the scope of Texas's mail-ballot program, those voters who are eligible to vote by mail are not arbitrarily disenfranchised for meaningless paperwork errors in violation of federal law.

to vote *due to immaterial errors* on *voting-related paperwork* come within that ambit. Denials of the right to vote for various other reasons (like failing to go to the right polling place, or to vote at the right time, or overvoting the ballot) simply do not. Intervenors cite a footnote from the non-precedential motions panel decision in *Vote.Org v. Callanen* (GOP Br. 10) for the proposition that "[i]t cannot be that any requirement that may prohibit an individual from voting if the individual fails to comply denies the right of that individual to vote under" the Materiality Provision. 39 F.4th 297, 305 n.6 (5th Cir. 2022). And that is literally correct: *only* refusals to count a voter's ballot for *immaterial errors on voting-related paperwork* are actionable under the statute's plain terms.

Applying the Materiality Provision *as written* to the circumstances presented in *this* case accordingly will not render states unable to write and enforce basic election rules, as Intervenors surmise. None of the rules at issue in the inapposite cases Intervenors cite—*e.g.*, party registration requirements, or the availability of "fusion voting," or in-precinct voting requirements, or mail-ballot-collection practices—involves immaterial paperwork errors.[4] And the other examples Intervenors cite also fall outside the plain language of the statute. The Materiality Provision would not apply to a requirement that a mail ballot be placed in a secrecy envelope (GOP Br. 10, 15), because that is not "an error or omission *on* any record or paper," 52 U.S.C. § 10101(a)(2)(B) (emphasis added). It would not apply to prohibitions on overvoting a ballot (GOP Br. 10, 14–15), because that error is not on some "paper" that is made "requisite to voting," but rather on *the ballot itself*. And it also may not apply to the failure to provide a voter's signature (GOP Br. 14, 15)

---

[4] *See* GOP Br. 8–10 (citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997) (fusion voting); *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2330 (2021) (in-precinct voting requirement and mail ballot collection); *id.* at 10–11 (citing *Rosario v. Rockefeller*, 410 U.S. 752, 754, *reh'g denied*, 411 U.S. 959 (1973) (party registration deadline).

9

because, depending on the circumstances, a signature requirement could be considered material to determining whether a voter is qualified to vote—for example, if such a requirement was on a form affirming their qualifications.[5]

The Materiality Provision does not apply to numerous rules concerning when or where or how to vote, or concerning the manner of voting itself, by mail or otherwise. But unlike the irrelevant examples cited by Intervenors, this case involves just what the statute forbids: denying the right to vote based on an irrelevant paperwork error.

### B.  The Statute Is Not Limited to Registration and Qualification.

Intervenors next argue (GOP Br. 11–12) that the Materiality Provision only "regulates requirements and practices related to qualifications and registration to vote." *E.g.*, GOP Br. 11. Again, the statutory text permits no such limitation.

The Materiality Provision prohibits denial of the right to vote based on immaterial errors or omissions "on any record or paper relating to any application, registration, *or other act requisite to voting*." 52 U.S.C. § 10101(a)(2)(B) (emphasis added). Limiting the statute's scope to papers relating to qualification determinations or voter registration itself would render the other listed categories (including the broad term "or other act requisite to voting") a dead letter. *See Tesfamichael v. Gonzales*, 411 F.3d 169, 175 (5th Cir. 2005) ("[C]ourts should strive to give operative meaning to every word in a statute."); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts, 174 (2012) ("If possible, every word and every provision [of an enactment] is to be given effect . . . None should be ignored."). Intervenors'

---

[5] Because the statute does not in fact threaten to invalidate "election rules across the country," its application in this case would not disturb (let alone upend) the federal-state balance, GOP Br. 14–15 (citing *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).

10

argument fails on those textual grounds alone. *E.g.*, *Migliori*, 36 F.4th at 162 n.56; *Common Cause v. Thomsen*, 574 F. Supp. 3d 634, 639 (W.D. Wis. 2021).

Intervenors are similarly wrong to suggest that the Materiality Provision only applies when the erroneous or omitted information *is* "used to determine any individual's qualifications to vote." GOP Br. 13–14; *see also id.* at 11. This misreads the statute, which prohibits refusing to count a person's vote based on a paperwork error or omission whenever the erroneous or omitted information "is *not* material" to determining a voter's qualifications. 52 U.S.C. § 10101(a)(2)(B) (emphasis added). Intervenors' attempt to limit the statute to instances where the error or omission *is* used in determining voter qualifications would allow all manner of irrelevant paperwork errors to be used to disenfranchise voters. Intervenors thus are not aided by their concession that the matching-number requirement is "not used to determine any individual's qualifications to vote" and does not affect any "'determin[ation]' that the individual is or is not 'qualified under State law to vote.'" GOP Br. 11, 13–14. Indeed, that admission shows why summary judgment should be granted in favor of OCA Plaintiffs. Intervenors concede that the matching-number requirement prevents voters' ballots from being accepted and counted based on paperwork errors and omissions that have nothing to do with a voter's qualifications—precisely what the Materiality Provision forbids.

Nor does it matter that refusing to count a voter's ballot or rejecting their mail application because of a failure to provide an ID number that matches the number in their voter registration record does not result in their "being stripped of the right to vote, or removed from the list of registered voters." GOP Br. 11. As this Court has recognized, the Materiality Provision applies to "all action necessary to make a vote effective," including any "action required by State law

11

prerequisite to voting, casting a ballot, and having such ballot counted" in the election. 52 U.S.C. §§ 10101(a)(3)(A), 10101(e); *LUPE*, 604 F. Supp. 3d at 541. Wholesale disqualification and removal from the voter rolls is not required.[6] Indeed, the broad definition of the "right to vote" demonstrates the incongruity of Intervenor's position. It would not make sense for Congress to capaciously define the right to vote to include all actions necessary to render a vote effective only to turn around and limit the application of its statute to the initial act of registering to vote.

At odds with the plain text, Intervenors wrongly assert that the statute must be limited to voter registration or qualification to avoid constitutional problems, because Congress sought with the Materiality Provision to prevent "racially discriminatory practices in *voter registration*." GOP Br. 15–16; *see also id.* at 7–8. But Intervenors cannot gin up a constitutional issue where none exists.

In addition to its power to regulate federal elections under the Elections Clause, U.S. Const. art. I, § 4, the Reconstruction Amendments authorize Congress to enact prophylactic legislation to protect the right to vote in particular, as the Supreme Court has repeatedly confirmed. *E.g.*, *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) (noting the validity of Congress's "suspension of literacy tests and similar voting requirements" as well as "other measures protecting voting rights" and collecting cases); *see also, e.g.*, *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 727–28

---

[6] Intervenors also point (GOP Br. 12) to other provisions of Section 10101(a)(2) containing varied uses of the term "qualification," but none of those support their proposed limiting construction. For example, it is true that Section 10101(a)(2)(C) prohibits the use of literacy tests "as a qualification for voting in any election." 52 U.S.C. § 10101(a)(2)(C). But Intervenors cite no support for the premise that this usage limits the federal prohibition on literacy tests to voter qualifications, thereby allowing literacy tests at the polls or on other pre-voting paperwork. Nor do they explain how those separate provisions limit the very different language of the Materiality Provision.

12

(2003). With respect to the Materiality Provision, it is true that Congress sought to "forbid[] the practice of disqualifying potential voters for their failure to provide information irrelevant to determining their eligibility to vote." *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003). But while Congress was responding to the practice of denying registration to Black voters based on immaterial paperwork errors, it used broader language in crafting a prophylactic rule that protects "the right of any individual to vote in any election" and that extends to "all action necessary to make a vote effective." 52 U.S.C. §§ 10101(a)(2)(B) & (e).[7] Indeed, Congress's clear intent to enact a broader rule—as evidenced first and foremost by the text it used in the statute, *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004)—makes good sense: a rule protecting voter *registration* only, but allowing registered voters to still be denied an *effective* vote based on irrelevant paperwork errors, would not have accomplished Congress' broader, well-documented aim of eradicating all manner of arbitrary and discriminatory denials of the right to vote. *E.g.*, H.R. Rep. No. 88-914 (1963), *reprinted at* 1964 U.S.C.C.A.N. 2391, 2394, 2485–87, 2491. Intervenors' assertion that their crabbed and easily defeated version of the Materiality Provision would have sufficiently addressed "the problem Congress sought to solve" in passing the Civil Rights and Voting Rights Acts (GOP Br. 16) does not pass the smell test.

---

[7] Intervenors' argument about legislative intent hinges on a single statement from several legislators noting testimony that "'registrars [would] overlook minor misspelling errors or mistakes in age or length of residence of white applicants, while rejecting' an African-American's application 'for the same or more trivial reasons.'" GOP MSJ at 8 (citing H.R. Rep. No. 88-914, Additional Views on H.R. 7152 of Hon. William M. McCulloch, Hon. John V. Lindsay, Hon. William T. Cahill, Hon. Garner E. Shriver, Hon. Clark MacGregor, Hon. Charles McC. Mathias, Hon. James E. Bromwell, pt. 2, at 5, (1963)). But the fact that there was testimony about the abuses of voter registrars does not in any way indicate that Congress intended to limit the scope of the statute to *only* voter registration—and most importantly, the plain text of the statute demonstrates the contrary intention.

13

In the end, Intervenors' meritless suggestions about Congress's purposes cannot limit the clear language that Congress actually deployed: "[W]hen the meaning of the statute's terms is plain, our job is at an end. The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1749 (2020).

### C. The ABBM and Mail Ballot Carrier Envelope Are Records or Papers Made Requisite to Voting.

Intervenors also wrongly contend (GOP Br. 12–13) that the neither the ABBM nor the mail ballot carrier envelope form come within the ambit of the statute, which covers errors or omissions on "any record or paper relating to any application, registration, or other act requisite to voting," 52 U.S.C. § 10101(a)(2)(B). But there is no dispute that the ABBM and carrier envelope form are literally paper forms, and there is no dispute that SB 1 makes correctly filling out the matching-number requirement on those forms an "act requisite to voting," *i.e.*, something required for a voter's application or ballot to be accepted rather than rejected. *Id.*; Tex. Elec. Code § 86.001; § 87.041(b)(8). Indeed, thousands of Texans have had their votes set aside on this immaterial basis since SB 1 went into force. OCA MSJ at 15.

Intervenors' alternative reading, supposedly supported by the canon of *ejusdem generis*, falls flat. Intervenors suggest that the terms "application" and "registration" relate to an initial qualification determination, and that the term "other act requisite to voting" must "therefore refer[] only to the functional equivalents of 'application' and 'registration'—*i.e.*, the initial processes to assess voter qualifications." GOP Br. 13. This construct does not hold. To start, Intervenors' resort to *ejusdem generis* must give way to the plain language of the statute, which unambiguously refers to "any . . . other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B). "[W]hen the statute's

14

language is plain, the sole function of the courts—as least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie*, 540 U.S. at 534; *see also In re SeaQuest Diving, LP,* 579 F.3d 411, 418 (5th Cir. 2009) (quoting same). As the Fifth Circuit has explained, "the word 'any' is expansive," and must be construed broadly and not in a limited fashion as pressed by Intervenors. *Tula Rubio v. Lynch*, 787 F.3d 288, 293 (5th Cir. 2015) (citing, *inter alia*, *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008)). It "'must' be read 'as referring to all' of the type to which it refers." *Id.* (quoting *Gonzales v. United States*, 520 U.S. 1, 5 (1997)).

Accordingly, the *ejusdem generis* canon has repeatedly been held inapplicable where Congress has used expansive "any" language that resists a limiting construction. *See, e.g.*, *Ali*, 552 U.S. at 225 (rejecting application of *ejusdem generis* to limit the general term in the phrase "any officer of customs or excise or any other law enforcement officer"); *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 589 (1980) (rejecting *ejusdem generis* and explaining that "the phrase 'any other final action,' in the absence of legislative history to the contrary, must be construed to mean exactly what it says, namely, *any other* final action"). That is the case here as well, where Congress *twice* deployed the term "any" to describe the range of paper forms that were covered by the prohibition against disenfranchisement for immaterial errors. *See Ali*, 552 U.S. at 219.

Regardless, Intervenors' *esjudem generis* argument fails on its own terms. Intervenors offer no basis for their suggestion that the term "application" (which could itself naturally apply to the ABBM) is limited only to the "initial processes" of assessing voter qualifications. *Ejusdem generis* does not apply where, as here, there is no clear "common attribute [that] connects the specific items" in the text at issue. *Ali*, 552 U.S. at 225.

15

Intervenors' limiting construction would meanwhile do violence to the text as Congress wrote it. Intervenors offer no example of what the "functional equivalents of 'application' and 'registration'" (GOP Br. 13) might be. Their reading in effect would have the term "or other act requisite to voting" do no work at all. But "the 'cardinal principle' of interpretation" is "that courts 'must give effect, if possible, to every clause and word of a statute.'" *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (citation omitted).[8]

The best reading of the statute is one that honors both the statutory text and Congress's overarching goal of eradicating arbitrary disenfranchisement based on irrelevant paperwork mistakes. Because the ABBM and the carrier envelope form are papers that state law requires voters to complete for their votes to be counted, they cannot be used to disenfranchise voters on the basis of immaterial paperwork errors or omissions.[9]

## CONCLUSION

Intervenors' motion for summary judgment should be denied.

Dated: June 23, 2023.

Respectfully submitted,

*/s/ Zachary Dolling*
Zachary Dolling
Texas Bar No. 24105809
Hani Mirza
Texas Bar No. 24083512
Sarah Chen*

---

[8] Intervenors also rely (GOP Br. 13) on *Friedman v. Snipes,* 345 F. Supp. 2d 1356 (S.D. Fla. 2004), but that case is inapposite. There, plaintiffs challenged the mail ballot deadline, which is not a paperwork requirement at all. *See id.* at 1371–72.

[9] Indeed, even applying a reasonable version of *ejusdem generis* to the text at issue here, the ABBM is itself an "application," and the carrier envelope form, like an application or registration form, requires voters to provide information in order to have their voting-related submission processed and accepted.

California Bar No. 325327
Veronikah Warms*
Texas Bar No. 24132682
**TEXAS CIVIL RIGHTS PROJECT**
1405 Montopolis Drive
Austin, TX 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)
zachary@texascivilrightsproject.org
hani@texascivilrightsproject.org
schen@texascivilrightsproject.org
veronikah@texascivilrightsproject.org

Thomas Buser-Clancy
Texas Bar No. 24078344
Edgar Saldivar
Texas Bar No. 24038188
Savannah Kumar
Texas Bar No. 24120098
Ashley Harris
Texas Bar No. 24123238
**ACLU FOUNDATION OF TEXAS, INC.**
5225 Katy Freeway, Suite 350
Houston, TX 77007
Telephone: (713) 942-8146
Fax: (915) 642-6752
tbuser-clancy@aclutx.org
esaldivar@aclutx.org
skumar@aclutx.org
aharris@aclutx.org

Adriel I. Cepeda Derieux*
Ari Savitzky*
Sophia Lin Lakin*
Dayton Campbell-Harris*
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
125 Broad St., 18th Floor
New York, NY 10004
(212) 284-7334
acepedaderieux@aclu.org
asavitzky@aclu.org
slakin@aclu.org
dcampbell-harris@aclu.org

17

Susan Mizner*
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
39 Drumm St.
San Francisco, CA 94111
(415) 343-0781 (phone)
smizner@aclu.org

Brian Dimmick*
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
915 15th St. NW
Washington, DC 20005
(202) 731-2395 (phone)
bdimmick@aclu.org

LUCIA ROMANO
Texas State Bar No. 24033013
PETER HOFER
Texas State Bar No. 09777275
CHRISTOPHER MCGREAL
Texas State Bar No. 24051774
**DISABILITY RIGHTS TEXAS**
2222 West Braker Lane
Austin, Texas 78758-1024
(512) 454-4816 (phone)
(512) 454-3999 (fax)
lromano@drtx.org
phofer@drtx.org
cmcgreal@drtx.org

Jerry Vattamala*
Susana Lorenzo-Giguere*
Patrick Stegemoeller*
**ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND**
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932 (phone)
(212) 966 4303 (fax)
jvattamala@aaldef.org
slorenzo-giguere@aaldef.org
pstegemoeller@aaldef.org

Jessica Ring Amunson*
Alyssa G. Bernstein*
**JENNER & BLOCK LLP**
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com
abernstein@jenner.com

Gregory D. Washington*
**JENNER & BLOCK LLP**
455 Market St. Suite 2100
San Francisco, CA 94105
gwashington@jenner.com

***COUNSEL FOR OCA-GREATER
HOUSTON
PLAINTIFFS.***
*admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

On June 23, 2023, I filed the foregoing using the CM/ECF system of the Western District of Texas, which will send notification of this filing to counsel of record.

/s/ *Zachary Dolling*