IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

|  |  |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>GREGORY W. ABBOTT, et al.,<br><br>    Defendants. | Civil Action No. 5:21-cv-844 (XR)<br>(consolidated cases) |

## UNITED STATES' BRIEF IN OPPOSITION TO STATE DEFENDANTS' AND INTERVENOR-DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

    A.    Factual Background ................................................................. 2

    B.    Procedural Background ........................................................... 5

STATUTORY BACKGROUND ....................................................................................... 5

LEGAL STANDARD ........................................................................................................ 6

ARGUMENT ....................................................................................................................... 7

    I.    Section 101 Forbids All Attempts to Deny Voters the Ballot Based on Paperwork Errors Not Material to Their Qualifications to Vote................................................. 9

    A.    Section 101 Applies to Mail Balloting Materials. ..................................................... 9

    1.    Mail Ballot Materials Are Papers or Records Related to an Act Requisite to Voting. ................................................................................................ 9

    2.    Section 101's Expansive Language Covers Any Papers or Records Requisite to Voting. ............................................................................. 13

    B.    SB 1 Denies Individuals the Statutory Right to Vote Under Section 101 By Requiring Officials to Reject ABBMs and Completed Ballots........................... 16

    C.    Section 101 Prohibits Denying the Statutory Right to Vote Based on Any Immaterial Error or Omission on a Covered Paper or Record. ......................... 19

    D.    Texas's Mail Ballot Restrictions Violate Section 101. .......................................... 22

    II.    Intervenor-Defendants' Concerns About Section 101's Scope Are Meritless........ 24

CONCLUSION ................................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Ali v. Fed. Bureau of Prisons*, 552 U.S. 214 (2008) .................................................................. 10

*Allen v. Milligan*, No. 21-1086, 559 U.S. ---, 2023 WL 3872517 (June 8, 2023) ................. 15, 20

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................. 6, 7

*Arizona* v. *Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ................................................ 28

*Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Systems, Inc.*, 563 U.S. 776 (2011) ............................................................................................................................................ 9

*Catalyst Pharms., Inc. v. Becerra*, 14 F.4th 1299 (11th Cir. 2021) ............................................ 20

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................. 6

*Condon v. Reno*, 913 F. Supp. 946 (D.S.C. 1995) ................................................................... 6, 12

*Eason v. Thaler*, 73 F.3d 1322 (5th Cir. 1996) .............................................................................. 7

*Ford v. Tenn. Senate*, No. 06-2031, 2006 WL 8435145 (W.D. Tenn. Feb. 1, 2006) ................. 16

*Harrison v. PPG Indus., Inc.*, 446 U.S. 578 (1980) ..................................................................... 10

*In re Gordon*, 218 F. Supp. 826 (N.D. Miss. 1963) ..................................................................... 13

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) ............................................................................. 27

*Keene Corp. v. United States*, 508 U.S. 200 (1993) ............................................................... 15, 21

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) ........................................................................... 13

*La Unión del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512 (W.D. Tex. 2022) .................... 6, 17

*Lynch v. Alworth-Stephens Co.*, 267 U.S. 364 (1925) .................................................................. 12

*Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022), *vacated as moot sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022) .................................................................................................................... 8, 22

*Pa. State Conf. of the NAACP v. Schmidt*, No. 1:22-cv-339, 2023 WL 3902954 (W.D. Pa. June 8, 2023) ........................................................................................................................................ passim

*Prudencio v. Runyon*, 3 F. Supp. 2d 703 (W.D. Va. 1998) .......................................................... 22

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ............................................... 7

*Rodriguez v. Pacificare, Inc.*, 980 F.2d 1014 (5th Cir. 1993) ..................................................... 6

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) ................................................................... 11, 12

*Singh v. Garland*, 855 F. App'x 958 (5th Cir. 2021) (per curiam) ............................................. 12

*Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260 (N.D. Ga. 2021) ............................................................................................................................................ 18

*South Carolina* v. *Katzenbach*, 383 U.S. 301 (1966) .................................................................. 28

United States v. Buie, 960 F.3d 767 (6th Cir. 2020) .................................................................... 10

*United States v. Crawford*, 229 F. Supp. 898 (W.D. La. 1964) ................................................... 6

*United States v. Dison*, 573 F.3d 204 (5th Cir. 2009) ................................................................. 22

*United States v. Gonzales*, 520 U.S. 1 (1997) ............................................................................. 13

*United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483 (2001) ................................ 27

*United States v. Palomares*, 52 F.4th 640 (5th Cir. 2022) ........................................................... 9

*Van Buren v. United States*, 141 S. Ct. 1648 (2021) ................................................................... 15

*Vote.Org v. Callanen*, 39 F.4th 297 (5th Cir. 2022) ....................................................... 11, 12, 25

*Vote.org v. Ga. State Election Bd.*, No. 1:22-cv-1734, 2023 WL 2432011 (N.D. Ga. Mar. 9, 2023) ..................................................................................................................................... 18, 23

*Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206 (5th Cir. 2009) ............................................ 6

*Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929 (2022) ............................................................. 22

## Statutes

25 Pa. Cons. Stat. § 3050 ................................................................................................ 27

25 Pa. Cons. Stat. § 3058 ................................................................................................ 27

52 U.S.C. § 10101(a)(2)(A) ............................................................................................. 21

52 U.S.C. § 10101(a)(2)(B) ....................................................................................... passim

52 U.S.C. § 10101(a)(2)(C) ............................................................................................. 21

52 U.S.C. § 10101(a)(3)(A) ..................................................................................... 6, 14, 23

52 U.S.C. § 10101(e) ................................................................................................ passim

52 U.S.C. § 10310(c)(1) ............................................................................................ 14, 15

52 U.S.C. § 20701 ........................................................................................................... 12

52 U.S.C. § 20703 ........................................................................................................... 12

52 U.S.C. § 21081(a)(1)(A)(iii) ...................................................................................... 26

Fla. Stat. § 101.64 .......................................................................................................... 26

Tex. Elec. Code § 63.003 ................................................................................................ 27

Tex. Elec. Code § 65.011 ................................................................................................ 26

Tex. Elec. Code § 82.001-004, .007-.008 ........................................................................ 3

Tex. Elec. Code § 84.011(a)(1) ....................................................................................... 25

Tex. Elec. Code § 86.001(b) ............................................................................................. 3

Tex. Elec. Code § 86.001(f) ................................................................................... 8, 18, 23

Tex. Elec. Code § 86.002 .................................................................................................. 3

Tex. Elec. Code § 86.013(c) ........................................................................................... 25

Tex. Elec. Code § 86.013(e) ........................................................................................... 25

Tex. Elec. Code § 87.041(b)(8) .............................................................................. 8, 18, 23

Va. Code § 24.2-611 ....................................................................................................... 26

## Other Authorities

Civil Rights Act of 1960, Pub. L. No. 86-449, §§ 301, 303, 74 Stat. 86 (1960) ........................ 12

Civil Rights Act of 1964, Pub. L. No. 88-352, § 101, 74 Stat. 241 (1964) ................................ 28

Election Integrity Protection Act of 2021, Tex. S.B. 1, 87th Leg., 2d C.S., ch. 1 (2021). ............ 3

H.R. Rep. No. 88-914, pt. 1 (1963), *reprinted in* 1964 U.S.C.C.A.N. 2391 (1963); 110 Cong.
   Rec. 1593 (1964) (statement of Rep. Farbstein) ..................................................... 28

S. Rep. No. 89-162 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2508 ........................................ 15

Voting Rights Act of 1965, Pub. L. No. 89–110, § 15(a), 79 Stat. 437 (1965) .......................... 28

## Rules

Fed. R. Civ. P. 56(a) ......................................................................................................... 6

## Constitutional Provisions

U.S. Const. amend. XIV, § 5 ........................................................................................... 28

U.S. Const. amend. XV, § 2 ............................................................................................. 28

## INTRODUCTION

Section 101 of the Civil Rights Act of 1964 provides voters with a straightforward protection of their right to vote.  It bars election officials from denying the right to vote based on errors or omissions on paperwork needed to vote that are not material to whether the voter is qualified to vote.  *See* 52 U.S.C. § 10101(a)(2)(B) (Section 101 or the Materiality Provision).  In achieving that goal, the statute's language is comprehensive: it protects the right of "any" individual to vote in "any" election, and prohibits denial of the right to vote because of immaterial errors or omissions on "any" paper or record related to "any" act requisite to voting. The statutory language reflects Congress's intent to eradicate obstacles to voting based on immaterial paperwork errors wherever and whenever they may occur.

Intervenor-Defendants ask this Court to narrow Section 101's scope by ignoring the statute's plain text.  In place of the statutory language extending Section 101's protection to voters in "any" election, they ask this Court to limit it to the single instance of initial determinations of voters' qualifications.  As to Congress's command that Section 101 applies to "any" paper or record related to "any" application, registration, or act requisite to voting, Intervenor-Defendants ask this Court to excise protections over all but registration papers. Where Section 101 by its terms restrains state officials from denying voters an effective ballot wherever their error or omission was "not material" to voter qualifications, Intervenor-Defendants suggest the Court instead read the statute to apply only where the information requested by the form *is* material to qualifications, leaving officials free to reject materials for immaterial errors and thereby all but nullifying the statute's protections.  And where the statute defines to right to vote to include "casting a ballot" and "having such ballot counted," Intervenor-Defendants urge the Court to ignore Congress's words outright and allow officials to

deny the right to cast a counted ballot based on immaterial paperwork errors.  The Court should decline these many invitations to unwind Congress's work.

For nearly sixty years, states have had little trouble regulating their own elections while complying with Section 101's prohibition on denying the statutory right to vote for immaterial paperwork errors.  Nothing about that would change if Texas officials were properly enjoined from rejecting mail ballot materials merely because the voter erred in writing an extraneous number that matches Texas's voter registration database records.  Intervenor-Defendants' admission that the information demanded from voters under Texas's new mail ballot restrictions is not material to a voter's qualifications confirms the core of a Section 101 violation and forecloses summary judgment for State Defendants and Intervenor-Defendants.  The Court should deny their motions.

## BACKGROUND

### A.    Factual Background[1]

Mail voting has been part of Texas elections for decades.  Supp. SOF ¶ 210.[2]  Texas law extends the mail ballot to several categories of voters for whom voting in person frequently presents enhanced or insurmountable challenges.  SUF ¶ 19.  These include elderly voters, disabled voters who cannot vote in person on Election Day "without the likelihood of needing personal assistance or injuring [their] health," voters absent from their home counties for the

_____

[1] The full background is described in the United States' Motion for Summary Judgment at 1-7, ECF No. 609.  This section summarizes only the background relevant to Defendants' motion.

[2] Citations to "SUF" refer to the United States' Statement of Uncontested Facts in Support of Its Motion for Summary Judgment, ECF No. 609-1.  Citations to "Supp. SOF" refer to the United States' Supplemental Statement of Facts in Support of its Opposition to Intervenor-Defendants' and State Defendants' Motions for Summary Judgment, filed as an exhibit to this brief.

entire in-person voting period, and voters who expect to give birth near Election Day.  SUF ¶ 17; Tex. Elec. Code §§ 82.001-004, .007-.008.

    An eligible Texas voter who intends to vote using a mail ballot must complete a series of requirements before getting a ballot and having it counted.  The voter first must send a timely paper application ("Application for a Ballot by Mail," or ABBM).  SUF ¶¶ 21, 38.  If an official accepts the application, the voter is sent a mail ballot and accompanying materials, including a carrier envelope that the voter must use to return the ballot.  SUF ¶¶ 47-48, 53; Tex. Elec. Code §§ 86.001(b), 86.002.  The carrier envelope also serves as a form voters must fill out with additional information, and officials analyze the information on the carrier envelope together with the voter's previously accepted application to determine whether to accept and count the mail ballot.  SUF ¶¶ 47, 56-65.  There has been no change to this process in recent years— officials have consistently evaluated a mail voter's application and carrier envelope for compliance with certain voter qualification, mail-ballot eligibility, and procedural requirements, for example whether the voter was registered to vote, stated a "legal ground" for voting by mail, met residency requirements for the ballot, and (if applicable) affirmed they had a disability qualifying them to vote by mail.  SUF ¶¶ 31, 42, 58, 60, 64, 70; Supp. SOF ¶ 211.

    While keeping all preexisting requirements in place, Texas enacted Senate Bill 1 (SB 1),[3] which layered on an additional demand beginning in December 2021: that before a county election official will give a voter a mail ballot, or accept a carrier envelope and count a mail ballot toward an election's vote totals, a voter must write, on both the application and carrier envelope, a "DPS Number"[4] (that is, a Texas driver's license number, Texas personal

---

[3] Election Integrity Protection Act of 2021, Tex. S.B. 1, 87th Leg., 2d C.S., ch. 1 (2021).

[4] Named for the Texas Department of Public Safety, the issuer of these cards.

identification card number, or Texas election identification certificate number), or the last four digits of a Social Security number (SSN4) that matches a number associated with the voter in Texas' voter registration records.[5]  SUF ¶¶ 1-4, 32, 50-51.  Unless the voter has never been issued any of the qualifying numbers, they cannot receive a mail ballot or have their mail ballot counted without successfully writing one of these numbers on their application and carrier envelope.  SUF ¶¶ 34-36, 51, 63, 70.  If a voter's timely mail ballot application or mail ballot is rejected under SB 1, the law contains a mechanism to "cure" the rejected form if the voter can do so before statutory deadlines.  SUF ¶¶ 37, 39-40, 61, 68, 200, 203.  In no event, however, can a voter cure without providing a required number.  SUF ¶¶ 39, 70.

SB 1 changed the face of voting in Texas for mail voters.  It led to a significant increase in mail ballot rejections in the March 2022 primary election and November 2022 general election, at rates that remain well above Texas's historical average and the national average. SUF ¶¶ 153, 159-160; *see also* U.S. Mot. Summ. J. 4-7, ECF No. 609.  Multiple Texas county election officials have acknowledged that it would not be possible to eliminate ABBM and mail ballot rejections from eligible voters while applying SB 1's new requirement.  SUF ¶ 126.

The law's implementation in 2022 also demonstrated that neither cure procedures nor the formal ability to vote in person after rejection reliably offers voters a second chance at casting an effective vote.  Statewide, less than half of voters who initially had a mail ballot rejected under SB 1 in the November 2022 election successfully cured the ballot or voted in person.  SUF ¶¶ 158, 161.  Cure procedures and in-person voting proved inadequate for some voters for

---

[5] Military voters, military family members, and overseas citizens may also use a Federal Post Card Application to apply for a mail ballot and a Texas-issued signature sheet to accompany a mail ballot in lieu of a carrier envelope, both of which must comply with SB1's requirements. SUF ¶ 48.

several reasons, including rejected voters not receiving notice of rejection in time to cure, misunderstanding or being unable to navigate the cure process, and being unable to vote in person.  *See* U.S. Mot. Summ. J. 4-5, 14-15.  Texas's implementation of SB 1 also revealed that the voter registration databases used to administer the new law are incomplete, error-ridden, and sometimes inadequate for the task.  *See* U.S. Mot. Summ. J. 3-4.

### B.     Procedural Background

The United States filed its Complaint on November 4, 2021.  *See* Compl., *United States v. State of Texas*, No. 5:21-cv-1085, ECF No. 1; *see also* Order, *United States v. State of Texas*, No. 5:21-cv-1085, ECF No. 13 (consolidating cases challenging SB 1); U.S.' Am. Compl., ECF No. 131.  Following two rounds of discovery, *see* Scheduling Order (Nov. 18, 2021), ECF No. 125; 2d Am. Scheduling Order (Mar. 30, 2023), ECF No. 579, Intervenor-Defendants moved for summary judgment on May 26, 2023, *see* Int.-Defs.' Mot. Summ. J., ECF No. 608.  State Defendants joined that motion and adopted its arguments with respect to the interpretation and application of Section 101.  *See* State Defs.' Notice of Joinder to Int.-Defs.' Mot. Summ. J., ECF No. 610.  This opposition follows.[6]

### STATUTORY BACKGROUND

Section 101 of the Civil Rights Act of 1964, as amended, prohibits any person acting under color of law from denying "the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election."  52 U.S.C. § 10101(a)(2)(B).

---

[6] The United States also moved for summary judgment on May 26, 2023, which is being briefed separately.  *See* U.S. Mot. Summ. J., ECF No. 609.

The term "vote" here "includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted." *Id.* § 10101(e); *see also id.* § 10101(a)(3)(A). "Section 101, as a result, does not only apply when a voter is absolutely prohibited from voting" and does not permit "state actors [to] initially deny the right to vote based on errors or omissions that are not material as long as they institute cure processes." *La Unión del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 541 (W.D. Tex. 2022). This provision was "necessary to sweep away such tactics as disqualifying an applicant who failed to list the exact number of months and days in his age." *Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995); *see also, e.g.*, *United States v. Crawford*, 229 F. Supp. 898, 901-02 (W.D. La. 1964) (describing practice of denying registration to Black "applicants on account of errors or omissions in their application forms while registering white applicants who have made similar errors or omissions"), *rev'd on other grounds sub nom. United States v. Clement*, 358 F.2d 89 (5th Cir. 1966).

## LEGAL STANDARD

A movant is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Rodriguez v. Pacificare, Inc.*, 980 F.2d 1014, 1019 (5th Cir. 1993). A genuine dispute of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009). When considering a motion for summary judgment, courts "must draw all reasonable inferences in favor of the nonmoving party" and "may not make credibility

determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *see also Anderson*, 477 U.S. at 250 ("The inquiry performed is the threshold inquiry of determining whether there is the need for a trial . . . ."). "However, mere conclusory allegations are not competent summary judgment evidence . . . ." *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).

## ARGUMENT

Section 101 is simultaneously precise and capacious. Precise, because it targets voting-related "papers or records" that stand between a voter and an effective ballot, and it prohibits officials from denying that ballot only when a voter's paperwork error is "not material" to the voter's qualifications. Capacious, because within this scope Section 101 applies to any official's action to "deny the right to vote in *any election*," and covers every paper or record related to "*any*" act requisite to voting, which includes "*all* action necessary to make a vote effective including . . . casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast." 52 U.S.C. § 10101(a)(2)(B), (e) (emphasis added). Simply put, Section 101 guarantees voters that no official can refuse a proper request for a mail ballot or reject a completed ballot based on paperwork errors that are not material to their qualifications to vote.

SB 1's mail ballot restrictions violate Section 101. Under SB 1, all mail voters must write on an ABBM or carrier envelope a driver's license number, identification card number, election identification certificate number, or the last four digits of a Social Security number that matches Texas's voter registration database records.[7] For voters who do not precisely provide a required number, SB 1 makes the consequences automatic: officials "shall reject" ABBMs and

---

[7] Except in the rare circumstances a voter has never been issued any of these numbers. *See* U.S. Mot. Summ. J. 2 n.1.

must refuse to accept completed ballots.  Tex. Elec. Code §§ 86.001(f), 87.041(b)(8); SUF ¶¶ 34-35, 51, 63.  The ABBM and carrier envelope are "papers or records related to any *application*, registration, or *other act requisite to voting*," 52 U.S.C. § 10101(a)(2)(B) (emphasis added), and thus covered by the statute.  And, as Intervenor-Defendants concede, writing a DPS Number or SSN4—a mandatory grounds for rejection when voters err in matching Texas's registration records, even when the fault lies with the database—is "not material" to a voter's qualifications.  Int.-Defs.' Br. 13.  Section 101 therefore prohibits what SB 1 does.  *See Migliori v. Cohen*, 36 F.4th 153, 162-63 & n.56 (3d Cir. 2022) (Section 101 violated when error or omission not material to state-law voter qualifications used as basis not to count mail ballot), *vacated as moot sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022); *see also Pa. State Conf. of the NAACP v. Schmidt*, No. 1:22-cv-339, 2023 WL 3902954, at *5-7 (W.D. Pa. June 8, 2023) (rejecting nearly identical arguments by Intervenor-Defendants).

Intervenor-Defendants' attempts to evade the federal statute fail.  The line they attempt to draw between "denying the right to vote" and "imposing mandatory rules" on being permitted to cast a ballot that's counted is atextual, legally irrelevant, and functionally meaningless.  Their suggestion that an error or omission must "affect a determination" about a voter's qualifications under state law likewise misreads the plain text, which prohibits denying the statutory right to vote based on errors or omissions *because* they are not material to that determination.  And their request that this Court curb Section 101's reach to "initial" registration or "voter registration specifically" similarly collides with the statute's plain language.

Intervenor-Defendants' suggestion that Section 101 will subsume state election regulations unless this Court coins an exception for "mandatory rules" likewise fails—and not only because for nearly sixty years the Civil Rights Act has not done so.  Section 101 applies

only when state action restricts a voter from casting an effective ballot based on an immaterial error or omission on a paper or record; it does not extend to any state law, procedure, or rule outside this context.  Intervenor-Defendants' fears are misplaced.

Accordingly, this Court should deny Intervenor-Defendants' and State Defendants' motions for summary judgment.

## I.    Section 101 Forbids All Attempts to Deny Voters the Ballot Based on Paperwork Errors Not Material to Their Qualifications to Vote.

### A.    Section 101 Applies to Mail Balloting Materials.

Despite Section 101's plain text, Intervenor-Defendants argue that Section 101 applies only to "processes used to *initially* determine a person's qualifications to vote"—in other words, the "voter registration process."  Int.-Def. Br. 12.  This extratextual attempt to defeat Section 101 at the threshold cannot be squared with Congress's words or its remedial scheme.

#### 1.    Mail Ballot Materials Are Papers or Records Related to an Act Requisite to Voting.

Intervenor-Defendants' argument that the phrase "other act requisite to voting" can only be coextensive with "registration" and "application" misses the mark.  Reducing "other act requisite to voting" to merely repeat the preceding statutory terms would violate the basic principle that "courts prefer interpretations that give independent legal effect to every word and clause in a statute."  *United States v. Palomares*, 52 F.4th 640, 644 (5th Cir. 2022) (citing *Williams v. Taylor*, 529 U.S. 362, 404 (2000)); *see also Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Systems, Inc.*, 563 U.S. 776, 788 (2011) (construction of statutory term that "adds nothing that is not already in the definition" is "contrary to [courts'] general reluctance to treat statutory terms as surplusage") (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)) (internal quotation marks and alteration omitted).

Nor does resort to the *ejusdem generis* principle—that "where general words follow an enumeration of specific items, the general words are read as applying only to other items akin to those specifically enumerated," *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980)—salvage Intervenor-Defendants' interpretation. Canons of construction such as *ejusdem generis* are applied only to resolve ambiguity, not create it. *See Harrison*, 446 U.S. at 588 (citing *United States v. Powell*, 423 U.S. 87, 91 (1975)); *see also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226-27 (2008) (rejecting attempt to use canons of construction to "create ambiguity where the statute's text and structure suggest none."). Within Section 101, the modifier "any" applies to each of the listed items that follows it: any registration, any application, or any other act requisite to voting. *See, e.g.*, *United States v. Buie*, 960 F.3d 767, 773 (6th Cir. 2020) ("[M]odifiers appearing at the beginning of the list . . . ordinarily are deemed to modify the entire list." (citing Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012)). As the very authority Intervenor-Defendants rely upon recognizes, Congress's use of the phrase "*any* other" when introducing a broadening provision is "expansive language" that "offers no indication whatever that Congress intended [a] limiting construction" of the general phrase constrained by more specific preceding examples. *Harrison*, 446 U.S. at 589 ("[T]he phrase, 'any other final action,' in the absence of legislative history to the contrary, must be construed to mean exactly what it says, namely, *any other* final action."). Especially where congressional intent to expand, rather than limit, the statute's coverage beyond a registration or application is so clear, courts "do not woodenly apply limiting principles every time Congress includes a specific example along with a general phrase," *Ali*, 552 U.S. at 227.

Moreover, with respect to mail ballot applications, the question whether they are also an "act requisite to voting" is academic. Section 101 expressly applies to "any . . . application." 52

10

U.S.C. § 10101(a)(2)(B).  In Texas, to get a mail ballot, a voter must complete an "Application for a Ballot by Mail," which must be rejected for any error or omission in writing thereon a DPS Number or SSN4.  SUF ¶¶ 34-35.  While Texas's description of its own documents may not always be dispositive (the State could not, for example, *avoid* bringing this record within the statute by renaming it), it would require untenable statutory contortions to conclude a paper the State repeatedly describes as an "application" is not an "application."

Intervenor-Defendants cite no controlling or persuasive authority imposing the narrow limitation they suggest.  Their repeated reliance on *Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003), for the proposition that Section 101 applies only to registration is misplaced.  *Schwier* involved a challenge to a Georgia's requirement that voters provide a Social Security number when registering to vote.  340 F.3d at 1286.  Because it considered only voter registration applications, the court had no reason to even consider, much less limit, Section 101's application to other "acts requisite to voting," and its statements that Section 101 was "intended to address the practice of requiring unnecessary information for voter registration," *id.* at 1294, neither implies nor establishes intent to capture registration exclusively.  And the Fifth Circuit's decision granting a stay pending appeal in *Vote.Org v. Callanen* also considered the materiality of wet-ink signatures only on voter registration applications, 39 F.4th 297, 300-01 (5th Cir. 2022), meaning whether the scope of Section 101 extends beyond registration was not at issue.[8]  The stay panel merely mused in a footnote that a "plausible argument can be made that [Section 101] is tied to

---

[8] Following the Fifth Circuit's grant of stay pending appeal, the United States participated as *amicus curiae* in the merits appeal, arguing that the wet signature requirement violated Section 101.  *See* Br. for U.S. as *Amicus Curiae* 19-29, *Vote.Org v. Callanen*, No. 22-50536 (5th Cir. Nov. 02, 2022) (Dkt. No. 67).  The case remains pending.  The United States did not dispute, then or now, that a signature on mail ballot materials in general may be material in determining whether a voter is qualified.  *See also infra* Part II.

voter registration specifically." *Id.* at 305 n.6.  Even if this were not dicta, and it is, it cannot be reconciled with the plain text of the statute and has no persuasive weight.[9]

Accepting Intervenor-Defendants' invitation to depart from the statutory text and limit Section 101's reach to initial registrations would undermine Congress's goal in enacting Section 101.  It would convert a statute intended to "sweep away" specious disqualifying tactics, *Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995), to a mere technical requirement for registration forms that leaves broader obstacles to the franchise unaddressed.  While Congress surely intended to prevent abuses in the voter registration process, *see, e.g.*, *Schwier*, 394 F.3d at 1294, neither Section 101's statutory language nor its legislative purpose gives rise to any indication that Congress chose to *allow* them at other stages in the process between voter registration and completing all legal requirements requisite to voting an effective ballot.  "[T]he plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover." *Lynch v. Alworth-Stephens Co.*, 267 U.S. 364, 370 (1925).

Indeed, even Texas's Office of the Attorney General does not give "act requisite to voting" the narrow construction Intervenor-Defendants urge here.  In Title III of the Civil Rights Act of 1960, Congress established certain requirements for local officials to preserve "all records and papers" in their possession "relating to any application, registration, payment of poll tax, or other act requisite to voting in [an] election [with candidates for federal office]," and to make those records available to the Attorney General on demand.  52 U.S.C. §§ 20701, 20703; Civil Rights Act of 1960, Pub. L. No. 86-449, §§ 301, 303, 74 Stat. 86, 88 (1960).  Except for

---

[9] "A decision granting a stay settles no law and is not binding on the merits panel, leaving it as a writing in water." *Singh v. Garland*, 855 F. App'x 958, 958 (5th Cir. 2021) (per curiam) (internal quotation marks and alteration omitted).

explicitly adding records related to payment of a poll tax, the operative phrase is identical to

Section 101.  And just ten months ago, the Attorney General of Texas issued a formal opinion

stating that "precinct election records," which include "voted ballots" among other documents,

must be preserved under both state law and Title III.  *See* Supp. SOF ¶ 213 (Texas Office of the

Attorney General Opinion No. KP-0411, citing 52 U.S.C. § 20701 as a basis for preservation

requirement).  Neither "precinct election records" nor "voted ballots" is specifically described in

Title III, meaning the Texas Office of the Attorney General construed the phrase "other act

requisite to voting" to include such records that are not narrowly related to registration.  On this

score, it correctly applied the "broad statutory classification of 'all records or papers . . . relating

to any . . . act requisite to voting,'" *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962), to

extend to records related to both "the registration and voting laws of the state," *In re Gordon*,

218 F. Supp. 826, 827 (N.D. Miss. 1963).

> **2.     Section 101's Expansive Language Covers Any Papers or Records Requisite to Voting.**

Congress made clear—in several places in the statutory text—that Section 101 applies to

papers or records that would deny the statutory right to vote in any given election.  First, it

forbade officials from denying any individual's right to vote "in *any* election," meaning that it

prohibits denial of the right to vote in a single election just as thoroughly as it prohibits

wholesale refusal to register a voter.  *Cf. United States v. Gonzales*, 520 U.S. 1, 5 (1997)

(explaining that "the word 'any' has an expansive meaning, that is, 'one or some indiscriminately

of whatever kind'" (quoting *Webster's Third New International Dictionary* 97 (1976))).  Second,

the statute forbids denying the right to vote based on errors or omissions "not material in

determining whether such individual is qualified under State law to vote *in such election*."  52

U.S.C. § 10101(a)(2)(B) (emphasis added).  In other words, denying the statutory right to vote

based on an error or omission that disqualifies a voter from only a single election violates
Section 101.  This language cannot reasonably be interpreted to mean Congress forbade denying
the right to vote only for errors that affect whether the voter is qualified "to register," or to vote
"in elections generally," as Intervenor-Defendants' interpretation would have it.  Third, the
definition of "vote" that Congress mandated be applied when interpreting Section 101 "includes
all action necessary to making a vote effective including, *but not limited to*, registration . . .
casting a ballot, and having such ballot counted and included in the appropriate totals of votes
cast . . . in *an* election."  52 U.S.C. § 10101(a)(3)(A), (e) (emphasis added).  Once again, this
language makes clear that the "right to vote" is evaluated on an election-by-election basis and
forecloses the argument that Section 101 applies only to initial registrations.

Similarly, the text specifies that Section 101 applies at more stages than just the
registration process.  As Intervenor-Defendants anticipated, the statutory definition of "vote"
controls.  Congress defined that right to include "all action necessary to make a vote effective
including, but not limited to, registration or other action required by State law prerequisite to
voting, casting a ballot, and having such ballot counted and included in the appropriate totals,"
52 U.S.C. § 10101(e).  Intervenor-Defendants have no answer for Congress's words except for
the bald assertion that "the question is not, as Plaintiffs argue, whether the identification-number
requirements result in a ballot not being 'counted.'"  Int.-Def. Br. 16.  But that is exactly the
question; the statute makes it so.  The Supreme Court reaffirmed this just weeks ago, when it
interpreted a nearly identical definition of "vote" in the Voting Rights Act of 1965, 52 U.S.C.
§ 10310(c)(1),[10] as "broad language" and rejected giving it a "crabbed reach."  *Allen v. Milligan*,

---

[10] "The terms 'vote' or 'voting' shall include all action necessary to make a vote effective in any
primary, special, or general election, including, but not limited to, registration, listing pursuant to

No. 21-1086, 559 U.S. ---, 2023 WL 3872517, at *20 (June 8, 2023).  Thus, that the statutorily

defined right to vote includes the right to have one's ballot counted is not merely what "Plaintiffs

argue," Int.-Def. Br. 16—it is what Congress directed, *see* 52 U.S.C. § 10101(e).  "When a

statute includes an explicit definition of a term, [courts] must follow that definition, even if it

varies from a term's ordinary meaning."  *Van Buren v. United States*, 141 S. Ct. 1648, 1657

(2021) (quoting *Tanzin v. Tanvir*, 141 S. Ct. 486, 490 (2020)) (internal quotation marks omitted).

     Inserting the relevant portion of the statutory definition of "vote" in the relevant place

where the term "vote" appears in Section 101 removes all doubt:

> No person acting under color of law shall . . . deny the right of any individual to
> [cast[] a ballot, and hav[e] such ballot counted and included in the appropriate totals
> of votes cast with respect to candidates for public office and propositions for which
> votes are received in an election] because of an error or omission on any record or
> paper relating to any application, registration, or other act requisite to voting, if
> such error or omission is not material in determining whether such individual is
> qualified under State law to vote in such election.

52 U.S.C. §§ 10101(a)(2)(B), (e).  The statutory definition of "vote" also explicitly

"include[es]," but is "*not limited to*, registration or other action required by State law prerequisite

to voting . . . ."  52 U.S.C. § 10101(e) (emphasis added).  And Congress's description of

registration as an act "*prerequisite* to voting" in its definition of "vote" that applies to Section

101 differs meaningfully from its use of the less-limited phrase "*requisite* to voting" in Section

101 itself.  *See Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (describing presumption

that congressional variations in language within the same statute are intentional); *compare* 52

---

this chapter, or other action required by law prerequisite to voting, casting a ballot, and having
such ballot counted properly and included in the appropriate totals of votes cast with respect to
candidates for public or party office and propositions for which votes are received in an
election."  52 U.S.C. § 10310(c)(1); *see also* S. Rep. No. 89-162, at 31 (1965), *reprinted in* 1965
U.S.C.C.A.N. 2508, 2569 ("The definition makes clear that [the Voting Rights Act] extends . . .
to all actions connected with registration, voting and having a ballot counted.").

U.S.C. § 10101(a)(2)(B) *with id.* § 10101(e).  The difference shows Congress knew how to craft statutory text that described initial acts like registration (that is, *prerequisite* to voting), and acts that are required to be able to vote at any stage, including after registration (that is, *requisite* to voting).  In drafting Section 101, it employed the latter.  Accordingly, Section 101 "by definition includes not only the registration and eligibility to vote, but also the right to have that vote counted."  *Ford v. Tenn. Senate*, No. 06-2031, 2006 WL 8435145, at *11 (W.D. Tenn. Feb. 1, 2006).

**B.      SB 1 Denies Individuals the Statutory Right to Vote Under Section 101 By Requiring Officials to Reject ABBMs and Completed Ballots.**

In another attempt to scope down Section 101 further than its plain language, Intervenor-Defendants argue that SB 1's ABBM denial and ballot rejection regime does not "deny the right of any individual to vote."  Int.-Def. Br. 9-11.  They rely on a purported distinction between "denying the right of any individual to vote" as described in Section 101 on the one hand, and "imposing mandatory rules on the act of requesting and casting a ballot" on the other.[11]  Int.-Def. Br. 9 (alterations omitted).  They also argue that the opportunity to cure rejected applications and carrier envelopes means a rejection does not "deny the right of any individual to vote."  *Id.* These atextual arguments fail.

Intervenor-Defendants' proposed distinction between "mandatory rules on the act of requesting and casting a ballot" and denials of the right to vote is illusory.  Neither Section 101's text nor logic explains why "mandatory rules" for being able to vote an effective ballot and

---

[11] "Mandatory rules" is not a term used in Section 101.  As Intervenor-Defendants use it, it appears indistinguishable from saying "state law."  At any rate, "mandatory rules"—however defined—are covered by Section 101 when they involve a paper or record requisite to voting. *See Pa. State Conf. of the NAACP*, 2023 WL 3902954, at *6 (rejecting argument that paperwork requirements on mail ballot envelopes are "mandatory rules" not subject to Section 101).

"denials of the right to vote" would be exclusive categories, or why a "mandatory rule"—or state law—cannot deny the statutory right to vote.  *See* 52 U.S.C. § 10101(a)(2)(B) (prohibiting denying the right to vote in "any" election based on an error on "any" paper or record requisite to voting).  A "mandatory rule" imposed by state law that requires officials to withhold or reject a ballot based on immaterial paperwork errors violates Section 101.

Intervenor-Defendants contend that SB 1 evades Section 101 because voters whose mail ballot materials are rejected "remain[] qualified, eligible, and registered to vote in the upcoming election (and future elections)."  Int.-Def. Br. 9.  But Section 101's protections do not take flight just because state law holds out the possibility that a voter may not be denied the statutory right to vote in a future election.  Allowing officials to achieve election-by-election what they are forbidden from doing categorically would be cold comfort to voters.  Congress defined the right to "vote" to include the right to "cast[] a ballot, and hav[e] such ballot counted and included in the appropriate totals of votes cast."  52 U.S.C. § 10101(e); *see Pa. State Conf. of the NAACP*, 2023 WL 3902954, at *6 (applying this definition and rejecting argument "mandatory rules" are not subject to Section 101).  That SB 1 does not deny the right to vote in perpetuity is irrelevant.

Trying another tack, Intervenor-Defendants contend that SB 1 does not "deny the right of any individual to vote" because some rejected voters can attempt to vote after their application or ballot is rejected.  Int.-Def. Br. 9-10.  But this is another distinction without a legal difference. Section 101 restricts officials from denying the statutory right to vote.  52 U.S.C. § 10101(a)(2)(B).  That denial occurs when the official rejects a mail ballot application or mail ballot.  Section 101 "does not say that state actors may initially deny the right to vote based on errors or omissions that are not material as long as they institute cure processes."  *La Unión del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 541 (W.D. Tex. 2022); *see also Vote.org v. Ga.*

*State Election Bd.*, No. 1:22-cv-1734, 2023 WL 2432011, at *7 (N.D. Ga. Mar. 9, 2023)

(rejecting the "argument that the opportunity to cure an error rehabilitates any potential

violation"); *Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1282

(N.D. Ga. 2021) (same).  SB 1 requires officials to reject the ABBM or ballot when there is an

error or omission in writing a DPS Number or SSN4.  *See* Tex. Elec. Code §§ 86.001(f),

87.041(b)(8).  The Section 101 violation occurs upon that rejection.  *See* U.S. Mot. Summ. J. 13-

14.

 And aside from being legally irrelevant, the formal ability to cure mail ballot materials is

no panacea.  Not all voters can effectively use cure procedures.  Intervenor-Defendants

mischaracterize voters who are unable to cure as "declin[ing] this opportunity" to cure, Int.-Def.

Br. 10.  Of course, nothing supports that conclusory generalization.  And the record shows that

the failure to cure is often not a choice.  Texas's cure procedure gives voters limited time to

supply the same information that matches their record in Texas's voter registration database, and

some voters will receive notice of a rejection and opportunity to cure too late.  SUF ¶¶ 202, 204.

Others misunderstand the rejection communication or are otherwise unable to use Texas's cure

procedures to vote after rejection of a mail ballot application or mail ballot.  SUF ¶ 186.  And

many voters are unable to write a DPS Number or SSN4 matching Texas's voter registration

records no matter how many opportunities they are given because Texas's registration database

records do not match the DPS Number in their possession or their SSN4, or the database does not

contain these numbers at all and requires correction before the voter can make even a potentially

fruitful attempt to comply with SB 1.  *See* U.S. Mot. Summ. J. 3-4.  Thus, even if cure

procedures were relevant (and they are not), they fail to preserve Section 101's statutory right to

vote.  *See also* U.S. Mot. Summ. J. 14-16.

With respect to in-person voting, the record establishes that there will always be voters for whom mail voting presents their only opportunity to vote, and for whom rejection of mail ballot materials fully denies them the ability to vote in that election.  *See* U.S. Mot. Summ. J. 12. Texas extends the franchise by mail specifically to categories of voters for whom in-person voting would generally be more difficult or impossible—and some of these voters, such as voters with disabilities, must certify that appearing in person would be difficult or dangerous.  Supp. SOF ¶ 210.  Members of the military, military family members, and overseas citizens also rely on mail voting to be able to vote at all.  SUF ¶ 199.  For these voters, the opportunity to vote in person is illusory.

In sum, SB 1 violates Section 101.  Intervenor-Defendants identify no facts to disturb that conclusion, let alone to demonstrate affirmatively that it does not do so.  Summary judgment for State Defendants and Intervenor-Defendants should be denied.

### C.    Section 101 Prohibits Denying the Statutory Right to Vote Based on Any Immaterial Error or Omission on a Covered Paper or Record.

Intervenor-Defendants concede that writing a DPS Number or SSN4 is not material to determining a voter's qualifications.  *See* Int.-Def. Br. 13.  That should end the inquiry.  But they assert another array of arguments to try to evade Section 101 by suggesting that, despite the conceded immateriality of this information, the statute does not capture it because DPS numbers and SSN4s are not used to *determine* whether an individual is qualified to vote.  This twisting of Section 101's concept of materiality would at best recast Section 101 contrary to Congress's plain words, and at worst gut it.  Because their arguments collide with the federal statute's plain text, they must be rejected.

For instance, Intervenor-Defendants argue that Section 101 requires that the error or omission also "*affect* a determination whether such individual is qualified under State law to

vote."  Int.-Def. Br. 11 (internal quotation marks and alteration omitted) (emphasis added).

Under this novel theory, election officials can deny the statutory right to vote based on an

immaterial error or omission *so long as* the official refuses only to permit the voter to cast a

ballot or to count a voter's ballot, and does not separately refuse or cancel the voter's

registration.  This gloss is foreclosed by Section 101's text.  Section 101 "is implicated when a

ballot is not counted because of an error on voting-related paperwork that is *not material* to

determining qualifications of the voter."  *Pa. State Conf. of the NAACP*, 2023 WL 3902954 at *7

(emphasis added); *see also* 52 U.S.C. § 10101(a)(2)(B).  An error is "not material" to

qualifications when it is unrelated to whether a voter is qualified to vote; the statute imposes no

additional requirement that there must be an additional determination about *whether* the voter is

qualified downstream of their ballot being rejected.  Contrary to this straightforward principle,

Intervenor-Defendants would freely allow officials to discard a ballot based on immaterial

paperwork errors—the very thing the statute forbids.  And nowhere does the federal statute say

that the "paper or record relating to any application, registration, or other act requisite to voting,"

52 U.S.C. § 10101(a)(2)(B), is limited to those designed to determine a voter's qualifications.

*Cf. Milligan*, 2023 WL 3872517, at *20 (rejecting attempt to limit meaning of "procedure" in

Voting Rights Act because separate statutory phrase "qualification or prerequisite to voting"

preceded it).  These attempts to graft additional requirements to Section 101 miss the mark.  *See*

*Catalyst Pharms., Inc. v. Becerra,* 14 F.4th 1299, 1309 (11th Cir. 2021) ("[W]e are not allowed

to add or subtract words from a statute; we cannot rewrite it."), *cert. dismissed sub nom. Jacobus*

*Pharm. Co. v. Catalyst Pharms*., 142 S. Ct. 2904 (2022).  It should accordingly come as little

surprise that another district court rejected this exact approach earlier this month.  *See Pa. State*

*Conf. of the NAACP*, 2023 WL 3902954 at *7 (describing interpretation limiting Section 101's

20

application to qualification determinations as "too narrow" and rejecting argument that Section 101 covers only these errors or omissions).

Intervenor-Defendants next argue that the Materiality Provision applies solely to errors or omissions made when submitting information requested for the purpose of determining *initial* qualifications, citing separate subsections (A) and (C) of Section 101 for support. *See* Int.-Def. Br. 12. This argument, too, fails. It elides the Materiality Provision's text, which Intervenor-Defendants implicitly acknowledge: they would have no need to import language from other provisions if the Materiality Provision said what they wanted. And it is hardly remarkable that Congress targeted different issues in different statutory subsections using different language, as it did here. Subsection (A) provides that "No person acting under color of law shall in determining whether any individual is qualified to vote under State law or laws to vote in any election," apply practices or procedures that differ from those applied to other qualified voters. 52 U.S.C. § 10101(a)(2)(A). Congress's use of the phrase "in determining whether any individual is qualified to vote under State law," *id.*, merely shows that Congress used different language specifically to target determinations of voter qualifications in subsection (A). Congress omitted that language in the Materiality Provision of subsection (B)—which of course it was entitled to do. Likewise, subsection (C) prohibits the use of literacy tests "as a qualification for voting" except in specified circumstances. 52 U.S.C. § 10101(a)(2)(C). Again, Congress showed it knew how to target qualifications to reflect its intent. "Where Congress includes particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp.*, 508 U.S. at 208 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)) (internal quotation marks and alteration omitted).

Intervenor-Defendants also claim that Section 101 applies only where the error or omission is related to one of the qualifications under state law to vote.  *See* Int.-Def. Br. 11-12. This argument would effectively repeal Section 101.  Information sought that is related to determining state-law qualifications is, by definition, material "in determining whether such individual is qualified," 52 U.S.C. § 10101(a)(2)(B).  As such, they fall *outside* the statute's scope.  Intervenor-Defendants argument would turn the statute upside down.  They interpret Section 101 to cover a null set of errors or omissions:  if the error is not material to determining qualifications, they argue it falls *outside* Section 101's ambit, and if an error is material to determining qualifications, denying the statutory right to vote based on that error would be permissible.  But the statute commands otherwise.  Intervenor-Defendants' bid to end-run federal law should be rejected.  *See Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939-40 (2022) (rejecting statutory interpretation that would leave "whole provisions without work to perform"); *Prudencio v. Runyon*, 3 F. Supp. 2d 703, 707 (W.D. Va. 1998) (rejecting argument derived "not from a reading of Congressional intent, but from semantic sleight-of-hand.").

### D.    Texas's Mail Ballot Restrictions Violate Section 101.

Having established Section 101's applicability to SB 1, that SB 1 violates Section 101 follows from the statute's plain text*.  See United States v. Dison*, 573 F.3d 204, 207 (5th Cir. 2009) ("When the plain language of a statute is unambiguous and does not lead to an absurd result, [a court's] inquiry begins and ends with the plain meaning of that language." (internal quotation marks omitted)).  It forbids any "person acting under color of law" from denying the right of "any individual to vote in any election" based on an error or omission on "any record or paper relating to any application, registration, or other act requisite to voting," where the error or omission is "not material in determining whether such individual is qualified under State law to vote in such election."  52 U.S.C. § 10101(a)(2)(B); *see also Migliori*, 36 F.4th at 162-63.  The

term "vote" as used in this provision is expansive. It "includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast . . . in an election." 52 U.S.C. § 10101(a)(3)(A), (e); *see also Pa. State Conf. of the NAACP*, 2023 WL 3902954, at *6; *Vote.org v. Ga. State Election Bd.*, 2023 WL 2432011, at *6. Section 101 thus bars officials from denying the ability to cast an effective ballot solely because of a paperwork error that is not material to whether that person is qualified to vote.

Each element of a Section 101 violation—(1) denial of any individual's statutory right to vote in any election, (2) because of an error or omission, (3) that is not material to determining a voter's qualifications to vote under state law, (4) on a paper or record, (5) that is related to any application, registration, or other act requisite to voting—is present every time a Texas voter's mail ballot application or mail ballot is rejected because of SB 1. *See* U.S. Mot. Summ. J. 8-25. First, SB 1 requires election officials to "reject" a mail ballot application if the DPS Number or SSN4 does not match Texas's voter registration database. Tex. Elec. Code § 86.001(f). If an application is rejected, the voter is denied the ability to cast a mail ballot. SUF ¶ 36. Similarly, the law directs county officials that a mail ballot "may be accepted only if" the DPS Number or SSN4 written on the carrier envelope matches Texas's voter registration database. Tex. Elec. Code § 87.041(b)(8). A rejected mail ballot is not counted, SUF ¶ 70, and the statutory right to vote is therefore denied. Second, the voter's failure to write a DPS Number or SSN4 that matches voter registration records is an "error or omission" on the application or carrier envelope. Third, as Intervenor-Defendants concede, those numbers are not material to determining an individual's qualifications to vote. *See* Int.-Defs.' Br. 13 (admitting that it is

"entirely correct" that writing ID numbers on ballots materials is "not material").  Fourth, ABBMs and carrier envelopes are each a "record or paper."  52 U.S.C. § 10101(a)(2)(B).  And finally, for any Texas voter voting by mail, these records are related to an "act requisite to voting," *id.*, because these forms are required for the mail voter to receive their ballot and have it counted.  An ABBM is also an "application" as that term is expressly used in the Section 101.  Nothing more is required to demonstrate the Section 101 violation, and summary judgment for Intervenor-Defendants and State Defendants therefore must be denied.

## II.   Intervenor-Defendants' Concerns About Section 101's Scope Are Meritless.

Intervenor-Defendants raise a host of arguments suggesting that applying Section 101 as it is written would have absurd or unintended consequences.  None is persuasive, let alone enough to overcome the presumption that courts should apply Congress's plain meaning when interpreting a statute.  *See supra* Part I.D.

First, Intervenor-Defendants raise the specter that applying Section 101 to cover SB 1 would require a "breathtakingly broad" interpretation because it would constrain states from enacting any "mandatory rules" that deny the statutory right to vote to a voter based on errors or omissions that do not "implement the requirements for determining whether an individual is an eligible voter."  Int.-Def. Br. 14 (internal quotations marks and alterations omitted).  But their fear that prohibiting officials from denying the right to vote based on immaterial paperwork errors or omissions would have such dramatic consequences does not bear scrutiny.  In fact, Intervenor-Defendants do not identify any substantial category of immaterial errors or omissions on a paper or record that they contend ought to serve as a valid basis for denying the vote but is blocked by Section 101.

Intervenor-Defendants muster only two examples of requirements in Texas that they think would be undercut, and neither supports their argument.  First, as to Texas's signature

requirement, the United States does not challenge the materiality of a signature and any questions about its materiality must be decided elsewhere.  Nevertheless, it is relevant that the signature requirement does establish material information—a voter's signature on a mail ballot application "certif[ies] that the information given in this application is true, and [they] understand that giving false information in this application is a crime," Tex. Elec. Code § 84.011(a)(1); SUF ¶ 24, and a voter's signature on a carrier envelope "certif[ies] that the enclosed ballot expresses my wishes independent of any dictation or undue persuasion by any person." Tex. Elec. Code § 86.013(c); SUF ¶ 54.  The carrier envelope also directs the voter, "do not sign this envelope unless the ballot has been marked by you or at your direction."  Tex. Elec. Code § 86.013(e).  The signatures on these records thus certify the voter's eligibility to cast a mail ballot (at the ABBM stage), and that the enclosed ballot is valid, legally sound, and was voted by the eligible voter (at the carrier envelope stage).  *See* Supp. SOF ¶¶ 214-215 (Expert Report of Tammy Patrick) ("A signature or identifying mark is something that voters inherently have the ability to provide without it having to be provided to them [and] . . . a voter will not misstate their own signature.  A signature is the typical means for a voter to certify the accuracy of the rest of the information they put on an application or carrier envelope.").  It is also worth noting that Intervenor-Defendants' argument depends on the premise that a signature is not material, which the Texas Office of the Attorney General plainly does not believe—that office already has argued a signature is material to the Fifth Circuit.  *See Vote.Org v. Callanen*, 39 F.4th 297, 306 (5th Cir. 2022) (granting stay pending appeal) ("[D]efendants argue that the wet signature requirement is material in determining whether an individual is qualified to vote.").

Second, Intervenor-Defendants incorrectly claim that Section 101 cannot apply across the voting process because that would nullify prohibitions on counting overvotes—the rule that a

ballot marked for two candidates for a single legislative seat will not be counted for that contest at all.  *See* Tex. Elec. Code § 65.011; Int.-Def. Br. 14.  But affording each voter only the allotted number of votes per contest does not deny the statutory right to vote.  Although Section 101 protects the right to have a "ballot" counted, that right denotes inclusion "in the appropriate totals of votes cast with respect to candidates for public office and propositions."  52 U.S.C. § 10101(e).  Faced with a completed and cast anonymous ballot marked for too many candidates, nothing in Section 101 prevents an election official who cannot determine the voter's preference from treating the ballot as unmarked in that particular contest.  To do otherwise would grant the voter additional votes.[12]  Thus, consistently with other provisions of federal law, a complete "ballot" that contains overvotes is still "cast and counted," *id.* § 21081(a)(1)(A)(iii)(III) (Help America Vote Act), even if the ballot effectively assigns no votes for an overvoted office, *see id.* § 21081(a)(1)(A)(iii)(II)-(III) (distinguishing "the effect of casting multiple votes for" an office from casting and counting a "ballot").

Whether the other state statutes raised by Intervenor-Defendants might violate Section 101 is not at issue here and has no bearing on the materiality of SB 1's requirements.  But even a cursory examination suggests that Intervenor-Defendants' fears are significantly overstated.  For instance, failure to use a secrecy envelope where one is provided, *see, e.g.*, Fla. Stat. § 101.64, is not an error or omission *on* a paper or record, making Section 101 inapplicable.  With respect to the pollbook requirements and voter-assistance forms, two of the cited statutes do not appear to impose any paperwork requirements on voters.  *See* Va. Code § 24.2-611 (requirement for

---

[12] In other words, in an overvote situation, officials cannot "include[]" the sole vote to which the voter is entitled "in the appropriate total[]" for one candidate because there is no way of knowing for which candidate the voter actually cast their vote.  52 U.S.C. § 10101(e).  Thus, there is no way to "make [that] vote effective."  *Id.*

election workers); Tex. Elec. Code § 63.003 (requirements for election workers).  The other pollbook requirement applies only to in-person signature of a voter certificate and residence address verification, which presents no materiality concerns.  *See* 25 Pa. Cons. Stat. § 3050.  The voter-assistance statute likewise does not describe any circumstance where a voter is denied Section 101's statutory right to vote, let alone where that denial is based on a paperwork error not material to a voter's qualifications.  *See* 25 Pa. Cons. Stat. § 3058.  In sum, despite raising alarms about Section 101's breadth, Intervenor-Defendants have raised hardly any circumstance where Section 101 stands as a broad obstacle to state regulation of elections.[13]

Intervenor-Defendants' separate contention that Section 101 must be interpreted more narrowly than its text as a matter of constitutional avoidance, Int.-Def. Br. 15-16, is also meritless.  First, "the canon of constitutional avoidance has no application in the absence of statutory ambiguity."  *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 494 (2001); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018).  Where, as here, the statute is clear, avoidance is inapt.  Even if avoidance were a proper consideration, Intervenor-Defendants concede that "Congress marshalled evidence of racially discriminatory practices" in enacting Section 101, Int.-Def. Br. 16.  They are correct.  *See, e.g.*, H.R. Rep. No. 88-914, pt. 1 (1963),

---

[13] *Amicus* Lawyers Democracy Fund also cites some mail ballot statutes that it claims have restrictions comparable to or stricter than those in SB 1.  *See* Br. of Lawyers Dem. Fund as *Amicus Curiae*, ECF No 623.  The Fund does not suggest this comparative analysis is relevant to Section 101.  It is not.  Furthermore, it appears that at least some of these statutes do not require rejections for a mismatch in providing a required number.  *See* Minn. Stat. § 203B.121(2)(b)(3) (officials must match signatures if numbers do not match) (Supp. SOF ¶ 217); Va. Code § 24.2-701(C)(1) (SSN4 requirement interpreted by at least one county to require giving officials discretion to compare signature instead under state analogue to Section 101, *see* Va. Code § 24.2-706(B); Def. Konopasek's Opp. to Pl.'s Mot. for Decl. & Inj. Relief, *Va. Inst. for Pub. Policy v. Konopasek*, No. CL2021-14420 (Va. Cir. Ct. Fairfax Cnty. Oct. 27, 2021)); Supp. SOF ¶ 216.  A hypothetical Section 101 challenge to a statute not before this Court would need to be decided with a developed record and specific analysis.

*reprinted in* 1964 U.S.C.C.A.N. 2391, 2394 (1963); 110 Cong. Rec. 1593 (1964) (statement of Rep. Farbstein).  Nevertheless, Intervenor-Defendants suggest that Congress could constitutionally solve this problem only on registration forms.  As enacted in the Civil Rights Act of 1964, Section 101 applied only to federal elections.  *See* Civil Rights Act of 1964, Pub. L. No. 88-352, § 101, 74 Stat. 241, 241 (1964).  Its enactment was supported by both Congress's "paramount" authority under the Elections Clause, *Arizona* v. *Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013), and its express power to enforce the Reconstruction Amendments, *see* U.S. Const. amend. XIV, § 5; *id.* amend. XV, § 2.  The subsequent expansion of Section 101 to cover state and local elections was fully supported by Congress's enforcement powers under the Reconstruction Amendments.  *See* Voting Rights Act of 1965, Pub. L. No. 89–110, § 15(a), 79 Stat. 437, 445 (1965).  When legislating pursuant to its Fifteenth Amendment powers, "Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting."  *South Carolina* v. *Katzenbach*, 383 U.S. 301, 324 (1966).  These "rational means" surely are not limited to solving a problem—disenfranchisement based on immaterial errors on voting paperwork—on a form-by-form basis.  After Congress identified and established a record of this problem, it was not limited to crafting a solution with an obvious loophole allowing officials to use different forms in the same way, and for the same purpose.  *See, e.g.*, *id.* at 309 (describing "voluminous legislative history" addressing "unremitting and ingenious defiance of the Constitution").

## CONCLUSION

For the foregoing reasons, this Court should deny State Defendants' and Intervenor-Defendants' motions for summary judgment.

Date:  June 23, 2023

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

*/s/ Michael E. Stewart*
T. CHRISTIAN HERREN, JR.
RICHARD A. DELLHEIM
DANIEL J. FREEMAN
DANA PAIKOWSKY
MICHAEL E. STEWART
JENNIFER YUN
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
michael.stewart3@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2023, I electronically filed the foregoing with the Clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

*/s/ Michael E. Stewart*
Michael E. Stewart
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530
(202) 307-2767
michael.stewart3@usdoj.gov