**United States' Supplemental Summary Judgment Exhibit Index**

*LUPE v. Abbott*, No. 5:21-cv-844

| Ex. | Bates Number (if applicable) | Perma.cc Link (if applicable) | Description |
|---|---|---|---|
| 107 | | https://perma.cc/3NNV-PT7U | Tex. Sec. of State, *Voting by Mail*, Votetexas.gov |
| 108 | | https://perma.cc/KK5L-HKQ4 | Excerpt from Revised Civil Statutes of the State of Texas (1925), art. 2956 |
| 109 | STATE115626 | https://perma.cc/XB86-8FVE | Tex. Sec. of State, *Notice of Rejected Ballot* (Form 8-15) |
| 110 | | https://perma.cc/6YMT-B9EU | Tex. Office of the Att'y Gen., *Op. No. KP-0411*, (Aug. 17, 2022) |
| 111 | | | Tammy Patrick, *Voting Assistance & Vote by Mail* |
| 112 | | https://perma.cc/45WB-ZRSH | Def. Konopasek's Opp. To Pl.'s Mot. for Decl. & Inj. Relief, *Va. Inst. For Pub. Policy v. Konoasek*, No. CL2021-14420 (Va. Cir. Ct. Fairfax Cnty. Oct. 27, 2021) |

# EXHIBIT 107

votetexas.gov - Voting by Mail

🔲 **Mobile Version** | **Contact** | **En Español**



```
Search          Go
```

## Voting by Mail

**To vote by mail, you must provide ONE of the following numbers on your ballot by mail (ABBM) and your mail ballot carrier envelope:**

- Texas Driver's License, Texas Personal Identification Number or Election Identification Certificate Number issued by the Texas Department of Public Safety (NOT your voter registration VUID number); OR the last 4 digits of your Social Security Number.

   

If you have not been issued a Texas Driver's License, Texas Personal Identification Number, Texas Election Identification Certificate Number or a Social Security Number, you must indicate so by checking the appropriate box on the ABBM or carrier envelope.

¹For voters aged 18–69 years, photo ID can be expired for up to four years. For voters aged 70 and older, photo ID can be expired for any length of time if otherwise valid.
²The Texas Election ID Certificate is a free photo ID issued by DPS for voting purposes. The number on this ID is NOT your Voter Unique Identifier (VUID) on the voter registration card you receive in the mail. Your VUID is NOT required information on either your ABBM or mail ballot carrier envelope.

Voting by mail in Texas has been available to elderly voters and voters with physical disabilities for decades. Remember, however, that many of the legal safeguards designed to protect voters and their ballots are impossible to enforce in the privacy of the voter's home. Here are a few tips that may prove helpful:

- Call your local or county office holding the election and request that an application to vote by mail be sent to you, or download the application here (PDF).
- **To vote by mail, you must provide ONE of the following numbers on your ABBM: (1) Texas Driver's License, Texas Personal Identification Number or Election Identification Certificate Number issued by the Texas Department of Public Safety (NOT your voter registration VUID number); OR (2) If you have not been issued one of the numbers above, the last 4 digits of your Social Security Number. If you have not been issued a Texas Driver's License, Texas Personal Identification Number or Texas Election Identification Certificate Number or a Social Security Number, you must indicate so by checking the appropriate box on the ABBM.**
- If you need help filling out the form or mailing it, ask someone you trust to help you. Your helper's name and address must be written next to your signature and they must sign the application.
- Address your application to the Early Voting Clerk. Applications mailed to an address other than the Early Voting Clerk may be rejected.
- Send your application for a ballot by mail as early as 60 days before an election. This will give you plenty of time to receive your ballot, mark it, and mail it back to the Early Voting Clerk. All applications to vote by mail must be received by the early voting clerk not later than the 11th day before election day by the close of regular business or 12 noon, whichever is later.

Applications to vote by mail must be submitted in person or by mail, email, common or contract carrier, or fax (if a fax machine is available in the office of the early voting clerk).

- If you are voting by mail because you are disabled or are 65 years of age or older, you may use a single application to request ballots by mail for all county elections in the calendar year. While you can submit this "annual" application anytime during the calendar year, it must be received at least 11 days before the first election in which you seek to request a ballot by mail.

- Generally, a ballot must be mailed to the address where you are registered to vote. However, if you are 65 or older or have a physical disability, you may have your ballot sent to a hospital, nursing home or long-term care facility, retirement center, or relative, but you must check the blank on the form indicating which address you are providing. If your reason for voting by mail is absence from the county, the ballot must be mailed to an address outside the county.

- If you need help reading, marking, or mailing the actual ballot, ask a trusted relative or friend for help. It's not uncommon for someone from a political organization to offer to help with your ballot soon after you've received it. We recommend you decline this kind of help for several reasons. If you allow your ballot to be mailed by someone you don't know, it might not be mailed at all. If it's delivered to the elections office by a common or contract carrier from the address of a candidate or a campaign's headquarters, your ballot will be rejected.

- Finally, if someone helps you with your mail ballot, you must put your helper's name and address on the carrier envelope, which is the one used to return your ballot to the early voting clerk. Your helper must also sign the carrier envelope.

**Switch to Mobile Site**

# EXHIBIT 108

# Texas Historical Statutes Project

## 1925
## CONSTITUTION
## OF THE
## UNITED STATES AND TEXAS



This project was made possible by the
**Texas State Law Library**
and a grant from the
**Litigation Section of the State Bar of Texas**

# Revised Civil Statutes

## *of the*

# State of Texas

A BILL to be entitled "An Act to Adopt and Establish the 'REVISED CIVIL STATUTES of the State of Texas.'"

*WHEREAS, It is expedient that the General Civil Statutes of this State should be arranged in appropriate titles, chapters and articles, and that the whole should, as far as practicable, be made concise, clear and consistent; therefore,*

*Section 1.   BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:*
*That the following titles, chapters, subdivisions and articles shall hereafter constitute*

# THE
# REVISED CIVIL STATUTES

### OF THE

# STATE OF TEXAS

## TITLE 1.

### GENERAL PROVISIONS.

|  | Article |
|---|---|
| Common Law | 1 |

Art. 1.  [5492] [3258]  **Common law.**—The common law of England, so far as it is not inconsistent with the Constitution and laws of this State, shall together with such Constitution and laws, be the rule of decision, and shall continue in force until altered or repealed by the Legislature.

### SPECIAL LAWS.

| | Article | | | Article |
|---|---|---|---|---|
| Special laws: notice | 2 | | Where applicant is a non-resident | 6 |
| If no newspaper is published | 3 | | Details unnecessary | 7 |
| Notice for each county | 4 | | Proof of publication | 8 |
| Affecting persons | 5 | | Proof of posting | 9 |

Art. 2.  [5494] [3260]  **Special laws: notice.**—Any person intending to apply for the passage of any local or special law shall give notice of such intention by having a statement of the substance of such law published in some newspaper published In the county embracing the locality to be affected by said law, at least once each week for the period of thirty days prior to the introduction into the Legislature of such contemplated laws. [Const. Art. 3, Sec. 57; Acts 1876, p. 7; G. L. Vol. 8, p. 843.]

Art. 3.  [5495] [3261]  **If no newspaper published.**—If no newspaper is published in said county, a written copy of such statement shall be posted at the court house door and in five other public places in the immediate locality to be affected thereby in said county, for thirty days, and such notice shall accurately define the locality to be affected by said law.   [Id.]

Art. 4.  [5496] [3262]  **Notice for each county.**—Where the locality to be affected by said law shall extend beyond the limits of any one county, such notice shall be given for each county to be affected.

Art. 5.  [5497] [3263]  **Affecting persons.** — Whenever any person intends applying for the passage of a special law which shall affect persons chiefly, and not directly affect any particular locality more than others, such persons, if residing in this State, shall make publication of notice of such intention in the county of the residence of such person in the same manner as if the said law was to affect such locality.   [Const. Art. 3, Sec. 2.]

1.  Persons under twenty-one years of age.
2.  Idiots and lunatics.
3.  All paupers supported by the county.
4.  All persons convicted of any felony, except those restored to full citizenship and right of suffrage, or pardoned.
5.  All soldiers, marines and seamen employed in the service of the army or navy of the United States. [Acts 1st C. S. 1905, p. 520.]

Art. 2955.   [2939]   **Qualifications for voting.**—Every person subject to none of the foregoing disqualifications who shall have attained the age of twenty-one years and who shall be a citizen of the United States, and who shall have resided in this State one year next preceding an election, and the last six months within the district or county in which he or she offers to vote, shall be deemed a qualified elector.  The electors living in an unorganized county may vote at an election precinct in the county to which such county is attached for judicial purposes; provided that any voter who is subject to pay a poll tax under the laws of this State or ordinances of any city or town in this State, shall have paid said tax before offering to vote at any election in this State and holds a receipt showing that said poll tax was paid before the first day of February next preceding such election; and, if said voter is exempt from paying a poll tax and resides in a city of ten thousand inhabitants or more, he or she must procure a certificate showing his or her exemptions, as required by this title.  If such voter shall have lost or misplaced said tax receipt, he or she shall be entitled to vote upon making and leaving with the judge of the election an affidavit that such tax was paid by him or her, or by his wife or by her husband before said first day of February next preceding such election at which he or she offers to vote, and that said receipt has been lost or misplaced.  In any election held only in a subdivision of a county for the purpose of determining any local question or proposition affecting only such subdivision of the county, then in addition to the foregoing qualifications, the voter must have resided in said county for six months next preceding such election.  The provisions of this article as to casting ballots shall apply to all elections including general, special and primary elections. [Acts 1st C. S. 1905, p. 520; Acts 1st C. S. 1917, p. 62; Acts 4th C. S. 1920, p. 10; Acts 1921, p. 217; Acts 1923, p. 318.]

Art. 2956.   [2939]   **Absentee voting.**—Any qualified elector, as defined by the laws of this State, who expects to be absent from the county of his or her residence on the day of the election may vote subject to the following conditions, to-wit:   At some time not more than ten days nor less than three days prior to the date of such election such elector shall make his or her personal appearance before the county clerk of his or her residence, and if personally unknown to such clerk, shall be identified by at least two reputable citizens of such county, and shall deliver to such clerk his or her poll tax receipt or exemption

certificate, entitling him or her to vote at such election, and said clerk shall deliver to such elector one ballot which has been prepared in accordance with the law for use in such election which shall then and there be marked by said elector apart and without the assistance or suggestion of any person and in such manner as said elector shall desire same to be voted, which ballot shall be folded and placed in a sealed envelope and delivered to said clerk who shall keep same so sealed, and who shall also keep said poll tax receipt or certificate open to the inspection of any person who may wish to examine or see same until the second day prior to said election, and said clerk shall on said second day place the said poll tax receipt or certificate together with the said envelope containing said marked ballot, in another envelope which shall be by said clerk then mailed to the presiding judge of the voting precinct in which said elector lives.  Or at some time not more than twenty days nor less than ten days prior to the date of such election, such elector shall make his or her personal appearance before a notary public, and if personally unknown to such notary public, shall be identified by at least two reputable citizens, and shall deliver to such notary public his poll tax receipt or exemption certificate, entitling said elector to vote at such election, or if such elector shall have lost or misplaced his or her poll tax receipt, he or she shall be entitled to vote upon making affidavit that such poll tax was actually paid by him or her before said first day of February next preceding such election at which he or she offers to vote and that said receipt has been lost, or misplaced, and in such case the affidavit so made shall be sent by the officer administering the oath to the county clerk of the county in which such elector resides.  Such county clerk receiving the affidavit shall verify same by examining the poll tax records of the county wherein said elector resides, or where he claims his residence to be.  Said notary public shall mail same to the county clerk of the county of residence of such elector so named, and upon receipt of the poll tax receipt or exemption certificate, the county clerk shall mail to such elector one ballot which has been prepared in accordance with the law for use in such election under registered letter marked "Official ballot for such elector (giving elector's name) not to be opened except in the presence of a notary public," printed on outside of letter.  Such elector shall make oath before such notary public that such ballot was then and there marked by such elector apart and without assistance or suggestion of any other person, in such manner as said elector shall desire same to be voted, which ballot shall be folded and placed in a sealed envelope together with such affidavit which shall be marked on the outside of said envelope "Official ballot of such elector (giving elector's name)" and mailed by such notary public to the county clerk of the county wherein such elector votes, who shall keep same so sealed, and who shall also keep said poll tax receipt or certificate open to the inspection of any person who may wish to examine or see same

until the second day prior to said election, and said clerk shall on said day place the said poll tax receipt or certificate together with the said sealed envelope containing said marked ballot in another envelope which shall be by said clerk then mailed to the presiding judge of the voting precinct in which said elector lives. The postage for the entire correspondence herein made necessary shall be provided by said elector. In the presence of the election officers provided by law, and on the day of such election and between the hours of two and three o'clock the said presiding judge of same in the precinct of the residence of said elector shall open the envelope containing said poll tax receipts and marked ballots and publicly announce that the ballot of such named electors is proposed to be cast, at which time any person who desires to challenge said vote and the right of same to be cast, shall be heard to present such challenge, and if there be no challenge of same, said vote shall be cast and counted according to the law; and if there be any challenge of such vote, legal cause for same shall be heard and decided according to the law provided in the case of challenge. In case no challenge is made, such poll tax receipt, after same is marked "Voted" as provided by law, shall be mailed back to the said county clerk. But in case of challenge, if challenged, such poll tax receipt together with affidavits relating thereto shall be mailed by said judge of election to the county clerk of such county who shall keep same for thirty days and if no demand be made for the production of same before any body or persons in authority within said time, said county clerk shall deliver such receipt to the owners thereof. When voted, the judge of election shall mark opposite the name of such absentee voter the word "Absentee." The provisions of this article shall apply to all elections, including general, special and primary elections.   [Id.]

Art. 2957.   [2940]   **To vote in city elections.**—All qualified electors of this State, as described in the two preceding articles who shall have resided for six months immediately preceding an election within the limits of any city or incorporated town shall have a right to vote for mayor and all other elective officers; but, in all elections to determine the expenditure of money or assumption of debt, or issuance of bonds, only those shall be qualified to vote who pay taxes on property in such city or incorporated town.   [Acts 1st C. S. 1905, p. 521, Sec. 3.]

Art. 2958.   [2941]   **"Residence".**—The "residence" of a single man is where he usually sleeps at night; that of a married man is where his wife resides, or if he be permanently separated from his wife, his residence is where he sleeps at night; provided that the residence of one who is an inmate or officer of a public asylum or eleemosynary institute, or who is employed as a clerk in one of the departments of the government at the capitol of this State, or who is a student of a college or university, unless such officer, clerk, inmate or student has become a bona fide resident citizen in the county where he is employed, or is such student, shall be construed to be where his home was before

# EXHIBIT 109

8-6

Prescribed by Secretary of State
Sec. 87.0431, Texas Election Code
1/2022

# NOTICE OF REJECTED BALLOT

This is to serve as notice that your ballot for the _____Election was finally rejected by the Early Voting Ballot Board and was not counted.  If you believe that your Ballot by Mail was rejected in error, please contact your Early Voting Clerk to determine what remedies may be available to you.

Name of Voter _____        VUID Number_____

**The Early Voting Ballot Board has placed a checkmark next to the reason that your ballot was rejected and not counted**

_____ 1.    Voter registration records indicate that the voter was deceased prior to the Carrier Envelope's postmark or receipt from a common or contract carrier.

_____ 2.    Our records indicate that you voted by personal appearance in the same election.

_____ 3.    It was determined that the signatures on the Application for Ballot by Mail and Carrier Envelope were not signed by the same person.

_____ 4.    Your Carrier Envelope was not signed or you did not make your mark.

_____ 5.    The Witness portion of your Carrier Envelope was not properly executed
            _____ The witness failed to indicate on the envelope that you could not make a mark.
            _____ The witness failed to print his or her name.
            _____ The witness failed to sign his or her name.
            _____ The residence address of the witness was not given.

_____ 6.    The Assistant portion of your Carrier Envelope was not properly executed.
            _____ The assistant failed to print his or her name.
            _____ The assistant failed to sign his or her name.
            _____ The residence address of the assistant was not given.
            _____ The assistant failed to indicate whether he or she received compensation or other benefit from a candidate, campaign or political committee.

_____ 7.    Voter registration records indicated you did not have an effective registration for this election.

_____ 8.    You indicate you are voting by mail due to expected absence from the county, but you did not provide an address outside the county.  When voting by mail on the ground of expected absence from the county, your ballot must be mailed to an address outside the county.

_____ 9.    The residence address you provided on the Statement of Residence is not located within the boundaries of the political subdivision conducting the election.

_____ 10.   Application for Ballot by Mail did not state a legal ground for voting by mail.

_____ 11.   The required Statement of Residence was not included in the Carrier Envelope.

_____ 12.   You were required to return a copy of your approved form of ID with your marked ballot.  No identification was included with your mail ballot.

_____ 13.   Your Carrier Envelope did not contain your Texas Driver's License Number, Texas Personal Identification Card Number, Texas Election Identification Certificate Number or the Last 4 digits of your Social Security Number or the number provided did not match your voter registration record OR if you were not issued one of the documents with the required number, you did not indicate this fact on the Carrier Envelope.

_____ 14.   Your Carrier Envelope was not properly delivered to the Early Voting Clerk.

_____ 15.   Your Carrier Envelope did not meet the legally required deadline for delivery to the Early Voting Clerk.

_____ 16.   The address to which your ballot was mailed was not an authorized mailing address because you did not designate it as a hospital, retirement center, long term care facility, nursing home, jail, involuntary civil commitment facility, or a relative OR the mailing address provided on your Application for Ballot by Mail did not match the address provided on your voter registration record or the Statement of Residence enclosed with your Carrier Envelope.

_____ 17.   Other:_____

_____        _____
Signature of Early Voting Ballot Board Judge        Printed Name of Early Voting Ballot Board Judge

_____
Date

| Print | Reset |

## AVISO DE BOLETA RECHAZADA

La presente sirve como aviso de que su boleta para las elecciones de _____ fue finalmente rechazada por la Junta de Votación Adelantada y no fue contada.  Si cree que su boleta por correo fue rechazada por error, póngase en contacto con su Secretario de Votación Adelantada para determinar qué remedios puede tener a su disposición.

Nombre del Votante _____      Número de VUID _____

**La Junta de Votación Adelantada ha colocado una marca de verificación junto a la razón por la que su boleta fue rechazada y no contada.**

_____ 1.      Los registros de inscripción de votantes indican que el votante había fallecido antes de que el Sobre de Envío llevara el matasellos o lo recibiera de un transportista común o contratado.

_____ 2.      Nuestros registros indican que usted votó por comparecencia personal en las mismas elecciones.

_____ 3.      Se determinó que las firmas en la Solicitud de Boleta Postal y en el Sobre de Envío no fueron     firmadas por la misma persona.

_____ 4.      Su Sobre de Envío no estaba firmado o no puso su marca.

_____ 5.      La parte del testigo de su Sobre de Envío no se ejecutó correctamente
         _____ El testigo le indicó en el sobre que usted no podía hacer una marca.
         _____ El testigo no imprimió su nombre.
         _____ El testigo no firmó con su nombre.
         _____ No se indicó la dirección de residencia del testigo.

_____ 6.      La parte del asistente de su Sobre de Envío no fue ejecutada correctamente.
         _____ El asistente no imprimió su nombre.
         _____ El asistente no firmó su nombre.
         _____ La dirección de residencia del asistente no fue indicada.
         _____ El asistente no indicó si recibió una compensación u otro beneficio de un candidato, campaña o comité político.

_____ 7.      Los registros de inscripción de votantes indicaron que usted no tenia un registro efectivo para esta elección.

_____ 8.      Indica que vota por correo debido a una ausencia prevista del condado, pero no proporcionó una dirección fuera del condado.  Si vota por correo debido a una ausencia prevista del condado, su boleta debe enviarse a una dirección fuera del condado.

_____ 9.      La dirección de residencia que proporcionó en la Constancia de Domicilio Permanente no está ubicada dentro de los límites de la subdivisión política que realiza las elecciones.

_____ 10.     La Solicitud de Boleta Postal no estableció una base legal para votar por correo.

_____ 11.     La Constancia de Domicilio Permanente requerida no se incluyó en el Sobre de Envío.

_____ 12.     Se le pidió que devolviera una copia de su documento de identidad aprobado con su boleta marcada.  No se incluyó ninguna identificación con su voto por correo.

_____ 13.     Su Sobre de Envío no contenía el número de su Licencia de Conducir de Texas, el número de su Tarjeta de Identificación Personal de Texas, el número de su Certificado de Identificación Electoral de Texas o los últimos 4 dígitos de su número de Seguro Social, o el número proporcionado no coincidía con su registro de votante O si no se le emitió uno de los documentos con el número requerido, no indicó este hecho en el Sobre de Envío.

_____ 14.     Su Sobre de Envío no fue entregado correctamente al Secretario de Votación Adelantada.

_____ 15.     Su Sobre de Envío no cumplió con el plazo legal de entrega al Secretario de Votación Adelantada.

_____ 16.     La dirección a la que se envió su boleta no era una dirección postal autorizada porque usted no la designó como hospital, centro de jubilación, centro de atención a largo plazo, hogar de ancianos, cárcel, centro de internamiento civil involuntario u un familiar O la dirección postal proporcionada en su Solicitud de Boleta Postal no coincidía con la dirección proporcionada en su registro de votantes o en la Constancia de Domicilio Permanente adjunta a su Sobre de Envío.

_____ 17.     Otro: _____

_____      _____
Firma del Juez de la Junta de Votación Adelantada      Nombre en Letra de Molde del Juez de la Junta de Votación Adelantada

_____
Fecha

| Imprimir | Limpiar |

STATE115627

# EXHIBIT 110



KEN PAXTON

ATTORNEY GENERAL OF TEXAS

August 17, 2022

The Honorable Kelly Hancock
Chair, Senate Committee on Veteran Affairs & Border Security
Texas State Senate
Post Office Box 12068
Austin, Texas 78711-2068

The Honorable Matt Krause
Chair, House Committee on General Investigating
Texas House of Representatives
Post Office Box 2910
Austin, Texas 78768-2910

**Opinion No. KP-0411**

Re: Whether a legislator or a member of the public may inspect or obtain copies of anonymous voted ballots (RQ-0424-KP)

Dear Senator Hancock and Representative Krause:

You ask whether a member of the public or a legislator may inspect or obtain copies of anonymous voted ballots.[1] To be clear, you explain that the subject of your inquiry is "anonymous voted ballots" or other voted ballots that have had any voter-identifying data redacted. Krause Letter at 1. You explain that members of the public and individual members of the Legislature desire to audit the results of Texas elections, but election administrators cite section 66.058 of the Election Code as precluding the release of voted ballots. Hancock Letter at 1; Krause Letter at 1. Thus, the question presented is whether the information contained within a voted ballot *that has been stripped of any information that could be used to reveal the identity of the voter* is public information subject to disclosure.

---

[1]*See* Letter from Honorable Kelly Hancock, Chair, Senate Comm. on Veteran Affairs & Border Sec., to Honorable Ken Paxton, Tex. Att'y Gen. at 1 (Sept. 28, 2021) ("Hancock Letter"); Letter from Honorable Matt Krause, Chair, House Comm. on Gen. Investigating, to Honorable Ken Paxton, Tex. Att'y Gen. at 1–2 (Aug. 16, 2021) ("Krause Letter"); https://texasattorneygeneral.gov/sites/default/files/request-files/request/2021/RQ0424KP.pdf.

The Honorable Kelly Hancock & The Honorable Matt Krause - Page 2

> **To fulfill the Texas Constitution's mandate that Texas preserve election integrity, the Legislature has designated anonymous voted ballots as election records under the Election Code and has established procedures aimed at both preserving those records and granting public access to them.**

Article VI, section 4 of the Texas Constitution provides:

> In all elections by the people, the vote shall be by ballot, and the Legislature shall provide for the numbering of tickets and make such other regulations as may be necessary to detect and punish fraud and preserve the purity of the ballot box; and the Legislature shall provide by law for the registration of all voters.

TEX. CONST. art. VI, § 4.  This provision requires the Legislature to "pass laws as necessary to deter fraud and protect ballot purity [and] is addressed to the sound discretion of the Legislature." *Andrade v. NAACP*, 345 S.W.3d 1, 16 (Tex. 2011) (quoting *Wood v. State ex rel. Lee*, 126 S.W.2d 4, 9 (Tex. 1939) (quotation marks omitted).

Your question involves access to "election records" which include "anything distributed or received by government under [the Election Code]." TEX. ELEC. CODE § 1.012(d)(1).  Voted ballots are expressly designated as "precinct election records." *Id.* § 66.002 (defining "precinct election records" as "the precinct election returns, *voted ballots*, and other records of an election that are assembled and distributed" under chapter 66 of the Election Code (emphasis added)).  The Election Code contains provisions aimed at both preserving election records and granting access to review those records. *See id.* §§ 1.012, 66.058.

To fulfill its constitutional mandate, the Legislature created the position of general custodian of election records and charged that office with, among other things, preserving precinct election records.[2]  *See id.* §§ 66.001, .058.  Subsection 66.058(a) requires "the precinct election records [to] be preserved by the authority to whom they are distributed for at least 22 months after election day." *Id.* § 66.058(a); *see also* 52 U.S.C. § 20701 (establishing 22-month preservation period for election records in certain federal elections).  For at least 60 days after an election, voted ballots must be kept in a locked room, in the locked ballot box delivered to the custodian. TEX. ELEC. CODE § 66.058(b).[3]  On the 61st day, the custodian may require the return of the key that unlocks the ballot box containing voted ballots and may "unlock the ballot box and transfer the voted ballots to another secure container for the remainder of the preservation period." *Id.* § 66.058(b)(1), (2).

"Except as permitted by [the Election Code], a ballot box or other secure container containing voted ballots may not be opened during the preservation period." *Id.* § 66.058(b-1).

---

[2]Depending on the type of election, the general custodian of election records is either the county clerk, the city secretary, or the secretary or presiding officer of a political subdivision's governing body.  TEX. ELEC. CODE § 66.001.

[3]Due to potential recounts and provisional ballots, the Legislature requires the election record custodian to keep voted ballots secure for the 60-day period.  *Id.* § 66.058(b)

The custodian commits a criminal offense if, during the preservation period, the custodian makes an unauthorized entry into the box or container or "fails to prevent another person from handling the box or container in an unauthorized manner or from making an unauthorized entry into the box or container." *Id.* § 66.058(d), (e). If anonymous voted ballots are disclosable public information, then the custodian's entry into the box to fulfill the state's disclosure obligations is authorized.

>   **The Election Code designates all election records, including anonymous voted ballots, as public information.**

Alongside the goal of ballot preservation, the Election Code also recognizes the importance of granting access to the public to review election records and ensure transparency and confidence in Texas elections. To that end, section 1.012 of the Election Code provides: "Except as otherwise provided by [the Election Code] or [the Public Information Act], all election records are public information." *Id.* § 1.012(c). Voted ballots become public information once "the custodian completes the unofficial tabulation of the results for that precinct." *Id.* § 66.057(a). "[A]n election record that is public information shall be made available to the public during the regular business hours of the record's custodian." *Id.* § 1.012(a).

>   **Because the Legislature designated anonymous voted ballots as public information and required public access to those records, a custodian's entry into the locked box for such purposes is an authorized entry under the Election Code.**

Section 66.058 recognizes the existence of exceptions that authorize entry into the locked ballot box during the preservation period provided the box or container is relocked or resecured after the authorized purpose has been fulfilled. *Id.* § 66.058(b-1), (c); *see, e.g., id.* §§ 213.007 (authorizing the custodian to make ballots available for a recount), 273.042 (authorizing the custodian to make the ballots available to a grand jury for purposes of a criminal investigation). Section 1.012 of the Election Code establishes one such exception by generally requiring the custodian to make election records available to the public, unless such records are expressly excepted by the Public Information Act or the Election Code.[4] *Id.* § 1.012(c); *see also* TEX. GOV'T CODE § 552.006 (providing that the Public Information Act "does not authorize the withholding of public information or limit the availability of public information to the public, except as expressly provided" within the Act).

Subchapter C of the Public Information Act establishes the exceptions to the general rule that public information shall be made available to the public. *See* TEX. GOV'T CODE §§ 552.101–.162 ("Information Excepted from Required Disclosure"). No section within that subchapter addresses anonymous voted ballots or expressly excepts them from disclosure. Furthermore, no

---

[4]Thirty-four years ago, in Open Records Decision 505, a previous Attorney General considered public access to voted ballots under the Public Information Act. Tex. Att'y Gen. ORD 505 (1988) at 1–2. The decision concluded that section 66.058's prohibition on unauthorized entry into the locked ballot box during the preservation period fell within the Public Information Act's disclosure exceptions for privileged or confidential information. Tex. Att'y Gen. ORD 505 (1988) at 2–3. However, in-depth review by this office of the issues raised in that decision results in the opposite conclusion. No language in either the Election Code nor the Public Information Act makes the entirety of a voted ballot privileged or confidential. Open Records Decision 505 is therefore overruled to the extent inconsistent with this opinion.

provision in the Election Code designates anonymous voted ballots as confidential or otherwise prohibits their disclosure to the public.  By demanding that the public have access to election records, including anonymous voted ballots, the Legislature thereby authorized the election records custodian's entry to the locked ballot box during the 22-month preservation period for such purposes.

**Any personally identifiable information contained in election records that could tie a voter's identity to their specific voting selections must be redacted for purposes of disclosure to protect the constitutional right to a secret ballot in Texas.**

While you ask specifically about *anonymous* voted ballots, it is important to note that Texas law has long established that all elections shall be by secret ballot.  *Wood*, 126 S.W.2d at 9.  This requirement of secrecy is mandatory—"that every voter is thus enabled to secure and preserve the most complete and inviolable secrecy *in regard to the persons for whom he votes*[.]"  *Id.* at 8; *Carroll v. State*, 61 S.W.2d 1005, 1007 (Tex. Crim. App. 1933) (emphasis added).  In order to protect the secret ballot, "[p]ublic policy requires that the veil of secrecy should be impenetrable, unless the voter himself voluntarily determines to lift it[.]"  *Carroll*, 61 S.W.2d at 1008.  The right of nondisclosure belongs to the individual voter.  *See Oliphint v. Christy*, 299 S.W.2d 933, 939 (Tex. 1957).  Your question appears to acknowledge this requirement by only inquiring about voted ballots that (1) have no information that could be used to identify the voter or (2) have been redacted to exclude any information that could be used to identify the voter.  Krause Letter at 1.

Information is excepted from public disclosure under the Public Information Act "if it is information considered to be confidential by law, either constitutional, statutory, or by judicial decision."  Tex. Gov't Code § 552.101.  No statutory provision generally designates election records or their contents as confidential.  However, the right to a secret ballot has been held to protect personally identifiable information contained in election records that could tie a voter's identity to their specific voting selections.  *See generally Wood*, 126 S.W.2d at 9; *Carroll*, 61 S.W.2d at 1008.  Therefore, a court would likely find that personally identifiable information contained in election records that could tie a voter's identity to their specific voting selections is excepted from public disclosure.  As a result, such information must be preserved, and the election records custodian must redact such personally identifiable information to protect the constitutional right to a secret ballot in Texas.  Tex. Gov't Code § 552.007 (providing that a governmental body has no discretion to release information deemed confidential by law).  To be clear, the presence of some confidential information on a ballot does not provide a basis to withhold the ballot in its entirety.

**The Election Code authorizes the Secretary of State and election records custodians to establish procedures to accomplish the dual priorities of ballot preservation and public access to anonymous voted ballots.**

The Secretary of State is the chief elections officer of the state and is required to "assist and advise all election authorities with regard to the application, operation, and interpretation" of the Election Code and any other election laws.  Tex. Elec. Code §§ 31.001(a), .004(a).  In furtherance of the preservation of precinct election records in particular, the Legislature directed the Secretary of State to "instruct the affected authorities on the actions necessary to comply" with

The Honorable Kelly Hancock & The Honorable Matt Krause - Page 5

section 66.058. *Id.* § 66.058(h). Thus, the Secretary of State has the authority to instruct elections administrators as to how to comply with both the ballot preservation requirements in section 66.058 and the public access requirements in section 1.012.

With the Secretary of State's oversight, the Legislature expressly authorized the election records custodian to "adopt reasonable rules limiting public access" under section 1.012 to further the purposes of "safeguarding the election records or economizing the custodian's time." *Id.* § 1.012(b). Pursuant to their respective authority, the Secretary of State and the election records custodians may establish procedures as authorized by law to accomplish the dual priorities of ballot preservation and public access to anonymous voted ballots under the Election Code.

## S U M M A R Y

Anonymous voted ballots are election records under the Election Code, and the Legislature has established procedures aimed at both preserving those records and granting public access to them.

Section 66.058 of the Election Code requires the anonymous ballots to be held in a locked ballot box during a 22-month preservation period, with entry only as authorized by the Election Code. Section 1.012 establishes these ballots as public information and requires the election records custodian to make the ballots available to the public. By expressly requiring the custodian to provide public access to such records, the Legislature authorized entry into the locked ballot box for such purpose during the 22-month period. Thus, members of the public and legislators may inspect or obtain copies of anonymous voted ballots during the 22-month preservation period.

Personally identifiable information contained in election records that could tie a voter's identity to their specific voting selections is confidential and excepted from public disclosure. Any confidential information on an anonymous voted ballot must be redacted for purposes of disclosure in order to protect the constitutional right to a secret ballot.

The Election Code authorizes the Secretary of State and election records custodians to establish procedures to accomplish the dual priorities of ballot preservation and public access to anonymous voted ballots.

Very truly yours,

KEN PAXTON
Attorney General of Texas

BRENT E. WEBSTER
First Assistant Attorney General

LESLEY FRENCH
Chief of Staff

The Honorable Kelly Hancock & The Honorable Matt Krause - Page 7

D. FORREST BRUMBAUGH
Deputy Attorney General for Legal Counsel

AARON REITZ
Deputy Attorney General for Legal Strategy

AUSTIN KINGHORN
General Counsel

RALPH MOLINA
Special Counsel to the First Assistant Attorney General

CHARLOTTE M. HARPER
Deputy Chair, Opinion Committee

# EXHIBIT 111

**Voting Assistance & Vote by Mail**

*La Unión Del Pueblo Entero et al. v. State of Texas et al.*

**Tammy Patrick**

## INTRODUCTION AND SUMMARY OF CONCLUSIONS

1. I am a longtime election administrator and election administration advisor and instructor.  I am engaged by the United States of America to provide my opinion on two aspects of Texas' new election law, SB1.  First, I was asked to analyze the oath that individuals providing assistance to a voter must swear under penalty of perjury and to evaluate whether it is consistent with sound principles for election assistance and election administration.  Second, I was asked to evaluate whether the provisions of SB1 requiring voters applying for a mail ballot or voting by mail to provide a number from a Texas identification document if the voter has been issued one, and a partial social security number if they have not, in order for their application or ballot to be accepted, are consistent with sound election administration principles.

2. With respect to the voter assistance oath under SB1, it is my opinion based on my knowledge and years of experience in election administration that the substantive limitations of the oath are not consistent with sound election assistance practices and principles.  The oath does not allow for assistance that is comprehensive or responsive to voters' needs, and may prevent timely and equitable assistance for some voters.  It also places a burden on election administrators to interfere with the assistance relationship between an assistor and voter, rather than to support ballot access and ensure voters receive the assistance they need.

3. With respect to the vote-by-mail provisions of SB1, it is my opinion that rejecting mail ballot applications or mail ballots based exclusively on a mismatch between an identification card number or partial social security number provided on ballot materials and voter records maintained by the state is not sound election administration practice, nor is it justified by any hypothetical interest in ballot security.  This all-or-nothing approach to reverifying the identity of mail voters will cause ballot rejections despite officials' ability to positively identify the voter who sent the materials, and will not meaningfully make elections more secure.  Evidence of the rejection rates from Texas' implementation of these provisions so far shows rejection rates far beyond what would be considered reasonable in a well-run election and demonstrates that the identification number requirement does not adequately protect access to voting.

## CONTENTS

4. This Report proceeds in six sections.  Section 1 describes my experience, expertise, and qualifications as they relate to the opinions expressed in this report.  Sections 2 and 3 pertain to voter assistance.  In Section 2, I lay out the principles of voter assistance applicable to my opinion in this case, and in Section 3, I apply those principles to the voter assistance oath provision of SB1.  Sections 4 and 5 pertain to voting by mail.  In Section 4, I provide background information and principles underlying sound administration of voting by mail.  In Section 5, I apply those principles to the identification document number requirements of SB1.  Section 6 summarizes my conclusions.

## REQUIRED DISCLOSURES

5. Over the past 4 years, I have not testified as an expert at trial or deposition.

2

6.  Over the past 10 years, I have authored the publications listed in Appendix A.

7.  I am being compensated for my time at the rate of $250.00 per hour.  My compensation is not dependent on my opinions and findings in this case.

## SECTION 1: EXPERTISE

8.  For almost twenty years, I have served as an election administrator and expert on election administration.  I provide a comprehensive *curriculum vitae* at Appendix B and will draw upon specific examples that have given me experience relevant to the questions the United States has asked me to opine on throughout this Report, as well as to contextualize my election administration experience as it relates to voter assistance and voting by mail.  Below, I highlight some of my most pertinent experience.

9.  From 2003-2014, I was the Federal Compliance Officer for the Maricopa County Elections Department in Arizona.  During my tenure in Maricopa County, I developed and formalized an award-winning Voter Assistance Program with comprehensive protocols establishing the proper staffing levels at the polls and ensuring the proficiency of workers to aid voters and their assistants, training of workers in proper assistance practices, and communicating with the voting community about their rights and the services available to them at the polls.  When constructing the program, it was critical to create something that contemplated all of the challenges in identifying vulnerabilities in the system and establishing mitigations prior to any voters being negatively impacted or receiving subpar service.  As such, I not only trained pollworkers, field trouble-shooters, and observers, but I also established a monthly meeting of a Community Network consisting of city and town clerks, tribal leaders, political party representatives, and members of the various voter advocacy communities.

10. In 2013, I was appointed a Commissioner on the Presidential Commission on Election Administration (PCEA) by then-President Barack Obama.  This bipartisan effort spent six months holding hearings around the country to look into specific items laid out in the Executive Order establishing the Commission, including voter assistance, language access, and vote by mail administration.  In public hearings, stakeholder meetings, and research and reports submitted to the Commission as testimony, we heard about the challenges that some voters were still facing in exercising their right to vote.

11. The Commission produced our report "The American Voting Experience" in January of 2014.  The report was well received by election officials, legislators, and voter advocates as containing practical, bipartisan solutions to some of the challenges facing our elections.  The report is still used authoritatively today.

12. From 2014 to 2017, I served as a Senior Fellow at the Bipartisan Policy Center advising their Elections Team on the implementation of the Presidential Commission on Election Administration's recommendations.  We convened workshops of large jurisdictions, published

reports on the "New Reality of Voting by Mail"[1] and election day command centers,[2] and established a voter wait time research agenda in collaboration with MIT that, for the first time in the United States, measured the impact of election administration on the voting experience.[3] During those three years I testified in numerous state legislatures, presented at dozens of conferences, and spoke to thousands of election administrators on how to improve election administration and policy.

13. Since 2017 I have been Senior Advisor to the Election Team at the Democracy Fund, an independent, nonpartisan foundation working towards a more equitable election system.  In that role, I have dedicated my time and expertise to the continued advancement of the field of election administration by conducting webinars, speaking, and teaching.  I have taught at the University of Minnesota's Humphrey School of Public Policy since 2017 and have lectured at Harvard, American University, MIT, and Arizona State University.  I am also a frequent speaker at the Election Sciences, Reform, and Administration (ESRA) Conferences.  Due to my expertise in voter assistance, language access, and voting by mail, I have testified in the United States Senate and House of Representatives and numerous state legislatures.  I often speak or hold webinars for civic engagement groups, am a frequent guest on NPR and PBS News Hour, and serve as a source for many of our largest newspapers and publications.

## SECTION 2: VOTER ASSISTANCE

14. In this Section, I provide an overview of the principles by which election administrators ensure voters are able to receive meaningful assistance at the polls in casting a ballot.  The information in this section is derived from my experience as an election administrator and my research and work supporting election administration and sound election management.

15. At the highest level, the assistance that voters receive from assistors of their choice is an integral part of the administration of any elections program.  If that connective tissue is jeopardized, if voters are unable to get effective assistance from their person of choice, it influences the administration of the entire program.

16. I have lectured and advised jurisdictions across the country on the implementation of effective assistance programs. Prior to the Census Bureau's 2011 Voting Rights Act Section 203 determinations, I worked with Weld County, Colorado and Fairfax County, Virginia.  I helped develop pollworker and staff training materials for Sonoma County, California when they launched their language program in 2016.  And I established the voter assistance program in Maricopa County, Arizona when I was an election administrator there.

---

[1] Bipartisan Policy Center.  The New Realities of Voting by Mail | Bipartisan Policy Center (June 29, 2016).

[2] Bipartisan Policy Center.  Election Day Commander Centers: An Invaluable Tool in Election Administration | Bipartisan Policy Center (January 22, 2016).

[3] Bipartisan Policy Center.  Improving The Voter Experience | Bipartisan Policy Center (April 27, 2018).

17. When I am reviewing a voter assistance program, there are a handful of primary principles that I have developed to gauge its efficacy, based on my years of experience and study. These principles have been informed by years of work with voter advocacy groups such as the National Disabilities Rights Network and the Arizona Center for Disability Law, and the hearings of the Presidential Commission on Election Administration. They are:

   1. Is the availability of assistance services widely disseminated to voters who may need them?
   2. Is the assistance unbiased/non-leading?
   3. Is the fulfillment of assistance requests timely and equitable?
   4. Is the assistance offered in a comprehensive manner for all voting options and methods?
   5. Is the assistance responsive to the voter's needs and does it fulfill the voter's wishes?
   6. Is the voter's autonomy and humanity maintained in all decision points?
   7. Are election officials provided with the proper tools and training commensurate with the import of the task at hand?
   8. Are the program's policies, materials, and procedures created in a vacuum, or are voters and the applicable community's experts engaged?

18. The foundation of any voter assistance program hinges upon its ability to serve the voting public, so that they are able to successfully navigate the process, and to ensure that the votes cast fully reflect the voter's wishes. For example, the first thing that I did in Maricopa County when establishing the County's voter assistance program was to create a mission statement that would be the guiding star and serve as a reminder of the importance of the job: "Maricopa County Elections Department's Assistance Program strives to ensure equal access to the electoral process for all its citizens and to provide the assistance some voters may require based on physical or mental abilities, mobility concerns, or language skill sets." Setting the proper expectation for voters of what services are available, and training staff and pollworkers to have the tools necessary to engage with the voting public—including supporting those who are assisting voters—are all part of any robust plan.

19. An effective assistance program provides eligible voters unencumbered access to assistance at all points of the process. As such, voters should be able to obtain assistance that is responsive to their individual needs. Physical, cognitive, and language barriers to completing the act of voting should not be determinative of voters' ability to successfully participate. Voting is not a literacy test, it is not a cognitive test, it is not a test of linguistic skills, and it is not a test of physical strength, dexterity, or acumen. Voting is the act and process of making one's voice heard in the selection of government representatives and ballot measures, and that act may not only benefit from assistance for some to participate but be reliant upon it.

20. There are many voters who rely on the aid of another in casting their ballot. In my experience, voters often bring someone with them when they know beforehand that they will need some help. Whether it be a family member, attendant, care-provider, or friend, voters often have those who aid them in other facets of their life assist them at the polls. These individuals commonly are very familiar with the voter's needs. Assistors provide voters with the assistance needed to effectively cast a ballot successfully reflecting each voter's intention.

21. Assistance from an assistor of one's choice can take on even further heightened importance in places where poll staffing is stretched thin.  For decades, we have witnessed a migration of in-person voting away from precinct-based polling locations offered for a few hours on a single Election Day.  In most states, voters now have options across a voting period and can choose a voting location, due to the growth of voting centers.  While both of these administrative polices are recommended in order to provide voters options in where and when to vote, it can provide managerial challenges in staffing, particularly in identifying where language assistance may be necessary.  This situation creates an even greater need to support voters when they bring along their own aid.

22. The need for voters to have access to assistors of their own choice will only increase in the coming years.  According to the National Center for Education Statistics, Texas is rated in the bottom 25% of the states in adult literacy, with Texas counties filling all but two spots on the list of the Bottom 10 Counties.[4]  Literacy concerns are aggravated with the elevated language that is used in voting materials and on the ballot itself.[5]  When you add in the growing need of an aging population—the Census Bureau projects that the 65-and-older population is estimated to nearly double from 49 million in 2016 to 95 million in 2060[6]—and the systemic underfunding of election offices,[7] the need for voters to have access to assistance from their person of choice has the potential to only increase in the years to come.  An election is the largest civic effort done on the national scale.  Thousands of election administrators train tens of thousands of permanent staff as well as hundreds of thousands of temporary workers on the intricacies of the election process, as dictated by state and federal law.  This is a particularly difficult task, especially given that more than a third of our election offices are part-time duties and only the very largest offices have more than a handful of full-time employees, as demonstrated by the Democracy Fund survey found at Appendix C.

## SECTION 3: ANALYSIS OF THE ASSISTOR'S OATH REQUIRED BY SB1

23. Based on my review of SB1, I conclude that the changes to the assistor's oath contained in SB1 are inconsistent with the principles of sound voter assistance laid out above.  The attestation that the assistor will confine their assistance to reading the ballot, directing the voter to read the ballot, marking the ballot, or directing the voter to mark the ballot appears to prevent assistors from providing meaningful and often necessary forms of assistance such as answering a voter's questions. The administration of the oath creates challenges for the management of the polling location due to the potential impact on efficient voter processing, increased

---

[4] "Summary of Estimates". National Center for Education Statistics. (2020) State and Counties with the Highest and Lowest Levels of Adult Literacy and Numeracy Skills (ed.gov).

[5] Literacy concerns are particularly problematic given that most ballots use language that ranks far higher than that on the Flesch-Kincaid Grade Level as noted in analysis by Ballotpedia for 2019 and 2021 https://ballotpedia.org/Ballot_measure_readability_scores,_2019 and https://ballotpedia.org/Ballot_measure_readability_scores,_2021.

[6] Vespa, Jonathan, Lauren Medina, and David M. Armstrong. "Demographic Turning Points for the United States: Population Projections for 2020 to 2060". Page 2.  (Revised February 2020).

[7] DeBonis, Mike and Amy Gardner. "Election experts sound alarms as costs escalate and funding dwindles" *Washington Post.* (February 16, 2022).

demands on pollworkers when they are already difficult to obtain in sufficient numbers and are stretched thin at the polls with other responsibilities, and the enforcement of the statute is unfeasible and without guidance.

24. A thoughtful voter assistance program structure can maintain the integrity and legitimacy of the electoral process without infringing on a voter's ability to obtain assistance should they require it; without the creation of a complex system for voters, assistants, and pollworkers to navigate; without introducing the threat of criminal penalties for offering common sense aid to voters. Comparing SB1 with the principles of voter assistance laid forth above, one can see that the structures in place in Texas after the passage of SB1 violate several of those principles, most notably the fulfillment of assistance being timely and equitable as well as responsive to the voter's needs.

25.   **Principle 3: Is the fulfillment of assistance requests timely and equitable?**
SB1 is likely to cause significant delays in providing assistance given the restrictions on assistors from answering clarifying questions.  The bureaucratic hurdle of an expanded oath will impede voters with disabilities, voters with limited English proficiency, and voters who may be both, from having the same voting experience and treatment other voters receive.  To my knowledge there is no research that would support the notion that the limitations in the revised oath would improve or maintain the quality of voter assistance or further secure the voting process.  What we do know is that there will be demonstrable delays for it will add considerable time to the processing of voters.  We know from queuing theory that the addition of even the shortest interval can accumulate and cause what is often referred to as the "elbow of death"—a point in which the line cannot be processed under existing resources in a timely manner and the wait time only continues to grow.[8]  This understanding of the implications of even the slightest change in voter-processing policy was exemplified at the 2018 Election Assistance Commission's Election Data Summit by Ms. Michelle White, General Registrar of Voters from Prince William County, Virginia.

26. **Principle 5: Is the assistance responsive to the voter needs?**
SB1's assistor oath creates a situation unresponsive to voters' needs due to the prevention of assistants from answering voters' questions and sets the stage for voters' needs to go unmet. Clarifying questions can take a number of forms beyond what is listed in the voting instructions.

---

[8]During the PCEA hearings we heard from MIT Professor Charles Stewart III on the implications in queuing theory of Little's Law which illustrates how wait times escalate once the volume of voters entering the line exceeds the processing capacity.  Starting in the 2014 election cycle MIT, the Bipartisan Policy Center, and numerous academics embarked on a rigorous data-collection effort to better understand polling location wait times. One such study, from the 2018 election, is the report "Improving The Voter Experience: Reducing Polling Place Wait Times by Measuring Lines and Managing Polling Place Resources" https://bipartisanpolicy.org/download/?file=/wp-content/uploads/2019/03/Improving-The-Voter-Experience-Reducing-Polling-Place-Wait-Times-by-Measuring-Lines-and-Managing-Polling-Place-Resources.pdf . There are now numerous tools available to demonstrate the impact when just a few additional seconds are introduced in the system.

Although those instructions may demonstrate how to mark the ballot or how many to vote for in a given race, voters often have other questions, for example around the consequences of voting for more (or fewer) candidates than allowed or what happens if they make a mistake marking the ballot or have an errant mark, among other potential questions.  The answers to these questions can be determinant in the successfully casting of a ballot.  If a voter asks their assistor the question "is there more to vote on the back of the ballot?" or "it says vote for no more than 3, so I can just vote for 2?" it appears an assistor answering those questions would be in violation of the oath, and it is unclear how this would be administered or who would make the judgment calls about what forms of assistance are not permitted, creating administrative problems.  Enforcement also has potential voter privacy implications with an impact not only on that voter, but the entire processing flow in the polling location while pollworkers get bogged down with the process.  Based on my experience there will be down-stream ramifications with impacts on call centers and hotlines due to increased calls asking for clarification, thus further delaying voter aid.  The Texas Secretary of State's Handbook for Election Judges and Clerks leaves many questions around the implementation and administration of the oath as to how it is to be carried out at the polls as well as the enforcement of the new criminal penalties.[9]

27. We know from the recently published instructions from the Secretary of State that observers are not allowed to observe assistance provided by an assistor of choice who is not an election official, but they are if the voter gets assistance from the pollworkers.[10]  The voter is put into a position where they have to decide between getting assistance from someone of their choice (but who cannot answer their questions) or subject themselves to outside observation in casting their ballot, abdicate their right to privacy in voting, and have pollworkers help them.  Voters may not be aware of this consequence when making their determination.  Nothing in the Election Judge Manual advises pollworkers to disclose this to voters; nor is it a required posting in Section 6 on Posting Notices (pages 9-11), so the voters may not be aware of the subjection to observation in casting their ballot by someone who is not a state or county official until they are actively voting.

28. In my opinion the changes to the oath violate these basic principles of voting assistance in the prevention of meaningful assistance and have substantive issues with implementation and enforcement.  The enforcement of this statute is untenable and complicates the provision of assistance to voters that will satisfy their needs

## SECTION 4: VOTE BY MAIL ADMINISTRATION

29. In this Section, I provide background and contextual information for my evaluation of the vote-by-mail provisions of SB1.

---

[9] Indeed, the Texas Secretary of State's Handbook for Election Judges and Clerk's manual states "An inspector may not observe the preparation of the ballot of a voter not being assisted by an election officer [34.002(b)]" page 18 (Section D4), and again on page 48 (Section D, 4g) in reference to both inspectors and pollwatchers.

[10] Texas Secretary of State's Election Judges manual, pages 17 (section 6l) and 48 (section 4g).

30.  Americans have been voting by mail since the Civil War.  Every state has some portion of citizens who vote using this method of voting; the proportion is directly related to the onerousness of the application process in that state.  Voters' ability to successfully navigate the process and submit a ballot that is ultimately counted depends on return options and acceptance protocols. For years, tens of millions of American voters have had their ballots handed to them by a United States Postal worker, not a pollworker. According to the Vote at Home Institute, with the expansion of states moving to all vote by mail elections and the number of voters on permanent early voting lists, one in three voters will have their ballots mailed out to them automatically in the 2022 midterm elections. This is in stark contrast with the handful of states that still require voters to provide an excuse to receive their ballot by mail.

31.  As with all things related to election administration, each step in the vote-by-mail process builds upon the one preceding it.  Vote by Mail can be defined in four main stages[11]:
    1.  Application options and requirements
    2.  Voter identification and authentication
    3.  Ballot return
    4.  Processing and verification

These principles apply to every state, no matter how many voters they have voting by mail.  If we look at what is most prevalent across the country and compare that to the new regime under SB1, we quickly see that the new construct is an outlier, creates unnecessary barriers, and will continue to be detrimental to eligible Texans attempting to access the franchise.

**Application Options and Requirements**

32.  Access to the application process does not imply a lack of security of the process.  States can, and must, have election policies that are both open and secure; these are not mutually exclusive.  Administering an election in a global pandemic demonstrated the need for voters to know all of their options in voting and what the requirements are for their participation.  We saw record engagement in the 2020 election cycle not just due to an expansion of options for voters, but in many states due to official messaging around the process that set accurate expectations for what was necessary to successfully navigate requirements.  Many states have adopted voter-centric policies to govern their administration of absentee and vote by mail voting by establishing reasons to accept an application, or doing away with the application process entirely, rather than to use it as an opportunity to reject the request.

**Voter Identification and Authentication of the Application**

33.  When processing a ballot application an election administrator must identify that the correct record is being worked and that the application is authentic.  The information being used is most often simply to inform that the correct record is being reviewed.  Whether a voter is requesting a ballot on an application for a specific election, or for a given calendar year, the information that they provide *in its totality* validates their identity.  The voter validation process should be

---

[11] These four stages are based upon the comprehensive "America's Election Model: Architecture of American Elections" NIST-EAC Interoperability Election Modeling Working Group Revision: 0.2 (June 11,2019) https://pages.nist.gov/ElectionModeling/ElectionProcessModel.pdf.

inclusive of reviewing a combination of pieces of information available to an election administrator or pollworker which may include: first/middle/last name, date of birth, mother's maiden name, county of birth, driver's license or non-operating identification number, last four of social security number, tribal identification number, handwriting sample (such as the completion of previous forms and requests)—the cumulative review of all fields on a voter registration form or ballot application informs voter identity.  Not all states require a written application to be completed, or even a written request.  Online and telephonic applications allow additional access points to voters and can utilize other identification elements such as personal knowledge of the voter (*i.e.* knowing the voter's voice) that can substantiate the voter's identity.

34.  Signature verification is the most common method of voter authentication and is sufficient for authentication of a ballot request. A signature or identifying mark is something that voters inherently have the ability to provide without it having to be provided to them, or have a path to be assisted in providing from someone of their choice.  A voter will not misstate their own signature.  That is not to say that signatures are static.  Forensic training tells us that signatures mature around the age of 25 and begin to degrade as a person ages, typically in their 70s or 80s. Temporary situations also arise that can cause a signature to vary: normal writing hand in a cast, so voter is using their other hand, an uneven writing surface, etc. Most signature rejections on applications and ballot affidavits are from eligible voters who either omitted their signature or had a situation arise that prevented them from signing as they usually do.  A signature is the typical means for a voter to certify the accuracy of the rest of the information they put on an application or carrier envelope.  By contrast, the rejection or acceptance of an application hinging on the provision of a single data point that must be obtained by a government agency and can be subject to clerical error, transcription, and misinterpretation is problematic and contrary to sound election administration principles.

35.  Voter authentication is an important part of maintaining the integrity of an election system, but it does not outweigh the need to ensure that eligible voters are able to engage.  As mentioned previously, in my experience I have seen that authentication can, and should, contemplate the totality of information from the voter—various data fields and even various forms and documents.  The prerequisite of a single data point as cause for rejection is problematic if other authentication elements are present (such as the signature).  It is standard protocol for election officials to augment voter applications with corrected or omitted information after reaching out to the voter.[12]  Indeed, this is as much a security measure as it is good customer service and proper use of public funds.  If someone had a request for a ballot made on their behalf without their knowledge, this voter authentication process of following up with the voter is the perfect

---

[12] Because this process is best understood by the general public, the NIST Working Group on Interoperability agreed that it should be one of six processes that plain-language slides were created for from the NIST "America's Election Model" report. The resulting slide deck is available publicly on electionline.org. The "Receive and Process Ballot Packets" https://electionline.org/resources/fig-48-receive-and-process-ballot-packages/.

way to find that out. Clarifying information with the voter enhances the security of the system by hearing directly from the voter why the signature was missing or mismatched.

## SECTION 5: VOTE BY MAIL ADMINISTRATION UNDER SB1

36. The creation of a single point of failure for applicants who are unable to, or who do not, provide the same number that is on the voter's registration record, is a clear construction of a barrier in the process. A December 20, 2021 news article in the Texas Tribune reported that there were 702,257 records that only had one of the necessary numbers on file and 106,911 that didn't have either of the required numbers.[13] A voter's signature is sufficient for other facets of engagement with the government, but not for requesting, or returning, a ballot. A voter's signature is sufficient for signing candidate nomination petitions—without the additional listing of one of the sanctioned numbers required under SB1, but not to request a ballot in order to vote for that candidate. We are already seeing the results of this overly prescriptive and limited acceptance policy in the increase in application and ballot rejections. Throughout the lead-up to the 2020 Primary Election there have been news reports of substantial increases in the rejection rates of both applications for ballots as well as the voted ballots, based not on the voters' ineligibility to vote, but due to being rejected based on the single point of data required under the new requirements post-SB1 implementation.

37. There are sound oversight practices in vote by mail administration that are comprehensive and do not result in mass rejections of applications. Quality control of the authentication process as well as the verification of signatures is critical. Administrative supervision that includes capturing contemporaneous data on staff at each step of the process to know if there are "acceptors" (those who say every application or signature is fine) or "rejecters" (those who are overly strict in their interpretation and statistically reject a higher rate than they should), along with a tiered oversight of the process ensures that it isn't a single person's interpretation that prevents a voter from obtaining a ballot or having their ballot be rejected/accepted. Voter registration and election management systems that archive and retain clipped images of all forms and applications as well as signatures from registers, rosters, petitions, and ballot affidavits improve the reviewer's ability to identify anomalous entries and flag potential issues without denying an eligible voter their vote. These administrative policies are commonplace across the country and have kept the vote by mail process secure without locking voters out, without inordinately high rejection rates of applications and ballots based on a single point of failure.

## SECTION 6: CONCLUSION

38. The American voter has diverse needs that require a comprehensive menu of solutions. There are two paths. The first path is what the best programs have done—they provide training and tools so that workers are prepared to assist voters and their aids, they cover all the service channels and educate the public on their available options, practices and policies are transparent and known. The second path does not follow these workable and protective

---

[13] Alexa Ura, "Hundreds of mail-in ballot applications are being rejected under Texas' new voting rules", *Texas Tribune* (January 12. 2022).

principles.  This is the path that legislation such as SB1 takes with its creation of bureaucratic hurdles and the resulting obstacles for voters.

39. In my opinion, the expansion of the assistor oath does not provide a security benefit to justify the resulting interference with on access to adequate assistance.  Similarly, the vote by mail ballot application requirements are onerous and unnecessary to identify the qualifications of, and authenticate, an eligible voter.

40. It bears repeating that across both provisions, SB1 erects unnecessary barriers for Texas voters needing assistance at the polls and for those wishing to cast absentee ballots.  The oath requirement preventing assistors from answering voter's questions violates basic principles of voting assistance and has substantive issues with implementation and enforcement, and the vote by mail identifying number requirement results in the rejection of applications and ballots by qualified voters.

I declare under penalty of perjury that the foregoing is true and correct.

Date: February 28, 2022.

Signed: _Tammy Patrick_

       Tammy Patrick

Executed in: St. Mary's County, Maryland

## APPENDIX A: Disclosure of Publications

- **2022**
  - Co-authored with Lindsay Daniels,  *Journal of Election Administration Research and Practice,* (estimated publication in March 2022)
  - Co-authored with Becky Stewart**, "**Now Live: Democracy Fund's Language Access for Voters Summit Landing Page" *electionlineWeekly* (February 17th, 2022) https://electionline.org/electionline-weekly/
- **2021**
  - **"**Additional Thoughts from Panelists on Election Reform Issues", *Conference Report The Carter-Baker Commission: 16 Years Later"* (October, 2021)
  - "Language Access for Voters" *electionlineWeekly* (September 16, 2021) https://electionline.org/electionline-weekly/2021/09-16/
- **2020**
  - "Every Election Has a Story to Tell, Story of 2020 Still Being Written, but Some Chapters are Done" *electionlineWeekly* (November 19, 2020) https://electionline.org/electionline-weekly/2020/11-19/
  - "New Post Master General Issues Directive" *electionlineWeekly* (July 30, 2020) https://electionline.org/electionline-weekly/2020/07-30/#tab-2
  - "Election Day Command Centers: A National Snapshot" *electionlineWeekly* (March 12, 2020) https://electionline.org/electionline-weekly/2020/03-12/
  - Co-authored with David Levine. "Here's Why the U.S. Can Handle Voter Intimidation", *The Fulcrum*, (October 30, 2020)  https://thefulcrum.us/election-dissection/report-voter-intimidation
- **2019 -2021**
  - Jennifer Morrell. "*Knowing It's Right*" series on post-election audits including "Part One: Practical Guide to Risk Limiting Audits" introduction, Democracy Fund https://democracyfund.org/idea/knowing-its-right-limiting-the-risk-of-certifying-elections/
- **2019**
  - Co-authored with Katy Owens-Hubler. "Building Terminology in the Field" Chapter 6 in *The Future of Election Administration* https://www.springerprofessional.de/en/the-future-of-election-administration/16853420
  - "Tammy's Blog: Incoming! Voter Registration Application Data" *electionlineWeekly* (December 5, 2019) https://electionline.org/electionline-weekly/2019/12-05/#tab-2
  - "Disaster Narrowly Averted: U.S. to Remain in the Universal Postal Union" *electionlineWeekly* (September 26, 2019) https://electionline.org/electionline-weekly/2019/09-26/
  - "Leave No Voter Behind: Implications of the U.S. Withdrawal from the Universal Postal Union" *electionlineWeekly* (August 1, 2019) https://electionline.org/electionline-weekly/2019/08-01/
  - "Knowing It's Right, Limiting the Risk of Certifying the Wrong Winner" *electionlineWeekly* (May 23, 2019) https://electionline.org/electionline-weekly/2019/05-23/
- **2018**
  - "Reflections on Election: Communication, Collaboration, and Commitment" *electionlineWeekly* (November 29, 2018) https://electionline.org/electionline-weekly/2018/11-29/

13

- o **"**Tammy's Blog: ADA Compliance at the Polls: What Everyone Needs to Know about Accessible Elections and Voters' Rights" *electionlineWeekly* (November 1, 2018) https://electionline.org/electionline-weekly/2018/11-01/#tab-2
- o "Tammy's Blog: My 2018 Summer Vacation" *electionlineWeekly* (October 11, 2018) https://electionline.org/electionline-weekly/2018/10-11/#tab-2
- o "An Opportunity to Make Every Vote Count" *Governing Magazine* (August 7, 2018)
- o "Increasing Trust in Elections: Democracy Fund's Election Validation Project" *electionlineWeekly* (May 31, 2018) https://electionline.org/electionline-weekly/2018/05-31/
- o "National Postal Forum 2018: Who? What? Where? When? & Why?" *electionlineWeekly* (May 17, 2018) https://electionline.org/electionline-weekly/2018/05-17/
- o Co-Authored with Stacey Scholl.  "Electionline.org Joins Democracy Fund" *electionlineWeekly* (January 4, 2018) https://electionline.org/electionline-weekly/2018/01-04/

- **2017**
  - o "You've Got Mail! Electionmail: Be Part of the Solution" *electionlineWeekly* (February 9, 2017) https://electionline.org/electionline-weekly/2017/02-09/
  - o "In Focus this Week Exit Interview: Helen Purcell" *electionlineWeekly* (January 26, 2017) https://electionline.org/electionline-weekly/2017/01-26/

- **2016**
  - o "*The New Realities in Election Mail*" by the Bipartisan Policy Center https://bipartisanpolicy.org/report/voting-by-mail/

- **2015**
  - o Council of State Governments Policy Working Group. "*Recommendations from the CSG Overseas Voting Initiative Policy Working Group*" Council of State Governments, https://ovi.csg.org/wp-content/uploads/2019/08/CSG-OVI-Recommendations-Report-Updated.pdf
  - o "Clarion Call: Voter Registration Modernization" in Council of State Government's *2015 Book of the States.*
  - o "First Person Singular: Tammy Patrick, Traveling the Country, Listening to Election Folks and Some Music" *electionlineWeekly* (June 4, 2015)

- **2014**
  - o Presidential Commission on Election Administration, *"American Voting Experience: Report and Recommendations of the Presidential Commission on Election Administration"* (January 22, 2014) https://web.mit.edu/supportthevoter/www/files/2014/01/Amer-Voting-Exper-final-draft-01-09-14-508.pdf

- **2013**
  - o "U.S. Elections Face a Crossroads on Rights and Technology" *Forbes* online (November 10, 2013)  https://techonomy.com/u-s-elections-face-crossroads-rights-technology/

- **2012**
  - o "Administrative Burden: Perspective of a Western County" in the *Public Administration Review J*ournal of the American Society of Public Administrators (Volume 72, Number 5) https://onlinelibrary.wiley.com/doi/10.1111/j.1540-6210.2012.02619.x

## APPENDIX B: Tammy Patrick CV

**Education:**
- **1991** Purdue University, Bachelor's Degree in American Studies
- **2007** Auburn University, Certified Election Registration Administrator (CERA)

**Election Experience-Employment**
- **2017+** Senior Advisor to the Election team at the Democracy Fund
- **2016+** University of Minnesota Adjunct Professor, Humphrey School of Public Policy
- **2014-2017** Democracy Project Fellow with the Bipartisan Policy Center
- **2003-2014** Federal Compliance Officer for Maricopa County Elections Department
  - Responsible for the Election Department's Voting Rights Act Section 5 submissions.
  - Oversaw voting assistance and materials in Braille, ASL, Spanish, and Tohono O'odham and organized the 2007 Native American Voter Outreach Summit.

**Election Experience—Awards & Recognition**
- **2013** Commissioner on the Presidential Commission on Election Administration, appointed by President Barack Obama
- **2016** USPS creation of ballot-specific Service Type IDs to improve the visibility of ballots in the mail stream
- **2016** National Association County Recorders Election Officials and Clerks Best Practices Award, "Disaster Recovery Plan"
- **2008** Arizona Disability Advocacy Coalition ADA Liberty Patriot Award
- **2008** National Association of Counties Achievement Award, "Maricopa County's Voter Assistance Website"
- **2007** Harvard Kennedy School of Government's Ash Institute Top 50 Innovations in Government, "Election Reporting System"
- **2007** Harvard Kennedy School of Government's Ash Institute Top 50 Innovations in Government Bright Ideas Award, "Election Reporting System"
- **2007** Election Center's Professional Practice Award, "Election Reporting System"
- **2007** National Association of Counties Achievement Award, "Election Reporting System"
- **2006** National Association of Counties Best in Category Award in the County Administration and Management Category, "Voter Language Assistance Proficiency Assurance Program"
- **2006** National Association of Counties Achievement Award, "Voter Assistance and Boardworker Enhancement Training Program"
- **2005** National Association of Counties Achievement Award, "Voter Assistance and Boardworker Enhancement Training Program"

**Election Experience-Boards & Working Groups**
- **2021+** Haas Jr. Foundation Working Group on Language Access
- **2021+** Microsoft Working Group on Vote by Mail Security
- **2020** Virginia Commonwealth Task Force on 2020 Elections
- **2019+** Protect Democracy National Task Force on Electoral Crisis
- **2019+** National Vote at Home Circle of Advisors
- **2019+** University of Minnesota Humphrey School of Public Administration: Election program steering committee
- **2019+** State of Michigan Election Modernization Advisory Committee

- **2017+** State of California Task Force on Voter Choice Act
- **2017+** Election Center Security Task Force Member
- **2017+** Center for Civic Design Board of Advisors
- **2017+** National States Geographic Information Council Circle of Advisors
- **2017+** Advisory Board for the MIT Election Data and Science Lab
- **2016+** State of Washington Postal Task Force
- **2016+** EAC Standards Board Postal Committee Advisor, 2016-present
- **2015+** National Voter Registration Day Steering Committee
- **2014+** Center for Technology in Civic Life Board of Directors, 2014-present
- **2014-2018** Council of State Governments Policy Working Group
- **2012+** IEEE/EAC/NIST Working Group on common data formats & interoperability
- **2010+** United States Postal Service Mailers Technical Advisory Committee
- **2010+** Election Center Postal Committee
- **2010-2018** Pew Advisory Board for the creation of the Elections Performance Index
- **2007-2009** Election Assistance Commission's working group on Language Assistance for Unwritten Languages
- **2006-2009** Election Center's National Task Force on Education and Training
- **2005+** Election Center Legislative Committee

**Election Experience-Testimony & Legislation**
- **2022** City of Philadelphia, testimony on Resolution #210657 for expansion of language access requirements
- **2021** United States Senate, written testimony on John Lewis Voting Rights Act Reauthorization
- **2020** United States House of Representatives, Homeland Security Committee testified in hearing on absentee/voting by mail/electionmail
- **2020** United States House of Representatives, House Administration Committee written testimony on absentee/voting by mail/electionmail
- **2016-2019** United States Department of Justice, Civil Rights Division subject matter expert report on voter accessibility and then settlement implementation support to jurisdiction
- **2015** United States Senate, Senate Rules Committee hearing on voter registration
- **2010** National Conference of Commissioners on Uniform State Law's Uniform Military and Overseas Voters Act active observer and contributor
- **2008-2017** Testified in state legislatures on online voter registration (Florida, Ohio, Rhode Island, Wisconsin); consolidation of election dates (Kansas); professionalization of election administration (Connecticut), expansion of voting options and vote by mail administration (California)
- **2007** United States House of Representatives, Administration Elections Subcommittee, hearing on election audits

**Election Experience-Publication**
- **2022**
  - Co-authored with Lindsay Daniels, *Journal of Election Administration Research and Practice,* (estimated publication in March 2022)
  - Co-authored with Becky Stewart**,** "Now Live: Democracy Fund's Language Access for Voters Summit Landing Page" *electionlineWeekly* (February 17th, 2022) https://electionline.org/electionline-weekly/
- **2021**

- o **"**Additional Thoughts from Panelists on Election Reform Issues", *Conference Report The Carter-Baker Commission: 16 Years Later"* (October, 2021)
- o "Language Access for Voters" *electionlineWeekly* (September 16, 2021) https://electionline.org/electionline-weekly/2021/09-16/

- **2020**
  - o "Every Election Has a Story to Tell, Story of 2020 Still Being Written, but Some Chapters are Done" *electionlineWeekly* (November 19, 2020) https://electionline.org/electionline-weekly/2020/11-19/
  - o "New Post Master General Issues Directive" *electionlineWeekly* (July 30, 2020) https://electionline.org/electionline-weekly/2020/07-30/#tab-2
  - o "Election Day Command Centers: A National Snapshot" *electionlineWeekly* (March 12, 2020) https://electionline.org/electionline-weekly/2020/03-12/
  - o Co-authored with David Levine. "Here's Why the U.S. Can Handle Voter Intimidation", *The Fulcrum*, (October 30, 2020)  https://thefulcrum.us/election-dissection/report-voter-intimidation

- **2019 -2021**
  - o Jennifer Morrell. "*Knowing It's Right*" series on post-election audits including "Part One: Practical Guide to Risk Limiting Audits" introduction, Democracy Fund https://democracyfund.org/idea/knowing-its-right-limiting-the-risk-of-certifying-elections/

- **2019**
  - o Co-authored with Katy Owens-Hubler. "Building Terminology in the Field" Chapter 6 in *The Future of Election Administration* https://www.springerprofessional.de/en/the-future-of-election-administration/16853420
  - o "Tammy's Blog: Incoming! Voter Registration Application Data" *electionlineWeekly* (December 5, 2019) https://electionline.org/electionline-weekly/2019/12-05/#tab-2
  - o "Disaster Narrowly Averted: U.S. to Remain in the Universal Postal Union" *electionlineWeekly* (September 26, 2019) https://electionline.org/electionline-weekly/2019/09-26/
  - o "Leave No Voter Behind: Implications of the U.S. Withdrawal from the Universal Postal Union" *electionlineWeekly* (August 1, 2019) https://electionline.org/electionline-weekly/2019/08-01/
  - o "Knowing It's Right, Limiting the Risk of Certifying the Wrong Winner" *electionlineWeekly* (May 23, 2019) https://electionline.org/electionline-weekly/2019/05-23/

- **2018**
  - o "Reflections on Election: Communication, Collaboration, and Commitment" *electionlineWeekly* (November 29, 2018) https://electionline.org/electionline-weekly/2018/11-29/
  - o **"**Tammy's Blog: ADA Compliance at the Polls: What Everyone Needs to Know about Accessible Elections and Voters' Rights" *electionlineWeekly* (November 1, 2018) https://electionline.org/electionline-weekly/2018/11-01/#tab-2
  - o "Tammy's Blog: My 2018 Summer Vacation" *electionlineWeekly* (October 11, 2018) https://electionline.org/electionline-weekly/2018/10-11/#tab-2
  - o "An Opportunity to Make Every Vote Count" *Governing Magazine* (August 7, 2018)
  - o "Increasing Trust in Elections: Democracy Fund's Election Validation Project" *electionlineWeekly* (May 31, 2018) https://electionline.org/electionline-weekly/2018/05-31/

17

- o   "National Postal Forum 2018: Who? What? Where? When? & Why?" *electionlineWeekly* (May 17, 2018) https://electionline.org/electionline-weekly/2018/05-17/
- o   Co-Authored with Stacey Scholl.  "Electionline.org Joins Democracy Fund" *electionlineWeekly* (January 4, 2018) https://electionline.org/electionline-weekly/2018/01-04/
- **2017**
  - o   "You've Got Mail! Electionmail: Be Part of the Solution" *electionlineWeekly* (February 9, 2017) https://electionline.org/electionline-weekly/2017/02-09/
  - o   "In Focus this Week Exit Interview: Helen Purcell" *electionlineWeekly* (January 26, 2017) https://electionline.org/electionline-weekly/2017/01-26/
- **2016**
  - o   "*The New Realities in Election Mail*" by the Bipartisan Policy Center https://bipartisanpolicy.org/report/voting-by-mail/
- **2015**
  - o   Council of State Governments Policy Working Group. "*Recommendations from the CSG Overseas Voting Initiative Policy Working Group*" Council of State Governments, https://ovi.csg.org/wp-content/uploads/2019/08/CSG-OVI-Recommendations-Report-Updated.pdf
  - o   "Clarion Call: Voter Registration Modernization" in Council of State Government's *2015 Book of the States.*
  - o    "First Person Singular: Tammy Patrick, Traveling the Country, Listening to Election Folks and Some Music" *electionlineWeekly* (June 4, 2015)
- **2014**
  - o   Presidential Commission on Election Administration, *"American Voting Experience: Report and Recommendations of the Presidential Commission on Election Administration"* (January 22, 2014) https://web.mit.edu/supportthevoter/www/files/2014/01/Amer-Voting-Exper-final-draft-01-09-14-508.pdf
- **2013**
  - o   "U.S. Elections Face a Crossroads on Rights and Technology" *Forbes* online (November 10, 2013)  https://techonomy.com/u-s-elections-face-crossroads-rights-technology/
- **2012**
  - o   "Administrative Burden: Perspective of a Western County" in the *Public Administration Review j*ournal of the American Society of Public Administrators (Volume 72, Number 5) https://onlinelibrary.wiley.com/doi/10.1111/j.1540-6210.2012.02619.x

## Election Experience-Communications & Presentations Highlights

- **Print News:** Washington Post, New York Times, Los Angeles Times, Chicago Tribune, Boston Herald, USA Today, Huffington Post, Politico, Mother Jones, Wall Street Journal, the Guardian, AP, Reuters, Bloomberg News
- **Magazines**: TIME, Atlantic, People, Forbes, New Yorker
- **Television**: ABC, BBC, CBS This Morning & CBS Evening News, CNN, NBC, MSNBC, NY1, PBS News Hour (election expert for the 2020 Presidential Election), Univision, Al Jazeera
- **Radio**: NPR
- **2021** "Electoral Reforms and Democracy" panelist, Global Forum on Democracy

18

- **2021** "Securing Democracy Through Election" panelist, Department of Homeland Security CISA Cybersecurity Summit
- **2020** International Foundation for Electoral Systems
- **2019** Carter Center
- **2016** "Delivering Democracy" webinar presented at the National Postal Forum and Ms. Patrick became the only non-postal employee to present to their operational leadership team
- **2011** "UOCAVA Voter Trend Analysis and Risk Assessment" presented to the Technical Guidelines Development Committee at the National Institute of Science and Technology
- **2010+** Speaker, panelist, discussant, keynote at national conferences for Election Center, National Association of State Elections Directors, National Association of Secretaries of State, National Conference of State Legislatures, International Association of Government Officials, United States Election Assistance Commission, National Postal Forum

## APPENDIX C:

2019 Democracy Fund/Reed College Survey of Local Election Officials Figure 6 highlights the important role that voter education, assistance, and services play in the hearts and minds of election officials:



**APPENDIX D:**

2020 Democracy Fund/Reed College Survey of Local Election Officials highlights the staffing inequities across jurisdiction sizes. Small jurisdictions, often those that are rural, are disproportionately impacted by not having any full-time staff in the majority of offices. Voters in these areas need to rely on self-identified assistance.



Source: 2020 Democracy Fund/Reed College Survey of Local Election Officials

## APPENDIX E:

2020 Democracy Fund/Reed College Survey of Local Election Officials documented the challenges that election officials were experiencing in securing bilingual pollworkers, a situation that only further highlights the impact restrictions on voter-chosen assistants can have on their ability to participate.



# EXHIBIT 112

**V I R G I N I A:**     **IN THE CIRCUIT COURT OF FAIRFAX COUNTY**

VIRGINIA INSTITUTE FOR PUBLIC POLICY, INC.
_____
Plaintiff
vs.

Civil Action No.  CL <u>2021</u> - <u>14420</u>

SCOTT O. KONOPASEK, et al.
_____
Defendant

Previous Chancery No.  CH _____

### FRIDAY MOTIONS DAY - RESPONSE/OPPOSITION TO MOTION

Title of Motion(s) to which Response is filed: <u>MOTION FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Responding Party: <u>DEFENDANTS, SCOTT O. KONOPASEK, ET AL.</u>

DATE TO BE HEARD: <u>10-29-21 @ 2:00 PM     (SPECIALLY SET by J. DEVINE)</u>

Time Estimate (combined, no more than 30 minutes): <u>30</u>

**RESPONSE** by: <u>ALEXANDER FRANCUZENKO</u>      <u>COOK, CRAIG & FRANCUZENKO,PLLC</u>
Printed Attorney Name/ Responding Party Name        Firm Name

<u>3050 CHAIN BRIDGE ROAD, SUITE 200, FAIRFAX, VA 22030</u>
Address

<u>(703) 865-7480</u>      <u>(703) 434-3510</u>      <u>36510</u>      <u>alex@cookcraig.com</u>
Tel. No.                Fax No.              VSB No.            E-Mail Address

### CERTIFICATIONS

☑ I certify that I have in good faith conferred or attempted to confer with other affected parties in an effort to resolve the subject of the motion without Court action; and,

☑ I have read, and complied with, each of the Instructions for Responding Party on the reverse side of this form.

_____
Responding Party/Counsel of Record

### CERTIFICATE OF SERVICE

I certify on the <u>27TH</u> day of <u>OCTOBER</u>, 2021 , a true copy of the foregoing Response was

☑ mailed ☐ faxed ☑ delivered to all counsel of record pursuant to the provisions of Rule <u>4:15</u>(e) of the Rules of the Supreme Court of Virginia.

_____
Responding Party/Counsel of Record

## INSTRUCTIONS FOR RESPONDING PARTY

**PARTIES/MOTION PAPERS**: If you receive notice of a motion set for the Two Week Docket, you must file a memorandum of points and authorities of five (5) pages or less in response. Such memorandum or any other pleading in opposition to a Two Week Motion, accompanied by the Court's green colored Response/Opposition to Motion – Friday Motions Day form, must be received by the Clerk of the Court no later than 4:00 p.m. on the Friday preceding the date of the hearing, or the Court may treat the matter as uncontested. If either party believes it necessary to file a memorandum exceeding five double-spaced pages, then the parties must utilize the Briefing Schedule procedure: contact opposing counsel or the opposing party and by agreement conduct a telephone conference call with the Calendar Control Judge, (703) 246-2221; or, if agreement is not possible, give advance notice of an appearance before the Calendar Control Judge to establish a Briefing Schedule.

As files for One Week Motions are normally received by the Judges on Thursday afternoon, any written response filed to a One Week Motion, without the Court's prior approval, may not be received by the Judge prior to the hearing. Where the responding party to a One Week Motion wishes to file a response, and further wants to assure that it will be timely received by the Judge, the parties should continue the motion, by agreement, to a Two Week Docket or, absent agreement, contact the Calendar Control Judge.

**Each side should bring a draft proposed order to Court on the day of the hearing, as the ruling must be reduced to an order that day, absent leave of Court.** Cases may only be removed from the docket by the Court or by counsel for the moving party or the moving party. One Week Motions may be removed from the docket up until 4:00 p.m. on the Thursday preceding the hearing date, by contacting the Motions Clerk: (703) 246-4355. Two Week Motions may not be continued or removed from the docket after 4:00 p.m. on the Friday preceding the hearing date, without leave granted by the Judge assigned to hear the motion, for good cause shown.

If a hearing on any motion must take longer than thirty (30) minutes, the moving and responding parties, or their counsel, should appear before the Calendar Control Judge to request a hearing for a day other than a Friday. See, "Motions Requiring More than 30 Minutes" in "Friday Motions Docket Procedures" on the Court's website at https://www.fairfaxcounty.gov/circuit/sites/circuit/files/assets/documents/pdf/civil-friday-motions-docket-procedures.pdf

**CERTIFICATE OF SERVICE**: Pursuant to Rule 4:15(e), a motions pleading shall be deemed served when it is actually received by, or in the office of, counsel of record through delivery, mailing, or facsimile transmission; not when it is mailed or sent.

## INFORMATION FOR RESPONDING PARTY

**CONCILIATION PROGRAM**: The Fairfax Circuit Court strongly encourages use of conciliation procedures to resolve motions. The Fairfax Bar Association's Conciliation Program conducts conciliation without charge by experienced litigators, who meet in person or by telephone with all interested parties. To request conciliation, fax a Request for Conciliation form to the Fax Hotline, (703) 273-1274; e-mail a request for conciliation to: ffxconciliation@aol.com; or leave a voice mail message at (703) 627-1228. You will be contacted before the hearing date by a representative of the Conciliation Program.

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR FAIRFAX COUNTY

| | |
|---|---|
| **VIRGINIA INSTITUTE**<br>**FOR PUBLIC POLICY, INC.,** | )<br>)<br>) |
| **Plaintiff,** | )<br>) |
| **v.** | )<br>)     **CL2021-14420**<br>) |
| **SCOTT O. KONOPASEK,** *et al.*, | )<br>) |
| **Defendants.** | )<br>)<br>) |

## DEFENDANT SCOTT KONOPASEK'S OPPOSITION TO PLAINTIFF'S MOTION FOR DECLARATORY AND INJUCTIVE RELIEF

COMES NOW, Scott O. Konopasek, ("Defendant"), in his official capacity as Director of the Office of Elections and General Registrar for Fairfax County, by counsel, Alexander Francuzenko, Esq., Christopher T. Craig, Esq., John David Coker Esq., and the law firm of Cook Craig & Francuzenko, PLLC, and states as follows in opposition to Plaintiff's Complaint for Declaratory and Injunctive Relief:

## ARGUMENT

This matter focuses solely upon Virginia's absentee ballot application statute. Not the ballot itself, or the election. Specifically, Plaintiff alleges Defendant violated Va. Code § 24.2-706(C) by sending absentee ballots to voter applicants who failed to include the last four digits of their Social Security Number ("SSN") on their ballot applications. Unfortunately, under that same statute Plaintiff lacks standing to bring this action, and the relief sought cannot be granted. But even if Plaintiff had standing, and the relief sought was available, Plaintiff has no

"likelihood of prevailing on the merits," falling short of that critical injunction requirement.

Defendant therefore asks this Court to dismiss this matter, with prejudice.

## STANDING

Under Va. Code §24.2-706, the General Assembly of Virginia provided great clarity as to

who has proper party standing to challenge the Registrar's absentee ballot procedures.

Specifically, Va. Code §24.2-706 (C) says:

> The circuit courts shall have jurisdiction to issue an injunction to enforce the provisions of this section upon the application of (i) any aggrieved voter, (ii) any candidate in an election district in whole or in part in the court's jurisdiction where a violation of this section has occurred, or is likely to occur, or (iii) the campaign committee or the appropriate district political party chairman of such candidate.

For this reason alone, this action must be dismissed.

Furthermore, under time-honored Supreme Court of Virginia precedent, a party

only has standing if, "it can show an immediate, pecuniary, and substantial interest in the

litigation, and not a remote or indirect interest." *Westlake Properties, Inc. v. Westlake*

*Pointe Prop. Owners Ass'n, Inc.,* 273 Va. 107, 120 (2007) (internal citations omitted). "The

concept of standing concerns itself with the characteristics of the person or entity who files

suit. The point of standing is to ensure that the person who asserts a position has a

substantial legal right to do so and that his rights will be affected by the disposition of the

case." *Cupp v. Bd. of Supr's of Fairfax County*, 227 Va. 580, 589 (1984).

Here Plaintiff is a Virginia nonstock corporation qualified as tax exempt under Section

501(c)(3) of the Internal Revenue Code. Though its mission is, "dedicated to promoting and

fostering individual liberty, dynamic entrepreneurship, economic growth, the rule of law, and

adherence to constitutional limits" (Compl. ¶ 5), Plaintiff is not listed among the class of the

persons and entities upon which the statute bestows standing to bring an action such as the one presented in this matter.   As such, the Court must dismiss this action.

Plaintiff claims it will suffer irreparable harm in that, "[it] has a unique interest in the 2021 General Election because it opposes the school bond question that will appear on the ballot." (Compl. ¶ 26).  However, even under *Westlake* Plaintiff failed to show an immediate interest and instead proffered only an indirect interest in which it claims it will have to, "devote additional time and resources. . . to discussion, planning, and cataloging. . ." *Id.* at 28.  Under the *Cupp* analysis, Plaintiff further fails to show a substantial legal right to bring suit under the applicable statute, which only grants standing to three specific parties: voters, candidates or their campaign committee in the appliable district, or the appropriate political party district chairman.

## MOOTNESS

Beyond a lack of standing, Plaintiff also failed to state a claim upon which the relief requested can be granted.  Specifically, Plaintiff asks this Court to enjoin the Fairfax County Registrar from sending absentee ballots to applicants who failed to list a portion of their SSN on their application.  But that relief cannot be granted as the statutorily required period of time within which the Registrar may mail absentee ballot to voters closed October 22, 2021, at 5:00 P.M. *See* Va. Code § 24.2-701(B)(2).  Therefore, any order enjoining the Registrar as requested would be a nullity, and moot on its face.

The Supreme Court stated in 2012 that, "[w]henever it appears or is made to appear that there is no actual controversy between the litigants, or that, if it once existed, it has ceased to do so, it is the duty of every judicial tribunal not to proceed to the formal determination of the apparent controversy, but to dismiss the case." *E.C. v. Virginia Dept. of Juvenile Justice*, 283 Va. 522, 530 (2012) (internal citations omitted).  The Court went on to hold, "It is not the office

of courts to give opinions on abstract propositions of law, or to decide questions upon which no rights depend, and where no relief can be afforded.  Only real controversies and existing rights are entitled to invoke the exercise of their powers." *Id.*  In 2006 the Court held that, "[m]ootness, however it may have come about, simply deprives us of our power to act; there is nothing for us to remedy, even if we were disposed to do so. . . we acknowledge there may be narrow circumstances in which a court may decide a case despite the absence of an actual, ongoing dispute—like when the underlying controversy is one capable of repetition, yet evading review." *Virginia Dept. of State Police v. Elliott*, 48 Va. App. 551, 555 (2006) (internal citations omitted).

Given that the Registrar is no longer charged with mailing absentee ballots, no actual controversy exists, the relief sought cannot be granted,[1] and this Court should dismiss the matter.

## PLAINTIFF IS NOT LIKELY TO PREVAIL ON THE MERITS

Beyond these procedural deficiencies preventing this Court from reaching the merits, Plaintiff misreads the statute by ignoring the discretion provided to the Registrar by the General Assembly.  In doing so, Plaintiff betrays its likelihood of prevailing in the merits.

Under the statute, "[a]pplications for absentee ballots shall contain the following information: The applicant's printed name and the last four digits of the applicant's social security number." Va. Code § 24.2-701(C)(1).  "In reviewing the application for an absentee ballot, the general registrar *shall not reject* the application of any individual because of an *error or omission* on *any* record or paper relating to the application, if such error or omission *is not material* in determining whether such individual is qualified to vote absentee." Va. Code § 24.2-706(B) (emphasis added).

---

[1] Note that nothing in Plaintiff's motion suggests that this mater falls into a "narrow circumstance. . . that is capable of repetition. . .", or that the alleged irreparable harm will continue. *Va. Dept of State Police* at 554-55.

The very statute that Plaintiff alleges is being violated includes both an exception to the listed requirements for the absentee ballot applications and provides the Registrar with the discretion to judge materiality. Specifically, without further statutory guidance Defendant Registrar must decide what is *material* when "determining whether such individual is qualified to vote absentee." *Id.* For example, the Registrar need not rely on SSN information for identity verification when Defendant can verify the applicant's name and address and compare his or her signature to the voter's signature on file within the Registrar's Office. Had the General Assembly preferred *not* to grant the Registrar such discretion, it could have written § 24.2-706(B) to prevent such discretion that is afforded to the Registrar. Indeed, nowhere in the Code does the statute direct the Registrar to refrain from mailing an absentee ballot to an applicant that failed to include the SSN. As statutes must be strictly construed, Plaintiff is not likely to prevail on the legal merits of its complaint and therefore its request for an injunction must be denied.

Respectfully Submitted,

Alexander Francuzenko, VSB# 36510
Christopher T. Craig, VSB# 36983
John David Coker, VSB# 92883
3050 Chain Bridge Road, Ste. 200
Fairfax, VA 22030
Phone: (703) 865-7480
Fax:    (703) 434-3510
alex@cookcraig.com
ccraig@cookcraig.com
jdcoker@cookcraig.com

## CERTIFICATE OF SERVICE

I HEREBY certify that on this 27TH day of October 2021, I sent a copy of the foregoing to the following parties via e-mail and ~~courier~~: *Regular mal : (tc)*

J. Christian Adams (VSB No. 42543)
Public Interest Legal Foundation
1729 King Street, Suite 350
Alexandria, VA 22314
(703) 963-8611
adams@publicinterestlegal.org
*Counsel for Plaintiff Virginia Institute for Public Policy, Inc.,*


Robert E. Draim (VSB No. 18635)
HUDGINS LAW FIRM, PC
2331 Mill Road, Suite 100
Alexandria, VA  22314
(703) 739-3300 phone
rdraim@hudginslawfirm.com
*Counsel for Defendants Stephen M. Hunt, in his capacity as Chairman of the Fairfax County Electoral Board, Bettina M. Lawton, in her capacity as Vice-Chairman of the Fairfax County Electoral Board, and Katherine K. Hanley, in her capacity as Secretary of the Fairfax County Electoral Board*


Alexander Francuzenko, VSB# 36510
Christopher T. Craig, VSB# 36983
John David Coker, VSB# 92883
3050 Chain Bridge Road, Ste. 200
Fairfax, VA 22030
Phone: (703) 865-7480
Fax:     (703) 434-3510
alex@cookcraig.com
ccraig@cookcraig.com
jdcoker@cookcraig.com