## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | |
| *Plaintiffs,* | 5:21-cv-844-XR |
| *v.* | |
| GREGORY W. ABBOTT, et al., | |
| *Defendants.* | |
| | |
| LULAC TEXAS, et al., | |
| *Plaintiffs,* | 1:21-cv-0786-XR |
| v. | |
| JANE NELSON, et al., | |
| *Defendants.* | |

## LULAC PLAINTIFFS' OPPOSITION TO INTERVENORS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION .................................................................................................................. 1

RESPONSE TO INTERVENORS' STATEMENT OF UNCONTESTED FACTS ........................ 3

STANDARD OF REVIEW ..................................................................................................... 10

ARGUMENT ....................................................................................................................... 10

    A.  Strict scrutiny is the correct standard for evaluating the Voter Interaction Ban's
       constitutionality. ....................................................................................................... 11

    B.  Intervenors fail to show that the Voter Interaction Ban satisfies strict scrutiny. ............... 15

    C.  Plaintiffs' facial challenges to the Voter Interaction Ban are appropriate and withstand
       summary judgment. ................................................................................................... 21

CONCLUSION .................................................................................................................... 22

CERTIFICATE OF SERVICE ................................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986)..................................................................................................10

*Ariz. Libertarian Party v. Reagan*,
 798 F.3d 723 (9th Cir. 2015) ...................................................................................18

*Babbitt v. United Farm Workers Nat'l Union*,
 442 U.S. 289 (1979).................................................................................................21

*Bernbeck v. Moore*,
 126 F.3d 1114 (8th Cir. 1997) .................................................................................15

*Buckley v. Am. Const. L. Found., Inc.*,
 525 U.S. 182 (1999).................................................................................................14

*Burdick v. Takushi*,
 504 U.S. 428 (1992).................................................................................................14

*Burson v. Freeman*,
 504 U.S. 191 (1992).................................................................................................20

*Cadena v. El Paso Cnty.*,
 946 F.3d 717 (5th Cir. 2020) ...................................................................................17

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986).................................................................................................10

*Citizens United v. Federal Election Commission*,
 558 U.S. 310 (2010)................................................................................2, 12, 13, 21

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
 142 S. Ct. 1464 (2022)......................................................................................11, 13

*Cotham v. Garza*,
 905 F. Supp. 389 (S.D. Tex. 1995) ..........................................................................13

*Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n*,
 760 F.3d 427 (5th Cir. 2014) ...............................................................12, 18, 19, 20

*Hart v. Hairston*,
 343 F.3d 762 (5th Cir. 2003) ...................................................................................17

*Libertarian Party of Ohio v. Blackwell*,
 462 F.3d 579 (6th Cir. 2006) ................................................................18

*Mazo v. New Jersey Sec'y of State*,
 54 F.4th 124 (3d Cir. 2022) ..................................................................14

*McIntyre v. Ohio Elections Comm'n*,
 514 U.S. 334 (1995)......................................................................12, 13

*Meyer v. Grant*,
 486 U.S. 414 (1988)..........................................................3, 12, 13, 15

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
 559 U.S. 229 (2010)............................................................................22

*NAACP v. Button*,
 371 U.S. 415 (1963)............................................................................15

*Perez v. Abbott*,
 253 F. Supp. 3d 864 (W.D. Tex. 2017)..................................................3

*R.A.V. v. City of St. Paul*,
 505 U.S. 377 (1992)......................................................................17, 21

*Reed v. Town of Gilbert*,
 576 U.S. 155 (2015)................................................................2, 11, 12, 13

*Serv. Emps. Int'l Union v. City of Hous.*,
 595 F.3d 588 (5th Cir. 2010) ..........................................................11, 20

*Sheridan v. Garrison*,
 415 F.2d 699 (5th Cir. 1969) ...............................................................22

*Susan B. Anthony v. Driehaus*,
 573 U.S. 149 (2014)............................................................................21

*Tex. League of United Latin Am. Citizens v. Hughs*,
 978 F.3d 136 (5th Cir. 2020) .................................................................4

*United States v. Playboy Ent. Grp.*,
 529 U.S. 803 (2000)..................................................................13, 17, 20

*Vicari v. Ysleta Indep. Sch. Dist.*,
 546 F. Supp. 2d 387 (W.D. Tex.), *aff'd in part*, 291 F. App'x 614 (5th Cir. 2008) ...........................................................................................10

*Voting for Am. Inc. v. Steen*,
 732 F.3d 382 (5th Cir. 2013) .......................................................13, 14, 15

**Statutes**

Tex. Elec. Code § 64.012 ............................................................................................20

Tex. Elec. Code § 276.013 ..........................................................................................20

Tex. Elec. Code § 276.015 ............................................................................................1

Tex. Elec. Code § 276.015(a)(1) ...................................................................................6

Tex. Elec. Code § 276.015(a)(2) ...................................................................................6

Tex. Penal Code § 12.34 .........................................................................................6, 16

**Other Authorities**

Fed. R. Civ. P. 56(a) ...................................................................................................10

Proclaimation, No. 41-3772, 45 Tex. Reg. 7079 (Oct. 1, 2020)...................................4

Texas Senate Bill 1 ............................................................................................ *passim*

Plaintiffs Texas LULAC ("LULAC"), Texas Alliance for Retired Americans ("TARA"), Texas American Federation of Teachers ("AFT"), and Voto Latino, collectively "LULAC Plaintiffs" or "Plaintiffs," by and through their undersigned counsel, oppose the motion for summary judgment filed by Intervenor-Defendants Harris County Republican Party, Dallas County Republican Party, Republican National Committee, National Republican Senatorial Committee, and National Republican Congressional Committee ("Intervenors"), *see* ECF No. 608 ("GOP Mot."), and joined by Defendants Gregory W. Abbott, Jane Nelson, Warren K. Paxton, and the State of Texas ("State Defendants"), *see* ECF No. 610.

LULAC Plaintiffs adopt in their entirety the arguments related to Section 208 that Plaintiffs La Union del Pueblo Entero, Friendship-West Baptist Church, Southwest Voter Registration Education Project, Texas Impact, Mexican American Bar Association of Texas, Anti-Defamation League Austin, Southwest, and Texoma, Texas Hispanics Organized for Political Education, Jolt Action, William C. Velasquez Institute, FIEL Houston Inc., and James Lewin, collectively ("LUPE Plaintiffs") raise in their Response in Opposition to Intervenors' Motion for Summary Judgment.

## INTRODUCTION

Texas has a long and regrettable history of making it difficult for people—and particularly its non-white residents—to vote, including by criminalizing efforts to facilitate participation at every step of the voting process. SB 1, which was passed in response to baseless claims of fraud in the 2020 presidential election, continues this reprehensible legacy. As relevant here, SB 1 makes it a crime—punishable by up to *ten years* in prison and a $10,000 fine—to have an "in-person interaction with one or more voters" that is "intended to deliver votes for a specific candidate or measure," if such an interaction happens to be in the "physical presence" of a ballot and if the speaker is receiving "compensation" or a "benefit." SB 1 § 7.04 (adding Tex. Elec. Code § 276.015) ("Voter Interaction Ban"). This sweeping ban on core political speech prohibits

completely unremarkable—but constitutionally-protected—expression, such as a canvasser who receives a stipend encouraging a voter to support a local ballot measure, should the voter's ballot happen to be nearby.

This overbroad prohibition on run-of-the-mill political speech causes serious injury to the LULAC Plaintiffs, who as part of their missions directly engage with voters and encourage them to support policies and candidates. The injury to the LULAC Plaintiffs is twofold: first, the Voter Interaction Ban chills Plaintiffs and their members from engaging in core protected speech—expression meant to urge a voter to act—and second, the Ban forces Plaintiffs to divert resources from other key initiatives central to their mission, including fundraising drives, membership recruitment, and other policy work, all in order to address the burden that the Ban places on Plaintiffs' ability to engage with voters.

Against this unrefuted record of injury—and ignoring the broad prohibition on political speech imposed by the Voter Interaction Ban's plain text—the Republican Intervenors demand this Court grant summary judgment and find that the Ban does not violate the First Amendment. In doing so, they rely on a series of flawed legal arguments. For example, they seek to lower their burden of proof by insisting that Plaintiffs' First Amendment claims are governed by the *Anderson-Burdick* balancing test; that is dead wrong. The Supreme Court has unambiguously held that content-based restrictions on core political speech, like the Voter Interaction Ban, are subject to strict scrutiny, and thus must be narrowly tailored to serve a compelling interest. *See, e.g.*, *Citizens United v. Federal Election Commission*, 558 U.S. 310, 340 (2010); *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The Republican Intervenors point to *no record evidence at all* that the Voter Interaction Ban meets this demanding standard. If anything, the record uniformly

shows that the Ban is a pointless and confusing burden on speech that serves no interest at all, never mind a compelling one.

Similarly, the Intervenors suggest Plaintiffs' First Amendment challenge must be dismissed because it is "facial." That argument is doubly wrong—whether a challenge is "facial" or not speaks to the breadth of an appropriate remedy but has no bearing on whether summary judgment is appropriate. Just as importantly, the argument ignores that the LULAC Plaintiffs' claims are *not* purely facial, but instead seek to remedy ongoing harm that the Voter Interaction Ban inflicts upon them. Such pre-enforcement First Amendment challenges are routinely decided in plaintiffs' favor and are critical to ensuring the "fundamental personal rights and liberties which are secured to all persons" under the Constitution. *Meyer v. Grant*, 486 U.S. 414, 420 (1988). The Intervenors' legally flawed and factually groundless motion should be denied.

## RESPONSE TO INTERVENORS' STATEMENT OF UNCONTESTED FACTS

Far from providing voters with a "panoply" of options to complete and cast their ballots, as the Intervenors gamely assert in their motion for summary judgment, GOP Mot. at 3, Texas has long been recognized as having among the most restrictive voting laws in the United States. *See* Rep. of Dr. Allan J. Lichtman ("Lichtman Rep.") at 25, 42–46 (LULAC Ex. E, App. 1); *see also Perez v. Abbott*, 253 F. Supp. 3d 864, 959 (W.D. Tex. 2017) (recognizing Texas's history of "restrictive and discriminatory voting laws" enacted in "response to a perception of increased voting power by emerging demographic groups"). Even before SB 1, Texas backed its restrictive voting regime with aggressive criminal prosecution of perceived election violations, a practice that has disproportionately targeted Black and Latino Texans. *See* Lichtman Rep. at 52, n.94. SB 1 is just the latest chapter in the state's ongoing history of hyper-criminalized electoral processes.

In 2020, Texans braved a global pandemic and restrictive voting laws to exercise their right to the franchise. In response to the COVID-19 crisis, county election officials across the state took

action to protect voters' access to the ballot box. These measures included extending early voting hours or setting up drop-box locations where voters could safely deposit their ballots. *See* LULAC Pls.' Second Am. Compl. ("SAC") at ¶¶ 54, 70 (certain counties offered early voting from 7:00 a.m. to 7:00 p.m., and Harris County established 12 ballot drop box locations); *see also Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 140-1 (5th Cir. 2020) (noting that during the 2020 election, a few large Texas counties wanted to set up multiple drop-box locations for absentee ballots); GOP Mot. Ex. A, Longoria Dep. Tr. at 76–77 (noting that Harris County set up "drive-thru" voting locations and kept some early-voting locations open overnight); *see also* Lichtman Rep. at 11 (Bee County and Calhoun County used drive-thru voting in 2020 election).

Rather than support efforts to make voting accessible in a global pandemic, Texas state officials pushed back. For example, Governor Abbott responded to certain counties' innovative pro-voter initiatives by restricting all counties to offering only a single drop box for early voting, regardless of the size or population of a given county. *See* Proclamation No. 41-3772, 45 Tex. Reg. 7079, 7080–81 (Oct. 1, 2020). Several weeks later, Attorney General Ken Paxton issued a statement attacking the legality of drive-thru voting centers employed in several counties, including Harris County. *See* Lichtman Rep. at 11. Shortly after Paxton released that statement, a Republican member of the Texas House of Representatives and several Republican candidates sued to toss out over 100,000 ballots cast at drive-thru voting centers during the 2020 general election in Harris County—Texas's largest and most racially diverse county—but tellingly took no action against drive-thru ballots cast in the same election in Bee County and Calhoun County, which are less racially diverse than Harris County. *Id.* at 11, 85 (noting that Republican Bee and Calhoun Counties have more proportionally more white voters than Harris County).

4

Despite state officials' last-minute attempts to interfere with these county-level efforts to make voting more accessible, Texas's 2020 general election was ultimately "smooth and secure" according to the Director of Elections. SAC ¶ 80; May 6, 2022, 30(b)(6) Dep. Tr. of Keith Ingram at 264:7–13 (Ex. E, App. 2) (describing the 2020 general election as a "smooth, safe, and secure election in the middle of a pandemic"). The evidence-free accusations of voter fraud from some elected officials were discredited, *id.* at 265:7–266:8 (describing Texas Secretary of State's office perception of the 2020 general election as a "resounding success" devoid of "rampant fraud"), and Intervenors point to no record evidence to the contrary. Rather than revealing any widespread criminal activity, the 2020 election in Texas featured historic turnout—about 67 percent of registered voters in Texas cast ballots, making it the highest turnout election in Texas since 1992.[1] *See* Apr. 26, 2022 30(b)(6) Dep. Tr. of Keith Ingram at 205:1–16 (Ex. E, App. 3) (stating that it was "remarkable . . . to have a record number of voters vote without any problem in the middle of a pandemic."); *see also* May 6, 2022, 30(b)(6) Dep. Tr. of Keith Ingram at 265:7–11 (noting "record turnout" in 2020 general election).[2]

Increased participation in the political process is usually cause for celebration, but Governor Abbott and the Texas Legislature took it as cause for alarm. They responded by surgically targeting the very measures that helped enable such increased turnout in the first place. *See* Lichtman Rep. at 78–86. The voting methods most impacted by SB 1 were, by no coincidence, disproportionately relied upon by non-white Texans during the 2020 election. *Id.* at 40–52. For

---

[1] *See* Texas Secretary of State, *Turnout and Voter Registration Figure (1970-current)*, https://www.sos.state.tx.us/elections/historical/70-92.shtml.

[2] *See also*, Daniel Arkin, *Texas breaks turnout records as more than 9 million cast ballots before Election Day*, NBC News (Oct. 30, 2020), https://www.nbcnews.com/politics/2020-election/texas-breaks-turnout-records-more-9-million-cast-ballots-election-n1245482 (last accessed Jun. 21, 2023).

instance, SB 1 restricts access to early voting, *see* SB 1 §§ 3.04, 3.12–3.13 (eliminating drive-thru voting), *id.* §§ 3.09–3.10 (restricting when counties can offer early voting hours); eliminates drop boxes, *id.* § 4.12; expands the power of partisans who observe polling sites and restricts election judges' ability to control such partisans, *see, e.g.*, SB 1 §§ 4.01, 4.02, 4.06–4.07, 4.09; adds new burdensome requirements to Texas's already restrictive mail-voting rules, *see id.* §§ 5.01–5.03, 5.07–5.08; limits the type of assistance that can be provided to voters, *see id.* §§ 6.03–6.04; and criminalizes election-related speech made in the presence of ballots, *see id.* §7.04.

As relevant to the Intervenors' motion for summary judgment on LULAC Plaintiffs' First Amendment claim (Count III), *see* GOP Mot. at 22–27, Section 7.04 of SB 1 prohibits individuals from engaging in "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure" in exchange for "compensation or other benefit[.]" SB 1 § 7.04 (adding Tex. Elec. Code § 276.015(a)(2)). A "benefit" in this context includes "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion." *Id.* § 276.015(a)(1). SB 1's Voter Interaction Ban therefore bars a person from engaging in speech intend to support a cause or candidate if a ballot happens to be "presen[t]" and if the speaker is receiving a "anything reasonably regarded as a gain or advantage," which could include a per diem, gas money, a letter of recommendation from an internship, or even modest tokens of appreciation, such as a LULAC t-shirt or a happy hour after a day of canvassing. Violating the Voter Interaction Ban is a third-degree felony, punishable by up to *ten years* in person and a fine of up to $10,000. *Id.*; Tex. Penal Code. § 12.34.

Despite its broad scope and harsh criminal sanctions, the Voter Interaction Ban is a solution in search of a problem. Neither the Intervenors, nor any of the State Defendants, have presented

any record evidence showing that the Voter Interaction Ban solves a real problem in Texas elections. To the contrary, when asked to identify instances of "impermissible in-person voter assistance" in Texas over the last twenty years, Defendants could muster only fourteen examples— over a period in which dozens of elections were held and tens of millions of ballots were cast. *See* Sec'y of State's May 2, 2022 Response to US Interrogatory No. 4 (Ex. E, App. 4) (noting the Texas Secretary of State has identified only 14 convictions for "impermissible in-person voter assistance by influencing or coercing a voter in the presence of his or her ballot" since 2006); Attorney General's May 11, 2022 Verification of Response to US Interrogatory No. 4 (Ex. E, App. 5) (same). And nowhere do Defendants explain why the Voter Interaction Ban is necessary to prevent any of the types of coercion they cite, all of which were already proscribed by Texas law anyway. *Id.*

Indeed, county officials tasked with administering Texas's elections agree that the Voter Interaction Ban is pointless, vague, and difficult to understand. *See* Apr. 20, 2020 Dep. Tr. of Bexar Elections Administrator Jacquelyn Callanen at 158:3–7 (Ex. E, App. 6) (Defendant not aware of any fraud in connection with so-called "vote harvesting" activities); Defendant Wise, El Paso County Election Administrator Mar. 31, 2023 Responses to LULAC Plaintiffs' 3rd Interrogatories (Ex. E, App. 7) (same); Defendant Limon-Mercado, Travis County Clerk, Mar. 23, 2023 Responses to LULAC Plaintiffs' 3rd Interrogatories (Ex. E, App. 8) (same); *see also* May 10, 2020 Dep. Tr. of Hidalgo Elections Administrator Yvonne Ramon at 70:14–71:4 (Ex. E, App. 9) (Section 7.04 does not serve any county interest); Apr. 29, 2022 Dep. Tr. of Dallas County Elections Administrator Michael Scarpello, at 228:3–229:13 (Ex. E, App. 10) (determining whether voting-related activities violate Section 7.04 was not possible because the provision is vague).

Moreover, the Voter Interaction Ban has already injured each of the LULAC Plaintiffs, as well as their members, volunteers, supporters, and constituencies.

***AFT***. AFT advances its mission of securing the employment rights of its members and advocating for high quality public education by helping its membership vote and supporting measures and candidates that further the union's mission. SAC ¶ 25; AFT Decl. ¶ 2 (Ex. A). SB 1 has necessitated changes to AFT's voter assistance and outreach efforts, often at the cost of its other key programs. Before SB 1's enactment, AFT relied on its large numbers of paid and volunteer block-walkers and its Temporary Political Organizers ("TPOs")—short-term employees who engage with members about voting and support AFT's political organizing—to speak with voters in person, advocate for candidates and issues important to the organization, and remind voters to cast their mail ballots. *See* AFT's Second Supplemental Responses and Objections to State Defendants' First Set of Interrogatories at 7–8 (Ex. E, App. 11); Ex. A ¶¶ 3, 6. The Voter Interaction Ban has forced AFT to drastically alter the way it communicates with its members and voters once mail ballots have been distributed, reducing the efficacy and reach of AFT's political speech. *See* AFT's Second Supplemental Responses and Objections to State Defendants' First Set of Interrogatories at 7; Ex. A ¶¶ 6–12. AFT now directs would-be block-walkers to call voters via telephone, text, or video call rather than knock on voters' doors, and the organization no longer sends its representatives to educate voters or persuade them to support specific candidates or measures in person out of fear that the representatives risk criminal liability. *See* AFT's Second Supplemental Responses and Objections to State Defendants' First Set of Interrogatories at 7–8; Ex. A ¶¶ 11–12.

***LULAC***. The Voter Interaction Ban has crippled LULAC's ability to conduct its voter assistance programs. In-person advocacy and interactions are critical to LULAC's mission of protecting the civil and voting rights of Latinos, as well as its advocacy of issues and legislation important to its constituents. *See* SAC ¶¶ 19–20; LULAC Decl. ¶¶ 3–9 (Ex. B). The Voter

Interaction Ban has a chilling effect on these efforts as fewer LULAC members and volunteers are willing to provide, and fewer seniors are willing to request, assistance in-person for fear inviting criminal investigation. Ex. B ¶ 18. Because LULAC councils provide their volunteers with gifts or reimbursements for their efforts, like gas money, food, or LULAC memorabilia like t-shirts—these nominal tokens could now qualify as a "benefit" under Section 7.04, subjecting LULAC's volunteers to criminal penalties if a mail ballot happens to be present. *Id.* ¶¶ 15–18. As a result, LULAC can no longer engage in the kind of in-person speech that is central to furthering its mission and has ended all in-person advocacy meant to persuade or assist Latino seniors to vote by mail due to SB 1. *Id.* ¶¶ 18–21.

**TARA.** The Voter Interaction Ban has hindered TARA's ability to pursue its mission-critical organizational goals. As part of its mission to "ensure the social and economic justice" of retired Americans, TARA Decl. ¶ 2 (Ex. C), TARA advocates for federal law reform, lobbies lawmakers, and encourages voter registration and civic participation, *id.* ¶¶ 3–6, 11. Its efforts are carried out by volunteer members and part-time organizers who encourage members and other retirees during in-person interactions to vote for measures that the organization supports. *Id.* ¶ 6. But because of the Voter Interaction Ban, TARA's volunteers cannot freely advocate for the causes TARA supports for fear that voters may have their ballots present, particularly as the November election draws nearer. *Id.* ¶¶ 11–13. Concern over the Voter Interaction Ban has therefore restricted one of TARA's most important means of furthering its mission, and the organization has been forced to divert resources from mission-critical initiatives towards "educating members about . . . the restrictions on assistance." *Id.* ¶ 14.

**Voto Latino.** Voto Latino's mission to ensure that Latinx voters are enfranchised and included in the democratic process, *see* SAC ¶ 21, is hindered by the Voter Interaction Ban. Before

the pandemic, Voto Latino's college chapter programming involved interacting with students and community members (in-person) and encouraging them to vote and support measures and candidates aligned with Voto Latino's mission. *See* Voto Latino Decl. (Ex. D) ¶¶ 5–6. Because of the Voter Interaction Ban, Voto Latino has not been able to re-launch its college chapter program out of fear that the new criminal provisions will put its college student volunteers at risk of criminal prosecution. *See id.* ¶ 8. Given that many college students request mail ballots and live in confined spaces like dorm rooms or small apartments, college chapter student canvassers engaging in voter education and voter persuasion efforts will likely interact with voters who happen to be in the physical presence of a ballot. *See id.* ¶¶ 5, 8.

## STANDARD OF REVIEW

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because the moving party bears the burden of showing no genuine dispute of fact, all evidence and reasonable inferences are viewed in the light most favorable to the nonmovant; all disputed facts are resolved in favor of the nonmovant; and the moving party must meet its burden before the burden shifts to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 255–57 (1986). Summary judgment is not appropriate if the nonmovant comes forward with "'significant probative evidence' showing that there is an issue regarding material facts." *Vicari v. Ysleta Indep. Sch. Dist.*, 546 F. Supp. 2d 387, 403–04 (W.D. Tex.), *aff'd in part*, 291 F. App'x 614 (5th Cir. 2008) (citing Fed. R. Civ P. 56(c)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## ARGUMENT

The Voter Interaction Ban is an unconstitutional content-based regulation that restricts the LULAC Plaintiffs' core political speech and does not serve *any* compelling state interest. The Ban

singles out speech intended to deliver votes for specific candidates and measures, restricting the

LULAC Plaintiffs' ability to carry out mission-critical in-person education and registration efforts.

Because the Ban is content-based and inhibits core political speech, it is subject to strict scrutiny

and Intervenors must show that it is narrowly tailored to serve a compelling state interest.

Intervenors failed to meet this standard. Unrefuted evidence shows that the Voter Interaction Ban

has already chilled the LULAC Plaintiffs' speech and will continue to do so in the future. The Ban

is also overbroad and burdensome, restricting a wide range of constitutionally protected conduct

without sufficient justification by any purported state interest. The Court should deny Intervenors'

motion for summary judgment.

> ### A.    Strict scrutiny is the correct standard for evaluating the Voter Interaction Ban's constitutionality.

>> 1.    *The Voter Interaction Ban is an unconstitutional content-based regulation on core political speech.*

At the outset, Intervenors' motion applies the wrong legal standard. It is well-settled that

strict scrutiny applies to regulations that restrict speech based on its content. *Reed*, 576 U.S. at 163.

The Voter Interaction Ban does exactly that: it "single[s] out specific subject matter for differential

treatment"—namely speech intended to deliver votes for a specific candidate or measure. *City of*

*Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (quoting *Reed*, 576

U.S. at 169). No other category of speech is targeted for similar disfavored treatment. *Serv. Emps.*

*Int'l Union v. City of Hous.*, 595 F.3d 588, 596 (5th Cir. 2010) (holding that content-based

regulations are those that distinguish between "favored" and "disfavored speech"). It does not

matter that the Ban does not target speech in support of *specific* candidates or measures—a

regulation is content-based "even if it does not discriminate among viewpoints within that subject

matter." *Reagan Nat'l*, 142 S. Ct. at 1472. Such regulations are presumed unconstitutional unless

"the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163; *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995).

Strict scrutiny is also warranted for a second independent reason: the Voter Interaction Ban unconstitutionally prohibits core political speech. The Ban restricts Plaintiffs' ability to carry out their in-person voter education activities, which are exactly the kinds of "interactive communication[s] concerning political change" that constitute core political speech. *Meyer*, 486 U.S. at 421–22. For example, AFT uses paid and volunteer block-walkers and Temporary Political Organizers ("TPOs") to speak with voters in person about the issues AFT advocates for, Ex. A ¶ 3, and to "persuad[e] voters to support candidates and initiatives aligned with Texas AFT's mission," *id.* ¶ 3. By criminalizing in-person interactions with voters aimed at garnering votes for specific measures or candidates, the Voter Interaction Ban prevents the LULAC Plaintiffs from engaging in the types of core political advocacy that are central to their missions. Like content-based regulations, laws "that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United*, 558 U.S. at 340 (cleaned up); *see also Dep't of Texas, Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n*, 760 F.3d 427, 438 (5th Cir. 2014).

2.     *The Intervenors' attempt to invoke Anderson-Burdick misreads governing standards.*

Perhaps recognizing that the Voter Interaction Ban stands little chance of withstanding proper constitutional scrutiny, the Intervenors suggest that courts must adopt the *Anderson-Burdick* framework whenever a speech restriction is related to elections. GOP Mot. at 23. But the Supreme Court has already rejected similar attempts to conflate regulations that restrict core political speech (and are subject to strict scrutiny), with those that simply "control the mechanics of the electoral process," and held that *Anderson-Burdick* does not apply to "a regulation of pure speech" even in

the election context. *McIntyre*, 514 U.S. at 345; *Cotham v. Garza*, 905 F. Supp. 389, 396 (S.D. Tex. 1995) (holding that provisions governing the mechanics of voting are subject to *Anderson-Burdick* while a "content-based restriction on core political speech" is subject to strict scrutiny).[3] Indeed, it makes little sense that a content-based restriction of core political speech should receive *lesser* scrutiny because it happens to regulate speech during elections, when "the importance of First Amendment protections" is at its "zenith." *Meyer*, 486 U.S. at 425; *McIntyre*, 514 U.S. at 346–47 (noting political speech "occupies the core of the protection afforded by the First Amendment" and that "[n]o form of speech is entitled to greater constitutional protection").

To support their erroneous standard, Intervenors misread *Voting for America Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013), which involved regulations that are readily distinguishable from SB 1's Voter Interaction Ban.[4] *See* GOP Mot. at 23. At issue in *Steen* were provisions that "regulate[d] the appointment and activities of volunteer deputy registrars ("VDRs")," who are "individuals trained and empowered" by the State of Texas to collect "and deliver completed voter registration applications." *Steen*, 732 F.3d at 385. VDRs play a "carefully regulated" role in the administration of elections in Texas, and act *on behalf of the state* "to serve the citizens who register to vote as well as the public interest in the integrity of the electoral body." *Id.* at 393.

---

[3] Although the Supreme Court at times has used the terms "strict" and "exacting" scrutiny interchangeably when describing the relevant standard of review for content-based restrictions, more recent Supreme Court precedent has clarified that both content-based regulations and laws that restrict political speech are subject to strict scrutiny. *See*, *e.g.*, *City of Austin*, 142 S. Ct. at 1471 (content-based regulations warrant application of strict scrutiny); *Reed*, 576 U.S. at 164 (content-based regulations must satisfy strict scrutiny); *Citizens United*, 558 U.S. at 340 (laws burdening political speech are subject to strict scrutiny); *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 812–13 (2000) (subjecting content-based restriction to strict scrutiny).

[4] Intervenors' misplaced reliance on *Steen* also ignores that the Fifth Circuit found the restricted activities at issue did not implicate speech to begin with; the court did not need to resolve the applicable legal standard for the plaintiffs' First Amendment challenge.

By contrast, the Voter Interaction Ban regulates political advocacy by non-state actors centered on candidates and measures; the duty of the speakers the Ban restricts "lies in furthering their own or the[ir] sponsors' advocacy." *Steen*, 732 F.3d at 393 (quoting *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 192 n.11 (1999)). The *Steen* court acknowledged the distinction between VDRs and petition circulators, for instance, who—like the LULAC Plaintiffs—engaged in speech to further their own political goals. *Id.* at 393 (quoting *Buckley*, 525 U.S. at 192 n. 11).

"[T]he character of any speech" limitations on VDRs in *Steen* is therefore "qualitatively different from the political speech restricted by" the Voter Interaction Ban, which impedes the LULAC Plaintiffs from carrying out mission-critical advocacy. 732 F.3d at 393. And courts analyzing such burdens on "core political speech" have repeatedly applied strict scrutiny, requiring the state to demonstrate that the challenged restriction is "narrowly tailored to serve a compelling governmental interest." *Buckley*, 525 U.S. at 207; *see also Mazo v. New Jersey Sec'y of State*, 54 F.4th 124, 140 (3d Cir. 2022) (holding that if the challenged "law does not primarily regulate the electoral process and instead aims at regulating political speech, it is subject to a traditional First Amendment analysis").[5]

---

[5] Even *if* the *Anderson-Burdick* framework applied, the Voter Interaction Ban would still be unconstitutional. Under that test, courts must balance the character and magnitude of the asserted injury against the state's justification for the election regulation. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). For all burdens, however slight, the Court must take "into consideration 'the extent to which [the State's] interests make it necessary to burden plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788–89). As discussed further below, the Ban unconstitutionally restricts core political speech, chilling Plaintiffs expressive activities, *see infra* at 15–17, yet the State failed to show that the Ban serves any compelling state interest, *see infra* at 17–21. At a minimum, given the highly fact-specific nature of the *Anderson-Burdick* analysis, there are outstanding questions of material fact as to whether Defendants violated the LULAC Plaintiffs' rights that preclude summary judgment.

**B.      Intervenors fail to show that the Voter Interaction Ban satisfies strict scrutiny.**

1.      *Record evidence shows that the Voter Interaction Ban restricts Plaintiffs' core political speech.*

Plaintiffs' in-person voter engagement activities constitute "the type of interactive communication concerning political change that [are] appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 421–22; *see also NAACP v. Button*, 371 U.S. 415, 437 (1963) ("'Free trade in ideas' means free trade in the opportunity to persuade to action . . . ." (quoting *Thomas v. Collins*, 323 U.S. 516, 537 (1945))). Urging voters to support particular measures or candidates during in-person interactions—the category of speech targeted by the Voter Interaction Ban—is fundamentally expressive, and an individual or organization that conducts such activities engages in speech by encouraging participation in the political process. *Cf. Steen*, 732 F.3d at 390 (recognizing that "[s]oliciting, urging and persuading [a] citizen to vote are" forms of protected speech); *see also Bernbeck v. Moore*, 126 F.3d 1114, 1115–16 (8th Cir. 1997) (rejecting effort to characterize regulation of political speech as mere regulation of the election "process" without First Amendment implications).

Yet because the Voter Interaction Ban is so vaguely and broadly defined—even as it threatens substantial criminal penalties—it hinders, and in some cases deters, the LULAC Plaintiffs' efforts to engage in the in-person advocacy that is central to their core political speech. Ex. A ¶¶ 10, 12; Ex. B ¶¶ 18–21; Ex. C ¶¶ 11–13; Ex. D ¶¶ 8–11. This is evident from the Ban's plain language, which states:

"A person commits an offense if the person, directly or through a third party, knowingly provides or offers to provide vote harvesting services [or 'in-person interaction[s] with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure'] in exchange for compensation or other benefit."

SB 1 § 7.04. The Ban applies to any speaker who is receiving a "benefit"—a term broadly defined as "anything reasonably regarded as a gain or advantage." *Id.* And violating the Voter Interaction Ban is a felony in the third degree punishable by a two-to-ten-year prison term and a fine up to $10,000—a severe penalty for merely encouraging a voter to cast their ballot for a particular candidate or cause. SB 1 § 7.04; Tex. Penal Code § 12.34. AFT traditionally relied on paid volunteers and short-term employees like TPOs to canvass voters in person. Ex. A ¶¶ 3, 6. LULAC gives its volunteers, "often high school seniors and college students . . . modest gifts [and] reimbursements—like food, t-shirts, or compensation for gas"—in exchange for canvassing. Ex. B ¶¶ 15–16. Voto Latino previously gave college student volunteers "modest gifts . . . including invitations to parties and free clothing" for helping students and community members register to vote and "engaging in . . . voter persuasion." Ex. D ¶ 5, 14. By the Ban's express terms, all of these individuals, many teenagers and young adults, risk a ten-year prison term or a $10,000 fine for accepting gifts as trivial as free t-shirts. Ex. B ¶ 15–16; *see also* Ex. D ¶ 9 (noting that Voto Latino's college student volunteers who canvass in "a dormitory or student housing shortly before an election" will "inevitabl[y] . . . encounter some students in the physical presence of a ballot, particularly given that many students live in confined spaces like dorm rooms or small apartments.").

Unrefuted evidence further establishes that the Ban has chilled (and will continue to chill) protected speech. AFT's President, Zeph Capo, explained that the organization no longer sends its representatives in-person to educate and persuade voters to support specific candidates or measures out of fear that the representatives will unwittingly speak to the voters in the presence of their ballot and risk criminal liability. Ex. A ¶ 11. AFT can therefore no longer employ one of its most effective means of persuading voters to support the causes and candidates that are critical to AFT's

mission. *Id.* LULAC's president, Domingo Garcia, testified that LULAC has had difficulty recruiting volunteers to conduct in-person voter outreach because prospective volunteers are afraid of being prosecuted under the Voter Interaction Ban. Ex. B ¶¶ 18–19*; see also* LULAC Apr. 28, 2023, Second Supp. Resp. to the State's First Interrogatories at 5–6 (Ex. E, App. 12). Mr. Garcia also explained that the individuals LULAC assists are similarly skeptical of engaging with LULAC due to fear of criminal liability. Ex. B ¶¶ 18–19*; see also* Ex. E, App. 12. Because LULAC cannot recruit the volunteers it needs or reach its constituents, it cannot engage in the kind of in-person speech that is central to furthering its mission. Similarly, Voto Latino's Managing Director stated that because of the Voter Interaction Ban, Voto Latino faces obstacles in re-launching its college chapters because it fears the "new criminal provisions will put its college student volunteers at risk of criminal prosecution." Ex. D ¶ 8. These are just a few examples of the Voter Interaction Ban's speech-chilling effects, all of which foreclose Intervenors' motion for summary judgment. *See Cadena v. El Paso Cnty.*, 946 F.3d 717, 725 (5th Cir. 2020) (explaining that unrefuted testimony from plaintiffs precludes summary judgment); *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003) (unrefuted statements made under penalty of perjury sufficient to defeat summary judgment).

 2. *The Voter Interaction Ban is not narrowly tailored to further any compelling state interest.*

 To justify the Voter Interaction Ban, the state (or here, Intervenors) must identify an "actual problem" in need of solving, *Playboy*, 529 U.S. at 822–23, and demonstrate that restricting free speech is *necessary* to the solution, *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992). Regulations that "burden political speech are subject to strict scrutiny" and are presumptively unconstitutional unless they "further[] a compelling interest and [are] narrowly tailored to achieve that interest." *Veterans of Foreign Wars*, 760 F.3d at 438 (quoting *Citizens United*, 558 U.S. at 340).

The Voter Interaction Ban fails at the outset because it does not further a compelling state interest. Intervenors' attempt to justify the law retreats to well-worn, generalized theories of voter fraud, GOP Mot. at 1, 4, confusion, and undue influence, relying on far-reaching hypotheticals and unsupported legal conclusions—all of which are unaccompanied by evidence. *See* GOP Mot. at 24 ("[I]f every state can shield in-person voting from pressure . . . surely Texas can [do the same] elsewhere[.]"); *see also Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 593 (6th Cir. 2006) ("[r]eliance on . . . speculative interests is not sufficient to justify a severe burden on First Amendment rights"); *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 732 n.12 (9th Cir. 2015) (expressing doubt that a court "may consider hypothetical rationales for a state's election law" in *Anderson-Burdick* analysis). In fact, all the competent evidence of putative state interests points the other way: several County Elections Administrators conceded that they knew of no fraud of the kind the Voter Interaction Ban claims to solve. Bexar County's March 17, 2023 Response to LULAC Pls.' Third Interrogatories No. 2 (Ex. E, App. 13); Ex. E, App. 7; Ex. E, App. 8; *see also* Ex. E, App. 9 at 70:14–71:4 (acknowledging the Ban serves no interest). And evidence from Plaintiffs' experts confirms that voter fraud in Texas is exceedingly rare, Rep. of Dr. Henry Flores ("Flores Rep.") ¶¶ 20–21, 24(s), 27 (Ex. E, App. 14) (revealing legislators' knowledge of the lack of voter fraud in Texas); Lichtman Rep. at 80–81, 83–84, 87–109 (demonstrating the lack of evidence of voter fraud in Texas during the 2020 election and the confidence Texans had in the voting process). Also unacknowledged by the Intervenors is the fact that the Secretary of State has identified only 14 convictions over roughly two decades—a period in which tens of millions of ballots were cast—involving "attempt[s] to provide impermissible in-person voter assistance by influencing or coercing a voter in the presence of their ballot." Ex. E, App. 4; *see also* Ex. E, App. 5 (stating the same). And even on those rare occasions, no party has explained how the Voter

Interaction Ban would have prevented any of those isolated events which, as the convictions reflect, were already proscribed by Texas law.

Nor is the Ban "narrow" in any sense; its sweeping restrictions prohibit conduct much broader than the purported evil it seeks to address and increase the risk that individuals will unwittingly subject themselves to criminal penalty. *Veterans of Foreign Wars*, 760 F.3d at 440 (holding that speech restrictions should not "sweep too broadly" if they are to be considered "narrowly tailored."). The Voter Interaction Ban fails to clearly explain when core political speech—urging others to support a candidate or cause—is permitted and when the same exact constitutionally-protected speech constitutes a felony, chilling much more than the fraudulent speech the Ban purports to prevent. For example, rather than prohibiting obviously protected expression—"intended[ed] to deliver votes for a specific candidate or measure"—the legislature could have crafted language specifically targeting speech that is "intended to defraud, confuse, unduly influence or deceive." Likewise, rather than restricting speech whenever a ballot is merely "present," the restriction at issue easily could have been limited to instances when a voter is actively completing their ballot. Instead, the Ban's broad terms extend its broad application to *any* "in-person interaction," from conversations at the voter's front door to conversations at the post office. The term "benefit" could reasonably mean anything from a campaign worker's salary, an expectation that a successful candidate may hire an earnest volunteer for a job, or a pizza-party or a happy hour to celebrate a successful day of door knocking.

Intervenors offer no serious suggestion that this broad language "does not sweep too broadly" and "could be replaced by no other regulation that could advance the interest . . . with less infringement of speech." *Veterans of Foreign Wars*, 760 F.3d at 440 (quoting *Republican Party of Minn. v. White,* 416 F.3d 738, 751 (8th Cir. 2005) (en banc)); *see also Playboy*, 529 U.S. at 813

(holding that "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative"); *Serv. Emps. Int'l Union*, 595 F.3d at 603–04 (holding that Houston's broad restriction on the timing of parades was not narrowly tailored because the city could have advanced its interests with less restrictive alternatives). They attempt to characterize the Voter Interaction Ban as a "constitutionally permissible ban[] on solicitation near polling places," GOP Mot. at 23, but even the case they cite makes clear that "[a]t some measurable distance . . . governmental regulation of vote solicitation could effectively become an impermissible burden" on free speech that violates the First Amendment. *Burson v. Freeman*, 504 U.S. 191, 210 (1992). The Voter Interaction Ban restricts speech anywhere at any time if a mail ballot is present; it effectively treats the entirety of Texas as a polling place where conversations about candidates and causes come with criminal liability.

Finally, existing laws that prohibit the very conduct that the Voter Interaction Ban supposedly targets should dispel any assertion of narrow tailoring. Texas's Election Code already imposes criminal penalties against "effort[s] to influence the independent exercise of the vote of another in the presence of the ballot or during the voting process," Tex. Elec. Code § 276.013, or voting (or attempting to vote) a ballot belonging to another person, or attempting to mark another person's ballot without their consent or specific direction, Tex. Elec. Code § 64.012. *See also*, *e.g.*, *Veterans of Foreign Wars*, 760 F.3d at 441 (holding that a statute's provision was not narrowly tailored because the purported interest it served was already met by a different provision).

In sum, the Voter Interaction Ban does not address an "actual problem" in need of solving, *Playboy*, 529 U.S. at 822–23, therefore restricting free speech cannot be a necessary solution, *see R.A.V.*, 505 U.S. at 395. The Intervenors have identified no evidence suggesting otherwise, and

actual, undisputed record testimony—as well as the provision's plain text—makes clear it is in no way narrowly tailored, which forecloses Intervenors' motion for summary judgment.

### C.    Plaintiffs' facial challenges to the Voter Interaction Ban are appropriate and withstand summary judgment.

The Intervenors also separately contend that "summary judgment is warranted" simply because Plaintiffs' First Amendment claims are facial, rather than as-applied, challenges. GOP Mot. at 22. But that argument fundamentally misunderstands the significance of those terms. As the Supreme Court made clear, the facial versus as-applied distinction "is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United*, 558 U.S. at 331. The scope of the challenge instead "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Id*. In other words, categorizing Plaintiffs' challenge to the Voter Interaction Ban as "facial" has no "automatic effect" on whether summary judgment is appropriate, contrary to the Intervenors' suggestion.

More importantly, the LULAC Plaintiffs' challenge is *not* purely facial. As their operative complaint alleges, and as the record shows, the LULAC Plaintiffs' speech has *already been chilled* by the Voter Interaction Ban. *See supra* at 8–10, 12, 15–17; *see also* SAC ¶ 283 (alleging the Ban "will deter Plaintiffs' members and volunteers from participating in Plaintiffs' voter education and GOTV efforts"); *id.* ¶ 285 (similar). Such pre-enforcement challenges are common in the First Amendment context. In *Susan B. Anthony List v. Driehaus*, for example, the Supreme Court construed a challenge as "both facial[] and as applied" where "the complaint alleged that [the plaintiff's] speech . . . had been chilled" and where the plaintiff intended to engage in similar speech going forward. *See* 573 U.S. 149, 155 (2014); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 301 (1979) (similar); *Milavetz, Gallop & Milavetz, P.A. v. United*

21

*States*, 559 U.S. 229, 234, 248–49 (2010) (considering an as-applied pre-enforcement challenge brought under the First Amendment). As the record here shows, the LULAC Plaintiffs' speech continues to be chilled by the Voter Interaction Ban. That unrefuted factual record—which Intervenors' motion fails to address—precludes the Intervenors' premature request for judgment. *See Sheridan v. Garrison*, 415 F.2d 699, 709 (5th Cir. 1969) (reversing grant of summary judgment to defendants where plaintiffs pointed to "specific facts" which "if proved" "would have tended to demonstrate the existence of a chilling effect on speech").

## CONCLUSION

For all the foregoing reasons, Intervenors' motion for summary judgment should be denied.

Dated: June 23, 2023

Respectfully submitted,

/s/ *Uzoma N. Nkwonta*
Uzoma N. Nkwonta*
Christopher D. Dodge*
Noah B. Baron*
Michael B. Jones*
Elena A. Rodriguez Armenta*
Daniela Lorenzo*
Marcos Mocine-McQueen*
Marisa A. O'Gara*
Omeed Alerasool*
ELIAS LAW GROUP LLP
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
unkwonta@elias.law
cdodge@elais.law
nbaron@elias.law
mjones@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
mmcqueen@elias.law
mogara@elias.law
oalerasool@elias.law

*Counsel for LULAC Plaintiffs*
*Admitted Pro Hac Vice

22

## CERTIFICATE OF SERVICE

On June 23, 2023, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Christopher D. Dodge*
Christopher D. Dodge
