# Exhibit A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTIONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br><br>       *Plaintiffs,*<br> v.<br>GREGORY W. ABBOTT, et al.,<br>       *Defendants.* | 5:21-cv-844-XR |
| LULAC TEXAS, et al.,<br><br>       *Plaintiffs,*<br> v.<br>JANE NELSON, et al.,<br>       *Defendants.* | 1:21-cv-0786-XR |

### **DECLARATION OF ZEPH CAPO**

I, Zeph Capo, having personal knowledge of the following facts, declare as follows:

1. I am the President of the Texas American Federation of Teachers ("Texas AFT"). As President, I work closely with Texas AFT officers, staff, and chapter presidents to oversee all aspects of Texas AFT's finances, operations, and programming, including those related to elections and voting.

2. Texas AFT is a statewide labor union that represents over 66,000 employees throughout Texas, including teachers, librarians, counselors, nurses, teaching assistants, and other public-school employees. Texas AFT advocates for the employment rights of its members and champions high quality public education, fairness, democracy, and economic opportunity for students, families, and communities. Texas AFT advances this mission by helping its membership elect candidates who embrace and uphold their interests as well as the values of the union. Texas AFT therefore encourages its members to vote and endorses and supports candidates for political

1

office, particularly in school board races, which have substantial impacts on the working conditions of its members.

3. The primary way that Texas AFT accomplishes this mission is through its paid and volunteer staff members, namely its Temporary Political Organizers ("TPOs")—short-term employees who engage with Texas AFT members about voting and broadly support Texas AFT's political organizing goals by leading volunteer recruitment efforts, facilitating general membership meetings, and overseeing teams of staff and volunteers persuading voters to support candidates and initiatives aligned with Texas AFT's mission through in-person canvassing, phone banking, and at polling locations outside of the campaigning demarcation line—and its paid and volunteer field organizers, who are the boots on the ground advocating for issues important to the organization and reminding voters to cast their ballots.

4. The work, programming, and financial resources of Texas AFT have been and will continue to be directly and adversely impacted by the enactment, implementation, and threat of enforcement of Texas Senate Bill 1 ("SB 1"), including the law's new criminal provisions.

5. Texas AFT has been forced to spend significant time educating its members about SB 1, including the resources available to them if they experience voter intimidation because of the expanded access to polling places that partisan poll-watchers now receive, and the ways in which SB 1 limits both who voters can receive assistance from and the type of assistance they have access to. This, in turn, has required Texas AFT staff and volunteers to spend more time communicating with members by phone and videoconference about SB 1, its impacts, and what members can do if they encounter problems at the polls.

6. Texas AFT has also been required to spend staff time redeveloping both the TPOs and the field organizers' training. Before SB 1, Texas AFT's Director of Political Organizing Anthony Elmo spent his time training TPOs and field organizers on how to persuade voters and

educate members about which candidates and issues the union was supporting. Now, that training involves far less instruction on voter persuasion or political information; instead, it involves more instruction on compliance with SB 1 to ensure that TPOs and field organizers do not risk criminal liability or provide members with advice that might expose members to criminal liability. For example, Texas AFT now must instruct them about how to respond to questions from elderly members and members with disabilities about from whom they are able to receive assistance and the kind of assistance they are able to receive consistent with the law's new voter assistance oath, the expanded protections for partisan poll watchers and the restrictions on their removal, and the resources available if voters encounter intimidation from partisan poll watchers emboldened by SB 1. Similarly, Texas AFT now trains its TPOs and field organizers on compliance with SB 1's criminal penalties when interacting with voters, including by discouraging them from in-person interaction with voters when a ballot might be present and for the limited occasions during which they may have such interactions, instructing them on how to interact with voters to ensure voters do not bring a ballot into their physical presence and how to respond if a voter brings a ballot into their physical presence or indicates that they have a ballot nearby.

7. Because of the influx of voter questions and concerns about whether voters can receive certain kinds of assistance at the polls consistent with the law's oath provisions and expanded freedoms for partisan poll watchers, TPOs must spend additional time with many voters over the phone and over Zoom to address these questions and concerns. As a result, it takes more TPO hours for Texas AFT to achieve its voter outreach goals and the organization must spend more money paying TPOs per voter interaction. Before SB 1, TPOs fielded far fewer questions about voting procedures and were able to reach greater numbers of voters and spend more time focusing on voter persuasion. Because of the additional time Texas AFT has to spend communicating with its thousands of members about SB 1, including its criminal penalties, the organization was forced

to double the number of TPOs it typically hires to keep up with the increased demands on staff time and resources. Still, Texas AFT falls short of achieving its voter outreach and persuasion goals. Texas AFT anticipates having to maintain this increased number of TPOs in future elections because of SB 1.

8.     SB 1 has also forced Texas AFT to divert staff time to conduct programs that were previously handled by TPOs. For example, Texas AFT has traditionally tasked TPOs with supervising groups of volunteers during neighborhood canvassing events. In these leadership roles, TPOs were expected to answer volunteer and member questions about appropriate behavior during in-person interactions with voters. However, because of the heightened risk of criminal penalties imposed by SB 1, Texas AFT must now hire expensive professional canvassing vendors to supervise these routine parts of its voter engagement efforts and ensure volunteers receive proper guidance and do not risk criminal exposure (of themselves or Texas AFT), as TPOs are not equipped to provide such advice.

9.     The resources necessary to implement the changes to Texas AFT's TPO program come at the expense of other programming. But for this diversion of resources, Texas AFT would have funded additional workshops or mailings to educate members about their labor rights, growing its fundraising capacity, or handling labor grievances. It also cannot afford as many paid phone calls, or to send out as many mailers, reminding voters to vote or promoting its causes and candidates.

10.    In addition, because of SB 1's restrictions on interactions "in the physical presence" of a ballot by someone receiving "compensation or other benefit," Texas AFT has been forced to significantly alter its canvassing and get-out-the-vote strategy, shifting away from using volunteer and paid field organizers. Before SB 1, Texas AFT relied heavily on field organizers to visit voters

in person to remind them to return their mail ballots and convince them to support specific candidates and causes Texas AFT sought to advance.

11. Texas AFT has also shifted many of its field organizers away from in-person engagement with voters after mail ballots have been distributed. Instead of canvassing, for example, Texas AFT's field organizers are now asked to engage with voters remotely—such as by Zoom and phone—to contact the voters that they are unable to reach at the doors. This shift has made Texas AFT's efforts less effective, as experience has shown that in-person interactions are particularly valuable for voter persuasion and voter turnout efforts. In contrast, remote engagement with voters results in fewer responses, as voters are less likely to pick up a call from unknown numbers than to answer the door.

12. To staff and fund these changes to Texas AFT's canvassing and get-out-the-vote strategy, Texas AFT has had to divert resources away from its volunteer recruitment efforts that support its day-to-day phone banks focused on voter persuasion—efforts that have already been harmed due to concerns from some volunteers about the complexity and liability that comes along with working in a post-SB 1 landscape. With fewer volunteers, Texas AFT cannot commit to supporting as many candidates in important political races as it could before. It also reaches each voter fewer times and reaches fewer voters overall. Additionally, Texas AFT has less staff time and funding to follow up with members who do volunteer to encourage and further engage them as leaders in the organization. Texas AFT expects that it will be forced to divert and reallocate resources in this manner as long as SB 1 remains in effect.

I certify under penalty of perjury that the foregoing is true and correct.

Executed June 23, 2023.         Signed  *Zeph Capo*
                                Zeph Capo
                                President, Texas AFT