# Appendix 1

# EXPERT REPORT OF DR. ALLAN J. LICHTMAN

*LULAC Texas*, et al.,

v.

*John Scott*, et al.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

Case No. 1:21-cv-786-XR
Consolidated Case No. 5:21-cv-844-XR

February 28, 2022

---------------------------------------------------------

Allan J. Lichtman

the votes cast in Harris County—ignoring the votes cast via drive-thru voting in less racially diverse counties.

- On October 16, 2020, Attorney General Ken Paxton (hereinafter "Paxton") issued a statement claiming that the Texas Election Code "makes no provision for 'drive-thru' voting centers." On October 28, 2020—just a few days before the General Election and after tens of thousands of votes had been cast at drive-thru voting centers in Harris County, Representative Toth, among others, sued to invalidated *only the votes cast in Harris County*, not in Bee County or Calhoun County, which also used drive-thru voting.

- During debates over restrictions on drive-thru voting, Republican legislators repeatedly critiqued the use of drive-thru voting in Harris County—ignoring that drive-thru voting had been used in other counties, including Bee County and Calhoun County, both of which have more Anglo voters than Harris County.

- Republican legislators who spoke in support of the restriction in S.B. 1 (and its predecessors)—and the drive-thru voting provision in particular—were unable to point to a single instance of voter fraud during the 2020 general election in Texas—let alone one related to drive-thru voting.

- One Republican member of the Senate Committee on State Affairs claimed that because drive-thru voting was disproportionately used by minorities, it represented a form of reverse racism and should be banned.

- Despite claims by Republican legislators that drive-thru voting hurt voter confidence in elections, an independent study conducted by Rice University after the election showed just the opposite. Voters across the political spectrum were more confident in the integrity of their ballot after voting at a drive-thru voting center and viewed drive-thru voting as a helpful, permanent option for future elections.

- More generally, the justification for S.B. 1 based on the prevention of voter fraud is contradicted by the experience in Texas that voter fraud is vanishing.

- Fraud was so rare in past elections that the chances were greater of a voter being hit by lightning than committing voter fraud.

- Attorney General Paxton—whose office logged more than 22,000 staff hours—was able to resolve only 16 prosecutions. All 16 cases involved residents who gave false addresses on their voter registration forms. None received any jail time.

- Post-election investigations and academic studies have demonstrated that the lack of evidence of significant voter fraud is not the result of insufficient efforts or the difficulty of detecting fraud.

- After the adoption of S.B. 1, the Secretary of State's post-election audit in four large Texas counties confirmed that voter fraud in Texas was vanishingly rare.

This pattern appears to be repeating itself in the 2020 redistricting cycle. Even though 95% of Texas's population growth was driven by *new minority residents*, the Texas Legislature failed to draw a single, additional majority-minority district.[28]

Texas's population changes have been driven by changes in large, urban, diverse counties. For example, in Harris County, the Anglo population since 2010 has declined by 40,053, while the minority population has grown by 678,739. In Dallas County, the Anglo population declined by 59,706, while the minority population grew by 305,106. In Tarrant County, the Anglo population declined by 32,151 while the minority population grew by 333,857. The Texas Legislature appeared to ignore these dramatic population shifts and instead drafted plans that preserved the ability of Anglo voters to elect candidates of their choice at the expense of minority voters.

In 2011, Texas enacted the most restrictive photo identification law in the nation. Every court that has examined this law has found that it had the effect of discriminating against voting opportunities for minorities across the state of Texas. These rulings include a 3-0 decision by the District Court of the District of Columbia, a decision by the Southern District of Texas, a 3-0 decision by a panel of the Fifth Circuit Court of Appeals, and a 9-6 *en banc* decision by the Fifth Circuit. The law was upheld only after a court-compelled amendment to authorize a reasonable impediment declaration for voters lacking an authorized ID.[29]

---

[28] Alexa Ura, *People of color make up 95% of Texas' population growth, and cities and suburbs are booming, 2020 census shows*, TEXAS TRIBUNE (Aug. 12, 2021), https://www.texastribune.org/2021/08/12/texas-2020-census/.

[29] *Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012); *Veasey v. Perry*, 71 F. Supp. 3d 627 (S.D. Tex. 2014); *Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015); *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc); Texas Secretary of State, "Election Advisory No. 2017-15, https://www.sos.texas.gov/elections/laws/advisory2017-15.shtml.

In 2016, when the Dallas City Council debated an ordinance prohibiting landlords from refusing to rent to recipients of housing vouchers, it found that it could not do so because of this law.[72]

## III.    Discriminatory Impact of S.B. 1

S.B. 1 restricts opportunities for the citizens of Texas to participate fully in the political process and elect candidates of their choice. As will be demonstrated below, these provisions have a disproportionate impact on minority citizens in Texas:

- Bans drive-thru voting

- Prohibits 24-hour voting and extended-hour voting

- Requires mail-in voters to provide the number on either their driver's license, election identification certificate, or personal identification card issued by the Department of Public Safety, or alternatively the last four digits of their Social Security Number both on their absentee ballot application forms and again on the envelope in which they return their ballots. Applicants can also file a statement indicating that they have not been issued any of the above numbers. Ballots can be

---

*and the Making of the Underclass* (Harvard University Press, 1993); Lincoln Quillian, *Does Segregation Create Winners and Losers? Residential Segregation and Inequality in Educational Attainment*, *61 Social Problems* 402 (2014); Lincoln Quillian, *Segregation and Poverty Concentration: The Role of Three Segregations*, 77 *American Sociological Review* 354 (2012); Kimberly Quick & Richard Kahlenberg, *Attacking the Black–White Opportunity Gap That Comes From Residential Segregation*, The Century Foundation (June 25, 2019), https://tcf.org/content/report/attacking-black-white-opportunity-gap-comes-residential-segregation/?agreed=1; Dionissi Aliprantis, *Racial Inequality, Neighborhood Effects, and Moving to Opportunity*, Federal Reserve Bank of Cleveland (Nov. 4, 2019), https://www.clevelandfed.org/newsroom-and-events/publications/economic-commentary/2019-economic-commentaries/ec-201917-moving-to-opportunity.aspx; Byron S. Graham, *Identifying and Estimating Neighborhood Effects*, 56 *Journal of Economic Literature,* 450 (2018); Patrick Sharkey, *Stuck in Place: Urban Neighborhoods and the End of Progress Towards Racial Equality* (University of Chicago Press, 2013).

[72] Rebecca Elliott, *State Sued Over Housing Discrimination Law*, HOUSTON CHRONICLE (February 17, 2017), http://www.houstonchronicle.com/news/politics/houston/article/State-sued-over-housing-discrimination-law- 10941911.php; Robert Wilonsky, *Dallas Non-Profit Sues Texas Over Law That Lets Landlords Refuse Housing Vouchers*, DALLAS MORNING NEWS (February 20, 2017).

rejected if the information on the ballot does not match the information on file in the voter registration rolls. There are provisions for the correction of errors if notified in time.

- Makes it a felony for a public official to send someone a mail-in ballot application the person did not request, even if the person is automatically qualified to vote absentee. Also applies criminal penalties to officials who approve the use of public funds "to facilitate" the unsolicited distribution of applications by third parties, which keeps counties from providing applications to groups helping get out the vote. However, in February 2022, federal District Court Judge Xavier Rodriguez temporarily enjoined this provision that prohibits public officials from soliciting mail-in ballot applications.[73]

- Requires that those who assist people with disabilities or language barriers in filling out ballots—other than those voters' caregivers—must fill out a document showing their name, address and relationship to the person they helped cast a ballot. Assistants would also have to take an oath under the criminal penalty of perjury, pledging that the voter is eligible for assistance and the assistant did not "pressure or coerce" the voter into choosing them for assistance.

- Requires those who simultaneously assists seven or more voters with transportation to a polling location for curbside voting will have to fill out a form giving their name and address and indicate whether they also provided help casting any ballots.

- Criminalizes so-called "vote harvesting" defined as "in-person interaction with one or more voters, in the presence of the ballot or during the voting process, intended to deliver votes for a specific candidate or measure" in exchange for payment or another benefit, with benefit undefined.

---

[73] Ashley Lopz Kut, *Judge Temporarily Halts Part of Texas Voting Law That Bans Officials From Encouraging Mail-in Voting*, HOUSTON PBS (February 14, 2022), https://www.houstonpublicmedia.org/articles/news/politics/2022/02/14/418953/judge-temporarily-halts-part-of-texas-voting-law-that-bans-officials-from-encouraging-mail-in-voting/.

- Gives greater freedom of access of partisan poll watchers. It prohibits anyone from denying partisan poll watchers "free movement" and authorizes them to get sufficiently close to "see and hear" every activity by a voter in the polling place exception for completion of the ballot.

- Criminalizes an election knowingly or intentionally refusing accept partisan poll watchers for service and similarly criminalizes any action that obstructs the view of a poll watcher or makes observation "not reasonably effective." Although S.B. 1 requires the Secretary of State to create a training and authorizes those who break the law to be summarily ejected, such ejections can take place only if an election official directly observes a violation of law, otherwise criminal penalties could apply.

- Requires those who assist people with language barrier or disabilities -- other than those voters' caregivers -- to fill out a document showing their name, address and relationship to the person they helped. Assistants would also have to take an oath under penalty of perjury pledging to obey the limits to assisting with reading and marking the ballot, with no opportunity for clarifying questions.

- Requires local election officials to refer all cases of improperly cast ballots to the Attorney General.

### A.  Pre-Existing Barriers to Voting in Texas

Even before the adoption of S.B. 1, Texas ranked last in the nation in access to registration and voting.  An academic study on access to voting and registration published in the *Election Law Journal* in 2020 developed a cost of voting index (COVI) based on some thirty indicators. The lower the COVI score the score the greater the access to registration and voting in the state. The higher the COVI, the more difficult it is to register and vote in a state. Texas had COVI index of 1.29, compared to 0.05 for the median state. Its COVI was 32% higher than the next highest state of Georgia, with a COVI index of 0.98.[74]

---

[74] Scot Schraufnagel, Michael J. Pomante II and Quan Li, "Cost of Voting in the American States," *Election Law Journal: Rules, Politics, and Policy*, 19 (2020), Figure 1.

Although many factors can influence voter participation in the states, the relationship between the cost of voting index and turnout in the 2020 general election for president is striking. Chart 1 graphs the cost of voting index in each state against the state's voter turnout in the presidential election of 2020. The sharply downward trend line demonstrates that as the cost of voting index rises voter turnout in the states falls. The trend line shows that for every one-point increase in the cost of voting index, voter turnout drops by a robust 4.51%.[75]

Consistent with this finding, Texas lags well behind the nation in voter turnout. It ranked fourth from the bottom in turnout in the presidential election of 2016 and even after a turnout surge in 2020, Texas still ranked seventh from the bottom among the states.[76] However, restrictive voting laws had a disproportionate impact on the State's historically marginalized communities, particularly Black and Latino Texans who, when compared to white Texans, have lower incomes and less wealth, higher unemployment and poverty, lower levels of education, greater health challenges, and, for Hispanics less proficiency with English.[77] In addition, specific provisions of S.B. 1 target voting options used disproportionately by minority voters in Texas.

[Continued on the following page]

---

[75] For studies on the deterrent effects of increased costs of voting see, for example, Joseph M. Colomer, *Benefits and Costs of Voting*, *Electoral Studies* 10 (1991), 313-315; Henry E. Brady & John E. McNulty, *Turning Out to Vote: The Costs of Finding and Getting to the Polling Place*, *American Political Science Review*, 105 (2011), 115-134; Moshe Haspel & H. Gibbs Knotts, *Location, Location, Location, Precinct Placement and the Costs of Voting*, *Journal of Politics*, 67 (2005, 560-573); Lee Sigelman & William D, Berry, *Costs and the Calculus of Voting*, *Political Behavior* 4 (1982) 419-428.

[76] Election Project, *2020 November General Election Turnout Rates*, http://www.electproject.org/2020g (last updated Dec. 7, 2020); Election Project, *2018 November General Election Turnout Rates*, http://www.electproject.org/2018g (last updated Dec. 14, 2018).

[77] Tables 3 and 8, documented the educational and economic disparities between Anglos and Hispanics and Blacks in Texas. Table 9 documents the disparities in health.

**GRAPH 1**
**COST OF VOTING RANKINGS BY STATE, 2020**

Scot Schraufnagel, Michael J. Spumante II and Quan Li, "Cost of Voting in the American States,"

*Election Law Journal: Rules, Politics, and Policy*, 2020, 19(4), Graph 1.





**CHART 1**
**RELATIONSHIP BETWEEN THE COST OF VOTING INDEX (COVI) AND VOTER TURNOUT BY STATE IN THE 2020 GENERAL ELECTION FOR PRESIDENT**



Texas' lagging overall turnout rate is entirely due to relatively low Black and Hispanic turnout. White turnout in Texas of 72% for the 2020 presidential election exceeded the national average of 70.9% (Table 28 and Chart 13).[78]

As a general matter, the new and complex voter restrictions mandated by S.B. 1 are similarly likely to disproportionately impact vulnerable Black and Latino citizens in Texas. In addition, specific provisions

---

[78] However, the turnout for Black and Hispanic Texans both fell below the national average, creating a greater disparity with the Anglo turnout than for the nation overall. In Texas, Black turnout trailed Anglo turnout by 11.2 percentage points. U.S. Census, Voting and Registration in the Election of November 2020, Tables 2, 4b, https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-585.html.

of the law will add an additional burden. As discussed below, these burdens will disproportionately impact minority voters—increasing the cost of voting in Texas for Black and Latino Texans in particular.

**B. Restrictions on Drive-Thru and 24-Hour Voting**

Harris County is the most populated county in the State, with the largest population of minority voters in the State. Harris County has a citizen voting age population of 2.8 million and a minority CVAP percentage of 62.3%, compared to 49.9% for the state. The elimination of drive-thru voting attacks a procedure used disproportionately by minority voters in Harris County during the 2020 General Election. The Texas Legislature abolished drive-thru voting after courts rejected Republican efforts to invalidate approximately 127,000 drive-in votes cast in Harris County. S.B. 1 also targets another procedure used in Harris County in the 2020 general election to facilitate voting: extended-hour and 24-hour voting.[79]

A post-election survey of Harris County voters in the 2020 general presidential election confirms that minorities used drive-thru voting in substantially higher proportion than Anglos. This survey examines a different metric, not the proportion of racial groups using different modes of early voting, but the rate at which racial groups used drive-in voting. As described in Table 11, 5.1% of Anglos reported voting drive-thru voting compared to 9.7% of Blacks, for a lead of over Anglos of 4.6 percentage points and 90.2%. In addition, 13.1 percent of Hispanics reported voting drive-thru voting, for a lead of over Anglos of 8 percentage points and 157%. Finally, 9.8 percent of Asians reported voting drive-thru voting, for a lead of over Anglos of 4.7 percentage points and 92.2%.[80]

---

[79] Abigail Rosenthal, *The Texas GOP is Still Furious About Harris County's Drive-thru Voting*, CHRON (March 15, 2021), https://www.chron.com/politics/article/texas-drive-thru-voting-senate-bill-7-election-16026395.php; Testimony on SB 1 By: Emily Eby, Staff Attorney, Texas Civil Rights Project. *Texas Senate State Affairs Committee* (July 10, 2021), https://txcivilrights.org/wp-content/uploads/2021/07/TCRP-Testimony-on-SB-1.pdf.

[80] "The Rice University Post-2020 Election Survey of Harris County Voters," https://mreece13.github.io/dtv-harris-2021/cross-tabs.html#method-of-voting.

Professor Kenneth R. Mayer further addresses the disparate impact of the ban on drive-thru and 24-hour voting in his expert report in this matter.

## C. Empowerment of Partisan Poll Watchers

The provision of S.B. 1 that gives partisan poll watches greater access to polling places and voters will also have a disproportionately negative impact on minority voters. Republicans also have a long history of exploiting so-called election integrity measures, like S.B. 1's expanded access for partisan poll watchers, to intimidate minorities and discourage their voting. This practice of voter suppression became sufficiently widespread that in response to lawsuits in 1982 and again in 1987, the national Republican Party agreed to consent decrees in federal court that prohibited it from engaging in "election integrity" or "anti-fraud" activities that targeted minority voters.

In a 2009 ruling, District Court Judge Dickinson Debevoise, who presided over the original consent decree, denied a motion to end it. "Minority voters continue to overwhelmingly support Democratic candidates," Judge Debevoise wrote in his decision. "As long as that is the case, the RNC and other Republican groups may be tempted to keep qualified minority voters from casting their ballots, especially in light of the razor-thin margin of victory by which many elections have been decided in recent years." After reviewing all evidence of alleged voter fraud presented by the RNC, the court held that "[i]n fact, even a cursory investigation of the prevalence of voter intimidation demonstrates that ballot security initiatives have the potential to unfairly skew election results by disenfranchising qualified voters in far greater numbers than the instances of in-person fraud that may occur during any given race."[81] Another court ultimately lifted the consent decree in 2018, eliminating that protection for minority voters.[82] In the

---

[81] *DNC v. RNC.*, No. 2:81-cv-03876-DRD-MAS ECF No. 84 Filed 12/01/09; *DNC v. RNC.*, 673 F.3d 192 (3d Cir. 2012).

[82] United States District Court of New Jersey, *Democratic National Committee v. Republican National Committee*, Civil Action No. 81-3876, Order, 8 January 2018.

Texas 2020 general election, the Texas Election Protection Coalition, which incorporates dozens of nonpartisan organizations dedicated to voting rights, received 267 complaints of voter intimidation at polling places.[83]

The prospect for minority voter intimidation turns on current developments as well as precedent. In April 2021, the non-partisan group Common Cause released a recording that outlined the "Harris County Republican Party Election Integrity Program." The presentation of a Republican County Precinct Chair, called for the recruitment of a 10,000 person "Election Integrity Brigade" for Harris County. The goal was to recruit and train 1,041 election judges, 2,812 election clerks, and 6,219 poll watchers. If the program achieved only a fraction of this goal, they would greatly expand the Republican presence of just 118 partisan poll watchers during early and election day voting in the general presidential election of 2022.[84]

The program sought to recruit persons from the suburbs to work in the predominantly minority neighborhoods of the county. The presenter explained that he wanted to "get folks in these suburbs out here that have, you know, a lot of Republican folks that got to have the courage" to work in the heavily minority precincts of Houston. He continued to claim falsely that minority areas are rife with fraud at the polls. If "we don't do that, this fraud down in here," he added, using an interactive map to circle city precincts, "this fraud down in here is really going to continue." He stressed that the purpose of training

---

[83] Judy Bao, *Voter Intimidation in Texas During the 2020 General Election*, TEXAS CIVIL RIGHTS PROJECT) FEBRUARY 2021), https://txcivilrights.org/wp-content/uploads/2021/02/Voter-Intimidation-report.pdf.

[84] Taylor Goldenstein, *Video Shows GOP Targeting Houston Minority Communities With Poll Watcher 'Brigade,'*" HOUSTON CHRONICLE, (April 15, 2021), https://www.houstonchronicle.com/politics/texas/article/Video-shows-GOP-targeting-Houston-minority-16089177.php, includes map . Recording at https://vimeo.com/534438337?utm_campaign=5370367&utm_source=affiliate&utm_channel=affiliate&cjevent=ba7e1f9e7d2711ec80b4083b0a82b836&clickid=ba7e1f9e7d2711ec80b4083b0a82b836.

was to empower Republican poll watchers when debating with election judges—which S.B. 1 encourages. The speaker further noted that a Republican donor had previously provided a limited amount of funds of pay poll watchers and raised the prospect of additional fund raising. The media extensively covered the recording and Common Cause discussed it at a hearing of the Senate Committee on State Affairs.[85]

Nicolas Riley, senior counsel at the Institute for Constitutional Advocacy and Protection (ICAP) at Georgetown University Law School, warns that "Simply by virtue of the fact that the more people you put in and around the polls on Election Day, the more likely you are to have chaos and other types of shenanigans that lead to all kinds of problems." [86] As is illustrated by Republican plans documented above, Vincent Hutchings, a political science and Afro-American and African studies professor at the University of Michigan, notes that poll watching can be especially problematic for minority voters. "In such a world where you can visually identify — typically — someone's racial or ethnic background, and when there's such a high correlation between race and ethnicity and partisanship, then that is a recipe for potential disaster."[87]

Professor Kenneth R. Mayer further addresses the disparate impact of partisan poll watchers in his expert report in this matter.

### D. Restrictions on Mail-In Voting

New restrictions on mail-in voting will disproportionately impact the ability of minorities to vote in upcoming elections. Even before the adoption of S.B. 1, Texas had especially difficult rules for the casting of mail-in ballots. Texas is one of only 16 states that require an "excuse" for casting an absentee

---

[85] *Id.*, 16463, Senate Committee on State Affairs, at 01:12:18.

[86] Jen Kirby, *Your Voting Precinct Might Have a Poll Watcher. Here's What to Know*, VOX (October 23, 2020), https://www.vox.com/21514657/poll-watchers-trump-army-voters.

[87] *Id.*

ballot by mail.[88] Among these 16 states, Texas has especially restrictive requirements. To cast an absentee vote in Texas a voter must be: (i) 65 years or older; (ii) sick or disabled; (iii) out of the county on election day and during the period for early voting by personal appearance; or (iv) be confined in jail, but otherwise eligible.[89]

Despite the many limitations in existing law, a major effort by minorities in the general election of 2020 resulted in the disproportionate use of the now restricted mail-in option. Table 12 reports the findings of two independent, respected surveys, the Cooperation Congressional Election Study (CCES) and Survey of the Performance of American Elections. For the CCES the lead of minorities over Anglos for 2020 mail-in voting is 3.7 percentage points and 30.6%. For the SPAE the lead of minorities over Anglos for 2020 mail-in voting is 3.8 percentage points and 39.6%. The minority lead in the larger sample CCES is statistically significant at levels beyond the stringent .01 standard in social science.

The disenfranchising effects of new rules for mail-in voting, implemented shortly after the passage of S.B. 1 without a transition period are already manifest. Judge Lina Hidalgo of Harris County reported that the county has rejected 16% of mail-in ballot applications and could be on track to thousands of applications this year. By contrast, in 2018, the Harris County rejection rate was 6%.[90] In Travis County, even after working with the Secretary of State's office to resolve invalid applications, the purported

---

[88] National Conference of State Legislatures, *Voting Outside the Polling Place*, (September 24, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx.

[89] Texas Secretary of State, *Application for a Ballot by Mail*, https://www.sos.texas.gov/elections/voter/reqabbm.shtml.

[90] Julian Aguilar, *Texas Officials Blame New Voting Law For Rise in Rejected Mail-In Ballot Applications*, KERA, (January 14, 2021), https://www.keranews.org/politics/2022-01-14/texas-election-officials-blame-new-voting-law-for-rise-in-rejected-mail-in-ballot-applications.

rejection rate was still 27%. In Dallas and Tarrant Counties, election officials have rejected 12% and 16% of mail-in applications as a result of identification problems.[91]

Professor Kenneth R. Mayer further addresses the disparate impact of mail-in ballot restrictions in his expert report in this matter.

### E. Flawed Citizenship Verification Procedures

S.B. 1 also requires the monthly matching of registration rolls with citizenship data, primarily from the Texas Department of Public Safety, a fraught process that Texas botched in 2019. Verifying citizenship is an inherently difficult and error-prone task. Naturalization changes citizenship status and forms of citizenship can be difficult to ascertain accurately.[92] As documented above significant numbers of Texas citizens have been mistakenly arrested and detained as undocumented aliens.

The predictable impact of the new regulation on U.S. citizens is already manifest. In December 2021 the *Texas Tribune* found that the current matching effort is still filled with similar errors to the discredited 2019 process. Of the voters that the Secretary of State's office flagged for review, a significant

---

[91] *Texas Leans on New Voting Law to Reject Thousands of Primary Ballots*, The Guardian, (February 3, 2022), https://www.theguardian.com/us-news/2022/feb/03/texas-new-restrictive-voting-law-reject-thousands-mail-in-ballots.

[92] *Citizenship Through Parents*, United States Citizenship and Immigration Services, https://www.uscis.gov/us-citizenship/citizenship-through-parents; "Chart C: Derivative Citizenship -- Lawful Permanent Resident Children Gaining Citizenship Through Parents' Citizenship, Immigration Legal Resource Center, https://www.ilrc.org/sites/default/files/resources/natz_chart-c-2020-2-20.pdf; *Acquisition of U.S. Citizenship at Birth by a Child Born Abroad*, United States Department of State – Bureau of Consular Affairs, https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/us-citizenship/Acquisition-US-Citizenship-Child-Born-Abroad.html. For the complexities of acquired citizenship see *Chart A: Determining Whether Children Born Outside The U.S. Acquired Citizenship At Birth*, and *Chart B: Determining If Children Born Abroad And Out Of Wedlock Acquired U.S. Citizenship At Birth*, Immigration Legal Resource Center, https://www.ilrc.org/sites/default/files/resources/natz_chart-a-2020-2-20.pdf; https://www.ilrc.org/sites/default/files/resources/natz_chart_b-20200218.pdf.

number had registered at naturalizations ceremonies (17% in Bexar County and 15% in Travis County, for example). But not every county can identify such errors and it is likely that many more will go undetected. The impact of errors will disproportionately impact persons of color who comprise 95 percent of the immigrant population in Texas.[93]

### F. Increased Criminal Penalties

The criminalization of the electoral process will also present an addition burden on minorities who have been the disproportionate target of criminal prosecutions for alleged for voting law violations. A study by the ACLU of Texas found that for prosecutions by the Attorney General's Election Integrity Unit under Ken Paxton, at least 72% of these prosecutions appear to have targeted Black and Latino individuals. In addition, "86% of the prosecutions involved offenses allegedly occurring in counties with majority non-white and Latinx populations."[94] Democratic Senator Boris L. Miles presented this data to the Senate Committee on State Affairs and Senator Hughes could not dispute its accuracy.[95] The specific provision of S.B. 1 that imposes new restrictive rules and penalties for helping someone vote by mail has a particular impact on Hispanics given their relatively low levels of educational attainment and English proficiency.

### IV. Sequence of Events

### A. Population Shifts in Texas

Critical to the sequence of events prior to the enactment S.B. 1 was the growth of the combined Hispanic and African American citizen voting age population (CVAP) in Texas, and the concurrent decline of white CVAP. This demographic shift was politically detrimental to the Republican majority in

---

[93] Alexa Ura, *Texas' Renewed Voter Citizenship Review is Still Flagging Citizens as 'Potential Non-Citizens,'* TEXAS TRIBUNE (December 19, 2021), https://www.texastribune.org/2021/12/17/texas-voter-roll-review/.

[94] ACLU of Texas, *Racial Disparities in Paxton's Election Integrity Unit Prosecutions*, (March 2021), https://www.aclutx.org/sites/default/files/oag_election_integrity_unit_analysis.pdf.

[95] 16333, Senate Committee on State Affairs, at 01:13:08-28.

The Texas General Assembly adopted the criminal provisions of S.B. 1 despite concerted public opposition to criminalizing the process for voting and conducting elections. As indicated in Table 18, per a July 2021 Texas poll, 68% of respondents agreed that neighbors who work as election workers shouldn't risk jail. In addition, 80% disagreed that it should "be a felony to assist more than three voters with disabilities or language barriers at polling locations."

## VII.   Contemporaneous Statements

The justifications offered by Republicans for the adoption of the omnibus election bill S.B. 1 were misleading and pretextual.

### A.  S.B. 1 Targeted Voting Methods Disproportionately Used By Minority Voters

In defending the Conference Committee report on S.B. 7 during the legislature's regular session, Senate sponsor Hughes said, "The provisions apply equally across the state. They are not limited to a particular group or particular area."[160]

Senator Hughes and other backers of S.B. 1 and its predecessors understood that two specific provisions of the bill – the ban on drive-thru and on 24-hour voting – were targeted directly at Harris County, the most populous county in the state, with the state's largest concentration of minority voters. Harris County voters cast approximately 127,000 by drive-thru and approximately 7,000 after-hours votes, equal to 8.2% of the 1.64 million votes cast for president in Harris County. Drive-thru voting, with its

---

*Being Thwarted.' Even Sin Solid Republican Counties, Hard-Liners Seek More Partisan Control of Elections*, TEXAS TRIBUNE (October 1, 2021), https://www.texastribune.org/2021/10/01/texas-election-official-hood/; Michelle Carew, *Partisan Attacks Drove Me Out of my Job as a Texas Election Official*, WASHINGTON POST (November 1, 2021), https://www.washingtonpost.com/opinions/2021/11/01/partisan-attacks-drove-me-out-my-job-texas-elections-official/.

[160] Chuck Lindell, *In 6 A.M. Vote, Divided Texas Senate Approves GOP Elections Bill After All-Night Debate*, AUSTIN-AMERICAN STATESMAN (May 30, 2021), http://roycewest.com/news/latest/6_am_vote/.

substantial number of votes was the particular target of decision-makers who backed the new "Election Integrity" bills.

The targeting of drive-thru voting in Harris County with surgical provision is a powerful indication of the racial intent of Republican decision-makers in the General Assembly. A study done by the Texas Civil Rights Project and presented to the Legislature in advance of S.B. 1's passage found that minority voters comprised a disproportionate share of voters using the drive-in and after-hours options. According to the Project's data, as shown in Table 10 and 11, Anglos comprised 62% of all early voters in Harris County, whereas Hispanics comprised 20%, Blacks 14%, Asians 4%, and all minorities 38%.[161] In contrast, Anglos comprised 47% of all drive-thru early voters in Harris County, whereas Hispanics comprised 23%, Blacks 22% and Asians 8%, and all minorities 53%. Among after-hours voters, Hispanics comprised 36%, Blacks 12%, Asians 8%, and all minorities 56%.[162]

A post-election survey demonstrated that voters using the drive-thru option in Harris County rated their experience far more positively than those voting by mail, early in-person, or at the election day polls. Harris County drive-in users were also far more confident about the integrity of their vote than those using these other modes of voting in Harris County. [163]

First, Republicans in the General Assembly focused on drive-thru voting in Harris County while ignoring its use in other Texas counties, including Bee County and Calhoun County.

---

[161] Emily Eby, Staff Attorney, Texas Civil Rights Project, *Testimony to Texas Senate State Affairs Committee* (July 10, 2021) https://txcivilrights.org/wp-content/uploads/2021/07/TCRP-Testimony-on-SB-1.pdf.

[162] I am unable to speak to the methodology used to model race and ethnicity in Harris County cited in the TCRP report. Accordingly, I rely on it as evidence that the Texas Legislature was repeatedly told that minority voters in Harris County disproportionately used drive-thru and after-hours

[163] "The Rice University Post-2020 Election Survey of Harris County Voters," August 2021, https://mreece13.github.io/dtv-harris-2021/cross-tabs.html#method-of-voting; additional polling data, email from Professor Robert Stein, Rice University.

During the debates over the S.B. 7 Conference Committee report in the regular session, Senator Hughes said the following:

**Senator Hughes:** But to answer your question about drive-thru voting, I'm only aware of it being used in Harris County in the November 2020 election.

He similarly asserted:

**Senator Hughes:** So then, particular, the provisions about 24-hour voting and drive-thru voting, to my knowledge, it was Harris County in one election in 2020 that created those processes, so it was actions in Harris County that gave rise to those two provisions of the bill, and all, and I'm sorry, one more. It was in Harris County where the, there was an attempt to, to mail applications for mail ballot to folks who were not legally entitled to vote by mail, so those three provisions, I know, were the result of what happened in Harris County in the 2020 election cycle that just passed.[164]

Senator Hughes admitted in the above exchange that it was only the use of drive-thru voting in Harris County, not in these other counties, which prompted him to propose banning the practice. Lieutenant Governor Dan Patrick similarly denounced Harris County as if it had created its own law unique in using drive-thru voting: "Well, I have news for Harris County. You're not the capital of Texas. The state Capitol resides in Travis County and the city of Austin in this building, not in the county judge or the mayor's office. Harris County does not make policy and create law for the other 253 Texas counties. Out of thin air they decided on drive-thru voting."[165] Patrick too ignored the use of drive-thru voting in the general presidential election of 2020 in at least two other counties: Bee and Calhoun.

Third, the ban on drive-thru voting in Harris County could not justified as a source of voter fraud. In debates on proposed "Election Integrity" bills, Republicans in the General Assembly could not provide any examples of fraud arising from drive-thru voting in Harris County. In a hearing of the Senate Committee on State Affairs Democratic Senator Boris L. Miles asked the following:

---

[164] Senate Journal, Eighty-Seventh Legislature, Regular Session, Addendum, Forty-Eighth Day, May 29, 2021, unpaginated, https://journals.senate.texas.gov/SJRNL/87R/HTML/87RSJ05-29-FA.HTM.

[165] Dan Patrick Press Conference Transcript, 6 April 2021, at 14.

**Senator Boris L. Miles**: "And to my, of knowledge, unless somebody knows something that I don't know, there wasn't any fraud detected in any drive through voting. Was it"

No Republican rose to the challenge and presented any evidence of drive-thru voter fraud. In the same hearing a Democratic Senator asked the following:

**Democratic Senator**: My first questions relate to drive through the voting ban, and they start on page six lines, 15 to 21 Senate. One would ban the use of drive through voting. Is there any evidence that the secretary of states have that drive through voting increases the law likelihood of voter fraud?

Keith Ingram, the Director of Elections in the Office of the Secretary of State responded as follows:

**Keith Ingram**: I don't think we have any evidence of, uh, act fraud.

Similarly, Ingram, affirmed the absence of fraud in 24-hour voting in Harris County.

**Keith Ingram**:  This last election was the, the first election that I'm aware of where we had any 24-hour voting. And I'm not aware of any fraud that occurred in that election at night.

Fourth, unable to rely on justifications based on voter fraud, backers of S.B. 1 in the General Assembly resorted to other false and misleading justifications. They misrepresented Judge Hanen's decision to claim that drive-thru voting was illegal, even in the early voting period. Lieutenant Governor Patrick said, "Now there was a case file[. T]he judge threw it out on lack of standing. But the judge said in the case, had I opined[,] I would have said it was unlawful [b]ecause the constitution says a voting location must be a building. A tent is not a building."[166] However, District Court Judge Andrew Hanen found that all 10 Harris County drive-thru locations were legal under Texas law during the early voting period. He ruled that the requirement for a "building" only applied on election day and that one of the ten sites still qualified.[167]

Backers of S.B. 1 also relied on the claim that despite an absence of voter fraud, there was a discrepancy in the Harris County 2020 general election early voting between the number of votes recorded

---

[166] Dan Patrick Press Conference Transcript at 1415.

[167] *Hotze v. Hollins*, In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:20-CV-03079, November 2, 2021.

on the county's website and the number submitted to the Secretary of State. They claimed without evidence that this discrepancy was a serious problem that resulted from drive-in voting. Regarding "the question about the drive through voting and that was asked, I think it's pretty well established. There was a significant discrepancy in the votes," said Republican Senator Robert Lee "Bob" Hall III. He added, "we're talking about protecting each person's individual, right. To have their vote count. And every time there is a discrepancy somebody is discounted." However, this alleged discrepancy was not a verified finding of the Secretary of State or any other election official in Texas. It was a complaint made during early voting, before final results were tallied, by Rachel Palmer Hooper, a Republican activist, precinct chair, and ardent Trump supporter.[168]

On October 25, 2020, with early voting still ongoing, the Secretary of State's Office asked Harris County officials to clarify "*apparent* discrepancies" (emphasis added) between early voting totals submitted to the Secretary of State's office and the numbers posted on the Harris County's early voting webpage. In response, Elizabeth Lewis, spokesperson for Harris County Clerk Chris Hollins, said the different numbers were the result of a "slight lag in reporting from when we push results to the Secretary of State versus when we publish them." She added "Unofficial results are provided daily from the Harris County Clerk's office. They are unofficial until after the hearing and canvass period after an election. Any discrepancies between the Secretary of State's website, and the official results put out by the Harris County Clerk, will be rectified once the official results come out."[169]

---

[168] 16333, Senate Committee on State Affairs Transcript, 02:23:-08:31; Don Hooper, Houston Conservative Forum, https://houstonconservativeforum.com/the-bet/.

[169] Syan Rhodes, *Texas Secretary of State Asks Harris County Clerk to Clarify 'Apparent Discrepancies' in Reporting Of Early Voting Totals*, CLICK2 HOUSTON (October 27, 2020), https://www.click2houston.com/news/local/2020/10/28/texas-secretary-of-state-asks-harris-county-clerk-to-clarify-apparent-discrepancies-in-reporting-of-early-voting-totals/.

Long after the official Harris County returns were in Senator Bettencourt misleadingly claimed that "we have the hard machine error of 1,884 votes. That's a discrepancy that still exists on the books in Harris County this day between the number of votes, the number of names."[170]

Fifth, as demonstrated above, two independent studies verified that minorities disproportionately used the drive-thru and 24-hour voting options in Harris County's 2020 general presidential election. Evidence for this disproportionality was presented to the Texas General Assembly, including that of the Texas Civil Rights Project discussed *supra* and testimony from Harris County Clerk, Isabel Longoria. Longoria testified in the second special session that drive-thru and 24-hour voting were "more often used by Black, Latino and Asian voters." Although not formally presented to the legislature, the Rice University study was released publicly on August 24, 2021, two weeks before the final vote on S.B. 1.[171]

Sixth, conjecture that the presence of multiple persons in drive-thru voting vehicles can lead to voter coercion fails to withstand scrutiny. Unlike polling place voting, there were no complaints from drive-thru voting in Harris County or elsewhere and there were no fraud prosecutions. The Rice University study found that 96% of Harris County voters traveled to drive-in sites with family members friends, and roommates, unlikely coercers, who would have had many opportunities to exert influence prior to voting drive-in. Moreover, for purposes of coercion, driving together to a drive-up location is not different that driving together to a curbside location or a polling place for alleged coercion.

---

[170] The official final Harris County results showed no such discrepancy. Harris Elections Results Archive, Cumulative Report — Official Harris County, Texas — General and Special Elections — November 03, 2020, https://www.harrisvotes.com/HISTORY/20201103/Official%20Cumulative.pdf.

[171] 16333, Senate Committee on State Affairs Transcript, 11:08:54.

The Rice survey further demonstrated that voters who used drive-thru voting in the 2020 general election in Harris County demonstrated that it was highly successful, and not just for Democrats.[172] As demonstrated in Table 20 and Chart 4, 91% of Harris County voters surveyed by Rice University evaluated their experience as excellent. The excellent evaluation of drive-thru voting is 26 percentage points and 37.9% ahead of the 66% excellent evaluation for absentee voting; 19 percentage points and 26.4% ahead of the 72% excellent evaluation for early in-person voting; and 28 percentage points and 44.4% ahead of the 63% excellent evaluation for election day voting. The differences between the evaluations for drive-in and other forms of voting is statistically significant beyond the stringent .01 level in social science.

In addition, Table 20 and Chart 5 demonstrate that drive-thru voting was not a seen by voters as temporary: 97% of Democrats and 95% of Independents said they would use drive-thru voting again. Among Republicans 71% said they would use drive-thru voting again.

Seventh, contrary to claims by Texas legislators that drive-thru voting lacks ballot security, the Rice University study showed that Harris County drive-thru voters in the 2020 general presidential election had greater voter confidence in the correct counting of their vote voters using other methods. As demonstrated in Table 21 and Chart 6, 97% of drive-thru voters reported that they were very or somewhat voter confident in their correct counting of their vote. This level of confidence led the 91.3% sum for absentee voters by 5.7 percentage points, it led the 88.8 sum for early-in person voters by 8.2 percentage points and 9.2%, and it led the sum for election day voters by 20.9 percentage points and 27.5%. The differences between voter confidence among drive-thru and other voters is yet more substantial when

---

[172] Amy Mccraig, *Drive-Through Voting is a Hit With Harris County Voters, According To Newly Released Rice U. Survey*, RICE UNIVERSITY NEWS AND MEDIA RELATIONS, (August 24, 2021), https://news.rice.edu/news/2021/drive-through-voting-hit-harris-county-voters-according-newly-released-rice-u-survey.

considering voters who reported themselves very confident, as further demonstrated in Table 21 and Chart 7. The 90.3 percent of very confident drive-thru voters led absentee voters by 16.7 percentage points and 22.7%, it led 67% of early in-person voters by 23.3 percentage points and 34.8% and it led the 52.7% of election day voters by 37.6 percentage points and 71.3%. All differences for the sum are statistically significant at the standard .05 level or beyond. All differences for the very confident responses are statistically significant beyond the stringent .01 level.

Eighth, Lieutenant Governor Dan Patrick also complained about the distribution of drive-thru locations in Harris County. He said that "in the largest Republican precincts they had two drive-thru locations. In the largest Democratic precincts, which was smaller than the Republican, they had five."[173] Even if true, this complaint is unavailing. In fact, this distribution of locations is consistent with the partisan line-up of precincts in heavily Democratic Harris County, where Biden carried more than 75% of Harris County precincts in the 2020 general presidential election.[174] In addition, because these were drive-thru facilities, they were accessible to all voters in Harris County. Moreover, the Rice University survey of drive-thru voters in Harris County found that 95% of respondents reported carpooling.[175]

Ninth, the use of drive-in voting was not a partisan maneuver instituted only by Democrats in Harris County. It was used in the 2020 general election by the at least two Republican counties: Bee and Calhoun. (Table 19).  In Harris County, drive-thru voting was developed by a bipartisan committee, first for use in the primary process of 2020. Republicans in the General Assembly raised no challenges to drive-

[173] Dan Patrick Press Conference Transcript at 20-21.

[174] Harris County, Canvass Report – Total Voters – Official, 2020 General Election, https://www.harrisvotes.com/HISTORY/20201103/Official%20Canvass.pdf.

[175] Rice University, "Harris County Voters," https://mreece13.github.io/dtv-harris-2021/index.html.

thru voting in primaries. As illustrated by the following exchange in Senate debates, Republicans only

challenged the process when it had partisan implications in the 2020 general presidential election.[176]

**Senator Miles**: Republicans in Harris [C]ounty had no problems with drive-thru voting in the primary, but in the general it became a big issue. Can you explain that to me?

**Senator Hughes**: So drive to, I don't know what happened in the primary, the general, if you say that's, that's where they were. I believe you. I wasn't part of that. I've just read about drive through voting after the general election.

      Finally, Republican Senator Bob Hall, a member of the pivotal Committee on State Affairs, made an extraordinary argument against drive-thru and 24-hour voting. He argued, in essence that any arrangement for voting used disproportionately by minorities was inherently racist and should be banned, even though the options are open to all voters. His comments are worth quoting in full:[177]

**Senator Hall**: I don't see any difference between what you're proposing is that's just as racist. I mean, there is something really racist, [be]cause you're talking about a method that favors. So, um, it's, it's just kind of the reverse of what we've talked about here in there. So

Harris County Election Administrator Isabel Longoria then interjected: "That probably goes to a deeper issue on how we feel about race and supporting those minority voters."

Senator Hall responded to her.

**Senator Hall**: I mean, if, I mean, if we came, if someone proposed a method of voting that favored non-minority voters, you would be, you and others would be all over that as being racist. And that's [what] we're trying to do here is recognize that we're all Americans, a black vote, a brown vote, a white vote is one vote and we're all Americans. And we have voting rules that favor voting it. Doesn't favor voting to make it convenient because of what culture or whatever beliefs you have or whatever it is that everybody has equal access, equal opportunity, no matter what, who they are in recognizing considerations for those with special conditions of handicap, but not setting up voting rules based on whether you are a particular minority or whether you're white in, in there. We, we had that at one time. We got rid of that. It was wrong when, when it was there, we got rid of that. And today what we're trying to do, and I think, uh, Senator Hughes with this bill is make equal opportunity for all people equally not set it up to favor one over the other, but I thank you for your testimony.

---

[176] 16333, Senate Committee on State Affairs Transcript, 01:14:30

[177] *Id.*, at 01:06:51 – 01:07:17.

86

**B.  S.B. 1 Will Not Prevent Voter Fraud**

The preamble to Senate Bill 1 in the second special session described the purpose of the act as "relating to ***election integrity*** and security, including by preventing fraud in the conduct of elections in this state …"[178] (emphasis in original). Chairman Briscoe Cain of the House Elections Committee affirmed that "Member, this is the bill we heard previously relating to election integrity and preservation of the purity of the ballot box."[179] Ironically, the sponsors of Jim Crow laws that earlier disenfranchised non-whites in the South, used this same phrase of protecting the "purity of the ballot" and had claimed that measures such as the white primary, the poll tax and the literacy test were needed to prevent fraud. In 1906, for example, U.S. Senator Culberson of Texas extolled the white primary as "uninfluenced by the chicanery and intrigue which heretofore defeated the will of the people." The primary, he said, "protects and guards the purity of the ballot."[180]

However, proponents had great difficulty in justifying S.B. 1 as a deterrent to fraud. The Director of Elections had testified that the 2020 election was "smooth and secure." The office of a highly incentivized Attorney General had turned up only a handful of uncoordinated, isolated cases of voter fraud in 2020 and throughout the period since 2004, successive Attorneys General had uncovered only a vanishingly small number of election fraud cases.

The difficulty that backers faced in justifying their elections legislation as a voter fraud measure is demonstrated by the colloquy between Senate sponsor Bryan Hughes and Democratic Senator Boris L. Miles in the debate over the Conference Committee Report at the end of the 2021 regular legislative

---

[178]  Texas State Legislature, 87th Legislature, Second Special Session, S.B. 1, https://capitol.texas.gov/Search/DocViewer.aspx?ID=872SB000014B&QueryText=%22election+integrity%22&DocType=B.

[179] House Elections Committee Hearing Transcript, 8 April 2021, at 3.

[180] *Satisfactory in Texas,* BALTIMORE SUN (June 26, 1906), 12.

session. Senator Hughes begrudgingly admits to a lack of problems in the 2020 general election and then

seemed to back off. However, when asked to identify any evidence of voter fraud Hughes tried to

change the subject:

**Senator Miles:**  So, basically from the federal courts, from the federal Washington, D.C., FBI Director, Homeland Security, and even our state secretary, no evidence of any type of voter fraud was found. We're on the same page with that?

**Senator Hughes:**  As I recall, they were talking about voting systems and hacking electronics like that, but yes, Sir--

**Senator Miles:**  No.

**Senator Hughes:**  --the 2020 elections in Texas went a lot better than most places.

**Senator Miles:**  Solid and secure.

**Senator Hughes:**  Yes, Sir.

**Senator Miles:**  Solid and secure. We can establish that. Solid and secure.

**Senator Hughes:**  As far as the--

**Senator Miles:**  As far as fraud of any type.

**Senator Hughes:**  --now, well are you asking if there's any fraud at all or if there--

**Senator Miles:**  Yeah, yes, Sir.

**Senator Hughes:**  --it went well?

**Senator Miles:**  If you could tell me what fraud existed in the 20, November 2020.

**Senator Hughes:**  Well Senator, you know, November 2020 is not the only election that, that we have records of. There was 2018, and there was elections—

Senator Hughes did not follow-up with evidence of fraud from 2018 or any other Texas

elections.

Similarly, the House Sponsor of S.B.1, Republican Representative Briscoe, the Chair of the

House Committee on Elections, came up empty, with no evidence of voter fraud. when asked if the lack

of voter fraud in Texas meant that the bill was a solution in search of a problem that didn't exist. He said that "even one instance of fraud is too much."[181]

During House floor debates. in an exchange with Democratic Vice-Chair Gonzalez, Chair Cain reluctantly agreed with the finding of the Texas Secretary of State that the 2020 election about the absence of problem in the 2020 general presidential elections in Texas:

**Vice-Chair Gonzalez**: Do you agree with me because the Secretary of State's Office testified before our committee, that very first day, and the Secretary of State said that the 2020 elections was free, fair, safe, and secure. Do you not agree with that – with -- with -- what the Secretary of State said?

**Chairman Cain**: I – I think that's her opinion. Sure.

**Vice-Chair Gonzalez**: That you think what?

**Chairman Cain**:  Mm -hm – yes. Well I – I think, yeah. I think for the most part it was free, fair, and safe. But we – I mean we heard testimony – that said otherwise.

**Vice-Chair Gonzalez**: But if the secretary – I mean the Secretary of State's office was there for a reason and so I would imagine –

**Chairman Cain**: They're there at every meeting.

**Vice-Chair Gonzalez**: -- that  -- that their opinion would be highly regarded that our elections were safe and secure.

**Chairman Cain**: Okay.

**Vice-Chair Gonzalez**: Or do you disagree with the Secretary of State's Office.

**Chairman Cain**: I – I mean I've heard – I've heard people say that they disagree with the Secretary of State's Office in Committee – so.

**Vice-Chair Gonzalez**: So are you saying that you disagree with the Secretary of State's office, is what I am asking you.

**Chairman Cain**: I'm going – I think they're probably right in – in the adding up of --- of it all from what they way of (unintelligible) a free, fair, and – and secure election.

**Vice-Chair Gonzalez**: So as of right now our – our elections are safe and secure, correct?

---

[181] Exhibit A For Dropping H.B. 6, Press Reader, 2 April 2021, https://www.pressreader.com/.

**Chairman Cain**: What this bill seeks to do is to make them safer and more secure.

**Vice-Chair Gonzalez**: I'm asking – I'm asking you – I mean if the Secretary of State's office said that and you said you – you agree with them, right.

**Chairman Cain**: Okay. [182]

Ultimately, Chairman Cain resorted to conjecture.

**Vice-Chair Gonzalez**: So if it's not broken then what – what are we trying to fix here that is not broken?

**Chairman Cain**: Well, I – I happen to believe that – you know, we don't need to wait for – for bad things to happen in order to try and protect and secure these elections and to make sure that this is a process that – everyone is following.[183]

Chairman Cain had no basis in evidence for speculating that contrary to decades of experience with many millions of ballots cast in Texas, that somehow a rash of voter fraud would emerge in the future absent his omnibus election bill.

The reason for these admissions and conjectures from the primary backers of "Election Integrity" bills is simple. Voter fraud was vanishingly rare not just in 2020, but in earlier elections as well. The website of the Attorney General's Election Integrity Unit indicates that since 2005, it successfully prosecuted voter fraud cases against 155 individuals and had pending cases against another 43 individuals. During this period the citizens of Texas cast some 94 million ballots. An analysis by the that, If you "Add to that 19 cases catalogued by the conservative Heritage Foundation, which include federal and county prosecutions, and you get a grand total of 174," the *Houston Chronicle* noted … "Together, they represent

---

[182] House Floor Debate Transcript, 6 May 2021, at 8-10.

[183] *Id*. at 11-12.

0.000185 percent of the total votes cast — or 1 in 540,000 voters."[184] Voters statistically are less likely to commit fraud than to be hit by lightning, which has odds of one in 500,000 according to the CDC.[185]

The *Chronicle* added that:

"Alas, most crimes were so minor that only 33 of the 174 perpetrators went to jail, most for less than a year. An analysis of media accounts and the attorney general's prosecution records obtained by this editorial board through the Texas Public Information Act shows that most cases ended with plea agreements — pre-trial diversion deals or probation. Of the 33 people who were sentenced to any jail time, none were the criminal masterminds conjured up to instill fear in the hearts of freedom-loving Americans. Some are felons who were not yet eligible to vote again, a few were small-town politicians falsely registering voters, others filled out another person's absentee ballot. Only five cases — yes, five out of 94 million — involved voter impersonation at the polls, that near-mythic species of voter fraud that launched Texas' epic battle for a voter ID law."[186]

These cases hardly justified a massive 67-page omnibus bill, filed with voter restrictions. Such a bill would not at any rate prevent random, isolated cases of voter fraud in Texas.

Attorney General Paxton, an important backer of S.B. 1 and earlier legislation, claimed that despite his best efforts, encompassing 22,000 hours, to ferret out fraud, implausibly claims that fraud is difficult

---

[184]    Attorney   General   of   Texas,   Election   Integrity   Unit,   *Election   Integrity*, https://www.texasattorneygeneral.gov/initiatives/election-integrity; Editorial Board, *Editorial: The Big Lie – If Voter Fraud is an Epidemic Why Can't Texas Find It?* HOUSTON CHRONICLE (April 19, 2021), https://www.houstonchronicle.com/opinion/editorials/article/Editorial-The-Big-Lie-If-voter-fraud-is-an-16107109.php?utm_medium=referral&utm_campaign=socialflow&utm_source=facebook.com.

[185] CDC, *Lightning: Victim Data*, https://www.cdc.gov/disasters/lightning/victimdata.html.

[186] *Id.*, *Editorial: The Big Lie*.

to detect and blames the lack of results on insufficient resources to track down fraud. [187] Richard L. Hasen, an election law professor at the University of California at Irvine, and an authority on elections and voting disagreed. He noted that Paxton, who is seeking reelection has "every incentive," politically, to find voter fraud and energize his Republican base. "He's finding very little of it despite spending a lot of money and using a lot of resources looking for it," Hasen said. "The reason is not that such fraud is too hard to find. Those that commit voter fraud tend not to be brain surgeons. The reason he's not finding a lot of it is because voter fraud is rare." [188] As documented below, a forensic audit of four pre-selected counties by the Texas Secretary of State focused on assessing fraud confirmed that fraud in Texas is vanishingly small at best.

Paxton's anti-fraud campaign suffered a setback in December 2021 when the all-Republican State Court of Criminal Appeals – the highest court on criminal matters – ruled that the Attorney General lacked the authority under the Texas Constitution to prosecute voter fraud without an explicit authorization from county prosecutors. [189] Eight of the court's nine justices signed on to the opinion. Rather than respecting the independence of the Texas judiciary, Paxton denounced the decision and launched a political campaign to compel the justices into reversing their ruling. In 2019, Paxton had tweeted "We need judges devoted to the constitution and strict application of the law, not to the political winds of the day." This time, however, Paxton questioned the Republican loyalty of the justices and on a TV program run by MyPillow CEO Mike Lindell, a prominent advocate of the "Big Lie" of a stolen presidential election in 2020, Paxton

---

[187] Taylor Goldenstein, Taylor Goldenstein, *Texas AG Paxton's $2.2M voter fraud unit closed three cases in 2021. GOP lawmakers still boosted its budget.*, Houston Chronicle (Dec. 17, 2021), https://www.houstonchronicle.com/politics/texas/article/Texas-AG-Paxton-s-2-2M-voter-fraud-unit-closed-16708051.php

[188] *Id.*

[189] *Texas v. Stephens*, No. PD-1033-20 (Dec. 15, 2021)

called upon voters to pressure the justices. "Call them out by name," he said. "I mean, you can look them up. There's eight of them that voted the wrong way. Call them, send mail, send email." Paxton said that unless the justices reconsider, he'll call upon Governor Abbott to summon a special session of the General Assembly prior to the 2022 elections, to enact legislation that would allow both his office and private individuals—to sue with the threat of "large penalties" in alleged cases of voter fraud. He said that even if such a law is unconstitutional, that would require the court "strike it down again, because it would take several years to go through that process, and at least we can keep that (law) in place through the next election."[190]

In an overt invocation of anti-Semitism that further questioned the integrity of Texas elections, Paxton charged that "Soros-funded district attorneys will have sole power to decide whether election fraud has occurred in Texas." The Jewish billionaire George Soros, a Holocaust survivor, is a frequent target of inflammatory attacks by Republicans in Texas. As demonstrated below, Republicans have charged Soros with using his money to foment a race war in the United States.[191]

The lack of voter fraud in Texas is consistent with national results for the 2020 election as affirmed by multiple officials of the Trump administration. The same lack of voter fraud nationwide is true of earlier elections as well. A nationwide 2011 study conducted by the Republican National Lawyers Committee and designed to root out as much voter fraud as possible found only 332 cases of voter fraud of any kind out of many hundreds of millions of ballots cast in primary and general elections across the United States. A more inclusive study by News21, a national reporting project of eleven universities, considered reported allegations of voter fraud (whether prosecuted or not), and News21 uncovered only

---

[190] Justin Miller, *Paxton Targets GOP Judges After They Strike Down His Powers on Voter Fraud*, TEXAS OBSERVER (January 28, 2022), https://www.texasobserver.org/paxton-targets-gop-judges-after-they-strike-down-his-powers-on-election-fraud/.

[191] *Id.*, Miller, *Paxton Targets*.

2,068 alleged fraud cases from 2000 to mid-2012. An updated analysis by the Conservative Heritage Foundation found only 1,340 allegedly "proven" cases of voter fraud nationwide from the 1980s through 2021, when billions of ballots were cast. President Trump's Presidential Advisory Commission on Election Integrity that he launched in 2017 disbanded after uncovering no significant evidence of voter fraud in its eight months of work.[192]

Post-election investigations and academic studies have demonstrated that the lack of evidence of significant voter fraud is not the result of insufficient efforts or the difficulty of detecting fraud. The Associated Press study of the 2020 election in six swing states, not only found no evidence of coordinated fraud, but also noted that most of the few isolated "potential" illegal votes were not counted. "The cases also underscore that suspected fraud is both generally detected and exceptionally rare," AP noted. "Election officials," it reported, "say that in most cases, the additional ballots were never counted because workers did their jobs and pulled them for inspection before they were added to the tally."[193]

Other post-election reviews found little if any evidence of voter fraud. In Arizona, the Maricopa County Election Department conducted an in-depth post-election review, by election professionals, of the 2020 general presidential election. Maricopa is Arizona's most populous county, with more than 2.6

---

[192] National Republican Lawyers Association, *Vote Fraud Survey* (November. 2011), http://www.rnla.org/survey.asp; *Election Fraud in America*, News21, (August 12. 2012), https://votingrights.news21.com/interactive/election-fraud-database/; Heritage Foundation, *Voter Fraud Cases*,
https://www.heritage.org/voterfraud/search?state=TX&combine=&year=&case_type=All&fraud_type=All&page=2 ; Elizabeth Landers, Eli Watkins and Kevin Liptak, *Trump Dissolves Voter Fraud Commission; Adviser Said it Went 'Off the Rails,'* CNN (January 4, 2018), http://www.cnn.com/2018/01/03/politics/presidential-election-commission/index.html.ee also, generally, Lorraine C. Minnite, *The Myth of Voter Fraud* (Cornell University Press, 2010). The National Republican Lawyers' Committee after finding minimal evidence of voter fraud scrubbed its website that reported the results of its fraud study.

[193] "Christina A. Cassidy, *Far Too Little Voter Fraud to Tip the Election to Trump, AP Finds*, Associated Press (December 14, 2021), https://apnews.com/article/voter-fraud-election-2020-joe-biden-donald-trump-7fcb6f134e528fee8237c7601db3328f.

million registered voters, about 60% of the state total. The review included an analysis of the audit initiated by Republicans in the State Senate. The Republican audit was conducted by a firm Cyber Ninjas, which had not experience in election analysis, and was headed by Doug Logan who had endorsed Trump's claim of a stolen election.[194]

The Department's review found that "The November 2020 General Election was administered with integrity and the results were accurate and reliable. This has been proven through statutorily required accuracy tests, court cases, hand counts performed by the political parties and post-election audits." . With respect to voter fraud, the review found that even instances of potentially [not proven] questionable ballots fit "the very definition of exceptionally rare." The review concluded: "In total we found fewer than 100 potentially questionable ballots cast out of 2.1 million. This is the very definition of exceptionally rare." That equals less than .005 percent of ballots cast and less than 1 percent of Biden certified 10,457 vote margin of victory in the state. The review added, "None of these instances impacted the outcome or races and a thorough review by our election professionals confirmed there were no systematic issues related to ballot counting and processing in the November 2020 General Election." . The review did not report any instances or coordinated fraud.[195]

The review additionally found that "Faulty data analysis and lack of understanding of federal and state laws appear to have results in Cyber Ninjas incorrectly claiming thousands of legally registered voters may have cast ballots illegally." The election professionals that conducted the County review examined in-depth each of Cyber Ninjas claims. For example, they found that of claims that 33,102 voters

---

[194] Maricopa County Elections Department, *Correcting the Record: Maricopa Counties In-Depth Analysis of the Senate Inquiry* (January 2022), https://recorder.maricopa.gov/justthefacts/pdf/Correcting%20The%20Record%20-%20January%202022%20Report.pdf.

[195] *Id.*, at 2, 5.

"may have illegally voted because they moved prior to or during the election cycle," only 5 were potentially accurate. The professionals found that of 1,370 claims of persons who voted with incomplete names, were deceased, were late registrations, had duplicate voter IDs, or were multiple voters, only 32 were involved potentially illegal votes.[196]

In January 2022, CEO Logan disclosed that Cyber Ninjas is shutting down and laying off all its employees. The news came on the same day that Judge John Hannah of the Maricopa County Superior Court ordered the firm to pay $50,000 a day in fines until it complied with a public records request to release data from its audit. Logan said that he is selling the company's assets, filing for bankruptcy, and starting a new company Ironically, the results of his audit showed that Biden received a few more net votes in Maricopa County than officially reported.[197]

Post-election analyses of earlier elections disclose a similar lack of voter fraud. These include intensive investigations in Maryland in 1994, in Wisconsin in 2004, and Minnesota in 2008, These investigations included representatives of both parties and law enforcement officials. No criminal charges resulted in Maryland or Minnesota, and only 14 charges in Michigan out of 2.9 million ballots cast. All the Michigan charges involved either felon voting or double voting. None of the double-voting cases led to a conviction.[198]

---

[196] *Id.*, at 53, 60.

[197] Joseph Marks, *Cyber Ninjas Says Farewell*, WASHINGTON POST (January 10, 2022), https://www.washingtonpost.com/politics/2022/01/10/cyber-ninjas-says-farewell/.

[198] Eric Schroek, *Conservative Media Hype 'Not Accurate' Report To Suggest Franken's Election Was "An Illegal Victory*, MEDIA MATTERS (July 13, 2010), https://www.mediamatters.org/fox-friends/conservative-media-hype-not-accurate-report-suggest-frankens-election-was-illegal; Steven H. Huefner, Daniel P. Tokaji, Edward B. Foley, and Nathan A. Cemenska, *From Registration to Recounts The Election Ecosystems of Five Midwestern States* (The Ohio State University Moritz College of Law: 2007), 121; Republican National Lawyer's Association, *Voter Fraud Study: Minnesota*, http://www rnla.org/survey.asp#mn.Jane Bowling, *Federal, State Investigations Close Governor's Race Probe*, THE DAILY RECORD (August 24, 1995), 9; Michael James, *Sauerbrey Abandons Election Appeal*, BALTIMORE

Scholarly studies additionally refute the unsubstantiated allegation that voter fraud goes undetected. A decisive study deployed a methodology was designed "to detect the possibility of election fraud even in the absence of allegations or reports of such activity." The study focused on the 2006 general election in Georgia – *before* the implementation of voter photo ID in that state. They examined a common charge regarding voter fraud: that fraudsters were voting in the name of dead persons. Through the examination of public records, they found that 66 deceased persons apparently voted in the election. However, investigation showed that these were absentee voters who died after voting, or in-person voters who "were cleared as being mistakes." Thus of 2.1 million votes cast in Georgia's 2006, not a single vote was cast in-person in the name of a deceased person.[199]

A study of voter impersonation, using a methodology that does not depend on investigations of allegations of voter fraud (thus answering the claim of those who say that such fraud is hard to detect or verify) reaches several critical conclusions. The authors found, "no evidence of voter impersonation in the 2012 election." The authors also found "no difference between states with and without strict voter ID requirements (where it should be hardest)." The authors conclude that, "based on this evidence, strict voter ID requirements address a problem that was certainly not common in the 2012 U.S. election. Efforts to improve American election infrastructure and security would be better directed toward other initiatives."[200]

---

SUN, (January 16, 1995), https://www.baltimoresun.com/news/bs-xpm-1995-01-16-1995016076-story.html .Allan J. Lichtman, *When the Dead Speak*, GAZETTE.NET (October, 16, 1998), http://www.gazette.net/stories/101698/poliadmiss_31866.shtml.

[199] M. V. Hood III and William Gillespie "They Just Don't Vote Like They Used To: A Methodology to Empirically Assess Election Fraud." *Social Science Quarterly,* 93 (2012), 76-94.

[200] John S. Ahlquist, Kenneth R. Mayer, and Simon Jackman, "Alien Abduction and Voter Impersonation in the 2012;Presidential Election: Evidence From a Survey List Experiment*, Election Law Journal* 13 (2014), 460-473.

In yet another study, the authors develop "a more inclusive method of measuring voter fraud" that "can identify anomalies created by even small amounts of electoral fraud. It picks up many types of election fraud regardless of whether they were done by mail-in ballot, early voting, or election-day voting. It also measures these forms of fraud, whether done by only a few individual voters, a campaign operative, a vote broker, or even a corrupt election official." The authors found that "Our results support the conclusion that electoral fraud, if it occurs, is an isolated and rare occurrence in modern U.S. elections."[201]

The two most prominent cases that charged voter fraud in Texas involved Black voters and felon disenfranchisement. I noted above the case of Hervis Rogers on the cusp of the first 2021 special session in Texas. The Hervis arrest recalls the most prominent example of alleged electoral fraud arising from the 2016 election, which also involved an African American, Crystal Mason. She had voted a provisional ballot while on supervised release after serving a prison term. Although technically not eligible to vote Mason claimed that she was unaware of this disqualification. The state argued that she was notified. Mason's vote had no impact on the election because officials did not count her provisional ballot and, like Rogers, she would have been eligible to vote in many other states. Nonetheless, Mason was prosecuted, convicted, and sentenced to an extraordinary five years in prison. A lower court turned down her appeal and the case is still pending before the State Court of Criminal Appeals.[202]

After hearing testimony about the lack of systematic fraud in Texas elections, House Elections Committee member, Republican Keith Travis admitted, "you can't determine the size of the [fraud] problem until you completed a full investigation." The Attorney General had already completed an

---

[201] Ray Christensen & Thomas J. Schultz, *Identifying Election Fraud Using Orphan and Low Propensity Voters, American Politics Research*, 42 (2014), 330-333.

[202] Eleanor Dearman, *Attorneys Appealing Crystal Mason Illegal Voting Case, Look to New Texas Election Law,* SAN ANTONIO STAR-TELEGRAM (December 10, 2021), https://www.star-telegram.com/news/politics-government/article256503521.html.

intensive investigation with minimal results. Further, the results are now in of the first phase of the Texas Secretary of State's forensic audit of four large pre-selected counties -- Collin, Dallas, Harris and Tarrant—focused on assessing voter fraud.[203] Consistent with the admonition of Republican Collin County Judge Whitley, the audit demonstrated that voter fraud if it occurred at all in these counties was vanishing small.

Out of 3.88 million ballots cast in the four counties in the 2020 general election, the audit uncovered 60 "potential" double-voters and 17 "potentially" deceased voters. These are only "potential" illegal, not verified illegal voters, and not necessarily fraudsters. As documented above, an academic study of alleged votes cast in the name of deceased persons in Georgia found that the allegations evaporated upon investigation. Double-voting could result from mismatches or from persons, and if it occurs, may not involve intentional fraud, but an honest belief that persons could vote in different places where they held property. "Whether they voted in another state and Texas, voted more than once in their county, whether someone not a U.S. Citizen voted, which should not have been done, the vast majority will be resolved as clerical errors, or easily understood glitches in the process, rather than intentional illegal voting," said Cal Jillison Professor of political scientist at Southern Methodist University.[204]

The Secretary also reported only de-minimis discrepancies between the electronic and the partial hand count of ballots in the four counties. Among three precincts examined in Collin County the audit found a discrepancy of 17 votes. Among seven precincts in Dallas County, the audit found a discrepancy

---

[203] Together, the Citizen Voting Age Population ("CVAP") of the four counties selected for audit is 55.1 percent—nearly 8 percent higher than the rest of the State. *See* U.S. Census, American Community Survey 2019.

[204] Office of the Texas Secretary of State, *Phase 1 Progress Report: Full Forensic Audit of November 2020 General Election*, (December 31, 2021), https://www.sos.texas.gov/elections/forms/phase1-progress-report.pdf; Lori Brown, *Audit Finds No Widespread Fraud During 2020 Presidential Election in Texas,* "Fox4, (December 31, 2021), https://www.fox4news.com/news/audit-finds-no-widespread-fraud-during-2020-presidential-election-in-texas..

of 10 votes. Among ten precincts in Harris County the audit found a discrepancy of 5 votes. Among seven precincts in Tarrant County, the audit found a discrepancy of 0 votes. That adds to a minimal total discrepancy of 32 votes out of more than 18,000 votes examined in the precincts of the four counties. In Collin, Dallas, and Harris counties, officials pointed to clerical errors. The report did not note any indication of fraud.[205]

Remi Garza, president of the Texas Association of Election Administrators, said of the audit results, "There doesn't seem to be anything too far out of the ordinary with respect to the information that's provided."[206] "Once those are all investigated, we'll find very few votes cast illegally, and so Texas will come out looking pretty good," added Professor Jillison.[207]

## C. S.B. 1 Was Not Necessary To Increase Voter Confidence

Faced with the inability to sustain a justification based on fraud, backers of "Election Integrity" legislature turned to the vaguer concept of voter confidence in the integrity of the vote in Texas. Republican Representative Travis Clardy, a member of the House Elections Committee made this shift explicit in a Committee hearing:

So I, I appreciate that, but are hearing this argument that, well, it's only a dozen, it's only 500, you know, look at the population of the state of Texas, look at how many registered voters there are, it's the fractional number. Uh, but that's really not the point to me. It, it's the erosion of the competence that we have in our elections. [208]

---

[205] *Id.*, Office of the Texas Secretary of State.

[206] Andrew Stanton, *Texas Audit Demanded by Trump Fails to Find Significant Voting Issues*, NEWSWEEK (January 1, 2022), https://www.newsweek.com/texas-election-audit-demanded-trump-fails-find-significant-voting-issues-1664815.

[207] *Id.*, Brown, *Audit Finds No Widespread Fraud*.

[208] 19871, House Elections Committee Hearing Transcript at 00:28:51.

As the Democratic vice-chair Gonzalez later explained in the hearing, even the figure of 500 prosecutions since 2004 refers to the number of counts, not the number of cases, which is much smaller, as also documented above.[209]

Earlier, in March 2021, when Republicans were considering "Election Integrity" bills, Republican Representative Dustin Burrows held a townhall meeting. A woman asked him how the legislature planned to "change the way we vote in Texas." "It's a great question," Burrows responded. "After this last election, I think that people's confidence in our election system is down, and rightfully so. ..."[210]

Senator Bryan Hughes the Senate sponsor of the "Election Integrity" bills admitted that concerns about voter confidence that motivated the push for "Election Integrity" legislation was tied to Republican efforts to cast doubt on confidence in the results of the 2020 election nationwide. "This was already in process, but then the 2020 election was so in the national spotlight, and so many people have questions, so many people have concerns," Hughes said. "I would say that has raised the profile of the issue."[211] The House sponsor of the "Election Integrity" bills, Republican Representative Biscoe Cain said, the purpose was to "restore trust in the electoral process." In a joint statement Senator Hughes and the House sponsor Representative Briscoe Cain said, "There is nothing more fundamental to this democracy and our state than the integrity of our elections … When people do not have confidence in our electoral institutions, when political legitimacy is questioned, liberty is threatened." In a reference to business groups that opposed the "Election Integrity" bills, they added, "Even as the national media minimizes the importance

---

[209] *Id.* at 00:36:46.

[210] Elaina Plott, *The GOP Won It All in Texas. Then It Turned on Itself*, NEW YORK TIMES, (May 4, 2021), https://www.nytimes.com/2021/05/04/magazine/texas-republicans.html/

[211] Abigail Rosenthal, *The Texas GOP is Still Furious About Harris County's Drive-thru Voting*, CHRON (March 15, 2021), https://www.chron.com/politics/article/texas-drive-thru-voting-senate-bill-7-election-16026395.php

of election integrity, the Texas Legislature has not bent to the headlines or corporate virtue signaling." Ironically, in 2020, Cain had volunteered with Trump allies in Pennsylvania in a vain attempt to overturn an election that Biden won by "180,000 votes and invalidate Pennsylvania's electoral votes.[212] Republican Lieutenant Governor, Dan Patrick, who presides over the State Senate said, "People in America have lost faith in their elections, in the outcome. And we have to resolve that issue in this country and in the state." Republican Representative Andrew Murr, another sponsor of Election Integrity legislation, said, "We want Texans to be confident in the outcome of the system."[213]

However, proponents of the "Election Integrity" bills failed to demonstrate either that there was a crisis of confidence about elections in Texas or that a partisan bill, sponsored only by Republicans, pushed ahead by Republicans through numerous procedural deviations, and enacted by Republicans along party lines could broadly improve confidence in elections in the state.

Survey data demonstrates limited public support for more strict voting laws, or the "Election Integrity" measures pushed by Republicans in the General Assembly. The data demonstrates greater public support for initiatives to facilitate registration and voting than for restrictive legislation. These polls also need to be considered in light of the facts that despite increasing competitiveness, Texas is still a Republican voting state. In addition, Republicans control all the levers of government power in Texas, including every statewide elected official and substantial majorities in the General Assembly. In addition,

---

[212] Chuck Lindell, *GOP Unveils Final Version of Texas Elections Bill, Which Includes More Restrictions*, AUSTIN-AMERICAN STATESMAN (May 29, 2021), https://www.statesman.com/story/news/2021/05/29/gop-unveils-final-and-far-longer-version-texas-elections-bill-sb-7/5263347001/; Alexa Ura, *Texas House Committee Advances Bill That Would Make it a Crime For Election Officials to Send Unsolicited Vote-By-Mail Applications*, TEXAS TRIBUNE (April 8, 2021), https://www.texastribune.org/2021/04/08/texas-elections-vote-by-mail-applications/.

[213] Dan Patrick Press Conference Transcript, at 7; J. David Goodman, Nick Corasaniti, and Reid J. Epstein, *Texas GOP Passes Election Bill, Raising Voter Barriers Even Higher*, NEW YORK TIMES (August 31, 2021), https://www.nytimes.com/2021/08/31/us/politics/texas-voting-rights-bill.html.

backers of "Election Integrity" bills launched a propaganda campaign for such measures and Democrats suffered the problem of boycotting the General Assembly and fleeing the state. A University of Texas at Austin/Texas Tribune Poll for August 2021 found that 26% of respondents strongly supported Democrats leaving the state and 10% somewhat approved, for a sum 36%. However, 43% strongly opposed Democrats leaving the state and 4% somewhat opposed for a sum of 47%.[214]

Survey data demonstrate that Republicans drove any demand for more strict voting laws in 2021 and support for the "Election Integrity" measures being considered in the State Legislature. In its methodology for its Texas Poll with the Texas Tribune, the University of Texas at Austin combined Republicans and Democrats with independents who lean towards either party into a single category of "Lean Republican" and "Lean Democratic."

The Texas Poll demonstrates that in August 2021, when the legislature was finalizing S.B. 1 there was no majority public support among Texas registered voters for enacting stricter voting rules. As indicated in Table 22 and Chart 7, 39% of poll respondents believed that voting rules in Texas should be stricter, compared to 24% who believed they should be less strict and 30% who believed they should be left unchanged. Thus, a 54% majority believed that either rules should be kept the same or made less strict. The support that did exist for stricter voting rules, moreover, was driven only by Republicans. As further indicated in Table 22 and Chart 8, 68% of respondents who lean Republican favored more strict rules, whereas 4% favored less strict rules, and 23% favored keeping rules the same. In contrast, the responses of registered voters who lean Democratic are the opposite mirror-image of the lean Republican responses.

---

[214] University of Texas at Austin/Texas Tribune Poll, August 2021, https://texaspolitics.utexas.edu/set/support-or-oppose-majority-democrats-texas-house-representatives-leaving-state-texas-delay.

Only 5% of respondents who lean Democratic favored more strict rules, whereas 67% favored less strict rules and 25% favored keeping rules the same.

The University of Texas/Texas Tribune poll for October 2021 additionally demonstrates that after the enactment of S.B. 1 there was less than majority approval for how state leaders and the legislature were handling election and voting laws. Again, approval was driven strictly by respondents who lean Republican. As indicated in Table 23 and Chart 9, 43% of all respondents approved of how state leaders and the legislature were handing election and voting laws, whereas 38% disapproved, 13% neither approved or disapproved and 5% were not sure. However, 73% of respondents who lean Republican approved, whereas only 9% disapproved, 16% neither approved or disapproved and 3% were unsure. In contrast, only 5% of respondents who lean Democratic approved, whereas 89% disapproved, including 81% who strongly disapproved; and 5% neither approved or disapproved and 5% were unsure.

A later University of Texas/Texas Tribune poll shows only limited support for measures considered by the General Assembly, in August 2021, when the Republican majority was finalizing the passage of S. B. 1. As shown in Table 24 and Chart 10, 46% of respondents supported the "new legislation on voting and elections being considered during the current special session," 32% were opposed, 14% were neither supportive or opposed, and 9% were unsure.

Survey data additionally demonstrates that despite false claims about lost confidence in election integrity advanced by Donald Trump and his allies in Texas, voter confidence about the integrity of elections in the state was high. That is, Texans drew a sharp distinction between the conduct of elections in their state and elsewhere in the nation as demonstrated by the findings of the University of Texas/Texas Tribune for February 2021, just as lawmakers were considering "Election Integrity" measures. Republicans in the General Assembly referenced the poll, if inaccurately, as shown below.

The poll showed high confidence in the accuracy of official Texas election results. It further showed much lower confidence in the accuracy of official national election results. As shown in Table 25 and Chart 11, 43% of poll respondents rated Texas results as very accurate and 35% as somewhat accurate for a sum of 78%. Only 5% rated Texas results as very inaccurate and 11 percent as somewhat inaccurate for a sum of 16%. The ratio between accurate and not accurate ratings is 7.1 to 1. By contrast, 36% of poll respondents rated national results as very accurate and 16 percent as somewhat accurate for a sum of 52%. Correspondingly, 30% rated national results as very inaccurate and 13 percent as somewhat inaccurate for a sum of 43%. The ratio between accurate and not accurate ratings is just 1.2 to 1. This data shows that the enactment of S.B. 1 in Texas was not in response to a lack of confidence about elections in the state, as compared to confidence about results nationally.

In hearings of the House Elections Committee Republican Representative Keith Bell sought to justify S.B. 1's predecessor by citing a lack of confidence in Texas election results from the Texas poll. However, he substituted the findings of the Texas poll on confidence in national results for confidence in Texas results. Bell explained: "You know, um, well, first of all, 43% of Texas believe our election results are inaccurate and that's according to the university of Texas center, Texas UN poll published in February of this year. So, there could be no mistaking the context of "our election results." [215] Bell immediately went on to discuss fraud prosecutions in Texas. However, as indicated in Table 25, the correct percentage from the February 2021 Texas Poll for a belief that Texas, not national, election results are inaccurate is not 43%, but 16%, 27 percentage points and 62.8% lower.

A comparison of voter confidence results before and after the enactment of S.B. 1 from the University of Texas/Texas Tribune poll demonstrated that this legislation did not increase voter

---

[215] 19734, House Elections Committee Transcript, at 01:47:50.

confidence in the accuracy of Texas election results. As shown in Table 26 and Chart 12, the percentage of Texas registered voters confident in the accuracy of Texas election results dipped slightly from 78% to 76%. More notably, the percentage of respondents "very confident" in the accuracy of Texas election results declined from 43 percent to 38 percent. This change is statistically significant at the standard .05 level in social science.

Statistical analysis shows that the fewer restrictions on voting, which result in lower cost of voting scores results in greater percentages of voters who are very confident about voting in their states. Chart 14, plots cost of voting scores against very confident findings in the states. The sharply downwardly sloping trend line is statistically significant at a level well below .01. It shows that for every 1-point increase in the cost of voting, this stringent measure of voter confidence declines by 5.35 percentage points. The linear correlation between COVI and this measure of high voter confidence is -0.44 out of a maximum of -1.0 and the squared linear correlation is 0.19, meaning cost of voting index accounts for about one-fifth of the differences across the states in voter confidence.

**CHART 14**
**RELATIONSHIP BETWEEN COST OF VOTING INDEX (COVI) AND THE PERCENTAGE OF VOTERS WHO ARE VERY CONFIDENT ABOUT THE VOTE IN THEIR STATES**



### D. S.B. 1 Will Not Achieve Uniformity In Elections

"I'm trying to strike a midrange solution," said Republican Senator Paul Bettencourt, a prominent supporter of "Election Integrity" measures in March 2021. "I'm not trying to disadvantage anybody or create an advantage for anybody. I'm trying to come up with a uniform answer."[216] Representative Cain

---

[216] Alexa Ura, *Texas Republicans Begin Pursuing New Voting Restrictions as They Work to Protect Their Hold On Power,* TEXAS TRIBUNE (March 22, 2021), https://www.texastribune.org/2021/03/22/texas-republicans-voting-restrictions/.

said, "one of the main purposes of this bill is to standardize and make uniform as best we can our elections, so that regardless of where people live, they – they know how elections are supposed to run.[217]

Republicans never explained why uniformity was a desirable goal for a state with counties as diverse as Texas. Counties in the state range from Loving County, which cast 66 votes in the general election of 2020 and King County with which cast 159 votes to Harris County, which cast 1.64 million votes and Dallas County which cast .92 million votes.[218] Governor Greg Abbot's executive order that limited drop boxes to one per county had a disproportionate impact on heavily minority Harris County, which had to reduce its drop boxes from twelve to one, the same as Loving and King County.

The Abbott administration also violated the goal of applying standards equally to all counties, when, as noted above, on September 23, 2021, more than ten months after the 2020 general election, the governor's appointed Secretary of State announced a full forensic audit of the election, limited to just four selected counties: Collin, Dallas, Harris, and Tarrant.[219]

In addition, Republicans in the general assembly failed to promote the goal of uniformity in the state's primary elections. This year, for example, the Republican leadership of Potter County, a large county with 57,000 registered voters decided to abandon the non-partisan election board and electronic voting. In a departure from standard process elsewhere in the state, the Republicans who run the county decided to administer its own primary elections with voting with the county's own issuance of paper ballots. Mark P. Jones, a professor of political science at Rice University in Houston, said the move "removes the Republican Party one more step away from the standard electoral procedure." He added,

---

[217] House Elections Committee Hearing Transcript, 8 April 2021, at 58.

[218] *Texas presidential results*, Politico, https://www.politico.com/2020-election/results/texas/.

[219] Texas Secretary of State Announces Full Forensic Audit of 2020 General Election in Four Texas Counites: Collin, Dallas, Harris, and Tarrant (September 23, 2021), https://www.sos.texas.gov/about/newsreleases/2021/092321.shtml.

"The integrity of our electoral system depends on institutionalizing and professionalizing election boards. There will be more doubts about the overall outcome, or it will lead to more slip-ups and more potential flaws and problems than if the professionals ran it."[220]

Moreover, if uniformity is a goal, it need not be achieved by banning procedures that advance the Republicans' purported goal of making it "easy to vote." The legislature could also achieve uniformity by authorizing explicitly initiatives that facilitate not hinder voting in Texas. The legislature could explicitly authorize drive-thru and 24-hour voting, with whatever safeguards it deems necessary, such as prohibiting partisan bumper stickers. It could join most other states in establishing no-excuse absentee voting. It could join more than a third of the states in authorizing voting for felons on parole or probation.

Other polls likewise show substantial support for reforms to expand not limit opportunities for registration and voting. The findings in Table 27 from a July 2021 survey by Ragnar Research Partners shows the 74% of respondents backed extending early voting by a week, 80% backed allowing early voting locations to be open on weekends, 87% backed increasing voting locations on Election Day, 57% backed having alternative secure ballot return sites, and 83% backed voter assistance in returning ballots from family, household members or caregivers. The findings in Table 27 from the 2020 Survey of the Performance of American Elections shows that 58.5% of respondents backed automatically registering all citizens over 18 to vote, 51.5% backed same day registration, 54.7% backed moving Election Day to a weekend, 71% backed making Election Day a national holiday, 74.4% backed only selecting election officials on a non-partisan basis, and 74% backed automatically registering moving voters at their new home.

---

[220] Jennifer Medina, *Republicans in Texas County, In Unusual Move, Upend Primary System*, NEW YORK TIMES (December 10, 2021), https://www.nytimes.com/2021/12/10/us/politics/republicans-amarillo-potter-county-primary.html.