# Appendix 2



## In The Matter Of

La Union Del Pueblo Entero, et al.,

Plaintiffs

v

State Of Texas, et al.,

Defendants

## CASE

5:21-cv-844

## Date

5-6-2022

## Witness

Brian Keith Ingram, JD

Volume II of II

**Certified Copy Transcript**

National Court Reporters Inc.  ·  888.800.9656  ·
NationalCourtReporters.com
NCRNetwork@nationalcourtreporters.com

Serving Legal Professionals From Coast To Coast and Internationally

Case 5:21-cv-00844-XR   Document 639-7   Filed 06/23/23   Page 3 of 7

| 5:21-cv-844 (XR) | Entero v Texas | Brian Keith Ingram JD 263 |
| --- | --- | --- |
| 5/6/2022 | NATIONAL COURT REPORTERS INC 888.800.9656 | 263 |

1    A.   I did not.

2    Q.   Did she in any way explain to you why she

3  wanted to replace record turnout with emphasis on smooth

4  safe, secure elections?

5    **A.   Well, the whole intent of this was to commend**

6  **the counties and the public on having a smooth, safe,**

7  **and secure election in the middle of a pandemic.**

8    Q.   So my question to you was:  Did she in any way

9  explain to you why she wanted to replace record turnout

10 with emphasis on smooth, safe, secure elections?

11   **A.   She didn't explain it to me, but it is**

12 **consistent with the intent of this press release.**

13   Q.   And how does Ms. Hughs define the word "smooth,

14 safe and secure"?

15   **A.   "Smooth, safe and secure" just means exactly**

16 **what I said it meant in my last deposition, which is**

17 **that the -- the election went well, it was not a**

18 **super-spreader event in the middle of a pandemic.**

19   Q.   Okay.

20   **A.   It was -- it was a relatively problem-free**

21 **election, there -- you know, that's not to say there**

22 **weren't problems, there were, but it was relatively**

23 **problem-free and considering the circumstances it was**

24 **exceptionally problem-free.**

25             MS. OLSON:  I am going to object as

1　nonresponsive.

2　　Q.   (By Ms. Olson)  Sir, how does Ms. Hughs define

3　the words, "smooth, safe and secure"?

4　　　　　MS. HUNKER:  Objection, asked and

5　answered.

6　　**A.   The way that our office defines them.**

7　　Q.   And how do you know that that's how Ms. Hughs

8　personally defines them?

9　　**A.   She and I talked about this before it was even**

10　**drafted what our purpose was, which to congratulate the**

11　**election administrators and the public for pulling off a**

12　**smooth, safe, and secure election in the middle of a**

13　**pandemic.**

14　　Q.   So my question was:  How does Ms. Hughs define

15　the words, "smooth, safe and secure"?

16　　　　　MS. HUNKER:  Objection, form.  Asked and

17　answered.

18　　**A.   And again, she answer -- she defines it the way**

19　**our office defines it.**

20　　　　　**"Smooth" means relatively problem-free.**

21　　　　　**"Safe" means it wasn't a super-spreader**

22　**event.**

23　　　　　**"Secure" means that we didn't suffer any**

24　**hacking events.**

25　　Q.   And -- but she did not discuss with you the

Case 5:21-cv-00844-XR   Document 639-7   Filed 06/23/23   Page 5 of 7

| 5:21-cv-844 (XR) | Entero v Texas | Brian Keith Ingram JD 265 |
|---|---|---|
| 5/6/2022 | NATIONAL COURT REPORTERS INC 888.800.9656 | 265 |

1  reason she was making the edits as set out in this
2  email; is that correct?
3         MS. HUNKER:  Objection, form.
4     A.  **She didn't discuss that particular edit with**
5  **me, but it is consistent with the purpose of the press**
6  **release, as we discussed before it was even drafted.**
7     Q.  And do you know how Ms. Hughs defined the term
8  "resounding success"?
9     A.  **"Resounding success" just means that we have**
10 **record turnout without it being a super-spreader in the**
11 **middle of a pandemic, it was tremendous.**
12    Q.  Did she discuss that phrase with you?
13    A.  **I -- we didn't discuss phrase my phrase.  We**
14 **discussed, generally, the need to make sure that the**
15 **public and the election officials were commended for**
16 **their efforts in keeping this safe.**
17    Q.  What factors did Ms. Hughs consider in order to
18 determine that the election was a resounding success?
19    A.  **The same factors that we have already talked,**
20 **the fact that we had record turnout, that it was smooth**
21 **without a great deal of problems, and that it was safe,**
22 **and that it was secure, free from hacking.**
23    Q.  And how do you know that?
24    A.  **Because that's what we have talked about,**
25 **that's the whole -- that's -- these are the criteria by**

1  **which we judge elections.**

2  Q.  Does Ms. Hughs consider an election with

3  rampant fraud to be one that is a resounding success?

4  MS. HUNKER:  Objection, form.  Outside of

5  personal knowledge and speculation.

6  **A.  Again, our office wouldn't consider an election**

7  **with rampant fraud to be a resounding success.  Every**

8  **election has fraud.**

9  MS. OLSON:  Objection, nonresponsive as to

10  the last sentence.

11  Q.  (By Ms. Olson)  Have you next look at the next

12  document which, I think, will be Exhibit 6.

13  (Exhibit No. 6 marked.)

14  Q.  Mr. Ingram, do you recognize Exhibit 6?

15  **A.  Yes.**

16  Q.  And that's another email chain on November the

17  9th of 2020, this one, the top email at 9:06 p.m.; is

18  that right?

19  **A.  I agree with that.**

20  Q.  And these same folks were the executive team in

21  the Secretary of State's Office; is that right?

22  **A.  That's correct.**

23  Q.  And incidentally, you're not part of that

24  executive team; is that right?

25  **A.  No.**

1   Q.  And you weren't at the time?

2   **A.  I was not.**

3   Q.  And you weren't at the time of the prior

4   exhibit, Exhibit No. 5 which is dated November 9th as

5   well; is that right?

6   **A.  That's correct.**

7   Q.  And, sir, with respect to Exhibit No. 6 in this

8   email, if we look at the bottom of Page 1, on to the top

9   of Page 2, that's another edit by Ms. Hughs; is that

10  right?

11  **A.  I agree.**

12  Q.  And she deleted a reference or proposed

13  deleting a reference to the Governor; is that correct?

14  **A.  I agree with that.**

15  Q.  Did you discuss this particular edit with

16  Ms. Hughs?

17  **A.  I did not.**

18          THE REPORTER:  Internet went off.

19          MS. OLSON:  Let's go off the record.

20          (Brief pause.)

21  Q.  (By Mr. Olson)  All right.  Mr. Ingram, I think

22  we were looking at Exhibit No. 6, which is that email

23  string that is dated 11-9-2020 at 9:06 p.m.

24          Do you have that in front of you, sir?

25  **A.  I do.**