# Appendix 11

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br>     *Plaintiffs,*<br>v.<br>GREGORY W. ABBOTT, et al.,<br>     *Defendants.* | 5:21-cv-844-XR |
| LULAC TEXAS, et al.,<br>     *Plaintiffs,*<br>v.<br>JANE NELSON, et al.,<br>     *Defendants.* | 1:21-cv-0786-XR |

**PLAINTIFF TEXAS AFT'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO STATE DEFENDANTS' FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Texas AFT, by and through its attorneys, hereby submits the following Second Supplemental Responses and Objections to the First Set of Interrogatories propounded by Defendant Ken Paxton, in his official capacity as the Texas Attorney General (the "Attorney General"), and Defendant Jane Nelson, in her official capacity as the Texas Secretary of State (the "Secretary," and, collectively, "State Defendants").

**GENERAL OBJECTIONS**

1. Texas AFT objects to State Defendants' Interrogatories to the extent that they seek disclosure of information that would infringe upon the associational rights protected by the First Amendment to the United States Constitution.

1

be identified is vast and would require Texas AFT to guess at its scope. Texas AFT further objects to this Interrogatory to the extent that it seeks identification of documents and communications that are protected by the First Amendment privilege, attorney-client privilege, the work product doctrine, or any other applicable privilege or immunity.

**SECOND SUPPLEMENTAL RESPONSE:**

Subject to and without waiving its Specific or General Objections, Texas AFT states as follows:

The Suppressive Provisions of SB 1 have required Texas AFT to divert substantial staff time, volunteer time, and funding to voter registration, education, and mobilization efforts. Texas AFT has dedicated significant staff time and funds to communicating with and educating its members about the new requirements of SB 1. For example, Texas AFT staff members who had focused on digital organizing for education-related issues have been forced to divert a substantial number of working hours to educate Texas AFT's members about the new requirements of SB 1, especially the new mail-in ballot identification requirements. Texas AFT staff has spent more time communicating with its members about the new requirements of SB 1 than any other voting-related bill. In addition, Texas AFT staff members that handle member services and grievances have diverted some of their time to answering member questions about the new requirements of SB 1—something they have not done in the past.

Further, Texas AFT has had to redevelop its training for paid and volunteer block-walkers to ensure that they comply with the broad restrictions imposed on in-person voter interaction by SB 1. The Voter Interaction Ban (section 7.04), for example, has forced Texas AFT to drastically alter the way it communicates with voters once mail ballots have been sent out. This has reduced the efficacy of Texas AFT's political speech, ensuring fewer people hear it. Prior to SB 1, Texas

AFT sent out large numbers of paid and volunteer block-walkers to speak with voters in person, advocating for candidates and issues important to the organization and reminding voters to cast their mail ballot. But because section 7.04 prohibits a broad swath of speech "in the physical presence" of a mail ballot—and because what constitutes "in the physical presence" is not clear—Texas AFT now largely has would-be block-walkers call voters on the telephone rather than knock on voters' doors. This strategy reduces the risk of violating section 7.04 but is far less effective: interacting with a voter in person tends to have a greater impact and few people answer calls from unknown numbers or are willing to speak to a stranger on the telephone.

Though Texas AFT still uses block-walkers *before* mail ballots are sent out, SB 1 has rendered them less effective too. These volunteers must now spend time educating voters on the specifics of complying with SB 1's requirements, such as spending more time at each house to remind voters to include identification numbers when the voter returns their mail ballot application (sections 5.02, 5.03, 5.07) and, later, mail ballot (section 5.08). That additional time spent with each voter means that the volunteer and, by extension, Texas AFT can reach fewer voters overall.

The focus on voting-related education and programming, as well as the increased spending, is a direct response to the number of voters, especially Texas AFT members, who are burdened by the Suppressive Provisions of SB 1.

For example, in anticipation of the 2022 General Election, Texas AFT undertook an extensive voter education effort to address SB 1's effects. Prior to SB 1, Texas AFT typically hired one or two paid temporary political organizers prior to elections to assist with voter mobilization and volunteer organization. But since SB 1, Texas AFT has had to hire *four or five* temporary political organizers to account for the barriers to voting SB 1 created, and expects it will need to continue to do so.