**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | |
| *Plaintiffs,* | |
| | |
| v. | 5:21-cv-0844-XR |
| | |
| STATE OF TEXAS, et al., | |
| *Defendants.* | |
| OCA-GREATER HOUSTON, et al., | |
| *Plaintiffs,* | |
| | |
| v. | 1:21-cv-0780-XR |
| | |
| TEXAS SECRETARY OF STATE JANE NELSON, et al., | |
| *Defendants.* | |
| HOUSTON AREA URBAN LEAGUE, et al., | |
| *Plaintiffs,* | |
| | |
| v. | 5:21-cv-0848-XR |
| | |
| GREGORY WAYNE ABBOTT, et al., | |
| *Defendants.* | |

## PLAINTIFFS' RESPONSE AND MEMORANDUM IN OPPOSITION TO STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PORTIONS OF DISTRICT ATTORNEY OGG'S MOTION FOR SUMMARY JUDGMENT ON ADA AND REHABILITATION ACT CLAIMS

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Home Assurance Co. v. United Space All.,*
LLC, 378 F.3d 482 (5th Cir. 2004)................................................................31, 49

*Anderson v. City of Blue Ash,*
798 F.3d 338 (6th Cir. 2015) ..............................................................................46

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986).......................................................................................31, 49

*Barber ex rel. Barber v. Colo. Dep't Of Revenue,*
562 F. 3d 1222 (10th Cir. 2009) .........................................................................48

*Baton Rouge Oil & Chem. Workers Union v. Exxon Mobil Corp.,*
289 F.3d 373 (5th Cir. 2002) ..............................................................................31

*Bennett-Nelson v. Louisiana Bd. Of Regents,*
431 F.3d 448 (5th Cir. 2005) .......................................................................32, 40

*Bentley v. Cleveland Cnty. Bd. of Cnty. Comm'rs,*
41 F.3d 600 (10th Cir. 1994) ..............................................................................34

*Block v. Tex. Bd, of Law Examiners,*
952 F.3d 613 (5th Cir. 2020) ..............................................................................36

*Bultemeyer v. Fort Wayne Cmty. Schs.,*
100 F.3d 1281 (7th Cir. 1996) ............................................................................43

*Cadena v. El Paso Cnty.,*
946 F.3d 717 (5th Cir. 2020) ..............................................................................40

*Crowder v. Kitagawa,*
81 F.3d 1480 (9th Cir. 1996) ..............................................................................48

*Davoll v. Webb,*
194 F.3d 1116 (10th Cir. 1999) ..........................................................................43

*Delano-Pyle v. Victoria Cnty., Tex.,*
302 F.3d 567 (5th Cir. 2002) ..............................................................................41

*Disabled in Action v. Bd. of Elections in N.Y.,*
752 F.3d 189 (2d Cir. 2014)................................................................................36

*Dunn v. Dunn*,
  318 F.R.D. 652 (M.D. Ala. 2016) ........................................................................35

*Fla. State Conf. of the NAACP v. Lee*,
  No. 4:21cv187-MW/MAF, 2021 WL 6072197 (N.D. Fla. Dec. 17, 2021) ............................36

*Frazier v. Bd. of Trs.*,
  765 F.3d 1278 (5th Cir. 1985) ............................................................................33

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000).........................................................................................33

*Fry v. Napoleon Cmty. Schs.*,
  137 S. Ct. 743 (2017).......................................................................................32

*Guckenberger v. Boston Univ.*,
  974 F. Supp. 106 (D. Mass. 1997) .......................................................................35

*Hall v. Morgan*,
  No. Civ.A.03-0303, 2003 WL 22800871 (E.D. La. Nov. 21, 2003) ................................43

*Hamilton v. Ill. Cent. R.R. Co.*,
  894 F. Supp. 1014 (S.D. Miss. 1995)....................................................................33

*Hargrave v. Vt.*,
  340 F.3d 27 (2d Cir. 2003)................................................................................48

*Hindel v. Husted*,
  875 F.3d 344 (6th Cir. 2017) ............................................................................48

*Housing Works v. Cnty. of L.A.*,
  No. CV 15-8982, 2016 WL 11730243 (C.D. Ca. 2016)...............................................46

*Hunt v. Cromartie*,
  526 U.S. 541 (1999)...................................................................................31, 49

*Innovative Health Sys., Inc. v. City of White Plains*,
  117 F.3d 37 (2d Cir. 1997)................................................................................32

*J.R. v. Austin Indep. Sch. Dist.*,
  574 F. Supp. 3d 428 (W.D. Tex. 2021)..................................................................32

*Johnson v. Callanen*,
  608 F. Supp. 3d 476 (W.D. Tex. 2022)..............................................................34, 36

*King v. Our Lady of the Lake Hosp., Inc.*,
  455 F. Supp. 3d 249 (M.D. La. 2020)...................................................................46

*League of Women Voters of Fla., Inc. v. Lee,*
   595 F. Supp. 3d 1042 (N.D. Fla. 2022)................................................................48, 49

*Levy v. La. Dep't of Pub. Safety & Corr.,*
   371 F. Supp. 3d 274 (M.D. La. 2019)................................................................45, 46

*Lincoln Gen. Ins. Co. v. Reyna,*
   401 F.3d 347 (5th Cir. 2005) ...............................................................................31

*Luke v. Texas,*
   46 F.4th 301 (5th Cir. 2022) ................................................................................36

*Mary Jo C. v. N.Y. State & Local Ret. Sys.,*
   707 F.3d 144 (2d Cir. 2013)...........................................................................47, 48

*Melton v. Dallas Area Rapid Transit,*
   391 F.3d 669 (5th Cir. 2004) ...............................................................................36

*MX Grp., Inc. v. City of Covington,*
   293 F.3d 326 (6th Cir. 2002) ...............................................................................43

*Nat'l Fed'n of the Blind v. Lamone,*
   813 F.3d 494 (4th Cir. 2016) .............................................................36, 37, 38, 48

*Nottingham v Richardson,*
   499 F. App'x 368 (5th Cir. 2012) ........................................................................34

*OCA Greater Hous. v. Texas,*
   No. 1:15-CV-679-RP, 2022 WL 2019295 (W.D. Tex. June 6, 2022) .....................14

*Oxford House, Inc. v. City of Baton Rouge, La.,*
   932 F. Supp. 2d 683 (M.D. La. 2013)...................................................................43

*Payan v. L.A. Cmty. Coll. Dist.,*
   11 F.4th 729 (9th Cir. 2021) ..........................................................................41, 43

*People First of Ala. v. Merrill,*
   491 F. Supp. 3d 1076 (N.D. Ala. 2020)......................................................36, 37, 49

*Pierce v. District of Columbia,*
   128 F. Supp. 3d 250 (D.D.C. 2015) .....................................................................41

*Powers v. MJB Acquisition Corp.,*
   993 F. Supp. 861 (D. Wyo. 1998).........................................................................46

*Randolph v. Rodgers,*
   170 F.3d 850 (8th Cir. 1999) ...............................................................................43

*Schaw v. Habitat for Humanity,*
    938 F.3d 1259 (11th Cir. 2019) ...................................................47

*Shotz v. Cates,*
    256 F.3d 1077 (11th Cir. 2001) ...................................................37

*Sixth Dist. of the African Methodist Episcopal Church v. Kemp,*
    574 F. Supp. 3d 1260 (N.D. Ga. 2021) ........................................37

*Smith v. Harris Cnty.,*
    956 F.3d 311 (5th Cir. 2020) .................................................32, 42

*T.W. v. N.Y. State Bd. of L. Exam'rs,*
    996 F.3d 87 (2d Cir. 2021) .........................................................34

*Taylor v. Principal Fin. Grp.,*
    93 F.3d 155 (5th Cir. 1996) ........................................................42

*U.S. Dep't of Transp. v. Paralyzed Veterans of Am.,*
    477 U.S. 597 (1986) ............................................................33, 34

*Windham v. Harris Cnty.,*
    875 F.3d 229 (5th Cir. 2017) ......................................................42

**Statutes**

42 U.S.C.A. § 12101 et seq. ............................................................38

29 U.S.C. § 794a(a)(2) ....................................................................32

42 U.S.C. § 12101(b)(1) ..................................................................47

42 U.S.C. § 12112(b)(5)(A) ............................................................42

42 U.S.C. § 12132 ......................................................................36, 38

42 U.S.C. § 12133 ...........................................................................32

52 U.S.C. § 21081(3)(A) .................................................................38

Tex. Elec. Code §§ 82.001-08 ...........................................................3

Tex. Election Code § 1.022 .............................................................39

**Rules**

Fed. R. Civ. P. 56(c) .......................................................................31

**Regulations**

28 C.F.R. § 35.130(b)(7)(i) .................................................................................42

28 C.F.R. § 35.151(b)(2)(i) .................................................................................38

28 C.F.R. § 35.130(b)(3)(ii) ................................................................................35

28 C.F.R. § 35.130(b)(7) .....................................................................................39

28 C.F.R. § 35.130(b)(8) .....................................................................................35

28 C.F.R. § 35.133(a) ..........................................................................................38

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................... 1

II.   STATEMENT OF MATERIAL FACTS ................................................................. 3

    a.    It Is Undisputed that Millions of Voters with Disabilities Reside in Texas ..................... 3

    b.    It Is Undisputed That People with Disabilities Disproportionately Face Barriers in Exercising Their Right to Vote ................................................................................... 4

    c.    It Is Undisputed That SB 1's New Requirements for Mail Voting and Assisting People with Disabilities to Vote have Caused Widespread Harm to Voters with Disabilities.............. 6

        i.    The Challenged Provisions Within Section 5 of SB 1 Impose New Requirements for Voting By Mail That Make It More Difficult for Voters with Disabilities to Vote. .............. 7

        ii.   The Challenged Provisions of Sections 6 and 7 of SB 1 Impose New Requirements on Voter Assistance That Make It More Difficult for Voters with Disabilities to Obtain Needed Assistance ................................................................................................ 13

    d.    It is Undisputed that Since the Enactment of SB 1, Mail Ballot Rejection Rates Have Skyrocketed................................................................................................................ 22

    e.    It is Undisputed That the State Has Failed to Issue Notices to the Public Regarding Their Rights Under the ADA and Failed to Train Counties on Their Obligations Under the ADA and Section 504................................................................................................. 24

    f.    Defendants' Assertions Regarding Reasonable Modifications Rest on Disputed Facts and Erroneous Assumptions ................................................................................... 25

        i.    Defendants Have Submitted No Evidence That a Request for a Reasonable Modification to the Challenged Provisions' Requirements Would be Considered or Granted 25

        ii.   For Some Challenged Provisions, Modification Requests Are Futile ......................... 27

        iii.  Counties Have Received Ample Requests for Modifications and Complaints from Disabled Voters Regarding the Challenged Provisions ....................................... 27

        iv.   Defendants Do Not Provide Adequate Training or Guidance to Counties on Their Obligations under the ADA Regarding Providing Reasonable Modifications................... 28

    g.    Defendants' Assertions Regarding Plaintiffs' Having Multiple Methods to Vote Rests on Disputed Facts............................................................................................ 29

III.  ARGUMENT ........................................................................................................ 30

    a.    Summary Judgment is Inappropriate on Plaintiffs' ADA and Section 504 Claims as to Defendant Ogg and State Defendants ....................................................................... 30

        i.    Summary Judgment Standard .................................................................... 30

    b.    Summary Judgment is Inappropriate on Plaintiffs' ADA and Section 504 Claims as to Defendant Ogg ....................................................................................................... 31

        i.    Plaintiffs Have Standing to Bring Their ADA and Section 504 Claims....................... 31

        1.     Defendant Ogg Is Subject to Plaintiffs' Section 504 Claims ................................... 33

  c.    Summary Judgment is Inappropriate on Plaintiffs' ADA and Section 504 Claims as to the State Defendants ............................................................................................................... 34

        1.     Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs' Equal Access Claim ................................................................................................................... 35

        2.     Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs' Reasonable Modifications Claims ..................................................................................... 38

          a.     Section 1.08 of SB1 Does Not Remedy Plaintiffs' Reasonable Modifications Claims ............................................................................................................................. 38

          b.     Plaintiffs Have Sufficiently Alleged an ADA Reasonable Modifications Claim . 39

          c.     Defendants Have Affirmative Obligations to Provide Reasonable Modifications 39

          d.     Plaintiffs Need Not Make Reasonable Modifications Requests Where Such Requests Would Be Futile ............................................................................................ 43

          e.     Defendants Do Not Provide Adequate Training or Guidance to Counties on Their Obligations under the ADA Regarding Providing Reasonable Modifications ............. 43

          f.     The ADA Requires That Reasonable Modifications Effectively Address Plaintiffs' Claims ........................................................................................................ 45

        3.     The Relief Plaintiffs Seek is Reasonable ................................................................ 45

IV.     CONCLUSION ............................................................................................................ 50

Plaintiffs La Unión Del Pueblo Entero, et. al., ("LUPE Plaintiffs"), Houston Area Urban League, et. al., ("HAUL Plaintiffs"), and the OCA–Greater Houston Chapter, et al. ("OCA Plaintiffs")[1] (collectively, "Plaintiffs") oppose the Motion for Summary Judgment of Defendants Governor of Texas Gregory W. Abbot, Texas Secretary of State Jane Nelson, Attorney General of Texas Warren K. Paxton, and the State of Texas (the "State Defendants") and the Motion for Summary Judgment of Defendant Harris County Defendant Kim Ogg ("Defendant Ogg") (collectively, the "Defendants"). ECF Nos. 616 and 614, respectively. For the reasons explained below, State Defendants' Motion for Summary Judgment ("State Brief") should be denied in full and Defendant Ogg's Motion for Summary Judgment ("Ogg Brief") should be denied as to the portions that address claims under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504").[2]

## I.      INTRODUCTION

In their Motions for Summary Judgment, Defendants ignore the extensive factual record in this case demonstrating that Senate Bill 1 ("SB 1") erects needless barriers to voting for people

---

[1] Plaintiffs are OCA-Greater Houston, the League of Women Voters of Texas, and REVUP-Texas ("OCA Plaintiffs"), La Unión del Pueblo Entero, Southwest Voter Registration Education Project, Texas Impact, Jolt Action, and FIEL Houston Inc. ("LUPE Plaintiffs"), and Houston Area Urban League, Delta Sigma Theta Sorority, Inc., The Arc of Texas, and Jeffrey Lamar Clemmons ("HAUL Plaintiffs").

[2] Because State Defendants' motion is devoted entirely to Plaintiffs' disability discrimination claims, in the interests of efficiency Plaintiffs also address Defendant Ogg's arguments related to disability discrimination claims in this opposition. Specifically, Section IV.B. of this Brief addresses Section IV.B.-C. of Defendant Ogg's Motion for Summary Judgment. "Plaintiffs" in Section IV.B. of this Brief refers only to HAUL and OCA Plaintiffs who have named District Attorney Ogg as a Defendant in their complaints. LUPE Plaintiffs have not sued District Attorney Ogg and are therefore not responding to arguments made Defendant Ogg's brief. Plaintiffs are also opposing the remainder of arguments raised in Ogg's Motion for Summary Judgment in a separate brief, Plaintiffs' Response in Opposition to Defendant Harris County District Attorney Kim Ogg's Motion for Summary Judgment. All other sections of this Brief address State Defendants' Motion for Summary Judgment on Plaintiffs' ADA and Section 504 Claims in its entirety.

with disabilities across Texas. Unable to counter this evidence, Defendants instead attempt to narrow the scope of the ADA and Section 504 by ignoring or mischaracterizing many of Plaintiffs' claims.  Defendants focus on whether individual voters made requests for modifications to county officials rather than the systemic, statewide effects of SB 1 and the unavailability of modifications to the law's requirements.  Defendants also mischaracterize evidence and arbitrarily select a few irrelevant facts to support their claims, while ignoring the bulk of the record of discrimination. Plaintiffs provide undisputed evidence of the burdens SB 1 places on voters with disabilities, who disproportionately vote by mail and require assistance to vote. The significant increase in rejections of mail ballots since the passage of SB 1 should, alone, provide a sufficient issue of material fact to preclude summary judgment. In addition, Plaintiffs have provided ample evidence of the increased barriers SB 1 erects for disabled voters. Defendants, on the other hand, introduced no evidence that effectively disputes these facts.

Defendants' legal arguments are equally unfounded. First, Defendant Ogg's argument that Plaintiffs lack standing is contrary to established precedent, including from this court in this action, allowing organizational plaintiffs to assert associational and organizational standing under the ADA and Section 504. Second, State Defendants' arguments ignore the scope of Plaintiffs' claims and the applicable legal requirements and are insufficient to meet Defendants' heavy burden on summary judgment.  Although Plaintiffs raise multiple arguments that SB 1 discriminates against voters with disabilities under the ADA and Section 504, Defendants have entirely failed to address all but two of them.  The arguments Defendants do raise are simply incorrect. Defendants assert, contrary to precedent, that they should win on summary judgment because Plaintiffs have multiple means of voting, and therefore no one could be denied access to the ballot. Next, Defendants assert that they cannot have violated the ADA because they received

no reasonable modification requests. But Plaintiffs have multiple examples of such requests, even though both Plaintiffs and Defendants evidence suggests the requests would be futile.

The bottom line remains: At least three million voting-eligible Texans have disabilities. The Challenged Provisions of SB 1 deny many of these individuals equal access to voting.[3] SB 1's Provisions inflict systemic harm on large groups of people with disabilities, causing a chilling effect and deterring those who seek to assist Plaintiffs' members and constituents in voting.

The evidentiary record demonstrates genuine issues of material fact appropriate for trial and resolution on Plaintiffs' claims against each of the Challenged Provisions. Summary judgment should be denied in full as to the State Defendants' Motion and as to portions of Defendant Ogg's Motion addressing the ADA and Section 504.

## II.     STATEMENT OF MATERIAL FACTS

### a.       It Is Undisputed that Millions of Voters with Disabilities Reside in Texas

There is no factual dispute that there are millions of voters with disabilities in Texas. Ex. 2, Report of Plaintiffs' Expert Douglas Kruse ("Kruse Report") ¶ 13. Three to five million voting-eligible Texans have disabilities, representing 15.6 to 30.5 percent of the state's total voting-eligible population. *Id.* ¶ 38. By any measure, disability prevalence is projected to grow as the overall population ages in the next few decades. *Id.* ¶ 40.

Unlike states that offer "no excuse" vote by mail to all residents, Texas allows only voters in certain categories to vote by mail, including individuals over 65 and people with disabilities. *See* Tex. Elec. Code §§ 82.001-08. As a result, the vast majority of mail voters are older adults and

---

[3] Plaintiffs are challenging SB 1 §§ 5.02, 5.03, 5.06, 5.07, 5.10, 5.12, 6.01, 6.03, 6.04, 6.05, 6.06., 6.07, and 7.04 under the ADA and Section 504 (the "Challenged Provisions").

people with disabilities.[4] The disability rate grows substantially with age, from 7.7% among those aged 18-34 to 70.3% among those 85 or older. Kruse Report ¶ 44. *See also* Ex. 4, Decl. of Dr. Kara Ayers ("Ayers Report") at 7 ("While 1 in 4 adults…have some type of disability, 2 in 5 …who are 65…and older have a disability."). Given the overlap between age and disability, there are undoubtedly many more disabled Texas voters who vote by mail than indicated by those who select "disability" as the reason for their mail in ballot. *See* Kruse Report ¶ 91.

### b.    It Is Undisputed That People with Disabilities Disproportionately Face Barriers in Exercising Their Right to Vote

Plaintiffs have provided uncontested evidence of the many barriers people with disabilities face, along with the fact that people with disabilities are more likely to require help in voting, and much more likely than the general Texas population to vote by mail. Close to 2.3 million Texan citizens aged 18 or older need assistance with one or more daily activities, such as going outside of the home for errands, accessing the Internet, doing housework, keeping track of money, and preparing meals. *Id.* ¶¶ 50-51. Ten percent of Texans report travel-limiting disabilities; 8.3% of Texans have difficulty walking or climbing stairs; and 5.8% of Texans have difficulty leaving the house without assistance. *Id.* ¶ 67. As Dr. Kruse explains, people with disabilities have an "increased likelihood of living alone, lower likelihood of having a vehicle one can drive, other barriers to traveling, lower likelihood of internet access, and lower levels of education," as well as "lower incomes and higher poverty rates." *Id.* ¶ 37.

Each of these barriers translates to limitations involved in voting. Physical and travel limitations pose significant barriers for many voters with disabilities to vote in person. In 2020,

---

[4] *See, e.g.* Ex. 60, Houston Chronicle Article ("Texas' strict eligibility criteria for voting by mail means the thousands of tossed votes most likely belonged to people 65 and older and people with disabilities."); Ex. 64, K. Ingram Mar. 28, 2023 Dep. 86:9-13, ("Q: Texas vote by mail eligibility involves being for the most part either over age 65 or physically disabled, is that correct -- or disabled in some way? A: Agreed.").

21.3% of in-person voters with disabilities nationwide either required assistance or had difficulties in voting, almost twice the rate among in-person voters without disabilities. *Id.* ¶ 18. In 2020, 14.0% of all voters with disabilities either required assistance or had difficulties in voting compared to 3.2% of all voters without disabilities. *Id.* And as Dr. Kruse explains, "people with disabilities are less likely to have the money to buy computers or own their own vehicles, making it harder to access information or get to election offices and polling sites. The social stigma many people with disabilities experience further compounds the difficulties they face in accessing voting." *Id.* ¶ 37. More specifically, people with disabilities can face extra barriers in finding or getting to the polling place, getting inside the polling place, standing in line, being prevented from voting by poll workers, reading or seeing the ballot, understanding how to vote or use the equipment, communicating with poll workers, writing on the ballot, and physically operating the voting machine. *Id.* ¶ 70; *See also* Ayers Report at 10-12.

These barriers cause people with disabilities to disproportionately require assistance to vote, both in person and by mail. Kruse Report ¶ 84. However, people with disabilities also have increased difficulty arranging assistance due to higher rates of social isolation. *Id.* ¶ 48. Remembering how one recorded ID information on a registration application is likely to be difficult for many people with disabilities, and this information may not be readily available to people with disabilities. *Id.* ¶ 91. For those living in congregate settings, staff attitudes are key determinants of whether residents have the necessary information for voting. *Id.*

Mail voting is often the most accessible, and sometimes the only option for many voters with disabilities. In 2020, 30.2% of voters with disabilities compared to just 8.2% of voters without disabilities voted by mail. *Id.* ¶ 17. Even before the pandemic, Texas voters with disabilities were more than three times as likely as voters without disabilities to vote by mail. *Id.* ¶ 69.

The Texas Legislature and Defendants are well aware of the burdens SB 1 places on voters with disabilities because these voters, including members of The Arc of Texas and REVUP Texas, submitted testimony of these harms prior to the enactment of the bill. As Courtney Pugh, a Denton County voter with muscular dystrophy and member of The Arc of Texas, explained in her testimony before the Texas Legislature:

> To vote in person, I need assistance. Finding a person who's willing to transport me, a wheelchair accessible vehicle, and someone to open doors to the voting location are just a few examples….With…SB1, it will be even harder to find people willing to help me exercise my right to vote if they are risking a felony because a poll worker misjudges my supporter's assistance as misconduct. *See* Ex. 5, TXLEG_0002408.

Bob Kafka, coordinator and board member of REVUP Texas, noted that "our members…communicated…that…Senate Bill 1 would have a negative impact… they [legislators] were well-aware … that the effect would be negative on our population." Ex. 27, Kafka Dep. 46:2-12. Alex Cogan with The Arc of Texas, also testified that multiple provisions in SB 1 "discourage[] the participation of those with disabilities to vote with accommodations and supports," by, among other things, chilling assistance which "foster[s] a false narrative that those who volunteer to help their fellow voters are to be suspected of fraud instead of celebrated for creating a more representative democracy." Ex. 6, TXLEEG_0000747. *See also* Ex. 22, Martinez Decl. ¶ 24; Ex. 7, Testimony of P. Ducayet; Ex. 8, Testimony of A. Robinson; Ex. 9, Rep. Bucy Comm. Comments.

> **c.      It Is Undisputed That SB 1's New Requirements for Mail Voting and Assisting People with Disabilities to Vote have Caused Widespread Harm to Voters with Disabilities.**

The Challenged Provisions create significant, additional barriers for many voters with disabilities, leaving them with unequal access and more barriers to voting than people without disabilities. As Dr. Kruse concluded, the Challenged Provisions "will create an extra burden in voting for a significant number of people with disabilities across the state of Texas and may

prevent some from voting altogether." Kruse Report ¶ 110; *See also* Ex. 22 ¶ 27. Toby Cole, a quadriplegic wheelchair user in Harris County, stated SB 1's restrictions are "even harder on people with disabilities...Anytime you make it more difficult for somebody with a disability to do anything, it harms them…This is not designed to help protect me." Ex. 28, T. Cole Dep. 20:4-9; 20:15-21:4; 27:23-28:8.

> i. **The Challenged Provisions Within Section 5 of SB 1 Impose New Requirements for Voting By Mail That Make It More Difficult for Voters with Disabilities to Vote.**

It is undisputed that Sections 5.02, 5.03, 5.06[5], 5.07, 5.10, and 5.12 of SB 1 impose new requirements to vote by mail and require voters to provide the number on their Texas driver's license, election identification certificate, or personal ID card on both their mail-in ballot applications and on the ballot carrier envelopes used to return their mail ballot. If the voter has not been issued one of these numbers, the voter may instead provide the last four digits of their Social Security number.  SB 1 § 5.02. If the voter has not been issued any of these numbers, the voter may sign a statement indicating that they have never been issued one of these numbers. *Id.* If the information the voter provides does not "identify the same voter identified" on the voter's registration application (*i.e.*, the ID number does not match what the voter used to register to vote), then the mail-in ballot application and/or ballot in the voter's carrier envelope must be rejected, even if the election clerk can verify the voter's application or mail ballot envelope

---

[5] In describing Section 5.06, Defendants mistakenly refer to Section 84.035 which is Section 4.07 of SB 1. Section 4.07 is not relevant to Plaintiffs' ADA claims and is not challenged by Plaintiffs under the ADA. As such, Defendants reference to Ms. Penrod's deposition addressing Section 4.07 is irrelevant to Plaintiffs' ADA claims. Ms. Penrod is not a person with a disability and was not disclosed as a witness in support of Plaintiffs' disability claims.  It should nevertheless be noted that Ms. Penrod's experience does not support Defendants' arguments. Ms. Penrod is a voter who faced barriers to voting based on SB 1's mail voting ID requirements and describes her and her husband's experience dealing with their mail ballot rejections. *See* Ex. 62, Penrod Deposition at 40-47.

through other means. *Id.* § 5.07. SB 1 provides that a voter may be notified by phone or e-mail of the defect and that the voter may request the voter's application to vote by mail canceled, go to the voting clerk's office in person to correct the defect, or through an online cure process. *Id.* § 5.12.

Plaintiffs have submitted evidence that the Challenged Provisions in Section 5, individually and together, make mail voting unnecessarily more difficult for voters with disabilities.  Texas voters with disabilities are nearly four times as likely as those without disabilities to vote by mail. Kruse Report ¶ 90. Therefore, the additional requirements to vote by mail and the consequences if the voter's ID number does not match the number with which they registered "are likely to have a significant negative impact on many voters with disabilities." *Id.* ¶ 90. Defendants have failed to identify any evidence that supports the notion that Section 5's provisions have or would have prevented any fraud in the vote-by-mail process.

People with disabilities may have more difficulty remembering how they recorded identification information on a registration application. *Id.* ¶ 91. Because disability correlates with age, it may have been a long time since the individual first registered. *Id.* Over 1 million eligible voters in Texas have cognitive disabilities, posing additional challenges for remembering the identification information. *Id.* Further, the identification numbers of many voters with disabilities may disproportionately be held by family members or facility staff and not readily available to the voters with disabilities themselves. *Id.* The staff in congregate settings— disproportionately used by people with disabilities—may be unwilling or not readily available to assist in locating the identification information. *Id.* Though SB 1 permits a voter to "make a statement" that they have not been issued any of the permissible identification numbers, a voter cannot make a statement indicating that they have been issued one of these numbers but do not

know the number, do not have access to it, or cannot provide the number for some other reason. *Id.*

Among voters with disabilities whose mail ballot applications are rejected, it is likely that correcting the information will be difficult for many. It is unclear how a voter who does not know these numbers will be able to cure the defect. Further, voters who are voting by mail due to a disability may be unable to go in person to cure the defect for the same reason they did not vote in person. *Id.* ¶ 92.

The online curing option may not help voters who are unable to cure in person because people with disabilities have lower levels of internet access: 15% of Texans with disabilities living in the community do not have internet access in their homes, compared to only 5% of those without disabilities. *Id.* ¶ 93. The gap is larger among those over 65, where 40% of Texans with disabilities do not have internet access compared to 18% of those without disabilities. And even those with internet access may be limited by inaccessible websites. A 2020 report found that 98% of all websites are not fully accessible to people with disabilities. *Id.* ¶ 93. As Dr. Kruse concluded "...Sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12...will cause some Texans with disabilities to be disenfranchised and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1." *Id.* ¶ 95.

Plaintiffs have also submitted evidence that voters with disabilities and their assistors, including the members of Plaintiff Organizations have experienced real harm from these provisions.

Terri Saltzman, a blind voter in Travis County and a member of The Arc of Texas and REVUP Texas, faced a myriad of barriers in voting by mail after SB 1 was enacted. Her March 2022 mail ballot was rejected multiple times because the ID numbers she provided did not match

the number in her voter registration record. Ex. 10, Saltzman Decl. ¶ 9. Upon contacting the

Travis County election office, the clerk informed Ms. Saltzman that she must cure her ballot

online. Ms. Saltzman was unable to because the State's website is inaccessible to blind voters.

*Id.* Ms. Saltzman had to contact the Travis County elections office four times to get assistance

with curing her ballot. Though she thought her ballot was cured on the fourth try, she later got a

notice in the mail (inaccessible to her as a blind person) that informed her that her ballot did not

count. At no time was Ms. Saltzman provided with any information regarding her rights to

request a reasonable modification as a voter with a disability.  *Id.* ¶ 11.  Ms. Saltzman attempted

to vote by mail again in November 2022, but her ballot was again rejected for ID-related reasons.

Ms. Saltzman stated:

> I registered to vote by mail based on my disability and I have always done this
> successfully in the past, but this option is no longer accessible to me due to all of the
> new ID requirements and burdens imposed by SB 1 on the voting by mail process. I
> tried so hard to vote in the March primary, but at every turn, I faced obstacles due to
> my disability…. I am very concerned about my ability to vote in the future due to SB
> 1.

*Id.* ¶ 16.

Yvonne Iglesias, a Hidalgo County voter and member of The Arc of Texas and REVUP

Texas, is partially blind and paraplegic. Ex. 11, Y. Iglesias Decl. ¶ 2. Voting by mail is the only

form of voting that is accessible to Ms. Iglesias. *Id.* Ms. Iglesias attempted to vote in the

November 2022 election but was unable to do so because her mail ballot application was rejected

twice due to SB 1's ID requirements. *Id.* ¶¶ 5-7. Ms. Iglesias noted that "I read the instructions

and I did what I was supposed to and [my ballot] still got rejected…I…don't know…

what…went wrong … I just felt … lost." Ex. 32, Y. Iglesias Dep. 64:18-21. When asked if she

knew what she needed to do to ensure her ballot was accepted in the May 2023 election, Ms.

Iglesias responded that she did not know. *Id.* 72:6-18.

Anne Scott, a Hidalgo County voter, a member of The Arc of Texas and REVUP Texas, and the mother of Taylor Scott, a voter with cerebral palsy who is partially blind and uses a wheelchair, explained that Taylor never received any notification as to whether or why her mail ballot application was rejected and, therefore, never had an opportunity to cure it. With no other options, Anne took Taylor to vote in person, but was concerned about doing so given Taylor's medical fragility. Ex. 13, A. Scott Decl. ¶ 9. *See also* Ex. 14, T. Scott Decl. ¶ 9; Ex. 65, T. Scott Dep. 10:1-5 (noting that she could not recall any other occasion in which she attempted to vote by mail but could not do so until the 2022 election).

Jennifer Miller, a Travis County voter, a member of The Arc of Texas, and the mother of an adult daughter with autism, Danielle, regularly assists her daughter to vote. Though Danielle's mail ballots were accepted in the March and November 2022 elections, her mail ballot was rejected in the May 2023 primary due to SB 1's ID requirement, forcing her to vote in person. Had there been more voters at the polling place that day, Danielle would have experienced extreme stress and anxiety due to her disability, which would have prevented her from being able to vote. Ex. 15, J. Miller Decl. ¶ 14. Jennifer notes: "it is difficult for my daughter…to recall which specific kind of identification they signed up to vote with … the [ID] requirement of SB 1 … causes serious confusion … [T]his process leads otherwise-valid ballots submitted by registered voters to be rejected." *id.* ¶ 12.

Sadia Tirmizi, a Travis County voter and member of Plaintiff Texas Impact, testified about the difficulty her father, who had cancer, experienced while voting by mail in the November

2022 election, despite having voted by mail in Texas before. Ex. 66, S. Tirmizi Dep. 45:21-46:19.[6]

County election officials implementing SB 1 echo these barriers. Tacoma Phillips, the Mail Ballot Supervisor for the Dallas County Elections Administrator's Office, noted that there were voters in Dallas County who were prevented from voting because their ballots were rejected due to SB 1's ID and cure requirements. Ex. 33, T. Phillips Dep. 119:11–20:6.[7] When asked whether she was aware of any voters who were unable to vote due to Section 5's ID requirements, Ms. Phillips stated that there were "a lot" of mail voters who could not match their ID number and "just got frustrated and...wouldn't turn [their mail ballot] back in." *Id.* 120:19-21:11. Some of these voters "couldn't get out of the house to get to the polls" and "their only way of voting[] was voting by mail." *Id.* Dallas County Elections Administrator Michael Scarpello noted that

---

[6] Defendants reference a witness, Pamela Gaskin, who they allege had no trouble voting after the passing of SB 1. However, Defendants' characterization of Ms. Gaskin's testimony is inaccurate. Ms. Gaskin is not an individual with a disability and was not brought as a witness in support of Plaintiffs' ADA claims. Ms. Gaskin's deposition is rife with references to how much harder SB 1 has made voting for everyone and how her mail ballot application was rejected twice due to SB 1's ID requirements, Ex. 61, P. Gaskin Dep. 21:17-22:21, 41:1-5, 48:7-49:19. The citation Defendants point to as Ms. Gaskin acknowledging improvements made by SB 1 is blatantly false – instead, she references a provision regarding curbside voting that she explicitly states existed before SB 1. *Id.* at 53:20-22. The reference to Ms. Gaskin having no trouble assisting her husband while voting is also misleading. The attorney questioning Ms. Gaskin did not ask about the oath or any of the new restrictions on assistance imposed by the Challenged Provisions. Instead, the attorney broadly asked if Ms. Gaskin "had any trouble" filling out the form to help her husband vote to which she replied that she did not. Defendants' characterization of Ms. Gaskin's testimony reflecting the "ease" she and her husband had in voting is in direct conflict with the record.

[7] Defendants claim that Section 5.12's cure process benefits voters with disabilities; however, that process does not remedy the discriminatory impact of SB 1's barriers to the mail voting process because it is not accessible to many voters with disabilities. *See* Ex. 27, Kafka Dep. 141:1-6 ("[A] cure process is only as good as it actually can be used…if it's not being able to be used by the population that is in need of the cure, it really is still a harmful effect.")

disabled voters, who are "less likely to be able to go in to [sic] a polling place," were searching for alternatives to mail voting given the SB 1 restrictions. Ex. 39, M. Scarpello Dep. 279:4-23.

Then-Harris County Elections Administrator Isabel Longoria, former Election Administrator for Harris County, described how onerous the new requirements can be on voters with disabilities, explaining that correcting a voter registration form where there is a discrepancy between what is in the voter file and what is in the mail ballot application "becomes an onerous task" when "you don't have access to computers or printers or can't get to our office in person." Ms. Longoria notes that this means that "some individuals…may not even be able to engage in the process to update their voter file or even cure their mail ballot" which leaves voters who "can't come in person and…can't return it by mail" to cure the mail ballot "effectively…out of options to cure" their ballot "even though you have the correct number, even though you could cure it." This led to nearly 20% of mail ballots in Harris County to be rejected "because of lack of ID or ID curing issue." Ex. 34, I. Longoria Dep. 42:4–16; 44:1-7.

ii.     **The Challenged Provisions of Sections 6 and 7 of SB 1 Impose New Requirements on Voter Assistance That Make It More Difficult for Voters with Disabilities to Obtain Needed Assistance**

The Challenged Provisions in Sections 6 and 7 of SB 1 impose new requirements on people who help people with disabilities exercise their right to vote. The evidentiary record contains extensive expert and factual testimony that these new requirements – and the vagueness with which they were drafted – chill potential assistors from helping people with disabilities to vote. Each of these provisions independently erects barriers for voters with disabilities and interact with each other to compound the challenges that voters with disabilities face in obtaining assistance.

**Section 6.01** requires any person other than a close relative who simultaneously drives seven or more voters to the polls for curbside voting to complete and sign a form stating their name and address and whether they only provided transportation assistance or also assistance with voting. Voters with disabilities are four times more likely than people without disabilities to face transportation barriers, including living in a household without a vehicle, social isolation, and living alone. Kruse Report ¶¶ 57, 97. Curbside voting is only available to voters who are more likely to have a disability. *Id.* ¶ 97. Given these facts, Dr. Kruse concluded that "Section 6.01 will cause some Texans with disabilities to be disenfranchised, and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1." *Id.* ¶¶ 97-98.

**Section 6.04** amends the oath of assistance, requiring assistors to swear under penalty of perjury that they did not pressure or coerce the voter or suggest by word, sign, or gesture how the voter should vote. Portions of Section 6.04 that were not mooted by this court[8] continue to impose harm on disabled voters. National data show that 6.2% of people with disabilities who voted in a polling place required assistance, and 10.5% of voters with disabilities who voted with a mail ballot required assistance. *Id.* ¶ 83. Because Section 6.04 does not define what constitutes pressuring or coercing the voter in violation of the law, voters with disabilities and assistors will be unsure of what assistance is allowed and may be reluctant to receive or provide assistance for fear of violating the law. This will interfere with the ability of people with disabilities to vote, particularly the over 1 million Texans with cognitive impairments and others with neurological

---

[8] In its Order Denying Defendants' Motion to Dismiss, the court explained that "all claims in this consolidated action challenging the portions of section 6.04 that the district court recently enjoined in *OCA Greater Hous. v. Texas*, No. 1:15-CV-679-RP, 2022 WL 2019295 (W.D. Tex. June 6, 2022) are moot." ECF No. 449.

and developmental disabilities who benefit from assistance in making informed choices in important areas of life. *Id.* ¶¶ 99-100. Dr. Kruse explained that Section 6.04 makes it "highly likely" that voters with disabilities "will find it difficult or impossible to obtain the assistance they require." *Id.* ¶ 101. As a result, he concludes that Section 6.04 "will cause some Texans with disabilities to be disenfranchised, and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1." *Id.*; *see also* Ex. 12, K. Ayers Dep. 73:6-11, 78-79.

**Sections 6.03 and 6.05** impose extra requirements for assistors to document their relationships to the voter and whether they received any form of compensation or other benefit from a candidate, campaign, or political committee. These sections make it more likely that the ballot of a person with a disability is rejected because of a clerical error or a minor mistake by the person providing the assistance. Kruse Report ¶ 102. These sections also make it more difficult for people with disabilities to find assistance at all. One-fifth of voters with disabilities who needed voting assistance in 2020 received it from people who were not family or household members. *Id.* ¶ 102. Dr. Kruse explained that Sections 6.03 and 6.05 make it "highly likely that many Texans with disabilities will find it difficult or impossible to find needed assistance," so those sections "will cause some Texans with disabilities to be disenfranchised, and a further substantial number to face significant difficulties in voting." *Id.* ¶¶ 102-103.

**Section 6.06** criminalizes assistance by a person who offers, solicits, receives, or accepts compensation for helping a voter with their mail ballot unless the assistor is an attendant or caregiver. This section prevents friends, neighbors, and other non-family members from assisting people with disabilities if they receive any type of economic benefit. Section 6.06 "will discourage well-meaning assistors from providing … assistance, because any type of

compensation or thank you, such as reimbursement for gas, could be construed as violating the law." *Id.* ¶ 104. It also prohibits people with disabilities from getting help from community or nonpartisan civic engagement organizations—like The Arc of Texas, LUPE and REVUP Texas—that routinely provide voting support to the disability community.  Ex. 63, T. Chavez Dep. 26:17-28:12; 27:21-28:23; 51:10-22. A 2020 study showed that 18% of the people who helped voters with disabilities vote by mail were friends, neighbors, or other non-relatives apart from home aides. Kruse Report ¶ 104.  Because voters with disabilities are more likely to be socially isolated and live alone (*id.* ¶ 15), non-family members may be the best and only options to assist many people with disabilities with voting by mail. Given these facts, Dr. Kruse concluded that "Section 6.06 will cause some Texans with disabilities to be disenfranchised, and a further number to face significant difficulties in voting." *Id.* ¶ 106.

**Section 7.04** bans compensated "vote harvesting," defined as "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." Restrictions on in-person interactions limit the ability of voters with disabilities to obtain needed assistance.   Kruse Report ¶ 107, *see also* Ex. 59, J. Valdez-Cox Dep. 66:2-67:15; 69:8-70:17; Ex. 63 at 25:18-26:7; 55:3-56:25. This interaction may particularly benefit voters with cognitive and developmental disabilities who may have difficulty understanding the issues and voting process. *Id*. Because voters with disabilities are more likely to live alone and be socially isolated, it is possible that someone connected to a campaign may be the best and only option to assist them with voting. Kruse Report ¶ 107. Receiving assistance from someone working with a campaign does not indicate that their vote will be influenced by that person. *See* Kruse Report ¶ 87; Ayers Report at 25. In addition, people with mobility disabilities may not be able to personally deliver their ballots to

mailboxes and may not have a close family or household member available to do so. Kruse Report ¶ 108. Dr. Kruse concluded that Section 7.04 will "cause some Texans with disabilities to be disenfranchised, and a further number to face significant difficulties in voting that they would not otherwise face but for SB 1." *Id.* ¶¶ 107-09.

State Defendants assert, without submitting evidence, that Section 6.04's oath requirement does not change anything or cause any harm because it was previously a Class A misdemeanor to do the same activities covered by the oath. Plaintiffs have provided evidence to the contrary, described in detail below. The new felony penalty creates a chilling effect that will make it harder for voters with disabilities to get assistance voting. In particular, the requirement to swear that the assistor "will not suggest, by word, sign, or gesture, how the voter should vote" can deter assistors who are worried that valid forms of assistance will be interpreted as a violation of the oath.

Cathy Cranston, a Travis County voter and member of REVUP Texas who works as a personal care attendant, worries that the type of assistance she routinely provides to voters with disabilities could be misinterpreted as suggesting how someone should vote and stated that the oath was a "red flag" for her. Ex. 35, Cranston Dep. 100:8-25.

 Nancy Crowther, a Travis County voter with a progressive neuromuscular disease and a member of The Arc of Texas and REVUP Texas, explained her fear regarding the assistance oath, noting that her disability is progressive and she will need increasing assistance to vote over time. She fears getting her assistant into legal trouble for providing her with the help she needs and has not allowed her assistant to help her vote since SB 1 was enacted for this reason. Ex. 55, N. Crowther Decl. ¶ 6. Crowther stated that SB 1 has caused her attendants to be "reluctant to help me vote…and fearful of the potential punitive

actions they may accidentally incur should a poll worker…misinterpret how they assist me as directing my vote or some kind of coercion." *Id.* ¶ 4.  Because Crowther did not have her personal care attendant to assist her to vote in the May 2023 election, it took her multiple attempts and great difficulty to vote. She felt intimidated by the poll worker and "humiliated" that her "right to vote was intruded upon." *Id.* ¶ 8. *See also* Ex. 31, Crowther Dep. 52:11–53:12; 54:7–15; 79:20–81:8; 84:3–90:2; 97:8–99:14; 100:20–102; 77:21–79:11.

Laura Halvorson, a Bexar County voter with muscular dystrophy who is a member of The Arc of Texas and REVUP Texas, explained that her personal care attendant was not willing to assist her with mail voting during the March 2022 primary because "as a green card holder, she was unwilling to take the oath to assist me…because she was afraid of the threat of criminal prosecution and the impact on her legal status." Ex. 21, Halvorson Decl. ¶ 19. As a result, Ms. Halvorson had to open and mark the ballot herself, which took her four attempts and significantly longer than had her attendant been able to assist. Because of this, Ms. Halvorson no longer trusts mail voting and voted in person for the November 2022 election. She did not ask her attendant to assist her because she was uncomfortable with the confusion of what is allowed and the penalties imposed by SB 1. Because of the lack of assistance, it again took Ms. Halvorson significantly longer to vote than it otherwise would have. Ms. Halvorson explained: "I already face significant barriers to vote and SB 1 has…made it harder for me to vote in 2022 and will…make it harder for me to vote in the future. I am disappointed that the state is working to make elections less accessible..." *Id.* ¶ 31.

Anne Scott is "concerned that my actions assisting my daughter vote by mail could be misunderstood and prosecuted under SB 1… I am also concerned that should Taylor vote in

person, and I am unavailable, an assistor will be unwilling to take an oath under penalty of

perjury and not assist Taylor at the polls" Ex. 13 ¶ 5. *See also* ex. 14. ¶ 10.

> Jennifer Miller noted:

> I am scared that my assistance to my daughter that allows her to access her right to vote might be misunderstood as a violation of the oath. I am concerned that the oath might prevent me from doing what I need to do to help my daughter…I am…nervous that few people will be willing to volunteer to support my daughter if I become unable to render assistance because of similar fears to my own. This new law feels like a trap laid for people like me and my daughter and it imposes harm on people with disabilities and those who help them. It should be easier to assist someone who needs help voting. Ex. 15 ¶¶ 15, 17.

Amy Litzinger, a Travis County voter with spastic quadriplegic cerebral palsy and a member

of The Arc of Texas and REVUP Texas, struggled to vote in May 2022 because, not wanting to

expose her personal care attendant to criminal liability, she was not able to receive the assistance

she need to remove her wheelchair chest strap that would allow her to mark her ballot. Ex. 16,

Litzinger Decl. ¶¶ 4, 18. This resulted in it taking significantly longer for her to vote and

required much more physical effort. Had the ballot been longer, Ms. Litzinger would not have

been able to finish her ballot and would be prevented from voting. *Id.* ¶ 19. Because she could

not use her assistor, Ms. Litzinger needed a poll worker to help her submit her ballot, which

violated her privacy. *Id.* ¶ 20. In November 2022, Ms. Litzinger brought her personal care

attendant on her first day on the job to the polls but did not allow her attendant to assist her out

of fear on the oath. However, poll workers still asked that her attendant sign the oath, causing

Ms. Litzinger significant stress:

> I felt badly that someone I rely on to assist me in my daily life had to be exposed to the risks of criminal liability just for trying to assist me when voting…I am concerned that I will not be able to find attendants who will assist me to vote and/or they would refuse to come to any shift where they know I intend to vote during that day. Because I cannot get out of bed without attendant care, having an attendant refuse to come on a day when I plan to vote would be incredibly dangerous for me…I face a number of barriers in my life. Voting should not be one of them. *Id.* ¶¶ 21, 23, 26.

Yolanda Ross, a Harris County voter who assists her daughter Hannah who has Fetal Alcohol Syndrome and intellectual disability to vote and is a member of The Arc of Texas and REVUP Texas, explains that Hannah needs assistance getting to the polling location, using the voting machine, and hearing the names of the candidates aloud to prompt her to make her choice. Ex. 17, Ross Decl. ¶ 11. SB 1 "makes it more difficult for people like Hannah to vote" and Ms. Ross is concerned that SB 1 is "targeting" people with disabilities who "will not be able to vote without assistance." *Id.* ¶ 12. Ms. Ross adds that she is "worried that these new laws are slowly trying to take our right to vote away." *Id.* ¶ 14.

Heisha Freeman, a Collin County voter who is the mother of a son with autism, Austin, and a member of The Arc of Texas, explains that without her support, Austin could not vote. Ex. 18, Freeman Decl. ¶ 5. Before SB 1, she recounts that she would "explain the propositions to him in plain language" and "reminded him that he does not have to vote on each proposition after he became visibly agitated when he could not understand some of the propositions." *Id.* ¶ 7. After SB 1, Ms. Freeman explains that she and her husband are afraid to take the oath for fear that their actions would be "misinterpreted or misconstrued" and that they are unable to find others to assist due to these concerns. Because of this, Austin has not voted since SB 1 was enacted: "I am worried that due to SB 1, Austin will lose his right to vote." *Id.* ¶¶ 9-12.

Marc Spier, a Travis County voter and the father of Katie, an individual with intellectual disability, and a member of The Arc of Texas and REVUP Texas, describes how Katie "understands the issues and candidates on the ballot" but "requires assistance to comprehend the logistical instructions of voting because of her disability". Ex. 19, Spier Dec. ¶ 5. Mr. Spier notes that "[e]ach time Katie has voted, my wife or I have explained written instructions…and helped Katie fill out portions of the ballot…[m]y wife and I also helped her understand the platforms of

candidates and the significance of ballot propositions." *Id.* ¶ 6. He adds: "I do not believe I should be threatened with criminal penalties for helping my daughter vote, and I would not want someone else to be put in that position. *Id.* ¶ 11.

Jodi Lydia Nunez Landry, a Harris County voter with muscular dystrophy and a member of The Arc of Texas and REVUP Texas, adds that she prefers to vote in person but has encountered barriers since SB 1 was enacted. Ex. 20, Landry Decl. ¶¶ 5, 7, 10. Landry notes that "I am nervous about asking my partner to assist me because he may be targeted with criminal liability." *Id.* ¶ 13. Because of SB 1, Landry's voting experiences in March and November 2022 were more stressful, time consuming, and difficult and less private than they would have been had she been able to use the assistor of her choice. *Id.* ¶ 12. Landry explains that her disability is degenerative and she will require even more assistance over time with tasks such as inserting the ballot into the voting machine and completing the ballot. She explains:

> If an attendant is unwilling to assist me with voting, I will be prevented from voting. Many personal care attendants are low wage workers of color and they may be afraid to assist me for fear of being accused of doing something illegal. I wouldn't want to put them at risk or risk losing them as a personal care attendant. I also want to be able to choose who I want to assist me, as assistance is most effective from someone who is familiar with and understands my needs…but I am very concerned that they will be afraid to help me. *Id*. ¶ 15.

Toby Cole explained the burden SB 1 imposes on his ability to receive needed assistance, noting how "onerous" the restrictions are and how he would never want to expose his assistors to legal trouble or harm based on these restrictions. Ex. 28 at 22:4-9; 24:18-25:18; 29:17-30:5. Mr. Cole often receives voting assistance from his paid legal assistants and paralegals, not from attendants or caregivers, creating further barriers to receiving the assistance. *Id.* 30:11-31:2.

Jennifer Martinez, Chief Executive Officer of The Arc of Texas, explains: "Our direct support professionals work so hard but are severely undervalued and underpaid--the threat of criminal penalties when they are simply doing their job…is an unacceptable risk." Ex. 22 ¶ 27.

State Defendants assert – without evidence -- that the Challenged Provisions are necessary to prevent assistors from acting "improperly" and to block the "victimization" of voters with disabilities. *See, e.g.*, ECF 616 at 18. But Defendants fail to provide any support for this paternalistic rationalization. *See* Ex. 12, Ayers Dep. 168-69 ("I don't have any evidence that [voter manipulation] happens at a higher rate, [to] people with disabilities. . . . it's really based on the premise of paternalism."). For example, to support the notion that SB 1's assistance restrictions are meant to protect voters with disabilities, State Defendants cite testimony from Bexar County Elections Administrator Jacquelyn Callanen (Ex. 36 at 31:25-36:9).  But, Callanen's deposition only reported that large numbers of people with disabilities needed curbside voting, and that it took significant time to go to the curb to help them vote. ECF 616 at 17 n.32. Ms. Callanen testified that she knew of no instances where a voter was forced to vote a certain way. Ex. 36 at 34:19-21; *see also* ex. 28 at 41:17-42:7 (describing the paternalism of assuming voters with disabilities will be manipulated at the polls).

> **d.      It is Undisputed that Since the Enactment of SB 1, Mail Ballot Rejection Rates Have Skyrocketed**

Since the enactment of SB 1, rejection rates of mail ballots have increased significantly. Given that Texas voters with disabilities are significantly more likely to vote by mail than voters without disabilities (Kruse Report ¶ 69), the fact that 1 in 8 mail ballots were rejected in the primary election is clear evidence of SB 1's discriminatory effect.  Defendants cite a lower rejection rate of 2.7% during the November 2022 election after an extensive education campaign. ECF 616 at 14. But this is still 150% more than rates of rejection were prior to SB1.[9]

---

[9] *See* Ex. 1, Taylor Goldenstein, *Nearly 25,000 Mail Ballots Were Rejected in Texas Primaries, Fueled by Confusion Over New Restrictions,* Houston Chron. (April 6, 2022).

Evidence in the record demonstrates that SB 1's new requirements are the reason for the rejections of these thousands of ballots. Dr. Daniel Smith calculated that more than 90% of the mail ballots rejected in Harris County in the March 2022 primary election were rejected because of SB 1's ID requirement. Ex. 38, D. Smith Report ¶ 29. Rachel Obakozuwa, Director of Logistics for the Harris County Election Administrator, stated: "SB 1 has brought challenges to mail voting that were not part of any other elections." Ex. 37, R. Obakozuwa Dep. 65:1–7.  Ms. Obakozuwa also highlighted the ongoing confusion and ballot rejections created by SB 1. *Id.* 58:2–18. Tacoma Phillips, Mail Ballot Supervisor for the Dallas County Elections Administrator, stated that the number of rejected mail ballots in the March 2022 primary was greater than it had been in the past 25 years and noted that the reason for this increased rejection rate was the new ID requirements. When asked if some individuals whose mail ballots were rejected are eligible voters who simply made errors filling out their ID numbers, Phillips responded that they were and that Dallas County was concerned by the increased rejection rates because "voters before the SB 1 law were able to vote and cast their ballots, and ballots counted." Ex. 33 at 155:22–157:2. *See also* Ex. 45, M. Scarpello Dep. 248:8–249:8 (noting "concerns" about the ID requirements leading to high rejection rates); Ex. 40, J. Colvin Dep. 90:17–91:2 (attributing higher rate of Harris County mail ballot rejections to SB 1's ID requirements).

Despite the cure process touted by Defendants, thousands of Texas voters who had their applications or ballots rejected due to SB 1's new ID requirements did not ultimately cast ballots that were counted. Dr. Smith calculated that "nearly three-fifths" of voters whose mail ballot applications were rejected due to SB 1 "did not cast valid ballots by any method (mail or in person) in the election." Ex. 54, D. Smith Report, dated April 22, 2023 ¶ 11. Less than 15% of

voters whose applications were rejected due to SB 1 ultimately cast mail ballots that were

accepted. *Id.* ¶ 72.

### e. It is Undisputed That the State Has Failed to Issue Notices to the Public Regarding Their Rights Under the ADA and Failed to Train Counties on Their Obligations Under the ADA and Section 504

Plaintiffs have undisputed evidence that the State has failed to issue notices to the public

regarding their ADA rights and failed to train the Counties on their obligations under the ADA

and Section 504 and how they pertain to SB 1.  In his depositions on behalf of the Secretary of

State's Office, Keith Ingram admitted as such:

> Q…did your office…provide or develop any written guidance, directives, or
> advisories to local election officials pertaining to the ADA in SB 1?
> A. No…
> Q. Is there any other written guidance, directives, or advisories that you have
> provided to local election officials regarding Section 1.022 of the Texas Election
> Code --
> A. No…
> Q. …Section 1.022 says that, you can't…prohibit or limit the right of a qualified
> individual with a disability from requesting a reasonable accommodation. Would
> you agree that it doesn't provide any advice or directive regarding granting a
> reasonable accommodation or modification?...
> A. I agree with that…
> Q. Is there… a voter education campaign that the Secretary of State is planning to
> inform voters with disabilities learn that they can request accommodations or
> modifications permitted by Section 1.022?
> A. No. …
> Q. And does your office direct local election officials to provide procedures or
> inform voters about requesting accommodations or modifications to election rules
> pursuant to Section 1.022?
> A. We do not…
> Q: Has your office put out any notices or other communications to the public
> pertaining specifically to SB 1 and voters with disabilities?
> A. We have not.

Ex. 41, B. Keith Ingram May 6 Dep. 354:1-5; 356:3-25; 357:24-358:3; 359:3-6.

Ingram also noted that his office had not provided any guidance to Counties regarding

when a voter with a disability may need a form of assistance not allowed under the oath. Ex. 42,

B. Keith Ingram April 26 Dep. 109:7-16. Ingram further stated that the Secretary's office does

not have expertise on the ADA:

> Q. Is there a reason that you rely on outside groups, outside the Secretary of
> State's Office to provide that information?
> A. They are the ones with the expertise.
> Q. So is it fair to say, the Secretary of State's Office's doesn't have expertise
> regarding the Americans With Disabilities Act?
> A. Not as much as the Coalition for Texans with Disabilities and Disability Rights
> Texas.
> Q. And the Secretary of State's Office doesn't have expertise regarding other
> federal and state laws that protect individuals with disabilities?...
> A. Not as much as the people who were in the mix in that field every day.

Ex. 41 at 352:23-53:1.

Election Administrators from Defendant Counties Harris, Bexar, Travis, and Dallas all

testified that State Defendants failed to provide them with any training on how the ADA applies

to SB 1, even when Counties affirmatively requested such guidance. *See* Ex. 43, L. Smith Dep.

66:4–8; Ex. 37 at 58:19–59:10; Ex. 44, D. Hayes Dep. 28:5-29:3; Ex. 36 at 280:1-9; Ex. 45 at

81:6-9.

### f.     Defendants' Assertions Regarding Reasonable Modifications Rest on Disputed Facts and Erroneous Assumptions

Defendants assert that Plaintiffs have not requested reasonable modifications. ECF No. 616

at 19-21. As evidence for this assertion, Defendants primarily cite statements from election

officials asserting that they did not deny any reasonable modifications requested or did not

receive any complaints. *Id.* at 7.  Plaintiffs have ample evidence contradicting these assertions, as

described below.

### i.     Defendants Have Submitted No Evidence That a Request for a Reasonable Modification to the Challenged Provisions' Requirements Would be Considered or Granted

Defendants have submitted no evidence that a request for a reasonable modification to SB 1's

requirements would be considered or granted.  To the contrary, their own evidence indicates that

Counties understood no reasonable modifications to the Challenged Provisions' requirements could be allowed. Several Defendant Counties testified that they would not provide a reasonable modification to the mail voting ID requirement if one was requested. *See* Ex. 44 at 19:11-15. ("Q. … if· a voter with a disability requested a modification to submit a ballot without an ID number, you would not have been able to grant that modification? A. No, we have to follow the law.")  Ex. 33 at 157:12–59:18 ("Q. Is a…voter with a disability able to get a modification…to the ID requirement for voting by mail? A. No. Q. So even if they request…a modification, a voter with disability would not be able to have any different rules apply to them for the ID requirement? A. No….").

The Secretary of State specifically instructed county election officials not to provide accommodations in certain circumstances. For example, Ms. Longoria described a situation where she saw a conflict between the mail ballot cure provisions in Section 5 of SB 1 and the ADA's reasonable modification requirement:

> For those individuals who need a accommodation [to the ID requirement]…I would assume our office would be directed to provide that accommodation, but I was told by the secretary…to not provide those accommodations… at the State Conference of Elections Administrators ... I…specifically raised this conflict in front of the group and asked for directions and stated that I believed that because of the … reasonable accommodation provision, that we were compelled by law regardless of other provisions of SB1 to provide accommodations to voters. And I was instructed by the secretary of state at that time as were the rest of the election officials…that they felt that other sections of Senate Bill 1 superseded this provision…. My precise wording was … 'SB1 contains a provision saying that reasonable accommodations must be made to voters with disabilities…. Isn't it true that, especially for the curing mail ballot process, individuals wouldn't be able to cure in person? By definition of having to request a mail ballot, they've already ceded that point. What do you want us to do in that situation where we cannot provide accommodations per the law? Doesn't that hurt voters with disabilities?'… Q….have you ever gotten a direct answer [from SOS] to your question that you posed at the conference in August?  A. No.

I.   Ex. 46, Longoria Dep. 43:2-11; 43:14–44:6; 44:8–17; 56:21–23.

Mr. Ingram testified that Section 6 always requires an assistor "to swear the oath as written" and that "[t]here was no guidance around whether a reasonable accommodation could include an assistor being able to not swear an oath." Ex. 42 at 107:16-20.

### ii. For Some Challenged Provisions, Modification Requests Are Futile

Many voters will not even understand that they need a modification or be able to request one until it is too late. For example, Laura Halvorson explained:

> If there had been a problem with my ballot – like if I had transposed numbers in my Texas ID number… I would not have been able to correct my ballot and my vote would have been thrown out…I will not know of errors until it is too late to fix them or to vote in person." Ex. 21 ¶¶ 21-22.

Similarly, Nancy Crowther explained:

> Although a reasonable accommodation may help ameliorate some of the difficulties I have when voting in person, the threshold problem is that I need assistance just to enter the building and it is not possible to request an accommodation when you are not even able to enter the polling center without assistance…my attendant is afraid of going with me due to the mere specter of the oath for assistors when voting in person. Ex. 55 ¶ 9.

### iii. Counties Have Received Ample Requests for Modifications and Complaints from Disabled Voters Regarding the Challenged Provisions

State Defendants assert that numerous counties have testified that they have not received any accommodations requests related to the Challenged Provisions.[10] ECF No. 616. But this is contradicted by multiple county and witness deposition testimony stating the opposite. *See* Ex. 43 at 19:12-20:19 (describing multiple complaints in Harris County during the November 2022 election related to the denial of reasonable modifications, including an assistor initially being barred from assisting by an election judge); Ex. 46 at 72:25–73:12. (describing a Harris County voter with a disability who requested assistance to vote from his mother in the March 2022

---

[10] Defendants claim that Bexar County, Dallas County, El Paso County, Hidalgo County, Cameron County, and Travis County have not received reasonable accommodations requests.

election, but was denied this assistance and later filed a grievance with the County); Ex. 47, L.

Wise Dep. 183:23-184:3 (noting that El Paso County received reasonable modification requests

and extensive questions on the new ID requirements and indicated that sending back applications

that were missing information took "a lot of our resources"); Ex. 44 at 16:18-21 (referencing the

numerous modification requests Travis County received during the November 2022 election);

Ex. 37 at 57:21–58:1 (noting that SB 1 increased the questions from voters the County received,

leading to a need to increase staff for the County help line); Ex. 40 at 45:19–46:12 (describing

disabled voters in Harris County who requested modifications to cure their rejected mail ballots

since they could not enter the polling place in order to cure); Ex. 33 at 103:2–05:17; 106:2–08:12

(noting that Dallas County spent a significant amount of time answering questions from voters

regarding the SB 1 ID requirements, that in elections prior to the enactment of SB 1 the County

did not receive any questions about IDs and mail ballots, and that most of the calls the County

received from voters regarding mail ballot rejections were related to the SB 1 ID requirements);

Ex. 36 at 327:9-28:6 (despite not properly classifying this as a modification request, describing a

mother calling Bexar County on behalf of her paralyzed son and requesting that she could pick

up his mail ballot application given his disability, a request which was rejected by the County);

*see also* Ex. 31 at 30:24–33:1 (testifying that she requests reasonable modifications in every

election).

### iv.   Defendants Do Not Provide Adequate Training or Guidance to Counties on Their Obligations under the ADA Regarding Providing Reasonable Modifications

There is also a genuine dispute of fact as to whether Defendants have a system in place to

train Counties on their obligations under the ADA, to notify voters with disabilities of their rights

under the ADA, and to process reasonable modification requests. Several Defendant Counties

testified that they lack any written policies on considering reasonable modification requests from voters with disabilities. *See* Ex. 44 at 15:5-19; Ex. 33 at 160:22–61:19; Ex. 39 at 286:3–87:22. A review of Defendant Counties' websites reveals that not one has adequate, if any, information on the full rights of voters with disabilities to request the reasonable modifications they need to vote.[11] Multiple voters with disabilities and their assistors have also stated that they saw no notices and received no information about their rights under the ADA regarding how to request reasonable modifications or file grievances. *See* Ex. 15 ¶ 16; Ex. 16 ¶ 22; Ex. 55 ¶ 12; Ex. 20 ¶ 16; Ex. 17 ¶ 13; Ex. 10 ¶ 11.

Some counties lack systems to handle the volume of requests that would be required for each affected voter to submit an individual accommodations request. In fact, voters with disabilities prefer contacting advocacy groups for assistance, rather than counties, because of slow response times. For example, Cathy Cranston testified that when a polling place fails to meet accessibility standards, she calls Disability Rights Texas because "the county doesn't always respond quickly enough on those issues." Ex. 35 at 88:18-89:12; s*ee also* Ex. 21 ¶ 23 (noting that she contacted Bexar County regarding the availability of accessible voting machines prior to the November 2022 elections but never received a response, requiring her father to go to the polling place prior to the election to confirm it would be accessible to her).

### g.   Defendants' Assertions Regarding Plaintiffs' Having Multiple Methods to Vote Rests on Disputed Facts

---

[11] *See* Ex. 48, Dallas Cnty. Elections webpage, (Explains accessible voting, using an assistor and other services for voters with disabilities, but no reference to requesting a reasonable accommodation); Ex. 49, Dallas Cnty. Elections Admin's. Office webpage (no mention of reasonable modification requests aside from those related to effective communication); Ex. 50, Bexar Cnty. Elections Dep't webpage (no mention of reasonable modifications); Ex. 51, Travis Cnty. Voters with Disabilities webpage (no reference to reasonable modifications); Ex. 52, El Paso Cnty. Voters with Special Needs webpage (no general information regarding reasonable modifications; information limited to requesting an exception to photo ID requirement); Ex. 53, Hidalgo Cnty. Voters with Special Needs webpage (no reference to reasonable modifications).

State Defendants assert that Plaintiffs' members and constituents with disabilities have multiple methods to vote and therefore do not require access to the methods of voting impacted by SB 1. ECF 616 at 6, 23. Even if these other methods of voting were relevant to Plaintiffs' claims, State Defendants have provided no evidence that they are accessible to individuals with disabilities. In fact, voters have reported numerous difficulties. *See* Ex. 31 at 43:1–10; 43:18–44:18; 45:7–46:1 (describing "frequent" accessibility barriers in Travis County polling places); Ex. 28 at 15:15-16:1; 18:25-19:3 (describing accessibility barriers at polling places and with curbside voting); Ex. 39 at 286:3–87:22 (noting there are polling places in Dallas County that "are not as compliant [with the ADA] as they need to be."). Further, Dallas County admitted that the restrictions imposed by SB 1 have discouraged them from implementing new voting options that would provide greater access to voters with disabilities: "I would say if SB 1 hadn't been implemented, we would have aggressively had drive-thru voting." *Id.* at 276:20–78:5.

## III. ARGUMENT

### a. Summary Judgment is Inappropriate on Plaintiffs' ADA and Section 504 Claims as to Defendant Ogg and State Defendants

Plaintiffs present ample evidence to raise genuine, triable issues of material facts on their claims that the Challenged Provisions of SB 1 discriminate against individuals with disabilities in violation of the ADA and Section 504. As such, summary judgment is inappropriate and should be denied in full as to the State Defendants' Motion and as to portions of Defendant Ogg's Motion addressing the ADA and Section 504.

#### i. Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must show there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. Fed. R.

Civ. P. 56(c). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of identifying the portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). If the moving party fails to meet its initial burden, the court must deny the motion for summary judgment, regardless of the non-moving party's response. *Baton Rouge Oil & Chem. Workers Union v. Exxon Mobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

At the summary judgment stage, the Court does not weigh conflicting evidence or make credibility determinations. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999). Instead, the court must simply determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249. In doing so, the court must draw all reasonable inferences in the light most favorable to the non-moving party. *Am. Home Assurance Co. v. United Space All.*, LLC, 378 F.3d 482, 486 (5th Cir. 2004).

> **b.     Summary Judgment is Inappropriate on Plaintiffs' ADA and Section 504 Claims as to Defendant Ogg**

> **i.    Plaintiffs Have Standing to Bring Their ADA and Section 504 Claims.**

As an initial matter, Defendant Ogg's claim that Plaintiffs cannot maintain a claim under Title II of the ADA ("Title II") because, as organizations, they are not "qualified individuals with disabilities," ECF No. 614 at 25, is inconsistent with established precedent and prior rulings in this case. Defendant Ogg argues that Plaintiffs must prove the organizations themselves, rather than their members, are being denied access to a "service, program, or activity" because of a disability. By this reasoning, organizations can never bring ADA or Section 504[12] claims on

---

[12] Claims under Section 504 and the ADA generally apply the same substantive standards and are interpreted in tandem. *See, e.g., Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 749 (2017);

behalf of their members. This Court has already rejected the argument that "organizations cannot assert a Title II claim because the organizations themselves do not have a disability," holding instead that the ADA permits "organizations that serve disabled individuals" to sue public entities in their own right. ECF No. 449 at 44 (seeing "no reason to carve out an exception" to this rule and collecting cases); *See also* 42 U.S.C. § 12133; 29 U.S.C. § 794a(a)(2); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997) Here,  Plaintiffs have each established their Article III standing with respect to their ADA claims against Ogg.

As this Court has also previously recognized in this litigation, "it is well settled that an organization may sue as the representative of its members." ECF No. 447 at 47. An organization may invoke associational standing when "[a] its members would otherwise have standing to sue in their own right, [b] the interests at stake are germane to the organization's purpose, and [c] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *J.R. v. Austin Indep. Sch. Dist.*, 574 F. Supp. 3d 428, 436 (W.D. Tex. 2021); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). Plaintiffs have thoroughly briefed this matter in their oppositions to State Defendants' Motions to Dismiss and

---

*Smith v. Harris Cnty.*, 956 F.3d 311, 317 (5th Cir. 2020).  Therefore, hereafter, unless noted otherwise, references to the ADA should be read to encompass Plaintiffs' Section 504 claims as well. To the extent that Defendants argue that Section 504 is a "more demanding standard because the discrimination must be "solely by reason" of plaintiff's disability, this does not indicate a higher standard.  *Bennett-Nelson v. Louisiana Bd. Of Regents*, 431 F.3d 448, 454 (5th Cir. 2005) (explaining that there is no difference between the two because both impose upon public entities an affirmative obligation to make reasonable accommodations for individuals with disabilities). Regardless, Defendant Ogg does not make any substantive arguments on how Section 504's standard applies to Plaintiffs' claims, and Plaintiffs have provided sufficient evidence.

need not do so again here. ECF No. 252 at 14-20; ECF No. 279 at 15-19. *See also* Ex. 2 ¶ 25; ECF No. 611 at 38-39.

Defendant Ogg does not dispute that Plaintiffs' members are individuals with disabilities or that they have been harmed by SB 1. *See generally* ECF No. 614 at 25-26. As such, Plaintiffs are not required to make such a showing to defeat summary judgment. Though they are not required to do so, Plaintiffs have identified specific members harmed by SB 1 in their amended complaints and have produced evidence establishing their harm. *See supra* Section II.C. As further detailed in Section II.A., the Challenged Provisions will also directly burden large numbers of Plaintiffs' members. *See supra* Section II.C-D.

### 1. Defendant Ogg Is Subject to Plaintiffs' Section 504 Claims

Contrary to Defendant Ogg's assertion, ECF No. 614 at 26, there is at least a triable issue of fact as to whether Ogg actually receives federal financial assistance and is thus subject to section 504.[13] When an agency is Congress' intended recipient of federal funds—rather than a mere third-party beneficiary—the agency falls under the purview of section 504 even if funds are received indirectly. *See, e.g.*, *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 606 (1986); *Frazier v. Bd. of Trs.*, 765 F.3d 1278, 1289-90 (5th Cir. 1985). Whether an agency is Congress' intended recipient of federal funds depends greatly on the language of the grant. *Hamilton v. Ill. Cent. R.R. Co.*, 894 F. Supp. 1014, 1020 (S.D. Miss. 1995). An agency that does not request but still receives funding from an intermediary may still be subject to suit under section 504. *See T.W. v. N.Y. State Bd. of L. Exam'rs*, 996 F.3d 87, 93 (2d Cir. 2021); *Bentley v. Cleveland Cnty. Bd. of Cnty. Comm'rs*, 41 F.3d 600, 604 (10th Cir. 1994). An

---

[13] No other party has sought summary judgment as to Plaintiffs' Section 504 claims on grounds that they do not receive Federal financial assistance. Therefore, Plaintiffs in this section address only Ogg's receipt of federal funds.

agency is considered an indirect recipient if the agency can decide "to accept or reject their obligations as part of the decision whether or not to 'receive' federal funds." *Paralyzed Veterans of Am.*, 477 U.S. at 606.

At an April 5, 2022 Harris County commissioners meeting, the commissioners approved the allocation of federal pandemic relief money to fund prosecutor positions in Ogg's office after hearing an update on the county's criminal court case backlog.[14] Ogg also received federal funding through the Department of Justice to support "overtime hours worked by an Assistant District Attorney assigned to domestic assault cases."[15] This raises at least a triable issue that Ogg received federal funding within the meaning of Section 504.[16]

>    **c.    Summary Judgment is Inappropriate on Plaintiffs' ADA and Section 504 Claims as to the State Defendants**

Plaintiffs have presented multiple claims under the ADA and Section 504 including that SB 1 discriminates against voters with disabilities by: (1) denying voters with disabilities an equal opportunity to participate in and benefit from Defendants' voting programs; (2) providing voters with disabilities a service that is not as effective in affording an equal opportunity to obtain the same benefit ... as that provided others; (3) imposing eligibility criteria that screen out or tend to screen out people with disabilities from the program and activity of  voting; (4) using criteria or methods of administration that subject voters with disabilities to discrimination or substantially impair accomplishment of the voting program's objectives with respect to voters with

---

[14] *See* Ex. 56, April 5, 2022 Video Harris County Commissioners.

[15] *See* Ex. 57, Harris Cnty. Sheriff's Office Victim Advocates Award. The award continued through at least September 2022. *See* Ex. 58, Grant Summary to Harris County webpage.

[16] The cases Ogg cites are inapposite. In both *Johnson v. Callanen*, 608 F. Supp. 3d 476 (W.D. Tex. 2022) and *Nottingham v Richardson,* 499 F. App'x 368 (5th Cir. 2012)*,* the plaintiffs failed even to allege the defendants received federal funding assistance.  Here, OCA and HAUL Plaintiffs have not only alleged, but have adduced evidence, that Defendant Ogg receives federal funding assistance.

disabilities; and (5) failing to make reasonable modifications to their policies, practices, and procedures, including having adequate systems in place to train counties regarding their obligations under the ADA, providing voters with disabilities with notice of their rights under the ADA and providing reasonable modifications needed to avoid discrimination in Defendants' voting program. ECF No. 199 ¶ 350; ECF No. 200 ¶¶ 130-135, ECF No. 208 ¶ 282.  Defendants fail entirely to address Plaintiffs' eligibility criteria[17] and methods of administration[18] claims, so presumably concede these are not subject to summary judgment. The arguments that Defendants raise against the remaining claims rest on erroneous legal assumptions and disputed facts.

### 1. Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs' Equal Access Claim

Rather than meaningfully engage with Plaintiffs' facts and arguments in support of their ADA claims, State Defendants spend a great deal of their brief arguing that the alleged availability of other methods of voting cures the barriers imposed by SB 1. ECF No. 616 at 6, 22-23. Plaintiffs do not dispute that Texas law provides both in-person and mail voting. But the availability of multiple forms of voting simply has no relevance to Plaintiffs' ADA claims. Moreover, for many of Plaintiffs' members, there is evidence in the record that these other voting methods are not accessible. *See supra* Section II.G.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity." 42

---

[17] *See* 28 C.F.R. § 35.130(b)(8); *Guckenberger v. Boston Univ.*, 974 F. Supp. 106, 134-35 (D. Mass. 1997) (discussing Title II's ban on eligibility criteria that tend to screen out people with disabilities).
[18] 28 C.F.R. § 35.130(b)(3)(ii); *Dunn v. Dunn*, 318 F.R.D. 652, 664-665 (M.D. Ala. 2016) (discussing ways in which neutral policies could give rise to a methods of administration claim by screening out people with disabilities).

U.S.C. § 12132. A successful claim requires showing that (i) plaintiffs have a disability; (ii) plaintiffs are otherwise qualified to receive the benefits of a public service, program, or activity; and (iii) plaintiffs were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability. *Luke v. Texas*, 46 F.4th 301, 305 (5th Cir. 2022); *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004). "A public entity's failure to make a reasonable modification may satisfy the second and third prongs of the prima facie case." *Block v. Tex. Bd, of Law Examiners*, 952 F.3d 613, 618 (5th Cir. 2020).

The ADA requires each of a covered entity's programs to be accessible to and useable by people with disabilities. If a state provides voters with choices for casting a ballot, such as in-person voting at a polling place and voting via mail, under the ADA ***each option*** must be independently accessible to voters with disabilities. *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 198-99, 503–04 (4th Cir. 2016) ("[T]o assume the benefit is ... merely the opportunity to vote at some time and in some way [ ] would render meaningless the mandate that public entities may not afford persons with disabilities services that are not equal to that afforded others."); *see also Disabled in Action v. Bd. of Elections in N.Y.*, 752 F.3d 189, 198–99 (2d Cir. 2014); *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1158–59 (N.D. Ala. 2020); *Fla. State Conf. of the NAACP v. Lee*, No. 4:21cv187-MW/MAF, 2021 WL 6072197, at *6 (N.D. Fla. Dec. 17, 2021); *Johnson v. Callanen*, 608 F. Supp. 3d 476, 484 (W.D. Tex. 2022) (Rodriguez, J.) (holding that mail voting in Texas is "at least a benefit—if not an actual, service, program, or activity—for which Bexar County is responsible" under the ADA). Defendants cannot simply point to a different method of voting that is not in dispute to defeat a discrimination claim under the ADA. *See Lamone*, 813 F.3d at 503–04 (4th Cir. 2016); *People First*, 491 F. Supp. 3d at 1158–59.

Further, to prove discrimination under the ADA, Plaintiffs "need not show that the voting access allegedly denied here is absolute. *Sixth Dist. of the African Methodist Episcopal Church v. Kemp,* 574 F. Supp. 3d 1260, 1281 (N.D. Ga. 2021); *see also Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001) ("A violation of Title II, however, does not occur only when a disabled person is completely prevented from enjoying a service, program, or activity."). The ADA does not require complete exclusion from voting, and a "partial denial of access" can be actionable. *Kemp*, 574 F. Supp. 3d at 1281. For example, even if in-person polling place machines have accessibility features for blind voters, such as an audio ballot, headset, and numeric keypad, this does not mean that a mail voting program that requires blind voters to mark a hard copy of a mail ballot without assistance is accessible under the standards of the ADA. *See Lamone,* 813 F.3d at 498, 506-07.

This Court has already recognized that alternative forms of voting are irrelevant to voters with disabilities when those alternative forms are themselves not accessible. In denying Defendants' Motion to Dismiss, the Court stated that voting by mail as an alternative form of voting "do[es] nothing for eligible disabled voters who are discriminated against when voting by mail. Surely, voting by mail cannot be a reasonable modification when . . . disabled voters who are eligible to vote by mail do not have meaningful access to actually do so because of their disabilities." ECF No. 448 at 45. Defendants also list several access features they have at the polling place as apparent evidence of their "accommodations" for people with disabilities. ECF No. 616 at 6 22-23. But legally required access is not an "accommodation." Rather, all of the examples Defendants cite are simply the minimum compliance that is required by federal law. *See* 52 U.S.C. § 21081(3)(A); 42 U.S.C.A. § 12101 et seq.; 42 U.S.C. §12132; 28 C.F.R. § 35.133(a); 28 C.F.R. § 35.151(b)(2)(i).

Plaintiffs' ADA challenges to SB 1 have nothing to do with the availability of voting machines or the physical accessibility of polling places. *See Lamone*, 813 F.3d at 503–04 (holding that the challenged policies were the appropriate scope for the court's ADA analysis, regardless of whether physical voting locations were accessible). The mail voting system is in place because for some voters with disabilities, making it to the polls requires an enormous effort. Equal access to the ballot box should not require voters with disabilities to have to work twice as hard as non-disabled voters to have their ballots counted.

These examples are more than sufficient to raise factual questions regarding the merit of Defendants' unsubstantiated assertions that they offer voters with disabilities multiple accessible options to vote.

### 2. Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs' Reasonable Modifications Claims

Defendants argue that Plaintiffs' reasonable modifications claims fail on the basis that (1) Section 1.08 of SB 1 remedies Plaintiffs' claims and (2) Plaintiffs have not requested any reasonable modifications. ECF No. 616 at 19-21, 23.  Both of these arguments fail.

#### a. Section 1.08 of SB1 Does Not Remedy Plaintiffs' Reasonable Modifications Claims

State Defendants make much of the fact that Section 1.08 of SB 1 states that the Texas Election Code cannot "limit the right of a qualified individual with a disability from requesting a reasonable accommodation or modification." Tex. Election Code § 1.022.  Defendants present this incomplete and inadequate restatement of federal law as evidence that SB 1 has a "blanket ban against voter discrimination" and that SB 1 provides voters with disabilities meaningful opportunities and methods to vote. ECF 616 at 23.

Again, Defendants seem to misunderstand disability rights laws. The ADA already requires public entities to "*make* reasonable modifications" to their programs and activities "when the

modifications are necessary to avoid discrimination."  28 C.F.R. § 35.130(b)(7) (emphasis

added).  Restating this fact in state legislation does not add to or create any additional rights, nor

does it remedy a state law that undermines those same rights for disabled voters. Additionally,

Section 1.08 is not even an accurate restatement of the ADA as it provides only that people with

disabilities may make *requests* for reasonable modifications; it says nothing about the obligations

of public entities to *grant* them (the actual ADA requirement) *Id.*)

The state has admitted that it lacks expertise in the ADA and that it has not advised counties

on how to recognize a request for a reasonable modification, what process to follow when a

request is received, or what types of modifications would be considered reasonable with regards

to the new restrictions imposed by SB 1. *Supra* Section II.f. When counties have specifically

requested this guidance, it has not been provided. Both State and County Defendants have noted

that they would refuse to provide any modifications, if requested by a voter with a disability, to

the Challenged Provisions, in direct contradiction to Defendants' claims that Section 1.08 is a

cure all for the widespread discrimination imposed by SB 1. *Supra* Section II.f.i.

### b.  Plaintiffs Have Sufficiently Alleged an ADA Reasonable Modifications Claim

Defendants argue that Plaintiffs' ADA claims fail because they have not requested—and

been denied—reasonable modifications by Defendants. State Defendants also claim that without

individual requests for modifications, "it would be impossible for the [state] to ascertain whether

an accommodation is needed at all, much less identify an accommodation that would be

reasonable under the circumstances." ECF No. 616 at 20. These arguments are without merit.

### c.  Defendants Have Affirmative Obligations to Provide Reasonable Modifications

The Fifth Circuit has held that "both the ADA and the Rehabilitation Act impose upon public

entities an *affirmative* obligation to make reasonable accommodations for disabled individuals."

*Bennett-Nelson v. La. Bd. Of Regents*, 431 F.3d 448, 454 (5th Cir. 2005); *Cadena v. El Paso Cnty.*, 946 F.3d 717, 724 (5th Cir. 2020) (emphasis added).  For this type of claim, a plaintiff must show that the entity knew of the disability and its consequential limitations, either because the plaintiff requested an accommodation *or because the nature of the limitation was open and obvious.*" *Id.* (internal quotations omitted).

Here, State Defendants can hardly claim that they were not aware of the large-scale harm the Challenged Provisions would impose on voters with disabilities. Plaintiffs and their members—voters with disabilities—testified to these harms as such before the Texas legislature before SB 1 was enacted. *Supra* Section II.b. Further, the correlation between age and disability is well-established and, therefore, Defendants are certainly aware that a disproportionate number of mail voters are voters with disabilities, including those who mark "age" as their reason for requesting a mail ballot.  *See supra* Section II.a.

In the face of this clear systemic injury to millions of voters with disabilities across the state, Defendants respond that each voter with a disability—already facing a myriad of disproportionate barriers to vote (*supra* Section II.b)—should be required to request individual modifications to a law that inherently disenfranchises voters with disabilities.  ECF No. 616 at 20. Defendants argue that voters with disabilities bear the full burden of informing the state of every possible violation of the law and requesting a modification, even though the same provisions of SB 1 will affect millions of Texans with disabilities. But the ADA requires more from states. Indeed, the ADA imposes requirements that public entities must take *affirmative* steps to *proactively* comply with federal disability antidiscrimination mandates *regardless of whether individual requests are made*. According to the Fifth Circuit:

> The ADA expressly provides that a disabled person is discriminated against when an entity fails to *take such steps as may be necessary* to ensure that no individual with a disability is

excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services.... Congress intended to impose an affirmative duty on public entities to create policies or procedures to prevent discrimination based on disability.

*Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 575 (5th Cir. 2002) (citation and quotations marks omitted, emphasis in original); *see also Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 266, 269 (D.D.C. 2015) (Jackson, J.) (rejecting argument that defendants only need to provide modifications when they are explicitly requested and holding that covered entities under Title II do not "have the option of being passive in their approach to disabled individuals as far as the provision of accommodations is concerned.")

Further, without a change in SB 1 itself, Defendants' approach would require Plaintiffs to request individual modifications *each and every time they vote*, an incredibly burdensome prospect for a voting population that is already severely overburdened and an incredibly impractical burden on those who administer elections. This is contrary to what the ADA requires. *See Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 738-9 (9th Cir. 2021) (differentiating between individual claims "based on an individualized request or need" and systemic claims "focused on modifying a policy or practice improve systemic accessibility) (citing multiple cases holding same). This is inconsistent with established precedent and the plain language of the ADA.

To support their argument, Defendants rely solely on cases brought by individuals, cases that are inapplicable here. Neither *Smith v. Harris Cnty.,* 956 F.3d 311 (5th Cir. 2020) nor *Windham v. Harris Cnty.*, 875 F.3d 229 (5th Cir. 2017) deals with challenges to systemic discrimination against individuals with disabilities like that challenged by Plaintiffs in this matter. In both *Smith* and *Windham*, the plaintiffs sought modifications to practices specifically directed at them as individuals (prisoner mental health care and a driving sobriety test), rather than seeking modifications to laws of systemic applicability to a large group of voters.

In addition, although they brought their claims under Title II, plaintiffs in *Smith* and *Windham* relied on a theory of the ADA's reasonable accommodation requirement that was advanced in *Taylor v. Principal Fin. Grp.*, 93 F.3d 155 (5th Cir. 1996), an employment discrimination case brought under Title I of the ADA ("Title I") (not at issue in this litigation). *Smith,* 956 F.3d at 317-318; *Windham,* 875 F.3d at 236-237. *Smith* and *Windham* fail to acknowledge that while Title I requires that a plaintiff's disability must have been "known" to the defendant, Title II has no such requirement, and in any event, the issues related to voters with disabilities were known by Defendant through extensive testimony before the legislature and passage of SB 1. *See supra* Section II.b.  *Compare* 42 U.S.C. § 12112(b)(5)(A) (discrimination under Title I includes not making accommodations "to the known physical or mental limitations of an otherwise qualified individual") *with* 28 C.F.R. § 35.130(b)(7)(i) (Title II requires public entities to *"make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability"* (emphasis added)). Unlike Title I, Title II provides no basis for requiring an individualized request before considering a reasonable modification claim.  Indeed, individual requests would offer no practical remedy for some of the harms caused by the Challenged Provisions cognizable under Title II.

As discussed in Section IV.B.*, supra,* lawsuits brought by organizational Plaintiffs challenging systemic discrimination under a state law do not require the individual participation of each of their members. Unlike in the cases cited by Defendants, Plaintiffs are not required to bring individual modification requests tailored to the particular needs of each of their members, nor would this be practicable in the face of systemic harm imposed by a statewide law impacting millions of voters with disabilities. *See Payan*, 11 F.4th at 738. The alleged lack of individual

requests, contradicted by the record, therefore provides no basis for a grant of summary judgment.

### d.  Plaintiffs Need Not Make Reasonable Modifications Requests Where Such Requests Would Be Futile

Plaintiffs are not required to make a reasonable modification request where such a request would be futile. *See MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 344 (6th Cir. 2002) (zoning); *Randolph v. Rodgers*, 170 F.3d 850, 858-59 (8th Cir. 1999) (under ADA Title II inmate need not repeat request for interpreter every time one was required, especially if prison always rejected it, refusing to discuss it); *Oxford House, Inc. v. City of Baton Rouge, La.*, 932 F. Supp. 2d 683, 691 (M.D. La. 2013) (zoning); *Hall v. Morgan*, No. Civ.A.03-0303, 2003 WL 22800871, at *2 (E.D. La. Nov. 21, 2003) (recognizing futility of making accommodation requests under ADA Title II left a genuine issue of material fact). Even under standards in employment cases, which as discussed are inappropriate here, Plaintiffs are not required to make a reasonable modification request where such a request would be futile. *Davoll v. Webb,* 194 F.3d 1116, 1132 (10th Cir. 1999); *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996).

As discussed above, at least some modification requests related to the Challenged Provisions would be futile. Many voters who vote by mail will not even know that they need a modification or be able to request one until their ballot has been rejected and it is too late. *Supra* Section II.c. For others, there is no way to request a modification to curing in person or the oath requirement if the voter with a disability cannot even enter an inaccessible polling place. *Supra* Section II.d.

### e.  Defendants Do Not Provide Adequate Training or Guidance to Counties on Their Obligations under the ADA Regarding Providing Reasonable Modifications

State Defendants claim that certain counties never received any reasonable modifications requests. ECF No. 616 at 20-21. Of course, even if true, this alone does not prove that voters

with disabilities are not experiencing discrimination due to the Challenged Provisions. Second, this claim is contradicted by evidence in the record, including testimony in county depositions, that demonstrates the counties identified by the State Defendants *did* receive extensive modification requests as well as complaints and grievances related to the Challenged Provisions. *See supra* Section II.f.iii.  Indeed, it is disputed as to whether the State even has a system in place to train counties on their obligations to process requests for modifications, and some counties lack the capacity to process requests in a reasonable amount of time (resulting in voters turning to advocacy groups for aid rather than election officials). *See supra* Section II.f. As is clear from their own websites, not one Defendant County includes required information regarding the rights of voters with disabilities under the ADA, including their right to reasonable modifications and how to file grievances. *Supra* Section II.f. Whether the identified counties received requests for accommodations creates a genuine issue of material fact that should be decided by a factfinder at trial.

The Secretary of State's claim that it "plays no part in receiving or providing accommodations to voters" is also incorrect. ECF No. 616 at 19.  The Court has already determined that the Secretary plays a role in enforcing all the Challenged Provisions, including those pertaining to voter assistance. ECF No. 448 at 8-19. Further, the Secretary of State plays a role in providing guidance and training to counties. *Supra* Section II.H.3. And State Defendants, by their own admission as well as admissions from Defendant Counties, have entirely failed to provide adequate guidance to counties on how to implement the Challenged Provisions while complying with the ADA. *Supra* Section II.F.

### f.   The ADA Requires That Reasonable Modifications Effectively Address Plaintiffs' Claims

Finally, State Defendants' claim that "*defendants* – not plaintiffs – get to choose between reasonable accommodations, and plaintiff's preferences between reasonable accommodations are irrelevant." ECF No. 616 at 24. This presumes that State Defendants *have actually provided* equally effective modifications for the Challenged Provisions. The case cited by Defendants, *E.T. v. Paxton,* applies only when defendants are actually providing two or more equivalent modifications. 41 F.4th 709 (5th Cir. 2022) (providing as an example a situation in which a defendant provides an equal choice between a wheelchair ramp or lift). However, as explained in Section II.F, *supra*, Defendants have not provided any evidence of providing guidance to counties regarding reasonable modifications to the Challenged Provisions that would meet this requirement. And in any event, the question of whether different potential modifications are reasonable is a question of fact not suited for summary judgment. *See Levy v. La. Dep't of Pub. Safety & Corr.,* 371 F. Supp. 3d 274, 286 (M.D. La. 2019) ("the determination of the reasonableness of a particular accommodation is often described by courts as "highly fact-specific" requiring "a complex balancing of factors.") (citations and internal quotations omitted); *Powers v. MJB Acquisition Corp.*, 993 F. Supp. 861, 868 (D. Wyo. 1998) ("the determination of what constitutes a reasonable modification or accommodation is a fact-intensive question ill-suited for resolution at the summary judgment stage"); *Anderson v. City of Blue Ash*, 798 F.3d 338, 356 (6th Cir. 2015) ("[D]etermination of what constitutes reasonable modification is highly fact-specific, requiring case-by-case inquiry") (citations and internal quotation marks omitted)).

### 3.   The Relief Plaintiffs Seek is Reasonable

Defendants' argument that the remedy Plaintiffs seek is not reasonable (ECF No. at 24-26) is both premature and incorrect.

First, the Court need not evaluate the appropriateness of the requested relief when considering a motion for summary judgment. The court can fashion appropriate relief after liability is determined.  See *King v. Our Lady of the Lake Hosp., Inc.*, 455 F. Supp. 3d 249, 260–61 (M.D. La. 2020) (where plaintiff presented evidence to defeat summary judgment regarding her standing for injunctive relief, the court would determine the proper scope of any injunctive relief after a finding of liability at trial and based on the evidence presented at trial); *Housing Works v. Cnty. of L.A.*, No. CV 15-8982, 2016 WL 11730243, at *8 (C.D. Ca. 2016): (defendants' motion for summary judgment as to whether relief sought by plaintiff was premature before liability had been established).  As noted in the previous section, whether a modification is reasonable is a fact-intensive inquiry. *Levy,* 371 F. Supp. 3d at 286 ("the determination of the reasonableness of a particular accommodation is often described by courts as "highly fact-specific" requiring "a complex balancing of factors.") (citation omitted); *Powers v. MJB Acquisition Corp*., 993 F. Supp. 861, 868 (D. Wyo. 1998) ("the determination of what constitutes a reasonable modification or accommodation is a fact-intensive question ill-suited for resolution at the summary judgment stage").

Second, Defendants argue – without evidence - that relief requiring a modification of state law provisions is necessarily a fundamental alteration and therefore not a viable form of relief under the ADA. ECF No. 616 at 24-25. This is also incorrect. Plaintiffs seek an order enjoining specific portions of SB 1 that would simply return the law to the status quo ante. Texas has administered successful elections with participation by Texans with disabilities without the Challenged Provisions in place. Therefore, requiring the state to return to administering elections in these ways would create no fundamental alteration in the voting program. *Schaw v. Habitat for Humanity*, 938 F.3d 1259, 1266-67 (11th Cir. 2019) (an alteration to a program is

fundamental if it would eliminate an "essential" aspect of the program and undermine "the basic purpose of the rule or policy at issue"). Tellingly, State Defendants make no argument that the practicalities of changing any of the Challenged Provisions would cause significant administrative or financial burden or otherwise constitute a fundamental alteration. To the contrary, evidence in the record points to the significant burdens Defendant Counties have experienced only since the enactment of SB 1 due to the Challenged Provisions.

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). When a conflict arises between a state or local law and the ADA's requirement that public entities make reasonable modifications to ensure equal opportunity, state and local laws must yield to the "comprehensive national mandate" of the ADA. *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 163 (2d Cir. 2013). Indeed, "[t]he 'natural effect' of Title II's 'reasonable modification' requirement . . . requires preemption of **inconsistent state law** when necessary to effectuate a required 'reasonable modification.'" *Id.* (emphases added). A relevant injunction of a state law can be considered a reasonable modification to rules, policies, or practices, which does not constitute a fundamental alteration of a program. *See, e.g., Crowder v. Kitagawa*, 81 F.3d 1480, 1485-86 (9th Cir. 1996) (reasonable modification requirement of the ADA can require modifying conflicting state administrative regulation); *Hindel v. Husted*, 875 F.3d. 344, 349 (6th Cir. 2017) (finding that state law requiring all voting machines to be certified did not make requested modification involving uncertified machines facially unreasonable, because "a state procedural requirement may not excuse a substantive ADA violation," and "[r]equiring public entities to make changes to rules, policies, practices, or services is exactly what the ADA does") (internal quotation marks omitted); *Lamone*, 813 F.3d at 508  (rejecting

the argument "that the mere fact of a state statutory requirement insulates public entities from making otherwise reasonable modifications to prevent disability discrimination"); *Hargrave v. Vt.*, 340 F.3d 27, 39 (2d Cir. 2003) (rejecting argument that enjoining state law fundamentally alters program at issue and holding the district court's injunction prohibiting enforcement of certain provisions of a civil commitment law that discriminated on the basis of disability did not constitute a fundamental alteration); *Mary Jo C.,* 707 F.3d at  163 (finding "nothing in the statutory phrase 'reasonable modification' to suggest that Congress intended to exclude modifications that require violation or waiver of mandatory state statutes in some circumstances"); *Barber ex rel. Barber v. Colo. Dep't Of Revenue,* 562 F. 3d 1222, 1233 (10th Cir. 2009) (rejecting argument that modifying a state driving statute would be a "per se not reasonable" modification under the Rehabilitation Act, and holding that "[r]eliance on state statutes to excuse non-compliance with federal laws is simply unacceptable under the Supremacy Clause").

Defendants cite *League of Women Voters* for the proposition that enjoining the identified sections of SB 1 would be a fundamental alteration. *League of Women Voters of Fla., Inc. v. Lee,* 595 F. Supp. 3d 1042 (N.D. Fla. 2022). But *League* is distinguishable from the instant case in several ways. First, *League,* was decided under a different standard, pursuant to Federal Rule of Civil Procedure 52(a) after a bench trial wherein the court "heard and considered all the testimony, evidence, and arguments." *Id.* at 1064-65. Defendants in this case seek judgment before trial, a more exacting standard that requires the court to construe all reasonable inferences in the light most favorable to the Plaintiffs in this matter. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986); *Am. Home Assurance Co. v. United Space All., LLC*, 378 F.3d 482, 486 (5th Cir. 2004).

Furthermore, in *League*, Plaintiffs sought to enjoin a Florida law imposing new restrictions on the state's vote by mail system, which was available to *all* of the state's voters, on the grounds that it discriminated against disabled voters. *Id.* at 1157-58.  In denying the injunction, the court in *League* weighed whether Plaintiffs' requested relief would eliminate an "essential aspect" of Defendants policy. *Id*. at 1158. The court found that Plaintiffs' relief   would not have been a fundamental alteration were the policy to apply only to the circumscribed subcategory of "older, disabled, and compromised voters."  *Id.* In Texas, the mail voting program is just so circumscribed. *Supra* Section II.a. Voters in Texas must have a valid reason in order to vote by mail, and chief among eligible categories are people with disabilities and older voters– who are disproportionately disabled. *Id.*

Courts have enjoined laws where a more narrowly defined portion of the population is affected by the modification. *See People First of Ala.,* 467 F. Supp. 3d at 1221-1222 (when plaintiffs sought to enjoin a voting law as to a circumscribed set of voters, the Court held that the plaintiffs' modification did not fundamentally alter an Alabama voting program); Although many Texans are voters with disabilities, this is a clearly defined subset of the entire voting populace in the state. Here, as in *People First of Alabama*, Defendants have presented no evidence to support their contention that enjoining SB 1's Challenged provisions would be a fundamental alteration of the entirety of Texas's voting system.

Plaintiffs have presented ample evidence from which a jury may infer that enjoining the Challenged Provisions of SB 1 is reasonable on its face. As discussed at length above, voters in Texas with and without disabilities voted successfully prior to the enactment of SB 1. *Supra* Section II.c.i. Therefore, a jury may easily infer that a request to return to the status quo is

reasonable on its face because it is exactly how the state and its voters successfully operated previously.

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny summary judgment in full as to State Defendants' Motion and as to portions of Defendant Ogg's Motion addressing the ADA and Section 504.

Date: June 23, 2023

Respectfully submitted,

REED SMITH LLP, NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., THE ARC OF THE UNITED STATES, INC.

*/s/ Shira Wakschlag*
Shira Wakschlag*
Megan Rusciano*
The Arc of the United States, Inc.
2000 Pennsylvania Ave. NW, Suite 500
Washington, DC 20006
Telephone: (202) 534-3708
Facsimile: (202) 534-3731
Wakschlag@thearc.org
Rusciano@thearc.org

Kenneth E. Broughton
Texas Bar No. 03087250
J. Keely Pippin
Texas Bar No. 24116306
Reed Smith LLP
811 Main Street, Suite 1700
Houston, TX 77002-6110
Telephone: (713) 469-3800
Facsimile: (713) 469-3899
kbroughton@reedsmith.com
kpippin@reedsmith.com

Sarah Cummings Stewart
Texas Bar No. 24094609
Reed Smith LLP
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Telephone: (469) 680-4200
Facsimile: (469) 680-4299
sarah.stewart@reedsmith.com

Destiny R. Lopez*
Reed Smith LLP
355 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
Telephone: (213) 457-8000
Facsimile: (213) 457-8080
dlopez@reedsmith.com

Jennifer A. Holmes*
NAACP Legal Defense and Educational Fund, Inc.
700 14th Street NW, Suite 600
Washington, DC 20005
Telephone: (202) 682-1300
Facsimile: (202) 682-1312
jholmes@naacpldf.org

Kathryn Sadasivan*
Amir Badat*
Victor Genecin*
Breanna Williams*
NAACP Legal Defense and Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592
ksadasivan@naacpldf.org
abadat@naacpldf.org
vgenecin@naacpldf.org
bwilliams@naacpldf.org

*Admitted *pro hac vice*

***Counsel for Plaintiffs Houston Area Urban League;
Delta Sigma Theta Sorority, Inc.; The Arc of Texas;
and Jeffrey Lamar Clemmons***

/s/ *Nina Perales*
Nina Perales (TX Bar No. 24005046)
Julia R. Longoria (TX Bar No. 24070166)
Fátima L. Menéndez (TX Bar No. 24090260)
Kenneth Parreno (MA BBO No. 705747)
MEXICAN AMERICAN LEGAL DEFENSE AND
EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, TX 78205
Telephone: (210) 224-5476
Facsimile: (210) 224-5382
nperales@maldef.org
jlongoria@maldef.org
fmenendez@maldef.org
kparreno@maldef.org

Michael C. Keats*
Rebecca L. Martin*
Jason S. Kanterman*
Kevin Zhen*
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, New York 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000
michael.keats@friedfrank.com
rebecca.martin@friedfrank.com
jason.kanterman@friedfrank.com
kevin.zhen@friedfrank.com

*Attorneys for Plaintiffs*
**LA UNIÓN DEL PUEBLO ENTERO,
SOUTHWEST VOTER REGISTRATION
EDUCATION PROJECT, MEXICAN
AMERICAN BAR ASSOCIATION OF TEXAS,
TEXAS HISPANICS ORGANIZED FOR
POLITICAL EDUCATION, JOLT ACTION,**

/s/ *Sean Morales-Doyle*
Sean Morales-Doyle (NY Bar No. 5646641)
Patrick A. Berry (NY Bar No. 5723135)
Jasleen K. Singh (CA. Bar No. 316596)
Eliza Sweren-Becker (NY Bar No. 5424403)
Andrew B. Garber (NY Bar No. 5684147)
Leah J. Tulin (MD No. 0812180236)
BRENNAN CENTER FOR JUSTICE AT NYU
SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
Telephone: (646) 292-8310
Facsimile: (212) 463-7308
sean.morales-doyle@nyu.edu
patrick.berry@nyu.edu
jasleen.singh@nyu.edu
eliza.sweren-becker@nyu.edu
andrew.garber@nyu.edu
tulinl@brennan.law.nyu.edu

Paul R. Genender (TX Bar No. 00790758)
Elizabeth Y. Ryan (TX Bar No. 24067758)
Matthew Berde (TX Bar No. 24094379)

Megan Cloud (TX Bar No. 24116207)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-8158
Facsimile: (214)746-7777
paul.genender@weil.com
liz.ryan@weil.com
matt.berde@weil.com
megan.cloud@weil.com

COUNSEL FOR
**FRIENDSHIP-WEST BAPTIST CHURCH,
ANTI-DEFAMATION LEAGUE AUSTIN,
SOUTHWEST, AND TEXOMA, TEXAS
IMPACT, JAMES LEWIN**

*/s/ Christopher McGreal*
CHRISTOPHER MCGREAL, Texas State Bar No.
24051774
LUCIA ROMANO, Texas State Bar No. 24033013
PETER HOFER, Texas State Bar No. 09777275
**DISABILITY RIGHTS TEXAS**
2222 West Braker Lane
Austin, Texas 78758-1024
(512) 454-4816 (phone)
(512) 454-3999 (fax)
lromano@drtx.org
phofer@drtx.org
cmcgreal@drtx.org

Zachary Dolling, Texas Bar No. 24105809
Hani Mirza, Texas Bar No. 24083512
Sarah Chen*, California Bar No. 325327
Veronikah Warms*, Texas Bar No. 24132682
**TEXAS CIVIL RIGHTS PROJECT**
1405 Montopolis Drive
Austin, TX 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)
zachary@texascivilrightsproject.org
hani@texascivilrightsproject.org
schen@texascivilrightsproject.org
veronikah@texascivilrightsproject.org

Thomas Buser-Clancy, Texas Bar No. 24078344
Edgar Saldivar, Texas Bar No. 24038188
Savannah Kumar, Texas Bar No. 24120098
Ashley Harris, Texas Bar No. 24123238
**ACLU FOUNDATION OF TEXAS, INC.**
5225 Katy Freeway, Suite 350
Houston, TX 77007
Telephone: (713) 942-8146
Fax: (915) 642-6752
tbuser-clancy@aclutx.org
esaldivar@aclutx.org
skumar@aclutx.org
aharris@aclutx.org

Adriel I. Cepeda Derieux*
Ari Savitzky*
Sophia Lin Lakin*
Dayton Campbell-Harris
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
125 Broad St., 18th Floor
New York, NY 10004
(212) 284-7334
acepedaderieux@aclu.org
asavitzky@aclu.org
slakin@aclu.org
dcampbell-harris@aclu.org

Susan Mizner*
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
39 Drumm St.
San Francisco, CA 94111
(415) 343-0781 (phone)
smizner@aclu.org

Brian Dimmick*
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**
915 15th St. NW
Washington, DC 20005
(202) 731-2395 (phone)
bdimmick@aclu.org

Jerry Vattamala*
Susana Lorenzo-Giguere*
Patrick Stegemoeller*
**ASIAN AMERICAN LEGAL DEFENSE AND
EDUCATION FUND**
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932 (phone)
(212) 966 4303 (fax)
jvattamala@aaldef.org
slorenzo-giguere@aaldef.org
pstegemoeller@aaldef.org

Jessica Ring Amunson*
Alyssa G. Bernstein*
**JENNER & BLOCK LLP**
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com
abernstein@jenner.com

Gregory D. Washington*
**JENNER & BLOCK LLP**
455 Market St. Suite 2100
San Francisco, CA 94105
gwashington@jenner.com

***COUNSEL FOR OCA-GREATER HOUSTON
PLAINTIFFS.***

*admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2023, I electronically filed the foregoing with the Clerk of  Court using the CM/ECF system, which will send notification of this filing to all counsel of record.

*/s/ Sarah Cummings Stewart*
Sarah Cummings Stewart