**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., <br> *Plaintiffs*, <br><br> v. <br><br> GREGORY W. ABBOTT, et al., <br> *Defendants*. | 5:21-cv-0844-XR |
| OCA-GREATER HOUSTON, et al., <br> *Plaintiffs*, <br><br> v. <br><br> TEXAS SECRETARY OF STATE JOHN SCOTT, et al., <br> *Defendants*. | 1:21-cv-0780-XR |
| HOUSTON AREA URBAN LEAGUE, et al., <br> *Plaintiffs*, <br><br> v. <br><br> GREGORY WAYNE ABBOTT, et al., <br> *Defendants*. | 5:21-cv-0848-XR |

**TABLE OF CONTENTS TO EXHIBITS IN SUPPORT OF PLAINTIFFS' RESPONSE
AND MEMORANDUM IN OPPOSITION TO STATE DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND PORTIONS OF DISTRICT ATTORNEY OGG'S
MOTION FOR SUMMARY JUDGMENT ON ADA AND REHABILITATION ACT
CLAIMS**

| Exhibit | Title |
|---|---|
| 1 | Article: Nearly 25,000 mail ballots were rejected in Texas primaries, fueled by confusion over new restrictions, Houston Chronicle, April 6, 2022 |
| 2 | Expert Report of Professor Douglas L. Kruse, Ph.D., February 28, 2022 |
| 3 | Declaration of Dr. Kara Ayers |
| 4 | Expert Report of Dr. Kara Ayers |
| 5 | Testimony to the Senate Affairs Committee Against SB1, August 9, 2021 [TXLEG_0002408] |

| 6 | *SB 1 Makes It Difficult for Texans with Disabilities to Vote*, *Hearing Before the Senate State Affairs Committee*, 2nd Special Session (2021) (written statement of Alex Cogan, Manager of Pub. Policy & Advocacy, The Arc of Tex.) [TXLEEG_0000747] |
|---|---|
| 7 | Testimony of Patty Ducayet |
| 8 | Testimony of Anne Robinson |
| 9 | Rep. Bucy comments from April 1, 2023, House Elections Committee Hearing |
| 10 | Declaration of Terri Saltzman, dated May 2023 |
| 11 | Declaration of Yvonne Iglesias, dated May 12, 2023 |
| 12 | Dr. Kara Ayers Deposition Excerpts. May 10, 2022 |
| 13 | Supplemental Declaration of Anne Scott, dated June 18, 2023 |
| 14 | Supplemental Declaration of Taylor Scott, dated June 18, 2023 |
| 15 | Declaration of Jennifer Miller, dated June 20, 2023 |
| 16 | Declaration of Amy Litzinger, dated June 21, 2023 |
| 17 | Declaration of Yolanda Ross, dated June 22, 2023 |
| 18 | Declaration of Heisha Freeman, dated June 22, 2023 |
| 19 | Declaration of Marc Spier, dated June 23, 2023 |
| 20 | Declaration of Jodi Lydia Nunez Landry, dated June 22, 2023 |
| 21 | Declaration of Laura Halvorson, dated May 24, 2023 |
| 22 | Declaration of Jennifer Martinez, dates June 20, 2023 |
| 23 | Supplemental Declaration of Bob Kafka, dated June 16, 2023 |
| 24 | Help America Vote Act (HAVA) information page from Texas Secretary of State, dated January 2022 |
| 25 | Help America Vote Act (HAVA) Update, Texas Association of Counties, Legislative Conference, dated August 27, 2020 |
| 26 | Letter from Ruth R. Hughs, Texas Secretary of State, to Mona Harrington, Acting Exec. Dir., U.S. Election Assistance Commission, dated May 14, 2020 |
| 27 | Bob Kafka Deposition Excerpts, April 7, 2022 |
| 28 | Toby Cole Deposition Excerpts, June 28, 2022 |
| 29 | Teri Saltzman Deposition Excerpts, July 15, 2022 |
| 30 | Alice Penrod Deposition Excerpts, April 27, 2023 |
| 31 | Nancy Crowther Deposition Excerpts, June 17, 2022 |
| 32 | Yvonne Iglesias Deposition Excerpts, April 17, 2023 |

| 33 | Dallas County 30(b)(6) Tacoma Phillips Deposition Excerpts, April 13, 2023 |
| 34 | Isabel Longoria Deposition Excerpts, Afternoon April 20, 2022 |
| 35 | Catherine Cranston Deposition Excerpts, June 23, 2022 |
| 36 | Jacquelyn Callanen Deposition Excerpts, April 20, 2022 |
| 37 | Rachelle Obakozuwa Deposition Excerpts, March 21, 2023 |
| 38 | Expert Report of Daniel A. Smith, Ph.D., dated April 29, 2022 |
| 39 | Dallas County 30(b)(6) Michael Scarpello Deposition Excerpts, April 13, 2023 |
| 40 | Jennifer Colvin Deposition Excerpts, March 21, 2023 |
| 41 | Brian Keith Ingram Deposition Excerpts, May 6, 2022 |
| 42 | Brian Keith Ingram Deposition Excerpts, April 26, 2022 |
| 43 | Lauren Smith Deposition Excerpts, March 21, 2023 |
| 44 | Dan Hayes Deposition Excerpts, March 29, 2023 |
| 45 | Michael Scarpello Deposition Excerpts, May 4, 2022 |
| 46 | Isabel Longoria Deposition Excerpts, Morning April 20, 2022 |
| 47 | Lisa Wise Deposition Excerpts, April 13, 2022 |
| 48 | Dallas County Elections Department webpage |
| 49 | Harris County Elections Administrator's Office webpage |
| 50 | Bexar County Elections Department webpage |
| 51 | Travis County Voters with Disabilities webpage |
| 52 | El Paso County Voters with Special Needs webpage |
| 53 | Hidalgo County Voters with Special Needs webpage |
| 54 | Expert Report of Daniel A. Smith, Ph.D., dated April 22, 2023 |
| 55 | Declaration of Nancy Crowther, dated June 21, 2023 |
| 56 | Harris County Commissioners Court Video webpage |
| 57 | Harris County Sheriff's Office Victim Advocates Award 2019-V3-GX-0134 |
| 58 | Grant Summary to Harris County webpage |
| 59 | Juanita Valdez-Cox Deposition Excerpts, March 4, 2022 |
| 60 | Article: More than 12% of mail-in ballots were rejected in Texas under new GOP voting rules, final tally shows, Houston Chronicle, April 6, 2022 |
| 61 | Pamela Gaskin Deposition Excerpts, June 29, 2022 |
| 62 | Alice Penrod Deposition Excerpts |

| 63 | Tania Chavez Deposition Excerpts, June 15, 2023 |
|----|--------------------------------------------------|
| 64 | Brian Keith Ingram Deposition Excerpts, March 28, 2023 |
| 65 | Taylor Scott Deposition Excerpt, April 18, 2023 |
| 66 | Sadia Tirmizi Deposition Excerpt, May 8, 2023 |

# EXHIBIT 1

Case 5:21-cv-00844-XR Document 642-2 Filed 06/20/23 Page 6 of 785



☰ HOUSTON ★ CHRONICLE

Subscribe | Sign In

**Most Popular**

| | | | | |
|---|---|---|---|---|
| **1.** Texas teacher spends night in jail after entering HISD meeting  | **2.** Houston weather: Unrelenting heat continues earlier than normal  | **3.** Houston Astros worker's missing World Series ring found  | **4.** What data tells us about the 29 HISD schools targeted for reforms  | **5.** International Asian chains flock to Chinatown, Katy Asian Town |

**POLITICS**

## Nearly 25,000 mail ballots were rejected in Texas primaries, fueled by confusion over new restrictions

 **Taylor Goldenstein, Austin Bureau**
Updated: April 6, 2022 6:24 p.m.

   | 



Pam Gaskin talks about her mail ballot at her home Monday, Jan. 31, 2022 in Missouri City. She advises people to fill out all the blanks even if it say one needs to be provided. She finally received her mail ballot today after multiple requests were rejected earlier this year.

Melissa Phillip, Houston Chronicle / Staff photographer

Northwest Houston resident Donna Hackemack Bryant thought she had done her due diligence when she voted by mail in last month's Democratic primary election. She even checked her status on the Harris Votes website, which said the ballot had been received.

But Bryant, who is 70 and the president of the Cy-Fair Area Democrats, received a letter last week notifying her that her vote never counted. She'd forgotten to include an ID number, a new Republican-backed requirement that tripped up many Texas voters and led to unusually high rejection rates statewide.

Bryant was one of nearly 25,000 voters whose ballots were rejected during the March 2022 primary, new data shows.

Case 5:21-cv-00844-XR Document 642-2 Filed 06/20/23 Page 7 of 785

"I was highly incensed, and that's putting it without expletives," Bryant said. "A lot of the candidates I voted for didn't make it. I'm wondering: How many of those rejected ballots did it mean would have voted for those same people like I did?"

The overall rejection rate was 12.4 percent statewide, with a slightly more pronounced rate in Democratic primaries, at 12.9 percent compared to 11.8 percent of Republican ballots, according to figures released Wednesday by the Texas Secretary of State. More than 3 million ballots were cast in this year's primary – about 2 million on the Republican side and 1 million on the Democratic side.

## Texas' largest counties by rejection rate

According to data from the secretary of state's office, these are the state's 10 largest counties ranked by their rejection rates of mail ballots submitted for the March 1 primary election.

Bexar County: 22%

**SEE MORE** ⌄

By comparison, Texas rejected just under 1 percent of mail ballots in the November 2020 election in which more than 11 million people voted, according to federal data. Sam Taylor, a spokesman for the secretary of state, said the 2020 data is based on self-reporting from Texas counties, and the office hasn't verified its accuracy.

The data released Wednesday did not specify how many Texas voters ended up voting in person after receiving notice a mail-ballot had been rejected.

**MAIL BALLOT DO-OVERS:** Texas woman recounts her mail ballot hassle: 3 forms, 28 days, lots of guesswork

Local election officials say the problem stems from the new requirement that absentee voters include either a driver's license number or the last four digits of the voter's Social Security number on the ballot. The number submitted by voters often did not match what the county had on file or they forgot to provide a number altogether, requiring them to hustle to correct their applications in time for their ballots to be counted.

Texas Democrats and voting rights advocates on Wednesday denounced the unusually high rejection rate as unacceptable.

"A 12-factor jump in the number of votes by mail rejected from 2020 is absolutely disastrous, and this new ID requirement was totally unnecessary," said James Slattery, a senior state attorney at the Texas Civil Rights Project. "It does nothing to make our elections more secure and now we know the primary effect on Texas elections was just to desenfranchise voters on a massive scale."

State Rep. Jessica González, vice-chair of the House elections committee, said the figures released Wednesday confirmed her fears prior to the bill's passage.

"Democrats warned in committee and on the House Floor that new SB1 requirements would disenfranchise voters," González said in a tweet. "Now we are seeing it in action."

Republican lawmakers who supported the legislation have said voters' troubles are part of a normal learning curve that will eventually improve over time with education.

Case 5:21-cv-00844-XR   Document 642-2   Filed 06/20/23   Page 8 of 785

Sen. Paul Bettencourt, a Houston Republican who helped craft the voting bill, said his office is checking in with county election offices to figure out why some fared better than others. He is also looking to get more data on how many people were still able to vote, either by canceling their mail ballot and voting in person, or by voting provisionally in person.

"What I know for sure is we've got an application rejection rate of 3.35 percent (statewide), and now we've got this 12 percent number," Bettencourt said. "So I'm spending my time understanding why is there a difference between the two of that magnitude.

Harris and Bexar counties' rejection rates were among the highest of large counties. In San Antonio's Bexar County, about 22 percent of more than 18,000 mail ballots were rejected.

The nearly 7,000 ballots rejected in Harris County far exceeded the 135 mail ballots rejected during the 2018 primary.

Of more than 7,700 mail ballots flagged there due to confusion over new ID requirements," less than 11 percent of voters resubmitted ID information and got their ballots corrected, officials said. This came despite efforts by Harris County that included sending letters instructing them how to correct their ballots and doubling the number of staff assigned to help handle voter questions.

**TEXAS TAKE:** Get the latest news on Texas politics sent directly to your inbox every weekday

Slattery said the effects of a rejection should not be underestimated.

"I think we underappreciate how damaging the message is to voters when they have their ballot or application rejected wrongly," he said. "For many voters who go through this, the clear message is the government doesnt want to hear your voice, and it's not interested in helping you participate in the democratic process."

The secretary of state's office says it plans to make the ID field stand out more by putting bold red lines around it on ballots going forward. The office launched its "VoteReady" education campaign on Feb. 7 with radio, digital, billboards and grassroots advertising and plans to continue that through the runup to the general election in November.

Taylor said the office received $500,000 less this year from the Legislature to educate voters about voter ID requirements.

Bryant, who suffers from back, hip and knee pain and has voted by mail the last three years, said she won't go back to absentee voting again in the next election.

"I will drag myself to the nearest polling place rather than risk the mail ballot process again," she said. "I don't want to do this again. I don't think I trust the process."

## Sign up for the Texas Take newsletter

Get in-depth political news and analysis from a source you can trust

**Email**

| | |
|---|---|
| | **SIGN UP** |

By signing up, you agree to our Terms of use and acknowledge that your information will be used as described in our Privacy Policy.

 Written By
**Taylor Goldenstein**

Reach Taylor on 

Taylor Goldenstein is a state bureau reporter covering the Attorney General and federal courts among other topics. She's previously written for the Austin-American Statesman, Los Angeles Times, Chicago Tribune and Tampa Bay Times. She hails from the suburbs of Chicago and earned her

undergraduate degree from the University of Illinois at Urbana-Champaign. In 2014, she was a visiting fellow at the Nieman Foundation for Journalism at Harvard University.

---

**VIEW COMMENTS**



### 2023 Texas Bill Tracker: Bills to watch

**HB20**
**Civilian border patrol**
Would create a civilian patrol unit to detain people crossing the Mexican border illegally. It would also create a felony trespassing charge aimed at blocking asylum claims of migrants who cross illegally.
Show reporter comment

AUTHORS
Matt Schaefer [R]
and 55 more

STATUS

| House | | Senate |
|---|---|---|
| Under Consideration | | Under Consideration |
| Passed | | Passed |
| | Governor's Desk | |

**Read more**

**HB5**
**Chapter 313 revival**
Would revive the state's largest corporate tax breaks and, for the first time, exclude renewable energy projects from being eligible.
Show reporter comment

AUTHORS
Todd Hunter [R]
and 81 more

STATUS

| House | | Senate |
|---|---|---|
| Under Consideration ✓ | | Under Consideration |
| Passed ✓ | | Passed |
| | Governor's Desk | |

**Read more**

**SB124**
**Pregnancy Medicaid ex**
Expands postpartum M
after pregnancy.
Show reporter comm

AUTHORS
Carol Alvarado [D]
and 7 more

STATUS

| House |
|---|
| Under Consideration |
| Passed |



See all bills

---

**CRIME**

## Quiz: How much do you know about Texas gun violence?

It is becoming impossible to ignore the growing impact of guns in Texas. See how much you know about gun crime in the state with this quiz.

BY JORDAN RAY-HART, ERIC DEXHEIMER

---

**EDITOR'S PICKS**

Case 5:21-cv-00844-XR  Document 642-2  Filed 06/23/23  Page 10 of 785



**Pioneering Houston leukemia doctor helps patients avoid chemo**

**The Chronicle 100: Houston's top companies, auto models & more**



**International Asian chains flock to Chinatown, Katy Asian Town**

**Another house in Houston's Freedmen's Town needs saving**



**HOUSTON ★ CHRONICLE**

TOP ∧

**ABOUT**

Our Company                          Interest Based Ads

Newspaper Delivery Safety Procedures  Terms of Use

Privacy Notice                        Advertising

Your California Privacy Rights        Careers

**CONTACT**

Subscribe                             Newsroom Contacts

e-Edition                             Our Use of AI

Archives                              Ethics Policy

Customer Service                      Corporate Subscriptions

Frequently Asked Questions

HEARST newspapers
©2023 Hearst Newspapers, LLC

# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., *Plaintiffs,* | |
| v. | 5:21-cv-0844-XR |
| GREGORY W. ABBOTT, et al., *Defendants.* | |
| OCA-GREATER HOUSTON, et al., *Plaintiffs,* | |
| v. | 1:21-cv-0780-XR |
| TEXAS SECRETARY OF STATE JOHN SCOTT, et al., *Defendants.* | |
| HOUSTON JUSTICE, et al., *Plaintiffs,* | |
| v. | 5:21-cv-0848-XR |
| GREGORY WAYNE ABBOTT, et al., *Defendants.* | |
| LULAC TEXAS, et al., *Plaintiffs,* | |
| v. | 1:21-cv-0786-XR |
| JOHN SCOTT, et al., *Defendants.* | |
| MI FAMILIA VOTA, et al., *Plaintiffs,* | |
| v. | 5:21-cv-0920-XR |
| GREG ABBOTT, et al., *Defendants.* | |

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>                              *Plaintiff*,<br><br>        v.<br><br>STATE OF TEXAS, et al.,<br>                              *Defendants*. | 5:21-cv-1085-XR |

<u>**Expert Report of Professor Douglas L. Kruse, Ph.D.**</u>

**Distinguished Professor**
**Rutgers School of Management and Labor Relations**
**Co-Director, Program for Disability Research**
**94 Rockafeller Road**
**New Brunswick, N.J. 08903**

On Behalf of Plaintiffs in *La Unión Del Pueblo Entero, et. al. v. Abbott, et al.; Houston Area Urban League, et al. v. Abbott, et al.; and OCA-Greater Houston, et al. v. Esparza, et al*., Case No. 5:21-cv-844(XR)

February 28, 2022

## Declaration of Professor Douglas L. Kruse, Ph.D.

I, Douglas Kruse, do hereby declare as follows:

I have been retained to act as an expert witness for the Plaintiffs in the above-captioned action.

Attached hereto as Exhibit A is a true and accurate copy of my February 28, 2022 Report in support of Plaintiffs' case, and the exhibits attached thereto (collectively, my "report").

My report describes the primary data and other information I considered in forming my opinions.

My CV is attached as Appendix A to my report, and sets forth my qualifications and all publications I have authored in the past 10 years.

Within the last four years, I have not provided reports as an expert witness or court monitor in any cases.

I am compensated for work on my report at a rate of $200 per hour.

I respectfully adopt and incorporate into this Declaration my report, which describes the testimony I am offering in support of Plaintiffs' case.

I understand and intend that my report is to be presented to the Court with the same weight and consequences as if I had stated the report orally, under oath, in a court of law. I declare under penalty of perjury that the foregoing is true and correct.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

I am aware that discovery in this case is ongoing, and I reserve the right to continue to supplement the foregoing report in light of additional facts, testimony, and/or materials that may come to light.

Executed this February 28, 2022, in Mercer County, New Jersey.

Douglas L. Kruse, Ph.D.

Report on Texas voting lawsuit
February 28, 2022

# PURPOSE OF ENGAGEMENT

**1.**　　I have been retained by Plaintiffs in *La Union Del Pueblo Entero, et al. v. Abbott, et al.; Houston Area Urban League, et al. v. Abbott, et al.*; and *OCA-Greater Houston, et al. v. Esparza, et al*., Consolidated Case No. 5:21-cv-844 (W.D. Tex.) to provide my expert opinions on issues related to the ways in which SB 1 erects barriers that harm voters with disabilities by impeding their access to voting in the State of Texas.

# QUALIFICATIONS

**2.**　　I am currently a Distinguished Professor in the School of Management and Labor Relations at Rutgers University.  I have been a Research Associate at the National Bureau of Economic Research in Cambridge, Massachusetts since 1995, and a Research Fellow at the IZA Institute of Labor Economics in Bonn, Germany since 2016.  In 2013-14, I served as a Senior Economist at the Council of Economic Advisers in the Executive Office of the President in Washington, D.C.

**3.**　　I received my Bachelor's Degree in Economics from Harvard University in 1981, my Master's Degree in Economics and Certification in Public Policy Analysis and Program Evaluation from the University of Nebraska-Lincoln in 1983, and my Ph.D. in Economics from Harvard University in 1988.

**4.**　　At Rutgers I am Co-Director of the Program for Disability Research, and am Associate Director of the Institute for the Study of Employee Ownership and Profit Sharing.  I have also served as our school's Associate Dean of Academic Affairs, and as Ph.D. Director where I oversaw Ph.D. students in their coursework, exams, and dissertations.

**5.**　　My research focuses on two areas: 1) economic, social, and political inclusion of people with disabilities, with a focus on the relationship of disability to employment and political participation, and 2) the causes, consequences, and implications of employee ownership and profit sharing plans.

**6.**　　I have authored, co-authored, or edited 14 books, along with 123 journal articles or book chapters, and 22 reports.  The book publishers include Cambridge University Press, University of Chicago Press, and Yale University Press among others.  Four of the books and 40 of the articles and book chapters have been published within the past 10 years.  My research has been cited over 12,000 times according to Google Scholar.

**7.**　　I have substantial expertise on the topic of voting among people with disabilities.  I have been principal investigator (PI) or Co-PI on four grant-funded national post-election surveys on the voting experiences of people with and without disabilities.  Two of these surveys were funded by the U.S. Election Assistance Commission.  Following the release of key results, the data were further analyzed with results published in peer-reviewed journals; one of these articles received a major award from the Western Political Science Association.  In addition to these

4

surveys, I have analyzed U.S. Census microdata after each election since 2008 and co-authored fact sheets with detailed analyses of disability and voter turnout in each election, along with pre-election fact sheets projecting the number of eligible voters with disabilities in 2016 and 2020. The most recent fact sheet analyzing the 2020 election was jointly released with the U.S. Election Assistance Commission.

**8.**     My professional service includes being Associate Editor of the British Journal of Industrial Relations from 2011 to 2021, and Associate Editor of the Journal of Participation and Employee Ownership from 2017 to the present.  My service to society includes being a member of the President's Committee on Employment of People with Disabilities from 1998 to 2000, and a member of the State Rehabilitation Advisory Council, New Jersey Division of Vocational Rehabilitation from 1999 to 2013.

**9.**     I have testified four times before Congress on my economic research.

**10.**     I have been PI or Co-PI on 24 grants with total funding of $16.4 million.  Currently I am PI or Co-PI on four disability-related grants, including two 5-year grants for centers funded by the National Institute on Disability, Independent Living, and Rehabilitation Research in the U.S. Department of Health and Human Services.

# EXECUTIVE SUMMARY

**11.**     The U.S. Department of Justice–charged with enforcing and interpreting the Americans with Disabilities Act (ADA)–has explained:

> Voting is one of our nation's most fundamental rights and a hallmark of our democracy. Yet for too long, many people with disabilities have been excluded from this core aspect of citizenship.  People with intellectual or mental health disabilities have been prevented from voting because of prejudicial assumptions about their capabilities.  People who use wheelchairs or other mobility aids, such as walkers, have been unable to enter the polling place to cast their ballot because there was no ramp.  People who are blind or have low vision could not cast their vote because the ballot was completely inaccessible to them.[1]

**12.**     This report finds that:

**13.**     Voting eligible people with disabilities vote at lower rates than those without disabilities, vote by mail significantly more often than those without disabilities, and experience barriers to voting—both in person and by mail—more frequently than people without disabilities.

**14.**     At least 3 million voting-eligible Texans have disabilities.

**15.**     Voting-eligible citizens in Texas with disabilities face a myriad of barriers in accessing voting stemming from high rates of needing assistance in activities of daily living, higher

---

[1] *The Americans with Disabilities Act and Other Federal Laws Protecting the Rights of Voters with Disabilities*, U.S. DEPARTMENT OF JUSTICE, October 10, 2014, https://www.ada.gov/ada_voting/ada_voting_ta.htm.

likelihood of living alone, lower likelihood of having a vehicle they can drive, other barriers to travel, lower likelihood of internet access, and lower average education levels compared to those without disabilities. Voting-eligible disabled citizens in Texas are more socially isolated which limits their support networks for assistance in voting.  They also must contend with well-documented social stigma that both reflects and reinforces their social isolation and increases the barriers to obtaining necessary resources and assistance in exercising the right to vote.

16.     Only 59.4% of voting-eligible people with disabilities in Texas voted in 2020, compared to 64.5% of those without disabilities.  The 5.1 percentage point gap is well outside the statistical margin of error, so we can be highly confident of a true gap in the population.

17.     Among Texas voters in 2020, 30.2% of people with disabilities and 8.2% of people without disabilities voted using a mail ballot.

18.     While specific data on voting difficulties by disability status are not available in Texas, national data show a high rate of voting difficulties among people with disabilities. In 2020, 21.3% of in-person voters with disabilities either required assistance or had difficulties in voting, which is almost twice the 11.9% rate among voters without disabilities. There was also a disability gap among mail voters, where 14.0% of voters with disabilities either required assistance or had difficulties in voting compared to 3.2% of voters without disabilities.

19.     Based on these findings, and in my expert opinion, several provisions of SB 1 will pose barriers to Texas citizens with disabilities who wish to exercise their right to vote.

20.     Sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12 place restrictions on mail voting for applications and correcting rejected applications that will burden many people with disabilities who find it less difficult to vote by mail due to their disabilities.

21.     Section 6.01 requires any person other than a close relative who simultaneously drives seven or more voters to the polls for curbside voting to complete and sign a form stating their name and address and whether they only provided transportation assistance or also assistance with voting.  This new requirement will create additional barriers for voters with disabilities who rely on group transportation to vote curbside.  Because many people with disabilities face transportation barriers and social isolation, this new requirement will make it harder for some people with disabilities to find people willing to provide transportation assistance.

22.     Section 6.04 adds language to the assistor oath which substantially restricts the types of assistance that can be given, which will burden people with disabilities who, because of their disabilities, need assistance to vote.  There are many types of assistance people with disabilities need that go beyond the assistance permitted by SB 1. Because many people with disabilities will need this assistance, this restriction will interfere with many people's ability to vote.

23.     Sections 6.03 and 6.05 create extra requirements for assistors to document their relationship to the voter and whether they received any compensation or benefit from a candidate, campaign, or political committee. Because people with disabilities are far more likely to use curbside voting and many people with disabilities need voting assistance, this will create an extra barrier to voting for some people with disabilities in finding people willing to provide assistance. It will also increase the likelihood that a voter's ballot will be rejected, either due to a

clerical error because they had inadequate assistance, or a mistake in the documentation of the assistance they did receive.

**24.**     Section 6.06 makes it a crime to compensate (or offer, solicit, receive, or accept compensation for) someone for helping a voter vote by mail. While there is an exception for previously known attendants or caregivers, this section will prohibit people with disabilities from getting assistance from a substantial number of people who they may have routinely turned to, including close friends or neighbors. It will also prohibit people with disabilities from getting assistance from staff or volunteers with community or nonpartisan civic engagement organizations that routinely provide voting support to the disability community.

**25.**     Section 7.04 makes it a crime      to receive any form of compensation or      benefit for collecting another voter's mail ballot. It also criminalizes in-person interaction with a voter about a specific candidate or measure, in the physical presence of a ballot, while receiving any form of compensation or benefit.  This provision will impose barriers on      people with disabilities who require assistance to vote, who live alone and face transportation barriers, and who may benefit from assistance while continuing to vote independently.

**26.**     In sum, in my expert opinion, these provisions of SB 1 will harm a significant number of Texans with disabilities and impose new barriers to them in exercising the right to vote.

# DEFINITION OF DISABILITY

**27.**     The ADA protects all those with a substantial limitation in one or more major life activities. The U.S. Department of Justice has explained:

> The term 'substantially limits' shall be construed  broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA…The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence.[2]

# INTERPRETING THE DATA

**28.**     This report presents an overview of the prevalence and characteristics of people with disabilities, drawing on analysis of six nationally representative surveys.   Three of these surveys are conducted by the U.S. Census Bureau:  the American Community Survey (ACS), the Survey of Income and Program Participation SSA Supplement (SIPP), and the Current Population Survey Voting and Registration Supplement (CPS).[3] The other three surveys are the National

---

[2] *Questions and Answers about the Department of Justice's Notice of Proposed Rulemaking to Implement the Americans with Disabilities Act Amendments Act of 2008*, U.S. DEPARTMENT OF JUSTICE, January 30, 2014, https://www.ada.gov/nprm_adaaa/adaaa-nprm-qa.htm.

[3] *See American Community Survey*, UNITED STATES CENSUS BUREAU, https://www.census.gov/programs-surveys/cps/about/supplemental-surveys.html (last visited 2/28/2022) (the relevant supplemental surveys are the Social Security Administration Supplement and Voter Registration Supplement, in addition to the general survey).

Household Travel Survey (NHTS) conducted by the Federal Highway Administration, the Survey of the Performance of American Elections (SPAE) conducted by the Caltech/MIT Voting Technology Project, and the Disability and Voting Accessibility Survey (DVAS) sponsored by the U.S. Election Assistance Commission and conducted by Rutgers University and SSRS Inc.[4] Each of these surveys has a large sample and uses a combination of methods to obtain information on a wide range of population characteristics. Responding households are chosen randomly, and any differences from known values in the population are corrected using statistical weights in order to ensure the final sample is representative of the population.

29.    I rely on ACS data where the measures are available, because this dataset: i) has a much larger sample size ensuring estimates with smaller margins of error, and ii) is more comprehensive by including residents living in group quarters, unlike the SIPP, CPS, and NHTS. Group quarters are categorized in ACS into either "institutional" settings (nursing homes, mental hospitals, and correctional facilities) or "non-institutional" settings (college dorms, military barracks, group homes, missions, and shelters). As will be explained below, people with disabilities are both significantly more likely than those without disabilities to be living by themselves when living in the community, and are also more likely to be living in institutional group quarters. To the extent that people with disabilities in institutional group quarters have more severe disabilities and face greater barriers, the CPS, SIPP, and NHTS will underreport the disparities faced by people with disabilities overall.

30.    The ACS and CPS have measures of both age and citizenship, so I limit the samples to the voting-eligible population (citizens age 18 or older). The DVAS includes only the voting-eligible population, and the SPAE includes only registered voters. The SIPP and NHTS have age but not citizenship measures, so estimates from those surveys are based on the voting-age population (age 18 or older).

31.    The ACS and CPS measure disability using six questions. Four of the questions measure impairments (vision, hearing, cognitive, and mobility), and two of the questions measure activity limitations (difficulty dressing or bathing, and difficulty going outside alone). These questions were chosen after extensive cognitive research by the Census Bureau, using interviews and focus groups to ascertain how respondents understood and interpreted the survey questions, to maximize the likelihood that answers to the final chosen questions would reflect accurate reporting of disabilities rather than alternative understandings of the questions.[5] SIPP uses a more extensive set of over 100 questions to derive its disability measure. The DVAS measures

---

[4] *National Household Travel Survey, U.S. Department of Transportation*, FEDERAL HIGHWAY ADMINISTRATION, https://nhts.ornl.gov/ (last visited 2/28/2022); *Survey of the Performance of American Elections*, MIT ELECTION LAB, https://electionlab.mit.edu/research/projects/survey-performance-american-elections (last visited 2/28/2022); *U.S. Election Assistance Commission Study on Disability and Voting in the 2020 Elections*, https://www.eac.gov/election-officials/us-election-assistance-commission-study-disability-and-voting-accessibility-2020 (last visited 2/28/2022).

[5] Kristen Miller and Theresa J. Demaio, *Report of Cognitive Research on Proposed ACS Disability Questions*, US CENSUS BUREAU, August 28, 2006, https://www.census.gov/library/working-papers/2006/adrm/ssm2006-06.html.

disability using the six ACS and CPS questions plus a seventh broader question, whereas the NHTS and SPAE each use one general question to measure disability.

**32.**     An important note is that the six questions used by the ACS and CPS are likely to capture only a portion of the full disability population (as defined by the broad ADA definition described above).  One issue is that people might underreport disabling conditions, as found in research comparing subjective reports to objective reports of health conditions.[6]  A second important issue is that measuring disability is made difficult by the wide variation in types of disability (e.g., hearing, vision, mobility, cognitive, developmental, chronic illnesses, and others) and the severity of disabilities (e.g., whether the condition causes a major or mild limitation in life activities).  Asking about all types of disabilities is not feasible in a survey, and due to the wide variation it is inevitable that any set of questions will miss some disabilities.  The six standard Census questions are likely to undercount speech impairments and learning disabilities, as well as mental illnesses such as depression and bipolar disorder.  They may also undercount people with episodic conditions that wax and wane such as epilepsy, Lupus, and Multiple Sclerosis, and conditions like cancer, long-COVID, or back problems that cause pain or fatigue. The Census surveys nonetheless provide a valuable window on a large portion of the disability population.  Because the six questions are likely to undercount certain types of disabilities, I also present results from a more extensive set of disability questions used in a SIPP module in 2014.  These more extensive questions have not been used in any major survey since 2014.  Due to the greater number of questions that cover a broader range of disabilities, the SIPP is likely to be a more comprehensive portrait of the disability population, although it has the drawback that it excludes people in institutional group quarters and does not have a citizenship measure as noted above.

**33.**     In this report I focus on the population of people with disabilities living in Texas.  The ACS has a large sample size of 127,398 for Texas, while the SIPP and CPS have smaller samples of 1,569 and 4,290.  The NHTS has a sample size of 44,040 for Texas.  These sample sizes are more than the standard sample size of 1,000 used to obtain reliable estimates within large populations.  Due to the smaller samples in SIPP and CPS, in several breakdowns I complement the Texas numbers from those surveys with numbers for the overall U.S., plus estimates of the significance of any differences between the U.S. and Texas samples.  The SPAE and DVAS have good samples for national estimates but do not have large enough samples within Texas for meaningful analysis, so I only present national figures from those surveys.

**34.**     In a number of places, I compare results between people with and without disabilities, showing that people with disabilities face economic and social disparities and higher rates of voting difficulties that are linked to lower voter participation.  These disparities are maintained when holding constant the effects of demographic characteristics (race, ethnicity, gender, age, and educational attainment).  The effects of disability may be even greater than indicated by the simple difference between people with and without disabilities, because voters without disabilities may face many other non-disability-related difficulties, such as language barriers.

**35.**     All estimates presented in this report use survey weights to ensure the sample is representative of the disability population on key characteristics.  Due to the pandemic possibly

---

[6] Michael Baker, Mark Stabile, and Catherine Deri, *What do self-reported, objective, measures of health measure?*, 39 J. HUMAN RESOURCES 1067 (2004).

affecting survey responses, the Census Bureau issued the 2020 ACS data with experimental weights, which I use in this report.  To ensure the results did not change substantially due to the pandemic, I have also made comparisons to the 2019 ACS data.  The results of this comparison (not reported here but available on request) are very similar on all key variables between 2019 and 2020.

**36.**     In short, the Census surveys do a reasonable job of providing a portrait of a large portion of the disability population, and are extensively used by scholars in peer-reviewed research on the status of people with disabilities.  To the extent that they undercount people with disabilities, they will undercount the number of people who face disability-related disparities and challenges in voting and other important activities.

# OVERVIEW: PREVALENCE AND GENERAL CHARACTERISTICS OF PEOPLE WITH DISABILITIES AND IMPLICATIONS FOR VOTING ACCESS

## Summary

**37.**     In order to fully understand the extensive barriers people with disabilities face in accessing their fundamental right to vote, it is critical to provide an overview of the general barriers people with disabilities face in their daily lives and how each of these factors can impact access to voting. People with disabilities are likely to face a myriad of barriers in exercising the right to vote.  These barriers can stem from a number of disability-related issues, including the need for assistance in activities of daily living, increased likelihood of living alone, lower likelihood of having a vehicle one can drive, other barriers to traveling, lower likelihood of internet access, and lower levels of education.  In addition, the lower economic status of people with disabilities, reflected in lower incomes and higher poverty rates, creates challenges in exercising the right to vote.  For example, people with disabilities are less likely to have the money to buy computers or own their own vehicles, making it harder to access information or get to election offices and polling sites. The social stigma many people with disabilities experience further compounds the difficulties they face in accessing voting.

## Overall Prevalence and Types of Disability

**38.**     Both ACS and SIPP data can be used to provide estimates of the number of people with disabilities in Texas. The ACS uses only 6 questions so is a more conservative estimate, while the SIPP disability measure is based on over 100 questions and is a more expansive estimate. Based on the 2020 ACS 6-question measure, Table 1 shows that 15.6% of voting-eligible people in Texas have disabilities, representing 3 million people. Based on the SIPP survey's more extensive set of disability questions, 30.5% of voting-age people in Texas have disabilities, representing 5.6 million people when applied to 2020 population numbers.[7]  The range of 3 to

---

[7] The 5.6 million figure assumes that the proportion of adults with disabilities in Texas using the SIPP measure did not change between 2014 and 2020, and that among all Texans with

5.6 million people reflects differences in whether disability is measured more narrowly or broadly.  Two important points about this range are:  1) both numbers indicate that a substantial portion of Texans have disabilities; and 2) when the narrower ACS measure is used, this is likely to result in conservative estimates of the number of people who face disability-related disparities.

**39.**     Whether one uses the narrower or broader measure, disability prevalence is projected to grow as the overall population ages in the next few decades.[8]

**40.**     As shown in Table 1, a breakdown of ACS data by disability type shows that the Texas population of citizens with disabilities includes (the categories may overlap):

- 1,604,700 people with mobility impairments,

- 1,082,500 with cognitive impairments,

- 875,900 with hearing impairments,

-  638,500 with vision impairments,

- 596,300 with difficulty dressing or bathing, and

- 1,127,500 with difficulty going outside alone due to a physical or mental condition.

**41.**     Table 1 also shows the margin of error for each estimate, reflecting the potential for sampling error.  The margin of error of 0.3% around the disability prevalence estimate of 15.6% means that there is a 95% probability that the true population value lies within plus or minus 0.3% of the estimate, or between 15.3% and 15.9%.

**42.**     These numbers are very similar to those from before the onset of the pandemic in 2020.  In 2019, the ACS data indicate that 15.6% of the Texas adult citizen population and 16.4% of the U.S. adult citizen populations had disabilities.

**43.**     The SIPP survey provides a more detailed look at variation in disabling conditions in Texas.  As shown in Table 2, more than 10% of the Texas population has difficulty with physical activities of walking, climbing stairs, lifting, standing, pushing or pulling, and crouching.  More than one-eighth (13.4%) have difficulty with one or more basic activities of daily living such as getting into a bed or chair, taking a bath or shower, eating, preparing meals, or using a telephone.  Applied to 2020 Texas population figures, 2.4 million Texans have difficulty with one or more

---

disabilities age 18 or older, the percent who are eligible citizens matches the percent in the 2020 ACS (93.9%).

[8] *Ageing and Disability*, UNITED NATIONS DEPARTMENT OF ECONOMIC AND SOCIAL AFFAIRS, last visited 2/28/2022, https://www.un.org/development/desa/disabilities/disability-and-ageing.html#:~:text=Currently%2C%20it%20is%20estimated%20that,experience%20moderate%20to%20severe%20disability.

activities of daily living.  The abilities needed for several of these activities are also needed in the act of voting, both in person and by mail.

**Demographic Characteristics**

**44.**     The prevalence of disability in Texas is markedly higher among Native Americans, Black people, older people, and those with lower levels of education.  The 2020 ACS data in Table 3 show that:

- Black people (17.9%) and Native Americans (17.8%) are more likely to have disabilities, compared to white non-Hispanic (16.3%) people. While the overall rate of disability (14.2%) is lower among Hispanic/Latinx citizens than among non-Hispanic/Latinx citizens overall, this is largely due to their younger average age that is linked to lower disability rates.  When broken down by age group, the rate of disability is significantly higher among Hispanic/Latinx citizens in every age group except for the youngest (18-34).[9]  As a consequence, Hispanic/Latinx citizens are likely to face disparities linked both to disability and to their Hispanic/Latinx heritage.  Similarly, the higher rates of disability among Black citizens means that they are likely to face disparities linked both to disability and to race.

- The disability rate climbs strongly with age, from 7.7% among those aged 18-34 to 70.3% among those aged 85 or older.

- The disability rate declines strongly as the rate of education rises, from 28.1% among those without a high school degree to 9.4% among those with a graduate degree.

**45.**     The relationship between education and disability reflects causality in both directions.  Disability can limit education due to barriers that people with disabilities often encounter in furthering their education, such as lack of a correct diagnosis or appropriate accommodations, especially for poorer children.  Education also has an impact on disability: it can open up jobs with safer working conditions that are less likely to lead to disability, and provide higher incomes that increase access to health services and assistive technology that help people cope with potentially disabling conditions.

**46.**     The estimated total number of voting-eligible people with disabilities in Texas is 1,551,800 among women, 1,472,400 among men, 1,533,400 among white non-Hispanic/Latinx people, 428,300 among Black non-Hispanic/Latinx people, and 881,800 among Hispanic/Latinx people.  Compared to pre-pandemic 2019 data, the percentages and numbers of people with disabilities in Texas are very similar between 2019 and 2020.

**Economic Status**

---

[9] The rates of disability for Hispanic/Latinx compared to white non-Hispanic people are 6.9% compared to 8.0% among those age 18-34, 9.9% compared to 8.2% among those age 35-49, 18.8% compared to 14.9% among those age 50-64, and 42.5% compared to 35.0% among those age 65 or older.

**47.**     People with disabilities in Texas have very low employment rates and high poverty rates. As shown in Table 4, only 40.1% of working-age (18-34) Texans with disabilities were employed in 2020, which is just over half the rate of people without disabilities (74.2%).  Among all ages, people with disabilities were almost twice as likely to live in poverty (18.0% compared to 9.2%).  They were also much more likely to receive income from Social Security (47.4% compared to 13.3%), reflecting both disability and retirement income provided through Social Security.  In part due to their low incomes, 20.3%  receive public assistance income or food stamps, and 26.5% receive health care coverage through Medicaid or another low-income plan, compared to 10.3% and 6.1% (respectively) of people without disabilities.  Additional breakdowns show that this pattern is very similar between Texas and the U.S. as a whole, and between 2019 and 2020.

**<u>Living Situation and Need for Assistance</u>**

**48.**     People with disabilities in Texas are more likely to live alone and be unmarried, and a large portion need assistance with activities of daily living.  From the 2020 ACS data shown in Table 4:

- People with disabilities are significantly more likely than people without disabilities to live alone—that is, not living with others either in the community or in institutional group quarters (20.8% compared to 12.3%).

- They are less likely to be currently married with a spouse present (42.8% compared to 52.4%), and more likely to be separated or divorced (19.4% compared to 12.1%) or widowed (14.4% compared to 3.4%) while not being currently married.

- They are four times more likely than people without disabilities to live in institutional group quarters (4.7% compared to 1.1% are in nursing homes, mental hospitals, or correctional facilities).

**49.**     These patterns of disparities are very similar between Texas and the entire U.S.

**50.**     People with disabilities are also more likely to need assistance with activities of daily living, which are measured only in SIPP.  Because the 2014 SIPP sample has only 566 Texans with disabilities, I also provide numbers for the full U.S. sample of 10,003.  From the data shown in Table 5, close to two-fifths of people with disabilities (41.2% in Texas and 37.4% in the U.S.) need assistance with one or more activities, with especially high rates for going outside of the home for errands (25.5% in Texas), accessing the Internet (15.2%), doing light housework (13.7%), keeping track of money (12.0%), and preparing meals (11.0%).

**51.**     Applied to the 2020 Texas population, this indicates that close to 2.3 million Texas citizens age 18 or older need assistance with one or more daily activities.

**52.**     Because a large number of people with disabilities live alone, many who need assistance must rely on non-household members.  Over one-third (34.9%, or an estimated 1.9 million in 2020) of Texans with disabilities receive assistance in daily activities from family members, 4.0% (220,000) from friends or neighbors, 4.0% (220,000) from paid help, 1.4% (79,000) from

partners or companions,  1.4% (78,000) from other non-relatives, with a total of 10.6% (589,000) from any non-relative (these categories overlap as individuals may receive help from more than one person).

**53.**     The above characteristics create greater challenges to voting for many people with disabilities, particularly when they need assistance and find it difficult to arrange such assistance due to their higher likelihood of living alone and greater social isolation.

**<u>Computer and Internet Access</u>**

**54.**     Due in part to their lower average incomes, people with disabilities in Texas are less likely to have internet access.  From the 2020 ACS data shown in Table 6:

- Among Texas citizens with disabilities eligible to vote, 84.5% live in homes with internet access, compared to 95.2% for people without disabilities.

- Translated into absolute numbers, an estimated 460,600 citizens with disabilities who are eligible to vote in Texas live in homes without internet access.

**55.**     These digital gaps also show up when looking at individual rather than household access to the internet.  Further data from the Census Bureau's 2019 Current Population Survey Computer and Internet Use Supplement show that:

- People with disabilities in Texas are less likely to use the internet at home (60.1% compared to 78.9% of people without disabilities).

- This gap is not decreased by adding in internet access outside the home.  Considering all forms of internet access, 60.5% of people with disabilities use the internet in any location compared to 82.3% of people without disabilities.

- Translated into absolute numbers, an estimated 823,200 Texas citizens with disabilities do not use the internet either inside or outside the home.

- The disability gaps are not explained by age differences between people with and without disabilities.  While older people are less likely to access the internet, Table 5 shows that large disability gaps exist within each age group.

- While the 2019 survey has a limited sample of Texans with disabilities, the disability gaps in each measure are outside of the margin of error.

**56.**     These disability gaps in computer and internet access can impact the ability of citizens with disabilities to obtain necessary resources for voting.  Not having internet access can make it more difficult to:  a) register to vote; b) find out how and where to vote, particularly if polling places have been changed;  c) gather information on candidates and issues in order to make informed decisions in voting; and d) cure issues with mail-in ballot applications.  These difficulties create special problems when voting information is only provided in an online format.

14

**Transportation**

57.     People with disabilities face transportation barriers.  Based on the 2017 National Household Travel Survey, 1.8 million Texans age 18 or older have travel-limiting disabilities, defined as "a temporary or permanent condition or handicap that makes it difficult to travel outside of the home."  The rate of travel-limiting disability in Texas was 10.0% among those age 18 or older.  Several findings shown in Table 7 are:

- Texans with disabilities were four times more likely to live in zero-vehicle households (14.4% compared to 3.0% of Texans without disabilities).

- Texans with disabilities took fewer average trips per day (2.3 compared to 3.5) and were more likely to take no trips in a day (40.0% compared to 15.8%).

- Texans with disabilities are less likely to be drivers than are those without disabilities (59.6% compared to 93.0%).

- Texans with disabilities were slightly more likely to use public transportation (12.6% compared to 8.8% among  Texans without disabilities).

- Texans with disabilities did not make up for transportation barriers by using ride-hailing services such as taxis or Uber (only 2.6% did so in the past month compared to 8.8% of Texans without disabilities) or by relying on online purchases (only 31.5% did so compared to 54.2% of Texans without disabilities.).

- Over half (53.6%) of Texans with disabilities agreed that travel is a financial burden, compared to only 39.6% of those without disabilities.

58.     These results are supported when employing a broader disability measure using national data.  As also shown in Table 7, the 2020 Disability and Voting Accessibility Survey (DVAS), shows that only 69.6% of people with disabilities can drive their own or a family vehicle, compared to 90.0% of people without disabilities.  People with disabilities were also more likely than those without disabilities to say they faced transportation problems "very often" or "always" (5.6% compared to 2.9%).

59.     Transportation difficulties can have a negative impact on voting as research finds a significantly higher likelihood of voting among those who have a vehicle they can drive.[10]

**Social Isolation, Stigma, and Bias**

60.     The lower employment levels, greater likelihood of living alone, lower internet access, and transportation barriers among people with disabilities documented above all contribute to social isolation.  The greater social isolation of people with disabilities is also evidenced in their

---

[10] Lisa Schur, Todd Shields, Douglas Kruse, & Kay Schriner, *Enabling Democracy: Disability and Voter Turnout.* 55 POLITICAL RESEARCH QUARTERLY 167 (2002).

lower likelihood of socializing with friends, relatives, or neighbors.[11]   This social isolation limits the support network upon which people with disabilities may rely for assistance with fundamental daily activities, including accessing the right to vote.

**61.**     The social isolation is reflected in, and reinforced by, the well-documented stigma attached to disability that continues to be manifested in attitudinal studies of the general population.[12]   These attitudes toward people with disabilities impact all areas of an individual's life.  The stigma attached to disability may impact the perception of a person's abilities that do not align with reality. This can impact the ability of people with disabilities to vote by, for example, making people (particularly those outside of their families) less willing to assist them with voting, and can also result in people with disabilities themselves being less willing to ask for assistance when needed.

# VOTING BARRIERS FACING PEOPLE WITH DISABILITIES

## Voter Participation

**62.**     People with disabilities in Texas and nationwide are less likely to vote than their non-disabled counterparts. Data from the Current Population Survey Voting and Registration Supplement, conducted by the Census Bureau every two years following national elections, show that 71.9% of eligible citizens with disabilities in Texas were registered to vote in 2020, and 59.4% voted, compared to 71.2% and 64.5% of citizens without disabilities respectively.  These numbers show that citizens with disabilities in Texas had a similar registration rate as those without disabilities (within the margin of error), but they were 5.2 points less likely to vote, and the voting gap is outside the margin of error.  In the U.S. as a whole, people with disabilities were 3.0 points less likely to be registered to vote, and 5.7 points less likely to vote, and the larger U.S. sample means that we are at least 99.9% confident that there is a true participation gap in the population.  These figures are provided in Table 8.  Similar disability participation

---

[11] Harris Interactive, *The ADA: 20 Years Later*, KESSLER FOUNDATION AND THE NATIONAL ORGANIZATION ON DISABILITY at 15-16, July 2010, http://www.advancingstates.org/hcbs/article/ada-20-years-later-2010-survey-americans-disabilities.

[12] Fatima Jackson-Best and Nancy Edwards, *Stigma and intersectionality: a systematic review of systematic reviews across HIV/AIDS, mental illness, and physical disability*, 18 BMC PUBLIC HEALTH 919 (2018); Barbara Muzzatti, *Attitudes towards disability: beliefs, emotive reactions, and behaviors by non disabled persons*, 35 GIORNALE ITALIANO DI PSICOLOGIA 313 (2008); Katarina Scior, *Public awareness, attitudes and beliefs regarding intellectual disability:  A systematic review*, 32 RESEARCH IN DEVELOPMENTAL DISABILITIES 2164 (2011); Denise Thompson, Karen Fisher, Christiane Purcal, Chris Deeming, and Pooja Sawrikar, *Community attitudes to people with disability: Scoping project No. 39.*, DISABILITY STUDIES AND RESEARCH CENTRE, UNIVERSITY OF NEW SOUTH WALES (2011); Harold Yuker, *Attitudes toward Persons with Disabilities, Springer* (1st Ed. 1988).

gaps at the national level are found in all of the 13 studies going back to the 1992 elections, which use differing samples and definitions of disability.[13]

**63.**     In both the Texas and overall U.S. samples, the disability voting gap is larger than the disability registration gap, indicating that lower voting among people with disabilities cannot be explained by lower registration rates.

**64.**     The importance of variation across different types of disability is shown in the voting figures.  Broken down by type of disability, national voter participation in 2020 was lowest among people with difficulty dressing or bathing (49.4%), cognitive impairments (50.7%), and difficulty going outside alone (51.6%), but participation was also low among those with visual impairments (59.2%) or difficulty walking or climbing stairs (60.4%).  These numbers are drawn from Table 9.

**65.**     Research indicates that several factors contribute to the disability participation gap, including lower levels of education and income, lower feelings of political efficacy among people with disabilities, and greater social isolation that reduces the likelihood of being recruited to vote by friends, neighbors, or colleagues. These factors do not, however, fully explain the disability gap in participation.[14]  Part of the remaining gap in participation can be traced to lower turnout due to prior difficulties in voting.[15]

**66.**     An important note is that voter participation can vary substantially across elections for citizens both with and without disabilities.  An increase in participation in an election among people with disabilities does not necessarily indicate the absence of continued voting barriers that discourage participation.

**Voting method**

**67.**     Each voting method can present access barriers to people with different types of disabilities.  Voting by mail can be an attractive option for people with mobility impairments, transportation problems, or other issues that make it hard to leave one's home.  This is particularly relevant to the 10.0% of Texans who report travel-limiting disabilities as shown in Table 7, and the 8.3% of Texans who have difficulty walking or climbing stairs and 5.8% of Texans who have difficulty going outside alone, as shown in Table 1.  The 3.3% of voting-

---

[13] Summarized in Lisa Schur & Meera Adya, *Sidelined or Mainstreamed? Political Participation and Attitudes of People with Disabilities in the United States*, 93 SOCIAL SCIENCE QUARTERLY 811 (2012).

[14] Lisa Schur, Todd Shields, Douglas Kruse, & Kay Schriner, *Enabling Democracy: Disability and Voter Turnout. 55* POLITICAL RESEARCH QUARTERLY 167 (2002); Lisa Schur, Todd Shields, & Kay Schriner, *Generational cohorts, group membership, and political participation by people with disabilities,* 58 POLITICAL RESEARCH QUARTERLY 487 (2005); and Lisa Schur & Meera Adya, *Sidelined or Mainstreamed? Political Participation and Attitudes of People with Disabilities in the United States,* 93 SOCIAL SCIENCE QUARTERLY 811 (2012).

[15] Lisa Schur, Mason Ameri, and Meera Adya, *Disability, Voter Turnout, and Polling Place Accessibility*, 98 SOCIAL SCIENCE QUARTERLY 1374 (2017).

eligible Texans with vision impairments, however, may not be able to vote independently with a mail ballot, and may need polling places where they can vote independently with an accessible machine required by the 2002 Help America Vote Act (HAVA).

**68.** Overall, people with disabilities are much more likely to vote by mail. Among Texas voters in 2020, 30.2% of people with disabilities and 8.2% of people without disabilities voted using a mail ballot, producing a gap of 22.0%, as shown in Table 8. Voting by mail was less likely in Texas than in the entire U.S. for people both with and without disabilities, but the disability gap was larger. The percentages of people with and without disabilities who voted by mail in the full U.S. were 53.2% and 41.9% respectively, producing a gap of 11.3%. The rate of voting by mail is high across all of the major disability types, as shown in Table 9. For many people with mobility restrictions, transportation barriers, and difficulty standing in long lines, voting by mail is effectively the only option they have to vote.

**69.** Voting by mail increased in 2020 due to the pandemic. Differences by disability status, however, existed before the pandemic. In the 2016 general election, Texas voters with disabilities were more than three times as likely as voters without disabilities to vote by mail (19.8% compared to 6.0%).

**Barriers to In-Person Voting**

**70.** As noted above, the disability gap in voter participation is not fully explained by standard predictors of participation. Voting barriers appear to play a role, as voter participation is lower when voting is more time-consuming and difficult. People with disabilities can face extra barriers in:

- Finding or getting to the polling place, particularly for those facing transportation barriers as described above.

- Getting inside the polling place, particularly for those in wheelchairs or with visual impairments.

- Standing in line, particularly for those with chronic illnesses or health conditions that limit their endurance.

- Being prevented from voting by poll workers, particularly for those who appear to have a cognitive disability.

- Reading or seeing the ballot, particularly for those with cognitive or vision impairments.

- Understanding how to vote or use the equipment, particularly for those with cognitive, vision, or upper arm mobility impairments.

- Communicating with poll workers, particularly for those with hearing, speech, or cognitive impairments.

18

- Writing on the ballot, particularly for those with impairments limiting upper body mobility.

- Physically operating the voting machine, particularly for those with vision impairments or impairments limiting upper body mobility.

**71.**     There is empirical evidence on a number of these factors.  Barriers in finding or getting to polling places have been shown to lower voter participation among people in general.[16] These barriers can be greater for people with disabilities:  one study found substantially lower voter participation among people with mobility limitations in areas with streets in poor condition.[17]

**72.**     Analysis of the nationally representative Survey of the Performance of American Elections (SPAE) conducted following the 2020 elections shows that 1.2% of all registered voters with disabilities said they did not vote because "I tried to vote, but was not allowed to when I tried" compared to 0.3% of people without disabilities.[18]  In addition, 1.4% of registered voters with disabilities in the U.S. reported they did not vote due to long lines at the polls, compared to 0.3% of those without disabilities.   Taken together, these results indicate that a substantial portion of the 5.7 point national disability gap in voter participation (from Table 9) can be accounted for by a greater likelihood that registered voters with disabilities said they were not allowed to vote or were dissuaded by the long lines.

**73.**     In the 2020 DVAS, over one-sixth (18.0%) of people with disabilities who voted at a polling place or election office reported at least one or more barriers, which was almost twice the rate of voters without disabilities (9.8%). The rate of barriers was especially high among those with cognitive impairments (30.0%) and those needing help with daily activities (24.8%).

**74.**     Specific barriers are listed in Table 10.  The most common polling place barriers people with disabilities faced were difficulty waiting in line (7.4% among all polling place voters with disabilities), difficulty reading or seeing the ballot (3.8% ), and getting inside the polling place (3.2%).  These problems were especially likely among those with vision and mobility impairments, and those needing help in daily activities.[19]

---

[16] Henry E. Brady & John E. McNulty, *Turning out to vote: The costs of finding and getting to the polling place*, 105 AMERICAN POLITICAL SCIENCE REVIEW 115 (2011).

[17] Philippa Clarke, Jennifer Ailshire, Els Nieuwenhuijsen, Marijke de Kleijn–de Vrankrijker, *Participation among adults with disability: The role of the urban environment*, 72 SOCIAL SCIENCE & MEDICINE 1674 (2011).

[18] The figures in this paragraph are derived from analysis in *Survey of the Performance of American Elections*, MIT ELECTION DATA + SCIENCE LAB, https://electionlab.mit.edu/research/projects/survey-performance-american-elections, last visited 2/28/2022. The data contain responses from 18,200 people registered to vote. No further information is available on what respondents meant by saying they were "not allowed to vote." This could indicate legal barriers such as having their eligibility challenged, having a mail ballot rejected, not having proper ID, or being at the wrong polling place.

[19] *See* Thad E. Hall & R. Michael Alvarez, *Defining the Barriers to Political Participation for Individuals with Disabilities,* THE INFORMATION TECHNOLOGY AND INNOVATION FOUNDATION,

75.     News reports provide examples from across the country of several of these barriers in voting at polling places:

- Liam Dougherty, who has a progressive muscular disability, has had problems getting inside polling places, waiting in line due to bladder control issues, and having poll workers not know how to lower the machine to reach his wheelchair.[20]

- Elizabeth Clay, who is missing her right leg, has difficulty navigating city streets and getting to her polling place.[21]

- Xian Horn, who has cerebral palsy, found the wheelchair-accessible entrance of her polling place blocked by trash cans.[22]

- Emily Ladau, who has Larsen syndrome which affects bone development, found the accessible entrance to her polling place locked, and had to rely on her father to go in through the main entrance to ask a poll worker to open the door.[23]

- LouAnn Blake, who is blind, found that poll workers did not know how to set up the audio ballot technology at her voting location.[24]

- Kathy Hoell, a wheelchair user with a brain injury, was initially denied permission to vote because poll workers told her she is not "smart enough," and has had poll workers lead her to stairs she could not climb and prevented her from using an accessible voting machine because they had not turned it on.[25]

---

May 14, 2012, https://elections.itif.org/reports/AVTI-001-Hall-Alvarez-2012.pdf (describing problems of polling place access, reading the ballot, and understanding the voting process among focus group participants with disabilities in Los Angeles in 2010).

[20] Michaela Winberg, *'I'm not included here': People with disabilities face barriers to voting in Philly and beyond*, WHYY, October 15, 2020, https://whyy.org/articles/voting-while-disabled-presents-challenges-for-philadelphians/.

[21] *Id.*

[22] Maggie Astor, *'A Failed System': What It's Like to Vote With a Disability During a Pandemic*, NEW YORK TIMES, September 25, 2020.

[23] *Id.*

[24] Jeanine Santucci, *30 years after the ADA, access to voting for people with disabilities is still an issue*, USA TODAY, July 26, 2020.

[25] Matt Vasilogambros, *How Voters With Disabilities Are Blocked From the Ballot Box*, PEW TRUSTS, February 1, 2018, https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2018/02/01/how-voters-with-disabilities-are-blocked-from-the-ballot-box.

76.     In addition, anonymous reports from voters with disabilities collected around the country by a disability organization regarding voter experiences in the 2020 election included[26]:

- "I could not turn on the screen"

- "No headsets were available"

- "Headsets available, did not work"

- "Poll worker did not know how to turn on the audio features"

- "Poll worker did not know how to make the sound louder or softer"

- "I did not know how to 'go back' or change who or what I voted for"

- "Had error message and could not vote"

- "Had to vote in person because I did not get my mail-in or absentee ballot"

- "Could not understand my ballot"

77.     Barriers to polling place access in Texas were identified in settlements since  2015 between the Justice Department and Harris, Nueces, Galveston, and McLennan counties, which included "steep ramps, gaps in sidewalks and walkways, and locked gates along the route barring pedestrian access."[27]

## Barriers to Voting With a Mail Ballot

78.     Potential barriers to voting with a mail ballot include:

- Complicated instructions in applying for a mail ballot

---

[26] *Experience Survey Results: Power of the Disability Vote*, SABE GOVOTER PROJECT, 2021, https://www.sabeusa.org/wp-content/uploads/2021/10/SABE-GoVoter-2020-Survey-Report.pdf.
[27] *Justice Department Reaches Agreement with Harris County, Texas, to Ensure Polling Place Accessibility for Voters with Disabilities*, US DEPARTMENT OF JUSTICE, March 12, 2019, https://www.justice.gov/opa/pr/justice-department-reaches-agreement-harris-county-texas-ensure-polling-place-accessibility; *Settlement Agreement Between the United States of America and Nueces County Texas Under the Americans with Disabilities Act* at §H, https://www.ada.gov/nueces_co_tx_pca/nueces_co_tx_sa.html; *Settlement Agreement Between the United States of America and Galveston County, Texas Under the Americans with Disabilities Act* at Attachment E, available at https://www.ada.gov/galveston_tx_pca/galveston_tx_sa.html; *Settlement Agreement Between the United States of America and McLennan County, Texas Under the Americans with Disabilities Act* at Attachment E, available at: https://www.ada.gov/mclennan_pca/mclennan_sa.html.

- Application requirements to identify as a person with a disability, which many people with significant impairments are reluctant to do due to disability stigma noted above

- The requirement to apply for a mail ballot in every election

- Difficulty reading or seeing the ballot, particularly for people with visual impairments

- Difficulty understanding the ballot or how to fill it out, particularly for people with cognitive or developmental disabilities

- Difficulty filling out the ballot or placing it in an envelope, particularly for people with limited dexterity

- Difficulty taking the ballot to a mailbox, a drop box, or an election office, particularly for people with mobility impairments or difficulty going outside alone

- Postage expense in mailing the ballot in locations where stamps are required to return a ballot

**79.**    In the 2020 DVAS survey, the overall rate of difficulty in voting with a mail ballot was 5.4% among voters with disabilities. The rate was especially high among those with visual impairments (22.1%) who expressed the most difficulties with reading and filling out the ballot, as shown in Table 11.

**80.**    Barriers to voting by mail are exemplified in the following anecdotal cases from across the country:

- Jack Dougherty voted by mail in 2020 after many experiences of barriers to voting at a polling place.  Due to dexterity issues, he said he had difficulty in filling out the bubbles on the mail ballot and writing his name and address on the correct lines.[28]

- Katie Maunder, who is blind, said she could not have filled out her mail ballot without her mother's help.[29]

- Sheryl Grossman has Bloom syndrome, a genetic disorder that weakens her immune system and causes cognitive disabilities.  She cannot safely go to a polling place or allow anyone into her home, and cannot complete a mail ballot, so she had to tape her mail ballot to her door with a list of choices and watch as election officials filled out and sealed the ballot.[30]

---

[28] Michaela Winberg, *'I'm not included here': People with disabilities face barriers to voting in Philly and beyond*, WHYY, October 15, 2020, https://whyy.org/articles/voting-while-disabled-presents-challenges-for-philadelphians/.
[29] *Id.*
[30] Maggie Astor, *'A Failed System': What It's Like to Vote With a Disability During a Pandemic*, NEW YORK TIMES, September 25, 2020.

22

- Joanne Wolf, who has multiple sclerosis and cannot write by hand or sign a mail ballot, had her ballot with a signature stamp rejected twice.[31]

**81.**     In addition, anonymous reports from voters with disabilities collected by a disability organization regarding voter experiences with mail ballots in the 2020 election included a number of barriers that included[32]:

- "I had to ask for help."

- "I had problems understanding how to complete the ballot."

- "I had problems mailing my ballot."

- "I had to pay postage."

**82.**     Experiencing these types of difficulties predicts attitudes among people with disabilities that discourage voting in the future.[33]

**<u>Need for Assistance in Voting</u>**

**83.**     As described earlier, about two-fifths of people with disabilities need assistance with one or more activities of daily living.  Many people who need assistance with activities of daily living will also need voting assistance, since voting requires functional abilities that are often needed to perform activities of daily living (for example, manual dexterity needed for getting dressed or preparing meals is also needed in operating most voting machines).  In the 2020 DVAS, 6.2% of people with disabilities who voted at a polling place reported needing assistance in voting, compared to 3.7% of those without disabilities.[34]  Among those who voted by mail, 10.5% of people with disabilities reported needing assistance in doing so, compared to 1.1% of voters without disabilities.[35]  The greater gap in assistance needed in mail voting is likely due to the greater likelihood of severe disability among those who vote by mail.

**84.**     Among people with disabilities who needed assistance in voting in a polling place, such assistance was most commonly provided by election officials (54%), family members (19%), and home aides (6%).  Among those who needed assistance in voting with a mail ballot, such assistance was most commonly provided by family members living with the voter (56%), family

---

[31] *Id.*

[32] *Experience Survey Results: Power of the Disability Vote*, SABE GoVoter Project, 2021, https://www.sabeusa.org/wp-content/uploads/2021/10/SABE-GoVoter-2020-Survey-Report.pdf.

[33] Lisa Schur, Mason Ameri, and Meera Adya, *Disability, Voter Turnout, and Polling Place Accessibility*, 98 Social Science Quarterly 1374 (2017).

[34] The difference of 2.7 points is within the 3.1 point margin of error.

[35] The difference of 9.4 points is outside the 3.5 point margin of error.

members not living with the voter (19%), friends or neighbors (8%), home aides (7%), or other non-relatives (6%).

**85.**     People with disabilities are less likely to be able to vote independently (without assistance) with no difficulties.  The 2020 DVAS found that over one-fifth (21.3%) of in-person voters with disabilities either required assistance or had difficulties in voting, which is almost twice the 11.9% rate among voters without disabilities.  There was also a disability gap among mail voters, where 14.0% of voters with disabilities either required assistance or had difficulties in voting compared to 3.2% of voters without disabilities.

**86.**     As described earlier, Texans with disabilities are more likely than those without disabilities to live in institutional group quarters such as nursing homes and assisted living settings.  Those in institutions generally have more severe disabilities that are more likely to require assistance in voting and daily activities.  There is, however, tremendous variation in registration and voting procedures, staff attitudes, and likelihood of voting among nursing homes and assisted living settings; one study found that residents who wanted to vote were unable to do so at nearly one-third of sites, and that staff and administrator attitudes were a critical factor.[36]

**87.**     Assistance in voting is about more than just driving someone to the polls or helping them with the physical act of marking a ballot.  People with mental health disabilities may require and receive assistance in various aspects of the voting process that in no way suggest the assistor is "voting for" the person with a disability or exercising improper influence over the voter.  A substantial literature supports the idea that people with cognitive disabilities, including intellectual and developmental disabilities, can make important decisions such as voting while relying on trusted assistors in executing those decisions.[37]  Such assistance can "facilitate the exercise of autonomy" for individuals with certain neurological or cognitive conditions.[38] In the context of voting, this assistance often involves more than just reading the ballot aloud and helping people to mark it.

---

[36] Jason H.T. Karlawish et al., *Identifying the barriers and challenges to voting by residents in nursing homes and assisted living settings*, 20 J. AGING SOC. POLICY 65 (2008).

[37] *Id*.; Raymond Raad, Jason Karlawish, & Paul S. Appelbaum, *The capacity to vote of persons with serious mental illness*, 60 PSYCHIATRIC SERVICES 624 (2009); Jason H. Karlawish et al, *Addressing the ethical, legal, and social issues raised by voting by persons with dementia*, 292 JAMA 1345 (2004); Andrew Peterson, Jason Karlawish, and Emily Largent, *Supported Decision Making With People at the Margins of Autonomy*, 21 AM. J. BIOETHICS 4 (2021).

[38] Andrew Peterson, Jason Karlawish, and Emily Largent, *Supported Decision Making With People at the Margins of Autonomy*, 21 AM. J. BIOETHICS 4 (2021).

# SB 1 IMPOSES BARRIERS ON TEXAS VOTERS WITH DISABILITIES THAT WILL MAKE IT HARDER FOR THEM TO VOTE AND MAY PREVENT SOME FROM VOTING ALTOGETHER

88.     The above findings are relevant to an analysis of the likely effects of SB 1 on the ability to vote among people with disabilities.  Drawing on these data and my knowledge of the voting needs of people with disabilities, it is my opinion  that SB 1 will impose barriers to voting on Texans with disabilities. The following provisions of SB 1 make it harder for Texans with disabilities to vote and may prevent some from voting altogether:

## Sections 5.02, 5.03, 5.06,  5.07, 5.10, and 5.12

89.     These sections impose new requirements to vote by mail.  They now require voters to provide the number on their Texas driver's license, Texas election identification certificate, or Texas personal ID card on both their mail-in ballot applications and on the ballot carrier envelopes used to return their ballot. If the voter has not been issued one of these numbers, the voter may instead provide the last four digits of their Social Security number. If the voter has not been issued any of these numbers, the voter may sign a statement indicating that they have never been issued one of these numbers.  The law further provides that if the information the voter provides does not "identify the same voter identified" on the voter's registration application, then the mail-in ballot application and/or ballot in the voter's carrier envelope must be rejected.  SB 1 provides that a voter may be notified by phone or e-mail of the defect and that the voter may request to have the voter's application to vote by mail canceled or go to the voting clerk's office in person to correct the defect or go through an online curing process. There are several relevant research findings regarding the likely impact of these provisions on voters with disabilities:

90.     Texas voters with disabilities were almost four times as likely as those without disabilities to vote by mail in 2020 (30.2% compared to 8.2%), so these additional requirements to be able to vote by mail, and the critical consequences if the ID number they provide does not match the ID number with which they registered, are likely to have a significant negative impact on many voters with disabilities.

91.     Remembering how one recorded ID information on a registration application is likely to be difficult for many people with disabilities. Because disability correlates with age, it may have been a long time since they first registered and many of them may have difficulty remembering what ID information they presented for their initial registration. As noted above, an estimated 1,082,500 eligible voters in Texas have cognitive disabilities, which are measured as difficulty in concentrating, remembering, or making decisions. The records or identifying documents may be held by family members or facility staff, and may not be readily available to people with disabilities.  The staff in congregate settings may be unwilling or uninterested in helping people with disabilities get the correct information; as noted, research has found that staff attitudes are

key determinants of whether residents have the necessary information for voting.[39] Though SB 1 permits a voter to "make a statement" that they have not been issued any of the permissible identification numbers, a voter cannot make a statement indicating that they have been issued one of these numbers but do not know the number or do not have access to it or cannot provide the number for some other reason.

92.     Among those whose applications are initially rejected, it is likely that correcting the information will be difficult for many people with disabilities. Whether attempting to remedy this in person or online, it is unclear how a voter who does not know these numbers will be able to cure the defect. Further, voters who are voting by mail due to a disability may be unable to go in person to cure the defect for the same reason they did not vote in person.

93.     The online curing option may not help voters who are unable to cure in person because, as discussed above, people with disabilities have lower levels of internet access: a full 15% of Texans with disabilities living in the community (not in group quarters) do not have internet access in their homes, compared to only 5% of those without disabilities.[40]  The gap is larger among those age 65 or older, where 40% of Texans with disabilities compared to 18% of those without disabilities do not have internet access.  Even those with internet access may be limited by inaccessible websites.  A 2020 report found that 98% of all websites are not fully accessible to people with disabilities.[41]  Since 15% of Texans with disabilities do not have access to the internet at their homes, it is my opinion they will be disenfranchised by this provision since many will not be able to cure in person either.

94.     Indeed, as has already been reported, as of February 25, 2022, election officials in the most populous Texas counties have rejected roughly 30% of the absentee ballots they have received largely because voters did not include their driver's license number or Social Security number, or the numbers they put down did not match what officials had on file–new provisions imposed by SB 1. As reported, this rate of rejection represents a significant increase from past elections, including 2020, when the statewide rejection rate of absentee ballots was less than 1% for the general election. In 2020, officials rejected 8,304 absentee ballots in Texas out of nearly a million votes across the state. This year, that number has already been surpassed in just two counties.[42] As reported by the *New York Times*:

> But with voting by mail limited to elderly and disabled voters, the concern that
> initially rejected ballots will disenfranchise voters has grown. Guillermina

---

[39] Jason H.T. Karlawish et al., *Identifying the barriers and challenges to voting by residents in nursing homes and assisted living settings*, 20 J. AGING SOC. POLICY 65 (2008).

[40] The ACS does not measure internet access for those living in institutional or non-institutional group quarters.

[41] Ruderman Family Foundation, *98% of Websites Fail to Comply With Accessibility for People With Disabilities,* ICT SOLUTIONS & EDUCATION MAGAZINE, https://isemag.com/2020/11/telecom-98-percent-of-websites-fail-to-comply-with-accessibility-requirements-for-people-with-disabilities/, last visited 2/28/22.

[42] Nick Corasantini, *Ballot Rejections in Texas Spike After New Voting Law*, NEW YORK TIMES, Feb. 25, 2022, https://www.nytimes.com/2022/02/25/us/politics/texas-primary-ballot-rejections.html.

Nevárez lives at home in the Maverick County border region with her husband, Alfonso Nevárez Sr., and her 98-year-old mother, who is disabled and recovering from a recent surgery. In all three of their ballots, they missed the field to include their identification information, presuming that since their ballot application had been accepted they were free to cast their ballot. "We didn't look at the fine print," said Ms. Nevárez, who is also the mother of a former Democratic state representative. "And there's so much of it, the fine print." She corrected the three ballots and sent them back by mail. She is hoping that the information is correct — because of her mother's condition, they cannot go in person to fix any issues. "It is very upsetting," Ms. Nevárez said.[43]

95.     I conclude with a reasonable degree of certainty, based on the above data, that Texans with disabilities are four times more likely to vote by mail, more likely to have difficulty accessing the requisite ID numbers and ensuring the numbers on the application and envelope match, and less likely to be able to access the curing process online or in person. As such, the new barriers imposed by Sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12 will make it harder for people with disabilities to vote. Therefore, I conclude that these sections will cause some Texans with disabilities to be disenfranchised and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1.

# SECTION 6.01

96.     This section requires any person other than a close relative who simultaneously drives seven or more voters to the polls for curbside voting to complete and sign a form stating their name and address and whether they only provided transportation assistance or also assistance with voting.  There are several research findings relevant to this section's impact on voters with disabilities.

97.     As discussed above, voters with disabilities are more likely to face transportation barriers than people without disabilities. Among all Texans of voting age, 10% report a disability that limits travel.  Texans with disabilities are four times more likely to live in a zero-vehicle household (14.4% compared to 3.0%) and are less likely to be drivers (59.6% compared to 93.0%).  Further, 5.8% of Texans have difficulty going outside alone, representing 1.1 million people. Voters with disabilities are also more likely to be socially isolated, and more likely to live alone. Because curbside voting is only available to certain voters who are far more likely to have a disability and people with disabilities are more likely to face transportation barriers and social isolation, it is my opinion that additional barriers to providing assistance in the form of group transportation for curbside voting will burden voters with disabilities.

98.     I can conclude with reasonable certainty, based on the above data, that Texans with disabilities are more likely to face transportation barriers, more likely to live alone, and more likely to be socially isolated. As such, the barriers imposed by Section 6.01 on providing group transportation to the polls for curbside voting will make it harder for some Texans with disabilities to vote. Therefore, I conclude that Section 6.01 will cause some Texans with

---

[43] *Id.*

disabilities to be disenfranchised, and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1.

# SECTION 6.04

**99.**     This section adds language to the assistor oath, substantially restricting the amount of assistance that can be given by anyone except an election officer.  This will make voting more difficult for many people with disabilities.  Texas data show that 41.2% of people with disabilities need assistance in one or more daily activities. National data show that 6.2% of people with disabilities who voted in a polling place required assistance, and 10.5% of voters with disabilities who voted with a mail ballot required assistance.

**100.**     This section limits the type of assistance that can be given by an assistor to reading or marking the ballot, or directing the voter to read or mark the ballot.  Because the law does not define everything that could constitute assistance, voters with disabilities as well as assistors will be unsure of what assistance is allowed, and voters may be reluctant to make use of assistance even when it is available for fear of violating the law. This does not allow the assistor to explain the voting process and choices.  In my expert opinion, this is likely to interfere with people with disabilities' ability to vote, in particular for the 1,082,500 Texans with cognitive impairments who are eligible to vote, and other people with neurological and developmental disabilities who benefit from assistance in making informed choices in important areas of life. Some examples of valuable voting assistance that arguably go beyond the narrow definition of assistance in the oath include:

- Using an American Sign Language interpreter to interpret the ballot to someone who is deaf and does not read written English fluently. ASL and English are different languages with different syntax and grammar. ASL sometimes requires a signed explanation and interpretation of key terms and concepts.

- Reminding someone with memory issues from a Traumatic Brain Injury about how to use his or her marked sample ballot to refresh recollection about how he or she wanted to vote.

- Using simple plain language to help someone with cognitive or developmental disabilities understand the voting process. This can include answering the voter's questions about the voting process or the ballot.

- Helping someone with a mobility or cognitive disability navigate the physical polling place to find the information they need, speak to the poll workers, and get to the voting booth.

- Helping someone with Autism Spectrum Disorder cope with stressful voting lines, noises, sensations, or lights. This may include implementing calming strategies to support the person so that he or she votes without triggering feelings of being overwhelmed.

- Helping someone with a visual impairment set up and use the accessible voting machine. This may include setting up the headphones or troubleshooting technical issues that arise while the voter is voting and helping the voter deliver his or her paper ballot to the ballot counter.

- Helping a person with an anxiety disorder cope with the anxiety of a possibly new and stressful situation of navigating the voting technology and process. This may include verbal reassurance that the person marked the ballot in the manner he or she intended.

101.    I conclude with a reasonable degree of certainty, based on the above data, that a large number of Texans with disabilities need assistance with voting and that many of them depend on receiving such assistance. I also conclude that it is highly likely that many Texans with disabilities will find it difficult or impossible to obtain the assistance they require given the restrictions imposed by section 6.04. Therefore, I conclude that section 6.04 will cause some Texans with disabilities to be disenfranchised, and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1.

# SECTIONS 6.03 AND 6.05

102.    These sections create extra requirements for assistors to document their relationship to the voter and whether they received any compensation or benefit from a candidate, campaign, or political committee. These sections will make it more likely that the ballot of a person with a disability is rejected because of a clerical error or a minor mistake by the person providing assistance.  These sections may also make it more difficult for people with disabilities to find assistance at all. As noted above, many people with disabilities are socially isolated and may have a hard time finding someone to assist them. One-fifth of voters with disabilities who needed voting assistance in 2020 reported receiving it from people who were not family or household members.  Due to the higher need for assistance with voting among people with disabilities, this provision creates an extra barrier to voting for some people with disabilities.

103.    I conclude with a reasonable degree of certainty, based on the above data, that a large number of Texans with disabilities need assistance with voting and that many of them depend on receiving such assistance from people other than family members. I also conclude that it is highly likely that many Texans with disabilities will find it difficult or impossible to find needed assistance because of sections 6.03 and 6.05 requirements of additional forms and statements. Therefore, I conclude that sections 6.03 and 6.05 will cause some Texans with disabilities to be disenfranchised, and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1.

# SECTION 6.06

104.    This section criminalizes the provision of assistance by any person who solicits, receives, or accepts compensation for helping a voter with their mail ballot unless the assistor is an attendant or caregiver. While attendants and caregivers are exempt, this section will prevent friends, neighbors, and other non-family members from assisting people with disabilities if they receive any type of economic benefit. It will also prohibit people with disabilities from getting

29

help from community or nonpartisan civic engagement organizations that routinely provide voting support to the disability community. The 2020 DVAS study showed that just under one-fifth (18.1%) of people providing assistance to voters with disabilities with voting by mail were friends, neighbors, or other non-relatives apart from home aides.  In my expert opinion, this provision will discourage well-meaning assistors from providing that assistance, because any type of compensation or thank you, such as reimbursement for gas, could be construed as violating the law. This will restrict the ability to obtain assistance for a substantial number of people with disabilities.

**105.**   Voters with disabilities are also more likely to be socially isolated, and more likely to live alone. It is thus very possible that a worker or volunteer with a community or civic engagement organization, a neighbor, a friend, or another non-family member may be the best and only option to assist them with voting by mail.

**106.**   I conclude with a reasonable degree of certainty, based on the above data, that a number of Texans with disabilities need assistance with voting their mail ballots and that some of them depend on receiving such assistance from people other than previously known attendants or caregivers. Therefore I conclude that Section 6.06 will cause some Texans with disabilities to be disenfranchised, and a further number to face significant difficulties in voting that they would not.

# SECTION 7.04

**107.**   This section limits "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." It also makes it a crime for any person to receive compensation or other benefit for collecting another voter's ballot. As noted above, many voters with disabilities require assistance in voting, and restrictions on in-person interactions will limit their ability to obtain needed assistance.  Such interaction may be of particular benefit to voters with cognitive impairments and developmental disabilities who may have difficulty understanding the issues and voting process but, as described above, have the right to vote.  Finding assistance may be especially difficult for many people with disabilities given their higher likelihood of living alone, and lower rate of socializing as documented above.  It is very possible that someone connected to a campaign (possibly the person who assists them regularly) may be the best and only option to assist them with voting.  Even if they are assisted by someone working or volunteering with a campaign, this does not imply that their vote will be influenced by that person.  As noted above, assisted decision making can "facilitate the exercise of autonomy" for people with certain conditions.[44]  The assisted voter must approve the vote before it is filed.

**108.**   In addition, people with mobility limitations may not be able to personally deliver their ballots to mailboxes, and they may not have a close family or household member or lawful assistant to do so. Restricting the individuals who can help with this process will create extra difficulties for these voters in delivering their ballot.

---

[44] Andrew Peterson, Jason Karlawish, and Emily Largent, *Supported Decision Making With People at the Margins of Autonomy*, 21 AM. J. BIOETHICS 4 (2021)

109.     I conclude with a reasonable degree of certainty, based on the above data that a large number of Texans with disabilities need assistance with voting their mail ballots and that some of them depend on receiving such assistance from persons other than a close family or household member or lawful assistant. Therefore I conclude that Section 7.04 will cause some Texans with disabilities to be disenfranchised, and a further number to face significant difficulties in voting that they would not otherwise face but for SB 1.

# CONCLUSION

110.     In sum, in my opinion, based on reasonable certainty, these provisions of SB 1 will create an extra burden in voting for a significant number of people with disabilities across the state of Texas and may prevent some from voting altogether.  As documented above, people with disabilities already face many social and economic disparities that impact their ability to vote, including a high rate of needing assistance in activities of daily living, higher likelihood of living alone, lower likelihood of driving or travel in general, lower likelihood of internet access, and lower economic resources compared to those without disabilities.  They also must contend with well-documented social stigma that both reflects and reinforces their social isolation and increases the difficulty of obtaining necessary resources and assistance in exercising the right to vote.  The number of barriers voters with disabilities face in Texas  help explain why voting-eligible Texans with disabilities were 5.1 percentage points less likely than those without disabilities to vote in 2020.  SB 1 creates extra voting barriers for many Texans with disabilities, making it more burdensome for them to exercise their right to vote. Media reports have already demonstrated that people with disabilities are facing new barriers related to SB 1.[45] In my opinion, SB 1 will cause some Texans with disabilities to be disenfranchised entirely and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1.

---

[45] *See* Juana Summers and Barbara Sprunt, *Texas election workers provide practical and emotional support to confused voters*, NATIONAL PUBLIC RADIO, Feb. 7, 2022, https://www.npr.org/2022/02/27/1082821390/texas-election-workers-provide-practical-and-emotional-support-to-confused-voter;%20; *see also* Nick Corasaniti, *Ballot Rejections in Texas Spike After New Voting Law*, NY TIMES, Feb. 25, 2022, https://www.nytimes.com/2022/02/25/us/politics/texas-primary-ballot-rejections.html.

**Table 1:  Disability Prevalence in Texas Using Census Definition, 2020**

**Figures are for Texas citizens age 18 or older.**

|  | Number | % of adult citizens | Margin of error (+/-) |
|---|---|---|---|
|  | **(1)** | **(2)** | **(3)** |
| **Total citizens age 18 or older** | 19,425,500 | 100.0% |  |
| **No disability** | 16,401,300 | 84.4% | 0.3% |
| **Disability** | 3,024,200 | 15.6% | 0.3% |
|  |  |  |  |
| **Type of disability** |  |  |  |
| **Hearing impairment** | 875,900 | 4.5% | 0.1% |
| **Vision impairment** | 638,500 | 3.3% | 0.1% |
| **Cognitive impairment** | 1,082,500 | 5.6% | 0.2% |
| **Mobility impairment** | 1,604,700 | 8.3% | 0.2% |
| **Difficulty with dressing or bathing** | 596,300 | 3.1% | 0.1% |
| **Difficulty going outside home alone** | 1,127,500 | 5.8% | 0.2% |
|  |  |  |  |
| **Sample size** | 127,398 |  |  |

Based on analysis of U.S. Census Bureau's 2020 American Community Survey microdata.  A disability is defined as having one or more of the six conditions listed.  See https://www.census.gov/topics/health/disability/guidance/data-collection-acs.html.

The margin of error is based on a 95% confidence interval.

**Table 2: Disability Prevalence Using More Expansive Definition**
Figures represent percent of Texas adults age 18 or older

| | Percent (1) | Margin of error (+/-) (2) |
|---|---|---|
| **Any disability** | 30.5% | 2.4% |
| | | |
| **Hearing impairment** | 6.3% | 1.2% |
| **Vision impairment** | 4.7% | 1.1% |
| **Speech impairment** | 2.1% | 0.7% |
| **Difficulty with physical activities:** | | |
| **Walking 3 blocks** | 13.5% | 1.7% |
| **Climbing stairs** | 12.7% | 1.6% |
| **Lifting** | 9.3% | 1.4% |
| **Grasping** | 4.3% | 1.0% |
| **Standing^** | 15.9% | 1.8% |
| **Pushing/pulling^** | 12.9% | 1.7% |
| **Sitting^** | 8.2% | 1.4% |
| **Crouching^** | 19.3% | 2.0% |
| **Reaching^** | 7.9% | 1.3% |
| **Difficulty with activities of daily living due to physical or mental condition:** | | |
| **Any of above** | 13.4% | 1.7% |
| **Getting around inside home** | 1.7% | 0.6% |
| **Going outside home for errands** | 8.3% | 1.4% |
| **Getting in bed or chair** | 4.3% | 1.0% |
| **Taking bath or shower** | 4.5% | 1.0% |
| **Getting dressed** | 3.0% | 0.8% |
| **Eating** | 0.7% | 0.4% |
| **Using toilet** | 1.7% | 0.6% |
| **Keeping track of money** | 4.7% | 1.1% |
| **Preparing meals** | 4.1% | 0.9% |
| **Doing light housework** | 5.0% | 1.0% |
| **Taking medicine** | 3.8% | 1.0% |
| **Using telephone** | 1.3% | 0.5% |
| **Mental or cognitive impairment:** | | |
| **Learning disability** | 4.3% | 1.1% |
| **Alzheimer's, senility, or dementia** | 3.4% | 0.9% |
| **Intellectual disability** | 1.7% | 0.7% |
| **Developmental disability** | 0.7% | 0.5% |
| **Other mental/emotional condition** | 4.4% | 1.1% |
| **Sample size** | 1,569 | |

^ These conditions were not included as part of the expanded disability definition but are reported here to illustrate the range of limitations faced by people with disabilities. Based on analysis of 2014 Survey of Income and Program Participation SSA Supplement microdata.  Discussion of the disability definition and fuller results for entire U.S. are in https://www.census.gov/library/publications/2018/demo/p70-152.html. The margin of error is based on a 95% confidence interval.

**Table 3: Disability and Demographic Characteristics in Texas, 2020**

**Figures are for Texas citizens age 18 or older.**

| | Total with disability (1) | Total with no disability (2) | % with disability (3) | Margin of error (+/-) (4) |
|---|---|---|---|---|
| **Total citizens age 18 or older** | 3,024,200 | 16,401,300 | 15.6% | 0.3% |
| **Female** | 1,551,800 | 8,385,000 | 15.6% | 0.4% |
| **Male** | 1,472,400 | 8,016,300 | 15.5% | 0.4% |
| **Asian** | 60,400 | 707,000 | 7.9% | 1.1% |
| **Black non-Hispanic/Latinx** | 428,300 | 1,963,400 | 17.9% | 0.9% |
| **Hispanic/Latinx** | 881,800 | 5,312,000 | 14.2% | 0.5% |
| **Native American/Alaskan** | 8,600 | 39,700 | 17.8% | 4.3% |
| **White non-Hispanic/Latinx** | 1,533,400 | 7,851,200 | 16.3% | 0.4% |
| **Other race/ethnicity** | 111,600 | 528,000 | 17.4% | 1.5% |
| **Age 18-34** | 487,600 | 5,874,500 | 7.7% | 0.4% |
| **Age 35-49** | 445,800 | 4,468,800 | 9.1% | 0.4% |
| **Age 50-64** | 761,000 | 3,732,800 | 16.9% | 0.6% |
| **Age 65-74** | 601,700 | 1,591,700 | 27.4% | 0.9% |
| **Age 75-84** | 460,600 | 620,300 | 42.6% | 1.4% |
| **Age 85+** | 267,500 | 113,200 | 70.3% | 2.2% |
| **No HS degree** | 583,000 | 1,488,100 | 28.1% | 1.0% |
| **HS degree** | 948,100 | 3,988,500 | 19.2% | 0.6% |
| **Some college, no degree** | 720,300 | 4,025,800 | 15.2% | 0.5% |
| **Associate's degree** | 212,200 | 1,335,200 | 13.7% | 0.9% |
| **Bachelor's degree** | 360,000 | 3,633,600 | 9.0% | 0.4% |
| **Graduate degree** | 200,600 | 1,930,100 | 9.4% | 0.6% |
| **Overall sample size** | 23,590 | 103,808 | | |

Based on analysis of U.S. Census Bureau's 2020 American Community Survey microdata.

The margin of error is based on a 95% confidence interval.

**Table 4:  Economic Status and Living Situation of People with Disabilities**

Figures are for Texas citizens age 18 or older.

| | Disability | No disability | Disability gap | Margin of error on gap (+/-) | |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | |
| **Employed if working age (18-64)** | 40.1% | 74.2% | -34.0% | 1.3% | * |
| **In poverty** | 18.0% | 9.2% | 8.9% | 0.8% | * |
| **Social Security income** | 47.4% | 13.3% | 34.0% | 0.9% | * |
| **Public assistance income or food stamps** | 20.3% | 10.3% | 10.0% | 0.8% | * |
| **Medicaid or other low-income health plan** | 26.5% | 6.1% | 20.4% | 0.8% | * |
| **Living situation** | | | | | |
| **Live alone** | 20.8% | 12.3% | 8.6% | 0.8% | * |
| **Live with others, not in group quarters** | 73.3% | 85.6% | -12.3% | 0.8% | * |
| **Noninstitutional group quarters^** | 1.2% | 1.1% | 0.2% | 0.1% | |
| **Institutional group quarters^^** | 4.7% | 1.1% | 3.6% | 0.2% | * |
| **Marital status** | | | | | |
| **Married, spouse present** | 42.8% | 52.4% | -9.6% | 1.0% | * |
| **Separated/divorced** | 19.4% | 12.1% | 7.3% | 0.8% | * |
| **Widowed** | 14.4% | 3.4% | 11.0% | 0.6% | * |
| **Never married** | 23.4% | 32.1% | -8.8% | 0.9% | * |
| **Sample size** | 9,609 | 23,590 | 103,808 | | |

* Disability gap is outside 95% margin of error.
^ College dorm, military barracks, group home, mission, or shelter
^^  Nursing home, mental hospital, or correctional facility
Based on analysis of Census Bureau's 2020 American Community Survey microdata.

**Table 5:  Need for Assistance in Disability Population**

Figures represent percent of disability population age 18 or older.

| | Texas | Margin of error (+/-) | United States | Margin of error (+/-) |
|---|---|---|---|---|
| | (1) | (2) | (3) | (4) |
| **Any help needed with activities of daily living** | 41.2% | 4.5% | 37.4% | 1.1% |
| **Need help with:** | | | | |
| **Getting around inside home** | 3.5% | 1.5% | 3.8% | 0.4% |
| **Going outside home for errands** | 25.5% | 4.0% | 21.2% | 1.0% |
| **Getting in bed or chair** | 7.5% | 2.3% | 7.2% | 0.6% |
| **Taking bath or shower** | 9.4% | 2.5% | 8.6% | 0.7% |
| **Getting dressed** | 6.6% | 2.1% | 6.9% | 0.6% |
| **Walking** | 7.9% | 2.3% | 8.2% | 0.6% |
| **Eating** | 0.5% | 0.5% | 1.3% | 0.3% |
| **Using toilet** | 3.4% | 1.7% | 3.3% | 0.4% |
| **Keeping track of money** | 12.0% | 2.9% | 12.2% | 0.8% |
| **Preparing meals** | 11.0% | 2.7% | 12.0% | 0.8% |
| **Doing light housework** | 13.7% | 2.9% | 15.4% | 0.8% |
| **Taking medicine** | 9.7% | 2.8% | 8.8% | 0.7% |
| **Accessing Internet** | 15.2% | 3.1% | 13.4% | 0.8% |
| | | | | |
| **Help provided by^:** | | | | |
| **Family members** | 34.9% | 4.3% | 30.7% | 1.1% |
| **Friends or neighbors** | 4.0% | 1.8% | 4.0% | 0.5% |
| **Paid help** | 4.0% | 1.6% | 4.2% | 0.5% |
| **Partner or companion** | 1.4% | 1.1% | 1.3% | 0.3% |
| **Other non-relative** | 1.4% | 1.0% | 1.9% | 0.3% |
| **Any non-family member** | 10.6% | 2.7% | 10.7% | 0.7% |
| | | | | |
| **Sample size** | 566 | | | |

Based on analysis of 2014 Survey of Income and Program Participation SSA Supplement microdata.  See Table 2 for prevalence figures using this definition of disability.  Fuller results for entire U.S. are in https://www.census.gov/library/publications/2018/demo/p70-152.html.

The margin of error is based on a 95% confidence interval.
^ The categories overlap as the individual may have received help from more than one person.

**Table 6:  Computer and Internet Access by Disability Status in Texas**

**Figures are for Texas citizens age 18 or older.**

| | Disability | No disability | Disability gap | Margin of error on gap (+/-) | |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | |
| **Home has internet access, 2020** | | | | | |
| **All** | 84.8% | 95.2% | -10.4% | 0.7% | * |
| **Age 18-64** | 90.4% | 96.3% | -5.9% | 0.8% | * |
| **Age 65 or older** | 60.5% | 82.3% | -21.8% | 1.3% | * |
| **Individual uses internet at home, 2019** | | | | | |
| **All** | 60.1% | 78.9% | -18.8% | 4.5% | * |
| **Age 18-64** | 68.0% | 80.8% | -12.8% | 6.4% | * |
| **Age 65 or older** | 68.9% | 84.4% | -15.5% | 6.3% | * |
| **Individual uses internet at home or elsewhere, 2019** | | | | | |
| **All** | 60.5% | 82.3% | -21.8% | 4.4% | * |
| **Age 18-64** | 53.1% | 67.9% | -14.8% | 6.8% | * |
| **Age 65 or older** | 53.1% | 70.4% | -17.3% | 6.8% | * |
| **Sample size** | | | | | |
| **2020 data** | 19,465 | 96,970 | | | |
| **2019 data** | 535 | 3,906 | | | |

* Disability gap is outside 95% margin of error.

Home internet access figures are based on analysis of Census Bureau's 2020 American Community Survey microdata, and individual internet use is based on analysis of November 2019 Current Population Survey Computer and Internet Use Supplement microdata.

37

**Table 7: Transportation and Disability**

| | All (1) | Disability (2) | No disability (3) | Disability gap (4) | |
|---|---|---|---|---|---|
| **Data for Texans age 18 or older^** | | | | | |
| Have travel-limiting disability | 10.0% | 100.0% | 0.0% | | |
| Live in zero-vehicle household | | 14.4% | 3.0% | 11.4% | * |
| Average trips per day | | 2.3 | 3.5 | -1.2 | * |
| No trips in a day | | 40.0% | 15.8% | 0.2 | * |
| Driver | | 59.6% | 93.0% | -0.3 | * |
| Public transportation in past 30 days | | 12.6% | 8.8% | 3.8% | * |
| Used ride-hailing in past 30 days | | 2.6% | 8.8% | -6.2% | * |
| Average online purchases for delivery in past month | | 31.5% | 54.2% | -22.7% | * |
| Agree that travel is a financial burden | | 53.3% | 39.6% | 13.7% | * |
| **National data from 2020 survey with broader disability measure^^** | | | | | |
| Can drive own or family vehicle | | 69.6% | 90.0% | -20.4% | * |
| Most often use for basic transportation: | | | | | |
| Own or family vehicle | | 82.7% | 93.3% | -10.7% | * |
| Someone else's vehicle | | 6.4% | 1.8% | 4.7% | * |
| Taxi or rideshare | | 3.2% | 0.5% | 2.7% | * |
| Para-transit | | 1.3% | 0.2% | 1.1% | * |
| Other public transportation | | 4.9% | 3.0% | 1.9% | |
| Other | | 1.5% | 1.2% | 0.3% | |
| Have transportation problems "very often" or "always" | | 5.6% | 2.9% | 2.6% | * |
| **Sample size** | | 1,768 | 787 | | |

^ From analysis of 2017 National Highway Travel Survey data at https://nhts.ornl.gov/

^^ From https://www.eac.gov/election-officials/us-election-assistance-commission-study-disability-and-voting-accessibility-2020, Table 31

**Table 8: Voting and Disability in 2020**

| | Texas | | | | United States | | | |
| | No disability (1) | Any disability (2) | Disability gap (3) | Margin of error on gap (+/-) (4) | No disability (5) | Any disability (6) | Disability gap (7) | Margin of error on gap (+/-) (8) |
|---|---|---|---|---|---|---|---|---|
| Among all eligible to vote: | | | | | | | | |
| Registered to vote | 71.2% | 71.9% | 0.7% | 4.2% | 73.0% | 70.1% | -3.0% | 1.1% * |
| Voted | 64.5% | 59.4% | -5.2% | 4.6% * | 67.5% | 61.8% | -5.7% | 1.1% * |
| | | | | | | | | |
| Method if voted: | | | | | | | | |
| In person on election day | 14.2% | 9.5% | -4.7% | 3.6% * | 31.2% | 25.8% | -5.4% | 1.3% * |
| Early in person | 77.6% | 60.2% | -17.5% | 5.7% * | 26.9% | 21.0% | -5.8% | 1.2% * |
| Mail ballot | 8.2% | 30.2% | 22.0% | 5.2% * | 41.9% | 53.2% | 11.3% | 1.5% * |
| | | | | | | | | |
| Sample size | 3,745 | 545 | | | 70,898 | 11,000 | | |

* Disability gap is outside 95% margin of error.
Based on analysis of 2020 Current Population Survey Voting and Registration Supplement microdata.

**Table 9: Voting by Disability Type in 2020**

All figures are for entire United
States

| | No disability (1) | Any disability (2) | Hearing impairment (3) | Vision impairment (4) | Cognitive impairment (5) | Mobility impairment (6) | Difficulty dressing or bathing (7) | Difficulty going outside alone (8) |
|---|---|---|---|---|---|---|---|---|
| **Among all eligible to vote:** | | | | | | | | |
| **Registered to vote** | 73.0% | 70.1% * | 76.2% * | 67.4% * | 61.6% * | 69.4% * | 61.9% * | 61.8% * |
| **Voted** | 67.5% | 61.8% * | 68.5% | 59.2% * | 50.7% * | 60.4% * | 49.4% * | 51.6% * |
| **Method if voted:** | | | | | | | | |
| **In person on election day** | 31.2% | 25.8% * | 25.4% * | 24.6% * | 26.4% * | 25.0% * | 23.4% * | 23.0% * |
| **Early in person** | 26.9% | 21.0% * | 22.0% * | 22.0% * | 19.3% * | 19.4% * | 14.4% * | 16.7% * |
| **Mail ballot** | 41.9% | 53.2% * | 52.6% * | 53.3% * | 54.2% * | 55.7% * | 62.1% * | 60.2% * |
| **Sample size** | 70,898 | 11,000 | 3,633 | 1,466 | 3,315 | 6,255 | 1,689 | 3,769 |

* Disability gap is outside 95% margin of error.
Based on analysis of 2020 Current Population Survey Voting and Registration Supplement microdata.

**Table 10:  In-Person Voting Difficulties by Disability Type in 2020**

| Types of voting difficulties | No disability (1) | Any disability (2) | Hearing impairment (3) | Visual impairment (4) | Cognitive impairment (5) | Mobility impairment (6) | No need for help in daily activities (7) | Need help in daily activities (8) |
|---|---|---|---|---|---|---|---|---|
| Any difficulty in voting in person at polling place or election office | 9.8% | 18.0% * | 19.3% | 23.5% | 30.0% ** | 17.2% * | 15.2% | 24.8% * |
| 1.  Difficulty in finding or getting to the polling place | 2.3% | 1.4% | 1.0% | 3.8% | 3.6% | 1.2% | 0.8% | 3.1% |
| 2.  Difficulty in getting inside the polling place (for example, steps) | 0.4% | 3.2% * | 1.6% | 1.1% | 2.4% | 5.1% * | 2.1% | 6.0% * |
| 3.  Difficulty waiting in line | 6.2% | 7.4% | 8.5% | 1.4% * | 11.2% | 5.1% | 7.1% | 8.1% |
| 4.  Difficulty reading or seeing the ballot | 0.0% | 3.8% * | 4.1% | 20.5% * | 7.4% * | 5.2% * | 1.5% * | 9.7% * |
| 5.  Difficulty understanding how to vote or use the voting equipment | 2.9% | 2.7% | 0.9% | 2.2% | 3.5% | 2.9% | 2.6% | 2.9% |
| 6.  Difficulty communicating with poll workers or other officials at the polling place | 0.6% | 2.1% | 3.2% | 1.1% | 2.5% | 2.6% | 1.3% | 3.8% |
| 7.  Difficulty writing on the ballot | 0.0% | 1.2% * | 0.9% | 1.2% | 2.3% | 2.2% | 0.5% | 3.2% |
| 8.  Difficulty operating the voting machine | 0.9% | 1.0% | 1.0% | 4.1% | 1.5% | 0.0% | 0.9% | 1.2% |
| 9.  Other type of difficulty in voting | 0.3% | 1.8% * | 4.0% | 2.2% | 4.3% | 1.2% | 1.7% | 2.0% |
| Sample size | 371 | 697 | 124 | 72 | 139 | 298 | 506 | 189 |

* Difference from non-disability sample is outside 95% margin of error
From 2020 Election Assistance Commission survey with results reported at https://www.eac.gov/election-officials/us-election-assistance-commission-study-disability-and-voting-accessibility-2020, Table 8.

**Table 11:  Specific Mail Voting Difficulties by Disability Type in 2020**

| Types of mail voting difficulties | No disabili ty (1) | Any disability (2) | | Hearing impairment (3) | Visual impairment (4) | | Cognitive impairment (5) | Mobility impairment (6) | | No need for help in daily activities (7) | Need help in daily activities (8) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Any difficulty receiving, returning, reading, understanding, or filling out ballot | 2.1% | 5.4% | * | 5.1% | 22.1% | * | 6.3% | 6.4% | * | 3.8% | 8.9% | * |
| Any difficulty reading, understanding, or filling out ballot | 0.7% | 2.3% | | 1.6% | 7.9% | * | 2.5% | 2.5% | | 1.8% | 3.3% | |
| Difficulty reading mail ballot | 0.0% | 1.4% | * | 1.6% | 5.7% | * | 1.9% | 1.2% | | 1.0% | 2.3% | |
| Difficulty understanding mail ballot | 0.4% | 0.4% | | 0.0% | 0.0% | | 0.0% | 0.4% | | 0.3% | 0.5% | |
| Difficulty filling out mail ballot | 0.0% | 0.8% | | 0.0% | 2.2% | | 0.6% | 1.3% | | 0.4% | 1.7% | |
| Other difficulty completing mail ballot | 0.4% | 0.1% | | 0.0% | 0.0% | | 0.0% | 0.3% | | 0.2% | 0.0% | |
| Difficulty receiving mail ballot | 1.7% | 1.9% | | 2.5% | 5.9% | | 3.0% | 1.9% | | 1.7% | 2.5% | |
| Difficulty returning mail ballot | 0.0% | 0.7% | * | 1.6% | 6.7% | | 2.0% | 0.9% | * | 0.2% | 1.9% | |
| Sample size | 319 | 797 | | 119 | 75 | | 155 | 398 | | 526 | 267 | |

* Difference from non-disability sample is outside 95% margin of error
From 2020 Election Assistance Commission survey with results reported at https://www.eac.gov/election-officials/us-election-assistance-commission-study-disability-and-voting-accessibility-2020, Table 11.

# **<u>EXHIBIT A</u>**

CURRICULUM VITAE

Douglas L. Kruse

ADDRESSES:

School of Management and Labor Relations        34 Wilson Road
Rutgers University        Princeton, N.J.  08540
94 Rockafeller Road        609-924-3422
New Brunswick, N.J. 08903
(848) 445-5991
E-mail:  dkruse@smlr.rutgers.edu

EDUCATION:

Harvard University, Cambridge, Massachusetts.
       Ph.D. in Economics, June, 1988.

       Major fields:  Labor Economics, Comparative Economic Systems.
       Minor fields:  Applied Econometrics, Industrial Organization.
       Dissertation topic:  Empirical test of Weitzman profit-sharing theory, and effect of
           profit sharing on productivity and growth.

University of Nebraska-Lincoln, Lincoln, Nebraska.
       M.A. in Economics, August 1983.
       Certification in Public Policy Analysis and Program
           Evaluation, 1983.
       Fields: Public Policy, Field Research, Comparative Economic Systems.

Harvard University, Cambridge, Massachusetts.
       B.A. in Economics, June 1981, Magna Cum Laude.

EMPLOYMENT:

Distinguished Professor, July 2014-present; Professor, July 2000-June 2014; Associate
       Professor, July 1994-June 2000; Assistant Professor, July 1988-June 1994; Dept. of
       Human Resource Management, School of Management and Labor Relations, Rutgers
       University.  Member of the Graduate Faculties in Economics, Labor and Employment
       Relations, and Human Resource Management.

Associate Dean for Academic Affairs, School of Management and Labor Relations, Rutgers
       University, 2017-2018.

Senior Economist, Council of Economic Advisers, Executive Office of the President,
    Washington, D.C., September 2013-August 2014.
Teaching Assistant, 9/86-5/88, Dept. of Economics, Harvard University.
    Labor Economics, Econometrics, Comparative Economic Systems, and
    Labor Thesis Advising.

    Economic Development Consultant, 5/83-9/84, Department of Economic Development,

State of Nebraska, Lincoln, Nebraska.


OTHER POSITIONS:

National Bureau of Economic Research (Cambridge, Massachusetts), Research Associate,
    September 1995-present, Faculty Research Fellow, September 1990-August 1995.

IZA Institute of Labor Economics (Bonn, Germany), Research Fellow, March 2016-present.

Associate Editor, British Journal of Industrial Relations, January 2011-June 2021.

Associate Editor, Journal of Participation and Employee Ownership, January 2017-present.

Editorial Board member, Human Resource Management Journal, January 2017-present.

Member, Transition Team for a Stronger and Fairer Economy, New Jersey Governor-elect
    Phil Murphy, November 2017-January 2018.

President, International Association for the Economics of Participation, 2012-2014; Vice-
    President, 2010-2012.

Co-director, Program for Disability Research, School of Management and Labor Relations,
    Rutgers University, January 2005-present.

Director, Ph.D. Program in Industrial Relations and Human Resources, School of
    Management and Labor Relations, Rutgers University July 2007-June 2013.

President's Committee on Employment of People with Disabilities, Subcommittee on
    Employment Disability Concerns (Washington, D.C.), January 1998-December 2000.

New Jersey State Rehabilitation Council, October 1999-June 2013.


BOOKS:

How Did Employee Ownership Firms Weather the Past Two Recessions?  Kalamazoo, MI: W.E. Upjohn Institute for Employment Research, 2017.  By Fidan Kurtulus and Douglas Kruse.

Sharing Ownership, Profits, and Decision-making in the 21st Century, Volume 14 in the series "Advances in the Economic Analysis of Participatory and Labor-managed Firms." Bingley, UK: Emerald Publishing, 2013.  Edited by Douglas Kruse.

People with Disabilities: Sidelined or Mainstreamed?  Cambridge, England: Cambridge University Press, 2013.  By Lisa Schur, Douglas Kruse, and Peter Blanck.

   Reviewed in British Journal of Industrial Relations, Industrial and Labor Relations Review, and Journal of Occupational Rehabilitation.

The Citizen's Share: Putting Ownership Back Into Democracy.  New Haven, CN:  Yale University Press, 2013.  By Joseph Blasi, Richard Freeman, and Douglas Kruse.

   Reviewed in Administrative Science Quarterly, Journal of American History, and Contemporary Sociology.

Shared Capitalism at Work: Employee Ownership, Profit Sharing, Gainsharing, and Broad-based Stock Options.  Chicago:  University of Chicago Press, 2010.  Edited by Douglas Kruse, Richard Freeman, and Joseph Blasi.

   Reviewed in Industrial and Labor Relations Review and Economic Record.

In the Company of Owners: The Truth About Stock Options (And Why Every Employee Should Have Them).  New York:  Basic Books, 2003.  By Joseph Blasi, Douglas Kruse, and Aaron Bernstein.

   Named a "Noteworthy Book in Industrial Relations and Labor Economics, 2003," by Princeton University Industrial Relations Section.
   Named as one of the top 10 business books of 2003 by Business Week.
   Reviewed in Academy of Management Perspectives, Library Journal, and Journal of Moral Education.

A Working Nation: Workers, Work, and Government in the New Economy.  New York: Russell Sage Foundation, 2000.  By David T. Ellwood, Rebecca M. Blank, Joseph Blasi, Douglas Kruse, William A. Niskanen, and Karen Lynn-Dyson.

   Reviewed in Journal of Economic Literature, Industrial and Labor Relations Review, Journal of Social Policy, and Monthly Labor Review.

Stock Options, Corporate Performance, and Organizational Change. Oakland, CA: National Center for Employee Ownership, 2000. By Joseph Blasi, Douglas Kruse, James Sesil, Maya Kroumova, and Ryan Weeden.

Meeting Future Workforce Needs.  Menomonie, WI: University of Wisconsin-Stout, 1999.
By Thomas Jennings, Steve Fusco, George Erickcek, Stacey Floyd, Chip Kenney,
Douglas Kruse, Rob McInnes, Paul Mulka, Darlene Robbins, Martin Sicker, and
Duane Watson.

Spinal Cord Injury:  An Analysis of Medical and Social Costs.  New York:  Demos
Publications, 1998.  By Monroe Berkowitz, Paul O'Leary, Douglas Kruse, and Carol
Harvey.

Kremlin Capitalism: The Privatization of the Russian Economy. Ithaca, NY:  Cornell
University Press, 1997.  By Joseph Blasi, Maya Kroumova, and Douglas Kruse.

Chinese translation published by Shanghai Far East Publishers in 2000.

Reviewed in Annals of the American Academy of Political and Social Science,
Australian Journal of International Affairs, British Journal of Sociology,
Business and the Contemporary World, Business History, Business Week,
Choice, Europe-Asia Studies, Economics of Transition, Fortune, Journal of
East-West Business, Journal of Political Ecology, Library Journal, New York
Review of Books, Review of Political Economy, Russian Review, Slavic
Review, Social Science Journal, Washington Monthly, and World Today.

Profit Sharing: Does It Make A Difference?  Kalamazoo, MI:  W.E. Upjohn Institute for
Employment Research, 1993.  By Douglas Kruse.

Awarded "Richard A. Lester Prize for Outstanding Book in Industrial Relations and
Labor Economics, 1993," by Princeton University Industrial Relations
Section.

Reviewed in Journal of Economic Literature, Journal of Comparative Economics,
Industrial and Labor Relations Review, Relations Industrielles.

The New Owners:  The Mass Emergence of Employee Ownership in Public Companies and
What it Means to American Business. New York:  HarperCollins, 1991.  By Joseph
Blasi and Douglas Kruse.

Russian translation published by Delo Publishers (Moscow) in 1995.

Named a "Noteworthy Book in Industrial Relations and Labor Economics, 1991," by
Princeton University Industrial Relations Section.

Reviewed in Journal of Economic Literature, British Journal of Industrial Relations,
Administrative Science Quarterly, Economic and Industrial Democracy.

Employee Ownership and Employee Attitudes:  Two Case Studies.

48

Norwood, Pennsylvania:  Norwood Editions, 1984. By Douglas Kruse.

Reviewed in <u>British Journal of Industrial Relations</u>, <u>California Management Review</u>, <u>Economic and Industrial Democracy</u>.

PUBLISHED ARTICLES AND CHAPTERS:

<u>Disability</u>

"Disability and precarious work."  Forthcoming in <u>Oxford Handbook on the Sociology of Disability</u>, Oxford University Press, 2022.  By Lisa Schur and Douglas Kruse.
**111.**

"Disability and Remote Work During the Pandemic with Implications for Cancer Survivors," <u>Journal of Cancer Survivorship,</u> forthcoming.  By Douglas Kruse, So Ri Park, Yana Rodgers, and Lisa Schur.

"COVID-19 and Employment Losses for Workers with Disabilities: An Intersectional Approach," forthcoming in Sophie Hennekam, Joy Beatty, and Mukta Kulkarni, eds., <u>Handbook of Disability and Management</u>, DeGruyter, 2022.  By Lisa Schur, Yana van der Meulen Rodgers, and Douglas Kruse, February 2021.

"Disability and influence in job interviews," <u>International Journal of Conflict Management</u>, forthcoming.  By Mason Ameri, Terri Kurtzberg, Lisa Schur, and Douglas Kruse.

"Qualitative Examination of Voting Empowerment and Participation Among People Living with Traumatic Brain Injury,"  <u>Archives of Physical Medicine and Rehabilitation</u>, forthcoming.  By Flora McConnell Hammond, Christine Davis, Mark Hirsch, Julia Snow, Martha Kropf, Lisa Schur, Douglas Kruse, and Andrew Ball.

"Telework after COVID: A "silver lining" for workers with disabilities?" <u>Journal of Occupational Rehabilitation</u> Vol. 30, no. 4, 2020: 521-536.  By Lisa Schur, Mason Ameri, and Douglas Kruse.

"No Room at the Inn?  Disability Access in the New Sharing Economy," <u>Academy of Management Discoveries,</u> August 2020, 6(2): 176-205.  By Mason Ameri, Sean Rogers, Lisa Schur, and Douglas Kruse.

**112.**  "Disability in the Unionized Workplace."  In Susanne Bruyere, ed., <u>Employment and Disability: Issues, Innovations, and Opportunities</u>.  Ithaca, NY:  Cornell University Press, 2019.  By Mason Ameri, Mohammad Ali, Lisa Schur, and Douglas Kruse.

"Why Do Workers with Disabilities Earn Less?  Occupational Ability Requirements and Disability Discrimination." <u>British Journal of Industrial Relations</u> Vol. 56, No. 4,

December 2018, pp. 798-834.  By Douglas Kruse, Lisa Schur, Sean Rogers, Mason Ameri.

"The Disability Employment Puzzle: A Field Experiment on Employer Hiring Behavior," ILR Review Vol. 71, No. 2, March 2018, pp. 329-364. By Mason Ameri, Lisa Schur, Meera Adya, Scott Bentley, Patrick McKay, and Douglas Kruse.

"Disability at Work: A Look Back and Forward," Journal of Occupational Rehabilitation, Vol. 57, No. 4, December 2017, pp. 482-497.  By Lisa Schur, Kyongji Han, Andrea Kim, Mason Ameri, Meera Adya, Peter Blanck, and Douglas Kruse.

"Are Workers with Disabilities More Likely to be Displaced?"  International Journal of Human Resource Management, Vol. 27, No. 14 (2016): 1550-1579.  By Sophie Mitra and Douglas Kruse.

"Disability and Election Policies and Practices," in Barry C. Burden & Charles Stewart, eds., The Measure of American Elections.  Cambridge, England: Cambridge University Press, 2014. By Lisa Schur and Douglas Kruse.

"Accommodating Workers with and Without Disabilities," Human Resource Management, Vol. 53, No. 4, July/August 2014, pp. 593-621.  By Lisa Schur, Lisa Nishii, Meera Adya, Douglas Kruse, Susanne Bruyere, and Peter Blanck.

"Assessing Voting Competence and Political Knowledge: Comparing Individuals with Traumatic Brain Injuries and 'Average' College Students," Election Law Journal. Vol. 11, No. 2, 2012, pp. 52-69.  By Jessica N. Link, Martha Kropf, Mark Alexander Hirsch, Flora M. Hammond, Jason Karlawish, Lisa Schur, Douglas Kruse, Christine S. Davis.

 "Projecting Potential Demand for Workers with Disabilities," Monthly Labor Review, Vol. 133, No. 10, October 2010.  By Douglas Kruse, Lisa Schur, and Mohammed Ali.

"Is Disability Disabling in All Workplaces?  Workplace Disparities and Corporate Culture," Industrial Relations, Vol. 48, No. 3, July 2009, pp. 381-410.  By Lisa Schur, Douglas Kruse, Joseph Blasi, and Peter Blanck.

"Corporate Culture and the Employment of People with Disabilities," Behavioral Sciences and the Law, Vol. 23, 2005, pp. 3-20.  By Lisa Schur, Douglas Kruse, and Peter Blanck.

"Calibrating the Impact of the ADA's Employment Provisions," Stanford Law and Policy Review, Vol. 14.2, 2003, pp. 267-290.  By Peter Blanck, Lisa Schur, Douglas Kruse, Susan Schwochau, and Chen Song.

"Disability and Employment: Symposium Introduction," Industrial Relations, Vol. 42, No. 1, January 2003.  By Douglas Kruse and Thomas Hale.

"Employment of People with Disabilities Following the ADA," <u>Industrial Relations</u>, Vol. 42, No. 1, January 2003, pp. 31-66.  By Douglas Kruse and Lisa Schur.

"Does the Definition Affect the Outcome?  Employment of People with Disabilities Under Alternative Disability Definitions," in David Stapleton and Richard Burkhauser, eds., <u>Why the Decline in Employment of People with Disabilities: A Policy Puzzle</u>. Kalamazoo, MI:  W.E.  Upjohn Institute for Employment Research, 2003, pp. 279-300.  By Douglas Kruse and Lisa Schur.

"Enabling Democracy:  Disability and Voter Turnout," <u>Political Research Quarterly</u>, Vol. 55, No. 1, March 2002, pp. 167-190.  By Lisa Schur, Todd Shields, Douglas Kruse, and Kay Schriner.

   Awarded prize by the Western Political Science Association as the best article published in the journal in 2002.

"What Affects Voter Turnout?  Lessons from Citizens with Disabilities," <u>Social Science Quarterly</u>, Vol. 81, No. 2, June 2000, pp. 571-587.  By Lisa Schur and Douglas Kruse.

"Persons with Disabilities:  Demographic, Income, and Health Care Characteristics," <u>Monthly Labor Review</u>, Vol. 121, No. 9, September 1998, pp. 13-22. By Douglas Kruse.

"The Role of Computer Skills in Employment and Earnings Following a Spinal Cord Injury," <u>Proceedings of the CSUN Conference on Technology and Persons with Disabilities</u>, Los Angeles, CA, March 1997.  By Douglas Kruse, Alan Krueger, and Susan Drastal.

"Computer Use, Computer Training, and Employment Outcomes Among People with Spinal Cord Injuries," <u>Spine</u>, Vol. 21, No. 7, April 1996, pp. 891-896.  By Douglas Kruse, Alan Krueger, and Susan Drastal.

<u>Employee Ownership, Profit Sharing, and Stock Options</u>

"Why Profit Sharing is Essential for Building Middle-class Incomes and Wealth," in Ray Boshara and Ida Rademacher, eds., <u>The Future of Building Wealth: Brief Essays on the Best Ideas to Build Wealth—for Everyone</u>.  St. Louis, MO:  Federal Reserve Bank of St. Louis and Aspen Institute, 2021, pp. 435-440.

"Guest editorial: New research on the impact of COVID-19 on employee-owned firms and the racial wealth gap in the context of the research literature<u>", Journal of Participation and Employee Ownership</u>, Vol. 4 No. 2 (2021), pp. 89-91. https://doi.org/10.1108/JPEO-09-2021-030.  By Blasi, J., Kruse, D. and Weltmann, D.

"The response of majority employee-owned firms during the pandemic compared to other firms," *Journal of Participation and Employee Ownership,* Vol. 4 No. 2  (2021), pp. 92-101. https://doi.org/10.1108/JPEO-09-2021-0014.  By Blasi, J., Kruse, D., & Weltmann, D.

"Race and gender wealth equity and the role of employee share ownership," Journal of Participation and Employee Ownership, Vol. 4 No. 2, pp. 116-135. https://doi.org/10.1108/JPEO-08-2021-0008. By Weissbourd, J., Conway, M., Klein, J., Chang, Y., Kruse, D., Hoover, M., Leverett, T., McKinley, J. & Trenholm, Z.

"Do Employee Share Owners Face Too Much Financial Risk?  Analysis of the Survey of Consumer Finances, forthcoming, https://doi.org/10.1177/00197939211007394.   By Douglas Kruse, Joseph Blasi, Dan Weltmann, Saehee Kang, Jung Ook Kim, and William Castellano.

"Aligning Interests to Leverage a Racially Diverse Workforce: The Effects of Racial Diversity on Firm-Level Outcomes Under the Use of Broad-Based Stock Options," Organization Science, forthcoming. By Han, J. H., Shin, D.-J., Castellano, W. G., Konrad, A. M., Kruse, D. L., & Blasi, J. R..

"Where does profit sharing work best? A meta-regression analysis," British Journal of Industrial Relations, 58(2), 2020, pp. 364-395.  By Hristos Doucouliagos, Patrice Laroche, Douglas L. Kruse, and T.D. Stanley.

"The State of ESOPs: What's Past Is Prologue: Introduction to the Special Issue on Employee Ownership, Policy, and New Data," Journal of Participation and Employee Ownership, Volume 2, Issue 3, Fall 2019.  By Joseph Blasi, Dan Weltmann, and Douglas Kruse.

"Broad-based Employee Stock Ownership: What Makes It Effective in the Management of Human Resources: Introduction to the Special Issue," Human Resource Management, Volume 58, Issue 6, November-December 2019, 567-584.  By Frank Mullins, Dan Weltmann, Douglas Kruse, and Joseph Blasi.

 "An Empirical Analysis of the Relationship between Employee Ownership and Employment Stability in the US: 1999–2011," British Journal of Industrial Relations, Vol. 56, No. 2, June 2018, pp. 245-291.  By Fidan Kurtulus and Douglas Kruse.

"Shared Capitalism in the U.S.: Evaluation and Future Policies."  In Jonathan Michie, Joseph Blasi, and Carlo Borzaga, eds., <u>Oxford Handbook of Mutual, Cooperative and Co-owned Businesses</u>.  Oxford: Oxford University Press, 2017, pp. 361-373. By Joseph R. Blasi and Douglas L. Kruse

"An American Historical Perspective on Employee Ownership."  In Jonathan Michie, Joseph Blasi, and Carlo Borzaga, eds., <u>Oxford Handbook of Mutual, Cooperative and Co-owned Businesses</u>.  Oxford: Oxford University Press, 2017, pp. 114-130.  By Joseph R. Blasi and Douglas L. Kruse.

"What does the U.S. Research Show about Worker Ownership?"  In Jonathan Michie, Joseph Blasi, and Carlo Borzaga, eds., <u>Oxford Handbook of Mutual, Cooperative and Co-owned Businesses</u>.  Oxford: Oxford University Press, 2017, pp. 211-226.  By Joseph R. Blasi, Richard Freeman, and Douglas L. Kruse

"Broad-based Employee Stock Ownership and Profit-Sharing:  History, Evidence, and Policy Implications," <u>Journal of Participation and Employee Ownership</u>, Vol. 1, No. 1, 2018, 38-60.  By Joseph R. Blasi, Douglas L. Kruse, and Richard Freeman.


"Having a Stake: Evidence and Implications for Broad-based Employee Stock Ownership and Profit Sharing" Policy Brief, February 2017. Third Way, Washington, D.C. http://www.thirdway.org/report/having-a-stake-evidence-and-implications-for-broad-based-employee-stock-ownership-and-profit-sharing.  By Joseph R. Blasi, Douglas L. Kruse, and Richard Freeman.

"Does Employee Ownership Improve Performance?" <u>IZA World of Labor</u>, December 2016, http://wol.iza.org/articles/does-employee-ownership-improve-performance;

"Do Broad-based Employee Ownership, Profit Sharing, and Stock Options Help the Best Firms Do Even Better?" <u>British Journal of Industrial Relations</u>, Vol. 54, No. 1, March 2016, pp. 55-82.  By Joseph Blasi, Richard Freeman, and Douglas Kruse.

"Anti-shirking effects of group incentives and human-capital-enhancing HR practices." <u>Advances in the Economic Analysis of Participatory and Labor-Managed Firms,</u> 16: 199-221, 2015.  By Andrea Kim, Kyongji Han, Joseph R. Blasi, and Douglas L. Kruse.

"Does Employee Ownership Affect Attitudes and Behaviors?  The Role of Selection, Status, and Size of Stake."  <u>Advances in the Economic Analysis of Participatory and Labor-Managed Firms,</u> 16: 251-277, 2015.  By Dan Weltmann, Joseph Blasi, and Douglas Kruse.

"Employee Stock Ownership and Profit Sharing in the New Era of Financialization and Inequality in the Distribution of Capital Income," in Christian Weller, ed., <u>Inequality, Uncertainty, and Opportunity: The Varied and Growing Role of Finance in Labor</u>

<u>Relations</u>.  Champaign, IL: Labor and Employment Relations Association, 2015, pp. 225-246.  By Joseph Blasi, Richard Freeman, and Douglas Kruse.

"Involvement work systems and operational effectiveness: Exploring the moderating effect of national power distance." <u>Journal of International Business Studies</u> Vol. 46, No. 3, 2014: 332-354. By Yuan Jiang, Saba Colakoglu, David P. Lepak, Joseph R. Blasi, and Douglas L. Kruse.

  Awarded the 2016 International HRM Scholarly Research Award, Human Resources Division, Academy of Management.

"Group Incentives and Financial Performance: The Moderating Role of Innovation," <u>Human Resource Management Journal</u>, Vol. 24, No. 1, 2014, 77-94.  By Rhokeun Park and Douglas Kruse.

"Firm Survival and Performance in Privately-held ESOP Companies," in Douglas Kruse, ed., <u>Sharing Ownership, Profits, and Decision-making in the 21st Century</u>, Volume 14 in the series "Advances in the Economic Analysis of Participatory and Labor-managed Firms." Bingley, UK:  Emerald Publishing, 2013.  By Joseph Blasi, Douglas Kruse, and Dan Weltmann.

"Employee share ownership and profit sharing in different institutional contexts," <u>International Journal of Human Resource Management</u>, Vol. 23, No. 8, 2012 pp. 1513-1518.  By Erik Poutsma, Joseph Blasi, and Douglas Kruse.

"An Empirical Analysis of Risk Preferences, Compensation Risk, and Employee Outcomes," in Ed Carberry, ed., <u>Employee Ownership and Shared Capitalism: New Directions in Research</u> Ithaca, NY:  Cornell University Press, 2011.  By Fidan Ana Kurtulus, Douglas L. Kruse, and Joseph R. Blasi.

"Solidarity and Sharing: Unions and Shared Capitalism," in Ed Carberry, ed., <u>Employee Ownership and Shared Capitalism: New Directions in Research</u> Ithaca, NY:  Cornell University Press, 2011.  By John E. McCarthy, Paula Voos, Adrienne.E. Eaton, Douglas L. Kruse, and Joseph R. Blasi.

"Worker Attitudes Toward Employee Ownership, Profit Sharing, and Variable Pay," in <u>Advances in the Economic Analysis of Participatory and Self-managed Firms, Volume 12</u>, edited by Jed DeVaro.  Bingley, UK:  Emerald Publishing, 2011, pp. 143-168. By Fidan Ana Kurtulus, Douglas Kruse, and Joseph Blasi.

"Employee stock ownership and diversification," <u>Annals of Operations Research</u>, April 2010, Vol. 176, No. 1, pp. 95-107.  By Harry Markowitz, Joseph Blasi, and Douglas Kruse.

"Employee involvement and group incentives in manufacturing companies: a multi-level analysis," Human Resource Management Journal, Vol. 20, No. 3, 2010, pp. 227-243. By Rhokeun Park, Eileen Appelbaum, and Douglas Kruse.

"Shared Capitalism in the U.S. Economy: Prevalence, Characteristics, and Employee Views of Financial Participation in Enterprises," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL: University of Chicago Press, 2010, pp. 41-76). By Douglas Kruse, Joseph Blasi, and Rhokeun Park.

"Worker Responses to Shirking under Shared Capitalism," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL: University of Chicago Press, 2010, pp. 77-104). By Richard Freeman, Douglas Kruse and Joseph Blasi.

"Risk and Lack of Diversification Under Employee Ownership and Shared Capitalism," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL: University of Chicago Press, 2010, pp. 105-138). By Joseph Blasi, Douglas Kruse, and Harry Markowitz.

"Creating a Bigger Pie? The Effects of Employee Ownership, Profit Sharing, and Stock Options on Workplace Performance," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL: University of Chicago Press, 2010, pp. 139-166). By Joseph Blasi, Richard Freeman, Chris Mackin, and Douglas Kruse.

"Who Has a Better Idea? Innovation, Shared Capitalism, and HR Policies," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL: University of Chicago Press, 2010, pp. 225-256). By Erika Harden, Douglas Kruse, and Joseph Blasi.

"Do Workers Gain by Sharing? Employee Outcomes Under Employee Ownership, Profit Sharing, and Broad-based Stock Options," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL: University of Chicago Press, 2010, pp. 257-290). By Douglas Kruse, Richard Freeman, and Joseph Blasi.

"Show Me the Money: Does Shared Capitalism Share the Wealth?" in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL:

University of Chicago Press, 2010, pp. 351-376).  By Robert Buchele, Douglas Kruse, Loren Rodgers, and Adria Scharf.

"Labor Practices and Outcomes Across Countries: Analysis of a Single Multinational Firm," in International Differences in the Business Practices and Productivity of Firms, edited by Richard Freeman and Kathryn Shaw.  Chicago: University of Chicago Press, 2009, pp. 105-136.  By Richard Freeman, Douglas Kruse, and Joseph Blasi.

"The Same Yet Different: Worker Reports on Labor Practices and Outcomes in a Single Firm Across Countries," Labour Economics, August 2008, Vol. 15, No. 4, pp. 750-71. By Richard Freeman, Douglas Kruse, and Joseph Blasi.

"Broad-based Employee Stock Options in the United States: Company Performance and Characteristics," Management Revue, Vol. 18, No. 2, 2007, pp. 5-22.  By James Sesil, Maya Kroumova, Douglas Kruse, and Joseph Blasi.

"The Changing Nature of Worker Ownership, Stock Options, and Profit Sharing in Corporate America," in The New American Workplace, edited by Edward Lawler and James O'Toole.  Palgrave Macmillan Publishers, 2006.  By Joseph Blasi, Douglas Kruse, and Richard Freeman.

"Are Diversification and Employee Ownership Incompatible?" The Journal of Employee Ownership Law and Finance, Vol. 18, No. 4, Fall 2006.  By Joseph Blasi and Douglas Kruse.

"Employee Ownership in the 2002 General Social Survey," The Journal of Employee Ownership Law and Finance, Vol. 18, No. 3, Summer 2006.  By Joseph Blasi and Douglas Kruse.

"The Political Economy of Employee Ownership in the United States: From Economic Democracy to Industrial Democracy?" International Review of Sociology, January 2006.  By Joseph Blasi and Douglas Kruse.

"Motivating Employee Owners in ESOP Firms: Human Resource Policies and Company Performance," in Virginie Perotin and Andrew Robinson, eds., Advances in the Economic Analysis of Participatory and Self-managed Firms, Vol. 8.  Greenwich, CN: JAI Press, 2004.  By Douglas Kruse, Richard Freeman, Joseph Blasi, Robert Buchele, Adria Scharf, Loren Rodgers, and Christopher Mackin.

"Does Employee Ownership Enhance Firm Survival?" in Virginie Perotin and Andrew Robinson, eds., Advances in the Economic Analysis of Participatory and Self-managed Firms, Vol. 8.  Greenwich, CN:  JAI Press, 2004.  By Rhokeun Park, Douglas Kruse, and James Sesil.

"The Effects of Restructuring Charges on Employer Contributions to Profit Sharing Plans," Journal of Accounting and Public Policy, Vol. 23, 2004, pp. 247-278.  By Scott Jackson, Elaine Mauldin, William Wilcox, and Douglas Kruse.

"Employee Stock Ownership," in Carl E. Van Horn and Herbert A. Schaffner, eds., Work in America: An Encyclopedia of History, Policy, and Society.  Santa Barbara, CA: ABC Clio, 2004, pp. 178-181.  By Joseph Blasi and Douglas Kruse.

"An Assessment of Employee Ownership In The United States With Implications For The EU," International Journal of Human Resource Management, September 2003.  By Joseph Blasi, Douglas Kruse, James Sesil, and Maya Kroumova.

"Motivating Employee Owners in ESOP Firms: Human Resource Policies and Company Performance," Proceedings of the 55th Annual Meeting, Industrial Relations Research Association, January 2003, pp. 307-317.  By Douglas Kruse, Richard Freeman, Joseph Blasi, Robert Buchele, Adria Scharf, Loren Rodgers, and Christopher Mackin.

"Sharing Ownership via Employee Stock Ownership," in Laixiang Sun, ed., Ownership and Governance of Enterprises: Recent Innovative Developments.  New York:  Palgrave MacMillan, 2003, pp. 96-123.  By James Sesil, Douglas Kruse, and Joseph Blasi.

"Research Evidence on the Prevalence and Effects of Employee Ownership," Journal of Employee Ownership Law and Finance, Vol. 14, No. 4, Fall 2002, pp. 65-90.  By Douglas Kruse.

"Broad-based Employee Stock Options in High-Technology Firms: Company Performance Effects," British Journal of Industrial Relations, Vol. 40, No. 2, June 2002, pp. 273-294.  By James Sesil, Maya Kroumova, Joseph Blasi, and Douglas Kruse.

"Broad-based Stock Option Programs: A Union-Nonunion Comparison," in David Lewin, ed.,  Advances in Industrial and Labor Relations.  Greenwich, CN:  JAI Press, 2002.  By Maya Kroumova, James Sesil, Douglas Kruse, and Joseph Blasi.

"Worker Ownership, Participation and Control: Toward a Theoretical Model," in Michael J. Handel, ed., Sociology of Organizations: Classic, Contemporary and Critical Readings.  Thousand Oaks, Ca.: Sage Publications, 2002.    By William Foote Whyte, Joseph Blasi, and Douglas Kruse.

"Broad-based Employee Stock Options in High-Technology Firms: Company Performance Effects," Proceedings of the Global Human Resource Management Conference, June 2001. By James Sesil, Maya Kroumova, Joseph Blasi, and Douglas Kruse.

"Employee Equity: Employee versus Owner Issues in Organizations," in Cary L. Cooper and Denise M. Rousseau, eds., Trends in Organizational Behavior, Volume 8.  New York and London: John Wiley & Sons, April 2001. By Joseph Blasi and Douglas Kruse.

"Is Employee Ownership An Unstable Form?  Or A Stabilizing Force?" in Margaret Blair and Thomas Kochan, eds., The New Relationship: Human Capital in the American Corporation.  Washington, D.C.: Brookings Institution, 2000. By Margaret Blair, Douglas Kruse, and Joseph Blasi.

"Broad-Based Stock Options and Company Performance: What the Research Tells Us," Journal of Employee Ownership Law and Finance, Vol. 12, No. 3, Summer 2000.  By Joseph Blasi, Douglas Kruse, James Sesil, and Maya Kroumova.

"Decentralisation of Bargaining Systems and Financial Participation: A Comparative Analysis of Italy, UK, and the US," Lavoro e Relazioni Industriali, Summer 1999, No. 1, pp. 1-41. By Alessandra Del Boca, Douglas Kruse, and Andrew Pendleton.

"Giving Employees an Ownership Stake," Brookings Review, Fall 1999, Vol. 17, No. 4, pp. 23-26. By Margaret Blair and Douglas Kruse.

"Public Opinion Polls on Employee Ownership and Profit Sharing," Journal of Employee Ownership Law and Finance, Vol. 11, No. 3, Summer 1999, pp. 3-25.  By Douglas Kruse and Joseph Blasi.

"Profit Sharing and the Demand for Low-Skill Workers," in Richard Freeman and Peter Gottschalk, eds., Generating Jobs: Increasing the Demand for Low-Skill Workers. New York:  Russell Sage Foundation, 1998, pp. 105-153. By Douglas Kruse.

"Employee Ownership, Employee Attitudes, and Firm Performance: A Review of the Evidence," in Daniel J.B. Mitchell, David Lewin, and Mahmood Zaidi, eds., Handbook of Human Resource Management.  Greenwich, CN: JAI Press, 1997, pp. 113-151. By Douglas Kruse and Joseph Blasi.

        Reprinted in Samuel Estreicher, ed., Employee Representation in the Emerging Workplace: Alternatives/Supplements to Collective Bargaining (Boston: Kluwer Law International, 1998), pp. 581-626.

"Financial Returns of Public ESOP Companies:  Investor Effects vs. Manager Effects," Financial Analysts Journal, Vol. 52, No. 4, Summer 1996, pp. 51-61.  By Michael Conte, Joseph Blasi, Douglas Kruse, and Rama Jampani.

"Why Do Firms Adopt Profit Sharing and Employee Ownership Plans?" British Journal of Industrial Relations, Vol. 34, No. 4, December 1996, pp. 515-38. By Douglas Kruse.

"Employee Stock Ownership and Corporate Performance Among Public Companies,"
Industrial and Labor Relations Review, Vol. 50, No. 1, October 1996, pp. 60-79.  By
Joseph Blasi, Michael Conte, and Douglas Kruse.

"Employee Ownership Through 401(k) Plans: The NCEO-Rutgers University Study,"
Journal of Employee Ownership Law and Finance, Vol 8, No. 4, Fall 1996, pp. 13-32.
By Susan Prolman and Douglas Kruse.

"The Impact of Financial Participation on Employee and Firm Performance," Corporate
Effectiveness and Human Resource Practices, Conference Proceedings, Institute of
Labor and Industrial Relations, University of Illinois, October 1996, pp. 423-463.  By
Douglas Kruse and Joseph Blasi.

"Profit Sharing and Public Policy," Journal of Economic Issues, Vol. 28, No. 2, June 1994.
By Douglas Kruse.

Reprinted in Basque journal Economiaz: Revista Vasca de Economia, Numero 33,
3er Cuatrimestre, 1995.

"Employees and Managers as Shareholders," Human Resource Planning, Vol. 17, No. 4,
1994, pp. 31-40. By Joseph Blasi, Douglas Kruse, and James Gasaway.

"Employee Ownership and Participation: Trends, Problems, and Policy Options," Journal of
Employee Ownership Law and Finance.  Vol 5, No. 2, Spring 1993, pp. 41-73. By
Joseph Blasi and Douglas Kruse.

"The New Owners: Stock Price Performance for Public Companies with Significant
Employee Ownership,"  Journal of Employee Ownership Law and Finance, Vol. 4,
No. 3, Summer 1992, pp. 95-130.  By Joseph Blasi, Michael Conte, and Douglas
Kruse.

"Profit Sharing and Productivity:  Microeconomic Evidence from the United States,"
Economic Journal, Vol. 102, No. 410, Jan. 1992, pp. 24-36. By Douglas Kruse.

"Employee Ownership," in Peter Newman, Murray Milgate, and John Eatwell, eds., The
New Palgrave Dictionary of Money and Finance.  London:  MacMillan Press Ltd.,
1992, pp. 759-761. By Joseph Blasi and Douglas Kruse.

"Profit Sharing in the 1980's: Disguised Wages or a Fundamentally Different Form of
Compensation?" in Randall Eberts and Erica Groshen, eds., Structural Changes in
U.S. Labor Markets: Causes and Consequences.  Armonk, NY:  M.E. Sharpe, 1992.
By Douglas Kruse.

"ESOPs, Profit Sharing, and Other Contingent Compensation Plans: How Do They Affect
Corporate Performance?"  Financial Management, Winter 1991, pp. 91-100.  By
Michael Conte and Douglas Kruse.

"The Role of Profit Sharing in Employee Compensation," <u>Commentary</u> (journal of the National University of Singapore), Vol. 9, No. 1/2, November 1991.  By Douglas Kruse and James Chelius.

"Strategic Problems and Tactical Promise: Unions and Employee Ownership," <u>Labor Law Journal</u>, Vol. 42, No. 8, August 1991, pp. 498-507. By Joseph Blasi and Douglas Kruse.

"Employee Ownership: Opportunities for Unions," <u>Work Place Topics</u>, Vol. 2, No. 1, July 1991, pp. 1-22.  By Joseph Blasi and Douglas Kruse.

"The New Owners: Employee Ownership in Public Companies," <u>Journal of Employee Ownership Law and Finance</u>, Vol III, No. 3, Summer 1991, pp. 129-152.  By Joseph Blasi and Douglas Kruse

"Profit Sharing and Employment Variability:  Microeconomic Evidence on the Weitzman Theory," <u>Industrial and Labor Relations Review</u>, Vol. 44, No. 3, April 1991, pp. 437-453. By Douglas Kruse.

> Reprinted in Morris Kleiner, ed., <u>Industrial Relations: Institutions and Organizational Performance</u> (Hampshire, England: Dartmouth, 1994).

"Profit Sharing and Productivity," in Alan Blinder, ed., <u>Paying For Productivity: A Look at the Evidence</u>.  Washington, D.C.:  Brookings Institution, 1990.  By Martin Weitzman and Douglas Kruse.

> Reprinted in Louis Putterman and Randy Kroszner, eds., <u>The Economic Nature of the Firm</u>, 1996.

<u>Other topics</u>

"Effects of Leader Networking Behaviors and Vertical Faultlines on Support for Innovation," *Small Group Research*, 2020, 51(5), 616-650.  By Chung, Y., Jiang, Y., Blasi, J. R., & Kruse, D. L.

"Worksite Segregation and Performance-Related Attitudes," <u>Work and Occupations</u>, February 2010; vol. 37, No. 1, pp. 45-72.  By Niki Dickerson, Lisa Schur, Douglas Kruse, and Joseph Blasi.

"High Performance Work Practices at Century's End: Incidence, Diffusion, Industry Group Differences and the Economic Environment, <u>Industrial Relations</u>, Vol. 45, No. 4, October 2006, pp. 547-578.  By Joseph Blasi and Douglas Kruse.

"The New Employee/Employer Relationship," in David Ellwood et al., <u>Working Nation: Workers, Work, and Government in the New Economy</u>.  New York:  Russell Sage Foundation, 2000.  By Douglas Kruse and Joseph Blasi.

>   Reprinted in Samuel Estreicher, ed., <u>Global Competition and the American Employment Landscape: As We Enter the 21st Century</u> (Boston: Kluwer Law International, 2001).

"Illegal Child Labor in the United States: Prevalence and Characteristics," <u>Industrial and Labor Relations Review</u>, Vol. 54, No. 1, October 2000, pp. 17-40.  By Douglas Kruse and Douglas Mahony.

"Flexible Work Hours and Labor Productivity: Some Evidence from the Pharmaceutical Industry," <u>Industrial Relations</u>, Vol. 35, No. 1, January 1996, pp. 123-139.  By Edward Shepard, Thomas Clifton, and Douglas Kruse.

"Pension Substitution in the 1980's:  Why the Shift Toward Defined Contribution Plans?" <u>Industrial Relations</u>, Vol. 34, No. 2, April 1995, pp. 218-241. By Douglas Kruse.

"Gender Differences in Attitudes Toward Unions," <u>Industrial and Labor Relations Review</u>, Vol. 46, No. 1, October 1992, pp. 89-102.  By Lisa Schur and Douglas Kruse.

"Supervision, Working Conditions, and the Employer Size-Wage Effect," <u>Industrial Relations</u>, Vol. 31, No. 2, Spring 1991, pp. 229-249. By Douglas Kruse.

"Displaced versus Disadvantaged Workers:  Policy Issues and Research Questions," in John Addison, ed., <u>Job Displacement: Consequences and Implications for Policy</u>. Detroit, MI:  Wayne State University Press, 1991. By Douglas Kruse.

"The Economic Implications of Employment Rights and Practices in the U.S.," <u>Journal of Comparative Economics</u>, Vol. 14, September 1990, pp. 221-253. By Douglas Kruse.

"International Trade and the Labor Market Experience of Displaced Workers," <u>Industrial and Labor Relations Review</u>, Vol. 41, No. 3, April 1988, pp. 402-417. By Douglas Kruse.

"Industrial Policy at the State Level in the United States," <u>Journal of Economic Issues</u>, XIX:2, June 1985.  By F. Gregory Hayden, Douglas Kruse, and Steven Williams.

"Small Business Financing:  A Survey of the Experiences and Attitudes of Nebraska Small Business Owners," <u>Proceedings of the Small Business Institute Directors' Association Conference, 1984</u>, February 1984, pp. 125-138.  By Douglas Kruse, Steve Williams and F. Gregory Hayden.


BOOK REVIEWS AND MISCELLANY:

"Foreword," <u>Institutional Analysis and Praxis: The Social Fabric Matrix Approach</u>, Tara Natarajan, Wolfram Elsner, and Scott Fullwiler, eds. (New York: Springer, 2009), pp. vii-viii.

"Commentary on 'The Economic and Social Impacts of Telework' by Sean Doherty et al.," <u>Telework: The New Workplace of the 21st Century</u>. Washington, D.C.: U.S. Department of Labor, 2000, pp. 98-102.

"<u>The Ownership Solution: Towards a Shared Capitalism for the 21st Century</u>: A Review," <u>Economic Analysis: The Journal of Enterprise and Participation</u>, Vol. 2, No. 1, 1999, pp. 70-72.

"<u>America's Agenda: Rebuilding Economic Strength</u>: A Review," <u>Journal of Comparative Economics</u>, Vol. 19, No. 1, August 1994, pp. 122-124.

"<u>Pensions and the Economy</u>:  A Review," <u>Industrial and Labor Relations Review</u>, Vol. 46, No. 3, July 1993.

"<u>Three Worlds of Labor Economics</u>:  A Review."  <u>Journal of Economic Issues</u>, XXIV:3, September 1990.

"<u>Workers' Self-Management in the United States</u>:  A Review." <u>Journal of Economic Issues</u>, XIX:3, September 1985.

"<u>Workplace Democracy and Social Change</u>:  A Review."  <u>Journal of Economic Issues</u>, XVII:4, December 1983.


CONGRESSIONAL TESTIMONY:

"Research on Stock Options," Testimony before the U.S. House of Representatives, Committee on Financial Services, Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises, April 21, 2004.

"Research Evidence on Prevalence and Effects of Employee Ownership," Testimony before the Subcommittee on Employer-Employee Relations, Committee on Education and the Workforce, U.S. House of Representatives, February 13, 2002.

"Profit Sharing and Gainsharing," Testimony before U.S. House of Representatives Committee on Small Business, Subcommittee on Regulation, Business Opportunities, and Technology, July 15, 1994.

"Testimony before the House Subcommittee on Economic Stabilization," <u>The National Entrepreneurship Act: Hearing before the Subcommittee on Economic Stabilization of</u>

the Committee on Banking, Finance,and Urban Affairs.  May 15, 1984, Serial No. 98-92. Washington, D.C.:  Government Printing Office, 1984.

REPORTS:

Disability and Voting Accessibility in the 2020 Elections: Final Report on Survey Results Submitted to the Election Assistance Commission.  February 2021.  By Lisa Schur and Douglas Kruse.

Projecting the Number of Eligible Voters with Disabilities in the November 2020 Elections, September 2020.  By Lisa Schur and Douglas Kruse.

Fact sheet: Elected Officials with Disabilities, September 2019.  By Lisa Schur and Douglas Kruse.

Fact sheet:  Disability and Voter Turnout in the 2018 Elections, July 2019.  By Lisa Schur and Douglas Kruse.

Fact sheet:  Disability and Voter Turnout in the 2016 Elections, August 2017.  By Lisa Schur and Douglas Kruse.

Projecting the Number of Eligible Voters with Disabilities in the November 2016 Elections, September 2016.  By Lisa Schur and Douglas Kruse.

Disability, Voter Turnout, and Voting Difficulties in the 2012 Elections, report submitted to the U.S. Election Assistance Commission, June 2013.  By Lisa Schur, Meera Adya, and Douglas Kruse.

Fact sheet:  Disability and Voter Turnout in the 2010 Elections, August 2011.  By Lisa Schur and Douglas Kruse.

Inclusive Capitalism for the American Workforce: Reaping the Rewards of Economic Growth through Broad-based Employee Ownership and Profit Sharing.  Center for American Progress, March 2011.  By Richard B. Freeman, Joseph R. Blasi, and Douglas L. Kruse.

Fact sheet:  Disability and Voter Turnout in the 2008 Elections, August 2009.  By Lisa Schur and Douglas Kruse.

Shared Capitalism, Employee Attitudes, and Company Outcomes:  An Analysis of the Great Place to Work Dataset, 2006-2008, submitted to the Sloan Foundation, December 2009.  By Joseph Blasi, Douglas Kruse, and Richard Freeman.

Employment of People with Disabilities: Report to the National Council on Disability, May 2007.  By Douglas Kruse (Principal Investigator) with James Schmeling, Meera Adya,

Carol Harvey, Todd Honeycutt, William Myhill, Cynthia Smith, M.A., Michael Morris, and Peter Blanck.

Assessment of Test Questions to Identify Disability Status: Report to the Bureau of Labor Statistics, January 2004.  By Douglas Kruse.

Theoretical Study on Stock Options in Small and Medium Enterprises, Report to the Enterprise-Directorate General, Commission of the European Communities, October 2002.  By Andrew Pendleton, Joseph Blasi, Douglas Kruse, Erik Poutsma, and James Sesil.

Non-standard Work Arrangements and Disability Income, Report to the Disability Research Institute, University of Illinois Urbana-Champaign, August 2002.  By Lisa Schur and Douglas Kruse.

Empowerment Through Civic Participation: A Study of the Political Behavior of Citizens with Disabilities, Report to the Rutgers Disability Research Consortium and N.J. Developmental Disabilities Council, March 1999.  By Douglas Kruse, Lisa Schur, Kay Schriner, and Todd Shields.

Disability and Employment: Characteristics of Employed and Non-employed People with Disabilities, Report to the Office of Policy, U.S. Department of Labor, September 1997.  By Douglas Kruse.

Disability, Employment, and Earnings in the Dawn of the Computer Age, Report to the Rutgers Disability Research Consortium and the N.J. Developmental Disabilities Council, October 1995.  By Douglas Kruse, Alan Krueger, and Susan Drastal.

ESOPs, Profit Sharing, and Gainsharing in Airlines and High-Technology Industries, Report to the U.S. Department of Labor, March 1995. By Linda Bell and Douglas Kruse.

Characteristics of Nebraska Migrants:  Data from the 1980 Census.  Lincoln, NE: Department of Economic Development, State of Nebraska, September 1984.

Equity Capital and Nebraska Small Businesses.  Lincoln, NE: Policy Research Office, State of Nebraska, 1984.  By F. Gregory Hayden, Douglas Kruse, and Steve Williams.

Nebraska Socioeconomic Indicators.  Lincoln, NE:  State of Nebraska, May 1984.  By Steve Williams and Douglas Kruse.


WORKING PAPERS AND CURRENT RESEARCH:

"See Me, Not the Disability: Field Experiments on Disability, Veteran, and Gender Status in Hiring Outcomes." By Mason Ameri, Lisa Schur, Meera Adya, and Douglas Kruse. October 2019.

"Disability and the Unionized Workplace," IZA Discussion Paper No. 12258, March 2019. By Mason Ameri, Mohammad Ali, Lisa Schur, and Douglas L. Kruse.

"Do Employee Share Owners Face Too Much Financial Risk?"  IZA Discussion Paper No. 12303, April 2019.  By Douglas Kruse, Joseph Blasi, Dan Weltmann, Saehee Kang, Jung Ook Kim, and William Castellano.

"Where does profit sharing work best? A meta-analysis on the role of unions, culture, and values,"  IZA Discussion Paper No. 11617, June 2018.  By Hristos Doucouliagos, Patrice Laroche, Douglas L. Kruse, and T.D. Stanley.

"The Disability Employment Puzzle: A Field Experiment on Employer Hiring Behavior." By Mason Ameri, Lisa Schur, Meera Adya, Scott Bentley, Patrick McKay, Douglas Kruse.  Working Paper No. 21560, National Bureau of Economic Research, Cambridge, MA, September, 2015.  Published in ILR Review.

"Show Me the Money: Does Shared Capitalism Share the Wealth?" NBER Working Paper 14830, April 2009.  By Robert Buchele, Douglas Kruse, Loren Rodgers, and Adria Scharf.  Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Shared Capitalism in the U.S. Economy: Prevalence, Characteristics, and Employee Views of Financial Participation in Enterprises," NBER Working Paper 14225, August 2008. By Douglas Kruse, Joseph Blasi, and Rhokeun Park.  Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Who Has a Better Idea? Innovation, Shared Capitalism, and HR Policies," NBER Working Paper 14234, August 2008.   By Erika Harden, Douglas Kruse, and Joseph Blasi. Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Creating a Bigger Pie?  The Effects of Employee Ownership, Profit Sharing, and Stock Options on Workplace Performance," NBER Working Paper 14230, August 2008.  By Joseph Blasi, Richard Freeman, Chris Mackin, and Douglas Kruse.  Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Do Workers Gain by Sharing? Employee Outcomes Under Employee Ownership, Profit Sharing, and Broad-based Stock Options," NBER Working Paper 14233, August 2008. By Douglas Kruse, Richard Freeman, and Joseph Blasi.  Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Worker Responses to Shirking under Shared Capitalism," NBER Working Paper 14227, August 2008.  By Richard Freeman, Douglas Kruse and Joseph Blasi.  Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Risk and Lack of Diversification Under Employee Ownership and Shared Capitalism," NBER Working Paper 14229, August 2008.  By Joseph Blasi, Douglas Kruse, and Harry Markowitz.  Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Motivating Employee-Owners in ESOP Firms:  Human Resource Policies and Company Performance," National Bureau of Economic Research Working Paper Number 10177, January 2004.  By Douglas Kruse, Richard Freeman, Joseph Blasi, Robert Buchele, Adria Scharf, Loren Rodgers, and Chris Mackin.

"Economic Democracy or Just Another Risk for Workers?  Reviewing the Evidence on Employee Ownership and Profit Sharing," presented at Columbia conference "Democracy, Participation, and Development," May 1999.

"Telecommuting and Home-based Work: Differences by Disability Status," November 1998.  By Douglas Kruse and MaryAnne Hyland.

"Labor Market Effects of Spinal Cord Injuries in the Dawn of the Computer Age," National Bureau of Economic Research Working Paper No. 5302, October 1995.  By Alan Krueger and Douglas Kruse.

GRANTS AND CONTRACTS:

Disability and Voting Accessibility in the 2020 Elections.  Lisa Schur and Douglas Kruse.  This $318,000 contract from the U.S. Election Assistance Commission funded a post-election national survey of 2569 people on disability and voting in the 2020 elections.  Report was delivered February 17, 2021.

Disability Inclusive Employment Policy RRTC (Rehabilitation Research and Training Center).  Douglas Kruse, Lisa Schur, Mason Ameri, and Yana Rodgers.  Funded by U.S. Department of Health and Human Services.  Project period 2020-2025.  Center is based at Syracuse with Rutgers and Harvard as partners.  Doug Kruse is PI on the Rutgers subaward of $943,000, and co-PI on the overall award of $4,375,000 based at Syracuse.

Disability and Assistive Technology.  Douglas Kruse, Lisa Schur, Mason Ameri, and Hazel-Anne Johnson.  "SFW-HTF-RL: Collaborative Research: Future of Work for People with Disabilities – Physical and Cognitive Training Through Perceptive and Adaptive Soft (PECASO) Wearable Robots." Funded by National Science Foundation.  Project period 2020-2024.  Project is based at CUNY with Rutgers as partner.  Doug Kruse is

PI on the Rutgers subaward of $619,279, and co-PI on the overall award of $1,884,010 based at CUNY.

Employee Ownership and Employment Stability.  Co-PI with Fidan Kurtulus for $40,000 grant from W.E. Upjohn Institute for Employment Research, 2012-2014.  We examined public employee ownership firms over the 1999-2011 period, analyzing their employment stability and survival during the two recessions. The results were published in a book in 2014.

Disability Discrimination and Job Requirements.  Co-PI for $200,000 grant from Employment Policy Rehabilitation Research and Training Center, based at University of New Hampshire and funded by National Institute on Disability and Rehabilitation Research, 2010-2015.  This project matches data on disability earnings gaps by occupation to data on occupational job tasks and ability requirements, examining whether disability earnings gaps are limited to occupations in which an impairment should limit productivity, or instead also exist in occupations where impairments do not limit productivity, which would support the idea that discrimination is at work.

Organizational Practices and Disability.  Co-investigator for $500,000 grant from the Office of Disability Employment Policy, U.S. Department of Labor, 2006-2007.  A consortium of Rutgers, Cornell, and Syracuse researchers worked with three other research partners and six companies to study how corporate policies and practices, and manager and co-worker attitudes, can limit or facilitate employment opportunities for people with disabilities.  The researchers developed case study standards and methodology, and then applied them in six case studies. The information from the case studies will provide lessons about what works in diverse settings, helping companies develop "best practices" for employing people with disabilities and providing a platform for ongoing benchmarking and self-evaluation.

Disability and Demand-side Employment Placement Models.  Co-investigator for $2.5 million grant in collaboration with Syracuse University and the University of Illinois, 2006-2011, from the National Institute on Disability and Rehabilitation Research, U.S. Dept. of Education.  This establishes a 5-year center to study factors affecting employer demand for people with disabilities.  The Rutgers projects include studies on contingent work, worker displacement, and 10-year projections of demand for specific abilities.

Desired and Actual Work Arrangements Among People with Disabilities.  Principal investigator for $51,350 in grants for putting disability questions on the 2006 General Social Survey.  In combination with two work modules (the Work Orientation module and the Quality of Work Life module), these data provide the first representative estimates of desired work arrangements among both employed and non-employed people with disabilities, and the attitudes and experiences of employed people with disabilities.

Shared Capitalism: Co-investigator with Richard Freeman, Joseph Blasi, and Chris Mackin
for $650,000 grant from Russell Sage Foundation and Rockefeller Foundation,
September 2000-December 2006.  We did case studies of 14 U.S. companies with
various forms of employee ownership, stock options, and profit sharing, with surveys
from 41,000 employees.  For nationally-representative data, we sponsored questions
on the 2002 and 2006 General Social Surveys regarding attitudes toward and
experience with employee ownership and profit sharing.  Results will form the basis of
a conference, several articles, and a book.

Design of Disability Questions for Current Population Survey:  Principal investigator for
$102,500 grant from Presidential Task Force on Employment of Adults with
Disabilities, August 2001-December 2002.  I worked with the Bureau of Labor
Statistics, under a Presidential Executive Order, to design disability questions for the
monthly population survey of the federal government.

Disability Research Institute:  Co-investigator for 5-year cooperative agreement with Social
Security Administration to do research on employment and disability income among
people with disabilities.  One project with Lisa Schur, funded by a $54,000 grant,
analyzed the prevalence and trends of alternative work arrangements among people
with disabilities over the 1992-2000 period, and legal issues facing workers with
disabilities in such arrangements.

Empowerment Through Civic Participation: A Study of the Political Behavior of Citizens
with Disabilities: Co-investigator for $102,500 in grants from the New Jersey
Developmental Disabilities Council, National Institute on Disability and
Rehabilitation Research, Presidential Task Force on Employment of Adults with
Disabilities, and Rutgers School of Management and Labor Relations for national
surveys following the November 1998 and 2000 elections.   The 2000 survey had 1000
respondents and the 1998 survey had 1240 respondents, with 500 respondents with
disabilities in 2000 and 700 respondents with disabilities in 1998.  The project, done
with collaborators Lisa Schur (Rutgers), Kay Schriner, and Todd Shields (U. of
Arkansas), compared people with and without disabilities in levels and determinants
of voter turnout and other forms of political participation.

Survival and Growth of Private ESOP Firms:  Co-investigator with Joseph Blasi for $20,000
grant from ESOP Foundation, National Center for Employee Ownership, and
Foundation for Enterprise Development, May, 2000-December, 2000.  This project
uses 1983-99 longitudinal Dun & Bradstreet data for 3010 firms to investigate the
relative survival and growth patterns of ESOP vs. non-ESOP firms.

<u>Disability and Employment</u>:  Principal investigator for $25,000 grant from U.S. Department of Labor, 1997.  I analyzed Survey of Income and Program Participation dataset to construct baseline information for evaluating likely impacts of policy proposals to encourage employment among people with disabilities.  The report provides portraits of employed and non-employed people with disabilities, and comparisons to the general population, with respect to demographic characteristics, personal and household income sources and amounts, health care insurance and utilization, and employment characteristics of the employed.

<u>Disability, Employment, and Computer Use</u>:  Co-investigator, with Alan Krueger of Princeton University, for $100,000 grant from Rutgers Disability Research Consortium and Princeton Industrial Relations Section.  We analyzed employment patterns among mobility-impaired individuals, and the extent to which computer technologies have affected the employability and earnings power of such individuals.

<u>ESOPs, Profit Sharing, and Gainsharing in Airlines and High-Technology Industries</u>:  Co-investigator, with Linda Bell of Haverford College, for $25,000 grant from U.S. Department of Labor to collect and analyze survey data from publicly-held firms in airlines and high-technology industries, 1995.

<u>The Productivity and Stability Theories of Profit Sharing</u>:  Principal investigator for $47,000 grant from W.E. Upjohn Institute for Employment Research to study profit sharing in publicly-held companies.  Published in Upjohn book in 1993.

PRESENTATIONS:

"Disability and Voting Accessibility in the 2020 Elections."  Presentation to American Council on the Blind, February 22, 2021, with Lisa Schur.

"Disability and Voting Accessibility in the 2020 Elections."  Presentation to U.S. Election Assistance Commission, February 17, 2021, with Lisa Schur.

"Disability and Voting: What Does the Research Say?" Presentation with Lisa Schur for "POWER: The Disability Vote" webinar, sponsored by American Association of People with Disabilities and REV UP! Campaign, June 22, 2020.

"Disability and Voting." Presentation with Lisa Schur for "Protecting the Right to Vote for People with Disabilities" webinar, sponsored by Leadership Conference On Civil and Human Rights, and National Disability Rights Network, May 21, 2020.

"Understanding Support for Employee Ownership," New Jersey/New York Center for Employee Ownership, Rutgers University, October 29, 2019.

"Where does profit sharing work best? A meta-analysis on the role of unions, culture, and values," International Association for the Economics of Participation conference, University of Ljubljana, Slovenia, July 2018.

"Where does profit sharing work best? A meta-analysis on the role of unions, culture, and values," Beyster Symposium, LaJolla, CA, June 2018.

"Employee Ownership: A Look at the Evidence," Vermont Employee Ownership Center, University of Vermont, Burlington, VT, June 2018.

"Disability and Employment," Sciences Po, St. Germain-en-Laye, Paris, France, March 16, 2018.

"Citizenship and Disability," Sciences Po, St. Germain-en-Laye, France, March 12, 2018.

"Tying Employee Rewards to Company Performance through Employee Ownership and Profit Sharing," University of Pennsylvania, July 2017.

"Do Employee Owners Face Too Much Financial Risk? Analysis of the Survey of Consumer Finances," International Association for the Economics of Participation, Copenhagen, Denmark, July 2016.

"Do Employee Owners Face Too Much Financial Risk? Analysis of the Survey of Consumer Finances," Beyster Symposium, LaJolla, CA, June 2016.

"The Disability Employment Puzzle: A Field Experiment on Employer Hiring Behavior," World Bank, January 13, 2016, with Mason Ameri and Lisa Schur.

"The Impact of Employee Stock Ownership and Profit Sharing for Low Income Families: The Rutgers University Kellogg Foundation Research Project," Kelso Workshop, Rutgers University, January 11, 2016.

"The Disability Employment Puzzle: A Field Experiment on Employer Hiring Behavior," NBER Summer Institute on Law and Economics, July, 2015, with Mason Ameri and Lisa Schur.

"How Did Employee Ownership Firms Weather the Last Two Recessions? Employee Ownership and Employment Stability in the U.S.: 1999-2010," Beyster Symposum, University of California-San Diego, January 2015, with Fidan Kurtulus.

"Survey Results on Polling Place Accessibility in the 2012 Elections," U.S. Election Assistance Commission, Washington, D.C., May 9, 2013

"Differentiating the Truly Great Place to Work Companies From the Good Companies," Beyster Mid-year Fellows Workshop, Rutgers University, February 2013.

"Shared Capitalism," Keynote Address, International Association for the Economic of Participation, Paris, France, July 2010.

"The Effects of Accommodations on the Employment of People with Disabilities," Jacobus ten Broek Symposium, National Federation of the Blind, Baltimore, MD, April 15, 2011.

"Research Overview for Discussion of CPS Disability Supplement," U.S. Bureau of Labor Statistics, Washington, D.C., October 19, 2010

"Does Shared Capitalism Help the Best Firms Do Even Better?" Centre for Economic Performance, London School of Economics, May 26, 2011.

"Shared Capitalism, Corporate Culture, and Performance," Beyster Institute, University of California-San Diego, July 2009.

"Disability at Work:  Job Characteristics and Attitudes of Employees with Disabilities," Labor and Employment Relations Association annual conference, San Francisco, CA, January 2009.

"Disability and Employment: Building a Research Agenda," Interagency Committee on Disability Research, Subcommittee on Employment, Washington, D.C., June 2008.

"Shared Capitalism Research Project," Organizational Dynamics, University of Pennsylvania, May 2008.

"Building Inclusive Organizations for Employees with Disabilities," School of Management and Labor Relations, Rutgers University, May 2008.

"Disability and Voter Turnout," University of North Carolina-Charlotte and Carolinas Rehabilitation Center, April 2008.  With Lisa Schur.

"Worker Responses to Shirking," M.I.T. Sloan School of Management, November 2007. With Richard Freeman and Joseph Blasi.

"Corporate Culture and the Experiences of Employees with Disabilities," Society of Industrial and Organizational Psychology, Dallas, TX, May 2006.  With Lisa Schur.

"Shared Capitalism in the U.S. Economy: Prevalence, Characteristics, and Employee Views of Financial Participation in Enterprises," NBER/Russell Sage Conference on Shared Capitalism, New York, NY, October 2006.

"Do Workers Gain by Sharing? Employee Outcomes Under Employee Ownership, Profit Sharing, and Broad-based Stock Options," NBER/Russell Sage Conference on Shared Capitalism, New York, NY, October 2006.

"Risk: Is It Economic Democracy, or Just Another Risk for Workers? Employee Attitudes Toward Risk-Sharing and Financial Participation in Company Rewards," October 2006.

"Motivating Employee-Owners in ESOP Firms:  Human Resource Policies and Company Performance," Industrial Relations Research Association, January 2004.

"Non-standard Work Arrangements and Disability Income," Disability Research Institute, Washington, D.C., June 5-6, 2002.  With Lisa Schur.

"Research Evidence on Prevalence and Effects of Employee Ownership," National Bureau of Economic Research, Cambridge, MA, April 12, 2002.

"Changes in the Workforce: Trends and Implications for Employment Law and Collective Bargaining," Industrial Relations Research Association, New Jersey chapter, April 1, 2002.  With Lisa Schur.

"Does the Definition Affect the Outcome?  Employment Trends Under Alternative Measures of Disability," Employment & Disability Policy Institute sponsored by Cornell University, Washington, D.C., October 2001.

"Non-standard Work Arrangements and Disability Income," Disability Research Institute, University of Illinois at Urbana-Champaign, April 26, 2001.

"Comments on 'The Economic and Social Impacts of Telework'," Conference on Telework, U.S. Department of Labor, New Orleans, LA, October 2000.

"Telecommuting and Home-based Work: Differences by Disability Status," Cornell Summer Institute on Disability and Employment Policy, Ithaca, NY, July 2000.

"Disability and Voter Turnout," presented to President's Committee on Employment of People with Disabilities, Subcommittee on Employee Disability Concerns, Washington, D.C., January 2000.

"Employment and Participation Among People with Disabilities," presented to European Union High Level Group on Disability, Washington, D.C., October 1999.

"Polling Place Accessibility for People with Disabilities," National Task Force on Elections Accessibility, Washington, D.C., June 1999, with Lisa Schur.

"Telecommuting and Home-based Work: Differences by Disability Status," Society for Disability Studies, Washington, D.C., May 1999.

"Economic Democracy or Just Another Risk for Workers?  Reviewing the Evidence on Employee Ownership and Profit Sharing," Conference on Democracy, Participation, and Development, Columbia, NY, April 1999.

"Telecommuting and Home-based Work: Differences by Disability Status," President's Committee on Employment of People with Disabilities, Washington, D.C., January 1999.

"The New Employee/Employer Relationship," Aspen Institute's Domestic Strategy Group, Aspen, Colorado, July 1998.

"The Wealth and Income Consequences of Employee Ownership," paper by Peter Kardas et al., presented at NBER conference "Shared Capitalism: Mapping the Research Agenda," Washington, D.C., May 1998.

"Is Employee Ownership an Unstable Form?  Or a Stabilizing Force?" MIT-Brookings Conference on Corporations and Human Capital, Dedham, MA, January, 1998.

"Employment Policies for the 21st Century," Social Security Administration conference on "Employment Post the Americans with Disabilities Act," Washington, D.C., November 1997.

"What Affects Voter Turnout?  Lessons from Citizens with Disabilities," Society for Disability Studies, Minneapolis, MN, May 1997, with Lisa Schur.

"Profit Sharing and the Demand for Low-Skill Workers," Federal Reserve Bank of Dallas, April 1997.

"The Role of Computer Skills in Employment and Earnings Following a Spinal Cord Injury," Conference on Technology and Persons with Disability, California State University-Northridge, Los Angeles, CA, March 1997.

"What Affects Voter Turnout?  Lessons from Citizens with Disabilities," Southern Political Science Association, Atlanta, GA, November 1996, with Lisa Schur.

"Disability, Employment, and Computer Use," American Spinal Injury Association, Seattle, WA, April 1996.

"Labor Market Effects of Spinal Cord Injuries in the Dawn of the Computer Age," Dept. of Economics, University of Maryland, Towson, MD, April 1996.

73

"Profit Sharing and Employee Ownership:  Review of the Issues and Research," Industrial Relations Research Association, San Francisco, CA, January 1996.

"Profit Sharing, Employee Ownership, and Corporate Governance," Seminar on Corporate Governance, Columbia University Law School, November 1995.

"Labor Market Effects of Spinal Cord Injuries in the Dawn of the Computer Age," National Bureau of Economic Research, Cambridge, MA, July 1995.

"Employee Ownership and Profit Sharing in the U.S. and Europe," Chinese State Commission for Restructuring the Economic System, New York, NY, July 1995.

"Profit Sharing and the Demand for Low-Skill Workers," Demand-Side Strategies for the Low-Wage Labor Market conference, Russell Sage Foundation, New York, NY, June 1995.

"Profit Sharing and Public Policy," Association for Evolutionary Economics, New York, NY, January 1994.

"Does Profit Sharing Affect Productivity?" Dept. of Economics, Columbia University, New York, NY, October 1993.

"Does Profit Sharing Affect Productivity?" National Bureau of Economic Research, Cambridge, MA, July 1993.

"Does Profit Sharing Affect Productivity?" Cornell University, Ithaca, NY, May 1993.

"Does Profit Sharing Affect Productivity?" Eastern Economics Association, Washington, D.C., March 1993.

"Profit Sharing, Productivity, and Employment Stability," U.S. Department of Labor, Pension and Welfare Benefits Administration, Washington, D.C., March 1990.

"Policy Implications of Profit Sharing," paper delivered at Society for the Advancement of Socio-Economics, Washington D.C., March 1990.

"Profit Sharing in the 1980's:  Disguised Wages or a Fundamentally Different Form of Compensation?" paper delivered at Wage Structure Conference, Federal Reserve Bank of Cleveland, November 1989.

"Profit Sharing and Productivity" (with Martin Weitzman), paper delivered at Brookings Institution conference on worker compensation and productivity, Washington, D.C., March 1989.

"The Economic Implications of Employment Rights and Practices in the United States," paper delivered at AEA/ACES Annual Meeting, New York, December 1988.

"Small Business Financing: A Survey of the Experiences and Attitudes of Nebraska Small Business Owners," with F. Gregory Hayden and Steven Williams, Small Business Institute Directors Association, February 1984, Denver, Colorado.

"The Effect of Employee Ownership on Desires for Participation," Western Social Science Association, April 1982, Denver, Colorado.


SERVICE TO PROFESSION:

Editor, British Journal of Industrial Relations, January 2011- June 2021.

Associate Editor, Journal of Participation and Employee Ownership, 2017-present.

Guest co-editor, special issue on Employee Ownership, Human Resource Management, 2018.

Co-chair, Awards Committee, Labor and Employment Relations Association, 2015-2018.

Member, Board of Reviewers, Industrial Relations, 1993-2004.

Recognized by Industrial and Labor Relations Review as one of its "most productive reviewers" over the 1995-99 period.

Referee for
Academy of Management Journal
American Economic Review
American Journal of Industrial Medicine
British Journal of Industrial Relations
Canadian Journal of Economics
Comparative Economic Studies
The Economic Journal
Human Resource Management
Industrial and Labor Relations Review
Industrial Relations
Journal of Comparative Economics
Journal of Disability Policy Studies
Journal of Economics and Business
Journal of Economic Behavior and Organization
Journal of Economic Issues
Journal of Labor Economics
The Milbank Quarterly
Organization Science

75

Policy Studies Journal
Quarterly Journal of Economics
Review of Economics and Statistics
Social Science Quarterly

SERVICE TO GOVERNMENT:

Member, Transition Team for a Stronger and Fairer Economy, New Jersey Governor-elect Phil Murphy, November 2017-January 2018.

Member of State Rehabilitation Advisory Council, New Jersey Division of Vocational Rehabilitation, 1999-2013.

Report prepared for National Council on Disability, Employment of People with Disabilities, May 2007.

Member of Advisory Committee for the Disability Statistics Center, Cornell University, 2004-2009.

Member of Blue Ribbon Expert Advisory Panel for the ADA Impact Study, funded by the National Council on Disability, 2004-2005.

Member of Advisory Committee for the Rehabilitation Research and Training Center for Economic Research on Employment Policy for Persons with Disabilities, Cornell University, 1998-2004.

Member of President's Committee on Employment of People with Disabilities, Subcommittee on Employment Disability Concerns, 1998-2000.

Consultant on designing Behavioral Risk Factor Surveillance System questions to identify environmental barriers facing people with disabilities, conducted by Craig Hospital (Denver, CO) with funding by Centers for Disease Control, 1998.

Consultant on designing and writing vocational rehabilitation book about labor market prospects for people with disabilities, Rehabilitation Services Administration, 1998-99.

Data prepared at request of Joint Economic Committee of the U.S. Congress, on employer stock and 401(k) plans, August 1998.

Report prepared for U.S. Department of Labor, Office of Policy, Disability and Employment: Characteristics of Employed and Non-employed People with Disabilities, September 1997.

Report prepared for U.S. Department of Labor, Office of the American Workplace, ESOPs, Profit Sharing, and Gainsharing in Airlines and High-Technology Industries, with Linda Bell, 1995.

Referee for National Science Foundation grant proposals, 1995, 1999.

Testimony before the Subcommittee on Employer-Employee Relations, Committee on Education and the Workforce, U.S. House of Representatives, concerning employee ownership and retirement security, February 13, 2002.

Testimony before U.S. House of Representatives Committee on Small Business, Subcommittee on Regulation, Business Opportunities, and Technology (Ron Wyden, Chair), concerning bill to provide incentives for profit-sharing and gainsharing plans, July 15, 1994.

Testimony before U.S. House of Representatives Committee on Banking, Finance, and

Urban Affairs, Subcommittee on Economic Stabilization (Charles Schumer, Chair), concerning

"The National Entrepreneurship Act," May 15, 1984.

SERVICE TO RUTGERS UNIVERSITY:

Associate Dean for Academic Affairs, School of Management and Labor Relations, Rutgers University (July 2017-December 2018)

Director, Ph.D. Program in Industrial Relations and Human Resources, School of Management and Labor Relations, Rutgers University (July 2007-June 2013)

New Brunswick Faculty Council representative (2014-2017)

Advisory Committee on Instructional Computing member (2001-2005)

University Research Council member (1998-2012)

Faculty mentoring committee member for Jasmine Feng (2016-present), Saunjuhi Verma (2015-present), Janice Fine (2007-2012), Saul Rubinstein (1996-2002), Stan Gully, (2000-2005), Ryan Smith (1995-2000), Marlene Kim (1993-1999), Barbara Rau (1995-1997), and Kirsten Wever (1997-1999).

Dissertation committee chair for Eric Schulz (1997), Rhokeun Park (2007), Andrea Kim (2013), Mason Ameri (2017), and Saehee Kang (current).

Dissertation committee member for Michael Zigarelli (1995), James Gasaway (1999), Maya Kroumova (1999), Douglas Mahony (2001), Haejin Kim (2003), Sean Way (2004), Saba Colakoglu (2008), and Dan Weltmann (2017).

Master's thesis committee chair for Sean Way (2001) and Rhokeun Park (2003)

Ph.D. Policy Committee, School of Management and Labor Relations (1995-1998, 2000-2005)

Library Committee, School of Management and Labor Relations (1988-1993, 1997-1998)

Admissions Committee (1989-1990, 1991-1992)

Health and Safety Committee, School of Management and Labor Relations (1989-1990)
Several faculty recruitment committees (1991-present)


AFFILIATIONS:

American Economic Association
Association for Comparative Economic Studies
Association for Evolutionary Economics
Labor and Employment Relations Association
Royal Economic Society
Society for Disability Studies

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF TEXAS, *et al.*,<br><br>Defendants. | Civil Action No. 5:21-cv-844 (XR)<br>(Consolidated Cases) |

## DECLARATION OF DR. KARA AYERS REGARDING THE IMPACT OF SENATE BILL 1'S REVISED OATH ON TEXAS VOTERS WITH DISABILITIES

I, Kara B. Ayers PhD, declare as follows:

## I. Purpose of this report and Summary of Opinion

1. My name is Dr. Kara B. Ayers, and I have been asked by the U.S. Department of Justice to offer an opinion on the impact of the revised voter assistance oath in Texas's enacted Senate Bill 1 ("SB 1") on voters with disabilities. This new law imposes strict limitations on the types of assistance citizens, including those with disabilities, can be provided in the voting booth.

2. Texas SB 1's revised oath will deny certain Texans with disabilities the help they need to cast votes that fully reflect their wishes. As a general matter, voters with disabilities disproportionately confront barriers to the ballot box. The revised oath adds to—not reduces—the impacts of these barriers, by barring forms of assistance that certain voters rely on to successfully vote, causing confusion about what assistance is allowed, and discouraging assistors from helping with threats of criminal consequences if they mistakenly provide help that is needed but not allowed. Texas already lags behind other states in overall voter turnout, which is inclusive of voters with disabilities (Li et al., 2018). SB 1 is likely to exacerbate the State's low turnout disproportionately

EXHIBIT

1

1

Exhibit 1

leaving out disabled voters who need more, not less, engagement in civic processes that greatly impact their lives (Li et al., 2018).

## II. Qualifications

3. I am a researcher whose work has focused on improving outcomes for people with disabilities, including better understanding the civic participation of people with disabilities. I am an Associate Professor of Pediatrics at Cincinnati Children's Hospital Medical Center (CCHMC) in the Division of Developmental and Behavioral Pediatrics. As part of this faculty appointment, I am also an affiliated faculty member of the University of Cincinnati College of Medicine Department of Pediatrics. As part of these roles, I am Associate Director of the University of Cincinnati Center for Excellence in Developmental Disabilities (UCCEDD) and the Director of the Center for Dignity in Healthcare for People with Disabilities. The UCCEDD is focused on improving a wide range of outcomes for Ohioans with disabilities, and the Center for Dignity is a national coalition that aims to identify and reduce healthcare inequities faced by people with disabilities.

4. I am trained as a psychologist. I obtained my PhD in clinical psychology from Nova Southeastern University in Fort Lauderdale, Florida in 2011. Prior to that, I graduated with my Master of Science in Clinical Psychology in 2007 from Nova Southeastern University and a Bachelor of Science in Psychology from Wright State University in Dayton, Ohio in 2003. My predoctoral training took place at Miami Children's Hospital, Dayton Children's Hospital, and Wright State University. My education and professional training provided a strong foundation of research and training to further my study of and work with people with disabilities across the lifespan. While many of my training placements and even my current place of employment are within pediatric health facilities, many of these institutions also house critical programming for adults with disabilities, who have served as the focus for most of my work.

5. My scholarship has been disseminated nationally and internationally. I have published 9 peer reviewed articles, 13 chapters, and 24 national conference abstracts on a wide range of disability-related topics, all with a general focus on pursuit of equitable community access and outcomes for people with disabilities. In my 2019

2

article "Fostering disability advocates: A framework for training future leaders through interprofessional education", I discuss my work developing disability policy curriculum for healthcare providers (e.g., physicians, physical therapists, social workers, psychologists, etc.). I've been invited to lead 2 international workshops and to serve as a panelist or presenter for 25 national events. Again, while specific topics of these workshops and presentations vary, they also share a common theme of spotlighting inequitable experiences of people with disabilities and what we can all do to improve fairness and justice for people with disabilities. My involvement in workgroups and taskforces reflects diversity within my work at different levels (e.g., local taskforces and international workgroups). I have been invited to speak to the White House on two occasions. In 2015, I was part of a White House panel on parenting with a disability, and in the spring of 2021, I spoke to the White House COVID-19 Health Equity Taskforce about the disproportionate impacts of the pandemic on people with disabilities. I have also been invited to share my work, research, and experience with multiple major media outlets, including the Washington Post and Fox News in 2021.

6. I am an American voter with a disability and have learned from the challenges I have experienced while voting. I was born with my disability, Osteogenesis Imperfecta, and use a wheelchair full-time for mobility. My disability also results in short stature, so I am a litter person. Although I have successfully cast my vote in many elections, I have also faced barriers. I have arrived at an assigned polling place with only steps to the entrance and no ramp. When polling precincts were reassigned, my new polling place was accessible but for several years, I was unable to reach the raised voting booth. I was given a clipboard to complete my ballot but wasn't afforded the same privacy provided to others in a voting booth. As I'm seated lower than most, it is quite easy for other voters walking past me to see the location of where I have bubbled my ballot. My polling station has recently added lowered tables that also included partitions for privacy. In my story alone, some progress is observable, but there is still work to do for election officials to be aware of disability issues and to ensure that all Americans, including voters with disabilities, can fully take part in our voting process.

3

7. In addition to authoring scholarship on disability policy, and I also have lived experience as a disabled person that informs my policy work. My professional position has entailed work in the realm of disability policy for approximately ten years, but I began working on disability policy more than 20 years ago when I was appointed to the National Youth Leadership Network. In that role, I received training on how to research policy impacts and how to communicate our experiences as disabled people effectively to policymakers. My focus on disability policy as an academic continues to examine the unintentional impacts of policy on the disability community. The disability movement has an important mantra, "Nothing about us without us." My dual role as a disability scholar and a disabled person has allowed me to apply what I learn in all parts of my life—both personal and professional—with a goal of reducing barriers for future generations of people with disabilities.

8. My work in disability advocacy has included supporting the successful participation of people with disabilities in the voting process. I serve on the national advisory council for the GoVoter Project, which is funded by Self Advocates Becoming Empowered (SABE), a disability advocacy organization for people with intellectual disabilities. The GoVoter Project is part of the National Technical Assistance Center for Voting and Cognitive Access, which helps protection and advocacy systems, election officials, and people with disabilities make voting accessible for all citizens. My work on this council has involved authoring and editing questions for an annual survey to explore the voting experiences of people with disabilities. After results are collected, I have helped with analyzing the results and writing the final report. I stay up to date on issues related to disability and voting by following the RevUp campaign, an initiative funded by the American Association of People with Disabilities (AAPD). RevUp stands for "Register, Educate, Vote, Use your Power!". RevUp aims to foster civic engagement and protect the voting rights of Americans with Disabilities. The RevUp network shares materials to help people with disabilities understand their right to vote and plan to vote in upcoming elections.

9. My curriculum vitae, which includes a complete list of my publications from the last ten years, is attached as Appendix A. I am being compensated at a rate of $300.00 per

4

hour. My compensation is not in any way contingent on the content of my opinion or the outcome of this matter. I have not served as an expert witness in the previous four years.

### III. Texans with Disabilities

10. Texans with disabilities are a large group of potential voters, making up approximately 28% of the adult population in the state or approximately 5.8 million adult Texans (CDC, 2019). This is just somewhat higher than overall prevalence in the United States (CDC, 2021). According to the most recent CDC (2019) state profile of Texans with disabilities, the most common type of disability is mobility (14%), followed by cognition (11%), disabilities that require assistance with independent living (7%), hearing disabilities (6%), vision disabilities (6%), and disabilities that require assistance with self-care (4%). Some Texans have more than one type of disability. Each of these types of disabilities can impact the process of casting a vote.

11. Not all disabilities are visible, and it may not be immediately apparent which voters need certain kinds of supports. Even some people with visible disabilities may be hesitant to identify as a person with a disability due to cultural variations, individual preferences, and the stigmatization of disability (Nario-Redmon, 2020). Because some people don't identify as disabled but objectively do have disabilities, the impact of policies like SB1 on people with disabilities is largely underestimated (Nario-Redmon, 2020).

12. Texas veterans with disabilities make up a disproportionate share of adults with disabilities in the state. The 2014 American Community Survey found that 20.5% of Texas veterans had a disability, compared to 14.9% of same-age nonveteran Texans (Committee on People with Disabilities, 2015).

### IV. Barriers to Voting for Texans with Disabilities

13. Voters with disabilities have lower voter turnout as compared to nondisabled Americans (Powell, 2017). Research by U.S. political scientist Schur and economist Kruse (2019) projected that one-sixth of the electorate, or more than 35 million people with disabilities (out of 56 million total people with disabilities), were eligible to vote in

5

the 2016 election. Many of these individuals with disabilities will be able to vote without assistance, but there will also be many people who require support and/or assistance to cast their ballot.

14. People with disabilities are an exceptionally heterogenous and diverse population; the most accurate representation of "the disability community" is captured with inclusion of a wide range of types, severity, and spectrums of disabilities and chronic illness. These variations within the disability community often impact the types of barriers people face and what kind of supports they would need to successfully cast their ballot. People with various types of disability (i.e., visual impairment, intellectual disability, brain injury) can have a "print disability", making it difficult for them to read, understand, fill out, and handle paper-based ballots or electronic ballots with written words on the screen. People with physical disabilities or mobility disabilities can need accessible polling stations and require accessible transportation to get to the polls. People who are Deaf, blind, or visually impaired may need their ballot in an alternative format. In order to make sense of the information on the ballot so that a person can make an informed decision, a voter may need to ask for clarity on which selection is marked (if a person is blind) or ask for clarification, rephrasing, or additional explanation about ballot instructions or ballot measures. Autistic voters and voters with traumatic brain injuries or other cognitive disabilities may exhibit body language that is difficult for unfamiliar others to interpret; they may find the sensory experience of voting (e.g., fluorescent lights, loud noises, and other sensory discomforts) difficult to tolerate without assurance and reminders on how to complete the process (Strömberg et al., 2021). Voters with memory impairments need prompting or reminders to help them remember the process (Strömberg et al., 2021).

15. Multiple factors drive down voter turnout for people with disabilities (Johnson & Powell, 2020; Friedman & Rizzolo, 2017). While voting trends are similar between disabled and nondisabled voters, their impacts are greater due to the overrepresentation of people with disabilities within groups who experience advanced age, poverty, and unemployment (Schur et al., 2008; Schur & Kruse, 2016). Since disabled people are more likely to be aging, live in poverty, and be unemployed, the

6

disparities in voting experienced by these groups are seen in greater proportion among people with disabilities. Disability can occur at any age, but it becomes more common as people advance in age. While 1 in 4 adults in the United States have some type of disability, 2 in 5 Americans who are 65 years and older have a disability (CDC, 2021). Socioeconomic ("SES") factors predict voting rates for people with and without disabilities, but their impact is disproportionately larger in driving down voting rates for people with disabilities because people with disabilities are more likely to live in poverty; an estimated 21.8% of Americans with disabilities earn less than $25,000 annually (Schur & Kruse, 2016). Low-income Americans with disabilities are also less likely to vote compared to Americans with disabilities with higher SES (Johnson & Powell, 2020). People with disabilities living in poverty are more likely to need assistance with voting because they have less access to sources to help them prepare or make voting easier (e.g., the internet and assisted technology). Also following trends of nondisabled Americans, people with disabilities who are unemployed are also less likely to vote than those who are employed (Johnson & Powell, 2020). Again, people with disabilities are disproportionately impacted by this predictor because people with disabilities are disproportionately unemployed as compared to nondisabled people.

16. The Sabe GoVoter survey is a participant-driven research effort led by people with disabilities to better understand the voting experience of people with disabilities. The 2020 GoVoter survey asked respondents (people with disabilities who did and did not vote) what types of accessibility problems they faced at polling locations. Some respondents indicated that poll workers lacked the competency to give them the assistance they needed to vote. Problems with accessible parking, trouble understanding the wording of ballots, broken elevators, and trouble voting from a wheelchair were noted (i.e., unable to reach the voting machine or table on which to vote). Long lines were particularly troublesome for people who lacked stamina to stand. Accommodations provided by the polling station, like a chair, may not be apparent or available until a person has waited for a significant amount of time in line. Voters reported, for example, that the directions poll workers gave them were confusing and that poll workers didn't know how to communicate with Deaf people. One respondent said that the poll worker spoke so loudly while assisting them that other people could

7

hear their selections. Research participants report frustration that their needs are not consistently met at the polls (Sabe, 2020; Friedman, 2017). Based on discussions with disabled people, many people who have a frustrating or humiliating experience at the polls will be less likely to return to exercise their vote.

17. Best practice in policy making directly includes the people most impacted. COVID-19 has also had its own impact on voting and policymaking for and about people with disabilities, as described in the most recent GoVoter report (SABE, 2020). Policymaking in the last 2+ years about the assistance people with disabilities need at the polls has included diminished input from people with disabilities whose safety was jeopardized by in-person testimony. Barriers to voting that were previously in place have been exacerbated. Many people with disabilities have underlying health conditions and have been disproportionately impacted by COVID-19 (Andrews et al., 2021; Syed et al., 2021). These concerns and decisions to forgo voting or participation in the democratic process are also reflected in decreased engagement in the legislative process because in-person testimony has remained the only option for many despite continued spread (at the time of this writing) of COVID-19. A 2021 Texas Tribune article shared the stories of voting rights advocates with disabilities who have also felt excluded from the policymaking process (Ura, 2021). Much of the in-person testimony about voting laws in Texas took place before COVID-19 vaccinations were available (Ura, 2021). The executive director for the Coalition of Texans with Disabilities is quoted by Ura (2021) to say, "Our voices weren't being heard at the very end when it was most important." By not risking their health to attend in-person legislative hearings, some advocates with disabilities were following recommendations by their healthcare teams. As a personal point of comparison, my own doctors had made similar recommendations (to avoid public places prior to vaccination). I previously traveled to Washington D.C. 4-6 times a year and delivered in-person testimony to my state policymakers a few times a year. Due to the risks of COVID-19, I have not traveled to DC for Hill visits or provided in-person testimony at my statehouse since 2020.

**V. Supports for People with Disabilities to Vote**

18. Most people with disabilities vote independently if their access needs are met. Approximately 70% of people surveyed in the Sabe GoVoter survey voted alone with the remainder receiving assistance from family (~20%), a service provider/staff (~5%), poll workers (~5%), and other (~2%). As reported, people with disabilities prefer to receive assistance from people already familiar in supporting their disability-related need, including people paid to assist them, friends, volunteers, and (most often) family members.

19. Just as there is great variation in the type and degree of support needed by voters with disabilities, their choice and needs in assistors are equally diverse. Poll workers who serve as assistors should be, but are not always, well-prepared to encounter voters with disabilities and know how to assist them. For example, voters report resistance and a lack of understanding among poll workers when they are asked to assist voters with disabilities. (Sabe, 2020). Other reported issues include that some poll workers are unfamiliar with how to facilitate use of accessible voting machines or when to suggest supports that would make the difference between a person casting their vote or not. While some poll workers do provide adequate assistance to voters who request it, it is not possible to train poll workers in all the ways to support all voters with disabilities. The option to bring one's preferred person and method to facilitate assistance is essential to preserve equal access to the polls. Voters with disabilities who require assistance from poll workers still have preferences in the type of assistance they need.

20. It has also been repeatedly reported that when people with disabilities need assistance to vote, whether they bring someone to help them or request help at the polls, they are often met with resistance and a lack of understanding from poll workers about whether they are entitled to vote, to receive assistance, and as to how they should be supported to vote (Schur, Adya, & Ameri, 2015). Rabia Belt (2016) described the anticipation of these difficulties or poor treatment at the poll as creating a "chilling effect" that has resulted in continued lower turnout of voters with disabilities. Addressing barriers to voting, including satisfaction or a feeling of fairness in the overall voting experience, is an important way to support citizens with disabilities to cast their ballot.

21. The assistance that people with disabilities need in order to vote varies widely. People with disabilities know best what kind of help they need to vote. Some people's disabilities require that they be provided with highly personalized or specific supports, making it necessary for them to rely on well-trained assistors who understand the individual's needs more intimately than a poll worker would to assist them with voting.

22. As previously stated, while some people can vote mostly independently if the ballot is read aloud to them, other people will need clarification about instructions on the ballot. The wording on ballots can be confusing. Some people with disabilities, such as those that impact audio processing or autism, need to recite aloud their understanding of their ballot and the choices they made to confirm with an assistor that they cast their ballot in line with their intentions. Some people with intellectual, cognitive, or psychiatric disabilities need time—without feeling rushed—to read or listen carefully while utilizing short-term memory and executive functioning skills to cast their vote. People with disabilities that impact short-term memory and executive functioning skills use memory aids or reminders from assistors to make their selections and cast their ballot. Some people with learning disabilities need simplified written directions in addition to verbal instructions to ensure they understand the voting process. Some people need trusted assistors to offer prompts or reminders as supports to help them remember the voting decision they made at home. Making decisions about voting are highly personal and varied. Getting help to vote can be an iterative process that, for some, may require asking process-related questions, getting feedback, and checking for understanding. Some blind people, especially those who retain some vision, need confirmation of which selections they've made. Sensory experiences at polling stations can also be overwhelming for people, including some autistic voters, who are overwhelmed by crowded, often noisy spaces. Some voters need help finding calm or regulating their emotions and sensory input prior to and during voting. Without attuned assistors who might recognize such a need and share the availability of such a support, the voter with a sensory disability would be at risk of not being able to fill out their ballot and cast their vote as intended.

10

23. People with disabilities are adept at problem-solving because we navigate a world not designed with us in mind daily. Citizens with disabilities are the best source of information about how they can best be supported to vote. People with disabilities want autonomy and have their own preferences, opinions, and civic priorities. Their disabilities—not a lack of these preferences and priorities—hinders their expression in environments that are not accessible and inclusive of assistance needed by people with disabilities. The range of supports is as variable as the spectrum of disability. Limiting supports will discourage voting because people will not have access to what they need to vote.

24. Accessible voting machines are another way to support voters with disabilities, but they may fall short if voters lack assistors who may explain how they work and answer the voter's questions. These machines vary in features available (Center for Civic Design, 2016). Some allow users to zoom in to enlarge text; others may read the ballot aloud or allow for selection through sip-and-puff technology by connecting to a person's customized assistive technology device (Center for Civic Design, 2016). Friedman's 2019 survey found some people found voting machines helpful to steady shaky hands and help people who find it difficult to write. Other respondents in that study reported machines at their polling station kept getting "stuck" and were "breaking down" (Friedman, 2019). Voters with disabilities need a range and always a choice of which supports work best with them to overcome unexpected difficulties like these. Some people want to ensure they have what they need by bringing their own equipment. In some cases, this includes an augmentative alternative communication device (AAC), including but not limited to text-to-speech systems or speech boards or communication systems (electronic or physical) that allow for symbol selection to communicate. When determining how to assist voters with disabilities who have brought their own equipment, poll workers and other assistors need to ask voters questions and to answer voters' questions to establish understanding.

25. People with various disabilities that make decision-making difficult (i.e., cognitive, learning disabilities, traumatic brain injuries, etc.) rely on assistors who use supported decision-making (SDM) to help them navigate the process of making significant

11

decisions (Davidson et al., 2015). SDM is a tool that allows people with disabilities to retain their decision-making capacity by selecting assistors to help them make choices. SDM prevents or limits the need for a substitute decision-maker and preserves the autonomy of a person to make their own decision (Davidson et al., 2015). Assistors familiar with the facilitation of SDM use this approach to help some people with disabilities cast their vote. Assistance to vote utilizing SDM includes learning about the voting process, gathering documents needed to register, accessing information about the candidates, and planning for what is needed at the polls to vote successfully. Some people get this type of support through SDM before they vote. Many still need assistance to complete the process of casting their vote. Permitting appropriate assistance to people with disabilities when and how those voters request it is a critical way to support the enfranchisement of citizens with disabilities in the voting process.

### VI. Concerns about Texas SB 1 and its impact on Texas voters with disabilities

26. I have reviewed the revised oath in SB 1 and have concluded that this law is likely to disenfranchise certain voters with disabilities by depriving them of the assistance they need to cast their ballot as they intend.

27. The oath states that an assistor must "confine (their) assistance to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot." This leaves a significant gap between the assistance that certain voters with disabilities need to vote and the assistance they will be permitted to receive. Some voters with intellectual disabilities will require an iterative dialogue of questions and answers that help them understand the voting process and the steps they need to take in casting their vote. Some voters with intellectual or developmental disabilities will need reminders of how to complete their ballot and the steps to take to cast their vote. Some people with intellectual disabilities benefit from basic gestures that guide voters through the multiple steps to cast their vote and submit their ballot. Some voters who want to use accessible voting machines need help in understanding how they work or how to use them alongside their own assistive technology, like wheelchairs and augmentative alternative communication devices. In some cases, assistors and/or poll workers will need to ask questions about how to best help a person. Per SB 1's

12

revised oath, assistors are prohibited from answering questions posed by the voter. Due to the variety of types of disabilities and ways to assist individuals to vote, it is essential that lines of communication remain open and unencumbered to facilitate voters with disabilities to take part in the process. To provide effective assistance, assistors, including poll workers, must be free to ask and, most importantly, answer questions about how best to assist the disabled voter.

28. Assistors must take the revised oath in SB 1, which includes an acknowledgment that if they fail to remain confined in the way they help voters, it is punishable under the penalty of perjury. Assistors and people with disabilities are not mutually exclusive. Many caregivers of people with disabilities also have disabilities themselves and/or are aging (Crabb et al., 2020). The oath imposes a substantial risk of confusion for some assistors, especially for those with developmental disabilities or difficulties hearing or processing auditory information. People who have provided assistance in the past in ways that are no longer allowed are also at risk of confusion with new restrictions. Some people will only hear the consequence if they inadvertently or unintentionally violate the restrictions. After analyzing this law and reviewing the relevant literature, I have concluded that a threat of criminalization will result in less—not more—interest and commitment from potential assistors to learn and understand how they can effectively and appropriately assist a voter with a disability. If faced with the question of denying a disabled person the right to vote or ensuring their own safety from criminalization related to SB 1, many assistors will likely err on the side of denying assistance. Many people with disabilities don't want to endanger their caregivers. A KWTX story about Texas SB 1 quoted a woman with spinal muscular atrophy who needs her caregiver to assist her in voting, "We don't want to jeopardize our attendants, but we want to be able to vote, but we need our attendants' help, so we're in a Catch-22." (Dey, 2022).

29. There are already several deterrents to voting for people with disabilities. There is reason for concern that the revised oath in SB 1 will become another barrier to voting because people will be uncertain how to get the help they need to vote. Places and organizations to which people with disabilities typically go to get important information about policies that impact people with disabilities lack certainty on the impacts of SB1.

Advocacy groups, including the Coalition of Texans with Disabilities and the State's Protection and Advocacy organization, Disability Rights Texas, are challenged to educate voters with disabilities about what they should do if the voters need assistance that conflicts with the new rules (Dey, 2022). Protection and advocacy organizations advocate for civil and legal rights of people with disabilities within each state. From conversations with people in the disability community, most voters with disabilities and their assistors typically want to comply with the law but fear that even an unintentional mistake could result in criminal consequences. That fear will add to the list of deterrents keeping Texas voters with disabilities from engaging in their fundamental right as American citizens. Fear keeps people from the polls, and failure to get the assistance needed to vote stops people from casting their ballot.

30. The frustration, discouragement, and disenfranchisement experienced by eligible voters with disabilities who go to the polls but experience barriers can have a lasting effect (SABE, 2020). For some eligible voters, they will never return to exercise their right to vote. Texas voters with disabilities who previously cast their vote with assistance that is no longer permitted will be faced with the untenable choice to forgo their right to vote or try to vote without the supports they know they need. This is likely to result in the very real possibility that voters with disabilities will not be able to cast their ballot as they intended. Voters will be unable to confirm, clarify, or check for understanding. They will be unable to receive reminders or gain access to individualized supports that make the difference between turning out to vote and casting their ballot or not.

## VII. Conclusion

31. Voters with disabilities often know what assistance they need to vote, and the rigidity introduced by the revised oath in SB 1 will make it impossible for some voters to get the help they need. Our democracy is strengthened by representation from all citizens. People with disabilities are often impacted in major ways by a wide range of local, state, and federal policies. The opportunity for engagement in the voting process by voters with disabilities is critical to ensuring laws are fair and that elected officials represent their constituents.

14

32. After reviewing the law, it is my opinion that SB 1 will not only discourage Texans with disabilities from voting but also discourage the poll workers and assistors from helping people to vote. The assistance assistors provide can make the difference whether a citizen can vote or not. The oath and its implementation introduce confusion and creates fear, which makes it more difficult to ask for help to vote, to get the help needed to vote, and to vote. The restrictions on asking and answering questions precludes assistors from effectively assisting certain people with disabilities to vote. It is paramount that voters with disabilities cast ballots that reflect their choices. To do so, they may need to ask questions and get answers about the voting process as it relates to their disability. Disability, the way it impacts a person, and effective supports are exceptionally variable. There are no "one size fits all" approaches to assistance. Limiting or constraining assistance to merely reading the ballot to the voter, directing the voter to read the ballot, marking the ballot for the voter, or directing the voter to mark the ballot will inevitably exclude a significant and important part of the Texas electorate.

## References

Andrews, E. E., Ayers, K. B., Brown, K. S., Dunn, D. S., & Pilarski, C. R. (2021). No body is expendable: Medical rationing and disability justice during the COVID-19 pandemic. *American Psychologist*, *76*(3), 451.

Belt, R. (2016). Contemporary voting rights controversies through the lens of disability. *Stan. L. Rev.*, *68*, 1491.

Center for Civic Design (2016). Assistive Technology in the Polling Place: Current and Emerging Technology. A White paper for Human Factors Public Working Group.

Centers for Disease Control and Prevention (2021). Disability Impacts All of Us. Retrieved from: https://www.cdc.gov/ncbddd/disabilityandhealth/infographic-disability-impacts-all.html.

Centers for Disease Control and Prevention (2019). Disability and Health U.S. State Profile Data for Texas (Adults 18+ years of age). Retrieved from: https://www.cdc.gov/ncbddd/disabilityandhealth/impacts/texas.html.

15

Committee on People with Disabilities. (2015). Policy recommendations for the 2015–
2017 biennium 84th legislative session: January 2015. Retrieved February 20,
2022, from http://gov.texas.gov/files/disabilities/2015-
17_Policy_Recommendations.pdf

Davidson, G., Kelly, B., Macdonald, G., Rizzo, M., Lombard, L., Abogunrin, O., ... &
Martin, A. (2015). Supported decision making: A review of the international
literature. *International Journal of Law and Psychiatry*, *38*, 61-67.

Dey, S. (2022, February). Texans with disabilities fear new restrictions on voting helpl
could mean criminal charges at the polls. KWTX. Retrieved from:
https://www.kwtx.com/2022/02/16/texans-with-disabilities-fear-new-restrictions-
voting-help-could-mean-criminal-charges-polls/.

Friedman, C., & Rizzolo, M. C. (2017). Correlates of voting participation of people with
intellectual and developmental disabilities. *Journal of social work in disability &
rehabilitation*, *16*(3-4), 347-360.

Hennessy, M. J., & Sullivan, K. A. (2021). A 'Network of Understanding and
Compassion': A Qualitative Study of Survivor Perspectives on Unmet Needs
After Traumatic Brain Injury (TBI) in Regional Communities. *Brain Impairment*, 1-
12.

Johnson, A. A., & Powell, S. (2020). Disability and election administration in the United
States: barriers and improvements. *Policy Studies*, *41*(2-3), 249-270.

Li, Q., Pomante, M. J., & Schraufnagel, S. (2018). Cost of voting in the American
states. *Election Law Journal: Rules, Politics, and Policy*, *17*(3), 234-247.

Nario-Redmond, M. R. (2020). Ableism: The Causes and Consequences of Disability
Prejudice. John Wiley & Sons.

Powell, S. (2017). Disability and Voting. *Disability and US Politics: Participation, Policy,
and Controversy [2 volumes]*, 95.

SABE GoVoter Survey Results Report. (2020). Retrieved from:
https://www.sabeusa.org/wp-content/uploads/2021/10/SABE-GoVoter-2020-Survey-Report.pdf

Schur, L. & Kruse, D. (2019). "Fact Sheet: Disability and Voter Turnout in the 2018 Elections." Rutgers School of Management and Labor Relations.<https://smlr.rutgers.edu/sites/default/files/Documents/Centers/Program_Disability_Research/Fact%20Sheet%20Disability%20Voter%202018%20Elections.pdf

Schur, L., Adya, M., & Ameri, M. (2015). Accessible democracy: reducing voting obstacles for people with disabilities. *Election Law Journal, 14*(1), 60-65.

Schur, L., Kruse, D., Schriner, K., & Shields, T. (2008). Voter turnout, voting difficulties, and disability in the 2000 elections: Laying a challenge at democracy's door. Retrieved January 30, 2008, from http://www.accessiblesociety.org/topics/voting/voterturnout.htm

Schur, L., Shields, T., & Schriner, K. (2005). Generational cohorts, group membership, and political participation by people with disabilities. Political Research Quarterly, 58(3), 487-496.

Strömberg, M., Liman, L., Bang, P., & Igelström, K. (2021). Experiences of Sensory Overload and Communication Barriers by Autistic Adults in Health Care Settings. *Autism in Adulthood.*

Syed, I., Bishop, M., Brannon, S., Hudson, E., & Lee, K. (2021). Designing Accessible Elections: Recommendations from Disability Voting Rights Advocates. *Election Law Journal: Rules, Politics, and Policy.*

Ura, A. (2021, July 5). "Texans with disabilities fear voting will get harder for them as special session on GOP restrictions nears." The Texas Tribune. Retrieved from: https://www.texastribune.org/2021/07/05/texas-voting-disability/

Executed on February 28, 2022 in Mason, Ohio.

I declare under penalty of perjury the foregoing is true and correct.

Dr. Kara B. Ayers, PhD

## CURRICULUM VITAE

### Kara B. (Sheridan) Ayers, PhD

**Office:** Cincinnati Children's Hospital
Medical Center
Department of Developmental
and Behavioral Pediatrics
3333 Burnet Ave., MLC 4002
Cincinnati, OH 45229
Phone: (513) 803-4402
Fax: (513) 803-0072
Email: kara.ayers@cchmc.org

## EDUCATION

| | |
|---|---|
| Bachelor of Science | 2003 |
| Wright State University | |
| Dayton, OH | |
| Major: Psychology | |
| Minor: Rehabilitation Services | |

| | |
|---|---|
| Master of Science in Clinical Psychology | 2007 |
| Nova Southeastern University | |
| Fort Lauderdale, Florida | |

Ph.D. in Clinical Psychology ... 2011
Nova Southeastern University
Fort Lauderdale, Florida
Dissertation: Growing up with Brittle Bones:
The Psychosocial
Functioning of Children and Adolescents with
Osteogenesis Imperfecta
Chair: Sarah Valley-Gray, Psy.D.

Predoctoral Training
Doctoral Internship ... 2010-2011
Wright State University
Rotations: Dayton Children's Hospital and Counseling
and Wellness Services
Supervisor: Robert Rando, Ph.D.
Pre-Doctoral Practicum ... 2006-2009
Miami Children's Hospital
Rotation: Inpatient and Outpatient Psychiatry
Supervisor: Janet Rosen, Ph.D.

| | |
|---|---|
| Pre-Doctoral Practicum<br>Florida International University<br>Rotation: Community-Based Research Institute<br>Supervisor: Staci L. Morris, Ph.D. | 2005-2006 |

**Other Training**

| | |
|---|---|
| The National Leadership Consortium on<br>Developmental Disabilities | 2015 |

Description: A week-long (August 3-7, 2015) competitive, intensive leadership training program for emerging leaders in the fields of developmental disabilities

| | |
|---|---|
| Certificate Program in Clinical and<br>Translational Research<br>University of Cincinnati<br>Completed: Introduction to<br>Epidemiology and Statistical programs | 2018-<br>present |

## ACADEMIC APPOINTMENT

| | |
|---|---|
| Associate Professor<br>Department of Pediatrics, University of<br>Cincinnati Division of Developmental<br>Behavioral Pediatrics at<br>Cincinnati Children's Hospital Medical Center | March 2016-present |

## PREVIOUS EMPLOYMENT

| | |
|---|---|
| Jackson Memorial Hospital<br>Outpatient Hematology/Oncology Clinic<br>Position: Pediatric Clinic Teacher. | April 2005 - August 2006 |
| Disaboom, Inc.<br>Position: Contracted Feature Writer | October 2007 - April 2010 |
| Cincinnati Recreation Commission<br>Position: Program Leader | May 2009 - May 2010 |
| The Family Nurturing Center<br>HOPE (Helping Others Parent Effectively)<br>Program<br>Position: PCIT Parent Group Facilitator | June 2009 - June 2010 |

Ivy Tech Community College                       August 2009-December
Position: Psychology Instructor (Adjunct)        2021

Child Focus, Inc.                                September 2011 - March 2012
Position: Postdoctoral Fellow

Professional Psychiatric Services                July 2012 - December 2013
Position: Independent Contractor
Diagnostician/Therapist

Cincinnati Children's Hospital Medical           January 2013-December 2015
Center
University of Cincinnati UCEDD
Position: Advocacy and Information
Dissemination Coordinator

## LICENSING and CERTIFICATIONS

Collaborative IRB Training Initiative (CITI) Program
      Human Subjects Research Core Curriculum: expires 6/21/2023
      Decisionally Impaired Subjects: expires 6/21/2023
      Children Research: expires 6/21/2023
      International Participants: expires 6/21/2023
      Students: expires 6/21/2023

Project ECHO certified trainer: February 2021

## AWARDS and HONORS

Wright State University's Community Advisor of the Year          2000

Faculty Academic Scholarship                                    2001

Oelman Psychology Scholarship                                   2002

Schardt Memorial Scholarship                                    2002

PSI CHI, National Psychology Honors Society                  2001-2003

Pi Lambda Theta, International Honor Society and           2004-present
Professional Association in Education

Women in Research Award Winner (Section 2)                      2007

| | |
|---|---|
| Youngest member to be inducted into Franklin County High School Hall of Fame | 2013 |
| Legacy Award from Living Arrangements for the Developmentally Disabled (LADD) | 2015 |
| Imagination and Courage Award from the Division of Developmental and Behavioral Pediatrics at Cincinnati Children's Hospital Medical Center | 2018 |
| Community Advocate Award from the Cincinnati Reds and 2019 Cincinnati Disability Organizations | 2019 |
| Cincinnati Children's Hospital Advocacy Achievement Faculty Award | 2019 |
| National Council of Schools and Programs of Professional Psychology Diversity Award | 2020 |
| Ed Roberts Award A National award in recognition of contributions to the study of parenting with a disability | 2021 |
| Certificate of Distinction from the Kentucky House of Representatives for work improving lives of families with disabilities | 2021 |
| Integrating Special Populations Award from the Center for Clinical and Translational Science and Training | 2021 |

## CLINICAL ACTIVITIES

Current appointment is non-clinical.

**Program Leadership**

| | |
|---|---|
| Co-Founder and Co-Director of the Disabled Parenting Project (DPP) | 2015-present |

Description: The DPP is an online information clearinghouse that leverages the power of connecting parents with disabilities to each other. The DPP informs social policy concerning this underserved population through the development of scholarly research, fact sheets, and training resources.
Impact: Online reach to an average 6,600 individuals per month. 79,875 reached last year.

| | |
|---|---|
| Associate Director of the University of Cincinnati Center for Excellence in Developmental Disabilities (UCCEDD) | 2016-present |

The Cincinnati UCEDD is one of 67 UCEDDs across the country. UCEDDs are federally funded from a competitive grant to fulfill the obligations of the Developmental Disabilities Act. As UCCEDD Associate Director, I lead efforts around disability policy (at both a state and federal level). Additionally, I supervise

programmatic efforts and ensure UCCEDD fulfills the four core functions: policy/research, community service/training, interdisciplinary training, and information dissemination.

Director of the Center for Dignity in Healthcare for People            2019-present
with Disabilities (CDHPD)
The CDHPD is a collaborative effort with eight national partners to identify and reduce life-limiting healthcare inequities for people with intellectual and developmental disabilities. The CDHPD contributes to research related to discrimination in healthcare. It has provided a wide range of resources on COVID-19 for people with disabilities, their families, and healthcare providers. On average these resources reach 15,000 people per week.

## RESEARCH and SCHOLARLY ACTIVITIES

My research and scholarly activities share a focus on improving outcomes for individuals with disabilities. My federal appointment to the Patient-Centered Outcomes Research Institute has facilitated the connection of my work on patient-engagement to critical initiatives aimed at transforming healthcare. Since co-founding the Disabled Parenting Project in 2015, my visibility in writing, teaching, and speaking about parenting with a disability has increased to a national and international level. I am also a frequently invited subject matter expert across a wide range of disability policy and bioethical issues. As a result of my dual alignment with and representation of both the disability community and multi-disciplinary fields of health and medicine, I am afforded unique opportunities to bridge these communities.

### Grants and Contracts
#### CURRENT GRANTS
1. University Centers for Excellence in Developmental Disabilities Education, Research, and Service from the Administration on Community Living.
Co-Investigator
HHS-2017-ACL-AOD-DDUC-0195
$547,000 per budget period with 5 budget periods
Awarded 2017-2022
Role: Co-Investigator; 70% Effort
Goals: 1) Conduct Leadership Education in Neurodevelopmental and other Disabilities (LEND) and other, formal interdisciplinary pre-service training program(s) to prepare pre-/para professionals, professionals, people with developmental disabilities (DD) and family members to work with people with disabilities/families in a culturally competent manner towards improved health outcomes and quality, community-based living. 2) Increase opportunities for improved health and quality community living by providing community training, technical assistance, and model and demonstration services for people with DD, their families, pre- and paraprofessionals, professionals and the general public. 3) Perform and evaluate, translate, and impact research and policy to improve health outcomes and quality community living of diverse

people with DD and their families. 4) Inform individuals with DD, their families, service systems, professionals, policy makers, and the public about the knowledge and expertise of the UC UCEDD and the UCEDD network and issues of importance to the DD community in an accessible and culturally competent way.

2. Department of Health and Human Services Administration for Community Living. Administration on Disability: Equal Access to Healthcare for People with Intellectual and Developmental Disabilities.
Developmental Disabilities: Project of National Significance
90DNHC0001
Principal Investigator; 20% Effort
$500,000 per budget period for 3 budget periods
Awarded: 2019-2022
Goal: Address discrimination and ableism in healthcare through the establishment of a multi-site collaborative Center for Dignity in Healthcare for People with Disabilities

3. Maternal and Child Health Bureau/Health Resources and Services Administration. Title of Project: University Affiliated Cincinnati Center for Developmental Disorders/Leadership Education in Neurodevelopmental and other Related Disabilities
No: T73 MC 00032
Funding amount: $710,000/per year; July 1, 2016 – June 30, 2021; $786,000/per year; July 1, 2011- June 30, 2016.
Role: Core Faculty; 10% Effort
Goals of Grant: 1) Advance the knowledge and skills of all child health professionals to improve health care delivery systems for children with developmental disabilities. 2) Provide high-quality interdisciplinary education that emphasizes the integration of services from state and local agencies and organizations, private providers, and communities. 3) Provide health professionals with skills that foster community-based partnerships. 4) Promote innovative practices to enhance cultural competency, family-centered care, and interdisciplinary partnerships.

4. National Institute on Disability, Independent Living, and Rehabilitation Research (NIDILRR). Title of Project: Center for Disability and Pregnancy Research (CDPR)
No: 90DPHF0011
Funding amount: FY21 $499,975; FY22 $499,975; FY23 $499,996
Role: Co-Investigator; 10% effort
Goals of grant: The CDPR is a cross-disability initiative that aims to 1) leverage existing and new data sources to examine racial and ethnic disparities in perinatal care, complications, and outcomes 2) develops and tests the efficacy of a preconception education curricula for women with mobility disabilities; 3) adapts and pilots the use of an accessible pregnancy action plan for women with diverse disabilities; 4) tests the efficacy of a disability accommodation field in the

electronic health record across a network of hospitals and 5) adapts and validates a screening tool for the detection of perinatal depression in women with intellectual and developmental disabilities.

5. National Institute on Disability, Independent Living, and Rehabilitation Research (NIDILRR). Project title: National Research Center for Parents with Disabilities.
No: 90DPCP0012
Funding amounts: FY 21 $500,000; FY 22 $500,000; FY 23 $500,000; FY 24 $500,000; FY 25 $500,000.
Role: Co-investigator, 10%
Goal of grant: The goal of the Parents Empowering Parents: National Research Center for Parents with Disabilities (PEP Center) is to conduct research and provide training and technical assistance to improve the lives of parents with disabilities and their families, particularly racial and ethnic minority parents.

## PREVIOUS GRANTS

4. DDTI Excellence in Developmental
   Disabilities National Training
   Initiative Administration for Community
   Living Principal Investigator
   90DDTI0035-01-00
   $50,000 per budget period with 1 budget period
   Awarded 2018-2019
   Role: Principal Investigator
   Goal: The Diversity Fellowship will provide a bridge between UCCEDD, multiple community/hospital-based partnerships, and refugees with disabilities and their families.

## PUBLICATIONS
**Peer-reviewed publications**

1. Powell, R., Andrews, E., & *Ayers, K.* (2016). RE: Menstrual Management for Adolescents with Disabilities. *Pediatrics, 138*(6).

2. Weber, S., Smith, J., *Ayers, K.*, & Gerhardt, J. (2019). Fostering disability advocates: A framework for training future leaders through interprofessional education. *Psychological services*. SNIP: 1.24 Altmetrics: 2.

3. Lund, E. M., & *Ayers, K.B.* (2020). Raising Awareness of Disabled Lives and Health Care Rationing During the COVID 19 Pandemic. *Psychological Trauma: Theory, Research, Practice, and Policy*. SNIP: 1.24 Altmetrics: 1. Cited by 6. http://dx.doi.org/10.1037/tra0000673

4. Andrews, E., *Ayers, K.B.*, Brown, K.S., Dunn, D., & Pilarski, C. (2020). No Body is Expendable: Medical Rationing and Disability Justice During the

COVID-19 Pandemic. *American Psychologist.* SNIP: 3.66 Altmetrics: 13. Cited by 8. http://dx.doi.org/10.1037/amp0000709

5. Andrews, E. E., Powell, R. M., & *Ayers, K. B.* (2020). Experiences of Breastfeeding among Disabled Women. Women's Health Issues. SNIP: 0.98 Altmetrics: 22 https://doi.org/10.1016/j.whi.2020.09.001

6. Nijhuis, W., Franken, A., *Ayers, K.*, Damas, C., Folkestad, L., Forlino, A., ... & Verhoef, M. (2021). A Standard Set of Outcome Measures for the Comprehensive Assessment of Osteogenesis Imperfecta. Orphanet Journal of Rare Diseases 16(140). https://doi.org/10.1186/s13023-021-01682-y

7. Ahlers, K. P., *Ayers, K. B.*, Iadarola, S., Hughes, R. B., Lee, H. S., & Williamson, H. J. (2021). Adapting Participatory Action Research to Include Individuals with Intellectual and Developmental Disabilities during the COVID-19 Global Pandemic. *Developmental Disabilities Network Journal, 1*(2), 5.

8. Epstein, S., **Ayers, K.**, & Swenor, B. (2021). COVID-19 Vaccine Prioritization for People with Disabilities. *The Lancet.* https://doi.org/10.1016/S2468-2667(21)00093-1

9. Nabors, L., Overstreet, A., Carnahan, C., & **Ayers, K.** (2021) Evaluation of a Pilot Healthy Eating and Exercise Program for Young Adults with Autism Spectrum Disorder and Intellectual Disabilities. *Advances in Neurodevelopmental Disorders* (2021). https://doi.org/10.1007/s41252-021-00214-w

## Books, Chapters, White Papers, Invited Papers, and Other Publications

1. *Sheridan, K. B.* (2001). Making waves with exercise and personal development. In Dollar, E.P. (ed.), Growing up with Osteogenesis Imperfecta (pp. 55-62). Gaithersburg, MA: Osteogenesis Imperfecta.

2. *Sheridan, K.B.* (2005). [Forward including a historical review of the development of children with Osteogenesis Imperfecta with a discussion of psychological benefits of exercise with a disability]. In H.L. Cintas & L.H. Gerber (Eds.), Children with Osteogenesis Imperfecta: Strategies to Enhance Performance (pp. v-xi). Gaithersburg, MA: Osteogenesis Imperfecta Foundation.

3. *Sheridan, K.B.* (2006). Mouth and Foot Painting Artists (MFPA) offer tools of change for people with and without disabilities. American Psychological Association Division of Rehabilitation (Div. 22) Newsletter, 34 (1), 14.

4. Schneider, B, *Sheridan, K.B.* & Kuemmel, A. (2007). Increasing your competency in evidence-based and innovative treatment approaches to self-injury: A review of Beyond Fear and Control: Working with Young People who Self-harm. *PsycCRITIQUES--Contemporary Psychology: APA Review of Books,* 53(7). Invited Review.

5. *Sheridan, K.B.* (2007). The uphill push: Women wheelchair users and access to health care. *New Mobility Magazine, 18,* 39-44.

6. Orvaschel, H. & *Sheridan, K.B.* (2008). There's a dog in the playroom! [Review of the book *Play Therapy with Kids & Canines: Benefits for Children's Developmental and Psychosocial Health].* PsycCRITIQUES-Contemporary Psychology: APA Review of Books.

7. *Ayers, K.B.* (2011). Anything for Baby (Cover Story), *New Mobility Magazine, 22* (209), 32-35

8. *Ayers, K. B.* (2014). *A family-centered approach to early-intervention: Our Story.* Featured on the Help Me Grow Ohio website. Retrieved from http://www.helpmegrow.ohio.gov/Early%20Intervention/EI%20Updates/A %20Family-Centered%20Approach%20to%20Early%20Intervention%20-%20Our%20Story%20by%20Kara%20Ayers.aspx.

9. *Ayers, K.* & Weber, S. (2014). Approaching disability from a strengths-based perspective. *PsycCRITIQUES, 59*(12). Retrieved from: http://psqtest.typepad.com/blogPostPDFs/ApproachingDisabilityFromStre ngths-BasedPerspective_2014-59-12.pdf

10. Andrew, E. & *Ayers, K.* (2016). Parenting with disability: Experiences of disabled women. In Miles-Cohen, S. & Signore, C. (Eds.), *Inequity in Equity: Improving the Health and Well-being of Women with Disabilities.* American Psychological Association.

11. McCarthy, M., Riddle, I., *Ayers, K.* and Morrison, R. (2016). Profile of People with Disabilities and their Families: Data and Voices from the Community. University of Cincinnati University Center for Excellence in Developmental Disabilities (UC UCEDD) at Cincinnati Children's Hospital Medical Center (CCHMC), Cincinnati, OH. Retrieved from https://www.ucucedd.org/sites/bmidrupalducedd.chmcres.cchmc.org/files/ media/Research/Ohio%20Disability%20Report

12. *Ayers, K.* (2017). A psychoanalytic analysis of the 2016 United States Presidential election calls for a global social justice movement: A review of Psychoanalyzing the Left and Right after Donald Trump: Conservatism, Liberalism, and Neoliberal Populisms. *PsycCritiques, 62*(11). Invited Review. Retrieved from: http://collections.uakron.edu/cdm/singleitem/collection/p15960coll21/id/85

874/rec/1

13. Ramos, P., Ayers, K., Brosco, J., Griffen, A., Hewitt, A., Riddle, I., Rodgers, R, Rudolph, D., and van Stone, M. (2021). The COVID-19 Pandemic and People with Disabilities: Primary Concerns, the AUCD Network Response, and Needs for the Future. Association of University Centers on Disabilities. Retrieved from:
    https://www.aucd.org/docs/publications/20201703_COVID19_Pandeminc_PWD.pdf

14. Ayers, K. B., & Reed, K. A. (2022). Inspiration Porn and Desperation Porn: Disrupting the Objectification of Disability in Media. In *Redefining Disability* (pp. 90-101). Brill.

**Professional Presentations and Abstracts**

### National Presentations, Abstracts, and Posters

1. Kuemmel, A., Richardson, N., Reiss, J. & *Sheridan, K.* (2007, August). Risk Factors of Abuse of People with Disabilities: Individual's Perceptions. Poster session presented at the 115th annual conference of the American Psychological Association (division 01), San Francisco, California.

2. *Ayers, K.* (2014, November). Building Bridges for Collaborations for Parents with Disabilities. Co-presenter for concurrent session of the AUCD National Conference. Washington, DC.

3. *Ayers, K.* (2015, November). Disability through the Lens of Art. Co-presenter for concurrent session of the AUCD National Conference. Washington, DC.

4. *Ayers, K.* (2015, November). The Final Frontier: Supporting Parents with Disabilities. Co-presenter for concurrent session of the AUCD National Conference. Washington, DC.

5. *Ayers, K.* (2015, November). Building Collaborations to Support Parents with Disabilities. Presenter for concurrent session of The Association for Successful Parenting (TASP) National Conference. Memphis, Tennessee.

6. *Ayers, K.* (2016, December). Bridging the Divide: Advocating across Differences within the Disability Community. Co-presenter for concurrent session at AUCD National Conference. Washington, DC.

7. Gerhardt, J. & *Ayers, K.* (2017, November). UCCEDD-Community Collaboration on Local Government Advocacy for Greater Employment Opportunities for People with Disabilities. Poster session at AUCD National Conference. Washington DC.

8. *Ayers, K.* (2018, April). Attitudes Towards Prenatal Genetic Diagnostic Testing Within the Osteogenesis Imperfecta Community. Poster session at the Osteogenesis Imperfecta Scientific Meeting. Chicago, Illinois.

9. Jones, E., *Ayers, K.*, & Riddle, I. (2018, November). Disabled Parenting Project (DPP): Leveraging Research to Inform Social Policy. Poster at Association of University Centers on Disability Conference.

10. Weber, S., Smither, J., *Ayers, K.*, Gerhardt, J., & Smith, T. (2018, November). Teaching Policy and Advocacy Skills in Interdisciplinary Professional Education. Poster at Association of University Centers on Disability Conference.

11. Powell, R., Andrews, E., & *Ayers, K.* (2018, November). Improving access to perinatal health care for parents with disabilities in the United States. In APHA's 2018 Annual Meeting & Expo (Nov. 10-Nov. 14). American Public Health Association.

12. *Ayers, K.,* Powell, R., & Andrews, E. (2018, November). Looking beyond barriers to identify strengths of parents with disabilities. Roundtable session at APHA: Emerging Issues in Interventions, Surveillance, Programs and Policies for Persons with Disabilities. San Diego, California.

13. Andrews, E., Powell, R., & *Ayers, K.* (2018, November). Factors that affect breastfeeding among mothers with disabilities. Roundtable session at APHA: Emerging Issues in Interventions, Surveillance, Programs and Policies for Persons with Disabilities. San Diego, California.

14. Eppelsheimer, R., Yoshino, L., Basey, J., Riddle, I., *Ayers, K.*, & Milberger, S. (2019). Leading change together with community advisory councils. Poster at AUCD. Washington, DC.

15. *Ayers, K.*, Riddle, I., Couch, C., Ramsay, K., Koller, S. (2019). It take a village: Training case managers to support parents with disabilities. Poster at AUCD. Washington, DC.

16. Gebre, S. & *Ayers, K.* (2019). Supporting refugees with disabilities to resettle in the Greater Cincinnati area: UCCEDD's Diversity Fellowship. Poster at AUCD.

17. *Ayers, K.*, Hughes, R., & Riddle, I. (2019). Tackling taboo topics: Reproductive health for women with disabilities. Concurrent session at AUCD. Washington, DC.

18. *Ayers, K.* & Smith, L. (2020). Undoing Ableism: Suicide Prevention for Youth with Disabilities. Poster at AUCD. Virtual.

Rev. 02/2022

19. *Ayers, K.*, Smith, L., Riddle, I., Adams, C. Opii, T. (2020). Addressing Inequities in Healthcare for People with Disabilities. Concurrent session at AUCD. Virtual.

20. *Ayers, K.*, Nugent, A., & Smith, L. (2021). Organ Rationing and People with Disabilities. American Society of Bioethics and Humanities Conference. Poster. Virtual.

21. Lanphier, E., Anani, U. K., *Ayers, K.*, & Gipe, K. (2021). Trauma-Informed Ethics Consultation. American Society of Bioethics and Humanities Conference. Concurrent. Virtual.

22. *Ayers, K.* Meredith, S., Van Stone, M., & Smith, L. (2021). Health Equity for People with Disabilities During a Pandemic. American Public Health Association Conference. Roundtable Discussion. Virtual.

23. *Ayers, K.* & Smith, L. (2021). Interventions in Healthcare Inequity: Guidelines for Addressing Bias Against People with ID/DD. Association of University Centers on Disability Conference. Poster. Virtual.

24. *Ayers, K.*, Smith, L., Sluzalis, S., & Parodi, G. (2021). Balancing Uneven Scales: Addressing Power Dynamics in Disability Stakeholder Groups. Association of University Centers on Disability Conference. Concurrent session. Virtual.

25. Ausloos-Lozano, J., Small, E., Lee, E-J., & *Ayers, K.* (2022). Diversity and Inclusion Since the Pandemic: The Impact of COVID-19 on Trainees with Disabilities. Rehabilitation Psychology Mid-Year National Conference.

26. Lund, E., Niemeier, J., Wilson, C., *Ayers, K.*, Ohayagha, C., & Lee, E-J. (2022). Advocacy Fatigue and Self-Compassion: A Guide for Healers and Helpers. Rehabilitation Psychology Mid-Year National Conference.

## Regional Presentations and Panels.

1. *Ayers, K.* (2015, November). Advocacy for Youth with Disabilities in Transition. for Transition Bootcamp. Cincinnati, Ohio.

2. *Ayers, K.* & Riddle, I. (2015, October). Employment for People with Disabilities. for the Department of Energy staff. Cincinnati, Ohio with live and archived (internal) webcast.

3. *Ayers, K.* (2015, October). Raising Resilient Families with Osteogenesis Imperfecta. Regional Osteogenesis Imperfecta Conference. Minneapolis, Minnesota.

4. *Ayers, K.* (2015, March). *Advocacy 101: Advocating for your Loved One.* Empowering Families Symposium. Cincinnati, Ohio.

5. *Ayers, K.* (2015, March). *Making Your Online Course Accessible.* Statewide Virtual Meeting of Instructional Designers. Online.

6. *Ayers, K.* (2017, February). Integrating Employees with Disabilities into your Workforce. Cincinnati Chamber of Commerce "Diverse by Design" Workshop. Cincinnati, OH.

7. *Ayers, K.* (2018, April). Tell me a Disability Story. Keynote Speaker. Joint Ohio LEND Poster Session. Cincinnati, OH.

8. Ayers, K. (2018, April). Brave Advocacy. Keynote Speaker. Empowering Families. Cincinnati, OH. 368 attendees.

9. *Ayers, K.* (2019, May). What Families with Children with Disabilities would like Residents to Know: Resident Lunch Learning Conference. Cincinnati, OH. 45 attendees.

10. *Ayers, K.* (2021, January). The Role of Ableism in Perpetuating Healthcare Inequities for People with Disabilities. Cardinal Hill Hospital Lunch and Learn. Lexington, KY. 89 attendees.

11. *Ayers, K.* (2021, March). Health Equity for Ohioans with Disabilities. Keynote Address for Ohio Developmental Disability Awareness and Advocacy Day. 680 attendees.

12. Ayers, K. (2021, May). Standards of Care, Disability, and a Public Health Emergency: Conversations on Equitable Care during COVID-19. Vanderbilt Kennedy Center Research Ethics Grand Rounds Panel. 55 attendees.

13. Ayers, K. (2021, May). Avoiding Racism and Ableism in Rationing of Scarce Healthcare Resources. Nisonger Center Summer Institute. 206 attendees.

14. Ayers, K. (2021, July). Crucial Conversations during these Times: Ableism and Individuals with Disabilities. University of Kentucky HealthCare's Diversity, Equity & Inclusion Council. 185 attendees.

15. Ayers, K. (2021, July). Employing Anti-Ableist Strategies to Reduce Healthcare Inequities. Resident Training for Cincinnati Children's Hospital Medical Center. 25 attendees.

16. Ayers, (2021, August). Parenting with a Disability. Maryland Centers for Independent Living Directors Meeting. 28 attendees.

17. Ayers, K. (2021, September). Health Equity for People with Disabilities. California Foundation of Independent Living Council board meeting. Invited Speaker. 48 attendees.

18. Ayers, K. (2021, October). Co-creating an Inclusive and Empowering University with the Disability Community. Invited Speaker. 20 participants.

19. Ayers, K. (2021, October). Ableism, Healthcare and Health Outcomes. Kennedy Krieger Institute Grand Rounds. Invited Speaker. 131 participants.

## Workshops

### International

1. Kuemmel, A., Richardson, N., Reiss, J. & *Sheridan, K.* (2006, August). *College students' perceptions of people with disabilities' vulnerabilities for abuse.* Interactive poster symposia presented at the International Congress of Applied Psychology,
Athens, Greece.

### National Workshops

1. Kuemmel, A., Richardson, N., Reiss, J. & *Sheridan (Ayers), K.* (2006, August). *Perceptions of People with Disabilities' Vulnerabilities to Abuse.* Poster session presented at the 114th annual conference of the American Psychological Association (division 22).

2. *Sheridan, K.B.* (2007, July). *Sexability Trainings: A solution for change.* Session presented at the annual conference of the National Council for Independent Living. Washington DC

3. Kuemmel, A., *Sheridan, K.*, Gibson, J., Abels, A., & Daughtry, D. (2007, August) Testing and Assessment of Clients with Disabilities. In A. Kuemmel (Chair) *Disability Issues in Psychology Not Typically Covered in Graduate School Diversity Courses.* Symposium presented at 115th annual conference of the American Psychological Association (APAGS), San Francisco, CA
*Awarded 2007 APAGS Outstanding Professional Development Presentation*

4. *Ayers, K.*, Gibson, W., Bergen, M., Swearer, S., Tolman, D., Brinkman, B., & Neal-Barnett, A. (August, 2015). Disability: An Often Unaddressed Target

of Bullying. Accepted proposal for Hurting from the Inside Out-Identity-Based Bullying among Adolescents workshop as part of American Psychological Association National Conference.

### Regional Workshops

1. *Sheridan, K.B.* (2006, February). *Taking action in the advocacy of psychology: Use your voice as a tool.* Workshop conducted during a colloquium hosted by the Student Organization for the Advocacy of Psychology at Nova Southeastern University, Fort Lauderdale, FL

2. Kuemmel, A., Richardson, N., Reiss, J. & *Sheridan, K.B.* (2006, November). *Domestic violence in the lives of people with disabilities.* Workshop conducted at the Women in Distress of Broward County Inc. Continuing Education Lecture Fort Lauderdale, FL

3. *Sheridan, K.B.* (2007, February). A new view on inclusion. Workshop commissioned by the Cincinnati/Dayton Area Recreation Therapy Association. Keynote speaker for annual conference. Cincinnati, OH

4. *Sheridan, K.B.* (2007, February). *Making waves after the Paralympics: The impact of recreational therapy.* Session delivered during annual conference of Cincinnati/Dayton Area Recreation Therapy Association, Cincinnati OH

5. Kuemmel, A., Richardson, N., Reiss, J. & *Sheridan, K.* (2007, March). *Perceptions of Perpetrators of Abuse of People with Disabilities.* Poster presented at the Division 22 Rehabilitation Psychology Mid- Winter Conference, Charlotte, NC *Section 2 Women in Rehabilitation Research Award Winner.*

6. *Sheridan, K.B.* (2007, July). *Youth Forum: Transitions to Work.* Invited Panelist for the Bridges to Employment Conference: Exploring Career Opportunities for Latinos with Disabilities, Miami, FL

7. *Ayers, K.* (2009, September). *Building Self-Esteem in Children and Teens with Osteogenesis Imperfecta.* Workshop conducted at Cincinnati Children's Hospital for the Ohio Osteogenesis Imperfecta regional support group. Cincinnati, OH.

8. *Ayers, K.* (2013, March). *Brain Hacks: Using Neuroscience in the Classroom.* Workshop conducted at Teaching, Techniques, and Technology Conference at the University of Cincinnati. Batavia, OH.

9. *Ayers, K.* (2015, 2016). Volunteer Training on Accessibility and Disability

Etiquette for the Reelabilities Film Festival. Cincinnati, OH.

10. *Ayers, K.* (2020, February). Disability Awareness for the Ohio Girl Scouts Leadership Conference. Mason, OH.

## Policy and Advocacy Publications

1. OH HB 195: Modify law regard transportation of people with disabilities
Authored Fact Sheet: https://bit.ly/2KD111h
Testimony from October 10, 2017: https://bit.ly/2G5kZjp

2. OH HB 332: Prohibit discrimination on the basis of disability for organ transplantation
Authored Fact Sheet: https://bit.ly/2lUh8Zr
Testimony from October 17, 2017: https://bit.ly/2RGb8Sh
Testimony from May 15, 2018: https://bit.ly/2rqfWQr

3. OH HB 188: Prohibit blindness from denying or limiting care of a minor.
Testimony from November 12, 2019 and January 21, 2019: https://bit.ly/2T2EdJv

4. Do you know your rights with COVID-19? Published on the Administration of Community Living and Ohio Department of Health websites. April 2020: https://bit.ly/3eRjxNQ

5. Safeguard Against Disability Discrimination During COVID-19. Published on Administration of Community Living and Ohio Department of Health websites. April 2020: https://bit.ly/3eRxsUo

6. Johns Hopkins Disability Health Research Center. COVID-19 Vaccine Prioritization Dashboard [Internet]. Johns Hopkins Disability Health Research Center; 2021 [updated 2021 Mar 17; cited 2021 Mar 18]. Available from: https://disabilityhealth.jhu.edu/vaccine/

## Digital Publications, Podcasts, and Interviews

1. Cochran, C. (2015, August). "Emotional meeting when parents with dwarfism meet their new son. Video Clip for US Today's series Humankind. Viewed more than 125,000 times. Retrieved from
https://www.youtube.com/watch?v=GIQAUAds348.

Cited frequently for education on parenting with a disability.

2. Cochran, C. (2015, August). "Eli Comes to America". A short-film documentary chronicled the first adoption from China by two parents who use wheelchairs. Ayers contributes interviews related to disability policies in the United States and China. The film was awarded a Mid-American Emmy as a Human Interest

program. Retrieved from:
https://www.cincinnati.com/videos/news/2015/07/26/30691111/

3. Ayers, K. & Ayers, A. (2016, August). Access Cincinnati. A short film describing universal design and the need for increased accessibility in cities. Viewed more than 8.1K times. Retrieved from: https://bit.ly/2EjB7Ms

4. Ayers, K. (2017, June). How to Call Your Senator. A short video demonstrating how to make a call to educate legislators on the impact of policy on people with disabilities. Retrieved from: https://www.youtube.com/watch?v=t9oBT2-PivI

5. Collier, L. (2017, December). Interview in "Sex and Intellectual Disabilities". Monitor on Psychology. Retrieved from: https://bit.ly/2QgcxT0

6. Ayers, K. (2018, September). Osteogenesis Imperfecta (OI) Foundation Podcast: Disability Identity and OI. Retrieved from:
https://www.youtube.com/watch?v=gJWBkGfZB5E

7. Keech, D. (2018, October). Interviewed for "8 Things Landlords Should Know About Accessibility Compliance". Retrieved from: https://bit.ly/2B2cob8

8. Klein, C. (2018, November). "Parents use what they have to do what they need": Dr. Kara Ayers of the Disabled Parenting Project on Creativity and Community. Feature interview for MuthaMagazine. Retrieved from:
http://muthamagazine.com/2018/11/parents-use-need-dr-kara-ayers-disabled-parenting-project-creativity-community/

9. Rasheed, M., Hamm, K., Schoechet, L., Novoa, C., Workman, S., & Jessen-Howard, S. (2018, December). America's Child Care Deserts in 2018. Contributed subject matter expertise related to lack of accessible childcare options for parents with disabilities and children with disabilities. Report retrieved from: https://ampr.gs/2Up5eqz

10. Ayers, K. (2019, December). Disabled Parenting in an Ableist World. TedX Cincinnati Women "Bold and Brilliant". 5,974 views. Retrieved from:
https://www.youtube.com/watch?v=STtI5wXxErY

11. Ayers, K. (2021, January). A Social Story about the COVID-19 Vaccine. 29,700 views. Retrieved from: https://centerfordignity.com/wp-content/uploads/2021/02/Getting-a-COVID-19-Vaccine-Social-Story-v2.pdf

12. Veno, C. (2021, January). 'We are more alike than different:' Ayers honored for work with disabled parents. Quoted in Kentucky State-Journal. Retrieved from: https://www.state-journal.com/news/we-are-more-alike-than-different-ayers-honored-for-work-with-disabled/article_107e0496-6255-11eb-b6a8-5fbbe950f8a3.html

13. Diament, M. (2021, February). Despite High Risk, Access to COVID-19 Vaccines Uneven for those with IDD. Disability Scoop. Retrieved from: https://www.disabilityscoop.com/2021/02/18/despite-high-risk-access-to-covid-19-vaccines-uneven-for-those-with-idd/29193/

14. Pan, D. (2021, February). They have disabilities and serious medical conditions. But under state guidelines, they don't qualify for early vaccination. Quoted in Boston Globe. Retrieved from: https://www.bostonglobe.com/2021/02/12/nation/they-have-disabilities-serious-medical-conditions-under-state-guidelines-they-dont-qualify-early-vaccination/?event=event25&fbclid=IwAR0tKwMtCHgkxT1vl6MyXiavBWJ2zbDofHyoyerugz8TwUNUf76djRYZOqM

15. Vega, T. (February, 2021). In Some States, People with Disabilities Feel Left Behind in Vaccine Rollout. The Takeaway National Radio Show Guest. Retrieved from: https://www.wnycstudios.org/podcasts/takeaway/segments/some-states-people-disabilities-feel-left-behind-vaccine-rollout

16. United Wheels Podcast (June, 2021). Talking to your children about disabilities. Retrieved from: https://www.listennotes.com/podcasts/united-on-wheels/talking-to-your-children-bR3ianwfBeo/

17. Leahy, C. (2021, August). Wisconsin's Olympians and Paralympians. Wisconsin Public Radio. Retrieved from: https://www.wpr.org/node/1836216

18. Pierce, L. P. (2021, August). Being more inclusive of people with disabilities. Determine our Future Podcast. Retrieved from: https://www.buzzsprout.com/1210403/8846393

19. Evans, I. (August, 2021). Into the Fold Podcast by the Hogg Foundation for Mental Health: Vaccine Equity for People with Disabilities. Retrieved from: https://podcastaddict.com/episode/125729327

20. Wright State Media Team. (2021, September). Quoted in The Disabled Parenting Dilemma. Wright State University Newsroom. Retrieved from: https://webapp2.wright.edu/web1/newsroom/2021/09/16/the-disabled-parenting-dilemma/

21. Tribune News Service. (2021, September). Quoted in People with disabilities have sexual, physical, and emotional needs like everyone else, so

can't we talk about it? South China Morning Post. Retrieved from:
https://www.scmp.com/lifestyle/health-wellness/article/3148509/people-disabilities-have-sexual-physical-and-emotional?module=perpetual_scroll&pgtype=article&campaign=3148509&fbclid=IwAR0FzE5xFlwxa2NqoV9dF0PwMiaZ2vT_7Q57DedB8yxyxUqhoA9AbVZr1b0

22. Katz, S. (2021, September). Quoted in People with disabilities are being left behind in vaccination push. Insider. Retrieved from:
https://www.insider.com/people-disabilities-being-left-behind-in-vaccination-push-2021-9?fbclid=IwAR3jLJv0zpgV8q4AdlMf6GXH6OpdklAkP5QuD1SOtVwsJvj-3dGHHLlbizA

23. Ayers, K. (2021, May). Stop Staring and Just be Cool. Diversity on Fire Podcast. Retrieved from: https://www.audible.com/pd/45-Stop-Staring-Just-be-Cool-Dr-Kara-Ayers-Podcast/B0943FR11T

24. Ayers, K. (2021, October). Toxic Positivity Directed Towards Little People. iPonder Big Deal Podcast with Chistophe Zajac-Denek. Retrieved from:
https://ipondr.com/author/christophe-zajac-denek

25. Ayers, K. & Wiley, S. (2021, November). Healthy and Young Podcast from Cincinnati Children's Hospital Medical Center. Retrieved from:
https://youngandhealthy.podbean.com/e/how-to-talk-to-kids-about-disabilities-and-prepare-them-to-value-differences-in-people/

26. Ayers, K. (2022, January 25). How to Talk to Kids About People with Disabilities. Cincinnati Children's Hospital Medical Center Blog. Retrieved from https://blog.cincinnatichildrens.org/86/how-talk-kids-people-disabilities.

## QUALITY REVIEW OF PUBLICATIONS

1. Weber, S., Smith, J., **Ayers, K.**, & Gerhardt, J. (2019). Fostering disability advocates: A framework for training future leaders through interprofessional education. *Psychological services*. SNIP: 1.24 Altmetrics: 2.
   I co-authored this publication, which has also served as an important part of the LEND curriculum to teach interdisciplinary healthcare providers how to advocate effectively. This training framework has been duplicated by other members of the national Association of University Centers on Disability (AUCD) and American Psychological Association (APA) network.

2.   Lund, E. M., & **Ayers, K.B.** (2020). Raising Awareness of Disabled Lives and
Health Care Rationing During the COVID 19 Pandemic. *Psychological
Trauma: Theory, Research, Practice, and Policy.* SNIP: 1.24 Altmetrics: 1.
Cited by 6. http://dx.doi.org/10.1037/tra0000673

I co-authored this publication with urgency at the start of the COVID-19
pandemic to highlight the inequities in crisis care standards. The article has
been referenced by peer reviewed and mainstream publications.

3.   Andrews, E., **Ayers, K.B.**, Brown, K.S., Dunn, D., & Pilarski, C. (2020). No
Body is Expendable: Medical Rationing and Disability Justice During the
COVID-19 Pandemic. *American Psychologist.* SNIP: 3.66 Altetrics: 13. Cited
by 8. http://dx.doi.org/10.1037/amp0000709

I was among leader disability scholars in co-authoring this article about the
role of ableism in the COVID-19 response. It has been highlighted and
disseminated by multiple media outlets.

4.   Andrews, E. E., Powell, R. M., & **Ayers, K. B.** (2020). Experiences of
Breastfeeding among Disabled Women. Women's Health Issues. SNIP: 0.98
Altmetrics: 22 https://doi.org/10.1016/j.whi.2020.09.001

This article, co-authored by co-founders of the Disabled Parenting Project, is
a continuation of my scholarship on parents with disabilities. It provides
important recommendations and implications for practice when working with
disabled mothers learning to breastfeed.

5.   Nijhuis, W., Franken, A., **Ayers, K.**, Damas, C., Folkestad, L., Forlino, A., ...
& Verhoef, M. (2021). A Standard Set of Outcome Measures for the
Comprehensive Assessment of Osteogenesis Imperfecta. Orphanet Journal
of Rare Diseases 16(140). https://doi.org/10.1186/s13023-021-01682-y

More than two years of international collaborations among world-renowned
leaders in the study of Osteogenesis Imperfecta resulted in a publication of a
standard set of outcome measures, which are now being piloted in 5 clinics
across the world.

6.   Ahlers, K. P., **Ayers, K. B.**, Iadarola, S., Hughes, R. B., Lee, H. S., &
Williamson, H. J. (2021). Adapting Participatory Action Research to Include
Individuals with Intellectual and Developmental Disabilities during the
COVID-19 Global Pandemic. *Developmental Disabilities Network
Journal*, *1*(2), 5.

Research participation of individuals with disabilities has always lagged.
COVID-19 worsened this problem of exclusion. I mentored post-doc trainee,
Dr. Ahlers to publish this article, along with other members of the Committee

on Research and Evaluation through the Association of University Centers on Disability. It includes applied suggestions to integrate researchers with disabilities while maintaining safety protocols.

7.   Epstein, S., **Ayers, K.**, & Swenor, B. (2021). COVID-19 Vaccine Prioritization for People with Disabilities. *The Lancet*. https://doi.org/10.1016/S2468-2667(21)00093-1
I co-authored this perspective piece following a large-scale collaboration with the Disability Health Research Center at John's Hopkins. Together, our Centers built a vaccine priority plan dashboard that accumulated more than 1 million hits while people with disabilities visited to determine when/where they were eligible to receive the COVID-19 vaccine.

## TEACHING and MENTORING

### Courses Taught

University of Cincinnati                                           Fall 2011-present
Adjunct Instructor

*Courses taught:*
Best Practices in Developmental Disabilities
Leadership and Policy in Developmental Disabilities
Abnormal Psychology
Social Psychology
Child Development
Adolescent Psychology
Child and Adolescent Development

Ivy Tech Community College                                    Fall 2009-2020
Instructor-Liberal Arts Department
*Courses taught:*
Abnormal Psychology
Introduction to Psychology
Introduction to Disabilities
Understanding Diversity

Indiana University East                                    Fall 2012-Fall 2015
Faculty
*Courses taught:*
Behavioral Neuroscience
Introduction to Counseling
Sensation and Perception
Special Topics in Psychology

ITT Technical Institute                                          Spring 2012
Adjunct Instructor-General Education
*Courses taught:*

Introduction to Psychology (face-to-face)

Wright State University                                    Fall 2010
Transient Professor/Teaching Assistant
*Course taught:*
Interviewing I (Doctoral level)

**Invited Guest Lectures (2017-2022)**

University of Cincinnati School of Pharmacy                January 16, 2017
Course: Introduction to Pharmacology                      120 students
Lecture: "Communicating to People with Disabilities"

University of Cincinnati School of Social Work            September 25, 2017
Course: Foundations of Developmental Disabilities         22 students
Lecture: "Disability History and Culture"

University of Cincinnati School of Social Work            November 6, 2017
Course: Foundations of Developmental Disabilities         22 students

Lecture: "Parenting with a Disability"

University of Cincinnati School of Social Work            September 17, 2018
Course: Foundations of Developmental Disabilities         18 students
Lecture: "Disability History and Culture"

Barrington Middle School                                  October 17, 2018
Course: Social Studies                                    12 students
Lecture: "Lift your Voice in DC for Change"
Description: Supported students with and without disabilities to prepare for an
upcoming trip to DC, which would provide the opportunity to meet with their
legislators.

University of Cincinnati                                   October 24, 2018
Program: Collaboration for Employment and Education       20 students
Synergy (CEES)
Lecture: "Youth Power in Disability Advocacy"

University of Cincinnati Blue Ash                          November 27, 2018
Course: Social Welfare Policy                             15 students
Lecture "How to Attitudes Impact Policy"

University of Wisconsin                                    April 17, 2020
Course: LEND program                                      45 students
Lecture: Dignity and Equity in Healthcare

University of Cincinnati                                   May 14, 2020
Course: Resident Hour for Physical Medicine and           12 students

Ayers 22                                                  Rev. 02/2022

Rehabilitation
Lecture: "Adapting to Disability"

University of Cincinnati
Course: Introduction to Disabilities
Lecture: "Disability History and Culture"

September 14, 2020
21 students

University of Wisconsin
Course: LEND program
Lecture: Dignity and Equity in Healthcare

October 30, 2020
45 students

Brandeis University
Course: Disability Seminar
Lecture: Addressing Ableism in Healthcare

February 18, 2021
18 students

University of Kentucky
Course: Developmental Disabilities for Special Educators
Lecture: "Supporting Parents with Disabilities"

February 22, 2021
24 students

University of Cincinnati
Course: LEND program
Lecture: Values in Disability through Literature

August 17, 2021
26 Students

University of Cincinnati
Course: LEND program
Lecture: Disability History and Justice

August 19, 2021
26 students

University of Cincinnati
Course: "Introduction to Disabilities"
Lecture: "Disability History and Culture"

August 30, 2021
26 students

National Institutes for Health
Course: Genetic Counseling Training Program
Lecture: "Health Equity and Anti-Ableist Health Outcomes"

October 1, 2021
29 students

Wisconsin LEND
Course: LEND Core
Lecture: "Addressing Healthcare Inequities with Anti-Ableism"

October 8, 2021
35 students

University of Kentucky LEND
Course: LEND Core
Lecture: "Social Determinants of Health and Disability"

November 5, 2021
22 students

University of Cincinnati LEND
Course: LEND Core
Lecture: "Ethics and Disability"

February 24, 2022
22 students

Rev. 02/2022

## National Invited Presentations and Panels

1. *Ayers, K.* (2012 July). Pregnancy for Women with Osteogenesis Imperfecta. Invited panelist as first bi-annual Women's Forum portion of the national Osteogenesis Imperfecta Foundation conference. Washington, DC.

2. *Ayers, K.* (2012, July). Building Self-Esteem in Young Adults with Osteogenesis Imperfecta. Invited presenter for Bi-Annual Osteogenesis Imperfecta Foundation Conference. Washington, DC.

3. *Ayers, K.* (2012, July). Building Self-Esteem in Children and Teens with Osteogenesis Imperfecta. Invited presenter for the Bi-Annual Osteogenesis Imperfecta Foundation Conference. Washington, DC

4. *Ayers, K.* (2016, May). Invited panelist for White House Forum on Parenting with a Disability. Washington, DC.

5. *Ayers, K.* (2017, November). Key Executive Branch Disability Champions Share their Priorities. Invited Panel Moderator for Plenary session at AUCD National Conference. Washington, DC.

6. *Ayers, K.* (2018, January). The Rights of Parents with Disabilities in the United States. Featured Guest on *Tuesdays with Liz.* Washington DC. Retrieved from: *https://www.aucd.org/template/news.cfm?news_id=13297&parent=16&par ent_title=Home&url=/template/index.cfm?*

7. *Ayers, K.* (2018, April). Measuring Pain and Outcomes Among Children with Osteogenesis Imperfecta. Invited speaker at the Osteogenesis Imperfecta Scientific Meeting. Chicago, Illinois.

8. *Ayers, K.*, Gomez, A. M., & Murray, M. (2018, September). Invited Panelist for Reproductive Freedoms and Barriers in the US: An On the Same Page panel. UC Berkeley.

9. Martin, A., *Ayers, K.*, Brandt, J., Constantino, J., Hewitt, A., & Pomeroy, S. (2018, November). The Science, Social, and Cultural Aspects of Disability: The Intersection of Disability Identity and Science. Invited panelist for concurrent session at Association of University Centers on Disability Conference.

10. Meredith, S., Van den Veyver, I., Stoll, K., *Ayers, K.*, Michie, M. & Constantino, J. (2019, October). The Intersection of Genetics and the Disability Rights Movement. Invited panelist for plenary at the American Society for Human Genetics conference. Houston, TX.

11. Martin, A., Jamal, L., Meredith, S., *Ayers, K.*, & Francis, S. (2019). Leading Change Session: Disability Rights, Ethics, and Genetics. Invited panelist for the

Association of University Centers on Disability Conference Plenary Session. Washington, DC.

12. Kennedy, T., *Ayers, K.*, Bagenstos, S., Mathis, J., & Yee, S. (2020). Disability Advocacy and COVID-19. Invited panelist for the American Association for People with Disabilities.

13. *Ayers, K.* & Fynan, M. (2020). Mental Health and COVID-19 for People with Osteogenesis Imperfecta (2020). Invited presenter for the Osteogenesis Imperfecta Foundation.

14. Johnson, J., Iezzoni, L., *Ayers, K.*, & Barrows, M. (2020). Continuing the March for Civil Rights: Equal Access to Health Care (Tackling Health Disparities to Increase Life Expectancy). Invited Presenter for the Home and Community Based Services Advancing States Conference.

15. *Ayers, K.*, Moreland, C., & Taylor, N. (2021, February). How to Include People with Disabilities in Research and Medicine: A Discussion on Disability Identity. Invited Panelist for Johns Hopkins Research Seminar Series. 98 attendees.

16. Artiga, S., Islam, N., & *Ayers, K.* (2021) Equitable Vaccine Access for People with Disabilities. Invited Expert Presenter for Biden White House COVID-19 Equity Task Force.

17. *Ayers, K.* (2021). No Body is Expendable: The Osteogenesis Imperfecta Community Faces COVID-19. Invited Presenter for OI Foundation Clinic Town Hall. 88 attendees

18. *Ayers, K.*, Gottlich, V., Harris, J., Barrows, M., & Lezotte, M. (2021). Health Care Updates. Invited Presenter for Disability Policy Seminar. 270 attendees.

19. Ayers, K., Brosco, J., Imparato, A., & Yee, S. (2021, January). Crisis Standards of Care During the COVID-19 Pandemic: Is it Ever OK to Discriminate? Invited Presenter. Webinar for the Association of University Centers on Disability.

20. Ayers, K., Lomerson, N., & Onaiwu, M. (2021, January). Parenting During a Pandemic. National Research Center on Parents with Disabilities Webinar. Invited Presenter for Webinar. 75 attendees.

21. Ayers, K. (2021, January). Parenting for People with Intellectual Disabilities. Association of University Centers on Disability Self-Advocacy Webinar. Invited Presenter. 52 attendees.

22. Ayers, K. (2021, September). Making the Invisible Visible: Underrepresentation in Data. Alliance in Health Equity Summit. Invited Presenter. 530 attendees.

23. Ayers, K. (2021, October). Applying Anti-Ableist Strategies to Reduce Health

Inequities and Improve Outcomes. American Physical Therapy Association (APTA) Section on Health Policy and Administration (HPA The Catalyst). <u>Invited Speaker</u>. 25 attendees.

24. Ayers, K., Mitra, M., Russel, B., & Nicola, N. (2021). Do you see me? Unpacking the Implications of Missing Disability Demographic Data. Association of University Centers on Disability Conference. <u>Invited Plenary Moderator</u>. 175 attendees.

25. Ayers, K., Skotko, B., Shogren, K., & Raymaker, D. (2021). Engaging People with Intellectual Disabilities in Research. PCORI Annual Meeting. <u>Invited Plenary Moderator</u>. 277 attendees.

26. Ayers, K. (2022). An Introduction to Patient-Centered Outcomes Research Institute (PCORI). An invited presentation for the Association of University Centers on Disability Council on Leadership and Advocacy (COLA). 30 attendees.

27. Ayers, K. (2022). Disability Language for Academic Journals. Invited Presentation and Technical Assistance for American Journal of Medical Genetics Board. 30 attendees.

## International and National Invited Workshops

1. *Ayers, K.* Raynor, O., Root-Elledge, S., Beatson, J., & Francis, W. (2015, November). Driving Change Session: Expand Your Visibility and Reach to Drive Change. <u>Invited presenter</u> for pre-conference workshop as part of AUCD National Conference. 345 attendees.

2. *Ayers, K.* & Hunter, T. (December, 2017). Women in Leadership Workshop. <u>Invited webinar panelist</u> as part of AUCD Leadership Academy. 45 attendees.

3. *Ayers, K.,* Aleong, S., Kermon, M. S., Levi-Shacklefod, Z., & Alliston, J. (2018, November). Achieving Inclusive Communities Begins with Us: Awareness in Person-First and Identity- First Language Use in Our Training and Community Education Programs. <u>Invited Panelist</u> for Community Education and Dissemination and Training Director workshop as part of Association of University Centers of Disability Conference. 263 attendees.

4. Ayers, K., Hill, C., & Wallentin, U. (2019). Psychosocial Aspects of Osteogenesis Imperfecta. <u>Invited Workshop</u> Presented at the Key for OI Quality of Life Conference. Amsterdam, Netherlands. 67 attendees.

5. *Ayers, K.* & Smith, L. (2020). Preventing Suicide through Empowerment of Youth with Disabilities. Mental Health and Developmental Disabilities National Training Center Webinar Series Workshop. 118 attendees.

6. Ayers, K. & Goodman, S. (2021). Methodological Challenges in Researching

Intellectual and Developmental Disabilities. Invited Speaker for PCORI
Workshop. 166 attendees.

7. Andrews, E., *Ayers, K.*, Pilarski, C., & Mona, L. (February 17, 2022). Disability
Advocacy in Your Communities: How to Be an Effective Activist and Ally.
Invited workshop for Rehabilitation Psychology Mid-Year National Pre-
Conference. 92 attendees.

## Course Development

| | |
|---|---|
| Ivy Tech Community College<br>HUMS270: Multicultural Counseling | April 2014<br>with annual updates |
| HUMS116: Introduction to Disabilities | March 2013 with<br>annual updates |

## Curriculum Development

University of Cincinnati Certificate in Developmental                         2015-2022
Disabilities: 4 courses
    Foundations in Developmental Disabilities
    Theories in Developmental Disabilities
    Best Practices in Developmental Disabilities
    Leadership and Policy in Developmental Disabilities


### *Mentoring*
Mentee: Kristen Clatos, MS
Position During Mentorship: 1) Graduate student at Northern Kentucky University
in Integrative Studies 2) Therapeutic Recreation Program Coordinator for
Cincinnati Recreation Commission
Focus of Mentorship: Thesis Committee Member
Output: 1) Successful defense of thesis and manuscript submission 2) Published
curriculum for parents to initiate discussions with their children with developmental
disabilities about sexuality.

Mentee: Benjamin "Rocky" Byington
Position During Mentorship: 1) LEND Self-Advocacy Trainee 2) Cincinnati
Children's Hospital Medical Center Senior Research Compliance Specialist
Focus of Mentorship: 2015-2016 LEND Supervisor; Advocacy related to improving
accessibility at Cincinnati Children's Hospital
Output: 1) Abstract accepted for 2016 AUCD Conference poster 2) Elected Spina
Bifida Coalition of Cincinnati Board Chair

Mentee: Morgan E. Bamberger
Position During Mentorship: 1) LEND Self-Advocacy Trainee 2) Senior Clinical
Research Professional at Cincinnati Children's Hospital Medical Center
Focus of Mentorship: 2016-2017 LEND Supervisor

Output: 1) Abstract accepted for 2017 AUCD Conference poster 2) Accepted new position with promotion at University of Cincinnati

Mentee: Rachel Rice
Position During Mentorship: 1) LEND Self-Advocacy Trainee 2) Warren County Developmental Disabilities Advocacy Specialist
Focus of Mentorship: 2017-2018 LEND Supervisor; Curriculum adaptation
Output: 1) Abstract accepted for 2018 AUCD Conference poster

Mentee: Rachel Sullivan, MS
Position During Mentorship: 1) Graduate Student in the University of Cincinnati Genetic Counseling program 2) LEND Genetic Counseling Trainee
Focus of Mentorship: Thesis Chair "Attitudes towards Prenatal Diagnostic Testing Among Parents with Osteogenesis Imperfecta" 2016-2018
Output: 1) Successful defense of thesis and manuscript submission 2) Poster presentation at National Society of Genetic Counselors 2018 conference

Mentee Group: Emily Jones, MS, Diane Burns, MS, Tiffany Moody MS, & Felicia Foci
Focus of Mentorship: 1) Co-led LEND Seminar in Evidenced Based Methods (SEBM) team "Disabled Parenting Project"
Output: 1) Poster presented during April 2018 Joint LEND Poster Presentation 2) Abstract accepted and presented at November 2018 AUCD Conference poster session 3) Fact sheets for providers treating women with disabilities and women with disabilities considering pregnancy published. Retrieved from: https://www.ucucedd.org/?p=2898

Mentee: Petra Harvey, MS
Position During Mentorship: 1) Graduate Student in Emory Rollins School of Public Health 2) Program and Education Coordinator at the Osteogenesis Imperfecta
Focus of Mentorship: Member of Thesis Committee "Identifying Informational Needs of Individuals affected by Osteogenesis Imperfecta and Bridging the Gap to Increase Health Literacy and Patient Engagement.
Output: 1) Successful defense of thesis and manuscript submission March 2018. 2) Abstract Accepted at NORD 3) Accepted position at the Genetic Alliance

Mentee: Susan Koller
Position During Mentorship: LEND Self-Advocacy Trainee
Focus of Mentorship: 2018-1019 LEND Supervisor; Curriculum adaptation Output: Graduated from program

Mentee: Abigail Ugas
Position During Mentorship: Graduate Student in the University of Cincinnati Genetic Counseling program
Focus of Mentorship: 2018-2020 Thesis Chair
Output: 1) Successful defense of thesis 2) Abstract accepted to AUCD conference 3) Accepted position at CCHMC

Mentee: Kristen George, MS
Position During Mentorship: Doctoral Candidate in Clinical Psychology program at
Wright State University
Focus of Mentorship: 2018-2020 Dissertation Committee Member
Output: 1) Successful defense of dissertation

Mentee: Shwana Garner
Position During Mentorship: Cincinnati LEND Trainee)
Focus of Mentorship: Development of guidance to increase accessibility of college
tours
Output: 1) Graduated from program

Mentee: Jen Powers-Alge, JD
Position During Mentorship: Cincinnati LEND Trainee (Discipline: Family) Focus
of Mentorship: Research on candidates' knowledge of issues relevant to people
with disabilities and their families
Output: 1) Graduated from program

Mentee: Leanne Baird
Position During Mentorship: Graduate Student in the University of Cincinnati
Genetic Counseling program
Focus of Mentorship: 2020-2022 Thesis Chair

Mentee: Nora Lascell, MS
Position During Mentorship: Cincinnati LEND Trainee (Discipline: UCCEDD)
Focus of Mentorship: Developing executive functioning supports for college
students with autism
Output: 1) Graduated from program

Mentee: Erika Slifer, MS
Position During Mentorship: Psychology Doctoral Candidate
Focus of Mentorship: 2020-2022 Dissertation Committee Member

Mentee: Sarah Phillips
Position During Mentorship: Undergraduate Rehabilitation Services Major
Focus of Mentorship: Internship with UCCEDD
Outputs: Graduated with rehabilitation services BA degree

Mentee: Hannah Greenland
Position During Mentorship: Postbaccalaureate Research Education Program
Focus of Mentorship: Achieve career as a PhD-Level Biomedical Scientest
Output 1) Graduated from program 2) Accepted into University of Indiana
Biomedical PhD program

## SERVICE AND LEADERSHIP

*SERVICE*

**Professional Organizations**

| | |
|---|---|
| Student Member<br>American Counseling Association | 2003-2005 |
| Student Member<br>Florida Association for Play Therapy | 2005-2008 |
| Student Member<br>Florida Psychological Association | 2005-2008 |
| Student Member<br>Ethnic Minority Association of Graduate Students | 2005-2008 |
| Student Member<br>Student Organization for the Advocacy of Psychology | 2005-2008 |
| Affiliate member<br>Association for Play Therapy | 2002-2009 |
| Member<br>National Alliance on Mental Illness | 2005-2014 |
| Member<br>American Association of People with Disabilities | 1998-2017 |
| Member<br>Psychologists with Disabilities Special Interest Group | 2010-present |
| Member<br>Association of University Centers on Disability<br>Legislative Affairs Committee | 2013-present |
| Board Member<br>The Association for Successful Parenting (TASP) | 2014-2019 |
| Member<br>The Association of the Severely Handicapped (TASH) | 2017-present |
| Member<br>National Council on Independent Living | 2017-present |
| Invited Member<br>Association of University Centers on Disability<br>Executive Director Search Committee | 2020 |
| Member<br>National Society on Bioethics and Humanities | 2021-present |

**Committee Involvement**

**Local**

| | |
|---|---|
| University of Cincinnati Center for Excellence in Developmental Disabilities Community Advisory Council Member | 2009-2011 |
| Mental Health Awareness and Substance Abuse Committee Member | 2009-2011 |
| Focus on the Future Committee Member | 2013-2016 |
| Pediatric Refugee Health Collaborative of Cincinnati Committee Member | 2018-present |
| Cincinnati Children's Hospital Medical Center Ethics Committee Member | 2019-present |
| Cincinnati Children's Hospital Medical Center Diversity, Equity, and Inclusion Faculty Committee Member | 2020-present |

**State/Regional**

| | |
|---|---|
| Northern Kentucky Suicide Prevention Committee | 2009- 2010 |
| Linking Employment and Potential (LEAP) Advocacy Committee | 2013-2015 |
| Cincinnati Reelabilities/Over the Rhine International Film Festival Co-Chair and Accessibility Chair | 2013-2017 |
| Ohio Candidates Disability Issues Forum Planning Committee | 2017-2018 |
| Ohio Advocacy and Protective Services Community Leadership Council | 2019-present |
| Ohio Home and Community Based Services Coalition | 2020-present |
| Ohio State Health Improvement Plan Committee (Invited) | 2021-present |
| Ohio Department of Health Vaccine Equity Disability Advisory Committee | 2020-present |
| Improving outcomes for Ohioans with Disabilities Workgroup | 2021-present |

| | |
|---|---|
| Ohio Health Policy Institute (appointed) | 2021-present |
| Ohio 14c subminimum wage transformation Workgroup | 2021-present |

**National**

National Youth Leadership Network    2004-2008
Strategic Planner
Public Information Committee Chair
Mentorship Committee Chair

Student Organization for the Advocacy of Psychology    2006-2008
Chair

Mental Health America    2009-2011

Osteogenesis Imperfecta Foundation    2006-present
Speakers' Bureau

United States Olympic Committee    2004-present
Ambassador Speakers' Bureau

National Council on Independent Living
Electronic Visit Verification    2017-2020
    Selected Steering Committee Member
    Taskforce Member

Parenting with a Disability
    Taskforce Member    2016-present
Opioid Workgroup    2017-present
    Taskforce Member

Patient-Centered Outcomes Research Institute (PCORI)    2018-present
    Research Transformation Committee
    Selection Committee
    Patient Engagement Advisory Panel (PEAP)
    PCORI Ambassador

Association of University Centers on Disability Executive    2020-2021
Director Search Committee

Association of University Centers on Disability Annual    2020-2021
Meeting Planning Committee

PCORI Annual Meeting Planning Steering Committee    2020-present

| CDC and AUCD Vaccine Confidence Community of Practice | 2021-present |
| National Academies of Societies of Education and Medicine Workshop Planning Group | 2021-present |
| Assisted Reproductive Technologies (ART) Working Group | 2021-present |
| Institute for Exceptional Care-Action to Build Clinical Culture and Confidence | 2021-present |

**International**

| Key 4 OI Affiliates: International working group on quality of life and patient-centered outcomes related to Osteogenesis Imperfecta | 2018-present |

**Editorial Service**

Journal Forum Editorial Responsibilities
| Review of Disability Studies: An International Journal Editorial Board Member | 2018-present |

Manuscript Review
| Pediatrics 4 manuscripts reviewed | 2018-present |
| American Journal of Medical Genetics 3 manuscripts reviewed | 2020-present |
| Inclusion 4 manuscripts reviewed | 2017-present |
| Review of Disability Studies: An International Journal 4-6 manuscripts reviewed per year | |
| Journal of Applied Research in Intellectual Disabilities 5 manuscripts reviewed | 2019-present |
| Children and Youth Services Review 3 manuscripts reviewed | 2019-present |
| Rehabilitation Psychology 4 manuscripts reviewed | 2020-present |

**Consultation**

Rev. 02/2022

| | |
|---|---|
| National Research Center for Parents with Disabilities | 2016-present |
| 2016-present Advisory Board | |
| NIH Study on Unintended Pregnancy among Women with | 2017-present |
| 2017-present Disabilities. PI: Rosemary Hughes | |
| Keep it Plain Consulting<br>Description: Developed and delivered district-wide<br>diversity training to 1,200 faculty and staff of Mason City<br>Schools | 2018-2019 |
| World Institute on Disability<br>Starbucks Disability Usability Consultant | November 2020 |
| McGraw Hill Publishing<br>Diversity/Disability Psychology Advisory Consultant | 2020-present |
| Consultant for RuffWear on functionality of gear for<br>service dogs and their owners | 2021-present |
| National Council on Disability Consultant for<br>Congressional Report on Deaths of People with<br>Disabilities in Congregate Settings during COVID-19<br>Pandemic | August 2021-<br>February 2022 |
| Department of Justice Expert Witness on Voting<br>Experiences of People with Disabilities | January 2022-<br>present |

## *LEADERSHIP*

| | |
|---|---|
| Co-Chair of the Association of University Centers Public<br>Policy Committee | 2016-present |
| President of The Association for Successful Parenting<br>(TASP) | 2019-2019 |
| Chair of the American Association of Intellectual and<br>Developmental Disabilities Family Interest Network | 2018-2020 |
| Vice-President and Executive Committee Member of the<br>Osteogenesis Imperfecta Foundation Board | 2018-2020 |
| Chair of the American Psychological Association<br>Committee on Disability Issues in Psychology | 2019-2020 |
| Vice-President of the Center for Independent Living<br>Options Board | 2020-2021 |

| | |
|---|---|
| Vice President Ohio State Independent Living Center Council (OSILC) (Appointed by Governor DeWine) | 2020-present |
| Patient Centered Outcomes Research Institute Board of Governors Vice-Chair of Selection Committee | 2020-present |
| Member-at-Large Division 22 American Psychological Association Executive Committee | 2021-present |

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNIÓN DEL PUEBLO ENTERO, *et al.*,

Plaintiffs,

v.

STATE OF TEXAS, *et al.*,

Defendants.

Civil Action No. 5:21-cv-844 (XR)
(Consolidated Cases)

## DECLARATION OF DR. KARA AYERS REGARDING THE IMPACT OF SENATE BILL 1'S REVISED OATH ON TEXAS VOTERS WITH DISABILITIES

I, Kara B. Ayers PhD, declare as follows:

## I. Purpose of this report and Summary of Opinion

1. My name is Dr. Kara B. Ayers, and I have been asked by the U.S. Department of Justice to offer an opinion on the impact of the revised voter assistance oath in Texas's enacted Senate Bill 1 ("SB 1") on voters with disabilities. This new law imposes strict limitations on the types of assistance citizens, including those with disabilities, can be provided in the voting booth.

2. Texas SB 1's revised oath will deny certain Texans with disabilities the help they need to cast votes that fully reflect their wishes. As a general matter, voters with disabilities disproportionately confront barriers to the ballot box. The revised oath adds to—not reduces—the impacts of these barriers, by barring forms of assistance that certain voters rely on to successfully vote, causing confusion about what assistance is allowed, and discouraging assistors from helping with threats of criminal consequences if they mistakenly provide help that is needed but not allowed. Texas already lags behind other states in overall voter turnout, which is inclusive of voters with disabilities (Li et al., 2018). SB 1 is likely to exacerbate the State's low turnout disproportionately

leaving out disabled voters who need more, not less, engagement in civic processes that greatly impact their lives (Li et al., 2018).

## II. Qualifications

3. I am a researcher whose work has focused on improving outcomes for people with disabilities, including better understanding the civic participation of people with disabilities. I am an Associate Professor of Pediatrics at Cincinnati Children's Hospital Medical Center (CCHMC) in the Division of Developmental and Behavioral Pediatrics. As part of this faculty appointment, I am also an affiliated faculty member of the University of Cincinnati College of Medicine Department of Pediatrics. As part of these roles, I am Associate Director of the University of Cincinnati Center for Excellence in Developmental Disabilities (UCCEDD) and the Director of the Center for Dignity in Healthcare for People with Disabilities. The UCCEDD is focused on improving a wide range of outcomes for Ohioans with disabilities, and the Center for Dignity is a national coalition that aims to identify and reduce healthcare inequities faced by people with disabilities.

4. I am trained as a psychologist. I obtained my PhD in clinical psychology from Nova Southeastern University in Fort Lauderdale, Florida in 2011. Prior to that, I graduated with my Master of Science in Clinical Psychology in 2007 from Nova Southeastern University and a Bachelor of Science in Psychology from Wright State University in Dayton, Ohio in 2003. My predoctoral training took place at Miami Children's Hospital, Dayton Children's Hospital, and Wright State University. My education and professional training provided a strong foundation of research and training to further my study of and work with people with disabilities across the lifespan. While many of my training placements and even my current place of employment are within pediatric health facilities, many of these institutions also house critical programming for adults with disabilities, who have served as the focus for most of my work.

5. My scholarship has been disseminated nationally and internationally. I have published 9 peer reviewed articles, 13 chapters, and 24 national conference abstracts on a wide range of disability-related topics, all with a general focus on pursuit of equitable community access and outcomes for people with disabilities. In my 2019

2

article "Fostering disability advocates: A framework for training future leaders through interprofessional education", I discuss my work developing disability policy curriculum for healthcare providers (e.g., physicians, physical therapists, social workers, psychologists, etc.). I've been invited to lead 2 international workshops and to serve as a panelist or presenter for 25 national events. Again, while specific topics of these workshops and presentations vary, they also share a common theme of spotlighting inequitable experiences of people with disabilities and what we can all do to improve fairness and justice for people with disabilities. My involvement in workgroups and taskforces reflects diversity within my work at different levels (e.g., local taskforces and international workgroups). I have been invited to speak to the White House on two occasions. In 2015, I was part of a White House panel on parenting with a disability, and in the spring of 2021, I spoke to the White House COVID-19 Health Equity Taskforce about the disproportionate impacts of the pandemic on people with disabilities. I have also been invited to share my work, research, and experience with multiple major media outlets, including the Washington Post and Fox News in 2021.

6. I am an American voter with a disability and have learned from the challenges I have experienced while voting. I was born with my disability, Osteogenesis Imperfecta, and use a wheelchair full-time for mobility. My disability also results in short stature, so I am a littler person. Although I have successfully cast my vote in many elections, I have also faced barriers. I have arrived at an assigned polling place with only steps to the entrance and no ramp. When polling precincts were reassigned, my new polling place was accessible but for several years, I was unable to reach the raised voting booth. I was given a clipboard to complete my ballot but wasn't afforded the same privacy provided to others in a voting booth. As I'm seated lower than most, it is quite easy for other voters walking past me to see the location of where I have bubbled my ballot. My polling station has recently added lowered tables that also included partitions for privacy. In my story alone, some progress is observable, but there is still work to do for election officials to be aware of disability issues and to ensure that all Americans, including voters with disabilities, can fully take part in our voting process.

7. In addition to authoring scholarship on disability policy, and I also have lived experience as a disabled person that informs my policy work. My professional position has entailed work in the realm of disability policy for approximately ten years, but I began working on disability policy more than 20 years ago when I was appointed to the National Youth Leadership Network. In that role, I received training on how to research policy impacts and how to communicate our experiences as disabled people effectively to policymakers. My focus on disability policy as an academic continues to examine the unintentional impacts of policy on the disability community. The disability movement has an important mantra, "Nothing about us without us." My dual role as a disability scholar and a disabled person has allowed me to apply what I learn in all parts of my life—both personal and professional—with a goal of reducing barriers for future generations of people with disabilities.

8. My work in disability advocacy has included supporting the successful participation of people with disabilities in the voting process. I serve on the national advisory council for the GoVoter Project, which is funded by Self Advocates Becoming Empowered (SABE), a disability advocacy organization for people with intellectual disabilities. The GoVoter Project is part of the National Technical Assistance Center for Voting and Cognitive Access, which helps protection and advocacy systems, election officials, and people with disabilities make voting accessible for all citizens. My work on this council has involved authoring and editing questions for an annual survey to explore the voting experiences of people with disabilities. After results are collected, I have helped with analyzing the results and writing the final report. I stay up to date on issues related to disability and voting by following the RevUp campaign, an initiative funded by the American Association of People with Disabilities (AAPD). RevUp stands for "Register, Educate, Vote, Use your Power!". RevUp aims to foster civic engagement and protect the voting rights of Americans with Disabilities. The RevUp network shares materials to help people with disabilities understand their right to vote and plan to vote in upcoming elections.

9. My curriculum vitae, which includes a complete list of my publications from the last ten years, is attached as Appendix A. I am being compensated at a rate of $300.00 per

hour. My compensation is not in any way contingent on the content of my opinion or the outcome of this matter. I have not served as an expert witness in the previous four years.

**III. Texans with Disabilities**

10. Texans with disabilities are a large group of potential voters, making up approximately 28% of the adult population in the state or approximately 5.8 million adult Texans (CDC, 2019). This is just somewhat higher than overall prevalence in the United States (CDC, 2021). According to the most recent CDC (2019) state profile of Texans with disabilities, the most common type of disability is mobility (14%), followed by cognition (11%), disabilities that require assistance with independent living (7%), hearing disabilities (6%), vision disabilities (6%), and disabilities that require assistance with self-care (4%). Some Texans have more than one type of disability. Each of these types of disabilities can impact the process of casting a vote.

11. Not all disabilities are visible, and it may not be immediately apparent which voters need certain kinds of supports. Even some people with visible disabilities may be hesitant to identify as a person with a disability due to cultural variations, individual preferences, and the stigmatization of disability (Nario-Redmon, 2020). Because some people don't identify as disabled but objectively do have disabilities, the impact of policies like SB1 on people with disabilities is largely underestimated (Nario-Redmon, 2020).

12. Texas veterans with disabilities make up a disproportionate share of adults with disabilities in the state. The 2014 American Community Survey found that 20.5% of Texas veterans had a disability, compared to 14.9% of same-age nonveteran Texans (Committee on People with Disabilities, 2015).

**IV. Barriers to Voting for Texans with Disabilities**

13. Voters with disabilities have lower voter turnout as compared to nondisabled Americans (Powell, 2017). Research by U.S. political scientist Schur and economist Kruse (2019) projected that one-sixth of the electorate, or more than 35 million people with disabilities (out of 56 million total people with disabilities), were eligible to vote in

the 2016 election. Many of these individuals with disabilities will be able to vote without assistance, but there will also be many people who require support and/or assistance to cast their ballot.

14. People with disabilities are an exceptionally heterogenous and diverse population; the most accurate representation of "the disability community" is captured with inclusion of a wide range of types, severity, and spectrums of disabilities and chronic illness. These variations within the disability community often impact the types of barriers people face and what kind of supports they would need to successfully cast their ballot. People with various types of disability (i.e., visual impairment, intellectual disability, brain injury) can have a "print disability", making it difficult for them to read, understand, fill out, and handle paper-based ballots or electronic ballots with written words on the screen. People with physical disabilities or mobility disabilities can need accessible polling stations and require accessible transportation to get to the polls. People who are Deaf, blind, or visually impaired may need their ballot in an alternative format. In order to make sense of the information on the ballot so that a person can make an informed decision, a voter may need to ask for clarity on which selection is marked (if a person is blind) or ask for clarification, rephrasing, or additional explanation about ballot instructions or ballot measures. Autistic voters and voters with traumatic brain injuries or other cognitive disabilities may exhibit body language that is difficult for unfamiliar others to interpret; they may find the sensory experience of voting (e.g., fluorescent lights, loud noises, and other sensory discomforts) difficult to tolerate without assurance and reminders on how to complete the process (Strömberg et al., 2021). Voters with memory impairments need prompting or reminders to help them remember the process (Strömberg et al., 2021).

15. Multiple factors drive down voter turnout for people with disabilities (Johnson & Powell, 2020; Friedman & Rizzolo, 2017). While voting trends are similar between disabled and nondisabled voters, their impacts are greater due to the overrepresentation of people with disabilities within groups who experience advanced age, poverty, and unemployment (Schur et al., 2008; Schur & Kruse, 2016). Since disabled people are more likely to be aging, live in poverty, and be unemployed, the

disparities in voting experienced by these groups are seen in greater proportion among people with disabilities. Disability can occur at any age, but it becomes more common as people advance in age. While 1 in 4 adults in the United States have some type of disability, 2 in 5 Americans who are 65 years and older have a disability (CDC, 2021). Socioeconomic ("SES") factors predict voting rates for people with and without disabilities, but their impact is disproportionately larger in driving down voting rates for people with disabilities because people with disabilities are more likely to live in poverty; an estimated 21.8% of Americans with disabilities earn less than $25,000 annually (Schur & Kruse, 2016). Low-income Americans with disabilities are also less likely to vote compared to Americans with disabilities with higher SES (Johnson & Powell, 2020). People with disabilities living in poverty are more likely to need assistance with voting because they have less access to sources to help them prepare or make voting easier (e.g., the internet and assisted technology). Also following trends of nondisabled Americans, people with disabilities who are unemployed are also less likely to vote than those who are employed (Johnson & Powell, 2020). Again, people with disabilities are disproportionately impacted by this predictor because people with disabilities are disproportionately unemployed as compared to nondisabled people.

16. The Sabe GoVoter survey is a participant-driven research effort led by people with disabilities to better understand the voting experience of people with disabilities. The 2020 GoVoter survey asked respondents (people with disabilities who did and did not vote) what types of accessibility problems they faced at polling locations. Some respondents indicated that poll workers lacked the competency to give them the assistance they needed to vote. Problems with accessible parking, trouble understanding the wording of ballots, broken elevators, and trouble voting from a wheelchair were noted (i.e., unable to reach the voting machine or table on which to vote). Long lines were particularly troublesome for people who lacked stamina to stand. Accommodations provided by the polling station, like a chair, may not be apparent or available until a person has waited for a significant amount of time in line. Voters reported, for example, that the directions poll workers gave them were confusing and that poll workers didn't know how to communicate with Deaf people. One respondent said that the poll worker spoke so loudly while assisting them that other people could

7

hear their selections. Research participants report frustration that their needs are not consistently met at the polls (Sabe, 2020; Friedman, 2017). Based on discussions with disabled people, many people who have a frustrating or humiliating experience at the polls will be less likely to return to exercise their vote.

17. Best practice in policy making directly includes the people most impacted. COVID-19 has also had its own impact on voting and policymaking for and about people with disabilities, as described in the most recent GoVoter report (SABE, 2020). Policymaking in the last 2+ years about the assistance people with disabilities need at the polls has included diminished input from people with disabilities whose safety was jeopardized by in-person testimony. Barriers to voting that were previously in place have been exacerbated. Many people with disabilities have underlying health conditions and have been disproportionately impacted by COVID-19 (Andrews et al., 2021; Syed et al., 2021). These concerns and decisions to forgo voting or participation in the democratic process are also reflected in decreased engagement in the legislative process because in-person testimony has remained the only option for many despite continued spread (at the time of this writing) of COVID-19. A 2021 Texas Tribune article shared the stories of voting rights advocates with disabilities who have also felt excluded from the policymaking process (Ura, 2021). Much of the in-person testimony about voting laws in Texas took place before COVID-19 vaccinations were available (Ura, 2021). The executive director for the Coalition of Texans with Disabilities is quoted by Ura (2021) to say, "Our voices weren't being heard at the very end when it was most important." By not risking their health to attend in-person legislative hearings, some advocates with disabilities were following recommendations by their healthcare teams. As a personal point of comparison, my own doctors had made similar recommendations (to avoid public places prior to vaccination). I previously traveled to Washington D.C. 4-6 times a year and delivered in-person testimony to my state policymakers a few times a year. Due to the risks of COVID-19, I have not traveled to DC for Hill visits or provided in-person testimony at my statehouse since 2020.

**V. Supports for People with Disabilities to Vote**

18. Most people with disabilities vote independently if their access needs are met. Approximately 70% of people surveyed in the Sabe GoVoter survey voted alone with the remainder receiving assistance from family (~20%), a service provider/staff (~5%), poll workers (~5%), and other (~2%). As reported, people with disabilities prefer to receive assistance from people already familiar in supporting their disability-related need, including people paid to assist them, friends, volunteers, and (most often) family members.

19. Just as there is great variation in the type and degree of support needed by voters with disabilities, their choice and needs in assistors are equally diverse. Poll workers who serve as assistors should be, but are not always, well-prepared to encounter voters with disabilities and know how to assist them. For example, voters report resistance and a lack of understanding among poll workers when they are asked to assist voters with disabilities. (Sabe, 2020). Other reported issues include that some poll workers are unfamiliar with how to facilitate use of accessible voting machines or when to suggest supports that would make the difference between a person casting their vote or not. While some poll workers do provide adequate assistance to voters who request it, it is not possible to train poll workers in all the ways to support all voters with disabilities. The option to bring one's preferred person and method to facilitate assistance is essential to preserve equal access to the polls. Voters with disabilities who require assistance from poll workers still have preferences in the type of assistance they need.

20. It has also been repeatedly reported that when people with disabilities need assistance to vote, whether they bring someone to help them or request help at the polls, they are often met with resistance and a lack of understanding from poll workers about whether they are entitled to vote, to receive assistance, and as to how they should be supported to vote (Schur, Adya, & Ameri, 2015). Rabia Belt (2016) described the anticipation of these difficulties or poor treatment at the poll as creating a "chilling effect" that has resulted in continued lower turnout of voters with disabilities. Addressing barriers to voting, including satisfaction or a feeling of fairness in the overall voting experience, is an important way to support citizens with disabilities to cast their ballot.

21. The assistance that people with disabilities need in order to vote varies widely. People with disabilities know best what kind of help they need to vote. Some people's disabilities require that they be provided with highly personalized or specific supports, making it necessary for them to rely on well-trained assistors who understand the individual's needs more intimately than a poll worker would to assist them with voting.

22. As previously stated, while some people can vote mostly independently if the ballot is read aloud to them, other people will need clarification about instructions on the ballot. The wording on ballots can be confusing. Some people with disabilities, such as those that impact audio processing or autism, need to recite aloud their understanding of their ballot and the choices they made to confirm with an assistor that they cast their ballot in line with their intentions. Some people with intellectual, cognitive, or psychiatric disabilities need time—without feeling rushed—to read or listen carefully while utilizing short-term memory and executive functioning skills to cast their vote. People with disabilities that impact short-term memory and executive functioning skills use memory aids or reminders from assistors to make their selections and cast their ballot. Some people with learning disabilities need simplified written directions in addition to verbal instructions to ensure they understand the voting process. Some people need trusted assistors to offer prompts or reminders as supports to help them remember the voting decision they made at home. Making decisions about voting are highly personal and varied. Getting help to vote can be an iterative process that, for some, may require asking process-related questions, getting feedback, and checking for understanding. Some blind people, especially those who retain some vision, need confirmation of which selections they've made. Sensory experiences at polling stations can also be overwhelming for people, including some autistic voters, who are overwhelmed by crowded, often noisy spaces. Some voters need help finding calm or regulating their emotions and sensory input prior to and during voting. Without attuned assistors who might recognize such a need and share the availability of such a support, the voter with a sensory disability would be at risk of not being able to fill out their ballot and cast their vote as intended.

23. People with disabilities are adept at problem-solving because we navigate a world not designed with us in mind daily. Citizens with disabilities are the best source of information about how they can best be supported to vote. People with disabilities want autonomy and have their own preferences, opinions, and civic priorities. Their disabilities—not a lack of these preferences and priorities—hinders their expression in environments that are not accessible and inclusive of assistance needed by people with disabilities. The range of supports is as variable as the spectrum of disability. Limiting supports will discourage voting because people will not have access to what they need to vote.

24. Accessible voting machines are another way to support voters with disabilities, but they may fall short if voters lack assistors who may explain how they work and answer the voter's questions. These machines vary in features available (Center for Civic Design, 2016). Some allow users to zoom in to enlarge text; others may read the ballot aloud or allow for selection through sip-and-puff technology by connecting to a person's customized assistive technology device (Center for Civic Design, 2016). Friedman's 2019 survey found some people found voting machines helpful to steady shaky hands and help people who find it difficult to write. Other respondents in that study reported machines at their polling station kept getting "stuck" and were "breaking down" (Friedman, 2019). Voters with disabilities need a range and always a choice of which supports work best with them to overcome unexpected difficulties like these. Some people want to ensure they have what they need by bringing their own equipment. In some cases, this includes an augmentative alternative communication device (AAC), including but not limited to text-to-speech systems or speech boards or communication systems (electronic or physical) that allow for symbol selection to communicate. When determining how to assist voters with disabilities who have brought their own equipment, poll workers and other assistors need to ask voters questions and to answer voters' questions to establish understanding.

25. People with various disabilities that make decision-making difficult (i.e., cognitive, learning disabilities, traumatic brain injuries, etc.) rely on assistors who use supported decision-making (SDM) to help them navigate the process of making significant

decisions (Davidson et al., 2015). SDM is a tool that allows people with disabilities to retain their decision-making capacity by selecting assistors to help them make choices. SDM prevents or limits the need for a substitute decision-maker and preserves the autonomy of a person to make their own decision (Davidson et al., 2015). Assistors familiar with the facilitation of SDM use this approach to help some people with disabilities cast their vote. Assistance to vote utilizing SDM includes learning about the voting process, gathering documents needed to register, accessing information about the candidates, and planning for what is needed at the polls to vote successfully. Some people get this type of support through SDM before they vote. Many still need assistance to complete the process of casting their vote. Permitting appropriate assistance to people with disabilities when and how those voters request it is a critical way to support the enfranchisement of citizens with disabilities in the voting process.

## VI. Concerns about Texas SB 1 and its impact on Texas voters with disabilities

26. I have reviewed the revised oath in SB 1 and have concluded that this law is likely to disenfranchise certain voters with disabilities by depriving them of the assistance they need to cast their ballot as they intend.

27. The oath states that an assistor must "confine (their) assistance to reading the ballot to the voter, directing the voter to read ballot, marking the voter's ballot, or directing the voter to mark the ballot." This leaves a significant gap between the assistance that certain voters with disabilities need to vote and the assistance they will be permitted to receive. Some voters with intellectual disabilities will require an iterative dialogue of questions and answers that help them understand the voting process and the steps they need to take in casting their vote. Some voters with intellectual or developmental disabilities will need reminders of how to complete their ballot and the steps to take to cast their vote. Some people with intellectual disabilities benefit from basic gestures that guide voters through the multiple steps to cast their vote and submit their ballot. Some voters who want to use accessible voting machines need help in understanding how they work or how to use them alongside their own assistive technology, like wheelchairs and augmentative alternative communication devices. In some cases, assistors and/or poll workers will need to ask questions about how to best help a person. Per SB 1's

revised oath, assistors are prohibited from answering questions posed by the voter. Due to the variety of types of disabilities and ways to assist individuals to vote, it is essential that lines of communication remain open and unencumbered to facilitate voters with disabilities to take part in the process. To provide effective assistance, assistors, including poll workers, must be free to ask and, most importantly, answer questions about how best to assist the disabled voter.

28. Assistors must take the revised oath in SB 1, which includes an acknowledgment that if they fail to remain confined in the way they help voters, it is punishable under the penalty of perjury. Assistors and people with disabilities are not mutually exclusive. Many caregivers of people with disabilities also have disabilities themselves and/or are aging (Crabb et al., 2020). The oath imposes a substantial risk of confusion for some assistors, especially for those with developmental disabilities or difficulties hearing or processing auditory information. People who have provided assistance in the past in ways that are no longer allowed are also at risk of confusion with new restrictions. Some people will only hear the consequence if they inadvertently or unintentionally violate the restrictions. After analyzing this law and reviewing the relevant literature, I have concluded that a threat of criminalization will result in less—not more—interest and commitment from potential assistors to learn and understand how they can effectively and appropriately assist a voter with a disability. If faced with the question of denying a disabled person the right to vote or ensuring their own safety from criminalization related to SB 1, many assistors will likely err on the side of denying assistance. Many people with disabilities don't want to endanger their caregivers. A KWTX story about Texas SB 1 quoted a woman with spinal muscular atrophy who needs her caregiver to assist her in voting, "We don't want to jeopardize our attendants, but we want to be able to vote, but we need our attendants' help, so we're in a Catch-22." (Dey, 2022).

29. There are already several deterrents to voting for people with disabilities. There is reason for concern that the revised oath in SB 1 will become another barrier to voting because people will be uncertain how to get the help they need to vote. Places and organizations to which people with disabilities typically go to get important information about policies that impact people with disabilities lack certainty on the impacts of SB1.

13

Advocacy groups, including the Coalition of Texans with Disabilities and the State's Protection and Advocacy organization, Disability Rights Texas, are challenged to educate voters with disabilities about what they should do if the voters need assistance that conflicts with the new rules (Dey, 2022). Protection and advocacy organizations advocate for civil and legal rights of people with disabilities within each state. From conversations with people in the disability community, most voters with disabilities and their assistors typically want to comply with the law but fear that even an unintentional mistake could result in criminal consequences. That fear will add to the list of deterrents keeping Texas voters with disabilities from engaging in their fundamental right as American citizens. Fear keeps people from the polls, and failure to get the assistance needed to vote stops people from casting their ballot.

30. The frustration, discouragement, and disenfranchisement experienced by eligible voters with disabilities who go to the polls but experience barriers can have a lasting effect (SABE, 2020). For some eligible voters, they will never return to exercise their right to vote. Texas voters with disabilities who previously cast their vote with assistance that is no longer permitted will be faced with the untenable choice to forgo their right to vote or try to vote without the supports they know they need. This is likely to result in the very real possibility that voters with disabilities will not be able to cast their ballot as they intended. Voters will be unable to confirm, clarify, or check for understanding. They will be unable to receive reminders or gain access to individualized supports that make the difference between turning out to vote and casting their ballot or not.

## VII. Conclusion

31. Voters with disabilities often know what assistance they need to vote, and the rigidity introduced by the revised oath in SB 1 will make it impossible for some voters to get the help they need. Our democracy is strengthened by representation from all citizens. People with disabilities are often impacted in major ways by a wide range of local, state, and federal policies. The opportunity for engagement in the voting process by voters with disabilities is critical to ensuring laws are fair and that elected officials represent their constituents.

14

32. After reviewing the law, it is my opinion that SB 1 will not only discourage Texans with disabilities from voting but also discourage the poll workers and assistors from helping people to vote. The assistance assistors provide can make the difference whether a citizen can vote or not. The oath and its implementation introduce confusion and creates fear, which makes it more difficult to ask for help to vote, to get the help needed to vote, and to vote. The restrictions on asking and answering questions precludes assistors from effectively assisting certain people with disabilities to vote. It is paramount that voters with disabilities cast ballots that reflect their choices. To do so, they may need to ask questions and get answers about the voting process as it relates to their disability. Disability, the way it impacts a person, and effective supports are exceptionally variable. There are no "one size fits all" approaches to assistance. Limiting or constraining assistance to merely reading the ballot to the voter, directing the voter to read the ballot, marking the ballot for the voter, or directing the voter to mark the ballot will inevitably exclude a significant and important part of the Texas electorate.

## References

Andrews, E. E., Ayers, K. B., Brown, K. S., Dunn, D. S., & Pilarski, C. R. (2021). No body is expendable: Medical rationing and disability justice during the COVID-19 pandemic. *American Psychologist*, *76*(3), 451.

Belt, R. (2016). Contemporary voting rights controversies through the lens of disability. *Stan. L. Rev.*, *68*, 1491.

Center for Civic Design (2016). Assistive Technology in the Polling Place: Current and Emerging Technology. A White paper for Human Factors Public Working Group.

Centers for Disease Control and Prevention (2021). Disability Impacts All of Us. Retrieved from: https://www.cdc.gov/ncbddd/disabilityandhealth/infographic-disability-impacts-all.html.

Centers for Disease Control and Prevention (2019). Disability and Health U.S. State Profile Data for Texas (Adults 18+ years of age). Retrieved from: https://www.cdc.gov/ncbddd/disabilityandhealth/impacts/texas.html.

Committee on People with Disabilities. (2015). Policy recommendations for the 2015–2017 biennium 84th legislative session: January 2015. Retrieved February 20, 2022, from http://gov.texas.gov/files/disabilities/2015-17_Policy_Recommendations.pdf

Davidson, G., Kelly, B., Macdonald, G., Rizzo, M., Lombard, L., Abogunrin, O., ... & Martin, A. (2015). Supported decision making: A review of the international literature. *International Journal of Law and Psychiatry*, *38*, 61-67.

Dey, S. (2022, February). Texans with disabilities fear new restrictions on voting helpl could mean criminal charges at the polls. KWTX. Retrieved from: https://www.kwtx.com/2022/02/16/texans-with-disabilities-fear-new-restrictions-voting-help-could-mean-criminal-charges-polls/.

Friedman, C., & Rizzolo, M. C. (2017). Correlates of voting participation of people with intellectual and developmental disabilities. *Journal of social work in disability & rehabilitation*, *16*(3-4), 347-360.

Hennessy, M. J., & Sullivan, K. A. (2021). A 'Network of Understanding and Compassion': A Qualitative Study of Survivor Perspectives on Unmet Needs After Traumatic Brain Injury (TBI) in Regional Communities. *Brain Impairment*, 1-12.

Johnson, A. A., & Powell, S. (2020). Disability and election administration in the United States: barriers and improvements. *Policy Studies*, *41*(2-3), 249-270.

Li, Q., Pomante, M. J., & Schraufnagel, S. (2018). Cost of voting in the American states. *Election Law Journal: Rules, Politics, and Policy*, *17*(3), 234-247.

Nario-Redmond, M. R. (2020). Ableism: The Causes and Consequences of Disability Prejudice. John Wiley & Sons.

Powell, S. (2017). Disability and Voting. *Disability and US Politics: Participation, Policy, and Controversy [2 volumes]*, *95*.

SABE GoVoter Survey Results Report. (2020). Retrieved from:
https://www.sabeusa.org/wp-content/uploads/2021/10/SABE-GoVoter-2020-Survey-Report.pdf

Schur, L. & Kruse, D. (2019). "Fact Sheet: Disability and Voter Turnout in the 2018 Elections." Rutgers School of Management and Labor Relations. <https://smlr.rutgers.edu/sites/default/files/Documents/Centers/Program_Disability_Research/Fact%20Sheet%20Disability%20Voter%202018%20Elections.pdf

Schur, L., Adya, M., & Ameri, M. (2015). Accessible democracy: reducing voting obstacles for people with disabilities. *Election Law Journal*, *14*(1), 60-65.

Schur, L., Kruse, D., Schriner, K., & Shields, T. (2008). Voter turnout, voting difficulties, and disability in the 2000 elections: Laying a challenge at democracy's door. Retrieved January 30, 2008, from http://www.accessiblesociety.org/topics/voting/voterturnout.htm

Schur, L., Shields, T., & Schriner, K. (2005). Generational cohorts, group membership, and political participation by people with disabilities. Political Research Quarterly, 58(3), 487-496.

Strömberg, M., Liman, L., Bang, P., & Igelström, K. (2021). Experiences of Sensory Overload and Communication Barriers by Autistic Adults in Health Care Settings. *Autism in Adulthood*.

Syed, I., Bishop, M., Brannon, S., Hudson, E., & Lee, K. (2021). Designing Accessible Elections: Recommendations from Disability Voting Rights Advocates. *Election Law Journal: Rules, Politics, and Policy*.

Ura, A. (2021, July 5). "Texans with disabilities fear voting will get harder for them as special session on GOP restrictions nears." The Texas Tribune. Retrieved from: https://www.texastribune.org/2021/07/05/texas-voting-disability/

Executed on February 28, 2022 in Mason, Ohio.

I declare under penalty of perjury the foregoing is true and correct.


_____        _____
Dr. Kara B. Ayers, PhD

APPENDIX A

**CURRICULUM VITAE**

**Kara B. (Sheridan) Ayers, PhD**

**Office:**  Cincinnati Children's Hospital
Medical Center
Department of Developmental
and Behavioral Pediatrics
3333 Burnet Ave., MLC 4002
Cincinnati, OH 45229
Phone: (513) 803-4402
Fax: (513) 803-0072
Email: kara.ayers@cchmc.org

## EDUCATION

Bachelor of Science                                          2003
Wright State University
Dayton, OH
Major: Psychology
Minor: Rehabilitation Services

Master of Science in Clinical Psychology                     2007
Nova Southeastern University
Fort Lauderdale, Florida

Ph.D. in Clinical Psychology                                 2011
Nova Southeastern University
Fort Lauderdale, Florida
Dissertation: Growing up with Brittle Bones:
The Psychosocial
Functioning of Children and Adolescents with
Osteogenesis Imperfecta
Chair: Sarah Valley-Gray, Psy.D.

Predoctoral Training
Doctoral Internship                                          2010-2011
Wright State University
Rotations: Dayton Children's Hospital and Counseling
and Wellness Services
Supervisor: Robert Rando, Ph.D.
Pre-Doctoral Practicum                                       2006-2009
Miami Children's Hospital
Rotation: Inpatient and Outpatient Psychiatry
Supervisor: Janet Rosen, Ph.D.

Pre-Doctoral Practicum                                   2005-2006
Florida International University
Rotation: Community-Based Research Institute
Supervisor: Staci L. Morris, Ph.D.

**Other Training**

The National Leadership Consortium on                         2015
Developmental Disabilities

Description: A week-long (August 3-7,
2015) competitive, intensive leadership
training program for emerging leaders
in the fields of developmental
disabilities

Certificate Program in Clinical and                          2018-
Translational Research                                      present
University of Cincinnati
Completed: Introduction to
Epidemiology and Statistical programs

## ACADEMIC APPOINTMENT

Associate Professor                      March 2016-present
Department of Pediatrics, University of
Cincinnati Division of Developmental
Behavioral Pediatrics at
Cincinnati Children's Hospital Medical Center

**PREVIOUS EMPLOYMENT**

Jackson Memorial Hospital                April 2005 - August 2006
Outpatient Hematology/Oncology Clinic
Position: Pediatric Clinic Teacher

Disaboom, Inc.                           October 2007 - April 2010
Position: Contracted Feature Writer

Cincinnati Recreation Commission         May 2009 - May 2010
Position: Program Leader

The Family Nurturing Center              June 2009 - June 2010
HOPE (Helping Others Parent Effectively)
Program
Position: PCIT Parent Group Facilitator

| | |
|---|---|
| Ivy Tech Community College<br>Position: Psychology Instructor (Adjunct) | August 2009-December 2021 |
| Child Focus, Inc.<br>Position: Postdoctoral Fellow | September 2011 - March 2012 |
| Professional Psychiatric Services<br>Position: Independent Contractor<br>Diagnostician/Therapist | July 2012 - December 2013 |
| Cincinnati Children's Hospital Medical Center<br>University of Cincinnati UCEDD<br>Position: Advocacy and Information Dissemination Coordinator | January 2013-December 2015 |

## LICENSING and CERTIFICATIONS

Collaborative IRB Training Initiative (CITI) Program
      Human Subjects Research Core Curriculum: expires 6/21/2023
      Decisionally Impaired Subjects: expires 6/21/2023
      Children Research: expires 6/21/2023
      International Participants: expires 6/21/2023
      Students: expires 6/21/2023

Project ECHO certified trainer: February 2021

## AWARDS and HONORS

| | |
|---|---|
| Wright State University's Community Advisor of the Year | 2000 |
| Faculty Academic Scholarship | 2001 |
| Oelman Psychology Scholarship | 2002 |
| Schardt Memorial Scholarship | 2002 |
| PSI CHI, National Psychology Honors Society | 2001-2003 |
| Pi Lambda Theta, International Honor Society and Professional Association in Education | 2004-present |
| Women in Research Award Winner (Section 2) | 2007 |

| | |
|---|---|
| Youngest member to be inducted into Franklin County High School Hall of Fame | 2013 |
| Legacy Award from Living Arrangements for the Developmentally Disabled (LADD) | 2015 |
| Imagination and Courage Award from the Division of Developmental and Behavioral Pediatrics at Cincinnati Children's Hospital Medical Center | 2018 |
| Community Advocate Award from the Cincinnati Reds and 2019 Cincinnati Disability Organizations | 2019 |
| Cincinnati Children's Hospital Advocacy Achievement Faculty Award | 2019 |
| National Council of Schools and Programs of Professional Psychology Diversity Award | 2020 |
| Ed Roberts Award A National award in recognition of contributions to the study of parenting with a disability | 2021 |
| Certificate of Distinction from the Kentucky House of Representatives for work improving lives of families with disabilities | 2021 |
| Integrating Special Populations Award from the Center for Clinical and Translational Science and Training | 2021 |

## CLINICAL ACTIVITIES

Current appointment is non-clinical.

**Program Leadership**

| | |
|---|---|
| Co-Founder and Co-Director of the Disabled Parenting Project (DPP) | 2015-present |

Description: The DPP is an online information clearinghouse that leverages the power of connecting parents with disabilities to each other. The DPP informs social policy concerning this underserved population through the development of scholarly research, fact sheets, and training resources.
Impact: Online reach to an average 6,600 individuals per month. 79,875 reached last year.

| | |
|---|---|
| Associate Director of the University of Cincinnati Center for Excellence in Developmental Disabilities (UCCEDD) | 2016-present |

The Cincinnati UCEDD is one of 67 UCEDDs across the country. UCEDDs are federally funded from a competitive grant to fulfill the obligations of the Developmental Disabilities Act. As UCCEDD Associate Director, I lead efforts around disability policy (at both a state and federal level). Additionally, I supervise

programmatic efforts and ensure UCCEDD fulfills the four core functions: policy/research, community service/training, interdisciplinary training, and information dissemination.

Director of the Center for Dignity in Healthcare for People          2019-present
with Disabilities (CDHPD)
The CDHPD is a collaborative effort with eight national partners to identify and reduce life-limiting healthcare inequities for people with intellectual and developmental disabilities. The CDHPD contributes to research related to discrimination in healthcare. It has provided a wide range of resources on COVID-19 for people with disabilities, their families, and healthcare providers. On average these resources reach 15,000 people per week.

## RESEARCH and SCHOLARLY ACTIVITIES

My research and scholarly activities share a focus on improving outcomes for individuals with disabilities. My federal appointment to the Patient-Centered Outcomes Research Institute has facilitated the connection of my work on patient-engagement to critical initiatives aimed at transforming healthcare. Since co-founding the Disabled Parenting Project in 2015, my visibility in writing, teaching, and speaking about parenting with a disability has increased to a national and international level. I am also a frequently invited subject matter expert across a wide range of disability policy and bioethical issues. As a result of my dual alignment with and representation of both the disability community and multi-disciplinary fields of health and medicine, I am afforded unique opportunities to bridge these communities.

**Grants and Contracts**

<u>CURRENT GRANTS</u>

1. University Centers for Excellence in Developmental Disabilities Education, Research, and Service from the Administration on Community Living.
Co-Investigator
HHS-2017-ACL-AOD-DDUC-0195
$547,000 per budget period with 5 budget periods
Awarded 2017-2022
Role: Co-Investigator; 70% Effort
Goals: 1) Conduct Leadership Education in Neurodevelopmental and other Disabilities (LEND) and other, formal interdisciplinary pre-service training program(s) to prepare pre-/para professionals, professionals, people with developmental disabilities (DD) and family members to work with people with disabilities/families in a culturally competent manner towards improved health outcomes and quality, community-based living. 2) Increase opportunities for improved health and quality community living by providing community training, technical assistance, and model and demonstration services for people with DD, their families, pre- and paraprofessionals, professionals and the general public**.** 3) Perform and evaluate, translate, and impact research and policy to improve health outcomes and quality community living of diverse

people with DD and their families. 4) Inform individuals with DD, their families, service systems, professionals, policy makers, and the public about the knowledge and expertise of the UC UCEDD and the UCEDD network and issues of importance to the DD community in an accessible and culturally competent way.

2. Department of Health and Human Services Administration for Community Living. Administration on Disability: Equal Access to Healthcare for People with Intellectual and Developmental Disabilities.
Developmental Disabilities: Project of National Significance
90DNHC0001
Principal Investigator; 20% Effort
$500,000 per budget period for 3 budget periods
Awarded: 2019-2022
Goal: Address discrimination and ableism in healthcare through the establishment of a multi-site collaborative Center for Dignity in Healthcare for People with Disabilities

3. Maternal and Child Health Bureau/Health Resources and Services Administration. Title of Project: University Affiliated Cincinnati Center for Developmental Disorders/Leadership Education in Neurodevelopmental and other Related Disabilities
No: T73 MC 00032
Funding amount: $710,000/per year; July 1, 2016 – June 30, 2021; $786,000/per year; July 1, 2011- June 30, 2016.
Role: Core Faculty; 10% Effort
Goals of Grant: 1) Advance the knowledge and skills of all child health professionals to improve health care delivery systems for children with developmental disabilities. 2) Provide high-quality interdisciplinary education that emphasizes the integration of services from state and local agencies and organizations, private providers, and communities. 3) Provide health professionals with skills that foster community-based partnerships. 4) Promote innovative practices to enhance cultural competency, family-centered care, and interdisciplinary partnerships.

4. National Institute on Disability, Independent Living, and Rehabilitation Research (NIDILRR). Title of Project: Center for Disability and Pregnancy Research (CDPR)
No: 90DPHF0011
Funding amount: FY21 $499,975; FY22 $499,975; FY23 $499,996
Role: Co-Investigator; 10% effort
Goals of grant: The CDPR is a cross-disability initiative that aims to 1) leverage existing and new data sources to examine racial and ethnic disparities in perinatal care, complications, and outcomes 2) develops and tests the efficacy of a preconception education curricula for women with mobility disabilities; 3) adapts and pilots the use of an accessible pregnancy action plan for women with diverse disabilities; 4) tests the efficacy of a disability accommodation field in the

electronic health record across a network of hospitals and 5) adapts and validates a screening tool for the detection of perinatal depression in women with intellectual and developmental disabilities.

5. National Institute on Disability, Independent Living, and Rehabilitation Research (NIDILRR). Project title: National Research Center for Parents with Disabilities.
No: 90DPCP0012
Funding amounts: FY 21 $500,000; FY 22 $500,000; FY 23 $500,000; FY 24 $500,000; FY 25 $500,000.
Role: Co-investigator, 10%
Goal of grant: The goal of the Parents Empowering Parents: National Research Center for Parents with Disabilities (PEP Center) is to conduct research and provide training and technical assistance to improve the lives of parents with disabilities and their families, particularly racial and ethnic minority parents.

<u>PREVIOUS GRANTS</u>

4. DDTI Excellence in Developmental Disabilities National Training Initiative Administration for Community Living Principal Investigator
90DDTI0035-01-00
$50,000 per budget period with 1 budget period
Awarded 2018-2019
Role: Principal Investigator
Goal: The Diversity Fellowship will provide a bridge between UCCEDD, multiple community/hospital-based partnerships, and refugees with disabilities and their families.

**PUBLICATIONS**
**Peer-reviewed publications**

1. Powell, R., Andrews, E., & ***Ayers, K.*** (2016). RE: Menstrual Management for Adolescents with Disabilities. *Pediatrics, 138*(6).

2. Weber, S., Smith, J., ***Ayers, K.***, & Gerhardt, J. (2019). Fostering disability advocates: A framework for training future leaders through interprofessional education. *Psychological services*. SNIP: 1.24 Altmetrics: 2.

3. Lund, E. M., & ***Ayers, K.B.*** (2020). Raising Awareness of Disabled Lives and Health Care Rationing During the COVID 19 Pandemic. *Psychological Trauma: Theory, Research, Practice, and Policy*. SNIP: 1.24 Altmetrics: 1. Cited by 6. http://dx.doi.org/10.1037/tra0000673

*4.* Andrews, E., ***Ayers, K.B.***, Brown, K.S., Dunn, D., & Pilarski, C. (2020). No Body is Expendable: Medical Rationing and Disability Justice During the

COVID-19 Pandemic. *American Psychologist.* SNIP: 3.66 Altmetrics: 13. Cited by 8. http://dx.doi.org/10.1037/amp0000709

5. Andrews, E. E., Powell, R. M., & ***Ayers, K. B.*** (2020). Experiences of Breastfeeding among Disabled Women. Women's Health Issues. SNIP: 0.98 Altmetrics: 22 https://doi.org/10.1016/j.whi.2020.09.001

6. Nijhuis, W., Franken, A., ***Ayers, K.***, Damas, C., Folkestad, L., Forlino, A., ... & Verhoef, M. (2021). A Standard Set of Outcome Measures for the Comprehensive Assessment of Osteogenesis Imperfecta. Orphanet Journal of Rare Diseases 16(140). https://doi.org/10.1186/s13023-021-01682-y

7. Ahlers, K. P., ***Ayers, K. B.***, Iadarola, S., Hughes, R. B., Lee, H. S., & Williamson, H. J. (2021). Adapting Participatory Action Research to Include Individuals with Intellectual and Developmental Disabilities during the COVID-19 Global Pandemic. *Developmental Disabilities Network Journal*, *1*(2), 5.

8. Epstein, S., **Ayers, K.**, & Swenor, B. (2021). COVID-19 Vaccine Prioritization for People with Disabilities. *The Lancet*. https://doi.org/10.1016/S2468-2667(21)00093-1

9. Nabors, L., Overstreet, A., Carnahan, C., & **Ayers, K** (2021) Evaluation of a Pilot Healthy Eating and Exercise Program for Young Adults with Autism Spectrum Disorder and Intellectual Disabilities. *Advances in Neurodevelopmental Disorders* (2021). https://doi.org/10.1007/s41252-021-00214-w


**Books, Chapters, White Papers, Invited Papers, and Other Publications**

1. *Sheridan, K. B.* (2001). Making waves with exercise and personal development. In Dollar, E.P. (ed.), Growing up with Osteogenesis Imperfecta (pp. 55-62). Gaithersburg, MA: Osteogenesis Imperfecta.

2. *Sheridan, K.B.* (2005). [Forward including a historical review of the development of children with Osteogenesis Imperfecta with a discussion of psychological benefits of exercise with a disability]. In H.L. Cintas & L.H. Gerber (Eds.), Children with Osteogenesis Imperfecta: Strategies to Enhance Performance (pp. v-xi). Gaithersburg, MA: Osteogenesis Imperfecta Foundation.

3. *Sheridan, K.B.* (2006). Mouth and Foot Painting Artists (MFPA) offer tools of change for people with and without disabilities. American Psychological Association Division of Rehabilitation (Div. 22) Newsletter, 34 (1), 14.

4. Schneider, B, *Sheridan, K.B.* & Kuemmel, A. (2007). Increasing your competency in evidence-based and innovative treatment approaches to self-injury: A review of Beyond Fear and Control: Working with Young People who Self-harm. *PsycCRITIQUES--Contemporary Psychology: APA Review of Books,* 53(7). Invited Review.

5. *Sheridan, K.B.* (2007). The uphill push: Women wheelchair users and access to health care. *New Mobility Magazine, 18*, 39-44.

*6.* Orvaschel, H. & *Sheridan, K.B.* (2008). There's a dog in the playroom! *[*Review of the book *Play Therapy with Kids & Canines: Benefits for Children's Developmental and Psychosocial Health]. PsycCRITIQUES-Contemporary Psychology: APA Review of Books.*

7. *Ayers, K.B.* (2011). Anything for Baby (Cover Story), *New Mobility Magazine, 22* (209), 32-35

8. *Ayers, K. B.* (2014). *A family-centered approach to early-intervention: Our Story.* Featured on the Help Me Grow Ohio website. Retrieved from http://www.helpmegrow.ohio.gov/Early%20Intervention/EI%20Updates/A%20Family-Centered%20Approach%20to%20Early%20Intervention%20-%20Our%20Story%20by%20Kara%20Ayers.aspx.

9. *Ayers, K.* & Weber, S. (2014). Approaching disability from a strengths-based perspective. *PsycCRITIQUES, 59*(12). Retrieved from: http://psqtest.typepad.com/blogPostPDFs/ApproachingDisabilityFromStrengths-BasedPerspective_2014-59-12.pdf

10. Andrew, E. & *Ayers, K.* (2016). Parenting with disability: Experiences of disabled women. In Miles-Cohen, S. & Signore, C. (Eds.), *Inequity in Equity: Improving the Health and Well-being of Women with Disabilities*. American Psychological Association.

11. McCarthy, M., Riddle, I., *Ayers, K.* and Morrison, R. (2016). Profile of People with Disabilities and their Families: Data and Voices from the Community. University of Cincinnati University Center for Excellence in Developmental Disabilities (UC UCEDD) at Cincinnati Children's Hospital Medical Center (CCHMC), Cincinnati, OH. Retrieved from https://www.ucucedd.org/sites/bmidrupalducedd.chmcres.cchmc.org/files/media/Research/Ohio%20Disability%20Report

12. *Ayers, K.* (2017). A psychoanalytic analysis of the 2016 United States Presidential election calls for a global social justice movement: A review of Psychoanalyzing the Left and Right after Donald Trump: Conservatism, Liberalism, and Neoliberal Populisms. *PsycCritiques, 62*(11). Invited Review. Retrieved from: http://collections.uakron.edu/cdm/singleitem/collection/p15960coll21/id/85

874/rec/1

13. Ramos, P., Ayers, K., Brosco, J., Griffen, A., Hewitt, A., Riddle, I., Rodgers, R, Rudolph, D., and van Stone, M. (2021). The COVID-19 Pandemic and People with Disabilities: Primary Concerns, the AUCD Network Response, and Needs for the Future. Association of University Centers on Disabilities. Retrieved from: https://www.aucd.org/docs/publications/20201703_COVID19_Pandeminc_PWD.pdf

14. Ayers, K. B., & Reed, K. A. (2022). Inspiration Porn and Desperation Porn: Disrupting the Objectification of Disability in Media. In *Redefining Disability* (pp. 90-101). Brill.

**Professional Presentations and Abstracts**

**National Presentations, Abstracts, and Posters**

1. Kuemmel, A., Richardson, N., Reiss, J. & *Sheridan, K.* (2007, August). Risk Factors of Abuse of People with Disabilities: Individual's Perceptions. Poster session presented at the 115th annual conference of the American Psychological Association (division 01), San Francisco, California.

2. *Ayers, K.* (2014, November). Building Bridges for Collaborations for Parents with Disabilities. Co-presenter for concurrent session of the AUCD National Conference. Washington, DC.

3. *Ayers, K.* (2015, November). Disability through the Lens of Art. Co-presenter for concurrent session of the AUCD National Conference. Washington, DC.

4. *Ayers, K.* (2015, November). The Final Frontier: Supporting Parents with Disabilities. Co-presenter for concurrent session of the AUCD National Conference. Washington, DC.

5. *Ayers, K.* (2015, November). Building Collaborations to Support Parents with Disabilities. Presenter for concurrent session of The Association for Successful Parenting (TASP) National Conference. Memphis, Tennessee.

6. *Ayers, K.* (2016, December). Bridging the Divide: Advocating across Differences within the Disability Community. Co-presenter for concurrent session at AUCD National Conference. Washington, DC.

7. Gerhardt, J. & *Ayers, K.* (2017, November). UCCEDD-Community Collaboration on Local Government Advocacy for Greater Employment Opportunities for People with Disabilities. Poster session at AUCD National Conference. Washington DC.

8. *Ayers, K.* (2018, April). Attitudes Towards Prenatal Genetic Diagnostic Testing Within the Osteogenesis Imperfecta Community. Poster session at the Osteogenesis Imperfecta Scientific Meeting. Chicago, Illinois.

9. Jones, E., *Ayers, K.*, & Riddle, I. (2018, November). Disabled Parenting Project (DPP): Leveraging Research to Inform Social Policy. Poster at Association of University Centers on Disability Conference.

10. Weber, S., Smither, J., *Ayers, K.*, Gerhardt, J., & Smith, T. (2018, November). Teaching Policy and Advocacy Skills in Interdisciplinary Professional Education. Poster at Association of University Centers on Disability Conference.

11. Powell, R., Andrews, E., & *Ayers, K.* (2018, November). Improving access to perinatal health care for parents with disabilities in the United States. In APHA's 2018 Annual Meeting & Expo (Nov. 10-Nov. 14). American Public Health Association.

12. *Ayers, K.,* Powell, R., & Andrews, E. (2018, November). Looking beyond barriers to identify strengths of parents with disabilities. Roundtable session at APHA: Emerging Issues in Interventions, Surveillance, Programs and Policies for Persons with Disabilities. San Diego, California.

13. Andrews, E., Powell, R., & *Ayers, K.* (2018, November). Factors that affect breastfeeding among mothers with disabilities. Roundtable session at APHA: Emerging Issues in Interventions, Surveillance, Programs and Policies for Persons with Disabilities. San Diego, California.

14. Eppelsheimer, R., Yoshino, L., Basey, J., Riddle, I*., Ayers, K.*, & Milberger, S. (2019). Leading change together with community advisory councils. Poster at AUCD. Washington, DC.

15. *Ayers, K.*, Riddle, I., Couch, C., Ramsay, K., Koller, S. (2019). It take a village: Training case managers to support parents with disabilities. Poster at AUCD. Washington, DC.

16. Gebre, S. & *Ayers, K.* (2019). Supporting refugees with disabilities to resettle in the Greater Cincinnati area: UCCEDD's Diversity Fellowship. Poster at AUCD.

17. *Ayers, K.*, Hughes, R., & Riddle, I. (2019). Tackling taboo topics: Reproductive health for women with disabilities. Concurrent session at AUCD. Washington, DC.

18. *Ayers, K.* & Smith, L. (2020). Undoing Ableism: Suicide Prevention for Youth with Disabilities. Poster at AUCD. Virtual.

19. *Ayers, K.*, Smith, L., Riddle, I., Adams, C. Opii, T. (2020). Addressing Inequities in Healthcare for People with Disabilities. Concurrent session at AUCD. Virtual.

20. *Ayers, K.*, Nugent, A., & Smith, L. (2021). Organ Rationing and People with Disabilities. American Society of Bioethics and Humanities Conference. Poster. Virtual.

21. Lanphier, E., Anani, U. K., *Ayers, K.*, & Gipe, K. (2021). Trauma-Informed Ethics Consultation. American Society of Bioethics and Humanities Conference. Concurrent. Virtual.

22. *Ayers, K.* Meredith, S., Van Stone, M., & Smith, L. (2021). Health Equity for People with Disabilities During a Pandemic. American Public Health Association Conference. Roundtable Discussion. Virtual.

23. *Ayers, K.* & Smith, L. (2021). Interventions in Healthcare Inequity: Guidelines for Addressing Bias Against People with ID/DD. Association of University Centers on Disability Conference. Poster. Virtual.

24. *Ayers, K.*, Smith, L., Sluzalis, S., & Parodi, G. (2021). Balancing Uneven Scales: Addressing Power Dynamics in Disability Stakeholder Groups. Association of University Centers on Disability Conference. Concurrent session. Virtual.

25. Ausloos-Lozano, J., Small, E., Lee, E-J., & *Ayers, K.* (2022). Diversity and Inclusion Since the Pandemic: The Impact of COVID-19 on Trainees with Disabilities. Rehabilitation Psychology Mid-Year National Conference.

26. Lund, E., Niemeier, J., Wilson, C., *Ayers, K.*, Ohayagha, C., & Lee, E-J. (2022). Advocacy Fatigue and Self-Compassion: A Guide for Healers and Helpers. Rehabilitation Psychology Mid-Year National Conference.

**<u>Regional Presentations and Panels</u>.**

1. *Ayers, K.* (2015, November). Advocacy for Youth with Disabilities in Transition. for Transition Bootcamp. Cincinnati, Ohio.

2. *Ayers, K.* & Riddle, I. (2015, October). Employment for People with Disabilities. for the Department of Energy staff. Cincinnati, Ohio with live and archived (internal) webcast.

3. *Ayers, K.* (2015, October). Raising Resilient Families with Osteogenesis Imperfecta. Regional Osteogenesis Imperfecta Conference. Minneapolis, Minnesota.

4. *Ayers, K.* (2015, March). *Advocacy 101: Advocating for your Loved One.* Empowering Families Symposium. Cincinnati, Ohio.

5. *Ayers, K.* (2015, March). *Making Your Online Course Accessible.* Statewide Virtual Meeting of Instructional Designers. Online.

6. *Ayers, K.* (2017, February). Integrating Employees with Disabilities into your Workforce. Cincinnati Chamber of Commerce "Diverse by Design" Workshop. Cincinnati, OH.

7. *Ayers, K.* (2018, April). Tell me a Disability Story. Keynote Speaker. Joint Ohio LEND Poster Session. Cincinnati, OH.

8. Ayers, K. (2018, April). Brave Advocacy. Keynote Speaker. Empowering Families. Cincinnati, OH. 368 attendees.

9. *Ayers, K.* (2019, May). What Families with Children with Disabilities would like Residents to Know: Resident Lunch Learning Conference. Cincinnati, OH. 45 attendees.

10. *Ayers, K.* (2021, January). The Role of Ableism in Perpetuating Healthcare Inequities for People with Disabilities. Cardinal Hill Hospital Lunch and Learn. Lexington, KY. 89 attendees.

11. *Ayers, K.* (2021, March). Health Equity for Ohioans with Disabilities. Keynote Address for Ohio Developmental Disability Awareness and Advocacy Day. 680 attendees.

12. Ayers, K. (2021, May). Standards of Care, Disability, and a Public Health Emergency: Conversations on Equitable Care during COVID-19. Vanderbilt Kennedy Center Research Ethics Grand Rounds Panel. 55 attendees.

13. Ayers, K. (2021, May). Avoiding Racism and Ableism in Rationing of Scarce Healthcare Resources. Nisonger Center Summer Institute. 206 attendees.

14. Ayers, K. (2021, July). Crucial Conversations during these Times: Ableism and Individuals with Disabilities. University of Kentucky HealthCare's Diversity, Equity & Inclusion Council. 185 attendees.

15. Ayers, K. (2021, July). Employing Anti-Ableist Strategies to Reduce Healthcare Inequities. Resident Training for Cincinnati Children's Hospital Medical Center. 25 attendees.

16. Ayers, (2021, August). Parenting with a Disability. Maryland Centers for Independent Living Directors Meeting. 28 attendees.

17. Ayers, K. (2021, September). Health Equity for People with Disabilities. California Foundation of Independent Living Council board meeting. Invited Speaker. 48 attendees.

18. Ayers, K. (2021, October). Co-creating an Inclusive and Empowering University with the Disability Community. Invited Speaker. 20 participants.

19. Ayers, K. (2021, October). Ableism, Healthcare and Health Outcomes. Kennedy Krieger Institute Grand Rounds. Invited Speaker. 131 participants.

**Workshops**

**International**

*1.* Kuemmel, A., Richardson, N., Reiss, J. & *Sheridan, K.* (2006, August). *College students' perceptions of people with disabilities' vulnerabilities for abuse.* Interactive poster symposia presented at the International Congress of Applied Psychology, Athens, Greece.

**National Workshops**

1. Kuemmel, A., Richardson, N., Reiss, J. & *Sheridan (Ayers), K.* (2006, August). *Perceptions of People with Disabilities' Vulnerabilities to Abuse.* Poster session presented at the 114th annual conference of the American Psychological Association (division 22).

2. *Sheridan, K.B.* (2007, July). *Sexability Trainings: A solution for change.* Session presented at the annual conference of the National Council for Independent Living. Washington DC

3. Kuemmel, A., *Sheridan, K.*, Gibson, J., Abels, A., & Daughtry, D. (2007, August) Testing and Assessment of Clients with Disabilities. In A. Kuemmel (Chair) *Disability Issues in Psychology Not Typically Covered in Graduate School Diversity Courses.* Symposium presented at 115th annual conference of the American Psychological Association (APAGS), San Francisco, CA
*Awarded 2007 APAGS Outstanding Professional Development Presentation*

4. *Ayers, K.*, Gibson, W., Bergen, M., Swearer, S., Tolman, D., Brinkman, B., & Neal-Barnett, A. (August, 2015). Disability: An Often Unaddressed Target

of Bullying. Accepted proposal for Hurting from the Inside Out-Identity-Based Bullying among Adolescents workshop as part of American Psychological Association National Conference.

### **Regional Workshops**

1. *Sheridan, K.B.* (2006, February). *Taking action in the advocacy of psychology: Use your voice as a tool.* Workshop conducted during a colloquium hosted by the Student Organization for the Advocacy of Psychology at Nova Southeastern University, Fort Lauderdale, FL

2. Kuemmel, A., Richardson, N., Reiss, J. & *Sheridan, K.B.* (2006, November). *Domestic violence in the lives of people with disabilities.* Workshop conducted at the Women in Distress of Broward County Inc. Continuing Education Lecture Fort Lauderdale, FL

3. *Sheridan, K.B.* (2007, February). A new view on inclusion. Workshop commissioned by the Cincinnati/Dayton Area Recreation Therapy Association. Keynote speaker for annual conference. Cincinnati, OH

*4. Sheridan, K.B.* (2007, February). *Making waves after the Paralympics: The impact of*
   *recreational therapy.* Session delivered during annual conference of Cincinnati/Dayton Area Recreation Therapy Association, Cincinnati OH

5. Kuemmel, A., Richardson, N., Reiss, J. & *Sheridan, K.* (2007, March). *Perceptions of Perpetrators of Abuse of People with Disabilities.* Poster presented at
   the Division 22 Rehabilitation Psychology Mid- Winter Conference, Charlotte, NC *Section 2 Women in Rehabilitation Research Award Winner.*

6. *Sheridan, K.B.* (2007, July). *Youth Forum: Transitions to Work.* Invited Panelist for the Bridges to Employment Conference: Exploring Career Opportunities for Latinos with Disabilities, Miami, FL

7. *Ayers, K.* (2009, September). *Building Self-Esteem in Children and Teens with Osteogenesis Imperfecta.* Workshop conducted at Cincinnati Children's Hospital for the Ohio Osteogenesis Imperfecta regional support group. Cincinnati, OH.

8. *Ayers, K.* (2013, March). *Brain Hacks: Using Neuroscience in the Classroom.* Workshop conducted at Teaching, Techniques, and Technology Conference at the University of Cincinnati. Batavia, OH.

9. *Ayers, K.* (2015, 2016). Volunteer Training on Accessibility and Disability

Etiquette for the Reelabilities Film Festival. Cincinnati, OH.

10. *Ayers, K.* (2020, February). Disability Awareness for the Ohio Girl Scouts Leadership Conference. Mason, OH.

**Policy and Advocacy Publications**

1. OH HB 195: Modify law regard transportation of people with disabilities Authored Fact Sheet: https://bit.ly/2KD111h
Testimony from October 10, 2017: https://bit.ly/2G5kZjp

2. OH HB 332: Prohibit discrimination on the basis of disability for organ transplantation
Authored Fact Sheet: https://bit.ly/2lUh8Zr
Testimony from October 17, 2017: https://bit.ly/2RGb8Sh
Testimony from May 15, 2018: https://bit.ly/2rqfWQr

3. OH HB 188: Prohibit blindness from denying or limiting care of a minor. Testimony from November 12, 2019 and January 21, 2019: https://bit.ly/2T2EdJv

4. Do you know your rights with COVID-19? Published on the Administration of Community Living and Ohio Department of Health websites. April 2020: https://bit.ly/3eRjxNQ

5. Safeguard Against Disability Discrimination During COVID-19. Published on Administration of Community Living and Ohio Department of Health websites. April 2020: https://bit.ly/3eRxsUo

6. Johns Hopkins Disability Health Research Center. COVID-19 Vaccine Prioritization Dashboard [Internet]. Johns Hopkins Disability Health Research Center; 2021 [updated 2021 Mar 17; cited 2021 Mar 18]. Available from: https://disabilityhealth.jhu.edu/vaccine/

**Digital Publications, Podcasts, and Interviews**

1. Cochran, C. (2015, August). "Emotional meeting when parents with dwarfism meet their new son. Video Clip for US Today's series Humankind. Viewed more than 125,000 times. Retrieved from https://www.youtube.com/watch?v=GIQAUAds348.
Cited frequently for education on parenting with a disability.

2. Cochran, C. (2015, August). "Eli Comes to America". A short-film documentary chronicled the first adoption from China by two parents who use wheelchairs. Ayers contributes interviews related to disability policies in the United States and China. The film was awarded a Mid-American Emmy as a Human Interest

program. Retrieved from:
https://www.cincinnati.com/videos/news/2015/07/26/30691111/

3. Ayers, K. & Ayers, A. (2016, August). Access Cincinnati. A short film describing universal design and the need for increased accessibility in cities. Viewed more than 8.1K times. Retrieved from: https://bit.ly/2EjB7Ms

4. Ayers, K. (2017, June). How to Call Your Senator. A short video demonstrating how to make a call to educate legislators on the impact of policy on people with disabilities. Retrieved from: https://www.youtube.com/watch?v=t9oBT2-PivI

5. Collier, L. (2017, December). Interview in "Sex and Intellectual Disabilities". Monitor on Psychology. Retrieved from: https://bit.ly/2QgcxT0

6.  Ayers, K. (2018, September). Osteogenesis Imperfecta (OI) Foundation Podcast: Disability Identity and OI. Retrieved from:
https://www.youtube.com/watch?v=gJWBkGfZB5E

7. Keech, D. (2018, October). Interviewed for "8 Things Landlords Should Know About Accessibility Compliance". Retrieved from: https://bit.ly/2B2cob8

8. Klein, C. (2018, November). "Parents use what they have to do what they need": Dr. Kara Ayers of the Disabled Parenting Project on Creativity and Community. Feature interview for MuthaMagazine. Retrieved from:
http://muthamagazine.com/2018/11/parents-use-need-dr-kara-ayers-disabled-parenting-project-creativity-community/

9. Rasheed, M., Hamm, K., Schoechet, L., Novoa, C., Workman, S., & Jessen-Howard, S. (2018, December). America's Child Care Deserts in 2018. Contributed subject matter expertise related to lack of accessible childcare options for parents with disabilities and children with disabilities. Report retrieved from: https://ampr.gs/2Up5eqz

10. Ayers, K. (2019, December). Disabled Parenting in an Ableist World. TedX Cincinnati Women "Bold and Brilliant". 5,974 views. Retrieved from:
https://www.youtube.com/watch?v=STtI5wXxErY

11. Ayers, K. (2021, January). A Social Story about the COVID-19 Vaccine. 29,700 views. Retrieved from: https://centerfordignity.com/wp-content/uploads/2021/02/Getting-a-COVID-19-Vaccine-Social-Story-v2.pdf

12. Veno, C. (2021, January). 'We are more alike than different:' Ayers honored for work with disabled parents. Quoted in Kentucky State-Journal. Retrieved from: https://www.state-journal.com/news/we-are-more-alike-than-different-ayers-honored-for-work-with-disabled/article_107e0496-6255-11eb-b6a8-5fbbe950f8a3.html

13. Diament, M. (2021, February). Despite High Risk, Access to COVID-19 Vaccines Uneven for those with IDD. Disability Scoop. Retrieved from: https://www.disabilityscoop.com/2021/02/18/despite-high-risk-access-to-covid-19-vaccines-uneven-for-those-with-idd/29193/

14. Pan, D. (2021, February). They have disabilities and serious medical conditions. But under state guidelines, they don't qualify for early vaccination. Quoted in Boston Globe. Retrieved from: https://www.bostonglobe.com/2021/02/12/nation/they-have-disabilities-serious-medical-conditions-under-state-guidelines-they-dont-qualify-early-vaccination/?event=event25&fbclid=IwAR0tKwMtCHgkxT1vl6MyXiavBWJ2zbDofHyoyerugz8TwUNUf76djRYZOqM

15. Vega, T. (February, 2021). In Some States, People with Disabilities Feel Left Behind in Vaccine Rollout. The Takeaway National Radio Show Guest. Retrieved from: https://www.wnycstudios.org/podcasts/takeaway/segments/some-states-people-disabilities-feel-left-behind-vaccine-rollout

16. United Wheels Podcast (June, 2021). Talking to your children about disabilities. Retrieved from: https://www.listennotes.com/podcasts/united-on-wheels/talking-to-your-children-bR3ianwfBeo/

17. Leahy, C. (2021, August). Wisconsin's Olympians and Paralympians. Wisconsin Public Radio. Retrieved from: https://www.wpr.org/node/1836216

18. Pierce, L. P. (2021, August). Being more inclusive of people with disabilities. Determine our Future Podcast. Retrieved from: https://www.buzzsprout.com/1210403/8846393

19. Evans, I. (August, 2021). Into the Fold Podcast by the Hogg Foundation for Mental Health: Vaccine Equity for People with Disabilities. Retrieved from: https://podcastaddict.com/episode/125729327

20. Wright State Media Team. (2021, September). Quoted in The Disabled Parenting Dilemma. Wright State University Newsroom. Retrieved from: https://webapp2.wright.edu/web1/newsroom/2021/09/16/the-disabled-parenting-dilemma/

21. Tribune News Service. (2021, September). Quoted in People with disabilities have sexual, physical, and emotional needs like everyone else, so

can't we talk about it? South China Morning Post. Retrieved from: https://www.scmp.com/lifestyle/health-wellness/article/3148509/people-disabilities-have-sexual-physical-and-emotional?module=perpetual_scroll&pgtype=article&campaign=3148509&fbclid=IwAR0FzE5xFlwxa2NqoV9dF0PwMiaZ2vT_7Q57DedB8yxyxUqhoA9AbVZr1b0

22. Katz, S. (2021, September). Quoted in People with disabilities are being left behind in vaccination push. Insider. Retrieved from: https://www.insider.com/people-disabilities-being-left-behind-in-vaccination-push-2021-9?fbclid=IwAR3jLJv0zpgV8q4AdlMf6GXH6OpdklAkP5QuD1SOtVwsJvj-3dGHHLIbizA

23. Ayers, K. (2021, May). Stop Staring and Just be Cool. Diversity on Fire Podcast. Retrieved from: https://www.audible.com/pd/45-Stop-Staring-Just-be-Cool-Dr-Kara-Ayers-Podcast/B0943FR11T

24. Ayers, K. (2021, October). Toxic Positivity Directed Towards Little People. iPonder Big Deal Podcast with Chistophe Zajac-Denek. Retrieved from: https://ipondr.com/author/christophe-zajac-denek

25. Ayers, K. & Wiley, S. (2021, November). Healthy and Young Podcast from Cincinnati Children's Hospital Medical Center. Retrieved from: https://youngandhealthy.podbean.com/e/how-to-talk-to-kids-about-disabilities-and-prepare-them-to-value-differences-in-people/

26. Ayers, K. (2022, January 25). How to Talk to Kids About People with Disabilities. Cincinnati Children's Hospital Medical Center Blog. Retrieved from https://blog.cincinnatichildrens.org/86/how-talk-kids-people-disabilities.

## QUALITY REVIEW OF PUBLICATIONS

1. Weber, S., Smith, J., **Ayers, K.**, & Gerhardt, J. (2019). Fostering disability advocates: A framework for training future leaders through interprofessional education. *Psychological services*. SNIP: 1.24 Altmetrics: 2.
   I co-authored this publication, which has also served as an important part of the LEND curriculum to teach interdisciplinary healthcare providers how to advocate effectively. This training framework has been duplicated by other members of the national Association of University Centers on Disability (AUCD) and American Psychological Association (APA) network.

2.  Lund, E. M., & *Ayers, K.B.* (2020). Raising Awareness of Disabled Lives and Health Care Rationing During the COVID 19 Pandemic. *Psychological Trauma: Theory, Research, Practice, and Policy*. SNIP: 1.24 Altmetrics: 1. Cited by 6. http://dx.doi.org/10.1037/tra0000673

    I co-authored this publication with urgency at the start of the COVID-19 pandemic to highlight the inequities in crisis care standards. The article has been referenced by peer reviewed and mainstream publications.

*3.*  Andrews, E., *Ayers, K.B.*, Brown, K.S., Dunn, D., & Pilarski, C. (2020). No Body is Expendable: Medical Rationing and Disability Justice During the COVID-19 Pandemic. *American Psychologist.* SNIP: 3.66 Altetrics: 13. Cited by 8. http://dx.doi.org/10.1037/amp0000709

    I was among leader disability scholars in co-authoring this article about the role of ableism in the COVID-19 response. It has been highlighted and disseminated by multiple media outlets.

4.  Andrews, E. E., Powell, R. M., & *Ayers, K. B.* (2020). Experiences of Breastfeeding among Disabled Women. Women's Health Issues. SNIP: 0.98 Altmetrics: 22 https://doi.org/10.1016/j.whi.2020.09.001

    This article, co-authored by co-founders of the Disabled Parenting Project, is a continuation of my scholarship on parents with disabilities. It provides important recommendations and implications for practice when working with disabled mothers learning to breastfeed.

5.  Nijhuis, W., Franken, A., *Ayers, K.*, Damas, C., Folkestad, L., Forlino, A., ... & Verhoef, M. (2021). A Standard Set of Outcome Measures for the Comprehensive Assessment of Osteogenesis Imperfecta. Orphanet Journal of Rare Diseases 16(140). https://doi.org/10.1186/s13023-021-01682-y

    More than two years of international collaborations among world-renowned leaders in the study of Osteogenesis Imperfecta resulted in a publication of a standard set of outcome measures, which are now being piloted in 5 clinics across the world.

6.  Ahlers, K. P., *Ayers, K. B.*, Iadarola, S., Hughes, R. B., Lee, H. S., & Williamson, H. J. (2021). Adapting Participatory Action Research to Include Individuals with Intellectual and Developmental Disabilities during the COVID-19 Global Pandemic. *Developmental Disabilities Network Journal*, *1*(2), 5.

    Research participation of individuals with disabilities has always lagged. COVID-19 worsened this problem of exclusion. I mentored post-doc trainee, Dr. Ahlers to publish this article, along with other members of the Committee

on Research and Evaluation through the Association of University Centers on Disability. It includes applied suggestions to integrate researchers with disabilities while maintaining safety protocols.

7.  Epstein, S., **Ayers, K.**, & Swenor, B. (2021). COVID-19 Vaccine Prioritization for People with Disabilities. *The Lancet*. https://doi.org/10.1016/S2468-2667(21)00093-1
    I co-authored this perspective piece following a large-scale collaboration with the Disability Health Research Center at John's Hopkins. Together, our Centers built a vaccine priority plan dashboard that accumulated more than 1 million hits while people with disabilities visited to determine when/where they were eligible to receive the COVID-19 vaccine.

## TEACHING and MENTORING

### Courses Taught

University of Cincinnati                                          Fall 2011-present
Adjunct Instructor
*Courses taught:*
Best Practices in Developmental Disabilities
Leadership and Policy in Developmental Disabilities
Abnormal Psychology
Social Psychology
Child Development
Adolescent Psychology
Child and Adolescent Development

Ivy Tech Community College                                        Fall 2009-2020
Instructor-Liberal Arts Department
*Courses taught:*
Abnormal Psychology
Introduction to Psychology
Introduction to Disabilities
Understanding Diversity

Indiana University East                                           Fall 2012-Fall 2015
Faculty
*Courses taught:*
Behavioral Neuroscience
Introduction to Counseling
Sensation and Perception
Special Topics in Psychology

ITT Technical Institute                                           Spring 2012
Adjunct Instructor-General Education
*Courses taught:*

Introduction to Psychology (face-to-face)

Wright State University                                     Fall 2010
Transient Professor/Teaching Assistant
*Course taught:*
Interviewing I (Doctoral level)

**Invited Guest Lectures (2017-2022)**

University of Cincinnati School of Pharmacy             January 16, 2017
Course: Introduction to Pharmacology                   120 students
Lecture: "Communicating to People with Disabilities"

University of Cincinnati School of Social Work         September 25, 2017
Course: Foundations of Developmental Disabilities      22 students
Lecture: "Disability History and Culture"

University of Cincinnati School of Social Work         November 6, 2017
Course: Foundations of Developmental Disabilities      22 students

Lecture: "Parenting with a Disability"

University of Cincinnati School of Social Work         September 17, 2018
Course: Foundations of Developmental Disabilities      18 students
Lecture: "Disability History and Culture"

Barrington Middle School                               October 17, 2018
Course: Social Studies                                 12 students
Lecture: "Lift your Voice in DC for Change"
Description: Supported students with and without disabilities to prepare for an
upcoming trip to DC, which would provide the opportunity to meet with their
legislators.

University of Cincinnati                                October 24, 2018
Program: Collaboration for Employment and Education    20 students
Synergy (CEES)
Lecture: "Youth Power in Disability Advocacy"

University of Cincinnati Blue Ash                       November 27, 2018
Course: Social Welfare Policy                          15 students
Lecture "How to Attitudes Impact Policy"

University of Wisconsin                                 April 17, 2020
Course: LEND program                                   45 students
Lecture: Dignity and Equity in Healthcare

University of Cincinnati                                May 14, 2020
Course: Resident Hour for Physical Medicine and        12 students

Rehabilitation
Lecture: "Adapting to Disability"

University of Cincinnati                                    September 14, 2020
Course: Introduction to Disabilities                       21 students
Lecture: "Disability History and Culture"

University of Wisconsin                                     October 30, 2020
Course: LEND program                                       45 students
Lecture: Dignity and Equity in Healthcare

Brandeis University                                        February 18, 2021
Course: Disability Seminar                                 18 students
Lecture: Addressing Ableism in Healthcare

University of Kentucky                                      February 22, 2021
Course: Developmental Disabilities for Special Educators   24 students
Lecture: "Supporting Parents with Disabilities"

University of Cincinnati                                    August 17, 2021
Course: LEND program                                       26 Students
Lecture: Values in Disability through Literature

University of Cincinnati                                    August 19, 2021
Course: LEND program                                       26 students
Lecture: Disability History and Justice

University of Cincinnati                                    August 30, 2021
Course: "Introduction to Disabilities"                     26 students
Lecture: "Disability History and Culture"

National Institutes for Health                             October 1, 2021
Course: Genetic Counseling Training Program                29 students
Lecture: "Health Equity and Anti-Ableist Health Outcomes"

Wisconsin LEND                                             October 8, 2021
Course: LEND Core                                          35 students
Lecture: "Addressing Healthcare Inequities with Anti-Ableism"

University of Kentucky LEND                                 November 5, 2021
Course: LEND Core                                          22 students
Lecture: "Social Determinants of Health and Disability"

University of Cincinnati LEND                               February 24, 2022
Course: LEND Core                                          22 students
Lecture: "Ethics and Disability"

**National Invited Presentations and Panels**

1. *Ayers, K.* (2012 July). Pregnancy for Women with Osteogenesis Imperfecta. Invited panelist as first bi-annual Women's Forum portion of the national Osteogenesis Imperfecta Foundation conference. Washington, DC.

2. *Ayers, K.* (2012, July). Building Self-Esteem in Young Adults with Osteogenesis Imperfecta. Invited presenter for Bi-Annual Osteogenesis Imperfecta Foundation Conference. Washington, DC.

3. *Ayers, K.* (2012, July). Building Self-Esteem in Children and Teens with Osteogenesis Imperfecta. Invited presenter for the Bi-Annual Osteogenesis Imperfecta Foundation Conference. Washington, DC

4. *Ayers, K.* (2016, May). Invited panelist for White House Forum on Parenting with a Disability. Washington, DC.

5. *Ayers, K.* (2017, November). Key Executive Branch Disability Champions Share their Priorities. Invited Panel Moderator for Plenary session at AUCD National Conference. Washington, DC.

6. *Ayers, K.* (2018, January). The Rights of Parents with Disabilities in the United States. Featured Guest on *Tuesdays with Liz.* Washington DC. Retrieved from: *https://www.aucd.org/template/news.cfm?news_id=13297&parent=16&parent_title=Home&url=/template/index.cfm?*

7. *Ayers, K.* (2018, April). Measuring Pain and Outcomes Among Children with Osteogenesis Imperfecta. Invited speaker at the Osteogenesis Imperfecta Scientific Meeting. Chicago, Illinois.

8. *Ayers, K.*, Gomez, A. M., & Murray, M. (2018, September). Invited Panelist for Reproductive Freedoms and Barriers in the US: An On the Same Page panel. UC Berkeley.

9. Martin, A., *Ayers, K.*, Brandt, J., Constantino, J., Hewitt, A., & Pomeroy, S. (2018, November). The Science, Social, and Cultural Aspects of Disability: The Intersection of Disability Identity and Science. Invited panelist for concurrent session at Association of University Centers on Disability Conference.

10. Meredith, S., Van den Veyver, I., Stoll, K., *Ayers, K.*, Michie, M. & Constantino, J. (2019, October). The Intersection of Genetics and the Disability Rights Movement. Invited panelist for plenary at the American Society for Human Genetics conference. Houston, TX.

11. Martin, A., Jamal, L., Meredith, S., *Ayers, K.*, & Francis, S. (2019). Leading Change Session: Disability Rights, Ethics, and Genetics. Invited panelist for the

Association of University Centers on Disability Conference Plenary Session. Washington, DC.

12. Kennedy, T., *Ayers, K*., Bagenstos, S., Mathis, J., & Yee, S. (2020). Disability Advocacy and COVID-19. Invited panelist for the American Association for People with Disabilities.

13. *Ayers, K*. & Fynan, M. (2020). Mental Health and COVID-19 for People with Osteogenesis Imperfecta (2020). Invited presenter for the Osteogenesis Imperfecta Foundation.

14. Johnson, J., Iezzoni, L., *Ayers, K*., & Barrows, M. (2020). Continuing the March for Civil Rights: Equal Access to Health Care (Tackling Health Disparities to Increase Life Expectancy). Invited Presenter for the Home and Community Based Services Advancing States Conference.

15. *Ayers, K*., Moreland, C., & Taylor, N. (2021, February). How to Include People with Disabilities in Research and Medicine: A Discussion on Disability Identity. Invited Panelist for Johns Hopkins Research Seminar Series. 98 attendees.

16. Artiga, S., Islam, N., & *Ayers, K*. (2021) Equitable Vaccine Access for People with Disabilities. Invited Expert Presenter for Biden White House COVID-19 Equity Task Force.

17. *Ayers, K*. (2021). No Body is Expendable: The Osteogenesis Imperfecta Community Faces COVID-19. Invited Presenter for OI Foundation Clinic Town Hall. 88 attendees

18. *Ayers, K*., Gottlich, V., Harris, J., Barrows, M., & Lezotte, M. (2021). Health Care Updates. Invited Presenter for Disability Policy Seminar. 270 attendees.

19. Ayers, K., Brosco, J., Imparato, A., & Yee, S. (2021, January). Crisis Standards of Care During the COVID-19 Pandemic: Is it Ever OK to Discriminate? Invited Presenter. Webinar for the Association of University Centers on Disability.

20. Ayers, K., Lomerson, N., & Onaiwu, M. (2021, January). Parenting During a Pandemic. National Research Center on Parents with Disabilities Webinar. Invited Presenter for Webinar. 75 attendees.

21. Ayers, K. (2021, January). Parenting for People with Intellectual Disabilities. Association of University Centers on Disability Self-Advocacy Webinar. Invited Presenter. 52 attendees.

22. Ayers, K. (2021, September). Making the Invisible Visible: Underrepresentation in Data. Alliance in Health Equity Summit. Invited Presenter. 530 attendees.

23. Ayers, K. (2021, October). Applying Anti-Ableist Strategies to Reduce Health

Inequities and Improve Outcomes. American Physical Therapy Association (APTA) Section on Health Policy and Administration (HPA The Catalyst). <u>Invited Speaker</u>. 25 attendees.

24. Ayers, K., Mitra, M., Russel, B., & Nicola, N. (2021). Do you see me? Unpacking the Implications of Missing Disability Demographic Data. Association of University Centers on Disability Conference. <u>Invited Plenary Moderator</u>. 175 attendees.

25. Ayers, K., Skotko, B., Shogren, K., & Raymaker, D. (2021). Engaging People with Intellectual Disabilities in Research. PCORI Annual Meeting. <u>Invited Plenary Moderator</u>. 277 attendees.

26. Ayers, K. (2022). An Introduction to Patient-Centered Outcomes Research Institute (PCORI). An invited presentation for the Association of University Centers on Disability Council on Leadership and Advocacy (COLA). 30 attendees.

27. Ayers, K. (2022). Disability Language for Academic Journals. Invited Presentation and Technical Assistance for American Journal of Medical Genetics Board. 30 attendees.

### <u>International and National Invited Workshops</u>

1. *Ayers, K.* Raynor, O., Root-Elledge, S., Beatson, J., & Francis, W. (2015, November). Driving Change Session: Expand Your Visibility and Reach to Drive Change. <u>Invited presenter</u> for pre-conference workshop as part of AUCD National Conference. 345 attendees.

2. *Ayers, K.* & Hunter, T. (December, 2017). Women in Leadership Workshop. <u>Invited webinar panelist</u> as part of AUCD Leadership Academy. 45 attendees.

3. *Ayers, K.,* Aleong, S., Kermon, M. S., Levi-Shacklefod, Z., & Alliston, J. (2018, November). Achieving Inclusive Communities Begins with Us: Awareness in Person-First and Identity- First Language Use in Our Training and Community Education Programs. <u>Invited Panelist</u> for Community Education and Dissemination and Training Director workshop as part of Association of University Centers of Disability Conference. 263 attendees.

4. Ayers, K., Hill, C., & Wallentin, U. (2019). Psychosocial Aspects of Osteogenesis Imperfecta. <u>Invited Workshop</u> Presented at the Key for OI Quality of Life Conference. Amsterdam, Netherlands. 67 attendees.

5. *Ayers, K.* & Smith, L. (2020). Preventing Suicide through Empowerment of Youth with Disabilities. Mental Health and Developmental Disabilities National Training Center Webinar Series Workshop. 118 attendees.

6. Ayers, K. & Goodman, S. (2021). Methodological Challenges in Researching

Intellectual and Developmental Disabilities. <u>Invited Speaker</u> for PCORI Workshop. 166 attendees.

7. Andrews, E., *Ayers, K.*, Pilarski, C., & Mona, L. (February 17, 2022). Disability Advocacy in Your Communities: How to Be an Effective Activist and Ally. Invited workshop for Rehabilitation Psychology Mid-Year National Pre-Conference. 92 attendees.


### Course Development

| | |
|---|---|
| Ivy Tech Community College | April 2014 |
| HUMS270: Multicultural Counseling | with annual updates |
| | |
| HUMS116: Introduction to Disabilities | March 2013 with annual updates |

### Curriculum Development

| | |
|---|---|
| University of Cincinnati Certificate in Developmental Disabilities: 4 courses | 2015-2022 |

       Foundations in Developmental Disabilities
       Theories in Developmental Disabilities
       Best Practices in Developmental Disabilities
       Leadership and Policy in Developmental Disabilities


### *Mentoring*

Mentee: Kristen Clatos, MS
Position During Mentorship: 1) Graduate student at Northern Kentucky University in Integrative Studies 2) Therapeutic Recreation Program Coordinator for Cincinnati Recreation Commission
Focus of Mentorship: Thesis Committee Member
Output: 1) Successful defense of thesis and manuscript submission 2) Published curriculum for parents to initiate discussions with their children with developmental disabilities about sexuality.

Mentee: Benjamin "Rocky" Byington
Position During Mentorship: 1) LEND Self-Advocacy Trainee 2) Cincinnati Children's Hospital Medical Center Senior Research Compliance Specialist
Focus of Mentorship: 2015-2016 LEND Supervisor; Advocacy related to improving accessibility at Cincinnati Children's Hospital
Output: 1) Abstract accepted for 2016 AUCD Conference poster 2) Elected Spina Bifida Coalition of Cincinnati Board Chair

Mentee: Morgan E. Bamberger
Position During Mentorship: 1) LEND Self-Advocacy Trainee 2) Senior Clinical Research Professional at Cincinnati Children's Hospital Medical Center
Focus of Mentorship: 2016-2017 LEND Supervisor

Output: 1) Abstract accepted for 2017 AUCD Conference poster 2) Accepted new position with promotion at University of Cincinnati

Mentee: Rachel Rice
Position During Mentorship: 1) LEND Self-Advocacy Trainee 2) Warren County Developmental Disabilities Advocacy Specialist
Focus of Mentorship: 2017-2018 LEND Supervisor; Curriculum adaptation
Output: 1) Abstract accepted for 2018 AUCD Conference poster

Mentee: Rachel Sullivan, MS
Position During Mentorship: 1) Graduate Student in the University of Cincinnati Genetic Counseling program 2) LEND Genetic Counseling Trainee
Focus of Mentorship: Thesis Chair "Attitudes towards Prenatal Diagnostic Testing Among Parents with Osteogenesis Imperfecta" 2016-2018
Output: 1) Successful defense of thesis and manuscript submission 2) Poster presentation at National Society of Genetic Counselors 2018 conference

Mentee Group: Emily Jones, MS, Diane Burns, MS, Tiffany Moody MS, & Felicia Foci
Focus of Mentorship: 1) Co-led LEND Seminar in Evidenced Based Methods (SEBM) team "Disabled Parenting Project"
Output: 1) Poster presented during April 2018 Joint LEND Poster Presentation 2) Abstract accepted and presented at November 2018 AUCD Conference poster session 3) Fact sheets for providers treating women with disabilities and women with disabilities considering pregnancy published. Retrieved from: https://www.ucucedd.org/?p=2898

Mentee: Petra Harvey, MS
Position During Mentorship: 1) Graduate Student in Emory Rollins School of Public Health 2) Program and Education Coordinator at the Osteogenesis Imperfecta
Focus of Mentorship: Member of Thesis Committee "Identifying Informational Needs of Individuals affected by Osteogenesis Imperfecta and Bridging the Gap to Increase Health Literacy and Patient Engagement.
Output: 1) Successful defense of thesis and manuscript submission March  2018. 2) Abstract Accepted at NORD 3) Accepted position at the Genetic Alliance

Mentee: Susan Koller
Position During Mentorship: LEND Self-Advocacy Trainee
Focus of Mentorship: 2018-1019 LEND Supervisor; Curriculum adaptation Output: Graduated from program

Mentee: Abigail Ugas
Position During Mentorship: Graduate Student in the University of Cincinnati Genetic Counseling program
Focus of Mentorship: 2018-2020 Thesis Chair
Output: 1) Successful defense of thesis 2) Abstract accepted to AUCD conference 3) Accepted position at CCHMC

Mentee: Kristen George, MS
Position During Mentorship: Doctoral Candidate in Clinical Psychology program at Wright State University
Focus of Mentorship: 2018-2020 Dissertation Committee Member
Output: 1) Successful defense of dissertation

Mentee: Shwana Garner
Position During Mentorship: Cincinnati LEND Trainee)
Focus of Mentorship: Development of guidance to increase accessibility of college tours
Output: 1) Graduated from program

Mentee: Jen Powers-Alge, JD
Position During Mentorship: Cincinnati LEND Trainee (Discipline: Family) Focus of Mentorship: Research on candidates' knowledge of issues relevant to people with disabilities and their families
Output: 1) Graduated from program

Mentee: Leanne Baird
Position During Mentorship: Graduate Student in the University of Cincinnati Genetic Counseling program
Focus of Mentorship: 2020-2022 Thesis Chair

Mentee: Nora Lascell, MS
Position During Mentorship: Cincinnati LEND Trainee (Discipline: UCCEDD)
Focus of Mentorship: Developing executive functioning supports for college students with autism
Output: 1) Graduated from program

Mentee: Erika Slifer, MS
Position During Mentorship: Psychology Doctoral Candidate
Focus of Mentorship: 2020-2022 Dissertation Committee Member

Mentee: Sarah Phillips
Position During Mentorship: Undergraduate Rehabilitation Services Major
Focus of Mentorship: Internship with UCCEDD
Outputs: Graduated with rehabilitation services BA degree

Mentee: Hannah Greenland
Position During Mentorship: Postbaccalaureate Research Education Program
Focus of Mentorship: Achieve career as a PhD-Level Biomedical Scientest
Output 1) Graduated from program 2) Accepted into University of Indiana Biomedical PhD program

## SERVICE AND LEADERSHIP

*SERVICE*

## Professional Organizations

| | |
|---|---|
| Student Member<br>American Counseling Association | 2003-2005 |
| Student Member<br>Florida Association for Play Therapy | 2005-2008 |
| Student Member<br>Florida Psychological Association | 2005-2008 |
| Student Member<br>Ethnic Minority Association of Graduate Students | 2005-2008 |
| Student Member<br>Student Organization for the Advocacy of Psychology | 2005-2008 |
| Affiliate member<br>Association for Play Therapy | 2002-2009 |
| Member<br>National Alliance on Mental Illness | 2005-2014 |
| Member<br>American Association of People with Disabilities | 1998-2017 |
| Member<br>Psychologists with Disabilities Special Interest Group | 2010-present |
| Member<br>Association of University Centers on Disability<br>Legislative Affairs Committee | 2013-present |
| Board Member<br>The Association for Successful Parenting (TASP) | 2014-2019 |
| Member<br>The Association of the Severely Handicapped (TASH) | 2017-present |
| Member<br>National Council on Independent Living | 2017-present |
| Invited Member<br>Association of University Centers on Disability<br>Executive Director Search Committee | 2020 |
| Member<br>National Society on Bioethics and Humanities | 2021-present |

## Committee Involvement

## Local

| | |
|---|---|
| University of Cincinnati Center for Excellence in Developmental Disabilities Community Advisory Council Member | 2009-2011 |
| Mental Health Awareness and Substance Abuse Committee Member | 2009-2011 |
| Focus on the Future Committee Member | 2013-2016 |
| Pediatric Refugee Health Collaborative of Cincinnati Committee Member | 2018-present |
| Cincinnati Children's Hospital Medical Center Ethics Committee Member | 2019-present |
| Cincinnati Children's Hospital Medical Center Diversity, Equity, and Inclusion Faculty Committee Member | 2020-present |

## State/Regional

| | |
|---|---|
| Northern Kentucky Suicide Prevention Committee | 2009- 2010 |
| Linking Employment and Potential (LEAP) Advocacy Committee | 2013-2015 |
| Cincinnati Reelabilities/Over the Rhine International Film Festival Co-Chair and Accessibility Chair | 2013-2017 |
| Ohio Candidates Disability Issues Forum Planning Committee | 2017-2018 |
| Ohio Advocacy and Protective Services Community Leadership Council | 2019-present |
| Ohio Home and Community Based Services Coalition | 2020-present |
| Ohio State Health Improvement Plan Committee (Invited) | 2021-present |
| Ohio Department of Health Vaccine Equity Disability Advisory Committee | 2020-present |
| Improving outcomes for Ohioans with Disabilities Workgroup | 2021-present |

| | |
|---|---|
| Ohio Health Policy Institute (appointed) | 2021-present |
| Ohio 14c subminimum wage transformation Workgroup | 2021-present |

## **National**

| | |
|---|---|
| National Youth Leadership Network<br>Strategic Planner<br>Public Information Committee Chair<br>Mentorship Committee Chair | 2004-2008 |
| Student Organization for the Advocacy of Psychology<br>Chair | 2006-2008 |
| Mental Health America | 2009-2011 |
| Osteogenesis Imperfecta Foundation<br>Speakers' Bureau | 2006-present |
| United States Olympic Committee<br>Ambassador Speakers' Bureau | 2004-present |
| National Council on Independent Living<br>Electronic Visit Verification<br>    Selected Steering Committee Member<br>    Taskforce Member | 2017-2020 |
| Parenting with a Disability<br>    Taskforce Member | 2016-present |
| Opioid Workgroup<br>    Taskforce Member | 2017-present |
| Patient-Centered Outcomes Research Institute (PCORI)<br>    Research Transformation Committee<br>    Selection Committee<br>    Patient Engagement Advisory Panel (PEAP)<br>    PCORI Ambassador | 2018-present |
| Association of University Centers on Disability Executive<br>Director Search Committee | 2020-2021 |
| Association of University Centers on Disability Annual<br>Meeting Planning Committee | 2020-2021 |
| PCORI Annual Meeting Planning Steering Committee | 2020-present |

| | |
|---|---|
| CDC and AUCD Vaccine Confidence Community of Practice | 2021-present |
| National Academies of Societies of Education and Medicine Workshop Planning Group | 2021-present |
| Assisted Reproductive Technologies (ART) Working Group | 2021-present |
| Institute for Exceptional Care-Action to Build Clinical Culture and Confidence | 2021-present |

**International**

| | |
|---|---|
| Key 4 OI Affiliates: International working group on quality of life and patient-centered outcomes related to Osteogenesis Imperfecta | 2018-present |

**Editorial Service**

Journal Forum Editorial Responsibilities

| | |
|---|---|
| Review of Disability Studies: An International Journal Editorial Board Member | 2018-present |

Manuscript Review

| | |
|---|---|
| Pediatrics 4 manuscripts reviewed | 2018-present |
| American Journal of Medical Genetics 3 manuscripts reviewed | 2020-present |
| Inclusion 4 manuscripts reviewed | 2017-present |
| Review of Disability Studies: An International Journal 4-6 manuscripts reviewed per year | |
| Journal of Applied Research in Intellectual Disabilities 5 manuscripts reviewed | 2019-present |
| Children and Youth Services Review 3 manuscripts reviewed | 2019-present |
| Rehabilitation Psychology 4 manuscripts reviewed | 2020-present |

**Consultation**

| | |
|---|---|
| National Research Center for Parents with Disabilities 2016-present Advisory Board | 2016-present |
| NIH Study on Unintended Pregnancy among Women with 2017-present Disabilities. PI: Rosemary Hughes | 2017-present |
| Keep it Plain Consulting<br>Description: Developed and delivered district-wide diversity training to 1,200 faculty and staff of Mason City Schools | 2018-2019 |
| World Institute on Disability<br>Starbucks Disability Usability Consultant | November 2020 |
| McGraw Hill Publishing<br>Diversity/Disability Psychology Advisory Consultant | 2020-present |
| Consultant for RuffWear on functionality of gear for service dogs and their owners | 2021-present |
| National Council on Disability Consultant for Congressional Report on Deaths of People with Disabilities in Congregate Settings during COVID-19 Pandemic | August 2021-February 2022 |
| Department of Justice Expert Witness on Voting Experiences of People with Disabilities | January 2022-present |

## *LEADERSHIP*

| | |
|---|---|
| Co-Chair of the Association of University Centers Public Policy Committee | 2016-present |
| President of The Association for Successful Parenting (TASP) | 2019-2019 |
| Chair of the American Association of Intellectual and Developmental Disabilities Family Interest Network | 2018-2020 |
| Vice-President and Executive Committee Member of the Osteogenesis Imperfecta Foundation Board | 2018-2020 |
| Chair of the American Psychological Association Committee on Disability Issues in Psychology | 2019-2020 |
| Vice-President of the Center for Independent Living Options Board | 2020-2021 |

| | |
|---|---|
| Vice President Ohio State Independent Living Center Council (OSILC) (Appointed by Governor DeWine) | 2020-present |
| Patient Centered Outcomes Research Institute Board of Governors Vice-Chair of Selection Committee | 2020-present |
| Member-at-Large Division 22 American Psychological Association Executive Committee | 2021-present |

Rev. 02/2022

# EXHIBIT 5

**Testimony to the Senate State Affairs Committee Against SB1**
**August 9, 2021**

**Courtney Pugh**
Member of The Arc of Texas

Hello and thank you for the opportunity to testify on SB1.  My name is Courtney Pugh, I am 24 years old and a member of The Arc of Texas.  I'm a resident of the City of Carrollton and am here to bring forth some common concerns of people with disabilities in respect to SB1.

Coming from a family who has served this amazing country in many ways, including participating in the armed forces, being police officers, and working for the government, it goes without saying that we believe in the democratic promise of this country, and that includes our civic duty to exercise our right to vote.

I live with paralysis due to a progressive health condition.  This means I have many evolving support needs that affect the way that I can vote.

To vote in person, I need assistance.  Finding a person who's willing to transport me, a wheelchair accessible vehicle, and someone to open doors to the voting location are just a few examples of this. If the table that the voting apparatus is located on is too high or too low, I am not able to push my wheelchair close enough to be able to use pen and paper nor reach an electronic device.  In situations where the height isn't optimal, but I am able to manage, my writing quality, therefore my signature, is extremely varied and may not reflect how it appears in other contexts.  Under this bill, my vote could be discarded if my authentic signature is believed to be fraudulent.

Now, more than ever, it can be hard to find available assistance in this nurse and caregiver shortage.  With the passage of SB1, it will be even harder to find people willing to help me exercise my right to vote if they are risking a felony because a poll worker misjudges my supporter's assistance as misconduct.

This past presidential election I utilized drive thru voting for the first time, which this bill also affects in some vicinities.  I had the assistance of someone to drive, to help me take my identification out of my wallet, as well as to give me the stylus and hold the tablet device on which I voted.

As someone who loves this country--the daughter of a veteran--I plead with you all to consider the tangible effects of the bill as it stands today and thank you all for your time.  God bless.

Thank you,


Courtney Pugh

pughcourt@gmail.com
(214) 515-2010
1109 E Hebron Pkwy
Carrollton, Texas 75010
*The Arc of Texas*

# EXHIBIT 6

**The Arc.**

*Texas*

*Achieve with us.*

**Senate State Affairs Committee**
**Regarding SB 1**
**July 10, 2021**

**Testimony by Alex Cogan, LMSW, Manager of Public Policy and Advocacy, The Arc of Texas**

Thank you for the opportunity to provide input on SB 1. My name is Alex Cogan, and I am Manager of Public Policy and Advocacy for The Arc of Texas, which promotes, protects, and advocates for the human rights and self-determination of Texans with intellectual and developmental disabilities (IDD). This includes ensuring Texans with disabilities can vote privately and independently with proper access, accommodations, and support.

There are multiple provisions in SB 1 that specifically interfere with the ability of Texans with disabilities to participate in the democratic process, a direct counter to the election integrity and security bill authors claim are the purpose of the legislation. Access to the electoral process for people with disabilities is something every Texan should seek, as public confidence in our democratic system requires that *all* eligible voters be able to participate in the process and have their vote counted. Unfortunately, the added requirements and enhanced penalties found in SB 1 fundamentally discourages the participation of those with disabilities to vote with accommodations and support.

**The Arc of Texas opposes the following provisions in SB 1 because they infringe on the civil rights of Texans with disabilities and their ability to vote:**

- **Section 4.01, Limits the use of signature accommodations**

  This section requires a signature to be "ink on paper," which does not allow Texans with disabilities to utilize a reasonable accommodation through the Americans with Disabilities Act. Again, this provision does not consider the reality of voters with disabilities actual support needs. For example, some individuals may not have the ability to hold a pen or the dexterity to traditionally sign, so they may require the use of a signature stamp.

- **Section 4.11, Inhibits Texans without a consistent signature from voting**

  Allowing a signature verification committee to use any known signature as comparison for a voter by mail does not consider the reality of some Texans with disabilities, whose signature can change due to their disability. For example, people with cerebral palsy, visual impairments, and/or other disabilities frequently do not sign their name consistently.

- **Section 5.01, Restricts access to curbside voting through additional unreasonable requirements**

  Curbside voting is a critical accommodation for accessible voting for many Texans with disabilities. It is unreasonable to expect a voter with a disability to be the only person in a vehicle. Further, providers from group homes, intermediate care facilities (ICF), state supported living centers (SSLC), or assisted living facilities often transport groups of voters from their facility to the polls. Some individuals with disabilities need additional support and cannot be left alone in the vehicle. It will also

TXLEG_0000747



**The Arc.**
*Texas*

*Achieve with us.*

inhibit people with disabilities who utilize ride-sharing services, such as Uber or Lyft. This unnecessary requirement will lead to disfranchisement of Texas voters with disabilities.

- **Sections 5.03 and 5.04, Add unnecessary and excessive requirements for individuals who assist voters with disabilities**

  These sections require people who assist voters with a disability to complete a form affirming that they "did not encourage [...] the voter into choosing" the assistant. It is not uncommon for a friend or colleague to remind someone that an election is approaching, encourage civic participation, and/or remind the individual that they are allowed to have an assistant, if needed, by law. In the case of people with disabilities who require assistance, the individual who is providing assistance may also be the individual who encouraged participation.

  These changes in oath complicate the voting process and lead to unnecessary confusion and the potential inability of Texans with disabilities to participate in the democratic process. People with support needs deserve the federal accommodation to exercise their civil right, but the added requirements foster a false narrative that those who volunteer to help their fellow voters are to be suspected of fraud instead of celebrated for creating a more representative democracy.

- **Section 5.05, Increases penalties for assisting voters**

  This section requires an assistant of a person voting by mail to fill out a new form with additional information about themselves and their assistance and will make any mistake in filling out the new form a state jail felony (unless the assistant is related to the voter). These new provisions will create a chilling effect that decreases the availability of support for Texans with disabilities to exercise their civil right to vote.

The above provisions do not consider the lived experiences of people with disabilities and the reasons voting accommodations exist. We urge the committee to recognize that all Texans have the right to vote as privately and independently as possible. People with disabilities already face barriers and discrimination daily, from public school inclusion to securing employment. We must not add voting to that list. As American citizens and Texans, voting is our fundamental right and must be maintained, but SB 1 falls short in maintaining our existing election integrity and security. At best, SB 1 creates significant barriers to the voting process and at worst, it is discriminatory against Texans with disabilities.

Please note that this testimony is a stand-in for in-person representation of people with intellectual and developmental disabilities, as this hearing's short notice created barriers for them to speak for themselves today. People with disabilities deserve a seat at the table; they deserve to be sharing their powerful stories directly to you. So, on behalf of 3 million Texans with disabilities, we hope the committee will consider the detrimental impact this bill will have on maintaining a system of democracy.

Thank you for the opportunity to provide these comments on behalf of The Arc of Texas. We are open to continuing to work with the author to ensure Texans with disabilities maintain their civil right to vote.

Alex Cogan, LMSW
acogan@thearcoftexas.org
(512) 485-9737

TXLEG_0000748

# EXHIBIT 7

Kirsten Mills

| | |
|---|---|
| **From:** | Ducayet,Patty (HHSC) <Patricia.Ducayet@hhs.texas.gov> |
| **Sent:** | Sunday, July 11, 2021 6:15 PM |
| **To:** | Logan Harrison |
| **Cc:** | Kirsten Mills |
| **Subject:** | Concerns with HB 3 |

Dear Mr. Harrison:

My name is Patty Ducayet and I head the Office of the State Long-Term Care Ombudsman. My office is located within HHSC and is independent within the agency to ensure I represent the interests of long-term care facility residents. Therefore, my testimony does not reflect the position or opinions of HHSC. State law governing my program can be found here.

Regrettably, I was unable to provide testimony and register a position on HB 3 when it was heard by the House Constitutional Rights and Remedies Committee on July 10. Although the committee voted out the bill without amendment today, I want to share my concerns on behalf of long-term care facility residents.

**Concerns with HB 3:** Residents have a right to exercise the same rights as other Texans. Due to physical disabilities, most residents of a nursing facility or assisted living facility vote in one of two ways: by mail or by curbside at a polling site. As filed, HB 3 makes voting by mail more difficult for residents.

Essentially every long-term care facility resident is eligible to vote by mail. Though residents and society benefit from their participation and long-term care residents are a key demographic for which voting by mail was intended, voting by mail is not without challenges for a resident and shouldn't be made more difficult. Some residents rely heavily on facility staff for help with accessing information on the Secretary of State website, requesting a ballot by mail, reading and marking the ballot, and mailing a ballot.

Most sections within Article 5 VOTING BY MAIL refer to a voter's signature requirements, several of which are about a signature matching process for the purpose of verifying a voter is who they say they are. Changes in a signature due to progressive or sudden disability means a resident risks their ballot being rejected and losing their chance to vote even though the person lawfully voted. Based on my experience working with residents, I believe the proposed provisions will erode a residents' trust that a mailed ballot will be counted, leading to either apathy or a forced choice to vote in-person where physical barriers exist for many long-term care facility residents.

**To protect a resident's right to vote by mail, I recommend that ballots by mail are required to include a section for the voter to mark if the voter has a physical impairment that makes signing their signature difficult.**

I am eager to work with Representative Murr and members of the House to protect the interests of long-term care residents, including their voting rights and opportunities. If you would like to reach me, my direct office line is 512-438-4356 and my cell number is 737-704-9075.

Sincerely,



Patty Ducayet
State Long-Term Care Ombudsman
Office of the State Long-Term Care Ombudsman
Health and Human Services
MC-W250, PO 149030
Austin, Texas 78714
Telework phone: 737-704-9075
patricia.ducayet@hhs.texas.gov

1

# EXHIBIT 8

To: Senator Powell
    Respective Texas State Senators and Representatives

From: Anne Robinson
    US Army Retired
    Texas Chapter, Paralyzed Veterans of America

Subject-Disabled Voter Access-SB 1 And HB 3

Senator Powell and Respective Senators and Representatives,

I would first like to thank you for the opportunity to present written testimony to you in regards to SB 1 and HB 3.  I greatly appreciate the work that you are doing on behalf of all Texans, ensuring that the voting standards are accessible to all and the integrity of the Texas voting systems are unwavering.

When reading over the proposed legislation for voting standards in Texas, I have a few concerns about some things that would greatly affect those of us with severe disabilities and would like to offer suggestions that might ensure total access to voting.  I have been a registered voter in Texas since I was 18, even voting in elections while deployed overseas with the Army and since being injured on active duty, I have not let my disability prevent me from performing my constitutional duty and casting a ballot.  I am a quadriplegic, paralyzed from the chest down with no arm or hand function, I sign documents using a pen placed in my mouth, which prohibits my signature from ever looking the same way twice.  If I have to cast a mail in ballot, the potential for my ballot to be rejected because the signature does not match is extremely high, which would be very disappointing for me.  There are other disabled persons that also cannot sign their name the same way consecutively due to traumatic brain injuries, diseases such as Parkinson's, and even those that are paralyzed but still have some hand function.  If perhaps a provision could be made for those that have established disabilities or diseases that prevent matching signatures, such as a one time voting code or a unique identifier that can be matched to something at the voting clerks office, it would lessen the chance of a ballot being rejected because of signature issues.

For mail-in ballots that have mistakes, allowing voters to rectify the mistakes is a tremendous step to keep ballots from being completely rejected.  However, if the carrier envelope that the ballot was mailed back in is missing the ID number or the number does not match the voters record, it cannot be corrected.  For many people who do not have a very good recall process, due to a disease such as lupus, or perhaps side effects from pain medications, remembering the number that should go on the outside of the envelope might be impossible.  Establishing one identifying code or personal number that does not change and is associated with the voter would potentially eliminate the confusion of what to put on the outside of the envelope.

TXLEG_0002390

For voters that need to correct their mail-in ballots, getting to the actual clerk's office to do the process could prove to be very difficult for those of us with disabilities. For myself, I rely on somebody to drive me everywhere, and if I had to go to the clerk's office, it would require an approximate one hour trip one way and the building is not very wheelchair friendly, nor is the downtown area of San Antonio. Many with disabilities rely on public transportation or perhaps do not have any transportation and are homebound. Perhaps provisions to correct the ballot online or at the closest polling place could help eliminate the rejection of a ballot because the disabled person cannot get to the correct facility to fix it. Also, if it is extremely close to the deadline to submit mail-in ballots, perhaps a provision in SB 1 could allow the cure deadline to correct ballots be allowed up to six days after the election, allowing those with disabilities to secure the means to fix the ballot.

Finally, the ability to vote curbside for those with disabilities is a relief for many caregivers and disabled Texans. When the polling place is not wheelchair friendly, the weather is bad or perhaps you are trying to keep a very vulnerable person away from crowds, having the voting machine brought to the vehicle so either the voter or the caregiver can cast a ballot without compromising themselves is very helpful. If the disabled person requires "voter assistance," as I do, putting extra requirements on the person helping them could potentially discourage voting. Providing clarification for the assistant and lessening their requirements will allow the disabled voter to have a much smoother time casting a ballot. Poll watchers can be very intrusive sometimes, ensuring the language in SB 1 and HB 3 clearly defines the distance a poll watcher can be from a voter and how they can observe a voter casting a curbside ballot is a necessity. As a potential curbside voter, I would feel very threatened if a poll watcher was to attempt to enter my vehicle. Perhaps a provision that clearly states language that would prevent this from happening can be inserted into both bills.

Thank you again for the opportunity to provide this testimony and for all that you contribute to the state of Texas. If you have any questions, please feel free to contact me by phone or email or mail.

Respectfully,
Anne Robinson
10814 Hunters Way
Helotes, Texas 78023
arobinson6@satx.rr.com
210-632-1263

# EXHIBIT 9

1

2

3

4

5

6

7     HOUSE ELECTIONS COMMITTEE HEARING

8

9

10

11

12

13     ***********************************************

14

15

16               April 1st 2021

17

18

19     ***********************************************

20

21

22

23     TRANSCRIBED BY:

24     Kathy Victoria McDaniel

25     Certified Shorthand Reporter

Kim Tindall & Associates, Inc.        16414 San Pedro        San Antonio, Texas 78232
Phone (210) 697-3400                  Suite 900              Fax (210) 697-3408

LUPE_0018756

```
 1                    REPRESENTATIVE CLARDY:  Thank you,

 2        Representative Rodriguez.  Thank you for being

 3        here with us this morning.  At this time, are

 4        there any other members of the committee who

 5        wish to ask questions of the bill author?

 6        Chair recognizes Mr. Bucy.

 7                    REPRESENTATIVE BUCY:  Thank you,

 8        Mr. Chairman.  Chairman Cain, I just have a few

 9        questions.  One, there something in the

10        committee substitute I appreciate.  I thank you

11        for those updates.

12                    CHAIRMAN CAIN:  I was listening to

13        you.

14                    REPRESENTATIVE BUCY:  Well, I

15        appreciate that.  I think we had a good back

16        and forth last time.  Can we jump to section

17        301 on page 3, specifically line 24, it's where

18        it gets started.  I see two sections here that

19        I want to reference; Section 301 line 3, 24.

20                    I'm sorry.  Page 3 line 24 to page

21        4 line 4 expressly prohibits a presiding judge

22        from having a poll watcher removed from the

23        polling place or requiring a poll watcher to

24        leave the polling place.  Okay, so that -- I

25        think that's pretty clear there, but if you
```

LUPE_0018786

```
 1        look at section 306 on page 5, line 16-20.
 2                    It creates a new section entitled:
 3        Removal of a Watcher from a polling place.  That
 4        says a presiding judge may remove a watcher
 5        from a polling place only if the watcher
 6        engages in activity that'll constitute an
 7        offense related to the conduct of the election.
 8                    So I'm just trying -- I'm a little
 9        confused, cause these two sections seem so
10        contradictory.  How can we have both a category
11        prohibition on a presiding judge having a poll
12        watcher removed as we see on page 3, section
13        301, but also give them some circumstances when
14        they can be removed?  Does that make sense?
15                    CHAIRMAN CAIN:  Yes, one moment.
16        So, alright.  We're looking at 3.06 and 3.01
17        together?
18                    REPRESENTATIVE BUCY:  Yes.  So
19        3.01 expressly prohibits removal, but then 3.06
20        gives a reference to it.  And 3.01 a presiding
21        judge may not have a watcher or appoint under
22        subchapter A, chapter 33 removed from the polling
23        place, but then in 3.06, I can find it real quick,
24        sorry. It says -- I mean it's a whole new section.  I
25        think this sub add-in, if that's right, about
```

LUPE_0018787

```
 1        removal of a watcher from a polling place.
 2                       CHAIRMAN CAIN:  Yes.
 3                       REPRESENTATIVE BUCY:  It says the
 4        presiding judge may remove a watcher from the
 5        polling place only if the watcher engages in
 6        activity that will constitute an offense
 7        related to the conduct of an election.  These
 8        seem contradictory to me -- I'm just trying to
 9        understand what the intent is here.
10                       CHAIRMAN CAIN:  Yeah.  I can -- I
11        can understand why, one may think there's a
12        contradiction there and we are -- I'm always
13        open to improving things and maybe clarifying
14        it like saying, I don't know -- except for to
15        point to something.  But really, the goal of
16        this is -- due to the nature of a watcher and
17        the watcher's position and what they're doing
18        there watching the process and watching the
19        election workers whereas the election judge
20        is watching the voters.
21                       It -- you might say it kind of
22        pits them against each other in a way.  And so
23        we want to ensure that an election judge is not
24        excluding somebody that is lawfully present
25        there, serving as kind of a check on the
```

LUPE_0018788

1    system.

2                        REPRESENTATIVE BUCY:  Can you

3    then, I guess, elaborate on section 306, which

4    I think is an improvement in the language about

5    what would be some examples when they can remove

6    them under this bill.

7                        CHAIRMAN CAIN:  Okay.

8                        REPRESENTATIVE BUCY:  So it allows

9    for some removal under 306.  What are some

10   examples of something a poll watcher could do

11   that would then constitute being removed?

12                       CHAIRMAN CAIN:  Well, with or

13   without the proposed section 33.062 to the

14   election code, people can be removed by a

15   police officer for violations of the penal

16   code, okay.  In fact, there are a lot of

17   provisions that speak to elections that are

18   in our penal code such as bringing a firearm

19   into an election place.  In fact, I think

20   the penal code mentions like the election 746

21   times or so.

22                       So, you know, I would say removing

23   somebody for a violation of our penal code

24   would not be the role of a presiding election

25   judge, that would be the role of a police

```
 1        officer.  And so it certainly -- you know,
 2        call the cops and usually there's officers
 3        nearby and can take care of that.
 4                    So as I'd said you know the poll
 5        watcher is not watching the voters, they're
 6        watching the election judge, or rather the
 7        election judge is.  The watcher is there to
 8        watch persons, you know, the people running
 9        the election.  And because the election
10        judge is part of the process, I think it
11        makes a little sense for the judge
12        to be able to eject a watcher without
13        reason.  And so in order to restrain the
14        discretion of an election judge and to give
15        transparency so that we know the rules.
16        That way the election judge has very clear
17        grounds of when they can do it so they can't
18        get in trouble, and someone can't go, Hey,
19        you're not allowed to do that.  Well, no.
20                    I'm allowed to do it right for any
21        of these violations that are in 276, they can
22        easily open up the code or pull up the phone
23        and point to it exact reason why they have
24        authority to move that watcher so that gives
25        them safety.  It also gives some safety to the
```

LUPE_0018790

1    watcher so that they know they can't be removed

2    without grounds.

3                    REPRESENTATIVE BUCY:  So, I agree.

4    And that's what I guess I'm trying to get out

5    of those questions.  I'm sure election judges

6    all over Texas are watching us this morning and

7    they want to know what your intent is here and

8    is it to say that they cannot remove a voter

9    unless it's spelled out right here?  So my

10   question is, if a poll watcher is intimidating

11   voters, if a poll watcher is yelling at

12   election officials are otherwise disrupting the

13   function of the election process, are you

14   saying the judge would not have the authority

15   to remove that person?

16                    CHAIRMAN CAIN:  I -- I don't think

17   anything prevents an election judge from moving

18   people causing trouble at the polling place.

19                    REPRESENTATIVE BUCY:  So in those

20   circumstances you think of course they still have

21   that authority if they're --

22                    CHAIRMAN CAIN:  Well, there are

23   going to be violations of the penal code.

24                    REPRESENTATIVE BUCY:  Okay.  Let

25   me ask you this.  You kind of hit on it.  You

LUPE_0018791

1    talked about a police officer having the ability

2    to remove someone, this is section 301.  I just

3    want to be very clear, we talked about this

4    last week.

5                    Does the election judge have the

6    authority to call a police officer on these

7    individuals without playing into removing them?

8    Because it says they cannot remove them, it

9    will be a crime to do so.  I want to make sure

10   our election judges understand that they still

11   have the ability to call a police officer if

12   they're having an incident and say I need you

13   to come in and deal with this situation and

14   potentially remove this person.

15                   Are they not the middle person in

16   removing that person and thus finding

17   themselves guilty of removing a judge?

18                   CHAIRMAN CAIN:  No.  No, we -- we

19   want them to call the police.

20                   REPRESENTATIVE BUCY:  So a judge

21   can call a police officer about an unruly poll

22   watcher and if it turns into them removing

23   them, then they're now an accomplice to that

24   removal and then found guilty under section

25   301.

April 01, 2021
Page 38

```
 1              CHAIRMAN CAIN:  I -- I agree with
 2      your reading of that.  Yeah, that would be a
 3      terrible policy.  In fact, we encourage them to
 4      do that.
 5              REPRESENTATIVE BUCY:  Agree.
 6              CHAIRMAN CAIN:  That prevents them
 7      from taking an unlawful action and if their the
 8      property authority to be, you know, citing
 9      people for crimes and applying the penal code.
10              REPRESENTATIVE BUCY:  Okay.  Now,
11      I appreciate your clarification there.  Let
12      me jump to page 9, "assistance of a voter."
13      So we're in the polling place.  We're
14      talking about assistance of voters who are
15      helping.  Usually we're talking about
16      individuals with a disability.  Maybe
17      English isn't their first language,
18      they're getting help in the process.
19              So I just want some clarity here.
20      I feel like -- what are we doing in this section?
21      We're adding some stuff to what an assistant
22      has to do, right; is that correct?  Right now
23      they provide their name and address, but you're
24      adding more here, is that correct?  So an
25      assistant would have to fill out?
```

LUPE_0018793

1            CHAIRMAN CAIN:  Well, I mean, no.
2    This is an entirely new section that would
3    require a person other than the election
4    officer, somebody serving there at the poll
5    like the election judge or clerk or an
6    alternate election jude, assist a voter in
7    accordance with chapter 64, required to
8    complete this form.
9            Really simple things. Give their
10    name and their address, the manner of their
11    assistance, right; what they're doing.  Whether
12    they're reading it to them because they're
13    unable to see or they need assistance writing
14    it down or some other form of assistance.
15            The reason the assistance is
16    necessary, that's important to explain why
17    they're doing it.  Because, again, there's
18    only certain people that are eligible for
19    these things.  And the relationship of the
20    assistant to the voter.
21            I think that's also important.
22    Maybe they're in a kind of position of
23    authority or some kind of pressure or they're
24    just a family member.  Those are important
25    things for us to know.  And then of course --

LUPE_0018794

```
 1                 REPRESENTATIVE BUCY:  What do you
 2      do with that data?  What happens to that data?
 3      What happens to these forms?
 4                 CHAIRMAN CAIN:  That's a good
 5      question.  I --
 6                 REPRESENTATIVE BUCY:  It's
 7      important for us to know.
 8                 CHAIRMAN CAIN:  Yeah.  Yeah, I
 9      think we'll have a resource witness later on, we
10      can ask that question too. I'd like to know
11      the answer.
12                 REPRESENTATIVE BUCY:  I guess what
13      I'm concerned -- so right now, if I'm in -- if
14      there's an individual with a disability, let
15      say maybe a vision disability and they need an
16      assistant.  You're saying right now, under the
17      current law, that assistant can come in tell the
18      election judge, I'm here to assist this voter
19      but they don't fill out a form and you're
20      adding a form.
21                 CHAIRMAN CAIN:  Yeah.  That's
22      correct.  But what really happens is, they'll just
23      walk up to a voter and tell them, "Hey, you look
24      like you need assistance."  And begin assisting
25      them and these people sometimes maybe are
```

LUPE_0018795

1    easily -- I don't know.  I wouldn't -- I'm

2    trying to think of another word for "pushed

3    around" but sometimes as a little short

4    guy like myself, if Clardy was to maybe walk up

5    and tell me I look like I need an assistant.

6              REPRESENTATIVE BUCY:

7    (Unintelligible).

8              CHAIRMAN CAIN:  I may say, yes,

9    sir.  So this is to ensure that Representative

10   Clardy had to fill out a form to know that I

11   would maybe -- who he was so that we could

12   track that.  Maybe the assistant later on,

13   there's a problem for that voter and that

14   assistant and they didn't know who they were,

15   cause they found them in the line at the

16   polling place.

17              And you know they just walked up

18   to them, because this is how it happens.  We

19   should be tracking that.

20              REPRESENTATIVE BUCY:  I mean, I

21   used to be a county party chair and put on

22   primaries.  I don't remember hearing this

23   happening, but if you're pointing to specific

24   examples, you know, I appreciate getting that

25   information from you.

LUPE_0018796

```
 1                    CHAIRMAN CAIN:  And I do want to
 2         be clear.  This -- a simple clerical error by
 3         the assistant doing the form, that's not a
 4         criminal issue.
 5                    REPRESENTATIVE BUCY:  Okay.
 6                    CHAIRMAN CAIN:  We're not
 7         punishing people for simple mistakes.  It
 8         doesn't -- this bill doesn't speak to that,
 9         but never should we be punishing people for
10         simple mistakes.  This only should be for, kind
11         of, knowing and intentional fraudulent conduct.
12                    REPRESENTATIVE BUCY:  No, I
13         appreciate that clarity.  You know, I guess
14         my concern is, if you're an individual with a
15         disability, there's already an extra challenge
16         to go into the polling place and voting because
17         of the process.  And what we're doing here,
18         I feel like it's adding more steps to that
19         individual having their right to vote.
20                    You know we talked last week
21         back and forth and you mentioned that these
22         requirements are about protecting the voter,
23         but to me individuals with disabilities have
24         come to my office and said we don't want these
25         requirements.
```

```
 1              They feel like it adds an undue
 2      burden to them having access to the ballot box.
 3      So I'm just curious, who came to you with this
 4      need for this extra section when I think about
 5      assistance and who gets that assistance and
 6      what problem are we solving here because I'm
 7      hearing the opposite.  And I think our
 8      testimony today is probably gonna lead to the
 9      opposite that this an undue burden on
10      individuals that already have a bigger
11      challenge to the ballot box and I'm just trying
12      to understand why this section is being added
13      in the first place?
14              CHAIRMAN CAIN:  Representative
15      Bucy, I -- I anticipate that we'll hear both
16      sides of the story.  There may be people here
17      to testify today that -- that side with your
18      argument.  I believe that we will have people
19      testifying today that are explaining how this
20      -- some things have been abused and why we
21      need more transparencies for assistance.
22              I'll give you an example.  We
23      wouldn't let someone go into the voting and
24      click the button to vote for them without an
25      oath or -- the person may be paid by a
```

Kim Tindall & Associates, Inc.      16414 San Pedro        San Antonio, Texas 78232
Phone (210) 697-3400                  Suite 900                Fax (210) 697-3408

LUPE_0018798

```
 1        campaign, but we would never let that happen,
 2        right?  So why would let someone assist
 3        somebody without an oath and knowing who they
 4        are?
 5                         REPRESENTATIVE BUCY:  I think
 6        because we need to not add undue burdens to
 7        individuals that have their right to the ballot
 8        box, but I guess that's our area for debate
 9        here.  Let me just say, I appreciate you saying
10        we're going to hear testimony.  I look forward
11        to the testimony from our individuals with
12        disability.
13                         I hope at the end, based on that
14        feedback, you and I can follow up on this
15        conversation about section 401 and what it
16        means and -- and whether we still think it's
17        necessary.  Section 404, jumping to it, says
18        compensation includes among other things
19        political favors beneficial or favorable
20        discretionary official acts.
21                         Can you just explain what that
22        means?  What are "political favors" in this
23        section?  I'm gonna ask other people this as
24        well so we can get a legal understanding of
25        what "political favors" means, but I would love
```

Kim Tindall & Associates, Inc.        16414 San Pedro        San Antonio, Texas 78232
Phone (210) 697-3400                  Suite 900              Fax (210) 697-3408

LUPE_0018799

```
 1        to know, as the bill author, what your intent
 2        by that was?
 3                      CHAIRMAN CAIN:  It's a good
 4        question.  Yeah, I would say, political favors,
 5        especially under the definition of benefit
 6        (unintelligible) penal code, which speaks to
 7        these concepts of things of value of
 8        pecuniary gain, elected officials, say
 9        mayors or others.  One of the reasons we often
10        let the laws restraining our actions is
11        because -- in a perfect world we wouldn't, we
12        wouldn't need this.
13                      But uh -- but in our world we got
14        to restrain kind of the temptations and desires
15        of greed and gain and political favor maybe by
16        a mayor or somebody looking the other way on
17        something or a building project or a permit or
18        granting something, that would be a
19        political favor.  Those things are -- are of
20        value.
21                      There's reasons people hire
22        lobbyist to do things because there's a desire
23        to have these things done to grease the wills of
24        government and so what could happen as opposed
25        to giving someone money or cash they can give
```

LUPE_0018800

1     them something even more valuable, political

2     favor or something beneficial of a

3     discretionary official act whereby  the

4     governmental official or city councilman could

5     choose to help them because of scratching their

6     back in a campaign.

7                         REPRESENTATIVE BUCY:  Does that

8     happen in Texas?

9                         CHAIRMAN CAIN:  I would never

10    think something like that would happen here.

11                        REPRESENTATIVE BUCY:  My bigger

12    issue is I guess we're leaving this so broad

13    and undefined I think it's gonna create a lot

14    of issues as we go through dealing with

15    political favor later on.  I'd love to see us

16    really jump into this section and define what

17    "political favor" means in the law so we can

18    have a better understanding --

19                        CHAIRMAN CAIN:  Yeah.

20                        REPRESENTATIVE BUCY:  -- out in

21    the real world how to not be guilty of what

22    this means (unintelligible) --

23                        CHAIRMAN CAIN:  It's a great idea.

24                        REPRESENTATIVE BUCY:  -- and not

25    accidentally walk into a crime here under this

Kim Tindall & Associates, Inc.        16414 San Pedro        San Antonio, Texas 78232
Phone (210) 697-3400                  Suite 900              Fax (210) 697-3408

LUPE_0018801

1    bill.

2                        CHAIRMAN CAIN:  I was thinking for

3    a moment there your question about "this

4    happens in Texas" is a part of an April fools

5    joke.

6                        REPRESENTATIVE BUCY:  Well, it

7    could be.  I thought we cleaned all that up.

8    All right.  Just a couple of more, Chairman.

9    Section 504 dealing with what you've called

10   "paid vote harvesting."  I noticed the definition

11   have changed.  Did you talk about that change

12   in your layout this morning?  I'm sorry if I

13   missed it.  I'm jumping over to section

14   504.

15                        CHAIRMAN CAIN:  Uh-huh.  Well,

16   I'll say, Representative Bucy, it's your fault

17   it changed; in a good way.

18                        REPRESENTATIVE BUCY:

19   (Laughter) Okay.

20                        CHAIRMAN CAIN:  You had asked

21   questions for one, we're gonna get to it right

22   now.  Members we're under section 504 that

23   would be proposed section 276 014 of the

24   election code.  Representative Bucy, if you

25   would jump to subsection E?

LUPE_0018802

```
 1                    REPRESENTATIVE BUCY:  Okay.

 2                    CHAIRMAN CAIN:  Some might be

 3         familiar of a question you'd had.  This section

 4         does not apply political speech or other acts

 5         maybe promoting a candidate or measure that do

 6         not involve direct interaction with an application

 7         ballot by mail, the presence of the voter where

 8         the voter is an official ballot vote by mail or

 9         their carrier envelope.

10                    REPRESENTATIVE BUCY:  Okay.

11                    CHAIRMAN CAIN:  Um, which was

12         really valid when you were bringing it up.  We

13         were like, man, I don't think that does that,

14         but we should be really clear that this is not

15         penalizing protected speech, political speech,

16         which my understanding under free speech

17         provisions constitutional laws the highest

18         realm of the first amendment.  So vote

19         harvesting now I would say is buying and

20         selling votes.

21                    REPRESENTATIVE BUCY:  Uh-huh.

22                    CHAIRMAN CAIN:  It's the

23         trafficking of votes for profit.  Financial

24         involvement can tend to make things

25         corruptible.
```

1          REPRESENTATIVE BUCY:  Okay.  So
2     -- and I appreciate you had changed it, and we
3     did have a lot of talk about that.  So just to
4     get it and make sure we're fully clear,
5     direct interaction.  If I send -- let's say
6     Dan Patrick; he sent out a bunch of mailers in
7     the past to voters over 65 that included vote
8     by mail application.  As he committed a crime
9     under this section?
10          CHAIRMAN CAIN:  I don't think so.
11          REPRESENTATIVE BUCY:  Okay.
12          CHAIRMAN CAIN:  But I don't
13     believe this speaks to that.
14          REPRESENTATIVE BUCY:  Cause he
15     sends the mail it has an application for ballot
16     by mail, we know he's done that a lot.  People
17     then can send that back in to request their
18     ballot through that application.  That's still
19     okay under this section.  Campaigns can still
20     do that as many did.
21          CHAIRMAN CAIN:  Yes, because I
22     don't believe you're directly interacting with
23     the ballot.
24          REPRESENTATIVE BUCY:  Okay.
25     Well then I -- so let me ask one more.  So

LUPE_0018804

```
 1        for mailers, paid calls, and door to door
 2        canvassing where it's a conversation or direct
 3        interaction about a ballot by mail application
 4        which to me seems to be direct interaction as
 5        defined here.
 6                    So if I call someone and they want
 7        to talk to me about how do I get a ballot by
 8        mail out; I'm a paid phone banker for a
 9        campaign, I'm working on the Brisco Cain
10        campaign for state rep, I'm a paid canvasser.
11                    CHAIRMAN CAIN:  I would love for
12        you to come do that. I'll look forward to it.
13                    REPRESENTATIVE BUCY:  (Laughter)
14        Well --
15                    CHAIRMAN CAIN:  I'll tell you, one
16        we will have the attorney general here for
17        resource witness, maybe on interpretation, maybe
18        the Secretary of State.  I would say, yeah, the
19        difference between this and GOTV efforts, my
20        campaign I look forward to you coming down.
21                    For example, for a ballot
22        trafficker, they often go inside someone's home
23        and fill out the ballot that would be your
24        direct interaction.  They touch the ballot.
25        It's not merely advocating for a candidate or
```

LUPE_0018805

1    telling someone where their polling location is.

2    It's --

3                    REPRESENTATIVE BUCY:  My concern

4    here isn't the ballot, it's the application for

5    a ballot because that happens a lot.  I'll be

6    on the phone and they'll say, Well how do I get

7    an application for a ballot?  And then I may

8    say, Well you can go to the website and you

9    can print out here.  I'm wondering if in that

10   simple act of directing them, did I just have

11   direct interaction with them with an

12   application for a ballot by mail?  That's what

13   I'm trying --

14                    CHAIRMAN CAIN:  I don't think so.

15                    REPRESENTATIVE BUCY:  You don't

16   think so.  Well then, that's exactly what I was

17   looking for.  Thank you, sir.  Final

18   question.  Section 504 also deals with perjury

19   and connection with certain election

20   procedures.  This is on page 17 lines 20 and 24.

21   I just want a little -- you made a change here

22   from the original bill, the committee

23   substitute.  I think the first one did this

24   and then the second one keeps it that way.

25   "Removed with intent to deceive and --

LUPE_0018806

```
 1        with knowledge of the statement's meaning;
 2        from the element of the offense."  What is the
 3        meaning of that?  Just trying to understand why
 4        that section was removed.  It was in your
 5        original bill.
 6                    CHAIRMAN CAIN:  Well, this -- this
 7        actually now aligns with the concept of perjury
 8        and its definition of the penal code.
 9                    REPRESENTATIVE BUCY:  Okay.
10                    CHAIRMAN CAIN:  It's the -- almost
11        similar wording, it doesn't go into those
12        details, it's -- perjury is making a false
13        statement or swearing to the truth of a false
14        statement made when you take an oath.
15                    REPRESENTATIVE BUCY:  All right.
16        Well, Chairman, I appreciate you answering my
17        questions.  I do look forward to our testimony
18        and maybe at the end, we can have a few follow
19        up conversations.
20                    CHAIRMAN CAIN:  Thank you,
21        Representative.
22                    REPRESENTATIVE BUCY:  Thank you,
23        sir.
24                    CHAIRMAN CLARDY:  Thank you,
25        Representative Bucy.  Are there any questions
```

LUPE_0018807

April 01, 2021
Page 106

1           REPORTER'S CERTIFICATE.

2                I, Kathy Victoria McDaniel, Certified

3       Shorthand Reporter in and for the State of

4       Texas, do hereby certify that the foregoing is

5       a correct transcription, to the best of my

6       ability, from the audio recording of the

7       proceedings in the above-styled matter.

8                I further certify that I am neither

9       counsel for, related to, nor employed by any of

10      the parties to the action in which this

11      recording was taken, and further, that I am not

12      financially or otherwise interested in the

13      outcome of the action.

14

15

16              /s/Kathy V. McDaniel
                Kathy Victoria McDaniel, CSR
17              Texas State Cert No. 6976
                Expiration date: 12/31/22
18

19

20

21

22

23

24

25

LUPE_0018861

```
 1              REPORTER'S CERTIFICATE CONT'D

 2          Please note that I was not personally

 3      present for said recording to make a

 4      stenographic record; therefore, due to the

 5      quality of the recording provided,

 6      unintelligibles or inaudibles may have created

 7      inaccuracies in the transcription of said

 8      recording or verify the correct spellings of

 9      proper names.  Without being present, I cannot

10      verify the accuracy of the speakers.

11                      /s/Kathy V. McDaniel
                        Kathy Victoria McDaniel, CSR
12                      Texas State Cert No. 6976
                        Expiration date: 12/31/22
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            D I S C L O S U R E

 2       Note:     Supreme Court Rule Adopted and

 3    Promulgated in Conformity with Chapter 52 of

 4    the Government Code, V.T.C.A

 5

 6       Please be advised that pursuant to Supreme

 7    Court Rule IV, B.5., with regards to

 8    disclosure, I, to the best of my knowledge,

 9    have no existing or past financial, business,

10    professional, family or social relationships

11    with any of the parties or their attorneys

12    which might reasonably create an appearance of

13    partiality, except as follows:   NONE.

14

15                    /s/Kathy V. McDaniel
                      Kathy Victoria McDaniel, CSR
16                    Texas State Cert No. 6976
                      Expiration date: 12/31/22
17

18

19

20

21

22

23

24

25
```

LUPE_0018863

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GREGORY W. ABBOTT, et al.,<br><br>Defendants. | Civ. Act. No. 5:21-cv-844 (XR)<br>(consolidated cases) |

## DECLARATION OF TERI SALTZMAN

My name is Teri Saltzman. I am over the age of 21 and fully competent to make this declaration. Under penalty of perjury, I declare the following based on my personal knowledge:

1. I am a 59-year-old woman who currently lives in Travis County, Texas. I have been mostly voting by mail since 1985. I voted for the first time in Texas in 1985. In 2000, I

moved to Florida and was a registered voter there. I moved to North Carolina in 2011 and was a registered voter there. Since 2014, I have been living and voting in Texas.

2. I am a member of The Arc of Texas and REVUP-Texas. I routinely receive informational emails from both organizations.

3. I vote by mail because I am legally blind. I am substantially limited in the major life activity of seeing. Being independent is important to me. I use a screen magnifier to assist my vision. I prefer to vote by mail because I have voted in person before and found it difficult due to my disability. Voting sites don't always have the machines working that make voting accessible to me. For example, I have tried to vote in person before and there were headphones missing from the accessible voting machine. The volunteers at the voting sites are helpful, but they don't always know how to

work or fix the machines so that I can vote. In addition, I do not drive due to my disability, so voting in person would require me to find transportation.

4. Prior to SB 1, I voted by mail in Texas several times and never had any problems.

5. In January 2022, I requested a mail-in ballot online at vote.org. I received a ballot request form, completed the form, and submitted the form within a week.

6. About a week later, my request for a mail-in ballot on the basis of my disability was denied. I was given two reasons for its denial. First, I received a letter stating that my request for a mail-in ballot had been denied because my driver's license number, Social Security number, or voter ID number were incorrect. However, I had entered all three numbers correctly. I verified these numbers were correct with a Training and Technical Support Specialist at Disability

Rights Texas. Second, an employee at the Elections Office told me the reason that my request for a mail-in ballot was denied was because the application I was sent was out of date. She stated that the Elections Office had changed forms in January. However, I requested my mail-in ballot application in January, so I should have been sent the up-to-date form.

7. The Elections Office employee directed me to go to the Texas Secretary of State Ballot by Mail Tracker at www.votetexas.gov to re-enter my information, but I was unsuccessful after several tries. The website was not accessible for blind users and was difficult to view with my screen magnifier. The website also seemed to be having technical issues. DRTX communicated with the Travis County Department of Elections on my behalf and obtained

- 4 -

an accessible document for me. I completed that document, submitted it, and thought I cured the issue.

8. In February 2022, I received my mail-in ballot, completed the ballot, and mailed the ballot before the deadline.

9. On March 4, 2022, less than a week before the deadline, I received a letter from Travis County Elections stating that my mail-in ballot was rejected. This Notice of Carrier Defect email stated that my Carrier Envelope was received and reviewed, but defective. The box was checked on the Notice that my carrier envelope did not contain my Texas Driver's License Number, Texas Personal Identification Number, Texas Election Identification Certificate Number or the last 4 digits of my Social Security Number; or that the number I provided did not match the number associated with my voter registration record as provided by my County's Voter Registrar. I contacted the Travis County Election Office to

clarify and was told that I did not provide my ID numbers under the envelope flap before I sealed and signed the envelope. Due to my disability, I did not see anything on the envelope flap when I received it. I had never heard of this requirement and did not receive any instructions regarding the envelope flap in my March ballot election envelope. I was once again directed to go to the Texas Secretary of State Ballot by Mail Tracker at www.votetexas.gov to attempt to cure, or to cancel my ballot. I attempted to cure through the Ballot by Mail Tracker and was unsuccessful. The website was still inaccessible even when I used my screen magnifier and seemed to be having technical issues.

10. I contacted Travis County's Election Office by phone four times to attempt to successfully cure my ballot through the State Ballot by Mail Tracker, and each person I spoke to suggested a different solution. I was told that it was possible

I was entering too much information and to attempt again, leaving out information. For example, my street address has "Avenue" in it, and I was told to leave "Avenue" out of my address. This did not work. Another person from the Travis County Election Office asked me if I knew about large print software and screen readers, which was frustrating to me because, as a legally blind person, I am very aware of this technology. I already use a screen magnifier. Finally, another person asked me if I could go down to their office and drop my ballot off, or if I could ask anyone to drive me there. This suggestion was frustrating as well, as I vote by mail due to my disability and to be independent. I did not feel I should be required to find and obtain transportation to fix the issue as this would defeat the purpose of voting by mail. After ample time on the phone, the website finally worked when I clicked the button and cured the ballot. I

called the Travis County Election Office to verify, and they confirmed my ballot was cured.

11.     At no time did I see or was I offered any information on my rights as a person with a disability, and the availability of reasonable modifications or accommodations under federal or state laws. At no time did I see or was I offered contact information for who could help me with reasonable modification or accommodations, or information as to what the grievance procedure would be if I was initially refused. This information was not available on the website, on anything that was mailed to me, or from any of the many people I spoke with.

12.     Approximately a week later, I received another letter, which was not in an accessible format for me because it was not in large print, stating that there were errors in my ballot, so therefore my ballot didn't count. I am unsure if this letter

was a copy from the week prior or if it was a new letter. I am now unsure if my vote was counted.

13.    In May 2022, I tried voting curbside rather than voting by mail during the primary runoff. A volunteer came outside with a laptop, but it was inaccessible, and they had no headphones. Because of this, the volunteer had to read the screen for me and I had no choice but to tell them my choices out loud. My vote was not private as the election volunteer heard my choices.

14.    In addition to the difficulties and barriers with voting in person described above, I cannot drive myself to the polling place, and paratransit is not available where I live in Pflugerville. While my husband does drive, he is not always available to drive me when the polls are open.

15.    I tried voting by mail again in November 2022. My optic device magnifies print to the eighth power, and yet the

font on the mail-in-ballot envelope flap is still too small for it to be readable for me. In November 2022, the font was even smaller because there was even more text on the envelope flap. My mail in ballot was rejected yet again for an ID-related reason, and I was again unable to cure the problem online because it again said that I was not a registered voter.

16.     SB 1 is making it harder for people with disabilities like me to vote. I registered to vote by mail based on my disability and I have always done this successfully in the past, but this option is no longer accessible to me due to all of the new ID requirements and burdens imposed by SB 1 on the voting by mail process. I tried so hard to vote in the March primary, but at every turn, I faced obstacles due to my disability. I am very concerned about my ability to vote in the future due to SB 1.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct. Executed on this __ day of May, 2023, at Austin, Texas.

Teri Salzman

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNIÓN DEL PUEBLO ENTERO, et al.,

Plaintiffs,

v.

GREGORY W. ABBOTT, et al.,

Defendants.

Civil Action No. 5:21-cv-844 (XR)
(consolidated cases)

## DECLARATION OF YVONNE IGLESIAS

My name is Yvonne Iglesias. I am over the age of 21 and fully competent to make this declaration.

Under penalty of perjury, I declare the following based on my personal knowledge:

1. I am an eligible and registered voter in Hidalgo County, Texas.

2. I am a person who is paralyzed, experiences consistent muscle spasms, and is blind in one eye.

3. Since at least 2006, I have voted in most elections, both federal and state. I vote for the best candidate for me and my issues, whether they are Republican, Democrat, or other political party candidates. I believe I included my voter registration card identification and other identification as requested when applying and voting by mail. Since 2006, I have voted by mail the same way each year and did not have any problems and my votes counted.

4. In the 2022 November elections, after the passage of SB 1, I submitted an application to vote-by-mail.

5.   I completed my application to vote-by-mail and sent it to the election office in Hidalgo County, Texas, just as I have since 2006, when my ballot was accepted and my votes were counted. I followed up on my application by calling the election office in Hidalgo County, Texas, well before the 2022 November election to confirm that my application was received. During this call, I was informed by a Hidalgo County election official that my vote-by-mail application had been rejected for an ID-related reason.

6.   The election official explained to me what ID number to write on my application, which I did, and then resubmitted my voter application.

7.   After submitting my second vote-by-mail application, I again reached out to the elections office for Hidalgo County, Texas, several days before the November 2022 election to confirm that my second application was received and accepted. I was again informed by an election official from Hidalgo County, Texas, that my second vote-by-mail application was rejected for an ID-related reason and because it had arrived too late.

8.   Because I am unable to travel on short notice, as my disabilities require me to engage in significant coordination to arrange appropriate, accessible transportation, I was unable to vote in the November 2022 election.

9.   Because of my disabilities, voting by mail remains the only form of voting that is accessible to me, but I no longer have confidence that I will be able to vote in the future as a result of the changes brought about by SB 1. Even after revising my ID number per the instructions of a county election official, my application to vote by mail was still rejected despite no issues applying to vote by mail in the previous fifteen years. I still do not understand why both of my applications were rejected.

DocuSign Envelope ID: 66D0CE41-51E5-4626-88D6-767C132F5399

10. I am a member of The Arc Texas and REVUP Texas. I became a member of these organizations because voting as a person with a disability is important to me. My sister, before she passed away, always stressed to me the importance of voting. I vote now in honor of her memory of this important right.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct. Executed on this 12th day of May, 2023, at Hidalgo County, Texas.

Yvonne Iglesias

# EXHIBIT 12

Kara Ayers                                          May 10, 2022

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
 2                 SAN ANTONIO DIVISION

 3    LA UNION DEL PUEBLO ENTERO, et    )
      al.,                             )
 4          Plaintiffs,               )
                                      ) CASE NO.
 5    vs.                             ) 5:21-cv-844-XR
                                      ) [LEAD CASE]
 6    GREGORY W. ABBOTT, et al.,       )
            Defendants.               )
 7    _____
      OCA-GREATER HOUSTON, et al.,     )
 8          Plaintiffs,               )
                                      ) CASE NO.
 9    vs.                             ) 1:21-cv-780-XR
      JOHN SCOTT, et al.,              )
10          Defendants.               )
      _____
11    HOUSTON JUSTICE, et al.,         )
            Plaintiffs,               )
12                                    ) CASE NO.
      vs.                             ) 5:21-cv-848-XR
13    GREGORY WAYNE ABBOTT, et al.,    )
            Defendants.               )
14    _____
      LULAC TEXAS, et al.,             )
15          Plaintiffs,               )
                                      ) CASE NO.
16    vs.                             ) 1:21-cv-0786-XR
      JOHN SCOTT, et al.,              )
17          Defendants.               )
      _____
18    MI FAMILIA VOTA, et al.,         )
            Plaintiffs,               )
19                                    )
                                      ) CASE NO.
20    vs.                             ) 5:21-cv-0920-XR
                                      )
21    GREG ABBOTT, et al.,             )
            Defendants.               )
22    _____

23        Videotaped Deposition of Dr. Kara Ayers

24              Tuesday, May 10, 2022

25    (Caption continued on next page)
```

1    (Caption Continued)

2    UNITED STATES OF AMERICA,          )
          Plaintiff,                    )
3                                       )
                                        ) CASE NO.
4    vs.                                ) 5:21-cv-1085-XR
                                        )
5    THE STATE OF TEXAS, et al.,        )
          Defendants.                   )
6    _____

7

8

9

10

11         Videotaped Deposition of DR. KARA AYERS

12                   Washington, D.C.

13               Tuesday, May 10, 2022

14              10:08 a.m. Eastern Time

15

16

17

18

19

20    Remotely Reported by:  Karen Kidwell, RMR, CRR

21

22

23

24              Magna Legal Services
                  866-624-6221
25               www.MagnaLS.com

```
 1    BY MR. SWEETEN:

 2         Q.    Okay.  You have concerns about the fact

 3    that it requires the oath signator to swear or affirm

 4    under penalty of perjury; is that right?

 5              MS. PAIKOWSKY:  Object to form.

 6              THE WITNESS:  As cited in my report, the

 7         concern that that introduces what -- what's

 8         known as a chilling effect, meaning that people

 9         would rather not act than act in error.  And in

10         this case, not acting would mean not providing

11         the assistance a voter needs.

12    BY MR. SWEETEN:

13         Q.    Do you know -- you can see that -- that

14    the language added is "under penalty of perjury."

15    But do you know if, under the prior oath -- first,

16    let's establish:  There was an oath already that

17    existed in Texas law, correct?  Under 63 -- 64.034,

18    correct?

19              MS. PAIKOWSKY:  Objection.  Form.

20              THE WITNESS:  You told me that the

21         underlined is added, so I'm assuming that the

22         original, you know -- yes, you said that the

23         underline was added.

24    BY MR. SWEETEN:

25         Q.    So you would agree that there was already
```

```
 1   BY MR. SWEETEN:

 2        Q.   -- added by SB1?

 3             MS. PAIKOWSKY:  Objection.  Form.

 4             THE WITNESS:  I'm not sure I could narrow

 5        it down to my primary concern.  Yes, I -- I have

 6        criticism of the confining of assistance

 7        detailed here in these four . . .

 8   BY MR. SWEETEN:

 9        Q.   Okay.  And we'll get to that.  Now I want

10   to look at another added sentence.  It says, below,

11   "I did not . . . pressure, or coerce the voter into

12   choosing me to provide assistance."  Did I read that

13   correctly?

14        A.   You did.

15        Q.   And do you have criticisms over an

16   attestor having to say those words, or attest to that

17   sentence?

18        A.   I have less concerns about these words

19   compared -- if we had to, you know, rank-order them.

20   But I remain concerned that there could still be a

21   lack of clarity in this, in knowing the -- the

22   multitude of situations that a voter with a

23   disability and their assistor find themselves in.

24   One could definitely question, you know, whether, you

25   know, a person encouraged the person to get up that
```

1   morning.  Did they -- I can just see where a person

2   could be confused, and again, going back to the --

3   under penalty of perjury, my concern is they would

4   err on not assisting rather than assisting in a way

5   that was -- potentially would put them at risk for

6   criminal penalty.

7         Q.   Okay.  Well, let me make sure I'm clear.

8   So you're saying you do have questions, but your -- I

9   mean, I'm just trying to get -- if you've got a

10  criticism of this line, "I did not . . . pressure, or

11  coerce the voter into choosing me to provide

12  assistance," I'd like to know what that is.

13         MS. PAIKOWSKY:  Objection.  Form.

14         THE WITNESS:  My primary criticism relates

15      to the reality that as disability rights

16      organizations are trying to make sense of what

17      this means, they want to make sure that they

18      communicate this fully to protect all parties

19      and get -- you know, ensure that people with

20      disabilities have the help they need, that

21      they'll call.

22         And so of course, you know, I don't want

23      anybody pressured or coerced.  But in context of

24      the oath, it again is -- is concerning that

25      it's -- it's under the threat of penalty, and,

 1    balance between allowing -- you know, providing for

 2    election security and -- and for also making sure

 3    that -- that folks have free and open right to vote,

 4    right?

 5              MS. PAIKOWSKY:  Objection to form.

 6              THE WITNESS:  From my research, election

 7         security is -- is not threatened by what I see

 8         as important for people with disabilities to

 9         vote.

10    BY MR. SWEETEN:

11         Q.   Are there instances where folks with

12    disabilities can be basically manipulated into voting

13    by -- by someone else?  Can that happen?

14              MS. PAIKOWSKY:  Objection.  Form.

15              THE WITNESS:  I don't have any evidence

16         that that happens at a higher rate, people with

17         disabilities.  So I mean, that could happen to

18         any voter.  My research doesn't indicate that it

19         happens any more likely to people with

20         disabilities, although -- you know, there --

21         there is that assumption.  Paternalism is

22         something that we see frequently in disability

23         policy, meaning that there's worry or concern

24         that people with disabilities aren't going to be

25         safe, or are going to be taken advantage of.  So

1          sometimes there can be an assumption that that

2          is happening, when it's really based on the

3          premise of paternalism.

4    BY MR. SWEETEN:

5          Q.   Okay.  So the oath states that an

6    assistor -- you say here, in paragraph 27, you say,

7    "The oath states that an assistor must 'confine

8    (their) assistance to reading the ballot to the

9    voter, directing the voter to read the ballot,

10   marking the voter's ballot, or directing the voter to

11   mark the ballot.'"

12             Did I read that correctly?

13        A.   Yes, you did.

14        Q.   You do not believe that the -- it is

15   your -- it is your opinion that the oath should not

16   state that they -- that they would confine their

17   assistance in this way, correct?

18             MS. PAIKOWSKY:  Objection.  Form.

19             THE WITNESS:  I'm not sure I look at it

20        in -- in that direction, of what the oath should

21        or shouldn't say.  I only comment on the oath as

22        it states, and the concerns that I have with

23        that.

24   BY MR. SWEETEN:

25        Q.   Okay.  Now, you would agree that -- we've

Kara Ayers

May 10, 2022
Page 182

```
 1                         CERTIFICATE

 2

 3          I, KAREN K. KIDWELL, Registered Merit Reporter,

 4     and Certified Realtime Reporter, do hereby certify

 5     that prior to the commencement of the examination,

 6     the deponent was remotely sworn to testify to the

 7     truth, the whole truth under penalty of perjury.

 8          I DO FURTHER CERTIFY that the foregoing is a

 9     verbatim transcript of the testimony as taken

10     stenographically by me at the time, place and on the

11     date hereinbefore set forth, to the best of my

12     ability.

13          I DO FURTHER CERTIFY that I am neither a

14     relative nor employee nor attorney nor counsel of any

15     of the parties to this action, and that I am neither

16     a relative nor employee of such attorney or counsel,

17     and that I am not financially interested in this

18     action.

19

20                    _____

21                    Karen K. Kidwell
                      Registered Merit Reporter
22                    Certified Realtime Reporter
                      Notary Public
23

24

25
```

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GREGORY W. ABBOTT, et al., <br><br> Defendants. | Civil Action No. 5:21-cv-844 (XR) <br> (consolidated cases) |

## SUPPLEMENTAL DECLARATION OF ANNE SCOTT

My name is Anne Scott. I am over the age of 21 and fully competent to make this declaration. I previously submitted a declaration in this case. See ECF 611-1, Ex. 48. The facts in my first declaration remain true and this second declaration is intended only to supplement the first, which is incorporated by reference here. Some of the facts set out in the first declaration are repeated here for ease of reading. Under penalty of perjury, I declare the following based on my personal knowledge:

1. I am an eligible and registered voter in Hidalgo County, Texas.

2. I am the mother of Taylor Scott. Taylor is also an eligible and registered voter in Hidalgo County, Texas.

3. Taylor is medically fragile. She is diagnosed with Cerebral Palsy, is blind in one eye, and uses a power wheelchair for mobility as she cannot walk independently.  Taylor's disabilities substantially limit several life activities, including walking, speaking, communicating, and caring for herself.

1

4.   Taylor's disabilities also impact her ability to speak and communicate with people who are unfamiliar with her speech patterns. Many people who do not know her may not understand her.

5.   Due to Taylor's disabilities, I assist her with many things, including voting by providing transportation to voting polls and only reading the candidates to her.  SB 1 imposes criminal penalties for receiving assistance and I am concerned that my actions assisting my daughter vote by mail could be misunderstood and prosecuted under SB 1. I am also concerned that others will not be willing to assist my daughter vote by mail when I am unable to do so given fear of prosecution under SB 1. In these situations, which can occur at any time as I travel periodically, Taylor would need to rely on a family friend, who we would need to compensate for their time for taking Taylor to vote and this would subject Taylor to potential criminal penalties. I am very concerned that these restrictions make my daughter's voting even harder. I am also concerned that should Taylor vote in person, and I am unavailable, an assistor will be unwilling to take an oath under penalty of perjury and not assist Taylor at the polls.

6.   Taylor has a valid U.S. passport. She also has a state-issued identification card, but this ID expired during the COVID-19 pandemic in October 2020. Due to Taylor's disabilities and medical fragility, we were unable to go in person to have her identification card renewed.  Her state-issued identification card is still expired.

7.   In the November 2022 election, I helped Taylor apply to vote by mail. I thought that we could not use Taylor's expired state identification card number on the mail-in-ballot application, so we used her U.S. passport number. Taylor did not receive a ballot in return after sending in her application to vote-by-mail in November 2022.

DocuSign Envelope ID: 814687A8-954A-4EE6-835E-2D8B094B750E

8.   Because Taylor never received any notification as to whether or why her application to vote by mail was rejected, she never had an opportunity to cure her application.

9.   When the ballot did not arrive for Taylor, I took her to vote in person.  Because of Taylor's disabilities and medical fragility, we are very cautious about taking her out in public due to COVID, so it was a risk to take her to vote in person.  Taylor was able to vote in person using her U.S. passport as identification.

10. I never influence my daughter's voting. My daughter votes independently and she tells me she disagrees with some of the candidates who I support.

11. Taylor and I are members of REVUP and The Arc of Texas.

12. My daughter and I receive email communications from REVUP and The Arc of Texas.


This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct. Executed on _June 18, 2023 | 4:03 PM PDT_, at Hidalgo County, Texas

DocuSigned by:

*Anne Scott*

DAC640A3C6F0404...

Anne Scott

# EXHIBIT 14

DocuSign Envelope ID: 206D5C40-3297-458A-98DF-EABB14EF3462

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

|  |  |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GREGORY W. ABBOTT, et al.,<br><br>Defendants. | Civil Action No. 5:21-cv-844 (XR)<br>(consolidated cases) |

## SUPPLEMENTAL DECLARATION OF TAYLOR SCOTT

My name is Taylor Scott. I am over the age of 21 and fully competent to make this declaration. I previously submitted a declaration in this case. See ECF 611-1, Ex. 47. The facts in my first declaration remain true and this second declaration is intended only to supplement the first, which is incorporated by reference here. Some of the facts set out in the first declaration are repeated here for ease of reading. Under penalty of perjury, I declare the following based on my personal knowledge:

1.  I am an eligible and registered voter in Hidalgo County, Texas.

2.  I am diagnosed with Cerebral Palsy, I am blind in one eye, and use a power wheelchair.

3.  My cerebral palsy substantially limits a number of my major life activities, including standing, walking, sitting, reaching, performing manual tasks, speaking, communicating, and interacting with others.

4.  My mom, Anne Scott, helps me with many things, such as filling out voting applications.

DocuSign Envelope ID: 206D5C40-3207-458A-08BE-EA8814EF3462

5. I have a Texas identification card, but it had expired before the election between Trump and Biden.

6. I do have a United States passport.

7. In the election between Beto and Abbott, I tried to vote by mail. My mom filled out the application to vote by mail and read it to me before it was sent in. I signed the application.

8. We put my passport number on the application to vote by mail.

9. I never received a ballot, so my mom took me to vote in person. It was very difficult for me to vote in person because of my disabilities. I successfully used my passport number to vote in person.

10. SB 1 also imposes criminal penalties for receiving assistance – my disability means that I often need assistance to vote and I am concerned about these restrictions making that even harder. I am concerned for my who will have to take an oath under penalty of perjury. I am also concerned that if my Mom is not available to help me or my attendants or caregiver, I may need to rely on a family friend who I would need to compensate. This would expose me to the criminal penalties of SB 1.

11. I am a member of The ARC of Texas and REVUP.


This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct. Executed on _____June 18, 2023 | 8:54 PM PDT_____, at Hidalgo County, Texas.

Taylor Scott

2

# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GREGORY W. ABBOTT, et al., <br><br> Defendants. | Civil Action No. 5:21-cv-844 (XR) <br> (consolidated cases) |

## DECLARATION OF JENNIFER MILLER

My name is Jennifer Miller. I am over the age of 21 and fully competent to make this declaration. Under penalty of perjury, I declare the following based on my personal knowledge:

1.      I currently live in Travis County, Texas.

2.      I am 55 years old.

3.      I live with my daughter, Danielle Miller, a 25-year-old woman who is also a registered voter in Travis County, Texas. Danielle has voted in elections since turning 18 years old.

4.      Danielle is a person with Autism. She also experiences seizures that she uses prescribed medications to manage. Danielle cannot drive herself due to her seizures. Danielle's disabilities substantially limit several life activities, including communicating, social interactions, and delay in processing information and some motor skills.  Danielle also needs consistent routines and struggles when those routines are interrupted. My daughter has dyslexia, which substantially limits and interferes with her ability to read and to relate speech sounds to written letters and words.

1

5.      Because of my daughter's disabilities, we use a supportive decision-making model to help her to make informed choices. My daughter selected me as a trusted advisor, and I assist her in making important life choices without making those choices for her.

6.      The Arc of Central Texas supports my family by providing case management and classes relevant to my daughter's disabilities and we are also members of The Arc of Texas.

7.      My daughter requires my assistance as she cannot drive and needs assistance in crowded or large occupied spaces due to her Autism. For example, when she goes to the post office, I will drive her in my car because our area does not have reliable public transportation and she does not drive due to her disability. I will then assist her in filling out any forms or addresses.

8.      My daughter has difficulty voting independently in person. I drive my daughter to the polling place and need to go in with her. Polling places that are crowded or new are challenging for Danielle. My daughter struggles with anxiety and therefore long lines and crowds, so I need to reassure her while waiting that we are almost there. If a polling place is new, Danielle struggles with stress and anxiety as she is unfamiliar with the surroundings and can be unpredictable in her behavior. Once we enter the polling place, I will provide assistance if she gets stuck, has a problem with the voting machine, or forgets how to use the voting machine. My daughter can communicate with and understand poll workers, but they may have a hard time understanding her because she sometimes does not enunciate properly. With Danielle's autism, she is fine until she is not, so it is difficult to predict what types of issues or surprises might pop up when we go to vote. If my daughter's anxiety builds up too much, she may experience a loss of behavioral control that prevents her from voting.

9.      Danielle also needs assistance with the voting machine. Danielle has issues with generalization and finds it difficult to apply general operational knowledge to different types of

DocuSign Envelope ID: F0830204-5F2B-47B6-A899-A38B5D28A6ED

the same machinery. For instance, Danielle is comfortable using the microwave in our home but is not able to use a microwave in a convenience store or other location. She is scared to use new and different voting machines because she was worried she would be unable to figure out how to use the machines. I would stand next to Danielle in case she needed assistance with the machines. I would remind her to hit the submit button. I would also remind Danielle to print the ballot and insert the ballot to cast her vote. At no time would I influence Danielle's decisions on whom and what (when it involved propositions, etc.) to vote for in any election.

10.     Because of these issues noted in the prior two paragraphs, it has been easier to vote by mail for Danielle.

11.     My daughter has difficulty voting independently by mail, as she finds it very confusing. First, I help my daughter find her ballot information and request a ballot. When the ballot arrives, I assist in opening the envelope for her due to her delayed motor skills so that it is not ripped or damaged. We read the ballot together. Danielle always chooses whom to vote for, and I never provide any input or influence. When preparing the ballot envelope, I usually remind her to complete certain portions and review to ensure everything is done correctly. I also remind her to sign it in the correct place. Danielle signs her ballot and then I review it for completeness. Next, I assist in placing the ballot in the double envelopes due to Danielle's delayed motor skills. We both sign the envelope. Then I drive her to the post office so she can mail the ballot. We live in a more rural area, so I want to ensure that our ballots get to the post office because pickups from the postal box near us are inconsistent. I provide this support in part to prevent my daughter's ballot from being rejected due to a mistake.

12.     In my experience, it is difficult for my daughter and other people with similar disabilities to recall which specific kind of identification they signed up to vote with. As a result,

DocuSign Envelope ID: F0830204-5F2B-47B6-A899-A3985D28A6ED

the requirement of SB 1 to include either the last four digits of a social security number or a driver's license that matches the ID used for registration causes serious confusion. I believe this process leads otherwise-valid ballots submitted by registered voters to be rejected. I think this process is difficult to understand and is unnecessary.

13.     In the March 2022 primary, I assisted my daughter in voting by mail. I helped her to reapply because new a new application is required every year. Then I signed the assistance oath to drive her to the post office. We did the same for the November 2022 general election.

14.     With the May 2023 local election in Travis County, Danielle's mail-in-ballot was rejected. Danielle, with my assistance, completed the mail-in ballot as we had for the March 2022 primary and November 2022 general election. The ballot was mailed a week and a half before its due date, but when we checked to see if the ballot was received by Travis County, we found it had not. We were not provided any reason why the ballot had not been received, nor did we receive it returned. Danielle, therefore, needed to vote in person. Fortunately, there were not many voters for the local election that involved a proposition. Had there been more voters, Danielle would have experienced extreme stress and anxiety due to her disabilities.

15.     I feel very uncomfortable when completing the SB 1 oath to help my daughter vote in person. I don't want to do anything wrong, and I am scared that my assistance to my daughter that allows her to access her right to vote might be misunderstood as a violation of the oath. I am concerned that the oath might prevent me from doing what I need to do to help my daughter. I need to be creative when communicating with my daughter, and I am concerned that if I say the wrong thing it could harm myself or my daughter because someone misunderstands my compliance with the oath.

16.     There is nothing I have seen online or in any publications or signs at the election office that indicates that my daughter has rights as a person with a disability to ask for reasonable modifications of SB1.  There is no information on whom to contact to ask for those reasonable modifications, or how to contact them.

17.     As my daughter's trusted advisor in her supported decision-making, it is incredibly important to me to help facilitate my daughter's independence and ensure she can access her fundamental rights as a citizen, including her right to vote. I am a law-abiding citizen. I want to do everything right and so does my daughter. Nonetheless, the voter assistance oath and other assistance restrictions imposed by SB 1 scare me.  I am concerned by SB 1, and nervous that few people will be willing to volunteer to support my daughter if I become unable to render assistance because of similar fears to my own. This new law feels like a trap laid for people like me and my daughter and it imposes harm on people with disabilities and those who help them. It should be easier to assist someone who needs help voting.


This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct. Executed on ___June 20, 2023 | 6:10 PM CDT___, at Travis County, Texas.

Jennifer Miller

Jennifer Miller

# EXHIBIT 16

DocuSign Envelope ID: 79A1F3BF-35AD-4D58-929B-33E17531119

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

|  |  |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GREGORY W. ABBOTT, et al.,<br><br>Defendants. | Civ. Act. No. 5:21-cv-844 (XR)<br>(consolidated cases) |

**DECLARATION OF AMY LITZINGER**

My name is Amy Litzinger. I am over the age of 21 and fully competent to make this declaration.

Under penalty of perjury, I declare the following based upon my personal knowledge.

1. I am a 35-year-old woman who lives in Travis County, Texas. I registered to vote for the first time shortly after I turned 18 in 2005. I have been a registered voter in Travis County ever since. I am a member of both REVUP Texas and The Arc of Texas.

2. Though I am eligible to vote by mail because of my disabilities, I typically vote in person and use early voting prior to election day when I can. Early in the pandemic I voted by mail instead and would vote by mail in the future if my disabilities make voting in person more difficult or dangerous.

3. Voting is important to me. In addition to voting in most elections, including primary elections, since I turned 18, I am also a Volunteer Deputy Registrar and register others to vote. In fact, I have registered several of my attendant care workers to vote and took them to vote for the first time when they voted with me before SB1 was passed.

4.  I have several disabilities that substantially limit several major life activities. I have spastic quadriplegic cerebral palsy from birth. I use a power wheelchair for mobility and when I am very tired, I use a chest strap to help keep me upright because I have no sitting balance. When the chest strap is buckled, I cannot remove it myself and I cannot lean forward far enough to comfortably access the voting machine. Similarly, if I am having a day with high spasticity, then I have trouble moving the controller of my power chair out of my way which further limits my mobility and ability to reach the voting machine.

5.  I also have contractures in my elbows so they are fused and I cannot straighten my arms all the way to reach things. This means I cannot open doors on my own or move chairs or other things that are in my way.

6.  My cerebral palsy also causes me to have visual tracking issues. My visual and balance problems mean that I lose my sitting balance when I try to read and turn a sheet of paper over. My cerebral palsy also makes it difficult to grasp a sheet of paper, to begin with, or to hold a pen. While I can sign my name, it is tiring to hold a pen and my signature looks different each time. I receive Botox injections to address some of the spasticity caused by my cerebral palsy; however, sometimes when my Botox treatments have just occurred, I am unable to sign my name or make a mark with a pen at all.

7.  As a result of my disabilities, I do not drive myself but require a driver to assist me into and drive my van which has a ramp and tie-downs to hold my wheelchair in place. When I cannot find someone to drive me in my van, I cannot accept a ride from others because I cannot ride in cars that do not have a ramp or wheelchair tie-downs. I also do not have enough sitting balance to safely transfer into or ride in a seat in a car—I can only travel safely if I am in my wheelchair.

8.  I also have dysautonomia, an autonomic dysfunction, which causes me to have an elevated heart rate if I am in hot temperatures for long periods of time, making it difficult to wait in long lines outdoors.

9.  Because of my disabilities, I have personal care attendants who assist me with my activities of daily living for approximately twelve hours per day, plus one hour of transportation assistance per day.

10. The individuals who assist me are themselves marginalized people, including people of color, people who are LGBTQ+, and/or have invisible disabilities themselves.

11. I have a process I would typically use to vote in person, as I did before the pandemic and SB1. I would usually go to the League of Women Voters website to educate myself about everyone who is running in an election and would print my sample ballot with my choices. Before I leave my house, I find my ID or my voter identification card.

12. I would usually go with my attendant to my polling place—they would assist me into my wheelchair-accessible vehicle, including tying my chair down and strapping my chest strap into place. They would then drive me to my polling place. When we arrived, they would assist me out of the van, open doors, and move any objects in my way so that I could get into the polling place.

13. My assistor would usually get my ID out before we would go through the doors of the polling place. Most of the time, I am able to hold my own ID card and sheet with my voting choices on it, though it is possible that if I were voting shortly after my Botox treatments, my grip would be affected and I would not be able to hold these items for myself.

14. I would hand my ID to the poll worker and this would then usually prompt them to give me several papers including my voting machine number, my voting ballot, and fliers for

the caucus events for primaries. I am not able to hold all of these items and can usually only hold my ID and sheet with my voting choices on it. My assistor would usually have to take these items for me and would also have to put my ID away for me in my wallet. Once they have taken my ID from me, they would usually hand me the number to input into the voting machine.

15. As long as I have been unbuckled from my chest strap, I am able to independently operate the voting machine most of the time. Once my choices print, I am not able to submit my ballot myself into the ballot box because it is at standing height and not reachable from my chair, even if I raise my power chair to its highest setting. My assistor would usually have to take my ballot and submit it for me.

16. During the early stages of the pandemic, I switched to mail-in voting. Pre-SB1, I had my assistor open the envelope for me and unfold my ballot. They would then have to hold the paper down flat for me so that I could read it without it moving. I would fill in the bubbles myself, but if I wanted to write in candidates, my assistor would have to write the candidate for me or it would be illegible. If there were any other blanks, my assistor would also have to do any other handwriting on the ballot and the ballot envelope. I would sign the ballot and my assistor would then have to fold it, put it back in the inner and outer envelopes, and would hand me the envelope so that I could seal it. They would have to help me line the envelope up so that the edges would match for sealing. I would then attempt to have my signature match as closely as possible to the one the elections clerk uses for me while also having to have it cross the two sides of the envelope.

17. My assistor would then have to assist me into the car, as described above, to take the envelope to the mailbox or the Travis County Clerk's office.

18. During the May 2022 election, my assistor forgot to remove my chest strap before we entered the polling place because I had been preoccupied with making sure I had on my face mask before entering the building. As I was checking in with the poll worker, I had trouble handing my ID to the poll worker but the chest strap became a significant limit to my voting when I got to the voting machine. I needed to take it off but I was not sure if my assistor could remove it once we were in the polling area without having to take an oath or if this would count as "assistance" that isn't allowed.

19. Because I wasn't sure and I didn't want to expose my assistor to having to sign an oath that they might have to break by providing me with more physical assistance than the oath allows, I did not ask for it to be removed and, as a result, struggled to vote. It took me longer to vote and took a lot of energy for me to fight against the chest strap. If it had been a longer ballot than only three questions, I would likely have been unable to finish my ballot and stopped voting.

20. As usual, I was not able to reach the ballot counter after voting but, because I was afraid that asking my assistor to put my ballot into the counter would require them to sign an oath or assist me in a way that isn't allowed, I asked the poll worker standing at the box to submit it for me, which they did. I would have preferred to be able to use my personal care attendant for this purpose to ensure I had more privacy in my voting experience, but SB 1 prevented me from doing so.

21. I again voted in person in the November 2022 general election. I had a new attendant and not only was it her first day working for me, but it was also her first time experiencing the voting process. She was not a registered voter and completely unfamiliar with the voting process, in general, and did not understand the limits to the assistance I needed and what

was allowed while voting. Specifically, she did not understand my need to vote alone to protect the privacy of my vote. Because of my attendant's unfamiliarity with the voting process, the elections staff perceived her actions as those of an assistor and attempted to have her sign an assistor's oath. Before going to vote, my assistor and I discussed the oath and concerns about exposing her to potentially violating an oath because of the physical assistance I may need and decided she would not sign it. However, because of the confusion that day, the elections staff did attempt to have her sign the oath. It caused me great stress to have to navigate these barriers with my new personal care attendant on her first day working with me. I felt badly that someone I rely on to assist me in my daily life had to be exposed to the risks of criminal liability just for trying to assist me when voting, which she understandably viewed as part of her job. Although she did not end up having to sign the oath, the demands from the poll workers were very concerning and caused significant anxiety for me and my assistor.

22. While I was at the polling place, I did not see any notices that told me about my rights as a person with a disability. There were no notices about my right to a reasonable modification under the law so that my assistor could help with more than what was outlined in the oath. There was no notice about who I might ask about giving me and my assistor permission to help me in the way that I needed. I did not see this on the website, at the polling place, or on any of the materials that I have read from the elections office. Even if I had known that this was an option, I would not have known whom to ask.

23. I have had conversations with several of my personal care attendants who have expressed confusion about what they can and cannot do to assist me to vote in the future. I am concerned that I will not be able to find attendants who will assist me to vote and/or they

would refuse to come to any shift where they know I intend to vote during that day. Because I cannot get out of bed without attendant care, having an attendant refuse to come on a day when I plan to vote would be incredibly dangerous for me.

24. Further, I do not feel comfortable having my attendants sign the assistor's oath when they escort me to vote. Not only is the oath unclear regarding what types of assistance are allowed, it also requires an assistor to certify that I qualify for help with voting. However, I do not believe that is always possible. When I voted in the November 2022 election, it was my attendant's first day working for me and she could not know me well enough to certify that I qualified for assistance under SB1. Further, I would not want my attendants to be exposed to possible punitive action related to the oath because of their unfamiliarity with me or the voting process or the misunderstanding of poll workers. While I am able to read the ballot and make my selections without assistance, I do need an attendant to assist me with transportation, to help me access the polling center, and to complete some physical tasks like placing my completed ballot in the box. These activities can be misinterpreted and misconstrued by poll workers and jeopardize my attendants who may be compelled to sign the assistor's oath.

25. I have similar concerns if I have to return to mail-in voting to protect my health. With the new requirements, even though I have access to my ID card, I would not be able to legibly write my ID number on the ballot and the envelope. My assistor would have to write this information for me, raising the same concerns noted above about their taking the oath or assisting me in ways that are not allowed. I do not think I would be able to find an attendant who is willing to write the information for me and take the assistor's oath.

26. SB 1 has made it harder for me and other people with disabilities to vote. It does not seem right or fair that I cannot receive the assistance I need to vote since the enactment of SB 1. As a person with a disability who requires intensive daily supports, I face a number of barriers in my life. Voting should not be one of them.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct. Executed on _____June 21, 2023 | 6:52 PM CDT_____, at Travis, Texas.

Amy Litzinger

# EXHIBIT 17

DocuSign Envelope ID: A75DC6E2-348C-417F-9891-48C3D549CC24

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GREGORY W. ABBOTT, et al., <br><br> Defendants. | Civ. Act. No. 5:21-cv-844 (XR) <br> (consolidated cases) |

**DECLARATION OF YOLANDA ROSS**

My name is Yolanda Ross. I am over the age of 21 and fully competent to make this declaration. Under penalty of perjury, I declare the following based upon my personal knowledge:

1. I live in Harris County, Texas, where I am registered to vote.

2. I live with my daughter, Hannah Symone Ross, who is a 25-year-old woman with an intellectual disability. She is also registered to vote in Harris County.

3. My daughter has Fetal Alcohol Syndrome and has intellectual and cognitive disabilities as a result of her condition. Her disabilities substantially limit several of her major life activities, including reading, writing, communicating, telling time, managing money, and driving.

4. Because of Hannah's disabilities, we use a supportive decision-making model to help her make informed choices. This means that she retains her right to make decisions for herself, but I provide help with certain choices, like medical decisions.

5. Hannah is able to do some things in her daily life on her own. She is able to feed herself, use the bathroom, and take her medications on her own. However, I am her primary assistor in other areas of life.

6. While she is able to read and write, she has difficulty with comprehension and processing. As a result, Hannah needs to be guided and shown how to do certain things. Due to her disability, Hannah's decision-making skills are severely impaired. Therefore, I assist

Hannah with managing her money, transportation, cooking, and interactions with people, particularly strangers.

7.  Hannah prefers to stick to clear routines. These routines help her form habits and effectively function in life. Due to her disability, spontaneous activities that disturb this routine are very difficult for her.

8.  Voting is one activity that Hannah requires assistance in. Hannah is registered to vote and has voted in several general and local elections in the past. Hannah has always had an assistor to assist her in voting. I have been her assistor many times, and when I am not available, my sister or a service provider has assisted her in voting.

9.  Hannah has always voted in person. We have never voted by mail. We enjoy voting in person because it's a more exciting experience and we enjoy getting the "I Voted" stickers and sharing our experience on social media.

10. Hannah has difficulty voting independently. Without assistance, Hannah would be unable to vote.

11. When I assist Hannah in voting, I drive her to the polling place. I assist her to check in at the polling location and accompany her to the ballot box. She can present her ID and sign her name, but Hannah needs assistance using the machine to vote. When we receive the ballot, I read the names of the candidates aloud. Hannah is able to verbally say who she wants to vote for and is also able to mark her choice on the ballot independently. I help her insert the ballot into the machine.

12. I definitely think SB 1 makes it more difficult for people like Hannah to vote. I am concerned that SB 1 is targeting people like Hannah, who have disabilities and will not be able to vote without assistance.

13. I have never seen any information about how to ask for reasonable modifications when voting or seen any contact information about whom to ask for these reasonable modifications of SB 1.

14. As people of color, voting is very important to Hannah and me. We strongly believe in our right to vote and know that it took a long time for us to be given the right to vote. For this reason, we take voting very seriously. We plan to continue voting but are worried that these new laws are slowly trying to take our right to vote away.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct. Executed on _June 22, 2023 | 2:19 PM PDT_, at Harris County, Texas.

DocuSigned by:

_Yolanda Ross_

Yolanda Ross

# EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNIÓN DEL PUEBLO ENTERO, et al.,

Plaintiffs,

v.

GREGORY W. ABBOTT, et al.,

Defendants.

Civ. Act. No. 5:21-cv-844 (XR)
(consolidated cases)

## DECLARATION OF HEISHA FREEMAN

My name is Heisha Freeman. I am over the age of 21 and fully competent to make this declaration.

Under penalty of perjury, I declare the following based upon my personal knowledge.

1. I am a 52-year-old woman who lives in Collin County, Texas. I am registered to vote in
   Collin County. I am a member of The Arc of Texas, I manage a group called Special Needs
   Parents of North America, and I am the secretary of the board of the Texas State
   Independent Living Council (SILC).

2. My son Austin is 29 years old and lives in Collin County, Texas, where he is also registered
   to vote.

3. Austin has autism, an intellectual disability, mixed receptive expressive language disorder,
   phonological disorder, and social pragmatic disorder, which makes it more difficult for him
   to engage in many daily activities such as leaving the house by himself, obtaining
   employment, managing finances, making decisions, and attending college. His autism
   substantially limits several of his major life activities, including caring for himself,
   speaking, thinking, communicating, interacting with others, difficulty understanding new

information and communicating thoughts, needs, and wants. Additionally, Austin requires prompting to dress appropriately, is a fall risk, has slow higher reasoning abilities, and takes a long time to make decisions. He will also have inappropriate social responses, such as laughing at serious moments. Although he has communication skills, he has a limited vocabulary and lacks reasoning skills that would be typical for his age.

4. Because of his disability, he needs assistance making some decisions, including understanding the options available to him. We use supported decision-making, a tool that allows disabled individuals to retain their decision-making capacity by choosing supporters who help them understand choices. I have served as his primary supporter, and I help him in voting in person.

5. I have assisted Austin during every general election since he was 18. Without my support, Austin would not vote in elections.

6. Austin and I do not vote for the same candidates or ballot measures, and I never have or would influence his vote.

7. Before the passage of SB 1, I helped Austin with voting in person by standing next to him while being monitored by a poll worker. For instance, I explained the propositions to him in plain language. I reminded him that he does not have to vote on each proposition after he became visibly agitated when he could not understand some of the propositions. Before voting, I researched each candidate's platform and explained their platforms in plain language so that Austin is equipped to make his decision. I also provided support with using the electronic voting machine.

8. Austin becomes nervous to vote because he is scared he will get something wrong because he needs help to understand the voting process. Because of his disabilities, he can't practice

ahead of time. Austin, therefore, relies on his phone as an assistive device to keep notes, but this phone is not allowed to be used when voting. He only wants to access his notes on his phone and paper notes do not work as it is an unfamiliar method to him. I did not know that I could ask for a reasonable accommodation for voting on behalf of Austin. There was never information at the polling center or from the election workers when Austin went to vote. There was also no notice of rights under the Americans with Disabilities Act or any receipt of information on those rights.

9. Austin needs my assistance to vote. I am afraid to take the oath of providing assistance under penalty of perjury due to SB 1. I am afraid my actions would be misinterpreted or misconstrued by other individuals or officials while assisting Austin within the parameters of the oath. My husband too refuses to take the oath under penalty of perjury. Further, we are unable to find any family friends or others that would be willing to take the oath and assist Austin with voting in person.

10. Austin would like to vote by mail in the future, but requires assistance with absentee voting. Austin needs assistance writing on the ballot or else his penmanship would be illegible. If I or my husband were unable to assist Austin in voting by mail, which is a distinct probability as we are often busy with our schedules, we would ask a family friend to help. We would need to compensate this family friend to help, but because of the criminal penalties of SB 1, we cannot do this as it would subject Austin to law enforcement liability.

11. After the passing of SB 1, I am worried about facing potential criminal liability as an assistor for providing the same support I have in the past. I am concerned that without my assistance, Austin will not be able to understand the language and issues on the ballot to

make his decision. Austin has not voted since SB 1 was enacted due to the concerns stated

above.

12. I am worried that due to SB 1, Austin will lose his right to vote.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the

foregoing is true and correct. Executed on June 22, 2023 | 9:24 PM PDT, at Collin County, Texas.

Heisha Freeman

Heisha Freeman

- 4 -

# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | |
| Plaintiffs, | |
| v. | Civ. Act. No. 5:21-cv-844 (XR) |
| | (consolidated cases) |
| GREGORY W. ABBOTT, et al., | |
| Defendants. | |

**DECLARATION OF MARC SPIER**

My name is Marc Spier. I am over the age of 21 and fully competent to make this declaration. Under penalty of perjury, I declare the following based on my personal knowledge.

1. I am a 58-year-old man currently living in Austin, Texas, where I am registered to vote. My family and I are members of The Arc of Texas and REVUP-Texas.

2. My 23-year-old daughter, Katie Spier, lives with my wife, Miriam Spier, and me in Austin, Texas, where she is also registered to vote. Katie voted in two elections in California and voted in Texas in the November 2022 General Election.

3. Katie has several disabilities that substantially limit several of her major life activities. Katie has an intellectual disability and is developmentally delayed. Katie's disabilities include delayed speech, reading comprehension, and other physical disabilities such as low muscle tone. Katie's disabilities do not fall under a specific, named condition.

4. Because of her disabilities, Katie requires assistance with performing daily tasks, such as making meals, transportation, managing her schedule, and maintaining personal hygiene

without reminders. My wife and I serve as the primary caretakers to Katie. She also receives some assistance from siblings, grandparents, and aides at one of her jobs.

5.  Katie has strong opinions, viewpoints, and preferences when it comes to voting. She understands the issues and candidates on the ballot and requires assistance to comprehend the logistical instructions of voting because of her disability. When Katie has voted in-person, she requires transportation to the polling place. It is possible that someone else may help Katie vote, but she would require assistance from someone she trusts to vote regardless.

6.  Katie requires extensive assistance to vote in-person. Katie has trouble comprehending written instructions, making it near impossible for her to identify which line to stand in, what portions of the ballot to mark, and how to mark a ballot to be read by the machine without assistance. Each time Katie has voted, my wife or I have explained written instructions on the ballot and helped Katie fill out portions of the ballot, and turn in her ballot. My wife and I also helped her understand the platforms of candidates and the significance of ballot propositions.

7.  In the November 2022 Election, I became aware of the possibility of using curbside voting only because I saw curbside voting signs at our polling place when I went to vote early. Neither Katie nor any member of my family received any communication about the opportunity for Katie to use curbside voting, or the process for us to request any other accommodation for Katie to vote. Likewise, neither my wife nor I received any notice prior to the November 2022 Election about the requirements of someone assisting a voter with a disability or the oath we would have to sign to assist Katie.

DocuSign Envelope ID: 548EC951-51F0-492A-982B-C92E521C0343

8.  In the November 2022 Election, I drove Katie to our polling place so that she could vote using curbside voting. I explained to her how she could vote while remaining in the car. A poll worker brought an electronic voting machine to our car window, and Katie voted by selecting candidates on the machine.

9.  It is important that Katie is able to vote in-person with the assistance she requires and with sufficient privacy so that she does not feel intimidated. Voting in-person is a more meaningful experience than voting by mail, and voting in-person helps her understand the importance of her vote and her impact on the local community. I am concerned that the new restrictions on assistance imposed by SB 1 will prevent Katie from receiving the assistance she needs to exercise her right to vote, which is deeply important to her. Whether Katie votes inside a polling place or curbside at a polling place, I am concerned about her opportunity to vote being denied.

10. I am particularly worried about losing the option for Katie to use curbside voting. Because of her disability, it is difficult for Katie to wait in line and concentrate if others are nearby focusing on her voting process and the assistance my wife or I provide to her. Given that we did not receive any information about the opportunity to use curbside voting in the last election, I am worried that Katie may not have access to curbside voting in future elections and that the requirements of SB 1 would make it difficult for her to vote in a polling location with the assistance she needs. Because Katie voted curbside in the November 2022 Election, she did not require as much assistance had she voted inside the polling location. I am concerned in future elections that Katie may require more extensive assistance and that her and the person assisting her will be under intense scrutiny.

DocuSign Envelope ID: 548EC954-51F0-492A-A8D8-C92F8221C0343

11. In the November 2022 Election, I signed an oath to assist Katie. As her father, I am willing to put myself at risk of penalty of perjury to ensure Katie can exercise her right to vote, which is so important to her. But I do not believe I should be threatened with criminal penalties for helping my daughter with disabilities vote, and I would not want someone else to be put in that position.

12. I am also worried more broadly about the barriers created by SB 1 for people with disabilities who need assistance to vote, like my daughter. I fear that new restrictions, including those in SB 1, make it confusing and difficult for voters with disabilities to receive the assistance they need and for assistors to provide assistance without fear of an invasion of their privacy by poll workers and potential legal liability. It is already more difficult for my daughter and other voters with disabilities to vote, and I worry that the barriers to the franchise created by SB 1 will decrease the participation of people with disabilities in the electoral process. If people with disabilities are excluded from elections because it is too difficult to vote, then I fear elected officials will have few incentives to pass laws benefitting people with disabilities and fight for the rights of people like my daughter.

13. My daughter and other voters with disabilities deserve the same opportunity to vote by private ballot as all other voters do. SB 1 threatens their fundamental right to vote and progress towards full equality for people with disabilities in Texas.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct. Executed on ___June 23, 2023 | 10:51 AM PDT___, at Travis County, Texas.

DocuSigned by:

*Marc Spier*

0E21AF8331744CE...

Marc Spier

4

# EXHIBIT 20

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | |
| Plaintiffs, | |
| v. | Civ. Act. No. 5:21-cv-844 (XR) (consolidated cases) |
| GREGORY W. ABBOTT, et al., | |
| Defendants. | |

**DECLARATION OF JODI LYDIA NUNEZ LANDRY**

My name is Jodi Lydia Nunez Landry. I am over the age of 21 and fully competent to make this declaration.  Under penalty of perjury, I declare the following based upon my personal knowledge:

1. I am a 53-year-old woman who currently lives in Harris County, Texas. I registered to vote for the first time in Ohio after I turned 18 and sometime before the 1992 presidential election, which was the first election I voted in.

2. In 1992, I was a registered voter in the Akron, Ohio metro area where I lived. Shortly thereafter, I moved to Wooster, in Wayne County, Ohio, and updated my voter registration. I lived there until 1996.

3. In 1996, I moved out of Ohio to live in Harris County, Texas. Since my move to Texas, I have registered to vote in Texas, and in Harris County. I have been continually registered to vote in Harris County, Texas since 1996.

4. Voting is important to me. I have voted in every presidential election since 1992 and most other local and state elections since then. I try to encourage others with disabilities to get

out and exercise their right to vote by posting pictures of myself after I have voted on social media.

5.  I am a member of REV UP Texas and The Arc of Texas and am involved in The Arc of Texas' Partners in Disability Leadership.

6.  I am also an active participant in the Texas Disability Issues Forum to encourage voter turnout amongst people with disabilities.

7.  I have Muscular Dystrophy. This is a disability that substantially limits several major life activities. My Muscular Dystrophy substantially limits my mobility (including walking, standing, lifting, and bending), ability to complete my activities of daily living (ADLs) necessary to care for myself, and my breathing while I sleep. I am on a BIPAP breathing machine during the night while I sleep. I can only stand with assistance briefly, to transfer from one chair to another for example. I can only lift my arms on my own for a short period of time as well. I cannot drive. My condition also causes me to often feel lethargic.

8.  Because of my Muscular Dystrophy, I require assistance for any gross motor skills that require strength. For example, I cannot grasp a jar of pickles and unscrew the top of the jar. However, I can perform some fine motor skills like sewing, crocheting and pressing the buttons on my remote control for my TV. Because of my Muscular Dystrophy, I do need assistance from caregivers the majority of the time to perform essentially all activities of daily living including cooking, dressing, and bathing.

9.  During the COVID-19 pandemic, I followed recommendations from the CDC and organizations for people with neuromuscular conditions and I did not leave the house at all for over a year because I am at "high risk" for severe reactions to the virus.

10. The only time I voted by mail was during the November 2020 Presidential Election due to the Covid-19 pandemic. I have always voted in person and prefer to do so. The new ID requirements imposed by SB 1 and all the news about how many more absentee ballots have been rejected since SB 1 was enacted have made me lose trust in the vote-by-mail system. I am afraid and nervous to vote by mail. I don't have faith that my vote will be counted. I am too concerned that my ballot will be rejected for one reason or another.

11. When I vote in person, I need someone to drive me to the polling station. I use a power wheelchair, and when I am in the voting booth it can be arduous to use the touch screen or feed paper into the machine, for those that require paper. Even accessible machines with remotes can be difficult for me to use. It is also difficult to predict when I will experience muscle fatigue that would prevent me from using a touch screen or a remote. As a result, I have frequently needed assistance to use the touch screen or feed paper into the machine.

12. I voted in person during the March 2022 primary elections. My partner drove my accessible van to our polling location, the Bay Area Community Center at Clear Lake Park. I used my power wheelchair to get to the entrance. My partner also went as he was going to vote as well. I am able to provide the poll worker with my ID and sign as needed. The poll worker assumed I needed the accessible voting machine so they directed me to it. I asked the friendly poll worker to assist me by inserting the paper with my voting number into the voting machine. The poll worker told me to let her know if I needed any additional assistance. I didn't ask for further help because I would have preferred someone I trust to assist me, like my partner. I did not see the accessible remote feature attached to the machine, so I had to lift my arms to vote on the actual machine. This also required that I lean out of my chair to press the touchscreen with some force to make my selections. While

DocuSign Envelope ID: FA936A38-A421-44C1-B39E-B8EA4631425E

voting, my arms grew tired and weak as I tabbed through the many screens that encompassed the long ballot. I had to take several breaks. Ultimately, I had to hold up my right arm with my left arm to give me extra support so that I could finish voting. I finished the ballot and I put my ballot in the ballot box myself. The process took me longer and was more difficult than it would have been had I received assistance.

13. In November 2022 I also voted in person. This time, I was able to use the accessible remote attached to the machine. I used the remote instead of the touch screen, but each time I thought I made a selection with the remote, it would jump back to the beginning screen. I called a poll worker for assistance. I didn't want to do so because I like to vote in private, but I was afraid my selections wouldn't be counted. The poll worker, however, had never been trained to use the remote and was also having trouble with the machine. The poll worker had to call over two other poll workers to address the situation which took a significant amount of time (?). Eventually, I was able to make all the proper selections and print out my ballot successfully, but I had two poll workers watching me vote and the process took far longer than it should have d have which made the overall process more difficult. I appreciate poll workers and the work they do, but I prefer to vote in private or with someone who I chose to assist me, like my partner. If it weren't for SB 1, I would have asked my partner to help me because he helps me with most other activities, like dressing, driving, and going to the grocery store. It would have made this process easier, less stressful, and more private. However, because of SB 1's new requirements, including the requirement for assistors to sign an oath and provide personal information, I am nervous about asking my partner to assist me because he may be targeted with criminal liability simply for assisting me. Even if the assistance he is providing is lawful under SB 1, the law

is very confusing and I would never want to risk exposing anyone to criminal liability, which prevents me from getting the assistance I need from the person of my choice.

14. During both elections in 2022, I was not given any information about my rights under the Americans with Disabilities Act. There was no sign that gave me information about my option to request an accommodation. There was no sign that gave me information about who I could contact to get an accommodation.

15. Because my disability is degenerative, it is unlikely that I will be able to sign in at the polling location and complete my own ballot for much longer. It will be more difficult to insert paper into a voting machine or do anything that requires writing, such as completing a mail-in ballot, as sometimes my handwriting is illegible. I will likely need the assistance of a personal care attendant in the near future. If an attendant is unwilling to assist me with voting, I will be prevented from voting.  Many personal care attendants are low wage workers of color and they may be afraid to assist me for fear of being accused of doing something illegal. I wouldn't want to put them at risk or risk losing them as a personal care attendant. I also want to be able to choose who I want to assist me, as assistance is most effective from someone who is familiar with and understands my needs I don't want to have to use a poll worker to help me vote because it is important to me to vote with privacy. I want to be able to choose someone who I can trust, but I am very concerned that they will be afraid to help me. My partner has assisted me in the past, but he will not always be available to assist me in the future, so I need to have the freedom to choose who will assist me.

16. I want to be able to vote like everyone else. I would prefer for my partner to assist me, but the process for securing assistance at the polling location makes me nervous which means

that I was not able to vote with the assistor of my choice in the November election. There are now many questions asked and a lot of information needed from an assistor. I don't want to draw more attention to myself when I am voting or raise any suspicions, especially because I already feel threatened when I vote in my area. It's also difficult for me to understand what is and isn't allowed because there is a lot of misinformation and a lack of clarity around this new law. At no point did I receive any information from the County or State regarding my rights as a voter with a disability or how to request a reasonable modification or file a grievance during the voting process.

17. As a person with a disability, I already face significant barriers to vote and SB 1 has added additional barriers to my right to vote. I am very disappointed that the Texas legislature is making it even harder for people with disabilities like me to vote instead of making it more accessible for us.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct. Executed on _____, at Harris County, Texas.

June 22, 2023 | 3:54 PM PDT

DocuSigned by:

1C89A3D4EE5A4DE

Jodi Lydia Nunez Landry

6

# EXHIBIT 21

DocuSign Envelope ID: 42E89393-3420-4CB6-A824-ADD5BDF429B7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNIÓN DEL PUEBLO ENTERO, et al.,

Plaintiffs,

v.

GREGORY W. ABBOTT, et al.,

Defendants.

Civil Action No. 5:21-cv-844 (XR)
(consolidated cases)

## DECLARATION OF LAURA HALVORSON

My name is Laura Halvorson. I am over the age of 21 and fully competent to make this declaration.  Under penalty of perjury, I declare the following based upon my personal knowledge:

1.      I am a 39-year-old woman who currently lives in Bexar County, Texas. I registered to vote for the first time after I turned 18 and sometime before the 2004 presidential election in which I voted.

2.      Between 2004 and 2014, I was a registered voter in the Dallas metro area where I lived.  During this decade, I lived at times in Dallas, Denton, and Collin counties and updated my registration to ensure I could vote each time after I moved.

3.      In 2015, I moved out of state and updated my registration to Virginia.  When I returned to Texas at the end of 2019, I registered to vote again in Texas, this time in Bexar County.  I have been continually registered to vote in Bexar County, Texas since 2019.

4.      Voting is important to me. I have voted in every presidential election since 2004 and most other local and state elections since then.

1

DocuSign Envelope ID: 42E89393-3420-4CB6-A824-ADD5BDF429B7

5.      I am a member of REVUP Texas ("REVUP") and The Arc of Texas.

6.      From talking to members of REVUP, I learned that Texas has some of the lowest voter turnout in the nation. In 2014, I was Ms. Wheelchair Texas and I made voting part of my platform that year. I have stayed involved with REVUP since then, including participating with the REVUP Virginia chapter while I lived there.  When I returned to Texas in 2019, I resumed my membership with REVUP Texas.

7.      I was a member of the National Council on Independent Living's Voting Rights Committee from 2016-2020 and had extensive social media engagement during this time with #CripTheVote to encourage voter turnout amongst people with disabilities.

8.      I have several disabilities that substantially limit several major life activities. I have a very progressive form of Muscular Dystrophy that substantially limits my mobility (including walking, standing, lifting, and bending), ability to complete my activities of daily living (ADLs) necessary to care for myself, and my breathing. I am on a BIPAP breathing machine 24 hours a day, require attendant care for 90% of my ADLs, and use a power wheelchair for all mobility. My conditions also cause me severe pain.

9.      Because of my Muscular Dystrophy, I require assistance for all gross motor skills like reaching for objects, grasping/holding objects, and pressing buttons. Because of my disabilities, I require what is known as "total care" from caregivers with essentially all activities of daily living including cooking, dressing, and bathing.

10.     I also have to have someone with me at all times because my chronic neuromuscular respiratory failure requires use of a BIPAP Ventilator 24 hours a day, 7 days a week, and if it became unplugged or unhooked, I could not survive more than a few minutes. I have been on my BIPAP Ventilator full time since about March 2017.

DocuSign Envelope ID: 42E89398-3420-4CB6-AB24-ADD6BDF439B7

11.     Because of my chronic neuromuscular respiratory failure, even a mild cough can quickly become serious and possibly fatal. As a result, during the COVID-19 pandemic, my medical providers have advised me to avoid public spaces and crowds, and this is still their advice for me due to my high risk, even as many others have resumed "normal" life without the precautions many took during the height of the pandemic.

12.     How I have voted has changed over time as my Muscular Dystrophy has progressed and the pandemic also changed my method of voting. In 2004 – 2014, when I was voting in the Dallas metro area, I typically voted early in person. During one of the last elections, poll workers did adjust the voting screen so that I could reach it and mark my vote.

13.     In Virginia, I typically voted curbside during early voting. During the one or two times I went inside a polling place in person, poll workers brought me to the front of the line so I did not have to wait, and I was given a paper ballot which I could mark without assistance. Since that time, my disabilities have progressed and marking a paper ballot without assistance is painful and difficult.

14.     Since I returned to Texas, I have voted in Bexar County. I voted in the 2020 presidential primaries in person during early voting. I required total assistance from my personal care attendant. They drove me to the polling place, helped me get out of my wheelchair accessible van, and put on a mask to protect me from COVID-19 because I could not lift my hands to do these activities for myself. While I am able to move my powerchair myself, they had to open doors for me to enter the building. I waited in a very short line and when it was my turn, I approached the poll worker. My personal care attendant then had to remove my Texas ID from my wallet and give it to the poll worker who confirmed my voter registration.

15.     The poll worker administered the oath to my personal care attendant. The poll worker then gave my attendant the number to input into the voting machine since I could not lift my hands to take the number. Because I could not lift my hands or press the button on the voting machine, my personal care attendant input my number into the machine and then marked who I told her I wanted to vote for. When the voting machine printed my ballot, I was not able to grasp the ballot myself so my personal care attendant had to take my ballot and cross the room with me to deposit it into the ballot box.

16.     By the time of the next election, COVID-19 cases were significantly higher and the lines were very long, even during early voting, so I used curbside vote during the November 2020 election in Bexar County. My boyfriend drove me to the polling place because I could not because of my disabilities. When we arrived, I called for curbside voting. After about twenty minutes, a poll worker came outside and my boyfriend got out my ID and gave it to the poll worker since I did not have the motor function to get out my ID or hand it to the worker. They returned with a form for my boyfriend to complete and administered the oath to him so that he could assist me with voting. The poll worker than handed the voting tablet to my boyfriend. I did not have the ability to press the screen so I told my boyfriend who I wanted to vote for and he pressed the screen for me.

17.     I curbside voted again in Bexar County during a 2021 local election. My boyfriend drove me again and had to assist me in much the same way—he had to get out my ID and give it to the poll worker and also had to hold the tablet and press buttons for me to designate who I wanted to vote for since I could not do so because of my disabilities.

18.     I had applied to vote by mail as a person with a disability after my return to Texas in 2020 because I was not sure what would happen with COVID and with my disabilities,

DocuSign Envelope ID: 42E89398-3420-4CB6-AB21-ADD6BDF429B7

and I did not know how crowded the polling places would be.  Since I was able to vote curbside in the 2020 elections, I had not tried to vote by mail-in ballot until this year.

19.     I voted by mail-in ballot during the March 2022 primary elections. My personal care attendants check and bring in my mail for me and one of them brought in my ballot. At the time, the assistor's oath still limited assistance to reading the ballot, marking the ballot, or directing me to do those things. My personal care attendant was not willing to assist me with opening or marking my ballot—as a green card holder, she was unwilling to take the oath to assist me (in person or by mail) because she was afraid of the threat of criminal prosecution and the impact on her legal status. Because she was not able to help me, I had to open and mark the ballot myself. Because of my disabilities, it took me four different times to mark my ballot—I could only hold the pen for short periods of time without my hand cramping and it also took a lot of energy and time to turn the ballot around on my table to position it so that I could fill in the bubble for who I wanted to vote for. After about ten minutes during which I would mark a few candidates, I would have to rest for about thirty minutes before I could try to hold a pen and mark the ballot again. All in all, it was very difficult for me to vote and the process was ultimately spread across two days.

20.     Similarly, it took me a lot of time to complete the information on the envelope and seal the envelope. Because of my gross motor difficulties, my signature changes day-to-day and my handwriting when printing can become difficult to read. Because of this, I was afraid my ballot would be rejected for not having the correct ID number. I also had great difficulty pressing hard enough to sign over the envelope flap.

21.     I submitted my mail-in ballot before the due date and it was shown as received on February 26 on the Secretary of State's website; however, it was not marked as accepted until well after the election when I looked online at the time. If there had been a problem with my ballot – like if I had transposed numbers in my Texas ID number, my handwriting had been illegible, or I hadn't been able to press hard enough for the signature on the envelope flap, I would not have been able to correct my ballot and my vote would have been thrown out.

22.     Because of how long it took to process my March 2022 primary mail-in ballot, I do not trust voting by mail because if I am unable to mark the ballot hard enough with the pen or transpose two numbers in my ID, I would not be notified with enough time to be able to correct my ballot or early vote in person, which means I would not get to vote at all.

23.     Because of my experience in March 2022, I voted in person in November 2022 during the general election so that I could be sure my vote counted. Before the November election, I spent several hours over the course of several days researching the voting machines available in Bexar County, including watching instructional videos and emailing elections officials to try to confirm availability of remotes for the voting machines. When I did not get an answer to my email, my father went to my polling place a few days before I did to confirm they had the devices I needed to vote.

24.     When I arrived at my polling place, I went to the sign-in table, which was so crowded that there were people hovering over me, not wearing masks. Voting in person put my health at risk—my personal care attendant and I were the only ones wearing masks. This is one of the only public places I have gone since mid-2020 other than a medical office or pharmacy.

25.     I surrendered my mail-in ballot and handed over my ID.  After I received my ballot, my personal care attendant accompanied me to the machine. Though it is my understanding that the oath for assistors is no longer so limited, I was still uncomfortable placing my attendant, who is a woman of color, in that position given that there is so much confusion around the law, so I did not ask for her assistance other than for her to monitor my ventilator in case there were any issues with it.

26.     The poll worker brought me over to the machine and plugged in the remote so that I could vote. I started to operate the remote and it was not working—the directions were reversed from what the buttons indicated (up was down, left was right, etc.). The poll worker did not know how to operate it and so was unable to help other than to ask if I was "pressing the buttons," which I was.

27.     Once I figured out the remote, which took several minutes, I came to the first name on the screen and discovered the font was so large that it cut off part of the candidate's name and their party. Most of the names on the ballot had at least part of the name or party designation cut off, making it hard to identify who I wanted to vote for and taking additional time.  Later I discovered this was likely because the large font feature had been turned on, even though I did not require a large font to read the ballot.

28.     On the summary screen, it was again very difficult to see my choices and confirm I'd voted for the candidates I wanted to vote for. After I had confirmed my choices, it took several additional minutes to figure out how to navigate with the remote to print my ballot.

29.     After my ballot printed, I took it across the room and adjusted the height and angle of my power wheelchair so that I could just barely reach the place to put my ballot into the ballot box. This also took several minutes.

30.     From the time I turned over my ID at the sign-in table to the time I submitted my ballot, it took over thirty minutes for me to vote in person.

34.     While I would like to vote by mail in the future, or have the option to do so when my health makes going in public more dangerous, I want to know that my ballot will be counted. My experience in March 2022 makes me worry my ballot will not be counted in the future and I will not know of errors until it is too late to fix them or to vote in person.

31.     As a person with a disability, I already face significant barriers to vote and SB 1 has already made it harder for me to vote in 2022 and will continue to make it harder for me to vote in the future. I am disappointed that the state is working to make elections *less* accessible for people like me.


This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct.  Executed on _____May 24, 2023 | 10:54 AM EDT_____, at Bexar County, Texas.

DocuSigned by:

*Laura Halvorson*
E1B80A01803B4A5...

Laura Halvorson

# EXHIBIT 22

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

<table>
<tr><td>

LA UNIÓN DEL PUEBLO ENTERO, et al.,

Plaintiffs,

v.

GREGORY W. ABBOTT, et al.,

Defendants.

</td><td>

Civil Action No. 5:21-cv-844 (XR)
(consolidated cases)

</td></tr>
</table>

## DECLARATION OF JENNIFER MARTINEZ

My name is Jennifer Martinez. I am over 21 years of age and fully competent to make this declaration. Under penalty of perjury, I declare the following based upon my personal knowledge:

**Background on The Arc of Texas**

1. I am the Chief Executive Officer (CEO) of The Arc of Texas. I have served as CEO since March 2019.

2. The Arc of Texas is a nonpartisan, non-profit, statewide advocacy, and membership organization located in Travis County, Texas.

3. In my role as Chief Executive Officer, I am responsible for overseeing The Arc of Texas' operations, including managing our staff and implementing our programs in collaboration with our local chapters across the state.

1

4. Since its founding in 1953, The Arc of Texas has worked to fulfill its mission of promoting, protecting, and advocating for the human rights and self-determination of Texans with intellectual and developmental disabilities (IDD).

5. The Arc of Texas has been instrumental in the creation of nearly every program, service, right, and benefit that is now available to more than half a million Texans with IDD.

6. The Arc of Texas works with and alongside people with IDD and their families to identify barriers and solutions to achieve inclusive education, competitive integrated employment, quality community-based services and supports, and access to civil rights and justice.

7. The Arc of Texas has over 7,400 individual members across the state and 24 local member chapters throughout the state.

8. Our members consist of people with IDD, their families, and their supporters. Our members receive monthly information from us about issues and advocacy opportunities relating to the IDD community. We ask that our members make a more proactive commitment to support our work and mission, including by engaging in advocacy, donating to support our work, participating in our committees, or undertaking other activities in support of our mission.

9. While The Arc of Texas has over 7,400 individual members, we reach and connect with even more people with IDD and their families through our trainings, advocacy, and outreach. Regardless of membership, The Arc of Texas' advocates for all Texans with IDD and their families across our state.

10. The Arc of Texas also has 24 local chapter members across the state of Texas. These chapters provide direct services to people with IDD and their families and advocate alongside The Arc of Texas for the rights of people with disabilities across the state.

11. The Arc of Texas' members with IDD drive our priorities and work. Our board consists of fourteen (14) people and in accordance with our by-laws the majority of our board members must be either a person with IDD or a family member of a person with IDD. Currently, our board consists of seven (7) family members of people with IDD, four (4) people with IDD, and three (3) community members with a connection to the IDD community, including a representative from one of our local Arc chapters.

12. To continue to achieve our mission, The Arc of Texas engages in public policy advocacy, conducts trainings, responds to communications from the public, and develops programs that promote, protect, and advocate for the self-determination and human rights of people with IDD.

13. The Arc of Texas' policy work is driven by our Policy Committee, which reports to our Board. The Policy Committee is chaired by a Board member and typically consists of roughly ten (10) people, including some Board members and advocates from across the state. Currently, the majority of our Policy Committee members are either people with IDD or family members of a person with IDD. The Policy Committee's role is to discuss systemic issues and complaints from advocates and determine if there are solutions, including legislative solutions. The Policy Committee recruits people to come to the Capitol to testify on important issues to the IDD community. During legislative session it also sends weekly messages to our members about what bills are being heard, how to testify, and how to contact local legislators. Our Director of Public Policy & Advocacy

typically attends these Policy Committee meetings and I typically join in my role as CEO. The Policy Committee meets at least monthly during legislative and usually quarterly thereafter.

14. Voting rights advocacy has always been a priority of The Arc of Texas. Voting rights are intertwined with all our advocacy efforts.

15. The Arc of Texas has participated in the Register, Educate, Vote—Use your Power ("REV UP") Texas program, a statewide volunteer coalition of advocacy organizations seeking to foster civic engagement and to protect the voting rights of Texans with disabilities, for years. The Arc of Texas also assists REV UP Texas with their social media outreach.

16. The Arc of Texas' members include voters who are eligible to vote by mail and who require assistance to vote.

17. The Arc of Texas participates in this action on behalf of its members who are qualified voters with disabilities across the state pursuant to the Americans with Disabilities Act.

**The Arc of Texas's Activities Before Senate Bill (S.B.) 1**

18. The Arc of Texas has four (4) public policy priorities, which include supported employment, inclusive education, ensuring quality community supports, and civil rights and justice. Our programs are directly attributable to these policy priorities.

19. Before S.B. 1, each of our policy staff generally focused on specific priorities. We had one staff member focusing on criminal justice issues, another on voting, one on community services, and another on inclusive education and supported employment.

20. Some of our programs include the Partners in Disability Leadership program, which equips professionals with information, leadership skills, and connections to influence

positive change in IDD services and support systems; The Whole Person Project, which seeks to expand access to quality mental health services for adult Texans with IDD, and our Tour of Texas program, where we visit and connect with our local chapters.

21. The issue of voting rights is tied to our priority on civil rights and justice. Historically, our voting rights work involved voter education and outreach efforts. We provided information on how to vote successfully and educated our members about relevant issues to the IDD community. Since many of our members have IDD, we focused on providing plain language resources to our members on these issues and how to respond so that they could effectively speak out for their rights before state agencies and the Texas legislature.

22. Prior to S.B. 1, The Arc of Texas provided trainings and conducted outreach, including on social media, about how to register to vote, how to receive assistance voting, how to contact Disability Rights Texas if someone had questions about their right to an accommodation to vote, and how to access the election protection hotline. Many of our chapters directly assisted people with disabilities in registering to vote, educated their members on where and how to vote, and provided transportation to polling places and other assistance.

23. Our Policy Committee raised S.B. 1 as a critical issue facing the IDD community and recommended that we engage in advocacy to combat the barriers to voting it creates for people with disabilities. We typically will not move forward with advocacy on an issue unless our Policy Committee has recommended that we do so.

24. In 2021, The Arc of Texas worked to educate legislators on provisions of S.B. 1 that were harmful to the IDD community. We sent out multiple action alerts to our members

to inform them of how S.B. 1 would deny equal access to the disability community. We met with legislators to share our concerns and submitted written testimony and oral testimony in opposition to these bills. Several of our members sought to testify in opposition to these bills but were unable to do so given that the Texas legislature did not allow for remote testimony during COVID-19.

**Impact of S.B. 1 on The Arc of Texas' Members**

25. S.B. 1 created barriers that significantly burden people with IDD's ability to vote.

26. While The Arc of Texas is a statewide advocacy organization focused on state legislative advocacy rather than direct services, we occasionally receive individual requests for assistance. We have received questions from people with IDD and their families about voting due to S.B. 1 and have referred those questions to Disability Rights Texas.

27. During our outreach, training, and our Policy Committee meetings, our members and chapters have raised concerns about these changes to the law and the barriers to voting they create for people with disabilities, especially people with IDD. These concerns include:

    a. That changes to the law which require people to match identification numbers on their application to the identification numbers provided for their initial voter registration are difficult for people with IDD to comply with.

        i. Many of our members qualify for and rely on voting by mail to cast their votes in elections because of challenges associated with voting in person. People with IDD often lack access to reliable transportation to vote in-person. People with IDD also rely on direct support professionals to help

them complete basic activities of daily living, like eating, bathing, dressing, and navigating the community. Coordinating both transportation and direct support care to vote in-person is difficult for many people with IDD. Even if this coordination is feasible, polling places may be inaccessible. For example, a person with Autism may have a difficult time waiting in line to vote due to their disability and be unable to access curbside voting because they do not have a physical disability. Thus, for many of our members and those in the community we serve, voting by mail is their only feasible option to vote. The provisions of S. B. 1 that make voting by mail more difficult will force many of these individuals to vote in person despite the burdens described above.

ii. People with IDD, by nature of their disabilities, have more difficulty correctly filling out and completing their ballots independently. As an example, a person with an intellectual disability, by nature of their disability, may have difficulty with comprehension, recall, and memory. As a result, they may not remember which number they provided on their initial voter registration, so that they can correctly complete their ballot.

iii. Moreover, some people with IDD live in congregate facilities, like nursing and assisted living facilities. Unfortunately, given the lack of access to community-based services, more and more people with IDD are being institutionalized in these facilities. In these situations, people with IDD may not have access to their identification cards to provide the correct numbers for their ballot. Without their identification cards, people with

IDD are unable to complete their applications to vote by mail and their ballots.

    iv.   This change coupled with the criminalization of certain forms of assistance has severely burdened people with IDD's ability to vote.

    v.   As other witness declarations summarize, in the wake of S.B. 1, members of The Arc have had their ballots rejected based on their inability to provide correct numbers. Some were unable to cure their ballots in time for the election, forcing them to go to great lengths to vote in person, or simply not have their vote count.

b.   That S.B. 1 has made it harder for people with disabilities to vote because it requires that anyone who assists a voter with a ballot provide their contact information and sign an oath limiting the scope of their assistance to specific tasks.

    i.   People with IDD rely on the support of direct support professionals to access community services and programs, including voting. There is currently a workforce shortage in Texas and across the country for direct support professionals. Many people with IDD are unable to secure sufficient staffing, which places them at risk of institutionalization. Often direct support professionals are low-paid jobs typically held by people of color. People with IDD already had difficulty finding a direct support professional to help them vote prior to the passage of S.B. 1. Now S.B. 1 adds an additional burden that they must find someone who is willing to sign an oath and potentially expose themselves to criminal penalties if

they inadvertently provide unauthorized assistance. Our direct support professionals work so hard but are severely undervalued and underpaid – the threat of criminal penalties when they are simply doing their job assisting people with disabilities with voting is an unacceptable risk.

ii. Moreover, many people with IDD require assistance that is outside the scope of the authorized activities detailed in the oath. For example, a person with IDD may require cueing to recall a conversation where they indicated whether or why they wanted to vote for a particular candidate or provision. Cueing is not mentioned as an authorized means of assistance in the oath, meaning that an assistor who provides this support could face criminal penalties.

iii. As other witness declarations summarize, members of The Arc have had difficulty locating assistors who are willing to help them vote. As a result of S.B. 1 they have had to go to great lengths, and in some cases, physical discomfort to vote independently so as not require their direct support staff to help.

**Impact of S.B. 1 on The Arc of Texas' Activities**

28. S.B. 1 has made it more difficult for The Arc of Texas to carry out our civil engagement mission of advancing the rights and self-determination of people with IDD.

29. The Arc of Texas already has limited resources. We have had to expend more time, money, and resources on our efforts to educate and assist voters and have had to divert resources from other priorities to do this work.

30. As a result of S.B. 1 we spent extensive time educating ourselves about the impact of S.B. 1 on people with IDD so that we could, in turn, educate our members and the community that we serve about the changes. At our community's request, we have conducted trainings to ensure that people with IDD, their advocates, and our chapters, better understood these changes and can comply with the law. As a result, we had to develop new training and outreach materials to educate people in the disability community about this law.

31. Due to S.B. 1, our staff's time needed to be reallocated from other projects to work on S.B. 1 education. As an example, our staff who worked on criminal justice and education and employment issues needed to dramatically decrease their work in those areas and take on voting rights work. The staff who works on our communications needed to reallocate significant time to respond to the increased outreach and activities we were engaged in because of S.B. 1

32. In the wake of S.B. 1, The Arc of Texas has shifted allocations from our other priorities to focus on voting. There are many time-sensitive issues and advocacy areas that we have not been able to devote sufficient resources to due to S.B. 1. Some of these initiatives include:

   a. Inclusive education: Recently, due to the COVID-19 pandemic, the number of children who do not have access to the assessments that they need to receive IDD supports and services has reached a crisis level. There also has been more attention on restraint and seclusion of children with disabilities in schools. Now is a pivotal time for advocacy on both issues; however, we have not been able to

devote sufficient resources to staff these policy issues due to our need to focus on the impacts of S.B. 1.

    b.   Criminal Justice: Our staff who currently works on criminal justice issues has needed to limit his time working in this area to provide support on voting rights.

    c.   Supported Employment: Many people with IDD rely on support to access inclusive jobs in the community. While we would like to have the opportunity to work more with the Texas Work Force Commission and other community partners on this issue, we do not have the resources to do so at this issue due to S.B. 1.

33. If provisions of S.B. 1 that discriminate against The Arc's members and people with disabilities across the state of Texas were to be enjoined, we would have more capacity to return to our mission-critical work of ensuring Texans with IDD can be fully included in the community, with access to quality supports, inclusive education, and integrated employment.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 20th day of June, 2023, at Austin, Texas.

_Jennifer Martinez_

_____

Jennifer Martinez

# EXHIBIT 23

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

<table>
<tr><td>

LA UNIÓN DEL PUEBLO ENTERO, et al.,

Plaintiffs,

v.

GREGORY W. ABBOTT, et al.,

Defendants.

</td><td>

Civil Action No. 5:21-cv-844 (XR)
(consolidated cases)

</td></tr>
</table>

## SUPPLEMENTAL DECLARATION OF BOB KAFKA

My name is Bob Kafka. I am over the age of 21 and fully competent to make this declaration. I previously submitted a declaration in this case. *See* ECF 611-1, Ex. 41. The facts in my first declaration remain true and this second declaration is intended only to supplement the first, which is incorporated by reference here. Some of the facts set out in the first declaration are repeated here for ease of reading. Under penalty of perjury, I declare the following based on my personal knowledge:

1.      I am the coordinator of REVUP-Texas ("REVUP"), as well as one of three Board members.

2.      REVUP stands for Register, Educate, Vote, Use Power.

3.      REVUP is a statewide, non-partisan, nonprofit grassroots organization that was formed in 2015.

4.      REVUP is a member-based organization whose members are primarily individuals with disabilities.  REVUP currently has about 500 members spread out across Texas. REVUP members with disabilities participate in and help guide the direction of REVUP's efforts.

5.      REVUP's members include voters who are eligible to vote by mail.

6.      Since its inception, REVUP's mission has been to empower persons with disabilities through voter registration and assistance, issue advocacy, mobilization and organizing.  REVUP typically engages in a variety of advocacy efforts on behalf of its members, which includes supporting certain policies at local and state legislative bodies, as well as outreach to members to support these policies.  This advocacy involves outreach to its members and others in the disability community through in-person events and trainings.

7.      A primary focus of accomplishing REVUP's mission is registering persons with disabilities, and their allies, to vote. REVUP, therefore, spends significant time to get as many of these individuals registered to vote as it can.  A corollary focus is educating REVUP members and the broader disability community about issues that impact their lives.

8.      To further REVUP's mission to register persons with disabilities, REVUP participates in National Voter Registration Day, and National Disability Voter Registration Week, which is coordinated nationwide by the American Association of People with Disabilities.

9.      To further REVUP's mission to educate its members and the disability community about registering to vote and about issues that impact them, REVUP has a dedicated website, a podcast series entitled "Use Your Power," and a presence on social media (e.g., Facebook, Instagram, and Twitter).

10.     REVUP also produces PSAs to educate and inform its members and the broader disability community about voter registration and issues that impact their lives.

11.     SB 1's passage, however, forced REVUP to shift its focus away from its established voter registration and education efforts and instead focus on educating voters about SB 1's changes to the mail-in-voting process, changes that place new barriers on getting a mail-in ballot.

12.     Prior to SB 1's enactment, REVUP's plans were to devote substantial time and resources on educating its members and the disability community about issues that affect their lives.  Instead, much time and resources were diverted to producing and disseminating podcasts and informational materials focused on SB 1, including changes and barriers in the new vote-by-mail process.

13.     Educating REVUP's members and others about the risks of improper rejection of a mail-in ballot hampers REVUP's mission of expanding voter registration and increasing voter turnout of persons with disabilities.

14.     REVUP has very limited resources—members do not pay dues—so that time and resources spent producing and disseminating informational materials and podcasts, answering calls and emails, and updating its website to explain the changes and barriers to mail-in-voting, are resources it would otherwise spend elsewhere.

15.     REVUP's voter registration and get out the vote efforts, as well as its goal of empowering the disability community to become a constituency, are undercut when persons with disabilities vote –by mail but have their ballots or applications rejected due to an immaterial identification issue.

16.     Because of SB 1 and its changes to the mail-in voting process, REVUP has had to expend some of its extremely limited financial resources on getting its website updated and for American Sign Language interpreters for its SB 1 podcasts and trainings.

17.     Unless and until SB 1's vote-by-mail requirements are changed, REVUP's voter registration and get out the vote efforts and its policy advocacy will continue to suffer because REVUP will need to continue to spend time and resources educating and warning its members about these onerous and immaterial requirements.

18.     REV UP continues to have concerns and diverts resources to address voter assistance restrictions imposed by SB 1. Because SB 1 also imposes criminal penalties for receiving assistance to vote by mail, REV UP is concerned about these restrictions making it harder for persons with disabilities to vote who do not rely on attendants and caregivers, but rather friends who they would need to compensate for their time helping them vote by mail. REV UP also remains concerned about the oath assistors must make under penalty of perjury and the deterring effect this has on assistors and individuals with disabilities not wanting to expose their assistors to an oath.

19.     In the past year, REV UP has had to continue to divert its outreach and  office time  to continue to answer questions about the assistor requirements and penalties imposed by SB 1 as there remains much confusion in the disability voting community. This has taken time away from REV UP's core mission of voter registration and trying to reach new populations so that individuals with disabilities can become registered and vote for the first time.

20.     Additionally, REV UP hosts and will continue to host monthly  meetings of its 10 regional coordinators. The monthly sessions will focus on  issues facing the organization, share information with, and collect feedback from our regional coordinators. While REV UP would want to focus all or most of the session on our core mission of voter registration, we will, unfortunately, need to re-direct and arrange for several portions of these sessions to be devoted to mail-in voting and voter assistance restrictions imposed by SB 1.


This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct.  Executed on _____, at Austin, Texas.

June 16, 2023 | 2:19 PM CDT

DocuSigned by:

*Bob Kafka*

17C999BCDC824AC...

Bob Kafka

# EXHIBIT 24

The Wayback Machine - https://web.archive.org/web/20220124191312/https://www.sos.texas.gov/election…



Note - Navigational menus along with other non-content related elements have been removed for your convenience. Thank you for visiting us online.

# Help America Vote Act (HAVA)



## Help America Vote Act of 2002

On October 29, 2002, President Bush signed HR 3295, the Help America Vote Act ("HAVA"). This federal legislation was in response to the voting irregularities experienced during the 2000 federal election and created many new mandates for state and local governments. The statute authorized approximately $3.86 billion in federal funding to help states meet the mandates imposed by HAVA. The primary allegations of voting irregularities experienced during the 2000 federal election concerned votes not being properly counted and voters being erroneously omitted from voter registration rolls, which resulted in eligible voters being turned away from the polls. Texas used its HAVA grants from the Federal government for the counties to purchase compliant voting systems and for the state to purchase and maintain a compliant electronic voter registration database as well as create a voter education program, VoteTexas.

## HAVA Election Security Grant Funding

On Friday, March 23, 2018, President Donald J. Trump signed the Consolidated Appropriations Act of 2018 into law. The Act included $380 million in grants, made available to states to improve the administration of elections for Federal office, including to enhance technology and make certain election security improvements.  Texas received $23.3 million and the legislature appropriated a five percent match of just over $1.1 million.  Congress specified that this election improvement money should be spent to improve the

security of elections.  Texas is spending two to three million at the state level to improve the security of the voter registration database and other election systems including the candidate filing and election night reporting system.  The remainder of the money is allocated to the counties to improve the security of their election systems. On December 20, 2019, President Donald J. Trump signed the Consolidated Appropriations Act of 2020 into law. The Act includes $425 million in new Help America Vote Act (HAVA) funds (PDF), made available to states to improve the administration of elections for Federal office, including to enhance technology and make election security improvements.  Texas is slated to receive $26,064,574, which will require 20% match totaling $5,212,915.

# EXHIBIT 25



# Help America Vote Act (HAVA) Update
## Texas Association of Counties
## Legislative Conference





# Texas Secretary of State

# Federal Awards

## Approx. $85MM Total

2020 HAVA CARES Act Grant - $24,546,840*

2018 HAVA Election Security Grant - $23,252,604**

2020 HAVA Election Security Grant - $26,064,574***

*Requires 20% match totaling $4,909,368
**Requires 5% match totaling $1,162,630
***Requires 20% match totaling $5,212,915



# Sub-grants to Counties

**GRANT AGREEMENTS**

**Federal Portion**

**Required Match**

**2020 HAVA CARES Act Grant**

Awarded based on 2020 Chapter 19 allocations (voter registration statistics)

20%
May use 2020 Chapter 19 funds or county funds

**HAVA Election Security Grant**

$120,000

(Federal Amount - $40,000)

* 20%





# Grant Periods

| GRANT AGREEMENTS | Grant Period Start Date | Grant Period End Date |
|---|---|---|
| 2020 HAVA CARES Act Grant | 3/28/2020 | 11/30/2020 |
| HAVA Election Security Grant | 12/21/2019 | 12/31/2021 |



# County Participation as of 8/27/2020



Texas Secretary of State


# Texas Secretary of State

# Dollar Status as of 8/27/2020

| Funding Source | Maximum Amount | Requested |
|----------------|---------------:|----------:|
| HAVA CARES Act Federal | $23,926,389 | $23,499,156 |
| HAVA CARES Act Match | $4,785,278 | $4,700,127 |
| HAVA Election Security Federal Funds | $30,480,000 | $9,843,153 |
| HAVA Election Security Match | $4,064,000 | $1,244,242 |
| | | |
| **TOTAL** | **$63,255,667** | **$39,286,677** |
| | | |
| **HAVA CARES Act Match** | | **Requested** |
| Chapter 19 Funds | | $1,792,149 |
| County Funds | | $2,907,978 |

**Texas Secretary of State**

# Grant Process

| SOS sends grant award notice to County Judge via DocuSign |
| --- |



- Commissioners Court must pass resolution prior to agreement being signed by the judge
- Same resolution can be used for both grant award agreements

| SOS issues grants funds upon receipt of signed award agreement |
| --- |



- All necessary fields in award agreement must be completed
- Resolution must be attached
- Single Point of Contact (SPOC) must be identified

| SPOC submits reports upon SOS request |
| --- |

- Expenditure reports will be required on a periodic basis
- Unexpended funds, including interest, must be returned to SOS at the end of the grant period




Texas Secretary of State

# 2020 HAVA CARES Act Funding Purposes

| | |
|---|---|
| **Voting Processes** | Additional costs for printing and mailing ballots, ballot tracking software, high speed scanners, letter opening equipment, registration list activities to improve the accuracy and currency of registrant addresses |
| **Staffing** | Additional poll workers, election office staff diverted to pandemic response, temporary staff |
| **Security and Training** | Pre- and post-election cleaning of polling places, staff and poll worker training on prevention processes |
| **Communications** | Notifying public of voter registration requirements, ballot request options, precautions or voting procedures |
| **Supplies** | Additional laptops, mobile IT equipment, cleaning supplies, personal protective equipment (PPE) |



# HAVA Election Security Funding Purposes

| | |
|---|---|
| **Voting Equipment** | Upgrades and replacement equipment – must be HAVA-compliant and paper verifiable |
| **Election Auditing** | Costs to conduct review after polls close for the purpose of determining whether the votes were counted accurately |
| **Cyber Security** | Security enhancements to protect the election process (e.g., remediation from election security assessments) |
| **Communications** | Costs needed to communicate with the public regarding election security |
| **Voter Registration Systems** | Costs to enhance voter registration system security |

# General Eligibility

Allowable

Allocable

Reasonable and Necessary

- Must be consistent with federal and state law as well as terms and conditions of the grant

- Must be used exclusively for eligible activity under the grant or prorated

- Must be documented and justifiable



# Eligibility Questions to Ask?

## HAVA Cares Act

| Is it in response to COVID-19's impact on federal elections? | Is it outside of the county budget? | Is it consistent with all applicable federal and state law? |
|---|---|---|



## HAVA Election Security

| Is it in response to election security needs? | Is it outside of the county budget? | Is it consistent with all applicable federal and state law? |
|---|---|---|





# Texas Secretary of State

# Documentation (Mitigate Risk)

## Eligibility
- Document the need/ justification

## Allocability
- Document the amount (%) applicable to the grant

## Paper Trail
- Retain records, e.g., procurement, invoices, payment, etc.

## Inventory
- Inventory capital expenditures and higher risk items



# Receipt of Funds



Funds must be deposited into an interest-bearing account in a fund designated for HAVA



Interest earned and any net program income shall be retained and used for HAVA-allowable activities



Program income is defined as revenue received from a grant-supported activity during the grant period



# Program Income

**What is program income?**
- Income earned as a result of grant-funded activity (e.g., election services contracts)

**What should be reported?**
- Net income
- Income earned during the grant period

**How can program income be expended?**
- Activities consistent with the grant





# Financial Reporting





# Contact Election Funds Management

Dan Glotzer

Dglotzer@sos.texas.gov

Mary Eliasen

Meliasen@sos.texas.gov

Amanda Grossman

Agrossman@sos.texas.gov

EFMAdmin@sos.texas.gov  512-463-5966

# EXHIBIT 26

# The State of Texas



Elections Division
P.O. Box 12060
Austin, Texas 78711-2060
www.sos.state.tx.us

Phone: 512-463-5650
Fax: 512-475-2811
Dial 7-1-1 For Relay Services
(800) 252-VOTE (8683)

## Ruth R. Hughs
### Secretary of State

VIA E-Mail:  **CARESFunding@eac.gov**

May 14, 2020 (Original Request Dated April 14, 2020)

Mona Harrington, Acting Executive Director
U.S. Election Assistance Commission
1335 East-West Highway, Suite 4300
Silver Spring, MD 20910

**RE:  2020 CARES Grant – Revised to Include Adjusted Amount**

Dear Ms. Harrington:

The purpose of this letter is to certify that the State of Texas will use the funds provided under the Notice of Grant Award, Agreement TX20101CARES, for activities consistent with the laws described in Section 906 of HAVA and will not use the funds in a manner that is inconsistent with the requirements of Title III of HAVA.

We further certify that we have reviewed and accept the terms of the award as specified in the Notice of Grant Award.  Our UEI number (formerly DUNS) is 806782546, and the signed Certifications are enclosed.

We are requesting $24,546,840 at this time.  We will use the funds to prevent, prepare for, and respond to coronavirus, domestically or internationally, for the 2020 Federal election cycle.  To address the effects of the coronavirus on the election we will sub-grant the funds to Texas counties to expend on activities consistent with the purposes outlined in the memo from Mona Harrington dated April 6, 2020.

If you have any questions about this request, please contact Keith Ingram at 512-463-9871 or kingram@sos.texas.gov.

Sincerely,

Ruth Hughs
D99E6134C3884CE...

Ruth R. Hughs
Texas Secretary of State

Cc.  Kinza Ghaznavi, Grants Manager

# EXHIBIT 27

```
 1              IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3  LA UNION DEL PUEBLO ENTERO,   )
    et al,                        )
 4         Plaintiffs,            )
                                  )
 5  v.                            )    Case No. 5:21-cv-844-XR
                                  )
 6  GREGORY W. ABBOTT, et al.,    )
           Defendants.            )
 7  _____)_____
    OCA-GREATER HOUSTON, et al.,  )
 8         Plaintiffs,            )
                                  )
 9  v.                            )    Case No. 1:21-cv-780-XR
                                  )
10  JOHN SCOTT, et al.,           )
           Defendants.            )
11  _____)_____
    HOUSTON JUSTICE, et al.,      )
12         Plaintiffs,            )
                                  )
13  v.                            )    Case No. 5:21-cv-848-XR
                                  )
14  GREGORY WAYNE ABBOTT, et al., )
           Defendants.            )
15  _____)_____
    LULAC TEXAS, et al.,          )
16         Plaintiffs,            )
                                  )
17  v.                            )
                                  )    Case No. 1:21-cv-0786-XR
18                                )
    JOHN SCOTT, et al.,           )
19         Defendants.            )
                                  )
20  _____)_____
    MI FAMILIA VOTA, et al.,      )
           Plaintiffs,            )
21                                )
    v.                            )    Case No. 5:21-cv-0920-XR
22                                )
    GREG ABBOTT, et al.,          )
23         Defendants.            )
    _____)_____
24

25
```

```
 1   UNITED STATES OF AMERICA,      )
          Plaintiff,               )
 2                                 )
     v.                            )      Case No. 5:21-cv-1085-XR
 3                                 )
     THE STATE OF TEXAS, ET AL.,   )
 4        Defendants               )
     _____
 5

 6

 7

 8   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
 9
                     VIDEOTAPED ORAL DEPOSITION OF
10
                             BOB KAFKA
11
                           April 7, 2022
12
     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
13

14

15            VIDEOTAPED ORAL DEPOSITION OF BOB KAFKA, produced as

16   a witness at the instance of the Office of the Attorney

17   General, and duly sworn, was taken in the above-styled and

18   numbered cause on the 7th day of April, 2022, from 10:12 a.m to

19   4:25 p.m., before Dottie Norman, Certified Shorthand Reporter

20   in and for the State of Texas, reported by machine shorthand,

21   at the Offices of Disability Rights Texas, 2222 W. Braker Lane,

22   Austin, Texas, pursuant to the Federal Rule of Civil Procedure

23   30(b)(6) and the provisions stated on the record.

24

25
```

1  conclusion.

2        THE WITNESS:  Without impugning any motivation,

3  our members and others in our community, including myself,

4  communicated to many of the people that some of the language

5  that was in Senate Bill 1 would have a negative impact.  So --

6  and since most of that was disregarded, I don't know if they

7  intentionally disregarded it or just dismissed what we said.

8  But they were given information that some of the things that

9  we're contesting they were well-aware that the disability

10  community -- I can't speak for every group, but people from

11  REVUP that the effect would be negative on our population.  So

12  I don't know what their motivation.

13        Q.   Well, that's an interesting way to put it.  So you

14  would agree with me you don't know what the motivation of any

15  particular legislator was in voting for Senate Bill 1?

16        A.   I do not have a psychology degree to be able to --

17  all I know is that they were given concrete information about

18  what potential negative effect it would have on people with

19  disabilities.  And they chose not to do it.

20        Q.   Well, you would agree that the legislature gave you

21  an opportunity to come speak to them, right?

22        A.   Even that was limited because of the pandemic, and

23  remote testimony was very limited.  So, you know, there was

24  some.  And I don't want to go into the specifics because I

25  don't remember all the -- the dates.  But there was many

1    -- you know, a cure process is only as good as it actually can

2    be used.  There's a difference between kinetic and potential

3    energy.  I see the process is the potential.  But if it's not

4    being able to be used by the population that is in need of the

5    cure, it really is still a harmful effect.  The outcome is what

6    we're looking at.

7              Q.    Section 5.14 which begins on page 46.  Do you see

8    that?

9              A.    Uh-huh.

10             Q.    Yes?

11             A.    Yes, sir.

12             Q.    Are you aware of who operates early voting ballot

13   boards?

14             A.    No.

15             Q.    Do you have any reason to dispute that early voting

16   ballot boards are operated by counties?

17             A.    I'm afraid I'm not up on the early voting ballot

18   boards, so --

19             Q.    Well, you have no reason to dispute that they are

20   run by the counties, right?

21             A.    No.

22             Q.    You have no reason to dispute that early voting

23   ballot boards are not operated by the Secretary of State's

24   Office, right?

25             A.    Right.

Bob Kafka                                                   April 07, 2022
                                                           Page 163

```
 1   UNITED STATES OF AMERICA,      )
          Plaintiff,                )
 2                                  )
     v.                             )     Case No. 5:21-cv-1085-XR
 3                                  )
     THE STATE OF TEXAS, ET AL.,    )
 4        Defendants                )
     _____
 5                       REPORTER'S CERTIFICATION
 6                   VIDEOTAPED ORAL DEPOSITION OF
                              BOB KAFKA
 7                          April 7, 2022

 8               I, DOTTIE NORMAN, Certified Shorthand Reporter

 9   in and for the State of Texas, hereby certify to the following:

10               That the witness, BOB KAFKA, was duly sworn by

11   the officer and that the transcript of the oral deposition is a

12   true record of the testimony given by the witness;

13               I further certify that pursuant to FRCP Rule

14   30(f)(1) that the signature of the deponent:

15        X      was requested by the deponent or a party

16   before completion of the deposition and returned within 30 days

17   from date of receipt of the transcript.  If returned, the

18   attached Changes and Signature Page contains any changes and

19   the reasons therefor;

20               _____ was not requested by the deponent or a

21   party before the completion of the deposition.

22               I further certify that I am neither attorney nor

23   counsel for, related to, nor employed by any of the parties to

24   the action in which this testimony was taken.  Further, I am

25   not a relative or employee of any attorney of record in this
```

1   cause, nor am I financially or otherwise interested in the

2   outcome of the action.

3                 Subscribed and sworn to on this the _____ day

4   of _____, 2022.

5

6

7                         _____
                          DOTTIE NORMAN, Texas CSR 2283
8                         Expiration Date:  8/31/2023
                          Magna Legal Services
9                         Firm Registration No. 633
                          16414 San Pedro, Suite 900
10                        San Antonio, Texas  78232
                          866.672.7880

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 28

```
 1              UNITED STATES DISTRICT COURT
                        FOR THE
 2              WESTERN DISTRICT OF TEXAS


 3
    LA UNION DEL PUEBLO          §
 4  ENTERO, ET AL.               §
                                 §
 5       Plaintiff               §
                                 §   Civil Action No.
 6  V.                           §   5:21-cv-00844-XR
                                 §
 7  GREGORY W. ABBOTT, ET        §
    AL.                          §
 8                               §
         Defendant.              §
 9

10

11

12

13              ORAL DEPOSITION OF
                    TOBY COLE
14               JUNE 28, 2022

15

16

17       ORAL DEPOSITION OF TOBY COLE, produced as a witness

18  at the instance of the Defendant and duly sworn, was

19  taken in the above styled and numbered cause on Tuesday,

20  June 28, 2022, from 9:16 a.m. to 10:42 a.m., before

21  DONNA QUALLS, Notary Public in and for the State of

22  Texas, by computerized stenotype machine, at the offices

23  of Cole Law Firm, 1616 South Voss Road, Houston, Texas,

24  pursuant to the Federal Rules of Civil Procedure and any

25  provisions stated on the record or attached hereto.
```

1    A.  Yes.

2    Q.  And you used an assister there?

3    A.  Yes.

4    Q.  Did you also vote from your car in that

5  election?

6    A.  Yes.

7    Q.  You described earlier some challenges that your

8  disability poses when voting.  Have those challenges

9  ever prevented you from voting?

10    A.  No.  I'm persistent.

11    Q.  So prior to the enactment of SB 1, have -- can

12  you think of any specific instances in which it was

13  difficult for you to vote?

14         MS. DAVIS:  Objection; form.

15    A.  Earlier on, you know, I've had access to a

16  polling place that was a challenge.  The polling place

17  wasn't accessible.  I was able to do a wheelie and get

18  in.  So I was able to overcome it, but if I was in this

19  chair back then where it happened, I wouldn't have been

20  able to go into the polling place.  That's probably my

21  earliest remembrance.  Using the curbside voting, I've

22  had a couple of different experiences with those where

23  the button didn't work; and as an alternative, somebody

24  had to go in to find someone to bring them out.  But,

25  yeah, there's been a couple of instances where there's

1  been voting difficulties.

2      Q.  (BY MR. WASSDORF)  But despite those

3  difficulties, you always persisted and succeeded in

4  casting a ballot?

5          MS. DAVIS:  Objection; form.

6      A.  Yeah, absolutely.  You know this last time, you

7  know, when I had the issue of pushing a button, you

8  know, I have my own job, and I have my own

9  transportation.  I have my own people.  I'm on my own

10  time frame, and so if it takes me 45 minutes to vote or

11  an hour and a half to vote, my life is set up where that

12  can be done.  But for a lot of people, that's not

13  available.

14          If you use METROLift to get to places to

15  vote, they're not going to wait for you to vote.  If you

16  have difficulty and you can't get out of your car -- I

17  can get out of the car or send somebody to find

18  somebody.  Other folks can't do that.  So, yeah, no, I

19  can vote.  It just took me -- you know, I remember

20  sitting in the parking lot for 45 minutes watching

21  20 people go in and out of the polling place that I did

22  not have that access to.

23          So, yeah, I can do it.  I absolutely could

24  do it.  But kind of like getting up to come here this

25  morning, it doesn't take me 15 minutes to get ready to

1      Q.  Are there any other individuals that you can

2   identify specifically that have had difficulties voting

3   due to a disability?

4      A.  Albert Melgoza.

5                THE REPORTER:  What's the last name?

6                THE WITNESS:  Melgoza, M-E-L-G-O-Z-A.

7      Q.  (BY MR. WASSDORF)  And what difficulties has he

8   had?

9      A.  I don't remember if it was access to a polling

10  place or the button not working for curbside voting.  I

11  don't remember the exact specifics, but I remember

12  Albert calling me up.  He's very vocal.

13     Q.  Do you know if he was ultimately able to cast a

14  vote?

15     A.  I don't.  I don't.  And I don't know if he's --

16  so when -- when I work with the people that I work with,

17  you know, we talk a lot about, you know, not cutting

18  things out of your life.  You know, don't stop going to

19  restaurants.  Don't stop going out with friends.  Don't

20  stop going to movies.  And a big thing for me is don't

21  stop voting.  You've got to have your voice heard.  Go

22  vote.

23                And so I think Albert did that because I'd

24  give him grief about that.  But I don't know if he voted

25  again.  I don't know if it was such a bad process that

1   he's, like, "I only have a limited amount of time to do

2   what I do in a day, and if it's going to be this

3   difficult, I'm just going to skip it."

4       Q.  Let's talk a little bit about your political

5   involvement.  Have you ever publicly endorsed a

6   political candidate?

7       A.  I think I've been asked to sit on people's

8   steering committees or -- I think with Lizzie Fletcher I

9   was asked to be on something.  I don't know what they

10  call it.  I've never been active, but I have been asked

11  to lend my name.

12      Q.  Have you ever donated to a political candidate?

13      A.  Yes.

14      Q.  Do you know who?

15      A.  Mainly judges.  That's mainly -- you know, all

16  politics are local and for me.  Judges are what's

17  important.  And so mainly judges.

18      Q.  And those Republicans?  Democrats?

19      A.  Mainly Democrats.

20      Q.  Have you ever publicly endorsed any ballot

21  measures or statutes or bills or anything like that?

22      A.  No.  I mean, publicly endorsed when -- when I

23  talked about I was the chairman of the committee that we

24  rewrote the ordinance when Uber wanted to come -- or TNC

25  wanted to come to Houston, I mean, that was a public

1    ordinance that got rewritten.  And so as a chairman of

2    the committee, I agreed with it.  So I don't know if

3    that's considered a public endorsement.

4         Q.  Do you contend that the provisions of Senate

5    Bill 1 have harmed you in any way?

6         A.  Yes.

7         Q.  How so?

8         A.  Anytime you make it more difficult for somebody

9    with a disability to do anything, it harms them.

10        Q.  And you believe that Senate Bill 1 makes it

11   more difficult?

12        A.  Absolutely.

13        Q.  What's the basis of that belief?

14        A.  I mean, we start from the fact that, you know,

15   this last election it took me 45 minutes, and they were

16   so confused.  And that was in a primary election.  And,

17   you know, the joker on primaries is you have to pull

18   people out of their houses to go vote.  You know, what's

19   going to happen in a major election?  It's going to be a

20   disaster.  You know, it's not going to be -- it's going

21   to be horrible.

22             The oath provision is very onerous on folks

23   like me that I need to have help me.  You know, I have

24   to decide what I'm going to do and how I'm going to do

25   it.  Because the way the oath is written right now,

1    whoever helps me could be violating that.  I could be

2    putting them in trouble.  SB 1 has restricted the

3    ability for people to vote, and that is even harder on

4    people with disabilities.

5         Q.  So let's talk about some of the provisions of

6    Senate Bill 1.  This will be marked as Exhibit 2.

7              (Exhibit No. 2 was marked.)

8         Q.  (BY MR. WASSDORF)  Let's turn to page 52.  We

9    are looking at Section 6.04 of the bill.  So that starts

10   on line 20.

11             Now, this is the oath provision that you've

12   discussed just a moment ago.  So could you go ahead and

13   read through that.  I believe it starts on line 20 of

14   page 52 and continues through line 14 on page 53.

15        A.  Section 6.04 --

16        Q.  You don't have to read it out loud.

17        A.  Oh, got it.

18        Q.  Just familiarize yourself with, and then we can

19   discuss.

20        A.  (Witness complies.)  Okay.

21        Q.  Now, Section 6.04 here, it doesn't impose a

22   specific requirement on voters themselves, does it?

23        A.  I don't understand what you mean.

24        Q.  This provision is about the oath, and the

25   assister must take.  But it does not impose any

1   requirement on the voter themselves.

2        A.   It absolutely does.

3        Q.   How so?

4        A.   Because I have to pick the assister.  I have to

5   have an assister that is willing to take this oath, and

6   I have to have an assister that's willing to be subject

7   of prosecution if something of this oath goes amiss.  So

8   absolutely it definitely put an onerous on me.

9        Q.   So can you -- in this provision in the language

10  of the oath, can you point out specifically what

11  sections that you believe harm you?

12       A.   Well, let's -- let's start with "I swear or

13  affirm under penalty of perjury," right?  So when we

14  started my deposition, what did you remind me of?

15       Q.   That you were under oath.

16       A.   That I was under oath under the penalty of

17  perjury, right?  And how many times have you taken a

18  deposition or I've taken a deposition where halfway

19  through the deposition you remind the witness that it is

20  the penalty of perjury and that they can go to jail and

21  that -- and that this is something that could put them

22  in harm's way.  And this is not for those folks to vote.

23  This is so that person can help me.  So, yeah, that

24  right there -- that right there is very difficult.

25       Q.   I mean, do you believe that someone taking this

```
 1              MS. DAVIS:  Objection; form.
 2        A.  I'll give you my example.  Before I vote, I do
 3   research.  And I can't write those things down.  So I
 4   use my assistants like I do in any deposition, like I'm
 5   having NaShunda do now.  And so, if it's a short ballot
 6   initiative like the Constitutional amendment where
 7   there's three, I'll have -- we'll do the research, and
 8   I'll have that discussion.  And I'll say, you know,
 9   remind me that I'm going "A" on one, "B" on the other,
10   "yes" on this, "no" on that.  Or if I'll have -- if it's
11   something more complicated, I'll have a sample ballot or
12   notes.
13              And then I'll need NaShunda or whoever's
14   with me, will you take the piece of paper?  What am I
15   going to vote on this one?  What am I going to vote on
16   that one?  And when they do that, they're violating this
17   oath.
18        Q.  (BY MR. WASSDORF)  Do you believe that, by
19   reminding you of your previously determined choices,
20   that an assister is violating that provision?
21        A.  It says it right here.  (As read) "I will
22   confine my assistance to reading the ballot to the
23   voter, directing the voter to read the ballot, marking
24   the voter's ballot, or directing the voter to mark the
25   ballot."  That's all they can do.  I don't know how I'm
```

1   going to vote in the next election.

2       Q.  Are you aware that it's the position of the

3   State defendants that under this oath that assisters may

4   still assist voters with disabilities by, for example,

5   reading the voter's notes or otherwise refreshing their

6   recollection?

7       A.  I'm sorry.  You said who's position?

8       Q.  The States's position, the State of Texas.

9       A.  Where is that in writing?  Because it could be

10  your position right now, but it may not be the position

11  of the next person at the AG's office or the next point

12  of emphasis.  So where does it say that?  Because right

13  now the way this is written, I have to vote from memory,

14  and that's not fair.  Or it's not a problem for me, I

15  just have to realize that the people that rely on me for

16  their lives, the jobs that I have for them can get

17  arrested at some point.  So do I put them in that harm's

18  way?

19      Q.  If there were some assurance that the

20  assistance that you're describing is still permitted

21  under SB 1, would you agree that this oath provision

22  does not harm you?

23          MS. DAVIS:  Objection; form.

24      A.  No.  The entire -- the entire idea of having to

25  take an oath under the penalty of perjury for anything

1  laws a long time ago.  I mean, do we need tests to make

2  sure that the assistant that we choose don't have undue

3  influence?  No one else who votes has to sing something

4  that says whoever drove me -- my wife or whoever else --

5  didn't put pressure on me.  It's just so paternalistic

6  and insulting that it's hard to read.

7       Q.  Do you not believe that there are people out

8  there who would take advantage of their position to

9  pressure or coerce someone with regard to their vote?

10      A.  Are you talking specifically about people with

11 disabilities that we surround ourselves with people that

12 pressure us, that we're not capable of finding people

13 who are resisting the pressure of people that would have

14 us vote?

15      Q.  I think I'm asking more about, you know, the

16 potential assisters.  I mean, there are nefarious people

17 in the world, are there not?

18      A.  Yeah, there are.  There are.

19      Q.  And if someone requires an assister to help

20 them vote, should the State not take steps to ensure

21 that those people aren't taking unfair advantage?

22           MS. PAIKOWSKY:  Objection; form.

23      A.  Did you hear what you just said?  That I need

24 the protection of the State to make sure someone doesn't

25 take advantage of me because I'm disabled.  No, I don't

1   need the AG's office to protect me from the people that

2   I hire, the people that I use to take care of my

3   children, that I use to help pay my bills, that I use to

4   practice law, that I use to help represent people that

5   need help.  No, because I don't need you to do it at the

6   voting booth unless you want to show up and do it at a

7   million other places, no.  This is not designed to help

8   protect me.

9                    Do you need it?

10                   THE REPORTER:  Can we take a break?

11                   MR. WASSDORF:  Sure.

12                   THE WITNESS:  Yeah.

13                   THE REPORTER:  Off the record at 9:56.)

14                   (Recess from 9:56 a.m. to 10:05 a.m.)

15                   THE REPORTER:  We are back on the record at

16   10:05.

17        Q.  (BY MR. WASSDORF)  So we just talked about the

18   oath provision of Senate Bill 1 which is Section 6.04 of

19   the bill.  Let's go back by a section and look at

20   Section 6.03.  And it starts at the very bottom of

21   page 51, but all of the text is on page 52.

22        A.  Got it.

23        Q.  Why don't you read that section to yourself and

24   let me know when you're finished.

25        A.  (Witness complies.)  Okay.

1      Q.  Now, this section mainly requires an individual

2  assisting a voter to identify themselves, their

3  relationship to the voter, and whether they received

4  compensation from a candidate, campaign, or political

5  action committee; is that correct?

6      A.  Yes.

7      Q.  Do you believe that that provision harms you or

8  other voters with disabilities in any way?

9      A.  Yes.

10      Q.  How so?

11      A.  Because why is it any business of the State who

12  helps me?  Why should -- why should the people that help

13  me have to go on record and -- and have their

14  information taken by the secretary of the state?  I mean

15  we don't do that in any other portion of things we do in

16  this world.  So why in this circumstance -- what if --

17  what if I have somebody that's undocumented that helps

18  me?  They can't.  They're not going to help me because,

19  when this occurs, then they can be deported.  So, yeah,

20  absolutely.

21              And I'm sure you're familiar with the fact

22  that we don't have state assistance for people with

23  disabilities.  There's no place of public money where

24  you can go and have people help you.  So you have to

25  find people that can help you.  And so sometimes those

 1   people are undocumented.  Sometimes those people may

 2   have warrants for their arrest because they haven't been

 3   able to pay tickets or whatever else is their life

 4   circumstance.  They're not going to do this, and I'm not

 5   going to ask them to.

 6       Q.  Let's turn to Section 6.06 of the bill which is

 7   towards the bottom of page 54 and goes onto page 55.

 8           Do you believe that Section 6.06 of the

 9   bill that you just read harms you or other voters with

10   disabilities in any way?

11       A.  So it -- assuming how you define Subsection F,

12   this section does not apply if the person assisting a

13   voter is an attendant or caregiver previously known to

14   the voter.  So, you know, the people that usually help

15   me are legal assistants or paralegals.  They're not

16   attendants or caregivers.  So that's an issue.  So...

17           I mean, but is it problematic because if I

18   have -- I help people that are my clients all the time

19   get into hospitals, go to football games.  I carry extra

20   tickets to the Texans, and I bring them with me so they

21   can have a little bit more expanded life.  They call me

22   up and say "Hey, Toby, can you help me get to a vote so

23   I can lend them my van."  That caregiver is not theirs.

24   It's mine.  I'm sending one of my people.  I think that

25   would violate this.  I help them with every other part

 1   of their life.  But if I help them with voting, that

 2   would be a violation.

 3              Can I read this one more time?

 4        Q.  Sure.

 5        A.  Thanks.

 6              Yeah, so if somebody is hired to take

 7   somebody to the polls to vote, they commit a felony,

 8   yeah.  How else do you get people with disabilities to

 9   the polls?  I hope people will do it for free.  Am I

10   reading that wrong?

11        Q.  I think you previously testified that you have

12   never voted by mail; is that correct?

13        A.  Yeah.

14        Q.  Are you aware of any other disabled individuals

15   who have had trouble voting by mail if they needed to?

16        A.  No.  I don't know of any individuals that vote

17   by mail.  My parents do, but they're not disabled.  They

18   just -- they couldn't figure it out.

19        Q.  Let's turn to page 16 of the bill,

20   Section 3.09.  It starts in the middle of the page.

21        A.  Which section?

22        Q.  Section 3.09 of the bill?

23        A.  Section 3.09.

24              THE WITNESS:  Don't provide me assistance.

25   You'll get in trouble.

1      Q.  Do you not believe that the fact that some

2  disabled individuals such as yourself require an

3  assister to help them vote does not put them at

4  increased risk at least to some extent of being undue

5  influence or coerced?

6                  MS. DAVIS:  Objection; form.

7      A.  No, no.  I think that is the problem.  I think

8  that is the problem that the State thinks that disabled

9  people are so infirm that they need to be protected.

10  It's insulting.

11      Q.  (BY MR. WASSDORF)  I mean, isn't it true that,

12  anytime you add another individual between the voter

13  themselves and the ballot box, that there could be some

14  increased risk of undue influence or coercion?

15      A.  For those of us with disabilities?

16      Q.  I mean, in any situation?

17      A.  How about when someone gets a ride to the

18  ballot box with their wife and their wife or their

19  husband is in their ear the entire time, "You need to go

20  vote for this because if you don't vote for XYZ."

21  People get influenced all the time by their loved ones.

22  What's the AG doing about that?  I mean I see signs that

23  what -- within 100 feet or 200 feet people trying to

24  convince you to change who you are.  No one's doing

25  anything about that.  But those poor, disabled people,

1    if someone has to hold something for them or drive them

2    to the ballot box, oh, man, they're going to get taken

3    advantage of.  No.  No, it's insulting.

4               There's a saying in the disabled community

5    "Nothing about us without us."  And it seems real clear

6    that whoever wrote this, did this, didn't do it with the

7    input of people with disabilities.

8         Q.  Now, despite your beliefs about Senate Bill 1

9    that we've already discussed here today, while Senate

10   Bill 1 has been in effect, you have been able to vote in

11   both the March 1st primary and the March -- or May 7th

12   local and constitutional amendment election; is that

13   correct?

14        A.  Yes.

15        Q.  And besides the -- I think you described it as

16   a long wait time to be able to vote, you didn't have any

17   particular problem at those elections?

18              MS. DAVIS:  Objection; form.

19        A.  Yeah.  But you said besides the long wait time.

20   It's like, you know, other than that, Mrs. Lincoln, how

21   was the play?

22        Q.  (BY MR. WASSDORF)  I'm just trying to figure

23   out if there's anything else.

24        A.  Yeah, well, now -- now I realize from this

25   examination and reading that that, yeah, it's a big

```
 1              REPORTER'S CERTIFICATION
                ORAL DEPOSITION OF
 2                   TOBY COLE
                TAKEN JUNE 28, 2022
 3              (REPORTED REMOTELY)

 4

 5         I, DONNA QUALLS, Shorthand Reporter and Notary

 6   Public in and for the State of Texas, hereby certify to

 7   the following:

 8         That the witness, TOBY COLE, was duly sworn by

 9   the officer and that the transcript of the oral

10   deposition is a true record of the testimony given by

11   the witness;

12         That the original deposition was delivered to

13   LIA DAVIS / WILLIAM D. WASSDORF;

14         That a copy of this certificate was served on

15   all parties and/or the witness shown herein on

16   _____.

17         I further certify that pursuant to FRCP No.

18   30(f)(i) that the signature of the deponent was

19   requested by the deponent or a party before the

20   completion of the deposition and that the signature is

21   to be returned within 30 days from date of receipt of

22   the transcript.  If returned, the attached Changes and

23   Signature Page contains any changes and the reasons

24   therefor.

25         I further certify that I am neither counsel
```

1    for, related to, nor employed by any of the parties in

2    the action in which this proceeding was taken, and

3    further that I am not financially or otherwise

4    interested in the outcome of the action.

5              Certified to by me this 13th day of July, 2022.

6

7

8

9

10   _____

11   DONNA QUALLS
     Notary Public in and for
     The State of Texas

12   My Commission expires 11/02/2022

13   Magna Legal Services
     Firm Registration No. 633

14   16414 San Pedro, Suite 900
     San Antonio, Texas 78232

15   (210)  697-3400

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 29

```
 1                 UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3    LA UNION DEL PUEBLO ENTERO,   )
      et al.,                       )
 4         Plaintiffs,              )
                                    )
 5    vs.                           ) CASE NO. 5:21-cv-844-XR
                                    ) [LEAD CASE]
 6    GREGORY W. ABBOTT, et al.,    )
           Defendants.              )
 7    _____
      OCA-GREATER HOUSTON, et al., )
 8         Plaintiffs,              )
                                    )
 9    vs.                           ) CASE NO. 1:21-cv-0780-XR
      JOHN SCOTT, et al.,           )
10         Defendants.              )
      _____
11    HOUSTON JUSTICE, et al.,      )
           Plaintiffs,              )
12                                  )
      vs.                           ) CASE NO. 5:21-cv-0848-XR
13    GREGORY WAYNE ABBOTT, et al.,)
           Defendants.              )
14    _____
      LULAC TEXAS, et al.,          )
15         Plaintiffs,              )
                                    )
16    vs.                           ) CASE NO. 1:21-cv-0786-XR
      JOHN SCOTT, et al.,           )
17         Defendants.              )
      _____
18    MI FAMILIA VOTA, et al.,      )
           Plaintiffs,              )
19                                  )
      vs.                           ) CASE NO. 5:21-cv-0920-XR
20    GREG ABBOTT, et al.,          )
           Defendants.              )
21    _____
      UNITED STATES OF AMERICA,     )
22         Plaintiff,               )
                                    )
23    vs.                           ) CASE NO. 5:21-cv-1085-XR
                                    )
24    THE STATE OF TEXAS, et al.,   )
           Defendants.              )
25    _____
```

1

2

3

*************************************************************

4

ORAL AND VIDEOTAPED DEPOSITION OF

5

TERI D. SALTZMAN

6

JULY 15, 2022

7

(Taken Via Remote Videoconference)

8

*************************************************************

9

10

11        ORAL AND VIDEOTAPED DEPOSITION OF TERI D. SALTZMAN,

12    produced as a witness at the instance of the STATE

13    DEFENDANTS, and duly sworn, was taken in the

14    above-styled and numbered cause on the 15th of July,

15    2022, from 10:05 a.m. to 2:32 p.m., before Mona S.

16    Whitmarsh, Certified Shorthand Reporter, in and for the

17    State of Texas, reported by machine shorthand via Zoom

18    videoconference, pursuant to the Federal Rules of Civil

19    Procedure and the provisions stated on the record or

20    attached hereto.

21

22

23

24

25

1        A    No.

2        Q    We have gone through a lot of questions today.

3   I appreciate your patience.  I know this probably wasn't

4   your first choice of how to spend a day.

5             Is there anything that you would like to add

6   to the record?

7        A    Well, I do -- would like to add that this -- I

8   never had any difficulty with voting until this year and

9   I never doubted whether my vote counted or not until

10  this year.  And as -- you probably see that I have a

11  good history of voting and never had a problem until

12  this year.  That's really all I have to say.

13       Q    Okay.  One final question I have:  Anything

14  that you have said today, would you like -- was there

15  anything you said today that you would like to add more

16  context to?

17       A    No.

18       Q    Okay.

19             MR. BERG:  Lia, that's all I have.

20             MS. DAVIS:  I don't have any questions,

21  but I am going to instruct the witness to state on the

22  record that she would like to read and sign her

23  deposition.

24             THE WITNESS:  I would like to read and

25  sign my deposition.

1   THE STATE OF TEXAS:

2   COUNTY OF HARRIS:

3        I, Mona S. Whitmarsh, a Certified Shorthand

4   Reporter, hereby certify that the foregoing testimony

5   was given before me after the Witness had been first

6   duly sworn.

7        I further certify that this deposition was

8   transcribed under my direction and is a complete and

9   correct transcript of the proceedings; and that it is

10  being filed with the Court in accordance with the

11  Stipulation of Counsel contained in this deposition.

12       I further certify that I am neither attorney for,

13  related to, nor employed by any of the parties to the

14  lawsuit in which this deposition was taken.  Further, I

15  am neither related to nor employed by any attorney of

16  record in this cause; nor do I have a financial interest

17  in the matter.

18       GIVEN UNDER MY HAND AND SEAL OF OFFICE this _____

19  day of _____, 2022.

20

21  _____

22  Mona S. Whitmarsh
    Texas CSR No. 3986
    Expiration Date:  04/30/24

23

24  MAGNA LEGAL SERVICES
    Firm Registration No. 622
    866-624-6221

25  www.MagnaLS.com

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, ET AL., | § § | CASE NO. 5:21-CV-844-XR |
| PLAINTIFFS, | § | [LEAD CASE] |
| | § | |
| V. | § | |
| | § | |
| GREGORY W. ABBOTT, ET AL., | § | |
| DEFENDANTS. | § | |
| | | |
| OCA-GREATER HOUSTON, ET AL., | § § | CASE NO. 1:21-CV-780-XR |
| PLAINTIFFS, | § | |
| | § | |
| V. | § | |
| | § | |
| JANE NELSON, ET AL,. | § | |
| DEFENDANTS. | § | |
| HOUSTON AREA URBAN LEAGUE, ET AL., | § § | CASE NO. 5:21-CV-848-XR |
| PLAINTIFFS, | § | |
| | § | |
| V. | § | |
| | § | |
| GREGORY WAYNE ABBOTT, ET AL., | § § | |
| DEFENDANTS. | | |
| LULAC TEXAS, ET AL., | § | |
| PLAINTIFFS, | § | CASE NO. 1:21-CV-0786-XR |
| | § | |
| V. | § | |
| | § | |
| JANE NELSON, ET AL., | § | |
| DEFENDANTS. | § | |
| | § | |
| | | |
| MI FAMILIA VOTA, ET AL., | § | |
| PLAINTIFFS, | § | CASE NO. 5:21-CV-0920-XR |
| | § | |
| V. | § | |
| | § | |
| GREG ABBOTT, ET AL., | § | |
| DEFENDANTS. | § | |



Page 2

```
 1   UNITED STATES OF AMERICA,    §
            PLAINTIFF,            § CASE NO. 5:21-CV-1085-XR
 2                                §
     V.                           §
 3                                §
     THE STATE OF TEXAS, ET       §
 4   AL.,                         §
            DEFENDANTS            §
 5

 6

     ************************************************************
 7

 8              ORAL AND VIDEOTAPED DEPOSITION OF
 9

                         ALICE PENROD
10

11                      APRIL 27, 2023

12

     ************************************************************
13

14          ORAL AND VIDEOTAPED DEPOSITION OF ALICE PENROD,
15   PRODUCED AS A WITNESS AT THE INSTANCE OF THE STATE'S
16   DEFENDANTS, WAS TAKEN IN THE ABOVE-STYLED AND -NUMBERED
17   CAUSE ON THE 27TH DAY OF APRIL, 2023, FROM 10:03 A.M. TO
18   12:24 P.M., BEFORE KAREN A. GONZALEZ, COMMISSIONED
19   NOTARY, IN AND FOR THE STATE OF TEXAS, REPORTED REMOTELY
20   BY MACHINE SHORTHAND, REMOTELY FROM DALLAS COUNTY,
21   TEXAS, PURSUANT TO THE TEXAS RULES OF CIVIL PROCEDURE,
22   THE TEXAS SUPREME COURT EMERGENCY ORDER REGARDING THE
23   COVID-19 STATE OF DISASTER AND THE PROVISIONS STATED ON
24   THE RECORD OR ATTACHED HERETO.
25
```



Page 40

1    Q.   THE 2022 PRIMARY ELECTION YOU TESTIFIED THAT THAT

2    WAS YOUR FIRST TIME VOTING BY MAIL; IS THAT CORRECT?

3    A.   THAT'S CORRECT.

4    Q.   AND WHAT ISSUES DID YOU HAVE VOTING BY MAIL IN

5    THE 2022 PRIMARY?

6              MR. BARON:  OBJECT TO FORM.

7              YOU CAN ANSWER.

8    A.   I MAILED MY BALLOT IN, AND THEN WE -- I DON'T

9    KNOW HOW LONG IT WAS, MAYBE -- I DON'T EVEN KNOW IF IT

10   WAS WITHIN TWO WEEKS, I GOT A LETTER SAYING THAT MY

11   BALLOT HAD BEEN REJECTED, AND I COULD GO ONLINE TO THE

12   WEBSITE -- THIS SPECIFIC WEBSITE TO MAKE CORRECTIONS.

13   AND SO I DID THAT.  I MADE THE CORRECTIONS THAT WERE

14   NEEDED.  AND THEN I KEPT CHECKING BACK, AND IT WASN'T

15   UNTIL A COUPLE OF WEEKS AFTER THAT, THAT IT FINALLY

16   SHOWED UP THAT MY BALLOT HAD BEEN ACCEPTED.

17   Q.   (BY MR. BERG) SO WOULD IT BE A -- CORRECT, THAT

18   YOU MAILED IN YOUR BALLOT, YOU WERE NOTIFIED THAT IT HAD

19   BEEN REJECTED, BUT THAT YOU COULD GO ONLINE TO MAKE

20   CORRECTIONS.  YOU WENT ONLINE TO MAKE CORRECTIONS, AND

21   YOU CHECKED A NUMBER OF TIMES, AND EVENTUALLY SAW THAT

22   IT WAS ACCEPTED SOMETIME IN THE FUTURE?

23             MR. BARON:  OBJECT TO FORM.

24             YOU CAN ANSWER.

25   A.   YES, THAT IS CORRECT.



Page 41

1    Q.  (BY MR. BERG)  WHEN YOU WERE NOTIFIED THAT YOUR

2  MAIL BALLOT HAD BEEN REJECTED, WAS THAT A LETTER OR AN

3  E-MAIL, DO YOU RECALL --

4    A.  IT WAS A LETTER, IN THE MAIL.

5    Q.  AND WAS THAT LETTER FROM THE BEXAR COUNTY

6  ELECTION'S OFFICE?

7    A.  I BELIEVE SO.

8    Q.  AND DID THE LETTER FROM THE BEXAR COUNTY

9  ELECTION'S OFFICE SAY WHY YOUR BALLOT HAD BEEN REJECTED?

10    A.  I DON'T RECALL IT SAYING SPECIFICALLY.

11    Q.  YOU JUST RECALL THAT THE LETTER SAID THAT YOUR

12  BALLOT HAD BEEN REJECTED?

13    A.  YES, AND THAT I COULD GO TO A WEBSITE TO CORRECT

14  -- TO MAKE CORRECTIONS.

15    Q.  AND AS WE SIT HERE TODAY, DO YOU KNOW WHY YOUR

16  BALLOT WAS INITIALLY REJECTED?

17    A.  I DON'T KNOW SPECIFICALLY, IF IT WAS THAT I

18  DIDN'T PUT A SPECIFIC NUMBER CORRECTLY ON THERE.  'CAUSE

19  IT ASKED FOR DRIVER'S LICENSE, IT ASKED FOR LAST FOUR OF

20  YOUR SOCIAL, IF I DIDN'T SIGN IT IN A SPECIFIC PLACE.  I

21  DON'T -- I DON'T REALLY KNOW.  ALL I KNOW IS, IT WAS

22  DENIED AND I WAS NOT HAPPY.

23    Q.  OKAY.  LET ME TRY TO HELP.

24        DO YOU KNOW WHETHER YOUR MAIL BALLOT WAS REJECTED

25  BECAUSE YOU FAILED TO SIGN THE BALLOT?



Page 42

1      A.   I DON'T KNOW SPECIFICALLY IF THAT'S THE CASE.

2      Q.   DO YOU KNOW THAT YOUR BALLOT WAS REJECTED BECAUSE

3   YOU FORGET TO -- FORGOT TO INDICATE THAT YOU WERE OVER

4   65 YEARS OF AGE?

5      A.   I DON'T -- I DON'T KNOW.   I DON'T KNOW THAT.

6      Q.   AND DO YOU KNOW THAT YOUR BALLOT WAS REJECTED FOR

7   MISSING IDENTIFICATION NUMBERS?

8      A.   I DON'T KNOW.

9      Q.   OKAY.

10     A.   I DON'T KNOW WHICH -- WHAT THE REASON WAS.   I

11  DON'T REMEMBER WHAT THE REASON WAS AT THIS POINT.

12     Q.   YOU STILL HAVE THAT LETTER?

13     A.   NO.

14     Q.   SO THE LETTER SAID THAT YOU COULD GO ONLINE TO

15  MAKE A CORRECTION TO YOUR BALLOT; IS THAT RIGHT?

16     A.   YES.

17     Q.   DO YOU RECALL WHAT WEBSITE IT TOLD YOU TO GO ON?

18     A.   WAS IT TEXASVOTE.ORG OR ONE OF THOSE -- I'M NOT

19  SURE.   YOU KNOW WHERE YOU CAN CHECK -- IT'S THE WEBSITE

20  WHERE YOU CAN CHECK IF YOU'RE REGISTERED TO VOTE, AND

21  ALL OF THAT.

22     Q.   GOT IT.

23          AND ON THE WEBSITE THAT YOU WENT TO, YOU WERE

24  ABLE TO CORRECT YOUR BALLOT; IS THAT RIGHT?

25     A.   YES, I COULD -- WELL, I DON'T KNOW THAT I WAS



Page 43

1    ABLE TO CORRECT MY BALLOT, BUT I WAS ABLE TO VERIFY THAT

2    IT -- THAT I HAD MAILED IT IN, THAT IT WAS ME.  SO I

3    DON'T KNOW THAT THERE WAS A PLACE, LIKE, IT DIDN'T SHOW

4    ME MY BALLOT TO SEE WHAT WAS WRONG AND COULD -- I DON'T

5    KNOW.  I JUST HAD TO PUT CERTAIN -- I HAD TO PUT ALL MY

6    INFORMATION IN ABOUT ME, AND THEN, I GUESS, THEY

7    REALIZED IT WAS ME, OR I PROVED THAT IT WAS ME.  I DON'T

8    KNOW HOW THEY -- I DON'T KNOW HOW TO EXPLAIN THAT.  I

9    DIDN'T --

10        Q.  SO --

11        A.  -- PICTURE OF MY BALLOT OR, YOU KNOW, WHAT WAS

12   WRONG WITH IT OR ANYTHING LIKE THAT.  I JUST GAVE THEM

13   THE INFORMATION THAT WAS REQUESTED AND THEN CHECKED BACK

14   LATER AND IT WAS ACCEPTED.

15        Q.  SO WHEN YOU WENT ONLINE TO FILL OUT A REPLACEMENT

16   BALLOT, YOU FILLED OUT A BLANK REPLACEMENT BALLOT WITH

17   ALL THE INFORMATION; IS THAT CORRECT?

18        A.  I DON'T -- I DON'T KNOW.

19        Q.  OKAY.

20        A.  I DIDN'T -- THE ONLY THING -- THE ONLY

21   CORRECTIONS I THINK I MADE WERE ABOUT MY IDENTIFICATION.

22   IT --

23        Q.  DO YOU RECALL THAT SPECIFICALLY --

24        A.  IT WAS NOTHING ABOUT WHO I WAS VOTING FOR.

25        Q.  SO --



Page 44

1    A.   IT WASN'T THE BALLOT ITSELF, IT WAS MY

2    IDENTIFICATION.  DOES THAT --

3    Q.   AND --

4    A.   -- MAKE SENSE, I DON'T KNOW.  I'M TRYING TO --

5    I'M TRYING TO MAKE SURE THAT IT'S CLARIFIED OF WHAT I

6    WAS CORRECTING.

7    Q.   I APPRECIATE THAT.

8         SO IT IS A CORRECT SUMMARY OF YOUR TESTIMONY JUST

9    THERE THAT YOU WERE CORRECTING SOME FORM OF VOTER ID,

10   AND NOT WHO YOU WERE ACTUALLY VOTING FOR?

11   A.   EXACTLY.

12   Q.   AND ONCE YOU DID THAT ONLINE, DID YOU HAVE TO

13   PRINT AND MAIL ANYTHING, OR HOW DID YOU --

14   A.   NO.  THEY JUST SAID KEEP CHECKING BACK AND, YOU

15   KNOW, AND I DID CHECK BACK OVER -- SEEMED LIKE IT WAS

16   SEVERAL WEEKS, BUT I DON'T KNOW IF IT REALLY WAS 'CAUSE

17   I WAS ANXIOUS ABOUT IT.  BUT FINALLY IT DID SHOW THAT IT

18   HAD BEEN ACCEPTED.

19   Q.   SO YOU WERE ABLE TO SUBMIT A NEW MAIL BALLOT

20   ONLINE, AND THEN YOU WAITED, AND KEPT CHECKING UNTIL YOU

21   WERE NOTIFIED THAT IT HAD BEEN ACCEPTED; IS THAT

22   CORRECT?

23   A.   I DIDN'T --

24        MR. BARON:  OBJECT TO FORM.

25   A.   I DIDN'T SUBMIT A NEW BILL IN -- MAIL-IN BALLOT



Page 45

1    ONLINE, NO.

2       Q.  (BY MR. BERG)  HOW WOULD YOU DESCRIBE WHAT YOU

3    DID ONLINE, THAT YOU SUBMITTED?

4       A.  I JUST VERIFIED THAT WHAT I HAD PREVIOUSLY

5    SUBMITTED WAS FROM ME, THAT I WAS THE PERSON.  IF IT WAS

6    MISSING A SPECIFIC -- I DON'T REMEMBER IF IT WAS A

7    SPECIFIC -- IF IT WAS MY DRIVER'S LICENSE THAT HAD BEEN

8    LEFT OUT, PUT IN INCORRECTLY, OR THE LAST FOUR OF MY

9    SOCIAL HAD BEEN PUT IN CORRECTLY.  I DON'T -- I DON'T

10   KNOW WHAT IT WAS SPECIFICALLY, BUT I JUST HAD TO VERIFY

11   MY IDENTIFICATION.

12      Q.  THANK YOU.

13          AND THEN, I BELIEVE, YOU TESTIFIED THAT YOU THEN

14   CHECKED SEVERAL TIMES TO MAKE SURE THAT YOUR BALLOT HAD

15   BEEN ACCEPTED; IS THAT RIGHT?

16      A.  YES.

17          MR. BARON:  SORRY TO INTERRUPT.  WE'VE BEEN

18   GOING FOR I THINK ABOUT AN HOUR.  AND SO IF WE CAN TAKE

19   A BREAK.  I NEED A COUPLE MINUTES TO WALK MY DOG AND USE

20   THE RESTROOM MYSELF.  AND I'M SURE THE COURT REPORTER

21   COULD USE A BREAK.

22          MR. BERG:  YEAH.  HOW MUCH TIME WOULD YOU

23   LIKE TO TAKE A BREAK FOR?

24          MR. BARON:  FIVE TO TEN MINUTES, ANYWHERE IN

25   THERE IS FINE.



Page 46

1            MR. BERG:  MS. PENROD, WOULD TEN MINUTES BE

2  A SUFFICIENT BREAK FOR YOU?

3            THE WITNESS:  THAT WOULD BE FINE.

4            MR. BERG:  OKAY.  LET'S TAKE A TEN MINUTE

5  BREAK.

6            LET'S GO OFF THE RECORD.

7            MR. BARON:  OKAY.

8            THE VIDEOGRAPHER:  THE TIME IS 11:08 A.M.,

9  AND WE ARE OFF THE RECORD.

10            (OFF THE RECORD.)

11            THE VIDEOGRAPHER:  THE TIME IS NOW

12  11:23 A.M., AND WE ARE BACK ON THE RECORD.

13    Q.  (BY MR. BERG)  MS. PENROD, BEFORE WE TOOK A BREAK

14  WE WERE TALKING ABOUT YOUR 2022 PRIMARY EXPERIENCE; IS

15  THAT CORRECT?

16    A.  YES.

17    Q.  AND YOU HAD TESTIFIED THAT AFTER YOU USED THE

18  ONLINE PROCESS, YOU CHECKED SEVERAL TIMES TO SEE WHETHER

19  YOUR BALLOT HAD BEEN ACCEPTED UNTIL YOU WERE NOTIFIED

20  THAT IT HAD BEEN; IS THAT CORRECT?

21    A.  YES.

22    Q.  AS WE SIT HERE TODAY, ARE THERE ANY ELECTIONS IN

23  EITHER 2022 OR 2023 WHERE YOUR BALLOT WAS ULTIMATELY NOT

24  ACCEPTED?

25    A.  NO.



Page 47

1    Q.   I BELIEVE YOU MENTIONED THAT 2022 IS YOUR FIRST

2    TIME VOTING BY MAILED BALLOT; IS THAT CORRECT?

3    A.   THAT'S CORRECT.

4    Q.   PRIOR TO THAT, HAD YOU EVER HAD TROUBLE VOTING

5    IN-PERSON?

6    A.   NO.

7    Q.   WHY DID YOU SWITCH IN 2022 TO VOTING FROM

8    IN-PERSON TO VOTE BY MAIL?

9    A.   IT WAS POST PANDEMIC.  MY 90 -- I GUESS, SHE WAS

10   90 AT THAT TIME, YEAR-OLD MOTHER IS STILL, YOU KNOW,

11   VERY -- YOU KNOW, MENTALLY CAPABLE, DISCUSSES POLITICS,

12   WANTS TO VOTE.  I JUST FELT IT WOULD BE EASIER, SINCE WE

13   ALL QUALIFIED TO VOTE -- TO VOTE BY MAIL, IT WOULD BE A

14   LOT EASIER NOT TO GO OUT AND EXPOSE HER TO A LOT OF

15   PEOPLE 'CAUSE WE JUST -- WE STILL MASK WHEN WE GO TO THE

16   GROCERY STORE, SHE'S -- YOU KNOW, SHE'LL BE 92.  I JUST

17   DON'T WANT TO TAKE THAT RISK SO -- AND SHE DOESN'T

18   EITHER.  SO WE JUST FELT THAT IT WOULD BE EASIER TO VOTE

19   BY MAIL.  AND IT TURNED OUT, HER'S WAS ACCEPTED, SHE

20   OBVIOUSLY FILLED HERS OUT CORRECTLY.  BUT MY HUSBAND'S

21   AND I, BOTH WERE REJECTED SO -- FOR NOT FILLING IT OUT

22   SOMEHOW CORRECTLY.  SO I JUST FELT IT WAS A BETTER PART

23   OF -- TO JUST GO IN-PERSON, IF I NEED TO VOTE.

24        I -- YOU KNOW, IT JUST -- IT JUST -- IT WAS VERY

25   DISCONCERTING AND IT WAS -- I FELT AN INFRINGEMENT OR AN



Page 84

```
 1   UNITED STATES OF AMERICA,    §
          PLAINTIFF,              § CASE NO. 5:21-CV-1085-XR
 2                                §
     V.                           §
 3                                §
     THE STATE OF TEXAS, ET       §
 4   AL.,                         §
          DEFENDANTS              §
 5
 6
 7
 8                   REPORTER'S CERTIFICATION
                      ORAL DEPOSITION OF
 9                       ALICE PENROD
                        APRIL 27, 2023
10
11       I, KAREN GONZALEZ, A NOTARY IN AND FOR THE STATE OF
12   TEXAS, HEREBY CERTIFY TO THE FOLLOWING:
13       THAT THE WITNESS, ALICE PENROD, WAS DULY SWORN BY THE
14   OFFICER AND THAT THE TRANSCRIPT OF THE ORAL DEPOSITION
15   IS A TRUE RECORD OF THE TESTIMONY GIVEN BY THE WITNESS;
16       THAT A COPY OF THE CERTIFICATE WAS SERVED ON ALL
17   PARTIES AND/OR THE WITNESS SHOWN HEREIN ON
18   _____.
19       I FURTHER CERTIFY THAT PURSUANT TO FRCP RULE
20    30(F)(1) THAT THE SIGNATURE OF THE DEPONENT:
21        X  WAS REQUESTED BY THE DEPONENT OR A PARTY BEFORE
22   THE COMPLETION OF THE DEPOSITION AND THAT SIGNATURE IS
23   TO BE BEFORE ANY NOTARY PUBLIC AND RETURNED WITHIN 30
24   DAYS FROM DATE OF RECEIPT OF THE TRANSCRIPT.  IF
25   RETURNED, THE ATTACHED CHANGES AND SIGNATURE PAGE
```



Page 85

1    CONTAINS ANY CHANGES AND THE REASONS THEREFOR;

2        WAS NOT REQUESTED BY THE DEPONENT OR A

3    PARTY BEFORE THE COMPLETION OF THE DEPOSITION.

4        I FURTHER CERTIFY THAT I AM NEITHER COUNSEL FOR,

5    RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES OR

6    ATTORNEYS IN THE ACTION IN WHICH THIS PROCEEDING WAS

7    TAKEN, AND FURTHER THAT I AM NOT FINANCIALLY OR

8    OTHERWISE INTERESTED IN THE OUTCOME OF THE ACTION.

9        CERTIFIED TO BY ME THIS 14TH DAY OF MAY, 2023.

10

11

12    _____

         KAREN A. GONZALEZ

13       NOTARY IN AND FOR THE

         STATE OF TEXAS

14       NOTARY:  132644762

         MY COMMISSION EXPIRES:

15       AUGUST 26, 2024

         MAGNA LEGAL SERVICES

16       866-624-6221

         WWW.MAGNALS.COM

17

18

19

20

21

22

23

24

25



# EXHIBIT 31

Nancy Crowther                                          June 17, 2022

```
1              UNITED STATES DISTRICT COURT
                        for the
2              WESTERN DISTRICT of TEXAS

3    LA UNION DEL PUEBLO            §
     ENTERO, et. Al.               §
4                                  §
          Plaintiff,               §
5                                  §         Civil Action No.
          v.                       §         5:21-cv-00844-XR
6                                  §
     GREGORY W. ABBOTT, et al.     §
7                                  §
          Defendant.               §
8

9

     **********************************************************
10
              ORAL AND VIDEOTAPED DEPOSITION OF
11
                     NANCY CROWTHER
12
                     June 17, 2022
13
     **********************************************************
14

15         ORAL and VIDEOTAPED DEPOSITION OF NANCY CROWTHER,

16   produced as a witness at the instance of the Plaintiff,

17   and duly sworn, was taken in the above-styled and

18   -numbered cause on the 17th day of June, 2022, from

19   10:08 a.m. to 3:14 p.m., before Karen A. Gonzalez,

20   Commissioned Notary, in and for the State of Texas,

21   reported by machine shorthand, remotely from Dallas

22   County, Texas, pursuant to the Texas Rules of Civil

23   Procedure, the Texas Supreme Court Emergency Order

24   Regarding the Covid-19 State of Disaster and the

25   provisions stated on the record or attached hereto.
```

1    Q.  And how long have you been registered to vote?

2    A.  Since I was 22.  Do the math.

3    Q.  And --

4    A.  But as soon as I could, I got registered.

5    Q.  And you're currently registered to vote in

6    Travis County, right?

7    A.  Correct.

8    Q.  Do you have a rough sense for how long you've

9    been registered in Travis County?

10   A.  Forty years.

11   Q.  Okay.  And you vote frequently, right?

12   A.  Yes.

13   Q.  You mentioned about the 2020 instance in which

14   you attempted to vote by mail, and we will circle back

15   to that, but I assume that means, then, that you've

16   voted in person, as well, right?

17   A.  No.

18   Q.  You have not voted in person before?

19   A.  I have voted in person as often, but the mail-in

20   ballot was a different issue.

21   Q.  Right.  Sorry, I'm -- I apologize -- strike

22   that -- let me restate my question.

23   A.  Okay.

24   Q.  You have also voted in person before, right?

25   A.  Yes.

Nancy Crowther

June 17, 2022
Page 31

```
 1     Q.  Okay.  And have you ever used an assister to
 2   vote?
 3     A.  I have one available.  My attendant is available
 4   to assist when needed.
 5     Q.  And have you used the help of your attendant or
 6   anybody else to help you vote?
 7     A.  In situations where I've dropped the ballot, I
 8   had need for help getting the adaptive equipment to use
 9   the voting machine disconnected from the Velcro; just in
10   those instances.
11     Q.  Okay.  Have you ever requested an accommodation
12   at a polling location?
13     A.  The only accommodation I recall asking for has
14   been the high-enough, wide-enough booth to accommodate
15   my wheelchair.
16     Q.  Do you have a rough sense for when that was?
17     A.  It's generally every election.
18     Q.  Okay.  So it's fair to say that you're familiar
19   with voting practices in Travis County, right?
20     A.  Yes.
21     Q.  Okay.  And you're familiar with the voting
22   options that Travis County has offered in the past,
23   right?
24     A.  Voting options?  What do you mean by that?
25     Q.  You're familiar with the voting practices in
```

Nancy Crowther

June 17, 2022
Page 32

```
 1   Travis County in the past, too, right?
 2       A.  I'm still not sure what you're asking.
 3       Q.  Sure.
 4           You know how voting practice works -- strike
 5   that --
 6           You know how voting works in Travis County,
 7   right?
 8                MS. SIFUENTES-DAVIS:   Objection, form.
 9       A.  Yeah.  I'm still having --
10       Q.  (BY MR. HERBERT)  It's okay.
11       A.  -- trouble with that question.
12       Q.  I think if I can rephrase it in a moment.
13       A.  Okay.
14       Q.  So we're probably gonna touch on the 2020
15   instance a couple of times here.  So we don't -- my
16   question just for right now is:  Were you able to vote
17   in 2020?
18       A.  Yes.
19       Q.  Okay.  And did you vote in the 2020 general
20   election?
21       A.  Yes.
22       Q.  Okay.  Did you vote in the 2020 primary election?
23       A.  I don't recall.
24       Q.  Did you vote in the 2020 special election in July
25   of 2020?
```

1    A.   I don't recall.

2    Q.   Did you vote in the 2020 July primary runoff?

3    A.   Specifically, I don't recall.  This was all

4    during COVID, and it's kind of a blur, but I don't

5    recall.

6    Q.   Okay.  Do you know if you voted -- strike that --

7         Did you vote in the 2021 November -- the

8    November 2021 constitutional amendment election?

9    A.   Yes.

10   Q.   Okay.  And let's talk about 2022.

11        Did you vote in the 2022 primary election on

12   March 1st?

13   A.   Yes.

14   Q.   Okay.  Which party's primary did you vote in?

15   A.   Democratic.

16   Q.   And have you voted in Texas Democratic primaries

17   before?

18   A.   Yes.

19   Q.   Do you have a rough estimate on how many times?

20   A.   Not really.

21   Q.   Okay.  Have you ever voted in the Republican

22   primary in Texas?

23   A.   Yes.

24   Q.   Do you have a rough sense for when that was?

25   A.   No.

Nancy Crowther                                        June 17, 2022
                                                            Page 43

1      A.  My experience with voting in different polling

2    places, they are not all accessible, because they can't

3    see you at the door, and you can't open the door to get

4    in.  So, you know, it's your definition of where you're

5    at, as far as being able to have accessibility.  Now, I

6    would say that it's getting better, but it just depends

7    on the individual.  When I'm short, people don't see me

8    out windows unless I get someone to open the door for

9    me.  So that is an access issue.  It will always be an

10   access issue to get into the polling place.

11      Q.  (BY MR. HERBERT)  In other words, for people who

12   need accommodations, there's no such thing as a

13   one-size-fits-all accommodation, right?

14            MS. SIFUENTES-DAVIS:  Objection, form.

15      A.  It has been my experience.  It doesn't fit

16   everybody.  But the -- it has tried to fit everybody,

17   but not all shoes fit the same person.

18      Q.  (BY MR. HERBERT)  And you had mentioned the issue

19   of accessibility for getting into a polling place and

20   the situation of doors or folks not being able to see

21   you.

22            Has that happened to you before?

23      A.  Yes.

24      Q.  When did that happen?

25      A.  Quite a few times, if I've been by myself without

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900   San Antonio, Texas 78232
210-697-3400                                                 210-697-3408

1  my attendant or if not another person shows up to vote

2  behind me or comes out from voting.  So there's some

3  times there -- so I -- I can't give you a number of how

4  many times that's happened, but it does happen quite

5  frequently.

6  Q.  When was the most recent time that's happened?

7  A.  I believe it was at a facility I wasn't familiar

8  with, and it was, I think, sometime this year, because I

9  went with my attendant, and she had to open the door,

10  and we had to go down a long hallway, and I said, If you

11  weren't here, I wouldn't have gotten in, because the

12  people that were voting were exiting through different

13  areas.  I could have been sitting there a long time.

14  Q.  So that was in 2022?

15  A.  As far as I can recall.  I believe it was a

16  primary.

17  Q.  Was it the March 2022 primary?

18  A.  I believe it was.

19  Q.  Okay.  Did it happen any other times in 2022?

20  A.  No.

21  Q.  Okay.  Did it happen anytime in 2021?  There was

22  the November 2021 election.  Did it happen at that

23  election?

24  A.  No.  That was the one where I carried it, right?

25  Q.  Are you referring to the November 2022 -- sorry.

Nancy Crowther                                          June 17, 2022
                                                              Page 45

1    Strike that --

2          Are you referring to the November 2020 general

3    election that we were previously talking about, how you

4    waited in line with cars?

5       A.   I've gotten lost on the question.

6       Q.   Sorry about that.  Let me restate it.

7          So you'd mentioned that at the March 2022

8    Democratic primary, when you went to vote, you were not

9    able to open the door by yourself, and you would not

10   have otherwise been able to open the door but for your

11   attendant who was there with you, right?

12      A.   Correct.

13      Q.   Did that also happen to you in the November 2021

14   election?

15      A.   Now, which one was that?

16      Q.   That would be the November 2021 constitutional

17   amendment election.

18      A.   Oh, yes.

19      Q.   It happened to you then, as well?

20      A.   Yes.

21      Q.   And was your attendant there with you?

22      A.   No.

23      Q.   But you were able to vote, right?

24      A.   I had to rely on another person to hold the door

25   open -- or open the door so I could get access into the

1    polling place.

2        Q.  And did that happen during the November 2020

3    general election?

4        A.  Well, you heard the story on that one.

5        Q.  Oh, that's right.  So it did not happen in the

6    November 2020 -- November election, right?  The issue of

7    not being able to get through doors because no one was

8    at the door to see you?

9        A.  Well, finding the location of the white box, I

10   think would be equivalent --

11       Q.  Okay.

12       A.  -- to not being able to get into a building,

13   because sitting in a line of cars while you're in a

14   wheelchair is rather intimidating, but...

15       Q.  I imagine so, and I didn't mean to make any

16   statement about that.  I just meant to say I'm --

17       A.  You're right.

18       Q.  -- trying to talk, specifically, just about the

19   door issue.  And we can talk about all of those, but the

20   door issue didn't happen in the 2020 election --

21       A.  Correct.

22       Q.  Did it happen in the July 2020 Democratic primary

23   runoff?

24       A.  July 2020?  No.

25       Q.  Did it happen any other times in 2020?

1   implementing ADA requirements, so I have vast knowledge,

2   and I don't need to speak with Mr. Moore.  I dealt with

3   Dana Dubois directly.

4       Q.  And when was that?  You said a long time before

5   2020; is that right?

6       A.  Yes.

7       Q.  Okay.  And you -- just to be clear, you never

8   called or contacted Mr. Tim Moore, the ADA coordinator,

9   right?

10      A.  No.

11      Q.  Okay.  Let's talk about SB1.

12          Do you contend that SB1 has harmed you?

13      A.  I don't feel like I have full knowledge -- or I

14   haven't read the whole bill to understand it.  I'm not a

15   lawyer.

16      Q.  Some might say that to be a good thing.

17      A.  Yeah.  There are jokes about that.

18          But to the basic knowledge, I know that it

19   would -- because of my disability that is progressive, I

20   will need more and more help, and the help that I will

21   be needing is going to be going through more, I want to

22   say, threatening issues that could -- how should I say

23   this?  It could jeopardize the relationship with my

24   attendant because of the, What you can do; what you

25   can't do.  If you instinctively pick up a ballot and

Nancy Crowther

June 17, 2022
Page 53

 1   it's not in the rule to pick up the ballot off the
 2   floor, you know, those types of things, I would be
 3   mortified for them if they were to get in trouble just
 4   for helping me.
 5       Q.  So your concern is about the future effect of
 6   Senate Bill 1 on your ability to vote, correct?
 7       A.  Yes.
 8       Q.  Has Senate Bill 1 thus far affected your ability
 9   to vote?
10       A.  Not to my knowledge.  If I had not done any -- I
11   haven't tried any mail-in voting or whatever else they
12   asked for in SB1 that I know of.
13       Q.  Okay.  Before we move on and go more in depth, do
14   you have any personal knowledge of anyone else for whom
15   SB1 has affected their ability to vote?  Or are the --
16   only personal knowledge you have about yourself?
17       A.  My own knowledge is all I have right now.
18       Q.  Okay.  So just to be clear, you do not have any
19   personal knowledge about anybody other than yourself who
20   has been affected by SB1 for the ability to vote,
21   correct?
22       A.  I would have to say, yes.
23       Q.  Okay.  And also, just to be clear, you do not
24   have any reason to believe that Senate Bill 1 affected
25   your ability to vote in the March 2022 primary only,

1    correct?

2        A.   Me personally?   No.

3        Q.   Okay.   And I'm just going to ask a couple more

4    questions like that before we move on to talking a

5    little bit more about SB1 specifically.

6        A.   Okay.

7        Q.   But again, just to clarify, you do not have any

8    basis to believe that SB1 harmed your ability to vote in

9    the May 7th local election specifically, correct?

10       A.   To clarify your question, I did not take my

11   attendant with me on that election because I did not

12   want to jeopardize their relationship with me based on

13   the new requirements, so I didn't take her.   So it has

14   impacted me.

15            Was that the question?

16       Q.   Sorry.   Not quite.   I'm trying to ask just a

17   little bit -- something different.   I understand that

18   you have concerns about the -- about certain ways in

19   which you believe that SB1 will affect you.   So I'm just

20   trying to make sure that I understand in what context

21   you're talking about those things.

22            My question is a little bit more just about --

23   you had said that you were concerned about the future

24   affect of SB1 because of the progressive nature of your

25   disability.

1    A.  Right.

2    Q.  Okay.  So for the mail issue, as in -- for the

3  USPS issue -- let's call it that, right?

4    A.  Uh-huh.

5    Q.  You would agree that SB1 has no effect on that,

6  right?

7    A.  It does have an effect on that.

8    Q.  Okay.  Tell me how SB1 affects your ability to

9  mail something by the USPS?

10    A.  Well, the -- to me, I don't find it safe to mail

11  something as important as a ballot, or with a vote in

12  it, through a system that is not reliable.

13    Q.  Is the system not reliable because of SB1, or

14  because of other reasons?

15    A.  The system become unreliable during the changes

16  in the lawmaking for mail delivery that related to --

17  and I mean, we're going to go all over the place, but it

18  does all come back to SB1, because it goes back out to

19  mailing, so it is all inter-related and a catch-22-type

20  situation.

21    Q.  But you can vote by mail through the USPS before

22  SB1, right?

23    A.  Yes.

24    Q.  Okay.  And you can vote by mail through the USPS

25  after SB1, right?

Nancy Crowther

June 17, 2022
Page 78

1      A.  I could, if I chose.

2      Q.  Okay.  So then my questions is --

3      A.  My -- I'm sorry.

4          My hesitancy is, prior to SB1, I felt more free

5  to do it, whereas now, after SB1, I feel as if it's more

6  difficult because of the stress it puts on the voter to

7  make sure everything gets done right for that one single

8  vote to get to be counted.

9      Q.  Okay.

10     A.  And --

11     Q.  Sorry.

12     A.  -- so I have to anticipate things differently

13  than you would.  You can fill it out, throw it in the

14  mailbox, and go.  Me, I have to get help.  I have to do

15  this.  I have to do that, and it's a lot harder for me.

16  So now, the tension is higher because now we have a new

17  law, so --

18     Q.  Okay.  So I'm -- I guess what I'm trying to get

19  at is that -- and I'm not trying to put words in your

20  mouth, so please do correct me if I'm wrong, but it

21  seems that there are independent concerns that you have

22  with the USPS, which the Texas legislature does not

23  control, on the one hand, and then you also have

24  concerns about what voting by mail looks like under SB1;

25  is that right?

Nancy Crowther

June 17, 2022
Page 79

1      A.   Yes.

2      Q.   Okay.   So you would agree that the Texas

3   legislature has no effect on the USPS's quality of

4   service, right?

5      A.   In all actuality, if you're going to do a mail-in

6   vote, you have to go through the USPS; is that correct?

7      Q.   You're asking me questions, now.

8      A.   I'm saying that, yeah, it has an effect, because

9   it changes people's trust level on whether or not they

10  want to go through mail ballots or in person, if they

11  can, or if they have to go to a drop box.

12     Q.   Okay.   So just to make sure I'm understanding,

13  you're saying that, yes -- when you say yes, you're

14  saying, Yes the Texas legislature does have an effect on

15  the USPS's mail service, right?

16     A.   Yes.

17     Q.   Okay.   So then, can you explain to me also now --

18  you had mentioned a drop box issue when it comes to

19  vote-by-mail.

20          What is your qualm with Senate Bill 1's effect on

21  drop boxes, if any?

22     A.   I'm not real sure when it all changed, but the

23  drop -- the number of polling places, the drop boxes for

24  mail-in ballots, all shrank in number, in access.   And

25  so now -- now I say, because I only found one in Travis

 1    A.  Yes.

 2    Q.  Okay.  So you would agree that the Texas

 3  legislature has no effect on the USPS's quality of

 4  service, right?

 5    A.  In all actuality, if you're going to do a mail-in

 6  vote, you have to go through the USPS; is that correct?

 7    Q.  You're asking me questions, now.

 8    A.  I'm saying that, yeah, it has an effect, because

 9  it changes people's trust level on whether or not they

10  want to go through mail ballots or in person, if they

11  can, or if they have to go to a drop box.

12    Q.  Okay.  So just to make sure I'm understanding,

13  you're saying that, yes -- when you say yes, you're

14  saying, Yes the Texas legislature does have an effect on

15  the USPS's mail service, right?

16    A.  Yes.

17    Q.  Okay.  So then, can you explain to me also now --

18  you had mentioned a drop box issue when it comes to

19  vote-by-mail.

20    What is your qualm with Senate Bill 1's effect on

21  drop boxes, if any?

22    A.  I'm not real sure when it all changed, but the

23  drop -- the number of polling places, the drop boxes for

24  mail-in ballots, all shrank in number, in access.  And

25  so now -- now I say, because I only found one in Travis

1    County, and I had to hunt that one down, because there

2    were initially going to be four, and then they shrunk it

3    down to one.  So once you find that, you have to figure

4    out how you're going to get there, who's going to go

5    with you if you need someone to go with you, what you're

6    going to need, what the weather is, how much time it's

7    going to take, and that's just -- it's a big issue.

8         Q.  Okay.  You had mentioned earlier -- all right.

9    Let me make sure I get this right.  Okay.  I think we

10   can put a pin in the vote-by-mail questions for now.

11   Let's move on to talk about -- I might have us come back

12   and ask a little bit more about that, if I can remember

13   my question.  But let's talk a little bit about your

14   attendant and actually going and voting in person.  Has

15   SB1 hampered your ability to have help at the polls?

16        A.  With my attendant, I feel that at -- you know,

17   having to sign whatever the paperwork is puts her more

18   in a position of -- of -- I don't want to say danger,

19   but in a position that, frankly, they aren't paid for,

20   you know.  They're not paid to -- you know, they're here

21   to help me do whatever I need done and -- but now it's

22   become a big issue on who's helping you and what they

23   can help you do.  Now, I've already talked about what I

24   can and cannot do, and that's just where I'm at now.  In

25   a year or so, who knows where I'll be at.  It will be

1    worse.  My needs will be more, so -- but I don't want to

2    put my attendant, who I value greatly, into that type of

3    a situation where, God forbid, you know, they should be

4    whatever the legal ramifications are for overstepping

5    the bounds of the requirements of SB1 to pick up my

6    ballot off the floor because I dropped it.

7         Q.  Right.

8         A.  I mean, it's just not fair.

9         Q.  Okay.  Let's talk a bit about this.  As we get

10   into it, I just want to introduce a brief exhibit, just

11   to make sure I understand the whole universe of things

12   here.

13        I'm going to mark this exhibit as

14   Exhibit Number 9.

15             (Exhibit 9 marked.)

16   Q.  (BY MR. HERBERT)  So this is a Texas Tribune

17   article from February 16, 2022.  Do you see at the top,

18   the title reads, "Texans with disabilities fear new

19   restrictions on voting could help" -- strike that --

20   sorry.  Let me reread that.

21        Do you see at the top where it reads, "Texans

22   with disabilities fear new restrictions on voting help

23   could mean criminal charges at polls."

24        Did I read that right?

25   A.  That's correct.

1    about.

2        A.  Okay.

3        Q.  Did your attendant help you cast ballots in the

4    2020 November general election?

5        A.  Yes.  That was the vote-by-mail one, correct?

6    I'm just trying to get -- it's getting a little

7    confusing.

8        Q.  Right.  You dropped off your --

9        A.  Right.  Okay.

10       Q.  -- mail-in ballot --

11       A.  Right.

12       Q.  -- in the November 2020 general election.

13       A.  Okay.

14       Q.  And your assistants -- one of your assistants

15   helped you in that election, right?

16       A.  Yes.

17       Q.  Okay.  What about the July 2020 Democratic

18   primary runoff?

19       A.  July 2020.  I'm trying to think if COVID affected

20   any of my abilities here.  Do you know which one that

21   was, again?

22       Q.  The July 2020 Democratic primary runoff.

23           Did you vote in that election?

24       A.  I believe I did.

25       Q.  And did one of your assistants --

Nancy Crowther

June 17, 2022
Page 85

1     A.   Yes.

2     Q.   -- help you with that?

3     A.   Yes.

4     Q.   And you voted in the March 2020 Democratic

5   primary, right?

6     A.   Yes.

7     Q.   And did one of your attendants help you in that

8   election?

9     A.   Yes.

10    Q.   And that election was in person, correct?

11    A.   Yes.

12    Q.   Okay.  So now, you said that your concern's about

13   the assistance that your attendants can provide you

14   moving forward under Senate Bill 1, right?

15    A.   Uh-huh.

16    Q.   Did your attendants help you in the March 2022

17   primary?

18    A.   March -- no, because of the concerns.

19    Q.   Did your attendant go with you to the voting

20   polls in the March 2022 primary?

21    A.   No.

22    Q.   How did you get to the polls in the March 2022

23   primary?

24    A.   I took a bus.

25    Q.   Okay.

Nancy Crowther

1      A.  But they got me up, they got me dressed, they fed

2    me and got me out the door so I could get to the bus so

3    I could get to the polling place, so they have a direct

4    impact on my ability to vote.

5      Q.  Okay.  And can I assume -- is it -- is it also

6    the case that they did not go with you to the May 7th

7    local and constitutional election this year in 2022?

8      A.  That is true, and the same is true for -- my

9    ability to get there was based on their assistance to

10   get me up and get dressed and get in my chair and get me

11   out the door, and I took the bus.

12     Q.  Okay.  And same question, but for -- as you can

13   probably guess -- the May 2022 Democratic primary runoff

14   election?

15     A.  That one was different, I believe, because it was

16   at a different polling site, and I believe she drove me

17   there and had to help me with the door in that

18   situation.

19     Q.  Okay.  So the May --

20     A.  I believe that was the one.

21     Q.  So the May 2022 Democratic primary runoff, your

22   attendants drove you to the poll; is that right?

23     A.  Yes.

24     Q.  And they helped you with the door getting into

25   the polling location; is that right?

1          A.   Yes.

2          Q.   Did they go into the polling location with you?

3          A.   Yes.

4          Q.   What did they -- what help did they provide you

5     in the polling location?

6          A.   They helped me bring the signature thing close to

7     me -- closer to me, because the polling person just kind

8     of flipped it, but I have short arms.  So she brought it

9     closer and tilted it to where she knew I could write on

10    it.  So -- she knows what my limitations are, to help me

11    in what I need to get done, and then when we got over to

12    the -- the booth, she pulled the Velcro thingamajigger

13    off the control and kind of stood by to make sure I

14    didn't drop anything.

15         Q.   Okay.  And you were able to vote in the May 2022

16    Democratic --

17         A.   Yes.

18         Q.   -- primary runoff.

19              So SB1 did not prevent you in that election --

20    not talking about other elections or your concern with

21    future elections, but in that election, Senate Bill 1

22    did not prevent you from having the help that you needed

23    at the polls, right?

24         A.   I want to say that we weren't prohibited by any

25    signatures or anything, that I recall, that would

 1   stop -- I mean, I would stop her from helping me if she

 2   had to sign something that would cause any harm -- harm

 3   to her.  So that's when I would stop it.  But we weren't

 4   required to sign anything, so we just kind of made our

 5   way through.

 6       Q.  Okay.  So let's talk about the signing, but just

 7   briefly, before we do, I just want to make sure I have a

 8   clear understanding, just to be clear, because I think

 9   my question is just a tiny bit different.

10           So, at least with regards to -- or strike that --

11           Just with regards to this May 2022 Democratic

12   primary runoff -- not another one -- SB1 did not prevent

13   you from getting the help you needed at the polls,

14   right?

15       A.  Correct.

16       Q.  Okay.  So let's talk about signing, because you

17   were saying that your concern moving forward is about

18   your attendants having to sign things --

19           MS. SIFUENTES-DAVIS:  Objection, form.

20       Q.  (BY MR. HERBERT) -- right?

21       A.  Yeah.  And the issue is that -- the form they

22   have to sign to provide assistance.

23       Q.  What is your concern with that?

24       A.  It states about the legal obligations and failure

25   to follow.  I don't have one in front of me, but you

1    probably do.  It just gives more of a -- more of an

2    opportunity for litigation upon, which -- I don't want

3    to put my attendant through that.

4        Q.  So -- please correct me if I'm wrong, but just so

5    I'm understanding.  So you're saying that you believe

6    that your attendant would face legal consequences for

7    giving you the help that you need at the polls under SB1

8    in the future; is that right?

9        A.  Yes.

10       Q.  Okay.  Who told you that?

11       A.  That is my understanding of what the bill

12   stipulates.  You're supposed to sign a form

13   authorizing -- or under penalty of law, et cetera,

14   compliance with this bill, and not everybody knows what

15   the compliance issues are.

16       Q.  Okay.  And you believe that compliance with the

17   bill -- not now, but in the future -- will prevent your

18   attendant from being able to give you help that you need

19   to vote; is that right?

20       A.  Yes.

21       Q.  Okay.  Now, just to be clear -- and I'm not

22   trying to change gears.  I'm asking just to -- just to

23   be clear, you don't believe that you face legal

24   consequences; you believe that your attendant would face

25   legal consequences; is that right?

 1              MS. SIFUENTES-DAVIS:   Objection, form.

 2        A.   Correct.

 3        Q.   (BY MR. HERBERT)   Okay.   And did you consult a

 4   lawyer about this question?

 5        A.   No.

 6        Q.   Did you talk to anybody from the Secretary of

 7   State's Office?

 8        A.   No.

 9        Q.   Did you talk to the Texas Secretary of State

10   himself?

11        A.   No.

12        Q.   Did you check the secretary of state website?

13        A.   No.

14        Q.   Did you talk to -- did you ask anybody from an

15   advocacy group about this question?

16        A.   That's possibly where I learned the information

17   on the ramifications of this requirement, or potential

18   ramifications.   And, frankly, my life depends on my

19   attendant, and I'll protect them in any way I need to.

20              So whatever it has to do with, knowing the law --

21   you know, you don't run red lights, but I didn't consult

22   the Secretary of State on that.   So I just want to

23   protect those that are taking care of me.

24        Q.   Do you remember the advocacy group that you

25   believe may have given you this information?

```
 1              MS. SIFUENTES-DAVIS:  Objection, form.
 2       A.  It really doesn't matter if they're paid or
 3   unpaid.  They're providing me in this, some assistance.
 4   And they still had to sign an oath of some sort --
 5       Q.  Okay.
 6       A.  -- to -- so, I mean, I can't answer that
 7   truthfully or honestly.
 8       Q.  Did your attendants not have to provide an oath
 9   in the past?
10       A.  No.
11       Q.  So the oath requirement under SB1 is something
12   new that your attendants would have to do moving
13   forward; is that right?
14       A.  It's my understandings, yes.
15       Q.  Okay.  Let's talk a little bit about -- let's
16   talk a little bit about that oath.
17           What is your specific concern about the oath?
18       A.  It's a -- from my understanding and my limited
19   legal background, it would be a legal document that has
20   their signature and could jeopardize -- if something
21   were to happen, could jeopardize their well-being.
22       Q.  Is it -- are you concerned -- and again, please
23   correct me if I'm wrong.  I'm just trying to understand
24   your concern with those.  Are you concerned that the
25   oath that they would sign prevents them from giving you
```

 1   the sort of help that you will need in the future -- not

 2   that you need right now, but that you will need in the

 3   future.  Is that your concern?

 4              MS. SIFUENTES-DAVIS:  Objection, form.

 5      A.  That's part of the concern.

 6      Q.  (BY MR. HERBERT)  Okay.  What's the rest of the

 7   concern?

 8      A.  That something as meaningful as voting is to me,

 9   that I need assistance with now, much less more in the

10   future, has now a bump, or speed bump, in the process,

11   to where now it's become more threatening to bring an

12   attendant in because they have to sign something that

13   says, Legally, if you do X, Y, and Z, you are in

14   violation of this law.

15          And it's like, why would I want to bring a

16   person, much less my attendant, into that role and have

17   them get all freaked out about, You mean to tell me if I

18   help you do something that is not on this form or I do

19   something that is on this form, I could get in trouble?

20          And it's just not worth it when your life is

21   dependant on your attendant or your caregiver or your

22   spouse or anything.  It's just not worth it.

23      Q.  Okay.  So let me -- let me try and -- correct me

24   if I'm wrong, but let me try and categorize the concerns

25   that you have with the oath, and then we can talk about

 1   each of those concerns independently, okay?

 2       A.  Uh-huh.

 3       Q.  So it sounds as though your concerns are twofold

 4   with the oath.  First being that the oath will -- strike

 5   that --

 6           First being that the oath will prevent your

 7   attendants from giving you the help that you need in the

 8   future.  And second being that the mere existence of

 9   having to take an oath is a speed bump or a road block,

10   as you said, for something -- it's something new that

11   your attendants now have to do that they didn't used to

12   have to do; is that right?

13               MS. SIFUENTES-DAVIS:  Objection, form.

14       A.  That is correct, in my eyes.

15       Q.  (BY MR. HERBERT)  Okay.  So let's talk about each

16   one of those two things.

17           First, let's -- let's take it in reverse order,

18   though.  The existence of an oath.  So I'm gonna have

19   you look at Exhibit No. 7.  And let's turn to Page 52.

20       A.  Okay.

21       Q.  Okay.  So before we look at the text here, I just

22   want to remind you of what we had talked about when we

23   first started looking at this --

24       A.  Uh-huh.

25       Q.  -- which is to say that if language has been

```
 1   removed, it's been crossed out.  If language is
 2   underlined, it's added in; it's new.  And if language
 3   were to appear just normally, in normal font, then
 4   they've just stayed the same from whatever the law used
 5   to be.
 6         Does that make sense?
 7   A.  Yes.
 8   Q.  Okay.  So I'm gonna have us look at -- starting
 9   at Line 20, it reads, "Section 6.04.  Section 64.034,
10   Election Code, is amended to read as follows."
11         Did I read that right?
12   A.  Yes.
13   Q.  Okay.  Then Line 22, Section 64.034, Oath.  "A
14   person other than an election officer selected to
15   provide assistance to a voter must take the following
16   oath administered by an election officer at the polling
17   place before providing assistance."
18         Did I read that accurately?
19   A.  Yes.
20   Q.  Okay.  So you would agree, looking at this, that
21   there, in fact, used to be an oath that was required
22   before SB1 was enacted, right?
23   A.  Yes.
24   Q.  Okay.  So you would agree, then, that the
25   existence of an oath does not harm your ability to cast
```

Nancy Crowther

June 17, 2022
Page 101

1    a ballot, right?

2              MS. SIFUENTES-DAVIS:   Objection, form.

3         A.  I would disagree, because the oath was not

4    enforced or administered, to my knowledge, anytime I've

5    done it with an attendant.

6         Q.  (BY MR. HERBERT)  And that includes the most

7    recent election in 2022, under which Senate Bill 1 was

8    in effect; is that right?

9         A.  Right.

10        Q.  Okay.  So at the very least, the administration

11   of an oath, for you, has not changed from before the

12   enactment of SB1 to after the enactment of SB1; is that

13   right?

14        A.  I did not have my attendant available, on

15   purpose, because of the oath, at the last election I

16   voted on, because of SB1.

17        Q.  You had said that in May 2022 at the Democratic

18   primary runoff that your attendant was there with you,

19   though, right?

20        A.  She was with me, but she did not provide

21   assistance.

22        Q.  But you had said that she helped you move the

23   signature equipment; isn't that right?

24        A.  Yes, but that was not in the voting booth.

25        Q.  Where was that?

 1       A.   That was at the registration --

 2       Q.   Okay.

 3       A.   -- table.

 4       Q.   But you had also said that she helped you drive

 5  to the polls; is that right?

 6       A.   Correct.

 7       Q.   And she also helped you enter the polling

 8  location, opened the doors, right?

 9       A.   They were electric, but yeah.

10       Q.   Okay.  So your concern is not about whether SB1

11  enacted an oath where there didn't used to be an oath,

12  rather, your concern is about whether the oath will now

13  be enforced after the passage of SB1; is that right?

14            MS. SIFUENTES-DAVIS:  Objection, form.

15       A.   That's correct.

16       Q.   (BY MR. HERBERT)  So your concern is not that SB1

17  passed a new oath that didn't exist before, right?

18       A.   Well, it depends on the verbiage of the oath,

19  doesn't it?

20       Q.   Okay --

21       A.   I mean, wouldn't it?

22       Q.   So let's explore that.  I'm not trying to, you

23  know, cut you off from --

24       A.   All right.

25       Q.   -- providing your answers.

1        UNITED STATES DISTRICT COURT
                   for the
2        WESTERN DISTRICT of TEXAS

3   LA UNION DEL PUEBLO          §
    ENTERO, et. Al.              §
4                                §
         Plaintiff,              §
5                                §        Civil Action No.
         v.                      §        5:21-cv-00844-XR
6                                §
    GREGORY W. ABBOTT, et al.    §
7        Defendant.              §

8

9                    REPORTER'S CERTIFICATION
10                    ORAL DEPOSITION OF
                       NANCY CROWTHER
11                     JUNE 17, 2022

12

13       I, Karen Gonzalez, a Notary in and for the State of

14   Texas, hereby certify to the following:

15       That the witness, NANCY CROWTHER, was duly sworn by

16   the officer and that the transcript of the oral

17   deposition is a true record of the testimony given by

18   the witness;

19       That a copy of the certificate was served on all

20   parties and/or the witness shown herein on

21   _____.

22       I further certify that pursuant to FRCP Rule

23    30(f)(1) that the signature of the deponent:

24       X  was requested by the deponent or a party before

25   the completion of the deposition and that signature is

Nancy Crowther                                           June 17, 2022
                                                         Page 143

1    to be before any notary public and returned within 30

2    days from date of receipt of the transcript.  If

3    returned, the attached Changes and Signature Page

4     contains any changes and the reasons therefor;

5           Was not requested by the deponent or a

6     party before the completion of the deposition.

7       I further certify that I am neither counsel for,

8    related to, nor employed by any of the parties or

9    attorneys in the action in which this proceeding was

10   taken, and further that I am not financially or

11   otherwise interested in the outcome of the action.

12      Certified to by me this 10th day of July, 2022.

13

14

15   _____

16   KAREN A. GONZALEZ
     Notary in and for the
     State of Texas
17   Notary:  132644762
     My Commission Expires:
18   August 26, 2024
     Magna Legal Services
19   866-624-6221
     www.MagnaLS.com

20

21

22

23

24

25

# EXHIBIT 32

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3

 4
   LA UNION DEL PUEBLO ENTERO,    )
 5 et al.,                        )
              Plaintiffs,         )   Case No.
 6                                )   5:21-CV-844-XR
   vs.                            )
 7                                )
   GREGORY W. ABBOTT, et al.,     )
 8         Defendants,            )
 9 _____

10 OCA-GREATER HOUSTON, et al.,   )
              Plaintiffs,         )   Case No.
11                                )   1:21-CV-780-XR
   vs.                            )
12                                )
   JANE NELSON, et al.,           )
13         Defendants.            )

14 _____

15
   HOUSTON AREA URBAN LEAGUE, et )
16 al.,                          )   Case No.
              Plaintiffs,         )   5:21-CV-848-XR
17                                )
   vs.                            )
18                                )
   GREGORY WAYNE ABBOTT, et al., )
19         Defendants.

20 _____

21
   LULAC TEXAS, et al.,           )
22         Plaintiffs,            )   Case No.
                                  )   1:21-CV-0786-XR
23 vs.                            )
                                  )
24 JANE NELSON, et al.,           )
           Defendants.            )
25
```



1 _____

2
  MI FAMILIA VOTA, et al.,          )
3        Plaintiffs,                )   Case No.
                                    )   5:21-CV-0920-XR
4  vs.                              )
                                    )
5  GREG ABBOTT, et al.,             )
         Defendants.                )
6
7 _____

8
  UNITED STATES OF AMERICA,         )
9        Plaintiff,                 )   Case No.
                                    )   5:21-CV-1085-XR
10 vs.                              )
                                    )
11 THE STATE OF TEXAS, et al.,      )
         Defendants.                )
12

13

14 _____

15              ORAL/VIDEOTAPED DEPOSITION OF

16                    YVONNE IGLESIAS

17                     APRIL 17, 2023

18 _____

19

20          ORAL/VIDEOTAPED DEPOSITION OF YVONNE IGLESIAS,
   produced as a witness at the instance of the
21 Defendants, and duly sworn, was taken in the
   above-styled and numbered cause on April 17, 2023, from
22 10:00 a.m. to 12:26 p.m., Nilda Codina, Notary in and
   for the State of Texas, recorded by machine shorthand,
23 remotely from Edinburg, Texas, County of Hidalgo,
   pursuant to the Federal Rules of Civil Procedure, the
24 current Emergency Order regarding the COVID-19 State of
   Disaster, and the provisions stated on the record or
25 attached hereto.



1  for Ballot by Mail or mail-in ballots?

2            MS. SNEAD:  Objection, form.

3       A.   Can you explain it more?

4       Q.   (BY MR. SZUMANSKI) Sure.  So as we talked

5  about earlier, there are several options for fixing a

6  defect on an Application for Ballot by Mail, right?

7       A.   Yes.

8       Q.   And we also discussed that there were several

9  options for fixing a defect on a mail-in ballot, such

10 as a carrier envelope or things like that, right?

11      A.   Yes.

12      Q.   So if a voter with a disability is more aware

13 of those different options, would you agree that they

14 are better able to successfully cast an Application for

15 Ballot by Mail or a mail-in ballot, in future elections

16 in Texas?

17           MS. SNEAD:  Objection, form.

18      A.   I believe that -- I mean, I read the

19 instructions and I did what I was supposed to and it

20 still got rejected, so I just don't know what -- what

21 really went wrong, you know.  I just felt, like, lost.

22      Q.   (BY MR. SZUMANSKI) Understood.  But you would

23 also agree with me that, as you stated here today, that

24 you were not aware of all of the different ways that

25 you could vote by mail and how to vote by mail,



1  rejected, in November of 2022; is that right?

2       A.   Yes.

3       Q.   Do you know what you did wrong, when you

4  filled out your application for November 2022?

5       A.   No.

6       Q.   Do you know what you needed to change, in

7  order to have your application to vote by mail be -- be

8  accepted in May for the May 2023 election?

9       A.   No.

10      Q.   So you agreed, when the Attorney General was

11 asking questions, you -- you believe you have more

12 knowledge now than you did before November about voting

13 by mail; is that accurate?

14      A.   Yes.

15      Q.   Do you think that -- even with that

16 knowledge, are you confident that your ballot will be

17 accepted for the May 2023 election?

18      A.   No.

19            MR. SZUMANSKI:  Objection, form.

20      Q.   (BY MS. SNEAD) And I want to just clarify

21 something you said earlier, when you were talking about

22 your sister.  You indicated that she pushed you to

23 vote; is that right?

24      A.   Yes.

25      Q.   Can you explain what you meant by she pushed



```
 1  _____

 2
    MI FAMILIA VOTA, et al.,        )
 3          Plaintiffs,             )  Case No.
                                    )  5:21-CV-0920-XR
 4  vs.                             )
                                    )
 5  GREG ABBOTT, et al.,            )
            Defendants.             )
 6
 7  _____

 8
    UNITED STATES OF AMERICA,       )
 9          Plaintiff,              )  Case No.
                                    )  5:21-CV-1085-XR
10  vs.                             )
                                    )
11  THE STATE OF TEXAS, et al.,     )
            Defendants.             )
12
                    REPORTER'S CERTIFICATE
13              ORAL/VIDEOTAPED DEPOSITION OF
                        YVONNE IGLESIAS
14                      APRIL 17, 2023

15       I, NILDA CODINA, Notary in and for the State of

16  Texas, hereby certify to the following:

17       That the witness, YVONNE IGLESIAS, was duly sworn

18  by the officer and that the transcript of the oral

19  deposition is a true record of the testimony given by

20  the witness;

21       I further certify that pursuant to FRCP Rule 30

22  (e)(1) that the signature of the deponent:

23       _____X_____was requested by the deponent or a party

24  before the completion of the deposition and returned

25  within 30 days from the date of receipt of the
```



 1 | transcript.  If returned, the attached Changes and

 2 | Signature Page contains any changes and the reason

 3 | therefor;

 4 | _____was not requested by the deponent or a

 5 | party before the completion of the deposition.

 6 | I further certify that I am neither attorney nor

 7 | counsel for, related to, nor employed by any of the

 8 | parties to the action in which this testimony was

 9 | taken.

10 | Further, I am not a relative or employee of any

11 | attorney of record in this cause, nor do I have a

12 | financial interest in the action.

13 | Subscribed and sworn to on this 26th day of April,

14 | 2023.

15 |

16 | _____
     NILDA CODINA
17 | Notary in and
     for the State of Texas
18 | My Commission No. 12878135-3
     Expires:  10/24/2023
19 |

20 | Magna Legal Services
     Firm Registration No. 633
21 | 16414 San Pedro Ave.
     Suite 900
22 | San Antonio, TX 78232
     Phone:(866)672-7880

23 |

24 |

25 |



# EXHIBIT 33

```
 1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF TEXAS
 2               SAN ANTONIO DIVISION

 3  LA UNION DEL PUEBLO ENTERO,)(
    ET AL.,                    )(
 4                             )(
        PLAINTIFFS,            )(
 5                             )(     CIVIL ACTION
    VS.                        )(     NO. SA-21-CV-00844-XR
 6                             )(
    GREGORY W. ABBOTT, ET AL., )(
 7                             )(
                               )(
 8      DEFENDANTS.            )(
    -----------------------------------------------------

 9
                VIDEOTAPED AND VIDEOCONFERENCED
10                   ORAL DEPOSITION OF
                RIVELINO LOPEZ, TACOMA PHILLIPS
11               AND MICHAEL SCARPELLO
                     APRIL 29, 2022

12

13         VIDEOTAPED AND VIDEOCONFERENCED ORAL DEPOSITION

14  OF RIVELINO LOPEZ, TACOMA PHILLIPS AND MICHAEL

15  SCARPELLO, produced as witnesses at the instance of the

16  Plaintiff LUPE, and duly sworn, was taken in the

17  above-styled and numbered cause on the 29th day of

18  April, 2022, from 10:47 a.m. to 8:02 p.m., before Holly

19  R. Swinford, CSR in and for the State of Texas, reported

20  by machine shorthand, at the Office of the Dallas

21  Elections Administrator, located at the Records

22  Building, 500 Elm Street, 7th Floor, Room 7Y11, in the

23  City of Dallas, County of Dallas, State of Texas,

24  pursuant to Notice, the Federal Rules, and the

25  provisions stated on the record or attached hereto.
```

```
 1      A.    I'm sorry.
 2      Q.    So you were getting phone calls from voters
 3   with questions about this process; is that right?
 4      A.    Yes.
 5      Q.    And generally, what were voters communicating
 6   to you?
 7      A.    The reason why they received the letter, what
 8   was the letter for.  If it was for missing their Social
 9   Security or driver's license, we explained to the voter
10   that the only thing they had to do was put that on their
11   ABBM application.
12      Q.    Did you get any voters asking why they were
13   being sent a Voter Registration Application when they
14   knew they were already registered to vote?
15      A.    Yes.  We informed them that their -- if, in
16   fact, if their voter registration record did not have
17   the Texas Driver's License or ID or Social Security,
18   that they would need to put that on their information --
19   on their application.  I'm sorry.  We need to put it --
20   have it on their voter registration record, also have it
21   on their ABBM application.  But it was a very rarity
22   that we did get any of those and we had to send those
23   applications out to a voter, because most of the time we
24   will have the information on the voter registration
25   file, but it wasn't on the ABBM application.
```

```
 1      Q.   Okay.  So, in your experience, many ABBMs were
 2  coming to your office and the voter had failed to put
 3  either a driver's license number or the last four of the
 4  Social?
 5      A.   Yes, or they forgot to put the correct
 6  information that was on the voter registration file.
 7      Q.   All right.  So they might have put a driver's
 8  license number when you had the last four of the Social?
 9      A.   Yes.
10      Q.   Or vice versa?
11      A.   Or vice versa.
12      Q.   They might have put the last four of the Social
13  and you only had the driver's license --
14      A.   Yes.
15      Q.   -- number?
16      A.   Yes.
17      Q.   Did your office keep track of the number of
18  communications you got from voters with questions about
19  the new ID verification requirements?
20      A.   No, we did not.
21      Q.   Would you say that your office spent a
22  significant amount of time answering questions from
23  voters or responding to their inquiries about the new ID
24  requirements?
25      A.   Yes.
```

```
 1              MS. HUNKER:   Objection, form.
 2        Q.    (By Ms. Perales)   Is there any way to get a
 3   sense of how much time that was taking out of your
 4   regular day?   Can you describe that for me since you
 5   didn't necessarily keep track of the number of calls?
 6        A.    Repeat that again.
 7        Q.    How can I -- how can I get a sense from you of
 8   exactly how much time it was taking to respond to voter
 9   inquiries if you're telling me you didn't necessarily
10   keep track of the number of phone calls that you were
11   getting?   How can I understand how much time or how much
12   resources of your office were dedicated in the lead-up
13   to the March 2022 primary to answering questions from
14   voters who had rejected ABBMs, for example?
15        A.    That's hard to say.   A call could take a
16   minute.   Another call could take ten minutes.   It's hard
17   to say.
18        Q.    Did you have particular staff that would --
19   that these calls would get transferred to so they could
20   explain to the voters what the new requirements were?
21        A.    No.   We have -- the way the system works is:
22   You call into our office.   You can pick who you want to
23   speak to:   mail ballot, absent- -- absentee, early
24   voting, voter registration.   So if they had a absentee
25   or mail ballot question, they would click Number 1.   And
```

```
 1   then they'll get a person that's in mail ballot in my

 2   office section.

 3       Q.   Would you say that you were spending more than

 4   an hour a week responding to voters who were calling

 5   with questions about the new ID requirements?

 6       A.   Yes.

 7       Q.   Can you give me a sense of how many hours a

 8   week you spent responding to voter inquiries?

 9       A.   You get phone calls every day, all day long,

10   so...

11       Q.   And specifically --

12       A.   That's more than an hour.

13       Q.   Yes.  And specifically, for these SB 1

14   ID requirements, can you tell me about how many hours

15   you might have spent either on a daily basis or a weekly

16   basis?

17       A.   It could be first time we sign in the morning,

18   8:00 o'clock until we sign out at 4:30, we'll be getting

19   a phone call.  So I don't -- I -- I don't understand the

20   question, how you're asking it.

21       Q.   Uh-huh.  So I'm hoping to get an understanding

22   of how these new ID number matching requirements under

23   SB 1 affected the workflow of your office.

24            So you'll agree with me that in elections prior

25   to the March primary 2022, you didn't have to answer any
```

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                          Page 107

1   questions from voters about their driver's license or

2   Social matching for their ABBM or their ballot, right?

3       A.   Correct.  We didn't have to answer those

4   questions before SB 1.

5       Q.   And then after SB 1 and for the March 2022

6   primary, you did have to answer questions from voters

7   about those requirements, correct?

8       A.   Yes.

9       Q.   So how much time did it take you to answer

10  those types of questions from voters on SB 1-related

11  requirements once you started putting them into effect

12  for the March primary?

13      A.   Are you asking me how long it took to answer a

14  phone call?

15      Q.   Answer -- if we add it up, the time that you

16  spent talking to voters and responding to their

17  inquiries about the ID-matching-number requirements, if

18  we added up those minutes, what would that be like for

19  you?

20      A.   Again, that's every day, all day.

21      Q.   Okay.

22      A.   I can't give you a -- a number, specific

23  number, because I don't have it.

24      Q.   Okay.

25      A.   We answer phone calls every day, all day long.

1     Q.    Would --

2     A.    I have a staff of eight in my office.  All

3   eight will answer the phone.  All eight would get a

4   phone call.

5     Q.    Would --

6     A.    So that person may get ten calls in one day.

7   That person may get 20 calls in one day.  I do not know.

8     Q.    Would it be fair to say that most of the calls

9   that you were getting from voters with questions about

10   why their ABBM or mail ballot was rejected were calls

11   that were related to the new ID requirements for SB 1?

12     A.    Yes.

13            MS. HUNKER:  Objection, form.

14     Q.    (By Ms. Perales)  You mentioned there are eight

15   people in your office.  Those are -- would that be

16   correct, then, to say that there are eight people whose

17   work is primarily dedicated to processing either

18   application for ballot by mail or mail ballots?

19     A.    Yes.

20     Q.    Were there voters who provided a number on

21   their ABBM that you were able to match and that you sent

22   them a mail ballot and then when you got the mail

23   ballots back, you could not match the ID number that had

24   been provided on the mail ballot envelope?

25     A.    Yes.

```
 1                  THE REPORTER:  Pre-perf.

 2                  THE WITNESS:  Uh-huh.

 3                  THE REPORTER:  Thank you.

 4      Q.    Pre-perforated?

 5      A.    Pre-perforated.  I'm sorry.  Yes.

 6      Q.    So you didn't have to use any tools or

 7  implements to try to get that open?

 8      A.    No.

 9      Q.    That's probably worth a phone call with some

10  counties that I can recommend to.

11            And so do you think that there are voters in

12  Dallas County who submitted an ABBM, you couldn't match

13  their ID number and you sent them the notice and the new

14  materials, but they were never able to cure the ABBM

15  and, thus, did not vote?

16                  MS. HUNKER:  Objection, form.

17      A.    Yes.

18      Q.    (By Ms. Perales)  Okay.  And what would be the

19  reasons that they couldn't cure the ABBM?

20      A.    What would be the reasons why?

21      Q.    Yes.  So, for example, one reason might be they

22  just didn't have enough time; they just didn't get it

23  done in time.

24            But were there people who gave you a number,

25  and you just simply weren't able to match it, even after
```

```
 1   you sent them the notice and --

 2       A.   Yes.

 3       Q.   Okay.  And would that be because you just

 4   didn't have their ID number that they provided in your

 5   system?

 6       A.   Yes.

 7       Q.   And now I'm going to ask on the mail ballot

 8   side, were there people who submitted a mail ballot to

 9   you and you weren't able to verify that number and,

10   thus, you were not able to have that ballot counted?

11            MS. HUNKER:  Objection, form.

12       A.   I -- I don't feel comfortable answering that

13   question because I don't, you know, make the decisions

14   on that.  Ballot Board does.  Early Voting Ballot Board

15   does.

16            THE WITNESS:  I'm sorry.  Early Voting

17   Ballot Board.

18            THE REPORTER:  Okay.

19       Q.   Did you or anyone in your office speak to any

20   voters who told you that they just hadn't been able to

21   vote in the election because of the voter ID number

22   matching requirements or as a result of the voter ID

23   number matching requirements?

24            MS. HUNKER:  Objection, form.

25       A.   Yes.
```

1      Q.    (By Ms. Perales)  Can you give me an example of

2  a person like that?  Do you recall any specific --

3      A.    Of a voter who just could not get to the polls?

4      Q.    Yes.

5      A.    That's it.  They couldn't -- they couldn't get

6  out of the house to get to the polls and that is their

7  only way of voting, was voting by mail.

8      Q.    And a voter who you couldn't match their ID

9  number?

10      A.    Yes.  A lot of voters just got frustrated and

11  didn't -- wouldn't turn it back in.

12      Q.    Do you receive mail ballots where another

13  individual has helped the voter, provided assistance to

14  that voter, and then signed that spot on the envelope

15  where they are supposed to sign?

16      A.    Do I receive -- ask me that again.

17      Q.    Yeah.  Do you receive mail ballots that come

18  back to you and you can see that an assistor has

19  provided assistance to that voter?

20      A.    Are you asking me do I receive the ABBM

21  application or the mail ballot?

22      Q.    I was asking just about the mail ballot.

23      A.    Do we see receive -- I can see that, yes.

24      Q.    Do you record anywhere that a mail ballot came

25  to you and there's an indication that the voter received

```
 1                    MS. CAI:  My name is Sophia Cai, and I'm
 2    representing the OCA Plaintiffs.
 3                    MS. PERALES:  Slow down for one second.
 4    Can you just say that more slowly?
 5                    MS. CAI:  Of course.  My name is Sophia
 6    Cai, spelled S-o-p-h-i-a.  Last name, Cai, C-a-i.
 7                    THE REPORTER:  Okay.  And you're
 8    representing who?
 9                    MS. CAI:  The OCA-Greater Houston
10    Plaintiffs.
11                    THE REPORTER:  Okay.  Thank you.
12                    Okay.  Thank you.
13                    MS. CAI:  Great.
14        Q.    (By Ms. Cai)  Hi, Ms. Phillips.  Thank you --
15        A.    Hi.
16        Q.    -- for bearing with us.  I just have a few
17    questions for you.
18                You testified earlier that you didn't know off
19    the top of your head the number of people who submitted
20    an application for ballot by mail that was incomplete
21    because you could not verify their ID number.
22                Even without that exact number off the top of
23    your head, do you know whether the number of ABBMs that
24    were rejected in the March primary was greater than in
25    past years?
```

1                    MS. HUNKER:   Objection, form.

2        A.   Yes, it was greater.

3        Q.   (By Ms. Cai)  What accounts for that greater

4    number of rejections?

5                    MS. HUNKER:   Objection, form.

6        A.   The new requirements, the missing driver's

7    license or the missing Social Security numbers.

8        Q.   (By Ms. Cai)  Do you have reason to believe

9    that some individuals whose applications for ballot by

10   mail or mail ballots are being rejected -- excuse me --

11   that have been rejected are, in fact, eligible voters

12   who made errors while filing -- filling out their ID

13   numbers?

14                   MS. HUNKER:   Objection, form.

15       A.   Yes.

16       Q.   (By Ms. Cai)  Are you or your office concerned

17   by the greater number of rejected applications for

18   ballot by mail or mail ballots in the March primary?

19                   MS. HUNKER:   Objection, form.

20       A.   Yes.

21       Q.   (By Ms. Cai)  Why are you concerned?

22       A.   Because voters before the SB 1 law were able to

23   vote and cast their ballots, and ballots counted.

24       Q.   Have you or your office conveyed that concern

25   to the Secretary of State?

1    A.    I have not; but my office -- some people in my

2    office probably have, yes.

3    Q.    Do you know what they have said?

4    A.    No, I don't.

5    Q.    Have you or your office conveyed that same

6    concern to other election officials?

7             MS. HUNKER:  Objection, form.

8    A.    Probably so.  I do not know.

9    Q.    (By Ms. Cai)  Have you personally conveyed that

10   concern to anyone?

11   A.    No.

12   Q.    Turning to SB 1 requirements next, are you

13   aware that SB 1 adds additional requirements in order to

14   register to vote by mail or to actually vote by mail?

15            MS. HUNKER:  Objection, form.

16   A.    Repeat that again.

17   Q.    (By Ms. Cai)  This has probably been covered,

18   but is it correct that you are aware that SB 1 adds

19   requirements to register to vote by mail or to actually

20   vote by mail?

21   A.    Yes.

22            MS. HUNKER:  Objection, form.

23   Q.    (By Ms. Cai)  Is a registered voter with a

24   disability able to get a modification or accommodation

25   to the ID requirement for voting by mail?

```
 1                 MS. HUNKER:  Objection, form.
 2      A.   No.
 3      Q.   (By Ms. Cai)  So even if they request an
 4  accommodation or a modification, a voter with disability
 5  would not be able to have any different rules apply to
 6  them for the ID requirement?
 7                 MS. HUNKER:  Objection, form.
 8      A.   No, not to my knowledge.
 9      Q.   (By Ms. Cai)  Have you received any requests
10  from voters with disabilities for any sort of
11  accommodation or modification to the ID requirement in
12  the March primary?
13      A.   No, not to my kno- -- not to my knowledge.
14      Q.   Who would a voter with a disability go to
15  to make such a request for their application for vote by
16  mail or their mail ballot?
17      A.   They would request the application from my
18  office, the Mail Ballot Office with Dallas County.
19      Q.   If they wanted some sort of accommodation or
20  modification so that they could vote by mail, would they
21  be able to ask somebody in your office for such
22  accommodation or modification?
23      A.   What type of accommodation or modification are
24  we asking about?
25      Q.   Any type.  It might vary by the type of
```

1  disability a person has.  Would they be able to ask for,

2  for instance, assistance filling out their ID number?

3       A.   If a voter is in our office, come to our office

4  at the counter and asks for help with assisting with

5  filling out their application, yes, we can help them

6  fill out their application.

7       Q.   Would they be able to request any other sorts

8  of modifications or accommodations?

9       A.   What modification are we asking about?

10      Q.   It would likely depend on the voter, but can

11  you think of any examples of people who have asked for

12  any assistance?

13      A.   No one has asked for any assistance or

14  modifications in our office, so I wouldn't know which

15  one you are referring to.

16      Q.   Have they called in or written in for any such

17  modifications?

18      A.   I have not received any, not to my knowledge.

19                 MS. CAI:  Okay.  Thank you very much,

20  Ms. Phillips.  That's all my questions.

21                 THE WITNESS:  Thank you.

22                 THE REPORTER:  Just a second, please.

23  Okay.  Thank you.

24                 MS. HUNKER:  Does any other Plaintiff

25  group want to ask questions before I begin?

```
 1                    Hearing none.

 2                      EXAMINATION

 3   BY MS. HUNKER:

 4       Q.    Hi, Ms. Phillips.  How with you?

 5       A.    I'm okay.  How are you?

 6       Q.    My name is Kathleen Hunker.  I represent the

 7   State Defendants in this matter.  I'm going to ask a few

 8   questions, mostly in response to what Plaintiffs have

 9   asked.  Because of that, I'm going to be jumping around

10   a little bit with respect to topics.  If at any point

11   you're confused or you don't follow when I transition to

12   topics, will you please let me know?

13       A.    Okay.

14       Q.    And I will be more than willing to either lay a

15   greater foundation or to rephrase the question.  Okay?

16       A.    Okay.

17       Q.    Also if you don't understand any of my

18   questions or you think you need additional

19   clarification, please let me know; and I'm happy to do

20   so.  Okay?

21       A.    Okay.

22       Q.    Excellent.  So I'm going to start with the last

23   topic of conversation, which was regarding the ADA

24   accommodation.  I believe Plaintiffs' Counsel for

25   OCA-Greater Houston, asked you a few questions on that,
```

1   correct?

2       A.   Yes.

3       Q.   And you had mentioned that no one had come into

4   your office asking a -- for assistance or an

5   accommodation with respect to the ID requirements; is

6   that correct?

7       A.   Correct, not to my knowledge.

8       Q.   Okay.  So when she was asking about whether or

9   not your office would accommodate, you don't have a

10  policy in place about the accommodation; is that

11  correct?

12      A.   That is correct.

13      Q.   And that would only be decided once you

14  actually received a request; is that right?

15      A.   Yes.

16      Q.   And I think you had mentioned that if somebody

17  came in requesting assistance, you would do your best to

18  aid them; is that correct?

19      A.   Yes.

20      Q.   You also spoke with Counsel regarding

21  communications with the Secretary of State's office, and

22  so let me get a little bit of clarification there.

23          You have not contacted the Secretary of State's

24  office regarding SB 1, is that right?  And when I say

25  "you" in this case, I'm referring to you as an

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                  Page 339

```
 1

 2
                    REPORTER'S_CERTIFICATION
 3               _____ _____

                 UNITED STATES DISTRICT COURT
 4                WESTERN DISTRICT OF TEXAS
                    SAN ANTONIO DIVISION
 5
   LA UNION DEL PUEBLO ENTERO,)(
 6 ET AL.,                    )(
                             )(
 7     PLAINTIFFS,            )(
                             )(   CIVIL ACTION
 8 VS.                        )(   NO. SA-21-CV-00844-XR
                             )(
 9 GREGORY W. ABBOTT, ET AL., )(
                             )(
10                           )(
       DEFENDANTS.           )(
11 -----------------------------------------------------------

12

13

14

15          ORAL DEPOSITION OF RIVELINO LOPEZ,

16       TACOMA PHILLIPS AND MICHAEL SCARPELLO

17                  APRIL 29, 2022

18

19

20       I, Holly R. Swinford, Certified Shorthand

21 Reporter in and for the State of Texas, do hereby

22 certify to the following:

23          That the witnesses, Rivelino Lopez, Tacoma

24 Phillips and Michael Scarpello, were by me duly sworn

25 and that the transcript of the oral deposition is a true
```

1  record of the testimony given by the witnesses.

2          I further certify that pursuant to Federal

3  Rules of Civil Procedure, Rule 30(e)(1)(A) and (B) as

4  well as Rule 30(e)(2), that review of the transcript and

5  signature of the deponent:

6          _____ was requested by the deponent and/or a

7  party before completion of the deposition.

8          _____ was not requested by the deponent and/or

9  a party before the completion of the deposition.

10         I further certify that I am neither attorney or

11  counsel for, nor related to or employed by any of the

12  parties to the action in which this deposition is taken

13  and further that I am not a relative or employee of any

14  attorney of record in this cause, nor am I financially

15  or otherwise interested in the outcome of the action.

16         The amount of time used by each party at the

17  deposition is as follows.

18

19     1.   MS. NINA PERALES
            TIME:  04:16
20     2.   MR. GRAHAM W. WHITE
            TIME:  00:37
21     3.   MS. KATHLEEN HUNKER
            TIME:  01:23
22     4.   BEN L. STOOL
            TIME:  00:00
23     5.   MS. BRADY BENDER
            TIME:  00:06
24     6.   MS. SOPHIA CAI
            TIME:  00:24
25     7.   MS. JACQUELINE VILLAREAL

```
 1            TIME:    00:00

 2            Subscribed and sworn to on the _____ day

 3   of May, 2022.

 4

 5            _____

 6            Holly R. Swinford
              Texas CSR 3356
              Expiration:  2/1/2024
 7            Magna Legal Services
              Firm Registration No. 633
 8            16414 San Pedro Ave., Suite 900
              San Antonio, Texas  78232
 9            (866) 672-7880

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 34

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  WESTERN DISTRICT OF TEXAS

 3                     SAN ANTONIO DIVISION

 4

 5   * * * * * * * * * * * * * * * * * * * * * * * * * *

 6   LA UNION DEL PUEBLO ENTERO, et al *

 7   v.                                *    CASE NO. 5:21-cv-844-XR

 8   GREGORY W. ABBOTT, et al          *

 9   * * * * * * * * * * * * * * * * * * * * * * * * * *

10   OCA-GREATER HOUSTON, et al        *

11   v.                                *    CASE NO. 1:21-cv-780-XR

12   JOHN SCOTT, et al                 *

13   * * * * * * * * * * * * * * * * * * * * * * * * * *

14   HOUSTON JUSTICE, et al            *

15   v.                                *    CASE NO. 5:21-cv-848-XR

16   GREGORY WAYNE ABBOTT, et al       *

17   * * * * * * * * * * * * * * * * * * * * * * * * * *

18   LULAC TEXAS, et al                *

19   v.                                *    CASE NO. 1:21-cv-0786-XR

20   JOHN SCOTT, et al                 *

21   * * * * * * * * * * * * * * * * * * * * * * * * * *

22   MI FAMILIA VOTA, et al            *

23   v.                                *    CASE NO. 5:21-cv-0920-XR

24   GREG ABBOTT, et al                *

25   * * * * * * * * * * * * * * * * * * * * * * * * * *
```

```
 1  UNITED STATES OF AMERICA          *

 2  v.                                *      CASE NO. 5:21-cv-1085-XR

 3  THE STATE OF TEXAS, et al         *

 4  * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

 5

 6                 ORAL AND VIDEOTAPED DEPOSITION OF

 7                        ISABEL LONGORIA

 8                        APRIL 20, 2022

 9                        VOLUME 1 OF 2

10

11          Oral and videotaped deposition of Isabel Longoria,

12  produced as a witness at the instance of the plaintiffs, and duly

13  sworn, was taken in the above-styled and numbered cause on April

14  20, 2022, from 2:45 p.m. to 4:56 p.m., before Terrie Doyle

15  Escobar, CSR in and for the State of Texas, reported by oral

16  stenography, at the Office of the Texas Attorney General,

17  Consumer Protection Division, Houston Regional Office, 808 Travis

18  Street, Suite 1520, Houston, Texas  77002, pursuant to Rule 30 of

19  the Federal Rules of Civil Procedure.

20                          *   *   *   *   *

21  APPEARANCES:

22

23  FOR THE PLAINTIFFS:

24      MR. KENNETH E. BROUGHTON

25      REED SMITH, LLP
```

 1   sends us their application one day before the deadline, you know,

 2   they may not have enough time regardless to, you know, correct

 3   that application and get it back to us.  So time is against them.

 4   If, as I described earlier, there's a discrepancy as to what is

 5   on their voter file versus what is provided on their application,

 6   be it a typo or if there's an inconsistency in what's in the

 7   record, taking time to investigate and get into the bottom of

 8   that which then the clock runs out and, therefore, voters can't

 9   apply even to vote by mail.  Later, if their application to vote

10   is accepted if they do correct their voter registration form --

11   and that requires sending another form to our voter registration

12   department to update that information, which in and of itself, if

13   you don't have access to computers or printers or can't get to

14   our office in person becomes an onerous task.  For some

15   individuals, they may not even be able to engage in the process

16   to update their voter file or even cure their mail ballot.  Those

17   tend to be problems even in the application process.

18          Fast forward, let's say you make it through the

19   application process, the voter's approved, you get to the mail

20   ballot process, you receive a mail ballot, you send it back to

21   us, the State has given us a template which because of time we

22   had to use for a mail ballot envelope on what we call a secrecy

23   flap, which means that the ID numbers have to be included under a

24   flap so that as those numbers are -- as that mail ballot is going

25   through the postal service, you can assume that certain

1   your mail ballot.  But if you can't come in person and if you

2   can't return it by mail to cure your mail ballot, then you are

3   effectively kind of out of options to cure your mail ballot even

4   though you have the correct number, even though you could cure

5   it.  So ultimately leading to about 20 percent of mail ballots in

6   Harris County that were rejected by the early voting ballot board

7   because of lack of ID or ID curing issue.

8            I'm happy to repeat any of that for the reporter.

9       Q.   (Laughs.)

10      A.   I know that was quite a lengthy --

11      Q.   I have a question back to people being able to go

12  online and cure and things like that.  Has your office

13  experienced very many people who for whatever reason don't have a

14  computer or are not computer literate or that sort of thing?

15      A.   Yes.

16      Q.   Tell us about that.

17      A.   It tends to be older voters or voters without means who

18  more likely than not don't have access to a printer.  So they

19  might have access to the internet on their phone or get access to

20  internet through a community center or other means or may even

21  request that we print and send to them a mail ballot application.

22  But if you don't have a printer, then your option is to, you

23  know, call us or hope that another application has gotten to you

24  in some form.

25            And then postage, individuals may not be aware or be

```
 1  UNITED STATES OF AMERICA          *

 2  v.                               *      CASE NO. 5:21-cv-1085-XR

 3  THE STATE OF TEXAS, et al         *

 4  * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

 5

 6                     REPORTER'S CERTIFICATION

 7                 ORAL AND VIDEOTAPED DEPOSITION OF

 8                  ISABEL LONGORIA (VOLUME 1 OF 2)

 9                        APRIL 20, 2022

10

11          I, Terrie Doyle Escobar, Certified Shorthand Reporter

12  in and for the State of Texas, hereby certify to the following:

13          That the witness, Isabel Longoria, was duly sworn by

14  the officer and that the transcript of the oral deposition is a

15  true record of the testimony given by the witness;

16          That the deposition transcript was submitted on

17  _____, 2022 to the witness or to the attorney

18  for the witness for examination, signature, and return to me by

19  _____, 2022;

20          That the amount of time used by each party at the

21  deposition is as follows:

22          Mr. Kenneth E. Broughton - 1:44 (1 hour, 44 minutes)

23          (All other parties used zero minutes.);

24          That pursuant to information given to the deposition

25  officer at the time said testimony was taken, the following
```

 1  includes counsel for all parties of record:

 2          Mr. Kenneth E. Broughton, Attorney for Plaintiffs; Mr.

 3  Jonathan Fombonne and Ms. Christina Beeler, Attorneys for

 4  Defendant Isabel Longoria; Mr. William T. Thompson, Attorney for

 5  State Defendants; Ms. Josephine Ramirez Solis, Attorney for

 6  Defendant Yvonne Ramon; Mr. Mike Jones, Attorney for Plaintiffs

 7  LULAC Texas and Voto Latino; Mr. L. Brady Bender, Attorney for

 8  Plaintiff United States of America;

 9          I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties or attorneys in

11  the action in which this proceeding was taken, and further that I

12  am not financially or otherwise interested in the outcome of the

13  action.

14          Further certification requirements pursuant to Rule 203

15  of TRCP will be certified to after they have occurred.

16          Certified to by me this 27th day of May, 2022.

17

18

19          _____

20          TERRIE DOYLE ESCOBAR, Texas CSR #11099

21          Expiration Date: July 31, 2023

22          Firm Registration No. 11909

23          Steno Agency, Inc.

24          315 W. 9th Street, Suite 807

25          Los Angeles, California  90015

# EXHIBIT 35

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO          )
     ENTERO, et al,              )
 4                               )
              Plaintiffs,   )
 5                               ) CIVIL ACTION
     VS.                         )
 6                               ) NO.: 5:21-cv-00844-XR
     GREGORY W. ABBOTT, et al,   )
 7                               )
              Defendants.   )
 8                               )

 9        ------------------------------------

10          ORAL AND VIDEOTAPED DEPOSITION OF

11              CATHERINE CRANSTON

12                JUNE 23, 2022

13        ------------------------------------
```

14      ORAL AND VIDEOTAPED DEPOSITION OF CATHERINE

15   CRANSTON, produced as a witness at the instance of the

16   DEFENDANTS, and duly sworn, was taken in the

17   above-styled and numbered cause on June 23, 2022, from

18   10:06 a.m. to 4:31 p.m., before Miah Parson, CSR in and

19   for the State of Texas, reported by oral stenography, at

20   the Disability Rights Texas, 2222 W. Braker Ln, Austin,

21   Texas 78758, pursuant to the Federal Rules of Civil

22   Procedure and the provisions stated on the record or

23   attached hereto.

24

25

1       A.   I'm sorry I'm laughing, but it says it, but

2   that doesn't mean it is, but go ahead.

3       Q.   And it states, polling places should support

4   voters not hinder them.  When you go to the polls in

5   Texas you can expect that it provides a list of

6   requirements, did I describe that section correctly?

7       A.   Yes.

8       Q.   And so among the requirements that polling

9   places are expected to meet this includes location on

10  ground floor that can be entered from the street or via

11  an elevator with doors that open at least 36 inches, did

12  I read that correctly?

13      A.   Yes.

14      Q.   Another one is doors, entrances, and exits used

15  to enter or leave the polling place that are at least 32

16  inches wide.  Did I read that correctly?

17      A.   Yes.

18      Q.   Now, you're, of course, aware that polling

19  places in Texas are supposed to meet strict

20  accessibility standards; is that right?

21      A.   They're supposed to, yes.

22      Q.   Although, as you stated earlier, they don't

23  always do so; is that --

24      A.   That is correct.  Yes.

25      Q.   And in cases where, in your experience, that

 1   you found they're not being accessible.  You communicate

 2   that to the counties or to the --

 3        A.  We actually call Disability Rights Texas.  We

 4   did because frankly, the county doesn't always respond

 5   quickly enough on those issues and so they need to be

 6   poked sometimes unfortunately.

 7        Q.  And in your experience, have counties rectified

 8   the problem either after you contacted them or after

 9   Disability Rights of Texas had contacted them?

10            MS. SNEAD:  Objection; form.

11        A.  I don't know.  I don't know.  I haven't been

12   back to those locations.

13        Q.  (BY MS. HUNKER)  So you don't know one way or

14   another if the problem has since been solved at those

15   locations; is that right?

16        A.  That's correct.  That's correct.

17            MS. SNEAD:  Let her finish the question --

18        A.  Oh, sorry.

19            MS. SNEAD:  -- and give me like a half a

20   second to object.

21        A.  Oh, I'm sorry.

22            MS. SNEAD:  Because we're talking over each

23   other.

24        Q.  (BY MS. HUNKER)  Would you agree that requiring

25   Texas polling places to meet strict accessibility

1      Q.  And have you contacted any county office Travis

2   or otherwise regarding Senate Bill 1?

3      A.  Not that I can recall, no.

4      Q.  And so to your knowledge you haven't contacted

5   any county office about interpreting any provision of

6   Senate Bill 1; is that fair to say?

7      A.  I would say so, yes.

8      Q.  And so we're talking about the -- the effects

9   of Senate Bill 1.  Where did you obtain your

10  understanding of how Senate Bill 1 operates?

11                 MS. SNEAD:   Objection --

12      A.  How it operates?

13                 MS. SNEAD:  -- form.

14      A.  I -- as a personal care attendant I know what I

15  do so -- and when I read that, the oath for me that was

16  a red flag and because I assist individuals with

17  disabilities and I know that there probably will come a

18  time when I'm working for an individual that may need

19  assistance because as an attendant I also not just read

20  things to people, but if people have a cognitive

21  disability then I also explain things in a different

22  form to where they can understand what -- what-- what's

23  been written or, you know, what's in front of them.  And

24  so with that I'm concerned that -- for me that was a ref

25  flag when I read that oath.

# EXHIBIT 36

Jacquelyn Callanen                                        April 20, 2022

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
 2                 SAN ANTONIO DIVISION

 3  LA UNION DEL PUEBLO ENTERO, )
    ET AL                       )
 4                              )
    vs.                         ) CASE NO. 5:21-CV-844-XR
 5                              )
    GREGORY W. ABBOTT, ET AL    )
 6  _____
    OCA-GREATER HOUSTON, ET AL  )
 7                              )
    vs.                         ) CASE NO. 1:23-CV-780-XR
 8                              )
    JOHN SCOTT, ET AL           )
 9  _____
    HOUSTON JUSTICE, ET AL      )
10                              )
    vs.                         ) CASE NO. 5:21-CV-848-XR
11                              )
    GREGORY WAYNE ABBOTT, ET AL )
12  _____
    LULAC TEXAS, ET AL   )
13                              )
    vs.                         ) CASE NO. 1:21-CV-0786-XR
14                              )
    JOHN SCOTT, ET AL           )
15  _____
    MIFAMILIA VOTA, ET AL       )
16                              )
    vs.                         ) CASE NO. 5:21-CV-0920-XR
17                              )
    GREG ABBOTT, ET AL          )
18  _____
    UNITED STATES OF AMERICA  )
19                              )
    vs.                         ) CASE NO. 5:21-CV-1085-XR
20                              )
    THE STATE OF TEXAS, ET AL   )
21  _____

22            ORAL VIDEOTAPED DEPOSITION

23                JACQUELYN CALLANEN

24                 APRIL 20, 2022

25
```

```
 1        ORAL VIDEOTAPED DEPOSITION OF JACQUELYN CALLANEN,

 2   produced as a witness at the instance of the Plaintiffs

 3   and duly sworn, was taken in the above-styled and

 4   numbered cause on the 20TH day of April, 2022, from

 5   9:27 a.m. to 7:07 p.m., before Sarah A. Prugh, Certified

 6   Shorthand Reporter in and for the State of Texas,

 7   reported by machine shorthand at the Offices of The

 8   Mexican American Legal Defense and Educational Fund, 110

 9   Broadway Street, Suite 300, San Antonio, Texas, pursuant

10   to the Federal Rules of Civil Procedure and the

11   provisions stated on the record or attached hereto.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1  to focus a little bit on prior to Senate Bill 1, how the

 2  secretary of state's office would insure uniformity

 3  among the counties.

 4      A.    Absolutely.

 5      Q.    So you testified that election law seminars

 6  were one way where this would happen?

 7      A.    Yes.

 8      Q.    What would happen at these seminars?

 9      A.    They were like in lecture form.  The attorneys

10  would all -- they have their subject expert in each of

11  the areas and they would put on their presentation, if

12  anything had changed and what to expect and numbers.

13  And you know, then we would have an open dialogue back

14  and forth and question and answer sessions.

15              And then we would breakdown by election

16  systems, there is the two systems in Texas.  And so one

17  afternoon, then we would breakdown and the people who

18  had ES&S would go these and people who had Hart went to

19  these.  And again, that was just for a balance.  If any

20  of the forms had changed or if the equipment had been

21  updated, what we were going to do for maintenance for

22  the PMs, all of that kind of stuff.  So it was very

23  educational.  But that was for one afternoon.  These

24  sessions were for three days.

25      Q.    Got it.  Okay.  I want to move on to talking

 1   about some instances of voter fraud that you testified

 2   about last time and I just want to ask some clarifying

 3   questions, sort of get a sense of more specifics about

 4   what you were talking about.  And I wanted to start with

 5   you had testified about your concerns with campaigns

 6   bringing vans of people to vote.  Do you recall that?

 7       A.   Yes, sir.

 8       Q.   Is it fair to say that your concern was that

 9   voting under these circumstances -- actually, strike

10   that.  Is it fair to say your concern was that vans of

11   people were being brought to vote curbside?

12       A.   Yes.

13       Q.   And was your concern that voting under those

14   circumstances wasn't private?

15       A.   Correct.

16       Q.   And why wasn't voting private under those

17   circumstances?

18       A.   Because the driver would not exit -- the van

19   would not exit the van.  And so there has to be a

20   dialogue between the election official and the voter

21   themselves one on one.  And especially like in the

22   primary, they have to ask the voter which ballot they

23   would like.  They don't ask them are you a Democrat or

24   Republican.  They ask which ballot would you like to

25   vote today?  So all of that was open to the world so to

1   speak.

2       Q.    And I think you testified last time that you

3   were concerned that the person driving the van was

4   forcing people to vote a certain way?

5       A.    Yes.

6       Q.    So how often did this happen?

7       A.    I can't speak to how often it happened but I

8   can speak to the locations that it happened at.

9       Q.    Let me --

10      A.    No.  So I can't -- you know, we are getting

11  a -- because of SB-1, we are going to have a better

12  handle on the number seven and the driver because that

13  is a new form that has to be filled out.  But prior to

14  that, we didn't have that.

15      Q.    So let me ask it a different way.  How did you

16  hear about this issue of vans full of people and

17  potential conversations?

18      A.    The election officials would alert us to that

19  point.

20      Q.    Which election officials?

21      A.    Like the early voting judges.  And I mean I am

22  not belittling sort of but the first time we would hear

23  about it is when we set up an election, there has to be

24  a judge, an alternate and a clerk.  So we base our

25  equipment, we base our staffing, we vote -- base the

Jacquelyn Callanen

April 20, 2022
Page 34

 1   supplies on like the prior like election.  So we will

 2   start out with the staffing at, like I said, let's use

 3   Las Palmas because that is where it happens.

 4                   So they start early voting and there is a

 5   total of four people at that poll, an election judge, an

 6   alternate and two clerks.  And that's sufficient.  But

 7   now when the van pulls up, it takes two of the election

 8   officials to go out to the van because that is how the

 9   election code is written.  You send two people.  And

10   when there is numerous people in the van, you need those

11   two people.

12                   And so the election officials would call

13   and say I need to add more staff because today we had X

14   number and I needed this, you know, I need more.  So of

15   course we allot more.  We say sure, go ahead and do --

16   we are taking care of you.  But again, that is how we

17   are alerted to this and we have certain parts of town

18   that we know this occurs at.

19        Q.   Do you know of any instances where somebody was

20   forced to vote a certain way that they didn't want to?

21        A.   No.

22                   MS. HUNKER:  Objection, form.

23        Q.   (By Mr. White) Do you know of any criminal

24   charges arising from any of these activities?

25                   MS. HUNKER:  Objection, form.

 1              THE WITNESS:  No, not in the drive-up

 2   ones, no.

 3        Q.   (By Mr. White) You said you testified a moment

 4   ago that this happened at Las Palmas?

 5        A.   Uh-huh.

 6        Q.   What was Las Palmas?

 7        A.   It is a public library.  We use it for early

 8   voting and election day.  If it is an early voting site,

 9   we will keep it open on election day because our voters

10   like it.  I mean they go there for early voting.  And so

11   if we, for some reason, don't open that site, boy, do we

12   hear about it.  So if it is an early voting site, it

13   will be an election day site.

14        Q.   Were you alerted to any instances of potential

15   privacy issues of voters in vans at polling sites other

16   than Las Palmas?

17        A.   Yes, yes.

18        Q.   Which polling sites were those?

19        A.   The three that come to mind right away is we

20   have Las Palmas and we have Shavano Park which is a

21   little suburb here that does a huge curbside, curbside

22   voting.  And then we have McCreless Library.  Those are

23   the top three.

24        Q.   Okay.  And did you hear about any instances at

25   other sites besides those three or those are just the

 1   three that come to mind?

 2       A.   Those are the top three.  I mean we have

 3   curbside voting everywhere but it is the ones that bring

 4   the vans.  You know, I mean again, normally, the

 5   curbside voting is when the car pulls up, it is usually

 6   just one person voting.  You know, and so that is

 7   handled in the normal way.  I mean if it is just one

 8   car, they know how much.  But it is when they get these

 9   groups that it takes and inordinate amount of time.

10       Q.   And when you were -- when election officials

11   alerted you about these activities, what did you do with

12   that information?

13       A.   Again, we gave them extra staffing.

14       Q.   Did you report anything to law enforcement?

15       A.   No.

16       Q.   And why not?

17       A.   Again, it was not first-hand for me.

18       Q.   And one other -- sorry.  Strike that.  Do you

19   know who was operating the vans that you were concerned

20   about?

21       A.   I know one.

22       Q.   Do you know who was that?

23       A.   Should I give the name?

24       Q.   Yes, please.

25       A.   Jose Gallegos.

 1      A.   Again, there was a strong hesitancy of sending

 2   information like that over the internet in an email.

 3   And I don't blame them.

 4      Q.   Understood.  And would they provide an updated

 5   number by phone?

 6      A.   No.

 7      Q.   Okay.  And we talked about they could

 8   theoretically do it online but it didn't work and only

 9   39 voters were able to do that?

10      A.   Correct.

11      Q.   Okay.  Can a voter -- could a voter who came in

12   person to cure their ballot, could they do that curbside

13   or would they have to physically go into your office and

14   talk to an elections worker?

15      A.   We did provide curbside for that.

16      Q.   Okay.  Great.  And we have talked a lot about

17   the steps that your office, the various steps that your

18   office has taken to help voters kind of understand and

19   cure their ballot issues.  Do you remember that?

20      A.   Yes.

21      Q.   And one of the things you mentioned is that

22   your office started advising people to just put both

23   numbers on everything?

24      A.   Correct.

25      Q.   When did you start advising that?

1      A.    Yes, ma'am.

2      Q.    What did you mean by hype?

3      A.    Dare I use the word the hysteria that the media

4  stirred up?

5      Q.    And so is it your belief that people were irate

6  about the hysteria surrounding SB-1 and this provision

7  in particular as opposed to the actual provision itself?

8      A.    Yes.

9      Q.    You gave an example of when a mother called

10  about getting a vote by mail application for her son.

11  Do you remember that conversation?

12      A.    Absolutely.

13      Q.    And you said you could not issue the

14  application for a mail-in ballot to the mother for the

15  son; is that correct?

16      A.    Correct.

17      Q.    Do you know if the mother was able to obtain an

18  application to vote by mail for her son at a later time?

19      A.    No, I do not know.

20      Q.    You do not know?

21      A.    Right, I do not know.

22      Q.    Did that mother request an accommodation?  Let

23  me take a step back.  You had mentioned that during the

24  phone call, the mother explained that her son was

25  paralyzed.

Jacquelyn Callanen                                    April 20, 2022
                                                          Page 328

1        A.    Yes.

2        Q.    Her son therefore had a disability; correct?

3        A.    Correct.

4        Q.    Did she at any point request an accommodation

5   on account of her son's disability?

6        A.    No.

7        Q.    I want to turn to talk about ballot delivery

8   locations and ballot delivery in person of mail-in

9   ballot locations.

10       A.    Okay.

11       Q.    The option of delivering your ballot in person

12  is relatively new in Texas; is that correct?

13       A.    No, ma'am.  You were able -- we have been able

14  for years and years to deliver your mail ballot in

15  person on election day to the main -- to our office.

16       Q.    And do you remember what year that was?

17       A.    No, ma'am.  I'm sorry.  I don't.  It has been

18  for quite a while.

19       Q.    Do you remember if it has been in the last

20  decade?

21       A.    Yes, I am sure it has been.

22       Q.    So the rule was you can hand in your mail-in

23  ballot on election day; correct?

24       A.    Yes.

25       Q.    And it had to be at the early voting clerk's

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO, )
     ET AL                       )
 4                               )
     vs.                         )  CASE NO. 5:21-CV-844-XR
 5                               )
     GREGORY W. ABBOTT, ET AL    )
 6   _____)_____
     OCA-GREATER HOUSTON, ET AL  )
 7                               )
     vs.                         )  CASE NO. 1:23-CV-780-XR
 8                               )
     JOHN SCOTT, ET AL           )
 9   _____)_____
     HOUSTON JUSTICE, ET AL      )
10                               )
     vs.                         )  CASE NO. 5:21-CV-848-XR
11                               )
     GREGORY WAYNE ABBOTT, ET AL )
12   _____)_____
     LULAC TEXAS, ET AL   )
13                               )
     vs.                         )  CASE NO. 1:21-CV-0786-XR
14                               )
     JOHN SCOTT, ET AL           )
15   _____)_____
     MIFAMILIA VOTA, ET AL       )
16                               )
     vs.                         )  CASE NO. 5:21-CV-0920-XR
17                               )
     GREG ABBOTT, ET AL          )
18   _____)_____
     UNITED STATES OF AMERICA  )
19                               )
     vs.                         )  CASE NO. 5:21-CV-1085-XR
20                               )
     THE STATE OF TEXAS, ET AL   )
21   _____)_____

22               REPORTER'S CERTIFICATE

23      ORAL VIDEOTAPED DEPOSITION OF JACQUELYN CALLANEN

24                   APRIL 20, 2022

25      I, Sarah A. Prugh, Certified Shorthand Reporter in
```

 1  and for the State of Texas, hereby certify to the

 2  following:

 3      That the witness, JACQUELYN CALLANEN, was duly sworn

 4  and that the transcript of the deposition is a true

 5  record of the testimony given by the witness;

 6      That pursuant to FCRP Rule 30(f)(1), request to

 7  review the transcript was not made by either deponent or

 8  party before the deposition was completed.

 9      That pursuant to information given to the deposition

10  officer at the time said testimony was taken, the

11  following includes all parties of record and the amount

12  of time used by each party at the time of the

13  deposition:

14      Ms. Sarah Cummings Stewart (0h0m)
            Attorney for Plaintiff
15      Ms. Ciara A. Sisco (1h10m)
            Attorney for Plaintiff
16      Ms. Nina Perales (2h3m)
            Attorney for Plaintiff
17      Ms. Jasmine Johnson (0h0m)
            Attorney for Plaintiff
18      Mr. Thomas Buser-Clancy (0h0m)
            Attorney for Plaintiff
19      Ms. Lia Sifuentes Davis (0h0m)
            Attorney for Plaintiff
20      Ms. Susana Lorenzo-Giguere (0h0m)
            Attorney for Plaintiff
21      Mr. Graham W. White (3h38m)
            Attorney for Plaintiff
22      Ms. Wendy Olson (0h0m)
            Attorney for Plaintiff
23      Ms. Leigh Tognetti (0h0m)
            Attorney for Defendant
24      Ms. Jacqueline Villarreal (0h0m)
            Attorney for Defendant
25      Ms. Barbara Nicholas (0h0m)
            Attorney for Defendant

Jacquelyn Callanen                                            April 20, 2022
                                                                  Page 357

```
 1        Mr. Anthony "Tony" Nelson (0h0m)
               Attorney for Defendant
 2        Mr. Jaywin Signh Malhi (0h13m)
               Attorney for United States of America
 3        Ms. Lisa V. Cubriel (0h0m)
               Attorney for Defendant
 4        Ms. Kathleen T. Hunker (0h41m)
               Attorney for Defendant
 5

 6        I further certify that I am neither counsel for,

 7   related to, nor employed by any of the parties in the

 8   action in which this proceeding was taken, and further

 9   that I am not financially or otherwise interested in the

10   outcome of this action.

11        Certified to by me on this 29th day of April, 2022.

12

13        _____

14                       Sarah A. Prugh, CSR
                         Texas CSR 3972
15                       Expiration:  1/31/24
                         Magna Legal Services
16                       Firm Registration Number 633
                         16414 San Pedro, Suite 900
17                       San Antonio, Texas 78232
                         210-697-3400
18

19

20

21

22

23

24

25
```

# EXHIBIT 37

Rachelle Obakozuwa                                March 21, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3

    LA UNION DEL PUEBLO          §
 4  ENTERO, et al.,              §
         Plaintiffs,             §
 5                               §
    v.                           §   Case No. 5:21-cv-844-XR
 6                               §
    GREGORY W. ABBOTT, et        §
 7  al.,                         §
         Defendants,             §
 8  _____§
                                 §
 9                               §
    OCA-GREATER HOUSTON, et      §
10  al.,                         §
         Plaintiffs,             §
11                               §
    v.                           §   Case No. 1:21-cv-780-XR
12                               §
    JANE NELSON, et. al.,        §
13       Defendants,             §
                                 §
14  _____§
                                 §
15  HOUSTON JUSTICE, et          §
    al.,                         §
16       Plaintiffs,             §
                                 §
17  v.                           §   Case No. 5:21-cv-848-XR
                                 §
18  GREGORY WAYNE ABBOTT,        §
    et al.,                      §
19       Defendants,             §
                                 §
20  _____§
                                 §
21  LULAC Texas, et al.,         §
         Plaintiffs,             §
22                               §
    v.                           §   Case No. 1:21-cv-0786-XR
23                               §
    JANE NELSON, et al.,         §
24       Defendants,             §
                                 §
25  _____§
```



```
1   MI FAMILIA VOTA, et        §
    al.,                        §
2        Plaintiffs,            §
                                §
3   v.                          §   Case No. 5:21-cv-0920-XR
                                §
4   GREG ABBOTT, et al.,        §
         Defendants.            §
```

```
5

6

7

8

9           ORAL AND VIDEOTAPED DEPOSITION OF

10                  RACHELLE OBAKOZUWA

11                    MARCH 21, 2023

12

13

14

15       ORAL AND VIDEOTAPED DEPOSITION OF RACHELLE

16   OBAKOZUWA, produced as a witness at the instance of the

17   Defendants and duly sworn, was taken in the above styled

18   and numbered cause on Tuesday, March 21, 2023, from

19   3:51 p.m. to 6:44 p.m., before DONNA QUALLS, Notary

20   Public in and for the State of Texas, reported by

21   computerized stenotype machine, at the offices of Harris

22   County Attorney's Office, 1019 Congress Street, 15th

23   Floor, Houston, Texas, pursuant to the Federal Rules of

24   Civil Procedure, and any provisions stated on the record

25   or attached hereto.
```



Rachelle Obakozuwa

March 21, 2023
Page 57

1     Q.   You described some voter education efforts that

2    your office engaged in around Senate Bill 1's

3    identification provision.   Why did you undertake those

4    efforts?

5     A.   There were voter questions and confusion about

6    why their ballots weren't being counted -- or why their

7    ballots were being rejected.   I apologize.   And -- and

8    the -- there were changes that SB1 had that we knew

9    would affect every voter who was voting by mail.

10     Q.   And do you anticipate needing to continue to

11    do -- maintain these efforts in future elections?

12     A.   Yes.

13     Q.   Earlier you testified that SB1 necessitated an

14    increase in temporary and full-time staff.   Why is that?

15     A.   There are a lot of implications for SB1.   With

16    the rejection of mail ballots, there has to be more

17    communication to voters.   So it takes more bodies to

18    create that communication to send items to the voters,

19    and there's a higher rate of transaction.   So it

20    requires more workers.

21          Additionally, SB1 affected some of our

22    staffing for election workers.   And so that was one of

23    the reasons recruitment efforts had to increase.   So we

24    had to have more staff for that.   And there are more

25    procedural-type questions and calls that we get.   So our



Rachelle Obakozuwa

March 21, 2023
Page 58

1    call center and help line had to increase staff as well.

2        Q.  Were there increased needs in -- for resources

3    dedicated to voter outreach and education related to

4    implementing Senate Bill 1's identification provision?

5        A.  And are we specifically speaking about the

6    period for November or prior to March?

7        Q.  Let's talk about just November for the moment.

8        A.  We increased the quantity of voter outreach

9    persons to go to it -- these community events to

10   communicate about these -- the changes to SB1.  Yes, for

11   both elections.

12       Q.  And do you believe those increased needs are

13   going to continue on in future elections as well?

14       A.  Yes.

15       Q.  Why is that?

16       A.  There's still confusion and there's still --

17   there are still issues with person's ballots, mail

18   ballots being rejected.

19       Q.  Did you ever have any communications with the

20   secretary of state's office about what kind of voter

21   education efforts your county should undertake related

22   to SB1's identification provision?

23       A.  Our communications team reached out to

24   secretary of state's office about how to engage with

25   voters without it appearing as soliciting which would be



Rachelle Obakozuwa

March 21, 2023
Page 59

```
 1    illegal under SB1.
 2         Q.  So your office sought guidance on the legality
 3    of your voter education efforts; is that correct?
 4         A.  Correct.
 5         Q.  Did you seek -- withdrawn.
 6              Did the secretary of state's office provide
 7    your office with any suggestions about best practices
 8    related to voter education and outreach around Senate
 9    Bill 1's identification provisions?
10         A.  No.
11         Q.  Would your ability -- your county's ability to
12    engage in these voter education efforts depend on your
13    budget in future years?
14              MS. HUNKER:  Objection; form.
15         A.  We have to consider budget in decisions about
16    voter education.
17         Q.  (BY MS. PAIKOWSKY)  Would your ability to
18    increase staffing in future years also depend on budget
19    constraints?
20         A.  Yes.
21         Q.  Is there anything else that might prohibit you
22    from undertaking these education and harm mitigation
23    programs?
24         A.  I mentioned earlier that some communities
25    haven't been interested in engagement or having us
```



Rachelle Obakozuwa

March 21, 2023
Page 65

1      Q.  So why do you think the rejection rate was

2   higher in November 2022 than in the past elections shown

3   here?

4              MS. HUNKER:  Objection; form.

5      A.  SB1 has brought challenges to mail voting that

6   were not part of any of the other elections --

7   elections.

8              MS. PAIKOWSKY:  I think I am ready to pass

9   the witness.

10                   EXAMINATION

11  BY MS. HOLMES:

12     Q.  Good afternoon.  My name is Jennifer Holmes,

13  and I represent the -- and now I have a microphone.

14              Good afternoon.  My name is Jennifer

15  Holmes, and I represent the HAUL plaintiffs in this

16  case.  Thank you for bearing with us today.

17              You testified earlier that your office had

18  engaged in increased efforts to recruit election

19  workers; is that correct?

20     A.  Yes.

21     Q.  And I believe you also testified that there was

22  some relation between SB1 and difficulty in retaining

23  election workers; is that correct?

24     A.  Yes.

25     Q.  And what is the relationship between SB1 and



1                       REPORTER'S CERTIFICATION
                      ORAL DEPOSITION OF

2                       RACHELLE OBAKOZUWA
                  TAKEN MARCH 21, 2023

3

4

5           I, DONNA QUALLS, Shorthand Reporter and Notary

6   Public in and for the State of Texas, hereby certify to

7   the following:

8              That the witness, RACHELLE OBAKOZUWA, was duly

9   sworn by the officer and that the transcript of the oral

10  deposition is a true record of the testimony given by

11  the witness;

12             That the original deposition was delivered to

13  SAMEER S. BIRRING / KATHLEEN T. HUNKER;

14             That a copy of this certificate was served on

15  all parties and/or the witness shown herein on

16  _____.

17          I further certify that pursuant to FRCP No.

18  30(f)(i) that the signature of the deponent was

19  requested by the deponent or a party before the

20  completion of the deposition and that the signature is

21  to be returned within 30 days from date of receipt of

22  the transcript.  If returned, the attached Changes and

23  Signature Page contains any changes and the reasons

24  therefor.

25          I further certify that I am neither counsel



Rachelle Obakozuwa

March 21, 2023
Page 101

1   for, related to, nor employed by any of the parties in

2   the action in which this proceeding was taken, and

3   further that I am not financially or otherwise

4   interested in the outcome of the action.

5           Certified to by me this 10th day of

6    April, 2023.

7

8

9   _____

10  DONNA QUALLS
    Notary Public in and for
    The State of Texas

11  My Commission expires 11/06/2026

12  Magna Legal Services
    Firm Registration No. 633

13  16414 San Pedro, Suite 900
    San Antonio, Texas 78232

14  (210) 697-3400

15

16

17

18

19

20

21

22

23

24

25



# EXHIBIT 38

**Supplemental Report Submitted in *Houston Area Urban League v. Abbott*,**

**No. 5:21-cv-00848-XR (W.D. Tex. 2021)**

Daniel A. Smith, Ph.D.[*]

April 29, 2022

[*]Professor and Chair of Political Science, University of Florida, and President, ElectionSmith

1

# Contents

I   **Purpose of Engagement**      5

II   **Summary of Findings**      7

III   **Data Relied Upon in this Report**      8

     III.1  The Texas Statewide Voter File . . . . . . . . . . . . . . . . . . . . . . . 9

     III.2  County Absentee Voter Files . . . . . . . . . . . . . . . . . . . . . . . . . 10

     III.3  Linking County Absentee Ballot Files to the Statewide Voter File . . . . . 11

     III.4  U.S. Census Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     III.5  Definition of a Rejected Absentee Ballot . . . . . . . . . . . . . . . . . . 13

     III.6  Definition of a Rejected Absentee Ballot under S.B. 1 . . . . . . . . . . . 14

     III.7  Calculating the Rate of Rejected Absentee Ballot under S.B. 1 for Voters with Hispanic and Non-Hispanic Surnames . . . . . . . . . . . . . . . . . . . . . . 15

IV   **Absentee Ballots in Harris County**      16

     IV.1  Absentee Ballot Rejection Rates in Harris County . . . . . . . . . . . . . 16

     IV.2  Absentee Ballot Rejection Rates of Hispanic and Non-Hispanic Voters in Harris County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     IV.3  Absentee Ballot Rejection Rates of Black and Non-Black Voters in Harris County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     IV.4  Summary: Harris County . . . . . . . . . . . . . . . . . . . . . . . . . . 25

V   **Absentee Ballots in Tarrant County**      25

     V.1  Absentee Ballot Rejection Rates in Tarrant County . . . . . . . . . . . . . 25

     V.2  Absentee Ballot Rejection Rates of Hispanic and Non-Hispanic Voters in Tarrant County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

V.3 Absentee Ballot Rejection Rates of Black and Non-Black Voters in Tarrant County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

V.4 Summary: Tarrant County . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**VI Absentee Ballots in Dallas County** **30**

VI.1 Absentee Ballot Rejection Rates in Dallas County . . . . . . . . . . . . . 30

VI.2 Absentee Ballot Rejection Rates of Hispanic and Non-Hispanic Voters in Dallas County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

VI.3 Absentee Ballot Rejection Rates of Black and Non-Black Voters in Dallas County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

VI.4 Summary: Dallas County . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**VII Absentee Ballots in Hidalgo County** **35**

VII.1 Absentee Ballot Rejection Rates in Hidalgo County . . . . . . . . . . . . . 35

VII.2 Absentee Ballot Rejection Rates of Hispanic and Non-Hispanic Voters in Hidalgo County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

VII.3 Absentee Ballot Rejection Rates of Black and Non-Black Voters in Hidalgo County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

VII.4 Summary: Hidalgo County . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**VIII Absentee Ballots in El Paso County** **37**

VIII.1 Absentee Ballot Rejection Rates in El Paso County . . . . . . . . . . . . . 37

VIII.2 Absentee Ballot Rejection Rates of Hispanic and Non-Hispanic Voters in El Paso County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

VIII.3 Absentee Ballot Rejection Rates of Black and Non-Black Voters in El Paso County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

VIII.4 Summary: El Paso County . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**IX  Five-County Analysis Shows that S.B. 1 has a Disparate Impact for a Majority of Texas' Black VAP and a Near Majority of Hispanic VAP Casting Absentee Ballots**                                                                          **39**

**X  Conclusion**                                                                                                          **40**

**XI  Appendices**                                                                                                        **43**

XI.1  Harris County Absentee Ballot Codebook ("Harris_Codebook.pdf" provided by counsel on April 26, 2022) . . . . . . . . . . . . . . . . .   43

XI.2  Dallas County Absentee Ballots Codebook ("Dallas Codebook_Mail Ballot Return Status.pdf" provided by counsel on April 26, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44

# I  Purpose of Engagement

**1**    Counsel for the Plaintiffs in *Houston Area Urban League v. Abbott*, No. 5:21-cv-00848-XR (W.D. Tex.  2021), have engaged me to form expert opinions on several items related to the impact on Texas voters of Texas' Senate Bill 1 (hereafter S.B. 1), signed into law on September 1, 2021 by Governor Greg Abbott, and in particular whether certain provisions have disproportionately adverse effects on Black and Hispanic registered voters in Texas.

**2**    I previously authored an Expert Report, dated February 28, 2022, in this matter.

**3**    Here, I address additional data provided to me from counsel after I submitted my initial report, specifically absentee ballot files provided to counsel from several Texas counties.  I analyze rejected absentee ballots (hereinafter, absentee ballots) returned by voters, including by Black, Hispanic, and white voters.

**4**    My additional analyses reinforce the conclusions in my initial Expert Report on the disparate effects of S.B. 1 on registered voters in Texas counties.  Specifically, my analysis shows that Black and Hispanic voters were much more likely to have their absentee ballots rejected in the March 1, 2022 statewide primary elections, and the reasons for the higher rejection rate are directly the result of S.B. 1's requirement that voters casting absentee ballots must provide their driver's license number, election identification certificate number, personal identification card number, or the last four digits of their Social Security number on their absentee ballot return envelopes, and that the ID number they provide must match what is on their voter registration record.

**5**     It is important to note that voters in Texas who wish to have an absentee ballot sent to them must also provide on of these ID numbers one their absentee ballot application, but at time of writing, I have not received any data from counsel concerning absentee ballot application rejections in the counties with absentee ballot application data. Based on my analysis of absentee ballot rejection data in this report, however, I expect the same trends to exist in the context of absentee ballot application rejections, namely, that the absentee ballot applications of Black and Hispanic voters are disproportionately rejected due to SB 1's ID-match requirement. As such, the absentee ballot analysis in this report is limited only to voters who successfully applied for, and received, their absentee ballots from local election officials. By definition, these voters provided the required information under S.B. 1 to receive their absentee ballots. As such, my analysis is very conservative, as there are many more eligible voters who *requested* absentee ballots but who did not have their ballot sent to them due to the S.B. 1's new requirements.[1] This is known as "survival bias," in that my analysis (because of a lack of data) is conservative as it does not consider registered voters who in the first place were unable to receive their absentee ballots due to *application* restrictions under S.B. 1.

**6**     In formulating my opinions, I utilize the same methods as in my first report. These methods are informed by standard sources and methodologies used in political science analyses. My background and qualifications, in addition to my curriculum vitae and rate of pay, are included in my original report. My compensation is contingent neither on the

---

[1] See "Why Texas election officials are rejecting hundreds of vote-by-mail applications," *NPR*, January 20, 2022, available `https://www.npr.org/2022/01/20/1074296368/why-texas-election-officials-are-rejecting-hundreds-of-vote-by-mail-applications` (last accessed April 28, 2022).

results of the analyses described herein nor on the contents of my report.

**7**     I reserve the right to supplement my analysis upon obtaining additional data through discovery or other means, including issues related to the March 1, 2022, statewide primary election.

# II   Summary of Findings

**8**     There is clear evidence that S.B. 1 increases the cost of voting for all voters in Texas, but particularly for Black and Hispanic voters who cast absentee ballots.

**9**     Data from the March 1, 2022 statewide primary election provide strong evidence that the restrictions put in place by S.B. 1 disproportionately increase the cost to vote for Black and Hispanic voters. S.B 1's ID-match requirements for voters casting absentee ballots drastically increased the rejection rate of returned absentee ballots, particularly for Black and Hispanic voters, in the 2022 March primary election. The disparate impact of S.B. 1 on the rejection rates of absentee ballots cast by Black and Hispanic voters is clear in the counties for which I have received data from counsel.

**10**     Although I do not have data from all 254 counties in Texas, the negative impact of S.B. 1 on the ability of Black and Hispanic voters to cast valid absentee ballots affects most of the state's Black Voting Age Population (VAP), and nearly half of the state's Hispanic VAP. My analysis of absentee voting in the five counties—Harris, Dallas, Tarrant, El Paso, and Hidalgo—captures 38.05% of the state's total VAP. More importantly, 45.73% of the

state's Hispanic VAP and a majority—52.05%—of the state's overall Black VAP resides in just these five counties.

**11**      Furthermore, the restrictions S.B. 1 places on voters casting absentee ballots will create downstream effects, most notably, longer lines and wait times at polling locations on Election Day, as Black and Hispanic voters will likely be dissuaded from voting an absentee ballot given the high rejection rates of absentee ballots cast by Black and Hispanic voters in the March 2022 statewide primary election.

# III   Data Relied Upon in this Report

**12**      To the best of my understanding, the State of Texas refused to produce in discovery their statewide database with voter-level information recording if a voter's application for an absentee ballot was rejected, or if a voter's returned absentee ballot was rejected. I have obtained from counsel voter-level data from several counties that records, among other information, the request and return dates of a voter's absentee ballot, whether or not it was rejected, and the reason it was rejected. I rely on these individual-level records, specifically the absentee files obtained by counsel through public records requests or discovery, analyzing all the files provided to me by counsel.

## III.1   The Texas Statewide Voter File

**13**      As in my original report, I rely on what I refer to as the statewide Texas voter file, also known as the statewide "Voter registration list."[2] The Texas voter file is comprised of 254 county-level files. I rely upon two voter files for this report. One lists registered voters in the State of Texas as of January 10, 2022, and the other from April 11, 2022. The January 10, 2022 voter file was available to me by counsel. I obtained the April 11, 2022 file in the course of my academic research. In both of the statewide voter files, every registered voter has a unique voter ID, called a VUID. For each voter, the January 10, 2022 statewide voter file contains fields with voter-level demographics, including age and gender, and other voter-level features like mailing addresses, county of registration, assigned precinct, and whether the voter has a Hispanic surname.[3] The April 11, 2022 statewide voter file contains the same fields for each voter except the field for whether the voter has a Hispanic surname.

---

[2]See "VOTER REGISTRATION PUBLIC INFORMATION REQUEST FORM," Texas Secretary of State, available at `https://www.sos.state.tx.us/elections/forms/pi.pdf` (last accessed January 21, 2022).

[3]Hispanic (Spanish) surnames are flagged on the statewide voter file by the Texas Department of State. For a list of Hispanic surnames, see U.S. Census Bureau, "Decennial Census Surname Files," available `https://www.census.gov/data/developers/data-sets/surnames.html` (last accessed February 26, 2022). When compared to the U.S. Census Bureau's American Community Survey, as of November 2020, the percent of registered voters with a Hispanic surname in Texas is less than the share of the state's Hispanic Citizen Voting Age Population (CVAP). See U.S. Census Bureau, "Citizen Voting Age Population by Race and Ethnicity," American Community Survey (ACS) 5-year estimates, 2015-2019, available `https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.html` (last accessed February 26, 2022).

## III.2   County Absentee Voter Files

**14**    At this time, I have received a series of what I refer to as absentee ballot files from counsel for five counties (Harris, Tarrant, Dallas, El Paso, and Hidalgo). Some counties provided counsel with voter-level absentee ballot data for multiple elections held in their county while others provided voter-level absentee ballot data for just one election, specifically, the March 1, 2022 statewide primary. My analysis for this report considers absentee ballot data from every election in every county that counsel has provided to me.[4]

---

[4]Absentee files analyzed include Harris County:   Longoria_001100 0818 By Mail Ballot List - Public Redacted.pdf, Longoria_001099 0618 By Mail Ballot List - Public.xlsx, Longoria_001098 0518 By Mail Ballot List - Public.xlsx, Longoria_001097 0322_VoterHistory_BothParties.xlsx, Longoria_001096 0318 By Mail Ballot List - Public.xlsx, Longoria_001094 1221 By Mail Ballot List - Public.xlsx, Longoria_001093 1220 By Mail Ballot List - Public.xlsx, Longoria_001092 1219 By Mail Ballot List - Public.xlsx, Longoria_001091 1218 By Mail Ballot List - Public.xlsx, Longoria_001090 1121 By Mail Ballot List - Public.xlsx, Longoria_001089 1120 By Mail Ballot List - Public.pdf, Longoria_001088 1119 By Mail Ballot List - Public.xlsx, Longoria_001087 1118 By Mail Ballot List - Public.pdf, Longoria_001086 0720 By Mail Ballot List - Public.xlsx, Longoria_001085 0621 By Mail Ballot List - Public.xlsx, Longoria_001084 0521 By Mail Ballot List - Public.xlsx, Longoria_001083 0519 By Mail Ballot List - Public.xlsx, Longoria_001082 0322 By Mail Ballot List - Public.xlsx, Longoria_001081 0320 By Mail Ballot List - Public.xlsx, Longoria_001080 0319 By Mail Ballot List - Public.xlsx, Longoria_001079 0122 By Mail Ballot List - Public.xlsx, Longoria_001078 0120 (SRD148) By Mail Ballot List - Public.xlsx, Longoria_001077 0119 By Mail Ballot List - Public.xlsx; Tarrant County: a_reqexp_PM16_all.txt, a_reqexp_PM18_all.txt, a_reqexpPM20_all.txt, a_reqexp1120full.txt, a_reqexpPM22_full.txt ; Dallas County:   MS015596 ULTRASENSITIVE Mail Ballot Files 01012022 - 03102022.xlsx, MS015549 ULTRASENSITIVE Mail Ballot Files 01012020 - 03122020.xlsx, MS015467 ULTRASENSITIVE Mail Ballot Files 01012018 - 03152018.xlsx ; Hidalgo County:   ABBM LIST March 1 2022 Rep.txt, ABBM LIST March 1 2022 Dem.txt ; El Paso County:  El Paso_March 2022 Data.xlsx .

## III.3  Linking County Absentee Ballot Files to the Statewide Voter File

**15**      As mentioned above, the Texas voter file is indexed by ten-digit voter identification numbers, known as VUIDs. When a county's absentee ballot files contain a voter's VUID, I am able to directly link voters who requested or cast an absentee ballot, as recorded in a county's absentee file, with the voter's record in the Texas voter file by his or her VUID.[5]

**16**      Not all the absentee files provided by counties to counsel contain VUID numbers.[6] In cases where there is no VUID number associated with a voter in a county's absentee ballot file, such as Harris County, I conduct an exact match of a registered voter's full name (including middle initial or name, and suffix, if provided) and precinct number from the statewide voter file and each county absentee file. Using this matching technique (full name and precinct number), I am able to link voters included in both the statewide voter file and in a county's absentee files. For example, Harris County did not include a VUID number in

---

[5]When matching individual-level data, for example voters included in a county-level absentee ballot file for a given election, against a single snapshot of a statewide voter file, there is invariably some slippage when it comes to coverage of all registered voters at a given moment in time. For example, it is possible, since I utilize both the January 2022 and the April 2022 statewide voter file to determine the demographic information regarding voters who cast absentee ballots in a given election, that I may not be able to match voters who are no longer registered to vote as of the April 2022 voter file snapshot, or who were not yet registered in the January 2022 voter file snapshot. Such individuals may have cast an absentee ballot in the March 1, 2022 statewide primary.

[6]For example, the Harris County absentee files did not include VUID numbers. Other counties are missing a VUID number associated with their record in the absentee file. My analysis of processed absentee ballots from the counties include only voters who have a 10-digit VUID in the county absentee ballot lists. It is my understanding that voters in a county's absentee file without a 10-digit VUID did not cast absentee ballot; they only requested one.

its absentee files.[7]

## III.4   U.S. Census Data

**17**     As in my initial report, I also rely on U.S. Census data for my analyses. Specifi-
cally, I rely on 2020 Census Block Assignment Files for the State of Texas, drawing on the
demographic (race/ethnicity) data in each Census block which I then am able to align with
a county's 2022 precincts.[8]  I downloaded these data files from the State of Texas' Capitol
Data Portal.[9]

---

[7]When matching a voter's full name and precinct number found in a county's
absentee file for a specific election with voters found in the April 2022 statewide
voter file, there are some voters in the absentee file that did not have an exact
match with the voter file. This is possible for several reasons. First, over 1,800
(of the more than 358,000) voters in the county's March 2022 absentee file do
not have a precinct number associated with their record, which is necessary
to do a name and precinct number match against the voter file. Second, it is
possible that a voter who cast a ballot in the March 2022 primary is no longer
registered in Harris County's April 2022 snapshot of the statewide voter file.
It is also possible that a voter who cast an absentee ballot in an earlier election
is no longer included in the April 2022 statewide voter file, or that a voter may
have changed his or her name, or had a middle initial, middle name, or hyphen
in his or her name in the statewide voter file but not in the Harris County
absentee file, or vice-versa. Non-matched voters in Harris County are included
when calculating the overall rate of rejected absentee ballots in an election in
the following tables, but they are not included when calculating the rejected
absentee ballots by Hispanic surname, as that information is obtained from the
April 2022 statewide voter file.

[8]For example, Harris County's March 2022 statewide primary election vote
history file includes precinct information for voters that was current for both
the 2020 and 2022 election cycles.

[9]See "2020 General Election VTDs (2020 Census)," "VTDs20G_2020.zip,"
available (`https://data.capitol.texas.gov/dataset/vtds` (last accessed
February 1, 2022), and "2020 Census Geography," "Blocks.zip," available
(`https://data.capitol.texas.gov/dataset/2020-census-geography/`
`resource/5338bb0a-aac3-463f-aac2-c0980f745bb8` (last accessed Febru-

## III.5   Definition of a Rejected Absentee Ballot

**18**      Before proceeding with my analysis of the impact of S.B. 1 on rejected absentee ballots that were cast in the March 2022 primary election, a few definitions are in order.

**19**      I take a conservative approach when determining if a voter's absentee ballot is rejected in a given county in a given election.  Although Texas counties may use slightly different nomenclature and codes to define the "return status" code of an absentee ballot, as found in the assortment of absentee ballot data files counsel provided to me, I take the following steps to ensure that I am not counting voters as having cast an absentee ballot when they did not.[10]  In particular, I exclude from the group of voters whose absentee ballots were rejected, those voters who:  1) cancelled an initial absentee ballot request ("CL"); 2) successfully requested an absentee ballot but did not return the ballot ("D1"); 3) had their absentee ballot request disallowed, such as a "no legal ground for vote by mail" ("NL"); 4) had not been registered to vote when they requested their absentee ballot ("NV"); 5) had their absentee ballot request come back to an election official undeliverable ("UN"); 6) had their absentee ballot cancelled at the polls so that they could vote in person (early or on Election Day) ("ED," "EV," "Z'," and "X").

**20**      In short, when calculating the rejection rate of absentee ballots in an election in a given county, I divide all absentee ballots with a return status designated by the county as

---

ary 21, 2022).

[10]For examples of the counties' coding systems, see Appendix XI.1 for Harris County's absentee ballot codebook and XI.2 Dallas County's absentee ballot codebook.

being rejected (the numerator)[11] into all the absentee ballots received by the county election official (the denominator). If a voter has more than one return status code in a county's absentee ballot file in a given election, I privilege the code (if there is one) that the absentee ballot was accepted.

## III.6   Definition of a Rejected Absentee Ballot under S.B. 1

**21**     I take a similarly conservative approach when determining if a voter's absentee ballot was rejected in a given county in a given election due to the new requirements under S.B. 1. Specifically, I am interested in whether an absentee ballot that was rejected was rejected because it failed to meet S.B. 1's requirement that voters casting absentee ballots must provide their driver's license number, election identification certificate number, personal identification card number, or the last four digits of their Social Security number on their absentee ballot return envelopes, and that the ID number they provide must match what is on file on their voter registration record. When calculating the rejection rate of absentee ballots in an election in a given county that were rejected due to the new requirements of S.B. 1 (the numerator), I divide all absentee ballots rejected with a return status code of "Incorrect or Missing SSN/TDL" ("IS") or "Incorrect/Missing SSN/TDL Returned" ("R1") into all absentee ballots with a return status designated by the county as being rejected (the denominator).[12]

---

[11]For example, El Paso County's return status codes for absentee ballots that I take as being received (whether accepted or rejected), include "OK" (OKAY), "BR" (Ballots received), "RJ" (Ballot Rejected by Board), and "IS" (Incorrect or Missing SSN/TDL).

[12]In cases where a voter has duplicate records in the absentee file, I privilege a code of "OK" over any of the many rejection codes, in order to eliminate any "rejected" ballots that were successfully cured by the voter.

14

**22**     In the tables that follow, starting in Section IV, for each county the first table displayed provides the overall counts of the number of absentee ballots cast in a given election, the number of rejected absentee ballots in a given election, and the rejection rates of absentee ballots cast in a given election.  The final two columns provide a count of the number of rejected absentee ballots that were rejected due to the new S.B. 1 requirement that voters must have their correct number on their absentee ballot return envelope, and the overall percentage of rejected absentee ballots in a given election due to S.B. 1.

## III.7   Calculating the Rate of Rejected Absentee Ballot under S.B. 1 for Voters with Hispanic and Non-Hispanic Surnames

**23**     Finally, following the same logic as above, for each county for which I have absentee ballot data, I again take a conservative approach to determine absentee ballot rejection rates for voters with Hispanic and non-Hispanic surnames.  As discussed above, by merging a county's absentee ballot files with the statewide voter file, I am able to determine if a voter is tagged in Texas's statewide voter file as having a Hispanic surname or not. Using this information from the voter file, I separate Hispanic and non-Hispanic absentee voters into two bins and then calculate if a voter's absentee ballot was rejected, and if it was rejected, the overall counts of the number of absentee ballots cast, the number of rejected absentee ballots in a given election, and the rejection rates of absentee ballots cast in a given election, for both Hispanic and non-Hispanic voters.  The final two columns provide a count of the number of rejected absentee ballots that were rejected due to the new S.B. 1 requirement that voters must have their correct number on their absentee ballot return envelope, and the overall percentage of rejected absentee ballots in a given election due to S.B. 1., for both Hispanic and non-Hispanic voters.

# IV   Absentee Ballots in Harris County

**24**      I begin my analysis by examining data on absentee ballot rejection rates in Harris County for 22 elections that were provided to me by counsel. Some of these elections are local elections and some are statewide elections. Statewide elections include the March 2018 primary election, the May 2018 primary election runoff, the November 2018 General Election, the July 2020 statewide primary election, the March 2020 presidential primary election, the November 2020 General Election, and the March 2022 primary election. The March 2022 primary election was the first statewide election in Texas in which S.B. 1's provisions on absentee ballot applications and received absentee ballots were enforced.

## IV.1   Absentee Ballot Rejection Rates in Harris County

**25**      Table 1 provides the raw count in each election in Harris County of the total number of absentee ballots cast, the total number of absentee ballots that were rejected, and the percent of absentee ballots that were rejected. The final two columns provide the raw count of the number of absentee ballots that were rejected because of S.B. 1's new requirements, specifically that voters must have their correct number on their return absentee ballot envelopes, and the percentage of all rejected absentee ballots that were rejected due to S.B. 1's new requirements.

**26**      As can be seen by going down the first column of Table 1, the raw count of absentee ballots cast in each of the elections ranges from as few as a 172 absentee ballots (January 2019, the State Representative District 145 Special Election To Fill A Vacancy) to 180,285 absentee ballots (November 2020 General Election). The second column reports the

number of absentee ballots that were rejected in each election. For example, there were 1,215 rejected absentee ballots cast in the March 2018 statewide primary election, 772 absentee ballots rejected in the November 2020 General Election, and 7,601 rejected in the March 2022 statewide primary election.

Table 1: Absentee ballot rejection, Harris County

| Election | Absentee ballots | | | SB 1 ballots | |
| --- | --- | --- | --- | --- | --- |
| | Total | Rejected | % | Rejected | % |
| March 2018 | 48,520 | 1,215 | 2.50 | 0 | 0.00 |
| May 2018 | 36,509 | 419 | 1.15 | 0 | 0.00 |
| June 2018 | 2,048 | 31 | 1.51 | 0 | 0.00 |
| August 2018 | 42,962 | 397 | 0.92 | 0 | 0.00 |
| November 2018 | 100,364 | 1,428 | 1.42 | 0 | 0.00 |
| December 2018 | 6,957 | 151 | 2.17 | 0 | 0.00 |
| January 2019 | 172 | 1 | 0.58 | 0 | 0.00 |
| March 2019 | 494 | 19 | 3.85 | 0 | 0.00 |
| May 2019 | 3,445 | 19 | 0.55 | 0 | 0.00 |
| November 2019 | 21,188 | 261 | 1.23 | 0 | 0.00 |
| December 2019 | 23,378 | 74 | 0.32 | 0 | 0.00 |
| January 2020 | 1,356 | 18 | 1.33 | 0 | 0.00 |
| March 2020 | 55,014 | 899 | 1.63 | 0 | 0.00 |
| July 2020 | 86,317 | 2,336 | 2.71 | 0 | 0.00 |
| November 2020 | 180,285 | 772 | 0.43 | 0 | 0.00 |
| December 2020 | 5,381 | 62 | 1.15 | 0 | 0.00 |
| May 2021 | 5,957 | 54 | 0.91 | 0 | 0.00 |
| June 2021 | 400 | 0 | 0.00 | 0 | 0.00 |
| November 2021 | 51,414 | 593 | 1.15 | 0 | 0.00 |
| December 2021 | 10,326 | 9 | 0.09 | 0 | 0.00 |
| January 2022 | 195 | 0 | 0.00 | 0 | 0.00 |
| March 2022 | 37,628 | 7,601 | 20.20 | 6,872 | 18.26 |

**27**    The third column of Table 1 displays the percentage of absentee ballots that were rejected in each election. The rejection rate of absentee ballots across the more than 20 elections ranges from zero percent in several local elections, to over 20% in the March 2022 primary election, when S.B. 1 was in effect. For example, in the November 2020 General

Election, of the more than 180,000 absentee ballots cast, 772 were rejected for a rate of 0.43%.

**28**      The most notable comparison with regard to the impact of S.B. 1 is across the two statewide primaries held four years apart in March 2018 and March 2022. In the March 2018 primary election, 1,215 of the 48,520 absentee ballots were rejected, a rate of 2.50%. In contrast, in the March 2022 primary election, the first statewide election following the implementation of S.B. 1, there were a total of 37,628 absentee ballots cast. Of these, 7,601 were rejected, a rejection rate of 20.20%. The overall absentee ballot rejection rate in Harris County in the March 2022 primary was **8 times** higher than the county's March 2018 primary election.

**29**      I now turn to the impact of S.B. 1 on the rejected absentee ballots in the March 2022 statewide primary. The final two columns of Table 1 report the number of absentee ballots that were rejected because of the new requirements on absentee ballot returns put in place by S.B. 1. As should be expected, the only election in Harris County in which the absentee ballot rejection rate due to S.B. 1 requirements was greater than zero was the March 2022 election. Drawing on raw individual-voter data obtained from the "return status" code in Harris County's absentee ballot file for the March 2022 election, of the 37,628 absentee ballots returned, 6,872 (18.26%) were rejected due to the new provisions of S.B. 1. In other words, more than 9 out of 10 absentee ballots (6,872 / 7,601) rejected in Harris County in the March 2022 statewide primary election were rejected because of S.B. 1.

**30**      The increase in the marginal cost of voting an absentee ballot under S.B. 1 is striking. If S.B. 1 were not in place, the rejection rate in the March 2022 primary election

would have tracked the rejection rate of similar previous elections.  As can be easily calculated from Table 1, if the number of S.B. 1-related rejections are subtracted from the overall count of rejected absentee ballots, only 729 rejected ballots remain under pre-S.B. 1 conditions, a rejection rate of less than 2%, which is comparable to the rejection rates of other elections.

## IV.2  Absentee Ballot Rejection Rates of Hispanic and Non-Hispanic Voters in Harris County

**31**     As mentioned above, by linking Harris County absentee files to the statewide voter file using the method described above, it is possible differentiate the rejection rates of voters with Hispanic and non-Hispanic surnames.  The top half of Table 2, which includes only absentee ballots cast by voters in Harris County with Hispanic surnames, provides columns with the total count of absentee ballots cast, the total number of rejected absentee ballots, the percentage of rejected absentee ballots, the count of absentee ballots rejected due to S.B. 1, and the percentage of rejected absentee ballots that were rejected due to S.B. 1, for each election.  The bottom half of Table 2 provides the same information for absentee voters in Harris County with non-Hispanic surnames.

**32**     As Table 2 shows, in the March 2022 primary election, 679 voters with Hispanic surnames who cast absentee ballots, or 22.43% of the 3,027 Hispanic voters who cast absentee ballots in that election—the first under S.B. 1—had their absentee ballots rejected.  In contrast, 19.23% of the 6,520 voters who have non-Hispanic surnames (which includes Black and white registered voters) had their absentee ballots rejected, which is 3.2 percentage points lower than voters with Hispanic surnames.

19

**33**     The final two columns of Table 2 report the number of absentee ballots that were rejected because of the new requirements on absentee ballot returns put in place by S.B. 1 for Hispanic and non-Hispanic voters.  Of the absentee ballots returned by Hispanic voters, 20.61% were rejected due to the new provisions put in place by S.B. 1.  In contrast, only 17.45% of the absentee ballots returned by non-Hispanic voters in Harris County were rejected in the March 2022 statewide primary election due to S.B. 1.

**34**     Given that the category of non-Hispanic includes Black voters in Harris County who cast absentee ballots, my findings on the disparate impact of S.B. 1 on Hispanic voters casting absentee are quite conservative. The analysis that follows shows this to be the case, as Black voters in Harris County were also more likely to have their absentee ballots rejected in the March 2022 primary election.  Absent S.B. 1, it is clear that the rejection rates for Hispanic voters in the March 2022 primary election would have been much lower, closer to the range observed in previous elections in Harris County.

Table 2: Absentee ballot rejection by ethnicity, Harris County

| Election | Total | Rejected | % | Rejected | % |
|---|---|---|---|---|---|
| | | Absentee ballots | | SB 1 ballots | |
| **Hispanic** | | | | | |
| March 2018 | 3,380 | 93 | 2.75 | 0 | 0.00 |
| May 2018 | 2,808 | 47 | 1.67 | 0 | 0.00 |
| June 2018 | 91 | 2 | 2.20 | 0 | 0.00 |
| August 2018 | 3,022 | 39 | 1.29 | 0 | 0.00 |
| November 2018 | 8,514 | 115 | 1.35 | 0 | 0.00 |
| December 2018 | 2,307 | 51 | 2.21 | 0 | 0.00 |
| January 2019 | 82 | 0 | 0.00 | 0 | 0.00 |
| March 2019 | 245 | 9 | 3.67 | 0 | 0.00 |
| May 2019 | 313 | 2 | 0.64 | 0 | 0.00 |
| November 2019 | 1,785 | 12 | 0.67 | 0 | 0.00 |
| December 2019 | 1,869 | 9 | 0.48 | 0 | 0.00 |
| January 2020 | 318 | 2 | 0.63 | 0 | 0.00 |
| March 2020 | 4,536 | 78 | 1.72 | 0 | 0.00 |
| July 2020 | 7,590 | 285 | 3.75 | 0 | 0.00 |
| November 2020 | 19,429 | 72 | 0.37 | 0 | 0.00 |
| December 2020 | 259 | 1 | 0.39 | 0 | 0.00 |
| May 2021 | 633 | 8 | 1.26 | 0 | 0.00 |
| June 2021 | 63 | 0 | 0.00 | 0 | 0.00 |
| November 2021 | 4,137 | 53 | 1.28 | 0 | 0.00 |
| December 2021 | 810 | 1 | 0.12 | 0 | 0.00 |
| March 2022 | 3,027 | 679 | 22.43 | 624 | 20.61 |
| **Non-Hispanic** | | | | | |
| March 2018 | 37,403 | 861 | 2.30 | 0 | 0.00 |
| May 2018 | 28,148 | 269 | 0.96 | 0 | 0.00 |
| June 2018 | 1,675 | 27 | 1.61 | 0 | 0.00 |
| August 2018 | 33,786 | 244 | 0.72 | 0 | 0.00 |
| November 2018 | 75,714 | 843 | 1.11 | 0 | 0.00 |
| December 2018 | 3,849 | 70 | 1.82 | 0 | 0.00 |
| January 2019 | 69 | 0 | 0.00 | 0 | 0.00 |
| March 2019 | 192 | 7 | 3.65 | 0 | 0.00 |
| May 2019 | 2,757 | 12 | 0.44 | 0 | 0.00 |
| November 2019 | 17,469 | 184 | 1.05 | 0 | 0.00 |
| December 2019 | 19,462 | 59 | 0.30 | 0 | 0.00 |
| January 2020 | 920 | 12 | 1.30 | 0 | 0.00 |
| March 2020 | 46,273 | 677 | 1.46 | 0 | 0.00 |
| July 2020 | 73,098 | 1,806 | 2.47 | 0 | 0.00 |
| November 2020 | 147,027 | 510 | 0.35 | 0 | 0.00 |
| December 2020 | 4,937 | 59 | 1.20 | 0 | 0.00 |
| May 2021 | 5,179 | 45 | 0.87 | 0 | 0.00 |
| June 2021 | 328 | 0 | 0.00 | 0 | 0.00 |
| November 2021 | 46,722 | 528 | 1.13 | 0 | 0.00 |
| December 2021 | 9,473 | 8 | 0.08 | 0 | 0.00 |
| January 2022 | 192 | 0 | 0.00 | 0 | 0.00 |
| March 2022 | 33,902 | 6,520 | 19.23 | 5,916 | 17.45 |

## IV.3   Absentee Ballot Rejection Rates of Black and Non-Black Voters in Harris County

**35**     In contrast to having a field for Hispanic surname, Texas' statewide voter file does not include a code for whether a voter identifies as Black. As such, in order to assess the impact of S.B. 1 on absentee ballots cast by Black voters in the 2022 primary election, I rely on regression analysis. Because neither the statewide voter file nor Harris County's absentee ballot file for the March 2022 primary election identify the race of the voter, I geocode the addresses of all registered voters in the county into Census blocks—the smallest geographic unit established by the U.S. Census Bureau.[13]

**36**     Census block data provides the racial/ethnic composition of the Voting Age Population (VAP) in each Census block in the county. By joining the geocoded voter file with the Harris County absentee file for the election, I am able to estimate whether Harris County's voters registered in Census blocks with higher rates of Black VAP, according to 2020 data from the U.S. Census, were more likely to have their absentee ballot rejected in the March 2022 primary election than voters in other Census blocks. I screen out any Census blocks that had fewer than 10 absentee ballots cast in the March 2022 primary election.

**37**     Figure 1 plots the percentage of Black VAP in a Census block (X-axis) against the percentage of voters in that Census block who had their absentee ballot rejected (y-axis)

---

[13]The batch geocoding process follows the suggestions of the U.S. Census Bureau. The most recent U.S. Census address features data were used to do the geocoding in ArcGIS. There was a 93.3 percent match rate. Any voters with missing address or an address that did not match did not get geocoded and are not included in my analysis.

in the March 2022 primary election in Harris County. The weighted (by Census block VAP) regression line shows a clear positive relationship: the greater the rate of Black VAP in a Census block, the greater the rate voters' absentee ballots were rejected. In Census blocks with no Black VAP, or almost no Black VAP, roughly 18 percent of absentee ballots in that Census block were rejected. In contrast, in Census blocks with nearly all-Black VAP, nearly 30% of absentee ballots cast were rejected. Given that Harris County includes approximately 25% of the Black VAP in the entire state of Texas, these results are especially indicative of the disproportionate effect that S.B. 1's provisions have on Black voters in Texas.

Figure 1: Percent Black Voting Age Population and Percent Rejected Absentee Ballots, by Harris County Census Block, March 2022 Primary Election



*Note: Each circle denotes a Harris County Census block, and each circle is sized proportionately to the VAP in each Census block. Weighted regression line is shown in grey.*

## IV.4    Summary: Harris County

**38**     It is clear—using the Hispanic surname and the Census block data to identify the race/ethnicity of voters—that Black and Hispanic voters in Harris County were much more likely than white registered voters to have their absentee ballots rejected in the 2022 statewide primary election.  Furthermore, absent S.B. 1, the rejection rates for Hispanic voters would have been in the range observed for previous elections. I conclude that due to the restrictions placed on absentee ballots by S.B. 1, Black and Hispanic voters in Harris County are experiencing a much higher cost of voting.

# V    Absentee Ballots in Tarrant County

**39**     I next turn to data on absentee ballot rejection rates in Tarrant County for the five elections that were provided to me by counsel.  All five elections are for statewide elections, either primary elections or the November 2020 General Election.  Again, the March 2022 primary election was the first statewide election in Texas in which S.B. 1's provisions on absentee applications and received absentee ballots were enforced.

## V.1    Absentee Ballot Rejection Rates in Tarrant County

**40**     Table 3 follows the same format as the tables for Harris County, as discussed above.  As can be seen clearly, the rate of rejected absentee ballots in the March 2022 primary election is 6.68%, nearly three times higher than in any previous election for which I have data.  Of the 14,304 absentee ballots cast in Tarrant County in the recent March primary, 814 (5.69%) were rejected due to the new provisions of S.B. 1.

**41**      As with Harris County, the increase in the marginal cost of voting an absentee ballot under S.B. 1 for voters can be calculated by subtracting the number of absentee ballots rejected due to S.B. 1 from the total number of rejected absentee ballots. Rather than 814 absentee ballots cast in the March 2022 primary election being rejected, there would have only been 142 rejected ballots, a rejection rate of less than 1%, which is actually *less* than the rejection rate in the other three primary elections for which I have data.

Table 3: Absentee ballot rejection, Tarrant County

|  | | Absentee ballots | | SB 1 ballots | |
| --- | --- | --- | --- | --- | --- |
| Election | Total | Rejected | % | Rejected | % |
| Primary 2016 | 19,251 | 224 | 1.16 | 0 | 0.00 |
| Primary 2018 | 21,090 | 317 | 1.50 | 0 | 0.00 |
| Primary 2020 | 21,216 | 496 | 2.34 | 0 | 0.00 |
| General 2020 | 76,744 | 508 | 0.66 | 0 | 0.00 |
| Primary 2022 | 14,304 | 956 | 6.68 | 814 | 5.69 |

## V.2   Absentee Ballot Rejection Rates of Hispanic and Non-Hispanic Voters in Tarrant County

**42**      Since there are VUID numbers in all the files, I am able to link Tarrant County's absentee files to the statewide voter file so as to differentiate the rejection rates of voters with Hispanic and non-Hispanic surnames. The top half of Table 4 provides data across the five elections for voters in Tarrant County with Hispanic surnames; the bottom half has data for voters with non-Hispanic surnames. Voters with Hispanic surnames regularly have absentee ballot rejection rates that are higher than voters with non-Hispanic surnames (in every election except the 2020 primary election). In the 2022 primary election, over 10% of voters with Hispanic surnames had their absentee ballots rejected; 9.71% of absentee ballots cast by Hispanic voters in Tarrant County were rejected due to S.B. 1 requirements. In contrast, only 6.53% of voters with non-Hispanic surnames had their absentee ballots

26

rejected in the election; and only 5.56% of all absentee ballots cast by non-Hispanic voters were rejected due to new regulations put in place by S.B. 1.

Table 4: Absentee ballot rejection by ethnicity, Tarrant County

| Election | Absentee ballots | | | SB 1 ballots | |
|---|---|---|---|---|---|
| | Total | Rejected | % | Rejected | % |
| **Hispanic** | | | | | |
| Primary 2016 | 1,160 | 24 | 2.07 | 0 | 0.00 |
| Primary 2018 | 1,098 | 22 | 2.00 | 0 | 0.00 |
| Primary 2020 | 1,335 | 28 | 2.10 | 0 | 0.00 |
| General 2020 | 5,183 | 36 | 0.69 | 0 | 0.00 |
| Primary 2022 | 700 | 73 | 10.43 | 68 | 9.71 |
| **Non-Hispanic** | | | | | |
| Primary 2016 | 16,748 | 158 | 0.94 | 0 | 0.00 |
| Primary 2018 | 19,199 | 271 | 1.41 | 0 | 0.00 |
| Primary 2020 | 19,049 | 430 | 2.26 | 0 | 0.00 |
| General 2020 | 65,619 | 324 | 0.49 | 0 | 0.00 |
| Primary 2022 | 13,353 | 872 | 6.53 | 742 | 5.56 |

## V.3   Absentee Ballot Rejection Rates of Black and Non-Black Voters in Tarrant County

**43**     As mentioned previously, Texas' statewide voter file does not include a code for whether a voter identifies as Black. In order to assess the impact of S.B. 1 on absentee ballots cast by Black voters in the March 2022 primary election, I rely on regression analysis, as with the Harris County analysis. I geocode the addresses of all registered voters in the county into Census blocks—the smallest geographic unit established by the U.S. Census Bureau.[14] Census block data provides the racial/ethnic composition of the Voting Age Population (VAP) in each Census block in the county. By joining the geocoded voter file

---

[14]As detailed above, the batch geocoding process follows the suggestions of the U.S. Census Bureau. There was a 95.9 percent match rate for Tarrant County.

with the Tarrant County absentee file for the election, I am able to estimate whether Tarrant County's voters registered in Census blocks with higher rates of Black VAP, according to 2020 data from the U.S. Census, were more likely to have their absentee ballot rejected in the March 2022 primary election than voters in other Census blocks.

**44**    Figure 2 plots the percentage of Black VAP in a Census block (X-axis) against the percentage of voters in that Census block who had their absentee ballot rejected (y-axis) in the March 2022 primary election in Tarrant County.  Although there are no Census blocks in Tarrant County with more than 35% Black VAP (and at least 10 absentee ballots cast in the election), the weighted (by Census block VAP) regression line shows a clear positive relationship: the greater the rate of Black VAP in a Census block, the greater the rate voters' absentee ballots were rejected.

Figure 2: Percent Black Voting Age Population and Percent Rejected Absentee Ballots, by Tarrant County Census Block, March 2022 Primary Election



*Note: Each circle denotes a Tarrant County Census block, and each circle is sized proportionately to the VAP in each Census block. Weighted regression line is shown in grey.*

## V.4    Summary: Tarrant County

**45**    It is clear—using the Hispanic surname and the Census block data to identify the race/ethnicity of voters—that Black and Hispanic voters in Tarrant County were more likely than white registered voters to have their absentee ballots rejected in the 2022 statewide primary election. Furthermore, absent S.B. 1, the rejection rates for Hispanic voters would have been less than in previous primary elections. I conclude that due to the restrictions placed on absentee ballots by S.B. 1, Black and Hispanic voters in Harris County are experiencing a higher cost of voting.

# VI    Absentee Ballots in Dallas County

**46**    I next turn to data on absentee ballot rejection rates in Dallas County for the three elections that were provided to me by counsel. The three elections are all statewide primary elections, including the March 2022 primary election.

## VI.1    Absentee Ballot Rejection Rates in Dallas County

**47**    Table 5 follows the same format as discussed above. The overall rate of rejected absentee ballots in the March 2022 primary election is 9.51%, nearly three times higher than in any previous election for which I have data. Nearly 6% (655) of the 11,097 absentee ballots cast in the March 2022 primary election were rejected due to the new provisions of S.B. 1.

Table 5: Absentee ballot rejection, Dallas County

|  | Absentee ballots | | | SB 1 ballots | |
| Election | Total | Rejected | % | Rejected | % |
|---|---|---|---|---|---|
| Primary 2018 | 12,949 | 257 | 1.98 | 0 | 0.00 |
| Primary 2020 | 12,389 | 410 | 3.31 | 0 | 0.00 |
| Primary 2022 | 11,097 | 1,055 | 9.51 | 655 | 5.90 |

## VI.2   Absentee Ballot Rejection Rates of Hispanic and Non-Hispanic Voters in Dallas County

**48**     As with the analysis for the preceding two counties, I am able to link Dallas County's three absentee files to the statewide voter file using VUID numbers to differentiate the rejection rates of voters with Hispanic and non-Hispanic surnames. The top half of Table 6 provides the data across the three elections for voters in Dallas County with Hispanic surnames, and the bottom half provides the data for voters with non-Hispanic surnames. In the two most recent primary elections, voters with Hispanic surnames had higher absentee ballot rejection rates than voters with non-Hispanic surnames. In the 2022 primary election, over 10.5% of voters with Hispanic surnames had their absentee ballots rejected; 6.60% of all the absentee ballots cast in the election were rejected due to S.B. 1's provisions. In contrast, 9.47% of voters with non-Hispanic surnames had their absentee ballots rejected in the election; only 5.93% of all absentee ballots cast were rejected due to the new regulations put in place by S.B. 1.

Table 6: Absentee ballot rejection by ethnicity, Dallas County

| | | Absentee ballots | | SB 1 ballots | |
|---|---|---|---|---|---|
| Election | Total | Rejected | % | Rejected | % |
| **Hispanic** | | | | | |
| Primary 2018 | 810 | 12 | 1.48 | 0 | 0.00 |
| Primary 2020 | 921 | 37 | 4.02 | 0 | 0.00 |
| Primary 2022 | 561 | 59 | 10.52 | 37 | 6.60 |
| **Non-Hispanic** | | | | | |
| Primary 2018 | 11,319 | 209 | 1.85 | 0 | 0.00 |
| Primary 2020 | 10,932 | 332 | 3.04 | 0 | 0.00 |
| Primary 2022 | 10,385 | 983 | 9.47 | 616 | 5.93 |

## VI.3   Absentee Ballot Rejection Rates of Black and Non-Black Voters in Dallas County

**49**    As mentioned previously, Texas' statewide voter file does not include a code for whether a voter identifies as Black. In order to assess the impact of S.B. 1 on absentee ballots cast by Black voters in the March 2022 primary election, I rely on regression analysis, as with the Harris County analysis. I geocode the addresses of all registered voters in the county into Census blocks—the smallest geographic unit established by the U.S. Census Bureau.[15] Census block data provides the racial/ethnic composition of the Voting Age Population (VAP) in each Census block in the county. By joining the geocoded voter file with the Dallas County absentee file for the election, I am able to estimate whether Dallas County's voters registered in Census blocks with higher rates of Black VAP, according to 2020 data from the U.S. Census, were more likely to have their absentee ballot rejected in the March 2022 primary election than voters in other Census blocks.

---

[15]As detailed above, the batch geocoding process follows the suggestions of the U.S. Census Bureau. There was a 97.8 percent match rate for Dallas County.

**50**     Figure 3 plots the percentage of Black VAP in a Census block (X-axis) against the percentage of voters in that Census block who had their absentee ballot rejected (y-axis) in the March 2022 primary election in Dallas County. Although the slope of the regression line is not as dramatic as found with the analysis of Harris County, it is nevertheless positive: Census blocks in Dallas County that have greater Black VAP were more likely to have a higher rate of voters' absentee ballots rejected in the March 2022 primary election.

Figure 3: Percent Black Voting Age Population and Percent Rejected Absentee Ballots, by Dallas County Census Block, March 2022 Primary Election



*Note: Each circle denotes a Dallas County Census block, and each circle is sized proportionately to the VAP in each Census block. Weighted regression line is shown in grey.*

## VI.4   Summary: Dallas County

**51**      It is clear—using the Hispanic surname and the Census block data to identify the race/ethnicity of voters—that Black and Hispanic voters in Dallas County were more likely than white registered voters to have their absentee ballots rejected in the 2022 statewide primary election. Furthermore, absent S.B. 1, the rejection rates for Hispanic voters would have been less than in previous primary elections. I conclude that due to the restrictions placed on absentee ballots by S.B. 1, Black and Hispanic voters in Harris County are experiencing a higher cost of voting.

# VII   Absentee Ballots in Hidalgo County

**52**      The absentee ballot rejection rates in Hidalgo County for the one election that was provided to me by counsel—the most recent March 2022 primary election, reveal a pattern similar to Harris County's rejection rates for that election.

## VII.1   Absentee Ballot Rejection Rates in Hidalgo County

**53**      Following the same format as discussed above, Table 7 reveals that the overall rate of rejected absentee ballots in the March 2022 primary election was 19.62%. Nearly 19% of all absentee ballots returned were rejected due to the new provisions put in place by S.B. 1.

Table 7: Absentee ballot rejection, Hidalgo County

| Election | Total | Absentee ballots Rejected | % | SB 1 ballots Rejected | % |
|---|---|---|---|---|---|
| 2022 Primary | 2,712 | 532 | 19.62 | 512 | 18.88 |

## VII.2    Absentee Ballot Rejection Rates of Hispanic and Non-Hispanic Voters in Hidalgo County

**54**    As with the prior analysis, I am able to link Hidalgo County's absentee file to the statewide voter file to differentiate the rejection rates of voters with Hispanic and non-Hispanic surnames. The top half of Table 8 shows the absentee ballots cast and rejected for voters in Hidalgo County with Hispanic surnames and the bottom half does so for voters with non-Hispanic surnames in the March 2022 primary election. In the March 2022 statewide primary election, over 21.5% of voters with Hispanic surnames had their absentee ballots rejected; over 21% of all absentee ballots cast in that election were rejected because of S.B. 1. In contrast, only 14.01% of voters with non-Hispanic surnames had their absentee ballots rejected in the election; only 12.54% of all absentee ballots cast by non-Hispanic voters were rejected due to the new regulations put in place by S.B. 1.

Table 8: Absentee ballot rejection by ethnicity, Hidalgo County

| Election | Total | Absentee ballots Rejected | % | SB 1 ballots Rejected | % |
|---|---|---|---|---|---|
| **Hispanic** | | | | | |
| 2022 Primary | 2,030 | 437 | 21.53 | 427 | 21.03 |
| **Non-Hispanic** | | | | | |
| 2022 Primary | 678 | 95 | 14.01 | 85 | 12.54 |

## VII.3    Absentee Ballot Rejection Rates of Black and Non-Black Voters in Hidalgo County

**55**    Texas' statewide voter file does not include a code for whether a voter identifies as Black. As with the foregoing analyses, I rely on regression analysis to assess the impact of S.B. 1 on absentee ballots cast by Black voters in the March 2022 primary election in Hidalgo County. After geocoding the addresses of all registered voters in the county into

36

Census blocks (there was an 87.7 percent match rate for the county), I join the geocoded voter file with the Hidalgo County absentee file for the election. However, the Black VAP in Hidalgo is extremely small and there are only seven Census blocks in the county that had over 10 absentee ballots cast in the March 2022 primary election. Because there are so few data points, my regression analysis was not able to generate meaningful results.

## VII.4   Summary: Hidalgo County

**56**    Using the Hispanic surname to identify the ethnicity of voters, I conclude that Hispanic voters in Hidalgo County were more likely than other registered voters to have their absentee ballots rejected in the March 2022 primary election, and that Hispanic voters in the county are experiencing a higher cost of voting.

# VIII    Absentee Ballots in El Paso County

**57**    Finally, I assess the absentee ballot rejection rates in El Paso County for the one election that was provided to me by counsel—the March 2022 primary election.

## VIII.1   Absentee Ballot Rejection Rates in El Paso County

**58**    Table 9 shows that the overall rate of rejected absentee ballots in the March 2022 primary election was nearly 17%. Of the 4,548 rejected absentee ballots cast, 768 (16.89%) were rejected, and more precisely, 677 (14.89%) of all absentee ballots cast were rejected due to the new provisions put in place by S.B. 1.

Table 9: Absentee ballot rejection, El Paso County

|            |       | Absentee ballots |       | SB 1 ballots |       |
|------------|-------|----------|-------|----------|-------|
| Election   | Total | Rejected | %     | Rejected | %     |
| 2022 Primary | 4,548 | 768    | 16.89 | 677      | 14.89 |

## VIII.2   Absentee Ballot Rejection Rates of Hispanic and Non-Hispanic Voters in El Paso County

**59**    By linking El Paso County's absentee file to the statewide voter file, I am able to differentiate the rejection rates of voters with Hispanic and non-Hispanic surnames. The top half of Table 10 reveals the absentee ballots cast and rejected for voters in El Paso County with Hispanic surnames, and the bottom half does so for voters with non-Hispanic surnames in the March 2022 primary election. Some 18.45% of voters with Hispanic surnames in El Paso County who cast an absentee ballot had their ballots rejected in the most recent statewide election; over 16% of all absentee ballots cast by voters with Hispanic surnames in that election were rejected because of S.B. 1. In contrast, only 14.24% of voters with non-Hispanic surnames had their absentee ballots rejected in the election.

Table 10: Absentee ballot rejection by ethnicity, El Paso County

|            |       | Absentee ballots |       | SB 1 ballots |       |
|------------|-------|----------|-------|----------|-------|
| Election   | Total | Rejected | %     | Rejected | %     |
| **Hispanic** |     |          |       |          |       |
| 2022 Primary | 2,899 | 535    | 18.45 | 472      | 16.28 |
| **Non-Hispanic** |  |         |       |          |       |
| 2022 Primary | 1,608 | 229    | 14.24 | 205      | 12.75 |

**60**    Using the Hispanic surname to identify the ethnicity of voters in El Paso County, my analysis shows that Hispanic voters were more likely than other registered voters to have their absentee ballots rejected in the March 2022 primary election, and that Hispanic voters in the county are experiencing a higher cost of voting.

38

## VIII.3   Absentee Ballot Rejection Rates of Black and Non-Black Voters in El Paso County

**61**      Texas' statewide voter file does not include a code for whether a voter identifies as Black.  After geocoding the addresses of all registered voters in the county into Census blocks (there was a 91.4 percent match rate for the county), I joined the geocoded voter file with the Hidalgo County absentee file for the March 2022 primary election.  However, like Hidalgo County, the Black VAP in El Paso County is extremely small, and there was only one Census block in the county that had over 10 absentee ballots cast in the March 2022 primary election.  Because there are so few data points, my regression analysis was not able to generate meaningful results.

## VIII.4   Summary: El Paso County

**62**      Using the Hispanic surname to identify the ethnicity of voters, I conclude that Hispanic voters in El Paso County were more likely than other registered voters to have their absentee ballots rejected in the March 2022 primary election, and that Hispanic voters in the county are experiencing a higher cost of voting.

## IX   Five-County Analysis Shows that S.B. 1 has a Disparate Impact for a Majority of Texas' Black VAP and a Near Majority of Hispanic VAP Casting Absentee Ballots

**63**      Despite having absentee ballot rejection data in the 2022 primary election for only five of Texas' 254 counties, the negative impact of S.B. 1 on Black and Hispanic voters

in the state is striking. As Table 11 reveals, 38.05% of the state's total VAP resides in the five counties. More importantly, 45.73% of the state's Hispanic VAP, and a majority—52.05%— of the state's overall Black VAP, reside in Harris, Dallas, Tarrant, El Paso, and Hidalgo counties (with 50.98% living in just Harris, Dallas, and Tarrant counties). As such, although my analysis covers only five counties, these counties account for where large segments of Texas' Black and Hispanic voters live. The fact that only five counties provided absentee ballot data for the March 2022 primary election in no way diminishes the negative impact of S.B. 1 on the ability of Black and Hispanic voters casting valid absentee ballots in Texas.

Table 11: Voting age population across counties

| County | VAP | Count | | Percent of Texas | | |
| | | Hispanic | Black | VAP | Hispanic | Black |
|---|---|---|---|---|---|---|
| Harris | 3,519,584 | 1,405,353 | 712,166 | 16.10 | 17.77 | 25.10 |
| Dallas | 1,972,578 | 722,471 | 452,877 | 9.02 | 9.14 | 15.96 |
| Tarrant | 1,574,046 | 414,177 | 281,397 | 7.20 | 5.24 | 9.92 |
| El Paso | 644,962 | 524,130 | 25,935 | 2.95 | 6.63 | 0.91 |
| Hidalgo | 608,225 | 549,880 | 4,605 | 2.78 | 6.95 | 0.16 |
| Total | 8,319,395 | 3,616,011 | 1,476,980 | 38.05 | 45.73 | 52.05 |

# X   Conclusion

**64**    My analysis of the county absentee files provided to me by counsel reveals a persistent pattern in Texas: in the March 2022 primary election, voters with Hispanic surnames and Census blocks with greater Black VAP are more likely to have their absentee ballots rejected than voters with a non-Hispanic surname or in Census blocks with less Black VAP, respectively. The new regulations put in place by S.B. 1 have caused Hispanic and Black voters to have higher absentee ballot rejection rates than non-Hispanic voters. All voters casting absentee ballots in Texas, but particularly Black and Hispanic voters casting absen-

tee ballots, face a higher cost of voting under S.B. 1. I conclude that there is strong evidence that S.B. 1's restrictions on the return of absentee ballots fall disproportionately on voters of color.

**65**    In conclusion, S.B. 1 raises the barriers for Black and Hispanic voters in Texas to cast valid absentee ballots. As studies in other states have shown, rejection rates of absentee ballots are consistently and disproportionately higher among minority voters compared to white voters casting absentee ballots (Baringer, Herron & Smith 2020; Shino, Suttmann-Lea & Smith 2021; Smith 2018; Smith & Baringer 2020; Smith 2021), even when taking into account a voter's past "experience" casting absentee ballots (Cottrell, Herron & Smith 2021). As my analysis shows, S.B. 1's added restrictions on registered voters returning their absentee ballots raises the costs even more for Black and Hispanic voters in Texas to cast a valid absentee ballot.

# References

Baringer, Anna, Michael C Herron & Daniel A Smith. 2020. "Voting by mail and ballot rejection: Lessons from Florida for elections in the age of the coronavirus." *Election Law Journal: Rules, Politics, and Policy* 19(3):289–320.

Cottrell, David, Michael C. Herron & Daniel A Smith. 2021. "Vote-by-mail ballot rejection and experience with mail-in voting." *American Politics Research* .

Shino, Enrijeta, Mara Suttmann-Lea & Daniel A. Smith. 2021. "Determinants of Rejected Mail Ballots in Georgia's 2018 General Election." *Political Research Quarterly* .

Smith, Daniel A. 2018. "Vote-By-Mail Ballots Cast in Florida." `https://www.aclufl.org/sites/default/files/aclufl_-_vote_by_mail_-_report.pdf`.

Smith, Daniel A. 2021. "Casting, Rejecting, and Curing Vote-by-Mail Ballots in Florida's 2020 General Election." `https://allvotingislocal.org/wp-content/uploads/2021/03/031121_FL_VBM-Report_final.pdf`.

Smith, Daniel A. & Anna Baringer. 2020. "ACLU Florida: Analysis of Vote-By-Mail Ballots in the 2018 General Election." `https://www.aclufl.org/en/aclu-florida-report-vote-mail-ballots-2018-general-election`.

# XI   Appendices

## XI.1   Harris County Absentee Ballot Codebook ("Harris_Codebook.pdf" provided by counsel on April 26, 2022)

| CODE | DESCRIPTION |
|------|-------------|
| OK | OKAY |
| PR | RECEIVED OK PENDIND SIG REVIEW |
| RS | RECEIVED PENDIND SIG/SOR REVIEW |
| CB | CORRECTION ON BALLOT LABEL |
| EV | CANCELLED BY EARLY VOTING |
| HB | HOLD THE BALLOT UNTIL |
| UN | RETURNED UNDELIVERABLE BY PO |
| VP | VOTED PROVISIONAL |
| AA | ASST RES ADDR NOT GIVEN |
| AN | ASST FAILED TO PRINT NAME |
| AS | ASSIST FAILED TO SIGN NAME |
| BR | BALLOT RETURNED AFTER ELECTION |
| CA | CANCELLED BY OFFICE |
| CN | REGISTRATION CANCELLED |
| D1 | DUPLCATE FIRST TIME |
| ED | RETURNED BBM & VOTED ON ED |
| ID | FAILED TO INCLUDE REQUIRED ID |
| IE | IMPOROPER EXECUTION OF CERT |
| IM | DID NOT INDICATE MARK |
| IR | INVALID RESIDENCE ADDRESS |
| IS | INCORRECT OR MISSING SSN/TDL |
| JA | JAIL ADDRESS IN REGISTRATION ADDRESS |
| MA | MAIL ADDRESS/VR MAIL ADDRESS MISMATCH |
| MC | MAILED INSIDE THE COUNTY |
| NE | APP SIGNATURE/ENVELOPE SIGNATURE MISMATCH |
| NI | NO IDENTIFICATION INCLUDED |
| NL | NO LGL GROUND FOR VOTE BY MAIL |
| NS | NO SIGNATURE OR MARK |
| NV | NO  VOTER REGISTRATION |
| OC | MAIL TO ADDRESS OUTSIDE OF COUNTY |
| QS | QUESTIONED SIGNATURE |
| R1 | INCORRECT/MISSING SSN/TDL RETURNED |
| RJ | REJECTED MAIL BALLOT |
| SF | SIGNATURE OBSCURED (FLAP) |
| SM | SIGNATURES DIDN'T MATCH |
| SR | STATEMENT OF RESIDENCE NOT INCLUDED |
| RS | TWO BALLOTS/ONE SIGNATURE |
| V1 | VERSION 1 DATABASE |
| WI | WITNESS INFO INCOMPLETE |
| X | CANCELLED TO ALLOW EARLY VOTING |
| Z | CANCEL TO VOTE ON ED |

**XI.2** **Dallas County Absentee Ballots Codebook ("Dallas Codebook_Mail Ballot Return Status.pdf" provided by counsel on April 26, 2022)**



MS015675

# EXHIBIT 39

The Office of the Dallas County Elections Administrator                April 29, 2022

```
1                UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
2                    SAN ANTONIO DIVISION

3  LA UNION DEL PUEBLO ENTERO,)(
   ET AL.,                    )(
4                             )(
       PLAINTIFFS,            )(
5                             )(     CIVIL ACTION
   VS.                        )(     NO. SA-21-CV-00844-XR
6                             )(
   GREGORY W. ABBOTT, ET AL., )(
7                             )(
                              )(
8      DEFENDANTS.            )(
   ---------------------------------------------------------
9
                VIDEOTAPED AND VIDEOCONFERENCED
10                   ORAL DEPOSITION OF
               RIVELINO LOPEZ, TACOMA PHILLIPS
11                AND MICHAEL SCARPELLO
                    APRIL 29, 2022
12

13          VIDEOTAPED AND VIDEOCONFERENCED ORAL DEPOSITION

14  OF RIVELINO LOPEZ, TACOMA PHILLIPS AND MICHAEL

15  SCARPELLO, produced as witnesses at the instance of the

16  Plaintiff LUPE, and duly sworn, was taken in the

17  above-styled and numbered cause on the 29th day of

18  April, 2022, from 10:47 a.m. to 8:02 p.m., before Holly

19  R. Swinford, CSR in and for the State of Texas, reported

20  by machine shorthand, at the Office of the Dallas

21  Elections Administrator, located at the Records

22  Building, 500 Elm Street, 7th Floor, Room 7Y11, in the

23  City of Dallas, County of Dallas, State of Texas,

24  pursuant to Notice, the Federal Rules, and the

25  provisions stated on the record or attached hereto.
```

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900   San Antonio, Texas 78232
210-697-3400                                                         210-697-3408

1  turnout in the general election?

2      A.   Yes.

3      Q.   And would you say, as a general matter, that

4  voter turnout in a spring election, like the one that

5  will happen in May, on May 7th, would typically be lower

6  than the turnout in a primary election?

7      A.   Yes.

8      Q.   Do you have any concerns about the impact of SB

9  1 on the upcoming November 2022 midterm election?

10            MS. HUNKER:   Objection, form.

11     A.   Yes.

12     Q.   (By Ms. Perales)   Okay.   And can you list what

13  those concerns are?

14     A.   I have continuing concerns about the provisions

15  of the -- the ID requirements for mail ballots, in that

16  the high rejection rate for applications and the

17  ballots, themselves.   I have concerns about the chilling

18  effect that the poll watcher provisions have on poll

19  worker recruitment and retention.   I'd have to kind of

20  think a little bit deeper about some of the other

21  provisions of SB 1, but those are my main ones.

22     Q.   Do you believe that there are voters who will

23  attempt to vote by mail in the November general election

24  who have not yet encountered the ID matching

25  requirements of SB 1 because they didn't vote in the

 1  primary?

 2      A.   Absolutely.

 3      Q.   All right.  And do you anticipate that, at

 4  least for some of those voters, for the first time, they

 5  are going to have either their application for ballot by

 6  mail or their mail ballot rejected because there is not

 7  a matching ID number in your records?

 8      A.   Yes.

 9           MS. PERALES:  Can we go off the record for

10  a few minutes?

11           (Mr. Stool moves head up and down.)

12           THE VIDEOGRAPHER:  Going off the record.

13  The time is 5:53.

14                    (Break taken.)

15           (Deposition Exhibit Number 8 marked.)

16           THE VIDEOGRAPHER:  We are back on the

17  record.  The time is 6:08.

18      Q.   (By Ms. Perales)  I'm handing you what has been

19  marked Deposition Exhibit Number 8.

20      (Document handed to the witness and Counsel.)

21      Q.   Do you -- do you recognize this document?

22      A.   Yes.

23      Q.   And do you -- do you see it's got some Bates

24  stamp numbers on it starting with "MS" in the bottom

25  right-hand -- oh, the -- yes, the Bates stamp MS, and

1  Dallas County?

2      A.   There are certain specified requirements.

3  Generally speaking, the disabled people not able to

4  readily get into a polling place.

5      Q.   Can you walk me through the steps of how a

6  voter casts a ballot when they vote using curbside

7  voting?

8      A.   We have a sign out on the -- on the outside of

9  the polling place that has a phone number.  When someone

10 pulls up, if there's not voter- -- if there's not

11 workers already outside, they call that number, which

12 rings into the judge's cell phone.  And they say, "Hey,

13 I'm here to vote curbside."

14         And so the judge sends a worker out with an

15 electronic poll book.  The voter -- they -- they find

16 the voter, and the voter signs the Epollbook.  They go

17 back inside; and they get the voting machine, bring that

18 out to the voter.  They -- they cast their ballot on

19 that voting machine.

20     Q.   Do you think there's an increased risk of fraud

21 with respect to the curbside voting?

22     A.   No.

23     Q.   Why not?

24     A.   It's the same procedure that takes place inside

25 the building as outside the building.

1      Q.   And are you familiar with the provisions in

2  SB 1 relating to drive-thru voting?

3      A.   Yes.

4      Q.   What is the difference between curbside voting

5  and drive-thru voting?

6      A.   Curbside voting, there is certain requirements

7  that allows someone to be a curbside voter as opposed to

8  drive-thru voting where there would not be those

9  requirements.

10     Q.   Requirements on who is eligible?

11     A.   Yes.

12     Q.   Has Dallas County ever offered drive-thru

13  voting?

14     A.   Not that I'm aware of.

15     Q.   Have you ever considered implementing it?

16     A.   I would say if SB 1 hadn't been implemented, we

17  would have aggressively had drive-thru voting.

18     Q.   And why -- why is that?

19     A.   I've got a long history of making voter --

20  voting more accessible to voters, including the

21  introduction of drop boxes, vote center voting, allowing

22  mail ballots to be dropped off at polling places, et

23  cetera, et cetera.  And so when I saw what Harris County

24  was doing in 2020, I really applauded that.  I thought

25  it was great.  And I -- when I got to Texas, I thought

1  we're going to do that in Dallas.

2      Q.   And so is it your opinion that drive-thru

3  voting would make voting more accessible?

4              MS. HUNKER:  Objection, form.

5      A.   Absolutely.

6      Q.   (By Mr. White)  I meant to ask this earlier.

7  So I had asked you earlier about whether you thought

8  there was an increased risk of fraud with respect to

9  curbside voting.

10         Are you aware of any instances of voter fraud

11  in Dallas County that have happened with respect to

12  curbside voting?

13     A.   No.

14     Q.   I also want to turn your attention back to this

15  article that I gave you.

16     A.   Uh-huh.

17     Q.   If you could flip to Page 4.

18     A.   (Witness complies.)

19     Q.   The middle of the page, there's a paragraph

20  that says -- and I'll just read it aloud -- "Noble" --

21  who appears to be a Democratic party official -- "noted

22  over 6 percent of mail-in ballots in the county were

23  rejected because of the new identification requirements.

24  Those voters, she said, had to show up in person if they

25  wanted to vote, leading to longer queues to vote

```
 1   curbside."
 2           Did I read that correctly?
 3       A.    Yes.
 4       Q.    Are you aware of any voters who showed up to
 5   vote curbside because of SB 1's identification
 6   requirements for mail-in ballots?
 7       A.    I --
 8                 MS. HUNKER:  Objection, form.
 9       A.    I speculate, just like Kristy Noble, that
10   that -- that was the case.
11       Q.    (By Mr. White)  And what is the reason for you
12   speculating in that way?
13       A.    Because a disabled voter or someone who is not
14   likely to -- less likely to be able to go in to a
15   polling place, is going to look for an alternative to
16   vote.  And one of those would be mail ballot, but
17   because of the provisions of SB 1 making mail ballots
18   that much more difficult in the high rejection rate, I
19   think that more people said, "Well, what are my --
20   what's my next alternative?"
21                 And that would be drive-thru voting or curbside
22   voting.  I have no evidence of that, but I'm
23   speculating.
24       Q.    Yeah.  Now, a moment ago you mentioned that you
25   were aware that Harris County implemented drive-thru
```

1  locations that have been -- that are ADA compliant,

2  basically.

3      Q.   Does your office have written ADA policies or

4  procedures?

5      A.   No, we don't.

6      Q.   So these are -- how are they communicated to

7  your employees or poll watchers?

8      A.   The -- the polling places, the county has

9  traditional polling places (indicating) that they've

10 been using for years, and those polling places, we -- in

11 earlier testimony, someone testified -- Revi testified

12 that those polling places were, when we moved to

13 countywide vote centers, they used those same polling

14 places.

15          In August of 2021, I proposed that we take a

16 look at those polling places in an effort to reinspect

17 them and to get the votes in our advisory committee to

18 look at the official locations of the county so that we

19 could modernize or be more compliant with ADA, as well

20 as other practical locations, you know, aspects of

21 those -- how many we have, where they're located and do

22 a deep dive in -- in the placement and quality of our

23 polling places.  But because of redistricting that was

24 taking place at the time, that effort was delayed; and

25 we will take that up again in June of this year.

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                          Page 287

 1      Q.   And when you say "accessible polling places,"
 2   what do you mean by that?
 3      A.   There's -- when there's -- when a polling place
 4   is contemplated for use, there are checklists that we go
 5   through where you -- you know, best practices call for a
 6   checklist to inspect a location.  You -- you're --
 7   there's a whole laundry list of things that make a
 8   location ADA compliant:  ramps, pressure on the doors
 9   (indicating), the types of knobs, access to drinking
10   fountains.  I mean, it's a very comprehensive list that,
11   basically, gives a grade to a location for ADA
12   compliance.
13      Q.   It sounds like you're very familiar with this
14   list, but if it's not written down anywhere, how do the
15   various locations go through this checklist?
16      A.   There -- there were the -- there were
17   inspections in 2019, and so we do have records of those
18   locations.  I just think that -- that we need to pay a
19   little bit better attention to the results of those
20   inspections and upgrade or eliminate those that are not
21   in compliance because I think we have some that are not
22   as compliant as they need to be.
23      Q.   That makes a lot of sense.  Thank you for that
24   on an accessibility point.
25           Broadly speaking, is your understanding that

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                       Page 339

```
 1

 2
                     REPORTER'S_CERTIFICATION
 3              _____ _____

                UNITED STATES DISTRICT COURT
 4               WESTERN DISTRICT OF TEXAS
                   SAN ANTONIO DIVISION
 5
    LA UNION DEL PUEBLO ENTERO,)(
 6  ET AL.,                    )(
                              )(
 7      PLAINTIFFS,            )(
                              )(    CIVIL ACTION
 8  VS.                       )(    NO. SA-21-CV-00844-XR
                              )(
 9  GREGORY W. ABBOTT, ET AL., )(
                              )(
10                            )(
        DEFENDANTS.           )(
11  ------------------------------------------------------------

12

13

14

15          ORAL DEPOSITION OF RIVELINO LOPEZ,

16      TACOMA PHILLIPS AND MICHAEL SCARPELLO

17               APRIL 29, 2022

18

19

20       I, Holly R. Swinford, Certified Shorthand

21  Reporter in and for the State of Texas, do hereby

22  certify to the following:

23          That the witnesses, Rivelino Lopez, Tacoma

24  Phillips and Michael Scarpello, were by me duly sworn

25  and that the transcript of the oral deposition is a true
```

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900   San Antonio, Texas 78232
210-697-3400                                                 210-697-3408

1   record of the testimony given by the witnesses.

2            I further certify that pursuant to Federal

3   Rules of Civil Procedure, Rule 30(e)(1)(A) and (B) as

4   well as Rule 30(e)(2), that review of the transcript and

5   signature of the deponent:

6            _____ was requested by the deponent and/or a

7   party before completion of the deposition.

8            _____ was not requested by the deponent and/or

9   a party before the completion of the deposition.

10           I further certify that I am neither attorney or

11  counsel for, nor related to or employed by any of the

12  parties to the action in which this deposition is taken

13  and further that I am not a relative or employee of any

14  attorney of record in this cause, nor am I financially

15  or otherwise interested in the outcome of the action.

16           The amount of time used by each party at the

17  deposition is as follows.

18

19       1.    MS. NINA PERALES
               TIME:  04:16
20       2.    MR. GRAHAM W. WHITE
               TIME:  00:37
21       3.    MS. KATHLEEN HUNKER
               TIME:  01:23
22       4.    BEN L. STOOL
               TIME:  00:00
23       5.    MS. BRADY BENDER
               TIME:  00:06
24       6.    MS. SOPHIA CAI
               TIME:  00:24
25       7.    MS. JACQUELINE VILLAREAL

1              TIME:    00:00

2              Subscribed and sworn to on the _____ day

3     of May, 2022.

4

5     _____

6     Holly R. Swinford
      Texas CSR 3356
      Expiration:  2/1/2024
7     Magna Legal Services
      Firm Registration No. 633
8     16414 San Pedro Ave., Suite 900
      San Antonio, Texas  78232
9     (866) 672-7880

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 40

Jennifer Colvin                                    March 21, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3

    LA UNION DEL PUEBLO        §
 4  ENTERO, et al.,            §
         Plaintiffs,           §
 5                             §
    v.                         §   Case No. 5:21-cv-844-XR
 6                             §
    GREGORY W. ABBOTT, et      §
 7  al.,                       §
         Defendants,           §
 8                             §
    _____  §
 9                             §
    OCA-GREATER HOUSTON, et    §
10  al.,                       §
         Plaintiffs,           §
11                             §
    v.                         §   Case No. 1:21-cv-780-XR
12                             §
    JANE NELSON, et. al.,      §
13       Defendants,           §
                               §
14  _____  §
                               §
15  HOUSTON JUSTICE, et        §
    al.,                       §
16       Plaintiffs,           §
                               §
17  v.                         §   Case No. 5:21-cv-848-XR
                               §
18  GREGORY WAYNE ABBOTT,      §
    et al.,                    §
19       Defendants,           §
                               §
20  _____  §
                               §
21  LULAC Texas, et al.,       §
         Plaintiffs,           §
22                             §
    v.                         §   Case No. 1:21-cv-0786-XR
23                             §
    JANE NELSON, et al.,       §
24       Defendants,           §
                               §
25  _____  §
```



```
 1   MI FAMILIA VOTA, et        §
     al.,                       §
 2        Plaintiffs,           §
                                §
 3   v.                         §   Case No. 5:21-cv-0920-XR
                                §
 4   GREG ABBOTT, et al.,       §
          Defendants.           §
 5

 6

 7

 8

 9              ORAL AND VIDEOTAPED DEPOSITION OF

10                      JENNIFER COLVIN

11                      MARCH 21, 2023

12

13

14

15        ORAL AND VIDEOTAPED DEPOSITION OF JENNIFER COLVIN,

16   produced as a witness at the instance of the Defendants

17   and duly sworn, was taken in the above styled and

18   numbered cause on Tuesday, March 21, 2023, from

19   12:20 p.m. to 3:43 p.m., before DONNA QUALLS, Notary

20   Public in and for the State of Texas, reported by

21   computerized stenotype machine, at the offices of Harris

22   County Attorney's Office, 1019 Congress Street, 15th

23   Floor, Houston, Texas, pursuant to the Federal Rules of

24   Civil Procedure, and any provisions stated on the record

25   or attached hereto.
```



Jennifer Colvin

March 21, 2023
Page 45

1    Q.  Okay.  Did you...

2    A.  That's a different department.

3    Q.  Okay.  Do you know if you were able to -- when

4  you were checking the numbers, was able to access the

5  TEAM's system, if needed?

6    A.  Yes.

7    Q.  And so I had asked a couple of questions

8  regarding accommodation for disabilities with the last

9  witness, but she had mentioned she thought you would be

10  a better person with respect to the vote by mail.  And

11  so I'm going to ask these questions.  If you do not know

12  the answer, just state so.

13         You are aware --

14    A.  Oh --

15    Q.  -- voters with disabilities have the option of

16  requesting an accommodation or change to normal voting

17  procedures, correct?

18    A.  Correct.

19    Q.  To your knowledge, did your office receive any

20  requests for accommodation regarding the requirement

21  that mail-in voters put their social security number or

22  ID number on the application for ballot by mail?

23    A.  We did have some voters that couldn't come into

24  the building.  So we would take a clipboard and go out

25  to them.



Jennifer Colvin

March 21, 2023
Page 46

```
 1        Q.  And so I know there's an option for the county
 2   to go to the voter cure the vote in -- in person; is
 3   that correct?
 4        A.  Correct.
 5        Q.  And your county utilized that option; is that
 6   right?
 7        A.  Yes, at our facility.  We didn't go to their
 8   house.
 9        Q.  Can you clarify?
10        A.  The voter would come to our facility, and we
11   would go out to their car.  We wouldn't drive to their
12   house.
13        Q.  Okay.  And was that the only request for
14   accommodation you received regarding the requirement
15   that mail-in voters put their social security number or
16   ID number on their application for ballot by mail?
17        A.  Yes.
18        Q.  And you were able to accommodate that request?
19        A.  Yes.
20        Q.  To your knowledge, did you receive any request
21   for accommodation regarding the requirement that mail-in
22   voters put their social security number or ID number on
23   their application for ballot by mail?
24        A.  No.
25        Q.  Did your office receive any complaints from
```



Jennifer Colvin

March 21, 2023
Page 90

1          A.  Yes.

2          Q.  And is that your signature?

3          A.  Yes.

4          Q.  So on page 3 this states:  Interrogat- --

5     "Interrogatory No. 4:  Please identify and describe with

6     specificity Harris County's final rejection rate of

7     timely received ballots by mail, expressed as a

8     percentage of all timely received ballots by mail and

9     rounded to two decimal places, for the following

10    elections."  And then it lists a number of different

11    general elections, A through F.

12               Do you see that?

13         A.  Yes.

14         Q.  Okay.  Starting with F, what is listed here as

15    the rejection rate for the November 2022 general

16    election?

17         A.  4.16 percent.

18         Q.  Okay.  And is this number accurate?

19         A.  Yes.

20         Q.  Okay.  And this number is larger than the

21    rejection rates listed above it for the November 2012,

22    2014, 2016, 2018, and 2020 general elections, correct?

23         A.  Correct.

24         Q.  And what -- do you have an understanding of

25    what accounts for that difference, why it's larger in



 1    the November 2022 election and prior elections?
 2         A.   SB1 law changes for the ID requirements.
 3         Q.   In the process of enforcing SB1's ID
 4    requirements in the November 2022 election, did your
 5    office identify any instances of voter fraud?
 6         A.   No.
 7                   MS. HOLMES:   Okay.   I think that is all for
 8    me.
 9                   MS. PAIKOWSKY:   Do you want to --
10                   MS. HOLMES:   Sorry.   I was going to ask to
11    go of the record for like two minutes and then I'll
12    probably be able to pass the witness.
13                   THE VIDEOGRAPHER:   We are going off the
14    record at 3:15 p.m.
15                   (Recess from 3:15 p.m. to 3:24 p.m.)
16                   THE VIDEOGRAPHER:   We're back on the record
17    at 3:24 p.m.   Sorry.
18         Q.   (BY MS. HOLMES)   All right.   Ms. Colvin, I just
19    have two more questions for you.
20                   With respect to voters whose ABB -- ABBMs
21    contained missing or mismatched ID numbers, is it
22    accurate to say that your office attempted to provide
23    every opportunity to cure if possible?
24         A.   Yes.
25         Q.   And with -- with respect to voters whose



Jennifer Colvin                                    March 21, 2023
                                                   Page 106

```
 1                  REPORTER'S CERTIFICATION
                    ORAL DEPOSITION OF
 2                     JENNIFER COLVIN
                    TAKEN MARCH 21, 2023
 3

 4

 5          I, DONNA QUALLS, Shorthand Reporter and Notary

 6   Public in and for the State of Texas, hereby certify to

 7   the following:

 8          That the witness, JENNIFER COLVIN, was duly

 9   sworn by the officer and that the transcript of the oral

10   deposition is a true record of the testimony given by

11   the witness;

12          That the original deposition was delivered to

13   SAMEER S. BIRRING / KATHLEEN T. HUNKER;

14          That a copy of this certificate was served on

15   all parties and/or the witness shown herein on

16   _____.

17          I further certify that pursuant to FRCP No.

18   30(f)(i) that the signature of the deponent was

19   requested by the deponent or a party before the

20   completion of the deposition and that the signature is

21   to be returned within 30 days from date of receipt of

22   the transcript.  If returned, the attached Changes and

23   Signature Page contains any changes and the reasons

24   therefor.

25          I further certify that I am neither counsel
```



Jennifer Colvin

March 21, 2023
Page 107

1    for, related to, nor employed by any of the parties in

2    the action in which this proceeding was taken, and

3    further that I am not financially or otherwise

4    interested in the outcome of the action.

5           Certified to by me this 10th day of

6    April, 2023.

7

8

9    _____

10   DONNA QUALLS
     Notary Public in and for
     The State of Texas

11   My Commission expires 11/06/2026

12   Magna Legal Services
     Firm Registration No. 633

13   16414 San Pedro, Suite 900
     San Antonio, Texas 78232

14   (210) 697-3400

15

16

17

18

19

20

21

22

23

24

25



# EXHIBIT 41

Case 5:21-cv-00844-XR   Document 642-2   Filed 06/23/23   Page 561 of 785

5:21-cv-844 (XR)
5/6/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 224

224

```
 1           IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
 2                 SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO       §
     ENTERO, ET AL.,          §
 4        Plaintiffs,      §  Civil Action No.
                       §  5:21-cv-844 (XR)
 5   VS.               §  (Consolidated Cases)
                       §
 6   STATE OF TEXAS, ET AL.,   §
          Defendants.       §
 7   ****************************************************

 8              ORAL DEPOSITION OF
              BRIAN KEITH INGRAM, J.D.
 9         CORPORATE REPRESENTATIVE FOR THE
             TEXAS SECRETARY OF STATE OFFICE
10               MAY 6, 2022
             VOLUME 2 OF 2 VOLUMES
11
     ****************************************************
12
```

13          ORAL DEPOSITION OF BRIAN KEITH INGRAM,

14   J.D., CORPORATE REPRESENTATIVE FOR THE TEXAS SECRETARY

15   OF STATE OFFICE, produced as a witness at the instance

16   of the Mi Familia Vota Plaintiffs, and duly sworn, was

17   taken in the above-styled and numbered cause on the 6th

18   day of May 2022, from 9:01 a.m. to 12:58 p.m., before

19   Caroline Chapman, CSR in and for the State of Texas,

20   reported by Computerized Stenotype Machine,

21   Computer-Assisted Transcription, held at the Price

22   Daniel Sr State Office Building, 209 West 14th Street,

23   Austin, Texas, and via web-based conference pursuant to

24   the Federal Rules of Civil Procedure.

25

Entero v Texas 5:21-cv-844 (XR)
5/6/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

224 Brian Keith Ingram JD

Page: 224

5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 352

352

1   guidance, directives or advisories to local election

2   officials regarding the Americans with -- Americans With

3   Disabilities Act and SB 1?

4       **A.   I don't believe so.**

5       Q.   Does your office provide any written guidance,

6   directives, or advisories to local election officials or

7   other local election workers regarding the ADA,

8   Americans With Disabilities Act and/or other federal and

9   state laws that protect individuals with disabilities

10  aside from whether it is related to SB 1?

11      **A.   We don't produce that material in our office.**

12  **We do make it available to counties at our county**

13  **election official seminar and then to city schools and**

14  **other political subdivisions at that seminar.**

15      Q.   All right.  Who produces that information that

16  your office distributes?

17      **A.   It depends on who we get to speak that year,**

18  **but either Disability Rights Texas or the Coalition for**

19  **Texans with Disabilities.**

20      Q.   Do you maintain copies of those -- whatever

21  materials are provide at the functions that you have

22  just described?

23      **A.   They should be with the rest of the seminar**

24  **materials with regard to each seminar.**

25      Q.   Is there a reason that you rely on outside

Entero v Texas 5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

352 Brian Keith Ingram JD

**Page: 352**

5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 353

353

1    groups, outside the Secretary of State's Office to

2    provide that information?

3        **A.   They are the ones with the expertise.**

4        Q.   So is it fair to say, the Secretary of State's

5    Office's doesn't have expertise regarding the Americans

6    With Disabilities Act?

7            MS. HUNKER:  Objection, form.

8        **A.   Not as much as the Coalition for Texans wth**

9    **Disabilities and Disability Rights Texas.**

10       Q.   And the Secretary of State's Office doesn't

11   have expertise regarding other federal and state laws

12   that protect individuals with disabilities?

13           MS. HUNKER:  Objection, form.

14       **A.   Not as much as the people who were in the mix**

15   **in that field every day.**

16       Q.   Who within the Secretary of State's Office has

17   the most expertise regarding the Americans with

18   Disabilities Act and/or other federal and state laws?

19       **A.   We did have an attorney who specialized in that**

20   **for us, and she was Krystine Ramon, she has left.  We**

21   **haven't reassigned that responsibility yet.**

22       Q.   When did Ms. Ramon leave?

23       **A.   Earlier this year.**

24       Q.   So earlier in 2022?

25       **A.   In '22, yes.**

Entero v Texas 5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

353 Brian Keith Ingram JD

**Page: 353**

5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 354

354

1    Q.   Okay.  And did your office have any plans to

2    provide or develop any written guidance, directives, or

3    advisories to local election officials pertaining to the

4    ADA in SB 1?

5    **A.   No.**

6    Q.   Have you asked either Disability Rights Texas

7    or the other coalition that you have described to

8    prepare any such materials?

9    **A.   We have not.**

10   Q.   Sir, are you familiar with Section 1.022 of the

11   Texas Election Code?

12   **A.   Yes.**

13   Q.   And that's the reasonable accommodation or

14   modification provision; is that right?

15   **A.   That was added by SB 1, yes.**

16   Q.   And it says that, a provision of this code may

17   not be interpreted to prohibit or limit the right of a

18   qualified individual with a disability from requesting a

19   reasonable accommodation or modification to any

20   election, standard, practice, or procedure mandated by

21   law or rule that the individual is entitled to request

22   under federal or state law; is that correct?

23   **A.   Agreed.**

24   Q.   And how does the Secretary of State's Office

25   interpret Section 1.022 of the Texas Election Code and,

Entero v Texas 5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

354 Brian Keith Ingram JD

**Page: 354**

5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 356

356

1    disabled people.  We said that before SB 1 and 1.022

2    existed and we say it now.

3       Q.   Is there any other written guidance,

4    directives, or advisories that you have provided to

5    local election officials regarding Section 1.022 of the

6    Texas Election Code --

7       A.   No.

8       Q.   -- and its administration?

9       A.   No.

10      Q.   I would note that Section 1.022 says that, you

11   can't prohibit or limit -- prohibit or limit the right

12   of a qualified individual with a disability from

13   requesting a reasonable accommodation.

14            Would you agree that it doesn't provide

15   any advice or directive regarding granting a reasonable

16   accommodation or modification?

17            MS. HUNKER:  Objection, form.

18      A.   I agree with that.

19      Q.   Or allowing a reasonable accommodation or

20   modification?

21            MS. HUNKER:  Objection, form.

22      A.   Well, I don't agree with that.  The fact that

23   it can be requested means that it can be allowed.

24      Q.   But it doesn't instruct the -- that it has to

25   be allowed, though, correct?

Entero v Texas 5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

356 Brian Keith Ingram JD

**Page: 356**

5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 357

357

1    **A.   That's true.**

2    Q.   Do you know -- who would be the person

3    determining whether to grant a reasonable accommodation

4    or modification?

5    **A.   Depends on to whom the request was made, but**

6    **either the presiding judge or the polling place or the**

7    **early voting clerk.**

8    Q.   And are you aware of what those individuals

9    would be relying on in making that determination about

10   whether to grant your reasonable accommodation or

11   modification?

12   **A.   No.**

13   Q.   Other than what you have described about this

14   seminary -- seminar in January of 2022 with the election

15   officials, is there any guidance or any information that

16   you have provided to those election officials?

17   **A.   No.**

18   Q.   Is there part of your -- any part of a voter

19   education campaign that the Secretary of State is

20   planning to inform voters with disabilities learn that

21   they can request accommodations or modifications

22   permitted by Section 1.022?

23   **A.   No.**

24   Q.   And does your office direct local election

25   officials to provide procedures or inform voters about

Entero v Texas 5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

357 Brian Keith Ingram JD

**Page: 357**

5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 358

358

1   requesting accommodations or modifications to election

2   rules pursuant to Section 1.022?

3      **A.   We do not.**

4      Q.   Has your office received inquiries from any

5   county election officials or other local election

6   workers regarding problems related to voting access for

7   persons with disabilities?

8      **A.   Nope.**

9      Q.   Has your office received inquiries from any

10  county election officials and/or other election workers

11  regarding providing modifications to election policies,

12  practices, and procedures for voters with disabilities?

13     **A.   No.  There is a preexisting law that says that**

14  **persons with mobility problems may, they don't have to**

15  **be, but they may be allowed to cut the line and we have**

16  **had questions from voters about that provision.**

17     Q.   Any other inquiries from county election

18  officials or other election workers regarding providing

19  modifications to election practices and procedures for

20  voters with disabilities?

21     **A.   No.**

22     Q.   Has your office received inquiries from any

23  county election officials or other election workers

24  regarding whether county officials can make a change to

25  voting election policies and procedures for a voter with

Entero v Texas 5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

*358 Brian Keith Ingram JD*

**Page: 358**

5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 359

359

1    a disability?

2    **A.   We have not.**

3    Q.   Has your office put out any notices or other

4    communications to the public pertaining specifically to

5    SB 1 and voters with disabilities?

6    **A.   We have not.**

7    Q.   All right.  If we could just take a short

8    break.  I think we may be at the end.

9         (Brief recess.)

10   Q.   (By Ms. Olson)  All right.  Mr. Ingram, I am

11   going to hand you what we are marking as Exhibit No. 19.

12         (Exhibit No. 19 marked.)

13   Q.   I would have been efficient, we would have done

14   that during the break.

15         And, Mr. Ingram, Exhibit No. 19 is a

16   series of emails, and just for identification purposes,

17   at the very top is to Heidi Martinez and Christina

18   Adkins dated June 30th of 2021 at 4:04 p.m.; is that

19   right?

20   **A.   That's right.**

21   Q.   And then down below there is an email from

22   District29.Thompson@house.Texas.gov to Ms. Martinez.

23   She says, "Heidi -- Heidi, can you confirm this

24   information.  Please pass this article on to Ed.  It

25   appears that Ruth Hughs, Keith Ingram and Ken Paxton

Entero v Texas 5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

359 Brian Keith Ingram JD

**Page: 359**

5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 379

379

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3    LA UNION DEL PUEBLO        §
      ENTERO, ET AL.,            §
 4         Plaintiffs,       §  Civil Action No.
                             §  5:21-cv-844 (XR)
 5    VS.                    §  (Consolidated Cases)
                             §
 6    STATE OF TEXAS, ET AL.,    §
           Defendants.       §
 7    ***************************************************

 8                REPORTER'S CERTIFICATION
          ORAL DEPOSITION OF BRIAN KEITH INGRAM, J.D.
 9            CORPORATE REPRESENTATIVE FOR THE
              TEXAS SECRETARY OF STATE OFFICE
10                   MAY 6, 2022

11    ***************************************************

12            I, CAROLINE CHAPMAN, Certified Shorthand

13    Reporter in and for the State of Texas, hereby certify

14    to the following:

15            That the witness, BRIAN KEITH INGRAM,

16    J.D., was duly sworn by the officer and that the

17    transcript of the oral deposition is a true record of

18    the testimony given by the witness;

19            That the deposition transcript was

20    submitted on May _____, 2022 to the witness or to the

21    attorney for the witness for examination, signature, and

22    return to me within 20 days;

23            That the amount of time used by each party

24    at the deposition is as follows:

25            Ms. Wendy J. Olson - Two hours and
```

Entero v Texas 5:21-cv-844 (XR)
5/6/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

*379 Brian Keith Ingram JD*

**Page: 379**

5:21-cv-844 (XR)
5/6/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 380

380

1    thirty-seven minutes.

2          Ms. Hunker - Eleven minutes.

3          That pursuant to information given to the

4    deposition officer at the time said testimony was taken,

5    the appearance page includes all parties of record.

6          I further certify that I am neither

7    counsel for, related to, nor employed by any of the

8    parties or attorneys in the action in which this

9    proceeding was taken, and further that I am not

10   financially or otherwise interested in the outcome of

11   the action.

12         Certified to by me on 16th day of May,

13   2022.

14

15                    _____
                      CAROLINE CHAPMAN, Texas CSR 467
16                    Expiration Date:  03/31/2023
                      Firm Registration No. 223
17                    WORLDWIDE COURT REPORTERS
                      3000 Weslayan, Suite 235
18                    Houston, Texas 77027
                      (713) 572-2000
19

20

21

22

23

24

25

Entero v Texas 5:21-cv-844 (XR)
5/6/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

380 Brian Keith Ingram JD

Page: 380

# EXHIBIT 42

Case 5:21-cv-00844-XR   Document 642-2   Filed 06/23/23   Page 572 of 785

5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 1
1

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
 2               SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO )
     et al.,                    )
 4        Plaintiffs,           )
                                ) Civil Action No. SA-21-cv-
 5   v.                         )    00844-XR
                                ) (Consolidated Cases)
 6   STATE OF TEXAS, et al.,    )
          Defendants.           )
 7

 8

 9
              ---------------------------------------
10
                     ORAL DEPOSITION OF
11                     KEITH INGRAM
                       APRIL 26, 2022
12                       Volume 1

13            ---------------------------------------

14                          `

15

16           ORAL DEPOSITION OF KEITH INGRAM  produced

17   as a witness at the instance of Plaintiff, and duly

18   sworn, was taken in the above-styled and numbered cause

19   on the 26th day of April, 2022 from 9:18 a.m. to 2:19

20   p.m. before Nancy Newhouse, a Certified Shorthand

21   Reporter in and for the State of Texas, reported by oral

22   shorthand, located at Price Daniel Sr. State Office

23   Building, 209 West 14th Street, Austin, Texas 78701,

24   pursuant to the Federal Rules of Civil Procedure, and the

25   provisions stated on the record or attached hereto.
```

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

1 Keith Ingram
**Page: 1**

 1    **disability.**

 2              **The example that we give for reasonable**

 3    **accommodation is that the Election Code in 61.014 says**

 4    **that no devices capable of recording sound or images are**

 5    **allowed on the polling place; however, a number of**

 6    **disabled persons use an iPhone or an iPad -- which are**

 7    **capable of recording sound and -- and images -- as their**

 8    **assistive device for communicating or for, you know,**

 9    **navigating the world.  And so we have told them**

10    **reasonable accommodation is to allow a disabled voter to**

11    **use those devices in a polling place.**

12         Q.   Was there any guidance about how reasonable

13    accommodations interacts with the assistor oath?

14         **A.   I haven't had that question.  I don't know**

15    **what you mean.**

16         Q.   So there was no guidance around whether a

17    reasonable accommodation could include an assistor being

18    able to not swear the oath?

19              MR. JEFFREY WHITE:  Objection, form.

20         **A.   No.  They have to swear the oath.**

21         Q.   (BY MR. STEWART)  They -- those -- do they

22    always have to swear that oath as written?

23         **A.   They have to swear the oath as written --**

24         Q.   Every time?

25         **A.   -- but I don't know what you mean, because**

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

1    Q.   No counties have had any questions about

2    implementing?

3    **A.   Not one.**

4    Q.   Are you aware of any accusations that of

5    perjury related to the oath?

6    **A.   No.**

7    Q.   Was any guidance given to counties about

8    circumstances where a voter wants forms of assistance

9    other than reading the ballot, marking the ballot,

10   directing the voter to read the ballot or directing the

11   voter to mark the ballot?

12   **A.   No.  I mean, we've got, obviously, the whole**

13   **guidance about interpretation as a means of assistance,**

14   **and that it's subject to the same requirements with**

15   **regard to qualifications of an interpreter versus an**

16   **assistant.**

17   Q.   Sorry, bear with me for a moment.

18        So if an assistor were to provide a form

19   of assistance beyond reading the ballot, marking the

20   ballot, directing the voter to read the ballot, or

21   directing the voter to mark the ballot, how can that --

22   how can that assistor feel comfortable signing the oath

23   that said they only did those things?

24        MR. JEFFREY WHITE:  Objection, form.

25   **A.   Yeah.  That -- that -- I don't have any idea**

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

```
 1           UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF TEXAS
 2             SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO )
     et al.,                    )
 4        Plaintiffs,           )
                                )
 5   v.                         ) Civil Action No. SA-21-CV-
                                )      00844-XR
 6   GREGORY W. ABBOTT, et al., ) (Consolidated Cases)
          Defendants.          )
 7

 8

 9

10           REPORTER'S CERTIFICATION
             DEPOSITION OF KEITH INGRAM
11              APRIL 26, 2022

12

13

14        I, Nancy Newhouse, Certified Shorthand Reporter

15   in and for the State of Texas, hereby certify to the

16   following:

17        That the witness, KEITH INGRAM , was duly sworn by

18   the officer and that the transcript of the oral

19   deposition is a true record of the testimony given by the

20   witness;

21             That the deposition transcript was submitted on

22   _____ to the witness or to the attorney for

23   the witness for examination, signature and return to me

24   by _____.

25
```

5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 220
220

```
 1          That the amount of time used by each party at

 2   the deposition is as follows:

 3       Mr. Michael E Stewart    - 02:20
         Mr. Richard Dellheim     - 00:00
 4       Mr. Dan Freeman          - 00:00
         Ms. Jennifer J. Yun      - 00:00
 5       Mr. Jason S. Kanterman   - 02:41
         Ms. Eliza Sweren-Becker  - 00:00
 6       Mr. Graham W. White      - 00:00
         Mr. Patrick Berry        - 00:00
 7       Mr. Jeffery White        - 00:00
         Ms. Kathleen T. Hunker   - 00:00
 8       Mr. Aaron Barnes         - 00:00
         Mr. Adam Bitter          - 00:00
 9       Mr. David Louk           - 00:00
         Ms. Wendy Olson          - 00:00
10       Ms. Lisa Cubriel         - 00:00
         Mr. Anthony Nelson       - 00:00
11       Ms. Leigh Tognetti       - 00:00
         Ms. Lia Sifuentes        - 00:00
12       Mr. Zachary David Dolling - 00:00

13

14          That pursuant to information given to the

15   deposition officer at the time said testimony was taken,

16   the following includes all parties of record:

17   Mr. Michael E. Stewart, Attorney for Plaintiff DOJ
     UNITED STATES
18   950 Pennsylvania Avenue, Northwest
     Washington, DC 20530
19
     Mr. Richard Dellheim, Attorney for Plaintiff DOJ
20   UNITED STATES
     950 Pennsylvania Avenue, Northwest
21   Washington, DC 20530

22   Mr. Dan Freeman, via Zoom, Attorney for Plaintiff
     Attorney for Plaintiff DOJ
23   TRIAL ATTORNEY VOTING SECTION, CIVIL RIGHTS DIVISION
     950 Pennsylvania Avenue, NW
24   Washington, DC 20530

25
```

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

220 Keith Ingram
**Page: 220**

5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 221
221

```
 1          ALL PARTIES OF RECORD Continued

 2

 3     Mr. Jennifer J. Yun, via Zoom, Attorney for Plaintiff
       DOJ
 4     LAW OFFICES OF JENNER & BLOCK, LLP
       1099 New York Avenue, NW
 5     Washington, DC 20001

 6     Mr. Jason S. Kanterman, Attorney for Plaintiff LUPE,
       Southwest Voter Registration Education Project, Mexican
 7     American Bar Association of Texas, Texas Hispanics
       Organized for Political Action, Jolt Action, William
 8     C. Velasquez Institute, Fiel Houston, Inc. LAW OFFICES
       OF FRIED, FRANK, HARRIS, SHRIVER & JACOBSON,  LLP
 9     One New York Plaza
       New York, New York 10004
10
       Ms. Eliza Sweren-Becker, via Zoom, Attorney for
11     Plaintiff LUPE VOTING RIGHTS & ELECTIONS PROGRAM
       Brennan Center for Justice at NYU School of Law
12
       Mr. Graham W. White, via Zoom, Attorney for Plaintiff
13     LULAC
       LAW OFFICES OF ELIAS LAW GROUP, LLP
14     10 G Street NE, Suite 600
       Washington, D.C. 20002
15
       Mr. Patrick Berry via Zoom Attorney for Plaintiff
16     COUNSEL, DEMOCRACY PROGRAM
       Brennan Center for Justice
17     120 Broadway, Suite 1750
       New York, New York, 10271
18     Mr. Jeffery White, Attorney for Defendant OAG
       ATTORNEY GENERAL KEN PAXTON OFFICE
19     SPECIAL COUNSEL SPECIAL LITIGATION UNIT
       P.O. Box 12548
20     Austin, Texas 78711

21     Ms. Kathleen T. Hunker, Attorney for Defendant OAG
       ATTORNEY GENERAL KEN PAXTON OFFICE
22     SPECIAL COUNSEL SPECIAL LITIGATION UNIT
       209 West 14th Street
23     Austin, Texas 78711

24

25
```

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

**221 Keith Ingram**
**Page: 221**

5:21-cv-844 (XR)
4/26/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 222
222

1          ALL PARTIES OF RECORD Continued

2

3    Mr. J. Aaron Barnes, Attorney for Defendant OAG
     ATTORNEY GENERAL KEN PAXTON OFFICE
     SPECIAL COUNSEL SPECIAL LITIGATION UNIT
4    209 West 14th Street
     Austin, Texas 78711
5

6    Mr. Adam Bitter, Attorney for Defendant SOS
     OFFICE OF THE SECRETARY OF STATE
     209 West 14th Street
7    Austin Texas, 78701

8    Mr. David Louk, via Zoom, Attorney for Defendant El Paso
     County
9    LAW OFFICES OF COOLEY, LLP
     3 Embarcadeo Center, 20th Floor
10   San Francisco, California 94111

11   Ms. Wendy Olson, via Zoom, Attorney for Defendant
     LAW OFFICES OF STOEL RIVES, LLP
12   101 South Capital Boulevard, Suite 1900
     Boise, Idaho 83702

13

14   Ms. Lisa Cubriel, via Zoom, Attorney for Defendant
     Bexar
     County
15   ASSISTANT DISTRICT ATTORNEY CIVIL DIVISION
     101 West Nueva Street, 7th Floor
16   San Antonio, Texas 78205

17   Mr. Anthony J. Nelson, via Zoom, Attorney for Defendant
     Travis County Rebecca Guerrero and José Garza
18   ASSISTANT COUNTY ATTORNEY, TRAVIS COUNTY ATTORNEY'S
     OFFICE
19   314 West 11th Street, Suite 500
     Austin, Texas 78767

20

21   Ms. Leigh Tognetti, via Zoom, Attorney for Defendant
     ASSISTANT DISTRICT ATTORNEY, HIDALGO COUNTY
     100 East Cano, Courthouse Annex III, 1st Floor
22   Edinburg, Texas 78539
     Telephone: (956) 292 7609

23

24

25

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

222 Keith Ingram
Page: 222

5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Keith Ingram 223
223

1          ALL PARTIES OF RECORD Continued

2

3     Mr. Zachary David Dolling, via Zoom, Attorney for
      Defendant TCRP
4     CIVIL RIGHTS PROJECT
      P.O. BOX 17757
5     Austin, Texas 78760

6     Ms. Lia Sifuentes Davis, via Zoom, Attorney for
      Defendant Bexar County
7     DISABILITY RIGHTS TEXAS
      2222 West Braker Lane
8     Austin, Texas 78758
      Telephone: (512) 454-4816
9     Fax: (512) 454-3999
      email: ldavis@drtx.org

10

11          I further certify that I am neither counsel

12    for, related to, nor employed by any of the parties or

13    attorneys in the action in which this proceeding was

14    taken, and further that I am not financially or otherwise

15    interested in the outcome of the action.

16          Certified to by me this 3rd day of May, 2022.

17

18          _____

19          NANCY NEWHOUSE, Texas CSR 9000
            Expiration Date:  08/31/23
20          Firm Registration No. 223
            Worldwide Court Reporters, Inc.
21          3000 Weslayan, Suite 235
            Houston, Texas 77027
22          Telephone: (800) 745-1101

23

24

25

Entero v Texas 5:21-cv-844 (XR)
4/26/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

223 Keith Ingram
**Page: 223**

# EXHIBIT 43

Lauren Smith                                            March 21, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3

   LA UNION DEL PUEBLO         §
 4 ENTERO, et al.,             §
        Plaintiffs,            §
 5                             §
   v.                          §   Case No. 5:21-cv-844-XR
 6                             §
   GREGORY W. ABBOTT, et       §
 7 al.,                        §
        Defendants.            §
 8                             §
   _____  §
 9                             §
   OCA-GREATER HOUSTON, et     §
10 al.,                        §
        Plaintiffs,            §
11                             §
   v.                          §   Case No. 1:21-cv-780-XR
12                             §
   JANE NELSON, et. al.,       §
13      Defendants,            §
                               §
14 _____  §
                               §
15 HOUSTON JUSTICE, et         §
   al.,                        §
16      Plaintiffs,            §
                               §
17 v.                          §   Case No. 5:21-cv-848-XR
                               §
18 GREGORY WAYNE ABBOTT,       §
   et al.,                     §
19      Defendants,            §
                               §
20 _____  §
                               §
21 LULAC Texas, et al.,        §
        Plaintiffs,            §
22                             §
   v.                          §   Case No. 1:21-cv-0786-XR
23                             §
   JANE NELSON, et al.,        §
24      Defendants,            §
                               §
25 _____  §
```



```
 1   MI FAMILIA VOTA, et        §
     al.,                       §
 2        Plaintiffs,           §
                                §
 3   v.                         §   Case No. 5:21-cv-0920-XR
                                §
 4   GREG ABBOTT, et al.,       §
          Defendants.           §
 5

 6

 7

 8              ORAL AND VIDEOTAPED DEPOSITION OF

 9                       LAUREN SMITH

10                      MARCH 21, 2023

11

12

13

14

15       ORAL AND VIDEOTAPED DEPOSITION OF LAUREN SMITH,

16   produced as a witness at the instance of the Defendants

17   and duly sworn, was taken in the above styled and

18   numbered cause on Tuesday, March 21, 2023, from 9:33

19   a.m. to 12:07 p.m., before DONNA QUALLS, Notary Public

20   in and for the State of Texas, reported by computerized

21   stenotype machine, at the offices of Harris County

22   Attorney's Office, 1019 Congress Street, 15th Floor,

23   Houston, Texas, pursuant to the Federal Rules of Civil

24   Procedure, and any provisions stated on the record or

25   attached hereto.
```



1   complaint form you had just mentioned.  I believe he

2   also showed you a copy as well; is that correct?

3        A.  Yes.

4        Q.  And we are going to be waiting for the printout

5   to be submitted as an exhibit.  But to save time, you

6   and I are going to discuss the electronic version which

7   will be identical.

8                    Is that understood?

9        A.  That's correct, yes.

10       Q.  And this will be Exhibit 3.

11            (Exhibit No. 3 was marked.)

12       Q.  (BY MS. HUNKER)  And so you had said you

13   received three complaints through the disability

14   complaint form for the November 2022 general election;

15   is that right?

16       A.  That's correct.

17       Q.  And so I'm just going to quickly talk about the

18   description of the complaints.  It seems one of the

19   complaints involved a judge asking the voter to leave

20   the service dog with her while he voted; is that

21   correct?

22       A.  That's correct.

23       Q.  And then the second involved an issue regarding

24   the court control with voting room setup, and that was

25   later addressed by a tech; is that correct?



Lauren Smith

March 21, 2023
Page 20

```
 1        A.  That's correct.

 2        Q.  And the third one had to do with a father

 3   assisting his son to vote; is that correct?

 4        A.  That's correct.

 5        Q.  To your knowledge, did any of these complaints

 6   address the requirements through SB1?

 7        A.  The one where the father was helping his son,

 8   that would pertain to our oath of assistance or the oath

 9   of assistance.

10        Q.  And do you recall what the controversy in that

11   case was?

12        A.  Not to the specifics.  But the judge had

13   confusion on what an assistant -- what the definition of

14   an assistant was as it relates to the SOS form or the

15   form -- the updated form, I should say.

16        Q.  Okay.  And it says here that the election judge

17   was advised that the son is eligible to vote because he

18   is registered and was also advised to allow the father

19   to assist; is that correct?

20        A.  Correct.  The judge has the opportunity to call

21   in to our ADA line to receive information as -- as it

22   regards to -- to any ADA policies.

23        Q.  And so in this case, are you aware if the

24   father was in fact able to assist the son?

25        A.  Yes, he was.
```



1    related to the Americas with Disabilities Act since

2    May 2022 to your office?

3         A.  No.

4         Q.  And at any time has the secretary of state

5    offered any training to your office related to

6    provisions of SB1 and the Americans -- how they

7    interacts with the Americans with Disabilities Act?

8         A.  I don't -- I'm not aware.

9         Q.  Ms. Hunker asked you about the disability

10   complaint form, and she walked through three complaints

11   on that form.  Do you recall that?

12        A.  I do.

13        Q.  Do voters ever contact your office about issues

14   related to disabilities in voting outside of the

15   disability complaint form process?

16        A.  They -- if they would, they would be in our --

17   they would call our -- our help line or our call center,

18   and so those are recorded in the call logs.

19        Q.  So you mentioned they can call a help line.

20   Are there any other ways in which a voter can contact

21   your office re- -- related to issues of voting with a

22   disability?

23        A.  Sure.  Our ADA e-mail inbox.  It would be --

24   you know, they can contact us there directly, and we can

25   handle them as they come in.



1                  REPORTER'S CERTIFICATION
                   ORAL DEPOSITION OF
2                     LAUREN SMITH
                  TAKEN MARCH 21, 2023
3

4

5          I, DONNA QUALLS, Shorthand Reporter and Notary

6    Public in and for the State of Texas, hereby certify to

7    the following:

8          That the witness, LAUREN SMITH, was duly sworn

9    by the officer and that the transcript of the oral

10   deposition is a true record of the testimony given by

11   the witness;

12         That the original deposition was delivered to

13   SAMEER S. BIRRING / KATHLEEN T. HUNKER;

14         That a copy of this certificate was served on

15   all parties and/or the witness shown herein on

16   _____.

17         I further certify that pursuant to FRCP No.

18   30(f)(i) that the signature of the deponent was

19   requested by the deponent or a party before the

20   completion of the deposition and that the signature is

21   to be returned within 30 days from date of receipt of

22   the transcript.  If returned, the attached Changes and

23   Signature Page contains any changes and the reasons

24   therefor.

25         I further certify that I am neither counsel



Lauren Smith                                          March 21, 2023
                                                           Page 91

1    for, related to, nor employed by any of the parties in

2    the action in which this proceeding was taken, and

3    further that I am not financially or otherwise

4    interested in the outcome of the action.

5             Certified to by me this 10th day of

6     April, 2023.

7

8

9

10    _____

11    DONNA QUALLS
      Notary Public in and for
      The State of Texas

12    My Commission expires 11/06/2026

13    Magna Legal Services
      Firm Registration No. 633

14    16414 San Pedro, Suite 900
      San Antonio, Texas 78232

15    (210) 697-3400

16

17

18

19

20

21

22

23

24

25



# EXHIBIT 44

Dan Hayes                                                    March 29, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3  LA UNION DEL PUEBLO ENTERO, ET AL.,)(
         Plaintiffs,                   )(
 4                                     )(   Case No.:
    V.                                 )(   5:21-cv-0844-XR
 5                                     )(
    TEXAS, ET AL.,                     )(
 6        Defendants.                  )(
    _____

 7
    OCA-GREATER HOUSTON, ET AL.,        )(
 8        Plaintiffs,                   )(
                                        )(
 9  V.                                  )(   Case No.:
                                        )(   1:21-cv-0780-XR
10  TEXAS SECRETARY OF STATE            )(
    JANE NELSON, ET AL.,                )(
11        Defendants.                   )(
    _____

12
    HOUSTON AREA URBAN LEAGUE, ET AL., )(
13        Plaintiffs,                   )(
                                        )(   Case No.:
14  V.                                  )(   5:21-cv-0848-XR
                                        )(
15  GREGORY WAYNE ABBOTT, ET AL.,       )(
          Defendants.
16  _____

17  LULAC TEXAS, ET AL.,                )(
          Plaintiffs,                   )(
18                                      )(   Case No.:
    V.                                  )(   1:21-cv-0786-XR
19                                      )(
    JANE NELSON, ET AL.,                )(
20        Defendants.                   )(
    _____

21
    MI FAMILIA VOTA, ET AL.,            )(
22        Plaintiffs,                   )(
                                        )(   Case No.:
23  V.                                  )(   5:21-cv-0920-XR
                                        )(
24  GREG ABBOTT, ET AL.,                )(
          Defendants.                   )(
25  _____
```



```
 1  THE UNITED STATES OF AMERICA,      )(
        Plaintiff,                     )(
 2                                     )(   Case No.
    V.                                 )(   5:21-cv-1085-XR
 3                                     )(
    STATE OF TEXAS, ET AL.,            )(
 4      Defendants.                    )(
```

 5   ******************************************************

 6                ORAL 30(b)(6) DEPOSITION OF

 7               TRAVIS COUNTY CLERK'S OFFICE

 8                 TESTIMONY OF DAN HAYES

 9                     March 29, 2023

10   ******************************************************

11

12

13                    ORAL DEPOSITION OF DAN HAYES,

14   produced as a witness at the instance of the

15   Consolidated Plaintiffs, and duly sworn, was taken in

16   the above-styled and numbered cause on the 29th day of

17   March, 2023, from 9:04 a.m. to 10:34 a.m., before

18   STEPHANIE DAVIS, CSR, in and for the State of Texas,

19   reported by oral stenograph, at the Travis County

20   Attorney's Office, 314 West 11th Street, Fifth Floor,

21   Austin, Texas, pursuant to the Federal Rules of Civil

22   Procedure and the provisions stated on the record or

23   attached herein.

24

25



Dan Hayes                                    March 29, 2023
                                                    Page 15

```
 1        A.   Correct.
 2        Q.   And were there any additional methods of
 3   outreach?
 4        A.   Not that I know of, no.
 5        Q.   Okay.  You testified previously that you
 6   weren't sure if your ADA written policies, practices,
 7   or procedures specifically addressed how you should
 8   handle a request for reasonable accommodation from a
 9   person with a disability; does that sound right?
10        A.   Yeah, I don't remember exactly the wording
11   of that, but that's -- we don't have specific policies
12   to address everything; so yes.
13        Q.   So my next question was:  Have those
14   policies been developed at all since your deposition
15   in May of 2022?  It sounds like perhaps not.
16        A.   Written policies, no.
17        Q.   Okay.  And informal policies?
18        A.   Yes.  We accommodate as necessary according
19   to Texas code and that federal law, ADA.
20        Q.   Okay.  And -- okay.  I'll get to that in a
21   little bit.  Were these sort of -- these informal
22   developments, were they in place before the November
23   2022 election?
24        A.   Yes.
25        Q.   And what do the policies say about how you
```



1  respond to a request for a reasonable accommodation

2  from a voter with a disability?  Not "say," per se,

3  but how do you...

4       A.   Listen to the accommodation to the request

5  and take into account, Is it allowed by law.  And then

6  do what we can to accommodate the request.

7       Q.   Okay.  Does -- does your policy contain

8  procedures for denying modification requests?  And

9  again, I assume this is not written.  It might be an

10  informal policy?

11       A.   That's never come up.

12       Q.   Okay.  It's never come up that you've had to

13  deny a request?

14       A.   Correct.

15       Q.   Okay.  Have you ever had to, like, have

16  internal discussion and debate it?  Or was it just

17  never even a thought?

18       A.   To the best of my knowledge -- my

19  recollection about the November election, those that

20  need accommodation mostly are curbside.  It could be

21  an assistance in the polling location.  Those

22  procedures are already written, and that's how we --

23  that's what I remember as far as that.  So no -- no

24  denial based on that.

25       Q.   Okay.  Thank you.  And did you -- have you



1  would not be able a grant a request from a voter with

2  a disability asking to not to have to prove an ID

3  number on a mail-in ballot; do you recall that?

4       A.   I don't recall that specifically, but I --

5  the mail-in ballots require a numerical ID, and if a

6  voter does not have the numerical ID on the

7  application for ballot-by-mail, and the carrier return

8  envelope, there's a checkmark -- check box that the

9  voter states that they have not been issued such an

10 ID.

11      Q.   Okay.  So for the November 2022 election, if

12 a voter with a disability requested a modification to

13 submit a ballot without an ID number, you would not

14 have been able to grant that modification?

15      A.   No, we have to follow the law.

16      Q.   Okay.  The law being the election code?

17      A.   Exactly, yes.  Yes.

18      Q.   Who, in your office, is the person who has

19 the final say on whether a request for a reasonable

20 accommodation regarding a mail-in ballot can be

21 granted?

22      A.   For me, I would pass it to my supervisor, my

23 superior, Bridgette Escobedo, and then it could be

24 further up.  We all rely on the election code.

25      Q.   Okay.  And I just had a follow-up thought to



1     Q.   So it's a high-viz paper in that scenario,

2   and then also social media posts?

3     A.   And that's for SB-1 ballot-by-mail

4   requirements.

5     Q.   Okay.  And then sort of related to what I

6   was asking previously about the Texas Secretary of

7   State, since your last time you testified, have you

8   had any communication at all with the Texas Secretary

9   of State pertaining to SB-1 and voters with

10   disabilities?

11     A.   Yes.

12     Q.   Can you -- what were those communications?

13     A.   With SB-1, I hope you're aware, the

14   Secretary of State provides timely advisories for

15   every election.  We receive those.  Okay.  SB-1, the

16   provisions based on that, are part of those

17   advisories.  The cure process, the ballot-by-mail

18   requirements, et cetera.  Also, at conferences, the

19   Secretary of State will have seminars for voters

20   with -- about -- relating to voters with disabilities.

21   Is it -- as you've asked -- stated before, is it both

22   together specifically?  No.  But we have SB-1

23   provisions, ballot-by-mail, and voters with

24   disabilities seminars.

25     Q.   And so while they may not be specifically



1  connected in the communications from SOS, you are able

2  to put them together as necessary?

3       A.   One would hope, yes.

4       Q.   Okay.  And I'm ready to pass this witness

5  except that I wanted to bring up just that I do have a

6  few questions later on about some of the interrogatory

7  answers having to do with mail-in ballot rejection

8  rates, and also potentially some questions about some

9  of the form -- mail-in ballot forms that were

10 produced.  And I think that Charlie Johnson is

11 probably the person who is knowledgeable about it, but

12 Mr. Hayes was designated on the topic that had to do

13 with documents produced.  So -- just want to flag

14 that.

15            MR. NELSON:  Sure.  And I think in

16 terms of -- that was sort of a -- we read that topic

17 as a catchall topic of documents produced.  And so I

18 would say to that that within that, their knowledge is

19 going to be to the other topics that they were

20 designated on.  They would be knowledgable about

21 documents produced with respect to those topics, if

22 that makes sense.

23            MR. DOLLING:  Okay.  It does.  I think

24 we can -- I can probably pass the witness, then.

25



```
 1  THE UNITED STATES OF AMERICA,      )(
         Plaintiff,                    )(
 2                                     )(  Case No.
    V.                                 )(  5:21-cv-1085-XR
 3                                     )(
    STATE OF TEXAS, ET AL.,            )(
 4       Defendants.                   )(
```

 5                    REPORTER'S CERTIFICATION
                 ORAL 30(b)(6) DEPOSITION OF
 6            TRAVIS COUNTY CLERK'S OFFICE
                       DAN HAYES
 7                   March 29, 2023

 8          I, STEPHANIE DAVIS, Certified Shorthand

 9  Reporter in and for the State of Texas, hereby certify

10  to the following:

11          That the witness, DAN HAYES, was duly sworn

12  by the officer and that the transcript of the oral

13  deposition is a true record of the testimony given by

14  the witness;

15          I further certify that pursuant to FRCP Rule

16  30(f)(1) that the signature of the deponent:

17          __X__ was requested by the deponent or a

18  party before the completion of the deposition and that

19  the signature is to be before any notary public and

20  returned within 30 days from the date of receipt of

21  the transcript.  If returned, the attached Changes and

22  Signature Page contains any changes and the reasons

23  therefor;

24          ____ was not requested by the deponent or a

25  party before the completion of the deposition.



Dan Hayes                                          March 29, 2023
                                                        Page 65

1           I further certify that I am neither counsel

2    for, related to, nor employed by any of the parties or

3    attorneys in the action in which the proceeding was

4    taken, and further that I am not financially or

5    otherwise interested in the outcome of the action.

6

7           Certified to by me this _____ day of

8    _____, 2023

9

10

11

12

13

14          STEPHANIE DAVIS, TEXAS CSR 11355
            Expiration Date:  11-30-2023
15          MAGNA LEGAL SERVICES
            Firm Registration No. 633
16          1635 Market Street
            Suite 800
17          Philadelphia, Pennsylvania 19103
            Telephone:  866-624-6621
18          Facsimile:  215-207-9462

19

20

21

22

23

24

25



# EXHIBIT 45

```
 1                  UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3    LA UNION DEL PUEBLO ENTERO )
      et al.,                    )
 4         Plaintiffs,           )
                                 ) Civil Action No. SA-21-cv-
 5    v.                         )          00844-XR
                                 ) (Consolidated Cases)
 6    STATE OF TEXAS, et al.,    )
           Defendants.           )
 7

 8

 9         ----------------------------------------

10           ORAL AND VIDEOTAPED DEPOSITION OF
                     MICHAEL SCARPELLO
11                     MAY 4, 2022
                        Volume 1
12
           ----------------------------------------
13

14

15              ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL

16    SCARPELLO produced as a witness at the instance of

17    Plaintiff, and duly sworn, was taken in the above-styled

18    and numbered cause on the 4th day of May, 2022 from 10:21

19    a.m. to 1:11 p.m. before Nancy Newhouse, a Certified

20    Shorthand Reporter in and for the State of Texas,

21    reported by oral shorthand, located at the Dallas County

22    Records Building, 500 Elm Street, Suite 6300, Dallas,

23    Texas 75202, pursuant to the Federal Rules of Civil

24    Procedure, and the provisions stated on the record or

25    attached hereto.
```

 1          A.    Yeah.  And you've -- you've refreshed my
 2    memory on this.
 3          Q.    Okay.  So what is your understanding of how
 4    SB 1 affects your ability to grant accommodations
 5    requested on the basis of disability?
 6          A.    I don't believe we got an interpretation on
 7    this section from the Secretary of State.  In -- in
 8    other words, it -- it seems fairly vague to me, and I
 9    don't know quite how to interpret it.
10          Q.    Sure.  And I'm not trying to put you in a box
11    or anything, but can you tell me --
12          A.    Uh-huh.
13          Q.    -- what about it is vague, or what part you're
14    unsure about?
15          A.    I don't know what a reasonable -- I don't know
16    an  example of a reasonable accommodation, what it
17    might, what it might need -- mean, under this particular
18    section.
19          Q.    You mean that it's not obvious what sorts of
20    accommodations would be reasonable, and what sorts
21    wouldn't be reasonable, is that what you mean?
22          A.    Yes.  And -- and -- and examples of -- of --
23    of a circ -- a hypothetical that would -- would kind of
24    lay out what would be reasonable, what would not be
25    reasonable, et cetera.

```
 1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF TEXAS
 2                SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO )
     et al.,                    )
 4        Plaintiffs,           )
                                )
 5   v.                         ) Civil Action No. SA-21-CV-
                                )      00844-XR
 6   GREGORY W. ABBOTT, et al., ) (Consolidated Cases)
          Defendants.          )

 7

 8

 9

10              REPORTER'S CERTIFICATION
            DEPOSITION OF MICHAEL SCARPELLO
11                 MAY 04, 2022

12

13

14        I, Nancy Newhouse, Certified Shorthand Reporter

15   in and for the State of Texas, hereby certify to the

16   following:

17        That the witness, MICHAEL SCARPELLO , was duly sworn

18   by the officer and that the transcript of the oral

19   deposition is a true record of the testimony given by the

20   witness;

21              That the deposition transcript was submitted on

22   _____ to the witness or to the attorney for

23   the witness for examination, signature and return to me

24   by _____.

25
```

Michael Scarpello                                              May 04, 2022
                                                                Page 96

 1            That the amount of time used by each party at

 2     the deposition is as follows:

 3          Ms. Nina Perales              - 00:04
            Ms. Julia R. Longoria        - 00:00
 4          Ms. L. Brady Bender          - 00:00
            Ms. Camryn Pak               - 00:00
 5          Mr. Graham W. White          - 00:00
            Mr. William T. Thompson      - 02:46
 6          Mr. Jason G. Schuette        - 00:00
            Mr. Ben L. Stool             - 00:00
 7          Ms. Barbara Nicholas         - 00:00
            Mr. Anthony J. Nelson        - 00:00
 8          Ms. Leigh Tognetti           - 00:00
            Ms. Josephine Ramirez Solis - 00:00

 9

10            That pursuant to information given to the

11     deposition officer at the time said testimony was taken,

12     the following includes all parties of record:

13      Ms. Nina Perales, Attorney for Plaintiff
        MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND
14      110 Broadway, Suite 300
        San Antonio, Texas 78205
15
        Ms. Julia R. Longoria, Attorney for Plaintiff LUPE
16      MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND, INC
        110 Broadway, Suite 300
17      San Antonio, Texas 78205

18      Ms. L. Brady Bender, Attorney for Plaintiff DOJ
        DOJ TRIAL ATTORNEY VOTING SECTION, CIVIL RIGHTS
19      DIVISION
        950 Pennsylvania Avenue, NW
20      Washington, DC 20530

21      Ms. Camryn Pak, Attorney for Plaintiff DOJ
        DOJ TRIAL ATTORNEY VOTING SECTION, CIVIL RIGHTS
22      DIVISION
        950 Pennsylvania Avenue, NW
23      Washington, DC 20530

24

25

```
 1                  PARTIES OF RECORD Continued

 2

 3      Mr. Graham W. White, Attorney for Plaintiff LULAC
        LAW OFFICES OF ELIAS LAW GROUP, LLP
 4      10 G Street NE, Suite 600
        Washington, D.C. 20002
 5
        Mr. William T. Thompson, Attorney for Defendant OAG
 6      ATTORNEY GENERAL KEN PAXTON OFFICE
        DEPUTY CHIEF, SPECIAL LITIGATION UNIT
 7      P.O. Box 12548 (MC-009)
        Austin, Texas 78711
 8
        Mr. Jason G. Schuette, Attorney for Defendant OAG
 9      DALLAS COUNTY DISTRICT ATTORNEY OFFICE: CIVIL DIVISION
        RECORDS BUILDING
10      500 Elm Street, Suite 6300
        Dallas, Texas 75202
11
        Mr. Ben L. Stool, Attorney for Defendant OAG
12      DALLAS COUNTY DISTRICT ATTORNEY OFFICE: CIVIL DIVISION
        RECORDS BUILDING
13      500 Elm Street, Suite 6300
        Dallas, Texas 75202
14
        Ms. Barbara Nicholas, Attorney for Defendant OAG
15      DALLAS COUNTY DISTRICT ATTORNEY OFFICE: CIVIL DIVISION
        RECORDS BUILDING
16      500 Elm Street, Suite 6300
        Dallas, Texas 75202
17
        Mr. Anthony J. Nelson, Attorney for Defendant Travis
18      County Rebecca Guerrero and José Garza
        ASSISTANT COUNTY ATTORNEY, TRAVIS COUNTY ATTORNEY'S
19      OFFICE
        314 West 11th Street, Suite 500
20      Austin, Texas 78767

21      Ms. Leigh Tognetti, Attorney for Defendant Hidalgo
        County
22      ASSISTANT DISTRICT ATTORNEY, HIDALGO COUNTY
        100 East Cano, Courthouse Annex III, 1st Floor
23      Edinburg, Texas 78539

24

25
```

Michael Scarpello                                           May 04, 2022
                                                              Page 98

1                    PARTIES OF RECORD Continued

2

3        Ms. Josephine Ramirez Solis, Attorney for Defendant
         Hidalgo County
4        ASSISTANT CRIMINAL DISTRICT ATTORNEY
         100 East Cano
5        Edinburg, Texas 78539

6

7             I further certify that I am neither counsel

8    for, related to, nor employed by any of the parties or

9    attorneys in the action in which this proceeding was

10   taken, and further that I am not financially or otherwise

11   interested in the outcome of the action.

12            Certified to by me this 16th day of May, 2022.

13

14

15        _____
          NANCY NEWHOUSE, Texas CSR 9000
16        Expiration Date:  08/31/23
          Firm Registration No. 633
17        Magna Legal Services
          16414 San Pedro, Suite 900
18        San Antonio, Texas 78232
          (210) 697-4300

19

20

21

22

23

24

25

# EXHIBIT 46

```
1              IN THE UNITED STATES DISTRICT COURT

2                   WESTERN DISTRICT OF TEXAS

3                     SAN ANTONIO DIVISION

4

5    * * * * * * * * * * * * * * * * * * * * * * * * * *

6    LA UNION DEL PUEBLO ENTERO, et al *

7    v.                            *    CASE NO. 5:21-cv-844-XR

8    GREGORY W. ABBOTT, et al       *

9    * * * * * * * * * * * * * * * * * * * * * * * * * *

10   OCA-GREATER HOUSTON, et al     *

11   v.                            *    CASE NO. 1:21-cv-780-XR

12   JOHN SCOTT, et al              *

13   * * * * * * * * * * * * * * * * * * * * * * * * * *

14   HOUSTON JUSTICE, et al         *

15   v.                            *    CASE NO. 5:21-cv-848-XR

16   GREGORY WAYNE ABBOTT, et al    *

17   * * * * * * * * * * * * * * * * * * * * * * * * * *

18   LULAC TEXAS, et al             *

19   v.                            *    CASE NO. 1:21-cv-0786-XR

20   JOHN SCOTT, et al              *

21   * * * * * * * * * * * * * * * * * * * * * * * * * *

22   MI FAMILIA VOTA, et al         *

23   v.                            *    CASE NO. 5:21-cv-0920-XR

24   GREG ABBOTT, et al             *

25   * * * * * * * * * * * * * * * * * * * * * * * * * *
```

```
 1   UNITED STATES OF AMERICA          *

 2   v.                               *        CASE NO. 5:21-cv-1085-XR

 3   THE STATE OF TEXAS, et al        *

 4   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

 5

 6                   ORAL AND VIDEOTAPED DEPOSITION OF

 7                         ISABEL LONGORIA

 8                         APRIL 20, 2022

 9                         VOLUME 1 OF 1

10

11          Oral and videotaped deposition of Isabel Longoria,

12   produced as a witness at the instance of the defense, and duly

13   sworn, was taken in the above-styled and numbered cause on April

14   20, 2022, from 9:24 a.m. to 2:32 p.m., before Terrie Doyle

15   Escobar, CSR in and for the State of Texas, reported by oral

16   stenography, at the Office of the Texas Attorney General,

17   Consumer Protection Division, Houston Regional Office, 808 Travis

18   Street, Suite 1520, Houston, Texas  77002, pursuant to Rule 30 of

19   the Federal Rules of Civil Procedure.

20

21

22

23

24

25
```

1     A.   Yes.

2     Q.   Can you describe the situation in which you thought

3   there was an apparent conflict between the ADA and SB1.

4     A.   Yes.  And as I mentioned earlier in my testimony, for

5   voters who need to cure their mail ballot and to just cut ahead

6   right, SB1 has new provisions that require ID in the curing

7   process for mail ballots.  For those individuals who need an

8   accommodation that is not the form online and that is not

9   appearing in person, I would assume our office would be directed

10  to provide that accommodation, but I was told by the secretary of

11  state to not provide those accommodations.

12    Q.   Please tell me about this communication with the

13  secretary of state's office.

14    A.   I believe it was in August at the State Conference of

15  Elections Administrators.  The secretary of state's office, I

16  believe it was Keith Ingram and Christina Adkins, took questions

17  from the crowd, and the crowd being a crowd of elections

18  administrators, there for their professional conference,

19  regarding provisions of Senate Bill 1 and how they were to be

20  implemented and what questions we as election officials had in

21  that forum, I in that moment specifically raised this conflict in

22  front of the group and asked for directions and stated that I

23  believed that because of the reasonable -- this section point --

24  I don't -- this reasonable accommodation provision, that we were

25  compelled by law regardless of other provisions of SB1 to provide

1   accommodations to voters.  And I was instructed by the secretary

2   of state at that time as were the rest of the election officials

3   that to the extent -- basically, I was instructed that they were

4   aware of this provision, but that they felt that other sections

5   of Senate Bill 1 superseded this provision including the cure

6   process for mail ballots which I raised specifically.

7         Q.    Do you remember the precise wording of your question?

8         A.    My precise wording was, if I remember correctly, "SB1

9   contains a provision saying that reasonable accommodations must

10  be made to voters with disabilities so that they can't be held --

11  you know, that their rights to vote must be upheld.  Isn't it

12  true that, especially for the curing mail ballot process,

13  individuals wouldn't be able to cure in person?  By definition of

14  having to request a mail ballot, they've already ceded that

15  point.  What do you want us to do in that situation where we

16  cannot provide accommodations per the law?  Doesn't that hurt

17  voters with disabilities?"

18        Q.    And who answered your question if anyone?

19        A.    I believe it was Keith Ingram.

20        Q.    And do you remember as precisely as you can what he

21  said in response?

22        A.    I believe he said that he was aware of that provision

23  and that the secretary of state's office would come out with

24  direction later on for the timing.  That conference was in

25  August, and so the provision -- I can't remember if the law had

 1  ask questions if you found yourself thinking there might be a

 2  conflict between say the ADA and SB1.  I think one was you might

 3  ask the secretary of state's office a question, and the other was

 4  that you might ask the county attorney's office a question.  Do I

 5  understand your testimony correctly?

 6      A.   Yes.

 7      Q.   And we've gone through your communication with the

 8  secretary of state's office, right?

 9      A.   Yes.

10      Q.   Did you have communications with the county attorney's

11  office about potential conflicts between the ADA and SB1?

12      A.   I can't remember, on this specific topic.  Let's put it

13  that way.  Yeah.

14      Q.   Sure.  Let me ask the question --

15      A.   Yeah.

16      Q.   -- more specifically.  Did you ask the county

17  attorney's office for any advice regarding what to do if a voter

18  is entitled to an accommodation for a disability, but you think

19  SB1 might prohibit granting that accommodation?

20      A.   I can't remember.

21      Q.   Can you remember asking anyone at all for advice on

22  that topic other than the secretary of state's office or the

23  county attorney's office?

24      A.   No.

25      Q.   Are you familiar with the process for providing

1  voter who requested that a third-party assistant, their mother,

2  be their assistant for voting, and I believe it was at the

3  Tomball voting location.  The election judge at the time shared

4  that she did not believe that voter needed assistance from their

5  mother and that election workers -- that election judge or the

6  election worker would be able to assist the voter if needed.  The

7  voters then reported to us in an ADA grievance, that they felt

8  that that was not correct, and we took corrective matter --

9  action against that election judge to let them know they could

10 not deny an election -- a voter who had expressed to us they

11 needed assistance the ability to choose between a third-party

12 assistant versus election worker assistant.

13      Q.   And, so, the corrective action, you discussed with a

14 communication to the election judge?

15      A.   Yes.

16      Q.   Was there any other corrective action?

17      A.   Corrective action being a retraining, a write-up, and a

18 note in that judge's file of the incorrect manner in which they

19 approached that situation.

20      Q.   Did the voter in question ultimately receive the

21 assistance she wanted?

22      A.   I can't remember exactly what assistance he did or did

23 not receive, but I know he was dissatisfied in his voting

24 experience.  I just can't remember the exact details of what he

25 did or did not receive.

1     Q.   Was the voter in question ultimately able to cast a

2   ballot?

3     A.   I believe so, yes.

4     Q.   Are you aware of any other examples in which someone

5   working at a polling place in Harris County has prohibited

6   someone from providing assistance requested by a voter?

7     A.   I can't remember specific cases, but I know generally

8   in elections cases have come up or issues have come up where

9   again voters have assistants and election workers or poll

10  watchers will interrupt about the translating assistant; for

11  example, a voter needing or using an assistant to translate a

12  ballot in another language and the election worker saying, you

13  know, "You've got to speak English.  Don't provide that kind of

14  assistance."  You know, "you've got to speak English."  Voters

15  have reported to us when election clerks are outside the bounds

16  in trying to or attempting to prohibit an assistant from

17  providing the appropriate help.

18    Q.   When did those incidents occur?

19    A.   I can't remember a specific case.  Generally, in the

20  time that I've been an elections administrator over the last year

21  and a half there have been cases that came up.

22    Q.   And what did you do in response to those incidents?

23    A.   When the voters or other election clerks report those

24  incidences to us, we investigate by calling the election clerks

25  or election judges in question, gathering information on what

```
 1  UNITED STATES OF AMERICA          *

 2  v.                               *      CASE NO. 5:21-cv-1085-XR

 3  THE STATE OF TEXAS, et al         *

 4  * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

 5

 6                    REPORTER'S CERTIFICATION

 7              ORAL AND VIDEOTAPED DEPOSITION OF

 8                      ISABEL LONGORIA

 9                      APRIL 20, 2022

10

11         I, Terrie Doyle Escobar, Certified Shorthand Reporter

12  in and for the State of Texas, hereby certify to the following:

13

14         That the witness, Isabel Longoria, was duly sworn by

15  the officer and that the transcript of the oral deposition is a

16  true record of the testimony given by the witness;

17

18         That the deposition transcript was submitted on

19  _____, 2022 to the witness or to the attorney

20  for the witness for examination, signature, and return to me by

21  _____, 2022;

22

23         That the amount of time used by each party at the

24  deposition is as follows:

25         Mr. William T. Thompson - 3:42 (3 hours, 42 minutes),
```

```
 1              Mr. Jonathan Fombonne - 0:01 (1 minute)

 2              (All other parties used zero minutes.);

 3

 4              That pursuant to information given to the deposition

 5    officer at the time said testimony was taken, the following

 6    includes counsel for all parties of record:

 7              Mr. Kenneth E. Broughton, Attorney for Plaintiffs; Mr.

 8    Jonathan Fombonne and Ms. Christina Beeler, Attorneys for

 9    Defendant Isabel Longoria; Mr. William T. Thompson, Attorney for

10    State Defendants; Ms. Josephine Ramirez Solis, Attorney for

11    Defendant Yvonne Ramon; Mr. Mike Jones, Attorney for Plaintiffs

12    LULAC Texas and Voto Latino; Mr. L. Brady Bender, Attorney for

13    Plaintiff United States of America;

14

15              I further certify that I am neither counsel for,

16    related to, nor employed by any of the parties or attorneys in

17    the action in which this proceeding was taken, and further that I

18    am not financially or otherwise interested in the outcome of the

19    action.

20

21              Further certification requirements pursuant to Rule 203

22    of TRCP will be certified to after they have occurred.

23

24              Certified to by me this 2nd day of June, 2022.

25
```

1

2

3

4    _____

5    TERRIE DOYLE ESCOBAR, Texas CSR #11099

6    Expiration Date: July 31, 2023

7    Firm Registration: 633

8    Magna Legal Services

9    1635 Market Street, 9th Floor

10   Philadelphia, Pennsylvania  19103

11   Phone: 866-624-6221

12   Website: www.MagnaLS.com

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 47

Lisa Wise                                                    April 13, 2022

```
 1                 UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3    LA UNION DEL PUEBLO ENTERO )
      et al.,                    )
 4          Plaintiffs,          )
                                 )
 5    v.                         ) Civil Action No. SA-21-CV-
                                 )             00844-XR
 6    GREGORY W. ABBOTT, et al., )
          Defendants.            )
 7

 8

 9          ----------------------------------------

10          ORAL AND VIDEOTAPED DEPOSITION OF
                         LISA WISE
11                    APRIL 13, 2022
                        Volume 1
12
            ----------------------------------------
13

14

15          ORAL AND VIDEOTAPED DEPOSITION OF LISA

16    WISE  produced as a witness at the instance of Plaintiff,

17    and duly sworn, was taken in the above-styled and

18    numbered cause on the 13th day of April, 2022 from 10:02

19    a.m. mountain time to 5:27 p.m. mountain time, before

20    Nancy Newhouse, a Certified Shorthand Reporter in and for

21    the State of Texas, reported by oral shorthand, located

22    at the 500 East San Antonio, Room 503, El Paso, Texas

23    79901, pursuant to the Federal Rules of Civil Procedure,

24    and the provisions stated on the record or attached

25    hereto.
```

1    visually impaired to find the signature line and the

2    party choices box with Braille, so that they can sign

3    that and fill that out independently.  We worked with

4    them and created that.  Those are the things that I can

5    think of off the top of my head, if that's -- if they

6    qualify under that.

7         Q.   Yeah.  So even before SB 1, did you have the

8    authority to modify procedures to accommodate the

9    disabled?

10             MS. SPECTOR:  Objection, calls for legal

11   conclusion, vague.

12        A.   I believe so.

13        Q.   (BY MR. WHITE)  And do you have a procedure

14   for those requests to make modifications?

15             MS. SPECTOR:  Objection, vague.

16        A.   Generally, they would just call our office and

17   I would speak with them, depending on what it was.  In

18   those situations I just worked with the request, to see

19   if they were able -- if they were able to be com -- to

20   -- to do, and, if they were, then we did.

21        Q.   (BY MR. WHITE)  Do you recall any requests for

22   modification that you simply couldn't implement?

23        A.   I believe there was one that we put in the

24   production documents, where somebody wanted the ballot

25   choices to be read as A, B, or C instead of 1, 2, 3, and

1      the audio ballot is already programmed to read what's on

2      the screen, so in that example, that was something we

3      could not change.

4           Q.   But, generally, when a request for

5      accommodation is made, is it your practice to try to

6      make that accommodation?

7           A.   Yes, if it's possible.

8           Q.   And is that true after SB 1 as well?

9                MS. SPECTOR:   Objection, vague.

10          A.   I don't know if we've had a request since

11     then, so that's hard to speak to, but I can say that

12     yes, I would still try as hard as I could to -- to work

13     with them.

14          Q.   (BY MR. WHITE)  Did SB 1 make it harder for

15     you to accommodate disabled voters?

16               MS. SPECTOR:   Objection, vague, calls for

17     legal conclusion

18          A.   That's hard to say.  If -- if there were, you

19     know, voters who marked disability on the ballot by mail

20     application, if they were rejected.  For in-person

21     voting, the assistance oath has more information

22     required on that, however we didn't have any issues with

23     that this election.  So as of right now, just maybe the

24     ballot by mail with the -- for the disability community

25     that requested.

1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
2                 SAN ANTONIO DIVISION

3    LA UNION DEL PUEBLO ENTERO )
     et al.,                    )
4         Plaintiffs,           )
                                )
5    v.                         ) Civil Action No. SA-21-CV-
                                )           00844-XR
6    GREGORY W. ABBOTT, et al., )
          Defendants.           )

7

8

9

10                 REPORTER'S CERTIFICATION
                   DEPOSITION OF LISA WISE
11                    APRIL 13, 2022

12

13

14          I, Nancy Newhouse, Certified Shorthand Reporter

15    in and for the State of Texas, hereby certify to the

16    following:

17        That the witness, LISA WISE , was duly sworn by the

18    officer and that the transcript of the oral deposition is

19    a true record of the testimony given by the witness;

20          That the deposition transcript was submitted on

21    _____ to the witness or to the attorney for

22    the witness for examination, signature and return to me

23    by _____.

24

25

Lisa Wise                                                              April 13, 2022
                                                                         Page 255

```
 1              That the amount of time used by each party at

 2      the deposition is as follows:

 3              Ms. Nina Perales          - 00:00
                Mr. Graham W. White       - 00:00
 4              Mr. Kevin Zhen            - 00:00
                Mr. Jason S. Kanterman    - 00:00
 5              Ms. Julia R. Longoria     - 00:00
                Ms. Jasleen Singh         - 00:00
 6              Ms. Wendy Olson           - 00:00
                Mr. Jaywin Singh Malhi    - 00:00
 7              Ms. L. Brady Bender       - 00:00
                Mr. Greg Byran            - 00:00
 8              Ms. Ashley Harris         - 00:00
                Mr. Thomas Buser-Clancy   - 00:00
 9              Mr. Jeffery White         - 07:27
                Ms. Kathleen T. Hunker    - 00:00
10              Ms. Kelsey Spector        - 00:00
                Ms. Kathleen Hartnett     - 00:00
11              Ms. Angelica Leo          - 00:00
                Mr. Jed Untereker         - 00:00
12              Ms. Christina Sanchez     - 00:00
                Ms. Lisa Cubriel          - 00:00
13              Mr. Anthony J. Nelson     - 00:00
                Mr. Mark Bieter           - 00:00
14              Ms. Liegh Tognetti        - 00:00
                Ms. Josephine Ramirez Solis - 00:00

15

16

17              That pursuant to information given to the

18      deposition officer at the time said testimony was taken,

19      the following includes all parties of record:

20
         Ms. Nina Perales
21      MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND
         110 Broadway, Suite 300
22      San Antonio, Texas 78205

23       Mr. Graham W. White,  Attorney for Plaintiff LULAC
        LAW OFFICES OF ELIAS LAW GROUP, LLP
24       10 G Street NE, Suite 600
         Washington, D.C. 20002

25
```

Lisa Wise                                                    April 13, 2022
                                                                Page 256

```
 1              ALL PARTIES OF RECORD Continued

 2

 3      Mr. Kevin Zhen, LUPE, via Zoom Attorney for Plaintiff
        Southwest Voter
 4      Registration Education Project, Mexican American Bar
        Association of Texas, Texas Hispanics Organized for
 5      Polical Education, Jolt Action, William C. Velasquez
        Institute, Fiel Houston, Inc.
 6      LAW OFFICES OF FRIED, FRANK, HARRIS, SHRIVER & JACOBSON,
        LLP
 7      One New York Plaza
        New York, New York 10004
 8
        Mr. Jason S. Kanterman, LUPE, via Zoom  Attorney
 9      for Plaintiff Southwest Voter Registration Education
        Project, Mexican American Bar Association of Texas,
10      Texas Hispanics Organized for Political Education, Jolt
        Action, William C. Velasquez Institute, Fiel Houston,
11      Inc.
        LAW OFFICES OF FRIED, FRANK, HARRIS, SHRIVER & JACOBSON,
12      LLP
        One New York Plaza
13      New York, New York 10004

14      Ms. Julia R. Longoria, via Zoom Attorney for Plaintiff
        LUPE
15      MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND, INC
        110 Broadway, Suite 300
16      San Antonio, Texas 78205

17      Ms. Jasleen Singh, via Zoom Attorney for Plaintiff LUPE
        BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
18      120 Broadway, Suite 1750
        New York, New York 10271
19
        Ms. Wendy Olson, via Zoom Attorney for Plaintiff Mi
20      Familia Vota
        LAW OFFICES OF STOEL RIVES, LLP
21      101 South Capitol Boulevard, Suite 1900
        Boise, ID 83702
22
        Mr. Jaywin Singh Malhi, via Zoom Attorney for Plaintiff
23      DOJ
        TRIAL ATTORNEY VOTING SECTION, CIVIL RIGHTS DIVISION
24      950 Pennsylvania Avenue, NW
        Washington, DC 20530
25
```

Lisa Wise                                                      April 13, 2022
                                                                  Page 257

```
 1              ALL PARTIES OF RECORD Continued

 2

 3     Ms. L. Brady Bender, via Zoom Attorney for Plaintiff DOJ
       DOJ TRIAL ATTORNEY VOTING SECTION, CIVIL RIGHTS
 4     DIVISION
       950 Pennsylvania Avenue, NW
 5     Washington, DC 20530

 6     Mr. Greg Byran, via Zoom Attorney for Plaintiff DOJ
       DOJ TRIAL ATTORNEY VOTING SECTION, CIVIL RIGHTS
 7     DIVISION
       950 Pennsylvania Avenue, NW
 8     Washington, DC 20530

 9     Ms. Ashley Harris, via Zoom Attorney for Plaintiff
       OCA-GH
10     ACLU FOUNDATION OF TEXAS, INC
       5225 Katy Freeway, Suite 350
11     Houston, Texas 77007

12     Mr. Thomas Buser-Clancy, via Zoom Attorney for Plaintiff
       OCA-GH
13     ACLU FOUNDATION OF TEXAS, INC
       5225 Katy Freeway, Suite 350
14     Houston, Texas 77007

15     Mr. Jeffery White, Attorney for Defendant OAG
       ATTORNEY GENERAL KEN PAXTON OFFICE
16     SPECIAL COUNSEL SPECIAL LITIGATION UNIT
       209 West 14th Street
17     Austin, Texas 78701

18     Ms. Kathleen T. Hunker, via Zoom Attorney for Defendant
       OAG
19     ATTORNEY GENERAL KEN PAXTON OFFICE
       SPECIAL COUNSEL SPECIAL LITIGATION UNIT
20     209 West 14th Street
       Austin, Texas 78701

21
       Ms. Kelsey Spector, Attorney for Defendant & Lisa Wise
22     El Paso County
       LAW OFFICES OF COOLEY, LLP
23     3 Embarcadeo Center, 20th Floor
       San Francisco, California 94111

24

25
```

```
 1                 ALL PARTIES OF RECORD Continued

 2

 3      Ms. Kathleen Hartnett, Attorney for Defendant El Paso
        County
 4      LAW OFFICES OF COOLEY, LLP
        3 Embarcadeo Center, 20th Floor
 5      San Francisco, California 94111

 6      Ms. Angelica Leo, via Zoom Attorney for Defendant El
        Paso County
 7      LAW OFFICES OF COOLEY, LLP
        3175 Hanover Street
 8      Palo Alto, California 94304

 9      Mr. Jed Untereker, via Zoom Attorney for Defendant El
        Paso County
10      ASSISTANT COUNTY ATTORNEY-CIVIL DIVISION CHIEF
        500 East San Antonio, Room 503
11      El Paso, Texas 79901

12      Ms. Christina Sanchez, Attorney for Defendant El Paso
        County
13      DIRECTOR ASSISTANT COUNTY ATTORNEY
        500 East San Antonio, Room 503
14      El Paso, Texas 79901

15      Ms. Lisa Cubriel, via Zoom Attorney for Defendant
        ASSISTANT DISTRICT ATTORNEY CIVIL DIVISION
16      101 West Nueva Street, 7th Floor
        San Antonio, Texas 78205

17
        Mr. Anthony J. Nelson, via Zoom Attorney for Defendants
18      Rebecca Guerrero and José Garza
        ASSISTANT COUNTY ATTORNEY, TRAVIS COUNTY ATTORNEY'S
19      OFFICE
        314 West 11th Street, Suite 500
20      Austin, Texas 78767

21      Ms. Liegh Tognetti, via Zoom Attorney for Defendant
        ASSISTANT DISTRICT ATTORNEY, HIDALGO COUNTY COMMUNITY
22      SERVICE AGENCY
        2524 North Closner Boulevard
23      Edinburg, Texas 78541

24

25
```

Lisa Wise                                                            April 13, 2022
                                                                     Page 259

```
 1                  ALL PARTIES OF RECORD Continued

 2

 3      Ms. Josephine Ramirez Solis, via Zoom Attorney for
        Defendant
 4      ASSISTANT CRIMINAL DISTRICT ATTORNEY
        100 East Cano
 5      Edinburg, Texas 78539

 6              I further certify that I am neither counsel

 7      for, related to, nor employed by any of the parties or

 8      attorneys in the action in which this proceeding was

 9      taken, and further that I am not financially or otherwise

10      interested in the outcome of the action.

11              Certified to by me this 28th day of April,

12      2022.

13                          _____

14                          NANCY NEWHOUSE, Texas CSR 9000
                            Expiration Date:  08/31/23
15                          Firm Registration No. 633
                            Magna Legal Services
16                          16414 San Pedro Avenue, Suite 900
                            San Antonio, Texas 78232
17                          Telephone: (866) 806-8265

18

19

20

21

22

23

24

25
```

# EXHIBIT 48

The Official Website of the Dallas County Elections Department

Home

Search...   Search

Registered Voters as of **06/23/23**

English ▼

**Total** 1,396,615

**Elections Office**

**About Us**

**Press Releases, Legal Notices, & Announcements**

**Voting Systems in Dallas County**

**Documents and Forms**

**Photo Gallery**

**Public Information Request**

**Contact Us**

**Elected Officials**

**Elected Officials Listings**

**Campaign Reporting**

**Candidate Information**

**2021 Redistricting Maps**

**Voting Precincts / Maps**

**Find My District**

**Voter Information**

**Voters with Special Needs**

**Voter Lookup and View Personal Sample Ballot**

**Secretary of State- Candidate Ballot Order**

**2021 Redistricting Maps**

**Public Information Request**

**Upcoming Election Information**

**Getting Involved**

**Become a Poll Worker**

**Training and Education**

**Volunteer Deputy Registrar Program**

**Event/Speaker Request Form**

**Register to Vote**

**Ballot by Mail**

**Early Voting**

**Election Day**



Upcoming Election Information



Voter Lookup, Personal Sample Ballot
& My Elected Officials



Become a Poll Worker



Early Voting
Location Finder



Election Day
Location Finder



Election Results & Reports



ID Requirement at Vote Center



Ballot by Mail Tracker



Live Stream Areas Containing
Voted Ballots



Related Links



Committee Meetings



Campaign Finance

Rumor Control



Important Dates for Volunteer Deputy Registrars



Facebook Feed



Twitter Feed



## Tweets from @DallasElections

Follow

**Dallas County Elec...** @DallasElec... · Jun 10

Visit our Election Results & Reports page by following this link: bit.ly/JuneElectionNi... or go to our interactive results page by visiting this link: bit.ly/JuneInteractiv... #DallasCountyVotes

Social

    

Upcoming Events

**Last Day to Register to Vote for November 7, 2023 General Election**
Tuesday, October 10th

**First Day of Early Voting 8AM-5PM for General Election**
Monday, October 23rd

Event Calendar

## Contact Us

1520 Round Table Drive, Dallas, TX 75247
Office Hours: Monday - Friday 8:00a – 4:30p

Main Office Phone Number: (469) 627-VOTE (8683)
Fax Number: (214) 819-6301
Contact the Elections Department by Email

## Helpful Links

Dallas County, Texas Official Website
Secretary of State – Election Information
Vote Texas. You Count.
Contact the WebMaster

The Official Dallas County of Texas Elections Website
Legal Disclaimer - C 2011-2023 Dallas County, TX - All Rights Reserved

# EXHIBIT 49

ⓘ VIEW INFORMATION FOR THE UPCOMING JUNE 10 RUNOFF ELECTIONS FOR THE CITY OF PASADENA

June 10, 2023 Joint Runoff Election

**HARRIS COUNTY**
ELECTIONS ADMINISTRATOR'S OFFICE

ENGLISH | ESPAÑOL | TIẾNG VIỆT | 中文 |

Voter    Voter Registrar    Election Workers    Candidates    **Public Information and Media**

Media

Public Information

Election Notices

# First-Time Voters

Explore all of the options available to first-time voters!

More Information

## Sign Up For Newsletter

Email

Full Name

Postal Code

Sign up!

**Calendar**

**Sample Ballot**

**Vote Centers**

**Jurisdiction & Precinct Maps**

**Voting Process FAQ**

**Election Results**

## OUR FEED

Harris County Elections
Follow Page   7.6K followers



Harris County Elections
about 2 weeks ago

Today is your last chance to vote in-person in the Pasadena run-off election. TODAY is Election Day and polls are open from 7 am - 7 pm. Log on to harrisvotes.com to check wait times, view your sample ballot, and choose your closest vote center. #harrisvotes

2      Comment      Share

## MEDIA

How to use the new voting machines in Harris…

**Get Voter Ready!**

Watch this educational video to learn about the Election process and how voters can cast a ballot utilizing our ballot marker machines.

## UPCOMING EVENTS

No upcoming events in this date range.

More Events

## About The Elections Administrator

The Elections Administrator of Harris County has the responsibility of carrying out statutory electoral functions outlined by federal and state laws. Some of the ele…

- Providing training to all Presiding and Alternate Election Judges to ensure the proper execution of state and federal election law during each county/federal ele
- Creating the ballot for county, state and federal elections in a manner provided by the state law;
- Establishing the number of Early Vote Centers in Harris County and schedule of voting hours (subject to approval by Commissioners Court);
- Securing Election Day Vote Centers (subject to approval by Commissioners Court);
- Securing the County's election equipment and maintenance of equipment;
- Accepting requests for ballots to be sent by mail and processing all returned ballots for tabulation;
- Storing official campaign disclosure forms for local candidates;
- Archiving official election results and voter histories for Harris County and reporting this information to the Secretary of State for district, statewide, and federa

In short, the Election Administrator works with the Commissioners Court, the major political parties and other stakeholders to establish an elections infrastructure
citizenry of the third largest county in the United States.

## Contact Us

Elections Administrator's Office

📍 1001 Preston St Houston, TX 77002

☎ (713)755-6965

@ voters@harrisvotes.com

@ ADA@vote.hctx.net

## Get Involved

Voter Registration
Vote Centers
Voting By Mail
Sample Ballot
Election Workers
Candidates & Ethics

## Get Informed

Voting Machine Info
Voting Process FAQ
County Wide Precinct Map
Update Your Registration
Election Calendar

## Election Division

About Us
Contact
Volunteer
Events
Education
Careers



The Harris County Elections Administrator's Office makes a diligent effort to post accurate information on this website, but ass
damages incurred directly or indirectly as a result of errors, omissions, or discrepancies. For additional information please review
our Accessibility Statement.

© 2023 All Rights Reserved Harris Elections Administrator's Office.

# EXHIBIT 50

## VOTING IN BEXAR COUNTY

Exercise your right to vote! Learn how to register to vote in Bexar County or make changes to your existing registration. Also, find out how to early vote or vote by mail.

**VOTER REGISTRATION**
Learn how to register to exercise your right to vote in Bexar County. Find information on eligibility, how to register, making registration changes, and checking your registration status.

**EARLY VOTING & ABSENTEE BALLOTS**
Avoid long lines on election day by voting early either in person or by mail with an absentee ballot.

**MILITARY/OVERSEAS VOTERS**
The Federal Post Card Application (FPCA) is a form provided by federal law to permit members of the U.S. armed forces and merchant marines, their dependents, and U.S. citizens abroad to vote early by mail, and, if necessary, to temporarily register to vote.

**VOTER PRECINCTS**
View maps and contact information for the various voter precincts within Bexar County.

**WHO REPRESENTS ME? SEARCH**
Search by street name or zip code to find jurisdiction information and get a list of helpful websites for your precinct.

**TextMyGov** **& POLLING LOCATION SEARCH**
registration status and determine your voter precinct and polling location.

Skip a phone call and send us a text message to find answers to your questions about elections and voter registration. Text "Hi" to Bexar County Elections at
**(210) 405-4404**

**VO**
**E**

More Info

Enable Google Translate





*Back to Elections Home*

**CONTACT ELECTIONS**

Jacquelyn F. Callanen

Elections Administrator

Elections Department

**Physical Address**

1103 S. Frio

Suite 100

San Antonio, TX 78207

Phone: 210-335-VOTE (8683)

Fax: 210-335-0371 (Elections)

Email: BexarCountyElections@bexar.org

**Early Voting Clerk**

1103 S. Frio St.

Suite 200

San Antonio, TX 78207-6328

Enable Google Translate

Enable Google Translate

# EXHIBIT 51



Website maintenance is scheduled on Saturday morning (6/24) from 7:00AM to 8:00AM.

English

🕐 Monday - Friday 8:00 am - 5:00 pm          📞 (512) 854-918



Travis County Clerk
Dyana Limon-Mercado

Home          Departments          How Do I...          PIR

Updates

# Voters with Disabilities

*Home* » *Departments* » *Elections* » *Voters with Disabilities*

Elections

2022 "I Voted" Sticker Contest Winners!

Current Election

Your Voting System

Election Results

Required Notices

Election Calendar

Voter ID

Ballot by Mail

Voters with Disabilities

Election Workers

Elected Officials

Campaign Finance

Resources

FAQ

Cast Vote Record

🇺🇸 English

# Notices

[Disability Complaints Process for Travis County Elections](#)

[Notice to Voters with Disabilities](#)

# Voters with Disabilities

The Travis County Clerk's Office is committed to creating a "safe haven" for voters so that they can exercise their right to vote in a polling place with a non-intimidating, supportive environment. We believe in making all polling places fully accessible and we're seeking input from the community to ensure that accessibility. We believe that all voters have the right to cast their ballot independently and privately. To meet these goals, Travis County's efforts include:

- Offering ES&S ExpressVote voting equipment and a system of electronic voting that meets disability standards as prescribed by the Texas Secretary of State and Federal Help America Vote Act (HAVA) requirements
- Working to ensure that 100 percent of all polling locations are accessible in accordance with standards set forth by the United States Department of Justice
- Providing education and training to election workers on methods to best assist voters with disabilities
- Providing voter outreach through demonstrations and educational materials

## Voters With Disabilities/Curbside Voting

Voters who are physically unable to enter the polling location without assistance or likelihood of injury to the voter's health may ask the presiding election official to allow them to vote outside the polling location. The election officer will deliver a ballot to the voter at the polling place entrance or curb.  (TEC Sec. 64.009)

Voters who are planning to vote curbside are encouraged to contact us upon their arrival at the polling location. Call (512) 238-VOTE (8683) or (512) 854-4996.

Please note that curbside is a slow process that takes time. It is not drive-thru voting so anyone utilizing curbside voting gives themselves plenty of time to complete the process.



🇺🇸 English

## Voting At The Polling Location

The Travis County Elections Division is dedicated to making all polling places fully accessible (including the pathway to the polling place) and seeking input from the community to ensure that accessibility. Polling places are inspected to ensure compliance with the Americans with Disabilities Act Checklist for Polling Places, and election workers are trained to offer support to persons with special needs.

## Voting System Accessibility Options

Travis County's voting system meets the disability standards as prescribed by the Texas Secretary of State and Federal Help America Vote Act. These features allow voters to cast their votes privately, securely, and without assistance.

- The paper-based ExpressVote Universal Voting System uses touch-screen technology in a Ballot Marking Device (BMD) that produces a paper record for tabulation. As a BMD, the ExpressVote handles the entire marking process, eliminating marginal marks and the need for interpretation of the voter's mark.
- Voters who are visually impaired or blind may choose to use headphones to hear the ballot read aloud. The audio is recorded in both English and Spanish.
- Voters with limited dexterity or limited upper body mobility may vote by using the tactile input switches on the equipment. Sip-and-puff accessibility is also available.
- Our customized voting tables make all the voting machines wheelchair accessible.
- Voters with disabilities may request the option of "curbside voting." In this case, a poll worker brings a voting unit to the voter's vehicle.

## Receiving Assistance At The Polls

You are entitled to receive assistance if you cannot read or write or if you have a physical disability that prevents you from reading or marking the ballot. You may be assisted by a person of your choice who is not your union representative or employer. Under certain circumstances, election workers are also available upon request to assist you.

Voters with a disability – Travis County Clerk



Pursuant to Section 63.0013, Election Code: An election officer may give voting order
with a mobility problem that substantially impairs the person's ability to move around.

## Using An Interpreter

If you cannot speak English, or if you communicate only with sign language, you may use an interpreter to help
you communicate with election officials at the polling place. You may select anyone to be your interpreter. If
you cannot read the languages on the ballot, your interpreter may also assist you by translating the language
on the ballot for you in the voting booth. If you have a hearing impairment and do not have a sign language
interpreter who can accompany you to communicate with the poll worker or read the ballot for you, please use
RelayTexas (dial 7-1-1) in order to contact us at (512) 238-VOTE (8683) or (512) 854-4996.

## Applying For A Photo ID Disability Exemption

Voters with a disability may apply for a permanent exemption. The application must contain written
documentation either from the U.S. Social Security Administration evidencing he or she has been determined to
have a disability, or from the U.S. Department of Veterans Affairs evidencing a disability rating of at least 50
percent. Exemption applications in English and Spanish are available at TravisCountyTax.org.

## We Want Your Feedback

If you have questions or want to provide feedback about accessibility issues, please contact our office by email
or by (512) 238-VOTE (8683) or (512) 854-4996.

Additional information on voting accessibility can be found on the United States Election Assistance
Commission or Texas Secretary of State's websites.

If you have any grievances about any Travis County polling locations, please complete the ADA Complaint Form by
clicking the button below.

ADA COMPLAINT FORM

Copyright © 2023 Travis County Clerk  -  Theme by SiteOrigin

# EXHIBIT 52

# Voters with Special Needs

El Paso County has made provisions to ensure voters with disabilities have the ability to cast their vote independently and in secret. Every polling place will provide an ADA compliant voting system accessible to voters with disabilities and offer an audio ballot specially for voters with vision or reading impairments.

## Assistance at the Polls

Tell the election official if you are a voter who needs assistance to vote, you do not have to provide proof of your disability.

**Voters are entitled to receive assistance if they:**

1. Cannot read or write; or
2. Have a physical disability that prevents them from reading or marking the ballot.

**Voters may be assisted by:**

1. Any person the voter chooses who is not an election worker;
2. Two election workers on Election Day; or
3. One election worker during Early Voting.

**Voters MAY NOT be assisted by:**

1. Their employer;
2. An agent of their employer; or
3. An officer or agent of the union.

**It is illegal for a person assisting the voter to:**

1. Try to influence the voter's vote;
2. Mark the voter's ballot in a way other than the way they have asked; or
3. Tell anyone how the voter voted.

## Voting Order Priority

Pursuant to Section 63.0013, Texas Election Code: An election officer may give voting priority to individuals with a mobility problem that substantially impairs the person's ability to move around.
- A person assisting an individual with a mobility problem may also, at the individual's request, be given voting order priority.
- Disabilities and conditions that may qualify you for voting order priority include paralysis, lung disease, the

use of portable oxygen, cardiac deficiency, severe limitation in the ability to walk due to arthritic, neurological, or orthopedic condition, wheelchair confinement, arthritis, foot disorder, the inability to walk 200 feet without stopping to rest, or use of a brace, can crutch, or other assistive device.

- Voters who wish to be given voting order priority, and be accepted for voting before others in line to vote at that polling place, may indicate this to any election officer serving at the polling place. The presiding election judge will determine whether the voter and the voter's assistant, if applicable, will be brought forward to the front of the line.

### *Curbside Voting*

If a voter is physically unable to enter the voting location without assistance or likelihood of injury to his or her health, they may ask that an election worker bring a voting unit during Early Voting or Election Day to their car at the entrance of the voting location. All curbside voters will be allowed the same privacy as a voter at the voting booth.

Curbside voting is allowed for voters who are "physically unable to enter the polling place without personal assistance or likelihood of injuring the voter's health." Tex. Elec. Code § 64.009. At the voter's request, an election officer shall deliver a ballot to the voter at any polling place entrance or the voter can exercise this option at any express curbside voting location.

For more information please contact our office at 915-546-2154.

### *Additional Resources*

**Notice of Voting Order Priority (PDF) (https://el-paso-county-elections.s3.amazonaws.com/documents/files/000/001/504/original/Notice_of_Voting_Order_Priority_1505834049)**

**United States Election Assistance Commission (https://www.eac.gov/voters/voting-accessibility)**

**Disability Rights Texas (http://www.disabilityrightstx.org/resources/voting-rights/)**

**Services Available to Voters with Disabilities in Texas (https://www.votetexas.gov/voters-with-special-needs/)**



# *Voter Information*

---

**Voter Registration (/voter_information/voter_registration)**

**Identification Required for Voting (/voter_information/identification_required_for_voting)**

**Civilian Ballot by Mail (/voter_information/civilian_ballot_by_mail)**

**FPCA-Military and Overseas (/voter_information/fpca_military_and_overseas)**

**Limited Ballot (/voter_information/limited_ballot)**

**Voters with Special Needs (/voter_information/voters_with_special_needs)**





## Am I Registered?
(/quick_links/am_i_registered)



## Current Election
(/quick_links/current_election)



## Early Voting Locations
(/quick_links/early_voting)



## Countywide Vote Centers
(/quick_links/where_do_i_vote)



## What To Expect When Voting



## Elected Officials

(/quick_links/what_to_expect_when_voting)                    (/elected_officials)



# *Download our mobile app!*

The El Paso County Elections Department app is the essential app for voters in the El Paso, Texas region. See if you are registered to vote, find your nearest Early Voting Location, find your nearest Election Day Countywide Vote Center, and get all of the information you need to prepare for the election!



(https://itunes.apple.com/us/app/el-paso-county-elections/id1277133366?mt=8)



(https://play.google.com/store/apps/details?id=com.vivaimpulse.epcountyelections&hl=en)



Case 5:21-cv-00844-XR Document 648-2 Filed 06/23/23 Page 649 of 785



# Registered voters as of Friday, June 23, 2023

# 489,659



## What's Happening Now

### Important Dates: June 2023 Runoff Election (/news_articles/important-dates-june-2023-runoff-election)

Published on: Thursday, May 18, 2023

Thursday, May 11, 2023 Last day to register to vote. Tuesday, May 30, 2023 First day of Early Voting by personal appearance. Tuesday, May 30, 2023 Last day to apply for Ballot by Mail. (Received, not postmarked). Tuesday, June 6, 2023 Last day... **Read More (/news_articles/important-dates-june-2023-runoff-election)**

### El Paso County Elections Department's Website Ranked Outstanding in Statewide Review (/news_articles/el-paso-county-elections-department-s-website-ranked-outstanding-in-statewide-review-6b2c6a7b-bb45-4948-a145-4d651192c7cb)

Published on: Monday, February 27, 2023

The El Paso County Election Department's website has been ranked "Outstanding" for a third time by the League of Women Voters of Texas. The League of Women Voters of Texas released the results from their statewide survey of election websites. Out... **Read More (/news_articles/el-paso-county-elections-department-s-website-ranked-outstanding-in-statewide-review-6b2c6a7b-bb45-4948-a145-4d651192c7cb)**

### Important Dates: November 2023 Uniform Election (/news_articles/important-dates-november-2023-uniform-election)

Published on: Friday, February 24, 2023

Case 5:21-cv-00844-XR   Document 648-2   Filed 06/23/23   Page 650 of 785

Tuesday, October 10, 2023 Last day to register to vote. First business day after Indigenous Peoples' Day. Monday, October 23, 2023 First day of Early Voting by personal appearance. Friday, October 27, 2023 Last day to apply for Ballot by Mail.... ***Read More (/news_articles/important-dates-november-2023-uniform-election)***

# *#govoteep*

*Copyright © 2023 El Paso County, TX (http://epcounty.com) - All Rights Reserved - Disclaimer (/see_more/disclaimer)*
*A Hello Amigo Website (https://helloamigo.com)*

# EXHIBIT 53

# Voters with Special Needs

## Web Accessibility Statement

Hidalgo County Election Department is committed to making the content of our website accessible to all, including individuals with disabilities, and to ensure our website is complying with Title II of the Americans with Disabilities Act and Sections 504 and 508 of the Rehabilitation Act, by using World Wide Web Consortium's (W3C) Web content Accessibility Guidelines (WCAG) 2.0 Level AA.

## Services Available to Voters with Special Needs in Texas

### Voter Registration

- People with disabilities have the right to register to vote so long as they are eligible, which means they:
  - Are citizens of the United States;
  - Are at least 17 years and 10 months old at time of registration (but to vote, they must be 18 years of age by Election Day);
  - Have not been finally convicted of a felony, or if they have been convicted, have completed all of their punishment, including any term of incarceration, parole, supervision, probation, or have received a pardon;
    - Note: Deferred adjudication is not a final felony conviction.
  - Have not been determined by a final judgment of a court exercising probate jurisdiction to be totally mentally incapacitated or partially mentally incapacitated without the right to vote.
- Individuals who have legal guardians may be eligible to register, depending on whether the court took away their right to vote. All guardianship orders issued after September 1, 2007 must state whether the individual can vote.
- People with disabilities can receive assistance registering to vote from any state agency that provides services to persons with disabilities or from any person they choose.

### Accessible Voting Systems: Tex. Elec. Code Sec. §61.012 (1)(2)

- On September 1, 1999, Texas became the first state to require that all new voting systems be accessible to voters with disabilities and provide a practical and effective means for voters with disabilities to cast a secret ballot.
- In every federal election (and most nonfederal elections), each polling place will offer at least one type of accessible voting equipment or Direct Record Electronic ("DRE") device. This equipment allows voters with disabilities to vote directly on the system or assist them in marking the paper ballot. Depending on the type of system, voters with disabilities may use headphones or other assistive devices to help them vote independently and secretly.
- In certain nonfederal elections held in counties with a population of less than 20,000, accessible machines may not be available at every polling place. To determine if accessible machines will be available or to

Enable Google Translate

request an accommodation, contact the early voting clerk of the county or political subdivision holding the election at least 21 days before the election.

## All Polling Places in Texas Must be Accessible: Tex. Election Code Sec. §43.034

Polling places should support voters, not hinder them. When you go to the polls in Texas, you can expect:

- Your polling place will meet strict accessibility standards, including:
- A location on the ground floor that can be entered from the street or via an elevator with doors that open at least 36 inches
- Doors, entrances, and exits used to enter or leave the polling place that are at least 32 inches wide
- Any curb next to the main entrance to the polling place must have curb-cuts or temporary non-slip ramps
- Stairs necessary to enter or leave the polling place must have handrails on each side and a non-slip ramp.
- Removal of all barriers such as gravel, automatically closing gates, closed doors without lever-type handles, or any other barrier that impedes the path of the physically disabled to the voting station.
- Voting systems that are accessible to voters with physical disabilities and can accommodate no vision, low vision, no hearing, low hearing, limited manual dexterity, limited reach, limited strength, no mobility, low mobility, or any combination of the foregoing (except the combination of no hearing and no vision)
- Each polling place will offer at least one type of accessible voting equipment or Direct Record Electronic ("DRE") device. This equipment allows voters with disabilities to vote directly on the system or assist them in marking the paper ballot. Depending on the type of system, voters with disabilities may use headphones or other assistive devices to help them vote independently and secretly.

## Voters May Receive Assistance at the Polls: Tex. Election Code Sec. §64.031

Tell the election official if you are a voter who needs help to vote. You do not have to provide proof of your disability. Voters are entitled to receive assistance if they:

- Cannot read or write; or   (Sec. §64.031)
- Have a physical disability that prevents them from reading or marking the ballot; or
- Cannot speak English, or communicate only with sign language, and want assistance in communicating with election officials.

Voters **MAY BE** assisted by: (Sec. §64.032)

- Any person the voter chooses who is not an election worker;
- Two election workers on Election Day; or
- One election worker during early voting.

Voters **MAY NOT** be assisted by: (Sec. §64.036)

- Their employer;
- An agent of their employer; or
- An officer or agent of their union.

The person assisting the voter must read him or her the entire ballot, unless the voter asks to have only parts of the ballot read. The person assisting the voter must take an oath that he or she will not try to influence the voter's vote and will mark the ballot as the voter directs. If the voter chooses to be assisted by polling place officials, poll workers and election inspectors may observe the voting process, but if the voter asks to be assisted by a person the voter chooses, no one else may watch him or her vote.

It is illegal for a person assisting the voter to:



- Try to influence the voter's vote; (Sec. §61.008)
- Mark the voter's ballot in a way other than the way they have asked; or (Sec. §61.009)
- Tell anyone how the voter voted.

**Voters May Use Interpreters at the Polls: Tex. Election Code Sec. §61.032 / §61.034 / §61.036**

Voters who cannot speak English, or who communicate only with sign language, may use an interpreter to help them communicate with election officials, regardless of whether the election official(s) attending to the voter can speak the same language as the voter. The voter may select any person other than the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs. If the voter cannot read the languages on the ballot, the interpreter may also assist by translating the language on the ballot for the voter in the voting booth. (See assistance section above for more details.) If the voter is deaf and does not have a sign language interpreter who can accompany them to help communicate with the poll worker or read the ballot, the voter should contact his or her local election officials before the election and request assistance. NOTE: This is a change in prior law, due to Court Orders issued on August 12 and 30, 2016

**Curbside Voting:Tex. Election Code Sec. §64.009**

If a voter is physically unable to enter the polling place, he or she may ask that an election officer bring a "touch access" voting machine to the entrance of the polling place or to a car at parked at the curbside. After the voter is done, they will give the voting machine to the election officer, who will take it back to the docking station.

TIP FOR VOTER WITH DISABILITY: If you plan to go alone to vote curbside, it is wise to call ahead so election officials will expect you. Generally speaking, you may vote curbside during the early voting period (the 17th day before Election Day until the 4th day before Election Day) or on Election Day. For a May uniform election date or resulting runoff election, the early voting period is the 12th day before Election Day until the 4th day before Election Day.

**Voters May Vote Early, Either in Person or by Mail**

Voters who vote during the early voting period may vote at any early voting site in the political subdivision that is holding the election. Alternatively, if a voter will be 65 years of age or older on Election Day, has a disability, or will be outside the county during early voting hours and on Election Day, the voter can apply to vote by mail. Simply submit a completed and signed Application for a Ballot by Mail any time from the 60th to the 11th day before Election Day to the proper county early voting clerk. Applications for a Ballot by Mail may also be submitted in person at the main early voting polling location, as long as early voting by personal appearance is NOT taking place. For further information on voting early in person or by mail, including information on assistance in requesting, marking, or mailing a ballot by mail, please see our "Ballot by mail" or our "Polling Places" page. Or call us at (956) 544-0809

For additional information, contact:

<div align="center">

Secretary of State
Elections Division
P.O. Box 12060
Austin, Texas 78711-2060
512.463.5650 or 1.800.252.VOTE (8683)
Fax 512.475.2811, TTY 7.1.1

Disability Rights Texas
Voting Rights Project for Voters with Disabilities
2222 West Braker Lane

</div>




Enable Google Translate

Austin, TX 78753
1-888-796-VOTE (8683) (V/TTY)
Fax: 512-323-0902
http://www.disabilityrightstx.org/contact/

Coalition of Texans with Disabilities
316 W. 12th Street, Suite 405
Austin, Texas 78701
Phone: (512) 478-3366
Fax: (512) 478-3370
e-mail: cotwd@cotwd.org

Texas Council for Developmental Disabilities
6201 E. Oltorf St., Ste. 600
Austin, TX 78741-7509
Phone: 512-437-5432
Toll-Free: 1-800-262-0334
Email: tcdd@tcdd.texas.gov

# We Welcome Your Feedback

If you have difficulty accessing information on our website because of a disability, please contact us. Be sure to include the information below, so that we may contact you to provide the information in another format.

Your name:
Email address:
Phone number:
URL (web address) of the material you tried to access:
The problem you are experiencing:

Attention to:
Salvador Hernandez Jr; Elections Analyst
Email: elections@co.hidalgo.tx.us
Phone number: 956-318-2570



# EXHIBIT 54

**Second Expert Report Submitted in**

*Houston Area Urban League v. Abbott,*

**No. 5:21-cv-00848-XR (W.D. Tex. 2021)**

Daniel A. Smith, Ph.D.*

April 22, 2023

(CORRECTING SECTIONS II, IV.1, V.1, VI, and VII

OF REPORT DATED February 9, 2023)

---

*Professor, Political Science, University of Florida, and President, ElectionSmith

1

# Contents

I Purpose of Engagement **3**

II Summary of Findings (CORRECTED) **4**

III Data Relied Upon in this Report **6**

   III.1 The Texas Statewide Voter File and Hispanic Surname . . . . . . . . . . . . 7

   III.2 Absentee Ballot Files from the March 1, 2022 primary election . . . . . . . 8

   III.3 Linking the Three Statewide Absentee Ballot Files to the Statewide Voter File 11

   III.4 U.S. Census Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

   III.5 Counts of Rejected Absentee Ballot Applications and Rejected Absentee Ballots 14

   III.6 Rates of Rejected Absentee Ballot Applications and Rejected Absentee Ballots 17

IV *Rejected Absentee Ballot Applications* in the March 2022 primary election **18**

   IV.1 Rejected Absentee Ballot Applications for Hispanic Voters (CORRECTED) . 18

   IV.2 Rejected Absentee Ballot Applications for Black Voters . . . . . . . . . . . 21

V *Rejected Absentee Ballots* in the March 2022 Primary Election **26**

   V.1 Rejected Absentee Ballots for Hispanic Voters (CORRECTED) . . . . . . . 27

   V.2 Rejected Absentee Ballots for Black Voters . . . . . . . . . . . . . . . . . 32

VI A Majority of Registered Voters whose Absentee Ballot Applications were Rejected Did Not Cast a Valid Ballot in the March 2022 Primary Election (CORRECTED) **37**

VII Conclusion (CORRECTED) **40**

VIII Appendix **43**

   VIII.1 *Curriculum vitae* of Daniel A. Smith (Updated) . . . . . . . . . . . . . . . 43

# I   Purpose of Engagement

**1**     Counsel for the Plaintiffs in *Houston Area Urban League v. Abbott*, No. 5:21-cv-00848-XR (W.D. Tex. 2021), have engaged me to form expert opinions on several items related to the impact on Texas voters of Texas' Senate Bill 1 (hereafter S.B. 1), signed into law on September 7, 2021 by Governor Greg Abbott, and in particular assess whether certain provisions of the law have had disproportionately adverse effects on Black and Hispanic registered voters in Texas.

**2**     I have authored two other reports in this litigation: 1) an Expert Report dated February 28, 2022 (which was corrected on May 13, 2022); and 2) a Supplemental Report dated April 29, 2022.

**3**     In this Second Expert Report, I address additional data provided to me by counsel after I submitted my earlier reports. Specifically, in this report I analyze three data files containing voter-level information: 1) a file with absentee ballot requests that were rejected in the March 1, 2022 primary election; 2) a file with returned absentee ballots that were rejected in the March 1, 2022 primary election; and 3) a file with absentee ballots requests that were accepted as valid in the March 1, 2022 primary election. In Texas, an absentee ballot is often referred to as a "Ballot By Mail," or BBM. In this report, I continue to use the term absentee ballot when referring to a BBM.

**4**     In formulating my opinions, I utilize the same methods as in my earlier reports. These methods are informed by standard sources and methodologies used in political science analyses. My background and qualifications are included in my February 28, 2022 Expert

Report. My updated curriculum vitae, which lists prior cases in which I have been retained as an expert, are included in the Appendix. My rate of pay continues to be $500 per hour. My compensation is contingent neither on the results of the analyses described herein nor on the contents of my report.

**5**    I reserve the right to supplement my analysis upon obtaining additional data through discovery or other means, including issues related to the March 1, 2022, statewide primary election, the November 8, 2022 General Election, or other Texas elections.

## II    Summary of Findings (CORRECTED)

**6**    My analysis in this Second Expert Report reinforces the conclusion in my initial Supplemental Report. With data from over half of Texas' 254 counties, I find that S.B. 1 negatively affected the ability of Black and Hispanic registered voters in Texas to request or cast a valid absentee ballot in the March 1, 2022 primary election.

**7**    Across the State of Texas, over 75% of all on-time absentee ballot applications that were rejected by county Signature Verification Committees (SVCs) and Early Voting Ballot Boards (EVBBs) in the March 1, 2022 primary election were rejected due to S.B. 1's new personal identification requirements.

**8**    Over 77% of voters with Hispanic surnames who submitted on-time absentee ballot applications in the March 1, 2022, primary election had their applications rejected by county election officials due to S.B. 1's new personal identification regulations. In addition, Census

4

blocks with higher percentages of Black Voting Age Population (VAP) had higher rejection rates of timely absentee ballot applications than voters in other Census blocks.

**9**     Across the State of Texas, Black and Hispanic voters were more likely than other voters to have their on-time absentee ballots rejected by SVCs and EVBBs in the March 1, 2022, primary election.  Nearly 17% of all absentee ballots cast by voters with Hispanic surnames had their absentee ballots rejected by county election officials, and Census blocks with higher percentages of Black VAP had greater rejection rates of absentee ballots than other Census blocks.  The preponderance of these rejected absentee ballots across the state were the result of S.B. 1's new personal identification requirements.

**10**     S.B. 1 increases the cost of voting for all voters in Texas, but particularly for Black and Hispanic voters who tried to request or cast absentee ballots in the March 2022 primary election.  Restrictions put in place by S.B. 1, specifically the law's ID-match requirements for voters requesting and casting absentee ballots, led to abnormally high rejection rates of both absentee ballot requests and returned absentee ballots in the 2022 March primary election for Black and Hispanic voters.

**11**     Of the thousands of registered voters in Texas who had their on-time absentee ballot applications rejected prior to the March 1, 2022 primary election, nearly three-fifths of these registered voters who unsuccessfully tried to request absentee ballots did not cast valid ballots by any method (absentee or in person) in the election.  Nearly 60% of registered voters with Hispanic surnames who had their on-time absentee ballot applications rejected did not vote in the election, despite clearly expressing their interest to vote by trying (unsuccessfully) to request an absentee ballot.  These eligible voters did not instead vote in-person ballots after

5

their applications for absentee ballots were denied by SVCs and EVBBs, belying the notion that voters can easily "substitute" one mode of voting for another mode when confronted with institutional barriers.

# III   Data Relied Upon in this Report

**12**      I rely on several data sources in this report.  Some are the same as the ones used in my previous reports; others have been recently provided to me by counsel.[1]

---

[1] On February 2, 2023, counsel provided several files from Harris County, including some with voter-level data.  One of these files, "Tatum _005208 1122 By Mail Ballot List – Public.xls", contains 83,853 records which appear to be absentee applications in the November 2022 election.  The number of records in the file is close to the number of absentee ballot applications reported in "Tatum _005209-005262 November _2022 _Post _Election _Assessment _and _Attachments.pdf", which is also included in the February 2, 2023 production from Harris County.  Unfortunately, the "Tatum _005208 1122 By Mail Ballot List – Public.xls" file does not include a field with VUID numbers.  In addition, there is a field in the file that is labeled "ABS _TYPE".  This field contains 13 codes, 80,134 of which are "RM."  The remaining 3,719 codes in the "ABS _TYPE" field appear to correspond mainly with overseas ballots and military ballots (although they are only two characters, not three; but the field does not appear to contain any codes concerning rejected absentee applications (or rejected ballots).  Furthermore, there are no codes in the "ABS _TYPE" field that are linked to the county's S.B. 1 absentee application or ballot rejection codes, which are listed in another pdf file provided in the production, "Tatum _005263-005264 BBM Apps and Returned Statuses Codes.pdf", such as "E3" or "E7" (which are evidently 2 of the 5 codes the county uses for S.B. 1 rejections).  Due to these data limitations, I am not able to provide any analysis concerning absentee ballot applications or absentee ballots cast that were rejected for Harris County in the November 2022 General Election.

## III.1   The Texas Statewide Voter File and Hispanic Surname

**13**     As in my earlier reports, I rely on what I refer to as the statewide Texas voter file, also known as the statewide "Voter registration list."[2]  The Texas voter file is comprised of 254 county-level files.

**14**     As in my earlier reports, I again rely upon two snapshots of the statewide Texas voter files for this report.  One lists registered voters in the state as of January 10, 2022; the other lists registered voters as of April 11, 2022.  The January 10, 2022 voter file was made available to me by counsel and I obtained the April 11, 2022 voter file in the course of my academic research.

**15**     In both of the statewide voter files, every registered voter has a unique voter ID, a ten-digit voter identification numbers, called a VUID. For each voter, the January 10, 2022 statewide voter file contains fields with voter-level demographics, including age and gender, and other voter-level features like mailing addresses, county of registration, assigned precinct, and whether the voter has a Hispanic surname.[3]  The April 11, 2022 statewide

---

[2]See "VOTER REGISTRATION PUBLIC INFORMATION REQUEST FORM," Texas Secretary of State, available at `https://www.sos.state.tx.us/elections/forms/pi.pdf` (last accessed January 21, 2023).

[3]Hispanic (Spanish) surnames are flagged on the statewide voter file by the Texas Department of State.  For a list of Hispanic surnames, see U.S. Census Bureau, "Decennial Census Surname Files," available `https://www.census.gov/data/developers/data-sets/surnames.html` (last accessed January 26, 2023).  When compared to the U.S. Census Bureau's American Community Survey, as of November 2020, the percent of registered voters with a Hispanic surname in Texas is less than the share of the state's Hispanic Citizen Voting Age Population (CVAP). See U.S. Census Bureau, "Citizen Voting Age Population by Race and Ethnicity," American Community Survey (ACS) 5-year es-

voter file contains the same fields for each voter except the field for whether the voter has a Hispanic surname. Instead of Hispanic surname, the April 11, 2022 statewide voter file contains a field for a voter's method of voting in the March 1, 2022 primary election.

**16**     Expanding the coverage of my April 29, 2022 Supplemental Report, which analyzed the rejections of absentee ballots in five counties in the March 2022 primary election—Harris, Dallas, Tarrant, El Paso, and Hidalgo—this report accounts for most of the state's Black and Hispanic VAP.[4] The data analyzed in this report provide further evidence of S.B. 1's disparate impact on Black and Hispanic voters across the State of Texas when it comes to applying for and returning valid absentee ballots.

## III.2   Absentee Ballot Files from the March 1, 2022 primary election

**17**     I also received data files from counsel that contain voter-level records concerning absentee ballots in the March 2022 primary election. These files are contained in two folders: "PIR 22-0331 - Batch 1" and "PIR 22-0331 - Batch 2." It has been represented to me by counsel that these absentee ballot voter files were generated by the Office of the Texas Secretary of State. This report draws on data contained in three Excel files in the two folders, which I describe below.

---

timates, 2015-2019, available `https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.html` (last accessed February 26, 2022).

[4]As detailed in my previous report, these five counties already accounted for 38.05% of the state's total VAP, including 45.73% of the state's Hispanic VAP and 52.05% of the state's overall Black VAP.

**18**     Table 1 provides a summary of the raw count of the number of counties and rows (or lines) in each of three Excel files contained in the folders "PIR 22-0331 - Batch 1" and "PIR 22-0331 - Batch 2." The table also offers a raw count of the number of on-time applications or ballots received in each Excel file, and the number of applications or ballots that were received on time with a unique VUID in each Excel file. In what follows, I provide details about how these three Excel files were processed to be able to conduct the analysis in this report.

Table 1: Summary details on PIR 22-0331 files

| File type | Counties | Lines | On time | On time, unique VUID |
|---|---|---|---|---|
| Rejected application | 166 | 12,613 | 8,643 | 8,197 |
| Rejected ballot | 181 | 24,587 | 22,834 | 22,808 |
| Accepted ballot | 252 | 174,007 | 174,007 | 173,638 |

**19**     Folder "PIR 22-0331 - Batch 2" includes an Excel spreadsheet that contains voter-level data that records, among other information, voters whose absentee ballots were accepted in the March 2022 primary election. I refer to this Excel file, "4-Individual-Mail-Ballot-Accepted.xlsx," as the "*Accepted Ballot* file." It contains 174,007 individual-level records of voters who cast valid absentee ballots across 252 counties in the March 2022 primary election.[5]

**20**     Folder "PIR 22-0331 - Batch 1" includes an Excel spreadsheet that contains voter-level data that records, among other information, voters whose absentee ballot applications were rejected, and the reason they were rejected, in the March 2022 primary election. I refer to this Excel file, "2-Individual-Mail-Application-Rejected.xlsx," as the "*Rejected Application*

---

[5]The two missing counties in "4-Individual-Mail-Ballot-Accepted.xlsx" are Hudspeth and Kent.

file." It contains 12,613 individual-level records of voters whose absentee ballot applications were rejected across 166 counties in the March 2022 primary election. It includes 3,970 individual rows of data with applications that were not timely, that is, that were either received too early or too late to be processed by county election officials.[6]

21      I note here that of the 252 counties included in the Accepted Ballot file that identify voters who cast valid absentee ballots in the March 2022 primary election, there are 86 counties that have no voters listed in the Rejected Application file. Since it is my understanding that these data were produced by the Texas Secretary of State, I assume, conservatively, that none of these 86 counties rejected a single absentee ballot application ahead of the March 1, 2022 primary election (although it is certainly possible that county officials simply did not report to the Secretary of State that they had rejected some absentee ballot applications).

22      Folder "PIR 22-0331 - Batch 2" includes another Excel spreadsheet that contains voter-level data recording voters whose absentee ballots were rejected, and the reason they were rejected, for the March 2022 primary election. I refer to this file, "3-Individual-Mail-Ballot-Rejected.xlsx," as the "*Rejected Ballot* file." It contains 24,587 individual-level records of voters whose absentee ballots were rejected across 181 counties in the March 2022 primary election.[7] My analysis screens out slightly over 1,700 records in the Rejected Ballot file of

---

[6]In addition, the file contains over 390 lines that have a duplicated VUID. There are 22 VUIDs listed in two rows, and one VUID listed in three rows. In addition, there are 9 rows with a VUID listed as a "0." My analysis eliminates duplicated records.

[7]This file includes data from the five counties that I analyzed in my previous Supplemental Report. The data, as with the other absentee files analyzed in this report, are represented to me by counsel as having been provided by the

voters whose absentee ballots that were rejected by county officials because their ballot was received after the State of Texas' absentee ballot deadline as well as unique VUID records that were duplicated in the file.

**23**     I note here that of the 252 counties included in the Accepted Ballot file that identify voters who cast valid absentee ballots in the 2022 March primary election, there are 71 counties that have no voters listed in the Rejected Ballot file. I assume, conservatively, that this is because none of these 71 counties rejected a single absentee ballot in the March 1, 2022 primary election (although it is certainly possible that county officials simply did not report to the Secretary of State that they had rejected some absentee ballots).

**24**     My analysis relies on voter-level records in these three data files to determine the count and rates of mail ballot applications that were rejected, as well as the count and rates of returned absentee ballot envelopes that were rejected in the March 2022 primary election for Black and Hispanic voters, as well as other voters. I also rely on these files to determine the count and rejection rate of absentee ballot applications and returned absentee ballots due to S.B. 1 in the March 2022 primary election. In order to conduct this analysis, I need to be able to link these files to the statewide voter file, a process by which I describe next.

## III.3   Linking the Three Statewide Absentee Ballot Files to the Statewide Voter File

**25**     As mentioned above, the Texas voter file is indexed by ten-digit voter identification numbers, known as VUIDs. Since voters in the three absentee files on which I drawn

---

Texas Secretary of State.

upon for this report (the Rejected Applications File, the Rejected Ballot file, and the Accepted Ballots File) contain a voter's VUID, I am able to directly link voters who requested or cast an absentee ballot, as recorded in a county's absentee file, with the voter's record in the Texas voter file by his or her VUID.

26      As I discuss in my previous reports, when matching individual-level records across files, such as snapshots of statewide voter files, there is invariably some slippage when it comes to coverage of all registered voters in Texas at any one moment in time. In addition, as I detail in my previous Supplemental Report, not all of the voter-level data the counties provided to counsel had the state VUID, thus requiring a matching algorithm to link voters in the absentee files to the statewide voter file.

27      Because I am using newly acquired data files containing absentee ballot applications and absentee ballots rejected and accepted, which I understand were created by the Texas Secretary of State (and provided to me by counsel), the counts (and rates) of absentee ballot applications and absentee ballots cast and rejected in counties included in this report do not exactly match the counts presented for the five counties I analyze in my April 29, 2022 Supplemental Report.[8]  The two batches of "PIR 22-0331" productions containing absentee data files that I rely upon in this report mostly include VUID numbers, and as such, I am able to directly link individuals in these files to their VUID in the Texas voter file.  For

_____

[8]For example, the counts of absentee ballots cast and rejected presented for Harris County in this report are not precisely the same as in those offered in my previous report. As noted in my previous report, the March 2022 primary election absentee file provided by Harris County did not include VUID numbers. In my previous Supplemental Report, I conducted an exact match of registered voters in the statewide voter file and a county's absentee file to link voters across the two datasets.

example, in the Rejected Ballot file, there are three voters who have a unique VUID who are not are not listed in the April 2022 statewide voter file as having cast absentee ballots that were received in the election. In the analysis that follows, I only count a voter as having cast a rejected absentee ballot if the voter is located in both the statewide voter file as having cast an absentee ballot and is located in the Rejected Ballot file.

28      In Table 2, I provide a summary of the processed voter-level records in the three absentee data files in the two "PIR 22-0331" folders upon which I rely in this report. The table provides a count of the unique VUIDs in each of the three data files, and the number of voters in these files that I am able to link with their unique VUIDs to the statewide voter file to obtain those with a Hispanic surname. As discussed in detail below, I process the raw data in the Rejected Application file, the Rejected Ballot file, and the Accepted Ballot file in order to reconcile missing data, duplicate VUIDs, timely applications and requests, cured applications, and inconsistencies across data files, which results in a lower overall count of rejected applications and rejected ballots than is found in the original Excel files, producing a more conservative analysis.

29      In addition, in the final column of Table 2, I provide a count of the number of absentee applications and absentee ballots, respectively going down the column, of registered voters linked to the statewide voter file with a Hispanic or non-Hispanic surname as well as a count of registered voters who had their absentee applications or ballots rejected in the March 2022 primary election due to the new personal ID restrictions S.B. 1.

Table 2: PIR 22-0331 production summary

| File type | Lines | Unique VUIDs | Hispanic link | SB 1 |
|---|---|---|---|---|
| Rejected application | 8,197 | 8,197 | 8,150 | 6,172 |
| Rejected ballot | 22,808 | 22,808 | 22,705 | 19,361 |
| Accepted ballot | 173,638 | 173,638 | 172,706 | |

## III.4   U.S. Census Data

**30**     As in my earlier Supplemental Report, I rely on U.S. Census data for my analyses. Specifically, I rely on 2020 Census Block Assignment Files for the State of Texas, drawing on the demographic (race and ethnicity) data in each Census block which I am able to then align with a county's 2022 precincts. I downloaded these data files from the State of Texas' Capitol Data Portal.[9]

## III.5   Counts of Rejected Absentee Ballot Applications and Rejected Absentee Ballots

**31**     Before proceeding with my analysis of rejected absentee ballot applications and rejected absentee ballots, and the impact of S.B. 1 in the March 2022 primary election on absentee rejected applications and rejected ballots, a few definitions are necessary to explain how I arrive at the counts and rates of rejected absentee ballot applications and rejected absentee ballots cast.

---

[9]See "2020 General Election VTDs (2020 Census)," "VTDs20G_2020.zip," available `https://data.capitol.texas.gov/dataset/vtds` (last accessed January 21, 2023), and "2020 Census Geography," "Blocks.zip," available `https://data.capitol.texas.gov/dataset/2020-census-geography/resource/5338bb0a-aac3-463f-aac2-c0980f745bb8` (last accessed February 21, 2022).

**32**     In order to determine if a voter's absentee ballot application or absentee ballot cast was rejected in the March 2022 primary election, I rely on the codes entered in the "REJECT_REASON STATUS" field that is included in both the Rejected Application file and the Rejected Ballot file.

**33**     In determining if an absentee ballot application or an absentee ballot was rejected due to S.B. 1, I take a conservative approach.  Under S.B. 1, voters who fill out an application to request an absentee ballot and voters who vote an absentee ballot in a return envelope must provide precise personal information: their driver's license number, election identification certificate number, personal identification card number, or the last four digits of their Social Security number (hereafter "personal IDs").  They must do so both on their absentee ballot request forms and on their absentee mail ballot carrier (return) envelopes, located on the back of the envelope underneath the security flap.  The personal ID numbers provided by voters on absentee ballot application forms and on return absentee ballot envelopes must match the information on their registration records administered by their local election officials.

**34**     I then take the following steps to determine if registered voters 1) who applied for absentee ballots; or 2) had returned their absentee ballot envelopes, had their applications or ballots rejected by their county elections officials due to S.B. 1, respectively.  I understand the following three codes in the "REJECT_REASON STATUS" field of the Rejected Application file to indicate that a voter's application for an absentee ballot was rejected due to S.B. 1:  "Incorrect/Missing SSN/TDL-Online Cure Available," "Incorrect/Missing SSN/TDL-Final Rejection," and "No TDL/SSN in VR Record."  I understand the following four codes in the "REJECT_REASON STATUS" field of the Rejected Ballot file to indicate that a voter's absentee ballot was rejected due to S.B. 1:  "INCORRECT OR MISSING

SSN / TDL - BALLOT RETURNED/MAILED TO VOTER," "INCORRECT OR MISS-
ING SSN / TDL # - FINAL REJECTION," "INCORRECT OR MISSING SSN / TDL
- ONLINE CORRECTION AVAILABLE," and "SVC/EVBB - INCORRECT/MISSING
SSN/TDL/ONLINE CURE AVAILABLE."

**35**    I take a conservative approach when processing the raw data in the Rejected
Application file. First, I eliminate voters whose unique VUID is found in either the Accepted
Ballot or the Rejected Ballot files.  Logically, these voters were able to cure their ballot
applications and ultimately did not have a rejected application, even if they may have been
burdened by the provisions of S.B. 1.  I then link the registered voters remaining in the
Rejected Application file, using their unique VUIDs, to the statewide voter file so as to
identify voters with Hispanic surnames and those who are not Hispanic.  I then eliminate
those remaining in the Rejected Application file whose applications for absentee ballots were
received outside of the permitted window prior to the March 1, 2022 primary election.[10]  I
rely on this same conservative logic when processing rejected absentee ballots in the Rejected
Ballot file.

---

[10]This is a conservative methodology as it necessarily reduces the raw number
of cases by eliminating from the count any duplicate VUIDs found in the
Rejected Application file, VUIDs that are found in the Accepted Ballot and
Rejected Ballot files, VUIDs not found in the statewide voter file, VUIDs
whose absentee ballot applications were identified by local elections officials
as coming too early or late (for example, the ballot application codes in the
"REJECT_REASON STATUS" field of the Rejected Application file were "Not
received before deadline" or was "Received 60 days before Election Day"; these
applications were rejected because they were not timely, and thus cannot be
evaluated if they violated S.B. 1's provisions).

## III.6   Rates of Rejected Absentee Ballot Applications and Rejected Absentee Ballots

**36**     When calculating the rate of rejected absentee applications, the numerator includes the set of unique voters in the Rejected Application file who had their applications rejected by county election officials, whose application request was timely, who did not cast an absentee ballot in the election (accepted or rejected), and whose VUID can be linked to the statewide voter file to identify them as Hispanic or not Hispanic. The denominator includes this set of voters who had their absentee ballot applications rejected, as well as those voters who successfully applied for an absentee ballot, and who then cast absentee ballots (either accepted or rejected) in the March 2022 primary election, and whose VUID can be linked to the statewide voter file.

**37**     When calculating the rate of rejected absentee ballots, the numerator includes the set of unique voters in the Rejected Ballot file who had their absentee ballot rejected by county election officials, whose return ballot envelope was timely, who did not cast an in-person ballot in the election according to the statewide voter file, and whose VUID can be linked to the statewide voter file to identify them as Hispanic or not Hispanic. The denominator includes voters who cast absentee ballots (either accepted or rejected) in the March 2022 primary election and whose VUID can be linked to the statewide voter file.[11]

---

[11]In cases where a voter has duplicate records in the Rejected Ballot file and the Accepted Ballot file, I privilege the accepted absentee record in order to eliminate any initially "rejected" ballots that were successfully cured by the voter. This is a conservative approach, as I do not double-count an initial rejection as being rejected if it was eventually accepted according to the Accepted Ballot file.

# IV  *Rejected Absentee Ballot Applications* in the March 2022 primary election

**38**    As detailed above, when determining the count of absentee ballots applications rejected and the application rejection rates for Hispanic and Black voters in Texas in the March 2022 primary election, as well as the share of absentee ballot applications that were rejected due to S.B. 1, my analysis draws on the "2-Individual-Mail-Application-Rejected.xlsx" (the Rejected Application file), and also necessarily on data from the Rejected Ballot file, the Accepted Ballots file, the statewide voter file, and Census block data.

## IV.1  Rejected Absentee Ballot Applications for Hispanic Voters (CORRECTED)

**39**    Following the logic as stated above, I take a conservative approach to determine the count of ballots and the absentee ballot application rejection rates in the March 2022 primary election for voters with Hispanic and non-Hispanic surnames. By merging the Rejected Application file with the statewide voter file, I am able to determine whether voters who had their applications rejected are tagged in Texas's statewide voter file as having a Hispanic surname or not. Using this information from the voter file, I separate Hispanic and non-Hispanic absentee voters into two bins, calculating the overall number of absentee ballot applications that were rejected, as well as the number of absentee ballot applications that were rejected due to S.B. 1 for both groups.

**40**    Columns 2 and 3 in Table 3 provide counts of the number of timely absentee ballot applications for applicants who could be linked to the statewide voter file that were rejected, as well as the number of applications that were rejected due to S.B. 1, for voters

18

identified as not having or having Hispanic surnames as well as all voters. Column 4 ("Ballots Received" provides the overall counts of the number of absentee ballots that were received by county election officials, which includes timely absentee ballots that were accepted and rejected. Column 5 ("Total") counts the number of absentee ballot applications that were rejected as well as absentee ballots that were cast (accepted or rejected). The final two columns of Table 3 provide the rates of all rejected absentee ballot applications out of all absentee ballots that were rejected as well as cast (rejected and received), and lastly, the similar rejection rates of absentee ballot applications that were rejected due to S.B. 1.

Table 3: Absentee applications and received absentee ballots in the March 2022 primary

| | Application rejections | | Ballots | | Rejection percent | |
|---|---|---|---|---|---|---|
| Voters | All | SB 1 | received | Total | All | SB 1 |
| **Non-Hispanic** | 7,267 | 5,460 | 168,183 | 175,450 | 4.14 | 3.11 |
| **Hispanic** | 883 | 680 | 27,226 | 28,109 | 3.14 | 2.42 |
| **All** | 8,150 | 6,140 | 195,409 | 203,559 | 4.00 | 3.02 |

**41**    As shown in Table 3, in the March 2022 primary election, some 8,150 absentee ballot applications that were received by counties from registered voters that were on time, but were rejected for one reason or another by SVCs and EVBBs. Some 6,140 of these timely applications were rejected due to S.B. 1 requirements, accounting for over 75% of all applications rejected.

**42**    The final two columns in Table 3 report the counts and the percents of all absentee ballots (rejected applications or received ballots (accepted and rejected)) due to the S.B. 1's added personal ID requirements in the March 2022 primary election. As the bottom row of the table reveals, rejected applications that were received in time to be processed by county election officials accounted for 4.00% of all timely absentee ballots applied for and

19

eventually cast (accepted or rejected) in the March 2022 primary election.  In the March 2022 primary election, the percentage of on-time ballot applications that were rejected due to S.B. 1 accounted for 3.02% of all timely absentee ballot applications as well as all of the absentee ballots that were eventually cast (accepted or rejected) in the election.[12]

**43**     As shown in Table 3, voters with Hispanic surnames had a slightly lower rejection rate (2.42%) of timely absentee ballot applications out of all absentee ballot applications rejected and absentee ballots received (accepted or rejected) than those with non-Hispanic surnames (3.11%) in the March 2022 primary election.  However, it is important to note that the non-Hispanic category includes registered voters of all other racial and ethnic groups.  It is also important to note that at least two counties with high rates of Hispanic registered voters, El Paso County and Hidalgo County, are not included in the Rejected Application file, although they are included in the Rejected Ballot File as well as in the statewide April voter file recording absentee ballots received (accepted and rejected) in the election).

**44**     The data reported in Table 3 also allow me to assess the impact of S.B. 1 on the rejection of absentee ballot applications for Hispanic voters in the March 2022 election. Although the overall rejection rate of applications (out of all absentee ballot requests that were rejected and all received absentee ballots (accepted or rejected)) for Hispanics was slightly lower than for non-Hispanic voters, the data reveal that voters with Hispanic surnames were more likely to have their on-time absentee ballot applications rejected due to SB 1's ID-match requirements compared to other voters.  Over 77% (680 out of 883) voters with

---

[12]To my knowledge, the State of Texas has not produced data on voters who successfully applied for absentee ballots but did not vote their absentee ballots in the election.

Hispanic surnames who had their on-time absentee ballot applications rejected, had them rejected due to S.B. 1's new personal ID requirements. The rejection rate of absentee ballot applications that were rejected due to S.B. 1 among voters with non-Hispanic surnames was 75% (5,460 out of 7,267), which was less than the rate for voters with Hispanic surnames.

## IV.2   Rejected Absentee Ballot Applications for Black Voters

**45**      In contrast to having a field for Hispanic surname, Texas' statewide voter file does not include a code for whether a voter identifies as Black. As such, in order to assess the impact of S.B. 1 on absentee ballot request by Black voters across the State of Texas in the 2022 primary election, I rely on regression analysis. Because neither the statewide voter file nor the Rejected Applications file for the March 2022 primary election identify the race of the voter, I geocode the addresses of all registered voters in the April 2022 voter file into Census blocks—the smallest geographic unit established by the U.S. Census Bureau. The batch geocoding process follows the suggestions of the U.S. Census Bureau. The most recent U.S. Census address features data were used to do the geocoding in ArcGIS, and I obtained a 91.8 percent match rate; any voters with missing address or an address that did not match the Census data did not get geocoded and are not included in my analysis.

**46**      Census block data provide the racial and ethnic composition of the VAP in each Census block in Texas. By joining the geocoded voter file with the Rejected Ballot file for the March 2022 election, I am able to estimate whether voters registered in Census blocks with higher rates of Black VAP, according to 2020 data from the U.S. Census, were more likely to have their absentee ballots rejected than voters in other Census blocks.

**47**     Figure 1 plots the percentage of Black VAP in a Census block (X-axis) against the percentage of voters in that Census block who had their absentee ballot applications rejected out of all rejected applications as well as all absentee ballots received (accepted and rejected) by county election supervisors (y-axis) in the March 2022 primary election across Texas.[13] The weighted (by Census block VAP) regression line shows a positive relationship: the greater the rate of Black VAP in a Census block, the greater the rate voters' absentee ballot applications were rejected.  In Census blocks with no Black VAP, roughly 5% of absentee ballot requests were rejected out of all rejected absentee applications and absentee ballots cast; in contrast, in Census blocks with nearly all-Black VAP, roughly 10% of absentee ballot applications were rejected.

---

[13]Of the 166 counties in the Rejected Application file, 154 reported at least one voter who had a timely absentee ballot application that was rejected.  To be conservative, I include in the denominator all the absentee ballots cast in the counties that reported not rejecting a single absentee ballot application.  For visual clarity, the figure screens out any Census blocks that had fewer than 20 absentee ballots cast (accepted or received) in the March 2022 primary election.

Figure 1: Percent Black Voting Age Population and Percent Rejected Absentee Ballot Applications, by Census Block, March 2022 Primary Election



*Note: Each circle denotes a Census block in Texas, and each circle is sized proportionately to the VAP in each Census block. Weighted regression line is shown in grey.*

23

**48**     Figure 2 plots the percentage of Black VAP in a Census block (X-axis) against the percentage of voters in that Census block who had their absentee ballot applications rejected due to S.B. 1 out of all rejected absentee ballot applications as well as all absentee ballots received (accepted and rejected) by county election supervisors (y-axis) in the March 2022 primary election across Texas.[14]  Here, the weighted (by Census block VAP) regression line is slightly negative, indicating that the greater the rate of Black VAP in a Census block, the lower the rate voters' absentee ballot applications were rejected.  In Census blocks with no Black VAP, roughly 4% of absentee ballot requests out of all absentee rejected applications and absentee ballots cast were rejected due to S.B. 1, whereas those Census blocks with nearly all-Black VAP had roughly 2% of absentee ballot applications rejected due to S.B. 1.

---

[14]Again, I include data for all 166 counties in the Rejected Application file, even though some did not report any rejected applications.  For visual clarity, the figure screens out any Census blocks that had fewer than 20 absentee ballots cast (accepted or received) in the March 2022 primary election.

Figure 2: Percent Black Voting Age Population and Percent Rejected Absentee Ballot Applications due to S.B. 1, by Census Block, March 2022 Primary Election



*Note: Each circle denotes a Census block in Texas, and each circle is sized proportionately to the VAP in each Census block. Weighted regression line is shown in grey.*

# V   *Rejected Absentee Ballots* in the March 2022 Primary Election

**49**     I now turn to return absentee ballots that were rejected in the March 1, 2022 primary election. As reported by the Associated Press two weeks after the election, across 187 of Texas' counties roughly 23,000 absentee ballots, or 13% of all absentee ballots cast, were rejected in the March 1, 2022 primary election.[15] The AP report was based on final vote reconciliation reports provided by the 187 counties that responded to the AP's requests. The AP's analysis, however, did not use individual-level data, and as such, was unable to identify the absentee ballot rejection rates for voters of different racial and ethnic identities, nor identify the share of absentee ballots that were rejected due to the new personal IDs requirements of S.B. 1.

**50**     To determine the number of absentee ballots rejected and the rejection rates for Hispanic and Black voters in Texas in the March 2022 primary election, as well as the share of absentee ballots that were rejected due to S.B. 1, I analyze data from the Rejected Absentee Ballots File and the Accepted Ballots file, as discussed earlier.

**51**     To preview my findings, I show that absentee ballots cast by Hispanic and Black voters were disproportionately rejected at a higher rate than those cast by white voters in the state's the March 2022 primary election, and that S.B. 1 accounted for most of these rejections. My analysis also shows that absentee ballot rejection rates in the election were

---

[15]"Texas mail ballot rejections soar under new restrictions," *AP News*, March 16, 2022, available `https://tinyurl.com/mu4kwzjk` (last accessed January 27, 2023.

largely a function of SB 1's ID-match requirements.

## V.1 Rejected Absentee Ballots for Hispanic Voters (COR-RECTED)

**52** I begin my analysis by examining the raw count of absentee ballots cast by Hispanic (and non-Hispanic) voters in the March 2022 primary election across the 181 counties for which I have data, the raw count and percent of absentee ballots that were rejected for each group of voters, and the raw count and percent of absentee ballots that were rejected due to S.B. 1 for each group of voters. My analysis of rejected absentee ballots excludes those that were later cured by a voter.

**53** As can be seen by going down the first column ("Total") of Table 4, the data from the absentee ballot files (joined with the statewide voter file) accounts for a total of 27,343 absentee ballots cast by Hispanic voters and 169,791 absentee ballots cast by non-Hispanic voters in the March 2022 primary election. In all, drawing on data in the Rejected Ballot file and the Accepted Ballots file, I am able to link 197,134 voters (27,343 + 169,791) who cast an absentee ballots to the statewide voter file.

**54** As detailed in columns 2 and 3 of Table 4, of the 27,343 absentee ballots cast by Hispanic voters in the election across the 181 counties included in my analysis, 4,531—some 16.57% of all absentee ballots cast—were rejected in the March 2022 primary election. Furthermore, as columns 4 and 5 report, some 3,266 rejected absentee ballots of the 27,343 absentee ballots cast by Hispanic voters in the primary election—nearly 12%—were rejected due to the new requirements of S.B. 1.

Table 4: Absentee ballot rejection by ethnicity, 2022 Primary

| | Absentee Ballots | | | | |
| Total | Rejected | % | SB1 | % |
|---|---|---|---|---|
| **Hispanic** | | | | |
| 27,343 | 4,531 | 16.57 | 3,266 | 11.94 |
| **Non-Hispanic** | | | | |
| 169,791 | 19,897 | 11.72 | 16,021 | 9.44 |

**55**    In contrast, as reported across the bottom row of columns 1-3 of Table 4, of the 169,791 absentee ballots cast by non-Hispanic voters in the election across the 181 counties included in my analysis, 19,897—or less than 12%—were rejected in the March 2022 primary election. Less than 10% of rejected absentee ballots cast by non-Hispanic voters (16,021 out of 169,791) were rejected due to the new requirements of S.B. 1, as reported in columns 4 and 5.[16]

**56**    It is important to note that the data reported in Table 4, which relies on the Rejected Ballot file to account for the number and rate of rejected absentee ballots, likely undercounts the number of absentee ballots that were rejected due to S.B. 1 in the March 2022

---

[16]It is possible to look across the rows to ascertain the percentage of rejected absentee ballots that were rejected due to S.B. 1 for voters with and without Hispanic surnames. Across the 181 counties included in the Rejected Ballot file, 72.1% of the 4,531 rejected absentee ballots cast by voters with Hispanic surnames and 80.5% of the 19,897 rejected absentee ballots that were cast by non-Hispanic voters were rejected due to S.B. 1. However, as discussed below in footnote 17, the fraction of rejected absentee ballots that were rejected due to S.B. 1 likely undercounts rejected ballots of voters with Hispanic surnames. For example, rejected absentee ballots cast in Hidalgo County in the March 1, 2022 primary election are not included in the these totals, even though 83.4% (427 of the 512) rejected absentee ballots were rejected due to S.B. 1. (See Table 8 (p. 36) in my April 29, 2022 Report for details on rejected absentee ballots cast by voters with Hispanic and non-Hispanic surnames in Hidalgo County in the March 1, 2022 primary election.)

primary election across the 181 counties included in the data file. In my earlier Supplemental Report of April 29, 2022, I provided detailed information about the number of rejected absentee ballots in the March 2022 primary election for five counties.[17] However, so as to retain the integrity of the Rejected Ballot file used in this report, and because I have no way of knowing which dataset is authoritative, I have decided not to co-mingle data from individual counties provided to me by counsel that I use in my previous reports. As such, my findings analyzing the 181 counties that provided data on absentee ballot rejections that I use in this report are likely conservative.

**57**    In Table 5 I provide a breakdown of overall count of absentee ballots cast and rejected, and rejected due to S.B. 1, in the March 2022 primary election in the 10 counties with the most active registered voters. Column 2 ("Total") provides the count of absentee ballots cast by Hispanic voters (top) and non-Hispanic (bottom) voters, respectively. Column 3 ("Rejected") of Table 5 provides a count of the absentee ballots rejected in each of these counties. Column 4 ("%") provides the overall rejection rates of absentee ballots cast in each county for the March 2022 primary election.

**58**    As column 4 in Table 5 reports, the overall rejection rate of absentee ballots cast by Hispanics in the March primary was 20.71%, which was over 6.5 percentage points higher

---

[17]My April 29, 2022 report details the high rate of absentee ballot rejections due to S.B. 1 across the 5 counties, particularly for Hispanic voters. For example, as shown in Table 7 (p. 35) of my April 29, 2022 Supplemental Report, data that I analyzed from Hidalgo County (that was provided by counsel) reveals that 512 of the 532 (96.2%) absentee ballots rejected in the county in the March 2022 primary election were due to the S.B. 1's new requirements. Unfortunately, every record for voters registered in Hidalgo County in the the Rejected Ballot file used in this report has the same code in the "REJECT_REASON STATUS" field: "REQUIRED IDENTIFICATION NOT INCLUDED (12)."

than the rejection rate of non-Hispanic voters in Texas' 10 counties with the most active registered voters.  It is important to note that voters in the non-Hispanic group include registered voters who identify as Black, Asian-American, and other racial and ethnic groups.

**59**     Looking down column 4 ("%"), we can see that in 9 of the 10 counties the absentee ballot rejection rate in the March 2022 primary election was higher for voters with Hispanic surnames than for non-Hispanic voters.  In Bexar County, one out of every four Hispanic voters had their absentee ballots rejected in the election, which was more than 5 percentage points greater than the rate for non-Hispanic absentee voters in the county.  Over one-in-four Hispanic voters in Harris and Hidalgo counties had their absentee ballots rejected, and the rate was nearly that high for Hispanic voters in Fort Bend and El Paso counties.

**60**     The final two columns of Table 5 ("SB 1" and "%") report the count of absentee ballots in the primary election that were rejected due to the personal ID requirements of S.B. 1 and the rate of all absentee ballots cast across the top 10 counties that were rejected due to the new requirements, for Hispanic (top) and non-Hispanic (bottom) voters, respectively. For all the counties in the file that reported data (except Denton), the rejection rates of absentee ballots in the March primary election were higher for Hispanic voters than non-Hispanic voters. In nearly every county (the exception being Bexar), every (or nearly every) rejected absentee ballot was rejected due to the new S.B. 1 requirements.

**61**     I pause to note here that Table 5 reports no information concerning rejected absentee ballots in Hidalgo County in the March 2022 primary election due to the new S.B. 1 requirements. As mentioned previously, this is because every record in the Rejected Ballot file's "REJECT_REASON STATUS" field for voters registered in Hidalgo County has the

Table 5: Absentee ballot rejection by ethnicity, top ten counties, 2022 Primary

| County | Total | Absentee Ballots Rejected | % | SB 1 | % |
|---|---|---|---|---|---|
| **Hispanic** | | | | | |
| Harris | 3,009 | 650 | 21.60 | 649 | 21.57 |
| Dallas | 547 | 41 | 7.50 | 40 | 7.31 |
| Tarrant | 527 | 68 | 12.90 | 68 | 12.90 |
| Bexar | 5,854 | 1,477 | 25.23 | 978 | 16.71 |
| Travis | 1,025 | 94 | 9.17 | 94 | 9.17 |
| Collin | 131 | 21 | 16.03 | 21 | 16.03 |
| Denton | 136 | 18 | 13.24 | 18 | 13.24 |
| Fort Bend | 333 | 64 | 19.22 | 64 | 19.22 |
| El Paso | 2,939 | 561 | 19.09 | 550 | 18.71 |
| Hidalgo | 2,021 | 428 | 21.18 | | |
| Total | 16,522 | 3,422 | 20.71 | 2,482 | 15.02 |
| **Non-Hispanic** | | | | | |
| Harris | 33,770 | 6,261 | 18.54 | 6,232 | 18.45 |
| Dallas | 10,142 | 675 | 6.66 | 671 | 6.62 |
| Tarrant | 10,621 | 810 | 7.63 | 805 | 7.58 |
| Bexar | 12,040 | 2,427 | 20.16 | 1,383 | 11.49 |
| Travis | 10,533 | 834 | 7.92 | 827 | 7.85 |
| Collin | 5,857 | 757 | 12.92 | 734 | 12.53 |
| Denton | 5,131 | 759 | 14.79 | 757 | 14.75 |
| Fort Bend | 4,368 | 504 | 11.54 | 504 | 11.54 |
| El Paso | 1,635 | 236 | 14.43 | 232 | 14.19 |
| Hidalgo | 676 | 91 | 13.46 | | |
| Total | 94,773 | 13,354 | 14.09 | 12,145 | 12.81 |

exact same code: "REQUIRED IDENTIFICATION NOT INCLUDED (12)."[18] The absence

---

[18]Table 5 reports that 428 Hispanic and 91 non-Hispanic voters cast absentee ballots were rejected in Hidalgo County in the March 2022 primary election. These counts are slightly less than the 437 Hispanic and 95 non-Hispanic rejected absentee ballots for the county that I report in Table 8 (p. 36) of my April 29, 2022 Supplemental Report. Table 8 of that earlier report indicates that of the 437 rejected absentee ballots cast by Hispanic voters in that election, 427 of the ballots were rejected due to S.B. 1's new requirements. As Table 8 in my earlier Supplemental Report indicates, Non-Hispanic voters in the county cast 95 rejected absentee ballots, with 85 of the absentee ballots rejected due to S.B. 1's requirements.

of rejected absentee ballots due to S.B. 1 in Hidalgo county in this report underscores the conservative methodology I've employed, as my April 29, 2022 Supplemental Report detailed that 512 of the 532 (96.2%) of the absentee ballots rejected in the county in the March 2022 primary election were due to the S.B. 1's new requirements.

## V.2   Rejected Absentee Ballots for Black Voters

**62**   As mentioned above when discussing the limitations of Texas' statewide voter file, to assess the impact of S.B. 1 on absentee ballots cast by Black voters across the State of Texas in the 2022 primary election, I again rely on regression analysis. Because neither the statewide voter file nor the Rejected Ballot file for the March 2022 primary election identify the race of the voter, I draw on the geocoded addresses of all registered voters in the April 2022 for my analysis. Again, my analysis excludes absentee ballots that were cured by voters.

**63**   Census block data provide the racial and ethnic composition of the VAP in each Census block in Texas. By joining the geocoded voter file with the Rejected Ballot file for the March 2022 election, I am able to estimate whether voters registered in Census blocks with higher rates of Black VAP, according to 2020 data from the U.S. Census, were more likely to have their absentee ballots rejected than voters in other Census blocks. I screen out any Census blocks that had fewer than 20 absentee ballots cast in the March 2022 primary election.

**64**   Figure 3 plots the percentage of Black VAP in a Census block (X-axis) against the percentage of voters in that Census block who had their absentee ballot rejected out of

all absentee ballots received (accepted and rejected) by county election supervisors (y-axis) in the March 2022 primary election across Texas.[19]  The weighted (by Census block VAP) regression line shows a clear positive relationship: the greater the rate of Black VAP in a Census block, the greater the rate voters' absentee ballots were rejected across the state in the March 2022 primary election.  In Census blocks with no Black VAP, roughly 16% of absentee ballots cast in that Census block were rejected.  In contrast, in Census blocks with nearly all-Black VAP, roughly 20% of absentee ballots cast were rejected.

---

[19]Of the 252 counties in the Rejected Ballot file, 163 reported at least one voter who had a timely absentee ballot rejected. To be conservative, I include data from all 252 counties in the regression analysis, including those that reported in the Rejected Ballot file 0 (zero) rejected absentee ballots. For visual clarity, the figure screens out any Census blocks that had fewer than 20 absentee ballots cast (accepted or rejected) in the March 2022 primary election.

33

Figure 3: Percent Black Voting Age Population and Percent Rejected Absentee Ballots, by Census Block, March 2022 Election



*Note: Each circle denotes a Census block in Texas, and each circle is sized proportionately to the VAP in each Census block. Weighted regression line is shown in grey.*

34

65       Finally, Figure 4 shows the effects of S.B. 1 on rejected absentee ballots cast in Census blocks with high rates of Black VAP across the state of Texas. Figure 4, which plots the percentage of Black VAP in a Census block (X-axis) against the percentage of voters in that Census block who had their absentee ballot rejected due to S.B. 1, out of all absentee ballots received (accepted or rejected) by county election supervisors (y-axis) in the March 2022 primary election across Texas.[20]  The plot looks very similar to the preceding Figure 3, as the weighted (by Census block VAP) regression line shows clearly that the greater the rate of Black VAP in a Census block, the greater the rate voters' absentee ballots were rejected due to the implementation of S.B. 1. in the March 2022 primary election. In Census blocks with no Black VAP, or almost no Black VAP, roughly 13% of absentee ballots in that Census block were rejected due to S.B. 1.  In contrast, in Census blocks with nearly all-Black VAP, roughly 20% of absentee ballots cast were rejected.  These results show of the disproportionate effect that S.B. 1's provisions had on the rejection of absentee ballots cast by voters in predominantly Black census blocks across Texas in the March 2022 primary election.

---

[20]Of the 252 counties in the Rejected Ballot file, 163 reported at least one voter who had a timely absentee ballot rejected. To be conservative, I include data from all 252 counties in the regression analysis, including those that reported in the Rejected Ballot file 0 (zero) rejected absentee ballots due to to S.B. 1. For visual clarity, the figure screens out any Census blocks that had fewer than 20 absentee ballots cast (accepted and rejected) in the March 2022 primary election.

Figure 4: Percent Black Voting Age Population and Percent Rejected Absentee Ballots due to S.B. 1, by Census Block, March 2022 Election



*Note: Each circle denotes a Census block in Texas, and each circle is sized proportionately to the VAP in each Census block. Weighted regression line is shown in grey.*

# VI   A Majority of Registered Voters whose Absentee Ballot Applications were Rejected Did Not Cast a Valid Ballot in the March 2022 Primary Election (CORRECTED)

**66**     Following the March 2022 primary election, Texas Secretary of State John Scott claimed that voters who had problems with their absentee ballots were still able to cast a valid ballot by going to the polls and voting a provisional ballot. "Just because their ballot was rejected doesn't mean they didn't vote in the election. The reason that's true is those folks once they're notified their ballot was rejected can still go vote provisionally in-person," Scott said. "There's some inferential evidence that leads me to believe from what others have reported," he continued, "that there may have been a high number of provisional ballots and a high number of those provisional ballots counted."[21]

**67**     To test Secretary of State Scott's claim, I examine if voters who had their absentee ballot applications rejected were able to cast valid ballots in the March 2022 primary election. In addition to examining any accepted provisional ballots cast at the polls by voters who had their absentee ballot applications rejected, I investigate if they were able to subsequently vote a valid ballot by any method.[22]

---

[21]See, "Exclusive:   Texas   Secretary   of   State   John   Scott on   rejected   mail   ballots,"   *CBS   News   DFW*,   April 6,   2022,   available   https://www.cbsnews.com/dfw/news/ exclusive-texas-sec-of-state-john-scott-on-rejected-mail-ballots/ (last accessed January 29, 2023).

[22]Secretary of State Scott was quoted as saying that voters who cast absentee ballots that were rejected could vote provisional ballots at the polls. Under Texas law, such a provisional ballot cast at the polls, though, would be rejected, as the voter cast an absentee ballot that SVCs and EVBBs deemed to be invalid. See "Eligibility to Vote a Provisional Ballot at the Early Voting or

**68**     My more conservative test allows me to determine whether registered voters whose absentee ballot applications were rejected due to S.B. 1 were indeed able to vote in person, what scholars call a "substitution effect." The scholarly literature on whether voters are able to easily substitute one method of voting for another when they face obstacles to the franchise is mixed.[23]

**69**     If registered voters who were denied absentee ballots because their applications were denied were still able to vote, it could indicate that S.B. 1's restrictions on voters applying for an absentee ballot did not have adverse effects; voters, the argument goes, were still able to have their vote count, just by a different method.  After having their absentee ballot applications denied, if these voters did vote in the election, it would indicate that they successfully cured their absentee ballot applications and voted absentee ballots, or alternatively, they opted to vote an in-person ballot during the early voting period or on Election Day.

**70**     Table 6, which links voters using their unique VUID across the several data files used in this report, reveals that nearly three-fifths of the more than 6,000 registered voters who had their absentee ballot applications rejected due to S.B. 1 did not cast a valid ballot by any modality in the March 1, 2022 primary election.

---

the Election Day Polling Place," Tex.  Admin.  Code §81.172 adopted to be effective April 3, 2014, 39 TexReg 2264, "(c) A person voting by mail may not vote a provisional ballot."  Available `http://txrules.elaws.us/rule/title1_chapter81_sec.81.172` (last accessed February 1, 2023).

[23]See Amos, Smith & Ste. Claire (2017) and Clinton et al. (2021) for recent efforts to estimate "substitution effects" when polling locations are altered.

**71**     As shown in Table 6, 58.68% of the 6,140 registered voters who had their absentee ballot applications rejected by their county's election officials due to S.B. 1 ahead of the election—some 3,603 registered voters—*did not vote in the March 2022 primary election* by any method.  The rate of not voting for voters with a Hispanic surname is one percentage points higher than those without a Hispanic surname.  (Recall that the category for non-Hispanic voters includes registered voters of other racial and ethnic groups, and that the Table excludes voters from Hidlago County who had their applications rejected due to S.B. 1 and who are disproportionately Hispanic).

Table 6: March 2022 primary outcomes for registered voters
with SB 1-rejected absentee applications

|  | All | | Non-Hispanic | | Hispanic | |
|---|---|---|---|---|---|---|
| Outcome | Total | Percent | Total | Percent | Total | Percent |
| Did not vote | 3,603 | 58.68 | 3,198 | 58.57 | 405 | 59.56 |
| Early | 944 | 15.37 | 847 | 15.51 | 97 | 14.26 |
| Election Day | 654 | 10.65 | 595 | 10.90 | 59 | 8.68 |
| Absentee accepted | 823 | 13.40 | 726 | 13.30 | 97 | 14.26 |
| Absentee rejected | 101 | 1.64 | 86 | 1.58 | 15 | 2.21 |
| Provisional accepted | 14 | 0.23 | 7 | 0.13 | 7 | 1.03 |
| Provisional rejected | 1 | 0.02 | 1 | 0.02 | 0 | 0.00 |
| Total | 6,140 | 100.00 | 5,460 | 100.00 | 680 | 100.00 |

**72**     Table 6 also reveals that only 823 of the 6,140 registered voters who appear in the Secretary of State's Rejected Application file ended up casting a valid absentee ballot in the election, according to the April 2022 statewide voter file.  This indicates that only 13.40% of voters whose absentee ballot applications were initially rejected by their county election officials were subsequently able to successfully cure their applications, enabling them to receive and vote a valid absentee ballot in the election.

**73**     The data offered in Table 6 belie Secretary of State Scott's claim that voters who had issues with their absentee ballot applications or ballots were able to successfully vote a provisional ballot at the polls. Only 14 registered voters out of the more than 6,000 registered voters who had their absentee ballot applications rejected successfully voted an in-person provisional ballot in the election, a rate of just 0.23%. Another 101 (1.64%) registered voters who initially had their absentee applications rejected had their cast absentee ballot rejected, 654 (10.65%) registered voters who had their absentee ballot applications rejected voted on Election Day, and 944 (15.37%) of such registered voters successfully cast early in-person ballots.

**74**     Finally, not only do the data in Table 6 raise serious doubts about Secretary Scott's claims about voters who had problems with their absentee ballots being able to vote a provisional ballot, they show that voters with Hispanic surnames who had problems with the absentee ballot applications were less likely to successfully cast a vote in the March 2022 primary election than those voters without a Hispanic surname. Of the 680 voters with Hispanic surnames, 405 (59.56%) did not vote in the election after their absentee ballot applications were rejected.

# VII   Conclusion (CORRECTED)

**75**     My analysis of absentee ballot applications and cast absentee ballots in the March 1, 2022 primary election reveals a persistent pattern across the State of Texas: voters with Hispanic surnames and Census blocks with greater levels of Black VAP are more likely to have their absentee ballot applications or absentee ballots rejected than voters with a non-Hispanic surname or in Census blocks with less Black VAP, respectively.

40

**76**     In conclusion, all voters casting absentee ballots in Texas, but particularly registered Black and Hispanic voters requesting and casting absentee ballots, face a higher cost of voting under S.B. 1.  This report finds further evidence that S.B. 1's restrictions on the requesting and returning of absentee ballots fall disproportionately on voters of color.  As my analysis shows, S.B. 1's added personal ID requirement on registered voters requesting and returning absentee ballots raises the costs of voting for Black and Hispanic registered voters in Texas.

# References

Amos, Brian, Daniel A. Smith & Casey Ste. Claire. 2017. "Reprecincting and Voting Behavior." *Political Behavior* 39(1):133–156.

Clinton, Joshua D, Nick Eubank, Adriane Fresh & Michael E Shepherd. 2021. "Polling place changes and political participation: evidence from North Carolina presidential elections, 2008–2016." *Political Science Research and Methods* 9(4):800–817.

# VIII   Appendix

## VIII.1   *Curriculum vitae* of Daniel A. Smith (Updated)

*22 April 2023*

**DANIEL A. SMITH**
*Curriculum Vitae*

**Mailing Address**
Department of Political Science
234 Anderson Hall
PO Box 117325
University of Florida
Gainesville, FL  32611-7325

**Contact**
Office: 303 Anderson Hall
Phone: 352.273.2346
Email: electionsmith@gmail.com dasmith@ufl.edu
Homepage: people.clas.ufl.edu/dasmith/
Google Scholar

### EDUCATION
*University of Wisconsin-Madison*
    Ph.D., Political Science, 1994
    M.A., Political Science, 1989
*The Pennsylvania State University*
    B.A., Political Science (Foreign Affairs) & B.A., History (*cum laude*), 1988
        University Scholars Program (University Honors)
        *Phi Beta Kappa, Phi Alpha Theta*
        Macro Economics Program, *Westminster College, Oxford University*, Summer, 1987

### ACADEMIC EMPLOYMENT
*University of Florida, Gainesville*
    Professor, Department of Political Science, 2010-
        Chair, 2017-
        Graduate Coordinator, 2014-2016
        Associate Chair, 2013-2014
        Director, Graduate Program in Political Campaigning, 2007-2011
        Affiliate Professor, Center for African Studies, 2010-
        Affiliate Professor, The Bob Graham Center for Public Service, 2013-
        Internship Coordinator, Department of Political Science, 2005-
    Associate Professor (with tenure), Department of Political Science, 2003-2009
*University of Denver*
    Associate Professor (with tenure), Department of Political Science, 2000-2003
    Assistant Professor, Department of Political Science, 1994-2000
    Director, *University of Denver/University of Ghana* Study Abroad Program, 1995-2002
*University of Ghana*
    Senior Fulbright Scholar, Department of Political Science, 2000-01
*West Virginia University*
    Visiting Assistant Professor, Department of Political Science, 1993-1994
*Beloit College*
    Visiting Lecturer, *Warner Mills Teaching Fellow*, Department of Government, 1992-1993
*University of Wisconsin-Madison*
    Teaching Assistant, Department of Political Science, 1988; 1990-1991
    Research Assistant, Center on Wisconsin Strategy, 1989-1991
    Project Assistant, Department of Political Science, 1989-1990

### RESEARCH FELLOWSHIPS
Visiting Scholar, Department of Political Science, Aarhus University (Denmark), 2022-23
University of Florida Term Professor, 2016-2018
Research Associate, *Ghana Center for Democratic Development* (*CDD-Ghana*), Accra, Ghana, Fall 2011
University of Florida Research Foundation (UFRF) Professor, 2010-2012
Visiting Scholar, Bill Lane Center for the Study of the North American West, Stanford University, Spring 2007
Senior Research Scholar, Ballot Initiative Strategy Center, Washington, D.C., Spring 2006
Senior Fulbright Scholar (Ghana), United States Department of State, 2000-01
Research Associate, *Ghana Center for Democratic Development* (*CDD-Ghana*), Accra, Ghana, 2000-01

43

### AREAS OF SPECIALIZATION
American State Politics
    Voting and Elections (Voting Rights, Election Administration, Redistricting, Political Campaigns)
    Direct Democracy (Ballot Initiatives and Referendums)
American Institutions (Political Parties and Interest Groups)

*COURSES TAUGHT*

Intro to American Politics (Undergrad)                State and Local Government (Grad & Undergrad)
Interest Group Politics (Undergrad)                   Political Parties (Grad & Undergrad)
Direct Democracy (Grad & Undergrad)                   Politics of Campaign Finance (Grad & Undergrad)
Politics of Reform (Grad)                             Problems of Markets and Governments (Undergrad)

*SCHOLARLY PUBLICATIONS*
*BOOKS*
3) Todd Donovan, Daniel A. Smith, Tracy Osborne, and Christopher Z. Mooney. 2015. *State and Local Politics: Institutions and Reform.* 4th edition. Boston: Cengage Learning/Wadsworth.
2) Daniel A. Smith and Caroline J. Tolbert. 2004. *Educated by Initiative: The Effects of Direct Democracy on Citizens and Political Organizations in the American States.* Ann Arbor: University of Michigan Press.
1) Daniel A. Smith. 1998. *Tax Crusaders and the Politics of Direct Democracy.* NY: Routledge.

*JOURNAL ARTICLES* (current PhD students **bold**; former PhD students *italics*; undergrad students ***italics***)
76) **Sara Loving** and Daniel A. Smith. 2022. "Riot in the Party? Voter Registrations in the Aftermath of the January 6, 2021 Capitol Insurrection," *Party Politics.*
75) Michael C. Herron and Daniel A. Smith. 2022. "The Racial Politics of Early In-Person Voting in Georgia," *Journal of Election Administration Research & Practice* 1(2): 27-46.
74) *Enrijeta Shino*, Daniel A. Smith, and **Laura Uribe**. 2022. "Lying for Trump? Elite Cue-Taking and Expressive Responding on Vote Method," *Public Opinion Quarterly.* 86 (4): 837–861.
73) Seth C. McKee, Daniel A. Smith, and *Enrijeta Shino*. 2022. "Redrawn, Withdrawn: The Effects of Redistricting on the Representative-Constituent Relationship," *Election Law Journal* 21 (4): 280-295.
72) **William Zelin** and Daniel A. Smith. 2022. "Weather to Vote: How Natural Disasters Shape Turnout Decisions," *Political Research Quarterly.*
71) David Cottrell, Michael Herron, and Daniel A. Smith. 2021. "Vote-by-mail Ballot Rejection and Experience with Mail-in Voting," *American Politics Research* 49(6): 577-590.
70) David Cottrell, Felix Herron, Michael Herron, and Daniel A. Smith. 2021. "Auditing the 2020 General Election in Georgia: Residual vote rates and a confusing ballot format," *Election Law Journal* 20(3): 1-18.
69) **Anna Baringer**, **Justin Eichermuller**, **William Zelin**, *Enrijeta Shino*, and Daniel A. Smith. 2022. "Election Administration and Public Records Responsiveness," *Public Integrity* 24(3): 280-291.
68) *Enrijeta Shino* and Daniel A. Smith. 2021. "Pandemic Politics: COVID-19, health concerns, and vote choice in the 2020 General Election," *Journal of Elections, Public Opinion and Parties.* 31: 191-205.
67) *Enrijeta Shino*, Mara Suttmann-Lea, and Daniel A. Smith. 2022 "Determinants of Rejected Mail Ballots in Georgia's 2018 General Election," *Political Research Quarterly* 75(1): 231-243.
66) Michael C. Herron and Daniel A. Smith. 2021. "Postal Delivery Disruptions and the Fragility of Voting by Mail: Lessons from Maine," *Research & Politics* (January-March): 1-12.
65) David Cottrell, Michael C. Herron, and Daniel A. Smith. 2021. "Voting Lines, Equal Treatment, and Early Voting Check-in Times in Florida," *State Politics and Policy Quarterly* 21(2): 109-138.
64) *William D. Hicks*, Seth C. McKee, and Daniel A. Smith. 2021. "Contemporary Views of Liberal Democracy and the 2016 Presidential Election." *PS: Political Science* 54(1): 33-40.
63) *Enrijeta Shino* and Daniel A. Smith. 2020. "Political Knowledge and Convenience Voting," *Journal of Elections, Public Opinion and Parties* 32(2): 408-428.
62) **Anna Baringer**, Michael Herron, and Daniel A. Smith. 2020. "Voting by Mail and Ballot Rejection: Lessons from Florida for Elections in the Age of the Coronavirus," *Election Law Journal* 19(3): 289-320.
61) *Enrijeta Shino* and Daniel A. Smith. 2020. "Mobilizing the Youth Vote? Early Voting on College Campuses." *Election Law Journal* 19(4): 524-541.
60) *Enrijeta Shino*, Michael Martinez, Michael P. McDonald, and Daniel A. Smith. 2020. "Verifying Voter Registration Records," *American Politics Review* 48(6): 677–681.
59) Charles Bullock, *William D. Hicks*, M.V. Hood III, Seth C. McKee, and Daniel A. Smith. 2020. "The Election of African American State Legislators in the Modern South." *Legislative Studies Quarterly* 45(4): 581-608.
58) *Thessalia Merivaki* and Daniel A. Smith. 2019. "A Failsafe for Voters? Cast and Rejected Provisional Ballots in North Carolina," *Political Research Quarterly* 73(1): 65-78.
57) Seth C. McKee, Daniel A. Smith, and M.V. Hood III. 2018. "The Comeback Kid: Donald Trump on Election Day in 2016." *PS: Political Science* 52 (2): 239-242.
56) Hannah L. Walker, Michael C. Herron, and Daniel A. Smith. 2019. "North Carolina voter turnout and early voting hours in the 2016 General Election." *Political Behavior* 41: 841-69.
55) Daniel Biggers and Daniel A. Smith. 2020. "Does Threatening their Franchise Make Registered Voters More Likely to Participate? Evidence from an Aborted Voter Purge." *British Journal of Political Science* 50(3): 933-954.

54) **Brian Amos**, *Diana Forster*, and Daniel A. Smith. 2018. "Who Signs? Ballot Petition Signatures as Political Participation," *American Review of Politics* 36(2): 19-37.

53) David Cottrell, Michael C. Herron, Javier M. Rodriguez, and Daniel A. Smith. 2019. "Mortality, Incarceration, and African-American Disenfranchisement in the Contemporary United States," *American Politics Research* 47(2) 195–237.

52) Daniel A. Smith, Seth C. McKee, and M.V. (Trey) Hood, III. 2018. "Election Daze: Voting Modes and Voter Preferences in the 2016 Presidential Election," *Florida Political Chronicle* 25(2): 123-141.

51) **Enrijeta Shino** and Daniel A. Smith. 2018. "Timing the Habit: Voter Registration and Turnout in the American States." *Electoral Studies* 51: 72-82.

50) William D. Hicks, Carl E. Klarner, Seth C. McKee, and Daniel A. Smith. 2018. "Revisiting Majority-Minority Districts and Black Representation," *Political Research Quarterly* 71(2): 408-23.

49) **Brian Amos**, Daniel A. Smith, and **Casey Ste. Claire**. 2017. "Reprecincting and Voting Behavior," *Political Behavior* 39(1): 133-156.

48) *William D. Hicks*, Seth C. McKee, and Daniel A. Smith. 2016. "A Bipartisan Election Reform? Explaining Support for Online Voter Registration in the American States," *American Politics Research* 44(6): 1008-1036.

47) Michael C. Herron and Daniel A. Smith. 2016. "Race, Shelby County, and the Voter Information Verification Act in North Carolina," *Florida State University Law Review* 43: 465-506.

46) *William D. Hicks*, Seth C. McKee, and Daniel A. Smith 2016 "The Determinants of State Legislator Support for Restrictive Voter ID Laws," *State Politics & Policy Quarterly* 16(4): 411-431.

45) Michael C. Herron and Daniel A. Smith. 2016. "Precinct Resources and Voter Wait Times," *Electoral Studies* 42: 249–63.

44) **Thessalia Merivaki** and Daniel A. Smith. 2016. "Casting and Verifying Provisional Ballots in Florida," *Social Science Quarterly* 97(3): 729–47.

43) Michael C. Herron and Daniel A. Smith. 2015. "Precinct Closing Times in Florida during the 2012 General Election," *Election Law Journal* 14: 220-38.

42) *William D. Hicks*, Seth C. McKee, **Mitchell Sellers**, and Daniel A. Smith. 2015. "A Principle or a Strategy? Voter Identification Laws and Partisan Competition in the American States," *Political Research Quarterly* 68: 18-33.

41) Michael C. Herron and Daniel A. Smith. 2014. "Race, Party, and the Consequences of Restricting Early Voting in Florida in the 2012 General Election," *Political Research Quarterly* 67: 646-65.

40) *Josh Brodbeck*, **Matthew T. Harrigan**, and Daniel A. Smith. 2013. "Citizen and lobbyist access to Members of Congress: Who gets and who gives?" *Interest Groups and Advocacy* 2: 323-42.

39) Michael C. Herron and Daniel A. Smith. 2013. "The Effects of House Bill 1355 on Voter Registration in Florida," *State Politics and Policy Quarterly*, 13: 279-305.

38) Michael C. Herron and Daniel A. Smith. 2012. "Souls to the Polls: Early Voting in Florida in the Shadow of House Bill 1355," *Election Law Journal* 11: 331-47.
    [Winner of the 2013 APSA State Politics and Policy Section's *Best Paper Award*]

37) Janine Parry, Daniel A. Smith, and Shayne Henry. 2011. "The Impact of Petition Signing on Voter Turnout," *Political Behavior 34: 117-36.*

36) *Stephanie Slade* and Daniel A. Smith. 2011. "Obama to Blame? African American Surge Voters and the Ban on Same-Sex Marriage in Florida," *The Forum* 9(2), Article 6.

35) Daniel A. Smith. 2011. "Generating Scholarship from Public Service: Media Outreach, Nonprofit Foundation Service, and Legal Expert Consulting," *PS: Political Science & Politics* 44: 255-9.

34) **Josh Huder**, **Jordan Ragusa**, and Daniel A. Smith. 2011. "The Initiative to Shirk? The Effects of Ballot Measures on Congressional Voting Behavior," *American Politics Research* 39 (3): 582-610.

33) Daniel A. Smith, Caroline J. Tolbert, and Amanda Keller. 2010. "Electoral and Structural Losers and Support for a National Referendum in the U.S." *Electoral Studies* 29: 509-520.

32) Daniel A. Smith and Caroline J. Tolbert. 2010. "Direct Democracy, Public Opinion, and Candidate Choice," *Public Opinion Quarterly* 74: 85-108.

31) Caroline Tolbert, Daniel A. Smith, and John Green. 2009. "Mass Support for Redistricting Reform: District and Statewide Representational Winners and Losers." *Political Research Quarterly* 62: 92-109.

30) Todd Donovan, Caroline J. Tolbert, and Daniel A. Smith. 2009. "Political Engagement, Mobilization, and Direct Democracy," *Public Opinion Quarterly* 73: 98-118.

29) Daniel A. Smith. 2009. "An Americanist in Africa," *PS: Political Science & Politics* 42 (4): 827-33.

28) Beatrix Allah-Mensa, *Kevin S. Fridy*, Daniel A. Smith, and Ukoha Ukiwo. "2009 APSA Workshop on African Elections and Democracy," *PS: Political Science & Politics.* 42. (4): 827-33. [Editors of a Special Symposium on the 2009 APSA Workshop on Ghana].

27) Todd Donovan, Caroline Tolbert, and Daniel A. Smith. 2008. "Priming Presidential Votes by Direct Democracy," *Journal of Politics* 70: 1217-31.

4

26) Daniel A. Smith and **Dustin Fridkin**. 2008. "Delegating Direct Democracy: Interparty Legislative Competition and the Adoption of the Initiative in the American States," *American Political Science Review* 102: 333-50.

25) Eric Heberlig, Bruce Larson, Daniel A. Smith, and *Kristen Soltis*. 2008. "Look Who's Coming to Dinner: Direct versus Brokered Member Campaign Contributions to the NRCC." *American Politics Research* 36 433-450.

24) Daniel A. Smith and Caroline J. Tolbert. 2007. "The Instrumental and Educative Effects of Ballot Measures: Research on Direct Democracy in the American States." *State Politics and Policy Quarterly* 4: 417-446.

23) Daniel A. Smith. 2007. "Representation and the Spatial Bias of Direct Democracy," *University of Colorado Law Review* 78 (4): 1395-1434.

22) Daniel A. Smith and Caroline J. Tolbert, and Daniel Bowen. 2007. "The Educative Effects of Direct Democracy: A Research Primer for Legal Scholars," *University of Colorado Law Review* 78 (4): 1371-94.

21) Daniel A. Smith, **Matthew DeSantis**, and **Jason Kassel**. 2006. "Same-Sex Marriage Ballot Measures and the 2004 Presidential Election," *State and Local Government Review* 38 (2): 78-91.

20) Caroline J. Tolbert and Daniel A. Smith. 2006. "Representation and Direct Democracy in the United States." *Representation: The Journal of Representative Democracy* 42 (1): 25-44.

19) Elizabeth Garrett and Daniel A. Smith. 2005. "Veiled Political Actors and Campaign Disclosure Laws in Direct Democracy." *Election Law Journal* 4 (4) 295-328.

18) Caroline J. Tolbert and Daniel A. Smith. 2005. "The Educative Effects of Ballot Initiatives on Voter Turnout." *American Politics Research* 33 (2): 283-309.

17) Daniel A. Smith. 2004. "Peeling Away the Populist Rhetoric: Toward a Taxonomy of Anti-Tax Ballot Initiatives." *Journal of Public Budgeting and Finance* 24 (4): 88-110.

16) Daniel A. Smith. 2003. "Overturning Term Limits: The Legislature's Own Private Idaho?" *PS: Political Science & Politics* 36 (2): 215-220.

15) Caroline J. Tolbert, Ramona McNeal, and Daniel A. Smith. 2003. "Enhancing Civic Engagement: The Effect of Direct Democracy on Political Participation and Knowledge." *State Politics and Policy Quarterly* 3 (1): 23-41.

14) Daniel A. Smith. 2003. "Distorted by Outside Money: National Parties and the Race for Colorado's Seventh Congressional District," *PS: Political Science & Politics* 36 (3) PSOnline E-Symposium <http://journals.cambridge.org/action/displayAbstract?aid=164256>.

13) Daniel A. Smith and **Joseph Lubinski**. 2002. "Direct Democracy during the Progressive Era: A Crack in the Populist Veneer?" *Journal of Policy History* 14 (4): 349-83.

12) Jonathan Temin and Daniel A. Smith.  2002. "Media Matters: Evaluating the Role of the Media in Ghana's 2000 Elections." *African Affairs* 101: 585-605.

11) Daniel A. Smith. 2002. "Consolidating Democracy? The Structural Underpinnings of Ghana's 2000 Elections." *Journal of Modern African Studies* 40 (4): 1-30.

10) Daniel A. Smith. 2002. "Ghana's 2000 Elections: Consolidating Multi-Party Democracy." *Electoral Studies* 21 (3): 519-26.

9) Daniel A. Smith and Caroline Tolbert. 2001. "The Initiative to Party: Partisanship and Ballot Initiatives in California." *Party Politics* 7 (6): 781-99.

8) Caroline Tolbert, John Grummel, and Daniel A. Smith. 2001. "The Effect of Ballot Initiatives on Voter Turnout in the American States." *American Politics Research* 29 (6): 625-48.

7) Daniel A. Smith. 2001. "Homeward *Bound*? Micro-Level Legislative Responsiveness to Ballot Initiatives." *State Politics and Policy Quarterly* 1 (1): 50-61.

6) Daniel A. Smith and ***Robert J. Herrington***. 2000. "The Process of Direct Democracy: Colorado's 1996 Parental Rights Amendment." *Social Science Journal* 37 (2): 179-94.

5) Daniel A. Smith. 1999. "Reevaluating the Causes of Proposition 13." *Social Science History* 23 (2): 173-210.

4) Daniel A. Smith and ***Nathaniel Golich***. 1998. "Some Unintended Consequences of TABOR." *Comparative State Politics* 19 (6): 33-40.

3) Daniel A. Smith, Kevin M. Leyden, and Stephen A. Borrelli. 1998. "Predicting the Outcomes of Presidential Commissions: Evidence from the Johnson and Nixon Years," *Presidential Studies Quarterly* 28 (2): 269-85.

2) Daniel A. Smith. 1996. "Populist Entrepreneur: Douglas Bruce and the Tax and Government Limitation Moment in Colorado, 1986-1992," *Great Plains Research* 6 (2): 269-94.

1) Daniel A. Smith. 1993. "Removing the Pluralist Blinders: Labor-Management Councils and Industrial Policy in the American States," *Economic Development Quarterly* 7 (4): 373-89.

***WORKS IN PROGRESS*** (current PhD students **bold**; former PhD students *italics*; undergrad students ***italics***)

1)  *Enrijeta Shino*, Seth C. McKee, and Daniel A. Smith, "The Fall of Trump: Mobilization and Vote Switching in the 2020 Presidential Election," Revise and Resubmited, *Political Science Research and Methods*.

2)  Michael P. McDonald, **Juliana Mucci**, *Enrijeta Shino*, and Daniel A. Smith, "Mail Voting and Voter Turnout," Revise and Resubmited, *Election Law Journal*.

3) *Enrijeta Shino*, Daniel A. Smith, and **LaRaven Temoney**, "The Effects of Election Administration Changes on Voters of Color in Florida," Revised and Resubmitted, *Journal of Election Administration Research & Practice*.
4) John Cho, Michael C. Herron, and Daniel A. Smith, "Who stands next to whom? Voting lines and political polarization."
5) Michael Martinez and Daniel A. Smith, "A Blue Primary in a Reddish State: How Preferences are Shaped by Expectations, Issues, and Sexism."
6) Michael C. Herron and Daniel A. Smith, "Disabling the Vote."
7) David Cottrell, Michael C. Herron, and Daniel A. Smith, "Who Substitutes? Differential Racial Effects when Weekend Early Voting is Eliminated."
8) Michael C. Herron, Marc Meredith, Michael Morse, Michael Martinez, and Daniel A. Smith, "Bad Ballot Design and Electoral Legitimacy: The 2018 United States Senate Race in Florida."
9) Enrijeta Shino and Daniel A. Smith, "Vote Method and Confidence in Elections."
10) Andy Jarrin, Michael C. Herron, and Daniel A. Smith, "Ghost in the Machine: Support for Candidates on the Ballot in Name Only."
11) Angela Gutierrez, Michael P. McDonald, Daniel A. Smith, Brian Amos, Matt Barreto, "Shared Language, Distinct Politics: A Deeper Look at Hispanic Vote Cohesion in South and Central Florida."
12) Mike McDonald, Enrijeta Shino, Daniel Smith, Payton Lussier and Danielle Dietz, "Voting During a Pandemic: Convenience Voting and Youth Turnout."

***BOOK CHAPTERS*** (current PhD students **bold**; former PhD students *italics*; undergrad students ***italics***)

31) *Enrijeta Shino* and Daniel A. Smith. Forthcoming. "Vote Choice during a Pandemic: How Health Concerns Shaped the 2020 Presidential Election," forthcoming in *Lessons Learned from the 2020 U.S. Presidential Election: Hindsight is 2020*, Joseph Coll and Joseph Anthony, eds. Berlin: Springer.
30) Todd Donovan and Daniel A. Smith. 2020, "Direct Democracy and Political Speech in the United States," in Direkte Demokratie: Festschrift für Otmar Jung, Hermann K. Heußner, Arne Pautsch, and Fabian Wittreck, eds. Berlin: Richard Boorberg Verlag (479-488).
29) *Thessalia Merivaki* and Daniel A. Smith. 2019. "Challenges in Voter Registration," in *The Future of Election Administration*, Mitchell Brown, Kathleen Hale, and Bridgett A. King, eds. New York: Palgrave/Macmillan.
28) Seth C. McKee and Daniel A. Smith. 2019. "Trump Territory," **in** *Florida* and the *2016 Election of Donald J. Trump*, Matthew Corrigan and Michael Binder, eds. Gainesville: University of Florida Press (49-75).
27) Daniel A. Smith, *Brian Amos*, Daniel Maxwell, and ***Tyler Richards***. 2019. "Rigged? Assessing Election Administration in Florida's 2016 General Election," **in** *Florida* and the *2016 Election of Donald J. Trump*, Matthew Corrigan and Michael Binder, eds. Gainesville: University of Florida Press (pp. 154-74).
26) Daniel A. Smith, ***Dillon Boatner***, ***Caitlin Ostroff***, ***Pedro Otálora***, and ***Laura Uribe***. 2019. "Early Bird Special: Convenience Voting in Florida's 2016 General Election," **in** *Florida* and the *2016 Election of Donald J. Trump*, Matthew Corrigan and Michael Binder, eds. Gainesville: University of Florida Press (pp.134-53).
25) Michael C. Herron, Daniel A. Smith, ***Wendy Serra***, and Joseph Bafumi. 2017. "Wait Times and Voter Confidence: A Study of the 2014 General Election in Miami-Dade County," in *The American Election 2014: Contexts and Consequences*, Tauna Sisco, Christopher Galdieri, and Jennifer Lucas, eds. Akron, OH: University of Akron Press (pp. 107-122).
24) **Joseph T. Eagleton** and Daniel A. Smith. 2015. "Drawing the Line: Public Support for Amendments 5 and 6," in *Jigsaw Puzzle Politics in the Sunshine State*, Seth C. McKee, ed. Gainesville, FL: University Press of Florida (pp. 109-25).
23) **Diana Forster** and Daniel A. Smith. 2014. "A Climate for Change? Environmental Ballot Measures," in *U.S. Climate Change Policy and Civic Society*, Yael Wolinsky-Nahmias, ed. Washington, DC: C.Q. Press.
22) Daniel A. Smith. 2014. "Direct Democracy," in *The Encyclopedia of Political Thought*, Michael T. Gibbons, ed. Oxford: Wiley-Blackwell.
21) **William Hicks** and Daniel A. Smith. 2013. "State Campaigns and Elections," in *The Oxford Handbook of State and Local Government,* Donald Haider-Markel, ed. New York: Oxford University Press.
20) Daniel A. Smith. 2012. "Direct Democracy: Regulating the 'Will of the People,'" in Matthew J. Streb, ed., *Law and Election Politics: The Rules of the Game*, 2nd ed. New York: Routledge.
19) Daniel A. Smith. 2011. "Direct Democracy in Colorado: A Historical Perspective," in Courtenay Daum, Robert Duffy, and John Straayer, eds., *State of Change: Colorado Politics in the Twenty-first Century*. Boulder: University of Colorado Press.
18) Daniel A. Smith. 2010. "Direct Democracy and Candidate Elections," in Stephen C. Craig and David Hill, *The Electoral Challenge: Theory Meets Practice,* 2nd edition. Washington, DC: CQ Press.
17) Daniel A. Smith. 2010. "Financing Ballot Measures in the U.S.," in Karin Gilland-Lutz and Simon Hug, eds., *Financing Referendum Campaigns*. New York: Palgrave.
16) Daniel A. Smith. 2008. "Direct Democracy and Campaigns," in Shaun Bowler and Amihai Glazer, eds., *Direct Democracy's Impact on American Political Institutions*. New York: Palgrave.

15) Todd Donovan and Daniel A. Smith. 2008. "Identifying and Preventing Signature Fraud on Ballot Measure Petitions," in Michael Alvarez, Thad E. Hall, and Susan D. Hyde, eds., *Election Fraud: Detecting and Deterring Electoral Manipulation.* Washington, DC: Brookings.

14) Daniel A. Smith. 2008. "Direct Democracy and Election and Ethics Laws," in Bruce Cain, Todd Donovan, and Caroline Tolbert, eds, *Democracy in the States: Experiments in Elections Reform.* Washington, DC: Brookings.

13) Daniel A. Smith. 2007. "Ballot Initiatives," in Gary Anderson and Kathryn Herr, eds., *Encyclopedia of Activism and Social Justice.* Thousand Oaks, CA: Sage Publications, Inc.

12) Raymond J. La Raja, **Susan E. Orr**, and Daniel A. Smith. 2006. "Surviving BCRA: State Party Finance in 2004," in John Green and Daniel Coffey, eds., *The State of the Parties* (5th edition). Lanham, MD: Rowman and Littlefield.

11) Daniel A. Smith. 2006. "Initiatives and Referendums: The Effects of Direct Democracy on Candidate Elections," in Steven Craig, ed., *The Electoral Challenge: Theory Meets Practice.* Washington, D.C.: CQ Press.

10) Daniel A. Smith (with **Sure Log**). 2005. "Orange Crush: Mobilization of Bias, Ballot Initiatives, and the Politics of Professional Sports Stadia," in David McCuan and Stephen Stambough, eds., *Initiative-Centered Politics.* Durham, NC: Carolina Academic Press.

9) Daniel A. Smith. 2005. "The Initiative to Party: The Role of Parties in State Ballot Initiatives," in David McCuan and Stephen Stambough, eds., *Initiative-Centered Politics.* Durham, NC: Carolina Academic Press.

8) Daniel A. Smith. 2004. "Strings Attached: Outside Money in Colorado's Seventh Congressional District," in David Magleby and Quin Monson, eds., *The Last Hurrah?* Washington, D.C.: Brookings.

7) Daniel A. Smith. 2004. "Direct Democracy," in David Wishart, ed., *Encyclopedia of the Great Plains.* Lincoln: University of Nebraska Press.

6) Daniel A. Smith. 2002. "Direct Democracy and Its Critics," in Peter Woolley and Albert Papa, eds., *American Politics: Core Argument/Current Controversy.* 2nd ed. Englewood Cliffs, NJ: Prentice Hall.

5) Daniel A. Smith. 2001. "Campaign Financing of Ballot Initiatives in the American States," in Larry Sabato, Bruce Larson, and Howard Ernst, eds., *Dangerous Democracy? The Battle Over Ballot Initiatives in America.* Lanham, MD: Rowman and Littlefield.

4) Daniel A. Smith. 2001. "Special Interests and Direct Democracy: An Historical Glance," in M. Dane Waters, ed., *The Battle Over Citizen Lawmaking.* Durham, NC: Carolina Academic Press.

3) Daniel A. Smith and Jonathan Temin. 2001. "The Media and Ghana's 2000 Elections," in Joseph Ayee, ed., *Deepening Democracy in Ghana: Politics of the 2000 Elections*, Volume 1 (Thematic Studies). Accra: Freedom Publications.

2) Daniel A. Smith. 2001. "The Politics of Upper East and the 2000 Ghanaian Elections," in Joseph Ayee, ed., *Deepening Democracy in Ghana: Politics of the 2000 Elections*, Volume 2 (Constituency Studies). Accra: Freedom Publications.

1) Daniel A. Smith. 1998. "Unmasking the Tax Crusaders," in Bruce Stinebrickner, ed., *Annual Editions: State & Local Government.* 9th ed. Guilford, CT: Dushkin/McGraw-Hill, 83-85 [Reprinted].

***RESEARCH GRANTS, HONORS, AND AWARDS***

39) University Scholars Program Grant (advising **Danielle Dietz**), University of Florida, "Moving Out: Household Transmission of Party Registration among Young Voters." Spring 2022/Fall 2022.

38) Investigator, "Does Institutional Change Influence Constituents' Intergroup Attitudes?" National Science Foundation (NSF) RAPID Grant, PIs Kate Ratliff and Jackie Chen, ($125,796), March 2022.

37) David King Defender of Democracy Award, League of Women Voters of Florida, January 2022.

36) Science Defender Award, Union of Concerned Scientists, December 2021.

35) University Scholars Program Grant (advising **Sara Loving**), University of Florida, "Movers and Political Polarization." Spring 2021/Fall 2021.

34) University Scholars Program Grant (advising **Emily Boykin** and **Jenna Tingum**), University of Florida, "Spanish Language Materials, Administrative Compliance, and Hispanic Voting in Florida." Fall 2019/Spring 2020.

33) CLAS Scholars Program Grant (advising **William Zelin**), University of Florida, "The Effect of Natural Disasters on Voter Turnout." Fall 2019/Spring 2020.

32) PI, Gill Foundation Grant, "LGBT Issues in Florida," Spring 2018, Co-PI, Michael Martinez ($75,000).

31) University of Florida Term Professorship, 2017-2019.

30) University Scholars Program Grant (advising **Pedro Otálora**), University of Florida, "Political Participation of Native-Born and Naturalized Citizens in Miami-Dade." Summer/Fall 2017.

29) Ruben Askew Scholar Award (advising **Wendy Serra**), Bob Graham Center, University of Florida, Summer 2016.

28) Emerging Scholars Program (advising **Anthony Rychkov**), University of Florida, "The Timing of Voter Registration and Turnout," Spring/Summer 2016.

27) University Scholars Program Grant (advising **Casey Ste. Claire**), University of Florida, College of Liberal Arts & Sciences, "Reprecincting and Voter Turnout," Fall 2015/Spring 2016.

26) University Scholars Program Grant (advising **Frances Chapman**), University of Florida, College of Liberal Arts & Sciences, "Truing or Suppressing the Vote? Private Voter Challenges in Florida," Fall 2013/Spring 2014.

25) Best Paper Award presented in 2012 by the APSA Organized Section on State Politics and Policy: "Souls to the Polls: Early Voting in Florida in the Shadow of House Bill 1355," 2013 (with Michael Herron).

24) University Scholars Program Grant (advising **Bryce Freeman**), University of Florida, College of Liberal Arts & Sciences, "Impact of Voter Suppression on Political Participation," Spring 2013.

23) PI, "Trans-Saharan Professionals Program," United States Department of State, Bureau of Educational and Cultural Affairs, S-ECAPPE-10-GR-231 (DT), September 2010-August 2012, Co-PI Leo Villalon ($800,000).

22) University of Florida Research Foundation (UFRF) Professor, 2010-2012 (annual salary supplement and research funding).

21) PI, *American Political Science Association* Workshop on Elections and Democracy, University of Ghana at Legon, Ghana, Summer 2009, funded by Mellon Foundation, $200,000.

20) Best Paper Award presented in 2006 by the APSA Organized Section on State Politics and Policy: "Do State-Level Ballot Measures Affect Presidential Elections?" (with Caroline Tolbert and Todd Donovan).

19) Research Grant, "Did Gay Marriage Re-Elect George W. Bush?" University of Florida, College of Liberal Arts & Sciences, Summer 2005.

18) University Scholars Program Grant (advising **Kirsten Soltis**), University of Florida, College of Liberal Arts & Sciences, "Money and the Member: An Analysis of Fundraising in Congressional Politics in the Post-Campaign Finance Reform Era," Fall 2005.

17) Research and Travel Grant, *Pew Charitable Trusts*, "Veiled Political Actors," Daniel Lowenstein, Kim Alexander, Robert Stern, Tracy Western, and Joseph Doherty, Principal Investigators, Fall 2003.

16) Travel Grant, *College of Liberal Arts and Sciences*, University of Florida, "Initiative and Referendum Campaigns," Fall 2003.

15) Research Grant, *Pew Charitable Trusts*, "Outside Money: Colorado's 7th Congressional District," PI David Magleby, Fall 2002.

14) Faculty Research Fund, "Ballot Initiatives during the Progressive Era," *University of Denver*, Fall 2002.

13) Research Grant, *American Political Science Association*, "Ballot Initiatives during the Progressive Era: Evidence from California, 1912-1920," Summer 2002.

12) Research Grant, *Colorado Endowment for the Humanities*, "The 'Golden Era' of Direct Democracy? Colorado's Election of 1912," (R017-0300-010) (with **Joseph Lubinski**), Summer 2000.

11) Partners in Scholarship: 2000 Winter Quarter Project Proposal, "The 'Golden Era' of Direct Democracy? Evidence from the Colorado Election of 1912," *University of Denver*, with **Joseph Lubinski**).

10) Rosenberry Fund, "Direct Democracy in Colorado," *University of Denver*, Spring 1999.

9) Best Paper, Charles Redd Politics of the American West, "Howard Jarvis, Populist Entrepreneur: Reevaluating Causes of Proposition 13," *Western Political Science Association*, Los Angeles, March 20, 1998.

8) Faculty Research Fund, "Ballot Warriors: Citizen Initiatives in the 1990s," *University of Denver*, Fall 1997.

7) Partners in Scholarship: 1997 Winter Quarter Project Proposal, "The Process of Direct Democracy: Parental Rights Amendment," *University of Denver*, with **Robert Herrington**, Winter 1997.

6) Faculty Research Fund, "*Faux* Populism: Populist Entrepreneurs and Populist Moments," *University of Denver*, Fall 1996.

5) International Small Grants, "Election Monitor: Ghana Presidential and Parliamentary 1996 Elections," Office of Internationalization, *University of Denver*, Fall 1996.

4) Faculty Research Fund, "Populist Prophets and the Mass Appeal of Direct Democracy," Program Support Services, *University of Denver*, Spring 1995.

3) Research Grant, Institute for Public Affairs, *West Virginia University*, Summer 1994.

2) Senate Research Travel Grant, Faculty Development Fund, *West Virginia University*, Fall 1994.

1) Research Travel Grant, Robert LaFollette Institute of Public Affairs, *University of Wisconsin-Madison*, Fall 1992.

***TECHNICAL REPORTS, WORK PRODUCTS, & OTHER SCHOLARLY PUBLICATIONS***

32) Daniel A. Smith, "Casting, Rejecting, and Curing Vote-by-Mail Ballots in Florida's 2020 General Election," *All Voting is Local*," March 2021.

31) Daniel A. Smith and **Anna Baringer**, "ACLU Florida: Report on Vote-by-Mail Ballots in the 2018 General Election," A Report Commissioned by *ACLU Florida*, April 2020.

30) Michael P. McDonald and Daniel A. Smith, "Audit of Assignment of Registered Voters to New, Court-Ordered House of Delegates Districts," Virginia Secretary of State, Spring 2019.

29) Daniel A. Smith, "Vote-by-Mail Ballots Cast in Florida," A Report Commissioned by *ACLU Florida*, August 2018.

28) Michael C. Herron and Daniel A. Smith, "Congestion at the Polls: A Study of Florida Precincts in the 2012 General Election," A Report Commissioned by Advancement Project, Washington, DC, June 24, 2013. Available: http://www.advancementproject.org/news/entry/voters-of-color-faced-longest-wait-times-in-florida.

27) Michael C. Herron and Daniel A. Smith, "Florida's 2012 General Election under HB 1355:  Early Voting, Provisional Ballots, and Absentee Ballots," League of Women Voters Florida, January 2013.

26) Daniel A. Smith, "Popular Support and Conditions for the Passage of Ballot Measures," The William and Flora Hewlett Foundation, June 2013.

25) Michael C. Herron and Daniel A. Smith, "Congestion at the Polls: A Study of Florida Precincts in the 2012 General Election," Advancement Project, June 2013.

24) Daniel A. Smith, "The Re-demarcation and Reapportionment of Parliamentary Constituencies in Ghana," *Ghana Center for Democratic Development (CDD-GHANA)*, Vol. 10 (2):  October 2011. Available: http://www.cddghana.org/documents/Vol.%2010,%20No.%202.pdf

23) Daniel A. Smith. 2010. "Educative Effects of Direct Democracy: Evidence from the US States," Memorandum requested by the British House of Lords, Constitution Committee, January 4. Available: http://www.publications.parliament.uk/pa/ld200910/ldselect/ldconst/99/99we14.htm.

22) Daniel A. Smith. 2006. "Money Talks: Ballot Initiative Spending in 2004." *Ballot Initiative Strategy Center*, June. Available: http://ballot.org.

21) Daniel A. Smith. 2006. "Ballot Initiatives, Tax Issues," in Larry Sabato and Howard Ernst, eds., *Encyclopedia of American Political Parties and Elections*. New York: Facts on File.

20) Daniel A. Smith, "Mobilization Effects of Ballot Measures in Colorado, Florida, Ohio, and Nevada," Ballot Initiative Strategy Center, Fall 2004.

19) Daniel A. Smith, "Mobilization Effects of Gay Marriage Ban in Ohio," Ballot Initiative Strategy Center, Fall 2004.

18) Daniel A. Smith and Caroline J. Tolbert. 2003. "Educated by Initiative," *Campaigns and Elections*, August, p. 31.

17) Elizabeth Garrett, and Daniel A. Smith. 2003. "Veiled Political Actors: The Real Threat to Campaign Disclosure Statutes" (July 22). USC Law and Public Policy Research Paper No. 03-13 http://ssrn.com/abstract=424603.

16) Daniel A. Smith. 2003. "Ballot Initiatives and the (Sub)Urban/Rural Divide in Colorado," in Daphne T. Greenwood, ed., *Colorado's Future: Meeting the Needs of a Changing State*. Colorado Springs: Center for Colorado Policy Studies.

15) Daniel A. Smith. 2003. "The Colorado 7th Congressional District," in David B. Magleby and Quin Monson, eds., *The Last Hurrah*? Provo, UT: Center for the Study of Elections and Democracy.

14) Stan Elofson, Daniel A. Smith, Jennifer Berg, and Joseph Lubinski. 2002. "A Listing of Statewide Initiated and Referred Ballot Proposals in Colorado, 1912-2001." Issue Brief No. 02-02. (March 5) *Colorado Legislative Council,* Colorado General Assembly, Denver. [Revised Edition].

13) Daniel A. Smith. 2001. "Howard Jarvis' Legacy? An Assessment of Antitax Initiatives in the American States." *State Tax Notes* 22: 10 (December): 753-764.

12) Daniel A. Smith. 2001. "The Structural Underpinnings of Ghana's December 2000 Elections." Critical Perspectives, No. 6. *Ghana Center for Democratic Development (CDD-Ghana)*, Accra, Ghana.

11) Daniel A. Smith, Jonathan Temin, and Kwaku Nuamah. 2001. "Media Coverage of the 2000 Election: A Report on the Media Coverage of Election 2000 (May 2000-Janurary 2001)." Research Paper, No. 8. *Ghana Center for Democratic Development (CDD-Ghana)*, Accra, Ghana.

10) Daniel A. Smith. 2000. "Election 2000: Debating the Issues?" Briefing Paper, Volume 2, Number 4, *Ghana Center for Democratic Development (CDD-Ghana)*, Accra, Ghana.

9) Daniel A. Smith. 2000. "Growth and Transportation Ballot Measures in Colorado," in Floyd Ciruli, ed., *Moving Visions: Next Steps Toward Growing Smart*. Denver: Gates Family Foundation.

8) Stan Elofson, Daniel A. Smith, Jennifer Berg, and Joseph Lubinski. 2000. "A Listing of Statewide Initiated and Referred Ballot Proposals in Colorado, 1912-2000." Issue Brief No. 8. (December) *Colorado Legislative Council,* Colorado General Assembly, Denver.  [updated 2002, 2004, 2006, 2008]

7) Daniel A. Smith. 2000. "Progressives and the Initiative Process: A Call to Arms." *Ballot Initiative Strategy Center (BISC)*.

6) Daniel A. Smith and Joseph Lubinski. 2000. "Sponsoring 'Counter-Majoritarian' Bills in Colorado." *Ag Journal*. (September): 12-13.

5) Daniel A. Smith. 1998. "Unmasking the Tax Crusaders." *State Government News*. 41:2 (March): 18-21.

4) Daniel A. Smith. 1997. "Howard Jarvis, Populist Entrepreneur," Working Paper, 97-8, Institute of Governmental Studies, *University of California - Berkeley*.

3) Daniel A. Smith. 1995. "The West Virginia Labor-Management Advisory Council," *The West Virginia Public Affairs Reporter*. 12:4 (Winter): 1-11.

2) Daniel A. Smith. 1992. "A Tale of Five Cities," *The La Follette Policy Report*. 5 (Fall): 18-21.

1) Daniel A. Smith. 1991. "Emerging Skill Needs in the Wisconsin Non-Automotive Engines Industry,"
Commissioned by the Wisconsin Board of Vocational, Technical, and Adult Education, Working Paper,
*Center on Wisconsin Strategy*, University of Wisconsin-Madison.

### OUTSIDE ACTIVITIES: BOARDS / EXPERT WITNESS / INVITED TESTIMONY / MISCELANEOUS

**Boards**
President, ElectionSmith, Inc. www.electionsmith.com (S-Corp) 2006-
Advisory Board Member, Common Cause Florida https://www.commoncause.org/florida/ 2014-
Board Member, Ballot Initiative Strategy Center (BISC) www.ballot.org 1999-2019.
Board President, 300 Club https://300clubswimandtennis.com/ 2018-2020.

**Domestic Consulting**
Expert (written declaration), *Houston Justice, et al. v. Abbott*. Case 5:21-cv-00848-XR (US District Court for the
Western Division of Florida) [Provided written report for plaintiffs analyzing effects of SB 1 in Texas],
2021-23.
Expert (written declaration), *Eva Jacqueline Espinosa v. Osceola County Canvassing Board, et al*. Case 2022-CA-
2363 (Circuit Court of the Ninth Judicial Circuit) [Provided written report of vote totals for candidates in a
contested county commission race], 2022.
Expert (written declaration), *Florida State Conference of NAACP v. Lee*. Case 4:21-cv-187-MW-MAF and *Florida
Rising Together v. Lee*, 4:21-cv-201-MW-MJF (US District Court for the Northern Division of Florida)
[Provided written reports for plaintiffs analyzing effects of SB 90 in Florida], 2021-22.
Co-author, "Brief of Direct Democracy Scholars, et al. Supporting Petitioners," *Thompson et al. v. DeWine, et al.*
[Contributed empirical evidence on ballot measures and freedom of speech.], March 2021.
Co-author, "Brief of Amici Curiae Empirical Elections Scholars in Support of Respondents," *Brnovich v.
Democratic National* Committee [Contributed empirical evidence of lack of fraud in American elections],
January 2021.
Consultant, All Voting is Local [Provided analysis of Rejected and Cured Vote by Mail ballots in Florida], 2020.
Expert (written declaration), *1199SEIU United Healthcare Workers East v. Louis DeJoy and the USPS*. Case 1:20-
cv-24069-RNS (US District Court for the Southern Division of Florida). [Provided written report for
plaintiffs analyzing absentee ballot return rates in Florida], 2020.
Expert (written declaration), *Texas League of United Latin American Citizens, et al. v. Abbott, et al*. Case 1:20-cv-
1006 (US District Court for the Western Division of Texas). [Provided written report for plaintiffs
analyzing absentee ballot drop-off locations in Texas], 2020.
Expert (written declaration), *Dream Defenders, et al. v. DeSantis, et al*. Case 4:20-cv-00067-RH-GRJ (US District
Court for the Northern District of Florida). [Provided written report for plaintiffs analyzing vote by mail
records in Florida], 2020.
Expert (written declaration), *Lewis, et al. v. Hughs*, Case 5:20-cv-00577 (US District Court for the Western District
of Texas). [Provided written report for plaintiffs analyzing vote by mail records in Texas], 2020.
Consulting Expert, *Nielsen, et al. v. DeSantis, et al.* Case 4:20-cv-00236-MW-MJF (US District Court for the
Northern District of Florida). [Provided confidential work product for plaintiffs on voting patterns in
Florida], 2020.
Expert (written declarations), *Gruver, et al. v. Barton, et al*. Case 1:19-cv-00121-MW-GRJ (US District Court for
the Northern District of Florida). [Provided written reports and deposed for plaintiffs analyzing records on
the impact of SB7066 on Florida residents with felony convictions and outstanding LFOs], 2019-20.
Consultant, Andrew Goodman Foundation [Analysis of on-campus early voting in Florida], 2019.
Consultant, ACLU-Florida [Data analysis of Ex-Felons in Florida], 2019-.
Expert (written declaration), *DNC Services Corporation et al. v. Lee et al.* Case 4:18-cv-00524-MW-CAS (US
District Court for the Northern District of Florida) [Provided written report for plaintiffs on Vote by Mail
ballots in Florida], 2019-.
Expert (written declaration), *MOVE Texas Civic Fund, et. al. v. Whitley, et. al.* Case 3:19-cv-00041 (US District
Court for the Southern District of Texas) [Provided written reports for plaintiffs on number of naturalized
citizens in Texas], 2019.
Expert (written declarations), *Fair Fight Action v. Crittenden*, Case No. 1:18-cv-05391 (US District Court for the
Northern District of Georgia) [Retained by plaintiffs to analyze data related to Georgia's election laws],
2018-.
Expert, *The Democratic Party of Georgia v. Crittenden*, Case No. 1:18-cv-05443 (US District Court for the
Northern District of Georgia) [Retained by plaintiffs to analyze data related to the 2018 gubernatorial
election], 2018.
Consultant, ACLU-Florida [Provided analysis of Vote by Mail ballots in Florida], 2018.

10

Expert, *Judicial Watch, Inc., Election Integrity Project California, Inc., et al. v. Dean C. Logan, et al*. Case No. 2:17-cv-08948-R-SK (US District Court for the Central District of California, Western Division). [Retained by defendants (California Department of Justice) to analyze data concerning inactive voters], 2018.

Expert (written declaration), *Rivera v. Detzner*, Case 1:18-cv-61474 (US District Court for the Norther District of Florida) [Provided written report for plaintiffs on Puerto Rican population and registered voters in Florida], 2018.

Expert, *Thompson et al. v. Merrill*, Case No. 2: 16-cv-783 (US District Court for the Middle District of Alabama) [Retained by plaintiffs to analyze data related to the discriminatory impact of Alabama's felony disenfranchisement scheme over time], 2018-.

Expert (written affidavit), *League of Women Voters of Florida, Inc., et al. v. Detzner*, Case No. 4:18-cv-00251-MW-CAS (US District Court for the Northern District of Florida) [Provided written report for plaintiffs (LWV) to extend early voting in Florida], 2018.

Expert (written affidavit), *Ohio A. Philip Randolph Institute, et al. v. Secretary of State, Jon Husted*, Case 2:16-cv-00303 (US District Court for the Southern District of Ohio, Eastern Division) [Provided written report and deposed for plaintiffs (APRI, ACLU OH, Demos) to reinstate registered voters removed by Ohio's "Supplemental Process"], 2017. [Decision, *Husted v. APRI*, by SCOTUS, July 11, 2018].

Expert (written affidavits), *Bellito & ACRU v. Snipes*, Case 4:16-cv-61474 (US District Court for the Southern District of Florida, Ft. Lauderdale Division) [Provided written expert reports and deposed for intervenors (SEIU, Project Vote, Demos) to defend NVRA compliance by Broward Supervisor of Elections, 2017; testified at trial].

Consultant, ACLU, Georgia [Provided analysis of CVAP, VAP, and registered voters in Irwin County, Georgia], 2017.

Consultant, ACLU, Georgia [Provided analysis of proposed redistricting changes to the Georgia House of Representatives by the Georgia state legislature], 2017.

Expert (written affidavit), *Florida Democratic Party v. Scott*, Case 4:16-cv-00626 (US District Court for the Northern District of Florida) [Provided written expert report for plaintiff-intervenors (Mi Familia Vota Education Fund) to extend voter registration deadline in Florida due to Hurricane Matthew], 2016.

Consultant, ACLU, Georgia [Provided analysis of registration deadline in Georgia due to Hurricane Matthew], 2016.

Expert (written affidavit), *Florida Democratic Party v. Detzner*, Case 4:16-cv-00607 (US District Court for the Northern District of Florida) [Provided written empirical analysis for plaintiff on vote-by-mail ballots cast in Florida], 2016.

Advisor, "Mad As Hell: Howard Jarvis and the Birth of the Tax Revolt," Documentary Film by Jason Cohn, Bread and Butter Films [Academic Advisor on Jarvis and antecedents of Prop. 13], 2011-16.

Advisor, "Rigged," Documentary Film by Natasha del Torro, Fusion TV (Naked Truth), 2016. [Winner of the Robert F. Kennedy Journalism Award for Best Documentary]. Available: http://tv.fusion.net/story/352548/naked-truth-rigged-elections-documentary/.

Advisor, "Voting: Last Week Tonight with John Oliver," HBO, February 14, 2016. Available: https://www.youtube.com/watch?v=rHFOwlMCdto.

Expert (written affidavit), *Frank v. Walker*, Case 16-3003, 16-3052 (US Court of Appeals for the Seventh Circuit) [Provided written empirical analysis for plaintiffs (*ACLU*) on voter ID and turnout], 2015.

Expert (consultant), *Greater Birmingham Ministries v. Alabama*, Case 2:15-cv-02193-LSC (US District Court for the Northern District of Alabama, Southern Division) [Provided oral empirical analysis for plaintiffs (*NAACP LDEF*) on use of absentee ballots], 2015.

Consultant, America Votes [Provided demographic shift of registered voters analysis for state of Florida], 2015.

Expert (written affidavits), *NAACP, et al. v. Husted, et al.*, 2:14 cv-00404 (US District Court for the Southern District of Ohio) [Provided written empirical analysis and deposed for plaintiffs (*ACLU*) on early in-person absentee voting in Ohio], 2014.

Expert (written affidavit), *John Sullivan, et al. v. Marni Lin Sawiki, et al.*, 2013-CA-003122 (20th Judicial Circuit (Lee County, FL) [Provided written empirical analysis and deposed on early, absentee, and Election Day vote totals in the November 5, 2013, Cape Coral mayoral election], 2014.

Expert (written affidavit), *Gateway Retail Center, LLC v. City of Jacksonville, Florida*, 3:13-cv1040-J-TJC-JRK (US District Court for the Middle District of Florida) [Provided empirical analysis for Gateway Retail Center's attorneys of African American voting during early voting in Duval County in the 2012 General Election], 2013.

Expert (written affidavits), *Arcia, et al. v. Detzner*, 1:12-cv-22282-WJZ (US District Court for the Southern District of Florida) [Provided empirical analysis for Arcia's attorneys of the Florida Department of State's various lists of "potential non-citizens"], 2012.  [*Arcia, et al. v. Florida Secretary of State* (Defendant-Appellee) *and Garcia, et al.* (Intervenor Defendants), 12-15738 (Appealed in 11th Circuit, from the United States District Court for the Southern District of Florida), 2014.

Elections Analyst, WUFT (TV and Radio), Election Night Coverage, November 6, 2012.

11

Advisor, "Voters in America: Who Counts?" CNN Documentary Investigation, October 14, 2012.
http://cnnpressroom.blogs.cnn.com/2012/10/19/voters-in-america-who-counts-joejohnscnn-investigates-voter-suppression-voter-fraud/

Expert (written affidavit), *Brown v. Detzner 3:12-cv-00852* (US District Court for the Middle District of Florida) [Provided empirical analysis for Brown's attorneys of minority early voting in Duval County during the 2008 and 2010 general elections and the 2011 Jacksonville mayoral race], 2012.

Expert (written affidavits), *Romo v. Scott*, No. 2012-CA-000412 (Fla. Cir. Ct., Leon County). [Provided empirical analyses and deposed for Coalition's attorneys of new Congressional redistricting maps submitted and adopted by the Florida legislature as well as alternative maps submitted by the The League of Women Voters of Florida, the National Council of La Raza, and Common Cause Florida], 2012-14.

Consultant (*Pro Bono*) (written work product), *League of Women Voters of FL v. Browning*, N.D. Fla. (4:11-cv-00628). [Provided empirical analysis for LWV's attorneys (Brennan Center, New York University), assessing the impact of Florida's "third party organization" voter registration requirements], 2012.

Consultant (*Pro Bono*) (written work product), Hillsborough Hispanic Coalition, Tampa, Florida, 2012. [Provided empirical analysis of the likely racial/ethnic impact of the redistricting maps adopted by the Hillsborough County Commission and provided alternative maps to be submitted by the Hillsborough Hispanic Coalition, in anticipation of federal litigation], 2012.

Member, 2012 Citizen Election District Review Committee, City of Gainesville, 2012 (Appointed by Mayor Craig Lowe).

*Invited Testimony*, U.S. Senate, Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights, "New State Voting Laws II: Protecting the Right to Vote in the Sunshine State," January 2012.

Expert (written affidavit), *Worley v. Detzner*, U.S. District Court, N.D. Fla (4:10-cv-00423-RH-WCS). [Provided expert opinion to Florida Secretary of State to help defend Election code provisions concerning the reporting, registration, and disclosure requirements applicable to political committees (ballot issues)], 2010.

Expert (written affidavit), *Citizens Against Slots v. PPE Casino*, 999 A.2nd 181 (2010) 415 Md. 117. [Provided empirical analysis of the validity rates of the signatures submitted by Citizens Against Slots for a county popular referendum], 2010.

Expert (written affidavit), *The Independence Institute, et. al. v. Bernie Buescher* 1:2010-cv-00609. (US 10th Circuit) [Provided empirical analysis for the Office of the Colorado Attorney General to defend Secretary of State's enforcement of public disclosure laws for ballot issue committees], 2009-2010.

Lead Author, "Direct Democracy Scholars" Amicus Brief, *Doe v. Reed*, 132 S. Ct. 449. [Provided empirical evidence that public disclosure of signatures on ballot measures serves sufficiently important governmental interests in order to prevent fraudulent signature gathering activities, to limit the deceptive solicitation of signatures, and to provide information to voters about ballot measures], 2010.

Expert (written affidavit), *Dallman, et al. v. William Ritter and Rich L. Gonzales and Daniel Ritchie, et al.* 09SA224 (Colorado Supreme Court) [Provided empirical analysis for Ritter, Gonzales, and Ritchie of analysis of campaign financing of ballot measures], 2009-10.

Expert (written affidavit), *Sampson v. Buescher*, 08-1389, 08-1415 (US 10th Circuit) [Provided empirical analysis refuting claims of barriers to participation in ballot issue campaigns for Office of the Colorado Attorney General, defending Secretary of State's enforcement of disclosure laws], 2007-10.

Consultant, *Trust the Voters*, Tallahassee, 2006.

Consultant, *The Washington State Patrol Troopers Association* [Conducted empirical analysis for State Patrol Troopers of the validity of signatures collected on ballot issue campaign], 2006.

Expert (written affidavit), *The City of Winter Springs, FL v. Seminole County*, City of Winter Springs, 2004.

Expert (written affidavit), *California Pro-Life Council, Inc. v. Karen Getman, et al.* 328 F.3d 1088, 1101 (US 9th Cir) [Provided empirical analysis for the Office of the California Attorney General on veiled political actors in California ballot measure campaigns], 2004-05.

Expert (written affidavit), *Colorado Right to Life Committee, Inc. v. Donetta Davidson* 395 F.Supp.2d 1001 (US 10th Circuit) [Provided empirical analysis of broadcasted television and direct mail ads in Colorado between 1999-2003 for the Office of the Colorado Attorney General], 2004-05.

Invited Testimony, Ballot Initiative Reform, Florida Legislature, 2002; 2003-05.

Invited Testimony Witness, Ballot Initiative Reform, Colorado Legislature, 1999-2000.

Consultant (*pro bono*), *Ad Hoc Committee to Defend Heath Care*, Denver, CO, 1998-2000.

***International Consulting***

Consultant, National Democratic Institute (NDI), Ghana, 2013.

Invited Written Testimony, *British House of Lords*, Constitution Committee (Direct Democracy), 2010.

Consultant, *Institute of International Education (IIE)*), New York, 2002-04.

Consultant, *Coalition of Domestic Elections Observers (CODEO)*, Accra, Ghana, 2000-01.

Consultant, *International Foundation for Election Systems (IFES)*, Washington, DC, 1999-2001.

Consultant, *International Student Exchange Program (ISEP)*, Washington, DC, 1995-97.

***BOOK REVIEWS & REVIEW ESSAYS***

9) Daniel A. Smith. 2008. Review of Dorothy Holland, Donald M. Nonini, Catherine Lutz, Lesley Bartlett, Marla Frederick-McGlathery, Thaddeus C. Guldbradsen, and Enrique G. Murillo, Jr., Local Democracy Under Siege: Activism, Public Interests, and Private Politics, *Perspectives on Politics* 6: 386-86.

8) Daniel A. Smith. 2006. Review of Stephen Nicholson, Voting the Agenda: Candidates, Elections, and Ballot Propositions, *Political Science Quarterly* 120: 695-697.

7) Daniel A. Smith. 2005. Review of John Matsusaka, For the Many or the Few? The Initiative, Public Policy, and American Democracy, *Perspectives on Politics* 3: 646-47.

6) Daniel A. Smith. 2000. Review of Shaun Bowler and Todd Donovan, Demanding Choices: Opinion, Voting, and Direct Democracy, *Social Science Quarterly* 81: 1104-1106.

5) Daniel A. Smith. 1999. Review of Shaun Bowler, Todd Donovan, Caroline Tolbert, eds., Citizens as Legislators, *American Political Science Review* 93: 446-447.

4) Daniel A. Smith. 1998. Review of David Ryden, Representation in Crisis, *Politics and Policy* 26: 514-515.

3) Daniel A. Smith. 1998. Review of Grant Reeher and Joseph Cammarano, eds., Education for Citizenship, *H-Pol, H-Net*. (February).

2) Daniel A. Smith. 1997. Review Essay of William S. K. Reno, Corruption and State Politics in Sierra Leone, and Sahr John Kpundeh, Politics and Corruption in Africa, *Africa Today* 44: 362-365.

1) Daniel A. Smith. 1996. Review of Stephen Lowe, The Kid on the Sandlot: Congress and Professional Sports, 1910-1992, *Sport History Review* 27: 90-92.

***TEACHING GRANTS, HONORS, AND AWARDS***

David King Defender of Democracy Award, League of Women Voters of Florida, January 2022.

Science Defender Award, Union of Concerned Scientists, December 2021.

Anderson Scholar Award, College of Liberal Arts and Sciences, University of Florida, 2011; 2015; 2016; 2017 ; 2021.

Political Science Board of Advisors, "Outstanding Professor Award," *University of Florida*, Spring 2008.

Center for Teaching and Learning Technology Grant, "Introduction to American Politics: Web-Based Interactive Learning," *University of Denver*, Spring, 1997.

Faculty Appreciation Award, Learning Effectiveness Program, *University of Denver*, April 1997.

Curriculum Diversity Grant, "A Theater History: The Racial and Class Politics of US Drama from Colonization Forward," *University of Denver*, Winter, 1997.

CORE Development Grant, "Drama of Politics/Politics of Drama," *University of Denver*, Summer, 1996.

International Small Grants, "Summer Student Study Abroad Program: University of Ghana at Legon," Office of Internationalization, *University of Denver*, Spring, 1995.

International Small Grants, "Ghana Study Abroad Program," Office of Internationalization, *University of Denver*, Spring, 1995.

***NEWSPAPER OP-EDS, INVITED BLOG POSTS & LETTERS TO THE EDITOR***

Op-Ed, "We work for the people of Florida. That's why we can't let the University of Florida silence us on a voting rights law," *The Washington Post*, November 3, 2021 (with Sharon Austin and Michael McDonald).

Op-Ed, "What is the Florida Legislature hiding on redistricting?" *Tampa Bay Times*, October 7, 2021 (with Michael P. McDonald).

Op-Ed, "Election integrity requires transparency," *Tampa Bay Times*, February 9, 2021 (with *Danielle Dietz* and *Gabriella Zwolfer* ).

Op-Ed, "*All counties should offer secure, 24/7 drop boxes for mail ballots*," *Tampa Bay Times*, October 12, 2020 (with ***Jose Vazquez*** ).

Op-Ed, "Do you usually vote by mail? A lot of Republicans who don't say so," *Washington Post* (Monkey Cage), October 9, 2020 (with *Enrijeta Shino*).

Op-Ed, "Minor postal delays could disenfranchise thousands of Florida vote-by-mail voters," *Tampa Bay Times*, August 14, 2020 (with Michael Herron).

Op-Ed, "Here's the problem with mail-in ballots: They might not be counted," *The Washington Post* (Monkey Cage), May 21, 2020 (with *Enrijeta Shino* and Mara Suttmann-Lea).

Op-Ed, "Your voting habits may depend on when you registered to vote," *Salon*, September 24, 2019. [Originally appeared in *the Conversation*] (with *Enrijeta Shino*).

Invited Blog Post, "Who Votes Provisionally and Why? A Look at North Carolina's 2016 General Election," MIT Election Science Data Lab, May 2, 2018. (with *Lia Merivaki*).

Op-Ed, "Do we have a right not to vote? The Supreme Court suggests we don't," *NY Daily News*, June 12, 2018 (with Michael C. Herron).

Op-Ed, "If more states start using Ohio's system, how many voters will be purged?" *The Washington Post* (Monkey Cage), June 17, 2018 (with Michael C. Herron).

Op-Ed, "2-to-1 Registration Advantage for Democrats among 440K New Hispanic Voters In Florida," *Huffington Post*, October 7, 2016.

Op-Ed, "The Battle Over "One Person, One Vote," Has Just Begun," *The American Prospect,* April 18, 2016. (with Carl Klarner).

Invited Blog Post, "Party competition is the primary driver of the recent increase in restrictive voter ID laws in the American states," London School of Economics, U.S. Politics and Policy, November 12, 2014 (with *William Hicks* and Seth McKee).

Op-Ed, "Rejected Ballots in Florida," *Florida Voices*, November 4, 2012 (with Michael Herron).

Op-Ed, "High ballot rejection rates should worry Florida voters," *Tampa Bay Times*, October 28, 2012 (with Michael Herron).

Op-Ed, "Voters need to push back against corporate cash," *St. Petersburg Times*, July 13, 2010.

Op-Ed, "A chance for Floridians to redraw rigged districts," *St. Petersburg Times*, November 25, 2009.

Op-Ed, "Lawmakers don't trust voters with the constitution," *Gainesville Sun*, October 21, 2006.

Op-Ed, "Jeb Bush's secret-squirrel hunt? Rocky, that's just a bunch of Bullwinkle," *Orlando Sentinel*, February 23, 2006.

Op-Ed, "Colorado: Independent of Whom?" Ballot Initiative Strategy Center, *Ballot Blog*, August 29, 2005.

Op-Ed, "Stop Political Fund-Raising Arm," *Gainesville Sun*, April 25, 2004 (with Nicole M. James).

Op-Ed, "Committees Hold the Secret to Campaign Financing," *St. Petersburg Times*, April 10, 2004 (with *Nicole M. James*).

Letter, "Reform Ballot Initiative and Preserve the People's Power," *Miami Herald*, February 29, 2004.

Op-Ed, "No: The Rich Have Taken Over," *Denver Post*, December 1, 2002.

Op-Ed, "The Millionaire's Club: Why Leave Ballot Initiatives to the Rich?" *Denver Post*, August 18, 2002.

Op-Ed, "The Political Consequence of 'Praying for Peace,'" *The Crusading Guide* [Accra, Ghana], 12-18 October 2000.

Letter, "Book's [*Democracy Derailed* by David Broder] premise is problematic," *Denver Post*, May 28, 2000.

Letter, "Initiative process ignores rural voices," *Denver Rocky Mountain News*, March 15, 2000.

Op-Ed, "Progressives need to show initiative on ballot signatures," *Denver Post*, January 13, 2000.

Op-Ed, "Colorado should put campaign finance data on the Internet," *Denver Post*, November 4, 1998 (with Richard Braunstein).

Letter, "Follow the Money," *Washington Post*, October 12, 1998.

Op-Ed, "Voters behind rule," *Denver Post*, June 21, 1998.

Op-Ed, "Founders crafted safeguards against popular excesses," *Denver Post*, May 21, 1995.

### *INVITED TALKS AND PROFESSIONAL PRESENTATIONS*

Invited Talk, "Vote Method and Confidence in Elections," Department of Political Science, Aarhus University, March 17 2023.

Invited Talk, "Riot in the Party? Voter Registrations in the Aftermath of January 6," Department of Political Science, University of Lund, Sweden, February 28, 2023.

Keynote Speaker, "Challenges to Academic Freedom and Freedom of Speech in the US," European Sociology Association/Political Sociology Network, University of Lausanne, Switzerland, November 11, 2022.

Keynote Speaker, Alachua County Democratic Party, "The Democratic Dilemma facing Democrats," Gainesville, FL, May 13, 2022.

Invited Panelist, "Briefing on Voting Rights in Florida," Testimony before the Florida Advisory Committee to the U.S. Commission on Civil Rights, March 28, 2022 [virtual].

Keynote Speaker, "The Threats to Faculty Free Speech in Florida," *Phi Sigma Alpha* Address, Southern Political Science Association, January 12, 2022 (with Sharon Austin and Michael McDonald) [virtual].

Invited Panelist, "Election Shifts in 2020 and Beyond:  Vote by Mail Organizing and Research Efforts," The Funders' Committee for Civic Participation, September 14, 2021 [virtual].

Invited Talk, "Voting in the Time of COVID-19," UF Retired Faculty, October 14, 2020 [virtual].

Invited Panelist, "Implications of Amendment 4 and SB 7066 on voting rights in Florida," Federal Bar Association (South Florida Chapter), September 3, 2020 [virtual].

Invited Panelist, "Hispanic Voting Rights," UF Hispanic Student Association [virtual], July 17, 2020.

Invited Talk, "Voting Rights in Florida," Marin County (CA) League of Women Voters [virtual], August 3, 2020.

Invited Panelist, "Voting Rights in Florida," All Voting is Local & The Leadership Conference on Civil and Human Rights, August 13, 2020 [virtual].

Invited Talk, "Ballot Design, Undervoting, and Pivotality: A Forensic Analysis of Florida's 2018 US Senate Race," Center for Voting and Parties, University of Copenhagen, Denmark, December 3, 2019.

Keynote Speaker, "6 Things Every Democrat Should Know about Florida Elections," Democratic Women's Club of Florida, 63rd Annual Convention, Orlando, September 14, 2019.

Invited Talk, "5 Things Every Floridian Should Know about Florida Elections," *Stetson University*, April 25, 2019.

Invited Talk, "The 2018 Mid-Term Elections," Graham Center, University of Florida, Gainesville, Florida, November 13, 2018.

Invited Talk, "Is a Blue Wave Coming? The 2018 General Election," FedCon, National Association of Retired Federal Employees Association, Jacksonville, Florida, August 28, 2018.

Invited Talk, "Voting Rights Litigation," ACLU of Florida, 2018 Lawyers Conference, Delray Beach, Florida, September 7, 2018.

Invited Panelist, "The Black Vote: Is it being taken for Granted?" *Collaboratively Woke and The Virginia Leadership Institute*, Downtown Alachua Public Library, Gainesville, Florida, June 23, 2018.

Invited Talk, "Public Records Requests and Analyzing Elections in Florida," The Bob Graham Center for Public Service, University of Florida, Gainesville, Civic Scholar Lecture, February 14, 2018.

Invited Talk, "Voting in Florida," Voter Suppression Forum, The Bob Graham Center for Public Service, University of Florida, Gainesville, November 13, 2017.

Invited Talk, "Journalist-Scholar Big Data Partnerships," Investigative Reporters and Editors, The National Institute for Computer-Assisted Reporting, Annual Conference, Jacksonville, FL, March 2, 2016.

Invited Talk, "Florida's Constitutional Revision Commission and Game Theory," Future of Florida Summit, University of Florida, Gainesville, Florida, February 18, 2016.

Invited Talk, "Explaining Trump's Win in Florida: 10 Election Myths and Realities," Graham Center, University of Florida, Gainesville, Florida, November 14, 2016.

Invited Response, Michael Kang (Emory School of Law) "Law and Politics of Judging Election Cases," University of Florida School of Law, Gainesville, Florida, November 4, 2016.

Invited Talk, "Patterns of Political Participation in Florida," Women, Race, and the U.S. Presidency, The Center for The Study of Race and Race Relations & The Center for Gender, Sexualities, and Women's Studies Research, University of Florida, Gainesville, October 13, 2016.

Invited Talk, "The Structural Pathologies of the American Electoral System," US Fulbright Association (UF International Center), Gainesville, September 27, 2016.

Invited Talk, "Registered Voters and Turnout in Alachua County," Gainesville Area Chamber of Commerce's Leadership Gainesville 43 Government and Policy Day, September 8, 2016.

Invited Talk, "The Politics of Voter Suppression in Florida," Santa Fe College, American Democracy Project, February 9, 2016.

Invited Talk, "The Contributions and Conundrums of Technology: EAVS Data Reporting Consistency," at The Evolution of Election Administration since the VRA, Auburn University, September 15, 2015 (with Lia Merivaki).

Invited Talk, "2014 Election Wrap-Up," Graham Center, University of Florida, Gainesville, Florida, November 6, 2014.

Roundtable Participant, "I Am A Millennial: The Importance of the Youth and Minority Vote," Graham Center, University of Florida, October 23, 2014.

Invited Talk, "Voting Rights in North Carolina," Emory University, Atlanta, April 8, 2014.

Keynote Speaker, "Anticipating 2014: The State of Voting Rights in Florida," Gainesville Labor Council, Gainesville, Florida, December 9, 2013.

Invited Talk, "Biometric registration and verification: Deterring voter fraud or inviting voter disenfranchisement? Corruption, Accountability, and Governance in Africa, Council on African Studies, Yale University, February 28, 2013.

Invited Talk, "Design Fail: The Attack on Voting Rights in Florida," University of Florida Retired Faculty, Harn Museum, University of Florida, February 22, 2013.

Keynote Speaker, "The Attack on Voting Rights in Florida," Gainesville Labor Council, Gainesville, Florida, December 10, 2012.

"Moved by the Spirit? Atmospherics and Ballot Measure Vote Choice," Initiatives and Referendums in the Elections of 2012, University of Southern California, November 16, 2012 (with Charles Dahan).

Invited Talk, "Design #Fail: Voting Rights in Florida," Graham Center's Election Wrap Up: Decision 2012, University of Florida, Gainesville, Florida, November 13, 2012.

Invited Talk, "Consolidating Representation in Ghana? Parliamentary Malapportionment and Rejected Ballots," *Stability Amidst Chaos: Reflections on Two Decades of Ghanaian Democracy*, Program of African Studies, Northwestern University, Chicago, Illinois, October 12, 2012.

Keynote Speaker, "Curtailing Voting Rights in Florida," *Civic Dialogues and the 2012 Election in the United States*, College of Central Florida, Ocala, Florida, October 22, 2012.

Keynote Speaker, "The Return of Jim Crow? Voting Rights Under Florida's House Bill 1355," League of Women Voters, Annual Fall Luncheon, Gainesville, Florida, September 11, 2012.

Invited Talk, "Litigating Voting Rights in Florida," 8th Judicial Circuit Florida Bar Association, Continuing Legal Education, Gainesville, Florida, September 21, 2012.

Invited Presentation, "The Impact of HB 1355 on Florida's Hispanics," Gator Academic Outreach Symposium, co-hosted by Hispanic Alumni Association and Miami-Dade College, Miami, FL, May 11, 2012.

Invited Talk, "Voting and Elections in the United States," US Embassy, Accra, Ghana, live satellite talk to US Embassy, Ivory Coast, October 3, 2011.

Invited Public Lecture, "Ghana's National Electoral Commission and the 2012 Elections: The Malapportionment of Parliamentary Constituencies, Rejected Ballots, and Questions of Representation," Department of Political Science International Lecture Series, University of Ghana, Accra, Ghana, November 17, 2011. [Q&A followed by several media interviews, including RadioUniverse, Ghana Television Broadcasting and TV3].

Invited Public Lecture, "Assessing the Credibility of Public Opinion Polls," Ghana Center for Democratic Development (CDD-Ghana), Accra, Ghana, November 23, 2011. [Taped broadcast by TV3 and several FM stations].

Invited Talk, "Obama to Blame?" Penn State University, February 26, 2010.

Invited Talk, "Shirking the Initiative?" Rutgers University, November 6-7, 2008.

Invited Talk, "Granting Power to the People: The Adoption of Direct Democracy in the American States," Bose Series Lecturer, University of Iowa, Iowa City, November 7-10, 2007.

Invited Talk, "Instrumental Effects of the Initiative in the American States," The Voice of the Crowd—Colorado's Initiative, Byron R. White Center for the Study of American Constitutional Law, University of Colorado, Boulder, Old Supreme Court Chambers, Colorado State Capitol, Denver, January 26, 2007.

Invited Paper/Presentation, "Initiating Reform: The Effects of Ballot Measures on State Election and Ethics Policy," 2008 and Beyond: The Future of Election and Ethics Reform in the States, Ohio State Capital Building, Kent State University, January 16, 2007.

Invited Paper/Presentation, "Financing Ballot Measures in the American States," Financing Referendum Campaigns Conference, University of Zurich, Switzerland, October 27-29, 2006.

Invited Talk, "Pressure at the Polls/Ballot Initiatives," Capitol Beat Conference, Columbus, OH, August 2006.

Invited Talk, "Turnout and Priming Effects of Ballot Initiatives," Ballot Initiative Strategy Center Spring Briefing, National Education Association, Washington, DC, May 11, 2006.

Invited Talk, "The People as Legislators: The Influence of Direct Democracy," Moritz College of Law, Ohio State University. Columbus, OH, March 3, 2006.

Invited Public Debate, "Initiative Reform in Florida," *Orlando Regional Chamber of Commerce*, Orlando, FL, February 23, 2006.

Invited Talk, "Direct Democracy: The Battle over Citizen Lawmaking," *Minnesota Council of Nonprofits*, *Public Policy Day 2006: Nonprofits as a Force for Change*, Minneapolis, MN, January 26, 2006.

Keynote Speaker, "Taking the Initiative in Florida," *National Conference of Editorial Writers* Regional Conference, University of Central Florida, Orlando, FL, October 16, 2005.

Panelist, "The Educative Effects of Direct Democracy," *Direct Democracy: Historical Roots and Political Realities*, The Bill Lane Center for the Study of the North American West, Stanford University, Stanford, CA, April 14-15, 2005.

Panelist, "The Initiative and Referendum Process," *The 2004 Election: What Does it Mean for Campaigns and Governance?* University of Southern California Law School, Los Angeles, CA, October 8, 2004.

Invited Talk, "Florida's Initiative Process," Oak Hammock, Gainesville, FL, October 21, 2004.

Invited Talk, "Educated by Initiative," Oak Hammock, Gainesville, FL, October 6, 2004.

Invited Talk, "Are Initiatives Good or Bad for Business," *National Chamber of Commerce Federation*, Boca Raton, FL, February 22, 2004.

Panelist, "Roundtable on Florida Politics," *UF-FSU Colloquium*, Gainesville, FL, November 10, 2003.

Panelist, "Initiatives and Referenda: Implications for Public Administration and Governance," *National Academy of Public Administration*, Washington, DC, October 22, 2003.

Panelist, "Initiatives and Referenda: Direct Democracy or Government for Sale?" *New York Bar Association*, New York City, May 8, 2003.

Keynote Speaker, "Direct Democracy in Colorado: The (Sub)Urban-Rural Divide," *Colorado Water Congress Annual Meeting*, Denver, November 8, 2002.

Invited Talk, "Prospects for a Universal Health Care Ballot Initiative in Florida," Alachua County Labor Party, Gainesville, FL, January 25, 2002.

Invited Talk, "The 2000 Ghana Elections: Lessons for the Future," The Center for African Studies, *University of Florida*, Gainesville, August 28, 2001.

Panelist, "Graduate Studies in Canada and U.S.," *University of Ghana at Legon*, Accra, Ghana, March 14, 2001.

Invited Talk, "Media Coverage of the 2000 [Ghanaian] Elections," *Ghana Center for Democratic Development (CDD-Ghana)*, Accra, Ghana, March 2, 2001.

Invited Talk, "Ghana's 2000 Elections: The 'Politics of Absence,'" *Ghana Center for Democratic Development (CDD-Ghana)*, Accra, Ghana, February 20, 2001.

Panelist, "Special Forum on U.S. Presidential Elections 2000," *University of Ghana at Legon*, Accra, Ghana, November 21, 2000.

Invited Talk, "The Role of The Media in US Elections," *Public Affairs Section, United States Embassy*, Accra, Ghana, October 31, 2000.

Facilitator, "Three's A Crowd? The Fate of Third Parties in America," *Humanities Institute Salon*, Denver, May 4, 11, & 18, 2000.

Chair and Discussant, "Factors Affecting the Success of Initiatives," *Western Political Science Association Conference*, San Jose, March 24-26, 2000.

Invited Talk, "The Progressive Myth: Direct Democracy in Colorado, 1912," *Willamette University*, February 3, 2000.

Invited Talk, "The Initiative to Party: The Partisan - Ballot Initiative Nexus," *Willamette University*, February 3, 2000.

Invited Talk, "Taking the Initiative into the 21st Century," *Colorado Water Congress Annual Meeting*, Broomfield, January 27, 2000.

Invited Talk, "Foundations of the American Political System," *Zhejiang University*, Zhejiang, China, October 13, 1999.

Invited Talk, "Trade, Taiwan, Tiananmen, and Theft: Partisanship in US-China Relations," *Fudan University*, Shanghai, China, October 11, 1999.

Invited Talk, "Republicans, Democrats, and US-China Relations," *The People's University*, Beijing, China, October 9, 1999.

Invited Talk, "US-China Relations and the 2000 Presidential Election," *China Institute of Contemporary International Relations*, Beijing, China, October 7, 1999.

Invited Talk, "Taking the Initiative: The Role of Money in Ballot Initiatives in the US," *Aspen Community & Institute Committee*, Aspen, August 10, 1999.

Facilitator, "Taking the Initiative: The Politics of Direct Democracy in Colorado," *Humanities Institute Salon*, May 20, May 27, & June 3, 1999.

Invited Talk, "The State of Direct Democracy in Colorado," American Center Series, *University of Colorado at Boulder*, April 9, 1999.

Participant, "TABOR: Today & Tomorrow," Graduate School of Public Affairs, *University of Colorado at Denver*, January 20-21, 1999.

Keynote Speaker, *Colorado Water Congress Annual Meeting*, "The Initiative Process: What You Need to Know," November 10, 1998.

Invited Talk, "The Political Economy of the Bronco's New Stadium Proposal," George Washington High School, *Reach Out DU*, October 15, 1998.

Invited Talk, "The Political Economy of the Bronco's New Stadium Proposal," Cherry Creek High School, *Reach Out DU*, October 15, 1998.

Invited Talk, "Tax Crusaders and the Politics of Direct Democracy," Tattered Cover Bookstore, Denver, August 20, 1998.

Academic Session Leader, "The Politics of Building a New Broncos Stadium," West High School VIP Program, *University of Denver*, April 17, 1998.

Participant, "Proposition 13 and its Progeny: Is California Suffering from an Excess of Democracy?" Institute of Governmental Studies, *University of California, Berkeley*, April 1-2, 1998.

Moderator, "Politics 101," Student Forum, *University of Denver*, March 3, 1998.

Panelist, "Ways to use Technology in Teaching," Dean's Luncheon on Teaching and Learning, *University of Denver*, February 20, 1998.

Panelist, "The End of Empire in Ghana, 1957," The End of Empire: 50 Years of British Withdrawal, Center for Teaching International Relations, *University of Denver*, February 7, 1998.

Moderator, "1996 Candidate Forum," DU Programs Board, *University of Denver*, October 28, 1996.

Invited Talk, "Election 1996," KARIS Community, Denver, October 24, 1996.

Invited Talk, "*Faux* Populism: Douglas Bruce, Populist Entrepreneur, and the Anti-Tax Moment in Colorado," Humanities Institute, *University of Denver*, October 17, 1996.

Panelist, "The Federal Budget Battle," Sponsored by Omicron Delta Epsilon and Pi Sigma Alpha, *University of Denver*, October 2, 1995.

Invited Talk, "US Energy Policy," Highlands Ranch High School, *Reach Out DU*, November 10, 1995.

Panelist, "Study Abroad," Second Annual University Conference: Internationalization at the University of Denver, *University of Denver*, April, 1994.

Chair and Panelist, "African Studies," Second Annual University Conference: Internationalization at the University of Denver, *University of Denver*, April, 1994.

Panelist, "Public Policy and Work Force Participation: Making the School-to-Work Transition," Public Policy and Work Force Participation Seminar, *University of Pittsburgh*, September 15, 1993.

Rapporteur, "City$Money Conference," The La Follette Institute for Public Affairs, *University of Wisconsin-Madison*, February 4-6, 1992.

***CONFERENCE PAPER PRESENTATIONS***

"Vote Method and Confidence in Elections," Elections, Public Opinion, and Voting Behavior Semi-Annual Meeting, Florida State University, March 2-4, 2023 (with Enrijeta Shino)

"Vote Method and Confidence in Elections," Southern Political Science Association Annual Meeting, January 12-15, 2022, St. Pete (with Enrijeta Shino).

"A Blue Primary in a Reddish State: How Preferences are Shaped by Expectations, Issues, and Sexism," Southern Political Science Association Annual Meeting, January 12-15, 2022, St. Pete (with Michael Martinez).

"Shared Language, Distinct Politics: A Deeper Look at Hispanic Vote Cohesion in South and Central Florida," Southern Political Science Association Annual Meeting, January 12-15, 2022, St. Pete (with Brian Amos, Matt Barreto, Maxwell Clarke, Angela Gutierrez, Andy Jarrin, and Mike McDonald).

"Voting During a Pandemic: Convenience Voting and Youth Turnout," Southern Political Science Association Annual Meeting, January 12-15, 2022, St. Pete (with Danielle Dietz, Payton Lussier, Mike McDonald, Enrijeta Shino).

"Shared Language, Distinct Politics: A Deeper Look at Hispanic Vote Cohesion in South and Central Florida," American Political Science Association, Montreal, Canada, September 15-18, 2021 (with Angela Gutierez, Matt Barreto, Mike McDonald, and Brian Amos).

"Mail Voting and Voter Turnout," Election Sciences, Reform, and Administration, University of North Carolina, Charlotte, July 27-30, 2022 (with Michael P. McDonald, Enrijeta Shino, and Juliana Mucci).

"Jews for Trump: An Analysis of Voting and Vote Choice in Florida" Midwest Political Science Association annual meeting. Chicago, March 7-10, 2022 (with Payton Lussier).

"Riot in the Party: Party Registration Switching in the Aftermath of the January 6, 2021, Capitol Insurrection," Midwest Political Science Association annual meeting. Chicago, March 7-10, 2022 (with Sara Loving).

"Who Stands Next to Whom? Voting Lines and Political Polarization," Midwest Political Science Association annual meeting. Chicago, March 7-10. 2022 (with John Cho and Michael Herron).

*"*Gauging Public Opinion Toward Accessory Dwelling Units (ADUs)," *Florida Political Science Association* annual meeting, Bethune-Cookman University, Daytona, March 26, 2022 (with William Bullen, Danielle Dietz, Colson Douglas, Payton Lussier, and Gaby Zwolfer).

"The Changing South in Presidential Elections, 2008-2020," Symposium on Southern Politics, The Citadel, Charleston, South Carolina, March 4-5, 2022 (with Trey Hood, Robert Lupton, and Seth McKee).

"Did Ballot Design Oust a US Senator? A Study of the 2018 Election in Florida," Conference on Empirical Legal Studies, University of Toronto Law School, Toronto, Canada, March 18-19, 2022 (with Michael C. Herron, Marc Meredith, Michael Morse, & Michael Martinez).

"The Expansion of Mail Voting and the Impact on Voter Turnout in the 2020 General Election," Southern Political Science Association Annual Meeting, January 12-15, 2022, San Antonio (with Juliana Mucci, Michael P. McDonald, and Enrijeta Shino).

"Riot in the Party: Voter Registrations in the Aftermath of the January 6, 2021, Capitol Insurrection," State of the Parties*:* 2020 and Beyond Virtual Conference. Ray C. Bliss Institute for Applied Politics, Akron, OH, November 5, 2021 (with Sara Loving).

"The Disparate Impact of Voting Restrictions on Persons of Color in Florida," American Political Science Association, Seattle, WA, September 29-October 2, 2021 (with Brandi Martinez, Enrijeta Shino, and LaRaven Temoney).

"The Racial Politics of Early In-Person Voting and Ballot Access in Georgia," American Political Science Association, Seattle, WA, September 29-October 2, 2021 (with Michael C. Herron and Enrijeta Shino).

"The Behavioral Effects of Redistricting," Florida Political Science Association Annual Meeting, March 27, 2021 [virtual] (with Brian Amos, Enrijeta Shino, and Seth McKee).

"The Electoral Landscape after a Natural Disaster: Hurricane Michael's Effect on Turnout in Florida," Southern Political Science Association Annual Meeting, January 8-11, 2020, San Juan, Puerto Rico (with William A. Zelin).

"The Turnout Effects of Spanish Language Voting Materials," Southern Political Science Association Annual Meeting, January 8-11, 2020, San Juan, Puerto Rico (with Emily Boykin and Jenna Tingum).

"Voter Registration after Parkland and Early Voting on College Campuses," American Political Science Association, Washington, DC, August 28-September 1, 2019 (with Enrijeta Shino).

"Did Ballot Design Oust a US Senator? A Study of the 2018 Election in Florida," American Political Science Association, Washington, DC, August 28-September 1, 2019 (with Michael C. Herron & Michael Martinez).

"Barriers to Registering Returning Citizens in Florida," American Political Science Association, Washington, DC, August 28-September 1, 2019.

"Ballot Design, Voter Intentions, and Representation: A Study of the 2018 Midterm Election in Florida," Election Sciences, Reform, and Administration, University of Pennsylvania, July 10-12, 201 (with Michael C. Herron & Michael Martinez).

"Mobilizing the Youth Vote? Early Voting on College Campuses in Florida," 19th State Politics and Policy Conference at the University of Maryland, May 30-June 1, 2019 (with Enrijeta Shino).

"Did Ballot-Design Outs an Incumbent Senator? A Study of the 2018 Midterm Election in Florida," Midwest Political Science Association Annual Meeting, April 4-7, 2019, Chicago (with Michael Herron and Michael Martinez).

"Election Administration and Public Records Responsiveness," Midwest Political Science Association Annual Meeting, April 4-7, 2019, Chicago (with Enrijeta Shino, Anna Baringer, Justin Eichermuller, and William Zelin).

"Voter Registration after Parkland and Early Voting on College Campuses," American Political Science Association, Washington, DC, August 28-September 1, 2019 (with Enrijeta Shino).

"Did Ballot Design Oust a US Senator? A Study of the 2018 Election in Florida," American Political Science Association, Washington, DC, August 28-September 1, 2019 (with Michael C. Herron & Michael Martinez).

"Barriers to Registering Returning Citizens in Florida," American Political Science Association, Washington, DC, August 28-September 1, 2019.

"Ballot Design, Voter Intentions, and Representation: A Study of the 2018 Midterm Election in Florida," Election Sciences, Reform, and Administration, University of Pennsylvania, July 10-12, 2019 (with Michael C. Herron & Michael Martinez).

"Mobilizing the Youth Vote? Early Voting on College Campuses in Florida," 19th State Politics and Policy Conference at the University of Maryland, May 30-June 1, 2019 (with Enrijeta Shino).

"Did Ballot-Design Outs an Incumbent Senator? A Study of the 2018 Midterm Election in Florida," Midwest Political Science Association Annual Meeting, April 4-7, 2019, Chicago (with Michael Herron and Michael Martinez).

"Election Administration and Public Records Responsiveness," Midwest Political Science Association Annual Meeting, April 4-7, 2019, Chicago (with Enrijeta Shino, Anna Baringer, Justin Eichermuller, and William Zelin).

"Estimating the Differential Effects of Purging Inactive Registered Voters," American Political Science Association, Boston MA, August 28-September 1, 2018 (with Michael C. Herron).

"Estimating the Differential Effects of Purging Inactive Registered Voters," Election Sciences, Reform, and Administration, University of Wisconsin-Madison, July 26-27, 2018 (with Michael C. Herron).

"Exact-Match Voter List Verification and Turnout," 18th State Politics and Policy Conference at Penn State, June 7-9, 2018 (with Michael P. McDonald, Pedro Otálora, and Enrijeta Shino).

"Estimating the Differential Effects of Purging Inactive Registered Voters," at the 18th State Politics and Policy Conference at Penn State, June 7-9, 2018 (with Michael C. Herron).

"Who are Provisional Voters? Evidence from North Carolina," Midwest Political Science Association Annual Meeting, April 5-8, 2018, Chicago (with Lia Merivaki).

"A History and Analysis of Black Representation in Southern State Legislatures," Symposium on Southern Politics, The Citadel, Charleston, South Carolina, March 1-2, 2018 (with Charles S. Bullock III, William D. Hicks, M. V. (Trey) Hood III, Seth C. McKee, and Adam Myers).

"Who are Provisional Voters? Evidence from North Carolina," Southern Political Science Association Annual Meeting, January 4-7, 2018, New Orleans (with Lia Merivaki).

"Naturalizing the Party: Party Registration and Voter Turnout of Foreign-Born Citizens," State of the Party: 2016 & Beyond, November 10, 2017, Ray C. Bliss Institute of Applied Politics, University of Akron, Ohio (with Lidia Kurganova).

"The Erosion of Liberal Democracy: Dissensus and Ideology in America," American Political Science Association, San Francisco, August 31-September 3, 2017 (with William D. Hicks and Seth C. McKee.

"Early Voting Availability and Turnout in Florida and North Carolina," American Political Science Association, San Francisco, August 31-September 3, 2017 (with David Cottrell and Michael C. Herron).

"Determinants of County Level Voter Turnout, 1970-2016," American Political Science Association, San Francisco, August 31-September 3, 2017 (with Carl Klarner, Brian Amos, and Michael P. McDonald).

"Waiting to Vote: Using EViD Data to Assess the Electoral Consequences of Long Voting Lines," Midwest Political Science Association annual meetings, April 6-9, 2017, Chicago (with David Cottrell and Michael C. Herron).

"Timing the Habit: Voter Registration and Turnout in the American States," American Political Science Association, Philadelphia, September 1-4, 2016 (with Enrijeta Shino).

"Revisiting Majority-Minority Districts and Black Representation," American Political Science Association, Philadelphia, September 1-4, 2016 (with Seth C. McKee, William D. Hicks; Carl E. Klaner).

"Defending Democracy: How Political Scientists Are Engaging in the Fight over Voting Rights (and Why You and Your Dept. Should too)," APSA Roundtable with Theda Skocpol, Presented by the Scholars Strategy Network, American Political Science Association, Philadelphia, September 1-4, 2016.

19

"Timing the Habit: Voter Registration and Turnout in the American States," State Politics and Policy Conference, University of Texas at Dallas, May 19-21, 2016 (with Enrijeta Shino).

"Revisiting Majority-Minority Districts and Descriptive Representation," State Politics and Policy Conference, University of Texas at Dallas, May 19-21, 2016 (with Seth C. McKee, William D. Hicks; Carl E. Klarner).

"Purging Participation? Eligibility Challenges, Psychological Reactance, and the Decision to Vote," Midwest Political Science Association annual meetings, April 7-10, 2016, Chicago (with Daniel Biggers and Bryce Freeman).

"Missing Black Men and Representation in American Political Institutions," Midwest Political Science Association annual meetings, April 7-10, 2016, Chicago (with David Cottrell, Michael Herron, and Javier Rodriguez).

"Early Voting Effects on Pre-Election Poll Estimates," Southern Political Science Association, January 7-10, 2016, San Juan, Puerto Rico (with Michael P. McDonald, Michael D. Martinez, and Chris McCarty).

"Your Ballot's in the Mail: The Effects of Unsolicited Absentee Ballots," American Political Science Association, San Francisco, September 1-4, 2015 (with Michael Martinez)

"A Reassessment of the Turnout Effects in of Election Reforms in the United States," American Political Science Association, San Francisco, September 1-4, 2015 (with Michael P. McDonald and Enrijeta Shino).

"Reprecincting and Voting Behavior," American Political Science Association, San Francisco, September 1-4, 2015 (with Brian Amos and Casey Ste. Claire)

"Looks Can Be Deceiving: Explaining Support for Online Voter Registration in the American States," State Politics and Policy Conference, California State University, Sacramento, May 28-30, 2015 (with William Hicks and Seth McKee).

"Public Opinion on Statewide Ballot Measures," State Politics and Policy Conference, California State University, Sacramento, May 28-30, 2015 (with Diana Forster).

"Early Voting Effects on Pre-Election Poll Estimates," American Association for Public Opinion Research Annual Conference, May 14-17, 2015, Hollywood, Florida (with Michael P. McDonald, Michael D. Martinez, and Chris McCarty).

"Dumbing Down the Electorate? Assessing the Political Knowledge of Early Voters," Midwest Political Science Association annual meetings, April 15-19, 2015, Chicago (with Enrijeta Shino).

"Race, Shelby County, and the Voter Information Verification Act in North Carolina," American Political Science Association, Washington, DC, August 27-31, 2014 (with Michael C. Herron).

"Who Signs? Ballot Petition Signatures as Political Participation," American Political Science Association, Washington, DC, August 27-31, 2014 (with Diana Forster and Brian Amos).

"Race, Shelby County, and the Voter Information Verification Act in North Carolina," State Politics and Policy Conference, Indiana University, Bloomington, IN, May 15-17, 2014 (with Michael C. Herron).

"The Effects of Spatial Proximity on Voting," State Politics and Policy Conference, Indiana University, Bloomington, IN, May 15-17, 2014 (with Kenton Ngo).

"Race, Shelby County, and the Voter Information Verification Act in North Carolina," Midwest Political Science Association Conference, Chicago, April 3-6, 2014 (with Michael C. Herron).

"Beyond Regulatory Interpretation: The Demand and Supply of Provisional Ballots in Florida," Symposium on Regulation in the U.S. States, DeVoe Center, Florida State University, Tallahassee, February 21, 2014 (with Lia Merivaki).

"Evolution of an Issue: Voter ID Laws in the American States," American Political Science Association Conference, Chicago, August 28-September 2, 2013 (with Seth McKee, William Hicks, and Mitch Sellers).

"Closing the Door on Democracy": Early Voting and Participation in Florida," American Political Science Association Conference, Chicago, August 28-September 2, 2013 (with Michael Herron).

"Evolution of an Issue: Voter ID Laws in the American States," State Politics and Policy Quarterly 13th annual conference, University of Iowa, Iowa City, IA, May 23-25, 2013 (with Seth McKee, William Hicks, and Mitch Sellers).

"Early Voting in Florida in the Aftermath of House Bill 1355," State Politics and Policy Quarterly 13th annual conference, University of Iowa, Iowa City, IA, May 23-25, 2013 (with Michael Herron).

"Racial Disparities in Provisional Ballot Rejection Rates," Midwest Political Science Association Conference, Chicago, April 11-14, 2013 (with Michael Herron).

"Who Registers? The Differential Impact of Florida's House Bill 1355 on Voter Registration," American Political Science Association Conference, New Orleans, August 30-September 2, 2012 (with Michael Herron).

"The Effect of Polling Locations Upon Vote Choice: A Natural Experiment," Southern Political Science Association Conference, Orlando, January 3-5, 2013 (with Charles Dahan).

"Casting and Verifying Provisional Ballots in Florida," Southern Political Science Association Conference, Orlando, January 3-5, 2013 (with Lia Merivaki).

"Who Registers? The Differential Impact of Florida's House Bill 1355 on Voter Registration," American Political Science Association Conference, New Orleans, August 30-September 2, 2012 (with Michael Herron).

"The Participatory Impact of Truncating Early Voting in Florida," State Politics and Policy Quarterly 12th annual conference, Rice University, Houston, TX, February 16 – February 18, 2012 (with Michael Herron).

"Engaging Potential Voters? The Collection of Valid Signatures on Ballot Petitions*,"* State Politics and Policy Quarterly 11th annual conference, Dartmouth University, June 4-6, 2011 (with Diana Forster).

"Pledging Democracy: Congressional Support for a National Advisory Initiative and Referendum," Southern Political Science Association, January 5-8, 2011, New Orleans (presented by Matthew Harrigan).

*"*We Know What You Did Last Summer: The Impact of Petition Signing on Voter Turnout," State Politics and Policy Quarterly 10th annual conference, University of Illinois, Springfield, June 5-6, 2010 (with Janine Parry and Shayne Henry).

"Reassessing Direct Democracy and Civic Engagement: A Panel Study of the 2008 Election," State Politics and Policy Quarterly 10th annual conference, University of Illinois, Springfield, June 5-6, 2010 (with Caroline J. Tolbert and Amanda Frost).

"Generating Scholarship from Public Service: Media Work, Nonprofit Foundation Service, and Legal Expert Consulting," State Politics and Policy Quarterly 10th annual conference, University of Illinois, Springfield, June 5-6, 2010.

"Obama to Blame: Minority Surge Voters and the Ban on Same-Sex Marriage in Florida," American Political Science Association Conference, Toronto, September 2-5, 2009 (with Stephanie Slade).

"State Context and Support for a National Referendum in the U.S."  State Politics and Policy Quarterly 9th annual conference, UNC Chapel Hill/Duke University, May 22-23, 2009 (with Caroline J. Tolbert and Amanda Frost).

"Direct Democracy, Opinion Formation, and Candidate Choice," American Political Science Association Conference, Boston, August 2008 (with Caroline J. Tolbert).

"The Legislative Regulation of the Initiative," State Politics and Policy Quarterly 8th annual conference, Temple University, Philadelphia, PA, May 30-31, 2008.

"The Initiative to Shirk? The Effects of Ballot Measures on Congressional Voting Behavior," State Politics and Policy Quarterly 8th annual conference, Temple University, Philadelphia, PA, May 30-31, 2008 (with Josh Huder and Jordan Ragusa).

"Participatory-Based Trust? Political Trust and Direct Democracy," American Political Science Association Conference, Chicago, August 2007 (with Caroline J. Tolbert and Daniel Bowen).

"Giving Power to the People: The Adoption of Direct Democracy in the American States," Western Political Science Association Conference, Las Vegas, NV, March 7-9, 2007 (with Dustin Fridkin).

"Mass Support for Redistricting Reform: District and Statewide Representational Winners and Losers," State Politics and Policy Quarterly 7th annual conference, Austin, TX, February 22-24, 2007 (with Caroline J. Tolbert and John C. Green).

"Mass Support for Redistricting Reform: Partisanship and Representational Winners and Losers," American Political Science Association Conference, Philadelphia, August 2006 (with Caroline J. Tolbert and John C. Green).

"Gaming the System: The Effect of BCRA on State Party Finance Activities." *The State of the Parties: 2004 & Beyond*. Ray C. Bliss Institute for Applied Politics, Akron, OH, October 2005 (with Susan Orr).

"Do State-Level Ballot Measures Affect Presidential Elections?" *American Political Science Association Conference*, Washington, D.C., September 1-4, 2005 (with Caroline Tolbert and Todd Donovan).

"Did Gay Marriage Elect George W. Bush?" *Fifth Annual Conference on State Politics and Policy*, Michigan State University, East Lansing, MI, May 13-14, 2005 (with Todd Donovan, Caroline Tolbert, and Janine Parry).

"Was Rove Right? Evangelicals and the Impact of Gay Marriage in the 2004 Election." *Fifth Annual Conference on State Politics and Policy*, Michigan State University, East Lansing, MI, May 13-14, 2005 (with Matt DeSantis and Jason Kassel).

"Partisanship, Direct Democracy, and Candidate Choice," *Midwest Political Science Association Conference*, Chicago, IL, April 7-10, 2005 (with Caroline Tolbert and Todd Donovan).

"Did Gay Marriage Elect the President? Mobilizing Effects of Ballot Measures in the 2004 Election," *Western Political Science Association Conference*, Oakland, CA, March 17-19, 2005 (with Todd Donovan and Caroline Tolbert).

"Initiatives and Referendums: The Effects of Direct Democracy on Candidate Elections," Conference on *What We Know and Don't Know about Campaigns and Elections, Graduate Program in Political Campaigning,* University of Florida, Gainesville, FL, February 24-5, 2005.

"Was Rove Right? The Partisan Wedge and Turnout Effects of Issue 1, Ohio's 2004 Ballot Initiative to Ban Gay Marriage," *University of California Center for the Study of Democracy/USC-Caltech Center for the Study of Law and Politics/Initiative and Referendum Institute Conference*, Newport Beach, CA, January 14-15, 2005.

"The Educative Effects of Direct Democracy on Voter Turnout," *American Political Science Association Conference*, Chicago, IL, September 1-5, 2004 (with Caroline Tolbert).

"Turning On and Turning Out: Assessing the Indirect Effects of Ballot Measures on Voter Participation," *Fourth Annual Conference on State Politics and Policy*, Kent State University, Kent, OH, April 30-May 2, 2004 (with Todd Donovan).

"Veiled Political Actors:  The Real Threat to Campaign Finance Disclosure Statutes?" *Midwest Political Science Association Conference*, Chicago, April 14-18, 2004 (with Elizabeth Garrett).

"Elephants, Umbrellas, and Quarrelling Cocks:  Disaggregating Party Identification in Ghana's Fourth Republic," *Western Political Science Association Conference*, Portland, OR, March 11-13, 2004 (with Kevin Fridy).

"Gaming the System: State Party Finance Activities in Colorado and Florida," Southern Political Science Association Conference, New Orleans, January 7-10, 2004.

"The Educative Effects of Direct Democracy: Ballot Campaigns and Civic Engagement in the American States," Societa Italiana di Studi Elettorali (SISE) VIIIth International Conference on Electoral Campaigns (Initiative and Referendum),Venice, Italy, December 18-20, 2003.

"In the Wake of Prop. 13," *American Political Science Association Conference*, Philadelphia, PA, August 27-31, 2003.

"Soft Money and Issue Advocacy in the 2002 Colorado 7th Congressional District Election," *Western Political Science Association Conference*, Denver, CO, March 26-30, 2003.

"Educated by Initiative: Direct Democracy and Civic Engagement in the American States," *Third Annual Conference on State Politics and Policy*, University of Arizona, Tucson, AZ, March 14-15, 2003 (with Caroline Tolbert).

"Ballot Initiatives and the (Sub)Urban/Rural Divide in Colorado," *Colorado's Future: How Can We Meet the Needs of a Changing State*? University of Colorado at Colorado Springs, September 27, 2002.

"Representation and the Spatial Dimension of Direct Democracy," *American Political Science Association Conference*, Boston, MA, August 29-September 1, 2002.

"Representation and the Spatial Bias of Direct Democracy," *Second Annual Conference on State Politics and Policy*," University of Wisconsin-Milwaukee, Milwaukee, WI, May 24-25, 2002.

"Minority Rights and the Spatial Bias of Direct Democracy," *Southwestern Political Science Association Conference*, New Orleans, LA, March 27-30, 2002.

"Representation and the Urban Bias of Direct Democracy," *Western Political Science Association Conference*, Long Beach, CA, March 21-24 2002.

"Ghost Busters: The Structural Underpinnings and Politics of Ghana's 2000 Elections," *African Studies Association Conference*, Houston, TX, November 15-18, 2001.

"The Effect of Ballot Initiatives on Voter Turnout," *American Political Science Association Conference*, Washington, DC, August 31-September 3, 2000 (with Caroline Tolbert and John Grummel).

"Campaign Finance of Ballot Initiatives," *National Direct Democracy Conference*, University of Virginia's Center for Governmental Studies, Charlottesville, VA, June 8-9, 2000.

"Meet the Authors Roundtable: Recent Books on Direct Democracy in the States," *Midwest Political Science Association Conference*, Chicago, April 27-30, 2000.

"Counter-Majoritarian Bills and Legislative Response of State Ballot Initiatives," *Western Political Science Association Conference*, San Jose, March 24-26, 2000.

"The Gun Behind the Door Fires Blanks," *Pacific Northwest Political Science Association Conference*, Eugene, OR, October 14-16, 1999.

"Orange Crush: Mobilization of Bias, Ballot Initiatives, and the Politics of Professional Sports Stadia," *American Political Science Association Conference*, Atlanta, September 2-5, 1999 (with Sure Log).

"Direct Democracy in Colorado: Limited Information, Tough Choices," A Century of Citizen Lawmaking: Initiative and Referendum in America, *Initiative and Referendum Institute*, Washington, D.C., May 6-8, 1999.

"The Initiative to Party: The Role of Political Parties in State Ballot Measures," *Western Political Science Association Conference*, Seattle, March 25-28, 1999.

"Direct Democracy in the Late 20th Century: The Legacy(ies) of Prop. 13," Roundtable, *American Political Science Association Conference*, Boston, September 3-6, 1998.

"The Legacy of Howard Jarvis and Proposition 13? Tax Limitation Initiatives in 1996," *Western Political Science Association Conference*, Los Angeles, March 19-21, 1998.

"Special Interests and the Initiative Process in Colorado: The Case of the Parental Rights Amendment" (with Robert Herrington), Poster Session, *American Political Science Association Conference*, Washington, D.C., August 28-31, 1997.

"Howard Jarvis, Populist Entrepreneur: Reevaluating Causes of Proposition 13," *Western Political Science Association Conference*, Tucson, March 13-15, 1997.

"Guided Immersion: A Non-Traditional Study Abroad Program at the University of Ghana at Legon," *Midwest Political Science Association Conference*, Chicago, April 10-12, 1997.

"Exploring the Political Dimension of Privatization: A Tale of Two Cities" (with Kevin Leyden), *Midwest Political Science Association Conference*, Chicago, April 18-20, 1996.

"Populist Entrepreneur: Douglas Bruce and the Tax Limitation Movement in Colorado," *20th Annual Interdisciplinary Symposium of the Politics and Culture of the Great Plains*, Lincoln, April 11-13, 1996.

"*Faux* Populism: Douglas Bruce and the Anti-Tax *Moment* in Colorado, 1986-1992," *Western Political Science Association Conference*, San Francisco, March 14-16, 1996.

"Insular Democracy: Advisory Councils and Task Forces in the American States," *Western Political Science Association Conference* , Portland, March 1995.

"Supporting Labor-Management Initiatives at the State Level: The Case of the West Virginia Labor-Management Advisory Council," *Southern Industrial Relations and Human Resource Conference*, Morgantown, WV, October 1994.

"State Autonomy, Capacity, and Coherence: Labor-Management Councils in the American States," *Western Political Science Association Conference*, Albuquerque, March 1994.

"Removing the Pluralist Blinders: Labor-Management Councils and Industrial Policy in the American States," *American Political Science Association Conference*, Chicago, September 1992.

"You Can't Live with Them...The Emerging Role of Organized Labor in Industrial Policy in the American States," *Midwest Political Science Association Conference*, Chicago, April 1992.

"It Can Happen Here: Apprenticeship, Workplace-based Learning, and the Affirmative Role of Unions" (with Eric Parker), *Southwestern Political Science Association Conference*, Austin, TX, March 1992.

"The Affirmative Role of U.S. Unions in Restructuring" (with Eric Parker), *American Sociological Association Conference*, Indianapolis, IN, August 1991.

"Economic Development Strategy and the Problem of Skills: The Case of Wisconsin's Advanced Metalworking Sector" (with Eric Parker), *American Society for Public Administration Conference*, Cleveland, OH, October 1990.

### EDITORIAL/ADVISORY BOARDS/REVIEWER

Review Board, National Science Foundation, Accountable Institutions and Behavior, 2016; 2020-2022
Editorial Board, *Journal of Election Administration Research and Practice*, 2021–
Editorial Board, *State Politics and Policy*, 1999-2007; 2014-2016
Editorial Board, *Election Law Journal*, 2012-2016.
Review Board, *American Political Science Association (APSA) Small Research Grant Program*, 2004-05.
Review Board, *Fulbright/APSA Congressional Fellowship Program*, 2002-2005.
Academic Advisory Board, *Annual Editions, State & Local Government*, 1995-2015.
Sub-Field Editor, *State Politics*, *FirstResearch*, 1999-2001.

### PROFESSIONAL MEMBERSHIPS

American Political Science Association, 1990-
    State Politics and Policy Section, 2000-
        President, 2013-2015
        Executive Council, 2010-2012
    Political Organizations and Parties Section, 2000-
    Elections, Public Opinion, and Voting Behavior, 2000-
        Chair, EPOVB Emerging Scholar Award, 2022
Midwest Political Science Association, 1990-
Southern Political Science Association, 2001-
Western Political Science Association, 1994-
    Local Co-Host, Annual Meeting (Denver), 2003
    Chair, Committee on Membership, Attendance, and Registration, 1998-2000
    Section Chair, State Politics and Policy, 1999 Annual Conference (Seattle)
    Member, Charles Redd Politics of the American West Award Committee, 1999
    Chair, Best Dissertation Award Committee, 1999-2001
Florida Political Science Association (1994-)
    Chair, State Politics, 2004 Annual Conference (Gainesville)

### PROFESSIONAL APPOINTMENTS

Research Associate, *Ghana Center for Democratic Development* (*CDD-Ghana*), Accra, Ghana, 2011.
Research Scholar, *Bill Lane Center for the Study of the American West*, Stanford University, 2007.
Senior Research Scholar, *Ballot Initiative Strategy Center Foundation (BISCF)*, Nonprofit 501 (c)(3), Washington, DC, (www.ballot.org), 2006.
Board of Directors, *Ballot Initiative Strategy Center Foundation (BISCF)*, Nonprofit 501 (c)(3), Washington, DC, 2000-2019.
Board of Scholars, *Initiative & Referendum Institute*, USC Law School, University of Southern California, 2004-.
Senior Research Fellow, *Initiative & Referendum Institute*, Washington, DC, 1998-2003.
Research Associate, *Ghana Center for Democratic Development* (*CDD-Ghana*), Accra, Ghana, 2000-01.
President & Co-Founder, *Citizens Institute for Voter Information in Colorado* (*CIVIC*), Denver, CO, 1998-2001.

### UNIVERSITY SERVICE

23

*University of Florida*
    **College/University**
    Appointed Member, Linguistics Department Chair Search, 2020-21
    Appointed Member, Latin American Studies Search Committee (Latino Studies), 2014-15
    Appointed Member, Political Science/African Studies Search Committee, 2013-14
    Appointed Member, 20th Century American History Search Committee (History), 2008-09
    Appointed Member, Latino Studies Search Committee (LAS), 2006-07
    Departmental Representative, United Faculty of Florida, 2005-2008
    Alternate Senator, United Faculty of Florida, 2005-06
    State Delegate, Florida Education Association, 2005-06
    Elected Member, College of Arts and Sciences, Nominating Committee, 2004-06
    Appointed Member, University of Florida Fulbright Committee, 2003-07

    **Department**
    Chair, 2017-
    Graduate Coordinator, 2014-2016
    Associate Chair, 2013-2014
    Appointed Member, Informatics Search Committee (Departmental Representative), 2013-14
    Appointed Member, Promotion (Full) Review Committee (Service), Leonardo Villalon, 2011
    Appointed Member, Promotion (Full) Review Committee (Research), Badredine Arfi, 2010
    Elected Member, Chair's Advisory Committee, 2004-05; 2006-07 (Chair); 2007-08 (Chair); 2010-11; 2012-13
    Elected Member, Chair Search Committee, 2004; 2009
    Appointed Member, Tenure Review Committee (Research), Daniel O'Neill, 2008
    Appointed Faculty Mentor, State Senator Mike Haridopolos, 2008-09
    Appointed Member, Strategic Planning Committee, 2008-09
    Appointed Director, Graduate Program in Political Campaigning, 2007-11
    Appointed Member, Committee to establish Undergraduate Certificate in Political Campaigning, 2007
    Elected Member, Market Equity Committee, 2006-07 (Chair); 2007-08; 2008-09 (Chair)
    Appointed Internship Coordinator, 2005-
    Elected Member, Merit Committee, 2004-05; 2005-06; 2006-07 (Chair)
    Appointed Faculty Mentor, Marcus Hendershot, 2006-
    Appointed Faculty Mentor, Helena Rodriques, 2005-06
    Appointed Member, Ad-Hoc Graduate Teaching Committee, 2005-06
    Appointed Member (Chair), Latino Politics Search Committee, 2004-05
    Appointed Member, Tenure and Promotion Committee (Samuel Barkin), 2004.
    Appointed Member, Mid-Career and Mentoring Task Force, 2004-05
    Appointed Member, Speakers Committee (Chair), 2003-05.
    Appointed Member, Tenure and Promotion Committee (Richard Conley), 2003.

*University of Denver*
    Social Science Promotion and Tenure Committee, 1999-2000
    Joint Ph.D. Program in Religious and Theological Studies, (with *Iliff School of Theology*), 1999-2002
    AH/SOCS Grade Appeals Committee, 1999-2001
    *Phi Beta Kappa* Selection Committee, *Gamma* of Colorado, 1998-2002
    Partners in Scholarship (PINS) Committee, 1997-2000
    AH/SOCS Elected Faculty Committee, 1996-98
    Post-Tenure Review Committee, 1996-98
    SOAR (Summer Orientation), 1997-2000
    Faculty Senate Representative, 1995-1996
    Study Abroad Faculty Advisory Committee, 1995-2000
    Study Abroad Travel Scholarships Committee, 1995-2000
    Faculty Member, Culture and Critical Studies Program, 1995-2000
    Faculty Mentor, 1995-2000
    Reach-Out DU, 1995-2000
    Advisor, Department of Political Science Honors Program, 1995-1996

*MEDIA INTERVIEWS*
Quoted more than 1,000 times by the media (newspaper, radio, television) on various political issues, including the *New York Times, Wall Street Journal, Washington Post, USA Today, Bloomberg, The Economist, Newsweek, Time, CNN, CBS News, Fox News, National Public Radio, Tampa Bay Times, Miami Herald, Florida Times-Union, San Francisco Chronicle, Los Angeles Times, Chicago Tribune, Boston Globe*, etc.

# EXHIBIT 55

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GREGORY W. ABBOTT, et al., <br><br> Defendants. | Civ. Act. No. 5:21-cv-844 (XR) <br> (consolidated cases) |

**DECLARATION OF NANCY CROWTHER**

My name is Nancy Crowther. I am over the age of 21 and fully competent to make this declaration.

Under penalty of perjury, I declare the following based on my personal knowledge:

1. I am a 65-year-old woman who currently lives in Travis County, Texas. I have been voting in person in Texas since I was in college around 1980, with the exception of the November 2020 general elections, when I unsuccessfully attempted to vote by mail because of health concerns related to the COVID-19 pandemic. I vote in almost every election and, due to the difficulties I face voting in person, I try to take advantage of early voting periods to avoid many of the access issues I have when I have to vote at my precinct polling center.

2. I am a member of REVUP-Texas and I routinely receive informational emails from the organization.

3. I am a person with a progressive neuromuscular disease that substantially limits my mobility and motor skills, making most physical activities difficult to perform without assistance. As my condition progresses, and I become weaker, I will need more assistance to do daily activities. Currently, my attendant helps transition and position me in my

customized electric wheelchair, helps me dress and bathe, assists me with shopping, cooking, cleaning, and other household chores, and helps me operate the durable medical equipment I use to maintain my health and independence. My attendant also escorts me to doctors' appointments, to volunteer at ADAPT, and to other activities I enjoy in the community. I have contractures in my hips and knees so my attendant will help transition me in the evening from my wheelchair to my bed, properly position me in my bed, and set up my C-PAP machine. In many essential ways, my life and independence depend on my attendant.

4. Although I have often had difficulty physically accessing polling places prior to SB1, I did not have the concern that my attendant may be exposed to any potential harm because of the help they provided me to vote, until SB1. My main concern now with voting in person is the risk of exposing my attendant to the oath under penalty of perjury and how the assistance I receive in voting as a person with disabilities could be misunderstood or misconstrued. Further, because of the changes to the oath assistors must sign, my attendants are reluctant to help me vote. They have told me they are fearful of the potential punitive actions they may accidentally incur should a poll worker or other election official misinterpret how they assist me as directing my vote or some kind of coercion.

5. Due to my weakening condition, my attendant must perform many physical tasks for me. When I vote in person, my attendant will escort me, open the doors to the polling place, assist me to present my photo ID and sign the register, help set up the adaptive voting equipment, and pick up items I may drop because of my general physical weakness. Usually, the adaptive voting equipment is not set up and the poll workers do not know how to set it up. The accessible keypad is attached to the voting machine with very strong Velcro

DocuSign Envelope ID: 6D567403-97DD-4517-98D9-E3EAC0ADAF9B

that I cannot remove myself. My attendant will help me remove the keypad from the Velcro if the poll worker is unavailable. It is also difficult for me to raise my arms and my attendant will assist me in positioning my arms when needed.

6.  Because of the concerns I have with my attendant potentially being subject to punitive action because of the oath required by SB1, I have not had a personal attendant assist me to vote in person since the provision has been in effect. Before SB1, my attendant would almost always assist me when voting in person, but the new oath requirements have chilled my attendants' willingness to assist me in the voting booth.

7.  I vote in almost all elections, including the March 2022 primary and November 2022 general elections. I usually vote during the early voting periods to avoid crowded polling centers which can make it more difficult for me to physically navigate the voting process.

8.  In the May 2023 elections, I could not push the buttons on the adaptive voting machine hard enough for them to register my selections. I did not take an attendant with me into the voting booth because I knew they had concerns with the oath requirements of SB1 and I did not want to jeopardize my working relationship with them. Unfortunately, the poll worker was unable to help me enter my selections. While trying to assist me, the poll worker would audibly announce my selections and I felt that my right to vote privately was not honored. Further, it felt intimidating to have an election official announce my vote selections as they are individuals with expanded authority under SB1. After multiple attempts, I was able to complete my ballot and cast my vote, but it took a very long time and it was not private. I felt humiliated and my right to vote was intruded upon.

9.  Although a reasonable accommodation may help ameliorate some of the difficulties I have when voting in person, the threshold problem is that I need assistance just to enter the

building and it is not possible to request an accommodation when you are not even able to enter the polling center without assistance. Again, my attendant is afraid of going with me due to the mere specter of the oath for assistors when voting in person. Poll workers cannot see me at the front door of my precinct polling center when I vote on election day, and I cannot enter the building without assistance. Sometimes, I have had to wait for another voter to open the door for me.

10. Absentee voting is not a solution for me. My one attempt to vote by mail was unsuccessful, and I am very concerned about the security of mail in my city, so I would have to bring it directly to the ballot drop box. I know of only one ballot drop box in Travis County and I have to take public transportation to get to this singular ballot drop box. When I attempted to vote by mail, it took me three hours to deliver my ballot to the drop box.

11. If I had to vote by mail due to my progressive disability or an attendant being unavailable or unwilling to assist me with in person voting, I would ask a friend to drive me to the single ballot drop box in Travis County. I would have to go with them to show my ID, as is required by SB1, and I would pay my friend for gas or any other costs they might incur for helping me vote. Because I have continued concerns about the security of the mail system in Austin, I would not feel comfortable submitting something as important to me as my ballot through the general mail. Because of the criminal penalties of SB 1, I cannot receive the assistance I need to deliver my ballot to the drop box. and therefore, voting by mail is not available to me.

12. I have never received any information from the State or County regarding my rights as a person with a disability under the ADA, including my right to request reasonable modifications or file grievances.

13. My right to vote is very important to me. As a person with a disability, I already face significant barriers to being able to cast my ballot and SB1 has made it even harder to do so.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct. Executed on <u>June 21, 2023 | 4:58 PM CDT</u>, at Travis County, Texas.

Nancy Crowther

Nancy Crowther

# EXHIBIT 56



Video Index | Full agenda | Share



4-5_HarrisCountyCC.pdf

Open

© 2003-2023 Swagit Productions, LLC (http://www.swagit.com)

# EXHIBIT 57

6/23/23, 3:43 PM
Case 5:21-cv-00844-XR Document 642-2 Filed 06/23/23 Page 732 of 785
Harris County Sheriff's Office Victim Advocates | Office for Victims of Crime

 An official website of the United States government, Department of Justice.

Here's how you know



Home / Funding & Awards

# Harris County Sheriff''s Office Victim Advocates

## Award Information

**Awardee:** HARRIS COUNTY
**Award #:** 2019-V3-GX-0134
**Funding Category:** Competitive Discretionary
**Location:** HOUSTON, TX
**Congressional District:** 18
**Status:** Open
**Funding First Awarded:** 2019
**Total funding (to date):** $819,514
**Original Solicitation:** OVC FY 2019 Law Enforcement-Based Victim Specialist Program

## Description of original award (Fiscal Year 2019, $819,514)

The purpose of this award, funded under the OVC FY 2019 Law Enforcement-Based Victim Specialist Program, is to develop or enhance and sustain crime victim specialist programs within law enforcement agencies and better coordinate services to victims to more quickly and more effectively serve the victim assistance and compensation needs of all crime victims and inform them of their rights as crime victims.

The Harris County Sheriff's Office will hire three additional Victim Advocates to supplement the four Victim Advocates currently employed. The goal for each new Victim Advocate is to make two victim contacts per day, which would result in assistance being provided to

approximately 4,320 crime victims over the course of this project. The Victim Advocates will provide a range of services to crime victims, including advocacy, referrals, education about the criminal justice system, crisis intervention, safety planning, and court accompaniment. In addition, a portion of grant funds will pay for overtime hours worked by an Assistant District Attorney assigned to domestic assault cases. CA/NCF

*Date Created: September 28, 2019*

## Similar Awards 🔗

The Link Safe Harbor Programs for Minor Victims of Sex Trafficking

OVC FY 2022 Field-Generated Solicitation: Increasing Options and Expanding Access for Victims of Crime

Consultation, Engagement, Support Team for Commercially Sexually Exploited Children and Youth



**U.S. DEPARTMENT OF JUSTICE**
OFFICE OF JUSTICE PROGRAMS

# EXHIBIT 58

ⓘ **Love using USAspending.gov? Tell us more!** ✖

USAspending.gov is looking to share stories of how federal spending data has improved your life or increased your trust in government. Share your story and you may be featured in an upcoming USAspending Youtube video!

🇺🇸 An official website of the United States government

Here's how you know ⌄

 USASPENDING.gov

AWARDING PROFILE
## Grant Summary

⤴

## Block Grant



FAIN  2019V3GX0134

**Completed**

**Awarding Agency**

### Department of Justice (DOJ)

**Assistance Listings (CFDA Programs)** ⓘ

16.582 - CRIME VICTIM ASSISTANCE/DISCRETIONARY GRANTS
**VIEW MORE INFO ABOUT THIS PROGRAM**

**Recipient**

### HARRIS COUNTY

201 CAROLINE ST STE 460
HOUSTON, TX 77002-1901
UNITED STATES
Congressional District: TX-18

**Dates** ⓘ

●────────────────────────────────●

Start Date                                                           Oct 01, 2019
End Date                                                            Sep 30, 2022

## $ Award Amounts

ⓘ

💬 **Description**                                                                    ⓘ

HARRIS COUNTY SHERIFF''S OFFICE VICTIM ADVOCATES

We're preparing your download(s)...
If you plan to leave the site, copy the download link before you go - you'll need it to access your file.

**Your Download Link**



$81
Obligated /

$81
Total F

⊞ View Transaction History



| Outlayed Amount |
| $0.00 |

| Obligated Amount |
| $819,514.00 |

| ○ Non-Federal Funding |
| $0.00 |

| Total Funding |
| $819,514.00 |

📊 **Grant Activity**

⊞ View transactions table

🥧 **Federal Accounts**

| Federal Account | Combined Obligated Amount ⇅ | Percent of Total ⇅ | Funding Agency |
|---|---|---|---|
| CRIME VICTIMS FUND, JUSTICE | $819,514 | 100% | (DOJ) DEPARTMENT OF JUSTICE |



We're preparing your download(s)...

If you plan to leave the site, copy the download link before you go - you'll need it to access your file.

**Summary of All Federal Accounts used by this Award**

| | |
|---|---|
| Total Funding Obligated | $819,514.00 |
| Total Count of Funding Agencies | 1 |
| Total Count of Awarding Agencies | 1 |
| Total Count of Federal Accounts | 1 |

⊞ View federal funding submissions

---

🔊 **Assistance Listing (CFDA Program) Information**                    ⓘ

**16.582: CRIME VICTIM ASSISTANCE/DISCRETIONARY GRANTS**

**Objectives**

The Office for Victims of Crime (OVC) administers a discretionary grant program and other assistance programs for crime victims with amounts set-aside from deposits into the Crime Victims Fund for (a) demonstra...

read more

**Administrative Agency**

OFFICE OF JUSTICE PROGRAMS, JUSTICE, DEPARTMENT OF

**Website**

http://www.ovc.gov

**SAM.gov Page**

https://sam.gov/fal/f8f3925f8c634b2e9df9498269043cbf/view

SHOW MORE

---

🕘 **Award History**                                            ⓘ

## Transaction History ⌄

| Modification Number ⬍ | Assistance Listing ⬍ | Action Date ⬍ | Amount ⬍ | Action Type ⬍ | Transaction Description ⬍ |
|---|---|---|---|---|---|
| 00 | 16.582 | 09/25/2019 | $819,514 | A: New | HARRIS COUNTY SHERIFF''S OFFICE VICTIM ADVO |

---

We're preparing your download(s)...

If you plan to leave the site, copy the download link before you go - you'll need it to access your file.

Expand All

🔒 Unique Award Key　　　　　　　　　　　　　　　　　　　　>

🏛 Agency Details　　　　　　　　　　　　　　　　　　　　>

📍 Place Of Performance　　　　　　　　　　　　　　　　　>

📅 Period Of Performance　　　　　　　　　　　　　　　　>

🏢 Recipient Details　　　　　　　　　　　　　　　　　　>

👤 Executive Compensation　　　　　　　　　　　　　　　　>

## Stay in touch

### Get release notes delivered to your inbox

Sign up to receive our release notes to keep up with what's new on USASpending.gov.

Sign Up →

### Request a USAspending training session

Receive customized training for your organization on how to use our tools and data.

Learn More →



Building a more transparent government.

Providing publicly accessible and searchable data on what the federal government spends each year.

ABOUT

Mission

Careers

HELP

FAQs

Community

Email Us

We're preparing your download(s)...
If you plan to leave the site, copy the download link before you go - you'll need it to access your file.

Bureau of the Fiscal Service



Accessibility

|

Privacy Policy

|

Freedom of Information Act

|

D&B Information

© 2023 USAspending.gov

We're preparing your download(s)...

If you plan to leave the site, copy the download link before you go - you'll need it to access your file.

# EXHIBIT 59

 1  elections.

 2      Q    Okay.  And then with respect to -- I mean, you used

 3  the term canvassing activities.  Are those the same as the

 4  get-out-to-vote initiatives?

 5      A    That's part of getting out the vote.

 6      Q    And you've described what canvassing is because that

 7  -- that's -- canvassing is talking to them about issues and --

 8      A    Yeah.

 9      Q    And candidates.

10      A    Yes.

11      Q    Okay.  Now, this -- this last week, prior to last

12  week, did you do some canvassing and get-out-the-vote

13  initiatives?

14      A    Oh, yes, uh-huh.

15      Q    Okay.  When did those start?

16      A    They start before the early vote.

17      Q    Okay.  So you were -- you began your efforts prior to

18  early voting?

19      A    Uh-huh.

20      Q    Okay.  That's yes?

21      A    Yes.

22      Q    Okay.  And so that would have been about

23  mid-February?  That's a bad question.  Let me ask it again.  I

24  think early voting started in mid-February.  So you began those

25  canvassing and get-out-the-vote measures when, prior to the

 1  early voting?

 2       A     Before the early vote.

 3       Q     Okay.  How many -- how many weeks before?

 4       A     Probably -- probably two to three.

 5       Q     And that's -- that's the usual way you do it?  You

 6  get out two to three weeks in advance of an election and

 7  canvass and get out the vote, right?

 8       A     Yes.

 9       Q     Okay.  By the way, on those individuals that -- that

10  -- and do you do this personally, the canvassing and

11  get-out-the-vote measures?

12       A     No, no, I don't.  I -- no, I don't.

13       Q     Are the individuals that do it, are they paid staff,

14  or are they volunteers?

15       A     We have both, but majority are paid staff.

16       Q     Okay.  And they did -- they -- and they -- this

17  year was like the last year?  Same paid staff, right?  I mean,

18  same model?  You used paid staff to go do the canvassing,

19  correct?

20       A     Yes.

21       Q     Okay.  Same number of staff, would you say roughly?

22       A     We had more this time.

23       Q     Okay.  How many more?

24       A     We hired seven.

25       Q     Okay.

 1  that role?

 2      A    Oh, actually, she's -- she just started, actually, so

 3  just this year, so she wouldn't have -- yeah, but she still has

 4  information.

 5      Q    She would have the information, the historical

 6  information, from '18?

 7      A    Yes.

 8      Q    Okay.  Would you say it was as -- you had a

 9  successful canvassing and get-out-the-vote operation this

10  time?

11      A    What -- what year?

12      Q    This year, this primary.  Was it successful?

13      A    It could have been -- it wasn't as successful,

14  because there was too much confusion created with SB1.

15      Q    Okay.  Did you -- did you witness any reduction in

16  the number of staff or volunteers that were willing to do these

17  activities?

18      A    There was a reduction.

19      Q    Okay.  From what to seven?

20      A    The reduction was in -- in assisting, to have it be

21  more successful in assisting voters.

22      Q    Okay.  Then -- and I -- I thought we were talking

23  about get-out-the-vote operations.  Do you consider

24  assistance --

25      A    That's part --

 1      Q     Let me finish the question if I could.  Do you
 2  consider the assistance of voters part of your get-out-the-vote
 3  canvassing operations?
 4      A     Yes, it's part of it.  The whole --
 5      Q     Okay.
 6      A     It's all -- until we finish getting the vote -- the
 7  -- the -- getting people -- assisting people to vote.  That's
 8  the end of it.
 9      Q     Okay.  Now, you've estimated for me that there were
10  seven individuals involved in your get-out-the-vote canvassing
11  operations.  That includes assisters, I assume.
12      A     That includes who?
13      Q     Assisters.
14      A     That's --
15      Q     You've said that that's part of the effort, so those
16  wouldn't --
17      A     Yes, yes, yes, yes.  I thought you said sisters.
18      Q     Okay.  Sorry.
19      A     Okay, okay.  That includes -- we also have -- yes, it
20  includes them and then some volunteers.
21      Q     Okay.  So you gave me a number of seven?
22      A     Yes.
23      Q     The number of assisters and volunteers encompasses
24  that total of seven, correct?  There were seven total in the
25  get-out-the-vote operations for 2022?  That's what you said,

# EXHIBIT 60

**TEXAS 2022 ELECTIONS**

# More than 12% of mail-in ballots were rejected in Texas under new GOP voting rules, final tally shows

Figures released by the Texas secretary of state show that more than 24,000 Texas voters had their ballots rejected in the March primary. The rejection rate is a significant increase over previous elections.

BY **ALEXA URA**    APRIL 6, 2022    UPDATED: 2 PM CENTRAL

*Sign up for The Brief, our daily newsletter that keeps readers up to speed on the most essential Texas news.*

The votes of more than 24,000 Texans who tried to cast ballots by mail were thrown out in the March primary — a dramatic increase in rejected ballots in the first election held under a new Republican voting law.

Roughly 12.4% of mail-in ballots returned to the state's 254 counties were not counted, according to figures released Wednesday by the Texas secretary of state. Just over 3 million people voted overall in the low-turnout primary.

Of 24,636 rejected mail-in ballots, 14,281 belonged to voters attempting to participate in the Democratic primary, and 10,355 belonged to voters in the Republican primary. But the rejection rate by party was fairly aligned; 12.9% of Democratic ballots were rejected and 11.8% of Republican ballots were rejected.

Put another way, 1 in every 8 mail-in voters lost their votes in their primary. The rate amounts to a significant surge in rejections compared with previous years, including the higher-turnout 2020 presidential election, when less than 1% of ballots were tossed.

Data previously collected by The Texas Tribune found rejection rates ranging from 6% to nearly 22% in 16 of the state's 20 counties with the most registered voters, which overall rejected 18,742 mail-in ballots. In most cases, county officials said, ballots were rejected for failing to meet new, stricter ID requirements enacted by the Republican-controlled Legislature last year that require voters to provide their driver's license number or a partial Social Security number to vote by mail.

6/19/23, 10:40 AM
Case 5:21-cv-00844-XR Document 642-2 Filed 06/23/23 Page 747 of 785
More than 20,000 mail-in ballots rejected in 2022 primary | The Texas Tribune

By contrast, the U.S. Election Assistance Commission found less than 2% of mail-in ballots were rejected statewide in the 2018 midterm election. The statewide rejection rate in the 2020 presidential election was less than 1%. In the higher-turnout 2020 election, 8,304 ballots were tossed statewide. In the 2022 primary — for which turnout fell shy of 18% — roughly three times as many ballots were rejected.

The data released by the secretary of state is the most official measure of the fallout of the tighter restrictions on voting by mail, which have so far proven the most frustrating aspect of Republicans' voting law in its first test.

The requirements were part of a package of voting changes and restrictions enacted last year through legislation known as Senate Bill 1, which Republicans argued were needed to enhance the security of the state's election even though they lacked evidence that previous elections had been foiled by widespread irregularities. Republican leaders who championed the law often said the measures in SB 1 would make it easier to vote and harder to cheat.

But the requirements vexed both voters and election workers responsible for processing mail-in ballots. In the lead-up to the election, county officials reported that qualified voters — some of whom had previously voted by mail many times — were being hampered by the law. In some cases, it took Texans as many as three attempts to get their votes through. Others abandoned the voting-by-mail option altogether, opting to vote in person instead for fear of being disenfranchised, county election officials previously said.

Texas' strict eligibility criteria for voting by mail means the thousands of tossed votes most likely belonged to people 65 and older and people with disabilities.

Tina Tran, director of AARP Texas, called the reported numbers "deeply troubling and a sad indication that too many voters, including many older voters, are being disenfranchised" because of the changes to the state's vote-by-mail rules.

"With a primary runoff election approaching and the state's general election scheduled for the fall, it is imperative that state and local election officials work extraordinarily hard and fast to better communicate new identification rules to voters," Tran said in a statement. "Lessons must be learned to prevent more voter disenfranchisement in the upcoming elections."

The office of Gov. Greg Abbott, who signed the bill into law, has not responded to requests for comment about the ballot rejection issues. The secretary of state's office has vowed to ramp up voter education about the rules ahead of the general election. But local election officials remained limited in how they can interact with prospective mail-in voters,

including a new prohibition on "soliciting" requests for mail-in ballots from voters that county election administrators say they fear violating.

County election officials have also walked away from specific outreach to regular mail-in voters in light of the prohibition.

*Disclosure: The Texas secretary of state has been a financial supporter of The Texas Tribune, a nonprofit, nonpartisan news organization that is funded in part by donations from members, foundations and corporate sponsors. Financial supporters play no role in the Tribune's journalism. Find a complete list of them here.*

*We can't wait to welcome you in person and online to the 2022 Texas Tribune Festival, our multiday celebration of big, bold ideas about politics, public policy and the day's news — all taking place just steps away from the Texas Capitol from Sept. 22-24. When tickets go on sale in May, Tribune members will save big. Donate to join or renew today.*

# EXHIBIT 61

Transcript of the Testimony of

# Pamiel Gaskin

### Date:

June 29, 2022

### Case:

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
2                    SAN ANTONIO DIVISION

3

4      LA UNIÓN DEL PUEBLO        )
       ENTERO, et al.,            )
5                                 )    Case No.
            Plaintiffs,           )    5:21-cv-844-XR
6                                 )
       VS.                        )    (Consolidated for
7                                 )    space)
       GREGORY W. ABBOTT,         )
8      et al.,                    )
            Defendants.           )
9

10

11

12    _ _ _ _ _ _ _ _ _ _

13            DEPOSITION OF PAMIEL J. GASKIN
                 June 29, 2022, 9:25 a.m.
14
           Location:  U.S. Department of Justice
15           1000 Louisiana Street, Suite 2300
                     Houston, Texas
16
              Volume 1 of 1 - Pages 1 - 127
17                              _ _ _ _ _ _ _ _ _ _

18

19

20

21

22

23    Stenographic Reporter:
      DENYCE M. SANDERS, TX CSR, RDR, CRR, CCR (LA)
24    dsanderscsr@gmail.com

25    JOB NO. 845774

 1  trouble voting in that election; correct?

 2      A.      I did.

 3      Q.      Now, in your own words, can you tell me

 4  about what happened.

 5      A.      Sure.  In Texas you have to apply every

 6  year for a mail-in ballot.  So part of my just

 7  general housekeeping is that I take care of those

 8  types of things the first week of the month --

 9      Q.      Okay.

10      A.      -- of January.

11              So on or about January 3rd, I pulled

12  out -- I went to Fort Bend County's website.  Pulled

13  down the application to vote by mail for both me and

14  my husband.  Pulled them down.  Filled them out.  We

15  signed them.  Well -- and I mailed it in.  Mailed

16  them in.

17              And about ten days later, I got a

18  letter saying that, through no fault of mine, my

19  application had been rejected.

20              So I called the election office and

21  spoke with Veronica -- Veronica Fernandez, who is

22  the early voting clerk.  They don't have -- it's not

23  a big office.  And she said I had used the wrong

24  form.

25              I said, "Well, Veronica, I got the

 1   form from you guys."

 2                   She said, "Well, the Secretary of

 3   State didn't send us the right forms in time, and we

 4   didn't populate the correct form until around the

 5   6th of January."

 6                   I said.  "Okay.  Is the correct form

 7   there now?"

 8                     She said, "Yes."

 9                   So I pulled the correct form down.

10   Filled it out.  Mailed it in.  And I had just -- it

11   was -- this was on the 13th.

12                   On the 20th, I had just finished a

13   League of Women Voters activity, and I was on my way

14   home.  And Veronica called me and said, "Don't shoot

15   the messenger.  Your application has been rejected."

16                   I said, "For what?"

17                   She said, "You didn't put the

18   correct ID on your application."

19                   I said, "Veronica, what do you mean

20   I didn't put the right ID?  It asks for my driver's

21   license number, and that's what I put on there."

22                   She says, "Well" --

23                   I said, "What was I supposed to put

24   on it?"

25                   She said, "Well, I can't tell you,

```
 1        A.     Yeah.  And folks call -- as I said,

 2    people call.

 3               But I keep up with the news.  And it

 4    was all over the news, about the high rejection rate

 5    of ballot applications.

 6        Q.     Now, where do you get your news?

 7        A.     A lot of places.  The local -- I always

 8    look at the local news.

 9        Q.     Mm-hmm.

10        A.     And I'm not particular about which one.

11    13, 11, 2.  CBS, NBC, ABC; local affiliates.

12        Q.     Do you read any physical newspapers?

13        A.     I do the Chronicle online.

14        Q.     Chronicle online.  Yeah, I used to get

15    it in person -- or, excuse me, physical --

16        A.     Yeah.

17        Q.     -- and then now they're doing online.

18        A.     Right.

19        Q.     Yeah.  I kind of miss the paper.

20        A.     Yeah.  I'm a reader, and it's always

21    good to turn the pages.

22        Q.     It just feels better in your hands.

23        A.     Yeah.

24        Q.     Anyway.

25               Now, you told me that you called
```

1      Q.      Okay.  And then you gave an interview

2   sort of explaining what the League was doing there?

3      A.      Yeah.

4      Q.      Any other times you've given an

5   interview on TV?

6      A.      No, not that I can recall.

7      Q.      And on one of those interviews you said,

8   and I'm quoting here, "These laws were meant to stop

9   certain classes and categories of people from

10  voting."  Do you remember that?

11     A.      I remember that.

12     Q.      What categories and classes did you

13  mean?

14             MS. HARRIS:  Objection; form.

15     A.      People who were maybe -- that

16  demographic studies may have shown would not vote

17  like the people who wrote the laws intended.

18     Q.      (BY MR. DiSORBO)  So I'm not sure I

19  understand.  Are you --  is there a particular class

20  or category of person that you think SB1 is trying

21  to prevent people from voting?

22             MS. HARRIS:  Objection; form.

23     A.      I think that they're not -- I may have

24  in terms of saying prevent people from voting.  I

25  think SB1's intent is to make it difficult for

 1 │ certain classes and categories of people to vote.

 2 │     Q.     (BY MR. DiSORBO)  That's helpful.  So

 3 │ you're saying it was -- you think it was intended to

 4 │ make it harder, not to prevent folks from voting; is

 5 │ that correct, ma'am?

 6 │     A.     To make it hard -- which in and of

 7 │ itself, if you make something hard enough, folks

 8 │ just won't try to do it.

 9 │     Q.     Now, you said certain types of

10 │ demographics.  Are you talking about race and

11 │ ethnicity?

12 │     A.     That is part of it.

13 │     Q.     And so do you think -- scratch that.

14 │            So do you think SB1 was written to

15 │ make it harder for certain types -- or folks of

16 │ certain races to vote?

17 │            MS. HARRIS:  Objection; form.

18 │     A.     Races and places where they live.  Urban

19 │ voters.

20 │     Q.     (BY MR. DiSORBO)  So let's talk about

21 │ races first; and then I want to talk about places

22 │ too.

23 │            Which races do you think SB1 was

24 │ intended to make it harder to vote for?

25 │            MS. HARRIS:  Objection; form.

 1   ma'am?

 2         A.     I'm sure there are, but right now,

 3   they're not coming to mind.

 4         Q.     None that you can remember sitting right

 5   here?

 6         A.     Right.

 7         Q.     Okay.  So you're registered in Fort Bend

 8   County; right?

 9         A.     Uh-huh.

10         Q.     Did they have drive-through voting in

11   2020?

12         A.     No.

13         Q.     So you've never voted via drive-through,

14   have you?

15         A.     No.

16         Q.     Do you know anybody who has?

17         A.     I know people in Harris County who voted

18   drive-through.

19         Q.     Yes, ma'am.  That's what I meant.

20         A.     Now, there is in the voting

21   provisions -- but it's been there; it was before

22   SB1 -- curbside voting.  And you can -- if you're

23   disabled or whatever, you can drive up to the -- to

24   the voting location.  And someone can go and take

25   your ID to the election judge, and they will bring a

# EXHIBIT 62

Page 2

1   UNITED STATES OF AMERICA,      §
        PLAINTIFF,                 § CASE NO. 5:21-CV-1085-XR
2                                  §
    V.                             §
3                                  §
    THE STATE OF TEXAS, ET         §
4   AL.,                           §
        DEFENDANTS                 §
5
6
    ************************************************************
7
8              ORAL AND VIDEOTAPED DEPOSITION OF
9
                       ALICE PENROD
10
11                    APRIL 27, 2023
12
    ************************************************************
13
14        ORAL AND VIDEOTAPED DEPOSITION OF ALICE PENROD,
15   PRODUCED AS A WITNESS AT THE INSTANCE OF THE STATE'S
16   DEFENDANTS, WAS TAKEN IN THE ABOVE-STYLED AND -NUMBERED
17   CAUSE ON THE 27TH DAY OF APRIL, 2023, FROM 10:03 A.M. TO
18   12:24 P.M., BEFORE KAREN A. GONZALEZ, COMMISSIONED
19   NOTARY, IN AND FOR THE STATE OF TEXAS, REPORTED REMOTELY
20   BY MACHINE SHORTHAND, REMOTELY FROM DALLAS COUNTY,
21   TEXAS, PURSUANT TO THE TEXAS RULES OF CIVIL PROCEDURE,
22   THE TEXAS SUPREME COURT EMERGENCY ORDER REGARDING THE
23   COVID-19 STATE OF DISASTER AND THE PROVISIONS STATED ON
24   THE RECORD OR ATTACHED HERETO.
25



Page 40

1    Q.   THE 2022 PRIMARY ELECTION YOU TESTIFIED THAT THAT

2    WAS YOUR FIRST TIME VOTING BY MAIL; IS THAT CORRECT?

3    A.   THAT'S CORRECT.

4    Q.   AND WHAT ISSUES DID YOU HAVE VOTING BY MAIL IN

5    THE 2022 PRIMARY?

6            MR. BARON:  OBJECT TO FORM.

7            YOU CAN ANSWER.

8    A.   I MAILED MY BALLOT IN, AND THEN WE -- I DON'T

9    KNOW HOW LONG IT WAS, MAYBE -- I DON'T EVEN KNOW IF IT

10   WAS WITHIN TWO WEEKS, I GOT A LETTER SAYING THAT MY

11   BALLOT HAD BEEN REJECTED, AND I COULD GO ONLINE TO THE

12   WEBSITE -- THIS SPECIFIC WEBSITE TO MAKE CORRECTIONS.

13   AND SO I DID THAT.  I MADE THE CORRECTIONS THAT WERE

14   NEEDED.  AND THEN I KEPT CHECKING BACK, AND IT WASN'T

15   UNTIL A COUPLE OF WEEKS AFTER THAT, THAT IT FINALLY

16   SHOWED UP THAT MY BALLOT HAD BEEN ACCEPTED.

17   Q.   (BY MR. BERG)  SO WOULD IT BE A -- CORRECT, THAT

18   YOU MAILED IN YOUR BALLOT, YOU WERE NOTIFIED THAT IT HAD

19   BEEN REJECTED, BUT THAT YOU COULD GO ONLINE TO MAKE

20   CORRECTIONS.  YOU WENT ONLINE TO MAKE CORRECTIONS, AND

21   YOU CHECKED A NUMBER OF TIMES, AND EVENTUALLY SAW THAT

22   IT WAS ACCEPTED SOMETIME IN THE FUTURE?

23           MR. BARON:  OBJECT TO FORM.

24           YOU CAN ANSWER.

25   A.   YES, THAT IS CORRECT.



Page 41

1    Q.  (BY MR. BERG)  WHEN YOU WERE NOTIFIED THAT YOUR

2  MAIL BALLOT HAD BEEN REJECTED, WAS THAT A LETTER OR AN

3  E-MAIL, DO YOU RECALL --

4    A.  IT WAS A LETTER, IN THE MAIL.

5    Q.  AND WAS THAT LETTER FROM THE BEXAR COUNTY

6  ELECTION'S OFFICE?

7    A.  I BELIEVE SO.

8    Q.  AND DID THE LETTER FROM THE BEXAR COUNTY

9  ELECTION'S OFFICE SAY WHY YOUR BALLOT HAD BEEN REJECTED?

10    A.  I DON'T RECALL IT SAYING SPECIFICALLY.

11    Q.  YOU JUST RECALL THAT THE LETTER SAID THAT YOUR

12  BALLOT HAD BEEN REJECTED?

13    A.  YES, AND THAT I COULD GO TO A WEBSITE TO CORRECT

14  -- TO MAKE CORRECTIONS.

15    Q.  AND AS WE SIT HERE TODAY, DO YOU KNOW WHY YOUR

16  BALLOT WAS INITIALLY REJECTED?

17    A.  I DON'T KNOW SPECIFICALLY, IF IT WAS THAT I

18  DIDN'T PUT A SPECIFIC NUMBER CORRECTLY ON THERE.  'CAUSE

19  IT ASKED FOR DRIVER'S LICENSE, IT ASKED FOR LAST FOUR OF

20  YOUR SOCIAL, IF I DIDN'T SIGN IT IN A SPECIFIC PLACE.  I

21  DON'T -- I DON'T REALLY KNOW.  ALL I KNOW IS, IT WAS

22  DENIED AND I WAS NOT HAPPY.

23    Q.  OKAY.  LET ME TRY TO HELP.

24        DO YOU KNOW WHETHER YOUR MAIL BALLOT WAS REJECTED

25  BECAUSE YOU FAILED TO SIGN THE BALLOT?



Page 42

1    A.  I DON'T KNOW SPECIFICALLY IF THAT'S THE CASE.

2    Q.  DO YOU KNOW THAT YOUR BALLOT WAS REJECTED BECAUSE

3  YOU FORGET TO -- FORGOT TO INDICATE THAT YOU WERE OVER

4  65 YEARS OF AGE?

5    A.  I DON'T -- I DON'T KNOW.  I DON'T KNOW THAT.

6    Q.  AND DO YOU KNOW THAT YOUR BALLOT WAS REJECTED FOR

7  MISSING IDENTIFICATION NUMBERS?

8    A.  I DON'T KNOW.

9    Q.  OKAY.

10    A.  I DON'T KNOW WHICH -- WHAT THE REASON WAS.  I

11  DON'T REMEMBER WHAT THE REASON WAS AT THIS POINT.

12    Q.  YOU STILL HAVE THAT LETTER?

13    A.  NO.

14    Q.  SO THE LETTER SAID THAT YOU COULD GO ONLINE TO

15  MAKE A CORRECTION TO YOUR BALLOT; IS THAT RIGHT?

16    A.  YES.

17    Q.  DO YOU RECALL WHAT WEBSITE IT TOLD YOU TO GO ON?

18    A.  WAS IT TEXASVOTE.ORG OR ONE OF THOSE -- I'M NOT

19  SURE.  YOU KNOW WHERE YOU CAN CHECK -- IT'S THE WEBSITE

20  WHERE YOU CAN CHECK IF YOU'RE REGISTERED TO VOTE, AND

21  ALL OF THAT.

22    Q.  GOT IT.

23        AND ON THE WEBSITE THAT YOU WENT TO, YOU WERE

24  ABLE TO CORRECT YOUR BALLOT; IS THAT RIGHT?

25    A.  YES, I COULD -- WELL, I DON'T KNOW THAT I WAS



Page 43

1    ABLE TO CORRECT MY BALLOT, BUT I WAS ABLE TO VERIFY THAT

2    IT -- THAT I HAD MAILED IT IN, THAT IT WAS ME.  SO I

3    DON'T KNOW THAT THERE WAS A PLACE, LIKE, IT DIDN'T SHOW

4    ME MY BALLOT TO SEE WHAT WAS WRONG AND COULD -- I DON'T

5    KNOW.  I JUST HAD TO PUT CERTAIN -- I HAD TO PUT ALL MY

6    INFORMATION IN ABOUT ME, AND THEN, I GUESS, THEY

7    REALIZED IT WAS ME, OR I PROVED THAT IT WAS ME.  I DON'T

8    KNOW HOW THEY -- I DON'T KNOW HOW TO EXPLAIN THAT.  I

9    DIDN'T --

10       Q.  SO --

11       A.  -- PICTURE OF MY BALLOT OR, YOU KNOW, WHAT WAS

12   WRONG WITH IT OR ANYTHING LIKE THAT.  I JUST GAVE THEM

13   THE INFORMATION THAT WAS REQUESTED AND THEN CHECKED BACK

14   LATER AND IT WAS ACCEPTED.

15       Q.  SO WHEN YOU WENT ONLINE TO FILL OUT A REPLACEMENT

16   BALLOT, YOU FILLED OUT A BLANK REPLACEMENT BALLOT WITH

17   ALL THE INFORMATION; IS THAT CORRECT?

18       A.  I DON'T -- I DON'T KNOW.

19       Q.  OKAY.

20       A.  I DIDN'T -- THE ONLY THING -- THE ONLY

21   CORRECTIONS I THINK I MADE WERE ABOUT MY IDENTIFICATION.

22   IT --

23       Q.  DO YOU RECALL THAT SPECIFICALLY --

24       A.  IT WAS NOTHING ABOUT WHO I WAS VOTING FOR.

25       Q.  SO --



Page 44

1     A.   IT WASN'T THE BALLOT ITSELF, IT WAS MY

2     IDENTIFICATION.  DOES THAT --

3     Q.   AND --

4     A.   -- MAKE SENSE, I DON'T KNOW.  I'M TRYING TO --

5     I'M TRYING TO MAKE SURE THAT IT'S CLARIFIED OF WHAT I

6     WAS CORRECTING.

7     Q.   I APPRECIATE THAT.

8          SO IT IS A CORRECT SUMMARY OF YOUR TESTIMONY JUST

9     THERE THAT YOU WERE CORRECTING SOME FORM OF VOTER ID,

10    AND NOT WHO YOU WERE ACTUALLY VOTING FOR?

11    A.   EXACTLY.

12    Q.   AND ONCE YOU DID THAT ONLINE, DID YOU HAVE TO

13    PRINT AND MAIL ANYTHING, OR HOW DID YOU --

14    A.   NO.  THEY JUST SAID KEEP CHECKING BACK AND, YOU

15    KNOW, AND I DID CHECK BACK OVER -- SEEMED LIKE IT WAS

16    SEVERAL WEEKS, BUT I DON'T KNOW IF IT REALLY WAS 'CAUSE

17    I WAS ANXIOUS ABOUT IT.  BUT FINALLY IT DID SHOW THAT IT

18    HAD BEEN ACCEPTED.

19    Q.   SO YOU WERE ABLE TO SUBMIT A NEW MAIL BALLOT

20    ONLINE, AND THEN YOU WAITED, AND KEPT CHECKING UNTIL YOU

21    WERE NOTIFIED THAT IT HAD BEEN ACCEPTED; IS THAT

22    CORRECT?

23    A.   I DIDN'T --

24         MR. BARON:  OBJECT TO FORM.

25    A.   I DIDN'T SUBMIT A NEW BILL IN -- MAIL-IN BALLOT



Page 45

1    ONLINE, NO.

2       Q.  (BY MR. BERG)  HOW WOULD YOU DESCRIBE WHAT YOU

3    DID ONLINE, THAT YOU SUBMITTED?

4       A.  I JUST VERIFIED THAT WHAT I HAD PREVIOUSLY

5    SUBMITTED WAS FROM ME, THAT I WAS THE PERSON.  IF IT WAS

6    MISSING A SPECIFIC -- I DON'T REMEMBER IF IT WAS A

7    SPECIFIC -- IF IT WAS MY DRIVER'S LICENSE THAT HAD BEEN

8    LEFT OUT, PUT IN INCORRECTLY, OR THE LAST FOUR OF MY

9    SOCIAL HAD BEEN PUT IN CORRECTLY.  I DON'T -- I DON'T

10   KNOW WHAT IT WAS SPECIFICALLY, BUT I JUST HAD TO VERIFY

11   MY IDENTIFICATION.

12      Q.  THANK YOU.

13          AND THEN, I BELIEVE, YOU TESTIFIED THAT YOU THEN

14   CHECKED SEVERAL TIMES TO MAKE SURE THAT YOUR BALLOT HAD

15   BEEN ACCEPTED; IS THAT RIGHT?

16      A.  YES.

17          MR. BARON:  SORRY TO INTERRUPT.  WE'VE BEEN

18   GOING FOR I THINK ABOUT AN HOUR.  AND SO IF WE CAN TAKE

19   A BREAK.  I NEED A COUPLE MINUTES TO WALK MY DOG AND USE

20   THE RESTROOM MYSELF.  AND I'M SURE THE COURT REPORTER

21   COULD USE A BREAK.

22          MR. BERG:  YEAH.  HOW MUCH TIME WOULD YOU

23   LIKE TO TAKE A BREAK FOR?

24          MR. BARON:  FIVE TO TEN MINUTES, ANYWHERE IN

25   THERE IS FINE.



Page 46

```
1              MR. BERG:  MS. PENROD, WOULD TEN MINUTES BE

2   A SUFFICIENT BREAK FOR YOU?

3              THE WITNESS:  THAT WOULD BE FINE.

4              MR. BERG:  OKAY.  LET'S TAKE A TEN MINUTE

5   BREAK.

6              LET'S GO OFF THE RECORD.

7              MR. BARON:  OKAY.

8              THE VIDEOGRAPHER:  THE TIME IS 11:08 A.M.,

9   AND WE ARE OFF THE RECORD.

10             (OFF THE RECORD.)

11             THE VIDEOGRAPHER:  THE TIME IS NOW

12  11:23 A.M., AND WE ARE BACK ON THE RECORD.

13     Q.  (BY MR. BERG)  MS. PENROD, BEFORE WE TOOK A BREAK

14  WE WERE TALKING ABOUT YOUR 2022 PRIMARY EXPERIENCE; IS

15  THAT CORRECT?

16     A.  YES.

17     Q.  AND YOU HAD TESTIFIED THAT AFTER YOU USED THE

18  ONLINE PROCESS, YOU CHECKED SEVERAL TIMES TO SEE WHETHER

19  YOUR BALLOT HAD BEEN ACCEPTED UNTIL YOU WERE NOTIFIED

20  THAT IT HAD BEEN; IS THAT CORRECT?

21     A.  YES.

22     Q.  AS WE SIT HERE TODAY, ARE THERE ANY ELECTIONS IN

23  EITHER 2022 OR 2023 WHERE YOUR BALLOT WAS ULTIMATELY NOT

24  ACCEPTED?

25     A.  NO.
```



Page 47

1    Q.  I BELIEVE YOU MENTIONED THAT 2022 IS YOUR FIRST

2   TIME VOTING BY MAILED BALLOT; IS THAT CORRECT?

3    A.  THAT'S CORRECT.

4    Q.  PRIOR TO THAT, HAD YOU EVER HAD TROUBLE VOTING

5   IN-PERSON?

6    A.  NO.

7    Q.  WHY DID YOU SWITCH IN 2022 TO VOTING FROM

8   IN-PERSON TO VOTE BY MAIL?

9    A.  IT WAS POST PANDEMIC.  MY 90 -- I GUESS, SHE WAS

10  90 AT THAT TIME, YEAR-OLD MOTHER IS STILL, YOU KNOW,

11  VERY -- YOU KNOW, MENTALLY CAPABLE, DISCUSSES POLITICS,

12  WANTS TO VOTE.  I JUST FELT IT WOULD BE EASIER, SINCE WE

13  ALL QUALIFIED TO VOTE -- TO VOTE BY MAIL, IT WOULD BE A

14  LOT EASIER NOT TO GO OUT AND EXPOSE HER TO A LOT OF

15  PEOPLE 'CAUSE WE JUST -- WE STILL MASK WHEN WE GO TO THE

16  GROCERY STORE, SHE'S -- YOU KNOW, SHE'LL BE 92.  I JUST

17  DON'T WANT TO TAKE THAT RISK SO -- AND SHE DOESN'T

18  EITHER.  SO WE JUST FELT THAT IT WOULD BE EASIER TO VOTE

19  BY MAIL.  AND IT TURNED OUT, HER'S WAS ACCEPTED, SHE

20  OBVIOUSLY FILLED HERS OUT CORRECTLY.  BUT MY HUSBAND'S

21  AND I, BOTH WERE REJECTED SO -- FOR NOT FILLING IT OUT

22  SOMEHOW CORRECTLY.  SO I JUST FELT IT WAS A BETTER PART

23  OF -- TO JUST GO IN-PERSON, IF I NEED TO VOTE.

24       I -- YOU KNOW, IT JUST -- IT JUST -- IT WAS VERY

25  DISCONCERTING AND IT WAS -- I FELT AN INFRINGEMENT OR AN



# EXHIBIT 63

```
 1   UNITED STATES OF AMERICA,    }
                     Plaintiff,   }      Case No: 5:21-cv-1085-XR
 2                                }
     v.                           }
 3                                }
     THE STATE OF TEXAS, et al,   }
 4               Defendants.      }
 5
 6
 7
     ---------------------------------------------------------
 8
                   ORAL AND VIDEOTAPED DEPOSITION OF
 9
                           TANIA CHAVEZ
10
                          JUNE 15, 2023
11
     ---------------------------------------------------------
12
13
14
15        ORAL AND VIDEOTAPED DEPOSITION OF TANIA CHAVEZ,
16   produced as a witness at the instance of the State
17   Defendants, and duly sworn, was taken in the
18   above-styled and numbered cause on the 15th day of June,
19   2023, from 10:06 a.m. to 12:24 p.m., before Tracie L.
20   Carbajal, CSR, in and for the State of Texas, reported
21   by machine shorthand, at the offices of La Union Del
22   Pueblo Entero, located at 1601 U.S. Business 83, San
23   Juan, Texas, pursuant to the Federal Rules of Civil
24   Procedure, and the provisions stated on the record or
25   attached hereto.
```



1    A.  Yes.

2    Q.  What other types of responsibilities do those two

3  employees have?

4    A.  All related to GOTV activities.

5    Q.  And when you say GOTV, you're referring to Get

6  Out The Vote?

7    A.  That is correct.

8    Q.  I assume those two persons are still employed

9  with -- with LUPE --

10    A.  Yes, they are.

11    Q.  -- now, in the middle of 2023, even though this

12  is not a state election year?

13    A.  That is correct because community members still

14  need to be able to register to vote.

15    Q.  Okay.  So are those two employees engaged

16  full-time in voter registration efforts?

17    A.  Yes, they are.

18    Q.  Now, my recollection is that SB 1 went into

19  effect around the end of 2021, or the very beginning of

20  2022, but before the primary election season.  Is that

21  your recollection, also?

22    A.  Yes.

23    Q.  Okay.  And because it was a new law, did that

24  require some special education efforts on the part of

25  LUPE towards its members?



1    A.  Yes, it did.

2    Q.  And, generally, what do you recall that you

3  personally were aware of in that regard?

4    A.  We were briefed on the changes that happened as a

5  result of the legislation, and canvassers were trained

6  on how to approach community members.  I was not present

7  at the trainings, but I do know that they took place.

8    Q.  Do you know approximately how much money LUPE

9  spent on that training prior to the 2022 primaries?

10    A.  I do not know.

11    Q.  Did you personally observe any problems related

12  to the March 2022 primaries among LUPE members?

13          MS. PERALES:  Objection; vague as to

14  problems.

15          You may answer if you understand.

16    A.  Could you clarify your question?

17    Q.  Sure.  I don't mean to be technical about it.

18  I'm just really asking you about any situations in which

19  people had unusual difficulties voting or in getting

20  their votes counted rather than rejected.

21    A.  Particularly in the primaries of 2022, we had a

22  lot of community members confused about their ballot by

23  mail, particularly community members complaining that

24  they had not yet received their ballot by mail.  And so

25  we had to inform them of the circumstances of SB 1 and



1   how it was affecting them receiving the ballot by mail.

2       We subsequently encouraged them to apply and

3   assisted them in applying for a ballot by mail.  And

4   then when community members received their ballot, they

5   had a lot of questions as to how they were supposed

6   to -- to return the ballot.  In addition to that, some

7   of our own staff members were confused on how to fill

8   out their own ballot by mail and chose to go to the

9   polls and change their ballot to be able to cast their

10  vote in person since they did not trust that their

11  vote -- their vote will be counted as a result of the

12  difficulties that SB 1 had on the ballot by mail.

13      Q.  Okay.  And those primaries in the first part of

14  2022 were the first time that SB 1 is effect -- was in

15  effect, and people had to learn about all of those

16  rules; is that correct?

17      A.  Yes.

18      Q.  Okay.  Now, let's look forward to the general

19  elections in the fall of 2022.

20      A.  Uh-huh.

21      Q.  Did LUPE have to do the same level of educational

22  effort prior to that election as it did prior to the

23  March primaries?

24      A.  We had to do more.

25      Q.  And why did LUPE choose to do more?



1           MS. PERALES:   Objection; mischaracterizes

2    the testimony.   Witness said they had to do more.   The

3    question was why did you choose to do more?

4           You may answer.

5    A.   We did more because community members were coming

6    to our offices requesting their ballot by mail.   By this

7    time, the word had already gotten around that they

8    weren't going to receive one, or we had to do outreach

9    to be able to, like, let them know that we're not going

10   to receive one.   So we were able to host several

11   community gatherings where elderly community members

12   came to our offices to be able to apply for their ballot

13   by mail.

14          In addition, the lettering on the application was

15   too small, and they were unable to fully read, and so we

16   were able to project the application and really, like,

17   read it out loud how -- what they needed to know in

18   order to apply, and that's how we were able to help them

19   apply for their ballot by mail.

20          Unfortunately, there's still a lot of community

21   members that do not -- do not know that they have to

22   apply and -- who are still pending to receive their

23   ballot by mail every time an election takes place.

24   Q.   Okay.   Let me see if I understand your answer.

25   You referred to having several community gatherings.



1   ballot by mail, and, subsequently, the county will send

2   them the ballots.

3       Q.  You mentioned earlier in your testimony that LUPE

4   had a concern about the oath that could put assisters in

5   jail.

6       A.  Uh-huh.

7       Q.  And I wanted to follow up and ask you if LUPE has

8   any concerns about making some kind of mistake in voter

9   assistance that could lead to investigation and

10  prosecution?

11      A.  Yes.

12          MR. BRYANT:  Objection; form.

13  BY MS. PERALES:

14      Q.  Could you elaborate on that, please?

15      A.  Yes.  One of the challenges that we have with the

16  oath is that it states, under penalty something or

17  other, and so -- which brings about the risk for them to

18  be prosecuted.  The biggest challenge or concern that we

19  have is that if an election worker, a poll watcher

20  believes that the person who did the oath is not abiding

21  by, that that could result on their incarceration as a

22  result of this.

23          Another incident that we have concerns of is the

24  ability for us as an entity to be able to support ballot

25  measures because once we have mail-in ballots of



1   people's homes, there's really no way for us to be able

2   to do GOTV at the doors.  I mean, it's not like we're

3   going to knock on the door and say, like, "Hello.  Do

4   you have a mail-in ballot because, otherwise, I can't

5   talk to you about what I'm about to talk to you."

6        I mean, that's just not how it works.  You're

7   supposed to be able to knock on the door and talk to

8   folks on a measure that you are supporting, for us that

9   we do, and for structural work that we do, drainage

10  work, pave roads, healthcare access, education.  There

11  could be a number of measures that we could support and

12  the inability to do this freely in the presence of a

13  ballot.  It brings about challenges that our staff could

14  potentially face jail time or us, an employer, or me as

15  an executive director that may pay the consequences of

16  that if somebody accidentally makes -- makes a mistake.

17       And then, really, like the biggest challenge that

18  we have seen is the inability to assist community

19  members on their ballot by -- by mail, given that we're

20  unable to compensate staff members to assist community

21  members to -- to assist in the ballot by mail.  And so

22  if -- if any of these incidents occur, which may result

23  in prosecution, which is a reason why we have spent

24  additional -- additional resources on doing training for

25  canvassers and staff during Get Out The Vote efforts.



# EXHIBIT 64

Keith Ingram                                    March 28, 2023

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
2                   SAN ANTONIO DIVISION
   LA UNION DEL PUEBLO ENTERO,      )
3  et al.,                          )
                    Plaintiffs,     )
4       vs.                         )Civil Action No.
   STATE OF TEXAS, et al.,          )5:21-cv-844(XR)
5                   Defendants.     )(Consolidated Cases)

6
                   ------------------------
7                    ORAL DEPOSITION OF
                     KEITH INGRAM
8                    March 28, 2023
                        Volume 1
9                  ------------------------

10

11       ORAL 30(b)(6) DEPOSITION OF KEITH INGRAM, Volume

12  1, produced as a witness at the instance of the

13  Plaintiff, and duly sworn, was taken in the

14  above-styled and numbered cause on March 28, 2023, from

15  4:22 p.m. to 7:22 p.m., before Dana Shapiro, CSR, in

16  and for the State of Illinois, reported by machine

17  shorthand, at 209 W. 14th Street, Austin, Texas 78701,

18  pursuant to the Federal Rules of Civil Procedure and

19  any provisions stated on the record or attached

20  hereto.

21

22

23

24

25



1   BY THE WITNESS:

2        A.     I mean we don't know.  I mean some voters

3   can drive it in as easily as they can mail it, but

4   there is a reason why people vote by mail.  Generally

5   it's because they are not as mobile.  So to increase

6   the odds of them curing we need to have a mail back

7   form.

8   BY MS. PERALES:

9        Q.     Texas vote by mail eligibility involves

10  being for the most part either over age 65 or

11  physically disabled, is that correct -- or disabled in

12  some way?

13       A.     Agreed.

14       Q.     So you had listed basically four things,

15  the 2026 effective date provision, and then the three

16  things you just talked to me about now.  Have you had

17  any discussions with members of the legislator or

18  legislative staff about amending any of the provisions

19  in SB 1 that are the subject of this lawsuit?

20       A.     No.

21       Q.     So then I won't have to ask it for each

22  individual provision.

23              Let's look at --

24       A.     Oh, we did talk to one senator's office

25  about possible changes to poll watchers.



# EXHIBIT 65

Taylor Scott

April 18, 2023
Page 2

```
 1   _____

 2   MIFAMILIA VOTA, et al.         )(
             Plaintiffs            )(
 3                                 )(   CASE NO.
     VS.                           )(   5:21-cv-0920-XR
 4                                 )(
     GREG ABBOTT, et al.           )(
 5           Defendants            )(
     _____
 6
     UNITED STATES OF AMERICA       )(
 7           Plaintiff             )(
                                   )(   CASE NO.
 8   VS.                           )(   5a;21-cv-1085-XR
                                   )(
 9   THE STATE OF TEXAS, et al.    )(
             Defendants            )(
10   _____

11              ORAL AND VIDEOTAPED DEPOSITION OF
12                        TAYLOR SCOTT
                         APRIL 18, 2023
13   _____

14

15           ORAL AND VIDEOTAPED DEPOSITION OF TAYLOR SCOTT,

16   produced as a witness at the instance of the State

17   Defendants, taken in the above-styled and numbered

18   cause on APRIL 18, 2023, between the hours of

19   11:33 a.m. and 11:57 a.m., reported stenographically by

20   DONNA McCOWN, Certified Court Reporter No. 6625, in and

21   for the State of Texas, at 7030 Mile 2 3/4 East,

22   Mercedes, Texas, pursuant to the Federal Rules of Civil

23   Procedure and any provisions stated on the record or

24   attached therein.

25
```



```
 1        Q.  Do you recall any occasion in which you

 2   attempted to vote by mail but couldn't do so?

 3        A.  Yes.

 4        Q.  When did that occur?

 5        A.  In this year's election.

 6        Q.  Was that in 2022 or 2023?

 7        A.  2023.

 8        Q.  And what do you recall about the attempt that

 9   you made to vote by mail on that election?

10        A.  I didn't get a ballot.

11        Q.  Do you recall whether or not you sent in an

12   application for a mail-in ballot on that occasion?

13        A.  Yes.

14        Q.  Did you fill out that application yourself?

15        A.  My mom did.

16        Q.  Okay.  Did you sign that application?

17        A.  She -- she writes for me.  I can't -- I can't

18   write.

19        Q.  And did you read that application before it was

20   sent in?

21        A.  She read it to me.

22        Q.  And do you recall that the application required

23   you to provide some type of identification number?

24        A.  Yes, sir.

25        Q.  And what type of identification number or
```



# EXHIBIT 66

ORAL & VIDEO DEPOSITION OF:


SADIA TIRMIZI


May 8, 2023


-------------------------------------------------


Oral & video deposition of SADIA TIRMIZI, produced as

a witness at the instance of the defendants, and duly

sworn, was taken in the above-styled and numbered cause on

the 8th day of May, 2023, before Patrick Stephens,

Certified Court Reporter, at 209 West 14th Street,

Austin, Texas 78701.



 1    So anyways, I drove Mom to the place to go vote.  The

 2 person at the voting site who was helping her -- so Mom had only

 3 done mail-in ballots for the previous maybe two to three years

 4 and so wasn't as familiar with the machines.  Somebody at the

 5 site was showing her, kind of orienting her to the machines, and

 6 I was standing maybe about this distance as I am from you just

 7 kind of observing, and the person was showing Mom how to select

 8 people on the ballot and pointed to a specific candidate and

 9 saying something like, So you just push -- push this button

10 right here, or, You just touch the screen right here.

11    And afterwards we left.  She did not push the button that

12 was being indicated.  After she completed her voting, as we were

13 walking out, she said to me, Well, that was weird.  The person

14 was trying to lead me toward -- to a certain option, and just

15 was a weird encounter.  As far as Dad's mail-in ballot, they

16 didn't have stamps at the house, and so we stopped by the

17 grocery store to pick -- pick up -- really all we needed was one

18 stamp, but apparently you can't buy just one stamp; you had to

19 buy a book of stamps, and so that's what we picked up and then

20 mailed in Dad's ballot the next day.

21    In the meantime -- again, like I said, I've never done a

22 mail-in ballot before, so -- but Dad has, so he -- I helped him

23 complete the stuff because his writing was really -- like, his

24 hands were weak, so he wasn't able to write as well or just fill

25 out the right information, so he directed me on how to fill it



 1  out and I did.

 2       And then we sealed, I guess, the ballot envelope -- or some

 3  -- there was something that you had to seal and then the

 4  instructions said that after you seal it, you have to sign, and

 5  as he was doing that, we realized that there was a second slip

 6  of paper in the bigger envelope that all the information came in

 7  that indicated that before you seal that and sign it, you needed

 8  to have -- I think it was a social or a DL or both on there, and

 9  that's not something that had previously been a requirement, and

10  so Dad wasn't anticipating that.  So we had to, like, very

11  carefully help him unseal it, fill out the missing information,

12  reseal it and I think we put tape on it to make sure it

13  didn't... yeah.

14       And -- oh, and he -- because of his weakness, his signature

15  was not super visible, so I asked him -- gave him like a -- you

16  know, a better pen and asked him to sign right next to it, so

17  there were two signatures side by side, and we just sort of

18  hoped that that wouldn't -- none of that would, you know,

19  disqualify his ballot.  We put it in the mail.  I think my

20  issues that I was frankly sharing with my friend Josh is that

21  had I not been there -- and my Mom actually said this -- that

22  she probably wouldn't have voted.

23       When you're dealing with a terminal illness, there's just

24  so many things going on in their lives that this wasn't --

25  wouldn't have been -- it would have fallen off their radar,

