**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*, | |
| *Plaintiffs*, | Case No. 5:21-CV-844-XR |
| v. | (consolidated cases) |
| STATE OF TEXAS, *et al.*, | |
| *Defendants* | |

## HAUL AND MFV PLAINTIFFS' OPPOSITION TO INTERVENOR-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

STATEMENT OF MATERIAL FACTS ................................................................................ 2

LEGAL STANDARD ............................................................................................................ 12

ARGUMENT ......................................................................................................................... 13

    I.   SB 1's Poll Watcher Provisions are Unconstitutionally Vague ...................................... 13

        A.   Plaintiffs' Vagueness Challenge is Not Premature .................................................. 13

        B.   Sections 4.06, 4.07, and 4.09 are Unconstitutionally Vague .................................... 15

        C.   A Stringent Vagueness Standard Applies to Section 4.07 Because of Its
            Quasi-Criminal Nature. ........................................................................................... 19

    II.  Section 208 Preempts SB 1's Restrictions on Voter Assistance. ...................................... 21

        A.   Section 208 Protects an Expansive Right to Assistance From a Person of the
            Voter's Choice During the Full Voting Process. ...................................................... 22

        B.   Section 208 Does Not Permit Limitations on a Voter's Choice of Assistor. ............ 22

            1. The Text and Legislative History of Section 208 Demonstrate the Intent to
               Preclude Restrictions on Assistance ..................................................................... 23

            2. Courts Have Held that Section 208 Preempts Restrictions that Prevent
               Eligible Voters from having the Assistor of their Choice. .................................... 25

        C.   Intervenors' Reading of Section 208 Would Undermine a Voter's Meaningful
            Choice of Assistor. .................................................................................................. 25

    III. SB 1's Regulation of Assistors Burdens Voters' Right to Assistance. ............................. 26

        A.   Restrictions on Assistors Impact the Assistance Available to Voters. ...................... 26

        B.   Whether SB 1's Provisions Unduly Burden Voters' Rights Under Section 208
            is a Triable Factual Issue. ........................................................................................ 27

CONCLUSION ..................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Milligan,*
No. 21-1086, slip op. (S. Ct. June 8, 2023) ........................................................22

*Ark. United v. Thurston,*
626 F. Supp. 3d 1064 (W.D. Ark. 2022) .................................................25, 26, 27

*Babbitt v. United Farm Workers Nat'l Union,*
442 U.S. 289 (1979) ........................................................................................13, 14

*Belt v. EmCare, Inc.,*
444 F.3d 403 (5th Cir. 2006) ................................................................................23

*Carey v. Wis. Elections Comm'n,*
No. 22-CV-402-jdp, 2022 WL 3910457 (W.D. Wis. Aug. 31, 2022) ...................27

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ..............................................................................................13

*City of El Cenizo v. State,*
264 F. Supp. 3d 744 (W.D. Tex. 2017), *aff'd in part, vacated in part on other
grounds,* 890 F.3d 164 (2018).............................................................................20

*Coates v. Cincinnati,*
402 U.S. 611 (1971) ..............................................................................................17

*Ctr. for Individual Freedom v. Carmouche,*
449 F.3d 655 (5th Cir. 2006) ................................................................................14

*Democracy N.C. v. N.C. State Bd. of Elections,*
476 F. Supp. 3d 158 (M.D.N.C. 2020) ..................................................................25

*Democracy N.C. v. N.C. State Bd. of Elections,*
590 F. Supp. 3d 850 (M.D. N.C. 2022) .................................................................27

*Deville v. Marcantel,*
567 F.3d 156 (5th Cir. 2009) ................................................................................13

*Disability Rts. N.C. v. N.C. State Bd. of Elections,*
602 F. Supp. 3d 872 (E.D.N.C. 2022) ...................................................................25

*Dream Defs. v. DeSantis,*
559 F. Supp. 3d 1238 (N.D. Fla. 2021) .................................................................14

*Gade v. Nat'l. Solid Wastes Mgmt. Ass'n*,
  505 U.S. 88 (1992) ........................................................................................21

*Health and Hospital Corporation of Marion County v. Talevski*,
  21-806, slip op. (S. Ct. June 8, 2023) ...........................................................22

*Hillman v. Maretta*,
  569 U.S. 483 (2013) ...............................................................................23, 24

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ..........................................................................................15

*Johnson v. United States*,
  576 U.S. 591 (2015) ...............................................................................13, 18

*Kolender v. Lawson*,
  461 U.S. 352 (1983) ......................................................................................13

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
  66 F.4th 905 (11th Cir. 2023) ..............................................................*passim*

*Moore v. Hannon Food Serv., Inc.*,
  317 F.3d 489 (5th Cir. 2003) ........................................................................23

*Nat'l Rifle Ass'n of Am., Inc. v. McCraw*,
  719 F.3d 338 (5th Cir. 2013) ........................................................................14

*OCA Greater Hous. V. Texas*,
  No. 1:15-CV-679-RP, 2022 WL 2019295 (W.D. Tex. June 6, 2022) .....................9

*OCA-Greater Hous. v. Texas*,
  867 F.3d 604 (5th Cir. 2017) ..................................................................22, 26

*Rost v. United States*,
  No. 1:19-CV-0607-RP, 2021 WL 5190875 (W.D. Tex. Sept. 22, 2021), *aff'd*,
  44 F.4th 294 (5th Cir. 2022), *reh'g denied*, No. 21-51064, 2022 WL 16569594
  (5th Cir. Oct. 11, 2022) ................................................................................19

*Sessions v. Dimaya*,
  138 S. Ct. 1204 (Gorsuch, J., concurring) ....................................................19

*Speech First, Inc. v. Fenves*,
  979 F.3d 319 (5th Cir. 2020) ........................................................................14

*State v. Hollins*,
  No. 20-0729, 2020 WL 5919729 (Tex. Oct. 7, 2020) .......................................2

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ...........................................................................................14

*United States v. 329.73 Acres of Land, Situated in Grenada & Yalobusha Ctys.*,
   678 F.2d 21 (5th Cir. 1982) ...............................................................................23

*United States v. Brockamp*,
   519 U.S. 347 (1997) ...........................................................................................23

*United States v. Brooks*,
   681 F.3d 678 (5th Cir. 2012) .............................................................................13

*United States v. Clinical Leasing Serv., Inc.*,
   925 F.2d 120 (5th Cir. 1991) .............................................................................20

*United States v. Hale Cnty.*,
   No. 5-05CV0043-C (N.D. Tex., Apr. 27, 2006) ...............................................27

*United States v. L. Cohen Grocery Co.*,
   255 U.S. 81 (1921) .............................................................................................21

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ...........................................................................18, 19, 20

**Statutes**

52 U.S.C. § 10508 .........................................................................................11, 21

Tex. Elec. Code § 32.071 ......................................................................................2

Tex. Elec. Code § 32.075(a) .................................................................................2

Tex. Elec. Code § 32.075(g)–(h) ........................................................................15

Tex. Elec. Code § 33.051 ......................................................................................3

Tex. Elec. Code § 33.056 .................................................................................3, 20

Tex. Elec. Code § 33.061 .................................................................................4, 20

Tex. Elec. Code § 33.061(b) .................................................................................4

Tex. Elec. Code § 61.003 ....................................................................................19

Tex. Elec. Code § 64.009(e) .................................................................................8

Tex. Elec. Code § 64.009(f) .................................................................................8

Tex. Elec. Code § 64.0322 ...................................................................................8

Tex. Elec. Code § 64.032(c) ................................................................................26

Tex. Elec. Code § 86.010 ....................................................................................29

Tex. Elec. Code § 86.010(e) ..................................................................................8

Tex. Elec. Code § 62.0115(b) ................................................................................2

**Legislative Materials**

H.R. Rep. No. 227, 97th Cong., 1st Sess. 14 (1981) ...................................11

SB 1 § 4.06(a) ........................................................................................................3

SB 1 § 4.06(b) ...................................................................................................3, 15

SB 1 § 4.06(g) ........................................................................................................3

SB 1 § 4.07 .............................................................................................................3

SB 1 § 4.07(e) ...................................................................................................4, 16

SB 1 § 4.07(f) ....................................................................................................4, 16

SB 1 § 4.09(a) ........................................................................................................4

SB 1 § 6.01(f) ...................................................................................................8, 28

SB 1 § 6.05(e) ......................................................................................................29

SB 1 § 8.01(b) ........................................................................................................4

SB 1 § 8.01(c) ...................................................................................................4, 20

S. Rep. No. 97-417, 97th Cong. 2d Sess., 1982 U.S.C.C.A.N. 177 (1982). .........................24, 27

**Other Authorities**

Proclamation, No. 41-3772, 45 Tex. Reg. 7079 (Oct. 9, 2020)......................................2

Sec'y of State, Election Advisory No. 2022-09 (Feb. 4, 2022),
    https://www.sos.state.tx.us/elections/laws/advisory2022-09.shtml .........................4

*Bills to Amend the Voting Rights Act of 1965: Hearings before the Subcomm. on
    the Const. of the S. Comm. on the Judiciary*, 97th Cong. 63 (May 4, 1982)
    (statement of Sen. DeConcini)..............................................................11

Sec'y of State, *Poll Watcher's Guide* (Jan. 2022),
    https://www.sos.state.tx.us/elections/forms/pollwatchers-guide.pdf ........................4

The HAUL Plaintiffs and the MFV Plaintiffs[1] (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to Intervenor-Defendants' ("Intervenors") Motion for Summary Judgment (the "Motion"), ECF No. 608, in which State Defendants have joined, ECF No. 610. The Motion should be denied as to the HAUL Plaintiffs' Void for Vagueness claim and as to the HAUL and MFV Plaintiffs' claim under Section 208 of the Voting Rights Act.[2]

## **INTRODUCTION**

Record numbers of voters turned out across Texas in the election of November, 2020. Afterwards, Defendant Texas Secretary of State (the "SoS") touted the election as "smooth and secure." Despite this success, the Texas Legislature enacted the Texas Election Integrity Act of 2021 ("SB 1"), a law that creates and reinforces a raft of complex provisions that make it harder to vote and harder for election workers to administer elections.

At issue here are Section 4 and Section 6 of SB 1, concerning poll watchers and voter assistance, respectively. Section 4 exposes election workers to criminal penalties for violating vaguely worded entitlements the law bestows on poll watchers. This discourages election workers from serving, causing mass resignations among those who administer elections and guard against intimidation. Section 6 adds to the restrictions placed on people who assist others in voting, piling on burdensome administrative and disclosure requirements backed by criminal penalties. Here, too, the law has had a chilling effect, making it harder for voters to obtain the assistance they need and are entitled to under federal law. Intervenors' attempts to trivialize the burdens imposed by

---

[1] The HAUL Plaintiffs and MFV Plaintiffs filed a joint Second Amended Complaint. ECF No. 199. The HAUL Plaintiffs include the Houston Area Urban League, Delta Sigma Theta Sorority, Inc., the Arc of Texas, and Jeffrey Lamar Clemmons. The MFV Plaintiffs include Mi Familia Vota, Marla López, Marlon López, and Paul Rutledge.
[2] The HAUL and MFV Plaintiffs do not claim SB 1 violates the Federal Materiality Provision or free speech rights; accordingly, this memorandum of law does not address Intervenors' arguments addressed to those claims.

these provisions of SB 1 are belied by the record. Disputed issues of fact make Plaintiffs' claims appropriate for trial.

## STATEMENT OF MATERIAL FACTS[3]

1.     For more than 150 years, Black voters, Latino voters, and voters with disabilities have borne the brunt of Texas's restrictive, exclusionary voting laws,[4] which have kept turnout low and vulnerable voters away from the polls.[5] The State has moved repeatedly to quash voter turnout whenever it increases among Black and Latino voters.[6] The 2020 election was no different. Texas sought to block counties' efforts to make voting accessible and safe during the COVID-19 pandemic.[7] Voter turnout nonetheless ticked upward, and the legislature promptly drafted measures to roll it back, restrict voting, and discourage voters. Far from making a "modest" change in the law, Mot. 4, SB 1's sweeping changes to the Election Code, added new burdens to already onerous registration and vote-by-mail processes and made voting with assistance more difficult and more intimidating. The new law also enhanced penalties for election workers who attempt to regulate poll watchers, augmenting the risk of disorder and intimidation at the polls.

### *Section 4 of SB 1 – Poll Watcher Provisions*

2.     Among their many duties, election workers are responsible for maintaining order at the polling place and guarding against voter intimidation and harassment. *See* Tex. Elec. Code

---

[3] Plaintiffs' statement of material facts adduces the disputed issues of material fact concerning Plaintiffs' vagueness and Section 208 claims. Intervenors' "statement of uncontested facts" includes several factual assertions that are not material to those claims, but are not "uncontested," as Intervenors claim. Plaintiffs decline to address Intervenors' factual assertions that are not necessary to adjudication of the Motion, but do not concede they are undisputed. For example, Intervenors' description of the purpose of SB 1, Mot. 4, is contradicted in the record by evidence supporting Plaintiffs' claims of the law's discriminatory purpose, but none of these claims are at issue in the Motion.

[4] *See* Ex. A, Expert Report of Franita Tolson, J.D. ¶¶ 13-16, 87-92 (Feb. 28, 2022).

[5] *See* Ex. B, Expert Report of Prof. Douglas L. Kruse ¶ 16 (Feb. 28, 2022) ("Only 59.4% of voting-eligible people with disabilities in Texas voted in 2020, compared to 64.5% of those without disabilities.").

[6] *See, e.g.*, Tolson Expert Report ¶ 90.

[7] *See State v. Hollins*, No. 20-0729, 2020 WL 5919729 (Tex. Oct. 7, 2020) (Texas sued Harris County Clerk over proposal to mail ballot applications to all registered voters); Proclamation, No. 41-3772, 45 Tex. Reg. 7079, 7080–81 (Oct. 9, 2020) (limiting drop boxes to one per county); *see also* Mot. 4.

§§ 32.071, 32.075(a), 62.0115(b). At times, the presence of poll watchers impedes these duties. For example, poll watchers, inadvertently or not, can "harass a voter" by "get[ting] in their personal space and stand[ing] too close to them."[8] Such behavior "has always been a source of tension" between poll watchers and election workers.[9] SB 1, however, drastically changed the balance of power between election workers and poll watchers. The law could be interpreted to grant poll watchers nearly unlimited authority to go anywhere within a polling place and to get extremely close to voters and election workers, while imposing stiff penalties—including criminal sanctions—upon election workers who take actions to regulate poll watchers, even when such actions are necessary to prevent voter harassment or to preserve good order in the polling place.

3.      SB 1 § 4.06 amended Texas Election Code ("Elec. Code") § 33.051, which governs acceptance of a poll watcher for service. An election judge may refuse to accept a poll watcher who presents a certificate of appointment and a certificate of completion of the SoS's poll watcher training, *see* SB 1 § 4.06(a)-(b), only if the poll watcher has a prohibited recording device or is ineligible, or if the maximum number of watchers from the appointing political party, campaign, or candidate are already present. *See* SB 1 § 4.06(b). Neither SB 1 nor the rest of the Election Code indicates whether an election judge may refuse to accept a poll watcher for other violations of law, such as intimidating voters. SB 1 makes violation of § 4.06 a criminal offense, specifically a Class A misdemeanor. SB 1 § 4.06(g).

4.      SB 1 also allows poll watchers to roam about polling places and counting locations and to be in close proximity to voters and election workers. SB 1 § 4.07 amended Elec. Code § 33.056 ("Observing Activity Generally") to add:

---

[8] Ex. C, SoS Keith Ingram 30(b)(6) Dep. 129:15-17 (Apr. 26, 2022) ("SoS 30(b)(6) Dep.").
[9] *Id.* at 146:19-25.

(e) Except as provided by Section 33.057(b), a watcher may not be denied free movement where election activity is occurring within the location at which the watcher is serving.

(f) In this code, a watcher who is entitled to "observe" an election activity is entitled to sit or stand near enough to see and hear the activity.

SB 1 § 4.07(e)-(f). Violations are punishable by termination of employment, loss of employment benefits, or an action for a writ of mandamus. *See* SB 1 § 8.01(b)-(c).

5.      Relatedly, SB 1 § 4.09 made the following amendment to Elec. Code § 33.061 ("Unlawfully Obstructing Watcher"):

(a) A person commits an offense if the person serves in an official capacity at a location at which the presence of watchers is authorized and knowingly prevents a watcher from observing an activity or procedure the person knows the watcher is entitled to observe, including by taking any action to obstruct the view of a watcher or distance the watcher from the activity or procedure to be observed in a manner that would make observation not reasonably effective.

SB 1 § 4.09(a) (underlining in original to show new language). This offense is punishable as a Class A misdemeanor. Elec. Code § 33.061(b).

6.      Neither SB 1 nor the Election Code defines "free movement" or explains when observation is "not reasonably effective." Nor do they indicate how an election worker might avoid interfering with a poll watcher's subjective ability to see and hear.

7.      SoS guidance and training materials do not help. Its *Poll Watcher's Guide* refers just once to "free movement" and "mak[ing] observation not reasonably effective," parroting the text of SB 1.[10] SoS's poll watcher training simply repeats the information in the *Guide*.[11] County

---

[10] *See* Sec'y of State, *Poll Watcher's Guide* at 9 (Jan. 2022), https://www.sos.state.tx.us/elections/forms/pollwatchers-guide.pdf; *see also* Sec'y of State, Election Advisory No. 2022-09 (Feb. 4, 2022), https://www.sos.state.tx.us/elections/laws/advisory2022-09.shtml.
[11] *See* Ex. D, Bridgette Escobedo Dep. 63:10-64:21 (May 11, 2023).

officials, election workers, poll watchers, and the Executive Director of the Travis County Republican Party have all criticized these materials as unhelpful and inadequate.[12]

8.      SoS does not "have a view as to specific conduct that 4.09 prohibits."[13] Asked whether an election worker who requests that a poll watcher stand ten feet from voting machines could be charged with the crime of obstruction, SoS's designee equivocated: "Well, I don't know, maybe. It just depends."[14] SoS takes no position on when a poll watcher is near enough to see and hear, or what would make observation "not reasonably effective."[15] Nor can SoS apply the term "free movement" in practice.[16]

9.      Yet, SoS warns election workers to "be careful" when attempting to comply with these provisions because of the risk of criminal penalties.[17] According to SoS, the best course would be to obtain legal advice before acting to remove, or otherwise protect voters from, a poll watcher: "[B]e careful, because it's a -- it's a Class A misdemeanor to obstruct a poll watcher, so think about what you're doing, maybe call your county election officer. Maybe call your county attorney before you make a final choice . . . ."[18]

*SB 1's poll watcher provisions create confusion, fear, and departures among election workers.*

10.      The absence of definitions and objective standards in SB 1's poll watcher provisions have created confusion and inconsistent implementation among election workers. Alan

---

[12] *See id.* at 64:18-21 (relaying Executive Director comments that "the training was not very helpful. There were still a lot of questions of what . . . could and couldn't be done in a polling location."); Ex. E, 4/4/22 Jacquelyn Callanen 186:4-187:1 (Apr. 4, 2022); Ex. F, 2/28/23 Jacquelyn Callanen 150:8-152:10 (Feb. 28, 2023) (characterizing the poll watcher training as "a joke").

[13] *See* SOS 30(b)(6) Dep. 160:10-13.

[14] *Id.* at 159:4-8.

[15] *See* SOS 30(b)(6) Dep. 143:18-20 ("Q. [F]rom whose perspective is somebody near enough to see and hear? A. There's the rub."); *id.* at 158:1-7 (Q. "Does your office have an idea or interpretation of the law as to what would make, quote, 'observation not reasonably effective,' closed quote? . . . A. No. That's going to be up to the poll watcher to alert somebody that their ability to effectively observe has been deteriorated in some way.").

[16] *See* SOS 30(b)(6) Dep. 155:23-156:2 ("[W]ould it be a denial of free movement to prevent a poll watcher from standing within one foot of a voter . . .? A. We don't get into those kind of details.").

[17] *See id.* at 145:24-146:15.

[18] *Id.* at 145:18-23.

Vera, the late Ballot Security Chair of the Harris County Republican Party, who trained the party's poll watchers, believed the distance a poll watcher may stand to an election activity "depends [on] how good the poll watcher's vision and hearing is."[19] Mr. Vera also thought that any limit on how close a poll watcher can get to voters or an election activity, other than the ban on physical contact, would violate § 4.09's prohibition on obstruction by distancing the watcher.[20] By contrast, Bexar County Election Administrator Jacquelyn Callanen believes it permissible for an election worker to stand between a poll watcher and the voter to give the voter a greater sense of privacy.[21] Inconsistent interpretations have made election judges hesitant to restrain poll watchers even when they believe their responsibility for the proper operation of the polling place requires them to.[22]

11.     County election administrators have no means of resolving this uncertainty. Counties cannot advise election workers how close poll watchers may get to voters, nor whether poll watchers may stand directly behind a voter who is marking a ballot.[23] The best advice one county official could offer an election judge who was confused about whether she could intervene when a poll watcher seemed to be too close to a voter was to rely on the word of the poll watcher.[24] As a result, the individuals tasked with administering elections are left with questions and uncertainty about the requirements, especially how to apply them in the crowded and sometimes fraught context of a busy polling place.[25]

12.     Fear of prosecution for running afoul of SB 1's poll watcher provisions has led to significant attrition among experienced election workers. Travis County estimated losing 25-50

---

[19] Ex. G, Alan Vera Dep. 54:4-17 (Feb. 27, 2023).
[20] *Id.* at 57:8-23.
[21] Ex. H, 4/20/22 Jacquelyn Callanen Dep. 252:20-253:4 (Apr. 20, 2022).
[22] Ex. I, Jeffrey Clemmons Decl. 6, 10 (June 22, 2023).
[23] Ex. J, Rachelle Obakozuwa Dep. 69:1-70:20 (Mar. 21, 2023); 2/28/23 Callanen Dep. 168:21-24.
[24] Obakozuwa Dep. 70:21-71:14 ("procedure would be to tell the judge to ask the poll watcher . . . if they were inspecting the ballot").
[25] *Id.*; Escobedo Dep. 59:15-62:5.

election workers who were concerned "they could be penalized criminally," leading to "quite significant" staff shortages for the March, 2022 primary.[26] In Harris County, nearly 600 election judges declined to work on election day in November 2022, some citing concerns about SB 1, and specifically, "[t]hat poll watchers at the voting location can be a challenge to work with and that they don't know when they are doing something that would get them in trouble with a poll watcher."[27] In Bexar County, nearly 20% of election judges declined to work the general election.[28]

*Plaintiff Jeffrey Clemmons*

13.     Plaintiff Jeffrey Clemmons is an example of the chilling effect of the poll watcher provisions. A lifelong Texan, Mr. Clemmons is a civically engaged recent college graduate who served as an election judge in Travis County during the primary runoff in July, 2020.[29] He hoped to serve again, given ongoing election worker shortages in Travis County, but declined to do so after the passage of SB 1 because he was concerned that he might inadvertently violate the law's poll watcher provisions and risk prosecution or other legal consequences.[30] Mr. Clemmons believes the poll watcher provisions are unclear and ambiguous, leaving him without an understanding of an election judge's authority to refuse to accept a poll watcher, the definition of "free movement," and of how to apply the standards for "observe" and "obstruct" that rely on whether a poll watcher can "see and hear" and whether observation is "reasonably effective."[31] He is particularly confused about how to carry out his other duties as an election judge without violating the poll watcher provisions. Although his concerns persist, he has decided to serve again as an election judge in the March, 2024 primary and potentially as soon as the November 7, 2023

---

[26] Escobedo Dep. 66:15-68:4, 189:12-24.
[27] Obakozuwa Dep. 65:17-66:25.
[28] 2/28/23 Callanen Dep. 151:20-152:10; 162:22—63:20.
[29] Ex. K, Jeffrey Clemmons Dep. 15:11-16, 17:7-16, 20:6-20, 21:14-20, 24:7-14 (Apr. 1, 2022); Clemmons Decl. ¶ 3.
[30] Clemmons Dep. 40:25-41:21; Clemmons Decl. ¶¶ 4-11, 16.
[31] Clemmons Dep. 44:15-45:18; 48:5-49:6; Clemmons Decl. ¶¶ 7-9.

election.[32] He hopes to help mitigate the election worker shortages in Travis County and to support democracy through careful stewardship of elections, despite the risks he now faces.[33]

***Section 6 of SB 1 – Voter Assistance Provisions***

14.    SB 1 also takes aim at voters who require assistance at the polls. A person who transports seven or more non-family voters simultaneously for curbside voting must now disclose his identity, address, and any other assistance he is providing. SB 1 § 6.01(f) (amending Elec. Code § 64.009(f)). Poll watchers are expressly allowed to witness these interactions. Elec. Code § 64.009(e). Election officials must provide the assistors' information to SoS, which forwards it to the Attorney General. *Id.* § 64.009(g).

15.    SB 1 §§ 6.03, 6.05, & 6.07 require those who assist voters, other than family members and election officers, to disclose their personal information, including their name, address, and relationship to the voter, and whether they received compensation or benefit from a candidate, campaign, or political committee. Elec. Code §§ 64.0322, 86.010(e). A person who assists a voter without meeting these requirements may be charged with a state jail felony, *id.* § 86.010(g), and a voter's ballot will be rejected if the assistor does not fill out the assistor's part of the form.[34]

16.    Under § 6.04, assistors now must swear under penalty of perjury that the voter represented that he or she is eligible to receive assistance, that they did not pressure or coerce the voter into choosing them, that they will not communicate how the voter has voted to another

---

[32] Clemmons Decl. ¶¶ 13-16. When Mr. Clemmons returns to service as an election judge, he will be hesitant to do what is necessary to maintain order in the polling location and protect voters from intimidation and harassment in interactions with poll watchers. *Id.* ¶¶ 6, 18.

[33] Clemmons Dep. 24:21-25:24, Clemmons Decl. ¶ 16; Escobedo Dep. 71:4-18.

[34] *See, e.g.*, 4/4/2022 Callanen Dep. 161:1-7 (ballots rejected for lack of the assistor's address).

person, and that they understand that if assistance was provided to someone not eligible for assistance, that voter's ballot may not be counted.[35]

17.     Under § 6.06, it is now unlawful for a person who assists with a mail ballot, other than caregivers already known to the voter, to accept or request *any* economic benefit, as defined by Texas Penal Code § 38.01, a broad definition that may include gas money or lunch.[36]

*Section 6 of SB 1 disenfranchises voters.*

18.     Voters requiring assistance will have their ballots rejected if their chosen assistor fills out the paperwork incorrectly, or if their assistor will not take an oath, fill out the required paperwork, or consent to oversight by poll watchers. Voters by mail whose assistor did not fill out the form have had their ballots rejected.[37] Bob Kafka of REVUP-Texas testified that he spoke with a mother who said that the attendant for her adult disabled child was not willing to assist at the polls because of SB 1.[38] Assistors may not wish to help voters whose need for assistance is not apparent, because they must attest, under oath, that the voter has represented he or she is eligible for assistance.[39]

---

[35] Section 6.04 also significantly limited the types of assistance that may be offered, duplicating the language of an earlier Texas statute that had *already been enjoined* for violating the rights of individuals who require assistance to vote. *OCA Greater Hous. V. Texas*, No. 1:15-CV-679-RP, 2022 WL 2019295, *4 (W.D. Tex. June 6, 2022). This portion of Section 6.04 has since been enjoined as well, but the requirement remains that assistors swear to various other statements under penalties of perjury. *See* Order Granting and Denying in Part the LULAC Plaintiffs' Motion to Dismiss, ECF No. 444 at 2 n.3.

[36] Escobedo Dep. 24:4-7.

[37] *See, e.g.*, 4/4/2022 Callanen Dep. 161:1-7 (noting that ballots were rejected because the assistor did not give their address). Notably, options to cure are limited; that voter would have to find a new assistor or vote without assistance. Voters who require assistance to vote may also not be able to navigate options for curing either in person or online. *See* Kruse Report ¶ 92 (voters with disabilities that cannot vote in person likely cannot cure in person); Ex. L, Bob Kafka Dep. 136:19-24 (Apr. 7, 2022) (many people with disabilities cannot access the online portal to cure application issues).

[38] Kafka Dep. 105:7-23.

[39] *Id*. at 142:8-25, *see also id*. at 158:25-159:8.

9

*Section 6 of SB 1 chills assistors.*

19.     SB 1 § 6 has "a chilling effect on folks who are looking to support folks with disabilities."[40] Voters are deprived of assistance by a person of their choice, often before they even get to the polls. This chilling effect has been felt by voters and assistors throughout the state and by many organizations that assist voters or support assistors. Maria Gomez, who assisted voters for many years, stopped doing so in 2021 because of her fears about SB 1.[41] Juanita Valdez-Cox testified that LUPE was concerned about risk to staff and volunteers, and noted that she herself did not assist voters because of SB 1.[42] Would-be assistors advised HAUL that they are intimidated by the requirements and disinclined to help voters.[43] They are concerned about swearing an oath with vague terms because of the risk of being accused of a crime.[44] Both La Union del Pueblo Entero ("LUPE") and the League of Women Voters testified that they have seen reductions in the number of individuals willing to assist voters.[45] MFV has had to divert resources toward encouraging assistors to continue to help voters despite the risks presented by SB 1.[46] Members of Delta Sigma Theta drive people to the polls, but the sorority is grappling with the possibility that voters will be disenfranchised if drivers stop volunteering or decline to complete paperwork because of the threat of criminal sanctions.[47] The Harris County Election Administrator also

---

[40] Ex. M, Jennifer Martinez Dep. 67:4-7 (Apr. 12, 2022); Ex. N, Maria Gomez Dep. 39:3-43:7 (Apr. 25, 2023) (Ms. Gomez has stopped assisting, and has limited transporting voters for fear of increased scrutiny and prosecution under SB 1); Ex. O, Michelle Brown Dep. 86:1-87:24 (Apr. 23, 2022) ("Delta Sigma Theta Sorority, Inc. 30(b)(6) Dep."); *see also* Kafka Dep. 102:15-20 (criminalization will chill assistors at a time when disabled individuals generally cannot find assistors).

[41] Maria Gomez Dep. 14:10-15; 15:25-16:8; 20:22-21:6.

[42] Ex. P, Juanita Valdez-Cox Dep. 163:2-14; 164:2-9 (Mar. 4, 2023).

[43] Ex. Q, Ray Shackleford Dep. 131:1-132:24, 133:4-9, 138 (Apr. 29, 2022).

[44] *Id*. at 138, 139; Martinez Dep. 67:4-17; 74:4-11.

[45] Valdez-Cox Dep. 69:12-21, 79:8-18, 81:23-82:1; Ex. R, Grace Chimene Dep. 187:21-24, 189:3-190:8 (Apr. 26, 2022). League of Women Voters' volunteers expressed concern about the oath requirement and about unintentional violations of the stringent compensation requirements, questioning whether accepting a cookie or free parking might violate the law.

[46] Ex. S, Angelica Razo Dep. 185:23-186:4 (Apr. 5, 2022) (drivers may not agree to assist seven or more voters).

[47] Delta Sigma Theta Sorority, Inc. 30(b)(6) Dep. 143:21-144:21, 145:13-148:2.

received a complaint from a person who, after providing assistance in the past, declined to assist her partner at the polls because of the oath.[48]

*SB 1 deprives voters of access to assistance by a person of the voter's choice.*

20.     SB 1 has significantly limited the pool of available assistors. Voters who wish to be assisted by a person of their choice may not be able to find an assistor; if they do, they may elect not to vote rather than put their assistor at risk.[49] Toby Cole testified that he needs assistance to vote but is afraid to get his chosen assistor into trouble.[50] Others members of The Arc of Texas who require assistance have expressed similar concerns.[51] The League of Women Voters noted that at least one disabled voter opted not to vote rather than ask for help that might expose her assistor to risk.[52]

*Poll workers cannot be substituted for an assistor chosen by the voter.*

21.     A poll worker is not a substitute for "a person of the voter's choice." 52 U.S.C. § 10508. Section 208 was enacted in part to protect voters from coercion by election officials.[53] To require disabled voters to rely on strangers, even if they are poll workers, leaves those voters with concerns about mishandling of their ballot,[54] and deprives them of their right to vote in

---

[48] Ex. T, Jennifer Colvin Dep., Ex. 15, at 4047.

[49] Shackleford Dep. 132.

[50] Ex. U, Toby Cole Dep. 20:22-21:4; 22:4-8 (June 28, 2022). *See also id.* at 25:14-18. ("I just have to realize that the people that rely on me for their lives, the jobs that I have for them can get [them] arrested at some point. So do I put them in that harm's way?").

[51] Ex. V, Jodi Lydia Nunez Landry Decl. ¶¶ 15-16 (June 22, 2023); Ex. W, Nancy Crowther ¶¶ 5-6 (June 21, 2023); Ex. X, Teri Saltzman Decl. ¶¶ 10, 15-16 (May 2023) (discussing how SB 1 deters a voter from seeking assistance and voting by mail); Ex. Y, Laura Halvorson Decl. ¶ 19 (May 24, 2023); Ex. Z, Amy Litzinger Decl. ¶¶ 19-22 (June 21, 2023).

[52] *See* Chimene Dep. 63:2-17, 67:13-21. Other voters expressed similar concerns to League of Women Voters. *Id.* at 73:3-74:23.

[53] H.R. Rep. No. 227, 97th Cong., 1st Sess. 14 (1981); *Bills to Amend the Voting Rights Act of 1965: Hearings before the Subcomm. on the Const. of the S. Comm. on the Judiciary*, 97th Cong. 63 (May 4, 1982) (statement of Sen. DeConcini); *see also* Tolson Report ¶ 10 (historically, election officials in Texas have participated in the disenfranchisement of Black voters).

[54] *See, e.g.*, Razo Dep. 248:1-9 (recounting that a voter expressed concern that her ballot was mishandled by an assisting poll worker, and that she may not have been able to make her own ballot decisions).

secret.[55] Jodi Lydia Nunez Landry would have preferred to vote in November, 2022 in private or with the assistance of someone she chose, but had to vote in the presence of poll workers.[56]

*SB 1 erects new barriers for voters who already face voting challenges.*

22.     Voters with disabilities or who require language assistance confront significant difficulties in voting and in finding assistors willing to help them. They are more likely to need assistance in daily living and to live alone. They are also less likely to have a vehicle or to be able to travel, and less likely to have internet access. Their social isolation makes it challenging to access assistance in voting from their support networks.[57] More than 4 out of 5 voters who need help get it from non-family members outside their home.[58] SB 1 became law, moreover, at a time when many disabled voters cannot find caregivers or community attendants to assist them even with basic daily tasks.[59] If those who might help disabled voters must risk criminal sanctions, it will be even less likely that the voter will be able to obtain assistance from a person of her choice.[60] Notably, "the prevalence of disability in Texas is markedly higher among Native Americans, Black people, older people, and those with lower levels of education."[61] Angelica Razo also testified that in her experience, the need for voter assistance is great in the Latino community.[62]

## LEGAL STANDARD

To succeed on a motion for summary judgment, the moving party must show that "there is no genuine issue of . . . material fact" and that the movant "is entitled . . . to judgment as a matter

---

[55] Saltzman Decl. ¶ 13.
[56] Landry Decl. ¶¶ 12-13, 15.
[57] Kruse Report ¶ 15, 48, 52-60.
[58] *Id.* ¶ 104.
[59] Kafka Dep. 109:11-25; 104:2-105:1 (describing conversations with disabled voters who were having a difficult time finding community attendants and supports).
[60] *Id.* at 109:11-25.
[61] Kruse Report ¶ 44.
[62] Razo Dep. 180:6-10, 181:1-13.

of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is on the moving party to identify "those portions of [the record] which [it] believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. In evaluating summary judgment claims, the Court must "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Deville v. Marcantel*, 567 F.3d 156, 163–64 (5th Cir. 2009).

## ARGUMENT

### I.     SB 1's Poll Watcher Provisions are Unconstitutionally Vague

The provisions of SB 1 that curtail the authority of election workers to regulate poll watchers do not provide fair notice of how election workers can comply but expose them to criminal sanctions should they guess incorrectly. Summary judgment on Plaintiffs' vagueness challenge to these provisions is improper.

A law is unconstitutional under the Due Process Clause if it is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Brooks*, 681 F.3d 678, 696 (5th Cir. 2012) (citing *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). Without "such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Kolender*, 461 U.S. at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 575 (1974)).

#### A.  Plaintiffs' Vagueness Challenge is Not Premature

Contrary to Intervenors' contentions, Mot. 16–17, courts frequently adjudicate pre-enforcement vagueness challenges. *See, e.g.*, *Babbitt v. United Farm Workers Nat'l Union*, 442

13

U.S. 289, 298–303 (1979); *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 944–48 (11th Cir. 2023) (hereinafter "*Lee*"); *Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1264–65 (N.D. Fla. 2021). "When contesting the constitutionality of a criminal statute, 'it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.'" *Babbitt*, 442 U.S. at 298 (alteration in original) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159-61 (2014) (collecting pre-enforcement cases); *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 345 (5th Cir. 2013) (allowing pre-enforcement Second Amendment challenge to a criminal statute). The *Babbitt* Court rejected the argument—made by Intervenors here—that "the criminal penalty provision has not yet been applied and may never be applied[.]" 442 U.S. at 302; *see also Speech First, Inc. v. Fenves*, 979 F.3d 319, 336 (5th Cir. 2020) ("[A] lack of past enforcement does not alone doom a claim.").

And for good reason: "the mere existence of an allegedly vague . . . statute" can cause "sufficient" pre-enforcement injury, especially if it chills participation in the electoral process. *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006). SB 1's poll watcher provisions dissuade election workers from serving or from carrying out their duties fully when they do serve, curtailing the participation of these officials, who are appointed by political parties and are integral to the smooth administration of elections. Laws that curb associative conduct and political activity are properly challenged before they are enforced. *Cf. Speech First*, 979 F.3d at 330–31 (The Fifth Circuit "has repeatedly held, in the pre-enforcement context, that chilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement." (internal quotations omitted)). A regulated party should not have to choose between abstaining from the desired conduct and the hope that a later court will adopt a limiting construction in an

enforcement proceeding. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 15 (2010) (Plaintiffs "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.") (quoting *Babbitt*, 442 U.S. at 302); *Lee*, 66 F.4th at 948 ("[T]he promise of due process later on does not obliterate the vagueness doctrine altogether.").

Record evidence shows the poll watcher provisions are already causing injury. Hundreds of former election workers, including Plaintiff Jeffrey Clemmons, have declined to serve since SB 1 went into effect, citing fears about the poll watcher provisions and the penalties they include. *See supra*, Statement of Material Facts ("SOF") ¶¶ 12-13. Such chilling of political activity is precisely what the vagueness doctrine is intended to prevent. The resultant election worker shortages, moreover, have made it more difficult for counties to administer elections. *Id*. ¶ 12.

### B. Sections 4.06, 4.07, and 4.09 are Unconstitutionally Vague

#### 1. *Section 4.06*

SB 1 § 4.06 fails to inform election judges of the scope of their authority to refuse poll watchers for service, placing them at legal risk: to exceed their authority is a criminal offense. Under 4.06, the only permissible grounds for refusal are a poll watcher's use of a recording device, ineligibility, or if the maximum number of poll watchers are already present in the polling place. *See* SB 1 § 4.06(b). The section is silent on whether election judges may refuse to accept a poll watcher whose behavior violates other provisions of the Election Code. Election judges are thus in the dark when deciding whether to accept poll watchers while also carrying out their other duties, including preventing voter intimidation. SOF ¶ 13.

Intervenors cite Elec. Code § 32.075(g)–(h), concerning election judges' power to *remove* a poll watcher. This section applies only to "a watcher *duly accepted for service*," § 32.075(g), begging the question how an election judges can be certain of the lawful grounds for refusing to accept the poll watcher in the first instance. Indeed, this section only adds to the confusion: which

scope of authority would apply in a criminal proceeding against an election judge for wrongfully refusing to accept a poll watcher? Intervenors point to no interpretative guidance within SB 1 or the Election Code that explains how § 4.06's regulations for acceptance of poll watchers interacts with election judges' power to remove a poll watcher. Mot. 20. Must an election judge accept a disorderly, threatening, or violent poll watcher who presents himself for service and then wait until the poll watcher exhibits such behavior again before removing him? Intervenors' implication that election judges' power to remove a poll watcher for a violation of the penal code, breach of the peace, or violation of the law should be read into the scope of election judges' authority to accept or refuse a poll watcher is a welcome one, albeit one articulated only in the context of litigation here. As it stands, this provision remains constitutionally flawed and unable to give election judges notice of what conduct is prohibited when accepting or refusing a poll watcher for service.

## 2. *Sections 4.07 and 4.09*

SB 1 §§ 4.07 and 4.09 fail to put ordinary people serving as election workers on notice of the conduct that is prohibited when they interact with poll watchers. Section 4.07 concerns poll watchers' entitlement to "observe," stating that they "may not be denied free movement" and are "entitled to sit or stand near enough to see and hear" an election activity. SB 1 § 4.07(e)-(f). Section 4.09 adds to the offense of "obstructing" a poll watcher to indicate that actions that "would make observation not reasonably effective" constitute a violation. *Id.* § 4.09(a). SB 1 and the Election Code contain no definitions for the terms "free movement" or "not reasonably effective," creating doubt and confusion about how election workers can carry out responsibilities such as maintaining order and preventing voter intimidation in situations in which a poll watcher is the source of the problem. Nor does the language that poll watchers must be "near enough to see and hear" provide clarity. Whether a poll watcher's observation is reasonably effective, and whether he or she can

see and hear, are subjective matters that vary according to the visual and auditory abilities of the individual poll watcher. SOF ¶¶ 8, 10. The Supreme Court has held that a law based on similarly subjective perceptions by potential complainants—an ordinance prohibiting conduct that was "annoying to persons passing by"—was unconstitutionally vague. *Coates v. Cincinnati*, 402 U.S. 611, 612 (1971). Recently, the Eleventh Circuit similarly held a law banning conduct that would have "the effect of influencing'" a voter is unconstitutionally vague. *Lee*, 66 F.4th at 947.

SB 1 §§ 4.07 & 4.09 set forth no objective standard, basing the legality of an election worker's conduct on information that the election worker cannot know except by asking poll watchers whether they can see and hear and whether their observation is reasonably effective. "If the best—or perhaps only—way to determine what activity" obstructs a poll watcher or denies them free movement "is to ask the [poll watcher], then the question of what activity has that effect is a 'wholly subjective judgment without statutory definition, narrowing context, or settled legal meaning.'" *Lee*, 66 F.4th at 947 (quoting *United States v. Williams*, 553 U.S. 285, 306 (2008)).

Intervenors contend that other sources provide interpretive guidance, Mot. 20–21, but the Election Code language that Intervenors assert adds clarity—that free movement applies only "where election activity is occurring" and to watchers "while on duty," and that poll watchers may not communicate with election officials or voters, Mot. 21—does little more than state the basics of serving as a poll watcher.

The SoS, moreover, has not provided helpful guidance defining or prescribing the scope of SB 1's ambiguous and subjective terms, nor would such guidance have the force of law. SOF ¶¶ 7-8. The SoS admits to having no position on many questions concerning the application of the poll watcher provisions or the scope of conduct prohibited. *Id.* ¶ 12. County officials, election workers, and partisan poll watchers have all criticized the SoS's poll watcher training course as

unhelpful and inadequate. *Id.* ¶ 7. The lack of definitions or standards exposes election workers to arbitrary enforcement and makes their job more difficult, particularly in the context of elections where tensions can run high.

The evidentiary record confirms that, at minimum, there are material factual disputes that bear on the question of vagueness. Given the absence of standards in the law, regulated parties present conflicting interpretations or do not understand how to order their conduct to abide by the it. *Id.* ¶ 10. County election administrators are unable to train election workers on how to determine whether poll watchers are too close to voters, despite receiving complaints from voters that poll watchers were hovering over them and making them uncomfortable. *Id.* ¶ 11. Election judges are hesitant to restrain poll watchers even when they think such action is required by their responsibility for the proper operation of the polling place, in some cases resorting to asking the poll watcher's opinion concerning compliance with the law. *Id.* According to the SoS, this fear is well founded, given the law's criminal penalties, and election workers should consider seeking advice from a county attorney before taking action concerning a poll watcher. *Id.* ¶ 9. A law that requires the help of an attorney to be understood is not one that puts an ordinary person on notice of what it prohibits.

Citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982), Intervenors argue that a law must be impermissibly vague in all applications to be unconstitutional. Mot. 17. Since *Hoffman* was decided, however, the Supreme Court has squarely rejected the argument that "a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson*, 576 U.S. at 602. Intervenors further mischaracterize Plaintiffs' vagueness challenge as faulting SB 1 for using a qualitative standard rather than specifying an exact distance at which poll watchers may stand. Plaintiffs do not claim

that any law with a qualitative standard is inherently unconstitutional; however, a qualitative standard that is "wholly subjective," undefined, and varies according to the poll watcher, is unconstitutionally vague.[63] *Lee*, 66 F.4th at 947. Plaintiffs do not demand "impossible standards of clarity," Mot. 17, but rather suggest that statutory language defining the unclear terms and providing a distance rule might have avoided the constitutional defect.

### C. A Stringent Vagueness Standard Applies to Section 4.07 Because of Its Quasi-Criminal Nature.

Laws enforced by civil penalties are not exempt from the Due Process Clause; indeed, courts often hold them to the same stringent vagueness standard as criminal laws. *See, e.g.*, *Rost v. United States*, No. 1:19-CV-0607-RP, 2021 WL 5190875, at *6 (W.D. Tex. Sept. 22, 2021), *aff'd*, 44 F.4th 294 (5th Cir. 2022), *reh'g denied*, No. 21-51064, 2022 WL 16569594 (5th Cir. Oct. 11, 2022) (applying vagueness standard to IRS disclosure requirements enforced by civil penalties); *see also Sessions v. Dimaya*, 138 S. Ct. 1204, 1228 ("[I]n the criminal context this Court has generally insisted that the law must afford ordinary people fair notice of the conduct it punishes. And I cannot see how the Due Process Clause might often require any less than that in the civil context either.") (Gorsuch, J., concurring) (cleaned up).

This is especially true where the law in question has a quasi-criminal dimension. In *Hoffman*, the case Intervenors cite for the proposition that laws with civil penalties are generally subject to a more lenient vagueness standard, Mot. 21, the Supreme Court ultimately applied the more exacting standard to the civil ordinance at issue. 455 U.S. at 499–500. The Court reasoned that a prohibition on the sale without a license of paraphernalia or other items marketed for use

---

[63] Intervenors claim that a distance rule would be "one-size-fits-all" and ill-suited to polling locations, Mot. 20, but the Election Code sets forth various easily applied distance rules. *See, e.g.*, Elec. Code § 61.003 (no electioneering "within 100 feet of an outside door through which a voter may enter the building in which a polling place is located"); § 213.015 (no bystanders within 30 feet of the entrance to a room where a recount is being conducted).

with illegal drugs was "quasi-criminal," and its "prohibitory and stigmatizing effect" warranted the stricter vagueness test. *Id.*; *see also United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122-23 (5th Cir. 1991) (applying strict vagueness test to federal statute imposing civil penalties for distribution of controlled substances without registration). Section 4.07 regulates conduct that is closely linked to criminalized activity, just as did the laws at issue in *Hoffman* and *Clinical Leasing Service*, giving its application "quasi-criminal" effect. The section applies to conduct that overlaps or is closely intertwined with criminal provisions of the Election Code, such as section 33.061(a) (Unlawfully Obstructing Watcher). Section 4.07 also amends the Election Code section describing poll watchers' entitlement to observe (Elec. Code § 33.056), by adding the free movement language and characterizing the verb to "observe" as establishing an entitlement to "sit or stand near enough to see or hear the activity." Elsewhere, the Election Code criminalizes the act of "knowingly prevent[ing] a watcher from *observing* an activity." Elec. Code § 33.061 (emphasis added). Section 4.07 thus provides the only definition there is, an utterly vague and subjective one, for a key term in the corresponding criminal provision and also prohibits similar conduct. Thus, the statute has a quasi-criminal effect: the vague language of section 4.07 not only exposes election workers to arbitrary civil enforcement[64] but can also impact criminal enforcement under other provisions. The "consequences of imprecision" in section 4.07 are not "qualitatively less severe" than a criminal statute, *Hoffman*, 455 U.S. at 498-99, and the stringent vagueness test should apply.

Even under a more lenient standard, section 4.07 is still unconstitutionally vague for the reasons discussed above. *See supra* Section I.B. Civil statutes with undefined, standardless terms

---

[64] The civil penalties attached to section 4.07 are severe, including termination of employment and loss of benefits, *see* SB 1 § 8.01(c), enhancing its prohibitory effect in a manner that also renders the provision quasi-criminal in nature. *See City of El Cenizo v. State*, 264 F. Supp. 3d 744, 786–87 (W.D. Tex. 2017), *aff'd in part, vacated in part on other grounds*, 890 F.3d 164 (2018) (holding that the civil penalties for violating the law at issue—fines "between $1,000 and $25,500 per violation and removal from office of local elected and appointed officials"—were quasi-criminal).

can also be void for vagueness. *See, e.g.*, *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89-93, (1921) (holding that a law prohibiting grocers from charging an "unjust or unreasonable rate" was unconstitutionally vague). Due process requires that outcome here.

Accordingly, the Court should deny summary judgment on Plaintiffs' vagueness claim.

## II.     Section 208 Preempts SB 1's Restrictions on Voter Assistance.

Section 208 of the Voting Rights Act unambiguously provides certain voters the right to decide for themselves whom to choose to assist them with voting:

> Any voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the  voter's employer or agent of that employer or officer or agent of the voter's union.

52 U.S.C. § 10508. Conflict preemption applies when compliance with both federal and state law is not possible, or "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade v. Nat'l. Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (internal quotation marks and citations omitted). Congress intended Section 208 to grant a broad and unfettered right to assistance, while SB 1 undermines Congress's purposes by placing myriad obstacles between voters and the assistance to which they are entitled.

Intervenors' arguments for summary judgment on Plaintiffs' preemption claim under Section 208 fail for three reasons: First, in its text and purpose, Section 208 does not allow for additional limitations or exceptions not stated in the statute. Second, regulations on assistors directly impact the ability of voters to obtain assistance. Third, SB 1's burdens on the rights guaranteed by Section 208 cannot be characterized as "modest," or at minimum, the extent of the burden is a triable issue of fact. Accordingly, summary judgment would be improper.[65]

---

[65] Acknowledging that the Court has already rejected their argument, Intervenors contend that there is no private right of action under Section 208 because of the existence of a public enforcement scheme. Mot. 27 n.4. In addition to the

**A.  Section 208 Protects an Expansive Right to Assistance From a Person of the Voter's Choice During the Full Voting Process.**

Section 208's right to assistance is broad. By its terms, the section permits only two limitations on assistors, and "plainly contemplates" the scope assistance to ""include[] steps in the voting process before entering the ballot box, 'registration,' and steps in the voting process after leaving the ballot box that are necessary to 'hav[e] such ballot counted properly.'" *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 615 (5th Cir. 2017); *see also Allen v. Milligan*, No. 21-1086, slip op. at 2–3 (S. Ct. June 8, 2023) ("[T]he terms 'vote' or 'voting shall include *all action necessary to make a vote effective*.") (emphasis in original) (quoting 52 U.S.C. § 10310(c)(1)).

Sections 6.01, 6.03, 6.05, and 6.07 of SB 1 restrict a voter's right to assistance by requiring assistors to take an oath under penalties of perjury and by adding burdensome form and disclosure requirements for assistors who help voters with in-person and mail voting or transport curbside voters to the polls. These restrictions directly contravene Section 208.

**B.  Section 208 Does Not Permit Limitations on a Voter's Choice of Assistor.**

In *OCA-Greater Houston v. Texas*, the Fifth Circuit affirmed a district court ruling preempting a state law that required interpreters to be registered voters in the assisted voter's county of residence. 867 F.3d 604, 615 (5th Cir. 2017). Reasoning that "the right to select any assister of their choice" was "subject only to the restrictions expressed in Section 208 of the VRA itself," *id.* at 608, the Court held that the state law's restrictions on interpreters "impermissibly narrow[ed] the right guaranteed by Section 208," *id.* at 615. This conclusion necessarily follows

---

reasons already explained in the Court's July 12, 2022 Order Granting and Denying in Part the LULAC Plaintiffs' Motion to Dismiss, *see* ECF No. 444 at 33–36, the Court should again reject this contention given the Supreme Court's recent decision in *Health and Hospital Corporation of Marion County v. Talevski*, 21-806, slip op. (S. Ct. June 8, 2023). *Talevski* held that a statute's "comprehensive enforcement scheme" does not preclude a private right of action where that scheme is not "incompatible" with private enforcement. Slip Op. at 19-20. Here, Section 208's public enforcement scheme is neither comprehensive nor incompatible with a private right of action.

from the statute itself: nothing in the text of Section 208 or its legislative history permits states to restrict a voter's selection of assistor beyond the two exceptions expressly stated in its text.

### 1. The Text and Legislative History of Section 208 Demonstrate the Intent to Preclude Restrictions on Assistance.

The Supreme Court's application of the *expressio unius est exclusio alterius* canon of statutory construction requires that the "other than" clause excluding employers or union officers from providing assistance be read to forbid all other limitations. "[W]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Hillman v. Maretta*, 569 U.S. 483, 496 (2013); *see also United States v. Brockamp*, 519 U.S. 347, 352 (1997) (The "explicit listing of exceptions . . . indicate[s] to us that Congress did not intend courts to read other unmentioned, open-ended . . . exceptions into the statute that it wrote").

The Fifth Circuit has applied "reasoning akin to *expressio unius*," *Belt v. EmCare, Inc.*, 444 F.3d 403, 409–10 (5th Cir. 2006), to conclude that the words "other than" in a statute signal the exhaustiveness of the exceptions that follow. In *Nose v. Attorney General of United States*, the Fifth Circuit interpreted a statute that stated, "[a]n alien may not be provided a waiver under the pilot program unless the alien has waived any right . . . to contest, *other than* on the basis of an application for asylum, any action for deportation against the alien" to mean that an alien who wishes to maintain waiver eligibility "may *only* apply for asylum relief as a means of contesting deportation." 993 F.2d 75, 80 (5th Cir. 1993) (emphasis added); *see also Moore v. Hannon Food Serv., Inc.*, 317 F.3d 489, 493 (5th Cir. 2003); *United States v. 329.73 Acres of Land, Situated in Grenada & Yalobusha Ctys.*, 678 F.2d 21, 22 (5th Cir. 1982). A proper reading of Section 208's "other than" language yields the same conclusion: the list of two restrictions on assistance should be considered exhaustive.

The legislative history of Section 208 supports shows Congress intended to create an expansive right for eligible voters to receive assistance from a person of their own choosing, with only two exceptions. *See* S. Rep. No. 97-417, 97th Cong. 2d Sess., at 177, 1982 U.S.C.C.A.N. 177, 1982 WL 25033 (1982) (the "purpose" of Section 208 is to prescribe "the method by which voters who are blind, disabled, or illiterate are entitled to have assistance in a polling booth from a person of their own choosing, with two exceptions"). Congress granted eligible voters a nearly unfettered choice of assistor to enable them to receive assistance from a person that they trust. *See, e.g.*, *id.* at 240 ("Specifically, it is only natural that many such voters may feel apprehensive about casting a ballot in the presence of, or may be misled by, someone other than a person of their own choice . . . The Committee is concerned that some people in this situation do in fact elect to forfeit their right to vote."). Nothing in the congressional record indicates a "legislative intent" that "additional exceptions [may] be implied." *Hillman*, 569 U.S. at 496.

Intervenors contend that states are permitted to establish election procedures more restrictive than Section 208 so long as those state regulations "prevent fraud, undue influence, and abuse." Mot. 28. The text of the statute, which does not permit any additional restrictions on assistors, forecloses Intervenors' interpretation. Further, when the Senate Committee recognized the states' rights "to establish necessary election procedures . . . designed to protect the rights of voters," it also clearly stated the intention that any such voter assistance procedures "be established in a manner which encourages greater participation in the electoral process." S. Rep. No. 97-417, at 241. The provisions of SB 1, by contrast, stifle participation in the electoral process, making it more difficult for voters to obtain assistance. The right to choose one's own assistor is an essential element of the right to assistance. *See id.* (identifying assistance by a person whom the voter trusts and who cannot intimidate him as the only fully "meaningful" type of assistance). But Intervenors

24

have turned Congress's intent on its head by paternalistically contending that state law limiting a voter's choice will protect the rights of voters. Mot. 29. Intervenors' argument defies the text, history, and logic of Section 208.

### 2. Courts Have Held that Section 208 Preempts Restrictions that Prevent Eligible Voters from having the Assistor of their Choice.

Given Congressional intent, as reflected in the clear text of Section 208, to create an expansive right to assistance, courts routinely hold that limitations placed on assistors beyond the federal employment and union-based restrictions are preempted. *See, e.g.*, *Ark. United v. Thurston*, 626 F. Supp. 3d 1064, 1085 (W.D. Ark. 2022) (Section 208 preempted state statute that prohibited a person not a poll worker from assisting more than six voters); *Disability Rts. N.C. v. N.C. State Bd. of Elections*, 602 F. Supp. 3d 872, 877 (E.D.N.C. 2022) (state statute prohibiting anyone except a near relative or verifiable legal guardian from assisting eligible voters preempted by Section 208); *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 235 (M.D.N.C. 2020) (enjoining state statutes that required voters to rely on a near relative, legal guardian, or multi-partisan assistance team if available before they could choose any other person to assist them with marking, completing, or submitting their absentee ballots).

### C. Intervenors' Reading of Section 208 Would Undermine a Voter's Meaningful Choice of Assistor.

Intervenors assert that Section 208 permits restrictions on assistance beyond those states in its text so long as eligible voters are still left with "*a* person" whom they can choose to assist them. Mot. 28. This attempt to shoehorn meaning into Section 208's use of an indefinite article cannot trump the statute's clear statement of the limitations on assistance permitted by its plain text. *See supra* Section II.B(1); *see also Disability Rts. N.C.*, 602 F. Supp. 3d at 877 ("[T]he plain language of Section 208 gives voters unfettered choice over who may assist them with the voting process."). Intervenors' argument undermines the principle of voters' "unfettered choice" that is central to

Section 208. *Id.*; *see also Thurston*, 626 F. Supp. 3d at 1087. A voter's choice that is narrowed by state law exemptions and burdensome requirements ceases to be a meaningful choice.

Intervenors' argument also contradicts Texas's own interpretation of Section 208. The Election Code provides that, "on the voter's request, the voter may be assisted by *any* person selected by the voter other than the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs." Elec. Code § 64.032(c) (emphasis added). In *OCA-Greater Houston v. Texas*, Texas argued this provision "tracks the plain language of Section 208," 867 F.3d at 615, and the Fifth Circuit approved of this reading, interpreting the state law assistor provisions as granting physically disabled voters "the right to select *any* assistor of their choice, subject only to the restrictions expressed in Section 208 of the VRA itself." *Id.* at 608. Texas and the Fifth Circuit have used "a" and "any" interchangeably when interpreting Section 208 without adopting the contrived distinction Intervenors argue here.

### III.     SB 1's Regulation of Assistors Burdens Voters' Right to Assistance.

Intervenors argue that Plaintiffs' Section 208 claim seeks to vindicate a right to assist voters rather than the right to receive assistance. *See* Mot. 30. However, this argument fails to grasp that burdens and restrictions on assistors undermine the right of *voters* to receive assistance.

#### A.  Restrictions on Assistors Impact the Assistance Available to Voters.

Plaintiffs seek to vindicate the right of voters to receive assistance. Obtaining voting assistance under Section 208 requires an assistor to directly interact with a voter, and thus, regulating the actions of an assistor impacts any voter who requires assistance. Recognizing this link, many courts have found that laws regulating the conduct of assistors can and do violate the rights of voters under Section 208 by impeding a voter's practical ability to obtain assistance. *See Thurston*, 626 F. Supp. 3d at 1071, 1085 (finding an Arkansas law providing "no person other than [poll workers] shall assist more than six (6) voters in marking and casting a ballot at an election"

was preempted by Section 208); *Democracy N.C. v. N.C. State Bd. of Elections*, 590 F. Supp. 3d 850, 857–60, 869, 872 (M.D. N.C. 2022) (holding plaintiffs alleged sufficient facts to plead a Section 208 challenge to North Carolina law limiting who can assist a voter to a near relative, a legal guardian, or a member of a county-authorized assistance team); *Carey v. Wis. Elections Comm'n*, No. 22-CV-402-jdp, 2022 WL 3910457, at *2, *10 (W.D. Wis. Aug. 31, 2022) (holding Section 208 preempts state law prohibiting third-party ballot-return assistance to disabled voters).

Even if voters requiring assistance successfully cast a ballot, their right under Section 208 is violated if they voted without an assistor of their choice or forwent assistance altogether. *See* Consent Decree, *United States v. Hale Cnty.*, No. 5-05CV0043-C (N.D. Tex., Apr. 27, 2006) (requiring election administrators to provide language assistance to voters with limited English-language proficiency who had voted in an election in which the County failed to permit assistance to those voters); *Democracy N.C.*, 590 F. Supp. 3d at 856, 869 (holding legally blind plaintiff who voted absentee with his wife's assistance had standing to challenge a law restricting assistance that would prevent him from seeking assistance from staff at nursing home).

### B.  Whether SB 1's Provisions Unduly Burden Voters' Rights Under Section 208 is a Triable Factual Issue.

Intervenors allege—without any supporting evidence—that the challenged provisions impose only "modest" and "non-cognizable burdens" on the right to assistance by someone of a voter's choosing. Mot. 3, 30. These conclusory statements are insufficient to meet Intervenors' burden. The impact of the challenged provisions is a factual dispute that cannot be resolved on summary judgment. *See* S. Rep. No. 97-417 at 241 (stating that state provisions are preempted "to the extent that they unduly burden the right recognized in this section, with that determination being a practical one dependent upon the facts"). There is significant evidence in the record showing that by placing several burdensome form and disclosure requirements on assistors and

subjecting them to criminal liability, SB 1 chills would-be assistors and dissuades voters from seeking assistance. Each challenged restriction will deny, and has denied, voters with disabilities the right to an assistor of their choice sufficient to demonstrate a Section 208 violation:

### 1. Section 6.01

Section 6.01(f) limits the transportation of seven or more voters by requiring assistors to submit a form with their personal information, which is then disclosed to the SoS and Attorney General. As a result, individuals and organizations that have provided rides to the polls in the past have limited transportation since SB 1 went into effect. SOF ¶ 12.

### 2. Section 6.03 and 6.04

Section 6.03 requires assistors to complete a form with their personal information, relationship to the voter, and whether they received any compensation or benefit in connection with providing assistance. Changes to the voter assistance oath under Section 6.04 increase this burden, especially because the assistor must now swear to its contents under penalty of perjury.[66] These provisions have caused voters to decline assistance from a person of their choice because they worry about putting that person at risk of legal liability and because of the hassle and intrusiveness of the forms and oath. SOF ¶ 20.

For example, Harris County voter and member of Plaintiff The Arc of Texas, Ms. Landry, opted to not receive assistance from her husband—her assistor of choice—because the "process for securing assistance at the polling location makes me nervous. . . . There are now many questions asked and a lot of information needed from an assistor. I don't want to draw more attention to myself when I am voting or raise any suspicions[.]" SOF ¶ 20. Nancy Crowther, another Arc of

---

[66] Plaintiffs' challenge to § 6.04 is limited to the portions of the voter assistance oath not already enjoined. *See* Order Granting and Denying in Part the LULAC Plaintiffs' Motion to Dismiss, ECF No. 444 at 2 n.3.

Texas member, similarly declined assistance from her attendant for fear of exposing the attendant to increased scrutiny and criminal liability:

> I knew [the attendant] had concerns with the oath requirements of SB1… I did not want to jeopardize my working relationship with them. Unfortunately, the poll worker was unable to help me enter my selections. While trying to assist me, the poll worker would audibly announce my selections and I felt that my right to vote privately was not honored. Further, it felt intimidating to have an election official announce my vote selections as they are individuals with expanded authority under SB1.

*Id.*; *see also id.* ¶ 21 (multiple voters discussing consequences of not being assisted by someone of their choice such as not being able to vote privately). Testimony from assistors also shows that they have been deterred from providing in-person assistance to voters due to the oath. *Id.* ¶ 19.

In effect, the requirements of sections 6.03 and 6.04 have limited eligible voters' ability to receive the assistance Section 208 guarantees.

### 3. Sections 6.05 and 6.07

Finally, SB 1 § 6.05 exposes assistors to criminal penalties for errors in assisting a voter in completing a mail-in ballot. Section 6.05 requires the assistor to disclose on the carrier envelope their relationship with the voter and whether they received compensation for providing assistance.[67] *See* SB 1 § 6.05(e). Under the election code, failure to provide this information or to sign a voter assistance oath printed on the carrier envelope—identical to the one prescribed by SB 1 § 6.04—is a state jail felony. Elec. Code § 86.010. The risk of prosecution under these provisions has hindered voters from obtaining assistance from a person of their choice because would-be assistors are deterred by the threat of criminal penalties. As an example, Laura Halvorson, member of The Arc of Texas, explained that her personal care attendant was unwilling to assist her with absentee voting during the March 2022 primary because "as a green card holder, she was unwilling

---

[67] Section 6.07, which Plaintiffs also challenge, facilitates this requirement by requiring the carrier envelope to include space to disclose this information. *See* SB 1 § 6.07.

to take the oath to assist me (in person or by mail) because she was afraid of the threat of criminal prosecution and the impact on her legal status." SOF ¶ 20.

District attorneys have the authority to prosecute these violations, and counter to Defendant Ogg's argument that the Harris County District Attorney has not "taken, or threatened to take, any actions" that deny the right under Section 208, ECF No. 614 at 28, she has not disavowed such enforcement. Indeed, voters in Harris County have been denied the right to assistance from someone of their choice due to the risk of enforcement. *See e.g.*, SOF ¶¶ 20-21 (Harris County voter discussing the risks of criminal liability when she votes by mail are exacerbated for a personal care attendant who is more likely a person of color or low-wage worker).

Evidence in the record shows these requirements, with their threat of criminal penalties, dissuade voters from seeking assistance and assistors from rendering it. *Id*. ¶¶ 19-21 (SB 1 deters Teri Saltzman from seeking assistance and voting by mail because of the hurdles she's experienced); *id.* (Ms. Gomez felt "fear" about assisting people who vote by mail because of criminal liability and thus declined to assist voters who she assisted in the past. As a result, those voters did not get assistance and did not vote.).

On this record, there is a triable factual dispute about the extent to which the challenged provisions burden voters' right to assistance under Section 208, making summary judgment on this claim improper.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Intervenors' Motion for Summary Judgment as to HAUL and MFV Plaintiffs' Void for Vagueness and Section 208 claims.

Dated: June 23, 2023

Respectfully Submitted,

/s/ Courtney Hostetler
Courtney Hostetler*
Ron Fein*
John Bonifaz*
Ben Clements*
FREE SPEECH FOR THE PEOPLE
1320 Centre Street, Suite 405
Newton, MA 02459
(617) 249-3015
chostetler@freespeechforpeople.org
rfein@freespeechforpeople.org
jbonifaz@freespeechforpeople.org
bclements@freespeechforpeople.org

Wendy Olson*
Elijah Watkins*
Mark Bieter*
STOEL RIVES LLP
101 S. Capital Boulevard, Suite 1900
Boise, ID 83702
Telephone: (208) 389-9000
wendy.olson@stoel.com
elijah.watkins@stoel.com
mark.bieter@stoel.com

Bradley Prowant*
John Katuska*
STOEL RIVES LLP
33 S. Sixth Street, Suite 4200
Minneapolis, MN 55402
Telephone: (612) 373-8800
bradley.prowant@stoel.com
john.katuska@stoel.com

Laura Rosenbaum*
STOEL RIVES LLP
760 SW Ninth Ave., Suite 3000
Portland, OR 97205
Telephone: (503) 224-3380
laura.rosenbaum@stoel.com

Sean Lyons
Clem Lyons
LYONS & LYONS, P.C.

/s/ Jennifer A. Holmes
Jennifer A. Holmes*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, DC 20005
Telephone: (202) 682-1300
Facsimile: (202) 682-1312
jholmes@naacpldf.org

Amir Badat*
Victor Genecin*
Breanna Williams*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592
abadat@naacpldf.org
vgenecin@naacpldf.org
bwilliams@naacpldf.org

Shira Wakschlag*
THE ARC OF THE UNITED STATES,
INC.
1825 K Street, NW, Suite 1200
Washington, DC 20006
Telephone: (202) 534-3708
Facsimile: (202) 534-3731
Wakschlag@thearc.org

Kenneth E. Broughton
Texas Bar No. 03087250
J. Keely Pippin
Texas Bar No. 24116306
REED SMITH LLP
811 Main Street, Suite 1700
Houston, TX 77002-6110
Telephone: (713) 469-3800
Facsimile: (713) 469-3899
kbroughton@reedsmith.com
kpippin@reedsmith.com

237 W. Travis Street, Suite 100
San Antonio, Texas 78205
Telephone: (210) 225-5251
sean@lyonsandlyons.com

*Admitted *pro hac vice*

*Counsel for Plaintiffs Mi Familia Vota, Marla López, Marlon López, and Paul Rutledge ("MFV Plaintiffs")*

Sarah Cummings Stewart
Texas Bar No. 24094609
REED SMITH LLP
2850 N. Harwood Street, Suite 1500
Dallas, TX 75201
Telephone: (469) 680-4200
Facsimile: (469) 680-4299
sarah.stewart@reedsmith.com

J. Michael Showalter*
ARENTFOX SCHIFF LLP
South Wacker Drive, Suite 7100
Chicago, IL 60606
Tel: (312) 258-5561
j.michael.showalter@afslaw.com

*Admitted *pro hac vice*

*Counsel for Plaintiffs Houston Area Urban League; Delta Sigma Theta Sorority, Inc.; The Arc of Texas; and Jeffrey Lamar Clemmons ("HAUL Plaintiffs")*

## CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2023, a true and correct copy of the foregoing document was served on all counsel of record by filing with the Court's CM/ECF system.

*/s/ Jennifer A. Holmes*
Jennifer A. Holmes