# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, *et al.*,

                     Plaintiffs,

v.

GREGORY W. ABBOTT, *et al.*,

                     Defendants.

Civil Action No. 5:21-CV-844 (XR)
(Consolidated Case)

## Expert Report of Franita Tolson, J.D.

**Vice Dean for Faculty and Academic Affairs**
**Professor of Law**
**Professor of Political Science and International Relations (Courtesy)**
**USC Gould School of Law**
**699 W. Exposition Blvd.**
**Los Angeles, CA 90089**

On behalf of Plaintiffs Houston Justice, Houston Area Urban League, Delta Sigma Theta Sorority, Inc., The Arc of Texas, Mi Familia Vota, Marla López, Marlon López, Paul Rutledge, and Jeffrey Lamar Clemmons

## I.      Purpose of this Report

**1.** The plaintiffs in *La Union Del Pueblo Entero, et al. v. Abbott* (the "Plaintiffs") have asked me to provide historical context for Texas Senate Bill 1 ("SB 1") to show how this law operates like prior voting restrictions and practices in the state that have minimized the political power of minority communities. This report describes how, since the end of Reconstruction, Texas has disenfranchised minority voters through facially race neutral practices by singling out their geographic location and targeting the voting methods predominantly used by these communities. Enacted in response to the substantial increase in minority turnout and participation in the 2020 election, SB 1 is intended to keep

the Texas electorate predominantly white and resistant to demographic change by using similar tactics. This report focuses on the following portions of SB 1:

- SB 1 § 2.05 (requirement of monthly and quarterly voter purges)
- SB 1 §§ 3.04, 3.12-3.13 (eliminating drive-thru voting centers); SB 1 §§ 3.09-3.10 (restricting the scheduling of early voting hours and eliminating 24-hour voting); SB 1 § 4.12 (restricting vote-by-mail drop boxes); SB 1 §§ 5.04, 5.12-5.14 (limitations on absentee voting)
- SB 1 § 6.01; SB 1 § 6.04 (limitations on voting assistance);  SB 1 §§ 4.01, 4.06, 4.07, 4.09 (reducing restrictions on poll watchers)

While the finder of fact in this case has the final responsibility of deciding questions of law and fact, this analysis is intended to assist the finder of fact by showing how SB 1 fits within the broader landscape of Texas' election restrictions since the Post-Reconstruction era.

## II.    Table of Contents

I.   Purpose and Organization of This Report                                                1
II.  Table of Contents                                                                      2
III. Credentials                                                                            3
IV.  Summary of Major Findings                                                              3
V.   Discriminatory Voting Practices in Texas,
     from 1865 to the Present, as Historical Context for SB 1                               5
     A.  Creating a White Electorate: Texas Politics from 1865 through 1900                 7
         1.  Changing the Legal Regime to Facilitate Black and                              7
             Latino Disenfranchisement
         2.  Using Voter Fraud and Violence to Depress the Black                           14
             Vote in Rural Areas
     B.  Maintaining a White Electorate: Racial Discrimination in Texas                    20
         Politics 1900-1965
         1.  The Poll Tax and Other Restrictive Voting Measures                            21
         2.  The All-White Democratic Primary                                              23
         3.  Minority Vote Dilution in Texas                                               26
     C.  Resisting A Diverse Electorate: 1965 to the Present                               28
         1.  Section 5 Objections in Texas from 1975 to 2013                               29
         2.  Recent Voting Rights Act Litigation Against Texas                             32
VI.  The 2020 Election Cycle in Texas                                                      34
     A.  Pre-2020 Election Changes                                                         35
     B.  Election Practices During the 2020 Election in Texas                              37
         1.  The March 2020 Primary                                                        38
         2.  The 2020 General Election                                                     39
VII. A Solution in Search of a Problem: SB 1 as Voter Suppression
     that Mimics Historical Disenfranchising Practices                                     41
     A.  The Absence of Fraud in 2020 Elections                                            42

    B.  Limitations on Absentee Voting, Early Voting, Drop-Boxes,
       and Drive-Thru Voting Centers         45
    C.  Requirement of Monthly and Quarterly Voter Purges      46
    D.  Limitations on Voting Assistance and Empowering Poll Watchers      48
  VIII.  Bibliography      51

## III.    Credentials

**2.** I am Vice Dean for Faculty and Academic Affairs and Professor of Law at University of Southern California Gould School of Law, where I also hold a courtesy appointment in the Political Science and International Relations Department. A graduate of the University of Chicago Law School, I have been or will be a visiting professor in law schools at the University of Chicago, Northwestern, and Georgetown. My scholarship and teaching focus on election law, constitutional law, and legal history. I write on many topics including partisan gerrymandering, political parties, the Elections Clause, the Voting Rights Act of 1965, and the Fourteenth and Fifteenth Amendments. My work uses history as a methodology to illuminate modern day controversies over the right to vote and debates over the scope of congressional power to regulate elections. My research has appeared or will appear in leading law reviews including the *Harvard Law Review*, *Yale Law Journal*, *Stanford Law Review*, *California Law Review, University of Pennsylvania Law Review*, and *Vanderbilt Law Review.* I am also one coauthors of the leading election law casebook, *The Law of Democracy* (Foundation Press, 6th ed., forthcoming 2022). My forthcoming book, *In Congress We Trust?: Enforcing Voting Rights from the Founding to the Jim Crow Era*, will be published in 2022 by Cambridge University Press.

**3.** As a nationally recognized expert in election law, I have written for or appeared as a commentator for mass media outlets including *The New York Times*, *The Los Angeles Times, The Wall Street Journal, Reuters*, and *Bloomberg Law.* I have testified before Congress (both House and Senate) on voting rights issues four times between 2019 and 2021. I also consult on voting rights litigation and redistricting processes, both for amicus briefs and as a compensated expert. In 2020, I authored a legal analysis at the request of Senators Elizabeth Warren and Richard Durbin regarding a proposed constitutional amendment that would explicitly protect the right to vote. During the fall of 2020, CNN employed me as an election law analyst, and I continue to appear on that network and others. I am also a voting rights consultant for Facebook, and helped the platform develop a voter information center that helped over four million people register to vote during the 2020 election cycle. I currently co-host an election themed podcast, *Free and Fair with Franita and Foley,* with Ned Foley of The Ohio State University Moritz College of Law.

**4.** The analyses and opinions expressed in this report are my own. I am being compensated for my time at an hourly rate of $400. My compensation in this matter is not in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

## IV.    Summary of Major Findings

**5.** SB 1 is consistent with Texas' long history of racism and discrimination in voting. Since 1876, Texas has enacted voting laws to not only disenfranchise minorities, but to also create a cohesive white majority that will not form coalitions with minority voters. These voting restrictions have included, for example, poll taxes, the all-white Democratic primary, and restrictive voter registration systems. In recent years, Texas has continued this pattern of exclusion by closing polling places in predominantly minority neighborhoods, adopting a restrictive voter ID law, and gerrymandering its state legislative and congressional districts along racial and partisan lines. Notably, SB 1 was not adopted to address the problems that arose in the 2020 election cycle such as the long waits, the broken machines, and the lack of polling places in minority communities. Instead, the legislature enacted SB 1 to curb the high turnout and participation that minority communities enjoyed during the 2020 election cycle to protect the political power of a shrinking white majority electorate from the tide of demographic change.

**6.** While the techniques of disenfranchisement in Texas have evolved, there are features of Texas' political system that have remained constant for almost 150 years. Generally, Texas has disenfranchised its minority communities in two ways: 1) through facially discriminatory laws and practices—coupled with violence, intimidation, and fraud—that created an all-white electorate free of third-party competition; and 2) facially neutral laws that maintained this predominantly white electorate through discriminatory local implementation, minority vote dilution, and a practice known as "colorblind targeting."

**7.** "**Colorblind Targeting**," or the use of race neutral voting restrictions that target minorities based on their voting patterns, has a long history in Texas. This type of targeting usually has three aspects: timing, geography, and voting method.

    a. **Timing**: Historically, new voting restrictions in Texas occurred: 1) following a sizeable increase in the minority population and/or an increase in the political activism of the minority group; 2) following an election in which a minority group served as a pivotal swing block and/or had a substantial influence on the outcome of the election; or 3) following a contentious election cycle in which the majority party sought to secure their majority.

    b. **Geography**: Since the late nineteenth century, most of the voting restrictions in Texas have been formally colorblind and targeted black and Latino voters as well as their white allies in urban areas, where white men were less indebted to the Democratic Party and more likely to form coalitions with minority voters. In contrast, officials from more rural areas were more likely to use violence and intimidation, coupled with discriminatory implementation of the voting laws, to counter minority voting strength.

    c. **Voting Method**: Texas imposed targeted restrictions that singled out certain voting methods by, for example, requiring the Australian ballot and voter registration in some places but not others. Singling out certain voting methods for regulation was also a way to target biracial coalitions without harming white voters loyal to the party in power.

**8.** SB 1 is an example of colorblind targeting because it follows the same pattern that has defined laws that have historically disenfranchised minority voters in the state: timing, geography, and voting method. The law, which was enacted following the contentious 2020 election cycle, imposes restrictions on voting methods that were disproportionately used by minority communities in some of Texas' largest and most diverse counties.

**9.** To the extent that Texas is concerned about fraud or the appearance of fraud, the restrictions in SB 1 do not correlate to how voter fraud has occurred in the state historically. Since the post-Reconstruction period, voter fraud has disproportionately impacted voters of color. Counties with large black and/or Latino populations experienced documented and provable instances of voter fraud and violence that undermined their political power. Historically, election administrators have used the names of dead people on ballots or stuffed the ballot box, particularly in counties with large black populations in which minorities exercised significant political power and supported non-Democratic Party candidates. In addition, the Democratic political machines forced Latino voters to support Democratic candidates by threating to terminate their employment or at the threat of violence.

**10.** Recognizing that minority disenfranchisement occurred in the broader context of the class struggles among white factions in the state—that black voters posed the greatest threat to the majority party when they aligned with third parties, and that coalitions between Mexican laborers and large landowners often prompted the former's disenfranchisement— provides important insight into how race and racism has long been used as a tool to unite white factions under one political umbrella as far back as Reconstruction. The overlap between race, class, and political affiliation is endemic to Texas politics and endures to modern times.

## V.    Discriminatory Voting Practices in Texas, from 1865 to the Present, as Historical Context for SB 1

**11.** Texas politics during Reconstruction was similar to the political systems of the other states in the former Confederacy—marked by aggressive efforts by the white planter class, politically displaced by black men enfranchised by federal statutes and constitutional amendments,[1] to reclaim state government from the Republican Party. Nevertheless, there were also significant differences between Texas and the rest of the south that made its political struggles somewhat unique. First, Texas had a much smaller black population than other southern states—24.7 percent in 1880, who constituted a majority in 14 out of 144 Texas counties.[2] Given their numbers, black voters often served as an important swing block in elections that centered on economic and class issues that had created cleavages between white factions. Second, unlike other southern states, Texas also had a small Latino population (predominantly Mexican in the nineteenth century but one that has evolved to include

---

[1] *See, e.g.,* U.S. CONST. amend. XIV; *Id.* amend. XV. See also the Enforcement Acts of 1870, ch. 114, 16 Stat. 140 (instituting regime of federal oversight for congressional elections), and Enforcement Act of 1871, ch. 99, 16 Stat. 433 (same).
[2] In comparison, the population of both South Carolina and Mississippi in the 1870s majority black. *See* Richard Mark Gergel, WADE HAMPTON AND THE RISE OF ONE-PARTY RACIAL ORTHODOXY IN SOUTH CAROLINA 205 (1977); Samuel Shapiro, *A Black Senator from Mississippi: Blanche K. Bruce (1841-1898)*, 44 REV. OF POLITICS 83 (1982).

other ethnicities today) whose relationship with the state Democratic Party evolved somewhat differently from the African American experience, but nonetheless centered on racial discrimination and exclusion from the political process.[3]

**12.** Because of this unique racial and political environment, Texas had very robust third parties that competed with the Republican Party for minority support. White political elites were concerned that black and Latino voters would elevate third party opposition to the Democratic Party and/or cause splits within the Democratic Party itself. In most other southern states, white political elites had to contend with substantial black majorities who could elect (and did elect) significant numbers of black officials. While there were not enough black and Latino Texans to elect minority officials at similar levels, there was still a longstanding, intense, and dedicated campaign to disenfranchise these groups because of their ability to influence election outcomes. The process of disenfranchising minority voters took over three decades in Texas, a delay stemming from the fact that there was always some not insubstantial portion of the Democratic Party concerned that voting restrictions would unduly impact their white base. In addition, the sheer size and racial diversity of Texas required a mix of tactics to disenfranchise minority populations who were not similarly situated.[4] Black farmers and Mexican laborers did not consistently pose the same electoral threat to local white voters. Nor was the white majority a monolith uniformly aligned against biracial coalitions, given that some poor whites were willing to crossover and support third parties.[5]

**13.** In this complex political environment, the Texas government that white Democrats ultimately "redeemed" from radical Republicans was able to secure and maintain power by devising an election system that had two dominant features. First, the state has restricted its electorate through facially discriminatory laws and practices—coupled with violence, intimidation, and voter fraud—that purged the electorate of minority voters and poor white voters who supported third parties, leaving a predominantly white, one-party system in place. Second, the state has used facially neutral laws to maintain a white electorate, relying on discriminatory application of the law by local election administrators to target undesirable voters for exclusion; by legally restricting practices disproportionately used by minority voters to cast their ballots (also known as "Colorblind Targeting"); and by adopting voting practices such as at-large elections, majority vote requirements, and multimember districts to dilute the political power of minority communities.[6] Both categories

---

[3] DAVID MONTEJANO, ANGLOS AND MEXICANS IN THE MAKING OF TEXAS, 1836-1986 262 (1987) ("Jim Crow may appear to be an odd description of the situation of Mexicans in Texas. There was no constitutionally sanctioned 'separate but equal' provision for Mexicans as there were for blacks….But in political and sociological terms, blacks and Mexicans were basically seen as different aspects of the same race problem.").

[4] *See* J. MORGAN KOUSSER, THE SHAPING OF SOUTHERN POLITICS: SUFFRAGE RESTRICTION AND THE ESTABLISHMENT OF THE ONE-PARTY SOUTH, 1880-1910 198 (1974)("[s]ince Democrats from counties with large numbers of Negroes had less power in Texas than elsewhere, it took 27 years to enact poll tax legislation.").

[5] *Id.* at 197 ("The Democrats, predominantly white and drawing their support from all classes, although dominated by businessmen and rich landowners, struggled against the repeated efforts of a poor white-Negro coalition to gain power and office.").

[6] *See* Franita Tolson, *What Is Abridgment?: A Critique of Two Section Twos*, 67 ALA. L. REV. 433 (2015) (arguing that states in the former confederacy adopted race neutral voting restrictions to avoid federal oversight of their election practices, oversight that would be triggered by facially discriminatory laws that violated the Fifteenth Amendment).

have worked in tandem to prevent the full incorporation of minorities into the political process in Texas since the 1870s.   Understanding that Texas' political system has been about both racial exclusion, or creating a white electorate, and racial maintenance, or keeping the electorate white, helps to place the state's current suppression effort, SB 1, in historical context.

### A.   Creating a White Electorate: Texas Politics from 1865 Through 1900

**14.**   The racial divide has been, and continues to be, one of the defining features of Texas politics. During Reconstruction, much of the conflict, both political and economic, was between affluent, conservative white Democrats and the poor black and white farmers whose support was split across the Democratic Party, the Republican Party, and third parties.   As with the slavery issue prior to the Civil War, race was the wedge used to resolve conflicts between the two camps.   In the highly contested elections of 1873, Democrats were able to regain control of the governorship and the state legislature with racialized appeals, violence, and attacks on the Reconstruction project.[7]  Democrats argued that white supremacy was being undermined by "Negro" rule to deter poor whites from aligning with black voters despite their shared struggles and overlapping policy preferences.[8]

**15.**   Once back in power, they sought to create a loyal white electorate, uniform in their opposition to black equality, that resolved all disputes within the aegis of the Democratic Party.   Creating a politically uniform, white electorate would prove to be a difficult proposition because of class divisions within the white community, yet the Democrats worked tirelessly after the end of Reconstruction to minimize African American and Latino political power in the state towards this goal.[9]

### 1.  Changing the Legal Regime to Facilitate Black and Latino Disenfranchisement

**16.**   After the 1873 elections, Democrats pressed for greater restrictions on the right to vote despite the significant decline of the Republican Party, which posed little threat to Democratic dominance. But this would be a complex undertaking.   Much of the political apparatus in Texas was decentralized,

---

[7] Lewis L. Gould, Alexander Watkins Terrell: Civil War Soldier, Texas Lawmaker, American Diplomat 60 (2004).
[8] Chandler Davidson, Race and Class in Texas Politics 5 (1990) ("The unity and political skill of the planter class enabled it to enlist the rest of the South in the war, which, along with Reconstruction, increased greatly the solidarity of southern whites in all regions and thus dampened the internal conflicts that had existed before the war.").
[9] As one study notes,

> Even before Reconstruction ended, Democrats [in Texas] enjoyed advantages that their brethren elsewhere in Dixie could only have envied. African Americans constituted less than one-third of the state's population, and Republicans had proved unable to build a sizable and enduring following among white Texans. Accordingly, after narrow and contested Radical victories in 1869, Democrats won most legislative races and every congressional race and quickly rendered the Reconstruction government little more than a lame duck-this though the Republican governor held on like grim death until an armed confrontation at the state capitol removed him from office in 1874.

Patrick G. Williams, *Suffrage Restrictions in Post-Reconstruction Texas*, 68 J. Southern Hist. 31, 33 (2011).

with a web of county judges, sheriffs and aldermen overseeing communities, some of which had black voters and Republicans that continued to exercise significant governing authority.[10]

17. The complex racial diversity of Texas relative to other southern states also complicated suppression efforts. Redeemer Democrats were willing to consider some Latino elites to be "white" if it served their political ends while relegating poor Latinos into the same nonwhite constituency as African Americans.[11] There had already been significant efforts to suppress the Latino vote in south Texas, efforts that began well before the Civil War.[12] Democrats also expended considerable energy on suppressing the vote of the more numerous and disperse African American community in the rest of the state, who constituted a third of the state's population, as well as poor white people who often aligned themselves with third parties and/or black voters.

18. White farmers became attracted to third-party politics and open to the possibility of biracial coalitions after the Civil War triggered of a severe economic depression, leading to declines in cotton prices and the foreclosure of thousands of farms.[13] In the 1880s, white farmers formed the Farmers' Alliance, an agricultural interest group that initially attracted big and small farmers of every political leaning. Eventually, the group started to act in opposition to the ruling Democratic Party, providing an opportunity for less affluent white men to exercise meaningful political power. Similarly, so-called "Greenback Clubs" were growing across the state, focused on the money issues that they argued contributed to high inflation, but also providing another avenue for both white voters disillusioned with the major parties and black voters concerned about increasing discrimination to challenge the increasing dominance of the Democratic Party.[14] The Farmers Alliance and the Greenback Clubs created a pipeline to the Populist Party that emerged during this time.[15]

19. The resulting Populist and Greenback Parties that emerged from these grassroots efforts proposed solutions to the shared financial problems faced by black and white farmers alike.[16] Both parties attracted wide support from black Republicans, and they openly competed for black votes.[17]

---

[10] *Id.* at 34 (noting that "while most Texas communities were, like the state as a whole, categorically Democratic by the early 1870s, a number of its longest settled, most populous, and wealthiest districts were not. The state's fourteen former plantation counties with black majorities continued in many cases to sport powerful Republican officeholders, some of them African American.").

[11] *Id.* at 39 (noting that "in the 1870s the Latino vote seems not to have been defined as a problem by Texas Democrats" because of their relatively small numbers, concentrated in San Antonio, and support of the Democratic Party in some places).

[12] MONTEJANO, *supra* note 3, at 18-19.

[13] KOUSSER, *supra* note 4 , at 17.

[14] GOULD, *supra* note 7, at 73.

[15] DAVIDSON, *supra* note 8, at 19 ("Texas Populists made a genuine effort to breach the color line in politics. Their state executive committee at one point included two blacks. Several of their chief organizers and spokesmen were black, as were many of the rank and file.").

[16] *Id.* at 19. *See also* Tom Watson, "The Negro Question in the South," in NORMAN POLLACK, THE POPULIST MIND (1967).

[17] KOUSSER, *supra* note 4, at 25 ("[N]early every Independent appealed openly for Negro votes, thereby legitimizing the race's participation in politics, sanctioning biracial political alliances, and accustoming many white leaders to politicking in the black community."). *See also* PAUL LEWINSON, RACE, CLASS, & PARTY: A HISTORY OF NEGRO SUFFRAGE AND WHITE POLITICS IN THE SOUTH 75 (1965)("[B]itter political fights between the white factions had disturbed the peace of

While black farmers remained loyal to the Republican Party for much of the 1880s, making up three-fourths of the party in the state, the party's diminishing presence in Texas meant that black support became attractive to any coalition seeking to upset the Democratic Party's control of the election apparatus.[18]  For example, the Democratic candidate for governor defeated the Republican nominee by 26.8 percent in 1880; in contrast, the addition of a Greenback-Republican candidate in the 1882 race cut this margin to 11.6 percent.  Black voters also backed the Farmers' Alliance candidate in 1888, a conservative Democratic candidate for governor in 1892, and a Populist in 1896, all of which illustrate that black voters were more fluid in their support and could shift the outcome in close races.[19]  Only once during the sixteen-year period did blacks give the regular Democrat more than 28 percent of their voters when a third-party candidate was in the governor's race."[20]

**20.**  The impact of third parties on Democratic control in Texas was substantial, with 40.5% of the electorate supporting Republicans or Independents during the 1882 elections.[21]  The breakdown by race is even more notable—18% of white voters supported Republicans or Independents whereas 62% of black voters supported these groups.

**21.**  The Populists officially formed a third political party in 1891—the People's Party, which advocated for fiscal policies that would increase crop prices and make affordable credit more available.[22]  Populists also sought to reform the democratic process; to that end, they called for fair elections, direct election of senators, and an initiative and referendum processes.[23]  For a brief time, they were very competitive in Texas politics, winning hundreds of local elections and supported by a majority of voters in over fifty counties as late as 1894.[24]

**22.**  The Democratic Party responded to this increased third party activity in two ways: through increased legal restrictions and extra-legal violence.  As third parties became more competitive, the party escalated efforts to make voting harder.  In 1876, Texas Democrats amended the state constitution and passed new statutes to limit the political power of minority constituencies, but notably, adopted targeted measures to avoid harming those white voters most likely to support the party.

---

the Southern States.  During the course of such battles, the temptation was often irresistible to use Negro voters against the opposition, and, during the eighties and nineties, renewed attempts were made on the part of both groups to tighten statutory restrictions…which kept the Negro from the polls.").

[18] KOUSSER, *supra* note 4, at 14, 18.

[19] *Id.* at 198 (noting that "a considerable portion of the votes for unorthodox parties, left or right, came from the blacks, and those parties could not hope to contend with the Democrats without widespread black support.").

[20] DAVIDSON, *supra* note 8, at 19.

[21] KOUSSER, *supra* note 4, at 27.

[22] Gregg Cantrell & D. Scott Barton, *Texas Populists and the Failure of Biracial Politics*, 55 J. SOUTHERN HIST. 659, 659 (1989) ("Calling themselves Populists or the People's party, they broke with the Democrats and demanded a subtreasury system, the monetization of silver, and a paper-based currency as ways to bring higher crop prices and affordable credit…[R]ealizing that blacks would make logical allies in the battle against power and privilege, Populists in some states tried hard to recruit the black voter into the ranks of their third party.").

[23] *Id.*

[24] Gregg Cantrell & Kristopher B. Paschal, *Texas Populism at High Tide: Jerome C. Kearby and the Case of the Sixth Congressional District, 1894,* 109 SOUTHWESTERN HIST. Q 30 (2005).

**23.**  Congress required Texas to enact a new constitution during Reconstruction, and that document provided for universal manhood suffrage and enfranchised thousands of black men. Texas's 1836 constitution limited voting to "all free white persons,"[25] "who has attained the age of twenty-one years and shall have resided six month within the district or county where the election is held."[26]  In the post-Civil War era, cities across Texas continued to impose property or taxpaying qualifications to further limit who can participate in local elections.[27]   However, the right to vote described in its 1869 constitution was more expansive than its predecessor:

> Every male citizen of the United States, of the age of twenty-one years and upwards, not laboring under the disabilities named in this Constitution, without distinction of race, color or former condition, who shall be a resident of this State at the time of the adoption of this Constitution, or who shall thereafter reside in this State one year, and in the county in which he offers to vote sixty days next preceding any election, shall be entitled to vote for all officers that are now, or hereafter may be elected by the people, and upon all questions submitted to the electors at any election . . . .[28]

**24.**  In contrast, the state's 1876 Constitution (which has been amended but is still in force) and subsequent laws enacted to enforce its terms reflected the political changing of the guard in the state, a formal rejection of the Reconstruction project, and a desire to create a white, mostly affluent, electorate.  Its voters qualification standards were deceptively simple—any "person" over 21, who was not an "idiot," "lunatic," a pauper, a soldier, or a felon, could vote under the new constitution provided they met the durational residency requirement.[29]  But these criteria would prove to be illusory.

---

[25] TEX. CONST. art. VI, General Provisions, § 6 (1836).

[26] *Id.* art. 6, § 11.

[27] Williams, *supra* note 9, at 44 ("Through the antebellum and war years, and into the era of Presidential Reconstruction, Texas's largest cities had limited the political participation of poorer males-particularly transient bachelors-most commonly by placing various property- holding or taxpaying qualifications on officeholding, but also, under certain charters, by limiting the franchise to property owners and householders. As late as 1866 only householders and owners of at least $100 of real or personal property could vote in Houston elections, while in Galveston that same year one could not serve as mayor or alderman unless he held real estate within the city valued at least $3,000 and free of encumbrance. Such qualifications were lifted, however, when the Reconstruction legislature chartered major cities in 1870-71.").

[28] TEX. CONST. art. 6, § 1 (1869).

[29] *Id.*  The provision provides in relevant part:

> **SECTION 1.** The following classes of persons shall not be allowed to vote in this State, to wit:
> First--Persons under twenty-one years of age. Second--Idiots and lunatics. Third--All paupers supported by any county. Fourth--All persons convicted of any felony, subject to such exceptions as the Legislature may make. Fifth--All soldiers, marines and seamen, employed in the service of the army or navy of the United States.
> **SEC. 2.** Every male person subject to none of the foregoing disqualifications, who shall have attained the age of twenty-one years, and who shall be a citizen of the United States, and who shall have resided in this State one year next preceding an election, and the last six months within the district or county in which he offers to vote, shall be deemed a qualified elector…
> **SEC. 3.** All qualified electors of the State, as herein described, who shall have resided for six months immediately preceding an election within the limits of any city or corporate town, shall have the right to vote for mayor and all other elective officers; but in all elections to determine expenditure of money or assumption of debt, only those shall be qualified to vote who pay taxes on property in said city or incorporated

**25.** First, the new constitution disenfranchised persons convicted of *any* felony, violating the terms of the federal Reconstruction Acts readmitting the state back in the Union, which only allowed for disenfranchisement for felonies at common law.[30]  By allowing for disenfranchisement for any felony, this formed the basis for the racialized felon disenfranchisement regime that remains prominent in Texas today and disproportionately affects minority voters.[31]   Indeed, its system of felon disenfranchisement became another vehicle through which Texas engaged in colorblind targeting to disenfranchise minority voters.  Under the 1876 constitution, the legislature retained authority to exclude certain crimes from the list of felonies that triggered disenfranchisement.  Like most southern states during this period, enforcement discretion ensured that many of the qualifying felonies in Texas were those perceived to be more likely to be committed by black people, while exceptions were made for those crimes committed predominantly by white offenders.[32]  Disenfranchising minorities was an upside for Democrats from a practice that would prove to be quite lucrative: convict leasing.  In 1878, the Texas governor announced that the practice of leasing prisoners to private corporations had put "'more cash into the treasury in one year than has been paid from the establishment of the penitentiary.'"[33]

**26.** Second, legislators had sought to impose new, restrictive voter qualification standards in the state constitution, but there was significant disagreement over the substance of these restrictions.  State legislators who hailed from areas with substantial African American populations often proposed statewide voting restrictions; many of these efforts were rebuked.[34]   For example, the state constitutional convention declined to adopt a poll tax, with some Democrats arguing that it would harm white voters who supported the party.  Instead, they approved an article that restricted voting in elections that "determine the expenditure of money or the assumption of debt," or bond elections,

---

town; *provided*, that no poll tax for the payment of debts thus incurred, shall be levied upon the persons debarred from voting in relation thereto.
**SEC. 4.** In all elections by the people the vote shall be by ballot, and the Legislature shall provide for the numbering of tickets and make such other regulations as may be necessary to detect and punish fraud and preserve the purity of the ballot box; but no law shall ever be enacted requiring a registration of the voters of this State.
**SEC. 5.** Voters shall, in all cases, except treason, felony or breach of the peace, be privileged from arrest during their attendance at elections, and in going to and returning therefrom.

*Id.*
[30] Franita Tolson, *"In Whom is the Right of Suffrage?": The Reconstruction Acts as Sources of Constitutional Meaning,* 169 PENN. L. REV. 211 (2021).
[31] TEX. CONST. art. 6, § 1 (1876).
[32] JEFF MANZA & CHRISTOPHER UGGEN, LOCKED OUT: FELON DISENFRANCHISEMENT AND AMERICAN DEMOCRACY 43 (2006).  *See also* Hayes v. Williams, 341 F. Supp. 182, 185 (S.D. Tx. 1972) (rejecting, on procedural grounds, a challenge to the racially discriminatory application of Texas' felon disenfranchisement laws after state allowed two white individuals convicted of bribery offenses to appear as candidates for office while excluding a black person convicted of submitting false income tax returns from being able to vote)
[33] Christopher R. Adamson, *Punishment after Slavery: Southern State Penal Systems, 1865-1890,* 30 SOCIAL PROBLEMS 555, 564 (1983) (citing HILDA ZIMMERMAN, ORIGINS OF THE NEW SOUTH, 1877-1913 (1971)).
[34] KOUSSER, *supra* note 4, at 203-204.

to those who paid all local property taxes owed to the municipality.[35]  This more targeted measure gave only the most affluent voters, predominantly white, control over the dispersal of public funds, limiting the ability of black voters and the white working class to have a say over crucial matters of public policy.

**27.** The refusal to adopt restrictive measures that applied statewide, which might cast too wide a net and disqualify desirable voters,[36] meant that the state legislature had to engage in geographically targeted restrictions. In addition, Democrats in counties with large black majorities or disaffected white populations supplemented the constitutional voter qualification standards with local requirements.  These efforts, which were an attempt to protect loyal white Democrats, illustrate the use of colorblind targeting to isolate and subsequently neutralize the minority vote.  Notably, many of these restrictions emerged in large urban centers where black voters and white laborers had challenged Democratic rule.

**28.** In the 1870s and 1880s, for example, the legislature passed charters for Dallas and Houston to require that the mayor and alderman be property holders, a move that shrank the pool of potential officeholders significantly.[37]  Many of these urban centers also adopted the Australian ballot, intended to "protect" voters from outside influence by requiring they mark their ballots in private. A law that would have required the Australian ballot statewide failed, and instead, the version emerged applied the requirement to the ten largest cities but permitted election judges to assist illiterate voters.[38]  On the ground, enforcement discretion meant that election judges could assist illiterate white Democratic voters while declining to assist black voters with their ballots.  The high illiteracy rates among black voters as compared to their white counterparts made this an effective method of disenfranchisement.[39]

**29.** Similarly, an 1891 law, applicable to cities with 10,000 or people, made it easier to challenge voters at the polls, providing that "[t]he judges of election shall refuse to accept such vote of such elector unless in addition to his own oath, he proves by the oath of one well known resident of the ward, that he is a qualified voter at such election and in such ward."  Unsurprisingly, most challenged voters were either white working class or African American.[40]

**30.** That same year, the legislature also sent a proposed constitutional amendment to voters that authorized voter registration in cities of 10,000 or more people, after rejecting a proposal in 1876

---

[35] WILLIAMS, *supra* note 9, at 54-55 ("The electoral limitations mandated by the Redeemer convention allowed the propertied additional authority to determine which…purposes their wealth would be put, while preventing the manipulation of the 'floating' vote when the elite disagreed among themselves on these matters.").
[36] *Id.* at 58 (citing McKay, ed., Debates in the Texas Constitutional Convention of 1875, pp. 191-93.).
[37] *Id.* at 57.
[38] KOUSSER, *supra* note 4, at 203.
[39] In 1880, 75.9% of voting age black men were illiterate as compared to 11% of similarly situated white men. Williams, *supra* note 9, at n.8.
[40] *Id.*

that would applied voter registration statewide.[41]  In practice, this meant new restrictions concentrated in places like Dallas, Galveston, Houston, Austin, and a number of other cities in which the Republican Party no longer had a significant presence but poor whites and African Americans were still numerous enough to make the difference in close elections.[42]  The state legislature proposed this measure in 1887, but voters finally approved it following an 1891 mayoral election in Dallas in which the incumbent mayor, supported by a majority of black and working class white precincts, defeated the candidate endorsed by local Democratic leaders.[43]  Local leaders urged the legislature to resubmit the proposal to the voters, especially since voter registration requirements had proven wildly effective in suppressing the vote in other southern states during this period.[44]  The durational residency requirement imposed by the state constitution,[45] coupled with local registration and re-registration requirements, ultimately disenfranchised many minorities residing in urban areas.

**31.** Similarly, cities like Galveston and Houston shifted to at-large elections in 1895 for some government positions and made other offices appointive, eliminating the ability of minority voters concentrated in specific neighborhoods within the city from having any influence on the outcome of the elections because their vote, to the extent that it still existed, was consistently drowned out by the majority white electorate.[46]

**32.** Because of this strategic targeting by Democrats, in which voting discrimination was accomplished by regulating specific voting practices at the county level, it would take decades for the influence of minority voters to be fully eradicated from state politics.  This delay was facilitated by the discord among white voters that could not be papered over by appeals to white supremacy.  Success in statewide and most county elections after 1874 had proven insufficient to secure the Democratic Party's complete dominance in the state.  By the 1880s and 1890s, Texas Democrats realized that no constitutional or statutory restriction to keep African Americans and Latinos from voting would ever be sufficient if white people were politically divided and these voters could continue to serve as important swing blocks.[47]

---

[41] The 1869 Constitution required voter registration, and the system was subject to so much abuse that delegates to the 1875 constitutional convention rejected a similar measure.  In 1887, voters rejected a proposal that would adopt a statewide system of voter registration.  This law was finally approved in 1891.  *See* https://www.sll.texas.gov/assets/pdf/braden/26-article-vi.pdf.

[42] Williams, *supra* note 9, at 58.

[43] KOUSSER, *supra* note 4, at 203.

[44] *See* Tolson, *supra* note 6.

[45] Article VI provided that:

> Every male person…who shall have attained the age of twenty-one years, and who shall be a citizen of the United States, and who shall have resided in this State one year next preceding an election, and the last six months within the district or county in which he offers to vote, shall be deemed a qualified elector…

*Id.* at Sec. 2.  See also Dunn v. Blumstein.

[46] *Id.* at 60 ("In Galveston, where wards had continued for two decades after the end of Reconstruction to elect black and white working-class aldermen, the at-large system all but eliminated African American representation in the city's governing bodies and reduced white laborers' electoral clout.").

[47] LEWINSON, *supra* note 17, at 76-77.

**33.** To further suppress minority voting power, the Democratic Party relied on a second tactic: violence, intimidation, and voter fraud.  The party splintered into auxiliary clubs, concentrated in the black belt counties of East Texas, that worked to prevent black people from voting, limit the influence of third parties, and to facilitate the election of Democratic candidates.[48]  In south Texas, democratic political machines intimidated Latino voters, forcing them to cast ballots for Democratic candidates at threat of bodily harm and loss of employment/housing.  As the next section shows, Democrats used violence, intimidation, and voter fraud to supplement the targeted election restrictions enacted by state and local entities to eliminate the political influence of black voters and third parties by the turn of the century.

### 2.  Using Voter Fraud and Violence to Depress the Black Vote in Rural Areas

**34.** Given the difficulty of passing statewide voting restrictions because of their potential impact on white voters in safe Democratic areas, it was common for most disenfranchising efforts—both legal and extralegal—to take place at the local level.  During this period, Democratic elected officials often tampered with the ballot boxes in areas with a high percentage of black voters to minimize black political power.  For example, in 1871, Democrat D. C. Giddings ran against Republican W. T. Clarke seat for the Third District of Texas.[49] Clarke won the election and the Republican Governor, Edmund J. Davis, certified the results, but Giddings disputed the outcome.[50] According to the Governor, there were "[a]cts of violence and intimidation and armed disturbance" that prevented "such a number of qualified electors therein from voting as would have changed the result of the election in that county."[51]

**35.** For example, Giddings prevailed in one county where he earned 1,153 votes to Clarke's twenty-eight votes.[52] Similarly, in Harrison County, which had the largest black population in the state, the Governor determined that 621 voters were deterred from voting for Clarke.[53] The Governor's actions in certifying the election in favor of Clarke were heavily criticized, with *The Democratic Statesman* framing it as an "Executive manipulation of election returns" and warning that "similar practices will be resorted to in reference to the members of the next Legislature;" as such, "it behooves those who are elected to anticipate and defeat any attempt of the sort."[54] While Giddings successfully contested

---

[48] Darlene Clark Hine, *The Elusive Ballot: The Black Struggle against the Texas Democratic Primary, 1932-1945*, 81 SOUTHWESTERN HIST. Q 371, 372 (1978) (In the 1870s and 1880s, as Reconstruction concluded, whites in the black belt counties of East Texas organized clubs, unions, and associations for the express purpose of ousting blacks from local, county, and state politics…During the next quarter century, through fraud, intimidation, and murder, white democrats in counties such as Grimes, Wharton, Fort Bend, and Harrison achieved their objective, and the political complexion of those counties where black were in the numerical majority or, at least, represented sizable proportions of the total population changed as blacks were eliminated from the political system.").

[49] CHESTER H. ROWELL, HISTORICAL AND LEGAL DIGEST OF ALL THE CONTESTED ELECTION CASES IN THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES FROM THE FIRST TO THE FIFTY-SIXTH CONGRESS, 1789-1901 263 (1903).

[50] *Id.*

[51] H.R. Rep. No. 42-2, at 4-5.

[52] *Id.* at 5.

[53] *Id.*

[54] "Forewarned is to be Forearmed," *The Democratic Statesman*, Nov. 28, 1872.

the election before the House Committee on Elections and was awarded the seat, the stage was set for the scorch and burn tactics that would define elections moving forward.

**36.** With the invitation to get ahead of Republican attempts to "defraud" Democrats of their ill-gotten seats, violence against black voters predictably continued in successive election cycles, with white auxiliary organizations forming in majority-black counties like Harrison to further intimidate black voters and undercut their electoral influence.[55]  Republicans had dominated the political landscape in Harrison County, sending eleven black officials to the state legislature from 1868 until 1879, at which point conservative White Democrats formed the Citizen's Party to challenge the Republicans.[56]  In 1878, the Citizen's Party swept local elections by, according to one historian, "stuffing some boxes, playing some tricks on Negroes and partially by force."[57]  When Democrats and Republicans were at odds over counting votes from an out-of-precinct box, Democrats occupied county offices by force, seized the county judge's seal, and issued their own certificates of election.[58] In light of these events, federally-appointed supervisors oversaw Harrison County during the 1880 election and subsequently filed indictments against sixty-five men under the Enforcement Act of 1870 for fraudulently depriving black people of their voting rights during that election, in violation of the Enforcement Act of 1870.[59]  Hundreds of Black voters throughout the county testified at their trial; forty-five perpetrators pled guilty and were fined.[60]

**37.** Following the federal government's intervention in the 1880 election, the newly elected white officials in Harrison County—to evade federal intervention—adopted a two-ballot box system where one ballot box was designated for state and local elections and the other for federal elections. Because of the separate boxes, this system offered a method for perpetuating electoral fraud, with the difference in the number of votes cast in federal and state elections illustrating the number of fraudulent votes given to Democratic candidates.[61]

**38.** State races, unsurprisingly, almost always had higher turnout numbers.   The separate boxes led to widely divergent results in 1884—57% turnout for the gubernatorial election versus 47% for the presidential election.  The state-federal turnout gap increased sharply in 1886, when there was a 64% turnout rate for the gubernatorial election and only 31% for the congressional race.  By 1890, the gap decreased to 41%. After the Democrats abolished the two-box system in March 1894, the disparity dropped to 1% for the 1894 elections.[62]

---

[55] MICHAEL PERMAN, STRUGGLE FOR MASTERY, DISENFRANCHISEMENT IN THE SOUTH, 1888-1908, 290 (2001).
[56] Worth Robert Miller, "Harrison County Methods: Election Fraud in Late Nineteenth-Century Texas," LOCUS 111 (1995).
[57] *Dallas Morning News*, October 10, 1896. *See also* Brandon T. Jett, The Bloody Red River: Lynching and Racial Violence in Northeast Texas, 1890-1930 54 (2012) (dissertation on file).
[58] RANDOLPH B. CAMPBELL, A SOUTHERN COMMUNITY IN CRISIS: HARRISON COUNTY, TEXAS, 1850-1880 347-48 (1983); ALWYN BARR, RECONSTRUCTION TO REFORM: TEXAS POLITICS, 1876-1906 195 (1971).
[59] Miller, *supra* note 56.
[60] *Id.*
[61] *Id.*
[62] *Id.*

**39.** Nonetheless, the 1894 election cycle was not free of the fraud, violence and intimidation that had marked earlier elections, but outside of majority-black counties like Harrison—where Citizens Party candidates were winning races through documented violence and fraud against unsupportive black communities[63]—fraud was much more difficult to prove where the county was mostly white, and the politics splintered among several parties/factions.  In 1894, the People's Party won hundreds of local offices, twenty-two seats in the state House of Representatives, and two seats in the state Senate.[64] The party was, however, unable to win any seats at the federal level that year nor were they able to secure any statewide wins, the latter of which was understandable given that the Populists, as a minority party popular in certain areas of the state, could not muster enough votes statewide.[65]

**40.** The People's Party failed to win any of Texas' thirteen congressional seats and, unlike the statewide races, some of these losses defied any mathematical explanation, particularly in light of the margin in these contests.[66] For example, in the Sixth District congressional election (which included the urban city of Dallas and a sizeable black population), Populist Jerome C. Kearby lost to Democrat Jo Abbott by a margin of 200 votes out of over 40,000 cast; this race is illustrative of the difficulty of proving fraud in districts where the opposition party controls the election machinery.[67]  Kearby contested the Sixth District result, believing that a "great injustice" was done at both the voting and counting stages.[68]  The Committee on Elections in the House of Representatives, which resolved Kearby's election challenge, acknowledged that the Sixth District race brought up "[m]any questions" given the lag time between the casting of votes and the counting of votes; the fact that Democrats controlled all of the election machinery; and the existence of widespread irregularities.[69]  However, the existence of facts sufficient to raise questions does not necessarily prove, as historians have long

---

[63] Jett, *supra* note 57, at 55-56 ("Local whites [in Harrison County] realized that violent intimidation was an effective way to limit the political ambition of the black majority.  Furthermore, when white Democrats controlled the levers of state and local power, there was no need to fear retribution.  Local whites so thoroughly dominated local politics that no blacks represented the county in any state office after 1880 until the 1950s, when the Citizens Party finally lost political control of the county.").

[64] Cantrell & Paschal, *supra* note 24, at 31.

[65] *Id.*

[66] In the eighth congressional district, for example, Populist C. H. Jenkins lost to Democrat Charles K. Bell by a margin of 376 votes out of over 30,000 cast.  In the fourth district, Populist James H. Davis lost to Democrat David B. Culberson by a margin of 15,872 to 14,604.  In the sixth district, Populist Jerome C. Kearby lost to Democrat Jo Abbott by a margin of 200 votes out of over 40,000 cast.  In addition to these Populist candidates, Republican A.J. Rosenthal lost to Democrat Miles Crowley in the Tenth District by a margin of 1,303 votes.  *Id.* (noting that "with Populism so popular in certain regions of the state, it might reasonably be expected that the party could put together a majority in at least one of the heavily Populists districts").

[67] *Id.* at 529, 546.  A lot of election irregularities because of employers threaten employees with termination if the employee did not vote democratic; as such, it is much more subtle than fraud that occurs in the context of an election. *See* Donna A. Barnes, *People's Party*, Texas State Historical Society, available at https://www.tshaonline.org/handbook/entries/peoples-party ("In Huntsville for example, penitentiary employees who refused to pledge support for the Democratic party were discharged. Fear of job security subsequently spread through the ranks of state employees. Similar types of intimidation were experienced in the private sector.")

[68] *Dallas Morning News*, Nov. 14, 1894.

[69] ROWELL, *supra* note 49, at 546. Cantrell & Paschal, *supra* note 24, at 64.

asserted,[70] the existence of fraud in the contested congressional elections that year.  Despite the cloud of suspicion, the House of Representatives awarded the seat to Abbott.

**41.**  While the Sixth District had a small black population whose attempt to produce a fusion ticket with the Populist Kearby had failed, other counties where black voters had been able to successfully assert themselves politically told a different, more violent story.  In many of these counties, cotton had formed the backbone of the slave economy, and later, the sharecropping system, in which black farmers raised crops and/or cotton on rented land.  As a result, these areas had large black populations that, if organized, could exercise considerable political power. [71]

**42.**  In counties where the black population was large enough and willing to build coalitions with the Populist Party or any third party, Democrats framed the white Populists as opponents of white supremacy; racial issues, therefore, loomed larger in these races and violence against black voters tended to escalate accordingly.  For example, Grimes County was approximately 55 percent black at the end of the nineteenth century.  Black people in Grimes had been a significant political force in the state well after the end of Reconstruction; the community, which supported a mix of Republican and Greenback candidates, was able to retain local offices and send their candidates of choice to the state legislature for years after Reconstruction formally ended.[72] During the 1890s, these voters successfully put forward a fusion slate between the Republicans and the Populists.[73]

**43.**  In the Spring of 1899, Democrats in the County organized the White Man's Union to counter populism, eliminate black voters from the electorate, and ensure that only white Democrats would be elected to office.  The White Man's Union was stunningly effective in suppressing the political power of the black community in Grimes within a few short years.  During the 1900 mayoral election, for example, white voters cast their ballots while the Union turned away black voters, some by force.[74] The campaign of violence escalated against the black community in ensuing elections, with many African Americans arguing that the county was no longer safe given the active threats and demands to leave the county.  In July 1900, Jim Kennard, a black man, was shot by a white man (who was a known member of the Union, never prosecuted) in broad daylight in front of the county courthouse.[75] During the fall of 1901, the black populist leader, Jack Haynes, was murdered by unknown assailants at his farm.[76]

---

[70] LAWRENCE D. RICE, THE NEGRO IN TEXAS, 1874-1900 (1964); BARR, *supra* note 58.

[71] David L. Chapman, *Lynching in Texas 31* (1973) (dissertation on file) ("In Texas, over half of all lynchings occurred in counties where cotton formed the principal agricultural product.  Since the harvesting of cotton required a large amount of common labor, the percentage of Negroes in those counties ranked above the state average.").

[72] Lawrence C. Goodwyn, *Populist Dreams and Negro Rights: East Texas as a Case Study*, 76 AM. HIST. REV. 1435, 1437 (1971).

[73] *Id.* at 1437.

[74] *Id.* at 1439-40.

[75] *Id.* at 1440.

[76] *Id.* at 1441.

**44.** The effect of this violence on voter turnout was significant.  In 1898, 4500 votes had been cast in elections in Grimes County; in the 1900 elections, this number dropped to 1800, of which the People's Party received 366 votes.[77]  In Plantersville, the Populist vote fell from 256 in 1898 to 5 in 1900; in Navasota, the decline was from 120 votes to 3 votes two years later.  By this point, thousands of black voters had fled the county and others were too intimidated to show up to vote.[78]  The day after the November 1900 elections, the White Man's Union rode into Anderson, the county seat, took over the courthouse, and opened fired on the local sheriff, Garrett Scott, a white populist who had hired black deputies.  The violence in the town continued for five days, until the state guard showed up to diffuse the violence.  From that day forth, black voters were no longer a factor in a county that, a few years earlier, they effectively controlled.  And so it went in many Texas counties, particularly in those that were majority-minority and rural.

**45.** In addition to aggressive violence against duly elected fusion governments, public lynchings also became an effective mechanism to deter black people from voting in areas where their numbers were substantial.[79]  Texas ranks third in the country (behind Georgia and Mississippi) for lynchings. There were 493 lynchings in Texas from 1882 to 1962, 335 of which occurred between 1889 to 1918.[80] Among the ten counties in Texas that the Equal Justice Initiative lists as having the most lynchings from 1877-1950, most of the areas were rural with sizable black populations.  The top five, which also includes Harrison County (3) and Grimes County (5), are all rural, east Texas areas with high cotton production, large African American populations (usually 25 percent or higher), and an active Populist Party:[81]

- Anderson County (1): Number one in the state for lynchings, with 22 deaths recorded. Anderson's lynchings occurred during a July 1910 race riot near Slocum, a majority-black community within the county, which resulted in the deaths of 22 black people (reported), but estimates were as high as 200 dead.  After the Civil War, this rural county was 52 percent White and 48 percent black.[82]

- McLennan County (2): From 1860 until 1922, there were 43 lynchings in this county, with 15 of these lynchings occurring between 1877 and 1950.  Black people constituted 29 percent of the population by 1880, but they exercised very little power because former confederates infiltrated the local Republican organization in the 1870s.[83]  The infamous Giddings v. Clarke

[77] Id. at 1443
[78] FRANCIS WHITE JOHNSON, A HISTORY OF TEXAS AND TEXANS, Vol. 1 (1914).
[79] Chapman, *supra* note 71, at 31.
[80] *Id.* at 5-6.
[81] Equal Justice Initiative, *Lynching in America*, available at https://lynchinginamerica.eji.org/report/.  *See also* Jett, *supra* note 57.
[82] Georgia Kemp Caraway, *Anderson County*, Texas State Historical Society, available at https://www.tshaonline.org/handbook/entries/anderson-county.
[83] JAMES MARTEN, TEXAS DIVIDED: LOYALTY AND DISSENT IN THE LONE STAR STATE, 1856-1874 143 (2009) (noting that "The postmaster, district clerk, and sheriff of McLennan County called themselves Republicans but…refused to cooperate with the party…").

dispute over the congressional seat for Third District was based in McLennan County, which was, at various points during Reconstruction, occupied by federal troops.[84]  There was a strong Ku Klux Klan presence in this rural county, with the county seat of Waco holding a 1923 parade in which 2,000 Klansmen participated.

- Sabine County (4): Like many other east Texas counties with heavy cotton production, violence against the County's sizable black community was endemic after 1877.[85]  The black community nonetheless remained politically active, and the Populist Party carried the county in 1892 and 1896.  Rural Sabine County had the fourth largest number of lynchings in the state from 1877-early twentieth century.  In June 1908, nine black men were lynched following the murder of a white farmer.

These lynchings are indicative of how violence had become a systemic and effective deterrent for black voters.  County by county, White Democrats—organized into clubs—used force, fraud, and violence to deter black voters from casting ballots and, in some cases, to scare them into leaving the county.

46.  The 1896 election proved to be the last gasp for the People's Party, for populism writ large, and for black voters in Texas.  The gubernatorial race illustrated that fraud was not only endemic to Texas politics, but a key factor in disenfranchising and/or preventing African Americans from being the potential swing block that they had been in earlier races.  Despite his defeat in the Sixth District in 1894, Texas populists nominated Kearby for governor and he ran against Democrat Charles Culbertson in a race marked by "unprecedented violence, intimidation, and voter fraud."[86]  Culbertson won the race by 60,000 votes,[87] but his win was, in large part, because of a suspiciously large Democratic vote in the counties with large black populations.[88]  In Harrison County, for example, the two-box system was reinstated for this election and the subsequent state-federal turnout gap was 21%.[89]  In fact, the County, which had to have federal oversight of its 1880 elections because of the intimidation, fraud, and violence against black voters, consistently produced large Democratic majorities despite the fact that 68 percent of its voters were black.[90]  The 1896 election would prove to be no different.

---

[84] Vivian Elizabeth Smyrl, *McLennan County,* Texas State Historical Society, available at https://www.tshaonline.org/handbook/entries/mclennan-county.
[85] Sabine County's population breakdown by race for the period after the Civil War was not available, but in 1850, its population was 37 percent black (and enslaved).  Matthew Hayes Nall, *Sabine County,* Texas State Historical Society, available at https://www.tshaonline.org/handbook/entries/sabine-county.
[86] Cantrell & Barton, *supra* note 22, at 69 (citing Miller, "Harrison County Methods," 120-21).
[87] Worth Robert Miller, *Building a Progressive Coalition in Texas: The Populist-Reform Democrat Rapproachement*, 1900-1907, 52 J. SOUTHERN HIST. 163, 165 (1986) ("Hard-pressed Democrats responded with everything from charges of racial treason to bribery, stuffing ballot boxes, and shooting Populist organizers.").
[88] Barnes, *supra* note 67. Harrison county consistently had a 60 percent black majority until 1930.
[89] Miller, supra note 56, at 120-21.
[90] *Id.*

**47.** Like the African-American population, there was also a rural/urban divide that defined the political experience of Latino voters which, according to one scholar, meant "segregation and repression in the countryside; partial integration and patronage in the cities."[91] Indeed, the voter fraud and violence that marred the black political experience in Texas, particularly in the smaller counties, was also true for Latino voters in the late nineteenth and early twentieth century whose political strength was controlled by powerful Democratic machines.

**48.** In the South Texas counties with sizable Latino populations—Cameron, Hidalgo, Starr, and Duval, for example—the Democratic machines committed fraud using this community, by recruiting noncitizens to vote; marking ballots for illiterate voters; paying their poll taxes;[92] and, if necessary, engaging in politically motivated killings.[93]  Because the land in these counties were controlled by a handful of (mostly white) ranchers (in Cameron County (50 percent Latino), for example, two people owned 97 percent of the land in the county by 1890) or, alternatively, political bosses were able to broker deals with factions within the Democratic Party,[94] the political machines were able to deliver the votes of Mexican-Americans employed in these counties for the Democratic Party until around 1920.  In some counties, machine politics dominated as late as 1975.[95]

**49.** The neutralization of the Latino vote in south Texas, combined with the decline of populism and increasing violence against black voters, would prove to be the death knell for effective minority political participation in Texas.  While violence still occurred in the early decades of the twentieth century,[96] the violence of the mid to late nineteenth century had achieved its purpose of deterring minority voting.  By the turn of the century, the Democratic Party reclaimed ground lost to the Populists and other third-party groups, but still sought to maintain this advantage by implementing further voting restrictions that could keep the electorate white.[97]

## B.   Maintaining a White Electorate: Racial Discrimination in Texas Politics 1900-1965

---

[91] MONTEJANO, *supra* note 3, at 262-63.

[92] Alicia A. Garza, *Hidalgo County,* Texas State Historical Society, available at https://www.tshaonline.org/handbook/entries/hidalgo-county (noting that the Democratic Party retained power in Hidalgo County by using the block vote, which is "rounding up men, filling them with food and liquor, and paying their poll tax").

[93] Evan Anders, *Boss Rule and Constituent Interests: South Texas Politics during the Progressive Era,* 84 SOUTHWESTERN HIST. Q, 269 269 (1981).

[94] Alicia A. Garza, *Starr County,* Texas State Historical Society, available at https://www.tshaonline.org/handbook/entries/starr-county.

[95] Alicia A. Garza & Christopher Long, *Cameron County,* Texas State Historical Society, available at https://www.tshaonline.org/handbook/entries/cameron-county.  In the case of Duval County, the political machine run by George Parr was dominant until Parr's death in 1975.  Martin Donell Kohout, *Duval County,* Texas Historical Society, available at https://www.tshaonline.org/handbook/entries/duval-county.

[96] *See* Texas Public Radio, *Texas Matters: A History of Anti-Black Violence in Texas,* Feb. 5, 2016, available at https://www.tpr.org/show/texas-matters/2016-02-05/texas-matters-a-history-of-anti-black-violence-in-texas (detailing race riots in Slocum (1910), Waco (1916) Longview (1919), Beaumont (1943) and, more recently, the racially motivate dragging death of James Byrd.

[97] KOUSSER, *supra* note 4, at 36,

**50.** While most African Americans and Latinos had been effectively eliminated from (or rendered powerless within) the Texas electorate through fraud, violence, intimidation, and geographically specific election regulations by the turn of the century, the Texas legislature amended the state constitution with the goal of further shrinking their numbers.  The latest round of restrictions was, in part, a response to efforts by some Democratic leaders to solicit support from black voters as late as the 1890s; these new restrictions undercut these alliances.[98]  These new regulations including a statewide poll tax as well as rules that ensured that the Democratic Primary would remain a predominantly white affair.  These measures built on the efforts of late nineteenth century legislators to create an all-white electorate and maintain its racial purity.  These new laws were stunningly effective.  While 36 percent of black voters managed to cast ballots in 1902 despite widespread violence and intimidation, this number shrunk to 15 percent in 1904 and then 27 percent, 11 percent, 16 percent, and 2 percent, respectively, in successive elections.[99]

### 1. The Poll Tax and Other Restrictive Voting Measures

**51.** The 1876 constitution gave the state legislature the power to impose a poll tax; however, it was not explicitly tied to voting in the document's text.  In fact, the first poll tax was a financial measure and did not become a precondition to voting statewide until 1902.[100]  There were counties that used the poll tax prior to the 1902 law; in fact, the poll tax was common in south Texas as a means to deter and/or control voting among the majority Latino population in that area.  But the measure encountered substantial opposition when proposed as a statewide initiative.

**52.** For over twenty-five years, prominent Democrats in the Texas legislature introduced poll tax bills, but these bills failed.  Democrats in safe, majority white counties had no incentive to support a statewide restriction that could unduly impact white farmers, loyal to the party, but who had low cash incomes, relied on credit to make purchases, and could not pay a poll tax.[101]  In 1899, two leading Democrats in the state legislature, Pat M. Neff and Ashbury B. Davidson, both of whom were from counties that were almost a quarter African American, introduced an unsuccessful poll tax amendment.[102]  Neff and Davidson re-introduced the amendment to the next legislature in 1901 and successfully garnered the required two-thirds majority in both houses.[103]

**53.** Texas' proposed poll tax was not designed to be sweeping or exclude "masses of voters" because Democrats still hoped to siphon votes from Democrat-leaning third party constituents.[104]

---

[98] *Id.* at 199.

[99] *Id.* at 208.  *See also* MILLER, *supra* note 87, at 174 ("The largest opposition to disfranchisement centered in north Texas, where Populism had flourished, and along the Rio Grande, where those of Mexican heritage predominated. Eighty-one percent of those voting the Populist ticket in 1902 opposed the poll tax. The third-party vote of 1902, however, was only 5 percent of its 1896 poll.").

[100] Dick Smith, *Texas and the Poll Tax*, 45 SOUTHWESTERN SOC. SCI. Q 167, 168 (1964).

[101] J. Morgan Kousser, *Poll Tax*, THE INTERNATIONAL ENCYCLOPEDIA OF ELECTIONS (1999).

[102] PERMAN, *supra* note 55, at 291.  *See also* KOUSSER, *supra* note 4, at 204.

[103] PERMAN, *supra* note 55, at 291.

[104] *Id.* at 293.

Accordingly, this version of the poll tax was to be paid in February and was not cumulative.[105] Democrats framed the poll tax requirement as a necessary measure "to keep the purchasable voter from the polls."[106]  Black and white Republicans, as well as Populists, advocated against the tax, but this was insufficient to defeat the referendum.  Voters approved the tax by a margin of 200,650 to 107,748.[107]  Note, however, that only 41 percent of eligible voters voted in the November 1902 referendum because of the fraud, violence and intimidation that undermined or deterred black voters in counties that had sizeable black communities.  As political scientist Morgan Kousser observed,

> Whereas the Republican candidate for governor in 1902 got better than three-fourths of the estimated Negro votes, more than four-fifths of the same voters appear to have backed the poll tax.  Since it is ludicrous to assume either that Negroes voted for the tax or that black belt whites voted Republican, one can only conclude that election officers, realizing that the Democrats were safe in the gubernatorial election but fearing that the referendum might be close, changed the figures on the poll tax.[108]

**54.**  By 1903, Democrats turned their sights on finetuning the tax to ensure that it would be effective against the targeted demographic and not harm desirable voters.[109]  Former Congressman Alexander W. Terrell, the new Chair of the Texas House Committee on Elections and a long-term proponent of the poll tax, introduced and helped pass the aptly named "Terrell Election Bill" of 1903, which transformed the electoral system in the state.[110]  The poll tax, which would remain noncumulative and due six months before the election, was now a prerequisite for jury service and voting in primary and general elections.[111]  Its impact was not limited to African Americans; it also impacted Latinos (at least those Latinos whose taxes were not paid by the Democratic machine).[112] The law disenfranchised poor whites as well, as some Democratic legislators had feared.  White turnout dropped precipitously from highs of 80 percent and 62 percent in the 1900 and 1902 elections, respectively, to 46 percent (1904 elections); 27 percent (1906 elections); 39 percent (1908 elections); and 29 percent (1910 elections).[113]

**55.**  The Terrell Election Bill also made the Australian secret ballot, initially a staple in many urban areas, a statewide requirement for primary and general elections, and further provided that, only election judges could assist illiterate voters with their ballots.  Because of the high illiteracy rates among black residents and substantial number of non-English speaking Latino residents, restrictions on voter

---

[105] *Id.*

[106] *Dallas Morning News*, editorials, Oct. 6, 1902.

[107] PERMAN, *supra* note 55, at 291.  *See also* KOUSSER, *supra* note 4, at 206.

[108] KOUSSER, *supra* note 4, at 206-07.

[109] *Id.* at 294.

[110] *Id.* at 295-96.

[111] *Id.*

[112] *See* MONTEJANO, *supra* note 3, at 143 ("Terrell himself was explicit about the intent of the law; it would prevent opening 'the flood gates for illegal voting as one person could buy up the Mexican and Negro votes.' Proponents of the Terrell legislation also noted that Mexicans and blacks would either fail to pay so far in advance or lose their receipts when election time came around.").

[113] KOUSSER, *supra* note 4, at 208.

assistance disproportionately impacted these communities.[114]   Finally, the all-white Democratic primary—which was facilitated by a maze of state statutory and constitutional law; reinforced by election related fraud and violence; and importantly, served as a manifestation of a private settlement agreement between white factions that had spent decade at odds—became the defining feature of Texas politics for over half a century.  Its restrictions not only eliminated African American and Latino participation in the Democratic primary, the law also effectively shut out third parties from Texas politics until the 1950s.[115]

## 2.  The All-White Democratic Primary

**56.** In 1905, the Texas state legislature adopted a law that required a direct primary for all nominations to state, district, and county offices for parties "that cast 100,000 votes or more in the last general election;" as with its other election laws targeting a specific actor, the Democratic Party was the only party that met this criteria.[116]  This law regulated almost every aspect of the primary process, from the threshold required to win the nomination to the date of the primary.[117]  However, the law did not regulate voter qualifications; instead, it authorized county Democratic executive committees to set voter qualifications for the primary, authority that they utilized to exclude black and Latino voters from participating by requiring declarations of party loyalty and White solidarity.[118]

**57.** In 1923, Texas removed the executive committee's discretion to set voter qualifications, instead enacting a law that provided that, "In no event shall a negro be eligible to participate in a Democratic Party primary election held in the State of Texas."[119]   In a series of cases known as the *White Primary Cases*, the Supreme Court invalidated this law, and its successors, which prohibited African-American voters from participating in the Democratic Party's primary.   In *Nixon v. Herndon*, the Supreme Court struck down the 1923 law as a facially discriminatory effort by the state to disenfranchise African Americans on the basis of race in violation of the Fifteenth Amendment.

**58.** The state again tried to disenfranchise African Americans, this time re-delegating authority to the party executive committee to set voter qualification for the primary.  Shortly thereafter, the Democratic Party passed a resolution limiting participation to white voters.  The Court, in *Nixon v. Condon*, held that this effort also violated the Fifteenth Amendment, on the grounds that the executive committee had been "invested with an authority [by the State] independent of the will of the

---

[114] Texas' discrimination against illiterate voters and non-English speakers is discussed in more detail in Part V(A), *supra*.
[115] KOUSSER, *supra* note 4, at 208 ("In the 1900 presidential contest, 23 percent of the adult males in Texas voted for the Republican or Populist candidates, compared to 39 percent for the Democrats.  In 1904, after the poll tax went into effect, the combined GOP-Populist percentage dropped to 8 percent, and the opposition did not attract as many as one eligible voter in ten in any of the decade's remaining presidential or gubernatorial elections.").
[116] Weeks, *supra* note , at 96.  *See also id.* at 99 (noting that the only campaigning that occurs in the state is within the context of the Democratic Primary).
[117] *See The White Primary in Texas Since* Nixon v. Condon*, 46 Harv. L. Rev. 812, 812-13 (1933).  *See also* Smith v. Allwright, 321 U.S. 649 (1944) (noting that Texas was trying to facilitate discrimination because it regulated every aspect of the primary process except voter qualifications, which it delegated to the party to enforce).
[118] MONTEJANO, *supra* note 3, at 143.
[119] Nixon v. Herndon, 273 U.S. 536, 540 (1927) (quoting 1923 Tex. Gen. Laws 74).

association in whose name they undertake to speak," which makes them "organs of the State itself, the repositories of official power." As "governmental instruments," they, too, were bound by "the mandates of equality and liberty that bind officials everywhere."[120]

**59.** However, this promise of rigorous judicial enforcement proved to be illusory. In *Grovey v. Townsend*, the Supreme Court upheld a Texas Democratic Party resolution that limited membership to whites on the grounds that there was no direct state action that ran afoul of the Fourteenth and Fifteenth Amendments.[121] The Court refused to intervene even though it was clear that the state, which regulated almost every aspect of the primary system, left a gap in this regulatory regime to facilitate discrimination by the Democratic Party.[122] It was nothing more than a form of colorblind targeting that outsourced discrimination to third party actors, here the Democratic Party.

**60.** In the years following *Grovey*, the Supreme Court recognized that its position ignored the practical reality that minorities were being disenfranchised indirectly through the party process and the state was complicit in this disenfranchisement. In an about-face, the Court, in *U.S. v. Classic*, sustained the indictment of election commissioners who altered election returns in a primary election, and in doing so, upheld the constitutionality of federal criminal laws that prohibited anyone, acting under color of state law, from depriving an individual of any "rights, privileges and immunities secured and protected by the Constitution and laws of the United States." The Court found that the commissioners interfered with the right to vote "at the only stage of the election procedure when their choice is of significance."[123] *Classic,* and its holding that the primary is an integral part of the election for selecting congressman, opened the door for successful challenge to the all-white primary. In 1944, the Court decided *Smith v. Allwright*, which held that the Democratic Party's practice of excluding African Americans from their primary violated the Fifteenth Amendment.[124]

**61.** Despite *Smith*, the number of minority voters in Texas did not increase to its full potential because there were still other barriers to voting, including the poll tax, discrimination by local officials, and all white primaries by Democratic auxiliary groups.[125] In 1946, the first election following *Smith*, an estimated 75,000 of the 100,000 registered black voters cast ballots in the gubernatorial election, but this turnout only represented 14 percent of the eligible black voting age population in the state. This low number can be attributed, in part, to the $1.50 poll tax required to vote.[126] The all-white Democratic primary had been a key aspect of preserving the white electorate, but building a more inclusive electorate would require removing those additional barriers that had also kept the electorate white.

**62.** Over the next decade, black voters challenged a variety of other mechanisms that state and local officials used to limit their participation. In 1953, the Court decided *Terry v. Adams*, which

[120] Nixon v. Condon, 286 U.S. 73, 88 (1932).
[121] 295 U.S. 45 (1935).
[122] *See* Franita Tolson, *The Spectrum of Congressional Authority over Elections*, 99 B.U. L. REV. 317 (2019).
[123] United States v. Classic, 313 U.S. 299, 310 (1941).
[124] 321 U.S. 649 (1944).
[125] Patrick Cox, *"Nearly a Statesman": LBJ and Texas Blacks in the 1948 Election*, 74 SOC. SCI. Q. 241, 243 (1993).
[126] *Id.* at 244.

extended *Smith*'s to primaries held by county political organizations—here, the so-called "Jaybird Primary," which was held in Fort Bend County.[127]  While the Jaybirds served a similar function as other Democratic auxiliary organizations like the Citizen's Party and the White Union League that dominated local politics in the nineteenth and early twentieth centuries, the remarkably violent story behind the Jaybird Primary illuminates how racial animosity prevented the types of political coalitions once thought possible in post-Reconstruction era Texas.

**63.**  Like the Grimes County insurrection in 1899, the Jaybird Primary emerged because of violent disagreements between white political factions who were literally at war.  The Jaybirds were wealthy white Democrats who, after the Civil War, worked to retake control of the county from Republicans.  The Woodpeckers were white populists who had gained office through the support of black Republican voters.  During the election of 1888, these two factions were involved in a series of violent altercations, resulting in the death of one Jaybird leader and serious injury to another. Following these violent episodes, the Jaybirds demanded that black voters leave the county, presumably to deprive the Woodpeckers of a winning coalition on election day, but this effort failed and the Woodpeckers were re-elected to office.

**64.**  By August 1889, the two factions, after a series of skirmishes, had one last epic battle—the Battle of Richmond—resulting in heavy casualties on both sides.  As a result of this battle, the Governor reorganized county government, removed all the Woodpeckers from office, and replaced them with Jaybirds.  In October 1889, whites in Fort Bend had a mass meeting to establish an organization that would permanently maintain white control by preventing any faction from forming coalitions with black voters.  The resulting Jaybird Association controlled Fort Bend County politics and remained white-only despite *Smith*'s invalidation of the all-white Democratic primary, until *Terry v. Adams.*[128]

**65.**  Like black voters, Latinos were also casualties of the all-white primary.  Not all Latino voters were controlled by machine politicians in the early twentieth century, and some of these voters, like the black community in Fort Bend County, were targeted for exclusion by auxiliary organizations tasked with ensuring that the Democratic Primary remained all white.  In 1914, white Democrats formed the White Man's Primary Association in Dimmit County, a majority-Latino county in south Texas, to eliminate the ability of Mexican American voters to have any influence in nominating county candidates.  The manipulation of the Latino vote by prominent Democrats, their propensity for "corruption [and] ignorance," and concerns for "the purity of Anglo women" were all excuses used to justify the exclusion of Latino voters from the nomination process; in reality, the changing demographics of the county prompted this change.[129]  Latinos had become numerous enough to form coalitions with large landowners and undermine the interests of the small farmers, prompting new

---

[127] 345 U.S. 461 (1953).
[128] Pauline Yelderman, *Jaybird-Woodpecker War,* Texas State Historical Society, available at https://www.tshaonline.org/handbook/entries/jaybird-woodpecker-war.
[129] MONTEJANO, *supra* note 3, at 144.

efforts to disenfranchise this community.[130]  Similar to the Jaybird Primary, the White Man's Primary was the only process that mattered for the selection and election of candidates for local office; the exclusion of Latinos from this primary ensured their exclusion from Dimmit County politics for a generation.

66.  Thanks to the complex web of exclusionary laws, practices, and norms, Texas remained a one-party state with one of the country's largest congressional delegations at key points during the twentieth century—a delegation that was almost uniform in its opposition to civil and political rights for blacks and Latinos, directly impacting national politics and policies for decades.  Many key committees in Congress were chaired by Texans, who used their outsized authority to filibuster civil rights legislation or bury it in committee.[131]  This opposition to civil rights was a key tenet of almost every Democratic campaign in Texas from Reconstruction to the 1960s, years after black voters sued and won for the right to participate in the all-white primary.[132]

### 3.  Minority Vote Dilution in Texas

67.  Integral to voter suppression in Texas has been the use of electoral structures that dilute the voting strength of minority populations.  For example, the eradication of the all-white primary was a key step towards integrating minority voters into the fabric of Texas' political system; however, Texas retained multi-member districts and a strict "majority" vote requirement that strengthened the majority's ability to submerge these voters such that they could never elect their candidate of choice, despite being able to nominally participate in the Democratic Primary.

68.  In a multi-member district election, voters can cast one vote for each slot available (so if a district elects two representatives, for example, a voter will cast one vote for each seat).  In *Fortson v. Dortsey*, the Supreme Court suggested that multimember districts could violate the Fourteenth Amendment because of how they could operate to dilute the political power of minority communities; in *White v. Register*, discussed below, the Court went further, invalidating multimember districts in Bexar and Dallas Counties.[133]

69.  Similarly, a majority vote requirement provides that if no candidate receives a majority of the votes in the primary, a runoff is held between the two highest vote getters.  This requirement was very common in southern states during the Jim Crow era, a response to the factions that had split from the Democratic Party to join the populist movements in the 1870s and 1880s.  According to prominent voting rights scholar Laughlin McDonald, majority vote rules help ensure that white voters remained in lockstep:

---

[130] Id. at 145 ("The WMPA [White Man's Primary Association], by forcing candidates to limit their appeal to the Anglo community, guaranteed that no paternalistic alliance between large landowners and Mexican workers would disturb or restrain the influence of the small farmers. …the WMPA was the mechanism by which small farmers assured their control over the development of the region.").

[131] DAVIDSON, *supra* note 8.

[132] 379 U.S. 433 (1965).

[133] 412 U.S. 755 (1973).

The purpose of the direct primary, with its majority vote and runoff features, was to ensure white Democratic political unity and dominance. Nomination by political bosses at a convention or caucus, as well as nomination by a small plurality in a primary, created a considerable risk that the discontented would bolt the party and vote Republican in the general election or leave southern whites split into warring factions and politically impotent. However, the runoff primary system insured that the nominee of the Democratic party had broad-based consensus support. With the demise of two-party politics in the South and the general disfranchisement of blacks, the system further insured that the Democratic nominee, almost always white, would invariably win in the general election.[134]

**70.** If voting is racially polarized (or, where white and minority voters prefer different candidates), the runoff structure allows white voters who may have split among different candidates in the primary to coalesce behind one candidate at the runoff stage and defeat the plurality winner of the primary (who might have been the preferred candidate of minority voters).[135]

**71.** While the Supreme Court has never directly resolved the constitutionality of majority vote requirements nor has it definitively held that using multimember districts constitute a *per se* constitutional violation, it has recognized that the use of these tools can, in certain situations, cause unconstitutional minority vote dilution. In *White v. Regester*, the Court held that the use of multi-member districts in Dallas and Bexar Counties, when considered in the broader context of election rules designed exclude African Americans and Latinos from the Texas electorate, violated the Fourteenth Amendment. At the time of the 1973 decision in *White*, these groups were sizable enough to elect their candidate of choice if placed in single member districts. Because of racially polarized voting, the use of the multimember district essentially negated the black and Latino vote in each county, submerging them into a majority white electorate that could elect all the representatives.[136]

**72.** The *White* Court argued that minorities in Bexar and Dallas Counties "had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice."[137] It placed great weight on the history of official discrimination in Texas in finding

---

[134] Laughlin McDonald, *The Majority Vote Requirement: Its Use and Abuse in the South,* 17 URBAN LAWYER 429, 431 (1985).

[135] Laughlin McDonald describes one such incident in the Democratic primary for the Second Congressional District of North Carolina:

> One often cited example of the discriminatory effect of the majority vote rule is the candidacy of H.M. (Mickey) Michaux in the 1982 Democratic primary for the Second Congressional District of North Carolina. Michaux, a black and former United States attorney, won the primary with 44 percent of the votes. Two white opponents, Tim Valentine and James Ramsey, got 33 percent and 23 percent of the votes, respectively. In the mandatory runoff, Michaux increased his vote to 46 percent, but whites regrouped behind Valentine who received 54 percent of the votes and the party's nomination. Valentine went on to defeat the Republican nominee in the general election.

*Id.* at 432.

[136] *See* White v. Regester, 412 U.S. 755, 768 (1973) (noting that Latinos were 29 percent of Bexar County's population). *See also* City of Port Arthur v. United States, 459 U.S. 159 (1983) (affirming use of a combination of multimember and single member districts for city council elections in Port Arthur, provided that the city eliminates its majority vote requirement).

[137] *White,* 412 U.S. at 766.

that the state had acted with discriminatory purpose, and much of this evidence was not limited to discrimination in politics.[138] The Court also found that other characteristics of the Texas system— "requiring a majority vote as a prerequisite to nomination in a primary election"; "the so-called 'place' rule limiting candidacy for legislative office from a multi-member district to a specified 'place' on the ticket"; and powerful, white-dominated slating organizations—made racial discrimination more likely.[139]

**73.** As the *White* decision illustrates, the Democratic Party, by the mid-twentieth century, employed a number of facially race neutral voting restrictions that, in totality, ensured: 1) that all disputes would be filtered into the Democratic Party primary process rather than as interparty competition between multiple parties; 2) that factions within the party could not form coalitions with black and Latino voters; and 3) that the political power of minority voters would be diluted through both restrictive rules and the redistricting process.[140]  In sum, Texas adopted a variety of laws to keep the electorate predominantly white prior to the adoption of the Voting Rights Act of 1965.

## C.   Resisting A Diverse Electorate: 1965 to the Present

**74.** Over the course of the twentieth century, Latino voters displaced African Americans as the dominant minority within the state of Texas.  In 1910, Latinos had been only about 7% of Texas's population whereas African Americans, most of whom descended from individuals who had been enslaved in the state, were approximately a third of the population from the Civil War era until the Great Migration of the late nineteenth/early twentieth century.  Over the course of the twentieth century, the Latino population increased exponentially; as of 2020, Latinos accounted for almost 40% of Texas' population (and African Americans approximately 12.9 percent).[141]  In addition, African Americans have tended to be politically cohesive, but Latinos have been more politically diverse.  In the 2020 election, for example, Latino voters were 23 percent of the Texas electorate and supported President Joe Biden to former President Donald Trump, 59 percent to 41 percent.[142]  In contrast, African Americans (13.4 percent of the electorate) supported President Biden over former President Trump, 89 percent to 11 percent.[143]

---

[138] *See id.* at 768 (finding that Hispanics in Texas "had long 'suffered from, and continue[] to suffer from, the results and effects of invidious discrimination and treatment in the fields of education, employment, economics, health, politics[,] and others'" (quoting Graves v. Barnes, 343 F. Supp. 704, 728 (W.D. Tex. 1972), *aff'd in part, rev'd in part sub nom. White*, 412 U.S. 755)).

[139] *See id.* at  766–67.

[140] O. Douglas Weeks, *The Texas Direct Primary System*, 13 SOUTHWESTERN SOC. SCI. Q. 95, 95 (1932) ("The Democratic party is, indeed, not a party in the true sense of the term, at least for state and local purposes, but is rather a state-within-a-state. The voter who does not participate in its primaries and precinct conventions is a voter only in name, for he deprives himself of any share in the choice of public officials.").

[141] U.S. Dep't of Com., U.S. Census Bureau, available at https://www.census.gov/quickfacts/fact/table/TX/POP010210.

[142] Holly K. Sonneland, *Chart: How U.S. Latinos Voted in the 2020 Presidential Election*, AS/COA, Nov. 5, 2020, available at https://www.as-coa.org/articles/chart-how-us-latinos-voted-2020-presidential-election.

[143] Jakob Rodriguez, *Here's how Texans voted in the 2020 election by age, race and more, according to AP's VoteCast,* KSAT.COM, available at https://www.ksat.com/news/local/2020/11/04/heres-how-texans-voted-in-the-2020-election-by-age-race-and-more-according-to-aps-votecast/.

**75.** As the Republican Party became ascendent in Texas, following a political realignment that started in the mid-1960s, it co-opted many of the discriminatory techniques and methods that had been common during the heyday of one-party Democratic rule in the state.[144]   Since 1965, the state of Texas has engaged in a number of tactics, both at the state and local level, to disenfranchise its growing minority population.   For example, the Twenty Fourth Amendment, enacted in 1966, invalidated the poll tax for federal elections; two years later, the Supreme Court invalidated the poll tax for state elections.[145]   In response, Texas amended its constitution to require voters to register annually during a four-month period ending January 31st of each election year.   In *Beare v. Smith,*[146] a federal district court invalidated this law, describing it as a "direct descendant of the poll tax" given that it adopted all the features of the tax except for requiring payment:

> The closing of registration so far in advance of the general election, in the years one is held, perpetuates the obstacles the <u>twenty-fourth amendment</u> prohibits. The evidence presented in this case shows that if the annual registration obstacle were removed over one million Texans would be eligible to vote that would not have been eligible with that requirement.[147]

**76.** There has not been a decade since the adoption of the Voting Rights Act of 1965 that Texas has not been sued for racial discrimination in voting or denied preclearance by the DOJ for certain discriminatory voting practices that seek to mimic the exclusionary impact of invalidated practices like the poll tax.   The next section details some of these DOJ preclearance denials, involving several practices that use colorblind targeting to single out minority populations for disenfranchisement.

### 1.   Section 5 Objections in Texas from 1975 to 2013

**77.** Texas, despite its long history of racial discrimination in voting, did not become a covered jurisdiction under Section 5 of the Voting Rights Act until 1975, ten years after the statute's enactment. Sections 4(b) and 5 of the Act suspended all changes to state election laws in covered jurisdictions, including nondiscriminatory voter qualification standards and procedural regulations that govern state elections.   Sections 4(e), 4(f)(4), and 203 require these jurisdictions to provide voting materials in their native language to voters who have limited English proficiency.   At the time that Texas became a covered jurisdiction: (1) Latinos comprised over 5% of the voting population; (2) election materials were available in English only; and (3) less than 50% of voting-age citizens were registered to vote or had voted in the 1972 election.[148]   These factors triggered coverage for Texas under the preclearance regime of Section 5.

---

[144] *See generally* Danny Hayes & Seth C. McKee, *Toward A One-Party South?*, in RICHARD M. VALELLY, ED., PRINCETON READINGS IN AMERICAN POLITICS (2009); Alan I. Abramowitz & Kyle L. Saunders, *Ideological Realignment in the U.S. Electorate,* 60 J. POL. 634 (1998).
[145] Harper v. Va. St. Bd. of Elecs., 383 U.S. 663 (1966).
[146] 321 F. Supp. 1100 (S.D. Tex. 1971).
[147] *Id.* at 1103.
[148] *Partial List of Determinations*, 40 Fed. Reg. 49,422 (Oct.  22, 1975); *Partial List of Determinations*, 40 Fed. Reg. 43,746 (Sept. 23, 1975).

**78.** From 1975 until 2013, the DOJ has issued 211 Section 5 objections to proposed election changes in Texas.[149]   For the period 1982 to 2006, Texas had 107 objections, second to only Mississippi; ten of these objections were for statewide changes.[150]   The DOJ's objections to Texas's proposals mainly pertained to four activities: redistricting, annexations, changes to the method of election, and changes to voting procedures.   Many of the practices that were not precleared involved colorblind targeting and minority vote dilution.   According to a comprehensive report on voting rights in Texas from 1982-2006, specific examples of DOJ objections include:

- discriminatory use of numbered posts and staggered terms that ensured a majority—or even a plurality—of non-Hispanic white voters continued to be overrepresented in elected office;

- discriminatory implementation of majority vote and/or runoff requirements;

- polling place or election date changes that deny minorities equal voting opportunities;

- discriminatory absentee voting practices;

- discriminatory annexations or deannexations;

- dissolution of single member districts, reductions in the number of offices, or revocation of voting rules when the candidates preferred by minorities are about to be elected to office;

- election procedures that violate Section 203 of the Voting Rights Act;[151] and

- discriminatory redistricting practices that deny minorities an equal opportunity to elect their chosen candidates.[152]

Between 1982 and 2006, Texas led the nation in Section 2 and Section 5 violations.[153]   Similarly, of the 101 counties required to have voting materials for those who lack English proficiency, 80 percent failed to show that they complied with Section 203.[154]

**79.** Despite being subject to preclearance, Texas and its political subdivisions have consistently updated their discriminatory tactics, seeking to disenfranchise or dilute the political power of minority communities through methods old and new.   For example, in 1978, Latino plaintiffs sued the city of Seguin for failing to redistrict in accordance with the 1970 census results.[155]   The plaintiffs sought to

---

[149] *See Department of Justice Voting Determination Letters for Texas*, available at https://www.justice.gov/crt/voting-determination-letters-texas (last visited February 5, 2022) (listing subject matter and dates for all Section 5 objection letters issued for Texas).

[150] Nina Perales, Luis Figueroa, & Criselda G. Rivas, *Voting Rights in Texas: 1982-2006*, 17 S. CAL. L. & SOC. JUSTICE 713 (2008).

[151] Section 203 violations are ongoing.   In 2016, MALDEF found that many counties in Texas failed to provide the required materials under Section 203. *See* United States Commission on Civil Rights, *An Assessment of Minority Voting Rights Access in the United States: 2018 Statutory Report*.

[152] Perales et al., *supra* note 150, at 713.

[153] *Id.*

[154] *Id.* at 715.

[155] *See* Ramos v. Koebig, 638 F.2d 838, 840 (5th Cir. 1981).

enjoin the city council and city secretary from conducting the 1978 election based on an outdated districting plan.[156] The district court enjoined the election and approved a new redistricting plan submitted by the city council.[157] The plaintiffs filed a second lawsuit to block the newly approved plan from going into effect, believing that it needed DOJ preclearance.[158] The Fifth Circuit ruled that preclearance was required for the redistricting plan.[159]

**80.** But even after the 1980 and 1990 censuses, the city failed to redistrict until Latino plaintiffs successfully sued a third time and settled with the city to create eight single-member districts.[160] After the 2000 Census, Seguin redistricted but split the Latino population into different districts to maintain a majority-White city council.[161] When the DOJ refused to preclear the plan, Seguin corrected its redistricting plan, but closed the candidate filing period to prevent other candidates from entering the race after the plan was approved.[162] Latino plaintiffs sued a fourth time, secured an injunction, and settled after setting a new election date.[163] This example illustrates how jurisdictions within Texas consistently and defiantly circumvented the protections of the VRA, forcing plaintiffs to expend time and resources over the course of four decades to protect minority political power.

**81.** The state of Texas, like its localities, has also been defiant in its attempt to protect a shrinking white majority from the onslaught of demographic change; indeed, the demise of the preclearance regime has only exacerbated this situation.  In 2013, the Supreme Court invalidated the coverage formula of Section 4(b) of the Voting Rights Act, neutering the regime that had, for almost 50 years, successfully required Texas and other southern states to preclear laws that could potentially undermine minority voting rights with the federal government for approval.[164] The last state-wide proposal to be denied preclearance concerned the new voter registration and ID requirements proposed in S.B. 14 (2011).  S.B. 14 required individuals to present a valid driver's license or a personal ID card issued by the Texas Department of Public Safety (DPS) for in-person voting.[165] In refusing to preclear this proposal, the DOJ reviewed data from the DPS indicating that a Hispanic voter was 46.5% to 120% more likely than a non-Hispanic voter to lack the required type of ID.[166] Additionally, only two-thirds of Texas' counties had operational driver's license offices and even fewer were open for extended

---

[156] *Id.*
[157] *Id.* at 841.
[158] *Id.*
[159] *See id.* at 844–45; Trinidad v. Koebig, 638 F.2d 846, 847-48 (5th Cir. 1981).
[160] League of United Latin Am. Citizens Council #682 v. City of Seguin, No.  93-0333 (W.D. Tex.  1994).
[161] *See* Complaint at 5–7, League of United Latin Am. Citizens v. City of Seguin, No. 5:02-cv00369-OLG-ECP (W.D. Tex. Apr. 12, 2002).
[162] *See id.* at 6.
[163] League of United Latin Am. Citizens v. City of Seguin, No.  5:02-cv-00369-OLG-ECP (W.D. Tex.  Apr. 30, 2002) (order granting preliminary injunction).
[164] Shelby County v. Holder, 570 U.S. 529 (2013).
[165] *Id.* at 2.
[166] *See* Letter from Thomas E. Perez, Assistant Attorney Gen., Civil Rights Div., Dep't of Justice, to Keith Ingram, Director of Elections, Tex. Elections Division, 2-3 (Mar. 12, 2012).

hours.[167] As such, the new ID requirement disproportionately burdened those with limited access to transportation or a DPS office during its hours of operation.[168]

**82.** In *Veasey v. Perry*, a federal district court struck down Texas' voter identification law on both statutory (Section 2 of the Voting Rights Act) and constitutional grounds. In addition to Texas' history of official discrimination, the court found that Texas intentionally discriminated against Latinos and African Americans in enacting its photo ID law for a number of reasons, including the tenuousness of the state's policy justification (that the law was need to address voter fraud); the law's racially disparate impact; and the legislature's departures from its established procedures in passing the law.[169] Indeed, the state legislature knew that adopting the voter identification law would be an instance of colorblind targeting given the law's impact on indigents, a group that is disproportionately minority.[170] The Fifth Circuit, hearing the case *en banc*, affirmed the district court's holding that the law violated Section 2 of the Voting Rights Act.[171]

**83.** Texas has the dubious distinction of having at least one jurisdiction that is still subject to the preclearance requirement despite the Supreme Court's *Shelby County* decision. In the 2018 case of *Patino v. City of Pasadena*, a federal district court invalidated a 2014 city council plan that changed the city of Pasadena, Texas from eight single member districts to six single member districts and two at-large districts. Notably, the court held that the city acted with discriminatory intent towards Latinos in violation of Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments. Because of these findings, the court concluded that the City should again be subject to the preclearance requirement under section 3(c) of the VRA and must submit any future changes to its redistricting plan to the Department of Justice for preclearance before those changes can go into effect.[172] In the *Patino* case, the court's decision to place the city back into preclearance was relatively straightforward because of its intentionally discriminatory actions. However, the city's blatantly discriminatory behavior should not obscure that changes to the method of election—the type of colorblind targeting that has been endemic in Texas since the end of Reconstruction—continue to abridge the voting rights of minorities to this day.[173]

---

[167] *Id.* at 4.

[168] *Id.* at 5.

[169] *Veasey v. Perry*, 71 F. Supp. 2d 627 (S.D. Tex. 2015).

[170] *Id.* at 701 ("Proponents of SB 14 claimed that it was modeled after voter ID laws in Georgia and Indiana which had passed constitutional and VRA muster. However, SB 14 was a material departure from those other state laws, was openly understood to be "the strictest photo ID law in the country, and it lacked any accommodations for indigents, who the legislature knew were disproportionately African-American and Latino.").

[171] *Id.* (affirming the statutory holding but reversing on the constitutional claims). Texas passed an updated version of its law in 2017 that allowed voters who lacked the permissible ID to vote after signing an affidavit declaring that there was a reasonable impediment preventing them from obtaining the required ID. *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016). The Fifth Circuit upheld the revised law against statutory and constitutional challenges. Veasey v. Abbott, 888 F.3d 792 (5th Cir. 2018).

[172] Although the coverage formula of Section 4(b) was invalidated in *Shelby County v. Holder*, 570 U.S. 529 (2013), the pocket trigger of Section 3(c) remains in effect. Thus, if a jurisdiction is found guilty of intentional discrimination in voting, it can be bailed into the preclearance regime.

[173] *See* Asian Americans Advancing Justice (AAAJ), *Practice Based Preclearance: Protecting Against Tactics Persistently Used to Silence Minority Communities' Votes*, Nov. 2019, *available at* https://tinyurl.com/d5nuzecv ("Since 1957, there have been at least 1,753 legal and advocacy actions that successfully overturned a discriminatory change in method of election because of its discriminatory intent or effects.")

### 2.  Recent Voting Rights Act Litigation Against Texas

**84.** The racialized nature of partisan disputes in Texas—in which the state has used colorblind targeting and partisan gerrymandering to burden the voting rights of minorities—has been a reoccurring issue in litigation under the VRA for at least four decades.  Similar to its efforts to dissuade white voters from forming coalitions with minority voters by adopting the all-white Democratic Primary, Texas has utilized racial and partisan gerrymandering in the 2000 and 2010 redistricting cycles for similar purposes: to make it difficult for racial groups to elect their preferred candidates, and/or to prevent them from forming coalitions with white voters willing to crossover and vote for the candidate preferred by the minority group.[174]

**85.** For example, in 2003, after the Republicans gained control of both houses of the state legislature, they redistricted both the state legislative districts and the congressional districts mid-decade.  The Supreme Court, in *League of United Latin Am. Citizens v. Perry*, held that the mid-decade character of the 2003 plan, which the plaintiffs argued was solely motivated by partisan gain, did not violate the Constitution.  However, the Court held that the legislature's dismantling of a majority-Latino district—District 23—violated Section 2 of the Voting Rights Act.  Importantly, the legislature violated Section 2 even though they dismantled the district, in part, to protect an increasingly unpopular Republican incumbent, Henry Bonilla, who was losing support among the majority-Latino electorate.  However, incumbency protection could not trump the right of Latinos to select their candidate of choice; indeed, the Court concluded that:

> In essence the State took away the Latinos' opportunity because Latinos were about to exercise it.  This bears the mark of intentional discrimination that could give rise to an equal protection violation.  Even if we accept the District Court's finding that the State's action was taken primarily for political, not racial reasons, the redrawing of the district lines was damaging to the Latinos in District 23.[175]

In other words, gerrymandering that "undermined the progress of a racial group that has been increasingly subject to significant voting-related discrimination and that as becoming increasingly politically active and cohesive" crossed the line into the "excessive" partisan gerrymandering that most of the justices agree would violate the Constitution.[176]

---

[174] Currently, there is litigation pending against Texas for its redistricting plan generated after the 2020 census, claiming that this plan, like the 2000 and 2010 plans before it, discriminates against minority voters.  Alexa Ura, *Federal judges won't halt Texas primary in state Senate district being challenged for alleged discrimination,* TEXAS TRIBUNE, Feb. 1, 2022, available at https://www.texastribune.org/2022/02/01/texas-redistricting-lawsuit-primary/.

[175] *Id.* at 440.

[176] In fact, in *LULAC,* Justice Kennedy conceded that incumbency protection, an inherently partisan consideration, can be a legitimate factor in districting, but observed that context matters:

> If the justification for incumbency protection is to keep the constituency intact so the officeholder is accountable for promises made or broken, then the protection seems to accord with concern for the voters.  If, on the other hand, incumbency protection means excluding some voters from the district simply because they are likely to vote against the officeholder, the change is to benefit the officeholder, not the voters.  By purposely redrawing lines around those who opposed Bonilla, the state legislature took the latter course.  This policy, whatever its validity in the realm of politics, cannot justify the effect on Latino voters.

**86.** Texas has a pattern of engaging in partisan and racial gerrymandering that undermines the political power of minority groups, seeking to insulate its actions on the grounds that they were undertaken for partisan, rather, than racial reasons.[177]  Following the 2010 round of redistricting, Texas adopted congressional redistricting plans that were blocked by a federal district court, and subsequently never used, after the court found that the minorities were worse off under the state's proposed plan that explicitly failed to protect coalition and crossover districts in which minorities could elect their candidate of choice with the help of white voters.[178]  In addition, the district court specifically found that Texas acted with discriminatory intent in enacting its 2011 plan, rejecting Texas' defense that it was motivated by partisan, rather than racial, considerations.[179]

**87.** The history of discrimination in Texas corroborates that partisan affiliation has long been a proxy for race that the state has exploited to discriminate against minority communities.  For example, throughout most of the late nineteenth and early twentieth centuries, seventy-five percent of the fledgling Republican Party in the state were made up of black voters.[180]  Today's parties remain just as racially polarized.  Sixty-five percent of white voters in Texas supported Republican presidential candidate Donald Trump in 2020, and eighty-nine percent of black voters and sixty-seven percent of Latino voters supported the Democratic nominee, Joe Biden.[181]  By focusing on partisan affiliation instead of race, the state has used and can use colorblind targeting to target and subsequently, disenfranchise, racial minorities.

## VI.    The 2020 Election Cycle in Texas

**88.**  As the prior sections show, race neutral voting restrictions instituted at the state level were successful in curbing minority and third-party voting power in large, urban centers like Dallas, Houston, and Galveston during the nineteenth century.  Violence, intimidation, and voter fraud were also effective in suppressing black and Latino voters, particularly in more rural areas.  Once the minority population was sufficiently diminished at the turn of the century, voting restrictions, like those instituting a statewide poll tax and governing the all-white primary, became more centralized, applying to urban and rural areas alike.  For decades, Texas has continued its efforts to undermine minority power—through onerous voter registration requirements, majority vote rules, unfavorable redistricting plans, stringent voter ID requirements, etc.—consistently resisting the slow and steady march towards an inclusive democracy.

---

*LULAC,* 548 U.S. at 441.

[177] *See, e.g.,* Abbott v. Perez, 138 S. Ct. 2305 (2018).

[178] Texas v. United States, 887 F. Supp. 2d 133, 147 (D.D.C. 2012).

[179] *Id.* at 160 (inferring discriminatory intent from the fact that the legislature made substantial changes to minority opportunity districts that were not made to white districts including the removal of economic centers, the congressional representative's district office, departures from its normal decisionmaking process, and the exclusion of minority elected officials from the process of drawing new maps).

[180] *See* Part V(A)(1), *supra.*

[181] Jakob Rodriguez, *Here's how Texans voted in the 2020 election by age, race and more, according to AP's VoteCast,* KSAT.COM, available at https://www.ksat.com/news/local/2020/11/04/heres-how-texans-voted-in-the-2020-election-by-age-race-and-more-according-to-aps-votecast/.

**89.** Most of these restrictions protected the predominantly white electorate from a growing number of Latino and black voters who sought to use the political power that their numbers should have guaranteed them. While the state's tactics may have changed over the years, the overall goal of keeping the electorate majority-white has not. In fact, Texas and/or its political subdivisions have a recent history of discriminating against minority voters through colorblind targeting and dilutive practices, just as in the past.[182] For example, in 2004, the Waller County District Attorney threatened to arrest student voters at the historically black college, Prairie View A & M University, by falsely claiming that students could not legally vote using their university addresses.[183] In fall 2018, the NAACP LDF sued Waller County after it assigned fewer early voting hours to the university than it assigned to other areas of the county.[184] Waller County has a history of targeting this historically black college, further highlighting how Texas officials have used proxies to disenfranchise or deter voters of color that are more likely to vote in opposition to the majority party.

**90.** Similarly, in 2019, after historic turnout among Latino voters in the 2018 midterm election,[185] the Texas Secretary of State threatened to purge approximately 98,000 voters from the rolls on the basis that they might not be U.S. citizens, a move that would have disproportionately affected Latino voters. A federal court enjoined the Advisory, and Texas officials later admitted that the majority of voters on the purge list were all naturalized U.S. citizens.[186] Using "race" neutral proxies, such as citizenship or geographic location (i.e., HBCUs), to discriminate against minority voters mimics the tactics of Gilded and Jim Crow era politics, where the proxies tended to be urban v. rural, felony status, literacy rates, etc. This use of colorblind targeting has not only survived in Texas, but SB 1 is the heir to these earlier, disenfranchising practices.

### A. Pre-2020 Election Changes

---

[182] *See* Part V(C)(2).

[183] Ralph Blumenthal, *2 Voter Rights Cases, One Gripping a College Town, Stir Texas,* N.Y. TIMES, May 28, 2008, available at https://www.nytimes.com/2008/05/28/us/28texas.html.

[184] *See* Allen v. Waller County, Tx., 18-cv-03985 (S.D. Tx. July 15, 2020) (denying defendant's motion for summary judgment).

[185] Suzanne Gamboa & Nicole Acevedo, *Youth, Latino mobilization paid off in the midterms. Now groups gear up for 2020.*, NBC NEWS, Nov. 12, 2018, available at https://www.nbcnews.com/news/latino/youth-latino-mobilization-paid-midterms-now-groups- gear-2020-n934516.

[186] *See* Texas Secretary of State, Election Advisory No. 2019-02; Settlement Agreement, *Tex. League of United Latin Am. Citizens v. Whitley*, No. SA-19-CA-074-FB (W.D. Tex., case filed Jan. 20, 2019), https://campaignlegal.org/sites/default/files/2019- 04/Agrmt%20all%20signatures.pdf; *see also,* National Public Radio, *Texas Officials Begin Walking Back Allegations About Noncitizen Voters,* CPR NEWS, Jan. 30, 2019, available at https://www.cpr.org/2019/01/30/texas-officials-begin-walking-back-allegations-about- noncitizen-voters/. Settlement Agreement, *Tex. League of United Latin American Citizens v. Whitley*, No. SA-19- CA-074-FB, (W.D. Tex.), at https://static.texastribune.org/media/files/411cff760b0b2b79a159b2390ef3f939/Voter_rolls_settl ement_agreement.pdf?_ga=2.52669679.637990502.1618250800-1075633374.1617978724. *See Texas LULAC v. Whitley*, 2019 WL 7938511 (W.D. Tex. Feb. 27, 2019).

**91.** Before SB 1 was enacted, Texas had achieved yet another dubious distinction: being the hardest state to cast a ballot in the country.[187]  By intent or design, its election infrastructure has not been able to accommodate its explosive population growth.  From 2010 to 2020, Texas' population grew by over 4 million people, with Latinos (49.5 percent), Asian Americans (16 percent), and African Americans (15 percent) making up almost all of the population growth in Texas over the last decade; white people were only five percent of the growth in the state.[188]  Harris County led the country in overall population growth, with Tarrant (6), Bexar (7), and Dallas (8) counties all placing in the top ten;[189] notably, the majority of voters in all of these counties supported President Joe Biden, a Democrat, in the 2020 election.[190]

**92.** Despite its burgeoning electorate, Texas has been resistant to updating its system of elections; instead, the state made it more difficult to cast a ballot from 2010 to 2020.  In addition to adopting one of the most restrictive voter ID laws in the country in 2013,[191] the state legislature passed a 2019 law that prohibited counties from establishing mobile early voting locations, a practice that had reduced wait times predominantly minority, urban areas.[192]  Part of the reason that waiting times had substantially increased is because Texas closed 750 polling place locations over the course of the decade, or about 50 percent of its total number.  Like the prohibition on mobile early voting locations, these closures harmed majority-minority counties the most.  According to news accounts:

> [T]he 50 counties that gained the most Black and Latinx residents between 2012 and 2018 closed 542 polling sites, compared to just 34 closures in the 50 counties that have gained the fewest black and Latinx residents. This is despite the fact that the population in the former group of counties has risen by 2.5 million people, whereas in the latter category the total population has fallen by over 13,000."[193]  Closures resulted in a near doubling of the average

---

[187] *See* Ross Ramsey, *Analysis: It's harder to vote in Texas than in any other state,* TEX. TRIBUNE, Oct. 19, 2020, available at https://www.texastribune.org/2020/10/19/texas-voting-elections/.

[188] *See* Steve Taylor, *Perales Population changes in Texas are quite stunning,* RIO GRANDE GUARDIAN, Aug. 26, 2021, available at https://riograndeguardian.com/perales-population-changes-in-texas-are-quite-stunning/#:~:text=According%20to%20the%20Census%20Bureau,Less%20than%20five%20percent.  *See also* Veasey v. Perry, 71 F. Supp. 3d 627, 700 (S.D. Tx. 2014) ("Hispanics and African-Americans accounted for 78.7% of Texas's total population growth between 2000 and 2010. In addition, it was during this time that Texas first became a majority-minority state, with Anglos no longer comprising a majority of the state's population.").

[189] Heather Leighton, *Four Texas counties had the highest numeric growth in America, according to new Census numbers,* URBAN EDGE BLOG, Apr. 19, 2019, available at https://kinder.rice.edu/urbanedge/2019/04/18/fastest-growing-texas-counties-cities-census-bureau

[190] 2020 Election Results, Tarrant County, available at https://www.tarrantcounty.com/content/dam/main/elections/2020/1120/reports/cumulative.pdf;  2020 Election Results, Dallas County, available at https://results.enr.clarityelections.com/TX/Dallas/106273/web.264614/#/summary; Mark Dunphy, *How Bexar County and surrounding counties voted in the 2020 presidential election,* MYSA, Oct. 30, 2020, available at https://www.mysanantonio.com/news/local/politics/slideshow/Coronavirus-cases-in-nearby-counties-7-day-212112.php; 2020 Election Results, Harris County, https://www.click2houston.com/decision-2020/2020/10/29/harris-county-decision-2020-election-results/.

[191] *See* Part V(C)(1), *supra*.

[192] Plaintiffs' Amended Complaint, La Union Del Pueblo Entero v. Abbott, 21 CV 844, at 8.

[193] *Id.* at 8 (citing Richard Salame, *Texas closes hundreds of polling sites, making it harder for minorities to vote,* THE GUARDIAN, Mar. 2, 2020, available at https://www.theguardian.com/us- news/2020/mar/02/texas-polling-sites-closures-voting).

number of eligible voters served by each polling place. With the majority of closures affecting Black and Latino neighborhoods,[194] compared to white voters, voters of color in Texas must travel much longer distances and endure significantly longer wait times to vote."

**93.** Although Texas had one polling place per 4,000 voters in 2012 as compared with one polling place per 7,700 voters in 2018,[195] voters turned out in historic numbers to cast ballots in the 2020 elections.   As the next section shows, historic turnout during this cycle, particularly in majority-minority urban areas, caused predictable issues given Texas' recent assaults on the right to vote:  long lines, broken voting machines, and long wait times, sometimes in excess of 5 hours.[196]

## B. Election Practices During the 2020 Election in Texas

**94.** When a state legislature changes or alters election laws to address nonissues while failing to address actual problems that emerge during any given election cycle, this has usually been a sign that the legislature, for racial and/or partisan reasons, is trying to deter some category of voters from casting a ballot.[197]  For example, one might say that Texas' adoption of a strict voter ID law in 2013, in response to alleged in-person voter fraud that rarely occurs, is illustrative.  This law increases the costs of voting to address an issue that does not exist to deter turnout among minority voters.

**95.** When Texas enacts legislation to address nonissues, this legislation usually comes at the expense of ignoring or downplaying the actual problems that plague the system.  For example, the onset of the COVID-19 pandemic after the March 2020 primaries might have incentivized Texas to relax its absentee ballot requirements,[198] or increase the number of drop boxes to avoid long Election Day lines, but the opposite proved to be true over the course of the 2020 election cycle.

**96.** Indeed, one enduring problem in Texas' elections, since at least since 2008, is that its growing population has not corresponded to the increase in voter registration and turnout that one might expect in an inclusive democracy.  In the 2018 midterm elections, which had the highest voter turnout

---

[194] *See id*; *see also* Benjamin Wermund, *Texas Has Closed More Polling Places Than Any Other State, Report Shows*, HOUSTON CHRONICLE, Sept. 10, 2019, available at https://www.houstonchronicle.com/politics/texas/article/Texas-has-closed-more-polling-places- than-any-14429443.php.

[195] *See* Notley Scholars Voting Rights Project, An Exploration of Voting Rights in Travis County, available at http://sites.utexas.edu/notleyvrp/.

[196] Scott Friedman & Eva Parks, *Texas Voters Break Records Despite Long Lines, Broken Machines, Quarantined Workers,* NBC DFW, Oct. 13, 2020, available at https://www.nbcdfw.com/investigations/long-lines-broken-voting-machines-quarantined-poll-workers-as-texas-breaks-early-voting-records/2460236/.

[197] See Part V, *supra.*

[198] In past elections, Texas voters were unlikely to vote by mail as a general matter because, unless a voter is out of state or over 65, then the state requires that a voter show that they have a qualifying disability.  Prior to the 2020 general election, approximately 5% of voters voted by mail in any given election cycle.  DeLuca & Read, *supra* note , at 11.

of any midterm in 100 years,[199] Texas ranked last among the states in voter turnout.[200] In the 2020 election, two-thirds of all eligible voters in Texas voted, the best turnout since the 1992 election, when 72.3 percent of registered voters cast ballots.[201] However, Texas still lagged in voter registration and voter turnout relative to other states in 2020; only 53.86 percent of its residents were registered to vote in 2020, trailing every state except Idaho and Wyoming.[202] After the 2020 election, Texas retained its position in the tier of states with the lowest voter turnout, ranking ahead of only eight states that had lower numbers.[203]

97. Texas' problems with voter registration and turnout, especially relative to the growing voting age population in the state, were especially evident following the March 2020 primary elections. By the primaries, the state had set a record for voter registration, with 16.2 million voters registered (or 78.5 percent of the voting age population), but only 12.44 percent of registered voters participated in the primaries (or 9.34 percent of the voting age population).[204] Thus, a clear challenge for Texas by the 2020 general election cycle was not, as SB 1 would have one believe, addressing voter fraud; rather, it was creating an election infrastructure that could: 1) increase voter registrations; 2) close the gap between registration and turnout; and/or 3) accommodate increased voter turnout. Texas addressed none of these issues, instead opting to make voting in the state even more difficult following the 2020 elections.

### 1. The March 2020 Primary

98. During the March 2020 primary, which was not marred by significant COVID-19 concerns, there were reports that voters, mostly in predominantly minority areas, had to wait in long lines for

---

[199] Scott Keeter & Ruth Igielnik, *Democrats Made Gains From Multiple Sources in 2018 Midterm Victories,* Sept. 8, 2020, available at https://www.pewresearch.org/methods/2020/09/08/democrats-made-gains-from-multiple-sources-in-2018-midterm-victories/.

[200] *See, e.g.,* Fernando Ramirez, *Voter Turnout in Texas is Dead Last in America, Study Finds,* HOUSTON CHRONICLE, Sept. 19, 2018, available at https://www.houstonchronicle.com/news/houston- texas/texas/article/Voter-turnout-in-Texas-is-dead-last-in-America-13241845.php; Ross Ramsey, *Analysis: It's harder to vote in Texas than in any other state,* TEXAS TRIBUNE, Oct. 19, 2020, available at https://www.texastribune.org/2020/10/19/texas-voting-elections/; Elbert Wang, *Texas Saw the Nation's Sixth-Highest Voter Turnout Increase, But Still Lagged Behind Most Other States,* TEXAS TRIBUNE, Dec. 7, 2018, available at https://www.texastribune.org/2018/12/07/texas-voter-turnout-sixth-highest-increase-2018-midterms/. *See also* Scot Schraufnagel, Michael J. Pomante II, & Quan Li, *Cost of Voting in the American States: 2020,* 19 ELECTION L. J. 503, 506-507 (2020).

[201] Stacker, *18.9 million votes: See the demographics of Texas' voting population,* Nov. 3, 2021, available at https://stacker.com/texas/189-million-votes-see-demographics-texas-voting-population; Shannon Najmabadi & Mani Cai, *Democrats hoped high turnout would usher in a blue wave across Texas. It didn't.,* TEX. TRIBUNE, Nov. 4, 2020, available at https://www.texastribune.org/2020/11/04/texas-voter-turnout-democrats/.

[202] Number of Registered Voters by State 2022, World Population Review, available at https://worldpopulationreview.com/state-rankings/number-of-registered-voters-by-state.

[203] Statista, *2020 Election: Which States Had the Highest Turnout?,* Nov. 10, 2020, available at https://www.statista.com/chart/23444/oting-eligible-population-turnout-by-state/.

[204] Texas Secretary of State, *Turnout and Voter Registration Figures (1970-Current),* available at https://www.sos.state.tx.us/elections/historical/70-92.shtml; Kevin DeLuca and Blair Read, *Texas Primary Analysis,* Stanford-MIT Healthy Elections Project, Sept. 14, 2020, at 4-5 ("Importantly, voter registration has already increased in recent years. There were over 16 million registered voters by March of 2020, a state record for voter registration. More voters means more traffic at the polls, more potential vote-by-mail ballots to count, and a general increase in logistical challenges facing election administrators.").

hours to cast a ballot.[205]  As mentioned prior, Texas has closed hundreds of polling places since 2013; unsurprisingly, researchers found that, during the 2020 primaries, there was "a positive correlation between the percent of white residents in a county and the number of polling stations, and a negative correlation between the proportion of black residents and polling stations."[206]  These delays persisted despite the fact that 42.3 percent of Texans did not vote on Election Day, but instead opted to vote early.[207]

99.  During the primaries, the turnout for the Democratic primary was 45.9 percent higher than in 2016; on the Republican side, there was a decrease of 28.9 percent from 2016 to 2020.  The turnout numbers are not unusual for the state of the parties at the time—President Donald Trump was running for reelection, largely uncontested, and received 94.1 percent of the vote in the Republican Primary.[208]  In contrast, the contest for the Democratic nomination was wide open. Despite the decline in turnout during the essentially uncontested Republican Primary, the primaries—particularly on the Democratic side—provided insight that turnout and interest in the general election would likely be high, if not historic.

100.  In fact, researchers issued a warning, ahead of the general election, about the risk of long lines at early voting sites given voting patterns during the primaries:

> Texas votes are increasingly shifting away from voting on Election Day. When compared with 2016 (in select counties with available data), voters were more likely to use Early Voting rather than vote on Election Day. Voters in the Democratic primary were more likely to vote early or by-mail than those in the Republican primary. Importantly, many early voters in the primaries voted towards the end of the voting period — both those voting early in-person and by mail. Election administrators should keep this in mind, as Early Voting sites may become crowded as people rush to vote early as Election Day approaches, and issues with USPS may make it difficult to accommodate and count a rush of absentee ballots that come in on the days immediately prior to and following Election Day.[209]

101.  There were other early indicators of the problems that would await voters in November 2020.  In addition to the voters in majority-minority areas who sometimes waited hours to cast ballots, one notable incident at HBCU Texas Southern University in Houston involved voters were in line almost six hours after polls closed.  During the 2020 primaries, it was abundantly clear that black and Latino voters were more likely than white voters to have long wait times.[210]  The state, instead of

[205] Matt Harab & Andrew Schneider, *Who's to Blame for Long Lines on Super Tuesday? Depends on who You Ask*, HOUSTON PUBLIC MEDIA (March 5, 2020), available at https://www.houstonpublicmedia.org/articles/news/politics/election-2020/2020/03/04/362662/local-officals-explain-long-lines-on-super-tuesday/; Jen Rice, *TSU Voters Waited Hours to Cast a Ballot on Super Tuesday. Harris County Says it Won't Happen Again*, HOUSTON PUBLIC MEDIA (Oct. 30, 2020), available at https://www.houstonpublicmedia.org/articles/news/politics/election- 2020/2020/10/29/384985/voting-problems/.
[206] DeLuca & Read, *supra* note , at 15.
[207] *Id.* at 9.
[208] *Id.* at 9.
[209] *Id.* at 5.
[210] *See* Connor Perrett, *Young black and Latino voters spent hours waiting to vote in Texas and the state can't even say how it will fix the problem before November*, INSIDER, Mar. 4, 2020, available at https://www.businessinsider.com/texas-voting-lines-super-

preparing for this onslaught, tried to prevent majority-minority counties from accommodating their voters.

### 2. The 2020 General Election

**102.** Several counties adopted measures in response to issues that arose during the 2020 primary election. For example, Harris County made several changes to its voting procedures to address the increased turnout and problems that arose during the primaries, including:

(1) increasing the county's election budget for the 2020 general election by $29 million (from $4 million in 2016 to $33 million in 2020);
(2) moving the county clerk's election headquarters to a 100,000 square foot arena;
(3) tripling the number of early and Election Day polling locations, including twelve mail-in ballot drop-off locations, drive-thru voting centers, and six 24-hour polling locations;
(4) increasing the number of voting machines by 50% at polling places in the county; and
(5), in direct response to the issue of long lines at TSU, tripling the number of voting machines available at the University."[211]

These are the types of election regulations that one would expect given the problems that arose during the March primary.

**103.** Governor Abbott responded to these accommodations by issuing an Executive Order that limited each county to only one ballot drop-off location, regardless of the county's size or population. Practically, this means that some of the biggest counties in Texas had one drop box to accommodate hundreds of thousands of voters.  Harris County alone has over 4 million people.[212]  To confine this county, which has a population that is the size of Rhode Island, to one drop box was an attempt to undermine a local solution to one of the longstanding voting issues in Texas—the gaps in registration and turnout.

**104.** Governor Abbott's obstruction in 2020, seeking to stop Harris, Bexar, Dallas, Travis, and other counties from making voting easier must be viewed in historical context, especially since SB 1 continues these efforts moving forward.  Historically, Texas has often centralized election administration to prevent the type of local discretion that can lead to increased participation by minorities.  While some mix of decentralized and centralized election rules were key in creating the white electorate, centralized rules became key in maintaining a predominantly white electorate— through its felon disenfranchisement provisions, adopted 1876; the statewide poll tax law, adopted 1903; the direct primary requirement, adopted 1905, and so on.  In other words, implementing

tuesday-worse-in-november-2020-3. National studies also show that long wait times at the polls are correlated with precincts with a higher percentage of voters of color. Jonathan Coopersmith, *It Takes a Long Time to Vote*, TEXAS A&M TODAY, July 9, 2020, available at https://today.tamu.edu/2020/07/09/it-takes-a-long-time-to- vote/; Alexa Ura, *Texas voting lines last hours after polls close on Super Tuesday*, TEX. TRIBUNE, Mar. 3, 2020, available at https://www.texastribune.org/2020/03/03/texas-voting-lines-extend-hours-past- polls-closing-super-tuesday/.
[211] Plaintiffs' Amended Complaint, La Union Del Pueblo Entero v. Abbott, 21 CV 844, at 4.
[212] U.S. Dep't of Com., U.S. Census Bureau, available at https://www.census.gov/quickfacts/harriscountytexas.

discriminatory practices at the state level cemented a status quo that—after 30 years of violence, political fights, and upheaval—had finally eliminated or neutralized most minority voters from the Texas electorate. By subjecting every county, regardless of population and size, to the same limit on drop boxes, Governor Abbott's executive order froze in place a discriminatory status quo that ensures that Texas will continue to have one of the lowest voter turnouts in the country.

**105.**   Private litigation brought to challenge these enfranchising measures was also a relic of a time not long past—efforts by private individuals to circumscribe voting rights has a long history in the state. The Citizens Party, the White Union League, the Jaybirds, the Woodpeckers—these were all private political clubs that furthered the goals of the majority party to undermine black and Latino voting rights. Outsourcing these disenfranchising efforts to private individuals is part of the fiber of Texas politics that survives today. It is therefore no surprise that individual litigants tried to unsuccessfully challenge 120,000 votes cast at drive thru voting locations in Harris County.[213] In Texas, colorblind targeting and racial discrimination in voting have always involved a partnership between the public (state, localities) and the private (political parties, auxiliary groups, private individuals).[214]

## VII.   A Solution in Search of a Problem: SB 1 as Voter Suppression that Mimics Historical Disenfranchising Practices

**106.**   SB 1 continues Texas' long tradition of racial maintenance, or keeping the electorate predominantly white, through colorblind targeting. Like the voting restrictions enacted in the 1890s, SB 1 is also about timing, geography, and voting method. Notably, the law was enacted following an election cycle in which minority voter engagement was very high. During the 2020 election, Latino voter turnout was more than 10 percent higher than in the 2016 presidential election; black and Asian voters also saw substantial increases over 2016. Combined, these voters made up 40% of Texas' 2020 electorate. Unsurprisingly, many of these increases were in majority-minority counties—Harris County, which saw its highest turnout in 18 years; El Paso County, which had its highest voter turnout ever; and Dallas County, which surpassed its 2016 record—were among those counties that experienced historic turnout from minority communities. In 2020, these counties adopted measures to accommodate these increases including 24 hour and mobile voting, extended hours at polling locations, and sending unsolicited applications for absentee voting.[215]

**107.**   Following the 2020 election, the legislature adopted SB 1. Notably, SB 1 was not adopted to address the problems that arose in the 2020 election cycle—the long waits, the broken machines, the lack of polling places—nor was it an attempt to update Texas' outdated election infrastructure to address the explosive growth of the electorate.[216]   Instead, the legislature enacted SB 1 to curb the

---

[213] Hotze v. Hollins, No. 4:20-cv-03709, 2020 WL 6437668, *7-12 (S.D. Tex. Nov. 2, 2020) (holding that the plaintiffs lack standing to challenge the use of drive-thru voting centers).
[214] *See, e.g.,* Terry v. Adams, 345 U.S. 461 (1953) (discussed in Part V(B)(2), *supra*).
[215] Plaintiffs' Amended Complaint, La Union Del Pueblo Entero v. Abbott, 21 CV 844, at 4.
[216] Nearly 60.4% of the eligible voting population turned out in Texas, 6.6 percent more than the 2016 turnout figures.

high turnout and participation that minority communities enjoyed during the 2020 election cycle and to freeze in place a status quo in which voter turnout remains relatively low despite the number of voting age citizens who reside in the state.

**108.** The law accomplishes this by targeting those voting methods disproportionately used in large, majority-minority counties to accommodate the increase in voter turnout. Although SB 1 recently went into effect in December 2021, its provisions have, so far, resulted in hundreds of voter registrations being rejected ahead of the March 2022 primaries.[217] During the first week of early voting, 45 percent of mail-in ballots have been rejected in El Paso, Texas, a city that is almost 80 percent Latino; in prior elections, the rejection rate was 5-10 percent.[218] Early evidence suggests that SB 1 should not be understood as an attempt to address voter fraud "or protect the purity of the ballot box" as the legislature claims. Instead, it is an effort to protect the predominantly white electorate from the tide of demographic change.

### A. The Absence of Fraud in 2020 Elections

**109.** There was no evidence of widespread voting fraud in Texas during the 2020 election cycle, but the Secretary of State conducted a selective audit of four majority-minority counties following that election to create confusion around the objective truth that the 2020 election was likely the safest on record. According to his findings, "Statewide, a total of 67 potential votes cast in the name of deceased people are under investigation. Of those, 3 were cast in Collin County, 9 were cast in Dallas County, 4 were cast in Harris County and 1 was cast in Tarrant County."[219] It is not a coincidence that the audit, which was purportedly in its first "phase," focused on four counties that had experienced the largest minority population growth since 2010, instead of the other counties that were the source of the other 50 allegedly fraudulent votes.[220] Since 2015, 72 percent of all voter fraud prosecutions brought by Texas Attorney General Paxton since he took office have been against black and Latino voters, and 86 percent of these voter fraud prosecutions involved offenses that allegedly occurred in majority minority counties; only four of the ninety-three total prosecutions were against white defendants.[221]

---

United States Election Project, 2020 November General Election Turnout Rates (last updated Dec. 7, 2020), available at http://www.electproject.org/2020g.

[217] Nick Corasanti, *Ballot Rejections in Texas Spike After New Voting Law*, NY TIMES, Feb. 25, 2022, available at https://www.nytimes.com/2022/02/25/us/politics/texas-primary-ballot-rejections.html.

[218] Robert Moore, *45% of El Paso mail ballots rejected in the first week of early voting*, EL PASO MATTERS, Feb. 21, 2022, available at https://elpasomatters.org/2022/02/21/45-of-el-paso-mail-ballots-rejected-in-first-week-of-early-voting/

[219] Texas Secretary of State, *Texas Secretary of State Releases Phase 1 Progress Report on Full Forensic Audit of 2020 General Election*, available at https://www.sos.texas.gov/about/newsreleases/2021/123121.shtml.

[220] *See* Alexa Ura & Allyson Waller, *First part of Texas' 2020 election audit reveals few issues, echoes findings from review processes already in place*, TEX. TRIBUNE, Dec. 31, 2021, available at https://www.texastribune.org/2021/12/31/secretary-state-texas-election-audit/.

[221] Taylor Goldenstein, *At least 72% of AG Ken Paxton's voter fraud prosecutions target people of color, analysis shows*, Houston Chronicle, Mar. 24, 2021, available at https://www.houstonchronicle.com/politics/texas/article/Ken-Paxton-voter-fraud-minorities-target-election-16049496.php.

110.   The Secretary of State and the Attorney General have painted a selective picture of the voter fraud in the state because of their inability to counter the burgeoning evidence that the 2020 election was not rife with fraud.  But the facts speak for themselves.  By the end of 2021, AG Paxton had only closed three alleged voter fraud cases.[222]  The infrequent prosecutions have done little to silence those who clamor for more voting restrictions to address alleged fraud in Texas elections.  The impact of false claims of widespread voter fraud, and the subsequent investigations into the alleged fraud, have negatively impacted voters' perceptions of whether Texas' elections are in fact free and fair.[223]

111. Relying on concerns about fraud and maintaining the purity of the ballot box as a justification for greater election restrictions has a long and tortured history in Texas.  The adoption of the poll tax at the turn of the twentieth century is illustrative of this point.  In 1902, the editor of the *San Antonio Express* argued that, "By requiring a poll tax receipt, secured six months previous to an election, fraudulent elections can be prevented almost entirely." [224]  Similarly, Alexander Terrell, sponsor of the 1902 election bill imposing the tax, argued that Texas' election laws had to be changed to "prevent the man who will sell his vote from delivering the goods."  He went on to further note that the "lazy and depraved element of every race, who will not pay even a poll tax for education, must be kept away from the ballot box."[225]  Terrell rejected the argument that the poll tax would not prevent vote buying, noting that:

> It is sometimes said wealthy people and corporations will pay the poll tax for others and control their votes.  A statute yet to be passed will prevent all that.  Let the tax be paid six months beforehand, and let the law require the certificate to be kept by the voter and money will lose its power over it, for it will be advanced on a corrupt bargain for a vote six months in advance.[226]

112.   But these statements, even if aspirational, gave a false sense of the facts on the ground.  South Texas counties with majority-Latino populations already had the poll tax, and it was customary for political bosses to pay the poll taxes of Latino laborers as an inducement to vote Democratic, regardless of the personal preferences of these voters.[227]  The 1902 law did little to change this state of affairs, as the political machines in south Texas controlled the Latino vote in most of these counties

---

[222] Taylor Goldenstein, *Texas AG Paxton's $2.2M voter fraud unit closed three cases in 2021. GOP lawmakers still boosted its budget,* HOUSTON CHRONICLE, Dec. 17, 2021, available at
https://www.houstonchronicle.com/politics/texas/article/Texas-AG-Paxton-s-2-2M-voter-fraud-unit-closed-16708051.php.
[223] *See, e.g.,* Complaint of Christopher Herbert to the Texas SOS, Jan. 15, 2020 (claiming that Texas has violated the NVRA by failing to purge its voter rolls); Complaint of Tamara McFarlane to the Texas SOS, Nov. 8, 2020 (claiming that "Fort Bend County saw a 74% increase in the number of votes over the 2016 election"); Complaint of Michelle Melchor, Nov. 19, 2020 (questioning whether a voting machine used in Tarrant County were compromised); Complaint of Brent Nasworthy to Texas SOS, March 14, 2020 (questioning whether the receipt of two voter registration cards for people who no longer reside at his address is voter fraud).
[224] FREDERIC D. OGDEN, THE POLL TAX IN THE SOUTH 9-10 (1958).
[225] *Views of Terrell*, GALVESTON DAILY NEWSPAPER, Aug. 22, 1902.
[226] *Id.*
[227] *See* Part V(A), *supra*.

until 1920 (and in others, as late as 1975). If the poll tax was intended to be a fraud prevention measure, it sorely failed in this regard. Instead, the poll tax ensured that minority voters in other parts of Texas remained disenfranchised because of their inability to pay the tax.

113. Many of the most well-known, fraudulent elections in Texas—the 1880 elections that led to a federal convictions and oversight of elections in Harrison County, the 1894 and 1896 elections in which fraud decimated the electoral prospects of the Populist Party—were attempts by the governing majority to diminish or control the power of black and Latino voters in the state. Thanks to disinformation, voters in Texas today have very little context for how voter fraud was a tool used by the majority in an effort to retain power; to be effective, particularly in close elections, control of the election apparatus and/or local government was usually a prerequisite to committing widespread voter fraud.[228] Election outcomes rarely, if ever, changed as a result of the lone fraudster who showed up pretending to be a dead person, yet voter complaints often use this example as their baseline for describing what behaviors and which people at the polling place are suspicious.

114. Even the most infamous example of voter fraud in Texas is not usually recounted as an incident of racial disenfranchisement, even though that was the case. During the 1948 Senate primary contest, Lyndon B. Johnson defeated former Texas governor Coke Stevenson by 87 votes. Prevailing narratives focus on the storied precinct in Jim Wells County that delivered these votes for Johnson. This precinct was controlled by the head of the Democratic Machine in South Texas, George Berham Parr, who used fraudulent votes to help Johnson eek out the win. This fraud would not have been possible but for the fact that Parr's machine controlled the Latino vote until 1975, depriving these voters of any control over selecting their candidate of choice.[229]

115. Thus, SB 1 harkens back to this time in which arguments about "preserving the purity of the ballot box" and "preventing fraud" became code for disenfranchising black and Latino voters.[230] Just as the six month lag between paying the poll tax and voting in the election made voting impossible for black farmers who only received money once a year at the harvest, or alternatively, did not prevent white ranchers in south Texas from paying the poll tax of Mexican laborers,[231] SB 1 is not designed to address the minuscule amounts of fraud that have been prosecuted in an election cycle in which 11.3 million ballots were cast.[232] Indeed, most voter fraud over the last five years has involved individuals

---

[228] *See* Part V(A)(1), *supra* (discussing how Populists lost congressional elections across the state in 1894 because Democrats controlled the election machinery).

[229] MONTEJANO, *supra* note 3.

[230] *See also* Tex. Const. Art. IV (1876) ("Sec. 4. In all elections by the people the vote shall be by ballot, and the Legislature shall provide for the numbering of tickets and make such other regulations as may be necessary to detect and punish fraud and preserve the purity of the ballot box; but no law shall ever be enacted requiring a registration of the voters of this State").

[231] Part V(A)(1), *supra*.

[232] The Texas Attorney General received 197 election fraud complaints between 2015 and 2020 and prosecuted 55 people for election fraud during that period. *See* Jeremy Rogalski, *Despite national outcry, Texas received relatively few voting fraud reports this election,* KHOU 11, Nov. 20, 2020, available at https://www.khou.com/article/news/investigations/texas-received-few-voting-fraud-reports/285-deec7c9a-581b-42b1-b430-4cae7aef5f26.

making false statement on voter applications or third parties filling out a voter's absentee ballot.[233]  As the next section shows, SB 1's provisions, which regulates everything from early voting to poll watchers, have little to do with fraud, and everything to do with making voting harder by curbing those voting measures disproportionately (and lawfully) used by minority voters during the 2020 election.

**B.  Limitations on Absentee Voting, Early Voting, Drop-Boxes, and Drive-Thru Voting Centers**

**116.**  SB 1 prohibits drive-through voting, restricts early voting hours, eliminates 24-hour voting, and limits vote-by-mail drop boxes.[234]  It also prohibits election officials from automatically mailing eligible voters an application to vote absentee, while creating new requirements for those who opt to vote by mail.[235] The limitations that SB 1 imposes on these practices are an example of colorblind targeting.

**117.**  These restrictions affect practices disproportionately used by minority voters in large counties during the 2020 presidential election.  For example, over 120,000 voters in Harris County voted by drive-thru, 53 percent of whom were Black, Hispanic, or Asian.  Similarly, 56 percent of those who voted during extended voting hours in the county were also minorities.[236]  Over 140,000 Harris County voters used early voting; in the two largest counties, Harris and Dallas, the increase of early voting from the 2016 election was over 11%.  Similarly, most Bexar County voters cast their ballots during the early voting period, either in person or by mail.[237]  Black and Latino Harris County voters were also more likely to vote by mail and more likely to vote early than non-Black and non-Latino Harris County voters.[238]

**118.**  Just as SB 1 targets certain practices utilized in large urban areas to identify undesirable voters, election officials in the 1870s used similar metrics to target voters for exclusion.  In 1891, the Texas constitution was amended to authorize voter registration in cities of 10,000 people or more—implicating Dallas, Galveston, Houston, Austin, and a number of others urban centers where African Americans and poor whites aligned with third parties were numerous enough to make the difference

---

[233] *Id.*

[234] SB 1 §§ 3.04, 3.12-3.13 (eliminating drive-thru voting centers); SB 1 §§ 3.09-3.10 (restricting the scheduling of early voting hours and eliminates 24-hour voting); SB 1 § 4.12 (restricting vote-by-mail drop boxes).

[235] *See* SB 1 § 5.04.

[236] Plaintiffs' Amended Complaint, La Union Del Pueblo Entero v. Abbott, 21 CV 844, at 76 (citing Texas Civil Rights Project (@TXCivilRights), Twitter (Mar 27, 2021, 10:56 a.m.), https://twitter.com/txcivilrights/status/1375869409919700997?s=21.)

[237] Bexar Cnty. Elections Dept., Historical Election Results: November 3, 2020 General Election Media Report, available at https://www.bexar.org/DocumentCenter/View/28532/November-3-2020-General- Election-Media-Report.

[238] SB 1 §§ 5.02, 5.03, 5.07, 5.08 (imposes voter identification requirements on early voting ballot applications); Plaintiffs' Amended Complaint, La Union Del Pueblo Entero v. Abbott, 21 CV 844, at 9 (noting that "the law creates rigid new requirements for mail-in ballots by requiring voters to provide the same identification number on their ballot as on their registration, allowing ballot signatures to be compared against signatures more than six years old, and allowing two different committees to analyze each ballot and reject allegedly defective ballots without notice to the voter of the alleged defect.").

in close elections.[239] Like the 2020 election cycle, these new restrictions came at a time in which minority groups were starting to exercise significant— and in some cases, outcome altering[240]— political power.

119.    SB 1 also limits the discretion that local election officials have to adopt voting methods that best work for their counties.  Historically, the Texas legislature has centralized voting restrictions and limited the discretion of local officials to prevent the type of permissive voting practices that had facilitated the biracial coalitions that threatened the Democratic Party.  For example, the legislature enacted the 1902 and 1905 voting restrictions that gave rise to the all-white Democratic primary, even though custom and practice already dictated the exclusion of black and Latino voters from the primary, because there were still white voters within the Democratic Party willing to form coalitions with these voters.[241]  Enacting a statewide ban on their membership precluded such alliances from coming into existence.

120.    As this section shows, SB 1 burdens the ability of black and Latino voters to coalesce behind their preferred candidates, either individually or collectively, by eliminating or burdening those voting methods that made it easier for them to cast a ballot.   SB 1 follows the longstanding practice of past laws that have strategically regulated certain voting practices, shifting between local and statewide oversight, to facilitate efforts to disenfranchise minority communities.  SB 1, by raising the costs associated with some methods of voting and removing local discretion, is similar to voting restrictions enacted at the turn of the twentieth century.

C.   **Requirement of Monthly and Quarterly Voter Purges**

121.    SB 1 requires election officials to purge voter rolls both monthly and quarterly, at risk of losing funding for failure to do so; a wrongly purged voter must provide additional proof of citizenship—documentation that is often costly to obtain—to retain their voter registration.[242]  If a voter does not produce proof of citizenship, then their registration will be canceled.

122.    The fact that purges will occur monthly and quarterly means that a substantial number of lawful voters who are erroneously purged—voters who tend to be disproportionately minority[243]—

---

[239] *Id.* at 58.

[240] *See* Part V(A)(1), supra.

[241] *See* discussion of the Jaybird Primary and White Man's Primary, Part V(A)(2) and Part V(B), *supra*.

[242] SB 1 § 2.05; Plaintiffs' Amended Complaint, La Union Del Pueblo Entero v. Abbott, 21 CV 844, at 9.

[243] *See also* Ben Nadler, *Voting Rights Become a Flashpoint in Georgia's Governors Race*, AP, Oct. 9, 2018, available at https://apnews.com/article/race-and-ethnicity-elections-voting-voting-rights-atlanta-fb011f39af3b40518b572c8cce6e906c (noting that Georgia cancelled over 1.4 million voter registrations between 2012 and 2017, and although "Georgia's population is approximately 32 percent black, according to the U.S. Census, but the list of voter registrations on hold with Kemp's office is nearly 70 percent black"); *See also* Li Zhou, *Voter Purges are on the rise in states with a history of racial discrimination*, VOX, Jul. 20, 2018, available at https://www.vox.com/2018/7/20/17595024/voter-purge-report-supreme-court-voting-rights-act (noting that, between 2012 and 2016, 2 million more voters were purged from the rolls in states covered by Section 5 of the VRA as compared to noncovered jurisdictions).

will have to provide the appropriate documentation or re-register to vote in the next election cycle.[244] Voter purges have been an effective use of colorblind targeting because these practices can be concentrated in counties with high minority populations,[245] and/or election officials can use citizenship status as a proxy for race in purging voters from the rolls.[246]  Moreover, Texas election officials have no choice but to rigorously enforce these voter maintenance duties, or face defunding by the state legislature, further incentivizing vigorous use of a practice that has a racially disproportionate impact.[247]

**123.**  During the Jim Crow era, annual registration requirements essentially functioned as a type of voter purge since all voters were kicked off the rolls and had to re-register every year.  It was stunningly effective in disenfranchising African American voters.[248]  These restrictions have an especially pernicious history in Texas, which has used registration as a disenfranchising tactic since the 1890s.[249]  After the invalidation of the poll tax in 1966, for example, Texas enacted a law that required all voters in the state to re-register, a throwback to Jim Crow era tactics to shrink the electorate.[250]

**124.**  After the 1970 re-registration law was struck down by a federal district court, Texas next adopted a voter purge law to which the Department of Justice objected under Section 5 of the VRA

---

[244] Myrna Perez, *How the Midterm Elections May Be Compromised*, NY TIMES, July 19, 2018, available at https://www.nytimes.com/2018/07/19/opinion/midterms-voting-purges-elections-registration.html (noting that election officials routinely conduct purges and/or have written voter purge policies that violate federal law).
[245] *See* Sanford Nowlin, *Texas' renewed voting-roll purge is flagging citizens, including some in San Antonio, as likely non-citizens*, SAN ANTONIO CURRENT, Dec. 17, 2021, available at https://www.sacurrent.com/sanantonio/texas-renewed-voting-roll-purge-is-flagging-citizens-including-some-in-san-antonio-as-likely-non-citizens/Content?oid=27798066. *See also* Demos, *How the Wisconsin Voter Purge Targets Black Voters*, Dec. 20, 2019, available at https://www.demos.org/blog/how-wisconsin-voter-purge-targets-black-voters (noting that counties with substantial black, Asian and Latinos populations received a disproportionate number of the mailers signaling that a voter will be removed from the rolls).
[246] *See, e.g.,* Alexa Ura, *Texas' renewed voter citizenship review is still flagging citizens as possible non-U.S. citizens*, TEXAS TRIBUNE, Dec. 17, 2021, available at https://www.texastribune.org/2021/12/17/texas-voter-roll-review/ (noting that the voter purge process systematically targets naturalized citizens who are eligible voters).
[247] *See* S.B. 1113, available at https://capitol.texas.gov/tlodocs/87R/billtext/pdf/SB01113F.pdf#navpanes=0 ("If a registrar fails to timely perform a duty imposed on the registrar under this subchapter requiring the approval, change, or cancellation of a voter 's registration, the secretary of state may withhold funds administered and distributed by the secretary…").
[248] Tolson, *supra* note 6, at (discussing an 1882 South Carolina annual registration law that disenfranchised seventy-five percent of the black population in the state).
[249] *See* Part V(A)(1), *supra*.   *See also* Tex. Const. Art VI, Sec. 2 (1970):

> Every person…who shall have attained the age of twenty-one (21) years and who shall be a citizen of the United States and who shall have resided in this State one (1) year next preceding an election and the last six (6) months within the district or county in which such person offers to vote, shall be deemed a qualified elector; provided, however, that before offering to vote at an election a voter shall have registered annually, but such requirement for registration shall not be considered a qualification of an elector within the meaning of the term 'qualified elector' as used in any other Article of this Constitution in respect to any matter except qualification and eligibility to vote at an election."

In 1972, the Supreme Court invalidated long durational residency requirements as a prerequisite for voting.  *See* Dunn v. Blumstein, 405 US 330 (1972).  Today, states require voters to register ahead of an election somewhere between the day of the election and 30 days out; one state has no voter registration system at all.
[250] *See* Part V(C), *supra*.

and that was subsequently enjoined by a three-judge court.[251]  The 1982 law has been routinely cited as evidence that more robust federal legislation is needed to protect voting rights.[252]  Thus, SB 1's attempt to impose more frequent voter purges has to be viewed in broader historical context in which purges and voter registration requirements have been tools of disenfranchisement in the state.

### D.  Limitations on Voting Assistance and Empowering Poll Watchers

**125.**  SB 1 imposes restrictions on third parties seeking to help voters in need.  The law impedes assistance like transportation to the polls, navigation within a polling place, translation of a ballot printed in a language unfamiliar to the voter, or providing physical help to complete a ballot.[253]

**126.**  Restrictions that prevent voting assistance has a racialized history in Texas.  Since Reconstruction, Texas law has prevented individuals from assisting voters who are illiterate or non-English speakers, substantially burdening the rights of black and Latino voters.  During the Gilded era, for example, the state relied on the enforcement discretion of local election administrators to help illiterate white voters likely to cast ballots in support of the Democratic Party, while declining similar assistance to illiterate black voters.[254]  In 1918, the state legislature barred interpreters from the polls, making it difficult for non-English speakers to cast ballots, and, moreover, prohibited any assistance for naturalized citizens unless that person had been a citizen for 21 years.[255]  With respect to the 1918 law, enforcement discretion at the local level was key to its effectiveness, allowing local officials to "exempt" those who voted for the Democratic Party from its restrictions.[256]  The state law prohibiting any assistance to illiterate voters in marking or preparing their ballots was not deemed invalid by a federal court until 1970.[257]

---

[251] *See generally* Flowers v. Wiley, 675 F.2d 704 (5th Cir. 1982).  *See also* Statement of George Korbel, Voting Rights and Election Administration in Texas: A Listening Session before the Committee on House Administration, 116th Cong., at 97 ("In 1975, in apparent response to *Beare* [invalidating Texas law requiring voters register annually], the legislature passed a statute required a complete purge of all registrants and a total re-registration of every voter in Texas. All this was to be accomplished before the 1976 general election.").

[252] *See, e.g., Voting Rights and Election Administration in Texas: A Listening Session before the Committee on House Administration,* 116th Cong., at 97; Testimony of Antonia Hernandez, President and General Counsel of MALDEF, Equal Access to Voting Act of 1989, 101st Cong., May 10, 1989, at 68 (noting the "formidable barriers to registration faced by the Latino Community in Texas" and discussing MALDEF's filing of "the *Flowers v. Wiley* lawsuit under Section 5 against the State of Texas to prevent implementation of a new law that would have put into effect a state-vide purge with preregistration requirements for eligibility to vote.").

[253] *See* SB 1 § 6.01; SB 1 § 6.04.

[254] *See* Part V(A), *infra.*

[255] MONTEJANO, *supra* note 3, at 143 ("The intent of this act was meant to discourage Texas Mexican voters who, with the potential 'naturalization' of the Mexican immigrant, constituted a decisive bloc of voters in the state").

[256] *Id.* ("While these laws and policies sanctioned control of the Mexican American voter, the county officials were the critical actors here; they, as noted before, had the authority to administer and thus to interpret the federal and state election codes the way they saw fit.").

[257] Garza v. Smith, 320 F. Supp. 131, 135, 138 (W.D. Tex. 1970), *vacated and remanded on procedural grounds*, 401 U.S. 1006 (1971) (finding that this practice violates the Fourteenth Amendment).

127.   These practices, just like SB 1's bans on voter assistance, disproportionately excluded Latino and Black voters, as well as those voters with disabilities,[258] from effective political participation. Strikingly, the rights of these individuals to meaningful assistance come at the expense of empowering those who, in some cases, would make voting more difficult for these communities.  SB 1 increases the power of poll watchers to monitor elections and challenge voters; election officials who impede them face liability under the new law.[259]

128.   While SB 1's restrictions on voting methods disproportionately used by minority voters are about racial exclusion, the provisions governing poll watchers are about racial maintenance; the former helps create a white electorate, the latter keeps the electorate white.  With respect to racial maintenance, Texas has a long history of outsourcing authority to discriminate, either explicitly or implicitly, to private individuals or organizations.  For example, the Democratic Party, and its many auxiliary organizations, played this role of policing the electorate until *Smith v. Allwright* invalidated the Jaybird Primary in 1953.

129.   SB 1's provisions empowering poll watchers with free movement within the polling location performs a similar function.  Some poll watchers have used their access to threaten and intimidate black and Latino voters to deter them from voting.    During the 2020 presidential election, for example, black and Latino voters faced a record number of threats and harassment while trying to exercise their fundamental right to vote.[260]  Poll workers who harass lawful voters, like the citizens who threatened and intimidated black and Latino voters as they went to the polls in 2020, were a staple of nineteenth and early twentieth century politics.  During the 1899 mayoral election in Grimes County, for example, black voters had to confront intimidation and threats from the White Union League at various polling places as they sought to cast their ballots.[261]   Similarly, black voters in Harrison County, Texas were deterred from casting their ballots for the Republican candidate in the 1880 election.[262] The intimidation and violence that minority voters faced on Election Day was not

---

[258] Sneha Dey, *Texans with disabilities fear new restrictions on voting help could mean criminal charges at the polls,* TEX. TRIBUNE, Feb. 16, 2022, available at https://www.texastribune.org/2022/02/16/texas-voter-assistance-primaries/.

[259] SB 1 §§ 4.01, 4.06, 4.07, 4.09.  *See* United States Comm'n on Civil Rights, Texas Advisory Comm., *Voting Rights in Texas*, An Advisory Memorandum at 9-11 (July 2018) (describing voter intimidation, discriminatory impact of polling place relocations, and adverse impact of closing polling locations on voters of color during 2016 election).  *See also* Perales, *supra* note , at 741-43.

[260] *See* Plaintiffs' Amended Complaint, La Union Del Pueblo Entero v. Abbott, 21 CV 844, at 5-6 ("In the 2020 presidential election alone, the non-partisan Election Protection coalition received some 267 reports of voter intimidation in Texas, many of which were reports of intimidation by armed citizens or organized demonstrators close to polling locations.").

[261] *See* Part V(B), *supra*.  *See also* Plaintiffs' Amended Complaint, La Union Del Pueblo Entero v. Abbott, 21 CV 844, at 6 (noting that "voters in Hidalgo County reported two men with visible firearms freely walking around a polling location speaking with voters, despite clear signs at the location that no firearms were allowed.").  *See also* Kevin Krause & Charles Scudder, *Far-right Extremists Pose Rising Threat in North Texas around Election, FBI's Dallas Office Says,* THE DALLAS MORNING NEWS, Oct. 1, 2020, available at https://www.dallasnews.com/news/crime/2020/10/01/far-right-extremists-pose-rising-threat-in-north-texas-around-election-fbis-dallas-office-says/.

[262] *See* Part V(A)(1), *supra*.

confined to just casting a ballot; it was part of a systemic pattern of violence and retaliation that included lynching, threats, and intimidation by those tasked with overseeing the election.[263]

**130.** The conception of poll watchers as innocent overseers, tasked with ensuring a fair election, cannot be divorced from their historic role of policing the boundaries of the white electorate to keep minorities out.  Over the course of Texas history, poll watchers have abused their authority, engaging in voter suppression tactics similar to white auxiliary groups at the height of Jim Crow.[264]  By allowing poll watchers to roam freely, SB 1's provisions provide an opening for suppressive tactics that were once common on election day to once again have free reign.  In some ways, SB 1 is very similar to an 1891 law election law that permitted challenges to voters at the polls, a rule obviously utilized to undermine minority voting.  The 1891 law empowered election officials to challenge voters: "[t]he judges of election shall refuse to accept such vote of such elector unless in addition to his own oath, he proves by the oath of one well known resident of the ward, that he is a qualified voter at such election and in such ward."[265]  SB 1, by outsourcing the ability to discriminate against lawful voters to private individuals, goes even further, empowering poll watchers at the expense of election officials.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on February 28, 2022 in Los Angeles, California.

_Franita Tolson_

_____

Professor Franita Tolson

---

[263] *See* Part V(B), *supra*.

[264] Nick Corasaniti, *G.O.P. Seeks to Empower Poll Watchers, Raising Intimidation Worries*, N.Y. TIMES, May 1, 2021, available at https://www.nytimes.com/2021/05/01/us/politics/republican-pollwatchers.html.

[265] *See* Part V(A), *infra*.

## Bibliography

Abramowitz, Alan I.  & Kyle L. Saunders.  *Ideological Realignment in the U.S. Electorate,* 60 J. Pol. 634 (1998).

Anders, Evan.  *Boss Rule and Constituent Interests: South Texas Politics during the Progressive Era*, 84 Southwestern Hist. Q, 269 (1981).

Asian Americans Advancing Justice (AAAJ), *Practice Based Preclearance: Protecting Against Tactics Persistently Used to Silence Minority Communities' Votes*, Nov. 2019, *available at* https://tinyurl.com/d5nuzecv.

Barnes, Donna A.  *People's Party*, Texas State Historical Society, available at https://www.tshaonline.org/handbook/entries/peoples-party.

Blumenthal, Ralph. *2 Voter Rights Cases, One Gripping a College Town, Stir Texas,* N.Y. TIMES, May 28, 2008, available at https://www.nytimes.com/2008/05/28/us/28texas.html.

Alwyn Barr, Reconstruction to Reform: Texas Politics, 1876-1906 (1971).

Campbell, Randolph B.  A Southern Community in Crisis: Harrison County, Texas, 1850-1880 347-48 (1983).

Cantrell, Gregg and D. Scott Barton. *Texas Populists and the Failure of Biracial Politics*, 55 J. Southern Hist. 659 (1989).

Cantrell, Gregg and Kristopher B. Paschal, *Texas Populism at High Tide: Jerome C. Kearby and the Case of the Sixth Congressional District, 1894,* 109 Southwestern Hist. Q 30 (2005).

Caraway, Georgia Kemp. *Anderson County*, Texas State Historical Society, available at https://www.tshaonline.org/handbook/entries/anderson-county.

Chapman, David L. *Lynching in Texas 31* (1973) (dissertation).

Coopersmith, Jonathan.  *It Takes a Long Time to Vote*, TEXAS A&M TODAY, July 9, 2020, available at https://today.tamu.edu/2020/07/09/it-takes-a-long-time-to- vote/.

Corasanti, Nick.  *Ballot Rejections in Texas Spike After New Voting Law*, NY TIMES, Feb. 25, 2022, available at https://www.nytimes.com/2022/02/25/us/politics/texas-primary-ballot-rejections.html.

Corasaniti, Nick.  *G.O.P. Seeks to Empower Poll Watchers, Raising Intimidation Worries*, N.Y. TIMES, May 1, 2021, available at https://www.nytimes.com/2021/05/01/us/politics/republican-pollwatchers.html.

Cox, Patrick.  *"Nearly a Statesman": LBJ and Texas Blacks in the 1948 Election*, 74 Soc. Sci. Q. 241 (1993).

Davidson, Chandler. Race and Class in Texas Politics (1990).

Demos, *How the Wisconsin Voter Purge Targets Black Voters*, Dec. 20, 2019, available at https://www.demos.org/blog/how-wisconsin-voter-purge-targets-black-voters.

Dey, Sneha. *Texans with disabilities fear new restrictions on voting help could mean criminal charges at the polls*, TEX. TRIBUNE, Feb. 16, 2022, available at https://www.texastribune.org/2022/02/16/texas-voter-assistance-primaries/.

Equal Justice Initiative, *Lynching in America*, available at https://lynchinginamerica.eji.org/report/.

Garza, Alicia A. *Hidalgo County,* Texas State Historical Society, available at https://www.tshaonline.org/handbook/entries/hidalgo-county.

Garza, Alicia A. *Starr County,* Texas State Historical Society, available at https://www.tshaonline.org/handbook/entries/starr-county.

Garza, Alicia A. & Christopher Long. *Cameron County*, Texas State Historical Society, available at https://www.tshaonline.org/handbook/entries/cameron-county.

Gergel, Richard Mark. Wade Hampton and the Rise of One-Party Racial Orthodoxy in South Carolina (1977).

Goldenstein, Taylor. *At least 72% of AG Ken Paxton's voter fraud prosecutions target people of color, analysis shows,* Houston Chronicle, Mar. 24, 2021, available at https://www.houstonchronicle.com/politics/texas/article/Ken-Paxton-voter-fraud-minorities-target-election-16049496.php.

Goldenstein, Taylor. *Texas AG Paxton's $2.2M voter fraud unit closed three cases in 2021. GOP lawmakers still boosted its budget,* HOUSTON CHRONICLE, Dec. 17, 2021, available at https://www.houstonchronicle.com/politics/texas/article/Texas-AG-Paxton-s-2-2M-voter-fraud-unit-closed-16708051.php.

Goodwyn, Lawrence C. *Populist Dreams and Negro Rights: East Texas as a Case Study*, 76 Am. Hist. Rev. 1435 (1971).

Gould, Lewis L. Alexander Watkins Terrell: Civil War Soldier, Texas Lawmaker, American Diplomat (2004).

Harab, Matt & Andrew Schneider. *Who's to Blame for Long Lines on Super Tuesday? Depends on who You Ask*, HOUSTON PUBLIC MEDIA (March 5, 2020), available at https://www.houstonpublicmedia.org/articles/news/politics/election-2020/2020/03/04/362662/local-officals-explain-long-lines-on-super-tuesday/.

Hayes, Danny & Seth C. McKee. *Toward A One-Party South?*, in Richard M. Valelly, ed., Princeton Readings in American Politics (2009).

Hine, Darlene Clark. *The Elusive Ballot: The Black Struggle against the Texas Democratic Primary, 1932-1945*, 81 Southwestern Hist. Q 371 (1978).

Jett, Brandon T. The Bloody Red River: Lynching and Racial Violence in Northeast Texas, 1890-1930 (2012).

Johnson, Francis White. A History of Texas and Texans, Vol. 1 (1914).

Keeter, Scott & Ruth Igielnik. *Democrats Made Gains From Multiple Sources in 2018 Midterm Victories,* Sept. 8, 2020, available at https://www.pewresearch.org/methods/2020/09/08/democrats-made-gains-from-multiple-sources-in-2018-midterm-victories/.

Kohout, Martin Donell. *Duval County,* Texas State Historical Society, available at https://www.tshaonline.org/handbook/entries/duval-county.

Kousser, J. Morgan. The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910 (1974).

Kousser, J. Morgan. *Poll Tax*, The International Encyclopedia of Elections (1999).

Krause, Kevin & Charles Scudder. *Far-right Extremists Pose Rising Threat in North Texas around Election, FBI's Dallas Office Says,* THE DALLAS MORNING NEWS, Oct. 1, 2020, available at https://www.dallasnews.com/news/crime/2020/10/01/far-right-extremists-pose-rising-threat-in-north-texas-around-election-fbis-dallas-office-says/.

Leighton, Heather. *Four Texas counties had the highest numeric growth in America, according to new Census numbers,* URBAN EDGE BLOG, Apr. 19, 2019, available at https://kinder.rice.edu/urbanedge/2019/04/18/fastest-growing-texas-counties-cities-census-bureau.

Lewinson, Paul. Race, Class, & Party: A History of Negro Suffrage and White Politics in the South 75 (1965).

Manza, Jeff & Christopher Uggen, Locked Out: Felon Disenfranchisement and American Democracy (2006).

Marten, James. Texas Divided: Loyalty and Dissent in the Lone Star State, 1856-1874 (2009).

McDonald, Laughlin. *The Majority Vote Requirement: Its Use and Abuse in the South,* 17 Urban Lawyer 429 (1985).

Miller, Worth Robert. *Building a Progressive Coalition in Texas: The Populist-Reform Democrat Rapprochement*, 1900-1907, 52 J. Southern Hist. 163 (1986).

Miller, Worth Robert. "Harrison County Methods: Election Fraud in Late Nineteenth-Century Texas," Locus 111 (1995).

Montejano, David. Anglos and Mexicans in the Making of Texas, 1836-1986 (1987).

Moore, Robert. *45% of El Paso mail ballots rejected in the first week of early voting,* EL PASO MATTERS, Feb. 21, 2022, available at https://elpasomatters.org/2022/02/21/45-of-el-paso-mail-ballots-rejected-in-first-week-of-early-voting/.

Nall, Matthew Hayes. *Sabine County,* Texas State Historical Society, available at https://www.tshaonline.org/handbook/entries/sabine-county.

National Public Radio, *Texas Officials Begin Walking Back Allegations About Noncitizen Voters*, CPR NEWS, Jan. 30, 2019, available at https://www.cpr.org/2019/01/30/texas-officials-begin-walking-back-allegations-about- noncitizen-voters/.

Nowlin, Sanford. *Texas' renewed voting-roll purge is flagging citizens, including some in San Antonio, as likely non-citizens,* SAN ANTONIO CURRENT, Dec. 17, 2021, available at https://www.sacurrent.com/sanantonio/texas-renewed-voting-roll-purge-is-flagging-citizens-including-some-in-san-antonio-as-likely-non-citizens/Content?oid=27798066.

Ogden, Frederic D.  The Poll Tax in the South 9-10 (1958).

Perales, Nina, Luis Figueroa, & Criselda G. Rivas. *Voting Rights in Texas: 1982-2006*, 17 S. Cal. L. & Soc. Justice 713 (2008).

Perez, Myrna. *How the Midterm Elections May Be Compromised*, NY TIMES, July 19, 2018, available at https://www.nytimes.com/2018/07/19/opinion/midterms-voting-purges-elections-registration.html.

Perman, Michael.  Struggle for Mastery, Disenfranchisement in the South, 1888-1908 (2001).

Perrett, Connor. *Young black and Latino voters spent hours waiting to vote in Texas and the state can't even say how it will fix the problem before November*, INSIDER, Mar. 4, 2020, available at https://www.businessinsider.com/texas-voting-lines-super-tuesday-worse-in-november-2020-3

Ramsey, Ross. *Analysis: It's harder to vote in Texas than in any other state*, TEX. TRIBUNE, Oct. 19, 2020, available at https://www.texastribune.org/2020/10/19/texas-voting-elections/.

Ramirez, Fernando. *Voter Turnout in Texas is Dead Last in America, Study Finds*, HOUSTON CHRONICLE, Sept. 19, 2018, available at https://www.houstonchronicle.com/news/houston-texas/texas/article/Voter-turnout-in-Texas-is-dead-last-in-America-13241845.php.

Ramsey, Ross. *Analysis: It's harder to vote in Texas than in any other state*, TEXAS TRIBUNE, Oct. 19, 2020, available at https://www.texastribune.org/2020/10/19/texas-voting-elections/.

Rice, Lawrence D.  The Negro in Texas, 1874-1900 (1964).

Rice, Jen. *TSU Voters Waited Hours to Cast a Ballot on Super Tuesday. Harris County Says it Won't Happen Again*, HOUSTON PUBLIC MEDIA (Oct. 30, 2020), available at https://www.houstonpublicmedia.org/articles/news/politics/election-2020/2020/10/29/384985/voting-problems/.

Rodriguez, Jakob. *Here's how Texans voted in the 2020 election by age, race and more, according to AP's VoteCast,* KSAT.COM, available at https://www.ksat.com/news/local/2020/11/04/heres-how-texans-voted-in-the-2020-election-by-age-race-and-more-according-to-aps-votecast/.

Rowell, Chester H.  Historical and Legal Digest of All the Contested Election Cases in the House of Representatives of the United States from the First to the Fifty-Sixth Congress, 1789-1901 (1903).

Schraufnagel, Scot, Michael J. Pomante II, & Quan Li.  *Cost of Voting in the American States: 2020*, 19 ELECTION L. J. 503, 506-507 (2020).

Shapiro, Samuel. *A Black Senator from Mississippi: Blanche K. Bruce (1841-1898)*, 44 Rev. of Politics 83 (1982).

Smyrl, Vivian Elizabeth.  *McLennan County,* Texas State Historical Society, available at https://www.tshaonline.org/handbook/entries/mclennan-county.

Smith, Dick. *Texas and the Poll Tax*, 45 Southwestern Soc. Sci. Q 167 (1964).

Sonneland, Holly K. *Chart: How U.S. Latinos Voted in the 2020 Presidential Election*, AS/COA, Nov. 5, 2020, available at https://www.as-coa.org/articles/chart-how-us-latinos-voted-2020-presidential-election

Taylor, Steve.  *Perales Population changes in Texas are quite stunning,* RIO GRANDE GUARDIAN, Aug. 26, 2021, available at https://riograndeguardian.com/perales-population-changes-in-texas-are-quite-stunning/#:~:text=According%20to%20the%20Census%20Bureau,Less%20than%20five%20percent

*The White Primary in Texas Since* Nixon v. Condon*, 46 Harv. L. Rev. 812 (1933).

Texas Public Radio, *Texas Matters: A History of Anti-Black Violence in Texas,* Feb. 5, 2016, available at https://www.tpr.org/show/texas-matters/2016-02-05/texas-matters-a-history-of-anti-black-violence-in-texas

Tolson, Franita.  *What Is Abridgment?: A Critique of Two Section Twos*, 67 Ala. L. Rev. 433 (2015).

Tolson, Franita. *"In Whom is the Right of Suffrage?": The Reconstruction Acts as Sources of Constitutional Meaning,* 169 Penn. L. Rev. 211 (2021).

Tolson, Franita. *The Spectrum of Congressional Authority over Elections*, 99 B.U. L. Rev. 317 (2019).

Ura, Alexa.  *Federal judges won't halt Texas primary in state Senate district being challenged for alleged discrimination,* TEXAS TRIBUNE, Feb. 1, 2022, available at https://www.texastribune.org/2022/02/01/texas-redistricting-lawsuit-primary/.

Ura, Alexa.  *Texas voting lines last hours after polls close on Super Tuesday*, TEX. TRIBUNE, Mar. 3, 2020, available at https://www.texastribune.org/2020/03/03/texas-voting-lines-extend-hours-past- polls-closing-super-tuesday/.

Ura, Alexa & Allyson Waller. *First part of Texas' 2020 election audit reveals few issues, echoes findings from review processes already in place,* TEX. TRIBUNE, Dec. 31, 2021, available at https://www.texastribune.org/2021/12/31/secretary-state-texas-election-audit/.

Wang, Elbert. *Texas Saw the Nation's Sixth-Highest Voter Turnout Increase, But Still Lagged Behind Most Other States*, TEXAS TRIBUNE, Dec. 7, 2018, available at https://www.texastribune.org/2018/12/07/texas-voter-turnout-sixth-highest-increase-2018-midterms/.

Watson, Tom. "The Negro Question in the South," in Norman Pollack, The Populist Mind (1967).

Weeks, O. Douglas. *The Texas Direct Primary System*, 13 Southwestern Soc. Sci. Q. 95 (1932).

Wermund, Benjamin. *Texas Has Closed More Polling Places Than Any Other State, Report Shows*, HOUSTON CHRONICLE, Sept. 10, 2019, available at https://www.houstonchronicle.com/politics/texas/article/Texas-has-closed-more-polling-places-than-any-14429443.php.

Williams, Patrick G. *Suffrage Restrictions in Post-Reconstruction Texas*, 68 J. Southern Hist. 31 (2011).

Yelderman, Pauline. *JayBird-Woodpecker War,* Texas State Historical Society, available at https://www.tshaonline.org/handbook/entries/jaybird-woodpecker-war.