# Exhibit D

```
 1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3

    LA UNIÓN DEL PUEBLO             §
 4  ENTERO, ET AL.,                 §
        PLAINTIFFS,                 §
 5                                  §
    V.                              §  CASE NO. 5:21-cv-844-XR
 6                                  §
    TEXAS, ET AL.,                  §
 7      DEFENDANTS.                 §
    ------------------------------------------------------------
 8  OCA-GREATER HOUSTON,            §
    ET AL.,                         §
 9      PLAINTIFFS,                 §
                                    §
10  V.                              §  CASE NO. 1:21-cv-0780-XR
                                    §
11  TEXAS SECRETARY OF STATE        §
    JOHN SCOTT, ET AL,              §
12      DEFENDANTS.                 §
    ------------------------------------------------------------
13  HOUSTON AREA URBAN LEAGUE,      §
    ET AL.,                         §
14      PLAINTIFFS,                 §
                                    §
15  V.                              §  CASE NO. 5:21-cv-0848-XR
                                    §
16  GREGORY WAYNE ABBOTT,           §
    ET AL.,                         §
17      DEFENDANTS.                 §
    ------------------------------------------------------------
18  LULAC TEXAS, ET AL.,            §
        PLAINTIFFS,                 §
19                                  §
    V.                              §  CASE NO. 1:21-cv-0786-XR
20                                  §
    JOHN SCOTT, ET AL.,             §
21      DEFENDANTS.                 §
    ------------------------------------------------------------
22  MI FAMILIA VOTA, ET AL.,        §
        PLAINTIFFS,                 §
23                                  §
    V.                              §  CASE NO. 5:21-cv-0920-XR
24                                  §
    GREG ABBOTT, ET AL.,            §
25      DEFENDANTS.                 §
    ------------------------------------------------------------
```



```
 1  UNITED STATES OF AMERICA,   §
          PLAINTIFF,            §
 2                              §
    V.                          §  CASE NO. 5:21-cv-1085-XR
 3                              §
    THE STATE OF TEXAS,         §
 4  ET AL.,                     §
          DEFENDANTS.           §
 5  *********************************************************

 6                  ORAL 30(b)(6) DEPOSITION OF

 7              TRAVIS COUNTY CLERK REPRESENTATIVE

 8              TESTIMONY OF BRIDGETTE ESCOBEDO

 9                        MAY 11, 2022

10                      (Reported remotely)

11  *********************************************************

12

13              ORAL DEPOSITION OF BRIDGETTE ESCOBEDO,

14  produced as a witness at the instance of the Plaintiff

15  OCA-Greater Houston, and duly sworn, was taken in the

16  above-styled and numbered cause on the 11th day of

17  May, 2022, from 10:11 a.m. to 4:27 p.m., reported

18  remotely via Zoom, before MICHELLE CARVER, CSR, in and

19  for the State of Texas, reported by oral stenograph in

20  Travis County, Texas, pursuant to the Federal Rules of

21  Civil Procedure, the current Emergency Order regarding

22  the COVID-19 State of Disaster, and the provisions

23  stated on the record or attached hereto.

24

25
```



```
 1  money?
 2              MS. HUNKER:  Objection.  Form.
 3       A.   Yes.
 4       Q.   Would you agree with me that buying
 5  someone's lunch could be considered a type of
 6  compensation?
 7       A.   Yes.
 8       Q.   Have you received any training from the
 9  Secretary of State about this particular new provision
10  606?
11       A.   No.  Well, there are advisories that come
12  out that you're -- you can read, and I have probably
13  read that, but specific training, no.
14       Q.   Do you know if there was an advisory about
15  606?
16       A.   Not specifically.
17       Q.   What kind of advisories do you typically get
18  from the Secretary of State?
19       A.   They're -- they come out periodically about
20  topics, and they are available for the public.
21       Q.   Are they available -- well, are they
22  advisories directed at elections administrators?
23       A.   Yes.
24       Q.   And do they -- does the Secretary of State
25  send the advisory to you?
```



```
 1       Q.   And how do election workers verify the
 2  current form?
 3       A.   So the form was recently updated, and so we
 4  provided them with a -- with the old form and the new
 5  form so they can compare and make sure that it was the
 6  correct form they're using.
 7       Q.   Actually, I'm sorry.  I shouldn't have asked
 8  that foundational question.  Which -- what form are
 9  you referring to?
10       A.   The appointment of poll watcher.
11       Q.   Are you -- do you mean a certificate of --
12       A.   Certificate of appointment, yes.
13       Q.   Understood.
14       A.   Yeah.
15       Q.   Got it, thanks.  Okay.  And if we could flip
16  to the next page to 4.07, and if you wouldn't mind
17  taking a second to just read 4.07.  And it starts from
18  line 21 on page 27, and it goes through line 8 on
19  page 28.
20       A.   Okay.  I'm aware.
21       Q.   Okay.  You do --
22       A.   I've read -- yes.  This one I know.
23       Q.   Understood. Okay.  What is your
24  understanding of what this provision is?
25       A.   The poll watcher is entitled to sit or stand
```



```
 1  near enough to hear or see what they're trying to
 2  observe.
 3       Q.   And did you provide any training to election
 4  workers on how to implement this provision?
 5       A.   We gave them the information in the Code,
 6  yes.
 7       Q.   And when you gave election workers this
 8  provision, did you provide any explanation on what
 9  some of the terms -- the language in this provision
10  means?
11       A.   Yes.  And we had a lot of questions, but due
12  to COVID, they were very -- the election workers were
13  very concerned because some of the poll watchers stand
14  very closely, and they -- a lot of the workers wanted
15  them to maintain the -- the 6-foot social distancing.
16  We had to educate them on the differences between
17  asking them to stay away and allowing them to be
18  closer.  We had to let them know they had this right
19  to do so.
20       Q.   That poll watchers had --
21       A.   That poll watchers had the right.
22       Q.   Understood.  And so let me unpack that a
23  little bit.  A moment ago you said you had a lot of
24  questions about this provision.
25       A.   Uh-huh.
```



1    Q.   You mean questions during the training --
2              (Simultaneous speaking)
3    A.   Yes.
4    Q.   Okay.  And --
5              THE COURT REPORTER:  I'm sorry.  I need
6  you to repeat your question.  Y'all are talking at the
7  same time, and I'm missing portions of it.
8              MR. WHITE:  My fault.  Thanks.  I'll
9  repeat it.
10   Q.   So a moment ago you said that you had a lot
11 of questions about this provision, and is that fair to
12 say?
13   A.   Yes.
14   Q.   And these are questions that were asked
15 during the training session that your office provided
16 to election workers?
17   A.   Yes.
18   Q.   And what sorts of questions were election
19 judges asking?
20   A.   Specifically about the 6-foot distance.
21 They wanted -- they -- they allowed the election
22 workers -- because COVID was still in effect, they
23 wanted to be able to ask the poll watchers to stay
24 6-feet away from them.
25   Q.   And what did you -- strike that.



 1            How did you answer those questions?
 2       A.   We just told them that according to this
 3  Code that they were allowed to sit or stand near
 4  enough to see or hear, and so they had to just use
 5  their best judgment with that.
 6       Q.   So would you agree with me that this
 7  provision prevents election workers from denying a
 8  poll watcher free movement at a polling place?
 9            MR. POPE:  Objection.  Form.
10            MS. HUNKER:  Objection.  Form.
11       Q.   Do you want me to repeat the question?
12       A.   Yes.
13       Q.   Would you agree that this provision prevents
14  election workers from denying a poll watcher free
15  movement at a polling site?
16       A.   Yes.
17            MS. HUNKER:  Same objection.
18       Q.   And what is your understanding of what it
19  means to deny a poll watcher free movement at a
20  polling site?
21       A.   To not allow them to go into a specific
22  location or be at a specific process.
23       Q.   Did the Secretary of State's Office provide
24  any guidance on what it means to deny a poll watcher
25  free movement at a polling place?



```
 1       A.   Not specific items, but they did say that
 2  there was a poll watcher -- a new -- SB 1 required a
 3  new training for the poll watchers to -- to take.
 4       Q.   When you say "they," you're referring to the
 5  Secretary of State's Office?
 6       A.   Yes.
 7       Q.   And who in the Secretary of State's Office
 8  told you that?
 9       A.   The staff attorneys.
10       Q.   And you also just mentioned that -- the
11  training program for poll watchers.  Are you familiar
12  with that training program?
13       A.   Yes.
14       Q.   Have you completed it yourself?
15       A.   Yes.
16       Q.   Is there an assessment at the end of the
17  training program that ascertains whether the poll
18  watcher has understood the material in the program?
19       A.   I don't remember.
20       Q.   Okay.  Would the existence of some sort of
21  assessment at the conclusion of the training program,
22  in your opinion, affect how effective the program is?
23            MR. POPE:  Objection.  Form.
24       A.   Based on feedback that I heard, it's --
25  it's -- it's not very effective.
```



1    Q.   And what sort of feedback have you heard?
2    A.   That it is nothing more than reading the
3    poll watcher guide.
4    Q.   And where did you hear this from?
5    A.   Various sources.  The -- one of the party
6    members.  A member of a particular party that we
7    contract with.
8    Q.   Who was that member?
9    A.   The executive director of the Republican
10   Party (inaudible).
11           THE COURT REPORTER:  I'm sorry.  Can
12   you repeat your answer?
13   A.   The executive director of the Republican
14   Party in Travis County.
15   Q.   So the executive director of the Republican
16   Party complained to you about the training program?
17   A.   Well, he didn't complain.  He just made a
18   statement saying that it's not -- the training was not
19   very helpful.  There was still a lot of questions of
20   what, you know, could and couldn't be done in a
21   polling location.
22   Q.   Understood.  And what were the circumstances
23   under which he made this or she made this statement to
24   you?
25   A.   We were trying to make sure that all of the



1     A.   Yes.
2     Q.   And what does this provision do?
3     A.   It says that you commit an offense if you
4  knowingly obstruct a poll watcher from viewing
5  something.
6     Q.   And what sorts of actions can obstruct the
7  view of a poll watcher?
8     A.   If you don't allow them to see someone
9  check -- being checked-in on a poll book or they ask
10 to view a record.
11    Q.   Did you receive any guidance from the
12 Secretary of State's Office about the types of actions
13 that can obstruct a poll watcher?
14    A.   Not that I can recall.
15    Q.   So would you agree with me that this
16 provision makes it a criminal offense if a person
17 obstructs the poll watcher?
18    A.   Yes.
19    Q.   And did you receive any concerns from
20 election workers about this provision?
21    A.   Yes.
22    Q.   And what were those concerns?
23    A.   So they -- the workers would have -- at the
24 end of a training session, they would tell our
25 trainers that it was a concern for them that they



```
 1  didn't want to be committed of an offense, and so they
 2  had concerns about working in the future.  So, yeah,
 3  this one was -- was really -- caused a lot of concern
 4  for them.
 5       Q.   Do you know if there are any election
 6  workers who decided not to work in the future because
 7  of this provision?
 8       A.   Yes.  There are several.
 9       Q.   There are several?  Do you know how many?
10       A.   I don't know exactly how many.
11       Q.   More than 5?
12       A.   Yes.
13       Q.   More than 10?
14       A.   Yes.  I'd say probably between 25 to 50.
15       Q.   So 25 to 50 election workers who chose not
16  to work in the future because out of concerns of
17  SB 1's provisions relating to poll watchers?
18       A.   Yes.
19       Q.   Okay.  And are these individuals who had
20  served as election workers during previous election
21  cycles?
22       A.   Yes.
23       Q.   Did this lead to any staff shortages during
24  the March 2022 primary?
25       A.   Yes.
```



1     Q.   And how significant of staff shortages did
2  Travis County experience?
3     A.   Initially, it was -- it was quite
4  significant; so yes.
5     Q.   What impact did that have on your ability to
6  administer the March primary election?
7     A.   Well, we, Travis County, were able to get
8  all of our polling locations fully staffed.  But in
9  the very beginning, we start recruiting quite early
10 for the primary election like in November and
11 December, and that was initially when SB 1 went into
12 effect.  And so there was so many unknowns, and a lot
13 of the election workers had just heard on the news or
14 via social media that they can be committed of an
15 offense.  And so when we were initially around that
16 same time calling them asking them, you know, if they
17 were interested in working the primary election, they
18 related to us they were not interested.
19    Q.   And so you were ultimately able to have all
20 your polling sites fully staffed?
21    A.   Right.
22    Q.   And tell me a little bit about the process
23 of replacing these election workers.
24    A.   So we just -- we did several different
25 things:  We did a press release.  We really relied on



```
 1   any of the provisions, we would have called the legal
 2   line, but I can't recall a specific instance where we
 3   needed guidance.
 4         Q.   And apologies for jumping around.  A moment
 5   ago you had mentioned shortages of poll watchers and
 6   your efforts to recruit replacements.  Are you
 7   concerned about staffing shortages in future
 8   elections?
 9         A.   Not poll watchers.
10         Q.   Oh, I'm sorry.
11         A.   Poll workers?
12         Q.   Poll workers.
13         A.   Yes.
14         Q.   Excuse me.  Yes?
15         A.   Yes.
16         Q.   "Yes" you are concerned about shortages in
17   future elections?
18         A.   Yes.
19         Q.   Okay.  Did your office record the number of
20   poll watchers who report for service in a given
21   election?
22         A.   Yes.
23         Q.   How does your office record that
24   information?
25         A.   There's two different avenues for recording
```



| | |
|---|---|
| BRIDGETTE ESCOBEDO | May 11, 2022 |
| LA UNIÓN DEL PUEBLO ENTERO V. TEXAS | 189 |

```
 1              THE COURT REPORTER:  Okay.  Thanks.
 2       Q.   Is it your position that there is no action
 3  with respect to removing a poll watcher that you
 4  wouldn't take now that you would have taken prior to
 5  SB 1?
 6       A.   Can you repeat the question?  I'm sorry.
 7       Q.   Is there any action with respect to removing
 8  a poll watcher that you wouldn't take now that you
 9  would have prior to SB 1?
10              MR. WHITE:  Objection.  Form.
11       A.   I'm not aware.
12       Q.   Now, you had talked a little bit about
13  shortages or declining -- you talked a little about
14  shortages of election workers with respect to the poll
15  watchers provision; is that correct?
16       A.   Yes.
17       Q.   Okay.  Now, when you were talking about poll
18  workers or election judges who declined to serve this
19  term, do you know if it was the provisions of SB 1 or
20  people's descriptions of provisions of SB 1?
21       A.   It was to my -- I -- I -- I believe it was
22  their understanding that they could be penalized
23  criminally; they did not want to experience any of
24  that.  So that's what was told to me.
25              MR. WHITE:  I'm sorry.  I object to
```

