# Exhibit K

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


LA UNION PUEBLO ENTERO, et al., )
                                )
          Plaintiffs,           )
                                )
V.                              ) Case No. 5:21-cv-844-XR
                                )
GREGORY W. ABBOTT, et al.,      )
                                )
          Defendants.           )
      ----------------------------------------------------------
OCA-GREATER HOUSTON, et al.,    )
                                )
          Plaintiffs,           )
                                )
V.                              ) Case No. 1:21-cv-780-XR
                                )
JOHN SCOTT, et al.,             )
                                )
          Defendants.           )
      ----------------------------------------------------------
HOUSTON JUSTICE, et al.,        )
                                )
          Plaintiffs,           )
                                )
V.                              ) Case No. 5:21-cv-848-XR
                                )
GREGORY WAYNE ABBOTT, et al.,   )
                                )
          Defendants.           )
      ----------------------------------------------------------

```
LULAC TEXAS, et al.,                 )
                                     )
          Plaintiffs,                )
                                     )
V.                                   ) Case No. 1:21-cv-0786-XR
                                     )
JOHN SCOTT, et al.,                  )
                                     )
          Defendants.                )
      ---------------------------------------------------------------
MI FAMILIAR VOTA, et al.,            )
                                     )
          Plaintiffs,                )
                                     )
V.                                   ) Case No. 5:21-cv-0920-XR
                                     )
GREG ABBOTT, et al.,                 )
                                     )
          Defendants.                )
      ---------------------------------------------------------------

UNITED STATES OF AMERICA,            )
                                     )
          Plaintiffs,                )
                                     )
V.                                   ) Case No. 5:21-cv-1085-XR
                                     )
THE STATE OF TEXAS, ET AL.,          )
                                     )
          Defendants.                )
      ---------------------------------------------------------------
```

ORAL DEPOSITION OF JEFFREY L. CLEMMONS


April 1, 2022


--------------------------------------------------------


Oral deposition of JEFFREY L. CLEMMONS, produced as a

witness at the instance of the defendants, and duly sworn,

was taken in the above-styled and numbered cause on the

1st day of April, 2022, before Patrick Stephens,

Certified Court Reporter, at 401 Congress Ave,

Suite 1800, Austin, Texas 78704.

1      Q    And did any individual contact you to encourage you to

2 file a lawsuit challenging SB1 again outside of somebody from

3 the NC --

4      A    No.

5      Q    Did you contact any other individual organization to

6 encourage them to file the lawsuit?

7      A    I did not.

8      Q    All right.  I'm going to put that aside for a moment,

9 but we are going to go back to it.

10      A    Okay.

11      Q    Mr. Clemmons, can you please tell me your age?

12      A    22.

13      Q    And are you a resident of Texas?

14      A    I am.

15      Q    How long have you been a resident of Texas?

16      A    My whole life.

17      Q    And what's your current address?

18      A    Current address is 1300 Crossing Place, Apartment 327,

19 Austin, Texas 78741.

20      Q    And how long have you lived there?

21      A    I've lived there in this particular apartment for

22 about -- since August of last year, and then prior to that, I

23 was living in the same complex from the fall of 2019, so about

24 two years.

25      Q    And so how long have you been in Austin in total?

1    Q    Did you have any other major or minor?

2    A    Huh-uh, no, no, I haven't.

3    Q    Are you currently pursuing a postgraduate degree?

4    A    Not at this moment.

5    Q    And I assumed that was for a bachelor of arts.

6    A    Yes.

7    Q    What student organizations were you part of?

8    A    I was part of the NAACP on our campus, so Unit 69-AA;

9    I was also a member of -- I was the student leader for Texas

10   Rising, part of the Texas Freedom Network, in addition to being

11   the chair of Austin's college student commission, although that

12   was -- I suppose that was technically off campus.  In addition

13   to that, I was also a HBCU ambassador for the

14   Andrew Goodman Foundation, and I'm not sure if this counts as a

15   campus organization, I was also the White House scholar for the

16   initiative on HBCUs, and for a brief time, student government.

17   Q    So I'm familiar with the work that the NAACP does, but

18   I have not heard of Texas Rising.  Can you give me a sense of

19   what organization that is?

20   A    Yeah.  So Texas Rising is a statewide organization

21   under the Texas Freedom Network that advocates for policies, pro

22   and in certain areas including voting rights, climate justice,

23   criminal justice, LGBTQ equality as well as immigration rights,

24   specifically organizing college students.

25   Q    And so did you organize events?

1    Rising, is a paid position.

2        Q    It is?

3        A    It has a stipend.

4        Q    Any other paid employment?

5        A    Huh-uh.

6        Q    Are you a member of a civic association or

7    recreational group?

8        A    Off campus?

9        Q    Off campus.

10       A    Yes, I would consider the Austin College Student

11   Commission, that organization.

12       Q    And what does the Austin student commission do?

13       A    So the College Student Commission advises City Council

14   on policies related to college students, which covers a pretty

15   broad umbrella, but includes things like transportation,

16   housing, food insecurity, things of that nature, essentially

17   creating recommendations together across the five campuses we

18   cover, which includes Huston-Tillotson, UT, St. Edwards,

19   Concordia and ACC, and we make those recommendations to counsel

20   and they inevitably pass them, should they choose.

21       Q    Have they taken on some of your recommendations?

22       A    They have taken on one.  I was not, like, the lead

23   author on it, but it did pass while I was chair, which was our

24   Food Insecurity Grant Program, $50,000 for two years for all

25   five campuses to essentially do with what they will to combat

1    food insecurity on their campuses.

2         Q    Congratulations on getting that through.

3         A    Thank you.

4         Q    Did any of your initiatives pertain to voting?

5         A    No.

6         Q    I actually should've mentioned -- asked that question

7    when we were talking about some of your student organizations.

8    Did any of your work there pertain to voting?

9         A    Yes.  With respect to voting, I'm included in things

10   like voter registration as well as doing things like testifying

11   at the Capitol on voting-related legislation in addition to, of

12   course, encouraging peers to vote, educating them about the

13   voting process, candidates and issues and things of that nature.

14        Q    Do you still work on voter-registration efforts?

15        A    Not actively.  I am still a VDR with Travis County,

16   and I've registered a few voters, but I do not do it actively

17   while working with the congressman.

18        Q    When did you go through the training to become a

19   deputy voting registrar?

20        A    That would have been in January of 2020.

21        Q    I'm going to list a couple of organizations, and I

22   just want you to clarify whether or not you're a member of

23   theirs.

24        A    Sure.

25        Q    Are you a member of Houston-Area Urban League?

Jeffrey Clemmons

April 01, 2022
Page 24

```
 1      A    No.

 2      Q    Can you go back to Exhibit 2, which was the second

 3 amended complaint?

 4      A    Yes.

 5      Q    And we're going back to Paragraph 70.

 6      A    Okay.

 7      Q    In this paragraph, the complaint states that you

 8 served as an election judge in Travis County for the July 14th,

 9 2020, primary election; correct?

10      A    Yes.

11      Q    Now, I know it says primary election, but I assume

12 based on the date that you served during the primary runoff.

13      A    That's correct.

14      Q    Was this your first time serving as an election judge?

15      A    It was.

16      Q    And how many times did you volunteer as an election

17 judge?

18      A    Just this one time.

19      Q    And how old were you when you served?

20      A    That would have been in 2020, so I was 20 years old.

21      Q    Am I right in assuming that COVID-19 pandemic played a

22 role in your decision to become an election judge?

23      A    It did.

24      Q    Can you explain why?

25      A    There was a shortage of election judges at that time,
```

1   especially since it was the very beginning of the pandemic, and

2   so there was a call for more election judges, and so I went to

3   help fill that gap.

4        Q    And to the best of your knowledge, that gap is closed

5   now that the pandemic has slowly ebbed away?

6        A    No.

7        Q    What's your basis for believing that there is still a

8   gap?

9        A    There have been continued asks from various

10  organizations to have folks sign up as election judges, and I --

11  I do believe there's been some reporting on it.  I could not

12  tell you the --

13       Q    Okay.

14       A    -- source of the reporting.

15       Q    And in those asks, do they state that there's a

16  shortage?

17       A    Yes.

18       Q    And what organizations are the ones that are sending

19  you these messages?

20       A    I have seen those messages from the Democratic Party

21  and I've also seen it from organizations like MOVE Texas.

22       Q    You've not received any messages from the -- Travis

23  County itself?

24       A    Oh, yes, also Travis County Elections.

25       Q    What were your responsibilities as an election judge?

```
 1      A     No misconduct.

 2      Q     You did not witness an election judge attempt to expel

 3 or obstruct a poll watcher because of the poll watcher's

 4 misconduct; correct?

 5      A     Correct.

 6      Q     And you did not witness an election judge or worker

 7 seek to expel a poll watcher because of misconduct, but being

 8 unable to do so as a result of SB1; is that correct?

 9      A     That's correct.

10      Q     And because you've not served as an election worker or

11 a judge, you didn't have the opportunity to observe the

12 interactions with poll watchers outside the time it took you to

13 vote; is that correct?

14      A     That's correct.

15      Q     So, Mr. Clemmons, for the next set of questions, I'm

16 going to ask about the asserted injury under SB1 generally and

17 then I'm going to look at the provisions you're challenging

18 individually.  Okay?

19      A     Okay.

20      Q     Okay.  What is the specific injury, if any, you've

21 suffered as a result of SB1?

22      A     As a result of SB1, the -- the specific injury would

23 be my role as an election judge, the powers that I have being

24 challenged.

25      Q     So you think it discourages you from becoming an
```

Jeffrey Clemmons

April 01, 2022
Page 41

1    election judge; is that correct?

2        A    Yes.

3        Q    And what is the basis of your belief that it

4    discourages you?

5        A    I believe that SB1 changes the relationship between

6    the election judge and other poll workers in the polling

7    location to the extent that the election judge is either

8    disempowered or put under more strict scrutiny than they were

9    before, which was quite strict.

10       Q    So I am going to offer a summary, and please let me

11   know if I've misunderstood your statement.  You believe that SB1

12   changes the relationship between an election judge and poll

13   watchers; is that correct?

14       A    Yes.

15       Q    And you believe that SB1 disempowers election judges.

16       A    Yes.

17       Q    They have less authority; is that correct?

18       A    Yes.

19       Q    And you feel like if they're more -- under more

20   scrutiny; is that correct?

21       A    Yes.

22       Q    What level of scrutiny do you think is appropriate for

23   an election judge?

24       A    I think the level of scrutiny that is appropriate is

25   to the degree that they are not going to either intentionally or

Jeffrey Clemmons                                                    April 01, 2022
                                                                       Page 44

```
 1                VIDEOGRAPHER:  Back on the record, 11 a.m.
 2                THE WITNESS:  I'm ready.
 3   BY MS. HUNKER (resuming):
 4        Q    Mr. Clemmons, did you enjoy your break?
 5        A    I did.
 6        Q    So let's turn to Section 4.06 of SB1.  I believe it's
 7   on Page 26.
 8        A    Uh-huh.
 9        Q    All right.  Please take a moment to read the section
10   and let me know when you're done.
11        A    In its entirety?
12        Q    Mostly the parts that have the underlines, since
13   that's the language that was added.
14        A    Gotcha.  (Reviewing.)  I have read it.
15        Q    How does Section 4.06 specifically injure you?
16        A    So Section G of course speaks about the removal of a
17   poll watcher, which of course would be a power that only the
18   election judge would have the discretion to make.
19        Q    So that if you were to volunteer as an election judge
20   again, that would be a power that would be within your control;
21   correct?
22        A    Normally, yes.
23        Q    Or I should say it pertains to you more than it does
24   other poll workers.
25        A    Correct, yeah.
```

1     Q     Before we talk about Subsection G more intently, you

2  don't think that Subsection H, which requires the watcher to

3  create an oath, I swear or affirm that I will not disrupt the

4  voting process or harass voters in the discharge of my duties,

5  injures you; correct?

6     A     Correct.

7     Q     So your only objection is Subsection G; is that

8  correct?

9     A     Yes.

10    Q     You don't anticipate knowingly refusing to accept a

11 poll watcher for service; correct?

12    A     That's correct.

13    Q     You wouldn't reject a poll watcher if they had valid

14 credentials; is that correct?

15    A     Correct.

16    Q     And you wouldn't reject a poll watcher if they weren't

17 intimidating voters; correct?

18    A     I don't believe this section is clear enough to say.

19    Q     Let's look at Subsection 4.07.

20    A     Okay.

21    Q     I believe it's starts on Page 27 --

22    A     Uh-huh.

23    Q     -- and if you would take a moment to read the

24 subsection.

25    A     Okay.  (Reviewing.)  Okay.  I've read it.

Jeffrey Clemmons                                            April 01, 2022
                                                                  Page 48

```
 1      A     Yep.

 2      Q     If you can please read it to yourself, and let me know

 3 when you're done.

 4      A     (Complies with request.)  Okay.

 5      Q     Okay.  What specific injury, if any, that you suffered

 6 as a result of Section 4.09?

 7      A     The election judge's ability to protect the integrity

 8 of the voter's ballot by prohibiting them from potentially

 9 obstructing the view of the poll watcher.

10      Q     Okay.  And do you intend to obstruct the view of a

11 poll watcher?

12      A     It's never one's intention to, but -- but you may have

13 to.

14      Q     Would you knowingly obstruct a poll watcher?

15      A     Based -- based on the statute, I mean, it's unclear.

16 It would depend on the situation.

17      Q     In what situations would you obstruct a poll watcher?

18      A     Potentially if the poll watcher is trying to look

19 into, you know, a voter's voting booth when they're in that

20 private moment making -- casting their ballot, you know, and a

21 poll watcher gets too close.  That could be an instance.

22      Q     And what is your basis for your belief that you cannot

23 either obstruct or ask the poll watcher to move from watching a

24 individual voter casting their ballot?

25      A     I believe through SB1, they're -- they're giving this
```

1    free movement, and since that free movement's not very well

2    defined, any obstruction or moving them from where they can

3    reasonably see and hear would be potentially a violation.

4         Q     So is it fair to say that your basis is the statute

5    itself?  Like, the text of the statute.

6         A     Yes.

7         Q     Okay.  Do you have any other basis besides the text of

8    the statute?

9         A     That -- could you restate the question?

10        Q     Yes.  Do you have any basis outside of the text of the

11   statute that you would be unable to obstruct or ask a poll

12   watcher to stop watching a individual voter cast their ballot?

13        A     I would imagine if, you know, the poll watcher

14   themselves were -- objected to making that move.

15        Q     Do you have any basis, though, for that belief that

16   the poll watcher would object?

17        A     Not beyond the statute.

18        Q     And do you have any basis outside of the statute that

19   you would be penalized if you were to intervene in that

20   situation?

21        A     I believe that there have been instances -- I could

22   not tell you the instances, but I do believe that, you know, an

23   election judge could be put in -- in legal jeopardy if they took

24   an action extraordinarily.

25        Q     Do you know when those -- the actions would have