# Exhibit L

Bob Kafka                                                                    April 07, 2022

```
 1                  IN THE UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF TEXAS
 2                         SAN ANTONIO DIVISION

 3  LA UNION DEL PUEBLO ENTERO,   )
    et al,                        )
 4        Plaintiffs,             )
                                  )
 5  v.                            )     Case No. 5:21-cv-844-XR
                                  )
 6  GREGORY W. ABBOTT, et al.,    )
          Defendants.             )
 7  _____
    OCA-GREATER HOUSTON, et al.,  )
 8        Plaintiffs,             )
                                  )
 9  v.                            )     Case No. 1:21-cv-780-XR
                                  )
10  JOHN SCOTT, et al.,           )
          Defendants.             )
11  _____
    HOUSTON JUSTICE, et al.,      )
12        Plaintiffs,             )
                                  )
13  v.                            )     Case No. 5:21-cv-848-XR
                                  )
14  GREGORY WAYNE ABBOTT, et al., )
          Defendants.             )
15  _____
    LULAC TEXAS, et al.,          )
16        Plaintiffs,             )
                                  )
17  v.                            )
                                  )     Case No. 1:21-cv-0786-XR
18                                )
    JOHN SCOTT, et al.,           )
19        Defendants.             )
    _____
20  MI FAMILIA VOTA, et al.,      )
          Plaintiffs,             )
21                                )
    v.                            )     Case No. 5:21-cv-0920-XR
22                                )
    GREG ABBOTT, et al.,          )
23        Defendants.             )
    _____
24

25
```

```
 1  UNITED STATES OF AMERICA,      )
          Plaintiff,               )
 2                                 )
    v.                             )    Case No. 5:21-cv-1085-XR
 3                                 )
    THE STATE OF TEXAS, ET AL.,    )
 4        Defendants               )
    _____
 5

 6

 7

 8
    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
 9
                    VIDEOTAPED ORAL DEPOSITION OF
10
                              BOB KAFKA
11
                           April 7, 2022
12
    * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
13

14

15          VIDEOTAPED ORAL DEPOSITION OF BOB KAFKA, produced as

16  a witness at the instance of the Office of the Attorney

17  General, and duly sworn, was taken in the above-styled and

18  numbered cause on the 7th day of April, 2022, from 10:12 a.m to

19  4:25 p.m., before Dottie Norman, Certified Shorthand Reporter

20  in and for the State of Texas, reported by machine shorthand,

21  at the Offices of Disability Rights Texas, 2222 W. Braker Lane,

22  Austin, Texas, pursuant to the Federal Rule of Civil Procedure

23  30(b)(6) and the provisions stated on the record.

24

25
```

Bob Kafka                                                                                                    April 07, 2022
                                                                                                                    Page 102

1  "Another example is REVUP member Laura Halvorson.  Ms.
2  Harvorson is a registered voter, a resident of San Antonio, and
3  lives with muscular dystrophy, quadriplegia, and chronic
4  neuromuscular respiratory failure."  Do I read that correctly?
5       A.   Correct.
6       Q.   So let's talk about these three examples.
7            What does REVUP contend the impacts of the
8  sections that they are challenging are on Mr. Ruben (sic)?
9       A.   Okay.  Like I said, he also would be affected by
10 the -- the increased ID requirements in Section 5 as well as
11 the Section 6.04, 6.06 in terms of what an assistant can do and
12 the oath that the attendant needs now to sign.  The increase
13 there would generally affect him negatively in all those areas
14 in terms of finding an assistant.
15           ==We have a major crisis already in finding what==
16 ==we call community attendants.  And now that there is==
17 ==criminalization potential of the oath that the person has to==
18 ==sign is one of the big factors of the people who use an==
19 ==attendant basically in person and/or -- not and/or.  Or when==
20 ==they use mail-in ballot.==
21      Q.   Do you know if Mr. Fernandez voted in the March
22 primary?
23      A.   No, we don't track individual -- individuals, either
24 their disability or if they voted.  I do not have any knowledge
25 if he participated in the -- in the primary.  He is just

1  very active in Texas Parent to Parent as well as being REVUP
2  members.
3        Q.   Do you know if Ms. Litzinger voted in the March
4  primary?
5        A.   I don't know.
6        Q.   Do you know if Ms. Litzinger needs an assistant to
7  assist her in voting?
8        A.   Definitely.  And the limitations put in, you know,
9  of what an assistant can do, definitely, if she did vote, would
10 be limited because of now the much more restrictive things that
11 are written in the law that an assistant can actually help
12 with.
13       Q.   Do you know if Ms. Litzinger actually had difficulty
14 finding an assistant to help her vote in the March primary?
15       A.   I don't know that specifically, but again -- and
16 this was only a few days ago talking with, you know, her mother
17 there.  She was trying to help find Amy a community attendant
18 at all.  We have such a crisis, the infrastructure.  And so the
19 potential for criminalization is just another factor, you know,
20 in terms of people having difficulty for that specific task of
21 voting.
22       Q.   Okay.
23       A.   You can't -- can't find somebody to put you into
24 bed, yet alone possibly getting, you know, a Class A
25 misdemeanor by signing something when you didn't realize you

Bob Kafka  April 07, 2022
Page 105

1  were doing anything wrong.
2      Q.   Well, let me ask you this:  If Ms. Litzinger is
3  unable to find an assistant to even help her get in and out of
4  bed -- I mean, that's not on account of Senate Bill 1, right?
5      A.   No, but it only -- and, again, it's sort of
6  cumulative, you know, of what people -- you know, somebody --
7  this was anecdotal, not specifically to Amy.  But this is
8  classic who is not named.  But the individual had an attendant,
9  but that attendant would not -- would not go with the
10 individual to the poll because of the potential for criminal
11 penalty.
12     Q.   When was that?
13     A.   That was -- I got that call -- I think it was just
14 before the primary.  I would have to go back and look.  It was
15 just somebody called.  It was a mother of somebody.  And I
16 never did get the person's name, but the mother was just
17 complaining about that individual and never did --
18     Q.   Did you get any indication why the -- why the parent
19 didn't just take the child to the poll if they couldn't find an
20 assistant?
21     A.   You know, that -- you know, again, in today's
22 economy it is really difficult.  Parents are, you know, just
23 trying to economically hold their families together.  And, you
24 know, that's -- that's what has really intensified the
25 difficulty.  You know, in the past, unfortunately, it all fell

Bob Kafka                                                                                     April 07, 2022
Page 109

1     Q.   Do you know whether Ms. Halvorson has requested an
2 accommodation in advance of the May primary that would allow
3 her to vote?
4     A.   I do not know.  And same answer is that we don't
5 track how people vote.
6     Q.   I understand and I don't mean to be tedious about
7 it.  I have just got to have --
8     A.   I know.
9     Q.   -- this for the record.
10    A.   I respect that.
11    Q.   With regard to Ms. Halvorson, do you know if she had
12 any difficulty finding an assistant if she needed one to help
13 her vote in the March 22 primary?
14    A.   No, but I can tell you -- uh, not specific to
15 voting, she is on a respirator 24 hours a day and has had
16 critical difficulty in finding a personal care attendant for
17 months actually.  So, again, I don't know specifically for
18 voting.  But, again, as my answer for all three of those
19 individuals, the idea of finding an attendant today is, you
20 know, very, very -- it is a crisis in the infrastructure of our
21 whole community attendants.
22    Q.   Well, I think you would also agree that that crisis
23 existed before Senate Bill 1, right?
24    A.   Right, but the criminalization in SB 1 only adds to
25 the potential reason they can't find somebody.

1    A.   I think each of the sections there in terms of --
2  since the primary just occurred, to be able to quantify at this
3  point is -- right now we're not able to do that.
4              MR. BUSER-CLANCY:  Objection.  Just for the
5  record, 5.04 is not a part of our lawsuit.
6              MR. HUDSON:  My apologies.
7    Q.   (By Mr. Hudson) Let me jump to 5.06.  So Section
8  5.06 on page 38.  The change there is:  "An election judge may
9  permit a person to whom an early voting ballot has been sent
10 who cancels the person's application for a ballot to be voted
11 by mail in accordance with Section 84.032 but fails to return
12 the ballot to be voted by mail to the early voting clerk,
13 deputy early voting clerk, or presiding judge as provided by
14 that section to vote only a provisional ballot under Section
15 63.011."  Did I read that correctly?
16   A.   Uh-huh.  Yeah.
17   Q.   Does REVUP have a position on how Section 5.06
18 impacts disabled voters differently than non-disabled voters?
19   A.   Being that so many people with disabilities may have
20 cognitive and other disabilities, some of the process, you
21 know, to remediate some of the problem of canceling the
22 person's application -- all the -- the new portal is really
23 almost not usable by so many of the people with disabilities
24 than people who don't have disabilities.  And, again, because
25 people with disabilities are one of the large allowed in terms

Bob Kafka
April 07, 2022
Page 142

1    Q.   You have no basis to assert that early voting ballot
2  boards are operated by the Texas Office of the Attorney
3  General, right?
4    A.   Right.
5    Q.   Can you flip over to Section 6.06 of Senate Bill 1
6  on Defendants' 3?  It's at page 54.
7    A.   Okay.
8    Q.   What is REVUP's issue with Section 6.06?
9         MR. BUSER-CLANCY:  Objection; vague.
10        THE WITNESS:  It basically criminalizes, you
11 know, the potential of a community attendant who in good faith
12 is assisting a person.  And because of the narrowing of what
13 assistants can do are putting themselves in jeopardy when they
14 are potentially just assisting a person, and criminalizing
15 something when the individual in good faith signs the oath as
16 currently and then inadvertently, without knowing, setting up
17 something or not doing just the four things that are outlined
18 in Senate Bill 1 that they can do in the oath would be charged
19 with perjury.  And that criminalizes it.  And that is the
20 chilling effect, the criminalization of somebody just helping
21 somebody to vote.  And when you -- and you even said it
22 yourself.  With invisible disabilities and someone that may
23 need assistance, a deaf person, closed-head injury, uh, and
24 somebody thinks maybe even that person doesn't have a
25 disability and they are actually voting for them.  So that's

1  poll watchers not understanding the balance between a person
2  with more cognitive needs, closed-head injury.  And even my own
3  learning curve, there are deaf/blind people who are quite high
4  level and their interpreter does it within their hand.  So it
5  is part of some of the, again, criminalization part that we
6  worry about because of the -- the 254 counties that some of the
7  things that are assisting vote will be seen as telling the
8  person how to vote, so you know.
9       Q.   Has REVUP ever seen abuse by caretakers?
10      A.   To be honest, yes, there has been in the past.  But,
11 again, it's -- it hasn't been rampant.  But, you know, to be
12 truthful, I would have to say yes, there has been.
13      Q.   And you mentioned just a moment ago that there are
14 ethics and codes for assistants; is that right?
15      A.   Pretty much in each of the professions,
16 interpreters, sighted guides.  There are trainings for people,
17 you know, different organizations in terms of like the
18 intellectual/developmental community, the autism which is part
19 of that spectrum there.  So -- and then there's what we call
20 independent living training for people with physical
21 disabilities in terms of consumer control, consumer direction,
22 in terms of that.  So primarily giving -- you used the word
23 power in this situation as much to the individual, not to the
24 person who is helping.
25      Q.   Would you agree I've been courteous to you today?

1      A.   Oh, you have been a real gentleman.

2      Q.   Well, thank you.

3           Anything I haven't asked you that you think I

4  should have?

5      A.   No.  I think your questions have been fair.

6      Q.   Thank you.

7           MR. HUDSON:  We'll reserve.

8           MS. DAVIS:  No redirect.

9           THE VIDEOGRAPHER:  We are off the record.

10          MR. HUDSON:  Well, hold on.

11          THE VIDEOGRAPHER:  Oh, I'm sorry.

12          MR. HUDSON:  Can we get a read and sign?  That

13  was it.  That's got to go on the record.

14          MS. DAVIS:  Yeah.  Thank you.

15          THE VIDEOGRAPHER:  We are off the record at

16  4:25.

17

18

19

20

21

22

23

24

25