Exhibit Z

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNIÓN DEL PUEBLO ENTERO, et al.,

Plaintiffs,

v.

GREGORY W. ABBOTT, et al.,

Defendants.

Civ. Act. No. 5:21-cv-844 (XR)
(consolidated cases)

**DECLARATION OF AMY LITZINGER**

My name is Amy Litzinger. I am over the age of 21 and fully competent to make this declaration.

Under penalty of perjury, I declare the following based upon my personal knowledge.

1. I am a 35-year-old woman who lives in Travis County, Texas. I registered to vote for the first time shortly after I turned 18 in 2005. I have been a registered voter in Travis County ever since. I am a member of both REVUP Texas and The Arc of Texas.

2. Though I am eligible to vote by mail because of my disabilities, I typically vote in person and use early voting prior to election day when I can. Early in the pandemic I voted by mail instead and would vote by mail in the future if my disabilities make voting in person more difficult or dangerous.

3. Voting is important to me. In addition to voting in most elections, including primary elections, since I turned 18, I am also a Volunteer Deputy Registrar and register others to vote. In fact, I have registered several of my attendant care workers to vote and took them to vote for the first time when they voted with me before SB1 was passed.

1

4. I have several disabilities that substantially limit several major life activities. I have spastic quadriplegic cerebral palsy from birth. I use a power wheelchair for mobility and when I am very tired, I use a chest strap to help keep me upright because I have no sitting balance. When the chest strap is buckled, I cannot remove it myself and I cannot lean forward far enough to comfortably access the voting machine. Similarly, if I am having a day with high spasticity, then I have trouble moving the controller of my power chair out of my way which further limits my mobility and ability to reach the voting machine.

5. I also have contractures in my elbows so they are fused and I cannot straighten my arms all the way to reach things. This means I cannot open doors on my own or move chairs or other things that are in my way.

6. My cerebral palsy also causes me to have visual tracking issues. My visual and balance problems mean that I lose my sitting balance when I try to read and turn a sheet of paper over. My cerebral palsy also makes it difficult to grasp a sheet of paper, to begin with, or to hold a pen. While I can sign my name, it is tiring to hold a pen and my signature looks different each time. I receive Botox injections to address some of the spasticity caused by my cerebral palsy; however, sometimes when my Botox treatments have just occurred, I am unable to sign my name or make a mark with a pen at all.

7. As a result of my disabilities, I do not drive myself but require a driver to assist me into and drive my van which has a ramp and tie-downs to hold my wheelchair in place. When I cannot find someone to drive me in my van, I cannot accept a ride from others because I cannot ride in cars that do not have a ramp or wheelchair tie-downs. I also do not have enough sitting balance to safely transfer into or ride in a seat in a car—I can only travel safely if I am in my wheelchair.

8. I also have dysautonomia, an autonomic dysfunction, which causes me to have an elevated heart rate if I am in hot temperatures for long periods of time, making it difficult to wait in long lines outdoors.

9. Because of my disabilities, I have personal care attendants who assist me with my activities of daily living for approximately twelve hours per day, plus one hour of transportation assistance per day.

10. The individuals who assist me are themselves marginalized people, including people of color, people who are LGBTQ+, and/or have invisible disabilities themselves.

11. I have a process I would typically use to vote in person, as I did before the pandemic and SB1. I would usually go to the League of Women Voters website to educate myself about everyone who is running in an election and would print my sample ballot with my choices. Before I leave my house, I find my ID or my voter identification card.

12. I would usually go with my attendant to my polling place—they would assist me into my wheelchair-accessible vehicle, including tying my chair down and strapping my chest strap into place. They would then drive me to my polling place. When we arrived, they would assist me out of the van, open doors, and move any objects in my way so that I could get into the polling place.

13. My assistor would usually get my ID out before we would go through the doors of the polling place. Most of the time, I am able to hold my own ID card and sheet with my voting choices on it, though it is possible that if I were voting shortly after my Botox treatments, my grip would be affected and I would not be able to hold these items for myself.

14. I would hand my ID to the poll worker and this would then usually prompt them to give me several papers including my voting machine number, my voting ballot, and fliers for

the caucus events for primaries. I am not able to hold all of these items and can usually only hold my ID and sheet with my voting choices on it. My assistor would usually have to take these items for me and would also have to put my ID away for me in my wallet. Once they have taken my ID from me, they would usually hand me the number to input into the voting machine.

15. As long as I have been unbuckled from my chest strap, I am able to independently operate the voting machine most of the time. Once my choices print, I am not able to submit my ballot myself into the ballot box because it is at standing height and not reachable from my chair, even if I raise my power chair to its highest setting. My assistor would usually have to take my ballot and submit it for me.

16. During the early stages of the pandemic, I switched to mail-in voting. Pre-SB1, I had my assistor open the envelope for me and unfold my ballot. They would then have to hold the paper down flat for me so that I could read it without it moving. I would fill in the bubbles myself, but if I wanted to write in candidates, my assistor would have to write the candidate for me or it would be illegible. If there were any other blanks, my assistor would also have to do any other handwriting on the ballot and the ballot envelope. I would sign the ballot and my assistor would then have to fold it, put it back in the inner and outer envelopes, and would hand me the envelope so that I could seal it. They would have to help me line the envelope up so that the edges would match for sealing. I would then attempt to have my signature match as closely as possible to the one the elections clerk uses for me while also having to have it cross the two sides of the envelope.

17. My assistor would then have to assist me into the car, as described above, to take the envelope to the mailbox or the Travis County Clerk's office.

18. During the May 2022 election, my assistor forgot to remove my chest strap before we entered the polling place because I had been preoccupied with making sure I had on my face mask before entering the building. As I was checking in with the poll worker, I had trouble handing my ID to the poll worker but the chest strap became a significant limit to my voting when I got to the voting machine. I needed to take it off but I was not sure if my assistor could remove it once we were in the polling area without having to take an oath or if this would count as "assistance" that isn't allowed.

19. Because I wasn't sure and I didn't want to expose my assistor to having to sign an oath that they might have to break by providing me with more physical assistance than the oath allows, I did not ask for it to be removed and, as a result, struggled to vote. It took me longer to vote and took a lot of energy for me to fight against the chest strap. If it had been a longer ballot than only three questions, I would likely have been unable to finish my ballot and stopped voting.

20. As usual, I was not able to reach the ballot counter after voting but, because I was afraid that asking my assistor to put my ballot into the counter would require them to sign an oath or assist me in a way that isn't allowed, I asked the poll worker standing at the box to submit it for me, which they did. I would have preferred to be able to use my personal care attendant for this purpose to ensure I had more privacy in my voting experience, but SB 1 prevented me from doing so.

21. I again voted in person in the November 2022 general election. I had a new attendant and not only was it her first day working for me, but it was also her first time experiencing the voting process. She was not a registered voter and completely unfamiliar with the voting process, in general, and did not understand the limits to the assistance I needed and what

was allowed while voting. Specifically, she did not understand my need to vote alone to protect the privacy of my vote. Because of my attendant's unfamiliarity with the voting process, the elections staff perceived her actions as those of an assistor and attempted to have her sign an assistor's oath. Before going to vote, my assistor and I discussed the oath and concerns about exposing her to potentially violating an oath because of the physical assistance I may need and decided she would not sign it. However, because of the confusion that day, the elections staff did attempt to have her sign the oath. It caused me great stress to have to navigate these barriers with my new personal care attendant on her first day working with me. I felt badly that someone I rely on to assist me in my daily life had to be exposed to the risks of criminal liability just for trying to assist me when voting, which she understandably viewed as part of her job. Although she did not end up having to sign the oath, the demands from the poll workers were very concerning and caused significant anxiety for me and my assistor.

22. While I was at the polling place, I did not see any notices that told me about my rights as a person with a disability. There were no notices about my right to a reasonable modification under the law so that my assistor could help with more than what was outlined in the oath. There was no notice about who I might ask about giving me and my assistor permission to help me in the way that I needed. I did not see this on the website, at the polling place, or on any of the materials that I have read from the elections office. Even if I had known that this was an option, I would not have known whom to ask.

23. I have had conversations with several of my personal care attendants who have expressed confusion about what they can and cannot do to assist me to vote in the future. I am concerned that I will not be able to find attendants who will assist me to vote and/or they

would refuse to come to any shift where they know I intend to vote during that day. Because I cannot get out of bed without attendant care, having an attendant refuse to come on a day when I plan to vote would be incredibly dangerous for me.

24. Further, I do not feel comfortable having my attendants sign the assistor's oath when they escort me to vote. Not only is the oath unclear regarding what types of assistance are allowed, it also requires an assistor to certify that I qualify for help with voting. However, I do not believe that is always possible. When I voted in the November 2022 election, it was my attendant's first day working for me and she could not know me well enough to certify that I qualified for assistance under SB1. Further, I would not want my attendants to be exposed to possible punitive action related to the oath because of their unfamiliarity with me or the voting process or the misunderstanding of poll workers. While I am able to read the ballot and make my selections without assistance, I do need an attendant to assist me with transportation, to help me access the polling center, and to complete some physical tasks like placing my completed ballot in the box. These activities can be misinterpreted and misconstrued by poll workers and jeopardize my attendants who may be compelled to sign the assistor's oath.

25. I have similar concerns if I have to return to mail-in voting to protect my health. With the new requirements, even though I have access to my ID card, I would not be able to legibly write my ID number on the ballot and the envelope. My assistor would have to write this information for me, raising the same concerns noted above about their taking the oath or assisting me in ways that are not allowed. I do not think I would be able to find an attendant who is willing to write the information for me and take the assistor's oath.

26. SB 1 has made it harder for me and other people with disabilities to vote. It does not seem right or fair that I cannot receive the assistance I need to vote since the enactment of SB 1. As a person with a disability who requires intensive daily supports, I face a number of barriers in my life. Voting should not be one of them.

This Declaration is made pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct. Executed on _____, at Travis, Texas.

June 21, 2023 | 6:52 PM CDT

Amy Litzinger