# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, FRIENDSHIP-WEST BAPTIST CHURCH, SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT, TEXAS IMPACT, MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS, TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION, JOLT ACTION, WILLIAM C. VELASQUEZ INSTITUTE, FIEL HOUSTON INC., and JAMES LEWIN, | |
| Plaintiffs, | No. 5:21-CV-00844-XR |
| v. | |
| THE STATE OF TEXAS, JANE NELSON, in her official capacity as the Texas Secretary of State, JOHN SCOTT, in his official capacity as the interim Texas Attorney General, MICHAEL SCARPELLO, in his official capacity as the Dallas County Elections Administrator, JOHN CREUZOT, in his official capacity as the Dallas County District Attorney, LISA WISE, in her official capacity as the El Paso County Elections Administrator, BILL D. HICKS, in his official capacity as the El Paso County District Attorney, and JOSÉ GARZA, in his official capacity as the Travis County District Attorney, | |
| Defendants. | |

## LUPE AND OCA PLAINTIFFS' RESPONSE IN OPPOSITION TO INTERVENOR-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

Introduction ....................................................................................................................1

Counterstatement of Undisputed Facts.........................................................................2

    A.      Texas Held a "Safe, Free and Fair" Election in 2020........................................2

    B.      Texas Enacted SB1 Based on Unsubstantiated Claims of Voter Fraud .............3

    C.      SB1 Limits Access to Voter Assistance.............................................................4

    D.      SB1 Limits Community Organizations' Voter Outreach Efforts........................5

    E.      SB1 Empowers Poll Watchers to Interfere with Voting ...................................6

Standard of Review........................................................................................................7

Argument........................................................................................................................7

I.      Intervenors Fail to Establish the Absence of Genuine Disputes of Material Fact........................7

II.     Intervenors Fails to Satisfy the Summary Judgment Standard on Plaintiffs' Section 208
Claim (LUPE Count 5, OCA Count 4, LULAC Count 4) ...........................................8

    A.      The Court Has Already Rejected a Limited Reading of Section 208 ...............9

    B.      Intervenors' Interpretation of Section 208 Is Inconsistent with Section 208's
Text .................................................................................................................9

    C.      Intervenors' Interpretation of Section 208 Is Contrary to the Statute's Purpose,
Its Legislative History, and Controlling Precedent..........................................11

    D.      Section 208 Does Not Permit States to Deprive Voters of Their Choice of
Assistor by Deterring Assistors.......................................................................13

III.    Intervenors Fail to Satisfy the Summary Judgment Standard on Plaintiffs' First
Amendment Claims (LUPE Count 7, OCA Count 7, and LULAC Count 3)..............................14

    A.      Intervenors Misstate the Legal Standards for the First Amendment Claims .................14

    B.      Genuine Disputes of Material Fact Exist Concerning SB1's Voter Outreach
Restrictions......................................................................................................16

            1.      Factual Disputes Exist Over Section 7.04's Burden on Political Speech ..........16

            2.      Intervenors Fail to Establish that Section 7.04 Is Necessary to Serve a
Compelling State Interest or Narrowly Tailored to Serve Any Such
Interest........................................................................................................18

IV.    Intervenors Are Not Entitled to Summary Judgment on Plaintiffs' Void-for-Vagueness
Claims (LUPE Counts 7 and 8, OCA Count 8)..........................................................20

    A.      Genuine Issues of Material Fact Exist Regarding Section 7.04's Vagueness................21

    B.      Genuine Issues of Material Fact Also Exist as to Section 4.09's Vagueness ................23

C.     Intervenors Misstate the Applicable Legal Standard.........................................................26

V.     Intervenors' Attempts to Defeat Plaintiffs' Facial Challenges Are Unavailing.........................28

Conclusion.........................................................................................................................................29

Certificate of Service.........................................................................................................................33

# TABLE OF AUTHORITIES

**Cases**  **Page(s)**

*Adams v. Travelers Indem. Co.,*
    465 F.3d 156 (5th Cir. 2006) ...................................................................................7, 19

*Ark. United v. Thurston,*
    No. 5:20-CV-5193, 2020 WL 6472651 (W.D. Ark. Nov. 3, 2020) ....................... 11, 13

*Baggett v. Bullitt,*
    377 U.S. 360 (1964) ...................................................................................................25

*Brnovich v. Democratic Nat'l Comm.,*
    141 S. Ct. 2321 (2021) .................................................................................................9

*Brown v. Ent. Merch. Ass'n,*
    564 U.S. 786 (2011) ............................................................................................. 15, 16

*Buckley v. Am. Const. L. Found., Inc.,*
    525 U.S. 182 (1999) ...................................................................................................16

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) .....................................................................................................7

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ................................................................................... 16, 20, 29

*City of Chicago v. Morales,*
    527 U.S. 41 (1999) (plurality opinion) ......................................................................25

*Coates v. City of Cincinnati,*
    402 U.S. 611 (1971) .............................................................................................. 24, 25

*Democracy N.C. v. N.C. State Bd. of Elections,*
    590 F. Supp. 3d 850 (M.D.N.C. 2022) ................................................................ 13, 16

*Disability Rts. N.C. v. N.C. State Bd. of Elections,*
    602 F. Supp. 3d 872 (E.D.N.C. 2022) .......................................................................11

*DSCC v. Simon,*
    950 N.W.2d 280 (Minn. 2020) ...................................................................................13

*Ferguson v. Estelle,*
    718 F.2d 730 (5th Cir. 1983) ......................................................................................24

*Fish v. Schwab,*
    957 F.3d 1105 (10th Cir. 2020) ..................................................................................16

*Galvan v. Calhoun Cnty.,*
    719 F. App'x 372 (5th Cir. 2018) ................................................................................7

*Hill v. Colorado,*
    530 U.S. 703 (2000) .............................................................................................. 22, 28

*Hillman v. Maretta,*
    569 U.S. 483 (2013) ...................................................................................................10

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) .......................................................................................................28

*Iancu v. Brunetti*,
  139 S. Ct. 2294 (2019) ............................................................................................. 16, 19

*Johnson v. United States*,
  576 U.S. 591 (2015) ....................................................................................................... 27

*Kee v. City of Rowlett*,
  247 F.3d 206 (5th Cir. 2001) .............................................................................. 7, 8, 19

*Kramer v. Price*,
  712 F.2d 174 (5th Cir. 1983), *reh'g granted*, 723 F.2d 1164 (5th Cir. 1984) ................... 27

*League of United Latin Am. Citizens v. Perry*,
  548 U.S. 399 (2006) .......................................................................................................... 1

*League of Women Voters of Fla. v. Fla. Sec'y of State*,
  66 F.4th 905 (11th Cir. 2023) .............................................................. 13, 22, 26, 27

*League of Women Voters of Tenn. v. Hargett*,
  400 F. Supp. 3d 706 (M.D. Tenn. 2019) ......................................................... 22, 23

*LeMaire v. La. Dep't of Transp. & Dev.*,
  480 F.3d 383 (5th Cir. 2007) .......................................................................................... 8

*Little v. Liquid Air Corp.*,
  37 F.3d 1069 (5th Cir. 1994) (en banc) ........................................................................ 8

*Meyer v. Grant*,
  486 U.S. 414 (1988) ................................................................................................. 15, 16

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ....................................................................................................... 20

*Navarro v. City of San Juan*,
  624 F. App'x 174 (5th Cir. 2015) .................................................................................. 8

*OCA Greater Hous. v. Texas*,
  No. 1:15-CV-679-RP, 2022 WL 2019295 (W.D. Tex. June 6, 2022) ...................... 9

*OCA-Greater Houston v. Texas*,
  867 F.3d 604 (5th Cir. 2017) .................................................................................. 12, 13

*Priorities USA v. Nessel*,
  487 F. Supp. 3d 599 (E.D. Mich. 2020) ..................................................................... 11

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ......................................................................................................... 7

*Republic of Arg. v. NML Capital, Ltd.*,
  573 U.S. 134 (2014) ....................................................................................................... 12

*Reynolds v. Sims*,
  377 U.S. 533 (1964) ....................................................................................................... 29

*Sessions v. Dimaya*,
  138 S. Ct. 1204 (2018) (Gorsuch, J., concurring) ..................................................... 27

*United States v. Alvarez*,
  567 U.S. 709 (2012) ....................................................................................................... 16

*United States v. Davis*,
   139 S. Ct. 2319 (2019) .................................................................................... 2, 21, 28

*United States v. Smith*,
   499 U.S. 160 (1991) ...................................................................................................... 12

*United States v. Westbrooks*,
   858 F.3d 317 (5th Cir. 2017) ...................................................................................... 27

*Vill. of Hoffman Ests. v. Flipside*,
   455 U.S. 489 (1982) ................................................................................................ 27, 28

*Voting for Am., Inc. v. Andrade* (*Voting for America I*),
   488 F. App'x 890 (5th Cir. 2012) .............................................................................. 28

*Voting for Am., Inc. v. Steen* (*Voting for America II*),
   732 F.3d 382 (5th Cir. 2013) ...................................................................................... 28

## Statutes

52 U.S.C. § 10508 ............................................................................................................ 10

Tex. Elec. Code § 33.061(a) .......................................................................................6, 24

Tex. Elec. Code § 33.061(b) .............................................................................................. 6

Tex. Elec. Code § 61.033 ................................................................................................. 13

Tex. Elec. Code § 64.009(e)-(h) ........................................................................................ 4

Tex. Elec. Code § 64.0322 ................................................................................................. 4

Tex. Elec. Code § 64.034 ................................................................................................... 4

Tex. Elec. Code § 86.010(e), (h)-(i) .................................................................................. 4

Tex. Elec. Code § 86.0105(a), (c), (e)-(f) ......................................................................... 4

Tex. Elec. Code § 276.015 ................................................................................................. 4

Tex. Elec. Code § 276.015(a)(2) ........................................................................... 5, 6, 23

Tex. Elec. Code § 276.015(b)-(d) ...................................................................................... 5

Tex. Penal Code § 12.21 .................................................................................................... 6

## Other Authorities

David Lynch, *Bexar County's Early Voting Locations Staying Open Later this Week*,
   KENS5 (Oct. 27, 2020),
   https://www.kens5.com/article/news/politics/elections/bexar-countys-earlyvoting-
   locations-staying-open-later-this-week/273-c7e85454-46c8-4d7b-a048-
   85f306fc8281 ................................................................................................................. 2

Fed. R. Civ. P. 56(a) .......................................................................................................... 7

Fed. R. Civ. P. 56(c)(1)(A) ............................................................................................7, 8

*Governor Abbott Delivers 2021 State of the State Address*, OFFICE OF THE TEXAS
   GOVERNOR (Feb. 1, 2021), https://gov.texas.gov/news/post/governor-abbott-
   delivers-2021-state-of-the-state-address ...................................................................... 3

*Governor Abbott Holds Press Conference on Election Integrity Legislation*, OFFICE OF THE TEXAS GOVERNOR (Mar. 15, 2021), https://gov.texas.gov/news/post/governor-abbott-holds-press-conference-on-election-integrity-legislation ..................................... 3

*Governor Abbott Signs Election Integrity Legislation Into Law*, OFFICE OF THE TEXAS GOVERNOR (Sept. 7, 2021), https://gov.texas.gov/news/post/governor-abbott-signs-election-integrity-legislation-into-law ............................................................ 3

H.R. Rep. No. 227, 97th Cong., 1st Sess. 14 (1981) ................................................... 12

Jolie McCullough, *Nearly 127,000 Harris County Drive-Thru Votes Appear Safe after After Federal Judge Rejects GOP-Led Texas Lawsuit*, TEX. TRIB. (Nov. 2, 2020), https://www.texastribune.org/2020/11/02/texas-drive-thru-votes-harris-county/ ............................... 2

S. Rep. No. 97-417 (1982) ........................................................................................... 12

Taylor Goldenstein, *Fact Checking Texas Lawmaker's Claim of 400 Voter Fraud 'Cases,'* HOUSTON CHRONICLE (Apr. 12, 2021) (updated Apr. 13, 2021) ........................................... 3

Thomas M. Boyd & Stephen J. Markman, *The 1982 Amendments To The Voting Rights Act: A Legislative History*, 40 WASH. & LEE L. REV. 1347, 1362–63 & n.83 (1983) ..................................................................................................................... 12

Plaintiffs La Unión del Pueblo Entero ("LUPE"), Southwest Voter Registration Education Project, Mexican American Bar Association of Texas, Texas Hispanics Organized for Political Education, JOLT Action, William C. Velasquez Institute, FIEL Houston, Friendship-West Baptist Church, Texas Impact, and James Lewin (collectively, "LUPE Plaintiffs") and OCA-Greater Houston, League of Women Voters of Texas, and REVUP-Texas (collectively, "OCA Plaintiffs") respectfully oppose the motion for summary judgment filed by Defendant-Intervenors Harris County Republican Party, Dallas County Republican Party, Republican National Committee, National Republican Senatorial Committee, and National Republican Congressional Committee (collectively, "Intervenors").

## INTRODUCTION

"Texas has a long, well-documented history of discrimination" against various groups of Texans in the voting and electoral process, employing "[d]evices such as the poll tax, an all-white primary system, and restrictive voter registration time periods." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 439-40 (2006) (citation omitted). The law challenged in this case follows that well-worn path. Senate Bill 1 ("SB1") is yet another attempt to disenfranchise voters who need assistance, prevent community-based organizations from working to increase voter turnout among marginalized groups, and empower poll watchers to interfere with the democratic process. Plaintiffs brought this suit to vindicate their rights. Intervenors' motion for summary judgment fails to establish that there are no genuine disputes of material fact and that Defendants are entitled to judgment as a matter of law.

Intervenors hardly mention the evidentiary record, and they provide almost no record evidence in support of their arguments. Instead, they make sweeping factual assertions without evidentiary support and focus almost exclusively on legal arguments. Because Intervenors fail to establish that there are no genuine disputes of material fact, their motion fails at this first step. Likewise, each argument in Intervenors' motion fails on the merits. First, the statutory text of Section 208, its legislative history, and Fifth Circuit precedent all confirm that Section 208 forbids laws like SB 1 that restrict a voter's choice of

assistor beyond those categories specifically enumerated by statute. Second, Section 7.04's criminalization of in-person communication in favor of a particular candidate or measure is an unconstitutional content- and viewpoint-based restriction on core political speech. Third, Sections 4.09 and 7.04 are void because they are criminal laws that fail to adequately put election workers and canvassers (among others) on notice of what the law prohibits. And "[i]n our constitutional order, a vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). Accordingly, the Court should deny Intervenors' summary judgment motion.

## COUNTERSTATEMENT OF UNDISPUTED FACTS

### A.    Texas Held a "Safe, Free and Fair" Election in 2020

Texas's 2020 General Election was a "resounding success" despite unprecedented health threats and logistical obstacles posed by the COVID-19 pandemic. Ingram Dep. 204:16–22, 206:14-15 (Apr. 26, 2022) (Ex. 1). Public officials and groups throughout Texas worked to increase voter participation by making voting more accessible and educating and encouraging voters to cast lawful ballots.[1] Election officials in some counties also took additional steps to make voting more accessible for voters who might be hesitant to come to the polls during the global health crisis, including setting up outdoor and drive-through polling locations, keeping early-voting locations open overnight, and establishing ballot drop-

---

[1] *See, e.g.*, David Lynch, *Bexar County's Early Voting Locations Staying Open Later this Week*, KENS5 (Oct. 27, 2020), https://www.kens5.com/article/news/politics/elections/bexar-countys-earlyvoting-locations-staying-open-later-this-week/273-c7e85454-46c8-4d7b-a048-85f306fc8281 (discussing efforts to make voting easier and increase the number of polling places); Jolie McCullough, *Nearly 127,000 Harris County Drive-Thru Votes Appear Safe After Federal Judge Rejects GOP-Led Texas Lawsuit*, Tex. Trib. (Nov. 2, 2020), https://www.texastribune.org/2020/11/02/texas-drive-thru-votes-harris-county/ (discussing Houston Democrats' efforts to make voting easier and increase the number of polling places); Razo Dep. 96:25-98:17 (Ex. 3) (discussing Mi Familia Vota's work educating community members who "work nontraditional work hours" on "24-hour voting" in 2020); Michelle Brown Dep. 33:20-34-1, 37:24-38:5 (Ex. 4) (discussing Delta Sigma Theta's work providing voters "educational awareness programs" for the November 2020 election); Emily Timm Dep. 59:13-60:5 (Ex. 5) (discussing Workers Defense Action Fund's work telling voters "that they could hand-deliver their mail-in ballot for the November 2020 election before election day").

box sites. Longoria Morning Dep. 76:4-77:25 (Apr. 20, 2022) (Ex. 2); Longoria Afternoon Dep. 27:14-22 (Apr. 20, 2022) (Ex. 29). As a result of these efforts, Texas achieved record voter turnout, including increased turnout among Latino, Asian-American, and Black voters. LUPE Second Am. Compl. ¶¶ 66, 68, 76, ECF No. 208 ("LUPE 2AC"); Ex. 1 206:22–25.

The Texas Secretary of State's office proclaimed that Texas had a "safe, free and fair election" in 2020. Ex. 1 213:15-25.

**B.      Texas Enacted SB1 Based on Unsubstantiated Claims of Voter Fraud**

Despite these successes, Governor Greg Abbott and Attorney General Ken Paxton sought to cast doubt on the integrity of the 2020 election by launching investigations of voter fraud and announcing that "election integrity" would be an "emergency item" for the Texas Legislature's 2021 term.[2] The Governor and Attorney General took these steps despite the fact that there was no evidence of widespread voter fraud in the 2020 election and no evidence of a substantial risk of fraud in future elections in Texas. *See, e.g.*, Expert Report of Dr. Allan J. Lichtman at 12, 58-62, 78-109 (Ex. 6). Attorney General Paxton's office spent 22,000 staff hours investigating voter fraud in the 2020 election, but identified only 16 minor voting offenses out of more than 11,000,000 ballots cast.[3]

Following claims that undermined the credibility of the 2020 election, the Texas Legislature enacted Senate Bill 1 or "SB1," which Governor Abbott signed into law on September 7, 2021. *Governor Abbott Signs Election Integrity Legislation Into Law*, OFFICE OF THE TEXAS GOVERNOR (Sept. 7, 2021),

---

[2] *See, e.g.*, *Governor Abbott Holds Press Conference on Election Integrity Legislation*, Office of the Texas Governor (Mar. 15, 2021), https://gov.texas.gov/news/post/governor-abbott-holds-press-conference-on-election-integrity-legislation; *Governor Abbott Delivers 2021 State of the State Address*, OFFICE OF THE TEXAS GOVERNOR (Feb. 1, 2021), https://gov.texas.gov/news/post/governor-abbott-delivers-2021-state-of-the-state.address.
[3] *See* Taylor Goldenstein, *Fact Checking Texas Lawmaker's Claim of 400 Voter Fraud 'Cases,'* HOUSTON CHRONICLE (Apr. 12, 2021) (updated Apr. 13, 2021), https://www.houstonchronicle.com/politics/texas/article/Fact-checking-Texas-lawmaker-s-claim-of-400-16095858.php.

https://gov.texas.gov/news/post/governor-abbott-signs-election-integrity-legislation-into-law. SB1 significantly limits access to voting in Texas and makes it far more difficult for voters to exercise their constitutional rights.

### C.      SB1 Limits Access to Voter Assistance

SB1 targets eligible voters who vote with assistance—including those with disabilities, limited English proficiency, and less formal education—and makes it more difficult for them to receive the assistance they need. *See* S.B. 1 §§ 6.01, 6.03-6.06, 7.04, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at Tex. Elec. Code §§ 64.009(e)-(h), 64.0322, 64.034, 86.010(e), (h)-(i), 86.0105(a), (c), (e)-(f), 276.015). Section 6.01 requires an assistor who transports seven or more curbside voters to the polls to complete and sign a form stating whether the driver is providing only transportation assistance or is also providing assistance with voting. Similarly, Sections 6.03 and 6.05 require an assistor to fill out a form and provide information on the mail ballot carrier envelope stating the assistor's "relationship to the voter" and whether the assistor "received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee." Section 6.04 requires an assistor to swear, under penalty of perjury, that the voter "represented to [the assistor that] they are eligible to receive assistance," and that the assistor did not "pressure" the voter to choose them as the assistor. Section 6.06 makes it a crime for a person to solicit, receive, offer, or accept compensation in connection with mail voting assistance. And Section 7.04 prohibits anyone from engaging in any in-person interaction with a voter "in the physical presence of an official ballot" with intent "to deliver votes for a specific candidate or measure" if the individual conducts such activities in exchange "for compensation or other benefit."

These provisions prevent people from receiving assistance with voting by discouraging others from providing that assistance. Texas election officials have testified that an assistor "might think that if they make a mistake in . . . giving the assistance to the wrong type of voter that they might be accused of perjury for having signed the oath." Wise Dep. (Ex. 7) 147:16-148:15; *see also* Callanen Dep. (Ex. 8)

238:7-239:4, 240:18-23 (Bexar County Election Administrator's Office official testifying that, personally, she would not "sign an oath under penalty of perjury if [she wasn't] sure [she was] complying with the oath"). Thus, as one witness explained, SB1 is "not only a burden on the people that want to provide assistance but it's a burden on the voters that need assistance, because now, they don't have access to as many people that otherwise would be willing to help them." Shackelford Dep. 131:22-132:22 (Ex. 9).[4]

**D.      SB1 Limits Community Organizations' Voter Outreach Efforts**

SB1 also takes aim at community-based organizations that conduct non-partisan voter turnout activities by criminalizing certain types of voter interactions, which the law characterizes as "vote harvesting." *See, e.g.*, Expert Report of Henry Flores ¶ 14 (Ex. 15). Under section 7.04, a person commits a criminal offense if the person (a) "directly or through a third party, knowingly provides or offers to provide vote harvesting services in exchange for compensation or other benefit"; (b) "directly or through a third party, knowingly provides or offers to provide compensation or other benefit to another person in exchange for vote harvesting services"; or (c) "knowingly collects or possesses a mail ballot or official carrier envelope in connection with vote harvesting services." S.B. 1 § 7.04, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at Tex. Elec. Code § 276.015(b)-(d)). SB1 broadly defines "[v]ote harvesting services" as any "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." *Id.* (codified at Tex. Elec. Code § 276.015(a)(2)). The law also broadly defines "benefit" as "anything reasonably regarded as a gain or advantage." *Id.* Notably, however, SB1 does not define "in-person interaction" or what kind of a nexus is needed for an interaction to occur "in the physical presence of" a ballot. *See id.*

---

[4] *See also* Cole Dep. 21:21-22:24 (Ex. 10) (explaining that Section 6.04 is onerous on him, as a person who requires assistance to vote, because he must find an "assister that's willing to be subject to prosecution if something of this oath goes amiss."); Crowther Dep. 98:6-22 (Ex. 11) (explaining that she is reluctant to expose her assister to criminal penalty).

Texas election officials have been unable to say how broadly Section 7.04 reaches. *See* Ex. 1 182:25-185:8, 187:14-188:16; Ex. 7 169:6-17; White Dep. 169:1-171:1 (Ex. 12). And Section 7.04 has chilled core speech, with community organizations scaling back their community outreach efforts, re-cruiting, and voter assistance out of fears that their members may be subjected to criminal penalties for communicating with voters about election issues in the presence of mail ballots. *See* Chen Dep. 217:19-219:4, 221:17-222:17 (Mar. 28, 2022) (Ex. 13). As a result, the universe of assistors available to help voters is dwindling, which is likely to impede voting by marginalized Texans such as those with disabili-ties and those with limited English proficiency. *See, e.g.*, Expert Report of Doug Kruse ¶¶ 107, 109 (Ex. 14) (lack of voting assistance may disenfranchise Texans with disabilities); Ex. 15 at 7 (losing access to assistors and outreach workers will have a negative impact on Latino voters).

E.     **SB1 Empowers Poll Watchers to Interfere with Voting**

SB1 also limits the ability of poll workers and election officials to effectively manage and remove unruly poll watchers. Section 4.09 imposes criminal liability if a poll worker "knowingly prevents a watcher from observing an activity or procedure the person knows the watcher is entitled to observe, including by taking any action to obstruct the view of a watcher or distance the watcher from the activity or procedure to be observed in a manner that would make observation not reasonably effective." S.B. 1 § 4.09, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021) (codified at Tex. Elec. Code § 33.061(a)). An offense under this section is a Class A misdemeanor punishable by up to one year in jail, a fine of up to $4,000, or both. *Id*. (codified at Tex. Elec. Code § 33.061(b)); Tex. Penal Code § 12.21. Because section 4.09 is broadly and imprecisely defined, poll workers cannot know whether they are violating the statute. *See* James Lewin Dep. 107:20-108:13 (Ex. 16). The uncertainty discourages poll workers from seeking to control or remove poll watchers who seek to intimidate voters or engage in other disruptive behavior at polling places. Lewin Decl. ¶¶ 6, 10 (Ex. 17); Lee Decl. ¶ 7 (Ex. 25).

To address these intrusions on protected rights, Plaintiffs sued to enjoin SB1's enforcement.

## STANDARD OF REVIEW

Summary judgment is appropriate only when the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must consider the record taken as a whole, drawing reasonable inferences and construing all evidence in favor of the nonmoving party without weighing the evidence or making credibility determinations. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

"The moving party bears the initial burden of informing the Court of the basis of its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Adams v. Travelers Indem. Co.*, 465 F.3d 156, 163 (5th Cir. 2006) (citation omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In particular, to establish that a fact is not genuinely disputed, the movant must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001). If the movant satisfies that burden, "the burden shifts to the nonmovant to produce evidence to oppose the motion." *Galvan v. Calhoun Cnty.*, 719 F. App'x 372, 376 (5th Cir. 2018).

## ARGUMENT

### I.    Intervenors Fail to Establish the Absence of Genuine Disputes of Material Fact

As a threshold matter, the motion cites no record evidence to demonstrate the absence of a genuine issue of material fact on any of Plaintiffs' claims. Intervenors devote a scant three pages of their brief to the Section 208 argument. Intervenor Defs.' Mot. Summ. J. 27-30, ECF No. 608 ("Mot."). None of those three pages contains a citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions,

interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Similarly, nothing in Intervenors'

Statement of Uncontested Facts addresses voter assistance. And the remainder of Intervenors' summary

judgment motion cites record evidence for three propositions only: that the November 2022 General

Election ran more "smoothly" than the March 2022 Primary Election (Mot. 5-6); that mail ballot rejection

rates were lower in the November 2022 General Election compared to the March 2022 Primary Election

(*id.*); and that SB1 requires a voter assistor, before providing assistance, to obtain from the voter a state-

ment of eligibility (*id.* at 27). But these three record citations are not enough to establish that there are no

genuine disputes of material fact in the massive factual record.

Courts routinely deny motions for summary judgment in which the movant has failed to assert

and support facts. *See, e.g.*, *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 388 (5th Cir. 2007)

(reversing in part because "bare-bones motion" for summary judgment was "insufficient to put [Plaintiff]

on notice that he needed to produce evidence on those issues"); *see also Navarro v. City of San Juan*, 624

F. App'x 174, 178 (5th Cir. 2015) ("The party moving for summary judgment has the burden to show the

absence of a genuine dispute as to a material fact.").  Because Intervenors "fail[ed] to meet th[e] initial

burden, the motion must be denied, regardless of the nonmovant's response." *Little v. Liquid Air Corp.*,

37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Kee*, 247 F.3d at 210. The Court should deny

Intervenors' motion for failure to comply with Rule 56(c)(1)(A).

## II.     Intervenors Fail to Satisfy the Summary Judgment Standard on Plaintiffs' Section 208 Claim (LUPE Count 5, OCA Count 4, LULAC Count 4)

Intervenors' motion also fails on its own terms. Intervenors argue Congress intended Section 208

to have a narrow preemptive effect, and that states are free to restrict further the universe of voter assistors.

*See, e.g.*, Mot. 28 ("SB1 imposes only modest regulations to prevent potential abuses—exactly the type

of laws Congress ought to leave undisturbed when it enacted Section 208."). But this Court has already

rejected the argument that Section 208 permits states to impose restrictions on voter assistance beyond

those found in the statute. Order Den. Mot. to Dismiss 27–30, ECF No. 424 ("Order"). And Intervenors provide no sound basis for this Court to disregard that ruling and reach a different result.

### A.      The Court Has Already Rejected a Limited Reading of Section 208

In May 2022, the Court considered and rejected State Defendants' argument that the United States failed to state a claim that Section 208 preempted Section 6.04 of SB1.[5] Noting that "[t]he Voting Rights Act is ambitious, in both goal and scope," the Court denied the motion after concluding that "[t]he State Defendants interpret § 208 too narrowly." Order 27, 29 (quoting *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2330 (2021)). The Court observed that "§ 208 of the VRA guarantees a voter who requires assistance, because of blindness, disability, or inability to read or write, the right to assistance by a person of their choice in order to make their vote effective at all stages of the voting process." Order 28. The Court continued, "Section 208, therefore, not only describes who may give assistance. It also establishes what type of assistance may be given to a voter who requires assistance to vote because of blindness, disability, or inability to read or write—that assistance is whatever assistance is necessary to ensure their vote is effective." *Id.* at 29. Those rulings foreclose the legal arguments Intervenors make in their motion.

### B.      Intervenors' Interpretation of Section 208 Is Inconsistent with Section 208's Text

In any event, Intervenors' argument also fails because it is foreclosed by Section 208's plain text. Section 208 provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice, other than the voter's employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508. In creating these two categories of excluded individuals (representatives of the voter's employer or union), Congress chose to allow all others to serve as assistors. Generally, "[w]here Congress explicitly

---

[5] The United States' Section 208 challenge to Section 6.04 was later mooted by the injunction in *OCA Greater Hous. v. Texas*, No. 1:15-CV-679-RP, 2022 WL 2019295 (W.D. Tex. June 6, 2022).

9

enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Hillman v. Maretta*, 569 U.S. 483, 496 (2013) (citation omitted). SB1's voter-assistance restrictions ignore Section 208's plain language guaranteeing the right to an assistor of the voter's choice, subject to limited, expressly enumerated exceptions.

Intervenors argue that SB1 can permissibly restrict *who* can serve as a voter assistor, but that argument is even more inconsistent with Section 208 than the State Defendants' already rejected argument that SB1 can permissibly restrict the *type* of assistance provided by an assistor. *Compare* Mot. 29-30 (arguing that SB1 "sensibly" protects voters by disqualifying certain assistors), *with* Order 29 ("State Defendants claim that § 208 does not preempt section 6.04 because § 208 addresses who may give assistance, while section 6.04 addresses what assistance is appropriate."). Intervenors also argue that Plaintiffs misread Section 208 to preempt state laws that "place *any* limits on whom disabled individuals can select to provide voter assistance." Mot. 27-28 (emphasis in the original). That is nothing more than a strawman. With respect to who can serve as an assistor, the question is whether Section 208 preempts SB1's prohibitions on choosing assistors who are compensated by community-based non-profit organizations or have already conducted issue outreach to the voters. It does.

Intervenors rely on *Priorities USA v. Nessel* for the proposition that Section 208 "does not say that a voter is entitled to assistance from *the* person of his or her choice," and that use of the article "a" in Section 208 "suggests that some state law limitations on the identity of persons who may assist voters are permissible." Mot. 28 (quoting *Priorities USA v. Nessel*, 487 F. Supp. 3d 599, 619 (E.D. Mich. 2020)). However, *Nessel* is an outlier decision that multiple other district courts have rejected. *See, e.g.*, *Disability Rts. N.C. v. N.C. State Bd. of Elections*, 602 F. Supp. 3d 872, 878 (E.D.N.C. 2022) (use of the indefinite article "a" does not show intent by Congress to allow states to restrict a federally created right, for Congress does not "hide elephants in mouseholes" (citation omitted)); *Ark. United v. Thurston*, No.

5:20-CV-5193, 2020 WL 6472651, at *4 (W.D. Ark. Nov. 3, 2020) (same). Indeed, Intervenors' reading would eviscerate Section 208, as it would mean that a State could eliminate a voter's ability to select an assistor—so long as the State left the person with a choice between two assistors who were each hand-picked by the State. On Intervenors' reading, the voter would still be selecting "a person" of the voter's choice. That is nonsense. The obvious import of Congress's language is that the choice is up to the voter, not the State.

Intervenors argue that Plaintiffs' reading would allow a voter to select an incarcerated person as an assistor. Not so. As the court in *Arkansas United v. Thurston* explained, "a common-sense reading of § 208 suggests that any assistor chosen by a voter must be *willing* and *able* to assist. If a chosen person declines to assist the voter or simply does not show up at the polling place, that person has not violated § 208." 626 F. Supp. 3d 1064, 1087 (W.D. Ark. 2022). "And an incarcerated person would not be able assist at the polling place for reasons that are completely unrelated to [Texas's] elections laws." *Id.*

Indeed, Intervenors themselves state the rule correctly in their own motion: "Congress understood Section 208 as a guarantee that each voter, not the government, would choose her own assistant." Mot. 29. By excluding new categories of individuals from serving as assistors, beyond those set out by Congress in Section 208, SB1 conflicts with Section 208 and undermines the federal guarantee that voters who need assistance be able to choose their assistors.

## C.   Intervenors' Interpretation of Section 208 Is Contrary to the Statute's Purpose, Its Legislative History, and Controlling Precedent

Lacking support in the statutory text, Intervenors argue that SB1's restrictions on who can serve as an assistor are "exactly the type of laws Congress sought to leave undisturbed when it enacted Section 208." Mot. 28. But Intervenors offer no example of a law similar to SB1's assistance restrictions that existed at the time of Section 208's enactment and that Congress sought to "leave undisturbed." Moreover, the Supreme Court has repeatedly cautioned against creating rights-limiting exceptions beyond those

Congress created. *See, e.g.*, *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 144-46 (2014); *United States v. Smith*, 499 U.S. 160, 166-67 (1991).

Intervenors also claim that Section 208's legislative history shows that Congress was concerned about chosen assistors coercing or manipulating voters who are disabled or who cannot read or write. *See* Mot. 28-29 (discussing S. Rep. No. 97-417, at 62 (1982)). But preemption flows from the statutory text, not a committee report. In any event, the committee reports make clear that Congress was concerned about poll workers coercing or manipulating voters. *See* H.R. Rep. No. 227, 97th Cong., 1st Sess. 14 at 22 (1981); S. Rep. No. 97-417, at 61 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 241 ("[T]he committee has concluded that the only kind of assistance that will make fully 'meaningful' the vote of the blind, disabled, or those who are unable to read or write is to permit them to bring into the voting booth a person whom the voter trusts and who cannot intimidate him."); Thomas M. Boyd & Stephen J. Markman, *The 1982 Amendments To The Voting Rights Act: A Legislative History*, 40 WASH. & LEE L. REV. 1347, 1362–63 & n.83 (1983).

In *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017), the Fifth Circuit considered whether Section 208 preempted a Texas law that restricted a voter's ability to choose a language assistor by requiring that assistor to be registered to vote in the same county as the voter. Based on the "unambiguous language" of Section 208, the Fifth Circuit "conclude[d] that the limitation on voter choice expressed in Tex. Elec. Code § 61.033 impermissibly narrows the right guaranteed by Section 208 of the VRA." *Id*. at 614-15. District courts in other jurisdictions have followed suit. *See Ark. United*, 626 F. Supp. 3d at 1085 (invalidating state statute that prohibited individuals from helping more than six voters); *DSCC v. Simon*, 950 N.W.2d 280, 288-90 (Minn. 2020) (invalidating state statute that prohibited indi-

viduals from helping more than three voters complete their ballots or return their absentee ballots); *Democracy N.C. v. N.C. State Bd. of Elections*, 590 F. Supp. 3d 850, 872 (M.D.N.C. 2022) (denying motion to dismiss claim that state statute that limited assistors for nursing home residents violated Section 208).

Intervenors do not even try to distinguish SB1's prohibition on choosing voter assistors from other statutes invalidated under Section 208. They merely assert that Congress "expected states to continue regulating voter assistance" following passage of Section 208 and that "Section 6.06 is precisely the type of law Congress expected states to pass in harmony with the VRA." Mot. 28-29. But that unsubstantiated assertion is not a basis to disregard Section 208's text and binding Fifth Circuit precedent.

### D.   Section 208 Does Not Permit States to Deprive Voters of Their Choice of Assistor by Deterring Assistors

The remainder of Intervenors' arguments either mischaracterize or fail to address Plaintiffs' claims. Intervenors' only argument concerning Sections 6.01, 6.03, 6.04, 6.05, and 6.07 is that Plaintiffs attempt to assert the rights of voter assistors (not voters) under Section 208. Mot. 30. That is inaccurate. Plaintiffs claim that the challenged provisions of Article 6 deprive *voters* of their chosen assistors by deterring assistors. Mot. for Leave to File Second Am. Compl., Ex. A ¶¶ 261, 264, ECF No. 194-1 ("LULAC 2AC"); LUPE 2AC ¶¶ 104, 108-16, 142-43, 161, 164, 270; OCA Second Am. Compl. ¶¶ 96, 148, 161, 164-166, 178, ECF No. 200 ("OCA 2AC"). Intervenors also contend (without asserting facts or citing the record) that "section 6.04 imposes only modest, non-cognizable burdens on assistants [and does not] limit[] a voter's choice of assistant." Mot. 30. But the record evidence demonstrates otherwise. *See* Valdez-Cox Dep. 26:18-27:24, 79:3-21, 81:23-82:1, 162:24-164:5 (Ex. 18); Gomez Dep. 6:10-15, 7:9-15, 7:20-24, 11:15-25, 12:20-13:8, 13:25-14:15, 15:25-16:8, 19:21-20:3, 28:9-19, 35:10-36:8, 37:24-38:4, 49:14-50:2 (Apr. 25, 2023) (Ex. 19); Chavez Dep. 23:10-24:8, 25:18-26:7; 40:23-42:22, 47:6-48:2, 55:3-22, 57:3-11 (June 15, 2023) (Ex. 20); Contractor Dep. 34:1-17 (July 20, 2022) (Ex. 21).

Intervenors make similarly baseless arguments with respect to Section 7.04. They contend that Section 7.04 merely "[p]rohibit[s] partisan pressure." Mot. 30. But they provide no textual basis for that rule, as no language in Section 7.04 mentions partisans or partisanship. Rather, Section 7.04 applies to voters whose chosen assistors are compensated by non-profit, non-partisan organizations, including Plaintiff LUPE.[6] Intervenors also argue that Plaintiffs' employees would never provide assistance to a voter after "attempt[ing] to persuade the assisted individual to vote in a particular way." *See* Mot. 29. But Intervenors offer no facts to support their prediction. Plaintiffs allege that "an employee of any of a wide array of civic engagement organizations, including the Plaintiff organizations, could potentially be prosecuted under [Section 7.04] by canvassing for a local measure (such as infrastructure improvements) and assisting a mail voter who invites her into the house and requests help voting." LUPE 2AC ¶ 142. And extensive record evidence supports those allegations. *See* Ex. 18 66:2-67:15, 69:8-70:17; *see also* Ex. 20 25:18-26:7, 55:3-56:25.

Finally, Intervenors argue that there is no private right of action under section 208. Mot. 27 n.4. But this Court has already rejected that argument as well. Order 64-68.

## III.   Intervenors Fail to Satisfy the Summary Judgment Standard on Plaintiffs' First Amendment Claims (LUPE Count 7,[7] OCA Count 7, and LULAC Count 3)

### A.   Intervenors Misstate the Legal Standards for the First Amendment Claims

Intervenors' motion for summary judgment on the First Amendment claims is similarly unfounded, relying more on rhetoric than the record. Intervenors paint Section 7.04 as an "[e]lection rule[]"

---

[6] Intervenors similarly contend that Section 6.06 "protect[s] voters from a small group particularly likely to apply pressure in pursuit of partisan ends." Mot. 29. But again, Section 6.06's text does not mention partisans or partisanship. Instead, it restricts voter assistors who are compensated by Plaintiff non-profit, non-partisan organizations.

[7] LUPE Plaintiffs voluntarily dismissed their First Amendment challenges to Article 6 (Count IX) so the Court need not address those claims in response to Intervenors' motion. Order Granting Mot. to Dismiss, ECF No. 624.

with incidental speech effects" that is "*not* subject to strict scrutiny but rather to the *Anderson/Burdick* framework." Mot. 23. That argument lacks merit. The way that people interact, in person, to persuade other individuals to vote for a particular candidate or measure is by communicating with them to change their minds. Indeed, "interactive communication concerning political change . . . is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421-22 (1988). Moreover, Section 7.04 regulates such in-person communication on the basis of its viewpoint and content because penalties attach only if the communication is "intended to deliver votes for a specific candidate or measure." If a person's speech is intended to increase votes for a candidate or measure, that communication is a crime. But if a person communicates about a completely different topic (say, the weather or food), takes no position, or seeks to discourage someone from voting altogether, then the provision is not implicated. It is thus both the content and viewpoint expressed that determines whether the communication is a crime.

Section 7.04 therefore triggers strict scrutiny because it applies to particular speech because of the topic discussed or the idea or messaged expressed. *See Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 790-91, 799 (2011). Under the First Amendment, the "government has no power to restrict expression because of its messages, its ideas, its subject matter, or its content." *Id.* at 790-91 (citation omitted). "Laws that burden political speech" in this way "are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (citation omitted); *see also, e.g., United States v. Alvarez*, 567 U.S. 709, 715 (2012); *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 207-08 (1999) (Thomas J., concurring) ("When a State's election law directly regulates core political speech, we have always subjected the challenged restriction to strict scrutiny[.]"). The bar for a viewpoint-based restriction is even higher: "[V]iewpoint discrimination is an 'egregious form of content discrimination' and is 'presumptively unconstitutional.'" *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) (citation omitted).

Further, even if *Anderson-Burdick* were the applicable framework, there are genuine issues of material fact precluding summary judgment because, as noted above, the law severely burdens "core political speech," *Meyer*, 486 U.S. at 421–22; *see infra* Section III.B.1, and is not narrowly drawn to serve a compelling state interest, *see Fish v. Schwab*, 957 F.3d 1105, 1127-36 (10th Cir. 2020) (invalidating Kansas law requiring voter registration applicants to produce proof of citizenship under *Anderson-Burdick* because it significantly burdened the right to vote and was not justified by the state's interests in election security and preventing voter fraud); *Democracy N.C.*, 590 F. Supp. 3d at 864–65 (finding that "assisting voters in filling out ballot requests forms is subject to the First Amendment" and holding that "Plaintiffs have sufficiently stated a plausible First Amendment claim" under *Anderson-Burdick* because "the burden on speech is 'not justified'" in light of existing protections against voter fraud); *see infra* Section III.B.2.

**B.    Genuine Disputes of Material Fact Exist Concerning SB1's Voter Outreach Restrictions**

**1.    Factual Disputes Exist Over Section 7.04's Burden on Political Speech**

Intervenors contend that Section 7.04 imposes only a "modest burden on speech" because the requirement that the communication be "in the physical presence of" a ballot means that it applies to "an inherently narrow range of scenarios." Mot. 23. But Intervenors fail to point to undisputed facts to support this assertion. The evidence in the record instead supports Plaintiffs' position that Section 7.04 criminalizes a sweeping array of activities in which non-profit employees and volunteers participate and thereby chills their speech in many contexts. *See, e.g.*, Ex. 15 at 7 (explaining that Section 7.04 "is so broad that it can encompass almost any interaction with persons just discussing voting, whether a mail ballot is visible or not"). Indeed, Section 7.04 restricts individuals from having *any* in-person interaction advocating for a measure with *any* voter—a fellow employee, family member, friend, neighbor, acquaintance, or any other person—in *any* location—a workplace, home, school, house of worship, public park, library,

or any other place—if the discussion occurs in the presence of a mail ballot—even if the ballot is merely in the same room or in the voter's purse. *See, e.g.*, *id.* at 7-8.

The testimony of Texas election officials further undermines Intervenors' contention that Section 7.04 imposes only an incidental burden on speech. For example, when presented with a specific situation where a "resident grabs their ballot, brings it to the front door and has a conversation with" a canvasser, Keith Ingram, then-Director of the Election Division of the Texas Secretary of State's Office, explained that he did not "have enough facts" to determine whether the canvasser had violated the law and would need to "send [the complaint] back to the person who complained and say, tell me more." Ex. 1 190:8-191:13; *see also* Ex. 12 169:1-170:5 (Apr. 27, 2022) (stating, in a response to a hypothetical where a canvasser is speaking to a voter about a clean air measure at the voter's front door and the voter's mail ballot is on the kitchen table, that "it may be unclear whether or not the definition of vote harvesting services has been actually triggered or not").

The evidence also shows that Section 7.04's breadth creates a deep chilling effect. For example, OCA-GH no longer holds community information sessions to help inform and educate voters because of concerns of the risk "that people might come with questions with their mail-in ballots." Ex. 13 217:19-218:1. OCA-GH also stopped recruiting volunteers due to concerns about section 7.04, which has resulted in the "loss of those opportunities to engage with [volunteers]" and long-term harm to its ability to bring new volunteers "into our pipeline of volunteerism around civic engagement work." *Id.* at 221:17-222:17.[8]

---

[8] *See also id.* at 215:19-219:4, 220:1-8, 271:11-272:9 (discussing chilling of OCA-GH's voter assistance and GOTV activities); Ex. 22 ¶¶ 4-27 (describing how post-SB1 OCA-GH has ceased providing mail-in voting assistance and holding in-person candidate forums and AAPI candidate "meet and greets," as well as severely scaled back its communications during activities at which mail-in ballots may be present); Ex. 20 25:18-26:7; 55:3-56:25 (describing experience of LUPE).

Intervenors analogize Section 7.04 to "constitutionally permissible bans on solicitation near polling places," Mot. 23, but that argument illustrates the fatal flaws with Section 7.04: It applies statewide, no matter how far a person is from a polling place, and then applies to all in-person communications urging votes for particular political outcomes. Indeed, *Burson v. Freeman*, a case cited by Intervenors, explains that "[a]t some measurable distance from the polls, of course, governmental regulation of vote solicitation could effectively become an impermissible burden" on speech. 504 U.S. 191, 210 (1992). That describes Section 7.04 perfectly: Its content- and viewpoint-based restriction applies to any and every public or private space where a voter has a ballot. *See, e.g.*, Ex. 15 at 7 ("Canvassing for votes door to door in a neighborhood is a traditional practice in Latino neighborhoods where *vecinos y comadres*, who may also promote ballot issues like infrastructure development or school bonds, assist or help the elderly and those who have disabilities to vote.").

## 2. Intervenors Fail to Establish that Section 7.04 Is Necessary to Serve a Compelling State Interest or Narrowly Tailored to Serve Any Such Interest

Intervenors cannot succeed on their summary judgment motion unless they establish—with undisputed facts—that Section 7.04 is necessary to serve a compelling state interest and that the law is narrowly tailored to serve that interest. *See Kee*, 247 F.3d at 210; *Adams*, 465 F.3d at 163. Content-based restrictions on speech "rarely survive[]" that test, *Burson*, 504 U.S. at 199-200, and viewpoint-based restrictions almost never do, *see Iancu*, 139 S. Ct. at 2299. Intervenors cannot carry their burden on either prong, particularly at the summary judgment stage.

Intervenors argue that Section 7.04 serves an interest in "protecting voters from confusion and undue influence," positing—without any evidence—that voters, especially "elderly voters," are "more vulnerable to undue influence" when they cast ballots by mail. Mot. 20. But "[t]o survive strict scrutiny . . . a State must do more than assert a compelling state interest—it must demonstrate that its law is necessary to serve the asserted interest." *Burson*, 504 U.S. at 199-200. Intervenors offer no record evidence

18

to substantiate their purported concern for elderly voters. Moreover, Section 7.04 is not limited to communications with elderly voters or to voter assistance. Any in-person communication in the presence of a ballot and with the requisite intent to persuade is criminalized, no matter the age of the voter.

Record evidence also indicates that undue influence in connection with mail voting has not been a problem in Texas. *See, e.g.*, Ex. 6 at 78-109 (no evidence of voter fraud in Texas or elsewhere during the 2020 election and no crisis of confidence in Texas elections). El Paso County Elections Administrator Lisa Wise testified that she was not aware of "any incidents of voter fraud related to individuals visiting mail voters at their homes" in El Paso County or of "anyone that's with a nonprofit or community organization . . . trying to commit fraud with a mail voter and the mail ballot." Ex. 7 170:8-21.

Intervenors also fail to point to uncontroverted evidence showing that Section 7.04 is narrowly tailored. They argue that Section 7.04 is "narrowly tailored" because it "prohibits persuasion by compensated activists only 'in the physical presence of' a ballot." Mot. 23. But the physical presence requirement is no answer to the lack of tailoring. Among other things, the law is still not limited to situations involving the State's purported concerns about undue influence, in particular over elderly voters. Rather, the law reaches far beyond those concerns to criminalize a wide array of political discourse so long as a ballot is physically present. And persuasion on topics of political interest lies at the very heart of the First Amendment, regardless of whether the speaker is paid. *See, e.g.*, *Citizens United*, 558 U.S. at 365; *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270-71 (1964) (paid advertisement).

In fact, the record supports the opposite conclusion: that Section 7.04 harms the very voters it purports to protect. For example, Texans with disabilities often have difficulty finding voting assistance, and for many of those individuals, someone without a close personal relationship "may be the best and only option to assist them with voting." Ex. 14 ¶ 107. But Section 7.04 chills non-profit community organizations from assisting Texans with disabilities with their mail ballots. Without that assistance,

"some Texans with disabilities" may be "disenfranchised," or otherwise "face significant difficulties in voting that they would not . . . but for SB1." *Id.* ¶ 109. Likewise, Section 7.04 "will have a negative effect on Latino voters who, because of limited English proficiency, lower levels of formal education, or traditional reliance on voter outreach, will lose access to assistors and outreach workers." Ex. 15 at 9 ("The penalties for violating SB1, even inadvertently, are overly stringent and will deter individuals from serving as assistors and outreach workers."). Rather than protecting those voters from undue influence, record evidence shows that Section 7.04 instead limits their ability to interact with community-based outreach workers, depriving voters of access to political speech, or disenfranchising them entirely by preventing outreach workers from assisting them. For example, OCA-GH did not hold an in-person candidate forum ahead of the 2022 primary due to fear that community members would bring mail ballots to the event, and has not been able to provide mail voting assistance to the limited English proficiency Asian-American or Pacific Islander ("AAPI") voters (typically Chinese speakers) it has historically assisted. Chen Supp. Decl. ¶¶ 19-25 (Ex. 22).

Accordingly, there are genuine disputes of material fact regarding whether Section 7.04 is necessary to serve any compelling state interest and whether the law is narrowly tailored to serve any such interest. The Court should deny summary judgment on these claims.

## IV.   Intervenors Are Not Entitled to Summary Judgment on Plaintiffs' Void-for-Vagueness Claims (LUPE Counts 7 and 8, OCA Count 8)

"In our constitutional order, a vague law is no law at all." *Davis*, 139 S. Ct. at 2323. The Court should deny Intervenors' summary judgment motion on Plaintiffs' vagueness claims because record evidence establishes the existence of genuine issues of material fact concerning whether Sections 4.09 and 7.04 are unconstitutionally vague.

### A.      Genuine Issues of Material Fact Exist Regarding Section 7.04's Vagueness

Section 7.04 is unconstitutionally vague for many of the same reasons it offends the First Amend-ment as an unconstitutional abridgement of speech. As explained above, Section 7.04 criminalizes a range of communications by individuals whose outreach activities are now prohibited as so-called "vote harvesting services." *See supra* Section III.B.1. Intervenors argue that Section 7.04 is not unconstitution-ally vague because it prevents a "[p]aid activist" from "approach[ing] someone and try[ing] to persuade them to vote for a candidate or cause when their ballot is immediately present." Mot. 19. But key terms in the statute are undefined and poorly understood, and Plaintiffs have raised genuine issues of material fact as to whether the statute lacks reasonable safeguards to alert regulated persons to the kind of conduct that is prohibited.

First, the phrase "in the physical presence of" a ballot fails to provide reasonable notice as to what kind of nexus is required between the communication and the ballot. How close does the ballot need to be? Within reach? In plain view? In the same room? Intervenors argue that vagueness concerns are mit-igated by the fact that prosecutors must show scienter to prove a criminal violation of the statute. Mot. 18. But the problem is that a person's knowledge that there is a ballot in the vicinity still does not tell them whether they are violating the statute. Is it a crime to speak to a voter about a candidate while the voter's mail ballot lies nearby on the entryway table?  What if the ballot is on the kitchen table in the next room instead of the entryway? What if the voter brings the ballot to a community meeting at which Plaintiffs' employees speak? A person of "ordinary intelligence" has no way to know where the line is drawn, and will respond with self-censorship of core political speech. *See Hill v. Colorado*, 530 U.S. 703, 732 (2000); *League of Women Voters of Fla. v. Fla. Sec'y of State*, 66 F.4th 905, 947-48 (11th Cir. 2023) ("We will not rely on the assumption that a state court enforcing the law would impose a *mens rea* re-quirement, apply the law with lenity, and require that the defendant's conduct had the natural and proba-ble effect of influencing the voter." (alterations and citation omitted)). Indeed, as noted above, even State

officials do not seem to know at what distance a ballot stops being "in the physical presence of" Plaintiffs' staff or volunteers. Ex. 12 169:1-170:5 (Apr. 27, 2022); *see also* Ex. 1 184:24-185:8 (Apr. 26, 2022).

Second, Section 7.04 provides no clarity about what "compensation or other benefit" makes political speech a crime. At least one court struck down a law on vagueness grounds in similar circumstances because the law left unclear "what types of arrangement[s] qualif[ied] as 'payment,'" reasoning that "[w]ithout some clarity," it was "impossible for a person or organization to know if it is covered." *League of Women Voters of Tenn. v. Hargett*, 400 F. Supp. 3d 706, 728 (M.D. Tenn. 2019). Under Section 7.04, LUPE and OCA-GH could be banned from providing food and drink to their volunteers because that may qualify as "compensation or other benefit." *See* OCA-GH 30(b)(6) Dep. 218:20-219:4. Likewise, they could be prohibited from paying modest stipends to student members and volunteer canvassers. And if any benefit will do, no matter how trivial, then that might reduce the vagueness but only at the cost of making the statute even more clearly overbroad and unconstitutional.

Finally, Section 7.04 fails to provide reasonable notice of what constitutes an interaction "intended to deliver votes for a specific candidate or measure." Tex. Elec. Code § 276.015(a)(2) (2021). LUPE, for example, canvasses homes in the *colonias* of the Rio Grande Valley and encourages voters to support ballot measures to improve drainage work, pave roads, and improve healthcare access and education. LUPE canvassers do not know if, when they encourage voters to support these types of local measures, their communication is "intended to deliver votes for a specific candidate or measure." Ex. 20 55:23-56:25 (discussing issue-based canvassing). Likewise, OCA-GH could be deemed to harbor this intent when it hosts a "meet and greet" for an AAPI candidate. *See* Ex. 22 ¶ 20; *see also* Chimene Dep. 124:17-126:6 (Ex. 23) (explaining that people sometimes perceive hosting a candidate forum as an endorsement of certain candidates and that "because of the vagueness of the law I am very concerned about

our members getting accused of . . . vote harvesting"). It is also unclear how regulated persons communicate their intent. Would, for example, a button, bumper sticker, or t-shirt supporting a cause—*e.g.*, workers' rights to unionize or fair wages—be construed to infer a canvasser's intent to deliver votes for a candidate who supports that cause? It is impossible to know from the statute's language, and Intervenors cite no evidence or law establishing otherwise.

"These are not outlandish hypotheticals—they are easily foreseeable possibilities that go to the heart of how [the law] would work," *Hargett*, 400 F. Supp. 3d at 728, because Section 7.04 provides no meaningful notice of what types of exchanges are criminalized in the face of easily foreseeable possibilities. There is also a genuine issue of material fact about the risk of arbitrary enforcement of Section 7.04 because vote harvesting is one of the Election Code's most charged offenses. White Dep. 27:7-14 (May 5, 2022) (Ex. 28).

## B.      Genuine Issues of Material Fact Also Exist as to Section 4.09's Vagueness

Section 4.09 is likewise unconstitutionally vague. Before SB1, Texas law prohibited poll workers from "knowingly prevent[ing] a watcher from observing an activity the watcher is entitled to observe." Tex. Elec. Code § 33.061(a) (2020). SB1 replaced that clear rule with an ill-defined one under which a violation lies in the eyes of the beholder. SB1 now provides that any person serving at a polling location in an official capacity violates the statute "by taking any action to obstruct the view of a watcher or distance the watcher from the activity or procedure to be observed in a manner that would make observation not reasonably effective." Tex. Elec. Code § 33.061(a) (2021). Intervenors claim that "far from injecting vagueness," these amendments clarify existing law and that the State is not required to specify "exactly how far away poll watchers may stand." Mot. 20 (emphasis omitted). Intervenors have it exactly backwards.

Plaintiffs have adduced evidence demonstrating that the expansiveness and imprecision of the amendments to Section 4.09—particularly the language criminalizing "any action" that would render a

poll watcher's observation "not reasonably effective"—create confusion and ambiguity for individuals who wish to serve as poll workers. Specifically, this evidence creates a genuine issue of material fact as to whether "obstruct[ing] the view of a watcher" or "distanc[ing] the watcher" from certain activity "in a manner that would make observation not reasonably effective," Tex. Elec. Code § 33.061(a), require unknowable determinations to the point that "no standard of conduct is specified at all," *Ferguson v. Estelle*, 718 F.2d 730, 735 (5th Cir. 1983) (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)).

For example, plaintiff James Lewin, who has served as a poll worker and an election judge in Travis County, does not know what actions he can take, if any, that would not render a poll watcher's observation "not reasonably effective" because the phrase lends itself to an individual watcher's subjective interpretation. Ex. 17 ¶ 6. Richard Ertel, a member of Texas Impact who has served as a county chair, precinct chair, member of the early voting ballot board, and a poll worker in Kerr County, has similar concerns. Ertel Decl. ¶¶ 8-9 (Ex. 24). Tanesa Lee, a member of Friendship-West Baptist Church who has served as an election judge in Dallas County, is also unsure of how to regulate her conduct to conform with Section 4.09's dictates. Ex. 25 ¶¶ 7-9. Indeed, even the State, county officials, and Intervenors themselves have acknowledged how expansive and imprecise Section 4.09 is. *See* Ex. 1 157:18-157:25 (Apr. 26, 2022) (explaining that obstructing a poll watcher's view "could be as … much as just standing between the watcher and the activity being viewed, it could be making them stay in a designated area, I mean, it could be a lot of things"); Ex. 12 128:24-129:4 (April 27, 2022) ("I don't know what that [] action would be. Could be anything, I suppose."); Vera Dep. 54:4-24 (Ex. 26) (acknowledging that how close a poll watcher to observe "depends on how good the poll watcher[']s vision and hearing is"); Ex. 7 96:13-96:23 (April 15, 2022).

Section 4.09 requires just the sort of subjective inquiry that the Supreme Court has repeatedly found to be unconstitutionally vague because conduct that makes the observation of one poll watcher "not reasonably effective" may not affect another poll watcher. *See, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 62 (1999) (plurality opinion) (striking down an anti-loitering ordinance on vagueness grounds because whether someone had "no apparent purpose" for standing on a sidewalk was "inherently subjective"); *Coates*, 402 U.S. at 613-14 (holding an ordinance unconstitutionally vague that criminalized conduct "annoying to persons passing by" because "[c]onduct that annoys some people does not annoy others"); *Baggett v. Bullitt*, 377 U.S. 360, 368 (1964) (invalidating on vagueness and overbreadth grounds an oath requiring teachers to steer clear of an "undefined variety" of behavior considered "subversive" to the government). Like the laws at issue in *Morales*, *Coates*, and *Baggett*, criminal liability under Section 4.09 fails to give the ordinary person notice of what it permits and what it forbids.

The Eleventh Circuit's recent decision in *League of Women Voters of Florida* is instructive. In that case, the court upheld the district court's decision to enjoin a provision of Florida law that prohibited any person from soliciting voters inside a polling place, where "solicitation" was defined as, among other things, "engaging in any activity with the . . . effect of influencing a voter." 66 F.4th at 947 (citing Fla. Stat. § 102.031(4)(b) (2022)). The court concluded that the subjective inquiry demanded by the statute's language rendered the provision impermissibly vague:

> How is an individual seeking to comply with the law to anticipate whether his or her actions will have the subjective effect of influencing a voter? Knowing what it means to influence a voter does not bestow the ability to predict which actions will influence a voter. As a result, the district court correctly determined that this phrase in the solicitation provision both fails to put Floridians of ordinary intelligence on notice of what acts it criminalizes and encourages arbitrary and discriminatory enforcement, making this provision vague to the point of unconstitutionality.

*Id.* (citation omitted). Here, as in *League of Women Voters of Florida*, the criminal prohibition on taking any action that could render a poll watcher's view "not reasonably effective" fails to give notice of what

conduct is criminalized and grants prosecutors and law enforcement officers unbounded discretion, which invites arbitrary and discriminatory enforcement.

Intervenors claim that other provisions of the Texas Election Code—namely the provisions of Chapter 33 that identify which activities a poll watcher is entitled to observe and the requirement that poll watchers complete a training course—provide sufficient guidance to eliminate any vagueness concerns. Mot. 20-21. But the provisions cited by Intervenors provide no clarity about what might render a poll watcher's observation "not reasonably effective" beyond stating that a poll watcher must be able to see and hear an activity that he or she is permitted to observe. *See* Ex. 1 157:18-157:25, 158:1-158:7, 158:15-22, 159:4-159:16, 160:10-160:19 (Apr. 26, 2022); Ex. 12 128:24-129:4 (Apr. 27, 2022); Ex. 7 96:13-96:23 (Apr. 15, 2022). Allowing Intervenors to "shap[e] a vague statute's contours" by reference to other statutory proscriptions that offer no refinement to Section 4.09's vague language would transfer to Intervenors a job that belongs to the legislature. *See Sessions v. Dimaya*, 138 S. Ct. 1204, 1228 (2018) (Gorsuch, J., concurring).

Likewise, Section 4.09's inclusion of a *mens rea* standard for "knowingly prevent[ing] a watcher from observing an activity" does not rescue good-faith poll workers from liability. *See Kramer v. Price*, 712 F.2d 174, 178 (5th Cir. 1983), *reh'g granted*, 723 F.2d 1164 (5th Cir. 1984) ("Specifying an intent element does not save [a statute] from vagueness [when] the conduct which must be motivated by intent, as well as the standard by which that conduct is to be assessed, remain vague."); *cf. League of Women Voters of Fla.*, 66 F.4th at 947-48 (rejecting the argument that a state court interpreting the law would impose a *mens rea* requirement as a means of saving a law from vagueness, and explaining that "the promise of due process later on does not obliterate the vagueness doctrine altogether").

### C.    Intervenors Misstate the Applicable Legal Standard

Nevertheless, Intervenors argue that they are entitled to summary judgment on Plaintiffs' vagueness challenges to Sections 4.09 and 7.04 because Plaintiffs cannot show that the challenged provisions

"are 'impermissibly vague in all of [their] applications.'" Mot. 17 (quoting *Vill. of Hoffman Ests. v. Flip-side*, 455 U.S. 489, 495 (1982)). But the Supreme Court and the Fifth Circuit have emphatically rejected the notion that "a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson v. United States*, 576 U.S. 591, 602, 603 (2015) (rejecting the "supposed requirement of vagueness in all its applications" as such a standard is "not a requirement at all, but a tautology"); *United States v. Westbrooks*, 858 F.3d 317, 325 (5th Cir. 2017) (an unconstitution-ally vague statute "is not saved by the fact that some conduct clearly falls within a statute's prohibition" (citing *Johnson*, 576 U.S. at 602-03)). Instead, the question is whether the law "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732. "When Congress passes a vague law, the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite [the legislature] to try again." *Davis*, 139 S. Ct. at 2323.

Intervenors also fail to acknowledge that Supreme Court precedent requires greater statutory pre-cision when the statute threatens to criminalize the exercise of a constitutionally protected right. For ex-ample, "[w]hen a statute 'interferes with the right of free speech or of association, a more stringent vague-ness test . . . appl[ies].'" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) (quoting *Flipside*, 455 U.S. at 499). A more stringent standard is necessary here because both Sections 4.09 and 7.04 impli-cate core speech and thus Plaintiffs' constitutional rights to free expression, as well as the underlying right to vote.

The Fifth Circuit has recognized that "[s]oliciting, urging and persuading . . . citizen[s] to vote" are protected forms of political speech for a "canvasser." *Voting for Am., Inc. v. Steen* (*Voting for America II*), 732 F.3d 382, 390 (5th Cir. 2013); *see also Voting for Am., Inc. v. Andrade* (*Voting for America I*),

488 F. App'x 890, 897 (5th Cir. 2012) ("[T]he primary act of simply encouraging citizens to vote consti-

tutes core speech and would be protected under the First Amendment."). And Section 4.09 implicates

expressive conduct in which Plaintiff poll workers engage—such as communicating with voters to help

them cast legal ballots and providing information about the voting process—that are likewise protected

under the First Amendment. *See Voting for America II*, 732 F.3d at 389 ("The state does not deny that

some voter registration activities involve speech—'urging' citizens to register; 'distributing' voter regis-

tration forms; 'helping' voters to fill out their forms; and 'asking' for information to verify that registra-

tions were processed successfully."); Ex. 17 ¶¶ 5, 8; Ex. 24 ¶ 7; Ex. 25 ¶ 6.

A more rigorous vagueness analysis is also required because Sections 4.09 and 7.04 jeopardize

the constitutional rights of voters—whom Plaintiffs are seeking to assist—to exercise their fundamental

right to vote free from intimidation, harassment, and discrimination. *See, e.g.*, *Reynolds v. Sims,* 377 U.S.

533, 561-62 (1964) ("Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic

society."); *see also* Ex. 17 ¶¶ 6-9; Ex. 24 ¶¶ 8-11; Ex. 25 ¶¶ 7-12; Obakozuwa Dep. 65:25-66:8 (Ex. 27).

In sum, Intervenors fail to meet both their burden of demonstrating that the facts relevant to the

question of vagueness are undisputed and their burden of proving that they are entitled to judgment as a

matter of law on that undisputed record.

## V.      Intervenors' Attempts to Defeat Plaintiffs' Facial Challenges Are Unavailing

At various points in their motion, Intervenors contend that Plaintiffs' facial challenges to SB1

must fail because Plaintiffs cannot show that the challenged provisions are unconstitutional in all of their

applications. *See, e.g.*, Mot. 22. As explained above, this standard does not apply to either Plaintiffs' First

Amendment claims or their void-for-vagueness claims. *See supra* Sections III-IV. More importantly,

however, Plaintiffs are advancing *both* as-applied and facial challenges because SB1 imposes unconsti-

tutional burdens in all of its applications, as well as in the specific applications raised in this case. *See*

LUPE 2AC ¶ 298; LULAC 2AC ¶¶ 281-285; OCA 2AC ¶¶ 220-22. At this stage of the litigation, the

only questions are whether Intervenors have shown the absence of a genuine dispute or material fact (they have not) and if so, whether they are entitled to judgment as a matter of law (they are not). Because there are genuine issues of material facts with respect to each of Plaintiffs' claims, this Court need not determine at this juncture whether the challenged provisions of SB1 are unconstitutional on their face or unconstitutional only insofar as they relate to the facts at issue in this case. *See Citizens United*, 558 U.S. at 331 ("[T]he distinction between facial and as-applied challenges . . . goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint."). Rather, this Court need only determine that genuine issues of material fact exist, such that summary judgment is not warranted.

## CONCLUSION

For the reasons stated above, the Court should deny the Intervenors' motion for summary judgment.

DATED:          June 23, 2023

/s/ Nina Perales
Nina Perales
Julia R. Longoria
Fátima Menéndez
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, TX 78205
(210) 224-5476
(210) 224-5382 (fax)
nperales@maldef.org
jlongoria@maldef.org
fmenedez@maldef.org

Michael C. Keats*
Rebecca L. Martin*
Jason S. Kanterman*
Kevin Zhen*
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, New York 10004
(212) 859-8000
(212) 859-4000 (fax)
michael.keats@friedfrank.com
rebecca.martin@friedfrank.com
jason.kanterman@friedfrank.com
kevin.zhen@friedfrank.com

* Admitted *pro hac vice*

Attorney for Plaintiffs:
LA UNIÓN DEL PUEBLO ENTERO,
SOUTHWEST VOTER REGISTRATION
EDUCATION PROJECT, MEXICAN
AMERICAN BAR ASSOCIATION OF
TEXAS, TEXAS HISPANICS
ORGANIZED FOR POLITICAL
EDUCATION, JOLT ACTION, WILLIAM
C. VELASQUEZ INSTITUTE, FIEL
HOUSTON INC.

Respectfully submitted,

/s/ Sean Morales-Doyle
Sean Morales-Doyle (NY Bar No. 5646641)
Patrick A. Berry* (NY Bar No. 5723135)
Jasleen K. Singh* (Cal. Bar No. 316596)
Robyn N. Sanders* (NC Bar No. 58339)
Eliza Sweren-Becker* (NY Bar No. 5424403)
Andrew B. Garber* (NY Bar No. 5684147)
BRENNAN CENTER FOR JUSTICE AT NYU
SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310
sean.morales-doyle@nyu.edu
patrick.berry@nyu.edu
Jasleen.singh@nyu.edu
rs8592@nyu.edu
eliza.sweren-becker@nyu.edu
andrew.garber@nyu.edu

Leah J. Tulin (DC Bar No. 98803)
BRENNAN CENTER FOR JUSTICE AT NYU
SCHOOL OF LAW
1140 Connecticut Avenue NW, Suite 1150
Washington, DC 20036
(202) 650-6397
tulinl@brennan.law.nyu.edu

/s/ Elizabeth Y. Ryan

Paul R. Genender (Tex. Bar No. 00790758)
Elizabeth Y. Ryan (Tex. Bar No. 24067758)
Megan Cloud (Tex. Bar No. 24116207)
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
(214) 746-8158
paul.genender@weil.com
liz.ryan@weil.com
matt.berde@weil.com
megan.cloud@weil.com

Attorneys for Plaintiffs:
FRIENDSHIP-WEST BAPTIST CHURCH,
TEXAS IMPACT, JAMES LEWIN

*/s/ Zachary Dolling*
Zachary Dolling
Texas Bar No. 24105809
Hani Mirza
Texas Bar No. 24083512
Sarah Chen*
California Bar No. 325327
Veronikah Warms*
Texas Bar No. 24132682
TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)
zachary@texascivilrightsproject.org
hani@texascivilrightsproject.org
schen@texascivilrightsproject.org
veronikah@texascivilrightsproject.org

Thomas Buser-Clancy
Texas Bar No. 24078344
Edgar Saldivar
Texas Bar No. 24038188
Savannah Kumar
Texas Bar No. 24120098
Ashley Harris
Texas Bar No. 24123238
ACLU FOUNDATION OF TEXAS, INC.
5225 Katy Freeway, Suite 350
Houston, TX 77007
Telephone: (713) 942-8146
Fax: (915) 642-6752
tbuser-clancy@aclutx.org
esaldivar@aclutx.org
skumar@aclutx.org
aharris@aclutx.org

Adriel I. Cepeda Derieux*
Ari Savitzky*
Sophia Lin Lakin*
Dayton Campbell-Harris
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St., 18th Floor

New York, NY 10004
(212) 284-7334
acepedaderieux@aclu.org
asavitzky@aclu.org
slakin@aclu.org
dcampbell-harris@aclu.org

Susan Mizner*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
39 Drumm St.
San Francisco, CA 94111
(415) 343-0781 (phone)
smizner@aclu.org

Brian Dimmick*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St. NW
Washington, DC 20005
(202) 731-2395 (phone)
bdimmick@aclu.org

Lucia Romano
Texas State Bar No. 24033013
Peter Hofer
Texas State Bar No. 09777275
Christopher McGreal
Texas State Bar No. 24051774
DISABILITY RIGHTS TEXAS
2222 West Braker Lane
Austin, Texas 78758-1024
(512) 454-4816 (phone)
(512) 454-3999 (fax)
lromano@drtx.org
phofer@drtx.org
cmcgreal@drtx.org

Jerry Vattamala*
Susana Lorenzo-Giguere*
Patrick Stegemoeller*
ASIAN AMERICAN LEGAL DEFENSE
AND EDUCATION FUND
99 Hudson Street, 12th Floor

31

New York, NY 10013
(212) 966-5932 (phone)
(212) 966 4303 (fax)
jvattamala@aaldef.org
slorenzo-giguere@aaldef.org
pstegemoeller@aaldef.org

Jessica Ring Amunson*
Alyssa G. Bernstein*
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com

abernstein@jenner.com

Gregory D. Washington*
JENNER & BLOCK LLP
455 Market St. Suite 2100
San Francisco, CA 94105
gwashington@jenner.com

* Admitted *pro hac vice*

Attorneys for Plaintiffs:
OCA-GREATER HOUSTON

**CERTIFICATE OF SERVICE**

I certify that on June 23, 2023, a true and correct copy of the foregoing document and exhibits in support of were served on counsel of record via electronic service.

/s/ Elizabeth Y. Ryan
Elizabeth Y. Ryan