# *EXHIBIT 6*

# EXPERT REPORT OF DR. ALLAN J. LICHTMAN

*LULAC Texas*, et al.,

v.

*John Scott*, et al.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

Case No. 1:21-cv-786-XR
Consolidated Case No. 5:21-cv-844-XR

February 28, 2022

Allan J. Lichtman

**Table of Contents**

STATEMENT OF PURPOSE ................................................................................................ 3

QUALIFICATIONS ......................................................................................................... 13

METHODOLOGY & ANALYSIS ....................................................................................... 17

EXPERT OPINION ......................................................................................................... 18

   I. S.B. 1 in the National Perspective ........................................................................ 18

   II. Historical Background ........................................................................................... 20

      A.  Recent Discrimination in Voting ……………………………………………………23

      B.  Discrimination in Education ........................................................................... 27

      C.  Discrimination in Law Enforcement ............................................................. 34

      D.  Discrimination in Immigration Policy ........................................................... 37

      E.  Discrimination in Housing Policy ................................................................. 39

   III.   Discriminatory Impact of S.B. 1 ...................................................................... 40

      A.  Pre-Existing Barriers to Voting in Texas ..................................................... 42

      B.  Restrictions on Drive-Thru and 24-Hour Voting .......................................... 46

      C.  Empowerment of Partisan Poll Watchers ...................................................... 47

      D.  Restrictions on Mail-In Voting ..................................................................... 49

      E.  Flawed Citizenship Verification Procedures ................................................. 51

      F.  Increased Criminal Penalties ......................................................................... 52

   IV.   Sequence of Events ......................................................................................... 52

      A.  Population Shifts in Texas .............................................................................. 52

      B.  The Beginning of the Big Lie ........................................................................ 54

      C.  The Introduction of S.B. 1 ............................................................................. 58

      D.  Lack of a Racial Impact Study ...................................................................... 60

   V. Procedural Deviations ........................................................................................... 61

   VI.   Substantive Deviations .................................................................................... 76

   VII. Contemporaneous Statements ........................................................................... 78

      A.  S.B. 1 Targeted Voting Methods Disproportionately Used By Minority Voters ...................... 78

      B.  S.B. 1 Will Not Prevent Voter Fraud ........................................................... 87

      C.  S.B. 1 Was Not Necessary To Increase Voter Confidence ................................... 100

D.  S.B. 1 Will Not Achieve Uniformity In Elections ................................................. 107

Republicans Have Expressed Racial Animus Toward Minority Texans ................................ 110

**CONCLUSIONS** ................................................................................ 136

APPENDIX 1 : CURRICULUM VITAE ........................................................ 142

APPENDIX 2: CASES ........................................................................ 164

APPENDIX 3: TABLES........................................................................ 166

## STATEMENT OF PURPOSE

I was retained by LULAC Plaintiffs' counsel to consider and offer my opinions on whether Senate Bill 1 (hereinafter "S.B. 1") was adopted with the intent of discriminating against racial and ethnic minorities.[1] I have also been asked to respond to any material presented by the defendants, including reports submitted by defendants' experts.  I have enclosed my CV (Appendix 1), which fairly and accurately describes my training, education, and experience.  In addition, I have enclosed a table of cases (Appendix 2) in which I have been involved as an expert witness since 2015. My fee in this matter is $500 per hour. My compensation does not depend on the outcome of this litigation or my conclusions.

I have enclosed an updated CV which describes my training, education, and experience. As discussed below, my analyses and opinions in this litigation are based on historical, political, and statistical information gathered and reviewed in my capacity as an expert in political history, political analysis, and historical and statistical methodology. My analyses and opinions are provided from that perspective and are not intended to provide a legal opinion.

---

[1] For the purposes of this report, minority is defined as any person who is not a non-Hispanic white.  Anglo is defined as a non-Hispanic white.

## SUMMARY OF OPINIONS

Based on my experience and the evidence, methodology, and analysis discussed below, I have concluded that all necessary elements for establishing intentional discrimination are present in the adoption of S.B. 1. Documentation and analysis follow in the text below.

### I.   S.B. 1 in Context

- S.B. 1 arose after a smooth and secure election in Texas in 2020. S.B. 1 is part of a larger, race-based political strategy to mobilize the Republican Party's Anglo[2] base by restricting voting opportunities for the Democratic Party's minority base.

### II.   Texas has a long and ongoing history of official discrimination against minorities.

- Texas entered the Union as a slave state, joined the Confederacy, and through the 1960s maintained Jim Crow discrimination in voting, education, public facilities, housing, health care, transportation, law enforcement, and employment.

- Texas was covered by the pre-clearance provisions of the Voting Rights Act in 1975. Through the end of pre-clearance in 2013, it has experienced more objections from the U.S. Department of Justice than any other state.

- In each redistricting cycle since 1980 – the first in which Texas was covered under Section 5 – the United States Department of Justice (DOJ) has objected to or intervened in litigation to block at least one of Texas' statewide redistricting plans for Congress or the state legislature.

- In the redistricting that followed the 2010 Census, Texas was the only state in the union to have any one of its plans for Congress, the State House, and the State Senate fail to achieve preclearance under the Voting Rights Act. All three of Texas' statewide plans failed to gain preclearance.

- In 2011, Texas enacted the most restrictive photo identification law in the nation that four separate courts found to violate the Voting Rights Act of the Constitution. The law was upheld only after a court-mandated amendment allowed voters without the requisite identification an opportunity to fill out a "reasonable impediment" declaration.

- A 2017 decision by the three-judge court in *Perez* v. *Abbott* found that the state's 2011 congressional plan had the intent and effect of discriminating against minority voters.

---

[2] I use the terms "white" and "Anglo" interchangeably in this report to refer to non-Hispanic white individuals.

- In 2019, the Texas Secretary of State initiated a fundamentally flawed purge of alleged non-citizens from the voter rolls that did not account for prior non-citizens who obtained their citizenship before registering to vote.

- In 2020, Texas Governor Greg Abbott issued an executive order limiting counties to a single drop box location for the delivery of absentee votes. Racially-diverse Harris County, with 3.5 million persons of voting age, had to drop its twelve drop boxes to one – the same as predominantly-Anglo King County, with fewer than 200 persons of voting age.

- In addition to S.B. 1, the Texas Legislature passed other voter restriction bills during their 2021 legislative sessions.

- On September 23, 2021, more than ten months after the 2020 general election, the Texas Secretary of State announced a forensic audit of the 2020 general election, limited to just four counties: Collin, Dallas, Harris, and Tarrant. Together, the counties' citizen-voting-age population total just over 55 percent.

- In addition to official discrimination in voting, Texas continues to discriminate against its minority citizens in areas that impact voting opportunities for minorities, including education, law enforcement, and immigration.

- In education, the same legislature that adopted S.B. 1 enacted legislation that seeks to downplay racial oppression and discrimination in the history of America and Texas, decoupling past discrimination and oppression from the current racial disparities in Texas on economic status, housing, education, and health.

- Also, in education, Texas public schools are substantially more likely to suspend minority students than Anglo students.

- In law enforcement, police in Texas engage in racial profiling and other discriminatory actions regarding minorities.

- Texas has the sixth-highest incarceration rate among the states, at 529 per 100,000 residents. Incarceration disproportionately impacts Black and Hispanic Texans.

- The system for holding law enforcement officials accountable for discrimination against minorities, and any other misconduct, is ineffective. The same legislature that enacted S.B. 1 failed to act on a reform proposal.

- In the immigration context, Texas enacted S.B. 4 in 2017. The law is one of the harshest "anti-sanctuary city" laws in the country. S.B. 4 has a disparate impact on people of color, who are the target of immigration enforcement in Texas. Such enforcement has incorrectly ensnared U.S. citizens in Texas.

- In the housing context, in 2015, Texas enacted a law authorizing individuals to refuse to rent a home to those receiving federal housing assistance. The law, one of the few of its kind in the

nation, has a discriminatory impact on minorities, who comprise most federal housing aid recipients in Texas.

- S.B. 1 fits squarely within the historical pattern and ongoing practice of discrimination against racial minorities, particularly in the voting context

## III.   S.B. 1's discriminatory impact on minority voters.

- Although many factors can influence voter participation in the states, there is a strong negative relationship between a high cost of voting and voter turnout.

- Texas's restrictive voting laws—including S.B. 1—have a disparate impact on Black and Hispanic Texans who, when compared to Anglos, have lower incomes, less wealth, higher rates of unemployment and poverty, lower levels of education, greater health challenges, and—for Hispanics—less proficiency with English.

- Texas's low voter turnout rate is a result of the low turnout among Black and Hispanic voters. For example, in 2020, Anglo turnout in Texas exceeded the national average, whereas Black and Hispanic turnout fell below the national average.

- As a general matter, the new and complex voter restrictions mandated by S.B. 1 are likely to disproportionately impact Black and Latino Texans.

- The prohibition on drive-thru voting attacks a voting option used by some 127,000 voters in Harris County, which has the largest minority population in the State. And independent studies have confirmed that Blacks and Hispanics disproportionately used the drive-thru voting option in the 2020 general election.

- S.B. 1 gives partisan poll watchers greater access to polling places, which will disproportionately and negatively impact minority voters.

- New restrictions on the already difficult procedures for mail-in voting in Texas burden minority voters, who disproportionately used this mode of voting in 2020.

- The effects of new rules for mail-in voting are already manifest in Texas, with much higher rejection rates for absentee mail-in applications in counties with substantial minority populations than existed before the implementation of S.B. 1.

- S.B. 1's requirement for matching registration rolls with citizenship data establishes a process prone to significant error that Texas attempted and botched in 2019. Because minority voters are more likely to be naturalized citizens, the fraught process disproportionately harms minority voters.

- In 2021, some 2,000 U.S. citizens were removed from the rolls in Texas for failure to respond to a thirty-day notice for providing proof of citizenship.

- S.B. 1's criminalization of the election process will likely present an additional burden on minorities, who have been the disproportionate target of criminal prosecutions for alleged election law violations in Texas.

- Republicans in the State Legislature introduced new "election integrity" measures with no expert analysis or studies to assess the impact of their proposals on vulnerable citizens, including minorities and persons with disabilities.

## IV.    The sequence of events leading up to the passage of S.B. 1.

### Long-Term Trends

- Over the past several decades, Texas has seen a significant increase in minority citizen-voting-age population, as well as a corresponding increase in the competitiveness of the Democratic Party.

- According to 2020 U.S. Census data, minorities accounted for 95% of the population growth since 2010 that netted Texas two additional congressional seats.

- This shift in population has also led to a shift in voting patterns. For example, in recent years— and in 2020 in particular—the State has seen a transformation of absentee mail-in voting from an option used disproportionately by Anglo voters to one used more often by minority voters.

### Short-Term Trends

- In the lead-up to and aftermath of the 2020 general election, former-President Donald Trump and his allies attempted discredit and overturn the results of the 2020 presidential election through false claims of massive voter fraud. Many Texas Republicans, including the Texas Attorney General and members of the Texas House and Senate, were at the forefront of these efforts.

- Accordingly, the enactment of S.B. 1 in Texas was not an isolated event. It was part of a coordinated effort by Republican elected officials to enact restrictive voting laws in states across the country, using false claims of voter fraud in the 2020 general presidential election to galvanize support for these bills.

- This effort was coordinated by organizations like the Heritage Foundation, and its political arm, Heritage Action for America, as well as the American Legislative Exchange Council ("ALEC").

- The effort was successful in Texas and other states. Texas was one of four Republican-controlled states, along with Florida, Georgia, and Iowa, to enact sweeping, omnibus election "reform" packages.

## V.    The adoption of SB 1 is marked by serious procedural deviations.

- S.B. 1 began as two separate bills: Senate Bill 7 (S.B. 7) and House Bill 6 (H.B. 6).

- On March 4, 2021—before either bill was introduced—the House Elections Committee, chaired by Republican Representative Briscoe Cain (hereinafter "Cain") held a formal meeting to discuss the state of Texas's elections. At that meeting, Keith Ingram, the Director of the Elections Division for the Texas Secretary of State, testified that Texas elections were "in good shape," a "success," and "smooth and secure."

- Still, Republican Senator Bryan Hughes introduced S.B. 7 less than one week later, with Cain's introduction of H.B. 6 shortly thereafter.

- According to Jessica Anderson, the Executive Director of Heritage Action for America, at least "19 provisions" in H.B. 6 were "written by the Heritage Foundation's experts."

- In the House, during the first hearing on H.B. 6, Cain presented his bill to the House Elections Committee, leaving Democratic Vice-Chair of the House Elections Committee, Representative Jessica Gonzalez, as acting chair. During questioning, he admitted that he had not read the bill in its entirety, because he received a substitute draft earlier that morning.

- When Democratic Representative Nicole Collier appeared to ask questions about the bill, Cain quickly took the gavel back, refused to recognize her, and recessed the hearing. Because there are no Black lawmakers on the House Elections Committee, Representative Collier would have been the only Black lawmaker to ask questions about H.B. 6.

- This procedural move prevented more than 200 Texans—many of whom had traveled to Austin from elsewhere in the State—from testifying on H.B. 6 because Cain failed to set a time to reconvene after the lunch break.

- Eventually, after 22 hours of testimony—which included substantial testimony from Texans who were opposed to the H.B. 6—the House Elections Committee passed H.B. 6 out of committee.

- Weeks later, the House Elections Committee took up and passed S.B. 7 with no advance notice to the public or to any member of the House Elections Committee. Cain accomplished this by substituting the text of S.B. 7—which had been passed out of the Senate—for the text of H.B. 6.

- Cain's maneuver preempted any public commentary on S.B. 7 in the House, negated the need for any public commentary on H.B. 6 in the Senate State Affairs Committee, and virtually guaranteed that S.B. 7 would be rewritten behind closed doors in Republican-dominated Conference Committee without input from the public or Democratic legislators.

- Indeed, a final version of S.B. 7 was finally released on Saturday, May 29, 2021, after being negotiated behind closed doors by Republicans on the Conference Committee with no input from the public or Democratic members of the Conference Committee.

- The Conference Committee version of S.B. 7 included several new substantive provisions that the public had not had the opportunity to weigh in on or meaningfully assess, including a provision that would prohibit in-person voting on the Sunday before Election Day from beginning earlier

than 1 p.m. and new identification requirements for mail-in ballots—neither of which had been raised in previous debates on the bill.

- The truncated debate schedule that followed meant that lawmakers in both chambers had an extremely limited amount of time to discuss the changes with local election officials, voting rights groups, or constituents.

- On Saturday, May 29, 2021, Republican members of the Texas Senate voted to suspend a Senate rule that required the Senate to wait 24 hours to debate and vote on the bill. Instead, debate on S.B. 7 began at about 10pm, with a final vote taking place at about 6am.

- On the afternoon of Sunday, May 30, 2021, the Texas House began debate on S.B. 7. Near midnight—and before a final vote could be called—Democrats thwarted final passage of S.B.7 by walking out of the chamber and denying the House the quorum needed to pass any further legislation.

- After S.B. 7 died on the floor of the House, Republican State Representative Travis Clardy and Cain both characterized the restriction on Sunday voting—and along with it historical Souls to the Polls programs—to be a "scrivener's error," or typo that substituted 1pm for 11am. However, Republican legislators—including S.B. 7's author—had explicitly defended the 1pm restriction in Senate debates.

- In response to Democratic Representatives breaking quorum, Republican Governor Greg Abbott vetoed funding for the State Legislature and promised a special session for the purpose of taking up S.B. 7 again.

- On July 8, 2021, the first special session of the Texas Legislature began. The call to session issued by Governor Abbott included an instruction that the legislature should take up and consider election-related legislation.

- During the first special session, Senate Bill 1 ("S.B. 1") was introduced in the Senate and House Bill 3 ("H.B. 3") was introduced in the House—both of which contained the majority of S.B. 7.

- In calling for a hearing on H.B. 3, House Republicans gave just 48 hours' notice, violating the rule for 72 hours' notice.

- On July 10, 2021, the day H.B. 3 was scheduled to be heard, the House did not hear public testimony on the bill until the wee hours of the morning, long after the first witnesses had registered their place in line to testify at 8am.

- That same day, an overlapping hearing on S.B. 1 lasted well past midnight.

- Republicans in the House and the Senate ignored the witness testimony, passing both bills S.B. 1 and H.B. 3 out of their respective committees along party lines with limited changes.

- In response, over 50 Democratic House members flew to Washington, D.C. on July 12, and once again denied the House the quorum it needed to conduct business, choosing instead to meet with congressional leaders and White House officials to push federal voting legislation.

- A continued boycott by Democrats prevented the adoption of the omnibus voter suppression bill during the First Called Session, but—after more than a month away from their homes and after the Speaker of the house issued a warrant for their arrest—enough of the absent Democratic House members returned for election-related legislation to be taken up and considered during a second special session.

- Once Democrats returned, the Republican majorities in both the House and the Senate quickly enacted S.B. 1 along party lines.

## VI.   S.B. 1 includes substantive deviations.

- When the Texas Legislature enacted strict voter ID requirements for in-person voters in 2011, they did not include absentee mail-in ballots.

- The Texas Legislature added identification measures for mail-in voting a decade later in S.B. 1 only after mail-in voting shifted from an option overwhelmingly used by Anglo voters to one used more often by minority voters.

- Texas imposed harsher criminal penalties non-partisan officials and those assisting disabled, and non-English speaking voters, while simultaneously instituting new protections for partisan poll watchers.

- The Texas Legislature adopted the criminal provisions of S.B. 1 despite concerted public opposition to criminalizing the process for voting and conducting elections.

- S.B. 1, in effect, endorses the threats and harassment directed at election officials who allegedly participated in the "stolen election" of 2020.

## VII.   Justifications offered by lawmakers for S.B. 1 are pretextual.

- The targeting of multiple voting procedures used disproportionately by minority voters provides powerful confirmation of the racial intent behind S.B. 1. Texas lawmakers repeatedly heard from election officials and voting rights groups that minority voters disproportionately used drive-thru voting and extended-hour voting.

- In Harris County, drive-thru voting was developed by a bipartisan committee, first for use in the primary process of 2020.

- In a lawsuit brought by a collection of Republican voters, including Representative Steve Toth, challenging the legality of drive-thru voting prior to the passage of S.B. 1 focused exclusively on

the votes cast in Harris County—ignoring the votes cast via drive-thru voting in less racially diverse counties.

- On October 16, 2020, Attorney General Ken Paxton (hereinafter "Paxton") issued a statement claiming that the Texas Election Code "makes no provision for 'drive-thru' voting centers." On October 28, 2020—just a few days before the General Election and after tens of thousands of votes had been cast at drive-thru voting centers in Harris County, Representative Toth, among others, sued to invalidated *only the votes cast in Harris County*, not in Bee County or Calhoun County, which also used drive-thru voting.

- During debates over restrictions on drive-thru voting, Republican legislators repeatedly critiqued the use of drive-thru voting in Harris County—ignoring that drive-thru voting had been used in other counties, including Bee County and Calhoun County, both of which have more Anglo voters than Harris County.

- Republican legislators who spoke in support of the restriction in S.B. 1 (and its predecessors)—and the drive-thru voting provision in particular—were unable to point to a single instance of voter fraud during the 2020 general election in Texas—let alone one related to drive-thru voting.

- One Republican member of the Senate Committee on State Affairs claimed that because drive-thru voting was disproportionately used by minorities, it represented a form of reverse racism and should be banned.

- Despite claims by Republican legislators that drive-thru voting hurt voter confidence in elections, an independent study conducted by Rice University after the election showed just the opposite. Voters across the political spectrum were more confident in the integrity of their ballot after voting at a drive-thru voting center and viewed drive-thru voting as a helpful, permanent option for future elections.

- More generally, the justification for S.B. 1 based on the prevention of voter fraud is contradicted by the experience in Texas that voter fraud is vanishing.

- Fraud was so rare in past elections that the chances were greater of a voter being hit by lightning than committing voter fraud.

- Attorney General Paxton—whose office logged more than 22,000 staff hours—was able to resolve only 16 prosecutions. All 16 cases involved residents who gave false addresses on their voter registration forms. None received any jail time.

- Post-election investigations and academic studies have demonstrated that the lack of evidence of significant voter fraud is not the result of insufficient efforts or the difficulty of detecting fraud.

- After the adoption of S.B. 1, the Secretary of State's post-election audit in four large Texas counties confirmed that voter fraud in Texas was vanishingly rare.

- Proponents failed to demonstrate either that there was a crisis of confidence about elections in Texas or that a partisan bill, sponsored only by Republicans, pushed ahead by Republicans through numerous procedural deviations, and enacted by Republicans along party lines, could broadly improve confidence in elections in the state.

- Voter confidence about the integrity of elections in the state was high, especially when compared with confidence about integrity nationwide. Polling data showed that only 16% of registered voters in Texas lacked confidence in Texas election results, compared to 43% nationwide.

- To justify the adoption of an omnibus "Election Integrity" law in Texas, Republican Representative Keith Bell, a member of the House Elections Committee, distorted these figures and invoked the 43% nationwide figure—rather than the more accurate, Texas-specific 16%—lacked confidence in "our election results."

- Voter confidence about the integrity of elections in the state was high, especially when compared with confidence about integrity nationwide. That is, Texans drew a sharp distinction between the conduct of elections in their state and elsewhere in the nation.

- The majority of Texas voters did not support stricter voting laws and whatever support that did exist was driven strictly by Republicans.

- In contrast, statistical analysis shows that fewer restrictions on voting, which result in lower cost of voting scores, lead to higher percentages of voters who are very confident about voting in their states.

- Republican legislators also claimed that S.B. 1 was required to stop counties, like Harris County, from conducting their elections differently than any other county.

- That justification ignores the fact that the Texas Election Code implicitly recognizes different needs of different counties, that primaries can be conducted differently by different counties, and that uniformity can be just as easily achieved by explicitly authorizing procedures for facilitating registration and voting for all counties rather than banning such procedures.

- Republican legislators' repeated claims that the restrictions of S.B. 1 are race-neutral are undermined by the multitude of overt, demeaning racial appeals issued by Texas State Representatives and Senators in recent years.

- These racial appeals demonstrate racial animus or at least a propensity to exploit racial bigotry and fears for political advantage. These appeals exploit and inflame rather than dampen or heal racial divisions.

## QUALIFICATIONS

This study draws on my experience in political history, political analysis, and historical and statistical methodology, as well as serving as an expert in voting rights litigation. I am a Distinguished Professor of History at American University in Washington, D.C., where I have been employed for 46 years. Formerly, I served as Chair of the History Department and Associate Dean of the College of Arts and Sciences at American University. I received my BA in History from Brandeis University in 1967 and my Ph.D. in History from Harvard University in 1973, with a specialty in the mathematical analysis of historical data.

I am the author of numerous scholarly works on quantitative methodology in social science. This scholarship includes articles in such academic journals as *Political Methodology*, *Journal of Interdisciplinary History*, *International Journal of Forecasting*, and *Social Science History*. In addition, I have co-authored *Ecological Inference* with Dr. Laura Langbein, a standard text on the analysis of social science data, including political information. I have published articles on the application of social science analysis to civil rights issues. This work includes articles in such journals as *Journal of Law and Politics*, *La Raza Law Journal*, *Evaluation Review*, *Journal of Legal Studies*, and the *National Law Journal*. My scholarship also includes the use of quantitative and qualitative methods to conduct contemporary and historical studies, published in academic journals such as *Proceedings of the National Academy of Sciences*, *American Historical Review*, *International Journal of Forecasting*, *International Journal of Information Systems & Social Change*, and *Journal of Social History*.

Quantitative and historical analyses also ground my books, including *Prejudice and the Old Politics: The Presidential Election of 1928*, *The Thirteen Keys to the Presidency* (co- authored with Ken DeCell), *The Keys to the White House*, *White Protestant Nation: The Rise of the American Conservative Movement*, and *FDR and the Jews* (co-authored with Richard Breitman). My most recent books from

13

2017 to 2021 are *The Case for Impeachment; The Embattled Vote in America: From the Founding to the Present; Repeal the Second Amendment: The Case for a Safer America*, and *13 Cracks: Repairing American Democracy After Trump. The Embattled Vote in America*, published in September 2018 by Harvard University Press, examines both the history and current status of voting rights in America.

My book *White Protestant Nation* was one of five finalists for the National Book Critics Circle Award for the best general nonfiction book published in America. My book *FDR and the Jews* was published under the Belknap Imprint of the Harvard University Press, reserved for works of special significance and lasting impact. This book was an editor's choice book of the New York Times in 2013, the winner of the most prestigious prize in American Jewish Studies, the National Jewish Book Award, and a finalist for Los Angeles Times Book Prize in history.

My book *The Case for Impeachment* was an independent bookstore bestseller. In 2018, I was the winner of the Alfred Nelson Marquis Life-Time Achievement Award for the top 5% of persons included in Marquis' WHO'S WHO. I was also cited by rise.global as one of the world's leading geopolitical experts.

I have worked as a consulting or testifying witness for both plaintiffs and defendants in some 100 voting and civil rights cases, providing testimony on many issues, including the Senate Factors. My work includes cases for the United States Department of Justice and cases for many civil rights organizations. I have also worked as a consulting or testifying witness numerous times for state and local jurisdictions. My work also includes several cases in the state of Texas, including the voter identification and redistricting cases brought by the state of Texas before the U.S. District Court for the District of Columbia, *Texas v. Holder*, No. 1:12-cv-128-DST-RMC-RLW (D.D.C.) (voter identification); *Texas v. United States*, No. 1:11-cv-1303-RMC-TBG-BAH (D.D.C.) (redistricting), the 2010-cycle redistricting litigation before a three-judge federal court in the Western District of Texas, *Perez v. Perry*, No. 5:11-cv-360-OLG-

JES-XR (W.D. Tex.), the voter identification litigation in the Southern District of Texas, *Veasey v. Perry*, No. 2:13-cv-193 (S.D. Tex.), a recent Section 2 case in the Northern District of Texas, *Harding v. County of Dallas*, 3:15-CV-131-D, and the recent challenge to the ban on straight ticket voting in the Southern District of Texas, *Bruni v. Hughs*, Civil Action No. 5:20-CV-35. In the U.S. Supreme Court case *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006), the majority opinion authoritatively cited my statistical work to invalidate a congressional district in southwest Texas for diluting the votes of Hispanics.

I have testified numerous times on the issue of intentional discrimination by legislative bodies. For example, the three-judge court in the District of Columbia in the Section 5 litigation on the 2011 State of Florida Senate redistricting plan cited my work in support of their finding that the State's redistricting plans intentionally discriminated against minority voters *(State of Florida v. United States and Eric H. Holder*, 887 F. Supp. 2d 133, 138-39 (D.ED. 2012), as did the San Antonio Court (*Shannon Perez v. Greg Abbott*, SA-11-CV-360 (2017), and Judge Ramos in her opinion on intentional discrimination in the adoption of the Florida' voter ID law (*Veasey v. Perry*, 71 F.Supp.3d 627 (2014).). In *North Carolina State Conference of the NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016) the Fourth Circuit Court of Appeals accepted my opinion that the state intentionally discriminated against minorities in adopting the omnibus legislation known as the Voter Information and Verification Act (VIVA). Subsequently, in 2019, a federal district court in *North Carolina State Conference of the NAACP v. Cooper*, Case No.1:18CV1034, in issuing a preliminary injunction accepted my opinion that there was intentional racial discrimination in adopting another photo voter ID law after the rejection of such a law as part of the VIVA legislation. The case is pending after the Circuit Court stayed the District Court's preliminary injunction. In *Committee for a Fair and Balanced Map v. Illinois State Board of Elections*, a three-judge court accepted my opinion that the state of Illinois did not intentionally discriminate against Hispanic voters in

its 2011 congressional redistricting plan. In *McConchie v. Illinois State Board of Elections* No. 1:21-cv-03091 (N.D. Ill., 2021) the three judge District Court accepted my opinion that Illinois had not intentionally discriminated against Black and Hispanic voters in its redistricting plan for the State Legislature. In *Pico Neighborhood Association v. City of Santa Monica*, a state Court of Appeals accepted my opinion that the city had not intentionally discriminated against minorities in the adoption or maintenance of its at-large election system for city council. The State Supreme Court declined to review this finding.

## METHODOLOGY & ANALYSIS

This report draws upon sources standard in historical and social scientific analysis. Those sources include scholarly books, articles, and reports; newspaper and other journalistic articles; demographic information; election returns; court opinions, briefs, and reports; government documents; and scientific surveys.

In assessing intentional discrimination, historians generally follow the non-exhaustive methodological guidelines set forth by the United States Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp*., 429 U.S. 252 (1977). This report employs those guidelines, which are standard in my field of study. In *Arlington Heights*, the Court focused on five factors to ascertain intentional discrimination: (1) historical background, (2) discriminatory impact, (3) the sequence of events leading up to the decision, (4) procedural or substantive deviations from the normal decision-making process, and (5) legislative history, including contemporaneous viewpoints expressed by the decision-makers. This report considers the factual basis for each of these factors. The Report does not reach any legal conclusions. The methodology I employ here and the opinions I have reached are the product of standard principles and methods used in my field of history, which are consistent with Supreme Court guidelines.

## EXPERT OPINION

### I.   S.B. 1 in the National Perspective

Texas's enactment of an omnibus voting and elections bill on voting and elections was not motivated by the discovery of consequential problems with Texas elections. That would be impossible— as there were none. There was no crisis of confidence about the accuracy of Texas election results. Keith Ingram, the Secretary of State's Director of Elections, declared the 2020 elections to be "smooth and secure," an assessment that the Secretary of State recently confirmed in a "forensic audit" of four Texas counties.[3]

S.B. 1 is part of a larger campaign of voter suppression that simultaneously targets minority voters that in many states—including Texas—are the base of the Democratic Party and motivates the primarily Anglo base of the Republican Party. Like omnibus voter suppression bills in other states like Florida, Georgia, and Iowa, S.B. 1 was motivated by a national political strategy executed in tandem by Republican elected officials and conservative organizations like the Heritage Foundation. In fact, the Executive Director of Heritage Action for America, the political arm of the Heritage Foundation, took credit for no less than 19 of the restrictions included in S.B. 1.[4]

These anti-democratic tactics are not new. Professor Jacob Grumbach of the University of Washington analyzed and explained this national Republican strategy that drives "democratic

---

[3] Taylor Goldenstein, Jeremy Blackman, *Did A 'Smooth And Secure' 2020 Election Cost The Texas Secretary Of State Her Job?* HOUSTON CHRONICLE (May 24, 2021), https://www.houstonchronicle.com/politics/texas/article/Texas-Secretary-of-State-Ruth-Hughs-resigns-under-16195586.php.

[4] Ari Berman and Nick Surgey, *Leaked Video: Dark Money Group Brags About Writing GOP Voter Suppression Bills Across the Country*, MOTHER JONES (May 13, 2021), https://www.motherjones.com/politics/2021/05/heritage-foundation-dark-money-voter-suppression-laws/. Video at vimeo.com/549310910

backsliding."[5] Dr. Grumbach developed a "State Democracy Index," which demonstrated that "electoral democracy" is especially important "for minority populations who have been historically subjugated." Grumbach found that Republican control of state government dramatically reduced states' democratic performance between 2008 and 2018. Moreover, Grumbach found that Republican-controlled states are not independently adopting anti-democratic policies. Anti-democratic policies are, rather, a symptom of a greater national political strategy at work. The results of Grumbach's work indicated that—rather than state policies developing independently—the "racial, geographic, and economic incentives of groups in national party coalitions may instead determine the health of democracy in the states."[6]

Grumbach noted that "preferences with respect to race and partisan identity provide the Republican electoral base with reason to oppose democracy in a diversifying country." The "politics of race are therefore still central to this theory of party coalitions." In recent years, "racial appeals and frames are facilitated by a sophisticated conservative media ecosystem that consolidates the mass elements of the Republican Party."[7]

This strategy is particularly effective in Texas because of the State's long—and ongoing—history of official discrimination on the basis of race. As demonstrated below, the strategy is particularly salient considering Black and Latino Texans outnumber Anglo Texans and make up an ever-increasing rising share of the state's eligible voters, Democrats are becoming more competitive in local and statewide elections, and mail-in voting in Texas has shifted from majority-Anglo to majority-minority. The strategy

---

[5] Jacob Grumbach, *Laboratories of Democratic Backsliding*, (April 5, 2021), at 3-4, link at https://www.wnycstudios.org/podcasts/otm/segments/laboratories-democratic-backsliding-on-the-media.

[6] *Id*. at 1, 17.

[7] *Id*, at 1, 16-17, 53.

is further reflected in overt racial appeals by Republican officeholders, candidates, party officials, and activists and in legislation enacted in Texas to limit what can be taught in schools about race.

Texas legislators have justified S.B. 1's passage with misleading and pretextual justifications—including claims that voter fraud is a significant problem in Texas (ignoring the fact that the Texas Secretary of State's Director of Elections assessed the election to be "smooth and secure") and the need for uniformity.[8] But, Chair of the House Elections Committee and author of H.B. 6—the precursor to S.B. 1—said the quiet part out loud when he referenced the "purity of the ballot"—a relic of the Jim Crow era.

## II.   Historical Background

Texas has a long history of official discrimination against Hispanic and Black Texans in elections and in voting. Sadly, this pattern and practice of racial discrimination is not confined to the past—there are myriad examples in recent years of discrimination against historically marginalized groups in the State. In fact, official discrimination against minorities in Texas continues to be recognized by federal courts.[9]

The State's history of, and ongoing, discrimination extends past voting and into other realms of everyday life, including education, housing, and law enforcement. Those other forms of discrimination have lingering effects on socio-economic disparities between Anglos and minorities across the state, which bear directly on the ability of minorities to participate fully in the political process.

As the Supreme Court recognized in 2006, "the 'political, social, and economic legacy of past discrimination' for Hispanics in Texas . . . may well 'hinder their ability to participate effectively in the political process.'"[10] Over a decade later, a three-judge panel credited "expert and lay witness testimony

---

[8] Taylor Goldenstein, *Did a 'smooth and secure' 2020 election cost the Texas secretary of state her job?*, HOUSTON CHRONICLE (May 24, 2021), https://www.houstonchronicle.com/politics/texas/article/Texas-Secretary-of-State-Ruth-Hughs-resigns-under-16195586.php.

[9] *See, e.g.*, *LULAC*, 548 U.S. at 439-40; *Perez v. Abbott*, 253 F. Supp. 3d 864, 959 (W.D. Tex. 2017).

[10] *LULAC*, 548 U.S. at 439.

concerning Texas' long history of discrimination with regard to voting and in general."[11] That same court recognized that Texas has a historical pattern of enacting "restrictive and discriminatory voting laws . . . in response to a perception of increased voting power by emerging demographic groups."[12]

Texas's history of discrimination is well-documented. For example:[13]

- Texas joined the Union as a slave state and joined the Confederacy to preserve the institution of slavery.

- Texas prohibited Mexicans from organizing political rallies or serving as election judges as early as the 1840s.

- After the Civil War, in 1866, an all-white Texas constitutional convention prohibited freed slaves from voting, holding office, or serving on juries.

- After Reconstruction, white-dominated Texas governments sharply curtailed Black and Hispanic political rights through the poll tax, the gerrymandering of legislative districts, restrictive registration laws, and all-white primaries. Texas did not abolish the poll tax until 1966.

- After Reconstruction and into the 1960s, Black and Hispanic Texans were subject to Jim Crow discrimination in education, public facilities, housing, health care, transportation, law enforcement, and employment.

---

[11] *Perez*, 253 F. Supp. 3d at 959

[12] *Id.*

[13] *See, e.g.*, Brian E. Behnken, *Fighting Their Own Battles: Mexican-Americans, African Americans and the Struggle for Civil Rights in Texas* (University of North Carolina Press, 2011); Chandler Davidson and Bernard Grofman, eds., *Quiet Revolution in the South, Chapter 8: Texas* (Princeton University Press, 1994); D. Alwynn Barr, *Black Texans: A History of African Americans in Texas*, 1528-1995 (2d ed., 1995); David Montejano, *Whites And Mexicans in the Making Of Texas, 1836-1986*, 130 (University of Oklahoma Press, 1987).

- Texas has the largest number of known lynching victims, apart from Mississippi and Georgia. Of the 470 lynching victims in Texas between 1885 and 1942, 339 were black, 77 were white, 53 were Hispanic, and 1 was Native American. [14]

- Texas retained an all-white primary system from the turn of the twentieth century to 1944. In 1927, the Supreme Court struck down Texas's all-white primary as a violation of the Equal Protection clause of the Fourteenth Amendment. Texas quickly revised its law in a way that enabled the Democratic Party to stipulate that "all white Democrats . . . and none other" could participate in its primaries.  In 1932, the Court invalidated the new law and the persistent Texas legislature passed yet another white primary statute to evade this decision. Not until it was compelled to do so in *Smith v. Allwright*, 321 U.S. 649 (1944), did Texas abandon its white primary. [15]

- In 1975, Congress covered Texas under Section 5 of the Voting Rights Act, which required preclearance by the U.S. Department of Justice or a federal court for all changes to electoral laws and procedures, including voting requirements and redistricting. [16]

- Later that year, Texas enacted S.B. 300, a law intended to purge voter registration rolls and require re-registration. In its first objection letter to Texas, the Department of Justice blocked the law because of its discriminatory effects on African Americans and Hispanics.[17]

---

[14] Texas State Historical Association, *Lynching*, https://tshaonline.org/handbook/online/articles/jgl01

[15] Charles L. Zelden, *The Battle for the Black Ballot:* Smith v. Allwright *and the Defeat of the Texas All-White Primary* (University Press of Kansas, 2004).

[16] *Voting Rights in Texas: An Advisory Memorandum of the Texas Advisory Committee to the U.S. Commission on Civil Rights*, United States Commission on Civil Rights 2 (2018), https://www.usccr.gov/files/pubs/2018/07-23-TX-Voting-Rights.pdf.

[17] J. Stanley Pottinger, Assistant Attorney General, to Mark White, Texas Attorney General, 10 December 1975, https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/TX-1000.pdf.

- Until the Supreme Court's 1954 decision in *Brown v. Board of Education*, Texas maintained a system of segregated public education, underfunding schools for minority children.[18]

- Texas aggressively resisted efforts to desegregate its schools. In 1970, U.S. District Court Judge William Wayne Justice placed the full state of Texas under a desegregation order—many districts were only released from this order in 2010.[19]

- Discrimination in higher education in Texas persisted long after the *Brown* decision. In 1978, the U.S. Office of Civil Rights of the Department of Education found that Texas had not eliminated the vestiges of legalized segregation in higher education. To avoid litigation, Texas had to adopt four plans to deal with persisting discrimination in higher education beginning in 1981 and extending through the early 2000s. [20]

## A. Recent Discrimination in Voting

Racial discrimination in Texas is not limited to earlier history. Rampant racial discrimination continues to exist in Texas—and is further evidenced by S.B. 1.

Texas has received the largest number of preclearance objections under Section 5 of the Voting Rights Act. In every redistricting cycle since 1980, Texas been denied preclearance for at least one of its congressional, state house, or state senate redistricting plans.[21] Texas is the only state with this consistent record of DOJ intervention against statewide redistricting plans.[22] In fact, in the redistricting cycle that

---

[18] *United States v. Texas*, 321 F. Supp. 1043, 1047 (E.D. Tex. 1970)

[19] *Id.*

[20] Patrick Michels and Gus Bova, Some Texas Schools are Still Fighting Decades-Old Desegregation Orders, *Texas Observer* (September 16, 2016), https://www.texasobserver.org/school-desegregation-pi/.

[21] United States Department of Justice, "Section 5 Objection Letters," https://www.justice.gov/crt/section-5-objection-letters.

[22] *Id.*

followed the 2010 Census, Texas was the *only* state to have any of its plans for Congress, the State House, and the State Senate fail to achieve preclearance under the Voting Rights Act. For example, in 2012, courts found that Texas's congressional plan had the intent and effect of discriminating against minority voters in Dallas County.[23]

A 2017 decision by the three-judge court in *Perez v. Abbott* found that the state of Texas's 2011 congressional plan constituted a racial gerrymander, and had the intent and effect of discriminating against minority voters in Texas—and in the Dallas-Fort Worth ("DFW") area in particular.[24] The *Perez* court further found that "race was used as a proxy for political affiliation," and that "was done intentionally to dilute minority voting strength."[25] Ultimately the *Perez* court concluded that "[w]hile there is certainly an overlap between cracking and packing Democrats and cracking and packing minorities, the Court finds that Plaintiffs have satisfied their burden of showing that intentional minority vote dilution was a motivating factor in the drawing of district lines in DFW and that map drawers intentionally diluted minority voting strength in order to gain partisan advantage."[26]

The Court then established interim remedial plans for Congress, which it redrew after the Supreme Court ruled that the initial plans did not give sufficient deference to the decisions of the Texas Legislature. Texas then adopted a new set of interim plans. The Court found that adoption of the 2013 plans continued Texas' intentional discrimination against minorities.[27]

---

[23] *Texas v. United States*, 887 F. Supp. 2d 133 (2012), at 159-162, 163-66.

[24] *Id*., *Perez*, 253 F. Supp. 3d at 953.

[25] *Id*.

[26] *Id*. at 949.

[27] Ultimately, the Supreme Court overturned the *Perez* court's ruling on the 2013 plans, but did not consider the court's findings on the 2011 plans.

This pattern appears to be repeating itself in the 2020 redistricting cycle. Even though 95% of Texas's population growth was driven by *new minority residents*, the Texas Legislature failed to draw a single, additional majority-minority district.[28]

Texas's population changes have been driven by changes in large, urban, diverse counties. For example, in Harris County, the Anglo population since 2010 has declined by 40,053, while the minority population has grown by 678,739. In Dallas County, the Anglo population declined by 59,706, while the minority population grew by 305,106. In Tarrant County, the Anglo population declined by 32,151 while the minority population grew by 333,857. The Texas Legislature appeared to ignore these dramatic population shifts and instead drafted plans that preserved the ability of Anglo voters to elect candidates of their choice at the expense of minority voters.

In 2011, Texas enacted the most restrictive photo identification law in the nation. Every court that has examined this law has found that it had the effect of discriminating against voting opportunities for minorities across the state of Texas. These rulings include a 3-0 decision by the District Court of the District of Columbia, a decision by the Southern District of Texas, a 3-0 decision by a panel of the Fifth Circuit Court of Appeals, and a 9-6 *en banc* decision by the Fifth Circuit. The law was upheld only after a court-compelled amendment to authorize a reasonable impediment declaration for voters lacking an authorized ID.[29]

---

[28] Alexa Ura, *People of color make up 95% of Texas' population growth, and cities and suburbs are booming, 2020 census shows*, TEXAS TRIBUNE (Aug. 12, 2021), https://www.texastribune.org/2021/08/12/texas-2020-census/.

[29] *Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012); *Veasey v. Perry*, 71 F. Supp. 3d 627 (S.D. Tex. 2014); *Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015); *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc); Texas Secretary of State, "Election Advisory No. 2017-15, https://www.sos.texas.gov/elections/laws/advisory2017-15.shtml.

In January 2019, the Texas Secretary of State's office issued Election Advisory 2019-02. That advisory promised to dispatch to county voter registrars "actionable information" regarding more than 95,000 potential instances in which non-citizens were registered to vote. The Secretary directed county registrars to send letters to these voters warning that their registration could be purged for a lack of citizenship. But this list was fundamentally flawed—it did not account for naturalized citizens who obtained their citizenship before registering to vote. Only after Texas LULAC filed a voting rights lawsuit did then-Secretary of State David Whitley agree to a settlement that required him to "rescind Election Advisory 2019-02 and advise county voter registrars and elections administrators to take no further action on any data files that the Secretary of State sent them in connection with Election Advisory 2019-02."[30]

In 2020, prior to the upcoming elections, Texas Governor Greg Abbott issued an Executive Order limiting each county in the state to a single drop box location for the delivery of absentee ballots.[31] Racially diverse Harris County with 3.5 million persons of voting age had prior to the executive order opened twelve drop box locations. [32] Under the order, it would have the same single location as predominantly-Anglo King County, with fewer than 200 persons of voting age. Governor Abbott was instrumental in the enactment of S.B. 1 calling extra special sessions to assure its passage.

In addition to S.B. 1, the Texas Legislature passed several other voter restriction bills during their 2021 legislative sessions. Like S.B. 1, the hurdles placed in these bills fall most heavily on minority voters with lower income and education, higher poverty levels, and for Hispanics, a lesser command of English.

---

[30] Settlement Agreement at 4, *Texas League of United Latin Am. Citizens v. Whitley*, No. SA-19-CA-074-FB (W.D. Tex. 2019), https://texascivilrightsproject.org/wp-content/uploads/2019/04/4-25-10_voter_purge_settlement_agreement.pdf.

[31] Ashley Kilough and Caroline Kelly, "Texas Supreme Court Sides With Governor on Rule Requiring One Drop Box Per County," *CNN*, 27 October 2020, https://www.cnn.com/2020/10/27/politics/texas-supreme-court-drop-boxes/index.html.

[32] *Id.*

- **S.B. 1111**: prohibits establishing residence "for the purpose of influencing the outcome of a certain election," and limits opportunities to vote for transient voters.[33]

- **H.B. 3107:** requires individuals who submit their registration applications through fax to provide a copy of their application with their original signature signed with pen on paper — also known as a "wet-ink signature."

- **S.B. 1113:** allows the Texas Secretary of State to withhold state funds from registrars if they do not regularly purge voter registrations.

- **H.B. 3920**: lays out new limitations on who can request a mail ballot and for what reasons, including limiting what qualifies as a disability and requiring disabled voters who request a mail ballot to affirm their eligibility by signing a statement attesting to their physical inability to vote at the polls.

- **H.B. 2283**: limits donations to election administrators — a response to nonprofit organizations such as the Center for Tech and Civic Life that provided grants to support election administration costs during the 2020 election after Republicans refused to adequately fund election infrastructure.[34]

### B. Discrimination in Education

Minority Texans disproportionately enroll in public schools in Texas—minority students comprise nearly 75% of enrollments (Table 1).[35] And Texas lags behind nearly all other states in financial support

---

[33] LegiScan, Texas Senate Bill 1111, https://legiscan.com/TX/bill/SB1111/2021.

[34] LegiScan, Texas House Bill 3920, https://legiscan.com/TX/bill/HB2283/2021.

[35] *Enrollment in Texas Public Schools*, Division of Research and Analysis, Office of Governance and Accountability, Texas Education Agency 8 (June 2021), https://tea.texas.gov/sites/default/files/enroll-2020-21.pdf.

for public education, ranking third from last among all states in per-pupil financial support for public schools, 32% below the national average.[36]

In addition to funding disparities, public schooling in Texas is characterized by harsher disciplinary actions for minority students when compared to white students (Table 2). After reviewing nearly one million student records, a study published in 2011 by the independent, non-partisan Justice Center found that minority students in public school grades 7 to 12 in Texas, especially African American students, were substantially more likely to receive disciplinary punishment than white students. The study found that 75.1% of African American students had one or more disciplinary actions, compared to 64.8% of Hispanic students, and 46.9% of Anglo students. In addition, 26.2% of African American students were placed in out-of- school suspensions for their first violation, compared to 18% of Hispanic students and 9.9% of white students. Through controlled analysis, the study found that within the ninth-grade year, African American students had about a 31% higher likelihood of a discretionary school disciplinary action, compared to the rate for otherwise identically situated Anglo students.[37] These disparities continue today.[38]

The failings in Texas regarding public school funding and disparate disciplinary actions are reflected in substantial racial disparities in educational attainment. White students have higher rates of

---

[36] Sterling C. Lloyd & Alex Harwin  *Special Report: Education Funding,* EDUCATION WEEK, (June 1, 2021), https://www.edweek.org/policy-politics/nation-earns-a-c-on-school-finance-reflecting-inconsistency-in-k-12-funding-and-equity/2021/06.

[37] Council of State Governments Justice Center in partnership with the Public Policy Research Institute at Texas A&M University*, Breaking Schools' Rules: A Statewide Study of How School Discipline Relates to Students' Success and Juvenile Justice Involvement* (July 2011), https://csgjusticecenter.org/wp-content/uploads/2020/01/Breaking_Schools_Rules_Report_Final.pdf.

[38] *See Miseducation: Texas*, ProPublica (2018), https://projects.propublica.org/miseducation/state/TX.

high school and college graduation than Black or Hispanic students and greater proficiency in reading and mathematics. A significant percentage of Hispanics also "speak English less than very well." (Table 3).

Rather than giving priority attention funding deficiencies in public education or racially disproportionate disciplinary actions, the same legislature that adopted S.B. 1 sought to exert control over the content of education in Texas. It adopted legislation in 2021 seeks to downplay racial oppression and discrimination in the history of America and Texas and to decouple past discrimination and oppression from the current racial disparities in Texas on economic status, housing, education, and health. Texas has adopted these regulations for a public school system that is nearly three-quarters minority in its racial composition.

A pattern of denying the existence of discrimination has also emerged in schools. In 2021, the Texas Legislature enacted two bills—H.B. 3979 and S.B. 3—designed to limit teachers' ability to accurately teach the history of racial injustice and discrimination in the United States and the societal inequities that stem from racial discrimination.[39]

In a confounding attack on an individual scholar, teachers have been forbidden from requiring students to understand the 1619 Project, created by Pulitzer Prize and MacArthur Genius award winner Nikole Hannah-Smith to bring "the consequences of slavery and the contributions of black American to the very center of our national narrative." These blanket restrictions sparked concern amongst educators and historians. For example, in a May 2021 letter to the Texas State Senate, 134 historians—many affiliated with institutions in Texas—expressed their opposition to H.B. 3979. In particular, the historians

---

[39] The Texas Education Agency (TEA) provided a comprehensive accounting of the two bills, with an analysis of what changed and remained the same in S.B. 3 compared to H.B. 3979. Texas Education Agency, Senate Bill 3, 87th Texas Legislature, "Second Called Session – Update to Instructional Requirements and Prohibitions," 18 November 2021, https://tea.texas.gov/about-tea/news-and-multimedia/correspondence/taa-letters/senate-bill-3-87th-texas-legislature-second-called-session-update-to-instructional-requirements-and-prohibitions.

reiterated that students "have a right to learn an accurate account of history, including the darkest parts of our history and the long efforts for freedom and social justice." [40] They continued, H.B. 3979 "places history and civics teachers in a professionally compromising position in the classroom. It is impossible to teach the history of the United States without discussing race, gender, religion, or injustice. That inaccurate account of history would not meet standards set by professional historical associations."[41] Despite these admonitions the State Legislature enacted both H.B. 3979 and later—during the Second Special Session— a more restrictive bill known as S.B. 3.

In June 2021, PEN America, one of the world's leading free speech advocacy groups, has condemned legislation like S.B. 3 that restricts education. More than 100 leading academic and professional organizations in the United States endorsed the statement, which read in part:

> The clear goal of these efforts is to suppress teaching and learning about the role of racism in the history of the United States. Purportedly, any examination of racism in this country's classrooms might cause some students "discomfort" because it is an uncomfortable and complicated subject ... Legislation cannot erase "concepts" or history; it can, however, diminish educators' ability to help students address facts in an honest and open environment capable of nourishing intellectual exploration . . . Knowledge of the past exists to serve the needs of the living. In the current context, this includes an honest reckoning with all aspects of that past. Americans of all ages deserve nothing less than a free and open exchange about history and the forces that shape our world today, an exchange that should take place inside the classroom as well as in the public realm generally ... A white-washed view of history cannot change what happened in the past.[42]

---

[40] "We are Historians Against HB 4979 and SB 2202," https://www.idra.org/wp-content/uploads/2021/05/Historians-Against-HB-3979-SB-2202.pdf.

[41] *Id.*

**[42] Pen America, *Joint Statement on Legislative Efforts to Restrict Education About Racism and American History* (June 16, 2021), https://pen.org/joint-statement-legislative-efforts-restrict-education-racism-american-history/.**

S.B. 3 further chills teaching by failing to specify any objective standards for assessing violations. Instead, a violation can be triggered by the subjective clams by a student or parent that they are made to feel "responsibility, blame, or guilt for actions committed by other members of the same race or sex."[43] For example, a student whose ancestors held slaves could complain of feelings of "responsibility, blame or guilt" from teaching the history of slavery in Texas and nationally. Likewise, a student with police officers in the family could complain of distress from a discussion of racial profiling in law enforcement. The bill thus opens to door for politically motivated "outing" or even the purging of educators who do not share the Republicans' minority ideology.[44]

Restrictions on education and voting are interconnected. "The approach of some Republican-led state legislatures," in adopting educational restrictions, "is a method for continuing to roll back racial progress regarding everything from voting rights to police reform."[45] It is, therefore, unsurprising that same organizations leading the fight for restrictive voter laws, are on the forefront of sanitizing the teaching of American history in public schools.

---

[43] Texas Educ. Code §28.0022(a)(4)(A)(ii)).

[44] **Molly Henessy-Fiske, *A 'War on Books'? Conservatives Push for Audits of School Libraries*, Los Angeles Times, 8 November 2021, https://www.latimes.com/world-nation/story/2021-11-08/texas-schools-ordered-to-investigate-books; Tyler Kingkade, *In Wealthy Loudon County, Virginia, Parents Face Threats in Battle Over Equity in Schools*, NBC News (June 1, 2021), https://www.nbcnews.com/news/us-news/wealthy-loudoun-county-virginia-parents-face-threats-battle-over-equity-n1269162?icid=related; Tyler Kingkade, *Critical Race Theory Battles are Driving Frustrated, Exhausted Educators out of Their Jobs,"* NBC News (July 12, 2021), https://www.nbcnews.com/news/us-news/critical-race-theory-battles-are-driving-frustrated-exhausted-educators-out-n1273595; Kate Reilly, *As Teachers and School Boards Face a Spike in Violent Threats, the Justice Department Is Stepping In*, TIME, 6 October 2021, https://time.com/6104539/justice-department-schools-threats/.**

[45] Rashawn Ray and Alexandra Gibbons, *Why are States Banning Critical Race Theory*, The Brookings Institution (August 2021), https://www.brookings.edu/blog/fixgov/2021/07/02/why-are-states-banning-critical-race-theory/.

For example, journalist Christopher Rufo was one of the first to villainize Critical Race Theory— a legal doctrine—as a political weapon to attack any discussion of state-sponsored racial injustice in schools. Rufo called Critical Race Theory "the perfect villain." He explained that when strung together, "the phrase 'critical race theory' connotes hostile, academic, divisive, race-obsessed, poisonous, elitist, anti-American." Rufo has assisted states in crafting anti-critical race theory legislation and published a "Critical Race Theory Briefing Book." It features political strategies and "powerful words and phrases to include in your communications," such as "Race-based Marxism," "State-sanctioned Racism," "Racial Engineering," "Political Predators," and "Critical Race Theory Teaches Children to Hate Each Other and Hate Their Country."[46]

Texas Lieutenant Governor Dan Patrick used Critical Race Theory as a political strawman, arguing that it teaches "one race is better than another and that someone, by virtue of their race or sex, is innately racist, oppressive or sexist."[47] Yet, the aim of Critical Race Theory is just the opposite: to call attention away from accusations of individual racism and focus instead on how racial discrimination is embedded in American law and practice.[48] Instead, Critical Race Theory has become a proxy for any version of American history or civics that does not reinforce existing power structures and racial hierarchies.

---

[46] Benjamin Wallace-Wells, *How a Conservative Activist Invented the Conflict Over Critical Race Theory*, NEW YORKER, (June 18, 2021), https://www.newyorker.com/news/annals-of-inquiry/how-a-conservative-activist-invented-the-conflict-over-critical-race-theory; Laura Meckler and Josh Dawsey, *Republicans, Spurred on by an Obscure Figure, See Political Promise in Targeting Critical Race Theory*, WASHINGTON POST, (June 21, 2021), https://www.washingtonpost.com/education/2021/06/19/critical-race-theory-rufo-republicans/; Christopher Rufo, *Critical Race Theory Briefing Book*, https://christopherrufo.com/crt-briefing-book/?mc_cid=340fbeafe6&mc_eid=f645157ebf.

[47] Kate McGee, *Lt. Gov. Dan Patrick proposes ending university tenure to combat critical race theory teachings*, TEXAS TRIBUNE (Feb. 18, 2022), https://www.texastribune.org/2022/02/18/dan-patrick-texas-tenure-critical-race-theory/.

[48] Gary Peller, I've Been a Critical Race Theorist for 30 Years. Our Opponents Are Just Proving Our Point For Us, POLITICO (June 30, 2021), https://www.politico.com/news/magazine/2021/06/30/critical-race-theory-lightning-rod-opinion-497046; Jason Johnson, Critical Race Theory is a Convenient Target for

The transformation of Critical Race Theory from legal framework to national boogeyman issue has resulted in educators—including educators in Texas—being harassed, fired, and pushed to resign for advocating racial equality and diversity. In fact, teachers and administrators in Texas have lost their jobs for engaging in activities related to racial equity that could be lumped into "Critical Race Theory."[49]

Republicans in Texas leaned into critiques of Critical Race Theory to further mobilize their predominately-white base. H.B. 3979 and S.B. 3 harken back to the racially driven censorship of education during the era of Jim Crow discrimination in the South when Black teachers in Black schools were not free to teach the truth about racial oppression, but instead "were dependent, either directly or indirectly, upon politicians and officials who insisted upon black acquiescence in white supremacy."[50] Indeed, Black students were "not permitted to use school books [that included] the Declaration of Independence or the

---

Conservatives, SLATE, (June 15, 2021), https://slate.com/news-and-politics/2021/06/critical-race-theory-ibram-kendi-racism-racists.html; Isabella Zou, What is critical race theory? Explaining the discipline that Texas' governor wants to 'abolish', TEXAS TRIBUNE (June 22, 2021), https://www.texastribune.org/2021/06/22/texas-critical-race-theory-explained/.

[49] Edward McKinley, *Center of the Culture Wars: Trump-Era Rancor Spills Into Texas School Board Politics*, HOUSTON CHRONICLE, (October 15, 2021), https://www.houstonchronicle.com/politics/texas/article/trump-culture-war-texas-school-board-fights-books-16535985.php; Brian Lopez, *Death Threats and Doxxing: The Outcome of Mask Mandate and Critical Race Theory Fights at a Texas School Board*, TEXAS TRIBUNE, (December 15, 2021), https://www.texastribune.org/2021/12/15/texas-school-boards-political-fights/; Katie Shepherd, *Texas Parents Accused a Black Principal of Promoting Critical Race Theory. The District Has Now Suspended Him*, WASHINGTON POST, (September 1, 2021), https://www.washingtonpost.com/nation/2021/09/01/texas-principal-critical-race-theory/; Tyler Kingkade, *Critical Race Theory Battles are Driving Frustrated, Exhausted Educators out of Their Jobs*, NBC NEWS ( July 12. 2021), https://www.nbcnews.com/news/us-news/critical-race-theory-battles-are-driving-frustrated-educators-out-n1273595.

[50] Adam Fairclough, "Being in the Field of Education and also Being a Negro...Seems...Tragic: Black Teachers in the Jim Crow South," *Journal of American History*, 75, (2000), at 75.

Constitution of the United States." White supremacists feared that through exposure to such material disenfranchised black people "might learn to contend for the rights therein guaranteed."[51]

## C. Discrimination in Law Enforcement

Racism and racial inequity also permeate law enforcement in Texas, with important implications for voting and civic engagement. Texas disenfranchises most felons during their prison term and while on parole or probation. Incarceration can deter education, job prospects, and mental health, which in turn diminish opportunities to participate in the political process. Consequences of the carceral system are disproportionately borne by Black and Latino Americans—and Texas is no exception.

Recent reports document racism among law enforcement officers in several Texas jurisdictions, including the city of Austin, Dallas County, and Dennison County. According to a June 2019 report in the *Texas Monthly*, "[p]olice officers in Dallas and Denison have been caught making and circulating bigoted posts on social media, often advocating for the use of deadly violence against the citizens they are paid to protect and serve." Many of the posts "are disturbingly violent, and often target African Americans, activists, Hispanics, immigrants, Muslims, LGBT people, and women."[52]

In fall 2019, Austin Assistant Police Chief Justin Newsom resigned after a complaint charging him with using racial slurs to refer to black officers, another assistant chief who was Black, a Black member of the city council, and President Barack Obama.[53] Subsequent independent audits found "significant

---

[51] Carter G. Woodson, *The Miseducation of the Negro*, reprint of 1933 edition, (12th Media Services, 2017) at. 54.

[52] Leif Reigstad, *North Texas Cops Caught Being Racist Online*, TEXAS MONTHLY, (June 7, 2019), https://www.texasmonthly.com/politics/north-texas-cops-caught-sharing-racist-facebook-posts/; see also, *Plain View Project Online*, https://www.plainviewproject.org/.

[53] Melanie Torre, *Complaint Details Alleged Racist Statements by Former APD Leader*, CBS Austin (November 9, 2019), https://cbsaustin.com/news/local/former-apd-assistant-chief-apologizes-for-inappropriate-language-ahead-of-investigation.

racial and gender disparities in the standards and practices of APD's Training and Recruiting divisions." The reviewers found that "force and force severity is disproportionately used on African Americans, even when other neighborhood demographic characteristics such as poverty and crime are considered." They additionally found that "[n]ational and local data indicate that a higher percentage of African Americans and Latinos were stopped, cited, arrested, and searched than whites, even when other factors were considered." [54] Additional data confirmed that in Austin there exists "an institutional culture that lacks accountability at the leadership level in responding to repeated complaints about racism, gender, and sexual orientation.[55]

The data reported in Table 5 for major cities in Texas, documents the racial profiling of Blacks who are readily identifiable from Anglos based on appearance. As shown in Table 5, the disparity between the percentage of Blacks in the adult population and the percentage of Blacks in traffic stops ranges from 35% to 116%, with a mean of 78%.[56]

Texas has the sixth highest incarceration rate among the states, at 710 per 100,000 adult residents.[57] As shown in Table 6, Black and Latino Texans are disproportionally incarcerated, with the burden falling most heavily on Black Texans. Disparities in juvenile incarceration, which exist for Blacks and Hispanics are especially significant for impacting potential at an early age. Texas also disenfranchises all felons who

---

[54] Joyce James Consulting, *Racial Inequities and Institutional Racism: A Report Submitted to The City of Austin Equity Office and The Austin Police Department* (November 2020), at 7. Available at https://www.austintexas.gov/edims/pio/document.cfm?id=352525.

[55] *Id.*

[56] *2020 Racial Profiling Report*, Texas Commission on Law Enforcement, https://www.tcole.texas.gov/content/racial-profiling-reports.

[57] Bureau of Justice Statistics, "Prisoners in 2020 – Statistical Tables, https://bjs.ojp.gov/content/pub/pdf/p20st.pdf. The prisoner statistics include only 10 prisoners below age 18 in Texas. U.S. Bureau of the Census, American Community Survey 2019 for population data. Juvenile custody rates from The Sentencing Project, "Criminal Justice Facts, Texas," https://www.sentencingproject.org/the-facts/#map.

are incarcerated or on probation or parole. This disenfranchisement system disproportionately impacts minority residents of the state. As indicated in Table 7, in 2020, 5.9% of African Americans were disenfranchised with felony convictions in Texas, compared to 3.3% of Hispanics and 2.8% all races.[58]

The perception of people of color by law enforcement as uniquely threatening is deeply ingrained, whether conscious or not.[59] And, despite statutory prohibitions against racial profiling, statewide regulation of law enforcement in Texas is largely toothless and fails "to meet the needs of the state" as a bipartisan advisory commission of the Texas State Legislature concluded in 2020.[60]

Law enforcement directly impacts voting because persons incarcerated as juveniles or adults have had their lives disrupted. They are more likely than others to become entangled with law enforcement again, to have their education disrupted, to suffer mental health challenges, to have difficulty finding remunerative employment. The adverse effects of adult incarceration also negative impact their children and families.[61] Moreover, the adverse effects of adult incarceration can exacerbate economic disparities between Anglo Texans and Black and Latino Texans, documented in Table 8.

---

[58] The Sentencing Project, "Locked Out, 2020," https://www.sentencingproject.org/wp-content/uploads/2020/10/Locked-Out-2020.pdf#page=18.

[59] See the compilation in National Academies of Sciences, Engineering, and Medicine, *Proactive Policing: Effects on Crime and Communities* (The National Academies Press, 2018).

[60] Sunset Advisory Commission, *Texas Commission on Law Enforcement, 2020-2021 Staff Report* (November 2020), https://www.sunset.texas.gov/public/uploads/files/reports/Texas%20Commission%20on%20Law%20Enforcement%20Staff%20Report_11-6-20.pdf.

[61] See, for example, Bruce Western, "The Impact of Incarceration on Wage Mobility and Inequality," *American Sociological Review*, 67 (4), August 2002, 526-546; Ian Lambe and Isabel Randell, "The Impact of Incarceration on Juvenile Offenders," *Clinical Psychology Review*, 33 (3) 2013, 448-459; David Murphy and P. Mae Cooper, "Parents Behind Bars," *Child Trends*, October 2015, http://www.childtrends.org/wp-content/uploads/2015/10/2015-42ParentsBehindBars.pdf.; Lucious Couloute, "Getting Back on Course: Educational Exclusion and Attainment Among Formerly Incarcerated Persons," Prison Policy Initiative, October 2018, https://www.prisonpolicy.org/reports/education.html#figure3; Bruce Western and Becky Pettit,

In addition, felon disenfranchisement is rooted in efforts by white supremacists to eliminate the Black vote in their states. In the nineteenth century, southern states began adopting and expanding laws disenfranchising felons and ex-felons, with applicable crimes often tailored to African American offenders, such as larceny and "moral turpitude." In their study of felon disenfranchisement Professors Angela Behrens, Christopher Uggen and Jeff Manza conclude:

> "By restricting the voting rights of a disproportionately nonwhite population, felon disenfranchisement laws offered one method for states to avert 'the menace of negro domination' (Alabama 1901, p. 12). The sharp increase in African-American imprisonment goes hand-in-hand with changes in voting laws. … Felon disenfranchisement provisions offered a tangible response to the threat of new African-American voters that would help preserve existing racial hierarchies."[62]

### D.  Discrimination in Immigration Policy

In 2017, Texas adopted the "anti-sanctuary city" legislation, S.B. 4, one of the most stringent anti-immigration laws in the nation. This law authorizes all police forces to question the immigration status of anyone they detain or arrest, including persons detained for minor traffic infractions. Under penalty of fines, imprisonment, or removal from office, it requires police chiefs and sheriffs to honor requests for deportation by Immigration and Customs Enforcement ("ICE"). Under threats of jail time or fines, local elected and appointed officials could not "adopt, enforce, or endorse" policies under which the entity "prohibit[ed] or materially limit[ed]" immigration enforcement.[63]

Although a portion of S.B. 4 that required local officials to assist in federal immigration enforcement was struck down in Court, S.B. 4—and its subsequent enforcement—has disproportionately

---

"Incarceration & Social Inequality," *Daedalus*, Summer 2010, https://www.amacad.org/publication/incarceration-social-inequality.

[62] Angela Behrens, Christopher Uggen, and Jeff Manza, "Ballot Manipulation and the 'Menace of Negro Domination': Racial Threat and Felon Disenfranchisement in the United States, 1850-2002," *American Journal of Sociology* 56 (2003), 598.

[63] Enrolled Version, S.B. No. 4, https://capitol.texas.gov/tlodocs/85R/billtext/pdf/SB00004F.pdf.

injured communities of color and Latinos in particular. From 2014 to 2018, Texas led the nation by far in the number of interior arrests for immigration violations, with 128,012 arrests—nearly double the arrests of second-place California. Of those arrests in Texas, 97% were of people from Central and Latin America, with nearly all of the small remainder of people from Africa and Asia.[64]

ICE interior arrests in Texas are not limited to undocumented immigrants. One study, for example, showed that between 2005 and 2017, "814 targets of ICE detainers in Travis County—3.3 percent of all requests—claimed U.S. citizenship and presented officers with a Social Security number (SSN)." Cato additionally found that "[t]he rate of wrongful detainer issuances in Travis County implies that ICE targeted at least 3,506 U.S. citizens in Texas."[65]

Another study by the *Los Angeles Times* examined cases where persons detained as alleged undocumented immigrants established that they were wrongfully detained U.S. citizens, not counting legal permanent residents. The study found that Houston led the country, with 111 such cases between 2008 and 2018. El Paso was third with 78 cases, topping the much more populous cities of Los Angeles with 69 cases and Miami with 29.[66]

---

[64] Syracuse University, TRAC, *Immigration and Customs Enforcement Arrests*, https://trac.syr.edu/phptools/immigration/arrest/.

[65] David J. Bier, *U.S. Citizens Targeted by ICE: U.S. Citizens Target/ed by Immigration and Customs Enforcement in Texas*, CATO INSTITUTE (August 29, 2018), https://www.cato.org/publications/immigration-research-policy-brief/us-citizens-targeted-ice-us-citizens-targeted.

[66] Paige St. John and Joel Rubin, *ICE Held an American Man in Custody for 1,273 Days. And He is Not the Only One Who Had to Prove His Citizenship*, LOS ANGELES TIMES (April 27, 2018), https://www.latimes.com/local/lanow/la-me-citizens-ice-20180427-htmlstory.html.

Contrary to the advocacy of proponents of "anti-sanctuary city" laws, ICE arrests and detentions do not make communities safer.[67] On the contrary, immigrants—document and undocumented—commit crimes at lower levels than native-born citizens and the criminal conviction rate for legal immigrants was about 66 percent below the native-born rate."[68]

## E.  Discrimination in Housing Policy

In 2015, Texas enacted a law allowing landlords to refuse to rent a home to those receiving federal housing assistance. At the time, Texas was the only state in the nation to enact at the time such a restrictive housing law. [69] The law has a disparate effect on minorities who, due to long-standing racial discrimination, disproportionately rely on federal housing assistance. In the Dallas area, for example, Texans of color comprise 90% housing voucher recipients.[70] The law consigns minorities to low income, segregated communities, which perpetuates socio-economic disparities between whites and minorities.[71]

---

[67] Julian Aguilar, *Senate Committee Advance Anti-Sanctuary Cities Bill*, TEXAS TRIBUNE, (February 3, 2017), https://www.texastribune.org/2017/02/03/protesters-flood-state-capitol-lawmakers-debate-sanctuary-cities-bill/; Michelangelo Landgrave and Alex Nowrasteh, *Criminal Immigrants in 2017: Their Numbers, Demographics, and Countries of Origin*, CATO INSTITUTE (March 4, 2019), https://www.cato.org/publications/immigration-research-policy-brief/criminal-immigrants-2017-their-numbers-demographics

**[68] Alex Nowrasteh, *Criminal Immigrants in Texas: Illegal Immigrant Conviction and Arrest Rates for Homicide, Sex Crimes, Larceny, and Other Crimes*, CATO INSTITUTE, (February 26, 2018), https://www.cato.org/publications/immigration-research-policy-brief/criminal-immigrants-texas-illegal-immigrant. CATO found that similar results held for homicides and drunk driving.**

[69] Affordable Housing, Source of Income Discrimination in Housing, https://affordablehousingonline.com/source-of-income-antidiscrimination-laws.

[70] Neena Satija, *Dallas Struggles to Escape Segregated Legacy*, TEXAS TRIBUNE (Jan. 2, 2016), https://www.texastribune.org/2016/01/02/dallas-struggles-overcome-segregated-housing-legac/.

[71] *See, e.g.*, D. R. Williams and C. Collins, *Racial Residential Segregation: A Fundamental Cause Of Racial Disparities In Health*, 116 *Public Health Reports* 404 (2001); Melvin E. Thomas et al., *Separate and Unequal: The Impact of Socio-economic Status, Segregation, and the Great Recession on Racial Disparities in Housing Values*, 4 *Sociology of Race and Ethnicity* 229 (2017); Matthew Hall et al., *Neighborhood Foreclosures, Racial/Ethnic Transitions, and Residential Segregation*, 80 *American Sociological Review* 526 (2015); Douglas S. Massey & Nancy Denton, *American Apartheid: Segregation*

In 2016, when the Dallas City Council debated an ordinance prohibiting landlords from refusing to rent to recipients of housing vouchers, it found that it could not do so because of this law.[72]

## III.   Discriminatory Impact of S.B. 1

S.B. 1 restricts opportunities for the citizens of Texas to participate fully in the political process and elect candidates of their choice. As will be demonstrated below, these provisions have a disproportionate impact on minority citizens in Texas:

- Bans drive-thru voting

- Prohibits 24-hour voting and extended-hour voting

- Requires mail-in voters to provide the number on either their driver's license, election identification certificate, or personal identification card issued by the Department of Public Safety, or alternatively the last four digits of their Social Security Number both on their absentee ballot application forms and again on the envelope in which they return their ballots. Applicants can also file a statement indicating that they have not been issued any of the above numbers. Ballots can be

---

*and the Making of the Underclass* (Harvard University Press, 1993); Lincoln Quillian, *Does Segregation Create Winners and Losers? Residential Segregation and Inequality in Educational Attainment*, 61 *Social Problems* 402 (2014); Lincoln Quillian, *Segregation and Poverty Concentration: The Role of Three Segregations*, 77 *American Sociological Review* 354 (2012); Kimberly Quick & Richard Kahlenberg, *Attacking the Black–White Opportunity Gap That Comes From Residential Segregation*, The Century Foundation (June 25, 2019), https://tcf.org/content/report/attacking-black-white-opportunity-gap-comes-residential-segregation/?agreed=1; Dionissi Aliprantis, *Racial Inequality, Neighborhood Effects, and Moving to Opportunity*, Federal Reserve Bank of Cleveland (Nov. 4, 2019), https://www.clevelandfed.org/newsroom-and-events/publications/economic-                commentary/2019-economic-commentaries/ec-201917-moving-to-opportunity.aspx; Byron S. Graham, *Identifying and Estimating Neighborhood Effects*, 56 *Journal of Economic Literature,* 450 (2018); Patrick Sharkey, *Stuck in Place: Urban Neighborhoods and the End of Progress Towards Racial Equality* (University of Chicago Press, 2013).

[72] Rebecca Elliott, *State Sued Over Housing Discrimination Law*, HOUSTON CHRONICLE (February 17, 2017),              http://www.houstonchronicle.com/news/politics/houston/article/State-sued-over-housing-discrimination-law- 10941911.php; Robert Wilonsky, *Dallas Non-Profit Sues Texas Over Law That Lets Landlords Refuse Housing Vouchers*, DALLAS MORNING NEWS (February 20, 2017).

rejected if the information on the ballot does not match the information on file in the voter registration rolls. There are provisions for the correction of errors if notified in time.

- Makes it a felony for a public official to send someone a mail-in ballot application the person did not request, even if the person is automatically qualified to vote absentee. Also applies criminal penalties to officials who approve the use of public funds "to facilitate" the unsolicited distribution of applications by third parties, which keeps counties from providing applications to groups helping get out the vote. However, in February 2022, federal District Court Judge Xavier Rodriguez temporarily enjoined this provision that prohibits public officials from soliciting mail-in ballot applications.[73]

- Requires that those who assist people with disabilities or language barriers in filling out ballots—other than those voters' caregivers—must fill out a document showing their name, address and relationship to the person they helped cast a ballot. Assistants would also have to take an oath under the criminal penalty of perjury, pledging that the voter is eligible for assistance and the assistant did not "pressure or coerce" the voter into choosing them for assistance.

- Requires those who simultaneously assists seven or more voters with transportation to a polling location for curbside voting will have to fill out a form giving their name and address and indicate whether they also provided help casting any ballots.

- Criminalizes so-called "vote harvesting" defined as "in-person interaction with one or more voters, in the presence of the ballot or during the voting process, intended to deliver votes for a specific candidate or measure" in exchange for payment or another benefit, with benefit undefined.

---

[73] Ashley Lopz Kut, *Judge Temporarily Halts Part of Texas Voting Law That Bans Officials From Encouraging Mail-in Voting*, HOUSTON PBS (February 14, 2022), https://www.houstonpublicmedia.org/articles/news/politics/2022/02/14/418953/judge-temporarily-halts-part-of-texas-voting-law-that-bans-officials-from-encouraging-mail-in-voting/.

- Gives greater freedom of access of partisan poll watchers. It prohibits anyone from denying partisan poll watchers "free movement" and authorizes them to get sufficiently close to "see and hear" every activity by a voter in the polling place exception for completion of the ballot.

- Criminalizes an election knowingly or intentionally refusing accept partisan poll watchers for service and similarly criminalizes any action that obstructs the view of a poll watcher or makes observation "not reasonably effective." Although S.B. 1 requires the Secretary of State to create a training and authorizes those who break the law to be summarily ejected, such ejections can take place only if an election official directly observes a violation of law, otherwise criminal penalties could apply.

- Requires those who assist people with language barrier or disabilities -- other than those voters' caregivers -- to fill out a document showing their name, address and relationship to the person they helped. Assistants would also have to take an oath under penalty of perjury pledging to obey the limits to assisting with reading and marking the ballot, with no opportunity for clarifying questions.

- Requires local election officials to refer all cases of improperly cast ballots to the Attorney General.

### A.  Pre-Existing Barriers to Voting in Texas

Even before the adoption of S.B. 1, Texas ranked last in the nation in access to registration and voting.  An academic study on access to voting and registration published in the *Election Law Journal* in 2020 developed a cost of voting index (COVI) based on some thirty indicators. The lower the COVI score the score the greater the access to registration and voting in the state. The higher the COVI, the more difficult it is to register and vote in a state. Texas had COVI index of 1.29, compared to 0.05 for the median state. Its COVI was 32% higher than the next highest state of Georgia, with a COVI index of 0.98.[74]

---

[74] Scot Schraufnagel, Michael J. Pomante II and Quan Li, "Cost of Voting in the American States," *Election Law Journal: Rules, Politics, and Policy*, 19 (2020), Figure 1.

Although many factors can influence voter participation in the states, the relationship between the cost of voting index and turnout in the 2020 general election for president is striking. Chart 1 graphs the cost of voting index in each state against the state's voter turnout in the presidential election of 2020. The sharply downward trend line demonstrates that as the cost of voting index rises voter turnout in the states falls. The trend line shows that for every one-point increase in the cost of voting index, voter turnout drops by a robust 4.51%.[75]

Consistent with this finding, Texas lags well behind the nation in voter turnout. It ranked fourth from the bottom in turnout in the presidential election of 2016 and even after a turnout surge in 2020, Texas still ranked seventh from the bottom among the states.[76] However, restrictive voting laws had a disproportionate impact on the State's historically marginalized communities, particularly Black and Latino Texans who, when compared to white Texans, have lower incomes and less wealth, higher unemployment and poverty, lower levels of education, greater health challenges, and, for Hispanics less proficiency with English.[77] In addition, specific provisions of S.B. 1 target voting options used disproportionately by minority voters in Texas.

[Continued on the following page]

---

[75] For studies on the deterrent effects of increased costs of voting see, for example, Joseph M. Colomer, *Benefits and Costs of Voting*, *Electoral Studies* 10 (1991), 313-315; Henry E. Brady & John E. McNulty, *Turning Out to Vote: The Costs of Finding and Getting to the Polling Place*, *American Political Science Review*, 105 (2011), 115-134; Moshe Haspel & H. Gibbs Knotts, *Location, Location, Location, Precinct Placement and the Costs of Voting*, *Journal of Politics*, 67 (2005, 560-573); Lee Sigelman & William D, Berry, *Costs and the Calculus of Voting*, *Political Behavior* 4 (1982) 419-428.

[76] Election Project, *2020 November General Election Turnout Rates*, http://www.electproject.org/2020g (last updated Dec. 7, 2020); Election Project, *2018 November General Election Turnout Rates*, http://www.electproject.org/2018g (last updated Dec. 14, 2018).

[77] Tables 3 and 8, documented the educational and economic disparities between Anglos and Hispanics and Blacks in Texas. Table 9 documents the disparities in health.

**GRAPH 1**
**COST OF VOTING RANKINGS BY STATE, 2020**
Scot Schraufnagel, Michael J. Spumante II and Quan Li, "Cost of Voting in the American States,"
*Election Law Journal: Rules, Politics, and Policy*, 2020, 19(4), Graph 1.





**CHART 1**
**RELATIONSHIP BETWEEN THE COST OF VOTING INDEX (COVI) AND VOTER TURNOUT BY STATE IN THE 2020 GENERAL ELECTION FOR PRESIDENT**



Texas' lagging overall turnout rate is entirely due to relatively low Black and Hispanic turnout. White turnout in Texas of 72% for the 2020 presidential election exceeded the national average of 70.9% (Table 28 and Chart 13).[78]

As a general matter, the new and complex voter restrictions mandated by S.B. 1 are similarly likely to disproportionately impact vulnerable Black and Latino citizens in Texas. In addition, specific provisions

---

[78] However, the turnout for Black and Hispanic Texans both fell below the national average, creating a greater disparity with the Anglo turnout than for the nation overall. In Texas, Black turnout trailed Anglo turnout by 11.2 percentage points. U.S. Census, Voting and Registration in the Election of November 2020, Tables 2, 4b, https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-585.html.

of the law will add an additional burden. As discussed below, these burdens will disproportionately impact minority voters—increasing the cost of voting in Texas for Black and Latino Texans in particular.

## B. Restrictions on Drive-Thru and 24-Hour Voting

Harris County is the most populated county in the State, with the largest population of minority voters in the State. Harris County has a citizen voting age population of 2.8 million and a minority CVAP percentage of 62.3%, compared to 49.9% for the state. The elimination of drive-thru voting attacks a procedure used disproportionately by minority voters in Harris County during the 2020 General Election. The Texas Legislature abolished drive-thru voting after courts rejected Republican efforts to invalidate approximately 127,000 drive-in votes cast in Harris County. S.B. 1 also targets another procedure used in Harris County in the 2020 general election to facilitate voting: extended-hour and 24-hour voting.[79]

A post-election survey of Harris County voters in the 2020 general presidential election confirms that minorities used drive-thru voting in substantially higher proportion than Anglos. This survey examines a different metric, not the proportion of racial groups using different modes of early voting, but the rate at which racial groups used drive-in voting. As described in Table 11, 5.1% of Anglos reported voting drive-thru voting compared to 9.7% of Blacks, for a lead of over Anglos of 4.6 percentage points and 90.2%. In addition, 13.1 percent of Hispanics reported voting drive-thru voting, for a lead of over Anglos of 8 percentage points and 157%. Finally, 9.8 percent of Asians reported voting drive-thru voting, for a lead of over Anglos of 4.7 percentage points and 92.2%.[80]

---

[79] Abigail Rosenthal, *The Texas GOP is Still Furious About Harris County's Drive-thru Voting*, Chron (March 15, 2021), https://www.chron.com/politics/article/texas-drive-thru-voting-senate-bill-7-election-16026395.php; Testimony on SB 1 By: Emily Eby, Staff Attorney, Texas Civil Rights Project. *Texas Senate State Affairs Committee* (July 10, 2021), https://txcivilrights.org/wp-content/uploads/2021/07/TCRP-Testimony-on-SB-1.pdf.

[80] "The Rice University Post-2020 Election Survey of Harris County Voters," https://mreece13.github.io/dtv-harris-2021/cross-tabs.html#method-of-voting.

Professor Kenneth R. Mayer further addresses the disparate impact of the ban on drive-thru and 24-hour voting in his expert report in this matter.

### C.  Empowerment of Partisan Poll Watchers

The provision of S.B. 1 that gives partisan poll watches greater access to polling places and voters will also have a disproportionately negative impact on minority voters. Republicans also have a long history of exploiting so-called election integrity measures, like S.B. 1's expanded access for partisan poll watchers, to intimidate minorities and discourage their voting. This practice of voter suppression became sufficiently widespread that in response to lawsuits in 1982 and again in 1987, the national Republican Party agreed to consent decrees in federal court that prohibited it from engaging in "election integrity" or "anti-fraud" activities that targeted minority voters.

In a 2009 ruling, District Court Judge Dickinson Debevoise, who presided over the original consent decree, denied a motion to end it. "Minority voters continue to overwhelmingly support Democratic candidates," Judge Debevoise wrote in his decision. "As long as that is the case, the RNC and other Republican groups may be tempted to keep qualified minority voters from casting their ballots, especially in light of the razor-thin margin of victory by which many elections have been decided in recent years." After reviewing all evidence of alleged voter fraud presented by the RNC, the court held that "[i]n fact, even a cursory investigation of the prevalence of voter intimidation demonstrates that ballot security initiatives have the potential to unfairly skew election results by disenfranchising qualified voters in far greater numbers than the instances of in-person fraud that may occur during any given race."[81] Another court ultimately lifted the consent decree in 2018, eliminating that protection for minority voters.[82] In the

---

[81] *DNC v. RNC.*, No. 2:81-cv-03876-DRD-MAS ECF No. 84 Filed 12/01/09; *DNC v. RNC.*, 673 F.3d 192 (3d Cir. 2012).

[82] United States District Court of New Jersey, *Democratic National Committee v. Republican National Committee*, Civil Action No. 81-3876, Order, 8 January 2018.

Texas 2020 general election, the Texas Election Protection Coalition, which incorporates dozens of nonpartisan organizations dedicated to voting rights, received 267 complaints of voter intimidation at polling places.[83]

The prospect for minority voter intimidation turns on current developments as well as precedent. In April 2021, the non-partisan group Common Cause released a recording that outlined the "Harris County Republican Party Election Integrity Program." The presentation of a Republican County Precinct Chair, called for the recruitment of a 10,000 person "Election Integrity Brigade" for Harris County. The goal was to recruit and train 1,041 election judges, 2,812 election clerks, and 6,219 poll watchers. If the program achieved only a fraction of this goal, they would greatly expand the Republican presence of just 118 partisan poll watchers during early and election day voting in the general presidential election of 2022.[84]

The program sought to recruit persons from the suburbs to work in the predominantly minority neighborhoods of the county. The presenter explained that he wanted to "get folks in these suburbs out here that have, you know, a lot of Republican folks that got to have the courage" to work in the heavily minority precincts of Houston. He continued to claim falsely that minority areas are rife with fraud at the polls. If "we don't do that, this fraud down in here," he added, using an interactive map to circle city precincts, "this fraud down in here is really going to continue." He stressed that the purpose of training

---

[83] Judy Bao, *Voter Intimidation in Texas During the 2020 General Election*, TEXAS CIVIL RIGHTS PROJECT) FEBRUARY 2021), https://txcivilrights.org/wp-content/uploads/2021/02/Voter-Intimidation-report.pdf.

[84] Taylor Goldenstein, *Video Shows GOP Targeting Houston Minority Communities With Poll Watcher 'Brigade*,'" HOUSTON CHRONICLE, (April 15, 2021), https://www.houstonchronicle.com/politics/texas/article/Video-shows-GOP-targeting-Houston-minority-16089177.php, includes map . Recording at https://vimeo.com/534438337?utm_campaign=5370367&utm_source=affiliate&utm_channel=affiliate&cjevent=ba7e1f9e7d2711ec80b4083b0a82b836&clickid=ba7e1f9e7d2711ec80b4083b0a82b836.

was to empower Republican poll watchers when debating with election judges—which S.B. 1 encourages. The speaker further noted that a Republican donor had previously provided a limited amount of funds of pay poll watchers and raised the prospect of additional fund raising. The media extensively covered the recording and Common Cause discussed it at a hearing of the Senate Committee on State Affairs.[85]

Nicolas Riley, senior counsel at the Institute for Constitutional Advocacy and Protection (ICAP) at Georgetown University Law School, warns that "Simply by virtue of the fact that the more people you put in and around the polls on Election Day, the more likely you are to have chaos and other types of shenanigans that lead to all kinds of problems." [86] As is illustrated by Republican plans documented above, Vincent Hutchings, a political science and Afro-American and African studies professor at the University of Michigan, notes that poll watching can be especially problematic for minority voters. "In such a world where you can visually identify — typically — someone's racial or ethnic background, and when there's such a high correlation between race and ethnicity and partisanship, then that is a recipe for potential disaster."[87]

Professor Kenneth R. Mayer further addresses the disparate impact of partisan poll watchers in his expert report in this matter.

### D. Restrictions on Mail-In Voting

New restrictions on mail-in voting will disproportionately impact the ability of minorities to vote in upcoming elections. Even before the adoption of S.B. 1, Texas had especially difficult rules for the casting of mail-in ballots. Texas is one of only 16 states that require an "excuse" for casting an absentee

---

[85] *Id.*, 16463, Senate Committee on State Affairs, at 01:12:18.

[86] Jen Kirby, *Your Voting Precinct Might Have a Poll Watcher. Here's What to Know*, VOX (October 23, 2020), https://www.vox.com/21514657/poll-watchers-trump-army-voters.

[87] *Id.*

ballot by mail.[88] Among these 16 states, Texas has especially restrictive requirements. To cast an absentee vote in Texas a voter must be: (i) 65 years or older; (ii) sick or disabled; (iii) out of the county on election day and during the period for early voting by personal appearance; or (iv) be confined in jail, but otherwise eligible.[89]

Despite the many limitations in existing law, a major effort by minorities in the general election of 2020 resulted in the disproportionate use of the now restricted mail-in option. Table 12 reports the findings of two independent, respected surveys, the Cooperation Congressional Election Study (CCES) and Survey of the Performance of American Elections. For the CCES the lead of minorities over Anglos for 2020 mail-in voting is 3.7 percentage points and 30.6%. For the SPAE the lead of minorities over Anglos for 2020 mail-in voting is 3.8 percentage points and 39.6%. The minority lead in the larger sample CCES is statistically significant at levels beyond the stringent .01 standard in social science.

The disenfranchising effects of new rules for mail-in voting, implemented shortly after the passage of S.B. 1 without a transition period are already manifest. Judge Lina Hidalgo of Harris County reported that the county has rejected 16% of mail-in ballot applications and could be on track to thousands of applications this year. By contrast, in 2018, the Harris County rejection rate was 6%.[90] In Travis County, even after working with the Secretary of State's office to resolve invalid applications, the purported

---

[88] National Conference of State Legislatures, *Voting Outside the Polling Place*, (September 24, 2020), https://www.ncsl.org/research/elections-and-campaigns/absentee-and-early-voting.aspx.

[89] Texas Secretary of State, *Application for a Ballot by Mail*, https://www.sos.texas.gov/elections/voter/reqabbm.shtml.

[90] Julian Aguilar, *Texas Officials Blame New Voting Law For Rise in Rejected Mail-In Ballot Applications*, KERA, (January 14, 2021), https://www.keranews.org/politics/2022-01-14/texas-election-officials-blame-new-voting-law-for-rise-in-rejected-mail-in-ballot-applications.

rejection rate was still 27%. In Dallas and Tarrant Counties, election officials have rejected 12% and 16% of mail-in applications as a result of identification problems.[91]

Professor Kenneth R. Mayer further addresses the disparate impact of mail-in ballot restrictions in his expert report in this matter.

### E. Flawed Citizenship Verification Procedures

S.B. 1 also requires the monthly matching of registration rolls with citizenship data, primarily from the Texas Department of Public Safety, a fraught process that Texas botched in 2019. Verifying citizenship is an inherently difficult and error-prone task. Naturalization changes citizenship status and forms of citizenship can be difficult to ascertain accurately.[92] As documented above significant numbers of Texas citizens have been mistakenly arrested and detained as undocumented aliens.

The predictable impact of the new regulation on U.S. citizens is already manifest. In December 2021 the *Texas Tribune* found that the current matching effort is still filled with similar errors to the discredited 2019 process. Of the voters that the Secretary of State's office flagged for review, a significant

---

[91] *Texas Leans on New Voting Law to Reject Thousands of Primary Ballots*, The Guardian, (February 3, 2022), https://www.theguardian.com/us-news/2022/feb/03/texas-new-restrictive-voting-law-reject-thousands-mail-in-ballots.

[92] *Citizenship Through Parents*, United States Citizenship and Immigration Services, https://www.uscis.gov/us-citizenship/citizenship-through-parents; "Chart C: Derivative Citizenship -- Lawful Permanent Resident Children Gaining Citizenship Through Parents' Citizenship, Immigration Legal Resource Center, https://www.ilrc.org/sites/default/files/resources/natz_chart-c-2020-2-20.pdf; *Acquisition of U.S. Citizenship at Birth by a Child Born Abroad*, United States Department of State – Bureau of Consular Affairs, https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/us-citizenship/Acquisition-US-Citizenship-Child-Born-Abroad.html. For the complexities of acquired citizenship see *Chart A: Determining Whether Children Born Outside The U.S. Acquired Citizenship At Birth*, and *Chart B: Determining If Children Born Abroad And Out Of Wedlock Acquired U.S. Citizenship At Birth*, Immigration Legal Resource Center, https://www.ilrc.org/sites/default/files/resources/natz_chart-a-2020-2-20.pdf; https://www.ilrc.org/sites/default/files/resources/natz_chart_b-20200218.pdf.

number had registered at naturalizations ceremonies (17% in Bexar County and 15% in Travis County, for example). But not every county can identify such errors and it is likely that many more will go undetected. The impact of errors will disproportionately impact persons of color who comprise 95 percent of the immigrant population in Texas.[93]

### F.  Increased Criminal Penalties

The criminalization of the electoral process will also present an addition burden on minorities who have been the disproportionate target of criminal prosecutions for alleged for voting law violations. A study by the ACLU of Texas found that for prosecutions by the Attorney General's Election Integrity Unit under Ken Paxton, at least 72% of these prosecutions appear to have targeted Black and Latino individuals. In addition, "86% of the prosecutions involved offenses allegedly occurring in counties with majority non-white and Latinx populations."[94] Democratic Senator Boris L. Miles presented this data to the Senate Committee on State Affairs and Senator Hughes could not dispute its accuracy.[95] The specific provision of S.B. 1 that imposes new restrictive rules and penalties for helping someone vote by mail has a particular impact on Hispanics given their relatively low levels of educational attainment and English proficiency.

## IV.  Sequence of Events

### A.  Population Shifts in Texas

Critical to the sequence of events prior to the enactment S.B. 1 was the growth of the combined Hispanic and African American citizen voting age population (CVAP) in Texas, and the concurrent decline of white CVAP. This demographic shift was politically detrimental to the Republican majority in

---

[93] Alexa Ura, *Texas' Renewed Voter Citizenship Review is Still Flagging Citizens as 'Potential Non-Citizens*,' TEXAS TRIBUNE (December 19, 2021), https://www.texastribune.org/2021/12/17/texas-voter-roll-review/.

[94] ACLU of Texas, *Racial Disparities in Paxton's Election Integrity Unit Prosecutions*, (March 2021), https://www.aclutx.org/sites/default/files/oag_election_integrity_unit_analysis.pdf.

[95] 16333, Senate Committee on State Affairs, at 01:13:08-28.

the State Legislature, given that Republicans in Texas depend largely on votes from white Texans, while Democrats depend largely on votes from Black and Latino Texans. According to U.S. Census estimates reported in Table 13, the percentage of Black and Hispanic CVAP in Texas rose from 39.4% in the 2008-to-2012 period to 41.5% in the 2012-to-2016 period. In contrast, the white CVAP during these two periods declined from 56.4% to 53.8%. Updated data for the 2019 showed a continued decline of white CVAP to 50.1%, and a continued increase of African American and Hispanic CVAP to 44.2%.

The increase in Black and Hispanic CVAP relative to white CVAP has partisan implications. As shown in Table 14 and Chart 2, the Republican voter base in Texas is heavily Anglo and the Democratic voter base in heavily minority. As demonstrated in Table 15, the rise in minority CVAP has also made the state more competitive for Democrats. A standard means for measuring party competitiveness is to compare the national two-party vote for president with the vote in that state. As demonstrated in Table 15, in 2012, Barack Obama won 52 percent of the popular vote nationally, but only 42 percent in Texas: a differential of 10 percentage points and 19.2%. In 2016, that differential narrowed sharply. Democratic presidential candidate Hillary Clinton received 51.1 percent of the popular vote nationally, and 45.3 percent of the vote in Texas; a differential of 5.8 percentage points and 11.4%. "Texas shifted toward Democrats in the presidential race more than every state except Utah, which was an outlier after independent candidate Evan McMullin turned the state into a three-way race."[44] In 2020, that differential further narrowed to 5.1 percentage points and 9.8 percent.

Polling data from just after the 2020 election and early 2021, when Republicans were considering S.B. 1, showed that Democrats were competitive in Texas. Contemporaneous polling data reinforced that understanding.[96]

---

[96] For example, a Civiqs poll released on November 10, 2020, showed potential future Democratic candidate Beto O'Rourke in a dead heat with incumbent Republican Senator Ted Cruz, with O'Rourke at

Also, part of the long-term sequence of events is the transformation of absentee mail-in voting from an option used disproportionately by Anglo voters to one used disproportionately by minority voters in 2020. This shift in the racial composition of mail-in voting is documented in Table 16. The data reported in Table 16 is from the two surveys: the Congressional Cooperative Election Study (CCES) and the Survey of the Performance of American Elections (SPAE) both show the same pattern of change over time in mail-in voting by race. The data show that in 2008, Anglos outpaced minorities in their use of mail-in voting, whereas that pattern reversed in 2020, with minorities now outpacing Anglos in their use of mail-in voting.

## B.  The Beginning of the Big Lie

The immediate lead-up to S.B. 1 included significant efforts by former-President Donald Trump and his allies in Texas to discredit and overturn the results of the 2020 presidential election through false claims of massive voter fraud. Texas Republicans were in the forefront of advancing the "Big Lie" of a stolen election. Prior to anyone casting a single vote in 2020, Trump charged that the election would be marred by massive fraud in mail-in ballots. In June 2020, Trump warned his supporters that Democrats were "trying to rig the election," and that the 2020 election would be "the most corrupt election in the history of our country, and we cannot let that happen." Republican elected officials in Texas joined in the pre-election attack on mail-in voting. Lieutenant Governor Dan Patrick called efforts to expand mail-in voting during the pandemic a "scam by Democrats" that would lead to "the end of America." Attorney

---

48% and Cruz at 47%. An April 19, 2021 University of Texas at Tyler poll showed potential candidate Matthew McConaughey ahead of incumbent governor Greg Abbott, 45% to 33%.Texas Polls, FiveThirtyEight, https://projects.fivethirtyeight.com/polls/texas/.

General Ken Paxton agreed that voting by mail "invites fraud."[97] After he lost, President Trump continued to claim that the 2020 general election was "rigged" and "stolen," and Republicans in Texas continued to echo that rhetoric.

In direct contrast to President Trump, high-ranking federal government officials repeatedly affirmed the legitimacy of an election across the nation free of any consequential voter fraud.[98] As discussed repeatedly throughout this report, Texas election officials said the same.

These efforts to claim that Democrats "stole" the 2020 presidential election, continued for months after the election had been decided in Texas and elsewhere. Dozens of federal and state court judges universally rejected claims that Democrats had "stolen" the election. Some of those lawsuits were brought by Texas officials—even though Trump had won in Texas and Texas Republicans bested their Democratic opponents in their statewide races.

---

[97] **Megan Vasquez and Donald Judd, *Trump Predicts 'Most Corrupt Election' in US History While Making False Claims About Mail-In Voting*, CNN (June 23, 2020), https://www.cnn.com/2020/06/23/politics/donald-trump-mail-voter-fraud-most-corrupt-election/index.html; Alexa Ura And Abby Livingston, *In Texas, Republicans Fight Voting By Mail Expansion While Encouraging Their Voters To Use It*, TEXAS TRIBUNE (September 4, 2020), https://www.texastribune.org/2020/09/04/texas-republicans-vote-by-mail/.**

[98] Hannah Miao, *FBI Has Not Seen Evidence of Widespread Voter Fraud, Director Tells Senators*, CNBC (September 24, 2020), https://www.cnbc.com/2020/09/24/fbi-has-not-seen-evidence-of-widespread-voter-fraud-director-wray-tells-senators.html; Michael Balsamo*, Disputing Trump, Barr Sees No Widespread Fraud*, AP News (December 1, 2020), https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d; David Levinthal, *US's Chief Election Admin.: Trump's Voter-Fraud Claims 'Shameful*,' BUSINESS INSIDER (November 12, 2020), https://www.businessinsider.com/nations-chief-election-administrator-calls-trumps-voting-fraud-claims-shameful-2020-11; "JOINT STATEMENT FROM ELECTIONS INFRASTRUCTURE GOVERNMENT COORDINATING COUNCIL & THE ELECTION INFRASTRUCTURE SECTOR COORDINATING EXECUTIVE COMMITTEES," 12 November 2020, https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election.

Texas Attorney General Ken Paxton and other Texas Republicans continued the effort to overturn the election results. On December 8, 2020, the date when state-certified election results are considered presumptively valid, Attorney General Paxton petitioned the U.S. Supreme Court to overturn the election results of four states that Biden won and decided the election: Georgia, Michigan, Pennsylvania, and Wisconsin.[99] Three days later, in an unsigned order without dissent, the Supreme Court rejected Paxton's petition. Justice Samuel Alito, joined by Justice Clarence Thomas, said that the Court was constitutionally bound to hear a cross-state suit, but added that they would "not grant other relief."[100]

On December 27, 2020, Texas Representative Louie Gohmert filed another lawsuit that sought to allow Vice President Mike Pence to ignore the certified results in favor of President Biden in multiple states and appoint Trump electors from those states instead. The Eastern District of Texas summarily dismissed the case and—after Gohmert appealed—the Supreme Court declined to take up the case in an unsigned order without dissent.[101]

Even after the failure of these lawsuits Attorney General Paxton traveled to Washington on January 6 to speak at the "Stop the Steal" rally that culminated in the violent assault on the U.S. Capitol that led to the deaths of officers and civilians, as well as 150 police officers being injured.[102] Paxton rallied the crowd before they stormed the Capitol, telling them "[w]hat we have in President Trump is a fighter. And

---

[99] *Supreme Court Orders Reply To Texas AG Ken Paxton's Election Lawsuit By 3PM Thursday*, CBS DFW (December 9, 2020), https://dfw.cbslocal.com/2020/12/09/supreme-court-orders-reply-texas-election-lawsuit/.

[100] U.S. Supreme Court, (ORDER LIST: 592 U.S.) FRIDAY, DECEMBER 11, 2020, ORDER IN PENDING CASE 155, ORIG. TEXAS V. PENNSYLVANIA, ET AL.

[101] Josh Gerstein and Kyle Cheney, *Federal Appeals Court Tosses Gohmert Suit Aimed At Overturning 2020 Election Results,* POLITICO (January 2, 2021), https://www.politico.com/news/2021/01/01/louie-gohmert-lawsuit-pence-453387; U.S. Supreme Court, (ORDER LIST: 592 U.S.) THURSDAY JANUARY 7,2021, ORDER IN PENDING CASE 20A115, GOHMERT, LOUIE, ET. AL. V. PENCE.

[102] Chris Cameron, *These are the People Who Died in Connection with the Capitol Riot*, NEW YORK TIMES (January 5, 2022), https://www.nytimes.com/2022/01/05/us/politics/jan-6-capitol-deaths.html.

I think that's why we're all here." He continued, "[w]e will not quit fighting. We're Texans, we're Americans, and the fight will go on." After the violent assault on the Capitol, sixteen of Texas's 23-member Republican House delegation and Senator Ted Cruz then voted to overturn Pennsylvania's electoral votes when Congress convened on January 6, 2021, to count the votes.[103]

The Associated Press reviewed "every *potential* case of voter fraud in the six battleground states disputed by former President Donald Trump" and those in Attorney General Paxton's lawsuit. The AP review "took months and encompassed more than 300 local election offices, is one the most comprehensive examinations of suspected voter fraud in last year's presidential election. It relies on information collected at the local level, where officials must reconcile their ballots and account for discrepancies and includes a handful of separate cases cited by secretaries of state and state attorneys general."[104]

In its bottom line, the AP "review of every potential case of voter fraud in the six battleground states disputed by former President Donald Trump has found fewer than 475," or less than 0.0002 percent, of the 25.5 million ballots cast in the states, which Joe Biden won by 311,257 votes, presuming that all "potential" cases are fully proven. AP noted that "the review also showed no collusion intended to rig the voting. Virtually every case was based on an individual acting alone to cast additional ballots." The AP reported that when it contacted former President Trump for comment that he "repeated a litany of unfounded claims of fraud he had made previously but offered no new evidence that specifically

---

[103] Benjamin Wermund, *Ken Paxton at Trump's Rally: We Will Not Stop Fighting*, HOUSTON CHRONICLE (January 6, 2021), https://www.houstonchronicle.com/politics/texas/article/Paxton-Trump-DC-rally-election-2020-georgia-15850073.php; Karen Yourish, Larry Buchanan and Denise Lu, *The 147 Republicans Who Voted to Overturn Election Results*, NEW YORK TIMES (January 7, 2021), https://www.nytimes.com/interactive/2021/01/07/us/elections/electoral-college-biden-objectors.html.

[104] "Christina A. Cassidy, *Far Too Little Voter Fraud to Tip the Election to Trump, AP Finds*, ASSOCIATED PRESS (December 14, 2021), https://apnews.com/article/voter-fraud-election-2020-joe-biden-donald-trump-7fcb6f134e528fee8237c7601db3328f.

contradicted the AP's reporting. He said a soon-to-come report from a source he would not disclose would support his case and insisted increased mail voting alone had opened the door to cheating that involved "hundreds of thousands of votes."[105] As of the date of this report, no such proof had emerged in any source.

### C.  The Introduction of S.B. 1

After all this, Republicans used their fantastical claims about voter fraud to justify the enactment S.B. 1. Republicans in the Texas Legislature enacted SB 1 along party lines. The push for S.B. 1 could not be linked to issues of fraud with Texas's elections—because there was no evidence voter fraud had occurred—let alone tainted the reliability of Texas's elections. To the contrary, Keith Ingram, the Director of Elections in the Secretary of State's office told the House Elections Committee—prior to the introduction of S.B. 1 or its predecessors—that "Texas had an election that was smooth and secure." After repeatedly defending the results of the 2020 elections in Texas—an election where Republican statewide candidates succeeded—Secretary of State Ruth Hughs resigned because the Republican-controlled State Senate declined to take up her appointment during the legislative session.[106]

During one of the hearings held by the House Elections Committee on S.B. 1 (and its predecessors), Dallas County District Attorney John Creuzot testified about the lack of voter fraud in Dallas County. He explained that since he had taken office in January 2019, he had seen "no credible claim of election fraud." This is striking considering that Creuzot had presided over a series of elections

---

[105] *Id.*

[106] Taylor Goldenstein, Jeremy Blackman, *Did A 'Smooth And Secure' 2020 Election Cost The Texas Secretary Of State Her Job?* Houston Chronicle (May 24, 2021), https://www.houstonchronicle.com/politics/texas/article/Texas-Secretary-of-State-Ruth-Hughs-resigns-under-16195586.php.

where Dallas County voters cast more than 2.1 million ballots.[107] Creuzot was later asked if he was concerned that voter fraud would increase in Dallas County.  He responded:

> I'm concerned you all are looking for a solution that there's no problem for as a public official and one who has to make decisions based on data. If there's not a problem, we don't need a solution.[108]

Creuzot was then asked whether he needed laws changed so he could have "more authority" or if he felt that he had "the authority to continue to run safe and secure elections in Dallas County?" Creuzot responded: "I think we have the authority to do so."[109]

As this exchange—and others detailed within this report—demonstrate, S.B. 1's suppressive provisions were decoupled from any actual problems with elections in Texas. Instead, the efforts to enact omnibus voter suppression legislation in Texas and other states was a coordinated, national effort supported by third-party organizations, including Heritage Action for America. Executive Director of Heritage Action for America, Jessica Anderson. spoke at the "Heritage Foundation 2021 Annual Leadership Conference" in a session called "Restoring Confidence in Our Elections." Anderson told attendees that Heritage Action was playing a critical role in the crafting and enactment of omnibus election bills in Texas and in other states across the nation. Texas was one of eight priority states, along with Arizona, Florida, Georgia, Iowa, Michigan, Nevada, and Wisconsin, in which Heritage Action was spending $10 million in support of this effort. Their goal was to "indicate which bills should be introduced and how to get them passed."[110]

---

[107] 19871, House Elections Committee Hearing Transcript, at 00:14:28.

[108] *Id.*, at 00:22:32-00:22:48.

[109] *Id.*, at 00:23:20-00:23:39.

[110] Ari Berman and Nick Surgey, *Leaked Video: Dark Money Group Brags About Writing GOP Voter Suppression Bills Across the Country*, MOTHER JONES (May 13, 2021), https://www.motherjones.com/politics/2021/05/heritage-foundation-dark-money-voter-suppression-laws/. Video at vimeo.com/549310910.

Anderson said Heritage Action aimed to "right the wrongs of November." She said that her group held weekly meetings in which they would "give marching orders for the week ahead." Heritage Action would prepare "model elections laws" and "hire state lobbyists for election law change." They would then "work to sell the bills back to the American people." In Texas, she said in H.B. 6, a predecessor to S.B. 1, "there are 19 provisions in this bill that are written by Heritage Foundation experts." In addition to hired lobbyists in Texas, Heritage Action activated 120 of its supporters, known as "sentinels," to "testify in support of this bill until 4 a.m." Heritage Action kept its role secret. "In some cases, we actually draft them for them," she said, "or we have a sentinel on our behalf give them the model legislation, so it has that grassroots, from-the-bottom-up type of vibe."[111]

Hans von Spakovsky, a lawyer who gained notoriety for stoking baseless claims about voter fraud, bragged at that same conference that "state legislatures are actually following [Heritage's] recommendations." Von Spakovsky explained he had held private briefings with Secretaries of State and emphasized the confidential nature of those meetings.[112]

### D. Lack of a Racial Impact Study

The Republicans who controlled the State Legislature and sponsored S.B. 1 and its predecessors did not conduct any study to determine the impact of their legislation on minority opportunities to participate in the political process in Texas. On a straight-line party vote in the House Elections Committee on April 29, 2021, Republicans rejected an amendment to conduct such a study. They rejected another amendment to study the racial impact of "Election Integrity" legislation if enacted and implemented.[113]

---

[111] *Id.*

[112] *Id.*

[113] House Elections Committee Hearing Transcript, Part 2, 29 April 2021, pp. 20-21, 24-26.

Similarly, the Office of the Secretary of State conducted no study of the impact of "Election Integrity" bills on minority voters.[114]

## V.    Procedural Deviations

Republicans in the Texas State Legislature enacted S.B. 1 along party lines through a rushed process marred by procedural deviations and political chicanery. Republican legislators, with the support of Governor Abbott, Lieutenant Governor Patrick, and Attorney General Paxton, worked throughout the Regular Session and two Special Sessions to pass S.B. 1, despite the fact that there was no evidence that Texas elections were anything but "smooth and secure."

Indeed, Republicans in Texas had much to celebrate after the general election of 2020. Not only had Republicans won every statewide election, but despite the pandemic, voter turnout surged from 51.4% in 2016 to 60.4% in 2020, a modern record for Texas.

Rather than celebrating these results (or the increase in voter turnout), Republicans in Texas sought to impose new restrictions on the country's most restrictive system for registration and voting. Republicans claimed they were it "easier to vote and harder to cheat."[115] Yet, as demonstrated above, *Republican* election officials had already confirmed that there was no cheating in the 2020 general election in Texas—and none of the measures proposed by S.B. 1 would have prevented the vanishingly rare instances of so-called voter fraud that Republican legislators repeatedly pointed to justify the passage of S.B. 1. S.B. 1 and its predecessors make it harder, not easier, to vote in Texas, especially for the state's vulnerable minority citizens.

---

[114] 16458, Senate Committee on Government Affairs Transcript, at 00:21:42-22:15.

[115] Ashley Lopez, *Here's what's in Texas Republicans' New Voting Law*, Austin MONITOR (September 28, 2021), https://www.austinmonitor.com/stories/2021/09/heres-whats-in-texas-republicans-new-voting-law/

In the face of concerted opposition to their discriminatory voter suppression bill, Republicans in the Texas House and Senate engaged in several significant procedural deviations. The push for new voter restrictions began during the regular legislative session of 2020, with separate efforts in the House (initially H.B. 6) and the Senate (initially S.B. 7). As noted above, Republicans in the State Legislature introduced purported "election integrity measures" with no expert analysis or studies to assess the impact of their proposals on historically disenfranchised communities, including minority Texans and persons with disabilities.

On March 4, 2021—before either bill was introduced—the House Elections Committee, chaired by Republican Representative Briscoe Cain ("Cain") held a formal meeting to discuss the state of Texas's elections. At that meeting, Keith Ingram, the Director of the Elections Division for the Texas Secretary of State, testified that Texas elections were "in good shape," a "success," and "smooth and secure."[116]

Still, Republican Senator Bryan Hughes introduced S.B. 7 less than one week later, with Cain's introduction of H.B. 6 shortly thereafter. As discussed at multiple points during this report, Jessica Anderson, the Executive Director of Heritage Action for America, claimed that at least "19 provisions" in H.B. 6 were "written by the Heritage Foundation's experts."[117]

In the House, during the first hearing on H.B. 6, Cain presented his bill to the House Elections Committee, leaving Democratic Vice-Chair of the House Elections Committee, Representative Jessica Gonzalez, as acting chair. During questioning he admitted that he had not read the bill in its entirety because he received a substitute draft earlier that morning.

---

[116] *Texas Matters: The Future in the Pas When Voting in Texas*, NPR (March 6, 2021), https://www.tpr.org/podcast/texas-matters/2021-03-06/texas-matters-the-future-is-the-past-when-voting-in-texas

[117] Id., Berman and Surgey, Video.

When Democratic Representative Nicole Collier appeared to ask questions about the bill, Cain quickly took the gavel back, refused to recognize her, and recessed the hearing. Because there are no Black lawmakers on the House Elections Committee—Representative Collier would have been the only Black lawmaker to ask questions about H.B. 6. Although Collier does not sit on the House Elections Committee, legislators who are not on a particular committee are often afforded the courtesy of being recognized for questions during the introduction of significant legislation.[118]

This procedural move prevented more than 200 Texans—many of whom had traveled to Austin from elsewhere in the State—from testifying on H.B. 6 because Cain failed to set a time to reconvene after his hasty departure. A few days later—and after 22 hours of testimony—which included substantial testimony from Texans who were opposed to the H.B. 6—the House Elections Committee passed H.B. 6 out of committee without addressing concerns raised about the provisions that would discriminate against voter. H.B. 6 was subsequently passed out of the House and sent to the Senate for consideration.

S.B. 7 faced similar opposition in the Senate. Witness after witness explained that SB 7 would make it more difficult for eligible, lawful voters of color to cast a ballot. Witnesses specifically highlighted the negative impact of provisions challenged by Plaintiffs in this lawsuit. The Harris County Elections Administrator, Isabel Longoria, characterized the limitations imposed by SB 7 as "applying Jim Crow sundown laws to voting."[119] Despite these critiques, S.B. 7 eventually passed out of the Senate and was sent to the House for consideration.

---

[118] John Engel, *GOP Election Bill Stalls, Hundreds Unable To Testify Due To Committee Chairman's Mistake*, KXAN (March 25, 2021), https://www.kxan.com/news/texas-politics/texas-gop-election-bill-stalls-hundreds-unable-to-testify-due-to-committee-chairmans-mistake/; Audio Transcript, 8 April 2021, House Elections Committee Hearing, at. 66, 68.

[119] Isabel Longoria, *Testifying Against S.B. 7.*, https://www.facebook.com/LongoriaForH/videos/742078446670809/.

Weeks later, the House Elections Committee took up and passed S.B. 7 with no advance notice to the public or to any member of the House Elections Committee. Cain accomplished this by substituting the text of S.B. 7—which had been passed out of the Senate—for the text of H.B. 6.

Rather than take up S.B. 7 in the House Elections Committee—which is standard procedure when the Senate sends a bill to the House for consideration—Chairman Cain surprised his colleagues and substituted the language of H.B. 6 with the language of S.B. 7. Cain argued to his colleagues that because S.B. 7 and H.B. 6 were "identical," there was no need to hold a hearing to review S.B. 7 because there already had been a hearing on the purportedly identical H.B. 6. "We've already heard a hearing on House Bill 6 and so that's sufficient," Cain said.[120].

However, Democratic Vice-Chair Jessica Gonzalez noted that as Chairman Cain had previously argued that S.B. 7 and H.B. 6 were substantially different. She explained:

> **Vice-Chair Gonzalez**: These two bills are substantially different. You have said that time and time again in committee. Many times, you have said that these bills are totally different when somebody compares it to SB7. I mean I have to object. I mean this is wrong. We deserve to have a public hearing on this ... This is a deviation.

Chairman Cain did not respond to these comments. Instead, Chairman Cain called the question on the Committee Substitute to H.B. 6 (aka S.B. 7) and—when it became clear that his Republican colleagues would not uniformly support this maneuver—adjourned the Elections Committee to allow his colleagues time to consider the substitute. Later that day, the Elections Committee passed the Committee Substitute (aka S.B. 7) out of committee without a hearing. This procedural chicanery foreclosed the possibility of any public hearing or testimony on S.B. 7 and negated the need for a hearing on H.B. 6 in the Senate. The maneuver was such a surprise that Chairman Cain was forced to adjourn and reconvene later that day

---

[120] House Elections Committee Hearing Transcript, Part 1, 29 April 2021, at 4,5.

because even one of his Republican colleagues were hesitant to agree to such a procedural deviation with no notice. Later that day, Republicans on the Committee voted down along party lines all amendments proposed by Democratic members. Cain's maneuver preempted any public hearing in the House on S.B. 7 and virtually guaranteed that two versions of S.B. 7 – the original version and the House substitute -- would go to a Republican-dominated conference committee that could rewrite the legislation behind closed doors without input from the public or Democratic legislators.[121]

Indeed, a final version of S.B. 7 was finally released on Saturday, May 29, 2021, after being negotiated behind closed doors by Republicans on the Conference Committee with no input from the public or Democratic members of the Conference Committee. The Conference Committee version of S.B. 7 included several new substantive provisions that the public had not had the opportunity to weigh in on or meaningfully assess, including a provision that would prohibit in-person voting on the Sunday before Election Day from beginning earlier than 1 p.m. and new identification requirements for mail-in ballots— neither of which had been raised in previous debates on the bill. The truncated debate schedule that followed meant that lawmakers in both chambers had an extremely limited amount of time to discuss the changes with local election officials, voting rights groups, or constituents.[122] The Conference Committee did not hold any meetings as Senator Hughes, the Senate Chair admitted in debates:

> **Senator Hughes:** So, I don't know what every conferee did. There was never a time where the Senate conferees sat down together. There were individual conversations and, of course, you—[123]

---

[121] *Id.*, at 5, 6, 7; Alexa Ura, *In Push For New Texas Voting Restrictions, House Panel Sets Up GOP Faceoff Over Which Chamber's Legislation Will Advance*, TEXAS TRIBUNE (April 29, 2021), https://www.texastribune.org/2021/04/29/texas-voting-restrictions-fight/.

[122] Alexa Ura, *Texas Lawmakers Poised to Pass Sweeping Voter Bill to Restrict Voting Hours and Change Election Rules*, TEXAS TRIBUNE, 29 May 2021, https://www.texastribune.org/2021/05/29/texas-voting-restrictions-bill/.

[123] Senate Journal, Eighty-Seventh Legislature, Regular Session, Addendum, Forty-Eighth Day, May 29, 2021, unpaginated, https://journals.senate.texas.gov/SJRNL/87R/PDF/87RSJ05-29-F.PDF.

On Saturday, May 29, 2021, Republican members of the Texas Senate voted to suspend a Senate rule that required the Senate to wait 24 hours to debate and vote on the bill. Republicans did not adhere to Senate rule that would give lawmakers 24 hours to debate and vote on the bill, which was included in a Conference Committee report, signed only by Republican members of the Conference Committee.[124] Of more than 40 Conference Committee reports delivered to the Senate on May 29, 2021, the same day as the report on S.B. 7, only one other report was signed only by Republicans. That was the report on Senate Bill 155, another "Election Integrity" measure.[125] Instead, debate on S.B. 7 began at 10pm, with a final vote taking place at 6am.[126] On the afternoon of Sunday, May 30, 2021, the Texas House began debate on S.B. 7. Near midnight—and before a final vote could be called—Democrats thwarted final passage of S.B.7 by walking out of the chamber and denying the House the quorum needed to pass any further legislation.[127]

As noted by the NAACP Legal Defense and Education Fund (LDF), immediately upon release of the Conference Committee report, the newly added 1 p.m. restriction on the Sunday voting before Election Day appeared to be targeted squarely against the "Souls to the Polls" Sunday turnout initiative used by Black voters:

---

[124] Senate of Texas, "Temporary Senate Rules," Adopted January 13, 2021, Amended August 7, 2021, https://senate.texas.gov/_assets/pdf/SenateRules87-temp-amended.pdf.

[125] Senate Journal, Eighty-Seventh Legislature, Regular Session, Addendum, Forty-Eighth Day, May 29, 2021, unpaginated, https://journals.senate.texas.gov/SJRNL/87R/PDF/87RSJ05-29-F.PDF.

[126] Alex Aura, *After Drastic Changes Made Behind Closed Doors and an Overnight Debate, Texas Senate Approves Voter Bill*, TEXAS TRIBUNE (May 30, 2021), https://www.texastribune.org/2021/05/30/texas-voting-restrictions-senate/; Legiscan Texas, "Vote: Senate Adopts Conference Committee Report, https://legiscan.com/TX/rollcall/SB7/id/1095840.

[127] Lauren McGaughy, *Texas Democrats Walk Out of House Chamber to Stop Debate on Sweeping GOP-Backed Election Bill*, TEXAS METRO NEWS (June 1, 2021), https://texasmetronews.com/11268/texas-democrats-walk-out-of-house-chamber-to-stop-debate-on-sweeping-gop-backed-elections-bill/.

> This provision would directly and significantly impact "Souls to the Polls" – a popular voting method in the Black community whereby voters caravan to early voting sites following Sunday church services. Souls to the Polls is nationally recognized as critical to the Black community because it has allowed churches to leverage the transportation they already provide to and from church to bring voters early voting polling sites. Indeed, Souls to the Polls was popular and used by the Black community in Texas in the November 2020 Presidential election.[128]

In response, Republican State Representative Travis Clardy and S.B. 7's House sponsor, State Representative Briscoe Cain, called the 1 p.m. restriction a "scrivener's error," that substituted 1 for 11. "Call it a scrivener's error, whatever you want to," he said. "I think there was a—you know, call it a mistake if you want to. What should have been 11 was actually printed up as one…. So, it's actually providing for extended hours in most locations."[129]

But the belated claim regarding a "scrivener's error" lacks credibility for several reasons. First, such a clerical error might result in specifying 1 rather than 11, but it does not explain the further typo of "p.m." rather than "a.m." Second, no Republican raised this claim of a "scrivener's error" in debates on the bill. Third, and most telling, the bill's Senate sponsor Senate Bryan Hughes, explicitly defended the 1 p.m. restriction during the Senate debates. "Those election workers want to go to church, too," Hughes said during debate over the bill. "And so that's why it says 1 p.m. [and] no later than 9 p.m. You can make Sunday service and go after that." Beyond this statement, Senator Hughes engaged in an extended

---

[128] LDF, *RE: LDF Opposition Senate Bill 7 Conference Committee Report*, (May 29, 2021), https://www.naacpldf.org/wp-content/uploads/LDF-Conference-Committee-Report-Opposition-Senate-20210529-1.pdf.

[129] Aaron Blake, *Texas GOP Now Claims Its Bill Limiting Black Churches' 'Souls to the Polls' Was a Typo*, WASHINGTON POST (June 2, 2021), https://www.washingtonpost.com/politics/2021/06/01/what-texas-voting-bill-reveals-about-gop/; Zachary Evans, *Texas Republican Claims Provision to Limit Voting on Sunday Was a 'Scrivener's Error,'* NATIONAL REVIEW (June 1, 2021), https://www.nationalreview.com/news/texas-republican-claims-provision-to-limit-voting-    Texas Republican Claims Provision to Limit Voting on Sunday Was a 'Scrivener's Error on-sunday-was-scriveners-error/.

discussion with Black Democratic Senator Royce West over the 1 p.m. restriction in bill's new provisions.[130] Had the Democrats not walked out, the bill with the 1 p.m. limitation would have been enacted by the House and included in the engrossed legislation. This section of the bill dealing with Sunday voting was also modified during the legislative process, without changing the time limit. Finally, by putting the Sunday limitation into a Conference Committee Report rather than proposed legislation, Republicans assured that it could not be removed or amended. Conference Committee reports cannot be modified in any way but can only be voted up or down and Republicans had more than enough votes to assure adoption of the report, with its many additions.[131]

The Conference Committee's addition of the 1 p.m. limitation violated standard procedure for a Conference Committee. As noted by the non-partisan Texas Legislative Council (TLC) in its publication The Legislative Process in Texas, "*A conference committee's charge is limited to reconciling differences between the two chambers*, and the committee may not change, alter, amend, or omit text that is not in disagreement without the adoption of an 'out of bounds' resolution by both chambers. The committee also may not add text on any matter that is not in disagreement or that is not included in either version of the bill in question without such a resolution."[132]

---

[130] Jane C. Timm, *Texas Republican Blames Typo for Proposed Sunday Voting Limits,* NBC NEWS (June 1, 2021), https://www.nbcnews.com/politics/elections/texas-republicans-blame-typo-early-sunday-voting-limit-n1269344; Senate Journal, Eighty-Seventh Legislature, Regular Session, Addendum, Forty-Eight Day, May 29, 2021, unpaginated, https://journals.senate.texas.gov/SJRNL/87R/HTML/87RSJ05-29-FA.HTM.

[131] According to the Texas House Rules Manual, 2021, "A conference committee report is not subject to amendment, but must be accepted or rejected in its entirety."

[132] Texas Legislative Council, *The Legislative Process in Texas* (February 2021), https://tlc.texas.gov/docs/legref/legislativeprocess.pdf#page=12. (emphasis in original)  The TLC notes that "The mission of the Texas Legislative Council is to provide professional, nonpartisan service and support to the Texas Legislature and legislative agencies. In every area of responsibility, we strive for quality and efficiency."

According to the rules of the House, "The [Out-of-Bounds] resolution shall specify in detail:

(1) the exact language of the matter or matters proposed to be considered;

(2) the specific limitation or limitations to be suspended;

(3) the specific action contemplated by the conference committee;

(4) except for a resolution suspending the limitations on the conferees for the general appropriations bill, the reasons that suspension of the limitations is being requested …[133]

The resolution presented by Republicans on the Conference Committee to the Senate and House did not provide any reasons, much less the reasons "in detail," for adding the 1 p.m. limitation. The resolution does not mention the controversial limitation at all. Rather for the added section of S.B. 7 that included the 1 p.m. limitation, the resolution provides only this brief, generic non-explanation: "The change is necessary to regulate the hours for voting on a Saturday or Sunday in counties with population of 30,000 or more and certain counties with a population under 30,000."[134]

It is also notable that members of State Senate received the "out-of-bounds" resolution with its explanation of additions just after 10 p.m. when they had begun their final late-hours debate. So, there was little time for study and no opportunity for public input, as noted by Democratic Senator Beverly Powell during the debates:

**Senator Powell:**  And then tonight we got the outside-the-bounds resolution at 10:35 p.m. … And do you not believe that we should be vetting consequential election legislation before voting on it within 48 hours of the end of our session?

---

[133] House Rules Manual, 87th Legislature, 2021, p. 232, https://house.texas.gov/_media/pdf/House-Rules-of-Procedure-87.pdf.

134 Senate of the State of Texas, 87th Legislature, Regular Session, 2021, Senate Resolution 547, https://legiscan.com/TX/text/SR547/2021; House of Representatives of the State of Texas, 87th Legislature, Regular Session, 2021, House Resolution 2007, https://capitol.texas.gov/tlodocs/87R/billtext/html/HR02007I.htm.

**Senator Powell:**  And you think those rules make it alright for us to just add some things into this bill that we've never vetted before the public? That we've never allowed any public input, that we've, we've never allowed the transparency of having vetted this information before our voters.[135]

Moreover, "out-of-bounds" are an exception from usual practice for conference committees as shown by this exchange between Senator Hughes Democratic Senator Nathan Johnson.

**Senator Johnson:**  Thank you, Senator Hughes. Promise to be brief. It's not often that we go out of bounds on these things. Right?

**Senator Hughes:**  Senator, I don't have the statistics. I know that there are out of bounds resolutions every session.

**Senator Johnson:**  Would you call it often?

**Senator Hughes:**  I'll defer to you. I don't know what the--

**Senator Johnson:**  Do you know how many times we've done it this session?

**Senator Hughes:**  I don't know. I believe you, if you tell me, I'll trust you. I don't know--

**Senator Johnson:**  And I'm not sure either, I think the answer is one and it has to do with the budget. You would agree that it's not customary, that it's, it's less than half the time that we go out of bounds.

**Senator Hughes:**  I bet it's less than half the times but I'm just guessing, but I bet it's less than half the time.

**Senator Johnson:**  Are you--

**Senator Hughes:**  I bet you're right.

**Senator Johnson:**  --are you aware of any this session other than this one?

**Senator Hughes:**  Well, Senator, conference committee reports are just now coming back, so I think we're going to, we're going to see these again.

**Senator Johnson:**  Are you aware of any this session other than this one?

---

[135] *Id.*, Senate Journal, 29 May 2021.

**Senator Hughes:**  Well, you mentioned the one on the budget.

**Senator Johnson:**  Right.

**Senator Hughes:**  And there may be others, I'm not sure--

**Senator Johnson:**  Are you aware of any others?

**Senator Hughes:**  --if you know, I believe, you tell me--

**Senator Johnson:**  I don't know of any others so what I'm getting at is this is, this is something that we do in this, in this Chamber. Right? We do go out of bounds--

**Senator Hughes:**  Yes, Sir.

**Senator Johnson:**  --from time to time. But it's not a normal thing to do, so if we're going to do it, I'd like to just kind of take a look at, see what, what exactly we're doing because you mentioned that, for example, Senator Creighton's bill is stuffed into here, out of bounds. There are other things stuffed into here out of bounds.[136]

After the Democratic walkout, Governor Abbott vetoed funding for the State Legislature for the next fiscal year, a maneuver unprecedented in the recent history of Texas. Under the Texas Constitution, however, members of the legislature would still be paid. The veto impacted 2,165 legislative staffers and individuals working at legislative agencies.[137]

Governor Abbott then called for a special session, to include the "Election Integrity" (S.B. 1 and its predecessors) legislation which he said was "emergency" legislation.[138] In fact, there was no

---

[136] *Id.*

[137] Cassandra Pollock, *Gov. Greg Abbott vetoes funding for Texas Legislature and its staff as punishment for Democrats' walkout on elections bill*, Texas Tribune (June 18, 2021), https://www.texastribune.org/2021/06/18/greg-abbott-veto-legislature-democrats/

[138] Greg Abbott, Tweet, 30 May 2021, https://twitter.com/GregAbbott_TX/status/1399210295315337217.

emergency requiring new election laws. The emergency was a ruse for including the so-called "Election Integrity" in the special session.

As noted above, the Director of Elections, Keith Ingram, affirmed that even under the difficult circumstances of the Texas had an election that was "smooth and secure." These findings in Texas are consistent affirmations by top officials of the Trump administration. Despite the assiduous efforts of the motivated Texas Attorney General Ken Paxton, his investigations found only vanishingly small and inconsequential examples of voter fraud in the 2020 general election. The *Houston Chronicle* reported that in 2020, "The Texas attorney general's office spent nearly twice as much time working on voter fraud cases this year as it did in 2018 — logging more than 22,000 staff hours — yet resolved just 16 prosecutions, half as many as two years ago, records show. All 16 cases involved Harris County residents with incorrect addresses on their voter registration forms. None received any jail time." There are nearly 17 million registered voters in Texas and Texans cast more than 11 million ballots in 2020.[139] An updated analysis found that in 2021, the Attorney General had closed just 3 additional cases and opened seven new ones. The Attorney achieved these minimal results despite an increased staff and budget.[140] Even an analysis by the conservative Heritage Foundation found only 98 purported cases of voter fraud in Texas from 2005 to 2019, out of many tens of millions of ballots cast.[141]

---

[139] Taylor Goldenstein, *Ken Paxton's Beefed-Up 2020 Voter Fraud Unit Closed 16 Minor Cases, All In Harris County*, HOUSTON CHRONICLE (December 27, 2020), https://www.houstonchronicle.com/politics/texas/article/Ken-Paxton-s-beefed-up-2020-voter-fraud-unit-15820210.php.

[140] Taylor Goldenstein, *Texas AG Paxton's $2.2M Voter Fraud Unit Closed Three Cases In 2021. GOP Lawmakers Still Boosted Its Budget*, HOUSTON CHRONICLE (December 17, 2021), https://www.houstonchronicle.com/politics/texas/article/Texas-AG-Paxton-s-2-2M-voter-fraud-unit-closed-16708051.php.

[141] Heritage Foundation, *Election Fraud Cases, Texas*, https://www.heritage.org/voterfraud/search?combine=&state=TX&year=&case_type=All&fraud_type=All&page=6.

The voters of Texas recognized that so-called "Election Integrity" was not a high priority for the special session of the legislature. As indicated in Table 17 and Chart 3, a poll of 1,000 likely Texas voters by Ragnar Associates found that "Improving Election Security," ranked fifth among priorities for the special legislative session. Just 8% ranked "Improving Election Security," as their first priority.

During the first special session, Republicans in the House and the Senate held a public hearing on S.B. 1 in July 2021. The Senate hearing was held with just 48 hours of notice. Yet, the Legislature requires witnesses to request disability accommodations 72 hours before their appearances.[142]

Democratic Senator Judith Zaffirini stated in the hearing that her staff's "preliminary tally showed there were 353 witnesses registered to testify regarding S.B. 1, with 7 testifying on the bill; 64 for; and 287 against. Opposing witnesses included persons with disabilities, persons of color, seniors, and even veterans.[143]

The House hearing did not begin until the wee hours of the morning at 1:41 a.m., some 17 hours after the first witnesses had registered their place in line to testify at about 8 a.m.[144] According to a compilation by the *Texas Tribune*, "The House's registration figures showed 484 members of the public had come to the Capitol to register a position on the chamber's bill, with 407 marking themselves as opposed to the legislation, 65 in support and 12 as neutral."[145] Republicans ignored this testimony and

---

[142] Jane C. Timm, *Republicans Advance Voting Bills After All-Night Hearing*, NBC NEWS (July 10, 2021), https://www.nbcnews.com/politics/elections/problem-doesn-t-exist-democrats-activists-slam-texas-voter-fraud-n1273634.

[143] Senator Judith Zaffirini, *Statement Regarding Senate Bill 1*, Texas Senate Journal, July 13, 2021, https://journals.senate.texas.gov/SJRNL/871/HTML/87S107-13-F.HTM.

[144] Alexa Ura and Cassandra Pollock, *GOP Voting Bills Advance in Texas House and Senate After Overnight Committee Hearings*, TEXAS TRIBUNE (July 10, 2021), https://www.texastribune.org/2021/07/10/voting-bill-texas/.

[145] *Id.*, Alexa Ura, *Texans Testifying on GOP Voting Bill Faced A 17 Hour-Wait To Be Heard By Lawmakers in the Dead Of Nigh*t, TEXAS TRIBUNE (July 11, 2021), https://www.texastribune.org/2021/07/10/texas-legislature-gop-voting-bill/.

shortly after the hearing closed, and advanced their bills through committee. However, a continued boycott by Democrats prevented the adoption of final legislation at the first special session. Governor Abbott then called a second special session, which would again take up "Election Integrity" measures.

Democrats left the state to again forestall a quorum that could enact the "Election Integrity" legislation. Governor Abbott then called a third special session again to enact an "Election Integrity" bill as emergency legislation. Absent a true emergency, Governor Abbott and his allies in the State Legislature sought to enact their legislation in time for the midterm elections of 2022. State House Speaker Dan Phelan on August 10, 2021, signed arrest warrants to compel Democrats to return to legislature and regain a quorum. The House voted to authorize law enforcement to track down any absent Democrats after the State Supreme Court had authorized authorities to detain the Democrats.[146] With two weeks left in the third special session enough Democrats returned to the legislature to establish a quorum. The Republican majority then enacted S.B. 1 along party lines. Governor Abbott had pledged to call as many special sessions as needed to enact the bill.[147]

Finally, the same Texas Legislature that adopted S.B. 1 failed to enact bills for more sweeping reforms introduced in 2021 to expand access to the ballot, despite lagging turnout behind national averages. In the same second special session that the adopted S.B. 1 and Republicans to be committed to

---

[146] Morgan O'Hanlon, Allie Morris, and Todd J. Gilman, "*House Speaker Signs Warrant to Arrest 52 Wayward Democrats*", DALLAS MORNING NEWS (August 10, 2021), https://www.dallasnews.com/news/2021/08/10/texas-supreme-court-issues-stay-on-restraining-order-blocking-arrest-of-h.ouse-democrats-who-fled/.

[147] James Barragán, *After a Nearly Six-Week Exodus Over GOP Voting Bill, Enough Democrats Return to Texas House to Begin Work*, TEXAS TRIBUNE (August 19, 2021), https://www.texastribune.org/2021/08/18/texas-house-democrats-quorum/; LegiScan, Votes: TX S.B.1 | 2021 | 87th Legislature 2nd Special Session, https://legiscan.com/TX/votes/SB1/2021/X2**.**

.

making it easier to vote, the Republican-controlled legislature failed to act on the following bills designed to facilitate voting:

- **H.B. 213**: Expands the forms of photo identification authorized for purposes of voting.[148]

- **H.B. 214**: Extends opportunities for early voting.[149]

- **S.B. 71**: Provides for electronic registration, same day registration, and voting places on college campuses.[150]

- **H.B. 215**: Authorizes voting by mail by any qualified voter in the state.[151]

- **H.B. 224**: Designates election day as a state holiday.[152]

- **S.B. 52**: Allows for the delivery of ballots voted by mail to be deposited in an authorized depository box.[153]

- **S.B. 67:** Expands the list of identification for voting to included non-photo forms of ID.[154]

- **S.B. 57:** Authorizes non-partisan poll watchers.[155]

---

[148] Texas House Bill 213, 87th Legislature, Second Special Session, https://legiscan.com/TX/text/HB213/id/2429638.

[149] Texas House Bill 214, 87th Legislature, Second Special Session, https://legiscan.com/TX/text/HB214/2021/X2.

[150] Texas Senate Bill 71, 87th Legislature, Second Special Session, *Openstates*, https://openstates.org/tx/bills/872/SB71/.

[151] Texas House Bill 215, 87th Legislature, Second Special Session, https://legiscan.com/TX/bill/HB215/2021/X2.

[152] Texas House Bill 224, 87th Legislature, Second Special Session, https://legiscan.com/TX/text/HB224/2021/X2.

[153] Texas Senate Bill 52, 87th Legislature, Second Special Session, https://legiscan.com/TX/bill/SB52/2021/X2.

[154] Texas Senate Bill 67, 87th Legislature, Second Special Session, https://legiscan.com/TX/text/SB67/2021/X2.

[155] Texas Senate Bill 57, 87th Legislature, Second Special Session, https://legiscan.com/TX/bill/SB57/2021/X2.

- **S.B. 74**: Authorizes the automatic voter registration of students enrolled in public institutions of higher education.[156]

- **H.B. 49:** Authorizes the automatic voter registration of eligible citizens on issuance or change of a driver's license or identification card by the Department of Public Safety.[157]

## VI.    Substantive Deviations

The two most notable substantive deviations in S.B. 1—substantial departures from past policy or practice -- are the crackdown on mail-in voting and the criminalization of election administration in Texas. Both deviations are departures from past policies of the state. In 2011, Texas adopted a strict photo vote identification law, with no option for voters without authorized ID to sign a reasonable impediment exception. The law required ID only for voting at the polls, although Republican lawmakers believed at the time that absentee ballots, not votes cast at the polls, were most susceptible to voter impersonation (see below). Yet the Republican majority exempted absentee ballots from any identification requirement, leaving the status quo in place.

An August 2010 report by Republican Representative Todd Smith, Chairman of the House Committee on Elections, for the upcoming 2011 session, summarized earlier findings of the House Committee on Elections, from the 80th Legislative Session that began in 2007. The Committee, then Chaired by Republican Representative Leo Berman and consisting of four Republicans and three Democrats concluded:

> At the end of the hearing all committee members could agree that there is some amount of fraud in Texas' election process. What the committee found is most election fraud happening in Texas occurs within the absentee or

---

[156]    Texas    Senate    Bill    74,    87th    Legislature,    Second    Special    Session, https://legiscan.com/TX/text/SB74/2021/X2.

[157]    Texas    House    Bill    49,    87th    Legislature,    Second    Special    Session, https://legiscan.com/TX/text/HB49/2021/X2.

> mail-in process, through voter registration, and through *politiqueras* or *vote brokers* which are usually found in South Texas. (*Politiqueras* are paid to deliver votes, usually by shepherding elderly to the polls or by manipulating the mail-in ballot system)[158]

There is no mention in these findings of fraud through voter impersonation at the polls that voter photo identification bills are designed to deter.

As noted above, at the time of the adoption of the voter photo ID, the absentee vote in Texas was disproportionately white. However, after the upsurge in mail-in voting in 2020, for the first time the absentee vote became disproportionately minorities. Only then did the General Assembly impose new restrictions on mail-in voting. In addition to the restrictions explained above, the new law did include a provision for the curing of errors in mail-in ballots but would impact less than 1% of ballots submitted even if implemented perfectly.

The preamble to S.B. 1 in the second special session stated that a purpose of the act was "increasing criminal penalties; creating criminal offenses."  Texas for the first time imposed new criminal penalties on the administration of elections by non-partisan officials and those assisting disabled-and-language-challenged voters, while simultaneously instituting new protections for partisan poll watchers. The new law, in effect, formalizes the threats and harassment directed at election officials who allegedly participated in the "stolen election" of 2020.[159]

---

[158] Representative Todd Smith, *Voter Identification Forum*, 81st Session Interim, 6 August 2010, p. 31, State email submission, 008252 TX_00091058.

[159] S.B. No. 1, https://capitol.texas.gov/tlodocs/872/billtext/html/SB00001F.htm. See, for example,  Andy Sullivan, Brad Heath, and Mark Hosenball. *Website Targeting U.S. Election Officials Draws Attention of Intelligence Agencie*s, REUTERS (December 20, 2020), https://www.reuters.com/article/usa-election-threats/website-targeting-u-s-election-officials-draws-attention-of-intelligence-agencies-idUSKBN28K34F; Dan Glaun, *Threats to Election Officials Piled Up as President Trump Refused to Concede*, FRONTLINE (November 20, 2020); https://www.pbs.org/wgbh/frontline/article/threats-to-election-officials-piled-up-as-president-trump-refused-to-concede/; Jeremy Schwartz, *'God's Will is*

The Texas General Assembly adopted the criminal provisions of S.B. 1 despite concerted public opposition to criminalizing the process for voting and conducting elections. As indicated in Table 18, per a July 2021 Texas poll, 68% of respondents agreed that neighbors who work as election workers shouldn't risk jail. In addition, 80% disagreed that it should "be a felony to assist more than three voters with disabilities or language barriers at polling locations."

## VII.   Contemporaneous Statements

The justifications offered by Republicans for the adoption of the omnibus election bill S.B. 1 were misleading and pretextual.

### A.  S.B. 1 Targeted Voting Methods Disproportionately Used By Minority Voters

In defending the Conference Committee report on S.B. 7 during the legislature's regular session, Senate sponsor Hughes said, "The provisions apply equally across the state. They are not limited to a particular group or particular area."[160]

Senator Hughes and other backers of S.B. 1 and its predecessors understood that two specific provisions of the bill – the ban on drive-thru and on 24-hour voting – were targeted directly at Harris County, the most populous county in the state, with the state's largest concentration of minority voters. Harris County voters cast approximately 127,000 by drive-thru and approximately 7,000 after-hours votes, equal to 8.2% of the 1.64 million votes cast for president in Harris County. Drive-thru voting, with its

---

Being Thwarted.' Even Sin Solid Republican Counties, Hard-Liners Seek More Partisan Control of Elections, TEXAS TRIBUNE (October 1, 2021), https://www.texastribune.org/2021/10/01/texas-election-official-hood/; Michelle Carew, Partisan Attacks Drove Me Out of my Job as a Texas Election Official, WASHINGTON POST (November 1, 2021), https://www.washingtonpost.com/opinions/2021/11/01/partisan-attacks-drove-me-out-my-job-texas-elections-official/.

[160] Chuck Lindell, In 6 A.M. Vote, Divided Texas Senate Approves GOP Elections Bill After All-Night Debate, AUSTIN-AMERICAN STATESMAN (May 30, 2021), http://roycewest.com/news/latest/6_am_vote/.

substantial number of votes was the particular target of decision-makers who backed the new "Election Integrity" bills.

The targeting of drive-thru voting in Harris County with surgical provision is a powerful indication of the racial intent of Republican decision-makers in the General Assembly. A study done by the Texas Civil Rights Project and presented to the Legislature in advance of S.B. 1's passage found that minority voters comprised a disproportionate share of voters using the drive-in and after-hours options. According to the Project's data, as shown in Table 10 and 11, Anglos comprised 62% of all early voters in Harris County, whereas Hispanics comprised 20%, Blacks 14%, Asians 4%, and all minorities 38%.[161]  In contrast, Anglos comprised 47% of all drive-thru early voters in Harris County, whereas Hispanics comprised 23%, Blacks 22% and Asians 8%, and all minorities 53%. Among after-hours voters, Hispanics comprised 36%, Blacks 12%, Asians 8%, and all minorities 56%.[162]

A post-election survey demonstrated that voters using the drive-thru option in Harris County rated their experience far more positively than those voting by mail, early in-person, or at the election day polls. Harris County drive-in users were also far more confident about the integrity of their vote than those using these other modes of voting in Harris County.[163]

First, Republicans in the General Assembly focused on drive-thru voting in Harris County while ignoring its use in other Texas counties, including Bee County and Calhoun County.

---

[161] Emily Eby, Staff Attorney, Texas Civil Rights Project, *Testimony to Texas Senate State Affairs Committee* (July 10, 2021) https://txcivilrights.org/wp-content/uploads/2021/07/TCRP-Testimony-on-SB-1.pdf.

[162] I am unable to speak to the methodology used to model race and ethnicity in Harris County cited in the TCRP report. Accordingly, I rely on it as evidence that the Texas Legislature was repeatedly told that minority voters in Harris County disproportionately used drive-thru and after-hours

[163] "The Rice University Post-2020 Election Survey of Harris County Voters," August 2021, https://mreece13.github.io/dtv-harris-2021/cross-tabs.html#method-of-voting; additional polling data, email from Professor Robert Stein, Rice University.

During the debates over the S.B. 7 Conference Committee report in the regular session, Senator Hughes said the following:

**Senator Hughes:** But to answer your question about drive-thru voting, I'm only aware of it being used in Harris County in the November 2020 election.

He similarly asserted:

**Senator Hughes:** So then, particular, the provisions about 24-hour voting and drive-thru voting, to my knowledge, it was Harris County in one election in 2020 that created those processes, so it was actions in Harris County that gave rise to those two provisions of the bill, and all, and I'm sorry, one more. It was in Harris County where the, there was an attempt to, to mail applications for mail ballot to folks who were not legally entitled to vote by mail, so those three provisions, I know, were the result of what happened in Harris County in the 2020 election cycle that just passed.[164]

Senator Hughes admitted in the above exchange that it was only the use of drive-thru voting in Harris County, not in these other counties, which prompted him to propose banning the practice. Lieutenant Governor Dan Patrick similarly denounced Harris County as if it had created its own law unique in using drive-thru voting: "Well, I have news for Harris County. You're not the capital of Texas. The state Capitol resides in Travis County and the city of Austin in this building, not in the county judge or the mayor's office. Harris County does not make policy and create law for the other 253 Texas counties. Out of thin air they decided on drive-thru voting."[165] Patrick too ignored the use of drive-thru voting in the general presidential election of 2020 in at least two other counties: Bee and Calhoun.

Third, the ban on drive-thru voting in Harris County could not justified as a source of voter fraud. In debates on proposed "Election Integrity" bills, Republicans in the General Assembly could not provide any examples of fraud arising from drive-thru voting in Harris County. In a hearing of the Senate Committee on State Affairs Democratic Senator Boris L. Miles asked the following:

---

[164] Senate Journal, Eighty-Seventh Legislature, Regular Session, Addendum, Forty-Eighth Day, May 29, 2021, unpaginated, https://journals.senate.texas.gov/SJRNL/87R/HTML/87RSJ05-29-FA.HTM.

[165] Dan Patrick Press Conference Transcript, 6 April 2021, at 14.

**Senator Boris L. Miles**: "And to my, of knowledge, unless somebody knows something that I don't know, there wasn't any fraud detected in any drive through voting. Was it"

No Republican rose to the challenge and presented any evidence of drive-thru voter fraud. In the same hearing a Democratic Senator asked the following:

**Democratic Senator**: My first questions relate to drive through the voting ban, and they start on page six lines, 15 to 21 Senate. One would ban the use of drive through voting. Is there any evidence that the secretary of states have that drive through voting increases the law likelihood of voter fraud?

Keith Ingram, the Director of Elections in the Office of the Secretary of State responded as follows:

**Keith Ingram**: I don't think we have any evidence of, uh, act fraud.

Similarly, Ingram, affirmed the absence of fraud in 24-hour voting in Harris County.

**Keith Ingram**:  This last election was the, the first election that I'm aware of where we had any 24-hour voting. And I'm not aware of any fraud that occurred in that election at night.

Fourth, unable to rely on justifications based on voter fraud, backers of S.B. 1 in the General Assembly resorted to other false and misleading justifications. They misrepresented Judge Hanen's decision to claim that drive-thru voting was illegal, even in the early voting period. Lieutenant Governor Patrick said, "Now there was a case file[. T]he judge threw it out on lack of standing. But the judge said in the case, had I opined[,] I would have said it was unlawful [b]ecause the constitution says a voting location must be a building. A tent is not a building."[166] However, District Court Judge Andrew Hanen found that all 10 Harris County drive-thru locations were legal under Texas law during the early voting period. He ruled that the requirement for a "building" only applied on election day and that one of the ten sites still qualified.[167]

Backers of S.B. 1 also relied on the claim that despite an absence of voter fraud, there was a discrepancy in the Harris County 2020 general election early voting between the number of votes recorded

---

[166] Dan Patrick Press Conference Transcript at 1415.

[167] *Hotze v. Hollins*, In the United States District Court for the Southern District of Texas, Houston Division, Civil Action No. 4:20-CV-03079, November 2, 2021.

on the county's website and the number submitted to the Secretary of State. They claimed without evidence that this discrepancy was a serious problem that resulted from drive-in voting. Regarding "the question about the drive through voting and that was asked, I think it's pretty well established. There was a significant discrepancy in the votes," said Republican Senator Robert Lee "Bob" Hall III. He added, "we're talking about protecting each person's individual, right. To have their vote count. And every time there is a discrepancy somebody is discounted." However, this alleged discrepancy was not a verified finding of the Secretary of State or any other election official in Texas. It was a complaint made during early voting, before final results were tallied, by Rachel Palmer Hooper, a Republican activist, precinct chair, and ardent Trump supporter.[168]

On October 25, 2020, with early voting still ongoing, the Secretary of State's Office asked Harris County officials to clarify "*apparent* discrepancies" (emphasis added) between early voting totals submitted to the Secretary of State's office and the numbers posted on the Harris County's early voting webpage. In response, Elizabeth Lewis, spokesperson for Harris County Clerk Chris Hollins, said the different numbers were the result of a "slight lag in reporting from when we push results to the Secretary of State versus when we publish them." She added "Unofficial results are provided daily from the Harris County Clerk's office. They are unofficial until after the hearing and canvass period after an election. Any discrepancies between the Secretary of State's website, and the official results put out by the Harris County Clerk, will be rectified once the official results come out."[169]

---

[168] 16333, Senate Committee on State Affairs Transcript, 02:23:-08:31; Don Hooper, Houston Conservative Forum, https://houstonconservativeforum.com/the-bet/.

[169] Syan Rhodes, *Texas Secretary of State Asks Harris County Clerk to Clarify 'Apparent Discrepancies' in Reporting Of Early Voting Totals*, CLICK2 HOUSTON (October 27, 2020), https://www.click2houston.com/news/local/2020/10/28/texas-secretary-of-state-asks-harris-county-clerk-to-clarify-apparent-discrepancies-in-reporting-of-early-voting-totals/.

Long after the official Harris County returns were in Senator Bettencourt misleadingly claimed that "we have the hard machine error of 1,884 votes. That's a discrepancy that still exists on the books in Harris County this day between the number of votes, the number of names."[170]

Fifth, as demonstrated above, two independent studies verified that minorities disproportionately used the drive-thru and 24-hour voting options in Harris County's 2020 general presidential election. Evidence for this disproportionality was presented to the Texas General Assembly, including that of the Texas Civil Rights Project discussed *supra* and testimony from Harris County Clerk, Isabel Longoria. Longoria testified in the second special session that drive-thru and 24-hour voting were "more often used by Black, Latino and Asian voters." Although not formally presented to the legislature, the Rice University study was released publicly on August 24, 2021, two weeks before the final vote on S.B. 1.[171]

Sixth, conjecture that the presence of multiple persons in drive-thru voting vehicles can lead to voter coercion fails to withstand scrutiny. Unlike polling place voting, there were no complaints from drive-thru voting in Harris County or elsewhere and there were no fraud prosecutions. The Rice University study found that 96% of Harris County voters traveled to drive-in sites with family members friends, and roommates, unlikely coercers, who would have had many opportunities to exert influence prior to voting drive-in. Moreover, for purposes of coercion, driving together to a drive-up location is not different that driving together to a curbside location or a polling place for alleged coercion.

---

[170] The official final Harris County results showed no such discrepancy. Harris Elections Results Archive, Cumulative Report — Official Harris County, Texas — General and Special Elections — November 03, 2020, https://www.harrisvotes.com/HISTORY/20201103/Official%20Cumulative.pdf.

[171] 16333, Senate Committee on State Affairs Transcript, 11:08:54.

The Rice survey further demonstrated that voters who used drive-thru voting in the 2020 general election in Harris County demonstrated that it was highly successful, and not just for Democrats.[172] As demonstrated in Table 20 and Chart 4, 91% of Harris County voters surveyed by Rice University evaluated their experience as excellent. The excellent evaluation of drive-thru voting is 26 percentage points and 37.9% ahead of the 66% excellent evaluation for absentee voting; 19 percentage points and 26.4% ahead of the 72% excellent evaluation for early in-person voting; and 28 percentage points and 44.4% ahead of the 63% excellent evaluation for election day voting. The differences between the evaluations for drive-in and other forms of voting is statistically significant beyond the stringent .01 level in social science.

In addition, Table 20 and Chart 5 demonstrate that drive-thru voting was not a seen by voters as temporary: 97% of Democrats and 95% of Independents said they would use drive-thru voting again. Among Republicans 71% said they would use drive-thru voting again.

Seventh, contrary to claims by Texas legislators that drive-thru voting lacks ballot security, the Rice University study showed that Harris County drive-thru voters in the 2020 general presidential election had greater voter confidence in the correct counting of their vote voters using other methods. As demonstrated in Table 21 and Chart 6, 97% of drive-thru voters reported that they were very or somewhat voter confident in their correct counting of their vote. This level of confidence led the 91.3% sum for absentee voters by 5.7 percentage points, it led the 88.8 sum for early-in person voters by 8.2 percentage points and 9.2%, and it led the sum for election day voters by 20.9 percentage points and 27.5%. The differences between voter confidence among drive-thru and other voters is yet more substantial when

---

[172] Amy Mccraig, *Drive-Through Voting is a Hit With Harris County Voters, According To Newly Released Rice U. Survey*, RICE UNIVERSITY NEWS AND MEDIA RELATIONS, (August 24, 2021), https://news.rice.edu/news/2021/drive-through-voting-hit-harris-county-voters-according-newly-released-rice-u-survey.

considering voters who reported themselves very confident, as further demonstrated in Table 21 and Chart 7. The 90.3 percent of very confident drive-thru voters led absentee voters by 16.7 percentage points and 22.7%, it led 67% of early in-person voters by 23.3 percentage points and 34.8% and it led the 52.7% of election day voters by 37.6 percentage points and 71.3%. All differences for the sum are statistically significant at the standard .05 level or beyond. All differences for the very confident responses are statistically significant beyond the stringent .01 level.

Eighth, Lieutenant Governor Dan Patrick also complained about the distribution of drive-thru locations in Harris County. He said that "in the largest Republican precincts they had two drive-thru locations. In the largest Democratic precincts, which was smaller than the Republican, they had five."[173] Even if true, this complaint is unavailing. In fact, this distribution of locations is consistent with the partisan line-up of precincts in heavily Democratic Harris County, where Biden carried more than 75% of Harris County precincts in the 2020 general presidential election.[174] In addition, because these were drive-thru facilities, they were accessible to all voters in Harris County. Moreover, the Rice University survey of drive-thru voters in Harris County found that 95% of respondents reported carpooling.[175]

Ninth, the use of drive-in voting was not a partisan maneuver instituted only by Democrats in Harris County. It was used in the 2020 general election by the at least two Republican counties: Bee and Calhoun. (Table 19).  In Harris County, drive-thru voting was developed by a bipartisan committee, first for use in the primary process of 2020. Republicans in the General Assembly raised no challenges to drive-

[173] Dan Patrick Press Conference Transcript at 20-21.

[174] Harris County, Canvass Report – Total Voters – Official, 2020 General Election, https://www.harrisvotes.com/HISTORY/20201103/Official%20Canvass.pdf.

[175] Rice University, "Harris County Voters," https://mreece13.github.io/dtv-harris-2021/index.html.

thru voting in primaries. As illustrated by the following exchange in Senate debates, Republicans only challenged the process when it had partisan implications in the 2020 general presidential election.[176]

**Senator Miles**: Republicans in Harris [C]ounty had no problems with drive-thru voting in the primary, but in the general it became a big issue. Can you explain that to me?

**Senator Hughes**: So drive to, I don't know what happened in the primary, the general, if you say that's, that's where they were. I believe you. I wasn't part of that. I've just read about drive through voting after the general election.

Finally, Republican Senator Bob Hall, a member of the pivotal Committee on State Affairs, made an extraordinary argument against drive-thru and 24-hour voting. He argued, in essence that any arrangement for voting used disproportionately by minorities was inherently racist and should be banned, even though the options are open to all voters. His comments are worth quoting in full:[177]

**Senator Hall**: I don't see any difference between what you're proposing is that's just as racist. I mean, there is something really racist, [be]cause you're talking about a method that favors. So, um, it's, it's just kind of the reverse of what we've talked about here in there. So

Harris County Election Administrator Isabel Longoria then interjected: "That probably goes to a deeper issue on how we feel about race and supporting those minority voters."

Senator Hall responded to her.

**Senator Hall**: I mean, if, I mean, if we came, if someone proposed a method of voting that favored non-minority voters, you would be, you and others would be all over that as being racist. And that's [what] we're trying to do here is recognize that we're all Americans, a black vote, a brown vote, a white vote is one vote and we're all Americans. And we have voting rules that favor voting it. Doesn't favor voting to make it convenient because of what culture or whatever beliefs you have or whatever it is that everybody has equal access, equal opportunity, no matter what, who they are in recognizing considerations for those with special conditions of handicap, but not setting up voting rules based on whether you are a particular minority or whether you're white in, in there. We, we had that at one time. We got rid of that. It was wrong when, when it was there, we got rid of that. And today what we're trying to do, and I think, uh, Senator Hughes with this bill is make equal opportunity for all people equally not set it up to favor one over the other, but I thank you for your testimony.

---

[176] 16333, Senate Committee on State Affairs Transcript, 01:14:30

[177] *Id.*, at 01:06:51 – 01:07:17.

### B. S.B. 1 Will Not Prevent Voter Fraud

The preamble to Senate Bill 1 in the second special session described the purpose of the act as "relating to *election integrity* and security, including by preventing fraud in the conduct of elections in this state …"[178] (emphasis in original). Chairman Briscoe Cain of the House Elections Committee affirmed that "Member, this is the bill we heard previously relating to election integrity and preservation of the purity of the ballot box."[179] Ironically, the sponsors of Jim Crow laws that earlier disenfranchised non-whites in the South, used this same phrase of protecting the "purity of the ballot" and had claimed that measures such as the white primary, the poll tax and the literacy test were needed to prevent fraud. In 1906, for example, U.S. Senator Culberson of Texas extolled the white primary as "uninfluenced by the chicanery and intrigue which heretofore defeated the will of the people." The primary, he said, "protects and guards the purity of the ballot."[180]

However, proponents had great difficulty in justifying S.B. 1 as a deterrent to fraud. The Director of Elections had testified that the 2020 election was "smooth and secure." The office of a highly incentivized Attorney General had turned up only a handful of uncoordinated, isolated cases of voter fraud in 2020 and throughout the period since 2004, successive Attorneys General had uncovered only a vanishingly small number of election fraud cases.

The difficulty that backers faced in justifying their elections legislation as a voter fraud measure is demonstrated by the colloquy between Senate sponsor Bryan Hughes and Democratic Senator Boris L. Miles in the debate over the Conference Committee Report at the end of the 2021 regular legislative

---

[178]   Texas   State   Legislature,   87th   Legislature,   Second   Special   Session,   S.B.   1, https://capitol.texas.gov/Search/DocViewer.aspx?ID=872SB000014B&QueryText=%22election+integrity%22&DocType=B.

[179] House Elections Committee Hearing Transcript, 8 April 2021, at 3.

[180] *Satisfactory in Texas,* BALTIMORE SUN (June 26, 1906), 12.

session. Senator Hughes begrudgingly admits to a lack of problems in the 2020 general election and then

seemed to back off. However, when asked to identify any evidence of voter fraud Hughes tried to

change the subject:

**Senator Miles:**  So, basically from the federal courts, from the federal Washington, D.C., FBI Director, Homeland Security, and even our state secretary, no evidence of any type of voter fraud was found. We're on the same page with that?

**Senator Hughes:**  As I recall, they were talking about voting systems and hacking electronics like that, but yes, Sir--

**Senator Miles:**  No.

**Senator Hughes:**  --the 2020 elections in Texas went a lot better than most places.

**Senator Miles:**  Solid and secure.

**Senator Hughes:**  Yes, Sir.

**Senator Miles:**  Solid and secure. We can establish that. Solid and secure.

**Senator Hughes:**  As far as the--

**Senator Miles:**  As far as fraud of any type.

**Senator Hughes:**  --now, well are you asking if there's any fraud at all or if there--

**Senator Miles:**  Yeah, yes, Sir.

**Senator Hughes:**  --it went well?

**Senator Miles:**  If you could tell me what fraud existed in the 20, November 2020.

**Senator Hughes:**  Well Senator, you know, November 2020 is not the only election that, that we have records of. There was 2018, and there was elections—

Senator Hughes did not follow-up with evidence of fraud from 2018 or any other Texas

elections.

Similarly, the House Sponsor of S.B.1, Republican Representative Briscoe, the Chair of the

House Committee on Elections, came up empty, with no evidence of voter fraud. when asked if the lack

of voter fraud in Texas meant that the bill was a solution in search of a problem that didn't exist. He said that "even one instance of fraud is too much."[181]

During House floor debates. in an exchange with Democratic Vice-Chair Gonzalez, Chair Cain reluctantly agreed with the finding of the Texas Secretary of State that the 2020 election about the absence of problem in the 2020 general presidential elections in Texas:

**Vice-Chair Gonzalez**: Do you agree with me because the Secretary of State's Office testified before our committee, that very first day, and the Secretary of State said that the 2020 elections was free, fair, safe, and secure. Do you not agree with that – with -- with -- what the Secretary of State said?

**Chairman Cain**: I – I think that's her opinion. Sure.

**Vice-Chair Gonzalez**: That you think what?

**Chairman Cain**:  Mm -hm – yes. Well I – I think, yeah. I think for the most part it was free, fair, and safe. But we – I mean we heard testimony – that said otherwise.

**Vice-Chair Gonzalez**: But if the secretary – I mean the Secretary of State's office was there for a reason and so I would imagine –

**Chairman Cain**: They're there at every meeting.

**Vice-Chair Gonzalez**: -- that  -- that their opinion would be highly regarded that our elections were safe and secure.

**Chairman Cain**: Okay.

**Vice-Chair Gonzalez**: Or do you disagree with the Secretary of State's Office.

**Chairman Cain**: I – I mean I've heard – I've heard people say that they disagree with the Secretary of State's Office in Committee – so.

**Vice-Chair Gonzalez**: So are you saying that you disagree with the Secretary of State's office, is what I am asking you.

**Chairman Cain**: I'm going – I think they're probably right in – in the adding up of --- of it all from what they way of (unintelligible) a free, fair, and – and secure election.

**Vice-Chair Gonzalez**: So as of right now our – our elections are safe and secure, correct?

---

[181] Exhibit A For Dropping H.B. 6, Press Reader, 2 April 2021, https://www.pressreader.com/.

**Chairman Cain**: What this bill seeks to do is to make them safer and more secure.

**Vice-Chair Gonzalez**: I'm asking – I'm asking you – I mean if the Secretary of State's office said that and you said you – you agree with them, right.

**Chairman Cain**: Okay. [182]

Ultimately, Chairman Cain resorted to conjecture.

**Vice-Chair Gonzalez**: So if it's not broken then what – what are we trying to fix here that is not broken?

**Chairman Cain**: Well, I – I happen to believe that – you know, we don't need to wait for – for bad things to happen in order to try and protect and secure these elections and to make sure that this is a process that – everyone is following.[183]

Chairman Cain had no basis in evidence for speculating that contrary to decades of experience with many millions of ballots cast in Texas, that somehow a rash of voter fraud would emerge in the future absent his omnibus election bill.

The reason for these admissions and conjectures from the primary backers of "Election Integrity" bills is simple. Voter fraud was vanishingly rare not just in 2020, but in earlier elections as well. The website of the Attorney General's Election Integrity Unit indicates that since 2005, it successfully prosecuted voter fraud cases against 155 individuals and had pending cases against another 43 individuals. During this period the citizens of Texas cast some 94 million ballots. An analysis by the that, If you "Add to that 19 cases catalogued by the conservative Heritage Foundation, which include federal and county prosecutions, and you get a grand total of 174," the *Houston Chronicle* noted … "Together, they represent

---

[182] House Floor Debate Transcript, 6 May 2021, at 8-10.

[183] *Id*. at 11-12.

0.000185 percent of the total votes cast — or 1 in 540,000 voters."[184] Voters statistically are less likely to commit fraud than to be hit by lightning, which has odds of one in 500,000 according to the CDC.[185]

The *Chronicle* added that:

"Alas, most crimes were so minor that only 33 of the 174 perpetrators went to jail, most for less than a year. An analysis of media accounts and the attorney general's prosecution records obtained by this editorial board through the Texas Public Information Act shows that most cases ended with plea agreements — pre-trial diversion deals or probation. Of the 33 people who were sentenced to any jail time, none were the criminal masterminds conjured up to instill fear in the hearts of freedom-loving Americans. Some are felons who were not yet eligible to vote again, a few were small-town politicians falsely registering voters, others filled out another person's absentee ballot. Only five cases — yes, five out of 94 million — involved voter impersonation at the polls, that near-mythic species of voter fraud that launched Texas' epic battle for a voter ID law."[186]

These cases hardly justified a massive 67-page omnibus bill, filed with voter restrictions. Such a bill would not at any rate prevent random, isolated cases of voter fraud in Texas.

Attorney General Paxton, an important backer of S.B. 1 and earlier legislation, claimed that despite his best efforts, encompassing 22,000 hours, to ferret out fraud, implausibly claims that fraud is difficult

---

[184] Attorney General of Texas, Election Integrity Unit, *Election Integrity*, https://www.texasattorneygeneral.gov/initiatives/election-integrity; Editorial Board, *Editorial: The Big Lie – If Voter Fraud is an Epidemic Why Can't Texas Find It?* HOUSTON CHRONICLE (April 19, 2021), https://www.houstonchronicle.com/opinion/editorials/article/Editorial-The-Big-Lie-If-voter-fraud-is-an-16107109.php?utm_medium=referral&utm_campaign=socialflow&utm_source=facebook.com.

[185] CDC, *Lightning: Victim Data*, https://www.cdc.gov/disasters/lightning/victimdata.html.

[186] *Id.*, *Editorial: The Big Lie*.

to detect and blames the lack of results on insufficient resources to track down fraud. [187] Richard L. Hasen, an election law professor at the University of California at Irvine, and an authority on elections and voting disagreed. He noted that Paxton, who is seeking reelection has "every incentive," politically, to find voter fraud and energize his Republican base. "He's finding very little of it despite spending a lot of money and using a lot of resources looking for it," Hasen said. "The reason is not that such fraud is too hard to find. Those that commit voter fraud tend not to be brain surgeons. The reason he's not finding a lot of it is because voter fraud is rare." [188] As documented below, a forensic audit of four pre-selected counties by the Texas Secretary of State focused on assessing fraud confirmed that fraud in Texas is vanishingly small at best.

Paxton's anti-fraud campaign suffered a setback in December 2021 when the all-Republican State Court of Criminal Appeals – the highest court on criminal matters – ruled that the Attorney General lacked the authority under the Texas Constitution to prosecute voter fraud without an explicit authorization from county prosecutors. [189] Eight of the court's nine justices signed on to the opinion. Rather than respecting the independence of the Texas judiciary, Paxton denounced the decision and launched a political campaign to compel the justices into reversing their ruling. In 2019, Paxton had tweeted "We need judges devoted to the constitution and strict application of the law, not to the political winds of the day." This time, however, Paxton questioned the Republican loyalty of the justices and on a TV program run by MyPillow CEO Mike Lindell, a prominent advocate of the "Big Lie" of a stolen presidential election in 2020, Paxton

---

[187] Taylor Goldenstein, Taylor Goldenstein, *Texas AG Paxton's $2.2M voter fraud unit closed three cases in 2021. GOP lawmakers still boosted its budget.*, Houston Chronicle (Dec. 17, 2021), https://www.houstonchronicle.com/politics/texas/article/Texas-AG-Paxton-s-2-2M-voter-fraud-unit-closed-16708051.php

[188] *Id.*

[189] *Texas v. Stephens*, No. PD-1033-20 (Dec. 15, 2021)

called upon voters to pressure the justices. "Call them out by name," he said. "I mean, you can look them up. There's eight of them that voted the wrong way. Call them, send mail, send email." Paxton said that unless the justices reconsider, he'll call upon Governor Abbott to summon a special session of the General Assembly prior to the 2022 elections, to enact legislation that would allow both his office and private individuals—to sue with the threat of "large penalties" in alleged cases of voter fraud. He said that even if such a law is unconstitutional, that would require the court "strike it down again, because it would take several years to go through that process, and at least we can keep that (law) in place through the next election."[190]

In an overt invocation of anti-Semitism that further questioned the integrity of Texas elections, Paxton charged that "Soros-funded district attorneys will have sole power to decide whether election fraud has occurred in Texas." The Jewish billionaire George Soros, a Holocaust survivor, is a frequent target of inflammatory attacks by Republicans in Texas. As demonstrated below, Republicans have charged Soros with using his money to foment a race war in the United States.[191]

The lack of voter fraud in Texas is consistent with national results for the 2020 election as affirmed by multiple officials of the Trump administration. The same lack of voter fraud nationwide is true of earlier elections as well. A nationwide 2011 study conducted by the Republican National Lawyers Committee and designed to root out as much voter fraud as possible found only 332 cases of voter fraud of any kind out of many hundreds of millions of ballots cast in primary and general elections across the United States. A more inclusive study by News21, a national reporting project of eleven universities, considered reported allegations of voter fraud (whether prosecuted or not), and News21 uncovered only

---

[190] Justin Miller, *Paxton Targets GOP Judges After They Strike Down His Powers on Voter Fraud*, TEXAS OBSERVER (January 28, 2022), https://www.texasobserver.org/paxton-targets-gop-judges-after-they-strike-down-his-powers-on-election-fraud/.

[191] *Id.*, Miller, *Paxton Targets*.

2,068 alleged fraud cases from 2000 to mid-2012. An updated analysis by the Conservative Heritage Foundation found only 1,340 allegedly "proven" cases of voter fraud nationwide from the 1980s through 2021, when billions of ballots were cast. President Trump's Presidential Advisory Commission on Election Integrity that he launched in 2017 disbanded after uncovering no significant evidence of voter fraud in its eight months of work.[192]

Post-election investigations and academic studies have demonstrated that the lack of evidence of significant voter fraud is not the result of insufficient efforts or the difficulty of detecting fraud. The Associated Press study of the 2020 election in six swing states, not only found no evidence of coordinated fraud, but also noted that most of the few isolated "potential" illegal votes were not counted. "The cases also underscore that suspected fraud is both generally detected and exceptionally rare," AP noted. "Election officials," it reported, "say that in most cases, the additional ballots were never counted because workers did their jobs and pulled them for inspection before they were added to the tally."[193]

Other post-election reviews found little if any evidence of voter fraud. In Arizona, the Maricopa County Election Department conducted an in-depth post-election review, by election professionals, of the 2020 general presidential election. Maricopa is Arizona's most populous county, with more than 2.6

---

[192] National Republican Lawyers Association, *Vote Fraud Survey* (November. 2011), http://www.rnla.org/survey.asp; *Election Fraud in America*, News21, (August 12. 2012), https://votingrights.news21.com/interactive/election-fraud-database/; Heritage Foundation, *Voter Fraud Cases*, https://www.heritage.org/voterfraud/search?state=TX&combine=&year=&case_type=All&fraud_type= All&page=2 ; Elizabeth Landers, Eli Watkins and Kevin Liptak, *Trump Dissolves Voter Fraud Commission; Adviser Said it Went 'Off the Rails,'* CNN (January 4, 2018), http://www.cnn.com/2018/01/03/politics/presidential-election-commission/index.html.ee also, generally, Lorraine C. Minnite, *The Myth of Voter Fraud* (Cornell University Press, 2010). The National Republican Lawyers' Committee after finding minimal evidence of voter fraud scrubbed its website that reported the results of its fraud study.

[193] "Christina A. Cassidy, *Far Too Little Voter Fraud to Tip the Election to Trump, AP Finds*, Associated Press (December 14, 2021), https://apnews.com/article/voter-fraud-election-2020-joe-biden-donald-trump-7fcb6f134e528fee8237c7601db3328f.

million registered voters, about 60% of the state total. The review included an analysis of the audit initiated by Republicans in the State Senate. The Republican audit was conducted by a firm Cyber Ninjas, which had not experience in election analysis, and was headed by Doug Logan who had endorsed Trump's claim of a stolen election.[194]

The Department's review found that "The November 2020 General Election was administered with integrity and the results were accurate and reliable. This has been proven through statutorily required accuracy tests, court cases, hand counts performed by the political parties and post-election audits." . With respect to voter fraud, the review found that even instances of potentially [not proven] questionable ballots fit "the very definition of exceptionally rare." The review concluded: "In total we found fewer than 100 potentially questionable ballots cast out of 2.1 million. This is the very definition of exceptionally rare." That equals less than .005 percent of ballots cast and less than 1 percent of Biden certified 10,457 vote margin of victory in the state. The review added, "None of these instances impacted the outcome or races and a thorough review by our election professionals confirmed there were no systematic issues related to ballot counting and processing in the November 2020 General Election." . The review did not report any instances or coordinated fraud.[195]

The review additionally found that "Faulty data analysis and lack of understanding of federal and state laws appear to have results in Cyber Ninjas incorrectly claiming thousands of legally registered voters may have cast ballots illegally." The election professionals that conducted the County review examined in-depth each of Cyber Ninjas claims. For example, they found that of claims that 33,102 voters

---

[194] Maricopa County Elections Department, *Correcting the Record: Maricopa Counties In-Depth Analysis of the Senate Inquiry* (January 2022), https://recorder.maricopa.gov/justthefacts/pdf/Correcting%20The%20Record%20-%20January%202022%20Report.pdf.

[195] *Id.*, at 2, 5.

"may have illegally voted because they moved prior to or during the election cycle," only 5 were potentially accurate. The professionals found that of 1,370 claims of persons who voted with incomplete names, were deceased, were late registrations, had duplicate voter IDs, or were multiple voters, only 32 were involved potentially illegal votes.[196]

In January 2022, CEO Logan disclosed that Cyber Ninjas is shutting down and laying off all its employees. The news came on the same day that Judge John Hannah of the Maricopa County Superior Court ordered the firm to pay $50,000 a day in fines until it complied with a public records request to release data from its audit. Logan said that he is selling the company's assets, filing for bankruptcy, and starting a new company Ironically, the results of his audit showed that Biden received a few more net votes in Maricopa County than officially reported.[197]

Post-election analyses of earlier elections disclose a similar lack of voter fraud. These include intensive investigations in Maryland in 1994, in Wisconsin in 2004, and Minnesota in 2008, These investigations included representatives of both parties and law enforcement officials. No criminal charges resulted in Maryland or Minnesota, and only 14 charges in Michigan out of 2.9 million ballots cast. All the Michigan charges involved either felon voting or double voting. None of the double-voting cases led to a conviction.[198]

---

[196] *Id.*, at 53, 60.

[197] Joseph Marks*, Cyber Ninjas Says Farewell*, WASHINGTON POST (January 10, 2022), https://www.washingtonpost.com/politics/2022/01/10/cyber-ninjas-says-farewell/.

[198] Eric Schroek, *Conservative Media Hype 'Not Accurate' Report To Suggest Franken's Election Was "An Illegal Victory*, MEDIA MATTERS (July 13, 2010), https://www.mediamatters.org/fox-friends/conservative-media-hype-not-accurate-report-suggest-frankens-election-was-illegal;  Steven H. Huefner, Daniel P. Tokaji, Edward B. Foley, and Nathan A. Cemenska, *From Registration to Recounts The Election Ecosystems of Five Midwestern States* (The Ohio State University Moritz College of Law: 2007), 121; Republican National Lawyer's Association, *Voter Fraud Study: Minnesota*, http://www rnla.org/survey.asp#mn.Jane Bowling, *Federal, State Investigations Close Governor's Race Probe*, THE DAILY RECORD  (August 24, 1995), 9; Michael James, *Sauerbrey Abandons Election Appeal*, BALTIMORE

Scholarly studies additionally refute the unsubstantiated allegation that voter fraud goes undetected. A decisive study deployed a methodology was designed "to detect the possibility of election fraud even in the absence of allegations or reports of such activity." The study focused on the 2006 general election in Georgia – *before* the implementation of voter photo ID in that state. They examined a common charge regarding voter fraud: that fraudsters were voting in the name of dead persons. Through the examination of public records, they found that 66 deceased persons apparently voted in the election. However, investigation showed that these were absentee voters who died after voting, or in-person voters who "were cleared as being mistakes." Thus of 2.1 million votes cast in Georgia's 2006, not a single vote was cast in-person in the name of a deceased person.[199]

A study of voter impersonation, using a methodology that does not depend on investigations of allegations of voter fraud (thus answering the claim of those who say that such fraud is hard to detect or verify) reaches several critical conclusions. The authors found, "no evidence of voter impersonation in the 2012 election." The authors also found "no difference between states with and without strict voter ID requirements (where it should be hardest)." The authors conclude that, "based on this evidence, strict voter ID requirements address a problem that was certainly not common in the 2012 U.S. election. Efforts to improve American election infrastructure and security would be better directed toward other initiatives."[200]

---

SUN, (January 16, 1995), https://www.baltimoresun.com/news/bs-xpm-1995-01-16-1995016076-story.html .Allan J. Lichtman, *When the Dead Speak*, GAZETTE.NET (October, 16, 1998), http://www.gazette.net/stories/101698/poliadmiss_31866.shtml.

[199] M. V. Hood III and William Gillespie "They Just Don't Vote Like They Used To: A Methodology to Empirically Assess Election Fraud." *Social Science Quarterly,* 93 (2012), 76-94.

[200] John S. Ahlquist, Kenneth R. Mayer, and Simon Jackman, "Alien Abduction and Voter Impersonation in the 2012;Presidential Election: Evidence From a Survey List Experiment*, Election Law Journal* 13 (2014), 460-473.

In yet another study, the authors develop "a more inclusive method of measuring voter fraud" that "can identify anomalies created by even small amounts of electoral fraud. It picks up many types of election fraud regardless of whether they were done by mail-in ballot, early voting, or election-day voting. It also measures these forms of fraud, whether done by only a few individual voters, a campaign operative, a vote broker, or even a corrupt election official." The authors found that "Our results support the conclusion that electoral fraud, if it occurs, is an isolated and rare occurrence in modern U.S. elections."[201]

The two most prominent cases that charged voter fraud in Texas involved Black voters and felon disenfranchisement. I noted above the case of Hervis Rogers on the cusp of the first 2021 special session in Texas. The Hervis arrest recalls the most prominent example of alleged electoral fraud arising from the 2016 election, which also involved an African American, Crystal Mason. She had voted a provisional ballot while on supervised release after serving a prison term. Although technically not eligible to vote Mason claimed that she was unaware of this disqualification. The state argued that she was notified. Mason's vote had no impact on the election because officials did not count her provisional ballot and, like Rogers, she would have been eligible to vote in many other states. Nonetheless, Mason was prosecuted, convicted, and sentenced to an extraordinary five years in prison. A lower court turned down her appeal and the case is still pending before the State Court of Criminal Appeals.[202]

After hearing testimony about the lack of systematic fraud in Texas elections, House Elections Committee member, Republican Keith Travis admitted, "you can't determine the size of the [fraud] problem until you completed a full investigation." The Attorney General had already completed an

---

[201] Ray Christensen & Thomas J. Schultz, *Identifying Election Fraud Using Orphan and Low Propensity Voters, American Politics Research*, 42 (2014), 330-333.

[202] Eleanor Dearman, *Attorneys Appealing Crystal Mason Illegal Voting Case, Look to New Texas Election Law,* SAN ANTONIO STAR-TELEGRAM (December 10, 2021), https://www.star-telegram.com/news/politics-government/article256503521.html.

intensive investigation with minimal results. Further, the results are now in of the first phase of the Texas Secretary of State's forensic audit of four large pre-selected counties -- Collin, Dallas, Harris and Tarrant—focused on assessing voter fraud.[203] Consistent with the admonition of Republican Collin County Judge Whitley, the audit demonstrated that voter fraud if it occurred at all in these counties was vanishing small.

Out of 3.88 million ballots cast in the four counties in the 2020 general election, the audit uncovered 60 "potential" double-voters and 17 "potentially" deceased voters. These are only "potential" illegal, not verified illegal voters, and not necessarily fraudsters. As documented above, an academic study of alleged votes cast in the name of deceased persons in Georgia found that the allegations evaporated upon investigation. Double-voting could result from mismatches or from persons, and if it occurs, may not involve intentional fraud, but an honest belief that persons could vote in different places where they held property. "Whether they voted in another state and Texas, voted more than once in their county, whether someone not a U.S. Citizen voted, which should not have been done, the vast majority will be resolved as clerical errors, or easily understood glitches in the process, rather than intentional illegal voting," said Cal Jillison Professor of political scientist at Southern Methodist University.[204]

The Secretary also reported only de-minimis discrepancies between the electronic and the partial hand count of ballots in the four counties. Among three precincts examined in Collin County the audit found a discrepancy of 17 votes. Among seven precincts in Dallas County, the audit found a discrepancy

---

[203] Together, the Citizen Voting Age Population ("CVAP") of the four counties selected for audit is 55.1 percent—nearly 8 percent higher than the rest of the State. *See* U.S. Census, American Community Survey 2019.

[204] Office of the Texas Secretary of State, *Phase 1 Progress Report: Full Forensic Audit of November 2020 General Election*, (December 31, 2021), https://www.sos.texas.gov/elections/forms/phase1-progress-report.pdf; Lori Brown, *Audit Finds No Widespread Fraud During 2020 Presidential Election in Texas*, "Fox4, (December 31, 2021), https://www.fox4news.com/news/audit-finds-no-widespread-fraud-during-2020-presidential-election-in-texas..

of 10 votes. Among ten precincts in Harris County the audit found a discrepancy of 5 votes. Among seven precincts in Tarrant County, the audit found a discrepancy of 0 votes. That adds to a minimal total discrepancy of 32 votes out of more than 18,000 votes examined in the precincts of the four counties. In Collin, Dallas, and Harris counties, officials pointed to clerical errors. The report did not note any indication of fraud.[205]

Remi Garza, president of the Texas Association of Election Administrators, said of the audit results, "There doesn't seem to be anything too far out of the ordinary with respect to the information that's provided."[206] "Once those are all investigated, we'll find very few votes cast illegally, and so Texas will come out looking pretty good," added Professor Jillison.[207]

## C. S.B. 1 Was Not Necessary To Increase Voter Confidence

Faced with the inability to sustain a justification based on fraud, backers of "Election Integrity" legislature turned to the vaguer concept of voter confidence in the integrity of the vote in Texas. Republican Representative Travis Clardy, a member of the House Elections Committee made this shift explicit in a Committee hearing:

So I, I appreciate that, but are hearing this argument that, well, it's only a dozen, it's only 500, you know, look at the population of the state of Texas, look at how many registered voters there are, it's the fractional number. Uh, but that's really not the point to me. It, it's the erosion of the competence that we have in our elections. [208]

---

[205] *Id.*, Office of the Texas Secretary of State.

[206] Andrew Stanton, *Texas Audit Demanded by Trump Fails to Find Significant Voting Issues*, NEWSWEEK (January 1, 2022), https://www.newsweek.com/texas-election-audit-demanded-trump-fails-find-significant-voting-issues-1664815.

[207] *Id.*, Brown, *Audit Finds No Widespread Fraud*.

[208] 19871, House Elections Committee Hearing Transcript at 00:28:51.

As the Democratic vice-chair Gonzalez later explained in the hearing, even the figure of 500 prosecutions since 2004 refers to the number of counts, not the number of cases, which is much smaller, as also documented above.[209]

Earlier, in March 2021, when Republicans were considering "Election Integrity" bills, Republican Representative Dustin Burrows held a townhall meeting. A woman asked him how the legislature planned to "change the way we vote in Texas." "It's a great question," Burrows responded. "After this last election, I think that people's confidence in our election system is down, and rightfully so. ..."[210]

Senator Bryan Hughes the Senate sponsor of the "Election Integrity" bills admitted that concerns about voter confidence that motivated the push for "Election Integrity" legislation was tied to Republican efforts to cast doubt on confidence in the results of the 2020 election nationwide. "This was already in process, but then the 2020 election was so in the national spotlight, and so many people have questions, so many people have concerns," Hughes said. "I would say that has raised the profile of the issue."[211] The House sponsor of the "Election Integrity" bills, Republican Representative Biscoe Cain said, the purpose was to "restore trust in the electoral process." In a joint statement Senator Hughes and the House sponsor Representative Briscoe Cain said, "There is nothing more fundamental to this democracy and our state than the integrity of our elections … When people do not have confidence in our electoral institutions, when political legitimacy is questioned, liberty is threatened." In a reference to business groups that opposed the "Election Integrity" bills, they added, "Even as the national media minimizes the importance

---

[209] *Id.* at 00:36:46.

[210] Elaina Plott, *The GOP Won It All in Texas. Then It Turned on Itself*, NEW YORK TIMES, (May 4, 2021), https://www.nytimes.com/2021/05/04/magazine/texas-republicans.html/

[211] Abigail Rosenthal, *The Texas GOP is Still Furious About Harris County's Drive-thru Voting*, CHRON (March 15, 2021), https://www.chron.com/politics/article/texas-drive-thru-voting-senate-bill-7-election-16026395.php

of election integrity, the Texas Legislature has not bent to the headlines or corporate virtue signaling." Ironically, in 2020, Cain had volunteered with Trump allies in Pennsylvania in a vain attempt to overturn an election that Biden won by "180,000 votes and invalidate Pennsylvania's electoral votes.[212] Republican Lieutenant Governor, Dan Patrick, who presides over the State Senate said, "People in America have lost faith in their elections, in the outcome. And we have to resolve that issue in this country and in the state." Republican Representative Andrew Murr, another sponsor of Election Integrity legislation, said, "We want Texans to be confident in the outcome of the system."[213]

However, proponents of the "Election Integrity" bills failed to demonstrate either that there was a crisis of confidence about elections in Texas or that a partisan bill, sponsored only by Republicans, pushed ahead by Republicans through numerous procedural deviations, and enacted by Republicans along party lines could broadly improve confidence in elections in the state.

Survey data demonstrates limited public support for more strict voting laws, or the "Election Integrity" measures pushed by Republicans in the General Assembly. The data demonstrates greater public support for initiatives to facilitate registration and voting than for restrictive legislation. These polls also need to be considered in light of the facts that despite increasing competitiveness, Texas is still a Republican voting state. In addition, Republicans control all the levers of government power in Texas, including every statewide elected official and substantial majorities in the General Assembly. In addition,

---

[212] Chuck Lindell, *GOP Unveils Final Version of Texas Elections Bill, Which Includes More Restrictions*, AUSTIN-AMERICAN STATESMAN (May 29, 2021), https://www.statesman.com/story/news/2021/05/29/gop-unveils-final-and-far-longer-version-texas-elections-bill-sb-7/5263347001/**;** Alexa Ura, *Texas House Committee Advances Bill That Would Make it a Crime For Election Officials to Send Unsolicited Vote-By-Mail Applications*, TEXAS TRIBUNE (April 8, 2021), https://www.texastribune.org/2021/04/08/texas-elections-vote-by-mail-applications/**.**

[213] Dan Patrick Press Conference Transcript, at 7; J. David Goodman, Nick Corasaniti, and Reid J. Epstein, *Texas GOP Passes Election Bill, Raising Voter Barriers Even Higher*, NEW YORK TIMES (August 31, 2021), https://www.nytimes.com/2021/08/31/us/politics/texas-voting-rights-bill.html.

backers of "Election Integrity" bills launched a propaganda campaign for such measures and Democrats suffered the problem of boycotting the General Assembly and fleeing the state. A University of Texas at Austin/Texas Tribune Poll for August 2021 found that 26% of respondents strongly supported Democrats leaving the state and 10% somewhat approved, for a sum 36%. However, 43% strongly opposed Democrats leaving the state and 4% somewhat opposed for a sum of 47%.[214]

Survey data demonstrate that Republicans drove any demand for more strict voting laws in 2021 and support for the "Election Integrity" measures being considered in the State Legislature. In its methodology for its Texas Poll with the Texas Tribune, the University of Texas at Austin combined Republicans and Democrats with independents who lean towards either party into a single category of "Lean Republican" and "Lean Democratic."

The Texas Poll demonstrates that in August 2021, when the legislature was finalizing S.B. 1 there was no majority public support among Texas registered voters for enacting stricter voting rules. As indicated in Table 22 and Chart 7, 39% of poll respondents believed that voting rules in Texas should be stricter, compared to 24% who believed they should be less strict and 30% who believed they should be left unchanged. Thus, a 54% majority believed that either rules should be kept the same or made less strict. The support that did exist for stricter voting rules, moreover, was driven only by Republicans. As further indicated in Table 22 and Chart 8, 68% of respondents who lean Republican favored more strict rules, whereas 4% favored less strict rules, and 23% favored keeping rules the same. In contrast, the responses of registered voters who lean Democratic are the opposite mirror-image of the lean Republican responses.

---

[214]   University of Texas at Austin/Texas Tribune Poll, August 2021, https://texaspolitics.utexas.edu/set/support-or-oppose-majority-democrats-texas-house-representatives-leaving-state-texas-delay.

Only 5% of respondents who lean Democratic favored more strict rules, whereas 67% favored less strict rules and 25% favored keeping rules the same.

The University of Texas/Texas Tribune poll for October 2021 additionally demonstrates that after the enactment of S.B. 1 there was less than majority approval for how state leaders and the legislature were handling election and voting laws. Again, approval was driven strictly by respondents who lean Republican. As indicated in Table 23 and Chart 9, 43% of all respondents approved of how state leaders and the legislature were handing election and voting laws, whereas 38% disapproved, 13% neither approved or disapproved and 5% were not sure. However, 73% of respondents who lean Republican approved, whereas only 9% disapproved, 16% neither approved or disapproved and 3% were unsure. In contrast, only 5% of respondents who lean Democratic approved, whereas 89% disapproved, including 81% who strongly disapproved; and 5% neither approved or disapproved and 5% were unsure.

A later University of Texas/Texas Tribune poll shows only limited support for measures considered by the General Assembly, in August 2021, when the Republican majority was finalizing the passage of S. B. 1. As shown in Table 24 and Chart 10, 46% of respondents supported the "new legislation on voting and elections being considered during the current special session," 32% were opposed, 14% were neither supportive or opposed, and 9% were unsure.

Survey data additionally demonstrates that despite false claims about lost confidence in election integrity advanced by Donald Trump and his allies in Texas, voter confidence about the integrity of elections in the state was high. That is, Texans drew a sharp distinction between the conduct of elections in their state and elsewhere in the nation as demonstrated by the findings of the University of Texas/Texas Tribune for February 2021, just as lawmakers were considering "Election Integrity" measures. Republicans in the General Assembly referenced the poll, if inaccurately, as shown below.

The poll showed high confidence in the accuracy of official Texas election results. It further showed much lower confidence in the accuracy of official national election results. As shown in Table 25 and Chart 11, 43% of poll respondents rated Texas results as very accurate and 35% as somewhat accurate for a sum of 78%. Only 5% rated Texas results as very inaccurate and 11 percent as somewhat inaccurate for a sum of 16%. The ratio between accurate and not accurate ratings is 7.1 to 1. By contrast, 36% of poll respondents rated national results as very accurate and 16 percent as somewhat accurate for a sum of 52%. Correspondingly, 30% rated national results as very inaccurate and 13 percent as somewhat inaccurate for a sum of 43%. The ratio between accurate and not accurate ratings is just 1.2 to 1. This data shows that the enactment of S.B. 1 in Texas was not in response to a lack of confidence about elections in the state, as compared to confidence about results nationally.

In hearings of the House Elections Committee Republican Representative Keith Bell sought to justify S.B. 1's predecessor by citing a lack of confidence in Texas election results from the Texas poll. However, he substituted the findings of the Texas poll on confidence in national results for confidence in Texas results. Bell explained: "You know, um, well, first of all, 43% of Texas believe our election results are inaccurate and that's according to the university of Texas center, Texas UN poll published in February of this year. So, there could be no mistaking the context of "our election results." [215] Bell immediately went on to discuss fraud prosecutions in Texas. However, as indicated in Table 25, the correct percentage from the February 2021 Texas Poll for a belief that Texas, not national, election results are inaccurate is not 43%, but 16%, 27 percentage points and 62.8% lower.

A comparison of voter confidence results before and after the enactment of S.B. 1 from the University of Texas/Texas Tribune poll demonstrated that this legislation did not increase voter

---

[215] 19734, House Elections Committee Transcript, at 01:47:50.

confidence in the accuracy of Texas election results. As shown in Table 26 and Chart 12, the percentage of Texas registered voters confident in the accuracy of Texas election results dipped slightly from 78% to 76%. More notably, the percentage of respondents "very confident" in the accuracy of Texas election results declined from 43 percent to 38 percent. This change is statistically significant at the standard .05 level in social science.

Statistical analysis shows that the fewer restrictions on voting, which result in lower cost of voting scores results in greater percentages of voters who are very confident about voting in their states. Chart 14, plots cost of voting scores against very confident findings in the states. The sharply downwardly sloping trend line is statistically significant at a level well below .01. It shows that for every 1-point increase in the cost of voting, this stringent measure of voter confidence declines by 5.35 percentage points. The linear correlation between COVI and this measure of high voter confidence is -0.44 out of a maximum of -1.0 and the squared linear correlation is 0.19, meaning cost of voting index accounts for about one-fifth of the differences across the states in voter confidence.

**CHART 14**
**RELATIONSHIP BETWEEN COST OF VOTING INDEX (COVI) AND THE PERCENTAGE OF VOTERS WHO ARE VERY CONFIDENT ABOUT THE VOTE IN THEIR STATES**



### D.  S.B. 1 Will Not Achieve Uniformity In Elections

"I'm trying to strike a midrange solution," said Republican Senator Paul Bettencourt, a prominent

supporter of "Election Integrity" measures in March 2021. "I'm not trying to disadvantage anybody or

create an advantage for anybody. I'm trying to come up with a uniform answer."[216] Representative Cain

---

[216] Alexa Ura, *Texas Republicans Begin Pursuing New Voting Restrictions as They Work to Protect Their Hold On Power,* TEXAS TRIBUNE (March 22, 2021), https://www.texastribune.org/2021/03/22/texas-republicans-voting-restrictions/.

said, "one of the main purposes of this bill is to standardize and make uniform as best we can our elections, so that regardless of where people live, they – they know how elections are supposed to run.[217]

Republicans never explained why uniformity was a desirable goal for a state with counties as diverse as Texas. Counties in the state range from Loving County, which cast 66 votes in the general election of 2020 and King County with which cast 159 votes to Harris County, which cast 1.64 million votes and Dallas County which cast .92 million votes.[218] Governor Greg Abbot's executive order that limited drop boxes to one per county had a disproportionate impact on heavily minority Harris County, which had to reduce its drop boxes from twelve to one, the same as Loving and King County.

The Abbott administration also violated the goal of applying standards equally to all counties, when, as noted above, on September 23, 2021, more than ten months after the 2020 general election, the governor's appointed Secretary of State announced a full forensic audit of the election, limited to just four selected counties: Collin, Dallas, Harris, and Tarrant.[219]

In addition, Republicans in the general assembly failed to promote the goal of uniformity in the state's primary elections. This year, for example, the Republican leadership of Potter County, a large county with 57,000 registered voters decided to abandon the non-partisan election board and electronic voting. In a departure from standard process elsewhere in the state, the Republicans who run the county decided to administer its own primary elections with voting with the county's own issuance of paper ballots. Mark P. Jones, a professor of political science at Rice University in Houston, said the move "removes the Republican Party one more step away from the standard electoral procedure." He added,

---

[217] House Elections Committee Hearing Transcript, 8 April 2021, at 58.

[218] *Texas presidential results*, Politico, https://www.politico.com/2020-election/results/texas/.

[219] Texas Secretary of State Announces Full Forensic Audit of 2020 General Election in Four Texas Counites: Collin, Dallas, Harris, and Tarrant (September 23, 2021), https://www.sos.texas.gov/about/newsreleases/2021/092321.shtml.

"The integrity of our electoral system depends on institutionalizing and professionalizing election boards. There will be more doubts about the overall outcome, or it will lead to more slip-ups and more potential flaws and problems than if the professionals ran it."[220]

Moreover, if uniformity is a goal, it need not be achieved by banning procedures that advance the Republicans' purported goal of making it "easy to vote." The legislature could also achieve uniformity by authorizing explicitly initiatives that facilitate not hinder voting in Texas. The legislature could explicitly authorize drive-thru and 24-hour voting, with whatever safeguards it deems necessary, such as prohibiting partisan bumper stickers. It could join most other states in establishing no-excuse absentee voting. It could join more than a third of the states in authorizing voting for felons on parole or probation.

Other polls likewise show substantial support for reforms to expand not limit opportunities for registration and voting. The findings in Table 27 from a July 2021 survey by Ragnar Research Partners shows the 74% of respondents backed extending early voting by a week, 80% backed allowing early voting locations to be open on weekends, 87% backed increasing voting locations on Election Day, 57% backed having alternative secure ballot return sites, and 83% backed voter assistance in returning ballots from family, household members or caregivers. The findings in Table 27 from the 2020 Survey of the Performance of American Elections shows that 58.5% of respondents backed automatically registering all citizens over 18 to vote, 51.5% backed same day registration, 54.7% backed moving Election Day to a weekend, 71% backed making Election Day a national holiday, 74.4% backed only selecting election officials on a non-partisan basis, and 74% backed automatically registering moving voters at their new home.

---

[220] Jennifer Medina, *Republicans in Texas County, In Unusual Move, Upend Primary System*, NEW YORK TIMES (December 10, 2021), https://www.nytimes.com/2021/12/10/us/politics/republicans-amarillo-potter-county-primary.html.

### E.  Republicans Have Expressed Racial Animus Toward Minority Texans

In the late stages of the debates on S.B. 1, Republican House Speaker Dade Phelan sought to ban the use of the word "racist" in the House chamber. "We can talk about racial impacts with this legislation without accusing members of this body of being racist," Phelan said.[221] After a statement by American Airlines criticized a version of S.B. 1, Lieutenant Governor Dan Patrick responded: **"**Well, let me tell you what, Mr. American Airlines, I take it personally. You're questioning my integrity, and the integrity of the governor, and the integrity of the 18 Republicans who voted for this. When you suggest we're trying to suppress the vote, you are - in essence, between the lines - calling us racist, and that will not stand," He added, "We have to heal this nation. And we can't heal this nation. If people cry racism on every issue at every turn, what's the end game in all of that short term gain, maybe it helps you win an election. Long-term divisiveness in this country."[222]

Despite Republicans in Texas taking umbrage at the suggestion that they harbor any racial animosity and seek only to heal divisions, the many overt, demeaning racial appeals promulgated by Texas Republicans in recent years tell a different story. They either demonstrate racial animus or at least a propensity to exploit racial bigotry and fears for political advantage. These appeals exploited and inflamed rather than dampened divisiveness or healed racial divisions as proponents of S.B. 1 professed as their goal. What follows is not fringe advocacy. Such advocacy includes Governor Greg Abbott who helped engineer the passage of SB 1 and signed it into law. It includes Texas Republican candidates and members of the state legislature and Congress, and officials of the Texas Republican Party.

---

[221] Rachel Scully, *Texas House State House Speaker Bans the Word 'Racism' Amid Voting Bill Debate*, THE HILL (August 27, 2021), https://thehill.com/homenews/state-watch/569671-texas-state-house-speaker-bans-the-word-racism-amid-voting-bill-debate.

[222] Dan Patrick Press Conference Transcript, 6 April 2021, at 10, 13.

Two weeks before the general election of 2006, Republican Tony Goolsby, an incumbent state representative from District 102, claimed his Democratic opponent, Harriett Miller, had committed voter fraud when the pair ran against each other two years earlier. The basis for this explosive charge was that she had received large numbers of votes in a heavily African American precinct, hardly unusual for a Democratic candidate. The Goolsby campaign sent out mailers claiming that Miller was under investigation for voter fraud (despite that no charges were ever filed) and anonymous mailers warned voters that they could be jailed if they committed voter fraud, a standard tactic for suppression of the African American and Hispanic vote.[223]

In 2014, then-Attorney General Greg Abbott, the leading candidate for the Republican nomination for Governor, invited rock performer Ted Nugent to join him as a featured guest on a campaign tour. Nugent is well-known for his bigoted anti-minority tirades. Nugent had called President Obama a "subhuman mongrel" and a "chimpanzee," terms used by white supremacists to characterize African Americans during the eras of slavery, segregation, and Jim Crow.[224] Nugent also had said that African Americans could not "honestly celebrate the legacy of Dr. King" until they "admit to the self-inflicted destructo-derby they are waging." Of allegedly armed undocumented immigrants, Nugent said, "I'd like to shoot them dead."[225] Nugent also said that "[i]f Barack Obama becomes the president in November, I

---

[223] Richard Whittaker, *Hard Fight '04, Dirty Fight '06, Court Fight '07*, AUSTIN CHRONICLE (Oct. 17, 2007), https://www.austinchronicle.com/daily/news/2007-10-17/551741/print /; Art Levine, *House Panel Launches Probe:Did FBI Ignore Threats To Jail Black Voters?*, *Huffington Post* (Apr. 9, 2008), https://www.huffpost.com/entry/house-panel-launches-prob_b_94263.

[224] Justin Sink, *Nugent: Obama a 'Subhuman Mongrel,'* THE HILL (Jan. 22, 2014), https://thehill.com/video/administration/196156-nugent-obama-a-subhuman-mongrel.

[225] Timothy Johnson, *20 Inflammatory Comments from State of the Union Invitee Ted Nugent*, MEDIA MATTERS (Feb. 11, 2013),https://www.mediamatters.org/national-rifle-association/20-inflammatory-comments-state-union-invitee-ted-nugent ; Timothy Johnson, *Ted Nugent Proposes Treating Undocumented Immigrants "Like Indentured Servants"*, MEDIA MATTERS (May 13, 2013),

will either be dead or in jail by this time next year," which prompted a visit from Secret Service agents.[226]

Despite all of these statements, now-Governor Abbott chose Nugent to be a prominent face of his campaign.[227]

Abbott is not the only statewide Texas leader to associate himself closely with Ted Nugent. Sid Miller, former Republican member of the Texas House and ultimately successful candidate for Agriculture Commissioner, appointed Nugent the Treasurer of his campaign in 2014.[228] Instead of distancing himself from Nugent's statements, which were widely perceived as racist, Miller embraced them. As Miller's spokesman stated: "[w]e are not going to do anything to distance ourselves from Ted Nugent," and that "[i]f we had concerns about some of the things that Mr. Nugent has said or done, we wouldn't have reached out to him and asked him to become involved in our campaign on such a high level."[229] Miller continues to spread stereotypes connecting minorities and violence while in office. In 2017, for example, he spread

---

https://www.mediamatters.org/national-rifle-association/ted-nugent-proposes-treating-undocumented-immigrants-indentured-servants.

[226] Elias Isquith, *Ted Nugent Writes Insanely Racist Op-Ed About the Legacy of Martin Luther King Jr.*, *Salon* (Jan. 17, 2014), https://www.salon.com/2014/01/16/ted_nugent_writes_insanely_racist_op_ed_about_the_legacy_of_martin_luther_ king_jr/; *see* Ted Nugent, *What Would Dr. King Say About Black Culture?*, WND (Jan. 15, 2014), https://www.wnd.com/2014/01/what-would-dr-king-say-about-black-culture/.

[227] ABC News, *Ted Nugent Rocks Texas Campaign for GOP's Greg Abbott*" (Feb. 18, 2014), http://abcnews.go.com/blogs/politics/2014/02/ted-nugent-rocks-texas-campaign-for-gops-greg-abbott/; New York Daily News, *Crowd Protests Nugent Concert*, (Aug. 6, 2013), http://www.nydailynews.com/news/national/ted-        nugentprotesters-target-new-haven-club-article-1.1419543.

[228] Ben Kamisar, *Agriculture Commissioner Candidate Stands by Ted Nugent*, DALLAS MORNING NEWS (Feb. 19, 2014), https://www.dallasnews.com/news/politics/2014/02/19/agriculture-commissioner-candidate-stands-by-ted- nugent/.

[229] *Id.*

a false claim that three hunters had been shot by Mexican immigrants, fomenting the stereotype that Hispanics are violent and dangerous.[230]

Chris Mapp, a candidate for U.S. Senate in the 2014 Republican primary, told the editorial board of the Dallas Morning News that ranchers should be allowed to shoot on sight anyone illegally crossing the border on to their land, referred to such individuals as "wetbacks." He then said such language is "normal" in Texas.[231]

Republican State Representative Debbie Riddle, from District 150, when running for re-election in 2014, said that foreigners and Middle Easterners are coming to the U.S. to deliver "terror anchor babies," and told an American student with a Middle Eastern name to move to Afghanistan. She said to her primary opponent Tony Noun—who is of Middle Eastern descent but has lived in the district for 25 years — "You need to go back to your country and run a campaign."[232]

In 2014, Republican Dallas County Judge candidate Ron Natinsky made a not-so-subtle racial appeal when he said that GOP candidates would benefit if persons in Eddie Bernice Johnson's predominantly-minority congressional district "spend their food stamp money" on Election Day instead of going to the polls. He said, "We don't want to motivate her voters. What we want them to think is: 'There's no reason. She doesn't have an opponent. I don't need to go to the polls. I'll go spend my food

---

[230] Brett Barrouquere, *Fake News? That Didn't Stop Sid Miller From Spreading It*, HOUSTON CHRONICLE (January 15, 2017), https://www.chron.com/news/houston-texas/texas/article/Fake-news-That-didn-t-stop-Sid-Miller-from- 10859067.php.

[231] *Report: Senate Candidate From Texas Urges Border Residents To Shoot 'Wetbacks' On Sight*, FOX NEWS (February 16, 2014), https://www.foxnews.com/politics/report-senate-candidate-from-texas-urges-border-residents-to-shoot- wetbacks-on-sight; Kolton Parker, *South Texas Senate Hopeful Slammed for Racial Slur*, SAN ANTONIO EXPRESS (February 21, 2014), https://www.mysanantonio.com/news/local/article/South-Texas-Senate-hopeful-slammed-for-racial-slur-5255976.php.

[232] Christopher Hooks, *Primary Madness: Down Ballot Roundup*, THE TEXAS OBSERVER (Feb. 24, 2014), https://www.texasobserver.org/primary-madness-ballot-roundup/.

stamp money at the grocery store, or whatever, you know, on Election Day.'" Natinsky added, "We don't need another five or ten thousand of her people going to the polls."[233]

In 2013, Ken Emanuelson, a leader of the Tea Party with close ties to the Dallas County Republican Party, was leading a meeting of Battlefield Dallas County, a group dedicated to turning out Republican voters in the upcoming elections. In response to a question about Republican outreach to black voters, Emanuelson said, "Well, I'm going to be real honest with you. The Republican Party doesn't want black people to vote if they're going to vote nine to one for Democrats." Emanuelson later tried to minimize the damage from these comments, saying it was his personal opinion only and not the official position of the Texas Republican party.[234]

Major figures in the state Republican Party have made similar remarks about minorities. Shortly after the Emanuelson controversy, U.S. Representative Kenny Marchant, in expressing opposition to overhauling the immigration laws, said, "If you give the legal right to vote to 10 Hispanics in my district, seven to eight of them are going to vote Democrat." A day after Marchant's comments were reported, at a national Republican meeting on immigration, another Texas Representative Michael Burgess questioned the political wisdom of providing citizenship to "11 million undocumented Democrats."[235]

---

[233] Gromer Jeffers, Jr., *GOP County Judge Candidate Natinsky Ripped for 'Food Stamp' Remark*, DALLAS MORNING NEWS (Oct. 28, 2014), https://www.dallasnews.com/news/local-politics/2014/10/28/gop-county-judge- candidate-natinsky-ripped-for-food-stamp-remark.

[234] Wayne Slater, "Update: Dallas Tea Party Activists Responds to Democratic Charge on Comments About Black Voters," DALLAS MORNING NEWS, (June 4, 2013), https://www.dallasnews.com/news/politics/2013/06/04/update-dallas- tea-party-activist-responds-to-democratic-charge-on-comments-about-black-voters/.

[235] Annie-Rose Strasser, *Congressman Opposes Immigration Reform Because He Fears Latino Vote*, THINKPROGRESS (June 17, 2013), https://thinkprogress.org/congressman-opposes-immigration-reform-because-he-fears-latino-voters-5162381b4029/.

In 2018, a white candidate for Dallas County Commissioner, Vickers "Vic" Cunningham, explained to the *Dallas Morning News* that he believed his children should only marry a Caucasian person, and that doing otherwise would not be "Christian."[236]

In a 2018 campaign ad Republican U.S. Senator, Ted Cruz sought to associate his Democratic opponent with murderous illegal immigrants. The ad featured a picture of a Hispanic man with the caption. "Suspect in **killing** of San Francisco woman had been **deported five times**." The ad does not mention that the "suspect" had been acquitted of the murder in 2017.[237]

In 2018, U.S. Representative Pete Sessions in Congressional District 32 ran a digital ad with his African American opponent's name over a picture of a darkened hand over the mouth of a white woman (Figure 1). Sessions also accused his opponent of wanting to legalize crack cocaine, a drug that plays a significant role in stereotypes about African Americans.[238]

---

[236] Naomi Martin, *White, Straight and Christian: Dallas County Candidate Admits Rewarding His Kids if They Marry Within Race*, DALLAS MORNING NEWS (May 18, 2018(, https://www.dallasnews.com/news/2018/05/18/white-straight-and-christian-dallas-county-candidate-admits-rewarding-his-kids-if-they-marry-within-race/.

[237] Campaign Legal Center*, Race in Our Politics: A Catalogue of Campaign Materials*, https://campaignlegal.org/race-our-politics-catalog-campaign-materials; Daniel Arkin and Corky Siemaszko, *Shooting of Kathryn Steinle: San Francisco Pier Killing Found Not Guilty of Murder, NBC NEWS* (November 30, 2017), https://www.nbcnews.com/news/us-news/jose-ines-garcia-zarate-san-francisco-pier-killing-suspect-found-n823351.

[238] Julia Craven, *Here's a Running List of Racist Attacks Against Candidates of Color*, HUFFINGTON POST (Oct. 24, 2018), https://www.huffpost.com/entry/racist-attacks-candidates-of-color-midterm-elections_n_5bc0e7b5e4b0bd9ed559f1d7.

**FIGURE 1**
**PETE SESSIONS AD AGAINST COLIN ALLRED, 2018 CONGRESSIONAL DISTRICT 32**



During the campaign for the 2018 election, Republican incumbent Pete Olson faced Democratic challenger Sri Preston Kulkarni, a person of East Indian heritage, in the 23rd congressional district. Olson demeaned Kulkarni, who had lived in Texas since the age of two, as a "liberal Indo-American who is a carpetbagger" and wondered if his funding is "coming from overseas." In support of Olson, the Fort Bend County Republican Party circulated a circulated an ad depicting a Hindu god, Lord Ganesha, and asking "Would you worship a donkey or an elephant? The choice is yours." (Figure 2) The Hindu American

Foundation condemned the ad. It said that the ad equated "Hindus' veneration of the Lord Ganesha with choosing a political party based on its animal symbol."[239]

**FIGURE 2**
**CONGRESSIONAL DISTRICT 23 CONTEST BETWEEN INCUMBENT REPUBLICAN PETE OLSON AND INDIAN-AMERICAN DEMOCRAT SRI PRESTON KULKARNI IN 2018**



---

[239] *Id.*

In his 2020 campaign at a time of rising hate-crimes against Asian-Americans, Congressional District 24 incumbent Mike McCaul ran an ad against his Democratic opponent Mike Siegel which falsely charged that "The Chinese Communist Party unleashed a pandemic on the world."  The had then claimed that "Mike Siegel still defends the communist regime." As proof, the ad quotes a speech that Siegel delivered in 2014, years before the pandemic. Siegel's remarks had nothing to do with Communist China or his current views on any matter. Instead, he was recounting his family's history, saying, "I'm here as a proud red diaper baby… and I would say in our family, my mom's the Che, and my dad's the Fidel."[240]

During the 2020 campaigns in Texas, leading county party chairpersons, and one statewide elected official – Sid Miller -- made overt racial appeals that denigrated and demeaned Black people, the most loyal Democrats in Texas. Keith Nielsen, the GOP chairperson-elect in Harris County, Texas' most populous county, posted an image on Facebook that showed a Martin Luther King Jr. quote — "Injustice anywhere is a threat to justice everywhere" — on a background with a banana (Figure 3). The juxtaposition of a Black person with a banana, reprises one of the oldest and worst racial slurs that represents Black people with monkeys. It is a barely more indirect version of Ted Nugent's calling Barack Obama a "chimpanzee." Despite condemnation of his post from some prominent state leaders, Nielsen still assumed his position as the GOP Chair of the state's most populous county.

---

[240] America's Voice, *2020 Ad Tracker*, http://2020adwatch.com/taxonomy/term/176?page=2.

**FIGURE 3**
**KEITH NIELSEN, CHAIR-ELECT, HARRIS COUNTY REPUBLICAN PARTY,**
**2020 FACEBOOK POST**



In late May 2020, Sue Piner, Chair of the Comal County Republican Party posted a harsh picture of billionaire George Soros, a Holocaust survivor, with the following caption in capitals (Figure 4):[241]

I PAY WHITE COPS TO MURDER BLACK PEOPLE.

AND THEN I PAY BLACK PEOPLE TO RIOT BECAUSE RACE WARS KEEP

THE SHEEP IN LINE.

---

[241] Patrick Svitek, *Five Texas GOP County Leaders Share Racist Facebook Posts, Including One Juxtaposing an MLK Quote With a Banana,* TEXAS TRIBUNE (June 4, 2020), https://www.texastribune.org/2020/06/04/texas-greg-abbott-bexar-GOP-conspiracy/; Patrick Svitek, *Despite Promising to Step Aside After Racist Facebook Post, Keith Nielsen Becomes Harris County GOP Chair*, TEXAS TRIBUNE (August 3, 2020), https://www.texastribune.org/2020/08/03/keith-nielsen-harris-county/.

**FIGURE 4**
**SUE PINER, COMAL COUNTY GOP CHAIR, POST ON GEORGE SOROS AND BLACK CRIMINALS, 2020**



Cynthia Brehm, Chair of the Bexar County Republican Party, put out a Facebook post in 2020 entitled, "George Floyd – A Staged Event?"[242] (Figure 5) She wrote, "I think there is at the very least the 'possibility' that this was a filmed public execution of a black man by a white cop, with the purpose of creating racial tensions and driving a wedge in the growing group of anti deep state sentiment from common people …"

---

[242] Karina Kling, *Governor Abbott Calls for Bexar County GOP Chair to Resign After Floating George Floyd Conspiracy Theory*, SPECTRUM NEWS (June 4, 2020), https://spectrumlocalnews.com/tx/austin/news/2020/06/04/gov--abbott-calls-for-bexar-county-gop-chair-to-resign-after-floating-george-floyd-conspiracy-theory-.

**FIGURE 5**
**CYNTHIA BREHM, CHAIR BEXAR COUNTY REPUBLICAN PARTY, 2020 FACEBOOK POST**



Jim Kaelin, the Chair of the Nueces County Republican party, placed the same post on Facebook. He called it an "interesting perspective." Similarly, Lee Lester the Republican Chair of Harrison County, also perpetuated the conspiracy theory. He recirculated it in a party Facebook group. Lester wrote, "Food for thought: Copied from a post by a retired TX Ranger and ex-Sheriff: This article was sent to me by a state police investigator. I thought I would share it with you for your consideration."[243]

Cindy Weatherby, the Republican chairperson of Reagan County, shared a post with 21 "puzzling questions" about Floyd's death, including "Can someone really not breathe when someone kneels on his neck and is the victim really able to speak for considerable periods of time if he can't breathe?" and "Why did the kneeling officer appear completely cool and calm, as if he was posing for the camera?"[244]

Texas Agriculture Commissioner, Sid Miller, again engaged in racial appeals during the 2020 campaigns. Among many other racial appeals, Miller posted a picture of George Soros under the caption: "This man is pure evil." Miller then fabricates a statement that falsely appears from the post to be attributed to Soros, again in all capitals (Figure 6)[245]:

CLIMATE CHANGE DIDN'T WORK. IMPEACHMENT DIDN'T WORK. THE VIRUS DIDN'T WORK.

START THE RACE WAR.

---

[243] *Id.*, Wyndi Veigel, *Harrison County GOP Chair Called Out on Controversial Post*, THE MARSHALL NEWS MESSENGER (June 11, 2020), https://www.marshallnewsmessenger.com/news/harrison-county-gop-chair-called-out-on-controversial-post/article_d5a8d39a-a789-11ea-8d6a-0b32be52a127.html.

[244] Naomi Andu, Clare Proctor and *Miguel Gutierrez Jr., Conspiracy Theories and Racist Memes: How a Dozen Texas GOP County Chairs Caused Turmoil Within the Party,* TEXAS TRIBUNE  (June 5, 2020), https://www.texastribune.org/2020/06/05/texas-gop-chairs-racist-george-floyd/.

[245] Alex Samuels, In false Facebook posts, Texas Agriculture Commissioner Sid Miller Accused George Soros of Paying Protesters to 'Destroy' the Country, TEXAS TRIBUNE (June 5, 2020), https://www.texastribune.org/2020/06/05/sid-miller-george-floyd-protests/.

**FIGURE 6**
**SID MILLER ON GEORGE SOROS AND RACE WAR, 2020**



Lynne Teinert, the Republican Chair of Shackelford County, shared a picture of Soros with the similar text in 2020, "The pandemic isn't working. Start the racial wars."[246] A phony flyer circulated in Texas sought to associate Soros, Black people, and Democrats with violence (Figure 7). The flyer has a picture of a dangerous masked man next to a black power symbol. It reads: "Get paid to be a… Professional Anarchist! Get paid up to $200/Direct Action! Remember, Direct Action Gets The Goods. Contact your local Open Society Foundation Branch." It says funded by George Soros and lists the Thurston County Democrats as contacts. Republican Party Chairs, Doug Sanford, of Freestone County, Russell Hayter, of Hays County and Jaime Durham, of Foard County all shared the flyer. The flyer is

---

[246] *Id.*, Andu.

fabricated, nothing in it is true.[247] These posts portray Soros as an evil Jewish manipulator who pays off black people to do his bidden and instigate a race war in America.

**FIGURE 7**
**FALSE ADVERTISEMENT CIRCULATED BY REPUBLICAN PARTY CHAIRS IN TEXAS**



---

[247] Reuters Staff, *Fact Check: A Flyer Showing a Job Listing to Become a 'Professional Anarchist*, REUTERS, (June 5, 2020), https://www.reuters.com/article/uk-factcheck-fake-flyer-anarchist-soros/fact-check-fake-flyer-showing-a-job-listing-to-become-a-professional-anarchist-idUSKBN23926L.

Governor Greg Abbott and other state GOP leaders denounced the racial appeals by Republican Party officials (not Miller) and in some cases called for resignations. But no Republican was held accountable. Neilson slid into his position as Harris County GOP chairperson and all other chairpersons held their positions. Miller kept his job as Agriculture Commissioner and is running for reelection in 2022. So, Republicans in Texas had it both ways. They had racial appeals to their anti-minority base and verbal wrist-tapping to assuage more tolerant voters.

Overt racial appeals in 2020 were not limited to party officials and Agriculture Commissioner Miller. In her 2020 congressional campaign, Republican Genevieve Collins ran an ad that featured a photoshopped photo of her opponent, incumbent Democratic Representative Colin Allred (District 32), standing in front of violent rioters. The had falsely claimed that Allred had "voted to eliminate $600 million in funding for law enforcement." (Figure 8).[248]

[Continued on the following page]

---

[248] Simone Carter, *Allred Accuses Republican Opponent of Darkening His Skin in Campaign Mailers*, DALLAS OBSERVER (October 20, 2020), https://www.dallasobserver.com/news/allred-accuses-republican-opponent-of-darkening-his-skin-color-in-campaign-mailers-11956745.

**FIGURE 8**
**GENEVIEVE COLLINS AD AGAINST COLIN ALLRED, 2020 CONGRESSIONAL CAMPAIGN, DISTRICT 32**



In the 2020 campaign for Congressional District 24, the Republican Leadership Fund ran an ad against Democratic candidate Candace Valenzuela, who would be the first Afro-Latina to serve in the Texas congressional delegation. The ad accused her of endangering Texas families and featured a dark, menacing hooded figure. It included a blackened picture of Valenzuela (Figure 9). The National Republican Congressional Committee released another Valenzuela attack ad with a blackened picture. The ad falsely claims that Valenzuela "already supports citizenship for ALL illegal immigrants in the US." It shows her next to Elizabeth Warren holding a baby.[249] (Figure 10)

[Continued on the following page]

---

[249]   America's Voice, *2020 Ad Tracker*, http://2020adwatch.com/taxonomy/term/176?page=0, http://2020adwatch.com/taxonomy/term/176?page=5.

**FIGURE 9**
**REPUBLICAN CONGRESSIONAL LEADERSHIP FUND AND NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE (NRCC), AD AGAINST DEMOCRATIC CONGRESSIONAL CANDIDATE CANDACE VALENZUELA, CONGRESSIONAL DISTRICT 24**



**FIGURE 10**
**NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE, ANTI-VALENZUELA AD, 2020**



**FIGURE 11**
**SHELBY SLAWSON ANTI-LATINO IMMIGRANT AD, 2020**



Jackie Peden in her primary campaign against Cheryl Johnson, the Galveston County Tax Assessor in 2020 ran an ad that falsely accused Johnson of deliberately registering illegal aliens to vote in the county. Like the Slawson ad, the inflammatory racial appeal of this ad featured a fierce-looking, tattooed young Latino-looking man (Figure 12).[250]

The common depictions in Texas Republican ads of Latino immigrants as dangerous and threatening are not isolated examples. They are part of an "immigrant threat narrative" reflected in Texas's "anti-sanctuary city" legislation. A 2012 study by Professor Xia Wang of Arizona State University found that although the weight of evidence suggests that immigration does not cause more crime, this finding has not affected public perceptions of immigrant criminality because public opinion about immigrants seems to be driven more by stereotype than by empirical fact. Professor Wang found that "the perceived size of undocumented immigrants is likely to prompt perceptions of undocumented immigrants as a criminal threat for native respondents." The researcher also linked this perceived immigrant threat to "the media and politicians who desire to restrict immigration have portrayed undocumented immigrants as undeserving criminals." [251] In contradiction to this threat narrative, a study by the libertarian Cato Institute found "that in Texas, illegal immigrants were 37.1 percent less likely to be convicted of a crime than native-born Americans and legal immigrants were about 57.2 percent less likely to be convicted of a crime than native-born Americans."[252]

---

[250] America's Voice, *2020 Ad Tracker*, http://2020adwatch.com/taxonomy/term/176?page=0.

[251] Xia Wang, "Undocumented Immigrants as Perceived Criminal Threat: A Test of the Minority Threat Perspective,"

*Criminology*, 50 (2012): 743-776.

[252] Alex Nowrasteh, Criminal Immigrants in Texas in 2019: Illegal Immigrant Conviction Rates and Arrest Rates for Homicide, Sex Crimes, Larceny, and Other Crimes, CATO INSTITUTE (May 11, 2020), https://www.cato.org/immigration-research-policy-brief/criminal-immigrants-texas-2019.

**FIGURE 12**
**2020 GALVESTON COUNTY TAX ASSESSOR ELECTION, REPUBLICAN CANDIDATE JACKIE PEDEN AD AGAINST DEMOCRATIC INCUMBENT CHERYL JOHNSON**



Like the efforts to ban so-called Critical Race Theory from the classroom and enact new voter restriction laws, the pursuit of this threat narrative to frighten voters with dangerous, racist stereotypes, is part of a broad Republican strategy that extends beyond Texas. Republicans across the country have used similar or the same stock photos of fierce shirtless and tattooed, young Hispanic men as in Texas. Compare, for example, the photo in Jackie Peden's Texas campaign (Figure 11) ad with the photos from Republicans ad in New York and California (Figures 12 and 14).[253]

In 2021, Gary O'Connor the Democratic chairperson of Lamar County, Texas, used a racial slur when he called Black Republican Senator Tim Scott of South Carolina an "oreo." O'Connor resigned his position and apologized.  "I am deeply and sincerely sorry for my inappropriate and hurtful use of racist term I used to describe Sen. Tim Scott on my personal Facebook page. It was insensitive, and I have embarrassed myself and my party by its use," he said.[254]

By engaging in explicit and subtle racial appeals capitalizing on racial and ethnic stereotypes, candidates for office in Texas attempt to cause race and ethnicity to influence voters' choices at the polls.

[Continued on the following page]

---

[253] Campaign Legal Center, *Race in our Politics: A Catalogue of Campaign Materials*, https://campaignlegal.org/race-our-politics-catalog-campaign-materials; America's Voice, 2020 Ad Tracker, http://2020adwatch.com/

[254] Emma Colton, *Abbott demands Texas Democratic Party official step down following 'disgusting' racial slur against Tim Scott*, WASHINGTON EXAMINER (May 2, 2021), https://www.washingtonexaminer.com/news/abbot-demands-texas-democratic-party-official-step-down-racial-slur-tim-scott.

**FIGURE 13**
**REPUBLICAN PARTY AD AGAINST NASSAU CO. DEMOCRATIC EXECUTIVE, LAURA CURRAN, 2017**



**FIGURE 14**
**MIKE CARGILE, REPUBLICAN CANDIDATE FOR CONGRESSIONAL DISTRICT 35, AD AGAINST DEMOCRAT NORMA TORRES CALIFORNIA, 2020**

MS-13 commits shocking acts of violence to instill fear, including machete attacks, executions, gang rape, human trafficking, and more. Their motto is to "kill, rape, control."

But to Nancy Pelosi? She referred to MS-13 saying, "we are all God's children ... we respect the dignity and worth of every person."

Norma Torres is cut from the same cloth. It's time we fire Norma Torres from Congress.



## **CONCLUSIONS**

S.B. 1 did not arise organically from any problems with Texas elections. Like omnibus restrictive laws in other states, S.B. 1 was part of a national Republican political strategy aimed at appealing to an Anglo base and restricting minority voter opportunity. In the words of Professor Grumbach, national political strategy was turning Republican-dominated states into "laboratories of democratic backsliding." Even before 2020, when Texas Republicans led the nation in promoting the "Big Lie" of a stolen election, the state reflected this anti-democratic strategy, with highest cost of voting score in the nation. These prior restrictions had already had a disparate impact on vulnerable minority voters in Texas. Texas' lagging turnout relative to other states in 2020 reflected Black and Hispanic participation rates below the national average in a state with Black and Hispanic CVAP above the national average. Anglo turnout, in contrast, exceeded the national average in 2020.

The enactment of S.B. 1 in Texas fit within a historical and ongoing pattern of official discrimination against minorities that included the same legislature that adopted this bill along party lines. Analysis shows that S.B. 1 cannot be justified by the de-minimis voter fraud in Texas or by a distrust in the integrity of Texas election results, as compared to national results. As in other states it was driven national political imperatives in a diversifying population and an expanding electoral base of minorities. The same legislature that adopted S.B. 1 also ignored that state's expanding minority population in its 2021 redistricting plan for Congress. The plan limited minority electoral opportunities to a level well below their representation among the state's eligible voters.

This same legislature also followed a national Republican political strategy in adopting a restrictive law on education. In minimizing the history of race and the relationship between racial discrimination and current racial inequities, SB 3 inculcates in students views that are held by most Republicans, but rejected by all others: Democrats, Independents, and affiliates of third parties. Like restrictive voter legislation,

adoption of the laws that take control over education are coordinated by ALEC and the Heritage Foundation. Numerous states with Republican-controlled legislatures have passed similar or nearly identical legislation to S.B. 3. Restrictions on education and voting are two halves of the same walnut. They are both part of an integral GOP across the nation to maintain and expand Republican political power by exploiting racial divides. In Texas, Republican officeholders, candidates, activists, and party officials have advanced this strategy through overt racial, political appeals.

Key provisions of S.B. 1 have a discriminatory impact on minority voters in Texas. The prohibition on previously legal drive-thru and 24-hour voting during the early voting period targets with surgical precision an option used by some 134,000 Harris County. As compared to other forms of early voting in the county, decision-makers in the General Assembly knew that minorities used these options far more than Anglo voters. The new stringent identification requirements for mail-in voting fall most heavily on minorities who as compared to Anglos have greater levels of poverty, lower levels of education, less access to documentary identification, and for Hispanics, much less proficiency in English. Already, the effects of these requirements are being felt with escalated rates of absentee ballot applications in Harris County and other counties with substantial minority populations. The reestablishment of a stringent purging process for alleged non-citizenship falls most heavily on non-whites who comprise nearly all of the immigrant population in Texas. Significant numbers of Texas citizens have been mistakenly arrested and detained as undocumented aliens. Already U.S. citizens have been ensnared in the purging and more than 2,000 voters removed from the rolls for failure to respond to a thirty-day notice for providing proof of citizenship. The increased latitude for partisan poll watchers opens a door for the intimidation of minority voters, consistent with the history of such intimidation by Republicans. The criminalization of the alleged impeding of poll watchers removes any effective restraint on such intimidation. Currently, Republicans in Harris County are seeking to recruit thousands of poll watchers from the suburbs with the

"courage" to go into heavily minority precincts in Texas under the false claim that voter fraud takes place in these precincts.

In the sequence of events, Donald Trump's "Big Lie" abetted by Republican leaders in Texas provided cover for enacting new "Election Integrity" legislation. Longer-term trends in the sequence of events a substantially expanded Black and Hispanic CVAP from 2010 to 2019 and a substantially falling white CVAP during this period. Corresponding with these demographic shifts, Texas has become more competitive for Democrats in recent years and the racial composition of absentee mail-in voting in Texas shifted from majority Anglo to majority minority

To push an "Election Integrity" law through the legislature in the face of concerted Democratic opposition, the majority Republicans resorted to many procedural deviations. Some of the most significant include postponing public hearings, delaying hearings for many hours until late at night, violating notice requirements for hearings, misleadingly engineering a conference committee in which Republicans behind closed doors added 12 pages of new provisions without fulfilling the rule for detailed justification. They included providing insufficient time for legislative review or public comment on new proposals and Governor Abbott's veto of legislative funding to pressure boycotting Democrats. Eventually the Republican majority in the State Legislature prevailed after Governor Abbott called a third special session to enact among other allegedly emergency measures an "Election Integrity" law even though there was no electoral emergency present.

Republicans in the General Assembly compounded these procedure deviations with significant substantive deviations. For the first time Republicans imposed stringent requirements on mail-in voting. This deviation followed a turnabout in mail-in voting from predominantly Anglo to predominantly minority. For the first time as well, the General Assembly imposed criminal and civil penalties on several aspects of the electoral process.

The failure of decision-makers to provide a non-racial rationale for banning drive-thru and 24-hour voting provides powerful confirmation of the racial intent behind the adoption of S.B. 1. In their lawsuit and contemporary statements Republicans showed that the specifically targeted drive-thru voting in heavily minority Harris County while ignoring the use of this option in other counties that on balance were heavily Anglo. Although drive-thru voting in Texas was initially adopted by a bipartisan committee for the 2020 primary process, Republicans only challenged the option after it had partisan implications in the 2020 general presidential election and attracted large numbers of Harris County voters. They could not justify their probation on the basis of fraud given the absence of any examples of fraud arising from drive-thru or 24-hour voting. So, they contrived pretextual and misleading justifications. Survey data found that drive-thru voters in Harris County, rated their experience far more positively than county voters using other forms of voting. Substantial majorities of both Democrats and Republicans rated their drive-thru voting experience as "excellent." The survey further data showed that Harris County drive-thru voters both Democrats and Republicans, had far more confidence in the integrity of their vote than county voters suing other voting options. It showed that nearly all drive-thru voters would use this option again in future elections.

More generally decision-makers in the General Assembly could not justify S.B. 1 on the basis of preventing fraud. They turned instead to the vaguer concept of promoting voter confidence in the integrity of Texas elections. Yet they failed demonstrate either that there was a crisis of confidence about elections in Texas or that a partisan bill, sponsored only by Republicans, pushed ahead by Republicans through numerous procedural deviations, and enacted by Republicans along party lines could broadly improve confidence. Survey data showed that there was no majority support for stricter elections laws in Texas and that such support that existed was driven solely by Republicans. Survey data additionally demonstrated that there was no crisis of confidence in Texas elections and that Texans sharply distinguished between

confidence in the results of state elections as compared to results for national elections. Prior promises that Texas' photo voter ID laws failed to materialize and the same was true of such laws enacted in states across the nation. Data further demonstrated that voters states with photo voter ID laws had less confidence in election integrity and greater beliefs that voter impersonation occurred in their states. Survey data further showed that after the adoption of S.B. 1, approval of how the General Assembly handled election and voting laws was again limited to Republicans.

The Heritage Foundation's "Election Integrity Scorecard," which included an array of restrictive measures that promised to advance voter confidence was negatively associated with the percentage of voters in the states that were "very confident" about the integrity of the vote. Analysis shows that the fewer restrictions on voting, which result in lower cost of voting scores results in greater percentages of voters who are very confident about voting in their states. The claim that the absence of fraud arises from insufficient investigations or the difficulty of detecting fraud is contradicted by the intense investigation of the Texas Attorney General, by the results of post-election scrutiny of fraud claims in other states, and by academic studies. The post-election "forensic audit" by the Texas Secretary of State in four pre-selected counties with substantial minority populations confirmed that at most fraud was vanishingly small.

The justification by decision-makers that S.B. 1 was needed to achieve uniformity across counties is unavailability. Decision-makers never explained why uniformity should apply to Texas counties with vastly different populations. Republicans also contradicted their advocacy of uniformity by their preselection of counties for the Secretary's forensic audit," and by failing to require uniformity for primary elections. In addition, uniformity could be obtained not by restricting options to facilitate voting like drive-thru centers, but by explicitly authorizing these options for all counties.

Claims by decision-makers that the adoption of S.B. 1 did not indicate any racial animus towards minorities is contradicted by the over racial appeals by Republicans in Texas, many of them issued in

2020. These appeals demonstrate racial animus or at least a propensity to exploit racial bigotry and fears for political advantage. The appeals exploited rather than dampened or healed racial divisions. The Republicans issued such appeals include leading party members, s Texas Republican candidates and members of the state legislature and Congress, and officials of the Texas Republican Party.

In sum, analysis demonstrates that all elements of the Arlington Heights assessment of racial intent are present in the enactment of S.B. 1 in Texas. The enactment is consistent with the ongoing history of official discrimination against minorities in Texas, including actions by the same legislature that passed S.B. 1. In multiple ways the legislation has a discriminatory impact on minorities. It follows a long-term and short-term sequence of racially linked events in Texas. Decision-makers pushed "Election Integrity" measures through the General Assembly through many procedural deviations and included significant substantive deviations in S.B. 1. Justifications for the bill by decision-makers are invariably pretextual and misleading. Ultimately, the enactment of S.B. 1 was not based on any demonstrable problems with voting and elections in Texas, which already had the most restrictive systems in the nation and ranked sixth among the states on the Heritage Foundation's "Election Integrity Scorecard. Rather the enactment of S.B. 1 but was part of a national Republican strategy that predated the 2020 elections of exploiting racial divisions for political gain.

## APPENDIX 1 : CURRICULUM VITAE

Allan J. Lichtman
9219 Villa Dr.
Bethesda, MD 20817

(240) 498-8738 h
(202) 885-2411 o

## EDUCATION

BA, Brandeis University, Phi Beta Kappa, Magna Cum Laude, 1967

PhD, Harvard University, Graduate Prize Fellow, 1973

## PROFESSIONAL EXPERIENCE

Teaching Fellow, American History, Harvard University, 1969-73

Instructor, Brandeis University, 1970, quantitative history.

Assistant Professor of History, American University, 1973-1977

Associate Professor of History, American University, 1977-1978

Professor of History, American University, 1979 –

Distinguished Professor, 2011 -

Expert witness in more than 90 redistricting, voting rights and civil rights cases

Associate Dean for Faculty and Curricular Development, College of Arts & Sciences, The American University 1985-1987

Chair, Department of History, American University, 1997- 2001

Regular political analyst for CNN Headline News, 2003-2006

## HONORS AND AWARDS

Outstanding Teacher, College of Arts and Sciences, 1975-76

Outstanding Scholar, College of Arts and Sciences, 1978-79

Outstanding Scholar, The American University, 1982-83

Outstanding Scholar/Teacher, The American University, 1992-93 (Highest University faculty award)

Sherman Fairchild Distinguished Visiting Scholar, California Institute of Technology, 1980-81

American University summer research grant, 1978 & 1982

Chamber of Commerce, Outstanding Young Men of America 1979-80

Graduate Student Council, American University, Faculty Award, 1982

Top Speaker Award, National Convention of the International Platform Association, 1983, 1984, 1987

National Age Group Champion (30-34) 3000-meter steeplechase 1979

Eastern Region Age Group Champion (30-34) 1500-meter run 1979

Defeated twenty opponents on nationally syndicated quiz show, TIC TAC DOUGH, 1981

 Listing in Marquis, WHO'S WHO IN THE AMERICA AND WHO'S WHO IN THE WORLD

McDonnell Foundation, Prediction of Complex Systems ($50,000, three years), 2003-2005

Organization of American Historians, Distinguished Lecturer, 2004 -

Selected by the Teaching Company as one of America's Super Star Teachers."

Associate Editor, International Journal of Operations Research and Information Systems, 2008 -

Keynote Speaker, International Forecasting Summit, 2007 and 2008

Cited authoritatively by United States Supreme Court in statewide Texas Congressional redistricting case *LULAC v. Perry* (2006)

Interviews nominated by the Associated Press for the Edward R. Murrow Award for broadcasting excellence.

WHITE PROTESTANT NATION: THE RISE OF THE AMERICAN CONSERVATIVE MOVEMENT: Finalist for the 2008 National Book Critics Circle Award in general nonfiction.

Elected Member, PEN American Center, 2009

Appointed Distinguished Professor, 2011

FDR AND THE JEWS: Designated for Belknap Imprint of the Harvard University Press, reserved for works of special distinction and lasting value; *New York Times* editors' choice book for 2013, submitted for Pulitzer Prize 2013, winner of Tikkun Olam Award for Holocaust Studies, winner of National Jewish Book Award in American Jewish Studies, finalist for Los Angeles Times Book Award in History.

THE CASE FOR IMPEACHMENT: Independent bookstore bestseller, Amazon.com bestseller in several academic categories, *Newsweek*, best new book releases, April 18, 2017.

Winner of the Alfred Nelson Marquis Lifetime Achievement Award for top 5% of persons included in Marquis WHO'S WHO, 2018.

Listed by rise.global as # 85 among 100 most influential geopolitical experts in the world.

**SCHOLARSHIP**

A. Books

PREJUDICE AND THE OLD POLITICS: THE PRESIDENTIAL ELECTION OF 1928 (Chapel Hill: University of North Carolina Press, 1979)

PREJUDICE AND THE OLD POLITICS: THE PRESIDENTIAL ELECTION OF 1928 (Lanham, MD: Lexington Books, 2000), reprint of 1979 edition with new introduction.

HISTORIANS AND THE LIVING PAST: THE THEORY AND PRACTICE OF HISTORICAL STUDY (Arlington Heights, Ill.: Harlan Davidson, Inc., 1978, with Valerie French)

ECOLOGICAL INFERENCE (Sage Series in Quantitative Applications in the Social Sciences, 1978, with Laura Irwin Langbein)

YOUR FAMILY HISTORY: HOW TO USE ORAL HISTORY, PERSONAL FAMILY ARCHIVES, AND PUBLIC DOCUMENTS TO DISCOVER YOUR HERITAGE (New York: Random House, 1978)

KIN AND COMMUNITIES: FAMILIES IN AMERICA (edited, Washington, D. C.: Smithsonian Press, 1979, with Joan Challinor)

THE THIRTEEN KEYS TO THE PRESIDENCY (Lanham: Madison Books, 1990, with Ken DeCell)

THE KEYS TO THE WHITE HOUSE, 1996 EDITION (Lanham: Madison Books, 1996)

THE KEYS TO THE WHITE HOUSE, (Lanham: Lexington Books Edition, 2000)

THE KEYS TO THE WHITE HOUSE, POST-2004 EDITION (Lanham: Lexington Books Edition, 2005)

THE KEYS TO THE WHITE HOUSE, 2008 EDITION (Lanham: Rowman & Littlefield, 2008)

WHITE PROTESTANT NATION: THE RISE OF THE AMERICAN CONSERVATIVE MOVEMENT (New York: Grove/Atlantic Press, 2008)

THE KEYS TO THE WHITE HOUSE, 2012 EDITION (2012, Lanham: Rowman & Littlefield)

FDR AND THE JEWS, (Cambridge: Harvard University Press, Belknap Imprint, 2013, with Richard Breitman).

THE KEYS TO THE WHITE HOUSE, 2016 EDITION (Lanham: Rowman & Littlefield)

THE CASE FOR IMPEACHMENT (HarperCollins, April 2017, updated paperback January 2018)

THE EMBATTLED VOTE IN AMERICA: FROM THE FOUNDING TO THE PRESENT (Harvard University Press, 2018)

REPEAL THE SECOND AMENDMENT: THE CASE FOR A SAFER AMERICA (St. Martin's Press, 2020)

THE KEYS TO THE WHITE HOUSE, 2020 EDITION (Lanham: Rowman & Littlefield, 2020)

THIRTEEN CRACKS: CLOSING DEMOCRACIES LOOPHOLES ((Lanham: Rowman & Littlefield, 2021)


Monographs:

"Report on the Implications for Minority Voter Opportunities if Corrected census Data Had Been Used for the Post-1990 Redistricting: States With The Largest Numerical Undercount," UNITED STATES CENSUS MONITORING BOARD, January 2001

"Report on the Racial Impact of the Rejection of Ballots Cast in the 2000 Presidential Election in the State of Florida," and "Supplemental Report," in VOTING IRREGULARITIES IN FLORIDA DURING THE 2000 PRESIDENTIAL ELECTION, United States Commission on Civil Rights, June 2001

B. Scholarly Articles

"The Federal Assault Against Voting Discrimination in the Deep South, 1957-1967," JOURNAL OF NEGRO HISTORY (Oct. 1969) REF

"Executive Enforcement of Voting Rights, 1957-60," in Terrence Goggin and John Seidel, eds., POLITICS AMERICAN STYLE (1971)

"Correlation, Regression, and the Ecological Fallacy: A Critique," JOURNAL OF INTERDISCIPLINARY HISTORY (Winter 1974) REF

"Critical Election Theory and the Reality of American Presidential Politics, 1916-1940," AMERICAN HISTORICAL REVIEW (April 1976) REF

"Across the Great Divide: Inferring Individual Behavior From Aggregate Data," POLITICAL METHODOLOGY (with Laura Irwin, Fall 1976) REF

"Regression vs. Homogeneous Units: A Specification Analysis," SOCIAL SCIENCE HISTORY (Winter 1978) REF

"Language Games, Social Science, and Public Policy: The Case of the Family," in Harold Wallach, ed., APPROACHES TO CHILD AND FAMILY POLICY (Washington, D. C.: American Association for the Advancement of Science, 1981)

"Pattern Recognition Applied to Presidential Elections in the United States, 1860-1980: The Role of Integral Social, Economic, and Political Traits," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCE (with V. I. Keilis-Borok, November 1981) REF

"The End of Realignment Theory? Toward a New Research Program for American Political History," HISTORICAL METHODS (Fall 1982)

"Kinship and Family in American History," in National Council for Social Studies Bulletin, UNITED STATES HISTORY IN THE 1980s (1982)

"Modeling the Past: The Specification of Functional Form," JOURNAL OF INTERDISCIPLINARY HISTORY (with Ivy Broder, Winter 1983) REF

"Political Realignment and `Ethnocultural` Voting in Late Nineteenth Century America," JOURNAL OF SOCIAL HISTORY (March 1983) REF

"The `New Political History:' Some Statistical Questions Answered," SOCIAL SCIENCE HISTORY (with J. Morgan Kousser, August 1983) REF

"Personal Family History: A Bridge to the Past," PROLOGUE (Spring 1984)

"Geography as Destiny," REVIEWS IN AMERICAN HISTORY (September 1985)

"Civil Rights Law: High Court Decision on Voting Act Helps to Remove Minority Barriers," NATIONAL LAW JOURNAL (with Gerald Hebert, November 10, 1986).

"Tommy The Cork: The Secret World of Washington`s First Modern Lobbyist," WASHINGTON MONTHLY (February 1987).

"Discriminatory Election Systems and the Political Cohesion Doctrine," NATIONAL LAW JOURNAL (with Gerald Hebert, Oct. 5, 1987)

"Aggregate-Level Analysis of American Midterm Senatorial Election Results, 1974-1986," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES (Dec. 1989, with Volodia Keilis-Borok) REF

"Black/White Voter Registration Disparities in Mississippi: Legal and Methodological Issues in Challenging Bureau of Census Data," JOURNAL OF LAW AND POLITICS (Spring, 1991, with Samuel Issacharoff) REF

"Adjusting Census Data for Reapportionment: The Independent Role of the States," NATIONAL BLACK LAW JOURNAL (1991)

"Passing the Test: Ecological Regression in the Los Angeles County Case and Beyond," EVALUATION REVIEW (December 1991) REF

Understanding and Prediction of Large Unstable Systems in the Absence of Basic Equations," PROCEEDINGS OF THE INTERNATIONAL SYMPOSIUM ON CONCEPTUAL TOOLS FOR UNDERSTANDING NATURE (with V. I. Keilis-Borok, Trieste, Italy, 1991).

"The Self-Organization of American Society in Presidential and Senatorial Elections," in Yu. Krautsov, ed., THE LIMITS OF PREDICTABILITY (with V.I. Keilis-Borok, Nauka, Moscow, 1992).

"'They Endured:' The Democratic Party in the 1920s," in Ira Foreman, ed., DEMOCRATS AND THE AMERICAN IDEA: A BICENTENNIAL APPRAISAL (1992).

"A General Theory of Vote Dilution," LA RAZA (with Gerald Hebert) 6 (1993). REF

"Adjusting Census Data for Reapportionment: The Independent Role of the States," JOURNAL OF LITIGATION (December 1993, with Samuel Issacharoff)

"The Keys to the White House: Who Will be the Next American President?" SOCIAL EDUCATION 60 (1996)

"The Rise of Big Government: Not As Simple As It Seems," REVIEWS IN AMERICAN HISTORY 26 (1998)

"The Keys to Election 2000," SOCIAL EDUCATION (Nov/Dec. 1999)

"The Keys to the White House 2000," NATIONAL FORUM (Winter 2000)

 "What Really Happened in Florida's 2000 Presidential Election," JOURNAL OF LEGAL STUDIES (January 2003) REF

"The Keys to Election 2004," SOCIAL EDUCATION (January 2004)

"History: Social Science Applications," ENCYCLOPEDIA OF SOCIAL MEASUREMENT (Elseveir, 2006)

"The Keys to the White House: Forecast for 2008," SPECIAL FEATURE, *FORESIGHT: THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING* 3 (February 2006), 5-9 with response: J. Scott Armstrong and Alfred G. Cuzan, "Index Methods for Forecasting: An Application to the American Presidential Elections."

"The Keys to the White House: Updated Forecast for 2008," *FORESIGHT; THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING* 7 (Fall 2007)

"The Keys to the White House: Prediction for 2008," SOCIAL EDUCATION (January 2008)

"The Keys to the White House: An Index Forecast for 2008," INTERNATIONAL JOURNAL OF FORECASTING 4 (April-June 2008) REF

"The Updated Version of the Keys," SOCIAL EDUCATION (October 2008)

"Extreme Events in Socio-Economic and Political Complex Systems, Predictability of," ENCYCLOPEDIA OF COMPLEXITY AND SYSTEMS SCIENCE (Springer, 2009, with Vladimir Keilis-Borok & Alexandre Soloviev)

"The Keys to the White House:  A Preliminary Forecast for 2012" INTERNATIONAL JOURNAL OF INFORMATION SYSTEMS & SOCIAL CHANGE (Jan.-March 2010)
REF

 "The Keys to the White House:  Forecast for 2012," <u>FORESIGHT: THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING</u> (Summer 2010)

"The Keys to the White House: Prediction for 2012," SOCIAL EDUCATION (March 2012)

"The Keys to the White House: Prediction for 2016," SOCIAL EDUCATION (February 2016)

"The Keys to the White House," SOCIAL EDUCATION (October 2016)

"The Keys to the White House: Forecast for 2016," WORLD FINANCIAL REVIEW (January-February 2016)

"Barack Obama" in James M. Banner, Jr., ed., PRESIDENTIAL MISCONDUCT: FROM GEORGE WASHINGTON TO TODAY (New Press, 2019)

"<u>The 2020 Presidential Election: How the Keys Are Pointing</u>**,**" SOCIAL EDUCATION, Jan./Feb. 2020.

"The Keys to the White House: Forecast for 2020," HARVARD DATA SCIENCE REVIEW (Oct. 2020) REF

 "The Alternative-Justification Affirmative: A New Case Form," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Charles Garvin and Jerome Corsi, Fall 1973) REF

"The Alternative-Justification Case Revisited: A Critique of Goodnight, Balthrop and Parsons, `The Substance of Inherency, `" JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Jerome Corsi, Spring 1975) REF

"A General Theory of the Counterplan," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Fall 1975) REF

"The Logic of Policy Dispute," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Spring 1980) REF

"Policy Dispute and Paradigm Evaluation," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Fall 1982) REF

"New Paradigms For Academic Debate," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (Fall 1985) REF

"Competing Models of the Debate Process," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (Winter 1986) REF

"The Role of the Criteria Case in the Conceptual Framework of Academic Debate," in Donald Terry, ed., MODERN DEBATE CASE TECHNIQUES (with Daniel Rohrer, 1970)

"Decision Rules for Policy Debate," and "Debate as a Comparison of Policy Systems," in Robert 2, ed., THE NEW DEBATE: READINGS IN CONTEMPORARY DEBATE THEORY (with Daniel Rohrer, 1975)

"A Systems Approach to Presumption and Burden of Proof;" "The Role of Empirical Evidence in Debate;" and "A General Theory of the Counterplan," in David Thomas, ed., ADVANCED DEBATE: READINGS IN THEORY, PRACTICE, AND TEACHING (with Daniel Rohrer, 1975)

"Decision Rules in Policy Debate;" "The Debate Resolution;" "Affirmative Case Approaches;" "A General Theory of the Counterplan;" "The Role of Empirical Evidence in Debate;" and "Policy Systems Analysis in Debate," in David Thomas, ed., ADVANCED DEBATE (revised edition, with Daniel Rohrer and Jerome Corsi, 1979)

C. Selected Popular Articles

"Presidency By The Book," POLITICS TODAY (November 1979) Reprinted:
LOS ANGELES TIMES

"The Grand Old Ploys," NEW YORK TIMES
Op Ed (July 18, 1980)

"The New Prohibitionism," THE CHRISTIAN CENTURY (October 29, 1980)

"Which Party Really Wants to `Get Government Off Our Backs`?" CHRISTIAN SCIENCE MONITOR Opinion Page (December 2, 1980)

"Do Americans Really Want `Coolidge Prosperity` Again?" CHRISTIAN SCIENCE MONITOR Opinion Page (August 19, 1981)

"Chipping Away at Civil Rights," CHRISTIAN SCIENCE MONITOR Opinion Page (February 17, 1982)

"How to Bet in 1984.  A Presidential Election Guide," WASHINGTONIAN MAGAZINE (April 1982) Reprinted: THE CHICAGO TRIBUNE

"The Mirage of Efficiency," CHRISTIAN SCIENCE MONITOR Opinion Page (October 6, 1982)

"For RIFs, It Should Be RIP," LOS ANGELES TIMES Opinion Page (January 25, 1983)

"The Patronage Monster, Con`t." WASHINGTON POST Free For All Page (March 16, 1983)

"A Strong Rights Unit," NEW YORK TIMES Op Ed Page (June 19, 1983)

"Abusing the Public Till," LOS ANGELES TIMES Opinion Page (July 26, 1983)

The First Gender Gap," CHRISTIAN SCIENCE MONITOR Opinion Page (August 16, 1983)

"Is Reagan A Sure Thing?" FT. LAUDERDALE NEWS Outlook Section (February 5, 1984)

"The Keys to the American Presidency: Predicting the Next Election," TALENT (Summer 1984)

"GOP: Winning the Political Battle for `88," CHRISTIAN SCIENCE MONITOR, Opinion Page, (December 27, 1984)

"The Return of `Benign Neglect`," WASHINGTON POST, Free For All, (May 25, 1985)

"Selma Revisited: A Quiet Revolution," CHRISTIAN SCIENCE MONITOR, Opinion Page, (April 1, 1986)

"Democrats Take Over the Senate" THE WASHINGTONIAN (November 1986; article by Ken DeCell on Lichtman`s advance predictions that the Democrats would recapture the Senate in 1986)

"Welcome War?" THE BALTIMORE EVENING SUN, Opinion Page, (July 15, 1987)

"How to Bet in 1988," WASHINGTONIAN (May 1988; advance prediction of George Bush's 1988 victory)

"President Bill?, WASHINGTONIAN (October 1992; advance prediction of Bill Clinton's 1992 victory)

"Don't be Talked Out of Boldness," CHRISTIAN SCIENCE MONITOR, Opinion Page (with Jesse Jackson, November 9, 1992)

"Defending the Second Reconstruction," CHRISTIAN SCIENCE MONITOR, Opinion Page (April 8, 1994)

"Quotas Aren't The Issue," NEW YORK TIMES, Op Ed Page (December 7, 1994)

"History According to Newt," WASHINGTON MONTHLY (May 1995)

"A Ballot on Democracy," WASHINGTON POST Op Ed (November 1, 1998)
"The Theory of Counting Heads vs. One, Two, Three," CHRISTIAN SCIENCE MONITOR Op Ed (June 22, 1999)

"Race Was Big Factor in Ballot Rejection, BALTIMORE SUN Op Ed (March 5, 2002)

"Why is George Bush President?" NATIONAL CATHOLIC REPORTER (Dec. 19, 2003)

"In Plain Sight: With the Public Distracted, George W. Bush is Building a Big Government of the Right," NEWSDAY, (August 7, 2005)

"Why Obama is Colorblind and McCain is Ageless," JEWISH DAILY FORWARD (June 26, 2008)

"Splintered Conservatives McCain," POLITICO (June 24, 2008)

"Will Obama be a Smith or a Kennedy," NATIONAL CATHOLIC REPORTER (October 17, 2008)

"What Obama Should Do Now," POLITICO (Jan. 22, 2010)

"Why Democrats Need Hillary Clinton in 2016," THE HILL, June 11, 2014

"How Corporations Buy Our Government," THE HILL, July 1, 2014

"Who Rules America," THE HILL, August 12, 2014

"The End of Civil Discourse?" THE HILL, September 10, 2014

"Pass the Ache Act and Stop Destroying Appalachia?" THE HILL, October 28, 2014

"Democrats Have No One to Blame But Themselves,' THE HILL, November 7, 2014

"Donald Trump's Best Friend: Bernie Sanders," THE HILL March 10, 2016

"Trump Had One Thing Right About Abortion," THE HILL, April 1, 2016

"What is so Progressive About Sanders' Old-Fashioned Protectionism," April 7, 2016

"Sanders is Only Helping Trump by Staying in Race," THE HILL, June 30, 2016

"7 Pieces of Advice for Hillary Clinton," THE HILL, July 25, 2016

"Donald Trump's Call For Russia To Hack Hillary Clinton's Email Is A New Low For American Politics — And Maybe A Crime, NEW YORK DAILY NEWS, July 27, 2016

"Here's the Big Speech Clinton Needs to Make," THE HILL, September 9, 2016

"The Real Story Behind Trump's Tax Returns," THE HILL, October 3, 2016

"Trump is Establishment No Matter What He Says," THE HILL, October 12, 2016

"Trump Brings the Big Lie About Voter Fraud," THE HILL, October 19, 2016

"How a New Clinton Presidency Will Change American Politics Forever," THE HILL, October 22, 2016

"The Media is Rigging the Election by Reporting WikiLeaks Emails," THE HILL, October 26, 2016

"Why James Comey Must Resign Now," THE HILL, November 3, 2016

"Why Trump is Vulnerable to Impeachment," USA TODAY, April 18, 2017

"Donald Trump Meet the Real Andrew Jackson," THE HILL, May 5, 2017

"Why Does Trump's Voter Fraud Commission Really Wants Your Personal Voter Information," THE HILL, August 3, 2017

"Trump is a Lot Closer to Being Impeached, TIME.COM, November 2, 2017

"American Democracy Could be at Risk in the 2018 Elections," VICE December 20, 2017

"We are One Tantrum Away From Accidental War With North Korea," THE HILL, January 25, 2018

"Democrats Can't Survive on Anti-Trumpism Alone," TIME.COM, January 28, 2018

"Don't Expect the Mueller Investigation to End Anytime Soon," VICE March 21, 2018

"President Trump Faces Political Disaster if he Tries to Fire Mueller," THE HILL April 5, 2018

"Framers Fail: Voting is a Basic Right But They Didn't Guarantee it in the Constitution," USA TODAY, September 26, 2018

Suppressing Voting Rights is as Old as the Republic, But the Tactics Change," ZOCALO, October 8, 2018

"Voter Fraud Isn't a Problem in America. Low Turnout Is," WASHINGTON POST, Made for History, October 22, 2018

"Here are five ways a Democratic US House might try to impeach Donald Trump," LONDON SCHOOL OF ECONOMICS, US CENTRE, October 26, 2018.

"The Midterm Results Will Reveal What Drives Voters: A Love or Hate of Trump," THE GUARDIAN, November 5, 2018

"Unless Democrats Find a 2020 Candidate Like Beto O'Rourke, Trump May Well Be Set to Win" THE DAILY CALLER, November 7, 2018

"Why Nancy Pelosi Should be the Next Speaker, FORTUNE, November 27, 2018

"It's Well Past Time to Restructure the U.S. Senate," DAILY CALLER, December 4, 2018

"The Seven Crucial Takeaways From William Barr's Confirmation Hearings," SPECTATOR USA, January 16, 2019

"Did Democrats Forfeit, 2020" THE HILL March 14, 2019

"Barr's 'Summary' Of The Mueller Report Hardly Vindicates Trump," DAILY CALLER, March 25, 2019

"Collusion and Obstruction by Trump remain Open Questions after Attorney General's "Summary" of the Mueller Report," ARTSFORUM, March 26, 2019

"21 Questions for Robert Mueller," THE HILL, April 24, 2019

With U.S. Representative Al Green, "Congress Has a Duty to go Through With the Impeachment and Trial of Donald Trump," THE HILL, May 17, 2019

"If Democrats Want to Beat Trump, They Need to Take off the Gloves in the Primary," GQ, June 26, 2019

 "Why Impeachment Of William Sulzer Is Solid Precedent For Donald Trump," THE HILL, September 9, 2019

"Not Futile To Impeach," NY DAILY NEWS, September 25, 2019

"Why Impeachment Favors Democrats In The Election," THE HILL, September 28, 2019

"If Trump is Impeached, Pence Should Go Too," TPM, October 7, 2019

"Time to Stop Talking 'Quid Pro Quo," and Start Looking at Actual Crimes," THE HILL, November 13, 2019

"Of all the Presidential Impeachment Inquiries, This is the One That Transcends Politics the Most," POLITICO, November 16, 2019

"Bill Barr's Dangerous Celebration of Unchecked Presidential Power, NEW YORK DAILY NEWS, November 25, 2019

"What Trump Really Wanted From Ukraine Was Not About Enemies," THE HILL, November 25, 2019

"Pelosi, Schiff Should Take More Time If They Want A Successful Impeachment Effort," DAILY CALLER, November 29, 2019

"It's Our Political System, Not Impeachment, That Is Broken. And Only Politics Can Fix It," POLITICO, December 6, 2019

"The 2010s Were the Decade That Brought Democracy to the Breaking Point," TPM, December 23, 2019

"Will Roberts Call Balls and Strikes at the Impeachment Trial," THE HILL, December 30, 2019

"The Bill Clinton Trial Cannot Serve as the Model for the Donald Trump Trial," THE HILL, January 8, 2020

"What Law Did Donald Trump Break?" THE HILL, January 23, 2020

"The Flawed Case of Alan Dershowitz," THE HILL, January 30, 2020

"What Will the History Books Say About This Impeachment," POLITICO, February 5, 2020

"Why Bernie Sanders is Electable," THE HILL, February 24, 2020

"The Ugly History of Trump's Looting/Shooting Threat," NEW YORK DAILY NEWS, May 29, 2020

"What Joe Biden Must do Now," THE HILL, June 10, 2020

"Bad Economies do not Threaten Lives," (with Sam Lichtman), THE HILL, July 6, 2020

"He Predicted Trump's Win in 2016: Now He's Ready to Call 2020," NEW YORK TIMES VIDEO, August 5, 2020

"Time to Jettison Horse Race Polls," THE HILL, November 19, 2020

"Here is the Smoking Gun Evidence to Back Impeachment of Donald Trump," THE HILL, February 8, 2021.

"There's No Constitutional Question: The Senate Can Try Trump," NEW YORK DAILY NEWS, February 8, 2021


Bi-weekly column, THE MONTGOMERY JOURNAL, GAZETTE 1990 – 2013

Election-year column, REUTERS NEWS SERVICE 1996 & 2000

Contributor: THE HILL, 2014-present

D. Video Publication

"Great American Presidents," The Teaching Company, 2000.

## TEACHING

Ongoing Courses

The History of the U. S. I & II, The Emergence of Modern America, The U. S. in the Twentieth Century, United States Economic History, Historiography, Major Seminar in History, Graduate Research Seminar, Colloquium in U. S. History Since 1865, The American Dream, The Urban-Technological Era, Senior Seminar in American Studies, Seminar in Human Communication.

New Courses: Taught for the first time at The American University

Quantification in History, Women in Twentieth Century American Politics, Women in Twentieth Century America, Historians and the Living Past (a course designed to introduce students to the excitement and relevance of historical study), Historians and the Living Past for Honors Students, How to Think: Critical Analysis in the Social Sciences, Pivotal Years of American Politics, Government and the Citizen (Honors Program), Introduction to Historical Quantification, Public Policy in U. S. History, Honors Seminar in U.S. Presidential Elections, America's Presidential Elections, What Is America?, Honors Seminar on FDR, Jews, and the Holocaust, The Modern American Presidency, Voting and Elections in America, American Conservatism.

## TELEVISION APPEARANCES

More than 1,000 instances of political commentary on NBC, CBS, ABC, CNN, C-SPAN, FOX, MSNBC, BBC, CBC, CTV, NPR, VOA, and numerous other broadcasting outlets internationally,

including Japanese, Russian, Chinese, German, French, Irish, Austrian, Australian, Russian, Swedish, Danish, Dutch, and Middle Eastern television.

Regular political commentary for NBC News Nightside.

Regular political commentary for Voice of America and USIA.

Regular political commentary for America's Talking Cable Network.

Regular political commentary for the Canadian Broadcasting System.

Regular political commentary for CNN, Headline News

Consultant and on-air commentator for NBC special productions video project on the history of the American presidency.

CBS New Consultant, 1998 and 1999

Featured appearances on several History Channel specials including *The Nuclear Football* and *The President's Book of Secrets*.

**RADIO SHOWS**

I have participated in many thousands of radio interview and talk shows broadcast nationwide, in foreign nations, and in cities such as Washington, D. C., New York, Atlanta, Chicago, Los Angeles and Detroit. My appearances include the Voice of America, National Public Radio, and well as all major commercial radio networks.

**PRESS CITATIONS**

I have been cited many hundreds of times on public affairs in the leading newspapers and magazines worldwide. These include, among many others,

*New York Times, Washington Post, USA Today, Los Angeles Times, Wall Street Journal, Miami Herald, Washington Times, St. Louis Post Dispatch, Christian Science Monitor, Philadelphia Inquirer, Time, Newsweek, Business Week, Le Monde, Globe and Mail, Yomuiri Shimbun, Die Welt, El Mundo, and South China Post,* among others.

**SELECTED CONFERENCES, PRESENTATIONS, & LECTURES: UNITED STATES**

Invited participant and speaker, Bostick Conference on Fogel and Engerman`s TIME ON THE CROSS, University of South Carolina, November 1-2, 1974

"Critical Election Theory and the Presidential Election of 1928," Annual Meeting of the American Historical Association, December 1974

"A Psychological Model of American Nativism," Bloomsberg State Historical Conference, April 1975

"Methodology for Aggregating Data in Education Research," National Institute of Education, Symposium on Methodology, July 1975, with Laura Irwin

Featured Speaker, The Joint Washington State Bicentennial Conference on Family History, October 1975

Featured Speaker, The Santa Barbara Conference on Family History, May 1976

Chair, The Smithsonian Institution and the American University Conference on Techniques for Studying Historical and Contemporary Families, June 1976

Panel Chair, Sixth International Smithsonian Symposium on Kin and Communities in America, June 1977

"The uses of History for Policy Analysis," invited lecture, Federal Interagency Panel on Early Childhood Research, October 1977

Invited participant, Conference on "Child Development within the Family - Evolving New Research Approaches," Interagency Panel of the Federal Government for Research and Development on Adolescence, June 1978

Commentator on papers in argumentation, Annual Meeting of the Speech Communication Association, November 1978

Commentator on papers on family policy, Annual Meeting of the American Association for the Advancement of Science, Jan. 1979

"Phenomenology, History, and Social Science," Graduate Colloquium of the Department of Philosophy," The American University, March 1979

"Comparing Tests for Aggregation Bias: Party Realignments of the 1930s," Annual Meeting of the Midwest Political Science Association March 1979, with Laura Irwin Langbein

"Party Loyalty and Progressive Politics: Quantitative Analysis of the Vote for President in 1912," Annual Meeting of the Organization of American Historians, April 1979, with Jack Lord II

"Policy Systems Debate: A Reaffirmation," Annual Meeting of the Speech Communication Association, November 1979

"Personal Family History: Toward a Unified Approach," Invited Paper, World Conference on Records, Salt Lake City, August 1980

"Crisis at the Archives: The Acquisition, Preservation, and Dissemination of Public Documents," Annual Meeting of the Speech Communication Association, November 1980

"Recruitment, Conversion, and Political Realignment in America: 1888- 1940," Social Science Seminar, California Institute of Technology, April 1980

"Toward a Situational Logic of American Presidential Elections," Annual Meeting of the Speech Communication Association, November 1981

"Political Realignment in American History," Annual Meeting of the Social Science History Association, October 1981

"Critical Elections in Historical Perspective: the 1890s and the 1930s," Annual Meeting of the Social Science History Association, November 1982

Commentator for Papers on the use of Census data for historical research, Annual Meeting of the Organization of American Historians, April 1983

"Thirteen Keys to the Presidency: How to Predict the Next Election," Featured Presentation, Annual Conference of the International Platform Association, August 1983, Received a Top Speaker Award

"Paradigms for Academic Debate," Annual Meeting of the Speech Communication Association, November 1983

Local Arrangements Chair, Annual Convention of the Social Science History Association, October 1983

"Forecasting the Next Election," Featured Speaker, Annual Convention of the American Feed Manufacturers Association, May 1984

Featured Speaker, "The Ferraro Nomination," Annual Convention of The International Platform Association, August 1984, Top Speaker Award

"Forecasting the 1984 Election," Annual Convention of the Social Science History Association Oct. 1984,

Featured Speaker, "The Keys to the Presidency," Meeting of Women in Government Relations October 1984

Featured Speaker, "The Presidential Election of 1988," Convention of the American Association of Political Consultants, December 1986

Featured Speaker, "The Presidential Election of 1988," Convention of the Senior Executive Service of the United States, July 1987

Commentary on Papers on Voting Rights, Annual Meeting of the American Political Science Association, September 1987.

Commentary on Papers on Ecological Inference, Annual Meeting of the Social Science History Association, November 1987.

Featured Speaker: "Expert Witnesses in Federal Voting Rights Cases," National Conference on Voting Rights, November 1987.

Featured Speaker: "The Quantitative Analysis of Electoral Data," NAACP National Conference on Voting Rights and School Desegregation, July 1988.

Panel Chair, "Quantitative Analysis of the New Deal Realignment," Annual Meeting of the Social Science History Association, Nov. 1989.

Keynote Speaker, Convocation of Lake Forest College, Nov. 1989.

Featured Speaker, The American University-Smithsonian Institution Conference on the Voting Rights Act, April 1990

Panel Speaker, Voting Rights Conference of the Lawyer's Committee for Civil Rights Under Law, April 1990

Panel Speaker, Voting Rights Conference of the NAACP, July 1990

Panel Speaker, Voting Rights Conference of Stetson University, April 1991

Panel Chair, Annual Meeting of the Organization of American Historians, April 1992

Panel Speaker, Symposium on "Lessons from 200 Years of Democratic Party History, Center for National Policy, May 1992

Olin Memorial Lecture, U.S. Naval Academy, October 1992

Commentator, Annual Meeting of the Organization of American Historians, April 1993

Panel presentation, Conference on Indian Law, National Bar Association, April 1993

Feature Presentation, Black Political Science Association, Norfolk State University, June 1993

Feature Presentation, Southern Regional Council Conference, Atlanta Georgia, November 1994

Master of Ceremonies and Speaker, State of the County Brunch, Montgomery County, February 1996

Feature Presentation, Predicting The Next Presidential Election, Freedom's Foundation Seminar on the American Presidency, August 1996

Feature Presentation, Predicting The Next Presidential Election, Salisbury State College, October 1996

Feature Presentation on the Keys to the White House, Dirksen Center, Peoria, Illinois, August 2000

Feature Presentation on American Political History, Regional Conference of the Organization of American Historians, August 2000

Testimony Presented Before the United States Commission on Civil Rights Regarding Voting Systems and Voting Rights, January 2001

Testimony Presented Before the United States House of Representatives, Judiciary Committee, Subcommittee on the Constitution, February 2001

Testimony Presented Before the United States Senate, Government Operations Committee, Regarding Racial Differentials in Ballot Rejection Rates in the Florida Presidential Election, June 2001

Testimony Presented Before the Texas State Senate Redistricting Committee, Congressional Redistricting, July 2003

Testimony Presented Before the Texas State House Redistricting Committee, Congressional Redistricting, July 2003

American University Honors Program Tea Talk on the Election, September 2004

Feature Presentation, The Keys to the White House, International Symposium on Forecasting, June 2006.

Feature Presentation, The Keys to the White House, International Symposium on Forecasting, New York, June 2007.

Keynote Speaker, Hubert Humphrey Fellows, Arlington, Virginia, 2007-2013

Feature Presentation, Forecasting 2008, Annual Meeting of the American Political Science Association, Chicago, August 2007

Keynote Speaker, International Forecasting Summit, Orlando, Florida, February 2008.

Feature Presentation on the Keys to the White House, Senior Executive's Service, Washington, DC, June 2008

Feature Presentation, American Political History, Rockford Illinois School District, July 2008

American University Honors Program Tea Talk on the Election, September 2008

Featured Lecture, Keys to the White House, American Association for the Advancement of Science, Washington, DC, September 2008

Keynote Speaker, International Forecasting Summit, Boston, September 2008

Keynote Lecture, Hubert Humphrey Fellows, Arlington, Virginia October 2008

Featured Lectures, Keys to the White, Oklahoma Central and East Central Universities, October 2008

Bishop C. C. McCabe Lecture, "Seven Days until Tomorrow" American University, October 28, 2008

Featured Lecture, WHITE PROTESTANT NATION, Eisenhower Institute, December 2008

American University Faculty on the Road Lecture, "Election 2008: What Happened and Why?" Boston, February 2009

Critic Meets Author Session on WHITE PROTESTANT NATION, Social Science History Association, November 2009

American University Faculty on the Road Lecture, "The Keys for 2012" Chicago, April 2010

Keynote Speaker, Hubert Humphrey Fellows, Arlington, Virginia October 2010, 2011

Panel Participant, Search for Common Ground, Washington, DC, April 2011

Presentation, The Keys to the White House, International Symposium on Forecasting, June 2012

Presentation, Classic Forecasting Models, American Political Science Association, September 2021

**SELECTED CONFERENCES, PRESENTATIONS, & LECTURES: INTERNATIONAL**

Featured Speaker, World Conference on Disarmament, Moscow, Russia, November 1986

Delegation Head, Delegation of Washington Area Scholars to Taiwan, Presented Paper on the promotion of democracy based on the American experience, July 1993

Lecture Series, American History, Doshisha University, Kyoto, Japan, December 2000

Lectures and Political Consultation, Nairobi, Kenya, for RFK Memorial Institute, October 2002

Featured Lectures, US Department of State, Scotland and England, including Oxford University, University of Edinburg, and Chatham House, June 2004

Keynote Speech, American University in Cairo, October 2004

Feature Presentation on the Keys to the White House, University of Munich, June 2008

Featured Lectures, US Department of State, Russia, Ukraine, Slovenia, Austria, and Romania, 2008-2010

Paper Presentation, Fourth International Conference on Interdisciplinary Social Science, Athens, Greece, July 2009

Featured Lectures, US Department of State, India, Korea, and Belgium 2012

Panel Speaker, Economic Forum, Krynica, Poland, 2013

**DEPARTMENTAL AND UNIVERSITY SERVICE**

Department of History Council 1973 -

Undergraduate Committee, Department of History 1973-1977

Chair Undergraduate Committee, Department of History 1984-1985

Graduate Committee, Department of History, 1978-1984

Freshman Advisor, 1973-1979

First Year Module in Human Communications, 1977-1979

University Committee on Fellowships and Awards 1976-1978

University Senate 1978-1979, 1984-1985

University Senate Parliamentarian and Executive Board 1978-1979

Founding Director, American University Honors Program, 1977-1979

Chair, College of Arts and Sciences Budget Committee 1977-1978, 1982-1984

University Grievance Committee, 1984-1985

Member, University Honors Committee 1981-1982

College of Arts and Sciences Curriculum Committee 1981-1982

Jewish Studies Advisory Board, 1982-1984

Mellon Grant Executive Board, College of Arts & Sciences, 1982-1983

Chair, College of Arts and Sciences Faculty Colloquium, 1983

Chair, College of Arts and Sciences Task Force on the Department of Performing Arts, 1984-1985

Local Arrangements Chair, National Convention of the Social
Science History Association, 1983

Chair, Rank & Tenure Committee of the Department of History,
1981-1982, 1984-1985

Board Member, Center for Congressional and Presidential Studies, The American University,
1988-1989

Chair, Graduate Committee, Department of History, 1989 - 1991

Chair, Distinguished Professor Search Committee 1991

Member, College of Arts & Sciences Associate Dean Search Committee, 1991

Board Member, The American University Press, 1991-1995

Chair, Subcommittee on Demographic Change, The American University Committee on Middle States
Accreditation Review 1992-1994

Member, Dean's Committee on Curriculum Change, College of Arts and Sciences 1992-1993

Member, Dean's Committee on Teaching, College of Arts and Sciences 1992

Co-Chair, Department of History Graduate Committee, 1994-1995

Vice-Chair, College of Arts & Sciences Educational Policy Committee, 1994-1995

Elected Member, University Provost Search Committee, 1995-1996

Chair, Search Committee for British and European Historian, Department of History, 1996

Department Chair, 1999-2001

CAS Research Committee, 2006-2007

University Budget and Benefits Committee, 2008

Chair, Personnel Committee, Department of History, 2010-11, 2012-13

Chair, Term Faculty Search Committee, Department of History, 2011

## OTHER POSITIONS

Director of Forensics, Brandeis University, 1968-71

Director of Forensics, Harvard University, 1971-72

Chair, New York-New England Debate Committee, 1970-71

Historical consultant to the Kin and Communities Program of the Smithsonian Institution 1974-1979

Along with general advisory duties, this position has involved the following activities:

1. directing a national conference on techniques for studying historical and contemporary families held at the Smithsonian in June 1976.
    2. chairing a public session at the Smithsonian on how to do the history of one's own family.
    3. helping to direct the Sixth International Smithsonian Symposium on Kin and Communities in America (June 1977).
    4. editing the volume of essays from the symposium.

Consultant to John Anderson campaign for president, 1980.

I researched and wrote a study on "Restrictive Ballot Laws and Third-Force Presidential Candidates." This document was a major component of Anderson's legal arguments against restrictive ballot laws that ultimately prevailed in the Supreme Court (Anderson v. Celebreeze 1983). According to Anderson's attorney: "the basis for the majority's decision echoes the themes you incorporated in your original historical piece we filed in the District Court."

Statistical Consultant to the George Washington University Program of Policy Studies in Science and Technology, 1983

I advised researchers at the Policy Studies Program on the application of pattern recognition techniques to their work on the recovery of communities from the effects of such natural disasters as earthquakes and floods.

Consultant to the New York City Charter Revision Commission, 2000-2006

I analyzed the implications of non-partisan elections for voting rights issues for the Charter Revision Commissions appointed by mayors Rudy Giuliani and Michael Bloomberg.

## **APPENDIX 2: CASES**

*LULAC v. Pate* (Iowa District Court, Johnson County), 2021

*McConchie v. Illinois State Board of Elections* (U.S. District Court, Illinois), 2021

*City of South Miami v. DeSantis* (U.S. District Court for the Southern District of Florida), 2020

*Bruni v. Hughs* (U.S. District Court for the Southern District of Texas), 2020

*NAACP v. Cooper*, (U.S. District Court for the Middle District of North Carolina), 2019

*Jason Gonzalez v. Michael J. Madigan*, (U.S. District Court for the Northern District of Illinois), 2019

*Anne Harding v. County of Dallas*, (U.S. District Court for the Northern District of Texas), 2018

*Pico Neighborhood Association v. Santa Monica*, (State Superior Court, California), 2018

*Arizona Democratic Party v. Reagan*, (U.S. District Court, Arizona), 2017

*Perez v. Abbott*, (U.S. District Court for the Western District of Texas), 2017

*Terrebonne Parish NAACP v. Jindal*, (U.S. District Court for the Middle District of Louisiana), 2017

*Feldman v. Arizona Secretary of State*, (U.S. District Court for the District of Arizona), 2016, 2017

*Covington v. North Carolina*, (U. S. District Court for the Middle District of North Carolina), 2016

*One Wisconsin Institute v. Nichols*, (United States District Court for the Western District of Wisconsin), 2016

*Lee v. Virginia State Board of Elections*, (United States District Court for the Eastern District of Virginia), 2016

*League of Women Voters v. Detzner*, (Circuit Court for the Second Judicial Circuit, Leon County), 2015

*North Carolina State Conference of the NAACP v. McCrory*, (U. S. District Court for the Middle District of North Carolina), 2015

## APPENDIX 3: TABLES

### TABLE 1
### ENROLLMENT IN TEXAS PUBLIC SCHOOLS 2020-2021, BY RACE

| Racial Group | Number | Percentage |
|---|---|---|
| Total | 5,371,586 | 100% |
| | | |
| All Minority | 3,947,335 | 73.5% |
| | | |
| Anglo | 1,424,251 | 26.5% |
| | | |
| Hispanic | 2,840,982 | 52.9% |
| | | |
| African American | 681,401 | 12.7% |
| | | |
| Hispanic + African American | 3,540,365 | 65.6% |
| | | |
| Multiracial | 143,763 | 2.7% |
| | | |
| Asian | 254,163 | 4.7% |
| | | |
| Other | 27,026 | 0.5% |
| | | |
| | | |
| | | |
| Source: "Enrollment in Texas Public Schools 2020-2021," Table 4, https://tea.texas.gov/sites/default/files/enroll-2020-21.pdf. | | |

**TABLE 2**
**RACIAL DISPARITIES IN PUBLIC K-12 SCHOOL DISCIPLINE, TEXAS, 2015-2016**
**SCHOOL YEAR**

| DAYS LOST PER 100 STUDENTS, OUT-OF-SCHOOL SUSPENSIONS, 2015-2016 | | |
|---|---|---|
| | | |
| BLACK STUDENTS | HISPANIC STUDENTS | WHITE STUDENTS |
| | | |
| 44 DAYS | 15 DAYS | 7 DAYS |
| | | |
| RATIO OF LOST DAYS MINORITY TO WHITE | | |
| | | |
| BLACK STUDENTS | HISPANIC STUDENTS | WHITE STUDENTS |
| | | |
| 6.3 TO 1 | 2.1 TO 1 | NA |
| | | |
| Daniel J. Losen And Amir Whitaker, Joint Report By The Center For Civil Rights Remedies Of UCLA's Civil Rights Project And The American Civil Liberties Union Of Southern California, "11 Million Days Lost: Race, Discipline and Safety at U.S. Public Schools," Part 1, https://www.aclu.org/sites/default/files/field_document/final_11-million-days_ucla_aclu.pdf. | | |

**TABLE 3**
**EDUCATIONAL MEASURES BY RACE, TEXAS, 2019 US CENSUS, AMERICAN COMMUNITY SURVEY**

| MEASURE | BLACK | HISPANIC | WHITE |
|---|---|---|---|
| | | | |
| **HIGH SCHOOL GRADUATES AGE 25+ \*** | **91.3%** | **68.3%** | **94.4%** |
| | | | |
| **BACHELOR'S DEGREE OR MORE AGE 25+ \*** | **25.7%** | **16.1%** | **39.4%** |
| | | | |
| **SPEAK ENGLISH LESS THAN "VERY WELL"** | **2.2%** | **28.1%** | **1.2%** |
| | | | |
| **PERCENT AT OR ABOVE BASIC 8TH GRADE READING** | **47%** | **62%** | **80%** |
| | | | |
| **PERCENT AT OR ABOVE BASIC 8TH GRADE MATH** | **52%** | **63%** | **80%** |
| | | | |
| | | | |
| Educational Achievement Data From: National Center for Educational Statistics, Texas, Reading, 2019, https://nces.ed.gov/nationsreportcard/subject/publications/stt2019/pdf/2020014TX8.pdf; National Center for Educational Statistics, Texas, Mathematics, 2019, https://nces.ed.gov/nationsreportcard/subject/publications/stt2019/pdf/2020013TX8.pdf. | | | |

**TABLE 4**
**POSITIONS ON RACIAL ISSUES, REPUBLICANS IN TEXAS COMPARED TO ALL OTHERS**

| Question | Republican % Agree | Others % Agree | Difference Percentage Points | Difference Percent |
|---|---|---|---|---|
| White people in the U.S. have certain advantages because of the color of their skin. | 19.8% | 70.0% | +50.2 PTS | +254% |
| | | | | |
| Generations of slavery and discrimination have created conditions that make it difficult for blacks to work their way out of the lower class. | 15.2% | 58.0% | +42.8 PTS | +282% |
| K-12 teachers should be permitted to discuss how historical examples of discrimination in our laws apply to inequalities today* | 35% | 66.9% | +31.9 PTS | +91% |
| | | | | |
| **Question** | **Republican % Disagree** | **Others % Disagree** | **Difference Percentage Points** | **Difference Percent** |
| | | | | |
| Racial problems in the U.S. are rare, isolated situations. | 32.1% | 64.2% | +32.1 PTS | +100% |
| | | | | |

Source: Cooperative Congressional Election Study (CCES), 2020, https://cces.gov.harvard.edu/. Common Weight, N=2,000 registered voters. Dallas Morning News/University of Texas at Tyler Poll, September 2021, https://www.uttyler.edu/politicalscience/files/dmn-uttylersept2021rv.pdf.

**TABLE 5**
**RACIAL PROFILING IN TEXAS, 2020 TRAFFIC STOPS FOR BLACKS, 6 CITIES WITH 500,000+ POPULATION**

| CITY | % NH BLACK 18+ POPULATION % | % BLACK TRAFFIC STOPS | PERCENTAGE POINT DIFFERENCE | PERCENT DIFFERENCE |
|---|---|---|---|---|
| | | | | |
| HOUSTON | 20.3% | 38.4% | +18.1 PTS | +89% |
| | | | | |
| SAN ANTONIO | 6.7% | 11.6% | +4.9 PTS | +73% |
| | | | | |
| DALLAS | 23.0% | 39.7% | +16.7 PTS | +73% |
| | | | | |
| AUSTIN | 6.9% | 14.9% | +8.0 PTS | +116% |
| | | | | |
| FORT WORTH | 19.0% | 25.6% | +6.6 PTS | +35% |
| | | | | |
| EL PASO | 3.2% | 5.8% | +2.6 PTS | +81% |
| | | | | |
| MEAN PERCENT DIFFERENCE | | | | +78% |
| | | | | |
| Source: Texas Commission on Law Enforcement, 2020 Racial Profiling Report, https://www.tcole.texas.gov/content/racial-profiling-reports. | | | | |

**TABLE 6**
**INCARCERATION RATES BY RACE, ADULT AND JUVENILE**

| STATISTIC | WHITE | BLACK | HISPANIC | BLACK RATIO TO WHITE | HISPANIC RATIO TO WHITE |
|---|---|---|---|---|---|
| | | | | | |
| INCARCERATION RATE PER 100,000 18-YEAR OLD+ | 452 | 1,547 | 471 | 3.4 TO 1 | 1 TO 1 |
| | | | | | |
| JUVENILE CUSTODY RATE PER 100,000 | 82 | 412 | 112 | 5.0 TO 1 | 1.4 TO 1 |
| | | | | | |
| Source: Bureau of Justice Statistics, "Prisoners in 2020 – Statistical Tables, https://bjs.ojp.gov/content/pub/pdf/p20st.pdf. The prisoner statistics include only 10 prisoners below age 18 in Texas. U.S. Bureau of the Census, American Community Survey 2019 for population data. Juvenile custody rates from The Sentencing Project, "Criminal Justice Facts, Texas," https://www.sentencingproject.org/the-facts/#map. | | | | | |

**TABLE 7**
**FELON DISENFRANCHISEMENT BY RACE**

| RACIAL GROUP | DISENFRANCHISEMENT RATE |
|---|---|
| | |
| BLACK | 5.9% |
| | |
| HISPANIC | 3.3% |
| | |
| ALL | 2.8% |
| | |
| Source, The Sentencing Project, "Locked Out, 2020," https://www.sentencingproject.org/wp-content/uploads/2020/10/Locked-Out-2020.pdf#page=18. | |

**TABLE 8**
**ECONOMIC AND HOUSING INDICATORS BY RACE, TEXAS**

| MEASURE | BLACK | HISPANIC | WHITE |
|---|---|---|---|
| **MEDIAN HOUSEHOLD INCOME*** | $47,432 | $52,010 | $78,905 |
| **PER CAPITA INCOME*** | $25,721 | $20,401 | $44,953 |
| **UNEMPLOYMENT RATE*** | 6.9% | 4.5% | 3.7% |
| **FOOD STAMP RECIPIENT*** | 19.1% | 16.5% | 5.4% |
| **POVERTY RATE, PERSONS*** | 18.4% | 18.7% | 8.0% |
| **HOUSEHOLD ASSET POVERTY RATE**** | 35.1% | 28.5 | 17.3 |
| **HOUSEHOLD LIQUID ASSET POVERTY RATE**** | 51.6% | 57.4% | 31.5% |
| **NET WORTH OF HOUSEHOLDS**** | NA | $36,500 | $151,080 |
| **HOUSEHOLDS, NO BANK ACCOUNT**** | 19.0% | 16.1% | 2.8% |
| **UNDERBANKED HOUSEHOLDS**** | 39.0% | 28.2% | 18.2% |
| **PERCENT OWNER OCCUPIED** | 40.0% | 57.7% | 70.5% |
| **MEDIAN HOME VALUE** | $178,600 | $139,200 | $238,900 |
| **NO VEHICLES AVAILABLE** | 11.0% | 5.6% | 3.8% |
| **Sources: * U.S. Census American Community Survey, 2019; ** Prosperity Now Scorecard, 12 September 2021, https://scorecard.prosperitynow.org/.[255]** | | | |

[255] Prosperity Now is a nonpartisan, independent research organization founded in 1979. It launched its first scorecard on the states using standard sources in social science, including for example, the American Community Survey, and the U.S. Census Survey of Income and Program Participation, the Bureau of Labor Statistics, the Mortgage Bankers Association, the Kaiser Family Foundation,

**TABLE 9**
**HEALTH INDICATORS BY RACE, TEXAS**

| MEASURE | BLACK | HISPANIC | WHITE |
|---|---|---|---|
| | | | |
| **PERCENT WITH PRIVATE HEALTH INSURANCE** | **59.8%** | **46.8%** | **74.6%** |
| | | | |
| **PERCENT WITH NO HEALTH INSURANCE** | **14.7%** | **28.6%** | **10.6%** |
| | | | |
| **FORGO HEALTH CARE DUE TO COSTS** | **16.0%** | **22.8%** | **12.8%** |
| | | | |
| **POOR OR FAIR HEALTH STATUS** | **20.7%** | **22.9%** | **15.9%** |
| | | | |
| **LIFE EXPECTANCY** | **74.8** | **79.5** | **78.2** |
| | | | |
| **% LOW WEIGHT BIRTHS** | **13.4%** | **7.5%** | **7.5%** |
| | | | |
| **INFANT MORTALITY** | **10.0%** | **5.1%** | **4.5%** |

Source: Texas Department of State Health Services, Vital Statistics, Annual Report, 2014, https://www.dshs.texas.gov/chs/vstat/vs14/anrpt.aspx; US Census, American Community Survey, 2019.

**TABLE 10**
**RACIAL COMPOSITION ALL EARLY VOTERS, DRIVE-THRU EARLY VOTERS, AFTER-HOURS EARLY VOTERS, HARRIS COUNTY, 2020 GENERAL ELECTION**

| EARLY VOTERS | ANGLOS | HISPANICS | BLACKS | ASIANS | ALL MINORITIES |
|---|---|---|---|---|---|
| ALL | 62% | 20% | 14% | 4% | 38% |
| DRIVE-THRU | 47% | 23% | 22% | 8% | 53% |
| AFTER HOURS | 44% | 36% | 12% | 8% | 56% |

Source: Testimony on SB 1 By: Emily Eby, Staff Attorney, Texas Civil Rights Project, *Texas Senate State Affairs Committee*, July 10, 2021, https://txcivilrights.org/wp-content/uploads/2021/07/TCRP-Testimony-on-SB-1.pdf.

**TABLE 11**
**PERCENTAGE OF VOTERS USING DRIVE-THRU VOTING IN HARRIS COUNTY, 2020 GENERAL PRESIDENTIAL ELECTION BY RACE**

| MODE OF VOTING | ANGLOS | BLACKS | HISPANICS | ASIANS |
|---|---|---|---|---|
| DRIVE-THRU | 5.1% | 9.7% | 13.1% | 9.8% |
| LEAD OVER ANGLOS | ANGLOS | BLACKS | HISPANICS | ASIANS |
| | NA | +4.6 PTS +90.2% | +8.0 PTS +157% | +4.7 PTS +92.2% |

Source: "The Rice University Post-2020 Election Survey of Harris County Voters," https://mreece13.github.io/dtv-harris-2021/cross-tabs.html#method-of-voting. N = 2,297

**TABLE 12**
**USE OF MAIL-IN VOTING IN TEXAS 2020 GENERAL PRESIDENTIAL ELECTION, BY RACE**

| PERCENT OF GROUPS REPORTING VOTING BY MAIL, 2020 GENERAL | | | |
|---|---|---|---|
| **SURVEY** | **ANGLOS** | **MINORITIES** | **MINORITY LEAD OVER ANGLOS** |
| | | | |
| **CCES** | **12.1%** | **15.8%** | **+3.7 PTS +30.6%** |
| | | | |
| **SPAE** | **9.6%** | **13.4%** | **+3.8 PTS +39.6%** |
| | | | |

Source: Cooperative Congressional Election Study, 2020 (CCES), https://cces.gov.harvard.edu/, N = 3,220, Common weight; Survey of the Performance of American Elections, 2020 (SPAE), https://electionlab.mit.edu/research/projects/survey-performance-american-elections, N = 182, Case weight.

**TABLE 13**
**CHANGES IN CVAP IN TEXAS, HISPANICS, AFRICAN AMERICANS, & WHITES**

| Group | % Of CVAP 2008-2012 Estimates | % Of CVAP 2012-2016 Estimates | % Of CVAP 2019 Estimates |
|---|---|---|---|
| | | | |
| Hispanics & Blacks | 39.4% | 41.5% | 44.2% |
| | | | |
| Anglos | 56.4% | 53.8% | 50.1% |
| | | | |
| Difference | **Anglo +17 Percentage Pts.** | **Anglo +12.3 Percentage Pts.** | **Anglo +5.9 Percentage Pts.** |
| | | | |

Source: U.S. Census, American Community Survey

**TABLE 14**
**VOTING FOR REPUBLICAN AND DEMOCRATIC CANDIDATES, BY RACE, TEXAS, 2016 AND 2020**

| RACIAL GROUP | VOTE FOR TRUMP 2020 | VOTE FOR BIDEN 2020 |
|---|---|---|
| | | |
| ANGLOS | 66% | 33% |
| HISPANICS | 41% | 58% |
| BLACKS | 9% | 90% |
| | | |
| RACIAL GROUP | VOTE FOR TRUMP 2016 | VOTE FOR CLINTON 2016 |
| | | |
| ANGLOS | 69% | 29% |
| HISPANICS | 34% | 61% |
| BLACKS | 11% | 84% |
| | | |
| RACIAL GROUP | AVERAGE REPUBLICAN | AVERAGE DEMOCRATIC |
| | | |
| ANGLOS | 67.5% | 31% |
| HISPANICS | 37.5% | 59.5% |
| BLACKS | 10% | 87% |
| | | |
| Sources: CNN Exit Poll 2016, N=2,827; CNN Exit Poll 2020, N=4,768 | | |

**CHART 2**
**VOTING FOR REPUBLICAN AND DEMOCRATIC CANDIDATES, BY RACE, TEXAS, 2016**
**AND 2020, FROM TABLE 14**



**TABLE 15**
**CHANGES IN COMPETITIVENESS OF DEMOCRATIC PRESIDENTIAL CANDIDATES IN TEXAS, TWO-PARTY VOTE, 2012 VS. 2016**

| Election | % National Dem. President | % Texas Dem. President | Percentage Point Difference | Percent Difference |
|---|---|---|---|---|
| | | | | |
| 2012 General | 52.0% | 42.0% | -10% | -19.2% |
| | | | | |
| 2016 General | 51.1% | 45.3% | -5.8% | -11.4% |
| | | | | |
| 2020 General | 52.3% | 47.2% | -5.1% | -9.8% |

Sources: David Leip, "Atlas of Presidential Election Results," https://uselectionatlas.org/RESULTS/; Texas Secretary of State, "Election Results Archive," https://www.sos.state.tx.us/elections/historical/elections-results-archive.shtml.

**TABLE 16**
**SHIFTS BY RACE IN USE OF MAIL-IN VOTING IN TEXAS 2008 AND 2020 GENERAL PRESIDENTIAL ELECTIONS**

| PERCENT OF GROUPS REPORTING VOTING BY MAIL, 2020 GENERAL | | | |
|---|---|---|---|
| | | | |
| SURVEY | ANGLOS | MINORITIES | DIFFERENCE MINORITIES/ANGLO |
| | | | |
| CCES 2008 | 5.0% | 3.4% | ANGLO + 2.6 PTS +52% |
| CCES 2020 | 12.1% | 15.8% | MINORITY +3.7 PTS +30.6% |
| | | | |
| SPAE 2008 | 6.6% | 2.3% | ANGLO + 4.3 PTS +65.2% |
| SPAE 2020 | 9.6% | 13.4% | MINORITY +3.8 PTS +39.6% |
| | | | |

Source: Cooperative Congressional Election Study, 2008 2020 (CCES), https://cces.gov.harvard.edu/, N = 2,447, 3,220, Common weight; Survey of the Performance of American Elections, 2020 (SPAE), https://electionlab.mit.edu/research/projects/survey-performance-american-elections, N = 359, 182, Case weight.

**TABLE 17**
**LIKELY VOTERS IN TEXAS FIRST CHOICE OF PRIORITIES FOR SPECIAL SESSION**

| PRIORITY | % INDICATING FIRST CHOICE |
|---|---|
| | |
| Reforming The Electric Reliability Council Of Texas | 26% |
| | |
| Improving Border Security | 25% |
| | |
| Lowering Property Taxes | 15% |
| | |
| Banning The Teaching of Critical Race Theory In Public Schools | 14% |
| | |
| Improving Election Security | 8% |
| | |
| Reforming Our Prison Bail Bond System | 4% |
| | |
| Stopping Social Media Companies From Censoring Citizens | 3% |
| | |
| N = 1,000 Likely Voters. Ragnar Research Associates, Poll July 2021, https://static1.squarespace.com/static/5ab92d8f266c071e567dd752/t/60e3b5b6df051a4991308d96/1625535926613/Ragnar+Research+%7C+Secure+Democracy+July+2021+TX+Poll.pdf. | |

**CHART 3**
**LIKELY VOTERS IN TEXAS FIRST CHOICE OF PRIORITIES FOR SPECIAL SESSION, FROM TABLE 17**



**TABLE 18**
**TEXAS, OPPOSITION TO CRIMINALIZING ELECTIONS**

| QUERY | STRONGLY SUPPORT OR AGREE | SOMEWHAT SUPPORT OR AGREE |
|---|---|---|
| | | |
| Neighbors who work as election workers shouldn't risk jail | 68% | 18% |
| | | |
| QUERY | YES | NO |
| | | |
| Should it be a felony to assist more than three voters with disabilities or language barriers at polling locations | 12% | 80% |
| | | |
| Threatening people with criminal prosecution of they accidentally vote without knowing they ineligible | 28% | 66% |
| | | |
| Source: Ragnar Research Partners, "Voting and Election Issues, Texas," July 2021, https://static1.squarespace.com/static/5ab92d8f266c071e567dd752/t/60e3b5b6df051a4991308d96/1625535926613/Ragnar+Research+%7C+Secure+Democracy+July+2021+TX+Poll.pdf; *Survey of the Performance of American Elections, 2020, https://electionlab.mit.edu/research/projects/survey-performance-american-elections. | | |

**TABLE 19**

**ANGLO CVAP AND TWO-PARTY PRESIDENTIAL VOTE 2020, BEE, CALHOUN, AND KERR COUNTIES TEXAS**

| COUNTY | TOTAL CVAP | ANGLO CVAP | VOTE FOR TRUMP | VOTE FOR BIDEN |
|---|---|---|---|---|
| | | | | |
| BEE | 25,100 | 8,740 | 6,066 | 3,288 |
| | | | | |
| CALHOUN | 14,840 | 7,550 | 5,641 | 2,148 |
| | | | | |
| KERR | 39,560 | 30,415 | 20,879 | 6,524 |
| | | | | |
| THREE COUNTIES | 79,500 | 46,705 58.7% | 32,526 73.1% | 11,960 26.9% |
| | | | | |
| HARRIS COUNTY | 2,705,675 | 1,073,395 39.7% | 700,630 43.3% | 918,193 56.7% |
| | | | | |
| Source: Texas County 2020 Presidential Election Results, ABC News, https://abcnews.go.com/Elections/texas-county-presidential-election-results-2020. American Community Survey, 2015-2019. | | | | |

**TABLE 20**
**EVALUATIONS OF HARRIS COUNTY VOTING BY MODE OF VOTING, PARTY, AND FUTURE INTENTION, FOR DRIVE-THOUGH VOTING**

| EVALUATION | DRIVE-THRU | ABSENTEE | EARLY IN-PERSON | ELECTION DAY |
|---|---|---|---|---|
| | | | | |
| **EXCELLENT** | **91%** | **66%** | **72%** | **63%** |
| | | | | |
| EVALUATION | DRIVE-THRU | ABSENTEE | EARLY IN-PERSON | ELECTION DAY |
| | | | | |
| **DRIVE-THRU LEAD** | **NA** | **+25 PTS +37.9%** | **+19 PTS +26.4%** | **+28 PTS +44.4%** |
| | | | | |
| EVALUATION | ALL | DEMOCRAT | INDEPENDENT | REPUBLICAN |
| | | | | |
| **USE DRIVE-THRU AGAIN** | **93%** | **97%** | **95%** | **71%** |
| | | | | |
| | | | | |

Source: "The Rice University Post-2020 Election Survey of Harris County Voters," August 2021, https://mreece13.github.io/dtv-harris-2021/cross-tabs.html#method-of-voting; additional polling data, email from Professor Robert Stein, Rice University.

**CHART 4**
**EVALUATIONS OF HARRIS COUNTY VOTING BY MODE OF VOTING, FROM TABLE 20**



**CHART 5**
**EVALUATIONS OF HARRIS COUNTY DRIVE-THRU VOTING BY FUTURE INTENTION,**
**FROM TABLE 20**



**TABLE 21**

**VOTER CONFIDENCE THAT VOTE WAS COUNTED CORRECTLY, HARRIS COUNTY VOTERS IN THE 2020 GENERAL ELECTION, BY METHOD OF VOTING**

| METHOD OF VOTING | VERY CONFIDENT | SOMEWHAT CONFIDENT | SUM | DRIVE-THRU LEAD | DRIVE-THRU LEAD VERY CONFIDENT |
|---|---|---|---|---|---|
| | | | | | |
| **DRIVE-THRU** | **90.3%** | **6.7%** | **97%** | **NA** | |
| | | | | | |
| **ABSENTEE** | **73.6%** | **17.7%** | **91.3%** | **+5.7 PTS +6.2%** | **+16.7 PTS +22.7%** |
| | | | | | |
| **EARLY IN-PERSON** | **67%** | **21.8%** | **88.8%** | **+8.2 PTS +9.2%** | **+23.3 PTS +34.8%** |
| | | | | | |
| **ELECTION DAY** | **52.7%** | **23.4%** | **76.1%** | **+20.9 PTS +27.5%** | **+37.6 PTS +71.3%** |
| Source: "The Rice University Post-2020 Election Survey of Harris County Voters," https://mreece13.github.io/dtv-harris-2021/cross-tabs.html#method-of-voting. N = 2,297 | | | | | |

**CHART 6**
**VOTER CONFIDENCE, HARRIS COUNTY VOTERS IN THE 2020 GENERAL ELECTION,**
**BY METHOD OF VOTING, FROM TABLE 21**



**TABLE 22**
**SHOULD THE RULES FOR VOTING IN TEXAS SHOULD BE MADE MORE STRICT, LESS STRICT, OR LEFT AS THEY ARE NOW?**

| MORE STRICT | LESS STRICT | KEPT AS THEY ARE NOW | NOT SURE |
|---|---|---|---|
| | | | |
| 39% | 24% | 30% | 6% |
| | | | |
| **LEAN REPUBLICAN** | | | |
| MORE STRICT | LESS STRICT | KEPT AS THEY ARE NOW | NOT SURE |
| | | | |
| 68% | 4% | 23% | 5% |
| | | | |
| **LEAN DEMOCRATIC** | | | |
| MORE STRICT | LESS STRICT | KEPT AS THEY ARE NOW | NOT SURE |
| | | | |
| 5% | 67% | 25% | 4% |
| | | | |

Source: University of Texas/Texas Tribune Poll, The Texas Politics Project at the University of Texas at Austin, August 2021, https://texaspolitics.utexas.edu/set/accuracy-official-texas-election-results-august-2021. N = 1,200 registered voters.

**CHART 7**
**SHOULD THE RULES FOR VOTING IN TEXAS SHOULD BE MADE MORE STRICT, LESS STRICT, OR LEFT AS THEY ARE NOW? FROM TABLE 22**



**CHART 8**
**SHOULD THE RULES FOR VOTING IN TEXAS SHOULD BE MADE MORE STRICT, LESS STRICT, OR LEFT AS THEY ARE NOW? LEAN REPUBLICAN AND LEAN DEMOCRATIC, FROM TABLE 22**



**TABLE 23**
**STATE LEADERS AND LEGISLATIVE APPROVAL: HANDLING OF ELECTION AND VOTING LAWS**

| State Leaders and Legislative Approval: Handling of Election and Voting Laws All Respondents | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPROVE STRONGLY | APPROVE SOMEWHAT | SUM | NEITHER APPROVE OR DISAPPROVE | DISAPPROVE STRONGLY | DISAPPROVE SOMEWHAT | SUM | NOT SURE |
| 24% | 19% | 43% | 13% | 8% | 30% | 38% | 5% |
| State Leaders and Legislative Approval: Handling of Election and Voting Laws Lean Republican Only | | | | | | | |
| APPROVE STRONGLY | APPROVE SOMEWHAT | SUM | NEITHER APPROVE OR DISAPPROVE | DISAPPROVE STRONGLY | DISAPPROVE SOMEWHAT | SUM | NOT SURE |
| 40% | 33% | 73% | 16% | 3% | 6% | 9% | 3% |
| State Leaders and Legislative Approval: Handling of Election and Voting Laws Lean Democratic Only | | | | | | | |
| APPROVE STRONGLY | APPROVE SOMEWHAT | SUM | NEITHER APPROVE OR DISAPPROVE | DISAPPROVE STRONGLY | DISAPPROVE SOMEWHAT | SUM | NOT SURE |
| 4% | 1% | 5% | 5% | 81% | 8% | 89% | 5% |

Texas Poll, The Texas Politics Project at the University of Texas at Austin, October 2021, https://texaspolitics.utexas.edu/set/approval-how-state-leaders-and-legislature-have-handled-election-and-voting-laws-texas-october#republican-identification; https://texaspolitics.utexas.edu/set/approval-how-state-leaders-and-legislature-have-handled-election-and-voting-laws-texas-october#democratic-identification. N = 1,200 registered voters.

**CHART 9**
**STATE LEADERS AND LEGISLATIVE APPROVAL: HANDLING OF ELECTION AND VOTING LAWS, FROM TABLE 23**



**TABLE 24**
**SUPPORT FOR NEW LEGISLATION ON VOTING AND ELECTIONS BEING CONSIDERED**
**IN SPECIAL SESSION**

| Support or Oppose: New Legislation on Voting and Elections Being Considered During the Current Special Session of the Texas Legislature<br>All Respondents | | | | | | | |
|---|---|---|---|---|---|---|---|
| STRONGLY SUPPORT | SOMEWHAT SUPPORT | SUM | NEITHER SUPPORT OR OPPOSE | STRONGLY OPPOSE | SOMEWHAT OPPOSE | SUM | NOT SURE |
| | | | | | | | |
| 34% | 12% | 46% | 14% | 5% | 27% | 32% | 9% |

| Support or Oppose: New Legislation on Voting and Elections Being Considered During the Current Special Session of the Texas Legislature<br>Lean Republican Only | | | | | | | |
|---|---|---|---|---|---|---|---|
| STRONGLY SUPPORT | SOMEWHAT SUPPORT | SUM | NEITHER SUPPORT OR OPPOSE | STRONGLY OPPOSE | SOMEWHAT OPPOSE | SUM | NOT SURE |
| | | | | | | | |
| 60% | 17% | 77% | 9% | 3% | 4% | 7% | 7% |

| Support or Oppose: New Legislation on Voting and Elections Being Considered During the Current Special Session of the Texas Legislature<br>Lean Democratic Only | | | | | | | |
|---|---|---|---|---|---|---|---|
| STRONGLY SUPPORT | SOMEWHAT SUPPORT | SUM | NEITHER SUPPORT OR OPPOSE | STRONGLY OPPOSE | SOMEWHAT OPPOSE | SUM | NOT SURE |
| | | | | | | | |
| 3% | 3% | 6% | 9% | 65% | 13% | 78% | 7% |

University of Texas/Texas Tribune Poll, The Texas Politics Project at the University of Texas at Austin, August 2021, https://texaspolitics.utexas.edu/set/accuracy-official-texas-election-results-august-2021. N=1,200 registered voters.

**CHART 10**
**SUPPORT FOR NEW LEGISLATION ON VOTING AND ELECTIONS BEING CONSIDERED**
**IN SPECIAL SESSION, FROM TABLE 24**



**TABLE 25**
**TEXAS POLL, THE TEXAS POLITICS PROJECT AT THE UNIVERSITY OF AUSTIN, CONFIDENCE IN ACCURACY OF ELECTION RESULTS**

| Confidence in the Accuracy of Official Texas Election Results | | | | | | | |
|---|---|---|---|---|---|---|---|
| **VERY ACCURATE** | **SOMEWHAT ACCURATE** | **SUM** | **VERY INACCURATE** | **SOMEWHAT INACCURATE** | **SUM** | **RATIO OF ACCURATE TO NOT** | **NOT SURE** |
| 43% | 35% | 78% | 5% | 11% | 16% | 7.1 TO 1 | 6% |
| **Confidence in the Accuracy of Official United States Election Results** | | | | | | | |
| **VERY ACCURATE** | **SOMEWHAT ACCURATE** | **SUM** | **VERY INACCURATE** | **SOMEWHAT INACCURATE** | **SUM** | **RATIO OF ACCURATE TO NOT** | **NOT SURE** |
| 36% | 16% | 52% | 30% | 13% | 43% | 1.2 TO 1 | 6% |

University of Texas/Texas Tribune Poll, The Texas Politics Project at the University of Texas at Austin, February 2021, https://static.texastribune.org/media/files/3a5ba1fa214ffe117a062178b5d1dd83/uttt-2021-02-summary-full.pdf.

**CHART 11**
**CONFIDENCE IN ACCURACY OF TEXAS VERSUS US ELECTION RESULTS, FROM TABLE 25**



**TABLE 26**
**VOTER CONFIDENCE IN THE ACCURACY OF TEXAS ELECTION RESULTS BEFORE AND AFTER ENACTMENT OF S.B. 1**

| Confidence in the Accuracy of Official Texas Election Results February 2021 | | | | | | | |
|---|---|---|---|---|---|---|---|
| VERY ACCURATE | SOMEWHAT ACCURATE | SUM | VERY INACCURATE | SOMEWHAT INACCURATE | SUM | RATIO OF ACCURATE TO NOT | NOT SURE |
| | | | | | | | |
| 43% | 35% | 78% | 5% | 11% | 16% | 7.1 TO 1 | 6% |
| | | | | | | | |
| Confidence in the Accuracy of Texas Election Results October 2021 | | | | | | | |
| | | | | | | | |
| VERY ACCURATE | SOMEWHAT ACCURATE | SUM | VERY INACCURATE | SOMEWHAT INACCURATE | SUM | RATIO OF ACCURATE TO NOT | NOT SURE |
| | | | | | | | |
| 38% | 38% | 76% | 3% | 12% | 15% | 1.2 TO 1 | 8% |
| University of Texas/Texas Tribune Poll, The Texas Politics Project at the University of Texas at Austin, February 2021, October 2021, N = 1,200 registered voters https://static.texastribune.org/media/files/3a5ba1fa214ffe117a062178b5d1dd83/uttt-2021-02-summary-full.pdf; https://texaspolitics.utexas.edu/sites/texaspolitics.utexas.edu/files/202110_poll_topline.pdf. | | | | | | | |

**CHART 12**
**VOTER CONFIDENCE IN THE ACCURACY OF TEXAS ELECTION RESULTS BEFORE AND AFTER ENACTMENT OF S.B. 1, FROM TABLE 26**



**TABLE 27**
**TEXAS, SUPPORT FOR VOTER REFORMS TO EXPAND VOTER ACCESS & LIMIT PARTISAN INTERFERENCE IN ELECTIONS**

| QUERY | SUPPORT |
|---|---|
| **Ragnar Research Partners, "Voting and Election Issues, Texas," July, 2021** | |
| **Extend early voting locations by one week** | **74%** |
| **Allow early voting locations to be open two weekends** | **80%** |
| **Increasing voting locations on Election Day** | **87%** |
| **Have alternate secure ballot return sites** | **57%** |
| **Voter assistance in returning ballots from family, household members or caregivers** | **83%** |
| **State lawmakers should take steps to protect their elections from partisan interference** | **90%** |
| **Survey of the Performance of American Elections (SPAE), 2020** | |
| **Automatically Register all Citizens Over 18 to Vote** | **58.5%** |
| **Same Day Registration at Polls** | **51.5%** |
| **Move Election Day to a Weekend** | **54.7%** |
| **Make Election Day a National Holiday** | **71.0%** |
| **Only Select Election Officials on a Non-partisan Basis** | **74.4%** |
| **When Registered Voters Move They Should be Automatically Registered at New Home** | **74.0%** |

Sources: Ragnar Research Partners, "Voting and Election Issues, Texas," July 2021, https://static1.squarespace.com/static/5ab92d8f266c071e567dd752/t/60e3b5b6df051a4991308d96/1625535926613/Ragnar+Research+%7C+Secure+Democracy+July+2021+TX+Poll.pdf; Survey of the Performance of American Elections, 2020, https://electionlab.mit.edu/research/projects/survey-performance-american-elections.

**TABLE 28**
**CITIZEN VOTING AGE POPULATION (CVAP), TURNOUT DIFFERENCES BY RACE, TEXAS COMPARED TO NATION**

| VOTER TURNOUT TEXAS, 2020 | | | | |
|---|---|---|---|---|
| | | | | |
| ANGLOS | BLACKS | DIFFERENCE WITH ANGLOS | HISPANICS | DIFFERENCE WITH ANGLOS |
| 72% | 60.8% | -11.2 PERCENTAGE PTS | 53.1% | -18.9 PERCENTAGE PTS |
| | | | | |
| VOTER TURNOUT NATION 2020 | | | | |
| | | | | |
| ANGLOS | BLACKS | DIFFERENCE WITH ANGLOS | HISPANICS | DIFFERENCE WITH ANGLOS |
| 70.9% | 62.6% | -8.3 PERCENTAGE PTS | 53.7% | -17.2 PERCENTAGE PTS |
| | | | | |
| Source: U.S. Census, Current Population Survey of Voting and Registration in the November 2020 Election, Tables 2, 4b, https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-585.html. | | | | |

**CHART 13**
**CITIZEN VOTING AGE POPULATION (CVAP), TURNOUT DIFFERENCES BY RACE, TEXAS COMPARED TO NATION, FROM TABLE 28**

