# *EXHIBIT 14*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | |
| *Plaintiffs,* | |
| | |
| v. | 5:21-cv-0844-XR |
| | |
| GREGORY W. ABBOTT, et al., | |
| *Defendants.* | |
| OCA-GREATER HOUSTON, et al., | |
| *Plaintiffs,* | |
| | |
| v. | 1:21-cv-0780-XR |
| | |
| TEXAS SECRETARY OF STATE JOHN SCOTT, et al., | |
| *Defendants.* | |
| HOUSTON JUSTICE, et al., | |
| *Plaintiffs,* | |
| | |
| v. | 5:21-cv-0848-XR |
| | |
| GREGORY WAYNE ABBOTT, et al., | |
| *Defendants.* | |
| LULAC TEXAS, et al., | |
| *Plaintiffs,* | |
| | |
| v. | 1:21-cv-0786-XR |
| | |
| JOHN SCOTT, et al., | |
| *Defendants.* | |
| MI FAMILIA VOTA, et al., | |
| *Plaintiffs,* | |
| | |
| v. | 5:21-cv-0920-XR |
| | |
| GREG ABBOTT, et al., | |
| *Defendants.* | |

UNITED STATES OF AMERICA,
                                    *Plaintiff*,

        v.                                                      5:21-cv-1085-XR

STATE OF TEXAS, et al.,
                                    *Defendants*.

**Expert Report of Professor Douglas L. Kruse, Ph.D.**

**Distinguished Professor**
**Rutgers School of Management and Labor Relations**
**Co-Director, Program for Disability Research**
**94 Rockafeller Road**
**New Brunswick, N.J. 08903**

On Behalf of Plaintiffs in *La Unión Del Pueblo Entero, et. al. v. Abbott, et al.; Houston Area Urban League, et al. v. Abbott, et al.; and OCA-Greater Houston, et al. v. Esparza, et al*., Case No. 5:21-cv-844(XR)

February 28, 2022

## Declaration of Professor Douglas L. Kruse, Ph.D.

I, Douglas Kruse, do hereby declare as follows:

I have been retained to act as an expert witness for the Plaintiffs in the above-captioned action.

Attached hereto as Exhibit A is a true and accurate copy of my February 28, 2022 Report in support of Plaintiffs' case, and the exhibits attached thereto (collectively, my "report").

My report describes the primary data and other information I considered in forming my opinions.

My CV is attached as Appendix A to my report, and sets forth my qualifications and all publications I have authored in the past 10 years.

Within the last four years, I have not provided reports as an expert witness or court monitor in any cases.

I am compensated for work on my report at a rate of $200 per hour.

I respectfully adopt and incorporate into this Declaration my report, which describes the testimony I am offering in support of Plaintiffs' case.

I understand and intend that my report is to be presented to the Court with the same weight and consequences as if I had stated the report orally, under oath, in a court of law. I declare under penalty of perjury that the foregoing is true and correct.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

I am aware that discovery in this case is ongoing, and I reserve the right to continue to supplement the foregoing report in light of additional facts, testimony, and/or materials that may come to light.

Executed this February 28, 2022, in Mercer County, New Jersey.

Douglas L. Kruse, Ph.D.

Report on Texas voting lawsuit
February 28, 2022

# PURPOSE OF ENGAGEMENT

**1.**     I have been retained by Plaintiffs in *La Union Del Pueblo Entero, et al. v. Abbott, et al.; Houston Area Urban League, et al. v. Abbott, et al.*; and *OCA-Greater Houston, et al. v. Esparza, et al.*, Consolidated Case No. 5:21-cv-844 (W.D. Tex.) to provide my expert opinions on issues related to the ways in which SB 1 erects barriers that harm voters with disabilities by impeding their access to voting in the State of Texas.

# QUALIFICATIONS

**2.**     I am currently a Distinguished Professor in the School of Management and Labor Relations at Rutgers University.  I have been a Research Associate at the National Bureau of Economic Research in Cambridge, Massachusetts since 1995, and a Research Fellow at the IZA Institute of Labor Economics in Bonn, Germany since 2016.  In 2013-14, I served as a Senior Economist at the Council of Economic Advisers in the Executive Office of the President in Washington, D.C.

**3.**     I received my Bachelor's Degree in Economics from Harvard University in 1981, my Master's Degree in Economics and Certification in Public Policy Analysis and Program Evaluation from the University of Nebraska-Lincoln in 1983, and my Ph.D. in Economics from Harvard University in 1988.

**4.**     At Rutgers I am Co-Director of the Program for Disability Research, and am Associate Director of the Institute for the Study of Employee Ownership and Profit Sharing.  I have also served as our school's Associate Dean of Academic Affairs, and as Ph.D. Director where I oversaw Ph.D. students in their coursework, exams, and dissertations.

**5.**     My research focuses on two areas: 1) economic, social, and political inclusion of people with disabilities, with a focus on the relationship of disability to employment and political participation, and 2) the causes, consequences, and implications of employee ownership and profit sharing plans.

**6.**     I have authored, co-authored, or edited 14 books, along with 123 journal articles or book chapters, and 22 reports.  The book publishers include Cambridge University Press, University of Chicago Press, and Yale University Press among others.  Four of the books and 40 of the articles and book chapters have been published within the past 10 years.  My research has been cited over 12,000 times according to Google Scholar.

**7.**     I have substantial expertise on the topic of voting among people with disabilities.  I have been principal investigator (PI) or Co-PI on four grant-funded national post-election surveys on the voting experiences of people with and without disabilities.  Two of these surveys were funded by the U.S. Election Assistance Commission.  Following the release of key results, the data were further analyzed with results published in peer-reviewed journals; one of these articles received a major award from the Western Political Science Association.  In addition to these

4

surveys, I have analyzed U.S. Census microdata after each election since 2008 and co-authored fact sheets with detailed analyses of disability and voter turnout in each election, along with pre-election fact sheets projecting the number of eligible voters with disabilities in 2016 and 2020. The most recent fact sheet analyzing the 2020 election was jointly released with the U.S. Election Assistance Commission.

**8.**     My professional service includes being Associate Editor of the British Journal of Industrial Relations from 2011 to 2021, and Associate Editor of the Journal of Participation and Employee Ownership from 2017 to the present.  My service to society includes being a member of the President's Committee on Employment of People with Disabilities from 1998 to 2000, and a member of the State Rehabilitation Advisory Council, New Jersey Division of Vocational Rehabilitation from 1999 to 2013.

**9.**     I have testified four times before Congress on my economic research.

**10.**     I have been PI or Co-PI on 24 grants with total funding of $16.4 million.  Currently I am PI or Co-PI on four disability-related grants, including two 5-year grants for centers funded by the National Institute on Disability, Independent Living, and Rehabilitation Research in the U.S. Department of Health and Human Services.

# EXECUTIVE SUMMARY

**11.**     The U.S. Department of Justice–charged with enforcing and interpreting the Americans with Disabilities Act (ADA)–has explained:

> Voting is one of our nation's most fundamental rights and a hallmark of our democracy. Yet for too long, many people with disabilities have been excluded from this core aspect of citizenship.  People with intellectual or mental health disabilities have been prevented from voting because of prejudicial assumptions about their capabilities.  People who use wheelchairs or other mobility aids, such as walkers, have been unable to enter the polling place to cast their ballot because there was no ramp.  People who are blind or have low vision could not cast their vote because the ballot was completely inaccessible to them.[1]

**12.**     This report finds that:

**13.**     Voting eligible people with disabilities vote at lower rates than those without disabilities, vote by mail significantly more often than those without disabilities, and experience barriers to voting—both in person and by mail—more frequently than people without disabilities.

**14.**     At least 3 million voting-eligible Texans have disabilities.

**15.**     Voting-eligible citizens in Texas with disabilities face a myriad of barriers in accessing voting stemming from high rates of needing assistance in activities of daily living, higher

---

[1] *The Americans with Disabilities Act and Other Federal Laws Protecting the Rights of Voters with Disabilities*, U.S. DEPARTMENT OF JUSTICE, October 10, 2014, https://www.ada.gov/ada_voting/ada_voting_ta.htm.

likelihood of living alone, lower likelihood of having a vehicle they can drive, other barriers to travel, lower likelihood of internet access, and lower average education levels compared to those without disabilities. Voting-eligible disabled citizens in Texas are more socially isolated which limits their support networks for assistance in voting.  They also must contend with well-documented social stigma that both reflects and reinforces their social isolation and increases the barriers to obtaining necessary resources and assistance in exercising the right to vote.

16.     Only 59.4% of voting-eligible people with disabilities in Texas voted in 2020, compared to 64.5% of those without disabilities.  The 5.1 percentage point gap is well outside the statistical margin of error, so we can be highly confident of a true gap in the population.

17.     Among Texas voters in 2020, 30.2% of people with disabilities and 8.2% of people without disabilities voted using a mail ballot.

18.     While specific data on voting difficulties by disability status are not available in Texas, national data show a high rate of voting difficulties among people with disabilities. In 2020, 21.3% of in-person voters with disabilities either required assistance or had difficulties in voting, which is almost twice the 11.9% rate among voters without disabilities. There was also a disability gap among mail voters, where 14.0% of voters with disabilities either required assistance or had difficulties in voting compared to 3.2% of voters without disabilities.

19.     Based on these findings, and in my expert opinion, several provisions of SB 1 will pose barriers to Texas citizens with disabilities who wish to exercise their right to vote.

20.     Sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12 place restrictions on mail voting for applications and correcting rejected applications that will burden many people with disabilities who find it less difficult to vote by mail due to their disabilities.

21.     Section 6.01 requires any person other than a close relative who simultaneously drives seven or more voters to the polls for curbside voting to complete and sign a form stating their name and address and whether they only provided transportation assistance or also assistance with voting.  This new requirement will create additional barriers for voters with disabilities who rely on group transportation to vote curbside.  Because many people with disabilities face transportation barriers and social isolation, this new requirement will make it harder for some people with disabilities to find people willing to provide transportation assistance.

22.     Section 6.04 adds language to the assistor oath which substantially restricts the types of assistance that can be given, which will burden people with disabilities who, because of their disabilities, need assistance to vote.  There are many types of assistance people with disabilities need that go beyond the assistance permitted by SB 1. Because many people with disabilities will need this assistance, this restriction will interfere with many people's ability to vote.

23.     Sections 6.03 and 6.05 create extra requirements for assistors to document their relationship to the voter and whether they received any compensation or benefit from a candidate, campaign, or political committee. Because people with disabilities are far more likely to use curbside voting and many people with disabilities need voting assistance, this will create an extra barrier to voting for some people with disabilities in finding people willing to provide assistance. It will also increase the likelihood that a voter's ballot will be rejected, either due to a

clerical error because they had inadequate assistance, or a mistake in the documentation of the assistance they did receive.

**24.** Section 6.06 makes it a crime to compensate (or offer, solicit, receive, or accept compensation for) someone for helping a voter vote by mail. While there is an exception for previously known attendants or caregivers, this section will prohibit people with disabilities from getting assistance from a substantial number of people who they may have routinely turned to, including close friends or neighbors. It will also prohibit people with disabilities from getting assistance from staff or volunteers with community or nonpartisan civic engagement organizations that routinely provide voting support to the disability community.

**25.** Section 7.04 makes it a crime     to receive any form of compensation or     benefit for collecting another voter's mail ballot. It also criminalizes in-person interaction with a voter about a specific candidate or measure, in the physical presence of a ballot, while receiving any form of compensation or benefit.  This provision will impose barriers on     people with disabilities who require assistance to vote, who live alone and face transportation barriers, and who may benefit from assistance while continuing to vote independently.

**26.** In sum, in my expert opinion, these provisions of SB 1 will harm a significant number of Texans with disabilities and impose new barriers to them in exercising the right to vote.

# DEFINITION OF DISABILITY

**27.** The ADA protects all those with a substantial limitation in one or more major life activities. The U.S. Department of Justice has explained:

> The term 'substantially limits' shall be construed  broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA…The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence.[2]

# INTERPRETING THE DATA

**28.** This report presents an overview of the prevalence and characteristics of people with disabilities, drawing on analysis of six nationally representative surveys.  Three of these surveys are conducted by the U.S. Census Bureau:  the American Community Survey (ACS), the Survey of Income and Program Participation SSA Supplement (SIPP), and the Current Population Survey Voting and Registration Supplement (CPS).[3] The other three surveys are the National

---

[2] *Questions and Answers about the Department of Justice's Notice of Proposed Rulemaking to Implement the Americans with Disabilities Act Amendments Act of 2008*, U.S. DEPARTMENT OF JUSTICE, January 30, 2014, https://www.ada.gov/nprm_adaaa/adaaa-nprm-qa.htm.

[3] *See American Community Survey*, UNITED STATES CENSUS BUREAU, https://www.census.gov/programs-surveys/cps/about/supplemental-surveys.html (last visited 2/28/2022) (the relevant supplemental surveys are the Social Security Administration Supplement and Voter Registration Supplement, in addition to the general survey).

Household Travel Survey (NHTS) conducted by the Federal Highway Administration, the Survey of the Performance of American Elections (SPAE) conducted by the Caltech/MIT Voting Technology Project, and the Disability and Voting Accessibility Survey (DVAS) sponsored by the U.S. Election Assistance Commission and conducted by Rutgers University and SSRS Inc.[4] Each of these surveys has a large sample and uses a combination of methods to obtain information on a wide range of population characteristics. Responding households are chosen randomly, and any differences from known values in the population are corrected using statistical weights in order to ensure the final sample is representative of the population.

29.     I rely on ACS data where the measures are available, because this dataset: i) has a much larger sample size ensuring estimates with smaller margins of error, and ii) is more comprehensive by including residents living in group quarters, unlike the SIPP, CPS, and NHTS. Group quarters are categorized in ACS into either "institutional" settings (nursing homes, mental hospitals, and correctional facilities) or "non-institutional" settings (college dorms, military barracks, group homes, missions, and shelters). As will be explained below, people with disabilities are both significantly more likely than those without disabilities to be living by themselves when living in the community, and are also more likely to be living in institutional group quarters. To the extent that people with disabilities in institutional group quarters have more severe disabilities and face greater barriers, the CPS, SIPP, and NHTS will underreport the disparities faced by people with disabilities overall.

30.     The ACS and CPS have measures of both age and citizenship, so I limit the samples to the voting-eligible population (citizens age 18 or older). The DVAS includes only the voting-eligible population, and the SPAE includes only registered voters. The SIPP and NHTS have age but not citizenship measures, so estimates from those surveys are based on the voting-age population (age 18 or older).

31.     The ACS and CPS measure disability using six questions. Four of the questions measure impairments (vision, hearing, cognitive, and mobility), and two of the questions measure activity limitations (difficulty dressing or bathing, and difficulty going outside alone). These questions were chosen after extensive cognitive research by the Census Bureau, using interviews and focus groups to ascertain how respondents understood and interpreted the survey questions, to maximize the likelihood that answers to the final chosen questions would reflect accurate reporting of disabilities rather than alternative understandings of the questions.[5] SIPP uses a more extensive set of over 100 questions to derive its disability measure. The DVAS measures

---

[4] *National Household Travel Survey, U.S. Department of Transportation*, FEDERAL HIGHWAY ADMINISTRATION, https://nhts.ornl.gov/ (last visited 2/28/2022); *Survey of the Performance of American Elections*, MIT ELECTION LAB, https://electionlab.mit.edu/research/projects/survey-performance-american-elections (last visited 2/28/2022); *U.S. Election Assistance Commission Study on Disability and Voting in the 2020 Elections*, https://www.eac.gov/election-officials/us-election-assistance-commission-study-disability-and-voting-accessibility-2020 (last visited 2/28/2022).

[5] Kristen Miller and Theresa J. Demaio, *Report of Cognitive Research on Proposed ACS Disability Questions*, US CENSUS BUREAU, August 28, 2006, https://www.census.gov/library/working-papers/2006/adrm/ssm2006-06.html.

disability using the six ACS and CPS questions plus a seventh broader question, whereas the NHTS and SPAE each use one general question to measure disability.

**32.**     An important note is that the six questions used by the ACS and CPS are likely to capture only a portion of the full disability population (as defined by the broad ADA definition described above).  One issue is that people might underreport disabling conditions, as found in research comparing subjective reports to objective reports of health conditions.[6]  A second important issue is that measuring disability is made difficult by the wide variation in types of disability (e.g., hearing, vision, mobility, cognitive, developmental, chronic illnesses, and others) and the severity of disabilities (e.g., whether the condition causes a major or mild limitation in life activities).  Asking about all types of disabilities is not feasible in a survey, and due to the wide variation it is inevitable that any set of questions will miss some disabilities.  The six standard Census questions are likely to undercount speech impairments and learning disabilities, as well as mental illnesses such as depression and bipolar disorder.  They may also undercount people with episodic conditions that wax and wane such as epilepsy, Lupus, and Multiple Sclerosis, and conditions like cancer, long-COVID, or back problems that cause pain or fatigue. The Census surveys nonetheless provide a valuable window on a large portion of the disability population.  Because the six questions are likely to undercount certain types of disabilities, I also present results from a more extensive set of disability questions used in a SIPP module in 2014.  These more extensive questions have not been used in any major survey since 2014.  Due to the greater number of questions that cover a broader range of disabilities, the SIPP is likely to be a more comprehensive portrait of the disability population, although it has the drawback that it excludes people in institutional group quarters and does not have a citizenship measure as noted above.

**33.**     In this report I focus on the population of people with disabilities living in Texas.  The ACS has a large sample size of 127,398 for Texas, while the SIPP and CPS have smaller samples of 1,569 and 4,290.  The NHTS has a sample size of 44,040 for Texas.  These sample sizes are more than the standard sample size of 1,000 used to obtain reliable estimates within large populations.  Due to the smaller samples in SIPP and CPS, in several breakdowns I complement the Texas numbers from those surveys with numbers for the overall U.S., plus estimates of the significance of any differences between the U.S. and Texas samples.  The SPAE and DVAS have good samples for national estimates but do not have large enough samples within Texas for meaningful analysis, so I only present national figures from those surveys.

**34.**     In a number of places, I compare results between people with and without disabilities, showing that people with disabilities face economic and social disparities and higher rates of voting difficulties that are linked to lower voter participation.  These disparities are maintained when holding constant the effects of demographic characteristics (race, ethnicity, gender, age, and educational attainment).  The effects of disability may be even greater than indicated by the simple difference between people with and without disabilities, because voters without disabilities may face many other non-disability-related difficulties, such as language barriers.

**35.**     All estimates presented in this report use survey weights to ensure the sample is representative of the disability population on key characteristics.  Due to the pandemic possibly

---

[6] Michael Baker, Mark Stabile, and Catherine Deri, *What do self-reported, objective, measures of health measure?*, 39 J. HUMAN RESOURCES 1067 (2004).

affecting survey responses, the Census Bureau issued the 2020 ACS data with experimental weights, which I use in this report. To ensure the results did not change substantially due to the pandemic, I have also made comparisons to the 2019 ACS data. The results of this comparison (not reported here but available on request) are very similar on all key variables between 2019 and 2020.

**36.**     In short, the Census surveys do a reasonable job of providing a portrait of a large portion of the disability population, and are extensively used by scholars in peer-reviewed research on the status of people with disabilities. To the extent that they undercount people with disabilities, they will undercount the number of people who face disability-related disparities and challenges in voting and other important activities.

# <u>OVERVIEW: PREVALENCE AND GENERAL CHARACTERISTICS OF PEOPLE WITH DISABILITIES AND IMPLICATIONS FOR VOTING ACCESS</u>

## <u>Summary</u>

**37.**     In order to fully understand the extensive barriers people with disabilities face in accessing their fundamental right to vote, it is critical to provide an overview of the general barriers people with disabilities face in their daily lives and how each of these factors can impact access to voting. People with disabilities are likely to face a myriad of barriers in exercising the right to vote. These barriers can stem from a number of disability-related issues, including the need for assistance in activities of daily living, increased likelihood of living alone, lower likelihood of having a vehicle one can drive, other barriers to traveling, lower likelihood of internet access, and lower levels of education. In addition, the lower economic status of people with disabilities, reflected in lower incomes and higher poverty rates, creates challenges in exercising the right to vote. For example, people with disabilities are less likely to have the money to buy computers or own their own vehicles, making it harder to access information or get to election offices and polling sites. The social stigma many people with disabilities experience further compounds the difficulties they face in accessing voting.

## <u>Overall Prevalence and Types of Disability</u>

**38.**     Both ACS and SIPP data can be used to provide estimates of the number of people with disabilities in Texas. The ACS uses only 6 questions so is a more conservative estimate, while the SIPP disability measure is based on over 100 questions and is a more expansive estimate. Based on the 2020 ACS 6-question measure, Table 1 shows that 15.6% of voting-eligible people in Texas have disabilities, representing 3 million people. Based on the SIPP survey's more extensive set of disability questions, 30.5% of voting-age people in Texas have disabilities, representing 5.6 million people when applied to 2020 population numbers.[7] The range of 3 to

---

[7] The 5.6 million figure assumes that the proportion of adults with disabilities in Texas using the SIPP measure did not change between 2014 and 2020, and that among all Texans with

5.6 million people reflects differences in whether disability is measured more narrowly or broadly.  Two important points about this range are:  1) both numbers indicate that a substantial portion of Texans have disabilities; and 2) when the narrower ACS measure is used, this is likely to result in conservative estimates of the number of people who face disability-related disparities.

**39.**     Whether one uses the narrower or broader measure, disability prevalence is projected to grow as the overall population ages in the next few decades.[8]

**40.**     As shown in Table 1, a breakdown of ACS data by disability type shows that the Texas population of citizens with disabilities includes (the categories may overlap):

- 1,604,700 people with mobility impairments,

- 1,082,500 with cognitive impairments,

- 875,900 with hearing impairments,

-  638,500 with vision impairments,

- 596,300 with difficulty dressing or bathing, and

- 1,127,500 with difficulty going outside alone due to a physical or mental condition.

**41.**     Table 1 also shows the margin of error for each estimate, reflecting the potential for sampling error.  The margin of error of 0.3% around the disability prevalence estimate of 15.6% means that there is a 95% probability that the true population value lies within plus or minus 0.3% of the estimate, or between 15.3% and 15.9%.

**42.**     These numbers are very similar to those from before the onset of the pandemic in 2020. In 2019, the ACS data indicate that 15.6% of the Texas adult citizen population and 16.4% of the U.S. adult citizen populations had disabilities.

**43.**     The SIPP survey provides a more detailed look at variation in disabling conditions in Texas.  As shown in Table 2, more than 10% of the Texas population has difficulty with physical activities of walking, climbing stairs, lifting, standing, pushing or pulling, and crouching.  More than one-eighth (13.4%) have difficulty with one or more basic activities of daily living such as getting into a bed or chair, taking a bath or shower, eating, preparing meals, or using a telephone. Applied to 2020 Texas population figures, 2.4 million Texans have difficulty with one or more

---

disabilities age 18 or older, the percent who are eligible citizens matches the percent in the 2020 ACS (93.9%).

[8] *Ageing and Disability*, UNITED NATIONS DEPARTMENT OF ECONOMIC AND SOCIAL AFFAIRS, last visited 2/28/2022, https://www.un.org/development/desa/disabilities/disability-and-ageing.html#:~:text=Currently%2C%20it%20is%20estimated%20that,experience%20moderate%20to%20severe%20disability.

activities of daily living.  The abilities needed for several of these activities are also needed in the act of voting, both in person and by mail.

**Demographic Characteristics**

**44.**     The prevalence of disability in Texas is markedly higher among Native Americans, Black people, older people, and those with lower levels of education.  The 2020 ACS data in Table 3 show that:

- Black people (17.9%) and Native Americans (17.8%) are more likely to have disabilities, compared to white non-Hispanic (16.3%) people.  While the overall rate of disability (14.2%) is lower among Hispanic/Latinx citizens than among non-Hispanic/Latinx citizens overall, this is largely due to their younger average age that is linked to lower disability rates.  When broken down by age group, the rate of disability is significantly higher among Hispanic/Latinx citizens in every age group except for the youngest (18-34).[9]  As a consequence, Hispanic/Latinx citizens are likely to face disparities linked both to disability and to their Hispanic/Latinx heritage.  Similarly, the higher rates of disability among Black citizens means that they are likely to face disparities linked both to disability and to race.

- The disability rate climbs strongly with age, from 7.7% among those aged 18-34 to 70.3% among those aged 85 or older.

- The disability rate declines strongly as the rate of education rises, from 28.1% among those without a high school degree to 9.4% among those with a graduate degree.

**45.**     The relationship between education and disability reflects causality in both directions.  Disability can limit education due to barriers that people with disabilities often encounter in furthering their education, such as lack of a correct diagnosis or appropriate accommodations, especially for poorer children.  Education also has an impact on disability: it can open up jobs with safer working conditions that are less likely to lead to disability, and provide higher incomes that increase access to health services and assistive technology that help people cope with potentially disabling conditions.

**46.**     The estimated total number of voting-eligible people with disabilities in Texas is 1,551,800 among women, 1,472,400 among men, 1,533,400 among white non-Hispanic/Latinx people, 428,300 among Black non-Hispanic/Latinx people, and 881,800 among Hispanic/Latinx people.  Compared to pre-pandemic 2019 data, the percentages and numbers of people with disabilities in Texas are very similar between 2019 and 2020.

**Economic Status**

---

[9] The rates of disability for Hispanic/Latinx compared to white non-Hispanic people are 6.9% compared to 8.0% among those age 18-34, 9.9% compared to 8.2% among those age 35-49, 18.8% compared to 14.9% among those age 50-64, and 42.5% compared to 35.0% among those age 65 or older.

47.     People with disabilities in Texas have very low employment rates and high poverty rates. As shown in Table 4, only 40.1% of working-age (18-34) Texans with disabilities were employed in 2020, which is just over half the rate of people without disabilities (74.2%).  Among all ages, people with disabilities were almost twice as likely to live in poverty (18.0% compared to 9.2%).  They were also much more likely to receive income from Social Security (47.4% compared to 13.3%), reflecting both disability and retirement income provided through Social Security.  In part due to their low incomes, 20.3%  receive public assistance income or food stamps, and 26.5% receive health care coverage through Medicaid or another low-income plan, compared to 10.3% and 6.1% (respectively) of people without disabilities.  Additional breakdowns show that this pattern is very similar between Texas and the U.S. as a whole, and between 2019 and 2020.

**<u>Living Situation and Need for Assistance</u>**

48.     People with disabilities in Texas are more likely to live alone and be unmarried, and a large portion need assistance with activities of daily living.  From the 2020 ACS data shown in Table 4:

- People with disabilities are significantly more likely than people without disabilities to live alone—that is, not living with others either in the community or in institutional group quarters (20.8% compared to 12.3%).

- They are less likely to be currently married with a spouse present (42.8% compared to 52.4%), and more likely to be separated or divorced (19.4% compared to 12.1%) or widowed (14.4% compared to 3.4%) while not being currently married.

- They are four times more likely than people without disabilities to live in institutional group quarters (4.7% compared to 1.1% are in nursing homes, mental hospitals, or correctional facilities).

49.     These patterns of disparities are very similar between Texas and the entire U.S.

50.     People with disabilities are also more likely to need assistance with activities of daily living, which are measured only in SIPP.  Because the 2014 SIPP sample has only 566 Texans with disabilities, I also provide numbers for the full U.S. sample of 10,003.  From the data shown in Table 5, close to two-fifths of people with disabilities (41.2% in Texas and 37.4% in the U.S.) need assistance with one or more activities, with especially high rates for going outside of the home for errands (25.5% in Texas), accessing the Internet (15.2%), doing light housework (13.7%), keeping track of money (12.0%), and preparing meals (11.0%).

51.     Applied to the 2020 Texas population, this indicates that close to 2.3 million Texas citizens age 18 or older need assistance with one or more daily activities.

52.     Because a large number of people with disabilities live alone, many who need assistance must rely on non-household members.  Over one-third (34.9%, or an estimated 1.9 million in 2020) of Texans with disabilities receive assistance in daily activities from family members, 4.0% (220,000) from friends or neighbors, 4.0% (220,000) from paid help, 1.4% (79,000) from

partners or companions,  1.4% (78,000) from other non-relatives, with a total of 10.6% (589,000) from any non-relative (these categories overlap as individuals may receive help from more than one person).

**53.**     The above characteristics create greater challenges to voting for many people with disabilities, particularly when they need assistance and find it difficult to arrange such assistance due to their higher likelihood of living alone and greater social isolation.

**<u>Computer and Internet Access</u>**

**54.**     Due in part to their lower average incomes, people with disabilities in Texas are less likely to have internet access.  From the 2020 ACS data shown in Table 6:

- Among Texas citizens with disabilities eligible to vote, 84.5% live in homes with internet access, compared to 95.2% for people without disabilities.

- Translated into absolute numbers, an estimated 460,600 citizens with disabilities who are eligible to vote in Texas live in homes without internet access.

**55.**     These digital gaps also show up when looking at individual rather than household access to the internet.  Further data from the Census Bureau's 2019 Current Population Survey Computer and Internet Use Supplement show that:

- People with disabilities in Texas are less likely to use the internet at home (60.1% compared to 78.9% of people without disabilities).

- This gap is not decreased by adding in internet access outside the home.  Considering all forms of internet access, 60.5% of people with disabilities use the internet in any location compared to 82.3% of people without disabilities.

- Translated into absolute numbers, an estimated 823,200 Texas citizens with disabilities do not use the internet either inside or outside the home.

- The disability gaps are not explained by age differences between people with and without disabilities.  While older people are less likely to access the internet, Table 5 shows that large disability gaps exist within each age group.

- While the 2019 survey has a limited sample of Texans with disabilities, the disability gaps in each measure are outside of the margin of error.

**56.**     These disability gaps in computer and internet access can impact the ability of citizens with disabilities to obtain necessary resources for voting.  Not having internet access can make it more difficult to:  a) register to vote; b) find out how and where to vote, particularly if polling places have been changed;  c) gather information on candidates and issues in order to make informed decisions in voting; and d) cure issues with mail-in ballot applications.  These difficulties create special problems when voting information is only provided in an online format.

**Transportation**

57.     People with disabilities face transportation barriers.  Based on the 2017 National Household Travel Survey, 1.8 million Texans age 18 or older have travel-limiting disabilities, defined as "a temporary or permanent condition or handicap that makes it difficult to travel outside of the home."  The rate of travel-limiting disability in Texas was 10.0% among those age 18 or older.  Several findings shown in Table 7 are:

- Texans with disabilities were four times more likely to live in zero-vehicle households (14.4% compared to 3.0% of Texans without disabilities).

- Texans with disabilities took fewer average trips per day (2.3 compared to 3.5) and were more likely to take no trips in a day (40.0% compared to 15.8%).

- Texans with disabilities are less likely to be drivers than are those without disabilities (59.6% compared to 93.0%).

- Texans with disabilities were slightly more likely to use public transportation (12.6% compared to 8.8% among Texans without disabilities).

- Texans with disabilities did not make up for transportation barriers by using ride-hailing services such as taxis or Uber (only 2.6% did so in the past month compared to 8.8% of Texans without disabilities) or by relying on online purchases (only 31.5% did so compared to 54.2% of Texans without disabilities.).

- Over half (53.6%) of Texans with disabilities agreed that travel is a financial burden, compared to only 39.6% of those without disabilities.

58.     These results are supported when employing a broader disability measure using national data.  As also shown in Table 7, the 2020 Disability and Voting Accessibility Survey (DVAS), shows that only 69.6% of people with disabilities can drive their own or a family vehicle, compared to 90.0% of people without disabilities.  People with disabilities were also more likely than those without disabilities to say they faced transportation problems "very often" or "always" (5.6% compared to 2.9%).

59.     Transportation difficulties can have a negative impact on voting as research finds a significantly higher likelihood of voting among those who have a vehicle they can drive.[10]

**Social Isolation, Stigma, and Bias**

60.     The lower employment levels, greater likelihood of living alone, lower internet access, and transportation barriers among people with disabilities documented above all contribute to social isolation.  The greater social isolation of people with disabilities is also evidenced in their

_____

[10] Lisa Schur, Todd Shields, Douglas Kruse, & Kay Schriner, *Enabling Democracy: Disability and Voter Turnout.* 55 POLITICAL RESEARCH QUARTERLY 167 (2002).

lower likelihood of socializing with friends, relatives, or neighbors.[11]  This social isolation limits the support network upon which people with disabilities may rely for assistance with fundamental daily activities, including accessing the right to vote.

**61.**     The social isolation is reflected in, and reinforced by, the well-documented stigma attached to disability that continues to be manifested in attitudinal studies of the general population.[12]  These attitudes toward people with disabilities impact all areas of an individual's life.  The stigma attached to disability may impact the perception of a person's abilities that do not align with reality. This can impact the ability of people with disabilities to vote by, for example, making people (particularly those outside of their families) less willing to assist them with voting, and can also result in people with disabilities themselves being less willing to ask for assistance when needed.

# VOTING BARRIERS FACING PEOPLE WITH DISABILITIES

## Voter Participation

**62.**     People with disabilities in Texas and nationwide are less likely to vote than their non-disabled counterparts. Data from the Current Population Survey Voting and Registration Supplement, conducted by the Census Bureau every two years following national elections, show that 71.9% of eligible citizens with disabilities in Texas were registered to vote in 2020, and 59.4% voted, compared to 71.2% and 64.5% of citizens without disabilities respectively.  These numbers show that citizens with disabilities in Texas had a similar registration rate as those without disabilities (within the margin of error), but they were 5.2 points less likely to vote, and the voting gap is outside the margin of error.  In the U.S. as a whole, people with disabilities were 3.0 points less likely to be registered to vote, and 5.7 points less likely to vote, and the larger U.S. sample means that we are at least 99.9% confident that there is a true participation gap in the population.  These figures are provided in Table 8.  Similar disability participation

---

[11] Harris Interactive, *The ADA: 20 Years Later*, KESSLER FOUNDATION AND THE NATIONAL ORGANIZATION ON DISABILITY at 15-16, July 2010, http://www.advancingstates.org/hcbs/article/ada-20-years-later-2010-survey-americans-disabilities.

[12] Fatima Jackson-Best and Nancy Edwards, *Stigma and intersectionality: a systematic review of systematic reviews across HIV/AIDS, mental illness, and physical disability*, 18 BMC PUBLIC HEALTH 919 (2018); Barbara Muzzatti, *Attitudes towards disability: beliefs, emotive reactions, and behaviors by non disabled persons*, 35 GIORNALE ITALIANO DI PSICOLOGIA 313 (2008); Katarina Scior, *Public awareness, attitudes and beliefs regarding intellectual disability:  A systematic review*, 32 RESEARCH IN DEVELOPMENTAL DISABILITIES 2164 (2011); Denise Thompson, Karen Fisher, Christiane Purcal, Chris Deeming, and Pooja Sawrikar, *Community attitudes to people with disability: Scoping project No. 39.*, DISABILITY STUDIES AND RESEARCH CENTRE, UNIVERSITY OF NEW SOUTH WALES (2011); Harold Yuker, *Attitudes toward Persons with Disabilities, Springer* (1st Ed. 1988).

gaps at the national level are found in all of the 13 studies going back to the 1992 elections, which use differing samples and definitions of disability.[13]

**63.** In both the Texas and overall U.S. samples, the disability voting gap is larger than the disability registration gap, indicating that lower voting among people with disabilities cannot be explained by lower registration rates.

**64.** The importance of variation across different types of disability is shown in the voting figures. Broken down by type of disability, national voter participation in 2020 was lowest among people with difficulty dressing or bathing (49.4%), cognitive impairments (50.7%), and difficulty going outside alone (51.6%), but participation was also low among those with visual impairments (59.2%) or difficulty walking or climbing stairs (60.4%). These numbers are drawn from Table 9.

**65.** Research indicates that several factors contribute to the disability participation gap, including lower levels of education and income, lower feelings of political efficacy among people with disabilities, and greater social isolation that reduces the likelihood of being recruited to vote by friends, neighbors, or colleagues. These factors do not, however, fully explain the disability gap in participation.[14] Part of the remaining gap in participation can be traced to lower turnout due to prior difficulties in voting.[15]

**66.** An important note is that voter participation can vary substantially across elections for citizens both with and without disabilities. An increase in participation in an election among people with disabilities does not necessarily indicate the absence of continued voting barriers that discourage participation.

**Voting method**

**67.** Each voting method can present access barriers to people with different types of disabilities. Voting by mail can be an attractive option for people with mobility impairments, transportation problems, or other issues that make it hard to leave one's home. This is particularly relevant to the 10.0% of Texans who report travel-limiting disabilities as shown in Table 7, and the 8.3% of Texans who have difficulty walking or climbing stairs and 5.8% of Texans who have difficulty going outside alone, as shown in Table 1. The 3.3% of voting-

---

[13] Summarized in Lisa Schur & Meera Adya, *Sidelined or Mainstreamed? Political Participation and Attitudes of People with Disabilities in the United States*, 93 SOCIAL SCIENCE QUARTERLY 811 (2012).

[14] Lisa Schur, Todd Shields, Douglas Kruse, & Kay Schriner, *Enabling Democracy: Disability and Voter Turnout. 55* POLITICAL RESEARCH QUARTERLY 167 (2002); Lisa Schur, Todd Shields, & Kay Schriner, *Generational cohorts, group membership, and political participation by people with disabilities,* 58 POLITICAL RESEARCH QUARTERLY 487 (2005); and Lisa Schur & Meera Adya, *Sidelined or Mainstreamed? Political Participation and Attitudes of People with Disabilities in the United States,* 93 SOCIAL SCIENCE QUARTERLY 811 (2012).

[15] Lisa Schur, Mason Ameri, and Meera Adya, *Disability, Voter Turnout, and Polling Place Accessibility*, 98 SOCIAL SCIENCE QUARTERLY 1374 (2017).

eligible Texans with vision impairments, however, may not be able to vote independently with a mail ballot, and may need polling places where they can vote independently with an accessible machine required by the 2002 Help America Vote Act (HAVA).

**68.** Overall, people with disabilities are much more likely to vote by mail. Among Texas voters in 2020, 30.2% of people with disabilities and 8.2% of people without disabilities voted using a mail ballot, producing a gap of 22.0%, as shown in Table 8. Voting by mail was less likely in Texas than in the entire U.S. for people both with and without disabilities, but the disability gap was larger. The percentages of people with and without disabilities who voted by mail in the full U.S. were 53.2% and 41.9% respectively, producing a gap of 11.3%. The rate of voting by mail is high across all of the major disability types, as shown in Table 9. For many people with mobility restrictions, transportation barriers, and difficulty standing in long lines, voting by mail is effectively the only option they have to vote.

**69.** Voting by mail increased in 2020 due to the pandemic. Differences by disability status, however, existed before the pandemic. In the 2016 general election, Texas voters with disabilities were more than three times as likely as voters without disabilities to vote by mail (19.8% compared to 6.0%).

**Barriers to In-Person Voting**

**70.** As noted above, the disability gap in voter participation is not fully explained by standard predictors of participation. Voting barriers appear to play a role, as voter participation is lower when voting is more time-consuming and difficult. People with disabilities can face extra barriers in:

- Finding or getting to the polling place, particularly for those facing transportation barriers as described above.

- Getting inside the polling place, particularly for those in wheelchairs or with visual impairments.

- Standing in line, particularly for those with chronic illnesses or health conditions that limit their endurance.

- Being prevented from voting by poll workers, particularly for those who appear to have a cognitive disability.

- Reading or seeing the ballot, particularly for those with cognitive or vision impairments.

- Understanding how to vote or use the equipment, particularly for those with cognitive, vision, or upper arm mobility impairments.

- Communicating with poll workers, particularly for those with hearing, speech, or cognitive impairments.

- Writing on the ballot, particularly for those with impairments limiting upper body mobility.

- Physically operating the voting machine, particularly for those with vision impairments or impairments limiting upper body mobility.

**71.**    There is empirical evidence on a number of these factors.  Barriers in finding or getting to polling places have been shown to lower voter participation among people in general.[16] These barriers can be greater for people with disabilities:  one study found substantially lower voter participation among people with mobility limitations in areas with streets in poor condition.[17]

**72.**    Analysis of the nationally representative Survey of the Performance of American Elections (SPAE) conducted following the 2020 elections shows that 1.2% of all registered voters with disabilities said they did not vote because "I tried to vote, but was not allowed to when I tried" compared to 0.3% of people without disabilities.[18]  In addition, 1.4% of registered voters with disabilities in the U.S. reported they did not vote due to long lines at the polls, compared to 0.3% of those without disabilities.   Taken together, these results indicate that a substantial portion of the 5.7 point national disability gap in voter participation (from Table 9) can be accounted for by a greater likelihood that registered voters with disabilities said they were not allowed to vote or were dissuaded by the long lines.

**73.**    In the 2020 DVAS, over one-sixth (18.0%) of people with disabilities who voted at a polling place or election office reported at least one or more barriers, which was almost twice the rate of voters without disabilities (9.8%). The rate of barriers was especially high among those with cognitive impairments (30.0%) and those needing help with daily activities (24.8%).

**74.**    Specific barriers are listed in Table 10.  The most common polling place barriers people with disabilities faced were difficulty waiting in line (7.4% among all polling place voters with disabilities), difficulty reading or seeing the ballot (3.8% ), and getting inside the polling place (3.2%).  These problems were especially likely among those with vision and mobility impairments, and those needing help in daily activities.[19]

---

[16] Henry E. Brady & John E. McNulty, *Turning out to vote: The costs of finding and getting to the polling place*, 105 AMERICAN POLITICAL SCIENCE REVIEW 115 (2011).
[17] Philippa Clarke, Jennifer Ailshire, Els Nieuwenhuijsen, Marijke de Kleijn–de Vrankrijker, *Participation among adults with disability: The role of the urban environment*, 72 SOCIAL SCIENCE & MEDICINE 1674 (2011).
[18] The figures in this paragraph are derived from analysis in *Survey of the Performance of American Elections*, MIT ELECTION DATA + SCIENCE LAB,
https://electionlab.mit.edu/research/projects/survey-performance-american-elections, last visited 2/28/2022. The data contain responses from 18,200 people registered to vote.
No further information is available on what respondents meant by saying they were "not allowed to vote." This could indicate legal barriers such as having their eligibility challenged, having a mail ballot rejected, not having proper ID, or being at the wrong polling place.
[19] *See* Thad E. Hall & R. Michael Alvarez, *Defining the Barriers to Political Participation for Individuals with Disabilities,* THE INFORMATION TECHNOLOGY AND INNOVATION FOUNDATION,

75.     News reports provide examples from across the country of several of these barriers in voting at polling places:

- Liam Dougherty, who has a progressive muscular disability, has had problems getting inside polling places, waiting in line due to bladder control issues, and having poll workers not know how to lower the machine to reach his wheelchair.[20]

- Elizabeth Clay, who is missing her right leg, has difficulty navigating city streets and getting to her polling place.[21]

- Xian Horn, who has cerebral palsy, found the wheelchair-accessible entrance of her polling place blocked by trash cans.[22]

- Emily Ladau, who has Larsen syndrome which affects bone development, found the accessible entrance to her polling place locked, and had to rely on her father to go in through the main entrance to ask a poll worker to open the door.[23]

- LouAnn Blake, who is blind, found that poll workers did not know how to set up the audio ballot technology at her voting location.[24]

- Kathy Hoell, a wheelchair user with a brain injury, was initially denied permission to vote because poll workers told her she is not "smart enough," and has had poll workers lead her to stairs she could not climb and prevented her from using an accessible voting machine because they had not turned it on.[25]

---

May 14, 2012, https://elections.itif.org/reports/AVTI-001-Hall-Alvarez-2012.pdf (describing problems of polling place access, reading the ballot, and understanding the voting process among focus group participants with disabilities in Los Angeles in 2010).

[20] Michaela Winberg, *'I'm not included here': People with disabilities face barriers to voting in Philly and beyond*, WHYY, October 15, 2020, https://whyy.org/articles/voting-while-disabled-presents-challenges-for-philadelphians/.

[21] *Id.*

[22] Maggie Astor, *'A Failed System': What It's Like to Vote With a Disability During a Pandemic*, NEW YORK TIMES, September 25, 2020.

[23] *Id.*

[24] Jeanine Santucci, *30 years after the ADA, access to voting for people with disabilities is still an issue*, USA TODAY, July 26, 2020.

[25] Matt Vasilogambros, *How Voters With Disabilities Are Blocked From the Ballot Box*, PEW TRUSTS, February 1, 2018, https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2018/02/01/how-voters-with-disabilities-are-blocked-from-the-ballot-box.

**76.**     In addition, anonymous reports from voters with disabilities collected around the country by a disability organization regarding voter experiences in the 2020 election included[26]:

- "I could not turn on the screen"

- "No headsets were available"

- "Headsets available, did not work"

- "Poll worker did not know how to turn on the audio features"

- "Poll worker did not know how to make the sound louder or softer"

- "I did not know how to 'go back' or change who or what I voted for"

- "Had error message and could not vote"

- "Had to vote in person because I did not get my mail-in or absentee ballot"

- "Could not understand my ballot"

**77.**     Barriers to polling place access in Texas were identified in settlements since  2015 between the Justice Department and Harris, Nueces, Galveston, and McLennan counties, which included "steep ramps, gaps in sidewalks and walkways, and locked gates along the route barring pedestrian access."[27]

**<u>Barriers to Voting With a Mail Ballot</u>**

**78.**     Potential barriers to voting with a mail ballot include:

- Complicated instructions in applying for a mail ballot

---

[26] *Experience Survey Results: Power of the Disability Vote*, SABE GOVOTER PROJECT, 2021, https://www.sabeusa.org/wp-content/uploads/2021/10/SABE-GoVoter-2020-Survey-Report.pdf.
[27] *Justice Department Reaches Agreement with Harris County, Texas, to Ensure Polling Place Accessibility for Voters with Disabilities*, US DEPARTMENT OF JUSTICE, March 12, 2019, https://www.justice.gov/opa/pr/justice-department-reaches-agreement-harris-county-texas-ensure-polling-place-accessibility; *Settlement Agreement Between the United States of America and Nueces County Texas Under the Americans with Disabilities Act* at §H, https://www.ada.gov/nueces_co_tx_pca/nueces_co_tx_sa.html; *Settlement Agreement Between the United States of America and Galveston County, Texas Under the Americans with Disabilities Act* at Attachment E, available at https://www.ada.gov/galveston_tx_pca/galveston_tx_sa.html; *Settlement Agreement Between the United States of America and McLennan County, Texas Under the Americans with Disabilities Act* at Attachment E, available at: https://www.ada.gov/mclennan_pca/mclennan_sa.html.

- Application requirements to identify as a person with a disability, which many people with significant impairments are reluctant to do due to disability stigma noted above

- The requirement to apply for a mail ballot in every election

- Difficulty reading or seeing the ballot, particularly for people with visual impairments

- Difficulty understanding the ballot or how to fill it out, particularly for people with cognitive or developmental disabilities

- Difficulty filling out the ballot or placing it in an envelope, particularly for people with limited dexterity

- Difficulty taking the ballot to a mailbox, a drop box, or an election office, particularly for people with mobility impairments or difficulty going outside alone

- Postage expense in mailing the ballot in locations where stamps are required to return a ballot

**79.**     In the 2020 DVAS survey, the overall rate of difficulty in voting with a mail ballot was 5.4% among voters with disabilities. The rate was especially high among those with visual impairments (22.1%) who expressed the most difficulties with reading and filling out the ballot, as shown in Table 11.

**80.**     Barriers to voting by mail are exemplified in the following anecdotal cases from across the country:

- Jack Dougherty voted by mail in 2020 after many experiences of barriers to voting at a polling place.  Due to dexterity issues, he said he had difficulty in filling out the bubbles on the mail ballot and writing his name and address on the correct lines.[28]

- Katie Maunder, who is blind, said she could not have filled out her mail ballot without her mother's help.[29]

- Sheryl Grossman has Bloom syndrome, a genetic disorder that weakens her immune system and causes cognitive disabilities.  She cannot safely go to a polling place or allow anyone into her home, and cannot complete a mail ballot, so she had to tape her mail ballot to her door with a list of choices and watch as election officials filled out and sealed the ballot.[30]

---

[28] Michaela Winberg, *'I'm not included here': People with disabilities face barriers to voting in Philly and beyond*, WHYY, October 15, 2020, https://whyy.org/articles/voting-while-disabled-presents-challenges-for-philadelphians/.

[29] *Id.*

[30] Maggie Astor, *'A Failed System': What It's Like to Vote With a Disability During a Pandemic*, NEW YORK TIMES, September 25, 2020.

- Joanne Wolf, who has multiple sclerosis and cannot write by hand or sign a mail ballot, had her ballot with a signature stamp rejected twice.[31]

**81.**     In addition, anonymous reports from voters with disabilities collected by a disability organization regarding voter experiences with mail ballots in the 2020 election included a number of barriers that included[32]:

- "I had to ask for help."

- "I had problems understanding how to complete the ballot."

- "I had problems mailing my ballot."

- "I had to pay postage."

**82.**     Experiencing these types of difficulties predicts attitudes among people with disabilities that discourage voting in the future.[33]

**Need for Assistance in Voting**

**83.**     As described earlier, about two-fifths of people with disabilities need assistance with one or more activities of daily living.  Many people who need assistance with activities of daily living will also need voting assistance, since voting requires functional abilities that are often needed to perform activities of daily living (for example, manual dexterity needed for getting dressed or preparing meals is also needed in operating most voting machines).  In the 2020 DVAS, 6.2% of people with disabilities who voted at a polling place reported needing assistance in voting, compared to 3.7% of those without disabilities.[34]  Among those who voted by mail, 10.5% of people with disabilities reported needing assistance in doing so, compared to 1.1% of voters without disabilities.[35]  The greater gap in assistance needed in mail voting is likely due to the greater likelihood of severe disability among those who vote by mail.

**84.**     Among people with disabilities who needed assistance in voting in a polling place, such assistance was most commonly provided by election officials (54%), family members (19%), and home aides (6%).  Among those who needed assistance in voting with a mail ballot, such assistance was most commonly provided by family members living with the voter (56%), family

---

[31] *Id.*

[32] *Experience Survey Results: Power of the Disability Vote*, SABE GoVOTER PROJECT, 2021, https://www.sabeusa.org/wp-content/uploads/2021/10/SABE-GoVoter-2020-Survey-Report.pdf.

[33] Lisa Schur, Mason Ameri, and Meera Adya, *Disability, Voter Turnout, and Polling Place Accessibility*, 98 SOCIAL SCIENCE QUARTERLY 1374 (2017).

[34] The difference of 2.7 points is within the 3.1 point margin of error.

[35] The difference of 9.4 points is outside the 3.5 point margin of error.

members not living with the voter (19%), friends or neighbors (8%), home aides (7%), or other non-relatives (6%).

**85.**     People with disabilities are less likely to be able to vote independently (without assistance) with no difficulties.  The 2020 DVAS found that over one-fifth (21.3%) of in-person voters with disabilities either required assistance or had difficulties in voting, which is almost twice the 11.9% rate among voters without disabilities.  There was also a disability gap among mail voters, where 14.0% of voters with disabilities either required assistance or had difficulties in voting compared to 3.2% of voters without disabilities.

**86.**     As described earlier, Texans with disabilities are more likely than those without disabilities to live in institutional group quarters such as nursing homes and assisted living settings.  Those in institutions generally have more severe disabilities that are more likely to require assistance in voting and daily activities.  There is, however, tremendous variation in registration and voting procedures, staff attitudes, and likelihood of voting among nursing homes and assisted living settings; one study found that residents who wanted to vote were unable to do so at nearly one-third of sites, and that staff and administrator attitudes were a critical factor.[36]

**87.**     Assistance in voting is about more than just driving someone to the polls or helping them with the physical act of marking a ballot.  People with mental health disabilities may require and receive assistance in various aspects of the voting process that in no way suggest the assistor is "voting for" the person with a disability or exercising improper influence over the voter.  A substantial literature supports the idea that people with cognitive disabilities, including intellectual and developmental disabilities, can make important decisions such as voting while relying on trusted assistors in executing those decisions.[37]  Such assistance can "facilitate the exercise of autonomy" for individuals with certain neurological or cognitive conditions.[38] In the context of voting, this assistance often involves more than just reading the ballot aloud and helping people to mark it.

---

[36] Jason H.T. Karlawish et al., *Identifying the barriers and challenges to voting by residents in nursing homes and assisted living settings*, 20 J. AGING SOC. POLICY 65 (2008).

[37] *Id*.; Raymond Raad, Jason Karlawish, & Paul S. Appelbaum, *The capacity to vote of persons with serious mental illness*, 60 PSYCHIATRIC SERVICES 624 (2009); Jason H. Karlawish et al, *Addressing the ethical, legal, and social issues raised by voting by persons with dementia*, 292 JAMA 1345 (2004); Andrew Peterson, Jason Karlawish, and Emily Largent, *Supported Decision Making With People at the Margins of Autonomy*, 21 AM. J. BIOETHICS 4 (2021).

[38] Andrew Peterson, Jason Karlawish, and Emily Largent, *Supported Decision Making With People at the Margins of Autonomy*, 21 AM. J. BIOETHICS 4 (2021).

# SB 1 IMPOSES BARRIERS ON TEXAS VOTERS WITH DISABILITIES THAT WILL MAKE IT HARDER FOR THEM TO VOTE AND MAY PREVENT SOME FROM VOTING ALTOGETHER

88.     The above findings are relevant to an analysis of the likely effects of SB 1 on the ability to vote among people with disabilities.  Drawing on these data and my knowledge of the voting needs of people with disabilities, it is my opinion  that SB 1 will impose barriers to voting on Texans with disabilities. The following provisions of SB 1 make it harder for Texans with disabilities to vote and may prevent some from voting altogether:

## Sections 5.02, 5.03, 5.06,  5.07, 5.10, and 5.12

89.     These sections impose new requirements to vote by mail.  They now require voters to provide the number on their Texas driver's license, Texas election identification certificate, or Texas personal ID card on both their mail-in ballot applications and on the ballot carrier envelopes used to return their ballot. If the voter has not been issued one of these numbers, the voter may instead provide the last four digits of their Social Security number. If the voter has not been issued any of these numbers, the voter may sign a statement indicating that they have never been issued one of these numbers.  The law further provides that if the information the voter provides does not "identify the same voter identified" on the voter's registration application, then the mail-in ballot application and/or ballot in the voter's carrier envelope must be rejected.  SB 1 provides that a voter may be notified by phone or e-mail of the defect and that the voter may request to have the voter's application to vote by mail canceled or go to the voting clerk's office in person to correct the defect or go through an online curing process. There are several relevant research findings regarding the likely impact of these provisions on voters with disabilities:

90.     Texas voters with disabilities were almost four times as likely as those without disabilities to vote by mail in 2020 (30.2% compared to 8.2%), so these additional requirements to be able to vote by mail, and the critical consequences if the ID number they provide does not match the ID number with which they registered, are likely to have a significant negative impact on many voters with disabilities.

91.     Remembering how one recorded ID information on a registration application is likely to be difficult for many people with disabilities. Because disability correlates with age, it may have been a long time since they first registered and many of them may have difficulty remembering what ID information they presented for their initial registration. As noted above, an estimated 1,082,500 eligible voters in Texas have cognitive disabilities, which are measured as difficulty in concentrating, remembering, or making decisions. The records or identifying documents may be held by family members or facility staff, and may not be readily available to people with disabilities.  The staff in congregate settings may be unwilling or uninterested in helping people with disabilities get the correct information; as noted, research has found that staff attitudes are

key determinants of whether residents have the necessary information for voting.[39] Though SB 1 permits a voter to "make a statement" that they have not been issued any of the permissible identification numbers, a voter cannot make a statement indicating that they have been issued one of these numbers but do not know the number or do not have access to it or cannot provide the number for some other reason.

92.     Among those whose applications are initially rejected, it is likely that correcting the information will be difficult for many people with disabilities. Whether attempting to remedy this in person or online, it is unclear how a voter who does not know these numbers will be able to cure the defect. Further, voters who are voting by mail due to a disability may be unable to go in person to cure the defect for the same reason they did not vote in person.

93.     The online curing option may not help voters who are unable to cure in person because, as discussed above, people with disabilities have lower levels of internet access: a full 15% of Texans with disabilities living in the community (not in group quarters) do not have internet access in their homes, compared to only 5% of those without disabilities.[40]  The gap is larger among those age 65 or older, where 40% of Texans with disabilities compared to 18% of those without disabilities do not have internet access.  Even those with internet access may be limited by inaccessible websites.  A 2020 report found that 98% of all websites are not fully accessible to people with disabilities.[41]  Since 15% of Texans with disabilities do not have access to the internet at their homes, it is my opinion they will be disenfranchised by this provision since many will not be able to cure in person either.

94.     Indeed, as has already been reported, as of February 25, 2022, election officials in the most populous Texas counties have rejected roughly 30% of the absentee ballots they have received largely because voters did not include their driver's license number or Social Security number, or the numbers they put down did not match what officials had on file–new provisions imposed by SB 1. As reported, this rate of rejection represents a significant increase from past elections, including 2020, when the statewide rejection rate of absentee ballots was less than 1% for the general election. In 2020, officials rejected 8,304 absentee ballots in Texas out of nearly a million votes across the state. This year, that number has already been surpassed in just two counties.[42] As reported by the *New York Times*:

> But with voting by mail limited to elderly and disabled voters, the concern that initially rejected ballots will disenfranchise voters has grown. Guillermina

---

[39] Jason H.T. Karlawish et al., *Identifying the barriers and challenges to voting by residents in nursing homes and assisted living settings*, 20 J. AGING SOC. POLICY 65 (2008).

[40] The ACS does not measure internet access for those living in institutional or non-institutional group quarters.

[41] Ruderman Family Foundation, *98% of Websites Fail to Comply With Accessibility for People With Disabilities,* ICT SOLUTIONS & EDUCATION MAGAZINE, https://isemag.com/2020/11/telecom-98-percent-of-websites-fail-to-comply-with-accessibility-requirements-for-people-with-disabilities/, last visited 2/28/22.

[42] Nick Corasantini, *Ballot Rejections in Texas Spike After New Voting Law*, NEW YORK TIMES, Feb. 25, 2022, https://www.nytimes.com/2022/02/25/us/politics/texas-primary-ballot-rejections.html.

Nevárez lives at home in the Maverick County border region with her husband, Alfonso Nevárez Sr., and her 98-year-old mother, who is disabled and recovering from a recent surgery. In all three of their ballots, they missed the field to include their identification information, presuming that since their ballot application had been accepted they were free to cast their ballot. "We didn't look at the fine print," said Ms. Nevárez, who is also the mother of a former Democratic state representative. "And there's so much of it, the fine print." She corrected the three ballots and sent them back by mail. She is hoping that the information is correct — because of her mother's condition, they cannot go in person to fix any issues. "It is very upsetting," Ms. Nevárez said.[43]

95.    I conclude with a reasonable degree of certainty, based on the above data, that Texans with disabilities are four times more likely to vote by mail, more likely to have difficulty accessing the requisite ID numbers and ensuring the numbers on the application and envelope match, and less likely to be able to access the curing process online or in person. As such, the new barriers imposed by Sections 5.02, 5.03, 5.06, 5.07, 5.10, and 5.12 will make it harder for people with disabilities to vote. Therefore, I conclude that these sections will cause some Texans with disabilities to be disenfranchised and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1.

# SECTION 6.01

96.    This section requires any person other than a close relative who simultaneously drives seven or more voters to the polls for curbside voting to complete and sign a form stating their name and address and whether they only provided transportation assistance or also assistance with voting.  There are several research findings relevant to this section's impact on voters with disabilities.

97.    As discussed above, voters with disabilities are more likely to face transportation barriers than people without disabilities. Among all Texans of voting age, 10% report a disability that limits travel.  Texans with disabilities are four times more likely to live in a zero-vehicle household (14.4% compared to 3.0%) and are less likely to be drivers (59.6% compared to 93.0%).  Further, 5.8% of Texans have difficulty going outside alone, representing 1.1 million people. Voters with disabilities are also more likely to be socially isolated, and more likely to live alone. Because curbside voting is only available to certain voters who are far more likely to have a disability and people with disabilities are more likely to face transportation barriers and social isolation, it is my opinion that additional barriers to providing assistance in the form of group transportation for curbside voting will burden voters with disabilities.

98.    I can conclude with reasonable certainty, based on the above data, that Texans with disabilities are more likely to face transportation barriers, more likely to live alone, and more likely to be socially isolated. As such, the barriers imposed by Section 6.01 on providing group transportation to the polls for curbside voting will make it harder for some Texans with disabilities to vote. Therefore, I conclude that Section 6.01 will cause some Texans with

---

[43] *Id.*

disabilities to be disenfranchised, and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1.

# __SECTION 6.04__

**99.**     This section adds language to the assistor oath, substantially restricting the amount of assistance that can be given by anyone except an election officer.  This will make voting more difficult for many people with disabilities.  Texas data show that 41.2% of people with disabilities need assistance in one or more daily activities. National data show that 6.2% of people with disabilities who voted in a polling place required assistance, and 10.5% of voters with disabilities who voted with a mail ballot required assistance.

**100.**     This section limits the type of assistance that can be given by an assistor to reading or marking the ballot, or directing the voter to read or mark the ballot.  Because the law does not define everything that could constitute assistance, voters with disabilities as well as assistors will be unsure of what assistance is allowed, and voters may be reluctant to make use of assistance even when it is available for fear of violating the law. This does not allow the assistor to explain the voting process and choices.  In my expert opinion, this is likely to interfere with people with disabilities' ability to vote, in particular for the 1,082,500 Texans with cognitive impairments who are eligible to vote, and other people with neurological and developmental disabilities who benefit from assistance in making informed choices in important areas of life. Some examples of valuable voting assistance that arguably go beyond the narrow definition of assistance in the oath include:

- Using an American Sign Language interpreter to interpret the ballot to someone who is deaf and does not read written English fluently. ASL and English are different languages with different syntax and grammar. ASL sometimes requires a signed explanation and interpretation of key terms and concepts.

- Reminding someone with memory issues from a Traumatic Brain Injury about how to use his or her marked sample ballot to refresh recollection about how he or she wanted to vote.

- Using simple plain language to help someone with cognitive or developmental disabilities understand the voting process. This can include answering the voter's questions about the voting process or the ballot.

- Helping someone with a mobility or cognitive disability navigate the physical polling place to find the information they need, speak to the poll workers, and get to the voting booth.

- Helping someone with Autism Spectrum Disorder cope with stressful voting lines, noises, sensations, or lights. This may include implementing calming strategies to support the person so that he or she votes without triggering feelings of being overwhelmed.

- Helping someone with a visual impairment set up and use the accessible voting machine. This may include setting up the headphones or troubleshooting technical issues that arise while the voter is voting and helping the voter deliver his or her paper ballot to the ballot counter.

- Helping a person with an anxiety disorder cope with the anxiety of a possibly new and stressful situation of navigating the voting technology and process. This may include verbal reassurance that the person marked the ballot in the manner he or she intended.

101.    I conclude with a reasonable degree of certainty, based on the above data, that a large number of Texans with disabilities need assistance with voting and that many of them depend on receiving such assistance. I also conclude that it is highly likely that many Texans with disabilities will find it difficult or impossible to obtain the assistance they require given the restrictions imposed by section 6.04. Therefore, I conclude that section 6.04 will cause some Texans with disabilities to be disenfranchised, and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1.

# SECTIONS 6.03 AND 6.05

102.    These sections create extra requirements for assistors to document their relationship to the voter and whether they received any compensation or benefit from a candidate, campaign, or political committee. These sections will make it more likely that the ballot of a person with a disability is rejected because of a clerical error or a minor mistake by the person providing assistance.  These sections may also make it more difficult for people with disabilities to find assistance at all. As noted above, many people with disabilities are socially isolated and may have a hard time finding someone to assist them. One-fifth of voters with disabilities who needed voting assistance in 2020 reported receiving it from people who were not family or household members.  Due to the higher need for assistance with voting among people with disabilities, this provision creates an extra barrier to voting for some people with disabilities.

103.    I conclude with a reasonable degree of certainty, based on the above data, that a large number of Texans with disabilities need assistance with voting and that many of them depend on receiving such assistance from people other than family members. I also conclude that it is highly likely that many Texans with disabilities will find it difficult or impossible to find needed assistance because of sections 6.03 and 6.05 requirements of additional forms and statements. Therefore, I conclude that sections 6.03 and 6.05 will cause some Texans with disabilities to be disenfranchised, and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1.

# SECTION 6.06

104.    This section criminalizes the provision of assistance by any person who solicits, receives, or accepts compensation for helping a voter with their mail ballot unless the assistor is an attendant or caregiver. While attendants and caregivers are exempt, this section will prevent friends, neighbors, and other non-family members from assisting people with disabilities if they receive any type of economic benefit. It will also prohibit people with disabilities from getting

help from community or nonpartisan civic engagement organizations that routinely provide voting support to the disability community. The 2020 DVAS study showed that just under one-fifth (18.1%) of people providing assistance to voters with disabilities with voting by mail were friends, neighbors, or other non-relatives apart from home aides.  In my expert opinion, this provision will discourage well-meaning assistors from providing that assistance, because any type of compensation or thank you, such as reimbursement for gas, could be construed as violating the law. This will restrict the ability to obtain assistance for a substantial number of people with disabilities.

**105.**    Voters with disabilities are also more likely to be socially isolated, and more likely to live alone. It is thus very possible that a worker or volunteer with a community or civic engagement organization, a neighbor, a friend, or another non-family member may be the best and only option to assist them with voting by mail.

**106.**    I conclude with a reasonable degree of certainty, based on the above data, that a number of Texans with disabilities need assistance with voting their mail ballots and that some of them depend on receiving such assistance from people other than previously known attendants or caregivers. Therefore I conclude that Section 6.06 will cause some Texans with disabilities to be disenfranchised, and a further number to face significant difficulties in voting that they would not.

# **SECTION 7.04**

**107.**    This section limits "in-person interaction with one or more voters, in the physical presence of an official ballot or a ballot voted by mail, intended to deliver votes for a specific candidate or measure." It also makes it a crime for any person to receive compensation or other benefit for collecting another voter's ballot. As noted above, many voters with disabilities require assistance in voting, and restrictions on in-person interactions will limit their ability to obtain needed assistance.  Such interaction may be of particular benefit to voters with cognitive impairments and developmental disabilities who may have difficulty understanding the issues and voting process but, as described above, have the right to vote.  Finding assistance may be especially difficult for many people with disabilities given their higher likelihood of living alone, and lower rate of socializing as documented above.  It is very possible that someone connected to a campaign (possibly the person who assists them regularly) may be the best and only option to assist them with voting.  Even if they are assisted by someone working or volunteering with a campaign, this does not imply that their vote will be influenced by that person.  As noted above, assisted decision making can "facilitate the exercise of autonomy" for people with certain conditions.[44]  The assisted voter must approve the vote before it is filed.

**108.**    In addition, people with mobility limitations may not be able to personally deliver their ballots to mailboxes, and they may not have a close family or household member or lawful assistant to do so. Restricting the individuals who can help with this process will create extra difficulties for these voters in delivering their ballot.

---

[44] Andrew Peterson, Jason Karlawish, and Emily Largent, *Supported Decision Making With People at the Margins of Autonomy*, 21 AM. J. BIOETHICS 4 (2021)

**109.**    I conclude with a reasonable degree of certainty, based on the above data that a large number of Texans with disabilities need assistance with voting their mail ballots and that some of them depend on receiving such assistance from persons other than a close family or household member or lawful assistant. Therefore I conclude that Section 7.04 will cause some Texans with disabilities to be disenfranchised, and a further number to face significant difficulties in voting that they would not otherwise face but for SB 1.

# **CONCLUSION**

**110.**    In sum, in my opinion, based on reasonable certainty, these provisions of SB 1 will create an extra burden in voting for a significant number of people with disabilities across the state of Texas and may prevent some from voting altogether.  As documented above, people with disabilities already face many social and economic disparities that impact their ability to vote, including a high rate of needing assistance in activities of daily living, higher likelihood of living alone, lower likelihood of driving or travel in general, lower likelihood of internet access, and lower economic resources compared to those without disabilities.  They also must contend with well-documented social stigma that both reflects and reinforces their social isolation and increases the difficulty of obtaining necessary resources and assistance in exercising the right to vote.  The number of barriers voters with disabilities face in Texas  help explain why voting-eligible Texans with disabilities were 5.1 percentage points less likely than those without disabilities to vote in 2020.  SB 1 creates extra voting barriers for many Texans with disabilities, making it more burdensome for them to exercise their right to vote. Media reports have already demonstrated that people with disabilities are facing new barriers related to SB 1.[45] In my opinion, SB 1 will cause some Texans with disabilities to be disenfranchised entirely and a further substantial number to face significant difficulties in voting that they would not otherwise face but for SB 1.

---

[45] *See* Juana Summers and Barbara Sprunt, *Texas election workers provide practical and emotional support to confused voters*, NATIONAL PUBLIC RADIO, Feb. 7, 2022, https://www.npr.org/2022/02/27/1082821390/texas-election-workers-provide-practical-and-emotional-support-to-confused-voter;%20; *see also* Nick Corasaniti, *Ballot Rejections in Texas Spike After New Voting Law*, NY TIMES, Feb. 25, 2022, https://www.nytimes.com/2022/02/25/us/politics/texas-primary-ballot-rejections.html.

**Table 1:  Disability Prevalence in Texas Using Census Definition, 2020**

**Figures are for Texas citizens age 18 or older.**

|  | Number<br>(1) | % of adult citizens<br>(2) | Margin of error (+/-)<br>(3) |
|---|---|---|---|
| **Total citizens age 18 or older** | 19,425,500 | 100.0% | |
| **No disability** | 16,401,300 | 84.4% | 0.3% |
| **Disability** | 3,024,200 | 15.6% | 0.3% |
| | | | |
| **Type of disability** | | | |
| **Hearing impairment** | 875,900 | 4.5% | 0.1% |
| **Vision impairment** | 638,500 | 3.3% | 0.1% |
| **Cognitive impairment** | 1,082,500 | 5.6% | 0.2% |
| **Mobility impairment** | 1,604,700 | 8.3% | 0.2% |
| **Difficulty with dressing or bathing** | 596,300 | 3.1% | 0.1% |
| **Difficulty going outside home alone** | 1,127,500 | 5.8% | 0.2% |
| | | | |
| **Sample size** | 127,398 | | |

Based on analysis of U.S. Census Bureau's 2020 American Community Survey microdata.  A disability is defined as having one or more of the six conditions listed.  See https://www.census.gov/topics/health/disability/guidance/data-collection-acs.html.

The margin of error is based on a 95% confidence interval.

**Table 2: Disability Prevalence Using More Expansive Definition**
Figures represent percent of Texas adults age 18 or older

| | Percent (1) | Margin of error (+/-) (2) |
|---|---|---|
| Any disability | 30.5% | 2.4% |
| | | |
| Hearing impairment | 6.3% | 1.2% |
| Vision impairment | 4.7% | 1.1% |
| Speech impairment | 2.1% | 0.7% |
| Difficulty with physical activities: | | |
|     Walking 3 blocks | 13.5% | 1.7% |
|     Climbing stairs | 12.7% | 1.6% |
|     Lifting | 9.3% | 1.4% |
|     Grasping | 4.3% | 1.0% |
|     Standing^ | 15.9% | 1.8% |
|     Pushing/pulling^ | 12.9% | 1.7% |
|     Sitting^ | 8.2% | 1.4% |
|     Crouching^ | 19.3% | 2.0% |
|     Reaching^ | 7.9% | 1.3% |
| Difficulty with activities of daily living due to physical or mental condition: | | |
|     Any of above | 13.4% | 1.7% |
|     Getting around inside home | 1.7% | 0.6% |
|     Going outside home for errands | 8.3% | 1.4% |
|     Getting in bed or chair | 4.3% | 1.0% |
|     Taking bath or shower | 4.5% | 1.0% |
|     Getting dressed | 3.0% | 0.8% |
|     Eating | 0.7% | 0.4% |
|     Using toilet | 1.7% | 0.6% |
|     Keeping track of money | 4.7% | 1.1% |
|     Preparing meals | 4.1% | 0.9% |
|     Doing light housework | 5.0% | 1.0% |
|     Taking medicine | 3.8% | 1.0% |
|     Using telephone | 1.3% | 0.5% |
| Mental or cognitive impairment: | | |
|     Learning disability | 4.3% | 1.1% |
|     Alzheimer's, senility, or dementia | 3.4% | 0.9% |
|     Intellectual disability | 1.7% | 0.7% |
|     Developmental disability | 0.7% | 0.5% |
|     Other mental/emotional condition | 4.4% | 1.1% |
| Sample size | 1,569 | |

^ These conditions were not included as part of the expanded disability definition but are reported here to illustrate the range of limitations faced by people with disabilities. Based on analysis of 2014 Survey of Income and Program Participation SSA Supplement microdata. Discussion of the disability definition and fuller results for entire U.S. are in https://www.census.gov/library/publications/2018/demo/p70-152.html. The margin of error is based on a 95% confidence interval.

**Table 3: Disability and Demographic Characteristics in Texas, 2020**

**Figures are for Texas citizens age 18 or older.**

| | Total with disability (1) | Total with no disability (2) | % with disability (3) | Margin of error (+/-) (4) |
|---|---|---|---|---|
| **Total citizens age 18 or older** | 3,024,200 | 16,401,300 | 15.6% | 0.3% |
| **Female** | 1,551,800 | 8,385,000 | 15.6% | 0.4% |
| **Male** | 1,472,400 | 8,016,300 | 15.5% | 0.4% |
| **Asian** | 60,400 | 707,000 | 7.9% | 1.1% |
| **Black non-Hispanic/Latinx** | 428,300 | 1,963,400 | 17.9% | 0.9% |
| **Hispanic/Latinx** | 881,800 | 5,312,000 | 14.2% | 0.5% |
| **Native American/Alaskan** | 8,600 | 39,700 | 17.8% | 4.3% |
| **White non-Hispanic/Latinx** | 1,533,400 | 7,851,200 | 16.3% | 0.4% |
| **Other race/ethnicity** | 111,600 | 528,000 | 17.4% | 1.5% |
| **Age 18-34** | 487,600 | 5,874,500 | 7.7% | 0.4% |
| **Age 35-49** | 445,800 | 4,468,800 | 9.1% | 0.4% |
| **Age 50-64** | 761,000 | 3,732,800 | 16.9% | 0.6% |
| **Age 65-74** | 601,700 | 1,591,700 | 27.4% | 0.9% |
| **Age 75-84** | 460,600 | 620,300 | 42.6% | 1.4% |
| **Age 85+** | 267,500 | 113,200 | 70.3% | 2.2% |
| **No HS degree** | 583,000 | 1,488,100 | 28.1% | 1.0% |
| **HS degree** | 948,100 | 3,988,500 | 19.2% | 0.6% |
| **Some college, no degree** | 720,300 | 4,025,800 | 15.2% | 0.5% |
| **Associate's degree** | 212,200 | 1,335,200 | 13.7% | 0.9% |
| **Bachelor's degree** | 360,000 | 3,633,600 | 9.0% | 0.4% |
| **Graduate degree** | 200,600 | 1,930,100 | 9.4% | 0.6% |
| **Overall sample size** | 23,590 | 103,808 | | |

Based on analysis of U.S. Census Bureau's 2020 American Community Survey microdata.
The margin of error is based on a 95% confidence interval.

34

**Table 4:  Economic Status and Living Situation of People with Disabilities**

Figures are for Texas citizens age 18 or older.

| | Disability | No disability | Disability gap | Margin of error on gap (+/-) | |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | |
| **Employed if working age (18-64)** | 40.1% | 74.2% | -34.0% | 1.3% | * |
| **In poverty** | 18.0% | 9.2% | 8.9% | 0.8% | * |
| **Social Security income** | 47.4% | 13.3% | 34.0% | 0.9% | * |
| **Public assistance income or food stamps** | 20.3% | 10.3% | 10.0% | 0.8% | * |
| **Medicaid or other low-income health plan** | 26.5% | 6.1% | 20.4% | 0.8% | * |
| **Living situation** | | | | | |
| **Live alone** | 20.8% | 12.3% | 8.6% | 0.8% | * |
| **Live with others, not in group quarters** | 73.3% | 85.6% | -12.3% | 0.8% | * |
| **Noninstitutional group quarters^** | 1.2% | 1.1% | 0.2% | 0.1% | |
| **Institutional group quarters^^** | 4.7% | 1.1% | 3.6% | 0.2% | * |
| **Marital status** | | | | | |
| **Married, spouse present** | 42.8% | 52.4% | -9.6% | 1.0% | * |
| **Separated/divorced** | 19.4% | 12.1% | 7.3% | 0.8% | * |
| **Widowed** | 14.4% | 3.4% | 11.0% | 0.6% | * |
| **Never married** | 23.4% | 32.1% | -8.8% | 0.9% | * |
| **Sample size** | 9,609 | 23,590 | 103,808 | | |

* Disability gap is outside 95% margin of error.
^ College dorm, military barracks, group home, mission, or shelter
^^ Nursing home, mental hospital, or correctional facility
Based on analysis of Census Bureau's 2020 American Community Survey microdata.

35

**Table 5:  Need for Assistance in Disability Population**

Figures represent percent of disability population age 18 or older.

| | Texas (1) | Margin of error (+/-) (2) | United States (3) | Margin of error (+/-) (4) |
|---|---|---|---|---|
| **Any help needed with activities of daily living** | 41.2% | 4.5% | 37.4% | 1.1% |
| **Need help with:** | | | | |
| **Getting around inside home** | 3.5% | 1.5% | 3.8% | 0.4% |
| **Going outside home for errands** | 25.5% | 4.0% | 21.2% | 1.0% |
| **Getting in bed or chair** | 7.5% | 2.3% | 7.2% | 0.6% |
| **Taking bath or shower** | 9.4% | 2.5% | 8.6% | 0.7% |
| **Getting dressed** | 6.6% | 2.1% | 6.9% | 0.6% |
| **Walking** | 7.9% | 2.3% | 8.2% | 0.6% |
| **Eating** | 0.5% | 0.5% | 1.3% | 0.3% |
| **Using toilet** | 3.4% | 1.7% | 3.3% | 0.4% |
| **Keeping track of money** | 12.0% | 2.9% | 12.2% | 0.8% |
| **Preparing meals** | 11.0% | 2.7% | 12.0% | 0.8% |
| **Doing light housework** | 13.7% | 2.9% | 15.4% | 0.8% |
| **Taking medicine** | 9.7% | 2.8% | 8.8% | 0.7% |
| **Accessing Internet** | 15.2% | 3.1% | 13.4% | 0.8% |
| | | | | |
| **Help provided by^:** | | | | |
| **Family members** | 34.9% | 4.3% | 30.7% | 1.1% |
| **Friends or neighbors** | 4.0% | 1.8% | 4.0% | 0.5% |
| **Paid help** | 4.0% | 1.6% | 4.2% | 0.5% |
| **Partner or companion** | 1.4% | 1.1% | 1.3% | 0.3% |
| **Other non-relative** | 1.4% | 1.0% | 1.9% | 0.3% |
| **Any non-family member** | 10.6% | 2.7% | 10.7% | 0.7% |
| | | | | |
| **Sample size** | 566 | | 10,003 | |

Based on analysis of 2014 Survey of Income and Program Participation SSA Supplement microdata.  See Table 2 for prevalence figures using this definition of disability.  Fuller results for entire U.S. are in https://www.census.gov/library/publications/2018/demo/p70-152.html.

The margin of error is based on a 95% confidence interval.

^ The categories overlap as the individual may have received help from more than one person.

**Table 6:  Computer and Internet Access by Disability Status in Texas**

Figures are for Texas citizens age 18 or older.

| | Disability | No disability | Disability gap | Margin of error on gap (+/-) | |
|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | |
| **Home has internet access, 2020** | | | | | |
| **All** | 84.8% | 95.2% | -10.4% | 0.7% | * |
| **Age 18-64** | 90.4% | 96.3% | -5.9% | 0.8% | * |
| **Age 65 or older** | 60.5% | 82.3% | -21.8% | 1.3% | * |
| | | | | | |
| **Individual uses internet at home, 2019** | | | | | |
| **All** | 60.1% | 78.9% | -18.8% | 4.5% | * |
| **Age 18-64** | 68.0% | 80.8% | -12.8% | 6.4% | * |
| **Age 65 or older** | 53.1% | 67.9% | -14.8% | 6.8% | * |
| | | | | | |
| **Individual uses internet at home or elsewhere, 2019** | | | | | |
| **All** | 60.5% | 82.3% | -21.8% | 4.4% | * |
| **Age 18-64** | 68.9% | 84.4% | -15.5% | 6.3% | * |
| **Age 65 or older** | 53.1% | 70.4% | -17.3% | 6.8% | * |
| | | | | | |
| **Sample size** | | | | | |
| **2020 data** | 19,465 | 96,970 | | | |
| **2019 data** | 535 | 3,906 | | | |

\* Disability gap is outside 95% margin of error.

Home internet access figures are based on analysis of Census Bureau's 2020 American Community Survey microdata, and individual internet use is based on analysis of November 2019 Current Population Survey Computer and Internet Use Supplement microdata.

**Table 7: Transportation and Disability**

|  | All (1) | Disability (2) | No disability (3) | Disability gap (4) | |
|---|---|---|---|---|---|
| **Data for Texans age 18 or older^** | | | | | |
| Have travel-limiting disability | 10.0% | 100.0% | 0.0% | | |
| Live in zero-vehicle household | | 14.4% | 3.0% | 11.4% | * |
| Average trips per day | | 2.3 | 3.5 | -1.2 | * |
| No trips in a day | | 40.0% | 15.8% | 24.2% | * |
| Driver | | 59.6% | 93.0% | -33.4% | * |
| Public transportation in past 30 days | | 12.6% | 8.8% | 3.8% | * |
| Used ride-hailing in past 30 days | | 2.6% | 8.8% | -6.2% | * |
| Average online purchases for delivery in past month | | 31.5% | 54.2% | -22.7% | * |
| Agree that travel is a financial burden | | 53.3% | 39.6% | 13.7% | * |
| **National data from 2020 survey with broader disability measure^^** | | | | | |
| Can drive own or family vehicle | | 69.6% | 90.0% | -20.4% | * |
| Most often use for basic transportation: | | | | | |
| Own or family vehicle | | 82.7% | 93.3% | -10.7% | * |
| Someone else's vehicle | | 6.4% | 1.8% | 4.7% | * |
| Taxi or rideshare | | 3.2% | 0.5% | 2.7% | * |
| Para-transit | | 1.3% | 0.2% | 1.1% | * |
| Other public transportation | | 4.9% | 3.0% | 1.9% | |
| Other | | 1.5% | 1.2% | 0.3% | |
| Have transportation problems "very often" or "always" | | 5.6% | 2.9% | 2.6% | * |
| **Sample size** | | 1,768 | 787 | | |

^ From analysis of 2017 National Highway Travel Survey data at https://nhts.ornl.gov/

^^ From https://www.eac.gov/election-officials/us-election-assistance-commission-study-disability-and-voting-accessibility-2020, Table 31

**Table 8: Voting and Disability in 2020**

| | Texas | | | | United States | | | |
| | No disabili ty (1) | Any disabili ty (2) | Disabi lity gap (3) | Margin of error on gap (+/-) (4) | No disabili ty (5) | Any disabili ty (6) | Disabi lity gap (7) | Margin of error on gap (+/-) (8) |
|---|---|---|---|---|---|---|---|---|
| Among all eligible to vote: | | | | | | | | |
| Registered to vote | 71.2% | 71.9% | 0.7% | 4.2% | 73.0% | 70.1% | -3.0% | 1.1% * |
| Voted | 64.5% | 59.4% | -5.2% | 4.6% * | 67.5% | 61.8% | -5.7% | 1.1% * |
| | | | | | | | | |
| Method if voted: | | | | | | | | |
| In person on election day | 14.2% | 9.5% | -4.7% | 3.6% * | 31.2% | 25.8% | -5.4% | 1.3% * |
| Early in person | 77.6% | 60.2% | -17.5% | 5.7% * | 26.9% | 21.0% | -5.8% | 1.2% * |
| Mail ballot | 8.2% | 30.2% | 22.0% | 5.2% * | 41.9% | 53.2% | 11.3% | 1.5% * |
| | | | | | | | | |
| Sample size | 3,745 | 545 | | | 70,898 | 11,000 | | |

* Disability gap is outside 95% margin of error.
Based on analysis of 2020 Current Population Survey Voting and Registration Supplement microdata.

**Table 9: Voting by Disability Type in 2020**

All figures are for entire United States

| | No disability (1) | Any disability (2) | | Hearing impairment (3) | | Vision impairment (4) | | Cognitive impairment (5) | | Mobility impairment (6) | | Difficulty dressing or bathing (7) | | Difficulty going outside alone (8) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Among all eligible to vote:** | | | | | | | | | | | | | | | |
| **Registered to vote** | 73.0% | 70.1% | * | 76.2% | * | 67.4% | * | 61.6% | * | 69.4% | * | 61.9% | * | 61.8% | * |
| **Voted** | 67.5% | 61.8% | * | 68.5% | | 59.2% | * | 50.7% | * | 60.4% | * | 49.4% | * | 51.6% | * |
| | | | | | | | | | | | | | | | |
| **Method if voted:** | | | | | | | | | | | | | | | |
| **In person on election day** | 31.2% | 25.8% | * | 25.4% | * | 24.6% | * | 26.4% | * | 25.0% | * | 23.4% | * | 23.0% | * |
| **Early in person** | 26.9% | 21.0% | * | 22.0% | * | 22.0% | * | 19.3% | * | 19.4% | * | 14.4% | * | 16.7% | * |
| **Mail ballot** | 41.9% | 53.2% | * | 52.6% | * | 53.3% | * | 54.2% | * | 55.7% | * | 62.1% | * | 60.2% | * |
| | | | | | | | | | | | | | | | |
| **Sample size** | 70,898 | 11,000 | | 3,633 | | 1,466 | | 3,315 | | 6,255 | | 1,689 | | 3,769 | |

* Disability gap is outside 95% margin of error.
Based on analysis of 2020 Current Population Survey Voting and Registration Supplement microdata.

**Table 10:  In-Person Voting Difficulties by Disability Type in 2020**

| Types of voting difficulties | No disability (1) | Any disability (2) | | Hearing impairment (3) | Visual impairment (4) | | Cognitive impairment (5) | | Mobility impairment (6) | | No need for help in daily activities (7) | Need help in daily activities (8) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Any difficulty in voting in person at polling place or election office | 9.8% | 18.0% | * | 19.3% | 23.5% | | 30.0% | ** | 17.2% | * | 15.2% | 24.8% | * |
| 1.  Difficulty in finding or getting to the polling place | 2.3% | 1.4% | | 1.0% | 3.8% | | 3.6% | | 1.2% | | 0.8% | 3.1% | |
| 2.  Difficulty in getting inside the polling place (for example, steps) | 0.4% | 3.2% | * | 1.6% | 1.1% | | 2.4% | | 5.1% | * | 2.1% | 6.0% | * |
| 3.  Difficulty waiting in line | 6.2% | 7.4% | | 8.5% | 1.4% | * | 11.2% | | 5.1% | | 7.1% | 8.1% | |
| 4.  Difficulty reading or seeing the ballot | 0.0% | 3.8% | * | 4.1% | 20.5% | * | 7.4% | * | 5.2% | * | 1.5% * | 9.7% | * |
| 5.  Difficulty understanding how to vote or use the voting equipment | 2.9% | 2.7% | | 0.9% | 2.2% | | 3.5% | | 2.9% | | 2.6% | 2.9% | |
| 6.  Difficulty communicating with poll workers or other officials at the polling place | 0.6% | 2.1% | | 3.2% | 1.1% | | 2.5% | | 2.6% | | 1.3% | 3.8% | |
| 7.  Difficulty writing on the ballot | 0.0% | 1.2% | * | 0.9% | 1.2% | | 2.3% | | 2.2% | | 0.5% | 3.2% | |
| 8.  Difficulty operating the voting machine | 0.9% | 1.0% | | 1.0% | 4.1% | | 1.5% | | 0.0% | | 0.9% | 1.2% | |
| 9.  Other type of difficulty in voting | 0.3% | 1.8% | * | 4.0% | 2.2% | | 4.3% | | 1.2% | | 1.7% | 2.0% | |
| Sample size | 371 | 697 | | 124 | 72 | | 139 | | 298 | | 506 | 189 | |

* Difference from non-disability sample is outside 95% margin of error
From 2020 Election Assistance Commission survey with results reported at https://www.eac.gov/election-officials/us-election-assistance-commission-study-disability-and-voting-accessibility-2020, Table 8.

**Table 11:  Specific Mail Voting Difficulties by Disability Type in 2020**

| Types of mail voting difficulties | No disability (1) | Any disability (2) | | Hearing impairment (3) | Visual impairment (4) | | Cognitive impairment (5) | Mobility impairment (6) | | No need for help in daily activities (7) | Need help in daily activities (8) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Any difficulty receiving, returning, reading, understanding, or filling out ballot | 2.1% | 5.4% | * | 5.1% | 22.1% | * | 6.3% | 6.4% | * | 3.8% | 8.9% | * |
| Any difficulty reading, understanding, or filling out ballot | 0.7% | 2.3% | | 1.6% | 7.9% | * | 2.5% | 2.5% | | 1.8% | 3.3% | |
| Difficulty reading mail ballot | 0.0% | 1.4% | * | 1.6% | 5.7% | * | 1.9% | 1.2% | | 1.0% | 2.3% | |
| Difficulty understanding mail ballot | 0.4% | 0.4% | | 0.0% | 0.0% | | 0.0% | 0.4% | | 0.3% | 0.5% | |
| Difficulty filling out mail ballot | 0.0% | 0.8% | | 0.0% | 2.2% | | 0.6% | 1.3% | | 0.4% | 1.7% | |
| Other difficulty completing mail ballot | 0.4% | 0.1% | | 0.0% | 0.0% | | 0.0% | 0.3% | | 0.2% | 0.0% | |
| Difficulty receiving mail ballot | 1.7% | 1.9% | | 2.5% | 5.9% | | 3.0% | 1.9% | | 1.7% | 2.5% | |
| Difficulty returning mail ballot | 0.0% | 0.7% | * | 1.6% | 6.7% | | 2.0% | 0.9% | * | 0.2% | 1.9% | |
| Sample size | 319 | 797 | | 119 | 75 | | 155 | 398 | | 526 | 267 | |

\* Difference from non-disability sample is outside 95% margin of error
From 2020 Election Assistance Commission survey with results reported at https://www.eac.gov/election-officials/us-election-assistance-commission-study-disability-and-voting-accessibility-2020, Table 11.

# **<u>EXHIBIT A</u>**

CURRICULUM VITAE

Douglas L. Kruse

ADDRESSES:

School of Management and Labor Relations          34 Wilson Road
Rutgers University                                Princeton, N.J.  08540
94 Rockafeller Road                               609-924-3422
New Brunswick, N.J. 08903
(848) 445-5991
E-mail:  dkruse@smlr.rutgers.edu

EDUCATION:

Harvard University, Cambridge, Massachusetts.
          Ph.D. in Economics, June, 1988.

                    Major fields:  Labor Economics, Comparative Economic Systems.
                    Minor fields:  Applied Econometrics, Industrial Organization.
                    Dissertation topic:  Empirical test of Weitzman profit-sharing theory, and effect of
                              profit sharing on productivity and growth.

Harvard University of Nebraska-Lincoln, Lincoln, Nebraska.
          M.A. in Economics, August 1983.
          Certification in Public Policy Analysis and Program
                    Evaluation, 1983.
          Fields: Public Policy, Field Research, Comparative Economic Systems.

Harvard University, Cambridge, Massachusetts.
          B.A. in Economics, June 1981, Magna Cum Laude.

EMPLOYMENT:

Distinguished Professor, July 2014-present; Professor, July 2000-June 2014; Associate
          Professor, July 1994-June 2000; Assistant Professor, July 1988-June 1994; Dept. of
          Human Resource Management, School of Management and Labor Relations, Rutgers
          University.  Member of the Graduate Faculties in Economics, Labor and Employment
          Relations, and Human Resource Management.

Associate Dean for Academic Affairs, School of Management and Labor Relations, Rutgers
          University, 2017-2018.

Senior Economist, Council of Economic Advisers, Executive Office of the President, Washington, D.C., September 2013-August 2014.

Teaching Assistant, 9/86-5/88, Dept. of Economics, Harvard University. Labor Economics, Econometrics, Comparative Economic Systems, and Labor Thesis Advising.

Economic Development Consultant, 5/83-9/84, Department of Economic Development,

State of Nebraska, Lincoln, Nebraska.

OTHER POSITIONS:

National Bureau of Economic Research (Cambridge, Massachusetts), Research Associate, September 1995-present, Faculty Research Fellow, September 1990-August 1995.

IZA Institute of Labor Economics (Bonn, Germany), Research Fellow, March 2016-present.

Associate Editor, British Journal of Industrial Relations, January 2011-June 2021.

Associate Editor, Journal of Participation and Employee Ownership, January 2017-present.

Editorial Board member, Human Resource Management Journal, January 2017-present.

Member, Transition Team for a Stronger and Fairer Economy, New Jersey Governor-elect Phil Murphy, November 2017-January 2018.

President, International Association for the Economics of Participation, 2012-2014; Vice-President, 2010-2012.

Co-director, Program for Disability Research, School of Management and Labor Relations, Rutgers University, January 2005-present.

Director, Ph.D. Program in Industrial Relations and Human Resources, School of Management and Labor Relations, Rutgers University July 2007-June 2013.

President's Committee on Employment of People with Disabilities, Subcommittee on Employment Disability Concerns (Washington, D.C.), January 1998-December 2000.

New Jersey State Rehabilitation Council, October 1999-June 2013.

BOOKS:

How Did Employee Ownership Firms Weather the Past Two Recessions?  Kalamazoo, MI:
W.E. Upjohn Institute for Employment Research, 2017.  By Fidan Kurtulus and
Douglas Kruse.

Sharing Ownership, Profits, and Decision-making in the 21st Century, Volume 14 in the
series "Advances in the Economic Analysis of Participatory and Labor-managed
Firms."  Bingley, UK: Emerald Publishing, 2013.  Edited by Douglas Kruse.

People with Disabilities: Sidelined or Mainstreamed?  Cambridge, England: Cambridge
University Press, 2013.  By Lisa Schur, Douglas Kruse, and Peter Blanck.

    Reviewed in British Journal of Industrial Relations, Industrial and Labor Relations
    Review, and Journal of Occupational Rehabilitation.

The Citizen's Share: Putting Ownership Back Into Democracy.  New Haven, CN:  Yale
University Press, 2013.  By Joseph Blasi, Richard Freeman, and Douglas Kruse.

    Reviewed in Administrative Science Quarterly, Journal of American History, and
    Contemporary Sociology.

Shared Capitalism at Work: Employee Ownership, Profit Sharing, Gainsharing, and Broad-
based Stock Options.  Chicago:  University of Chicago Press, 2010.  Edited by
Douglas Kruse, Richard Freeman, and Joseph Blasi.

    Reviewed in Industrial and Labor Relations Review and Economic Record.

In the Company of Owners: The Truth About Stock Options (And Why Every Employee
Should Have Them).  New York:  Basic Books, 2003.  By Joseph Blasi, Douglas
Kruse, and Aaron Bernstein.

    Named a "Noteworthy Book in Industrial Relations and Labor Economics, 2003," by
        Princeton University Industrial Relations Section.
    Named as one of the top 10 business books of 2003 by Business Week.
    Reviewed in Academy of Management Perspectives, Library Journal, and Journal of
        Moral Education.

A Working Nation: Workers, Work, and Government in the New Economy.  New York:
Russell Sage Foundation, 2000.  By David T. Ellwood, Rebecca M. Blank, Joseph
Blasi, Douglas Kruse, William A. Niskanen, and Karen Lynn-Dyson.

    Reviewed in Journal of Economic Literature, Industrial and Labor Relations Review,
    Journal of Social Policy, and Monthly Labor Review.

Stock Options, Corporate Performance, and Organizational Change. Oakland, CA: National
Center for Employee Ownership, 2000. By Joseph Blasi, Douglas Kruse, James Sesil,
Maya Kroumova, and Ryan Weeden.

Meeting Future Workforce Needs.  Menomonie, WI: University of Wisconsin-Stout, 1999.
    By Thomas Jennings, Steve Fusco, George Erickcek, Stacey Floyd, Chip Kenney,
    Douglas Kruse, Rob McInnes, Paul Mulka, Darlene Robbins, Martin Sicker, and
    Duane Watson.

Spinal Cord Injury:  An Analysis of Medical and Social Costs.  New York:  Demos
    Publications, 1998.  By Monroe Berkowitz, Paul O'Leary, Douglas Kruse, and Carol
    Harvey.

Kremlin Capitalism: The Privatization of the Russian Economy. Ithaca, NY:  Cornell
    University Press, 1997.  By Joseph Blasi, Maya Kroumova, and Douglas Kruse.

    Chinese translation published by Shanghai Far East Publishers in 2000.

    Reviewed in Annals of the American Academy of Political and Social Science,
        Australian Journal of International Affairs, British Journal of Sociology,
        Business and the Contemporary World, Business History, Business Week,
        Choice, Europe-Asia Studies, Economics of Transition, Fortune, Journal of
        East-West Business, Journal of Political Ecology, Library Journal, New York
        Review of Books, Review of Political Economy, Russian Review, Slavic
        Review, Social Science Journal, Washington Monthly, and World Today.

Profit Sharing: Does It Make A Difference?  Kalamazoo, MI:  W.E. Upjohn Institute for
    Employment Research, 1993.  By Douglas Kruse.

    Awarded "Richard A. Lester Prize for Outstanding Book in Industrial Relations and
        Labor Economics, 1993," by Princeton University Industrial Relations
        Section.

    Reviewed in Journal of Economic Literature, Journal of Comparative Economics,
        Industrial and Labor Relations Review, Relations Industrielles.

The New Owners:  The Mass Emergence of Employee Ownership in Public Companies and
    What it Means to American Business. New York:  HarperCollins, 1991.  By Joseph
    Blasi and Douglas Kruse.

    Russian translation published by Delo Publishers (Moscow) in 1995.

    Named a "Noteworthy Book in Industrial Relations and Labor Economics, 1991," by
        Princeton University Industrial Relations Section.

    Reviewed in Journal of Economic Literature, British Journal of Industrial Relations,
        Administrative Science Quarterly, Economic and Industrial Democracy.

Employee Ownership and Employee Attitudes:  Two Case Studies.

Norwood, Pennsylvania:  Norwood Editions, 1984. By Douglas Kruse.

Reviewed in <u>British Journal of Industrial Relations</u>, <u>California Management Review</u>, <u>Economic and Industrial Democracy</u>.


PUBLISHED ARTICLES AND CHAPTERS:

<u>Disability</u>

"Disability and precarious work."  Forthcoming in <u>Oxford Handbook on the Sociology of Disability</u>, Oxford University Press, 2022.  By Lisa Schur and Douglas Kruse.


"Disability and Remote Work During the Pandemic with Implications for Cancer Survivors," <u>Journal of Cancer Survivorship,</u> forthcoming.  By Douglas Kruse, So Ri Park, Yana Rodgers, and Lisa Schur.

"COVID-19 and Employment Losses for Workers with Disabilities: An Intersectional Approach," forthcoming in Sophie Hennekam, Joy Beatty, and Mukta Kulkarni, eds., <u>Handbook of Disability and Management</u>, DeGruyter, 2022.  By Lisa Schur, Yana van der Meulen Rodgers, and Douglas Kruse, February 2021.

"Disability and influence in job interviews," <u>International Journal of Conflict Management</u>, forthcoming.  By Mason Ameri, Terri Kurtzberg, Lisa Schur, and Douglas Kruse.

 "Qualitative Examination of Voting Empowerment and Participation Among People Living with Traumatic Brain Injury,"  <u>Archives of Physical Medicine and Rehabilitation</u>, forthcoming.  By Flora McConnell Hammond, Christine Davis, Mark Hirsch, Julia Snow, Martha Kropf, Lisa Schur, Douglas Kruse, and Andrew Ball.

 "Telework after COVID: A "silver lining" for workers with disabilities?" <u>Journal of Occupational Rehabilitation</u> Vol. 30, no. 4, 2020: 521-536.  By Lisa Schur, Mason Ameri, and Douglas Kruse.

 "No Room at the Inn?  Disability Access in the New Sharing Economy," <u>Academy of Management Discoveries,</u> August 2020, 6(2): 176-205.  By Mason Ameri, Sean Rogers, Lisa Schur, and Douglas Kruse.

 "Disability in the Unionized Workplace."  In Susanne Bruyere, ed., <u>Employment and Disability: Issues, Innovations, and Opportunities</u>.  Ithaca, NY:  Cornell University Press, 2019.  By Mason Ameri, Mohammad Ali, Lisa Schur, and Douglas Kruse.


 "Why Do Workers with Disabilities Earn Less?  Occupational Ability Requirements and Disability Discrimination." <u>British Journal of Industrial Relations</u> Vol. 56, No. 4,

December 2018, pp. 798-834.  By Douglas Kruse, Lisa Schur, Sean Rogers, Mason Ameri.

"The Disability Employment Puzzle: A Field Experiment on Employer Hiring Behavior," ILR Review Vol. 71, No. 2, March 2018, pp. 329-364. By Mason Ameri, Lisa Schur, Meera Adya, Scott Bentley, Patrick McKay, and Douglas Kruse.

"Disability at Work: A Look Back and Forward," Journal of Occupational Rehabilitation, Vol. 57, No. 4, December 2017, pp. 482-497.  By Lisa Schur, Kyongji Han, Andrea Kim, Mason Ameri, Meera Adya, Peter Blanck, and Douglas Kruse.

"Are Workers with Disabilities More Likely to be Displaced?"  International Journal of Human Resource Management, Vol. 27, No. 14 (2016): 1550-1579.  By Sophie Mitra and Douglas Kruse.

"Disability and Election Policies and Practices," in Barry C. Burden & Charles Stewart, eds., The Measure of American Elections.  Cambridge, England: Cambridge University Press, 2014. By Lisa Schur and Douglas Kruse.

"Accommodating Workers with and Without Disabilities," Human Resource Management, Vol. 53, No. 4, July/August 2014, pp. 593-621.  By Lisa Schur, Lisa Nishii, Meera Adya, Douglas Kruse, Susanne Bruyere, and Peter Blanck.

"Assessing Voting Competence and Political Knowledge: Comparing Individuals with Traumatic Brain Injuries and 'Average' College Students," Election Law Journal. Vol. 11, No. 2, 2012, pp. 52-69.  By Jessica N. Link, Martha Kropf, Mark Alexander Hirsch, Flora M. Hammond, Jason Karlawish, Lisa Schur, Douglas Kruse, Christine S. Davis.

"Projecting Potential Demand for Workers with Disabilities," Monthly Labor Review, Vol. 133, No. 10, October 2010.  By Douglas Kruse, Lisa Schur, and Mohammed Ali.

"Is Disability Disabling in All Workplaces?  Workplace Disparities and Corporate Culture," Industrial Relations, Vol. 48, No. 3, July 2009, pp. 381-410.  By Lisa Schur, Douglas Kruse, Joseph Blasi, and Peter Blanck.

"Corporate Culture and the Employment of People with Disabilities," Behavioral Sciences and the Law, Vol. 23, 2005, pp. 3-20.  By Lisa Schur, Douglas Kruse, and Peter Blanck.

"Calibrating the Impact of the ADA's Employment Provisions," Stanford Law and Policy Review, Vol. 14.2, 2003, pp. 267-290.  By Peter Blanck, Lisa Schur, Douglas Kruse, Susan Schwochau, and Chen Song.

"Disability and Employment: Symposium Introduction," Industrial Relations, Vol. 42, No. 1, January 2003.  By Douglas Kruse and Thomas Hale.

"Employment of People with Disabilities Following the ADA," <u>Industrial Relations</u>, Vol. 42, No. 1, January 2003, pp. 31-66.  By Douglas Kruse and Lisa Schur.

"Does the Definition Affect the Outcome?  Employment of People with Disabilities Under Alternative Disability Definitions," in David Stapleton and Richard Burkhauser, eds., <u>Why the Decline in Employment of People with Disabilities: A Policy Puzzle</u>. Kalamazoo, MI:  W.E.  Upjohn Institute for Employment Research, 2003, pp. 279-300.  By Douglas Kruse and Lisa Schur.

"Enabling Democracy:  Disability and Voter Turnout," <u>Political Research Quarterly</u>, Vol. 55, No. 1, March 2002, pp. 167-190.  By Lisa Schur, Todd Shields, Douglas Kruse, and Kay Schriner.

   Awarded prize by the Western Political Science Association as the best article published in the journal in 2002.

"What Affects Voter Turnout?  Lessons from Citizens with Disabilities," <u>Social Science Quarterly</u>, Vol. 81, No. 2, June 2000, pp. 571-587.  By Lisa Schur and Douglas Kruse.

"Persons with Disabilities:  Demographic, Income, and Health Care Characteristics," <u>Monthly Labor Review</u>, Vol. 121, No. 9, September 1998, pp. 13-22. By Douglas Kruse.

"The Role of Computer Skills in Employment and Earnings Following a Spinal Cord Injury," <u>Proceedings of the CSUN Conference on Technology and Persons with Disabilities</u>, Los Angeles, CA, March 1997.  By Douglas Kruse, Alan Krueger, and Susan Drastal.

"Computer Use, Computer Training, and Employment Outcomes Among People with Spinal Cord Injuries," <u>Spine</u>, Vol. 21, No. 7, April 1996, pp. 891-896.  By Douglas Kruse, Alan Krueger, and Susan Drastal.

<u>Employee Ownership, Profit Sharing, and Stock Options</u>

"Why Profit Sharing is Essential for Building Middle-class Incomes and Wealth," in Ray Boshara and Ida Rademacher, eds., <u>The Future of Building Wealth: Brief Essays on the Best Ideas to Build Wealth—for Everyone</u>.  St. Louis, MO:  Federal Reserve Bank of St. Louis and Aspen Institute, 2021, pp. 435-440.

"Guest editorial: New research on the impact of COVID-19 on employee-owned firms and the racial wealth gap in the context of the research literature", Journal of Participation and Employee Ownership, Vol. 4 No. 2 (2021), pp. 89-91. https://doi.org/10.1108/JPEO-09-2021-030.  By Blasi, J., Kruse, D. and Weltmann, D.

"The response of majority employee-owned firms during the pandemic compared to other firms," *Journal of Participation and Employee Ownership,* Vol. 4 No. 2  (2021), pp. 92-101. https://doi.org/10.1108/JPEO-09-2021-0014.  By Blasi, J., Kruse, D., & Weltmann, D.

"Race and gender wealth equity and the role of employee share ownership," Journal of Participation and Employee Ownership, Vol. 4 No. 2, pp. 116-135. https://doi.org/10.1108/JPEO-08-2021-0008. By Weissbourd, J., Conway, M., Klein, J., Chang, Y., Kruse, D., Hoover, M., Leverett, T., McKinley, J. & Trenholm, Z.

"Do Employee Share Owners Face Too Much Financial Risk?  Analysis of the Survey of Consumer Finances," ILR Review, forthcoming, https://doi.org/10.1177/00197939211007394.   By Douglas Kruse, Joseph Blasi, Dan Weltmann, Saehee Kang, Jung Ook Kim, and William Castellano.

"Aligning Interests to Leverage a Racially Diverse Workforce: The Effects of Racial Diversity on Firm-Level Outcomes Under the Use of Broad-Based Stock Options," Organization Science, forthcoming. By Han, J. H.**,** Shin, D.-J., Castellano, W. G., Konrad, A. M., Kruse, D. L., & Blasi, J. R..

"Where does profit sharing work best? A meta-regression analysis," British Journal of Industrial Relations, 58(2), 2020, pp. 364-395.  By Hristos Doucouliagos, Patrice Laroche, Douglas L. Kruse, and T.D. Stanley.

"The State of ESOPs: What's Past Is Prologue: Introduction to the Special Issue on Employee Ownership, Policy, and New Data," Journal of Participation and Employee Ownership, Volume 2, Issue 3, Fall 2019.  By Joseph Blasi, Dan Weltmann, and Douglas Kruse.

"Broad-based Employee Stock Ownership: What Makes It Effective in the Management of Human Resources: Introduction to the Special Issue," Human Resource Management, Volume 58, Issue 6, November-December 2019, 567-584.  By Frank Mullins, Dan Weltmann, Douglas Kruse, and Joseph Blasi.

 "An Empirical Analysis of the Relationship between Employee Ownership and Employment Stability in the US: 1999–2011," British Journal of Industrial Relations, Vol. 56, No. 2, June 2018, pp. 245-291.  By Fidan Kurtulus and Douglas Kruse.

"Shared Capitalism in the U.S.: Evaluation and Future Policies."  In Jonathan Michie, Joseph Blasi, and Carlo Borzaga, eds., <u>Oxford Handbook of Mutual, Cooperative and Co-owned Businesses</u>.  Oxford: Oxford University Press, 2017, pp. 361-373. By Joseph R. Blasi and Douglas L. Kruse

"An American Historical Perspective on Employee Ownership."  In Jonathan Michie, Joseph Blasi, and Carlo Borzaga, eds., <u>Oxford Handbook of Mutual, Cooperative and Co-owned Businesses</u>.  Oxford: Oxford University Press, 2017, pp. 114-130.  By Joseph R. Blasi and Douglas L. Kruse.

"What does the U.S. Research Show about Worker Ownership?"  In Jonathan Michie, Joseph Blasi, and Carlo Borzaga, eds., <u>Oxford Handbook of Mutual, Cooperative and Co-owned Businesses</u>.  Oxford: Oxford University Press, 2017, pp. 211-226.  By Joseph R. Blasi, Richard Freeman, and Douglas L. Kruse

"Broad-based Employee Stock Ownership and Profit-Sharing:  History, Evidence, and Policy Implications," <u>Journal of Participation and Employee Ownership</u>, Vol. 1, No. 1, 2018, 38-60.  By Joseph R. Blasi, Douglas L. Kruse, and Richard Freeman.

"Having a Stake: Evidence and Implications for Broad-based Employee Stock Ownership and Profit Sharing" Policy Brief, February 2017. Third Way, Washington, D.C. http://www.thirdway.org/report/having-a-stake-evidence-and-implications-for-broad-based-employee-stock-ownership-and-profit-sharing.  By Joseph R. Blasi, Douglas L. Kruse, and Richard Freeman.

"Does Employee Ownership Improve Performance?" <u>IZA World of Labor</u>, December 2016, http://wol.iza.org/articles/does-employee-ownership-improve-performance;

"Do Broad-based Employee Ownership, Profit Sharing, and Stock Options Help the Best Firms Do Even Better?" <u>British Journal of Industrial Relations</u>, Vol. 54, No. 1, March 2016, pp. 55-82.  By Joseph Blasi, Richard Freeman, and Douglas Kruse.

"Anti-shirking effects of group incentives and human-capital-enhancing HR practices." <u>Advances in the Economic Analysis of Participatory and Labor-Managed Firms,</u> 16: 199-221, 2015.  By Andrea Kim, Kyongji Han, Joseph R. Blasi, and Douglas L. Kruse.

"Does Employee Ownership Affect Attitudes and Behaviors?  The Role of Selection, Status, and Size of Stake."  <u>Advances in the Economic Analysis of Participatory and Labor-Managed Firms,</u> 16: 251-277, 2015.  By Dan Weltmann, Joseph Blasi, and Douglas Kruse.

"Employee Stock Ownership and Profit Sharing in the New Era of Financialization and Inequality in the Distribution of Capital Income," in Christian Weller, ed., <u>Inequality, Uncertainty, and Opportunity: The Varied and Growing Role of Finance in Labor</u>

<u>Relations</u>.  Champaign, IL: Labor and Employment Relations Association, 2015, pp. 225-246.  By Joseph Blasi, Richard Freeman, and Douglas Kruse.

"Involvement work systems and operational effectiveness: Exploring the moderating effect of national power distance." <u>Journal of International Business Studies</u> Vol. 46, No. 3, 2014: 332-354. By Yuan Jiang, Saba Colakoglu, David P. Lepak, Joseph R. Blasi, and Douglas L. Kruse.

> Awarded the 2016 International HRM Scholarly Research Award, Human Resources Division, Academy of Management.

"Group Incentives and Financial Performance: The Moderating Role of Innovation," <u>Human Resource Management Journal</u>, Vol. 24, No. 1, 2014, 77-94.  By Rhokeun Park and Douglas Kruse.

"Firm Survival and Performance in Privately-held ESOP Companies," in Douglas Kruse, ed., <u>Sharing Ownership, Profits, and Decision-making in the 21st Century</u>, Volume 14 in the series "Advances in the Economic Analysis of Participatory and Labor-managed Firms." Bingley, UK:  Emerald Publishing, 2013.  By Joseph Blasi, Douglas Kruse, and Dan Weltmann.

"Employee share ownership and profit sharing in different institutional contexts," <u>International Journal of Human Resource Management</u>, Vol. 23, No. 8, 2012 pp. 1513-1518.  By Erik Poutsma, Joseph Blasi, and Douglas Kruse.

"An Empirical Analysis of Risk Preferences, Compensation Risk, and Employee Outcomes," in Ed Carberry, ed., <u>Employee Ownership and Shared Capitalism: New Directions in Research</u> Ithaca, NY:  Cornell University Press, 2011.  By Fidan Ana Kurtulus, Douglas L. Kruse, and Joseph R. Blasi.

"Solidarity and Sharing: Unions and Shared Capitalism," in Ed Carberry, ed., <u>Employee Ownership and Shared Capitalism: New Directions in Research</u> Ithaca, NY:  Cornell University Press, 2011.  By John E. McCarthy, Paula Voos, Adrienne.E. Eaton, Douglas L. Kruse, and Joseph R. Blasi.

"Worker Attitudes Toward Employee Ownership, Profit Sharing, and Variable Pay," in <u>Advances in the Economic Analysis of Participatory and Self-managed Firms, Volume 12</u>, edited by Jed DeVaro.  Bingley, UK:  Emerald Publishing, 2011, pp. 143-168. By Fidan Ana Kurtulus, Douglas Kruse, and Joseph Blasi.

"Employee stock ownership and diversification," <u>Annals of Operations Research</u>, April 2010, Vol. 176, No. 1, pp. 95-107.  By Harry Markowitz, Joseph Blasi, and Douglas Kruse.

"Employee involvement and group incentives in manufacturing companies: a multi-level analysis," Human Resource Management Journal, Vol. 20, No. 3, 2010, pp. 227-243. By Rhokeun Park, Eileen Appelbaum, and Douglas Kruse.

"Shared Capitalism in the U.S. Economy: Prevalence, Characteristics, and Employee Views of Financial Participation in Enterprises," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL: University of Chicago Press, 2010, pp. 41-76).  By Douglas Kruse, Joseph Blasi, and Rhokeun Park.

"Worker Responses to Shirking under Shared Capitalism," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL: University of Chicago Press, 2010, pp. 77-104).  By Richard Freeman, Douglas Kruse and Joseph Blasi.

"Risk and Lack of Diversification Under Employee Ownership and Shared Capitalism," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL: University of Chicago Press, 2010, pp. 105-138).  By Joseph Blasi, Douglas Kruse, and Harry Markowitz.

"Creating a Bigger Pie?  The Effects of Employee Ownership, Profit Sharing, and Stock Options on Workplace Performance," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL: University of Chicago Press, 2010, pp. 139-166). By Joseph Blasi, Richard Freeman, Chris Mackin, and Douglas Kruse.

"Who Has a Better Idea? Innovation, Shared Capitalism, and HR Policies," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL: University of Chicago Press, 2010, pp. 225-256).  By Erika Harden, Douglas Kruse, and Joseph Blasi.

"Do Workers Gain by Sharing? Employee Outcomes Under Employee Ownership, Profit Sharing, and Broad-based Stock Options," in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL: University of Chicago Press, 2010, pp. 257-290). By Douglas Kruse, Richard Freeman, and Joseph Blasi.

"Show Me the Money: Does Shared Capitalism Share the Wealth?" in Douglas Kruse, Richard Freeman, and Joseph Blasi, eds., Shared Capitalism at Work: Employee Ownership, Profit and Gain Sharing, and Broad-based Stock Options (Chicago, IL:

University of Chicago Press, 2010, pp. 351-376).  By Robert Buchele, Douglas Kruse, Loren Rodgers, and Adria Scharf.

"Labor Practices and Outcomes Across Countries: Analysis of a Single Multinational Firm," in International Differences in the Business Practices and Productivity of Firms, edited by Richard Freeman and Kathryn Shaw.  Chicago: University of Chicago Press, 2009, pp. 105-136.  By Richard Freeman, Douglas Kruse, and Joseph Blasi.

"The Same Yet Different: Worker Reports on Labor Practices and Outcomes in a Single Firm Across Countries," Labour Economics, August 2008, Vol. 15, No. 4, pp. 750-71. By Richard Freeman, Douglas Kruse, and Joseph Blasi.

"Broad-based Employee Stock Options in the United States: Company Performance and Characteristics," Management Revue, Vol. 18, No. 2, 2007, pp. 5-22.  By James Sesil, Maya Kroumova, Douglas Kruse, and Joseph Blasi.

"The Changing Nature of Worker Ownership, Stock Options, and Profit Sharing in Corporate America," in The New American Workplace, edited by Edward Lawler and James O'Toole.  Palgrave Macmillan Publishers, 2006.  By Joseph Blasi, Douglas Kruse, and Richard Freeman.

"Are Diversification and Employee Ownership Incompatible?" The Journal of Employee Ownership Law and Finance, Vol. 18, No. 4, Fall 2006.  By Joseph Blasi and Douglas Kruse.

"Employee Ownership in the 2002 General Social Survey," The Journal of Employee Ownership Law and Finance, Vol. 18, No. 3, Summer 2006.  By Joseph Blasi and Douglas Kruse.

"The Political Economy of Employee Ownership in the United States: From Economic Democracy to Industrial Democracy?" International Review of Sociology, January 2006.  By Joseph Blasi and Douglas Kruse.

"Motivating Employee Owners in ESOP Firms: Human Resource Policies and Company Performance," in Virginie Perotin and Andrew Robinson, eds., Advances in the Economic Analysis of Participatory and Self-managed Firms, Vol. 8.  Greenwich, CN: JAI Press, 2004.  By Douglas Kruse, Richard Freeman, Joseph Blasi, Robert Buchele, Adria Scharf, Loren Rodgers, and Christopher Mackin.

"Does Employee Ownership Enhance Firm Survival?" in Virginie Perotin and Andrew Robinson, eds., Advances in the Economic Analysis of Participatory and Self-managed Firms, Vol. 8.  Greenwich, CN:  JAI Press, 2004.  By Rhokeun Park, Douglas Kruse, and James Sesil.

"The Effects of Restructuring Charges on Employer Contributions to Profit Sharing Plans," Journal of Accounting and Public Policy, Vol. 23, 2004, pp. 247-278.  By Scott Jackson, Elaine Mauldin, William Wilcox, and Douglas Kruse.

"Employee Stock Ownership," in Carl E. Van Horn and Herbert A. Schaffner, eds., Work in America: An Encyclopedia of History, Policy, and Society.  Santa Barbara, CA: ABC Clio, 2004, pp. 178-181.  By Joseph Blasi and Douglas Kruse.

"An Assessment of Employee Ownership In The United States With Implications For The EU," International Journal of Human Resource Management, September 2003.  By Joseph Blasi, Douglas Kruse, James Sesil, and Maya Kroumova.

"Motivating Employee Owners in ESOP Firms: Human Resource Policies and Company Performance," Proceedings of the 55th Annual Meeting, Industrial Relations Research Association, January 2003, pp. 307-317.  By Douglas Kruse, Richard Freeman, Joseph Blasi, Robert Buchele, Adria Scharf, Loren Rodgers, and Christopher Mackin.

"Sharing Ownership via Employee Stock Ownership," in Laixiang Sun, ed., Ownership and Governance of Enterprises: Recent Innovative Developments.  New York:  Palgrave MacMillan, 2003, pp. 96-123.  By James Sesil, Douglas Kruse, and Joseph Blasi.

"Research Evidence on the Prevalence and Effects of Employee Ownership," Journal of Employee Ownership Law and Finance, Vol. 14, No. 4, Fall 2002, pp. 65-90.  By Douglas Kruse.

"Broad-based Employee Stock Options in High-Technology Firms: Company Performance Effects," British Journal of Industrial Relations, Vol. 40, No. 2, June 2002, pp. 273-294.  By James Sesil, Maya Kroumova, Joseph Blasi, and Douglas Kruse.

"Broad-based Stock Option Programs: A Union-Nonunion Comparison," in David Lewin, ed.,  Advances in Industrial and Labor Relations.  Greenwich, CN:  JAI Press, 2002.  By Maya Kroumova, James Sesil, Douglas Kruse, and Joseph Blasi.

"Worker Ownership, Participation and Control: Toward a Theoretical Model," in Michael J. Handel, ed., Sociology of Organizations: Classic, Contemporary and Critical Readings.  Thousand Oaks, Ca.: Sage Publications, 2002.   By William Foote Whyte, Joseph Blasi, and Douglas Kruse.

"Broad-based Employee Stock Options in High-Technology Firms: Company Performance Effects," Proceedings of the Global Human Resource Management Conference, June 2001. By James Sesil, Maya Kroumova, Joseph Blasi, and Douglas Kruse.

"Employee Equity: Employee versus Owner Issues in Organizations," in Cary L. Cooper and Denise M. Rousseau, eds., Trends in Organizational Behavior, Volume 8.  New York and London: John Wiley & Sons, April 2001. By Joseph Blasi and Douglas Kruse.

"Is Employee Ownership An Unstable Form?  Or A Stabilizing Force?" in Margaret Blair and Thomas Kochan, eds., The New Relationship: Human Capital in the American Corporation.  Washington, D.C.: Brookings Institution, 2000. By Margaret Blair, Douglas Kruse, and Joseph Blasi.

"Broad-Based Stock Options and Company Performance: What the Research Tells Us," Journal of Employee Ownership Law and Finance, Vol. 12, No. 3, Summer 2000.  By Joseph Blasi, Douglas Kruse, James Sesil, and Maya Kroumova.

"Decentralisation of Bargaining Systems and Financial Participation: A Comparative Analysis of Italy, UK, and the US," Lavoro e Relazioni Industriali, Summer 1999, No. 1, pp. 1-41. By Alessandra Del Boca, Douglas Kruse, and Andrew Pendleton.

"Giving Employees an Ownership Stake," Brookings Review, Fall 1999, Vol. 17, No. 4, pp. 23-26. By Margaret Blair and Douglas Kruse.

"Public Opinion Polls on Employee Ownership and Profit Sharing," Journal of Employee Ownership Law and Finance, Vol. 11, No. 3, Summer 1999, pp. 3-25.  By Douglas Kruse and Joseph Blasi.

"Profit Sharing and the Demand for Low-Skill Workers," in Richard Freeman and Peter Gottschalk, eds., Generating Jobs: Increasing the Demand for Low-Skill Workers. New York:  Russell Sage Foundation, 1998, pp. 105-153. By Douglas Kruse.

"Employee Ownership, Employee Attitudes, and Firm Performance: A Review of the Evidence," in Daniel J.B. Mitchell, David Lewin, and Mahmood Zaidi, eds., Handbook of Human Resource Management.  Greenwich, CN: JAI Press, 1997, pp. 113-151. By Douglas Kruse and Joseph Blasi.

   Reprinted in Samuel Estreicher, ed., Employee Representation in the Emerging Workplace: Alternatives/Supplements to Collective Bargaining (Boston: Kluwer Law International, 1998), pp. 581-626.

"Financial Returns of Public ESOP Companies:  Investor Effects vs. Manager Effects," Financial Analysts Journal, Vol. 52, No. 4, Summer 1996, pp. 51-61.  By Michael Conte, Joseph Blasi, Douglas Kruse, and Rama Jampani.

"Why Do Firms Adopt Profit Sharing and Employee Ownership Plans?" British Journal of Industrial Relations, Vol. 34, No. 4, December 1996, pp. 515-38. By Douglas Kruse.

"Employee Stock Ownership and Corporate Performance Among Public Companies,"
Industrial and Labor Relations Review, Vol. 50, No. 1, October 1996, pp. 60-79.  By
Joseph Blasi, Michael Conte, and Douglas Kruse.

"Employee Ownership Through 401(k) Plans: The NCEO-Rutgers University Study,"
Journal of Employee Ownership Law and Finance, Vol 8, No. 4, Fall 1996, pp. 13-32.
By Susan Prolman and Douglas Kruse.

"The Impact of Financial Participation on Employee and Firm Performance," Corporate
Effectiveness and Human Resource Practices, Conference Proceedings, Institute of
Labor and Industrial Relations, University of Illinois, October 1996, pp. 423-463.  By
Douglas Kruse and Joseph Blasi.

"Profit Sharing and Public Policy," Journal of Economic Issues, Vol. 28, No. 2, June 1994.
By Douglas Kruse.

> Reprinted in Basque journal Economiaz: Revista Vasca de Economia, Numero 33,
> 3er Cuatrimestre, 1995.

"Employees and Managers as Shareholders," Human Resource Planning, Vol. 17, No. 4,
1994, pp. 31-40. By Joseph Blasi, Douglas Kruse, and James Gasaway.

"Employee Ownership and Participation: Trends, Problems, and Policy Options," Journal of
Employee Ownership Law and Finance.  Vol 5, No. 2, Spring 1993, pp. 41-73. By
Joseph Blasi and Douglas Kruse.

"The New Owners: Stock Price Performance for Public Companies with Significant
Employee Ownership,"  Journal of Employee Ownership Law and Finance, Vol. 4,
No. 3, Summer 1992, pp. 95-130.  By Joseph Blasi, Michael Conte, and Douglas
Kruse.

"Profit Sharing and Productivity:  Microeconomic Evidence from the United States,"
Economic Journal, Vol. 102, No. 410, Jan. 1992, pp. 24-36. By Douglas Kruse.

"Employee Ownership," in Peter Newman, Murray Milgate, and John Eatwell, eds., The
New Palgrave Dictionary of Money and Finance.  London:  MacMillan Press Ltd.,
1992, pp. 759-761. By Joseph Blasi and Douglas Kruse.

"Profit Sharing in the 1980's: Disguised Wages or a Fundamentally Different Form of
Compensation?" in Randall Eberts and Erica Groshen, eds., Structural Changes in
U.S. Labor Markets: Causes and Consequences.  Armonk, NY:  M.E. Sharpe, 1992.
By Douglas Kruse.

"ESOPs, Profit Sharing, and Other Contingent Compensation Plans: How Do They Affect
Corporate Performance?"  Financial Management, Winter 1991, pp. 91-100.  By
Michael Conte and Douglas Kruse.

"The Role of Profit Sharing in Employee Compensation," <u>Commentary</u> (journal of the National University of Singapore), Vol. 9, No. 1/2, November 1991.  By Douglas Kruse and James Chelius.

"Strategic Problems and Tactical Promise: Unions and Employee Ownership," <u>Labor Law Journal</u>, Vol. 42, No. 8, August 1991, pp. 498-507. By Joseph Blasi and Douglas Kruse.

"Employee Ownership: Opportunities for Unions," <u>Work Place Topics</u>, Vol. 2, No. 1, July 1991, pp. 1-22.  By Joseph Blasi and Douglas Kruse.

"The New Owners: Employee Ownership in Public Companies," <u>Journal of Employee Ownership Law and Finance</u>, Vol III, No. 3, Summer 1991, pp. 129-152.  By Joseph Blasi and Douglas Kruse

"Profit Sharing and Employment Variability:  Microeconomic Evidence on the Weitzman Theory," <u>Industrial and Labor Relations Review</u>, Vol. 44, No. 3, April 1991, pp. 437-453. By Douglas Kruse.

> Reprinted in Morris Kleiner, ed., <u>Industrial Relations: Institutions and Organizational Performance</u> (Hampshire, England: Dartmouth, 1994).

"Profit Sharing and Productivity," in Alan Blinder, ed., <u>Paying For Productivity: A Look at the Evidence</u>.  Washington, D.C.:  Brookings Institution, 1990.  By Martin Weitzman and Douglas Kruse.

> Reprinted in Louis Putterman and Randy Kroszner, eds., <u>The Economic Nature of the Firm</u>, 1996.

<u>Other topics</u>

"Effects of Leader Networking Behaviors and Vertical Faultlines on Support for Innovation," *Small Group Research*, 2020, 51(5), 616-650.  By Chung, Y., Jiang, Y., Blasi, J. R., & Kruse, D. L.

"Worksite Segregation and Performance-Related Attitudes," <u>Work and Occupations</u>, February 2010; vol. 37, No. 1, pp. 45-72.  By Niki Dickerson, Lisa Schur, Douglas Kruse, and Joseph Blasi.

"High Performance Work Practices at Century's End: Incidence, Diffusion, Industry Group Differences and the Economic Environment, <u>Industrial Relations</u>, Vol. 45, No. 4, October 2006, pp. 547-578.  By Joseph Blasi and Douglas Kruse.

"The New Employee/Employer Relationship," in David Ellwood et al., <u>Working Nation: Workers, Work, and Government in the New Economy</u>.  New York:  Russell Sage Foundation, 2000.  By Douglas Kruse and Joseph Blasi.

       Reprinted in Samuel Estreicher, ed., <u>Global Competition and the American Employment Landscape: As We Enter the 21st Century</u> (Boston: Kluwer Law International, 2001).

"Illegal Child Labor in the United States: Prevalence and Characteristics," <u>Industrial and Labor Relations Review</u>, Vol. 54, No. 1, October 2000, pp. 17-40.  By Douglas Kruse and Douglas Mahony.

"Flexible Work Hours and Labor Productivity: Some Evidence from the Pharmaceutical Industry," <u>Industrial Relations</u>, Vol. 35, No. 1, January 1996, pp. 123-139.  By Edward Shepard, Thomas Clifton, and Douglas Kruse.

"Pension Substitution in the 1980's:  Why the Shift Toward Defined Contribution Plans?" <u>Industrial Relations</u>, Vol. 34, No. 2, April 1995, pp. 218-241. By Douglas Kruse.

"Gender Differences in Attitudes Toward Unions," <u>Industrial and Labor Relations Review</u>, Vol. 46, No. 1, October 1992, pp. 89-102.  By Lisa Schur and Douglas Kruse.

"Supervision, Working Conditions, and the Employer Size-Wage Effect," <u>Industrial Relations</u>, Vol. 31, No. 2, Spring 1991, pp. 229-249. By Douglas Kruse.

"Displaced versus Disadvantaged Workers:  Policy Issues and Research Questions," in John Addison, ed., <u>Job Displacement: Consequences and Implications for Policy</u>. Detroit, MI:  Wayne State University Press, 1991. By Douglas Kruse.

"The Economic Implications of Employment Rights and Practices in the U.S.," <u>Journal of Comparative Economics</u>, Vol. 14, September 1990, pp. 221-253. By Douglas Kruse.

"International Trade and the Labor Market Experience of Displaced Workers," <u>Industrial and Labor Relations Review</u>, Vol. 41, No. 3, April 1988, pp. 402-417. By Douglas Kruse.

"Industrial Policy at the State Level in the United States," <u>Journal of Economic Issues</u>, XIX:2, June 1985.  By F. Gregory Hayden, Douglas Kruse, and Steven Williams.

"Small Business Financing:  A Survey of the Experiences and Attitudes of Nebraska Small Business Owners," <u>Proceedings of the Small Business Institute Directors' Association Conference, 1984</u>, February 1984, pp. 125-138.  By Douglas Kruse, Steve Williams and F. Gregory Hayden.

BOOK REVIEWS AND MISCELLANY:

"Foreword," <u>Institutional Analysis and Praxis: The Social Fabric Matrix Approach</u>, Tara Natarajan, Wolfram Elsner, and Scott Fullwiler, eds. (New York: Springer, 2009), pp. vii-viii.

"Commentary on 'The Economic and Social Impacts of Telework' by Sean Doherty et al.," <u>Telework: The New Workplace of the 21st Century</u>.  Washington, D.C.: U.S. Department of Labor, 2000, pp. 98-102.

"<u>The Ownership Solution: Towards a Shared Capitalism for the 21st Century</u>: A Review," <u>Economic Analysis: The Journal of Enterprise and Participation</u>, Vol. 2, No. 1, 1999, pp. 70-72.

"<u>America's Agenda: Rebuilding Economic Strength</u>: A Review," <u>Journal of Comparative Economics</u>, Vol. 19, No. 1, August 1994, pp. 122-124.

"<u>Pensions and the Economy</u>:  A Review," <u>Industrial and Labor Relations Review</u>, Vol. 46, No. 3, July 1993.

"<u>Three Worlds of Labor Economics</u>:  A Review." <u>Journal of Economic Issues</u>, XXIV:3, September 1990.

"<u>Workers' Self-Management in the United States</u>:  A Review." <u>Journal of Economic Issues</u>, XIX:3, September 1985.

"<u>Workplace Democracy and Social Change</u>:  A Review."  <u>Journal of Economic Issues</u>, XVII:4, December 1983.

CONGRESSIONAL TESTIMONY:

"Research on Stock Options," Testimony before the U.S. House of Representatives, Committee on Financial Services, Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises, April 21, 2004.

"Research Evidence on Prevalence and Effects of Employee Ownership," Testimony before the Subcommittee on Employer-Employee Relations, Committee on Education and the Workforce, U.S. House of Representatives, February 13, 2002.

"Profit Sharing and Gainsharing," Testimony before U.S. House of Representatives Committee on Small Business, Subcommittee on Regulation, Business Opportunities, and Technology, July 15, 1994.

"Testimony before the House Subcommittee on Economic Stabilization," <u>The National Entrepreneurship Act: Hearing before the Subcommittee on Economic Stabilization of</u>

the Committee on Banking, Finance, and Urban Affairs.  May 15, 1984, Serial No. 98-92. Washington, D.C.:  Government Printing Office, 1984.

REPORTS:

Disability and Voting Accessibility in the 2020 Elections: Final Report on Survey Results Submitted to the Election Assistance Commission.  February 2021.  By Lisa Schur and Douglas Kruse.

Projecting the Number of Eligible Voters with Disabilities in the November 2020 Elections, September 2020.  By Lisa Schur and Douglas Kruse.

Fact sheet: Elected Officials with Disabilities, September 2019.  By Lisa Schur and Douglas Kruse.

Fact sheet:  Disability and Voter Turnout in the 2018 Elections, July 2019.  By Lisa Schur and Douglas Kruse.

Fact sheet:  Disability and Voter Turnout in the 2016 Elections, August 2017.  By Lisa Schur and Douglas Kruse.

Projecting the Number of Eligible Voters with Disabilities in the November 2016 Elections, September 2016.  By Lisa Schur and Douglas Kruse.

Disability, Voter Turnout, and Voting Difficulties in the 2012 Elections, report submitted to the U.S. Election Assistance Commission, June 2013.  By Lisa Schur, Meera Adya, and Douglas Kruse.

Fact sheet:  Disability and Voter Turnout in the 2010 Elections, August 2011.  By Lisa Schur and Douglas Kruse.

Inclusive Capitalism for the American Workforce: Reaping the Rewards of Economic Growth through Broad-based Employee Ownership and Profit Sharing.  Center for American Progress, March 2011.  By Richard B. Freeman, Joseph R. Blasi, and Douglas L. Kruse.

Fact sheet:  Disability and Voter Turnout in the 2008 Elections, August 2009.  By Lisa Schur and Douglas Kruse.

Shared Capitalism, Employee Attitudes, and Company Outcomes:  An Analysis of the Great Place to Work Dataset, 2006-2008, submitted to the Sloan Foundation, December 2009.  By Joseph Blasi, Douglas Kruse, and Richard Freeman.

Employment of People with Disabilities: Report to the National Council on Disability, May 2007.  By Douglas Kruse (Principal Investigator) with James Schmeling, Meera Adya,

63

Carol Harvey, Todd Honeycutt, William Myhill, Cynthia Smith, M.A., Michael Morris, and Peter Blanck.

Assessment of Test Questions to Identify Disability Status: Report to the Bureau of Labor Statistics, January 2004.  By Douglas Kruse.

Theoretical Study on Stock Options in Small and Medium Enterprises, Report to the Enterprise-Directorate General, Commission of the European Communities, October 2002.  By Andrew Pendleton, Joseph Blasi, Douglas Kruse, Erik Poutsma, and James Sesil.

Non-standard Work Arrangements and Disability Income, Report to the Disability Research Institute, University of Illinois Urbana-Champaign, August 2002.  By Lisa Schur and Douglas Kruse.

Empowerment Through Civic Participation: A Study of the Political Behavior of Citizens with Disabilities, Report to the Rutgers Disability Research Consortium and N.J. Developmental Disabilities Council, March 1999.  By Douglas Kruse, Lisa Schur, Kay Schriner, and Todd Shields.

Disability and Employment: Characteristics of Employed and Non-employed People with Disabilities, Report to the Office of Policy, U.S. Department of Labor, September 1997.  By Douglas Kruse.

Disability, Employment, and Earnings in the Dawn of the Computer Age, Report to the Rutgers Disability Research Consortium and the N.J. Developmental Disabilities Council, October 1995.  By Douglas Kruse, Alan Krueger, and Susan Drastal.

ESOPs, Profit Sharing, and Gainsharing in Airlines and High-Technology Industries, Report to the U.S. Department of Labor, March 1995. By Linda Bell and Douglas Kruse.

Characteristics of Nebraska Migrants:  Data from the 1980 Census.  Lincoln, NE: Department of Economic Development, State of Nebraska, September 1984.

Equity Capital and Nebraska Small Businesses.  Lincoln, NE: Policy Research Office, State of Nebraska, 1984.  By F. Gregory Hayden, Douglas Kruse, and Steve Williams.

Nebraska Socioeconomic Indicators.  Lincoln, NE:  State of Nebraska, May 1984.  By Steve Williams and Douglas Kruse.


WORKING PAPERS AND CURRENT RESEARCH:

"Progress or Regress amid the Pandemic? Disability, Voting Accessibility, and Voter Turnout From 2008 to 2020," presented at APSA annual conference, October 1, 2021.  By Lisa Schur, Douglas Kruse, Lauren Gilbert, Mason Ameri, and Meera Adya.

"See Me, Not the Disability: Field Experiments on Disability, Veteran, and Gender Status in Hiring Outcomes." By Mason Ameri, Lisa Schur, Meera Adya, and Douglas Kruse. October 2019.

"Disability and the Unionized Workplace," IZA Discussion Paper No. 12258, March 2019. By Mason Ameri, Mohammad Ali, Lisa Schur, and Douglas L. Kruse.

"Do Employee Share Owners Face Too Much Financial Risk?"  IZA Discussion Paper No. 12303, April 2019.  By Douglas Kruse, Joseph Blasi, Dan Weltmann, Saehee Kang, Jung Ook Kim, and William Castellano.

"Where does profit sharing work best? A meta-analysis on the role of unions, culture, and values,"  IZA Discussion Paper No. 11617, June 2018.  By Hristos Doucouliagos, Patrice Laroche, Douglas L. Kruse, and T.D. Stanley.

"The Disability Employment Puzzle: A Field Experiment on Employer Hiring Behavior." By Mason Ameri, Lisa Schur, Meera Adya, Scott Bentley, Patrick McKay, Douglas Kruse.  Working Paper No. 21560, National Bureau of Economic Research, Cambridge, MA, September, 2015.  Published in ILR Review.

"Show Me the Money: Does Shared Capitalism Share the Wealth?" NBER Working Paper 14830, April 2009.  By Robert Buchele, Douglas Kruse, Loren Rodgers, and Adria Scharf.  Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Shared Capitalism in the U.S. Economy: Prevalence, Characteristics, and Employee Views of Financial Participation in Enterprises," NBER Working Paper 14225, August 2008. By Douglas Kruse, Joseph Blasi, and Rhokeun Park.  Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Who Has a Better Idea? Innovation, Shared Capitalism, and HR Policies," NBER Working Paper 14234, August 2008.   By Erika Harden, Douglas Kruse, and Joseph Blasi. Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Creating a Bigger Pie?  The Effects of Employee Ownership, Profit Sharing, and Stock Options on Workplace Performance," NBER Working Paper 14230, August 2008.  By Joseph Blasi, Richard Freeman, Chris Mackin, and Douglas Kruse.  Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Do Workers Gain by Sharing? Employee Outcomes Under Employee Ownership, Profit Sharing, and Broad-based Stock Options," NBER Working Paper 14233, August 2008. By Douglas Kruse, Richard Freeman, and Joseph Blasi.  Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Worker Responses to Shirking under Shared Capitalism," NBER Working Paper 14227, August 2008.  By Richard Freeman, Douglas Kruse and Joseph Blasi.  Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Risk and Lack of Diversification Under Employee Ownership and Shared Capitalism," NBER Working Paper 14229, August 2008.  By Joseph Blasi, Douglas Kruse, and Harry Markowitz.  Published in Shared Capitalism at Work (eds. Douglas Kruse et al., University of Chicago Press, 2010).

"Motivating Employee-Owners in ESOP Firms:  Human Resource Policies and Company Performance," National Bureau of Economic Research Working Paper Number 10177, January 2004.  By Douglas Kruse, Richard Freeman, Joseph Blasi, Robert Buchele, Adria Scharf, Loren Rodgers, and Chris Mackin.

"Economic Democracy or Just Another Risk for Workers?  Reviewing the Evidence on Employee Ownership and Profit Sharing," presented at Columbia conference "Democracy, Participation, and Development," May 1999.

"Telecommuting and Home-based Work: Differences by Disability Status," November 1998.  By Douglas Kruse and MaryAnne Hyland.

"Labor Market Effects of Spinal Cord Injuries in the Dawn of the Computer Age," National Bureau of Economic Research Working Paper No. 5302, October 1995.  By Alan Krueger and Douglas Kruse.

GRANTS AND CONTRACTS:

Disability and Voting Accessibility in the 2020 Elections.  Lisa Schur and Douglas Kruse.  This $318,000 contract from the U.S. Election Assistance Commission funded a post-election national survey of 2569 people on disability and voting in the 2020 elections.  Report was delivered February 17, 2021.

Disability Inclusive Employment Policy RRTC (Rehabilitation Research and Training Center).  Douglas Kruse, Lisa Schur, Mason Ameri, and Yana Rodgers.  Funded by U.S. Department of Health and Human Services.  Project period 2020-2025.  Center is based at Syracuse with Rutgers and Harvard as partners.  Doug Kruse is PI on the Rutgers subaward of $943,000, and co-PI on the overall award of $4,375,000 based at Syracuse.

Disability and Assistive Technology.  Douglas Kruse, Lisa Schur, Mason Ameri, and Hazel-Anne Johnson.  "SFW-HTF-RL: Collaborative Research: Future of Work for People with Disabilities – Physical and Cognitive Training Through Perceptive and Adaptive Soft (PECASO) Wearable Robots." Funded by National Science Foundation.  Project period 2020-2024.  Project is based at CUNY with Rutgers as partner.  Doug Kruse is

PI on the Rutgers subaward of $619,279, and co-PI on the overall award of $1,884,010 based at CUNY.

Employee Ownership and Employment Stability.  Co-PI with Fidan Kurtulus for $40,000 grant from W.E. Upjohn Institute for Employment Research, 2012-2014.  We examined public employee ownership firms over the 1999-2011 period, analyzing their employment stability and survival during the two recessions. The results were published in a book in 2014.

Disability Discrimination and Job Requirements.  Co-PI for $200,000 grant from Employment Policy Rehabilitation Research and Training Center, based at University of New Hampshire and funded by National Institute on Disability and Rehabilitation Research, 2010-2015.  This project matches data on disability earnings gaps by occupation to data on occupational job tasks and ability requirements, examining whether disability earnings gaps are limited to occupations in which an impairment should limit productivity, or instead also exist in occupations where impairments do not limit productivity, which would support the idea that discrimination is at work.

Organizational Practices and Disability.  Co-investigator for $500,000 grant from the Office of Disability Employment Policy, U.S. Department of Labor, 2006-2007.  A consortium of Rutgers, Cornell, and Syracuse researchers worked with three other research partners and six companies to study how corporate policies and practices, and manager and co-worker attitudes, can limit or facilitate employment opportunities for people with disabilities.  The researchers developed case study standards and methodology, and then applied them in six case studies. The information from the case studies will provide lessons about what works in diverse settings, helping companies develop "best practices" for employing people with disabilities and providing a platform for ongoing benchmarking and self-evaluation.

Disability and Demand-side Employment Placement Models.  Co-investigator for $2.5 million grant in collaboration with Syracuse University and the University of Illinois, 2006-2011, from the National Institute on Disability and Rehabilitation Research, U.S. Dept. of Education.  This establishes a 5-year center to study factors affecting employer demand for people with disabilities.  The Rutgers projects include studies on contingent work, worker displacement, and 10-year projections of demand for specific abilities.

Desired and Actual Work Arrangements Among People with Disabilities.  Principal investigator for $51,350 in grants for putting disability questions on the 2006 General Social Survey.  In combination with two work modules (the Work Orientation module and the Quality of Work Life module), these data provide the first representative estimates of desired work arrangements among both employed and non-employed people with disabilities, and the attitudes and experiences of employed people with disabilities.

Shared Capitalism: Co-investigator with Richard Freeman, Joseph Blasi, and Chris Mackin for $650,000 grant from Russell Sage Foundation and Rockefeller Foundation, September 2000-December 2006.  We did case studies of 14 U.S. companies with various forms of employee ownership, stock options, and profit sharing, with surveys from 41,000 employees.  For nationally-representative data, we sponsored questions on the 2002 and 2006 General Social Surveys regarding attitudes toward and experience with employee ownership and profit sharing.  Results will form the basis of a conference, several articles, and a book.

Design of Disability Questions for Current Population Survey:  Principal investigator for $102,500 grant from Presidential Task Force on Employment of Adults with Disabilities, August 2001-December 2002.  I worked with the Bureau of Labor Statistics, under a Presidential Executive Order, to design disability questions for the monthly population survey of the federal government.

Disability Research Institute:  Co-investigator for 5-year cooperative agreement with Social Security Administration to do research on employment and disability income among people with disabilities.  One project with Lisa Schur, funded by a $54,000 grant, analyzed the prevalence and trends of alternative work arrangements among people with disabilities over the 1992-2000 period, and legal issues facing workers with disabilities in such arrangements.

Empowerment Through Civic Participation: A Study of the Political Behavior of Citizens with Disabilities: Co-investigator for $102,500 in grants from the New Jersey Developmental Disabilities Council, National Institute on Disability and Rehabilitation Research, Presidential Task Force on Employment of Adults with Disabilities, and Rutgers School of Management and Labor Relations for national surveys following the November 1998 and 2000 elections.   The 2000 survey had 1000 respondents and the 1998 survey had 1240 respondents, with 500 respondents with disabilities in 2000 and 700 respondents with disabilities in 1998.  The project, done with collaborators Lisa Schur (Rutgers), Kay Schriner, and Todd Shields (U. of Arkansas), compared people with and without disabilities in levels and determinants of voter turnout and other forms of political participation.

Survival and Growth of Private ESOP Firms:  Co-investigator with Joseph Blasi for $20,000 grant from ESOP Foundation, National Center for Employee Ownership, and Foundation for Enterprise Development, May, 2000-December, 2000.  This project uses 1983-99 longitudinal Dun & Bradstreet data for 3010 firms to investigate the relative survival and growth patterns of ESOP vs. non-ESOP firms.

Disability and Employment:  Principal investigator for $25,000 grant from U.S. Department

of Labor, 1997.  I analyzed Survey of Income and Program Participation dataset to

construct baseline information for evaluating likely impacts of policy proposals to

encourage employment among people with disabilities.  The report provides portraits

of employed and non-employed people with disabilities, and comparisons to the

general population, with respect to demographic characteristics, personal and

household income sources and amounts, health care insurance and utilization, and

employment characteristics of the employed.

Disability, Employment, and Computer Use:  Co-investigator, with Alan Krueger of
Princeton University, for $100,000 grant from Rutgers Disability Research
Consortium and Princeton Industrial Relations Section.  We analyzed employment
patterns among mobility-impaired individuals, and the extent to which computer
technologies have affected the employability and earnings power of such individuals.

ESOPs, Profit Sharing, and Gainsharing in Airlines and High-Technology Industries:  Co-
investigator, with Linda Bell of Haverford College, for $25,000 grant from U.S.
Department of Labor to collect and analyze survey data from publicly-held firms in
airlines and high-technology industries, 1995.

The Productivity and Stability Theories of Profit Sharing:  Principal investigator for $47,000
grant from W.E. Upjohn Institute for Employment Research to study profit sharing in
publicly-held companies.  Published in Upjohn book in 1993.

PRESENTATIONS:

"Disability and Voting Accessibility in the 2020 Elections."  Presentation to American
Council on the Blind, February 22, 2021, with Lisa Schur.

"Disability and Voting Accessibility in the 2020 Elections."  Presentation to U.S. Election
Assistance Commission, February 17, 2021, with Lisa Schur.

"Disability and Voting: What Does the Research Say?" Presentation with Lisa Schur for
"POWER: The Disability Vote" webinar, sponsored by American Association of
People with Disabilities and REV UP! Campaign, June 22, 2020.

"Disability and Voting." Presentation with Lisa Schur for "Protecting the Right to Vote for People with Disabilities" webinar, sponsored by Leadership Conference On Civil and Human Rights, and National Disability Rights Network, May 21, 2020.

"Understanding Support for Employee Ownership," New Jersey/New York Center for Employee Ownership, Rutgers University, October 29, 2019.

"Where does profit sharing work best? A meta-analysis on the role of unions, culture, and values," International Association for the Economics of Participation conference, University of Ljubljana, Slovenia, July 2018.

"Where does profit sharing work best? A meta-analysis on the role of unions, culture, and values," Beyster Symposium, LaJolla, CA, June 2018.

"Employee Ownership: A Look at the Evidence," Vermont Employee Ownership Center, University of Vermont, Burlington, VT, June 2018.

"Disability and Employment," Sciences Po, St. Germain-en-Laye, Paris, France, March 16, 2018.

"Citizenship and Disability," Sciences Po, St. Germain-en-Laye, France, March 12, 2018.

"Tying Employee Rewards to Company Performance through Employee Ownership and Profit Sharing," University of Pennsylvania, July 2017.

"Do Employee Owners Face Too Much Financial Risk? Analysis of the Survey of Consumer Finances," International Association for the Economics of Participation, Copenhagen, Denmark, July 2016.

"Do Employee Owners Face Too Much Financial Risk? Analysis of the Survey of Consumer Finances," Beyster Symposium, LaJolla, CA, June 2016.

"The Disability Employment Puzzle: A Field Experiment on Employer Hiring Behavior," World Bank, January 13, 2016, with Mason Ameri and Lisa Schur.

"The Impact of Employee Stock Ownership and Profit Sharing for Low Income Families: The Rutgers University Kellogg Foundation Research Project," Kelso Workshop, Rutgers University, January 11, 2016.

"The Disability Employment Puzzle: A Field Experiment on Employer Hiring Behavior," NBER Summer Institute on Law and Economics, July, 2015, with Mason Ameri and Lisa Schur.

"How Did Employee Ownership Firms Weather the Last Two Recessions? Employee Ownership and Employment Stability in the U.S.: 1999-2010," Beyster Symposum, University of California-San Diego, January 2015, with Fidan Kurtulus.

"Survey Results on Polling Place Accessibility in the 2012 Elections," U.S. Election Assistance Commission, Washington, D.C., May 9, 2013

"Differentiating the Truly Great Place to Work Companies From the Good Companies," Beyster Mid-year Fellows Workshop, Rutgers University, February 2013.

"Shared Capitalism," Keynote Address, International Association for the Economic of Participation, Paris, France, July 2010.

"The Effects of Accommodations on the Employment of People with Disabilities," Jacobus ten Broek Symposium, National Federation of the Blind, Baltimore, MD, April 15, 2011.

"Research Overview for Discussion of CPS Disability Supplement," U.S. Bureau of Labor Statistics, Washington, D.C., October 19, 2010

"Does Shared Capitalism Help the Best Firms Do Even Better?" Centre for Economic Performance, London School of Economics, May 26, 2011.

"Shared Capitalism, Corporate Culture, and Performance," Beyster Institute, University of California-San Diego, July 2009.

"Disability at Work:  Job Characteristics and Attitudes of Employees with Disabilities," Labor and Employment Relations Association annual conference, San Francisco, CA, January 2009.

"Disability and Employment: Building a Research Agenda," Interagency Committee on Disability Research, Subcommittee on Employment, Washington, D.C., June 2008.

"Shared Capitalism Research Project," Organizational Dynamics, University of Pennsylvania, May 2008.

"Building Inclusive Organizations for Employees with Disabilities," School of Management and Labor Relations, Rutgers University, May 2008.

"Disability and Voter Turnout," University of North Carolina-Charlotte and Carolinas Rehabilitation Center, April 2008.  With Lisa Schur.

"Worker Responses to Shirking," M.I.T. Sloan School of Management, November 2007. With Richard Freeman and Joseph Blasi.

"Corporate Culture and the Experiences of Employees with Disabilities," Society of Industrial and Organizational Psychology, Dallas, TX, May 2006.  With Lisa Schur.

"Shared Capitalism in the U.S. Economy: Prevalence, Characteristics, and Employee Views of Financial Participation in Enterprises," NBER/Russell Sage Conference on Shared Capitalism, New York, NY, October 2006.

"Do Workers Gain by Sharing? Employee Outcomes Under Employee Ownership, Profit Sharing, and Broad-based Stock Options," NBER/Russell Sage Conference on Shared Capitalism, New York, NY, October 2006.

"Risk: Is It Economic Democracy, or Just Another Risk for Workers? Employee Attitudes Toward Risk-Sharing and Financial Participation in Company Rewards," October 2006.

"Motivating Employee-Owners in ESOP Firms:  Human Resource Policies and Company Performance," Industrial Relations Research Association, January 2004.

"Non-standard Work Arrangements and Disability Income," Disability Research Institute, Washington, D.C., June 5-6, 2002.  With Lisa Schur.

"Research Evidence on Prevalence and Effects of Employee Ownership," National Bureau of Economic Research, Cambridge, MA, April 12, 2002.

"Changes in the Workforce: Trends and Implications for Employment Law and Collective Bargaining," Industrial Relations Research Association, New Jersey chapter, April 1, 2002.  With Lisa Schur.

"Does the Definition Affect the Outcome?  Employment Trends Under Alternative Measures of Disability," Employment & Disability Policy Institute sponsored by Cornell University, Washington, D.C., October 2001.

"Non-standard Work Arrangements and Disability Income," Disability Research Institute, University of Illinois at Urbana-Champaign, April 26, 2001.

"Comments on 'The Economic and Social Impacts of Telework'," Conference on Telework, U.S. Department of Labor, New Orleans, LA, October 2000.

"Telecommuting and Home-based Work: Differences by Disability Status," Cornell Summer Institute on Disability and Employment Policy, Ithaca, NY, July 2000.

"Disability and Voter Turnout," presented to President's Committee on Employment of People with Disabilities, Subcommittee on Employee Disability Concerns, Washington, D.C., January 2000.

"Employment and Participation Among People with Disabilities," presented to European Union High Level Group on Disability, Washington, D.C., October 1999.

"Polling Place Accessibility for People with Disabilities," National Task Force on Elections Accessibility, Washington, D.C., June 1999, with Lisa Schur.

"Telecommuting and Home-based Work: Differences by Disability Status," Society for Disability Studies, Washington, D.C., May 1999.

"Economic Democracy or Just Another Risk for Workers?  Reviewing the Evidence on Employee Ownership and Profit Sharing," Conference on Democracy, Participation, and Development, Columbia, NY, April 1999.

"Telecommuting and Home-based Work: Differences by Disability Status," President's Committee on Employment of People with Disabilities, Washington, D.C., January 1999.

"The New Employee/Employer Relationship," Aspen Institute's Domestic Strategy Group, Aspen, Colorado, July 1998.

"The Wealth and Income Consequences of Employee Ownership," paper by Peter Kardas et al., presented at NBER conference "Shared Capitalism: Mapping the Research Agenda," Washington, D.C., May 1998.

"Is Employee Ownership an Unstable Form?  Or a Stabilizing Force?" MIT-Brookings Conference on Corporations and Human Capital, Dedham, MA, January, 1998.

"Employment Policies for the 21st Century," Social Security Administration conference on "Employment Post the Americans with Disabilities Act," Washington, D.C., November 1997.

"What Affects Voter Turnout?  Lessons from Citizens with Disabilities," Society for Disability Studies, Minneapolis, MN, May 1997, with Lisa Schur.

"Profit Sharing and the Demand for Low-Skill Workers," Federal Reserve Bank of Dallas, April 1997.

"The Role of Computer Skills in Employment and Earnings Following a Spinal Cord Injury," Conference on Technology and Persons with Disability, California State University-Northridge, Los Angeles, CA, March 1997.

"What Affects Voter Turnout?  Lessons from Citizens with Disabilities," Southern Political Science Association, Atlanta, GA, November 1996, with Lisa Schur.

"Disability, Employment, and Computer Use," American Spinal Injury Association, Seattle, WA, April 1996.

"Labor Market Effects of Spinal Cord Injuries in the Dawn of the Computer Age," Dept. of Economics, University of Maryland, Towson, MD, April 1996.

"Profit Sharing and Employee Ownership:  Review of the Issues and Research," Industrial Relations Research Association, San Francisco, CA, January 1996.

"Profit Sharing, Employee Ownership, and Corporate Governance," Seminar on Corporate Governance, Columbia University Law School, November 1995.

"Labor Market Effects of Spinal Cord Injuries in the Dawn of the Computer Age," National Bureau of Economic Research, Cambridge, MA, July 1995.

"Employee Ownership and Profit Sharing in the U.S. and Europe," Chinese State Commission for Restructuring the Economic System, New York, NY, July 1995.

"Profit Sharing and the Demand for Low-Skill Workers," Demand-Side Strategies for the Low-Wage Labor Market conference, Russell Sage Foundation, New York, NY, June 1995.

"Profit Sharing and Public Policy," Association for Evolutionary Economics, New York, NY, January 1994.

"Does Profit Sharing Affect Productivity?" Dept. of Economics, Columbia University, New York, NY, October 1993.

"Does Profit Sharing Affect Productivity?" National Bureau of Economic Research, Cambridge, MA, July 1993.

"Does Profit Sharing Affect Productivity?" Cornell University, Ithaca, NY, May 1993.

"Does Profit Sharing Affect Productivity?" Eastern Economics Association, Washington, D.C., March 1993.

"Profit Sharing, Productivity, and Employment Stability," U.S. Department of Labor, Pension and Welfare Benefits Administration, Washington, D.C., March 1990.

"Policy Implications of Profit Sharing," paper delivered at Society for the Advancement of Socio-Economics, Washington D.C., March 1990.

"Profit Sharing in the 1980's:  Disguised Wages or a Fundamentally Different Form of Compensation?" paper delivered at Wage Structure Conference, Federal Reserve Bank of Cleveland, November 1989.

"Profit Sharing and Productivity" (with Martin Weitzman), paper delivered at Brookings Institution conference on worker compensation and productivity, Washington, D.C., March 1989.

"The Economic Implications of Employment Rights and Practices in the United States,"
paper delivered at AEA/ACES Annual Meeting, New York, December 1988.

"Small Business Financing: A Survey of the Experiences and Attitudes of Nebraska Small
Business Owners," with F. Gregory Hayden and Steven Williams, Small Business
Institute Directors Association, February 1984, Denver, Colorado.

"The Effect of Employee Ownership on Desires for Participation," Western Social Science
Association, April 1982, Denver, Colorado.


SERVICE TO PROFESSION:

Editor, British Journal of Industrial Relations, January 2011- June 2021.

Associate Editor, Journal of Participation and Employee Ownership, 2017-present.

Guest co-editor, special issue on Employee Ownership, Human Resource Management,
2018.

Co-chair, Awards Committee, Labor and Employment Relations Association, 2015-2018.

Member, Board of Reviewers, Industrial Relations, 1993-2004.

Recognized by Industrial and Labor Relations Review as one of its "most productive
reviewers" over the 1995-99 period.

Referee for
Academy of Management Journal
American Economic Review
American Journal of Industrial Medicine
British Journal of Industrial Relations
Canadian Journal of Economics
Comparative Economic Studies
The Economic Journal
Human Resource Management
Industrial and Labor Relations Review
Industrial Relations
Journal of Comparative Economics
Journal of Disability Policy Studies
Journal of Economics and Business
Journal of Economic Behavior and Organization
Journal of Economic Issues
Journal of Labor Economics
The Milbank Quarterly
Organization Science

Policy Studies Journal
Quarterly Journal of Economics
Review of Economics and Statistics
Social Science Quarterly


SERVICE TO GOVERNMENT:

Member, Transition Team for a Stronger and Fairer Economy, New Jersey Governor-elect
    Phil Murphy, November 2017-January 2018.

Member of State Rehabilitation Advisory Council, New Jersey Division of Vocational
    Rehabilitation, 1999-2013.

Report prepared for National Council on Disability, Employment of People with
    Disabilities, May 2007.

Member of Advisory Committee for the Disability Statistics Center, Cornell University,
    2004-2009.

Member of Blue Ribbon Expert Advisory Panel for the ADA Impact Study, funded by the
    National Council on Disability, 2004-2005.

Member of Advisory Committee for the Rehabilitation Research and Training Center for
    Economic Research on Employment Policy for Persons with Disabilities, Cornell
    University, 1998-2004.

Member of President's Committee on Employment of People with Disabilities,
    Subcommittee on Employment Disability Concerns, 1998-2000.

Consultant on designing Behavioral Risk Factor Surveillance System questions to identify
    environmental barriers facing people with disabilities, conducted by Craig Hospital
    (Denver, CO) with funding by Centers for Disease Control, 1998.

Consultant on designing and writing vocational rehabilitation book about labor market
    prospects for people with disabilities, Rehabilitation Services Administration, 1998-
    99.

Data prepared at request of Joint Economic Committee of the U.S. Congress, on employer
    stock and 401(k) plans, August 1998.

Report prepared for U.S. Department of Labor, Office of Policy, Disability and
    Employment: Characteristics of Employed and Non-employed People with
    Disabilities, September 1997.

Report prepared for U.S. Department of Labor, Office of the American Workplace,
ESOPs, Profit Sharing, and Gainsharing in Airlines and High-Technology
Industries, with Linda Bell, 1995.

Referee for National Science Foundation grant proposals, 1995, 1999.

Testimony before the Subcommittee on Employer-Employee Relations, Committee on
Education and the Workforce, U.S. House of Representatives, concerning employee
ownership and retirement security, February 13, 2002.

Testimony before U.S. House of Representatives Committee on Small Business,
Subcommittee on Regulation, Business Opportunities, and Technology (Ron Wyden,
Chair), concerning bill to provide incentives for profit-sharing and gainsharing plans,
July 15, 1994.

Testimony before U.S. House of Representatives Committee on Banking, Finance, and

Urban Affairs, Subcommittee on Economic Stabilization (Charles Schumer, Chair), concerning

"The National Entrepreneurship Act," May 15, 1984.

SERVICE TO RUTGERS UNIVERSITY:

Associate Dean for Academic Affairs, School of Management and Labor Relations,
Rutgers University (July 2017-December 2018)
Director, Ph.D. Program in Industrial Relations and Human Resources, School of
Management and Labor Relations, Rutgers University (July 2007-June 2013)
New Brunswick Faculty Council representative (2014-2017)
Advisory Committee on Instructional Computing member (2001-2005)
University Research Council member (1998-2012)
Faculty mentoring committee member for Jasmine Feng (2016-present), Saunjuhi Verma
(2015-present), Janice Fine (2007-2012), Saul Rubinstein (1996-2002), Stan Gully,
(2000-2005), Ryan Smith (1995-2000), Marlene Kim (1993-1999), Barbara Rau
(1995-1997), and Kirsten Wever (1997-1999).
Dissertation committee chair for Eric Schulz (1997), Rhokeun Park (2007), Andrea Kim
(2013), Mason Ameri (2017), and Saehee Kang (current).
Dissertation committee member for Michael Zigarelli (1995), James Gasaway (1999),
Maya Kroumova (1999), Douglas Mahony (2001), Haejin Kim (2003), Sean Way
(2004), Saba Colakoglu (2008), and Dan Weltmann (2017).
Master's thesis committee chair for Sean Way (2001) and Rhokeun Park (2003)
Ph.D. Policy Committee, School of Management and Labor Relations (1995-1998, 2000-
2005)
Library Committee, School of Management and Labor Relations (1988-1993, 1997-1998)
Admissions Committee (1989-1990, 1991-1992)

77

Health and Safety Committee, School of Management and Labor Relations (1989-1990)
Several faculty recruitment committees (1991-present)


AFFILIATIONS:

American Economic Association
Association for Comparative Economic Studies
Association for Evolutionary Economics
Labor and Employment Relations Association
Royal Economic Society
Society for Disability Studies