# *EXHIBIT 15*

**Expert Report on Behalf of MALDEF**
*LUPE, et al v Texas, Scott, et al*
**Case No. 5:21-cv-00844-XR**

**SB1**

**By**

**Henry Flores, PhD**

**Introduction**

1.      My name is Henry Flores and I am over 18 years of age.  I have never been convicted of a crime and am fully competent to express the below opinions.  The following observations and opinions are within my personal and professional knowledge and are accurate and correct.

2.      Currently I am a Scholar in Residence in the Department of Political Science at the University of Houston in Houston, Texas. Additionally, I am the Distinguished University Research Professor of Political Science Emeritus at St. Mary's University in San Antonio, Texas where I taught for thirty-five years.  During my tenure at St. Mary's, I was Dean of the Graduate School for nine years, Chair of the Department of Political Science twice, Director of the Graduate Program in Public Administration three times and Director of the Graduate Political Science Program once. My résumé is attached as Appendix A.

3.      I was awarded my PhD from the University of California at Santa Barbara in December 1981with examination fields in American Politics (Urban and Latino), Public Administration (Organizational and Decision Theories), Political Philosophy (Conceptual Analysis and Structural Theories) and Multivariate Statistical Analyses.  I have published numerous books, scholarly articles, encyclopedia entries and invited chapters in books as well as presented learned papers on racially polarized voting, Latino and Urban Politics, racial intent, structural discrimination, and decision theory.  Throughout my publications I have examined the connections between race and politics in many areas of public policy including voting, gun

1

control, immigration and economic development in the nation, Texas, San Antonio and Los Angeles, California.

4.      I have taken part as a testifying or research expert in over 30 voting rights matters since 1986 including: contributing a submission to the Assistant Attorney General for Civil Rights of the United States concerning congressional redistricting in Texas in 1991 and subsequently testifying on behalf of the Texas Republican Party on the racially polarized nature of elections in the state the same year; testifying on behalf of Latinos during the Texas Redistricting litigation in 1991 on racially polarized voting; in 2011 testifying on behalf of Latino plaintiffs in *LULAC v Perry* regarding racial intent on the part of state redistricters, my work was cited in the Supreme Court decision on plaintiff's behalf.  Besides state redistricting I have also served as a voting rights testifying expert in city, county, school and special district matters over the years.

5.  Currently, I am serving as an expert witness on racial intent in *League of United Latin American Citizens, et al v Gregg Abbott and Jose A. Esparza*. Finally, I have offered expert testimony in fifteen civil and criminal suits concerned with employment, change of venue, probate, birthright citizenship, and delivery of social services.  A list of all cases I have testified in or supported by research may be found in my attached résumé.

6.  As a scholar, I have observed the Texas Legislature for over 35 years and have written scholarly and popular articles on Texas Politics.  My most recent two books have been about how racism has become infused in the redistricting and voter ID policies of Texas.  I have appeared on television, radio and cited in the print media from the international, national and local levels on Texas politics, Texan voting patterns, and various state policies affecting the Latino community.

7.      The Mexican American Legal Defense and Educational Fund has retained as an expert witness in the matter currently before this court.  I am being compensated at a rate of $150 per hour plus reasonable expenses for my work.

8.      I was retained to examine whether the enactment of SB 1 was characterized by intentional racial discrimination.  The analytical framework for my expert opinion is based on the factors set forth in *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).

9.      I also consulted the following documents, books, news articles, and learned articles to reach my opinions which appear in the last section of this report.

      a.   *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).

      b.   *Thornberg v. Gingles*, 478 U.S. 30 (1986).

      c.   *League of United Latin American Citizens v. Perry,* 548 U.S. 399 (2006).

      d.   *Terrazas v. Slagle*, 789 F. Supp. 828 (W.D. Tex. 1991).

      e.   *Balderas, Roman, et al v State of Texas, (*CA 6:010v 158).

      f.   *G.I. Forum v. Perry* 543 U.S. 941 (2004).

      g.   *White* v. *Regester,* 412 U. S. 755  (1973).

      h.   Senate and House Journals for the months of July, August, and September 2021.

      i.   Transcripts of relevant proceedings in the 2021 sessions of the Texas Legislature on SB7 and SB1.

      j.   Daniel Kahneman.  2011.  *Thinking Fast and Slow.*  NY:  Farrar, Straus and Giroux.

      k.   _____, Olivier Sibony, and Cass R. Sunstein.  2021.  *Noise:  A Flaw in Human Judgment.*  NY:  Little, Brown Spark.

      l.   Daniel Gardner. 2009.  *The Science of Fear:  How the Culture of Fear Manipulates Your Brain.*  NY:  PLUME an Imprint of Penguin Random House LLC.

      m.   Jennifer L. Eberhardt.  2020.  *Biased:  Uncovering the Hidden Prejudice That Shapes What We See, Think, Do.*  NY:  Penguin Books.

      n.   Henry Flores.  2015.  *Latinos and the Voting Rights Act:  The Search for Racial Purpose.*  NY:  Lexington Books.

3

o. _____. 2019. *Racism, Latinos, and the Public Policy Process.* NY: Lexington Books.

p. David Montejano. 1987. *Anglos and Mexicans in the Making of Texas, 1836-1986.* Austin, TX: University of Texas Press.

q. A variety of newspaper and newsmagazine articles from the *New York Times, Washington Post, Los Angeles Times, Austin American Statesman, Houston Chronicle, Dallas Morning News, U.S. News and World Report, Time, The Economist, Texas Monthly,* and *Texas Observer.*

**Methodology**

10.     The Supreme Court recognized that determining whether a jurisdiction acted with intentional racial discrimination is a difficult and complex undertaking. Nevertheless, the Court set forth guidance as to what variables needed consideration when seeking to understand whether official action is characterized by intentional racial discrimination. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977). As a result, the search for whether the enactment of SB1 was characterized by intentional racial discrimination follows the guidelines set forth by the Supreme Court.

11.     **The Arlington Heights Factors –** In *Arlington Heights*, the Supreme Court noted that "determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." A "sensitive inquiry" requires the investigator to seek evidence as carefully and thoroughly as possible. Additionally, as the Court notes, direct evidence of intentional racial discrimination may not be available. In this last context the Court may be referring to data or information that may have been destroyed, advertently or inadvertently, and information that was relayed by word-of-mouth, behind closed doors therefore not recorded in any document. One also must be aware of the many code words or racial shields that are constructed to conceal direct evidence of racial intent. Because direct evidence of intentional racial discrimination may be absent, the Supreme Court set out additional factors related to circumstantial evidence of intent:

- "The impact of the official action whether it 'bears more heavily on one race than another,' . . . may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face."

4

- "The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes."

- "The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes."

- "Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role."

- "Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."

- "The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."

- "The foregoing summary identifies, without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed."

  *Arlington Heights*, 429 U.S. at 266–68 (internal citations omitted).

12. With respect to **direct evidence** of intentional racial discrimination, HB6, an earlier introduced omnibus election bill (prior to SB1) made reference, in its text, to preserving the "purity of the ballot box."   Historically, this phrase was used to justify excluding individuals from the electorate on the basis that the individuals were morally impure, prone to committing fraud, likely to infect the election process and thus appropriately denied the right to vote. Latinos in Texas have found themselves targeted by ballot purity policies. For example, in 1913, State Rep. Joseph O. Boehmer of Eagle Pass established the Ballot Purification League, and submitted a bill admitting his intent was "to disqualify the Mexicans of the Western and Lower Rio Grande

Counties."[1] Phrases like "the purity of the ballot box," reveal legislative intent to exclude minority and disfavored populations from voting.

13. In this matter, there are several instances during floor debate in both chambers that provide direct evidence of discriminatory racial intent.  For example, during the Senate State Affairs Committee hearing on SB 1 on July 10, 2021, Chairman Hughes stated that there were people "lurking" at the polling places offering to assist vulnerable voters. First, Chairman Hughes only described voter assistance fraud as occurring in the Rio Grande Valley, an area of Texas that is overwhelmingly Latino. Second, although he suggested that there was something fraudulent in what he described, Chairman Hughes only described individuals standing outside the polling place and offering to provide assistance to voters who are elderly or need help casting their ballots.[2]  This is legal activity.  Two prominent witnesses who testified in support of SB 1, and who claimed there was widespread voter fraud,  only referred to the Rio Grande Valley and Harris County as specific geography where fraud occurs.[3]  Those areas are both majority Latino. On August 26, 2021, during the House debate over SB 1,  Representative Murr, one of the sponsors, pointed out that he did not consider conducting a racial disparity study to determine the effects of SB 1 on minority communities.  The most compelling part of his answer was that he said he was not aware of any "disparate impact studies that are currently in existence" when, in fact, there are many.[4]

14. With respect to the **impact** of SB1, the bill imposes additional burdens on voters who use assistance, including disabled voters, voters who cannot read or speak English, voters who interact with or vote with the assistance of community organizations and the elderly (over age 65).  The bill also loosens restrictions intended to protect voters from unruly poll watchers. Although the language of SB1 doesnot explicitly single out minority voters, the provisions for voting with assistance, voting by mail, activities of "poll watchers," and "vote harvesting" make

---

[1] Anders, Evan. *Boss Rule in South Texas: The Progressive Era*. Austin: University of Texas, 1982, p. 102; Montejano, David. *Anglos and Mexicans in the Making of Texas, 1836-1886*. Austin: University of Texas Press, 1987, p. 143.

[2] Senate State Affairs Committee Meeting.  July 10, 2021.  p. 130.

[3] Senate State Affairs Committee Meeting.  July 10, 2021.  pp. 200, 322-323.

[4] Senate Bill 1 House Floor Debate.  August 26, 2021.  p. 35.

voting more burdensome and difficult for less educated, Latino, disabled, and elderly voters. These burdens imposed by SB 1 will prevent voters from participating in the electoral process and the most affected are Latinos, the disabled and elderly.

- SB 1's provisions limit voter assistance to reading and marking the ballot even when many limited proficient voters, as well as disabled voters, need and use assistors to navigate the polling place, communicate with poll workers, and use voting machines. SB 1's regulation of voter assistance is so strict that it will deny assistance to Latino (and Asian American) voters and serve to discourage assistors who will face new time consuming and burdensome paperwork requirements.[5] There are 1,959,253 naturalized citizens living in Texas and 85% of those citizens are originally from either Latin America or Asia.[6]

- According to SB 1"'Vote harvesting services' means in-person interaction with one or more voters, involving an official ballot, a ballot voted by mail, or an application for ballot by mail, intended to deliver votes for a specific candidate or measure."[7] Canvassing for votes door to door in a neighborhood is a traditional practice in Latino neighborhoods where *vecinos y comadres*, who may also promote ballot issues like infrastructure development or school bonds, assist or help the elderly and those who have disabilities to vote. These friends and neighbors may also help these same individuals to purchase groceries, keep medical appointments and so forth. In addition, community based organizations may also send volunteers and employees to canvass in Latino neighborhoods, including canvassers who urge the voters to vote for ballot issues like infrastructure development or school bonds. The vote harvesting prohibition is so broad that it can encompass almost any interaction with persons just discussing voting, whether a mail ballot is visible or not. The prohibition against compensation would not even allow a community organization to provide meals or a t-shirt to volunteer canvassers.

---

[5] Article 5.  Section 5.03-5.06.

[6] U.S. Census, American Community Survey B05002  PLACE OF BIRTH BY NATIVITY AND CITIZENSHIP STATUS (Texas)
(2019: ACS 1-Year Estimates), available at
https://data.census.gov/cedsci/table?t=Native%20and%20Foreign%20Born&g=0400000US48&d=ACS%201-Year%20Estimates%20Detailed%20Tables&tid=ACSDT1Y2019.B05002

[7] Texas Election Code.  Article 6.  Section 6.03.  Chapter 276.015 (2).

Because this sort of canvassing plays an important role in Get Out the Vote and mail ballot assistance activities in Latino communities, the vote harvesting provisions of SB 1 will have a negative effect on Latino voters.

- SB1's loosening of the rules governing the behavior of poll watchers in polling places, and new restrictions on the duly sworn election officials working at the polling place, will have a negative effect on Latino voters.  In the past, Anglo poll watchers have used the ability to walk around and watch voters in the polling place to intimidate minority voters. Lifting the requirement that poll watchers observe from one location in the polling place will suppress the votes of Latinos and Blacks who are already suspicious of many types of public officials and may confuse a poll watcher with an election official.[8]  Last year, a Harris County political party official advised attendees of a Zoom call that they needed to recruit "an army" of 10,000 poll watchers from the suburbs for an "election integrity brigade."  Indicating inner city Houston on a map, he stated that he needed poll watchers with "the confidence and courage to come down here," and added "this is where the fraud is occurring."[9]  SB 1's allowing poll watchers to follow around voters in the polling place, and imposing stiff penalties on polling place officials who try to protect voters, will have a negative effect on Latino and other minority voters who historically have been the target of poll watcher intimidation.

- The rules for requesting and submitting a mail-in ballot are so confusing and complex, that they will discourage individuals with lesser educational attainment levels and those who cannot read well from voting by mail, as well as result in the rejection of their applications and ballots if they fail to comply with the new requirements.[10]  The new requirements for mail ballot applications and mail ballots will adversely affect Latino voters, particularly those with low levels of formal schooling.[11]

---

[8] Article 3. Sections 3.01 – 3.04.

[9] Washington Post, "Video shows Texas GOP official seeking 'army' of volunteers to monitor polls in mostly Black and Hispanic Houston precincts," available at https://www.washingtonpost.com/nation/2021/04/08/texas-voting-gop-poll-watchers/

[10] Senate Bill 1.  A BILL TO BE ENTITLED AN ACT relating to election integrity and security, including by preventing fraud in the conduct of elections in this state; increasing criminal penalties; creating criminal offenses; providing civil penalties. Article 4.

[11] The warnings in public testimony about mail-in ballot applications came true after SB 1's passage, with counties rejecting up to 40% of mail-in ballot applications because of an inability to match the voter's ID numberID number..

- The penalties for violating SB 1, even inadvertently, are overly stringent[12] and will deter individuals from serving as assistors and outreach workers.  This will have a negative effect on Latino voters who, because of limited English proficiency, lower levels of formal education, or traditional reliance on voter outreach, will lose access to assistors and outreach workers.

15.     With respect to **"the historical background of the decision [] particularly if it reveals a series of official actions taken for invidious purposes**,"  although Texas has a well-documented history of denying the franchise to Latinos, beginning with its secession from Mexico through the middle of the 1950s, Texas became more sophisticated in its efforts at voting discrimination in the late Twentieth and into the Twenty-First Centuries.[13]  Initially, the efforts at denying Latinos the franchise were overt and included laws that simply stated "Mexicans" were not allowed to vote in various counties such as Bexar (San Antonio).[14]  These efforts later evolved into various forms of vote dilution, including multi-member districts in urban counties (struck down in *White v. Regester*, 412 U.S. 755 (1973)) and discriminatory redistricting.  Early disenfranchising efforts were led by elected officials associated with the Democratic Party who were later replaced by Republican Party elected officials starting in the 1990's. As a result, vote denial or suppression is not the purview of any particular political party; each has a history of discriminating against Latino voters to limit their participation and political influence in order to maintain control of the state government, particularly the legislative bodies.

---

Alexa Ura. February 10, 2022.  "Hundreds of Mail-in Ballots are Being Returned to Texas Voters Because They Don't Comply with New Voting Law." *The Texas Tribune.*  Downloaded February 11, 2022. The rejection rate for mail-in ballot applications in Harris County, the most racially diverse in the state, is so high at 40% that the County Judge has requested that Congress pass voting rights legislation to protect minority voters"Judge Hidalgo Responds to Rise in Direct Mail-In Ballot Applications Calls for Voting Rights Legislation."  *Click2Houston.com.*  Downloaded February 18, 2022.

[12] Article 3.  Section. 3.05; Article 6.  Section 6.03. Sec. 276.015 (2) (g); Section 276.016 (4) (e); Article 7. Section 7.01 (f); Section 7.05.  Subchapter C.

[13] David Montejano.  1987.  *Anglos and Mexicans in the Making of Texas, 1836-1986.*  Austin, TX:  University of Texas Press.  Benjamin Márquez.  2014. *Democratizing Texas Politics:  Race, Identity, and Mexican American Empowerment, 1945-2002.*  Austin, TX:  University of Texas Press.  Henry Flores.  2015.  *Latinos and the Voting Rights Act:  The Search for Racial Purpose.*  NY:  Lexington Books.

[14] Paul S. Taylor.  1934.  *An American-Mexican Frontier:  Nueces County, Texas.*  Chapel Hill, N.C.:  University of North Carolina Press.  Cited in Montejano, pp. 38-39.

9

16.     In redistricting, Texas has discriminated against Latino voters in every redistricting cycle since the 1970's.[15]  In addition, in 2016 the U.S. Court of Appeals for the Fifth Circuit ruled that the Texas voter identification law diluted minority voting strength in violation of the federal Voting Rights Act.[16]  Racially discriminatory election laws and practices operated in conjunction with official and unofficial discrimination in education, health delivery, employment, and the criminal justice system throughout the history of Texas to guarantee Latinos a permanent place at the lower strata of the state's socio-economic community.  Racism, although alleviated somewhat in recent decades, has permeated Texas's social and political culture since the beginning of the state and its legacy is borne by Latino voters today.

17. "The **specific sequence of events leading up to the challenged decision**" suggests that SB 1 has discriminatory origins.

18. The Texas Legislature enacted SB 1 after Latino voters turned out in record numbers in the 2018 General Election.  In 2018, 30% eligible voters in Texas were Latino – up eight percentage points since 2000.  Over the same time period, the share of Anglo eligible voters in Texas fell 12 percentage points, from 62% in 2000 to a bare majority 51% in 2018.[17]

19. In the 2020 General Election, several counties, most notably Harris County, expanded procedures related to voting by mail and curbside voting to respond to COVID-19 safety concerns of voters.  The turnout in Harris County was 1,633,557 (65.86% of eligible voters) -- up from 1,304,480 (58.37% of eligible voters) in the 2016 General Election.[18]  Harris County slightly outpaced the statewide increase in voter turnout from 2016 to 2020 (59.39% to

---

[15] *See White v. Regester*, 422 U.S. 935 (1975); U.S. Department of Justice, January 25 and January 29, 1982 Letters of Objection, *available at* http://www.justice.gov/crt/about/vot/sec_5/tx_obj2.php (Texas House, congressional and Senate redistricting plans); U.S. Department of Justice, November 12, 1991 Letter of Objection (Texas House redistricting plan); U.S. Department of Justice, November 16, 2001, Letter of Objection, available at http://www.justice.gov/crt/about/vot/sec_5/tx_obj2.php (Texas House redistricting plan); *LULAC v. Perry*, 548 U.S. 399 (2006) (Texas congressional redistricting plan); *Abbott v. Perez*, 138 S.Ct. 2305 (2018) (Texas House redistricting plan).

[16] *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016).

[17] Pew Research Center, "The Changing Racial and Ethnic Composition of the U.S. Electorate," available at https://www.pewresearch.org/2020/09/23/the-changing-racial-and-ethnic-composition-of-the-u-s-electorate/

[18] Texas Secretary of State, "Harris County Voter Registration Figures," available at https://www.sos.state.tx.us/elections/historical/harris.shtml

66.73%).[19]    21. In addition, driven in part by concerns over COVID-19 and college students voting from outside their counties, Texans cast 1 million absentee ballots before Election Day in 2020, up from less than 500,000 in 2016.[20]

20.  "There is no evidence that voter fraud affected the outcome of the 2020 General Election. In March 2021, Keith Ingram, state director of elections, told Texas legislators: "In spite of all the circumstances, Texas had an election that was smooth and secure[.] Texans can be justifiably proud of the hard work and creativity shown by local county elections officials.""[21]

21.  Nevertheless, following the 2020 election, legislative leadership introduced and pushed for a new bill they claimed was necessary to ensure election integrity.[22]  Senator Hughes, the sponsor of SB 1 and similar legislation earlier in 2021, explicitly linked increased voter turnout with the need for SB 1: "And back in 2012, 59 percent of registered voters actually voted. Last year, 66 percent of registered voters voted. So total rates are up,participation is up, and that's good. We are for more participation. When more voters vote, it's better for everyone.  Of course, many say there's no fraud, and that's just demonstrably false. These are not subjective questions. These hard numbers. This is reality. The AG's office has over 500 counts pending in court against 43 defendants. Since 2005, they've prosecuted over a thousand counts, and that's just the attorney general's office. It doesn't count those being handled by local officials only. These cour- -- these cases are resource-intensive, they're geographically diverse, and they're increasingly complicated. And so for all those reasons, we recognize this is something that must be addressed."[23]

22.  The specific sequence of events leading up to the challenged decision also includes efforts before the second special session to enact bills purporting to fight voter fraud.

---

[19] Texas Secretary of State, "Election Information and Turnout Data," available at https://www.sos.state.tx.us/elections/historical/index.shtml

[20] Texas Tribune, "Four years ago, Texas Republicans were the most likely to use mail-in voting. Here's how that flipped in the last election," available at https://www.texastribune.org/2021/01/11/texas-mail-in-ballot-absentee-democrats-republicans/

[21] Houston Chronicle, "Did a 'smooth and secure' 2020 election cost the Texas secretary of state her job?," May 21, 2021.  Available at  https://www.houstonchronicle.com/politics/texas/article/Texas-Secretary-of-State-Ruth-Hughs-resigns-under-16195586.php

[22] Texas State Senate Journal.  August 9, 2021.  p. 5

[23] Texas State Senate Journal.  August 9, 2021.  pp. 6-7.

SB 1 is the last of multiple attempts by the Texas Legislature to pass an omnibus elections bill this year. Earlier efforts were plagued by an especially undemocratic course through the Texas Legislature that departed from normal procedure in a number of ways.

First came Senate Bill 7 ("SB7") during the Regular Session.  In considering SB7, the legislature repeatedly bypassed ordinary procedure, rushed votes on amendments, and limited opportunities for legislative and public debate.  The legislature heard extensive testimony that SB7 would impose a discriminatory burden on voters of color, along with testimony from MALDEF that the phrase "the purity of the ballot box," which appeared in SB 7's initial statement of purpose, "reveal[ed] legislative intent to exclude minority and disfavored populations from voting."

Nevertheless, the Senate and the House passed differing versions of SB 7.  Although the Senate passed a modified version of the bill, the House was unable to do so before the Regular Session ended on May 31, 2021.  Democratic members of the House left the chamber on the last day of the Regular Session, depriving the House of the quorum needed to pass legislation.

Soon thereafter, Governor Abbott called a special session to begin on July 8.  Still without a quorum in the House, the session ended on August 6, 2021 without passing any legislation.

Governor Abbott called a second special session, which began on August 7.

While the House was still without quorum, the Senate quickly passed numerous rule changes to bypass ordinary procedure, including eliminating provisions that required specified time and notice before public hearings.

Immediately after rules changes were passed,  Senator Brian Hughes introduced SB 1.  SB 1 was heard before the Senate State Affairs Committee on August 9, 2021. The Committee voted out SB 1 as substituted on the same day. Early morning on August 12, 2021, following a 15-hour filibuster by Senator Carol Alvarado, SB 1 passed on a party-line vote.

The House regained a quorum on August 19, 2021. SB 1 was heard before the House Select Committee on Constitutional Rights and Remedies on August 23, 2021. The House sponsor of SB1, Representative Murr, introduced a committee substitute that changed the bill language to reflect the language in the House's election bill, HB 3.

The Committee passed SB 1 on the same day.

During  the House hearing of the House Select Committee on Constitutional Rights & Remedies on August 23, 2021, two witnesses were permitted to testify on SB1 virtually.  But the Committee Chair never alerted the public that witnesses could provide testimony without attending the hearing in person nor was any vote taken to permit virtual testimony, notwithstanding the fact that Texas faced a surge of COVID-19 cases at the time of the hearing.

The House debated SB1 on August 26, 2021, and adopted seventeen amendments to the bill. The House passed the bill on August 27, 2021.

23.   The next *Arlington Heights Factor* states "**Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role**." Committee chairmen kept public hearings to a minimum and limited speakers to two minutes of testimony, including testimony from election and voting experts.  Given the complexity of some of SB 1's provisions, two-minutes is hardly enough time to present a cogent, logical, and clear argument on any, let alone more than one, amendment.  As a result, committees did not take detailed expert testimony, and community input was similarly limited.   The actual deliberations on this complex legislation, possessing many complicated and, in some cases, vague provisions, were accomplished in one day in each chamber yet there were 80 proposed amendments to the bill.  All of these procedural departures suggest that the leadership rushed the legislation through and employed a process designed not to include careful deliberation.

24. Many attempts to amend SB 1 by either state senators or house members during floor deliberations were not adopted by both chambers.  Several senators including Royce West (African American), Judith Zafarini (Latina), and Juan Hinojosa (Latino) noted in their comments the lack of openness on the part of the decision makers.[24]

> r.   Senators offered 12 amendments to  the bill during floor debate, including a rather extensive submission of what was designated the "Barbara Jordan Act," were submitted for consideration.  Of the 12 submitted amendments, 7 were approved of which five were by *viva voce.* [25]  All amendments that were not approved were submitted by Latino and African American senators.[26]

---

[24] Senate Journal, April 1, 2021.

[25] Ibid.  August 11, 2021.

[26] Texas Legislature Online.  History of SB 1.

s.   Senator Zafarini  pointed out that SB 1 reduced the number of early voting hours in the four largest counties in the state where approximately 30% of all Latino, 30% of all African American, and 30% of all Asian American voters resided. These data led Senator Zafarini to declare that SB 1 was specifically designed to suppress the minority vote in the state.  Senator Zafarini also pointed out that although preventing voter fraud was one of the goals of SB 1 the level of fraud in the state is miniscule with only 44 cases out of 11.2 million votes cast being investigated at that time (only .000004 percent of all ballots cast suspected of being fraudulent).  Apparently there were so few cases of voter fraud that the Attorney General was forced to close his Voter Fraud Unit for lack of work.[27]

t.   Senator Hinojosa noted that the elimination of drive-through and 24-hour voting were designed to make voting more difficult for Latino and Black voters who worked long hours, held two or more jobs, or worked odd shifts to vote.[28]  These voters generally came from low-income areas in urban areas.  He also cited research by Schaufnagel, Pomarck and Li who created a Cost of Voting Index noting that Texas had fallen from having the 17th most open election system to having the most stringent and closed in the United States since 2016.[29]

u.   The Senate began debate on SB 1 August 11, 2021 and engrossed it the following day, August 12, 2021.  During that short timeframe the twelve amendments were debated and either approved or rejected.[30]

v.   Senate Bill 1 was received by the House on August 19th and immediately referred to the Constitutional Rights and Remedies Committee. The House Committee heard SB 1 on August 23rd.  That same day a committee substitute was introduced and voted out by the Committee.  The House

---

[27] Taylor Goldstein.  December 17, 2021.  "Texas Vote Fraud Unite Closed Three Cases in 2021.  GOP Lawmakers Still Boosted its Budget."  *Houston Chronicle*.  Downloaded February 8, 2022.

[28] Rick Casey.  February 8, 2022.  "The Real Fraud Behind the New Texas 'Election Integrity' Law."  *San Antonio Report*.  Downloaded February 9, 2022.

[29] "Cost of Voting in the United States: 2020."  December, 2020.  *Election Law Journal:  Rules, Politics, and Policy*.  http://doi.org/10.1089/elj.2020.0666.  Downloaded February 8, 2020.

[30] Texas State Senate Journal.  August 11, 2021.

debated SB 1 on August 26 and passed it the following day.   During the one day of floor debate the House entertained 63 amendments of which 17 were approved.  Several attempts to amend SB 1 deserve mention because they speak directly to the *Arlington Heights* factors.  Thirty-five (35) of the amendments that were voted down were submitted by either Latino or Black members.

1.   Representatives Dutton (African American), and Cole (African American), offered two amendments for the inclusion of "increases turnout" or "maximize turnout" as part of the goals of SB 1 one amendment was voted down, the other withdrawn.[31]

2.   Representative Toni Rose (African American) submitted three amendments to have the Secretary of State report on the number of voting applications and ballots rejected by race and age.  These were rejected.[32]

3.   Representatives Dutton (African American), Anchia (Latino), Dominguez (Latino), Rosenthal (White), Turner (Black), and Zwiener (White) offered six  amendments to limit unruly behavior of poll watchers but all were rejected.[33]

4.   Representatives Zweiner, Gonzalez (Latina), and Moody (African American) offered five amendments to lower the barriers for voter assistance but were defeated.[34]

5.   Representative Neave (Latina) offered an amendment to add to SB 1 language based on 52 USC, Sec. 10303 (f) (2) (2) "No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United

---

[31] Texas House Journal.  August 26, 2021.

[32] Ibid.

[33] Ibid.

[34] Ibid.

States to vote because he is a member of a language minority group." This amendment was also defeated.[35]

6.  SB 1 was passed by the House on August 27th and that same day the Senate requested a Conference Committee to work on several differences.  The Conference Committee members were appointed that same day. The Conference Committee filed its report with new provisions on August 30th[36] and sent the final report to both chambers that same day. The report was adopted by both chambers on August 31st.[37]

25.  The next Arlington Heights factor is:  "**Substantive departures** too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."  One important substantive departure is the failure by legislators who enacted SB 1 to incorporate into the bill the recommendations of the vast majority of witnesses who testified against SB 1, the recommendations of representatives of the minority community, election and voting rights experts or their own colleagues from across the aisle.[38]

26.  Second, the chambers' leadership's total disregard for the opinions and observations of minority representatives reflects a level of disrespect in an institution where collegiality is supposed to be the norm.  As pointed out in the legislative record by House Member Martinez-Fischer, "SB 1 has one purpose:  to stop people from voting. More than that, it tries to stop certain people from voting—people that look like me, my family, and my community.  I cannot abide by that.  If my colleagues in the majority cared about crafting a sound policy, they would have offered in good faith to negotiate with the minority.  Instead, we found ourselves on the receiving end of social media stunts and "Wanted" poster graphics that put a literal target on the backs of Black and Brown members like me.  If they cared about public input, they would have

---

[35] Ibid.

[36] Ibid.

[37] Ibid.

[38] Senate Journal.  August 11, 2021.  Citing Senators Zafarini and Hinojosa.  House Journal August 26, 2021.  Citing Representatives Beckley, Gonzalez, Martinez-Fischer, Muñoz, and Ordaz-Perez.

started taking testimony on the elections bill earlier than nearly 2:00 in the morning during the first called special session.  They would not have voted immediately after taking hours upon hours of public testimony, denying members the time to reflect on what they had heard.  The quality of our policy reflects the quality of our process.  In short, if the majority cared about the process, they would have gone to every length to ensure transparency and good faith engagement with the public and with their colleagues in the minority party. They opted instead for a hasty, sloppy, self-serving process that has left the People s' House in a shambles."[39]

27.  Another important substantive departure is the fact that SB 1 does not match its stated intent.  The supporters of SB 1 stated that it was required to prevent widespread voter fraud; however there is no evidence of widespread voter fraud and only relatively few isolated incidents of wrongdoing.  Although supporters claim that SB 1's restrictions were required to ensure the security of the ballot, the stringent nature of the supposed safeguards actually serve to diminish the ability to vote of Latinos, those with less education, the elderly and disabled.  In fact, the majority rejected proposed amendments to enhance access to voting.[40]

> w.  Several Democratic Senators inserted comments in the record following floor debate, speaking to the disconnect between the stated intent of SB 1 and the language in various provisions of the bill that appeared to deviate from the intent.  Senator Zafarini argued that Senator Hughes, the bill's sponsor, stated that SB 1 was designed to "make it easier to vote and harder to cheat" but that the provisions of the bill did just the opposite by creating more complex and stringent requirements to vote by mail and at the polls.[41]
>
> x.  With respect to "the legislative or administrative history" of SB 1,  the legislative record reveals that the leadership acted contrary to the evidence, the recommendations of voting rights experts, the recommendation of the vast majority of witnesses who testified on the bill, and the urging of minority legislators.  One of the most important issues was pointed out by Senator Zafarini, among others, that the miniscule level of voter fraud in Texas did not warrant tightening the voting laws of the state.  This is a law

---

[39] Texas House Journal.  August 19, 2021.

[40] Senate Journal.  August 26, 2021.  Citing Representatives Dutton, Cole, and Rose.

[41] Ibid.  August 11, 2021.

that is not necessary if there are relatively few attempts to subvert the election process subsequently declared safe and secure by the Secretary of the State's office.[42]  The goals of the bill are to prevent fraud and ensure the integrity of the ballot but there is little evidence of this occurring.  As a matter of course, the 2020 election was deemed the most secure in the nation's history.[43]  The Brennan Center report cites the FBI, Homeland Security and Department of Justice, three federal judges, one state judge, 59 election security and computer scientists, and 39 Republican Secretary of States as the source for the conclusion as to the security of the 2020 election.  The legislative history suggests that this law was not written to protect ballot security or its integrity but for some other reason.  If one mines deeper into the various barriers created within SB 1, one discovers that the most affected communities are those of color, Latinos, Blacks, and Asian Americans together with the elderly and the disabled.

y.  The legislature refused, on three occasions, to accept amendments that included making increasing turnout a goal of SB 1.  Leaving one to conclude that the legislature did not want very many people to vote but to suppress the vote instead.  The sponsors of SB 1 refused to accept or consider amendments that would have increased voter turnout.  Apparently, increasing voter turnout would make voting less secure in the eyes of the bill sponsors.

**Decisional Theory**

In enacting SB 1, the Legislature violated some of the most fundamental tenets of decisional theory.  A good decision requires that the end policy is designed to meet the stated goals of the

---

[42] According to some news pundits, Hughes was forced to resign because her nomination was not taken p by the Senate Nominations Committee after she declared the 2021 General Elections "safe and secure" contradicting the Republican Party's state leadership. Charles Kuffner.  October 30, 2021.  "There is no Reason to Trust John Scott." *Off the Cuff.*  Downloaded February 19, 2022.
[43] "It's Official:  The Election Was Secure."  December 11, 2020.  *Brennan Center for Justice.*

decision.  There are specific steps that must be taken to achieve this end.  Decision models come in different varieties and should be constructed to the specific problem at hand.[44]

1.  The first step is to identify the problem to be solved.  In this case, legislators claimed  that the election system is not secure.  Given the available data however, this appears to be an unsupported claim.  Nevertheless, if the Legislature thought that elections needed to be made more secure, it would have proceeded to the next step.

2.  Step two is to state the actual goal of the policy.  In this case it is "election integrity and security, including by preventing fraud in the conduct of elections in this state."[45]  The goals then are to lend integrity and security to elections, and prevent fraud in the conduct of elections.

3.  The next step is to consider which variables to include in the decision to achieve the goals.  The Legislature considered the criminal code, assuming that criminal penalties would act as a deterrent to fraud.  Additionally, the Legislature considered increased use of identification numbers and signature verification as controlling measures.  The Legislature did not take up controls on truth or integrity in advertising or limiting campaign contributions.   The Legislature also failed to consider mechanisms to encourage more voting which may give the voting public the impression that the Legislature wishes more input from the citizenry.

4.  The next step is to exclude any variables deemed inappropriate in reaching this decision, for example the weather or costs to the state.

5.  The next step is to determine any negative externalities that may occur from the decision such as suppressive or intimidative effects and either eliminate them or find mechanisms to control these effects.  As the record indicates, legislators who proposed and supported SB 1  were made aware of these issues by their colleagues, experts and the public but failed to mitigate the negative effects.

---

[44] Examples of other models and the various biases that influence a decision can be found at "Decision-Making Theories and Models: A Discussion of Rational and Psychological Decision-Making Theories and Models: The Search for a Cultural-Ethical Decision-Making Model." *EJBO Electronic Journal of Business Ethics and Organization Studies.* Vol.12, No. 2 (2007) by Arnaldo Oliveira.

[45] SB 1.

6. The next step is to test the policy on some small scale in order to control all variables and outcomes, measure the externalities before making final adjustments, and propose the final policy which would be subject to input from the public, experts and colleagues. The Legislature did not create a pilot program but instead enacted SB 1.

Daniel Kahneman, a Nobel Laureate, noted that when a decision maker decides, for instance, which variable to include or exclude from the decisional model the decision maker generally bases that decision on which variable they know more about. Simultaneously, the individual decision maker's predilections, personality, personal biases, and the political situation affect one's decision-making. Kahneman called this "noise" in the system, but it can have a strong effect on the decision.[46] Voter suppression and intimidation have been a political norm in the state's history since the beginning of the Republic. As noted earlier, denying the franchise to Latinos is part of Texas's political culture and history.

**Expert Opinion**

In *Arlington Heights* the Court noted the need for a "sensitive" inquiry into the particulars of action to prove racial intent. The reason this is necessary is because acting with racial intent in the Twenty-First Century has evolved from the vulgarly explicit actions and utterances of the Nineteenth and early Twentieth Centuries when racial epithets, name calling, and explicit discrimination was the norm, to the vague and subtle use of "racial shields" and "code words" to hide racist behavior used in the latter part of the 20th Century and currently. I applied the *Arlington Heights* factors to the actions the State Legislature took to develop and pass SB 1. In my expert opinion I am convinced that the State Legislature of Texas acted with racial intent to suppress the votes of Latinos by creating overly stringent rules and criminal penalties for voter assistance, voter outreach (now criminalized as vote harvesting), voters who are temporarily out of the jurisdiction, and vote by mail. The Legislature also refused to accept amendments designed to loosen some of the more stringent requirements of the new law. These even included refusing to lend more clarity to vote harvesting which remains broad and vaguely defined.

---

[46] Daniel Kahneman, Olivier Sibony, and Cass R. Sunstein. 2021. *Noise: A Flaw in Human Judgment.* NY: Little, Brown Spark.

The Legislature violated one of the basic tenets of decision theory.  One of the earliest provisions of any decision-making model is, after identifying your problem and setting forth your goal, in this case creating safe and secure elections, the Legislature was then obliged to determine which variables contributed to the insecurity of the election process and focus on repairing these.  One variable they may have considered is voter assistance, for instance.  This is a particularly important variable to consider in a community or culture where neighborly assistance in many day-to-day activities is the norm.  In Latino communities neighbors assist the elderly and infirm to shop for groceries, visit doctors, and vote.  Sometimes a family member will assist friends of one's grandmother or elderly aunt.  To place stringent requirements on the type of voter assistance that is the norm within the Latino community acts to both intimidate members of the community and consequently have a depressive effect on voting in that community.  This is likely given that the penalties and the complex new requirements to assist a voter are such that many Latinos will be hesitant to provide or ask for assistance.  The next step would be to identify any extraneous variables to exclude from their model, such as the weather perhaps.  Next, the Legislature should have considered what negative or positive consequences their law might create.  In this case, legislators should have considered the suppressive or intimidating effects of their law on various communities.  In SB 1, the Legislature created a law that did not meet their stated goals.  This leaves SB 1 as a suppressive and intimidating law, without a justification in ensuring election integrity. The State Legislature indicated that the reason for this law was to prevent voter fraud.  Yet, the incidence of voter fraud is so small that the normal safeguards have controlled it efficiently.  As a result, this is not a logical reason for the passage of SB 1.  The effect of SB 1 on Latino, less educated and limited English proficient voters, as well as voters who rely on assistance and outreach from community organizations, in combination with the other factors presented and discussed above, leads to the conclusion that SB 1 was enacted with racially discriminatory intent in order to limit voting by Latinos and other minority racial groups.

I conclude that instead of protecting the security and integrity of the ballot, SB 1 was created with racial intent to suppress the vote of Latinos.  Essentially, each of the provisions spoken of here, the voter assistance restrictions, criminalization of voter outreach, increasing investigation and possible prosecution of voters who may be away from the jurisdiction temporarily, increased requirements for mail voting, loosening standards for poll watchers, and the intense criminal

penalties act *in toto*, considered in the aggregate, act in concert to discriminate against Latinos -- who are more likely to be limited English proficient, have lower educational achievement, rely more heavily on in-person voter outreach, and have past negative experience with voter intimidation.  .  The voters most likely to be able to comply with SB 1's provisions are Anglo, better educated, healthy and English literate individuals.

Pursuant to 28 US Code § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on  February 28, 2022

Henry Flores, PhD