IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
|     *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
|     *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..............................................................................................................2

LEGAL STANDARD ................................................................................................................4

ARGUMENT & AUTHORITIES ..................................................................................................5

I.   Texas, like other States, may adopt and apply neutral measures to deter and prevent voter fraud by verifying the voters' identity. ......................................................................5

II.  The Materiality Provision does not invalidate evenly applied state law requirements. ............9

III. SB 1's ID Number Requirement is material to determining whether voters are qualified to vote by mail under Texas law. ....................................................................................11

    **A.**   **Texas law deems identification numbers material; therefore, they are material.** 12

    **B.**   **The ID Number Requirement is material because it confirms that the person casting the ballot is in fact the eligible voter.** ................................................15

IV. The Challenged Provisions do not deny Texans the right to vote. ..........................................22

Defendants Gregory W. Abbott, in his official capacity as Governor of Texas, Jane Nelson, in her official capacity as Secretary of State, John Scott, in his official capacity as Provisional Attorney General of Texas, and the State of Texas ("State Defendants"), file this Response in Opposition to United States' Motion for Summary Judgment, and will respectfully show the Court as follows:

## INTRODUCTION

The United States here seeks a partial summary judgment on a single statutory claim: that SB 1 violated the 1964 Civil Rights Act, 52 U. S. C § 10101(a)(2)(B) (the "Materiality Provision") by requiring voters to provide the number from a government-issued ID on any application to vote by mail ("ABBM") as well as the carrier envelope by which the ballot itself is returned. This common, and common-sense, requirement that the individual returning a ballot was the individual who was registered to vote, is a vital protection against "the potential and reality of fraud," which the Fifth Circuit has recognized, "is much greater in the mail-in-ballot context than with in-person voting." *Veasey v. Abbott*, 830 F.3d 216, 239 (5th Cir. 2016) (en banc). Compliance with that identification requirement is thus part of the qualifications to vote under Texas law. More to the point, it is entirely consistent with federal law. As Judge Jones stated just last year:

> It cannot be that any requirement that may prohibit an individual from voting if the individual fails to comply denies the right of that individual to vote under the [Materiality Provision]. Otherwise, virtually every rule governing how citizens vote would be suspect. Even the most permissive voting rules must contain some requirements and the failure to follow these rules constitutes the forfeiture of the right to vote, not the denial of that right.

*Vote.org v. Callanen*, 39 F.4th 297, 305 n.6 (5th Cir. 2022) (quotation marks omitted).

In arguing to the contrary, the United States does not claim that these requirements were intended to discriminate against anyone or do not apply evenly to all Texas voters, regardless of race, color, or any other protected classification. Instead, DOJ's motion is based on highly disputed facts relating to the wisdom of these state-law mail-voting-identification requirements. But the United

States' views on the wisdom of state law are irrelevant; its factual disputes are improper in a motion for summary judgment; and its legal argument is contradicted by the recently expressed views of the Fifth Circuit as well as those of three Supreme Court Justices who read the Materiality Provision to have no application to evenly applied state-law voting requirements like SB 1 voter-identification requirements.

Perhaps more disturbing, the United States espouses the position that "all other regulations— including state law concerning 'protection of voters, prevention of fraud and corrupt practices, [and] counting of votes'— fall outside" of what it deems material to vote. ECF 609 at 24 (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)). If taken to its logical conclusion, the United States' assertion that any regulation enforcing state voter-qualification provisions is illegitimate would invalidate a host of basic regulations and safeguards on which Texas relies to protect from fraud and disorder. Such a conclusion would contradict both "[c]ommon sense, as well as constitutional law," which "compel[] the conclusion that government must play an active role in structuring elections," —a role that already presents logistical challenges under the best of circumstances. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). The Materiality Provision says nothing that suggests, let alone requires, this Court to create such a dramatic change to the democratic process.

## OBJECTIONS TO THE UNITED STATES' UNDISPUTED FACTS

State Defendants' The United States' Statement of Uncontested Facts is inaccurate or incomplete in many respects. For a complete list of State Defendants' Objections to United States' Undisputed Facts, *see* Exhibit 1.

## LEGAL STANDARD

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to show that "there is an absence of evidence to support the

nonmoving party's case." *Kinnison v. City of San Antonio*, 699 F. Supp. 2d 881, 887 (W.D. Tex. 2010). On cross motions for summary judgment, the court will "review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Bitco Gen. Ins. Corp. v. Monroe Guar. Ins. Co.*, 31 F.4th 325, 329 (5th Cir. 2022). However, that is only "provided those inferences are reasonable." *Donahue v. Makar Installations, Inc.*, 33 F.4th 245 (5th Cir. 2022). Additionally, with respect to a facial challenge, the court "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–50 (2008).

**ARGUMENT & AUTHORITIES**

The United States takes issue with Texas's decision to bring mail-in voting into conformity with requirements already employed for in-person voting: that voters offer proof of identification by means of a government issued ID. This argument fails. The Materiality Provision guards against arbitrary deprivations of the right to vote. It does not prohibit Texas from confirming a voter's identity using the same information that Congress, through the Help America Vote Act ("HAVA"), requires voters to provide to register to vote for an election for federal office. *See* 52 U.S.C. § 21083(a)(5)(A)(i). Nor does it compel Texas to adopt a specific method of voter verification, even if some voters may find Texas's chosen method more inconvenient. In arguing otherwise, the United States misapprehends the case law and history surrounding § 10101(a)(2), as well as the purpose that the ID Number Requirement serves in Texas's voter registration regime.

## I.     Texas, like other States, may adopt and apply neutral measures to deter and prevent voter fraud by verifying the voters' identity.

The United States challenges two provisions in SB 1 under the Materiality Provision: Section 5.07 and 5.13, which state respectively that an ABBM and mail ballot may only be accepted if the numerical identifying information identifies the same voter identified on the voter's registration file. The prerogative of States to make such statutory rules for the conduct of their own elections is squarely

rooted in the Constitution. Article I, Section 4 expressly assigns this right to the legislature of each state. *See Cotham v. Garza*, 905 F. Supp. 389, 397 (S.D. Tex. 1995) (citing *Burdick*, 504 U.S. at 43). Texas and other States may—and indeed must—make election rules to deter and prevent vote fraud and protect public confidence in the integrity and legitimacy of their elections. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). As the Supreme Court has recognized:

> There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process. While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.

*Crawford v. Marion Cty. Election Bd.*, 128 S. Ct. 1610, 1619–20 (2008). As a result, it is common practice for States and the federal government to enact safeguards for both in person and absentee voting that help verify that the person attempting to vote in fact the person eligible to vote. *See, e.g.*, Haw. Rev. Stat. § 11-106; Me. Rev. Stat. tit. 21-A, §§ 756, 759; N.J. Stat. § 19:63-17; *see also* ECF 623 at 5–7. And, time and again, courts have upheld the States' authority to require voters coming to the polls to present "photo identification issued by the government." *Cf Veasey v. Abbott*, 888 F.3d 792, 802 (5th Cir. 2018).[1]

Although absentee or mail-in voting was rare in 1964, at the time § 10101(a)(2)(B) was enacted,[2] it has become an increasingly widespread practice. Adding to that, voting by mail is even

---

[1] *See, e.g.. Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008) (upholding as material requirement that ID number be checked before registration); *Common Cause v. Thomsen*, 574 F. Supp. 3d 634, 636 (W.D. Wis. 2021); *see also Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 841 (S.D. Ind. 2006); *Howlette v. City of Richmond*, 485 F. Supp. 17, 23 (E.D. Va. 1978), *aff'd*, 580 F.2d 704 (4th Cir. 1978). *See also United States v. Ward*, 345 F.2d 857, 862 (5th Cir. 1965); *Org. for Black Struggle v. Ashcroft*, No. 2:20-CV-04184-BCW, 2021 WL 1318011, at *5 (W.D. Mo. March 9, 2021) (signature is not immaterial to voter qualification); *Howlette*, 485 F. Supp. 22–23 (signature-before-notary requirement impresses upon the signatory the importance of voting for referendum). *But see Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003).

[2] Even by 1982, States still required nearly all voters to cast their ballots in person on election day and allowed only narrow and tightly defined categories of voters to cast absentee or mail-in ballots. *Brnovich v. Dem. Nat'l Comm.*, 141 S. Ct. 2321, 2338–39 (2021).

more susceptible to voter fraud than in-person voting because in most instances no election official ever sees or communicates directly with the mail-in voter. *See Veasey,* 830 F.3d at 239; *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 239 (5th Cir. 2020). As one witness has explained, "in any other type of voting, that ballot remains under [the early voting clerk's] control, either . . . at the office or the poll workers' control out in the field." But "that doesn't happen with mail ballots."[3] Instead, as the former head of the Election Integrity Division at the Office of Attorney General explained, "[m]ail ballots operate in an uncontrolled environment,"[4] out of sight, without clear chains of custody.[5]

Therefore, it is not surprising that many States have instituted ID Number Requirements for mail-in voters, including: Florida, Georgia, Iowa, Kansas, Minnesota, North Carolina, Ohio, Virginia, and Wisconsin.[6] And an additional number of States rely on signature comparisons as proof of identity.[7] The Florida mail-in voter identification requirements—which are very similar to the challenged Texas requirements in SB 1[8]—were upheld against Constitutional and Voting Rights Act attacks just last year in *League of Women Voters of Fla. v. Lee*, 595 F. Supp. 1042, 1167–69 (N. D. Fla. 2022). That specific ruling was not even challenged on appeal. *League of Women Voters of Fla. v. Fla. Sec'y of State*, 2023 WL 3108161 (11th Cir. Apr. 27, 2023) (addressing other aspects of the ruling). Texas's voter-identification rules fall well within established norms. For years, Texas has had signature

---

[3] Resp. Appx. R (Frank Phillips March 31, 2023 Dep.) at 114:2–9.

[4] Resp. Appx. AA (Jonathan White May 5, 2022 Dep.) at 143:1–12.

[5] *See* Resp. Appx. BB (Johnathan White Decl.) at 4; Resp. Appx. NN (STATE 112177–STATE 112193); Resp. Appx. R (Frank Phillips March 31, 2023 Dep.) at 113:24–114:23 (explaining the vulnerability of the vote-by-mail process, and stating that SB1 reduced and "definitely help[ed]" address vote-by-mail fraud). *See also* Resp. Appx. D (Rep. Rafael Anchia August 22, 2022 Dep.) at 65:20–68:3, 69:2–70:1, 71:18–73:3, 82:10–89:18; Resp. Appx. B (Carol Alvarado October 6, 2022 Dep.) at 166:12–171:20; Resp. Appx. C (House Journal, April 23, 2007 – Remarks of Rep. Rafael Anchia) at 2224; Resp. Appx. GG (December 23, 2018 Letter from Sen. Judith Zaffirini).

[6] FLA. STAT. § 101.62(1)(b); GA. CODE §§ 21-2-381(a)(1)(C)(i), (b)(1); KAN. STAT. §§ 25-1122(c), (e)(2); MINN. STAT. § 203B.04(d); N.C. GEN. STAT. § 163-230.2(a)(4); OHIO REV. CODE § 3509.03(B)(5); VA. CODE § 24.2-701(C)(1); WIS. STAT. § 6.86(1)(ac), 6.87(1).

[7] *See, e.g.,* HAW. REV. STAT. § 11-106; ME. REV. STAT. tit. 21-A, §§ 756, 759); N.J. STAT. § 19:63-17.

[8] The Florida mail-in voter identification provision, § 101.62(1)(b), Fla. Stat. (2021), requires any voter seeking to vote by mail to provide their Florida driver's license number, Florida identification card number, or the last four digits of their social security number with their mail-in vote request.

matching, which prior to the passage of SB 1 could result in a rejection of the voter's mail ballot with no opportunity to cure—at least until SB 1 provided such an opportunity.

Yet the United States has never before hinted that such a requirement violates the Materiality Provision of the Civil Rights Act, and for good reason: the Federal Government too has recognized the importance and materiality of verifying voters' identity throughout the voting process, up to and including having voters provide a government-issued identification number. Congress provided in HAVA that:

> "[A]n application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes: (I) in the case of an applicant who has been issued a current and valid driver's license, the applicant's driver's license number; or (II) in the case of any other applicant . . . the last 4 digits of the applicant's social security number.

52 U.S.C. § 21083(a)(5)(A)(i). The Department of Defense, meanwhile, includes in its Federal Post Card Application ("FPCA") for "absent Uniformed Service members, their families, and citizens residing outside the United States," a space for them to provide *both* their "Social Security Number" and the "Driver's License or State ID #."[9] The Acting Director of the Federal Voting Assistance Program ("FVAP") testified that these fields existed for decades before SB 1.[10]

In sum, it is common practice for both the States and the federal government to require those who vote by mail to provide identification—whether by providing government-issued ID numbers, signature verification, or otherwise. SB 1's requirement to provide ID numbers thus falls squarely within Texas's power to "preserv[e] the integrity of its election process," *Purcell*, 549 U.S. at 4 (2006),

---

[9] Resp. Appx. CC (J. Scott Wiedmann July 29, 2022 Dep.) at 50:4–51:18. The materials distributed by the FVAP to military and overseas voters acknowledge the prevalence of identification numbers in state absentee voting programs. For example, the instructions on the FPCA explain, "Most states allow you to provide a Driver's License number or the last 4 digits of your SSN. Some states require a full SSN." Resp. Appx. Q (OMB Control Number 0704-0503, FPCA) at 2. The Voting Assistance Guide advises voters that they must provide their state-issued ID number or social security number to have their FPCA and/or their Federal Write-In Absentee Ballot accepted in multiple states. Resp. Appx. NN (STATE115061, STATE115067, STATE115076, STATE115088, STATE115094, STATE115103, STATE115109, STATE115122, STATE115137, STATE115145, and STATE115205).
[10] Resp. Appx. CC (J. Scott Wiedmann July 29, 2022 Dep.) at 49:10–51:18, 74:6–17.

and design its election rules so that "order, rather than chaos, is to accompany the democratic processes." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

## II.     The Materiality Provision does not invalidate evenly applied state law requirements.

Nothing in the Materiality Provision deprives the States of the ability to pass such neutral, common-sense laws to prevent voter fraud. Passed in response to the Jim Crow era, the Provision sought to prohibit abuses by which local officials sought to prevent black citizens from registering to vote, which were typically not based on state laws, but on extra-statutory requirements imposed by local officials. In a characteristic example, some local officials required black citizens (but not white ones) to state their age in months. *See, e.g., United States v. Crawford*, 229 F. Supp. 898 (W. D. La. 1964); *see also* H. Rep. No. 914, pt. 2, at 5 (1963). Defendants do not dispute that the United States rightfully acted to eradicate such local practices that had nothing to do with voter fraud and unevenly applied to citizens of one race or color. But that is not what the United States seeks to do here: instead, it seeks to overturn a neutral, evenly applied law that helps Texas and local election officials identify the person requesting and casting a mail-ballot as the registered voter. Nothing in the statute allows such a challenge.

Looking at § 10101(a)(2) as a whole—as the Court must—it becomes apparent that the Materiality Provision functions as a safeguard against the discriminatory application of state voter qualification and registration rules. In its entirety, the statute reads:

> No person acting under color of law shall –
>
> (A) in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision which have been found by State officials to be qualified to vote;

(B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election; or

(C) employ any literacy test as a qualification for voting in any election unless (i) such test is administered to each individual and is conducted wholly in writing, and (ii) a certified copy of the test and of the answers given by the individual is furnished to him within twenty-five days of the submission of his request made within the period of time during which records and papers are required to be retained . . . .

The Materiality Provision here is the second of the three subsections, but each serves a similar function: to prevent individuals acting under color of law from applying state laws relating to voting *differently with respect to some citizens than to others* so as to deny or abridge the right of *all* citizens to vote. This is not surprising: the Fifteenth Amendment provides the authorization for this federal statute to limit the authority of state and local officials to order elections. *See South Carolina v. Katzenbach*, 383 U.S. 301, 325 (1966).

Because they serve a common function, common tools of statutory construction require the three provisions of section 10101(a)(2) to be read *in pari materia. See In re Sanders*, 403 B. R. 435, 443 n.13 (W. D. Tex. 2009); *BG Gulf Coast LNG, LLC v. Sabine-Neches Nav. Dist.*, 587 F. Supp. 3d 508, 525 (E. D. Tex. 2022; *Allen v. Sherman Oper. Co., LLC*, 520 F. Supp. 3d 854, 865 (E. D. Tex. 2021). Under this principle, statutes with the same purpose (and especially if adopted at the same time) are to be read together. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184–85 (1988); Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 539 (1947) ("Statutes cannot be read intelligently if the eye is closed to considerations evidenced in affiliated statutes.").[11] Here, because §

---

[11] As James Kent explained, "Several acts *in pari materia*, and relating to the same subject, are to be taken together, and compared in the construction of them, because they are considered as having one object in view, and as acting upon one

10101(a)(2)(B) was written to invalidate state-endorsed inequality, this principle requires §
10101(a)(2)(B) to be read as aimed at such inequality—not to prohibit the race-neutral application of
ordinary voter-registration laws. *In re Sanders*, 403 B. R. at 443, n.13.

Because they are facially neutral, Texas's voter-ID requirements—whether for in-person or
mail-in voting—are different in kind from the type of laws targeted by the Materiality Provision.
Neither in its motion for summary judgment nor its 55-page statement of facts has the United States
asserted—let alone established the absence of a question of fact—that Sections 5.07 and 5.13 were
racially motivated or have been applied in a racially discriminatory way. But such a showing is necessary
for the United States to obtain summary judgment, *Broyles v. Tex.*, 618 F. Supp. 2d 661, 697 (S.D. Tex.
2009), *aff'd*, 381 F. App'x 370 (5th Cir. 2010) (holding that only racially motivated deprivations of
rights are actionable under Section 1971). Therefore, the United States' motion must fail. Neither the
language nor the purpose of § 10101(a)(2)(B) allows their claim to succeed.

III.    **SB 1's ID Number Requirement is material to determining whether voters are qualified
to vote by mail under Texas law.**

Even if the Materiality Provision could bar facially neutral—and neutrally applied—state laws,
the state law at issue easily satisfies federal law. The Materiality Provision governs the voter registration
process, not provisions like sections 5.07 and 5.13 which impose procedures voters must follow to
request and cast a mail-in ballot. When the Materiality Provision was enacted, there was already an
established distinction between the right to vote and the privilege of voting by mail. *Tex. Democratic
Party v. Abbott*, 978 F.3d 168, 185 (5th Cir. 2020) ("*Texas Democratic Party I*") (discussing congressional
sources contemporaneous to the Materiality Provision). Moreover, "[w]hen a mail-in ballot is not
counted because it was not filled out correctly, the voter is not denied 'the right to vote.' Rather, that

---

system." 1 JAMES KENT, COMMENTARIES ON AMERICAN LAW 433 (1826); *see also* EMMERICH DE VATTEL, THE LAW OF
NATIONS § 286, at 236 (1758; new trans. ed. 1793) ("As two articles in one and the same treaty may relate to each other,
two different treaties may do so too; and in this case, they are to be explained by one another.").

individual's vote is not counted because he or she did not follow the rules for casting a ballot." *Ritter v. Migliori*, 142 S. Ct. 1824, 1825 (2022) (Alito, J., dissenting from denial of application for stay); *see Vote.org*, 39 F.4th at 305 n.6 ("It cannot be that any requirement that may prohibit an individual from voting if the individual fails to comply denies the right of that individual to vote under [the Materiality Provision].")

State Defendants concur with Intervenor-Defendants, who have explained why the Materiality Provision does not preclude the challenged provisions of SB 1. ECF 608 at 7–16 (distinguishing between voter registration and rules related to requesting and casting a ballot). Rather than restating those arguments here, for the purpose of judicial economy, State Defendants incorporate by reference the relevant sections of Intervenor-Defendants' motion. ECF 608 at 7–13. However, should this Court conclude that § 10101(a)(2)(B) extends to rules governing ABBM and mail-ballots, the United States' claim still fails because the identification numbers are material in determining whether an individual is qualified under Texas law to vote by mail.

### A.    Texas law deems identification numbers material; therefore, they are material.

In assessing whether the omission of an original signature is "material in determining whether such individual is qualified under State law to vote," courts must necessarily look to state law. 52 U.S.C. § 10101(a)(2)(B). In Texas, to be a qualified voter under state law, a person must be 18 or older, a United States citizen, a resident of Texas, a non-felon (subject to certain exceptions), and must not have been determined by a court to be mentally incapacitated. Tex. Elec. Code § 11.002(a)(1)–(5). Furthermore, while "any qualified voter is eligible for early voting by personal appearance," *id.* at § 82.005, to be entitled to cast an early voting ballot by mail, a person must fall under one of the specified categories, *see id.* at §§ 82.001–82.004 (i.e., 65-years of age or older), and "make an application for an early voting ballot to be voted by mail as provided by this title." *Id.* at § 84.001(a). According to the Election Code, said application "must include . . . (A) the number of the applicant's driver's

license, election identification certificate, or personal identification card issued by the Department of Public Safety; (B) . . . the last four digits of the applicant's social security number; or (C) a statement by the applicant that the applicant has not been issued a number described by Paragraph (A) or (B)" for it to be accepted. *Id.* at § 84.002.

Thus, "[i]n Texas, an individual is qualified to vote [by mail] only if" the individual has submitted a complete ABBM, and to submit a complete ABBM, the individual must comply with the ID Number Requirement. *Vote.org,* 39 F.4th at 307. This in turn means that "to be qualified to vote [by mail] she must mail her application to the [early voting clerk] with [the required ID]." *Id.* The omission of the identification numbers when applying to vote by mail is thus "material in determining whether [an] individual is qualified under State law to vote" by mail, 52 U.S.C. § 10101(a)(2)(B)—that is, without an identification number, a person is not a qualified mail-in voter under state law. The same is true with respect to the ballot itself, as Texas has determined that for an individual to be able to cast a ballot, it must contain an identification number that "identifies the same voter identified on the voter's application for voter registration." Tex. Elec. Code § 87.041(b)(8). Accordingly, the identification requirement articulated in SB 1 necessarily cannot violate the materiality provision regardless of whether the United States believes the requirements serve a strong state interest, which they do.

To establish otherwise, the United States insists that a matching identification number is not a "substantive eligibility requirement." ECF 609 at 19. This fails for three reasons. *First*, their position adds verbiage that does not appear in § 10101 itself: nothing in the text limits materiality to "substantive" eligibility requirements—let alone what "substantive" might mean in this context. *Cf. United States v. Samaniego-Garcia*, 758 F.3d 1007, 1008 (8th Cir. 2014) (noting that "[t]he line between what is procedural and what is substance" can be "famously fuzzy"). The statute merely stipulates that the error or omission be material to determining whether a voter is qualified to vote under state law—

that would encompass all qualifications implemented by the State. *Common Cause*, 574 F. Supp. 3d at 636 (determining "'qualified' in § 10101(a)(2)(B) is not limited to these substantive qualifications").

*Second*, the United States ignores the definition of "qualified under state law" that is articulated in the statute. It reads, "the words 'qualified under state law' shall mean qualified according to the laws, customs, and usages of the State." 52 U.S.C. § 10101(e). In Texas, voters must "satisfy all other requirements for voting prescribed by law for the particular election," Tex. Elec. Code § 11.001(a)(3), including the applicable voter-identification requirements.

*Third*, the United States relies on inconsistent definitions of words that appear in the same sentence. The United States asserts that the word "vote" means "all action necessary to make a vote effective," ECF 609 at 19 (citing § 10101(a)(3)(A), (e)), but it only applies that expansive definition to the phrases "deny the right . . . to vote" and "other act requisite to voting." It applies a narrower definition to "qualified under State law to vote." There, the United States effectively cabins the term to mean qualifications for registration, as opposed to the qualifications that Texas imposes each step of the way. This is a mistake.

Taken together, § 10101 contemplates that States will impose different rules and requirements throughout the voting process; these rules and requirements, in turn, are material in determining whether a voter is qualified to take a desired action, such as casting a mail-ballot and having it count. "There is no reason," after all, "why the requirements that must be met in order to register (and thus be 'qualified') to vote should be the same as the requirements that must be met in order to cast a ballot that will be counted. Indeed, it would be silly to think otherwise." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting). Hence, the qualifications that govern prospective mail-in voters in Texas go beyond characteristics such as age, citizenship, and residence, as well as the characteristics necessary for voters to fall within one of the six categories authorized to vote by mail. The qualifications also comprise

whatever neutral applicable (and applied) rules the State decides should be mandatory. *See id.* at 1826.[12] Since SB 1, Texas has made it mandatory that voters verify their identity on their ABBM and mail-ballot by matching their identification number with one in their voter registration file before they are "entitled to vote an early voting ballot by mail." Tex. Elec. Code § 84.001(a). The identification numbers are therefore material in determining whether a voter is qualified to vote by mail.

**B.      The ID Number Requirement is material because it confirms that the person casting the ballot is in fact the eligible voter.**

Even if the mandatory nature of Texas voter-identification rules were not sufficient, they are independently material. The materiality inquiry turns on "the nature of the underlying information requested," not "the nature of the error." *Browning*, 522 F.3d at 1175. Requiring a voter to provide a government-issued identification number serves to verify the voter's identity and confirm that the person requesting and ultimately casting the ballot is in fact the registered voter.[13] *Id.* at 1174 (finding that ID number mismatch makes it more likely that the applicant is not a qualified voter).

This is because other information on the ABBM and carrier envelope, such as the voter's name, residence, and date of birth, can be obtained from public records. The testimony of Isabel Longoria, the former Harris County Election Administrator ("HACEA") demonstrates why the new identification requirements are necessary. In sworn testimony, Longoria admitted that the county will produce a voter's registration file upon receiving a valid public-information request.[14] Depending on how that request is worded, that disclosure could contain the voter's name, registration status, vote

---

[12] For the avoidance of doubt, the State Defendants do not dispute that there are other limitations on the State's ability to impose requirements to vote—as the *Anderson–Burdick* line of cases amply demonstrates. At present, it is speaking only to the restriction imposed by the Materiality Provision at issue in this motion.

[13] *See, e.g.*, Resp. Appx. O (Keith Ingram March 28, 2023 Dep.) at 36:2–36:9 (explaining that the purpose of SB1's mail-ballot provisions "is to identify the voter"); Resp. Appx. S (Frank Phillips Decl.) ¶ 12 (affirming that election office uses unique identifier as a reliable way to positively identify voters).

[14] Resp. Appx. P (Isabel Longoria April 20, 2022 Dep.) at 142:9–147:2. The former HACEA also admitted that Harris County enables anyone to download some of this information from its website although she could not recall whether it was entire voter file or the vote record for a specific election.

history, and residence.[15] Longoria conceded that if a person wished to impersonate an eligible voter, that person would have access not only to the information needed to submit a complete ABBM, but also to target voters who are registered but vote infrequently and are therefore less likely to notice that someone sent an ABBM on their behalf—that is until SB 1.[16] By contrast, state law takes precautions to keep the voter's social security number and the number on the voter's driver's license, election identification certificate, or personal identification card from being disclosed. *See, e.g.,* Tex. Elec. Code §§ 13.004(c); 65.060 (exempting numbers from public information requests).[17]

The United States does not dispute that a voter's name, residence, and even date of birth are public information. Instead, the United States protests Texas's assertion that the numbers required under Section 5.07 and 5.13 identify the voter. But to obtain summary judgment, the United States cites two putative facts that are subjective to considerable dispute: (1) that "county officials neither need nor typically use a DPS number or SSN to query registration records," ECF 609 at 22; and (2) that the TEAM database "fails to identify voters accurately" due to incorrect and incomplete records, ECF 609 at 23. Leaving aside that summary judgment is never proper in the presence of a genuine fact dispute, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986), neither point is persuasive.

*First*, the United States conflates locating a person's registration file in the TEAM or offline county database with positively identifying the voter. Even if counties used other information on the ABBM or mail-ballot to find a voter's registration file, such as the voter's name or address, "[t]he most

---

[15] Resp. Appx. P (Isabel Longoria April 20, 2022 Dep.) at 142:22–143:23

[16] Resp. Appx. P (Isabel Longoria April 20, 2022 Dep.) at 143:24–146:25; *see also* Resp. Appx. G (Jacquelyn Callanen April 4, 2022 Dep.) at 77:17–77:23 (Before SB 1, "it would have been possible for people to send in an application for a person who they know does not vote regularly, has never voted[,] and they can sign the application, get the ballot, sign the ballot[,] and no one would be the wiser"—all because "the system was set up to only match the signature of the application to the signature of the ballot.").

[17] Resp. Appx. P (Isabel Longoria April 20, 2022 Dep.) at 146:3–25; Resp. Appx. DD (Lisa Wise April 13, 2022 Dep.) at 140:21-141:8; Resp. Appx. V (Michael Scarpello May 4, 2022 Dep.) at 54:20–59:3; Resp. Appx. G (Jacquelyn Callanen April 4, 2022 Dep.) at 78:22-80:11. Resp. Appx. BB (Johnathan White Decl.) ¶ 40.

that" the United States "can fairly contend" is that the ABBM or mail-ballot "contained [information] which matched [the database file] of registered voters." *Howlette*, 485 F. Supp. at 22. The United States "cannot claim with certainty that the persons who signed the [the ABBM or mail ballot] were in fact qualified voters." *Id.* This is where SB 1 comes in: it requires voters to provide a number that identifies them in a similar way a photo ID would identify them if they appeared in person because it is unique to them, and that for reasons unrelated to voting is unlikely in anyone else's possession.[18] The number was also issued by a governmental authority with both the motive and the ability to certify that would-be voters are who they say they are. To offer analogy, a receptionist at an airline ticket counter can pull-up a flight reservation with the passenger's name and destination, but the airline and TSA will still direct the passenger to offer a photo or other government ID to identify that the person standing before them is in fact the passenger on the reservation. So too here.

In any event, the record demonstrates that in the past counties have mixed-up voters' registration records when processing ABBMs and mail-ballots due to the absence of identification numbers. The 2020 Secretary of State's Election Audit of Collin, Dallas, Harris, and Tarrant Counties found that hundreds of ballots were issued to voters who were under age sixty-five but were improperly coded by those counties having qualified to vote by mail on account of age.[19] In the majority of cases, the irregularity was caused by a data-entry error, and the voter was eligible to vote by mail on different grounds.[20] However, on multiple occasions, the voter was not entitled to vote by mail but nonetheless received a mail-ballot from the county in violation of state law.[21] The former Deputy and Legal Director of the Forensic Audit Division Jacqueline Doyer testified this happened

---

[18] Resp. Appx. BB (Jonathan White Decl.) ¶¶ 40, 45.
[19] Resp. Appx. NN (STATE115231–115232, STATE11544–STATE115449).
[20] Resp. Appx. NN (STATE115231).
[21] Resp. Appx. NN (STATE115230–STATE115232, STATE15446–STATE115448); Resp. Appx. J (Jacqueline Doyer 30(b)(6) March 29, 2023 Dep.) at 28:6–24.

because county election offices attached the ABBM to the wrong record in the database.[22] The example she provided was a junior/senior situation, where two voters share similar names and other personal information.[23] She testified that SB 1's ID Number Requirement would preclude this irregularity from occurring in the future since it would enable counties to more accurately link an ABBM and mail-ballot to the correct voter.[24]

*Second*, the United States presumes but points to no actual evidence (as is required at this stage in the proceedings) that the Materiality Provision requires perfection if the ID Number Requirement is to survive scrutiny. No such system exists. Even when the counties processed ABBMs and mail-ballots with minimal personal identifying information, such as name and address, errors could occur that would prevent individuals from voting if the county pulled the wrong record.[25] In these cases, not only could the ballot be sent to the wrong person, but the county could reject a ballot if the county has the voter—or someone with a similar name and address—marked as having already submitted a mail-ballot. Given that all systems are prone to some error, the Materiality Provision cannot be interpreted as demanding that a State or county eliminate all potential inaccuracies, omissions, or incomplete records before implementing a system for identifying the voter—absent some indication that the errors are pretext for racial discrimination. Otherwise, the statute would prevent States from confirming the would-be voter's eligibility, which it does not. *Supra* p. [x]. At any rate, because materiality turns on "the nature of the underlying information requested," the notion that "an error caused by a typo cannot be material because it does not reflect the absence of any actual, substantive element that makes the applicant ineligible" operates under "[a] mistaken premise." *Browning*, 522 F.3d at 1174.

---

[22] Resp. Appx. J (Jacqueline Doyer 30(b)(6) Mar. 29, 2023 Dep.) at 29:1–29:6; *see also* Resp. Appx. NN (STATE115447, STATE115449).
[23] Resp. Appx. J (Jacqueline Doyer 30(b)(6) March 29, 2023 Dep.) at 28:25–29:6.
[24] Resp. Appx. J. (Jacqueline Doyer 30(b)(6) Mar. 29, 2023 Dep.) at 38:8–38:14.
[25] Resp. Appx. J. (Jacqueline Doyer 30(b)(6) Mar. 29, 2023 Dep.) at 29:1–29:6; *see also* Resp. Appx. NN (STATE115447, STATE115449).

Moreover, the record shows that the ID numbers used in accordance with the statute *have* identified the voter accurately in the vast majority of cases. According to the United States' own expert Dr. Eitan Hersch,[26] only 11,430 mail ballots in the 2022 November general election were initially rejected due to voters' failure to provide a matching ID number.[27] Only 6,355 mail ballots were rejected where the voter did not ultimately cure.[28] This is out of 332,281 mail-ballots cast and 8,107,475 total ballots cast once in-person voting is taken into account.[29] As Dr. Mark Hoekstra also explains, Dr. Hersch does not know how many of these voters failed to follow instructions as opposed to being tripped up by any alleged inaccuracy, omission, or incomplete record.[30] Moreover, Hersch does not know how many of the 6,355 mail-ballots were submitted by qualified voters.[31] The United States simply assumes that SB 1 caused the rejection of ballots that were legally cast—as opposed to accomplishing its goal of preventing unlawful or duplicative votes from being accepted and influencing an election. While such an assumption is arguably permissible at the pleadings stage, it does not permit the United States to carry its burden to obtain summary judgment.

Although it fails to explain why, the United States next asserts that SB1's ID Number Requirement is redundant, ECF 609 at 17, 19, 22. Assuming *arguendo* that the Materiality Provision precludes redundancy, *but see Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1213 (S.D. Fla. 2006) (finding materiality irrespective of redundancy), Sections 5.07 and 5.13 target the gaps in Texas's voter

---

[26] Dr. Hersh's own empirical analyses in his Second Supplemental Report also directly contradict most, if not all, of the assumptions and conclusions he made in his analyses of the TEAM database back in February 2022. Before Texas conducted any elections under the new rule, he estimated that mail-ballot rejection rate would be between 15 and 16 percent. His examination of the November 2022 general election, in contrast, indicated an initial rejection rate of 4.1 percent and a final rejection rate of 2.5 percent. *See also* Resp. Appx. K (Hoekstra Suppl. Rep. to Hersh) at ¶ 11.
[27] ECF 609-8 Ex. 36 (Hersh Second Suppl. Rep.) ¶¶ 19–21.
[28] ECF 611-1 at Ex. 3 (Hersh Second Suppl. Rep.) ¶¶ 6, 14 n.1; Resp. Appx. K (Hoekstra Suppl. Rep. to Hersh) at ¶¶ 6,7.
[29] The figure for total ballots cast was derived by adding 7,775,194 in person ballots to 332,281 mail-ballots. *See* ECF 611-1 at Ex. 3 (Hersh Second Suppl. Rep.) ¶ 15, 18; Resp. Appx. K (Hoekstra Suppl. Rep. to Hersh) at ¶ 27 n.6 (noting that 0.078 percent (6,355/8,102,908) of all votes cast were potentially "lost" due to SB1).
[30] Resp. Appx. K (Hoekstra Suppl. Rep. to Hersh) at ¶¶ 6, 16. *See, e.g.*, Resp. Appx. X (Anne Scott Apr. 18, 2023 Dep.) at 15:17–18:23 (entering passport number on ABBM)); Resp. Appx. Y (Taylor Scott Apr. 18, 2023 Dep.) at 9:13–11:21 (entering passport number on ABBM).
[31] Resp. Appx. K (Hoekstra Suppl. Rep. to Hersh) at ¶¶ 6, 16, 19.

verification regime. Specifically, prior to SB1, Texas relied exclusively on signature matching to identify a mail-in voter and confirm their eligibility.[32] The process, however, was itself subject to litigation in light of its own limitations in verifying voters' identity. *First*, because the SVC and EVBB would compare the signature on the carrier envelope with the signature on the ABBM, the process was not as effective as when a person who was not the voter submitted an ABBM since the signatures on the two documents would match.[33] Tex. Elec. Code §§ 87.027(i), 87.041(e).[34] *Second*, a person's signature can change with age or due to a physical impairment.[35] *Third*, the process of matching signatures can be subjective.[36] SB1's ID Number Requirement ameliorated these concerns by allowing SVCs and EVBBs to identify the voter at both the application stage and the voting stage through an objective metric—identification numbers—that is less subject to change.[37]

To the extent the United States is referring to the fact that SB 1 requires identification on both the ABBM and the ballot, this too fails. Congress itself has "deemed the identification numbers material to determining eligibility to register and to vote" and has made that "kind[] of information automatically material." *Browning*, 522 F.3d at 1174. The United States cannot explain why identification numbers would be material in the registration context but not when voters seek to obtain

---

[32] In accordance with this process, "the voter must place [the mail ballot] in the official ballot envelope and then seal the ballot envelope, place the ballot envelope in the official carrier envelope and then seal the carrier envelope, and sign the certificate on the carrier envelope." Tex. Elec. Code § 86.005(c). The Texas Election Code then stipulates that the Signature Verification Committee (SVC) "shall compare the signature on each carrier envelope certificate, except those signed for a voter by a witness, with the signature on the voter's ballot application to determine whether the signatures are those of the voter. The committee may also compare the signatures with any known signature of the voter on file with the county clerk or voter registrar . . . ." *Id.* at § 87.027(i). The Early Voting Ballot Board (EVBB) too has the option of consulting "any known signature of the voter on file" when determining "whether the signatures are those of the voter." *Id.* at 87.041(e). Prior to SB 1, the SVC and EVBB could only compare the signature on the carrier envelope with two or more signatures made by the voter within the preceding six years to determine whether the signatures are those of the voter.
[33] *Cf.* Resp. Appx. BB (Jonathan White Decl.) ¶ 34.
[34] A mayoral candidate in the City of Carrollton took advantage of this weakness when submitting fraudulent ABBMs. Resp. Appx. BB (Jonathan White Decl.) ¶¶ 18–22; Resp. Appx. S (Frank Phillips Decl.) ¶ 10.
[35] *See* Resp. Appx. T (Yvonne Ramon April 21, 2022 Dep.) at 153:17-155:1 ("[W]e see the elderly especially that registered at a young age whose signature is no longer the same signature."); Resp. Appx. B (Sen. Carol Alvarado October 6, 2022 Dep.) at 157:6–158:2; Resp. Appx. F (Rep. John Bucy August 9, 2022 Dep.) at 157:25–159:2.
[36] *See* Resp. Appx. BB (Jonathan White Decl.) ¶¶ 35–36.
[37] Resp Appx. N (Keith Ingram 30(b)(1) March 28, 2023 Dep.) at 23:5–23:13 ("The [ID] number is designed to take the place of a less objective measure, which is the signature.").

a ballot by mail or actually cast that ballot. Moreover, the SVC and EVBB only compare signatures on the carrier envelope.[38] Until SB1, Texas did not have a mechanism to corroborate that the person requesting the ballot and the registered voter were one and the same. In addition, even if the registered voter requested the ballot, the record shows that vote harvesters will attempt to get between voters and their ballot.[39] Having the voter provide their identification number at each stage of the mail-voting process therefore helps ensure that no one intercepted the ballot while it was en route. The requirement is anything but redundant.

Finally, the United States takes the radical position that all regulations that "might help enforce the states' qualifications," including verifying a voter's identity, fall outside of the definition of "material" and therefore are preempted by § 10101(a)(2)(B). *See* ECF 609 at 24. But that cannot be correct as other courts have recognized. *Rokita*, 458 F. Supp. 2d at 841 (ruling that because "verifying an individual's identity is a material requirement of voting, . . . the state may establish procedures to verify this requirement"); *Howlette*, 485 F. Supp. at 22–23 (finding regulations "material" when they "protect [voters] against both fraud and caprice"). Taken to its logical conclusion, the United States' position would invalidate "virtually every electoral regulation" that confirms the voters' eligibility, no matter how basic, "hamper[ing] the ability of States to run efficient and equitable elections, and compel[ling] federal courts to rewrite state electoral codes." *Clingman v. Beaver*, 544 U.S. 581, 593 (2005). For example, if a Texas voter is on the suspense list, or if the residence on the voter's ABBM does not match the residence on file, the voter must submit a statement of residence before her mail-ballot can be accepted. Would the United States strike that rule as well since it only enforces Texas's qualification that voters reside in the political jurisdiction in which they vote? Congress did not "hide [the] elephant[]" of this sweeping outcome "in [the] mousehole[]" of the Materiality Provision. *See*

---

[38] Resp. Appx. BB(Jonathan White Decl.) ¶¶ 20–21.
[39] Resp. Appx. BB (Jonathan White Decl.) ¶¶ 8–10, 25, 45.

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). This Court should therefore deny the United States' motion for summary judgment.

## IV.    The Challenged Provisions do not deny Texans the right to vote.

The United States' claim fails for the additional reason that the ID Number Requirement does not deny Texas voters the right to vote when read (as the Court must) in the context of other provisions of the Election Code. Under Texas law, "the early voting clerk shall review each application for a ballot to be voted by mail." Tex. Elec. Code § 86.001(a). If the numerical information required under § 84.002(a)(1-a) "does not identify the same voter identified" in the voter's registration file, "the clerk shall reject the application." The United States contends that this initial rejection is sufficient to satisfy the first factor of a materiality claim—that "[n]o person under the color of law shall . . . *deny* the right of any individual to vote." § 10101(a)(2)(B) (emphasis added); ECF 609 at 13–16. However, as the State Defendants have explained, unlike other voting laws, the Materiality Provision does not cover rules that "abridge" the right to vote, and under binding Fifth Circuit case law, the right to vote has been "denied" only when the would-be voter has been "in fact absolutely prohibited from voting." ECF 145 at 10–12 (quoting *Tex. Democratic Party II*, 978 F.3d at 188). An applicant whose mail-in ballot is rejected for failure to provide identification retains a right to cure her ABBM or vote by personal appearance if her ABBM is rejected as a result of the ID Number Requirement.

In fact, Texas law provides applicants with robust opportunities to cure—in part due to SB 1. If an ABBM is rejected pursuant to the ID Number Requirement, "the clerk shall provide notice of the rejection," which "must include information regarding the ability to correct or add information." Tex. Elec. Code §§ 86.001(f), (f-1). The applicant at this point may, , depending on the nature of the rejection: (1) resubmit her ABBM with a number that matches the one in her registration record, *id.* § 86.001(f-2); (2) validate or correct the required information through the Ballot by Mail Tracker, *id.* § 86.015(c)(4); (3) update her voter registration record by submitting a new registration form, *id.*

§ 15.021; (4) validate her personal identification numbers on Texas.Gov[40]; or (5) vote in person. *Id.* § 84.031(b). Military and overseas voters have the additional option of resubmitting their FPCAs.[41] Because the FPCA acts as both voter registration form and an ABBM, the early-voting clerk may update the voter-registration record upon receipt. *Id.* at § 84.014. To facilitate the cure process, the counties will often process ABBMs within 24 to 48 hours.[42] For example, the El Paso County Election Administrator does so and also encloses a voter registration form with the notice of defect because it helps voters successfully fix the defect in their ABBM.[43] Applicants have until the 11th day before election day to cure their ABBM before they receive a final rejection, at which time they may vote in person.[44] Tex. Elec. Code § 84.007(c).

Similarly, if a voter submits a mail-ballot, but the carrier envelope does not contain an identification number that identifies the same voter as the voter's registration record, *see* Tex. Elec. Code § 87.041(b)(8), that voter has the option to cure or vote by personal appearance. Specifically, the Election Code states that not later than the second day after the SVC or EVBB discovers a defect, the SVC and EVBB "shall send the voter a notice of the defect and a corrective action form . . . by mail or by common or contract carrier." Tex. S.B. 1599, 88th Legis., R.S., § 8, sec. 87.0271(b), 2023 Tex. Gen. Laws.[45] The voter may then correct the defect in the voter's ballot by "submitting the corrective action form" by mail or by "coming to the early voting clerk's office not later than the sixth day after election day."[46] Tex. S.B. 1599, 88th Legis., R.S., § 8, sec. 87.0271(c), 2023 Tex. Gen. Laws. The voter also has the option of correcting the required information through the Ballot by Mail Tracker or

---

[40] ECF 609.3 at Ex. 3 (Election Advisory No. 2022-08) at 4,5, 24.
[41] Resp. Appx. I (Jennifer Colvin March 21, 2023 Dep.) at 31:19–24.
[42] Resp. Appx. EE (Lisa Wise April 15, 2022 Dep.) at 36:12-20.
[43] Resp. Appx. FF (El Paso Cty. Lisa Wise April 18, 2023 Dep.) at 40:6–20.
[44] ECF 609.3 at Ex. 2 (Election Advisory 2022-08) at 3.
[45] The effective date of SB 1599 is September 1, 2023.
[46] "Because the signature sheet is separate from the voted ballot and is authorized under state and federal law, FPCA voters who have a defect in their signature sheet have additional methods for returning this corrected or missing required documentation. Specifically, an FPCA voter may submit a corrected signature sheet by email, fax, personal delivery, or mail." ECF 609.3 at Ex. 2 (Election Advisory 2022-08) at 16.

cancelling their ABBM and voting in person. Tex. Elec. Code § 87.0271(c). To facilitate this process, many counties are having the early voting clerk remove the secrecy flap so that the clerk might check whether the number on the carrier envelope matches the voter's registration file and contact the voter earlier through email or phone.[47]

The United States argues that these options are insufficient because some voters may receive their notice of defect too late or may be prevented from voting in person for various reasons. ECF 609 at 14–15. However, in these cases, any impediment would be circumstantial rather than a legal bar to the voters' right to vote. To the extent that Sections 5.07 and 5.13 impose a burden on voters, that would be relevant to an *Anderson–Burdick* analysis, not § 10101(a)(2)(B).[48] What matters in a materiality claim is whether the relevant law "disqualif[ied] potential voters." *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003). The provisions currently at issue cannot do so because, as alluded to above, *supra* at Section IV, the law distinguishes between "the right to vote" and "claimed right to receive absentee ballots." *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807 (1969 By permitting voters to vote by mail—and to cure faults in their mail ballot applications or ballots—"Texas permits the plaintiffs" numerous voting options, including the option "to vote in person; that is the exact opposite of 'absolutely prohibit[ing]' them from doing so." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 404 (5th Cir. 2020) ("*Tex. Democratic Party II*"). Put another way, "[e]ven the most permissive voting rules must contain some requirements." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting). So "[i]t cannot be that any requirement that may prohibit an individual from voting if the individual fails to comply

---

[47] Resp. Appx. U (The Office of the Dallas County Elections Administrator April 29, 2022 Dep.) at 90:22–91:11; Resp. Appx. I (Harris Cty. Jennifer Colvin 30(b)(6) March 21, 2023 Dep.) at 17:23-19:1 ("Q. And how do you contact the voter if you determine that the voter did not put down an ID number? A. There's multiple ways you can contact them. We normally give a phone call, and we send a letter."); *see also* Resp. Appx. NN (STATE01471) at 4.

[48] Even if *Anderson–Burdick* were applicable, that would not aid the United States because such analysis looks to effect on voters as a whole, not individual voters. *See, e.g., Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 601 (4th Cir. 2016) ("Every decision that a State makes in regulating an election will, inevitably, result in somewhat more inconvenience for some voters than for others.").

denies the right of that individual to vote" under the Materiality Provision. *Vote.Org*, 39 F.4th at 306 n. 6.

The State Defendants acknowledge that this Court adopted a different position than the one advanced here in denying their motion to dismiss. *See* ECF 424 at 40–42. There, this Court concluded that the initial rejection of a vote-by-mail application or mail-ballot carrier envelope could constitute a violation of § 10101(a)(2)(B) despite Texas giving voters the opportunity to cure or vote in person. *Id.* The ruling conflicts with intervening Fifth Circuit precedent arising from a motion to stay in a § 10101 challenge to Texas's requirement that prospective voters provide an original signature when registering to vote via fax machine. *Vote.org*, 39 F.4th at 305–07. Like here, any application deemed noncompliant was initially rejected, with the prospective voter receiving notice of the rejection, an explanation for the rejection, and an opportunity to cure the defect. *Id.* at 306. Prospective voters also had "many other means of registering, by mail or personal delivery, for instance." *Id.* Because voters were "given a second bite at the apple," the Fifth Circuit concluded in a published decision, "no applicant must comply with the wet signature requirement—there are plenty of alternative means to register. Thus, it is hard to conceive how the wet signature rule deprives anyone of the right to vote." *Id.* The same reasoning applies here.

In addition, when arriving at its ruling, this Court did not address the entirety of § 10101(a)(2)(B)'s text. The Court noted that the statute defines the word "vote" to include "all action necessary to make a vote effective," ECF 424 at 41 (quoting 28 U. S. C. § 10101(e)), which this Court interpreted as reaching the actions contemplated under sections 5.07 and 5.13. The Court, however, did not address the meaning or implications of the word "deny," which the statute leaves undefined. As the Fifth Circuit acknowledged in *Tex. Democratic Party II*, 978 F.3d at 188, "denial" of a right means the "deprivation" of that "right." *See also Denial*, Black's Law Dictionary (4th ed. 1968) edition contemporaneous with the 1964 Civil Rights Act). For these reasons, along with the reasons that State

Defendants articulated in their motion to dismiss, *see* ECF 145 at 10–12, and that Intervenor-Defendants in their motion for summary judgment, *see* ECF 608 at 9–11, and the Fifth Circuit recognized in *Tex. Democratic Party I*, 961 F.3d at 404, Texas's mail-in ballot laws do not deny anyone the right to vote. State Defendants respectfully ask the Court to reconsider its ruling that the Materiality Provision applies even when voters are not absolutely prohibited from voting, ECF 424 at 41, and hold that the United States has not shown that it is undisputed that Texas violated federal law when it extended the requirement that a voter provide government issued IDs from in-person voting to absentee voting.

## CONCLUSION

For the reasons explained above, the Court should deny the United States' Motion for Summary Judgment.

Date: June 24, 2023                    Respectfully submitted.

JOHN SCOTT                             */S/ KATHLEEN T. HUNKER*
Provisional Attorney General of Texas  KATHLEEN T. HUNKER
                                       Special Counsel
BRENT WEBSTER                          Tex. State Bar No. 24118415
First Assistant Attorney General
                                       RYAN G. KERCHER
GRANT DORFMAN                          Tex. State Bar No. 24060998
Deputy First Assistant Attorney General Deputy Chief, General Litigation Division

SHAWN E. COWLES                        WILLIAM D. WASSDORF
Deputy Attorney General for Civil      Assistant Attorney General
Litigation                             Tex. State Bar No. 24103022

                                       OFFICE OF THE ATTORNEY GENERAL
                                       P.O. Box 12548 (MC-009)
                                       Austin, Texas 78711-2548
                                       Tel.: (512) 463-2120
                                       Fax: (512) 320-0667
                                       kathleen.hunker@oag.texas.gov
                                       ryan.kercher@oag.texas.gov
                                       will.wassdorf@oag.texas.gov

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on June 24, 2023, and that all counsel of record were served by CM/ECF.

*/S/ KATHLEEN T. HUNKER*
KATHLEEN T. HUNKER