IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX A

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

LA UNION DEL PUEBLO ENTERO, et al.,　　§
　　　*Plaintiffs,*　　　　　　　　　　　§
　　　　　　　　　　　　　　　　　　§
*v.*　　　　　　　　　　　　　　　　　§　　Case No. 5:21-cv-844-XR
　　　　　　　　　　　　　　　　　　§
GREGORY W. ABBOTT, et al.,　　　　　§
　　　*Defendants.*　　　　　　　　　　§

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO**
**THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

LA UNION DEL PUEBLO ENTERO,    )
et. al.,                       )
                               )
     Plaintiffs,               )
                               )  CIVIL ACTION NO.
                               )  5:21-CV-00844-XR
v.                             )
                               )
GREGORY W. ABBOTT, et al.      )
     -----------------------------------------------------------

ORAL & VIDEO DEPOSITION OF CAROL ALVARADO

October 6, 2022
-------------------------------------------------

        Oral & video deposition of Carol Alvarado, produced

as a witness at the instance of the plaintiffs, and

duly sworn, was taken in the above-styled and numbered

cause on the 6th day of October, 2022, before

Patrick Stephens, Certified Court Reporter, at

209 West 14th Street, Ground Floor Conference Room,

Austin, Texas 78701.



Carol Alvarado

Page 154

1 have either a Social Security number or a driver's license
2 number in their voter-registration file decreased?
3    A    No.
4    Q    Now, when you were giving me some stats regarding
5 Harris County and some of the other rejection rates, were you
6 talking about the -- for applications to vote by mail or were
7 you -- applications or were you talking about the actual
8 ballots?
9    A    The ballots.
10    Q    Okay.  Now, did you look at the numbers for the
11 subsequent elections that occurred in 2022?
12    A    Well, the number I gave you was 20 -- the '22 primary.
13    Q    Okay.
14    A    That was the 12.4 percent statewide.
15    Q    And so that was for the March 1st, 2022, primary; is
16 that correct?
17    A    Right.
18    Q    And you're --
19    A    And -- and versus less than 1 percent in the previous
20 -- well, the 2020 presidential election, November.
21    Q    And you're aware that there have been two other
22 statewide elections since the March primary; correct?
23    A    Yes.
24    Q    There was also the primary runoff on May 24th;
25 correct?

Page 155

1    A    Yeah.  Those are much smaller turnouts, yes.
2    Q    And there was also the May 7th election.
3    A    Even smaller.
4    Q    Did you look to see what the rejection rates were for
5 mail ballots for those two elections?
6    A    No, because I was trying -- attempting to compare
7 apples to apples, so looking at, you know, 2022 primary versus
8 the 2020 presidential, the 2018.  I wouldn't see it being
9 comparing apples to apples with the very small -- I don't even
10 know -- know what the turnout was, but it was a very small
11 turnout in the May election --
12    Q    So you --
13    A    -- and runoffs are small turnouts, too.
14    Q    So you did not look to see if the rejection rate had
15 decreased --
16    A    No.
17    Q    -- during the other elections --
18    A    No.
19    Q    -- is that correct?
20    A    Right.
21    Q    Have you spoken to any of the election officials in
22 Harris County about how they tried to inform voters about the ID
23 requirement?
24    A    No.
25    Q    Have you spoken to them about whether they've gotten

Page 156

1 the feeling that voters are becoming more accustomed to the
2 requirement?
3    A    No.
4    Q    Have you spoken to them about whether there are often
5 higher rejection rates after new requirements get implemented
6 through law?
7    A    No.
8    Q    Did you talk to them about how they implemented
9 Senate Bill 1?
10    A    I don't recall that one.
11    Q    And so where did you get the rejection-rate numbers?
12    A    Oh, from my staff.
13    Q    Okay.  And do you expect similar rejection-rate
14 numbers for the 2020 general?
15    A    I don't know.
16    Q    Sorry.  Let me rephrase that.  Do you expect similar
17 rejection rates to the 2022 general?
18    A    I don't know.
19    Q    Sorry.  I realized I had given the wrong date.
20    A    I knew what you meant.
21    Q    And did you talk to any other counties about the
22 implementation of the voter-ID provision in Senate Bill 1?
23    A    Didn't -- say that again.
24    Q    Did you speak to any other county --
25    A    Oh, no.

Page 157

1    Q    And so is it fair to say that your sole understanding
2 of how the voter-ID provision [sic] effect on voters was the
3 rejection-rate numbers that your staff looked up?
4         MR. GOLANDO:  Objection, form.
5 BY THE WITNESS (resuming):
6    A    State it again, please.
7    Q    Sure.  Is it fair to say that your understanding of
8 how the ID numbers affected voters -- when I say ID numbers, I
9 mean the ID requirement --
10    A    Uh-huh.
11    Q    -- came from the rejection-rate numbers that you
12 received from staff?
13    A    Partially.
14    Q    What other information do you have regarding the
15 implementation of Senate --
16    A    Well, talking -- talking to folks in the community.
17 People -- I mean, this was a pretty high-profile bill.  Talking
18 to people that are involved in campaigns that knew of ballots
19 that had been rejected.
20    Q    And did you speak to anybody that had their own ballot
21 rejected?
22    A    I don't recall.  Yeah, I...
23    Q    And so you don't recall if you spoke to any individual
24 who had their ballot rejected as a result of the voter-ID number
25 requirement; is that correct?



Page 158

1    A   Right, I don't recall.
2    Q   Now, the 19 percent, do you know if that includes the
3  number of individuals who were later able to cure the defect in
4  their ballot?
5    A   I don't know.
6    Q   Now, you had, I believe, discussed on the floor --
7    A   Uh-huh.
8    Q   -- during your filibuster some of your concerns
9  regarding the signature-match requirement; is that right?
10   A   Yes.
11   Q   Okay.  I believe you said that individuals with
12 disabilities, that their signature can change --
13   A   Yes.
14   Q   -- is that correct?
15   A   Yes.
16   Q   And so one of your concerns is that a voter would have
17 their signature rejected because their disability would cause
18 their signature not to be the same election to election; is that
19 correct?
20   A   Right.
21   Q   A voter-ID number does not change; is that correct?
22   A   Right.
23   Q   And so do you think some voters with disabilities
24 would find it easier to include their voter-ID number as a
25 method of identification as opposed to signature match?

Page 159

1    A   I don't know.  I mean, if they are elderly, they may
2  not recall what they used on -- one each one.  I don't know.
3    Q   Let's take a quick look at Senate Bill 1.
4    A   (Complies with request.)
5        THE WITNESS:  We can put these two back over
6  there.
7        MR. GOLANDO:  (Complies with request.)
8        THE WITNESS:  Thank you.
9  BY THE WITNESS (resuming):
10   A   Okay.
11   Q   And we're going to look at Section 5.07, and I will
12 let you know it is Page 38.
13   A   (Complies with request.)
14   Q   And so if you see Subsection F of Section 5.07, which
15 amends Section 86.001 of the election code, it reads:  If the
16 information required under Section 84.002(a-1)(a)[sic] included
17 on the application does not identify the same voter identified
18 on the applicant's application for voter registration under
19 Section 13.002(c)(8), the clerk shall reject the application.
20 Did I read that correctly?
21   A   Yes.
22   Q   And so are you aware that a voter who applies for --
23 let me rephrase that.  Is it your understanding that a voter can
24 use any of the required numbers so long as one of them matches
25 and have their application accepted?

Page 160

1    A   Yes.
2    Q   And you're aware that the standard is that if the
3  number does not match something in the record as opposed to the
4  specific number that was used either on the application or
5  voter-registration form [sic].
6    A   Yes.
7    Q   All right.  We can put that down.  So we talked a
8  little bit about voter-ID requirement.
9    A   Uh-huh.
10   Q   Were there any other provisions within Senate Bill 1
11 that you thought were harmful to voters?
12   A   Well, I -- I just didn't see the -- the need for the
13 bill to begin with.  It made it seem like there was -- they were
14 trying to prevent -- they were trying to say that there was
15 fraud when there wasn't.  In fact, the number of charges and
16 prosecutions, if we can look at that, from 20 -- 2004 to 2020,
17 0.0006 percent of votes cast during that time resulted any -- in
18 any type of prosecution; 534 offenses that were made that was --
19 that -- that number out of 94 million votes cast, and of those
20 534 offenses, 154 were actually charged.  So I felt that -- that
21 the bill was a solution in search of a problem.
22   Q   Okay.  And so is it that you believe that the 2020
23 general election was basically smooth and secure, and that's why
24 there was not a need for --
25   A   All along.  I mean, we've -- we've not heard of any

Page 161

1  prosecutions, anything that would demonstrate that elections
2  were -- contained fraud and that we needed this massive bill to
3  address it.
4    Q   So we had talked a little bit earlier about some of
5  the litigation in response to Harris County.
6    A   Uh-huh.
7    Q   Would you agree with me that there was at least a lot
8  of open questions about what the election code allowed in
9  regards to certain voting practices, such as drive-through
10 voting, multiple in-person delivery [sic] ballot locations and
11 24-hour voting?
12   A   To some extent.
13   Q   And so I want to introduce our next exhibit.  I
14 believe this is Exhibit 31.
15       THE WITNESS:  Can you give me a minute?  I need
16 to --
17       MS. HUNKER:  Sure.  Can we go off the record real
18 quickly?
19       THE WITNESS:  Yes.  Okay.  Thank you.
20       VIDEOGRAPHER:  Off record at 3:10.
21       (A recess is taken.)
22       VIDEOGRAPHER:  On the record at 3:16.
23 BY MS. HUNKER (resuming):
24   Q   Senator Alvarado, if you can please turn to
25 Exhibit 31.



Page 166

1    Q   And would you agree with me that the Texas Attorney
2    General has brought charges against -- for illegal voting or
3    election fraud in other counties as well?
4    A   According to this, yes.
5    Q   Are you aware that election -- election-fraud
6    prosecutions are also brought by county district attorneys?
7    A   Yes.
8    Q   Do you know the amount of charges that are brought by
9    these district attorneys each year?
10   A   No.
11   Q   I also want to turn to Page 30 -- sorry -- Exhibit 32.
12   A   (Complies with request.)
13   Q   And you'll see that there's a caption, Lupe v. Texas.
14   Do you see that?
15   A   Yes.
16   Q   And do you see where it says, United States' Responses
17   to Texas' First Set of RFPs-Privilege Log?
18   A   Yes.
19   Q   And I want to look towards the privilege basis that's
20   brought for some of these documents.
21   A   Okay.
22   Q   And do you see where -- the third entry down, it says,
23   Complaint alleging voter fraud via text message.
24   A   Yes.
25   Q   And do you see the next one down says, Voicemail

Page 167

1    complaint alleging voter fraud in Texas?
2    A   Yes.
3    Q   And do you see how there are other entries here that
4    also state that there were complaints received by the United
5    States regarding election fraud in Texas?
6    A   Yes.
7    Q   We can put these two documents aside.  I'm going to
8    introduce Exhibit 33.
9        MS. HUNKER:  (Provides exhibit.)
10       MR. GOLANDO:  Thank you.
11   BY MS. HUNKER (resuming):
12   Q   Do you have the exhibit in front of you?
13   A   Yes.
14   Q   Do you see it says House Journal?
15   A   Yes.
16   Q   And do you see this is from Monday, April 23rd, 2007;
17   is that correct?
18   A   Yes.
19   Q   And so I'm going to turn -- ask you to turn the page
20   to 2224, and I will represent to you that I've only included the
21   portions of this House Journal that were relevant to our
22   deposition for today.  And so do you see where it says
23   Representative Anchia?
24   A   Yes.
25   Q   Do you know who Representative Anchia is?

Page 168

1    A   Yes.
2    Q   And he's a Democrat; correct?
3    A   Yes.
4    Q   And did you work with him when you were in the Texas
5    House?
6    A   Yes.  And just to be clear, I was not in the House
7    during this time, during 2007.
8    Q   And I want to go to the third paragraph, where it
9    starts with, Furthermore.
10   A   Okay.
11   Q   Actually, let's do the whole paragraph.  Let's start
12   with, We know.  It says:  We know that there's no evidence of
13   it, but if this body wants to create an opportunity for voter
14   fraud, then vote for HB218.  In fact, that Section 3 Part A of 2
15   -- HB218 creates a wonderful opportunity for people at a low
16   cost to be able to impersonate someone else by saying that this
17   is a valid employee ID and no poll worker, no election worker,
18   no election judge will be able to discern a ballot from invalid
19   ID.  Did I read that correctly?
20   A   Yes.
21   Q   Furthermore, there's another wonderful loophole in
22   this bill that creates a glaring weakness:  It essentially
23   allows vote by mail to continue without voter identification.
24   Vote by mail, as we know, is the greatest source of fraud --
25   voter fraud in this state.  In fact, all of the prosecutions by

Page 169

1    the attorney general -- I shouldn't say all, but a great
2    majority of the prosecutions by the attorney general occur with
3    request to vote by mail.  Did I read that correctly?
4    A   Yes.
5    Q   Would you agree with me that in this statement on the
6    floor, Representative Anchia said that vote by mail is the
7    greatest source of voter fraud in this state?
8    A   According to what I'm reading, that -- that's what he
9    said.
10   Q   Okay.  And would you agree with me that he is talking
11   about fraud in vote-by-mail context -- sorry.  Let me rephrase
12   that.  Would you agree with me that he is talking about fraud
13   through vote by mail in the context of photo ID?
14       MR. GOLANDO:  Objection, form.
15   BY THE WITNESS (resuming):
16   A   I don't know.
17   Q   Okay.  Would you agree with me that he's comparing
18   vote by mail from in-person voting with respect to photo IDs?
19       MR. GOLANDO:  Same objection.
20   BY THE WITNESS (resuming):
21   A   I don't know.
22   Q   Would you agree with me that he says that the bill
23   would create a wonderful loophole because it allows vote by mail
24   to continue without photo identification?
25   A   I'm not sure.



Carol Alvarado

October 06, 2022
Pages 170 to 173

Page 170

1  Q   Okay.  Would you agree that he says there's another
2  wonderful loophole in this bill that creates a glaring weakness:
3  It essentially allows vote by mail to continue without photo
4  identification?
5  A   (Reviewing.)  That's what I'm reading.
6  Q   And let's go to introduce the next exhibit, which is
7  34.
8      MS. HUNKER:  (Provides exhibit.)
9      MR. GOLANDO:  Thank you.
10 BY MS. HUNKER (resuming):
11  Q   And you see that this is a letter from Judith
12 Zaffirini, State Senator, District 21?
13  A   Yes.
14  Q   And Senator Zaffirini is a Democrat; correct?
15  A   Yes.
16  Q   And this letter was sent on December 3rd, 2018; is
17 that correct?
18  A   Yes.
19  Q   And it's directed to Senator Hughes, chair of the
20 select committee on election security.
21  A   Yes.
22  Q   Okay.  I want to look at page -- Paragraph 1 where it
23 says, This letter, however, let me know when you've arrived.
24  A   Yes, I have it.
25  Q   Okay.  It reads:  This letter however is to record my

Page 171

1  concerns regarding the need to, one, provide concrete
2  recommendations to address mail-in ballot fraud.  Did I read
3  that correctly?
4  A   Yes.
5  Q   And now let's look at the next paragraph:  During the
6  last several sessions, many legislators have focused on voter-ID
7  laws intended to prevent in-person voter fraud, but not on [sic]
8  increasingly serious problem of mail-in ballot fraud.  Our
9  committee heard troubling testimony regarding the state of
10 election security related to the latter.  Did I read that
11 correctly?
12  A   Yes.
13  Q   It continues:  The report's recommendation that the
14 legislature needs to find a solution to the vexing issue of
15 mail-in ballot fraud.  At nursing homes and assisted-living
16 facilities is a good start, but we must take all possible steps
17 to address voting irregularities caused by fraudulent mail-in
18 ballots.  Did I read that correctly?
19  A   Yes.
20  Q   And so would you agree that in this letter she states
21 that the legislature needs to provide concrete recommendations
22 to address mail-in ballot fraud?
23  A   (Reviewing.)
24  Q   Based on the first paragraph.
25  A   Well, if the -- that's what it reads here.

Page 172

1  Q   Would you agree with me that she said that:
2  Legislators are focused on voter-ID laws intended to prevent
3  in-person voter fraud, but not on the increasing serious problem
4  of mail-in ballot fraud.
5  A   That's what I read.
6  Q   And you'd agree that she said that she heard troubling
7  testimony regarding the state of election security related to
8  mail-in ballot fraud.
9  A   That's what it reads here.
10  Q   The voter-ID number requirement introduces a voting --
11 let me take -- let rephrase that.  The requirement that a voter
12 provide either their Social Security number or driver's license
13 or voter ID on their mail-in ballot adds a voter-ID component to
14 mail-in ballots; is that correct?
15  A   I suppose so.
16  Q   Would you agree that it addresses the concern raised
17 by Senator Zaffirini that legislators are focused on voter-ID
18 laws intended to prevent in-person voter fraud, but not on the
19 increasing serious problem of mail-in ballot fraud?
20  A   I -- I don't know.  I can't say.
21  Q   We can put that document aside.  So we had discussed
22 earlier about some of your concerns regarding poll watchers;
23 correct?
24  A   Yes.
25  Q   And do you have concerns regarding poll watchers with

Page 173

1  respect to Senate Bill 1?
2  A   Yeah, there are some.  I mean, obviously we've talked
3  quite a bit about the -- training.
4  Q   Uh-huh.
5  A   But if I recall, I don't know if there are provisions
6  in there on what exactly a poll watcher can do, if they can
7  speak at any moment or get up and wander around at any moment.
8  I -- I don't recall.
9  Q   Okay.
10  A   But I know that -- that was a concern as well of mine.
11  Q   Okay.  And so we did talk a little bit about training,
12 and so just out of curiosity, have you at any point looked at
13 the training that was provided by the secretary of state for
14 poll watchers?
15  A   After the bill?
16  Q   Yes.
17  A   No, no.
18  Q   Have you talked to any of the new poll watchers
19 regarding the training and their experience going through the
20 training?
21  A   No.
22  Q   And have you talked to any election administrators or
23 county election officials about how the training has worked with
24 respect to poll watchers at their locations?
25  A   No, not yet.



**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO**
**THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX C



**EXHIBIT**

33

# HOUSE JOURNAL

## EIGHTIETH LEGISLATURE, REGULAR SESSION

### PROCEEDINGS

#### SIXTIETH DAY — MONDAY, APRIL 23, 2007

The house met at 10 a.m. and was called to order by the speaker.

The roll of the house was called and a quorum was announced present (Record 590).

Present — Mr. Speaker; Allen; Alonzo; Anchia; Anderson; Aycock; Bailey; Berman; Bohac; Bolton; Bonnen; Branch; Brown, B.; Brown, F.; Burnam; Callegari; Castro; Chavez; Chisum; Christian; Cohen; Coleman; Cook, B.; Cook, R.; Corte; Crabb; Creighton; Crownover; Darby; Davis, J.; Davis, Y.; Delisi; Deshotel; Driver; Dukes; Dunnam; Dutton; Eiland; Eissler; Elkins; England; Escobar; Farabee; Farias; Farrar; Flores; Flynn; Frost; Gallego; Garcia; Gattis; Geren; Giddings; Gonzales; Gonzalez Toureilles; Goolsby; Guillen; Haggerty; Hamilton; Hancock; Hardcastle; Harless; Harper-Brown; Hartnett; Heflin; Hernandez; Herrero; Hilderbran; Hill; Hochberg; Hodge; Homer; Hopson; Howard, C.; Howard, D.; Hughes; Isett; Jackson; Jones; Keffer; King, P.; King, T.; Kolkhorst; Krusee; Kuempel; Latham; Laubenberg; Leibowitz; Lucio; Macias; Madden; Mallory Caraway; Martinez; Martinez Fischer; McCall; McClendon; McReynolds; Menendez; Merritt; Miles; Miller; Morrison; Mowery; Murphy; Naishtat; Noriega; O'Day; Oliveira; Olivo; Orr; Ortiz; Otto; Parker; Patrick; Paxton; Peña; Phillips; Pickett; Pierson; Pitts; Puente; Quintanilla; Raymond; Riddle; Ritter; Rodriguez; Rose; Smith, T.; Smith, W.; Smithee; Solomons; Strama; Straus; Swinford; Talton; Taylor; Thompson; Truitt; Turner; Van Arsdale; Vaught; Veasey; Villarreal; Vo; West; Woolley; Zedler; Zerwas.

Absent, Excused — King, S.; Moreno.

The invocation was offered by Steve Doles, director, Pray Lubbock, as follows:

Our Heavenly Father, your servant, Moses, not only brought law and order to his people, but provided the foundation upon which laws are established today. May each member of the house breathe in a fresh sense of divinely ordained duty and their stamina renewed as they consider legislation regarding the affairs of our state. May their noble work bring forth laws which will protect our freedoms, enhance life for individuals, and insure rule and order in our society.

We thank you that you have created the men and women in this room with passion about their opinions on appropriate governing policy. I pray that you will endow these representatives, whether on the debate floor or in the committee room, with self-control and honorable statesmanship equal to their passion allowing true corporate wisdom to prevail in this 80th Legislature.

Absent — Cook, R.; King, S.; Woolley.

## STATEMENT OF VOTE

When Record No. 617 was taken, my vote failed to register. I would have voted yes.

Woolley

## HB 218 - REMARKS

REPRESENTATIVE ANCHIA: Members, I'm going to be brief, this has been a long day. The debate has gone on for, oh boy, about six hours and this is what we learned. We've learned that the authors of this bill have provided not one shred of evidence of voter impersonation, which is the type of voter fraud this bill gets at. We have learned that upwards of two million Texans may be disenfranchised by this bill. We have learned that the sense of this body is not to prosecute the offenders and not to set up and devote resources to engage a prosecuting voter impersonation.

So, let me tell you what I know it's not about. This is clearly not about voter fraud, it's not about voter impersonation, it's not about expanding the franchise, it's not about protecting those that are least vulnerable in our society, and it's not about making sure that elections are more secure, and I'll tell you why. I've been saving this wonderful nugget for you guys until the end. If you look at the list of documents that you can offer up, it includes employee identification. No matter how much training you do with poll workers, no matter how much training you do of election judges and election officials, it will be impossible for them to discern what is a valid employment identification and what is an invalid employment identification. Mr. Talton probably has an identification for his law firm. It would be impossible for me to tell whether it was valid or invalid or whether Joe Deshotel's face was on it or whether it was correct or not. In fact, you can go down to Kinko's and have a bogus little ID made and say that you're an employee of whatever organization you want to be for about five dollars. In fact, this bill, rather than increasing the integrity of elections, makes sure that there's a huge loophole that you can drive a train through to increase voter fraud that was what was crossing the mind of a particular person.

We know that there's no evidence of it, but if this body wants to create an opportunity for voter fraud then vote for **HB 218**. In fact, that Section 3 part (a) of **HB 218** creates a wonderful opportunity for people at a low cost to be able to impersonate someone else by saying that this is a valid employee ID and no poll worker, no election worker, no election judge will be able to discern a valid from an invalid ID. Furthermore, there's another wonderful loophole in this bill that creates a glaring weakness. It essentially allows vote by mail to continue without photo identification. Vote by mail, that we know, is the greatest source of voter fraud in this state. In fact, all of the prosecutions by the attorney general—I shouldn't say all, but a great majority of the prosecutions by the attorney general occur with respect to vote by mail.

So ladies and gentlemen, you have a pig on your hands. It's an ugly bill. It creates more of an opportunity for voter fraud than current law, and I will tell you that if you vote for this without any commensurate enforcement like what was

offered up in Representative Strama's bill, you are voting for a pig with no lipstick, and it's going to be nasty. So I urge you, members of this body, to please vote against the loopholes that this bill creates and vote against the opportunities of voter fraud that this creates and vote against **HB 218**.

REPRESENTATIVE BURNAM: I particularly want to thank Rafael Anchia for the leadership role he's taken, both on the Elections Committee and today, and I'm only going to add a few words from my hometown daily paper, the *Star-Telegram* today. The opening paragraph, "An insidious scheme to turn back the clock on voting rights in Texas tragically has once again made it's way to the state house floor. The architects of this idea pitched as a noble effort to prevent voter fraud cannot be allowed to succeed with what is surely one of the greatest assaults on the right to vote in this state since the passage of The Federal Voting Rights Act in 1965." Racism is racism, xenophobia is xenophobia. It's too bad that we're going to see it enacted on the house floor again.

### REMARKS ORDERED PRINTED

Representative Thompson moved to print all closing remarks on **HB 218**.

The motion prevailed.

REPRESENTATIVE VEASEY: Mr. Speaker, members, thank you very much. I'll be very brief. I want to start off by thanking some of the folks that have helped bring attention to this voter ID, or what I call a voter suppression bill. First of all, I'd like to thank the Baptist General Convention of Texas. They put out a pamphlet, a flier today asking members to please oppose this bill. I think that's significant because the Civil Rights Movement back when we were going through a lot of these issues that we're facing today—and don't be mistaken about it—this is a Civil Rights issue that we are debating today. But back during the '60s the black ministers and everyone else that marched for freedom, that marched for voting rights, rarely did any of the white pastors from the South join in, and the fact that the Baptist General Convention joined in shows that we are making some progress in this country on racial harmony.

Unfortunately, this bill sets us back. We have heard absolutely no evidence of any voter impersonation today, absolutely none. I think that Representative Strama and Representative Anchia pointed that out very eloquently. All of the amendments and everything that Ms. Brown has offered you today is asking you to vote for this bill based on generalizations, and based on stereotypes, and based on things that are untrue. There has been absolutely not one shred of evidence, and we're voting for this bill today. It makes absolutely no sense, and especially in light of what's going on with the attorney general in the State of Texas. They were trying to force U.S. attorneys to say that there was voting fraud going on in their respective districts in there respective states so they could produce convictions that would prove voter impersonation. The panel, the U.S. panel who looked into this, found none. They had to help doctor some of the findings to make their findings more compelling. And I think that it's time that—instead of 15 or 20 years from now—because, you know, when we look down the road this is going to be embarrassing that we even voted for this. But right now people are

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| Defendants. | § | |

STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT

# APPENDIX D

Transcript of the Testimony of

**Rafael Anchia**

**Date:**

August 22, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

1           IN THE UNITED STATES DISTRICT COURT
                          FOR THE
2                WESTERN DISTRICT OF TEXAS

3  LA UNION DEL PUEBLO          )
   ENTERO, et al,               )
4                               )
     Plaintiff,                 )
5                               )    Civil Action No.
   v.                           )    5:21-cv-00844-XR
6                               )
   GREGORY W. ABBOTT, et al,    )
7                               )
     Defendant.                 )
8

9

10      ---------------------------------------------
            ORAL AND VIDEOTAPED DEPOSITION OF
11
           REPRESENTATIVE RAFAEL ANCHIA
12
                  AUGUST 22, 2022
13      ---------------------------------------------

14

15        ORAL DEPOSITION OF REPRESENTATIVE RAFAEL ANCHIA,

16  produced as a witness at the instance of the state

17  defendants and duly sworn, was taken in the above-styled

18  and numbered cause on August 22, 2022, from 9:20 a.m. to

19  12:02 p.m. before Brent Sturgess, CSR in and for the

20  State of Texas, reported by machine shorthand at the

21  offices of Civitas Capital Group, 1722 Routh Street,

22  Suite 800, Dallas, Texas, 75201, pursuant to Notice, the

23  Federal Rules of Civil Procedure and the provisions

24  stated on the record or attached hereto.

25

Rafael Anchia

August 22, 2022
Pages 62 to 65

Page 62

1    Q.  Have you ever voted by mail?
2    A.  I don't believe so.
3    Q.  You haven't voted by mail since Senate Bill
4  1 took effect; correct?
5    A.  No.
6    Q.  And you haven't attempted to vote by mail
7  since Senate Bill 1 took effect; correct?
8    A.  No.
9    Q.  Have you witnessed anyone attempting to vote
10  by mail since Senate Bill 1 took effect?
11    A.  No.
12    Q.  Can you identify any voters who were
13  prevented from voting as a result of Senate Bill 1's
14  provisions related to voting by mail?
15    A.  No.
16    Q.  Do you have any personal knowledge of any
17  problems related to voting by mail that you would
18  attribute to Senate Bill 1?
19    A.  No.
20    Q.  You're represented by counsel for purposes
21  of this litigation; right?
22    A.  Say -- say it one more time.
23    Q.  You're represented by counsel for purposes
24  of this litigation --
25        MR. QUESADA:  Well, for this --

Page 63

1    Q.  (By Mr. Thompson)  -- correct?
2        MR. QUESADA:  For this deposition.
3        MR. THOMPSON:  Okay.
4    A.  Yes.
5        MR. THOMPSON:  And I'm not trying to
6  broaden the scope of your representation or anything.
7        MR. QUESADA:  Fine.
8    Q.  (By Mr. Thompson)  So I see that Tex here is
9  a lawyer for you; correct?
10    A.  That is correct.
11    Q.  Do you have any other lawyers related to
12  this matter other than Tex?
13        MR. QUESADA:  I'm going to object to
14  the form of the question.
15    A.  I would answer Sean McCaffity and --
16        MR. THOMPSON:  I just want to know who
17  represents him.
18        MR. QUESADA:  In -- for purposes of
19  this deposition my firm -- the lawyers in my firm do.
20        THE WITNESS:  Yeah.
21        MR. QUESADA:  Including Mr. McCaffity.
22    Q.  (By Mr. Thompson)  Do you remember the name
23  of that law firm?
24    A.  Sommerman, Quesada -- or, no -- So -- I
25  think Quesada comes first.

Page 64

1        MR. QUESADA:  It should, but it comes
2  third.
3        THE WITNESS:  It should, it should.
4    Q.  (By Mr. Thompson)  If you --
5    A.  Sommerman, Quesada, McCaffity...
6    Q.  Sure.
7    A.  In some order.
8    Q.  Do you want to just confirm that --
9        MR. QUESADA:  Well, I think ours has
10  four.  My card's there.  Sommerman, McCaffity --
11        THE WITNESS:  Sommerman, McCaffity,
12  Quesada & Geisler.
13    Q.  (By Mr. Thompson)  Other than lawyers at
14  that law firm, are you represented by any other
15  attorneys related to this matter?
16    A.  Not that I'm aware of.
17    Q.  Have you communicated with anyone other than
18  attorneys at that law firm about testifying in a trial
19  in this matter?
20    A.  No.
21    Q.  Are you aware that some of the plaintiffs in
22  this case identified you as a potential witness at
23  that trial?
24    A.  Yes.
25    Q.  How did you become aware of that?

Page 65

1    A.  My counsel.
2        MR. QUESADA:  Yeah.  Don't answer if
3  it -- if it involves attorney-client.
4        THE WITNESS:  Okay.
5        MR. QUESADA:  Just tell him it involves
6  attorney-client.
7        THE WITNESS:  It involves
8  attorney-client.
9    Q.  (By Mr. Thompson)  Other than conversations
10  with counsel, you don't have any knowledge about being
11  listed as a witness; is that fair?
12    A.  That's fair.
13    Q.  Do you have any plans to testify at the
14  trial in this matter?
15    A.  Not at the present time.
16        (Exhibit Number 12 marked.)
17    Q.  (By Mr. Thompson)  I'll hand you Exhibit 12.
18    A.  Thank you.
19        MR. QUESADA:  Thank you.
20    Q.  (By Mr. Thompson)  Representative Anchia,
21  does the front of Exhibit 12 say "House Journal,
22  Eighty-Second Legislature, Regular Session"?
23    A.  It does.
24    Q.  Is it dated Monday, March 21, 2011?
25    A.  It is.

Page 66

1    Q.   Does this appear to be a copy of the House
2  Journal published by the Texas Legislature?
3    A.   It does.
4    Q.   Can you flip to Page 914?
5         The page numbers are on the top-left
6  and right-hand corners, sort of booklet style.
7    A.   I'm on Page 914.
8    Q.   According to this excerpt from the House
9  Journal, about the middle of the page you are quoted
10  as saying "Yet this bill doesn't deal with the type of
11  voter fraud that we've seen most prevalently in the
12  state of Texas, which is mail-in ballots."
13         Do you see that?
14    A.   Yes.
15    Q.   Is that an accurate reporting of what you
16  said?
17    A.   Yes.  Those are the words I said in the
18  journal, as reflected in the journal.
19    Q.   This was in the context of a debate about a
20  voter ID bill; correct?
21    A.   Yes.  A strict photo ID bill, correct.
22    Q.   And you were opposing that bill; correct?
23    A.   That's correct.
24    Q.   That bill dealt with a voter showing photo
25  identification in order to vote in person; correct?

Page 67

1    A.   Correct.
2    Q.   And I believe some supporters of the bill
3  said that the bill would be helpful for combating or
4  preventing in-person voter-impersonation fraud --
5    A.   Right.
6    Q.   -- is that right?
7    A.   Correct.
8    Q.   And you explained to your colleagues that
9  that type of voter-impersonation fraud was less common
10  than fraud related to voting by mail; correct?
11    A.   Virtually nonexistent.
12         MR. THOMPSON:  Do you want to --
13         MR. QUESADA:  I'm sorry, go ahead.  It
14  says whatever it says.  I'm going to object to the
15  form of the question.  I don't think that's -- I don't
16  think that's what Chairman Anchia said on the record.
17    Q.   (By Mr. Thompson)  Now, at the bottom of
18  this Page 914 --
19    A.   Yes.
20    Q.   -- you're quoted saying, "If you have opened
21  the door to the integrity of elections, then I think
22  it's fair game to discuss that type of fraud, which we
23  actually do see in the state of Texas."
24         Do you see that?
25    A.   Yes.

Page 68

1    Q.   And you were referring to mail-in ballot
2  fraud; correct?
3    A.   Yes.
4    Q.   Can you flip to Page 915?
5         The second set of remarks from you on
6  this page says, "I actually chair the select committee
7  on that, and I've had in the past mail-in ballot
8  bills.
9         Do you see that?
10    A.   Yes.
11    Q.   Do you recall what bills you were referring
12  to in those remarks?
13    A.   I don't.
14    Q.   Based on what you remember today, have you
15  offered bills in the past related to mail-in ballots?
16    A.   I think I was a joint author on mail-in
17  ballot bills in the past.
18    Q.   Would this have been a bill authored by
19  Representative Oliverson...
20    A.   I don't recall.
21    Q.   ...where he would have --
22    A.   I don't recall.
23    Q.   To the best of your recollection, what was
24  the purpose of the bills related to mail-in ballots
25  that you were offering?

Page 69

1    A.   I don't recall.
2    Q.   Let me go to the next comment from you on
3  that page.  It's the third one, "Here's the quandary
4  for this body.  If you say passing this bill is going
5  to restore integrity of elections, you do nothing in
6  this bill to deal with mail-in ballots and 70 percent
7  of all the prosecutions by the Attorney General have
8  been mail-in ballots, then you're really not restoring
9  integrity of elections because people, like they have
10  for the last six years, will be reading about mail-in
11  ballot fraud, mail-in ballot fraud, mail-in ballot
12  fraud."
13         Do you see that?
14    A.   I do.
15    Q.   Do you generally conduct research to support
16  the factual statements that you make on the floor of
17  the House of Representatives?
18    A.   Yes.
19    Q.   Do you think you've researched the
20  prosecutions brought by the Attorney General related
21  to voter fraud?
22    A.   Yes.
23    Q.   And your research showed that 70 percent of
24  the Attorney General's prosecutions related to voter
25  fraud were about mail-in ballots?

Page 70

1    A.  At the time.
2    Q.  Do you know whether those numbers are
3  similar or different now?
4    A.  I don't, I don't.  I recall that they were
5  low -- very low at the time.  So 70 percent of a low
6  number.  I don't recall that exact number.  But my
7  whole point in -- just for further context because,
8  you know, folks have tried to take this language out
9  of context on the House floor.  So I figured I'd offer
10  an explanation, some context here.
11      Number one is an acknowledgment that
12  voter fraud in the state of Texas is a very s -- a
13  very small number.  It's like a rou -- I think I
14  described it at one point as a rounding error of a
15  rounding error.  You're more -- you're more likely to
16  get struck by lightning.  To the extent it exists, it
17  is not in -- it was not found in voter impersonation,
18  which undercut the -- the pretext that was being given
19  by the legislature at that time about the need to have
20  strict -- a strict photo ID standard in the state, and
21  ultimately we won this in court.
22      But it undercut their argument to
23  suggest that in-person voter impersonation was about
24  the integrity of election when at the time they were
25  not doing anything about mail-in ballot fraud, which

Page 71

1  was the one place where we did see some, not much, but
2  some.
3      And of the cases that the Attorney
4  General had prosecuted, they had all been in that
5  area.  So it seemed to suggest that their pretext for
6  bringing that photo identification bill was -- was not
7  sincere, and that's what I was pointing out here.
8    Q.  I certainly don't mind you offering context.
9      MR. THOMPSON:  I will, nonetheless,
10  have to object as nonresponsive.
11    A.  Okay.
12    Q.  (By Mr. Thompson)  It's nothing personal, of
13  course.
14    A.  No, of course.  None -- no personal...
15    Q.  Okay.
16    A.  Nothing -- nothing personal taken, Will.
17      (Exhibit Number 13 marked.)
18    Q.  (By Mr. Thompson)  Good.  I'm going to hand
19  you what's been marked as Exhibit 13.
20      Exhibit 13 is an excerpt from the House
21  Journal of the Eightieth Legislature, Regular Session;
22  correct?
23    A.  Yes.
24    Q.  And it's dated Monday, April 23, 2007;
25  correct?

Page 72

1    A.  Yes.
2    Q.  If you could flip to Page 2224, please.
3    A.  I am with you.
4    Q.  That Page 2224 contains remarks from you
5  about House Bill 218; correct?
6    A.  Yes.
7    Q.  Take a look down at the third paragraph of
8  your remarks, and then halfway through that paragraph
9  there's a sentence that begins "Furthermore..."
10      Do you see that?
11    A.  Yes.
12    Q.  I'm going to read that and ask you to
13  confirm that I read it correctly.
14    A.  Yes.
15    Q.  "Furthermore, there's another wonderful
16  loophole in this bill that creates a glaring weakness
17  that essentially allows vote by mail to continue
18  without photo identification.  Vote by mail, that we
19  know, is the greatest source of voter fraud in this
20  state.  In fact, all of the prosecutions by the
21  Attorney General -- I shouldn't say all, but a great
22  majority of the prosecutions by the Attorney General
23  occur with respect to vote by mail."
24      Do you see that?
25    A.  Correct.

Page 73

1    Q.  And this is an accurate transcription of
2  what you said in those remarks; correct?
3    A.  Correct.
4      (Exhibit Number 14 marked.)
5    Q.  (By Mr. Thompson)  I'd like to show you a
6  new exhibit.  This is marked Exhibit 14.
7    A.  Thank you.
8      MR. QUESADA:  Thank you, guy.
9    Q.  (By Mr. Thompson)  Representative Anchia, is
10  Exhibit 14 -- I'm sorry.  Before we get going, I just
11  want to make sure.  There's a printer error on my
12  copy, and it's a little bit hard to read.
13      Does your copy look clear?
14    A.  It does.
15    Q.  Okay, perfect.  Then I'll just use a
16  different copy.
17      Exhibit 14 is an excerpt from the House
18  Journal of the Eighty-Seventh Legislature, Second
19  Called Session; correct?
20    A.  Yes.
21    Q.  And it's dated Tuesday, August 31, 2021;
22  correct?
23    A.  Yes.
24    Q.  Okay.  If you flip to Pa -- the next page is
25  Page 316 in the top left-hand corner.

Rafael Anchia

August 22, 2022
Pages 82 to 85

Page 82

1  an honest man?
2      A.  I don't know.
3          MR. QUESADA:  He said he was a Cubs
4  fan.
5          (Exhibit Number 15 marked.)
6      Q.  (By Mr. Thompson)  I'm going to hand to you
7  what's been marked as Exhibit 15.
8      A.  Yeah.
9          MR. QUESADA:  Thank you.
10     Q.  (By Mr. Thompson)  Is Exhibit 15 an article
11 from the Dallas Morning News entitled "Texas needs
12 tougher laws to reel in mail-in vote fraud"?
13     A.  Yes.
14     Q.  Is it written by Gromer Jeffers, Jr.?
15     A.  Yes.
16     Q.  Is it dated April 26th, 2017?
17     A.  Yes.
18     Q.  Do you see in the first paragraph of
19 Mr. Jeffers it says "Let's face it.  Mail-in ballot
20 voting, a necessary and noble process, is vulnerable
21 to fraud"?
22     A.  Yes.
23     Q.  Do you see in the second paragraph he says
24 "Residents --," referring to residents of West
25 Dallas, "-- there have complained about receiving

Page 83

1  absentee ballots they didn't request, raising the
2  possibility that someone is casting votes for them."
3          Do you see that?
4      A.  Yes.
5      Q.  Do you have any knowledge one way or the
6  other about whether residents were receiving absentee
7  ballots they didn't request?
8      A.  I'm unaware.
9      Q.  Do you know one way or the other whether
10 someone was casting votes for them?
11     A.  I'm unaware.
12     Q.  If you could flip to Page 2, please.  Up at
13 the top says -- it has a quote from Mayor Mike
14 Rawlings.
15         Do you see that?
16     A.  Yes.
17     Q.  Excuse me.  The quote is also jointly
18 authored by Representative Eric Johnson; correct?
19     A.  Yes.
20     Q.  And they said, "We ask that you devote
21 additional resources to verify the integrity of each
22 mail-in ballot in Texas."
23         Do you see that?
24     A.  Yes.
25     Q.  And they wrote that in a letter to the

Page 84

1  Dallas County Elections Department; correct?
2      A.  Yes.
3      Q.  Were you involved at all in the Dallas
4  County Elections Department's response to that letter?
5      A.  Not that I recall.
6      Q.  Do you recall communicating with Mayor
7  Rawlings, Representative Johnson or anyone from the
8  Dallas County government about this issue at the time?
9      A.  Not that I recall.
10     Q.  If you'll look in Paragraph 3, Mr. Jeffers
11 says, "Voter fraud, even with mail-in ballots, does
12 not occur on a large scale.  But in low-turnout
13 elections, stealing just a few votes can be the
14 difference between winning and losing."
15         Do you see that?
16     A.  I do.
17     Q.  Are you aware of the fact that some elected
18 officials in Texas are elected by just a few votes in
19 a very close race?
20     A.  Yes.
21     Q.  You've had colleagues in the House of
22 Representatives who won by just a handful of votes;
23 right?
24     A.  Yes.
25     Q.  And so even a very small amount of mail-in

Page 85

1  ballot fraud in those elections could alter the
2  outcome; correct?
3      A.  Certainly, or a small amount of voters being
4  turned away at the polls.
5      Q.  Who is Representative Steve Wolens?
6      A.  Steve Wolens is a lawyer, a former state
7  representative and my predecessor in office.  I
8  call -- I would consider him a friend.
9      Q.  He was a knowledgeable public servant?
10     A.  Quite.
11     Q.  He's quoted in the fourth paragraph on Page
12 2 as saying "'You have to have a conversation in order
13 to prevent coercion and fraud,' said former Rep --
14 former State Rep. Steve Wolens, who in 2003 sponsored
15 legislation to overhaul the state's mail-in ballot
16 system, 'Then you tailor-make a new law that deals
17 with abuse and opens up voting.'"
18         Do you see that?
19     A.  I do.
20     Q.  If you look at the seventh paragraph on Page
21 2, it uses a Spanish term "politiqueros".
22         Do you see that?
23     A.  Yes.
24     Q.  Are you familiar with that term?
25     A.  Vaguely.

Rafael Anchia

Page 86

1    Q.  What is your understanding of the term
2    "politiqueros"?
3    A.  People who are involved in political
4    campaigns.
5    Q.  Here Mr. Jeffers says "The law also devised
6    ways to track mail-in vote operatives, called
7    "politiqueros," in Hispanic neighborhoods where
8    absentee campaigns are aggressive."
9        Do you see that?
10   A.  I do.
11   Q.  Are you familiar with allegations that
12   people identified as "politiqueros" have
13   inappropriately stolen people's votes?
14   A.  No.
15   Q.  You don't know one way or the other?
16   A.  No.  I'm unaware of any allegations.
17   Q.  Do you know whether any of your colleagues
18   in the Texas Legislature read this piece by
19   Mr. Jeffers in the Dallas Morning News?
20   A.  I don't.
21   Q.  Do you recall Representative Lozano
22   referring to it on the floor when the legislature was
23   debating SB 1?
24   A.  To this specific piece?  Is that the
25   question?

Page 87

1    Q.  Yeah.
2    A.  No.
3    Q.  Do you recall your colleagues more generally
4    talking about newspaper articles on the topic of
5    mail-in ballot fraud?
6    A.  I don't.
7        (Exhibit Number 16 marked.)
8    Q.  (By Mr. Thompson)  I'm going to hand you
9    what's been marked as Exhibit 16.
10   A.  Thank you.
11       MR. QUESADA:  Thank you, sir.
12   Q.  (By Mr. Thompson)  Does Exhibit 16 appear to
13   be an article from the Dallas Observer entitled "City,
14   County Investigate Possible Voter Fraud In Upcoming
15   Council Election"?
16   A.  Yes.
17   Q.  Is it authored by Stephen Young?
18   A.  Yes.
19   Q.  Is it dated April 24, 2017?
20   A.  Yes.
21   Q.  And in the bottom right-hand corner on Page
22   1, do you see a Bates stamp MS007397?
23   A.  Yes.
24   Q.  And I'll just represent to you that there's
25   some highlighting in this document.  My understanding

Page 88

1    is that this highlighting came from the party that
2    produced the document and that the highlighting
3    probably was not in the original publication.
4        Are you able to read the document okay
5    despite the highlighting?
6    A.  Correct.
7    Q.  Okay.  Do you read the Dallas Observer?
8    A.  On occasion.
9    Q.  Do you know whether any of your colleagues
10   in the legislature read the Dallas Observer?
11   A.  I don't.
12   Q.  If you could turn to the second page of this
13   exhibit, which is Bates stamped MS007398, in the
14   second full paragraph it says "Earlier this month
15   several senior citizens in West Dallas and Oak Cliff
16   complained to WFAA-TV that they'd received mail-in
17   ballots without having asked for one."
18       Do you see that?
19   A.  I do.
20   Q.  You represent part of West Dallas; correct?
21   A.  Correct.
22   Q.  Do you represent Oak Cliff?
23   A.  I do.
24   Q.  Did your office receive any complaints on
25   this topic?

Page 89

1    A.  Not that I'm aware.
2    Q.  Do you have any reason to doubt that senior
3    citizens from West Dallas and Oak Cliff complained to
4    the local TV station that they had received mail-in
5    ballots without having asked for one?
6    A.  No.
7    Q.  Would you agree that receiving a mail-in
8    ballot that you did not request would reasonably cause
9    one to wonder whether some sort of irregularity was
10   occurring?
11   A.  Error or irregularity.  Certainly error.
12   Q.  In Texas you're not supposed to receive a
13   mail-in ballot without having asked for one; right?
14   A.  That's right.
15   Q.  So when senior citizens receive a mail-in
16   ballot without having asked for one, they know
17   something's gone wrong; correct?
18   A.  Yes.
19       MR. THOMPSON:  Do you need to take a
20   break or anything?
21       MR. QUESADA:  Nope.
22   Q.  (By Mr. Thompson)  If you look toward the
23   bottom of this page, the second-to-the-last paragraph,
24   second sentence, it says "As the Dallas Observer has
25   documented for well over a decade, Dallas' council

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,     §
    *Plaintiffs,*     §
         §
*v.*     §    Case No. 5:21-cv-844-XR
         §
GREGORY W. ABBOTT, et al.,     §
    *Defendants.*     §

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX E

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO          *
     ENTERO, et al.              *
 4                               *
                                 *
 5   VS.                         *   Civil Action No.
                                 *   5:51-cv-00844-XR
 6                               *
     GREGORY W. ABBOTT, et al.   *
 7

 8   ********************************************************

 9            ORAL AND VIDEOTAPED DEPOSITION OF
                    ROBERTO BENAVIDES
10                  MARCH 30, 2023
                  (Reported Remotely)
11
     ********************************************************
12

13           ORAL AND VIDEOTAPED DEPOSITION of ROBERTO
     BENAVIDES, produced as a witness at the instance of the
14   Defendants, and duly sworn, was taken remotely in the
     above-styled and numbered cause on the 30th day of
15   March, 2023, between the hours of 9:03 a.m. and
     11:06 a.m., before TRICIA FOX WILLIAMS, CSR, in and for
16   the State of Texas, reported by machine shorthand, with
     the witness located in Austin, Texas, in accordance with
17   the Federal Rules of Civil Procedure and the provisions
     stated on the record or attached hereto.
18

19

20

21

22

23

24

25
```



Roberto Benavides

March 30, 2023
Pages 26 to 29

Page 26

1 it again.
2    Q.   Okay.  And is that true today, that you don't
3 know?
4    A.   I do know now.
5    Q.   Okay.  Well, we'll get to that a little bit
6 later.
7    A.   Yes.
8    Q.   So once you received a second mail in ballot,
9 what did you do?
10    A.   Filled it out exactly the same, the same voter
11 ID number, license driver's number, same one that I
12 had because it's the one that's on my license, and the
13 last four numbers of my social security card.
14    Q.   Okay.  And did you check to make sure that you
15 had both your social security number and your driver's
16 license number written down exactly correctly?
17    A.   I checked extra carefully this time.
18    Q.   And once you completed your second mail in
19 ballot and the envelope, what did you do?
20    A.   Mailed it back as soon as I could.
21    Q.   Okay.  And when did you next hear anything
22 about your ballot after mailing in the second one?
23    A.   That was it, I thought it was all done.
24    Q.   Okay.  And so did there come a time when you
25 concluded or learned that your ballot had not been

Page 27

1 counted or cast?
2    A.   Yes, when Dana called me at home and she said
3 that there had been a problem with the ballot.
4    Q.   Approximately when was that?
5    A.   Two months ago.  Maybe two months ago, three, I
6 don't know.
7    Q.   And what other conversation did you have with
8 Dana at that time?
9    A.   I just told her I was not aware that there had
10 been problems.  I knew that I had voted twice, but I
11 didn't know that, you know, there was other problems.
12    Q.   Okay.  All right.  You mentioned that you
13 learned something about whether the initial rejection
14 was because of an error in your writing down one of your
15 numbers, or an error in the state database that
16 contained those numbers; is that correct?
17    A.   That's correct.
18    Q.   When did you learn of that problem?
19    A.   About three or four days ago.
20    Q.   Okay.  And what did you learn at that time?
21    A.   I called the voter's office, and the lady said
22 that their records show that my driver's license number
23 ends in a five, and my actual driver's license number
24 ends in a four.
25    Q.   Did you have any conversation with the election

Page 28

1 officials at any time relating to the numbers that you'd
2 provided for your social security number?
3    A.   No, not the social security.  She said
4 everything -- the social security number was okay, the
5 voter ID number was okay, my address is okay, it's just
6 a problem with the driver's license number, that was the
7 only problem.
8    Q.   Okay.  Do you know the name of the person that
9 you spoke to on that occasion?
10    A.   No, I don't.
11    Q.   How did you and that person get in touch with
12 each other?
13    A.   I was told to call voter -- the Travis County
14 voter office, or whatever they call it.
15    Q.   Who told you to do that?
16       MS. WARMS:  Objection, privileged.
17    Q.   (By Mr. Bryant)  Did one of your attorneys tell
18 you to do that?
19    A.   Yes.  Excuse me.  Because I wanted to find out
20 why it was rejected.
21       MR. DOLLING:  Mr. Benavides, we're going
22 to instruct you not to disclose the content of any of
23 the conversations that we have had with you.
24       THE WITNESS:  All right.
25       THE REPORTER:  Who's speaking?

Page 29

1       MR. DOLLING:  This is Zach Dolling for the
2 OCA plaintiffs and for the witness.
3    Q.   (By Mr. Bryant)  Have you ever heard of
4 something called ballot tracker?
5    A.   No.
6    Q.   Do you -- so is it fair to say that you have no
7 information about ballot tracker even as we sit here
8 today?
9    A.   No, I don't.
10    Q.   Do you have any information about any method by
11 which you could have checked on the status of your
12 ballot in the November 2022 general election?
13    A.   No.
14    Q.   Have you ever gone online to a website called
15 votetexas.org or Vote Texas?
16    A.   I might have, but -- you know.  Yes, I did, I
17 guess.  Yeah.
18    Q.   You did.  Approximately when did you do that?
19    A.   Probably, I don't know, before the election
20 maybe.
21    Q.   When you say before the election, are you
22 referring to before the November 2022 election?
23    A.   Right.
24    Q.   Do you have any recollection as to how many
25 times you went online to that website, Vote Texas?



Roberto Benavides

March 30, 2023
Pages 42 to 45

Page 42

1  whether any have occurred.  I'm not getting into the
2  content of them.  So you can answer that question.
3     A.  Yes.
4     Q.  And how many occasions?
5     A.  Once.
6     Q.  And was that in preparation for this
7  deposition, or on a different occasion?
8     A.  Preparation.
9     Q.  So this is the conversation that you mentioned
10  earlier that has occurred in the last two days?
11     A.  Yes.
12     Q.  Was that the first time that you met Dana, or
13  was she on the phone or otherwise not present?
14     A.  I had talked to her on the phone before, Dana.
15     Q.  And you met her in person for the first time?
16     A.  Yes.
17     Q.  When?
18     A.  The same day, two or three days ago.
19     Q.  Okay.  And was Dana present throughout that
20  deposition preparation meeting?
21     A.  Yes.
22     Q.  Did you ever consider voting in person in the
23  November 2022 general election, either early voting or
24  on election day itself?
25     A.  No, I did not.

Page 43

1     Q.  Is there any reason why that would not have
2  been possible?
3     A.  Taking care of my wife, I guess.  I didn't want
4  to leave her alone for too long of a time.
5     Q.  Well, is it correct that your wife passed away
6  several weeks before the election day?
7     A.  Correct.
8        MR. MIRZA:  Objection, form.
9     A.  I had already voted by mail.
10     Q.  (By Mr. Bryant)  Is there any reason why you
11  could not have either voted in person on election day or
12  voted in person in early voting sometime after your
13  wife's passing?
14        MR. MIRZA:  Objection, form.
15        MS. WARMS:  Objection, form.
16     A.  I had already voted by mail, so I didn't even
17  think about it.
18     Q.  (By Mr. Bryant)  Had you thought about it, is
19  there anything that would have prevented you?  Had you
20  known that your -- that there was some issue with your
21  ballot being counted, referring to your second mail in
22  ballot, is there any reason why you could not have cast
23  your ballot in person on election day, or in the week or
24  two prior thereto during the early voting period?
25        MS. WARMS:  Objection, form.  You can

Page 44

1  answer.
2     A.  I didn't think about it because I had voted by
3  mail the last three times, so I figured I'll just do it.
4     Q.  (By Mr. Bryant)  Okay.  My question was -- I
5  understand your thought process, why you didn't think it
6  was necessary, but my question is if you had known that
7  there was an issue with your mail in ballot, is there
8  any reason why you couldn't have cast a ballot in person
9  on election day or in the early voting period after your
10  wife passed?
11        MS. WARMS:  Objection, form.  You can
12  answer.
13     A.  I didn't think about it, I guess because I was
14  busy taking care of my wife and I didn't want to leave
15  her.  So that was the main thought in my head.  So
16  you're saying when I -- I should have just went and
17  voted in person?
18     Q.  (By Mr. Bryant)  My question is whether -- had
19  you known that you -- that your mail in ballot had not
20  been --
21     A.  I didn't know.
22     Q.  -- counted -- I understand that, but if you had
23  known, is there any reason why you couldn't have voted
24  in person on November 8th, 2022, election day?
25     A.  Because I didn't want to leave my wife alone.

Page 45

1     Q.  Your wife had passed already at that point,
2  right?
3        MS. WARMS:  Okay.
4     A.  Yeah, but I had already voted by mail.
5        MS. WARMS:  Objection, cumulative.
6        MR. BRYANT:  I'm trying to get an answer
7  to my actual question.
8        MS. WARMS:  He's answered your question.
9     Q.  (By Mr. Bryant)  Was there any physical
10  obstacle to your voting in person after your wife passed
11  in mid October 2022?
12     A.  I had already voted, so I didn't even consider
13  that.
14        MS. WARMS:  Objection, form.
15        MR. BRYANT:  Objection, nonresponsive.
16     Q.  (By Mr. Bryant)  During the period in September
17  and October of 2022 prior to your wife's passing, did --
18  were there times when your son looked after your wife
19  and you took care of other necessary tasks?
20     A.  Very shortly, just for a very small amount of
21  time.
22     Q.  And --
23     A.  Because she wanted me there.  There's things
24  that I can do that he couldn't do.
25     Q.  And did -- during that period, how did you take



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX F

Transcript of the Testimony of

# John Bucy III

## Date:

August 09, 2022

## Case:

LA UNION DEL PUEBLO ENTERO V. GREGORY W. ABBOTT

```
                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF TEXAS
                            SAN ANTONIO DIVISION


LA UNION DEL PUEBLO ENTERO,        )
et al.,                            )
                                   )
          Plaintiffs,              )
                                   )
V.                                 ) Case No. 5:21-cv-844-XR
                                   )
GREGORY W. ABBOTT, et al.,         )
                                   )
          Defendants.              )
          -----------------------------------------------------------
OCA-GREATER HOUSTON, et al.,       )
                                   )
          Plaintiffs,              )
                                   )
V.                                 ) Case No. 1:21-cv-780-XR
                                   )
JOHN SCOTT, et al.,                )
                                   )
          Defendants.              )
          -----------------------------------------------------------
HOUSTON JUSTICE, et al.,           )
                                   )
          Plaintiffs,              )
                                   )
V.                                 ) Case No. 5:21-cv-848-XR
                                   )
GREGORY WAYNE ABBOTT, et al.,      )
                                   )
          Defendants.              )
          -----------------------------------------------------------
```

John Bucy III

Page 2

```
LULAC TEXAS, et al.,              )
                                  )
          Plaintiffs,             )
                                  )
V.                                ) Case No. 1:21-cv-0786-XR
                                  )
JOHN SCOTT, et al.,               )
                                  )
          Defendants.             )
------------------------------------------------------
MI FAMILIA VOTA, et al.,          )
                                  )
          Plaintiffs,             )
                                  )
V.                                ) Case No. 5:21-cv-0920-XR
                                  )
GREG ABBOTT, et al.,              )
                                  )
          Defendants.             )
------------------------------------------------------
UNITED STATES OF AMERICA,         )
                                  )
          Plaintiffs,             )
                                  )
V.                                ) Case No. 5:21-cv-1085-XR
                                  )
THE STATE OF TEXAS, ET AL.,       )
                                  )
          Defendants.             )
------------------------------------------------------
```

Page 3

ORAL & VIDEO DEPOSITION OF JOHN BUCY III

August 9, 2022

-------------------------------------------------

Oral deposition of JOHN BUCY III, produced as a witness at

the instance of the defendants, and duly sworn, was taken

in the above-styled and numbered cause on the 9th day of

August, 2022, before Patrick Stephens, Certified

Court Reporter, at 1717 N Interstate Hwy 35, Suite 305,

Round Rock, Texas 78664.

Page 4

A P P E A R A N C E S
ON BEHALF OF THE DEFENDANTS:
     PATRICK K. SWEETEN, ESQ.
     KATHLEEN HUNKER, ESQ.
     Office of the Attorney General
     P.O. Box 12548
     Austin, Texas 78711
     Telephone: (512) 463-4139
     patrick.sweeten@oag.texas.gov
     kathleen.hunker@oag.texas.gov
ON BEHALF OF THE WITNESS:
     SCOTT BRAZIL, ESQ.
     Brazil & Dunn, LLP
     13231 Champion Forest, Dr.
     Suite 406
     Houston, Texas 77069
     Telephone: (281) 580-6310
     scott@brazilanddunn.com
VIDEOGRAPHER:
     Manuel Martin
     Mamartin73@gmail.com
ALSO PRESENT VIA ZOOM:
     Elijah Watkins, Stoel Rives, LLP, Mi Familia Vota
     Leigh Ann Tognetti, Hidalgo County DA's Office
     Michael Stewart, Department of Justice
     Lauren Smith, Department of Justice
     Nicholas Adkins, Fried Frank
     Sameer Birring, Harris County Elections Admin.
     Rachel Miller, Jones Day
     Abigail Schultz, TX Office of Attorney General
     Georgina Yeomans, NAACP LDF, HAUL Plaintiffs
     Will Wilder, Brennan Center, LUPE Plaintiffs

Page 5

```
 1              I N D E X
 2 APPEARANCES ............................... 04
 3 JOHN BUCY III
 4        Cross-Examination by Mr. Sweeten ............... 08
 5
 6
 7
 8
 9
10
11
12
13
14 Reporter's Certificate ................... 169
15
16
17
18
19
20
21
22
23
24
25
```

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900          San Antonio, Texas 78232
210-697-3400                                                        210-697-3408

John Bucy III

August 09, 2022
Pages 154 to 157

Page 154

1  A  And -- and I remember speaking to this provision some
2  during these ongoing hearings.
3  Q  And you agree that B says:  A watcher may not be
4  present at the voting station when a voter is preparing the
5  voter's ballot or is being assisted by a person of the voter's
6  choice; correct?
7  A  Correct.
8  Q  And that -- that existed, again, since 1997 at least;
9  right?
10  A  Yep.
11  Q  And you would agree with me that that provides
12  protections about what the poll watcher may or may not do;
13  right?
14  A  Yes.
15  Q  And then if we look at 33.05(a), it says:  While on
16  duty, a watcher may not converse with an election officer
17  regarding the election except to call attention to an
18  irregularity or violation of the law; right?
19  A  Yes.
20  Q  You would agree that it says:  You may also converse
21  -- you may not converse with a voter and may not communicate in
22  any manner with a voter regarding the election.  That's what
23  the existing provision says; right?
24  A  Yes.
25  Q  And that's been in existence, if we look below, at

Page 155

1  least since 1986; correct?
2  A  Yes.
3  Q  SB1 neither changed that provision or the preceding
4  provision, did it?
5  A  Correct, and I think it even references this.
6  Q  Okay.  And, in fact, SB1 provides that a poll watcher
7  can be ejected for breach of the peace or for a violation of
8  law, can't they?
9  A  I think that's some areas we really fought for, yeah.
10  Q  And that's in SB1; right?
11  A  Correct.
12  Q  Okay.  Now, you would agree with me that the
13  implementation -- had -- let me ask it this way:  The quorum
14  break lasted for about six weeks; correct?
15  A  That sounds right.
16  Q  Okay.  And that was -- and -- and ultimately SB1
17  passed sometime in August of 2021; right?
18  A  Yes.
19  Q  Okay.  Have you had -- heard any concerns about the
20  amount of time to implement SB1?
21  A  Not that I can think of at the moment.
22  Q  Okay.  Have you heard any complaints from election
23  workers about how much time it took to implement -- or not
24  being given enough time to implement SB1?
25  A  I haven't, but I don't -- we haven't had those

Page 156

1  interim hearings yet, where I'm sure, if those are out there,
2  we'll hear them.
3  Q  Okay.  Has -- has any election official reached out
4  to you to discuss issues related to the implemission (ph) --
5  implementation of SB1?
6  A  I've -- I've heard some concerns about who can send
7  out ballot by mails and what can be posted on our website and
8  that kind of thing.
9  Q  From whom?
10  A  Just generically reading press articles,
11  conversations around, you know, what organizations have that
12  authority now, what's been restricted.  I think there was
13  conversations around Dan Patrick sending out a whole bunch of
14  ballot-by-mail applications and where did that fall into the
15  provisions, and I'm just thinking more generically kind of
16  press articles and things we've seen.
17  Q  Okay.  Other than what you've read in the press, have
18  you had any specific conversations with any of the county
19  election officials in this state about difficulties or feedback
20  regarding SB1 and its implementation?
21  A  I'm not recalling any specific conversations at this
22  time.
23  Q  Have you talked to any election officials since the
24  -- since SB1 was implemented about SB1 or its contents?
25  A  You know, I -- I occasionally speak to Chris Davis

Page 157

1  with Williamson County.  I don't remember any specific details
2  of any conversation at this moment.
3  Q  Okay.  So is it fair to say that as you're sitting
4  here today you cannot recount any conversations with any Texas
5  election officials regarding SB1 since its passage?
6  A  Man, I'm -- I'm trying to remember.  I don't want to
7  mislead you just because I do speak to Chris Davis somewhat
8  periodically, but I don't -- I'm not remembering any specific
9  conversation.
10  Q  Okay.  And that's with Chris Davis or any -- any
11  other county election official.
12  A  Yeah.  I mean, we've only had the one interim
13  hearing, and -- and it didn't deal with -- I mean, it dealt
14  with the poll-watcher training, so we talked to Keith Ingram
15  about that and some of the challenges about how we can make the
16  training -- you know, it was a good start, right?  We got it,
17  we wanted it, how do we make it better.  So there's been some
18  conversations through that hearing.  I'd have to go back and
19  reference that hearing.
20  Q  Okay.  So -- so --
21  A  Outside of that hearing, I can't remember any
22  specific conversations that I had.
23  Q  When was there a hearing?  What are you -- what
24  hearing are you talking about?
25  A  The elections committee had an interim hearing maybe

Page 158

1 two months ago, roughly.

2     Q    And -- and the elections committee had -- was SB1

3 discussed at that hearing?

4     A    To some extent, because we talked about the -- the

5 poll-watcher training.

6     Q    Did you -- were any county election administrators

7 present?  Yes or no or I don't know.

8     A    I believe there were.  I know Chris Davis wasn't

9 there, which I thought was --

10    Q    Okay.

11    A    You know, he -- he had a conflict.

12    Q    So outside of the single hearing that you've had with

13 the elections committee --

14    A    I don't remember any specific conversations outside

15 of that.

16    Q    Representative Bucy, I've got to ask --

17    A    Oh, I'm sorry.

18    Q    -- the whole question.

19    A    Go ahead.  Yeah.

20    Q    That's okay.  All right.  Outside of the hearing that

21 you attended sometime after the passage of SB1, are there --

22 are there any specific county election officials that you've

23 talked to about SB1?  And that's a yes or no.

24    A    Not that I recall.

25    Q    Okay.  A signature verification.  In the old days

Page 159

1 prior to SB1, when you sent in a mail-in ballot, the method

2 that was utilized was signature verification; correct?

3     A    Correct.

4     Q    And that -- that was utilized to determine whether or

5 not the person that sent in the ballot was the -- in fact the

6 person that was registered to vote for that ballot; correct?

7     A    Correct.

8     Q    Okay.  And signature verification was the only method

9 -- mechanism for verifying; correct?

10    A    I'll take your word for it.

11    Q    Okay.  Can you think of any others?

12    A    No, no.

13    Q    Okay.  Now, you would agree that there's some

14 significant issues with signature verification as being a -- a

15 -- an objective verifier; correct?

16    A    I would agree, and we heard from disability groups

17 and senior groups and others with concerns around it.

18    Q    Okay.  And you would agree with me that signatures

19 sometimes change in people's lives.

20    A    Yes.

21    Q    You would agree with me that because of disabilities,

22 signatures can be different than the original signature.

23    A    Yes.

24    Q    Okay.  And you would agree with me that signatures

25 are -- are a far more subjective measure than placing and

Page 160

1 affixing ID numbers on ballots by mail.

2     A    Yes.

3     Q    Okay.  Now, you opposed, though, having -- having

4 verification by ID on ballots by mail; is that correct?

5     A    Voting is a fundamental right, and so adding

6 restrictions that will make it harder, I oppose those, yes.

7     Q    Okay.  So any match of any ID, you opposed.

8     A    I mean, I don't know if that's true.  I -- I'm not

9 sure we -- we -- that was even on the table.  We have some

10 policies and law around voter ID that are set right now, and,

11 in fact, I tried to expand on some of the voter ID.  I had a

12 bill to do that would have allowed, you know, like student IDs,

13 for example, to use, and -- and that was fought back and -- and

14 not passed.  So -- so I don't -- I don't think I would say

15 that.  I just think we want to make sure we're very careful

16 when you add any provisions around our fundamental right to the

17 ballot box.

18    Q    Okay.  Is there any verification system outside of

19 signatures that you advocated for implementing?

20    A    I don't know if it would directly speak to that.

21 I've been very passionate for online voter registration, which

22 I think would lead to better data and therefore better rolls

23 and information around voting because it's put in directly by

24 the individual, it's typed in so there's not -- as you just

25 talked about with signatures, there's not interpretation to

Page 161

1 handwriting, there's not a middle person to -- to deliver it,

2 so that's one area that I fought for that I think would

3 modernize and create safer and more accurate data.

4          MR. SWEETEN:  Okay.  I might have to object as

5 nonresponsive because my question is something different.

6          THE WITNESS:  Oh.

7 BY MR. SWEETEN: (resuming)

8     Q    My question is:  Did you advocate for any other sort

9 of verification for mail-in ballots?

10    A    Not that I recall at this moment.

11    Q    Can -- are there any that you have in mind right now

12 outside of signature verifications that you believe would

13 improve the system and -- and make sure that those that are

14 sending in the ballots are in fact those who were entitled to

15 cast their ballot?

16    A    I -- I have a bill that would allow for, like,

17 individuals with disability to be able to use -- kind of like

18 we do with the military overseas, send the ballot and therefore

19 they can use their computer to fill it out.  So let's say if

20 they -- if they -- if they're blind, visually challenged, they

21 could use their technology to fill out their ballot and then

22 still send back and -- a specific -- you know, they can still

23 send -- print and send back a paper ballot, but like we do with

24 the military, be able to E-mail that ballot through a secured

25 network that we've been using.  So I've propose that, and that

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,        §
    *Plaintiffs,*        §
            §
*v.*        §        Case No. 5:21-cv-844-XR
            §
GREGORY W. ABBOTT, et al.,        §
    *Defendants.*        §

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX G

Transcript of the Testimony of

**Jacquelyn Callanen**

**Date:**

April 04, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO, )
     ET AL                       )
 4                               )
     vs.                         )  CASE NO. 5:21-CV-844-XR
 5                               )
     GREGORY W. ABBOTT, ET AL    )
 6   _____
     OCA-GREATER HOUSTON, ET AL  )
 7                               )
     vs.                         )  CASE NO. 1:23-CV-780-XR
 8                               )
     JOHN SCOTT, ET AL           )
 9   _____
     HOUSTON JUSTICE, ET AL      )
10                               )
     vs.                         )  CASE NO. 5:21-CV-848-XR
11                               )
     GREGORY WAYNE ABBOTT, ET AL )
12   _____
     LULAC TEXAS, ET AL   )
13                               )
     vs.                         )  CASE NO. 1:21-CV-0786-XR
14                               )
     JOHN SCOTT, ET AL           )
15   _____
     MIFAMILIA VOTA, ET AL       )
16                               )
     vs.                         )  CASE NO. 5:21-CV-0920-XR
17                               )
     GREG ABBOTT, ET AL          )
18   _____
     UNITED STATES OF AMERICA  )
19                               )
     vs.                         )  CASE NO. 5:21-CV-1085-XR
20                               )
     THE STATE OF TEXAS, ET AL   )
21   _____

22            ORAL VIDEOTAPED DEPOSITION

23               JACQUELYN CALLANEN

24               APRIL 4, 2022

25
```

Jacquelyn Callanen

April 04, 2022
Pages 2 to 5



Page 2

1       ORAL VIDEOTAPED DEPOSITION OF JACQUELYN CALLANEN,

2   produced as a witness at the instance of the Defendant

3   and duly sworn, was taken in the above-styled and

4   numbered cause on the 4TH day of April, 2022, from

5   9:11 a.m. to 4:38 p.m., before Sarah A. Prugh        ,

6   Certified Shorthand Reporter in and for the State of

7   Texas, reported by machine shorthand at the Offices of

8   The Texas Attorney General, Consumer Protection

9   Division, San Antonio Regional Office, 112 E. Pecan,

10   Suite 735, San Antonio, Texas, pursuant to the Federal

11   Rules of Civil Procedure and the provisions stated on

12   the record or attached hereto.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1               APPEARANCES

2

3   FOR PLAINTIFFS HOUSTON AREA URBAN LEAGUE; DELTA SIGMA
      THETA SORORITY, INC.; THE ARC OF TEXAS; AND JEFFREY
4   LAMAR CLEMMONS:
5      Mr. Kenneth E. Broughton (Via Zoom)
       E-mail: kbroughton@reedsmith.com
6
       Mr. Jarrett Dillard (Via Zoom)
7      Ms. Harneet Kaur (Via Zoom)
8      Reed Smith, LLP
       811 Main Street, Suite 1700
9      Houston, Texas 77002-6110
       Telephone: 713-469-3800
10
       Ms. Danielle Ahlrich
11     401 Congress Avenue, Suite 1800
       Austin, Texas 78701
12       Telephone: n512-623-1777
       E-mail: dahlrich@reedsmith.com
13
       Ms. Ciara A. Sisco
14      Email: csisco@naacpldf.org
       Ms. Liliana Zaragoza (Via Zoom)
15      Email: lzaragoza@naacpldf.org
       NAACP Legal Defense and Educational Fund, Inc.
16      40 Rector Street, 5th Floor
       New York, New York 10006
17      Telephone: 212-965-2200
18     Ms. Shira Wakschlag (Via Zoom)
       The Arc of the United States, Inc.
19      1825 K Street, NW, Suite 1200
       Washington, DC 20006
20      Telephone: 202-534-3708
       E-mail: wakschlag@thearc.org
21
22
23
24
25

Page 4

1   FOR PLAINTIFFS LA UNION DEL PUEBLO ENTERO, SOUTHWEST
      VOTER REGISTRATION EDUCATION PROJECT, MEXICAN AMERICAN
2   BAR ASSOCIATION OF TEXAS, TEXAS HISPANICS ORGANIZED FOR
      POLITICAL EDUCATION, JOLT ACTION, WILLIAM C. VELASQUEZ
3   INSTITUTE, FIEL HOUSTON, INC.:
4      Ms. Nina Perales
       E-mail: nperales@maldef.org
5      Ms. Julia R. Longoria (Via Zoom)
       E-mail: jlongoria@maldef.org
6      Mexican American Legal Defense and Educational Fund
       110 Broadway, Suite 300
7      San Antonio, Texas 78205
       Telephone: 210-224-5476
8
       Ms. Breanna Williams (Via Zoom)
9      Fried, Frank, Harris, Shriver & Jacobson, LLP
       One New York Plaza
10     New York, New York 10004
       Telephone: 212-859-8000
11      E-mail: breanna.williams@friedfrank.com
12     Mr. Patrick Berry (Via Zoom)
       E-mail: patrick.berry@nyu.edu
13     Ms. Jasleen Singh (Via Zoom)
       E-mail: jasleen.singh@nyu.edu
14     Brennan Center for Justice at NYU School of Law
       120 Broadway, Suite 1750
15     New York, New York 10271
       Telephone: 646-292-8389
16
       Mr. Will Wilder (Via Zoom)
17     Brennan Center for Justice at NYU School of Law
       1140 Connecticut Avenue, NW, Suite 1150
18     Washington DC, 20036
       Telephone: 205-540-0362
19      E-mail: wilderw@brennan.law.nyu.edu
20  FOR PLAINTIFFS OCA-GREATER HOUSTON, LEAGUE OF WOMEN
      VOTERS OF TEXAS, REVUP-TEXAS, TEXAS ORGANIZING PROJECT
21  AND WORKERS DEFENSE ACTION FUND:
22     Ms. Lia Sifuentes Davis (Via Zoom)
       Disability Rights Texas
23     2222 West Braker Lane
       Austin, Texas 78758-1024
24     Telephone: 512-454-4816
       E-mail: ldavis@drtx.org
25

Page 5

1   FOR PLAINTIFF LULAC TEXAS:
2      Mr. Graham W. White
       Elias Law Group, LLP
3      10 G Street NE, Suite 600
       Washington, DC 20002
4      Telephone: 202-968-4490
       E-mail: gwhite@elias.law
5
       FOR PLAINTIFF MI FAMILIA VOTA:
6
       Ms. Wendy Olson (Via Zoom)
7      Stoel Rivas, LLP
       101 S. Capitol Boulevard, Suite 1900
8      Boise, Idaho 83702
       Telephone: 208-387-4291
9      E-mail: wendy.olson@stoel.com
10  FOR DEFENDANT HIDALGO COUNTY ELECTIONS ADMINISTRATOR
      YVONNE RAMON:
11
       Ms. Josephine Ramirez (Via Zoom)
12     Ms. Leigh Tognetti (Via Zoom)
       Hidalgo County District Attorney's Office
13      E-mail: josephine.ramirez@da.co.hidalgo.tx.us
14  FOR DALLAS COUNTY:
15     Mr. Jason G. Schuette (Via Zoom)
       Dallas District Attorney's Office
16
       FOR DEFENDANTS GUERRERO & GARZA:
17
       Mr. Anthony "Tony" Nelson (Via Zoom)
18     Assistant Travis County Attorney
       E-mail: tony.nelson@traviscountytx.gov
19
       FOR UNITED STATES OF AMERICA:
20
       Mr. Michael E. Stewart (Via Zoom)
21     Trial Attorney
       Civil Rights Division, Voting Section
22     US Department of Justice
       Telephone: 202-598-7233
23      E-mail: michael.stewart3@usdoj.gov
24
25

Page 50

1  A.  Yes.
2  Q.  Are those sections describing the initiatives
3  that they wanted you to undertake?
4  A.  Correct.
5  MS. CUBRIEL:  Hold on a second.  Somebody
6  is not on mute.
7  REPORTER:  I think they have muted now.
8  Q.  (By Mr. Jeff White)  Yeah, I understand.  The
9  technology, one of the gifts of the pandemic; right?
10  Zoom meetings?
11  A.  Right.
12  Q.  So to reset, we are on the second page of
13  Exhibit 3 where it says Section I.  Do you see that?
14  A.  Uh-huh.
15  Q.  Is it correct that this section lists a number
16  of changes to election procedures that the commissioners
17  were hoping you would consider?
18  A.  Correct.
19  Q.  And we have discussed this previously I believe
20  but did you implement any of the procedures listed here?
21  A.  Again, we did stay open until 10:00 o'clock for
22  two days.
23  Q.  And that would be under the sub-bullet lower
24  case V; correct?
25  A.  Yes.

Page 51

1  Q.  What would you have told the commissioners if
2  they had consulted you before passing this resolution?
3  MS. CUBRIEL:  Objection, form.
4  THE WITNESS:  This was not timely as far
5  as mailing out the mail ballot applications.  It was a
6  waste of time, money, added a level of confusion for the
7  voters and doubled our work load.
8  Q.  (By Mr. Jeff White)  Why was it not timely?
9  A.  This was at the end of August when we had
10  already as of -- I want to say September 15th, we were
11  mailing ballots.  So this came in at the 11th hour.
12  Again, Texas has been very very very
13  strong on mail balloting and Texas implements -- it is
14  called an annual ballot by mail which is, again, so
15  accepted by our voters.  And that means they put in one
16  application at the beginning of the year and that gets
17  them every single election that they are eligible for.
18  And it is a win-win for everyone.  It is a
19  win for the voter.  They don't have to remember to send
20  it in.  They don't have to go find a stamp for each
21  election.  It comes in.  It is a win-win for us because
22  if we have three or five or seven elections in a year,
23  we don't have to pound in that same application each
24  time.  So we enter it once in the year and it rolls over
25  for each one.  So we already had the majority of our

Page 52

1  applications already signed, sealed and delivered, so to
2  speak.
3  Q.  So if you go to page -- I believe it is the
4  third page of Exhibit Number 3, do you see at the bottom
5  where it says approved?
6  A.  Uh-huh.
7  Q.  And can you read that line, please?
8  A.  Approved 14th day of August 2020.
9  Q.  So this resolution passed the commissioners
10  court in August of 2020?
11  A.  Correct.
12  Q.  And I believe you just said that you would be
13  emailing ballots September 2020?
14  A.  15th, uh-huh.
15  Q.  So there is a month between this resolution and
16  the date you are mailing ballots.  Is that not enough
17  time to make changes?
18  A.  Again, I don't -- I don't want to be
19  dismissive.  But if you understand the way the wheels of
20  county government turn, they turn rather slowly.  If
21  this was signed on the 14th, then they would have had to
22  go.  And our vendor, they would have had to notify a
23  vendor, get the database, get a permit number from the
24  post office, put in a check which takes about two weeks
25  to get from the county so that the county could start

Page 53

1  placing these.
2  So again, because it was signed on the
3  14th does not mean it was implemented on the 14th,
4  county government moves quite slowly.
5  Q.  If you were going to make changes to election
6  procedures, in order to do them correctly, how much lead
7  time do you need?
8  A.  Are you asking me as we sit here in the midst
9  of SB-1?  We needed at least a year, at least a year
10  when we are making major changes, at least a year, you
11  know, maybe six months because there are only so many
12  vendors that are certified by the State of Texas to
13  produce election records.
14  So it is like we can't go run down to
15  Kinko's to have, you know, 75,000-100,000 of these
16  applications made.  And again, to go to the post office
17  to get a permit number, and then to get the check cut to
18  put in there and mail them all out, it takes time.  And
19  again, for us, again, just coming off of this SB-1, we
20  would have loved to have had a year.
21  Q.  So would it be fair to say that for a normal
22  election, you would get going on implementing it a year
23  in advance?
24  A.  We run on six months.  The project management
25  system we run is six months.  Can we do an election in

Jacquelyn Callanen

Page 54

1 one month? Yes, but it is really stressful for the
2 staff. You know, when we get a special election called,
3 for instance, I mean it is all hands on deck. And it
4 can be done.
5       But for large elections, I mean, again,
6 you have to think. We have got to get/reach out to the
7 facilities so that we can reserve them. There are just
8 so many pieces to this puzzle that six months is
9 perfect.
10   Q.   So six months is the time for preparation for a
11 normal election; correct?
12   A.   Yes, sir.
13   Q.   And when you are referring to saying you would
14 have preferred a year, was that because the laws were
15 changing?
16   A.   So many of the laws were changing at the same
17 time.
18   Q.   So when laws change, the six months an go up to
19 a year to try to implement them?
20   A.   That is a nice way to put it, yes, sir.
21   Q.   So just kind of wrapping up on the
22 November 2020, what happened to turn out in that
23 election?
24   A.   We had the turn out that we were expecting. I
25 mean we really did -- the mail ballots went up, way up.

Page 55

1 But again, the people voted by mail. They didn't vote
2 in person. But as far as the percentage of the people
3 who voted, it did not change much. The method changed
4 but the number of people didn't change that much.
5   Q.   And would you agree that November 2020 was not
6 a normal election in Bexar County?
7   A.   It was not a normal election, yes, sir.
8   Q.   And a lot of these changes were due to the
9 pandemic; correct?
10   A.   Correct.
11   Q.   And the Election Code didn't change in November
12 of 2020; did it?
13       MS. CUBRIEL:  Objection, form.
14   Q.   (By Mr. Jeff White) Let me strike that. We
15 talked about changes to the early voting period;
16 correct?
17   A.   Yes, sir.
18   Q.   And we talked about extended days for dropping
19 off ballots in person; correct?
20   A.   Yes, sir.
21   Q.   Those changes were not changes made in the
22 Election Code but changes made through governor
23 proclamation; correct?
24   A.   Yes, sir.
25   Q.   And in normal circumstances when you are not in

Page 56

1 a pandemic, who has the authority to specify what the
2 voting procedures are going to be in Texas elections?
3   A.   Well, I mean it obviously comes from the
4 Secretary of State's office when you have an elections
5 administrator. The elections administrator sets the
6 elections.
7   Q.   Let me step back a bit I guess. As an election
8 administrator, is it your duty to operate in accordance
9 with the Texas Election Code?
10   A.   Absolutely.
11   Q.   And who can modify the Election Code?
12   A.   The governor.
13   Q.   When?
14   A.   The legislature.
15       MS. CUBRIEL:  We have been going for about
16 an hour I think. Do you need to take a break?
17       MR. JEFF WHITE:  It would be fine. If you
18 need a break, it would be fine for me.
19       MS. CUBRIEL:  Does anybody else need to
20 take a break?
21       MS. PERALES:  Yeah, I think a break would
22 be good.
23       MR. JEFF WHITE:  Why don't we go off the
24 record?
25       VIDEOGRAPHER:  The time is 10:21 a.m. and

Page 57

1 we are off the record.
2       (Recess taken)
3       VIDEOGRAPHER:  The time is 10:32 a.m. and
4 we are back on the record.
5   Q.   (By Mr. Jeff White) Ms. Callanen or Jackie, I
6 am going to shift a little bit now and get to the meat
7 of this case. Senate Bill-1. And I just wanted to ask.
8 You reviewed Senate Bill-1 to prepare for today;
9 correct?
10   A.   Correct.
11   Q.   And what is your impression of the bill or your
12 thoughts in your own words?
13       MS. CUBRIEL:  Object to form.
14   Q.   (By Mr. Jeff White) What do you think about
15 Senate Bill-1?
16       MS. CUBRIEL:  Object to form. You can
17 answer.
18       THE WITNESS:  I am trying to figure out
19 how to answer. There is a lot in my opinion. In my
20 opinion, there is a lot of unnecessary items in here.
21 There is a lot of good things in here and there is a lot
22 of not so good things here.
23   Q.   (By Mr. Jeff White) I am kind of writing those
24 down. What would you say are unnecessary in Senate
25 Bill-1?

Page 58

1   A.   Again, I guess if we go back, Jeff, to before
2   we took a break and things, the big one that we talked
3   about for the length of time to implement things, it was
4   onerous and an undue stress point for us and many of the
5   counties to have to get all of the videotaping, to turn
6   on the video cameras.  The expense is outrageous.  There
7   were a lot of unfunded mandates in this that we had to
8   really scramble to implement.  And I guess what I am
9   saying is just in the natural progression in the natural
10  preparation for each election to put this many changes
11  in this short of time was -- I will just say it -- a
12  disaster waiting to happen.
13  Q.   So would it be fair to say if there was more
14  lead time to implement the changes, you would have been
15  more comfortable with them?
16  A.   Yes.
17  Q.   You said there were three types of the bill,
18  unnecessary, good and not so good.  I think we talked
19  about unnecessary.  What would you say are the not so
20  good provisions?
21  A.   Again, probably if not the biggest not so good
22  was in the implementation time line.  You know, when it
23  takes effect in December, I think December 2nd, it was
24  to take effect.  And we weren't getting any directives
25  or information or new forms or new envelopes or anything

Page 59

1   from the Secretary of State to come in.  Our voters, you
2   know, it is -- it has been -- it has been unbelievably
3   trying to answer all of the media because everybody is
4   just spinning about how many applications we rejected.
5   I mean that's the hot topic, how many we rejected, how
6   many we rejected.
7        Well, again, again, the forms were
8   changed.  The law was changed.  The forms didn't come
9   down until January.  January 14th was the first time
10  that we had the ability to look at the new application
11  for ballot by mail.
12       So again, you will hear me say these are
13  my voters, my Bexar County -- they are our voters.  And
14  for years and years and years, we have those wonderful
15  people who -- 25,000, 40,000, they know how to vote by
16  mail.  They have done it.  They keep their applications
17  for ballots by mail.
18       I mean it is like okay, I know I am going
19  to need one in January so they will put one with their
20  important papers.  That is what they tell us.  So come
21  January 1, they fill out that application and they put
22  it in the mail.  They love that.  Now they don't have to
23  worry for the entire year.
24       All of a sudden, these regular voters of
25  ours did that.  They woke up after New Year's and said

Page 60

1   okay, I am going to do this.  It was the wrong
2   application.  It wasn't their fault.  But all of a
3   sudden, we had our normal applications coming in.
4   Again, a county the size of ours, it is thousands of
5   that come in.  We had to reject these.  With had to
6   send them a new application once we received them.
7        Like I said, they were approved in
8   January.  So again, by the time we got them from our
9   printer, had to set it up, start sending it back out,
10  did huge media blitzes, tried to get the word out, it
11  was monumental.
12       And piece that I personally -- I guess
13  that is what this is about -- that I personally abhor,
14  and that is a strong word, is that in SB-1, it is
15  written that I or my staff, anyone, you know, can only
16  send an application, not a ballot, an application to the
17  person that requests it.  That has been the most onerous
18  part of this entire -- entire SB-1 in my opinion.
19       If you would have to sit on the end of a
20  phone call from one of our long-standing mail ballot
21  applicants, and this mother calls me and says hey, blah,
22  blah, blah, can I have -- it is time for us.  Would you
23  please mail myself and my son an application for a
24  ballot by mail?  I have to say I will sure send yours
25  but I need to talk to your son.  Can I please talk to

Page 61

1   him on the phone?  Just put him on the phone so he can
2   ask me for one.
3        He is disabled and he can't speak.  I
4   can't send him an application.  So what I said to her
5   was well, if you have a computer, go online and download
6   it.  I can't send him one.
7        So then I go out and I tell people well,
8   just go online and get this application.  And then I am
9   accused of being insensitive because not everyone has a
10  computer.  And I know that, I have walked right into
11  that and that's not fair.
12       We have a phone system, an IVR system and
13  I know people hate those phone trees, press one, press
14  two, press three.  And it has been so successful for us.
15  Our voters 24 hours a day in this mailbox, if you want a
16  mail ballot application, leave your name and address,
17  phone number and we will mail one out to you.
18       Well, the husband, one or the other says
19  okay, please send me two applications.  We can send one.
20  We can send one.  If we have the phone number, we call
21  them and say can we please speak to whoever the other
22  one is.
23       Well, again, just stop, Jeff, and think,
24  we didn't have the staff ramped up to do that.  I didn't
25  have 20 temps hired and trained and everything else to

Jacquelyn Callanen

April 04, 2022
Pages 62 to 65

Page 62

1 do his. I had no idea of the impact that one part of
2 SB-1 was going to have on us.
3          I'm sorry. I will let it go at that.
4          REPORTER: Trey, there is a note in the
5 chat that their audio is fine but the sound is low.
6          THE WITNESS: Could you turn that down?
7          VIDEOGRAPHER: The only way I can fix it,
8 we have to go off the record and I have to get the phone
9 set up.
10          REPORTER: I am just letting you know what
11 is there.
12          MS. CUBRIEL: Do you want to go off the
13 record to --
14          MR. JEFF WHITE: Yeah, let's go off the
15 record.
16          VIDEOGRAPHER: The time is 10:41 a.m. We
17 are off the record.
18          (Recess taken)
19          VIDEOGRAPHER: The time is 10:43 a.m. and
20 we are back on the record.
21     Q.   (By Mr. Jeff White) Just to get reset, I
22 believe you were telling me about the problems that you
23 have had with voters calling in to request applications
24 for ballot by mail; correct?
25     A.   Yes, sir.

Page 63

1     Q.   And you said that there have been a lot of
2 problems in this last March 22 primary with that
3 provision; correct?
4     A.   Correct.
5     Q.   Are you doing things now to make sure that goes
6 better in May and in later elections?
7     A.   Yes.
8     Q.   And what are you doing?
9     A.   We are -- we have developed our own insert that
10 we are going to put with the application when we send it
11 to the voter and also with the mail ballots so that we
12 can get those two numbers. We want them to give us both
13 numbers, not just one. Done, again, a lot of media,
14 media blitzes, worked with radio stations, TV stations.
15 Everybody has the application. Everyone, every time we
16 have a chance to speak, we say we can only send one.
17          It's counterintuitive. It really is
18 because we have quote/unquote the official mail ballot
19 application which is large enough. It is readily
20 available. You know, we have tens of thousands of them
21 in our office. But SB-1 did not put any of those
22 requirements on consultants or parties. They only put
23 it on people whose business it is to get the voter their
24 ballot and to protect it. And for that, it just doesn't
25 make sense.

Page 64

1     Q.   Do you know why they implemented that provision
2 as applicable to election administrators?
3          MS. CUBRIEL: Objection, form.
4          THE WITNESS: Absolutely I do not.
5     Q.   (By Mr. Jeff White) Do you think it might be
6 tied to what happened in Harris County in 2020?
7          MS. CUBRIEL: Objection, form.
8          THE WITNESS: I do not.
9     Q.   (By Mr. Jeff White) If a voter comes in to your
10 office, are they allowed to pick up applications for
11 ballots by mail?
12     A.   One.
13     Q.   If somebody is in the car with them, would they
14 be able to pick up for that other person?
15     A.   (Shakes head from side to side.)
16          MS. CUBRIEL: You need to say it out loud.
17          THE WITNESS: I'm sorry. No, we have to
18 see the person and they have to request it.
19     Q.   (By Mr. Jeff White) But if they do have access
20 to a computer, they can download them and you don't have
21 any limits there on number of downloads; do you?
22     A.   Correct.
23     Q.   Okay. You have also said that there were some
24 good provisions in SB-1; right?
25     A.   Yes.

Page 65

1     Q.   And what are those provisions?
2     A.   Again, for the protection of the voters, I
3 personally really appreciate the portion of SB-1 that
4 speaks to campaigns driving voters to the polls, and
5 where we have to get the name and address and everyone
6 of the driver and the relationship of the driver if they
7 bring, you know, the six or seven people.
8          It has historically been the role of the
9 campaigns where they will rent a van and like go to a
10 senior center and fill up the van. And then they ask
11 for curbside where the driver of the van stays in there
12 and the election official then assists all of those
13 voters so that they can cast their ballot. But at that
14 point, it is not private. It is not private.
15          So I really appreciate that. I think that
16 was one of the strongest pieces that was in here.
17     Q.   And how does SB-1 improve the privacy of that
18 form of voting?
19     A.   Well, then at least we have the name of the
20 person who drove all of those people to the polls. And
21 again, I don't know what they are going to do with them.
22 It is legal to do that. But maybe just the idea that
23 they now have to fill out an official form and take an
24 oath may give those voters a little bit more privacy. I
25 don't know.

Page 70

1    Q.   Cary Roberts?
2    A.   Carry Roberts.
3    Q.   And I believe you said you reach out to a
4  representative named Jose.  Can you give me his full
5  name?
6    A.   Senator Jose Menendez.  He is very actively
7  involved in elections for us.
8    Q.   And I believe you said one other name.
9  Barbara -- I didn't catch the last name.
10    A.   Representative Barbara Gervin-Hawkins.  I want
11  to say she is 125 I think.
12    Q.   And so in the last legislative session and
13  special session, if you were talking to a representative
14  or senator, it would have been those two people?
15    A.   Correct.
16    Q.   Through your lobbying?
17    A.   Yes, sir.
18    Q.   Was that usually by phone or by email?
19    A.   With Senator Menendez, it is mainly in person.
20  But again, phone, email.  And with Barbara
21  Gervin-Hawkins, it was Zoom or by phone or emails, you
22  know.
23    Q.   Did you testify at any hearings?
24    A.   I did not.  I did not go up at this time.  Our
25  spokesman was Chris Davis and he is the EA for

Page 71

1  Williamson County.  So he was the closest so he got
2  nominated.  He could get there a lot faster than a bunch
3  of us.
4    Q.   So the testimony he gave at the hearings would
5  have been on behalf of the Texas Association of Election
6  Administrators?
7    A.   Yes, sir.
8    Q.   So he wasn't testifying just as Williamson
9  County; correct?
10    A.   Correct.  He may have at other times.  But
11  yeah, normally, he was -- he carried our voice.
12    Q.   And can you just kind of give me an overview of
13  what this association does on an on-going basis, the
14  Texas Association of Election Administrators?
15    A.   We are a group, again, Jeff, I don't want to
16  belabor the point.  But you know, Texas has 254
17  counties.  And in Texas, elections can be run by three
18  different models where the county clerk does the
19  election side of the house, the tax assessor does the
20  voter registration side of the house.  And depending on
21  the county, either one of those can handle elections.
22        Then the third model is the elections
23  administrator.  We are non-partisan appointed officials
24  and we have both hats under one office which makes it
25  much more efficient.  And Texas has been, again, going

Page 72

1  towards the EA model more and more.  And I think at last
2  count, we had like 112 counties now had EAs, 110, 112
3  where it is under one office.
4    Q.   Who appointed you for Bexar County?
5    A.   I with appointed by what is known as the
6  Election Commission.  That is for everyone in the State
7  of Texas.  It is a five member board.  It is the county
8  judge, it is the country clerk and the tax assessor, the
9  two people who would have to give up elections or voter
10  registration, and the chair of the Democratic and
11  Republican party.  Those five members.  And it is three
12  to hire and four to fire.
13    Q.   What is the term for that appointment?
14    A.   Until they fire you or you retire or resign.
15  Basically, it is when, you know, we are all one bad
16  election away from not being there anymore in reality.
17    Q.   So of what you know of SB-1, what do you think
18  the purpose of the bill was when the legislature passed
19  it?
20        MS. CUBRIEL:  Objection, form.
21        THE WITNESS:  I know it spoke to the
22  integrity and voter fraud.  I think that was the basis
23  of it.  You know, I think, you know, it has all of the
24  pieces from voter registration through the by-mail
25  process.

Page 73

1        Again, early voting, election day, the
2  poll watchers, the video cameras, the video.  In the
3  name of integrity, I think -- and I say I think -- I
4  think SB-1 casts all of us that hold elections in a very
5  bad way because it was like, look, we are coming in to
6  protect everybody because this is what these terrible
7  people do.
8    Q.   (By Mr. Jeff White) Do you think some of that
9  was driven from what happened in Harris County in 2020?
10        MS. CUBRIEL:  Objection, form.
11        THE WITNESS:  I think so.
12    Q.   (By Mr. Jeff White) And you mentioned that you
13  thought SB-1 may have been based on election integrity;
14  correct?
15    A.   That is exactly what it says, yes, sir.
16    Q.   And the prevention of fraud?
17    A.   Yes, sir.
18    Q.   What about uniformity in elections?
19    A.   Again, I can't -- I can't speak to that because
20  in all of my years, we all have our procedures and our
21  codes and everything set by the Secretary of State.  I
22  mean as I said, we all go to, you know, an election law
23  seminar once a year and everybody has the same programs,
24  the same guides, the same procedures.  So that
25  doesn't -- that doesn't work.

Jacquelyn Callanen

April 04, 2022
Pages 74 to 77

---

Page 74

1    Q.    So on the issue of preventing fraud, do you
2  believe election fraud has occurred in Texas in past
3  elections?
4          MS. CUBRIEL:  Objection, form.
5          THE WITNESS:  Anecdotally, yes.
6    Q.    (By Mr. Jeff White) What types of election
7  fraud have you heard about?
8    A.    Again, mail ballot.  I mean that seems to be
9  the catch all.
10    Q.    And how would this fraud occur with the use of
11  mail ballots?
12    A.    This is where I am going to go down another
13  path.  Again, historically, our voters fill out that
14  mail ballot application and they sign it.  And we -- and
15  that signature on the application must match the
16  signature on the return ballot.  And the early ballot
17  board determines that.
18          Now just like today, technology is our
19  friend.  So in the larger counties, when we get the
20  application in, we scan it.  We scan it right then and
21  there and we clip the signature.  Then when the mail
22  ballot comes back in, we scan both sides of the mail
23  ballot and we clip that signature.
24          And then we have a program that when it is
25  time to accept, when the early ballot board is doing

Page 75

1  their job, the program puts the application signature in
2  the mail ballot envelope signature one on top of the
3  other.  And they decide sitting at a computer, Democrat
4  in one chair, Republican in another chair, and they
5  decide if that signature is substantially the same.
6          And as we have all moved forward with
7  this, numerous counties do it numerous ways.  I mean
8  whether you are looking and matching, the Election Code
9  still speaks to a ballot -- a jacket envelope where you
10  keep both signatures, the physical signature.  And the
11  person will sit at the table and just do this, you know,
12  to match the signatures to say okay, they look --
13          But the system we have now makes a huge
14  responsibility because the people who are accepting
15  those signatures and accepting the mail ballots now sign
16  in so we actually know who accepted it.  Which again,
17  great paper trail, great paper trail.
18          But the Election Code has grown over the
19  years to say well, maybe the signatures don't quite look
20  alike.  But you can now go back and look at the last six
21  signatures.  You can go back and look at the last six
22  signatures to see.  And you can usually tell if there is
23  a letter or somebody signs, you know, the capital or
24  whatever.
25          But it is a recognition that our senior

Page 76

1  citizens, much like myself with arthritis, my signature
2  may not look the same in the morning as it looks in the
3  afternoon or it looks in the evening.  So it gives the
4  benefit of the doubt.  It allows them to get more
5  information and to check the signatures.
6          Well, now SB-1 says let's use numbers
7  instead of signatures.  So they are asking for Texas
8  driver's license or their election ID card or the last
9  four of their SSN.  And where the breakdown came this
10  time for SB-1 -- and you have heard me say we didn't
11  have enough time to implement it.
12          When you look in our database, our
13  database, who can get ballots by mail?  Anyone over 65.
14  Well, anyone over 65, a lot of times, myself included,
15  registered 40 years ago.  When you register 40 years
16  ago, nobody asked you for your Texas driver's license
17  number.  Nobody asked you for the last four of your SSN.
18          So now SB-1 comes.  And once we get them
19  the right application because they have sent in the
20  wrong one, then they have to put in driver's license or
21  SSN.  We get it back, we have nothing to match it
22  against.  It is not there.  They never gave it to us.
23  So now we have to reach out to them again and send them
24  a voter registration card because SB-1 doesn't allow us
25  to update those rules based on the ABBM.

Page 77

1    Q.    So I just --
2    A.    Are you with me?  Do you see -- do you see
3  where we are and why we are saying we needed such time
4  to do this?
5    Q.    And I think we will get to this.  I think we
6  may have gone down one of these rabbit holes so I kind
7  of want to step back a little bit.
8    A.    Okay.  I'm sorry.
9    Q.    No, no need to apologize.  We were talking
10  about history and some of the issues that SB-1 may have
11  been trying to address.  And we were talking about
12  frauds in mail-in balloting.  And I think they is where
13  we got down the trail of signature match and now
14  numerical match.
15          But what is the way that a mail-in ballot
16  could be used to fraudulently vote?
17    A.    Again, the system was set up to only match the
18  signature of the application to the signature of the
19  ballot.  And at that time, it would have been possible
20  for people to send in an application for a person who
21  they know does not vote regularly, has never voted and
22  they can sign the application, get the ballot, sign the
23  ballot and no one would be the wiser.
24    Q.    What information other than the signature goes
25  on to the registration application when you submit it?

---

Jacquelyn Callanen

April 04, 2022
Pages 78 to 81

Page 78

1     A.   Now it is those two numbers.  Now we need
2  either the Texas driver's license number, election ID,
3  personal ID or the last four.
4     Q.   Let me be more specific.  Prior to SB-1 when
5  somebody wanted to register to vote, how do they do
6  that?
7     A.   To register to vote.  Okay.  Again,
8  registration, different animal.  That's -- NVRA has set
9  that up.  We have a registration card that they must
10  fill out, postage paid free we do it.  Texas also allows
11  DVRs, deputy voter registrars.  They come in for
12  training.  We train them for about an hour.  They take a
13  test and then they are permitted to register people to
14  vote.  They will be campaigns that will do that.  League
15  of Women Voters is really good.  High school principals
16  are to register the students.  Registration cards are
17  out at the social services.  They are out at the
18  libraries.  They are readily available.
19          People can register to vote.  And the day
20  we goat the card, time stamped in, you are registered 30
21  days after that.
22     Q.   And is information on who is registered to vote
23  available to the public?
24     A.   Yes.
25     Q.   Now, if you -- prior to SB-1, if you are

Page 79

1  applying for ballot by mail, what information goes on
2  that application prior to SB-1?
3     A.   Name, address.  There is a space to mail my
4  ballot to if you are not at home or in a nursing home or
5  going to be out of the county on that election day, that
6  you must check a reason.  We have four reasons in Texas,
7  over 65, disabled, out of the county on election day.
8  And then, again, I am just being silly.  But my favorite
9  one is confined in jail.  And we see a whole lot of that
10  when the sheriff is on the ballot.  But normally, not so
11  much.  And those are the four reasons.
12          So they have to check a reason.  And
13  obviously, if they check over 65, when we go to put
14  their application in, the computer is going to tell us
15  their age.  And so mail my ballot to and they have to
16  sign it.  And for this March election, Jeff, I mean they
17  had to pick a party.  So if they want a party, they had
18  to mark that.  If they did not mark a party, then we set
19  it aside and we put it in for the May election because a
20  lot of people don't vote in primaries as we all know.
21     Q.   So prior to SB-1, for a registered voter to
22  submit an application for ballot by mail, they needed a
23  name, address, check a reason and then sign the
24  application; correct?
25     A.   Yes.

Page 80

1     Q.   And the names of registered voters were
2  publicly available?
3     A.   Yes.
4     Q.   Were the addresses of registered voters
5  publicly available?
6     A.   Yes.
7     Q.   So is it correct that in theory, somebody could
8  look at the publicly available information and identify
9  name, address and then all they would have left to do is
10  check a box and sign prior to SB-1?
11     A.   Yes.
12     Q.   Is information on registered voters who vote in
13  certain elections publicly available?
14     A.   Yes.
15     Q.   So from that publicly available information,
16  somebody could figure out whose registered but who
17  hasn't voted in a long time?
18     A.   Yes.
19     Q.   Is publicly -- strike that.  Does publicly
20  available information let you know if a registered voter
21  has previously requested to vote by mail?
22     A.   Yes, consultants can keep that database, our
23  information will tell you per voter.  So the people that
24  request our information will give us an election.  They
25  will say, you know, they would like to see all of the

Page 81

1  people who voted by mail in the Democratic or Republican
2  party for March 18, March 20th.  And they get those
3  names.
4          Then, again, I am sure that all of the
5  consultants have large computer programs where they can
6  keep track of this election after election.
7     Q.   Who are these consultants?  Strike that.  I am
8  not asking you to name every consultant.  But do you
9  know who employs these consultants that request this
10  voter information?
11     A.   Sure.  Candidates or -- what do we call them --
12  packs, you know, like bond, if they are running a bond,
13  they go to -- like right now, the attorneys are the ones
14  that are in charge of the bonds.  And so they go to them
15  and get that information.
16     Q.   Okay.  So now SB-1 is in effect.  And when a
17  voter wants to request an application to vote my mail,
18  what new information do they have to provide?
19     A.   Again, now they must provide either their Texas
20  driver's license, their personal ID, their election ID
21  or the last four of their social.
22     Q.   Is there a third option if somebody doesn't
23  have either of those two numbers?
24     A.   There is -- they can check that they do not
25  have one.  But then that takes another set of documents

Jacquelyn Callanen

April 04, 2022
Pages 98 to 101

Page 98

1    Q.   If they want to change that Election Code to
2 prevent fraud, do you think they have to actually have
3 proof of actual fraud before they do that or is trying
4 to prevent it okay?
5         MS. CUBRIEL:  Objection, form.
6         THE WITNESS:  I don't know how to answer
7 that.
8    Q.   (By Mr. Jeff White) But you would you agree the
9 legislature, it is their purview to modify the Election
10 Code?
11   A.   Correct.
12   Q.   I believe you said that in the climate we are
13 in now, you are getting a lot of reports of suspected
14 fraud; is that correct?
15   A.   Correct.
16   Q.   And if people think fraud is occurring, does
17 that affect their competence in the elections
18 themselves?
19        MS. CUBRIEL:  Objection, form.
20        THE WITNESS:  That is what it feels like.
21   Q.   (By Mr. Jeff White) So if people think fraud is
22 occurring and have lower confidence in the elections, do
23 you think putting in additional procedures to try to
24 prevent fraud, conserve to improve the competence of the
25 voters?

Page 99

1         MS. CUBRIEL:  Objection, form.
2         THE WITNESS:  If it is done in a timely
3 manner.
4    Q.   (By Mr. Jeff White) And following up on that --
5 strike that.  You don't think SB-1 making changes to a
6 large 2022 primary was enough time for you to implement;
7 is that correct?
8    A.   Correct.
9    Q.   If SB-1 had allotted Bexar County more time to
10 implement it before it went into effect for an election,
11 could it have been done better?
12   A.   Yes.
13   Q.   And do you think that because you didn't have a
14 lot of time, that there were issues?
15   A.   Yes.
16   Q.   And the issues created by that lag of time did
17 not create confidence; is that correct?
18   A.   Correct.
19        MS. CUBRIEL:  When you get to a good
20 stopping point, I think it would be a good time for
21 another break.
22   Q.   (By Mr. Jeff White) Okay.  But if you had more
23 time to implement SB-1, do you think it could have been
24 more effective at improving voter confidence?
25        MS. CUBRIEL:  Objection, form.

Page 100

1         THE WITNESS:  Yes.
2         MR. JEFF WHITE:  We can take a quick break
3 now.
4         VIDEOGRAPHER:  The time is 11:42 a.m.  We
5 are off the record.
6         (Recess taken)
7         VIDEOGRAPHER:  The time is 12:00 p.m. and
8 we are back on the record.
9    Q.   (By Mr. Jeff White) Ms. Callanen, Jackie, I
10 just wanted to quickly talk about -- we had previously
11 talked about some of the improvements in SB-1.  And
12 there was one topic I wanted to ask you about that I
13 don't think came up.  Didn't SB-1 extend early voting
14 hours?
15   A.   Excuse me.  Yes, it did.  It is up until I
16 think 10:00 o'clock but here in Bexar County.  I mean
17 like I didn't -- I don't want to say I dismissed that
18 part but we have always been ahead of the curve.  We
19 have always had our 10 hour days and our 12 hour days so
20 I sort of skipped that part of it.
21   Q.   Are you aware that it also extended mandatory
22 hours for early voting to smaller counties?
23   A.   Yes.
24   Q.   And do you view that as an improvement in SB-1?
25   A.   I would say so.

Page 101

1    Q.   And are you aware of the provision in SB-1 --
2 strike that.  Prior to SB-1, are you aware that the
3 Election Code protected workers who needed time off from
4 work on election day?
5    A.   Yes, sir.
6    Q.   And are you aware of SB-1 changing that
7 provision?
8    A.   I think it -- yes, yes, because I think it
9 extended it now to early voting.  They could have the
10 time off during early voting.  Prior to that, I think it
11 was just election day.
12   Q.   Would you view that as something that made it
13 easier to vote?
14   A.   Yes and no.  I mean I am split on that because
15 I believe with our 10 hours a day and with our weekend
16 availability, that there would be enough time for
17 someone to go.
18   Q.   So what you are saying is that the early voting
19 hours that you offer in Bexar County make it pretty easy
20 for someone to vote if they want to during the early
21 period?
22   A.   Yes, sir.
23   Q.   So we briefly touched on this issue of how you
24 got ready, maybe not briefly, how you have been
25 implementing the changes in SB-1.  And I just kind of

Jacquelyn Callanen

Page 102

1 wanted to step back and kind of talk a little bit more
2 about the training that you had to do to implement it.
3 So we may have talked about this before.  But what
4 training did you receive from the Secretary of State's
5 office?
6     A.   I think we had webinars available to us and
7 some advisories that would come down.
8     Q.   And did they -- strike that.  Did the Secretary
9 of State's office cover all of the changes in SB-1 that
10 were relevant to you as Bexar County administrator?
11    A.   I would say yes, but again, with reservations.
12    Q.   What are the reservations?
13    A.   There were so many thing ins SB-1.  There were
14 so many pieces and parts to it that I am sure we haven't
15 discovered everything yet.
16    Q.   So on your own end for the county, I think you
17 said that you had to do your own training; correct?
18    A.   Correct.
19    Q.   And who did you have to train?
20    A.   Well, we have internal staff we have to train
21 and then our 1200 workers that we have to train so it is
22 an on-going thing.  The temps that come in have to have
23 training so it is quite, quite a lot.
24    Q.   And what changes in SB-1 were the hardest to
25 train them to implement?

Page 103

1     A.   The by-mail process definitely.
2     Q.   And why is that?
3     A.   Again, as we have talked about, with the number
4 of rejections that we had and the number of steps we had
5 to take so that we could handle our by-mail voters and
6 the actions in the time that we normally handled them.
7 So it put a push to it.
8     Q.   And in addition to training, did you have to
9 implement new processes and procedures?
10    A.   Absolutely.
11    Q.   So what kind of processes and procedures do you
12 maintain as election administrator?
13    A.   I would say pick one.  The one we had to -- and
14 I think I alluded to it earlier -- was that with the --
15 the necessity to have parts of our office under 24 hour
16 video surveillance, that was quite a last minute, I mean
17 again, emergency kind of thing.  As I said before, the
18 wheels of county government go very slowly.
19         And we were still living with it because
20 not only did the video 24 hours a day, seven days a week
21 streaming -- and I can't believe I am saying this -- but
22 the only way we did it was to have it up on YouTube.
23 And unbeknownst to myself, as we were getting into the
24 planning stages and with my technical support people,
25 YouTube only allows you to stream for 12 hours and then

Page 104

1 you have to stop and then you have to restart.  Well,
2 that sounds fine.  But now, all of a sudden, I have a
3 staff member and we have to get a special computer that
4 we had to hurry up and buy so that they could go online
5 and stop and start it.  And so it just was an added
6 burden to these people whether, you know, it is like oh,
7 my God, I forgot, setting alarms, handing off the
8 computer so see who could do it because one person
9 wasn't going to step up til midnight each night.
10 However, it was just a complication.
11    Q.   And when you implemented these processes, are
12 they documented in written form?
13    A.   The instructions on the YouTube is yes.
14    Q.   What about for other changes in SB-1, do you
15 have procedure documents that kind of --
16    A.   Incomplete ones, incomplete ones.  We had
17 fantastic -- really proud of the documentations.  But
18 because of all of the changes and as we have learned
19 through time, that when you set a process up, you have
20 to live a process before you can document a process
21 because what looks good on paper may not work in
22 reality.  And so we are still at that point right now
23 because we just came off of the March election.
24    Q.   So are these procedural documents that are
25 maintained at your office on the computer?

Page 105

1     A.   Yes, sir.
2     Q.   And you are those based on what happened in
3 March 2022?
4     A.   We are now, yes, sir.
5     Q.   And so in addition to SB-1, at the same time,
6 we just had restricting in Texas.  How does that impact
7 your ability to implement in changes in SB-1?
8     A.   The restricting came down so late we all know.
9 And I think just, you know, as we have been sitting here
10 just all of us talking about what had happened and the
11 pandemic and how it changed our lives and, you know, it
12 was easy to sit at home and say and hear on the news
13 that there were supply chain problems.  There were
14 supply chain problems.  It hit us really hard.
15         The redistricting came along and it was
16 months later than normal.  As you heard me say before,
17 we always sent our cards out November 15th to
18 December 15th every odd year.  And this year, we were
19 all still in the throws of redistricting when it was
20 time to mail out our cards.  So now we have the perfect
21 storm because we are changing districts, we are changing
22 voter registration cards.  We need to get our voter
23 registration cards in the hands of our voters who are
24 going to vote in the primary.  And we all ran up against
25 a wall that there was absolutely no blue paper to

Jacquelyn Callanen

Page 106

1 vote -- to print our voter registration cards, our
2 1,194,000 voter registration cards.
3          And it makes you crazy when you have it
4 ready and you call and we don't have the paper yet, we
5 don't have the paper yet, we don't have the paper yet.
6 And now we are into January, January 15th, we don't have
7 the paper yet.
8          And then one day, you get this call and
9 you have this bright spot that your vendor says, we know
10 the paper is in a warehouse in New Jersey.  Our blue
11 paper was printed in Slovakia.  So it is on
12 a boat from Slovakia and it is now in a warehouse in New
13 Jersey.  And so now we are waiting for our paper to get
14 to San Antonio.  That is where our vendor is.  And we
15 wait and we wait and we wait.
16          So our voter registration cards were
17 mailed out the first week of February, which as you can
18 imagine, was the perfect storm.  Because now we are in
19 the throws of SB-1 with rejecting applications.  People
20 were getting their new cards.  They are calling to tell
21 us like we had the discussion before, that I got this
22 card, these people don't live here.  So just for a
23 management situation, it was the perfect storm.
24          But the voters had their cards in time to
25 vote in the registration, you know, the primary with

Page 107

1 their registration cards.  We are still working through
2 the return voter registration cards and sending out the
3 confirmation cards, getting all of that done.
4          And again, when redistricting occurs, Nina
5 and I can smile because we have been down this road -- I
6 think this will be our third one which was very nice.
7 But a lot of the voters have no idea that their district
8 has been moved.  And so they go to the polls in the
9 primary and then they are fighting with our election
10 judges because they know that they vote in this district
11 and why are they giving them this ballot and they are
12 given them the wrong ballot.  It just sort of snowballs.
13    Q.   So did the restricting effort, did that --
14 strike that.  Was your ability to send out these
15 registration cards to voters in February, did that
16 impact the time available for those voters to request
17 mail-in ballots?
18    A.   No, it was on a different track.  It was on a
19 collision course but it did not affect them.
20    Q.   Why did it not affect that?
21    A.   Like again, they are separate processes.  The
22 difference -- and when I said it was a perfect storm is
23 when some of our voters received their ballot at home,
24 after we had got through the process, then they were
25 calling because they were unfamiliar with the people

Page 108

1 that were on their ballot.  They had always been in this
2 district and why did we sent them a ballot with this
3 name on it, that we were wrong.  So we had to finesse
4 that and explain to them that yes, the census was --
5 because of the pandemic, the census wasn't done in a
6 timely fashion, restricting wasn't done in a timely
7 fashion, and so on and so forth.
8    Q.   So I think I understand.  So when they request
9 a mail-in ballot, it doesn't matter what is on the
10 ballot at that time; is that correct?  Strike that.
11          Is it correct to say that a voter can
12 request to receive a mail-in ballot before the
13 redistricting process is complete?
14    A.   Yes, sure, depending on whenever.  I mean in
15 2010 I think it was, it took years for us to get through
16 the legal parameters.
17    Q.   But when they ask for they mail-in ballot, they
18 are not specifying what ballot that they want to return;
19 is that correct?
20    A.   Correct.
21    Q.   So if the restricting boundaries changed after
22 they send in the request, when it is time to send them
23 the ballot, you send them the correct ballot?
24    A.   We send them the correct one, yes, sir.
25    Q.   So is that how these were on separate tracks

Page 109

1 and they weren't affected by this delay of blue paper?
2    A.   Correct.
3    Q.   Do you know if some voters rely on receiving
4 the registration card before they ask for a mail-in
5 ballot?
6    A.   Absolutely.
7    Q.   So for those voters, would getting that late
8 have made them apply for the mail-in ballot late?
9    A.   No.  Well, because when they called and said
10 where is my registration card, you know, then we had to
11 explain to them this and this and this.  So no, they
12 knew the had to get their applications in.
13    Q.   What was the deadline for requesting a mail-in
14 ballot for the March primary?
15    A.   February 18th.
16    Q.   So if they were waiting for that card to do it,
17 they would have missed out; correct?
18    A.   Correct.
19    Q.   So these individuals who didn't get the card,
20 you said some of them called in to ask you why?
21    A.   Yes.
22    Q.   So would those individuals have applied for the
23 mail-in ballot later than usual?
24    A.   No.  Again, I don't -- I don't -- when they
25 called, we were speaking to them and telling them to get

Jacquelyn Callanen

1 come back in and vote.  It is what we do.
2    Q.  So you are planning to update your processes
3 based on lessons learned from March; correct?
4    A.  That's right, and that is my phrase, lessons
5 learned.
6    Q.  Are you planning to do more voter outreach?
7    A.  Yes, sir.
8    Q.  Did you see a lot of issues caused by voters
9 not being familiar with the new requirements?
10    A.  Yes, sir.
11    Q.  So is the hope that this new outreach will get
12 over some of these issues?
13    A.  Well, yes, sir.  And I mean, again, we -- for
14 the March election, the primary that we just came
15 through, we had 23,339 applications come into our
16 office, 23,339.  When it was all said and done, we
17 counted 14,180 ballots.
18        Now, that looks like there is a big chunk
19 that did not come in.  But we always have a drop off
20 from the people who decide to vote in person.  We have a
21 drop off for the people that look at the ballot and say
22 oh, there is nobody on here I want to vote for and they
23 never sent it back in.  But we did have a larger than
24 normal drop off on this one.
25        But for us and as we talk in the office,

1 it is sort of like a win-win because we now have 14,180
2 people that know how to do it and they are going to be
3 our ambassadors as we go forward.
4        So you know, it is -- again, it is sort of
5 like baby steps.  Like I told you, it is the lessons
6 learned.  So we will move forward from that.  So we know
7 at this next election, we have almost 15,000 people now
8 that will get their mail ballot, do what they have to do
9 and get it back without a problem.  And it is going to
10 be up to us for all of the people that we notified on
11 the rejections, whether we did it by phone or email or
12 sent them letters, those 23,000 people have some inkling
13 of what is going on.
14    Q.  So if you were assessing whether the changes in
15 SB-1 make it more difficult, apart from these education
16 and training issues, would you agree it would be a more
17 fair assessment if you did it two years down the road
18 after you had had time to go through it?
19    A.  Absolutely.
20    Q.  So now I want to go into some of the changes in
21 SB-1.  And since we have I think talked about it the
22 most, I think I will start with the changes to the
23 application for ballot by mail.
24    A.  Okay.
25    Q.  And then when the voters submit the ballot.  So

1 the changes the carrier envelope, are you familiar with
2 that?
3    A.  Yes, sir.
4    Q.  So just to recap, what is the new requirement
5 in SB-1 for mail ballot applications?
6    A.  They have the addition on the application for
7 the voter to write down either their TDL, Texas driver's
8 license.  It can be their personal ID.  It can be their
9 election ID.  But basically, it is the number have
10 received from any document they have received from DPS.
11 Then if they don't have one of those, they may give us
12 the last four of their social.  And barring neither of
13 those, they can check the box that says I have neither
14 of these.
15    Q.  And then when those applications come in, are
16 you required to verify those numbers?
17    A.  Absolutely, against what is on their voter
18 registration record.
19    Q.  And where is that record that you are checking
20 the application against, where is that maintained?
21    A.  In our office.
22    Q.  So I understand that different counties have
23 different registration record systems; is that correct?
24    A.  Correct.
25    Q.  And I have heard of online and offline

1 counties.  Can you explain what that is?
2    A.  Very good, terrific.  That is what we talked
3 about a little bit ago.  On the TEAM system, the 254
4 counties were all to use that system in real time
5 meaning that we took the application, you were on their
6 system and you put it directly into that database.  And
7 they discovered that, again, it is either somewhere
8 between 15 or 30 counties, I am not sure how many, the
9 big boys, that number fluctuates and we had to go get an
10 outside vendor.  So we do our work in-house so we are
11 called offline counties.  And those offline counties
12 have 75 percent of the registered voters.  So the other
13 counties obviously are much smaller and they use it in
14 real time.
15        Again, we have a delay just like I
16 explained where I have a person that wraps up the work
17 product of the day and sends it up to the Secretary of
18 State's office.  It is a TEAM system.
19    Q.  So your offline system, is it linked to the
20 statewide TEAM system?
21    A.  No, sir.
22    Q.  Do you get any updates from the state that you
23 have to load into your offline system?
24    A.  It goes through our vendor first and then it is
25 loaded.  So they have to make sure that everything

Jacquelyn Callanen

April 04, 2022
Pages 138 to 141

Page 138

1  get a lot smarter because, you know, a lot of people
2  want the metrics on this and understandably so.
3    Q.  Is that one of the lessons learned from this
4  election?
5    A.  It certainly is.
6    Q.  So if we are now only -- strike that.  So if
7  somebody is just looking at the rate of rejection for
8  applications for by mail in Bexar County, that is going
9  to be inflated because of this change in form issue;
10 correct?
11   A.  Yes.
12   Q.  So now if we are just looking at people who
13 send in the updated form, can you explain what issues
14 you were seeing there that might have led to rejection?
15   A.  Again, it was -- they were sending them in.
16 They were either sending in the opposite number from
17 what we had on file or they were sending it in and we
18 had no number on file.  So again, like I said, I think
19 and I know and I feel that we got smarter.  Because as
20 we started to send out the new application, after the
21 original one was rejected, we started to put voter
22 registration cards in there.
23   Q.  And why did you do that?
24   A.  Again, so that the voter could give us updated
25 information.

Page 139

1    Q.  And was that your idea to do that?
2    A.  (Nods head up and down.)
3      MS. CUBRIEL:  Can you say yes or no?
4      THE WITNESS:  Yes.  I'm sorry.
5    Q.  (By Mr. Jeff White) So it was your idea to send
6  out registration cards when you sent the new forms to
7  people that had sent in the wrong forms?
8    A.  Yes, anything we could do to try to mitigate
9  this.
10   Q.  Would those be more lessons that you will apply
11 in the future?
12   A.  Absolutely.
13   Q.  So you said when people submitted the correct
14 form, that you were seeing either a number that wasn't
15 in your system, the opposite number; correct?
16   A.  Correct.
17   Q.  Or they would put a number down on the
18 application that you didn't have on file; correct?
19   A.  Yes.
20   Q.  So you wouldn't have had it on file in the
21 offline and wouldn't check TEAM.  It wasn't there
22 either; correct?
23   A.  Right, in the beginning with -- we were not,
24 yes, you are correct.
25   Q.  Did you have people that didn't put any number

Page 140

1  down on the application provided by mail?
2    A.  Absolutely.
3    Q.  Do you have any idea why they didn't complete
4  that part of the form?
5      MS. CUBRIEL:  Objection, form.
6      THE WITNESS:  Well, again, I can only
7  speak anecdotally.  They were the people that were so
8  very very concerned about identity theft.
9    Q.  (By Mr. Jeff White) And what is your basis for
10 thinking that it was an identify theft issue?
11   A.  They would tell us.
12   Q.  When would they tell you?
13   A.  When they, again, SB-1 said we can contact them
14 by telephone.
15   Q.  Is there any chance that they just didn't read
16 the instructions?
17   A.  Probably.
18   Q.  Did you hear anything like that when you were
19 contacting them that they hadn't read it?
20   A.  No, no.  Because I mean, we, again, I don't
21 want to say jokingly but we say, you know, that they
22 don't read.  You have seen the carrier envelope and the
23 font on it is ridiculously small.  And it has so much
24 legal ease on it, that I don't think many of the voters
25 read it.  I really don't.

Page 141

1    Q.  This might be a joke.  Are you going to send
2  them a magnifying glass next time?
3    A.  We have talked about it.
4    Q.  So I think I characterized it as they didn't
5  read the instructions.  But is there a chance some of
6  them couldn't read the instructions and therefore didn't
7  put a number down on the application?
8    A.  Again, I am assuming that is the case because
9  as I said, we have developed an insert that we are going
10 to do for future elections that is a quarter of a page
11 that has that exact space where it asks for the TDL or
12 SSN blown up so that it covers that entire block with a
13 red thing and a highlight here and they can actually see
14 what that says.  So we are going to put that quarter
15 sheet in English on one side, Spanish in the other and
16 stick it in every mail ballot that we send out.
17   Q.  So we have talked about your rejection rates,
18 include people who sent the wrong form.  And then we
19 just talked about people who you couldn't match their
20 numbers; correct?
21   A.  Uh-huh.
22   Q.  And we talked about people who just didn't put
23 anything down; correct?
24   A.  Correct.
25   Q.  Can you answer?

Jacquelyn Callanen

April 04, 2022
Pages 218 to 221

Page 218

1    Q.   (By Mr. Jeff White) And when you are referring
2 to your commissioners, you are referring to the Bexar
3 County commissioners?
4    A.   Yes, sir.
5    Q.   And is that part of the smart initiative that
6 we talked about earlier?
7    A.   Yes, sir.  Yes, sir.
8    Q.   And so the commissioners actually sent out
9 ballots in November 2020; correct?
10    A.   Correct.
11    Q.   Would you agree that sending out applications
12 for that --
13    A.   That was in 2020.
14    Q.   Okay.  Let me restate my question.  So in the
15 November 2020 election, the commissioners in Bexar
16 County sent out applications unsolicited to voters, not
17 you?
18       MS. CUBRIEL:  Objection form.
19       THE WITNESS:  Correct.
20    Q.   (By Mr. Jeff White) Would you acknowledge that
21 there is a difference between sending out applications
22 for ballot by mail to everybody in the system
23 unsolicited versus the scenario you brought up where a
24 mother calls and asks for hers and her sons?
25    A.   I see those as two different things.

Page 219

1    Q.   And how are they different?
2    A.   Well, I mean, again, one is a request and that
3 is how we have always handled it, that someone can
4 request.  And it was at that point, we don't send out
5 unsolicited cards.
6    Q.   And when you say cards, are you referring --
7    A.   The applications.
8    Q.   You send out cards.  You are referring to the
9 applications for ballot by mail?
10    A.   Yes, sir.
11    Q.   And you have never in the past sent those out
12 without somebody asking?
13    A.   Correct.
14    Q.   Are there any risks of fraud associated with
15 sending out applications for ballot by mail when people
16 don't ask for them?
17       MS. CUBRIEL:  Objection, form.
18       THE WITNESS:  There is a possibility, yes,
19 sir.
20    Q.   (By Mr. Jeff White) And what is that risk?
21    A.   Well, again, I think maybe this morning, it
22 seems like it is a long time ago.  But when we talked
23 about the voter registration cards going to homes.  And
24 occasionally, we would be notified that a homeowner or
25 someone who lives in the home got application, got our

Page 220

1 voter registration cards for people who had lived there
2 previously or had been registered there previously.  So
3 that if that were the case, if we would send everyone in
4 our database, then we would automatically send one to
5 that same home to those same people who aren't there.
6    Q.   So sending out unsolicited applications for
7 ballot by mail could put them in the hands of people who
8 live in the home but aren't the person that is on the
9 application?
10    A.   Correct.
11    Q.   And prior to SB-1, if you had the application,
12 you could look up the information on it and fill it out
13 theoretically from public records; correct?
14    A.   Correct, that is what campaigns do, yes.
15    Q.   So if -- strike that.  The March 2022 primary
16 is in the past now; correct?
17    A.   Yes, sir.
18    Q.   Have you had a time to reflect on these
19 experience?
20    A.   There is a difference between reflecting on it
21 and doing the data mining.  We still have not dug into
22 any of the metrics and the deep dives that we need to
23 do.  And so that will be on-going.  The reason we
24 haven't done it is because as the primary was being
25 held, we had just passed the filing deadline for the May

Page 221

1 7th election so we had to -- our focus went to
2 programming the May 7th election and then the May 24th.
3 So it may be a while until we get to actually sit down
4 and dig deep.
5    Q.   And is it your duty to report the voting
6 history to the state after an election like the March
7 primary?
8    A.   Absolutely, yes, sir.
9    Q.   And have you collected and reported that data?
10    A.   Yes, yes, that goes right away.
11    Q.   Do you know when you did that?
12    A.   We beat the deadline but I don't know when it
13 was.
14    Q.   Is the deadline 30 days after the election?
15    A.   I think that is when you can make your last
16 changes to it, yes.
17    Q.   And what does that history data -- what is
18 recorded in that data that you reported to the state?
19    A.   Again, the voter registration number of the
20 person, their name, their address, the year of their
21 birth and the party that they voted in.
22    Q.   Does it tell you what method of voting they
23 used?
24    A.   Yes.
25    Q.   Does it tell you what precinct they voted in?

Christina Adkins
July 20, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


LA UNION DEL PUEBLO ENTERO, ET AL )
                                  )
    PLAINTIFFS,                   )
                                  )
VS.                               )CIVIL ACTION NO.
                                  )5:21-CV-844 (XR)
                                  )(CONSOLIDATED CASES)
STATE OF TEXAS, ET AL,            )
                                  )
    DEFENDANTS.                   )


************************************************************

ORAL DEPOSITION OF

CHRISTINA ADKINS

JULY 20, 2022

************************************************************



        ORAL DEPOSITION of CHRISTINA ADKINS, produced as

a witness at the instance of the Plaintiffs, and duly

sworn, was taken in the above-styled and numbered cause

on the 20th day of July, 2022, from 9:00 a.m. to 3:06

p.m., before Gabriela S. Silva, CSR, RPR in and for the

State of Texas, reported by stenograph, at William P.

Clements Building, 300 W. 15th Street, Austin, Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

Christina Adkins
July 20, 2022

Page 70

1 number, they should put down the last four digits of
2 their social, and if they have neither, they should
3 check the box that says they have neither?
4          MRS. HUNKER: Objection, form.
5     A. I would agree that generally it says that. I'd
6 have to look at the specific words, but conceptually,
7 yes.
8     Q. (By Mrs. Yun) Okay. Are there any plans to
9 change this official position of recommending voters to
10 put down both numbers?
11    A. Just -- again, just to clarify, when asked, we
12 tell people we recommend if you have concerns to put
13 down both numbers, but you're not required to. And that
14 -- I don't -- I'm not aware of any plans to change that.
15    Q. Okay. Can you think of any other instances of
16 guidance or recommendation that is inconsistent with the
17 text that is on the form?
18          MRS. HUNKER: Objection, form.
19    A. I don't agree that that's inconsistent with the
20 text on the form.
21    Q. (By Mrs. Yun) Okay.
22    A. Yeah.
23    Q. Would you agree that it's different from what is
24 on the form?
25    A. I don't know if I would agree with that either.

Page 71

1     Q. Okay. How would you describe the difference
2 between what is being recommended to voters about
3 putting both numbers down and what is on the -- on the
4 ABBM forms?
5          MRS. HUNKER: Objection, form, vague,
6 ambiguous.
7     A. Because the form itself reflects the text of the
8 law, but the corrective action process and the remedies
9 that are available to voters that have a missing or
10 incorrect personal identification number are much
11 broader than that. And the instructions to the Early
12 Voting Clerk and the Ballot Board and/or Signature
13 Verification Committee when they're validating those
14 numbers don't say anything about prioritizing one or the
15 other.
16          So as a practical matter, there's an instruction
17 to the voter, but it's -- as far as the application of
18 the law, it's -- I think the recommendation we're giving
19 is consistent with what the law contemplates.
20    Q. (By Mrs. Yun) Okay. So it's your position -- am
21 I understanding your testimony just now correctly, and
22 please correct me if I'm wrong, that because there is a
23 separate provision that -- there's a provision that says
24 what should be on your -- on the form, on the two forms
25 and then there's a separate provision that instructs the

Page 72

1 Ballot Board how to verify or process those forms and
2 the text of those two provisions are not the same, you
3 believe, that your guidance to the voters is consistent
4 with those two provisions put together?
5          MRS. HUNKER: Objection, form, compound,
6 ambiguous.
7     A. If I understand correct, the law is specific with
8 the instructions that the voter is -- receives with
9 respect to the forms itself. The law does not or the
10 law's a little bit different with respect to the person
11 evaluating the Ballot by Mail application and the Ballot
12 Board reviewing that information as to what they need to
13 validate.
14          So I think that our recommendation or our advice,
15 what we tell voters in this situation, encompasses both
16 components; both what the voter needs to put, and what
17 needs to be considered for -- to make it a legal
18 document, you know, legally compliant document.
19    Q. (By Mrs. Yun) Would you be able to put that
20 recommendation on the form?
21          MRS. HUNKER: Objection, form, calls for
22 speculation.
23    Q. (By Mrs. Yun) I'm sorry. Is it legally
24 permissible for you to put that recommendation, say --
25 saying, We recommend, but it is not required for you to

Page 73

1 put both numbers down?
2          MRS. HUNKER: Objection, calls for legal
3 conclusion.
4     A. I don't know. I'd have to talk to my team about
5 it and probably talk to our general Counsel about it.
6 You know, there are provisions in the law that say that
7 we cannot waive, modify or suspend state law, so we have
8 to be very careful when we are prescribing an official
9 form to make sure that it accurately reflects the text
10 of the law as it relates to that situation. And so I --
11 you know, any modification to that, I'd have to double
12 check with, like, the rest of our team and our general
13 Counsel.
14    Q. (By Mrs. Yun) Has that idea ever been discussed?
15    A. I don't recall if we've discussed that or not.
16 There's also space issues on these forms because the
17 legislature has prescribed very specific language in
18 certain circumstances. When you look throughout Chapter
19 84 and 86 and 87, I think a little bit here and there,
20 there are very, very specific requirements and not a
21 whole lot of room to deviate from that on any of our
22 forms.
23    Q. Okay. Has your office received any complaints
24 regarding confusion as to what number they're supposed
25 to put down in the mail voting forms?

Christina Adkins
July 20, 2022

Page 78

1  speak about, you know, voting -- you know, the programs
2  that they offer to help military and overseas voters.
3  They have some voter guides on their website and so we
4  correspond with them regularly to make sure that the
5  information they have on their website is updated and
6  accurate.  And I mean, it's -- yeah, that kind of stuff.
7      Q.  Understood.
8      A.  All in the interest of helping, helping voters.
9  Yeah.
10         (Exhibit Number 10 was marked.)
11     Q.  (By Mrs. Yun) I'm handing you what's been marked
12  as Exhibit 10.  Bates-numbered 019849.  Do you recognize
13  this document?
14     A.  I do.
15     Q.  And what is it?
16     A.  It appears to be a copy of Advisory Number 22-08
17  that was issued in January of this year.
18     Q.  And we talked about election advisories in
19  general earlier.  Would you say -- you said that there's
20  some routine ones and there's some medior ones and
21  bigger ones.  Which category would you put this in?
22     A.  This is definitely in the bigger category, yes.
23     Q.  Okay.
24     A.  Anything that's a change in policy or reflective
25  of legislative changes would be big.

Page 79

1      Q.  Okay.  So you were involved in drafting this
2  advisory?
3      A.  Yes.
4      Q.  And reviewing it also?
5      A.  Yes.
6      Q.  Okay.  And is it accurate to say that election
7  advisories are intended for election officials, county
8  officials in the state of Texas?
9         MRS. HUNKER:  Objection, form.
10     A.  I would say that they're intended for a broader
11  audience than that.  It's not just counties that run
12  elections.  Local election officials also run elections,
13  cities, school districts and whatnot.  And we consider
14  our advisories, to the extent that we can, binding on
15  all the election officials that are using them.
16     Q.  (By Mrs. Yun) Okay.  Understood.  Election
17  officials, but not necessarily voters.  Would that be
18  accurate?
19     A.  It depends on the advisory.
20     Q.  Okay.
21     A.  It depends on what we're discussing.
22     Q.  I see.
23     A.  Yeah.
24     Q.  Would you say that this advisory, given that the
25  To line says, Election Officials, the intended audience

Page 80

1  is election officials and not voters?
2      A.  I think generally, but I'd have to -- if there's
3  a specific section in there, I'd, you know, I can look
4  at that specific section.  I think our audience is
5  election officials, but that doesn't mean it doesn't
6  apply broadly to other folks out there.
7      Q.  Right.
8      A.  Like, the information is not limited to other
9  folks.
10     Q.  And how is this -- how are election advisories
11  generally disseminated?
12     A.  They're disseminated in two different ways.  We
13  will send an e-mail to all of the county election
14  officials that are on our e-mail distribution list.  And
15  if it's something that's relevant to local election
16  officials, that e-mail distribution list, and that's
17  just so that they can get it directly from us.
18         In addition, to that they're posted on our
19  website so that they're available for public
20  consumption.
21     Q.  So let's turn to Page 9 of the advisory.
22     A.  Okay.
23     Q.  So under the subheading, Recommended Timelines
24  for Notification Process, it states, According to the
25  United States Postal Service, first-class delivery can

Page 81

1  take up to five business days.  Because a defective
2  carrier envelope needs to be returned to the voter, and
3  then mailed back to the Early Voting Clerk, the SOS
4  recommends that the SVC or EVBB implement a policy to
5  provide notification of a defect by phone or e-mail to
6  all voters whose ballots are reviewed by the SVC or EVBB
7  on or after the 14th day before Election Day,
8  approximately 10 business days.  Did I read that
9  correctly?
10     A.  You did.
11     Q.  So if a county were to follow this recommendation
12  that I just read, any defective carrier envelope
13  received between 20 days and 14 days before Election Day
14  will be mailed back by the SVC.  Is that right?
15         MRS. HUNKER:  Objection, form, calls for
16  legal conclusion and assuming facts not in evidence.
17     A.  It could be.  It kind of broadly depends on what
18  policy the SVC or EVBB decided to implement with respect
19  to to the process in general.
20     Q.  (By Mrs. Yun) And how does it depend on the
21  process?
22     A.  It could be that they -- that the ballot board or
23  the SVC -- EVBB or SVC was also simultaneously calling
24  people or, you know, something to that affect.  Like,
25  they're -- you know, the law defers in some instances to

Christina Adkins
July 20, 2022

Page 82

1  the Ballot Board and the SVC to determine how and when
2  they take certain steps in the corrective action
3  process.
4      Q.  Right.  So --
5      A.  And I guess just to clarify, it's a
6  recommendation, but it's not a blanket policy and the
7  law was set up to defer some of those decisions locally.
8      Q.  Okay.
9      A.  Yeah.
10     Q.  So it is not binding on the counties.  Correct?
11     A.  We call it a recommendation.
12     Q.  Yes.
13     A.  It's a strong recommendation, but that timeframe
14  that they establish, our recommendation is you come up
15  with a policy that works in your county on this
16  particular issue.  This is our recommendation, but
17  again, the way the law was set up there is to defer to
18  the local entity on what the actual decision is.
19     Q.  Okay.  So if a county to follow this
20  particular recommendation, starting 14 days before
21  Election Day, voters would be notified by phone or
22  e-mail.  Is that -- is that correct?
23     A.  Yes.  Uh-huh.
24     Q.  Do you know how many counties followed this
25  particular recommended timeline?

Page 83

1      A.  I do not.
2      Q.  And your office cannot require counties to have
3  the Signature Verification Committee review the carrier
4  envelopes for ID errors.  Is that right?
5      A.  That's correct.
6      Q.  And because they could elect to have the Early
7  Voting Ballot Board to review them?
8      A.  It's -- whether or not you establish a Signature
9  Verification Committee, it's not mandatory.  I mean,
10  there's -- it's -- you know, it's based on -- it's a
11  county-by-county thing.
12     Q.  So if there's no SVC, then the ballot board --
13     A.  It defaults to the ballot board, correct.
14     Q.  Is it correct that in some counties the ballot
15  board only meets starting four days before Election Day?
16     A.  If there are under 100,000 in population, that's
17  correct.  The law restricts their meetings until that
18  point or rather doesn't allow them to meet up until four
19  days before Election Day.
20     Q.  Understood.  Let's turn to Page 16 of the
21  advisory.  So under, Correction of Defects by FPCA
22  voters, it says, If the FPCA voter provides missing
23  missing or incorrect identification information on their
24  carrier envelope or signature sheet, or did not include
25  the official election signature sheet for an FPCA voter,

Page 84

1  the voter must be notified of the defect in the same
2  manner as a regular ABBM voter.  Did I read that
3  correctly?
4      A.  You did.
5      Q.  So for a county that adopted the timeline, the
6  recommended timeline that we just spoke of on Page 9,
7  would you agree that that county would be mailing back
8  defective envelopes or signature sheets from FPCA voters
9  if they arrive between 20 days and 14 days before
10  Election Day?
11     A.  No.
12         MRS. HUNKER:  Objection, form.
13     A.  No.  I don't agree with that.
14     Q.  (By Mrs. Yun) Okay.  What did I get wrong?
15     A.  FPCA voters, they use what's called a Federal
16  Postcard Application, which is different from the
17  application for Ballot by Mail.  They're kind of in a
18  different category and there are some different rules
19  that apply to them.
20         So it is entirely conceivable that a ballot board
21  or a Signature Verification Committee may have a
22  slightly different policy for those voters than they
23  would for regular ABBM voters, as we would say.
24     Q.  Okay.  So could you explain to me what this
25  sentence means, on Page 16 which says, The voter must be

Page 85

1  notified of the defect in the same manner as a regular
2  ABBM voter?
3      A.  It means they also have the ability to be
4  notified of defects and receive the benefit of a
5  corrective action process.
6      Q.  Okay.  So --
7      A.  It means that it applies to them too is -- the
8  ability to correct a defect applies to FPCA voters as
9  well.
10     Q.  I see.  So in the same manner does not mean in
11  the same way of transmitting that information.  Is that
12  --
13     A.  Correct.
14     Q.  Okay.  So is there an election advisory or any
15  other document from your office that informs the
16  counties that they can institute a different
17  notification mechanism for FPCA voters than for regular
18  ABBM voters?
19     A.  Something separate and apart from this?  I don't
20  believe so.  But if I might add on there, and there's
21  language somewhere in the advisory that reflects this,
22  you know, that voters -- we always advocate that voters
23  be treated the same and as uniformly as possible.
24         And these provisions of law indicate that voters
25  need to be treated as uniformly as possible, voters in

Christina Adkins
July 20, 2022

Page 166

1  director may have, you know?  There was something that
2  we discussed earlier where it was my comments on an
3  article that was published indicating that there was bad
4  information in that article.  And I, you know, urged our
5  communications director to make sure that -- in anything
6  that he's doing that we're making sure that we're
7  communicating it correctly.
8      Q.  What were some of the inaccuracies that you saw
9  in the media about SB1?
10     A.  One of them was that voters had to match what was
11 on their written application, not their voter
12 registration record.  That was a huge problem.  And it
13 caused a lot of fear and confusion among voters that was
14 completely unnecessary.  And then other inaccuracies
15 were about the hierarchy that voters had to put one
16 number over the other and that's just not what the law
17 says.
18     Q.  How are you doing?  You need a break?
19     A.  I'm fine.
20         (Exhibit Number 19 was marked.)
21     Q.  (By Mr. Bieter) I'm going to hand you what I have
22 marked as Exhibit 19.  I'm sorry about the --
23     A.  Stapled in the wrong corner?  Trying to confuse
24 me here.
25     Q.  So Exhibit 19 is a PowerPoint that is titled FAQs

Page 167

1  on Applications for Ballot by Mail, ABBMs.  Do you
2  recognize this?
3      A.  I do.
4      Q.  Did you have a role in drafting it?
5      A.  Probably, yes.
6      Q.  Do you know who this -- whom this was presented
7  to?
8      A.  So I don't know the date that it was presented,
9  but we did a number of webinars targeted towards our
10 county election officials to help them with the
11 implementation of some of the new requirements related
12 to SB1.  We were trying to do them very regularly to
13 address those "of the moment" questions.  So I don't
14 know which one this was in the process.
15         I don't know if the date on here was the date it
16 was printed from our website or the date that it was
17 given, so my guess is it was, you know, obviously at
18 some point post -- in posteffective date of SB1 to try
19 to help our county election officials have a little more
20 clarity on the law.
21     Q.  Were there any elections after SB1 became
22 effective in December 2021 -- and -- did any elections
23 happen before the March 2022 primary?
24     A.  Yes.  Absolutely.  Yeah.
25     Q.  And so -- so did the changes in SB1 effect those

Page 168

1  elections?
2      A.  Probably not, because the language in SB1,
3  there's a provision towards the end that says that SB1
4  was in effect for elections that were ordered after a
5  certain date.  And most of the elections that would've
6  happened, like in late December, like a runoff election
7  from the November election, or what we refer to as like
8  Article 11 Section 11, like, elections that are
9  constitutionally required for cities that have
10 vacancies, those elections were typically ordered prior
11 to the implementation or prior to the effective date of
12 SB1, so they would've been under old law.
13     Q.  If we could just turn to Page 5, Slide 5.  And
14 the question is on the top, If a voter uses an old ABBM
15 form, should I reject the ABBM?  And the short answer is
16 yes.
17     A.  Uh-huh.
18     Q.  What -- what is an old ABBM form?
19     A.  An old ABBM form, what I was probably referring
20 to here, was the form that was effective prior to SB1,
21 prior to adding the requirement for personal
22 identification numbers.  This presentation, I'm pretty
23 confident, it was given with the upcoming primary in
24 mind.
25     Q.  Do you recall what the factors were that came --

Page 169

1  that entered into that response?
2      A.  Because the law required it after that point.
3      Q.  Do you recall earlier we were discussing pre-SB1
4  implementation ABBM forms that changed as to disabled
5  individuals?
6      A.  Uh-huh.
7      Q.  And in that instance, it was -- your team advised
8  that it was permissible for voters who were not using
9  the disabled category to use an old form?
10     A.  That's correct.
11     Q.  But in this instance, they can't use an old form?
12     A.  That's correct.
13     Q.  Do you know why the policy was different?
14     A.  Because the law changed.  I mean, that's all.
15 The law changed.  Like, there's now a new field on the
16 application for Ballot by Mail forms that's required and
17 that applied to all voters.  So the old forms couldn't
18 be used unless that voter proactively, you know, wrote
19 in their personal identification number on an old form.
20         One other thing to note with ABBM forms though
21 too is to remember that they're good for certain voters on
22 an annual basis.  January 1 everybody would've been
23 filling out those new forms anyway.
24     Q.  And I think I know the answer to this, but did
25 your team consult with anyone in providing this specific

Christina Adkins
July 20, 2022

Page 170

1  guidance?
2      A.  No.  The face of the law.
3      Q.  If you could turn to the next Bates page, Page 6?
4  The question is, What if a voter provides only a
5  driver's license number on the ABBM, but the voter
6  registration record does not contain a driver's license
7  number?  And the answer is, The ABBM must be rejected.
8  Do you see that?
9      A.  Uh-huh, I do.
10     Q.  Did your team also develop that guidance?
11     A.  Yes, based on the requirements in the law.
12     Q.  Do you have any concern with how the guidance --
13 this guidance has operated in practice?
14         MRS. HUNKER:  Objection, form, vague.
15     A.  Generally speaking, no.  There were some isolated
16 incidents where counties weren't following this process.
17 And I had concerns about why those counties were not
18 following this process even though we told them what the
19 law said.
20     Q.  (By Mr. Bieter) How did you communicate those
21 concerns?
22     A.  Well, there's one example specifically with
23 Travis county where Travis County had a very high ABBM
24 rejection rate and there was a little bit of a
25 hullabaloo in the media about it.  And I remember

Page 171

1  looking at that and looking at what they were reporting
2  their rejection rate to be and it was very high.  And
3  that number didn't look correct to me.
4          And I actually reached out to both Dana
5  DeBeauvoir and Elections Director Bridgette Escobedo and
6  spoke to her.  I didn't speak to Dana directly, but I
7  did speak to Bridgette about it to try to get some
8  information because her rejection number was way too
9  high.  And in talking to her, I found out that they were
10 doing two things.
11         One, they were applying a hierarchy that they
12 shouldn't have been providing.  And two, if -- they were
13 kind of misapplying this concept.  If somebody put one
14 number on their ABBM form -- if they put the SSN on
15 their ABBM form, but the voter registration record had
16 both the SSN and driver's license number, they were
17 rejecting it.  And that was improper.
18         And what I later found out when I was briefing my
19 staff on it the next day is that our team had answered
20 that question for them twice earlier in the week.  And
21 yet they still were rejecting them anyway even though
22 they spoke to members of my team about it.
23     Q.  So do you review the numbers of rejected ballots
24 for counties?
25     A.  Generally speaking, no.  But there was a lot of

Page 172

1  press about that.  It was hard to miss it.  And I think
2  there was, like, a Twitter fight between our
3  communications director and somebody from Travis County.
4  And so that's part of how -- I was -- the day that it
5  happened I was speaking at a conference, but that's how
6  it got on my radar.
7          I found out that there was some Twitter fight and
8  so I started looking at that, and what they were
9  purporting to be their numbers was vastly too high.  I
10 couldn't figure out any reason why those numbers were so
11 high.  So I reached out to them because I figured that
12 there was a problem somewhere.
13     Q.  Can you say approximately of all the rejected
14 ballots after the March 2022 primary what portion of
15 those were related to improper interpretation by
16 counties?
17     A.  I don't know the answer to that.  Yeah.  I'm
18 sorry.  We don't have -- to my knowledge, we don't that
19 kind of granular data.
20     Q.  But there -- there were more rejections than
21 usual in the March 2022 primary?
22         MRS. HUNKER:  Objection, form.
23     A.  You'd have to ask the county specifically on
24 that.  I know that varies on a county-by-county basis.
25 But I remember seeing reports of that in the news,

Page 173

1  that's -- yes.  I remember counties reporting that their
2  rejection numbers were higher.  Some of them were a lot
3  higher, a lot higher than other counties.  And like I
4  said, with Travis County, that's why I reached out to
5  them proactively because their numbers did not seem
6  accurate at all.  There was no way they could have been
7  right.
8      Q.  (By Mr. Bieter) Does your team have
9  responsibilities to respond to allegations of voter
10 fraud?
11         MRS. HUNKER:  Objection, form.
12     A.  What do you mean by voter fraud?  Kind of a broad
13 term.
14     Q.  (By Mr. Bieter) Well, I'll use the example I used
15 earlier.  If somebody's trying to vote under a deceased
16 person's name.
17     A.  So it would depend on how the information is
18 presented to us and at what point during the process.  I
19 will say generally speaking, anything that constitutes
20 potential criminal conduct or would be -- have some kind
21 of criminal penalty associated with, we're not an
22 enforcement agency so I can't really advise on those
23 areas of law and my team really can't advise on those
24 areas of law because we're not the ones that make
25 decisions on prosecutions.