**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX H

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3
    LA UNION DEL PUEBLO         )
 4  ENTERO, ET AL.,             )
                                )
 5            Plaintiffs,        )
                                ) Case No. 5:21-CV-844-XR
 6  vs.                         )
                                )
 7  GREGORY W. ABBOTT, ET AL.,  )
                                )
 8            Defendants.        )
    _____ )
 9  OCA-GREATER HOUSTON,        )
    ET AL.,                     )
10                              )
              Plaintiffs,        )
11                              ) Case No. 1:21-CV-780-XR
    vs.                         )
12                              )
    JANE NELSON, ET AL.,        )
13                              )
              Defendants.        )
14  _____ )
    HOUSTON JUSTICE, ET AL.,    )
15                              )
              Plaintiffs,        )
16                              ) Case No. 5:21-CV-848-XR
    vs.                         )
17                              )
    GREGORY WAYNE ABBOTT,       )
18  ET AL.,                     )
                                )
19            Defendants.        )
    _____ )
20  LULAC TEXAS, ET AL.,        )
                                )
21            Plaintiffs,        )
                                ) Case No. 1:21-CV-0786-XR
22  vs.                         )
                                )
23  JANE NELSON, ET AL.,        )
                                )
24            Defendants.        )
    _____ )
25  MI FAMILIA VOTA, ET AL.,    )
                                )
```



Jacquelyn Callanen

February 28, 2023
Pages 2 to 5

## Page 2

```
1            Plaintiffs,    )
                            )
2   vs.                     )
                            ) Case No. 5:21-CV-0920-XR
3   GREG ABBOTT, ET AL.,    )
                            )
4           Defendants.     )
    _____)
5   UNITED STATES OF AMERICA, )
                            )
6           Plaintiff,      )
                            )
7   vs.                     )
                            ) Case No. 5:21-CV-1085-XR
8   THE STATE OF TEXAS,     )
    ET AL.,                 )
9                           )
            Defendants.     )
10  _____)
11
12      ****************************************
13          ORAL AND VIDEOTAPED DEPOSITION OF
14              JACQUELYN CALLANEN
15              FEBRUARY 28, 2023
16      ****************************************
17
18          THE ORAL AND VIDEOTAPED DEPOSITION of
19  JACQUELYN CALLANEN, produced as a witness at the
20  instance of the Defendant, and duly sworn, was taken
21  in the above styled and numbered cause on Tuesday,
22  the 28th day of February, 2023 from 9:10 a.m. to
23  3:51 p.m., before PAMELA SUE PETERSON, Certified
24  Shorthand Reporter in and for the State of Texas,
25  reported by stenographic and computer-aided
```

## Page 3

```
1   transcription, at the Office of the Texas Attorney
2   General, Weston Centre, 112 East Pecan Street,
3   3rd Floor, San Antonio, Texas 78205, pursuant to the
4   Federal Rules of Civil Procedure and the provisions
5   stated on the record or attached hereto.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1   APPEARANCES OF COUNSEL:
2   For Plaintiff HOUSTON JUSTICE, HOUSTON AREA URBAN
    LEAGUE, DELTA SIGMA BETA SORORITY, INC., THE ARC OF
3   TEXAS, MI FAMILIA VOTA, MARLA LOPEZ, MARLIN LOPEZ,
    PAUL RUTLEDGE, JEFFREY LAMAR CLEMENS:
4
    NAACP LEGAL DEFENSE FUND
5   BY:  VICTOR GENECIN, ESQUIRE
        40 Rector Street
6       5th floor
        New York, New York 10006
7       (929) 388-9246
        vgenecin@naacpldf.org
8
9   For Defendant GREGORY W. ABBOTT AND JANE NELSON, ET
    AL:
10
    KEN PAXTON, ATTORNEY GENERAL OF TEXAS
11  OFFICE OF THE ATTORNEY GENERAL
    BY:  DAVID BRYANT, ESQUIRE
12       KATHLEEN T. HUNKER, ESQUIRE (Via Zoom
    Videoconference)
13  P.O. Box 12548
    Austin, Texas 78711-2548
14  (512) 936-2275
    david.bryant@oag.texas.gov
15
16  For Defendant UNITED STATES OF AMERICA:
17  U.S. DEPARTMENT OF JUSTICE
    CIVIL RIGHTS DIVISION
18  BY:  DANA PAIKOWSKY, ESQUIRE
        Robert F. Kennedy Building
19      950 Pennsylvania Avenue NW
        Washington, District of Columbia 20530
20      (202) 353-5225
        dana.paikowsky@usdoj.gov
21
22
23
24
25
```

## Page 5

```
1   APPEARANCES OF COUNSEL (Continued):
2   For Witness JACQUELYN F. CALLANEN, CERA:
3   JOE D. GONZALES, CRIMINAL DISTRICT ATTORNEY
    OFFICE OF BEXAR COUNTY CRIMINAL DISTRICT ATTORNEY
4   BY:  LISA V. CUBRIEL, ESQUIRE
        Paul Elizondo Tower
5       101 West Nueva
        7th Floor
6       San Antonio, Texas 78205-3030
        (210) 335-2142
7       lisa.cubriel@bexar.org
8
    Also Present:
9
    JACQUELYN F. CALLANEN, CERA
10      Witness
11  JULIA R. LONGORIA (Via Zoom Videoconference)
        Mexican American Legal Defense and Educational
12      Fund, Inc.
13  CAROLINE LEBAL (Via Zoom Videoconference)
    NATALIE FELSEN (Via Zoom Videoconference)
14      Cooley, LLP
        On behalf of El Paso County Elections
15      Administrator Lisa Wise
16  MARINA EISNER (Via Zoom Videoconference)
        States United Democracy Center
17
    LOUIS J. CAPOZZI (Via Zoom Videoconference)
18      Jones Day
        On behalf of intervenors
19
    KEVIN ZHEN (Via Zoom Videoconference)
20      Fried, Frank, Harris, Shriver & Jacobson, LLP
        On behalf of LUPE Plaintiffs
21
    JOSEPHINE RAMIREZ SOLIS (Via Zoom Videoconference)
22      Office of Criminal District Attorney
        Hidalgo County
23      On behalf of Hidalgo County Elections
        Administrator
24
    GABE HODGE (Via Zoom Videoconference)
25      Observer
```



Page 38

1  other site, sir.  We have a fantastic relationship
2  with the City of San Antonio.  And so, when they open
3  a library, a public library, we're there.
4        Well, a few years ago the City of
5  San Antonio passed a bond election.  And the bond
6  election was for remodeling their libraries.  And
7  so, we had issues -- I hate that word.  We had issues
8  with one of their time schedules on their library.
9  We were to be able to be moved back into Memorial
10 Library.  And due to supply chain issues, they didn't
11 open.  They -- they didn't complete their work in
12 time.
13       So at the last minute, where we thought we
14 would be at Memorial Library, we had to go back to
15 our alternate site of West Point.  So, it's issues
16 like that that we just take it right up to the wall
17 because we -- we -- the voters know to go to Memorial
18 Library.  So, we had to post a big sign and move them
19 on.
20    Q.   Did you become aware of any complaints in
21 connection with the general election in November of
22 2022 regarding the number or distribution of polling
23 places or vote centers?
24    A.   Yes, sir.
25    Q.   Could you describe what you became aware

Page 39

1  of?
2    A.   I'm -- I'm respectful of the fact, and we
3  have to keep ever most in our mind, that on May 24th
4  we had the shooting in Uvalde.  And so here in Bexar
5  County, 68 percent of our poll sites are in schools,
6  and the schools didn't want us.  They -- after --
7  after the Uvalde, you know, the horrendous shooting
8  over there, they didn't want the elections to be
9  on-site when the students were there.
10       So, we met with Region 20, which is our --
11 all of our school districts, and we had some great
12 leadership.  We have 13 different school districts in
13 Bexar County, and we had great leadership from some
14 of ours, and they chose to make election day an
15 in-service day so there would not be students.  So,
16 for a portion of our normal sites we were --
17 everything was fine.
18       But for the school districts that chose not
19 to make it an in-service day, the students were
20 there.  And so, what happened in a few of our sites
21 is, now we're trying make amends.  You know, they --
22 they want to keep the students safe.  We need to say,
23 and of course, they can't refuse us if we ask them.
24       And so, the accommodation was, okay,
25 instead of putting you in the foyer where, you know,

Page 40

1  you pull up and you go in and you're right in the
2  foyer, we're going to put you back around into the
3  gymnasium or we're going to allow you to have access
4  to the library.
5        So, that complied with it, so we have the
6  voting site there.  But what we ended up finding out
7  was, for a lot of our senior citizens and a lot of
8  our ADA, the longer walk then became problematic.
9  They did it, but then we took calls of they -- you
10 know, weren't -- why did we do it?  Why did we move
11 it there?  And so, again, lessons learned.
12       So, you know, we went back and have worked
13 with the school districts.  And so, with the
14 legislative session up there now, we are hoping and
15 praying that they will mandate that election day is a
16 school holiday or an in-service day because there
17 shouldn't be that angst.
18    Q.   Are you aware of anyone who was unable to
19 vote or was dissuaded from voting on election day in
20 November of 2022 in Bexar County because of the issue
21 that you just described?
22    A.   No.
23    Q.   Okay.  Let's talk about mail-in ballots.
24    A.   Uh-huh.
25    Q.   Have there been procedure changes since the

Page 41

1  primaries in the first half of 2022 with respect to
2  mail-in ballots in Bexar County that were in place in
3  connection with the general election in November of
4  2022?
5    A.   Huge changes.
6    Q.   Okay.  Could you generally describe those.
7    A.   SB-1 when it was first rolled out,
8  obviously, for the primary, came very late into our
9  world.  And I had just said the supply chain issue.
10 We -- SB-1 mandated that we needed all new election
11 envelopes and all -- everything new because of the
12 requirement and the language and -- and the ID and
13 the ID requirements and the perf lines on them.
14       And so, we -- we managed to get -- we got
15 them at the 11th hour, but we did it and it caused us
16 stress and the voters were anxious because their
17 ballots weren't getting there.
18       So -- and we had a number of our voters in
19 March and -- and May that their ballots were
20 rejected, the applications were rejected, because
21 SB-1 required either the TDL or the SSN.
22       And I would like to remind you that most of
23 our voters by mail are senior citizens who registered
24 years and years ago when it was not required to give
25 either an SSN or a TDL.



Jacquelyn Callanen                                         February 28, 2023
                                                           Pages 42 to 45

Page 42

1    So, the way the law was written is, the
2  ABBM had to have one of those numbers and we had to
3  match one of those numbers with the original voter
4  registration card, well, we couldn't do it.  We
5  didn't have it.  We didn't have it on record.
6          And so then we would -- as we rejected it,
7  we had to send them a new ABBM and a new voter
8  registration card so that they could send it back and
9  update their records.
10         Well, as -- as you know, I mean, I'm not
11 going to go back and beat a dead horse.  But that
12 procedure, because of the problematic rollout of it,
13 was worked on and worked on and worked on, and the --
14 the State was able to work with DPS somehow and we
15 were able to get...
16         I'm not technical, but they were able to
17 take all of our voters and mash them against DPS and
18 get the license numbers, or TDLs for a number of our
19 voters.  So, by the time we were into the May
20 elections, we had a much more robust database.  And
21 so, we were able to make these matches much -- much,
22 much better.
23         And then there was a court case that the
24 State lost that required the language on the
25 envelopes that we had to be changed.  Again, now

Page 43

1  we're problematic.  We have -- we have the old ones.
2  And so, do we sit there with a Sharpie and black out
3  all of these or do we order more?
4          And so, again, I mean, we're not the only
5  county that was doing this.  I mean, everyone was,
6  sort of, you know, really, really pushing it and it
7  worked.  I mean, we were -- we were able to do it.
8          I think the blessing in all of this is that
9  in 2022, which is, you know, the gubernatorial
10 elections, those election have --
11    Q.   You're talking about the general elections?
12    A.   General elections from the primary, that
13 whole year is much smaller than a presidential year.
14 And so, you know, we had 40,000 mail ballots, mail
15 ballot applications in 2022.  Where in 2020, we had
16 124,000.  So, again, you can see that it was an
17 economy of scale, and we were much -- it was much
18 easier to manage the -- the economy of scale that we
19 did.  But it was -- it was strenuous.
20    Q.   Have you described all of the changes that
21 occurred in the -- the mail-in ballot procedures
22 between the primaries in the first half of 2022 and
23 the procedures that were in place for the general
24 election in November -- in October of 2022 in Bexar
25 County?

Page 44

1    A.   Yes.
2    Q.   Okay.  And what was the overall effect of
3  the changes as you observed them in October and
4  November of 2022 as compared to the previous -- the
5  first half of 2022?
6    A.   I -- I'm proud to say that -- that the
7  changes that we effected here in Bexar County we did
8  a lot of it on our own from our media outreach, to --
9  to -- I'll show you how we -- we developed an insert
10 for the ballot.  I mean, we did a lot of outreach on
11 our own, and we had a much, much higher success rate
12 in November.  So, it was -- it was a huge relief.
13    Q.   And when you refer to a success rate, could
14 you explain what you mean by that.
15    A.   Well, again, in -- in every -- in every
16 election, in the mail balloting process, we'll send
17 out -- I mean, let's just say on this one, like,
18 we'll send out 40,000.  And when it's time to
19 actually count the mail ballots, you're down to
20 30,000, 30-, 32,000.
21         And to a layperson out there, they're like,
22 where did the other ones go?  Well, you sent out this
23 many, why don't you have this many back?  Well, human
24 nature enters into it a lot.
25         And about probably anywhere eight to

Page 45

1  10 percent of the people who get a mail ballot will
2  return that mail ballot and go vote in person because
3  they use that mail ballot as a sample ballot.  We
4  have issues with that because, obviously, the mail
5  ballots cost a lot of money, time, you know, people.
6  Anyhow, I won't go into all those details.  So, we
7  don't get those back.
8          Then you have the ones that are mailed in
9  that are rejected for obvious reasons.  You know,
10 they didn't sign it.  They signed -- what we see in a
11 number of things is, a husband and wife will each get
12 their ballot, but when it comes back in to us, the
13 husband has signed the wife's ballot and vice versa.
14 And so, those have to go out and be rejected to come
15 back so that we have the right signature with the
16 right ballot.
17         So, there's any number of reasons why this
18 happens.  And in any normal election, we're going to
19 get a reject rate of three percent, four percent.
20 That's normal for -- for any election for us.  But
21 when we did November 2022, with all of our extra
22 attention to it, we had a 1.7.  So we were, like,
23 yes.
24    Q.   You had a 1.7?
25    A.   Rejection rate.



Page 50

1    So, because we have that vendor, we use it
2 for our mail ballots.  We use it for our early
3 voting.  It's a wonderful system.  And they have
4 codes that we can put in for no signature, no
5 matching TDL, SSN.  And we -- we have those codes
6 that come out.
7    And so, we can differentiate if -- if
8 needed to exactly how many didn't sign it, you know,
9 how many -- the -- we're still working on -- working
10 with the vendor to update the codes so that we can
11 capture more of the information from SB-1 on the
12 cure, not cured, you know.
13    We sent it by, we called them on the phone
14 or that detail's not in our system yet, so it's not
15 mat- -- it doesn't match up -- the State doesn't have
16 it in their system.  So, this is a work in progress.
17 We're all learning and it's only getting better.
18    But again, there are third-party vendors
19 involved in, I think they said -- I think I'll
20 probably be wrong, but I think they said there were
21 31 counties that were not on TEAM real time.  That
22 may have changed, but don't hold me to that 31.
23    Q.  Is the information that Bexar County
24 captures on its software regarding the specific
25 reasons a mail-in ballot is rejected provided to the

Page 51

1 State?
2    A.  Yes.  It -- it goes up every day in that
3 export and that import.
4    Q.  Okay.  You testified that the rejection
5 rate for Bexar County in the -- the general election
6 in November of 2022, if I understand correctly, was
7 approximately 1.7 percent?
8    A.  Yes, sir.
9    Q.  And my impression is that you take some
10 satisfaction in having gotten the number down to that
11 point; is that correct?
12    A.  Absolutely.  I'm so proud of my staff.
13    Q.  How does that compare with the rejection
14 rate in 2020 in Bexar County?
15    A.  Again, as -- as -- as I said, 2020 had a
16 higher rejection rate because just on the economy of
17 scale, when we're talking approximately 40,000 in
18 2022, but 124,000 in 2020, you can see you're going
19 to have a higher rejection rate based on -- you know,
20 the rejection's are the same no matter what election
21 you're doing.
22    If somebody doesn't sign their ballot, they
23 don't sign their ballot and that happens every time.
24 The only new thing this time was the TDL or the SSN,
25 the missing -- the missing information, but we have

Page 52

1 those.  We have those.  And again, it's human nature.
2 If we have time to correct it, if the voter has time
3 to correct it, they can do it.
4    Q.  What was the rejection rate in Bexar County
5 for 2020, if you recall?
6    A.  I don't have that exactly, but I know it's
7 going to be in the three to four percent range.
8    Q.  Okay.
9    A.  I mean, that -- that was like our happy
10 zone.
11    Q.  What was your -- well, explain to me what
12 you mean by the "happy zone."
13    A.  Again, if one person doesn't get to vote,
14 that hits us.  I mean, that's what we do.  But if
15 you've gone through and you've had, you know, 124,000
16 ballots mailed out and -- and you've counted 92,000
17 and these others have been, you know, brought back to
18 you and not -- they just sit them on the shelf,
19 that's a good feeling.
20    But again, when the reject -- rejected
21 rate -- and again, please understand that the
22 rejected rate comes from partisan people because
23 we -- the election's office handles the manual part
24 of it.  You know, we print the ballots.  We take the
25 applications.  We data enter.  We mail them.  We

Page 53

1 bring them back in.  We scan them.
2    And then once they're back, they get turned
3 over to the early ballot board.  And that early
4 ballot board is a group of people that are appointed
5 by the Democrat and the Republican party.  They are
6 not our employees.  They are independent -- an
7 independent body.
8    And so, once we turn these over to them,
9 they are the ones who will make the decision that
10 there's no signature, or this person didn't sign it,
11 that signature doesn't match, whatever that's that
12 group.  And then that's where we get the rejection
13 rate, the final rejection rate.
14    Q.  How did Bexar County's 1.7 percent
15 rejection rate in the general election in 2022
16 compare to the rejection rate in general election
17 years prior to 2020?
18    A.  It was less.  It was less.  I -- I can't
19 give you a number.  I didn't do all the data mining,
20 but we can find it out.
21    Q.  Can -- can you say that it was
22 significantly less?
23    A.  It -- you know, I would feel like if you're
24 looking at just raw numbers it would appear to be
25 down 50 percent.  But the difference between a three



Page 58

1      MR. GENECIN:  Thank you.
2      MS. CUBRIEL:  This is counsel for Bexar
3  County.  I just want to say, at her last deposition,
4  she brought an earlier version of the form --
5      THE WITNESS:  Uh-huh.  Yes.
6      MS. CUBRIEL:  -- that was an exhibit.  And
7  so, our intent, and why I had her pull it out is, we
8  do wish to make this an exhibit because this is the
9  updated version.
10      MR. BRYANT:  Okay.
11      THE WITNESS:  It worked better.
12      MS. CUBRIEL:  Yeah.
13      MR. BRYANT:  Right.
14      MS. CUBRIEL:  And can you pass those extra
15  ones down.
16      MR. BRYANT:  I will do that.
17      (Exhibit 9 was marked.)
18      Q.  BY MR. BRYANT:  Miss Callanen, let me show
19  you what was marked Exhibit C at an earlier
20  deposition that you gave in this case, and I've
21  marked it as JC3, Exhibit 9.
22      A.  Uh-huh.
23      Q.  Can you describe what that is.
24      A.  This is an earlier version of -- of what we
25  have there.  And again, black and white.  And you can

Page 59

1  see, if you want to just -- to make the difference on
2  it, when we did it this time, we wrote on here.  It
3  says, "Under the flap on your teal envelope."  But we
4  took "teal" off.  We didn't -- people want to mess
5  with what the color was.
6          So the new ones just say, "Under the flap."
7  So, again, we just -- again, in our office, we use it
8  for not -- we were, like -- can I -- dare I say, we
9  were dumbing it down.  We wanted to make it as simple
10  as possible, so we took out extra -- I think, she
11  wants to see it.
12      MS. PAIKOWSKY:  Would you mind if I see it?
13      MR. BRYANT:  Absolutely.
14      MS. PAIKOWSKY:  Thanks so much.
15      Q.  BY MR. BRYANT:  And the -- Miss Miss
16  Callanen are all -- you -- you handed me three --
17      A.  Here's another one.
18      Q.  -- examples.  Are those all the same?
19      A.  Yes, sir.
20      Q.  Okay.
21      A.  That's all I brought.
22      MS. PAIKOWSKY:  And if it's helpful, I
23  actually have a color version of the previous
24  exhibit.
25      MR. BRYANT:  That's great.  Okay.

Page 60

1      THE WITNESS:  Yeah.
2      MR. GENECIN:  Are we going to mark this?
3      MR. BRYANT:  Yes, we will.  I'm just trying
4  to figure out what number I have not yet used.
5      (Exhibit 13 was marked.)
6      Q.  BY MR. BRYANT:  All right.  Miss Miss
7  Callanen I'm handing you what's been marked as JC3,
8  Exhibit 13.  Could you describe what that is.
9      A.  Yes, sir.  This is the insert that we used
10  for the November 2022 mail ballots.
11      Q.  Okay.  And the -- the earlier exhibit that
12  I showed you which is marked JC3, Exhibit 9, and also
13  Exhibit C to your earlier deposition, when was that
14  one in use?
15      A.  The black and white one came into use for
16  the May elections, the city and school elections.
17  Then the colored one came into use where it says the
18  teal, that was for the primary runoff, which was also
19  at the end of May.  So May --
20      Q.  May of 2022?
21      A.  -- of '22.  Yes, sir.  We had the primary
22  in March, and then we had the city and school
23  elections the first Saturday, and then we had the
24  primary runoff at the end of May.  And so then in the
25  next couple of months, then we went back and did

Page 61

1  another deep dive on it and we think this is simpler.
2  We -- we changed it a little bit.
3      Q.  And when you say, "this," you're referring
4  to JC3, Exhibit 13?
5      A.  Yes, sir.
6      Q.  Okay.
7      A.  I'm sorry.
8      Q.  It's just -- it's often a written --
9  written process, so we got to refer to exhibits.  Did
10  you observe in -- in Bexar County, in connection with
11  the November 2022 general election, changes in the
12  level of voter understanding of the mail-in voting
13  process?
14      A.  Absolutely.
15      Q.  Could you describe what you observed in
16  that regard.
17      A.  Again, anecdotally, if you want to say,
18  number one, you know, the reject rate proves that --
19  that we did see that.
20          But number two, in the course of the
21  election, we noticed that we were having a lessening
22  of the phone calls where they were asking for
23  assistance.  You know, that -- but again, we were
24  doing major media.  We were doing handouts
25  everywhere.  We had handouts out at the early voting



Page 62

1  sites.  We -- we were -- we just sort of threw
2  everything at it that we could because it was just so
3  important.
4        Q.  Okay.  You were describing some media
5  outreach and voter education efforts that occurred in
6  connection with the November 2022 general election;
7  is that right?
8        A.  Yes, sir.
9        Q.  Were those efforts that were made
10  specifically in and by Bexar County or were they a
11  broader effort, or both?
12        A.  We, the election's office, had our own
13  outreach.  But again, members of my commissioner's
14  court entered into it and they did their own outreach
15  for it also, separate and apart from the elections
16  office.
17        Q.  Okay.  Could you describe as -- as much as
18  you recall, the media outreach that was done to
19  educate voters about mail-in balloting in connection
20  with the November 2022 general election process in
21  Bexar County.
22        A.  Sure.  I mean, we -- we did press
23  conferences twice a week.  We did, again, outreach
24  everywhere we went, every -- every presentation we
25  put on, every meeting we went to.  We worked with the

Page 63

1  AARP.  We worked with Oasis.  We -- we did outreach
2  with the organizations that -- that go to the senior
3  citizens to -- to try and -- we worked very heavily
4  with the disability community.  In fact, we're still
5  working with the disability community at this time.
6  So, we -- we -- we just tried to do as much as we
7  could.
8        Q.  And during what period of time were those
9  efforts undertaken with respect to the November 2022
10  general election process?
11        A.  They started the middle of September
12  through Novem- -- November.  Because, again, the
13  middle of September is basically, again, for us is
14  when that's the go button, because we all have to
15  abide by the MOVE Act, which is the federal military
16  MOVE Act, and that's always 45 days before an
17  election.  So, once our ballots go out, it's --
18  somebody's hit the go button.
19        Q.  Did Bexar County comply with that 45-day
20  requirement in connection with the general
21  election --
22        A.  Absolutely.
23        Q.  -- in 2022?
24        A.  Absolutely.
25        MR. GENECIN:  David, would this be a good

Page 64

1  time for a break?
2        MR. BRYANT:  Certainly.  Let's take a
3  break.
4        THE VIDEOGRAPHER:  Time is 10:21.
5  Correction, 10:28 a.m. and we are off the record.
6        (A brief recess was taken.)
7        THE VIDEOGRAPHER:  Time is 10:38 a.m. and
8  we are on the record.
9        Q.  BY MR. BRYANT:  Miss Callanen, you were
10  testifying before the break about outreach and voter
11  education efforts that were made in connection with
12  the November 2022 general election.  And it sounded
13  to me as if those were fairly extensive and ramped up
14  from previous elections; is that correct?
15        A.  Yes, sir.  Yes, sir.
16        Q.  Do you anticipate looking forward that
17  it'll be necessary to continue to increase and
18  increase the level of effort and expense that Bexar
19  County does on -- on voter education and outreach?
20  Or do you believe that over time the need to do that
21  will level off or decline as people understand better
22  the -- the procedures?
23        MS. PAIKOWSKY:  Objection; form.
24        THE WITNESS:  I -- I understand your
25  question.  I -- again, this is an odd number year, so

Page 65

1  we will have so many less people.  And I think we
2  will have to duplicate our media outreach for 2024.
3  Because, again, you keep hearing me say we had 40,000
4  now and 124,000.  So that, to me, is there's another
5  80,000 that have not used the new method.
6        So, we're going to stay attuned to that and
7  stay focused on that.  So, I expect that when we get
8  to the 2024 we'll duplicate what we've done.
9        Q.  BY MR. BRYANT:  Okay.  Do you have any
10  expectations on that subject beyond 2024?
11        A.  No, sir.
12        Q.  Okay.  You testified earlier about efforts
13  that your office makes to contact people whose
14  mail-in ballots have initially been rejected.  And I
15  believe you indicated that sometimes that's by
16  e-mail, sometimes that's by phone.
17        Could you describe the extent and
18  regularity of those efforts that were undertaken in
19  connection with the November 2022 general election.
20        A.  Yes, sir.  Well, in SB-1 it opened up the
21  door for us to be able to have outreach so that they
22  could cure their -- their ballots, that's the phrase
23  we use, they could cure their ballots.  And they
24  opened up the avenue of the phone and by e-mail as
25  opposed to sending them the hard copy reject and

Jacquelyn Callanen

February 28, 2023
Pages 142 to 145

Page 142

1    Q.  BY MS. PAIKOWSKY:  Why do you think your
2  county's rejection rate was lower than the statewide
3  rate?
4    A.  Because I'm proud of our insert and the
5  work we did.
6    Q.  Do you think that other counties have the
7  same level of resources and expertise as Bexar County
8  to implement the kinds of interventions you
9  discussed?
10    MS. CUBRIEL:  Objection; form.
11    THE WITNESS:  I had made reference to that
12  before that, you know, prior to 2020, I would have
13  answered, yes.  But since we've had such a turnover
14  in election leadership, I -- I think it's really hard
15  for a new person to get all the nuances and
16  understand how you have to touch your voters.
17    Q.  BY MS. PAIKOWSKY:  Do economic resources
18  factor into county's ability to implement the kinds
19  of solutions you did in Bexar County in November of
20  2022?
21    A.  I would say absolutely.
22    Q.  So, earlier, you mentioned that the
23  November 2022 general election ran more smoothly than
24  the November 2020 election.  Can you describe more
25  about why that was.

Page 143

1    A.  Again, just sheer numbers.  It -- it -- it
2  basically was just a numbers thing.  Because as we
3  talked about mainly, you know, the mail ballots, when
4  you're dealing with 124,000 going out and 92,000
5  coming back, our office, because we do, we handle
6  everything in house, every single piece of it is
7  handled in house, in 2020 my office, we were -- we
8  were working two shifts.  We didn't have to do that
9  in 2022.
10    In 2020, we were, I think, since you had
11  asked, we did, like, 1,200 voters that we had --
12  workers that we had to put out there.  Well, in
13  2022 -- or 2020, because we expected more voters, we
14  had more workers.  And so we were, like, at 1,800.
15    And so, that's what I'm speaking to, the
16  more complexities, it's -- takes longer to get 1,800
17  people than it does to get 1,200.  It takes longer to
18  do 124 applications than it does to do 40.
19    Q.  And in the differences between the
20  November '22 general election and the November '20
21  general election, would you say that COVID-19 also
22  impacted the smoothness of one election as compared
23  to the other?
24    A.  No, because we had that figured out prior
25  to that November.

Page 144

1    Q.  Do you believe that the November 2022
2  general election was smoother than the 2018 general
3  election?
4    A.  No.  They were the same.
5    Q.  Okay.  As compared to the 2018 general
6  election, was mail voting more difficult in the 2022
7  general election?  And I'm referring to both
8  processing mail ballots and voter education.
9    A.  Yes.
10    Q.  Why is that?
11    A.  With the ID requirement.  The new -- you
12  know, the new -- relatively new ID requirement that
13  we didn't have in prior elections.
14    Q.  Was there any information that would have
15  been useful to administering mail voting in the
16  general election that was not captured in the TEAM
17  database?
18    A.  No.  My initial reaction would be, no.  But
19  in hindsight, during this back and forth -- I mean,
20  if -- if you were looking for multiples, you know,
21  maybe we would open up that for multiples.  But as an
22  administrator doing the election at the time, no.
23    Q.  Does your county keep any data on ABBM
24  rejections that is not reflected in TEAM?
25    A.  No.

Page 145

1    Q.  Does your county keep any data on carrier
2  envelope rejections that is not reflected in TEAM?
3    A.  No.
4    Q.  I think that is all my questions.
5    MS. PAIKOWSKY:  I would like to go off the
6  record if that's okay for just maybe five minutes and
7  we can chat and then come back on.
8    THE VIDEOGRAPHER:  The time is 1:27 p.m.
9  and we are off the record.
10    (A brief recess was taken.)
11    THE VIDEOGRAPHER:  The time is 1:33 p.m.
12  and we are on the record.
13    MS. PAIKOWSKY:  And I am going to pass the
14  witness at this time.
15    MR. GENECIN:  Thank you.
16
17    EXAMINATION
18  BY MR. GENECIN:
19    Q.  Good afternoon, Miss Callanen.
20    A.  Good afternoon, sir.
21    Q.  My name is Victor Genecin.
22    A.  Victor.  I said, "Dennis."  I'm sorry.
23    Q.  And I've got a few questions for you.  Just
24  a little while ago, when you were answering
25  Ms. Paikowsky's questions, you cited the number



**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO**
**THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX I

Jennifer Colvin                                              March 21, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3

    LA UNION DEL PUEBLO           §
 4  ENTERO, et al.,               §
         Plaintiffs,              §
 5                                §
    v.                            §    Case No. 5:21-cv-844-XR
 6                                §
    GREGORY W. ABBOTT, et         §
 7  al.,                          §
         Defendants,              §
 8  _____ §
                                  §
 9                                §
    OCA-GREATER HOUSTON, et       §
10  al.,                          §
         Plaintiffs,              §
11                                §
    v.                            §    Case No. 1:21-cv-780-XR
12                                §
    JANE NELSON, et. al.,         §
13       Defendants,              §
                                  §
14  _____ §
                                  §
15  HOUSTON JUSTICE, et           §
    al.,                          §
16       Plaintiffs,              §
                                  §
17  v.                            §    Case No. 5:21-cv-848-XR
                                  §
18  GREGORY WAYNE ABBOTT,         §
    et al.,                       §
19       Defendants,              §
                                  §
20  _____ §
                                  §
21  LULAC Texas, et al.,          §
         Plaintiffs,              §
22                                §
    v.                            §    Case No. 1:21-cv-0786-XR
23                                §
    JANE NELSON, et al.,          §
24       Defendants,              §
                                  §
25  _____ §
```



Jennifer Colvin

## Page 2

```
1   MI FAMILIA VOTA, et    §
    al.,                   §
2       Plaintiffs,        §
                           §
3   v.                     §   Case No. 5:21-cv-0920-XR
                           §
4   GREG ABBOTT, et al.,   §
        Defendants.        §
5
6
7
8
9           ORAL AND VIDEOTAPED DEPOSITION OF
10                      JENNIFER COLVIN
11                      MARCH 21, 2023
12
13
14
15      ORAL AND VIDEOTAPED DEPOSITION OF JENNIFER COLVIN,
16  produced as a witness at the instance of the Defendants
17  and duly sworn, was taken in the above styled and
18  numbered cause on Tuesday, March 21, 2023, from
19  12:20 p.m. to 3:43 p.m., before DONNA QUALLS, Notary
20  Public in and for the State of Texas, reported by
21  computerized stenotype machine, at the offices of Harris
22  County Attorney's Office, 1019 Congress Street, 15th
23  Floor, Houston, Texas, pursuant to the Federal Rules of
24  Civil Procedure, and any provisions stated on the record
25  or attached hereto.
```

## Page 3

```
1
2               A P P E A R A N C E S
3   FOR THE HARRIS COUNTY ELECTIONS ADMINISTRATOR:
        SAMEER S. BIRRING
4       TIFFANY BINGHAM
        OFFICE OF THE HARRIS COUNTY ATTORNEY CHRISTIAN
5       D. MENEFEE
        1019 Congress, 15th Floor
6       Houston, Texas  77002
        (713) 274-5142
7       sameer.birring@harriscountytx.gov

8   FOR THE HOUSTON AREA URBAN LEAGUE (HAUL) PLAINTIFFS:
        JENNIFER A. HOLMES
9       NAACP Legal Defense and Educational Fund, Inc.
        700 14th Street N.W., Suite 600
10      Washington, District of Columbia  20005
        (347) 573-0197
11      jholmes@naacpldf.org
12
    FOR THE UNITED STATES:
13      DANA PAIKOWSKY
        U.S. DEPARTMENT OF JUSTICE
14      950 Pennsylvania Avenue, NW
        Washington, District of Columbia  20530
15      (202) 353-5225
        dana.paikowsky@usdoj.gov
16
17  FOR THE STATE DEFENDANTS:
        KATHLEEN T. HUNKER
18      OFFICE OF THE ATTORNEY GENERAL
        P.O. BOX 12548 (MC-009)
19      AUSTIN, TEXAS  78711-2548
        (512) 463-2100
20      kathleen.hunker@oag.texas.gov
21
    Also Present:
22      STEPHEN KENNY (Via Zoom)
        BRADLEY PROWANT (Via Zoom)
23      BREANNA WILLIAMS, NAACP (Via Zoom)
        CARRIE LEBEL (Via Zoom)
24      GERMAINE HABELL (Via Zoom)
        JOHN GORE, GOP (Via Zoom)
25      JOHN SULLIVAN BAKER, DOJ (Via Zoom)
```

## Page 4

```
1   LEIGH TOGNETTI (Via Zoom)
        LISA CUBRIEL, BEXAR COUNTY (Via Zoom)
2   LUCIA ROMANO (Via Zoom)
        MIKE STEWART, DOJ (Via Zoom)
3   URUJ SHEIKH, LDF (Via Zoom)
        ZACHARY DOLLING, TCRP, OCA (Via Zoom)
4   REGGIE WRIGHT, THE VIDEOGRAPHER
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
1                       INDEX
2                                              PAGE
3
    Appearances...................................    3
4
5   JENNIFER COLVIN
6   Examination by Ms. Hunker.....................    7
    Examination by Ms. Paikowsky..................   47
7   Examination by Ms. Holmes.....................   74
    Further Examination by Ms. Hunker.............   92
8
9   Corrections & Signature.......................  104
10
    Reporter's Certificate........................  106
11
12                   EXHIBIT INDEX
13
    NUMBER      DESCRIPTION                        PAGE
14  Exhibit 11  Election reconciliation             24
                official totals
15  Exhibit 12  Defendant Harris County             38
                Elections Administrator,
16              Clifford Tatum's responses and
                objections to state defendants'
17              second set of interrogatories,
                and third set of requests for
18              Production
    Exhibit 13  Ballot insert                       41
19  Exhibit 14  Ballot insert                       53
    Exhibit 15  Call log spreadsheet                77
20  Exhibit 16  Harris County Elections             89
                Administrator, Clifford Tatum's
21              supplemental responses to state
                defendants' second set of
22              interrogatories
23
24
25
```



Jennifer Colvin

Page 14

1    A.  Yes.
2    Q.  And you also occupied this position for the May
3 local election and primary runoff that were both held in
4 May?
5    A.  Correct.
6    Q.  And then you also occupied this position for
7 the 2022 general election; is that right?
8    A.  Correct.
9    Q.  And approximately how many full-time employees
10 work under your supervision?
11    A.  Sixteen.
12    Q.  And do you know how many full-time employees
13 work for the Harris County Elections Administrator's
14 Office generally?
15    A.  I don't have that number.
16    Q.  And did you increase the number from 16 in the
17 lead-up to the November 2022 election?
18    A.  Full-time employees, no.
19    Q.  Did you hire temporary employees?
20    A.  We did.
21    Q.  And is that common practice in your office?
22    A.  It is for every election.
23    Q.  And how many did you add?
24    A.  For the November?
25    Q.  That's correct.

Page 15

1    A.  In total, approximately 100.
2    Q.  And is that about expected for a general
3 election?
4    A.  It depends on the number of applications we
5 receive, but, yes.
6    Q.  And so let's start with Topic No. 4.  Topic 4
7 reads:  "Your policies, practices, and procedures
8 regarding mail-in voting during the November 8, 2022,
9 general election.
10        Did I read that correctly?
11    A.  Yes.
12    Q.  And to do that, I want you to turn your
13 attention to Exhibit 4.  This is -- should be in your
14 pile.
15    A.  Exhibit 4?
16    Q.  Uh-huh.
17    A.  Okay.
18    Q.  Do you have the exhibit in front of you?
19    A.  I do.
20    Q.  And do you recognize this exhibit?
21    A.  I do.
22    Q.  And what is it?
23    A.  It's the Harris County Administrator's report
24 on the election.
25    Q.  Did you participate at all in the drafting of

Page 16

1 this particular report?
2    A.  I provided some information for this report.
3    Q.  And what information would that have been?
4    A.  Any numbers -- anything pertaining to ballot by
5 mail.
6    Q.  So let's turn to page 15.  And do you see where
7 it has "Subsection 4, Early Voting Operations"?
8    A.  I do.
9    Q.  And the first sentence reads:  "Early Voting
10 operations include ballot by mail and in-person voting
11 at EVCs."
12        Did I read that correctly?
13    A.  Correct.
14    Q.  And then let's go to the next subsection which
15 is "Subsection A, Ballot By Mail."
16        Do you see that?
17    A.  I do.
18    Q.  Okay.  And so my first question is going to be
19 quite general.  Did you implement any changes in your
20 voting-by-mail procedures between the May elections and
21 the November 2022 general election?
22    A.  The only change would be the form that we
23 mailed out with our ballots.
24    Q.  Okay.  And I will address that in a little bit.
25    A.  Okay.

Page 17

1    Q.  And you're referring to the ballot insert; is
2 that right?
3    A.  Yes.
4    Q.  So the first sentence reads:  "All mail ballots
5 returned by voters were delivered to the NRG Arena and
6 reviewed and processed by the Signature Verification
7 Committee."
8        Did I read that correctly?
9    A.  You did.
10    Q.  And just for clarification, can you please tell
11 me what is a signature verification committee?
12    A.  It's a group of both political parties.
13 They're appointed by their -- the parties, and they come
14 in to review -- it'll -- for instance, it's five Dems,
15 five Reps.  You have a judge, a presiding judge and an
16 alternate judge, one of each party.  And then they come
17 in and review the ballots to make sure the ID and
18 signature match.
19    Q.  And so I just want to understand the procedure.
20 So when a ballot by mail is delivered to the early
21 voting clerk, what happens to that particular ballot?
22 Like how is it processed?
23    A.  We receive the ballot in, and we image it.
24 We -- once we image it, it goes to -- it gets put in a
25 tub for the board.  It's sealed, and we log it.  Once



Jennifer Colvin

March 21, 2023
Pages 18 to 21

Page 18

1  the board sends members, we start -- they send in a
2  couple of members to help our team -- they designate our
3  team to pull the flaps to check for IDs.  Once we start
4  doing that, we process any that don't have IDs -- we
5  mail back to the voters to get them a chance to cure
6  that ballot.  Any -- all the rest of them are put back
7  in the tubs, and we hold them until the SVC convenes.
8      Q.  Okay.  And so you mentioned that in your county
9  the early voting clerk removes the flap to determine
10  whether or not the numbers were added; is that correct?
11     A.  Correct.  Well, us and some of the board
12  members.  It's a group effort depending on the quantity.
13     Q.  And this is to determine whether or not the
14  voter put down their either their social security or
15  Texas ID number?
16     A.  Correct.
17     Q.  And how do you contact the voter if you
18  determine that the voter did not put down an ID number?
19     A.  There's multiple ways you can contact them.  We
20  normally give a phone call, and we send a letter.  If
21  it's before the ballot board meets, the EVBB convenes,
22  we mail them the ballot back.
23     Q.  Okay.  And so are you doing this before this --
24  when I say "doing this," I mean removing the flap before
25  the signature verification committee meets?

Page 19

1      A.  Yes.
2      Q.  And so you can contact the voter before the
3  signature verification committee meets; is that correct?
4      A.  Correct.
5      Q.  And the signature verification committee, they
6  then -- how do they then handle the ballot?
7      A.  The one without the ID or the ones with the ID?
8      Q.  The ones -- first without the ID.  We'll start
9  there.
10     A.  They designate us to send the ballot back to
11  the voter on their behalf.
12     Q.  Okay.  And the ones with ID?
13     A.  The ones with ID, they go through the process
14  to compare the numbers to the -- statements in the
15  system to make sure that the two match, and then they
16  can okay the ballot.
17     Q.  And do they, too, call the voter?
18     A.  Go ahead.
19     Q.  Do they, too, call the voter if they notice
20  that they're -- let me strike that.
21         How does the Signature verification
22  committee contact the voter?
23     A.  They delegated that to our office.
24     Q.  And is that when your office would also call
25  or --

Page 20

1      A.  We call on their behalf.
2      Q.  And according to this report, the signature
3  verification committee convened on October 9th; is that
4  correct?
5      A.  Yes.
6          MS. BINGHAM:  Object to form.  It was the
7  19th.
8          THE REPORTER:  Can you speak up?
9          MS. BINGHAM:  Tiffany Bingham.
10     A.  It was October 19th.
11     Q.  (BY MS. HUNKER)  Okay.  And do they meet each
12  day after that?
13     A.  Depending on volume.  It's not a set schedule.
14     Q.  And you were -- your office was removing the
15  flap.  Did you notice that less voters as compared to
16  the primary and the May elections were not at --
17  including their ID number or social security number?
18         MS. HOLMES:  Objection to form.
19         MS. BINGHAM:  Objection to form.
20         MS. HUNKER:  You can answer the question.
21     A.  There were less voters that left off the ID.
22     Q.  (BY MS. HUNKER)  And the signature verification
23  committee, do they also review the ballot to determine
24  whether or not there is a signature match?
25     A.  They do.

Page 21

1      Q.  And are they contacted -- the individual voters
2  who, let's say, either failed to put their signature or
3  had a mismatch, are they contacted the same way?
4      A.  They are.
5      Q.  And then what happens when a -- the signature
6  verification committee processes the ballot, and then it
7  goes to the early voting ballot board?
8      A.  The signature verification committee can okay
9  the ballot.  If they have a questionable ballot, that's
10  when it -- that goes over to the ballot board.
11     Q.  So if a ballot is accepted by the signature
12  verification committee, it is accepted?
13     A.  Yes.
14     Q.  And it only the questionable ballots that move
15  to the early voting ballot board; is that correct?
16     A.  Correct.
17     Q.  Does the early voting ballot board then have
18  any role with respect to matching ID numbers?
19     A.  They do.
20     Q.  What is that role?
21     A.  They take -- they assume the same process as
22  the SVC.
23     Q.  And how do you contact the voter once the early
24  voting ballot board meets?
25     A.  We keep the ballot in our possession and notify



Jennifer Colvin

March 21, 2023
Pages 30 to 33

Page 30

1 returned -- those are ballots that were just not
2 returned by the voter, correct?
3     A. Right. They had no return status in our
4 system.
5     Q. What about mail ballots surrendered?
6     A. Those are voters that surrendered their ballots
7 at the poll if they wanted to vote early on Election
8 Day.
9     Q. And for a voter who did not include their ID
10 number or had a mismatched ID number, were they then
11 able to return their ballot and vote in person if they
12 had time?
13     A. Yes.
14     Q. And so the mail ballot surrendered, does that
15 include those individuals?
16     A. It could possibly.
17     Q. Okay. And then mail ballots not countable,
18 what does that mean?
19     A. That would mean they either came in after the
20 election. They were late ballots. They're not
21 countable ballots.
22     Q. And so the -- with the exception of the mail
23 ballots not countable, the other numbers are all ballots
24 that would have been received before the ballot-received
25 deadline the day after the election?

Page 31

1     A. Yes.
2     Q. Thank you. And let's go back to page 16. And
3 so it says "The EOA processed over 80,000 mail ballot
4 applications as reflected in the table below."
5         Did I read that correctly?
6     A. Yes.
7     Q. Okay.
8     A. EAO.
9     Q. EAO.
10     A. Yes.
11     Q. Thank you. And so we have domestic versus
12 UOCAVA voters, correct?
13     A. Yes.
14     Q. When a military or overseas voter did not
15 include an ID or had -- let's say had a defect in their
16 ballot, how would you go about contacting that military
17 voter?
18     A. Via e-mail or phone.
19     Q. And a military voter has the option of
20 resubmitting their signature sheet; is that correct?
21     A. Correct.
22     Q. And can they resubmit -- resubmit that
23 signature sheet via e-mail?
24     A. Correct.
25     Q. And so you can contact a military voter about a

Page 32

1 ID number defect by e-mail and have it resolved by
2 e-mail and returned?
3     A. Correct.
4     Q. And did you observe that, looking at the
5 rejected ballot, generally, that some ballots had
6 multiple defects, not just one?
7     A. Yes.
8     Q. Now, when you're reporting that defect, do you
9 put only one reason, or do you put the fact that there
10 were multiple defects?
11     A. VOTEC only allows us to put one reason. The
12 voter will get a letter for both reasons.
13     Q. So there are some voters who may be listed as
14 having one defect but their ballot in fact had
15 multiple -- is that correct? -- in your system?
16         MS. HOLMES: Objection to form.
17         MS. HUNKER: You can answer the question.
18     A. Correct. Well, let me -- let me elaborate.
19 Both of the letters will be in the system. So if a
20 voter were to call us, we can see both letters that were
21 sent. So we can tell them, yes, there was more than one
22 defect. But as far as reporting to the State, you can
23 only send one code.
24     Q. (BY MS. HUNKER) And so your reports to the
25 State only reflect one defect, not the -- not if there

Page 33

1 were multiple defects?
2     A. Correct.
3     Q. And looking specifically at the UOCAVA voters
4 who had their ballots rejected, did you look at the
5 reasons why those ballots were rejected?
6     A. Not each one individually, no.
7     Q. Were they rejected for a variety of reasons?
8     A. Yes.
9     Q. And so I just want to talk a little bit about a
10 little later on page where it says "Mail ballot problems
11 encountered," second paragraph specifically. It says:
12 "During the mail ballot period, the EAO received reports
13 that voters were not receiving" bal- -- "mail ballots
14 and that voters were being charged extra postage because
15 of the size of the carrier envelope."
16         Did I read that correctly?
17     A. Yes.
18     Q. And did your office ever determine why certain
19 voters were not receiving their ballots?
20     A. No.
21     Q. And for the voters who were not receiving their
22 ballots, the ballot was sent. It just was not received;
23 is that correct?
24     A. Correct.
25     Q. And so there was some issue with the postal



Jennifer Colvin

March 21, 2023
Pages 98 to 101

Page 98

1    A.  We had less.  There were more rejects due to ID
2  in previous elections.
3    Q.  (BY MS. HUNKER)  Now, you had spoken a little
4  bit with counsel about the different codes for when a
5  ballot was rejected for an ID requirement.  Is there a
6  separate code if there's a rejection due to lack of
7  signature?
8    A.  Yes.
9    Q.  Do you recommend that voters put down their
10  phone number or e-mail when they're applying to vote by
11  mail?
12    A.  Does our office recommend it?
13    Q.  Yes.
14    A.  Yes.  So we can reach out to the voters if
15  there's a problem with their application.
16    Q.  And do you find that most voters follow through
17  on your recommendation?
18    A.  We get a lot of phone numbers and e-mails.
19    Q.  You also discussed with counsel about that
20  there were occasions where the county voting system had
21  two IDs but the TEAM's database only had one.
22        Do you recall that conversation?
23    A.  Yes.
24    Q.  When you notice that the county database has
25  two ID numbers but the TEAM's database only has one, do

Page 99

1  you inform the secretary of state's office to update the
2  TEAM's database?
3    A.  No.
4    Q.  And do you know if there's -- if there's a
5  policy or procedure that perhaps your tech division has
6  with respect to updating?
7    A.  I don't know.
8    Q.  Okay.  If the county database only has one
9  number but the TEAM's database has two numbers and the
10  number the voter put is the one that was in the TEAM's
11  database but not the one in the county's database, you
12  would accept that ballot; is that correct?
13    A.  Correct.
14    Q.  There's an option for voters with disabilities
15  as well as voters over 65 to submit an application for
16  ballot by mail for the entire year, correct?
17    A.  Correct.  Annual.
18    Q.  And you've already started receiving annual
19  applications for the 2023?
20    A.  That's correct.
21    Q.  And did you notice fewer rejections for the
22  applications that were submitted this year due to the ID
23  mismatch or lack of ID as compared to previous elections
24  in 2022?
25    A.  I haven't analyzed that data, but we're

Page 100

1  receiving very minimal applications right now.
2    Q.  Okay.  To your knowledge, has Harris County
3  ever had a rejection rate for ballots by mail that was
4  zero?
5    A.  No.
6    Q.  And so I want to turn to Exhibit 16 which was
7  provided by your office during this deposition.
8    A.  16.
9    Q.  Yes.  This is the updated...
10    A.  Oh, my apologies.  It's right in front of me.
11    Q.  So looking at -- let me take a step back.
12        Are you using the same database, offline
13  database, in 2022, as you were in these previous
14  elections?
15    A.  Yes.
16    Q.  And how did you come to these rejection rates
17  for previous elections?
18    A.  From numbers within the voter management
19  system.
20    Q.  Were you required to report rejections prior to
21  2022?
22    A.  Yes.
23    Q.  And was that reported to the secretary of
24  state's office?
25    A.  Yes.

Page 101

1    Q.  And so in previous elections, Texas utilized
2  signature verification, correct?
3    A.  Yes.
4    Q.  And do you know if the signature verification
5  committee utilized the same standard election from
6  election?
7        MS. HOLMES:  Objection to form.
8    A.  Yes.
9    Q.  (BY MS. HUNKER)  And did they utilize the same
10  standard election to election?
11        MS. HOLMES:  Objection to form.
12    A.  Repeat that.
13    Q.  (BY MS. HUNKER)  So my first question was did
14  you know if they did, and then I realized that was maybe
15  not clear.  And so I just wanted to clarify, did they
16  use the same standard for signature verification
17  election from election?
18    A.  Prior to SB1, they didn't have to compare IDs.
19  But after SB1, they had to compare IDs.  That's the
20  difference in their processes.
21    Q.  So I think I maybe, then, asked a confusing
22  question.  So I'm talking about the signature
23  verification, not ID --
24    A.  Only their signature verification?
25    Q.  Only their signature verification.  So there



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX J

1     IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF TEXAS
2            SAN ANTONIO DIVISION

3    LA UNION DEL PUEBLO        )
     ENTERO, ET AL.,            )
4          Plaintiffs,      )
                             )
5    VS.                 ) CIVIL ACTION NO.
                         ) 5:21-CV-844 (XR)
6    STATE OF TEXAS, ET AL.,   )
           Defendants.       )
7

8
             ------------------------------------
9
                ORAL DEPOSITION OF
10
                JACQUELINE DOYER
11
                 MARCH 29, 2023
12
             ------------------------------------
13

14

15

16

17          ORAL DEPOSITION OF JACQUELINE DOYER,

18   produced as a witness at the instance of the Defendants,

19   and duly sworn, was taken in the above-styled and

20   numbered cause on the 29th day of March, 2023, from

21   3:14 p.m. to 4:03 p.m., before JAZZMEN CANALES, CSR, in

22   and for the State of Texas, reported by machine

23   shorthand at 209 West 14th Street, Austin, Texas 78701,

24   pursuant to the Texas Rules of Civil Procedure and the

25   provisions stated on the record or attached hereto.



Jacqueline Doyer

March 29, 2023
Pages 2 to 5

Page 2

1            A P P E A R A N C E S
2  FOR THE PLAINTIFFS:
3    MS. NINA PERALES
       MALDEF
4      110 Broadway, Suite 300
       San Antonio, Texas 78205
5      210-224-5476
       E-mail: nperales@maldef.org
6
   FOR THE HOUSTON AREA URBAN LEAGUE PLAINTIFFS:
7
     MR. VICTOR GENECIN (Via Videoconference)
8      NAACP Legal Defense and Educational Fund, Inc.
       40 Rector Street, 5th Floor
9      New York, New York 10006
       929-388-9246
10     E-mail:  vgenecin@naacpldf.org
11 FOR THE DEFENDANTS:
12   MS. KATHLEEN HUNKER
     MR. ETHAN SZUMANSKI
13   MR. ADAM BITTERS
     Office of the Attorney General of Texas
14     P.O. Box 12548
       Austin, Texas 78711
15     512-936-2275
       E-mail: kathleen.hunker@oag.texas.gov
16
   FOR THE UNITED STATES:
17
     MR. MICHAEL STEWART
18   MR. DANIEL FREEMAN
     MR. RICHARD DELLHEIM
19     U.S. Department of Justice
       950 Pennsylvania Avenue NW
20     Washington, D.C. 20530
       202-307-2767
21     E-mail:  michael.stewart3@usdoj.gov
22
23
24
25

Page 3

1              I N D E X
2                              PAGE
3  Appearances..................................  2
4  JACQUELINE DOYER
5    Examination By Mr. Stewart...............  5
     Examination By Mr. Genecin...............  36
6
   Changes and Signature Page ...................  41
7
   Reporter's Certificate .......................  43
8
9            E X H I B I T S
10 NUMBER  DESCRIPTION                        PAGE
11  23   Audit report                          9
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1           THE COURT REPORTER:  At this time, the
2  deposition of Jacqueline Hagan Doyer is being taken in
3  the United States District Court For the Western
4  District of Texas, San Antonio Division, Civil Action
5  No. 5:21-cv-844 (XR), styled La Unión Del Pueblo Entero,
6  et al. vs. State of Texas, et al.  This deposition is
7  being taken at The Price Daniel Sr. State Office
8  Building, 209 West 14th Street, Austin, Texas 78701.
9  The court reporter is Jazzmen Canales.  May counsel
10 please state your appearances,
11           MR. STEWART:  Michael Stewart for the
12 United States.  With me is Daniel Freeman and Richard
13 Dellheim.
14           MS. PERELAS:  Nina Perales of Plaintiff
15 LUPE, L-U-P-E, et al.
16           MR. STEWART:  Anyone who plans to ask
17 questions to the Zoom?
18           MS. HUNKER:  Kathleen Hunker with Ethan
19 Szumanski from the Office of the Texas Attorney General
20 representing State Defendants individual legislators.
21 With me is Adam Bitter and Zina Chala from the Office of
22 the Secretary of State.
23           JACQUELINE HAGAN DOYLE,
24 having been first duly sworn, testified as follows:
25

Page 5

1            EXAMINATION
2  BY MR. STEWART:
3     Q.  Good afternoon.  Do you prefer Doyer or Hagan
4  Doyer?
5     A.  Doyer.
6     Q.  First question, you did great.  So as we just
7  said, I am here on behalf of the United States.  My name
8  is Mike Stewart.  My understanding you are here as
9  representative of the Secretary of State's office today;
10 is that correct?
11    A.  That's correct.
12    Q.  Okay.  Thank you.  And I am understanding that
13 you are here to testify about the audit-related
14 questions in the notice of deposition; is that correct?
15    A.  I understood with regard to the audit report
16 and the specified sections of the report.
17    Q.  Great.  Thank you.  Have you been deposed
18 before?
19    A.  I have not.
20    Q.  Okay.  So before we start, I just want to real
21 quickly go through ground rules that will set us up
22 smoothly.  So a deposition, as you probably see, it goes
23 by question and answer.  The reporter can only take down
24 what you say out loud, so all your answers need to be
25 verbal.  Is that okay?



Jacqueline Doyer                                    March 29, 2023
                                                   Pages 6 to 9

Page 6

1   A. Yes, sir.
2   Q. I will try my best not to talk over you, and if
3 you can wait until I am finished asking the question,
4 that will work best. If ever I cut you off, just let me
5 know, and we can make sure your full answer gets on the
6 record. Okay?
7   A. Yes.
8   Q. So it is important to answer completely and
9 accurately to the best of your ability. Do you
10 understand that?
11   A. Yes.
12   Q. Great. If I ever ask a question that is
13 unclear, you can ask me for clarification. Okay?
14   A. Yes.
15   Q. Your attorney or attorney for another party may
16 object. That's fine. And I will give them a second
17 before you answer to allow them to object. But unless
18 you are instructed not to answer or there is a privilege
19 basis not to answer, you can go ahead and answer the
20 question regardless. Okay?
21   A. Yes.
22   Q. Once the question is pending, I will just ask
23 that you answer that question before you consult with
24 your attorney or anything. Is that okay?
25   A. I understand.

Page 7

1   Q. And then if you need a break -- this should be
2 short -- but just let me know, and we can see about
3 that. If you later remember something you forgot
4 earlier or want to add, just let me know, we can get
5 that on the record. Okay?
6   A. Understand.
7   Q. If you can think of a document that would help
8 refresh your recollection, we may have it. Just let me
9 know. Okay?
10   A. It looks like.
11   Q. This is just one, I will say that. And then
12 just -- this is a necessary question. But have you
13 taken any medication, alcohol, drugs, anything that
14 would affect your ability to understand what I am asking
15 or give a complete answer today?
16   A. No, sir.
17   Q. Okay. And then you understand you are under
18 oath, subject to penalties for false or misleading
19 testimony, correct?
20   A. I understand.
21   Q. Okay. Great. So how did you prepare to
22 testify for this deposition?
23   A. I met with my attorneys.
24   Q. And who would that be?
25   A. I met with Kathleen Hunker.

Page 8

1   Q. Anyone else?
2   A. I met with Adam Bitter.
3   Q. And anyone else?
4   A. I met with Zina Chala.
5   Q. Is that all?
6   A. I also met with the members of the FAD team.
7   Q. Okay. And those would be -- and do those
8 individuals report to you on the FAD team?
9   A. Some of them.
10   Q. Some of them. And what were their roles?
11   A. I have auditors that report to me, and then I
12 also have a legal assistant that reports to me.
13   Q. Okay. And when we say -- when you say FAD
14 team, that's the Forensic Audit Division of the
15 Secretary of State?
16   A. That is correct.
17   Q. Great. Thank you. Did you review any
18 documents in the course of your preparation?
19   A. I did.
20   Q. What documents were those?
21   A. I reviewed the audit report.
22   Q. Okay. Anything else?
23   A. I reviewed portions of the election code.
24   Q. Okay. And then did you bring any documents
25 with you here today?

Page 9

1   A. I did.
2   Q. What did you bring with you?
3   A. I brought a copy of the audit report and a copy
4 of the letter we sent to Harris County.
5   Q. Okay. Thank you. So -- and then just real
6 quickly. Can you tell me what your role is in the
7 Forensic Audit Division?
8   A. I am the deputy and legal director for the
9 division.
10   Q. And how long have you been in that role?
11   A. I was promoted in that role in November of
12 2022.
13   Q. Okay. Thank you. Were you with the Forensic
14 Audit Division before that?
15   A. I was.
16   Q. What was your role then?
17   A. I served as the attorney to the division.
18   Q. And when did you begin that?
19   A. April of 2022.
20   Q. Is that when you first joined the audit
21 division?
22   A. It is.
23   Q. Okay. So I am going to mark Exhibit 23.
24       (Exhibit 23 marked.)
25   Q. (BY MR. STEWART) Do you recognize this



Jacqueline Doyer

March 29, 2023
Pages 10 to 13

Page 10

1 document?
2 A. I do.
3 Q. What is it?
4 A. It appears to be a copy of our final report
5 issued in December of 2022.
6 Q. Thank you. So what were the goals of the
7 forensic audit for which this is the final report?
8 A. I believe that's reflected in the executive
9 summary.
10 Q. Is the executive summary complete and accurate
11 as to the goals of the audit?
12 A. Yes.
13 Q. Who was involved in designing the audit?
14 A. I don't understand your question.
15 Q. So what individuals within the audit division
16 were involved in designing the, shall I say,
17 investigative task of the audit?
18      MS. HUNKER: Objection. Form.
19 A. Can you specify what you mean by design?
20 Q. (BY MR. STEWART) Sure. So I guess to say,
21 when you determined -- or as the Forensic Audit Division
22 was determining, sort of, what to examine and how they
23 were going to examine it, who was involved in those
24 conversations?
25 A. I was involved in those conversations.

Page 11

1 Q. Who else?
2 A. Our director.
3 Q. Anyone else?
4 A. Auditors.
5 Q. Anyone outside the division involved in those
6 conversations?
7 A. The secretary.
8 Q. The secretary. Anyone outside the Secretary of
9 State's office involved in those conversations?
10 A. No.
11 Q. Okay. How were the topics for the audit
12 chosen?
13 A. They were data driven.
14 Q. And by data driven, what does that mean?
15 A. Based on the records that were provided, we
16 evaluated what areas had auditable points.
17 Q. And by the records you provided, provided by
18 whom?
19 A. Provided by the counties to -- directly to the
20 Forensic Audit Division or provided by the counties to
21 the elections division and then passed on to our
22 division.
23 Q. Were those records from the 2022 general
24 election?
25 A. Yes, they were.

Page 12

1 Q. Were there other types of records you are
2 referring to there?
3 A. Not that I am aware of.
4 Q. Were those records the counties required to
5 maintain or additional materials as well?
6 A. I want to correct something.
7 Q. Sure.
8 A. We did get some records from Tarrant County for
9 2022. They submitted those in error.
10 Q. Okay. But then going back to the previous
11 question, were those all records the counties were
12 required to maintain, or were there additional materials
13 they had that were also provided to you?
14 A. They were records they were required to
15 maintain, for the most part, or things that they kept as
16 a regular practice.
17 Q. Got it. Were there any -- besides your review
18 of the records provided by the counties, were there any
19 specific issues with the 2020 general election that were
20 identified as a reason for the audit?
21      MS. HUNKER: Objection. Form.
22 A. Can you maybe specify what you mean by that?
23 Q. (BY MR. STEWART) Yeah. Was there some sort of
24 imminence for the audit, either an error or mistake you
25 noticed or something that you thought merit an

Page 13

1 investigation that was a reason for the audit?
2 A. The reason for the audit is reflected in the
3 executive summary.
4 Q. Okay.
5 A. To ensure that all Texas voters can have
6 confidence in the election systems in our state.
7 Q. Was there a feeling that Texas voters did not
8 have confidence?
9      MS. HUNKER: Objection. Form.
10 A. I am not aware of the feelings that were
11 present. I am just here to testify about what's in the
12 report.
13 Q. (BY MR. STEWART) Fair. The question I am
14 trying to ask is, was that statement included in the
15 audit report based on an understanding in the Secretary
16 of State's office that voters did not have confidence in
17 the 2020 general election?
18      MS. HUNKER: Objection. Form.
19 A. This -- the audit was to ensure that Texas
20 voters can have confidence in the election systems in
21 our state.
22 Q. (BY MR. STEWART) Well, did the Secretary of
23 State's office and the Forensic Audit Division have any
24 specific information that voters did not have
25 confidence?



Jacqueline Doyer

March 29, 2023
Pages 14 to 17

Page 14

1     A.  I don't believe the agency has an official
2  position on that.
3     Q.  Okay.  Were there any information requests sent
4  to counties that were not reflected in the final report?
5     A.  When you say information requests, what do you
6  mean?
7     Q.  So let me back up then.  You -- you mentioned
8  that the audit was based on data and records sent to the
9  audit division by the counties, correct?
10    A.  Sent to our division by the counties or sent to
11 the election division and then provided to us.
12    Q.  Okay.  So I will broadly refer to the Secretary
13 of State's office, to be clear, because those are both
14 under the Secretary of State, right?
15    A.  Yes.
16    Q.  Okay.  Was that all items that were reported by
17 the counties in due course, or were there items
18 specifically requested by the Secretary of State's
19 office for the purpose of the audit?
20    A.  Some of the items reviewed were provided in due
21 course.  Some of the items reviewed were provided in
22 response to the request.
23    Q.  Okay.  And were there any specifically
24 requested items by the Secretary of State's office that
25 aren't reflected -- that their requests are not

Page 15

1  reflected somewhere in the body of this report?
2     A.  I am not sure what you mean by that.
3     Q.  I guess I am saying, was -- was each
4  information request you made, like a cataloging of it,
5  reflected somewhere in this report?
6     A.  Information requests are not cataloged in the
7  report.
8     Q.  So there are -- are there information you
9  received from counties that didn't lead into the final
10 audit report?
11       MS. HUNKER:  Objection.  Form.
12    A.  We received 369 gigabytes of data, and this is
13 a 359-page report.
14    Q.  (BY MR. STEWART)  Fair.
15    A.  Not everything is included in the report.
16    Q.  Let's talk about more categorically.  So were
17 there sort of areas -- you know, there's a list of
18 topics here.  So sort of topically, was there anything
19 investigated that did not -- or audited, I should say,
20 that did not end up in the final report?
21    A.  When you say audited that did not end up in the
22 final report, what do you mean by that?
23    Q.  Let me rephrase it this way.  Were there any
24 conclusions the audit division came to that were not
25 included in the final record?

Page 16

1     A.  No.  The audit division's conclusions are
2  reflected in the report.
3     Q.  Okay.  Which entities were being evaluated in
4  the audit report?
5     A.  When you say entities, do you mean counties?
6     Q.  Yes.
7     A.  The counties were Collin County, Dallas County,
8  Harris County, and Tarrant County.
9     Q.  Was any state governmental entity, other than
10 those four counties, evaluated by the report?
11    A.  What do you mean by state governmental entity?
12    Q.  Sure.  Whether it is at the state level, county
13 level, municipal level.  So taking state agencies, like
14 the AOG's office or the SOS, other counties, or, you
15 know, subdivision of counties, municipalities.  Was
16 anything other than those four counties you've
17 identified evaluated by the audit report?
18       MS. HUNKER:  Objection.  Form.
19    A.  I still don't understand the question.
20    Q.  (BY MR. STEWART)  Sure.  Are there any
21 conclusions about the performance of the Secretary of
22 State's office in the 2020 general election in this
23 audit report?
24    A.  We did not evaluate the Secretary of State's
25 office.

Page 17

1     Q.  Did you evaluate the Attorney General's office?
2     A.  We did not evaluate the Attorney General's
3  office.
4     Q.  Did you evaluate any counties other than the
5  four counties identified in the report?
6     A.  In the report, we only identified the four
7  counties, Collin, Dallas, Harris, and Tarrant County.
8     Q.  And those were the only counties evaluated by
9  the report?
10    A.  That's correct.
11    Q.  Okay.  Was the performance of early voting
12 ballot boards in those counties evaluated?
13       MS. HUNKER:  Objection.  Form.
14    A.  What do you mean by performance?
15    Q.  (BY MR. STEWART)  Well, let me rephrase it.
16 Were aspects of the activities of the early voting
17 ballot boards in those counties evaluated?
18       MS. HUNKER:  Objection.  Form.
19    A.  What do you mean by evaluated?
20    Q.  (BY MR. STEWART)  Sure.  Audited.  Did you
21 audit any aspect of, you know, how early voting ballot
22 boards performed their duties?
23       MS. HUNKER:  Same objection.
24    A.  When you say audit, can you be more specific?
25    Q.  (BY MR. STEWART)  Yeah.  All the activities



Jacqueline Doyer

March 29, 2023
Pages 18 to 21

Page 18

1  conducted in order to prepare this final report.
2          MS. HUNKER: Objection. Form.
3     A.  I still don't understand the question.
4     Q.  (BY MR. STEWART) Sure. Did you send any
5  information requests specifically regarding early voting
6  ballot boards?
7     A.  We did send those type of requests.
8     Q.  And did you come to any conclusions about the
9  performance of early voting ballot boards?
10    A.  We did not evaluate the performance of early
11 voting ballot boards.
12    Q.  Did you evaluate the performance of any
13 signature verification committees?
14         MS. HUNKER: Objection. Form.
15    A.  What do you mean by performance?
16    Q.  (BY MR. STEWART) I guess I put that back to
17 you. When you say you did not evaluate the performance
18 of early voting ballot boards, what did you mean by
19 that?
20    A.  We didn't evaluate how they did things.
21    Q.  Okay.
22    A.  We evaluated the processes and procedures that
23 each county used.
24    Q.  And by evaluated, were you saying whether they
25 were good or bad, or what do you mean by evaluated in

Page 19

1  this context?
2     A.  We asked questions, and then we reported on the
3  procedures.
4     Q.  Okay. And so using that same definition of
5  performance you've used for the early voting ballot
6  boards, did you evaluate the performance of the
7  signature verification committees?
8     A.  We asked questions for the counties that has
9  signature verification committees as to how they did
10 things and reported on those procedures.
11    Q.  Okay. I want to turn to the mail voting
12 section of this audit report, which I believe starts on
13 Page 198. And just so we are clear for the record, the
14 word "TEAM" appears in this report. Does that refer to
15 the Texas Election Administration Management database?
16    A.  It does.
17    Q.  Okay. And then when you use -- not you, but
18 when the SOS uses ABBM in this report, is that
19 application for ballot by mail?
20    A.  Yes, sir.
21    Q.  And BBM is just the ballot by mail, correct?
22    A.  Yes, sir.
23    Q.  Okay. I am going to turn quickly to Page 210
24 then. The second paragraph, it says, the counties were
25 unform in that they did not have a system or spreadsheet

Page 20

1  in place for tracking some rejected ABBMs. This refers
2  to the pre-Senate Bill 1 system, correct?
3          MS. HUNKER: Objection. Form.
4     A.  The law contained in the code -- for the law
5  contained in the report that we were evaluating the
6  counties on was pre-SB1.
7     Q.  (BY MR. STEWART) Okay.
8     A.  That existed in 2020.
9     Q.  So that's generally applicable to the audit,
10 right, that this all from before SB1?
11    A.  That's correct.
12    Q.  Okay. Did you make any conclusions in the
13 audit report about how the processes or procedures
14 evaluated would comply with SB1?
15    A.  We did not.
16    Q.  Okay. So in the next paragraph, it says, one
17 of the limitations with counties that are not online
18 with the TEAM database is the fact that the counties
19 must provide uploads to update the data that populates
20 TEAM. And then it says, there could be delays between
21 the counties reporting and upload to the database,
22 attributable to the action of the counties, actions of
23 the counties, or their offline vendors. This can
24 negatively affect the accuracy of the records contained
25 in TEAM. Did I read that correctly?

Page 21

1     A.  You did.
2     Q.  Okay. Were all of the audited counties offline
3  counties?
4     A.  Yes, they were all offline counties.
5     Q.  Did all of them have delays in uploading
6  records to TEAM?
7     A.  That would not be within my knowledge.
8     Q.  Okay. Do you know who would know that?
9     A.  Somebody who has more knowledge of the TEAM
10 system.
11    Q.  Would it be someone within the Forensic Audit
12 Division who would know that?
13    A.  No.
14    Q.  Was any aspect of TEAM evaluated or considered
15 during the audit?
16    A.  What do you mean by that?
17    Q.  Sure. Was the performance of TEAM evaluated?
18    A.  Could you specify --
19         MS. HUNKER: Objection. Form.
20    Q.  (BY MR. STEWART) Yeah. Was there anything
21 about the accuracy of the records in TEAM that was
22 evaluated in the course of the audit?
23    A.  We were not evaluating TEAM. However, if
24 somebody's vote history, as uploaded by the county, was
25 inaccurate in TEAM, that's tied to the voter



Jacqueline Doyer

March 29, 2023
Pages 22 to 25

Page 22

1  participating history that's uploaded by the county.
2      Q.  Okay.  Did you find instances where the vote
3  history was inaccurate in TEAM?
4      A.  Yes.
5      Q.  How frequently did that occur?
6          MS. HUNKER:  Objection.  Form.
7      A.  The frequency is not in the report.
8      Q.  (BY MR. STEWART)  For the purposes of preparing
9  this report, did the Forensic Audit Division look into
10  mail ballot impersonation fraud?
11      A.  What do you mean by that?
12      Q.  Did you conduct any activities or investigation
13  that would reveal mail ballot impersonation fraud?
14          MS. HUNKER:  Objection.  Form.
15      A.  What type of activities?
16      Q.  (BY MR. STEWART)  I guess that's my question to
17  you.  Is that something that was being audited?  Was
18  that within the scope -- let me withdraw that question.
19          Was mail ballot fraud within the scope of
20  this audit?
21          MS. HUNKER:  Objection.  Form.
22      A.  I am not sure I understand that question.
23      Q.  (BY MR. STEWART)  Sure.  Was -- did you reach
24  any conclusions regarding the existence or nonexistence
25  of mail ballot fraud in any of these counties?

Page 23

1          MS. HUNKER:  Objection.  Form.
2      A.  We did not reach any conclusions as to whether
3  or not there was mail ballot fraud.
4      Q.  (BY MR. STEWART)  Did you assess any procedures
5  that might identify whether or not there was mail ballot
6  fraud in any of these counties?
7      A.  Procedures by whom?
8      Q.  By the counties.
9      A.  I am not sure that procedures by the counties
10  would indicate whether or not there was mail voter
11  fraud.
12      Q.  Okay.  Did you assess any procedures by any
13  other entity that might indicate whether or not there
14  was mail voter fraud?
15      A.  No.  We only assessed the four counties.
16      Q.  Okay.  And so did -- you did assess county
17  procedures, though, correct?
18      A.  Yes.
19      Q.  And so I am correct in saying -- your testimony
20  here today is that none of those procedures would
21  indicate positively or negatively the existence of mail
22  voter fraud?
23          MS. HUNKER:  Objection.  Form.  Misstates
24  testimony.
25      A.  Procedures themselves did not indicate whether

Page 24

1  or not mail voter fraud occurred in 2020 for those four
2  counties.
3      Q.  (BY MR. STEWART)  I want to look at this
4  section on Dallas County, which is on Page 214.  And I
5  think in that sentence you mentioned difficulties in
6  processing the high volume of mail ballots; is that
7  correct?
8      A.  Yes.  Dallas County experienced difficulties in
9  processing the high volume of ballots by mail due to
10  staff turnover that occurred just prior to the 2020
11  general election.
12      Q.  All right.  Is there any other reason you
13  identified that wasn't included in here, or is that sort
14  of the only conclusion made as to the reason for
15  difficulty in processing mail ballots in 2020 in Dallas?
16      A.  I'm sorry.  Can you rephrase that?
17      Q.  Sure.  So this mentions the conclusion, you
18  know, it gives the reason why there was difficulty in
19  processing the high volume of mail ballots.  Was there
20  any reasons that you discovered that weren't reflected
21  in the final report?
22      A.  No.  There's additional reasons reflected on
23  214, but not that are absent from the report.
24      Q.  Nothing that's not in the report?
25      A.  That's correct.

Page 25

1      Q.  Okay.  And then turning to Harris County, which
2  is on 216, there's a -- the second sentence here says,
3  the BBM process was described to FAD as chaotic.  Do you
4  know who made that description as chaotic?
5      A.  It was one of the witnesses or individuals that
6  we spoke to during the course of the audit.
7      Q.  Do you know if that would be someone who worked
8  for the Harris County elections office?
9      A.  Honestly, I can't remember.
10      Q.  When it says the BBM process, is there any
11  specific processes it is referring to?
12      A.  I think it is the whole process.
13      Q.  And it says one of the reasons attributed to
14  this description was the volume of ballots by mail.
15  Were there any other reasons attributed to the
16  description of the process as chaotic that aren't
17  reflected here?
18          MS. HUNKER:  Objection.  Form.
19      A.  There aren't any other reasons reflected in the
20  report.
21      Q.  (BY MR. STEWART)  Are there any reasons that
22  are not reflected in the report but of which the
23  Forensic Audit Division is aware?
24      A.  What is in the report is what the final
25  determinations were.



Jacqueline Doyer

March 29, 2023
Pages 26 to 29

Page 26

1    Q.  Okay.  Was there any evaluation of ABBM
2  processes in Harris County?
3    A.  What do you mean when you say evaluation?
4    Q.  Sure.  Was there any auditing of ABBM processes
5  in Harris County?
6    A.  We were not able to discuss the ABBM processes
7  in Harris County because Harris County staff was not
8  made available regarding that matter.
9    Q.  Looking at now the last paragraph on 216 but
10  then rolls over into 217.  On the first line of 217, it
11  describes questionable carrier envelope in the sentence.
12  Any questionable carrier envelope is removed from a
13  batch and wrapped in a separate sheet for further
14  review.  Do you see where I am?
15    A.  Yes, sir.
16    Q.  What is meant by questionable carrier envelope
17  in that sentence?
18    A.  From our understanding out in the field,
19  questionable carrier envelope could be one that maybe
20  didn't have a matching signature or there was something
21  that needed to go on for further review by a ballot
22  board or another TEAM.  Harris County had a very
23  specific system that used multiple TEAMs.
24    Q.  Is the -- is the description as questionable
25  there meant to indicate potential fraud?

Page 27

1        MS. HUNKER:  Objection.  Form.
2    A.  The description of questionable is the word
3  that was used by the witnesses or individuals we were
4  able to speak with.
5    Q.  (BY MR. STEWART)  So you are reflecting exactly
6  what was said by the individuals interviewed?
7    A.  I wouldn't say exactly because obviously things
8  have been paraphrased.  But that was the term that was
9  used, and they used in other counties as well,
10  questionable or questioned.
11    Q.  Did the Forensic Audit Division have any
12  understanding that the term "questionable" meant a
13  ballot could be fraudulent?
14    A.  We didn't have an understanding of that.
15  Questionable usually meant that they couldn't agree, so
16  they asked another set of eyes to look at it.
17    Q.  Couldn't agree on what specifically?
18    A.  The signatures.
19    Q.  The signature.  Is a signature itself
20  potentially indicative of fraud?
21        MS. HUNKER:  Objection.  Form.  And how you
22  phrase it is outside the scope of her deposition topics.
23    A.  I don't know that I can speak to that.  It is
24  not reflected in the report.
25    Q.  (BY MR. STEWART)  Let me ask it that way.  Is

Page 28

1  there any indication either way of whether a signature
2  itself can be potentially indicative of fraud in the
3  audit report?
4    A.  We did not evaluate whether signatures
5  themselves could be potentially indicative of fraud.
6    Q.  Okay.  All right.  Turning to Page 224, there
7  is a section that begins, reason for requesting ballot
8  by mail.  I would say that -- is it correct to
9  characterize that in each county in which you had data,
10  the FAD determined that at least some voters who were
11  not eligible were permitted to vote by mail; is that
12  correct?
13    A.  So in the data available from the counties, we
14  were able to determine there were some individuals that
15  were not entitled to vote by mail for the reason of age
16  that did appear to have received a ballot.
17    Q.  Did the audit division conduct any analysis of
18  the root cause of why that occurred?
19    A.  Yes.
20    Q.  And what was the audit division's
21  determination?
22    A.  There were multiple reasons.
23    Q.  And what were they?
24    A.  One of the reasons was miscoding by the county.
25    Q.  What other reasons?

Page 29

1    A.  Another reason would be attaching a record, for
2  example, in a junior, senior situation, to the wrong
3  individual.  So it -- the record may have reflected that
4  a ballot by mail was issued to the junior when in fact
5  the senior had requested it, and the senior was the one
6  who wanted to vote by mail.
7    Q.  Were there any reasons that would have been
8  based on an action of the voter as opposed to county
9  election officials?
10    A.  Yes.
11    Q.  What were those?
12    A.  Not including information on the application
13  for a ballot by mail that would have indicated they were
14  eligible to vote by mail.
15    Q.  Any others?
16    A.  Yes.  For example -- let's see here.  On
17  Page 226, 42 voters had applications that requested to
18  vote by mail due to being 65 or older, but date of birth
19  records indicated the voters were not 65.
20    Q.  Any reasons that aren't reflected here on the
21  report?
22    A.  No.
23    Q.  Turning to Page 229.  It appears that with
24  respect to Dallas County you identified an issue
25  described here as bulk applications for ballot by mail,



Page 30

1 correct?
2    A.  Yes.
3    Q.  Can you describe just briefly for me what that
4 issue was?
5    A.  We identified from their record that they had
6 boxes containing applications received in bundle for
7 ballots by mail.
8    Q.  Did you determine whether those applications
9 received in bundle for ballots by mail violated state
10 law?
11    A.  We do not make those determinations.
12    Q.  Okay.  Did you refer this matter to the
13 Attorney General's office?
14       MS. HUNKER:  Objection.  I am going to
15 raise investigative privilege.  This is not saying you
16 can't answer, but I am going to advise you to only
17 answer information that either would be publicly
18 available or would not compromise the integrity of the
19 investigation as well as any specific information or
20 details that would be related to an ongoing prosecution
21 or one that was referred.
22       MR. STEWART:  Just for the clarity of the
23 record, would that include information whether it was
24 referred at all?  Just a yes or no.
25       MS. HUNKER:  If she is talking about

Page 31

1 specifics, yes.  If she is talking about like the
2 generality of like a subject area --
3       MR. STEWART:  Okay.
4       MS. HUNKER:  -- then no.  I just want to
5 make sure she doesn't get into the nitty-gritty.
6       MR. STEWART:  Yeah.  I just want to
7 understand the line.
8    A.  The Office of the Attorney General had agreed
9 to assist with providing additional information so that
10 occurrence in Dallas County could be referred to the
11 local authorities for investigation and potential
12 prosecution.
13    Q.  (BY MR. STEWART)  I see.  Do you know whether
14 there have been any prosecutions based on this issue
15 identified in this report here?
16    A.  That is not within the scope of my knowledge.
17    Q.  Okay.  Did the Forensic Audit Division speak
18 with the -- any individuals involved or described here?
19    A.  Can you be more specific?
20    Q.  Sure.  So I think it identifies an assistant
21 who signed multiple ABBMs as an assistant.  Did you
22 speak with that individual?
23    A.  Which page are we on?
24    Q.  I think we are on 230.  One address in
25 particular identified as an assisted living facility was

Page 32

1 the source of 55 ABBMs submitted with the same
2 individual's name as the assistant on all 55
3 applications.  Did the audit division speak with that
4 assistant?
5    A.  We did not.
6    Q.  Did you speak with any of the voters?
7    A.  We did not.
8    Q.  Did you visit that facility?
9    A.  We did not.
10    Q.  Okay.  Did you determine whether this -- did
11 you attempt to determine, let me say, whether the same
12 assistant also attempted to assistant the same voters
13 with their ballots?
14    A.  We attempted to locate the carrier envelopes
15 associated with the voters with that subset of data.
16    Q.  Did the Forensic Audit Division find any
17 evidence that the ABBMs at issue were not personally
18 signed by the voters or at their direction?
19    A.  What do you mean by evidence?
20    Q.  Did you conduct any investigation into whether
21 the voters, the 55 voters identified, personally signed
22 these ABBMs, or they were signed by an assistant at
23 their direction?
24    A.  We just reviewed the records.
25    Q.  Okay.  All right.  I want to turn quickly to

Page 33

1 the voter register topic, which is back on Page 42.
2       MR. STEWART:  Where are we on record time?
3       MS. HUNKER:  You said 42?
4       MR. STEWART:  42, yes.
5       MS. HUNKER:  I have you at five minutes
6 remaining.
7       MR. STEWART:  What's that?
8    Q.  (BY MR. STEWART)  Actually, you know what, I
9 asked this question already, so I don't think we need to
10 go there.  Actually, I will ask briefly about the
11 complaint section beginning on 351, but I don't think we
12 need to turn there.  I just want to ask.  Did the
13 Forensic Audit Division analyze the substance of any of
14 the complaints as to whether they were accurate or not?
15       MS. HUNKER:  Objection.  Form.
16    A.  We did not evaluate the accuracy of the
17 complaints.
18    Q.  (BY MR. STEWART)  Okay.  Who reviewed the audit
19 report before it was filed?
20    A.  I reviewed the report.
21    Q.  Did anyone else?
22    A.  Yes.
23    Q.  Who else reviewed it?
24    A.  Our director.
25    Q.  Anyone else outside the audit division review



Jacqueline Doyer

March 29, 2023
Pages 34 to 37

Page 34

1  it before it was finalized?
2      A.  The secretary.
3      Q.  Anyone outside the Secretary of State's office
4  review it before it was finalized?
5      A.  I believe the governor's office reviewed parts
6  of it.
7      Q.  Did the governor's office recommend any
8  changes?
9      A.  I believe so, yes.
10     Q.  Were they substantive as to the conclusions?
11     A.  No.
12     Q.  What was the nature of those changes?
13     A.  I do not recall.  It's been several months
14  since the nature of those changes were.
15     Q.  Do you know who would know that?
16     A.  I can probably try to find an answer for you on
17  that.
18     Q.  I would appreciate that.  Thank you.
19     A.  Okay.
20     Q.  Was there anyone -- leaving aside the governor
21  and the governor's office, was there anyone outside the
22  Secretary of State's office who requested or directed
23  that conclusions be changed before the audit report was
24  finalized?
25         MS. HUNKER:  Objection.  Form.

Page 35

1      A.  No.
2      Q.  (BY MR. STEWART)  Okay.  Were there any
3  topics -- topical areas that were included in the audit
4  design but are not reflected in the final report?
5      A.  What do you mean by audit design?
6      Q.  Sure.  So when you were coming up with the
7  scope of the audit and the activities that would be
8  undertaken to, you know, evaluate the counties'
9  processes, were there subject areas that were planned
10  for evaluation but ultimately were not included in the
11  final report?
12     A.  Yes.
13     Q.  What were those?
14     A.  We wanted to look at, for example, poll worker
15  staffing at polling locations.
16     Q.  Anything related to mail balloting?
17     A.  Like I said, it was data driving.  So if the
18  data was there, we were able to evaluate and make a
19  report of the conclusions and decisions.
20     Q.  So there is nothing specific you can recall
21  that related to mail balloting that was sort of dropped
22  from the scope of the report between the audit design
23  and the final report?
24     A.  No.
25     Q.  Okay.

Page 36

1         MR. STEWART:  With that, I have no further
2  questions.  I don't know if anyone on the Zoom has a
3  question that will take one minute.
4         All right.  Thank you.  I will pass the
5  witness.
6         THE WITNESS:  I think one person just
7  popped up.  But you are muted, sir.
8         MS. PERELAS:  No questions here.
9         MR. GENECIN:  Am I unmuted?  Can you hear
10  me?
11         MR. STEWART:  You are, Victor.
12         MR. GENECIN:  Good.
13             EXAMINATION
14  BY MR. GENECIN:
15     Q.  Ms. Doyer, my name is Victor Genecin.  I am a
16  lawyer with the NAACP Legal Defense Fund, and I
17  represent the Houston Area Urban League Plaintiff, and I
18  just have a few questions for you.  I would like to draw
19  your attention to Page 6 of Exhibit 23, the section
20  labeled key findings.
21         MS. HUNKER:  So I am going to interject.
22  We have reached the seven-hour limit for the 30(b)(6)
23  deposition, and so I am going to ask that we go off the
24  record and close out the deposition.
25         (Off the record.)

Page 37

1         MS. HUNKER:  After consulting with my
2  client, we've agreed to give an additional 15 minutes so
3  that the OCA greater Plaintiff's counsel can ask his
4  line of questions.
5         MR. GENECIN:  Thank you very much.
6      Q.  (BY MR. GENECIN)  Ms. Doyer, I would like to
7  draw your attention to Page 6 of the -- of Exhibit 23,
8  section called key findings.  Are you there?
9      A.  I am.
10     Q.  And specifically the next to last sentence of
11  that section reads, many of the irregularities observed
12  in the audit are less likely to occur in future
13  elections due to legislative changes made following the
14  2020 general election including Senate Bill 1.  Did I
15  read that section correctly?
16     A.  Yes, sir.
17     Q.  What is the basis in the audit for the sentence
18  that I just read?
19     A.  There were many improvements that came
20  legislatively that can preclude the volume in some of
21  what we saw in the records that we reviewed in those
22  four counties.
23     Q.  What are those changes?
24     A.  The mail ballot tracker, for example.
25     Q.  Any others?



Page 38

1     A.  Yes.  Senate Bill 1 added Section 127, I want
2  to say, 009 that requires counties to submit a
3  tabulation audit log to the Secretary of State's office.
4     Q.  Anything else?
5     A.  The addition of the requirement for counties to
6  put zero tapes at the polling location.
7     Q.  Anything else?
8     A.  The identifiers on the carrier envelopes would
9  preclude issues like we saw in Dallas where the --
10  Dallas and Collin where a voter had been attached to a
11  ballot by mail that had the identifiers been included,
12  then perhaps the voter record would have been more
13  accurate and the correct voter would have been reflected
14  as having voted by mail.
15     Q.  Anything else?
16     A.  Yeah, the reconciliation forms.
17     Q.  What are those?
18     A.  There are two forms that must be filled out.
19  One will include unofficial results and one would
20  include official records.  And -- but it gives a
21  county-wide look at reconciling ballots versus voters so
22  it can identify any issues at a high level early on that
23  can be addressed.
24     Q.  Anything else?
25     A.  It is not fully implemented yet, but the

Page 39

1  paper-based audit trail that's going to be required by
2  virtue of SB1 that will significantly assist with any
3  issues that we saw, for example, in Harris County with
4  the DREs.
5     Q.  What were those issues?
6     A.  One of the issues was the lack of the paper
7  ballot trail, which, because there was no way to access
8  the content of the mobile ballot boxes, we were unable
9  to verify the contents of those mobile ballot boxes.
10  The equipment had been destroyed.  There was no way to
11  access them.  And there was a significant chain of
12  custody issue that affected, you know, the whole
13  process.  And I think there were at least 1,084 ballots
14  that lacked proper chain of custody.
15     Q.  Are there any other irregularities you observed
16  in the audit that are less likely to occur at future
17  elections because of legislative changes made following
18  the 2020 general election including Senate Bill 1?
19     A.  The corrective action process will -- should
20  help with mail ballots.  That didn't exist prior to
21  Senate Bill 1.  Harris County had a sort of informal
22  review process that they engaged in, which was helpful
23  in assisting the voters.  Any irregularity we observed,
24  however, was that there were several instances where
25  Harris County marked a ballot as unresolved, yet that

Page 40

1  voter appeared to have voted and had vote history.  So
2  hopefully the corrective action process would eliminate
3  some of those irregularities.
4     Q.  Are there any other irregularities that would
5  be alleviated by Senate Bill 1?
6     A.  There may be.  That's -- those are the ones I
7  can recall off the top of my head.
8  _____
9     Q.  Why don't we leave a blank in the transcript,
10  and if you are able to think of any others when you
11  review the transcript and sign it, you will add them in.
12  All right?
13     A.  Yes, sir.
14     Q.  Thanks very much.
15        MR. GENECIN:  I will pass the witness.
16        THE WITNESS:  Thank you.
17        MS. HUNKER:  We can close out then the
18  deposition and dismiss the witness, and we ask for read
19  and sign.
20        (Proceedings ended at 4:03 p.m.)
21
22
23
24
25

Page 41

1              CHANGES AND SIGNATURE
2  PAGE/LINE              CHANGE              REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____



Jacqueline Doyer

March 29, 2023
Pages 42 to 44

**Page 42**

```
1            I, JACQUELINE DOYER, have read the
   foregoing deposition and hereby affix my signature that
2  same is true and correct, except as noted above.
3            _____
                  JACQUELINE DOYER
4
5
6
7  THE STATE OF TEXAS)
8  COUNTY OF _____)
9            Before me, _____, on
   this day personally appeared JACQUELINE DOYER, known to
10 me (or proved to me under oath or through
   _____) (description of identity card
11 or other document) to be the person whose name is
   subscribed to the foregoing instrument and acknowledged
12 to me that they executed the same for the purposes and
   consideration therein expressed.
13
14           Given under my hand and seal of office
   this _____ day of _____, 2023.
15
16
17
18
19
20           _____
             NOTARY PUBLIC IN AND FOR
21           THE STATE OF TEXAS
             MY COMMISSION EXPIRES:
22           _____
23
24
25
```

**Page 43**

```
1         IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2              SAN ANTONIO DIVISION
3  LA UNION DEL PUEBLO      )
   ENTERO, ET AL.,          )
4       Plaintiffs,         )
                            )
5  VS.                      ) CIVIL ACTION NO.
                            ) 5:21-CV-844 (XR)
6  STATE OF TEXAS, ET AL.,  )
        Defendants.         )
7
8          REPORTER'S CERTIFICATION
               ORAL DEPOSITION OF
9              JACQUELINE DOYER
               MARCH 29, 2023
10
11           I, JAZZMEN CANALES, Certified Shorthand
   Reporter in and for the State of Texas, hereby certify
12 to the following:
13           That the witness, Jacqueline Doyer, was
   duly sworn by the officer and that the transcript of the
14 oral deposition is a true record of the testimony given
   by the witness;
15
             I further certify that pursuant to FRCP
16 Rule 30(f)(1) that the signature of the deponent
17  __X__ was requested by the deponent or a party
   before the completion of the deposition and returned
18 within 30 days from date of receipt of the transcript.
   If returned, the attached Changes and Signature Page
19 contains changes and the reasons therefor;
20  _____ was not requested by the deponent or a party
   before the completion of the deposition.
21
             I further certify that I am neither
22 attorney nor counsel for, related to, nor employed by
   any of the parties to the action in which this testimony
23 was taken.
24           Further, I am not a relative or employee
   of any attorney of record in this cause, nor do I have a
25 financial interest in the action.
```

**Page 44**

```
1            Subscribed and sworn to on this _____ day
   of _____, 2023.
2
3
4
5
6
7  JAZZMEN C. CANALES, Texas CSR 9344
   Expiration Date: 04/30/2025
8  MAGNA LEGAL SERVICES
   Firm Registration No. 633
9  1635 Market Street
   Suite 800
10 Philadelphia, Pennsylvania 19103
   Telephone:  866-624-6621
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Jacqueline Doyer

## 0

**009** 38:2

## 1

**1** 20:2 37:14 38:1 39:18,21 40:5

**1,084** 39:13

**10006** 2:9

**110** 2:4

**12548** 2:14

**127** 38:1

**14th** 1:23 4:8

**15** 37:2

**198** 19:13

## 2

**2** 3:3

**2020** 12:19 13:17 16:22 20:8 24:1, 10,15 37:14 39:18

**2022** 9:12,19 10:5 11:23 12:9

**2023** 1:11,20

**20530** 2:20

**209** 1:23 4:8

**210** 19:23

**210-224-5476** 2:5

**214** 24:4,23

**216** 25:2 26:9

**217** 26:10

**224** 28:6

**226** 29:17

**229** 29:23

**23** 3:11 9:23,24 36:19 37:7

**230** 31:24

**29** 1:11

**29th** 1:20

## 3

**30(b)(6)** 36:22

**300** 2:4

**351** 33:11

**359-page** 15:13

**36** 3:5

**369** 15:12

**3:14** 1:21

## 4

**41** 3:6

**42** 29:17 33:1,3,4

**43** 3:7

**4:03** 1:21 40:20

## 5

**5** 3:5

**512-936-2275** 2:15

**55** 32:1,2,21

**5:21-cv-844** 1:5 4:5

**5th** 2:8

## 6

**6** 36:19 37:7

**65** 29:18,19

## 7

**78205** 2:4

**78701** 1:23 4:8

**78711** 2:14

## 9

**9** 3:11

## A

**ABBM** 19:18 26:1,4,6

**ABBMS** 20:1 31:21 32:1,17,22

**ability** 6:9 7:14

**above-styled** 1:19

**absent** 24:23

**access** 39:7,11

**accuracy** 20:24 21:21 33:16

**accurate** 10:10 33:14 38:13

**accurately** 6:9

**action** 1:5 4:4 20:22 29:8 39:19 40:2

**actions** 20:22

**activities** 17:16,25 22:12,15 35:7

**Adam** 2:13 4:21 8:2

**add** 7:4 40:11

**added** 38:1

**addition** 38:5

**additional** 12:5,12 24:22 31:9 37:2

**address** 31:24

**addressed** 38:23

**Administration** 19:15

**advise** 30:16

**affect** 7:14 20:24

**affected** 39:12

**afternoon** 5:3

**age** 28:15

**agencies** 16:13

**agency** 14:1

**agree** 27:15,17

**agreed** 31:8 37:2

**ahead** 6:19

**alcohol** 7:13

**alleviated** 40:5

**analysis** 28:17

**analyze** 33:13



answers 5:24

Antonio 1:2 2:4 4:4

AOG's 16:14

appearances 3:3 4:10

appeared 40:1

appears 10:4 19:14 29:23

applicable 20:9

application 19:19 29:12

applications 29:17,25 30:6,8 32:3

April 9:19

area 2:6 31:2 36:17

areas 11:16 15:17 35:3,9

aspect 17:21 21:14

aspects 17:16

assess 23:4,12,16

assessed 23:15

assist 31:9 39:2

assistant 8:12 31:20,21 32:2,4,12, 22

assisted 31:25

assisting 39:23

attached 1:25 38:10

attaching 29:1

attempt 32:11

attempted 32:12,14

attention 36:19 37:7

attorney 2:13 4:19 6:15,24 9:17 17:1,2 30:13 31:8

attorneys 7:23

attributable 20:22

attributed 25:13,15

audit 3:11 5:15 8:14,21 9:3,7,14,20 10:7,11,13,15,17,21 11:11,20 12:20, 24 13:1,2,15,19,23 14:8,9,19 15:10, 24 16:1,4,17,23 17:21,24 19:12 20:9,13 21:11,15,22 22:9,20 25:6,23 27:11 28:3,17,20 31:17 32:3,16 33:13,18,25 34:23 35:3,5,7,22 37:12,17 38:3 39:1,16

audit-related 5:13

auditable 11:16

audited 15:19,21 17:20 21:2 22:17

auditing 26:4

auditors 8:11 11:4

Austin 1:23 2:14 4:8

authorities 31:11

Avenue 2:19

aware 12:3 13:10 25:23

---

**B**

back 12:10 14:7 18:16 33:1

bad 18:25

ballot 17:12,17,21 18:6,9,11,18 19:5,19,21 22:10,13,19,25 23:3,5 26:21 27:13 28:7,16 29:4,13,25 37:24 38:11 39:7,8,9,25

balloting 35:16,21

ballots 24:6,9,15,19 25:14 30:7,9 32:13 38:21 39:13,20

based 11:15 13:15 14:8 29:8 31:14

basis 6:19 37:17

batch 26:13

BBM 19:21 25:3,10

begin 9:18

beginning 33:11

begins 28:7

behalf 5:7

Bill 20:2 37:14 38:1 39:18,21 40:5

birth 29:18

Bitter 4:21 8:2

BITTERS 2:13

blank 40:9

board 26:22

boards 17:12,17,22 18:6,9,11,18 19:6

body 15:1

Box 2:14

boxes 30:6 39:8,9

break 7:1

briefly 30:3 33:10

bring 8:24 9:2

broadly 14:12

Broadway 2:4

brought 9:3

Building 4:8

bulk 29:25

bundle 30:6,9

---

**C**

called 37:8

Canales 1:21 4:9

carrier 26:11,12,16,19 32:14 38:8

cataloged 15:6

cataloging 15:4

categorically 15:16

Certificate 3:7

chain 39:11,14

Chala 4:21 8:4

changed 34:23

chaotic 25:3,4,16

characterize 28:9

chosen 11:12

Civil 1:5,24 4:4

clarification 6:13

clarity 30:22

clear 14:13 19:13

client 37:2

close 36:24 40:17

code 8:23 20:4

Collin 16:7 17:7 38:10

committees 18:13 19:7,9

complaint 33:11

complaints 33:14,17



**complete** 7:15 10:10

**completely** 6:8

**comply** 20:14

**compromise** 30:18

**conclusion** 24:14,17

**conclusions** 15:24 16:1,21 18:8 20:12 22:24 23:2 34:10,23 35:19

**conduct** 22:12 28:17 32:20

**conducted** 18:1

**confidence** 13:6,8,16,20,25

**considered** 21:14

**consult** 6:23

**consulting** 37:1

**contained** 20:4,5,24

**content** 39:8

**contents** 39:9

**context** 19:1

**conversations** 10:24,25 11:6,9

**copy** 9:3 10:4

**correct** 5:10,11,14 7:19 8:16 12:6 14:9 17:10 19:21 20:2,11 23:17,19 24:7,25 28:8,12 30:1 38:13

**corrective** 39:19 40:2

**correctly** 20:25 37:15

**counsel** 4:9 37:3

**counties** 11:19,20 12:4,11,18 14:4, 9,10,17 15:9 16:5,7,10,14,15,16 17:4,5,7,8,12,17 19:8,24 20:6,17,18, 21,22,23 21:2,3,4 22:25 23:6,8,9,15 24:2 27:9 28:13 37:22 38:2,5

**counties'** 35:8

**county** 9:4 12:8 16:7,8,12 17:7 18:23 21:24 22:1 23:16 24:4,8 25:1, 8 26:2,5,7,22 28:9,24 29:8,24 31:10 39:3,21,25

**county-wide** 38:21

**court** 1:1 4:1,3,9

**CSR** 1:21

**custody** 39:12,14

**cut** 6:4

---

## D

**D.C.** 2:20

**Dallas** 16:7 17:7 24:4,8,15 29:24 31:10 38:9,10

**Daniel** 2:18 4:7,12

**data** 11:13,14 14:8 15:12 20:19 28:9, 13 32:15 35:17,18

**database** 19:15 20:18,21

**date** 29:18

**day** 1:20

**December** 10:5

**decisions** 35:19

**Defendants** 1:6,18 2:11 4:20

**Defense** 2:8 36:16

**definition** 19:4

**Del** 1:3 4:5

**delays** 20:20 21:5

**Dellheim** 2:18 4:13

**Department** 2:19

**deposed** 5:17

**deposition** 1:9,17 4:2,6 5:14,22 7:22 27:22 36:23,24 40:18

**deputy** 9:8

**describe** 30:3

**describes** 26:11

**description** 3:10 25:4,14,16 26:24 27:2

**design** 10:19 35:4,5,22

**designing** 10:13,16

**destroyed** 39:10

**details** 30:20

**determination** 28:21

**determinations** 25:25 30:11

**determine** 28:14 30:8 32:10,11

**determined** 10:21 28:10

**determining** 10:22

**difficulties** 24:5,8

**difficulty** 24:15,18

**directed** 34:22

**direction** 32:18,23

**directly** 11:19

**director** 9:8 11:2 33:24

**discovered** 24:20

**discuss** 26:6

**dismiss** 40:18

**District** 1:1 4:3,4

**division** 1:2 4:4 8:14 9:7,9,14,17,21 10:15,21 11:5,20,21,22 13:23 14:9, 10,11 15:24 21:12 22:9 25:23 27:11 28:17 31:17 32:3,16 33:13,25

**division's** 16:1 28:20

**document** 7:7 10:1

**documents** 8:18,20,24

**Doyer** 1:10,17 3:4 4:2 5:3,4,5 36:15 37:6

**DOYLE** 4:23

**draw** 36:18 37:7

**DRES** 39:4

**driven** 11:13,14

**driving** 35:17

**dropped** 35:21

**drugs** 7:13

**due** 14:17,20 24:9 29:18 37:13

**duly** 1:19 4:24

**duties** 17:22

---

## E

**E-MAIL** 2:5,10,15,21

**earlier** 7:4

**early** 17:11,16,21 18:5,9,10,18 19:5 38:22

**Educational** 2:8

**election** 8:23 11:24 12:19 13:6,17,



MAGNA ▶
LEGAL SERVICES

20 14:11 16:22 19:15 24:11 29:9 37:14 39:18

**elections**  11:21 25:8 37:13 39:17

**eligible**  28:11 29:14

**eliminate**  40:2

**end**  15:20,21

**ended**  40:20

**engaged**  39:22

**ensure**  13:5,19

**Entero**  1:3 4:5

**entities**  16:3,5

**entitled**  28:15

**entity**  16:9,11 23:13

**envelope**  26:11,12,16,19

**envelopes**  32:14 38:8

**equipment**  39:10

**error**  12:9,24

**et al**  4:6,15

**Ethan**  2:12 4:18

**evaluate**  16:24 17:1,2,4 18:10,12, 17,20 19:6 28:4 33:16 35:8,18

**evaluated**  11:16 16:3,10,17 17:8, 12,17,19 18:22,24,25 20:14 21:14, 17,22

**evaluating**  20:5 21:23

**evaluation**  26:1,3 35:10

**evidence**  32:17,19

**Examination**  3:5 5:1 36:13

**examine**  10:22,23

**executive**  10:8,10 13:3

**exhibit**  9:23,24 36:19 37:7

**exist**  39:20

**existed**  20:8

**existence**  22:24 23:21

**experienced**  24:8

**eyes**  27:16

**F**

**facility**  31:25 32:8

**fact**  20:18 29:4

**FAD**  8:6,8,13 25:3 28:10

**Fair**  13:13 15:14

**false**  7:18

**feeling**  13:7

**feelings**  13:10

**field**  26:18

**filed**  33:19

**filled**  38:18

**final**  10:4,7 14:4 15:9,20,22,25 18:1 24:21 25:24 35:4,11,23

**finalized**  34:1,4,24

**find**  22:2 32:16 34:16

**findings**  36:20 37:8

**fine**  6:16

**finished**  6:3

**Floor**  2:8

**forensic**  8:14 9:7,13 10:7,21 11:20 13:23 21:11 22:9 25:23 27:11 31:17 32:16 33:13

**forgot**  7:3

**Form**  10:18 12:21 13:9,18 15:11 16:18 17:13,18 18:2,14 20:3 21:19 22:6,14,21 23:1,23 25:18 27:1,21 33:15 34:25

**forms**  38:16,18

**fraud**  22:10,13,19,25 23:3,6,11,14, 22 24:1 26:25 27:20 28:2,5

**fraudulent**  27:13

**Freeman**  2:18 4:12

**frequency**  22:7

**frequently**  22:5

**full**  6:5

**fully**  38:25

**Fund**  2:8 36:16

**future**  37:12 39:16

**G**

**Genecin**  2:7 3:5 36:9,12,14,15 37:5, 6 40:15

**general**  2:13 4:19 11:23 12:19 13:17 16:22 24:11 31:8 37:14 39:18

**General's**  17:1,2 30:13

**generality**  31:2

**generally**  20:9

**gigabytes**  15:12

**give**  6:16 7:15 37:2

**goals**  10:6,11

**good**  5:3 18:25 36:12

**governmental**  16:9,11

**governor**  34:20

**governor's**  34:5,7,21

**great**  5:6,17 6:12 7:21 8:17

**greater**  37:3

**ground**  5:21

**guess**  10:20 15:3 18:16 22:16

**H**

**Hagan**  4:2,23 5:3

**Harris**  9:4 16:8 17:7 25:1,8 26:2,5,7, 22 39:3,21,25

**head**  40:7

**hear**  36:9

**helpful**  39:22

**hereto**  1:25

**high**  24:6,9,19 38:22

**history**  21:24 22:1,3 40:1

**Honestly**  25:9

**Houston**  2:6 36:17

**Hunker**  2:12 4:18 7:25 10:18 12:21 13:9,18 15:11 16:18 17:13,18,23 18:2,14 20:3 21:19 22:6,14,21 23:1, 23 25:18 27:1,21 30:14,25 31:4



Jacqueline Doyer

33:3,5,15 34:25 36:21 37:1 40:17

**I**

**identified** 12:20 16:17 17:5,6 24:13 29:24 30:5 31:15,25 32:21

**identifiers** 38:8,11

**identifies** 31:20

**identify** 23:5 38:22

**imminence** 12:24

**impersonation** 22:10,13

**implemented** 38:25

**important** 6:8

**improvements** 37:19

**inaccurate** 21:25 22:3

**include** 30:23 38:19,20

**included** 13:14 15:15,25 24:13 35:3,10 38:11

**including** 29:12 37:14 39:18

**indication** 28:1

**indicative** 27:20 28:2,5

**individual** 4:20 29:3 31:22

**individual's** 32:2

**individuals** 8:8 10:15 25:5 27:3,6 28:14 31:18

**informal** 39:21

**information** 13:24 14:3,5 15:4,6,8 18:5 29:12 30:17,19,23 31:9

**instance** 1:18

**instances** 22:2 39:24

**instructed** 6:18

**integrity** 30:18

**interject** 36:21

**interviewed** 27:6

**investigated** 15:19

**investigation** 13:1 22:12 30:19 31:11 32:20

**investigative** 10:17 30:15

**involved** 10:13,16,23,25 11:5,9

31:18

**irregularities** 37:11 39:15 40:3,4

**irregularity** 39:23

**issue** 29:24 30:4 31:14 32:17 39:12

**issued** 10:5 29:4

**issues** 12:19 38:9,22 39:3,5,6

**items** 14:16,17,20,21,24

**J**

**Jacqueline** 1:10,17 3:4 4:2,23

**Jazzmen** 1:21 4:9

**joined** 9:20

**junior** 29:2,4

**Justice** 2:19

**K**

**Kathleen** 2:12 4:18 7:25

**kathleen.hunker@oag.texas.gov** 2:15

**key** 36:20 37:8

**knowledge** 21:7,9 31:16

**L**

**L-U-P-E** 4:15

**La** 1:3 4:5

**labeled** 36:20

**lack** 39:6

**lacked** 39:14

**law** 20:4 30:10

**lawyer** 36:16

**lead** 15:9

**League** 2:6 36:17

**leave** 40:9

**leaving** 34:20

**legal** 2:8 8:12 9:8 36:16

**legislative** 37:13 39:17

**legislatively** 37:20

**legislators** 4:20

**letter** 9:4

**level** 16:12,13 38:22

**limit** 36:22

**limitations** 20:17

**list** 15:17

**living** 31:25

**local** 31:11

**locate** 32:14

**location** 38:6

**locations** 35:15

**log** 38:3

**long** 9:10

**loud** 5:24

**LUPE** 4:15

**M**

**machine** 1:22

**made** 15:4 24:14 25:4 26:8 37:13 39:17

**mail** 19:11,19,21 22:10,13,19,25 23:3,5,10,14,21 24:1,6,9,15,19 25:14 28:8,11,15 29:4,6,13,14,18,25 30:7,9 35:16,21 37:24 38:11,14 39:20

**maintain** 12:5,12,15

**make** 6:5 20:12 30:11 31:5 35:18

**MALDEF** 2:3

**Management** 19:15

**March** 1:11,20

**mark** 9:23

**marked** 9:24 39:25

**matching** 26:20

**materials** 12:5,12

**matter** 26:8 30:12

**meant** 26:16,25 27:12,15

**medication** 7:13



Jacqueline Doyer

**members** 8:6

**mentioned** 14:7 24:5

**mentions** 24:17

**merit** 12:25

**met** 7:23,25 8:2,4,6

**Michael** 2:17 4:11

**michael.stewart3@usdoj.gov** 2:21

**Mike** 5:8

**minute** 36:3

**minutes** 33:5 37:2

**miscoding** 28:24

**misleading** 7:18

**Misstates** 23:23

**mistake** 12:24

**mobile** 39:8,9

**months** 34:13

**multiple** 26:23 28:22 31:21

**municipal** 16:13

**municipalities** 16:15

**muted** 36:7

### N

**NAACP** 2:8 36:16

**nature** 34:12,14

**needed** 26:21

**negatively** 20:24 23:21

**Nina** 2:3 4:14

**nitty-gritty** 31:5

**nonexistence** 22:24

**notice** 5:14

**noticed** 12:25

**November** 9:11

**nperales@maldef.org** 2:5

**NUMBER** 3:10

**numbered** 1:20

**NW** 2:19

### O

**oath** 7:18

**object** 6:16,17

**objection** 10:18 12:21 13:9,18 15:11 16:18 17:13,18,23 18:2,14 20:3 21:19 22:6,14,21 23:1,23 25:18 27:1,21 30:14 33:15 34:25

**observed** 37:11 39:15,23

**OCA** 37:3

**occur** 22:5 37:12 39:16

**occurred** 24:1,10 28:18

**occurrence** 31:10

**office** 2:13 4:7,19,21 5:9 11:9 13:16, 23 14:13,19,24 16:14,22,25 17:1,3 25:8 30:13 31:8 34:3,5,7,21,22 38:3

**official** 14:1 38:20

**officials** 29:9

**offline** 20:23 21:2,4

**older** 29:18

**ongoing** 30:20

**online** 20:17

**opposed** 29:8

**ORAL** 1:9,17

**order** 18:1

### P

**p.m.** 1:21 40:20

**P.O.** 2:14

**paper** 39:6

**paper-based** 39:1

**paragraph** 19:24 20:16 26:9

**paraphrased** 27:8

**part** 12:15

**participating** 22:1

**parts** 34:5

**party** 6:15

**pass** 36:4 40:15

**passed** 11:21

**penalties** 7:18

**pending** 6:22

**Pennsylvania** 2:19

**Perales** 2:3 4:14

**PERELAS** 4:14 36:8

**performance** 16:21 17:11,14 18:9, 10,12,15,17 19:5,6 21:17

**performed** 17:22

**permitted** 28:11

**person** 36:6

**personally** 32:17,21

**phrase** 27:22

**place** 20:1

**Plaintiff** 4:14 36:17

**Plaintiff's** 37:3

**Plaintiffs** 1:4 2:2,6

**planned** 35:9

**plans** 4:16

**points** 11:16

**poll** 35:14

**polling** 35:15 38:6

**popped** 36:7

**populates** 20:19

**portions** 8:23

**position** 14:2

**positively** 23:21

**potential** 26:25 31:11

**potentially** 27:20 28:2,5

**practice** 12:16

**pre-sb1** 20:6

**pre-senate** 20:2

**preclude** 37:20 38:9

**prefer** 5:3



MAGNA
LEGAL SERVICES

**preparation**  8:18

**prepare**  7:21 18:1

**preparing**  22:8

**present**  13:11

**previous**  12:10

**Price**  4:7

**prior**  24:10 39:20

**privilege**  6:18 30:15

**Procedure**  1:24

**procedures**  18:22 19:3,10 20:13 23:4,7,9,12,17,20,25

**proceedings**  40:20

**process**  25:3,10,12,16 39:13,19,22 40:2

**processes**  18:22 20:13 25:11 26:2, 4,6 35:9

**processing**  24:6,9,15,19

**produced**  1:18

**promoted**  9:11

**proper**  39:14

**prosecution**  30:20 31:12

**prosecutions**  31:14

**provide**  20:19

**provided**  11:15,17,19,20 12:13,18 14:11,20,21

**providing**  31:9

**provisions**  1:25

**publicly**  30:17

**Pueblo**  1:3 4:5

**purpose**  14:19

**purposes**  22:8

**pursuant**  1:24

**put**  18:16 38:6

---

**Q**

**question**  5:6,23 6:3,12,20,22,23 7:12 10:14 12:11 13:13 16:19 18:3 22:16,18,22 33:9 36:3

**questionable**  26:11,12,16,19,24 27:2,10,12,15

**questioned**  27:10

**questions**  4:17 5:14 19:2,8 36:2,8, 18 37:4

**quickly**  5:21 9:6 19:23 32:25

---

**R**

**raise**  30:15

**reach**  22:23 23:2

**reached**  36:22

**read**  20:25 37:15,18 40:18

**reads**  37:11

**real**  5:20 9:5

**reason**  12:20 13:1,2 24:12,14,18 28:7,15 29:1

**reasons**  24:20,22 25:13,15,19,21 28:22,24,25 29:7,20

**recall**  34:13 35:20 40:7

**received**  15:9,12 28:16 30:6,9

**recognize**  9:25

**recollection**  7:8

**recommend**  34:7

**reconciliation**  38:16

**reconciling**  38:21

**record**  1:25 6:6 7:5 15:25 19:13 29:1,3 30:5,23 33:2 36:24,25 38:12

**records**  11:15,17,23 12:1,4,8,11,14, 18 14:8 20:24 21:6,21 29:19 32:24 37:21 38:20

**Rector**  2:8

**refer**  14:12 19:14 30:12

**referred**  30:21,24 31:10

**referring**  12:2 25:11

**refers**  20:1

**reflected**  10:8 13:2 14:4,25 15:1,5 16:2 24:20,22 25:17,19,22 27:24 29:3,20 35:4 38:13

**reflecting**  27:5

**refresh**  7:8

**regard**  5:15

**register**  33:1

**regular**  12:16

**rejected**  20:1

**related**  30:20 35:16,21

**remaining**  33:6

**remember**  7:3 25:9

**removed**  26:12

**rephrase**  15:23 17:15 24:16

**report**  3:11 5:15,16 8:8,11,21 9:3 10:4,7 13:12,15 14:4 15:1,5,7,10,13, 15,20,22 16:2,4,10,17,23 17:5,6,9 18:1 19:12,14,18 20:5,13 22:7,9 24:21,23,24 25:20,22,24 27:24 28:3 29:21 31:15 33:19,20 34:23 35:4,11, 19,22,23

**reported**  1:22 14:16 19:2,10

**reporter**  4:1,9 5:23

**Reporter's**  3:7

**reporting**  20:21

**reports**  8:12

**represent**  36:17

**representative**  5:9

**representing**  4:20

**request**  14:22 15:4

**requested**  14:18,24 29:5,17 34:22

**requesting**  28:7

**requests**  14:3,5,25 15:6 18:5,7

**required**  12:4,12,14 39:1

**requirement**  38:5

**requires**  38:2

**respect**  29:24

**response**  14:22

**results**  38:19

**reveal**  22:13

**review**  8:17 12:17 26:14,21 33:25 34:4 39:22 40:11



Jacqueline Doyer

**reviewed** 8:21,23 14:20,21 32:24 33:18,20,23 34:5 37:21

**Richard** 2:18 4:12

**role** 9:6,10,11,16

**roles** 8:10

**rolls** 26:10

**root** 28:18

**rules** 1:24 5:21

---

**S**

**San** 1:2 2:4 4:4

**SB1** 20:10,14 39:2

**scope** 22:18,19 27:22 31:16 35:7,22

**secretary** 4:22 5:9 8:15 11:7,8 13:15,22 14:12,14,18,24 16:21,24 34:2,3,22 38:3

**section** 19:12 24:4 28:7 33:11 36:19 37:8,11,15 38:1

**sections** 5:16

**Senate** 37:14 38:1 39:18,21 40:5

**send** 18:4,7

**senior** 29:2,5

**sentence** 24:5 25:2 26:11,17 37:10, 17

**separate** 26:13

**served** 9:17

**set** 5:21 27:16

**seven-hour** 36:22

**sheet** 26:13

**short** 7:2

**shorthand** 1:23

**sign** 40:11,19

**signature** 3:6 18:13 19:7,9 26:20 27:19 28:1

**signatures** 27:18 28:4

**signed** 31:21 32:18,21,22

**significant** 39:11

**significantly** 39:2

**sir** 6:1 7:16 19:20,22 26:15 36:7 37:16 40:13

**situation** 29:2

**smoothly** 5:22

**somebody's** 21:24

**sort** 10:22 12:23 15:17,18 24:13 35:21 39:21

**SOS** 16:14 19:18

**source** 32:1

**speak** 27:4,23 31:17,22 32:3,6

**specific** 12:19 13:24 17:24 25:11 26:23 30:19 31:19 35:20

**specifically** 14:18,23 18:5 27:17 37:10

**specifics** 31:1

**spoke** 25:6

**spreadsheet** 19:25

**Sr** 4:7

**staff** 24:10 26:7

**staffing** 35:15

**start** 5:20

**starts** 19:12

**state** 1:6,22 4:6,7,10,20,22 8:15 13:6,21 14:14 16:9,11,12,13 30:9

**State's** 5:9 11:9 13:16,23 14:13,18, 24 16:22,24 34:3,22 38:3

**stated** 1:25

**statement** 13:14

**States** 1:1 2:16 4:3,12 5:7

**Stewart** 2:17 3:5 4:11,16 5:2,8 9:25 10:20 12:23 13:13,22 15:14 16:20 17:15,20,25 18:4,16 20:7 21:20 22:8,16,23 23:4 24:3 25:21 27:5,25 30:22 31:3,6,13 33:2,4,7,8,18 35:2 36:1,11

**Street** 1:23 2:8 4:8

**styled** 4:5

**subdivision** 16:15

**subject** 7:18 31:2 35:9

**submit** 38:2

**submitted** 12:9 32:1

**subset** 32:15

**substance** 33:13

**substantive** 34:10

**Suite** 2:4

**summary** 10:9,10 13:3

**sworn** 1:19 4:24

**system** 19:25 20:2 21:10 26:23

**systems** 13:6,20

**Szumanski** 2:12 4:19

---

**T**

**tabulation** 38:3

**taking** 16:13

**talk** 6:2 15:16

**talking** 30:25 31:1

**tapes** 38:6

**Tarrant** 12:8 16:8 17:7

**task** 10:17

**team** 8:6,8,14 19:14 20:18,20,25 21:6,9,14,17,21,23,25 22:3 26:22

**TEAMS** 26:23

**term** 27:8,12

**testified** 4:24

**testify** 5:13 7:22 13:11

**testimony** 7:19 23:19,24

**Texas** 1:1,6,22,23,24 2:4,13,14 4:4, 6,8,19 13:5,7,19 19:15

**things** 12:15 18:20 19:10 27:7

**thought** 12:25

**tied** 21:25

**time** 4:1 33:2

**today** 5:9 7:15 8:25 23:20

**top** 40:7

**topic** 33:1

**topical** 35:3



Jacqueline Doyer

**topically** 15:18

**topics** 11:11 15:18 27:22 35:3

**tracker** 37:24

**tracking** 20:1

**trail** 39:1,7

**transcript** 40:9,11

**turn** 19:11,23 32:25 33:12

**turning** 25:1 28:6 29:23

**turnover** 24:10

**type** 18:7 22:15

**types** 12:1

### U

**U.S.** 2:19

**ultimately** 35:10

**unable** 39:8

**unclear** 6:13

**understand** 6:10,25 7:6,14,17,20 10:14 16:19 18:3 22:22 31:7

**understanding** 5:8,12 13:15 26:18 27:12,14

**understood** 5:15

**undertaken** 35:8

**unform** 19:25

**UNION** 1:3

**United** 1:1 2:16 4:3,12 5:7

**Unión** 4:5

**unmuted** 36:9

**unofficial** 38:19

**unresolved** 39:25

**update** 20:19

**upload** 20:21

**uploaded** 21:24 22:1

**uploading** 21:5

**uploads** 20:19

**Urban** 2:6 36:17

### V

**vendors** 20:23

**verbal** 5:25

**verification** 18:13 19:7,9

**verify** 39:9

**versus** 38:21

**vgenecin@naacpldf.org** 2:10

**Victor** 2:7 36:11,15

**Videoconference** 2:7

**violated** 30:9

**virtue** 39:2

**visit** 32:8

**volume** 24:6,9,19 25:14 37:20

**vote** 21:24 22:2 28:11,15 29:6,14,18 40:1

**voted** 38:14 40:1

**voter** 21:25 23:10,14,22 24:1 29:8 33:1 38:10,12,13 40:1

**voters** 13:5,7,16,20,24 28:10 29:17, 19 32:6,12,15,18,21 38:21 39:23

**voting** 17:11,16,21 18:5,9,11,18 19:5,11

### W

**wait** 6:3

**wanted** 29:6 35:14

**Washington** 2:20

**West** 1:23 4:8

**Western** 1:1 4:3

**withdraw** 22:18

**witnesses** 25:5 27:3

**word** 19:14 27:2

**work** 6:4

**worked** 25:7

**worker** 35:14

**wrapped** 26:13

**wrong** 29:2

### X

**XR** 1:5 4:5

### Y

**York** 2:9

### Z

**Zina** 4:21 8:4

**Zoom** 4:17 36:2



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| Defendants. | § | |

STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT

# APPENDIX K

Subject to Protective Order

EXPERT WITNESS REPORT

*La Union del Pueblo Entero v. Abbott*, No. 5:21-cv-844 (W.D. Tex.) (lead case)

Submitted by

Mark Hoekstra, PhD

Date of Report

March 3, 2023

## I.        Introduction

1.        I have been engaged to respond to the second supplemental report dated February 10, 2023, that was written by Professor Eitan Hersh in the consolidated case *La Union del Pueblo Entero v. Abbott*, No. 5:21-cv-844 (W.D. Tex.). My analysis is based on my knowledge and experience as an active research economist who is well versed in the frontier empirical methods used in causal analyses.

## II.       Qualifications and Compensation

2.        I am the Rex B. Grey Professor of Economics at Texas A&M University in College Station, Texas, where I have been on the faculty since 2011. Prior to arriving at Texas A&M, I was an assistant professor of economics at the University of Pittsburgh. I received my PhD in Economics from the University of Florida in 2006. I have published more than 20 papers in peer-reviewed journals in economics, including the American Economic Association's (AEA) top journal of *American Economic Review* as well as the top AEA journals relevant to my field (*American Economic Journal: Applied Economics* and *American Economic Journal: Economic Policy*) and top field journals (*Journal of Labor Economics; Journal of Public Economics; Journal of Human Resources*). These studies have used a wide variety of administrative datasets, including data on voting. I serve as a reviewer for approximately 20 paper submissions per year, including for top economics journals. I serve as an Associate Editor at the *Journal of Labor Economics* (since 2018) and at the J*ournal of Human Resources* (since 2015), which are the top two field journals in labor economics.

3.        The common theme throughout both my research and my teaching is careful attention to the assumptions underlying various research designs used to assess the causal impact of policies. Some of my research is used as examples in the textbook *Causal Inference: The Mixtape* by Scott Cunningham, which is a leading graduate-level book on empirical methods used in economics. I teach a PhD-level field course in labor economics, the focus of which is on understanding and assessing the

various research methodologies used by economists and other social scientists. These include the methods used to test for racial and gender bias in different settings. I also teach part of the core 1st-year PhD sequence in econometrics, in which I focus on how to assess causality in non-experimental contexts. I am perhaps best known among the PhD students as someone who offers advice on research projects, including whether the proposed method is sufficient to answer the question at hand. I recently won department-level awards for both the quality of graduate teaching and the quality of feedback given to students. During my time at Texas A&M, I have chaired more than 10 dissertation committees, and many of my students have gone on to careers at R-1 research universities. I have served on the committees of countless more PhD students.

4.      I also hold an appointment as a Research Fellow at the National Bureau of Economic Research based in Cambridge, Massachusetts, and as a Research Fellow at the Institute for Labor Economics (IZA) based in Bonn, Germany. In 2012 I received the IZA Young Labor Economist Award.

5.      I am being compensated for my time at the rate of $600/hour. I have not previously testified as an expert witness.

III.    Assessment of Professor Hersh's second supplemental report – Overview

6.      What does the November 2022 election—the first federal election since the passage of SB1—tell us about the actual impact of SB1 on mail-in voting?  To what extent did the new identification requirements impose a sufficiently large burden on voters as to deter voting?  A useful upper-bound for the right answer to that question is buried deep inside Professor Hersh's Second Supplemental Report.  In it, he calculates that among the more than 8.1 million votes cast, there were only 6,355 mail-in ballots that were rejected for a reason relating to identification, and where the voter did not cure the ballot or vote in person.  That is well less than one out of every one thousand votes

statewide.  Importantly, even this figure of 6,355 votes overstates the extent to which election officials failed to count mail-in votes that had been legally and properly cast, for two reasons:

    A.   Some, and potentially all, of these ballots may have been illegitimate.  There is nothing in Professor Hersh's report, or in the underlying data, to indicate whether or not those rejected mail-in votes were cast legally.  To the extent that some or all of those votes were illegitimate, Professor Hersh consistently misinterprets illegitimate votes as evidence that SB1 improperly caused a reduction in legitimate voting.

    B.   Some, and potentially all, of these 6,355 ballots could have been rejected because voters failed to write down *any* identification number on the ballot.  Professor Hersh cannot distinguish between ballots that were cast without writing down any identification number at all, from those that were cast, to quote his first report, "in perfect accordance with the state's instructions under SB 1".  In fact, there is nothing in Professor Hersh's report, save for one flawed analysis that I discuss below, that suggests the database issues he emphasizes are responsible for *any* of these 6,355 mail-in vote rejections under SB1.

7.    As a result of these factors, the proper interpretation of Professor Hersh's analysis is that there were *at most* 6,355 fewer legitimate votes cast and counted as a result of SB1, out of more than 8.1 million total votes.  For the reasons described above, the true number of legally cast mail-in votes that went uncounted—and especially the true number of legally and properly cast votes that went uncounted—is almost certainly smaller than that, and possibly zero.

8.    Moreover, the identification requirements of SB1 are still relatively new, and as with any new process, there is a learning curve for both election administrators and voters.  That fact, combined with the likelihood that at least some of the rejected votes counted by Professor Hersh were rejected due to voter error, suggests that the effect of SB1 going forward will likely be smaller than it was for the November 2022 election.  And as described above, the impact on that election was less than, and possibly much less than, 0.078 percent of all votes cast and counted.

9.    As alluded to above, there is only one analysis in Professor Hersh's Second Supplemental report that claims to provide any evidence that ballot rejections were "likely to be related to SB 1 requirements".  I demonstrate below that this analysis is based on three faulty assumptions. The consequence of those assumptions is that Professor Hersh would improperly conclude that the

Hoekstra                      4

higher rejection rates among those he classifies as "at risk" are caused by the database issues. Instead, the higher rejection rates could be due to differences in failing to provide a signature, or in failing to include a statement of residence. Alternatively, some or all of the differential could be due to "at risk" voters viewing in-person voting as a close-if-not-perfect substitute, consistent with empirical evidence I documented in my first report. Third, the differential could be due to other differences between the two groups of people, who are likely different in many ways, including those not observed in the data.

10.     Finally, in his Second Supplemental report, Professor Hersh also replicates the analysis of the state databases that he performed in his previous reports. In doing so, he addresses the following question: How many Texans would need to, in Professor Hersh's words, "be lucky", in order to cast a mail ballot without their application or ballot being rejected? As I documented in my response to his initial report, there are numerous flawed assumptions in that analysis. Put simply, that analysis assumed that everything that can go wrong with absentee voting will go wrong, ignored important aspects of the voting process, and did so for a population of mail-in voters that is vastly larger than anything observed in Texas history, including during the worst pandemic in 100 years.

11.     Strikingly, Professor Hersh's own empirical analyses in his Second Supplemental Report directly contradict most, if not all, of the assumptions and conclusions he made in his analyses of the voter databases.

A.  For example, his simulation of voting using the voter databases ignored the ballot curing process, and assumed that would-be absentee voters are never willing to vote in person instead. In contrast, Professor Hersh's analysis of actual voting in the 2022 election indicated that a large fraction of initially-rejected mail-in ballots were in fact cured, and that nearly half of mail-in ballots rejected for identification reasons are associated with a registrant whose record also shows they subsequently chose to, and were able to, vote successfully either by mail or in person.

B.  In assuming that everything that can go wrong will go wrong, Professor Hersh's simulation of voter databases also concluded that 15 percent of absentee ballots would be rejected. His analysis of actual voting in the 2022 general election shows that only 4.1 percent of mail-in ballots were initially rejected.

Hoekstra                                                                                                    5

12.     The net result of these, and other, unfounded assumptions is that Professor Hersh's analyses of voter databases, both in his second supplemental report and earlier reports, make the dire warning that as many as 2.7 million voters could be impacted by SB1's identification restrictions.  His analysis of actual voting directly contradicts this and shows that at most—*at most*—6,355 fewer votes were cast and counted than would have been otherwise.  Moreover, some or all of these may have been illegitimate, or may have been caused by a voter's failure to write down any identification number, rather than being caused by the database issues emphasized by Professor Hersh.

## IV.     The maximum number of votes not counted in the November 2022 federal election due to SB1's identification requirements

13.     To what extent did SB1's identification requirements result in fewer legitimate votes being cast and counted during the 2022 federal election?  This is an important question for understanding the likely burden that SB1 places on would-be absentee voters.  Were SB1's identification rules so stringent, and the voter databases so insufficient, as to burden would-be legitimate absentee voters so much that they were unable to cast votes?  If the answer were yes, this would indeed be problematic.  But the data do not support such a conclusion.

14.     It turns out that Professor Hersh's analysis of the 2022 election data contains a useful estimate of the maximum number of legally and properly cast votes that election officials failed to count, though it is buried deep in Professor Hersh's report.  Despite the dire warnings that Professor Hersh had issued and continues to issue regarding the likely impact of the database issue on absentee voting—namely, that 2.7 million registered voters in Texas could be impacted—Professor Hersh's own analysis indicates there were only 6,355 absentee votes that were rejected, where the voter also did not subsequently cast a ballot successfully either by mail or in person.  This is shown in paragraph 21 of Professor Hersh's Second Supplemental report.  Professor Hersh states there are 11,430 records indicating votes that were rejected due to reasons relating to identification verification.  However,

Hoekstra                                                                                                                  6

nearly half of the registered voters associated with these rejections—44.6 percent—were subsequently able to vote successfully either in person or by curing their ballot.  That suggests that out of the more than 8.1 million votes cast in Texas during the 2022 federal election, only 6,355 mail-in votes were rejected due to an identification-related reason, and associated with names of individuals who were not subsequently observed to vote successfully either by mail or in person.[1]

15.     Put another way, when put into practice, the concerns Professor Hersh identified reduced the total number of votes cast and counted in the general election by, at most, 0.078 percent.

16.     Moreover, even this figure of 6,355 votes overstates the true extent to which SB1's identification requirements reduced the total number of legitimate votes cast by voters who, in Professor Hersh's words, voted "in perfect accordance with the state's instructions under SB 1", for two reasons:

A.  Some, and potentially all, of these ballots may have been illegitimate.  Put simply, there is nothing in Professor Hersh's report, or in the underlying data, to indicate whether or not those rejected mail-in votes were legitimate mail ballots cast by the person who was registered to vote under that name.  To be clear, I do not know whether these 6,355 votes were cast legally.  But neither can Professor Hersh know, based on the data available to him.  What I know is that it is possible for some or all of those votes to have been illegitimate, in which case Professor Hersh consistently misinterprets illegitimate votes as evidence that SB1 improperly caused a reduction in legitimate voting.

This error leads to perverse consequences for the evaluation of SB1, given that the Texas Legislature's stated purpose for passing the law was to reduce the likelihood of illegally cast ballots.  Even if the only effect of the identification restrictions imposed by SB1 is to prevent fraudulent votes from being counted, Professor Hersh misinterprets those ballot rejections as evidence that SB1 is improperly reducing legitimate voting, rather than accomplishing its stated aim.

B.  Some, and potentially all, of these 6,355 ballots could have been rejected because voters failed to write down *any* identification number on the ballot.  Put simply, Professor Hersh cannot distinguish between ballots that were cast without writing down any identification number at all, and those that were rejected because the number written down did not match the number in the state database due to the issues he emphasizes.  That is because all of the codes that he uses to infer the rejection was due to identification verification, which are listed in footnote 7 of his second supplemental report, indicate things like "Incorrect or Missing SSN/TDL #".  None of them distinguish between not writing down

---

[1] 11,430*(1-0.446) = 6,355.

one's ID number at all and writing down a number that does not match the state database. That information is simply not recorded in the data.

17.     In fact, there is nothing in Professor Hersh's report, save for one flawed analysis that I discuss in the following section, that suggests the database issues he emphasizes are responsible for *any* mail-in ballot rejections, including for these 6,355 cases.

18.     In short, the problem is that Professor Hersh (mis)classifies any ballot rejection as due to SB1, even if that is a rejection due to voter error, or if the vote itself is illegitimate.  This is particularly misleading given that Professor Hersh uses the same language in attributing blame for the ballot rejections in the actual data as he does when he describes potential ballot rejections based on his simulation using voter databases.  For example, in his second supplemental report, Professor Hersh asserts that 2.7 million registered voters in Texas could run into problems when voting absentee due to the "SB 1 identification verification rule", or due to "SB 1's verification procedures".  His empirical analysis of actual voting echoes this language in that it makes no fewer than six references to ballots being rejected on account of "SB 1 identification rules", "SB 1 identification issues", or "SB 1 grounds".   Yet the empirical analysis cannot distinguish between rejections due to state database issues from rejections due to voter error, or even due to fraudulent voting.

19.     Professor Hersh's inability to distinguish voters' failures to follow instructions from rejections caused by the database issue he emphasizes also has important implications going forward. To the extent that some or all of the rejections he documents are due to voters failing to write down an identification number, we should expect to see further declines in mail-in ballot rejections in future elections.  That is because as with most new rules, there is a learning curve for both election administrators and voters.  This was evident in the fact that the mail-in ballot rejection rate fell from 12.4 percent to 2.7 percent from the 2022 primary election to the 2022 general election.[2]  It was also

---

[2] [Rejections of Texans' mail ballots decline markedly from big surge in March primary (dallasnews.com)](#)

explicitly acknowledged by the Brazos County Elections Administrator, who indicated that many of the November 2022 mail-in ballot rejections for the November 2022 election she had seen at the time of the interview were from voters who had not yet learned, despite election administrators' best efforts, to follow the new rules.[3]

**V.     The only evidence offered by Professor Hersh suggesting ballot rejections are due to the database issue is deeply flawed**

20.     Professor Hersh's main argument, throughout all of his reports, is that imperfections in the state databases used to verify a mail-in voter's identity will cause officials to reject legitimate votes, even if individuals fill out the ballot properly.  The problem, which is both unacknowledged and unaddressed by Professor Hersh, is that Professor Hersh cannot discern in the data whether a mail-in ballot was rejected because the voter did not write down an identification number (or wrote the identification number incorrectly), or if the number was correctly written down by the voter but did not match the number in the state database.  Thus, as described in the previous section, it is not clear that *any* of the rejected mail-in ballots that Professor Hersh identifies in his data are due to the database issue he emphasizes so much.

21.     Professor Hersh only provides one analysis claiming to provide evidence that it is this database issue, rather than voter error or even illegitimate voting, that causes the mail-in vote rejections.  Unfortunately, this analysis is deeply flawed.  In paragraph 27, Professor Hersh compares the mail-in ballot rejection rates of those 2.7 million Texans who he identifies as "at-risk" (mostly because they are associated with two ID numbers in the system), versus the rest of registered voters.

---

[3] Of the voters who had voted in the primary, Ms. Hancock said "This is a new process for them.  Those who voted in the primary and the runoff know what they need to do, as opposed to someone who is only voting in the November election."  *See* https://www.texastribune.org/2022/10/20/voting-texas-ballot-rejections/.

While this may seem intuitively sensible, there are three critical flaws in Professor Hersh's execution of this analysis, any one of which is sufficient to be fatal.

A.  The first problem is that in comparing the rate at which the two groups never cast a successful ballot, Professor Hersh inexplicably counts all of the mail-in ballots that were not counted, even though many, if not most, of these ballots were not counted for reasons that have nothing to do with the identification requirements of SB1.  For example, Professor Hersh counts those whose ballots were rejected for reasons that have nothing to do with the identification requirements of SB1, as well as those whose ballots were returned late, or even not returned at all.  As a result, the resulting analysis provides no evidence that the difference in the mail-in ballot success rates of the two groups is due to SB1, rather than other unrelated differences in behavior across the two groups.

B.  The second problem is that, as in his analyses of voter databases, Professor Hersh ignores the issue of substitution.  As I noted in my first report, the best research on this topic, published in a top journal by Stanford and UCLA researchers, indicates that Texas absentee voters view absentee and in-person voting as close-if-not-perfect substitutes.  In this analysis, Professor Hersh does not account for this, at all.  Thus, it is possible the entire differential documented by Professor Hersh is driven by the fact that the voters deemed to be "at-risk" by Professor Hersh subsequently vote in person at higher rates than those deemed "not at-risk".  Indeed, this would be unsurprising, if Professor Hersh is correct that these individuals are somewhat more likely to encounter a problem when attempting to vote absentee.  Yet Professor Hersh's analysis ignores this issue.

C.  The third problem is that Professor Hersh ignores the fact that correlation is not causation.  That is, anytime there are two groups of individuals that differ in one dimension—in this case, whether they qualify as "at risk" in Professor Hersh's analysis—they can differ in other ways as well, such as the likelihood of voting by mail, for reasons that have nothing to do with the first factor.[4]

22.     To be clear, Professor Hersh's analysis on this issue would conclude that the difference in mail-in voting rejection rates "is likely to be related to SB 1 requirements" *even if* the entire differential were due to the one group of people being more likely to forget to write down a number or sign their name on the ballot, or even remembering to return the ballot at all, none of which have anything to do with the database issue he emphasizes.  Similarly, Professor Hersh's analysis would conclude the difference "is likely to be related to SB 1 requirements" *even if* the entire differential were

---

[4] A trivial example is that while people who live in rural areas may vote for Republicans more often than people who live in urban areas, that does not mean that the locational difference is causing the difference in voting preferences.  Rather, it is possible that these individuals differ in other ways, such as views on the appropriate size of government, or any number of other factors, that could influence both locational choice and voting preferences.

due to "at-risk" voters choosing the close-if-not-perfect substitute of voting in person more often than not-at-risk voters.  Finally, Professor Hersh's analysis would conclude the difference "is likely to be related to SB 1 requirements" *even if* the difference in successful mail voting is caused by other differences between "at-risk" and "not at-risk" groups, which likely differ in many ways, including those unobserved in the data.

## VI.    Professor Hersh's assumptions and conclusions from his analysis of state databases are directly contradicted by his own analysis of the data from the 2022 federal election

23.     In his second supplemental report, Professor Hersh replicates an analysis previously performed in earlier reports aimed at assessing the fraction and number of registered voters in Texas who could encounter a problem when attempting to vote absentee under SB1.  He did this by attempting to simulate what would hypothetically happen if every registered voter in Texas were to vote absentee, under a range of assumptions about voting laid out in several thousand lines of code.

24.     In my response, I documented many of the implausible assumptions of that analysis. Put simply, Professor Hersh assumed that everything that could go wrong in absentee voting would go wrong, and did so for a population of absentee voters that is vastly larger than anything Texas has ever observed in history.  In addition, the assumptions he used ignored important aspects of actual absentee voting in Texas, such as the fact that the Texas Secretary of State recommends that voters write down two numbers, which would solve nearly all of the database issues emphasized by Professor Hersh; the ballot curing process; and the fact that existing empirical evidence indicates in-person voting is a close-if-not-perfect substitute for absentee voting.

25.     It turns out that Professor Hersh's own empirical analyses in his Second Supplemental Report directly contradict the conclusions from his analyses of the voter databases, and the assumptions used to generate those conclusions.  These contradictions include the following:

A. Professor Hersh's simulations assumed that zero mail-in voters who encountered problems would cure their ballots. That assumption is refuted by his own analysis of actual voting in the 2022 federal election. In Paragraph 19, he points out that of the 13,638 mail-in ballot rejections, "about 40%" have a status code that indicates the ballot was accepted, which Professor Hersh attributes to the ballot being initially rejected but eventually cured and accepted.

B. Similarly, Professor Hersh's simulations of voting assume that zero absentee voters who encounter difficulties will vote in person. In contrast, while he does not break down in-person voting separately from the curing of ballots, his analysis of actual voting in the 2022 federal election indicates this likely happened. In Paragraph 21, he states that of the 11,430 records indicating voters who were rejected due to an identification-related reason, nearly half of them (44.4 percent) are associated with a registrant whose record also shows they were able to vote successfully either by mail or in person. Importantly, as noted earlier, neither Professor Hersh nor I can rule out the possibility that the voters who voted successfully were the *only* ones among these 11,430 rejections who were attempting to cast legitimate votes.

C. As I demonstrated in my first report, Professor Hersh's analysis of voter records assumes that every Texan who has more than one DPS identification number writes down the number they did *not* register with. Put differently, faced with deciding which of two DPS numbers to put down on the ballot, Professor Hersh assumes that not only will every Texan fail to remember the number they registered with, but they will also guess wrong, every time. Similarly, Professor Hersh assumes that every absentee voter will write down only one number, even though the Texas Secretary of State, and at least some local election officials, strongly recommend writing down both a DPS number and the last four digits of the Social Security Number.[5]

26.     Professor Hersh's analysis of actual voting in 2022 also directly contradicts these assumptions. While Professor Hersh's simulations indicated that up to 16 percent of absentee voters would encounter problems, his analysis of actual voting in Paragraph 19 of his report indicates that the initial rejection rate was one-fourth of that.

27.     What is the net effect of all of the assumptions of Professor Hersh's analysis of state voter databases? Professor Hersh would have you believe his dire warnings, both in the second supplemental report and earlier reports, that 2.6 to 2.7 million registered voters in Texas could be disenfranchised due to the identification requirements imposed by SB1. And indeed, in a hypothetical world that operated according to the implausible assumptions he lays out, that may well be true. But

---

[5] For example, see https://www.sos.state.tx.us/about/newsreleases/2022/101222.shtml.

in the real world of voting in Texas, Professor Hersh's own analysis indicates that out of more than 8.1 million votes cast, there are at most 6,355 ballots that went uncounted.  That is 0.078 percent of all votes cast, or 0.036 percent of all registered voters in Texas.[6]  In short, Professor Hersh's simulation estimate of failed mail-in voting was 417 times as large as his own empirical estimate based on actual voting.[7]   And as noted earlier, this much lower number is itself inflated, given some or all of these rejections could have been fraudulent votes, or even if not, could be due to voters failing to write down any identification number.

## VII.    Conclusion

28.    In the conclusion of my first report in response to Professor Hersh, I stated that the burden imposed by SB1 on the handful of voters impacted by SB1 is likely minimal, and quite possibly zero.  Professor Hersh's own empirical analyses in his second supplemental report provides direct evidence in support of that opinion.  In addition, his empirical analyses of the 2022 election directly contradict both the assumptions used in his analyses of voter databases, and his conclusion that 2.7 million registered Texan voters could have their mail-in ballots rejected even if they fill out the ballot correctly.  In particular, Professor Hersh's empirical analysis demonstrates that in the 2022 federal election, there were *at most* 6,355 mail-in votes that were rejected for identification reasons and were not cured or cast in person.  By comparison, over 8.1 million votes were cast in that election.  Moreover, given the clear learning curve associated with new regulations such as those imposed by SB1, as demonstrated by the decline in rejections from the primary to the general election of 2022, as

---

[6] Per the Secretary of State Website, there were 8,102,908 votes cast and counted in the 2022 federal election.  Thus, as a fraction of total votes cast and counted, 0.078 percent (6,355/8,102,908) of all votes cast were potentially "lost" due to SB1, or 0.036 percent of all registered voters in Texas (6,355/17,672,143).    See  https://www.sos.state.tx.us /elections/historical/70-92.shtml.
[7] Professor Hersh's estimate of the potential mail-in ballot rejections was 15 to 16 percent of all registered voters; 15/0.036 = 417.

Hoekstra                                                                                                  13

well as factors laid out in my previous report, I believe it is likely that if anything, the rate of rejections will continue to decline going forward.

29.     Importantly, even that figure of 6,355 exceeds the actual number of legally and properly cast votes that were not counted.  This is because some, and potentially all, of those rejections could have occurred because the vote was illegally cast.  Similarly, some, and potentially all, of those ballots could have been rejected because voters did not write down any identification number (or mistakenly wrote down an incorrect number).  Professor Hersh cannot distinguish between either of those interpretations and his own hypothesis that the rejections were all due to the database issue deficiencies he asserts.  Put differently, Professor Hersh's own analysis is consistent with a belief that exactly zero legitimate votes were lost in the 2022 federal election due to SB1's identification requirements.  Similarly, even if one were to assume away the possibility of fraudulent voting, Professor Hersh's analysis is consistent with the belief that exactly zero votes failed to be cast and counted because of state voter database issues.   As a result, I again conclude that the impact of SB1 on mail-in voting is almost certainly minimal, and very possibly zero.

Respectfully Submitted,

Mark Hoekstra, PhD

CURRICULUM VITAE

Mark Hoekstra

Texas A&M University                         Office Phone:  979.845.7302
Department of Economics                      Email: markhoekstra@tamu.edu
275 Liberal Arts Social Sciences Building    https://sites.google.com/view/markhoekstra
College Station, TX  77840-4228              Google Scholar Profile (link)

## Academic Appointments

| | |
|---|---|
| 2018 – Present | Professor of Economics |
| 2015 – Present | Private Enterprise Research Center Rex B. Grey Professor of Economics, Texas A&M University |
| 2011 – 2018 | Associate Professor of Economics, Texas A&M University |
| 2006 – 2011 | Assistant Professor of Economics, University of Pittsburgh |

## Research Appointments

| | |
|---|---|
| 2015 – Present | Research Associate, National Bureau of Economic Research |
| 2013 – Present | Research Fellow, IZA |
| 2011 – 2015 | Faculty Research Fellow, National Bureau of Economic Research |

## Editorial Positions

| | |
|---|---|
| 2018 – Present | Associate Editor, *Journal of Labor Economics* |
| 2015 – Present | Associate Editor, *Journal of Human Resources* |

## Education

Ph.D.  Economics, University of Florida, August 2006
       Dissertation Advisor: David Figlio

B.A.   Economics, Hope College (*summa cum laude*), June 2001

## Research Interests

Applied Microeconomics, including Labor Economics, Law and Economics, and the Economics of Education

## Publications

"The Effect of Open-Air Waste Burning on Infant Health: Evidence from Government Failure in Lebanon" (with Pierre Mouganie and Ruba Ajeeb), forthcoming in *Journal of Human Resources*

"The Effect of School and Neighborhood Peers on Achievement, Misbehavior, and Adult Crime" (with Stephen B. Billings), forthcoming in *Journal of Labor Economics*

"Does Race Matter for Police Use of Force?  Evidence from 911 Calls" (with CarlyWill Sloan), *American Economic Review* 2022, 112(3): 827-860.

"The Effect of Own-Gender Jurors on Conviction Rates" (with Brittany Street), *Journal of Law and Economics* 2021, 64(3): 513-537.

"(Almost) No One Votes Without ID, Even When They Can" (with Vijetha Koppa), *Economics Letters* 2021, 205: 1-3.

"The Impact of College Diversity on Behavior Toward Minorities" (with Scott E. Carrell and James West), *American Economic Journal: Economic Policy* 2019, 11(4): 159-182.

"The Long-Run Effects of Disruptive Peers" (with Elira Kuka and Scott E. Carrell), *American Economic Review* 2018, 108(11): 3377-3415.

"Peer Quality and the Academic Benefits to Attending Better Schools (with Pierre Mouganie and Yaojing Wang), *Journal of Labor Economics* 2018, 36(4): 841-884.

"Cash for Corollas: When Stimulus Reduces Spending" (with Steven L. Puller and Jeremy West), *American Economic Journal: Applied Economics* 2017, 9(3): 1 − 35.

"Illegal Immigration, State Law, and Deterrence" (with Sandra Orozco-Aleman), *American Economic Journal: Economic Policy* 2017, 9(2): 228-252.

"Vehicle Miles (Not) Traveled: Why Fuel Economy Requirements Don't Increase Household Driving" (with Jeremy West, Jonathan Meer, and Steven L. Puller), *Journal of Public Economics* 2017, 145: 65-81.

"Are School Counselors an Effective Education Input?" (with Scott E. Carrell), *Economics Letters* 2014, 125(1): 66-69.

"Bank Privatization, Finance, and Growth" (with Daniel Berkowitz and Koen Schoors), *Journal of Development Economics* 2014, 110: 93-106.

"Does Strengthening Self-Defense Law Deter Crime or Escalate Violence?  Evidence from Expansions to Castle Doctrine (with Cheng Cheng) *Journal of Human Resources* 2013, 48(3): 821-854.

"Family Business or Social Problem?  The Cost of Unreported Domestic Violence" (with Scott E. Carrell) *Journal of Policy Analysis & Management* 2012, 31(4): 861-875.

"Is Poor Fitness Contagious?  Evidence from Randomly Assigned Friends" (with Scott E. Carrell and James West) *Journal of Public Economics* 2011, 95(7-8): 657-663.

"The Ticket to Easy Street?  The Financial Consequences of Winning the Lottery" (with Scott Hankins and Paige Marta Skiba) *Review of Economics and Statistics* 2011, 93(3): 961-969.

"Does Drinking Impair College Performance?  Evidence from a Regression Discontinuity Approach" (with Scott E. Carrell and James West) *Journal of Public Economics* 2011, 95 (1-2): 54-62.

"Does High School Quality Matter?  Evidence from Admissions Data" (with Daniel Berkowitz) *Economics of Education Review* 2011, 30(2): 280-288.

"Lucky in Life, Unlucky in Love?  The Effect of Random Income Shocks on Marriage and Divorce" (with Scott Hankins) *Journal of Human Resources* 2011, 46(2): 403-426.

"Externalities in the Classroom: How Children Exposed to Domestic Violence Affect Everyone's Kids" (with Scott E. Carrell) *American Economic Journal: Applied Economics* 2010, 2(1): 211-228.

"The Effect of Attending the Flagship State University on Earnings: A Discontinuity-Based Approach" *Review of Economics and Statistics* 2009, 91(4):  717-724.

**Other Publications**

"Returns to Education Quality". 2020. In Steve Bradley and Colin Green (Eds.), *The Economics of Education: A Comprehensive Overview, 2nd edition.* Edited by Steve Bradley and Colin Green. Elsevier Academic Press.

"Domino Effect" (with Scott E. Carrell). 2009. *Education Next:* 9(3). Available at http://www.hoover.org/publications/ednext/Domino_Effect.html.

**Working Papers**

"The Scale and Nature of Neighborhood Effects on Children: Evidence from a Danish Social Housing Experiment" (with Stephen B. Billings and Gabriel Pons Rotger)

"Illegal Immigration: The Trump Effect" (with Sandra Orozco-Aleman)

"When Should We Trust Weighted Least Squares Estimates?" (with Cheng Cheng)

**Awards**

IZA Young Labor Economist Award, 2012 (with Scott E. Carrell)

**Teaching Experience**

Texas A&M University:
　　Sports Economics, Public Economics I (PhD-level), Econometrics II (1st-year PhD), Labor Economics I (2nd-year PhD)

University of Pittsburgh:
　　Labor Economics (PhD-level), Sports Economics, Intermediate Public Finance, Industrial Organization, and Research Methods in Empirical Microeconomics

University of Florida:
　　Public Finance and Managerial Economics

**Department Service**

Executive Committee (Fall 2011 – Fall 2014; Fall 2016 – Spring 2017)
Graduate Instruction Committee (Fall 2012 – Spring 2019)
Director of PhD Admissions (Fall 2012 – Spring 2015; Fall 2018 – Spring 2019; Spring 2023)
Director of PhD Program (Fall 2012 – Fall 2014)
Applied Microeconomics Search Committee (2011-12, 2012-13, 2014-15)

**Primary Dissertation Advisor (Initial Placement, Current Position)**
(Non-tenure track positions and co-advisor roles are noted if applicable; excludes committee memberships)

| | |
|---|---|
| Suhyeon Oh | (expected 2025) |
| Maya Mikdash | (expected 2024) |
| Adam Bestenbostel | (2022, Air Force Academy, non-tenure-track Assistant Professor) |
| Meradee Tangvatcharapong | (2021, 5-year non-tenure-track Assistant Professor, Hitotsubashi University's Institute of Economic Research)) |
| CarlyWill Sloan | (2020, Claremont Graduate University, now at United States Military Academy West Point) |
| Brittany Street | (2019, University of Missouri) |
| Abigail Peralta | (2018, Louisiana State University) |
| Yaojing Wang | (2017, Bank of America, co-advised with Li Gan, now at Peking University) |
| Vijetha Koppa | (2016, Stephen F. Austin State University, now at Institute of Management |

|                 | Technology, Dubai)                                                      |
|-----------------|-------------------------------------------------------------------------|
| Jillian Carr    | (2015, Purdue University)                                               |
| Pierre Mouganie | (2015, American University of Beirut, now at Simon Fraser University)   |
| Gonzalo Sanchez | (2015, Pontificia Universidad Católica de Ecuador)                     |
| Cheng Cheng     | (2014, University of Mississippi, now at Amazon)                        |

## Presentations

*Essen Health Conference (keynote speaker, scheduled May 2023); Clemson University (November 2022); Berlin Applied Micro Seminar, October 2022; Simon Fraser University, April 2022, Jinan University, October 2021; National University of Singapore, April 2021; University of Florida, April 2021; ASSA American Economic Association Annual Meeting (x2), January 2021; San Diego State University, October 2020; Boston University, September 2020; University of Maryland, September 2020; Notre Dame, September 2020; NBER Summer Institute – Crime, July 2020; Claremont McKenna College, February 2020; Claremont Graduate University, January 2020; American Economic Association Annual Conference, January 2020; Southern Economic Association Annual Conference, November 2019; Victoria University of Wellington Applied Econometrics Workshop, October 2019 (keynote speaker); University of Mississippi, October 2019; Mississippi State University, October 2019; Stata/Texas Applied Microeconomics Conference, October 2019; University of Florida, May 2019; Georgia Tech, March 2019; West Virginia University, March 2018; University of Tennessee, January 2018, Purdue University, January 2018; University of Kentucky, October 2017; Annual Meeting of the Western Economic Association, June 2017; University of Leicester, June 2017; University of Leicester Domestic Violence Workshop, June 2017; American University of Beirut, March 2017; University of Uppsala, March 2017; Montana State University, April 2016; American University of Beirut, March 2016; Columbia University, February 2016; Annual Meeting of the American Economic Association Meeting (January 2016); Annual Meeting of the Southern Economic Association (November 2015); NBER Education Program Meeting (November 2015); Brigham Young University, February, 2015; Federal Reserve Bank of New York, February, 2015; Stata/Texas Applied Microeconomics Conference, November 2014; University of Florida, November, 2014; Louisiana State University, October 2014; Institute for the Study of Labor (IZA), October 2014;  University of Wisconsin-Milwaukee, October 2013; Ghent University, September 2013; University of Texas – Dallas, April 2013; Stata/Texas Applied Microeconomics Conference, December 2012; Southern Economic Association Annual Meeting, November 2012; University of Texas-Austin, April 2012; Georgetown Public Policy Institute, April 2012; University of Missouri, October 2011; Baylor University, August 2011; Texas A&M University, November 2010; University of Houston, October 2010; University of Pittsburgh School of Medicine, Psychiatry and Epidemiology Seminar, October 2009; NBER Summer Institute, Law and Economics Program, July 2009; University of California at Davis, April 2009; University of California at Berkeley Labor Lunch, March 2009; American Economic Association Annual Meetings, January 2009; Texas A&M University, September 2008; Carnegie Mellon University, September 2008; NBER Summer Institute, Economics of Education Program, July 2008; Society of Labor Economists Annual Meeting, May 2008; Vanderbilt University, April 2008; NBER Education Working Group, November 2006*

## Other Information

Referee: *American Economic Journal: Applied Economics, American Economic Journal: Economic Policy, American Economic Review, American Journal of Health Economics, American Sociological Review, Berkeley Electronic Press, Contemporary Economic Policy, Economic Development and Cultural Change, Economic Inquiry, Economic Journal, Economics of Transition, Education Economics, Education Finance and Policy, Empirical Economics, European Journal of Law & Economics; Journal of Applied Econometrics, Journal of Comparative Economics, Journal of Demographic Economics, Journal of the European Economic Association, Journal of Health Economics, Journal of Human Resources, Journal of Labor Economics, Journal of Policy Analysis and Management, Journal of Political Economy, Journal of Population Economics, Journal of Public Economics, Journal of Sports Economics, Journal of Urban Economics, Labour Economics, Proceedings of the National Academy of Sciences (PNAS), Quantitative Finance, Quarterly Journal of Economics, Regional Science and Urban Economics, Review of Economics and the Household, Review of Economics and Statistics, and Southern Economic Journal.*

Reviewer: Israel Science Foundation, National Science Foundation, Marsden Fund (New Zealand), Dutch Research Council

Citizenship: United States

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX M



## NATIONAL COURT REPORTERS INC
### SERVING LEGAL PROFESSIONALS COAST TO COAST AND INTERNATIONALLY

**In The Matter Of**

**La Union Del Pueblo Entero, et al.,**

**Plaintiffs**

**v**

**State Of Texas, et al.,**

**Defendants**

**CASE**

**5:21-cv-844**

**Date**

**4-28-2022**

**Witness**

**Brian Keith Ingram, J.D.**

### Certified Copy Transcript

**National Court Reporters Inc.  ·  888.800.9656  ·**
**NationalCourtReporters.com**
**NCRNetwork@nationalcourtreporters.com**

Serving Legal Professionals From Coast To Coast and Internationally

**5:21-cv-844 (XR)**
**4/28/2022**

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 5 (17 - 20)
**5 (17 - 20)**

Page 17

1  Q.  Okay.  And had those concerns taken hold among
2  voters in a significant way?
3      **A.  I don't know, but I was glad for the**
4  **opportunity to talk to the reporter to disabuse folks of**
5  **those notions if I could.**
6      Q.  Were there any groups of voters that you
7  observed in your role who were exhibiting concerns about
8  voting by mail?
9      **A.  I had a friend of mine who was asking me**
10  **questions about voting by mail and whether it was safe**
11  **and I referred him to that article.**
12      Q.  Anyone else?
13      **A.  Can't think of anybody.**
14      Q.  Prior to the 2020 election, what were the
15  built-in security checks for Texas's mail ballot system?
16      **A.  The -- well, you've got an application for**
17  **ballot by mail, the application goes through the process**
18  **of making sure that that voter is actually registered**
19  **and that the address listed is the address on file for**
20  **that voter, if not, then a -- with the balloting**
21  **materials they are going to give a statement of**
22  **residence, and so you get the application with the**
23  **signature and then, of course, you get the carrier**
24  **envelope and it is put in a jacket envelope with the**
25  **application so that all of that material is kept**

Page 18

1  **together.  I mean there was -- there was, apparently, a**
2  **belief that you could just have ballots come in from**
3  **anywhere, you know, you could just get your mail ballot,**
4  **have it photocopied and 15 people could send in a**
5  **ballot.  Well, that's not the way it works; you have got**
6  **an application that goes with the ballot, so it is an**
7  **one-to-one ratio.  And then, of course, they do the**
8  **signature checks and they make sure that the carrier**
9  **envelope is filled out properly, if there is an**
10  **assistant, and then the ballot is not counted unless**
11  **those things are approved by the Ballot Board.  And if**
12  **the Ballot Board or the Signature Verification Committee**
13  **needs further confirmation that the signatures are those**
14  **of the voter, they can look at any signatures on file**
15  **for the last six years to either confirm that it is the**
16  **voter or to confirm that it is not the voter and it**
17  **works both ways, but anyway, they can use any signature**
18  **from the voter registration file or any election files.**
19  **So any previous applications for ballot by mail or voter**
20  **registration application, all of those signatures are**
21  **available for comparison to identify the voter, and so**
22  **that's -- those were the measures that were in place at**
23  **that time.**
24      Q.  That's the complete set, just to be clear?
25      **A.  That's right.**

Page 19

1      Q.  Okay.  And then prior to the 2020 election, why
2  did you describe that complete set of built-in security
3  checks as robust?
4      **A.  Well, because -- well, there is not -- I mean**
5  **there were also the ballot -- the ballot has a serial**
6  **number, the -- so you know what ballot went to which**
7  **voter so, you know, you can -- you can keep track of**
8  **things in a way that you don't have to worry about**
9  **extraneous votes coming in or somebody voting by mail**
10  **that shouldn't be.**
11      Q.  And put together, you considered all those
12  security checks to be robust?
13      A.  Sure.
14          MS. HUNKER:  Objection, form.
15      Q.  Did concerns about the mail ballot system
16  persist after the 2020 general election?
17      A.  They did.
18      Q.  And why do you think that was?
19          MS. HUNKER:  Objection, form.  Lack of
20  personal knowledge.
21      A.  Yeah.  I don't know.
22      Q.  On the basis of your personal knowledge as the
23  Chief Elections Administrator for the State of Texas,
24  what was your understanding, if you understood that
25  there were these concerns, why those concerns persisted?

Page 20

1          MS. HUNKER:  Same objection.
2      **A.  I don't know why the concerns persist, that's a**
3  **very difficult question to answer.**
4      Q.  Are there individuals who continue to advance
5  messaging contrary to your messaging that the security
6  checks are not robust?
7          MS. HUNKER:  Objection, form.  Vague, lack
8  of personal knowledge.
9      **A.  Yeah.  There are people out there in the world**
10  **who want to cast doubt on the legitimacy of our**
11  **electoral system, our electoral processes.**
12      Q.  Are you aware of any fraud concerning mail
13  ballots in Texas at a scale that could impact statewide
14  contests?
15          MS. HUNKER:  Objection, form.  Lack of
16  foundation.  Lack of personal knowledge.
17      **A.  Yeah.  Not in a scale that could impact the**
18  **statewide election, but they definitely -- there is**
19  **definitely fraud that impacts local elections and**
20  **changes outcomes.**
21      Q.  Are you aware of any fraud concerning mail
22  ballots in Texas at a scale that could impact a state
23  Senate race?
24          MS. HUNKER:  Objection, form.
25      **A.  Like I said, I am not aware of mail ballot**

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

5 (17 - 20) Brian Keith Ingram JD
**Page: 5 (17 - 20)**

5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 6 (21 - 24)

6 (21 - 24)

Page 21

1  fraud at a scale that could impact a statewide race so
2  far.  Now, if we have a close statewide race then
3  obviously we could.  But so far, since I have been in
4  this job for the last 10 years the only -- the closest
5  race was 200,000 statewide, so I guess the Land
6  Commission at one time or the Comptroller was a little
7  closer to that on the primary, but anyway, no, the mail
8  ballot fraud that we see affects the local races
9  primarily.
10  Q.   Okay.  And I apologize if I was unclear.  I had
11  meant a race for the Texas Senate not the U.S. Senate.
12  I was trying to -- trying to get a little smaller, but I
13  think that your answer was clear, so thank you for that.
14       Did the 2020 election reveal any systemic
15  fraud concerning mail ballots in Texas?
16  A.   Not anymore than any other election, no.
17  Q.   Let me repeat myself and try and be a little
18  clearer.  Did the 2020 election reveal any broad
19  systemic statewide fraud concerning mail ballots in
20  Texas?
21  A.   No.
22  Q.   Did the rate of fraud concerning mail ballots
23  in Texas increase, to your knowledge, during the 2020
24  election?
25  A.   Not that I know of.

Page 22

1  Q.   Were concerns about the mail ballot system that
2  we have discussed based in fact?
3       MS. HUNKER:  Objection, form, vague.
4  A.   There is definitely --
5       MS. HUNKER:  Compound question and lack of
6  personal knowledge.
7  Q.   Yeah.  You may answer.
8  A.   There is definitely a well-founded concern
9  about the mail ballot process, yes.  There are
10  well-founded concerns that predated 2020 that -- that
11  persist.
12  Q.   Were concerns about the magnitude of fraud
13  within the mail ballot system based in fact?
14       MS. HUNKER:  Objection, form, vague, lack
15  of personal knowledge.
16  Q.   You can answer.
17  A.   Yeah, I don't know what that means.
18  Q.   Were -- let me try and rephrase that.  Were
19  concerns of which you were aware among voters about the
20  scale or magnitude of fraud in the mail ballot system in
21  Texas based in fact during the 2020 election?
22       MS. HUNKER:  Objection, form, vague,
23  compound, lack of personal knowledge.
24  Q.   You may answer.
25  A.   Except for I can't.  I don't how to answer that

Page 23

1  question.
2  Q.   If a voter were to have walked up to you prior
3  to the 2020 election and said, "I am concerned that
4  there is so much fraud in mail ballots that it is going
5  to change the outcome of the presidential election,
6  would you consider those concerns to be based on facts
7  about the mail ballot system in Texas?
8       MS. HUNKER:  Objection, form.  Improper
9  hypothetical.
10  A.   Yeah, I would have to ask -- I would have to
11  ask them what specifically their concerns were and how
12  specifically they thought the mail ballot process was
13  capable of being manipulated to that extent.  I would
14  need to know what their fear was to know how I could
15  disabuse them of it, if I could.
16  Q.   Okay.  We can move on.  I would like to move to
17  your legislative testimony.  In March of 2021, did you
18  testify to the Texas House Committee on Elections that
19  Texas elections are in good shape?
20  A.   I did.
21  Q.   What did you mean by "good shape"?
22  A.   I meant that -- that generally the election
23  framework is working the way it is supposed to.  The
24  county election officials are doing their job properly
25  and that the Texas elections are in good shape.

Page 24

1  Q.   Anything else?
2  A.   That's it.
3  Q.   When you said that Texas elections are in good
4  shape, did that reflect on the security of Texas
5  elections?
6  A.   Partly.
7  Q.   Would you -- is an election that is in good
8  shape free and fair?
9       MS. HUNKER:  Objection, form, vague.
10  A.   I agree.  Texas always has free and fair
11  elections.
12  Q.   Okay.  And you also -- am I correct that you
13  testified with respect to the 2020 presidential election
14  that, in spite of all the circumstances, Texas had an
15  election that was smooth and secure?
16  A.   That's not the entire context of that quote.
17  The point is that, we were trying to pat the county
18  election officials on the back for having a successful
19  election in a pandemic.  So people have taken that quote
20  out of context and made a drinking game out of it, but
21  that's not all I said in that sentence, and it is
22  certainly not consistent with the example that I gave
23  which was how my personal election administrator
24  reconfigured my particular polling place to make it safe
25  for activities so that the voters and the workers were

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

6 (21 - 24) Brian Keith Ingram JD

Page: 6 (21 - 24)

5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 25 (97 - 100)

**25 (97 - 100)**

Page 97

1   A.   It was consistent --
2        MS. HUNKER:  Objection, form.
3   A.   -- with the law and what was required at that
4   time.  The Legislature now requires a number be provided
5   as well.
6   Q.   Okay.  Do you know if family members tend to
7   have access to each other's driver's license numbers or
8   social security numbers?
9        MS. HUNKER:  Objection, form.
10  A.   And like I said in my earlier answer, this idea
11  of requesting mail ballots in the name of somebody else
12  was a live issue and very much on the minds of the
13  Elections Committee as they were working.
14  Q.   Okay.  Do you happen to know if family members
15  tend to have access to each's other's drivers license
16  numbers or social security numbers?
17  A.   I don't know.
18  Q.   Have you ever submitted a joint tax return with
19  a family member?
20  A.   I have a wife that I do joint returns with,
21  yes.
22  Q.   And do you know if your wife's social security
23  number is on your tax return?
24  A.   It is.
25  Q.   And so would it be possible for you to request

Page 98

1   an absentee ballot on your wife's behalf using the
2   social security number that's on your tax returns?
3        MS. HUNKER:  Objection, form.
4   A.   I could.
5   Q.   Would you say that it is easier or harder for a
6   family member to provide a Texas driver's license number
7   or social security number than it is for a family member
8   to forge a signature of another voter?
9        MS. HUNKER:  Objection, form.  Lack of
10  personal knowledge.
11  Q.   If you know.
12  A.   And again, I don't know.
13  Q.   Well, could you forge your wife's signature, do
14  you think?
15  A.   I don't know, never tried.
16  Q.   Fair enough.
17  A.   I can't imagine a set of circumstances where I
18  would.
19  Q.   Do you think sitting here today that you could
20  create a facsimile of your wife's signature?
21  A.   I don't know.
22  Q.   I won't make you try, tempted but I won't.
23       Do caregivers tend to have access to
24  senior citizen's driver's license numbers or social
25  security numbers?

Page 99

1   A.   I don't know.
2        MS. HUNKER:  Objection, form.  Lack of
3   personal knowledge.
4   Q.   Do you know if it is easier for a nursing home
5   resident -- strike that.
6        Do you know if it's easier for a nursing
7   home provider to put a resident's Texas driver's license
8   or social security number on an ABBM than it is for the
9   nursing home provider to forge a resident's signature?
10       MS. HUNKER:  Objection, form.  Vague,
11  compound.  Calls for information that's not personal
12  knowledge.
13  Q.   If you know.
14  A.   Yeah, I don't have any idea.
15  Q.   Okay.  Are you aware of any instances in which
16  an individual intended or attempted to impersonate a
17  mail voter as worded by this SB 1 identification number
18  requirement?
19  A.   I don't know.  Just had one election so far.
20  Q.   Sitting here today, though, you can't say that
21  you're aware of any acts of voter fraud being thwarted
22  by this requirement; is that right?
23       MS. HUNKER:  Objection, form.
24  A.   Well, what I know is that, we have had
25  testimony in committees on this bill about deceased

Page 100

1   persons, you know, who have mail ballot request in their
2   name years after they have died.
3        We also had testimony about people who had
4   mail ballot requests in their name even though they
5   didn't, they swore under oath that they didn't request
6   that mail ballot, and that wasn't their signature; so
7   that was the testimony in front of the Legislature at
8   the committees.  And that's what this is trying to stop.
9   Now we don't know, yet, whether those kinds of things
10  continued.  That's going to be something we will have to
11  see as upcoming elections happen and people do their due
12  diligence and their investigations.
13  Q.   But sitting here right now, you are not able to
14  identify any instances in which these requirements
15  awarded an act of voter fraud; is that right?
16       MS. HUNKER:  Objection, form.
17  A.   What I am trying to say is that, the evidence
18  in front of the Legislature in committee was that there
19  are circumstances that exist where this kind of
20  requirement could thwart, and that's what we have got
21  right now.  We don't have actual thwarted.
22  Q.   Got it.
23       MS. HUNKER:  Just ask my client to wait
24  until I can give my objection.
25  A.   Sorry.  I'm trying real hard.

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

25 (97 - 100) Brian Keith Ingram JD

**Page: 25 (97 - 100)**

5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 26 (101 - 104)

26 (101 - 104)

Page 101

1     Q.  I have a few follow-up questions about the form
2 of identification hierarchy as you discussed with my
3 colleague, Mike, on Tuesday.  I am not going to ask you
4 to run through all of it.  But if you could turn to
5 Section 5.02 of SB 1.  Are you there?
6     **A.  Uh-huh.**
7     Q.  Just focusing on Section 5.02.  For a voter who
8 has been issued a Texas driver's license number, what
9 information does Section 5.02 require?
10          MS. HUNKER:  Objection, form.  Calls for a
11 legal conclusion.
12     **A.  So it requires that the voter provide their**
13 **driver's license number or their social security number,**
14 **last four, or a statement that they don't have either**
15 **one of those.**
16     Q.  But for a voter who has been issued a Texas
17 driver's license number does 5.02 require anything
18 different than the Texas driver's license number?
19          MS. HUNKER:  Objection, form.
20     **A.  It does not.**
21     Q.  Does it require anything else besides the Texas
22 driver's license number?
23     **A.  There is no requirement for anything further.**
24 **We suggest and we strongly suggest that they go ahead**
25 **and put the last four of the social.**

Page 102

1     Q.  My question, though, is the ballot --
2     **A.  We cannot require it because the law doesn't**
3 **require it.**
4     Q.  And focusing on Section 5.08 of SB 1, for a
5 voter who -- for a voter who has been issued a Texas
6 driver's license number, what information does
7 Section 5.08 of SB 1 require?
8     **A.  It requires the driver's license number.**
9     Q.  Okay.  I would like to turn then to the HB 2512
10 process.
11     **A.  Okay.**
12     Q.  When I use the term HB 2512 process, what does
13 that mean?
14     **A.  There was a bill in the 83rd Session, I believe**
15 **it is, in 2013, that was HB 2512, and it provided that**
16 **any information in the driver's license file could be**
17 **used for voter registration purposes; it amended the**
18 **Transportation Code to provide for us to have**
19 **information in the driver's license file to assist with**
20 **voter registration.**
21     Q.  Prior to last year, how did you go about
22 importing DPS data into TEAM?  What was that process?
23     **A.  I don't know what that means.**
24     Q.  Prior to last year, what was the HB 2512
25 process?

Page 103

1     **A.  Because we get -- we get a lot of information**
2 **from DPS from a lot of ways, and so I just want to make**
3 **sure we are talking about the same thing.  If we aren't**
4 **talking about the ad hoc process, is that what you're**
5 **talking about?**
6     Q.  Well, let me rephrase if it is not clear to
7 you.  And I appreciate you letting me know.
8     **A.  Because 2512 covers the non-citizen process, it**
9 **covers felons, you know, it is information that DPS has**
10 **that we can use.**
11     Q.  Prior to last year, what was the process for
12 importing either social security numbers or DPS numbers
13 into TEAM from DPS databases?
14     **A.  So is what we instituted after the passage of**
15 **HB 2512 is an annual process where we would try to**
16 **maximize the number of full nines that we have in our**
17 **database, full nine of social security number in our**
18 **database.**
19     Q.  And prior to last year, am I correct that a
20 match as part of that process required a match of Texas
21 driver's license numbers that any sort of set of
22 matching criteria at least included a Texas driver's
23 license number?
24     **A.  I don't believe that's the case, no, sir.**
25     Q.  Do you know, prior to last year, that process

Page 104

1 of infilling SSN-9s, do you know what the criteria were?
2     **A.  Well, I mean it's the same as we always do.**
3 **You start out with matching social security numbers,**
4 **take those off the list, then you match the DLs and take**
5 **those off the list, and then you match the first and**
6 **last name, former last name, date of birth, and whatever**
7 **you got and see if you get more matches.**
8     Q.  So sitting here today, prior to last year, it
9 is your understanding that there were matches conducted
10 on a basis that did not include a Texas driver's license
11 number that resulted in the implication of an SSN-9?
12     **A.  Yes.**
13          MR. FREEMAN:  Can we go off the record for
14 a moment?
15          (Brief pause.)
16     Q.  (By Mr. Freeman)  If there were a document that
17 stated that, prior to last year, the criteria for
18 importation of an SSN-9 rested on only two document
19 match criteria, both of which included a Texas driver's
20 license number, would that surprise you?
21     **A.  I would have to go talk to my voter**
22 **registration manager and see if that's the way they did**
23 **it.**
24     Q.  So sitting here today, are you 100 percent
25 confident that SSN-9s were imported without a driver's

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

26 (101 - 104) Brian Keith Ingram JD

**Page: 26 (101 - 104)**

5:21-cv-844 (XR)
4/28/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 38 (149 - 152)

38 (149 - 152)

Page 149

1    A.  Yes.
2    Q.  Is that a document that, to your knowledge, has
3  been produced to the plaintiffs in discovery in this
4  case?
5    A.  I would be surprised if it had.  It has
6  confidential information in it, but it might.
7    Q.  So if I were to use the term "complaint log"
8  would that have a specific meaning to the folks in your
9  office?
10   A.  It would.
11   Q.  And is there only one complaint log that is
12  kept by your office?
13   A.  Should be.
14   Q.  How is that document updated?
15   A.  By my assistant when the complaints come in.
16   Q.  And so walk me through that process if you
17  would, please.
18   A.  A complaint comes in, it is recorded in the
19  complaint log, it is scanned and emailed to me for
20  review.
21   Q.  And do you review every complaint that does
22  come in?
23   A.  I do.
24   Q.  What happens after you conduct that review?
25   A.  Either a disposition letter will be put

Page 150

1  together by my assistant and mailed to the complainant
2  or it will be assigned to an attorney for either
3  referral to the Attorney General or for a letter back to
4  the complainant.
5    Q.  Who makes the decision, the ultimate decision
6  about whether it is issued a -- whether a disposition
7  letter is issued or if it is referred it an attorney for
8  further follow-up?
9    A.  Me.
10   Q.  Anybody else?
11   A.  No.
12   Q.  What type of information would appear on the
13  complaint log for each complaint that is sent in to your
14  office?
15   A.  I am not sure.  I haven't ever seen the
16  document myself, so I don't know all of the boxes that
17  it has, but it will have -- generally, it will have the
18  date the complaint was received, the nat -- the broad
19  general nature description of the complaint.  The person
20  bringing the complaint and I think usually the person
21  complained of.  It will also have --
22   Q.  Any others?
23   A.  -- a column for attorney assigned and then
24  disposition.
25   Q.  Thank you.  And forgive me, please, for

Page 151

1  speaking over you.
2        Any other information that you could think
3  of that might be captured on that document?
4    A.  Like I said, I don't know.  I haven't seen the
5  document myself.  I think those are the categories.
6    Q.  Having never seen the document, do you have any
7  information about whether it is in fact complete with
8  every complaint that has come in or not?
9        MS. HUNKER:  Objection, form.
10   A.  I believe it to be complete at least for the
11  last several years.  It has in the past been the
12  responsibility of the legal -- paralegal, legal
13  assistant to keep up with that document.  Our legal
14  assistant recently left us and so it's -- my assistant
15  has been doing it.  And I am pretty confident that the
16  legal assistants that we have had in the last four or
17  five years have done a good job of documenting every
18  complaint, so that's what I would say about that.
19   Q.  And so sitting here today, you have reason to
20  believe that if a complaint is submitted to your office
21  about some unlawful voting activity, the -- that
22  complaint has been recorded on the complaint log and a
23  scan of it has been saved to your system; is that fair?
24       MS. HUNKER:  Objection, form.
25   A.  I believe so.

Page 152

1    Q.  Ms. Hunker, a this point, I do believe the
2  witness testified he would be surprised if it were
3  produced in discovery.  I will make a formal referral
4  that we do obtain a copy of that and your office try to
5  produce it to us.  I recognize that there might be,
6  based on the witness' testimony, some material that will
7  require redaction.  But we, obviously, take no position
8  until we have seen it.  But if you have to produce it in
9  a redacted form of the privilege log, please do so.
10       MS. HUNKER:  I will note your request and
11  do inquiries into the matter.  However, to the extent
12  that it has confidential information, particularly, if
13  that information cannot be redacted without comprising
14  the document or can't be redacted at all, we would be
15  alleging privilege.
16       MR. KANTERMAN:  Noted and certainly happy
17  to follow-up after the deposition.  I certainly
18  appreciate the courtesy of taking a look though.  Thank
19  you.
20   Q.  (By Mr. Kanterman)  Mr. Ingram, moving on to my
21  next lines of questions if we could.
22       Did you or your office have any
23  communications with the Texas Governor and/or the Office
24  of the Texas Governor regarding any incidents of illegal
25  voting?

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

38 (149 - 152) Brian Keith Ingram JD

Page: 38 (149 - 152)

5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 39 (153 - 156)

39 (153 - 156)

Page 153

1      MS. HUNKER:  Objection, form.  Vague and
2  ambiguous.
3      **A.  Yeah.  I don't think so.**
4      Q.  Have you or your office have had any
5  communication was the Texas Governor or its office
6  regarding incidents of election fraud?
7      MS. HUNKER:  Objection, form, vague.
8      **A.  Yeah.  I -- I don't know.  I mean -- I have had**
9  **a ton of conversations with the Governor's office over**
10 **the last 10 years, I don't know, thousands of hours; so**
11 **have we talked about incidents of election fraud in that**
12 **probably.  Probably we talked about Gregg County, but I**
13 **don't have a specific recollection of the specific**
14 **conversation as we sit here today.**
15     Q.  And you said a conversation -- particularly a
16 conversation with Gregg County?
17     **A.  Gregg County, right.**
18     Q.  If you have a memory of that communication
19 generally, what would it have been?
20     **A.  Well, Gregg County is a circumstance where in a**
21 **primary election one candidate for County Commissioner,**
22 **one race for County Commissioner had a disproportionate**
23 **number of mail ballots cast in it and those mail ballots**
24 **went overwhelmingly for one candidate.  The early votes**
25 **in-person and the election day in-person actually went**

Page 154

1  **for the other candidate by some margin.  But because of**
2  **the overwhelming number of mail ballots that went**
3  **overwhelmingly for the one candidate, he ended up**
4  **winning the race by a few votes, and that has been the**
5  **subject of investigation by the Attorney General and it**
6  **has been the subject of indictments by the Attorney**
7  **General.**
8      Q.  And do you have any recollection sitting here
9  today the particulars of the conversations you had with
10 the Governor's office about that situation?
11     **A.  Just what we are talking about here today that**
12 **it happened and it was investigated.**
13     Q.  You mentioned you had thousands of hours of
14 communications with the Governor's office over your --
15 the course of your time with the Secretary of State's
16 Office; is that right?
17     **A.  That's right.**
18     Q.  Are those conversations generally in written
19 form in some other form?
20     **A.  No.  We talk.**
21     Q.  When you say "talk," are those in-person
22 communications, telephone communications or something
23 else?
24     **A.  Both.  Mostly on the phone but we do talk**
25 **in-person.**

Page 155

1      Q.  Did you have any additional communications with
2  the Texas Governor or his office about violations of
3  Texas election laws besides those we have already
4  discussed?
5      MS. HUNKER:  Objection, form.  Asked and
6  answered.
7      **A.  Yeah.  Again, I -- I can't remember any**
8  **specific conversations, but we talk a lot and we talk**
9  **about violations of the law a lot.  We talk about all**
10 **kinds of things.**
11     Q.  Have you had any communications with the Texas
12 Attorney General or his office regarding incident of or
13 investigation into illegal voting in the State of Texas?
14     MS. HUNKER:  I am going to object to the
15 extent this calls for investigative privilege and
16 instruct my witness not to reveal any information
17 concerning complaints that have been referred to the OAG
18 but have yet to be resolved through a final matter.
19     **A.  Yes.  I talk to the Attorney General's**
20 **investigative team on a regular basis.**
21     Q.  And, sir, I am not asking you for specifics of
22 any individual circumstances at the moment, generally,
23 what are those conversations about?
24     MS. HUNKER:  Same objection with the same
25 advice that my witness not communicate anything specific

Page 156

1  with respect to a complaint that has been referred to
2  the Attorney General but has yet to be resolved through
3  every conviction or dismissal.
4      **A.  Yeah.  We talk about a lot of stuff.  I mean,**
5  **we talk about complaints that we have sent over.  We**
6  **talk about the language of the statute and what we think**
7  **it means versus what they think it means.  We talk about**
8  **bills that get filed in the legislative process, so I**
9  **mean, we talk to them about a variety of things.**
10     Q.  But two of those items that you just mentioned
11 I wanted to discuss a little bit further.  If I heard
12 you correctly, first, that you discussed with the
13 Attorney General's Office your interpretation and their
14 interpretation of certain provisions of the law; is that
15 right?
16     **A.  That's right.**
17     Q.  Have you discussed with the Attorney General's
18 Office your interpretation and their interpretation of
19 provisions of SB 1.
20     MS. HUNKER:  Objection to the extent it
21 calls for investigative privilege as well as
22 attorney-client privilege, specifically where the
23 Secretary of State's Office is requesting advice from
24 the Attorney General, I would advise my client to
25 refrain from any of those type of communications.

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

39 (153 - 156) Brian Keith Ingram JD

**Page: 39 (153 - 156)**

5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 40 (157 - 160)

40 (157 - 160)

Page 157

1     **A.  No.**

2     Q.  Sir, when you are discussing -- when you are

3 having these conversations with the Attorney General's

4 Office that you mentioned, those in which they are

5 seeking your input on the interpretation of statutory

6 language and you are discussing their interpretation,

7 are you doing so in furtherance of seeking their legal

8 advice?

9     **A.  No.  The one instance I can think of, it was**

10 **them explaining to me their interpretation of the Penal**

11 **Code 36.02 so that I would quit sending them complaints**

12 **that they didn't think warranted investigation.**

13     Q.  And in your view was that conversation in

14 furtherance of seeking or receiving legal advice from

15 them?

16     **A.  No.**

17     Q.  Let's talk about -- let's talk about the scope

18 of that conversation then.  And can you repeat for me,

19 please, the code section you just referred to, 38?

20     **A.  36.02 of the Penal Code.**

21     Q.  And was it just a single conversation that you

22 can recall at the Attorney General's Office in which you

23 discuss their interpretation of Section 36.02 of the

24 Penal Code?

25     **A.  That's right.**

Page 158

1     Q.  And when was that conversation?

2     **A.  Several years ago.**

3     Q.  Do you have a more specific approximation of a

4 date?

5     **A.  No.**

6     Q.  Would it be before or after 2020?

7     **A.  It would be before '20.  Several years ago, it**

8 **was before '20.**

9     Q.  Do you think it was before 2018?

10     **A.  Don't know.**

11     Q.  Was this a conversation you had in-person, over

12 the telephone, by email or some other -- through some

13 other media?

14     **A.  It was a phone call.**

15     Q.  And approximately how long did that phone call

16 last?

17     **A.  Five, 10 minutes.**

18     Q.  And who attended that phone call, if you

19 recall?

20     **A.  Jonathan White and myself.**

21     THE REPORTER:  And excuse me, we had

22 someone come in the room.

23     Q.  Anybody else?

24     THE REPORTER:  Excuse me just a moment,

25 Mr. Kanterman.  May I get your name?

Page 159

1     MR. THOMPSON:  Will Thompson from the

2 Office of the Attorney General.

3     THE REPORTER:  Okay.  We are ready to go

4 back, Mr. Kanterman.

5     MR. FREEMAN:  Actually if we could go off

6 the record for a moment.

7     MR. KANTERMAN:  Thank you very much.

8     THE REPORTER:  Can we go off the record

9 for a moment?

10     MR. KANTERMAN:  Absolutely.  Off the

11 record, please.

12     (Brief recess.)

13     MR. KANTERMAN:  Thank you.  Just to be

14 clear on the record, if I can.  The last answer, I

15 believe the witness said was in response to my question

16 about who attended a phone call, is that -- has that

17 been recorded?

18     THE REPORTER:  Yes, sir.

19     MR. KANTERMAN:  Thank you very much.

20     Q.  (BY Mr. Kanterman)  Other than yourself and

21 Mr. White, Mr. Ingram, was there anyone else present on

22 that phone call?

23     A.  No.

24     Q.  Do you recall the content of that phone call?

25     A.  Yes.

Page 160

1     Q.  And tell me what it was, please.

2     **A.  So 36.02 is the anti-bribery statute, and it**

3 **says that -- that the crime consists of giving anything**

4 **of value to, in part, there is a lot of categories, but**

5 **one of the categories is a voter for that -- that you**

6 **anticipate influencing the voter's discretion in any**

7 **way, right.  So to us at the Secretary of State's**

8 **Office, that means the decision whether to vote or not**

9 **is part of the discretion of a voter.  And if somebody**

10 **gives, you know, like Free Blue Jean Day on Friday, if**

11 **we all have 100 percent turn out and vote, that to us**

12 **would be a violation of 36.02 because you're influencing**

13 **the discretion of a voter to turn out to actually vote**

14 **or not.**

15     **Jonathan says that the way that they -- or**

16 **said that the way that they interpret that statute is,**

17 **it has to be influencing the voter's discretion in the**

18 **booth in a particular way, so to vote for or against a**

19 **measure, for or against a candidate, and that the meer**

20 **enticement of voting by an offer of a free beer with**

21 **your out voted sticker, or whatever, is not sufficient**

22 **to constitute the crime; that there has been to be an**

23 **actual influencing of the voter's vote itself not their**

24 **decision to vote or not.  I still think he is --**

25     Q.  Beyond --

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

40 (157 - 160) Brian Keith Ingram JD

**Page: 40 (157 - 160)**

5:21-cv-844 (XR)
4/28/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 45 (177 - 180)

45 (177 - 180)

Page 177

1    A.  I don't know.  The Forensic Audit Division is
2  doing that process.  I assume it is four separate audits
3  but you would have to ask the FAD.
4    Q.  And to your understanding, this audit or these
5  audits remain ongoing; is that right?
6    A.  That's correct.
7    Q.  Has your office received any final
8  determinations or information from which it could draw
9  final conclusions about the outcome of these audits?
10   A.  No.
11   Q.  When do you anticipate, if ever, that you will
12 receive such information?
13   A.  I don't know.
14   Q.  Based on your experience with the Secretary of
15 State's Office, do you believe that illegal voting has
16 had an outcome determinative impact on any election in
17 Texas?
18   A.  Yes.
19       MS. HUNKER:  Objection, form.
20   Q.  I am sorry.  I didn't hear the witness' answer.
21   A.  Yes.
22   Q.  What election do you believe that illegal
23 voting had an outcome determinative impact in?
24   A.  Well, there's several of them, but at least
25 that County Commissioner's primary in Gregg County.

Page 178

1    Q.  And in what year is the Gregg County County
2  Commissioner election that you are referring to?
3    A.  I believe it was in March of '18, but I could
4  be wrong about that.
5    Q.  And I believe you said there are several, what
6  other elections other than the County Commissioner
7  election in Gregg County, possibly in March of 2018, do
8  you believe illegal voting has an outcome determinative
9  impact on?
10   A.  The City of Edinburg mayor's race.  Weslaco
11 Independent School District's Trustee race.  Maybe
12 Sheriff in Webb County.
13   Q.  So that -- I am missing one, forgive me.
14 Sheriff in Webb County.  In what year are we referring
15 to?
16   A.  The same year as the Gregg County -- it was the
17 same election primary of '18.
18   Q.  And was the city of -- there was a city school
19 district election you mentioned, correct?
20   A.  That's right.  Mayor of Edinburg.  And Weslaco.
21   Q.  And what year was that election?
22   A.  I don't know, maybe November of '18.
23   Q.  I believe you mentioned one other election with
24 the same thing, illegal voting had an outcome
25 determinative impact on, sir.  Can you --

Page 179

1    A.  Oh, another one, too.
2    Q.  -- remind me of that?
3    A.  Yeah, Weslaco Independent School District's
4  Trustee race, and then a Justice of the Peace Court race
5  in South Dallas County.
6    Q.  Yeah.  And so turning back to the Weslaco
7  Independent School District race election, what year was
8  that?
9    A.  I don't know for sure.  It was older, maybe
10 2013 or 2014, maybe 2012.
11   Q.  And the Justice of the Peace race, I believe
12 you said in South Dallas County, when was that election?
13   A.  I don't know for sure, it was before I got here
14 in January of '12, so it was sometime before then.
15 Prosecutions were well underway.
16   Q.  And so let's work through each of these.  The
17 County Commissioner election in Gregg County in what may
18 be March of 2018, why do you believe illegal voting had
19 an outcome determinative impact on that election?
20   A.  Because it did.
21   Q.  And what's your basis for that?
22   A.  I told you before, the ballot harvesting
23 operation resulted in, I think, 700 mail ballots for
24 that County Commissioner's race which was substantially
25 more than any other commissioner's race in that same

Page 180

1  election.  The mail ballots in that race were
2  predominantly in favor of one candidate.  The votes
3  in-person were in favor of the other candidate, but the
4  huge number of mail ballots in that race swung the
5  election by a few votes to the one who was indicted and
6  charged with ballot harvesting.
7    Q.  And who was the one indicted with ballot
8  harvesting?
9    A.  I don't know his name.  You can look in the
10 newspaper, it is out there.
11   Q.  Do you know whether that individual was
12 ultimately convicted or otherwise pled guilty to a
13 criminal offense?
14   A.  I do not.
15   Q.  Is the only basis that you're offering for your
16 conclusion that the Gregg County race in 2018 had been
17 impacted by illegal voting -- let me ask it differently.
18       Other than the allegation of ballot
19 harvesting in the March 2018 Gregg County election that
20 we are discussing, do you have any other basis upon
21 which you rested your conclusion that illegal voting had
22 an outcome determinative impact on an election?
23       MS. HUNKER:  Objection, form.
24   A.  Yeah.  I don't know what you mean.
25   Q.  What I am trying to understand, and hopefully

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

45 (177 - 180) Brian Keith Ingram JD

Page: 45 (177 - 180)

Case 5:21-cv-00844-XR   Document 645-3   Filed 06/24/23   Page 68 of 87

5:21-cv-844 (XR)          Entero v Texas          Brian Keith Ingram JD 46 (181 - 184)
4/28/2022          NATIONAL COURT REPORTERS INC 888.800.9656          46 (181 - 184)

Page 181

1 this will help clarify is: Why do you think that
2 illegal voting had an outcome determinative impact on
3 the Gregg County election in March of 2018?
4         You mentioned to me that there was a
5 ballot harvesting incident and that charges were brought
6 against an individual; is that right?
7    **A. There were charges brought against four**
8 **individuals.**
9    Q. And are you aware of whether any of those four
10 individuals had pled guilty or been convicted of ballot
11 harvesting or another crime?
12         MS. HUNKER: Objection, form. Asked and
13 answered.
14    **A. Yeah, I don't know.**
15    Q. And so other than the fact that four
16 individuals were indicted based upon alleged crimes that
17 had occurred relating to ballot harvesting, do you have
18 any other basis for concluding that illegal voting had
19 an outcome determinative impact on the Gregg County
20 election in March of 2018?
21         MS. HUNKER: Objection, form, vague,
22 ambiguous.
23    **A. I don't know why you're even asking that**
24 **question. That's kind of ludicrous. Other than, you**
25 **know, the crime occurring and causing the outcome is**

Page 182

1 **there any other evidence? No. The crime that occurred**
2 **and caused the outcome is all the evidence, that's all I**
3 **need.**
4         **What are you asking?**
5         **Why are you even asking that? That makes**
6 **no sense.**
7    Q. And so is it fair to say that if none of the
8 four individuals who were indicted with criminal -- let
9 me step back.
10         Is it fair to say that, if neither -- if
11 none of the four individuals that were indicted with
12 ballot harvesting in relation to the Gregg County, March
13 2018 election were either -- were ever convicted or
14 found guilty, that there was, in fact, no proof that
15 illegal voting activities had an outcome determinative
16 impact on the Gregg County election?
17         MS. HUNKER: Objection, form. Ambiguous,
18 vague, compound, and misstates testimony.
19    **A. Yeah, of course not. Don't need a conviction**
20 **to know what happened.**
21    Q. Let's move on to the Mayor of Edinburg March --
22 maybe November 2018 election. What is your basis for
23 concluding that illegal voting had an outcome
24 determinative impact on that election?
25    **A. Because the Mayor and his wife were indicted in**

Page 183

1 **an illegal voting scheme, along with several other**
2 **individuals, and the race margin was close.**
3    Q. Do you know if any of the individuals indicted
4 for activity relating to the Mayor of Edinburg election
5 were ever convicted or found guilty of voting rights?
6    **A. I don't know. I don't know what the outcome**
7 **was. I think it is still pending. I thought of another**
8 **election. There was a road utility district election**
9 **down in Montgomery County that was affected by and**
10 **swayed by fraud, illegal voting.**
11    Q. Thank you for that clarification. And when was
12 that utility election in Montgomery County that you
13 know?
14    **A. It was a while back. It would have been maybe**
15 **'12 or '13, maybe '14.**
16    Q. So let me ask you this: I believe you have
17 listed six elections in Texas that you think have been
18 influenced in an outcome determining fashion by illegal
19 voting in Texas. Other than those six, can you think of
20 any others as you sit here today?
21    **A. I can't as I sit here right now, but I could**
22 **maybe given time. I just -- I don't know off the top of**
23 **my head.**
24    Q. Let's return to the Mayor of Edinburg election
25 we were just talking about, which you say might have

Page 184

1 been in November of 2018. If I recall, sir, it was
2 that -- a number of individuals had been indicted but
3 you were unsure whether any of them had been convicted
4 or found guilty of any election-related crime; is that
5 right?
6         MS. HUNKER: Objection, form.
7    **A. That's right.**
8    Q. If you learned that none of those individuals
9 were found guilty of or ultimately convicted of
10 election-related crimes, would that alter your
11 conclusion that the Edinburg Mayor election, in November
12 of 2018, had been influenced in an outcome determinative
13 fashion by illegal voting?
14    **A. No.**
15    Q. Why not?
16    **A. Because it doesn't matter. Whether or not**
17 **there is ultimately a conviction doesn't matter. I saw**
18 **the evidence. I referred the complaint. There was**
19 **fraud. There was illegal voting.**
20    Q. So it is your testimony that a fact finder
21 ultimately concludes there was no fraud as presented.
22    **A. That's not --**
23         MS. HUNKER: Objection, form.
24    **A. That's not what a -- that's not what a failure**
25 **to convict means. That's not at all what a failure to**

Case 5:21-cv-00844-XR   Document 645-3   Filed 06/24/23   Page 69 of 87

5:21-cv-844 (XR)
4/28/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 47 (185 - 188)

47 (185 - 188)

Page 185

1  convict means. A failure to convict means that they
2  didn't carry their burden of proof by beyond a
3  reasonable doubt, it doesn't mean that they were
4  actually innocent. Doesn't mean they are innocent at
5  all.
6      Q. I am sorry. I heard something. I just want to
7  make sure that I should continue and there is no reason
8  to stop?
9      A. Everything is fine. We got a thumbs up.
10     Q. Okay. Thank you very much.
11         Turning next, sir, to the Webb County
12  Sheriff's election in March of 2018.
13     A. That one --
14     Q. What is your basis in that regard?
15     A. I had a long conversation with Senator
16  Zaffirini, she was convinced and, therefore, I was
17  convinced, I don't believe any criminal charges were
18  ever brought in connection with that matter, but it was
19  a similar kind of scheme to the one in Gregg County in
20  that Commissioner's race where the mail ballots were
21  heavily one way and a lot more of them than normal.
22     Q. You would agree with me, wouldn't you, that
23  increased number of mail ballots in a particular
24  election does not necessarily yield a conclusion that
25  fraud or illegal voting has occurred; is that right?

Page 186

1          MS. HUNKER: Objection, form.
2      A. Not necessarily, but whenever the
3  disproportionate number also is matched by a
4  disproportionate proportion in favor of one candidate
5  over another and that disproportionate sort of
6  favoritism for that candidate isn't reflected in the
7  in-person votes, that leads a reasonable person to
8  believe that fraud is occurring.
9      Q. Let's turn next to the Weslaco Independent
10  School District election in what I think you said might
11  have been on or before 2017. What basis do you have for
12  concluding that that election was influenced in an
13  outcome determinative fashion by illegal voting?
14     A. There were a couple of PolitiCares who were
15  convicted of ballot harvesting in that case and,
16  unfortunately, the Trustee who was elected eventually
17  committed suicide.
18     Q. Any other reasons for your conclusion that that
19  race was outcome determinatively impacted by illegal
20  voting?
21     A. No. That's it.
22     Q. You mentioned next the Justice of the Peace
23  race in South Dallas County which might have been before
24  January of 2012. Do you remember that?
25     A. It was definitely before January of 2012.

Page 187

1      Q. And what's your basis that that election was
2  influenced in an outcome determinative way by illegal
3  voting?
4      A. The Justice of the Peace who was elected and
5  several of his family members were charged with and
6  convicted of crimes including illegal voting and mail
7  ballot harvesting.
8      Q. And so I recognize you say they were convicted.
9  But I guess my question is a little bit more specific,
10  which is, whether or not those convictions reflect an
11  outcome determinative impact on the election?
12         Do you have any more specific reason to
13  conclude that the acts of these individuals had an
14  outcome determinative impact on that election?
15     A. No. It was before my time, and I didn't refer
16  that complaint, so I don't have any more details other
17  than what was in the newspaper.
18     Q. So I am actually going to circle back briefly
19  for a moment. So the Gregg County election that we
20  talked about in March of 2018, you said that there were
21  some, in your view, ballot harvesting activities.
22         What basis do you have for concluding that
23  those activities had an outcome determinative impact on
24  the election?
25     A. Have I not said this twice already?

Page 188

1          MS. HUNKER: Objection, form. Asked and
2  answered.
3      A. Yeah. I am not going over that again.
4      Q. Are you refusing to answer the question, sir?
5      A. I have answered the question twice already in
6  detail.
7      Q. If you would just indulge me then and forgive
8  my possible repetition. What is the outcome deter --
9  what is the basis of that impact was outcome
10  determinative of that election?
11     A. For the third time, here we go. There were a
12  disproportionate number of mail ballots in that race.
13  There was something over 700 instead of the 120 or so
14  that were in the other County Commissioner Court races,
15  so seven times as many mail ballots. They were
16  disproportionately 80/20, 85/15 for one candidate over
17  the other. Their early votes in-person -- the election
18  day votes in-person went for the other candidate, but
19  the margin built up in the mail ballots was such a
20  degree that it flipped the race for the one who was
21  getting the disproportionate number of mail ballots by a
22  few votes. It was a close election.
23     Q. Okay. Thank you. Let's go to the last of the
24  elections you pointed to. I think you said it was road
25  utility in Montgomery County sometime between 2012 and

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

47 (185 - 188) Brian Keith Ingram JD

Page: 47 (185 - 188)

5:21-cv-844 (XR)
4/28/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 48 (189 - 192)

48 (189 - 192)

Page 189

1 2014. Do I have that right?
2   **A.  You do.**
3   Q.   And what is your basis for concluding that that
4 election was impacted in an outcome determinative
5 fashion by illegal voting?
6   **A.   Well, the road utility district had only two or**
7 **three registered voters in the whole district, and so**
8 **what a group of Montgomery County folks decided to do is**
9 **register to vote at a Roadway Inn and run for office in**
10 **that road utility district so that they could influence**
11 **the letting of bonds; and so they -- they did that, the**
12 **ten of them registered at a Roadway Inn that they didn't**
13 **live at, and they proceeded to -- a couple of them filed**
14 **for office on the district trustees that were up for**
15 **election, and they voted their compadres in as trustees**
16 **on the road utility district.  There was an election**
17 **contest filed.  The election was overturned because of**
18 **illegal voting.  The complaint was sent to the Attorney**
19 **General and seven of those ten persons were convicted of**
20 **illegal voting and sentenced to prison.**
21   Q.   Changing subjects again.  Are you aware of any
22 instances of violence, intimidation, harassment, or
23 other misconduct from a poll watcher?
24     MS. HUNKER:  Objection, form.  Vague as to
25 the determine "other misconduct."

Page 190

1   Q.   I will try to finish my question and ask it --
2 maybe I will just ask it differently at this point.
3     Are you aware of any instances of violence
4 involving either a poll watcher, poll worker, clerk, or
5 election judge in Texas since SB 1 was enacted?
6   **A.   No.**
7   Q.   Are you aware of any complaint about the
8 behavior of poll watchers from January 2018 through
9 present day?
10   **A.   Yes.**
11     MS. HUNKER:  Objection, form.
12   Q.   Approximately how many complaints are you aware
13 of?
14   **A.   I don't know.**
15   Q.   Less than 100?
16   **A.   Probably.**
17   Q.   Less than 50?
18   **A.   I don't know about that.**
19   Q.   Are there any materials that would help refresh
20 your recollection or inform your opinion about how many
21 such complaints there might be?
22     THE REPORTER:  I'm sorry.  You cut out
23 there.  "Opinion about how many" ...
24   Q.   Such complaints there might be?
25   **A.   No.**

Page 191

1   Q.   Of the somewhere between 50 and 100 complaints,
2 have any been referred to the Attorney General's Office
3 for further investigation?
4   **A.   Yes.**
5   Q.   Do you know how many?
6   **A.   Oh, you're talking about complaints about poll**
7 **watchers, no.  Complaints about election officials**
8 **obstructing poll watchers, yes.**
9   Q.   And so the "no" is modifying your last answer.
10 You have not referred any complaint about the behavior
11 of poll watchers to the Attorney General's Office for
12 investigation from January 2018 to present?
13   **A.   I don't think so, no.  Those are usually**
14 **handled locally.**
15   Q.   Did your office maintain any policies,
16 practices, or procedures regarding the Americans With
17 Disabilities Act or other laws protecting individuals
18 with disabilities as those laws pertain to voting in an
19 election?
20   **A.   I don't know what that question means.**
21   Q.   Is there anyone specific in your office who
22 handled the intake of complaints or requests relating to
23 ADA accommodations or voters with disabilities in Texas?
24     MS. HUNKER:  Objection, form, lack of
25 foundation, vague, and assumes facts not in evidence.

Page 192

1   **A.   One of my lawyers that recently left us was the**
2 **one who headed up sort of the disability function of our**
3 **office.  So what happens is, Disability Rights of Texas**
4 **will go out and audit counties in an election to find**
5 **out if their polling places are acceptable and if they**
6 **are meeting the requirements of the Help America Vote**
7 **Act with regard to voting machine accessibility, and**
8 **they send a copy of those audits to our office as well**
9 **as to the county election official, and I usually have a**
10 **lawyer -- I don't have one designated currently because,**
11 **like I said, she recently left -- who will go over that**
12 **audit and call the county and see if we can offer any**
13 **help or assistance in remedying some of the things that**
14 **Disability Rights of Texas finds.**
15   Q.   And so you mentioned offering the county help
16 or assistance.  What sort of help and assistance have
17 you offered in the past?
18   **A.   We have got the original -- we have got the**
19 **ability now that we didn't used to have to send trainers**
20 **to go talk to the county about the specific issues and**
21 **to work with them to come up with remediations;**
22 **sometimes the polling place can't be salvaged and they**
23 **will have to find a different polling place.**
24   Q.   And the individuals you say you send to, I
25 guess, provided by you, are those individuals sponsored

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

48 (189 - 192) Brian Keith Ingram JD

Page: 48 (189 - 192)

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX N

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION
    LA UNION DEL PUEBLO ENTERO,      )
 3  et al.,                          )
                    Plaintiffs,      )
 4       vs.                         )Civil Action No.
    STATE OF TEXAS, et al.,          )5:21-cv-844(XR)
 5                  Defendants.      )(Consolidated Cases)

 6

                    ------------------------
 7                     ORAL DEPOSITION OF
                       KEITH INGRAM
 8                     March 28, 2023
                          Volume 1
 9                  ------------------------

10

11          ORAL 30(b)(1) DEPOSITION OF KEITH INGRAM, Volume

12  1, produced as a witness at the instance of the

13  Plaintiffs, and duly sworn, was taken in the

14  above-styled and numbered cause on March 28, 2023, from

15  9:15 a.m. to 4:18 p.m., before Dana Shapiro, CSR, in

16  and for the State of Illinois, reported by machine

17  shorthand, at 209 W. 14th Street, Austin, Texas 78701,

18  pursuant to the Federal Rules of Civil Procedure and

19  any provisions stated on the record or attached

20  hereto.

21

22

23

24

25
```



Keith Ingram

March 28, 2023
Pages 18 to 21

Page 18
1  if she was called up in that.  There was elections bill
2  there, but I don't know if she actually had to testify.
3      Q.    What's a sec -- did you -- sorry.
4      A.    Oh, she did have to testify.  It was on
5  Tuesday, that's right.  Tuesday a week ago.
6      Q.    Did you help her prepare for any of those
7  committee hearings?
8      A.    We discussed some of the bills that were
9  going to get heard at some of those hearings just
10  generally.
11      Q.    Did any of those bills impact or modify the
12  provisions of SB 1?
13      A.    Yes.
14      Q.    Which one is that?
15      A.    Well, it's not a direct impact on SB 1.  It
16  was more modification of House Bill 1382 in the regular
17  session of last time, but it was a Bucy bill and house
18  elections that modifies the requirements for accessing
19  the ballot tracker.
20      Q.    Is that HB 357?
21      A.    I don't know.
22      Q.    Anything else?
23      A.    I think that might be it.
24      Q.    What's a Secretary of State clean up bill?
25      A.    That's usually we will have a bill with

Page 19
1  some suggested small tweaks and changes throughout the
2  election code to make it more harmonious or to get rid
3  of obsolete language.  We don't have a clean up bill
4  this time.
5      Q.    Getting ahead of me, which is helpful.
6          At any time did you expect to testify on
7  March 16 before the House Elections Committee?
8      A.    No.
9      Q.    Let's turn to March 9 hearing.  During your
10  testimony before the House Elections Committee on March
11  9, did you testify concerning the statewide mail ballot
12  rejection rate in Texas; do you recall?
13      A.    I did.
14      Q.    Did you say that it was under 3 percent?
15      A.    I did for the general election, yes.
16      Q.    Am I correct this figure represents only
17  final rejections of mail ballots?
18      A.    That's correct.
19      Q.    Does it exclude those that were rejected,
20  then cured?
21      A.    It does.
22      Q.    Does it exclude those that were rejected,
23  then cancelled?
24      MS. HUNKER:  Objection, form.
25  BY THE WITNESS:

Page 20
1      A.    You mean if a voter decided to vote in
2  person and cancelled the mail ballot?
3      Q.    Yes.
4      A.    I don't know.
5      Q.    Do you know if it excludes any other forms
6  of rejections?
7      A.    It shouldn't.  I mean ballots that came in
8  late aren't technically rejected, they are just late.
9      Q.    Did you testify to the notion that you
10  expected that the number of statewide mail ballot
11  rejections would continue to improve as you go forward
12  in implementation of SB 1?
13      A.    That's my belief.
14      Q.    What's your basis for that belief?
15      A.    The trend that we've got so far, and past
16  experience.
17      Q.    Why do you expect that the trend will
18  necessarily continue?
19      A.    Because voters get more used to it and
20  ballot boards get more used to it as it goes through
21  election, continuous elections.
22      Q.    With respect to voters, are there a
23  different set of voters in every election that are
24  eligible to vote by mail in Texas?
25      A.    Well, yes, I presume so.

Page 21
1      Q.    New voters turned 65?
2      A.    But there is overlap as well.  People that
3  voted by mail continue to vote by mail.
4      Q.    Will the new voters who are eligible have
5  had an opportunity to learn about the process?
6      A.    Well, they will learn about it as they vote
7  by mail for the first time.
8      Q.    But the first time they won't have had
9  experience or a learning curve?
10      MS. HUNKER:  Objection, form.
11  BY THE WITNESS:
12      A.    They have peers who experience and a
13  learning curve.  They talk to each other at Sunday
14  school, they talk to each other at church, and at the
15  rotary club.  So the fact is that the experience of all
16  of the voters increases even as new voters vote by
17  mail.
18  BY MR. FREEMAN:
19      Q.    With respect to the ballot boards, were
20  there errors of any kind by the ballot boards that
21  contributed to the rejection rate in the November
22  general election?
23      A.    I don't know for sure because, you know,
24  obviously we are not on the ground other than in a few
25  counties observing the ballot boards.  Anecdotally I



Keith Ingram

March 28, 2023
Pages 22 to 25

Page 22

1  heard some ballot boards weren't comparing signatures
2  at all, and some ballot boards were still giving
3  rigorous examination of signatures. So those two
4  things probably offset each other.
5      Q.    So what further learning by the ballot
6  boards do you expect will contribute to reductions of
7  the mail ballot rejection rate?
8      A.    We have been training -- doing direct
9  trainings for ballot boards for a couple years now and
10  we will continue that. And in the context of that
11  training, we talk about the rebuttable presumption
12  that's in place after SB 1.
13          So, you know, if a signature -- if a voter
14  has a number on their carrier envelope that matches a
15  number in voter registration record, and then there is
16  a rebuttal presumption that signatures are of the same
17  voter. Of course we know as lawyers rebuttal
18  presumption means it shifts the burden of proof. Well,
19  ballot boards don't think that way. But they do need
20  to understand the signatures are starting from a
21  position of you've got to accept it unless there is
22  evidence to reject it. So that doesn't mean you don't
23  look at the signature at all. It doesn't mean you do
24  the same level of comparison that you would have done
25  before.

Page 23

1      Q.    Is there any learning by the ballot boards
2  that you think you anticipate will lead to reductions
3  in rejections based on the driver's license numbers or
4  Social Security number requirement of SB 1?
5      A.    Yes, I think as the ballot boards get more
6  used to this they will accord the number the
7  appropriate way. The number is designed to take the
8  place of a less objective measure, which is the
9  signature. So they -- as they rely on the number and
10  then give the signature the weight it's supposed to
11  have and only overcome it if there is some sort of
12  evidence to overcome it then I think more ballots will
13  get accepted.
14      Q.    Were some ballot boards not recording the
15  information the appropriate way.
16      A.    No. They weren't giving it the weight it's
17  supposed to be given.
18      Q.    I see. Any rejection -- just so I'm clear.
19  Any reduction in the mail ballot rejection rate based
20  on learning from the ballot boards will be related to
21  this signature, and not a reduction in rejections for
22  failure to match a number for the driver's license
23  field or Social Security number field?
24      MS. HUNKER: Objection, form.
25  BY THE WITNESS:

Page 24

1      A.    That is not exactly true, but because they
2  also have to integrate the early voting clerk process
3  from 86011D. From previous law, not SB 1, early voting
4  clerk has the ability to intervene if a voter has some
5  sort of facial compliance issue on their carrier
6  envelope. What we have discussed with counties and
7  with ballot boards is that if a ballot board sees
8  something that could be corrected by the early voting
9  clerk, they can pass that carrier envelope back to the
10  early voting clerk. You know, something like missed
11  number or mismatched number. Then the early voting
12  clerk can have either a personal trip to the voter or a
13  telephone call to the voter, email to the voter. They
14  can do all of those things that the ballot board can't
15  necessarily do. They have more flexibility in talking
16  to the voters and curing the problem.
17          So as we communicate that to the ballot
18  boards, I expect that there is going to be more of a
19  shift from the ballot board whenever they have got a
20  preliminary rejection back to the early voting clerks
21  because the early voting clerks has more flexibility in
22  dealing with that preliminary rejection and getting the
23  voter successfully in place with the vote. So they
24  want to make sure that that happens. And so I think
25  that's going to increase over time as well.

Page 25

1      Q.    Are you aware of any counties where the
2  early voting clerks were not engaged in this
3  preliminary review of SB 1 compliance?
4      A.    Well, I don't know if early voting clerks
5  are aware that they can do that. It's something that
6  we wanted to make sure that they understood, that
7  really the general election in '22 was the first time
8  we had a full fledged effort into educating with regard
9  to that. And so we expect that that education will
10  penetrate more as we go from election to election in
11  the future.
12      Q.    Certainly early voting clerks in large
13  counties were engaged in this effort throughout the
14  November 2022 general election period, correct?
15      A.    I don't know if every large county, but I
16  would assume the larger counties, they are more plugged
17  into our advice. And so yes, generally I would agree
18  with that.
19      Q.    Any improvement in terms of the actions
20  early voting clerk be mostly concentrated in smaller
21  counties; is that right?
22      MS. HUNKER: Objection, form.
23  BY THE WITNESS:
24      A.    Most of the counties in Texas are smaller
25  counties. We need to penetrate to the smaller



Page 34

1    Q.    So the changes that you suggest, the three
2  changes to SB 1?
3    A.    Well, three changes to SB 1, one to the
4  ballot tracker, so four changes.
5    Q.    How would you describe those if they are
6  sort of suggestions coming out of your office, but you
7  are never for a bill?  How does that fit?
8    A.    It's our office's role to advise on
9  technical implementation process.  And any time you
10  have got a new thing like a corrective ballot,
11  corrective action procedure for mail ballots, you are
12  going to have some kinks in it that need to be worked
13  out.  It's our office's role to point out those kinks
14  and suggest ways to work those out.
15        Whenever we implemented annual ballots by
16  mail, the first law was House Bill 666 in 2013.  It was
17  about this long, and it just said that a voter can ask
18  one time for all of the ballots by mail.  So there were
19  so many things.  That was the hardest thing we've ever
20  had to implement before SB 1.  It was so complicated.
21  The next session there was a bigger -- much bigger bill
22  to correct that process and make it more uniform.  And
23  then there was another bill the next session.  So any
24  time that there is a big change like that you expect
25  there is going to be some need to correct the

Page 35

1  implementation to make it more smooth.  And that's our
2  office's role to suggest those changes.  Not that they
3  were for or against them.  If you want to make a
4  change, here's something you might think about.
5    Q.    Thank you for clarifying.  I appreciate it.
6        Would you say then that during your time in
7  the elections division at the Office of the Secretary
8  of State, SB 1 has been the hardest bill to implement?
9    A.    It was by far the most comprehensive set of
10  changes we ever had.  It was every single form, every
11  single bit of educational material, every outline,
12  every everything had to change.
13    Q.    Going back to the March 9 hearing.  Did you
14  testify that statewide there were 163 ballots rejected
15  based on SB 1 requirements for voters who did not have
16  either a Social Security number or a driver's license
17  number in the system?
18    A.    I did.
19    Q.    Were those ballots or were those ballot
20  requests?
21    A.    Those were ballots.
22    Q.    How did those voters get ballots sent to
23  them if they didn't have driver's license numbers or
24  Social Security numbers in the system?
25    A.    That I don't know.  You would have to talk

Page 36

1  to the counties.
2    Q.    With respect to the voter who lacked
3  driver's license or Social Security number information
4  in their voter registration files, what purpose do the
5  mail ballots provisions of SB 1 serve?
6        MS. HUNKER:  Objection, form.
7  BY THE WITNESS:
8    A.    The same as they serve for any other
9  person, which is to identify the voter.
10  BY MR. FREEMAN:
11    Q.    Is it possible for SB 1 to serve that
12  purpose if the voter doesn't have a driver's license
13  number or Social Security number on file?
14    A.    Sure.
15    Q.    How would that happen?
16    A.    They put one on file as part of the
17  corrective action process.
18    Q.    So absent the voter taking further action
19  to supplement their registration file, can it serve any
20  purpose?
21    A.    Absolutely.  It serves the purposes of
22  making them supplement their voter registration file so
23  we have a more complete file.  That helps us with all
24  kinds of matching on our list maintenance.  It serves a
25  purpose, absolutely.

Page 37

1    Q.    With respect to voters who do not currently
2  have a driver's license number or Social Security
3  number on file, is there any connection between those
4  numbers and the voter's qualifications to vote in Texas
5  elections?
6        MS. HUNKER:  Objection, form.
7  BY THE WITNESS:
8    A.    Well, I mean obviously to vote successfully
9  they are going to have produce an ID when they vote in
10  person, and they are going to have to do the same thing
11  when they vote by mail.
12  BY MR. FREEMAN:
13    Q.    Not produce an ID, but produce a number?
14    A.    Produce an ID.
15    Q.    When they vote by mail?
16    A.    That's right, that's what the number is
17  it's an ID number.
18    Q.    Sorry.  When you say ID I thought you meant
19  like a copy of a card.
20        With respect to a voter who does not have a
21  Social Security number or driver's license number on
22  file, is there any connection between that number and
23  establishing the voter's identity prior to any
24  supplementation of their registration record?
25    A.    I'm not sure I understand that question.



Keith Ingram

March 28, 2023
Pages 38 to 41

Page 38

1    Q.    Well, if they don't have a driver's license
2  number or Social Security number on record, is there a
3  connection between the voter providing that number and
4  the voter establishing their identity?
5    A.    Yes.
6    Q.    Does the voter establish their identity
7  when they submit a mail ballot request with their
8  driver's license number if the driver's license number
9  isn't on TEAM?
10    MS. HUNKER:  Objection, form, asked and answered.
11  BY THE WITNESS:
12    A.    I don't know what you are getting at.  Yes.
13  BY MR. FREEMAN:
14    Q.    So switching gears, and we don't need to
15  take a break yet, that's good.
16        How long did you serve as director of the
17  elections division in the Office of the Texas Secretary
18  of State?
19    A.    11 years, two months, five days.
20    Q.    Based on your experience would you agree --
21    A.    Not that I was counting.
22    Q.    Based on your experience, would you agree
23  that a form provided to voters should be designed so
24  that a voter who follows the instructions will have the
25  form accepted?

Page 39

1    MS. HUNKER:  Objection, form.
2  BY THE WITNESS:
3    A.    Yes, that's true.  That's the goal of the
4  form.
5  BY MR. FREEMAN:
6    Q.    Since the May 2022 runoff, did the Office
7  of the Secretary of State make any changes to the
8  absentee ballot by mail application?
9    A.    We changed several forms.  I'm pretty sure
10  the application if it's got an oath of assistance on it
11  it changed, yes.
12    MR. FREEMAN:  Mark this as Exhibit 2.
13        (WHEREUPON, a certain document was
14        marked Deposition Exhibit No. 2,
15        for identification, as of 3/28/23.)
16  BY MR. FREEMAN:
17    Q.    Mr. Ingram, is this the current absentee
18  ballot by mail form?  I will represent to you this
19  form, I don't believe the date is on it, but it's the
20  form that's currently on your website and it's dated
21  December 9, 2021.
22    A.    Yes.  I mean it looks like it, yes.
23    Q.    Okay.  This form is still in effect, the
24  form that's on the website?
25    A.    It is.

Page 40

1    Q.    Any current plans to alter the form?
2    A.    No.
3    Q.    Has your office considered altering the
4  form since it was issued?
5    A.    No, not this form.
6    Q.    Why not?
7    A.    There is not a need to.
8    Q.    Is there a statutory reason this form could
9  not inform voters that they may provide both a Texas
10  driver's license number and a partial Social Security
11  number?
12    MS. HUNKER:  Objection, form.
13  BY THE WITNESS:
14    A.    It's not what the law says.  The form
15  outlines the law.
16  BY MR. FREEMAN:
17    Q.    Okay.  And so if the form outlines the law,
18  is it not allowed for the form to inform voters that
19  they may provide both numbers?
20    A.    Not on the form.  It's not the law.
21    Q.    Understood.
22        Has your office suggested any kind of
23  amendments to SB 1 that would permit including that
24  information on this form?
25    A.    No.  There is plenty of outside channels

Page 41

1  that emphasize that point.
2    Q.    So is it not necessary to your mind?
3    A.    Agree with that.
4    Q.    This form does clarify that the Texas
5  driver's license number is not your voter registration
6  VUID number, correct?
7    A.    Agree.
8    Q.    Is that in the law --
9    MS. HUNKER:  Objection, form.
10  BY MR. FREEMAN:
11    Q.    -- that clarification?
12    A.    Well, it's in the law is Texas election
13  identification certificate number.  People think that
14  means their voter registration number.
15    Q.    Why is it permissible to include this
16  clarification and not the clarification that a voter
17  may include both numbers if they wish?
18    A.    Because if we did that you would be sitting
19  there asking me questions about why we are requiring
20  people to do something the law doesn't require.  That
21  would be a different lawsuit, but it would still be a
22  lawsuit.
23    Q.    Do other forms promulgated by your office
24  include a red box around required information
25  frequently omitted by voters?



Page 62

1  provisions of SB 1?
2      A.   We try to say things in a more English and
3  flowing manner.
4      MR. FREEMAN:  I think it's a good time to take a
5  quick break.
6              (WHEREUPON, a recess was had.)
7  BY MR. FREEMAN:
8      Q.   Mr. Ingram, since the May 2022 runoff, did
9  The Office of the Secretary of State make any changes
10 to the FPCA signature sheet?
11     A.   Yes.
12     MR. FREEMAN:  Mark this as Exhibit 10.
13              (WHEREUPON, a certain document was
14              marked Deposition Exhibit No. 10,
15              for identification, as of 3/28/23.)
16 BY MR. FREEMAN:
17     Q.   Mr. Ingram, what's this document?
18     A.   This is the signature sheet for voters from
19 overseas or military who's domestic or oversees.
20     Q.   Is this the up-to-date version of that
21 form?
22     A.   It is.
23     Q.   What changes were made during the general
24 election period?
25     A.   The oath language was changed.

Page 63

1      Q.   That's all?
2      A.   That's it.
3      Q.   Did you or your staff consider any further
4  changes to the FPCA signature sheet during the general
5  election period?
6      A.   We did not.
7      Q.   Why not?
8      A.   There was no need.
9      Q.   Is there a statutory reason, just to
10 confirm, that the FPCA signature sheet could not inform
11 military overseas voters that they may provide both a
12 Texas driver's license number and a four digit Social?
13     A.   That's not required by the law.
14     Q.   Just to close the loop, if it's not
15 required by the law it can't be on this form, correct?
16     MS. HUNKER:  Objection, form.
17 BY THE WITNESS:
18     A.   The form is a map to the law.
19 BY MR. FREEMAN:
20     Q.   Any current plans to alter the signature
21 sheet?
22     A.   No.
23     Q.   Are you aware of how many FPCA voters had
24 their ballot rejected during the 2022 general election
25 because of SB 1 requirements related to numbers

Page 64

1  associated with the voter registration record?
2      A.   I don't know.
3      Q.   Are you aware of how many active duty
4  members of the military had their ballots rejected
5  during the 2022 general because of SB 1 number
6  requirements?
7      A.   I don't know.
8      Q.   Do you have any practical basis to believe
9  that any rejected ballots submitted by FPCA voters were
10 not returned by eligible Texas voters who were who they
11 said they were?
12     MS. HUNKER:  Objection, form.
13 BY THE WITNESS:
14     A.   I'm sorry.  I don't understand the
15 question.
16 BY MR. FREEMAN:
17     Q.   Do you have any reason to believe that any
18 FPCA voters -- strike that.
19          Do you have any reason to believe that any
20 FPCA ballots that were rejected due to SB 1 were
21 submitted by individuals who were not eligible Texas
22 voters?
23     MS. HUNKER:  Objection, form.
24 BY THE WITNESS:
25     A.   I don't know.

Page 65

1  BY MR. FREEMAN:
2      Q.   Do you have any future plans to address
3  ballot rejections among active duty military
4  specifically?
5      A.   Not other than, you know, the what we are
6  going to do with ballot boards, educate them on the
7  early voting process and their opportunities there.
8      Q.   My colleague intends to address training
9  conducted by The Office of the Secretary of State
10 during Rule 30(b)(6) deposition, but I have a few quick
11 questions about updates to the training prior to the
12 end of last year.  So if we could mark this document as
13 Exhibit 11 I promise we will only talk about a few
14 pages.
15              (WHEREUPON, a certain document was
16              marked Deposition Exhibit No. 11,
17              for identification, as of 3/28/23.)
18 BY MR. FREEMAN:
19     Q.   Mr. Ingram, what's this document?
20     A.   It appears to be a presentation on ballot
21 by mail.
22     Q.   Is this the most recent presentation on
23 ballot by mail that your office has provided?
24     A.   I believe so.  I mean what I find on those
25 power points is the date that it's printed is the date



Page 66

1  that shows up on here. So it's not really a very
2  useful guide. But as far as I know, we didn't change
3  our guidance or instructions in our presentations
4  throughout the '22 year.
5      Q.   It's from the election law seminar. Do you
6  know when that was held?
7      A.   I don't. It was in July or August.
8      Q.   Okay. Did you participate in the drafting
9  of this document?
10     A.   I did review it, yes.
11     Q.   So others drafted, but you reviewed after
12 it had been drafted; would that be right?
13     A.   That's correct.
14     Q.   Did you give the training based on this
15 document?
16     A.   No, sir.
17     Q.   Who did?
18     A.   I don't remember, maybe Heidi Martinez.
19     Q.   Who is Ms. Martinez?
20     A.   She is one of our staff attorneys.
21     Q.   Does this presentation -- are you aware of
22 whether this presentation instructed local clerks to
23 inform voters upon request whether they had a driver's
24 license or SSN on file?
25     A.   As I stated before, we don't have to tell

Page 67

1  them to do that. That's something they do, they answer
2  voter's questions.
3      Q.   Just to be clear, they -- you don't train
4  them to do that, that's just something you expect them
5  to do?
6      MS. HUNKER:  Objection, form.
7  BY THE WITNESS:
8      A.   I expect county election officials to
9  answer voter questions, yes, I do.
10 BY MR. FREEMAN:
11     Q.   Including that question?
12     A.   Yes, including that question very much so.
13     Q.   Turning to page 31. What are the matters
14 set on page 31?
15     A.   The best practices when reviewing an
16 application for ballot by mail.
17     Q.   So this is the review conducted by the
18 early voting clerk?
19     A.   Early voting clerk is the one who reviews
20 applications for ballot by mail, yes.
21     Q.   The early voting clerk has to look up the
22 registration status of the voter as part of that
23 process?
24     A.   That's correct.
25     Q.   And do you suggest as part of that training

Page 68

1  how they should look up the voter registration status
2  of an applicant?
3      A.   No.
4      Q.   Do you have an understanding of how they
5  typically go about doing that?
6      A.   They either use TEAM or they use their
7  local system. And some off-line counties use TEAM for
8  this.
9      Q.   What information do they plug in when they
10 are trying to pull up the registration status like
11 name?
12     A.   Well, I mean if you're using TEAM you can
13 search by voter name. That's probably the way they do
14 it. They are limited to their county.
15     Q.   If we turn to page 32. What are the
16 matters set out here?
17     A.   This talks about the new law.
18     Q.   This is talking about looking up
19 identification numbers; is that correct?
20     A.   That's correct.
21     Q.   That is separate from looking up
22 registration status?
23     A.   It's part of the registration status.
24     Q.   But it's --
25     A.   That's what it says at the last sentence

Page 69

1  you talk to the voter registrar to confirm the voter
2  registration and status.
3      Q.   But am I correct that the numbers provided
4  here, driver's license, Social Security number, they
5  are not used to look up the voter, they are used to
6  confirm the voter; is that correct?
7      A.   They are used to make sure the voter has
8  properly identified themself on the application, yes.
9      Q.   Those numbers are not used to find the
10 voter in TEAM as part of the ABBM processing, correct?
11     A.   No, sir. I mean not usually. I guess they
12 could look it up by DL number if they wanted to.
13     Q.   Do you have any understanding as to
14 whether -- strike that.
15         Do you instruct local officials to do that?
16     MS. HUNKER:  Objection, form.
17 BY THE WITNESS:
18     A.   We don't tell them how they use TEAM. All
19 of the fields are available to look up anything they
20 want to look up.
21 BY MR. FREEMAN:
22     Q.   Are you aware of any local officials using
23 the Texas driver's license number or Social Security
24 number to look up a voter as part of the initial
25 determination of their registration status?



Page 98

1  through Texas.gov.
2       Q.    Is this the page that voters would use to
3  update their Texas driver's license number or Social
4  Security number on their voter file?
5       A.    If they wanted to add to voter file this
6  was the one that replaces zero, no value with a number.
7       Q.    Is there any indication on this website
8  that this is the page that can be used to update Texas
9  driver's license number or Social Security number on
10  voter registration record?
11      A.    No.  But if you fill this out, the next
12  page in says, "If your purpose is to update your voter
13  record with your numbers you have done it so log out.
14  You are finished."
15      Q.    Okay.  In some are there any instructions
16  prior --
17      A.    Act of logging in supplies no values.
18      Q.    Understood.  In some are there any
19  instructions on Texas.gov prior to logging in that this
20  site may be used to add a Texas driver's license number
21  or Social Security number to voter registration
22  records?
23      A.    I don't think so.
24      Q.    We previously discussed a number of ways
25  voters can add or correct identification numbers on a

Page 99

1  ballot envelope or FCPA signature sheet.  Is there any
2  change in those procedures since May of 2022?
3       A.    There is not.
4       Q.    So I'm clear, a voter can correct on the
5  envelope or signature sheet and send it back, they can
6  hand return the envelope or they can cancel the mail
7  ballot and vote in person; is that right?
8       A.    Those are some of the options.
9       Q.    What are the other options?
10      A.    They can correct the ballot tracker and add
11  numbers to Texas.gov.
12      Q.    But if a mail ballot has been sent back to
13  them, they have to physically return the ballot; is
14  that right?
15      A.    They have to physically return a ballot,
16  yes.
17      Q.    They can only correct on the ballot tracker
18  if the early voting ballot board has retained the
19  ballot; is that right?
20      MS. HUNKER:  Objection, form.
21  BY THE WITNESS:
22      A.    Well, if they've got the ballot they've got
23  to get it back, but they can also correct the
24  information on the ballot tracker.  Those are not
25  mutually exclusive.

Page 100

1  BY MR. FREEMAN:
2       Q.    The ballot tracker is only accessible to
3  voters who have both a Texas driver's license number
4  and a Social Security number on their TEAM file,
5  correct?
6       A.    Right.
7       Q.    As of right now?
8       A.    That's correct.  Which is over 96 percent
9  of voters.
10      Q.    Mr. Ingram, do you recall when we met back
11  in April of 2022 that we discussed whether a single
12  voter could be issued more than one DPS number?
13      A.    Yes.
14      Q.    Do you recall whether you knew at the time
15  whether DPS had in fact issued multiple numbers to
16  particular individuals over the course of their
17  lifetime?
18      A.    If I didn't say that's a DPS question I am
19  saying it now, it's a DPS question.
20      Q.    Do you know whether DPS has done that in
21  the past?
22      A.    To my knowledge, you get one number.
23      Q.    I have some document I'm hoping can clear
24  this up.  We can mark this as Exhibit 19.
25            (WHEREUPON, a certain document was

Page 101

1            marked Deposition Exhibit No. 20,
2            for identification, as of 3/28/23.)
3       MR. FREEMAN:  This is 20.
4  BY MR. FREEMAN:
5       Q.    What's this document?
6       A.    It appears to be an email exchange with
7  Mr. or Mrs. Mickey Marvins and our office.
8       Q.    If you go to the original email on page 3
9  what's the problem that Ms. Marvins describes.
10      A.    That she got an ID to replace her driver's
11  license, and the ID number wasn't in her voter record.
12      Q.    As a result, her friend who had this
13  experience had a problem getting an absentee ballot
14  because the number on her DPS identification was
15  different when she went from a driver's license to an
16  ID card; is that right?
17      A.    Agree with that.  Just in case you are
18  wondering, that's not inconsistent with what I said.
19  You get one number.  You surrender your DL and you get
20  the ID number.  I don't want you under the impression
21  you got two numbers.  You got one number.  It just
22  changed.
23      Q.    I see.  Okay.  Bit of a clarification.
24      A.    I want to make sure we are clear.
25      Q.    Over the course of a lifetime, is what I



Keith Ingram                                                      March 28, 2023
                                                                 Pages 102 to 105

Page 102

1 asked before, a voter can be issued more than one ID
2 number by DPS; is that correct?
3      A.    If you change from one form of ID to
4 another then yes.
5      Q.    When did you first become aware of that
6 fact?
7      A.    I have always known that. I don't know --
8 it's not a strange or unusual piece of information. I
9 went to Arkansas, I had to surrender my driver's
10 license. I came back, I had to surrender my Arkansas
11 license.
12     Q.    Am I correct that SB 1 permits voters to
13 submit a driver's license number that is expired,
14 correct?
15     A.    That's correct.
16     Q.    Even if I have surrendered my driver's
17 license number, if that's the number -- if I have
18 surrendered my driver's license and gotten an ID, if my
19 driver's license is still on file with TEAM, I can vote
20 using the number on my driver's license; is that right?
21     A.    You can for up to four years for a person
22 under 70. Then for a person over 70 it can be expired
23 for however long you need it.
24     Q.    Are you sure that's the rule for SB 1 and
25 not for the voter ID?

Page 103

1      A.    It's the same. It incorporates 63101 into
2 mail ballots.
3      Q.    In any case, has your office taken any
4 actions to address issues created by voters who have
5 and hold DPS ID number on file and who have received a
6 new DPS ID number on a new form of ID?
7      A.    That's voter responsibility to update their
8 information in TEAM. And they can do that very
9 conveniently, they are at DPS, say, "Use this
10 information to update my voter record." They just have
11 to check yes on a box.
12     MR. FREEMAN: Off the record for a moment.
13          (WHEREUPON, a discussion was had
14           off the record.)
15 BY MR. FREEMAN:
16     Q.    Has your office done anything to address
17 the issue of voters who submit the number of old
18 identification that's no longer the number on TEAM, but
19 remains valid for SB 1 purposes?
20     A.    I don't know what that question means.
21     Q.    Sure. Let's say a voter had a driver's
22 license, surrenders it, gets an ID card and does update
23 TEAM with the ID card number -- thumbs up from the
24 witness -- but then they submit their old driver's
25 license number because they are concerned or

Page 104

1 misunderstand and think that's what they have to
2 submit. Has your office done anything to address that
3 specific scenario?
4      A.    You would have to talk to Sam about our
5 education campaign. But, you know, what we tell voters
6 if they call our office is that they need to use
7 whatever is currently in their voter registration, and
8 that's why we encourage them to use both numbers so
9 that if one of them hits they are good.
10     Q.    Is a voter able, to your knowledge, to call
11 their local clerk or election administrator and ask
12 specifically what number is on their registration
13 record?
14     A.    Of course.
15     Q.    So I could call and say what's the driver's
16 license on my registration record and then fill that in
17 on an ABBM?
18     A.    Sure.
19     MS. HUNKER: Objection, form.
20 BY THE WITNESS:
21     A.    It would go through some questions to
22 validate that it's you and not some vote harvester
23 trying to steal your vote, but yes.
24 BY MR. FREEMAN:
25     Q.    What questions would they use?

Page 105

1      A.    I don't know. Whatever the county uses
2 whenever they validate someone's identity on the phone.
3      Q.    Any information that isn't also on the
4 ABBM?
5      A.    Well, it's information that would be in
6 their voter record.
7      Q.    But it's information that was on the
8 application prior to SB 1, right, name, date of birth,
9 address, things like that, correct?
10     A.    That's correct.
11     Q.    In theory if a voter -- strike that.
12          So if an individual wanted to cast an ABBM
13 in someone else's name, the only security addition
14 created by SB 1 is the driver's license number or a
15 Social Security number, correct?
16     MS. HUNKER: Objection, form.
17 BY THE WITNESS:
18     A.    Well, I mean signature still counts.
19 BY MR. FREEMAN:
20     Q.    Sure. That was pre -- signature counted
21 pre-SB 1, right?
22     A.    Agreed.
23     Q.    In fact, it's easier to meet the signature
24 requirement after SB 1?
25     A.    Agreed.



Keith Ingram

March 28, 2023
Pages 106 to 109

Page 106

1    Q.    All the voter needs to do to get that
2  driver's license number is to call the clerk with
3  pre-SB 1 information and ask for which driver's license
4  number is on file, no?
5        MS. HUNKER:  Objection, form.
6  BY THE WITNESS:
7    A.    No.
8  BY MR. FREEMAN:
9    Q.    Why not?
10   A.    Because they can call and ask, "What do I
11 have on file?"  They will say DL or SSN or both.
12   Q.    What if they say what number is on file?
13   A.    If the voter -- then I would imagine, I
14 don't know because I'm not a county, but if I was a
15 county voter registrar I would say, "What driver's
16 license number -- what's your driver's license number?"
17 They would kind of say, "Yup that's what you got."
18   Q.    Okay.  Thank you for that clarification.
19        How many DPS ID numbers can be associated
20 with a voter's TEAM record?
21   A.    One.
22   Q.    Has there been any discussion, to your
23 knowledge, of adding a field to TEAM so that additional
24 driver's license numbers could be listed?
25   A.    That's something that we have recently

Page 107

1  discussed to think about the next iteration of TEAM,
2  and whether or not they want to have another field for
3  an ID number.  That decision has not been made yet.
4    Q.    What's the stage of the procurement process
5  for the next iteration of TEAM at this point?
6    A.    We are going through the drafting of the
7  RFP, RFO, whatever we are calling it.
8    Q.    Do you know when that will be complete?
9    A.    Soon.  If I had my way it would have been
10 two weeks ago.
11   Q.    To be clear, if a voter has been issued
12 multiple DPS numbers and provides a DPS ID number
13 different from the one listed in TEAM on an ABBM and
14 does not also provide a Social Security number, that
15 ABBM will be rejected, correct?
16   A.    If they don't provide a number that's in
17 their voter registration record they will be rejected,
18 yes, at least temporarily.
19   Q.    Same thing on mail ballot?
20   A.    Same thing on mail ballot.
21   Q.    Would you agree a duly registered voter
22 whose ballot was rejected under these circumstances was
23 not at fault?
24        MS. HUNKER:  Objection, form.
25 BY THE WITNESS:

Page 108

1    A.    I'm not going to get into assignment of
2  fault.
3  BY MR. FREEMAN:
4    Q.    Do you know if the fact that DPS has issued
5  multiple ID numbers to the same individuals over their
6  lifetimes has led to the rejection of mail ballot
7  materials under SB 1?
8        MS. HUNKER:  Objection, form.
9  BY THE WITNESS:
10   A.    It's my understanding that's happened at
11 least in Bexar County because I have a member of the
12 ballot board who has been coming up here for the
13 election meetings because of it.
14 BY MR. FREEMAN:
15   Q.    Have you conducted any further inquiry into
16 the extent to which such voters have had their mail
17 ballot materials rejected?
18   A.    Just what she says.
19   Q.    Is there anything else that could have been
20 done for voters who have multiple DPS ID numbers to
21 ensure their ballots are counted?
22   A.    I don't know how to answer that question.
23   Q.    I don't run an elections office.  I'm
24 asking if you know of anything else that could have
25 been done by your office to help those voters?

Page 109

1    A.    I don't know how to answer that question.
2    Q.    Okay.  Is there anything else that the
3  voter could have done if they have an old number on
4  TEAM and submit number on their new ID card or vice
5  versa?
6    A.    Well, the voter has the responsibility to
7  make sure their information in the voter registration
8  record is correct and accurate and updated.  The voter
9  bears that responsibility.
10   Q.    Do you know how many registered voters in
11 Texas have been issued multiple numbers in their
12 lifetimes?
13   A.    I do not.
14   Q.    Do you know how many ABBM or mail ballots
15 have been rejected on account of the voters submitting
16 a correct DPS ID number that was not listed on TEAM?
17   A.    I don't.
18   Q.    Have there been any actions taken by your
19 office other than in-filling driver's license numbers
20 as part of the HB2515 process to address the absence of
21 driver's license numbers or up-to-date driver's license
22 numbers on voter registration records?
23   A.    We have made sure we have got a pipeline
24 from Texas.gov so that we can capture that log-in
25 information whenever someone logs in to fill in the



Keith Ingram                                                                    March 28, 2023
                                                                          Pages 110 to 113

Page 110

1  values for us.
2      Q.   Anything else?
3      A.   That's not an unsubstantial thing.
4      Q.   Understood.  Is there anything else so I
5  have your full testimony?
6      A.   I mean we have told the voters they need to
7  use both.  We told voters the way they can add numbers
8  if they want to add numbers.
9      Q.   Anything else?
10     A.   That's it, I think.
11         MS. HUNKER:  I know we took a short break before,
12  but sort of a good place to take five if that's all
13  right?
14         MS. HUNKER:  Yes.
15             (WHEREUPON, a recess was had.)
16         MR. FREEMAN:  Back on the record.
17  BY MR. FREEMAN:
18     Q.   Mr. Ingram, to the extent you know, what
19  was the final mail ballot rejection rate in the 2022
20  primarily?
21     A.   You know, it's obviously two different
22  primaries, and there were different -- democrats were
23  higher than the republicans, but I believe the
24  composite rate was under 13 percent, under 12.8, 12.7,
25  something like that.

Page 111

1      Q.   Do you know what the rate in the democratic
2  primary was?
3      A.   No.  I think it was a little over 13 maybe.
4      Q.   It's not a quiz.  It's all right.
5      A.   We can look it up.
6      Q.   So the republican rate was a little bit
7  lower than that?
8      A.   It was a little under 12.
9      Q.   In the primary runoff, do you know what the
10  aggregate rate was?
11     A.   Right at 12 percent.
12     Q.   The democratic runoff, do you know what the
13  rate was then?
14     A.   I don't.
15     Q.   Was the democratic rate higher than the
16  republican rate in the primary runoff as well?
17     A.   I think in the runoff it went the other
18  way.  I just have to go look and make sure, but it was
19  close.
20     Q.   Then we already discussed, but just so we
21  have it here, what was the final rejection rate in the
22  2022 general election?
23     A.   2.7 percent.
24     Q.   Based on your knowledge and experience, how
25  do these figures compare, 2.7 for 13 or so to the rate

Page 112

1  of mail ballot impersonation in Texas elections before
2  passage of SB 1?
3         MS. HUNKER:  Objection, form.
4  BY THE WITNESS:
5      A.   I have no idea what the rate of mail ballot
6  impersonation is or ever has been.
7  BY MR. FREEMAN:
8      Q.   After serving for over a decade as the
9  director of elections for the State of Texas, do you
10  know whether or not 2.7 percent of mail ballots cast in
11  elections pre-SB 1 were actually cast by individuals
12  other than the registered voter on whose behalf the
13  ballots were cast?
14         MS. HUNKER:  Objection, form.
15  BY THE WITNESS:
16     A.   The rejection rate of 1 to 3 percent is
17  historically what it's always been.  So we are back in
18  the zone.  One of the reasons for rejection is that the
19  mail ballot was not signed by the voter.  It was signed
20  by somebody other than the voter.  The voter was not
21  the one who signed the carrier and the application.
22  BY MR. FREEMAN:
23     Q.   So that wasn't the answer to my question.
24  My question was, to your knowledge, were 2.7 percent or
25  more of mail ballots cast in any statewide election in

Page 113

1  Texas fraudulent because they were cast by someone
2  else?
3         MS. HUNKER:  Objection, form.
4  BY THE WITNESS:
5      A.   Again, I don't know how many were
6  fraudulent because they were cast by somebody else.  I
7  know ballot boards reject mail ballots because the
8  voter was not the one who signed them.
9  BY MR. FREEMAN:
10     Q.   Do you have any basis to believe based on
11  your knowledge and experience that over 2 percent of
12  mail ballots in any statewide election were cast by
13  someone other than the voter in whose name the ballot
14  was cast?
15     A.   Again, I don't know the answer to that
16  question.  The answer I have got is rejection, and
17  rejection because they're not the same person is the
18  most common rejection reason.
19     Q.   Because they are not the same person or
20  because they didn't sign?
21     A.   Because they are not the voter.  The
22  signatures don't match.
23     Q.   When a signature doesn't match -- strike
24  that.
25             If an election administrator or ballot



Keith Ingram

March 28, 2023
Pages 126 to 129

Page 126

1    Q.    Okay.  How often in the past did you
2  provide templates for op-eds?
3    A.    I don't know.  Several times.  It's -- what
4  we have done them for is the ID requirements.  The ID
5  requirements when they changed for photo ID, and they
6  changed again in 2017 --
7    Q.    So --
8    A.    -- or 2016.
9    Q.    -- for SB 14 the voter ID law, the change
10  to voter ID law, and SB 1, those are the three times
11  you can recall?
12    A.    That we have tried to use this form of
13  communication to get the counties to propagate
14  something, yes.  I mean we offer templates to the
15  counties for everything every year, every election
16  year, but the ones that we specifically drafted, you
17  know, for part of voter education were usually ID
18  related.
19    Q.    Do you know whether any other election
20  administrators or officials were able to place op-eds
21  about these requirements after this email went out?
22    A.    I don't know.
23    Q.    So you can't -- can you identify any other
24  counties that did manage to place op-eds?
25    A.    I don't know.

Page 127

1    Q.    Do you intend to submit templates or
2  examples to county officials about SB 1 ID requirements
3  again in the future?
4    A.    Sure.
5    Q.    Do you expect newspapers to be receptive to
6  op-eds when the requirements are no longer new?
7    A.    It's not just the op-eds.  It's also
8  talking to them about how to approach their local news
9  media and getting a story placed.  It's also handouts
10  and colorful material they can use to give to the
11  voters.  So it's a full fledged campaign that Sam would
12  know more about than I do.
13    Q.    Do you expect newspapers to be as receptive
14  to similar op-eds in the future when the requirements
15  are no longer new?
16    MS. HUNKER:  Objection, form.
17  BY THE WITNESS:
18    A.    Sure.
19  BY MR. FREEMAN:
20    Q.    Why is that?
21    A.    Because they are always hungry for content.
22  Local news needs content.  This is good content for
23  them.  They like it.
24    Q.    Do you expect substantial further
25  reductions in mail ballot rejections due to voter

Page 128

1  education?
2    A.    I don't know.  I mean I think as voters
3  talk amongst themselves it's going to get better, yes.
4  I don't know if it's substantial.  You say substantial
5  reductions.  I don't know about that.
6    Q.    Does your office have plans to reach
7  different voters from those reached previously by voter
8  education efforts on SB 1?
9    MS. HUNKER:  Objection, form.
10  BY THE WITNESS:
11    A.    That again is going to be part of the
12  request for proposal.  Depends on how much money the
13  legislature gives us.
14  BY MR. FREEMAN:
15    Q.    Do you have any knowledge of targeted plans
16  to reach voters who didn't understand prior voter
17  registration efforts?
18    A.    No.  I mean part of every education
19  campaign is the feedback loop.  And, you know,
20  determination of what can be done better next time.
21  But again, that's all done by the communications team
22  and the vendor.
23    Q.    Going back to Exhibit 21.  Did Mr. Taylor
24  attribute the decrease in voters -- strike that.
25    Did Mr. Taylor attribute the decrease in

Page 129

1  mail ballot rejection rates to voters getting used to
2  SB 1 requirements?
3    A.    Yes.
4    Q.    Do you agree --
5    A.    He said that, you know, one of the things
6  we have always expected was that the voters would get
7  used to it.
8    Q.    Do you agree?
9    A.    Absolutely.
10    Q.    If a voter had their ballot rejected, they
11  failed to cure, correct?
12    A.    If it's finally rejected, yes.
13    Q.    So the cure process affords a voter an
14  additional opportunity code to comply with SB 1
15  requirements during a single election; is that right?
16    MS. HUNKER:  Objection, form.
17  BY THE WITNESS:
18    A.    If that was the reason for the initial
19  rejection or notice of defect.
20  BY MR. FREEMAN:
21    Q.    Would you agree then that even when
22  presented with multiple opportunities to comply with SB
23  1, each final rejection represents a voter who failed
24  to learn and comply even with multiple opportunities?
25    MS. HUNKER:  Objection, form.



Page 130

1  BY THE WITNESS:
2      A.    Sometimes the clock runs out on folks.
3  But, you know, I don't know what you are trying to get
4  at. But you are assuming that the rejections were all
5  because of SB 1. That's not a safe assumption. There
6  are lots of reasons why mail ballots get rejected. If
7  you want to know the list, you should go to a county
8  and ask them.
9  BY MR. FREEMAN:
10     Q.    Let's just bracket to SB 1 rejections. And
11  say with respect to SB 1 rejections, because of the
12  cure opportunity, everyone has multiple chances to get
13  down their voter information, right, their ID numbers?
14     A.    I don't necessarily agree with that because
15  again the clock runs out.
16     Q.    But prior to the clock running out, there
17  is supposed to be an opportunity to cure, correct?
18     A.    If they got notice before the clock ran
19  out.
20     Q.    Some voters get notice after the clock runs
21  out?
22     A.    That's right.
23     Q.    With respect to the voters who did get
24  notice before the clock ran out, many of them had a
25  second opportunity, and nonetheless failed to get the

Page 131

1  information required by SB 1 on to their ballot,
2  correct?
3      A.    Maybe. Maybe they decided not to. Maybe
4  they deeded to cancel their mail ballot and vote in
5  person. You know, I don't know what happened with
6  those.
7      Q.    In light of the cure opportunity, why do
8  you expect that yet more exposure to the SB 1
9  requirements would continue to drive down rejection
10  rates?
11     A.    Because as people learn about something and
12  talk about it amongst themselves they get better at it.
13  It's just a fact.
14     Q.    In each new election cycle, do a new batch
15  of voters turn 65?
16     A.    We have talked about that before.
17     Q.    We have. They won't have to get used to SB
18  1 mail ballot requirements?
19     MS. HUNKER: Objection, form.
20  BY THE WITNESS:
21     A.    No. But they would have heard about it
22  from their peers.
23  BY MR. FREEMAN:
24     Q.    Have additional trainings of state and
25  local election officials helped to reduce ballot

Page 132

1  rejection rates between the March primary and November
2  general?
3      A.    Yes.
4      Q.    What's the county election seminar?
5      A.    That's a seminar that we do every year for
6  county election officials to teach them about election
7  law requirements and how to implement them in their
8  county.
9      Q.    When was the county election seminar in
10  2021?
11     A.    I don't remember.
12     Q.    Was it before --
13     A.    July or August.
14     Q.    So before SB 1 was passed?
15     A.    In '21, yes.
16     Q.    When was the seminar in '22?
17     A.    July or August.
18     Q.    After the March primary, before the
19  November general, correct?
20     A.    Agree with that.
21     Q.    So based on your experience as director of
22  elections, during the 2022 election cycle do you do
23  most -- sorry. Did most county election officials
24  understand the SB 1 acceptance and cure process during
25  the November 2022 general?

Page 133

1      A.    I don't know. That's a hard question. I
2  don't know what they hear. I only know what we say.
3  We had an election official email us a question in
4  2017, 2017, four years after photo ID requirements were
5  in place, asking if photo ID was required for voting.
6      Q.    That was after there had been --
7      A.    No.
8      Q.    -- a decision by the Federal court saying
9  that the original law violated the Voting Rights Act,
10  right?
11     A.    She was asking if photo ID was required at
12  all. She didn't have any clue. She had been in office
13  the whole four years. She had been to our seminars,
14  read our materials, I presume. I don't know. But I'm
15  saying I don't have any control at all over what the
16  counties hear and how they interpret it.
17     Q.    Are you aware of any ballot rejection in
18  the November general that resulted from misapplication
19  of SB 1 by local officials?
20     A.    Any what?
21     Q.    Ballot rejections, mail ballot rejections
22  in November that resulted -- that were the result of
23  misapplication of SB 1 by local officials?
24     A.    I think we have talked about the
25  misapplication of the signature requirement after the



Keith Ingram

March 28, 2023
Pages 134 to 137

Page 134

1 introduction of rebuttal presumption.
2     Q.    I mean the rejection of mail ballots based
3 on the driver's license or Social Security number
4 requirements?
5     A.    I don't know how you can separate the two.
6 The driver's license and Social Security number being
7 in the voter's record is supposed to create a
8 rebuttable presumption that the signatures are of the
9 voter.  So that signature comparison requirement, that
10 the degree of scrutiny that's applied to the signatures
11 part and parcel of SB 1 requirements.  If the
12 signatures were overanalyzed even though the number
13 already matched the number in their system, then that
14 results in a rejection because of a mistake by the
15 ballot board.
16     Q.    Okay.  Are you aware of any rejections of
17 ballots for failure to put a driver's license number,
18 Social Security number on the carrier envelope that
19 matches TEAM where the rejection was a result of
20 misapplication of SB 1 by local officials?
21     A.    So a voter puts a number on the envelope,
22 that number is in their TEAM record, and they still
23 rejected it --
24     Q.    Any rejection --
25     A.    -- because of that?

Page 135

1     Q.    Are you aware of any rejection of a mail
2 ballot based on the number requirements because of some
3 kind of error by a local official?
4     MS. HUNKER:  Objection, form.
5 BY THE WITNESS:
6     A.    I have already told you what I know about
7 rebuttable presumption not being evenly applied.
8 BY MR. FREEMAN:
9     Q.    Separate from the rebuttable presumption,
10 just the number requirements?
11     A.    I don't even know how that would be.  I
12 don't know what you are talking about.
13     Q.    Okay.  Let's try and ask in a way that
14 works for you then.
15     Just a yes/no requirement, you have to have
16 a number that matches TEAM, driver's license number,
17 Social Security number, that requirement standing
18 alone, that sort of bar to acceptance, are you aware of
19 any rejection based on that bar to acceptance of the
20 ballot where the rejection was a result of a
21 misapplication of SB 1 by local officials?
22     MS. HUNKER:  Objection, form.
23 BY THE WITNESS:
24     A.    I don't even know how that would be.  I
25 don't know what you are talking about.

Page 136

1 BY MR. FREEMAN:
2     Q.    Are you aware of any instances where the
3 official rejected a mail ballot where a voter had put
4 down their SSN, and had a driver's license number, and
5 SSN on TEAM and they applied the hierarchy, for
6 example, and shouldn't have, would that be an error by
7 a local official in applying SB 1 to the numbers?
8     MS. HUNKER:  Objection, form.
9 BY THE WITNESS:
10     A.    I'm not aware of anything like that
11 happening.  What we've told them is if the number that
12 the voter puts is in the record, they are supposed to
13 accept it.  I'm not aware of any county rejecting it
14 with a number in the record.  That would be crazy.
15 BY MR. FREEMAN:
16     Q.    Good.  Are you aware of any other similar
17 types of errors by local officials where they rejected
18 a ballot and they shouldn't have in relation to the
19 numbers themselves?
20     A.    No.
21     Q.    Okay.  Would you agree then you don't
22 expect any substantial further rejection or further
23 reductions in mail ballot rejections based on the
24 numbers alone from training of local officials --
25     MS. HUNKER:  Objection, form.

Page 137

1 BY MR. FREEMAN:
2     Q.    -- not based on signature?
3     A.    No, I wouldn't agree with that at all.
4 Because we also train ballot boards now.  We do
5 webinars for the ballot boards themselves.  Ballot
6 boards themselves are the ones who make the call
7 whether to accept or reject.  Now I'm not aware of a
8 ballot board rejecting a carrier envelope because
9 somebody had a number and they should have used the
10 other number.  That's crazy talk.  But there are a lot
11 of ballot boards who either didn't give the signatures
12 any weight at all or gave them too much weight and then
13 rejected even though the number was in the system.  So
14 that's the part that we are going to work on educating
15 and correcting.
16     Q.    But nothing related to the numbers standing
17 alone and not in relation to signatures?
18     A.    Again, I don't know what that means.  I
19 don't know how you would do that.
20     Q.    Okay.  Are there any other reasons why mail
21 ballot rejection rates decreased from the March primary
22 to the November general that we haven't talked about?
23     A.    You know, I just think -- I mean Sam calls
24 it getting used to, but it's a process of permeating
25 the side geist.  You know what I mean?  It's something



Keith Ingram

March 28, 2023
Pages 138 to 141

Page 138

1  that filters into people's consciousness over time,
2  that that is something that I don't know if we just
3  call it getting used to it.  But whatever it is it gets
4  better over time, the requirements.
5      Q.    Mr. Ingram, do you know what share of
6  voters cast ballots by mail in November of 2022?
7      A.    I did think of another reason they get
8  better over time.  It's because our data gets better
9  over time.  You know, the more voters that update their
10 information with one of the numbers, the better we are
11 going to have.  If they make the ballot tracker easier
12 to access, that's an easier way to correct the defect.
13     Q.    Do you know how many voters added driver's
14 license numbers or Social Security numbers to their
15 voter registration file using Texas.gov during the
16 general election period?
17     A.    I don't know.  I know we had over 40,000
18 people update their registration using Texas.gov.  I
19 don't know how many of those were numbers only.
20     Q.    A lot could have been address changes?
21     A.    A lot could have been address changes and a
22 lot of them could have been numbers.  I don't know how
23 many of each there are.
24     Q.    You are not getting new registrants who
25 don't provide either a driver's license number or

Page 139

1  Social Security number anymore into the system; is that
2  right?
3      A.    Well --
4      MS. HUNKER:  Objection, form.
5  BY THE WITNESS:
6      A.    -- they've got the opportunity to have
7  registration without either one of the numbers.
8  BY MR. FREEMAN:
9      Q.    Other than the very small fraction of
10 people who check that box, you are not getting --
11 everyone is providing either a driver's license number
12 or a Social Security number on their voter registration
13 applications now, correct?
14     A.    There is a box for them, but there is also
15 a box for "I don't have either one of those."
16     Q.    Do you know how many folks that you
17 register with the box that says, "I don't have a
18 driver's license number or Social"?
19     A.    I don't.  I'd agree with you it would be a
20 small number.
21     Q.    Prior to Helping America Vote Act, you
22 could register without a driver's license number or
23 Social?
24     A.    I don't know if you could in Texas.  I know
25 there was a period of time a long time ago.  But before

Page 140

1  the Help America Vote Act you had to have one of those.
2  I think we required the full nine, not the last four.
3  Help America Vote Act made us reduce it to the last
4  four only.
5      Q.    Okay.  But you are not getting a large
6  influx of additional voters now with no SSN, no DL?
7      A.    Agree with that.
8      Q.    And so attempts to add information are not
9  going to make further substantial changes in the future
10 because you have that for most of them already, right?
11     A.    Well, I mean that's the whole issue, right.
12 We have got less than half a percent who have neither
13 one of those numbers in the record, right.  Only if
14 that half of a percent tries to vote by mail and then
15 adds the number, we will get it, but that does happen,
16 and we will work on that last 93,800 folks to get them
17 a number.
18     Q.    What are you doing affirmatively to work to
19 get them a number?
20     A.    Well, what I talked about.  We have changed
21 Texas.gov where we get no value supplied to us if
22 anybody logs on to us.  We are telling voters if they
23 have their application rejected for lack of a number in
24 the system that's how you add the numbers to your
25 record.  I mean I don't know how else you would do it.

Page 141

1  The voter has to take responsibility to do that
2  themselves.  They have a mechanism for doing it
3  electronically or they can fill out a paper
4  application.  But over time as they try to vote by
5  mail, that number is going to decrease.  It will not
6  get bigger.
7      Q.    Did you see substantial movement in that
8  number between the March primary and the November
9  general?
10     A.    Not then, no.  We didn't check then.
11     Q.    You didn't check to see how many people had
12 no driver's license number and no Social Security
13 number?
14     A.    That's right.  We had already checked it at
15 the end of '21.  And then we added as many as we could
16 so we knew what the number was going into the end of
17 the year, and we did it at the end of December '22?
18     Q.    What was the change from the end of '21 to
19 the end of '22?
20     A.    I don't know.  I have got the end of '22
21 numbers in my head, but I don't remember what they are.
22 I mean before we did anything at all, we had about a
23 million records that didn't have a driver's license,
24 and a million that didn't have a Social, right.  We
25 had, I don't know, 160,000 that didn't have either one.



Keith Ingram

March 28, 2023
Pages 142 to 145

Page 142

1 At the end of '22 we have got 389 that have a DL, but
2 no Social, and we have got 298 that have a Social but
3 no DL. We have got 93,000 that don't have either one.
4       Q.    Do you expect substantial further changes
5 in decreasing that -- those numbers moving forward?
6       MS. HUNKER: Objection, form.
7 BY THE WITNESS:
8       A.    I don't know what you mean by substantial.
9 I expect that the numbers are going to decrease over
10 time. They are never going to get bigger than they are
11 now. They will decrease.
12 BY MR. FREEMAN:
13      Q.    Okay. Did the rate at which they
14 decreased -- strike that.
15            Did the share of numbers that you
16 decreased -- you know what, we will move on then.
17            Mr. Ingram, do you know what share of
18 voters cast ballots by mail in November of '22?
19      A.    I don't.
20      Q.    Do you know if it was greater or lessor
21 than the share that cast ballots by mail in November of
22 2018?
23      A.    I don't know. I think it would probably be
24 comparable number to 2018. It was less than 2020.
25      Q.    Do you know whether turnout in general was

Page 143

1 higher in 2022 or lower in 2018?
2       A.    I don't remember. They were both quite a
3 lot higher than normal mid-term elections, but I think
4 '22 may have been a little less.
5       Q.    To your knowledge, did March 2022 ballot
6 rejection deter some eligible voters from trying to
7 vote by mail in November?
8       A.    No idea.
9       Q.    Did any election administrators or clerks
10 indicate to you that voters were concerned about mail
11 ballot rejection in November of 2022?
12      A.    Well, as you can see from the email, voters
13 aren't shy about expressing directly to us. I don't
14 know if we have to rely on county officials for that.
15      Q.    Did any county officials indicate to you
16 that voters were concerned in November of 2022 about
17 ballot rejection?
18      A.    Not any more than normal.
19      Q.    What's normal in terms of those types of
20 concerns?
21      A.    Well, I mean whenever you send mail ballots
22 you are relying on the post office and you are relying
23 on whatever else. There is always trepidation until
24 you get confirmed that your ballot was accepted.
25      Q.    Are these concerns valid?

Page 144

1       A.    Sure. Absolutely.
2       Q.    Do you trust the post office? We already
3 discussed concerns that were raised with your office
4 directly about rejection of mail ballots. Were these
5 concerns valid?
6       A.    I don't know.
7       MR. FREEMAN: Take a break for a minute.
8             (WHEREUPON, a recess was had.)
9 BY MR. FREEMAN:
10      Q.    Thank you, Mr. Ingram. I will pass you to
11 Ms. Perales. But I think we all need a lunch break
12 before then.
13      A.    Great.
14            (WHEREUPON, a recess was had.)
15            EXAMINATION
16 BY MS. PERALES:
17      Q.    We are back on the record. Mr. Ingram, my
18 name is Nina Perales and I represent the LUPE
19 Plaintiffs. I'm with MALDEF. We know each other,
20 don't we?
21      A.    We do.
22      Q.    We have met in the past usually at the
23 legislature?
24      A.    Agreed.
25      Q.    Yes. You have been to so many more

Page 145

1 hearings than I have, much to your credit.
2             I am going to endeavor not to tread the
3 same ground as Mr. Freeman did, but if that means that
4 from time to time I'm pausing or flipping pages
5 forward, it's only because I'm trying to make sure I
6 don't re-ask any questions that are in my outline. I
7 hope you don't take it as me trying to delay or
8 anything. If I'm quiet, I'm skipping questions. How
9 about that?
10      A.    That's fine. Yes.
11      Q.    Thank you. Thank you. Just a few more
12 emails to go over with you along the same lines of
13 emails that Mr. Freeman went over with you?
14      A.    Okay.
15      Q.    I'm going to mark those.
16      MS. PERALES: Can we mark this one, please.
17            (WHEREUPON, a certain document was
18            marked Deposition Exhibit No. 23,
19            for identification, as of 3/28/23.)
20 BY MS. PERALES:
21      Q.    Mr. Ingram, can you identify this document?
22      A.    It looks like an email to our office from
23 Barry Brandt, and the response.
24      Q.    Was it an email to -- well, it says the
25 email is addressed to elections internet. Is that the



MAGNA
LEGAL SERVICES