IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX O

Keith Ingram                                          March 28, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION
      LA UNION DEL PUEBLO ENTERO,     )
 3    et al.,                         )
                      Plaintiffs,     )
 4         vs.                        )Civil Action No.
      STATE OF TEXAS, et al.,         )5:21-cv-844(XR)
 5                    Defendants.     )(Consolidated Cases)

 6
                       ------------------------
 7                       ORAL DEPOSITION OF
                         KEITH INGRAM
 8                       March 28, 2023
                            Volume 1
 9                     ------------------------

10

11         ORAL 30(b)(6) DEPOSITION OF KEITH INGRAM, Volume

12    1, produced as a witness at the instance of the

13    Plaintiff, and duly sworn, was taken in the

14    above-styled and numbered cause on March 28, 2023, from

15    4:22 p.m. to 7:22 p.m., before Dana Shapiro, CSR, in

16    and for the State of Illinois, reported by machine

17    shorthand, at 209 W. 14th Street, Austin, Texas 78701,

18    pursuant to the Federal Rules of Civil Procedure and

19    any provisions stated on the record or attached

20    hereto.

21

22

23

24

25
```



Keith Ingram

March 28, 2023
Pages 14 to 17

Page 14

1    Q.    That remain -- does that remain accurate
2  today?
3    A.    It does.
4    Q.    Does the statement that -- strike that.
5        Are these the only limitations on providing
6  cure data through the general election period?
7    MS. HUNKER:  Objection, form.
8  BY THE WITNESS:
9    A.    Well, I mean it's subject to the obvious
10 limitation of whether or not the counties reported it.
11 BY MR. STEWART:
12   Q.    Besides the -- whether the counties
13 reported it and the limitations stated here, any other
14 limitations you are aware of?
15   A.    Those would be them.
16   Q.    Then looking now at the supplemental
17 response on page 12.  To the best of your knowledge,
18 does this response remain accurate today?
19   A.    Yes.
20   Q.    Focusing on the November 8, 2022 general
21 election.  I want to focus on the final number under
22 here where it says total number of voters who use the
23 ballot by mail tracker to correct the defects in their
24 ABBM, and had their ABBM accepted or cancelled, their
25 application and voted in person:  419.

Page 15

1        Do you see that?
2    A.    I see that, but I don't think that's what
3  it says.
4    Q.    Sorry.  Could you restate it accurately.
5    A.    Well, I just want to make sure you
6  understand there is two different categories of folks
7  who are in here.  There is some that corrected a defect
8  and had their application for ballot by mail accepted,
9  and there are some who just canceled the application
10 and voted in person.  There is two different categories
11 of folks in this number.
12   Q.    That 419 response does that capture both of
13 those categories conjunctively?
14   A.    It does.
15   Q.    Does The Secretary of State maintain data
16 that could separately identify those two categories?
17   A.    No.  Because what we know is that they
18 either had a vote history that was successful or not.
19   Q.    I see.  There is no way to separate out the
20 ones who had either been accepted or those that
21 canceled and voted in person?
22   A.    There might be a way to do it.  It might
23 require a query for, you know, early voting in person
24 or election day in person as opposed to voting by mail.
25   Q.    Who would know whether that could be

Page 16

1  determined or not?
2    A.    Well, Kristi Hart would be the one to ask
3  the detailed information like that.
4    Q.    When --
5    A.    Don't tell her I used her name.  I will get
6  killed.
7    Q.    During your prior deposition today when
8  Mr. Freeman was asking questions, you spoke about the
9  ballot tracker at votetexas.gov, correct?
10   MS. HUNKER:  Objection, form.
11 BY THE WITNESS:
12   A.    So the ballot by mail tracker I don't think
13 is -- I mean I know it's not at votetexas.gov.  You can
14 get to it from there and you can get to it from SOS
15 website, but it's hosted actually by our third party
16 vendor who does TEAM for us.
17 BY MR. STEWART:
18   Q.    Understood.  Can that tracker be used to
19 cancel an ABBM?
20   A.    No.
21   Q.    No.  It can be used to correct information,
22 right?
23   A.    Well, it can be used to correct a defective
24 number so if somebody transposed digits, whenever they
25 send in their application for ballot by mail that can

Page 17

1  be corrected in the tracker.
2    Q.    Is there anything else that can be
3  corrected in the tracker?
4    A.    If they left off the information but TEAM
5  has it, they can do that in the tracker as well.
6    Q.    How can a voter cancel ABBM?
7    A.    So cancellation is not one of those things
8  I want to talk about off the top of my head.  Do you
9  want me to go up election code and talk about the
10 different ways of cancelling?
11   Q.    If you could tell me where in the election
12 code it is.
13   A.    Chapter 84.
14   Q.    The law I guess -- withdraw that.
15       What is in chapter 84 details all of the
16 ways by which an ABBM canceled?
17   A.    That's correct.  You know, generally a
18 voter can do it by surrendering their mail ballot in
19 person at the polling place and voting in person or go
20 to voting clerk office and fill out a cancellation form
21 and then go vote in person.
22   Q.    Would you say those are the two most common
23 ways it's done?
24   A.    That's generally what it is and there is
25 other permeations of those two that get very



Keith Ingram

March 28, 2023
Pages 18 to 21

Page 18

1 complicated.
2    Q.   Does the Secretary of State's Office
3 consider cancellation of ABBM to be a form of cure?
4    A.   Well, it's choice of voter as to whether or
5 not to pursue voting by mail or decide to vote in
6 person. From my perspective if the voter successfully
7 votes that's a win.
8    Q.   You haven't considered specifically to put
9 that under the umbrella of cure, if it's aimed towards
10 successful voting?
11    MS. HUNKER: Objection, form.
12 BY THE WITNESS:
13    A.   Right. It's not a cure of application if
14 they decide to vote by person, but it is a successful
15 vote.
16 BY MR. STEWART:
17    Q.   So then turning back to the same language
18 you looked at on page 12. This was presented this way
19 and then as use ballot by mail tracker to correct the
20 defects and have ABBM corrected or canceled their
21 application and voted in person because that's the way
22 data is maintained with those two things together,
23 right?
24    A.   The data is maintained as to whether or not
25 there was successful vote, yes.

Page 19

1    Q.   Turning to Exhibit 8 beginning on the
2 bottom of page 12 on the same exhibit. Do you see
3 where I am?
4    A.   Yes.
5    Q.   There is a portion where that asks state
6 the number of voters who have cured carrier envelope
7 identification defects using any on-line portal
8 provided pursuant to SB1 from February 9, 2022 to
9 present, correct?
10    A.   Correct.
11    Q.   The original response identified that TEAM
12 captures only the current or most recent status seeked
13 with any information in voter records, correct?
14    A.   That's correct.
15    Q.   Does that remain true for data collected
16 through the November 8, 2022 general election?
17    A.   That's correct.
18    Q.   Looking at the supplemental response on
19 page 13 and take a moment if you need to. But does the
20 data information here remain accurate, to the best of
21 your understanding today?
22    A.   From the first answer, yes.
23    Q.   By the first answer which one are you
24 identifying?
25    A.   I'm talking about the response and not the

Page 20

1 supplement response as far as I know supplemental
2 response is accurate as well. I want to separate the
3 two.
4    Q.   For the clean record, specifically for the
5 supplemental response do the numbers there appear
6 accurate to you?
7    A.   Yes.
8    Q.   So if we turn to page 14 what appears to be
9 the final item or the final paragraph says total number
10 of voters who use the ballot by mail tracker to correct
11 defective carrier envelope and had their mail ballot
12 accepted or cancelled -- withdraw that.
13    Total number of voters who use the ballot
14 by mail tracker to correct a defective carrier envelope
15 and had their mail ballot accepted or cancel their mail
16 ballot voted in person: 1,496.
17    Do you see where I am?
18    A.   I do.
19    Q.   I may know the answer to this, but similar
20 question as before, does the Secretary of State
21 maintain data that could separately show the number of
22 voters who used the tracker to correct a carrier
23 envelope and separately the number of voters who
24 cancelled?
25    A.   I think we could get there.

Page 21

1    Q.   How would you get there?
2    A.   With a separate query for people who using
3 this universe of numbers at 1531, if we still have that
4 list, and using it to who voted to decide to check who
5 voted in person.
6    Q.   Is it Ms. Hart who would know how to do
7 that as well?
8    A.   Well, she would know if there is a query
9 they could get that info.
10    Q.   Is it correct that similar to an ABBM, the
11 tracker cannot be used to cancel a mail ballot request?
12    A.   That's correct.
13    Q.   What was the overall statewide rejection
14 rate of ABBM for the November 22 general election?
15    MS. HUNKER: Objection, form.
16 BY THE WITNESS:
17    A.   I don't know.
18 BY MR. STEWART:
19    Q.   Do you know if there was somewhere we could
20 find that information?
21    A.   We can check and see what TEAM says, but
22 it's not accurate.
23    Q.   Why is it inaccurate?
24    A.   Because not all of the counties entered the
25 information.



Keith Ingram

Page 34

1 one voter a certain way they have got to treat all
2 voters similarly situated the same way.
3      Q.   Did the Secretary of State's Office issue,
4 leaving aside those responses to those questions, any
5 new guidance regarding the ID number requirements after
6 the primary runoff?
7      A.   No.
8      Q.   Nothing about the implementation should
9 have changed following the primary runoff, correct?
10      A.   I don't believe so.  I mean we sent
11 reminders about that implementation, we had seminar
12 presentations about that implementation.  We sent, you
13 know, materials that they could print and distribute to
14 voters about that implementation, but the guidance
15 itself didn't change after that.
16      Q.   Did any county request to modify a form
17 used to implement the ID number requirement following
18 the primary runoff?
19      A.   We had some requests for different sizes
20 and shapes and orientations of the carry envelope.  I
21 believe all of those were before the runoff.
22      Q.   Anything that would have changed the
23 substance of either the carrier envelope or the ABBM
24 form?
25      A.   No.

Page 35

1      Q.   Anything that would have changed the
2 substance of any of the instruction forms that the SOS
3 prepares?
4      A.   No.
5      MR. STEWART:  I think this is SOS 4.
6           (WHEREUPON, a certain document was
7           marked Deposition Exhibit No. 4,
8           for identification, as of 3/28/23.)
9 BY MR. STEWART:
10      Q.   You should have document SOS 4, state
11 122242.  I will give you a second to read that.  That's
12 the double-sided.  Let me know when you have had a
13 chance to read it.  Are you good?
14      A.   Yes.
15      Q.   This appears to be an email from a voter to
16 Secretary of State's Office, correct?
17      A.   I agree with that.
18      Q.   The voter identifies, would you agree with
19 the characterization, that they say the Tarrant County
20 election office said the numbers in the voter
21 registration database, I take that to mean their ID
22 numbers were transposed.
23      A.   That's what she says that her Social
24 Security number was entered incorrectly when she
25 originally registered back in 1980.

Page 36

1      Q.   She says that Tarrant's reply was that the
2 voter had to come to their office to fix the issue,
3 correct?
4      A.   That's what she says.
5      Q.   Would advice be correct, to the best of
6 your knowledge?
7      A.   Well, it kind of depends what issue they
8 were telling her that she needed to correct.  If she
9 needed to correct the number in the voter registration
10 record obviously she could do that with a voter
11 registration application and she doesn't need to come
12 in person.  If she's trying to fix the problem with the
13 application for ballot by mail then probably she needs
14 to show up in person or fill out a new application with
15 the transposed digits.
16      Q.   I see.  So if the problem were with the
17 ABBM, would she be able to correct that in the portal?
18      A.   If the problem was that the original number
19 was transposed, the only way to fix it in the portal
20 was to create the transposed numbers are correct.
21      Q.   The portal can't be used to change what's
22 in TEAM, it only be used to change what's on the ABBM?
23      A.   That's correct.
24      Q.   So how would she fix the issue -- if it is
25 correct that the issue in TEAM, what ways could she be

Page 37

1 directed to fix that?
2      A.   I think the only way you can fix that to
3 fill out a new voter registration application with the
4 correct number.
5      Q.   So if TEAM then is the source of
6 transposition, it would be correct from Tarrant that
7 she would need to go into the office to correct that?
8      MS. HUNKER:  Objection, form.
9 BY THE WITNESS:
10      A.   You don't need to fill out a voter
11 registration application in person.
12 BY MR. STEWART:
13      Q.   That's something she also could have done
14 remotely, correct?
15      A.   That's correct.
16      Q.   If it's correct in fact that the numbers
17 are transposed in TEAM, she would not be able to enter
18 the portal entering the correct number, right?
19      A.   That's correct.  She would have to enter
20 the transposed number and agree it's the correct number
21 for her mail bound application to be accepted.
22      Q.   Got it.  I want to turn to -- I think last
23 year when we spoke we discussed the HB2512 process; do
24 you recall?
25      A.   I do.



Keith Ingram

March 28, 2023
Pages 38 to 41

Page 38

1    Q.    That's the process for present purposes by
2  which driver's license, ID number or SSN data is
3  imported from DPS database into team, correct?
4    A.    That's correct.
5    Q.    Was the HB2512 process run at any point in
6  2022 following the primary election?
7    A.    No.
8    Q.    Was it --
9    A.    It was in December.
10    Q.    In December following the general election?
11    A.    Not before the general.
12    Q.    Not before the general, but in 2022
13  following -- let me withdraw that. It was not run
14  between the primary and the general, correct?
15    A.    That's correct.
16    Q.    It was run following the general before the
17  end of the year?
18    A.    I agree.
19    Q.    Has it been run again since then?
20    A.    No, sir.
21    Q.    Is that a regular annual process is that
22  why it was run in December?
23    A.    It has historically been run in December,
24  not every December, but obviously the last two.
25    Q.    I'm going to hand you what will be SOS 5. I

Page 39

1  will state I don't know why this document presented
2  without a Bates number. You Bates number on it. It is
3  state 137751. Just to put that on the record.
4            (WHEREUPON, a certain document was
5            marked Deposition Exhibit No. 5,
6            for identification, as of 3/28/23.)
7    MS. HUNKER: Thank you.
8  BY MR. STEWART:
9    Q.    Do you recognize this document, Mr. Ingram?
10    A.    I do.
11    Q.    What is this?
12    A.    This is the result of the comparison
13  process from December of '22.
14    Q.    That's the same HB2512 process we were just
15  discussing?
16    A.    That's correct.
17    Q.    So the initial numbers, would they reflect
18  the state of the database following the 2021 process?
19    A.    Plus whatever changes were made in the
20  course of the 2022.
21    Q.    So they wouldn't reflect any changes from a
22  systemic process, but they could represent -- reflect
23  what I will call ad hoc changes to individual records?
24    MS. HUNKER: Objection, form.
25  BY THE WITNESS:

Page 40

1    A.    That's correct. If an individual went to
2  DPS to renew driver's license and supplied a new number
3  or changed a number, it would be reflected in this.
4  BY MR. STEWART:
5    Q.    And then the post numbers reflect the state
6  of the database following the HB2512 process in
7  December of 2022, correct?
8    A.    Agree with that.
9    Q.    Looking at these numbers. There would be
10  some organic change in these numbers without the HP2512
11  process perhaps not to this degree, but they wouldn't
12  look the same as the 2021 numbers, correct?
13    A.    Agree with that.
14    Q.    Would you agree that though the HP2512
15  process did change these numbers to some extent?
16    A.    Yes.
17    Q.    Do you think the majority of this change is
18  due to HP2512?
19    MS. HUNKER: Objection, form.
20  BY THE WITNESS:
21    A.    When you say this change what do you mean?
22  BY MR. STEWART:
23    Q.    From the initial numbers on the left to the
24  post numbers on the right, each of which decreased.
25  For each of those categories, would you say the

Page 41

1  majority of the decrease is attributable to the HP2512
2  process?
3    A.    I would say the changes exclusively related
4  to 2512 process.
5    Q.    Why do you think additional numbers were
6  caught in the 2022 process that were not caught in the
7  2021 process?
8    A.    Because database is not the same.
9    Q.    You are saying some individuals may have,
10  for example, added an SSN or a driver's license to the
11  DPS database during the year 2022 before this was run
12  that are then pulled into the team database?
13    A.    No. I mean that could happen. But more
14  likely is the information in the TEAM database changed
15  so our matching was more efficient.
16    Q.    I see. So do you think it was mostly
17  attributable to improvement in matching on these
18  records?
19    A.    Not -- the matching criteria didn't change.
20  So the data that we use improves and the matching gets
21  better. So if a voter supplied one or the other of the
22  numbers then it's easier to pull in the other number.
23    Q.    You anticipated my next question. The
24  matching criteria was the same in the 2022 process as
25  in the 2021 process?



Page 42

1    A.    Yes.
2    Q.    Would there have been any new registrants
3  who were able to register with only one of the driver's
4  license or SSN numbers?
5    A.    One of those numbers is the only thing
6  that's required so definitely we could have had new
7  registrants who registered with one number or the
8  other, and we were able to get the other number for
9  that voter pulled in through that process.
10    Q.    Just so it's clear in my mind, this would
11  have -- the change in these numbers from initial to
12  post would capture 2021 first time registrants who
13  registered with one number, and then had the other
14  number pulled in through this HP2512 process?
15    A.    I agree with that.  I think you meant to
16  say '22 in that question.
17    Q.    I appreciate that correction.
18        Looking at these individual categories,
19  looking at the third category, number of active and
20  suspense, I'm going from top to bottom, the third
21  category number of active and suspense voters that have
22  neither a TDL or SSN on their voter record, no value
23  for both fields.  So those are the individuals in TEAM
24  who did not have either the TDL or the -- any portion
25  of an SSN, correct?

Page 43

1    A.    Agree with that.
2    Q.    That number moved by less than 2,000,
3  correct?
4    A.    It looks like about 1,300 maybe.
5    Q.    Why do you think the movement in that was
6  smaller than in the other categories?
7    A.    Because it's the hardest category to do
8  anything with.
9    Q.    Have you discussed any way to capture more,
10  improve the HP2512 process for that category of voters
11  in the future?
12    A.    No.
13    Q.    Just a couple quick questions.  After the
14  HP2512 process is run, how are those changes filtered
15  out to off-line counties?
16    A.    They are supposed to sync their data with
17  ours on a monthly basis.
18    Q.    That occurs monthly?
19    A.    It does or it's supposed to.
20    Q.    Is that a two-way sync?  So, for example,
21  if something gets changed in the county's off-line
22  database more recently than the information in TEAM,
23  should that be then filtering into TEAM as well?
24    A.    So there is two different things that you
25  might be confusing here.  Any changes in voter

Page 44

1  registration record that the county gets from the voter
2  is supposed to be reported nightly.  So that's what we
3  call our batch process.  That's not the same as syncing
4  the data.  Syncing the data means we want to make sure
5  everything we have got in our system is captured in
6  off-line system so the databases are identical, right.
7  So the goal is to have zero differences in the sync
8  file.  This kind of change in the SOS file is what we
9  are trying to sync to the voters.  Then of course there
10  are other kinds of changes the county makes with regard
11  to pre-syncing in particular that aren't reflected in
12  an individual voter change that we would get in a batch
13  process.  We want to sync those up as well.  So those
14  are the two things that we are syncing is making sure
15  that everything from our database is in theirs and
16  making sure all of their precinct lines they may have
17  re-drawn are in ours.
18    Q.    Taking those two processes separately
19  because I assume -- do those processes run at the same
20  time?
21    A.    Yes.
22    Q.    They do?
23    A.    The sync is simultaneous.
24    Q.    So the sync is referring to information
25  from TEAM filtering down to the counties?

Page 45

1    A.    That's right.
2    Q.    That occurs monthly?
3    A.    It's supposed to occur monthly.  We have to
4  do it much less often.  With this change in law it
5  became expedient to do it more often.
6    Q.    All new registrations are entered by the
7  county into their databases, correct?
8    A.    That's right, many changes to registration
9  is entered.
10    Q.    Those changes are coming upward to TEAM
11  daily?
12    A.    That's right.
13    Q.    Then new information from HP2512 is going
14  from TEAM to the counties monthly?
15    A.    Well, we sync the database monthly.  The
16  new information from 2512 is obviously an annual thing.
17    Q.    I see.  It would be part of that monthly
18  sync process?
19    A.    It would.
20    Q.    Information entered into the texas.gov
21  portal that gets pulled over, where does that go first?
22    A.    To TEAM.
23    Q.    That will to the counties as part of the
24  monthly process?
25    A.    That's right.



Keith Ingram

March 28, 2023
Pages 46 to 49

Page 46

1    Q.    If there is any difference in the county
2  and state databases, would those likely be due to a lag
3  in time between basically the monthly process
4  occurring?
5    MS. HUNKER:  Objection, form.
6  BY THE WITNESS:
7    A.    That's right, or they haven't resolved
8  everything that was a difference in the last sync file.
9  BY MR. STEWART:
10    Q.    What does it mean to resolve it?
11    A.    To choose one or the other.
12    Q.    When something comes down from the sync
13  file from TEAM to the county, the county needs to
14  resolve each of those in their own database?
15    A.    That's correct.
16    Q.    If there is an import from Texas.gov, those
17  cannot be used by the county in the cure process until
18  the next sync occurs; is that correct?
19    A.    No, they can use TEAM.  They are -- all
20  have access to TEAM and we told them to use tell.
21    Q.    They wouldn't be reflected in the county,
22  but the instruction from the SOS is to also look in the
23  TEAM database?
24    A.    That's right.
25    Q.    Do you know if all counties follow that

Page 47

1  instruction?
2    A.    I don't know that for sure.  I'm pretty
3  sure Bexar County didn't.  Jackie does what Jackie
4  does.
5    Q.    Any others you think may not have?
6    A.    No, I'm pretty sure they mostly did.
7    Q.    Are you aware of any counties -- withdraw
8  that.  Good news is I'm shortening my questions here.
9        Did any county report -- rephrase that.
10        Did any off-line counties report to the SOS
11  their vendors having issues with information keeping
12  for mail ballots for the general election?
13    A.    Not for the general.
14    Q.    For the primary?
15    A.    Yes.
16    Q.    Which counties were those if you recall?
17    A.    The VOTEC counties.
18    MR. STEWART:  Could we take a short break.
19        (WHEREUPON, a recess was had.)
20  BY MR. STEWART:
21    Q.    I'm going to show you, Mr. Ingram, the next
22  document if I can find it.
23    MR. STEWART:  I believe we are at SOS 6.  It's
24  Bates stamped 123228.
25        (WHEREUPON, a certain document was

Page 48

1        marked SOS Exhibit No. 6, for
2        identification, as of 3/28/23.)
3  BY MR. STEWART:
4    Q.    Give you a second to read, Mr. Ingram.
5    A.    Okay.
6    Q.    This is a mass email from the Secretary of
7  State's Office to county election officials?
8    A.    That's correct.
9    Q.    That's with instructions on finalizing
10  election reporting for the March 1 primary, correct?
11    A.    That's correct.
12    Q.    I want to focus on the section that
13  bulleted incomplete or missing TDL/SSN/on-line cure
14  available.  I'm going to look at the last paragraph
15  there to make sure I understand what it's saying.  Are
16  these directions on how ABBM information should be
17  entered into TEAM?
18    A.    Yes.
19    Q.    It says, "For ballots marked incomplete or
20  missing TDL/SSN on-line cure available following the
21  deadline for correction the ABBM records will need to
22  be updated to received after deadline.  Off-line
23  counties will need to submit status update for these
24  records.  Please verify correct coding for these
25  statuses with your vendors."

Page 49

1        Did I read that right?
2    A.    You did.
3    Q.    Does this mean that in TEAM no ABBM would
4  ultimately be identified as incomplete or missing
5  TDL/SSN on-line cure available once the cure deadline
6  has passed?
7    A.    That's what it looks like.  I'm not sure
8  why it says for ballots marked and then talks about
9  ABBMs.
10    Q.    So you are saying there's a mismatch there
11  between describing ballots on the one hand and ABBM on
12  the other?
13    A.    Agreed.
14    Q.    Would these instructions effect ballot
15  recordkeeping?
16    A.    Well, they reflect final status.
17    Q.    The final status of ABBMs?
18    A.    Exactly.
19    Q.    Would any -- I'm sorry.
20    A.    It's got the same discrepancy in the first
21  paragraph.  Not sure.
22    Q.    What I'm trying to understand is would you
23  be able to tell using TEAM then whether any ABBM was
24  rejected for incomplete or missing TDL/SSN on-line cure
25  available after the cure deadline has passed using the



Keith Ingram

March 28, 2023
Pages 82 to 85

Page 82

1    MS. HUNKER:  Objection, form.
2  BY THE WITNESS:
3    A.    The absolute number probably has increased,
4  but the percentage has probably gone down.
5  BY MS. PERALES:
6    Q.    Understood.  Do you keep track of number of
7  referrals you make to law enforcement?
8    A.    Yes.
9    Q.    With respect to section 2.11.
10    A.    Yes.
11    Q.    This is also related to persons excused
12  from jury duty for non-residence in the county.  And it
13  adds a requirement for the clerk to report not only to
14  the voter registrar, but also to the Secretary of
15  State.  So in some ways it's connected to that previous
16  provision that we looked at together.  And is your
17  testimony the same then that with respect to section
18  2.11 you, the Secretary of State, have not received any
19  referrals or lists from county jury clerks?
20    A.    That's correct of people who have been
21  excused because of non-residence in the county.
22    Q.    Thank you. Section 3.04 on page 14.  I feel
23  bad for massacring some of my descriptions of these
24  provisions.  But this is basically a requirement that
25  polling places be located inside a building, and

Page 83

1  essentially a prohibition on what people might call
2  drive-thru voting; is that right?
3    MS. HUNKER:  Objection, form.
4  BY THE WITNESS:
5    A.    I agree it's a prohibition on generalized
6  drive-thru voting and says that only people who qualify
7  for curbside voting can vote from a car.
8  BY MS. PERALES:
9    Q.    I accept your distinction between curbside
10  voting and drive-thru --
11    A.    Right.
12    Q.    -- voting.
13        Since the primary runoff election in 2022,
14  have you -- has your office received any expressions of
15  concern or opposition to the elimination of drive-thru
16  voting?
17    A.    Not that I'm aware of, no, ma'am, from
18  either the public or counties?
19    Q.    For you -- sorry?
20    A.    From either the public or counties.
21    Q.    Okay.
22        Did you have any communications from the
23  Secretary of State with, for example, the Office of
24  Attorney General that's separate and apart from
25  attorney-client stuff related to this litigation

Page 84

1  related to the prohibition on drive-thru voting?
2    A.    No.
3    MS. HUNKER:  I'm going to remind my client to
4  give me a second to object.
5  BY MS. PERALES:
6    Q.    We had talked earlier about a provision of
7  SB 1 that was given an effective date of 2026 that you
8  had some concerns might be problematic to carry out.
9  And so I wanted to ask you a similar question with
10  respect to section 3.04.  Since May of 2022, which
11  takes us into the March of 2023, have you had
12  conversations with legislators or legislative staff
13  about making changes to SB 1 other than that provision
14  that we were talking about that has an effective date
15  of 2026?
16    MS. HUNKER:  Objection, form.
17  BY THE WITNESS:
18    A.    Yes.
19  BY MS. PERALES:
20    Q.    Can you describe those?
21    A.    Yes. Well, what we have talked about is the
22  corrective action procedure needs a little bit of
23  tweaking for better implementation, smoother
24  implementation, more uniform implementation.  The main
25  change would be to stop the possibility of sending the

Page 85

1  ballot back to the voter instead of just sending a
2  corrective action form and having them mail it back.
3        The second thing is standardizing the cure
4  period so that it is not the case that some people have
5  until 7:00 p.m. on election day and other people have
6  six days after election day.  Have everybody have the
7  same cure period.  Then to allow the ballot boards more
8  time on the front end to start meeting earlier so that
9  they get notice to the voters sooner.
10    Q.    Do you think that with respect to item
11  number one, the cure procedure, do you think that if
12  the ballot board is able to retain custody of the
13  ballot and send the cure form, do you think that will
14  result in more ballots being cured?
15    A.    Yes, fewer ballots being lost in the mail.
16    Q.    Why would it result in more ballots being
17  cured?
18    A.    Because the opportunity to mail back the
19  correction form instead of having to deliver it in
20  person makes it more available.
21    Q.    Is that because a voter is more likely to
22  mail back the cure form than they are to physically
23  travel to the election administrator's office to
24  personally drop off the ballot?
25    MS. HUNKER:  Objection, form.



Page 86

1  BY THE WITNESS:
2      A.    I mean we don't know.  I mean some voters
3  can drive it in as easily as they can mail it, but
4  there is a reason why people vote by mail.  Generally
5  it's because they are not as mobile.  So to increase
6  the odds of them curing we need to have a mail back
7  form.
8  BY MS. PERALES:
9      Q.    Texas vote by mail eligibility involves
10  being for the most part either over age 65 or
11  physically disabled, is that correct -- or disabled in
12  some way?
13      A.    Agreed.
14      Q.    So you had listed basically four things,
15  the 2026 effective date provision, and then the three
16  things you just talked to me about now.  Have you had
17  any discussions with members of the legislator or
18  legislative staff about amending any of the provisions
19  in SB 1 that are the subject of this lawsuit?
20      A.    No.
21      Q.    So then I won't have to ask it for each
22  individual provision.
23            Let's look at --
24      A.    Oh, we did talk to one senator's office
25  about possible changes to poll watchers.

Page 87

1      Q.    Which senator's office was that?
2      A.    Royce West.
3      Q.    Now I will take a deep breath and I will
4  put my question on the record.  My question is what
5  communications if you could describe the substance of
6  the communication with Senator West's office regarding
7  making changes to SB 1's provisions related to poll
8  watchers?
9      MS. HUNKER:  I object on legislative privilege
10  grounds.  I represent Senator West for the purposes of
11  protecting his privilege today.  On behalf of Senator
12  West I object to that on the basis of legislative
13  privilege.  It's wholly inappropriate for this question
14  to be asked at all given the pending appeals to which
15  we are all a party.  We vehemently disagree with the
16  district court's decision to permit this kind of
17  questioning while we await a decision from the Fifth
18  Circuit.  Nonetheless the district court has wrongly
19  made clear that attorneys who raise these objections
20  face the possibility of contempt.  We have a duty to
21  our clients to protect their privileged information.
22  Because of the district court's orders and threat we
23  cannot instruct the witness not to answer this
24  question.  However, the State Defendants and Senator
25  West reserve all rights to challenge this improper

Page 88

1  questioning including sealing this portion of the
2  transcript, preventing its further disclosure or use at
3  trial, appealing or seeking any emergency relief from
4  the Fifth Circuit, and any other relief allowed by law.
5  We further designate this testimony as confidential
6  under the protected order in this matter.
7  BY THE WITNESS:
8      A.    So what we talked to him about was the
9  incident in Dallas County where the poll watcher had a
10  certificate that -- of appointment and had a
11  certificate that they had been trained, but they didn't
12  have to show an ID they were the same person on those
13  certificates.  So he wondered if maybe an ID
14  requirement for poll watchers should be added to the
15  code.  And we told him that was his choice.  But, you
16  know, that's an incident that we had with a poll
17  watcher that blew up into a confrontation that probably
18  didn't need to happen.
19  BY MS. PERALES:
20      Q.    Do you know where the precinct was located
21  in Dallas County?
22      A.    I don't.
23      Q.    Do you know if the poll worker and the poll
24  watcher were of different races?
25      A.    I don't know.

Page 89

1      MS. HUNKER:  Objection, form.
2  BY MS. PERALES:
3      Q.    When you say that you told Senator West
4  that it was ultimately up to him whether he wanted to
5  propose such a change, did you make a recommendation
6  either way?
7      MS. HUNKER:  I'm going to object on legislative
8  privilege grounds.
9  BY THE WITNESS:
10      A.    No.
11      MS. PERALES:  I will give you your fully
12  expressed objection.
13      MS. HUNKER:  Thank you.
14      THE WITNESS:  Sorry.
15  BY THE WITNESS:
16      A.    No.
17  BY MS. PERALES:
18      Q.    So having recalled that discussion with
19  Senator West related to poll watchers, do you recall
20  having any discussions with any other members of the
21  legislator or legislative staff about changing any of
22  the language in SB 1 related to poll watchers?  Anybody
23  else besides Senator West?
24      A.    No, that was -- that would be the only one.
25      Q.    Then so just to see if I can jog your



**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO**
**THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX P

Transcript of the Testimony of

**Isabel Longoria**

**Date:**

April 20, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO V. GREGORY W. ABBOTT

```
1              IN THE UNITED STATES DISTRICT COURT

2                  WESTERN DISTRICT OF TEXAS

3                    SAN ANTONIO DIVISION

4

5   * * * * * * * * * * * * * * * * * * * * * * * * * *

6   LA UNION DEL PUEBLO ENTERO, et al *

7   v.                              *      CASE NO. 5:21-cv-844-XR

8   GREGORY W. ABBOTT, et al        *

9   * * * * * * * * * * * * * * * * * * * * * * * * * *

10  OCA-GREATER HOUSTON, et al      *

11  v.                              *      CASE NO. 1:21-cv-780-XR

12  JOHN SCOTT, et al               *

13  * * * * * * * * * * * * * * * * * * * * * * * * * *

14  HOUSTON JUSTICE, et al          *

15  v.                              *      CASE NO. 5:21-cv-848-XR

16  GREGORY WAYNE ABBOTT, et al     *

17  * * * * * * * * * * * * * * * * * * * * * * * * * *

18  LULAC TEXAS, et al              *

19  v.                              *      CASE NO. 1:21-cv-0786-XR

20  JOHN SCOTT, et al               *

21  * * * * * * * * * * * * * * * * * * * * * * * * * *

22  MI FAMILIA VOTA, et al          *

23  v.                              *      CASE NO. 5:21-cv-0920-XR

24  GREG ABBOTT, et al              *

25  * * * * * * * * * * * * * * * * * * * * * * * * * *
```

Isabel Longoria

April 20, 2022
Pages 2 to 5

**Page 2**

1  UNITED STATES OF AMERICA        *
2  v.                              *      CASE NO. 5:21-cv-1085-XR
3  THE STATE OF TEXAS, et al       *
4  * * * * * * * * * * * * * * * * * * * * * * * * * * *
5
6              ORAL AND VIDEOTAPED DEPOSITION OF
7                     ISABEL LONGORIA
8                      APRIL 20, 2022
9                      VOLUME 1 OF 1
10
11         Oral and videotaped deposition of Isabel Longoria,
12  produced as a witness at the instance of the defense, and duly
13  sworn, was taken in the above-styled and numbered cause on April
14  20, 2022, from 9:24 a.m. to 2:32 p.m., before Terrie Doyle
15  Escobar, CSR in and for the State of Texas, reported by oral
16  stenography, at the Office of the Texas Attorney General,
17  Consumer Protection Division, Houston Regional Office, 808 Travis
18  Street, Suite 1520, Houston, Texas  77002, pursuant to Rule 30 of
19  the Federal Rules of Civil Procedure.
20
21
22
23
24
25

**Page 3**

1              A P P E A R A N C E S
2
3  FOR THE HAUL PLAINTIFFS:
4      MR. KENNETH E. BROUGHTON
5      REED SMITH, LLP
6      811 MAIN STREET, SUITE 1700
7      HOUSTON, TEXAS  77002
8      PHONE: 713-806-8434
9      EMAIL: kbroughton@reedsmith.com
10
11  FOR STATE DEFENDANTS:
12      MR. WILLIAM T. THOMPSON
13      OFFICE OF THE ATTORNEY GENERAL
14      DEPUTY CHIEF, SPECIAL LITIGATION UNIT
15      POST OFFICE BOX 12548
16      AUSTIN, TEXAS  78711
17      PHONE: 512-936-2567
18      EMAIL: will.thompson@oag.texas.gov
19
20  FOR DEFENDANT ISABEL LONGORIA:
21      MS. CHRISTINA BEELER
22      MR. JONATHAN FOMBONNE
23      OFFICE OF THE HARRIS COUNTY ATTORNEY
24      1019 CONGRESS PLAZA, 15TH FLOOR
25      HOUSTON, TEXAS  77002

**Page 4**

1      PHONE: 713-274-5101
2      EMAIL: Jonathan.Fombonne@cao.hctx.net
3
4  FOR DEFENDANT YVONNE RAMON:
5      MS. JOSEPHINE RAMIREZ SOLIS (Present via Zoom)
6      OFFICE OF CRIMINAL DISTRICT ATTORNEY - HIDALGO COUNTY, TEXAS
7      CHIEF, CIVIL DIVISION
8      100 E. CANO
9      EDINBURG, TEXAS  78539
10      PHONE: 956-292-7609
11      EMAIL: josephine.ramirez@da.co.hidalgo.tx.us
12
13  FOR PLAINTIFFS LULAC TEXAS and VOTO LATINO:
14      MR. MIKE JONES (Present via Zoom)
15      ELIAS LAW GROUP, LLP
16      10 G ST. NE, STE. 600
17      WASHINGTON, D.C.  20002
18      PHONE: 202-985-1752
19      EMAIL: mjones@elias.law
20
21  FOR PLAINTIFF UNITED STATES OF AMERICA:
22      MS. L. BRADY BENDER (Present via Zoom)
23      UNITED STATES DEPARTMENT OF JUSTICE
24      CIVIL RIGHTS DIVISION, VOTING SECTION
25      950 PENNSYLVANIA AVENUE NW

**Page 5**

1      4CON 8TH FLOOR
2      WASHINGTON, DC  20530
3      PHONE: 202-353-5373
4      EMAIL: laura.bender@usdoj.gov
5
6  ALSO PRESENT:
7      MR. TERRY HARRISON, VIDEOGRAPHER
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Isabel Longoria

April 20, 2022
Pages 142 to 145

Page 142

1 voters or were registered voters, perhaps, at the time they
2 applied, but for whatever reason, their voter registration lapsed
3 or, you know, for example, provisional voters weren't able to
4 then cure whatever provisional defect there was, so, ultimately,
5 they were unable to vote by mail.
6    Q.  Are you aware of instances in which someone has tried
7 to vote by mail but pretending to be somebody else?
8    A.  Not to my knowledge, no.
9    Q.  Before SB1 took effect, what information would someone
10 need to apply for a ballot by mail?
11    A.  Someone would need to submit an application to vote by
12 mail that contains their name, residential address, mailing
13 address -- name, address -- the reason for their qualification to
14 vote by mail -- for example, being in the military, disabled, or
15 over the age of 65 -- they had to sign the form essentially
16 saying, you know, I swear I am who I say I am, and then
17 submitting the election that they needed a ballot for.  I think
18 those are the general categories on there.
19    Q.  Right.  And so the kind of identifying information on
20 there would be the name and address; right?
21    A.  Yes.
22    Q.  Are voters' names and addresses publicly available in
23 Harris County?
24    A.  Yes.
25    Q.  They're available through the voter file, for example;

Page 143

1 right?
2    A.  Yes.
3    Q.  And your office will give out copies of the voter file
4 when requested; right?
5    A.  If the request is eligible for such information, yes.
6    Q.  Are political parties eligible to request the voter
7 file?
8    A.  Yes.
9    Q.  Who else is eligible to request the voter file?
10    A.  As I believe, if I understand correctly or remember
11 correctly, any eligible citizen is able to, you know, public
12 information request, request a copy of the voter file.  And I
13 believe you may even be able to download it from our website.  I
14 just can't remember if it's the voter file or the vote record for
15 any given election.
16    Q.  And for publicly available records, one could determine
17 whether another individual is registered to vote; right?
18    A.  Yes.
19    Q.  And one could determine whether someone who is
20 registered to vote has in fact voted in recent elections; right?
21    A.  If you got the vote history file, yes.
22    Q.  And that's publicly available?
23    A.  Yes.
24    Q.  So based on publicly available information, someone
25 could submit before SB1 an application to vote by mail with

Page 144

1 another registered voter's name and address; right?
2    A.  Their name and address?  Yes.
3    Q.  And, you know, if they wanted to be clever, they could
4 even do it for someone who's registered to vote but who has a
5 practice of not voting in recent elections; right?
6        MR. FOMBONNE:  Objection to form.
7 (BY MR. THOMPSON:)
8    A.  To the extent that they would have access to that kind
9 of information to determine that, yes.
10    Q.  Right.  So if someone got access to the publicly
11 available information from Harris County, he'd be able to submit
12 all the information required to request a ballot by mail on
13 someone else's behalf and do so in a way that targets people who
14 are registered to vote but who have not, in fact, voted recently;
15 right?
16    A.  No.  No.
17    Q.  Why?
18    A.  The voter file would not contain information about a
19 voter's age, and, so, if -- again, I can't 100 percent remember,
20 but I'm trying to remember -- if you -- if you need -- to the
21 extent you need to include your date of birth on the application,
22 an individual would have to find that date of birth not through
23 the voter file or some other means, in addition to which you
24 would still have to fill out the reason for which you could apply
25 to vote by mail, which would not be found in a voter file.

Page 145

1    Q.  Of course, the reason to vote by mail could just be a
2 lie; right?
3    A.  Uh, any -- sure.
4    Q.  It's not something you verify; right?
5    A.  Our office couldn't determine what is a lie or not a
6 lie, but, yes, a -- you know, an individual could fill out a
7 form.
8    Q.  If someone submits an application to vote by mail and
9 the reason given for voting by mail is that he expects to be out
10 of the county when in-person voting is happening, you wouldn't
11 have any way of verifying or not verifying that information;
12 right?
13    A.  Correct.
14    Q.  Are you aware that on an application to vote by mail
15 providing a date of birth is optional?
16    A.  I did not remember, but --
17        MR. FOMBONNE:  Objection to form.
18 (BY MR. THOMPSON:)
19    Q.  Do you have any reason to disagree with that?
20    A.  No.
21    Q.  So if a person wanted to submit an application to vote
22 by mail using someone else's information, he could gather the
23 required personal information from publicly available sources;
24 right?
25    A.  Yes.

Isabel Longoria

April 20, 2022
Pages 146 to 149

Page 146

1    Q.   At least, before SB1; right?
2    A.   Yes.
3    Q.   But with SB1, the application to vote by mail is
4  supposed to include some ID numbers; right?
5    A.   Yes.
6    Q.   And what are those numbers?
7    A.   The last four digits of your Social Security number,
8  your driver's license number; absent of either of those, a Texas
9  election ID number or a statement certifying that you have access
10  to neither of those documents -- or not access, but you don't
11  have either a Social Security, driver's license, or election ID
12  number.
13    Q.   To the best of your knowledge, are driver's license
14  numbers publicly available?
15    A.   No.
16    Q.   To the best of your knowledge, are Social Security
17  numbers publicly available?
18    A.   No.
19    Q.   To the best of your knowledge, are the last four digits
20  of a Social Security number publicly available?
21    A.   No.
22    Q.   So would it be fair to say that SB1, by imposing an ID
23  number requirement on an application to vote by mail, now
24  requires information that is not publicly available?
25    A.   Yes.

Page 147

1    Q.   And that's change from the pre-SB1 law; right?
2    A.   Yes.
3    Q.   Do people in Harris County ever express concerns about
4  election integrity to you?
5    A.   Yes.
6    Q.   Can you tell me about those.
7    A.   Broadly, calls -- again, calls that might come into the
8  office in broad buckets expressing voters who are worried
9  Russians are hacking elections in Harris County, are worried
10  that, you know, broadly, they hear claims of national election
11  stories and worried that somehow Harris County is also, you know,
12  prone or could be a victim of hacking or other issues related to
13  elections.
14    Q.   So are all of the concerns about election integrity
15  that you receive related to hacking?
16    A.   Hacking?  Yes, and, you know, can the machines be
17  hacked, are the machines connected to the internet, are the
18  machines faxing my vote to the Russians, broadly based conspiracy
19  or -- or hacking questions.
20    Q.   Do you ever receive calls expressing concerns about
21  election integrity related to ballot harvesting, for example?
22    A.   Ballot harvesting?  No.  Again, only related to
23  complaints of voters sharing that they prefer not to put their ID
24  numbers in mail as they have worries about identity theft, if
25  they include, you know, sensitive information that is then put in

Page 148

1  the mail.
2    Q.   When voters call to express concerns about election
3  integrity to your office, do you know whether they are sincere?
4        MR. FOMBONNE:  Objection to form.
5  (BY MR. THOMPSON:)
6    A.   To the extent that anyone -- that we assume anyone who
7  calls our office has a valid concern, and so we share the
8  information we can with them to alleviate any concerns they might
9  have.
10    Q.   That's not quite what I was asking.  Let me try again.
11    A.   Sure.
12    Q.   You've spoken on the phone with people who are
13  expressing concerns about election integrity; right?
14    A.   I have not; the call center that we run as part of the
15  office has.
16    Q.   So people in your call center have spoken on the phone
17  with Harris County residents who are expressing concern about
18  election integrity; right?
19    A.   Yes.
20    Q.   Do the people in this call center ever tell you whether
21  they think the callers are expressing sincere concerns?
22        MR. FOMBONNE:  Objection to form.
23  (BY MR. THOMPSON:)
24    A.   Yes, as in the voters are sincerely expressing those
25  concerns.

Page 149

1    Q.   The voters may be saying something that's inaccurate;
2  right?
3    A.   Yes.
4    Q.   But they honestly believe it when they say it; right?
5    A.   Yes.
6    Q.   And your office tries to alleviate those concerns?
7    A.   Yes.
8    Q.   Why?
9    A.   If voters have concerns about voting, whether or not be
10  about election integrity or anything else, it's our duty to make
11  sure that we give voters the most accurate information we have to
12  help them feel, you know, good and taken care of, just in general
13  customer service and constituent responses.
14    Q.   Do you think it's important for voters to believe that
15  the system is secure?
16    A.   Yes.
17    Q.   What is the purpose of having poll watchers in Harris
18  County elections?
19    A.   As I understand it, poll watchers are representatives
20  of campaigns who are there to observe that election clerks and
21  election judges and workers broadly are upholding the Texas
22  Election Code in the administration of elections.
23    Q.   So is the idea that someone were violating the law in
24  the administration of the election, a poll watcher might be able
25  to observe it and report it?

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| _Plaintiffs,_ | § | |
| | § | |
| _v._ | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| _Defendants._ | § | |

STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT

# APPENDIX Q

# Voter Registration and Absentee Ballot Request

Federal Post Card Application (FPCA)

**This form is for absent Uniformed Service members, their families, and citizens residing outside the United States. It is used to register to vote, request an absentee ballot, and update your contact information. See your state's guidelines at FVAP.gov.**

Print clearly in blue or black ink, please see back for instructions.

## 1 Who are you? Pick one.

I request an absentee ballot for all elections in which I am eligible to vote AND:

- ☐ I am on active duty in the Uniformed Services or Merchant Marine  **-OR-**  ☐ I am an eligible spouse or dependent.
- ☐ I am a U.S. citizen living outside the country, and I intend to return.
- ☐ I am a U.S. citizen living outside the country, and my intent to return is uncertain.
- ☐ I am a U.S. citizen living outside the country, I have never lived in the United States.

| Last name | Suffix (Jr., II) | ☐ Mr.   ☐ Miss |
|---|---|---|
| | | ☐ Mrs.  ☐ Ms. |

| First name | Previous names (if applicable) |
|---|---|

| Middle name | Birth date (MM/DD/YYYY) |
|---|---|

| Social Security Number | Driver's license or State ID# |
|---|---|

## 2 What is your address in the U.S. state or territory where you are registering to vote and requesting an absentee ballot?

Your voting materials will not be sent to this address.  See instructions on the other side of form.

| Street address | Apt # |
|---|---|

| City, town, village | State |
|---|---|

| County | ZIP |
|---|---|

## 3 Where are you now?  You MUST give your CURRENT address to receive your voting materials.

Your mailing address. (Different from above)    Your mail forwarding address. (If different from mailing address)

## 4 What is your contact information? This is so election officials can reach you about your request.

Provide the country code and area code with your phone and fax number. Do not use a Defense Switched Network (DSN) number.

| Email: | Phone: |
|---|---|
| Alternate email: | Fax: |

## 5 What are your preferences for upcoming elections?

A. How do you want to receive voting materials from your election office? (Select One)
- ☐ Mail
- ☐ Email or online
- ☐ Fax

B. What is your political party for primary elections?

## 6 What additional information must you provide?

Puerto Rico and Vermont require more information, see back for instructions. *Additional state guidelines* may be found at FVAP.gov. You may also use this space to clarify your voter information.

> **STATE'S EXHIBIT**
> 3
> PENGAD 800-631-6989

## 7 You must read and sign this statement.

**I swear or affirm, under penalty of perjury, that:**

- The information on this form is true, accurate, and complete to the best of my knowledge. I understand that a material misstatement of fact in completion of this document may constitute grounds for conviction of perjury.
- I am a U.S. citizen, at least 18 years of age (or will be by the day of the election), eligible to vote in the requested jurisdiction, and
- I am not disqualified to vote due to having been convicted of a felony or other disqualifying offense, nor have I been adjudicated mentally incompetent; or if so, my voting rights have been reinstated; and
- I am not registering, requesting a ballot, or voting in any other jurisdiction in the United States, except the jurisdiction cited in this voting form.

**Sign here** X _____    **Today's date** (MM/DD/YYYY)

This information is for official use only. Any unauthorized release may be punishable by law. Previous editions are obsolete. Standard Form 76 (Rev.09-2021), OMB No. 0704-0503, NSN 7540-00-643-5053

# You can vote wherever you are.

## 1. Fill out your form completely and accurately.

- Your U.S. address is used to determine where you are eligible to vote absentee. For military voters, it is usually your last address in your state of legal residence. For overseas citizens, it is usually the last place you lived before moving overseas. You do not need to have any current ties with this address. DO NOT write a PO Box # in section 2.

- Most states allow you to provide a Driver's License number or the last 4 digits of your SSN. New Mexico, Tennessee, and Virginia require a full SSN.

- If you cannot receive mail at your current mailing address, please specify a mail forwarding address.

- Many states require you to specify a political party to vote in primary elections. This information may be used to register you with a party.

- **Section 6 Requirements:** If your voting residence is Vermont, you must acknowledge the following by writing in section 6: "I swear or affirm that I have taken the Vermont Voter's Oath." If your voting residence is in Puerto Rico, you must list your mother's and father's first name.

- We recommend that you complete and submit this form every year while you are an absentee voter.

## 2. Remember to sign this form!

## 3. Return this form to your election official. You can find their contact information at FVAP.gov.

- Remove the adhesive liner from the top and sides. Fold and seal tightly. If you printed the form, fold it and seal it in an envelope.

- All states accept this form by mail and many states accept this form by email and fax. See your state's guidelines at FVAP.gov.

## Agency Disclosure Statement

The public reporting burden for this collection of information, OMB Control Number 0704-0503, is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or burden reduction suggestions to the Department of Defense, Washington Headquarters Services, at whs.mc-alex.esd.mbx.dd-dod-information-collections@mail.mil. Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number. DO NOT SUBMIT YOUR FORM TO THE E-MAIL ADDRESS ABOVE.

## Privacy Advisory

**When completed, this form contains personally identifiable information and is protected by the Privacy Act of 1974, as amended.**

**Questions?**
**Email: vote@fvap.gov**

---

(Fill in the address of your election office. The address can be found online at FVAP.gov.)

**To**

NO POSTAGE NECESSARY IN THE U.S. MAIL – DMM 703.8.0

OFFICIAL ABSENTEE BALLOTING MATERIAL – FIRST CLASS MAIL



International airmail postage is required if not mailed using the U.S. Postal Service, APO/FPO/DPO system, or diplomatic pouch.

(Your name and mailing address)

**From**

PAR AVION



U.S. Postage Paid
39 USC 3406

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,          §
     *Plaintiffs,*                                  §
                                             §
*v.*                                         §          Case No. 5:21-cv-844-XR
                                             §
GREGORY W. ABBOTT, et al.,                   §
     *Defendants.*                                  §

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX R

1        IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2                  SAN ANTONIO DIVISION

3    LA UNIÓN DEL PUEBLO     §
     ENTERO, ET AL.,         §
4                            §
          PLAINTIFFS,        §
5                            §
          V.                 §   CIVIL ACTION NO.5:21-CV-844 (XR)
6                            §   (CONSOLIDATED CASES)
     STATE OF TEXAS, ET      §
7    AL.,                    §
                             §
8         DEFENDANTS.        §

9
     *********************************************************
10
                      ORAL DEPOSITION OF
11
                      FRANK PHILLIPS
12
                      MARCH 31, 2023
13
     *********************************************************
14

15        ORAL DEPOSITION OF FRANK PHILLIPS, PRODUCED AS A

16   WITNESS AT THE INSTANCE OF THE PLAINTIFF, AND DULY

17   SWORN, WAS TAKEN IN THE ABOVE-STYLED AND -NUMBERED CAUSE

18   ON THE 31ST DAY OF MARCH, 2023, FROM 9:14 A.M. TO

19   12:40 P.M., BEFORE KAREN A. GONZALEZ, COMMISSIONED

20   NOTARY, IN AND FOR THE STATE OF TEXAS, REPORTED BY

21   MACHINE SHORTHAND, FROM DALLAS COUNTY, TEXAS, PURSUANT

22   TO THE TEXAS RULES OF CIVIL PROCEDURE, THE TEXAS SUPREME

23   COURT EMERGENCY ORDER REGARDING THE COVID-19 STATE OF

24   DISASTER AND THE PROVISIONS STATED ON THE RECORD OR

25   ATTACHED HERETO.



Frank Phillips

March 31, 2023
Pages 94 to 97

Page 94

1  Q. LET'S GO WITH DENTON COUNTY FIRST, AND THEN YOU
2  CAN TALK ABOUT IN GENERAL.
3       MS. HUNKER: OBJECTION; FORM.
4  A. SURE. ONE WOULD BE JUST OUR GENERAL INCREASE IN
5  POPULATION.
6  Q. (BY MS. YUN) UH-HUH.
7  A. AND I THINK IT'S JUST BECOME MORE -- I HATE TO
8  SAY ADVERTISED. I THINK IT'S PROMOTED MORE THAN IT USED
9  TO BE.
10 Q. UH-HUH.
11 A. I THINK PEOPLE TAKE ADVANTAGE OF MAIL VOTING. I
12 MEAN, I JUST THINK PEOPLE -- A LOT OF PEOPLE DO IT JUST
13 BECAUSE IT'S CONVENIENT. SO A POPULATION INCREASE AND
14 THE GENERAL PROMOTION OF VOTING BY MAIL IS CAUSING AN
15 INCREASE.
16 Q. UH-HUH.
17    AND WOULD YOU AGREE THAT FOR SOME FOLKS IN DENTON
18 COUNTY, THAT IT IS THE ONLY WAY FOR THEM TO VOTE?
19      MS. HUNKER: OBJECTION; FORM.
20 A. FOR SOME FOLKS, YES.
21 Q. (BY MS. YUN) DUE TO DISABILITY, FOR EXAMPLE?
22      MS. HUNKER: OBJECTION; FORM.
23 A. PROBABLY DISABILITY, YES.
24 Q. (BY MS. YUN) AND WOULD YOU AGREE THAT FOR SOME
25 FOLKS, IT IS VERY DIFFICULT FOR THEM TO CURE THEIR MAIL

Page 95

1  BALLOT ERROR?
2       MS. HUNKER: OBJECTION; FORM.
3  A. I WOULD SAY YES.
4  Q. (BY MS. YUN) OKAY. AND I THINK YOU TESTIFIED
5  EARLIER -- AND CORRECT ME IF I'M WRONG -- THAT SOMETIMES
6  FOLKS DON'T GET NOTIFIED IN TIME TO CURE THEIR MAIL
7  BALLOT IN ORDER FOR THEIR BALLOT TO COUNT; IS THAT
8  RIGHT?
9  A. YEAH, ESPECIALLY IF THEY TURN IT IN NEAR THE END,
10 YOU KNOW, THE LAST DAY OF EARLY VOTING, THEN, YES, IT'S
11 GOING TO BE TOUGH.
12      MS. YUN: I THINK I AM ALMOST DONE. I JUST
13 WANT TO TAKE A QUICK BREAK.
14      THE REPORTER: THE TIME IS 11:58 A.M. WE
15 ARE OFF THE RECORD.
16      (OFF THE RECORD.)
17      THE REPORTER: THE TIME IS 12:05 P.M. WE
18 ARE BACK ON THE RECORD.
19      MS. YUN: OKAY. JUST FOR THE RECORD, SO
20 WE'RE GOING TO MARK THE ABBM FORM THAT MR. PHILLIPS
21 LOOKED AT AS EXHIBIT 8. AND THEN THE CARRIER ENVELOPE
22 THAT HE LOOKED AT TO REFRESH HIS RECOLLECTION AS EXHIBIT
23 NO. 9.
24      (EXHIBITS 8 AND 9 MARKED.)
25 Q. (BY MS. YUN) SO JUST TO WRAP UP, IS THERE

Page 96

1  ANYTHING ELSE THAT YOU DISCUSSED WITH THE STATE ABOUT
2  YOUR TRIAL TESTIMONY THAT WE HAVEN'T DISCUSSED THUS FAR
3  TODAY?
4  A. I HAVEN'T DISCUSSED WITH THE STATE ABOUT MY --
5       THE WITNESS: OH, ARE YOU THE STATE?
6       MS. HUNKER: I'M THE STATE.
7  Q. (BY MS. YUN) SORRY. THE AG'S OFFICE,
8  MS. HUNKER.
9  A. NO.
10      MS. YUN: NOTHING ELSE. AND SO I'LL PASS
11 THE WITNESS.
12      MS. HUNKER: ARE THERE ANY OTHER PLAINTIFF
13 GROUP THAT WOULD LIKE TO ASK QUESTIONS OF THE WITNESS ON
14 THE ZOOM CALL?
15      MR. D'ANGELO: NOT FOR ME, THANK YOU.
16      MS. HUNKER: THAT WAS WILLIAM D'ANGELO.
17      ANY OTHER PLAINTIFF GROUPS HAVE ANY
18 QUESTIONS FOR THE WITNESS?
19      HEARING NONE, THE STATE IS GOING TO DO A
20 SHORT DIRECT EXAMINATION.
21      EXAMINATION
22 BY MS. HUNKER:
23 Q. MR. PHILLIPS, HAVE VOTERS CONVEYED TO YOU
24 CONCERNS ABOUT VOTER FRAUD?
25 A. YES.

Page 97

1  Q. HAVE VOTERS CONVEYED TO YOU CONCERNS ABOUT MAIL
2  BALLOT VOTER FRAUD SPECIFICALLY?
3  A. YES.
4  Q. IN YOUR EXPERIENCE, DOES VOTERS' PERCEPTION THAT
5  VOTER FRAUD, INCLUDING MAIL BALLOT VOTING FRAUD, EXISTS
6  UNDERMINE THEIR CONFIDENCE IN ELECTION RESULTS?
7  A. ABSOLUTELY.
8  Q. IN YOUR EXPERIENCE, DOES VOTERS' PERCEPTION THAT
9  VOTER FRAUD, INCLUDING MAIL VOTER FRAUD, EXISTS
10 UNDERMINE THEIR TRUST IN THE ELECTORAL PROCESS?
11 A. YES.
12 Q. HAVE YOU SEEN AN INCREASE IN THE LACK OF TRUST IN
13 THE ELECTORAL PROCESS OVER THE LAST FEW YEARS?
14 A. WITHOUT A DOUBT.
15 Q. DO YOU RECALL TALKING WITH COUNSEL ABOUT HOW THE
16 SB 1 ID REQUIREMENT FOR MAIL-IN BALLOTS ADDED ANOTHER
17 LAYER OF PROTECTION?
18 A. YES.
19 Q. WHAT DID YOU MEAN BY THAT?
20 A. I BELIEVE WE WERE TALKING ABOUT PRIOR TO SB 1 AND
21 THE ID REQUIREMENTS, YOU KNOW, HAD WE DISCOVERED ANY
22 MAIL FRAUD. AND THE ANSWER WAS NO. BUT, IN MY MIND,
23 THAT DOESN'T MEAN YOU DON'T ADD ANOTHER SECURITY --
24 ANOTHER LEVEL OF SECURITY, ESPECIALLY WHEN IT COMES TO
25 WHAT YOU WERE JUST TALKING ABOUT, ABOUT THE PERCEPTION



Frank Phillips

March 31, 2023
Pages 98 to 101

Page 98

1 OF THE INTEGRITY OF THE VOTING PROCESS. AND ANYTHING WE
2 CAN DO TO STRENGTHEN THE INTEGRITY OF THE VOTING PROCESS
3 OR EVEN THE APPEARANCE OF IT I'M FOR.
4     Q. BASED ON YOUR EXPERIENCE, HAD SB 1'S MAIL BALLOT
5 ID REQUIREMENTS BEEN IN PLACE IN 2020, WOULD IT HAVE
6 HELPED YOU IDENTIFY THE MAIL VOTING FRAUD INITIATED BY
7 THE CARROLLTON MAYORAL CANDIDATE?
8     A. I THINK IT WOULD HAVE HELPED IDENTIFY IT, BECAUSE
9 HE WOULD HAVE HAD A MUCH HARDER TIME SUBMITTING THAT
10 MANY APPLICATIONS THAT COULD HAVE POTENTIALLY MADE IT
11 THROUGH THE PROCESS. I THINK IT WOULD HAVE BEEN MUCH
12 HARDER FOR HIM TO SUCCESSFULLY SEND APPLICATIONS THROUGH
13 THE PROCESS.
14     Q. I WANT TO TURN BACK TO EXHIBIT 1 THAT WAS
15 INTRODUCED BY THE UNITED STATES.
16     A. OKAY.
17     Q. DO YOU HAVE THAT EXHIBIT IN FRONT OF YOU?
18     A. I DO.
19     Q. PLEASE TURN TO PAGE 2.
20     A. OKAY.
21     Q. CAN YOU PLEASE READ OUT LOUD THE PARAGRAPH JUST
22 BEFORE THE PICTURE.
23     A. "INVESTIGATORS MADE CONTACT WITH THE CARROLLTON
24 RESIDENTS WHOSE BALLOTS HAD BEEN REQUESTED AND LEARNED
25 THE RESIDENTS TOLD THEM THAT THEY HAD NOT REQUESTED ANY

Page 99

1 BALLOTS BE MAILED TO THE P.O. BOX,' THE SHERIFF'S OFFICE
2 SAID."
3     Q. THANK YOU. CAN YOU PLEASE READ THE PARAGRAPH
4 IMMEDIATELY FOLLOWING THE PHOTO.
5     A. "THESE INDIVIDUALS IN CARROLLTON, IF THIS GUY
6 HAD BEEN SUCCESSFUL, THEY COULD HAVE SHOWN UP ON
7 ELECTION DAY AND BEEN DENIED THEIR RIGHT TO VOTE BECAUSE
8 IT WOULD HAVE SHOWN THAT THEY'D ALREADY VOTED,' SAID
9 DENTON COUNTY SHERIFF TRACY MURPHREE."
10     Q. BASED ON YOUR EXPERIENCE IN THE ELECTIONS OFFICE
11 AND YOUR UNDERSTANDING OF TEXAS ELECTION LAW, WAS THE
12 DENTON COUNTY SHERIFF CORRECT THAT IF THIS GUY HAD BEEN
13 SUCCESSFUL, VOTERS COULD HAVE BEEN DENIED THEIR RIGHT TO
14 VOTE?
15     A. ABSOLUTELY.
16     Q. CAN INCIDENTS OF VOTER FRAUD DENY VOTERS THEIR
17 RIGHT TO VOTE?
18     A. YES.
19     Q. ARE YOU AWARE OF ANY ELECTION DECIDED BY A
20 HANDFUL OF VOTES?
21     A. OH, YES.
22     Q. CAN YOU PERHAPS GIVE ME AN EXAMPLE?
23     A. YES. IN NOVEMBER, WE HAD A CITY THAT HAD -- THE
24 CITY OF PILOT POINT HAD A MAYORAL RACE. AND AT THE END
25 OF THE ELECTION, THEY WERE -- THEY WERE TIED. AND WE --

Page 100

1 SO THEY WERE TIED, SO THAT LEFT THEM THE OPPORTUNITY FOR
2 ONE OF THEM TO ASK FOR A RECOUNT.
3     WE CAN LOOK AT OUR RESULTS AND SEE THAT EVEN
4 THOUGH THEY WERE TIED, THERE WAS A PERSON WHO SUBMITTED
5 A BALLOT THAT DIDN'T VOTE. SO IT WAS UNDERVOTE -- OR
6 OVERVOTE -- I'M SORRY. IT WAS NOT AN UNDERVOTE. IT WAS
7 AN OVERVOTE, MEANING ON THEIR BALLOT, THEY HAD SOMEHOW
8 MARKED THE BALLOT THAT MADE THE SCAN THINK THIS PERSON
9 HAD VOTED FOR BOTH CANDIDATES.
10     SO WE TOLD BOTH THE CANDIDATES THAT THEY COULD
11 HAVE AN OPTION OF REQUESTING A RECOUNT. "IF ONE OF YOU
12 REQUESTS A RECOUNT, WE CAN FIND THAT OVERVOTE. AND
13 UNDER THE TEXAS ELECTION CODE, DURING A RECOUNT, IF YOU
14 CAN LOOK AT AN OVERVOTE AND MAKE THE VOTER'S INTENT
15 DETERMINATION, THEN THAT VOTE CAN BE AWARDED TO A
16 CANDIDATE. SO POTENTIALLY, WITHOUT HAVING TO GO TO A
17 NEW ELECTION, WE CAN SOLVE THIS."
18     NEITHER ONE OF THEM WANTED TO, I GUESS, RISK
19 GOING FOR IT. SO WE ENDED UP HAVING A SECOND ELECTION,
20 WHICH WAS DECIDED BY THREE VOTES.
21     Q. BASED IN YOUR EXPERIENCE, IN THE CASE OF A CLOSE
22 ELECTION AS THE ONE YOU JUST DESCRIBED, IS IT MORE
23 LIKELY THAN OTHER ELECTIONS THAT VOTER FRAUD COULD
24 CHANGE THE OUTCOME OF THE ELECTION?
25     A. ABSOLUTELY, JUST BASED ON THE NUMBERS.

Page 101

1     Q. AND IS THAT TRUE EVEN IF VOTER FRAUD ONLY HAPPENS
2 ON OCCASION AS OPPOSED TO SYSTEMATICALLY?
3     A. YES.
4     Q. DO YOU RECALL DISCUSSING WITH COUNSEL THE
5 DIFFERENT POSSIBLE REASONS FOR A MISMATCH WITH RESPECT
6 TO THE ID REQUIREMENT?
7     A. YES.
8     Q. AND DO YOU RECALL THAT THAT DISCUSSION TALKED
9 ABOUT VOTERS WHO FAILED TO PUT AN ID NUMBER DOWN, PUT
10 THE -- PUT A TYPO OR TRANSPOSED NUMBERS ON THEIR
11 APPLICATION OR BALLOT OR HAD A TRANSPOSED NUMBER INSIDE
12 THE SYSTEM?
13     A. YES.
14     Q. WERE THERE FEWER INSTANCES OF THAT IN THE
15 NOVEMBER ELECTION AS COMPARED TO THE MARCH PRIMARY? AND
16 I CAN REPHRASE IF YOU NEED ME TO.
17     A. NO. I BELIEVE THE ANSWER TO THAT IS YES, BECAUSE
18 THERE WAS A MUCH HIGHER REJECTION RATE. SO I WOULD SAY
19 YES.
20     Q. DID YOU OBSERVE FEWER DATABASE ERRORS WHERE THE
21 REGISTRATION RECORD HAD THE WRONG NUMBER?
22     A. YES.
23     Q. DID YOU OBSERVE FEWER INSTANCES OF VOTERS HAVING
24 A TEXAS ID, BUT NOT THEIR SSN IN THEIR SYSTEM OR
25 VICE-VERSA? IN OTHER WORDS -- DO YOU NEED A



Frank Phillips

March 31, 2023
Pages 102 to 105

Page 102

1 CLARIFICATION?
2 A. NO. THEY PRESENTED A NUMBER THAT WE DIDN'T HAVE.
3 Q. THAT'S CORRECT.
4 A. I CAN'T SAY DEFINITIVELY ON THAT ONE.
5 Q. OKAY. WHEN A BALLOT ARRIVES TO YOUR OFFICE, DOES
6 THE DENTON COUNTY ELECTIONS OFFICE USE THE ID NUMBER,
7 WHETHER IT BE THE SOCIAL SECURITY NUMBER OR TEXAS ID
8 NUMBER, TO CONFIRM THE VOTER'S IDENTITY?
9 A. WE DO.
10 Q. DO YOU REMEMBER TALKING ABOUT YOUR EFFORTS TO
11 EDUCATE VOTERS ABOUT THE ID REQUIREMENT?
12 A. YES.
13 Q. WOULD YOU CONSIDER YOUR EFFORTS TO EDUCATE VOTERS
14 ABOUT THE ID REQUIREMENT SUCCESSFUL?
15 A. YES.
16 Q. WERE YOU ABLE TO REDUCE THE REJECTION RATE FROM
17 THE MARCH PRIMARY TO THE NOVEMBER ELECTION?
18 A. YES.
19 Q. DO YOU RECALL WHAT THE REJECTION RATE IN NOVEMBER
20 WAS?
21 A. I BELIEVE -- IT WAS A PRIMARY, WAS IT NOT?
22 Q. THIS DOCUMENT IS, YES.
23 A. I DON'T REMEMBER THE EXACT NUMBER IN NOVEMBER.
24 Q. DO YOU RECALL WHERE IT ROUGHLY FELL?
25 A. I'M GOING TO SAY ROUGHLY IN THE 8 TO 10 PERCENT

Page 103

1 RANGE. ROUGHLY. AND THAT COULD BE HIGH.
2 MS. HUNKER: CAN WE GO OFF THE RECORD FOR A
3 MOMENT?
4 MS. YUN: SURE.
5 THE REPORTER: OFF THE RECORD AT 12:17 P.M.
6 (OFF THE RECORD.)
7 THE REPORTER: THE TIME IS 12:19 P.M. WE
8 ARE BACK ON THE RECORD.
9 Q. (BY MS. HUNKER) MR. PHILLIPS, YOU MENTIONED YOU
10 WERE NOT SURE ABOUT THE REJECTION RATE FOR THE GENERAL
11 ELECTION, CORRECT?
12 A. CORRECT.
13 Q. I'M GOING TO REFRESH YOUR RECOLLECTION -- OR SEE
14 IF SOMETHING WOULD REFRESH YOUR RECOLLECTION.
15 CAN YOU PLEASE DESCRIBE WHAT YOU ARE SEEING ON MY
16 COMPUTER SCREEN.
17 A. IT'S AN EXCEL SPREADSHEET THAT HAS THE NOVEMBER
18 GENERAL ELECTION REJECTION RATES --
19 Q. OKAY.
20 A. -- BY COUNTY.
21 MS. HUNKER: AND I'M GOING TO REPRESENT, FOR
22 THE CLARITY OF THE RECORD, THAT THIS IS THE REJECTION
23 RATE SPREADSHEET THAT WAS PRODUCED BY THE STATE
24 DEFENDANTS AND WILL BE SENT TO THE COURT REPORTER FOR
25 HER TO INCLUDE IN THE TRANSCRIPT.

Page 104

1 Q. (BY MS. HUNKER) LET'S TAKE A LOOK AT DENTON
2 COUNTY.
3 MS. YUN: COUNSEL, COULD YOU CLARIFY ON THE
4 RECORD, WHERE THE REJECTION RATE DOCUMENT CAME FROM?
5 MS. HUNKER: THIS WAS PROVIDED BY THE
6 SECRETARY OF STATE'S OFFICE AND PRODUCED I BELIEVE IN
7 NOVEMBER.
8 MS. YUN: OKAY. THANK YOU.
9 MS. HUNKER: I BELIEVE NOVEMBER OR DECEMBER.
10 Q. (BY MS. HUNKER) DO YOU SEE WHERE IT SAYS DENTON
11 COUNTY?
12 A. I DO.
13 Q. CAN YOU PLEASE TELL ME WHAT THE REJECTION RATE IS
14 STATED ON THE SPREADSHEET?
15 A. 1.66 PERCENT.
16 Q. AND DOES THAT REFRESH YOUR RECOLLECTION?
17 A. IT DOES. BEFORE I WAS JUST GENERALLY SPEAKING
18 OFF OF A GUT FEELING, BUT THIS MAKES MORE SENSE.
19 Q. IS 1.66 PERCENT COMPARABLE TO PREVIOUS
20 ELECTIONS -- GENERAL ELECTIONS AT YOUR OFFICES?
21 A. I WOULD DEFINITELY SAY YES.
22 Q. ARE YOU AWARE OF ANY ELECTION WHERE THE REJECTION
23 RATE WAS ZERO PERCENT?
24 A. NO.
25 Q. IF SB 1 WAS ENJOINED OR REPEALED, WOULD THE NEXT

Page 105

1 ELECTION HAVE A REJECTION RATE OF ZERO PERCENT?
2 A. NO.
3 Q. WERE VOTERS ABLE TO CURE BALLOT DEFECTS BEFORE
4 SB 1?
5 A. NOT IN THE SAME MANNER. I MEAN, WE -- IF SOMEONE
6 LEFT A SIGNATURE OFF, WE WOULD CONTACT THEM TO SEE IF WE
7 COULD GET THEM TO FIX THEM. BUT IT WAS CODIFIED IN THE
8 SAME MANNER.
9 Q. WAS THERE ANY ESTABLISHED PROCESS THAT THE STATE
10 PROVIDED FOR A CURE PRIOR TO SB 1?
11 A. I DON'T REMEMBER WHAT IT WAS.
12 Q. ARE THERE OTHER DEFECTS BESIDES ID -- LET ME
13 REPHRASE THAT QUESTION.
14 CAN OTHER DEFECTS BESIDES FAILING TO PUT YOUR ID
15 NUMBER OR HAVING AN ID MISMATCH BE CURED THROUGH THE
16 CURE PROCESS PROVIDED BY SB 1?
17 A. SURE. SIGNATURES, MISMATCHED SIGNATURES, NO
18 SIGNATURES, THINGS LIKE THAT.
19 Q. HAD VOTERS UTILIZED THAT CURE PROCESS FOR DEFECTS
20 OTHER THAN FAILING TO PUT THEIR ID OR HAVING A
21 MISMATCHED ID NUMBER?
22 A. YES.
23 Q. DO YOU RECALL TALKING TO COUNSEL ABOUT THE PERSON
24 YOU ADDED FOR THE CURE PROCESS?
25 A. YES.



Frank Phillips

Page 106

1   Q. THAT EMPLOYEE, DOES SHE HANDLE CURES OF BALLOTS
2   WITH DEFECTS OTHER THAN ID NUMBER REQUIREMENTS?
3   A. YES.
4   Q. DO YOU RECALL TALKING TO COUNSEL ABOUT HOW
5   SOMETIMES NOTICE OF DEFECT ARRIVES TOO LATE FOR THE
6   VOTER TO CURE?
7   A. YES.
8   Q. WOULD THAT BE TRUE OF VOTERS WHOSE BALLOTS WERE
9   REJECTED FOR REASONS OTHER THAN A MAIL ID NUMBER
10  REQUIREMENT?
11  A. YES.
12  Q. WOULD THAT BE TRUE OF VOTERS WHOSE BALLOTS WERE
13  REJECTED FOR REASONS OTHER THAN THE MAIL ID NUMBER
14  REQUIREMENT BEFORE SB 1?
15  A. YES.
16  Q. FOR SOME VOTERS WHO DECIDE TO VOTE BY MAIL, IN
17  YOUR EXPERIENCE, ARE THEY EQUALLY ABLE TO ACCESS VOTING
18  IN PERSON?
19  A. REPEAT IT ONE MORE TIME.
20  Q. SURE.
21      IN YOUR EXPERIENCE, FOR AT LEAST SOME VOTERS WHO
22  VOTE BY MAIL, ARE THEY ABLE TO EQUALLY ACCESS VOTING IN
23  PERSON?
24  A. YES.
25  Q. DOES DENTON COUNTY GIVE VOTERS IN DENTON COUNTY

Page 107

1   AMPLE OPPORTUNITIES TO VOTE IN PERSON?
2   A. YES.
3   Q. IN YOUR EXPERIENCE, DID VOTERS EXHIBIT LESS
4   CONFUSION ABOUT SB 1'S MAIL-IN VOTING REQUIREMENT IN
5   NOVEMBER OF 2022 COMPARED TO THE MARCH PRIMARY?
6   A. YES.
7   Q. IN YOUR EXPERIENCE, IS THERE ALWAYS A LEARNING
8   CURVE WHEN NEW VOTING REQUIREMENTS ARE INTRODUCED?
9   A. ABSOLUTELY.
10  Q. DO YOU EXPECT THE TREND TO CONTINUE OF VOTERS
11  HAVING LESS CONFUSION ABOUT SB 1'S MAIL-IN VOTING
12  REQUIREMENTS?
13  A. YES.
14      MS. HUNKER: NO FURTHER QUESTIONS. I PASS
15  THE WITNESS.
16          FURTHER EXAMINATION
17  BY MS. YUN:
18  Q. JUST A FEW FOLLOW-UP QUESTIONS BASED ON WHAT YOU
19  JUST TESTIFIED.
20      YOU JUST TESTIFIED THAT YOU BELIEVE THAT THERE
21  WILL BE LESS CONFUSION GOING FORWARD ABOUT ID NUMBER
22  REQUIREMENTS.
23      SO FOR EACH ELECTION, THERE WILL BE NEW VOTERS
24  WHO QUALIFY TO VOTE BY MAIL FOR THE FIRST TIME; IS THAT
25  RIGHT?

Page 108

1   A. CORRECT.
2   Q. SO THOSE VOTERS WOULD NOT HAVE HAD ANY
3   OPPORTUNITY TO -- THOSE VOTERS WOULD NOT HAVE
4   EXPERIENCED ANY ID REQUIREMENT PRIOR TO THAT; IS THAT
5   RIGHT?
6   A. CORRECT.
7   Q. AND DO YOU HAVE ANY REASON TO BELIEVE THAT THOSE
8   VOTERS WOULD HAVE LESS DIFFICULT TIMES GOING FORWARD
9   WITH THE ID NUMBER REQUIREMENTS?
10  A. I MEAN, I WOULD SAY YES BECAUSE IT'S -- IT'S OUT
11  IN THE COMMON ARENA NOW, YOU KNOW. WHEN IT FIRST
12  STARTED, IT WAS NEW TO EVERYBODY. AND NOW THERE'S BEEN
13  SO MUCH DISCUSSION ABOUT IT THAT IT'S NOT ONLY US THAT
14  EDUCATE PEOPLE ON IT. THE POLITICAL PARTIES EDUCATE
15  PEOPLE ON IT. SO YEAH, I THINK THEY'LL HAVE A LESS
16  DIFFICULT TIME.
17  Q. AND WE TALKED -- YOU TALKED BRIEFLY WITH
18  MRS. HUNKER ABOUT VOTERS LOSING TRUST IN THE INTEGRITY
19  OF THE ELECTORAL SYSTEM.
20      WHAT IS YOUR -- WHAT IS THE BASIS FOR YOUR
21  STATEMENT THAT YOU BELIEVE THAT THAT IS THE CASE?
22  A. SO -- OKAY. FROM 2009 TO 2016, WE RARELY HEARD
23  ANYTHING THAT QUESTIONED THE INTEGRITY OF THE SYSTEM.
24  2016, THE QUESTIONING BEGAN. AND IT WAS AMPLIFIED IN
25  2020, SO MUCH SO THAT I SPEND PROBABLY THE MAJORITY OF

Page 109

1   MY TIME NOW DEBUNKING CONSPIRACY THEORIES OR ANSWERING
2   PUBLIC INFORMATION REQUESTS RELATED TO CONSPIRACY
3   THEORIES. SO THAT'S WHAT I BASE THAT ON, IS HOW MUCH
4   TIME I SPEND ON THOSE MATTERS NOW VERSUS WHAT I USED TO.
5   Q. OAK. AND WERE THOSE CONCERNS RELATED TO ANYTHING
6   THAT HAPPENED IN DENTON COUNTY OR IN TARRANT COUNTY
7   WHILE YOU WERE WORKING THERE?
8       MS. HUNKER: OBJECTION; FORM.
9   A. I MEAN, NOT NECESSARILY. I MEAN, I THINK THEY'RE
10  -- THEY TEND TO COME MORE FROM A NATIONAL PERSPECTIVE.
11  Q. (BY MS. YUN) OKAY. DID THE IMPLEMENTATION OF
12  SB 1'S ID REQUIREMENTS DO ANYTHING TO THOSE -- THE
13  AMOUNT OF THE CONSPIRACY THEORIES OR OTHER
14  MISINFORMATION OUT THERE ABOUT THE INTEGRITY OF THE
15  SYSTEM?
16      MS. HUNKER: OBJECTION; FORM.
17  A. I THINK IT MAY HAVE SLIGHTLY LESSENED THE
18  CONSPIRACY THEORIES AROUND MAIL BALLOTS. THERE'S
19  CERTAINLY BEEN NOTHING ABOUT VOTING SYSTEMS, THE
20  CONSPIRACY THEORIES SURROUNDING VOTING SYSTEMS.
21  Q. (BY MS. YUN) DID YOUR OFFICE IN DENTON COUNTY OR
22  TARRANT COUNTY WHEN YOU WERE THERE DO ANYTHING TO
23  ADDRESS THIS LOSS IN -- LOSS OF TRUST IN THE ELECTORAL
24  PROCESS?
25  A. WE HAVE. I MEAN, WE'VE -- I'VE MET WITH THESE



Frank Phillips

March 31, 2023
Pages 110 to 113

Page 110

1 GROUPS TO ADDRESS THEIR CONCERNS. I'VE INVITED PEOPLE
2 TO OUR OFFICE TO SHOW THEM HOW THINGS REALLY WORK VERSUS
3 HOW THEY THINK THEY WORK. AND I'VE DONE THAT AS
4 RECENTLY AS YESTERDAY.
5 Q. ARE THESE CONCERNS THAT YOU'VE BEEN -- YOU'RE NOW
6 SPENDING THE MAJORITY OF YOUR TIME ADDRESSING, ARE THESE
7 SPECIFICALLY ABOUT -- HOW MUCH OF IT IS ABOUT MAIL
8 VOTING VERSUS SOMETHING ELSE?
9 A. IT'S PROBABLY 10 PERCENT MAIL VOTING, 90 PERCENT
10 VOTING SYSTEM.
11 Q. AND DO YOU BELIEVE THAT THE ID REQUIREMENTS FROM
12 SB 1 ADDRESS THOSE CONCERNS?
13      MS. HUNKER: OBJECTION; FORM.
14 Q. (BY MS. YUN) THE 10 PERCENT CONCERNS.
15 A. I THINK THEY HELP. BUT TOTALLY, NO. I DON'T
16 THINK ANYTHING YOU DO WILL TOTALLY CONVINCE SOME PEOPLE.
17 Q. SO IF YOU WERE TO SORT OF QUANTIFY HOW MUCH IT
18 HELPS, WHAT WOULD YOU SAY?
19      MS. HUNKER: OBJECTION; FORM.
20 A. I MEAN, THAT'S -- OF THE 10 PERCENT THAT'S A BAD
21 MAIL BALLOTS, IT PROBABLY HELPS HALF OF THOSE PEOPLE
22 MAYBE.
23 Q. (BY MS. YUN) SO DO YOU -- SO YOU TELL THESE
24 FOLKS ABOUT THE MAIL BALLOT -- THE MAIL VOTING ID
25 REQUIREMENTS?

Page 111

1 A. I DO.
2 Q. AND YOU'D SAY HALF OF THOSE VOTERS WOULD SAY
3 LIKE, "OH, OKAY. THAT WOULD PROBABLY -- THAT ALLAYS MY
4 CONCERN"?
5 A. IT'S JUST A GUESS. I MEAN, THEY PROBABLY DON'T
6 RELAY THAT IN THE MANNER YOU JUST DID. IT'S JUST --
7 IT'S JUST A GUESS.
8 Q. OKAY. SO YOU TESTIFIED EARLIER, I BELIEVE -- AND
9 CORRECT ME IF I'M WRONG -- THAT THERE'S SOME MEASURES
10 THAT -- THAT WE SHOULD IMPLEMENT MEASURES THAT
11 STRENGTHEN VOTERS' CONFIDENCE IN THE SYSTEM.
12      IS THAT -- DO YOU RECALL THAT?
13 A. I DO.
14 Q. YEAH.
15      IS THERE ANY LIMIT TO WHAT YOU WOULD DO TO
16 STRENGTHEN VOTERS' CONFIDENCE IN THE INTEGRITY OF THE
17 SYSTEM?
18 A. I'M SURE THERE IS, BUT I DON'T KNOW WHAT THAT
19 WOULD BE, THE SPECIFIC EXAMPLE.
20 Q. SURE.
21      WOULD YOU BE COMFORTABLE -- OR WOULD YOU BE IN
22 FAVOR OF IMPLEMENTING MEASURES THAT REJECT BALLOT VOTES
23 IN ORDER TO SIMPLY SATISFY SOME VOTERS' CONCERNS ABOUT
24 THE INTEGRITY OF THE SYSTEM?
25 A. I MEAN, SIMPLY TO SATISFY SOMEBODY'S DESIRE? IS

Page 112

1 THAT WHAT --
2 Q. SIMPLE TO SATISFY OTHER VOTERS' CONCERN ABOUT THE
3 INTEGRITY OF THE SYSTEM.
4      MS. HUNKER: OBJECTION; FORM.
5 A. I MEAN, HONESTLY, THAT'S A LITTLE BROAD. BUT I
6 THINK, SURE, THERE WOULD BE SOME THINGS I WOULD NOT
7 AGREE WITH. I'M SURE SOMEBODY COULD THINK OF SOMETHING
8 I WOULDN'T AGREE WITH TO REJECT -- IF I UNDERSTAND WHAT
9 YOU'RE ASKING.
10 Q. (BY MS. YUN) YEAH. I GUESS I'M TALKING A LITTLE
11 BIT MORE GENERALLY THAT -- WHETHER IT WOULD BE -- YOU
12 WOULD BE IN FAVOR OF A POLICY OR A MEASURE THAT REJECTS
13 VALID VOTES THAT IS IMPLEMENTED SIMPLY IN ORDER TO ALLAY
14 CONCERNS ABOUT THE INTEGRITY OF THE VOTING PROCESS.
15      MS. HUNKER: OBJECTION; FORM.
16 A. YEAH. I MEAN, MY GUT REACTION IS I WOULDN'T BE
17 FOR THAT, BUT IT'S HARD TO SAY WITH THAT SPECIFIC
18 EXAMPLE.
19 Q. (BY MS. YUN) SURE.
20      WOULD YOU AGREE -- WOULD IT BE A FAIR STATEMENT
21 OR WOULD YOU AGREE WITH THE STATEMENT THAT SAYS IT'S A
22 BALANCING THAT YOU WOULD CONSIDER WHETHER A MEASURE HAS
23 NEGATIVE IMPACTS ON VALID VOTES VERSUS THE STRENGTHENING
24 OF VOTERS' FAITH IN THE SYSTEM?
25      MS. HUNKER: OBJECTION; FORM.

Page 113

1 A. I THINK THAT'S FAIR. IT IS A BALANCE. SO YOU'VE
2 GOT -- NOT ME, THE LEGISLATURE HAS TO PICK THEIR -- YOU
3 KNOW, WHAT THEY THINK IS A FAIR BALANCE.
4 Q. (BY MS. YUN) YOU SPOKE WITH MS. HUNKER ABOUT
5 VERY CLOSE ELECTIONS THAT YOU HAVE OVERSEEN.
6 A. UH-HUH.
7 Q. AND REJECTING A VALID VOTE CAN ALSO IMPACT THE
8 OUTCOME OF SUCH CLOSE ELECTIONS; RIGHT?
9 A. CORRECT.
10 Q. SO, FOR EXAMPLE, IF A BALLOT WHOSE ID NUMBER DID
11 NOT MATCH THE VOTER REGISTRATION RECORD, BUT IT IS A
12 VALID ID NUMBER AND IF THAT VOTE DID NOT COUNT, THE FACT
13 THAT IT DID NOT COUNT WOULD IMPACT A VERY CLOSE
14 ELECTION, CORRECT?
15      MS. HUNKER: OBJECTION; FORM, INCOMPLETE
16 HYPOTHETICAL.
17 A. YES.
18      MS. YUN: OKAY. JUST A SECOND.
19      I THINK THAT'S IT. DID YOU HAVE ANY?
20      MS. HUNKER: YEAH, JUST A VERY SMALL NUMBER.
21      MS. YUN: OKAY.
22         FURTHER EXAMINATION
23 BY MS. HUNKER:
24 Q. HAS SB 1 REDUCED CONCERNS AMONG VOTERS ABOUT MAIL
25 VOTING FRAUD?



Page 114

1   A. I WOULD SAY YES.
2   Q. DO YOU RECALL EARLY IN THE DEPOSITION MENTIONING
3   THAT YOU THOUGHT THAT MAIL VOTING WAS VULNERABLE TO
4   FRAUD?
5   A. YES.
6   Q. HOW IS MAIL VOTING VULNERABLE TO FRAUD?
7   A. BECAUSE IN ANY OTHER TYPE OF VOTING, THAT BALLOT
8   REMAINS UNDER OUR CONTROL, EITHER OUR CONTROL AT THE
9   OFFICE OR THE POLL WORKERS' CONTROL OUT IN THE FIELD.
10      THAT DOESN'T HAPPEN WITH MAIL BALLOTS. ONCE THAT
11  BALLOT IS MAILED, I DON'T KNOW WHAT HAPPENS TO IT. I
12  DON'T KNOW WHO RECEIVES IT, WHO INTERCEPTS IT, WHO GOT
13  IT OUT OF A MAILBOX. AND SO THAT'S WHY I SAY IT'S
14  SUSCEPTIBLE.
15      SO THERE HAS TO BE A WAY OF DETERMINING WHEN IT
16  COMES BACK THAT THE PERSON WHO GOT THE BALLOT AND
17  RETURNED IT IS THE PERSON WHO IT WAS MEANT TO GO TO.
18      MS. YUN: I WILL JUST NOTE THAT IT'S OUTSIDE
19  THE SCOPE OF THE REDIRECT, BUT KEEP GOING.
20  Q. (BY MS. HUNKER) IN YOUR OPINION, DOES SB 1
21  ADDRESS THAT VULNERABILITY OR SUSCEPTIBILITY?
22      MS. YUN: SAME OBJECTION.
23  A. YES, IT DEFINITELY HELPS.
24      MS. HUNKER: NO FURTHER QUESTIONS.
25      MS. YUN: OKAY.

Page 115

1       THE REPORTER: ARE WE DONE?
2       MS. YUN: YES.
3       THE REPORTER: IS ANYONE REQUESTING A COPY
4   OF THE TRANSCRIPT?
5       MS. YUN: YES.
6       AND, COUNSEL, I'LL JUST REQUEST THAT YOU
7   COPY ME WHEN YOU E-MAIL THE EXHIBIT.
8       THE REPORTER: NO ONE ONLINE -- OR THROUGH
9   ZOOM?
10      MR. KENNY: THIS IS STEPHEN KENNY. I'D LIKE
11  TO REQUEST A COPY OF THE TRANSCRIPT, PLEASE.
12      MR. D'ANGELO: THIS IS WILLIAM D'ANGELO ALSO
13  REQUESTING A COPY OF THE TRANSCRIPT.
14      THE REPORTER: THE TIME IS NOW 12:40. THIS
15  CONCLUDES OUR DEPOSITION FOR TODAY.
16
17
18      (DEPOSITION CONCLUDED AT 12:40 P.M.)
19
20
21
22
23
24
25

Page 116

1   C H A N G E S   A N D   S I G N A T U R E
2   WITNESS NAME: FRANK PHILLIPS
3   DATE OF DEPOSITION: MARCH 31, 2023
4
5       PLEASE INDICATE CHANGES ON THIS SHEET OF PAPER,
    GIVING THE CHANGE, PAGE NUMBER, LINE NUMBER, AND REASON
    FOR THE CHANGE. PLEASE SIGN EACH PAGE OF CHANGES.
6
7   PAGE/LINE        CORRECTION        REASON FOR CHANGE
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 117

1       J U R A T
2       I, _____, HAVE READ THE FOREGOING
3   DEPOSITION AND HEREBY AFFIX MY SIGNATURE THAT SAME IS
4   TRUE AND CORRECT, EXCEPT AS NOTED ABOVE;
5
6
7                   FRANK PHILLIPS
8
9   THE STATE OF TEXAS  )
10  COUNTY OF DALLAS     )
11
12      BEFORE ME, _____, ON THIS DAY
13  PERSONALLY APPEARED _____    _____, KNOWN TO ME OR
14  PROVED TO ME UNDER OATH OR THROUGH IDENTITY CARD OR
15  OTHER DOCUMENT TO BE THE PERSON WHOSE NAME IS SUBSCRIBED
16  TO THE FOREGOING INSTRUMENT AND ACKNOWLEDGED TO ME THAT
17  THEY EXECUTED THE SAME OF THE PURPOSES AND CONSIDERATION
18  THEREIN EXPRESSED.
19      GIVEN UNDER MY HAND AND SEAL OF OFFICE THIS _____
20  DAY OF _____, 2023.
21
22              _____
23              NOTARY PUBLIC IN AND FOR
24              THE STATE OF TEXAS
25



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX S

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
|     *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
|     *Defendants.* | § | |

---

## **DECLARATION OF FRANK PHILLIPS**

I, Frank Phillips, pursuant to 28 U.S.C. 1746, am executing this declaration. I declare under penalty of perjury that the facts stated below are true and correct to the best of my personal knowledge and belief.

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration.  The evidence set out in the foregoing Declaration is based on my personal knowledge and experience.

2. I am the Election Administrator of Denton County, Texas, a position I have held since 2016 and previously held from 2009 to 2014. From 2014 to 2016, I was the Election Administrator of Tarrant County, Texas.

3. My experience gives me substantial insight into the procedures, administration, and the various complexities of conducting elections in Texas.

4. In 2020, in my capacity as Denton County Election Administrator, I identified irregularities that led to an investigation into a major vote harvesting scheme.

5. That investigation indicated that Zul Mirza Mohamed, a 2020 candidate for Mayor of Carrollton, Texas, sought to improperly influence the outcome of that election by engaging in an illicit vote harvesting scheme. Mohamed was prosecuted for the fraud and currently awaits trial.

6. All available evidence uncovered in the course of investigation tend to establish that Mr. Mohamed forged several dozen applications for ballot by mail (ABBMs), which directed

my office to issue mail-ballots to a single post office box that Mr. Mohamed had obtained with false identification.

7. At the time of his arrest, Mr. Mohamed was found stuffing envelopes with applications for ballot by mail and appears to have sent fraudulent mail-in ballots prior to his arrest.

8. If Mr. Mohamed succeeded in his efforts, Denton County voters would have been disenfranchised by his scheme—legitimate Denton County voters could have shown up to the polls on election day and been told that their ballots had already been cast. As it was, multiple voters who Mr. Mohamed impersonated attempted to request their own mail-ballot. My office had to confirm with them which ABBM was legitimate.

9. While my office in Denton County sequestered any fraudulent ABBM or ballot cast by Mr. Mohamed, the City of Carrollton spans two other counties (Dallas County and Collin County), and I cannot confirm that fraudulent ABBMs or mail-ballots submitted as part of Mr. Mohamed's scheme were appropriately sequestered in those other two counties.

10. The signature requirements did not adequately prevent or detect the voter fraud scheme perpetrated by Mr. Mohamed. Only one county out of the three counties covered by the voting district in question detected the fraud scheme. If Mr. Mohamed had not routed so many voter registration documents through a single post office box, the attempted fraud may have gone undetected.

11. Based on my experience, SB 1's mail ballot identification requirements would have helped me identify the mail voting fraud scheme initiated by the Carrollton mayoral candidate earlier or would have prevented the scheme altogether.

12. Since SB 1's identification number requirement has been passed, my office's standard operating procedure has been to use that unique identifier as a reliable way to positively identify voters and help ensure that each person casting a ballot is in fact a qualified and registered Texas voter.

13. Because the identification number requirement was not in place in 2020, it was significantly easier for Mr. Mohamed to complete fraudulent ABBMs and actually receive illegitimate mail-ballots.

Executed in Denton County on the 21st day of June, 2023.

*Frank Phillips*

Frank Phillips
Denton County Election Administrator

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| Defendants. | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX T

Transcript of the Testimony of

**Yvonne Ramon**

**Date:**

April 21, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

```
 1              IN THE UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3    LA UNION DEL PUEBLO ENTERO,     )(
      ET AL.,                         )(
 4              PLAINTIFFS,           )(
                                      )(
 5    VS.                             )(      CASE NO.
                                      )(      5:21-cv-844-XR
 6    GREGORY W. ABBOTT, ET AL.,      )(
                DEFENDANTS.           )(
 7    _____ ___  _____

 8    OCA-GREATER HOUSTON, ET         )(
      AL.,                            )(
 9              PLAINTIFFS,           )(      CASE NO.
                                      )(      1:21-cv-780-XR
10    VS.                             )(
                                      )(
11    JOHN SCOTT, ET AL.,             )(
                DEFENDANTS.           )(
12    _____ ___  _____
                                      )(
13    HOUSTON JUSTICE, ET AL.,        )(
                PLAINTIFFS,           )(
14                                    )(      CASE NO.
      VS.                             )(      5:21-cv-848-XR
15                                    )(
      GREGORY WAYNE ABBOTT, ET        )(
16    AL.,                            )(
                DEFENDANTS.           )(
17    _____ ___  _____
                                      )(
18    LULAC TEXAS, ET AL.,            )(
                PLAINTIFFS,           )(
19                                    )(      CASE NO.
      VS.                             )(      1:21-cv-0786-XR
20                                    )(
      JOHN SCOTT, ET AL.,             )(
21              DEFENDANTS.           )(
      _____ ___  _____
22                                    )(
      MI FAMILIA VOTA, ET AL.,        )(
23              PLAINTIFFS,           )(
                                      )(      CASE No.
24    VS.                             )(      5:21-cv-0920-XR
                                      )(
25    GREG ABBOTT, ET AL.,            )(
                DEFENDANTS.           )(
```

Yvonne Ramon

April 21, 2022
Pages 2 to 5

## Page 2

```
 1  _____   __
                             )(
 2  UNITED STATES OF AMERICA,  )(
          PLAINTIFF,           )(
 3                             )(   CASE NO.
    VS.                        )(   5:21-cv-1085-XR
 4                             )(
    THE STATE OF TEXAS, ET AL.,)(
 5       DEFENDANTS.           )(
    _____   __  _____
 6
 7          ------------------------------------
 8          ORAL AND VIDEOTAPED DEPOSITION OF
 9                    YVONNE RAMON
10                   APRIL 21, 2022
11          ------------------------------------
12          ORAL AND VIDEOTAPED DEPOSITION OF YVONNE
13  RAMON, produced as a witness at the instance of the
14  STATE DEFENDANT, and duly sworn, was taken in the
15  above-styled and numbered cause on April 21, 2022, from
16  10:06 a.m. to 4:26 p.m., before Maribel Hernandez, CSR
17  in and for the State of Texas, reported by machine
18  shorthand at the Offices of Texas Attorney General,
19  Child Support Division, Pharr Regional Office, 3508
20  North Jackson Road, Pharr, Texas, pursuant to the
21  Federal Rules of Civil Procedure and the provisions
22  stated on the record or attached hereto.
23
24
25
```

## Page 3

```
 1              A P P E A R A N C E S
 2  FOR THE PLAINTIFF LA UNION DEL PUEBLO ENTERO:
        Nina Perales
 3      MALDEF
        110 Broadway Street
 4      Suite 300
        San Antonio, Texas 78202
 5      (210) 224-5476
 6  FOR THE PLAINTIFF OCA-GREATER HOUSTON:
        Susana Lorenzo
 7      ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND
        99 Hudson St, 12th Floor
 8      New York New York 10013
        (212) 966-5932
 9      info@aaldef.org
10  FOR THE PLAINTIFF LULAC TEXAS:
        Graham White
11      ELIAS LAW GROUP
        10 G St NE
12      Washington, DC 20002
        (202) 968-4507
13      gwhite@elias.law
14  FOR THE DEFENDANT YVONNE RAMON:
        Josephine Ramirez Solis
15      Leigh Ann Tognetti
        HIDALGO COUNTY DISTRICT ATTORNEY'S OFFICE
16      100 E. Cano, First Floor
        Hidalgo County Courthouse Annex III
17      Edinburg, Texas  78539
        Phone: (956) 292-7609
18      josephine.ramirez@da.co.hidalgo.tx.us
        leigh.tognetti@da.co.hidalgo.tx.us
19
    FOR THE DEFENDANTS:
20      Eric A. Hudson
        OFFICE OF ATTORNEY GENERAL OF TEXAS
21      Senior Special Counsel
        P.O. Box 12548
22      Austin, Texas 78711
        (512) 463-2100
23      eric.hudson@oag.texas.gov
24  ALSO PRESENT:
        David Diaz, Videographer (Zoom Video Conference)
25      Brady Bender, DOJ (Zoom Video Conference)
        Juan Estrada, Fried Frank Law Clerk (Zoom Video
```

## Page 4

```
 1  Conference)
         Julia Longoria (Zoom Video Conference)
 2       Knychelle Passmore, DOJ (Zoom Video Conference)
         Lisa Cubriel, Bexar County (Zoom Video Conference)
 3       Tony Nelson, Travis County (Zoom Video Conference)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1                     INDEX
 2                                            PAGE
 3  Appearances .....................................  3
 4  YVONNE RAMON
         Examination by Mr. Hudson ..................  7
 5
 6  Signature and Changes ........................... 229
 7  Reporter's Certificate .......................... 232
 8
 9              EXHIBITS
10  NO.  DESCRIPTION                            PAGE
11   1   Notice of Deposition ......................  10
12   2   S.B. No. 1 ................................  77
13   3   Fed Ex envelope .......................... 161
14   4   Cancellation of Ballot by Mail PowerPoint
             Presentation ......................... 190
15   5   Early Voting In Person Changes PowerPoint
             Presentation ......................... 191
16   6   Election Advisory No. 2022-07 ............ 192
17   7   Election Advisory No. 2022-08 ............ 194
18   8   Election Advisory No. 2022-09 ............ 195
19   9   Election Advisory No. 2022-12 ............ 196
20  10   Elections Division Advisories ............ 198
21  11   Training for EVBB/SVC Members on New Ballot
             by Mail Procedures ................... 200
22  12   FAQs on Applications for Ballot by Mail
             (ABBMs) .............................. 203
23
24  13   FAQs with the Elections Division 02/17/2022 . 204
25  14   FAQs with the Elections Division 02/24/2022 . 204
```

Yvonne Ramon

Page 150

1 has changed, so -- but prior to Senate Bill 1.
2           As soon as the second week of early vote,
3 so we bring them in because there are various processes
4 that I can speak to if you want me to after this.  So
5 they start to meet early enough, and -- and then they
6 make the determination.  It's the early voting ballot
7 board, not my office, that makes the determination to
8 accept or reject a carrier envelope with the ballot that
9 is inside.
10     Q.  Have you ever served as a member of a early
11 voting ballot board?
12     A.  I have not.
13     Q.  Have you ever witnessed an early voting ballot
14 board processing mail-in ballots?
15     A.  When I started, I did, and as per the Election
16 Code, I am not involved.  It is the early voting ballot
17 board, the members who are part of the ballot board that
18 make these determinations, not mine.  So I have a person
19 who is in charge of and over -- and helping in
20 overseeing because the law does allow a tabulator, is in
21 a sense it's called because we have to help them.
22 But -- but basically, that's the extent of our
23 involvement.
24     Q.  Does the Hidalgo County Elections
25 Administrator's office assist in any way with cure

Page 151

1 process for --
2     A.  Yes.
3     Q.  -- carrier envelopes?
4     A.  Yes, we do.  When the ballot board has advised
5 us that there is a ballot to be cured, then we do create
6 a list and that voter comes to our office, and we then
7 set the process for curing and assisting the voter to
8 cure the ballot, and then that ballot carrier/envelope
9 is returned to ballot board.
10     Q.  So you do have a process in place to cure
11 defective mail ballots?
12     A.  Yes.
13     Q.  All right.  Have you used that process prior to
14 Senate Bill 1?
15     A.  No.  There was no curing of the -- of the
16 carrier envelope.  Once it's with ballot board, that --
17 those laws were completely different from now.
18     Q.  And so since Senate Bill 1, you don't have this
19 cure process?
20     A.  Yes.
21     Q.  Have you used the cure process since the
22 passage of Senate Bill 1?
23     A.  Yes.
24     Q.  Was it effective in your opinion?
25     A.  I believe for being the first time it was, yes.

Page 152

1     Q.  Okay.  Do you have any idea of the number of
2 mail ballots that were cured through the process that
3 you put in place under Senate Bill 1?
4     A.  I do.
5     Q.  What's the number?
6     A.  95.
7     Q.  Okay.  So it's 95 voters that prior to Senate
8 Bill 1 would have their ballots rejected?
9     A.  Yes.
10     Q.  Okay.  To your understanding, what is the
11 method for matching identification numbers on a carrier
12 envelope at a ballot -- a mail ballot?
13     A.  So the process has changed from when senate
14 bill was enacted on December the 2nd to now.
15     Q.  Well -- well, let's start with the before time
16 if we can.  So can you walk the Court through the
17 process for examining a mail ballot by the early voting
18 ballot board prior to the passage of Senate Bill 1?
19     A.  So the -- the process is quite extensive
20 because the law requires that once the application has
21 been reviewed and deemed to be a qualified voter to vote
22 by mail, there is -- and I don't want to call it a kit,
23 but there -- there are envelopes that are created,
24 pocket envelopes that now hold that application in place
25 while the carrier envelope, which has various pieces, is

Page 153

1 sent to the voter.
2           Then when that carrier envelope is
3 returned, then it's matched up with the application,
4 because prior to Senate Bill 1, what needed to be
5 matched were the signatures, the signatures on the
6 application and the signature on the back of the carrier
7 envelope.
8     Q.  Now, let's talk about that for a moment.  So
9 prior to Senate Bill 1, the only way to marry up an
10 application and a ballot was by looking at the
11 signature, right?
12     A.  Yes.
13     Q.  Okay.  Do you know if Hidalgo County had ever
14 been sued over the signature match requirements prior to
15 passage of Senate Bill 1?
16     A.  Not to my knowledge.
17     Q.  Okay.  Let me ask you, in -- in your opinion,
18 do you think the signature match is the best way to
19 match ballots and applications?
20         MR. WHITE:  Objection; form.
21         MS. RAMIREZ:  Object to form.
22     A.  It's my opinion, not the law, but I don't
23 believe it is.  I -- I always have wanted there to be a
24 new signature on file every so many years.  I don't know
25 what that length of time would be, but we see the

Yvonne Ramon

April 21, 2022
Pages 154 to 157

Page 154

1 elderly especially that registered at a young age whose
2 signature is no longer the same signature.
3         Mine isn't the same signature now that
4 they're voting by mail.  So that in and of itself was a
5 difficult process sometimes.
6     Q.  (BY MR. HUDSON)  Okay.  Now, under Senate Bill
7 1, you have the signature, but you also have the
8 alternative of the identification numbers, right?
9     A.  Yes.
10     Q.  Assuming that somebody doesn't get a second
11 driver's license, are they going to have the same
12 driver's license number throughout their voting history
13 in Hidalgo County?
14         MS. RAMIREZ:  Object to form.
15     A.  Yes.
16     Q.  (BY MR. HUDSON)  What about Social Security
17 numbers?  Are you aware of anybody getting a different
18 Social Security number over the course of their
19 lifetime?
20     A.  I am not aware.  I don't know that process.
21     Q.  Okay.  So if someone were, for instance, to use
22 a Social Security number as opposed to a signature, in
23 your experience and in your opinion, you would assume
24 that that Social Security number belonged to the person
25 who used it, right?

Page 155

1     A.  Yes.
2     Q.  Okay.  Do you think that that's a more
3 effective way to match ballots and applications?
4         MR. WHITE:  Objection; form.
5         MS. RAMIREZ:  Object to form.
6     A.  It is effective.  It doesn't -- this Senate
7 Bill 1 does not exclude the signature, because if there
8 is no signature on that carrier envelope, it is also
9 rejected.
10     Q.  (BY MR. HUDSON)  Uh-huh.
11     A.  But it is not the bate -- primary basis for the
12 acceptance of that carrier envelope.
13     Q.  Okay.  Do you think that the identification
14 number system is superior to the signature match system?
15         MR. WHITE:  Objection; form.
16     A.  As we have -- as we have worked with the
17 Secretary of State to -- to work out all the bumps and
18 bruises along the way, eventually we hope that it will
19 be a more effective way.
20     Q.  (BY MR. HUDSON)  Okay.
21     A.  To begin with, it was difficult.
22     Q.  Okay.  Why was it difficult?
23     A.  Because not all IDs were in offline
24 county, which is a Hidalgo County databases.  The
25 Secretary of State has the official data -- database,

Page 156

1 which is called Team, and they work with DPS directly
2 and they upload to Team, but we had to work out to the
3 process of also uploading to the offline counties.
4     Q.  Well, let's explain to the court what you mean
5 by offline county.  So can you describe what that term
6 means, offline --
7     A.  Yes.
8     Q.  -- so that the judge understands?
9     A.  Yes.  So as I mentioned, the official voter
10 registration database is called Team, and it is managed
11 by the Secretary of State's office.  They have a whole
12 department on this.
13         So when we are an offline county, and if
14 this was before my time that I came in, we were already
15 deemed an offline county.  Apparently at that time, the
16 Secretary of State's team division was not strong enough
17 to handle all 254 counties.
18         So the larger counties broke away and, in
19 fact, we pay for a voter registration vendor while Team
20 is still providing that service to the counties that are
21 with them, I believe at no cost still.  I'm not sure
22 because I'm not an online county.
23         Regardless, every day we have to submit to
24 the State whatever has been processed.  So every day
25 there is an upload to the State, and we work very hard

Page 157

1 at synchronizing our data so that both Team and our
2 vems, is our vendor under VOTEC, databases are
3 synchronized and the same.
4     Q.  Okay.  So if that it's clear, when you say
5 offline, what you're referring to is your offline from
6 the Teams database?
7     A.  Yes.  And we -- they, that are online, actually
8 go into the team portal and set up their election.  We
9 also do that, but as an upload --
10     Q.  Okay.
11     A.  -- when it comes to voter records.
12     Q.  Now, the third-party vendor that Hidalgo County
13 uses to manage its voter registration information, does
14 that synchronize with the Team database operated by the
15 Texas Secretary of State?
16     A.  We do.  We utilize their software, but we are
17 the ones that have to synchronize with the state, not
18 our vendor.
19     Q.  Okay.
20     A.  We manage our -- our software.
21     Q.  So Hidalgo County has access to the Team
22 database --
23     A.  Yes.
24     Q.  -- to identify voter identification numbers,
25 right?

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO**
**THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX U

Transcript of the Testimony of

# The Office of the Dallas County Elections Administrator

## Date:

April 29, 2022

## Case:

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

1          UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF TEXAS
2              SAN ANTONIO DIVISION

3  LA UNION DEL PUEBLO ENTERO,)(
   ET AL.,            )(
4                     )(
     PLAINTIFFS,      )(
5                     )(  CIVIL ACTION
   VS.                )(   NO. SA-21-CV-00844-XR
6                     )(
   GREGORY W. ABBOTT, ET AL., )(
7                     )(
                      )(
8   DEFENDANTS.          )(
   -----------------------------------------------------

9          VIDEOTAPED AND VIDEOCONFERENCED
10              ORAL DEPOSITION OF
            RIVELINO LOPEZ, TACOMA PHILLIPS
11          AND MICHAEL SCARPELLO
                APRIL 29, 2022
12

13       VIDEOTAPED AND VIDEOCONFERENCED ORAL DEPOSITION

14  OF RIVELINO LOPEZ, TACOMA PHILLIPS AND MICHAEL

15  SCARPELLO, produced as witnesses at the instance of the

16  Plaintiff LUPE, and duly sworn, was taken in the

17  above-styled and numbered cause on the 29th day of

18  April, 2022, from 10:47 a.m. to 8:02 p.m., before Holly

19  R. Swinford, CSR in and for the State of Texas, reported

20  by machine shorthand, at the Office of the Dallas

21  Elections Administrator, located at the Records

22  Building, 500 Elm Street, 7th Floor, Room 7Y11, in the

23  City of Dallas, County of Dallas, State of Texas,

24  pursuant to Notice, the Federal Rules, and the

25  provisions stated on the record or attached hereto.

The Office of the Dallas County Elections Administrator            April 29, 2022
                                                                   Pages 2 to 5

Page 2

```
1          A P P E A R A N C E S
           – – – – – – – – – – –
2
3  APPEARING FOR THE PLAINTIFF LUPE:
4    MS. NINA PERALES
     MALDEF
5    110 Broadway, Suite 300
     San Antonio, Texas 78205
6    (210) 224-5476 ext. 206
     nperales@maldef.org
7
8  APPEARING FOR THE PLAINTIFF LULAC
9    MR. GRAHAM W. WHITE
     ELIAS LAW GROUP
10   10 G Street, NE Suite 600
     Washington, DC 20002
11   (202) 968-4507
     GWhite@elias.law
12
13 APPEARING FOR THE OCA-GH PLAINTIFFS:  (VIA ZOOM)
14   MS. SOPHIA L. CAI
     JENNER & BLOCK LLP
15   455 Market Street
     Suite 2100
16   San Francisco, CA  94105-2453
     (628) 267-6835
17   SCai@jenner.com
18
19 APPEARING FOR DALLAS COUNTY, TEXAS

20   MR. BEN L. STOOL
     ASSISTANT DISTRICT ATTORNEY
21   MR. JASON SCHUETTE
     ASSISTANT DISTRICT ATTORNEY
22   CIVIL DIVISION
     CRIMINAL DISTRICT ATTORNEY'S OFFICE
23   Records Building
     500 Elm Street, Suite 6300
24   Dallas, Texas  75202
     (214) 653-7358
25   Ben.Stool@dallascounty.org
     J.Schuette@dallascounty.org
```

Page 3

```
1          A P P E A R A N C E S
           – – – – – – – – – – –
2             (Continued)
3
   APPEARING FOR THE STATE DEFENDANTS:
4
   MS. KATHLEEN HUNKER
5  TEXAS OFFICE OF ATTORNEY GENERAL
   P.O. Box 12548  Mail Code:009
6  Suite 3550
   Austin, Texas  78711
7  (512) 936-2275
   Kathleen.Hunker@oag.texas.gov
8
9  APPEARING FOR THE UNITED STATES (VIA ZOOM)
10   MS. L. BRADY BENDER
     CIVIL RIGHTS DIVISION, VOTING SECTION
11   UNITED STATES DEPARTMENT OF JUSTICE
     950 Pennsylvania Avenue NW
12   Washington, DC  20530
     laura.bender@usdoj.gov
13   (202) 353-5373
14
   APPEARING FOR THE DEFENDANT HIDALGO COUNTY CRIMINAL
15 DISTRICT ATTORNEY RICARDO RODRIGUEZ, JR.   (VIA ZOOM)
16   MS. JACQUELINE VILLAREAL
     ASSISTANT DISTRICT ATTORNEY
17   CIVIL LITIGATION DIVISION
     OFFICE OF THE CRIMINAL DISTRICT ATTORNEY
18   HIDALGO COUNTY, TEXAS
     100 E. Cano
19   Edinburg, Texas  78539
     (956) 292-7609
20   jacqueline.villareal@da.co.hidalgo.tx.us
21
   ALSO PRESENT:  MR. JEREMY ROVNY, VIDEOGRAPHER
22
23
24
25
```

Page 4

```
1              I N D E X
2                              PAGE
3  Appearances....................................   2-3
4  Stipulations...................................   1/6
5  Exhibit Index..................................     5
6  Proceedings....................................     6
7  WITNESS:  RIVELINO LOPEZ
     Examination by Ms. Perales.................    10
8    Examination by Mr. White..................    41
     Examination by Ms. Hunker.................    45
9    Reexamination by Ms. Perales.............    54
     Reexamination by Ms. Hunker..............    57
10   Reexamination by Ms. Perales (cont).........   59
     Reexamination by Ms. Perales.............    61
11   Reexamination by Ms. Hunker..............    66
12 WITNESS:  TACOMA PHILLIPS
     Examination by Ms. Perales................    68
13   Examination by Ms. Perales (cont)..........    69
     Examination by Ms. Bender.................   149
14   Examination by Ms. Cai....................   154
     Examination by Ms. Hunker.................   160
15   Reexamination by Ms. Perales.............   179
     Reexamination by Ms. Hunker..............   182
16
   WITNESS:  MICHAEL SCARPELLO
17   Examination by Ms. Perales................   184
     Examination by Mr. White..................   254
18   Examination by Ms. Cai....................   282
     Examination by Ms. Hunker.................   295
19
20 Corrigendum and Signature for Mr. Lopez........  333/334
   Corrigendum and Signature for Ms. Phillips.....  335/336
21 Corrigendum and Signature for Mr. Scarpello....  337/338
22 Reporter's Certificate.........................   339
23
24
25
```

Page 5

```
1              EXHIBIT INDEX
2
   DEPOSITION
3  EXHIBIT NO.    IDENTIFICATION         MARKED/ID'D
   1    Plaintiffs' Third Amended Notice of
4        Rule 30(b)(6) Deposition of the Office of
         the Dallas County Elections Administrator    18
5  2    Chart received from attorneys at Dallas County
         designating topics and witnesses to speak
6        to topics regarding Dallas County Elections
         Department                                   19
7  3    Summary Report GRP-Detail dated
         November 6, 2018                              59
8  4    S.B. No. 1 as passed by the Legislature       202
   5    Oaths Prescribed by Secretary of State        207
9  6    Oath of Assistance Prescribed by Secretary
         of State                                     207
10 7    Emails provided in supplemental production    232
   8    Legislative Summary 2021 - Special Sessions   249
11 9    News article from KERA published
         April 12, 2022, regarding worker shortage
12       in March                                     263
13
14
15
16
17
18
19
20
21
22
23
24
25
```

The Office of the Dallas County Elections Administrator                April 29, 2022
Pages 6 to 9

Page 6

1          P R O C E E D I N G S
2          THE VIDEOGRAPHER:  Okay.  We are now on
3 record for the video deposition of Michael Scarpello,
4 Tacoma Phillips and Rivelino Lopez on April 29th, 2022,
5 at 10:47 a.m.  Would Counsel state your appearances for
6 the record?
7          MS. PERALES:  For Plaintiff LUPE, Nina
8 Perales of MALDEF.
9          MR. WHITE:  For -- for the LULAC
10 Plaintiffs, Graham White of the Elias Law Group.
11         MS. HUNKER:  For the State Defendants,
12 Kathleen Hunker.
13         MR. STOOL:  For Dallas County, Texas, Ben
14 Stool, Assistant District Attorney, Dallas County,
15 Texas.
16         MR. SCHUETTE:  And Jason Schuette,
17 Assistant District Attorney.
18         MS. PERALES:  Before we swear in the
19 witness, I would like to get a couple of agreements on
20 the record.  First, Plaintiffs have agreed to waive
21 the -- the reading, under Rule 30, by the court
22 reporter.
23         Defense Counsel, do you have any -- do you
24 also agree to waive that initial reading?
25         MR. STOOL:  Dallas County agrees to waive

Page 7

1 the reading.
2          MS. HUNKER:  State Defendants agree to
3 waive.
4          MS. PERALES:  And the second item I want
5 to address is the order of the witnesses today.
6          Mr. Stool, you've designated three
7 witnesses in response to the Notice of Topics for the
8 Notice of Deposition under Rule 30(b)(6), Michael
9 Scarpello, Tacoma Phillips and Rivelino Lopez.  And is
10 it correct to say Mr. Lopez is here.  He's being
11 produced first, and it's your plan, then, to provide
12 Ms. Phillips and then, at the end, Mr. Scarpello?
13         MR. STOOL:  That is correct.
14         MS. PERALES:  All right.  If -- and -- and
15 just for the purpose of the record, it was my plan to
16 start with Mr. Scarpello to try to cover as much ground
17 as possible before having to bring in these additional
18 witnesses.  And so, because we are starting with Mr.
19 Lopez and
20 Ms. Phillips, I just want to say on the record, that if
21 we get to Mr. Scarpello and he can't answer something,
22 we want to reserve the ability today to bring back
23 either Mr. Lopez or Ms. Phillips to answer those
24 questions.
25         RIVELINO LOPEZ:  Or whatever.

Page 8

1          MR. STOOL:  I understand.
2          MS. PERALES:  Okay.  And then, finally,
3 the last thing is that I wanted to note for the record
4 that Counsel for Dallas County brought some documents
5 with them today to the deposition, which I understand
6 are additional responsive production to a number of
7 Requests for Production by Plaintiffs.  The documents --
8 and I don't know, there's got to be at least 50 pages
9 here -- they are not Bates stamped.
10         Is it -- can you clarify on the record
11 whether you plan or have already sent these in
12 electronic form to Plaintiffs?
13         MR. STOOL:  They have already been sent in
14 electronic form to Plaintiffs this morning.
15         MS. PERALES:  And --
16         MR. STOOL:  The --
17         MS. PERALES:  -- can you tell me who the
18 sender was because I did not see --
19         MR. STOOL:  Barbara Nicholas.
20         MS. PERALES:  Barbara -- Barbara
21 Nicholas --
22         MR. STOOL:  Yes.
23         MS. PERALES:  -- is the sender?  Okay.
24 I'll look for that, and --
25         MR. STOOL:  9:53 this morning.

Page 9

1          MS. PERALES:  Okay.  9:53 a.m.  And
2 then --
3          MS. HUNKER:  The State Defense can confirm
4 that we received the email at that time.
5          MS. PERALES:  Okay.  Thank you.
6          And then is -- can you give me any
7 information on when you plan to produce these documents
8 with Bates stamps?  Would that be by the end of the day
9 or, more likely, at some other time?
10         MR. STOOL:  No.  I very much hope that it
11 will be by the end of the day, as a matter of fact, yes.
12         MS. PERALES:  Okay.  And just, for the
13 record -- and you and I have spoken off the record about
14 this -- I'm going to need some time to go through these
15 documents and decide whether I want to ask questions
16 about them.  So that may require us to take either a
17 longer break for lunch off the record or take some other
18 kind of break.
19         Is there anything else that we should
20 discuss on the record before we swear in the witness?
21         MR. STOOL:  I don't think so.  Not from
22 Dallas County.
23         MS. PERALES:  Okay.  Will you swear in the
24 witness, please?
25         THE REPORTER:  Yes.

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                      Pages 10 to 13

Page 10

1          Would you raise your right hand, please?
2     (Witness sworn by the court reporter.)
3          THE REPORTER:  Thank you.
4          And statements -- you can put your hand
5 down --
6          THE WITNESS:  Okay.
7          THE REPORTER:  Statements by the court
8 reporter, according to Rule 30(b) have been waived by
9 all parties present.
10         Would Counsel please state any agreements
11 that haven't already been stated on the record, on the
12 record.  Just according to the Federal Rules, correct?
13         MS. PERALES:  We have no additional
14 agreements to state.
15         THE REPORTER:  Thank you.
16         MS. PERALES:  Are you ready, Mr. Lopez?
17         THE WITNESS:  Oh, yeah.
18         REVELINO LOPEZ,
19 having being first duly sworn, testified as follows:
20              EXAMINATION
21 BY MS. PERALES:
22    Q.  Can you please state your name for the record?
23    A.  Rivelino Lopez.
24    Q.  Thank you.  My name is Nina Perales, and I
25 represent some of the Plaintiffs in this case.  I'm with

Page 11

1 the Mexican American Legal Defense and Educational Fund,
2 MALDEF, and I represent organizations and voters in this
3 case who are challenging the law we refer to as SB 1.
4    A.  Okay.
5    Q.  Have you ever had your deposition taken before?
6    A.  Before February, I had zero.  Now this is my
7 third one in the last two months, yeah, so...
8    Q.  Well, then you're an expert.
9    A.  Yeah.
10   Q.  I'm just going to, quickly, because you are
11 experienced, go through some of the ground rules to
12 refresh your memory of how we do some of this.
13   A.  All right.
14   Q.  Do you understand that you are under oath?
15   A.  Yes.
16   Q.  And that the testimony that you provide today
17 in this deposition is as if you were sitting in court
18 giving that testimony to a Judge?  Do you understand
19 that?
20   A.  Yes.
21   Q.  Okay.  Is there anything today that would
22 prevent you from giving me your full attention and
23 responding accurately?  For example, are you ill, or are
24 you taking any medication that makes your head fuzzy?
25 Is there anything that would prevent you from

Page 12

1 understanding and answering accurately?
2    A.  No.  I'm ready.
3    Q.  Okay.  Thank you.  This is your deposition.
4 You are not noticed for very many topics, so I don't --
5 I don't see this going too long, but I want you to know
6 that if you have a need for a break at any time, you are
7 not my hostage; you can take a break.  The only thing I
8 ask is that we take the break after you answer my
9 question.  So if there's a question still out there on
10 the table, that you answer it before we go on the break.
11         Is that all right with you?
12   A.  Yes.
13   Q.  All right.  And you're doing a great job of
14 answering out loud, but I'm going to remind you that the
15 court reporter cannot take down head nods or shakes or
16 shrugs, so will you agree to make your answers out loud?
17   A.  Yes.
18   Q.  Thank you.  And then, of course, if you would,
19 wait for me to finish my question before you start your
20 answer and I'll wait for you to finish your answer
21 before I start my next question so we don't talk over
22 each other.  Is that okay?
23   A.  Yes.
24   Q.  Thank you.  I'm entitled to your best estimate
25 but I don't want you to guess on anything.

Page 13

1          Do you understand that instruction?
2    A.  Yes.
3    Q.  Okay.  Thank you.  If you don't understand a
4 question, will you please ask me to rephrase it or
5 repeat it.
6    A.  Okay.
7    Q.  All right.  So I want to make sure if you give
8 me an answer, that you have a good understanding of what
9 I'm asking.  Okay?
10   A.  Okay.
11   Q.  And then, finally, I might use some terms
12 interchangeably.  So, for example, if I use the term
13 "Hispanic" or "Latino," will you understand those two
14 terms to mean the same thing for the purpose of this
15 deposition?
16   A.  Yes.
17   Q.  And if I use the term "limited English
18 proficient," will you understand, for the purpose of
19 this deposition, that I mean that it is a person for
20 whom English is not their primary language and they have
21 difficulty communicating in English?
22   A.  Okay.  Yes.
23   Q.  All right.  And then if I use the term "ABBM,"
24 do you understand that to mean application for ballot by
25 mail, or is that not a term you're familiar with?

Page 14

1    A.  Yes, I'm familiar.
2    Q.  Okay.  And would that be any application for
3  ballot by mail, annual or just for a single election?
4    A.  I just take it as a application; it could be
5  either-or.
6    Q.  Okay.  Thank you.
7    A.  Yes.
8    Q.  Thank you.
9    A.  Okay.
10   Q.  Are the attorneys who are here today for Dallas
11 County, Mr. Stool and Mr. Schuette, are they your
12 attorneys for this deposition?
13   A.  Yes.
14   Q.  Okay.  Thank you.  Now, I'm not going to ask
15 you to tell me any conversation or any communication
16 (indicating) that you had with your attorneys, but I
17 will ask you whether you met with your attorneys to
18 prepare for this deposition.
19   A.  Yes.
20   Q.  Okay.  And for about how long did you meet with
21 your attorneys, just time?
22   A.  Probably about two hours.
23   Q.  Okay.  Thank you.  Did you talk with anyone to
24 prepare for this deposition who is an attorney with the
25 Texas Attorney General's Office?

Page 15

1    A.  No.
2    Q.  Did you review any information to prepare for
3  this deposition?
4    A.  Yes.
5    Q.  Tell me, generally, what you reviewed to
6  prepare.
7    A.  I reviewed the topics that I'm going to be
8  asked questions on and -- just to prepare.
9    Q.  Okay.  Thank you.  Did you talk to anybody
10 besides your attorneys to prepare for the deposition?
11   A.  Yes, we had a get-together, a Zoom call; and it
12 was also Ms. Phillips and Mr. Scarpello.
13   Q.  Okay.  Anybody else besides Ms. Phillips and
14 Mr. Scarpello on the Zoom and your attorneys --
15   A.  No.
16   Q.  -- if they were there?
17       Okay.  So here, on my outline (pointing), I
18 usually will ask if you brought anything here with you
19 that's related to the case, and I do see a little bit of
20 paperwork there in front of you.
21       Can you just show me?  It looks like that --
22   A.  Well, this --
23   Q.  -- you've got a little chart there right on top
24 that has yellow and orange.  What's that?
25   A.  This is what I'm going to be asked.  I

Page 16

1  highlighted my part.  This whole binder is kind of all
2  the reference material from the case.  I haven't really
3  gone through; but yeah, this is just my -- my stuff
4  (indicating) I brought.
5    Q.  Okay.  Thank you.  And when you say "a binder
6  of reference material" -- I just want to be sure I'm
7  following the rules when I ask you that question.
8        Is -- that's -- can you tell me where those --
9  how do -- how did those materials get to you?  How did
10 you get those materials?
11   A.  They were on my desk when I walked in this
12 morning, so I'm not sure, yeah, who put it there or --
13   Q.  So you don't know who the source is --
14   A.  No.
15   Q.  -- of that?
16   A.  No.
17   Q.  Okay.  So we might -- do you know if there's
18 anything in there that is going to help you that you
19 would refer to it during this deposition?
20   A.  Huh-uh.  My stuff's right here, what I brought.
21   Q.  Oh, okay.
22   A.  Yeah.  This is, like, 200 pages (indicating).
23 I -- yeah, I didn't have time for all that.
24   Q.  You haven't looked at that yet.
25   A.  Huh-uh.

Page 17

1    Q.  So underneath the piece of paper that you said
2  has your designated topics, it looks like there's
3  another maybe couple of pieces of paper.
4        Can you tell me what those are?
5    A.  Statistical data, early voting counts from a
6  couple of elections.
7    Q.  Okay.  So just straight how many early votes
8  were cast --
9    A.  Yes.
10   Q.  -- information?
11   A.  Uh-huh.
12   Q.  Anything in there about whether it was broken
13 down by mail ballot or early voting by personal
14 appearance, anything like that?
15   A.  It has -- it's broken down -- it's just for the
16 primary election comparison, so it's broken down by
17 party.
18   Q.  Okay.  Okay.  So just the number of votes or
19 voters who turned out or the number of ballots cast?
20   A.  Right.
21   Q.  Does it break down the means that the voter
22 voted, like in-person early or mail?
23   A.  It breaks down early voting and election day.
24   Q.  Does it break down early voting by in-person or
25 mail ballot?

Page 18

1     A.  In-person early voting, in-person election day
2  and then other, which includes mail ballot and
3  provisionals.
4     Q.  Okay.  And does that have just data for 2022?
5     A.  '22, 2018 and 2014.
6     Q.  Okay.
7     A.  Yeah.
8     Q.  Thank you.  And later on, when we're on a
9  break, I'll ask your lawyers if that's been produced to
10 us.  And if it hasn't been produced to us, I'll ask to
11 take a copy of that.  Okay?
12    A.  Okay.
13    Q.  And then I'll also ask you some questions about
14 it, too.
15    A.  Okay.
16    Q.  Okay?
17        MS. PERALES:  I'd like to mark this
18 Exhibit 1.
19        (Deposition Exhibit Number 1 marked.)
20        THE REPORTER:  Would you like me to hand
21 it to him?
22        MS. PERALES:  Yes, please.
23        THE REPORTER:  Okay.
24        MS. PERALES:  My arms are not long enough.
25        (Document handed to the witness and Counsel.)

Page 19

1     Q.  Mr. Lopez, I have handed you what has been --
2  or you -- you have received what has been marked Exhibit
3  1 for this deposition.
4         Do you recognize this document?
5     A.  I think I have seen it.  I haven't gone through
6  it; but I have seen it, yes.
7     Q.  Okay.  Do you understand that you're testifying
8  today in response to this Notice of Deposition?
9     A.  Yes.
10    Q.  Okay.  And if you'll turn with me to Page 9, do
11 you see up at the top it's marked Exhibit A?
12    A.  Yes.
13    Q.  Okay.  And then if you just look through it,
14 there are some definitions and then there are some
15 topics, some numbered topics that begin on Page 12, but
16 I will -- yeah.  They begin on Page 12.
17        Do you see those there?
18    A.  Yes.
19    Q.  Okay.
20        MS. PERALES:  Can we mark this Number 2?
21        (Deposition Exhibit Number 2 marked.)
22        (Document handed to the witness and Counsel.)
23    Q.  And Mr. Lopez, you -- you have been handed what
24 has been marked Deposition Exhibit Number 2, and I'll
25 represent to you that this is a chart that we received

Page 20

1  (indicating) from your attorneys at Dallas County.
2     A.  Okay.
3     Q.  And do you see --
4     A.  Do I need to hold it up or -- so that --
5     Q.  No.
6     A.  -- everybody -- oh.
7     Q.  It's okay --
8     A.  Okay.
9     Q.  -- but it's very kind of you to offer.
10    A.  Okay.
11    Q.  Do you see that your name is listed on here, on
12 the far right column (indicating) next to certain
13 topics?
14    A.  Yes.
15    Q.  Okay.  And are you prepared to speak on those
16 topics that your name is associated with?
17    A.  Yes.
18    Q.  Now, do you understand that because you are
19 designated on certain topics, the answers that you give
20 are on behalf of the Dallas County Elections Department?
21    A.  Yes.
22    Q.  Tell me your current job title.
23    A.  Voter Registration Manager.
24    Q.  Okay.  How long have you held that position?
25    A.  11 years.

Page 21

1     Q.  And what was your job before you became the
2  Voter Registration Manager?
3     A.  I worked with the City of Dallas.
4     Q.  And what were you doing there?
5     A.  I was a supervisor at one of the local rec
6  centers.
7     Q.  And where was that rec center?
8     A.  At Harry Stone Recreation Center.
9     Q.  And what neighborhood is that in?
10    A.  Kind of far East Dallas.
11    Q.  Okay.  And so you went from that position with
12 the City of Dallas to become the Voter Registration
13 Manager --
14    A.  Uh-huh.
15    Q.  -- for Dallas --
16    A.  Yes.
17    Q.  -- County?
18    A.  Yes.
19    Q.  Okay.  Are you from Dallas originally?
20    A.  Born and raised, yes.
21    Q.  Where did you go to high school?
22    A.  I lived in Houston about five years, so I did
23 my whole high school career down in Houston at Clear
24 Creek High School.
25    Q.  Okay.  Clear Creek.

The Office of the Dallas County Elections Administrator

April 29, 2022
Pages 22 to 25

Page 22

1   A.   And then I came back to Dallas.
2   Q.   Then you came back here?
3   A.   Uh-huh.
4   Q.   Did you do any schooling after high school?
5   A.   Yes.  I went to Mountain View College for a few
6   years and then I transferred over to Dallas Baptist
7   University and that's where I graduated.
8   Q.   Okay.  And you got a bachelor's degree?
9   A.   Yes.
10  Q.   Have you done any schooling after that?
11  A.   No.
12  Q.   So, with respect to your current position as
13  the Voter Registration Manager, what are your duties?
14  A.   I oversee the voter registration area, and we
15  maintain voter lists, add and update voter information,
16  whether they're changing their address, changing their
17  name.  We work with the Secretary of State, uploading
18  files, downloading files, sending voter history over to
19  the Secretary of State, working on mapping, you know,
20  precincts and -- and stuff like that.  So we just --
21  just maintain all the voters, 1.4 million voters in
22  Dallas County.
23  Q.   That's a lot of voters.
24  A.   Oh, yeah.
25  Q.   Earlier I was telling you that the Bexar County

Page 23

1   Elections Administrator refers to the big counties as
2   "the big boys."  Have you heard that before?
3   A.   Yes.
4   Q.   Yeah.  Dallas County is one of the big boys,
5   isn't it?
6   A.   Oh, yeah.
7   Q.   Yeah.  Are you familiar with the TEAM system?
8   A.   Yes.
9   Q.   Is Dallas County an online county or an offline
10  county?
11  A.   Offline.
12  Q.   Do you know why Dallas County is an offline
13  county?
14  A.   I think the larger counties, it would be too
15  much for the State system to handle.  So I guess about
16  half the state, especially the larger ones, have their
17  own VR database.
18  Q.   Okay.  I'm going to ask these questions just --
19  not because I'm going to go into them deeply with you.
20  I just want to make sure I understand what you know --
21  A.   Okay.
22  Q.   -- about your relationship with the TEAM
23  system.  And like I said, I'm not going to go deep, but
24  I just want to make sure --
25  A.   Okay.

Page 24

1   Q.   -- I understand.
2       Do you know how many voters in Dallas County
3   you do not have either a driver's license number or the
4   last four of the Social?
5   A.   It's -- I know 99.46 percent do have a driver's
6   license or a Social on record.  So about a half a
7   percent of our -- our registered voters.  I guess it
8   would be close to 70,000.
9   Q.   Do you know how many people only have one
10  number and not both numbers?
11  A.   97.13 percent have at least one.
12  Q.   Have at least one?
13  A.   Uh-huh.
14  Q.   But do you -- can you tell me how many lack
15  both numbers?
16  A.   Probably close to 70,000.
17  Q.   Okay.  Yes.  I asked that question --
18  A.   Yeah.
19  Q.   -- wrong.  Let me try again.
20      How many of your registered voters only have
21  one number and not a second number?
22  A.   That would be -- I want to say -- well, because
23  97 percent of them have either a Texas Driver's License
24  or --
25  Q.   Uh-huh.

Page 25

1   A.   -- an ID.
2   Q.   Uh-huh.
3   A.   So, yeah, I'll have to look at that.  I don't
4   know that number off the top of my head.
5   Q.   Okay.  And so what you -- just so you
6   understand what I'm getting at, if you have a driver's
7   license number for me --
8   A.   Uh-huh.
9   Q.   -- but you don't have my Social --
10  A.   Right.
11  Q.   -- or you have my Social, but you don't have my
12  driver's license.
13      So people for whom you have one number filled
14  in, but you don't have a second number for them, you
15  would have to go back and try to see how many that were?
16  A.   Uh-huh.
17  Q.   Okay.
18  A.   Yes.
19  Q.   Okay.  And now with respect to TEAM, do you
20  have knowledge of whether you received an update from
21  TEAM -- "you," meaning Dallas County -- received an
22  update for TEAM sometime around December or January that
23  was from the Secretary of State that went into your
24  system that had additional ID numbers for your
25  registered voters?

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                       Pages 26 to 29

Page 26

1    A.   Not in December and January.  On February 22nd,
2  we received an import that contained driver's license or
3  Socials.  And our vendor matched those up, and whatever
4  voters didn't have a driver's license or Social, they
5  applied it to their record.
6    Q.   And you were able to bring that import in; you
7  didn't have any problems with your data coming in?
8    A.   No.
9    Q.   And that was on February 22nd?
10   A.   Yes.
11   Q.   Okay.  Okay.  Okay.  I'm going to ask you some
12  questions about the period 2018 to the present.
13   A.   Okay.
14   Q.   First, let me ask you whether, in 2018, you
15  used what are sometimes called vote centers or
16  countywide polling places.  Let's just start with for
17  early voting.
18   A.   Uh-huh.
19   Q.   Did you use vote centers or countywide polling
20  places for early voting since 2018?
21   A.   Yes.  Where anybody can vote at any early
22  voting location, yes.
23   Q.   Yes.  Do you have a phrase that you use for
24  that here in Dallas?
25   A.   Well, before we went to vote centers for

Page 27

1  election day, we just called it early voting, yeah.  So,
2  yeah.
3    Q.   Okay.  And so you've mentioned vote centers for
4  election day.
5    A.   Uh-huh.
6    Q.   Do you use vote centers for election day now?
7    A.   Yes.
8    Q.   And can you tell me when you started using vote
9  centers for election day?
10   A.   2019.
11   Q.   Okay.  Have you closed any precinct polling
12  places since you implemented vote centers on election
13  day?
14   A.   Me, personally (pointing), like --
15   Q.   Dallas County.
16   A.   Oh, Dallas County?
17   Q.   Yeah.
18   A.   Yes.  Each election, polling places sometimes
19  have to be closed, yes.
20   Q.   So I know that, for some counties, they are
21  bringing in vote centers for election day; but they
22  haven't yet started closing or eliminating (indicating)
23  precinct-based polling places.  They are trying to, I
24  think, get the vote center thing in there --
25   A.   Oh, okay.

Page 28

1    Q.   -- before they start closing precinct-based
2  polling places.
3    Is that an approach that Dallas County is
4  taking place, as well; or have you started closing
5  precinct-based in-person polls systematically?
6    A.   Right.  We don't have any precinct-based
7  anymore.  We just went straight to vote centers.
8    Q.   Okay.  So if there's a particular elementary
9  school, for example, that people know that they -- that
10  they historically would vote at, from that
11  neighborhood -- let's say they would all go to that
12  elementary school -- have you started closing those
13  types of, you know, polling places and redirecting
14  (indicating) voters to the vote centers that might be
15  fewer?
16   A.   That is currently happening right now.  In
17  2019, they decided to keep all polling places open for
18  vote centers.
19   Q.   Uh-huh.
20   A.   So right now, they are in the process of doing
21  that --
22   Q.   Okay.
23   A.   -- yes.
24   Q.   Got it.  Thank you.  And so for the March 1st,
25  2022, primary, all your polling places were vote

Page 29

1  centers; is that correct?
2    A.   Correct.
3    Q.   And you expect to do that, as well, for the
4  November 2022 general election?
5    A.   Yes.
6    Q.   Okay.  In -- do you recall -- do you recall the
7  hours that you had polling places open in 2018?
8    A.   No.  I'd have to look at the time, but it's --
9  it's pretty standard.  Usually the first week's 8:00 to
10  5:00; second week, 7:00 to 7:00 and then Saturdays,
11  usually 7:00 to 7:00 and Sundays 12:00 to 6:00.  It's
12  pretty -- that's our pretty standard hours each
13  election.
14   Q.   Uh-huh.  Okay.  And did you do anything with
15  extended hours for voting in 2020?
16   A.   They extended an extra week of early voting --
17   Q.   Uh-huh.
18   A.   -- so we had an extra week, and every day was
19  7:00 to 7:00.  So they extended -- instead of 8:00 to
20  5:00, it was 7:00 to 7:00 --
21   Q.   Okay.
22   A.   -- with the exception of Sunday, which was
23  still 12:00 to 6:00.
24   Q.   Okay.  So for -- we were just talking about
25  2020 --

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                Pages 30 to 33

Page 30

1    A.   (Witness moves head up and down.)
2    Q.   -- when you did that.
3         Have you then, with respect to 2022, for the
4   March primary, did you keep those same hours as you had
5   in 2020; or did you make any adjustments?
6    A.   No.  Went back to our standard 8:00 to 5:00,
7   7:00 to 7:00.  We did extend the last day of early
8   voting for the primary to 10:00 o'clock.
9    Q.   To 10:00 p.m.?
10   A.   Uh-huh.
11   Q.   And that was --
12   A.   I believe it was the 25th of February.  I
13  believe that was the last day of early voting.
14   Q.   And why did you extend voting until 10:00 p.m.
15  on February 25th, 2022?
16   A.   It was ordered by the County Judge.  We kind of
17  found out at the last minute.  They let us know, Hey
18  we're staying opened till 10:00.
19        And I don't even know if they advertised it or
20  whatever.  But yeah, we found out at the last minute, so
21  we just kept the polls open till 10:00.
22   Q.   You asked the poll workers to stay and --
23   A.   Yeah.  We had to send, like, a mass -- our
24  ePollbook has a messaging.  So we sent a mass message,
25  and we were also calling them, too, so -- to let them

Page 31

1   know.
2    Q.   Okay.  And do you know if staying open until
3   10:00 p.m. on February 25th afforded voters in Dallas
4   County an additional opportunity to go to the polls and
5   cast their ballot that day?
6         MS. HUNKER:  Objection, form.
7    A.   It did, yes.
8    Q.   (By Ms. Perales)  Do you know or do you have a
9   sense of why the County Judge ordered you to stay open
10  till 10:00 p.m. on the last day?
11   A.   I do not.
12   Q.   Okay.
13   A.   Can't recall.
14   Q.   All right.  Do you know if there were voters
15  who were trying to vote mail ballots who were then
16  coming to the polls on that last day, including up till
17  10:00 p.m., to -- to hand drop-off their mail ballots?
18        MS. HUNKER:  Objection to form.
19   A.   I don't know.
20   Q.   (By Ms. Perales)  Okay.  So I have a question
21  about your involvement in kind of voting during the
22  election days when people are voting.
23        You're the Voter Registration Manager --
24   A.   Uh-huh.
25   Q.   -- but it sounds like you've also got some

Page 32

1   duties that are related to the actual casting of
2   ballots; is that right?
3    A.   No.  I stick to voter registration.  So we
4   help -- like, if a judge calls, has a voter that's
5   having an issue, they can't find them in the poll book,
6   we look them up and help them.  Like, during early
7   voting, we offer limited ballot process.  Election Day,
8   they offer the provisional process, so we help them,
9   help the judge and the voter through that.
10   Q.   Okay.  And then, as the Voter Registration
11  Manager, were you involved in trying to process, for
12  March 2022, people's applications for ballot by mail and
13  mail ballots to the extent that there was this new
14  requirement to match the ID number, that was being
15  provided, to the voter?
16   A.   No.
17   Q.   You weren't doing any of that matching work?
18   A.   No.  If they -- if the ballot by mail
19  department gave us a form, we -- like, because it had a
20  Statement of Residence, also --
21   Q.   Uh-huh.
22   A.   -- on the form.  So if they filled out a form,
23  they would give it to us and we would update their
24  information.
25   Q.   Okay.  So that's if you had the person at the

Page 33

1   wrong address.
2         Do you have any knowledge, in March of 2022,
3   this most recent primary election, of voters having to
4   put an ID number, either driver's license or last four
5   of the Social, on their application for ballot by mail
6   or on the carrier envelope?
7    A.   Yes, I knew about that.
8    Q.   Okay.
9    A.   Yes.
10   Q.   Were you involved in doing any of the checking
11  of those numbers or trying to match those numbers to the
12  voter roll?
13   A.   No, I wasn't.
14   Q.   Okay.  You've been designated to talk about
15  Dallas County's experience with voters who vote with
16  assistance in person from 2018 to the present.
17        Do you have knowledge about Dallas County
18  Election's experience with voters who come with another
19  person to vote in person, so at the polls?
20   A.   When we were preparing, they asked if we can
21  pull statistics.  And so I went into our ePollbook, and
22  we -- we can.  We do track that with our new ePollbook,
23  our current one.  Before, we weren't tracking it; but I
24  was able to pull statistics to show how many people
25  requested assistance.

The Office of the Dallas County Elections Administrator

April 29, 2022
Pages 34 to 37

Page 34

1    Q.   Uh-huh. And I just learned yesterday that the
2  ePollbook can be handy for figuring that information
3  out.
4    A.   Yeah.
5    Q.   So a couple of questions. When you say that
6  you didn't track it before, what does "before" mean?
7    A.   Before we implement our current ePollbook,
8  which is before 2020.
9    Q.   Okay. But for -- at least for 2020 onward, you
10  can run a report that tells you how many voters voted at
11  the polling place with assistance; is that right?
12    A.   Yes.
13    Q.   And the poll book, the ePollbook is used in the
14  polling places where the people come personally to vote;
15  is that right?
16    A.   Yes.
17    Q.   Would you have that same information for who
18  voted with assistance by mail ballot, where the assistor
19  signs on the mail ballot --
20    A.   I wouldn't have that, no.
21    Q.   Okay. Did you run any reports about how many
22  voters used assistants in either this most recent 2022
23  or prior elections?
24    A.   I did. I didn't -- I -- I ran the reports to
25  get the numbers. I wrote the numbers down, but I don't

Page 35

1  have the reports.
2    Q.   Okay. So I'm going to ask you for the numbers
3  so you can --
4    A.   Okay.
5    Q.   -- tell me them, and then I'm going to ask for
6  the reports, themselves, to be produced because I
7  believe that information is responsive to at least one
8  of our Requests for Production.
9    A.   Okay.
10    Q.   Okay. So tell me the numbers that you have.
11    A.   For this recent primary election, 2022, there
12  was 752 voters requested assistance. For November 2021,
13  there was a hundred and thirty. For June 2021, we had
14  88. For May 2021, we had 228. And for November 2020,
15  we had 4,335. And we had a small run-off election
16  December '21. We only had one.
17    Q.   That must have been a very small run-off.
18    A.   Yeah.
19    Q.   December of 2021. I'm just trying to think of
20  what office would have been in a run-off in December of
21  2021, but it must --
22    A.   I --
23    Q.   -- must have been something special.
24    A.   Yeah.
25    Q.   Okay. Thank you.

Page 36

1    A.   All right.
2    Q.   So since it sounds like you've already run a
3  few reports, so you're familiar with how to run these
4  reports, is that right, on the ePollbook?
5    A.   Yes.
6    Q.   Okay. Can you also get the names of the
7  voters?
8    A.   Yes. The names are on the report.
9    Q.   Okay. Okay. So, for example, you could see
10  which voters have a Spanish surname, like Lopez or
11  Perales versus another kind of name?
12    A.   Yes.
13    Q.   Okay. What is the software that you're using
14  now that allows you to run the report?
15    A.   It's called ExpressPoll Connect, and the vendor
16  is ES&S, which is Election Systems & Software.
17    Q.   Have you ever assisted a voter to vote? Have
18  you ever gone with someone and helped them?
19    A.   I have not.
20    Q.   Okay. Do you have anyone in your family here
21  in Dallas County who uses assistants to vote?
22    A.   No.
23    Q.   No viejitos?
24    A.   No.
25    Q.   Okay. Does Dallas County -- or from January of

Page 37

1  2018 until now, has Dallas County done any kind of voter
2  registration or voter outreach to specific communities
3  within Dallas County, either aiming the outreach at
4  particular neighborhoods or particular populations,
5  either voter registration outreach or voter outreach?
6    A.   Not specifically. Anytime we've gone out to do
7  voter drives, we go to high schools, we go to colleges,
8  college campuses. If somebody invites us because they
9  are having a big event -- it could be in the southern
10  sector, west side, east, we attend those. And so we
11  don't specifically target one area over the other.
12    Q.   Okay. Have you ever done any special outreach,
13  for either registration or voting, to disabled folks in
14  the community, any special disability outreach?
15    A.   No.
16    Q.   Let's talk about immigrants to the United
17  States.
18         Do you do any voter registration drives outside
19  of naturalization ceremonies?
20    A.   No. We do inside. We -- we go inside to the
21  naturalization ceremony.
22    Q.   Okay. So --
23    A.   -- so...
24    Q.   -- somewhere in the building, you set up a
25  table. Is that it?

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                       Pages 38 to 41

Page 38

1  A.  Yes.  We used to, in the past, me and my staff,
2  we'd go to -- I mean, a couple of times a week
3  sometimes -- and we would register newly citizens.  Now
4  we have an Outreach Coordinator that kind of handles
5  that.  She was hired to do that, so she has volunteer
6  deputy registrars that go out to those locations now.
7  Q.  Do you have any records on how many people you
8  have registered to vote in connection with
9  naturalization ceremonies?
10  A.  I don't.
11  Q.  Nowhere do you -- do you have, like, something
12  in your office that says, okay, for this past year, this
13  is how many people we registered outside of
14  naturalization ceremonies, just to --
15  A.  Right.
16  Q.  -- show like how much work you're doing?
17  A.  Right.  Maybe our Outreach Coordinator would.
18  I just wouldn't have that right now.
19  Q.  Okay.  Do you do any outreach for voter
20  registration or voting in languages other than English?
21  A.  Spanish, yes.  And we just got a third
22  language, so I'm sure we'll be doing Vietnamese
23  outreach, as well.
24  Q.  You're newly covered for Vietnamese, right?
25  A.  Yes.

Page 39

1  Q.  And what's your other language?  You said it's
2  the third, so Spanish, Vietnamese --
3  A.  And English.
4  Q.  Oh.  Okay.  Have you ever done any voter
5  registration or voter outreach in minority neighborhoods
6  (indicating) specifically, or that just happens
7  naturally as a result of your regular work?
8  A.  Right.  It happens --
9        MS. HUNKER:  Objection, form.
10  A.  -- naturally.  I mean, if the high school or
11  the college is in a minority area, I mean, yes, we're --
12  we're there.
13  Q.  (By Ms. Perales)  Okay.  Do you -- do you have
14  any involvement in where you choose to locate polling
15  places for voting?
16  A.  I don't.
17        MS. PERALES:  I would like to take a
18  couple of minutes off the record, if I could.
19        THE VIDEOGRAPHER:  Okay.  We're going off
20  the record.  The time is 11:29 a.m.
21        (Break taken.)
22        THE VIDEOGRAPHER:  Okay.  We are back on
23  the record.  The time is 11:33 a.m.
24        MS. PERALES:  Okay.  Before I pass the
25  witness, Mr. Lopez, I want to thank you for your

Page 40

1  patience with us today.  You are not done, but you
2  are done with me, and I'm going to pass you along to
3  Mr. White here.  But I did want to note for the record
4  that, based on our discussion, that the ExpressPoll Pad
5  Connect software can run reports on how many voters
6  voted in person with an assistor, that we believe that
7  that information is responsive to some of our request
8  for production.  And we are happy to continue this
9  conversation, but I want to note for the record that we
10  believe that the reports that Mr. Lopez is referencing
11  is something that we've asked for in the case, and that
12  Mr. Lopez also suggested there might be records
13  maintained by the Outreach Coordinator on voters --
14  voter outreach at naturalization ceremonies, which may
15  also be responsive to our discovery requests.  And I'd
16  be happy to sort of pinpoint that for you at a later
17  point, but I want to make sure that I get that on the
18  record before I pass the witness.
19        MR. STOOL:  Understood.
20        MS. PERALES:  And now I pass the witness.
21        MR. STOOL:  All right.
22        MS. PERALES:  And we're just going to --
23        MR. WHITE:  Yeah, I'll --
24        MS. PERALES:  -- hand this microphone to
25  Mr. White.

Page 41

1              EXAMINATION
2  BY MR. WHITE:
3  Q.  Mr. Lopez, how are you?
4  A.  Doing good.
5  Q.  I just have a couple of questions about your
6  testimony earlier about extended hours in voting.
7        And you testified earlier that polling places
8  were open until 10:00 p.m. on February 25th, 2022 --
9  A.  Yes.
10  Q.  -- is that right?
11        And was that because of a Court Order?
12  A.  Yes.
13  Q.  And do you remember what the reason was for the
14  judge ordering the extended voting hours?
15  A.  I don't.
16  Q.  Okay.  And how late were polling places
17  supposed to stay open prior to that Court Order?
18  A.  7:00.
19  Q.  Until 7:00 p.m.?
20  A.  Well, If there's no voters in line at 7:00
21  o'clock.  But if there's voters, they got to vote.
22  Q.  Were you concerned that having polling places
23  open until 10:00 p.m. on that day would lead to a voter
24  fraud?
25  A.  No.

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                      Pages 42 to 45

Page 42

1    Q.  Why not?
2         MS. HUNKER:  Objection, form.
3    A.  I have no reason to believe that, no.
4    Q.  (By Mr. White)  Was anyone in your office
5  concerned that having the polling places open until
6  10:00 p.m. would lead to voter fraud?
7         MS. HUNKER:  Objection, form.
8    A.  I can't speak for them, no.
9    Q.  (By Mr. White)  Did you hear anyone in your
10  office express concerns to you that these extended hours
11  would lead to voter fraud?
12   A.  No.
13   Q.  Did your office receive any complaints from
14  voters that these extended hours would lead to voter
15  fraud?
16        MS. HUNKER:  Objection, form.
17   A.  I don't know if we received any complaints.
18   Q.  (By Mr. White)  Are you aware of any voter
19  fraud that occurred during these extended hours on
20  February 25th?
21   A.  I'm not aware of any.
22   Q.  Do you know how many voters showed up to vote
23  during these extended hours on February 25th?
24   A.  I do not have those numbers.
25   Q.  Okay.  Do you know if there were particular

Page 43

1  precincts in Dallas County where voters were more likely
2  to show up during these extended hours on February 25th?
3    A.  I don't --
4         MS. HUNKER:  Objection, form.
5    A.  -- know that.
6    Q.  Okay.
7         THE REPORTER:  I'm sorry.  Okay.  Thank
8  you.
9    Q.  (By Mr. White)  As a general matter, are there
10  voters in Dallas County who struggle to make it to the
11  polls during normal voting hours?
12        MS. HUNKER:  Objection, form.
13   A.  Repeat the question.
14   Q.  As a general matter, are there voters in Dallas
15  who struggle to make it to the polls during normal
16  voting hours?
17        MS. HUNKER:  Objection, form.
18   A.  I don't know.
19        MR. WHITE:  Okay.  I have no further
20  questions.
21        THE REPORTER:  Just a --
22        MR. WHITE:  And I will pass the --
23        THE REPORTER:  Just a second.  Okay.
24  Thank you.
25        MR. WHITE:  Okay.  Well, I will pass the

Page 44

1  witness, I guess, to anyone on the Zoom who wants to ask
2  questions remotely --
3         MS. PERALES:  Plaintiffs' side on the
4  Zoom.
5         MR. WHITE:  -- on the Plaintiffs' side.
6         MS. PERALES:  So I'm not tethered.  Just
7  give me a second to come down the table.
8         MS. BENDER:  The United States has no
9  questions at this time.  Thank you.
10        MS. PERALES:  Thank you.  This is Nina
11  Perales talking to you now.  Is there anybody on the
12  Zoom who has questions for the witness from the
13  Plaintiffs' side?
14        MS. CAI:  No questions from us at this
15  time.  Thank you.
16        THE REPORTER:  And can you identify?
17        MS. PERALES:  Yeah.  And just let me know
18  who said "No questions for the United States."
19        MS. BENDER:  This is Brady Bender.
20        MS. PERALES:  Brady Bender.
21        THE REPORTER:  Thank you.
22        MS. BENDER:  Yes.
23        MS. PERALES:  Thank you so much.  It just
24  sounds like --
25        MS. BENDER:  Thank you.

Page 45

1         MS. PERALES:  -- none of the other
2  Plaintiffs have questions.  So I think it's coming
3  around the table to Ms. Hunker.
4              EXAMINATION
5  BY MS. HUNKER:
6    Q.  All right.  Hello, Mr. Lopez.
7    A.  Hello.
8    Q.  It's good seeing you again.
9    A.  You, too.
10   Q.  So I have only a handful of questions for you.
11  To give you a precursor, my questions are mostly in
12  response to what the Plaintiffs have asked, and so
13  there's going to be a little bit of jumping around.
14        If at any point you get confused by my
15  switching subject or I'm not clear, can you please let
16  me know?  I am happy to lay either more foundation or to
17  rephrase the question.
18   A.  Okay.
19   Q.  Excellent.  So you had spoken about the
20  extended hours on February 25th, 2022; is that correct?
21   A.  Yes.
22   Q.  And the extended hours was based off of
23  decision from a Court; is that correct?
24   A.  Yes.  The County Judge, yes.
25   Q.  So when you say "a court" and you say "the

The Office of the Dallas County Elections Administrator

April 29, 2022
Pages 46 to 49

Page 46

1 County Judge," are you referring to a judicial action,
2 or are you referring to the County Judge acting in his
3 executive capacity in Dallas County?
4    A.   The County Judge from the Commissioners Court.
5    Q.   Okay.  So you're referring to the Commissioners
6 Court made the decision to have extended hours?
7    A.   Yes.
8    Q.   Okay.  So this was not imposed on Dallas
9 County.  This was a decision that Dallas County made,
10 itself; is that correct?
11    A.   Yes.
12    Q.   And they did not communicate why they asked for
13 extended hours on February 25th?
14    A.   They may have.  I just don't know that answer.
15    Q.   And so let me break that question down twice,
16 just to -- to clarify.
17         You were not aware of the reasons they
18 requested extended hours at all during that election; is
19 that correct?
20    A.   Correct.
21    Q.   And you do not know why they requested extended
22 hours on the specific day of February 25th; is that
23 correct?
24    A.   Correct.
25    Q.   When you extended hours from -- ending at 7:00

Page 47

1 moving it to 10:00 p.m., were there any logistical
2 challenges that you faced with that?
3    A.   Not that I'm aware of.
4    Q.   And when you're answering this question, are
5 you speaking about your specific subdivision within the
6 Election Administrator's Office, or are you talking
7 about the Election Administrators as a whole?
8    A.   As a whole.
9    Q.   Okay.  And so did you have problems, for
10 example, securing additional poll watcher- -- poll
11 workers?
12    A.   Not that I'm aware of.
13    Q.   And did you have any problem securing any
14 election judges?
15    A.   Not that I'm aware of.
16    Q.   Did you consider hosting 24-hour voting
17 locations during November 2020?
18    A.   No.
19    Q.   And do you know if your office considered
20 hosting extended hours during November 2020 at all?
21    A.   Not that I'm aware of.
22    Q.   So Ms. Perales had mentioned county-wide
23 voting, and you said you had -- Dallas County started
24 county-wide voting on Election Day in 2019; is that
25 right?

Page 48

1    A.   Yes.
2    Q.   And you had also discussed the process of
3 eliminating precincts; is that right?
4    A.   Yes.
5    Q.   Will precincts be closed in November of 2020
6 based on the -- let me rephrase that question because I
7 used the wrong year.
8    A.   Uh-huh.
9    Q.   Will precincts be closed in November 2022 based
10 on the switch to countywide voting in 2019?
11    A.   That is a plan, to close --
12    Q.   Okay.
13    A.   -- those centers, yes.
14    Q.   Do you know how many?
15    A.   I don't have that number yet.
16    Q.   Do you know how many early voting locations
17 were available for voters in November 2018?
18    A.   I don't know that number.
19    Q.   Okay.  What about November 2020?
20    A.   I don't have that number either.
21    Q.   Okay.  And you wouldn't know the amount of
22 election day locations on either of those years, would
23 you?
24    A.   No, not off the top of my head.  No.
25    Q.   Do you know if they'll be -- let's start with

Page 49

1 early voting -- if it will be the same number or
2 approximately the same number of polling locations in
3 the early voting period in November 2022 as there was in
4 November 2018?
5    A.   Approximately, yes, it should be close.
6    Q.   Okay.  And I'm going to ask the same question
7 with respect to November 2020.
8         Do you know if this might be approximately the
9 same number of locations in 2022, November, as there
10 were in November 2020?
11    A.   Approximately, yes, should be close.
12    Q.   And I'm going to ask the same question with
13 respect to Election Day.
14         To your knowledge, are there going to be
15 approximately the same number of polling locations on
16 Election Day in November 2022 as there were in November
17 2020?
18    A.   No.  It will be less.
19    Q.   And do you know by how much, roughly?
20    A.   I don't.
21    Q.   And what about based on 2018?  Would there be
22 approximately the same number of polling locations in
23 November 2022 as there would be -- as there were in
24 '20 -- November 2020?  Let me rephrase that question
25 because I completely messed up while stating it.

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                       Pages 50 to 53

Page 50

1       Do you know if it will be approximately the
2  same number of polling locations in November 2022 as
3  there were in November 2018?
4       A.  It will be less.
5       Q.  It will be less.
6       A.  Yes.
7       Q.  And what was the reason for the decline?
8       A.  It was -- in 2019, they decided to keep all of
9  them open, when we went to vote centers.  They wanted to
10 keep every single precinct open.  And then they said
11 after a two-year cycle, they would go down.  They
12 would -- the Commissioners Court would decide on
13 decreasing the number of locations to save on cost and
14 number of poll workers --
15      Q.  Uh-huh.
16      A.  -- so...
17      Q.  And did they have voter input with this, or did
18 they open the -- the decision-making process to voter
19 input?
20      A.  They opened it up.
21      Q.  And so voters were able to voice their concerns
22 or their support for the initiative?
23      A.  They have.
24          MR. WHITE:  Objection to form.
25      A.  They have -- they put a committee together,

Page 51

1  Vote Center Advisory Committee.
2       Q.  (By Ms. Hunker)  Do you know if any of the vote
3  center committees findings or discussions are online?
4       A.  I don't know if they are online.
5       Q.  Now, you had also discussed the ePad or the --
6  where you sign in on -- when in-person voting.  And I
7  believe you said that that picks up who has requested
8  assistance, all for the last few years; is that right?
9       A.  Yes.
10      Q.  How does that work exactly?
11      A.  The ePollbook has -- you can sign on the
12 ePollbook, so there's a oath on there if somebody
13 requests assistance, and then the person giving the
14 assistance signs the oath on there.  And so when we do
15 the report, even the signature comes on the report, as
16 well.
17      Q.  Okay.  And so when it comes to assistants, it's
18 only picking up individuals who took the oath; is that
19 correct?
20      A.  Yes.
21      Q.  And so it's only taking individuals who assist
22 with the actual marking of the ballot; is that correct?
23          MS. PERALES:  Objection, vague.
24      A.  The -- for the ballot-marking device, yes.
25      Q.  (By Ms. Hunker)  So if, let's say, I were to

Page 52

1  bring my grandmother in to vote and she's in a
2  wheelchair and I helped push her to the polling
3  location, but then she voted on her own, would she --
4  would I have had to sign the poll book?
5          MR. WHITE:  Objection --
6          MS. PERALES:  Objection --
7          MR. WHITE:  -- form.
8       A.  No.
9          THE REPORTER:  I'm sorry.  Thank you.
10      Q.  (By Ms. Hunker)  And so only certain types of
11 assistance are marked on the poll book; is that correct?
12          MS. PERALES:  Objec- --
13      A.  Voting assistance.
14          MS. PERALES:  -- -tion --
15      Q.  (By Ms. Hunker)  Voting assistance.
16          MS. PERALES:  -- this is --
17      A.  Yes.
18          THE REPORTER:  Sorry.
19          MS. PERALES:  Objection -- hold up --
20          THE WITNESS:  Okay.
21          MS. PERALES:  -- for one second --
22          THE WITNESS:  Okay.
23          MS. PERALES:  -- if you would.
24          First, objection, form; second, I want to
25 object that this is outside the scope of the designated

Page 53

1  topic of this witness and possibly outside the scope of
2  his knowledge as the Voter Registration Director.
3          THE REPORTER:  And I didn't hear your
4  answer.  Can you say your answer again?  You just said a
5  few words, I know, but I did not hear you.
6          THE WITNESS:  Yes.
7          THE REPORTER:  Thank you.
8       Q.  (By Ms. Hunker)  And so let me ask the question
9  again because I actually lost my place of thought.
10         MS. HUNKER:  And I would ask that we keep
11 speaking objections to a minimum under local rules, 30,
12 only because it does disrupt my thought process.
13         MS. PERALES:  And I will, however, be
14 making the same objections again.
15         Go ahead, Ms. Hunker.
16      Q.  (By Ms. Hunker)  So only certain types of
17 voting assistance are -- let me -- let me rephrase the
18 question.
19         Only people who are offering certain types of
20 voting assistance sign on the ePad; is that correct?
21      A.  Yes.
22         MS. PERALES:  Same objection.
23      Q.  (By Ms. Hunker)  And how much familiarity do
24 you have with the ePad or the process in which an
25 assistor would sign the ePad?

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                          Pages 54 to 57

Page 54

1    A.   I've been trained on it, and I've helped --
2    I've trained others on my staff.  I've trained them on
3    it, as well.
4    Q.   So is this part of your responsibilities?
5    A.   Not at the polls.
6    Q.   But you said you have trained on this
7    particular device; is that correct?
8    A.   Yes.
9    Q.   And you've trained others?
10   A.   Right.
11   Q.   And have you seen it work and function?
12   A.   Yes.
13   Q.   And are you familiar with how it operates?
14   A.   Yes.
15   Q.   And you're familiar with the procedures in
16   which it -- it operates on this?
17   A.   Yes.
18        MS. HUNKER:  All right.  No further
19   questions.
20        MS. PERALES:  I have questions if Defense
21   Counsel don't.
22        MR. STOOL:  No, I don't have any.
23        MS. PERALES:  Okay.
24             REEXAMINATION
25   BY MS. PERALES:

Page 55

1    Q.   Well, Mr. Lopez, I spoke too soon when I said I
2    was done with you.
3         Do you work at the polling place on Election
4    Day?
5    A.   No.
6    Q.   Do you make a decision or have you ever made
7    the decision whether somebody who is coming into the
8    polling place to assist another voter has to sign the
9    Oath of Assistance?
10   A.   Not at the polls, no.
11   Q.   Are you aware of the criteria that poll workers
12   and election judges use to decide who has to sign the
13   Oath of Assistance when they come with a voter to the
14   polling place?
15        MS. HUNKER:  Ob- --
16   A.   Yes.
17        MS. HUNKER:  -- -jection, form.
18   A.   Yes.
19   Q.   (By Ms. Perales)  Say that again.
20   A.   Yes.
21   Q.   And what is that criteria, then?
22   A.   If they are -- if the voter requests
23   assistance, that's the person that will be signing the
24   ePollbook.
25   Q.   Okay.  And so the voter comes with the

Page 56

1    assistor?
2    A.   Uh-huh.
3    Q.   The voter says, I -- I want to bring this
4    person here to help me vote, and then the assistor signs
5    the oath; is that correct?
6    A.   Yes.
7    Q.   And are -- do you know if there's criteria that
8    election judges and poll workers use to decide whether
9    someone who's pushing a wheelchair, for example, is or
10   isn't an assistor?
11   A.   Is there a criteria?
12   Q.   Yeah.  Do the poll workers make the decision,
13   who is an assistor?  You know, what kind of help makes
14   you an assistor or not?  Do -- are you aware of any
15   criteria that the poll workers use to make that
16   decision?
17   A.   They have a training guide, yes.
18   Q.   Okay.  And so do you -- can you say, sitting
19   here today, whether someone who's pushing a wheelchair
20   with a voter and then comes in with them and over to the
21   voting station, can you say whether, sitting here today,
22   you know whether the poll workers would ask that person
23   who was pushing a wheelchair to sign the oath or not?
24        MS. HUNKER:  Objection, form.
25   A.   Yes, because that person would have to say, "I

Page 57

1    need assistance, and here's my assistor" --
2    Q.   (By Ms. Perales)  Okay.
3    A.   -- yes.
4    Q.   So, in that instance, the person pushing the
5    wheelchair and going over to the voting station with the
6    voter is the assistor who would sign the oath; is that
7    right?
8    A.   Yes.
9         MS. PERALES:  Okay.  Thank you.
10        I pass the witness.
11        MR. WHITE:  I have no further questions.
12        MS. HUNKER:  Just to quickly clarify on a
13   point, assuming there's no other questions from the
14   attorneys on Zoom.  Hearing none --
15        MS. BENDER:  No questions.
16        MR. STOOL:  ID.  ID.  Who said that?
17        MS. PERALES:  Oh, that's -- that's Brady.
18        THE REPORTER:  Thank you.
19        MS. BENDER:  I'm sorry.  That's right.  No
20   questions at this time.  Thank you.
21             REEXAMINATION
22   BY MS. HUNKER:
23   Q.   So in the example where an individual is being
24   pushed, the way that the as- -- the way they would sign
25   the eBook or ePad is if they were announced, "This is my

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                  Pages 58 to 61

Page 58

1 assistor"; is that correct?
2    A.  Correct.
3    Q.  And so if the person who is voting chooses not
4 to state, "This is my assistor," that person would not
5 sign the eBook; is that correct?
6    A.  Correct.
7         MS. HUNKER:  Thank you.
8         MS. PERALES:  And so subject to another
9 witness saying that they can't testify on a topic that
10 Mr. Lopez says he has knowledge of, then I think we can
11 switch over to the next witness now.
12        MR. STOOL:  Okay.  Mr. Lopez needs to get
13 back to the Elections Department, which is not that far
14 from here, but -- so if he has to come back, he'll have
15 to drive back down here.  But he's got duties he's got
16 to take care of because early voting is going on as
17 we're having this conversation.
18        MS. PERALES:  Understood.
19        MR. STOOL:  Okay.  So --
20        MS. PERALES:  Shall we take a moment off
21 the record --
22        MR. STOOL:  Sure.
23        MS. PERALES:  -- to switch out our
24 witnesses.
25        MR. STOOL:  Yes.

Page 59

1         THE VIDEOGRAPHER:  Okay.  We're going off
2 the record.  The time is 11:53 a.m.
3         (Break taken.)
4         (Deposition Exhibit Number 3 marked.)
5         THE VIDEOGRAPHER:  Okay.  We're back on
6 the record.  The time is 12:06 p.m.
7            REEXAMINATION
8            (Continued)
9 BY MS. HUNKER:
10   Q.  Hi, Mr. Lopez.
11   A.  Hi.
12   Q.  I am sorry to bring you back onto the hot seat,
13 but I had one or two more questions for you in relation
14 to the document that you and your Counsel had produced
15 to us during the deposition.
16   A.  (Witness moves head up and down.)
17   Q.  So you see -- do you have in front of you the
18 document that says "Summary Report GRP-Detail," and then
19 it says "2018 General & Joint Election"?
20   A.  Yes.
21   Q.  And this is for November 6, 2018, correct?
22   A.  Correct.
23   Q.  And then there's a part here that says straight
24 ticket; is that right?
25   A.  Yes.

Page 60

1    Q.  What does that mean?
2    A.  That means a voter can go into the polls and
3 just select a party, and it would select all those
4 candidates on that party.
5    Q.  So voters had an opportunity to vote straight
6 ticket in 2018, correct?
7    A.  Yes.
8    Q.  They did not have that opportunity in November
9 2020; is that correct?
10   A.  That's correct.
11   Q.  And they will not have that opportunity in
12 November 2022; is that correct?
13   A.  That's correct.
14   Q.  And that's because the law changed in
15 between -- or I should say before November 2020
16 election; is that correct?
17   A.  Correct.
18   Q.  And so Texas no longer allows straight ticket
19 voting; is that correct?
20   A.  Yes.
21        MS. HUNKER:  Thank you.
22        THE WITNESS:  Okay.  Thanks.
23        MS. PERALES:  And --
24        THE REPORTER:  I'm sorry.  Can you wait
25 one second?  Thank you.

Page 61

1            REEXAMINATION
2 BY MS. PERALES:
3    Q.  And just a couple of questions also about this
4 document, which I would like the court reporter to hand
5 to you, and it has been marked as Exhibit 3.
6         (Document handed to the witness.)
7    Q.  So, Mr. Lopez, you've been handed what has been
8 marked Exhibit 3, and do you recognize those as the two
9 pages that you brought with you today to the deposition?
10   A.  Yes.
11   Q.  And you described them a little bit earlier in
12 the deposition; is that right?
13   A.  Yes.
14   Q.  And just for the sake of the record, on this
15 first page of the exhibit, which is dated November 6th,
16 2018, can you tell me what that last column is that is
17 titled ED, underscore, ADA?
18   A.  ED's for Election Day.  ADA is for America's
19 Disability Act, and that's for voters with disabilities
20 that are voting.
21   Q.  And is it voters who used a special machine to
22 vote?
23   A.  Yes.  An ADA machine, yes.
24   Q.  All right.  So if a voter came in with an
25 assistant to help that voter vote on a regular machine,

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                      Pages 62 to 65

Page 62

1 would the voter be listed in this column, ED,
2 underscore, ADA?
3    A.   If they had a disability and had to use that
4 machine, they would be listed on that column.
5    Q.   Okay.  Let's say they don't use an ADA machine;
6 they use a regular machine, because they bring someone
7 with them to help them.  If the voter uses a regular
8 machine --
9    A.   Okay.
10   Q.   -- non-ADA machine, with an assistor, would
11 that voter turn up here (pointing) in the column ED,
12 underscore, ADA?
13   A.   No.
14   Q.   Let me just check and see if I have any other
15 questions.
16   A.   Okay.
17   Q.   Is it correct to say that the column EV-ED,
18 underscore, PROV is for provisional ballots that were
19 cast and counted in the election?
20   A.   Yes, for both early voting and Election Day.
21 Yes.
22   Q.   And then I recognize the column, Election Day.
23        Now, that would be votes cast in person on
24 Election Day; is that right?
25   A.   Yes.

Page 63

1    Q.   And then the column, EV, underscore, Mail is
2 mail ballots that you counted?
3    A.   Yes.
4    Q.   And the column, EV, underscore, in Person is
5 people who voted in person early; is that correct?
6    A.   Yes.
7    Q.   And then under Total Votes, I see the number
8 there, 731,576.
9        Is that the total number of ballots cast in
10 that election?
11   A.   Yes.
12   Q.   And then I -- is it correct to say that the
13 orange highlighting on "Straight Party" and some of
14 those numbers, that came from you; is that right?
15   A.   Yes.
16   Q.   Okay.  On the second page of the exhibit, which
17 says: "Primary Election Comparison," is that the
18 document you mentioned earlier that totals up how many
19 votes were cast in either the Democratic Primary or the
20 Republican Primary?
21   A.   Yes.
22   Q.   And there's a -- there is a list of days here,
23 Day 1, Day 2; and then towards the bottom, it says Day
24 12.  Is that right?
25   A.   Yes.

Page 64

1    Q.   Okay.  But this is only for primary elections
2 in 2022, 2018 and 2014; is that right?
3    A.   Yes.
4    Q.   We were talking earlier about the polls staying
5 open until 10:00 p.m. on the last day of Early Voting in
6 a particular election.
7        And are the number of votes cast in each party
8 primary for that day that the polls stayed open until
9 10:00 p.m., is that represented on this chart here?
10   A.   Yes, that's Day 12.
11   Q.   For which year?
12   A.   2022.
13   Q.   So is it correct to say that for Day 12 in the
14 2022 primary, the number of ballots cast was 18,101 --
15   A.   Yes.
16   Q.   -- for Democrat, and 10,270 for Republican?
17   A.   Yes.
18   Q.   Are those numbers just of in-person Early
19 Voting?
20   A.   Yes.
21   Q.   So that doesn't include any tabulation of mail
22 ballots, correct --
23   A.   Correct.
24   Q.   -- or Election Day votes?
25   A.   Correct.

Page 65

1    Q.   Would it be fair to say, then, that for both
2 the Democratic and Republican Primaries in November
3 2022, that on that day that you held the polls open
4 until 10:00 p.m., more votes were cast than in the two
5 previous comparison years?
6        MS. HUNKER:  Objection to form.
7    A.   Can you repeat?  Did you say in November?  Will
8 you repeat?
9    Q.   (By Ms. Perales)  No.  I was asking if in
10 Nov- -- I did say November of --
11   A.   Yeah.
12   Q.   -- 2022.
13   A.   Okay.
14   Q.   That's my mistake.
15        Would it be fair to say that for the March
16 primary in 2022 on Day 12, Friday, which was the day the
17 polls stayed open until 10:00 p.m., that more votes were
18 cast in both the Democratic and Republican Primaries
19 when compared to previous years?
20   A.   Yes.
21        MS. HUNKER:  Objection to form.
22        MS. PERALES:  I pass the witness.
23        MR. WHITE:  I have no further questions.
24        MS. HUNKER:  I --
25        THE REPORTER:  Can you slow down just a

Page 66

1  little bit for me, please?  Can you slow down?
2          MS. HUNKER:  Yes.
3          THE REPORTER:  Thank you.  Okay.  I'm
4  ready.
5          MS. HUNKER:  Ready?
6          THE REPORTER:  Uh-huh.
7              REEXAMINATION
8  BY MS. HUNKER:
9      Q.  Mr. Lopez, when we were talking about the
10  document just earlier, we were referencing the
11  Plaintiff's Exhibit Number 3, correct?
12     A.  Number 3?
13         (Ms. Perales holding document up.)
14     A.  Yes.
15     Q.  And so let's look on the second page of that
16  exhibit.
17     A.  Okay.
18     Q.  And this is where it says "Primary Election
19  Comparison," correct?
20     A.  Yes.
21     Q.  And you were speaking to Counsel about Day 12,
22  correct?
23     A.  Yes.
24     Q.  And that was February 25th, 2022, correct?
25     A.  Yes.

Page 67

1      Q.  And that is the day that the polls were
2  extended an additional three hours; is that correct?
3      A.  Yes.
4      Q.  This chart does not list the times in which
5  voters voted, correct?
6      A.  Correct.
7      Q.  And so you don't know when the voters voted
8  that day, is that correct?
9      A.  That's correct.
10     Q.  And if we look at 2018 and 2014, it appears
11  that the last day of Early Voting has the most number of
12  in-person votes for the Early Voting period; is that
13  correct?
14     A.  That's correct.
15         MS. PERALES:  Objection.
16         MS. HUNKER:  No more questions.
17         MS. PERALES:  No more questions here.
18         MR. STOOL:  We don't have any questions.
19         MS. PERALES:  Shall we go off the record
20  while they switch microphones?
21         MS. HUNKER:  I think so.
22         MR. STOOL:  Yes.
23         THE VIDEOGRAPHER:  Okay.  We're going back
24  off the record.  The time is 12:16 p.m.
25         (Discussion off the record.)

Page 68

1          THE VIDEOGRAPHER:  Okay.  We're back on
2  the record.  The time is 12:19 p.m.
3              EXAMINATION
4  BY MS. PERALES:
5      Q.  Good afternoon, Ms. Phillips.
6      A.  Hello.
7      Q.  Can you please --
8          THE REPORTER:  Oh, I forgot to swear her
9  in.
10         MS. PERALES:  I know.  I just thought of
11  that.
12     Q.  Can you please give us a second because we want
13  to make sure that you're sworn in.
14     A.  Okay.
15         THE REPORTER:  Okay.  Can you please raise
16  your right hand?
17         (Witness sworn by the court reporter.)
18         THE REPORTER:  Okay.  Thank you.
19         MS. PERALES:  Do we know -- can we mute
20  that participant?
21     (The Videographer moves head up and down.)
22         MS. PERALES:  We're going to take a minute
23  to mute someone.
24         THE WITNESS:  Okay.
25         THE VIDEOGRAPHER:  I don't have the

Page 69

1  permission to mute them, so we'll just have to ask them.
2          MR. STOOL:  Just to --
3          THE VIDEOGRAPHER:  Never mind.  We're
4  good.
5          MS. PERALES:  Thank you.
6             TACOMA PHILLIPS,
7  having being first duly sworn, testified as follows:
8              EXAMINATION
9              (Continued)
10  BY MS. PERALES:
11     Q.  Ms. Phillips, you've been here since the start
12  of Mr. Lopez's testimony; is that correct?
13     A.  Yes.
14     Q.  And so you've already heard me introduce myself
15  and walk him through some of the rules of the road for a
16  deposition; is that right?
17     A.  Yes.
18     Q.  So I'll -- I'll ask you a shorter version of
19  those questions --
20     A.  Okay.
21     Q.  -- which is, first:  Have you ever had your
22  deposition taken?
23     A.  No.
24     Q.  Okay.  First time.  It's an honor to be taking
25  your deposition.

Page 70

1     Do you understand that the testimony that
2 you're giving is under oath?
3     A.  Yes.
4     Q.  And that your testimony today is as if you are
5 sitting in the courtroom testifying to the Judge?
6     A.  Yes.
7     Q.  Is there any reason for you, either that you're
8 taking medication or you don't feel well, that you
9 cannot understand my questions or testify accurately?
10    A.  No.
11    Q.  From time to time, you may hear one of the
12 lawyers making an objection during the deposition, and I
13 think you've probably already heard that.
14    A.  Yes.
15    Q.  In general, unless your lawyer instructs you
16 not to answer, you can go ahead and answer.  And so I
17 just want to leave you with that instruction.  Okay?
18    A.  Okay.
19    Q.  If I use the term "ABBM," will you understand
20 that to mean application for ballot by mail?
21    A.  Yes.
22    Q.  Do you understand that to mean all applications
23 for ballot by mail, both annual, as well as just for a
24 single election; or do you understand ABBM, for example,
25 to just be limited to the annual?

Page 71

1     A.  Application for ballot by mail, no.  It's just
2 the -- it's the same.  Everything's the same.
3     Q.  Okay.  Thank you.
4        What steps did you take to prepare for the
5 deposition today?
6     A.  We met, I believe it was Tuesday, I believe,
7 for two hours --
8     Q.  Okay.
9     A.  -- to go over --
10    Q.  Don't tell me --
11    A.  -- the questions.
12    Q.  Don't tell me what you said if your lawyers
13 were there.
14    A.  No, no, no, just to go over --
15    Q.  Okay.
16    A.  -- the questions that I'm responsible for.
17    Q.  Okay.  Thank you.
18    A.  Uh-huh.
19    Q.  Thank you.  I'm trying to play by the Rules.
20       Did you talk to anybody else besides Mr. Lopez,
21 Mr. Scarpello and your attorneys to prepare for this
22 deposition?
23    A.  No.
24    Q.  And can you just name that individual or
25 individuals?

Page 72

1     A.  Robert Heard.  He's in -- a contractor in our
2 office.  And it's another gentleman, the gentleman's
3 name -- I cannot remember his name.
4     Q.  And Mr. Heard, who is a contractor, is he what
5 somebody might call a temp?
6     A.  Yes, a temp contractor.
7     Q.  Okay.
8     A.  He's helping with the PIAs in our office.
9     Q.  Okay.  And when you say "PIA," you mean Public
10 Information --
11    A.  Yes --
12    Q.  -- for --
13    A.  Public Information Act, yes.
14    Q.  Okay.  So you're responding to requests for
15 information?
16    A.  Yes.
17    Q.  And then you mentioned one other individual.
18    A.  Yes, I did.  I do not remember his name.
19    Q.  Okay.  And he works in your office, as well?
20    A.  I believe he's a contractor, also.
21    Q.  Okay.  Did you talk to anybody from the Office
22 of the Attorney General for Texas?
23    A.  No.
24    Q.  Did you review any paperwork in preparation for
25 this deposition?

Page 73

1     A.  Just the paperwork that was given to answer my
2 portion of the questions.
3     Q.  Okay.  And who gave that paperwork to you?
4     A.  Ben Stool.
5     Q.  Did you bring anything here with you today
6 related to the case, any personal notes or charts or
7 other paperwork?
8     A.  Yes.  I brought the paperwork that was
9 provided -- given to me by Ben Stool, but I just jotted
10 down notes on that.
11    Q.  And do you mean that you jotted notes on the --
12 the chart that lists the topic and has your name across
13 from those topics?
14    A.  Yes.
15    Q.  Okay.  So let's go ahead and just refer back to
16 Exhibit 1.  It should be somewhere --
17       THE REPORTER:  It's over here (handing).
18    Q.  You have been handed what has been marked
19 Deposition Exhibit Number 1 (holding up a copy of
20 document), and it says Plaintiffs' Third Amended Notice
21 of Rule 30(b)(6) Deposition.
22       Do you see that at the top?
23    A.  I see that, yes.
24    Q.  Do you recognize this document; have you ever
25 seen it before?

Page 74

1    A.  It was sent to me.  Are you --
2    Q.  Do you recognize, starting on Page 12 -- no --
3 yes.
4        Starting on Page 12, do you recognize the items
5 listed under the heading "Deposition Topics"?
6    A.  Yes.
7    Q.  And then let's turn to Deposition Exhibit
8 Number 2.
9        THE REPORTER:  Oh, I'm sorry (handing).
10   Q.  Can you look at the places where your name is
11 listed in the right-hand column?
12   A.  Yes.
13   Q.  And that's on Page 1, Page 2, Page 3.
14       It looks like just pages 1, 2 and 3; is that
15 right?
16   A.  Yes.
17   Q.  Are you prepared to testify on those topics
18 today?
19   A.  Yes.
20   Q.  And do you understand that when you're
21 answering questions on these topics, that you're
22 speaking for the Dallas County Elections Department?
23   A.  Yes.
24   Q.  Because you are designated representative of
25 the department.  Yes?

Page 75

1    A.  Yes.
2    Q.  Okay.  And so when I say "you" or "yours,"
3 please understand that to mean Dallas County Elections
4 Department.
5    A.  Yes.
6    Q.  Now, if there is something outside your
7 knowledge, it's perfectly okay to say that.
8    A.  Okay.
9    Q.  And we can talk through whether there's
10 somebody else who maybe has more knowledge and -- and
11 then we can work through that with the attorneys.  Okay?
12   A.  Okay.
13   Q.  So even though you're testifying for Dallas
14 County Elections, I want to make sure that if something
15 is simply outside the scope of your knowledge, that you
16 feel comfortable saying that.
17   A.  Okay.
18   Q.  What is your title and your job?
19   A.  Mail Ballot Supervisor.
20   Q.  How long have you held that position?
21   A.  One year.
22   Q.  What did you do before you became the Mail
23 Ballot Supervisor?
24   A.  I was the Assistant Voter Registration
25 Supervisor.

Page 76

1    Q.  Did you work under the supervision of
2 Mr. Lopez?
3    A.  Yes.
4    Q.  How long were you an Assistant Voter
5 Registration Supervisor?
6    A.  I'm thinking.  I will say since 2014 through
7 2021, March of 2021.
8    Q.  So, roughly, seven years?
9    A.  Yes.
10   Q.  And then prior to becoming the Assistant Voter
11 Registration Supervisor, what were you doing?
12   A.  I was -- I was a Lead Clerk in Voter
13 Registration.
14   Q.  And do you know about how many years you did
15 that?
16   A.  I did that for probably a year.
17   Q.  And then before that?
18   A.  I was a clerk in Voter Registration.
19   Q.  I think they call those battlefield promotions.
20   A.  Yes.
21   Q.  Okay.  And how long were you a clerk in Voter
22 Registration?
23   A.  Since 1998, August of 1998.
24       THE REPORTER:  You said August of nineteen
25 ninety- --

Page 77

1        THE WITNESS:  1998, yes.
2        THE REPORTER:  Thank you.
3    Q.  So that would be -- and before you were a clerk
4 in Voter Registration, were you working for Dallas
5 County?
6    A.  No.
7    Q.  Okay.  So all in all, about how many years have
8 you been working for Dallas County Elections?
9    A.  August of 2022 would be 24 years.
10   Q.  Wonderful.  Congratulations.
11   A.  Thank you.
12   Q.  Before you became Mail Ballot Supervisor a year
13 ago, did somebody else hold that job?
14   A.  Yes.
15   Q.  Who was that?
16   A.  Brylon Franklin.
17   Q.  Spell the first name.
18   A.  B-r-y-l-o-n.
19   Q.  Brylon.  And then the last name?
20   A.  Franklin.
21   Q.  Franklin.  Do you know how long Brylon Franklin
22 was in the position of Mail Ballot Supervisor?
23   A.  No, I do not.
24   Q.  Was it more than a year?
25   A.  Yes.  Yes, it was more than a year, but I can't

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                          Pages 78 to 81

Page 78

1 tell you how long.
2   Q.   Who does the Mail Ballot Supervisor report to?
3   A.   Michael Scar- -- oh, I'm sorry.  Let me -- it's
4 Malissa Kouba.
5   Q.   And who is Malissa Kouba?
6   A.   Assistant Administrator Deputy.  I don't know
7 the exact title, the name of the title, but I know she's
8 the Assistant Administrator Deputy.
9   Q.   So do you report to Malissa Kouba?
10  A.   I report to Malissa Kouba, yes.
11  Q.   Do you know how long she's been in her
12 position?
13  A.   A year -- less than a year, I believe.
14  Q.   Less than a year.  So then who did Brylon
15 Franklin report to?
16  A.   Tony Pippin-Poole.
17       THE REPORTER:  Tony -- what was the last
18 name?
19       THE WITNESS:  Pippins-Poole (sic).
20  Q.   Was Tony Pippins-Poole the Elections
21 Administrator since you joined the Elections Department
22 in 1998?
23  A.   No.
24  Q.   When you first got to the Elections Department,
25 who was the Election Administrator, if anybody?

Page 79

1   A.   Bruce R. Sherbert.
2   Q.   Bruce R., like the letter R --
3   A.   Like the letter.
4   Q.   And then --
5   A.   Sherbert --
6   Q.   -- Sherbert --
7   A.   -- yes.
8   Q.   -- like the dessert?  Yeah, got it.
9       Are you from Dallas County?
10  A.   Yes.
11  Q.   Where did you go to high school?
12  A.   I went to Business Management High School,
13 Business Management Magna High School.
14  Q.   Okay.  That's here in Dallas?
15  A.   That was here in Dallas.
16  Q.   Did you do any education after high school?
17  A.   No.
18  Q.   Okay.  Did you start working for Dallas County
19 Elections after you completed high school?
20  A.   No.
21  Q.   Okay.  Sometimes I ask people, like what was
22 the most interesting thing they did before they got to
23 their position.  Senator Hughes told me he sold
24 appliances door to door, but I will not ask you that
25 question in the interest of time.

Page 80

1       When I'm quiet, it's because I'm not going to
2 ask you questions, so I'm just moving through my list.
3   A.   Okay.
4   Q.   Do you know, in general, what percent of votes
5 that are cast in Dallas County are vote by mail?
6   A.   In general, no, I do not.
7   Q.   For -- well, let me ask you this:  In the past,
8 to the best of your knowledge or from 2018 (indicating)
9 up until now, has Dallas County ever sent voters
10 application for ballot by mail on Dallas County's
11 initiative?
12       MS. HUNKER:  Objection, form.
13  A.   Not to my knowledge.
14  Q.   (By Ms. Perales)  So is it correct to say,
15 then, that Dallas County, from 2018 forward, has only
16 ever sent somebody an application for ballot by mail
17 because that voter requested it first?
18  A.   To my knowledge, yes.
19  Q.   So, for example, Dallas County never did a
20 mailing out to voters over 65, saying, Here's an
21 application for ballot by mail in case you want to use
22 it, or something like that?
23  A.   Not to my knowledge.
24  Q.   Before you became -- or before you were in your
25 current position, were you involved in processing or

Page 81

1 accepting applications for ballot by mail?
2   A.   No.
3   Q.   Okay.  And before you took your current
4 position, were you involved in processing or accepting
5 mail ballots?
6   A.   No.
7   Q.   Do you have any personal experience with
8 processing applications for ballot by mail or mail
9 ballots prior to the March 2022 election?
10  A.   Yes.
11  Q.   And which elections would that be for?
12  A.   That would be for the elections that was in May
13 of 2021 and November of 2021.
14  Q.   Okay.  So it would be fair to say that you
15 don't have personal experience with processing
16 applications for ballot by mail or mail ballots in
17 either 2020 or 2018; is that correct?
18  A.   I did not process in 2020, November 2020, but I
19 did assist in the Mail Ballot Department in '20 -- in
20 November of 2020.
21  Q.   Okay.  Did you assist in the Mail Ballot
22 Department in March of 2018 for the primary?
23  A.   No.
24  Q.   So you have some experience with the procedures
25 of the office handling the applications for ballot by

The Office of the Dallas County Elections Administrator
April 29, 2022
Pages 82 to 85

Page 82

1 mail and the mail ballots from November 2020?
2    A.  Yes.
3    Q.  So I'm going to ask you some questions about
4 the procedures of the office --
5    A.  Okay.
6    Q.  -- that were used prior to SB 1 --
7    A.  (Witness moves head up and down.)
8    Q.  -- so before this March primary.
9        Were there changes in the way the Elections
10 Department processed applications for ballot by mail or
11 mail ballots between November 2020 and November 2021
12 that you're aware of?
13    A.  Can you repeat that question again?
14    Q.  Yeah.  I want to ask some questions about the
15 procedures of your office in handling applications for
16 ballot by mail, processing them, and also mail ballots.
17 But I want to make sure that when I ask those questions,
18 I'm sort of capturing what your office does.
19        And so my first question is whether you changed
20 (indicating) any of the ways that you processed
21 applications for ballot by mail or mail ballots between
22 November 2020 and November 2021.
23        Did your office undergo any kind of changes in
24 the way you handled these materials or processed them?
25    A.  Not to my knowledge.

Page 83

1    Q.  So then I will ask you:  Prior to SB 1, prior
2 to the March 2022 primary, when you received an
3 application for ballot by mail in the mail, what would
4 you do from the moment that you opened it (indicating)?
5    A.  We'll open it, look to see -- date-stamp it,
6 and then we'll put it in a category of how it came in.
7 If it was a Y65, which is yearly person who's over the
8 age -- anyone over the age of 65, or is disabled, or if
9 they are going to be a RM, which is regular mail, out of
10 county, or they just particularly want one particular
11 election, they're -- they're selecting, or if it's a
12 military or something like that, well, then, we'll put
13 it in its category (indicating).
14        And then we will put a bar code label on there.
15 That way we can scan or capture the image of the
16 application and put it into the VR system.
17    Q.  What would you be checking when you first open
18 it, or would you scan it even if it was, for example,
19 incomplete or unsigned?  Is there a point at which
20 you're checking to make sure it's complete?
21        MS. HUNKER:  Objection, form.
22    A.  We are actually doing -- I believe -- first, we
23 will scan it.  The process of it -- the process now
24 would be still to image it, to capture the image of it.
25    Q.  Okay.

Page 84

1    A.  That way, we will have the image of the either
2 completed application or the incomplete application.
3    Q.  Does it also get a bar code?
4    A.  Yes.
5    Q.  Okay.  So, then, after it gets the bar code,
6 what happens next?
7    A.  Once it gets the bar code, then we would go
8 ahead and process that application in the -- in the
9 Vemacs voter registration system.  And we will process
10 it if it's complete.  If the application's complete,
11 then we will process it and prepare it for the election.
12        If it's not complete, then we will process it
13 still and then send the voter a notice letting them know
14 what was incomplete about the application.
15    Q.  Okay.  And when you're -- let's assume that
16 you've got an application for ballot by mail and it is
17 complete.  How -- what would your office do to make sure
18 that you knew this was coming from a real voter?  Is --
19 was there anything you would check about the voter
20 besides that you have a voter registration record for
21 that voter?
22    A.  Just -- just checking them in that voter
23 registration system.  They have to be a registered voter
24 in order -- and if they are not a registered voter, then
25 we will send them a letter letting them know, You are

Page 85

1 not a registered voter, and also a voter registration
2 application.
3    Q.  Okay.  And so assuming the application for
4 ballot by mail makes it through the system, is it fair
5 to say you would then send that voter a mail ballot?
6    A.  We'll send them a ballot for every election
7 that they are eligible to vote in.
8    Q.  So if you got an application for ballot by mail
9 in January, for example, and the voter had checked
10 "annual," you would put that person in the system and
11 send them mail ballots for the rest of the year; is that
12 right?
13    A.  Uh-huh.  You said just check annual, so we'll
14 just send them a ballot for an election that's not a
15 political party election because they have to declare.
16    Q.  Okay.  So if they wanted to vote in one primary
17 or another, they would still -- they'd have to send you
18 another --
19    A.  No.
20    Q.  -- application?
21    A.  They would have to state that on the
22 application.
23    Q.  Okay.  Got it.  Now, walk me through the
24 process pre-SB 1 (indicating) --
25    A.  Okay.

The Office of the Dallas County Elections Administrator                     April 29, 2022
                                                                            Pages 86 to 89

Page 86

1    Q.  -- of rece- -- your office would receive a mail
2  ballot now from a voter.
3        What would you -- what would be the process of
4  dealing with that?
5    A.  We'll take the actual carrier envelope, which
6  contains the ballot inside the carrier envelope.  We
7  will datestamp that carrier envelope, and then we will
8  run it through our Agilis machine to capture the image
9  of the side of the envelope that would contain the
10 voter's signature on there, and then we will wait for
11 SVC, which is Signature Verification Committee to verify
12 the signature.
13   Q.  Okay.  Have you ever done work to verify
14 signatures, yourself?
15   A.  No.
16   Q.  And who's on the Signature Verification
17 Committee?
18   A.  That's a committee that is determined by, I
19 believe, the political parties, the Republican party and
20 Democratic party.  And then they have a -- they have a
21 elect- -- Early Voting Ballot Board, which has a judge
22 and they determine who is the judge in -- in the ballot
23 board and who are selected to be on the committee for
24 signature verification.
25   Q.  And then, once the -- so do you have any

Page 87

1  understanding of what the Signature Verification
2  Committee does to verify the signature?
3    A.  Say that again, please.
4    Q.  Do you know what the Signature Verification
5  Committee would do to verify the signature?
6    A.  No.
7    Q.  Do you know if they compare the signature to
8  anything?
9        MS. HUNKER:  Objection to form.
10   A.  The law states that the Signature Verification
11 Committee is to verify the signature of the voter,
12 compare the signature of the voter's ABBM application
13 and compare the signature on the carrier envelope.
14   Q.  (By Ms. Perales)  Okay.  If you received a mail
15 ballot and the signature is missing on the carrier
16 envelope --
17   A.  (Witness moves head up and down.)
18   Q.  -- what would you do?
19   A.  If it's within the time frame of bef- -- if
20 it's within the time frame before the Signature
21 Verification Committee convenes, we will take that
22 carrier envelope and resubmit it back to the voter for
23 them to be able to either put their signature on that
24 carrier envelope, mail it back to us; or they can take
25 that carrier envelope and take it to the polls, either

Page 88

1  during early -- when Early Voting begins or Election
2  Day, and they can turn that carrier envelope in and vote
3  ballot for ballot.
4    Q.  So would you have a letter, like a form letter,
5  that you would send the carrier envelope back to the
6  voter with the letter explaining kind of what their
7  options are?
8    A.  And you're still asking the questions before --
9  prior to 20- --
10   Q.  Before SB 1.
11       (Simultaneously speaking.)
12   A.  SB 1.
13       THE REPORTER:  I'm sorry.  Can you slow
14 down just a little bit, and can you repeat the last
15 thing you just said.
16       THE WITNESS:  I asked -- I asked -- I
17 said, Are you still asking the questions before SB 1.
18       THE REPORTER:  Thank you.
19   A.  That works -- yes, we did send a notice back
20 with the carrier envelope to the voter explaining to
21 them that they failed to put their signature on the
22 carrier envelope and give it -- and -- and explain it to
23 them, there's the steps they can do next in order for
24 their vote or ballot to be cast.
25   Q.  What would you do if there wasn't enough time

Page 89

1  before the Election Day to mail the mail ballot back to
2  the voter?
3    A.  It would be turned over to the SVC.
4    Q.  The Signature Verifi- --
5    A.  Signature Verification --
6    Q.  -- -cation?
7    A.  -- Committee.
8    Q.  But if the signature was missing, you would
9  just turn it over anyway?
10   A.  If they're -- if Signature Verification
11 Committee has convened, everything is turned over to
12 them.
13   Q.  Did you have a process before SB 1 of trying to
14 reach out to a voter, either by phone or some other way,
15 to tell them what their options might be if there wasn't
16 enough time to mail back the mail ballot?
17   A.  No.
18   Q.  You have a big county.
19       Okay.  Now I'm ready to move to SB 1.
20   A.  Okay.
21   Q.  You'll agree with me that SB 1 created new
22 requirements for verification of application for ballot
23 by mail and mail ballots, correct?
24   A.  Yes.
25   Q.  And in your words, could you explain to me what

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                       Pages 90 to 93

Page 90

1 these new requirements are as they apply to ABBMs and
2 mail ballots?
3    A.   Okay.  For an ABBM application, now we are
4 required to look into the voter registration system, not
5 only to verify that they are a registered voter, but to
6 look at the voter registration identification, Texas
7 Driver's License, Texas ID or the Soc- -- last four
8 digits of the Social Security number and see if it
9 matches what the voter has provided on the ABBM
10 application.  Also -- we are also looking for the reason
11 why they are voting by mail --
12    Q.   (Moving moves head up and down.)
13    A.   -- and also if they provided a signature.
14    Q.   All right.
15    A.   And then if they met all those requirements,
16 then they will get inputted into the system, processed
17 as -- this first step as beginning to get a appli-- I
18 mean, a ballot by mail.  If they do not meet those
19 requirements, then we will send them, the voter, a
20 notice, letting them know which requirements were not
21 met.
22        If a carrier envelope comes into our office
23 now, we have a secrecy flap on that envelope, carrier
24 envelope, that we do remove.  The mail ballot staff does
25 remove that secrecy flap, and we do check to see if that

Page 91

1 voter does have either one of those numbers on there or
2 they have signed an applica- -- I mean, signed a carrier
3 envelope.
4        If any of the items are missing, then we would
5 go ahead and do a Corrective Action Form of a defect of
6 a carrier envelope, send that voter a notice with that.
7 And on that notice, if it's a Corrective Action Form and
8 if it's not a Number 4 that states that the voter has a
9 incorrect driver's license or Social Security or a
10 missing driver's license or Social Security, they will
11 send that form and that ballot back to the voter --
12    Q.   Okay.
13    A.   -- by mail.
14    Q.   Thank you.  I'm going to ask you some questions
15 about Dallas County's experience with these new
16 requirements --
17    A.   Okay.
18    Q.   -- for the March 2022 primary election.
19    A.   Okay.
20    Q.   Is it correct to say that the March 2022
21 primary election was the first election that Dallas
22 County was implementing the new ID requirements for mail
23 voting?
24    A.   Yes.
25    Q.   So starting with the first week in January of

Page 92

1 2022, did your office begin to receive applications for
2 ballot by mail?
3    A.   The first week in January?  I -- maybe.
4    Q.   Okay.
5    A.   I don't -- I do not recall when we really start
6 receiving applications then.
7    Q.   Would you say that you receive applications for
8 ballot by mail in January or --
9    A.   Yes.
10    Q.   -- did?
11    A.   Yes, we did.
12    Q.   Did you keep track of how many applications for
13 ballot by mail that you were receiving either daily,
14 weekly or monthly?
15    A.   Yes, daily or weekly.
16    Q.   And how -- how is that information recorded?
17    A.   It's recorded by hand count.
18    Q.   Is that in a chart somewhere?
19    A.   Yes.
20    Q.   Okay.  So we are in January.  Your office is
21 receiving applications for ballot by mail and because of
22 SB 1, it's fair to say that you were opening these
23 applications for ballot by mail and attempting to match
24 the ID number that was provided on the ABBM to your
25 records on voter registration; is that right?

Page 93

1    A.   Yes.
2    Q.   Tell me about what that experience was like in
3 January.
4        For example, were there times when you could
5 not match the information that was provided on the ABBM
6 to the voter registration record?
7    A.   Well, when we --
8        MS. HUNKER:  Objection, form.
9    A.   When we received a application, one of our
10 processes were to look at the application and if it was
11 missing any of the information, it automatically went
12 aside to one pile; and then all the other information,
13 anything that had other information, went to another.
14 And they'll still get the same bar code, everything.
15    Q.   (By Ms. Perales)  Okay.  So let's take the
16 example of an ABBM that you received that didn't have
17 either a driver's license number or the last four of the
18 Social.
19    A.   Okay.
20    Q.   It's correct to say that you described that you
21 would put that ABBM that was missing ID, missing any ID
22 information, over to a pile; is that right?
23    A.   Yes.
24    Q.   But would you still scan and barcode that ABBM?
25    A.   Yes.

Page 94

1    Q.   After you did that for that particular ABBM,
2  what would you do with it next?
3    A.   We would submit it into the -- put it into the
4  system because the person is already a registered voter.
5  So what we did was we created a notice, and the notice
6  would state that it was either missing your Texas
7  Driver's License, Social Security or Texas ID.
8    Q.   When you say "we created a notice," you mean
9  Dallas County created a notice?
10   A.   Dallas -- Dallas County mail ballot staff, yes.
11   Q.   And that was because you didn't have a notice
12  from the Secretary of State that included informing the
13  voter that the ID number was missing or couldn't be
14  matched; isn't that right?
15       MS. HUNKER:  Objection, form.
16   A.   I do not remember when the notice was given to
17  us, so...
18   Q.   (By Ms. Perales)  Do you --
19   A.   I know the notice was given to us in January,
20  but I do not remember the date that the notice was given
21  to us.
22   Q.   Do you remember creating your own form before
23  you received the notice from the Secretary of State?
24   A.   No, we did not create our form.
25   Q.   All right.  So before you received the notice

Page 95

1  or form notice from the Secretary of State, how were you
2  responding with these mail ballot applications that were
3  missing ID numbers?
4    A.   We already had forms, and that was already
5  created in our voter registration system, VEMACS.  So
6  what we did was just put "other," and then we'll just
7  write on there, stating the fact -- what was missing.
8    Q.   Okay.  Did you keep track of how many mail
9  ballot applications you were unable to process because
10  the ID numbers were either missing or you could not
11  match them to the voter's registration record?
12   A.   Yes.
13   Q.   Okay.  And where did you keep that information?
14   A.   In the VEMACS voter registration system.  And
15  let me -- let me go back to say we did create a notice.
16  We just created a notice in VEMACS, so...
17   Q.   When you say that in VEMACS you were able to
18  keep track of how many ABBMs you were not processing,
19  was VEMACS specific to which ABBMs you couldn't process
20  because of an ID number issue versus an ABBM that you
21  couldn't process because it was missing a signature or
22  something like that?
23   A.   Yes.  Yes and no, because if it was a multiple
24  incompletion, like someone failed to put their signature
25  or failed to put their driver's license and Social

Page 96

1  Security, we create a notice in VEMACS to say, Hey, this
2  is a multiple request, and the reason why.
3    Q.   Okay.  And so would it be fair to say, then,
4  that there were notices created in VEMACS specifically
5  for people who didn't have an ID number on there or that
6  you couldn't match the ID number?
7    A.   Yes.
8    Q.   Okay.  And does VEMACS -- now could you run a
9  report on VEMACS and ask it how many of those particular
10  ID-number-related notices went out?
11   A.   Yes.
12   Q.   Okay.  So I understand that you would then
13  notify the voter that you were missing an ID number that
14  you could match for -- for their ABBM; is that correct?
15   A.   Yes.
16   Q.   Do you know, sitting here today, about how many
17  of those notices you sent out to voters -- or let me
18  phrase it another way.  Do you know, sitting here today,
19  how many applications for ballot by mail you were unable
20  to process because they were missing an ID number or the
21  ID number that was provided by the voter could not be
22  matched to the registration record?
23   A.   Not offhand, no, I do not know the number.
24   Q.   Do you have that number somewhere in your
25  office?

Page 97

1    A.   Yes.
2    Q.   My next question is whether you know -- let me
3  see.
4        You know how many people submitted an
5  application for ballot by mail that you were able to
6  process and send a mail ballot, correct?
7    A.   Yes.
8    Q.   Do you know how many people initially sent you
9  an ABBM that you couldn't match the ID number and they
10  managed to cure that defect somehow by sending you
11  another ABBM that you could process?
12   A.   No, I do not know that number.
13   Q.   Do you know how many people sent you an ABBM
14  where you couldn't verify the ID number and, ultimately,
15  you never sent that person a mail ballot?
16   A.   Say that again.
17   Q.   I'll ask it a different way.
18       Is it fair to say that some voters submitted an
19  ABBM and you weren't able to verify their number because
20  it was either missing or you didn't have that number in
21  your records and you sent that voter a notice with a new
22  ABBM and they were able to submit to you information
23  that you could verify and you sent them a mail ballot?
24       MS. HUNKER:  Objection, form.
25   A.   If they completed it and then everything was in

Page 98

1 the system, correct, yes.
2    Q.  (By Ms. Perales)  Okay.  Now I'm asking about
3 the other group of people.
4        Do you have any idea about the number of people
5 who submitted an ABBM and you couldn't verify their ID
6 number and, ultimately, they were just never able to get
7 a mail ballot; they never received a mail ballot from
8 you?
9        MS. HUNKER:  Objection to form.
10    A.  I don't have a number for that, no.
11    Q.  (By Ms. Perales)  Is there any way that we
12 could figure out what that number is?
13    A.  Possibly, yes.
14    Q.  Okay.  How would we try to figure out what that
15 number is?
16    A.  Well, we can take a look at the list of
17 rejection letters, a list of voters on the rejection
18 list, compare them to the list of voters and to compare
19 them, see if they went to the polls to vote or if they,
20 in fact, did vote or if, in fact, they did re- -- submit
21 another ABBM application.
22    Q.  So we could compare the list of voters on the
23 rejection list for ABBM and -- and compare them to
24 voters who voted.
25        Could we also compare the list of voters on the

Page 99

1 rejection list for ABBMs with the list of voters who,
2 ultimately, got mail ballots?
3    A.  Yes.
4    Q.  Did you communicate with voters in the weeks
5 and months leading up to the March primary regarding
6 this new requirement to match the ID number?
7    A.  No.
8    Q.  Who would be talking -- who in your office
9 would be talking to voters who were contacting your
10 office, for example, when they received a notice saying
11 that their ID number could not be matched?
12    A.  Okay.  Repeat the first question.
13    Q.  You -- if a voter received one of these
14 notices --
15    A.  Uh-huh.
16    Q.  -- saying you couldn't verify their ID
17 number --
18    A.  Uh-huh.
19    Q.  -- would it be fair to say that the voter was
20 also receiving a new application for ballot by mail?
21    A.  Yes.
22    Q.  Okay.  Did you ever send voter registration
23 forms out to the voters, as well?
24    A.  A voter registration --
25    Q.  Form to -- a voter registration form to a voter

Page 100

1 whose ID number you couldn't verify?
2    A.  When you say "voter registration form," what
3 kind of form are you asking about?
4    Q.  Update.
5        MS. HUNKER:  Objection, form.
6    A.  Can you explain to me what type of form?  There
7 are multiple forms for voter registrations.
8    Q.  (By Ms. Perales)  Okay.  Tell me how many voter
9 registration forms you use here in Dallas County.
10    A.  We use a Statement of Residence, and we use
11 a -- they have a Address Confirmation Form.  They have
12 the Voter Registration Application.  That's a form,
13 also, so...
14    Q.  Did you ever send a Voter Registration
15 Application to a voter with a notice that you could not
16 verify their ID number on their ABBM?
17    A.  Yes.
18    Q.  Do you know how many of those you sent out?
19    A.  No.
20    Q.  So you did not keep track --
21    A.  No.
22    Q.  -- of that?
23        At what point did you start sending
24 applications for voter registration with the notice to
25 the voter saying you couldn't match the ID number on the

Page 101

1 ABBM?
2    A.  That's hard.  We've always sent Voter
3 Registration Application forms with the ABBM if the
4 voter -- even back then, if the voter's address wasn't
5 the same address in the voter registration system as on
6 the application, we would send a Voter Registration
7 Form, so...
8    Q.  In terms of what was happening starting in
9 January --
10    A.  Okay.
11    Q.  -- when you realized that there were voters who
12 had submitted ABBMs and for whom you could not verify
13 their number --
14    A.  Okay.
15    Q.  -- you -- you -- testified before you started
16 sending them notices.  But at what point, in either
17 January or February, did you make the decision or did
18 somebody make the decision at Dallas County to start
19 sending Voter Registration Applications along with the
20 notice, or was it simply from Day 1 you were doing that?
21    A.  We've always done it, Day 1.
22    Q.  Okay.  And even with respect to the ID numbers.
23        So are you saying that for every voter that you
24 could not match the ID number on the ABBM, you were
25 sending them Application for Voter Registration?

Page 102

1    A.  That's what we're -- yes, that's what we're
2  supposed to do.  Yes.
3    Q.  I'm going to go back to my question about
4  the -- the human beings in your office that communicate
5  with voters.
6       If a voter --
7    A.  Uh-huh.
8    Q.  -- submitted an ABBM and then received back
9  from your office a notice saying that you couldn't
10 process their ABBM and then there's a Voter Registration
11 Application in there --
12   A.  Uh-huh.
13   Q.  -- and also a new ABBM --
14   A.  Uh-huh.
15   Q.  -- and that person wanted to call Dallas County
16 Elections and ask questions about that --
17   A.  Uh-huh.
18   Q.  -- who would that person have spoken to; who
19 would the voter have spoken to?
20   A.  Anyone who answered the telephone.
21   Q.  Okay.  And you mentioned that you did not speak
22 to voters about that?
23   A.  I -- yes, I did speak to voters about that.  I
24 maybe misunderstood your question.
25   Q.  Okay.

Page 103

1    A.  I'm sorry.
2    Q.  So you were getting phone calls from voters
3  with questions about this process; is that right?
4    A.  Yes.
5    Q.  And generally, what were voters communicating
6  to you?
7    A.  The reason why they received the letter, what
8  was the letter for.  If it was for missing their Social
9  Security or driver's license, we explained to the voter
10 that the only thing they had to do was put that on their
11 ABBM application.
12   Q.  Did you get any voters asking why they were
13 being sent a Voter Registration Application when they
14 knew they were already registered to vote?
15   A.  Yes.  We informed them that their -- if, in
16 fact, if their voter registration record did not have
17 the Texas Driver's License or ID or Social Security,
18 that they would need to put that on their information --
19 on their application.  I'm sorry.  We need to put it --
20 have it on their voter registration record, also have it
21 on their ABBM application.  But it was a very rarity
22 that we did get any of those and we had to send those
23 applications out to a voter, because most of the time we
24 will have the information on the voter registration
25 file, but it wasn't on the ABBM application.

Page 104

1    Q.  Okay.  So, in your experience, many ABBMs were
2  coming to your office and the voter had failed to put
3  either a driver's license number or the last four of the
4  Social?
5    A.  Yes, or they forgot to put the correct
6  information that was on the voter registration file.
7    Q.  All right.  So they might have put a driver's
8  license number when you had the last four of the Social?
9    A.  Yes.
10   Q.  Or vice versa?
11   A.  Or vice versa.
12   Q.  They might have put the last four of the Social
13 and you only had the driver's license --
14   A.  Yes.
15   Q.  -- number?
16   A.  Yes.
17   Q.  Did your office keep track of the number of
18 communications you got from voters with questions about
19 the new ID verification requirements?
20   A.  No, we did not.
21   Q.  Would you say that your office spent a
22 significant amount of time answering questions from
23 voters or responding to their inquiries about the new ID
24 requirements?
25   A.  Yes.

Page 105

1       MS. HUNKER:  Objection, form.
2    Q.  (By Ms. Perales)  Is there any way to get a
3  sense of how much time that was taking out of your
4  regular day?  Can you describe that for me since you
5  didn't necessarily keep track of the number of calls?
6    A.  Repeat that again.
7    Q.  How can I -- how can I get a sense from you of
8  exactly how much time it was taking to respond to voter
9  inquiries if you're telling me you didn't necessarily
10 keep track of the number of phone calls that you were
11 getting?  How can I understand how much time or how much
12 resources of your office were dedicated in the lead-up
13 to the March 2022 primary to answering questions from
14 voters who had rejected ABBMs, for example?
15   A.  That's hard to say.  A call could take a
16 minute.  Another call could take ten minutes.  It's hard
17 to say.
18   Q.  Did you have particular staff that would --
19 that these calls would get transferred to so they could
20 explain to the voters what the new requirements were?
21   A.  No.  We have -- the way the system works is:
22 You call into our office.  You can pick who you want to
23 speak to:  mail ballot, absent- -- absentee, early
24 voting, voter registration.  So if they had a absentee
25 or mail ballot question, they would click Number 1.  And

The Office of the Dallas County Elections Administrator

---

1 then they'll get a person that's in mail ballot in my
2 office section.
3    Q.   Would you say that you were spending more than
4 an hour a week responding to voters who were calling
5 with questions about the new ID requirements?
6    A.   Yes.
7    Q.   Can you give me a sense of how many hours a
8 week you spent responding to voter inquiries?
9    A.   You get phone calls every day, all day long,
10 so...
11    Q.   And specifically --
12    A.   That's more than an hour.
13    Q.   Yes.  And specifically, for these SB 1
14 ID requirements, can you tell me about how many hours
15 you might have spent either on a daily basis or a weekly
16 basis?
17    A.   It could be first time we sign in the morning,
18 8:00 o'clock until we sign out at 4:30, we'll be getting
19 a phone call.  So I don't -- I -- I don't understand the
20 question, how you're asking it.
21    Q.   Uh-huh.  So I'm hoping to get an understanding
22 of how these new ID number matching requirements under
23 SB 1 affected the workflow of your office.
24         So you'll agree with me that in elections prior
25 to the March primary 2022, you didn't have to answer any

1 questions from voters about their driver's license or
2 Social matching for their ABBM or their ballot, right?
3    A.   Correct.  We didn't have to answer those
4 questions before SB 1.
5    Q.   And then after SB 1 and for the March 2022
6 primary, you did have to answer questions from voters
7 about those requirements, correct?
8    A.   Yes.
9    Q.   So how much time did it take you to answer
10 those types of questions from voters on SB 1-related
11 requirements once you started putting them into effect
12 for the March primary?
13    A.   Are you asking me how long it took to answer a
14 phone call?
15    Q.   Answer -- if we add it up, the time that you
16 spent talking to voters and responding to their
17 inquiries about the ID-matching-number requirements, if
18 we added up those minutes, what would that be like for
19 you?
20    A.   Again, that's every day, all day.
21    Q.   Okay.
22    A.   I can't give you a -- a number, specific
23 number, because I don't have it.
24    Q.   Okay.
25    A.   We answer phone calls every day, all day long.

1    Q.   Would --
2    A.   I have a staff of eight in my office.  All
3 eight will answer the phone.  All eight would get a
4 phone call.
5    Q.   Would --
6    A.   So that person may get ten calls in one day.
7 That person may get 20 calls in one day.  I do not know.
8    Q.   Would it be fair to say that most of the calls
9 that you were getting from voters with questions about
10 why their ABBM or mail ballot was rejected were calls
11 that were related to the new ID requirements for SB 1?
12    A.   Yes.
13         MS. HUNKER:  Objection, form.
14    Q.   (By Ms. Perales)  You mentioned there are eight
15 people in your office.  Those are -- would that be
16 correct, then, to say that there are eight people whose
17 work is primarily dedicated to processing either
18 application for ballot by mail or mail ballots?
19    A.   Yes.
20    Q.   Were there voters who provided a number on
21 their ABBM that you were able to match and that you sent
22 them a mail ballot and then when you got the mail
23 ballots back, you could not match the ID number that had
24 been provided on the mail ballot envelope?
25    A.   Yes.

1    Q.   Okay.  Do you know about how many those were?
2    A.   I do not know.
3    Q.   Would we be able to figure it out by -- did
4 you -- I answered my own question.  Let me start again.
5         Did you keep track of the voters for whom you
6 received a mail ballot, but you could not verify their
7 ID number in order to count that mail ballot?
8    A.   No.
9    Q.   Okay.  And presumably, if they were sending you
10 a mail ballot, they had already managed to get
11 themselves through the ABBM process, right, by giving
12 you a number you could match?
13    A.   Yes.
14    Q.   Okay.  But then, we have the number of people
15 who were sent mail ballots and then you get these mail
16 ballot back and you can't verify the number.  That's
17 a -- that's, like, a known -- we could figure that out?
18    A.   Yes.
19    Q.   Okay.  Did you ever advise a voter over the
20 phone what to do when they received a notice and a new
21 ABBM and maybe also a new Voter Registration
22 Application?  Did you ever advise a voter on the phone,
23 like, This is what you have to do with these papers and
24 get them back to us so we can send you a mail ballot?
25    A.   Yes.

The Office of the Dallas County Elections Administrator            April 29, 2022
Pages 110 to 113

Page 110

1    Q.  Did you ever -- did you ever talk to a voter
2  for whom there wasn't enough time left, either for you
3  to send them those new materials or for them to return
4  those materials, and did you offer those voters a
5  different advice?
6    A.  Yes.
7    Q.  Okay.  Tell me how that situation would come to
8  pass?
9    A.  Let's say if you sent in your information and
10  we sent you a notice back, and it was past the deadline
11  or you wouldn't have enough time to get into the mail,
12  if you received an ABBM, sent a ABBM in and a notice was
13  sent to you, then I would advise that voter to go to an
14  Early Voting location or go to the polls on Election Day
15  to vote in person.  And then the ABBM application that I
16  sent back to you, just go ahead -- and I will let them
17  know to fill out everything completely, answer all the
18  questions, and mail it back to us, and then we'll get
19  you ready for the next election.
20    Q.  Okay.  Did you ever have a voter tell you, in
21  response to that advice, that they -- they weren't
22  physically able to get to the poll to vote in person?
23    A.  Yes.
24    Q.  Do you remember what some of those reasons were
25  that the people were describing about themselves that

Page 111

1  they weren't physically able to get --
2    A.  They said --
3    Q.  -- to the poll?
4    A.  -- they could not walk or they couldn't --
5  didn't have a way or a car to get to the polls.
6    Q.  Okay.  Were most of the people that you were
7  talking to over age 65?
8    A.  Yes.
9    Q.  Do you have data on what -- let's say for
10  pre-SB 1, what proportion of your mail voters fall into
11  the over-65 category versus disability versus absent
12  from the jurisdiction on Election Day?
13    A.  Yes.
14    Q.  For pre-SB 1?
15    A.  Yes, because, you know, we have the category.
16  We have -- they have to tell us how they are vot- -- why
17  they're voting mail ballot, so we have -- we put that
18  into our system, Y65, which is annual 65; YDS, which is
19  disabled; or REM (phonetics), out of county.
20    Q.  Okay.
21    A.  Uh-huh.
22    Q.  And that's because they check a box; isn't
23  that --
24    A.  They check --
25    Q.  -- right --

Page 112

1    A.  -- a box, yes.
2    Q.  -- on the ABBM?
3    A.  Yes.
4    Q.  Okay.  And that continues through -- even
5  through the March primary of 2022?
6    A.  Yes.
7    Q.  And does that information go into your computer
8  system in any way?
9    A.  Yes.
10    Q.  So you could run a report, for example, how
11  many of your mail voters were sent a ballot because they
12  checked off over 65 versus disabled versus absent; is
13  that right?
14    A.  Yes.
15    Q.  What system would produce that report; what's
16  the name of your system?
17    A.  VEMACS.
18    Q.  VEMACS.
19        THE WITNESS:  It's V-E-M-A-C-S.
20        THE REPORTER:  Thank you.
21    Q.  Thank you.  I had completely gotten that wrong.
22    A.  A lot of people do.  I'm sorry.  And the
23  corporation is Votec that owns the VEMACS.
24        THE REPORTER:  I'm sorry?
25        THE WITNESS:  VOTEC, V-O-T-E-C.

Page 113

1    Q.  Did you find yourself unable to process
2  applications for ballot by mail at a greater number
3  following SB 1's requirement to match an ID number?
4    A.  Yes.
5    Q.  And how do you know the numbers are greater
6  post SB 1?
7    A.  Because of the requirements of the driver's
8  license and the ID it didn't ask before.
9    Q.  All right.  How do you know you were rejecting
10  more ABBMs and more mail ballots post SB 1?  Like, how
11  do you know the volume was greater?
12        MS. HUNKER:  Objection, form.
13    A.  How do I know the volume was greater?
14    Q.  (Moving head up and down.)
15    A.  By the numbers that we was putting into the
16  system of the notice codes, notices that we sending out.
17        THE REPORTER:  I'm sorry.  Can you repeat
18  your answer, and can you speak up just a little bit --
19        THE WITNESS:  I'm sorry.
20        THE REPORTER:  -- please.
21        THE WITNESS:  About how -- the
22  applications that we was -- put in the systems, the
23  notices that we were generating to the voters.
24        THE REPORTER:  Thank you.
25    Q.  And I think you said notice codes?

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                          Pages 114 to 117

Page 114

1   A.   Notice codes.
2   Q.   Were you here when Mr. Lopez testified that, at
3  some point, Dallas County received an update from the
4  Secretary of State in TEAMS or through TEAMS that gave
5  you more ID numbers?
6   A.   Yes.
7   Q.   Were you familiar with that when it happened?
8   A.   He told me that it happened.
9   Q.   Okay.  So do you know whether it got any easier
10 to find a matching ID number at that point?  Or -- I
11 understand it was February.
12        Was it too late at that point?  Do you -- do
13 you have any recollection of that?
14  A.   I do --
15        MS. HUNKER:  Objection, form.
16  A.   -- not know if it got easier or not.
17  Q.   (By Ms. Perales)  Okay.  Let me ask you another
18 question about verifying the ID number.
19        Would it be fair to say that when you received
20 either an ABBM or a mail ballot, that you would take
21 that number that was provided to you by the voter and
22 look it up in the Dallas County voter roll for that
23 voter?  You would look up that voter in your own voter
24 registration records to see if you could find a matching
25 number?

Page 115

1   A.   Repeat that again.
2   Q.   Okay.  Let's say you get either an ABBM or a
3  mail ballot from Susan Smith, and there's a -- Susan has
4  provided an ID number.  It's either an ABBM or a mail
5  ballot.
6        What would you be looking at to try to match
7  that number?  You -- I think you said it would be Susan
8  Smith's voter registration record; is that correct?
9   A.   Yes.
10  Q.   And is that Susan Smith's voter registration
11 record as maintained by Dallas County?
12  A.   Yes.
13  Q.   If you couldn't find a matching number in your
14 Dallas County voter roll or voter registration record
15 for Susan Smith, did you have another part of your
16 process where you would try to find that number for
17 Susan Smith maybe by doing an inquiry into TEAM?
18  A.   No, we wouldn't do a inquiry into TEAM.  It had
19 to be on our voter registration record roll.
20        THE REPORTER:  I'm sorry.  It would have
21 to be what?
22  A.   On our voter registration in VEMACS.  So how we
23 look it up is -- how we enter in the absentee
24 application is the same way how we will look up a voter
25 registration, the same way.  So it's on the same screen.

Page 116

1   Q.   I see.  So you would eith-- you would -- you
2  would find that voter as you were entering the
3  information for the application --
4   A.   Yes.
5   Q.   -- for ballot by mail?
6   A.   Yes.
7   Q.   And she would -- Susan Smith, she would appear
8  with the information that is associated with her voter
9  registration record as maintained by Dallas County; is
10 that right?
11  A.   Yes.
12  Q.   Do you know if TEAMS does any automatic updates
13 into your voter roll at Dallas County?
14  A.   That is a question for Rive Lopez.
15  Q.   Okay.  I have a question about what we call the
16 carrier envelope.
17  A.   Okay.
18  Q.   Is it fair to say that the mail ballot, itself,
19 goes inside an envelope and then that envelope goes
20 inside a mailing envelope?
21        MS. HUNKER:  Objection to form.
22  Q.   (By Ms. Perales)  Help me understand because
23 I've always had a sense that there are two envelopes
24 involved, but I need some help understanding which one
25 is the carrier envelope.

Page 117

1   A.   Okay.  So what we do is we have a mail ballot
2  packet (indicating).  We have -- for the primary 2020
3  election, we had to use the white envelope.  So we had a
4  white mailing envelope.  Then we had the white secrecy
5  or ballot envelope.  Then we have a carrier envelope,
6  and then we have inserts.
7        We put all those in a packet, along with the
8  ballot, to the voter.  The voter is -- are to return
9  their voted ballot inside the ballot secrecy envelope,
10 seal that, and take that and put it inside the carrier
11 envelope.  Before they close the carrier envelope, they
12 are to put their identification there, close
13 (indicating) the carrier envelope and, over the seal,
14 sign their signature, and then mail that to us.
15  Q.   So the carrier envelope is the envelope that's
16 handled, for example, by the US mail --
17  A.   Yes.
18  Q.   -- is that right?
19  A.   Yes.
20  Q.   And the secrecy envelope is the envelope that
21 contains the voted ballot?
22  A.   Yes.
23  Q.   Thank you.  Did you have any problems opening
24 the envelope that had the flap (indicating) with the ID
25 number written on it?

Page 118

1    A.  I do not open the envelope with the flap with
2 the ID number on it.
3    Q.  Who does?
4    A.  SVC.
5    Q.  Okay.  Did you hear of any problems the
6 Signature Verification Committee had getting those
7 envelopes open without destroying the number underneath?
8    A.  Are you asking about opening the flap, or are
9 you asking about opening the envelope?
10    Q.  Opening the flap.  Who opens the flap?
11    A.  I do.
12    Q.  Okay.
13    A.  I do.
14    Q.  Did you have any problems opening the flap?
15    A.  I hope not.  I designed that flap --
16    Q.  Okay.
17    A.  -- helped design it.  No, just kidding.  No.
18    Q.  I just -- as we go around this day and we
19 talked to all these counties --
20    A.  Uh-huh.
21    Q.  -- we get all kinds of stories.
22    A.  We have -- we have -- the way we designed the
23 flap was pre-perf, and we just pull it back.
24         THE REPORTER:  You said pre --
25         THE WITNESS:  Perf.

Page 119

1         THE REPORTER:  Pre-perf.
2         THE WITNESS:  Uh-huh.
3         THE REPORTER:  Thank you.
4    Q.  Pre-perforated?
5    A.  Pre-perforated.  I'm sorry.  Yes.
6    Q.  So you didn't have to use any tools or
7 implements to try to get that open?
8    A.  No.
9    Q.  That's probably worth a phone call with some
10 counties that I can recommend to.
11         And so do you think that there are voters in
12 Dallas County who submitted an ABBM, you couldn't match
13 their ID number and you sent them the notice and the new
14 materials, but they were never able to cure the ABBM
15 and, thus, did not vote?
16         MS. HUNKER:  Objection, form.
17    A.  Yes.
18    Q.  (By Ms. Perales)  Okay.  And what would be the
19 reasons that they couldn't cure the ABBM?
20    A.  What would be the reasons why?
21    Q.  Yes.  So, for example, one reason might be they
22 just didn't have enough time; they just didn't get it
23 done in time.
24         But were there people who gave you a number,
25 and you just simply weren't able to match it, even after

Page 120

1 you sent them the notice and --
2    A.  Yes.
3    Q.  Okay.  And would that be because you just
4 didn't have their ID number that they provided in your
5 system?
6    A.  Yes.
7    Q.  And now I'm going to ask on the mail ballot
8 side, were there people who submitted a mail ballot to
9 you and you weren't able to verify that number and,
10 thus, you were not able to have that ballot counted?
11         MS. HUNKER:  Objection, form.
12    A.  I -- I don't feel comfortable answering that
13 question because I don't, you know, make the decisions
14 on that.  Ballot Board does.  Early Voting Ballot Board
15 does.
16         THE WITNESS:  I'm sorry.  Early Voting
17 Ballot Board.
18         THE REPORTER:  Okay.
19    Q.  Did you or anyone in your office speak to any
20 voters who told you that they just hadn't been able to
21 vote in the election because of the voter ID number
22 matching requirements or as a result of the voter ID
23 number matching requirements?
24         MS. HUNKER:  Objection, form.
25    A.  Yes.

Page 121

1    Q.  (By Ms. Perales)  Can you give me an example of
2 a person like that?  Do you recall any specific --
3    A.  Of a voter who just could not get to the polls?
4    Q.  Yes.
5    A.  That's it.  They couldn't -- they couldn't get
6 out of the house to get to the polls and that is their
7 only way of voting, was voting by mail.
8    Q.  And a voter who you couldn't match their ID
9 number?
10    A.  Yes.  A lot of voters just got frustrated and
11 didn't -- wouldn't turn it back in.
12    Q.  Do you receive mail ballots where another
13 individual has helped the voter, provided assistance to
14 that voter, and then signed that spot on the envelope
15 where they are supposed to sign?
16    A.  Do I receive -- ask me that again.
17    Q.  Yeah.  Do you receive mail ballots that come
18 back to you and you can see that an assistor has
19 provided assistance to that voter?
20    A.  Are you asking me do I receive the ABBM
21 application or the mail ballot?
22    Q.  I was asking just about the mail ballot.
23    A.  Do we see receive -- I can see that, yes.
24    Q.  Do you record anywhere that a mail ballot came
25 to you and there's an indication that the voter received

Page 122

1 assistance?
2    A.  No, I do not.
3    Q.  So the only way we could figure out that number
4 would be to go back through the envelopes; is that
5 right?
6    A.  Yes.
7    Q.  Okay.  That sounds time-consuming.
8    A.  Yes.
9    Q.  And now let me ask you about the application
10 for ballot by mail.  If a voter receives assistance in
11 filling out the application for ballot by mail, do you
12 keep track of that number anywhere?
13    A.  No.
14    Q.  Okay.
15    A.  No, we do not keep track, but what I can say
16 is:  If a application come into our office and the --
17 they have a witness here (indicating), but they didn't
18 sign, then we send them that notice to the voter that
19 it's not signed; or if they signed it down here and
20 didn't fill out the information, then we send a notice
21 (indicating) to that, but...
22    Q.  So only in a situation where you can tell that
23 somebody provided assistance, but they didn't fill out
24 the paperwork --
25    A.  If it's --

Page 123

1    Q.  -- correctly?
2    A.  -- incomplete, yes.
3    Q.  Okay.  Do you send out mail ballots in Spanish?
4    A.  If it's requ- -- if it's requested, yes.
5    Q.  Is your mail ballot bilingual in the sense
6 that --
7    A.  Well, let me --
8    Q.  -- it has English and Spanish?
9    A.  I'm sorry.  Rephrase that.  Let me say:  Are
10 you asking the ballot or the mail ballot?
11    Q.  So let me ask you first about the mai- -- the
12 ballot, itself.
13    A.  The ballot, itself?
14    Q.  Is the ballot bilingual, or does it kind --
15    A.  Trilingual.
16    Q.  It's trilingual.
17    A.  English, Spanish and Vietnamese now.
18    Q.  Okay.  And so the mail ballot has all three of
19 those languages on it?
20    A.  The ballot has it, yes.
21    Q.  Okay.  Now, for application for ballot by mail,
22 if somebody is Spanish-speaking --
23    A.  Yes.
24    Q.  -- how could they make sure that you send them
25 a Spanish language application for ballot by mail?

Page 124

1    A.  Either they can call us on the phone and ask --
2 request -- that person requesting for their ballot, can
3 request a Spanish version of the ballot; or if it's a
4 Vietnamese, they can call and request that; or they can
5 submit a court request to us in writing, and they can
6 also state that in writing, asking for that.
7    Q.  If someone calls your -- your mail voting
8 group --
9    A.  Uh-huh.
10    Q.  -- and they're just speaking Spanish on the
11 phone --
12    A.  Uh-huh.
13    Q.  -- what would -- how would you handle that
14 call?
15    A.  Well, two ways, through the prompts in the
16 system they call, we have a Spanish version.  If they
17 say, I would like to speak to a Spanish speaker, then
18 they can still like that and then the phone call will go
19 to a Spanish-speaker.
20        If not, if we do get that call, then they'll
21 ask us -- either speak to us in English or ask if they
22 speak to someone in Spanish, and then we'll transfer
23 that call to the person who's speaking Spanish.
24    Q.  Between you and the eight people that work with
25 you --

Page 125

1    A.  Uh-huh.
2    Q.  -- in the mail-ballot group, do you have any
3 Spanish speakers?
4    A.  Yes.
5    Q.  Do you have any Vietnamese speakers?
6    A.  In my department, no.  But in the office, yes,
7 we have one.
8    Q.  Are the language prompts in your system yet for
9 someone to call Dallas County Elections and get a prompt
10 for -- if you need to speak -- if you need to hear this
11 message in Vietnamese, press whatever?
12    A.  I do not know.
13    Q.  Because it's new?
14    A.  It's new.
15    Q.  Okay.
16    A.  It may be.  I just don't know.
17    Q.  I want to ask you now about guidance from the
18 Secretary of State's office during this process,
19 starting January 1 of 2022.
20    A.  Okay.
21    Q.  Was there a time when your office was making
22 decisions about how to implement the new ID number
23 matching requirements and you had not yet received
24 guidance from the Secretary of State's office?
25    A.  Yes.

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                          Pages 126 to 129

Page 126

1        MS. HUNKER:  Objection, form.
2    Q.  (By Ms. Perales)  Give me an example of that.
3    A.  How we were going to handle the notices for the
4  missing or incorrect driver license, Texas ID or Social
5  Security; that was mostly that there.
6    Q.  Okay.
7    A.  And then how we was notifying the voters,
8  sending the notices out.
9    Q.  So you had to make those decisions as Dallas
10  County, correct?
11   A.  Yes.
12   Q.  Do you, in your job, ever talk to people at the
13  Secretary of State's office?
14   A.  Yes.
15   Q.  And did you ask for guidance on some of these
16  ID matching requirements for SB 1 from the Secretary of
17  State?
18   A.  Did I ask for guidance from the Secretar- --
19  no.
20   Q.  Did you have communications with anyone in the
21  Secretary of State's office, from January 1 until the
22  March primary date, about the signature -- or not the
23  signature, about the ID number matching requirements and
24  how to implement them in Dallas County?
25   A.  Repeat that again.

Page 127

1    Q.  Did you ever have communication with the
2  Secretary of State's office about implementing these ID
3  number matching requirements between January 1 and the
4  date of the election?
5    A.  Yes, emails and web-- -- webinars and some --
6        THE REPORTER:  I'm sorry.  Emails and
7  what?
8        THE WITNESS:  Webinar- -- webinars.
9  Webinars.
10   Q.  And so at some point, the Secretary of State
11  offered a webinar for implementing SB 1?
12   A.  Yes.
13   Q.  Do you remember about when that was?
14   A.  No, I do not.
15   Q.  Was it already when early voting or mail voting
16  was underway for you in Dallas County?
17   A.  Mail voting began on January 1st, 2022.  We did
18  receive a template and guidelines on how to do the
19  carrier envelopes, and we received that in December of
20  2021, so...
21   Q.  Okay.  And then from January 1 to the March
22  primary election day, you mentioned a webinar.
23       Do you remember more or less when that
24  happened?
25   A.  No, I do not.

Page 128

1    Q.  And then you also mentioned emails.
2    A.  Yes.
3    Q.  So, in your email account for where you are at
4  your office, there's going to be emails going back and
5  forth between you and people who work for the Secretary
6  of State about implementing SB 1?
7    A.  Yes.  They would send us the elections intranet
8  advisories, emails --
9    Q.  Okay.
10   A.  -- letting us know the new notices --
11   Q.  Uh-huh.
12   A.  -- giving us the webinar dates that they was
13  holding to put out --
14   Q.  Okay.
15   A.  -- and sending out the -- like I said, the
16  notices and the dates and the deadlines.
17   Q.  So there are emails from the Secretary of
18  State's office that kind of went to all the counties on
19  the same basis with --
20   A.  Yes.
21   Q.  -- this new information?
22   A.  Yes.
23   Q.  Did you ever have email or -- or other
24  communication back and forth with the Secretary of State
25  between January 1 and the March primary that was just

Page 129

1  you and somebody over there, that was not to all the
2  counties?
3    A.  Yes.
4    Q.  And what -- what were those types of emails
5  that were just specific to you and them?
6    A.  One of the -- Emily Harwell (phonetics) -- I
7  believe that's her name -- she's the representative for
8  Dallas County.  She would send us back email- --
9  actually, me a email to let me know if something needed
10  to be done in TEAMS or I needed to fix something in
11  TEAMS or fix something with my county to send to TEAMS.
12   Q.  And Emily Harwell is with the Secretary of
13  State?
14   A.  Yes.
15   Q.  Okay.  And she would send you that message
16  about fixing things in TEAMS?
17   A.  She would send me that message and others in
18  the office that message.
19   Q.  Including Mr. Lopez?
20   A.  Sometime Mr. Lopez, sometime Mr. Scarpello --
21   Q.  Okay.
22   A.  -- and to me, also.
23   Q.  And when you were interacting with TEAMS, this
24  was specific to mail ballots or ABBMs, or it just was --
25   A.  ABBMs, mail ballots, the ballot tracker, yes --

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                          Pages 130 to 133

Page 130

1   Q.   So --
2   A.   -- because we have to send something to the
3   TEAMS so it can get submitted to the ballot tracker, on
4   the ballot tracker.
5   Q.   So she was telling you to put something in
6   TEAMS?
7   A.   She was saying something I had missing, if I --
8   if I failed to have something, like, if -- let's say you
9   sent in an application for ballot by mail and the
10  request didn't go through first and then it said that I
11  mailed the ballot out to you, there's a order of steps
12  to send stuff to TEAMS.
13      So first I have to send in that say, Hey, Nina
14  Perales requested a application for ballot by mail.
15  Then the next thing I have to send is that I sent Nina
16  her ballot.  And then -- then I have to send something
17  back that's saying that Nina did, in fact, send her
18  ballot to us.
19  Q.   Uh-huh.
20  A.   Or I had one of the situations where, when we
21  was trying to get a clear understanding of our voter
22  registration system cancel -- like, say -- let's say if
23  you did receive a request for a ballot by mail and you
24  decided to go to polls to vote, we had to clear you out
25  the system.

Page 131

1   Q.   Uh-huh.
2   A.   Well, our voter registration system at the time
3   wouldn't -- didn't send that information to TEAMS
4   because it didn't have to.  But now -- now with the SB 1
5   law, you have to; so she let us know about that, told us
6   about that.
7   Q.   And would you have to do that in TEAMS voter by
8   voter, individually?
9   A.   Oh, no, no.
10  Q.   Okay.
11  A.   No, we would just have to send an export to
12  TEAMS.
13  Q.   Okay.  So there was some point at which the
14  export would be sent out to TEAMS?
15  A.   Yes.
16  Q.   And you could do more than one voter at a time?
17  A.   We could -- yes.
18  Q.   So when you were -- is it correct to say that
19  you were using VEMACS to record, for example, when you
20  received a request for application for ballot by mail or
21  that you sent out an application for ballot by mail, you
22  would be using VEMACS; is that --
23  A.   Yes.
24  Q.   -- right?
25      So VEMACS wasn't automatically talking to TEAM?

Page 132

1   A.   Yes, when we would send the report.  So what --
2   what I have to do is anything that we deal with a
3   particular election.  So let's say we were dealing with
4   the March primary; we associated that voter to that
5   March primary election.
6   Q.   Uh-huh.
7   A.   What we did was doing an export out of TEAM- --
8   out of VEMACS.
9   Q.   Uh-huh.
10  A.   And then once we created the export out of
11  VEMACS, it captured everything that we did to touch that
12  one particular voter.  And then we submit that
13  information to TEAMS, through an import through TEAMS.
14  Q.   And is it fair to say that Emily Harwell --
15  A.   Yes.
16  Q.   -- would contact you because there was
17  something missing with respect to just one individual
18  voter?
19  A.   It was -- there was one or a group.
20  Q.   Okay.  And there would be a step missing, for
21  example, in their process towards getting a mail ballot?
22  A.   Yes.
23  Q.   Okay.  Did you ever have a situation where a
24  voter or an individual was trying to request an
25  application for ballot by mail on behalf of another

Page 133

1   person?
2   A.   Yes.
3       MS. HUNKER:  Objection to form.
4   Q.   (By Ms. Perales)  And how did you handle that
5   situation when you would get contacted by someone who
6   says, I need to request an application for ballot by
7   mail for this other individual?
8   A.   I'll tell them, Unfortunately, I wouldn't be
9   able to do that; I will need to speak with the voter
10  that -- who needs the mail ballot.
11  Q.   And would there, then, the voter who needs
12  the ballot get on the phone?
13  A.   Yes.
14  Q.   Was there ever an instance where the person who
15  needed the ballot could not get on the phone and tell
16  you, themselves?
17  A.   Yes.
18  Q.   Give me that instance, if you could --
19  A.   Husband and wife --
20      THE REPORTER:  I'm sorry.
21      THE WITNESS:  I'm sorry.
22  A.   With the husband --
23      THE REPORTER:  Wait just a second.
24      THE WITNESS:  Uh-huh.
25      THE REPORTER:  I'm still -- okay.  Go

Page 134

1 ahead. Now start. Thank you.
2     A.   With the husband and wife situation, husband
3 calls, requests for a ballot by mail.  He wants to
4 request one for his wife.  We would tell him, no, we
5 have to speak to the wife.  Wife -- and he would say,
6 "The wife is at work."
7        And I said, "Well, she'll have to call us back
8 later."
9     Q.   Okay.  Was there ever an instance where the
10 person could not tell you over the phone -- that they
11 were there, but they could not communicate to you?
12    A.   No, not -- not to my knowledge (indicating).
13    Q.   Okay.  And then have you heard from anybody
14 else in your staff that they had a situation where the
15 voter could not communicate that they needed the ballot
16 and that's why this other person was calling on their
17 behalf?
18        MS. HUNKER:  Objection, form.
19    A.   Not to my knowledge.
20    Q.   (By Ms. Perales)  Okay.  Let me ask you about
21 the ballot tracker because that's --
22    A.   Okay.
23    Q.   -- the next thing on my list.
24        To the best of your knowledge, when did the
25 ballot tracker become available for Dallas County people

Page 135

1 to use to track their ballots?
2     A.   I do not know.
3     Q.   Okay.  Did you ever advise a voter to try to
4 use the ballot tracker to put ID number information in
5 there so that they could vote by mail?
6     A.   From my knowledge, you cannot put ID
7 information in the ballot tracker.
8     Q.   So what do you know about the ballot tracker?
9 What is --
10    A.   The ballot tracker is a device that the voter
11 can look up to track their ballot to see if their
12 application was accepted, if their ballot was mailed to
13 them and when the ballot was returned -- when they
14 mailed the ballot back to the county, and if the ballot
15 was received.
16    Q.   Do you know what information the voter has to
17 put into the ballot tracker to access that information?
18    A.   Yes.
19    Q.   What is that information?
20    A.   They have to put their name -- first name, last
21 name, date of birth, driver's license, Social Security,
22 address, the county that they live in.
23    Q.   Uh-huh.  Do you know if, in order to get into
24 the ballot tracker, that the system, the ballot tracker
25 system, had to match the voter's driver's license and

Page 136

1 last four of the Social in order for the voter to get
2 into the system?
3     A.   Yes.
4     Q.   Okay.  And so if the voter put in their
5 driver's license number and the last four of their
6 Social, but one of those numbers was missing from their
7 voter registration record, is it correct to say, then,
8 that they could not access the ballot tracker?
9     A.   Yes.
10    Q.   Did you have anybody contact your office to
11 tell you about that?
12    A.   Yes.
13    Q.   More than ten people?
14    A.   Yes.
15    Q.   Did you offer any advice to those voters about
16 how to access the ballot tracker system when they were
17 providing their ID numbers, but it -- it just wasn't
18 letting them in?
19    A.   Yes.
20    Q.   And what did you tell them?
21    A.   Well, if I was speaking to the voter, then I
22 would look up their voter registration information, and
23 I advised them what they had in the system.
24    Q.   And did you ever look up a voter and find that
25 there was a driver's license number, but no last four of

Page 137

1 the Social?
2     A.   Yes.
3     Q.   Did you ever look up a voter and see that there
4 was the last four of the Social, but no driver's license
5 number?
6     A.   I don't recall doing that, remember that one.
7     Q.   Was it more the -- more often the case that a
8 voter's driver's license number was in their
9 registration record, but not the last four of their
10 Social?
11    A.   Yes.
12    Q.   Do you know, when a person fills out a voter
13 registration application, whether they have to provide
14 both the driver's license number and the last four of
15 the Social or if they can just provide the driver's
16 license number and be accepted for voter registration?
17        MS. HUNKER:  Objection, form.
18    A.   On the voter registration application, it
19 does -- it has the question for both, but it says "or,"
20 either-or.
21    Q.   Is it also the case that you have voters
22 registered to vote in Dallas County who registered to
23 vote before the voter registration application asked for
24 either the driver's license number or the last four of
25 the Social?

Page 138

1    A.   Yes.
2    Q.   And do you know when the voter registration
3  form started asking for that information?
4    A.   No.
5    Q.   And so did you ever hear that somebody could
6  access the ballot tracker to try to cure their
7  application for a ballot by mail or cure the ID number
8  information for a mail ballot?
9    A.   Say that again, please.
10   Q.   Did you ever hear that somebody could access
11 the ballot tracker and then provide ID number
12 information that would allow them to, essentially, cure
13 either an ABBM or a mail ballot for which you could not
14 match (indicating) the ID number?
15   A.   No --
16        MS. HUNKER:  Objection, form.
17   A.   -- I did not hear anyone be able to access the
18 ballot tracker to cure.
19   Q.   (By Ms. Perales)  I see.  So you received
20 information from voters saying they could not get into
21 the ballot tracker?
22   A.   Yes.
23        MS. HUNKER:  Objection, form.
24   Q.   (By Ms. Perales)  Did you ever talk to a voter
25 who said, Yes, I am in the ballot tracker, but had some

Page 139

1  other question for you --
2    A.   Yes.
3    Q.   -- that they -- okay.
4        So some people you did hear from were able to
5  get into the ballot tracker?
6    A.   Yes.
7    Q.   And why would they be calling you at that point
8  if they were already in?
9    A.   They wanted to know why their ballot or their
10 application was in question.
11   Q.   Okay.  And when you say "in question," do you
12 know how they would see that in the ballot tracker?
13   A.   It would say, I believe, it was under review.
14   Q.   Under review.  Okay.  And what were -- was the
15 ID number mismatch a reason why it would be under
16 review, or what would typically be a reason that it
17 would be under review?
18   A.   With the new SB law, it gives a lot of options
19 to cure your absentee ballot by mail --
20   Q.   Uh-huh.
21   A.   -- or your -- I mean, your application or your
22 ballot by mail.  No driver license, no Social Security,
23 mismatched driver license and mismatched Social
24 Security, no signature.  If no signature, then -- if it
25 was a mismatched signature, a witness statement.  It

Page 140

1  gives a lot of ways for you to cure.  So I couldn't
2  really tell you more about the ballot tracker because I
3  didn't design it or --
4    Q.   Okay.
5    A.   -- work on it that much.
6    Q.   Would you say that Dallas County experienced
7  problems associated with the new voter ID number
8  matching requirements in SB 1?
9        MS. HUNKER:  Objection to form.
10   A.   What type of problems?
11   Q.   (By Ms. Perales)  Well, really, any kind of
12 problem.  So the topic on which you've been designated
13 is, quote, any issues, problems, concerns, or
14 difficulties you experienced because of the challenged
15 provisions of the SB 1, unquote.
16       So there's a lot of SB 1 that's at issue in
17 this lawsuit, but I wanted to ask specifically for
18 mail -- just for now, mail ballot ID matching
19 requirements, whether your office experienced any
20 issues, problems, concerns with that?
21   A.   I would say educating the voters that call on a
22 telephone, explaining to them why they have to have
23 their Texas Driver's License or their Social Security on
24 their application now in order to vote by mail.
25       I would say talking to them about -- talking to

Page 141

1  the voter on the telephone, trying to get them to -- on
2  the ballot tracker, how to access the ballot tracker,
3  what information to put on the ballot tracker, that
4  concern.  The longer hours that we probably worked for
5  filling -- doing the -- doing the notices, putting in
6  the notices, that right there.  I'd -- I'd -- I would
7  say something like that.
8    Q.   Did you ever try -- well, let me ask you this.
9        Was Dallas County receiving inquiries from
10 either the public or the media about the impact of SB
11 1's ID matching requirements on mail voting?
12       MS. HUNKER:  Objection, form.
13   A.   Yes.
14   Q.   (By Ms. Perales)  And were you responsible for
15 pulling together some of the information to respond to
16 these inquiries?
17   A.   Yes.
18   Q.   Did you ever pull together information that
19 would allow you to understand how many people ended up
20 not voting as a result of your inability to match their
21 ID number?
22   A.   No.
23   Q.   Okay.  What were the sorts of requests that
24 were coming from either the media or the public?
25   A.   They just wanted to know how many people were

Page 142

1 being rejected for -- they wanted to know the rates and
2 the number of how many people were being rejected for --
3 because of the SB 1.
4     Q.  Okay.  And you put that information together
5 for them when they would ask?
6     A.  I ran the report, yes.
7     Q.  But on those rejections, is it fair to say that
8 some of those people would have gotten something from
9 you in the mail and may or may not have been able to,
10 for example, submit an ABBM that you could process?
11     A.  Yes.
12     Q.  Okay.  Looking forward to the November 2022
13 election, do you anticipate that there are going to be
14 voters who submit ABBMs and you cannot match the number
15 that they provide on the ABBM to the voter registration
16 record?
17     A.  Yes.
18     Q.  Is it true that more voters vote in the general
19 than in the primary?
20     A.  Yes.
21     Q.  So there might be people who haven't even
22 encountered these SB 1 requirements yet because they
23 chose not to vote in the primary, but they plan to vote
24 in the general?
25         MS. HUNKER:  Objection --

Page 143

1     A.  There might --
2         MS. HUNKER:  -- form.
3     A.  There might be.
4     Q.  (By Ms. Perales)  And similarly, do you
5 anticipate that you're going to receive mail ballots
6 from voters that you cannot count because you can't
7 match their ID number?
8         MS. HUNKER:  Objection, form.
9     A.  Are you asking me about the ballots?
10     Q.  (By Ms. Perales)  Yes.  Do you anticipate --
11     A.  Ma'am, I -- I'm not Early Voting Ballot Board,
12 so I don't count ballots.
13     Q.  Okay.  Do you have a sense right now of how
14 many voters in Dallas County for whom you have a
15 driver's license number, but no last four of the Social?
16     A.  No.
17     Q.  Is there a way to run a report that shows you
18 the voters for whom you have a driver's license number,
19 but no last four of the Social?
20     A.  That would be for the Voter Registration
21 Manager, Rivelino Lopez.
22     Q.  And then I just have to ask this question vice
23 versa.  Do you -- do you know whether it's possible to
24 figure out how many voters in Dallas County for whom you
25 have the last four of the Social, but no driver's

Page 144

1 license number?
2     A.  That would be for the Voter Registration
3 Manager, Rivelino Lopez.
4     Q.  And then finally, do you know if it's possible
5 to identify the number of voters who lack both numbers
6 in your voter registration records?
7     A.  Voter Registration Manager, Rivelino Lopez.
8     Q.  Are you taking any steps, looking forward to
9 the November 2022 election and these SB 1 requirements
10 for mail voting, to try to prepare your office for what
11 you are anticipating will happen in November?  So, for
12 example, are you doing anything different, in terms of
13 either training or who -- how many people you're
14 planning to hire, either for temp or permanent because
15 of what you anticipate will be happening with mail
16 voting and this ID number matching requirement?
17     A.  We always prepare for the election the same
18 steps.  So if it's for the November '22 or for this
19 upcoming primary election, March runoff --
20     Q.  Uh-huh.
21     A.  -- the same steps.
22     Q.  Do you have local elections on May 7?
23     A.  May 7, yes.
24     Q.  Are you in --
25     A.  Like, it's a May -- it's a local and a state

Page 145

1 election.
2     Q.  Yes, local and state for May 7.
3         Are you currently rejecting ABBMs for the May 7
4 election?
5     A.  ABBM applications?
6     Q.  Yes, ABBM applications.
7     A.  That would have already occurred.  The deadline
8 for that cutoff was April the 26th.
9     Q.  Okay.  So about three days ago?
10     A.  Yes.
11     Q.  Did you find yourself rejecting applications
12 for ballot by mail because you were unable to match the
13 ID number?
14     A.  Maybe so.  I do not know.
15     Q.  Okay.
16     A.  I didn't run the numbers on that.
17     Q.  All right.  Do you know if your office was
18 sending out any notices with new application for ballot
19 by mail forms on the basis of being unable to match the
20 ID number?
21     A.  Maybe.  Probably so.
22     Q.  Okay.  And have you received any mail ballots
23 that you know were not counted because of an inability
24 to match the ID number for the May 7 election?
25     A.  For the mail ballots?

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                           Pages 146 to 149

Page 146

1    Q.  Yes.  If any mail ballots have not been able to
2  get counted because of the inability to match the ID
3  number.
4    A.  Technically --
5        MS. HUNKER:  Objection, form.
6    A.  -- we cannot count the ballots yet.  And also
7  we -- they have a cure period, so there's no final
8  rejection until after the cure period.
9    Q.  (By Ms. Perales)  Thank you for that.
10   A.  Uh-huh.
11       THE REPORTER:  Now, you said there's no
12 final -- there's no --
13       THE WITNESS:  No final rejection until
14 after the cure period.
15   Q.  And the cure period is a certain number of days
16 after --
17   A.  Six days after the election.
18       THE REPORTER:  I'm sorry.
19       THE WITNESS:  I'm sorry.
20       THE REPORTER:  If you'll please let her
21 get the whole question out -- thank you -- before you
22 start your answer.
23       THE WITNESS:  Do you need me to say --
24       THE REPORTER:  It's okay, I think.
25       THE WITNESS:  You got it.

Page 147

1    Q.  Are you receiving any applications for ballot
2  by mail for the May 24 election?
3    A.  Yes.
4    Q.  All right.  Do you know if you've had any
5  applications for ballot by mail for May 24 that you were
6  unable to process because you couldn't match the ID
7  number?
8    A.  Yes.
9    Q.  And have you been sending out notices and new
10 application for ballot by mail forms to those voters?
11   A.  Yes.
12   Q.  And could you run a report, for example, today
13 that tells you how many of these voters you've sent that
14 notice to?
15   A.  Yes.
16   Q.  And the reason code would be there for not
17 being able to match that ID number?
18   A.  Yes.
19   Q.  Okay.
20   A.  But I couldn't give you that information until
21 after the election.
22   Q.  Oh, okay.  Good to know.
23       Do you have any knowledge about any issues or
24 problems or concerns that your office would have had
25 related to other parts of SB 1 besides mail voting?  So,

Page 148

1  for example, changes to how someone provides assistance
2  to a voter in the polling place?
3    A.  I do not --
4        MS. HUNKER:  Objection --
5    A.  -- know.
6        MS. HUNKER:  -- form.
7    Q.  (By Ms. Perales)  Okay.  Would you say, then,
8  that your knowledge of any issues, problems or concerns
9  your department has experienced or Dallas County
10 Elections has experienced because of the challenge
11 provisions of SB 1 are limited to mail voting?
12   A.  Can you repeat that, please?
13   Q.  Uh-huh.  Would you say that your knowledge of
14 issues, problems or concerns, experienced by Dallas
15 County Elections because of SB 1 is limited to mail
16 voting?
17   A.  I don't know if I can say that.
18   Q.  Are you aware of any issues, problems or
19 concerns that Dallas County Elections has with SB 1
20 beyond mail voting?
21   A.  No, I'm not aware.
22   Q.  Would you -- would you necessarily know, for
23 example, if Dallas County Elections was having problems,
24 for example, with implementing SB 1's new requirements
25 on providing assistance to voters inside the polling

Page 149

1  place?  Would you be the person that would know if there
2  were problems --
3    A.  No --
4    Q.  -- with that?
5    A.  -- I would not be.
6    Q.  Okay.
7        MS. PERALES:  I need to go off the record
8  for a couple of minutes.
9        THE WITNESS:  Okay.
10       THE VIDEOGRAPHER:  Okay.  We're going off
11 the record.  The time is 2:02 p.m.
12       (Break taken.)
13       THE VIDEOGRAPHER:  All right.  We're back
14 on the record.  The time is 12 -- 2:12 p.m.
15       MS. PERALES:  I pass the witness.
16       MR. WHITE:  I don't have any questions for
17 Ms. Phillips.
18       MS. HUNKER:  Does anybody on the Zoom call
19 have any questions for Ms. Phillips?
20       MS. BENDER:  I would like to ask a few
21 questions on behalf of the United States.
22       MS. PERALES:  Would you mind flipping it
23 around (to the Videographer)?
24       (Laptop adjusted.)
25           EXAMINATION

Page 150

1 BY MS. BENDER:
2    Q.   Okay.  Ms. Phillips, thank you for being here
3 today.  I just had a few follow-up questions for you
4 based upon your conversation earlier.
5         So you talked earlier about looking up an
6 individual --
7             (Lights went off in the room.)
8             THE REPORTER:  Do y'all want to go off the
9 record?
10            MR. BENDER:  Yeah.
11            MS. PERALES:  Yeah.
12            THE REPORTER:  Can we go off the record?
13            THE VIDEOGRAPHER:  Okay.  We're going off
14 record at 2:13.
15            (Discussion off the record.)
16            THE VIDEOGRAPHER:  Okay.  We are back on
17 the record at 2:15 p.m.
18            MS. PERALES:  Brady, we need you to start
19 again, but also to start by saying who you are.
20            MS. BENDER:  Yes.  Hi.  So this is Brady
21 Bender.  I represent the United States.
22    Q.   (By Ms. Bender) So I just have a few questions
23 to follow up on the conversation from earlier.  You had
24 talked earlier about looking up an individual voter in
25 VEMAC when you were -- received an ABBM or carrier

Page 151

1 envelope.
2         When you received an application for ballot by
3 mail or a carrier envelope before SB 1, how would you
4 find the voter in your database to confirm eligibility
5 and registration?
6    A.   By looking them up in VEMACS, the same way --
7    Q.   So what do you confirm --
8    A.   We will use the voter's last name, first name.
9 The application always asks for a date of birth.  It
10 wasn't required, but they can put it on there, or we
11 will look up through their address.
12    Q.   Okay.  And when you receive an ABBM or mail
13 ballot carrier envelope after SB 1, how do you find the
14 voter in your database?
15    A.   Are you asking for the ABBM or the carrier
16 envelope?
17    Q.   Either one.  If they are different, then let's
18 start with the ABBM.
19    A.   Okay.  If we are looking up for ABB- -- ABBM
20 application, we would still look them up by the first
21 name, last name, date of birth.  Since they did provide
22 a driver's license or the last four digits of Social
23 Security, we can also look that voter up by their
24 driver's license.
25    Q.   And for the -- if mail ballot carrier envelope,

Page 152

1 would you look them up using different information?
2    A.   With the mail ballot carrier envelope, with the
3 VEMACS voter reg- -- VEMAC system, it creates a label;
4 and the label has a bar code on there.  Also it has the
5 voter's -- voter's certificate, which is in-house in
6 V- -- in VR system.
7    Q.   Okay.  And you said you would use the label
8 information --
9    A.   Yes.
10    Q.   -- to look them up?
11    A.   Yes.
12    Q.   Before SB 1, how long, on average, would you
13 estimate that it took your office to process an ABBM?
14    A.   Maybe a minute or less.
15    Q.   And after SB 1, how long would you estimate for
16 your office to process an ABBM?
17    A.   Maybe a minute or less.  About the same time.
18 It's actually --
19    Q.   Okay.
20    A.   -- verifying, looking up the voter.
21    Q.   Okay.  Before SB 1, how long would you estimate
22 it took to process a mail ballot carrier en- --
23    A.   I --
24            MS. HUNKER:  Objection, form.
25    A.   -- could not guess on that because I do not

Page 153

1 verify the carrier envelope.  Signature verification
2 does.
3    Q.   (By Ms. Bender)  Okay.  Okay.  During the March
4 2022 primary, if mail ballot materials did not list a
5 driver's license number that appeared in the database,
6 but it had the last four digits of the social security
7 number and it matched the database, would you accept it?
8    A.   Yes.
9    Q.   And is this always your interpretation of the
10 law?
11            MS. HUNKER:  Objection to form.
12    A.   Yes, either-or, whichever they put on there.
13 And if it's in our voter registration system, we -- we
14 picked either-or, either one.
15    Q.   (By Ms. Bender)  Okay.  So throughou- -- so
16 throughout the time that you were processing ballots for
17 March '22 -- '22 primary, you would accept if it had
18 either a driver's license number or a Social Security
19 number?
20    A.   Yes.
21    Q.   Okay.  And if it listed an incorrect driver's
22 license number compared to what you had in the database,
23 but it had the last four digits of the Social Security
24 number that matched the database, would you accept that?
25    A.   Yes.

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                          Pages 154 to 157

Page 154

1    Q.  And is this always the way that you interpreted
2  the law?
3          MS. HUNKER:  Objection, form.
4    A.  Yes.
5    Q.  (By Ms. Bender)  Okay.  So, again, throughout
6  the entire time that you were processing ballots for the
7  March 2022 primary --
8    A.  (Witness moves head up and down.)
9    Q.  -- you would accept it if the driver's license
10  number was incorrect, but the Social Security number was
11  correct?
12   A.  Yes.
13          MS. BENDER:  Okay.  That's all of my
14  questions.  Thank you.
15          THE WITNESS:  Thank you.
16          THE REPORTER:  Just a second.
17              EXAMINATION
18  BY MS. CAI:
19   Q.  Hello, Ms. Phillips.
20          MS. CAI:  Oh.  Go ahead.
21   A.  Hi.
22          MS. PERALES:  One second, please.  One
23  second, please.
24          THE REPORTER:  Okay.  And who is this,
25  please?

Page 155

1          MS. CAI:  My name is Sophia Cai, and I'm
2  representing the OCA Plaintiffs.
3          MS. PERALES:  Slow down for one second.
4  Can you just say that more slowly?
5          MS. CAI:  Of course.  My name is Sophia
6  Cai, spelled S-o-p-h-i-a.  Last name, Cai, C-a-i.
7          THE REPORTER:  Okay.  And you're
8  representing who?
9          MS. CAI:  The OCA-Greater Houston
10  Plaintiffs.
11          THE REPORTER:  Okay.  Thank you.
12          Okay.  Thank you.
13          MS. CAI:  Great.
14   Q.  (By Ms. Cai)  Hi, Ms. Phillips.  Thank you --
15   A.  Hi.
16   Q.  -- for bearing with us.  I just have a few
17  questions for you.
18          You testified earlier that you didn't know off
19  the top of your head the number of people who submitted
20  an application for ballot by mail that was incomplete
21  because you could not verify their ID number.
22          Even without that exact number off the top of
23  your head, do you know whether the number of ABBMs that
24  were rejected in the March primary was greater than in
25  past years?

Page 156

1          MS. HUNKER:  Objection, form.
2    A.  Yes, it was greater.
3    Q.  (By Ms. Cai)  What accounts for that greater
4  number of rejections?
5          MS. HUNKER:  Objection, form.
6    A.  The new requirements, the missing driver's
7  license or the missing Social Security numbers.
8    Q.  (By Ms. Cai)  Do you have reason to believe
9  that some individuals whose applications for ballot by
10  mail or mail ballots are being rejected -- excuse me --
11  that have been rejected are, in fact, eligible voters
12  who made errors while filing -- filling out their ID
13  numbers?
14          MS. HUNKER:  Objection, form.
15   A.  Yes.
16   Q.  (By Ms. Cai)  Are you or your office concerned
17  by the greater number of rejected applications for
18  ballot by mail or mail ballots in the March primary?
19          MS. HUNKER:  Objection, form.
20   A.  Yes.
21   Q.  (By Ms. Cai)  Why are you concerned?
22   A.  Because voters before the SB 1 law were able to
23  vote and cast their ballots, and ballots counted.
24   Q.  Have you or your office conveyed that concern
25  to the Secretary of State?

Page 157

1    A.  I have not; but my office -- some people in my
2  office probably have, yes.
3    Q.  Do you know what they have said?
4    A.  No, I don't.
5    Q.  Have you or your office conveyed that same
6  concern to other election officials?
7          MS. HUNKER:  Objection, form.
8    A.  Probably so.  I do not know.
9    Q.  (By Ms. Cai)  Have you personally conveyed that
10  concern to anyone?
11   A.  No.
12   Q.  Turning to SB 1 requirements next, are you
13  aware that SB 1 adds additional requirements in order to
14  register to vote by mail or to actually vote by mail?
15          MS. HUNKER:  Objection, form.
16   A.  Repeat that again.
17   Q.  (By Ms. Cai)  This has probably been covered,
18  but is it correct that you are aware that SB 1 adds
19  requirements to register to vote by mail or to actually
20  vote by mail?
21   A.  Yes.
22          MS. HUNKER:  Objection, form.
23   Q.  (By Ms. Cai)  Is a registered voter with a
24  disability able to get a modification or accommodation
25  to the ID requirement for voting by mail?

Page 158

1          MS. HUNKER:  Objection, form.
2     A.   No.
3     Q.   (By Ms. Cai)  So even if they request an
4  accommodation or a modification, a voter with disability
5  would not be able to have any different rules apply to
6  them for the ID requirement?
7          MS. HUNKER:  Objection, form.
8     A.   No, not to my knowledge.
9     Q.   (By Ms. Cai)  Have you received any requests
10  from voters with disabilities for any sort of
11  accommodation or modification to the ID requirement in
12  the March primary?
13    A.   No, not to my kno- -- not to my knowledge.
14    Q.   Who would a voter with a disability go to
15  to make such a request for their application for vote by
16  mail or their mail ballot?
17    A.   They would request the application from my
18  office, the Mail Ballot Office with Dallas County.
19    Q.   If they wanted some sort of accommodation or
20  modification so that they could vote by mail, would they
21  be able to ask somebody in your office for such
22  accommodation or modification?
23    A.   What type of accommodation or modification are
24  we asking about?
25    Q.   Any type.  It might vary by the type of

Page 159

1  disability a person has.  Would they be able to ask for,
2  for instance, assistance filling out their ID number?
3     A.   If a voter is in our office, come to our office
4  at the counter and asks for help with assisting with
5  filling out their application, yes, we can help them
6  fill out their application.
7     Q.   Would they be able to request any other sorts
8  of modifications or accommodations?
9     A.   What modification are we asking about?
10    Q.   It would likely depend on the voter, but can
11  you think of any examples of people who have asked for
12  any assistance?
13    A.   No one has asked for any assistance or
14  modifications in our office, so I wouldn't know which
15  one you are referring to.
16    Q.   Have they called in or written in for any such
17  modifications?
18    A.   I have not received any, not to my knowledge.
19         MS. CAI:  Okay.  Thank you very much,
20  Ms. Phillips.  That's all my questions.
21         THE WITNESS:  Thank you.
22         THE REPORTER:  Just a second, please.
23  Okay.  Thank you.
24         MS. HUNKER:  Does any other Plaintiff
25  group want to ask questions before I begin?

Page 160

1          Hearing none.
2              EXAMINATION
3  BY MS. HUNKER:
4     Q.   Hi, Ms. Phillips.  How with you?
5     A.   I'm okay.  How are you?
6     Q.   My name is Kathleen Hunker.  I represent the
7  State Defendants in this matter.  I'm going to ask a few
8  questions, mostly in response to what Plaintiffs have
9  asked.  Because of that, I'm going to be jumping around
10  a little bit with respect to topics.  If at any point
11  you're confused or you don't follow when I transition to
12  topics, will you please let me know?
13    A.   Okay.
14    Q.   And I will be more than willing to either lay a
15  greater foundation or to rephrase the question.  Okay?
16    A.   Okay.
17    Q.   Also if you don't understand any of my
18  questions or you think you need additional
19  clarification, please let me know; and I'm happy to do
20  so.  Okay?
21    A.   Okay.
22    Q.   Excellent.  So I'm going to start with the last
23  topic of conversation, which was regarding the ADA
24  accommodation.  I believe Plaintiffs' Counsel for
25  OCA-Greater Houston, asked you a few questions on that,

Page 161

1  correct?
2     A.   Yes.
3     Q.   And you had mentioned that no one had come into
4  your office asking a -- for assistance or an
5  accommodation with respect to the ID requirements; is
6  that correct?
7     A.   Correct, not to my knowledge.
8     Q.   Okay.  So when she was asking about whether or
9  not your office would accommodate, you don't have a
10  policy in place about the accommodation; is that
11  correct?
12    A.   That is correct.
13    Q.   And that would only be decided once you
14  actually received a request; is that right?
15    A.   Yes.
16    Q.   And I think you had mentioned that if somebody
17  came in requesting assistance, you would do your best to
18  aid them; is that correct?
19    A.   Yes.
20    Q.   You also spoke with Counsel regarding
21  communications with the Secretary of State's office, and
22  so let me get a little bit of clarification there.
23         You have not contacted the Secretary of State's
24  office regarding SB 1, is that right?  And when I say
25  "you" in this case, I'm referring to you as an

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                      Pages 162 to 165

Page 162

1 individual.
2    A.  No.
3    Q.  Okay.  And what about your particular division,
4 have they contacted the Secretary of State's office
5 regarding SB 1?
6    A.  Possible.
7    Q.  But not to your knowledge?
8    A.  Not to my knowledge.
9    Q.  And so you don't know if you're division
10 contacted the Secretary of State's office to request
11 clarifications about maybe a provision of SB 1; is that
12 right?
13   A.  That's correct.
14   Q.  And you wouldn't know if they contacted
15 Secretary of State's office on a complaint or a
16 criticism of SB 1; is that correct?
17   A.  That is correct.
18   Q.  And you wouldn't know if they communicated any
19 problems that they had to the Secretary of State's
20 office; is that right?
21   A.  That's correct.
22   Q.  Now let's talk about the Elections Department
23 as a whole.
24       Are you aware of the Elections Department
25 contacting the Secretary of State's office regarding a

Page 163

1 provision about SB 1?
2    A.  I am not aware.
3    Q.  And what about SB 1 as a general matter, not
4 necessarily talking about a specific provision?
5    A.  Contacting the --
6    Q.  Secretary of State's office.
7    A.  I'm not aware.
8    Q.  And so you wouldn't know the contents of any
9 communications or even if those communications existed
10 by the Elections Department contacting Secretary of
11 State's office about problems implementing SB 1; is that
12 correct?
13   A.  That's correct.
14   Q.  And you also wouldn't know the contents of any
15 communications of them -- of the Elections Department
16 expressing concerns about SB 1; is that correct?
17   A.  That's correct.
18   Q.  Or complaints about SB 1; is that correct?
19   A.  That's correct.  I don't have any knowledge of
20 it.
21   Q.  Okay.  And you have no knowledge about any
22 communications about questions about interpretation of
23 specific provisions; is that right?
24   A.  That's correct.
25   Q.  When you were speaking with Counsel, one of the

Page 164

1 questions also referred to election officials.
2       Now, how did you interpret the word election
3 officials in that question?
4    A.  In what question, and where at?
5    Q.  She had asked if you had communicated your
6 concerns or problems about SB 1 to election officials.
7 And I believe she asked that question.  I might have put
8 that down wrong in my notes.
9       But do you remember her discussing about your
10 communication with election officials?
11   A.  I don't remember --
12   Q.  Okay.
13   A.  -- if she said election officials or if she
14 said concerns that we had.
15   Q.  Okay.  Then let me ask the question
16 differently.
17       To your knowledge -- and let's start with you
18 as an individual --
19   A.  Uh-huh.
20   Q.  -- have you contacted any election official
21 regarding SB 1?
22   A.  And when you say an "election official," are
23 you saying -- who's an election official?
24   Q.  Well, that was actually --
25   A.  What's the meaning of the election official?

Page 165

1    Q.  That was one of the reasons I was asking for
2 clarification, when I thought she had asked that
3 question.  So what's the meaning of the election official?
4
5    Q.  Okay.  So I'll ask:  Have you contacted the
6 Legislature?
7    A.  No.
8    Q.  Have you contacted another member of an
9 Elections Department in a different county?
10   A.  Yes.
11   Q.  In what capacity?
12   A.  Asking how did they handle the situation,
13 handle something.
14   Q.  And so you've contacted other counties, and
15 you've gotten a sense of best practices?
16   A.  Yes.
17   Q.  And what was that over, specifically?
18   A.  How they handle the notice codes or the codings
19 of the SB 1 laws on sending information to the ballot
20 tracker.
21   Q.  So it was a data entry question?
22   A.  Yes.
23   Q.  So you also spoke with the DOJ Counsel about
24 VEMAC, correct?
25   A.  DOJ Counsel?

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                Pages 166 to 169

Page 166

1   Q.   Yes, Brady.
2   A.   Oh, Brady.  Okay.  Yes.
3   Q.   And you talked about the verification once a
4   application to vote by mail was received --
5   A.   Yes.
6   Q.   -- correct?
7   A.   Yes.
8   Q.   And I believe you had said that you, when
9   verifying, would look at:  first name, last name,
10  address, and, if available, date of birth?
11  A.   Yes.
12  Q.   So date of birth was not required on the form;
13  it was simply --
14  A.   Optional, yeah --
15  Q.   -- optional?
16  A.   -- yes.
17  Q.   So some had it, and some did not?
18  A.   Yes.
19  Q.   When you were doing it that way, did you have
20  problems with the verification, let's say, having a
21  false positive?
22  A.   Can you rephrase that question, please?
23  Q.   Sure.  When you were using the old format,
24  looking at first name, last name --
25  A.   Uh-huh.

Page 167

1   Q.   -- and address --
2   A.   Uh-huh.
3   Q.   -- did you have false positives?  Let's say you
4   had found there were two people with the same name.
5   A.   (Witness moves head up and down.)  Yes.  We
6   would find two people with the same name, yes.
7   Q.   And if they did not provide a date of birth,
8   how would you distinguish between the two?
9   A.   The address.
10  Q.   The address.  And so let's say about a father
11  and son.  I know my brother and father share the same
12  name.
13  A.   (Witness moves head up and down.)
14  Q.   What about in that type of a situation, how
15  would you verify?
16  A.   Well, it -- we would look at the application
17  and if they put down over 65, then we would look at the
18  date of birth on the voter registration system.  If the
19  voter -- if one of the voters was over 65 with the same
20  name, same address, then we knew that that was that
21  voter there.
22  Q.   Okay.  So you had to look at optional
23  information in order to make a distinction; is --
24  A.   Yes.
25  Q.   -- that correct?

Page 168

1   A.   Yes.
2   Q.   And with SB 1, you now have a Social Security
3   number or driver's license; is that right?
4   A.   Yes.
5   Q.   Have you found it easier to do the verification
6   with that number?
7   A.   Yes, I have.
8   Q.   In your experience, do voters typically call
9   with questions about changes to voting laws?
10  A.   When?
11  Q.   Okay.  So I'm shifting topics.  I'm talking
12  about the calls that you receive from voters, either
13  with questions or concerns --
14  A.   (Witness moves head up and down.)
15  Q.   -- or about how to submit an application to
16  vote by mail or how to submit their ballot, and I'm
17  curious -- let me put it this way:  Have you implemented
18  previous legislation before?
19  A.   A voter will call.  They request an ABBM
20  application, and we will ask to mail it out to a voter.
21  Q.   So when I -- let me rephrase that.
22       I'm talking about new legislation coming from
23  the Legislature.  So you have a new law on the books.
24  A.   Uh-huh.
25  Q.   Have you ever had to implement a new law that

Page 169

1   was recently passed by the Legislature outside of SB 1?
2   A.   Probably so, just don't recall which law that
3   was.
4   Q.   Okay.  None that were as, we'll say,
5   significant or multifaceted as SB 1?  Would that be
6   right?
7   A.   Yes.  I will say that, yes.
8   Q.   So SB 1 had a lot of changes to it --
9   A.   Yes --
10  Q.   -- is that right?
11  A.   -- it did.
12  Q.   So when I asked, in your experience, do voters
13  typically call with questions about changes to the laws,
14  do you know if you have, let's say, a change of
15  requirement that voters would contact you with questions
16  about, outside of the context of SB 1?
17  A.   No, no.
18  Q.   And is that because you don't -- you don't
19  remember a change in the requirements?
20  A.   I don't remember a change in the requirements
21  nor do I remember a voter calling and asking about the
22  changes of the laws, of a new law.
23  Q.   Okay.  And so you don't have a point of
24  comparison to note whether or not it's common practice
25  for voters to call frequently with questions when you

The Office of the Dallas County Elections Administrator                April 29, 2022
Pages 170 to 173

Page 170

1 have a dramatic change in the law regarding voting; is
2 that correct?
3        MR. WHITE:  Objection, form.
4    A.  Repeat that again, please.
5    Q.  (By Ms. Hunker)  You don't have a point of
6 reference when it comes to the number of voters who
7 would call about a cha- -- a dramatic change in the law;
8 is that correct?
9    A.  That's correct.
10   Q.  But you had also said, during the March
11 primary, that you were receiving phone calls all day
12 every day; is that right?
13   A.  Yes.
14   Q.  Is that typical in an election?
15   A.  Yes.
16   Q.  And so for, like, the November constitutional
17 election in 2021, you would have been receiving phone
18 calls all day every day?
19   A.  Well, I got phone calls from voters who
20 actually were voting or concerned about voting.
21   Q.  You also spoke with Ms. Perales about comparing
22 the list of individuals who did not list their voter ID
23 number to a list of individuals who ultimately
24 resubmitted their application and had it accepted; is
25 that correct?

Page 171

1        MS. PERALES:  Objection, form.
2    A.  Did we speak about it?
3    Q.  (By Ms. Hunker)  Yes.
4    A.  Yes.
5    Q.  That's what I was asking, if you spoke about
6 it.
7        And you had said that if you do a comparison,
8 that would help get at the number of individuals who --
9 who had their application rejected or at least a notice
10 was sent; is that correct?
11   A.  I believe she -- I believe she asked was there
12 a way for the comparison, yes.
13   Q.  Okay.  For voters who chose not to resubmit
14 their ABBM application or who chose -- you don't
15 personally know why they did not do so; is that correct?
16   A.  That's correct.
17   Q.  And you also do not -- let me take that -- let
18 me strike that question.
19        And for voters who chose to vote by personal
20 appearance as opposed to resubmitting their ABBM, you do
21 not personally know why they did not do so, why they
22 chose that option; is that correct?
23   A.  I don't know why.
24   Q.  So we are in the midst of Early Voting for the
25 May 7th election, correct?

Page 172

1    A.  Yes.
2    Q.  And I think you had mentioned earlier that the
3 application to vote by mail has passed, correct?
4    A.  Yes.
5    Q.  Okay.  And so you've already, at this point,
6 processed all the applications to vote by mail that you
7 have -- you will receive or, ultimately, receive for the
8 May 7th election; is that right?
9    A.  Yes.
10   Q.  So I want to compare your experience in March
11 2022 with the May 7th election.
12        In your experience, did you receive fewer
13 rejections of applications this round?
14        MR. WHITE:  Objection, form.
15   A.  I do not know if I can talk about that yet
16 because the election is not over with.
17   Q.  (By Ms. Hunker)  Okay.  When you say you can't
18 talk about that --
19   A.  Well, legally, normally, we cannot give out any
20 information until after the election, like, say, if it's
21 a PIA and a person asks for how many -- who requested
22 ABBMs --
23   Q.  Uh-huh.
24   A.  -- we can't give that out, or who has already
25 asked for a ballot by mail, we can't give that out.  So

Page 173

1 if we can't give that information out, I don't think we
2 can talk about that information either right now.
3    Q.  Okay.  So I understand maybe that you won't
4 feel comfortable giving specific numbers.
5        Would you be able to give impressions about the
6 numbers, like fewer or lessor, greater?
7    A.  Will that be the same thing, on the same level?
8    Q.  I do not view it the same, but you're the one
9 who's answering the questions.
10   A.  I view it the same.  So, obviously, I can't.
11 But you can ask me on May the 8th.
12   Q.  You probably don't want to sit down for another
13 deposition.
14   A.  No, I do not.
15   Q.  What about phone calls?
16   A.  Okay.
17   Q.  Okay.  So you had talked about receiving
18 concerns from voters or questions from voters about the
19 new ID requirements in the March primary, correct?
20   A.  Yes.
21   Q.  Okay.  And so I assume you also received phone
22 calls in the May 7th election, correct?
23   A.  Yes.
24   Q.  Did you receive fewer phone calls about the ID
25 requirements in the May 7th election?

The Office of the Dallas County Elections Administrator       April 29, 2022
                                                              Pages 174 to 177

Page 174

1    A.  At the present moment, I don't recall receiving
2  phone calls about the identification.  I'm receiving a
3  lot of phone calls about why I receiv- -- receiving --
4  Where is my second ballot?
5    Q.  Is it --
6    A.  Because we have two elections in May.
7    Q.  Yes.  So for the March primary, you clearly
8  remembered receiving phone calls about the ID
9  requirements; is that correct?
10   A.  Yes.
11   Q.  And you do not, for the May 7th, remember phone
12 calls --
13   A.  I do not recall --
14   Q.  Okay.
15   A.  -- if we received any.  We might have.  I just
16 don't know yet that --
17   Q.  That's fair.
18   A.  Uh-huh.
19   Q.  Based on your observations, are voters having
20 an easier time in the May 7th election with the voter ID
21 number requirement than they did in the March primary?
22   A.  I don't feel comfortable asking that question
23 until after the election.
24   Q.  Okay.  I believe you also had spoken to Counsel
25 about phone calls of people who couldn't vote in person;

Page 175

1  is that right?
2    A.  Yes.
3    Q.  You do not know whether those individuals
4  ultimately voted; is that right?
5    A.  That is correct.
6    Q.  Now, I believe you made a distinction between
7  your role and the Early Voting Ballot Board, correct?
8    A.  Yes.
9    Q.  And so you focus on the application side, the
10 Early Voting Board focuses on the mail ballot side?
11   A.  They focus on the verification of the
12 signatures and also the rejection of the bal- -- the
13 mail ballots.
14   Q.  Okay.  So you wouldn't have a sense on whether
15 ID number comparison is a more accurate identification
16 verification mechanism than signature match?
17         MR. WHITE:  Objection, form.
18   A.  I wouldn't know.
19         MS. HUNKER:  If we can go off record and
20 let me just consult my notes for a few minutes.
21         THE VIDEOGRAPHER:  Okay.  We're going off
22 the record.  The time is 2:43 p.m.
23         (Break taken.)
24         THE VIDEOGRAPHER:  We're back on the
25 record.  The time is 2:58 p.m.

Page 176

1    Q.  (By Ms. Hunker)  Ms. Phillips, over the break,
2  I believe you spoke to your Counsel; is that correct?
3    A.  Yes.
4    Q.  Okay.  And we're not going to get into the
5  substance of that, but after your communications, you're
6  now -- feel comfortable answering some of my questions
7  comparing the March primary with the May 7th election;
8  is that correct?
9    A.  Yes.
10   Q.  And for some of these questions, I know that
11 you are going to be answering more your personal
12 observations as opposed to a official pronouncement from
13 the Dallas County Election Administrator's Office.  I
14 simply ask that if I'm not clear in my question, that
15 when you're speaking in your individual capacity, simply
16 let me know.
17   A.  Okay.
18   Q.  Does that make sense?
19   A.  Yes, it does.
20   Q.  Okay.  So we had already spoken that May 7th
21 election early voting has begun, correct?
22   A.  That's correct.
23   Q.  And the deadline in which you -- in which
24 voters may send applications to vote by mail has already
25 passed, correct?

Page 177

1    A.  Yes.
2    Q.  And so your office has processed all the
3  applications it will have received for the May 7th
4  election, correct, to vote by mail?
5    A.  To -- to vote by mail in order to be qualified
6  to vote in the May 7th election, yes.
7    Q.  Okay.  So based on your personal observations
8  in your office, have you received -- have you issued
9  fewer rejections for vote by mail applications?
10   A.  Yes.
11   Q.  And you've issued fewer notices as compared,
12 again, to the March primary; is that correct?
13   A.  Repeat that again.
14   Q.  Fewer notices.  You sent fewer notices that --
15 let me -- let me start over from the beginning.
16   A.  Okay.
17   Q.  The May 7th election compared to the March
18 primary, you have issued fewer rejection applications,
19 to your knowledge, based on voters having a mismatch or
20 not putting their voter ID number; is that correct?
21   A.  Yes.
22   Q.  And so you've issued fewer notices to voters
23 stating that the reason that their ballot -- I'm
24 sorry -- that their application has been rejected is
25 because of their failure to either put a voter ID, an ID

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                          Pages 178 to 181

Page 178

1 number net down or to match correctly their ID number;
2 is that correct?
3    A.  Yes.
4    Q.  And you do not work on the ballot verification
5 process, correct?
6    A.  That is correct.
7    Q.  And so you don't have any personal knowledge if
8 there have been fewer rejections of vote by mail
9 ballots; is that right?
10    A.  There hasn't been any rejections yet because
11 the rejections are not till after the cure period.
12    Q.  Thank you for that clarification.
13    A.  Uh-huh.
14    Q.  So based on your personal experience, in the
15 March primary and in the May 7th election, have voters
16 become more accustomed to the rules for voter ID, for
17 voter ID numbers?
18         MR. WHITE:  Objection, form.
19    Q.  (By Ms. Hunker)  On their application.
20    A.  I wouldn't say that.
21    Q.  What would you say?
22    A.  One of the reasons -- the main reason why we
23 have fewer rejections, I mean -- yeah, fewer rejection
24 notices going out is because we pull annual voters 65
25 years of age or the disabled.  So the majority of our

Page 179

1 voters now are people who have already submitted their
2 applications beginning of the year.
3    Q.  Okay.  And you don't have any knowledge, with
4 respect to individuals who have not submitted an annual
5 vote by mail application, whether or not they are
6 receiving --
7    A.  Say that again, please.  I'm sorry.
8    Q.  Yeah.  So with respect to individuals who have
9 not submitted --
10    A.  Okay.
11    Q.  -- an annual vote by mail application --
12    A.  Uh-huh.
13    Q.  -- do you have any knowledge on whether there
14 are fewer rejections for that group?
15    A.  I have not ran the numbers, no.
16    Q.  Okay.  That's fine.  And so you don't know one
17 way or the other of whether voters are becoming more
18 familiar or accustomed to the rules; is that correct?
19    A.  That is correct.
20         MS. HUNKER:  No further questions.
21         THE WITNESS:  Thank you.
22         MR. STOOL:  No, I don't have any
23 questions.  Pardon me.
24              REEXAMINATION
25 BY MS. PERALES:

Page 180

1    Q.  I have just three small areas -- two small
2 areas.
3         Earlier, when you and I were speaking, you
4 mentioned that there were voters who had given up -- and
5 I think you used the words "given up" --
6    A.  Yes.
7    Q.  -- trying to get a mail ballot for the March
8 primary election.
9    A.  Yes.
10    Q.  And I just want to make clear that this was
11 because of the ID number matching requirements that you
12 were newly implementing for this election; is that
13 correct?
14         MS. HUNKER:  Objection to form.
15    A.  I would say so, yes.
16    Q.  (By Ms. Perales)  Okay.  And did you ever speak
17 to a voter or have a staff member tell you they spoke to
18 a voter who indicated that it was -- that they were
19 going to stop trying to get the information to you that
20 would allow you to send them a mail ballot?
21    A.  Yes.
22    Q.  And then, finally, I just want to return to the
23 hypothetical of the father and son with the same name.
24    A.  Okay.
25    Q.  You mentioned that you would look to see

Page 181

1 whether the voter had indicated they were requesting the
2 mail ballot because they were over age 65; is that
3 correct?
4    A.  Yes.
5    Q.  And then you would look at the voter's date of
6 birth in the voter registration record to confirm that
7 person's over 65, yes?
8    A.  Yes.
9    Q.  And in that instance you would be fairly
10 confident that the voter is over 65, right?
11    A.  Yes.
12    Q.  And the over 65 reason to request a mail
13 ballot, that's -- that's required information on the
14 ABBM, correct?
15    A.  Yes, they have to let us know why they are
16 voting, the reason why they are voting ballot by mail.
17    Q.  And the app- -- and the voter registration
18 record that you have also has the date of birth in it as
19 mandatory with voter registration, correct?
20    A.  Yes.  You have to -- you have -- that's a
21 requirement on the voter registration application in
22 order to get registered to vote.
23         MS. PERALES:  Okay.  Thank you.
24         I have no further questions.
25         MR. WHITE:  None for me.

The Office of the Dallas County Elections Administrator

April 29, 2022
Pages 182 to 185

Page 182

1    THE REPORTER: Wait just a second, please.
2 Okay. Thank you.
3    MS. HUNKER: Okay.
4    REEXAMINATION
5 BY MS. HUNKER:
6    Q. Going back to that scenario, the father and the
7 son --
8    A. Uh-huh.
9    Q. -- the father may not be over 65, correct?
10   A. Uh-huh.
11       THE REPORTER: Was that a "yes"?
12       THE WITNESS: I'm sorry. I'm sorry.
13 "Yes."
14   Q. And so if the father were not over 65, he would
15 not have to put his date of birth, correct?
16       MS. PERALES: Objection.
17   A. That --
18   Q. (By Ms. Hunker) I can rephrase the question.
19   A. Yes, please.
20   Q. You had mentioned earlier that date of birth
21 was not required on the application form, correct?
22   A. Beforehand, yes.
23   Q. Yes. And so if the father was not over 65,
24 there would be no requirement for him to put -- put his
25 date of birth on the application; is that correct?

Page 183

1    A. I believe there's no requirement on the
2 application now. I believe it's optional. I'm not
3 quite sure. I have to look at a application.
4    Q. Pre-SB 1?
5    A. I believe on pre -- I believe SB 1 is optional.
6 I have to look at the application. I -- to my
7 recollection, I don't remember; but I believe it's not a
8 requirement.
9    Q. Okay. And so you had spoken about voters who
10 you thought had given up and would not be requesting a
11 mail in ballot; is that correct?
12   A. That's correct.
13   Q. You don't know if those individuals decided to
14 vote by personal appearance?
15   A. I do not know.
16   Q. How do you know that they, first, gave up?
17   A. They said so.
18   Q. Okay. And second, that it was connected to the
19 ID requirement?
20   A. They said so.
21   Q. Okay. Do you know if they, in fact, decided to
22 resubmit --
23   A. I do not know.
24   Q. -- their application to vote by mail?
25   A. I don't know.

Page 184

1    MS. HUNKER: That's all.
2    MS. PERALES: Let's go off the record.
3    MR. SCHUETTE: Do we need to ask the
4 assembled --
5    MS. PERALES: Assembled people on Zoom,
6 are we ready to go off the record?
7    MS. BENDER: No questions. Thank you.
8    MS. PERALES: That was Brady.
9    THE VIDEOGRAPHER: We're going off the
10 record. The time is 3:07 p.m.
11       (Lunch recess.)
12       THE VIDEOGRAPHER: Okay. We are back on
13 the record. The time is 4:17 p.m.
14       MS. PERALES: I think we are ready to
15 swear the witness.
16       THE REPORTER: Okay.
17       Sir, would you raise your right hand,
18 please?
19       (Witness sworn by the court reporter.)
20       THE REPORTER: Thank you.
21       MICHAEL SCARPELLO,
22 having being first duly sworn, testified as follows:
23       EXAMINATION
24 BY MS. PERALES:
25   Q. Good afternoon.

Page 185

1    A. Good afternoon.
2    Q. Will you state your name for the record,
3 please?
4    A. Michael Scarpello.
5    Q. Thank you. I'll introduce myself to you
6 because you weren't here before.
7    A. Okay.
8    Q. My name is Nina Perales. I'm with the Mexican
9 American Legal Defense and Educational Fund, and I
10 represent the LUPE group of Plaintiffs --
11   A. Okay.
12   Q. -- in this matter.
13       Have you ever had your deposition taken before?
14   A. Yes.
15   Q. Have you ever taken a deposition before?
16   A. Yes.
17   Q. Okay. Let's start with: Have you had your
18 deposition taken before.
19       Can you tell me the most recent time you had
20 your deposition taken?
21   A. Two -- two weeks ago or something.
22   Q. Okay.
23   A. Two or three weeks -- I'm not sure --
24   Q. All right.
25   A. -- but in there.

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                          Pages 186 to 189

Page 186

1  Q.  So I'm sure that you remember the rules of the
2  road.
3  A.  Uh-huh.
4  Q.  I'm only going to ask you a condensed version
5  of questions related to that.
6  A.  (Witness moves head up and down.)
7  Q.  First of all, do you understand that you are
8  under oath today?
9  A.  I do.
10  Q.  And is there anything that would prevent you
11  from giving me your full attention or responding
12  accurately today, such as a medication --
13  A.  No.
14  Q.  -- or a medical condition?
15  A.  No, ma'am
16  Q.  Okay.  As I'm sure you know, this is your
17  deposition.  You can take a break at any time.  I would
18  only ask that you answer a question if it's out there on
19  the table before asking for the break.  Is that all
20  right?
21  A.  That's all right.
22  Q.  Thank you.  What steps did you take to prepare
23  for this deposition today?
24  A.  Reviewed briefly -- very briefly reviewed some
25  of the discovery documents that were produced some time

Page 187

1  ago and did a quick read through SB 1.
2  Q.  I'm not sure it's even possible to do a quick
3  read of such --
4  A.  Right.
5  Q.  -- a long document.
6  A.  Uh-huh.
7  Q.  But let me promise you that if we talk about
8  any part of SB 1 today, we'll mark the bill and --
9  A.  Okay.
10  Q.  -- go through it together.
11      Did you meet with your attorneys in order to
12  prepare for this deposition?
13  A.  Yes.
14  Q.  And did you meet with or talk to anybody from
15  the Attorney General's Office of Texas to prepare for
16  this --
17  A.  No.
18  Q.  -- deposition?
19      Did you have an opportunity to review documents
20  that were produced to us this morning?
21  A.  I did not get a chance to review those.
22  Q.  Okay.  If we discuss any of them, we'll be sure
23  to mark it so you can have it in front of you before we
24  ask questions.
25  A.  You bet.

Page 188

1      MS. PERALES:  If you wouldn't mind handing
2  Exhibit 1 to the witness.
3      (Document handed to the witness.)
4  Q.  Mr. Scarpello, do you recognize Exhibit 1 as
5  the Notice of Deposition for today's deposition?
6  A.  Yes.
7  Q.  And if you flip forward, you'll see around Page
8  9, there is an Attachment A; and then on Page 12 begins
9  a list of topics?
10  A.  Yes.
11  Q.  Have you seen these topics before?
12  A.  Yes.
13  Q.  Do you understand that you are testifying
14  pursuant to this Notice today?
15  A.  Yes.
16      MS. PERALES:  And if you wouldn't mind
17  handing the witness Exhibit 2.
18      (Document handed to the witness.)
19  Q.  Have you seen this document, Exhibit 2?
20  A.  Yes.
21  Q.  And do you see your name on the chart as being
22  the witness designated for certain topics?
23  A.  Yes.
24  Q.  Are you prepared to talk about those topics --
25  A.  Yes.

Page 189

1  Q.  -- today?
2      Do you understand that because this is a
3  30(b)(6) deposition --
4  A.  Uh-huh.
5  Q.  -- as we call it --
6  A.  (Witness moves head up and down.)
7  Q.  -- that when you're testifying that you are
8  speaking on behalf of the Elections Department?
9  A.  Yes.
10  Q.  Okay.  And so if I say "you" or "yours," will
11  you understand that I'm referring to your department?
12  A.  Yes.
13  Q.  Are you from Dallas County originally?
14  A.  No.
15  Q.  Where were you -- where did you grow up?
16  A.  Omaha, Nebraska.
17  Q.  When did you come to Dallas County?
18  A.  December of 2020.
19  Q.  Did you graduate high school in Omaha?
20  A.  Yes, Cathedral High School.
21  Q.  Sounds Catholic.
22  A.  Yes.
23  Q.  And did you do any schooling after you
24  graduated from high school?
25  A.  I went to the University of Nebraska at Omaha

The Office of the Dallas County Elections Administrator

April 29, 2022
Pages 190 to 193

Page 190

1 and graduated there in 1991 and then the University of
2 Nebraska, College of Law in Lincoln in 1995.
3    Q.   The same year my husband graduated from law
4 school.
5         Did you do any other degrees or other study
6 besides what you've described to me?
7    A.   Only things related to elections, cer- --
8 certificates --
9    Q.   Okay.
10   A.   Certified Election & Registration Administrator
11 from Election Center.
12   Q.   And before you came to Dallas -- oh, so you
13 came to Dallas County in December 2020.
14        Was that when you took the job as Election
15 Administrator?
16   A.   Yes.
17   Q.   Okay.  So prior to that, December 2020, what
18 job did you have?
19   A.   Prior to that, I was the Vice-President of
20 Voter -- of Election Management Systems for Runbeck
21 Election Services.
22   Q.   And tell me what Runbeck Election Services
23 does.
24   A.   The majority of their business is they're an
25 election ballot printer, and then they're -- they delve

Page 191

1 into certain areas like voter registration or election
2 management systems.
3    Q.   Would they be considered, for example, a vendor
4 for a county to maintain its voter registration rolls?
5    A.   They aren't -- currently have no accounts to do
6 that.  They are trying to become that.
7    Q.   Okay.  And you are the VP of Election --
8    A.   Election Management --
9    Q.   Management.
10   A.   -- Systems.  It's, basically, a voter
11 registration system.
12   Q.   And is Runbeck a -- like, would you call it a
13 software company or it's software plus kind of
14 management?
15   A.   I'd say they are a mail ballot -- mail ballot
16 service provider that dabbles in other areas of election
17 services.
18   Q.   Does Runbeck have contracts in Texas or did at
19 the time you were there?
20   A.   The only ones that I know of is there -- they
21 have -- in Harris County and in Dallas County, they
22 have -- they sold a mail ballot sorter, an Agilis mail
23 ballot sorter.
24   Q.   Was that a piece of hardware?
25   A.   Yes.

Page 192

1    Q.   Where are most of Runbeck's clients, then,
2 physically located?
3    A.   Throughout the country,
4    Q.   Okay.
5    A.   All around the country.
6    Q.   How long did you serve as VP of Election
7 Management for Runbeck?
8    A.   About a year and a half.
9    Q.   And what did you do before that?
10   A.   I was the Registrar of Voters for San
11 Bernardino, California.
12   Q.   How long did you do that job?
13   A.   About seven years, three -- seven years, four
14 months, something like that.
15   Q.   And what job did you have before that?
16   A.   I was the Director of Elections for the City
17 and County of Denver, Colorado.
18   Q.   How long did you do that job?
19   A.   About four years.
20   Q.   That's a beautiful place to live.
21   A.   It sure is.
22   Q.   And before that job, what were you doing?
23   A.   I was the Elections Manager for Douglas County,
24 Nebraska.  Omaha, Nebraska.
25   Q.   Douglas County produces a disproportionately

Page 193

1 high number of really good elections people because I
2 took the deposition of Lisa Wise a couple --
3    A.   Uh-huh.
4    Q.   -- of weeks ago.  She's also from Douglas
5 County.
6    A.   Uh-huh.  She worked with me.
7    Q.   Oh, so you were --
8    A.   Uh-huh.
9    Q.   You were at that office at the same time?
10   A.   For a brief time, yeah.
11   Q.   Okay.  So if we were to sort of add up the
12 years that you've been involved in administration of
13 either elections or voter registration, what would the
14 sum total number of years be?
15   A.   Twenty-two and a half years.
16   Q.   And it's fair to say that prior to December
17 2020, when you came here to Dallas, that you had
18 experience, hands-on experience, administering both
19 registration and voting; is that right?
20   A.   That's correct.
21   Q.   What is your current title?
22   A.   I'm the Elections Administrator for Dallas
23 County.
24   Q.   Is Dallas County the largest jurisdiction where
25 you've worked on election administration?

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                          Pages 194 to 197

Page 194

1    A.   It has the largest number of registered voters,
2  yes, not the largest in physical area.
3    Q.   So having lived in Dallas County for about a
4  year and a half --
5    A.   Uh-huh.
6    Q.   -- would you agree with me that Dallas County
7  has a substantial Latino or Hispanic population?
8    A.   Yes.
9    Q.   And would you agree with me that Dallas County
10 has a substantial black or African-American population?
11   A.   Yes.
12   Q.   And would you agree with me that Dallas County
13 has a substantial number of voters who are -- for whom
14 English is not their first language and who might
15 experience some barriers communicating in English?
16        MS. HUNKER:  Objection, form.
17   A.   I don't know.  It depends on how you define
18 "substantial."  They are certainly large enough to
19 re- -- trigger the SO- -- or the Department of Labor's
20 five-percent rule, to require us to provide alternate
21 language services to Vietnamese and Spanish speakers.
22   Q.   (By Ms. Perales)  And we talked a little bit
23 earlier today -- I don't think you were here -- that
24 Dallas County is newly covered for Vietnamese.
25   A.   That's correct.

Page 195

1    Q.   Would you say, just based on your observations,
2  that Dallas County has a substantial portion of
3  residents who are low income?
4    A.   I don't know that I -- I don't know.
5    Q.   Okay.
6    A.   I mean, that's in comparison to what, right,
7  so...
8    Q.   Uh-huh.  Well, let's not compare Dallas County
9  to anywhere else.  Dallas County is a big County.
10        Would you say you also happen to contain a
11 large number of people who are low income?
12   A.   Yes.
13   Q.   When I'm quiet, I'm skipping questions --
14   A.   It's okay.
15   Q.   -- because I have covered them already earlier
16 today.
17        Is it correct to say that Dallas County has not
18 used what's called drive-thru voting in the past?
19        MS. HUNKER:  Object --
20   A.   It's my --
21        MS. HUNKER:  -- to form.
22   A.   It's my understanding that they have not.
23   Q.   (By Ms. Perales)  Okay.  And tell me what your
24 understanding is of drive-thru voting.
25   A.   Drive-thru voting as employed in Texas, most

Page 196

1  recently in Harris County and in the 2020 Presidential
2  Election, was a method for people to, without excuse, to
3  be able to drive through and vote from their vehicle.
4    Q.   So similar to curbside voting, but without any
5  eligibility criteria?
6    A.   Correct.
7    Q.   Okay.
8        MS. HUNKER:  Objection, form.
9    Q.   (By Ms. Perales)  Has Dallas County, in the
10 past, allowed voters to drop off mail ballots at
11 locations other than your Elections Administration
12 Office?
13   A.   I don't believe so.
14   Q.   To your knowledge, has Dallas County used
15 movable structures for polling places?  And by "movable
16 structure," I mean, nonpermanent such as a tent or
17 something else that can be put up and then taken back
18 down?
19        MS. HUNKER:  Objection, form.
20   A.   I don't know, but I believe they may have.
21   Q.   (By Ms. Perales)  Okay.
22   A.   But I don't know.
23   Q.   Who would be the best person to testify on
24 that?
25   A.   Someone who's been around for a while.  I --

Page 197

1  I -- probably Robert Heard.  He's in our office right
2  now working as a contractor, and he was previously the
3  Assistant Elections Administrator.
4    Q.   Okay.  I'm going to ask you some questions
5  about voters who use assistants when they vote.
6    A.   Okay.
7    Q.   If -- if we get to something where you just
8  don't know the answer, I -- I want to make sure you
9  don't guess.
10   A.   (Witness moves head up and down.)
11   Q.   And just let me know if you don't know the
12 answer.
13   A.   Okay.
14   Q.   I'll probably ask you, then, like, who would be
15 the best person --
16   A.   Sure.
17   Q.   -- to talk about that; but we'll get there.
18 Okay?
19        Would you agree with me that voters who use
20 assistance include those voters who are disabled?
21        MS. HUNKER:  Objection to form.
22   A.   Yes.
23   Q.   (By Ms. Perales)  Okay.  And would you agree
24 with me that voters who use assistance include voters
25 who are illiterate in any language?

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900      San Antonio, Texas 78232
210-697-3400                                                    210-697-3408

Page 198

1          MS. HUNKER:  Objection, form.
2    A.  Yes.
3    Q.  (By Ms. Perales)  And would you agree with me
4  that voters who use assistance also include those who we
5  call "limited English proficient"?
6          MS. HUNKER:  Objection --
7    A.  Yes.
8          MS. HUNKER:  -- form.
9    Q.  (By Ms. Perales)  Can you describe for me the
10  sort of people who would go with a voter to help them
11  vote, to provide assistance?
12    A.  I would -- I don't have any statistics to say
13  this; but generally speaking, I think friends, family,
14  et cetera.
15    Q.  A neighbor maybe?
16    A.  Maybe.
17    Q.  Okay.  And then also are you aware whether any
18  community-based nonprofit organizations might provide
19  assistors for voters?
20    A.  I'm not aware.
21    Q.  Would you agree with me that assistors in the
22  polling place provide assistance to voters in physically
23  navigating the space of the polling place?
24          MS. HUNKER:  Objection, form.
25    A.  I don't think that -- probably doesn't meet the

Page 199

1  legal definition of what an "assistor" is --
2    Q.  (By Ms. Perales)  Uh-huh.
3    A.  -- by Texas laws.
4    Q.  Okay.  So let me ask it in a less legal way.
5    A.  Okay.
6    Q.  Are you aware whether a voter, for example, who
7  might be elderly or just not great at walking around --
8    A.  Uh-huh.
9    Q.  -- could come with a friend or a relative and
10  lean on that person while they're entering the polling
11  place and moving up to the table with the poll workers
12  or moving over to the voting machine?
13          MS. HUNKER:  Objection to form.
14    A.  Can you repeat the question?
15    Q.  (By Ms. Perales)  Yes.  Would you agree with me
16  that a voter could come to the polling place and this
17  voter could be either elderly or, otherwise, not very
18  good at walking steadily --
19    A.  Uh-huh.
20    Q.  -- and the voter would lean on or use the
21  assistance of their helper to physically move through
22  the polling place, to walk up to approach the table and
23  also the voting machine?
24    A.  I would imagine that happens, yes.
25    Q.  Okay.  Would you agree with me that some voters

Page 200

1  would use assistance of another individual in order to
2  interact with poll workers, to exchange information with
3  poll workers?
4    A.  Yes.
5    Q.  Would you agree with me that a voter could use
6  an assistor to help explain to the voter how to use the
7  voting machine equipment?
8          MS. HUNKER:  Objection to form.
9    A.  I believe there's people that would want that
10  sort of assistance, yes.
11    Q.  (By Ms. Perales)  And I do understand from
12  taking other depositions in other counties that there
13  might be a disabled voter who wants to do it all on
14  their own --
15    A.  Uh-huh.
16    Q.  -- right, and might use, for example, special
17  equipment to do that?
18    A.  That's correct.
19    Q.  But you will agree with me that there might be
20  a voter who isn't -- you know, who isn't insisting on
21  doing it all themselves and who might bring a trusted
22  assistor with them to help them vote?
23    A.  I believe that there's most likely people that
24  do that, yes.
25    Q.  Okay.  Would you agree with me that a voter

Page 201

1  might also rely on an assistor to help the voter
2  understand the questions on the ballot?
3          MS. HUNKER:  Objection to form.
4    A.  Can you repeat the question, because I want to
5  make sure I understand?
6    Q.  (By Ms. Perales)  Would you agree with me that
7  a voter might use an assistor to help the voter
8  understand the questions on the ballot?
9          MS. HUNKER:  Objection, form.
10    A.  Well, I believe that current law would prevent
11  them from doing that.
12    Q.  (By Ms. Perales)  Current law under SB 1?
13    A.  Yes.
14    Q.  Okay.  So let me ask that question in the
15  setting of prior to SB 1.
16    A.  Okay.
17    Q.  Do you imagine there would be a voter who would
18  use an assistor to help that voter understand the
19  questions on the ballot?
20    (Mr. Stool and Mr. Schuette confer off the record.)
21    A.  I be-- --
22          MS. HUNKER:  Objection, form.
23    A.  I -- I believe the language be- -- prior to
24  SB 1 would have allowed that.
25    (Mr. Stool and Mr. Schuette confer off the record.)

The Office of the Dallas County Elections Administrator                April 29, 2022
Pages 202 to 205

Page 202

1    MS. PERALES:  Let's mark this.
2    THE REPORTER:  Okay.
3    MS. PERALES:  Can you tell me what number
4  this is?
5    THE REPORTER:  Number 4.
6    (Deposition Exhibit Number 4 marked.)
7    (Document handed to the witness and Counsel.)
8    Q.  (By Ms. Perales)  Turn with -- oh, you have
9  been handed what has been marked Deposition Exhibit
10 Number 4, and I will represent to you that this is SB 1
11 as passed by the Legislature.
12    A.  (Witness moves head up and down.)
13    Q.  And I'm going to ask you to turn with me first
14 to Page 52.
15    A.  Okay.
16    Q.  You will see, beginning on Line 22, the bill --
17 actually, Line 20 -- the bill Section 6.04.
18    Do you see that there?
19    A.  Yes.
20    Q.  And then a couple of lines down, you see
21 Sections 64.034.  Do --
22    A.  Yes.
23    Q.  -- you see that?
24    A.  Uh-huh.
25    Q.  Okay.  So as we get started on this, will

Page 203

1  you -- will you understand with me that if text is
2  underlined, it's being added to the statute --
3    A.  Yes.
4    Q.  -- and if text is struck out, it's being taken
5  out of the statute?
6    A.  Yes.
7    Q.  Okay.  Now we're ready to go.
8    If you will look with me, starting sort of
9  close to the bottom of the page, would you agree with me
10 that SB 1 is adding language to the Oath of Assistance?
11    A.  Yes.
12    Q.  Okay.  And that language includes, quote, under
13 penalty of perjury --
14    A.  Yes.
15    Q.  -- unquote?
16    A.  Yes.
17    Q.  And then also the language includes, quote, the
18 voter I am assisting represented to me they are eligible
19 to receive assistance, unquote?
20    A.  I'm sorry.  I lost where you're at.
21    Q.  Oh, okay.
22    A.  What line are you on?
23    Q.  I'm on Line 26.
24    A.  Yes.  Okay.  Got it.
25    Q.  And I'll ask the question again.  SB 1 adds

Page 204

1  language to the assistor oath, quote, the voter I am
2  assisting represented to me they are eligible to receive
3  assistance --
4    A.  Yes.
5    Q.  -- unquote?
6    A.  Yes.
7    Q.  And then on Line 2, there is some new language
8  added related to the assistor confining assistance.
9    Do you see that?
10    A.  Yes.
11    Q.  And would you agree with me that SB 1 adds the
12 following language to confining assistance:  quote,
13 reading the ballot to the voter, directing the voter to
14 read the ballot, marking the voter's ballot, or
15 directing the voter to mark the ballot, unquote?
16    A.  Yes.
17    Q.  All right.  And will you agree with me that
18 those are four specific acts?
19    A.  Yes.
20    Q.  Now, will you agree with me on Line 5 -- and I
21 think you may have been talking about this a little
22 while ago -- that SB 1 removes from the assistor oath
23 that the assistor will confine assistance to, quote,
24 answering the voter's questions, unquote?
25    A.  Yes.

Page 205

1    Q.  Okay.  And then there's some additional
2  language that's also coming out of the assistor oath,
3  such as stating propositions on the ballot, naming
4  candidates and their political parties?
5    A.  Yes.
6    Q.  Okay.  Will you agree with me that, starting on
7  Line 7, that the SB 1 adds to the assistor oath, quote,
8  I did not pressure or coerce the voter into choosing me
9  to provide assistance, unquote?
10    A.  Yes.
11    Q.  And then, finally, on Line 12, do you agree
12 with me that SB 1 adds the language after the semicolon,
13 quote, and I understand that if assistance is provided
14 to a voter who is not eligible for assistance, the
15 voter's ballot may not be counted, unquote?
16    A.  Yes.
17    Q.  Would you agree with me that, now that the
18 assistor is signing the oath under penalty of perjury,
19 that the assistor would face a perjury prosecution for
20 lying or not doing what the oath says a person will do?
21    MS. HUNKER:  Objection to form.
22    A.  Can you repeat the question?
23    Q.  (By Ms. Perales)  Sure.  I'll ask a better
24 question.
25    A.  Okay.

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                      Pages 206 to 209

Page 206

1   Q.  Do you think that an assistor, looking at this
2   new oath, would want to make sure, because the assistor
3   is signing under penal of perjury, that they follow
4   the -- the commands of the oath very closely?
5   A.  Yes.  I think it --
6       MS. HUNKER:  Objection, form.
7   A.  I think anyone who signs under penalty of
8   perjury considers they're -- that -- that it's a serious
9   business, so...
10  Q.  And perjury is a crime, is it not?
11  A.  Yes.
12  Q.  So taking the first language that I reviewed
13  with you, if an assistor wants to make sure they comply
14  with the oath closely, how will the assistor obtain a
15  representation from the voter that the voter is eligible
16  to receive assistance?
17  A.  Give me a second.  I'm not sure, other than the
18  oral representation -- oral or written representation
19  from the voter that they qualify.
20  Q.  Okay.  So to secure an oral representation, the
21  assistor would ask the voter; and then the voter would
22  have to make that representation, correct?
23  A.  Yes.
24  Q.  Okay.
25      MS. PERALES:  I'm going to mark two more

Page 207

1   exhibits.
2       What number is this?
3       THE REPORTER:  It's 5.
4       (Deposition Exhibit Number 5 marked.)
5       MS. PERALES:  This will be 6 (handing).
6       THE REPORTER:  Okay.
7       (Deposition Exhibit Number 6 marked.)
8   (Documents handed to the witness and Counsel.)
9       MR. SCHUETTE:  Thank you.
10      MS. HUNKER:  Thank you.
11  Q.  (By Ms. Perales)  The court reporter has handed
12  you what has been marked Deposition Exhibit Number 5 and
13  Deposition Exhibit Number 6, and I thought it might just
14  be a little bit easier for us to go through the oaths.
15      So I will ask you first, with respect to
16  Exhibit 5, do you see in the upper left-hand corner, the
17  language prescribed by the Secretary of State?
18  A.  Yes.
19  Q.  And then, in that little section there at the
20  bottom, 9, slash, 13 --
21  A.  Yes.
22  Q.  Okay.  Now, if you look at the oath, you'll
23  notice it does not have the language about penalty of
24  perjury or securing a representation from the voter.
25      Do you see that?

Page 208

1   A.  Yes.
2   Q.  So will you understand with me this is what
3   we'll call the old oath --
4   A.  Yes.
5   Q.  -- the pre-SB 1 oath?
6   A.  Yeah.
7       MS. HUNKER:  Objection, form.
8   Q.  (By Ms. Perales)  And then on Exhibit 6, do you
9   see, in the upper left-hand corner, it says Prescribed
10  by the Secretary of State?
11  A.  Yes.
12  Q.  And then, at the very bottom of that, it has a
13  1, slash, 2022?
14  A.  Yes.
15  Q.  And do you see where it says "Oath of Person
16  Assisting Voter," and then, if you follow along, it has
17  that language "under penalty of perjury"?
18  A.  Yes.
19  Q.  Will you understand with me that this is the
20  new post SB 1 oath?
21  A.  That's --
22      MS. HUNKER:  Objection --
23  A.  -- correct?
24      MS. HUNKER:  -- form.
25  Q.  (By Ms. Perales)  Okay.  So let's stick with

Page 209

1   Exhibit 6 so that we can go through the oath together.
2   A.  Okay.
3   Q.  There's the -- the language about confining
4   assistance.  It now is specific to four things.
5       Do you understand the removal of the language
6   answering questions of the voter --
7   A.  Yes.
8   Q.  -- and the replacement with these four specific
9   actions?
10  A.  Yes.  That's my memory of it, yes.
11  Q.  Okay.  And do you understand that, then, to
12  mean that the assistor may not answer questions of the
13  voter beyond directing the voter to read the ballot or
14  reading the ballot to the voter?
15  A.  Yes.
16      MS. HUNKER:  Objection, form.
17  Q.  (By Ms. Perales)  Can you tell me the machines
18  that you use here in Dallas County, if you use machines
19  to vote?
20  A.  There's multiple machines and to -- which --
21  which piece of the -- there-- do you want me to
22  describe all the machinery?
23  Q.  No.
24  A.  Okay.
25  Q.  I want to ask:  When the voter is marking and

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                          Pages 210 to 213

Page 210

1 casting the ballot --
2    A.   Uh-huh.
3    Q.   -- here in Dallas County, whether that is done
4 on a machine.
5    A.   Yes.  That's the ES&S ExpressVote ballot
6 marking device.
7    Q.   Now, does that device -- scratch that.
8        When a voter is marking the ballot on that
9 device here in Dallas County, is the voter using a
10 touchscreen or a wheel or something else?
11   A.   They can use a touchscreen, or they can use
12 -- an assistive device for hearing impaired or
13 alternate languages.
14   Q.   Okay.  And when the voter has cast the ballot,
15 does the machine in Dallas County spit out a piece of
16 paper?
17   A.   It -- it does.  It marks the voter's choices on
18 that piece of paper for that voter to able to review.
19   Q.   And then does the voter take that piece of
20 paper and drop it into a separate machine called the
21 tabulator?
22   A.   They drop it into a separate machine called the
23 ES&S Dallas -- I mean, ES&S DS200 vote tabulator.
24   Q.   Wonderful.  And not called a trash can?
25   A.   That's right.

Page 211

1    Q.   I have seen some alarmed expressions, so I want
2 to explore with you more the confining of assistance.
3        Do you -- do you understand the oath now to
4 foreclose an assistor from explaining to the voter how
5 to use the voting machine aside from pointing out
6 anything that might be on the screen, itself, in terms
7 of instructions?
8        MS. HUNKER:  Objection to form.
9    A.   I believe the -- I believe the language would
10 be liberal enough to allow them to assist that voter in
11 how to mark that because it says "marking the voter's
12 ballot," one of them.
13   Q.   (By Ms. Perales)  So if the -- the assistor
14 could mark the ballot for the voter at the voter's
15 request?
16   A.   (Witness moves head up and down.)  That's my
17 interpretation in reading the -- the plain language of
18 this, this oath.
19   Q.   Okay.  If the voter had a question of the
20 assistor about what to do with the piece of paper, in
21 terms of putting it in the tabulator and that question
22 was not answered by reading the ballot, do you
23 understand the oath to foreclose the assistor's
24 explanation of the fact that this piece of paper is
25 going to come out of the machine and then must be

Page 212

1 reviewed and taken over and placed inside the tabulator?
2    A.   I'm sorry.  This is really difficult to read;
3 it's so small.
4    Q.   (Moving head up and down.)
5    A.   I would agree that the language could be
6 interpreted -- interpreted to be so narrow in -- in
7 its scope, that it would foreclose letting some -- you
8 know, telling -- assisting someone in dropping that into
9 the vote tabulator.
10   Q.   With an explanation about what to do?
11   A.   Yes.
12   Q.   Okay.  Would you agree with me that the Oath of
13 Assistance does not include the criteria for who is
14 eligible for assistance?
15       MS. HUNKER:  Objection, form.
16   A.   Yes.
17   Q.   (By Ms. Perales)  I want to ask you about the
18 language on Line 3.  I did not pressure -- use of the
19 term "pressure" -- the voter into choosing.
20       Would you agree with me that the Oath of
21 Assistance does not include a definition of "pressure"?
22   A.   Yes.
23       MS. HUNKER:  Objection, form.
24   Q.   (By Ms. Perales)  If a -- if someone called
25 your office and asked you if it was okay to remind his

Page 213

1 neighbor for three days in a row, during Early Voting,
2 that it was coming up and he was available to assist --
3 if someone called and asked you, "If I remind that voter
4 three times that I'm available to assist them, is that
5 pressuring," how would you answer that question?
6        MS. HUNKER:  Objection to form.
7    A.   We don't provide legal advice.  But I would
8 state -- I'll just leave it at that.  We don't provide
9 legal advice.
10   Q.   (By Ms. Perales)  Okay.  Would it also be fair
11 to say that you wouldn't have a definition of "pressure"
12 in this context to fall back on?
13   A.   That's correct.
14   Q.   One more question about confining assistance to
15 the four specific actions.
16   A.   Uh-huh.
17   Q.   If a voter wants -- okay.  Let me -- let me ask
18 it this way.
19       Do you have a Spanish-speaking poll worker at
20 every single polling place in Dallas County?
21   A.   That is our goal, to have one.  We don't always
22 have one, but we have a substantial number.
23   Q.   And then let me ask the same question for your
24 new language, Vietnamese.
25   A.   Uh-huh.

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                          Pages 214 to 217

Page 214

1    Q.   Are you aiming to try to have a Vietnamese
2  speaker in every polling place or certain polling
3  places?
4    A.   It usually takes a while to establish a network
5  of poll workers to be in every location.  So what we
6  will do, initially, is to -- to focus on those areas of
7  the county where there's high concentrations of
8  Vietnamese speakers and then grow that; but the goal --
9  with the goal to have one in every location.
10   Q.   Okay.  Thank you.  So let's pick a situation in
11 which the voter speaks a language and only that
12 language --
13   A.   Uh-huh.
14   Q.   -- and it's not English, so the voter is
15 limited English proficient and this particular polling
16 place does not have an election judge or a poll worker
17 who speaks this language --
18   A.   Uh-huh.
19   Q.   -- so the voter comes in with an assistor to
20 help -- help the voter.
21   A.   Uh-huh.
22   Q.   Would you agree with me that helping the voter
23 communicate with the poll workers and the election judge
24 is outside the scope of the four specific actions:  read
25 the ballot, mark the ballot, direct the voter to read

Page 215

1  the ballot, direct the voter to mark the ballot?
2         MS. HUNKER:  Objection, form.
3    A.   I think -- I think that you could -- you could
4  interpret that -- that some of the language of those
5  four pieces, in a very narrow way; and that would
6  prevent that.  And I think you could read it in a more
7  liberal way that would allow that and, in particular, or
8  you know -- or directing the voter to mark the ballot.
9         I mean, in a practical -- from a practical
10 perspective, it would be the more liberal interpretation
11 to -- you know, common sense would tell you we've got to
12 try to assist voters.
13   Q.   (By Ms. Perales)  Understood.  You would agree
14 with me that these four specific acts, that the assistor
15 confines assistance to, all involve interaction with the
16 ballot?
17         MS. HUNKER:  Objection, form.
18   A.   Well, in -- on Number 4, or directing the voter
19 to mark the ballot, yes.
20   Q.   (By Ms. Perales)  But -- and you would agree
21 with me that in all four of these actions, someone is
22 interacting with the ballot, either the assistor or the
23 voter; is that right?
24         MS. HUNKER:  Objection, form.
25   A.   Yes.

Page 216

1    Q.   (By Ms. Perales)  Okay.  And you would also
2  agree with me that voting, more generally, encompasses
3  actions that go beyond reading and marking the ballot?
4  For example, checking in and signing in to vote, yes?
5    A.   Yes.
6    Q.   And being accepted to vote by the poll workers?
7    A.   Yes.
8    Q.   And also includes being shown how to use the
9  voting machine and understanding how to use the voting
10 machine?
11   A.   Yes.  It depends on which machine we're talking
12 about.  I mean, the marking the ballot, it's clear that
13 the -- the vote, the ExpressVote, would be marking the
14 ballot, as opposed to using the vote tabulator, dropping
15 the ballot in, and confirming your choices.
16   Q.   And you would agree with me that the act of
17 voting also includes moving around the polling place,
18 going from one, kind of, spot to another?
19   A.   There's three distinct stations in our method
20 of voting -- actually, four:  checking in, potentially
21 further dealing with exceptions to the standard voting
22 procedure at the -- at the judge's table, marking your
23 ballot, and depositing your ballot.
24   Q.   And would it be fair to say that, while moving
25 through those four stages of voters, typically moving

Page 217

1  through space in the polling place, itself?
2    A.   That's correct.
3    Q.   This is a dumb question --
4    A.   Uh-huh.
5    Q.   -- but would it be fair to say that you would
6  not be aware of what a voter and an assistor would say
7  to each other, prior to coming to vote, about whether
8  the assistor is willing to vote?
9    A.   Fair.
10   Q.   To --
11   A.   That's fair to say.
12   Q.   Okay.  Thank you.  Have you done any training
13 of poll workers on the changes created by SB 1 with
14 respect to the Oath of Assistance?
15   A.   I believe we direct -- we point out the fact
16 that there is a new Oath of Assistance in that -- and
17 how to use that, that oath.
18   Q.   And -- okay.  And would those training
19 materials have been produced in this case?  So, for
20 example, you said you had reviewed some material prior
21 to this deposition --
22   A.   Uh-huh.
23   Q.   -- that you think was disclosed in the first
24 round of disclosures.
25   A.   Uh-huh.

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                      Pages 218 to 221

Page 218

1    Q.  Do you recall whether any of your training
2  materials were in there?
3    A.  I don't recall.
4    Q.  Okay.
5    A.  I will point out, though, that there is also --
6  the reference materials that we have at a polling place
7  include, not only our materials (indicating), but also
8  the Secretary of State's guide on how to conduct -- it's
9  a little bit thicker, more detailed, guide for those
10  activities at the polling place.
11       (Ms. Perales confers with Mr. White.)
12    Q.  So SB 1 also created a new form for assistors
13  to provide additional information, and I'm going to ask
14  you about that separately.
15    A.  (Witness moves head up and down.)
16    Q.  But do you recall, specifically, having
17  training for your poll workers on the changes in the
18  language of the oath?
19    A.  I -- I don't know.
20    Q.  Okay.  Do you recall receiving any specific
21  training or guidance from the Texas Secretary of State
22  about how to implement the changes in the assistor oath?
23    A.  The Secretary of State provides various
24  election advisories, webinars, et cetera.  I don't
25  recall if there was one, in particular, that covered

Page 219

1  this (indicating) area.
2    Q.  (Moving head up and down.)  Are you aware of
3  any incidents of voter fraud associated with in-person
4  assistance of voters at the polling place?
5    A.  No.
6    Q.  Are you aware whether Texas has other laws that
7  existed prior to SB 1 that criminalize unlawful voter
8  assistance?
9    A.  In the context of an assistant (indicating)
10  providing assistance at a polling place.
11    Q.  Yeah.  So, for example, do you know if it was
12  illegal before SB 1 to mark the ballot on behalf of the
13  voter, not the way the voter is -- is intending?
14       MS. HUNKER:  Objection, form.
15    A.  I -- I don't know.
16    Q.  (By Ms. Perales)  Okay.  Looking at the new
17  assistor oath, (indicating) do you know whether Dallas
18  County uses a hard copy form or whether Dallas County
19  uses the Poll Pad to collect the information?
20    A.  I believe we use both because the Poll Pad
21  software was not able to be updated in a timely fashion
22  to cha- -- have the -- the modified language.
23    Q.  And there's a -- there's an additional
24  requirement to state the relationship and --
25    A.  Uh-huh.

Page 220

1    Q.  So that's what you're referring to?
2    A.  Yes.
3    Q.  Okay.  Who's --
4    A.  And I -- I believe there's new software that's
5  been -- that's pending approval by the Secretary of
6  State before we can use it.
7    Q.  Okay.  So you would have to get approval from
8  the Secretary of State before implementing that new
9  software?
10    A.  I believe so, yes.
11    Q.  Do you have a sense of the timeline for that
12  new software getting approved?
13    A.  I wish I knew because that new software has
14  other features that we're very anxious to use.
15    Q.  Turning back to SB 1, I'm going to ask you now
16  about this new form.  If you will turn again with me to
17  Page 52 of the bill.
18    A.  Okay.
19    Q.  You'll see that starting on Line 2, there is a
20  new section, because it's all underlined, titled
21  "Submission of Form by Assistant."
22       Do you see that?
23    A.  Uh-huh.
24    Q.  And would you agree with me that this is a new
25  provision that says that an assistor who is not an

Page 221

1  election official is required to complete a form stating
2  certain information about the assistor?
3       MS. HUNKER:  Objection to form.
4    A.  Yes.
5    Q.  (By Ms. Perales)  Okay.  At this point in time,
6  are you using the new form required under this section
7  in hard copy at the polling place?  Are -- do you know?
8    A.  I believe so, but I can't -- I'd have to
9  confirm that.
10    Q.  So if that were the case, help me understand,
11  given the stages that you were describing before, at
12  what point the assistor signs the Oath of Assistance and
13  fills out the new form.
14       Is it after the voter checks in?
15    A.  It would be at the check-in table during
16  that -- that point in time.
17    Q.  And would you agree with me that filling out a
18  new form is going to take additional time compared to
19  the time period when the form was not required?
20    A.  Yes.
21    Q.  Would you agree with me that at a polling place
22  where there are more voters voting with assistors, the
23  new requirement of a form is going to take more time for
24  each instance in which an assistor has to fill out that
25  form?

Page 222

1  A.  Yes.
2        MS. HUNKER:  Objection, form.
3  Q.  (By Ms. Perales)  And you would understand with
4  me, wouldn't you, that this form has to be completed by
5  the assistor for each instance of assistance?
6  A.  Yes.
7  Q.  All right.  So if I come to the polls and I'm
8  helping my mother and my aunt, I'm going to have to fill
9  out this information twice, correct?
10  A.  Yes.
11  Q.  And I will have to take the oath twice?
12  A.  Yes.
13  Q.  Have you ever assisted a voter at the polling
14  place?
15  A.  Many, many, many years ago.  Probably 2001.
16  Q.  Okay.  Tell me what assistance you provided.
17  A.  I -- I don't recall.  This was in Nebraska --
18  Q.  Uh-huh.
19  A.  -- when I was working a polling place.  I
20  couldn't -- it's a vague memory.
21  Q.  Were you a poll worker at that time?
22  A.  I was the Chief Deputy Election Commissioner,
23  but I made my whole staff go work a polling place so we
24  could experience what it was like.
25  Q.  So, in that moment, you were fulfilling the

Page 223

1  roll of a poll worker?
2  A.  That's correct.
3  Q.  Okay.  Do you happen to recall whether the --
4  whether the voter was elderly or disabled --
5  A.  I believe --
6  Q.  -- or --
7  A.  -- elderly.
8  Q.  Okay.  Do you -- and you don't -- I don't want
9  to put words in your mouth about what assistance you
10  might have offered the elderly voter, but do you recall
11  any details about it?
12  A.  I don't.
13  Q.  Turn with me, if you would, to Page 50 --
14  A.  Okay.
15  Q.  -- where it starts on Line 19 with Section 6.01
16  and then Line 27 where it says f, in parentheses --
17  A.  (Witness moves head up and down.)
18  Q.  -- then, quote, A person who simultaneously
19  assists seven or more voters voting under this section
20  by providing the voters with transportation to the
21  polling place must complete and sign a form, unquote.
22  And it continues from there.
23      Do you see that?
24  A.  Yes.
25  Q.  Are you aware of any instances in Dallas County

Page 224

1  where an assistor has provided transportation to seven
2  or more curbside voters at a ti- -- at one time?
3        MS. HUNKER:  Objection, form.
4  A.  I'm not aware of any that have taken place
5  since the enactment of SB 1.
6  Q.  (By Ms. Perales)  How about before the
7  enactment of SB 1?  Are you familiar with any instances
8  where an assistor or a person brings seven or more
9  curbside voters at one time to vote curbside?
10        MS. HUNKER:  Same objection.
11  A.  To vote curbside?
12  Q.  (By Ms. Perales)  Yes.
13  A.  No.
14  Q.  Okay.  Turn with me, if you would, to Page 54.
15  A.  Okay.
16  Q.  Page 54, Line 20, the beginning, Section 6.06.
17      Do you see that?
18  A.  Yes.
19  Q.  Are you familiar with this provision which
20  creates an offense for compensating or accepting
21  compensation to assist a voter to vote by mail?
22  A.  Yes.
23  Q.  And would you agree with me that, at the bottom
24  of Page 54, the language that is coming out of the
25  statute is language related to a performance-based

Page 225

1  compensation scheme?  Do you see that?
2  A.  Yes.
3  Q.  So would you agree with me that the -- the
4  prohibition on compensating or accepting compensation to
5  assist mail voters is being broadened beyond the
6  compensation for performance-based activity?
7        MS. HUNKER:  Objection --
8  A.  I --
9        MS. HUNKER:  -- form.
10  A.  -- don't understand the question.
11  Q.  (By Ms. Perales)  Okay.  So would you
12  understand with me that before SB 1, if we look at the
13  bottom of Page 54, this prohibition on paying people --
14  A.  Uh-huh.
15  Q.  -- to help voters vote by mail was limited to
16  performance-based compensation schemes?
17        MS. HUNKER:  Objection, form.
18  A.  Yes.
19  Q.  (By Ms. Perales)  Okay.  And do you understand
20  with me a performance-based compensation scheme is where
21  you're going to pay somebody by the head to provide
22  assistance?
23  A.  Yes.
24  Q.  So now with the -- with this language coming
25  out of the statute on the bottom of Page 54, do you now

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                          Pages 226 to 229

Page 226

1  understand that the prohibition to either pay someone or
2  to accept payment to assist a voter vote by mail is now
3  expanded to all people who are either paying or getting
4  paid to assist a voter to vote by mail, regardless of
5  whether it is a performance-based scheme?
6          MS. HUNKER: Objection to form.
7      A.  Yes.
8      Q.  (By Ms. Perales)  Okay.  And we see on Page 55,
9  on Line 18, there's an exception here for an attendant
10 or a caregiver who is known to the voter?
11     A.  (Witness moves head up and down.)  Yes.
12     Q.  Do you see that?
13     A.  Uh-huh.
14     Q.  Would you agree with me, though, that beyond --
15 well, would you agree with me, then, that somebody who
16 is paid by a nonprofit community engagement organization
17 to assist voters to vote by mail would fall under the
18 prohibitions of this statute?
19         MS. HUNKER: Objection, form.
20     A.  It appears so, yes.
21     Q.  (By Ms. Perales)  Going to turn forward now to
22 Section 7.04 on Page Fif- -- well, it starts on Page 58,
23 and then it flows over onto Page 59.
24         If you look with me, starting on Line 7,
25 there's a definition of "vote harvesting services" on

Page 227

1  Page 59.
2      A.  Oh, okay.  Here we go.  Yes.
3      Q.  And would you agree with me that the definition
4  of "vote harvesting services" requires an in-person
5  interaction with the voter?
6      A.  Yes.
7      Q.  And that interaction has to be in the physical
8  presence of an official ballot or a ballot voted by
9  mail?
10     A.  Yes.
11     Q.  And then there has to be the intent to deliver
12 votes for a specific candidate or measure?
13     A.  Yes.
14     Q.  Would you agree with me that if a canvasser
15 who's going house-to-house to encourage people to vote
16 for -- well, before I ask my question, I want to know
17 whether you have any bond issues on the ballot for
18 Dallas County for this May 7 election.
19     A.  There's no Dallas County bond issues.  There's
20 city bond issues, and I think there's some school --
21     Q.  Some school --
22     A.  -- district bond issues.
23     Q.  -- or city?
24     A.  Yeah.
25     Q.  Okay.  So I want to make my hypothetical

Page 228

1  specific to that.
2      A.  Okay.
3      Q.  Somebody is going door-to-door canvassing
4  voters to encourage them to vote for the bond for the
5  school district.
6      A.  Uh-huh.
7      Q.  Their intent is to convince the voter to vote
8  for the bond because it means new schools, better
9  facilities.  And the voter says, Sure, I'll talk with
10 you; I have my mail ballot right here; it's right --
11 it's right here inside the door.  It's right here on the
12 kitchen table.
13         Would you agree with me that that would be an
14 in-person interaction with the voter, that -- that
15 canvassing, that conversation?
16     A.  Yes.
17     Q.  And would you agree with me that if the voter
18 said the ballot was right there, that that would mean in
19 the physical presence of the ballot?
20     A.  I guess it --
21         MS. HUNKER: Objection, form.
22     A.  -- depends on how you define physical presence.
23     Q.  (By Ms. Perales)  And would you agree with me
24 that the canvasser, who's urging to voter to vote for
25 the school bond, is intending to get the voter to vote

Page 229

1  for the school bond?
2      A.  Yes.
3      Q.  Okay.  And if the -- if the voter says, "Well,
4  I have -- I have the ballot right here," and it's let's
5  say within a foot or two of the voter, that would be in
6  the presence of the ballot?
7          MS. HUNKER: Objection, form.
8      A.  I don't think that the statute defines -- and,
9  I mean, it could be in the same house, could be in the
10 same block.
11     Q.  (By Ms. Perales)  Uh-huh.
12     A.  I mean, it's -- it's vague, so I -- I don't
13 know how to answer that question with specificity.
14     Q.  Okay.  Since we're very close to there, I would
15 like you to flip forward to Page 60, Line 15, which is a
16 section titled "Unlawful Solicitation and Distribution
17 of Application to Vote by Mail."
18         Do you see that there?
19     A.  Yes.
20     Q.  Do you understand this to be a prohibition on
21 you to send out to voters application for ballot by
22 mail --
23     A.  Ye- --
24     Q.  -- when they are not requested?
25     A.  Yes.

Page 230

1    Q.  And when the language says "commits an
2  offense," do you understand that to be a criminal act?
3    A.  Yes.  I believe they go on to say the State
4  Jail Felony.
5    Q.  Ye- -- and I imagine you -- you've become aware
6  of that language?
7    A.  Yes.  Uh-huh.
8    Q.  Are you -- are you concerned that certain
9  things that your office might do or might have done in
10  the past would run afoul of this provision and possibly
11  create criminal liability for you?
12          MS. HUNKER:  Objection --
13    A.  Yes.
14          MS. HUNKER:  -- form.
15    Q.  (By Ms. Perales)  Can you describe that for me?
16    A.  We have, historically, distributed
17  applications, you know, when someone comes in and says,
18  "Hey, I want to provide application; you know, I want to
19  distribute applications for vote by mail," we provide
20  those to them.
21    Q.  Uh-huh.
22    A.  And we no longer can do that.
23    Q.  Uh-huh.  So if someone came to your office and
24  said, "I regularly go to church on Sundays, and we have
25  a great group of congregants; I'd love to bring 25

Page 231

1  applications for ballot by mail to my next church
2  service, give them to the old folks, the folks over 65,"
3  in that situation, would you give the individual the 25
4  applications for ballot by mail?
5    A.  Not since the passage of SB 1.
6    Q.  And in fact, you would require a voter to
7  request of you the application for ballot by mail before
8  you would send it out, correct?
9    A.  That's correct.
10    Q.  Are you aware of voters who may have, in the
11  past, gotten their application for ballot by mail
12  without having to ask for it from you?
13    A.  Yes.
14    Q.  Do you know of any specific instances like
15  that?
16    A.  No.
17    Q.  Okay.  But you're familiar with individuals
18  having come for, let's say, batches of application for
19  ballot by mail because they intend to deliver those to
20  voters who are eligible so that the voter can submit it?
21    A.  Yes.
22    Q.  So I only have one copy of this, so we're going
23  to mark it; and then I'm going to do my best to remember
24  what it says.
25    A.  Okay.

Page 232

1          THE REPORTER:  That's Number 7.
2          MS. PERALES:  7.
3          (Deposition Exhibit Number 7 marked.)
4          MS. HUNKER:  Since I can't see it, can you
5  describe what it is?
6          MS. PERALES:  Yes, or maybe I'll ask the
7  witness to do that.
8          MS. HUNKER:  That's fine.
9          (Document handed to the witness.)
10    Q.  (By Ms. Perales)  And I'll represent to you
11  that this is a couple of emails that were provided to us
12  today in the supplemental production, and they don't
13  have Bates stamp numbers on them yet.
14          But would it be -- would it be correct to say
15  that this is an exchange of emails in which you are
16  inquiring about prepaying the postage for applications
17  for ballot by mail?
18    A.  If you can give me a moment to review it.
19    Q.  Please take your time.
20    A.  (Witness reviews document.)  Okay.
21          (Ms. Perales confers with Mr. White.)
22    Q.  Okay.  So would it be correct to say that this
23  is an exchange of emails in which you are inquiring
24  about paying the postage or putting the -- Dallas County
25  putting the postage on an application for a ballot by

Page 233

1  mail so that the voter doesn't have to pay the postage
2  to send it to you?
3    A.  Yes.
4    Q.  Okay.  And are you expressing a concern, in
5  these emails, about whether paying that postage could,
6  potentially, get you too close to the prohibited
7  practice under SB 1?
8    A.  Yes.
9    Q.  Okay.  So would it be fair to say that this
10  communication is an expression of your concern that
11  paying the postage on an application for ballot by mail
12  to come back to you is now prohibited?
13    A.  Yes.
14    Q.  Okay.  So you may have resolved your concern?
15    A.  (Witness moves head up and down.)
16    Q.  But would it be fair to say that, because of
17  the criminal offenses and heavy penalties associated
18  with SB 1, that it caused you to doubt whether some of
19  the practices in Dallas County were going to expose you
20  to criminal prosecution or cause you to worry that some
21  of the practices in Dallas County might expose you to
22  criminal prosecution?
23          MS. HUNKER:  Objection to form.
24    A.  I would say that it caused us to question the
25  practices to make sure that we weren't getting our --

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                          Pages 234 to 237

Page 234

1  any of our staff in trouble.
2     Q.   (By Ms. Perales) And so besides refraining
3  from handing out multiple applications for ballot by
4  mail, can you tell me if you changed any of your other
5  practices at Dallas County?
6     A.   Well, we were very concerned about anything
7  having to do with vote by mail applications.  For
8  instance, I, specifically, remember a candidate wanted
9  us to review their application for a vote by mail.  And
10 it's something that we would normally do, to make sure
11 that they've got the right information, dates, et
12 cetera.  And I said, "Well, even something as simple as
13 that, does that put us in legal jeopardy?"
14    Q.   Uh-huh.
15    A.   And so, you know, when it comes to state jail
16 penalties, you know, I -- I need to try to do as much as
17 I can to protect my staff.
18    Q.   Understood.  And I believe this came out
19 January 12th.  This was before we pro- -- we got
20 guidance from the Secretary of State in their election
21 advisory on SB 1.
22         Okay.  And so, as you received guidance from
23 the Secretary of State, you are understanding better
24 kind of what you can do and -- and what you can't do; is
25 that right?

Page 235

1     A.   As time went on, we -- we got a better
2  understanding as more election advisories and webinars,
3  et cetera, came out.
4     Q.   Is there still guidance that you've requested
5  that you're still waiting to come from the Secretary of
6  State's office related to SB 1 implementation?
7     A.   Off the top of my head, no.
8     Q.   Okay.  You're waiting for approval of new
9  software that incorporates some of the SB 1
10 requirements, correct?
11    A.   Correct.
12    Q.   All right.
13    A.   And I believe, in this particular case, with
14 the solicitation and distribution, there's a pending
15 court case on that also, so...
16    Q.   And you might get more guidance from the
17 Secretary of State, also, depending on how litigation
18 unfolds?
19    A.   Correct.
20    Q.   Okay.  And then on -- oh, let me ask you this.
21         Would you agree with me that, although you're
22 not allowed to send out unsolicited applications for
23 ballot by mail, that political party officials can still
24 do that under --
25    A.   That is correct.

Page 236

1     Q.   -- the law?
2     A.   Interesting enough.
3     Q.   Do you think that political party officials are
4  more likely to -- are more likely to send out
5  application for ballot by mail unsolicited in a way
6  that's fair and responsible, more likely than you, to do
7  that function?
8         MS. HUNKER:  Objection, form.
9     A.   I've always found the restrictions on election
10 officials as compared to other individuals to be very
11 strange.
12    Q.   (By Ms. Perales) Okay.  Do you think political
13 party officials are better equipped than you to send out
14 applications for ballot by mail?
15         MS. HUNKER:  Objection, form.
16    A.   Apparently, the Legislature thinks so.
17    Q.   (By Ms. Perales)  If you turn with me to Page
18 62 --
19    A.   (Witness complies.)
20    Q.   -- and with the -- beginning on Line 26,
21 Section 31.129, you'll see a "Civil Penalty" provision
22 there.
23    A.   Yes.
24    Q.   And then if we turn to the next page, it
25 says -- and I'm starting on Line 1 -- quote, An election

Page 237

1  official may be liable to this State for a civil penalty
2  if the official -- and then it continues on to Sub 2 --
3  violates a provision of this code, unquote?
4     A.   (Witness moves head up and down.)
5     Q.   Do you understand that to create a new civil
6  penalty, meaning money penalties against you as an
7  election official for violating the Election Code?
8     A.   Yes.
9     Q.   Are -- are you concerned about liability for
10 civil penalties for mistakenly violating the election
11 code?
12         MS. HUNKER:  Objection, form.
13    A.   Yes.  Every election official I know is
14 concerned about that provision.
15    Q.   (By Ms. Perales)  And are you aware of an
16 Elections Administrator who got sued during the November
17 2020 election for election procedures that she
18 implemented?
19    A.   I'm not aware.
20    Q.   Okay.  Are you -- okay.  Not sued.
21         Are you aware of an Election Administrator who
22 was indicted for actions that she took as an Election
23 Administrator?  And particularly, I'll point your
24 attention to the Travis County Elections Administrator
25 Dana DeBeauvoir?

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                          Pages 238 to 241

Page 238

1          MS. HUNKER:  Objection to form.
2     A.  I'm not aware of the details of that.
3     Q.  (By Ms. Perales)  Okay.  Do you know if an
4  indictment was sought against her, if she wasn't
5  indicted?
6          MS. HUNKER:  Objection to form.
7     A.  I'm not aware of the details of that.
8     Q.  (By Ms. Perales)  Would it concern you if you
9  knew that the Attorney General's Office had sought to
10 bring criminal charges against the Travis County
11 Elections Administrator in the past?
12    A.  Yes, it would.
13         MS. HUNKER:  Objection, form.
14    Q.  (By Ms. Perales)  Do you happen to know -- and
15 I know you haven't been here that long.  But do you
16 happen to know if -- if there are circumstances under
17 which a voter could be excused from jury duty because
18 they are not physically present in the county, for
19 example, if they are away taking care of a family member
20 or doing some work out in the oil fields, whether that
21 voter could still consider Dallas County their domicile
22 and their intended place of return?
23    A.  I think that's a bit of a compound question.
24 I'm not sure I understand which part --
25    Q.  So there are parts of SB 1 that have to do with

Page 239

1  registered voters who are excused from jury duty because
2  of nonresidence.
3     A.  Uh-huh.
4     Q.  And I'm wondering whether you think it's
5  possible that a registered voter in Dallas County
6  considers Dallas County to be their actual home, where
7  they live, could also be excused from jury duty for not
8  being in the county when they are called up, besides a
9  college student.  Put away the college students because
10 we can think of that scenario right away.
11    A.  I'm not familiar with the -- laws around
12 jury duty.
13    Q.  Okay.  Were you aware of either SB 1 or similar
14 predecessor legislation moving through the Texas
15 Legislature in the -- in the spring of 2021 during the
16 regular session?  Did you become aware?
17    A.  Yes.
18    Q.  And then, of course, we know that similar
19 legislation, then, was considered in the first special
20 session in the summer.
21    A.  Uh-huh.
22    Q.  And then finally SB 1 passes in the second
23 special session.
24        Are you sort of generally aware --
25    A.  And there was --

Page 240

1     Q.  -- of that?
2     A.  -- a series of Senate and House bills that were
3  introduced and, subsequently, died; and SB 1 was the --
4  kind of the culmination of all of those, yes.
5     Q.  All right.  Thank you.
6         So during that process, including the regular
7  session and the special sessions, did you communicate
8  with any members of the Texas Legislature regarding SB 1
9  or its predecessors?
10    A.  Yes.
11    Q.  Do you remember who in the Texas Legislature
12 you communicated with?
13    A.  I do not.  I know that we had -- there was
14 multiple sessions with multiple legislators and multiple
15 election officials.  So there was at least two -- two or
16 three of those.
17    Q.  Were those sessions in person or --
18    A.  No.
19    Q.  Okay.  So, like, a Zoom meeting?
20    A.  Yes.
21    Q.  And do you know if this was facilitated by the
22 Association of Elections Administrators?
23    A.  I don't know who the organizers were, but I
24 know that there was participants from that.  And there
25 was also -- yeah, so -- so participants from TAEA.

Page 241

1     Q.  TAEA.
2     A.  Texas Association of Elections Administrators.
3     Q.  How quickly I've forgotten because we were just
4  talking about this in a previous -- you are not the
5  first county.
6     A.  Okay.
7     Q.  So do you remember sharing, personally sharing,
8  any concerns that you might have about this legislation
9  with the legislators on that Zoom call?
10    A.  Yes.  And I -- I believe -- yes.
11    Q.  Do you recall the Tarrant County Elections
12 Administrator talking about specific numbers of voters
13 on his voter roll that he was saying lacked either a
14 driver's license number or the last four of the Social?
15    A.  I recall conversations about that subject.  I
16 don't recall who said what.
17    Q.  Okay.  And -- okay.  So I just want to put that
18 aside for a second because I don't want to forget about
19 the legislators.
20        Do you remember which -- the legislators on the
21 Zoom call, were they from all over the state or just
22 from Dallas County?
23    A.  I don't recall.
24    Q.  Do you remember ever sharing any concerns about
25 SB 1 with any local legislators, ones that represent

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                Pages 242 to 245

Page 242

1  Dallas County?
2      A.   Yes.
3      Q.   And do you remember who those legislators were?
4      A.   I don't recall.
5      Q.   Okay.  Do you remember whether they were State
6  House members or State Senator or some combi- --
7      A.   I believe --
8      Q.   -- nation?
9      A.   -- some combination.
10     Q.   Okay.  And can you give me a sense of the type
11 of concern that you were sharing with the elected
12 officials when you spoke with them?
13     A.   I think there was a series of concerns
14 considering that -- what we (indicating) just talked
15 about, criminal penalties for election -- election
16 officials, penalties for poll workers for their
17 interactions with poll watchers.  We were very concerned
18 that it would have a chilling effect on being able to
19 recruit and retain poll workers, as well as election
20 officials, themselves.
21     Q.   Did you --
22     A.   As well as other subject- -- I mean, it's --
23 it's a big bill, right.
24     Q.   Did you express any concerns about not being
25 able to process applications for ballot by mail or mail

Page 243

1  ballots because of the new requirements to match ID
2  number?
3      A.   Yes.
4      Q.   Did you ever express any of the concerns that
5  we were just talking about a moment ago to anybody in
6  the office of the Secretary of State?
7      A.   I believe -- we have biweekly meetings.
8  There's an elections advisory group of election
9  officials.  And I believe, on more than one occasion, we
10 shared our concerns --
11     Q.   Are you --
12     A.   -- with them.
13     Q.   Are you a member of the Election Advisory
14 Committee?
15     A.   Yes.
16     Q.   We were talking to Yvonne Ramon a week or so
17 ago, and she said she was also a member.
18     A.   Okay.
19     Q.   She's also on there, do you know?
20     A.   I don't know who --
21     Q.   From Hidalgo County.
22     A.   I believe so, but I don't know the whole list
23 of people on that committee.  It varies, depends on who
24 makes the meeting.
25     Q.   So do you recall any meetings in which either

Page 244

1  Keith Ingram or Christina Adkins were present and you
2  were expressing these types of concerns about SB 1?
3      A.   I know that Christina always leads those
4  meetings.  I believe Keith is on sometimes.  I don't --
5  he never typically leads those meetings.  He'll chime in
6  every so often.
7      Q.   And so do -- do you recall whether you were
8  ever expressing a concern about SB 1, either with
9  respect to penalties on election officials, the
10 poll-watcher issue or the matching-the-ID-number issue
11 when Christina Adkins was on the call?
12     A.   Most likely, yes.
13     Q.   All right.
14     A.   I don't remember the exact specific instance,
15 but most likely.
16     Q.   And would it be fair to say that Elections
17 Administrators on the advisory committee were largely
18 expressing similar concerns about SB 1 to Ms. Adkins
19 and, to the extent he was there, Mr. Ingram?
20          MS. HUNKER:  Objection --
21     A.   Ye- --
22          MS. HUNKER:  Objection, form.
23     A.   Yes.
24     Q.   (By Ms. Perales)  Did you ever have
25 communications with Governor Greg Abbott or his office

Page 245

1  or staff regarding SB 1 or its predecessors?
2      A.   No.
3      Q.   Did you ever have communications with the
4  Attorney General, Ken Paxton, or his staff regarding SB
5  1 or its predecessors?
6      A.   No.
7      Q.   All right.  You never called them up and said,
8  Okay, so if I did this, are you going to prosecutor me?
9      A.   No.
10     Q.   Okay.  Have you, personally, had communications
11 with Dallas County voters regarding any problems that
12 have come up in the implementa- -- problems for them
13 that have come up in the implementation of SB 1?
14          MS. HUNKER:  Objection, form.
15     A.   Yes.
16     Q.   (By Ms. Perales)  Okay.  Tell me about those
17 communications.
18     A.   Well, I think -- you know, we interact with a
19 lot of voter groups, Dallas Votes, Legal Women Voters,
20 et cetera.  And through those groups -- or in our
21 Citizen Election Advisory Committee, through those
22 groups, we've had discussions about the problematic
23 aspects of SB 1.
24     Q.   And would it be fair to say that, in those
25 meetings, the -- the groups that you're talking about

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                 Pages 246 to 249

Page 246

1 have expressed to you concerns about people -- voters
2 having a harder time voting under SB 1?
3    A.  Yes.
4          MS. HUNKER:  Objection, form.
5    Q.  (By Ms. Perales)  Have you spoken to any
6 individual voters who had problems voting under SB 1?
7    A.  I have to think.  I'm not sure.  Yes, yes.  Now
8 that I'm thinking about it, yes.
9    Q.  Tell me about what you can remember of those
10 communications.
11   A.  I was trying to remember.  This one had to do
12 with a particular constituent's mother not being able to
13 get a replacement mail ballot.  Gosh, I'm -- I'm trying
14 to remember the details, but having to do with the --
15 the mail ballot aspects, as far as providing the IDs, et
16 cetera.
17   Q.  So this was a voter who was trying to fulfill
18 the ID number requirement --
19   A.  Yes.
20   Q.  -- that was created by SB 1 --
21   A.  Uh-huh.
22   Q.  -- and through -- using the mail ballot and was
23 having a hard time --
24   A.  Yes.
25   Q.  -- voting?

Page 247

1    A.  Uh-huh.
2    Q.  Do you know if that voter ever successfully
3 voted?
4    A.  Yes.
5    Q.  You do know?
6    A.  This one I'm thinking of, yes.
7    Q.  And did that voter successfully vote?
8    A.  Yes.
9    Q.  Okay.  Do you know how the voter voted, like,
10 did the -- did the voter, for example, end up having to
11 go to the polling place and vote in person?
12   A.  No.  I think they got a replacement -- a
13 replacement ballot, I believe.
14   Q.  Okay.  So you -- you were not getting all the
15 phone calls that Tacoma Phillips was getting?
16   A.  I typically don't.  I mean, that's why Tacoma's
17 there.
18   Q.  Right.  Would it be correct to say that you did
19 not work for Dallas County Elections in the November
20 2020 election?
21   A.  That's correct.
22   Q.  That saves us a few questions.
23   A.  Uh-huh.
24   Q.  Would you say that, as a general matter, voter
25 turnout in the partisan primary is lower than voter

Page 248

1 turnout in the general election?
2    A.  Yes.
3    Q.  And would you say, as a general matter, that
4 voter turnout in a spring election, like the one that
5 will happen in May, on May 7th, would typically be lower
6 than the turnout in a primary election?
7    A.  Yes.
8    Q.  Do you have any concerns about the impact of SB
9 1 on the upcoming November 2022 midterm election?
10         MS. HUNKER:  Objection, form.
11   A.  Yes.
12   Q.  (By Ms. Perales)  Okay.  And can you list what
13 those concerns are?
14   A.  I have continuing concerns about the provisions
15 of the -- the ID requirements for mail ballots, in that
16 the high rejection rate for applications and the
17 ballots, themselves.  I have concerns about the chilling
18 effect that the poll watcher provisions have on poll
19 worker recruitment and retention.  I'd have to kind of
20 think a little bit deeper about some of the other
21 provisions of SB 1, but those are my main ones.
22   Q.  Do you believe that there are voters who will
23 attempt to vote by mail in the November general election
24 who have not yet encountered the ID matching
25 requirements of SB 1 because they didn't vote in the

Page 249

1 primary?
2    A.  Absolutely.
3    Q.  All right.  And do you anticipate that, at
4 least for some of those voters, for the first time, they
5 are going to have either their application for ballot by
6 mail or their mail ballot rejected because there is not
7 a matching ID number in your records?
8    A.  Yes.
9          MS. PERALES:  Can we go off the record for
10 a few minutes?
11         (Mr. Stool moves head up and down.)
12         THE VIDEOGRAPHER:  Going off the record.
13 The time is 5:53.
14         (Break taken.)
15         (Deposition Exhibit Number 8 marked.)
16         THE VIDEOGRAPHER:  We are back on the
17 record.  The time is 6:08.
18   Q.  (By Ms. Perales)  I'm handing you what has been
19 marked Deposition Exhibit Number 8.
20         (Document handed to the witness and Counsel.)
21   Q.  Do you -- do you recognize this document?
22   A.  Yes.
23   Q.  And do you -- do you see it's got some Bates
24 stamp numbers on it starting with "MS" in the bottom
25 right-hand -- oh, the -- yes, the Bates stamp MS, and

Page 250

1 the first page is many zeros and then the --
2    A.   Yes.
3    Q.   -- number, 2?
4    A.   Yes.
5    Q.   And is "MS," is that for your initials?
6    A.   I don't know.
7    Q.   Okay.  Do you -- do you, generally, know what
8 this document is?
9    A.   Yes.
10    Q.   And do you know who prepared it?
11    A.   Yes.
12    Q.   Who prepared it?
13    A.   We -- I hired a -- created a position called an
14 Elections Analyst, hired a young attorney to fill that
15 position.  And one of her roles is to monitor
16 legislation and to assist our managers in interpreting
17 or being aware of that legislation and incorporating the
18 changes into their procedures.
19    Q.   Okay.  And --
20    A.   And this is a document (indicating) that she
21 produced to help with that.
22    Q.   And when she was preparing comments for the
23 column titled, quote, Possible Impacts, slash, Changes,
24 slash, Comments, unquote, was she also receiving some
25 input from staff in the Elections Department --

Page 251

1    A.   Ye- --
2    Q.   -- in order to do that?
3    A.   Yes.  She would meet with each department and
4 kind of go over these changes and get their feedback, et
5 cetera.
6    Q.   I'm going to draw your attention to the very
7 last page of this document (indicating).
8    A.   Okay.
9    Q.   Now, I'll represent to you that, when I
10 received this document -- it's been produced more than
11 once, but the one that has the Bates stamp on it from
12 before --
13    A.   (Witness moves head up and down.)
14    A.   -- also had legislation attached to the back --
15    A.   (Witness moves head up and down.)
16    Q.   -- but I only copied the slide's portion.
17    A.   Okay.
18    Q.   So I'm going to refer you to the back page.  It
19 doesn't have a Bates stamp number, but it -- it has
20 Assistance of Voters (pointing) across the top.  And
21 then I'm going to point your attention to the -- one,
22 two -- third row down, which is in gray and is talking
23 about the changes (pointing) related to Section 64.031.
24    A.   (Witness moves head up and down.)
25    Q.   Do you see that there?

Page 252

1    A.   Uh-huh.  Yes.
2    Q.   And will you read with me in the box on the
3 right, at the first dot?  Tell me if I'm reading this
4 correctly, quote, need clarity on whether this law guts
5 cognitive disabilities, if any, unquote.
6    A.   Yes.
7    Q.   Do you recall having a conversation with
8 anybody in your department about whether the
9 restrictions on assistance were going to make it
10 difficult to assist a voter with cognitive disabilities?
11    A.   If you give me a moment, I want to read the --
12 the left-hand side and then see if I can refresh my
13 memory here.
14    Q.   (Moving head up and down.)
15    A.   (Witness reviewing document.)  I don't have any
16 specific memories of this particular section, just of
17 the document overall and covering the various subjects
18 with various department heads.
19    Q.   Do you know who the preparer of the document
20 might have spoken to that would have caused her to
21 write, in the comments section, needing clarity about
22 whether the law guts cognitive disabilities?
23    A.   In addition to reading the legislation, she was
24 also keeping abreast of other analysis of the law.  And
25 it could have come from that.  It could have come from

Page 253

1 her own mind.  It could have come from conversations
2 with staff.  I don't know.
3    Q.   My last question to you is whether you've done
4 any examination of Dallas County's practices with
5 respect to voters who need assistance, specifically with
6 the goal of making sure that you are providing
7 assistance to voters who need it?
8    A.   Since I've come here, my MO as an Elections
9 Administrator, is -- is to -- is someone who rebuilds an
10 organization, and so we have looked at the practices in
11 Dallas County and -- from A to Z and are retaking a look
12 at all of those practices and starting with the ones
13 that -- where we're most vulnerable and have made
14 significant changes to the -- the practices in the
15 county.  But we're not -- it takes a long time to do
16 that.  It takes years.
17          And so, it certainly -- that is one of the many
18 things that's on our list of things to do that we
19 haven't been able to do yet.  So until we get there,
20 it's status quo from the county's previous practices.
21 But it's certainly something that's high on our priority
22 to do in the future.
23    Q.   Thank you.
24          MS. PERALES:  And I want to thank you for
25 your time and your patience today.

Page 254

1          I'm going to pass the witness to
2    Mr. White.
3          MR. WHITE:  Thank you.
4               EXAMINATION
5    BY MR. WHITE:
6    Q.   Mr. Scarpello, thank you for your patience.  I
7    wanted to ask a few questions about SB 1's provisions
8    relating to poll watchers.
9    A.   Yes.
10   Q.   But before we even turn to SB 1, did poll
11   watchers serve at Dallas County polling sites before
12   SB 1 took effect?
13   A.   Yes.
14   Q.   Does your office track the amount of poll
15   watchers who report to polling sites?
16   A.   I believe we have documentation, from those
17   poll watcher certificates, that are collected in -- in
18   the elections, you know.
19   Q.   And when you refer to the "poll watcher
20   certificates," are you referring to the training
21   certificates that they are required to --
22   A.   Yes --
23   Q.   -- complete?
24   A.   -- the documents that they turn in to us.
25   Q.   Okay.  And the certificates that you're

Page 255

1    referring to, that was -- poll watchers were required to
2    present those as a result of SB 1, right?
3    A.   Yes.
4    Q.   And so before SB 1 was enacted, did your office
5    have any way of tracking how poll watchers --
6    A.   I --
7    Q.   -- how many poll watchers reported for service?
8    A.   I don't know that we have reliable information
9    on the number of poll watchers that we had in the past.
10   Q.   Okay.  Are you aware of any instance of poll
11   watchers harassing voters at Dallas County polling sites
12   prior to SB 1 being enacted?
13   A.   None that I'm aware -- no specific ones that
14   I'm aware of.
15   Q.   Is that because -- I'm sorry.  Can you remind
16   me when you first started working at the Dallas
17   County --
18   A.   December 7th, 2020.
19   Q.   Okay.  Are you aware of any incidents of poll
20   watchers harassing election workers at Dallas County
21   polling sites before SB 1?
22        MS. HUNKER:  Objection, form.
23   A.   Not that I'm aware of.
24   Q.   (By Mr. White)  Are you aware of any instances
25   prior to Senate Bill 1 where poll watchers discovered

Page 256

1    election irregularities and reported those
2    irregularities to poll -- poll officials?
3    A.   Not that I'm aware of.
4    Q.   Okay.  Did you train election workers about
5    SB 1's provisions relating to poll watchers?
6    A.   Yes.
7    Q.   You trained them, personally --
8    A.   No.
9    Q.   -- or your office?
10   A.   No.
11   Q.   At home?
12   A.   We have a training program.
13   Q.   Okay.  Who in your office conducted the
14   training?
15   A.   We have a -- we have a training staff -- that
16   was two people until recently; a third person was just
17   added -- of full-time staff members.  But the people
18   that actually do the training, for the most part, are
19   temporary workers that were -- I think we hired about
20   eight or nine temporary staff that facilitate our
21   training classes.  For the most part, though, our
22   training is recorded so that we have a consistence --
23   consistency between classes.
24   Q.   Okay.  And when did this training occur?  I'm
25   sorry.  When did this training of election workers about

Page 257

1    the SB 1's provisions relating to poll watchers occur?
2    A.   I believe -- so we revised a lot of our
3    training materials, a significant amount of our training
4    materials, going into the November election and -- and
5    made further modifications in preparations for the March
6    elections because of SB 1.
7    Q.   Okay.  And what was covered -- can you describe
8    what was covered during the most recent training that
9    you conducted?
10   A.   I -- I don't know -- I can't tell you that -- I
11   can't quote verbatim what was said, but I can tell you
12   the -- the gist of it was that -- to warn poll workers
13   not to interfere with the movement of poll watchers;
14   otherwise, they could face legal jeopardy.
15   Q.   Okay.  I want to talk about some of those
16   specific provisions.
17        Do you have the exhibit that -- like, Holly
18   gave you a copy of SB 1 --
19   A.   Uh-huh.
20   Q.   -- in front of you?
21        Can you turn to Page 27 of that?
22   A.   (Witness complies.)  Okay.
23   Q.   And let's take a look at Lines 12 through 15,
24   which I believe is Subsection g, and you can read it to
25   yourself and just let me know when you're finished.

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                        Pages 258 to 261

Page 258

1    A.  (Witness reviewing document.)  Okay.
2    Q.  What is your understanding of what this -- or
3  sorry.  Strike that.
4        Are you familiar with this provision?
5    A.  Yes.
6    Q.  And what is your understanding of what it
7  requires?
8    A.  That -- that interfering -- you know, that an
9  election officer commits an offense if they interfere
10  with a poll -- a poll watcher and it's a Class A
11  misdemeanor and that there's certain paperwork and oaths
12  that need to be taken by that poll watcher.
13    Q.  Did your office adopt any new policies or
14  procedures to address this provision?
15    A.  I believe so, yes.
16    Q.  And what were those?
17    A.  To accept that -- to be aware of this new
18  provision and to -- to accept that certificate, et
19  cetera.
20    Q.  Okay.  Let me ask you about other provisions,
21  and that's one relating to poll watchers.
22        Can you flip to the next page, Page 28; and
23  look at Lines 3 through 5?
24    A.  (Witness complies.)  Okay.
25    Q.  Have you seen this provision before?

Page 259

1    A.  Yes.
2    Q.  And what does it mean?
3    A.  That a poll watcher cannot be limited in where
4  they -- their activities as a watcher.
5    Q.  What is your understanding of what the phrase
6  "free movement" means?
7    A.  I think kind of what I just said, where they --
8  they can go where they want in order to observe election
9  activities.
10    Q.  Did you receive guidance from the Secretary of
11  State's office about the meaning of "free movement" or
12  the lengths to which poll watchers are allowed to
13  operate within polling places?
14    A.  I believe --
15        MS. HUNKER:  Objection, form.
16    A.  I believe there's an elections advisory,
17  that -- if I remember correctly, that there's an
18  elections advisory that kind of outlines this particular
19  section.
20    Q.  (By Mr. White)  Okay.  Is it your understanding
21  that -- under this provision of Senate Bill 1, can a
22  poll watcher follow a voter through a polling place?
23        MS. HUNKER:  Objection, form.
24    A.  I believe so.
25    Q.  (By Mr. White)  Can poll watchers stand by the

Page 260

1  machine where voters cast their ballot?
2        MS. HUNKER:  Objection, form.
3    A.  That is something that we would not allow.
4    Q.  (By Mr. White)  And why wouldn't you allow
5  that?
6    A.  The privacy of a voter, being able to cast a
7  ballot in privacy.
8    Q.  Is there anything in SB 1, that you're aware
9  of, that would prohibit that?
10    A.  No.
11    Q.  And let me also ask you if you could flip
12  back -- backwards to Page 25, Lines 3 through 7.
13    A.  (Witness complies.)
14    Q.  Maybe you can just take a second to read that.
15        MS. HUNKER:  What page?
16        MR. WHITE:  Page 25.
17        MS. HUNKER:  Thank you.
18    A.  (Witness reviews document.)  Okay.
19    Q.  (By Mr. White)  Have you seen this provision
20  before?
21    A.  Yes.
22    Q.  Is it fair to say that this provision requires
23  poll workers to report suspected irregularities to
24  election officials?
25    A.  Yes.

Page 261

1    Q.  Who are the election officials to whom poll
2  watchers are obligated to report irregularities?
3    A.  We encourage them to talk to the election
4  judge, the presiding judge --
5    Q.  And to --
6    A.  -- and to not -- not interact with the clerks.
7    Q.  And why -- why do you encourage them to not
8  interact with the clerks?
9    A.  Because the judge has more thorough training
10  and knowledge of what is allowed and what is not
11  allowed, whereas the clerks do not.
12    Q.  And --
13    A.  As well as just the general procedures; they
14  have a deeper understanding of how the conduct -- and
15  they are responsible for the conduct of the election at
16  that polling place.
17    Q.  And do election judges and clerks have
18  responsibilities on Election Day apart from waiting to
19  hear complaints from poll watchers?
20    A.  Yes.
21    Q.  And what are some of those responsibilities?
22    A.  Generally speaking, the judge is responsible
23  for all activities within that polling place, including
24  directing the activities to open it, close it, to run
25  it, as well as the specific responsibilities to handle

Page 262

1 what we call exceptions to the standard voting
2 procedure. Clerks handle the 80 percent that are easy.
3 Judges handle the 20 percent that are difficult.
4    Q.   Okay. So when a poll watcher is reporting a
5 suspected irregularity to an election official, is it
6 fair to say that the election official will be unable to
7 handle their other responsibilities while they are
8 dealing with the -- a watcher.
9         MS. HUNKER: Objection, form.
10   A.   I don't know that that's -- I mean, being a
11 judge is difficult, and they have to juggle. And -- and
12 so that's just another piece of their job that they have
13 to juggle, as well as dealing with difficult voters and
14 dealing with signs and, you know, dealing with the --
15 all the other things that someone who's running a
16 polling place has to deal with.
17   Q.   (By Mr. White) Well, would you agree that
18 while an election official is talking to or interacting
19 with a poll watcher, they are not able to do any of the
20 other tasks they're assigned to do?
21        MS. HUNKER: Objection, form.
22   A.   I would agree that most people can -- they have
23 to deal with one thing at a time.
24   Q.   (By Mr. White) Okay. During the March primary
25 of this year, did Dallas County experience a shortage of

Page 263

1 poll workers at polling sites?
2    A.   Yes.
3    Q.   How significant of a shortage?
4    A.   It was very significant.
5    Q.   Can you explain more what you mean by that?
6    A.   We had a big shortage of judges, in particular,
7 where judges had committed to working and then didn't
8 show up two days prior to the election to pick up their
9 supplies. I think we had 71 no-shows on the Sunday
10 before the election, then some more on Election Day.
11   Q.   Okay. I want to pass you exhibits. I'm not
12 sure what exhibit number we are up to, but --
13        THE REPORTER: 9.
14        MR. WHITE: 9.
15   Q.   Okay. I'll pass you what I would ask the court
16 reporter to mark as Exhibit 9.
17        (Document handed to the court reporter.)
18   Q.   And I'll represent to you this is a news
19 article about some of the --
20        MR. WHITE: Oh, I'm sorry. Could you --
21        THE REPORTER: I've got -- you've got to
22 quit talking for me to mark it. I'm sorry.
23        (Deposition Exhibit Number 9 marked.)
24        THE REPORTER: Okay. Thank you.
25        MR. WHITE: Thanks.

Page 264

1         (Document handed to the witness.)
2    Q.   So I'll just represent to you this is a news
3 article about some of, like, the wait times and worker
4 shortages during the March primary in Dallas County,
5 which I'm sure you're familiar with.
6         And if I could ask you to turn to Page 5 of
7 this article.
8    A.   (Witness complies.)
9    Q.   And the last full paragraph on Page 5 -- I'll
10 just read it aloud -- says: "Scarpello also said some
11 election judges were afraid of being prosecuted under a
12 provision of the law related to partisan poll watchers."
13        Did I read that correctly?
14   A.   Yes.
15   Q.   And then it goes on to say:  (Reading) SB 1
16 makes it a misdemeanor offense for a worker to knowingly
17 prevent (sic) a watcher from observing an activity or
18 procedure the person knows the watcher is entitled to
19 observe.
20        Did I read that correctly?
21   A.   Yes.
22   Q.   How did you become aware that election judges
23 were afraid of being prosecuted under this provision?
24   A.   We had several judges tell us that.
25   Q.   How many judges?

Page 265

1    A.   I don't know.
2    Q.   And who did they speak to about these concerns?
3    A.   Staff -- county -- our staff -- voting site
4 staff.
5    Q.   And so is it fair to say that this provision
6 was a cause of election judges not reporting for duty --
7 or, sorry. Strike that.
8         Is it fair to say that this provision was a
9 cause of the poll worker shortages that we were just
10 discussing?
11        MS. HUNKER: Objection, form.
12   A.   My speculation is that it was a contributing
13 factor.
14   Q.   (By Mr. White) And what other factors do you
15 believe led to the poll shortage, poll worker shortage?
16   A.   There's a general -- there's a general degree
17 of people not wanting to volunteer or not wanting to
18 work. We have difficulties getting temporary workers,
19 full time workers, poll workers. And so I think that,
20 you know, there's a -- wherever you go, we see that,
21 right?  You go to McDonald's. You can't -- they don't
22 have workers.
23        And so I think that's a contributing factor. I
24 think this -- this legislation's a contributing factor.
25 I think there's lots of factors.

Page 266

1    Q.   Did you have to close polling sites as a result
2  of the shortage of poll workers?
3    A.   Yes.
4    Q.   How many?
5    A.   I believe it was -- gosh, don't -- I think it
6  was nine, and then we ended up open -- opening one of
7  those nine later in the -- the morning.
8    Q.   Where, in Dallas County, were these nine poll
9  sites --
10    A.   Scattered throughout the county.
11    Q.   Scattered throughout.  Who decided to close
12  them?
13    A.   I did.
14    Q.   Did you attempt to recruit other poll workers
15  or election judges before making that decision?
16    A.   Yes.  I mean, remember, I said 71 didn't show
17  up on Sunday to pick up their supplies.  So, on Monday,
18  we scrambled and reassigned most and moved alternate
19  judges and successfully patched most of those holes
20  except for those eight or nine.
21    Q.   Did the shortage of poll workers cause longer
22  wait times for voters at polling sites?
23    A.   Yes.
24         MS. HUNKER:  Objection, form.
25    Q.   (By Mr. White)  If you could turn to Page 2 of

Page 267

1  the article that I just gave you.
2    A.   Uh-huh.
3    Q.   At the bottom, there are a couple of paragraphs
4  talking about a voter named Gladys Ivy who says that she
5  waited for four hours to vote at the Disciple Central
6  Community Church in DeSoto.
7         Are you aware of that polling site?
8    A.   I am.
9    Q.   And are you familiar with -- oh, strike that.
10         Are you familiar with this story about Gladys
11  Ivy having to wait four hours?
12    A.   I am familiar with it, and I have my doubts
13  about it.  We're investigating it.  It's highly
14  unlikely someone waited four hours.
15    Q.   Okay.  Why do you have your doubts?
16    A.   Because it's highly unlikely someone waited
17  four hours.  It's -- the math just doesn't add up.
18    Q.   Okay.  What do you -- were there other -- I'm
19  sorry.  Strike that.
20         Why -- why do you think the math doesn't add
21  up?
22    A.   Because it's -- it would be nearly impossible
23  for someone to wait four hours for that curbside voting
24  that she claims.
25    Q.   I guess I'm just trying to understand why

Page 268

1  you -- what is your basis for saying that's impossible
2  as someone, personally, who has not worked at an
3  election -- an election site?
4    A.   Given the time it takes to process a voter and
5  for a voter to cast a vote and that the potential line,
6  physical area, for the line to -- to, actually, line
7  up --
8    Q.   Uh-huh.
9    A.   -- it's unlikely.  And that's why we're
10  investigating.
11    Q.   Okay.
12    A.   Yeah.  People -- people have their own
13  perception of reality --
14    Q.   Sure.
15    A.   -- many times.
16    Q.   Did you -- are you aware of -- sorry.  Strike
17  that.
18         Did you talk to other voters about wait times
19  during the March 2022 primary?
20    A.   Yes.
21    Q.   And what is your understanding of how much
22  longer than usual wait times were during the primary
23  election?
24    A.   I think that, in some instances when we had
25  poll worker shortages, that there were less people to

Page 269

1  check in workers.  And at those locations, they had to
2  wait longer to check in.  And so then there -- there
3  would be waits at those locations.  But generally
4  speaking, there were -- when -- when we had a compliment
5  of voter -- poll workers, there were no waits.
6    Q.   Okay.  So when there were poll worker
7  shortages, the wait times were longer, if I'm --
8    A.   Correct.
9    Q.   -- understanding you correctly.  Okay.
10         And do you have a sense of how much longer
11  people typically had to wait because of these poll
12  worker shortages?
13    A.   No.
14    Q.   Okay.  Is there anyone in your office that
15  would know that --
16    A.   No.
17    Q.   -- answer?
18    A.   We don't have metrics on that.
19    Q.   Okay.  Did your office receive complaints about
20  wait times following the March 2022 primary election?
21    A.   A handful.
22    Q.   And when you say "a handful" (indicating), how
23  many are you thinking?
24    A.   I don't -- I couldn't quantify.
25    Q.   More than five?

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                       Pages 270 to 273

Page 270

1   A.  Yes.
2   Q.  More than 20?
3   A.  Probably not.
4   Q.  Okay.  In the March 2022 primary, did poll
5   watchers appear at Dallas County polling locations?
6   A.  Poll watchers?
7   Q.  Yeah.
8   A.  Yes.
9   Q.  And I think I asked you this before, but do you
10  know how many appeared during the March 2022 primary?
11  A.  I don't have that information.  I don't know
12  that information.
13  Q.  Okay.  Were there particular precincts where
14  poll watchers were more likely to report for service in
15  Dallas County?
16      MS. HUNKER:  Objection, form.
17  A.  I -- I'm not aware of any particular location
18  where there was a significant amount of -- of poll
19  watchers.
20  Q.  (By Mr. White)  Okay.  In the March 2022
21  primary, are you aware of any instance where poll
22  watchers intimidated voters?
23      MS. HUNKER:  Objection, form.
24  A.  We had one location where we had a conflict
25  between a poll watcher and a judge.  I don't know that

Page 271

1   there was a conflict between the poll watcher and any
2   voters.
3   Q.  (By Mr. White)  Okay.  And what was -- what
4   location was this?
5   A.  Early voting site.  The -- the name escapes me
6   right now, but it's on the tip of my tongue.  I can't
7   remember.
8   Q.  Okay.  What was the nature of the conflict
9   between the poll watcher and the judge?
10  A.  There's -- they were co-judges for this
11  election because it was a joint election.  There was a
12  Republican co-judge and a Democratic co-judge.  The
13  Republican co-judge and the poll watcher were -- the
14  Republican co-judge was letting the poll watcher have
15  access to things that she should not have, and the
16  Democratic co-judge had a problem with that.  And so
17  there was a conflict there.
18  Q.  Okay.  And when you say the Democratic co-judge
19  had a problem with it, how did the situation resolve
20  itself?
21  A.  They called our office.  We sent a -- a
22  technician to try to calm -- to negotiate -- mediate, if
23  you will.  The conflict just kept going until, I think,
24  later on.  One of the two parties called the Sheriff's
25  Office, and the Sheriff's Deputies, actually, went to

Page 272

1   that location.
2   Q.  And when the Sheriff Deputies arrived at the
3   location, what happened next?
4   A.  I -- I don't know the specifics of who did what
5   at that point.  I know the Sheriff's Deputies worked
6   with the judge to -- to make sure that she felt safe
7   and -- and that there weren't any further problems.
8   Q.  Do you know if the poll watcher was removed
9   from the polling site?
10  A.  I don't think -- I think some of this conflict
11  happened after the polling place was already closed.
12  Q.  Okay.  Before the polling place was closed, did
13  this conflict lead to any disruptions in the
14  administration of the election at the polling site?
15      MS. HUNKER:  Objection, form.
16  A.  I don't believe so.
17  Q.  (By Mr. White)  And you said that this conflict
18  arose from the Republican co-judge giving potentially
19  unwarranted access to the poll watcher.
20      Am I describing your testimony correctly?
21  A.  That's correct.
22  Q.  And what kind of access was being given to the
23  poll watcher?
24  A.  I believe they were -- they were attempting to
25  open up the ballot box on the vote tabulator.

Page 273

1   Q.  Did the poll watcher succeed in opening up the
2   ballot box?
3   A.  I don't believe so.
4   Q.  Okay.  Are you aware of any other problems
5   caused by poll watchers during the March 2022 primary?
6   A.  No.
7   Q.  Do you recall testifying earlier that one of
8   your biggest concerns with SB 1 was the deterrent effect
9   that poll watchers would potentially have on poll worker
10  recruitment?
11  A.  Yes.
12  Q.  Are you taking any steps to sort of address
13  that going forward?
14  A.  In the March election, we -- we actually hired
15  a firm to produce a video that we put -- that we show
16  during our training, to talk about the importance of
17  teamwork, the importance of getting along with poll
18  co-workers, the importance of getting along with poll
19  watchers and -- and with voters, as well as, you know,
20  having discussions during training about that importance
21  of not -- of de-escalating conflict.
22      We're going to continue to do that going into
23  the -- to the November election where -- where it's
24  contested, races where there's most likely going to be
25  more poll watchers and the potential for more conflict.

The Office of the Dallas County Elections Administrator

April 29, 2022
Pages 274 to 277

Page 274

1    Q.   This video that you just mentioned that you
2    produced, is this something for -- is this part of your
3    training materials?
4    A.   Yes.
5    Q.   Okay.  When Senate Bill 1 was being debated in
6    the Legislature, did you take a position supporting or
7    opposing these provisions relating to poll watchers?
8    A.   As an Elections Administrator, I don't really
9    take positions on legislation.  I do add my expertise as
10   an administrator to -- to advise legislators on what I
11   think the effects of that legislation might -- it might
12   have.
13   Q.   And did you advise legislators about the
14   provisions relating to poll watchers?
15   A.   Yes.
16   Q.   And what did you advise them, or how did you
17   advise them?
18   A.   I thought it would have a chilling effect on
19   the recruitment and retention of poll workers.  I said
20   that I thought that it could create conflict at -- at
21   polling places between poll watchers and poll workers
22   and, potentially, voters.
23   Q.   Okay.  And you mentioned that you didn't start
24   working at the Dallas County Election Administrator's
25   office until November of 2020, right?

Page 275

1    A.   Yes.  December 7th of 2020.
2    Q.   December 7th.  And so what was your basis for
3    believing that these poll watching provisions would have
4    a chilling effect on recruitment?
5    A.   Just my experience in the industry.
6    Q.   Okay.  Have you had experiences prior to your
7    service here in Dallas with the poll watchers that sort
8    of informed that opinion?
9    A.   Yes.
10   Q.   And what were those experiences?
11   A.   22 years of dealing with poll workers and poll
12   watchers and knowing the nature of elections, especially
13   as they've gotten more partisan and a little less polite
14   as the years have gone on.
15   Q.   Okay.  I'm going to shift gears and ask
16   about -- a few questions about curbside voting and
17   drive-thru voting.
18   A.   Uh-huh.
19   Q.   Does Dallas County offer curbside voting?
20   A.   Yes.
21   Q.   And how long has Dallas County offered curbside
22   voting?
23   A.   I don't know that answer.  For as long as Texas
24   state law has allowed it, I'm sure.
25   Q.   Sure.  Who's eligible to vote curbside in

Page 276

1    Dallas County?
2    A.   There are certain specified requirements.
3    Generally speaking, the disabled people not able to
4    readily get into a polling place.
5    Q.   Can you walk me through the steps of how a
6    voter casts a ballot when they vote using curbside
7    voting?
8    A.   We have a sign out on the -- on the outside of
9    the polling place that has a phone number.  When someone
10   pulls up, if there's not voter- -- if there's not
11   workers already outside, they call that number, which
12   rings into the judge's cell phone.  And they say, "Hey,
13   I'm here to vote curbside."
14        And so the judge sends a worker out with an
15   electronic poll book.  The voter -- they -- they find
16   the voter, and the voter signs the Epollbook.  They go
17   back inside; and they get the voting machine, bring that
18   out to the voter.  They -- they cast their ballot on
19   that voting machine.
20   Q.   Do you think there's an increased risk of fraud
21   with respect to the curbside voting?
22   A.   No.
23   Q.   Why not?
24   A.   It's the same procedure that takes place inside
25   the building as outside the building.

Page 277

1    Q.   And are you familiar with the provisions in
2    SB 1 relating to drive-thru voting?
3    A.   Yes.
4    Q.   What is the difference between curbside voting
5    and drive-thru voting?
6    A.   Curbside voting, there is certain requirements
7    that allows someone to be a curbside voter as opposed to
8    drive-thru voting where there would not be those
9    requirements.
10   Q.   Requirements on who is eligible?
11   A.   Yes.
12   Q.   Has Dallas County ever offered drive-thru
13   voting?
14   A.   Not that I'm aware of.
15   Q.   Have you ever considered implementing it?
16   A.   I would say if SB 1 hadn't been implemented, we
17   would have aggressively had drive-thru voting.
18   Q.   And why -- why is that?
19   A.   I've got a long history of making voter --
20   voting more accessible to voters, including the
21   introduction of drop boxes, vote center voting, allowing
22   mail ballots to be dropped off at polling places, et
23   cetera, et cetera.  And so when I saw what Harris County
24   was doing in 2020, I really applauded that.  I thought
25   it was great.  And I -- when I got to Texas, I thought

Page 278

1 we're going to do that in Dallas.
2    Q.   And so is it your opinion that drive-thru
3 voting would make voting more accessible?
4         MS. HUNKER:  Objection, form.
5    A.   Absolutely.
6    Q.   (By Mr. White)  I meant to ask this earlier.
7 So I had asked you earlier about whether you thought
8 there was an increased risk of fraud with respect to
9 curbside voting.
10        Are you aware of any instances of voter fraud
11 in Dallas County that have happened with respect to
12 curbside voting?
13   A.   No.
14   Q.   I also want to turn your attention back to this
15 article that I gave you.
16   A.   Uh-huh.
17   Q.   If you could flip to Page 4.
18   A.   (Witness complies.)
19   Q.   The middle of the page, there's a paragraph
20 that says -- and I'll just read it aloud -- "Noble" --
21 who appears to be a Democratic party official -- "noted
22 over 6 percent of mail-in ballots in the county were
23 rejected because of the new identification requirements.
24 Those voters, she said, had to show up in person if they
25 wanted to vote, leading to longer queues to vote

Page 279

1 curbside."
2         Did I read that correctly?
3    A.   Yes.
4    Q.   Are you aware of any voters who showed up to
5 vote curbside because of SB 1's identification
6 requirements for mail-in ballots?
7    A.   I --
8         MS. HUNKER:  Objection, form.
9    A.   I speculate, just like Kristy Noble, that
10 that -- that was the case.
11   Q.   (By Mr. White)  And what is the reason for you
12 speculating in that way?
13   A.   Because a disabled voter or someone who is not
14 likely to -- less likely to be able to go in to a
15 polling place, is going to look for an alternative to
16 vote.  And one of those would be mail ballot, but
17 because of the provisions of SB 1 making mail ballots
18 that much more difficult in the high rejection rate, I
19 think that more people said, "Well, what are my --
20 what's my next alternative?"
21        And that would be drive-thru voting or curbside
22 voting.  I have no evidence of that, but I'm
23 speculating.
24   Q.   Yeah.  Now, a moment ago you mentioned that you
25 were aware that Harris County implemented drive-thru

Page 280

1 voting in the 2020 election.
2         During the 2020 election, did voters ever call
3 your office to ask about drive-thru voting?
4    A.   I wasn't there.
5    Q.   Oh, that's right.
6    A.   But I believe that -- that my staff has told me that
7 there was lots of questions:  Why was Dallas not doing
8 it when Harris was?
9    Q.   And so is it fair to say that, just of those
10 complaints, were that Dallas County voters wanted to
11 have drive-thru voting in Dallas County?
12        MS. HUNKER:  Objection, form.
13   A.   That is my understanding.
14   Q.   (By Mr. White)  Did the availability -- I'm
15 sorry.  Strike that.
16        Apart from those calls that you received that
17 we just -- that I just asked you about, did the
18 availability of drive-thru voting in Harris County cause
19 other administrative difficulties for your office?
20        MS. HUNKER:  Objection, form.
21   A.   Not that I'm aware of.
22   Q.   (By Mr. White)  And earlier we were talking
23 about the poll watcher provisions.  I had asked you
24 whether you had any conversations with legislators, you
25 know, supporting or opposing or advising with respect to

Page 281

1 those provisions.
2    A.   Uh-huh.
3    Q.   Did you have any communications with
4 legislators about the prohibition of drive-thru voting
5 while SB 1 was being enacted?
6    A.   I don't recall, but I -- if -- the timing of it
7 was during the legislative session, but I always -- I
8 always spoke fondly of -- of the concept.
9         MR. WHITE:  Can we go off the record just
10 for a minute?  Thanks.
11        THE VIDEOGRAPHER:  Going off the record.
12 The time is 6:48 p.m.
13        (Discussion off the record.)
14        THE VIDEOGRAPHER:  Back on the record.
15 The time is 6:49 p.m.
16        MR. WHITE:  Mr. Scarpello, thank you.  I
17 don't have any further questions for you.  So I will
18 pass the witness first, I think, to any other attorneys
19 for the Plaintiffs who are appearing over Zoom, who'd
20 like to ask questions.
21        MS. BENDER:  No questions from the United
22 States.  Thank you.
23        THE REPORTER:  I'm sorry.  What was the
24 name again?
25        MS. PERALES:  Brady.

Page 282

1        MS. BENDER:  This is --
2        THE REPORTER:  Okay.  Thank you.
3        MS. BENDER:  This is Brady.  No questions
4   at this time.  Thank you.
5              EXAMINATION
6   BY MS. CAI:
7        Q.  Hello, Ms. Scarpello.  This is Sophia Cai on
8   behalf of the OC Plaintiffs
9        A.  I'm sorry.  I can't hear.
10       Q.  I was just going to ask you if you could hear
11  me okay.
12            How is this?
13       A.  That's better.
14       Q.  Great.  I'll just reintroduce myself.  My name
15  is Sophia Cai on behalf of the OCA Plaintiffs.
16            First I just wanted to ask you a few questions
17  about matching voters who apply for a ballot by mail.
18       A.  Okay.
19       Q.  If an individual applies to vote by mail, but
20  is not a registered voter, will their application for
21  ballot by mail be approved?
22       A.  If they apply to vote by mail, but they are not
23  a registered voter, no.
24       Q.  And that was also true prior to SB 1; is that
25  correct?

Page 283

1        A.  That's correct.
2        Q.  Put another way, everyone who successfully
3   applies for a ballot by mail has already registered to
4   vote in the county; is that right?
5        MS. HUNKER:  Objection, form.
6        (The lights go out in the room.)
7        THE REPORTER:  Can we go --
8        A.  I think we might pause.
9        THE REPORTER:  -- off the record, please?
10  Can we go off the record for a second, please?
11           THE VIDEOGRAPHER:  Going off the record at
12  6:51 p.m.
13           (Discussion off the record.)
14           THE VIDEOGRAPHER:  Okay.  We're back on
15  the record.  The time is 6:52 p.m.
16       Q.  I'll just reask my most recent question.  How's
17  that?
18            Everyone who successfully applies for a ballot
19  by mail has already registered to vote in the county?
20       MS. HUNKER:  Objection, form.
21       A.  That -- that's correct.
22       Q.  Prior to SB 1, how did your office check to see
23  if an individual applying to vote by mail was a
24  registered voter?
25       A.  They checked the voter registration, the VEMACS

Page 284

1   voter registration system.
2        Q.  And was that system meant to ensure that the
3   individuals were already registered?
4        A.  Yes.
5        Q.  Prior to SB 1 being granted an application for
6   ballot by mail, what would happen next?
7        A.  The vote by mail ballot would be sent.
8        Q.  Would the voter be assigned a unique
9   identification number?
10       A.  Yes.
11       Q.  And would that identification number be
12  associated with the ballot sent to the voter?
13       A.  Yes.  Not --
14       Q.  So --
15       A.  -- to the -- not to the ballot, but to the
16  ballot carrier envelope.
17       Q.  Okay.  I see.  Thank you for that
18  clarification.
19            So someone who successfully voted by mail would
20  then have to return that specific ballot envelope issue
21  to them, not any ballot envelope?
22       A.  That's correct.
23       Q.  Prior to SB 1, what information was the voter
24  required to include on the carrier envelope or ballot
25  envelope?

Page 285

1        A.  I believe their name, address.  I can't recall
2   all the specifics, but most likely, the name, address.
3        Q.  Okay.  And was the voter required to sign the
4   carrier envelope?
5        A.  Yes.
6        Q.  Was there a process in place to make sure that
7   the signature matched the voter signature on file?
8        A.  Yes.  There's the Signature Verification
9   Committee that compares the signature of the -- on the
10  carrier envelope to the signature on the application, as
11  well as they -- they have the ability to check other
12  signatures within the voter registration system.
13       Q.  And just to clarify, that answer also applies
14  prior to SB 1 --
15       A.  Yes.
16       Q.  -- is that correct?
17       A.  Yes.
18       Q.  Thank you.  Okay.  Next I want to ask you some
19  questions about voters with disabilities.
20            Are you familiar with your office's obligations
21  under the Americans with Disabilities Act or ADA?
22       A.  I'm -- I'm vaguely familiar, yes.
23       Q.  And what do you understand those obligations to
24  be?
25       A.  Most importantly, it's to provide voting

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                      Pages 286 to 289

Page 286

1 locations that have been -- that are ADA compliant,
2 basically.
3   Q.  Does your office have written ADA policies or
4 procedures?
5   A.  No, we don't.
6   Q.  So these are -- how are they communicated to
7 your employees or poll watchers?
8   A.  The -- the polling places, the county has
9 traditional polling places (indicating) that they've
10 been using for years, and those polling places, we -- in
11 earlier testimony, someone testified -- Revi testified
12 that those polling places were, when we moved to
13 countywide vote centers, they used those same polling
14 places.
15       In August of 2021, I proposed that we take a
16 look at those polling places in an effort to reinspect
17 them and to get the votes in our advisory committee to
18 look at the official locations of the county so that we
19 could modernize or be more compliant with ADA, as well
20 as other practical locations, you know, aspects of
21 those -- how many we have, where they're located and do
22 a deep dive in -- in the placement and quality of our
23 polling places.  But because of redistricting that was
24 taking place at the time, that effort was delayed; and
25 we will take that up again in June of this year.

Page 287

1   Q.  And when you say "accessible polling places,"
2 what do you mean by that?
3   A.  There's -- when there's -- when a polling place
4 is contemplated for use, there are checklists that we go
5 through where you -- you know, best practices call for a
6 checklist to inspect a location.  You -- you're --
7 there's a whole laundry list of things that make a
8 location ADA compliant:  ramps, pressure on the doors
9 (indicating), the types of knobs, access to drinking
10 fountains.  I mean, it's a very comprehensive list that,
11 basically, gives a grade to a location for ADA
12 compliance.
13   Q.  It sounds like you're very familiar with this
14 list, but if it's not written down anywhere, how do the
15 various locations go through this checklist?
16   A.  There -- there were the -- there were
17 inspections in 2019, and so we do have records of those
18 locations.  I just think that -- that we need to pay a
19 little bit better attention to the results of those
20 inspections and upgrade or eliminate those that are not
21 in compliance because I think we have some that are not
22 as compliant as they need to be.
23   Q.  That makes a lot of sense.  Thank you for that
24 on an accessibility point.
25       Broadly speaking, is your understanding that

Page 288

1 individuals with disabilities can, within reason, ask
2 for modifications or accommodations so that they can
3 vote?
4   A.  Yes.
5   Q.  And does your office have policies for sort of
6 changing the typical voting procedures, if needed, for
7 voters with disabilities to vote?
8   A.  Yes.  But I mean, number one, there's curbside
9 voting for people with disabilities; but there's also
10 certain procedures prescribed by the State that allow
11 preferential treatment to those who come into a polling
12 place (indicating), you know.  They get to cut the line,
13 if you will.  And so that's -- that's also allowed.
14   Q.  And so aside from this sort of cutting-the-line
15 feature, who has the authority to decide whether or not
16 to grant a voter's request for a reasonable modification
17 based on their disability?
18   A.  I believe Texas law gives that authority to the
19 presiding judge at a location.
20   Q.  And so would a person with a disability just
21 sort of ask at the location and then it would go to the
22 judge; how would that procedure work?
23   A.  Yes, they would ask at the location.
24   Q.  And that's the final say whether or not they
25 can have that modification?

Page 289

1   A.  Yes.  That's --
2       MS. HUNKER:  Objection, form.
3   A.  That's the -- in Texas, the presiding judge has
4 the last say as opposed to the Elections Administrator,
5 like in other states that I've been in.
6   Q.  (By Ms. Cai)  So how are either the election
7 judge you speak of or any of the employees or poll
8 workers who might be asked on a modification, what are
9 they trained to do when deciding whether that
10 modification is reasonable?
11   A.  We provide them with the language, as it's laid
12 out in the Texas Election Code; and there's certain
13 signage that's required.  And then we provide them with
14 that mater- -- the training materials and signage that
15 tell them if and when someone should have that
16 preferential treatment.
17   Q.  What are some of the asked-for modification
18 that's not on this list?
19       MS. HUNKER:  Objection, form.
20   A.  I'm not sure I understand the question.
21   Q.  (By Ms. Cai)  Let me rephrase.  What kinds of
22 modifications or changes to the typical voting
23 procedures would be allowed to be provided?
24   A.  The curbside voting, as well as the
25 preferential treatment when it comes to lines inside the

The Office of the Dallas County Elections Administrator     April 29, 2022
Pages 290 to 293

Page 290

1 polling place.
2    Q.  Okay.  And those are the only two you can think
3 of --
4    A.  That's the only --
5    Q.  -- off the top of your head?
6    A.  Off the top of my head, yes.
7    Q.  So to give a sort of comparable
8 example of something different, earlier today you
9 discussed the oath requirement of SB 1.
10    A.  (Witness moves head up and down.)
11    Q.  So what would you do if a voter with a
12 disability asked for their assistor to answer questions
13 or provide assistance beyond what the vote allows?
14        MS. HUNKER:  Objection, form.
15    A.  I think that -- that's a situational question.
16 I mean, if on Election Day we got a call from a -- an
17 election judge asking for, you know, telling us that
18 someone was asking for an accommodation, we would look
19 and see what that -- what they are asking for and we
20 would provide our recommendation and we'd do our
21 research, talk to our attorneys, talk to the Secretary
22 of State, et cetera, and find out what our -- what our
23 options are, if any, to offer to that voter.
24    Q.  (By Ms. Cai)  So would you do that procedure
25 for any question that an election judge called you with?

Page 291

1    A.  Yes.
2    Q.  So, for instance, if a voter with a disability
3 can't see where to put their ID on a mail ballot and you
4 got a call about that, you would then do the same
5 procedure?
6    A.  If -- if the -- I mean, it's kind of a
7 hypothetical, you know, a very generic --
8    Q.  Of course.
9    A.  -- hypothetical.  I mean, if -- if the -- if
10 the law is not clear, if the election's advisories that
11 have been promulgated by the Secretary of State are not
12 clear, then we would do that escalation procedure to
13 see, you know, what our options are.
14    Q.  Okay.  So the general sense is if there's not a
15 clear-cut answer, you would talk to your attorneys or
16 the Secretary of State to see whether that modification
17 could be provided for a voter with a disability in real
18 time?
19    A.  Yes.
20    Q.  And same question for the care procedure.
21 Let's say somebody with a disability has their ballot or
22 ballot -- final application rejected, but they can't
23 drive and, therefore, cannot go in person to carry their
24 ballot.
25        Would you consider granting a request for a

Page 292

1 modification so that their ballot could be cured in a
2 different way than is specifically, provided for by
3 SB 1?
4        MS. HUNKER:  Objection, form.
5    A.  I think that it's hard for me to speculate on,
6 you know, a vague hypothetical.  You know, I -- these --
7 these -- like I said before, this would be handled on a
8 case-by-case basis with, you know, true, you know,
9 facts.  And it would be a fact-based decision.
10    Q.  That makes a lot of sense.  Thank you.
11    A.  Uh-huh.
12    Q.  Has -- so moving away from hypotheticals,
13 then --
14    A.  Okay.
15    Q.  -- has your office received requests for
16 regional (phonetics) modifications for changes in voting
17 procedures from voters with disabilities post enactment
18 of SB 1?
19    A.  No, I don't believe so.
20    Q.  Okay.  I have one last set of questions about
21 the voter identification requirements.
22        After SB 1, does your office advise mail ballot
23 voters to provide both their Social Security number and
24 driver's license numbers?
25    A.  Yes.  After -- in February of 2022, as we were

Page 293

1 having a high rejection rate, we went to extraordinary
2 measures to try to educate the public, and we got -- I
3 think we got an allotment of $87,000 from the
4 Commissioners Court where we reached out directly to
5 voters who had rejected mail ballot applications.
6        We did some radio ads.  We did some Facebook
7 educational efforts to try to, number one, help people
8 who had already had rejected mail ballots or rejected
9 applications, as well as preventing those problems from
10 happening.  So, yes, you know, we do what we can to try
11 to prevent and solve the problem once it occurs.
12    Q.  So, to be clear, the recommendation to put both
13 the Social Security number and driver's license number
14 began around February; is that correct?
15    A.  Yes.
16    Q.  And you may have already answered this, but why
17 did you start advising to put both numbers?
18    A.  We kind of used the tag line, "When in doubt,
19 fill them both out," and -- because it's just, you know,
20 to be as safe as possible to try to get both of those
21 numbers down with the idea that someone is -- is likely
22 to have one of those two numbers on their voter
23 registration record.
24    Q.  So, in the circumstances where an individual
25 puts down only their driver's license number on their

Page 294

1 mail ballot, but you only have their Social Security
2 numbers on file, what would happen?
3    A.   That would be rejected, and they would -- they
4 would get a reject letter asking for more information;
5 or the form provided by the Secretary of State, we would
6 send them that form.
7    Q.   So they would get a reject letter, but the law
8 does not require that an individual write down both
9 numbers; is that correct?
10    A.   No.
11    Q.   So is it fair to say that, under the new
12 system, many people who put down a correct identifying
13 number for themselves are still at risk of having their
14 application for ballot by mail or mail ballot rejected?
15         MS. HUNKER:  Objection, form.
16    A.   That would be the case.  If they have -- if we
17 have a voter registra- -- or a driver's license on file,
18 but they send in a correct Social Security number, if
19 the two don't match, then we can't accept.
20         MS. CAI:  Thank you.  That's all my
21 questions.
22         THE REPORTER:  Just a second, please.
23 Okay.  Thank you.
24         MS. HUNKER:  How much time for the
25 Plaintiffs.

Page 295

1         THE REPORTER:  I couldn't tell you right
2 this second.
3         MR. WHITE:  Should we go off record for a
4 second?
5         THE VIDEOGRAPHER:  Off the record.  Time
6 is 7:08 p.m.
7         (Discussion off the record.)
8         THE VIDEOGRAPHER:  Okay.  We're back on
9 the record.  The time is 7:09 p.m.
10         EXAMINATION
11 BY MS. HUNKER:
12    Q.   Good evening, Mr. Scarpello.  How are you
13 today?
14    A.   Very good.
15    Q.   My name is Kathleen Hunker.  I represent the
16 State Defendants.  I am going to be asking you a series
17 of questions mostly in response to what Plaintiffs'
18 Counsel had asked you, so I'm going to be jumping around
19 a little bit with respect to topics.
20         If at any point, my switch of topics confuses
21 you or you don't understand the switch, would you please
22 let me know?
23    A.   Sure.
24    Q.   If you do, I'll be happy to provide additional
25 foundation or to restate the question as needed.  Okay?

Page 296

1    A.   Okay.
2    Q.   So I believe you testified that you started
3 this position December 7th, 2020; is that correct?
4    A.   That's correct.
5    Q.   How many elections have transpired since that
6 date, if you know?
7    A.   I can count.  I believe six.
8    Q.   And so that would include the November
9 constitutional --
10    A.   Yes.
11    Q.   -- is that correct?
12         And that would include the primary, correct?
13    A.   Yes.
14    Q.   Did you include in that number the May 7th
15 election that's --
16    A.   Yes.
17    Q.   -- ongoing?
18    A.   No, no.  The upcoming May 7th?
19    Q.   The upcoming.
20    A.   No.
21    Q.   Okay.  And what about the May 24th?  I
22 assume --
23    A.   No.
24    Q.   -- no.
25         Did the other elections consist of special

Page 297

1 elections?
2    A.   Yeah.  I think there was a couple of special
3 elections in February and March, then a May-joint-June,
4 runoff, November constitutional and --
5    Q.   Okay.
6    A.   -- March election primary.
7    Q.   And so would the March 2022 election be the
8 first federal election in which you are administrator
9 of?
10    A.   Yes.
11    Q.   Did you assess voting assistance laws prior to
12 the enactment of SB 1?
13    A.   Assistance in what form?  At curbside, inside
14 the polling place?  Could you be more specific?
15    Q.   So I was referring to generally.  If you
16 remember very early in your testimony, you were talking
17 with Ms. -- Ms. Perales about voter assistance.
18    A.   Uh-huh.
19    Q.   In that sense, she wasn't specifically limiting
20 it to in-person voting or curbside voting.  And so I'm
21 just trying to get a sense of what your familiarity was
22 with voting assistance law in Texas, generally, prior to
23 the enactment of SB 1.
24    A.   I think I mentioned earlier that elections in
25 Dallas needed a lot of work and -- and so when -- when

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                 Pages 298 to 301

Page 298

1 evaluating where we needed to spend our time, I don't
2 think that the assistance piece was a high priority.
3    Q.  So is it fair to say -- and please correct me
4 if I'm wrong -- the first time that you really inquired
5 into voting assistance law in Texas was post the
6 enactment of SB 1?
7    A.  I think that's probably fair to say.
8    Q.  And so I want you to turn to the copy of SB 1
9 that Ms. Perales had given you.
10   A.  (Witness complies.)  Okay.
11   Q.  I, unfortunately, don't remember the exact
12 exhibit number, but I think it might have been 4.
13   A.  7.
14   Q.  Oh.  7?
15   A.  No.  I'm sorry.  It's -- no, that's not it.  4.
16   Q.  4.  And if you can please turn to Page 52 and
17 53, and it's specifically Section 6.04.
18   A.  Do you have a line number?
19   Q.  Yes.  The section starts on Line 20.
20   A.  Got it.
21   Q.  Okay.  And so this section relates to the oath,
22 correct?
23   A.  Yes.
24   Q.  Okay.  Now, let's look to Page 53, Line 2,
25 where it says:  "I will confine my assistance to reading

Page 299

1 the ballot to the voter, directing the voter to read the
2 ballot, marking the voter's ballot, or directing the
3 voter to mark the ballot."
4       Do you see that section?
5    A.  Yes.
6    Q.  Okay.  I believe you had testified to
7 Mrs. -- Ms. Perales that you interpreted this language
8 as limiting the assistor to the four actions stipulated;
9 is that correct?
10   A.  I believe I actually said that -- as she asked
11 further, I said that -- that you could read those four
12 confinements in a liberal way or a very conservative way
13 and that, depending on how -- the situation, you could
14 interpret it to be very broad or very narrow.
15   Q.  Okay.  Does Dallas County take the liberal
16 approach to this language?
17   A.  I would say that Dallas County has a policy
18 that we're always going to be as voter-friendly as
19 possible.
20   Q.  And do you know if the Secretary of State's
21 office, for example, also has a policy of being as
22 friendly to the voter as possible?
23   A.  I don't know.
24   Q.  Do you know if other counties have that policy
25 of being as friendly to the voter as possible?

Page 300

1    A.  I don't know.
2    Q.  But Dallas County does, correct?
3    A.  That's our general approach.
4    Q.  And when you're interpreting this particular
5 provision, how did you come to your interpretation?
6    A.  My general approach, my philosophy, if you
7 will, is to try to make voting as easy as possible, as
8 long as we're following the law.
9    Q.  So, in the case of, let's say, applying Section
10 6.04, would you contact Dallas County attorneys?
11   A.  If -- if posed with a question, we would
12 consult with our attorneys.  We would -- well, first off
13 we would check the law.
14   Q.  Uh-huh.
15   A.  We would check the elections advisories.  We
16 would consult with our attorneys, and we would consult
17 with the Secretary of State.
18   Q.  With respect to Section 6.04 and, specifically,
19 these provisions regarding the oath, have you had a need
20 to go to the county attorneys?
21   A.  No.
22   Q.  Have you had a need to go to the Secretary of
23 State's office?
24   A.  Not that I can recall.
25   Q.  Okay.  And would you agree with me that not

Page 301

1 every assistance provided to a voter actually falls
2 under the term "assistor" in the -- the context of Texas
3 election laws?
4    A.  I don't understand the question.
5    Q.  Let me give you an example.  So if I were to
6 come to the polling location with my grandmother --
7    A.  Uh-huh.
8    Q.  -- who's confined to a wheelchair --
9    A.  Uh-huh.
10   Q.  -- and I helped wheel her in into the
11 location --
12   A.  Uh-huh.
13   Q.  -- and then brought her to the polling site, to
14 the place where the polling machine is, but then I left
15 and she handled voting herself --
16   A.  Uh-huh.
17   Q.  -- would that constitute -- or would I be
18 constituted as an assistor?
19        MR. WHITE:  Objection, form.
20   A.  Well, I think that that -- keep in mind that
21 that is up to the presiding judge, to make that
22 interpretation.  They're the boss --
23   Q.  (By Ms. Hunker)  Okay.
24   A.  -- in the state of Texas.  I'm not.  If asked
25 by a presiding judge my opinion, my opinion would be

Page 302

1 that that would not fall into the category of an
2 assistor.
3    Q.  Thank you.  And so when I was asking you the
4 question before, I was trying to get at that, but there
5 are actions that people might take to aid voters that
6 you would not necessarily characterize as voting
7 assistance under Texas Election Code?
8    A.  Yes.
9    Q.  You also spoke with Ms. Perales regarding how
10 bills work.
11       You had talked about that language that is
12 underlined is new text, correct?
13    A.  Yes.
14    Q.  And that language that is stricken -- I'm
15 sorry -- that has a line through it, has been stricken
16 from the statute; is that correct?
17    A.  Yes.  That's correct.
18    Q.  All right.  Bills only show the sections that
19 were changed; is that right?
20    A.  That's correct.
21    Q.  And so they don't show other provisions in the
22 Election Code; is that correct?
23    A.  Most of the time, yes.
24    Q.  And so you would have to consult with the
25 Election Code to see how they interact with the other

Page 303

1 provisions; is that right?
2    A.  Yes.  When we -- when we interpret a new bill,
3 we don't just look at the bill; we look at the Election
4 Code, itself.  In fact, what we have done is
5 incorporated strike and add language into a different
6 version where we see the full context, the full Election
7 Code, itself.
8    Q.  Okay.  And to continue with this line of
9 questioning, the bills also don't show any Court Opinion
10 that interprets the language?
11    A.  That's correct.
12    Q.  And so it's a very narrow snapshot of what
13 Texas law is; is that correct?
14    A.  That's correct.  Neither does -- it doesn't
15 show legislation.  I mean, we all know there's --
16 there's certain layers that you have to go through to --
17 to interpret legislation or their laws.
18    Q.  No objection there.
19    A.  Right.
20    Q.  So if we go to Page 52, Line 26.  And you see
21 where it says:  under the penalty of perjury?
22    A.  Yes.
23    Q.  Do you know whether assistors who took the,
24 oath prior to SB 1, were subject to perjury?
25    A.  I don't know.

Page 304

1    Q.  And would you agree with me that sometimes
2 statutes are clarifying a preexisting rule as opposed to
3 introducing a new rule?
4    A.  Sometimes they are codifying rules, yes.
5    Q.  And you had spoken that the eligibility
6 criteria is not included within this oath.
7       Do you remember that testimony with
8 Ms. Perales?
9    A.  Refresh my memory.
10    Q.  Let's turn the page to 53.
11    A.  (Witness complies.)
12    Q.  And so you see on Line 12 where it says:  "and
13 I understand that if assistance is provided to a voter
14 who is not eligible for assistance, the voter's ballot
15 may not be counted"?
16    A.  Yes.
17    Q.  During your conversation with Ms. Perales, she
18 had asked you whether or not the eligibility criteria
19 was included within this particular section, and you had
20 replied that it was not?
21    A.  That's correct.
22    Q.  Would you agree that the previous oath also did
23 not include eligibility criteria?
24    A.  Yes.
25    Q.  And would you agree with me that eligibility

Page 305

1 criteria could be listed in another provision of the
2 Texas Election Code?
3    A.  Absolutely.
4    Q.  Let's jump to Page 54, and let me know if you
5 need to refresh your recollection by rereading the
6 section.  But I'm particularly looking at Section 6.06,
7 Line 20.
8    A.  Okay.
9    Q.  And if you notice on Line 24, it says:
10 "compensates or offers to compensate another person for
11 assisting voters as provided by Section 86.010."
12    A.  (Witness moves head up and down.)
13    Q.  Do you see that on the --
14    A.  Yes.
15    Q.  And so this has to do with compensation for
16 assisting voters; is that correct?
17    A.  Yes.
18    Q.  Okay.  Do you remember speaking with
19 Ms. Perales about nonprofits assisting voters?
20    A.  Yes.
21    Q.  Okay.  And I believe you stated that you
22 thought the statute would apply to a nonprofit assisting
23 voters; is that correct?
24    A.  I believe so, if I'm -- if I'm remembering
25 correctly.  I don't remember the context of her

Page 306

1 question, but I remember the discussion about
2 nonprofits.
3      Q.  You do not enforce criminal laws as the Dallas
4 County Election Administrator; is that --
5      A.  That's --
6      Q.  -- correct?
7      A.  -- correct.
8      Q.  And so your office does not enforce this
9 particular provision; is that correct?
10     A.  That's correct.
11     Q.  And I don't believe the election judges enforce
12 this provision either, correct?
13     A.  That's correct.
14     Q.  And so this would be left to the Dallas County
15 DA's Office; is that --
16     A.  That's correct.
17     Q.  -- right?
18     A.  Correct.
19     Q.  And you're not aware of how they would
20 interpret this provision, correct?
21     A.  Correct.
22     Q.  And you wouldn't be aware if they have
23 contacted the Secretary of State's office to seek
24 clarification on how to interpret this provision; is
25 that correct?

Page 307

1      A.  That's correct.
2      Q.  And you wouldn't know if they contacted the
3 Office of Attorney General in order to seek
4 clarification on how to interpret this provision; is
5 that correct?
6      A.  I'm not aware of them contacting them.
7      Q.  And are you aware of the DA pursuing any
8 charges related to the specific provision against a
9 nonprofit?
10     A.  I'm not aware of any.
11     Q.  Thank you.  Let's jump to Page 60.
12 Specifically, I'm looking at the section that begins on
13 Line 15, which states:  "Unlawful solicitation and
14 Distribution of Application to Vote by Mail."
15         THE REPORTER:  I'm sorry.  Could you read
16 the very last few words again, please?
17         MS. HUNKER:  Of course.
18     Q.  Specifically, I am looking at Section -- on
19 Line 15 where it reads:  "Unlawful Solicitation and
20 Distribution of Application to Vote by Mail."
21         Do you see that?
22     A.  Yes.
23     Q.  If you need any time to reread the section,
24 please let me know.  Otherwise, I'm going to proceed
25 with asking some questions.

Page 308

1      A.  Go ahead.
2      Q.  Okay.  Do you know if voters need to use the
3 Dallas application -- sorry -- the application provided
4 by Dallas County to vote by mail?
5      A.  No.
6      Q.  And so a nonprofit can create their own
7 application form; is that correct?
8      A.  Yes.
9      Q.  And a voter can also create their own
10 application form, if needed; is that correct?
11     A.  Yes.
12     Q.  And so I believe you had spoken with Ms. --
13 Ms. Perales regarding nonprofits that used to come to
14 Dallas County and would take copies of the Dallas County
15 application; is that right?
16     A.  That's correct.
17     Q.  Okay.  These nonprofits have the option of
18 creating their own application; is that correct?
19     A.  That's correct -- correct.
20     Q.  You also discussed a little bit about your
21 confusion, for lack of a better term, about the
22 Legislature's decision to bar Election Administrators
23 from issuing the applications unsolicited as opposed to
24 private parties; is that right?
25     A.  I don't know if "confusion" is the right word.

Page 309

1 I think uncertainty about the language used and the
2 uncertainty of the meaning of their words.
3      Q.  Okay.  Have you checked the legislative record
4 to learn the Legislature's reasoning for permitting
5 private parties to distribute applications to vote by
6 mail and not election officials?
7      A.  No.
8      Q.  And so, therefore, you're not aware of any
9 incidence that would have instigated the change in the
10 provision; is that right?
11     A.  That's correct.
12     Q.  Under your conversation with Ms. Perales, she
13 had raised an incident regarding of Travis County Clerk,
14 Dana DeBeauvoir; is that right?
15     A.  Yes.
16     Q.  Okay.  And she had mentioned that the Office of
17 Attorney General had pursued an indictment against her;
18 is that correct?
19     A.  Yes.
20     Q.  Okay.  You do not know the reason for Office of
21 Attorney General to pursue the indictment, correct?
22     A.  No.
23     Q.  And you do not know what provision of the
24 Election Code that she would have violated; is that
25 right?

Page 310

1    A.  That's correct.

2    Q.  And you don't know if it was even about

3 applications to vote by mail?

4    A.  That's correct.

5    Q.  I am going to turn to what I believe is Exhibit

6 7, and this were the emails that were distributed to

7 myself and private Plaintiffs earlier this morning.  I

8 have mine on the laptop, but I believe you have a hard

9 copy in front of you.

10    A.  Okay.  Got it.  Exhibit 7?

11    Q.  Yes.  This is the emails?

12    A.  Yes.

13    Q.  And so this says an email dated Wednesday,

14 January 12th, 2022; is that correct?

15    A.  Yes.

16        MS. HUNKER:  The correct Bates number for

17 this?

18        MR. STOOL:  Number 7.

19        MS. HUNKER:  Yes.

20        MR. STOOL:  Uh-huh.

21    Q.  (By Ms. Hunker)  And so based on -- my -- the

22 form I have in front of me does not have a Bates number.

23 However, that was provided later.  And I believe the

24 Bates number is MS015753 for the first page and MS015754

25 on the second page, and that's just to clarify, for the

Page 311

1 record.

2    A.  (Witness moves head up and down.)

3    Q.  Now, this had to do with a conversation you had

4 with your staff on whether or not you could provide

5 return postage for both ballots and mail ballot

6 applications; is that correct?

7    A.  Yes.

8    Q.  And you -- I think in the bottom, it says:

9 (Reading)  Malissa, did the Secretary of State weigh in

10 on this at the conference?  Or were the new restrictions

11 only limited to solicitation aspects like providing

12 applications to those who did not ask for an

13 application?

14        Did I read that correctly?

15    A.  Yes.

16    Q.  Okay.  Did your office make a determination

17 that you were permitted to send return postage for poll

18 applications?

19    A.  I believe so.

20    Q.  Do you try to comply with state law in your

21 capacity as the Dallas County Election Administrator?

22    A.  Yes.

23    Q.  And do you try to comply with state law even

24 when it doesn't have a criminal penalty connected to it?

25    A.  Yes.

Page 312

1    Q.  And if you were uncertain of interpretation of

2 a provision, you would engage in this type of

3 conversation with your staff to try to ascertain the

4 meaning of a provision?

5    A.  Yes.

6    Q.  And so the discussion you had here was not very

7 different from any other conversation you would have

8 about a new provision of which you were uncertain?

9    A.  This is one of the many methods in which we

10 would communicate: orally, through email, through

11 TEAMS, through all sorts of communications, yes.

12    Q.  Okay.  I am going to shift our conversation to

13 talk about poll workers.

14    A.  Okay.

15    Q.  Were you aware of the rights of poll workers to

16 observe election activities prior to SB 1?

17    A.  Poll workers or poll watchers?

18    Q.  Sorry.  That is -- that is correct.  I make

19 this mistake very often when speaking, so my apologies.

20        Were you aware of the rights of poll watchers

21 to observe election activities prior to SB 1?

22    A.  Yes.

23    Q.  And were you aware of the rights of poll

24 watchers to move around the polling place prior to SB 1?

25    A.  Yes.

Page 313

1    Q.  And were you aware of the limits that election

2 judges had to obstruct the view of poll watchers prior

3 to SB 1?

4    A.  I don't know that that terminology was -- is

5 used any -- was used in the prior code, so I -- I don't

6 know if I agree with that statement.

7    Q.  Okay.  Do you know what authority election

8 judges had -- let me put it this way, then.

9        Do you know what the limits were for the right

10 of a poll watcher to observe an election activity?

11    A.  I bele-- I believe it was -- oh, gosh, I'd

12 have to look at the Election Code before SB 1, but I

13 believe it was something along the lines of, you know,

14 to maintain the orderly conduct-- conducting of

15 business at a polling place.

16    Q.  And so had you done a comparison of the

17 language between SB 1, these sections, versus prior to

18 SB 1?

19    A.  I'm sure I did at some point, yes.

20    Q.  Are you aware -- strike that.  Let me ask a

21 different question.

22        Is it your opinion that the rights of poll

23 workers to observe election activities changed post

24 SB 1?

25        MR. WHITE:  Objection, form.

Page 314

1    A.  There was -- let's put it this way.  As we
2 talked about this process, there were various iterations
3 of SB 1, some of which had more -- the line in the sand
4 was moving.  And we ended up with -- and so there was a
5 lot of concerns about some of that previous language.
6 And in the end, the language was better, but it was
7 still problematic.
8    Q.  (By Ms. Hunker)  Okay.  But you would view
9 SB 1 as -- let's -- looking in the context of the
10 legislation that was proposed --
11    A.  Uh-huh.
12    Q.  -- you would view the language in SB 1 as an
13 improvement from the predecessor bills?
14    A.  Yes.
15        MR. WHITE:  Objection, form.
16    Q.  (By Ms. Hunker)  Do you know if poll workers --
17 do you know if poll watchers reported irregularities
18 prior to SB 1?
19    A.  I have no specific knowledge of any complaints.
20 I know that -- well, I take that back.  I know that
21 there was ongoing litigation in Dallas County from years
22 ago with complaints from poll watchers, mostly in
23 central account rather than as opposed to at polling
24 places.
25    Q.  And do you know if they would -- if poll

Page 315

1 watchers would have reported irregularities that they
2 saw to the election judge that was on hand?
3    A.  I believe they would.
4    Q.  And so SB 1 didn't change that, to your
5 knowledge?
6    A.  No -- well, I know that our implementation of
7 SB 1, what we have done, is:  We've reached out to the
8 political parties to activists, et cetera, to try to
9 give them more avenues to report problems.  It can be to
10 the judge; it can be to what we call a VIP hotline,
11 which is given to the parties, poll watchers, et cetera,
12 for them to report those, as well as there's also
13 certain signage at a polling place that provides
14 different numbers to the Attorney General, Secretary of
15 States in Federal elections, another DOJ number, et
16 cetera.
17    Q.  So I just wanted to talk about the hotline
18 because this is the first time you've raised it.
19        If a poll watcher saw an irregularity --
20    A.  Uh-huh.
21    Q.  -- they would be able to call the hotline; is
22 that right?
23    A.  Correct.
24    Q.  And so there are other avenues besides
25 interrupting the election judge during the election --

Page 316

1    A.  Yes.
2    Q.  -- while voting is ongoing?
3    A.  Yeah.
4    Q.  And are you aware if any poll watcher utilized
5 the hotline this last election?
6    A.  I don't think so.  I'd have to check the
7 records, but not off the top of my head, I don't think
8 so.  Parties did, the parties.  You know, sometimes the
9 poll watchers talked to the parties, and the parties
10 talked to us.
11    Q.  So the parties utilized the hotline, but you're
12 not aware of any specific poll watcher that would have?
13    A.  Correct.
14    Q.  And it's possible that the parties contacted
15 the hotline in response to an observation of a poll
16 watcher?
17    A.  Correct.
18        MR. WHITE:  Objection, form.
19    Q.  (By Ms. Hunker)  I believe you had spoken to
20 Mr. -- Graham about a poll watcher standing close to the
21 voter while casting their ballot.
22        Do you remember that part of the --
23    A.  Yes.
24    Q.  -- conversation?
25        I believe you said that was prohibited; is that

Page 317

1 right?
2    A.  In my eyes, that would be prohibited.
3    Q.  And I believe you said that was not included in
4 SB 1; is that correct?
5    A.  I don't know that SB 1 provides guidance for
6 that situation.
7    Q.  My next question kind of connects to what you
8 just said.
9        Are you aware if that prohibition or the
10 restrictions would be in other provisions of the
11 Election Code that were not changed by SB 1?
12    A.  That -- it may be.  I don't know.
13    Q.  So you haven't looked to determine whether or
14 not there are other provisions in SB 1 -- sorry -- other
15 provisions in the election --
16    A.  I don't recall.
17    Q.  You don't recall.  And I want to turn to
18 Exhibit 9, which was the news article --
19    A.  Uh-huh.
20    Q.  -- specifically turning to Page 5.  So there's
21 a paragraph that reads:  "Scarpello also said some
22 election judges were afraid of being prosecuted under a
23 provision of the law related to partisan poll watchers."
24        Did I read that correctly?
25    A.  Yes.

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                 Pages 318 to 321

Page 318

1    Q.  It then continues:  (Reading) "SB 1 makes it a
2  misdemeanor offense for a worker to" -- in quotation
3  marks -- "knowingly prevents a watcher from observing an
4  activity or procedure the person knows the watcher is
5  entitled to observe," end quote.
6        Did I read that correctly?
7    A.  Yes.
8    Q.  Okay.  My question is actually going to be
9  about -- actually, I'm going to ask a question about
10 that particularly.
11       What was your basis for this observation?
12   A.  I don't think that -- that's not a quote from
13 me.
14   Q.  Oh, it's not?
15   A.  No.
16   Q.  So the only statement attributed to you, then,
17 is the first sentence; is that right?
18   A.  Yes.
19   Q.  Okay.  And so we go to the next paragraph.  It
20 reads:  "Election judge Kris Farrell said some of her
21 colleagues had heard about an earlier bill consequences
22 for election workers."
23       Did I read that correctly?
24   A.  Yes.
25   Q.  And so she was in this case, it sounds like,

Page 319

1  talking about the predecessor bills; is that right?
2    A.  That's what it sounds like, yes.
3    Q.  Okay.  When you had mentioned that you thought
4  some of the election judges were afraid of being
5  prosecuted under a provision of the law, do you know if
6  they were basing it off of the old language that was not
7  included in SB 1, so the language that would have come
8  from the predecessor bills?
9    A.  I don't think I can get in the head of the
10 poll -- of the poll workers.
11   Q.  Okay.  So when you were talking, then, about
12 poll workers who chose not to become a poll worker --
13   A.  Uh-huh.
14   Q.  -- because of this provision SB 1, how, then,
15 did you know what their motivation was if you can't be
16 in the head of the poll worker?
17   A.  When I said couldn't get in -- be in the head,
18 I don't know which version of SB 1 that they were
19 worried about.  I know that they were worried about
20 being prosecuted.
21   Q.  Okay.  So you don't know if it was based on the
22 language that actually passed the Legislature versus the
23 language that was discussed in the immediate and
24 predecessor bills?
25   A.  I do not know.

Page 320

1    Q.  And if we continue to the -- not the next
2  paragraph, but the one after where it begins with
3  "Farrell."
4        Do you see that?
5    A.  Yes.
6    Q.  The last sentence reads:  "But long hours and
7  bad weather at the end of February also contributed to a
8  shortage of workers."
9        Is that your experience, as well, with respect
10 to the shortage?  You had -- let me take that back.
11       You had mentioned, during your testimony, there
12 were other factors that led to the shortage of poll
13 workers; is that correct?
14   A.  Yes.
15   Q.  Okay.  Were long hours and bad weather part of
16 those factors?
17   A.  Well, I can't -- I can't get in the head of
18 this writer, the person who wrote this article.  So I'm
19 not sure where that -- that particular information came
20 from.  I can tell you that "long hours," he may be
21 referring to the fact that poll workers work long hours
22 and that they -- you know, it's a grueling 15-, 16-hour
23 day and that -- that, certainly, has an effect.
24       As far as the bad weather, the bad weather,
25 having to do with our election, is that we lost three

Page 321

1  days of preparation because of ice days.  And so that
2  affected the recruitment, the paperwork involved in --
3  in obtaining and retaining poll workers.
4    Q.  The next sentence -- sorry -- next paragraph
5  reads:  "Plus, there was a lack of familiar faces -- the
6  people who poll workers used to call directly to ask for
7  help or clarification."
8        Did I read that correctly?
9    A.  Yes.
10   Q.  And then it continues:  (Reading) There was a
11 new TEAM at the elections department.  There was a new
12 TEAM at the Democratic office.  There was a new TEAM at
13 the Republican office, Farrell said.  These were not
14 people that you knew.  You didn't have a relationship
15 with them.
16       Did I read that correctly?
17   A.  Yes.
18   Q.  To your knowledge, was there, in fact, new
19 TEAMS at the elections department?
20   A.  There is -- yes.  The Voting Sites Manager, who
21 was here until September of last year, she became the
22 Elections Administrator for a different county.  And so
23 there was a new -- and then there was a couple of
24 retirements out of that department, so there was new --
25 new people within that department.

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                 Pages 322 to 325

Page 322

1    Q.   And you may not know this, but are you aware if
2  there was a new TEAM at the Democratic Party office?
3    A.   There's a new Republican Party Chair and a new
4  Democratic Party Chair.
5    Q.   And so poll workers would have been interacting
6  with new individuals as opposed to established faces; is
7  that correct?
8    A.   Yes.
9    Q.   And based on your conversations with poll
10  workers in Dallas County or, perhaps, the individuals
11  who were recruiting and training poll workers, do you
12  know if this was a concern expressed by any poll
13  workers?
14    A.   What's "this"?
15    Q.   "This" was just referring to the fact that they
16  were new faces, and they wouldn't be interacting with
17  established personnel.
18    A.   I don't recall that being an issue.
19    Q.   Okay.  We can put this aside.
20        THE REPORTER:  And if you're at a breaking
21  point, I really need a break.  I'm sorry --
22        MS. HUNKER:  Yeah, we can take --
23        THE REPORTER:  -- but we've been going for
24  a good while.
25        MS. HUNKER:  -- a five-minute break --

Page 323

1        THE REPORTER:  Thank you.
2        MS. HUNKER:  -- or a ten-minute break.
3        THE WITNESS:  Okay.
4        THE VIDEOGRAPHER:  We're going off the
5  record.  The time is 7:43 p.m.
6        (Break taken.)
7        THE VIDEOGRAPHER:  We're back on the
8  record.  The time is 7:50 p.m.
9    Q.   (By Ms. Hunker)  Mr. Scarpello, before the
10  break, we were talking about poll watchers.
11  Specifically, we were looking at a news article that was
12  talking about possible poll worker shortage.
13        Do you remember that part of the con- --
14    A.   Yes.
15    Q.   -- -versation?
16        So that was in reference to the March primary
17  in 2022, correct?
18    A.   Correct.
19    Q.   So we are actually in Early Voting for the May
20  7th election; is that correct?
21    A.   That's correct.
22    Q.   Is there still a poll worker shortage in
23  Dallas?
24    A.   We're very worried about a poll worker shortage
25  for the May 7th and May 24th election for various

Page 324

1  reasons, including the fact that it's a Saturday in May
2  and the day before Mother's Day and that -- Texas
3  still -- or Dallas still has an extraordinarily high
4  number of polling places compared to other jurisdictions
5  and -- and because of SB 1.
6    Q.   Okay.  And have you had to close polling
7  locations for the May 7th election?
8    A.   We went to Commissioners Court, and we talked
9  about the issues with poll workers.  And we brought to
10  them several suggestions on what we might be able to do
11  about that, including increasing poll worker pay, which
12  we did, about recruiting more -- you know, that rather
13  than relying solely on the parties to recruit poll
14  workers, for our elections office to recruit poll
15  workers, which we -- we started to do.
16        We've talked about using county workers more
17  aggressively, adding some financial incentive to use
18  county poll workers as backup poll workers, which we're
19  doing.  And then we talked about reducing the number of
20  polling places because Dallas has so many compared to
21  other jurisdictions of similar size.
22        And -- and so we -- we got together with our
23  Citizen Election Advisory Committee, our Vote Center
24  Advisory Committee, and we got a consensus amongst all
25  those organizations to reduce the number by -- of

Page 325

1  polling places by 40.  Having said that, we still have
2  an extraordinarily high number of polling places for an
3  election of this predict- -- projected turnout, so we're
4  still concerned.
5    Q.   And was this also in relation to the transfer
6  to countywide polling places?  If you need me to provide
7  some foundation, I'm happy to do so.
8    A.   Could you, please?
9    Q.   So when Mr. Lopez was testifying, he was
10  explaining that, in 2019, Dallas County started
11  countywide polling locations on Election Day.
12    A.   Correct.
13    Q.   He also said that, attendant to that decision,
14  Dallas County intended to reduce, on Election Day,
15  polling locations at certain precincts and rely instead
16  on the ability of individuals to vote wherever they were
17  in the county.
18    A.   Texas law allows a county that moves from
19  precinct polling places to countywide polling places,
20  otherwise known as vote centers, to reduce the number of
21  locations because that's kind of the intent of vote
22  centers.  You have less locations, but better quality,
23  larger locations.
24        In 2019, Dallas County chose not to reduce the
25  simply -- every location that was a precinct polling

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                 Pages 326 to 329

Page 326

1 place, they made a countywide vote center.  In fact,
2 they increased the number.  Instead of just having the
3 same number, they had even more, which led to too
4 many -- too many vote centers.  And so that's why we're
5 where we're at today with this very large number of vote
6 centers because, like I said in my earlier testimony,
7 after that two-year period from 2019 to 2021, we tried
8 to reform the Vote Center Advisory Committee and to
9 bring a new proposal to study the use of vote centers
10 and either keep the number the same, increase the number
11 or decrease the number.
12         It -- we were going to go where the facts led
13 us and where the Vote Center Advisory Committee led us.
14 But unfortunately, we never got that committee together
15 because the county chose not to because we're in the
16 middle of redistricting.
17     Q.   Okay.  And so are you not reducing, for
18 November 2022, the number of vote centers on Election
19 Day?
20     A.   We have no plans to reduce for November.  The
21 proposal that was passed by Commissioners Court recently
22 was to reduce by 40 for the May elections only.
23     Q.   Do you know if you usually have a harder time
24 recruiting poll workers for the May election than you
25 would for a November election?

Page 327

1     A.   Recruiting poll workers usually mirrors -- the
2 interest in being a poll worker usually mirrors the
3 interest in participation of an election.  So a
4 Presidential election, a lot of voters, a lot of poll
5 workers.  A May election in -- in -- on a Saturday, not
6 a lot of voters, not a lot of poll workers.
7     Q.   And are you aware if the May local tends to
8 have the lowest interest of voters compared to the other
9 elections held?
10     A.   I'd have to kind of consult the -- the history,
11 but I -- generally speaking, yes, the May joint
12 election; or the May 24th election, for instance, the
13 joint runoff election for the primary, that's going to
14 be extraordinarily low turnout.
15     Q.   So the May 7th election has low interest for
16 individuals becoming a poll worker, is that correct,
17 lower?
18     A.   Yes, lower than -- than, say, the primary,
19 which would be lower than a general.
20     Q.   And the same is true of the primary runoff;
21 there will be a lower interest in becoming a poll worker
22 for the May 20 -- May runoff in '24?
23     A.   That's correct.
24     Q.   Do you remember your conversation with
25 OCA-Greater Houston's Counsel?  She was the individual

Page 328

1 who was on -- on the Zoom call --
2     A.   Yes.
3     Q.   -- where --
4     A.   Okay.  Yes.
5     Q.   Where she had asked you if everyone who
6 successfully applied to vote by mail was registered to
7 vote.  Do you remember that?
8     A.   Yes.
9     Q.   And do you remember you had said "yes"?
10     A.   Yes.
11     Q.   That assumes it was the voter who submitted the
12 application; is that correct?
13     A.   Yes.
14     Q.   You also had discussed drive-thru voting
15 earlier in your testimony.
16         Do you remember that?
17     A.   Yes.
18     Q.   And you said you would have pursued drive-thru
19 voting --
20     A.   (Witness moves head up and down.)
21     Q.   -- the option, but for SB 1; is that correct?
22     A.   Correct.
23     Q.   How far had you gotten into looking at
24 drive-thru voting before the enactment of SB 1?
25     A.   Not too far because we had heard rumblings in

Page 329

1 the Legislature that they were going to get rid of
2 drive-thru voting.
3     Q.   Had you looked at the logistics of drive-thru
4 voting?
5     A.   Not necessarily, no.
6     Q.   And did you inquire into the logistics of how
7 Harris County implemented their drive-thru voting
8 turnout?
9     A.   I read about it.  I didn't talk to anyone
10 firsthand in Harris.
11     Q.   Did you inquire about any irregularities that
12 occurred in Harris County related to drive-thru voting?
13     A.   No.
14     Q.   And did you -- did you inquire about any
15 possible vote discrepancies that occurred during
16 drive-thru voting?
17     A.   I don't imagine -- I'm trying to imagine why
18 there would be any vote discrepancies.  Drive-thru
19 voting is no different than -- you're just sitting in
20 your car instead of standing up, walking into a
21 building.  So that -- that wouldn't be at the top of my
22 list of -- the logistics, of course, are the bigger
23 concern.
24     Q.   Okay.  So you wouldn't know about any vote
25 discrepancies that would have occurred in Harris County

Page 330

1 in relation to --
2    A.  No.
3    Q.  -- drive-thru voting?
4         And you hadn't troubleshooted whether or not
5 there would be difficulties in implementing it through
6 logistics with drive-thru voting?
7    A.  We had not gotten that deep into it, no.
8    Q.  You also had discussed communications that your
9 office had received from voters about drive-thru voting.
10       Do you remember this part of your testimony?
11   A.  Yes.
12   Q.  And I believe you said voters had questions
13 about drive-thru voting.
14   A.  That's my memory, is that people were asking:
15 If Harris is doing it, how come Dallas is not doing it?
16   Q.  You were not in Dallas County at the time this
17 occurred, correct?
18   A.  That's correct.
19   Q.  And so you would have only heard about these
20 conversations second-hand; is that right?
21   A.  That's correct.
22   Q.  And this would have been months after those
23 conversations took place, correct?
24   A.  That's correct.
25       MS. HUNKER:  I do not believe I have

Page 331

1 anymore questions for you.
2         MR. WHITE:  I have no further questions.
3         MR. STOOL:  I have no questions.
4         MS. HUNKER:  Does anybody on the Zoom call
5 have anymore questions for the witness?
6         MS. CAI:  None here.  Thank you.
7         MS. BENDER:  No.  Thank you.
8         THE REPORTER:  Let's see.  And which order
9 was that in just now for the --
10        MS. CAI:  That was Ms. Cai followed by
11 Brady.
12        THE REPORTER:  You were first and then
13 Ms. Brady?
14        MS. CAI:  Yeah.
15        THE REPORTER:  Okay.  Thank you.
16        THE VIDEOGRAPHER:  Okay.  We're going off
17 the record.  The time is 8:00 o'clock p.m.
18        (Discussion off the record.)
19        THE VIDEOGRAPHER:  Okay.  We're on record
20 at 8:02 p.m.
21        THE REPORTER:  Okay.  Would Counsel please
22 state any stipulations about custody of the original,
23 the exhibits or any other pertinent matters, on the
24 record?
25        MR. STOOL:  Opportunity to review and

Page 332

1 sign.
2         THE REPORTER:  Okay.  Thank you.  That's
3 all.
4         THE VIDEOGRAPHER:  Okay.  We're going off
5 record at 8:02 p.m.
6
7         (Deposition concluded at 8:02 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 333

1                    CORRIGENDUM
2 WITNESS NAME:  RIVELINO LOPEZ          4/29/22
3 PAGE  LINE  CHANGE              REASON
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                       Pages 334 to 337

Page 334

1       I, RIVELINO LOPEZ, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
       _____
6           RIVELINO LOPEZ
7
8  THE STATE OF TEXAS        )
9  COUNTY OF _____)
10
       Before me, _____, on
11  this day personally appeared RIVELINO LOPEZ, known to me
   (or proved to me under oath or through _____
12  _____) (description of identity
   card or other document) to be the person whose name is
13  subscribed to the foregoing instrument and acknowledged
   to me that they executed the same for the purposes and
14  consideration therein expressed.
15     Given under my hand and seal of office, this _____
   day of _____, 2022.
16
17
       _____
18          NOTARY PUBLIC IN AND FOR
       THE STATE OF _____
19
20  My commision expires: _____
21
22
23
24
25

Page 335

1           CORRIGENDUM
2  WITNESS NAME: TACOMA PHILLIPS         4/29/22
3  PAGE  LINE  CHANGE          REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 336

1       I, TACOMA PHILLIPS, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
       _____
6           TACOMA PHILLIPS
7
8  THE STATE OF TEXAS        )
9  COUNTY OF _____)
10
       Before me, _____, on
11  this day personally appeared TACOMA PHILLIPS, known to
   me (or proved to me under oath or through
12  _____
   (description of identity card or other document) to be
13  the person whose name is subscribed to the foregoing
   instrument and acknowledged to me that they executed the
14  same for the purposes and consideration therein
   expressed.
15
       Given under my hand and seal of office, this _____
16  day of _____, 2022.
17
18
       _____
19          NOTARY PUBLIC IN AND FOR
       THE STATE OF _____
20
   My commision expires: _____
21
22
23
24
25

Page 337

1
2               CORRIGENDUM
3  WITNESS NAME:  MICHAEL SCARPELLO            4/29/22
4  PAGE    LINE   CHANGE            REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

The Office of the Dallas County Elections Administrator

April 29, 2022
Pages 338 to 341

## Page 338

```
 1  _____
 2        I, MICHAEL SCARPELLO, have read the foregoing
 3  deposition and hereby affix my signature that same is
 4  true and correct, except as noted above.
 5
 6
 7                        MICHAEL SCARPELLO
 8
 9  THE STATE OF TEXAS         )
10  COUNTY OF _____)
11
          Before me, _____, on
12  this day personally appeared MICHAEL SCARPELLO, known to
    me (or proved to me under oath or through
13  _____)
    (description of identity card or other document) to be
14  the person whose name is subscribed to the foregoing
    instrument and acknowledged to me that they executed the
15  same for the purposes and consideration therein
    expressed.
16
          Given under my hand and seal of office, this _____
17  day of _____, 2022.
18
19  _____
                        NOTARY PUBLIC IN AND FOR
20                      THE STATE OF _____
21
    My commision expires:  _____
22
23
24
25
```

## Page 340

```
 1  record of the testimony given by the witnesses.
 2        I further certify that pursuant to Federal
 3  Rules of Civil Procedure, Rule 30(e)(1)(A) and (B) as
 4  well as Rule 30(e)(2), that review of the transcript and
 5  signature of the deponent:
 6        _____ was requested by the deponent and/or a
 7  party before completion of the deposition.
 8        _____ was not requested by the deponent and/or
 9  a party before the completion of the deposition.
10        I further certify that I am neither attorney or
11  counsel for, nor related to or employed by any of the
12  parties to the action in which this deposition is taken
13  and further that I am not a relative or employee of any
14  attorney of record in this cause, nor am I financially
15  or otherwise interested in the outcome of the action.
16        The amount of time used by each party at the
17  deposition is as follows.
18
19  1.    MS. NINA PERALES
            TIME: 04:16
20  2.    MR. GRAHAM W. WHITE
            TIME: 00:37
21  3.    MS. KATHLEEN HUNKER
            TIME: 01:23
22  4.    BEN L. STOOL
            TIME: 00:00
23  5.    MS. BRADY BENDER
            TIME: 00:06
24  6.    MS. SOPHIA CAI
            TIME: 00:24
25  7.    MS. JACQUELINE VILLAREAL
```

## Page 339

```
 1
 2
              REPORTER'S_CERTIFICATION
              _____  _____
 3
              UNITED STATES DISTRICT COURT
 4              WESTERN DISTRICT OF TEXAS
                  SAN ANTONIO DIVISION
 5
    LA UNION DEL PUEBLO ENTERO,)(
 6  ET AL.,                    )(
                              )(
 7    PLAINTIFFS,             )(
                              )(   CIVIL ACTION
 8  VS.                       )(   NO. SA-21-CV-00844-XR
                              )(
 9  GREGORY W. ABBOTT, ET AL.,)(
                              )(
10    DEFENDANTS.             )(
11  ----------------------------------------------------
12
13
14
15        ORAL DEPOSITION OF RIVELINO LOPEZ,
16     TACOMA PHILLIPS AND MICHAEL SCARPELLO
17              APRIL 29, 2022
18
19
20        I, Holly R. Swinford, Certified Shorthand
21  Reporter in and for the State of Texas, do hereby
22  certify to the following:
23        That the witnesses, Rivelino Lopez, Tacoma
24  Phillips and Michael Scarpello, were by me duly sworn
25  and that the transcript of the oral deposition is a true
```

## Page 341

```
 1        TIME:  00:00
 2        Subscribed and sworn to on the _____ day
 3  of May, 2022.
 4
 5                        _____
 6                        Holly R. Swinford
                          Texas CSR 3356
 7                        Expiration: 2/1/2024
                          Magna Legal Services
 8                        Firm Registration No. 633
                          16414 San Pedro Ave., Suite 900
 9                        San Antonio, Texas  78232
                          (866) 672-7880
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

The Office of the Dallas County Elections Administrator

**$**

**$87,000** 293:3

**-**

**-cation** 89:6

**-jection** 55:17

**-tion** 52:14

**-versation** 323:15

**1**

**1** 5:8 11:3 18:18,19 19:3 63:23 73:16, 19 74:13,14 82:6 83:1 85:24 88:10, 12,17 89:13,19,21 92:22 101:20,21 105:25 106:13,23 107:4,5 108:11 111:10,14 113:6,10 125:19 126:16, 21 127:3,11,21 128:6,25 131:4 140:8,15,16 142:3,22 144:9 147:25 148:11,15,19 151:3,13 152:12,15,21 156:22 157:12,13,18 161:24 162:5, 11,16 163:1,3,11,16,18 164:6,21 165:19 168:2 169:1,5,8,16 183:4,5 187:1,8 188:2,4 201:12,15,24 202:10 203:10,25 204:11,22 205:7, 12 208:5,13,20 217:13 218:12 219:7,12 220:15 224:5,7 225:12 231:5 233:7,18 234:21 235:6,9 236:25 238:25 239:13,22 240:3,8 241:25 244:2,8,18 245:1,5,13,23 246:2,6,20 248:9,21,25 254:10,12 255:2,4,12,21,25 257:6,18 259:21 260:8 264:15 273:8 274:5 277:2,16 279:17 281:5 282:24 283:22 284:5, 23 285:14 290:9 292:3,18,22 297:12,23 298:6,8 303:24 312:16, 21,24 313:3,12,17,18,24 314:3,9,12, 18 315:4,7 317:4,5,11,14 318:1 319:7,14,18 324:5 328:21,24

**1's** 113:3 141:11 148:24 254:7 256:5 257:1 279:5

**1-related** 107:10

**1.4** 22:21

**1/6** 4:4

**10** 2:10 4:7

**10,270** 64:16

**10:00** 30:8,9,14,18,21 31:3,10,17 41:8,23 42:6 47:1 64:5,9 65:4,17

**10:47** 1:18 6:5

**11** 20:25

**110** 2:5

**11:29** 39:20

**11:33** 39:23

**11:53** 59:2

**12** 5:11 19:15,16 63:24 64:10,13 65:16 66:21 74:2,4 149:14 188:8 205:11 257:23 304:12

**12548** 3:5

**12:00** 29:11,23

**12:06** 59:6

**12:16** 67:24

**12:19** 68:2

**12th** 234:19 310:14

**13** 207:20

**149** 4:13

**15** 229:15 257:23 307:13,19

**15-** 320:22

**154** 4:14

**16-hour** 320:22

**160** 4:14

**179** 4:15

**18** 5:4 226:9

**18,101** 64:14

**182** 4:15

**184** 4:17

**19** 5:6 223:15

**1991** 190:1

**1995** 190:2

**1998** 76:23 77:1 78:22

**1st** 28:24 127:17

**2**

**2** 5:5 19:20,21,24 63:23 74:8,13,14 188:17,19 204:7 220:19 237:2 250:3

266:25 298:24

**2-3** 4:3

**20** 49:24 81:19 108:7 202:17 224:16 262:3 270:2 298:19 305:7 327:22

**20-** 88:9

**200** 16:22

**20002** 2:10

**2001** 222:15

**2014** 18:5 64:2 67:10 76:6

**2018** 5:7 18:5 26:12,14,20 29:7 33:16 37:1 48:17 49:4,21 50:3 59:19,21 60:6 61:16 64:2 67:10 80:8,15 81:17,22

**2019** 27:10 28:17 47:24 48:10 50:8 287:17 325:10,24 326:7

**202** 5:8

**202 353-5373** 3:13

**202 968-4507** 2:11

**2020** 29:15,25 30:5 34:8,9 35:14 47:17,20 48:5,19 49:7,10,17,24 60:9,15 81:17,18,20 82:1,11,22 117:2 189:18 190:13,17 193:17 196:1 237:17 247:20 255:18 274:25 275:1 277:24 280:1,2 296:3

**2021** 5:10 35:12,13,14,19,21 76:7 81:13 82:11,22 127:20 170:17 239:15 286:15 326:7

**2022** 1:11,18 5:11 6:4 18:4 28:25 29:4 30:3,15 32:12 33:2 34:22 35:11 41:8 45:20 48:9 49:3,9,16,23 50:2 60:12 64:2,12,14 65:3,12,16 66:24 77:9 81:9 83:2 91:18,20 92:1 105:13 106:25 107:5 112:5 125:19 127:17 142:12 144:9 153:4 154:7 172:11 208:13 248:9 268:19 269:20 270:4, 10,20 273:5 292:25 297:7 310:14 323:17 326:18 334:15 336:16

**20530** 3:12

**206** 2:6

**207** 5:8,9

**21** 35:16

**210 224-5476** 2:6

**2100** 2:15

**214 653-7358** 2:24

The Office of the Dallas County Elections Administrator

**22** 18:5 144:18 153:17 202:16 275:11

**228** 35:14

**22nd** 26:1,9

**232** 5:10

**24** 77:9 147:2,5 305:9 327:22

**24-hour** 47:16

**249** 5:10

**24th** 296:21 323:25 327:12

**25** 230:25 231:3 260:12,16

**254** 4:17

**25th** 30:12,15 31:3 41:8 42:20,23 43:2 45:20 46:13,22 66:24

**26** 203:23 236:20 303:20

**263** 5:12

**26th** 145:8

**27** 223:16 257:21

**28** 258:22

**282** 4:18

**29** 1:11

**295** 4:18

**29th** 1:17 6:4

**2:02** 149:11

**2:12** 149:14

**2:13** 150:14

**2:15** 150:17

**2:43** 175:22

**2:58** 175:25

---

**3**

**3** 5:7 59:4 61:5,8 66:11,12 74:13,14 212:18 258:23 260:12

**30** 6:21 53:11

**30(b)** 10:8

**30(b)(6)** 5:4 7:8 73:21 189:3

**300** 2:5

**31.129** 236:21

**333/334** 4:20

**335/336** 4:20

**337/338** 4:21

**339** 4:22

**3550** 3:6

**3:07** 184:10

---

**4**

**4** 5:8 91:8 202:5,6,10 215:18 278:17 298:12,15,16

**4,335** 35:15

**4/29/22** 333:2 335:2

**40** 325:1 326:22

**41** 4:8

**45** 4:8

**455** 2:15

**4:17** 184:13

**4:30** 106:18

---

**5**

**5** 4:5 204:20 207:3,4,12,16 258:23 264:6,9 317:20

**50** 8:8 223:13

**500** 1:22 2:23

**512 936-2275** 3:7

**52** 202:14 220:17 298:16 303:20

**53** 298:17,24 304:10

**54** 4:9 224:14,16,24 225:13,25 305:4

**55** 226:8

**57** 4:9

**58** 226:22

**59** 4:10 5:7 226:23 227:1

**5:00** 29:10,20 30:6

**5:53** 249:13

---

**6**

**6** 4:6 5:7,9 59:21 207:5,7,13 208:8 209:1 278:22

**6.01** 223:15

**6.04** 202:17 298:17 300:10,18

**6.06** 224:16 305:6

**60** 229:15 307:11

**600** 2:10

**61** 4:10

**62** 236:18

**628 267-6835** 2:16

**6300** 2:23

**64.031** 251:23

**64.034** 202:21

**65** 80:20 83:8 111:7,18 112:12 167:17,19 178:24 181:2,7,10,12 182:9,14,23 231:2

**66** 4:11

**68** 4:12

**69** 4:13

**6:00** 29:11,23

**6:08** 249:17

**6:48** 281:12

**6:49** 281:15

**6:51** 283:12

**6:52** 283:15

**6th** 61:15

---

**7**

**7** 5:10 144:22,23 145:2,3,24 205:7 226:24 227:18 232:1,2,3 260:12 298:13,14 310:6,10,18

**7.04** 226:22

**70,000** 24:8,16

**71** 263:9 266:16

**731,576** 63:8

**752** 35:12

**75202** 2:23

**78205** 2:5

**78539** 3:19

**78711** 3:6

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: 7:00..advise

**7:00** 29:10,11,19,20 30:7 41:18,19, 20 46:25

**7:08** 295:6

**7:09** 295:9

**7:43** 323:5

**7:50** 323:8

**7th** 1:22 171:25 172:8,11 173:22,25 174:11,20 176:7,20 177:3,6,17 178:15 248:5 255:18 275:1,2 296:3, 14,18 323:20,25 324:7 327:15

**7Y11** 1:22

**8**

**8** 249:15,19

**80** 262:2

**86.010** 305:11

**88** 35:14

**8:00** 29:9,19 30:6 106:18 331:17

**8:02** 1:18 331:20 332:5,7

**8th** 173:11

**9**

**9** 5:11 19:10 188:8 207:20 263:13,14, 16,23 317:18

**94105-2453** 2:16

**956 292-7609** 3:19

**97** 24:23

**97.13** 24:11

**99.46** 24:5

**9:53** 8:25 9:1

**A**

**a.m.** 1:18 6:5 9:1 39:20,23 59:2

**ABB-** 151:19

**ABBM** 13:23 70:19,24 87:12 90:3,9 92:24 93:5,16,21,24 94:1 95:20 96:14 97:9,11,13,19,22 98:5,21,23 100:16 101:1,3,24 102:8,10,13 103:11,21,25 107:2 108:10,21 109:11,21 110:12,15 112:2 114:20 115:2,4 119:12,14,19 121:20 138:13 142:10,15 145:5,6 150:25 151:12, 15,18,19 152:13,16 168:19 171:14, 20 181:14

**ABBMS** 90:1 95:18,19 99:1 101:12 104:1 105:14 113:10 129:24,25 142:14 145:3 155:23 172:22

**Abbott** 1:6 244:25

**ability** 7:22 285:11 325:16

**above-styled** 1:17

**abreast** 252:24

**absent** 111:11 112:12

**absent-** 105:23

**absentee** 105:23,24 115:23 139:19

**Absolutely** 249:2 278:5 305:3

**accept** 153:7,17,24 154:9 226:2 258:17,18 294:19

**accepted** 135:12 137:16 170:24 216:6

**accepting** 81:1,4 224:20 225:4

**access** 135:17 136:8,16 138:6,10, 17 141:2 271:15 272:19,22 287:9

**accessibility** 287:24

**accessible** 277:20 278:3 287:1

**accommodate** 161:9

**accommodation** 157:24 158:4,11, 19,22,23 160:24 161:5,10 290:18

**accommodations** 159:8 288:2

**account** 128:3 314:23

**accounts** 156:3 191:5

**accurate** 175:15

**accurately** 11:23 12:1 70:9 186:12

**accustomed** 178:16 179:18

**acknowledged** 334:13 336:13

**act** 61:19 72:13 216:16 230:2 285:21

**acting** 46:2

**action** 1:5 46:1 91:5,7

**actions** 209:9 213:15 214:24 215:21 216:3 237:22 299:8 302:5

**activists** 315:8

**activities** 218:10 259:4,9 261:23,24 312:16,21 313:23

**activity** 225:6 264:17 313:10 318:4

**acts** 204:18 215:14

**actual** 32:1 51:22 86:5 239:6

**ADA** 61:17,18,23 62:2,5,12 160:23 285:21 286:1,3,19 287:8,11

**add** 22:15 107:15 193:11 267:17,20 274:9 303:5

**added** 107:18 203:2 204:8 256:17

**adding** 203:10 324:17

**addition** 252:23

**additional** 7:17 8:6 10:13 25:24 31:4 47:10 67:2 157:13 160:18 205:1 218:13 219:23 221:18 295:24

**address** 7:5 22:16 33:1 100:11 101:4,5 135:22 151:11 166:10 167:1,9,10,20 258:14 273:12 285:1, 2

**adds** 157:13,18 203:25 204:11 205:7,12

**adjusted** 149:24

**adjustments** 30:5

**Adkins** 244:1,11,18

**administering** 193:18

**administration** 193:12,25 196:11 272:14

**administrative** 280:19

**administrator** 1:21 5:4 23:1 78:6,8, 21,25 190:10,15 193:22 197:3 237:16,21,23,24 238:11 241:12 253:9 274:8,10 289:4 297:8 306:4 311:21 321:22

**Administrator's** 47:6 176:13 274:24

**Administrators** 47:7 240:22 241:2 244:17 308:22

**adopt** 258:13

**ads** 293:6

**advertised** 30:19

**advice** 110:5,21 136:15 213:7,9

**advise** 109:19,22 110:13 135:3 274:10,13,16,17 292:22

**advised** 136:23

**advising** 280:25 293:17

**advisories** 128:8 218:24 235:2 291:10 300:15

**advisory** 51:1 234:21 243:8,13 244:17 245:21 259:16,18 286:17 324:23,24 326:8,13

**affected** 106:23 321:2

**affix** 334:2 336:2

**afforded** 31:3

**afoul** 230:10

**afraid** 264:11,23 317:22 319:4

**African-american** 194:10

**afternoon** 68:5 184:25 185:1

**age** 83:8 111:7 178:25 181:2

**aggressively** 277:17 324:17

**Agilis** 86:8 191:22

**agree** 6:24 7:2 12:16 89:21 106:24 194:6,9,12 197:19,23 198:3,21 199:15,25 200:5,19,25 201:6 203:9 204:11,17,20 205:6,11,17 212:5,12, 20 214:22 215:13,20 216:2,16 220:24 221:17,21 224:23 225:3 226:14,15 227:3,14 228:13,17,23 235:21 262:17,22 300:25 304:1,22, 25 313:6

**agreed** 6:20

**agreements** 6:19 10:10,14

**agrees** 6:25

**ahead** 53:15 70:16 73:15 84:8 91:5 110:16 134:1 154:20 308:1

**aid** 161:18 302:5

**aiming** 37:3 214:1

**alarmed** 211:1

**allotment** 293:3

**allowed** 196:10 201:24 235:22 259:12 261:10,11 275:24 288:13 289:23

**allowing** 277:21

**aloud** 264:10 278:20

**alternate** 194:20 210:13 266:18

**alternative** 279:15,20

**Amended** 5:3 73:20

**America's** 61:18

**American** 11:1 185:9

**Americans** 285:21

**amount** 48:21 104:22 254:14 257:3 270:18

**analysis** 252:24

**Analyst** 250:14

**announced** 57:25

**annual** 14:3 70:23,25 85:10,13 111:18 178:24 179:4,11

**answering** 12:1,14 47:4 74:21 104:22 105:13 120:12 173:9 176:6, 11 204:24 209:6

**answers** 12:16 20:19

**anticipate** 142:13 143:5,10 144:15 249:3

**anticipating** 144:11

**Antonio** 1:2 2:5

**anxious** 220:14

**anymore** 28:7 331:1,5

**Anytime** 37:6

**apologies** 312:19

**app-** 181:17

**Apparently** 236:16

**appearance** 17:14 171:20 183:14

**appearances** 4:3 6:5

**appeared** 153:5 270:10 334:11 336:11

**appearing** 2:3,8,13,18 3:3,9,14 281:19

**appears** 67:10 226:20 278:21

**applauded** 277:24

**appli-** 90:17

**appliances** 79:24

**applica-** 91:2

**application** 13:24 14:2,4 33:5 70:20 71:1 80:10,16,21 83:3,16 84:2,8,14, 16 85:2,3,8,20,22 87:12 89:22 90:3,

10 93:9,10 97:5 98:21 99:20 100:12, 15 101:3,6,25 102:11 103:11,13,19, 21,25 108:18 109:22 110:15 115:24 116:3 121:21 122:9,11,16 123:21,25 130:9,14 131:20,21 132:25 133:6 135:12 137:13,18,23 138:7 139:10, 21 140:24 145:18 147:10 151:2,9,20 155:20 158:15,17 159:5,6 166:4 167:16 168:15,20 170:24 171:9,14 172:3 175:9 177:24 178:19 179:5,11 181:21 182:21,25 183:2,3,6,24 229:17,21 230:18 231:7,11,18 232:25 233:11 234:9 236:5 249:5 282:20 284:5 285:10 291:22 294:14 307:14,20 308:3,7,10,15,18 311:13 328:12

**application's** 84:10

**applications** 32:12 70:22 81:1,8, 16,25 82:10,15,21 92:1,6,7,12,21,23 95:2,9 96:19 100:24 101:19 103:23 113:2,22 145:5,6,11 147:1,5 156:9, 17 172:6,13 176:24 177:3,9,18 179:2 230:17,19 231:1,4 232:16 234:3,7 235:22 236:14 242:25 248:16 293:5,9 308:23 309:5 310:3 311:6,12,18

**applied** 26:5 328:6

**applies** 282:19 283:3,18 285:13

**apply** 90:1 158:5 282:17,22 305:22

**applying** 283:23 300:9

**approach** 28:3 199:22 299:16 300:3,6

**approval** 220:5,7 235:8

**approved** 220:12 282:21

**approximately** 49:2,5,8,11,15,22 50:1

**April** 1:11,18 5:11 6:4 145:8

**area** 22:14 37:11 39:11 194:2 219:1 268:6

**areas** 180:1,2 191:1,16 214:6

**arms** 18:24

**arose** 272:18

**arrived** 272:2

**article** 5:11 263:19 264:3,7 267:1 278:15 317:18 320:18 323:11

**as-** 57:24

**ascertain** 312:3

**asked-for** 289:17

**asks** 151:9 159:4 172:21

**aspects** 245:23 246:15 286:20 311:11

**assembled** 184:4,5

**assess** 297:11

**assigned** 262:20 284:8

**assist** 51:21 55:8 81:19,21 211:10 213:2,4 215:12 224:21 225:5 226:2, 4,17 250:16 252:10

**assistance** 5:9 33:16,25 34:11,18 35:12 51:8,13,14 52:11,13,15 53:17, 20 55:9,13,23 57:1 121:13,19 122:1, 10,23 148:1,25 159:2,12,13 161:4, 17 197:20,24 198:4,11,22 199:21 200:1,10 203:10,19 204:3,8,12,23 205:9,13,14 206:16 209:4 211:2 212:13,14,21 213:14 215:15 217:14, 16 219:4,8,10 221:12 222:5,16 223:9 225:22 251:20 252:9 253:5,7 290:13 297:11,13,17,22 298:2,5,25 301:1 302:7 304:13,14

**assistant** 2:20,21 3:16 6:14,17 61:25 75:24 76:4,10 78:6,8 197:3 219:9 220:21

**assistants** 34:22 36:21 51:17 197:5

**assisted** 36:17 222:13

**assisting** 159:4 203:18 204:2 208:16 212:8 305:11,16,19,22

**assistive** 210:12

**assistor** 34:18 40:6 53:25 56:1,4, 10,13,14 57:1,6 58:1,4 62:10 121:18 199:1 200:6,22 201:1,7,18 204:1,8, 22,23 205:2,7,18,19 206:1,2,13,14, 21 209:12 211:4,13,20 214:19 215:14,22 217:6,8 218:22 219:17 220:25 221:2,12,24 222:5 224:1,8 290:12 299:8 301:2,18 302:2

**assistor's** 211:23

**assistors** 198:19,21 218:12 221:22 303:23

**assists** 223:19

**Association** 240:22 241:2

**assume** 84:15 173:21 296:22

**assumes** 328:11

**assuming** 57:13 85:3

**attached** 1:25 251:14

**Attachment** 188:8

**attempt** 248:23 266:14

**attempting** 92:23 272:24

**attend** 37:10

**attendant** 226:9 325:13

**attention** 11:22 186:11 237:24 251:6,21 278:14 287:19

**attorney** 2:20,21 3:5,15,16,17 6:14, 17 14:24,25 72:22 187:15 238:9 245:4 250:14 307:3 309:17,21 315:14

**ATTORNEY'S** 2:22

**attorneys** 5:5 14:10,12,16,17,21 15:10,14 20:1 57:14 71:21 75:17 187:11 281:18 290:21 291:15 300:10,12,16,20

**attributed** 318:16

**August** 76:23,24 77:9 286:15

**aunt** 222:8

**Austin** 3:6

**authority** 288:15,18 313:7

**automatic** 116:12

**automatically** 93:11 131:25

**availability** 280:14,18

**Avenue** 3:11

**avenues** 315:9,24

**average** 152:12

**aware** 42:18,21 46:17 47:3,12,15,21 55:11 56:14 82:12 148:18,21 157:13,18 162:24 163:2,7 198:17,20 199:6 217:6 219:2,6 223:25 224:4 230:5 231:10 237:15,19,21 238:2,7 239:13,16,24 250:17 255:10,13,14, 19,23,24 256:3 258:17 260:8 264:22 267:7 268:16 270:17,21 273:4 277:14 278:10 279:4,25 280:21 306:19,22 307:6,7,10 309:8 312:15, 20,23 313:1,20 316:4,12 317:9 322:1 327:7

**B**

**B-R-Y-L-O-N** 77:18

**bachelor's** 22:8

**back** 7:22 22:1,2 25:15 30:6 39:22 58:13,14,15 59:5,12 67:23 68:1 73:15 87:22,24 88:5,19 89:1,16 91:11 95:15 101:4 102:3,8 108:23 109:16,24 110:10,16,18 118:23 121:11,18 122:4 128:4,24 129:8 130:17 134:7 135:14 149:13 150:16 175:24 182:6 184:12 196:17 213:12 220:15 233:12 249:16 251:14,18 260:12 276:17 278:14 281:14 283:14 295:8 314:20 320:10 323:7

**backup** 324:18

**backwards** 260:12

**bad** 320:7,15,24

**bal-** 175:12

**ballot** 13:24 14:3 17:13,25 18:2 31:5 32:7,12,18 33:5 34:18,19 51:22 70:20,23 71:1 75:19,23 77:12,22 78:2 80:10,16,21 81:1,8,16,19,21,25 82:10,16,21 83:3 84:16 85:4,5,6,8, 14 86:2,6,21,22 87:15 88:3,24 89:1, 16,22 90:18,24 91:11 92:2,8,13,21, 23 94:10 95:2,9 96:19 97:5,6,15,23 98:7 99:20 105:23,25 106:1 107:2 108:10,18,22,24 109:6,7,10,16,24 111:17 112:11 113:2 114:20 115:3,5 116:5,18 117:1,5,8,9,21 120:7,8,10, 14,17 121:21,22,24 122:10,11 123:5,10,12,13,14,18,20,21,25 124:2,3 129:25 130:3,4,9,11,14,16, 18,23 131:20,21 132:21,25 133:6, 10,12,15 134:3,15,21,25 135:4,7,8, 10,11,12,13,14,17,24 136:8,16 138:6,7,8,11,13,18,21,25 139:5,9, 12,19,22 140:2,18 141:2,3 143:11 145:12,18 147:1,5,10 151:2,13,25 152:2,22 153:4 155:20 156:9,18 158:16,18 165:19 168:16 172:25 174:4 175:7,10 177:23 178:4 180:7, 20 181:2,13,16 183:11 190:25 191:15,22,23 201:2,8,19 204:13,14, 15 205:3,15 209:13,14 210:1,5,8,14 211:12,14,22 214:25 215:1,8,16,19, 22 216:3,12,14,15,23 219:12 227:8, 17 228:10,18,19 229:4,6,21 231:1,4, 7,11,19 232:17,25 233:11 234:3 235:23 236:5,14 242:25 246:13,15,

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: ballot-marking..CA

22 247:13 249:5,6 260:1,7 272:25
273:2 276:6,18 279:16 282:17,21
283:3,18 284:6,7,12,15,16,20,21,24
291:3,21,22,24 292:1,22 293:5
294:1,14 299:1,2,3 304:14 311:5
316:21

**ballot-marking** 51:24

**ballots** 17:19 31:15,17 32:2,13
62:18 63:2,9 64:14,22 81:5,9,16
82:1,11,16,21 85:11 89:23 90:2 99:2
108:18,23 109:15 113:10 121:12,17
123:3 129:24,25 135:1 143:5,9,12
145:22,25 146:1,6 153:16 154:6
156:10,18,23 175:13 178:9 196:10
243:1 248:15,17 277:22 278:22
279:6,17 293:8 311:5

**Baptist** 22:6

**bar** 83:14 84:3,5,7 93:14 152:4
308:22

**Barbara** 8:19,20

**barcode** 93:24

**barriers** 194:15

**based** 40:4 45:22 48:6,9 49:21
150:4 174:19 177:7,19 178:14 195:1
288:17 310:21 319:21 322:9

**basically** 191:10 286:2 287:11

**basing** 319:6

**basis** 106:15,16 128:19 145:19
268:1 275:2 292:8 318:11

**batches** 231:18

**Bates** 8:9 9:8 232:13 249:23,25
251:11,19 310:16,22,24

**battlefield** 76:19

**be-** 201:21,23

**bearing** 155:16

**beautiful** 192:20

**bef-** 87:19

**began** 127:17 293:14

**begin** 19:15,16 92:1 159:25

**beginning** 90:17 177:15 179:2
202:16 224:16 236:20

**begins** 88:1 188:8 307:12 320:2

**begun** 176:21

**behalf** 20:20 132:25 134:17 149:21
189:8 219:12 282:8,15

**beings** 102:4

**bele-** 313:11

**believing** 275:3

**Ben** 2:19 6:13 73:4,9

**Ben.stool@dallascounty.org**
2:24

**Bender** 3:10 4:13 44:8,19,20,22,25
57:15,19 149:20 150:1,10,20,21,22
153:3,15 154:5,13 184:7 281:21
282:1,3 331:7

**Bernardino** 192:11

**bet** 187:25

**Bexar** 22:25

**big** 23:1,2,4 37:9 89:18 195:9 242:23
263:6

**bigger** 329:22

**biggest** 273:8

**bilingual** 123:5,14

**bill** 187:8 202:16,17 220:17 242:23
255:25 259:21 274:5 303:2,3 318:21

**bills** 240:2 302:10,18 303:9 314:13
319:1,8,24

**binder** 16:1,5

**birth** 135:21 151:9,21 166:10,12
167:7,18 181:6,18 182:15,20,25

**bit** 15:19 45:13 61:11 66:1 88:14
113:18 160:10 161:22 194:22
207:14 218:9 238:23 248:20 287:19
295:19 308:20

**biweekly** 243:7

**black** 194:10

**block** 2:14 229:10

**board** 86:21,23 120:14,17 143:11
175:7,10

**bond** 227:17,19,20,22 228:4,8,25
229:1

**book** 32:5 34:13 52:4,11 276:15

**books** 168:23

**Born** 21:20

**boss** 301:22

**bottom** 63:23 203:9 207:20 208:12
224:23 225:13,25 249:24 267:3
311:8

**box** 3:5 111:22 112:1 252:2 272:25
273:2

**boxes** 277:21

**boys** 23:2,4

**Brady** 3:10 44:19,20 57:17 150:18,
20 166:1,2 184:8 281:25 282:3
331:11,13

**break** 9:17,18 12:6,7,8,10 17:21,24
18:9 39:21 46:15 59:3 149:12
175:23 176:1 186:17,19 249:14
322:21,25 323:2,6,10

**breaking** 322:20

**breaks** 17:23

**briefly** 186:24

**bring** 7:17,22 26:6 52:1 56:3 59:12
62:6 73:5 200:21 230:25 238:10
276:17 326:9

**bringing** 27:21

**brings** 224:8

**broad** 299:14

**broadened** 225:5

**Broadly** 287:25

**Broadway** 2:5

**broken** 17:12,15,16

**brother** 167:11

**brought** 8:4 15:18 16:4,20 61:9 73:8
301:13 324:9

**Bruce** 79:1,2

**Brylon** 77:16,19,21 78:14

**building** 1:22 2:22 37:24 276:25
329:21

**business** 79:12,13 190:24 206:9
313:15

―――――――――――

### C

**C-A-I** 155:6

**CA** 2:16

The Office of the Dallas County Elections Administrator

**Cai** 2:14 4:14,18 44:14 154:18,20
155:1,5,6,9,13,14 156:3,8,16,21
157:9,17,23 158:3,9 159:19 282:6,7,
15 289:6,21 290:24 294:20 331:6,
10,14

**California** 192:11

**call** 15:11 72:5 76:19 102:15 105:15,
16,22 106:19 107:14 108:4 116:15
119:9 124:1,4,14,16,18,20,23 125:9
134:7 140:21 149:18 168:8,19
169:13,25 170:7 189:5 191:12 198:5
208:3 241:9,21 244:11 262:1 276:11
280:2 287:5 290:16 291:4 315:10,21
321:6 328:1 331:4

**called** 26:15 27:1 36:15 159:16
195:18 210:20,22,24 212:24 213:3
239:8 245:7 250:13 271:21,24
290:25

**calling** 30:25 106:4 134:16 139:7
169:21

**calls** 32:4 103:2 105:5,10,19 106:9
107:25 108:6,7,8,10 124:7 134:3
168:12 170:11,18,19 173:15,22,24
174:2,3,8,12,25 247:15 280:16

**calm** 271:22

**campuses** 37:8

**cancel** 130:22

**candidate** 227:12 234:8

**candidates** 60:4 205:4

**Cano** 3:18

**canvasser** 227:14 228:24

**canvassing** 228:3,15

**capacity** 46:3 165:11 176:15 311:21

**capture** 83:15,24 86:8

**captured** 132:11

**capturing** 82:18

**car** 111:5 329:20

**card** 334:12 336:12

**care** 58:16 238:19 291:20

**career** 21:23

**caregiver** 226:10

**carrier** 33:6 86:5,6,7 87:13,15,22,
24,25 88:2,5,20,22 90:22,23 91:2,6
116:16,25 117:5,10,11,13,15 127:19

150:25 151:3,13,15,25 152:2,22
153:1 284:16,24 285:4,10

**carry** 291:23

**case** 10:25 11:3 15:19 16:2 40:11
73:6 80:21 137:7,21 161:25 217:19
221:10 235:13,15 279:10 294:16
300:9 318:25

**case-by-case** 292:8

**cast** 17:8,19 31:5 62:19,23 63:9,19
64:7,14 65:4,18 80:5 88:24 156:23
210:14 260:1,6 268:5 276:18

**casting** 32:1 210:1 316:21

**casts** 276:6

**category** 83:6,13 111:11,15 302:1

**Cathedral** 189:20

**Catholic** 189:21

**caused** 233:18,24 252:20 273:5

**cell** 276:12

**center** 21:7,8 27:24 51:1,3 190:11
277:21 324:23 326:1,8,13

**centers** 21:6 26:15,19,25 27:3,6,9,
12,21 28:7,14,18 29:1 48:13 50:9
286:13 325:20,22 326:4,6,9,18

**central** 267:5 314:23

**cer-** 190:7

**ceremonies** 37:19 38:9,14 40:14

**ceremony** 37:21

**certificate** 4:22 152:5 258:18

**certificates** 190:8 254:17,20,21,25

**Certified** 190:10

**cetera** 198:14 218:24 234:12 235:3
245:20 246:16 251:5 258:19 277:23
290:22 315:8,11,16

**cha-** 170:7 219:22

**Chair** 322:3,4

**challenge** 148:10

**challenged** 140:14

**challenges** 47:2

**challenging** 11:3

**chance** 187:21

**change** 169:14,19,20 170:1,7 309:9
315:4 333:3 335:3

**changed** 60:14 82:19 234:4 302:19
313:23 317:11

**changing** 22:16 288:6

**characterize** 302:6

**charges** 238:10 307:8

**chart** 5:5 15:23 19:25 64:9 67:4
73:12 92:18 188:21

**charts** 73:6

**check** 62:14 84:19 85:13 90:25
111:22,24 269:1,2 283:22 285:11
300:13,15 316:6

**check-in** 221:15

**checked** 85:9 112:12 283:25 309:3

**checking** 33:10 83:17,20 84:22
216:4,20

**checklist** 287:6,15

**checklists** 287:4

**checks** 221:14

**Chief** 222:22

**chilling** 242:18 248:17 274:18 275:4

**chime** 244:5

**choices** 210:17 216:15

**choose** 39:14

**chooses** 58:3

**choosing** 205:8 212:19

**chose** 142:23 171:13,14,19,22
319:12 325:24 326:15

**Christina** 244:1,3,11

**church** 230:24 231:1 267:6

**circumstances** 238:16 293:24

**Citizen** 245:21 324:23

**citizens** 38:3

**city** 1:23 21:3,12 192:16 227:20,23

**civil** 1:5 2:21 3:10,17 236:21 237:1,
5,10

**claims** 267:24

**clarification** 160:19 161:22 165:2
178:12 284:18 306:24 307:4 321:7

clarifications 162:11

clarify 8:10 46:16 57:12 285:13 310:25

clarifying 304:2

clarity 252:4,21

Class 258:10

classes 256:21,23

clear 21:23,25 45:15 130:21,24 176:14 180:10 216:12 291:10,12 293:12

clear-cut 291:15

clerk 76:12,18,21 77:3 309:13

clerks 261:6,8,11,17 262:2

click 105:25

clients 192:1

close 24:8,16 48:11 49:5,11 117:11, 12 203:9 229:14 233:6 261:24 266:1,11 316:20 324:6

closed 27:11,19 48:5,9 272:11,12

closely 206:4,14

closing 27:22 28:1,4,12

co-judge 271:12,13,14,16,18 272:18

co-judges 271:10

co-workers 273:18

code 83:14 84:3,5,7 93:14 147:16 152:4 237:3,7,11 289:12 302:7,22, 25 303:4,7 305:2 309:24 313:5,12 317:11

Code:009 3:5

codes 113:16,25 114:1 165:18

codifying 304:4

codings 165:18

coerce 205:8

cognitive 252:5,10,22

colleagues 318:21

collect 219:19

collected 254:17

college 22:5 37:8 39:11 190:2 239:9

colleges 37:7

Colorado 192:17

column 20:12 61:16 62:1,4,11,17,22 63:1,4 74:11 250:23

combi- 242:6

combination 242:9

comfortable 75:16 120:12 173:4 174:22 176:6

commands 206:4

comments 250:22,24 252:21

commision 334:20 336:20

Commissioner 222:22

Commissioners 46:4,5 50:12 293:4 324:8 326:21

commits 230:1 258:9

committed 263:7

committee 50:25 51:1 86:11,17,18, 23 87:2,5,11,21 89:7,11 118:6 243:14,23 244:17 245:21 285:9 286:17 324:23,24 326:8,13,14

committees 51:3

common 169:24 215:11

communicate 46:12 99:4 102:4 134:11,15 214:23 240:7 312:10

communicated 162:18 164:5 240:12 286:6

communicating 13:21 103:5 194:15

communication 14:15 127:1 128:24 164:10 233:10

communications 104:18 126:20 161:21 163:9,15,22 176:5 244:25 245:3,10,17 246:10 281:3 312:11 330:8

communities 37:2

community 37:14 226:16 267:6

community-based 198:18

company 191:13

comparable 290:7

compare 87:7,12,13 98:18,22,23,25 172:10 195:8

compared 65:19 153:22 177:11,17 221:18 236:10 324:4,20 327:8

compares 285:9

comparing 170:21 176:7

comparison 17:16 63:17 65:5 66:19 169:24 171:7,12 175:15 195:6 313:16

compensate 305:10

compensates 305:10

compensating 224:20 225:4

compensation 224:21 225:1,4,6, 16,20 305:15

complaint 162:15

complaints 42:13,17 163:18 261:19 269:19 280:10 314:19,22

complete 83:20 84:10,12,17 221:1 223:21 254:23

completed 79:19 84:2 97:25 222:4

completely 49:25 110:17 112:21

compliance 287:12,21

compliant 286:1,19 287:8,22

complies 236:19 257:22 258:24 260:13 264:8 278:18 298:10 304:11

compliment 269:4

comply 206:13 311:20,23

compound 238:23

comprehensive 287:10

computer 112:7

con- 323:13

concentrations 214:7

concept 281:8

concern 141:4 156:24 157:6,10 233:4,10,14 238:8 242:11 244:8 322:12 329:23

concerned 41:22 42:5 156:16,21 170:20 230:8 234:6 237:9,14 242:17 325:4

concerns 42:10 50:21 140:13,20 147:24 148:8,14,19 163:16 164:6,14 168:13 173:18 241:8,24 242:13,24 243:4,10 244:2,18 246:1 248:8,13, 14,17 265:2 273:8 314:5

concluded 332:7

condensed 186:4

condition 186:14

conduct 218:8 261:14,15

conduct- 313:14

conducted 256:13 257:9

conducting 313:14

confer 201:20,25

conference 311:10

confers 218:11 232:21

confident 181:10

confine 204:23 298:25

confined 301:8

confinements 299:12

confines 215:15

confining 204:8,12 209:3 211:2 213:14

confirm 9:3 151:4,7 181:6 221:9

Confirmation 100:11

confirming 216:15

conflict 270:24 271:1,8,17,23 272:10,13,17 273:21,25 274:20

confused 45:14 160:11

confuses 295:20

confusion 308:21,25

Congratulations 77:10

congregants 230:25

Connect 36:15 40:5

connected 183:18 311:24

connection 38:8

connects 317:7

consensus 324:24

consequences 318:21

conservative 299:12

consideration 334:14 336:14

considered 47:19 191:3 239:19 277:15

considers 206:8 239:6

consist 296:25

consistence 256:22

consistency 256:23

constituent's 246:12

constitute 301:17

constituted 301:18

constitutional 170:16 296:9 297:4

consult 175:20 300:12,16 302:24 327:10

cont 4:10,13

contact 132:16 136:10 169:15 300:10

contacted 133:5 161:23 162:4,10, 14 164:20 165:5,8,14 306:23 307:2 316:14

contacting 99:9 162:25 163:5,10 307:6

contained 26:2

contemplated 287:4

contents 163:8,14

contested 273:24

context 169:16 213:12 219:9 301:2 303:6 305:25 314:9

continue 40:8 273:22 303:8 320:1

Continued 3:2 59:8 69:9

continues 112:4 223:22 237:2 318:1 321:10

continuing 248:14

contractor 72:1,4,6,20 197:2

contracts 191:18

contributed 320:7

contributing 265:12,23,24

convened 89:11

convenes 87:21

conversation 14:15 40:9 58:17 150:4,23 160:23 228:15 252:7 304:17 309:12 311:3 312:3,7,12 316:24 327:24

conversations 241:15 253:1 280:24 322:9 330:20,23

conveyed 156:24 157:5,9

convince 228:7

Coordinator 38:4,17 40:13

copied 251:16

copies 308:14

copy 18:11 73:19 219:18 221:7 231:22 257:18 298:8 310:9

corner 207:16 208:9

corporation 112:23

correct 7:10,13 10:12 29:1,2 45:20, 23 46:10,19,20,23,24 51:19,22 52:11 53:20 54:7 56:5 58:1,2,5,6 59:21,22 60:6,9,10,12,13,16,17,19 62:17 63:5,12 64:13,22,23,25 66:11, 19,22,24 67:2,5,6,8,9,13,14 69:12 80:14 81:17 89:23 91:20 93:20 96:14 97:6 98:1 104:5 107:3,7 108:16 115:8 126:10 131:18 136:7 154:11 157:18 161:1,6,7,11,12,18 162:13,16,17,21 163:12,13,16,17, 18,19,24 165:24 166:6 167:25 170:2,8,9,25 171:10,15,16,22,25 172:3 173:19,22 174:9 175:5,7 176:2,8,21,22,25 177:4,12,20 178:2, 5,6 179:18,19 180:13 181:3,14,19 182:9,15,21,25 183:11,12 193:20 194:25 195:17 196:6 200:18 206:22 208:23 213:13 217:2 222:9 223:2 231:8,9 232:14,22 235:10,11,19,25 247:18,21 269:8 272:21 282:25 283:1,21 284:22 285:16 293:14 294:9,12,18 296:3,4,11,12 298:3,22 299:9 300:2 302:12,16,17,20,22 303:11,13,14 304:21 305:16,23 306:6,7,9,10,12,13,16,18,20,21,25 307:1,5 308:7,10,16,18,19 309:11, 18,21 310:1,4,14,16 311:6 312:18 315:23 316:13,17 317:4 320:13 322:7 323:17,18,20,21 325:12 327:16,23 328:12,21,22 330:17,18, 21,23,24 334:3 336:3

Corrective 91:5,7

correctly 123:1 178:1 252:4 259:17 264:13,20 269:9 272:20 279:2 305:25 311:14 317:24 318:6,23 321:8,16

Corrigendum 4:20,21 333:1 335:1

cost 50:13

Counsel 6:5,23 8:4 10:10 18:25 19:22 54:21 59:14 66:21 160:24 161:20 163:25 165:23,25 174:24

176:2 202:7 207:8 249:20 295:18 327:25 331:21

**count** 92:17 109:7 143:6,12 146:6 296:7

**counted** 62:19 63:2 120:10 145:23 146:2 156:23 205:15 304:15

**counter** 159:4

**counties** 23:1,14 27:20 118:19 119:10 128:18 129:2 165:14 200:12 299:24

**country** 192:3,5

**counts** 17:5

**county** 1:23 2:18 3:14,18 5:4,5,6 6:13,14,25 8:4 9:22 14:11 20:1,20 21:17 22:22,25 23:4,9,10,12,13 24:2 25:21 27:15,16 28:3 30:16 31:4,9 33:17 36:21,25 37:1,3 43:1,10 45:24 46:1,2,3,4,9 47:23 74:22 75:3,14 77:5,8 79:9,18 80:5,9,15,19 83:10 89:18 91:22 94:9,10 100:9 101:18 102:15 111:19 114:3,22 115:11,14 116:9,13 119:12 125:9 126:10,24 127:16 129:8,11 134:25 135:14,22 137:22 140:6 141:9 143:14,24 148:9,15,19,23 158:18 165:9 176:13 189:13,17 190:13 191:4,21 192:17, 23,25 193:5,23,24 194:3,6,9,12,24 195:2,8,9,17 196:1,9,14 209:18 210:3,9,15 213:20 214:7 219:18 223:25 227:18,19 232:24 233:19,21 234:5 237:24 238:10,18,21 239:5,6, 8 241:5,11,22 242:1 243:21 245:11 247:19 253:11,15 254:11 255:11,17, 20 262:25 264:4 265:3 266:8,10 270:5,15 274:24 275:19,21 276:1 277:12,23 278:11,22 279:25 280:10, 11,18 283:4,19 286:8,18 299:15,17 300:2,10,20 306:4,14 308:4,14 309:13 311:21 314:21 321:22 322:10 324:16,18 325:10,14,17,18, 24 326:15 329:7,12,25 330:16 334:9 336:9

**county's** 33:15 80:10 91:15 253:4, 20

**county-wide** 47:22,24

**countywide** 26:16,19 48:10 286:13 325:6,11,19 326:1

**couple** 6:19 17:3,6 34:5 38:2 39:18 41:5 61:3 149:8 193:2 202:20 232:11 267:3 297:2 321:23

**court** 1:1 6:21 10:2,7 11:17 12:15 41:11,17 45:23,25 46:4,6 50:12 61:4 68:17 124:5 184:19 207:11 235:15 263:15,17 293:4 303:9 324:8 326:21

**courtroom** 70:5

**cover** 7:16

**covered** 38:24 157:17 194:24 195:15 218:25 257:7,8

**covering** 252:17

**create** 94:24 95:15 96:1 230:11 237:5 274:20 308:6,9

**created** 89:21 94:5,8,9 95:5,16 96:4 132:10 217:13 218:12 246:20 250:13

**creates** 152:3 224:20

**creating** 94:22 308:18

**Creek** 21:24,25

**crime** 206:10

**criminal** 2:22 3:14,17 230:2,11 233:17,20,22 238:10 242:15 306:3 311:24

**criminalize** 219:7

**criteria** 55:11,21 56:7,11,15 196:5 212:13 304:6,18,23 305:1

**criticism** 162:16

**CSR** 1:19

**culmination** 240:4

**curbside** 196:4 224:2,9,11 267:23 275:16,19,21,25 276:6,13,21 277:4, 6,7 278:9,12 279:1,5,21 288:8 289:24 297:13,20

**cure** 97:10 119:14,19 138:6,7,12,18 139:19 140:1 146:7,8,14,15 178:11

**cured** 292:1

**curious** 168:17

**current** 20:22 22:12 33:23 34:7 80:25 81:3 193:21 201:10,12

**custody** 331:22

**cut** 288:12

**cutoff** 145:8

**cutting-the-line** 288:14

**cycle** 50:11

## D

**DA** 307:7

**DA's** 306:15

**dabbles** 191:16

**daily** 92:13,15 106:15

**Dallas** 1:20,23 2:18,23 5:4,5,6 6:13, 14,25 8:4 9:22 14:10 20:1,20 21:3, 10,12,15,19 22:1,6,22 23:4,9,12 24:2 25:21 26:24 27:15,16 28:3 31:3 33:15,17 36:21,25 37:1,3 43:1,10,14 46:3,8,9 47:23 74:22 75:3,13 77:4,8 79:9,14,15,18 80:5,9,10,15,19 91:15,21 94:9,10 100:9 101:18 102:15 114:3,22 115:11,14 116:9,13 119:12 125:9 126:9,24 127:16 129:8 134:25 137:22 140:6 141:9 143:14, 24 148:9,14,19,23 158:18 176:13 189:13,17 190:12,13 191:21 193:17, 22,24 194:3,6,9,12,24 195:2,8,9,17 196:9,14 209:18 210:3,9,15,23 213:20 219:17,18 223:25 227:18,19 232:24 233:19,21 234:5 238:21 239:5,6 241:22 242:1 245:11,19 247:19 253:4,11 254:11 255:11,16, 20 262:25 264:4 266:8 270:5,15 274:24 275:7,19,21 276:1 277:12 278:1,11 280:7,10,11 297:25 299:15,17 300:2,10 306:3,14 308:3, 4,14 311:21 314:21 322:10 323:23 324:3,20 325:10,14,24 330:15,16

**Dana** 237:25 309:14

**data** 17:5 18:4 26:7 111:9 165:21

**database** 23:17 151:4,14 153:5,7, 22,24

**date** 94:20 126:22 127:4 135:21 151:9,21 166:10,12 167:7,18 181:5, 18 182:15,20,25 296:6

**date-stamp** 83:5

**dated** 5:7 61:15 310:13

**dates** 128:12,16 234:11

**datestamp** 86:7

**day** 1:17 9:8,11 17:23 18:1 27:1,4,6, 9,13,21 29:18 30:7,13 31:5,10,16 32:7 41:23 46:22 47:24 48:22 49:13, 16 55:4 61:18 62:20,22,24 63:23 64:5,8,10,13,24 65:3,16 66:21 67:1, 8,11 88:2 89:1 101:20,21 105:4

The Office of the Dallas County Elections Administrator

106:9 107:20,25 108:6,7 110:14
111:12 118:18 127:22 170:11,12,18
261:18 263:10 290:16 320:23 324:2
325:11,14 326:19 334:11,15 336:11,
16

**days** 31:22 63:22 145:9 146:15,17
213:1 263:8 321:1

**DC** 2:10 3:12

**de-escalating** 273:21

**deadline** 110:10 145:7 176:23

**deadlines** 128:16

**deal** 132:2 262:16,23

**dealing** 86:4 132:3 216:21 262:8,13,
14 275:11

**debated** 274:5

**Debeauvoir** 237:25 309:14

**December** 25:22 26:1 35:16,19,20
127:19 189:18 190:13,17 193:16
255:18 275:1,2 296:3

**decide** 9:15 50:12 55:12 56:8
288:15

**decided** 28:17 50:8 130:24 161:13
183:13,21 266:11

**deciding** 289:9

**decision** 45:23 46:6,9 55:6,7 56:12,
16 101:17,18 266:15 292:9 308:22
325:13

**decision-making** 50:18

**decisions** 120:13 125:22 126:9

**declare** 85:15

**decline** 50:7

**decrease** 326:11

**decreasing** 50:13

**dedicated** 105:12 108:17

**deep** 23:23 286:22 330:7

**deeper** 248:20 261:14

**deeply** 23:19

**defect** 91:5 97:10

**DEFENDANT** 3:14

**Defendants** 1:8 3:3 6:11 7:2 160:7
295:16

**Defense** 6:23 9:3 11:1 54:20 185:9

**define** 194:17 228:22

**defines** 229:8

**definition** 199:1 212:21 213:11
226:25 227:3

**definitions** 19:14

**degree** 22:8 265:16

**degrees** 190:5

**DEL** 1:3

**delayed** 286:24

**deliver** 227:11 231:19

**delve** 190:25

**Democrat** 64:16

**Democratic** 63:19 65:2,18 86:20
271:12,16,18 278:21 321:12 322:2,4

**Denver** 192:17

**department** 3:11 5:6 20:20 32:19
58:13 74:22,25 75:4 78:21,24 81:19,
22 82:10 125:6 148:9 162:22,24
163:10,15 165:9 189:8,11 194:19
250:25 251:3 252:8,18 321:11,19,
24,25

**depend** 159:10

**depending** 235:17 299:13

**depends** 194:17 216:11 228:22
243:23

**depositing** 216:23

**deposition** 1:10,13 5:2,4 6:3 7:8 8:5
11:5,17 12:3 13:15,19 14:12,18,24
15:3,10 16:19 18:19 19:3,8,21,24
59:4,15 61:9,12 69:16,22,25 70:12
71:5,22 72:25 73:19,21 74:5,7
173:13 185:13,15,18,20 186:17,23
187:12,18 188:5 189:3 193:2 202:6,
9 207:4,7,12,13 217:21 232:3
249:15,19 263:23 332:7 334:2 336:2

**depositions** 200:12

**Deputies** 271:25 272:2,5

**deputy** 38:6 78:6,8 222:22

**describe** 105:4 198:9 209:22
230:15 232:5 257:7

**describing** 110:25 221:11 272:20

**description** 334:12 336:12

**design** 118:17 140:3

**designated** 7:6 17:2 20:19 33:14
52:25 74:24 140:12 188:22

**designating** 5:5

**designed** 118:15,22

**desk** 16:11

**Desoto** 267:6

**dessert** 79:8

**destroying** 118:7

**detailed** 218:9

**details** 223:11 238:2,7 246:14

**determination** 311:16

**determine** 86:22 317:13

**determined** 86:18

**deterrent** 273:8

**device** 51:24 54:7 135:10 210:6,7,9,
12

**died** 240:3

**difference** 277:4

**differently** 164:16

**difficult** 212:2 252:10 262:3,11,13
279:18

**difficulties** 140:14 265:18 280:19
330:5

**difficulty** 13:21

**digits** 90:8 151:22 153:6,23

**direct** 214:25 215:1 217:15

**directing** 204:13,15 209:13 215:8,
18 261:24 299:1,2

**directly** 293:4 321:6

**Director** 53:2 192:16

**disabilities** 61:19 158:10 252:5,10,
22 285:19,21 288:1,7,9 292:17

**disability** 37:14 61:19 62:3 111:11
157:24 158:4,14 159:1 288:17,20
290:12 291:2,17,21

**disabled** 37:13 83:8 111:19 112:12
178:25 197:20 200:13 223:4 276:3
279:13

The Office of the Dallas County Elections Administrator

**Disciple** 267:5

**disclosed** 217:23

**disclosures** 217:24

**discovered** 255:25

**discovery** 40:15 186:25

**discrepancies** 329:15,18,25

**discuss** 9:20 187:22

**discussed** 48:2 51:5 290:9 308:20 319:23 328:14 330:8

**discussing** 164:9 265:10

**discussion** 40:4 67:25 150:15 281:13 283:13 295:7 306:1 312:6 331:18

**discussions** 51:3 245:22 273:20

**disproportionately** 192:25

**disrupt** 53:12

**disruptions** 272:13

**distinct** 216:19

**distinction** 167:23 175:6

**distinguish** 167:8

**distribute** 230:19 309:5

**distributed** 230:16 310:6

**distribution** 229:16 235:14 307:14, 20

**district** 1:1 2:20,21,22 3:15,16,17 6:14,17 227:22 228:5

**dive** 286:22

**division** 1:2 2:21 3:10,17 162:3,9

**document** 18:25 19:4,22 59:14,18 61:4,6 63:18 66:10,13 73:20,24 187:5 188:3,18,19 202:7 232:9,20 249:20,21 250:8,20 251:7,10 252:15,17,19 258:1 260:18 263:17 264:1 334:12 336:12

**documentation** 254:16

**documents** 8:4,7 9:7,15 186:25 187:19 207:8 254:24

**DOJ** 165:23,25 315:15

**domicile** 238:21

**door** 79:24 228:11

**door-to-door** 228:3

**doors** 287:8

**dot** 252:3

**doubt** 233:18 293:18

**doubts** 267:12,15

**Douglas** 192:23,25 193:4

**downloading** 22:18

**dramatic** 170:1,7

**draw** 251:6

**drinking** 287:9

**drive** 58:15 196:3 291:23

**drive-thru** 195:18,24,25 275:17 277:2,5,8,12,17 278:2 279:21,25 280:3,11,18 281:4 328:14,18,24 329:2,3,7,12,16,18 330:3,6,9,13

**driver** 126:4 139:22,23

**driver's** 24:3,5,23 25:6,12 26:2,4 33:4 90:7 91:9,10 93:17 94:7 95:25 103:9,17 104:3,7,13 107:1 113:7 135:21,25 136:5,25 137:4,8,14,15, 24 140:23 143:15,18,25 151:22,24 153:5,18,21 154:9 156:6 168:3 241:14 292:24 293:13,25 294:17

**drives** 37:7,18

**drop** 196:10 210:20,22 277:21

**drop-off** 31:17

**dropped** 277:22

**dropping** 212:8 216:14

**DS200** 210:23

**duly** 1:16 10:19 69:7 184:22

**dumb** 217:3

**duties** 22:13 32:1 58:15

**duty** 238:17 239:1,7,12 265:6

**E**

**earlier** 22:25 41:6,7 61:11 63:18 64:4 66:10 150:4,5,23,24 155:18 172:2 180:3 182:20 194:23 195:15 273:7 278:6,7 280:22 286:11 290:8 297:24 310:7 318:21 326:6 328:15

**early** 17:5,7,13,22,23,24 18:1 26:17, 20,21 27:1 29:16 30:7,13 32:6 48:16

49:1,3 58:16 62:20 63:5 64:5,18 67:11,12 86:21 88:1 105:23 110:14 120:14,16 127:15 143:11 171:24 175:7,10 176:21 213:1 271:5 297:16 323:19

**easier** 114:9,16 168:5 174:20 207:14

**east** 21:10 37:10

**easy** 262:2 300:7

**ebook** 57:25 58:5

**ED** 61:17 62:1,11

**ED's** 61:18

**Edinburg** 3:19

**educate** 293:2

**educating** 140:21

**education** 79:16

**educational** 11:1 185:9 293:7

**effect** 107:11 242:18 248:18 254:12 273:8 274:18 275:4 320:23

**effects** 274:11

**effort** 286:16,24

**efforts** 293:7

**eith-** 116:1

**either-or** 14:5 137:20 153:12,14

**elderly** 199:7,17 223:4,7,10

**elect-** 86:21

**elected** 242:11

**election** 14:3 17:16,23 18:1 27:1,4, 6,9,12,18,21 29:4,13 31:22 32:7 33:3 35:11,15 36:16 46:18 47:6,7, 14,24 48:22 49:13,16 55:3,12 56:8 59:19 60:16 61:18 62:19,20,22,24 63:10,17 64:6,24 66:18 70:24 78:25 81:9 83:11 84:11 85:6,14,15 88:1 89:1 91:18,21 110:14,19 111:12 117:3 120:21 127:4,22 132:3,5 142:13 144:9,17,19 145:1,4,24 146:17 147:2,21 157:6 164:1,2,6,10, 13,20,22,23,25 165:4 170:14,17 171:25 172:8,11,16,20 173:22,25 174:20,23 176:7,13,21 177:4,6,17 178:15 180:8,12 190:10,11,14,20, 21,22,25 191:1,7,8,16 192:6 193:25 196:2 214:16,23 218:24 221:1 222:22 227:18 234:20 235:2 236:9,

25 237:7,10,13,17,21,22 240:15
242:15,19 243:8,13 244:9 245:21
247:20 248:1,4,6,9,23 255:20 256:1,
4,25 257:4 258:9 259:8 260:24
261:1,3,15,17,18 262:5,6,18 263:8,
10 264:11,22 265:6 266:15 268:3,23
269:20 271:11 272:14 273:14,23
274:24 280:1,2 289:6,12 290:16,17,
25 296:15 297:6,7,8 301:3 302:7,22,
25 303:3,6 305:2 306:4,11 308:22
309:6,24 311:21 312:16,21 313:1,7,
10,12,23 315:2,25 316:5 317:11,15,
22 318:20,22 319:4 320:25 323:20,
25 324:7,23 325:3,11,14 326:18,24,
25 327:3,4,5,12,13,15

**election's** 33:18 291:10

**elections** 1:21 5:4,6 17:6 20:20
23:1 34:23 58:13 64:1 74:22 75:3,14
77:8 78:20,21,24 79:19 81:11,12
82:9 102:16 106:24 125:9 128:7
144:22 148:10,15,19,23 162:22,24
163:10,15 165:9 174:6 189:8 190:7
192:16,23 193:1,13,22 196:11 197:3
237:16,24 238:11 240:22 241:2,11
243:8 244:16 247:19 250:14,25
253:8 254:18 257:6 259:16,18 274:8
275:12 289:4 296:5,25 297:1,3,24
300:15 315:15 321:11,19,22 324:14
326:22 327:9

**electronic** 8:12,14 276:15

**elementary** 28:8,12

**Elias** 2:9 6:10

**eligibility** 151:4 196:5 304:5,18,23,
25

**eligible** 85:7 156:11 203:18 204:2
205:14 206:15 212:14 231:20
275:25 277:10 304:14

**eliminate** 287:20

**eliminating** 27:22 48:3

**Elm** 1:22 2:23

**email** 9:4 128:3,23 129:9 310:13
312:10

**email-** 129:8

**emails** 5:10 127:5,6 128:1,4,8,17
129:4 232:11,15,23 233:5 310:6,11

**Emily** 129:6,12 132:14

**employed** 195:25

**employees** 286:7 289:7

**en-** 152:22

**enacted** 255:4,12 281:5

**enactment** 224:5,7 292:17 297:12,
23 298:6 328:24

**encompasses** 216:2

**encountered** 142:22 248:24

**encourage** 227:15 228:4 261:3,7

**end** 7:12 9:8,11 247:10 314:6 318:5
320:7

**ended** 141:19 266:6 314:4

**ending** 46:25

**enforce** 306:3,8,11

**engage** 312:2

**engagement** 226:16

**English** 13:17,20,21 38:20 39:3
123:8,17 124:21 194:14,15 198:5
214:14,15

**ensure** 284:2

**enter** 115:23

**entering** 116:2 199:10

**entire** 154:6

**entitled** 12:24 264:18 318:5

**entry** 165:21

**envelope** 33:6 86:5,6,7,9 87:13,16,
22,24,25 88:2,5,20,22 90:22,23,24
91:3,6 108:24 116:16,19,20,25
117:3,4,5,9,11,13,15,20,24 118:1,9
121:14 151:1,3,13,16,25 152:2
153:1 284:16,20,21,24,25 285:4,10

**envelopes** 116:23 118:7 122:4
127:19

**epad** 51:5 53:20,24,25 57:25

**epollbook** 30:24 33:21,22 34:2,7,13
36:4 51:11,12 55:24 276:16

**equipment** 200:7,17

**equipped** 236:13

**errors** 156:12

**ES&S** 36:16 210:5,23

**escalation** 291:12

**escapes** 271:5

**essentially** 138:12

**establish** 214:4

**established** 322:6,17

**estimate** 12:24 152:13,15,21

**EV** 63:1,4

**EV-ED** 62:17

**evaluating** 298:1

**evening** 295:12

**event** 37:9

**Everything's** 71:2

**evidence** 279:22

**exact** 78:7 155:22 244:14 298:11

**examination** 4:7,8,12,13,14,17,18
10:20 41:1 45:4 68:3 69:8 149:25
154:17 160:2 184:23 253:4 254:4
282:5 295:10

**examples** 159:11

**Excellent** 45:19 160:22

**exception** 29:22 226:9

**exceptions** 216:21 262:1

**exchange** 200:2 232:15,23

**excuse** 156:10 196:2

**excused** 238:17 239:1,7

**executed** 334:13 336:13

**executive** 46:3

**exhibit** 4:5 5:1,3 18:18,19 19:2,11,
21,24 59:4 61:5,8,15 63:16 66:11,16
73:16,19 74:7 188:2,4,17,19 202:6,9
207:4,7,12,13,16 208:8 209:1 232:3
249:15,19 257:17 263:12,16,23
298:12 310:5,10 317:18

**exhibits** 207:1 263:11 331:23

**existed** 163:9 219:7

**expanded** 226:3

**expect** 29:3

**experience** 33:15,18 81:7,15,24
91:15 93:2 104:1 168:8 169:12
172:10,12 178:14 193:18 194:15
222:24 262:25 275:5 320:9

The Office of the Dallas County Elections Administrator

**experienced** 11:11 140:6,14,19 148:9,10,14

**experiences** 275:6,10

**expert** 11:8

**expertise** 274:9

**expires** 334:20 336:20

**explain** 88:22 89:25 100:6 105:20 200:6 263:5

**explained** 103:9

**explaining** 88:6,20 140:22 211:4 325:10

**explanation** 211:24 212:10

**explore** 211:2

**export** 131:11,14 132:7,10

**expose** 233:19,21

**express** 42:10 242:24 243:4

**expressed** 246:1 322:12 334:14 336:14

**expressing** 163:16 233:4 244:2,8, 18

**expression** 233:10

**expressions** 211:1

**Expresspoll** 36:15 40:4

**Expressvote** 210:5 216:13

**ext** 2:6

**extend** 30:7,14

**extended** 29:15,16,19 41:6,14 42:10,14,19,23 43:2 45:20,22 46:6, 13,18,21,25 47:20 67:2

**extent** 32:13 244:19

**extra** 29:16,18

**extraordinarily** 324:3 325:2 327:14

**extraordinary** 293:1

**eyes** 317:2

---

**F**

---

**face** 205:19 257:14

**Facebook** 293:6

**faced** 47:2

**faces** 321:5 322:6,16

**facilitate** 256:20

**facilitated** 240:21

**facilities** 228:9

**fact** 9:11 95:7 98:20 103:16 130:17 156:11 183:21 211:24 217:15 231:6 303:4 320:21 321:18 322:15 324:1 326:1

**fact-based** 292:9

**factor** 265:13,23,24

**factors** 265:14,25 320:12,16

**facts** 292:9 326:12

**failed** 88:21 95:24,25 104:2 130:8

**failure** 177:25

**fair** 65:1,15 81:14 85:4 92:22 96:3 97:18 99:19 108:8 114:19 116:18 132:14 142:7 174:17 193:16 213:10 216:24 217:5,9,11 233:9,16 236:6 244:16 245:24 260:22 262:6 265:5,8 280:9 294:11 298:3,7

**fairly** 181:9

**fall** 111:10 213:12 226:17 302:1

**falls** 301:1

**false** 166:21 167:3

**familiar** 13:25 14:1 23:7 36:3 54:13, 15 114:7 179:18 224:7,19 231:17 239:11 258:4 264:5 267:9,10,12 277:1 285:20,22 287:13 321:5

**familiarity** 53:23 297:21

**family** 36:20 198:13 238:19

**Farrell** 318:20 320:3 321:13

**fashion** 219:21

**father** 167:10,11 180:23 182:6,9,14, 23

**feature** 288:15

**features** 220:14

**February** 11:6 26:1,9 30:12,15 31:3 41:8 42:20,23 43:2 45:20 46:13,22 66:24 101:17 114:11 292:25 293:14 297:3 320:7

**federal** 1:24 10:12 297:8 315:15

**feedback** 251:4

**feel** 70:8 75:16 120:12 173:4 174:22 176:6

**Felony** 230:4

**felt** 272:6

**fewer** 28:15 172:12 173:6,24 177:9, 11,14,18,22 178:8,23 179:14

**fields** 238:20

**Fif-** 226:22

**figure** 98:12,14 109:3,17 122:3 143:24

**figuring** 34:2

**file** 103:25 104:6 285:7 294:2,17

**files** 22:18

**filing** 156:12

**fill** 110:17 122:20,23 159:6 221:24 222:8 250:14 293:19

**filled** 25:13 32:22

**filling** 122:11 141:5 156:12 159:2,5 221:17

**fills** 137:12 221:13

**final** 146:7,12,13 288:24 291:22

**finally** 8:2 13:11 144:4 180:22 205:11 239:22

**financial** 324:17

**find** 32:5 113:1 114:10,24 115:13,16 116:2 136:24 145:11 151:4,13 167:6 276:15 290:22

**findings** 51:3

**fine** 179:16 232:8

**finish** 12:19,20

**finished** 257:25

**firm** 273:15

**firsthand** 329:10

**five-minute** 322:25

**five-percent** 194:20

**fix** 129:10,11

**fixing** 129:16

**flap** 90:23,25 117:24 118:1,8,10,14, 15,23

**flip** 188:7 229:15 258:22 260:11

278:17

**flipping** 149:22

**Floor** 1:22

**flows** 226:23

**focus** 175:9,11 214:6

**focuses** 175:10

**folks** 37:13 231:2

**follow** 150:23 160:11 206:3 208:16 259:22

**follow-up** 150:3

**fondly** 281:8

**foot** 229:5

**foreclose** 211:4,23 212:7

**foregoing** 334:1,13 336:1,13

**forget** 241:18

**forgot** 68:8 104:5

**forgotten** 241:3

**form** 8:12,14 31:6,18 32:19,22 39:9 42:2,7,16 43:4,12,17 50:24 52:7,24 55:17 56:24 65:6,21 80:12 83:21 87:9 88:4 91:5,7,11 93:8 94:15,22, 24 95:1 97:24 98:9 99:25 100:2,3,5, 6,11,12 101:7 105:1 108:13 113:12 114:15 116:21 119:16 120:11,24 126:1 133:3 134:18 137:17 138:3, 16,23 140:9 141:12 143:2,8 146:5 148:6 152:24 153:11 154:3 156:1,5, 14,19 157:7,15,22 158:1,7 166:12 170:3 171:1 172:14 175:17 178:18 180:14 182:21 194:16 195:21 196:8, 19 197:21 198:1,8,24 199:13 200:8 201:3,9,22 205:21 206:6 208:7,24 209:16 211:8 212:15,23 213:6 215:2,17,24 218:12 219:14,18 220:16,21 221:1,3,6,13,18,19,23,25 222:2,4 223:21 224:3 225:9,17 226:6,19 228:21 229:7 230:14 233:23 236:8,15 237:12 238:1,6,13 244:22 245:14 246:4 248:10 255:22 259:15,23 260:2 262:9,21 265:11 266:24 270:16,23 272:15 278:4 279:8 280:12,20 283:5,20 289:2,19 290:14 292:4 294:5,6,15 297:13 301:19 308:7,10 310:22 313:25 314:15 316:18

**format** 166:23

**forms** 95:4 99:23 100:7,9 101:3 145:19 147:10

**forward** 80:15 142:12 144:8 188:7 226:21 229:15 273:13

**found** 30:17,20 167:4 168:5 236:9

**foundation** 45:16 160:15 295:25 325:7

**fountains** 287:10

**frame** 87:19,20

**Francisco** 2:16

**Franklin** 77:16,20,21 78:15

**fraud** 41:24 42:6,11,15,19 219:3 276:20 278:8,10

**free** 259:6,11

**frequently** 169:25

**Friday** 65:16

**friend** 199:9

**friendly** 299:22,25

**friends** 198:13

**front** 15:20 59:17 187:23 257:20 310:9,22

**frustrated** 121:10

**fulfill** 246:17

**fulfilling** 222:25

**full** 11:22 186:11 264:9 265:19 303:6

**full-time** 256:17

**function** 54:11 236:7

**Fund** 11:1 185:9

**future** 253:22

**fuzzy** 11:24

### G

**gave** 32:19 73:3 114:4 119:24 183:16 257:18 267:1 278:15

**gears** 275:15

**general** 3:5 29:4 43:9,14 59:19 70:15 72:22 80:4,6 142:18,24 163:3 245:4 247:24 248:1,3,23 261:13 265:16 291:14 300:3,6 307:3 309:17,21 315:14 327:19

**General's** 14:25 187:15 238:9

**generally** 15:5 103:5 198:13 216:2 239:24 250:7 261:22 269:3 276:3 297:15,22 327:11

**generating** 113:23

**generic** 291:7

**gentleman** 72:2

**gentleman's** 72:2

**get all** 118:21

**get-together** 15:11

**gist** 257:12

**give** 9:6 13:7 20:19 32:23 44:7 45:11 68:12 88:22 106:7 107:22 121:1 126:2 133:18 147:20 172:19,24,25 173:1,5 206:17 231:2,3 232:18 242:10 252:11 290:7 301:5 315:9

**giving** 11:18,22 51:13 70:2 109:11 128:12 173:4 186:11 272:18

**Gladys** 267:4,10

**goal** 213:21 214:8,9 253:6

**good** 13:8 41:4 45:8 68:5 69:4 147:22 184:25 185:1 193:1 199:18 295:12,14 322:24

**gosh** 246:13 266:5 313:11

**Governor** 244:25

**grade** 287:11

**graduate** 189:19

**graduated** 22:7 189:24 190:1,3

**Graham** 2:9 6:10 316:20

**grandmother** 52:1 301:6

**grant** 288:16

**granted** 284:5

**granting** 291:25

**gray** 251:22

**great** 12:13 155:13 199:7 230:25 277:25 282:14

**greater** 113:2,5,11,13 155:24 156:2, 3,17 160:15 173:6

**Greg** 244:25

**GREGORY** 1:6

The Office of the Dallas County Elections Administrator

**ground** 7:16 11:11

**group** 2:9 6:10 98:3 124:8 125:2 132:19 159:25 179:14 185:10 230:25 243:8

**groups** 245:19,20,22,25

**grow** 189:15 214:8

**GRP-DETAIL** 5:7 59:18

**grueling** 320:22

**guess** 12:25 23:15 24:7 44:1 152:25 197:9 228:20 267:25

**guidance** 125:17,24 126:15,18 218:21 234:20,22 235:4,16 259:10 317:5

**guide** 56:17 218:8,9

**guidelines** 127:18

**guts** 252:4,22

**GWHITE@ELIAS.LAW** 2:11

---

**H**

**half** 23:16 24:6 192:8 193:15 194:4

**hand** 10:1,4 18:20 31:17 40:24 61:4 68:16 92:17 184:17 315:2 334:15 336:15

**handed** 18:25 19:1,22,23 61:6,7 73:18 188:3,18 202:7,9 207:8,11 232:9 249:20 263:17 264:1

**handful** 45:10 269:21,22

**handing** 73:17 74:9 188:1,17 207:5 234:3 249:18

**handle** 23:15 124:13 126:3 133:4 165:12,13,18 261:25 262:2,3,7

**handled** 82:24 117:16 292:7 301:15

**handles** 38:4

**handling** 81:25 82:15

**hands-on** 193:18

**handy** 34:2

**happen** 144:11 195:10 223:3 238:14,16 248:5 284:6 294:2

**happened** 114:7,8 127:24 272:3,11 278:11

**happening** 28:16 101:8 144:15 293:10

**happy** 40:8,16 45:16 160:19 295:24 325:7

**harassing** 255:11,20

**hard** 101:2 105:15,16 219:18 221:7 246:23 292:5 310:8

**harder** 246:2 326:23

**hardware** 191:24

**Harris** 191:21 196:1 277:23 279:25 280:8,18 329:7,10,12,25 330:15

**Harry** 21:8

**harvesting** 226:25 227:4

**Harwell** 129:6,12 132:14

**he'll** 58:14 244:5

**head** 11:24 12:15 25:4 30:1 48:24 59:16 68:21 82:7 87:17 90:12 113:14 154:8 155:19,23 167:5,13 168:14 186:6 189:6 197:10 202:12 211:16 212:4 218:15 219:2 223:17 225:21 226:11 233:15 235:7 237:4 249:11 251:13,15,24 252:14 290:5, 6,10 305:12 311:2 316:7 319:9,16, 17 320:17 328:20

**heading** 74:5

**heads** 252:18

**hear** 42:9 53:3,5 70:11 118:5 125:10 138:5,10,17 139:4 261:19 282:9,10

**heard** 23:2 69:14 70:13 72:1,4 134:13 197:1 318:21 328:25 330:19

**hearing** 57:14 160:1 210:12

**heavy** 233:17

**held** 20:24 65:3 75:20 327:9

**helped** 36:18 52:2 54:1 118:17 121:13 301:10

**helper** 199:21

**helping** 72:8 214:22 222:8

**hereto** 1:25

**Hey** 30:17 96:1 130:13 230:18 276:12

**Hidalgo** 3:14,18 243:21

**high** 21:21,23,24 22:4 37:7 39:10 79:11,12,13,16,19 189:19,20,24 193:1 214:7 248:16 253:21 279:18 293:1 298:2 324:3 325:2

**highlighted** 16:1

**highlighting** 63:13

**highly** 267:13,16

**hire** 144:14

**hired** 38:5 250:13,14 256:19 273:14

**Hispanic** 13:13 194:7

**historically** 28:10 230:16

**history** 22:18 277:19 327:10

**hold** 20:4 52:19 77:13

**holding** 66:13 73:19 128:13

**holes** 266:19

**Holly** 1:18 257:17

**home** 239:6 256:11

**honor** 69:24

**hope** 9:10 118:15

**hoping** 106:21

**hostage** 12:7

**hosting** 47:16,20

**hot** 59:12

**hotline** 315:10,17,21 316:5,11,15

**hour** 106:4,12

**hours** 14:22 29:7,12,15 30:4 41:6,14 42:10,14,19,23 43:2,11,16 45:20,22 46:6,13,18,22,25 47:20 67:2 71:7 106:7,14 141:4 267:5,11,14,17,23 320:6,15,20,21

**house** 121:6 229:9 240:2 242:6

**house-to-house** 227:15

**Houston** 21:22,23 155:9 160:25

**Houston's** 327:25

**How's** 283:16

**Hughes** 79:23

**Huh-uh** 16:20,25

**human** 102:4

**hundred** 35:13

**Hunker** 3:4 4:8,9,10,11,14,15,18 6:11,12 7:2 9:3 31:6,18 39:9 42:2,7, 16 43:4,12,17 45:3,5 51:2,25 52:10, 15 53:8,10,15,16,23 54:18 55:15,17 56:24 57:12,22 58:7 59:9 60:21

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: husband..individually

65:6,21,24 66:2,5,8 67:16,21 80:12
83:21 87:9 93:8 94:15 97:24 98:9
100:5 105:1 108:13 113:12 114:15
116:21 119:16 120:11,24 126:1
133:3 134:18 137:17 138:16,23
140:9 141:12 142:25 143:2,8 146:5
148:4,6 149:18 152:24 153:11 154:3
156:1,5,14,19 157:7,15,22 158:1,7
159:24 160:3,6 170:5 171:3 172:17
175:19 176:1 178:19 179:20 180:14
182:3,5,18 184:1 194:16 195:19,21
196:8,19 197:21 198:1,6,8,24
199:13 200:8 201:3,9,22 205:21
206:6 207:10 208:7,22,24 209:16
211:8 212:15,23 213:6 215:2,17,24
219:14 221:3 222:2 224:3,10 225:7,
9,17 226:6,19 228:21 229:7 230:12,
14 232:4,8 233:23 236:8,15 237:12
238:1,6,13 244:20,22 245:14 246:4
248:10 255:22 259:15,23 260:2,15,
17 262:9,21 265:11 266:24 270:16,
23 272:15 278:4 279:8 280:12,20
283:5,20 289:2,19 290:14 292:4
294:15,24 295:11,15 301:23 307:17
310:16,19,21 314:8,16 316:19
322:22,25 323:2,9 330:25 331:4

**husband** 133:19,22 134:2 190:3

**hypothetical** 180:23 227:25 291:7,
9 292:6

**hypotheticals** 292:12

─────────────────────

**I**

**ice** 321:1

**ID** 25:1,24 32:14 33:4 57:16 90:7
91:22 92:24 93:21 94:7,13 95:3,10,
20 96:5,6,13,20,21 97:9,14 98:5
99:6,11,16 100:1,16,25 101:22,24
103:17 104:19,23 106:5,14,22
108:11,23 109:7 113:3,8 114:5,10,
18 115:4 117:24 118:2 119:13
120:4,21,22 121:8 125:22 126:4,16,
23 127:2 135:4,6 136:17 138:7,11,
14 139:15 140:7,18 141:11,21 143:7
144:16 145:13,20,24 146:2 147:6,17
155:21 156:12 157:25 158:6,11
159:2 161:5 170:22 173:19,24
174:8,20 175:15 177:20,25 178:1,
16,17 180:11 183:19 243:1 246:18
248:15,24 249:7 291:3

**ID-MATCHING-NUMBER** 107:17

**ID-NUMBER-RELATED** 96:10

**idea** 98:4 293:21

**identification** 5:3 90:6 117:12
174:2 175:15 278:23 279:5 284:9,11
292:21

**identify** 44:16 144:5

**identifying** 294:12

**identity** 334:12 336:12

**IDS** 246:15

**ill** 11:23

**illegal** 219:12

**illiterate** 197:25

**image** 83:15,24 84:1 86:8

**imagine** 199:24 201:17 230:5
329:17

**immigrants** 37:16

**impact** 141:10 248:8

**Impacts** 250:23

**impaired** 210:12

**implement** 34:7 125:22 126:24
168:25 218:22

**implementa-** 245:12

**implementation** 235:6 245:13
315:6

**implemented** 27:12 168:17 237:18
277:16 279:25 329:7

**implementing** 91:22 127:2,11
128:6 148:24 163:11 180:12 220:8
277:15 330:5

**implements** 119:7

**import** 26:2,6 132:13

**importance** 273:16,17,18,20

**importantly** 285:25

**imposed** 46:8

**impossible** 267:22 268:1

**impressions** 173:5

**improvement** 314:13

**in-house** 152:5

**in-person** 17:22,24 18:1 28:5 51:6
64:18 67:12 219:3 227:4 228:14

297:20

**inability** 141:20 145:23 146:2

**incentive** 324:17

**incidence** 309:9

**incident** 309:13

**incidents** 219:3 255:19

**include** 64:21 197:20,24 198:4
212:13,21 218:7 284:24 296:8,12,14
304:23

**included** 94:12 304:6,19 317:3
319:7

**includes** 18:2 203:12,17 216:8,17

**including** 31:16 129:19 240:6
261:23 277:20 324:1,11

**income** 195:3,11

**incomplete** 83:19 84:2,14 123:2
155:20

**incompletion** 95:24

**incorporated** 303:5

**incorporates** 235:9

**incorporating** 250:17

**incorrect** 91:9 126:4 153:21 154:10

**increase** 326:10

**increased** 276:20 278:8 326:2

**increasing** 324:11

**Index** 4:5 5:1

**indicating** 14:16 16:4,22 20:1,12
27:22 28:14 39:6 80:8 82:20 83:4,13
85:24 117:2,13,24 122:17,21 134:12
138:14 218:7 219:1,9,17 242:14
250:20 251:7 269:22 286:9 287:9
288:12

**indication** 121:25

**indicted** 237:22 238:5

**indictment** 238:4 309:17,21

**individual** 57:23 71:24 72:17
121:13 132:17,24 133:7 150:6,24
162:1 164:18 176:15 200:1 231:3
246:6 282:19 283:23 293:24 294:8
327:25

**individually** 131:8

The Office of the Dallas County Elections Administrator

**individuals** 51:18,21 71:25 156:9 170:22,23 171:8 175:3 179:4,8 183:13 231:17 236:10 284:3 288:1 322:6,10 325:16 327:16

**industry** 275:5

**information** 9:7 15:2 17:10 22:15 32:24 34:2,17 35:7 40:7 72:10,13,15 92:16 93:5,11,12,13,22 95:13 97:22 103:18,24 104:6 110:9 112:7 116:3, 8 122:20 128:21 131:3 132:13 135:4,7,16,17,19 136:22 138:3,8,12, 20 141:3,15,18 142:4 147:20 152:1, 8 165:19 167:23 172:20 173:1,2 180:19 181:13 200:2 218:13 219:19 221:2 222:9 234:11 255:8 270:11,12 284:23 294:4 320:19

**informed** 103:15 275:8

**informing** 94:12

**Ingram** 244:1,19

**initial** 6:24

**initially** 97:8 214:6

**initials** 250:5

**initiative** 50:22 80:11

**input** 50:17,19 250:25

**inputted** 90:16

**inquire** 329:6,11,14

**inquired** 298:4

**inquiries** 104:23 105:9 106:8 107:17 141:9,16

**inquiring** 232:16,23

**inquiry** 115:17,18

**inserts** 117:6

**inside** 37:20 86:6 116:19,20 117:9, 10 148:25 212:1 228:11 276:17,24 289:25 297:13

**insisting** 200:20

**inspect** 287:6

**inspections** 287:17,20

**instance** 1:15 57:4 133:14,18 134:9 159:2 181:9 221:24 222:5 234:8 244:14 255:10 270:21 291:2 327:12

**instances** 223:25 224:7 231:14 255:24 268:24 278:10

**instigated** 309:9

**instruction** 13:1 70:17

**instructions** 211:7

**instructs** 70:15

**instrument** 334:13 336:13

**intend** 231:19

**intended** 238:22 325:14

**intending** 219:13 228:25

**intent** 227:11 228:7 325:21

**interact** 200:2 245:18 261:6,8 302:25

**interacting** 129:23 215:22 262:18 322:5,16

**interaction** 215:15 227:5,7 228:14

**interactions** 242:17

**interchangeably** 13:12

**interest** 79:25 327:2,3,8,15,21

**interesting** 79:22 236:2

**interfere** 257:13 258:9

**interfering** 258:8

**interpret** 164:2 215:4 299:14 303:2, 17 306:20,24 307:4

**interpretated** 212:6

**interpretation** 153:9 163:22 211:17 215:10 300:5 301:22 312:1

**interpreted** 154:1 212:6 299:7

**interpreting** 250:16 300:4

**interprets** 303:10

**interrupting** 315:25

**intimidated** 270:22

**intranet** 128:7

**introduce** 69:14 185:5

**introduced** 240:3

**introducing** 304:3

**introduction** 277:21

**investigating** 267:13 268:10

**invites** 37:8

**involve** 215:15

**involved** 32:11 33:10 80:25 81:4 116:24 193:12 321:2

**involvement** 31:21 39:14

**irregularities** 256:1,2 260:23 261:2 314:17 315:1 329:11

**irregularity** 262:5 315:19

**issue** 32:5 95:20 140:16 244:10 284:20 322:18

**issued** 177:8,11,18,22

**issues** 140:13,20 147:23 148:8,14, 18 227:17,19,20,22 324:9

**issuing** 308:23

**item** 7:4

**items** 74:4 91:4

**iterations** 314:2

**Ivy** 267:4,11

---

## J

**J.schuette@dallascounty.org** 2:25

**JACQUELINE** 3:16

**jacqueline.villareal@da.co. hidalgo.tx.us** 3:20

**jail** 230:4 234:15

**January** 25:22 26:1 36:25 85:9 91:25 92:3,8,20 93:3 94:19 101:9,17 125:19 126:21 127:3,17,21 128:25 234:19 310:14

**Jason** 2:20 6:16

**JENNER** 2:14

**jeopardy** 234:13 257:14

**JEREMY** 3:21

**job** 12:13 20:22 21:1 75:18 77:13 126:12 190:14,18 192:12,15,18,22 262:12

**joined** 78:21

**joint** 59:19 271:11 327:11,13

**jotted** 73:9,11

**JR** 3:15

**judge** 11:18 30:16 31:9 32:4,9 41:14 45:24 46:1,2,4 70:5 86:21,22

The Office of the Dallas County Elections Administrator

214:16,23 261:4,9,22 262:11 270:25
271:9 272:6 276:14 288:19,22
289:3,7 290:17,25 301:21,25 315:2,
10,25 318:20

**judge's** 216:22 276:12

**judges** 47:14 55:12 56:8 261:17
262:3 263:6,7 264:11,22,24,25
265:6 266:15,19 306:11 313:2,8
317:22 319:4

**judicial** 46:1

**juggle** 262:11,13

**jump** 305:4 307:11

**jumping** 45:13 160:9 295:18

**June** 35:13 286:25

**jurisdiction** 111:12 193:24

**jurisdictions** 324:4,21

**jury** 238:17 239:1,7,12

**JUSTICE** 3:11

---

**K**

**Kathleen** 3:4 6:12 160:6 295:15

**Kathleen.hunker@oag.texas.
gov** 3:7

**keeping** 252:24

**Keith** 244:1,4

**Ken** 245:4

**KERA** 5:11

**kidding** 118:17

**kind** 9:18 16:1 20:9 21:10 30:16
31:21 36:11 37:1 38:4 56:13 82:23
88:6 100:3 123:14 128:18 140:11
191:13 216:18 234:24 240:4 248:19
251:4 259:7,18 272:22 291:6 293:18
317:7 325:21 327:10

**kinds** 118:21 289:21

**kitchen** 228:12

**knew** 33:7 84:18 103:14 167:20
220:13 238:9 321:14

**kno-** 158:13

**knobs** 287:9

**knowing** 275:12

**knowingly** 264:16 318:3

**knowledge** 25:20 33:2,17 49:14
53:2 58:10 75:7,10,15 80:8,13,18,23
82:25 134:12,19,24 135:6 147:23
148:8,13 158:8,13 159:18 161:7
162:7,8 163:19,21 164:17 177:19
178:7 179:3,13 196:14 261:10
314:19 315:5 321:18

**Kouba** 78:4,5,9,10

**Kris** 318:20

**Kristy** 279:9

---

**L**

**LA** 1:3

**label** 83:14 152:3,4,7

**Labor's** 194:19

**lack** 24:14 144:5 308:21 321:5

**lacked** 241:13

**laid** 289:11

**language** 13:20 38:22 39:1 123:25
125:8 194:14,21 197:25 201:23
203:10,12,17 204:1,7,12 205:2,12
206:12 207:17,23 208:17 209:3,5
211:9,17 212:5,18 213:24 214:11,
12,17 215:4 218:18 219:22 224:24,
25 225:24 230:1,6 289:11 299:7,16
302:11,14 303:5,10 309:1 313:17
314:5,6,12 319:6,7,22,23

**languages** 38:20 123:19 210:13

**laptop** 149:24 310:8

**large** 194:18 195:11 326:5

**largely** 244:17

**larger** 23:14,16 325:23

**largest** 193:24 194:1,2

**late** 41:16 114:12

**Latino** 13:13 194:7

**laundry** 287:7

**laura.bender@usdoj.gov** 3:12

**law** 2:9 6:10 11:3 60:14 87:10 131:5
139:18 153:10 154:2 156:22 168:23,
25 169:2,22 170:1,7 190:2,3 201:10,
12 236:1 252:4,22,24 264:12 275:24
288:18 291:10 294:7 297:22 298:5

300:8,13 303:13 311:20,23 317:23
319:5 325:18

**laws** 165:19 168:9 169:13,22 199:3
219:6 239:11 297:11 301:3 303:17
306:3

**lawsuit** 140:17

**lawyer** 70:15

**lawyers** 18:9 70:12 71:12

**lay** 45:16 160:14

**layers** 303:16

**lead** 41:23 42:6,11,14 76:12 272:13

**lead-up** 105:12

**leading** 99:5 278:25

**leads** 244:3,5

**lean** 199:10,20

**learn** 309:4

**learned** 34:1

**leave** 70:17 213:8

**led** 265:15 320:12 326:3,12,13

**left** 110:2 301:14 306:14

**left-hand** 207:16 208:9 252:12

**legal** 11:1 185:9 199:1,4 213:7,9
234:13 245:19 257:14

**legally** 172:19

**legislation** 168:18,22 239:14,19
241:8 250:16,17 251:14 252:23
274:9,11 303:15,17 314:10

**legislation's** 265:24

**legislative** 5:10 281:7 309:3

**legislators** 240:14 241:9,19,20,25
242:3 274:10,13 280:24 281:4

**Legislature** 5:8 165:6 168:23 169:1
202:11 236:16 239:15 240:8,11
274:6 319:22 329:1

**Legislature's** 308:22 309:4

**lengths** 259:12

**lessor** 173:6

**letter** 79:2,3 84:25 88:4,6 103:7,8
294:4,7

**letters** 98:17

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: letting..make

**letting** 84:13,25 90:20 128:10
136:18 212:7 271:14

**level** 173:7

**liability** 230:11 237:9

**liable** 237:1

**liberal** 211:10 215:7,10 299:12,15

**license** 24:3,6,23 25:7,12 26:2,4
33:4 90:7 91:9,10 93:17 94:7 95:25
103:9,17 104:3,8,13 107:1 113:8
126:4 135:21,25 136:5,25 137:4,8,
14,16,24 139:22,23 140:23 143:15,
18 144:1 151:22,24 153:5,18,22
154:9 156:7 168:3 241:14 292:24
293:13,25 294:17

**lights** 150:7 283:6

**limited** 13:17 32:7 70:25 148:11,15
198:5 214:15 225:15 259:3 311:11

**limiting** 297:19 299:8

**limits** 313:1,9

**Lincoln** 190:2

**lines** 202:20 257:23 258:23 260:12
289:25 313:13

**Lisa** 193:2

**list** 63:22 67:4 80:2 98:16,17,18,22,
23,25 99:1 134:23 153:4 170:22,23
188:9 243:22 248:12 253:18 287:7,
10,14 289:18 329:22

**listed** 20:11 62:1,4 74:5,11 153:21
305:1

**lists** 22:15 73:12

**litigation** 3:17 235:17 314:21

**live** 135:22 192:20 239:7

**lived** 21:22 194:3

**LLP** 2:14

**local** 21:5 53:11 144:22,25 145:2
241:25 327:7

**locate** 39:14

**located** 1:21 192:2 286:21

**location** 26:22 52:3 110:14 214:5,9
270:17,24 271:4 272:1,3 287:6,8,11
288:19,21,23 301:6,11 325:25

**locations** 38:6 47:17 48:16,22 49:2,
9,15,22 50:2,13 196:11 269:1,3

270:5 286:1,18,20 287:15,18 324:7
325:11,15,21,22,23

**logistical** 47:1

**logistics** 329:3,6,22 330:6

**long** 12:5 14:20 18:24 20:24 75:20
76:4,21 77:21 78:1,11 106:9 107:13,
25 152:12,15,21 187:5 192:6,12,18
238:15 253:15 275:21,23 277:19
300:8 320:6,15,20,21

**longer** 9:17 60:18 141:4 230:22
266:21 268:22 269:2,7,10 278:25

**looked** 16:24 253:10 317:13 329:3

**Lopez** 1:10,14 4:7,20 6:4 7:9,10,19,
23,25 10:16,18,23 19:1,23 36:10
39:25 40:10,12 41:3 45:6 55:1
58:10,12 59:10 61:7 66:9 71:20 76:2
114:2 116:14 129:19,20 143:21
144:3,7 325:9 333:2 334:1,6,11

**Lopez's** 69:12

**lost** 53:9 203:20 320:25

**lot** 22:23 112:22 121:10 139:18
140:1,16 169:8 174:3 245:19 257:2
287:23 292:10 297:25 314:5 327:4,6

**lots** 265:25 280:7

**loud** 12:14,16

**love** 230:25

**low** 195:3,11 327:14,15

**lower** 247:25 248:5 327:17,18,19,21

**lowest** 327:8

**LULAC** 2:8 6:9

**lunch** 9:17 184:11

**LUPE** 1:16 2:3 6:7 185:10

**lying** 205:20

---

### M

**machine** 1:20 61:21,23,25 62:4,5,6,
8,10 86:8 199:12,23 200:7 210:4,15,
20,22 211:5,25 216:9,10,11 260:1
276:17,19 301:14

**machinery** 209:22

**machines** 209:17,18,20

**made** 46:6,9 55:6 156:12 175:6
222:23 253:13 257:5 326:1

**Magna** 79:13

**mai-** 123:11

**mail** 3:5 13:25 14:3 17:13,22,25 18:2
31:15,17 32:12,13,18 33:5 34:18,19
63:1,2 64:21 70:20,23 71:1 75:19,22
77:12,22 78:2 80:5,10,16,21 81:1,5,
8,16,19,21 82:1,10,11,16,21 83:3,9
84:16 85:4,5,8,11 86:1 87:14,24
89:1,16,23 90:2,11,18,24 91:13,22
92:2,8,13,21,23 94:10 95:2,8 96:19
97:5,6,15,23 98:7 99:2,20 105:23,25
106:1 108:10,18,22,24 109:6,7,10,
15,24 110:11,18 111:10,17 112:11
113:2,10 114:20 115:3,4 116:5,18
117:1,14,16 120:7,8 121:7,12,17,21,
22,24 122:10,11 123:3,5,10,18,21,
25 124:7 127:15,17 129:24,25
130:9,14,23 131:20,21 132:21,25
133:7,10 134:3 135:5 138:7,8,13
139:19,22 140:18,24 141:11 142:9
143:5 144:10,15 145:12,19,22,25
146:1 147:2,5,10,25 148:11,15,20
151:3,12,25 152:2,22 153:4 155:20
156:10,18 157:14,19,20,25 158:16,
18,20 166:4 168:16,20 172:3,6,25
175:10,13 176:24 177:4,5,9 178:8
179:5,11 180:7,20 181:2,12,16
183:11,24 191:15,22 196:10 224:21
225:5,15 226:2,4,17 227:9 228:10
229:17,22 230:19 231:1,4,7,11,19
232:17 233:1,11 234:4,7,9 235:23
236:5,14 242:25 246:13,15,22
248:15,23 249:6 277:22 279:16,17
282:17,19,21,22 283:3,19,23 284:6,
7,19 291:3 292:22 293:5,8 294:1,14
307:14,20 308:4 309:6 310:3 311:5
328:6

**mail-ballot** 125:2

**mail-in** 278:22 279:6

**mailed** 130:11 135:12,14

**mailing** 80:20 116:20 117:4

**main** 178:22 248:21

**maintain** 22:15,21 191:4 313:14

**maintained** 40:13 115:11 116:9

**majority** 178:25 190:24

**make** 12:16 13:7 23:20,24 30:5
40:17 43:10,15 55:6 56:12,15 68:13
75:14 82:17 83:20 84:17 101:17,18
120:13 123:24 126:9 158:15 167:23
176:18 180:10 197:8 201:5 206:2,

The Office of the Dallas County Elections Administrator

13,22 227:25 233:25 234:10 252:9
272:6 278:3 285:6 287:7 300:7
301:21 311:16 312:18

**makes** 11:24 56:13 85:4 243:24
264:16 287:23 292:10 318:1

**making** 53:14 70:12 125:21 253:6
266:15 277:19 279:17

**MALDEF** 2:4 6:8 11:2

**Malissa** 78:4,5,9,10 311:9

**managed** 97:10 109:10

**management** 79:12,13 190:20
191:2,8,9,14 192:7

**Manager** 20:23 21:2,13 22:13 31:23
32:11 143:21 144:3,7 192:23 321:20

**managers** 250:16

**mandatory** 181:19

**mapping** 22:19

**March** 5:12 28:24 30:4 32:12 33:2
65:15 76:7 81:9,22 82:8 83:2 91:18,
20 99:5 105:13 106:25 107:5,12
112:5 126:22 127:21 128:25 132:4,5
144:19 153:3,17 154:7 155:24
156:18 158:12 170:10 172:10
173:19 174:7,21 176:7 177:12,17
178:15 180:7 257:5 262:24 264:4
268:19 269:20 270:4,10,20 273:5,14
297:3,6,7 323:16

**mark** 18:17 19:20 187:8,23 202:1
204:15 206:25 211:11,14 214:25
215:1,8,19 219:12 231:23 263:16,22
299:3

**marked** 18:19 19:2,11,21,24 52:11
59:4 61:5,8 73:18 202:6,9 207:4,7,
12 232:3 249:15,19 263:23

**MARKED/ID'D** 5:3

**Market** 2:15

**marking** 51:22 204:14 209:25
210:6,8 211:11 216:3,12,13,22
299:2

**marks** 210:17 318:3

**mass** 30:23,24

**match** 32:14 33:11 92:23 93:5 95:11
96:6,14 97:9 99:6 100:25 101:24
108:21,23 109:12 113:3 115:6
119:12,25 121:8 135:25 138:14
141:20 142:14 143:7 145:12,19,24

146:2 147:6,17 175:16 178:1 243:1
294:19

**matched** 26:3 94:14 96:22 99:11
153:7,24 285:7

**matches** 90:9

**matching** 32:17 106:22 107:2
114:10,24 115:13 120:22,23 125:23
126:16,23 127:3 140:8,18 141:11
144:16 180:11 248:24 249:7 282:17

**matching-the-id-number** 244:10

**mater-** 289:14

**material** 16:2,6 217:20

**materials** 16:9,10 82:24 110:3,4
119:14 153:4 217:19 218:2,6,7
257:3,4 274:3 289:14

**math** 267:17,20

**matter** 9:11 43:9,14 160:7 163:3
185:12 247:24 248:3

**matters** 331:23

**May-joint-june** 297:3

**Mcdonald's** 265:21

**meaning** 25:21 164:25 165:4 237:6
259:11 309:2 312:4

**means** 17:21 60:2 228:8 259:6

**meant** 278:6 284:2

**measure** 227:12

**measures** 293:2

**mechanism** 175:16

**media** 141:10,24

**mediate** 271:22

**medical** 186:14

**medication** 11:24 70:8 186:12

**meet** 14:20 90:18 187:11,14 198:25
251:3

**meeting** 240:19 243:24

**meetings** 243:7,25 244:4,5 245:25

**member** 165:8 180:17 238:19
243:13,17

**members** 240:8 242:6 256:17

**memories** 252:16

**memory** 11:12 209:10 222:20
252:13 304:9 330:14

**mentioned** 27:3 47:22 63:18 72:17
102:21 108:14 127:22 128:1 161:3,
16 172:2 180:4,25 182:20 274:1,23
279:24 297:24 309:16 319:3 320:11

**message** 30:24 125:11 129:15,17,
18

**messaging** 30:24

**messed** 49:25

**met** 14:17 71:6 90:21

**met all** 90:15

**method** 196:2 216:19

**methods** 312:9

**metrics** 269:18

**Mexican** 11:1 185:8

**Michael** 1:11,14 4:16 6:3 7:8 78:3
184:21 185:4

**microphone** 40:24

**microphones** 67:20

**middle** 278:19 326:16

**midst** 171:24

**midterm** 248:9

**military** 83:12

**million** 22:21

**mind** 69:3 149:22 188:1,16 253:1
301:20

**mine** 310:8

**minimum** 53:11

**minority** 39:5,11

**minute** 30:17,20 68:22 105:16
152:14,17 281:10

**minutes** 39:18 105:16 107:18 149:8
175:20 249:10

**mirrors** 327:1,2

**misdemeanor** 258:11 264:16 318:2

**mismatch** 139:15 177:19

**mismatched** 139:23,25

**missing** 87:15 89:8 91:4,10 93:11,
21 94:6,13 95:3,7,10,21 96:13,20
97:20 103:8 126:4 130:7 132:17,20

136:6 156:6,7

**mistake** 65:14 312:19

**mistakenly** 237:10

**misunderstood** 102:24

**MO** 253:8

**modernize** 286:19

**modification** 157:24 158:4,11,20, 22,23 159:9 288:16,25 289:8,10,17 291:16 292:1

**modifications** 159:8,14,17 257:5 288:2 289:22 292:16

**modified** 219:22

**moment** 58:20 83:4 174:1 222:25 232:18 243:5 252:11 279:24

**Monday** 266:17

**money** 237:6

**monitor** 250:15

**monthly** 92:14

**months** 11:7 99:5 192:14 330:22

**morning** 8:14,25 16:12 106:17 187:20 266:7 310:7

**mother** 222:8 246:12

**Mother's** 324:2

**motivation** 319:15

**Mountain** 22:5

**mouth** 223:9

**movable** 196:15

**move** 89:19 199:21 312:24

**moved** 266:18 286:12

**movement** 257:13 259:6,11

**moves** 30:1 59:16 68:21 82:7 87:17 90:12 154:8 167:5,13 168:14 186:6 189:6 197:10 202:12 211:16 218:15 223:17 226:11 233:15 237:4 249:11 251:13,15,24 290:10 305:12 311:2 325:18 328:20

**moving** 47:1 80:2 90:12 113:14 199:11,12 212:4 216:17,24,25 219:2 239:14 252:14 292:12 314:4

**MS015753** 310:24

**MS015754** 310:24

**multifaceted** 169:5

**multiple** 95:23 96:2 100:7 209:20 234:3 240:14

**mute** 68:19,23 69:1

---

## N

**named** 267:4

**names** 36:6,8

**naming** 205:3

**narrow** 212:6 215:5 299:14 303:12

**nation** 242:8

**naturalization** 37:19,21 38:9,14 40:14

**naturally** 39:7,10

**nature** 271:8 275:12

**navigating** 198:23

**NE** 2:10

**Nebraska** 189:16,25 190:2 192:24 222:17

**necessarily** 105:5,9 148:22 163:4 302:6 329:5

**needed** 129:9,10 133:15 134:15 288:6 295:25 297:25 298:1 308:10

**needing** 252:21

**negotiate** 271:22

**neighbor** 198:15 213:1

**neighborhood** 21:9 28:11

**neighborhoods** 37:4 39:5

**net** 178:1

**network** 214:4

**newly** 38:3,24 180:12 194:24

**news** 5:11 263:18 264:2 317:18 323:11

**Nicholas** 8:19,21

**Nina** 2:4 6:7 10:24 44:10 130:13,15, 17 185:8

**nineteen** 76:24

**ninety-** 76:25

**no-shows** 263:9

**Noble** 278:20 279:9

**nods** 12:15

**non-ada** 62:10

**nonpermanent** 196:16

**nonprofit** 198:18 226:16 305:22 307:9 308:6

**nonprofits** 305:19 306:2 308:13,17

**nonresidence** 239:2

**normal** 43:11,15

**NOTARY** 334:18 336:18

**note** 8:3 40:3,9 169:24

**noted** 278:21 334:3 336:3

**notes** 73:6,10,11 164:8 175:20

**notice** 1:24 5:3 7:7,8 19:8 73:20 84:13 88:19 90:20 91:6,7 94:5,8,9, 11,16,19,20,23,25 95:1,15,16 96:1 97:21 99:10 100:15,24 101:20 102:9 109:20 110:10,12 113:16,25 114:1 119:13 120:1 122:18,20 147:14 165:18 171:9 188:5,14 207:23 305:9

**noticed** 12:4

**notices** 96:4,10,17 99:14 101:16 113:16,23 126:3,8 128:10,16 141:5, 6 145:18 147:9 177:11,14,22 178:24

**notify** 96:13

**notifying** 126:7

**Nov-** 65:10

**November** 5:7 29:4 35:12,14 47:17, 20 48:5,9,17,19 49:3,4,7,9,10,16,23, 24 50:2,3 59:21 60:8,12,15 61:15 65:2,7,10 81:13,18,20 82:1,11,22 142:12 144:9,11,18 170:16 237:16 247:19 248:9,23 257:4 273:23 274:25 296:8 297:4 326:18,20,25

**nperales@maldef.org** 2:6

**number** 8:6 17:18,19 18:19 19:20, 21,24 24:3,10,21 25:4,7,13,14 32:14 33:4 48:15,18,20 49:1,2,9,15,22 50:2,13,14 59:4 63:7,9 64:7,14 66:11,12 67:11 73:19 74:8 90:8 91:8 92:24 93:17 94:13 95:20 96:5,6,13, 20,21,23,24 97:9,12,14,19,20 98:4, 6,10,12,15 99:6,11,17 100:1,16,25 101:13,24 104:3,8,15,17 105:5,10, 25 106:22 107:22,23 108:20,23

The Office of the Dallas County Elections Administrator

109:7,12,14,16 113:2,3 114:10,18,
21,25 115:4,7,13,16 117:25 118:2,7
119:13,24 120:4,9,21,23 121:9
122:3,12 125:22 126:23 127:3 135:4
136:5,25 137:5,8,14,16,24 138:7,11,
14 139:15 140:7 141:21 142:2,14
143:7,15,18 144:1,5,16 145:13,20,
24 146:3,15 147:7,17 153:5,7,18,19,
22,24 154:10 155:19,21,22,23
156:4,17 159:2 168:3,6 170:6,23
171:8 174:21 175:15 177:20 178:1
180:11 193:1,14 194:1,13 195:11
202:3,5,6,10 207:2,4,7,12,13 213:22
215:18 232:1,3 241:14 243:2 246:18
249:7,15,19 250:3 251:19 255:9
263:12,23 276:9,11 284:9,11 288:8
292:23 293:7,13,25 294:13,18
296:14 298:12,18 310:16,18,22,24
315:15 324:4,19,25 325:2,20 326:2,
3,5,10,11,18

**numbered** 1:17 19:15

**numbers** 24:10,15 25:24 33:11
34:25 35:2,10 42:24 63:14 64:18
91:1 95:3,10 101:22 113:5,15 114:5
136:6,17 144:5 145:16 156:7,13
173:4,6 178:17 179:15 232:13
241:12 249:24 292:24 293:17,21,22
294:2,9 315:14

**NW** 3:11

---

## O

**oath** 5:9 11:14 51:12,14,18 55:9,13
56:5,23 57:6 70:2 186:8 203:10
204:1,22 205:2,7,18,20 206:2,4,14
207:22 208:3,5,15,20 209:1 211:3,
18,23 212:12,20 217:14,16,17
218:18,22 219:17 221:12 222:11
290:9 298:21 300:19 303:24 304:6,
22 334:11 336:11

**oaths** 5:8 207:14 258:11

**Ob-** 55:15

**Objec-** 52:12

**object** 52:25 195:19

**objection** 31:6,18 39:9 42:2,7,16
43:4,12,17 50:24 51:23 52:5,6,19,24
53:22 56:24 65:6,21 67:15 70:12
80:12 83:21 87:9 93:8 94:15 97:24
98:9 100:5 105:1 108:13 113:12
114:15 116:21 119:16 120:11,24
126:1 133:3 134:18 137:17 138:16,

23 140:9 141:12 142:25 143:8 146:5
148:4 152:24 153:11 154:3 156:1,5,
14,19 157:7,15,22 158:1,7 170:3
171:1 172:14 175:17 178:18 180:14
182:16 194:16 196:8,19 197:21
198:1,6,24 199:13 200:8 201:3,9,22
205:21 206:6 208:7,22 209:16 211:8
212:15,23 213:6 215:2,17,24 219:14
221:3 222:2 224:3,10 225:7,17
226:6,19 228:21 229:7 230:12
233:23 236:8,15 237:12 238:1,6,13
244:20,22 245:14 246:4 248:10
255:22 259:15,23 260:2 262:9,21
265:11 266:24 270:16,23 272:15
278:4 279:8 280:12,20 283:5,20
289:2,19 290:14 292:4 294:15
301:19 303:18 313:25 314:15
316:18

**objections** 53:11,14

**obligated** 261:2

**obligations** 285:20,23

**observation** 316:15 318:11

**observations** 174:19 176:12 177:7
195:1

**observe** 259:8 264:19 312:16,21
313:10,23 318:5

**observing** 264:17 318:3

**obstruct** 313:2

**obtain** 206:14

**obtaining** 321:3

**OC** 282:8

**OCA** 155:2 282:15

**OCA-GH** 2:13

**OCA-GREATER** 155:9 160:25
327:25

**occasion** 243:9

**occur** 256:24 257:1

**occurred** 42:19 145:7 329:12,15,25
330:17

**occurs** 293:11

**offense** 224:20 230:2 258:9 264:16
318:2

**offenses** 233:17

**offer** 20:9 32:7,8 110:4 136:15
275:19 290:23

**offered** 127:11 223:10 275:21
277:12

**offering** 53:19

**offers** 305:10

**offhand** 96:23

**office** 1:20 2:22 3:5,17 5:4 14:25
35:20 38:12 42:4,10,13 47:6,19
72:2,8,19,21 81:25 82:4,15,18,23
84:17 86:1 90:22 92:1,20 96:25
99:8,10 102:4,9 104:2,17,21 105:12,
22 106:2,23 108:2,15 120:19 122:16
125:6,18,21,24 126:13,21 127:2
128:4,18 129:18 136:10 140:19
144:10 145:17 147:24 152:13,16
156:16,24 157:1,2,5 158:18,21
159:3,14 161:4,9,21,24 162:4,10,15,
20,25 163:6,11 176:13 177:2,8
187:15 193:9 196:12 197:1 212:25
230:9,23 235:6 238:9 243:6 244:25
254:14 255:4 256:9,13 258:13
259:11 269:14,19 271:21,25 274:25
280:3,19 283:22 286:3 288:5
292:15,22 299:21 300:23 306:8,15,
23 307:3 309:16,20 311:16 321:12,
13 322:2 324:14 330:9 334:15
336:15

**office's** 285:20

**officer** 258:9

**official** 164:20,22,23,25 165:4
176:12 221:1 227:8 237:1,2,7,13
262:5,6,18 278:21 286:18

**officials** 157:6 164:1,3,6,10,13
235:23 236:3,10,13 240:15 242:12,
16,20 243:9 244:9 256:2 260:24
261:1 309:6

**offline** 23:9,11,12

**oil** 238:20

**Omaha** 189:16,19,25 192:24

**ongoing** 296:17 314:21 316:2

**online** 23:9 51:3,4

**onward** 34:9

**open** 28:17 29:7 30:21 31:2,9 41:8,
17,23 42:5 50:9,10,18 64:5,8 65:3,
17 83:5,17 118:1,7 119:7 261:24
266:6 272:25

**opened** 30:18 50:20 83:4

The Office of the Dallas County Elections Administrator

April 29, 2022

**opening** 92:22 117:23 118:8,9,10, 14 266:6 273:1

**opens** 118:10

**operate** 259:13

**operates** 54:13,16

**opinion** 275:8 278:2 301:25 303:9 313:22

**opportunity** 31:4 60:5,8,11 187:19 331:25

**opposed** 171:20 176:12 216:14 277:7 289:4 304:2 308:23 314:23 322:6

**opposing** 274:7 280:25

**option** 171:22 308:17 328:21

**optional** 166:14,15 167:22 183:2,5

**options** 88:7 89:15 139:18 290:23 291:13

**oral** 1:10,13 206:18,20

**orally** 312:10

**orange** 15:24 63:13

**order** 7:5 41:11,17 84:24 88:23 109:7 130:11 135:23 136:1 140:24 157:13 167:23 177:5 181:22 187:11 200:1 251:2 259:8 307:3 331:8

**ordered** 30:16 31:9

**ordering** 41:14

**orderly** 313:14

**organization** 226:16 253:10

**organizations** 11:2 198:18 324:25

**organizers** 240:23

**original** 331:22

**originally** 21:19 189:13

**outline** 15:17

**outlines** 259:18

**outreach** 37:2,3,5,12,14 38:4,17,19, 23 39:5 40:13,14

**over-65** 111:11

**oversee** 22:14

**owns** 112:23

**P**

**p.m.** 1:18 30:9,14 31:3,10,17 41:8, 19,23 42:6 47:1 59:6 64:5,9 65:4,17 67:24 68:2 149:11,14 150:17 175:22,25 184:10,13 281:12,15 283:12,15 295:6,9 323:5,8 331:17, 20 332:5,7

**P.O.** 3:5

**packet** 117:2,7

**Pad** 40:4 219:19,20

**pages** 8:8 16:22 61:9 74:14

**paid** 226:4,16

**paper** 17:1,3 210:16,18,20 211:20, 24

**papers** 109:23

**paperwork** 15:20 72:24 73:1,3,7,8 122:24 258:11 321:2

**paragraph** 264:9 278:19 317:21 318:19 320:2 321:4

**paragraphs** 267:3

**Pardon** 179:23

**parentheses** 223:16

**part** 16:1 54:4 59:23 115:15 187:8 238:24 256:18,21 274:2 316:22 320:15 323:13 330:10

**participant** 68:20

**participants** 240:24,25

**participation** 327:3

**parties** 10:9 86:19 205:4 271:24 308:24 309:5 315:8,11 316:8,9,11, 14 324:13

**partisan** 247:25 264:12 275:13 317:23

**parts** 147:25 238:25

**party** 17:17 60:3,4 63:13 64:7 85:15 86:19,20 235:23 236:3,13 278:21 322:2,3,4

**pass** 39:24 40:2,18,20 43:22,25 57:10 65:22 110:8 149:15 254:1 263:11,15 281:18

**passage** 231:5

**passed** 5:8 169:1 172:3 176:25 202:11 319:22 326:21

**passes** 239:22

**past** 38:1,12 80:7 110:10 155:25 195:18 196:10 230:10 231:11 238:11 255:9

**patched** 266:19

**patience** 40:1 253:25 254:6

**pause** 283:8

**Paxton** 245:4

**pay** 225:21 226:1 233:1 287:18 324:11

**paying** 225:13 226:3 232:24 233:5, 11

**payment** 226:2

**penal** 206:3

**penalties** 233:17 234:16 237:6,10 242:15,16 244:9

**penalty** 203:13 205:18 206:7 207:23 208:17 236:21 237:1,6 303:21 311:24

**pending** 220:5 235:14

**Pennsylvania** 3:11

**people** 24:9 25:13 28:9 31:22 33:24 34:14 38:7,13 53:19 63:5 79:21 96:5 97:4,8,13 98:3,4 108:15,16 109:14 110:25 111:6 112:22 119:24 120:8 124:24 126:12 128:5 134:25 136:13 139:4 141:19,25 142:2,8,21 144:13 155:19 157:1 159:11 167:4,6 174:25 179:1 184:5 193:1 195:11 196:2 198:10 200:9,23 225:13 226:3 227:15 243:23 246:1 256:16,17 262:22 265:17 266:18 268:12,25 269:11 276:3 279:19 288:9 293:7 294:12 302:5 321:6,14,25 330:14

**people's** 32:12

**Perales** 2:4 4:7,9,10,12,13,15,17 6:7,8,18 7:4,14 8:2,15,17,20,23 9:1, 5,12,23 10:13,16,21,24 18:17,22,24 19:20 31:8,20 36:11 39:13,17,24 40:20,22,24 44:3,6,10,11,17,20,23 45:1 47:22 51:23 52:6,12,14,16,19, 21,23 53:13,22 54:20,23,25 55:19 57:2,9,17 58:8,18,20,23 60:23 61:2 65:9,22 66:13 67:15,17,19 68:4,10, 19,22 69:5,10 80:14 87:14 93:15

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900
210-697-3400

San Antonio, Texas 78232
210-697-3408

The Office of the Dallas County Elections Administrator                    April 29, 2022
Index: percent..poll

94:18 98:2,11 100:8 105:2 108:14
114:17 116:22 119:18 121:1 126:2
130:14 133:4 134:20 138:19,24
140:11 141:14 143:4,10 146:9 148:7
149:7,15,22 150:11,18 154:22 155:3
170:21 171:1 179:25 180:16 181:23
182:16 184:2,5,8,14,24 185:8 188:1,
16 194:22 195:23 196:9,21 197:23
198:3,9 199:2,15 200:11 201:6,12
202:1,3,8 205:23 206:25 207:5,11
208:8,25 209:17 211:13 212:17,24
213:10 215:13,20 216:1 218:11
219:16 221:5 222:3 224:6,12
225:11,19 226:8,21 228:23 229:11
230:15 232:2,6,10,21 234:2 236:12,
17 237:15 238:3,8,14 244:24 245:16
246:5 248:12 249:9,18 253:24
281:25 297:17 298:9 299:7 302:9
304:8,17 305:19 308:13 309:12

**percent**  24:5,7,11,23 80:4 262:2,3
278:22

**perception**  268:13

**Perf**  118:25

**perfectly**  75:7

**performance-based**  224:25 225:6,
16,20 226:5

**period**  26:12 49:3 67:12 146:7,8,14,
15 178:11 221:19 326:7

**perjury**  203:13 205:18,19 206:3,8,
10 207:24 208:17 303:21,24

**permanent**  144:14

**permission**  69:1

**permitted**  311:17

**permitting**  309:4

**person**  13:19 32:25 33:16,19 40:6
51:13 55:23 56:4,22,25 57:4 58:3,4
62:23 63:4,5 83:7 85:10 94:4 97:15
102:15,18 106:1 108:6,7 110:15,22
121:2 124:2,23 133:1,14 134:10,16
137:12 149:1 159:1 172:21 174:25
196:23 197:15 199:10 205:20
208:15 223:18 224:8 240:17 247:11
256:16 264:18 278:24 288:20
291:23 305:10 318:4 320:18 334:12
336:13

**person's**  181:7

**personal**  17:13 73:6 81:7,15 171:19
176:11 177:7 178:7,14 183:14

**personally**  27:14 34:14 157:9
171:15,21 241:7 245:10 256:7 268:2
334:11 336:11

**personnel**  322:17

**perspective**  215:10

**pertinent**  331:23

**Phillips**  1:10,14 4:12,20 6:4 7:9,12,
20,23 15:12,13 68:5 69:6,11 149:17,
19 150:2 154:19 155:14 159:20
160:4 176:1 247:15 335:2 336:1,6,
11

**philosophy**  300:6

**phone**  89:14 103:2 105:10 106:9,19
107:14,25 108:3,4 109:20,22 119:9
124:1,11,18 133:12,15 134:10
170:11,17,19 173:15,21,24 174:2,3,
8,11,25 247:15 276:9,12

**phonetics**  111:19 129:6 292:16

**phrase**  26:23 96:18 259:5

**physical**  194:2 227:7 228:19,22
268:6

**physically**  110:22 111:1 192:2
198:22 199:21 238:18

**PIA**  72:9 172:21

**PIAS**  72:8

**pick**  105:22 214:10 263:8 266:17

**picked**  153:14

**picking**  51:18

**picks**  51:7

**piece**  17:1 191:24 209:21 210:15,18,
19 211:20,24 262:12 298:2

**pieces**  17:3 215:5

**pile**  93:12,22

**pinpoint**  40:16

**Pippin-poole**  78:16

**Pippins-poole**  78:19,20

**place**  28:4 34:11 53:9 55:3,8,14
148:2 149:1 161:10 192:20 198:22,
23 199:11,16,22 213:20 214:2,16
216:17 217:1 218:6,10 219:4,10
221:7,21 222:14,19,23 223:21 224:4
238:22 247:11 259:22 261:16,23
262:16 272:11,12 276:4,9,24 279:15
285:6 286:24 287:3 288:12 290:1

297:14 301:14 312:24 313:15
315:13 326:1 330:23

**placement**  286:22

**places**  26:16,20 27:12,18,23 28:2,
13,17,25 29:7 34:14 39:15 41:7,16,
22 42:5 74:10 196:15 214:3 259:13
274:21 277:22 286:8,9,10,12,14,16,
23 287:1 314:24 324:4,20 325:1,2,6,
19

**plain**  211:17

**Plaintiff**  1:16 2:3,8 6:7 159:24

**Plaintiff's**  66:11

**Plaintiffs**  1:4 2:13 6:10,20 8:7,12,14
10:25 45:2,12 155:2,10 160:8
185:10 281:19 282:8,15 294:25
310:7

**Plaintiffs'**  5:3 44:3,5,13 73:20
160:24 295:17

**plan**  7:11,15 8:11 9:7 48:11 142:23

**planning**  144:14

**plans**  326:20

**play**  71:19

**point**  40:17 45:14 57:13 83:19
100:23 101:16 114:3,10,12 127:10
131:13 139:7 160:10 169:23 170:5
172:5 217:15 218:5 221:5,12,16
237:23 251:21 272:5 287:24 295:20
313:19 322:21

**pointing**  15:17 27:14 62:11 211:5
251:20,23

**policies**  258:13 286:3 288:5

**policy**  161:10 299:17,21,24

**polite**  275:13

**political**  85:15 86:19 205:4 235:23
236:3,12 315:8

**poll**  30:22 32:5 34:13 47:10 50:14
52:4,11 55:11 56:8,12,15,22 110:22
111:3 199:11 200:2,3 213:19 214:5,
16,23 216:6 217:13 218:17 219:19,
20 222:21 223:1 242:16,17,19
248:18 254:8,10,14,17,19 255:1,5,7,
9,10,19,25 256:2,5 257:1,12,13
258:10,12,21 259:3,12,22,25 260:23
261:1,19 262:4,19 263:1 264:12
265:9,15,19 266:2,8,14,21 268:25
269:5,6,11 270:4,6,14,18,21,25

The Office of the Dallas County Elections Administrator

271:1,9,13,14 272:8,19,23 273:1,5, 9,18,25 274:7,14,19,21 275:3,7,11 276:15 280:23 286:7 289:7 312:13, 15,17,20,23 313:2,10,22 314:16,17, 22,25 315:11,19 316:4,9,12,15,20 317:23 319:10,12,16 320:12,21 321:3,6 322:5,9,11,12 323:10,12,22, 24 324:9,11,13,14,18 326:24 327:1, 2,4,6,16,21

poll-watcher 244:10

polling 26:16,19 27:11,18,23 28:2, 13,17,25 29:7 34:11,14 39:14 41:7, 16,22 42:5 49:2,15,22 50:2 52:2 55:3,8,14 148:2,25 196:15 198:22, 23 199:10,16,22 213:20 214:2,15 216:17 217:1 218:6,10 219:4,10 221:7,21 222:13,19,23 223:21 247:11 254:11,15 255:11,21 259:13, 22 261:16,23 262:16 263:1 266:1,22 267:7 270:5 272:9,11,12,14 274:21 276:4,9 277:22 279:15 286:8,9,10, 12,13,16,23 287:1,3 288:11 290:1 297:14 301:6,13,14 312:24 313:15 314:23 315:13 324:4,6,20 325:1,2,6, 11,15,19,25

polls 28:5 30:21 31:4,16 33:19 43:11,15 54:5 55:10 60:2 64:4,8 65:3,17 67:1 87:25 98:19 110:14 111:5 121:3,6 130:24 222:7

population 194:7,10

populations 37:4

portion 73:2 195:2 251:16

posed 300:11

position 20:24 21:11 22:12 75:20 77:22 78:12 79:23 80:25 81:4 250:13,15 274:6 296:3

positions 274:9

positive 166:21

positives 167:3

possibly 53:1 98:13 230:10

post 113:6,10 208:20 292:17 298:5 313:23

postage 232:16,24,25 233:1,5,11 311:5,17

potential 268:5 273:25

potentially 216:20 233:6 272:18 273:9 274:22

practical 215:9 286:20

practice 169:24 233:7

practices 165:15 233:19,21,25 234:5 253:4,10,12,14,20 287:5

pre 118:24 183:5

pre-perf 118:23 119:1

Pre-perforated 119:4,5

pre-sb 85:24 111:10,14 183:4 208:5

precinct 27:11 50:10 325:19,25

precinct-based 27:23 28:1,5,6

precincts 22:20 43:1 48:3,5,9 270:13 325:15

precursor 45:11

predecessor 239:14 314:13 319:1, 8,24

predecessors 240:9 245:1,5

predict- 325:3

preexisting 304:2

preferential 288:11 289:16,25

preparation 72:24 321:1

preparations 257:5

prepare 14:18,24 15:2,6,8,10 71:4, 21 84:11 144:10,17 186:22 187:12, 15

prepared 20:15 74:17 188:24 250:10,12

preparer 252:19

preparing 33:20 250:22

prepaying 232:16

prescribed 5:8,9 207:17 208:9 288:10

presence 227:8 228:19,22 229:6

present 3:21 10:9 26:12 33:16 174:1 238:18 244:1 255:2

Presidential 196:1 327:4

presiding 261:4 288:19 289:3 301:21,25

press 125:11

pressure 205:8 212:18,19,21 213:11 287:8

pressuring 213:5

pretty 29:9,12

prevent 11:22,25 186:10 201:10 215:6 264:17 293:11

preventing 293:9

prevents 318:3

previous 65:5,19 168:18 241:4 253:20 304:22 314:5

previously 197:2

Primaries 65:2,18

primarily 108:17

primary 13:20 17:16 28:25 30:4,8 33:3 35:11 63:17,19,20 64:1,8,14 65:16 66:18 81:22 82:8 83:2 85:16 91:18,21 99:5 105:13 106:25 107:6, 12 112:5 117:2 126:22 127:22 128:25 132:4,5 142:19,23 144:19 153:4,17 154:7 155:24 156:18 158:12 170:11 173:19 174:7,21 176:7 177:12,18 178:15 180:8 247:25 248:6 249:1 262:24 264:4 268:19,22 269:20 270:4,10,21 273:5 296:12 297:6 323:16 327:13,18,20

printer 190:25

prior 34:23 41:17 76:10 81:9 82:6 83:1 88:9 106:24 190:17,19 193:16 201:15,23 217:7,20 219:7 255:12,25 263:8 275:6 282:24 283:22 284:5,23 285:14 297:11,22 303:24 312:16,21, 24 313:2,5,17 314:18

priority 253:21 298:2

privacy 260:6,7

private 308:24 309:5 310:7

pro- 234:19

problem 47:13 140:12 271:16,19 293:11

problematic 245:22 314:7

problems 26:7 47:9 117:23 118:5, 14 140:7,10,13,20 147:24 148:8,14, 18,23 149:2 162:19 163:11 164:6 166:20 245:11,12 246:6 272:7 273:4 293:9 315:9

procedure 216:22 262:2 264:18 276:24 288:22 290:24 291:5,12,20 318:4

**procedures** 54:15 81:24 82:4,15 237:17 250:18 258:14 261:13 286:4 288:6,10 289:23 292:17

**proceed** 307:24

**Proceedings** 4:6

**process** 28:20 32:7,8,11 48:2 50:18 53:12,24 81:18 83:23 84:8,9,11,12 85:24 86:3 89:13 95:9,19,21 96:20 97:6,11 102:10 103:3 109:11 113:1 115:16 125:18 132:21 142:10 147:6 152:13,16,22 178:5 240:6 242:25 268:4 285:6 314:2

**processed** 82:10,20,24 90:16 172:6 177:2

**processes** 93:10

**processing** 80:25 81:4,8,15 82:16 95:18 108:17 153:16 154:6

**produce** 9:7 112:15 273:15

**produced** 1:15 7:11 18:9,10 35:6 59:14 186:25 187:20 217:19 250:21 251:10 274:2

**produces** 192:25

**production** 5:10 8:6,7 35:8 40:8 232:12

**proficient** 13:18 198:5 214:15

**program** 256:12

**prohibit** 260:9

**prohibited** 233:6,12 316:25 317:2

**prohibition** 225:4,13 226:1 229:20 281:4 317:9

**prohibitions** 226:18

**projected** 325:3

**promise** 187:7

**promotions** 76:19

**prompt** 125:9

**prompts** 124:15 125:8

**promulgated** 291:11

**pronouncement** 176:12

**proportion** 111:10

**proposal** 326:9,21

**proposed** 286:15 314:10

**propositions** 205:3

**prosecuted** 264:11,23 317:22 319:5,20

**prosecution** 205:19 233:20,22

**prosecutor** 245:8

**protect** 234:17

**PROV** 62:18

**proved** 334:11 336:11

**provide** 7:11 11:16 137:13,15 138:11 142:15 151:21 167:7 194:20 198:11,18,22 205:9 213:7,8 218:13 225:21 230:18,19 285:25 289:11,13 290:13,20 292:23 295:24 311:4 325:6

**provided** 5:10 32:15 73:9 90:9,13 92:24 93:5 96:21 108:20,24 114:21 115:4 120:4 121:13,19 122:23 205:13 222:16 224:1 232:11 289:23 291:17 292:2 294:5 301:1 304:13 305:11 308:3 310:23

**provider** 191:16

**providing** 136:17 148:25 219:10 223:20 246:15 253:6 311:11

**provision** 162:11 163:1,4 220:25 224:19 230:10 236:21 237:3,14 258:4,14,18,25 259:21 260:19,22 264:12,23 265:5,8 300:5 305:1 306:9,12,20,24 307:4,8 309:10,23 312:2,4,8 317:23 319:5,14

**provisional** 32:8 62:18

**provisionals** 18:3

**provisions** 1:25 140:15 148:11 163:23 248:14,18,21 254:7 256:5 257:1,16 258:20 274:7,14 275:3 277:1 279:17 280:23 281:1 300:19 302:21 303:1 317:10,14,15

**public** 72:9,13 141:10,24 293:2 334:18 336:18

**published** 5:11

**PUEBLO** 1:3

**pull** 33:21,24 118:23 141:18 178:24

**pulling** 141:15

**pulls** 276:10

**purpose** 7:15 13:14,18

**purposes** 334:13 336:14

**pursuant** 1:24 188:14

**pursue** 309:21

**pursued** 309:17 328:18

**pursuing** 307:7

**push** 52:2

**pushed** 57:24

**pushing** 56:9,19,23 57:4

**put** 10:4 16:12 33:4 50:25 83:6,12, 14,16 85:10 87:23 88:21 93:21 94:3 95:6,24,25 103:10,18,19 104:2,5,7, 12 111:17 113:22 117:7,10,12 128:13 130:5 135:4,6,17,20 136:4 141:3 142:4 151:10 153:12 164:7 167:17 168:17 177:25 182:15,24 196:17 223:9 234:13 239:9 241:17 273:15 283:2 291:3 293:12,17 294:12 313:8 314:1 322:19

**puts** 293:25

**putting** 107:11 113:15 141:5 177:20 211:21 232:24,25

**Q**

**qualified** 177:5

**qualify** 206:19

**quality** 286:22 325:22

**quantify** 269:24

**question** 12:9,19,21 13:4 16:7 24:17 31:20 43:13 45:17 46:15 47:4 48:6 49:6,12,24 53:8,18 79:25 82:13,19 97:2 99:12 102:3,24 105:25 106:20 109:4 114:18 116:14, 15 120:13 137:19 139:1,10,11 143:22 146:21 160:15 164:3,4,7,15 165:3,21 166:22 171:18 174:22 176:14 182:18 186:18 199:14 201:4, 14 203:25 205:22,24 211:19,21 213:5,14,23 217:3 225:10 227:16 229:13 233:24 238:23 253:3 283:16 289:20 290:15,25 291:20 295:25 300:11 301:4 302:4 306:1 313:21 317:7 318:8,9

**questioning** 303:9

**questions** 7:24 9:15 15:8 18:13 23:18 26:12 34:5 41:5 43:20 44:2,9, 12,14,18 45:2,10,11 54:19,20 57:11,

13,15,20 59:13 61:3 62:15 65:23
67:16,17,18 69:19 70:9 71:11,16
73:2 74:21 80:2 82:3,14,17 88:8,17
91:14 102:16 103:3 104:18,22
105:13 106:5 107:1,4,6,10 108:9
110:18 149:16,19,21 150:3,22
154:14 155:17 159:20,25 160:8,18,
25 163:22 164:1 168:9,13 169:13,
15,25 173:9,18 176:6,10 179:20,23
181:24 184:7 186:5 187:24 195:13
197:4 201:2,8,19 204:24 209:6,12
247:22 254:7 275:16 280:7 281:17,
20,21 282:3,16 285:19 290:12
292:20 294:21 295:17 307:25
330:12 331:1,2,3,5

**queues** 278:25

**quick** 187:1,2

**quickly** 11:10 57:12 241:3

**quiet** 80:1 195:13

**quit** 263:22

**quo** 253:20

**quotation** 318:2

**quote** 140:13 203:12,17 204:1,12,23
205:7,13 223:18 236:25 250:23
252:4 257:11 318:5,12

————————————

                    **R**

————————————

**races** 273:24

**radio** 293:6

**raise** 10:1 68:15 184:17

**raised** 21:20 309:13 315:18

**Ramon** 243:16

**ramps** 287:8

**ran** 34:24 142:6 179:15

**rarity** 103:21

**rate** 248:16 279:18 293:1

**rates** 142:1

**re-** 98:20 194:19

**reach** 89:14

**reached** 293:4 315:7

**read** 187:1,3 204:14 209:13 212:2
214:24,25 215:6 252:2,11 257:24
260:14 264:10,13,20 278:20 279:2

299:1,11 307:15 311:14 317:24
318:6,23 321:8,16 329:9 334:1
336:1

**readily** 276:4

**reading** 6:21,24 7:1 204:13 209:14
211:17,22 216:3 252:3,23 264:15
298:25 311:9 318:1 321:10

**reads** 307:19 317:21 318:20 320:6
321:5

**ready** 10:16 12:2 66:4,5 89:19
110:19 184:6,14 203:7

**real** 84:18 291:17

**reality** 268:13

**realized** 101:11

**reask** 283:16

**reason** 41:13 42:3 50:7 70:7 90:10
96:2 103:7 119:21 139:15,16 147:16
156:8 177:23 178:22 181:12,16
279:11 288:1 309:20 333:3 335:3

**reasonable** 288:16 289:10

**reasoning** 309:4

**reasons** 46:17 110:24 119:19,20
165:1 178:22 324:1

**reassigned** 266:18

**rebuilds** 253:9

**rec** 21:5,7

**recall** 29:6 31:13 92:5 121:2 137:6
169:2 174:1,13 218:1,3,16,20,25
222:17 223:3,10 241:11,15,16,23
242:4 243:25 244:7 252:7 273:7
281:6 285:1 300:24 317:16,17
322:18

**rece-** 86:1

**receiv-** 174:3

**receive** 42:13 86:1 92:1,7 121:12,
16,17,20,23 127:18 130:23 143:5
151:12 168:12 172:7,12 173:24
203:19 204:2 206:16 259:10 269:19

**received** 5:5 9:4 19:2,25 25:20,21
26:2 42:17 83:2 87:14 93:9,16
94:23,25 98:7 99:10,13 102:8 103:7
109:6,20 110:12 114:3,19 121:25
125:23 127:19 131:20 135:15
138:19 145:22 150:25 151:2 158:9
159:18 161:14 166:4 173:21 174:15

177:3,8 234:22 251:10 280:16
292:15 330:9

**receives** 122:10

**receiving** 92:6,13,21 99:20 141:9
147:1 170:11,17 173:17 174:1,2,3,8
179:6 218:20 250:24

**recent** 33:3 34:22 35:11 185:19
257:8 283:16

**recently** 169:1 196:1 256:16 326:21

**recess** 184:11

**recognize** 19:4 61:8 62:22 73:24
74:2,4 188:4 249:21

**recollection** 114:13 183:7 305:5

**recommend** 119:10

**recommendation** 290:20 293:12

**record** 1:25 6:3,6,20 7:15,20 8:3,10
9:13,17,20 10:11,12,22 24:6 26:5
39:18,20,23 40:3,9,18 58:21 59:2,6
61:14 67:19,24,25 68:2 84:20 93:6
95:11 96:22 103:16,20 115:8,11,14,
19 116:9 121:24 131:19 136:7 137:9
142:16 149:7,11,14 150:9,12,14,15,
17 175:19,22,25 181:6,18 184:2,6,
10,13 185:2 201:20,25 249:9,12,17
281:9,11,13,14 283:9,10,11,13,15
293:23 295:3,5,7,9 309:3 311:1
323:5,8 331:17,18,19,24 332:5

**recorded** 92:16,17 256:22

**records** 1:21 2:22 38:7 40:12 92:25
97:21 114:24 144:6 249:7 287:17
316:7

**Recreation** 21:8

**recruit** 242:19 266:14 324:13,14

**recruiting** 322:11 324:12 326:24
327:1

**recruitment** 248:19 273:10 274:19
275:4 321:2

**redirecting** 28:13

**redistricting** 286:23 326:16

**reduce** 324:25 325:14,20,24 326:20,
22

**reducing** 324:19 326:17

**Reexamination** 4:9,10,11,15 54:24
57:21 59:7 61:1 66:7 179:24 182:4

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: refer..request

**refer**  11:3 16:19 73:15 251:18
254:19

**reference**  16:2,6 170:6 218:6
323:16

**referencing**  40:10 66:10

**referred**  164:1

**referring**  46:1,2,5 159:15 161:25
189:11 220:1 254:20 255:1 297:15
320:21 322:15

**refers**  23:1

**reform**  326:8

**refraining**  234:2

**refresh**  11:12 252:12 304:9 305:5

**reg-**  152:3

**regional**  292:16

**register**  38:3 157:14,19

**registered**  24:7,20 25:25 38:8,13
84:23,24 85:1 90:5 94:4 103:14
137:22 157:23 181:22 194:1 239:1,5
282:20,23 283:3,19,24 284:3 328:6

**registra-**  294:17

**Registrar**  192:10

**registrars**  38:6

**registration**  20:23 21:2,12 22:13,14
31:23 32:3,10 37:2,5,13,18 38:20
39:5 53:2 75:24 76:5,11,13,18,22
77:4 84:9,20,23 85:1 90:4,6 92:25
93:6 95:5,11,14 96:22 99:22,24,25
100:2,9,12,14,24 101:3,5,6,19,25
102:10 103:13,16,20,24 104:6
105:24 109:21 114:24 115:8,10,14,
19,22,25 116:9 130:22 131:2 136:7,
22 137:9,13,16,18,23 138:2 142:15
143:20 144:2,6,7 151:5 153:13
167:18 181:6,17,19,21 190:10
191:1,4,11 193:13,19 283:25 284:1
285:12 293:23

**registrations**  100:7

**regular**  39:7 61:25 62:6,7 83:9
105:4 239:16 240:6

**regularly**  230:24

**reinspect**  286:16

**reintroduce**  282:14

**reject**  294:4,7

**rejected**  105:14 108:10 142:1,2
155:24 156:10,11,17 171:9 177:24
249:6 278:23 291:22 293:5,8 294:3,
14

**rejecting**  113:9 145:3,11

**rejection**  98:17,23 99:1 146:8,13
175:12 177:18 178:23 248:16
279:18 293:1

**rejections**  142:7 156:4 172:13
177:9 178:8,10,11,23 179:14

**related**  15:19 32:1 73:6 108:11
147:25 186:5 190:7 204:8 224:25
235:6 251:23 264:12 307:8 317:23
329:12

**relates**  298:21

**relating**  254:8 256:5 257:1 258:21
274:7,14 277:2

**relation**  59:13 325:5 330:1

**relationship**  23:22 219:24 321:14

**relative**  199:9

**reliable**  255:8

**rely**  201:1 325:15

**relying**  324:13

**REM**  111:19

**remember**  41:13 72:3,18 94:16,20,
22 110:24 127:13,23 137:6 164:9,11
169:19,20,21 174:11 183:7 186:1
231:23 234:8 240:11 241:7,20,24
242:3,5 244:14 246:9,11,14 259:17
266:16 271:7 297:16 298:11 304:7
305:18,25 306:1 316:22 323:13
327:24 328:7,9,16 330:10

**remembered**  174:8

**remembering**  305:24

**remind**  12:14 212:25 213:3 255:15

**remotely**  44:2

**removal**  209:5

**remove**  90:24,25

**removed**  272:8

**removes**  204:22

**repeat**  13:5 43:13 65:7,8 82:13
88:14 99:12 105:6 113:17 115:1
126:25 148:12 157:16 170:4 177:13
199:14 201:4 205:22

**rephrase**  13:4 45:17 48:6 49:24
53:17 123:9 160:15 166:22 168:21
182:18 289:21

**replacement**  209:8 246:13 247:12,
13

**replied**  304:20

**report**  5:7 34:10 36:8,14 51:15
59:18 78:2,9,10,15 96:9 112:10,15
132:1 142:6 143:17 147:12 254:15
260:23 261:2 270:14 315:9,12

**reported**  1:19 255:7 256:1 314:17
315:1

**reporter**  6:22 9:25 10:2,3,7,8,15
12:15 18:20,23 43:7,21,23 44:16,21
52:9,18 53:3,7 57:18 60:24 61:4
65:25 66:3,6 68:8,15,17,18 73:17
74:9 76:24 77:2 78:17 88:13,18
112:20,24 113:17,20,24 115:20
118:24 119:1,3 120:18 127:6
133:20,23,25 146:11,18,20,24
150:8,12 154:16,24 155:7,11 159:22
182:1,11 184:16,19,20 202:2,5
207:3,6,11 232:1 263:13,16,17,21,
24 281:23 282:2 283:7,9 294:22
295:1 307:15 322:20,23 323:1
331:8,12,15,21 332:2

**Reporter's**  4:22

**reporting**  262:4 265:6

**reports**  34:21,24 35:1,6 36:3,4 40:5,
10

**represent**  10:25 11:2 19:25 150:21
160:6 185:10 202:10 232:10 241:25
251:9 263:18 264:2 295:15

**representation**  206:15,18,20,22
207:24

**representative**  74:24 129:7

**represented**  64:9 203:18 204:2

**representing**  155:2,8

**Republican**  63:20 64:16 65:2,18
86:19 271:12,13,14 272:18 321:13
322:3

**requ-**  123:4

**request**  40:7 96:2 124:2,3,4,5
130:10,23 131:20 132:24 133:6
134:4 158:3,15,17 159:7 161:14
162:10 168:19 181:12 211:15 231:7
288:16 291:25

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                Index: requested..safe

**requested** 33:25 35:12 46:18,21 51:7 80:17 123:4 130:14 172:21 229:24 235:4

**requesting** 124:2 161:17 181:1 183:10

**requests** 8:7 35:8 40:15 51:13 55:22 72:14 134:3 141:23 158:9 292:15

**require** 9:16 194:20 231:6 294:8

**required** 90:4 151:10 166:12 181:13 182:21 221:1,6,19 254:21 255:1 284:24 285:3 289:13

**requirement** 32:14 99:6 113:3 144:16 157:25 158:6,11 169:15 174:21 181:21 182:24 183:1,8,19 219:24 221:23 246:18 290:9

**requirements** 89:22 90:1,15,19,20 91:16,22 104:19,24 105:20 106:5, 14,22 107:7,11,17 108:11 113:7 120:22,23 125:23 126:16,23 127:3 140:8,19 141:11 142:22 144:9 148:24 156:6 157:12,13,19 161:5 169:19,20 173:19,25 174:9 180:11 235:10 243:1 248:15,25 276:2 277:6,9,10 278:23 279:6 292:21

**requires** 227:4 258:7 260:22

**reread** 307:23

**rereading** 305:5

**research** 290:21

**reserve** 7:22

**Residence** 32:20 100:10

**residents** 195:3

**resolve** 271:19

**resolved** 233:14

**resources** 105:12

**respect** 22:12 25:19 30:3 49:7,13 101:22 132:17 160:10 161:5 179:4,8 207:15 217:14 244:9 253:5 276:21 278:8,11 280:25 295:19 300:18 320:9

**respond** 105:8 141:15

**responding** 11:23 72:14 95:2 104:23 106:4,8 107:16 186:11

**response** 7:7 19:8 45:12 110:21 160:8 295:17 316:15

**responsibilities** 54:4 261:18,21,25 262:7

**responsible** 71:16 141:14 236:6 261:15,22

**responsive** 8:6 35:7 40:7,15

**rest** 85:11

**restate** 295:25

**restrictions** 236:9 252:9 311:10 317:10

**resubmit** 87:22 171:13 183:22

**resubmitted** 170:24

**resubmitting** 171:20

**result** 39:7 120:22 141:20 255:2 266:1

**results** 287:19

**retain** 242:19

**retaining** 321:3

**retaking** 253:11

**retention** 248:19 274:19

**retirements** 321:24

**return** 110:3 117:8 180:22 238:22 284:20 311:5,17

**returned** 135:13

**REVELINO** 10:18

**Revi** 286:11

**review** 15:2 72:24 139:13,14,16,17 187:19,21 210:18 232:18 234:9 331:25

**reviewed** 15:5,7 186:24 206:12 212:1 217:20

**reviewing** 252:15 258:1

**reviews** 232:20 260:18

**revised** 257:2

**RICARDO** 3:15

**rid** 329:1

**right-hand** 74:11 249:25

**rights** 3:10 312:15,20,23 313:22

**rings** 276:12

**risk** 276:20 278:8 294:13

**Rive** 116:14

**Rivelino** 1:10,14 4:7 6:4 7:9,25 10:23 143:21 144:3,7 333:2 334:1,6, 11

**RM** 83:9

**road** 69:15 186:2

**Robert** 72:1 197:1

**RODRIGUEZ** 3:15

**role** 175:7

**roles** 250:15

**roll** 33:12 114:22 115:14,19 116:13 223:1 241:13

**rolls** 191:4

**room** 1:22 150:7 283:6

**roughly** 49:19 76:8

**round** 172:13 217:24

**ROVNY** 3:21

**row** 213:1 251:22

**rule** 5:4 6:21 7:8 10:8 73:21 194:20 304:2,3

**rules** 1:24 10:12 11:11 16:7 53:11 69:15 71:19 158:5 178:16 179:18 186:1 304:4

**rumblings** 328:25

**run** 34:10,21 36:2,3,14 40:5 86:8 96:8 112:10 143:17 145:16 147:12 230:10 261:24

**run-off** 35:15,17,20

**Runbeck** 190:20,22 191:12,18 192:7

**Runbeck's** 192:1

**running** 262:15

**runoff** 144:19 297:4 327:13,20,22

**S**

**S-O-P-H-I-A** 155:6

**S.B.** 5:8

**SA-21-CV-00844-XR** 1:5

**safe** 272:6 293:20

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: sake..shifting

**sake** 61:14

**San** 1:2 2:5,16 192:10

**sand** 314:3

**Saturday** 324:1 327:5

**Saturdays** 29:10

**save** 50:13

**saves** 247:22

**SB** 11:3 82:6 83:1 88:10,12,17 89:13,19,21 92:22 106:13,23 107:4, 5,10 108:11 113:3,6,10 126:16 127:11 128:6 131:4 139:18 140:8, 15,16 141:10 142:3,22 144:9 147:25 148:11,15,19,24 151:3,13 152:12, 15,21 156:22 157:12,13,18 161:24 162:5,11,16 163:1,3,11,16,18 164:6, 21 165:19 168:2 169:1,5,8,16 183:5 187:1,8 201:12,15,24 202:10 203:10,25 204:11,22 205:7,12 208:20 217:13 218:12 219:7,12 220:15 224:5,7 225:12 231:5 233:7, 18 234:21 235:6,9 238:25 239:13,22 240:3,8 241:25 244:2,8,18 245:1,4, 13,23 246:2,6,20 248:8,21,25 254:7, 10,12 255:2,4,12,21 256:5 257:1,6, 18 260:8 264:15 273:8 277:2,16 279:5,17 281:5 282:24 283:22 284:5,23 285:14 290:9 292:3,18,22 297:12,23 298:6,8 303:24 312:16, 21,24 313:3,12,17,18,24 314:3,9,12, 18 315:4,7 317:4,5,11,14 318:1 319:7,14,18 324:5 328:21,24

**SCAI@JENNER.COM** 2:17

**scan** 83:15,18,23 93:24

**Scar-** 78:3

**Scarpello** 1:11,15 4:16,21 6:3 7:9, 12,16,21 15:12,14 71:21 129:20 184:21 185:4 188:4 254:6 264:10 281:16 282:7 295:12 317:21 323:9

**Scattered** 266:10,11

**scenario** 182:6 239:10

**scheme** 225:1,20 226:5

**schemes** 225:16

**school** 21:21,23,24 22:4 28:9,12 39:10 79:11,12,13,16,19 189:19,20, 24 190:4 227:20,21 228:5,25 229:1

**schooling** 22:4,10 189:23

**schools** 37:7 228:8

**Schuette** 2:20 6:16 14:11 184:3 201:20,25 207:9

**scope** 52:25 53:1 75:15 212:7 214:24

**scrambled** 266:18

**scratch** 210:7

**screen** 115:25 211:6

**seal** 117:10,13 334:15 336:15

**seat** 59:12

**second-hand** 330:20

**secrecy** 90:23,25 117:4,9,20

**Secretar-** 126:18

**Secretary** 5:8,9 22:17,19 25:23 94:12,23 95:1 114:4 125:18,24 126:13,16,21 127:2,10 128:5,17,24 129:12 156:25 161:21,23 162:4,10, 15,19,25 163:6,10 207:17 208:10 218:8,21,23 220:5,8 234:20,23 235:5,17 243:6 259:10 290:21 291:11,16 294:5 299:20 300:17,22 306:23 311:9 315:14

**section** 3:10 106:2 202:17 207:19 220:20 221:6 223:15,19 224:16 226:22 229:16 236:21 251:23 252:16,21 259:19 298:17,19,21 299:4 300:9,18 304:19 305:6,11 307:12,18,23

**sections** 202:21 302:18 313:17

**sector** 37:10

**secure** 206:20

**securing** 47:10,13 207:24

**security** 90:8 91:9,10 94:7 96:1 103:9,17 126:5 135:21 139:22,24 140:23 151:23 153:6,18,23 154:10 156:7 168:2 292:23 293:13 294:1,18

**seek** 306:23 307:3

**select** 60:3

**selected** 86:23

**selecting** 83:11

**semicolon** 205:12

**Senate** 240:2 255:25 259:21 274:5

**Senator** 79:23 242:6

**send** 30:23 84:13,25 85:5,6,11,14, 17 88:5,19 90:19 91:6,11 97:6 99:22 100:14 101:6 103:22 109:24 110:3 122:18,20 123:3,24 128:7 129:8,11, 15,17 130:2,12,13,15,16,17 131:3, 11 132:1 176:24 180:20 229:21 231:8 233:2 235:22 236:4,13 294:6, 18 311:17

**sender** 8:18,23

**sending** 22:18 97:10 100:23 101:16,19,25 109:9 113:16 126:8 128:15 145:18 147:9 165:19

**sends** 276:14

**sense** 31:9 105:3,7 106:7 116:23 123:5 143:13 165:15 175:14 176:18 215:11 220:11 242:10 269:10 287:23 291:14 292:10 297:19,21

**sentence** 318:17 320:6 321:4

**separate** 210:20,22

**separately** 218:14

**September** 321:21

**series** 240:2 242:13 295:16

**serve** 192:6 254:11

**service** 191:16 231:2 255:7 270:14 275:7

**services** 190:21,22 191:17 194:21 226:25 227:4

**session** 239:16,20,23 240:7 281:7

**sessions** 5:10 240:7,14,17

**set** 37:24 292:20

**setting** 201:15

**shakes** 12:15

**share** 167:11

**shared** 243:10

**sharing** 241:7,24 242:11

**she'll** 134:7

**Sherbert** 79:1,5,6

**Sheriff** 272:2

**Sheriff's** 271:24,25 272:5

**shift** 275:15 312:12

**shifting** 168:11

**shortage** 5:11 262:25 263:3,6 265:15 266:2,21 320:8,10,12 323:12,22,24

**shortages** 264:4 265:9 268:25 269:7,12

**shorter** 69:18

**shorthand** 1:20

**show** 15:21 33:24 38:16 43:2 263:8 266:16 273:15 278:24 302:18,21 303:9,15

**showed** 42:22 279:4

**shown** 216:8

**shows** 143:17

**shrugs** 12:16

**sic** 78:19 264:17

**side** 37:10 44:3,5,13 86:9 120:8 175:9,10 252:12

**sign** 51:6,11 52:4 53:20,25 55:8,12 56:23 57:6,24 58:5 106:17,18 117:14 121:15 122:18 223:21 276:8 285:3 332:1

**signage** 289:13,14 315:13

**signature** 4:20,21 51:15 86:10,11, 12,16,24 87:1,2,4,5,7,10,11,12,13, 15,20,23 88:21 89:4,5,8,10 90:13 95:21,24 117:14 118:6 126:22,23 139:24,25 153:1 175:16 285:7,8,9, 10 334:2 336:2

**signatures** 86:14 175:12 285:12

**signed** 91:2 121:14 122:19

**significant** 104:22 169:5 253:14 257:3 263:3,4 270:18

**signing** 55:23 205:18 206:3 216:4

**signs** 34:19 51:14 56:4 206:7 221:12 262:14 276:16

**similar** 196:4 239:13,18 244:18 324:21

**similarly** 143:4

**simple** 234:12

**simply** 75:15 101:20 119:25 166:13 176:14,15 325:25

**simultaneously** 88:11 223:18

**single** 14:3 50:10 70:24 213:20

**Sir** 184:17

**sit** 173:12

**site** 265:3 267:7 268:3 271:5 272:9, 14 301:13

**sites** 254:11,15 255:11,21 263:1 266:1,9,22 321:20

**sitting** 11:17 56:18,21 70:5 96:16,18 329:19

**situation** 110:7 122:22 132:23 133:5 134:2,14 165:12 167:14 214:10 231:3 271:19 299:13 317:6

**situational** 290:15

**situations** 130:20

**size** 324:21

**skipping** 195:13

**slash** 207:20 208:13 250:23,24

**slide's** 251:16

**slow** 65:25 66:1 88:13 155:3

**slowly** 155:4

**small** 35:15,17 180:1 212:3

**Smith** 115:3,15,17 116:7

**Smith's** 115:8,10

**snapshot** 303:12

**SO-** 194:19

**Soc-** 90:7

**social** 24:4,6 25:9,11 26:4 33:5 90:8 91:9,10 93:18 94:7 95:25 103:8,17 104:4,8,12 107:2 126:4 135:21 136:1,6 137:1,4,10,15,25 139:22,23 140:23 143:15,19,25 151:22 153:6, 18,23 154:10 156:7 168:2 241:14 292:23 293:13 294:1,18

**Socials** 26:3

**software** 36:13,16 40:5 191:13 219:21 220:4,9,12,13 235:9

**sold** 79:23 191:22

**solely** 324:13

**solicitation** 229:16 235:14 307:13, 19 311:11

**solve** 293:11

**son** 167:11 180:23 182:7

**Sophia** 2:14 155:1,5 282:7,15

**sort** 40:16 82:18 158:10,19 193:11 198:10 200:10 203:8 239:24 273:12 275:7 288:5,14,21 290:7

**sorter** 191:22,23

**sorts** 141:23 159:7 312:11

**sought** 238:4,9

**sounds** 31:25 36:2 44:24 122:7 189:21 287:13 318:25 319:2

**source** 16:13

**southern** 37:9

**space** 198:23 217:1

**Spanish** 36:10 38:21 39:2 123:3,8, 17,25 124:3,10,16,17,22,23 125:3 194:21

**Spanish-speaker** 124:19

**Spanish-speaking** 123:22 213:19

**speak** 5:5 20:15 42:8 102:21,23 105:23 113:18 120:19 124:17,21,22 125:10 133:9 134:5 171:2 180:16 265:2 289:7

**speaker** 124:17 214:2

**speakers** 125:3,5 194:21 214:8

**speaking** 47:5 53:11 66:21 74:2 88:11 124:10,23 136:21 163:25 176:15 180:3 189:8 198:13 261:22 269:4 276:3 287:25 305:18 312:19 327:11

**speaks** 214:11,17

**special** 5:10 35:23 37:12,14 61:21 200:16 239:19,23 240:7 296:25 297:2

**specific** 37:2 46:22 47:5 95:19 107:22 121:2 129:5,24 163:4,23 173:4 204:18 209:4,8 213:15 214:24 215:14 218:20 227:12 228:1 231:14 241:12 244:14 252:16 255:13 257:16 261:25 284:20 297:14 307:8 314:19 316:12

**specifically** 37:6,11 39:6 96:4 106:11,13 140:17 165:17 218:16 234:8 253:5 292:2 297:19 298:17 300:18 307:12,18 317:20 323:11

**specificity** 229:13

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: specifics..substantial

**specifics** 272:4 285:2

**speculate** 279:9 292:5

**speculating** 279:12,23

**speculation** 265:12

**Spell** 77:17

**spelled** 155:6

**spend** 298:1

**spending** 106:3

**spent** 104:21 106:8,15 107:16

**spit** 210:15

**spoke** 55:1 161:20 165:23 170:21
171:5 176:2 180:17 242:12 281:8
302:9

**spoken** 9:13 45:19 102:18,19
174:24 176:20 183:9 246:5 252:20
304:5 308:12 316:19

**spot** 121:14 216:18

**spring** 239:15 248:4

**staff** 38:1 54:2 90:24 94:10 105:18
108:2 134:14 180:17 222:23 234:1,
17 245:1,4 250:25 253:2 256:15,17,
20 265:3,4 280:6 311:4 312:3

**stages** 216:25 221:11

**stamp** 232:13 249:24,25 251:11,19

**stamped** 8:9

**stamps** 9:8

**stand** 259:25

**standard** 29:9,12 30:6 216:21 262:1

**standing** 316:20 329:20

**start** 7:16 12:19,21 26:16 28:1 48:25
69:11 79:18 92:5 100:23 101:18
109:4 134:1 146:22 150:18,19
151:18 160:22 164:17 177:15
185:17 274:23 293:17

**started** 27:8,22 28:4,12 47:23
101:15 107:11 138:3 202:25 255:16
296:2 324:15 325:10

**starting** 7:18 74:2,4 91:25 101:8
125:19 203:8 205:6 220:19 226:24
236:25 249:24 253:12

**starts** 223:15 226:22 298:19

**state** 1:19,23 3:3 5:8,9 6:5,11 7:2

9:3 10:10,14,22 22:17,19 23:15,16
25:23 58:4 85:21 94:6,12,23 95:1
114:4 124:6 126:17 127:10 128:6,24
129:13 144:25 145:2 156:25 160:7
185:2 207:17 208:10 213:8 218:21,
23 219:24 220:6,8 230:3 234:15,20,
23 235:17 237:1 241:21 242:5,6
243:6 275:24 288:10 290:22 291:11,
16 294:5 295:16 300:17 301:24
311:9,20,23 331:22 334:8,18 336:8,
19

**State's** 125:18,24 126:13,21 127:2
128:18 161:21,23 162:4,10,15,19,25
163:6,11 218:8 235:6 259:11 299:20
300:23 306:23

**stated** 1:25 10:11 305:21

**statement** 32:20 100:10 139:25
313:6 318:16

**statements** 10:4,7

**states** 1:1 3:9,11 37:17 44:8,18
87:10 91:8 149:21 150:21 281:22
289:5 307:13 315:15

**stating** 49:25 95:7 177:23 205:3
221:1

**station** 56:21 57:5

**stations** 216:19

**Statistical** 17:5

**statistics** 33:21,24 198:12

**status** 253:20

**statute** 203:2,5 224:25 225:25
226:18 229:8 302:16 305:22

**statutes** 304:2

**stay** 30:22 31:9 41:17

**stayed** 64:8 65:17

**staying** 30:18 31:2 64:4

**steadily** 199:18

**step** 90:17 132:20

**steps** 71:4 88:23 130:11 144:8,18,
21 186:22 273:12 276:5

**stick** 32:3 208:25

**stipulated** 299:8

**stipulations** 4:4 331:22

**Stone** 21:8

**Stool** 2:19 6:13,14,25 7:6,13 8:1,13,
16,19,22,25 9:10,21 14:11 40:19,21
54:22 57:16 58:12,19,22,25 67:18,
22 69:2 73:4,9 179:22 201:20,25
249:11 310:18,20 331:3,25

**stop** 180:19

**stories** 118:21

**story** 267:10

**straight** 17:7 28:7 59:23 60:5,18
63:13

**strange** 236:11

**Street** 1:22 2:10,15,23

**stricken** 302:14,15

**strike** 171:18 258:3 265:7 267:9,19
268:16 280:15 303:5 313:20

**struck** 203:4

**structure** 196:16

**structures** 196:15

**struggle** 43:10,15

**student** 239:9

**students** 239:9

**study** 190:5 326:9

**stuff** 16:3 22:20 130:12

**stuff's** 16:20

**subdivision** 47:5

**subject** 45:15 58:8 241:15 303:24

**subject-** 242:22

**subjects** 252:17

**Submission** 220:21

**submit** 94:3 97:22 98:20 124:5
132:12 142:10,14 168:15,16 231:20

**submitted** 97:4,18 98:5 101:12
102:8 119:12 120:8 130:3 155:19
179:1,4,9 328:11

**subscribed** 334:13 336:13

**Subsection** 257:24

**subsequently** 240:3

**substance** 176:5

**substantial** 194:7,10,13,18 195:2
213:22

**succeed** 273:1

**successfully** 247:2,7 266:19 283:2, 18 284:19 328:6

**sued** 237:16,20

**suggested** 40:12

**suggestions** 324:10

**Suite** 2:5,10,15,23 3:6

**sum** 193:14

**Summary** 5:7,10 59:18

**summer** 239:20

**Sunday** 29:22 263:9 266:17

**Sundays** 29:11 230:24

**supervision** 76:1

**supervisor** 21:5 75:19,23,25 76:5, 11 77:12,22 78:2

**supplemental** 5:10 232:12

**supplies** 263:9 266:17

**support** 50:22

**supporting** 274:6 280:25

**supposed** 41:17 102:2 121:15

**surname** 36:10

**Susan** 115:3,7,10,15,17 116:7

**suspected** 260:23 262:5

**SVC** 86:11 89:3 118:4

**swear** 6:18 9:20,23 68:8 184:15

**Swinford** 1:19

**switch** 48:10 58:11,23 67:20 295:20,21

**switching** 45:15

**sworn** 1:16 10:2,19 68:13,17 69:7 184:19,22

**system** 23:7,15,23 25:24 83:16 84:9,23 85:4,10 90:4,16 94:4 95:5, 14 98:1 101:5 105:21 111:18 112:8, 15,16 113:16 120:5 124:16 125:8 130:22,25 131:2 135:24,25 136:2, 16,23 152:3,6 153:13 167:18 191:11 284:1,2 285:12 294:12

**systematically** 28:5

**systems** 36:16 113:22 190:20 191:2,10

---

**T**

**table** 12:10 37:25 44:7 45:3 186:19 199:11,22 216:22 221:15 228:12

**tabulation** 64:21

**tabulator** 210:21,23 211:21 212:1,9 216:14 272:25

**Tacoma** 1:10,14 4:12 6:4 7:9 69:6 247:15 335:2 336:1,6,11

**Tacoma's** 247:16

**TAEA** 240:25 241:1

**tag** 293:18

**takes** 214:4 253:15,16 268:4 276:24

**taking** 11:24 28:4 51:21 69:24 70:8 105:3,8 144:8 200:12 206:12 238:19 273:12 286:24

**talk** 12:21 14:23 15:9 33:14 37:16 71:20 72:21 75:9 110:1 126:12 138:24 162:22 172:15,18 173:2 187:7,14 188:24 197:17 228:9 257:15 261:3 268:18 273:16 290:21 291:15 312:13 315:17 329:9

**talked** 118:19 150:5,24 166:3 173:17 194:22 242:14 302:11 314:2 316:9,10 324:8,16,19

**talking** 29:24 44:11 47:6 64:4 66:9 99:8,9 107:16 111:7 131:25 140:25 163:4 168:11,22 204:21 216:11 241:4,12 243:5,16 245:25 251:22 262:18 263:22 267:4 280:22 297:16 319:1,11 323:10,12

**target** 37:11

**Tarrant** 241:11

**tasks** 262:20

**TEAM** 23:7,22 25:19,21,22 115:17, 18 131:25 321:11,12 322:2

**TEAM-** 132:7

**TEAMS** 114:4 116:12 129:10,11,16, 23 130:3,6,12 131:3,7,12,14 132:13 312:11 321:19

**teamwork** 273:17

**Technically** 146:4

**technician** 271:22

---

**telephone** 102:20 140:22 141:1

**telling** 22:25 105:9 130:5 212:8 290:17

**tells** 34:10 147:13

**temp** 72:5,6 144:14

**template** 127:18

**temporary** 256:19,20 265:18

**ten** 105:16 108:6 136:13

**ten-minute** 323:2

**tent** 196:16

**term** 13:12,17,23,25 70:19 212:19 301:2 308:21

**terminology** 313:4

**terms** 13:11,14 101:8 144:12 211:6, 21

**testified** 10:19 41:7 69:7 101:15 114:2 155:18 184:22 286:11 296:2 299:6

**testify** 58:9 70:9 74:17 196:23

**testifying** 19:7 70:5 75:13 188:13 189:7 273:7 325:9

**testimony** 11:16,18 41:6 69:12 70:1,4 272:20 286:11 297:16 304:7 320:11 326:6 328:15 330:10

**tethered** 44:6

**Texas** 1:1,19,23 2:5,18,23 3:5,6,18, 19 6:13,15 14:25 24:23 60:18 72:22 90:6,7 94:6,7 103:17 126:4 140:23 187:15 191:18 195:25 199:3 218:21 219:6 239:14 240:8,11 241:2 275:23 277:25 288:18 289:3,12 297:22 298:5 301:2,24 302:7 303:13 305:2 324:2 325:18 334:8 336:8

**text** 203:1,4 302:12

**there-** 209:21

**thicker** 218:9

**thing** 8:3 12:7 13:14 27:24 79:22 88:15 103:10 130:15 134:23 173:7 262:23

**things** 129:16 190:7 209:4 230:9 253:18 262:15 271:15 287:7

**thinking** 76:6 246:8 247:6 269:23

**thinks** 236:16

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: thirty..unable

**thirty** 35:13

**thought** 53:9,12 68:10 165:2 183:10 207:13 274:18,20 277:24,25 278:7 305:22 319:3

**throughou-** 153:15

**ti-** 224:2

**ticket** 59:24 60:6,18

**till** 30:18,21 31:10,16 178:11

**time** 9:4,9,14 12:6 14:21 16:23 29:8 39:20,23 44:9,15 57:20 59:2,6 67:24 68:2 69:24 70:11 79:25 87:19,20 88:25 89:16 103:23 104:22 105:3,8, 11 106:17 107:9,15 110:2,11 119:22,23 125:21 131:2,16 149:11, 14 152:17 153:16 154:6 174:20 175:22,25 184:10,13 185:19 186:17, 25 191:19 193:9,10 221:5,16,18,19, 23 222:21 224:2,9 232:19 235:1 246:2,23 249:4,13,17 253:15,25 262:23 265:19 268:4 281:12,15 282:4 283:15 286:24 291:18 294:24 295:5,9 298:1,4 302:23 307:23 315:18 323:5,8 326:23 330:16 331:17

**time-consuming** 122:7

**timeline** 220:11

**timely** 219:21

**times** 38:2 67:4 93:4 213:4 264:3 266:22 268:15,18,22 269:7,20

**timing** 281:6

**tip** 271:6

**title** 20:22 75:18 78:7 193:21

**titled** 61:17 220:20 229:16 250:23

**today** 7:5,22 8:5 11:16,21 14:10 19:8 40:1 56:19,21 61:9 70:4 71:5 73:5 74:18 96:16,18 147:12 150:3 186:8,12,23 187:8 188:14 189:1 194:23 195:16 232:12 253:25 290:8 295:13 326:5

**today's** 188:5

**told** 79:23 114:8 120:20 131:5 280:6

**tongue** 271:6

**Tony** 78:16,17,20

**tools** 119:6

**top** 15:23 19:11 25:4 48:24 73:22 155:19,22 235:7 251:20 290:5,6 316:7 329:21

**topic** 53:1 58:9 73:12 140:12 160:23

**topics** 5:5,6 7:7 12:4 15:7 17:2 19:15 20:13,16,19 73:13 74:5,17,21 160:10,12 168:11 188:9,11,22,24 295:19,20

**total** 63:7,9 193:14

**totals** 63:18

**touch** 132:11

**touchscreen** 210:10,11

**track** 33:22 34:6 92:12 95:8,18 100:20 104:17 105:5,10 109:5 122:12,15 135:1,11 254:14

**tracker** 129:25 130:3,4 134:21,25 135:4,7,8,10,17,24 136:8,16 138:6, 11,18,21,25 139:5,12 140:2 141:2,3 165:20

**tracking** 33:23 255:5

**traditional** 286:9

**train** 256:4

**trained** 54:1,2,6,9 256:7 289:9

**training** 56:17 144:13 217:12,18 218:1,17,21 254:20 256:12,14,15, 18,21,22,24,25 257:3,8 261:9 273:16,20 274:3 289:14 322:11

**transfer** 124:22 325:5

**transferred** 22:6 105:19

**transition** 160:11

**transpired** 296:5

**transportation** 223:20 224:1

**trash** 210:24

**Travis** 237:24 238:10 309:13

**treatment** 288:11 289:16,25

**trigger** 194:19

**trilingual** 123:15,16

**trouble** 234:1

**troubleshooted** 330:4

**true** 142:18 282:24 292:8 327:20 334:3 336:3

**trusted** 200:21

**Tuesday** 71:6

**turn** 19:10 62:11 74:7 88:2 89:9 121:11 202:8,13 220:16 223:13 224:14 226:21 236:17,24 254:10,24 257:21 264:6 266:25 278:14 298:8, 16 304:10 310:5 317:17

**turned** 17:19 89:3,11

**turning** 157:12 220:15 317:20

**turnout** 247:25 248:1,4,6 325:3 327:14 329:8

**Twenty-two** 193:15

**two-year** 50:11 326:7

**type** 100:6 140:10 158:23,25 167:14 242:10 312:2

**types** 28:13 52:10 53:16,19 107:10 129:4 244:2 287:9

**typical** 170:14 288:6 289:22

**typically** 139:16 168:8 169:13 216:25 244:5 247:16 248:5 269:11

---

**U**

**Uh-huh** 17:11 21:14 22:3 24:13,25 25:2,8,16 26:18 27:5 28:19 29:14,17 30:10 31:24 32:21 34:1 48:8 50:15 56:2 66:6 71:18 85:13 99:15,18 102:7,12,14,17 106:21 111:21 118:20 119:2 124:9,12 125:1 128:11 130:19 131:1 132:6,9,15 133:24 135:23 139:20 144:20 146:10 148:13 164:19 166:25 167:2 168:24 172:23 174:18 178:13 179:12 182:8, 10 186:3 187:6 189:4 193:3,6,8 194:5 195:8 199:2,8,19 200:15 202:24 210:2 213:16,25 214:13,18, 21 217:4,22,25 219:25 220:23 222:18 225:14 226:13 228:6 229:11 230:7,21,23 234:14 239:3,21 246:21 247:1,23 252:1 257:19 267:2 268:8 275:18 278:16 281:2 292:11 297:18 300:14 301:7,9,12,16 310:20 314:11 315:20 317:19 319:13

**ultimately** 97:14 98:6 99:2 170:23 172:7 175:4

**unable** 95:9 96:19 113:1 145:12,19 147:6 262:6

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: uncertain..voter

**uncertain** 312:1,8

**uncertainty** 309:1,2

**undergo** 82:23

**underlined** 203:2 220:20 302:12

**underneath** 17:1 118:7

**underscore** 61:17 62:2,12,18 63:1, 4

**understand** 8:1,5 11:14,18 13:1,3, 13,18,24 19:7 20:18 23:20 24:1 25:6 70:1,9,19,22,24 74:20 75:3 96:12 105:11 106:19 114:11 116:22 141:19 160:17 173:3 186:7 188:13 189:2,11 200:11 201:2,5,8,18 203:1 205:13 208:2,19 209:5,11 211:3,23 221:10 222:3 225:10,12,19 226:1 229:20 230:2 237:5 238:24 267:25 285:23 289:20 295:21 301:4 304:13

**understanding** 12:1 13:8 87:1 106:21 116:24 130:21 195:22,24 216:9 234:23 235:2 258:2,6 259:5, 20 261:14 268:21 269:9 280:13 287:25

**Understood** 40:19 58:18 215:13 234:18

**underway** 127:16

**unfolds** 235:18

**UNION** 1:3

**unique** 284:8

**United** 1:1 3:9,11 37:16 44:8,18 149:21 150:21 281:21

**University** 22:7 189:25 190:1

**unlawful** 219:7 229:16 307:13,19

**unquote** 140:15 203:15,19 204:5, 15,24 205:9,15 223:21 237:3 250:24 252:5

**unsigned** 83:19

**unsolicited** 235:22 236:5 308:23

**unwarranted** 272:19

**upcoming** 144:19 248:9 296:18,19

**update** 22:15 25:20,22 32:23 100:4 114:3

**updated** 219:21

**updates** 116:12

**upgrade** 287:20

**uploading** 22:17

**upper** 207:16 208:9

**urging** 228:24

**usual** 268:22

**utilized** 316:4,11

---

**V**

**V-** 152:6

**V-E-M-A-C-S** 112:19

**V-O-T-E-C** 112:25

**vague** 51:23 222:20 229:12 292:6

**vaguely** 285:22

**varies** 243:23

**vary** 158:25

**vehicle** 196:3

**VEMAC** 150:25 152:3 165:24

**Vemac** 84:9 95:5,14,16,17,19 96:1, 4,8,9 112:17,18,23 115:22 131:19, 22,25 132:8,11 151:6 152:3 283:25

**vendor** 26:3 36:15 191:3

**verbatim** 257:11

**Verifi-** 89:4

**verification** 86:11,16,24 87:1,4,10, 21 89:5,10,22 104:19 118:6 153:1 166:3,20 168:5 175:11,16 178:4 285:8

**verify** 86:11,13 87:2,5,11 90:5 97:14,19,23 98:5 99:16 100:1,16 101:12 109:6,16 120:9 153:1 155:21 167:15

**verifying** 114:18 152:20 166:9

**versa** 104:10,11 143:23

**version** 69:18 124:3,16 186:4 303:6 319:18

**versus** 36:11 95:20 111:11 112:12 313:17 319:22

**vice** 104:10,11 143:22

**Vice-president** 190:19

**video** 6:3 273:15 274:1

**VIDEOCONFERENCED** 1:9,13

**viejitos** 36:23

**Vietnamese** 38:22,24 39:2 123:17 124:4 125:5,11 194:21,24 213:24 214:1,8

**view** 22:5 173:8,10 313:2 314:8,12

**VILLAREAL** 3:16

**violated** 309:24

**violates** 237:3

**violating** 237:7,10

**VIP** 315:10

**voice** 50:21

**volume** 113:11,13

**volunteer** 38:5 265:17

**vot-** 111:16

**vote** 26:15,19,21,25 27:3,6,8,12,21, 24 28:7,10,14,18,25 31:15 33:15,19 34:14 36:17,21 38:8 41:21 42:22 50:9 51:1,2 52:1 56:4 60:5 61:22,25 80:5 85:7,16 88:2,24 98:19,20 103:14 110:15,22 119:15 120:21 130:24 135:5 137:22,23 140:24 142:18,23 156:23 157:14,19,20 158:15,20 166:4 168:16 171:19 172:3,6 174:25 176:24 177:4,5,6,9 178:8 179:5,11 181:22 183:14,24 196:3 197:5 198:11 200:22 209:19 210:23 212:9 216:4,6,13,14 217:7,8 224:9,11,21 225:15 226:2,4,17,25 227:4,15 228:4,7,24,25 229:17 230:19 234:7,9 247:7,11 248:23,25 267:5 268:5 272:25 275:25 276:6,13 277:21 278:25 279:5,16 282:19,22 283:4,19,23 284:7 286:13 288:3,7 290:13 307:14,20 308:4 309:5 310:3 324:23 325:16,20,21 326:1,4,5,8,9, 13,18 328:6,7 329:15,18,24

**Votec** 112:23,25

**voted** 17:22 34:10,18 40:6 52:3 63:5 67:5,7 98:24 117:9,21 175:4 227:8 247:3,9 284:19

**voter** 17:21 20:23 21:2,12 22:13,14, 15,18 31:23 32:3,4,9,10,15 33:12 36:17 37:1,2,5,7,18 38:19 39:4,5 40:14 41:23 42:6,11,14,18 50:17,18 53:2 55:8,13,22,25 56:3,20 57:6 60:2 61:24,25 62:1,7,11 75:24 76:4, 10,12,18,21 77:4 80:17 84:9,13,18,

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: voter's..weekly

19,20,21,22,23,24 85:1,5,9 86:2
87:11,22 88:6,20 89:2,14 90:4,5,6,9,
19 91:1,6,8,11 92:25 93:6 94:4,13
95:5,14 96:13,21 97:21 99:13,19,22,
24,25 100:2,7,8,12,14,15,24,25
101:2,4,5,6,19,23,25 102:6,10,19
103:9,13,16,20,23,24 104:2,6 105:8,
24 106:8 109:19,21,22 110:1,13,20
114:21,22,23 115:8,10,14,19,22,24
116:2,8,13 117:8 120:21,22 121:3,8,
13,14,19,25 122:10,18 130:21
131:2,7,8,16 132:4,12,18,24 133:9,
11 134:15 135:3,10,16 136:1,4,7,21,
22,24 137:3,12,16,18,23 138:2,24
140:7 141:1 142:15 143:20 144:2,6,
7 148:2 150:24 151:4,14,23 152:3,
20 153:13 157:23 158:4,14 159:3,10
167:18,19,21 168:19,20 169:21
170:22 174:20 177:20,25 178:16,17
180:17,18 181:1,6,10,17,19,21
190:20 191:1,4,10 193:13 198:10
199:6,16,17,20 200:5,6,13,20,25
201:1,7,17,18 203:18 204:1,13,15
205:8,14 206:15,19,21 207:24
208:16 209:6,13,14,25 210:8,9,14,
18,19 211:4,10,14,19 212:19 213:3,
17 214:11,14,19,20,22,25 215:1,8,
18,23 217:6 219:3,7,13 221:14
222:13 223:4,10 224:21 226:2,4,10
227:5 228:7,9,14,17,24,25 229:3,5
231:6,20 233:1 238:17,21 239:5
241:13 245:19 246:17 247:2,7,9,10,
24,25 248:4 252:10 259:22 260:6
267:4 268:4,5 269:5 276:6,15,16,18
277:7,19 278:10 279:13 282:20,23
283:24,25 284:1,8,12,23 285:3,7,12
290:11,23 291:2,17 292:21 293:22
294:17 297:17 299:1,3,22,25 301:1
304:13 308:9 316:21 328:11

**voter's** 86:10 87:12 95:11 101:4
135:25 137:8 151:8 152:5 181:5
204:14,24 205:15 210:17 211:11,14
288:16 299:2 304:14

**voter-** 276:10

**voter-friendly** 299:18

**voters** 11:2 17:19 22:21,23 24:2,7,
20 25:25 26:4 28:14 31:3,14 33:3,
15,18 34:10,22 35:12 36:7,10 40:5,
13 41:20,21 42:14,22 43:1,10,14
48:17 50:21 60:5 61:19,21 67:5,7
80:9,20 96:17 97:18 98:17,18,22,24,
25 99:1,4,9,23 101:11 102:5,22,23
103:2,5,12 104:18,23 105:14,20
106:4 107:1,6,10,16 108:9,20 109:5

110:4 111:10 112:11 113:23 119:11
120:20 121:10 126:7 136:15 137:21
138:20 140:21 142:14,18 143:6,14,
18,24 144:5 147:10,13 148:25
156:11,22 158:10 167:19 168:8,12
169:12,15,25 170:6,19 171:13,19
173:18 174:19 176:24 177:19,22
178:15,24 179:1,17 180:4 183:9
192:10 194:1,13 196:10 197:5,19,
20,24 198:4,19,22 199:25 215:12
216:25 219:4 221:22 223:19,20
224:2,9 225:5,15 226:17 228:4
229:21 231:10,20 239:1 241:12
245:11,19 246:1,6 248:22 249:4
251:20 253:5,7 255:11 260:1 262:13
266:22 268:18 270:22 271:2 273:19
274:22 277:20 278:24 279:4 280:2,
10 282:17 285:19 288:7 292:17,23
293:5 302:5 305:11,16,19,23 308:2
327:4,6,8 330:9,12

**votes** 17:7,18 62:23 63:7,19 64:7,24
65:4,17 67:12 80:4 227:12 245:19
286:17

**voting** 3:10 17:5,13,23,24 18:1
26:17,20,22 27:1 29:15,16 30:8,13,
14 31:21,22 32:7 37:13 38:20 39:15
41:6,14 43:11,16 47:16,23,24 48:10,
16 49:1,3 51:6 52:13,15 53:17,20
56:21 57:5 58:3,16 60:19 61:20
62:20 64:5,19 67:11,12 86:21 88:1
90:11 91:23 105:24 110:14 111:17
120:14,16 121:7 124:7 127:15,17
141:11,20 143:11 144:10,16 147:25
148:11,16,20 157:25 168:9 170:1,20
171:24 175:7,10 176:21 181:16
193:19 195:18,24,25 196:4 199:12,
23 200:7 211:5 213:1 216:2,9,17,20,
21 221:22 223:19 246:2,6,25 262:1
265:3 267:23 271:5 275:16,17,19,22
276:7,17,19,21 277:2,4,5,6,8,13,17,
20,21 278:3,9,12 279:21,22 280:1,3,
11,18 281:4 285:25 288:6,9 289:22,
24 292:16 297:11,20,22 298:5 300:7
301:15 302:6 316:2 321:20 323:19
328:14,19,24 329:2,4,7,12,16,19
330:3,6,9,13

**VP** 191:7 192:6

**VR** 23:17 83:16 152:6

**vulnerable** 253:13

───────────

**W**

───────────

**wait** 12:19,20 60:24 86:10 133:23

**waited** 267:5,14,16

**waiting** 235:5,8 261:18

**waits** 269:3,5

**waive** 6:20,24,25 7:3

**waived** 10:8

**walk** 69:15 85:23 111:4 199:22
276:5

**walked** 16:11

**walking** 199:7,18 329:20

**wanted** 8:3 50:9 85:16 102:15 139:9
140:17 141:25 142:1 158:19 234:8
254:7 278:25 280:10 282:16 315:17

**wanting** 265:17

**warn** 257:12

**Washington** 2:10 3:12

**watcher** 248:18 254:17,19 258:10,
12 259:3,4,22 262:4,8,19 264:17,18
270:25 271:1,9,13,14 272:8,19,23
273:1 280:23 313:10 315:19 316:4,
12,16,20 318:3,4

**watcher-** 47:10

**watchers** 242:17 254:8,11,15
255:1,5,7,9,11,20,25 256:5 257:1,13
258:21 259:12,25 261:2,19 264:12
270:5,6,14,19,22 273:5,9,19,25
274:7,14,21 275:7,12 286:7 312:17,
20,24 313:2 314:17,22 315:1,11
316:9 317:23 323:10

**watching** 275:3

**ways** 82:20 124:15 140:1

**weather** 320:7,15,24

**web-** 127:5

**webinar** 127:11,22 128:12

**Webinar-** 127:8

**webinars** 127:5,8,9 218:24 235:2

**Wednesday** 310:13

**week** 29:10,16,18 38:2 91:25 92:3
106:4,8 243:16

**week's** 29:9

**weekly** 92:14,15 106:15

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: weeks..Zoom

**weeks** 99:4 185:21,23 193:4

**weigh** 311:9

**west** 37:10

**WESTERN** 1:1

**wheel** 210:10 301:10

**wheelchair** 52:2 56:9,19,23 57:5
301:8

**whichever** 153:12

**white** 2:9 4:8,17 6:9,10 40:3,23,25
41:2 42:4,9,18 43:9,19,22,25 44:5
50:24 52:5,7 57:11 65:23 117:3,4
149:16 170:3 172:14 175:17 178:18
181:25 218:11 232:21 254:2,3,5
255:24 259:20,25 260:4,16,19
262:17,24 263:14,20,25 265:14
266:25 270:20 271:3 272:17 278:6
279:11 280:14,22 281:9,16 295:3
301:19 313:25 314:15 316:18 331:2

**who'd** 281:19

**wife** 133:19 134:2,4,5,6

**Wise** 193:2

**witnesses** 1:15 5:5 7:5,7,18 58:24

**Women** 245:19

**Wonderful** 77:10 210:24

**wondering** 239:4

**word** 164:2 308:25

**words** 53:5 89:25 180:5 223:9
307:16 309:2

**work** 22:17 32:17 38:16 39:7 51:10
54:11 55:3 75:11 76:1 86:13 108:17
124:24 128:5 134:6 140:5 178:4
222:23 238:20 247:19 265:18
288:22 297:25 302:10 320:21

**worked** 21:3 141:4 193:6,25 268:2
272:5

**worker** 5:11 213:19 214:16 222:21
223:1 248:19 264:3,16 265:9,15
268:25 269:6,12 273:9 276:14 318:2
319:12,16 323:12,22,24 324:11
327:2,16,21

**workers** 30:22 47:11 50:14 55:11
56:8,12,15,22 199:11 200:2,3 214:5,
23 216:6 217:13 218:17 242:16,19
255:20 256:4,19,25 257:12 260:23
263:1 265:18,19,22 266:2,14,21

269:1,5 274:19,21 275:11 276:11
289:8 312:13,15,17 313:23 314:16
318:22 319:10,12 320:8,13,21
321:3,6 322:5,10,11,13 324:9,14,15,
16,18 326:24 327:1,5,6

**workflow** 106:23

**working** 22:19 77:4,8 79:18 197:2
222:19 255:16 263:7 274:24

**works** 72:19 88:19 105:21

**worried** 319:19 323:24

**worry** 233:20

**worth** 119:9

**write** 95:7 252:21 294:8

**writer** 320:18

**writing** 124:5,6

**written** 117:25 159:16 206:18 286:3
287:14

**wrong** 24:19 33:1 48:7 112:21 164:8
298:4

**wrote** 34:25 320:18

────────────────

## Y

**y'all** 150:8

**Y65** 83:7 111:18

**YDS** 111:18

**Ye-** 229:23 230:5 244:21 251:1

**year** 38:12 48:7 64:11 75:21 76:16
77:12,24,25 78:13,14 85:11 179:2
190:3 192:8 194:4 262:25 286:25
321:21

**yearly** 83:7

**years** 20:25 21:22 22:6 48:22 51:8
65:5,19 76:8,14 77:7,9 155:25
178:25 192:13,19 193:12,14,15
222:15 253:16 275:11,14 286:10
314:21

**yellow** 15:24

**yesterday** 34:1

**young** 250:14

**Yvonne** 243:16

────────────────

## Z

**zeros** 250:1

**Zoom** 2:13 3:9,15 15:11,14 44:1,4,
12 57:14 149:18 184:5 240:19
241:9,21 281:19 328:1 331:4