**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

LA UNION DEL PUEBLO ENTERO, et al.,                §
    *Plaintiffs,*                §
                    §
*v.*                §   Case No. 5:21-cv-844-XR
                    §
GREGORY W. ABBOTT, et al.,                §
    *Defendants.*                §

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO**
**THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX V

Transcript of the Testimony of

**Michael Scarpello**

**Date:**

May 04, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO et al. vs GREGORY W. ABBOTT

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
 2                 SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO )
     et al.,                    )
 4        Plaintiffs,           )
                                ) Civil Action No. SA-21-cv-
 5   v.                         )       00844-XR
                                ) (Consolidated Cases)
 6   STATE OF TEXAS, et al.,    )
          Defendants.           )
 7

 8

 9        ---------------------------------------

10        ORAL AND VIDEOTAPED DEPOSITION OF
                   MICHAEL SCARPELLO
11                   MAY 4, 2022
                      Volume 1
12        ---------------------------------------

13

14

15            ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL

16   SCARPELLO produced as a witness at the instance of

17   Plaintiff, and duly sworn, was taken in the above-styled

18   and numbered cause on the 4th day of May, 2022 from 10:21

19   a.m. to 1:11 p.m. before Nancy Newhouse, a Certified

20   Shorthand Reporter in and for the State of Texas,

21   reported by oral shorthand, located at the Dallas County

22   Records Building, 500 Elm Street, Suite 6300, Dallas,

23   Texas 75202, pursuant to the Federal Rules of Civil

24   Procedure, and the provisions stated on the record or

25   attached hereto.
```

Michael Scarpello

May 04, 2022
Pages 18 to 21

Page 18

1   manipulation?
2       A.  Well, I think that's -- I think the
3   legislature has prescribed rules to -- to protect
4   voters, and I follow the rules.
5       Q.  Which rules do you think help protect voters
6   from manipulation, just a couple of examples, perhaps?
7       A.  Sure.  Privacy of in -- in the ballot booth,
8   for instance, so that you don't have someone standing
9   over your shoulder, telling you who to vote for; the
10  100-foot rule to keep people away from a polling place
11  as -- as far as in electioneering.
12      Q.  So you mentioned that the rules regarding
13  privacy in the ballot booth help ensure that a voter
14  won't be kind of told who to vote for by someone else,
15  is that right?
16      A.  Yes.
17      Q.  Are you familiar with instances in which
18  someone has tried to tell voters who to vote for in --
19  in an inappropriate way?
20      A.  No.
21      Q.  And the rules around privacy and other things
22  help make sure that doesn't happen?
23      A.  Yes.
24      Q.  A couple of things to confirm, you are not a
25  criminal prosecutor, are you?

Page 19

1       A.  No.
2       Q.  You don't have the authority to put anyone in
3   jail for violating a criminal law, right?
4       A.  No.
5       Q.  Do you have the authority to file civil
6   enforcement actions related to violations of the
7   Election Code?
8       A.  No.
9       Q.  I'm going to set aside Exhibit 1, if you could
10  just keep it somewhere near here for the court reporter,
11  eventually.
12          MR. THOMPSON:  I'm going to mark Exhibit
13  2.
14          (Defendant's Exhibit No. 2 was marked for
15  identification.)
16          MS. PERALES:  Oh, I get one this time.
17          MR. THOMPSON:  Oh.
18          MS. PERALES:  Did you have Exhibit 1 for
19  me?
20          MR. THOMPSON:  Oh yeah, I'm sorry.  I
21  didn't even realize --
22          MS. PERALES:  Well, thank you.
23          MR. THOMPSON:  -- you didn't get a copy,
24  hate to leave you out.
25          MS. PERALES:  Thank you so much.

Page 20

1           MR. THOMPSON:  Of course.
2       Q.  (BY MR. THOMPSON)  Mr. Scarpello, can you see
3   Exhibit 2 in front of you?
4       A.  Yes.
5       Q.  In the bottom right-hand corner does it have a
6   Bates stamp that says "MS007415"?
7       A.  Yes.
8       Q.  Do you recognize Exhibit 2?
9       A.  Yes.
10      Q.  At the bottom of Exhibit 2, it appears to show
11  an email from someone named Zachary J. Bowen to you, is
12  that right?
13      A.  Yes.
14      Q.  Who is Zachary J. Bowen?
15      A.  He's a -- I don't know what his pos -- I know
16  he's a special agent for Secret Service, well,
17  Diplomatic Security Service.
18      Q.  Now, it looks to me like he wanted to meet
19  with you to discuss voter fraud, is that right?
20      A.  Yes.
21          MR. STOOL:  I'm going to object top any
22  further questioning in this area on the grounds of law
23  enforcement privilege.  I understand you have the email,
24  and so you have that, but with regard to any
25  conversations that Agent -- Special Agent Bowen or

Page 21

1   anybody else with the federal government had concerning
2   this matter, I'll have to object to that on the grounds,
3   privilege of law enforcement privilege.
4           MR. THOMPSON:  Well, let's see if I can
5   ask some questions that you think aren't covered by
6   privilege, but maybe just to --
7           MR. STOOL:  Uh-huh.
8           MR. THOMPSON:  -- for me to understand
9   what's going on here.
10              Whose privilege are we talking about
11  right now, is this a privilege that, like, is -- I don't
12  know, could you tell me about the privilege we're
13  talking about?
14          MR. STOOL:  It would be law enforcement
15  priv -- law enforcement privilege with regard to the
16  Diplomatic Security Service of the Federal Government,
17  is whatever conversations that Mr. Scarpello has had
18  with them, I -- I would need to assert that, because I
19  don't know what they are.
20              I mean, I -- I don't know exactly what
21  else is behind this, but if -- if it's an investigation
22  being conducted, and -- and I'm just looking at this,
23  says "federal criminal investigation", then it would be
24  a privilege to not disclose matters of a federal
25  criminal investigation, that privilege under law

Michael Scarpello

May 04, 2022
Pages 54 to 57

Page 54

1  context of mail-in voting compared to in-person voting?
2      A.  I would speculate that it's higher.  I have no
3  evidence to point to that.
4      Q.  Are you familiar with any other public
5  officials elected from the State of Texas who've made
6  that claim?
7      A.  No.
8      Q.  Okay.  So we say -- we just established that
9  there is some level of risk that is there for that
10  someone will try to vote under someone else's name, even
11  if we don't know how high it is.
12          So regardless of how high it is, do you
13  think that requiring identification numbers, either a
14  driver's license, or the last four digits of the social
15  security number, to vote by mail, will increase or
16  decrease the risk of someone voting under someone else's
17  name?
18          MS. PERALES:  Objection.
19      A.  I don't know.
20      Q.  (BY MR. THOMPSON)  Are you familiar with an --
21  with the form that is often used to apply for a ballot
22  by mail?
23      A.  Yes.
24      Q.  Do you know what information is required on
25  that form?

Page 55

1      A.  Yes.
2      Q.  Before SB 1 took effect, is it fair to say
3  that the information required on that form, that
4  identifies the requesting voter, was all publicly
5  available?
6      A.  I don't know.
7      Q.  Now, let's --
8      A.  I don't recall.
9      Q.  Let's break it down.
10          The application to vote by mail before
11  SB 1 required a voter's name, right?
12      A.  Yes.
13      Q.  And it required the voter's address, right?
14      A.  Yes.
15      Q.  Do you know whether it required any other
16  identifying information?
17      A.  I don't think so.
18      Q.  Are you familiar with the term voter file?
19      A.  Uh-huh.
20      Q.  What is the voter file?
21      A.  The voter file is -- well, which voter file?
22  I mean, there -- there is a county voter file, the --
23  the list of registered voters that we maintain in Dallas
24  County, which is also imported or merged with other
25  counties at the state level, and maintained at the state

Page 56

1  level.
2      Q.  So let's start with the Dallas County one.
3          The Dallas County voter file would
4  contain the names and addresses of registered voters in
5  Dallas County, right?
6      A.  Yes.
7      Q.  Do you know whether the Dallas County voter
8  file is publically available?
9      A.  It is.
10      Q.  So putting all that together, is it fair to
11  say that the information -- excuse me, the identifying
12  information that a voter had to fill out on an
13  application to vote by mail before SB 1 took effect was
14  all publically available?
15      A.  Yes.
16      Q.  How has the application to vote by mail
17  changed, in terms of what information it requires, since
18  SB 1 took effect?
19      A.  Now, a voter has to include their driver's
20  license or last four digits of their social security
21  number, and that information on their application has to
22  match up to the information on their voter registration.
23      Q.  The voter file doesn't contain voters'
24  driver's license numbers, right?
25      A.  Can you repeat the question?

Page 57

1      Q.  Do you know whether the voter file contains
2  driver's license numbers for the voters listed?
3      A.  It does for some, for -- for most people.
4      Q.  Are you sure about that?
5      A.  Can you ask me the question again?
6      Q.  I'm talking about driver's license numbers.
7      A.  Uh-huh.
8      Q.  Perhaps I am just mistaken, but my
9  understanding is I could not discover your driver's
10  license number, for example, by requesting the Dallas
11  County voter file and pulling up your name?
12      A.  So we -- we have a different understanding of
13  voter file.  We have the voter file that -- that we
14  maintain, contains driver's license numbers.  A voter
15  file that someone would purchase, is releasable, it
16  would not contain that.
17      Q.  I'm sorry, that -- that's my fault for asking
18  the question in a poor way.  I'm trying to ask about the
19  version of the voter file that is publically available.
20      A.  Okay.
21      Q.  And this is a document that political
22  campaigns request --
23      A.  Right.
24      Q.  -- for example?
25          Right.  And other people can request it?

Michael Scarpello

May 04, 2022
Pages 58 to 61

Page 58

1    A.  Yes.
2    Q.  With regard to the publically-available
3  version of the voter file, does it contain voters'
4  driver's license numbers?
5    A.  Yes.  I mean no, no.
6    Q.  That's okay.  Let's get it clear on the
7  record.
8         The publically-available version of a
9  voter file doesn't contain voters' driver's license
10  numbers, correct?
11    A.  Correct.
12    Q.  And the publically-available version of the
13  voter file doesn't contain voters' social security
14  numbers, correct?
15    A.  Correct.
16    Q.  Those are personally-identifying numbers that
17  Dallas County doesn't disclose to the public, right?
18    A.  Correct.
19    Q.  So now, after SB 1, the application to vote by
20  mail requires a voter to provide information that is not
21  publically available, correct?
22    A.  Correct.
23    Q.  Given that, is it fair to say that SB 1 has
24  made it more difficult for anyone to successfully
25  request an application to vote by mail, using someone

Page 59

1  else's information?
2         MS. PERALES:  Objection.
3    A.  Probably.
4         MR. THOMPSON:  What was the objection,
5  Nina?
6         MS. PERALES:  Well, I'm limited by the
7  Rules in terms of what --
8         MR. THOMPSON:  But you're not if I ask.
9         MS. PERALES:  So, you know, I think it's
10  vague.  The witness answered, so objection, form, vague.
11         MR. THOMPSON:  Okay.
12         MS. PERALES:  I think it's probably also
13  outside the scope of the witness' knowledge.
14    Q.  (BY MR. THOMPSON)  Are you familiar with the
15  cure process established by SB 1?
16    A.  Yes.
17    Q.  Are you implementing the cure process in
18  Dallas County?
19    A.  The Ballot Board is implementing the cure
20  process.
21    Q.  Do you know how the Ballot Board is
22  implementing the cure process?
23    A.  Yes.
24    Q.  Can you tell me about it, just at a high
25  level?

Page 60

1    A.  Well, we have to be more specific.  Cure
2  processes regarding applications, or -- or regarding
3  ballots?
4    Q.  Right.  So I -- I just wanted to understand
5  the process for both, actually, and I'm happy to ask you
6  more specifically, or however you want to handle it.
7    A.  Yeah.  Why don't you go ahead and ask me --
8    Q.  Okay.
9    A.  -- more specifically.
10    Q.  Is there a cure process for applications for a
11  ballot by mail?
12    A.  Yes.
13    Q.  Does it come into play when an application is
14  otherwise going to be rejected?
15    A.  Yes.
16    Q.  What can a voter do to cure an application to
17  vote by mail that would otherwise be rejected?
18    A.  They can -- if they -- if they're missing --
19  well, it depends on what the -- the -- the flaw in the
20  application is.  If they haven't signed, they need to
21  sign.  If they haven't provided one of those two numbers
22  that we spoke of, they have to provide one of those
23  numbers.
24         There is a cure process, in theory,
25  that's supposed to work from -- to -- to have them go to

Page 61

1  the State's mail ballot tracking application, and be
2  able to cure through that.  That -- though, that has
3  been highly problematic, especially in counties what --
4  what are called offline counties.
5    Q.  There are other options for curing as well?
6    A.  Yes.
7    Q.  Do those involve, for example, a voter coming
8  to the Dallas County Elections Office?
9    A.  Yes.
10    Q.  Have any voters come to the Dallas County
11  Elections Office as part of the cure process?
12    A.  Yes.
13    Q.  Do you know whether they were able to
14  successfully cure issues with applications to vote by
15  mail?
16    A.  Yes.
17    Q.  Did they successfully cure those issues?
18    A.  Yeah.  And I don't have those numbers.
19    Q.  Do you have any high-level understanding of
20  how often they were successful?
21    A.  No.
22    Q.  All right.  So we were just talking about the
23  application to vote by mail, and the cure process
24  related to that.
25         There is also a cure process related to

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,  §
    *Plaintiffs,*  §
     §
*v.*  §   Case No. 5:21-cv-844-XR
     §
GREGORY W. ABBOTT, et al.,  §
    *Defendants.*  §

---

STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT

# APPENDIX AA

Transcript of the Testimony of

# Jonathan White

**Date:**

May 05, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs STATE OF TEXAS

Jonathan White                                                    May 05, 2022

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                      SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO            )
     ENTERO, et al,                 )
 4                                  )
                   Plaintiffs,      )
 5                                  ) CIVIL ACTION
     VS.                            )
 6                                  ) NO.: 5:21-cv-844(XR)
     STATE OF TEXAS, et al,         ) (Consolidated Cases)
 7                                  )
                   Defendants.      )
 8                                  )

 9        ------------------------------------

10        ORAL AND VIDEOTAPED DEPOSITION OF

11                  JONATHAN WHITE

12   Designated Representative for the Office of the Texas

13                  Attorney General

14                   MAY 5, 2022

15        ------------------------------------

16        ORAL DEPOSITION OF JONATHAN WHITE, produced as a

17   witness at the instance of the DEFENDANTS, and duly

18   sworn, was taken in the above-styled and numbered cause

19   on May 5, 2022, from 10:02 a.m. to 4:06 p.m. before Miah

20   Parson, CSR in and for the State of Texas, reported by

21   oral stenography, at the Offices of the Attorney General

22   300 W. 15th Street Austin, Texas 78701, pursuant to the

23   Federal Rules of Civil Procedure and the provisions

24   stated on the record or attached hereto.

25
```

Jonathan White

May 05, 2022
Pages 90 to 93

---

Page 90

1 and incomplete hypothetical.
2     A. I don't have a position on that very specific
3 scenario to share. I can say that we not entered into
4 one of those agreements historically.
5     Q. Thank you. That was my next question.
6     A. I knew it was.
7     Q. So if we could turn back to Exhibit No. 5
8 which was Chapter 273 of the election code. I'd like to
9 go to 273.022 which is also on Page 2 and I'll just read
10 it out slowly. Title is cooperation with local
11 prosecutor. The attorney general may direct the county
12 or district attorney serving the county in which the
13 offense is to be prosecuted to prosecute an offense that
14 the attorney general is authorized to prosecute under
15 Section 273.021 or to assist the attorney general in the
16 prosecution. Did I read that correctly?
17     A. Yes, sir.
18     Q. Has the OAG ever used this authority to direct
19 a county prosecutor to prosecute an offense without the
20 OAG's involvement?
21     A. Not to my recollection.
22     Q. Has the OAG ever used this authority to direct
23 a county prosecutor to assist the OAG in a prosecution?
24     A. I think my answer would be the same as it was
25 to your similar question under Section 273.002 to the

---

Page 91

1 extent that we've ever done this we have never directed
2 a district attorney to prosecute or assist. It's
3 possible that we may have mentioned this provision and
4 now refreshing my recollection that there are separate
5 provisions for investigations and prosecution, I'm not
6 sure which is which, but if we ever used it would have
7 been the same circumstances I described before as it
8 would have been a soft touch. It would have been a
9 request that we would not have pushed without agreement
10 of the district attorney. And at most it would have
11 been a reference to a code section, but never a
12 mandatory directive.
13     Q. Okay. And so I guess that means that the OAG
14 has never utilized this provision against a county
15 prosecutor's wishes?
16     A. Exactly. Not -- not used it per se, but it
17 could have been referenced with regards to a request.
18     Q. Okay.
19     A. It was not, you know, a directive or mandatory
20 in nature.
21     Q. Would the OAG ever use this authority if a
22 county prosecutor did not want to prosecute or assist
23 with the -- in the -- the prosecution?
24         MR. HUDSON: Object as to attorney/client
25 privilege, work product doctrine, investigative

---

Page 92

1 privilege, similar processes privilege, to the extent
2 you can respond without encroaching on those privileges,
3 you may do. Otherwise I'm instructing you not to
4 answer.
5     A. I know way of knowing if the attorney general
6 would ever use it. We have never used it in the past
7 and as I previously testified here and before the
8 legislature is we always used a soft touch and a
9 cooperative approach with local prosecutors. We'd never
10 desired to step on a local prosecutor's toes or tried to
11 force them to do anything or be involved in anything
12 that they didn't want to be.
13     Q. Okay. Thank you. So handing you what I've
14 marked as Exhibit 8, which is a copy of SB1 enrolled.
15 Just confirm that for me.
16         (Exhibit No. 8 marked.)
17     A. Yes, sir.
18         MR. HUDSON: In the interest of short
19 circuiting out objections on the document itself as he's
20 asking questions. Can you verify where you got it from
21 and the reason I ask that is, is there's an actual
22 signed copy on the Secretary of States website. I don't
23 know if this is the final enrolled copy or not. Is
24 there any chance I can get you to clarify that?
25     Q. (BY MR. DOLLING) I cannot remember exactly what

---

Page 93

1 the website is called, but it's the legislative look up
2 that's provided by the state on the capital website or
3 whatever it is.
4         MR. HUDSON: Thank you.
5     Q. (BY MR. DOLLING) So, Mr. White, do you
6 understand that when text is struck through it means
7 that SB1 removed that text from the law?
8     A. Yes, sir.
9     Q. And when text is underlined it means that the
10 text was added by --
11     A. Yes.
12     Q. Okay. And then if we turn to Page 75
13 Section 10 -- oh sorry. Wait for you to get there.
14     A. Yes, sir.
15     Q. It says, Section 10.04 says, this act takes
16 effect on the 91st day after the last day of the
17 legislative session; is that correct?
18     A. Yes, sir.
19     Q. And would you agree with me that that means
20 that SB1 took effect on December 2nd, 2021?
21     A. Sounds correct.
22     Q. And so when I refer to the effective date of
23 SB1, I'm referring to December 2nd, 2021?
24     A. Yes, sir.
25     Q. So can we turn to Section 2.04 which is I think

---

Jonathan White

Page 142

1  receive specific to their work on violation of election
2  laws of Texas?
3      A. I generally provide training to my group on the
4  election laws. I'm not aware of any source such as
5  TDCAA, any source that provides election specific
6  training to prosecutors.
7      Q. And those trainings that you provide to the
8  investigators within Election Integrity Unit do you
9  sometimes use power points?
10     A. I dont. They're generally one on one.
11     Q. Are there any written materials that are
12  provided as training materials to those investigators?
13     A. No, I don't believe.
14     Q. You testified that the Election Integrity
15  Division was stood up as an independent division because
16  the Election Integrity issues are so complex or at least
17  that's one of the reasons; is that correct?
18     A. It's a specialized field.
19     Q. Would you recall whether you had desribed it as
20  complex before?
21     A. They are complex cases.
22     Q. And I think you then -- explaining the term
23  complex to Mr. Dolling said that voting takes place in a
24  block box. Do you recall that?
25     A. I do recall that.

Page 143

1      Q. What do you mean by voting takes place in a
2  black box?
3      A. Well, what I testified in terms of the secrecy
4  of the ballot provides a certain shroud around the
5  voting process that's protected. We generally don't
6  have or didn't used to have cameras in the polling place
7  particularly with the mail balloting process. Mail
8  ballots operate in an uncontrolled environment.
9  Someone's home, there's no election officials around.
10 So there -- there's quite a bit of the process that is
11 not really outfitted with a whole lot of security
12 features at least historically speaking.
13     Q. That's not any different from some other kind
14 of fraud, correct?
15     A. I think it might be.
16     Q. Well, for example, if you had a caregiver who's
17 taking care of another person some reason and has their
18 power of attorney that person would have the ability to
19 embezzle funds or take funds with really hardly any
20 oversight, correct.
21     A. Correct. Particularly if that person had
22 dementia or something like that that might be very
23 similar to what we see.
24     Q. So there's other  similar kinds of investment
25 challenges and other kind of criminal activity, correct?

Page 144

1      A. Certainly.
2      Q. And you testified a lot election security is on
3  the honor system. Do you call testifying to that?
4      A. Yes, ma'am.
5      Q. What do you mean by that?
6      A. If I check the box that's on a voter
7  registration application and affirm and swear that I'm
8  eligible to vote the system essentially in the past has
9  taken people at their word and register them to vote
10 vote and let them vote when they come to the pole and
11 let's the check in. So voting in that sense in terms of
12 eligibility has been primarily on the honor system.
13     Q. And there are other kinds of government
14 benefit's or processes that operate on the honor system
15 as well, correct?
16         MR. HUDSON:  Objection; form.  Foundation.
17     A. I sort of stay in my lane of Election Integrity
18 you may be right.
19     Q. (BY MS. OLSON) So you simply don't know if
20 there are other torts, for example, Social Security
21 applications that might operate on the honor system.
22         MR. HUDSON:  Objection; form.  Foundation
23 Objection.  Outside of the scope.
24     A. I think what you're saying may be true.  I
25 don't have enough experience with the system to know

Page 145

1  where the gaps are and how easy they are to fit through.
2      Q. (BY MS. OLSON) And so it may be that the
3  election security being on the honor system is no
4  different than in a lot oh other circumstances where
5  conduct is on the honor system?
6          MR. HUDSON:  Same objections.
7      A. It sounds like -- it sounds like the examples
8  that your giving may be similar examples that may be
9  investigated and prosecuted federally, but maybe not on
10 a state level on some of those.
11     Q. (BY MS. OLSON) Have you ever prosecuted any
12 benefit fraud cases on the state level?
13     A. I haven't.
14     Q. And so it might be the same on the state level
15 someone filled out a form indicating that they're
16 eligible for some sort of state benefit that also might
17 be done on the honor system, correct?
18         MR. HUDSON:  Same objections.
19     A. I haven't heard of state prosecutions for
20 benefits fraud.
21     Q. (BY MS. OLSON) So you just don't have any
22 knowledge one way or the other whether that would be an
23 appropriate example or appropriately similar to being
24 something that's on the honor system similar to election
25 security?

Jonathan White                                                    May 05, 2022
                                                              Pages 146 to 149

Page 146

1    A.  Correct I haven't really seen those cases in
2  14 years.
3    Q.  You indicated that there were also complexities
4  in the prosecution of election law cases; is that
5  correct?
6    A.  Yes, ma'am.
7    Q.  And I think you talked about how there were
8  often times in a matter that was investigated there
9  could be hundred of ballots affected, for example,
10 correct?
11   A.  Yes.
12   Q.  And that the conviction stage you typically
13 didn't hold that number because you couldn't get every
14 witness every voter and they may not be able to identify
15 the person who came and got the ballot from them is that
16 a fair summary of what you testified to before?
17   A.  I think so more or less.
18   Q.  And some of your cases have been resolved by a
19 plea agreement; is that correct?
20   A.  Yes, ma'am.
21   Q.  And that doesn't require any witness to take
22 the stand?
23   A.  That's correct.
24   Q.  And what has been the largest number of
25 harvested ballots in a case of conviction whether by

Page 147

1  trial or by plea?
2    A.  And do you mean.
3    Q.  For a single Defendant what is the -- based on
4  your knowledge of these cases, what is the highest
5  number of ballots that someone has plead guilty to or
6  been convicted of harvesting?
7    A.  I don't know that off the top of my head, but
8  it would probably be a small number.
9    Q.  Even if it were a conviction by way of a plea
10 agreement?
11   A.  Correct.  Normally.  Normally that's how plea
12 agreements work.
13   Q.  Is it fair to say when you say normally that's
14 how plea agreements work, what do you mean?
15   A.  One of the primary negotiation terms in a plea
16 would be to get the number of counts down to one that's
17 what a defense attorney would be looking to get the
18 number of offenses the Defendant is pleading guilty to
19 to down to one.  And usually a lower level of offense.
20   Q.  But then that's all they're convicted of,
21 correct?
22   A.  That's correct.
23   Q.  I think, Mr. Dolling asked you the question,
24 his question was, is it fair to say that the office of
25 the attorney general ahs a policy of investigating all

Page 148

1  credible allegations of a violation of the election
2  code.  Do you recall that question?
3    A.  Yes, I believe I do.
4    Q.  And I think your answer was yes that the policy
5  of the office of the attorney general to investigate all
6  credible allegations; is that right?
7         MR. HUDSON:  Objection; form.  Foundation
8  objection.  Remind you the stipulation concerning his
9  presentation on responding to that tweet.
10        MS. OLSON:  Well, with respect to your
11 objection,  Mr. Hudson, Mr. Dollings question that I
12 repeated back was asked in a much earlier portion of the
13 deposition.
14   Q.  So do you recall that prior to being asked
15 about the tweet, do you recall Mr. Dollig's question, is
16 it fair to say that the office of the Attorney General
17 has a policy of investigating all credible allegations
18 of a violation of the election code?
19   A.  I do remember that question.
20   Q.  And do you recall what your answer was?
21   A.  I think I do.
22   Q.  And what was your answer?
23   A.  I think I answered that, I was not prepared to
24 make a policy statement by the Attorney General's office
25 on that specific language, but that our practice in the

Page 149

1  Election Integrity Division is to or Election Integrity
2  Unit evaluates every credible complaint, then determines
3  whether to proceed with an investigation and that we do
4  not blanket, exclude any specific type of case we don't
5  have a standing policy that we actually filter out
6  cases.
7    Q.  And I think the term credible allegations was
8  actually Mr. Dolling's term, but is there a phrase where
9  a standard practice is used by the Election Integrity
10 unit to assess whether somethings a credible allegation?
11        MR. HUDSON:  Objection; form.
12 Argumentative.
13   A.  I don't believe there's a defined standard for
14 what credible is.
15   Q.  (BY MS. OLSON)  And, for example, I'll tell you
16 that in some prosecutors offices or some investigating
17 officers the standard is if the facts as alleged would
18 make out a violation of the statute they will initiate
19 an investigation.  So is there anything like that a
20 standard that is used when reviewing and complaint a
21 standard that is used by the Election Integrity Unit  to
22 determine whether or not it's going to move forward on
23 investigation?
24   A.  Not as such that's a very baseline standard.
25 We would have that standard in place because if a

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,          §
   *Plaintiffs,*        §
                §
*v.*               §   Case No. 5:21-cv-844-XR
                §
GREGORY W. ABBOTT, et al.,     §
   *Defendants.*       §

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX BB

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

## DECLARATION OF JONATHAN WHITE

I, Jonathan White, pursuant to 28 U.S.C. 1746, am executing this declaration as part of my assigned duties and responsibilities. I declare under penalty of perjury that the facts stated below are true and correct to the best of my personal knowledge and belief.

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The evidence set out in the foregoing Declaration is based on my personal knowledge.

2. I am the former Division Chief of the Election Integrity Division of the Office of the Attorney General of Texas and submit this Declaration in support of the State's Motion for Summary Judgment in the above-captioned case.

3. I have been involved in election fraud prosecutions as some portion of my work since I started at the Attorney General's office 15 years ago in the White Collar Crime and Public Integrity Section of the Criminal Prosecutions Division. Through the years, our election caseload expanded, resulting in the creation of an Election Fraud Section, and ultimately the Election Integrity Division. In that time, I have reviewed hundreds of investigations, and handled approximately 100 prosecutions, many of which were complex, involving multiple, if not dozens, of election offenses.

4. The Election Integrity Division receives complaints about potential election fraud forwarded primarily from the Secretary of State's office. Our investigators then determine whether the facts support an allegation of fraud, and, if warranted, the Election Integrity Division prosecutes the offenses or assists counties in prosecuting the offenses. This prosecution role has evolved somewhat since the end of 2022.

1

5. During my tenure as Division Chief of the Election Integrity Division, I became familiar with the administration and operations of Texas elections, including the tasks, practices, and responsibilities that local Texas election authorities must fulfill; and the laws and regulations with which local election authorities must comply to plan, coordinate, manage, and execute a successful election.

6. During my tenure as Division Chief of the Election Integrity Division, I investigated and prosecuted a variety of offenses related to voter fraud, including but not limited to ballot harvesting, illegal voting, and illegal ballot assistance. Based on that experience, I believe that the ID requirement of SB1 with regard to applications for ballots by mail and mail-in ballots is both reasonably calculated and necessary to eliminate several common types of voter fraud. *See* Tex. Elec. Code §§ 84.002(1-a); 86.001(f); Section 87.041(b)(8).

7. In my investigations and prosecutions, by far the most common type of voter fraud is related to mail-in ballots. There are three main types of election violations: mail-in ballot fraud, illegal voting, and voter assistance fraud. Mail-in ballot fraud accounts for roughly 2/3 of the offenses we prosecute. Around 1/4 deal with illegal voting, and around 1/5 deal with voter assistance. These categories may overlap within the same case. In my experience, the prevalence of mail ballot fraud is attributable to the fact that voting by mail lacks the security mechanisms that are inherent facets of in-person voting.

8. The central feature of both mail ballot fraud and voter assistance fraud schemes is a person with a political agenda getting between a voter and their ballot. With mail ballots, a vote harvester travels in person to wherever the voter is located, in a nursing home, for example, or at the voter's home, and attempts to ensure that the ballot is voted for the candidate or group of candidates the harvester supports. This may be achieved by actually filling the ballot out for the voter, or suggesting to the voter how they should vote during the voting process. The degree to which a campaign worker or political operative can get access to the voters ballot is directly proportional to the degree to which they can ensure that vote gets cast according to their wishes.

9. Ballots may also be diverted from the voter, without their knowledge. A bad actor may submit applications for ballot by mail fraudulently, without the voters' permission and then vote ballots on their behalf.

10. In voter assistance fraud schemes, political operatives may transport voters to the polls and assign the voter to an "assistant" who walks them through the voting process, including physically entering the votes on the voting machine. Alternatively, "assistants" may latch on to a voter at the polling location by soliciting, or by simply informing the voter that they are providing them "voting assistance" and end up either entering votes for the candidates of their choice, or influencing the voter's choice by suggestion. In each scenario, the key element is getting in-between the voter and their ballot.

11. My office has observed that in both mail-in ballot fraud and in-person voter assistance fraud, vulnerable individuals are frequently targeted. Usually, these individuals are elderly, or occasionally, may have disabilities. The person seeking to "assist" with ballots is normally a campaign worker or someone closely affiliated with a candidate or campaign.

Though I use the term "campaign worker," vote harvesters are usually paid off book. On occasion, though, they may be listed on campaign reports as "canvassers," "blockwalkers," "GOTV" (get out the vote), "outreach," or some other euphemism or title. Occasionally, the harvester or "assistant" is an actual candidate on the ballot.

12. In a vote harvesting operation, harvesters will first go through a target neighborhood/precinct and sign up as many people as possible for mail-in ballots. This process, known as the "seeding" phase, can be done by collecting actual signatures from voters, but this can also be accomplished by forging signatures, having other members of a household sign for a voter, or even by misrepresenting the nature of the document the voter is signing. If the "annual application" box is checked on the application, and it normally is, voters will receive mail ballots for the entire year – including every local election. Harvesters may alter the selections or information on applications without the knowledge of a voter, or fill them in after the fact. We have seen this practice result in voters receiving ballots against their wishes, or for the wrong political party's primary and runoff elections. The fundamental goal is to generate as large a pool of mail ballots as possible that can be later harvested. In effect, voters are treated as a commodity, and their voices are lifted from them and reappropriated for use by a political campaign.

13. Depending on the number of votes needed to swing a targeted election, vote harvesters may resort to signing up young, able-bodied people who do not qualify for mail ballot voting. In one case, my office identified a district where close to half of the mail ballots for certain precincts were issued for disabilities. The investigation showed these individuals to be young, able-bodied voters. Typically, only 1-2% of mail ballots are issued to people with disabilities, and the rest to people over 65 or absentee voters.

14. At election time, a harvester will follow up door-to-door to collect ballots from the voters they signed up to receive mail ballots. In some parts of the state, this process is referred to as "following the mail truck" as mail ballots are delivered by the postal service. Harvesters may develop connections in the post office to get the best information possible on when mail ballots go out, or even illegally purchase lists from mail carriers of those receiving mail ballots. In this collection or "harvesting" phase, the harvester often presents themselves in an official or quasi-official capacity, or simply informs the voter that they are there to help the voter vote their ballot. The harvester will normally mark, or at least attempt to mark, the votes directly on the ballot. They may ask the voter their preferences for President, Vice-President or other up-ballot candidates, and may even honor the voter's request, particularly if the harvester is really interested in a down-ballot race, or races, as is usually the case. Other times a harvester may verify that the voter wants to vote a "straight-ticket" for a particular party, but in a party primary election, where that instruction provides zero direction on how the ballot will actually be voted.

15. An experienced harvester may have a warm, friendly interaction with the voter, but it is unlikely the voter will have any idea how their votes were actually cast. After collecting the ballot from the voter, the harvester may leave a gift for the voter, often a trinket, but in some cases it could be an item like a scarf, fruit basket, or bag of groceries. These gifts may also be offered up front in order to lower defenses, or trigger a sense of reciprocity in the voter.

3

16. Since 2015, the OAG has prosecuted over 800 election offenses against 126 individuals. Approximately 343 offenses against 39 defendants pending in court were placed in jeopardy in late 2022, due to the Court of Criminal Appeals' ruling in *State v. Zena Stephens*, which declared the AG's statutorily granted authority to prosecute election cases unconstitutional.

17. All mail ballots, due to their nature of being handled and voted outside of a polling location, lack significant security mechanisms available to in-person voters. In the polling location, in-person voters have election judges and poll watchers to make sure that there is no electioneering; no harassment, pressure, or persuasion being placed on the voter to vote a certain way; that no one is marking the voter's ballot without authorization; and that the vote is actually turned in, counted, and not altered by any person. Paid operatives are not allowed to loiter in the polling place, or to collect ballots from voters and remove them from the polling place, with a promise to turn them in later on behalf of the voter. Voting not conducted in a polling location lacks these protections. There are laws prohibiting many of these bad acts, but there is no monitoring and no ability to stop them from happening. The vote-by-mail process is wide open to politically interested individuals to proliferate mail ballots to targeted precincts and then pursue those ballots to ensure they get voted according to their preferences. When compared to voting by personal appearance, voting by mail is exceptionally vulnerable to fraud, particularly from vote harvesting operations.

18. My office investigated a mayoral candidate in Carrollton, Texas, named Zul Mohamed. The investigation proved that Mohamed fraudulently filled out and submitted at least 100 applications for ballot by mail, that we know of, in the 2020 election. He did this without the consent or knowledge of a single voter, and then voted or attempted to vote the ballots. He targeted elderly voters of the highest ages who had not voted in recent elections, in order to decrease his likelihood of detection. Mohamed directed the mail ballots to be sent to a virtual mailbox he acquired under a false identity. The City of Carrolton spans three different counties, and he targeted at least Denton and Dallas counties in his scheme, which was detected and reported only by the Denton County Elections Office.

19. An operation by Denton County Sheriff's Office, assisted by our investigations unit, caught Zul in the act of picking up a box of mail ballots and transporting them to his home, where he was still in the process of creating numerous fraudulent ballot applications and submitting them to Dallas County. A significant number of the voters targeted in Dallas County were deceased, but had not yet been removed from the rolls. Dallas County Elections, acting under instructions of the Dallas County District Attorney and Commissioner's Court was uncooperative with the investigation, and declined to produce certain election records for our investigation. The elections office did, however, flag a list of fraudulent ballots we provided them with, after having already accepted and counted a number of them, which minimized some of the damage. Dallas County also declined to press charges on our completed investigation, or conduct their own; however, Zul was prosecuted by the Denton County District Attorney's Office for the dozens of fraudulent ballots he attempted to case there. His case is currently set for trial.

20. It is not uncommon for dozens or perhaps even hundreds of mail ballots to be delivered to multi-family dwellings, residential care facilities, or other such locations. Had the Denton

County elections office not taken additional steps to investigate and verify the nature of the address the ballots were being diverted to, and then report the activity, I have no doubt that hundreds of votes would have been fraudulently cast and counted in both Denton and Dallas Counties. I am confident that Dallas County would have accepted and counted each fraudulent ballot it received, had our investigation not intervened, instead of the relatively small number that was counted before we intervened.

21. Because Zul forged voters' signatures when requesting mail ballots, and also signed the respective ballot envelopes, signature verification did not reveal the fraud. Zul would not, however, have been able to provide the identification numbers required under a mail ballot ID number requirement, either on the applications or ballot envelopes. This security measure would have prevented this fraud scheme entirely, and would have stopped it early, at the application phase.

22. Although Zul was ultimately caught in the act, and likely hundreds of fraudulent votes prevented, he was still able to successfully cast fraudulent ballots in the election. Once processed and removed from their envelopes, ballots are entirely anonymous and untraceable. They cannot be identified for removal from counting. Additionally, once a voter requests a mail ballot, they are unable to vote at a polling place without surrendering their mail ballot or going to election headquarters to file paperwork, including a sworn affidavit. Most voters will not complete this process, but even if they are willing and able, they will still not be able to vote if the mail ballot has already been processed at the elections office. Simply put, mail ballot fraud disenfranchises voters by making it impossible for them to cast their vote. Voters' voices are stolen and supplanted by those driven to make their voices heard louder than everyone else's.

23. Had Texas utilized an ID number requirement, election officials would not have accepted the fraudulent applications for ballot by mail in the first place. No voters, either in the Zul case, or any other mail ballot fraud case, would be disenfranchised by vote harvesters who do not have or cannot gain access to the voters unique ID numbers. This is a common sense security measure.

24. Other vote harvesters illegally harvest hundreds of ballots with more subtle methods than ballot diversion. Many ballot harvesters interact directly with the voters to obtain actual signatures on applications and ballot envelopes. In these cases, fraud is far more difficult to detect. Unless an opposing candidate is aware their opponent is conducting a harvesting campaign, or discovers significant statistical anomalies in the election data, vote harvesting is likely to go undetected. Even if fraud is both detected and reported, in situations where harvesters who collect authentic-looking, or actually authentic signatures from voters, it is difficult to know whether a voter's ballot was marked or influenced by a vote harvester.

25. Investigating and prosecuting mail ballot fraud violations after the fact is difficult for a number of reasons. Inadequate detection mechanisms are in place to identify mail ballot fraud and to capture and preserve evidence of it. There are typically not eyewitnesses or video recordings to capture interactions between a harvester and a voter, or a ballot being diverted from a mailbox. Additionally, victims are often elderly and sometimes disabled, and may have diminished perception or memory of the event.

26. Perhaps most importantly, if performed correctly, fraud committed during harvesting interactions is designed to be undetectable to the voter. An experienced harvester can gain a voter's trust by leveraging ties to the community or acquaintances they have in common. A harvester may also be able to portray themself as an election official or volunteer, with whom the voter can feel comfortable in allowing them to "assist" with or to collect a mail ballot. From there, a skilled harvester can avoid pushing a voter beyond a certain point of comfort and can settle for whatever level of influence they are able to assert over the voter's ballot. This might range from merely suggesting which candidates the voter should vote for, to physically marking the voter's ballot, to collecting a ballot—marked or unmarked, envelope sealed or unsealed—from the voter. If a voter insists on voting a ballot against the harvester's preferences, that vote can easily be reversed or cancelled by the harvester by either altering the ballot or discarding the ballot, in a worst-case scenario. The individuals we investigate and prosecute do this work not to help others, but to deliver votes.

27. A common harvesting practice, mentioned earlier, is to ask the voter whom they wish to vote for on one or two top-of-ballot candidates, and then vote the rest of the ballot without the voter's input or consent, or to simply mark the votes opposite of the voter's direction, if any is given. A harvester could theoretically go over the entire ballot with the voter if they had the time and inclination, but the only thing that matters is how the harvester actually marks the votes.

28. It was also not uncommon for our investigators to encounter voters who have been conditioned over perhaps years of vote harvesting interactions to simply hand over unmarked ballots directly to the vote harvester. While this may seem strange to outsiders, it is more understandable when one takes into consideration that some of these voters did not actually want to receive a ballot in the first place, but they signed an application when it was put in front of them by a friendly, pushy, or deceptive vote harvester.

29. Another challenge to investigators and prosecutors is that even if a voter did perceive an illegal interaction, and is willing to talk to investigators, it is common for that voter to be unable to identify who the harvester was (if they ever knew) or to recall key facts about the interaction. Given the number of times elections are conducted in even years, often just weeks or months apart, with primaries, runoffs, and local elections in rapid succession, interactions with harvesters may easily be confused or forgotten. Investigations are often conducted many months, or even a year or more after an election, given delays in reporting and investigative workload and staffing. With scant documentary evidence and the uncontrolled and unmonitored environments where mail ballot interactions take place, it is a long shot that a voter will be able to decisively remember enough detail to establish the elements of an election offense to a criminal burden of proof.

30. Organized mail ballot fraud activity is another hurdle to investigation and prosecution. When multiple people act in coordination, which is common, to divide the illegal activities among multiple players, it is more difficult to prove a case, and easy for bad actors to point to an unknown actor in the process to evade responsibility. For example, our division investigated an individual who signed as an assistant on a ballot application for a woman who had been dead for 8 years. The mail ballot was voted and counted. But when DNA on

6

the ballot envelope came back to an unknown actor, the illegal voting case could not be proved beyond a reasonable doubt. Furthermore, the co-conspirator who signed the application as an assistant claimed that she been provided the application by an unknown individual (but likely a member of her harvesting crew), and she merely signed the document to comply with the law. Of course, she claimed no knowledge of how the deceased voter's ballot was actually cast.

31. Because mail ballots have few safeguards, fraud is perpetrated relatively easily. But it is many orders of magnitude more difficult to prove what happened, and even in cases of clear fraud, to identify the perpetrator and prove each element of an offense beyond a reasonable doubt. Our successful prosecutions represent a tiny fraction of the number of individuals involved in vote harvesting and the number of votes and voters who have been defrauded.

32. A single ballot harvester can impact dozens or hundreds of votes, depending on the industriousness and experience of the harvester. A single ballot-harvesting scheme can result in hundreds of people being disenfranchised from their right to vote. Depending on the scale of the operation, dozens of ballot harvesters may be acting in coordination. Even if one or two are caught, many others may escape detection. Even if detected, the investigation and prosecution challenges described above ensure that cases that result in successful prosecutions represent a fraction of total ballot harvesting activity.

33. Prior to SB1, one requirement intended to protect the integrity of the mail ballot was comparing the signature on the carrier envelope with the signature on the application for ballot by mail or another signature on file. While signature matching certainly provides some measure of protection against fraud, its utility is limited, and it can be circumvented relatively easily by a determined bad actor.

34. Vote harvesting methods have evolved to avoid having ballots rejected for signature mismatch. A basic workaround is simply forging both signatures. Our office observed a scheme that captured digital signatures from voters on an iPad to request a mail ballot, which was used to populate mail ballot applications which the harvesting crew printed and mailed in bulk to the elections office. These digital signatures, some of which appeared forged by the harvester, were of such low quality as to be practically useless in a signature comparison. Yet they provided the harvesting crew with the means to automatically generate mail ballot applications in future years, while bypassing the voters entirely. It also provided harvesters a template for applying a reasonably decent forgery to a ballot. Common sense legislation was passed to address this problem, requiring wet ink signatures on mail ballot applications, but harvesters have since (and had long before) operated successfully without being thwarted by the signature matching process.

35. Another problem with mail ballot safeguards is that standards are not evenly applied across counties. Some counties enforce requirements more strictly than others. For example, one Texas county used an unorthodox interpretation in its signature verification process that negated the process completely if a ballot had been assisted. In a case of non-matching signatures, if the ballot envelope had been signed by a person "assisting" a voter, the ballot board or signature verification committee was instructed to disregard the non-matching

signatures and treat the ballot as if it were "witnessed." A "witnessed" signature is where a voter is physically unable to sign the ballot envelope due to disability, and a witness is required to sign an attestation in order to verify the ballot was cast by the voter. Assisting and witnessing are two entirely different processes under the law, and have different notations on the ballot envelope. By conflating these differences, non-matching signatures on untold numbers of assisted ballots (often an indicator of mail ballot fraud) bypassed the signature verification process and were counted.

36. Another challenge in the signature verification process is inconsistency or changes in handwriting due to a voter's age or infirmity. This issue has been highlighted by voter rights groups over the years in attempt to eliminate the requirement. A careful judge can consider the possible issues an elderly or disabled voter might develop and allow leeway for handwriting deterioration. Of course, it is relatively easy for a vote harvester to provide a low-quality signature that suggests deterioration. Recovery from a malady, resulting in improved handwriting quality, is also possible. Because of these issues, in practice, many, if not most, ballot boards will approve every signature that could conceivably be that of the voter. In most cases, a signature must clearly appear to be the handwriting of a different person it will be rejected. This tendency understandably limits the effectiveness of signature matching, which is a subjective determination, in preventing mail ballot fraud. Signature matching is useful, though certainly subjective in comparison to the requirement of an identifying number.

37. Ballot harvesting is most effective in low-turnout races and smaller jurisdictions, rather than large, statewide elections. This is because ballot harvesting is labor-intensive and is cost-effective generally when relatively low numbers of votes are required to secure a race. Larger operations are also more difficult to coordinate, and they leave more clues behind. In low-turnout races, a few votes can make the difference. Hundreds of votes can put many close primaries or local elections in play.  I would estimate that least ninety percent of the vote harvesting and mail-in ballot fraud cases we investigate and prosecute occur in local elections or primary elections.

38. Some of the local elections most vulnerable to ballot harvesting are independent school districts. In some parts of the state, the school district may be a county or municipality's biggest employer, and the ISD wields enormous influence in controlling jobs and valuable contracts.  These races often have the lowest turnout of any elections, many districts opting to conduct their own elections rather than contracting through the county elections office, and historically holding them on non-uniform election days. In such elections, harvested votes can easily affect the outcome. The early voting clerk who is responsible for accepting and processing mail ballots, in an election run by the district, is appointed by the officials who run the district, who are on the ballot. The incumbent candidates handpick the people that ultimately determine whether signatures match and which ballots will be counted.

39. The Election Integrity Division investigated a primary race for county commissioner in Gregg County. In that race, a candidate lost the in-person vote by 20 percentage points, but a large vote harvesting campaign generated an abnormally large number of mail ballots, of which more than 70% were cast for the harvesting candidate. That candidate ended up winning the election by four votes. Shannon Brown, Marlena Jackson, Charlie Burns, and

DeWayne Ward were indicted and pled guilty to election fraud offenses, in a prosecution by the Gregg County District Attorney, assisted by our office. The losing candidate, who would have won the election handily, was unable to contest her election because her attorney missed a filing deadline.

40. SB1 requires a voter to provide an ID number (either a driver's license, Texas ID, election identification certificate, DPS-issued personal identification card number, or the last 4 digits of an SSN) in order to apply for and cast a ballot by mail. The very fact of adding a unique identifier to the ballot provides security in the same way that it does for other types of applications or transactions that require ID numbers – the number is not publicly known or readily available to persons besides the voter. ID requirements help to verify that a person is who they claim to be.

41. I believe the ID number requirement is a reasonable security measure to address a significant vulnerability of mail ballots, that offers voters eligible to vote by mail a far greater degree of convenience than in-person voting. It strikes an appropriate balance between election integrity and accommodation of voters who might have difficulty or require assistance voting in person.

42. Requiring the provision of an ID number helps eliminate schemes involving direct diversion of ballots. This helps narrow the field of possible vote harvesting schemes, and of those possible schemes, it makes them more difficult.

43. Having to extract a sensitive piece of personal information from a stranger changes the dynamic of a ballot harvesting interaction in a meaningful way. It also increases the likelihood of a voter getting assistance, if needed, from a family member, trusted friend, roommate, or caregiver, instead of an opportunistic or aggressive vote harvester.

44. Vote harvesters are more successful when they can minimize intrusive requests to a voter that are necessary to gain access to a ballot. Obtaining a piece of sensitive information from a stranger is an obstacle to a bad actor.

45. By way of illustration, a harvester normally approaches a voter as someone there to help them vote or mail their ballot. The initial ask is usually "do you have your ballot handy?" An experienced harvester typically offers a stamp and mailing services, to demonstrate value to the voter. An experienced harvester will likely pick up on any physical attributes of the voter that might be helpful to the harvester's cause. Eyeglasses become an invitation for the harvester to read the ballot to the voter. Some voters are more trusting by nature, others more skeptical. The helpful harvester seeks to skillfully insert themselves between the voter and their ballot, and once they mark the voter's ballot, they will fold it, and slip it into the ballot envelope, at which point they need only collect a quick signature before whisking the ballot away from the voter. However, most people know to be wary in providing sensitive personal information like social security numbers to a person they do not know well, although they will provide it readily to a family member or trusted caregiver.

46. For this reason, having an ID number requirement for mail ballots makes it more likely that people who need help with filling out or returning a ballot will get that help from someone they trust, rather than a ballot harvester who might fraudulently repurpose their vote to a predetermined candidate or slate of candidates. It also bears mention that a vast swath of absentee voters, voters 65 years and older, and even individuals with disabilities have no problems filling out ballots, ballot envelopes, providing ID numbers, and sending letters without assistance. But where assistance is needed, it should be encouraged to come from a trusted friend, family member, or caregiver.

47. An ID number requirement for mail ballots provides needed security for vulnerable mail ballots, in a manner comparable to the existing ID requirement for in-person voting. However, it is even easier to provide. A mail ballot voter does not have to produce an ID card (or include a photocopy with the mail ballot, or witness affidavit of identity, as some states require), but rather simply provide a number, from a list of options, which can be as simple as the last 4 digits of an SSN.

48. Generally speaking, it is important to realize that election fraud is extremely difficult to detect, harder to prove, and even harder to rectify after the votes are counted. The reality is that the only effective way to achieve election integrity is to have adequate measures in place to prevent fraud before the votes are cast, and in the case of mail-ballots, to implement security measures that achieve the same level of security that is in place at a polling location. The ID number requirement in SB1 is a small step in that direction.


Executed in Travis County on the 22nd day of June, 2023.


Jonathan White
Former Division Chief
Election Integrity Division
Office of the Attorney General of Texas

10

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX W

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


LA UNIÓN DEL PUEBLO ENTERO,   *
et al.,                        *
       Plaintiffs,          *
                     *
v.                             *   Civil Action No.
                     *   5:21-cv-844 (XR)
STATE OF TEXAS, et al.,        *
       Defendants.          *


*******************************************************

ORAL AND VIDEOTAPED 30(b)(6) DEPOSITION OF
THE DALLAS COUNTY ELECTIONS ADMINISTRATOR
THROUGH ITS DESIGNATED REPRESENTATIVE,
MICHAEL SCARPELLO
APRIL 13, 2023

*******************************************************


DEPOSITION of MICHAEL SCARPELLO,

produced as a witness at the instance of the

Plaintiffs, and duly sworn, was taken in the

above-styled and numbered cause on the 13th day of

April, 2023, from 10:20 a.m. to 2:25 p.m., before

Christy R. Sievert, CSR, RPR, in and for the State

of Texas, reported by machine shorthand, at the

offices of the Dallas County Records Building, 500

Elm Street, Dallas, Texas, pursuant to the Federal

Rules of Civil Procedure and the provisions stated

on the record or attached hereto.

18

1  2022 general election, correct?
2      A.   Correct.
3      Q.   Did you use the same polling places for
4  early voting that you did for election day?
5      A.   We used a certain amount of polling places
6  for early voting and then additional -- then used
7  those also plus additional ones for election day.  I
8  think it was 50 early voting places and 469 election
9  day.
10     Q.   And on election day, were you polling
11 places vote centers?
12     A.   Yes.
13     Q.   And for early voting, were your 50 polling
14 places, 50ish, were they vote centers as well?
15     A.   Yes.
16     Q.   And it's correct to say that you used vote
17 by mail for certain voters for the 2022 general
18 election, correct?
19     A.   Yes.
20     Q.   Do you know approximately what percent of
21 ballots were cast by mail in the 2022 general
22 election?
23     A.   I do not.  I don't recall.
24     Q.   Did you send applications for ballot by
25 mail for the 2022 general to any voters who had not

20

1  I think an 8.5 by 11 or -- 8.5 by 14-inch insert
2  with verbiage from top to bottom, as well as the
3  vote by mail envelope being chock-full of verbiage
4  also.  And it's been my experience that when you do
5  that -- when you have that sort of thing, no one
6  reads anything, and, thus, the compliance with those
7  rules is -- is not good.
8         And so what we did is we summarized on
9  a -- we put on a pink sheet step-by-step
10 instructions to help voters understand what the
11 requirements were.  And using kind of the best
12 practices, plain language, getting it down to a, you
13 know, fifth, sixth grade level so that people can
14 understand what they need to do to return that mail
15 ballot.
16     Q.   And so did you have a name for that insert?
17 What did you call that insert?
18     A.   Abbreviated instructions.
19     Q.   Who created the abbreviated instructions?
20     A.   I did.
21     Q.   And did you work with other members of your
22 staff --
23     A.   Yes.
24     Q.   -- in consultation?
25     A.   Yes.

19

1  requested an application --
2      A.   No.
3      Q.   -- for ballot by mail?
4      A.   No.
5      Q.   Do you know whether in 20- -- do you know
6  whether your practice in the 2022 general election
7  of not sending unsolicited ABBMs was different than
8  Dallas County's practice in 2020?
9      A.   I don't believe so.
10     Q.   For the 2022 general election, did you
11 include any inserts along with either ABBMs or mail
12 ballots that were intended to inform voters about
13 requirements under SB1?
14     A.   Yes.
15     Q.   Can you tell me about those inserts?
16     A.   The Texas ABBM -- this is in the -- in the
17 mail ballot packet, if that's what you're referring
18 to.
19     Q.   Either.  Either you included it when you
20 sent someone an application for ballot by mail or
21 you included it when you sent someone the mail
22 ballot packet?
23     A.   Okay.  In the mail ballot packet, we find
24 that the items provided by the Secretary of State,
25 the required items are incredibly user unfriendly.

21

1      Q.   Did the abbreviated instructions address
2  the requirement to provide an identification number
3  on the mail ballot --
4      A.   Yes.
5      Q.   -- material?
6         Did you instruct the voter to provide one
7  ID number or two ID numbers?
8      A.   We instructed them to -- we advised them to
9  provide both numbers.
10     Q.   Does the Secretary of State's material
11 advise the voter to provide both?
12     A.   I don't recall, but I don't think so.
13     Q.   Did you provide the abbreviated
14 instructions sheet in languages other than English?
15     A.   I believe so.  I can't remember, but I -- I
16 believe so, yes.
17     Q.   Would Ms. Tacoma Phillips know?
18     A.   Yes.
19     Q.   I will ask her that question.
20         Did the Secretary of State provide you
21 guidance on including additional materials in your
22 mail ballot packet to assist voters in meeting the
23 new ID requirements?
24     A.   No.
25     Q.   Did you send any similar inserts to voters

130

1    A.  Yes.
2    Q.  And do you recall saying that the turnout
3  rate for mail voting as compared to overall voting
4  was down in November 2022?
5    A.  That's my -- my vague memory of it is yes.
6    Q.  Okay.  What did you mean by "previous
7  elections"?  What was your comparison?
8    A.  Well, prior to going into an election, I
9  talked about how we project and we do our
10  projections.  So we look at similar type of
11  elections over the last several years.  And not only
12  the overall turnout but turnout by type and then
13  turnout by location.  My general impression is that
14  vote by mail, we -- the projections weren't -- the
15  actual numbers weren't as high as we projected based
16  off of historic turnout.
17    Q.  Do you know if these voters would have
18  voted in person?
19    A.  Don't know.
20    Q.  And when you said you were looking at the
21  past elections in your analysis for projection, was
22  that looking at midterm elections, or did that also
23  include looking at presidential?
24    A.  We look at all elections but focus on the
25  similar type of election.  But I will say that

131

1  there's -- there's no so many factors that play into
2  turnout, that it's -- it's an art as much as it is a
3  science.
4    Q.  So I guess I'm just trying to understand
5  your -- your answer.  Is it that the rate was not as
6  high as you projected, or is it down compared to
7  previous elections?
8    A.  I don't know that it's down compared to
9  previous elections.  I can very easily pull up that
10  information.  I just don't recall.  My general
11  impression was that it was down.
12    Q.  Do you recall telling counsel you thought
13  the rejection rate was too high?
14    A.  Yes.
15    Q.  So I kind of want to understand what your
16  baseline is.  So in your mind, what should the
17  rejection be?
18    A.  It should be zero.
19    Q.  Would you then consider a 1 percent
20  rejection rate to be too high?
21    A.  I think any rejection rate is too high.
22    Q.  Are you aware of any election that had a
23  zero percent rejection rate?
24    A.  No.
25    Q.  Dallas County was able to reduce its

132

1  rejection rate compared to the primary elections,
2  correct?
3    A.  Correct.
4    Q.  And it was able to reduce its rejection
5  rates as compared to the primary runoff and the May
6  election, correct?
7    A.  Correct.
8    Q.  And you -- Dallas County will be continuing
9  to work to reduce the number of rejection rates in
10  elections going forward, correct?
11    A.  Correct.
12    Q.  You still have rejections due to lack of
13  signature, mismatched signature or statement of
14  residence; is that correct?
15    A.  Yes.
16    Q.  Will you be working to decrease those
17  rejections as well?
18    A.  Yes.
19    Q.  Do you know what the cure process was
20  perSB1?
21    A.  I'm vaguely familiar with it.
22    Q.  Do you expect the rejection rate to ever be
23  zero?
24    A.  Rejection rate for applications or carrier
25  envelopes?

133

1    Q.  Carrier envelopes.
2    A.  No.
3         THE STENOGRAPHER:  I'm sorry, your
4  answer?
5         THE WITNESS:  No.
6    A.  And I'll elaborate.  No, under the current
7  law.
8  BY MS. HUNKER:
9    Q.  Do you think that the rejection rate due to
10  lack of signature will ever be zero?
11    A.  No.
12    Q.  Do you think the rejection rate regarding
13  mismatched signature will ever be zero?
14    A.  No.
15    Q.  And do you think that the rejection rate
16  do -- voters not including required statement of
17  residence will ever be zero?
18    A.  No.
19    Q.  You talked with counsel about the
20  abbreviated insert, correct?
21    A.  Yes.
22    Q.  Did you include a type of abbreviated
23  insert prior to SB1?
24         MS. PERALES:  Objection; asked and
25  answered.

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

LA UNION DEL PUEBLO ENTERO, et al.,　　§
　　　*Plaintiffs,*　　　　　　　　　　　§
　　　　　　　　　　　　　　　　　　　§
*v.*　　　　　　　　　　　　　　　　　§　　Case No. 5:21-cv-844-XR
　　　　　　　　　　　　　　　　　　　§
GREGORY W. ABBOTT, et al.,　　　　　§
　　　*Defendants.*　　　　　　　　　　§

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO**
**THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX X

```
 1            IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3

 4   LA UNION DEL PUEBLO ENTERO,    )(
     et al.                         )(
 5            Plaintiffs            )(
                                    )(
 6   VS.                            )(    CASE NO.
                                    )(    5:21-cv-844-XR
 7                                  )(    (LEAD CASE)
     GREGORY W. ABBOTT, et al.      )(
 8            Defendants            )(
     _____
 9
      OCA-GREATER HOUSTON, et al.   )(
10            Plaintiffs            )(
                                    )(    CASE NO.
11   VS.                            )(    1:21-cv-780-XR
                                    )(
12   JANE NELSON, et al.            )(
              Defendants            )(
13   _____
14   HOUSTON AREA URBAN LEAGUE,     )(
     et al.                         )(
15            Plaintiffs            )(
                                    )(    CASE NO.
16   VS.                            )(    5:21-cv-848-XR
                                    )(
17   GREGORY WAYNE ABBOTT, et al.   )(
              Defendants            )(
18   _____
19   LULAC TEXAS, et al.            )(
              Plaintiffs            )(
20                                  )(
                                    )(    CASE NO.
21   VS.                            )(    1:21-cv-0786-XR
                                    )(
22   JANE NELSON, et al.            )(
              Defendants            )(
23   _____
24

25
```



Anne Scott

April 18, 2023
Pages 2 to 5

## Page 2

```
 1  _____
 2  MIFAMILIA VOTA, et al.       )(
            Plaintiffs          )(
 3                              )(   CASE NO.
    VS.                         )(   5:21-cv-0920-XR
 4                              )(
    GREG ABBOTT, et al.         )(
 5          Defendants          )(
 6  _____
    UNITED STATES OF AMERICA    )(
 7          Plaintiff           )(
                                )(   CASE NO.
 8  VS.                         )(   5:21-cv-1085-XR
                                )(
 9  THE STATE OF TEXAS, et al.  )(
            Defendants          )(
10  _____
11
            ORAL AND VIDEOTAPED DEPOSITION OF
12                     ANNE SCOTT
                     APRIL 18, 2023
13  _____
14
15          ORAL AND VIDEOTAPED DEPOSITION OF ANNE SCOTT,
16  produced as a witness at the instance of the State
17  Defendants, taken in the above-styled and numbered
18  cause on APRIL 18, 2023, between the hours of 9:44 a.m.
19  and 11:04 a.m., reported stenographically by DONNA
20  McCOWN, Certified Court Reporter No. 6625, in and for
21  the State of Texas, at 7030 Mile 2 3/4 East, Mercedes,
22  Texas, pursuant to the Federal Rules of Civil Procedure
23  and any provisions stated on the record or attached
24  therein.
25
```

## Page 3

```
 1                   APPEARANCES
 2  COUNSEL FOR STATE DEFENDANTS:
 3      DAVID BRYANT
        OFFICE OF THE TEXAS ATTORNEY GENERAL
 4      P.O. Box 12548
        Austin, Texas, 78711-2548
 5
    COUNSEL FOR DEFENDANT HIDALGO COUNTY ELECTIONS
 6  ADMINISTRATOR:
 7      LEIGH ANN TOGNETTI
        HIDALGO COUNTY DISTRICT ATTORNEY'S OFFICE
 8      100 East Cano Street
        Edinburg, Texas  78539
 9
    COUNSEL FOR INTERVENOR DEFENDANTS:
10
        STEPHEN KENNY, via Zoom
11      JONES DAY
        51 Louisiana Avenue, NW
12      Washington, DC  20001
13  COUNSEL FOR PLAINTIFFS OCA-GREATER HOUSTON, et al.:
14      LISA SNEAD
        DISABILITY RIGHTS TEXAS
15      222 West Braker Lane
        Austin, Texas, 78758-1024
16
        LUCIA ROMANO, via Zoom
17      DISABILITY RIGHTS TEXAS
        1500 McGowen, Suite 100
18      Houston, Texas  77004
19      CHRISTOPHER McGREAL, via Zoom
        DISABILITY RIGHTS TEXAS
20      1420 West Mockingbird Lane, Suite 450
        Dallas, Texas  75247
21
    COUNSEL FOR PLAINTIFFS HOUSTON AREA URBAN LEAGUE,
22  et al.:
23      DESTINY LOPEZ, via Zoom
        REED SMITH, LLP
24      355 South Grand Avenue No. 2900
        Los Angeles, California, 90071
25
```

## Page 4

```
 1  COUNSEL FOR PLAINTIFF UNITED STATES OF AMERICA:
 2      DANIEL J. FREEMAN, via Zoom
        U.S. DEPARTMENT OF JUSTICE
 3      950 Pennsylvania Avenue NW, 4CON 8.143
        Washington, DC  20530
 4
    COUNSEL FOR PLAINTIFFS LA UNION DEL PUEBLO ENTERO,
 5  et al.:
 6      PATRICK BERRY, via Zoom
        BRENNAN CENTER FOR JUSTICE
 7      120 Broadway, Suite 1750
        New York, New York  10271
 8
    ALSO PRESENT:
 9      Rene Ortiz, Videographer
10                     INDEX
11                                              PAGE
    Appearances ...................................   2
12
    ANNE SCOTT
13  Examination by Mr. Bryant .....................   6
    Examination by Ms. Snead ......................  44
14
    Errata Sheet/Signature Page ...................  46
15
    Reporter's Certificate ........................  48
16
    Attached to the end of the transcript:  Stipulations
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1                   EXHIBITS
 2  NUMBER  DESCRIPTION                          PAGE
 3     1    Notice of Deposition ..................  27
 4     2    Sixth Supplemental Initial Disclosures ..  27
 5     3    REV UP Website Pages ..................  34
 6     4    The Arc of Texas Website Pages .........  35
 7     5    Texas Secretary of State Website Pages ..  37
 8     6    Impact Report, The Arc of Texas .........  38
 9     7    Texas Department of Public Safety Website
               Pages ..............................  39
10
11     8    Texas by Texas Webpages ...............  42
12
       9    Texas by Texas Welcome Webpage .........  43
13    10    Texas Department of Public Safety
               Website Pages ......................  43
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 14

1    A.  Yes, sir.
2    Q.  And did she also vote in person?
3    A.  Yes, sir.
4    Q.  In connection with the 2022 general election,
5  did you submit an application for a mail-in ballot?
6    A.  Yes, sir.
7    Q.  And did your daughter Taylor also submit an
8  application for a mail-in ballot?
9    A.  I submitted one for her.
10    Q.  And did you provide on your application for a
11  mail-in ballot an identification number of some kind?
12    A.  Yes, sir.
13    Q.  What type of identification number did you
14  submit with your application for a ballot by mail in
15  the 2022 general election?
16    A.  I believe I submitted my passport number.
17    Q.  Did you submit only one number, or did you
18  submit multiple numbers?
19    A.  I think it was just the one number on the
20  passport.
21    Q.  Was that a United States passport that was
22  still active --
23    A.  Yes.
24    Q.  -- not expired?
25    A.  Yes, sir.

Page 15

1    Q.  And approximately when did you submit that
2  application for a mail-in ballot in connection with the
3  2022 general election?
4    A.  I'm sorry.  I really don't remember.  It was
5  during early -- it was before early voting, I believe.
6  And I'm sorry.  I don't really remember the date.
7    Q.  After you submitted that application for a
8  mail-in ballot, did you receive a mail-in ballot?
9    A.  I did, yes.
10    Q.  Approximately, when did you receive that
11  mail-in ballot for the 2022 general election?
12    A.  I'm sorry.  I don't remember.
13    Q.  I believe you said that you filled in your
14  mail-in ballot once you had received it; is that
15  correct?
16    A.  That is correct.
17    Q.  And did you submit an identification number or
18  numbers of some kind on that mail-in ballot?
19    A.  Yes, sir.
20    Q.  What identification number or numbers did you
21  submit?
22    A.  My United States passport number.
23    Q.  And did you mail in that mail-in ballot to the
24  proper address in Hidalgo County?
25    A.  Yes, sir.

Page 16

1    Q.  Approximately when did you do that?
2    A.  There again, I really don't remember the date.
3  I'm sorry.  I just --
4    Q.  Okay.  And sometime after you submitted your
5  mail-in ballot in connection with the 2022 general
6  election, did you receive some type of communication or
7  return of that ballot prior to the general election?
8    A.  I -- I received the ballot back before the
9  election, yes.
10    Q.  Okay.  When you received your mail-in ballot
11  back, do you know if you received it from the Hidalgo
12  County Election Office or from the U.S. Postal Service
13  or from whom?
14    A.  It was the election office, because it was
15  stamped.
16    Q.  And what did the stamp say on it?
17    A.  It just said "return" -- I don't even remember
18  what it said, but there was a stamp on it, and it said
19  return for more information or something.  I don't
20  really recall, but it was stamped by the Hidalgo County
21  Election Office.
22    Q.  I take it from that answer that you don't
23  recall what specific information the Hidalgo County
24  Election Office indicated you needed to provide in
25  order to -- or to have a mail-in ballot that they would

Page 17

1  accept?
2    A.  That is correct.
3    Q.  Did you attempt to get any help from anyone to
4  try to determine what you needed to do to provide
5  information requested by the Hidalgo County Election
6  Office so your mail-in ballot would be accepted?
7    A.  No, I did not contact anyone.
8    Q.  Why did you not contact anyone to get some
9  assistance in that matter?
10    A.  Well, I was going to have to transport Taylor
11  over to -- because she did not get a ballot, so I
12  figured, well, if I have to transport Taylor over
13  there, I might as well take my ballot in hand and do it
14  there in Mercedes at the polls.
15    Q.  At any time prior to completing the mail-in
16  ballot for the 2022 general election, did you do
17  anything to get information about what types of
18  identification numbers were required or acceptable?
19    A.  No.  I figured a U.S. passport would be fine.
20  I didn't use my driver's license because my name is
21  misspelled, and so it's not my correct name.  So
22  that -- I use that as a form of identification wherever
23  I go, and it seems to work.
24    Q.  In 2022, did you have a valid Texas driver's
25  license?



Anne Scott                                                    April 18, 2023
                                                            Pages 18 to 21

Page 18

1    A. Yes, I do.
2    Q. In 2022, did you have a Social Security number?
3    A. Yes, sir.
4    Q. Did you consider submitting the last four
5  digits of your Social Security number on the
6  application for mail-in ballot or on the mail-in ballot
7  as an identification number?
8    A. I believe I did also, but I can't remember
9  if -- if I did or not, but I -- if it -- if they asked
10  for it, I'm sure I did.
11    Q. Did you look at anything either online or any
12  materials in paper form to determine whether or not a
13  passport number was an acceptable form of
14  identification for voting in Texas?
15    A. I assume a passport would -- a valid passport
16  would be just about the best identification you could
17  have.
18    Q. My question was whether you did anything to --
19    A. No.
20    Q. -- determine that rather than just assume.
21    A. No.
22    Q. When -- strike that.
23        When did your daughter first register to
24  vote?
25    A. Before the 2020 election, but I can't remember

Page 19

1  the exact date.
2    Q. In 2022, did your daughter have a Texas
3  driver's license?
4    A. She had an expired Texas ID.
5    Q. Okay. So she did not have a driver's license,
6  but she had a state ID card?
7    A. Yes, sir.
8    Q. And how long had she had a Texas state ID card?
9    A. I'm going to say since she was 20 years old.
10  It went through two cycles of renewal, because I did it
11  online once, so...
12    Q. And when did the state ID card expire in the
13  year or two prior to the general election in 2022?
14    A. It expired Taylor's birthday 10-25-2020.
15    Q. Did you or Taylor take any steps to, try to
16  renew her state ID card in 2019, 2020, or 2021?
17    A. No.
18    Q. Is there a reason why neither of you took any
19  steps to renew her Texas state ID card during those
20  years?
21    A. Taylor is medically fragile, and this was
22  during COVID, and Taylor didn't even leave the house
23  for quite -- quite a while. So I already had renewed
24  it over -- online previously, so I couldn't do it
25  again. So that's the story on that.

Page 20

1    Q. In 2022, did you or Taylor take any steps to
2  attempt to renew her Texas state ID card?
3    A. No, sir.
4    Q. What was the reason for not taking any steps
5  like that in 2022?
6    A. I guess just being lazy.
7    Q. And have you or Taylor taken any steps in 2023
8  so far to attempt to renew her Texas state ID card?
9    A. No, we have not.
10    Q. Is there any reason for that?
11    A. Taylor still does not go out in the public,
12  normally. She does go to day care. Everyone wears a
13  mask. Most people at day care are medically fragile.
14  They're tested once a week for COVID. So it's kind of
15  a closed situation.
16        So Taylor goes to day care and comes home,
17  and that's pretty much it for her. Like a lot of
18  medically fragile people, we have to be very careful.
19  She is up-to-date on her COVID shots and everything,
20  but we still worry about her because of her medical
21  condition.
22    Q. Does your daughter Taylor have a Social
23  Security number?
24    A. Yes, she does.
25    Q. How long has she had a Social Security number,

Page 21

1  roughly?
2    A. Probably since she was born.
3    Q. By the way, I forgot to say, but I want to say
4  any time you want to take a break, feel free to call a
5  break. If you have to take care of the dog or anything
6  else, please feel free.
7    A. I'm fine.
8    Q. Okay. So what caused Taylor to have an
9  interest for the first time in voting in 2022, if
10  that's the first time she expressed that interest?
11        MS. SNEAD: Objection, form.
12        THE WITNESS: I can still answer the
13  question?
14        MS. SNEAD: Yes.
15    A. I think -- I think just -- just listening to
16  the news, and she just decided, "Hey, it's my right. I
17  would like to vote, Mom," you know. There was a lot of
18  people trying to get out to vote.
19    Q. I may have made an error in my question. Did
20  she first vote in 2020?
21    A. Yes.
22    Q. Okay.
23    A. That is correct.
24    Q. I asked you about 2022 --
25    A. Oh, okay. Okay.



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX Y

```
 1              IN THE UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3

 4   LA UNION DEL PUEBLO ENTERO,    )(
     et al.                         )(
 5           Plaintiffs            )(
                                    )(
 6   VS.                            )(    CASE NO.
                                    )(    5:21-cv-844-XR
 7                                  )(    (LEAD CASE)
     GREGORY W. ABBOTT, et al.      )(
 8           Defendants            )(
     _____
 9
      OCA-GREATER HOUSTON, et al.   )(
10           Plaintiffs            )(
                                    )(    CASE NO.
11   VS.                            )(    1:21-cv-780-XR
                                    )(
12   JANE NELSON, et al.            )(
             Defendants            )(
13   _____

14   HOUSTON AREA URBAN LEAGUE,     )(
     et al.                         )(
15           Plaintiffs            )(
                                    )(    CASE NO.
16   VS.                            )(    5:21-cv-848-XR
                                    )(
17   GREGORY WAYNE ABBOTT, et al.   )(
             Defendants            )(
18   _____

19   LULAC TEXAS, et al.            )(
             Plaintiffs            )(
20                                  )(
                                    )(    CASE NO.
21   VS.                            )(    1:21-cv-0786-XR
                                    )(
22   JANE NELSON, et al.            )(
             Defendants            )(
23   _____

24

25
```



Taylor Scott                                                    April 18, 2023
                                                                Pages 2 to 5

---

**Page 2**

```
1  _____
2  MIFAMILIA VOTA, et al.      )(
        Plaintiffs            )(
3                             )(   CASE NO.
   VS.                        )(   5:21-cv-0920-XR
4                             )(
   GREG ABBOTT, et al.        )(
5       Defendants            )(

6  _____

   UNITED STATES OF AMERICA    )(
7       Plaintiff             )(
                              )(   CASE NO.
8  VS.                        )(   5a;21-cv-1085-XR
                              )(
9  THE STATE OF TEXAS, et al.  )(
        Defendants            )(
10 _____

11
         ORAL AND VIDEOTAPED DEPOSITION OF
12                   TAYLOR SCOTT
                   APRIL 18, 2023
13 _____

14
15        ORAL AND VIDEOTAPED DEPOSITION OF TAYLOR SCOTT,
16 produced as a witness at the instance of the State
17 Defendants, taken in the above-styled and numbered
18 cause on APRIL 18, 2023, between the hours of
19 11:33 a.m. and 11:57 a.m., reported stenographically by
20 DONNA McCOWN, Certified Court Reporter No. 6625, in and
21 for the State of Texas, at 7030 Mile 2 3/4 East,
22 Mercedes, Texas, pursuant to the Federal Rules of Civil
23 Procedure and any provisions stated on the record or
24 attached therein.
25
```

---

**Page 3**

```
1              APPEARANCES
2  COUNSEL FOR STATE DEFENDANTS:
3     DAVID BRYANT
        OFFICE OF THE TEXAS ATTORNEY GENERAL
4       P.O. Box 12548
        Austin, Texas, 78711-2548
5
   COUNSEL FOR DEFENDANT HIDALGO COUNTY ELECTIONS
6  ADMINISTRATOR:
7     LEIGH ANN TOGNETTI
        HIDALGO COUNTY DISTRICT ATTORNEY'S OFFICE
8       100 East Cano Street
        Edinburg, Texas  78539
9
   COUNSEL FOR INTERVENOR DEFENDANTS:
10
      STEPHEN KENNY, via Zoom
11      JONES DAY
        51 Louisiana Avenue, NW
12      Washington, DC  20001
13 COUNSEL FOR PLAINTIFFS OCA-GREATER HOUSTON, et al.:
14    LISA SNEAD
        DISABILITY RIGHTS TEXAS
15      222 West Braker Lane
        Austin, Texas, 78758-1024
16
      LUCIA ROMANO, via Zoom
17      DISABILITY RIGHTS TEXAS
        1500 McGowen, Suite 100
18      Houston, Texas  77004
19    CHRISTOPHER McGREAL, via Zoom
        DISABILITY RIGHTS TEXAS
20      1420 West Mockingbird Lane, Suite 450
        Dallas, Texas  75247
21
   COUNSEL FOR PLAINTIFFS HOUSTON AREA URBAN LEAGUE,
22 et al.:
23    DESTINY LOPEZ, via Zoom
        REED SMITH, LLP
24      355 South Grand Avenue No. 2900
        Los Angeles, California, 90071
25
```

---

**Page 4**

```
1
2  COUNSEL FOR PLAINTIFF UNITED STATES OF AMERICA:
      DANIEL J. FREEMAN, via Zoom
3       U.S. DEPARTMENT OF JUSTICE
        950 Pennsylvania Avenue NW, 4CON 8.143
4       Washington, DC  20530

5  COUNSEL FOR PLAINTIFFS LA UNION DEL PUEBLO ENTERO,
   et al.:
6     PATRICK BERRY, via Zoom
        BRENNAN CENTER FOR JUSTICE
7       120 Broadway, Suite 1750
        New York, New York  10271
8
   ALSO PRESENT:
9     Rene Ortiz, Videographer
      Anne Scott
10                    INDEX
11                                           PAGE
   Appearances ...................................  2
12
   TAYLOR SCOTT
13 Examination by Mr. Bryant .....................  5
   Examination by Ms. Snead ......................  18
14
   Errata Sheet/Signature Page ...................  21
15
   Reporter's Certificate ........................  23
16
   Attached to the end of the transcript:  Stipulations
17
                    EXHIBITS
18
   NUMBER  DESCRIPTION                         PAGE
19
     (No Exhibits Marked)
20
21
22
23
24
25
```

---

**Page 5**

```
1        THE VIDEOGRAPHER:  Today is April 18,
2  2023.  It is 11:33 a.m.  We're on the record.
3             TAYLOR SCOTT,
4  having been duly sworn, testified as follows:
5             EXAMINATION
6  BY MR. BRYANT:
7     Q.  Ms. Scott, my name is David Bryant.  I am with
8  the Texas Attorney General's Office, and appreciate you
9  being here for the deposition today.
10        I want to allow the other attorneys to
11 state their appearances so everyone will know who's
12 participating in the deposition.
13        MS. SNEAD:  This is Lisa Snead from
14 Disability Rights Texas representing the OCA Plaintiffs
15 and defending Ms. Scott's deposition.
16        MS. TOGNETTI:  Leigh Ann Tognetti from the
17 Hidalgo County District Attorney's Office representing
18 the Hidalgo County Elections Administrator.
19        MR. BRYANT:  Are there other participants
20 on Zoom who want to state an appearance?
21        Let the record reflect that there are
22 none.  And we'll begin the deposition at this time.
23    Q.  (By Mr. Bryant) Ms. Scott, I'm going to be
24 asking you a series of questions.  You're under oath
25 just as you would be if you were testifying in court or
```



Taylor Scott

April 18, 2023
Pages 6 to 9

Page 6

1  in front of a judge.
2          And so you -- you have an obligation to be
3  as truthful as you can.  Do you understand that
4  obligation?
5      A.  Yes.
6      Q.  Have you ever testified in a deposition or
7  otherwise --
8      A.  No.
9      Q.  -- before today?
10     A.  No, sir.
11     Q.  Okay.  One of the things that we have to
12  remember in these depositions is that all that really
13  matters is what the court reporter writes down, so if
14  you and I were just having a conversation, a lot of
15  times you would know what I'm asking before I finish my
16  question and you might answer it, but if you can wait
17  until my question is finished before you answer it --
18     A.  Okay.
19     Q.  -- that will help, and also, I will try not to
20  interrupt you when you are giving an answer --
21     A.  Okay.
22     Q.  -- so your answer will get fully on the page.
23     A.  Okay.
24     Q.  Any time that you need to take a break --
25     A.  Okay.

Page 7

1      Q.  -- please feel free to just say, "I need a
2  break."
3      A.  Yeah.
4      Q.  And you'll get one.
5      A.  Okay.
6      Q.  And also, if you have any difficulty
7  understanding anything that is going on, I want you to
8  feel free to --
9      A.  Okay.
10     Q.  -- consult your attorney, and your mother is
11  present here, and I'm fine with that on behalf of
12  the --
13     A.  Okay.
14     Q.  -- Attorney General and the State Defendants in
15  this case.
16     A.  Okay.
17     Q.  Okay.  What was your date of birth?
18     A.  10-30-87.
19     Q.  And are we currently in your home in Mercedes,
20  Texas?
21     A.  Yes, sir.
22     Q.  Have you lived here all your life?
23     A.  Yes, sir.
24     Q.  Do you recall when you first got a Texas state
25  ID?

Page 8

1      A.  Yes.  I had to go over to the driver's license
2  place.
3      Q.  About how old were you when you did that?
4      A.  I can't remember.
5      Q.  And do you still have a Texas state ID card?
6      A.  Yes.
7      Q.  Is it now expired?
8      A.  Yes, sir.
9      Q.  Approximately, when did your Texas state ID
10  card expire?
11     A.  I can't remember, sir.
12     Q.  Have you ever voted in an election?
13     A.  Yes.
14     Q.  How many times have you voted in an election?
15     A.  Once by mail.
16     Q.  And do you know what year it was when you voted
17  by mail in an election?
18     A.  No, sir.
19     Q.  What do you recall about the instance in which
20  you voted by mail in an election?
21     A.  We got our ballots.  We signed them and sent
22  them back.
23     Q.  And do you know what year that was?
24     A.  I don't remember.
25     Q.  Have you ever voted in person in a Texas

Page 9

1  election?
2      A.  Yes.
3      Q.  How many times have you voted in person?
4      A.  Once.
5      Q.  What year was it when you voted in person in an
6  election?
7      A.  It was this year.
8      Q.  Okay.  This year is 2023.  Was it the last
9  election in November '22?
10     A.  Yes.  No.  It was 2023.
11     Q.  Okay.  What do you recall about voting in the
12  election in person?
13     A.  I had to go to a building and vote.  I took my
14  passport to vote.  I didn't have my ID.
15     Q.  Where did you vote?
16     A.  In a building in Mercedes.
17     Q.  Was that a building you had been to before, or
18  was it the first time you had been there?
19     A.  It was the first time I've been there.
20     Q.  And who went with you to vote on that occasion?
21     A.  My mom.
22     Q.  Did you have any trouble casting your ballot
23  when you went to the polling place in Mercedes in that
24  election?
25     A.  No.  It was all done electronically.



Taylor Scott

April 18, 2023
Pages 10 to 13

Page 10

1    Q. Do you recall any occasion in which you
2 attempted to vote by mail but couldn't do so?
3    A. Yes.
4    Q. When did that occur?
5    A. In this year's election.
6    Q. Was that in 2022 or 2023?
7    A. 2023.
8    Q. And what do you recall about the attempt that
9 you made to vote by mail on that election?
10    A. I didn't get a ballot.
11    Q. Do you recall whether or not you sent in an
12 application for a mail-in ballot on that occasion?
13    A. Yes.
14    Q. Did you fill out that application yourself?
15    A. My mom did.
16    Q. Okay. Did you sign that application?
17    A. She -- she writes for me. I can't -- I can't
18 write.
19    Q. And did you read that application before it was
20 sent in?
21    A. She read it to me.
22    Q. And do you recall that the application required
23 you to provide some type of identification number?
24    A. Yes, sir.
25    Q. And what type of identification number or

Page 11

1 numbers, if any, did -- did your mother provide on your
2 application for a mail-in ballot?
3    A. My passport number.
4    Q. Did she provide any other numbers?
5    A. No.
6    Q. At the time that that attempt was made to get a
7 mail-in ballot, did you have a Social Security number?
8    A. Yes.
9    Q. Did you know at that time that you could
10 provide the last four digits of your Social Security
11 number on that application?
12    A. Yes, sir.
13    Q. Is there a reason why you or your mom did not
14 provide the last four digits of your Social Security
15 number on that application?
16    A. I don't know.
17    Q. Did you provide the number on your state ID
18 card, even though it was expired?
19    A. No, sir.
20    Q. Why did you not do that?
21    A. Because it was expired. I used my passport.
22    Q. When I spoke with your mother earlier, she told
23 me that you had gone to high school; is that right?
24    A. Yes.
25    Q. So do you read well?

Page 12

1    A. Not very well.
2    Q. Is it -- do you think that you read?
3    A. Excuse me?
4    Q. Do you read fairly well?
5    A. Barely. I can read some words, but not many.
6    Q. Did you -- strike that.
7       Do you go online and read things?
8    A. No.
9    Q. Did you read any of the -- any material related
10 to the voting process when you applied to vote by mail?
11    A. No.
12    Q. Are you a registered voter in Texas?
13    A. Yes, sir.
14    Q. How long have you been a registered voter in
15 Texas?
16    A. I just started last year.
17    Q. Which year was that?
18    A. Last year.
19    Q. Was that 2022 or 2023?
20    A. 2023.
21    Q. Did your mother assist you in getting
22 registered as a voter?
23    A. Yes.
24    Q. Have you ever sought any assistance from anyone
25 other than your mother in connection with the voting or

Page 13

1 registering to vote?
2    A. No.
3    Q. Is it fair to say that you've never had any
4 contact with anybody at the State of Texas about
5 voting?
6    A. No, sir.
7    Q. Is it correct that you have not had any
8 contact, other than when you went in person, with
9 anybody at Hidalgo County about voting?
10    A. No, sir.
11       MS. SNEAD: I'm going to object to the
12 form, because I'm not sure she understands the
13 question.
14       MR. BRYANT: Okay.
15       MS. SNEAD: If you can phrase it more
16 directly.
17       MR. BRYANT: I'll try to do that.
18    Q. Have you ever talked in person or on the phone
19 with anyone from the State of Texas about voting?
20    A. My hand -- I cannot use the phone. My hand --
21 my hands do not work, so...
22    Q. So I assume from that that you've never talked
23 with anybody on the phone --
24    A. No, no.
25    Q. Have you ever talked with anybody from the



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,        §
     *Plaintiffs,*        §
                       §
*v.*        §        Case No. 5:21-cv-844-XR
                       §
GREGORY W. ABBOTT, et al.,        §
     *Defendants.*        §

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX Z



**In The Matter Of**

**La Union Del Pueblo Entero, et al.,**

**Plaintiffs**

**v**

**State Of Texas, et al.,**

**Defendants**

**CASE**

**5:21-cv-844**

**Date**

**4-27-2022**

**Witness**

**Jonathan Sherman White**

## Certified Copy Transcript

**National Court Reporters Inc.  ·  888.800.9656  ·**
**NationalCourtReporters.com**
**NCRNetwork@nationalcourtreporters.com**
Serving Legal Professionals From Coast To Coast and Internationally

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Page 1

```
 1   IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF TEXAS
 2           SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO      §
     ENTERO, ET AL.,          §
 4        Plaintiffs,         § Civil Action No.
                              § 5:21-cv-844 (XR)
 5   VS.                      § (Consolidated Cases)
                              §
 6   STATE OF TEXAS, ET AL.   §
          Defendants.         §
 7   *********************************************

 8            ORAL DEPOSITION OF

 9         JONATHAN SHERMAN WHITE

10             APRIL 27, 2022

11

12   *********************************************

13        ORAL DEPOSITION OF JONATHAN SHERMAN WHITE,

14   produced as a witness at the instance of the Plaintiffs

15   and Plaintiff-Intervenors, and duly sworn, was taken in

16   the above-styled and numbered cause on the 27th day of

17   April 2022, from 9:11 a.m. to 5:31 p.m., before Caroline

18   Chapman, CSR in and for the State of Texas, reported by

19   Computerized Stenotype Machine, Computer-Assisted

20   Transcription, held at the William P. Clements Jr. State

21   Office Building, 300 West 15th Street, Hearing Room

22   1001E, Austin, Texas, pursuant to the Federal Rules of

23   Civil Procedure.

24

25
```

Page 2

```
 1            A P P E A R A N C E S

 2   COUNSEL FOR THE PLAINTIFFS AND PLAINTIFF-INTERVENORS:
          RICHARD A. DELLHEIM
 3        DANA PAIKOWSKY
          Attorneys, Voting Section
 4        Civil Rights Division
          U.S. Department of Justice
 5        950 Pennsylvania Avenue NW
          Washington, D.C. 20530
 6        (202) 305-4355
          daniel.freeman@usdoj.gov
 7        dana.paikowsky@usdoj.gov

 8        JENNIFER J. YUN (via videoconference)
          Trial Attorney
 9        Voting Section, Civil Rights Division
          U.S. Department of Justice
10        4 Constitution Square
          150 M Street NE
11        Washington, DC 20530
          (202) 307-2767 (202) 305-5533
12        jennifer.yun@usdoj.gov

13   COUNSEL FOR THE DEFENDANTS THE STATE OF TEXAS, ET AL.:
          ERIC HUDSON
14        Office of the Attorney General for the
           State of Texas
15        Special Litigation Division
          P.O. Box 12548, Capitol Station
16        Austin, Texas 78711-2548
          (512) 936-2266 Fax: (512) 457-2548
17        eric.hudson@oag.texas.org

18   COUNSEL FOR THE MEXICAN AMERICAN LEGAL DEFENSE AND
     EDUCATIONAL FUND (MALDEF):
19        NINA PERALES
          Vice President of Litigation
20        Mexican American Legal Defense and
           Educational Fund, Inc. (MALDEF)
21        JULIA LONGORIA (via videoconference)
          Staff Attorney at MALDEF
22        110 Broadway, Suite 300
          San Antonio, TX  78201
23        210) 845-5147 Fax:  (210) 224-5382
          nperales@maldef.org

24
          - and -
25
```

Page 3

```
 1        A P P E A R A N C E S (CONTINUED)

 2        KATIE M. FRIEL (via videoconference)
          Fellow, Voting Rights & Elections
 3        Brennan Center for Justice at NYU School of Law
          120 Broadway,  Suite 1750
 4        New York, NY 10271
          (646) 292-8310 Fax:  (212) 463-7308
 5        freilk@brennan.law.nyu.edu

 6   COUNSEL FOR THE LUPE PLAINTIFFS:
          ELIZA SWEREN-BECKER (via videoconference)
 7        Counsel, Voting Rights & Elections Program
          Brennan Center for Justice at NYU School of Law
 8        120 Broadway, Suite 1750
          New York, NY 10271-202
 9        (646) 925-8765 Fax: (917) 597-9040
          Eliza.sweren-becker@nyu.edu

10   COUNSEL FOR MI FAMILIA VOTA PLAINTIFFS:
          LAURA E. ROSENBAUM (via videoconference)
11        STOEL RIVES, LLP
          760 SW Ninth Avenue, Suite 3000
12        Portland, OR 97205
          (503) 294-9642
13        Laura.rosenbaum@stoel.com

14   COUNSEL FOR DEFENDANT TRAVIS COUNTY CLERK REBECCA
     GUERRERO AND DISTRICT ATTORNEY JOSE P. GARZA:
15        ANTHONY "TONY" NELSON (via videoconference)
          Civil Litigation Division of the Travis County
16        Attorney's Office
          P.O. Box 1748
17        Austin, TX 78767-1748
          (512) 854-9513 Fax: (512) 854-4808
18        tony.nelson@traviscountytx.gov

19   COUNSEL FOR YVONNE RAMÓN ELECTIONS ADMINISTRATORS OF
     HIDALGO COUNTY:
20        LEIGH ANN LEAVELL TOGNETTI (via videoconference)
          Hidalgo County District Attorney's Office
21        100 East Cano, Courthouse Annex III, 1st Floor
          Edinburg, TX 78539
22        (956) 292-7609 EXT 8182
          Leigh.tognetti@da.co.hidalgo.tx.us

23

24

25
```

Page 4

```
 1        A P P E A R A N C E S (CONTINUED)

 2   COUNSEL FOR THE HIDALGO COUNTY DISTRICT ATTORNEY'S
     OFFICE:
 3        VICTOR M. GARZA (via videoconference)
          Chief Administrative Attorney
 4        Civil Division-Assistant District Attorney
          Office of the Criminal District Attorney
 5        Hidalgo County, Texas
          100 East Cano Street
 6        Edinburg, TX 78539
          (956) 292-7609 EXT. 8185
 7        Fax: (956) 292-7619
          victor.garza@da.co.hidalgo.tx.us

 8   COUNSEL FOR OCA-GREATER HOUSTON PLAINTIFFS:
          ZACHARY "ZACH" DOLLING (via videoconference)
 9        STAFF ATTORNEY
          TEXAS CIVIL RIGHTS PROJECT
10        P.O. Box 17757
          Austin TX 78760
11        (512) 496-4746
          zachary@texascivilrightsproject.org

12

13   COUNSEL FOR REVUP:
          LUCIA IRENE ROMANO-OSTROM (via videoconference)
14        Supervising Attorney
          Disability Rights Texas
15        1500 McGowen Street, Suite 100
          Houston, TX 77004-1153
16        (832) 681-8210
          lromano@disabilityrightstx.org

17   COUNSEL FOR ISABEL LONGORIA WITH THE HARRIS COUNTY
     ATTORNEY'S OFFICE:
18        SUSANNAH MITCHAM (via videoconference)
19        ASSISTANT COUNTY ATTORNEY
          Office of the Harris County Attorney
20        1019 Congress, 15th Floor
          Houston, TX  77002
21        (713) 274-5334
          Susannah.Mitcham@cao.hctx.net

22

23

24

25
```

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 22 (85 - 88)

22 (85 - 88)

Page 85

1 identifying information, or an identifier such as a DL
2 or the last four of the social.  That could be an
3 obstacle to a vote harvesting crew that wishes to bypass
4 the voter.
5         And then, as I already stated, it could
6 also be an obstacle to gaining the voter's compliance,
7 because here's a stranger asking for my DL number so
8 that they can complete these documents on my behalf or
9 submit this, you know, carrier envelope on my behalf, so
10 it -- by putting the control of the interaction more in
11 the voter's hands because those are -- those are numbers
12 that the voter has access to that the harvester is less
13 likely to have access to, I think it promotes security
14 in that fashion.
15     Q.  So if I, moving forward, refer to the activity
16 you described of collecting as many absentee ballots and
17 collecting and submitting ballots by mail as illegal
18 vote harvesting, will you understand what I'm referring
19 to?
20     A.  Sure.  And if for some reason that definition
21 needs clarifying, then I'll bring it up at that time.
22     Q.  You mentioned that SB1's mail ballot
23 identification requirements would be more effective in
24 preventing some vote harvesting more so than others.
25 Are there instances you can think of where SB1's mail

Page 86

1 ballot identification requirements would not be
2 effective in deterring vote harvesting?
3     A.  The primary scenario I can think of is where a
4 vote harvesting crew already has enough information
5 about the voters that they possess those identifying
6 numbers that have to be provided.
7     Q.  Do you believe that SB1's mail ballot
8 identification requirements would be effective in
9 preventing vote harvesting if a defendant filled out
10 either the voter's application or mail ballot in the
11 presence of that voter?
12         MR. HUDSON:  Objection, form, foundation.
13 Objection, incomplete hypothetical.
14     A.  If I understand the question, I think that
15 the -- the piece that I mentioned earlier, where the
16 voter could be put off by a harvester requesting that
17 information from the voter, that could reduce the
18 likelihood of a successful vote harvesting transaction.
19 I think that would be my answer.
20     Q.  And can you think of situations where a
21 perpetrator might be able to obtain an ID from the
22 person they're seeking to harvest a ballot from?
23         MR. HUDSON:  Objection, incomplete
24 hypothetical.  Objection, foundation.
25     A.  An ID number or an actual -- actual

Page 87

1 identification document.  They could just ask for it,
2 and if the voter was inclined to provide it or show it
3 to them because they had that level of trust somehow
4 with a stranger or -- or a harvester maybe that they've
5 known from previous election cycles, that's possible.
6     Q.  Uh-huh.
7         Do you have any personal knowledge of the
8 operative underlying facts of a case that was positively
9 resolved, so the spreadsheet we've been working on,
10 where the defendant who engaged in voter -- in a vote
11 harvesting crime filled out the voter's ballot or
12 absentee ballot by mail request in the voter's presence?
13     A.  Sure.  Although I would say, because this --
14 this isn't the most up-to-date document.  Some of the
15 most recent cases are the ones that are immediately
16 popping into my mind and they're not on this document
17 yet, but they have been resolved.
18     Q.  They have been resolved?
19     A.  And there may be ones on here as well that I
20 would have to take a look at, but most of these cases
21 focus on the -- on the -- kind of the harvesting side of
22 the process rather than the seeding or the application
23 side of the process, from what I looked through.
24 Actually, you know, I was flagging the ones that were --
25 that were unlawful assistance interactions, and so we

Page 88

1 probably do have some application fraud situations here.
2 But a majority -- I would say a majority of the
3 application violation cases do involve completing an
4 application in the presence of the voter.
5     Q.  The majority involve completing an application
6 in the presence of the voter?
7     A.  Most of it happens in the presence of the
8 voter.  And I think the reason for that is because
9 eventually they have to go back to the voter for the
10 ballot, and so it's helpful to have that prior
11 interaction with the voter.  It's helpful to get -- it's
12 easy to get an actual signature from the voter for an
13 application, because I'm just helping you get a mail
14 ballot.
15     Q.  Right.
16     A.  Now, when you go to the mail ballot, that's
17 where the skill comes in.
18     Q.  So in most of these vote harvesting schemes,
19 the harvesters are trying to build some relationship
20 with the people they're targeting?
21     A.  I would say they're trying to -- trying to
22 establish some level of trust or confidence with that --
23 with that voter.  If they're doing it well, they are.
24     Q.  And in those instances, is it possible that
25 they could ask the voter for their identification number

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

22 (85 - 88) Jonathan Sherman White

Page: 22 (85 - 88)

5:21-cv-844 (XR)
4/27/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 23 (89 - 92)

23 (89 - 92)

Page 89

1  or have the voter fill out their own identification
2  number?
3      A.   That's right.  Absolutely.
4          MS. PAIKOWSKY:  If it's okay, can I take a
5  five-minute break?
6      A.   Sure.
7          MR. HUDSON:  No objection.
8          (Lunch recess.)
9      Q.   (By Ms. Paikowsky)  Mr. White, I'm going to go
10  back to asking questions about SB1's mail ballot
11  identification provisions.  Without SB1's mail ballot
12  identification provisions, would your office have other
13  means of detecting vote harvesting?
14          MR. HUDSON:  Object to the extent that
15  that would encroach on investigator privilege, and
16  remind you of the stipulation concerning the running
17  objection.  Just instruct the witness, to the extent
18  that that would encroach on methods of investigation or
19  practices, I'll instruct you not to answer.
20      A.   Yeah.  Without going into our mental
21  impressions and our investigative practices, I guess I
22  could say we have prosecuted vote harvesting cases in
23  the past.
24      Q.   And this, again, is not seeking specific
25  information about any investigation, but do you have --

Page 90

1  does your office have methods by which you would detect
2  potential illegal vote harvesting?
3          MR. HUDSON:  Same objections.
4      A.   We have --
5          MR. HUDSON:  Same instruction.
6      A.   We have other methods.
7      Q.   All right.  I'm going to show you a document
8  that we can mark Exhibit 5.
9          (Exhibit 5 marked.)
10          MS. PERALES:  What are you marking?  You
11  tell me.  This is 5?
12          MS. PAIKOWSKY:  This is 5.
13      Q.   (By Ms. Paikowsky)  Do you recognize this
14  document?  Sorry, and I should say this is marked
15  State -- Bates No. State 05462.
16      A.   Yes, I believe I do.
17      Q.   And what is this document?
18      A.   It is a PowerPoint file including some
19  information about election integrity at the Attorney
20  General's Office.
21      Q.   Who created this PowerPoint?
22      A.   I guess a collaboration involving myself and
23  some other members of our team, I'm not sure exactly
24  who.
25      Q.   What has the slide show been used for?

Page 91

1      A.   This specific version, I'm not 100 percent
2  sure, but -- I couldn't say for sure.
3      Q.   What are instances where you presented some
4  version of this slide show?
5      A.   The one I recall is -- would be the Secretary
6  of State's annual elections conference for elections
7  administrators.
8      Q.   And in that conference, who are you presenting
9  this slide show to?
10      A.   Elections officials.
11      Q.   What is the purpose of giving this presentation
12  to election officials?
13      A.   To inform them about election integrity efforts
14  and enforcement and to give them some information on
15  what they can look for in terms of detecting election
16  fraud and how to report it.
17      Q.   If you wouldn't mind turning to Bates
18  No. 054641.
19      A.   Okay.
20      Q.   Can you describe this slide?
21      A.   So this slide is intended to show some examples
22  or representations of examples of mail ballot
23  application activity that might be associated with --
24  with fraud or vote harvesting operations.
25      Q.   Does this slide show tools that your office

Page 92

1  uses to detect vote harvesting and impersonations?
2      A.   The intent was to show elections administrators
3  items that they might detect, and if looking -- if
4  looked into further might find evidence of fraud that
5  they would report to our office.
6      Q.   So is it fair to say that the examples you see
7  here might give your office or others cause to
8  investigate potential absentee ballot by mail fraud?
9      A.   They might if we received a complaint with this
10  type of information inside of it.
11      Q.   Have there been instances -- again, not going
12  into privileged information about any specific
13  investigation -- have there been instances in the past
14  where you office has received a complaint that includes
15  an example that you -- similar to those that you've
16  provided here to detect a vote harvesting?
17      A.   Yes.
18      Q.   To your knowledge, will your office continue to
19  rely on this tool to detect vote harvesting?
20      A.   We'll continue to rely on complaints that have
21  credible information about election fraud.
22      Q.   And the kinds of evidence that you might
23  consider credible evidence warranting an investigation
24  would be -- would include what's provided on this slide
25  show?

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

23 (89 - 92) Jonathan Sherman White

Page: 23 (89 - 92)

5:21-cv-844 (XR)
4/27/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 54 (213 - 216)

54 (213 - 216)

Page 213

1 or some other polling place, and without respect to
2 whether the food is being offered as an inducement to
3 vote, but just having a barbecue set up, chicken plates
4 on the lawn of the county courthouse, outside the
5 electioneering zone does not violate Texas law, right?
6         MR. HUDSON:  Objection, form, incomplete
7 hypothetical.  Objection, asked and answered.
8 Objection, foundation.  Go ahead.
9     A.   I -- yeah, I mean, I might miss something, but,
10 you know, absent -- absent some facts that actually
11 indicate an offense under the Election Code or some
12 other code, no, I mean people can gather and have food.
13    Q.   And you mentioned that the chicken plate is a
14 phenomenon of South Texas.  Is that what you've heard?
15    A.   That's what I've heard.
16    Q.   Are you aware that campaigns set up barbecues
17 and tents and lawn chairs and hand out food to people in
18 other parts of Texas besides South Texas?
19    A.   That wouldn't surprise me to hear that.  I just
20 haven't heard a lot of those stories.
21    Q.   What percent of the cases that you have
22 prosecuted of voter assistance fraud have involved Anglo
23 defendants versus non Anglo defendants?
24    A.   No idea.
25    Q.   Have you ever seen an instance where a voter

Page 214

1 cast a ballot for a family member who was ineligible
2 because the family member was dead?
3     A.   I'm trying to think of whether I have any of
4 those cases on the resolved prosecutions spreadsheet.
5 But I -- I could say I have seen that scenario, but I
6 would be limited to talking about the facts of those
7 scenarios unless they've been resolved prosecutions.
8     Q.   Would the answer be the same if I asked you if
9 you've ever seen instances where a voter cast the ballot
10 for a family member who was ineligible because the
11 family member was no longer a resident of the
12 jurisdiction?
13    A.   We've had lots of residency cases, but I don't
14 remember one where a vote was cast for a family member.
15    Q.   You've never seen, for example, parents vote a
16 mail ballot for a child who's in college but that child
17 is already gone and voting on their own wherever they
18 went?
19    A.   I don't recall the fact of the family member
20 voting another family member's ballot who had, you know,
21 vacated the residency or moved their residency.
22    Q.   Can you give me any other examples of a voter
23 casting a ballot for another voter who is ineligible
24 either because of felony convictions, deceased, absent,
25 no longer a resident?  Any other examples of people

Page 215

1 voting for other people, basically?
2     A.   Sure.  Well, the one that comes to mind
3 immediately is the one associated with the victim's
4 assistance coordinator of Omar Escobar, whose vote
5 harvesting operation caught up a deceased voter who had
6 been -- who had passed away nine years earlier, and
7 applied for a mail ballot for that voter, and that mail
8 ballot got voted.  The issue in the case was actually
9 pending that offense to the specific person, and we
10 ultimately did not obtain that conviction against
11 Ms. Garza in that case.
12    Q.   Did you charge her?  Did you go to court?
13    A.   We did.
14    Q.   Was she acquitted?
15    A.   No.
16    Q.   The charges were dropped?
17    A.   The charges were dropped.
18    Q.   Okay.  Do you have any sense of the relative
19 proportion of fraud that occurs by family members voting
20 for other family members versus one of these vote
21 harvesting operations that you've identified in your
22 chart?
23    A.   I have a very general sense of it based on just
24 a cumulative 14 years of dealing with cases.
25    Q.   And what is your sense?

Page 216

1     A.   The exception to the rule.
2     Q.   What would be fair to say, also, though, that
3 you are less likely to learn of an instance in which a
4 family member votes for another family member because
5 it's isolated and there are fewer people to report it?
6     A.   I would say we're probably equally likely to
7 learn of it if the voter is deceased, for example,
8 because there are ways that gets flagged by the system.
9 If it's a -- we might -- anytime a voter is aware that
10 their ballot has been taken and voted against their will
11 or they show up to vote in person to vote but they're
12 told, "No, you've already voted by mail," or something
13 like that, it's fairly likely that that could get
14 reported.
15         So I think I agree with the premise that
16 it is probably more likely in a number of situations for
17 a vote harvesting operation to be reported than a family
18 member.  It's also not across the board, and there are
19 other factors in a vote harvesting operation that make
20 it extremely unlikely for those offenses to be reported,
21 as well, such as the fact that if it's done correctly,
22 vote harvesting is invisible to the voter.  "Someone
23 stopped by to help me with my ballot," and as far as the
24 voter knows, they voted exactly the way the voter wanted
25 them to vote, because I asked you, "Who would you like

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

54 (213 - 216) Jonathan Sherman White

Page: 54 (213 - 216)

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 55 (217 - 220)

55 (217 - 220)

Page 217

1 to vote for for this race?"  And I may or may not
2 mention the down ballot races, which I fill in for the
3 people that I'm actually working for, because I don't
4 care about who's up ballot when I'm vote harvesting.  I
5 care about local elections that I'm getting paid for.
6         So, you know, done properly, vote
7 harvesting is invisible to the voter, and unless there's
8 a situation where something has been just completely --
9 you know, without the voter's knowledge or consent,
10 there has been an application for a mail ballot and they
11 are planning on voting in person and find out that,
12 "Wait a second.  No, I already voted by mail?  No, I
13 don't."  That's going to get reported a lot of the time,
14 you know.  So I agree and -- and would disagree or
15 distinguish --
16    Q.  Uh-huh.
17    A.  -- on other grounds.
18    Q.  Is it also the case that if a voter assister, a
19 mail ballot voter assister is doing everything the way
20 that they are supposed to do, that the experience is
21 similarly seamless for the voter, who understands that
22 the assister is filling out according to their wishes
23 and helping them with the ballot and in a completely
24 appropriate way.  The voter would similarly have a
25 seamless and non-troubling experience with that?

Page 218

1    A.  Yeah.  And I would say it's more likely that
2 the voter would have a bad experience when the vote
3 harvester is doing the wrong thing, but, yeah, I think
4 that that's the challenging -- that's the challenge of
5 investigating mail ballot fraud and proving it after the
6 fact, is that, done correctly, it may look to the voter
7 just like it's done appropriately.
8    Q.  I'm going to ask you no more questions about
9 your testimony.
10         Is it -- is it your contention that when
11 you are advising a legislator during the legislative
12 process about facts related to voter fraud, that you
13 have an attorney-client relationship with the
14 legislator?
15         MR. HUDSON:  I'm going to object to the
16 extent that that would encourage attorney-client
17 privilege between me and my client, or attorney work
18 product, or legislative privilege.  To the extent that
19 you can answer that without revealing any
20 attorney-client privilege or any other privileges,
21 you're free to do so.  Otherwise, I'm instructing you
22 not to answer.
23    A.  I don't know that I can.
24         THE REPORTER:  Can we take a short break?
25         (Brief recess.)

Page 219

1         MS. PERALES:  Yes.
2    Q.  Okay.  We're back on the record.  I was -- and
3 I'm also checking -- okay.  I was asking you some
4 questions about the attorney-client relationship.
5         Look, it's the end.  You can see right
6 here, there's nothing -- there's nothing down below,
7 so --
8         MR. HUDSON:  You can't sweet talk him into
9 answering your question.
10         THE WITNESS:  That's exciting.
11         MR. HUDSON:  For purposes of the record,
12 we're all laughing.  I know this isn't being recorded,
13 but I want to make it very clear that we're all
14 chuckling about that one.
15         MS. PERALES:  Yes, it's all in good humor.
16 And I've been foiled by Mr. Hudson and my charm
17 offensive.
18    Q.  (By Ms. Perales)  So I do have some questions
19 for you about the attorney-client privilege, which is,
20 is there a difference, in your mind, in terms of whether
21 you've formed an attorney-client relationship with a
22 legislator or whether you are giving fact information --
23 for example, like the number of prosecutions or what a
24 prosecution was about -- versus advising them on
25 something like the interpretation of statutory language?

Page 220

1 Do you draw a distinction there at all?
2         MR. HUDSON:  I'm going to object.  That's
3 an improper contention.  Mr. White is here as a fact
4 witness, not to give legal opinions about
5 attorney-client, attorney work product.  We also have a
6 stipulation on the record.  With that, I'll instruct you
7 not to answer to the extent that your answer would
8 encroach on any stipulated privileges.  To the extent
9 that you can answer, you're free to do so.
10    A.  I don't -- I don't know that I can.
11    Q.  Okay.  Well, that was -- that is me kind of
12 getting closer to what I really want to ask you about,
13 which is discussions that you've had with legislators
14 that you consider not privileged by the attorney-client
15 privilege.  Not every discussion you've ever had with a
16 legislator can be understood to be attorney-client
17 privileged.  Would you agree with me on that?
18    A.  Certainly not questions that I was asked at a
19 legislative committee hearing.  Things like that would
20 be -- would be covered, I would agree.
21    Q.  So for the purpose of the record, are you
22 asserting that any private conversation you would have
23 had with a legislator, regardless of the content, would
24 be privileged as attorney-client privilege?
25         MR. HUDSON:  Same objections.

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

55 (217 - 220) Jonathan Sherman White

**Page: 55 (217 - 220)**