IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,           §
     *Plaintiffs,*                                        §
                                         §
                                         §
*v.*                                                       §    Case No. 5:21-cv-844-XR
                                         §
GREGORY W. ABBOTT, et al.,                     §
     *Defendants.*                                      §

---

### STATE DEFENDANTS' BRIEF IN RESPONSE TO
### THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT

# APPENDIX CC

```
1                    UNITED STATES DISTRICT COURT
                              FOR THE
2                     WESTERN DISTRICT OF TEXAS

3

4    LA UNION DEL PUEBLO ENTERO, et. al. )
              Plaintiff,                 )
5                  v.                    )Civil Action No. 5:21-cv-00844-XR
     GREGORY W. ABBOTT, et al.           )
6                                        )
              Defendant.                 )
7

8

9    - - - - - - - - - - - - - - - - - - - - - - - - x

10   Deposition of J. SCOTT W, WIEDMANN, taken pursuant to Subpoena to

11   testify at Deposition, was held at the U.S. Department of Justice, 150

12   M Street NE, 8th Floor, Washington, DC 20002, commencing July 29, 2022

13   at 9:48 A.M., on the above date, before JEANINN ALEXIS, a Stenographer

14   and Notary Public in and for the District of Columbia.

15   - - - - - - - - - - - - - - - - - - - - - - - - x

16

17

18                    MAGNA LEGAL SERVICES
                        (866)624-6221
19                      www.MagnaLS.com

20

21

22
```



J. Scott Wiedmann

July 29, 2022
Pages 46 to 49

Page 46

1    the last four digits.

2         Is that correct?

3    A    If they have such number, yes.

4    Q    Is there anything about paragraph 6 that you

5    believe is now inaccurate as compared to when you

6    wrote this particular draft?

7    A    I believe paragraph 6 is accurate.

8    Q    Are there any changes you would make to

9    paragraph 6 since the time you wrote this initial

10   draft?

11   A    I don't believe so.

12   Q    You can put Exhibit 2 to the side, but I

13   wouldn't put it too far.

14        (Wiedmann Deposition Exhibit 3 marked for

15   identification.)

16        BY MS. HUNKER:

17   Q    Do you have Exhibit 3 in front of you?

18   A    Yes.

19   Q    And do you recognize this document?

20   A    Yes, I do.

21   Q    This is a voter registration absentee ballot

22   request specifically known as a Federal Post Card

Page 47

1    Application; is that correct?

2    A    It appears to be, yes.

3    Q    I will represent to you that I got this

4    particular Federal Post Card Application from the

5    Federal Voting Assistance Program's website.

6         Do you have any reason to doubt on that?

7    A    I do not.  I haven't read every word but I

8    have no reason to doubt it.

9    Q    And so there are a bunch of different

10   fields.  Let's look at Section 1 first.  It says, Who

11   are you pick one.  And then it has four check boxes

12   which reads, I am on active duty in the Uniformed

13   Services or Merchant Marines or I am an eligible

14   spouse or dependent.  Two, I am a US citizen living

15   outside the country and I intend to return.  Three, I

16   am a US citizen living outside the country and my

17   intent to return is uncertain.  And, Four, I am a US

18   citizen living outside the country.  I have never

19   lived in the United States.

20        Did I read those correctly?

21   A    You did.  I would characterize them as five

22   options, but you did read them correctly.

Page 48

1    Q    And do you know what happens if the voter

2    does not check one of these boxes?

3    A    So these boxes would serve a couple

4    purposes.  One is as stated in the red box at the top,

5    the form is intended for active duty military and

6    their families who are absent from their voting

7    jurisdiction or US citizens outside the United States.

8         So if an individual submitting this form did

9    not check one of these five boxes, it would be

10   difficult for the local election office to determine

11   if this person is actually an individual who is

12   covered by Uniformed Overseas Citizens Absentee Voting

13   Act.

14   Q    So -- oh, sorry.

15   A    That's the primary reason for those boxes.

16   Q    So if an individual does not check one of

17   these boxes, they would have their application

18   rejected.

19        Is that correct?

20   A    I would say it depends on the state and what

21   their procedures are as to what to do with a Federal

22   Post Card Application.  They may not reject it

Page 49

1    outright.  They may put it on hold and contact the

2    voter or they could reject it outright and send a

3    notification to the voter.  It depends on the state's

4    procedures.

5    Q    But if -- a voter does not fill out one of

6    these five boxes would not have their FPCA accepted.

7         Is that right?

8    A    I can't say what a state would accept or not

9    accept.

10   Q    But would you agree with me that certain

11   states would require the voter either resubmit the

12   form or provide additional information before

13   accepting the FPCA in the event the voter did not fill

14   out one of these five boxes?

15   A    I would agree with that statement, yes.

16   Q    And also in Section 1, we have fields for

17   last name, first name, and middle name as well as

18   previous names, birth date; is that correct?

19   A    Yes.

20   Q    And also in Section 1, there's a field for

21   social security numbers; is that right?

22   A    Yes.



J. Scott Wiedmann

Page 50

1    Q    And there is also a field for driver's
2   license or state ID numbers; is that right?
3    A    Yes.
4    Q    And so the fields with social security
5   numbers and driver's license or state ID number are on
6   the Federal Post Card Application?
7         Is that right?
8    A   Yes, they are.
9    Q    And you had stated before that the Federal
10  Post Card Application did not change as a result of
11  Senate Bill 1; correct?
12   A    That's correct.
13   Q    So the social security number field and
14  driver's license field existed on the Federal Post
15  Card Application independent of Senate Bill 1; is that
16  correct?
17   A    That's correct.
18   Q    Now, you had mentioned that you do updates
19  for the Federal Post Card Application every two years.
20  Was the social security number field and the driver's
21  license number field added in 2021 or did it
22  pre-exist?

Page 51

1    A    It pre-existed, to the best of my
2   recollection.
3    Q    So the social security number field and the
4   driver's license number field pre-existed on the
5   Federal Post Card Application prior to 2021; is that
6   right?
7    A    Yes.
8    Q    Do you know when they were added to the
9   form?
10   A    I cannot recall them not being on the form.
11   Q    And you've been working with the Federal
12  Voting Assistance Program since 1993; is that right?
13   A    Yes.
14   Q    And since 1993, you do not recall a Federal
15  Post Card Application that did not have a social
16  security number or a driver's license field; is that
17  right?
18   A    That is correct.
19   Q    In your experience, do applicants typically
20  fill in all the fields?
21   A    I do not receive these forms so I cannot
22  comment on what fields are filled out or not filled

Page 52

1   out.
2    Q    So you don't know what percentage of voters
3   would fill in a field for social security numbers or
4   driver's licenses; is that right?
5    A    That is correct.  I do not know.
6    Q    So you mentioned that these fields have been
7   on the form for quite some time.  Do you know why they
8   were put on the form?
9    A    So the form is to facilitate communications
10  between the voter and their election office so the
11  voter can provide information necessary so they can be
12  registered to vote and to have a ballot sent to them.
13  So if a state -- if states require these, that's why
14  they will be on there.
15   Q    And so the field on the Federal Post Card
16  Application for social security number and driver's
17  license number is to facilitate registration and
18  absentee ballot requests with the state; is that
19  right?
20   A    As part of the form as a whole, yes.
21   Q    And do you know what occurs if an individual
22  does not provide their birth date on the Federal Post

Page 53

1   Card Application?
2    A    I believe it will be something similar to
3   the other check boxes in that the state would, based
4   on the state rules, regulations, procedures, determine
5   whether or not the form could be accepted and/or they
6   would have to communicate with the voter for
7   subsequent information prior to accepting the form.
8    Q    So you would agree with me that if an
9   overseas or military voter did not provide a birth
10  date on a Federal Post Card Application, that some
11  states would require the voter to either resubmit the
12  form or, in some way, communicate the information to
13  the state; is that right, before accepting the
14  application?
15   A    My understanding is that it is a requirement
16  by the states, yes.
17   Q    And have you looked into how states require
18  a military or overseas voter to cure these types of
19  defects such as not providing a birth date on the
20  Federal Post Card Application?
21   A    We do not have -- we do not collect and/or
22  distribute information on the cure process for any



Page 66

1    A   My understanding is that upon receiving this
2   and it being approved, meeting the states' or
3   localities' requirements for voter registration, than,
4   yes, all subsequent elections for federal offices that
5   occur during that year, the absentee ballot will be
6   sent to the voter.
7    Q   So barring a mistake on the form, the voter
8   would only have to fill this out one time each
9   calendar year; is that right?
10    A   As long as that individual's situation has
11   not changed.
12    Q   That's a good clarification.  Thank you.
13       If we can go back to the first page.  You
14   see Section 2 where it says, What is your address in
15   the US state or territory were you're registering to
16   vote and requesting an absentee ballot.
17    A   Yes.
18    Q   Now, if a voter failed to fill out this
19   particular section, you will agree with me that the
20   state would require the voter to either resubmit their
21   Federal Post Card Application or provide additional
22   information before the application was accepted.

Page 67

1       Is that correct?
2    A   This would be part of the information
3   required by many states in order to correctly process
4   the form, yes.
5    Q   We can put this document to the side.
6       (Wiedmann Deposition Exhibit 4 marked for
7   identification.)
8       BY MS. HUNKER:
9    Q   This is Exhibit No. 4.  Do you have the
10   document in front of you?
11    A   Yes.
12    Q   And do you recognize this document?
13    A   It looks like it is a complete Federal
14   Write-In Absentee Ballot form.
15    Q   And I will represent to you that I took this
16   particular form from the website of the Federal Voting
17   Assistance Program.
18       Do you have any reason to doubt my
19   characterization of this document?
20    A   I do not.
21    Q   And so this acts as the backup ballot for
22   military and overseas voters; is that correct?

Page 68

1    A   Yes, it is one avenue.  It is one back up
2   that can be used, yes.
3    Q   Look where it says, You can vote wherever
4   you are.  This is how.
5       Do you see that?
6    A   Yes.
7    Q   One, Fill out your voter information page
8   completely and accurately.  The first bullet point
9   reads, Your US voting residence is used to determine
10   where you are eligible to vote absentee.  For military
11   voters, it is usually the last address in your state
12   of legal residence.  For overseas citizens, it is
13   usually the last place you lived before moving
14   overseas.  You do not need to have any current ties to
15   this address.  Do not write a post box in Section 2.
16       Did I read this correctly?
17    A   Yes.
18    Q   And you agree with me that providing a
19   voting residence address is required by many states
20   for the Federal Write-In Ballot to be accepted?
21    A   I do not know to what extent states would
22   verify all the information on this voter information

Page 69

1   sheet that's provided.
2    Q   And you see in the second bullet point, it
3   says, Most states allow you to provide a driver's
4   license number or the last four digits of your social
5   security number.  New Mexico, Tennessee, and Virginia
6   require a full social security number.
7       Did I read that correctly?
8    A   Yes.
9    Q   And so for those states, mainly New Mexico,
10   Tennessee, and Virginia, based on this document, a
11   voter would have to put on there their driver's
12   license number or their full social security number in
13   order to accurately fill out and have their Federal
14   Write-In Absentee Ballot accepted.
15       Is that correct?
16    A   I'm not sure if that's correct because there
17   are states as listed up above or that are not listed
18   up above that will accept this form as both the
19   registration form and the absentee ballot itself.
20       So I can't say for sure whether or not those
21   states would reject the ballot if the voter had
22   already gone through the registration process



J. Scott Wiedmann

July 29, 2022
Pages 70 to 73

Page 70

1  previously.

2     Q    Okay.  Would you agree with me that some

3  states require a driver's license number, state ID

4  number, or social security number in order to complete

5  the -- successfully complete the Federal Write-In

6  Absentee Ballot?

7     A    Again, I'm not sure what states, what

8  information on this form states would use to verify

9  the voter's identification before accepting the voter

10  ballot portion.

11     Q    And this document is prescribed in your

12  office; correct?

13     A    That is correct.

14     Q    And that is true also from the Federal Post

15  Card Application?

16     A    That is correct.

17     Q    And so if we turn to page 2, you will see

18  that it has a bunch of fields where the voter has to

19  fill out.

20        Is that correct?

21     A    Yes.

22     Q    And like with the FPCA, Section 1 provides a

Page 71

1  list of five check boxes that read, I am on active

2  duty in Uniformed Services or Merchant Marine, I am an

3  eligible spouse with dependent, I a US citizen living

4  outside the country and intend to return, I am a US

5  citizen living outside of the country and my intent to

6  return is uncertain, I am a US citizen living outside

7  the country.  I have never lived inside the United

8  States.

9        Did I read those correctly?

10     A    Yes.

11     Q    And do you know what happens if a voter does

12  not check one of these five boxes?

13     A    I am not 100 percent sure.  It may depend on

14  whether the voter is using this form for voter

15  registration versus just as a way of affirming who

16  they are upon reaching the ballot.

17     Q    Would you agree with me that in some states,

18  if a voter did not check one of these five boxes, that

19  the state would require the voter to either resubmit

20  the write-in ballot or provide additional information

21  before they would accept the Federal Write-In Absentee

22  Ballot?

Page 72

1     A    I can't necessarily agree with that because

2  I don't -- again, I don't know what states would

3  require for solely affirming the voter's identity to

4  accept the ballot versus in a state where this might

5  be used for registration.

6     Q    So what about the states that don't use it

7  as a voter registration form?  For those states, would

8  you agree with me that if a voter did not check one of

9  these boxes, that the state or states would require

10  the voter to either resubmit the Federal Write-In

11  Absentee Ballot or, in some way, provide the

12  additional information?

13     A    That may be the case.  I would agree that

14  may be the case.

15     Q    And if we look at Section 1, you will see a

16  bunch of different fields like last name; first name;

17  middle name; suffix; previous name, if applicable; and

18  birth date.

19        Is that correct?

20     A    Yes.

21     Q    And then we also have a field for social

22  security number and driver's license or state ID

Page 73

1  number; is that correct?

2     A    Yes.

3     Q    And I should specify these fields are

4  separate, so social security is one field, driver's

5  license or state ID is another field?

6     A    Yes.

7     Q    And you had mentioned that the Federal

8  Voting Assistance Program did not make changes to the

9  form, specifically the federal Write-In Absentee

10  Ballot in response to Senate Bill 1; correct?

11     A    That's correct.

12     Q    And so the fields that have social security

13  number and the field that has driver's license or

14  state ID number, is this form independent of the

15  requirements of Senate Bill 1; is that correct?

16     A    That's my understanding, yes.

17     Q    Were the fields for social security number

18  and driver's license or state ID on this form prior to

19  2021?

20     A    Yes.

21     Q    And is this also an example of you not

22  remembering the Federal Write-In Absentee Ballot not



J. Scott Wiedmann

Page 74

1  having a field for social security number and/or
2  driver's license and state ID?
3      A   I don't recall whether it was or was not on
4  there for my entire time there, but I don't recall
5  that.
6      Q   Okay.  To your recollection, did these
7  fields exist prior to 2021?
8      A   Yes.
9      Q   To your recollection, do you know how long
10  they would have been on this form?
11     A   I would say multiple election cycles.  I
12  don't remember exactly.
13     Q   So the fields for social security numbers
14  and driver's license or state ID have been on the
15  Federal Write-In Absentee Ballot for multiple election
16  cycles; is that right?
17     A   Yes.
18     Q   And you don't know what percentage of voters
19  provide either driver's license number or social
20  security number when filling out this form, do you?
21     A   We do not.
22     Q   Do you know if voters typically fill in all

Page 75

1  the fields available?
2          MS. YUN:  Objection.  Foundation.
3          BY MS. HUNKER:
4      Q   You can answer.
5      A   I do not know how complete the voters submit
6  -- complete the form before submission.
7      Q   Does the Federal Voting Assistance Program
8  recommend to voters that they fill out all the fields
9  on this form?
10     A   We recommend voters provide as much
11  information as possible to ensure the election office
12  has the information they need to process it and either
13  register or have the ballot count.
14     Q   Do you recommend that -- when I say you, I
15  mean the Federal Voting Assistance Program recommend
16  that voters put down their social security number or
17  their driver's license or state ID number?
18     A   Again, we would recommend that voters
19  provide whatever information they feel is necessary to
20  ensure that the state can process the form.  If a
21  voter has concern about providing those numbers
22  because of security or whatever other reasons, then we

Page 76

1  may tell them to check with the election official to
2  see whether or not it's required.
3      Q   And if we look to Section 4, it says, What
4  is your contact information.  This is so election
5  officials can reach you about your request.
6          Did I read that correctly?
7      A   Yes.
8      Q   And there are four fields.  The fields read:
9  Email, alternate email, phone, fax.
10         Did I read that correctly?
11     A   Yes.
12     Q   And this is in part so that election
13  officials can get in contact with the voters; is that
14  correct?
15     A   That would be one reason they would provide
16  the information.
17     Q   And what are the other reasons?
18     A   If they are requesting using this as a
19  registration form and providing the email so the voter
20  or the state can either send them a ballot by email or
21  through some sort of email with a link-type,
22  online-type service.

Page 77

1      Q   And do you recommend to voters that they put
2  their email or phone number?
3      A   We do.
4      Q   And you wouldn't happen to know what
5  percentage provide their phone or email?
6      A   I do not know.
7      Q   And then if we look to No. 6, it says, What
8  additional information must you provide.
9          Did I read that correctly?
10     A   Yes.
11     Q   And then there are a couple of sentences
12  following.  It reads, Alabama requires two witness
13  signatures; Alaska, Virginia, and Wisconsin require
14  one witness signature.
15         Did I read that line correctly?
16     A   Yes.
17     Q   And so I take from this that Alabama
18  requires two witnesses signatures in order for the
19  absentee ballot to be counted.
20         Is that correct?
21         MS. YUN:  Objection.  Foundation.
22         THE DEPONENT:  In our coordination with the



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT

# APPENDIX DD

Transcript of the Testimony of

**Lisa Wise**

**Date:**

April 13, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO et al. vs GREGORY W. ABBOTT

Lisa Wise                                                    April 13, 2022

```
 1                UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO )
     et al.,                    )
 4        Plaintiffs,           )
                                )
 5   v.                         ) Civil Action No. SA-21-CV-
                                )         00844-XR
 6   GREGORY W. ABBOTT, et al., )
          Defendants.           )
 7

 8

 9        ----------------------------------------

10           ORAL AND VIDEOTAPED DEPOSITION OF
                        LISA WISE
11                    APRIL 13, 2022
                       Volume 1
12
          ----------------------------------------
13

14

15           ORAL AND VIDEOTAPED DEPOSITION OF LISA

16   WISE  produced as a witness at the instance of Plaintiff,

17   and duly sworn, was taken in the above-styled and

18   numbered cause on the 13th day of April, 2022 from 10:02

19   a.m. mountain time to 5:27 p.m. mountain time, before

20   Nancy Newhouse, a Certified Shorthand Reporter in and for

21   the State of Texas, reported by oral shorthand, located

22   at the 500 East San Antonio, Room 503, El Paso, Texas

23   79901, pursuant to the Federal Rules of Civil Procedure,

24   and the provisions stated on the record or attached

25   hereto.
```

Lisa Wise

Page 138

1    A. Correct.
2    Q. (BY MR. WHITE) So apart from providing your
3  driver's license number or your social security number,
4  what other information is required on the form for
5  application by ballot by mail?
6         MS. SPECTOR: Objection, vague.
7    A. Depending on the election there may be a party
8  selection, if it's a primary; what qualifies you to vote
9  by mail, so obviously your date of birth is required; if
10  you're voting by mail because of disability, you need to
11  mark that; if you're voting by mail because you're going
12  to be out of the county during early voting on Election
13  Day you mark that and then give us an address outside
14  the county to mail the ballot, that's that on the
15  qualifications.
16        The other information is what elections
17  you want. There is the annual option, which is, if you
18  qualify, you must be 65 or over or have marked disabled
19  on the application, and in that example we'll give you a
20  ballot for every election that your jurisdiction is
21  participating in, we'll send you one so you don't have
22  to keep sending in the application. Or you can mark the
23  -- this, in this one for example you could mark Democrat
24  or Republican primary or any resulting runoff, the
25  election selection.

Page 139

1    Q. (BY MR. WHITE) What information on the
2  application for ballot by mail is used to identify the
3  voter requesting the ballot, apart from the driver's
4  license number or the partial social -- social security
5  number?
6         MS. SPECTOR: Objection, vague.
7    A. It's generally the name, address and date of
8  birth.
9    Q. (BY MR. WHITE) And is the name of registered
10  voters on that public file that you maintain?
11    A. Yes.
12    Q. And is the address on that public file?
13    A. Yes.
14    Q. And is the date of birth?
15    A. We do not give date of birth out on the public
16  file.
17    Q. And now after -- strike that.
18        Sin -- you maintain driver's license
19  numbers and partial social security numbers in your
20  voter registration file, is that correct?
21    A. Yes.
22         MS. SPECTOR: Objection --
23         THE WITNESS: Sorry.
24         MS. SPECTOR: -- vague.
25         It's okay.

Page 140

1    A. Yes.
2    Q. (BY MR. WHITE) And when did you start
3  maintaining that information?
4         MS. SPECTOR: Objection, calls for
5  speculation.
6    A. Yeah. I mean, well before I started.
7    Q. (BY MR. WHITE) Do you remember what the
8  requirement is to keep that information?
9         MS. SPECTOR: Objection, vague, calls for
10  legal conclusion.
11    A. I'm sorry, I don't understand the question.
12    Q. (BY MR. WHITE) Do you remember what law
13  required you to gather that information when voters
14  registered?
15         MS. SPECTOR: Same objections.
16    A. I -- I don't know the law offhand. I know
17  that -- that right now that's required from the
18  registration form, and that we do ask for that, but no,
19  that was well before I lived here, probably even in the
20  state of Texas.
21    Q. (BY MR. WHITE) Does the identification
22  number, whether it's the driver's license, a
23  certificate, identification certificate or your social
24  security number, does that end up in the public file
25  that can be obtained on voters?

Page 141

1         MS. SPECTOR: Objection, vague.
2    A. It's in our system, but it's not run on the
3  voter file for the publically-released information.
4    Q. (BY MR. WHITE) So if I wrote in and asked for
5  all the voters registered in El Paso County, I wouldn't
6  get the driver's license number or the social security
7  number, correct?
8    A. Correct.
9    Q. And are the voter registration files regularly
10  requested from your office?
11         MS. SPECTOR: Objection, vague.
12    A. Regularly? I -- I mean, we get -- we get
13  requests. I don't know exactly how many we've had, but
14  I would say monthly at least.
15    Q. (BY MR. WHITE) Is it a big file?
16         MS. SPECTOR: Objection, vague.
17    A. It's large.
18    Q. (BY MR. WHITE) How many people are registered
19  in the -- in the system?
20    A. About 495,000.
21    Q. And do you know who's requesting those files?
22         MS. SPECTOR: Objection, vague.
23    A. We -- it's we get different people. We've had
24  media that requests it, we have campaigns or candidates
25  that request it, we have the city clerks who are allowed

1  by law to have a copy, so they'll take the list, and
2  that's -- that's about it.
3     Q.  (BY MR. WHITE) So does adding an additional
4  requirement to the application for ballot by mail that's
5  not in that public file, would you admit that that makes
6  it more difficult for somebody to impersonate a
7  registered voter and request their ballot?
8        MS. SPECTOR: Objection, calls for
9  speculation, vague.
10    A.  I mean, in my experience I have not seen an
11  impersonation on that form, but yes, I would say it
12  does.
13    Q.  (BY MR. WHITE) And how would you know if
14  somebody was impersonating a registered voter and
15  requesting their ballot illegally?
16        MS. SPECTOR: Object to form.
17    A.  I mean, generally, when we would get the
18  ballot, have it sent to that location, the address of
19  the registered voter. If that person didn't ask it, we
20  -- we'll get calls and somebody might say -- we've had
21  this.
22        We have had this happen, where somebody
23  requested an annual ballot, maybe in January, and then
24  the ballot for the March election might come and they
25  may say I don't remember that I requested this, and so

1  we'll show them the form and they did.
2        So I would assume we would be either
3  alerted to that, if a ballot was sent to an address that
4  someone did not request it, and then once the ballot is
5  returned, if it is, the signature verification on that.
6    Q.  (BY MR. WHITE) And do you have any history of
7  people complaining about receiving a ballot that they
8  didn't request?
9        MS. SPECTOR: Objection, vague.
10    A.  Just those few examples where maybe they
11  forgot, but we have had people come down into our office
12  and actually review their application, and then they
13  will. We've never had someone say no, that's absolutely
14  not my signature. When they come in, they -- they've
15  all agreed yes, okay, I forgot that I sent this in, or I
16  didn't know that.
17        MR. JEFF WHITE: It's been an hour in
18  this session. Why don't we take a break here for a
19  little bit?
20        MS. SPECTOR: Okay.
21        VIDEOGRAPHER: We are off record at 2:15
22  p.m.
23        (Off the record.)
24        VIDEOGRAPHER: We are back on record at
25  2:32 p.m.

1    Q.  (BY MR. WHITE) So Ms. Wise, I'm going to hand
2  you another document, I think this is now Exhibit 5.
3        (Defendant's Exhibit No. 5 was marked for
4  identification.)
5        (Sneeze.)
6        THE WITNESS: Excuse me.
7        VIDEOGRAPHER: Bless you.
8        THE WITNESS: I'm sorry, I apologize.
9        MS. SPECTOR: You're okay.
10    Q.  (BY MR. WHITE) Have you had a chance to look
11  at it?
12        So Ms. Wise, can you --
13    A.  Yes.
14    Q.  -- read the title at the top of this page?
15    A.  "Voter Information Field Guide".
16    Q.  And can you read the bottom footer?
17    A.  The Exhibit 5 or the revised?
18    Q.  At the very bottom of Exhibit 5, can you read
19  what it has on the document?
20    A.  "Revised 02/09/2021".
21    Q.  Are you familiar with this document?
22    A.  Yes.
23    Q.  And what is your understanding of what this
24  is?
25    A.  This explains what the categories are in the

1  voter -- in a -- in the voter registration system.
2    Q.  Does this show the information that the public
3  can obtain with a request to your office?
4        MS. SPECTOR: Objection, vague.
5    A.  I believe so, with the exception of the birth
6  date. There was a case, not 100 percent sure when, but
7  that's not, that's no longer included in our voter file
8  made available to the public.
9    Q.  (BY MR. WHITE) So if I told you I pulled this
10  off your website, is this out of date?
11    A.  Probably.
12    Q.  Do you --
13    A.  I would have to double check. I know that I
14  -- what I remember that we could give the year but not
15  the full DOB, if I remember correctly.
16    Q.  And you believe there is a case that made that
17  the requirement?
18    A.  I believe it was an AG opinion. I don't
19  remember exactly about DOBs being public.
20    Q.  Do you remember about when that may have came
21  out?
22    A.  I don't, I'm sorry.
23    Q.  So we talked in detail about the application
24  for ballot by mail in the 2020 March primary. So now I
25  want to move to the situation where you've actually sent

Lisa Wise                                                              April 13, 2022
                                                                      Pages 214 to 217

Page 214

1  them. I don't know if I would say that they were trying
2  to register, since they marked on there not citizen,
3  very few, I think I can think of three, so obviously we
4  sent them a rejection notification stating that they are
5  -- they marked non-citizen, we are not able to register,
6  as directed by law.
7       Q.  (BY MR. WHITE)  Have you ever identified
8  individuals that have successfully registered to vote,
9  and then later you found out that they were not
10 citizens?
11      MS. SPECTOR:  Object to form.
12      A.  Not that I can recall.
13      Q.  (BY MR. WHITE)  Have you ever received any
14 complaints about voters being paid to vote for a
15 particular candidate?
16      MS. SPECTOR:  Object to form.
17      A.  No.
18      Q.  (BY MR. WHITE)  Are you aware of any
19 allegations of that sort in El Paso County?
20      A.  No.
21      Q.  In El Paso County do you have any issues with
22 organizations that gather voter registration cards
23 providing invalid registrations?
24      MS. SPECTOR:  Objection, vague.
25      MS. PERALES:  I'm sorry, could you repeat

Page 215

1  the question?  I can't hear, because you're --
2       MR. JEFF WHITE:  Oh, I'm sorry.
3       MS. PERALES:  -- facing away from me, and
4  your voice is getting softer.
5       MR. JEFF WHITE:  Sorry.  I will say it.
6       Q.  (BY MR. WHITE)  Are you aware of any
7  organizations that collect voter registration
8  information providing you with faulty information?
9       MS. SPECTOR:  Objection, vague.
10      A.  No.
11      Q.  (BY MR. WHITE)  Have you had any complaints in
12 El Paso County about individuals providing assistance to
13 voters but pressuring the voter to vote a certain way?
14      MS. SPECTOR:  Objection, vague, compound.
15      A.  We've had isolated incidences of someone
16 calling and say I -- I think I heard someone tell him
17 how to vote, or I was at the polling site and so and so
18 was telling their wife how to vote, those isolated
19 instance -- incidences, yes, but, you know, generally,
20 we would call the judge and ask them, did you -- did you
21 witness this, has this been an issue?  We haven't had
22 anything substantiated on that.  It's nothing that we've
23 had documentation on.
24      Q.  (BY MR. WHITE)  So in your opinion as
25 elections administrator, based on your experience, do

Page 216

1  you believe fraud occurs in elections in El Paso County?
2       MS. SPECTOR:  Object to form.
3       A.  In my experience in El Paso County and my
4  experience in -- in Douglas County in Nebraska, very
5  isolated incidents.
6       Q.  (BY MR. WHITE)  And do you -- strike that.
7       Do you think some voters in Texas think
8  that fraud occurs in elections?
9       MS. SPECTOR:  Object to form, calls for
10 speculation.
11      A.  I do.
12      Q.  (BY MR. WHITE)  Do you hear from those voters
13 about their concerns about fraud?
14      MS. SPECTOR:  Object to form.
15      A.  I do.  However, it seems that steps that we've
16 taken -- I mean, we used to get complaints about fraud
17 dealing with the machines, now we have paper-based
18 system, so that's -- you know, those are all -- have all
19 been basically handled.
20      So it -- it seems like we get kind of a
21 little pocket here of an issue and then it's --
22 hopefully, it's gets resolved by either being
23 transparent or meeting with them, having them come lodge
24 an accuracy test, explaining processes and then it's
25 generally dropped.

Page 217

1       Q.  (BY MR. WHITE)  So if citizens of Texas are
2  concerned about fraud, do you think it's a valid purpose
3  of the legislature to take steps to reduce that concern,
4  whether or not the fraud is actually happening or not?
5       MS. SPECTOR:  Object to form, calls for
6  legal conclusion, vague and calls for speculation.
7       A.  I believe to take necessary steps, reasonable
8  steps, yes.
9       Q.  (BY MR. WHITE)  If voters are concerned about
10 fraud, does that affect their confidence in the outcome
11 of elections?
12      MS. SPECTOR:  Object to form, calls for
13 speculation.
14      A.  Yes.
15      Q.  (BY MR. WHITE)  So if the legislature takes
16 steps that reduce their concern about fraud, would the
17 result be that they would have greater confidence in the
18 outcome of elections?
19      MS. SPECTOR:  Object to form, calls for
20 speculation.
21      A.  I think that's a pretty vague question.  I
22 think there's some steps that you -- that can be taken
23 for that, to reach that, however, I don't know if, you
24 know, voters also lose faith in the process if they
25 don't believe that their vote counts, or that they're

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

### STATE DEFENDANTS' BRIEF IN RESPONSE TO
### THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT

# APPENDIX EE

Transcript of the Testimony of

# Lisa Wise

**Date:**

April 15, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO et al. vs GREGORY W. ABBOTT

1          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF TEXAS
2              SAN ANTONIO DIVISION

3   LA UNION DEL PUEBLO ENTERO )
    et al.,                    )
4        Plaintiffs,           )
                               )
5   v.                         ) Civil Action No. SA-21-CV-
                               )        00844-XR
6   GREGORY W. ABBOTT, et al., )
         Defendants.           )

7

7

8
              ----------------------------------------
9
              ORAL AND VIDEOTAPED DEPOSITION OF
10                       LISA WISE
                      APRIL 15, 2022
11                       Volume 1

12            ----------------------------------------

13

15

16          ORAL AND VIDEOTAPED DEPOSITION OF LISA

17   WISE  produced as a witness at the instance of Plaintiff,

18   and duly sworn, was taken in the above-styled and

19   numbered cause on the 14th day of April, 2022 from 9:06

20   a.m. to 5:05 p.m., before Nancy Newhouse, a Certified

21   Shorthand Reporter in and for the State of Texas,

22   reported by oral shorthand, located at the 500 East San

23   Antonio, Room 503, El Paso, Texas 79901, pursuant to the

24   Federal Rules of Civil Procedure, and the provisions

25   stated on the record or attached hereto.

Page 34

1    A.  I don't believe that we contacted our vendor.
2  We -- we can import that list into -- into our system
3  without, I believe, going through there, unless there's
4  fields that weren't created yet or something like that,
5  so I believe we did that internally.
6    Q.  (BY MS. PERALES)  And so when you import that
7  update into your system, would that have to be done
8  individually by voter, or could it come as a multiple-
9  voter input to you?
10        BY MS. SPECTOR:  Object to form.
11    A.  I believe as one -- one report, we would do
12  one action to import it.
13    Q.  (BY MS. PERALES)  Do you know if that update
14  information was provided to El Paso County in a way that
15  you could import it?
16        MS. SPECTOR:  Object to form.
17    A.  I believe so; how -- I -- however, I have to
18  say I'm not 100 percent sure.
19    Q.  (BY MS. PERALES)  So is it your best
20  understanding that El Paso County did, in fact, receive
21  and import that update from the Secretary of State?
22        MS. SPECTOR:  Object to form.
23    A.  Yes.
24    Q.  (BY MS. PERALES)  And it is -- is it also fair
25  to say that, after that update, you still had many

Page 35

1  voters for whom you were unable to match information
2  that they provided on their application for ballot by
3  mail, or mail ballot related to ID number?
4        MR. JEFFREY WHITE:  Objection, form.
5    A.  Yes.
6    Q.  (BY MS. PERALES)  Yesterday you mentioned that
7  when you had either an application for ballot by mail or
8  mail ballot with a number that you could not match, that
9  you would go into TEAM and see if there was an update on
10  that voter's ID number information, is that correct?
11    A.  We would go into the ballot tracker.  That was
12  the -- I'm sorry, if I said TEAM I meant ballot tracker.
13    Q.  Probably my mistake in note-taking.
14        So I want to walk you through those steps
15  from when you received the application for ballot by
16  mail or mail ballot.
17        So if you can think about that time
18  leading up to the March 2022 primary election, and your
19  office or one of your workers would receive an
20  application for ballot by mail, and there would be an ID
21  number written on there, that worker would then look up
22  the voter, is that how it would work?
23    A.  Correct.
24    Q.  That worker would be looking up the voter in
25  the El Paso County system, is that right?

Page 36

1    A.  Correct.
2    Q.  And if the worker saw, for example, no
3  driver's license or last four of the social for that
4  voter, what would the worker do with the application for
5  ballot by mail right in that moment?
6    A.  You would mark it as pending, and we would --
7  we would send them a notice, a notification, letting
8  them know that this information was missing, with a
9  clean application, eventually, with a voter registration
10  form, so if they wanted to match that up, and -- and
11  mail it back out.
12    Q.  Okay.  And would you do that immediately, or
13  would you put that application for ballot by mail or
14  mail ballot to the side, to wait a day or so to check
15  the ballot tracker and see if you could get updated
16  information that way?
17    A.  We were turning them around in about 24 to 48
18  hours; however, we still were tracking -- we were still
19  checking ballot tracker one by one on pending or
20  rejected, to see if those had -- had been updated.
21    Q.  Okay.  So when you were sending the voter the
22  notice that you -- you were unable to confirm the number
23  on their application for ballot by mail, for example,
24  would you enclose that original application for ballot
25  by mail in the mailing back to the voter, or would you

Page 37

1  hang onto the application for ballot by mail?
2    A.  We would hang on to that.  But the
3  notification also informed them how they could get on
4  ballot tracker.  So honestly, until we sent them that
5  notification, the voter real -- wasn't aware that they
6  -- their ballot -- ballot tracker existed.  So we would
7  keep it, we would send them a clean copy with the
8  notification and -- and how they could get on the ballot
9  tracker, if they wanted, or just send in a new
10  application.
11    Q.  So because you retained the applications for
12  ballot by mail, you were able then to both notify the
13  voter, but maybe also use that document to check in a
14  day or so against the ballot tracker, to see if the
15  information had been updated?
16    A.  Correct.
17    Q.  How many times would you check for, let's say,
18  one particular application for ballot by mail, was it
19  just after that couple of days later, then you would
20  just put it aside if you still couldn't match it?
21    A.  No.  We'd continue to check until we basically
22  had no more time to check.  We -- we asked for reports,
23  you know, or, I mean, we were kind of doing two things.
24  We were asking reports for the SOS, we were also trying
25  to get our vendor to work with that system, to give us

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX FF

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE WESTERN DISTRICT OF TEXAS

 3                  SAN ANTONIO DIVISION

 4   LA UNION DEL PUEBLO          )
     ENTERO, et al.,              )
 5                                )
                   Plaintiffs,    )
 6                                )
     vs.                          )
 7                                ) NO. 5:21-cv-844-XR
     GREGORY W. ABBOTT, et al.,   )
 8                                )
                   Defendants.    )
 9            ------------------------------------

10            ORAL AND VIDEOTAPED DEPOSITION OF

11                       LISA WISE

12                    April 18, 2023

13                  (REMOTELY REPORTED)

14            ------------------------------------

15        The Oral and Videotaped Deposition of LISA WISE,

16   produced as a witness at the instance of the defendant,

17   and duly sworn, was taken in the above-styled and

18   numbered cause on the 18th of April, 2023 from 9:13 a.m.

19   to 3:27 p.m., in and for the State of Texas, reported by

20   machine shorthand, conducted El Paso County Courthouse

21   500 E. San Antonio, 5th Floor, Suite 503 El Paso, Texas

22   79901, pursuant to the Federal Rules of Civil Procedure

23   and the provisions stated on the record or attached

24   hereto.

25
```



Page 38

1 Q. (BY MS. HUNKER)  That's a good question --
2 that's a good distinction.
3        So you receive applications for ballots by
4 mail weeks, if not months, in advance of an election,
5 correct?
6 A. Correct.
7 Q. Okay.  So let's talk then first about the ones
8 that are received well before the election -- before
9 the -- the ballots go out.
10        When does your office check to determine
11 whether or not the application for ballot by mail
12 satisfied the ID number requirement after it arrived?
13        MS. LEBEL:  Object to form.
14 A. Usually that day or the next business day.
15 Depending on, obviously, how many we have.
16 Q. (BY MS. HUNKER)  And how long from that does it
17 take to issue a notice of defect in the event that the
18 number did not match?
19        MS. LEBEL:  Object to form.
20 A. I would say 24 to 48 hours.
21 Q. (BY MS. HUNKER)  So is it fair to say that if
22 an application for ballot by mail arrives in your
23 office, a notice of defect will go out within 24 to 48
24 hours in the event that that application for ballot by
25 mail did not satisfy the ID number requirements?

Page 39

1        MS. LEBEL:  Object to form.
2 A. Yes.  Now, if we have a lot of them, I mean,
3 that's a separate issue.  I mean, it could be three
4 days, it could be 72 hours.  But in general, I would say
5 two days.  I would say 48 hours.
6 Q. (BY MS. HUNKER)  Is it fair to say that you try
7 to get the notice of defect out as fast as possible to
8 inform the voter of the need to cure?
9 A. Yes.
10 Q. And is that true for applications that arrive
11 closer to the election?
12        MS. LEBEL:  Object to form.
13 A. Yes.
14 Q. (BY MS. HUNKER)  And if an application for
15 ballot by mail arrives and it has a defect other than an
16 ID number related issue, how long does that take to go
17 out?
18        MS. LEBEL:  Object to form.
19 A. Same time.
20 Q. (BY MS. HUNKER)  And you are an offline county,
21 correct?
22 A. We're an offline county.
23 Q. So when an application for ballot by mail comes
24 in, your office first checks your offline county
25 database system to determine whether the ID number is in

Page 40

1 the system; is that correct?
2 A. Correct.
3 Q. And in the event the number is not in your
4 system, do you check the TEAMS database?
5 A. We do.
6 Q. So you mentioned that you send out an insert
7 for the applications for ballot by mail.  In the event
8 that there was a defect due to the numbers not appearing
9 in the system, do you also send out a voter registration
10 form with the notice of defect?
11 A. We do.
12 Q. And that is because a voter can update the ID
13 numbers for the voter registration file by submitting a
14 voter registration form; is that correct?
15 A. Correct.
16 Q. And did you notice that sending a voter
17 registration form along with the notice of defect helped
18 the voter cure?
19        MS. LEBEL:  Object to form.
20 A. Yes.
21 Q. (BY MS. HUNKER)  And so I want to talk now
22 about the ballot by mail.
23 A. Okay.
24 Q. Federal law requires that ballots by mail go
25 out 45 days to military and overseas voters before a

Page 41

1 federal election, correct?
2        MS. LEBEL:  Object to form.
3 A. Correct.
4 Q. (BY MS. HUNKER)  Did your office meet that
5 deadline this -- for the November 2022 General Election?
6 A. Yes.
7 Q. And when did the ballots go out for voters who
8 were not military or overseas?
9 A. They got out the next week.  Sometimes it's
10 four days later, sometimes it's five days later, but
11 they go within the next week following the military and
12 overseas.
13 Q. And when a ballot by mail comes in, does your
14 office remove the flap to check whether or not the ID
15 number was included on the carrier envelope?
16 A. Yes.
17 Q. And does your office check that number against
18 the system?
19        MS. LEBEL:  Object to form.
20        MS. HUNKER:  Let me rephrase that.
21 Q. (BY MS. HUNKER)  Does your office check the ID
22 number on the carrier envelope to the voter's
23 registration file?
24 A. Yes.
25 Q. How does your office contact the voter to



Page 86

1 Administrator account?

2    A.  Yes.  It's El Paso County Elections.

3    Q.  Were any of the groups you spoke with -- you

4 know, you gave the example of rotary groups -- were any

5 of those in Spanish?

6    A.  None that I spoke to, no.

7    Q.  More broadly with your office, do you know if

8 there were any?

9    A.  I know that when we did the -- like, our voter

10 registration drives, both of -- we have Spanish speakers

11 at those, and I know that they did address that with

12 people that had questions and things like that.

13       So I know they were able to communicate if

14 somebody brought that question up in Spanish at those

15 locations, but -- those events.  But when I would speak

16 at events, no.

17    Q.  I think you said you did not have any paid

18 media in connection with the November 2022 General,

19 right?

20    A.  Correct.

21    Q.  Who developed the content of this outreach?

22 Let's take them one at a time.

23       So we'll start with, you know, what you're

24 going to say in an in-person town hall, you know, who

25 comes up with the content for that?

Page 87

1       MS. LEBEL:  Object to form.

2    A.  Generally I do.  When -- and it's basically

3 based off of the insert and things like that, which I

4 created in conjunction with our County Attorney's Office

5 to make sure there wasn't any issue with that.  And then

6 also, share that with the SOS, just to let them know

7 that we were doing that and -- so they knew that that

8 was something we were promoting.

9    Q.  (BY MR. STEWART)  Did the SOS, and I assume you

10 mean the Secretary of State --

11    A.  Yes, yes --

12    Q.  Yeah, just for the record.

13       Did the SOS have any feedback on the

14 insert?

15    A.  I think they supported that.  I mean, you know,

16 we had had those conversations that other counties were

17 also doing some inserts.  And that's kind of where we

18 got the idea, too.  So I believe they were in favor of

19 it.

20    Q.  Did you pattern your insert off another county?

21       MS. LEBEL:  Object to form.

22    A.  No, I don't think we did.  We may have picked

23 from a couple that we saw that we liked, but we really

24 drafted that on our own with our attorneys.

25    Q.  (BY MR. STEWART)  Did the SOS ask you to change

Page 88

1 anything on the insert?

2    A.  No.

3    Q.  And then for social media, were you also coming

4 up with the content for that?

5    A.  Yes.

6    Q.  Did you consult with the SOS on your voter

7 education efforts in any way beyond the insert?

8    A.  No.

9    Q.  Were you aware during the General Election

10 period of the voter education efforts conducted by the

11 Secretary of State?

12       MS. LEBEL:  Object to form.

13    A.  I'm aware that they had mentioned that that was

14 going to be a component.

15       But as far as voter education, we would

16 receive our advisories, but I did not -- I was not

17 seeing anything out in the -- I guess, in the public if

18 that's what you're asking.

19    Q.  (BY MR. STEWART)  Yeah.  Maybe I'll ask it more

20 crisply, you know.

21       Did you notice the presence of the

22 Secretary of State's voter education efforts during the

23 General Election?

24       MS. HUNKER:  Objection.  Form.

25       MS. LEBEL:  Object to form.

Page 89

1    A.  I remember a press release.  And that's --

2 that's what I remember.

3    Q.  (BY MR. STEWART)  Okay.  Did you receive any

4 feedback from voters regarding the voter education

5 efforts you undertook?

6    A.  Yes.  I mean, I know that they did appreciate

7 the insert, and we -- especially with the ballot, where

8 we would send the picture of what the envelope would

9 look like and highlight where they were supposed to

10 actually fill it in and send the screenshot.  I know

11 that people -- we did get positive feedback on that.

12    Q.  Did you hear from any voters who were

13 continuing to struggle with the ID number requirements

14 during the General Election?

15       MS. LEBEL:  Object to form.

16       MS. HUNKER:  Object to form.

17    A.  Yes, we did.

18    Q.  (BY MR. STEWART)  About how many?

19       MS. LEBEL:  Object to form.

20    A.  That's really tough to -- to give.  I didn't

21 keep -- I didn't keep track of that.  We would get some

22 calls, and I -- I don't know the number.

23    Q.  (BY MR. STEWART)  Was it primarily by phone?

24       MS. LEBEL:  Object to form.

25    A.  Primarily by phone.  We would -- we would get



Lisa Wise

April 18, 2023
Pages 90 to 93

Page 90

1 maybe something on an application, a little note like,
2 why do I have to fill this out, like, something like
3 that.  But mostly phone.
4       Q.   (BY MR. STEWART)  Was most of that feedback
5 regarding the ID requirement?
6            MS. LEBEL:  Object to form.
7            MS. HUNKER:  Objection.  Form.
8       A.   Was the feedback about the ID requirement
9 regarding the ID?
10      Q.   (BY MR. STEWART)  Yeah.  I guess that's -- let
11 me --
12      A.   Sorry.
13      Q.   -- strike that question and make -- make it
14 much clearer.
15           I guess I would say, what portion of the,
16 you know, overall feedback you received from voters
17 during the General Election period pertained to the ID
18 requirement?
19           MS. LEBEL:  Object to form.
20           MS. HUNKER:  Object to form.
21      A.   It's hard for me to really quantify that,
22 honestly.  Because, like I said, we really didn't
23 keep -- keep track of it in, like, how many calls we got
24 about the ID.  But we did still spend a lot of time
25 explaining ID -- ID requirements to -- to voters that

Page 91

1 were on it to vote by mail.
2      Q.   (BY MR. STEWART)  Did you generate any topics
3 for future voter education based on what you were
4 hearing from voters?
5      A.   So generally we do a pretty robust media
6 package for presidential years 'cause we always have
7 something that comes up.
8           For example, in 2024 -- I'm sorry.  In
9 2020, we had the pandemic.  So in 2024, we will, again,
10 do a media package, and one of the components will be
11 the identifier.  We will really try to replace some of
12 that pandemic language with the -- the identifier, the
13 changes, and, frankly, any major changes that come out
14 of this legislative session.
15           So we -- we try to do that because we have
16 a lot of voters who do only vote every four years, and
17 we like to -- you know, we don't have an endless budget,
18 so we kind of put that all in -- what we can in the
19 presidential years.
20      Q.   I -- I believe you've already said, correct me
21 if I'm wrong, that at some point, your office began
22 advising voters to put both their driver's license or ID
23 number and their Social Security number on mail ballot
24 materials; is that correct?
25      A.   Correct.

Page 92

1      Q.   That did not begin during the General --
2 right -- that predated the General?
3      A.   That predated the General.
4      Q.   Why did you continue to give that advice?
5      A.   We had done that about -- we didn't do it
6 initially in March until we started to see these -- you
7 know, these rejection rates and these -- coming back, so
8 then we started to include it, I would say about,
9 halfway through the actual process in -- for the March
10 election.
11           So basically we just said, look, let's --
12 let's not wait for an application to be rejected, let's
13 just give them all this information at the very
14 beginning.  So we -- if somebody asked us for, you know,
15 an application, then with the application we would send
16 them that information.
17           Now, people can also get an application on
18 our website or they could get it from a party.  You
19 know, there might be other entities that send out the
20 application.  We can't control that they didn't have the
21 insert or any of that information in there, and so we
22 may still receive applications that were not -- that
23 didn't comply with that requirement.
24      Q.   Were there any ways besides the insert that you
25 transmitted that message to voters?

Page 93

1            MS. LEBEL:  Object to form.
2            MS. HUNKER:  Object to form.
3      A.   The social media, the -- you know, what we did
4 with interviews.  Anything we could, we would try to get
5 that information out.  But frankly, you know, the best
6 bang for the buck was with the application because they
7 were, we know, going to fill that out, and it was there
8 included in the packet.
9            MR. STEWART:  I want to use -- I think
10 we're on number 5?
11           THE REPORTER:  Yes.
12      Q.   (BY MR. STEWART)  And I don't want to rush you
13 reading it, but, in general, do you recognize this
14 document?
15      A.   Yes.
16      Q.   And what is this?
17      A.   This is our application for ballot by mail.
18      Q.   And your office uses the standard ABBM prepared
19 by the Secretary of State, correct?
20      A.   We do.
21      Q.   And you would agree that the portion that
22 implements the ID number requirement is below the
23 bold -- or the capital letters, rather, you must provide
24 one and then lower case of the following numbers?
25      A.   Yes.



Lisa Wise

April 18, 2023
Pages 118 to 121

Page 118

1          Let me put it this way; during the
2  November 2022 General Election cycle, did El Paso County
3  do any investigation of whether the ID numbers, so
4  driver's license, SSN, and ID number, contained in VOTEC
5  are accurate?
6          MS. LEBEL:  Object to form.
7          MS. HUNKER:  Object to form.
8      A.  So, like, specifically check if, like, my
9  driver's license matches what the DPS gave the State?
10      Q.  (BY MR. STEWART)  Yes.
11      A.  No.
12      Q.  Did you conduct any investigation like that for
13  El Paso County voters located in TEAM?
14      A.  No.
15      Q.  Earlier today, I believe counsel asked you
16  whether the November 2022 General Election was
17  successful in El Paso County, specifically as it relates
18  to mail balloting; is that right?
19      A.  Yes.
20      Q.  And you said it was successful, right?
21      A.  Yes.
22      Q.  How do you define success in this circumstance?
23      A.  So -- it -- when I would look at success, I
24  mean, that kind of a question I asked, is that I
25  would say, you know, were we have -- was there anything

Page 119

1  that violated the code?  Was there anything that stood
2  out that was obviously we'd done something wrong and
3  that kept voters from voting?  You know, those kinds of
4  things is how I guess I would deem that.
5      Q.  So were you answering it from the standpoint of
6  the El Paso County Election Administration's
7  administration of the election?
8      A.  Yes.
9      Q.  Do you believe there were areas for
10  improvement?
11      A.  Yes.
12      Q.  What were those?
13      A.  There's always things I know that we can do
14  better.  I think that in -- with regards to -- we did
15  have to send out a corrected ballot.  I know we
16  mentioned that earlier.  We -- I believe there's things
17  we could be quicker on.  I mean, I know sometimes we get
18  stuff out in 48 hours.  With the sheer volume, sometimes
19  we can't get stuff out in 24 hours.  I'd love to have
20  our staff trained even better, having more knowledge on
21  the Election Code.
22          So there's always a couple of things I'd
23  love to see us do a little bit differently.  Have more
24  money.  I'd love to do a media package every election,
25  every general election.  Those are our wish list, so --

Page 120

1      Q.  So when you say that the election was
2  successful, was that making any comment on, you know,
3  whether the mail ballots rejection rate was acceptable?
4          MS. HUNKER:  Object to form.
5          MS. LEBEL:  Object to form.
6      A.  I don't think so.  I think it's just, to me,
7  did we do the best we could with what we had?  And
8  that's, I guess, how I kind of looked at it.
9      Q.  (BY MR. STEWART)  And I think you also
10  testified earlier that you weren't aware of any voters
11  who were unable to vote because of SB1; is that right?
12      A.  Correct.
13      Q.  That doesn't include voters having their mail
14  ballots rejected because of the identification number
15  requirement, correct?
16      A.  Correct.
17      Q.  How did you understand -- so, let me strike
18  that.
19          What did you include in not able to vote
20  then when you were asked that question?
21      A.  I'm sorry?
22      Q.  Sure.
23          When counsel asked you, you know, were any
24  voters unable to vote, how did you determine whether
25  someone was unable to vote?

Page 121

1      A.  You know, I guess a final rejection on a
2  ballot, that if they had sent that and they weren't able
3  to cure in time, if we didn't get in touch with them.
4  We did hear from a few voters where we sent their ballot
5  back to be cured, and they thought it was just a second
6  ballot, and so they didn't open it.  I do remember two
7  voters specifically that called our office that said, I
8  tossed that ballot because I thought that was a second
9  ballot and you just sent me another ballot.
10          And so, I mean, those -- obviously those
11  voters didn't vote, and they thought they had voted
12  because they did not take the -- they did not open up
13  the notice of defect.  So those, you know, little kind
14  of pockets out there.
15      Q.  So those are people you would characterize as
16  unable to vote in the past election?
17      A.  Well, they thought they did, and they didn't.
18  So --
19      Q.  Sure.
20          MR. STEWART:  Can we go off the record for
21  two minutes?
22          MS. LEBEL:  Yup.
23          THE VIDEOGRAPHER:  The time is 1:36 p.m.
24  And we're off the record.
25          (A recess was taken.)



Lisa Wise

April 18, 2023
Pages 174 to 177

Page 174

1    Q. Did any nonprofit group contact your office
2 about concerns over the voting assistance oath?
3        MS. LEBEL: Object to form.
4    A. I don't believe so.
5    Q. (BY MS. HUNKER) Do you recall talking to
6 counsel about a person in your staff who handled notices
7 of defects?
8    A. Yes.
9        MS. LEBEL: Object to form and to the
10 extent this is concerning any communications with your
11 attorneys on the basis of privilege. You said talked to
12 counsel.
13        MS. HUNKER: Oh, so let me clarify.
14    Q. (BY MS. HUNKER) Do you recall during this
15 deposition opposing counsel asking you about a person in
16 your office who handled notices of defects?
17    A. Yes.
18    Q. Did that person handle notifying voters who had
19 detects other than the ID requirement -- the ID number
20 requirement?
21    A. Yes.
22    Q. Would it be fair to say that she handled
23 implementing the cure provisions in Senate Bill 1?
24        MS. LEBEL: Object to form.
25    A. Yes.

Page 175

1    Q. (BY MS. HUNKER) Do you recall earlier in the
2 deposition opposing counsel asking whether you thought
3 the number of voters who had their ballot rejected due
4 to missing or mismatched ID numbers would ever be zero?
5    A. Yes.
6    Q. Do you believe that the number of voters who
7 had their ballot rejected due to missing or mismatched
8 signature will ever be zero?
9        MS. LEBEL: Object to form.
10    A. No.
11    Q. (BY MS. HUNKER) And so I want to clarify a
12 question that I had asked earlier based on the opposing
13 counsel's subsequent question.
14        To the best of your knowledge, you're not
15 aware of any voters who were unable to vote in-person in
16 El Paso County during the November 2022 General Election
17 because of SB1 or any of its provisions, correct?
18        MS. LEBEL: Object to form.
19    A. Not that I know of.
20    Q. (BY MS. HUNKER) Do you recall discussing the
21 Secretary of State's voter education program with
22 counsel -- opposing counsel earlier in this deposition?
23    A. Yes.
24    Q. And do you recall stating that you had not seen
25 the Secretary of State's voter education materials; is

Page 176

1 that correct?
2    A. I've seen a press release, I believe -- that I
3 remember seeing. And we received documents informing us
4 as election administrators, but I do not remember seeing
5 anything for a voter besides the press release.
6    Q. Were you specifically looking for the Secretary
7 of State's voting education material?
8    A. No.
9    Q. And when you were saying that you were
10 receiving notifications from the Secretary of State's
11 Office, can you maybe describe in a little bit more
12 detail what was in those communications?
13    A. Sure.
14        We would receive, like, copies of the press
15 release, you know, Secretary of State announces, changes
16 via SB1, updated poll watcher training, those things.
17 We would get those notifications in our -- to our email.
18    Q. Did you use any of the Secretary of State's
19 voting education materials in your own voter education
20 outreach?
21    A. I don't believe so.
22        MS. HUNKER: No further questions.
23        MS. LEBEL: Can we take 5 to 10 minutes off
24 the record?
25        THE VIDEOGRAPHER: The time is 3:16 p.m.,

Page 177

1 and we're off the record.
2        (A recess was taken.)
3        THE VIDEOGRAPHER: The time is 3:36 p.m.
4 We're back on the record.
5        MS. LEBEL: I don't have any questions. So
6 the witness is ready to review and sign.
7        MS. HUNKER: Just before we do, does the
8 intervenor defendants have any questions they want to
9 ask?
10        MR. CORE: We have no questions. Thank
11 you.
12        MR. STEWART: I have no further questions.
13        MS. PERALES: No questions here.
14        MS. HUNKER: All right.
15        THE VIDEOGRAPHER: This concludes the
16 deposition. Time is 3:27 p.m. We are now off the
17 record.
18        (The deposition concluded.)
19
20
21
22
23
24
25

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,          §
    *Plaintiffs,*                                §
                                             §
*v.*                                           §          Case No. 5:21-cv-844-XR
                                             §
GREGORY W. ABBOTT, et al.,                     §
    *Defendants.*                                §

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX GG

Vice Chair, Natural Resources
and Economic Development
Texas Judicial Council
Chair, Eagle Ford Shale
Legislative Caucus



Judith Zaffirini
State Senator, District 21
President Pro Tempore, 1997

Committees
Administration
Business and Commerce
State Affairs

December 3, 2018

The Honorable
Bryan Hughes, Chair
Senate Select Committee
  on Election Security
P.O. Box 12068
Austin, TX 78711



Dear Chair Hughes:

Thank you for your leadership as Chair of the Senate Select Committee on Election
Security. It is my privilege to serve with you, and I appreciate the opportunity to
share my perspective regarding the Committee's Interim Report to the 86th
Legislature. The report includes numerous good recommendations, and I am
delighted to sign it. This letter, however, is to record my concerns regarding the
need to (1.) provide concrete recommendations to address mail-in ballot fraud and
(2.) reflect that Texas lags behind much of the nation in modernizing and
simplifying the registration process, which is critical in offering adequate
opportunities for all Texans to register to vote.

During the last several sessions many legislators have focused on voter ID laws
intended to prevent in-person voter fraud, but not on the increasingly serious
problem of mail-in ballot fraud. Our Committee heard troubling testimony
regarding the state of election security related to the latter. The report's
recommendation that the Legislature needs to find a solution to the "vexing issue"
of mail-in ballot fraud at nursing homes and assisted living facilities is a good start,
but we must take all possible steps to address voting irregularities caused by
fraudulent mail-in ballots.

The report also states that current federal and state laws governing Texas' voter
registration system "create a broad base of opportunity for registration for all
Texans" and describes how eligible persons may register to vote. It does not
mention, however, that we have not adopted secure voter registration reforms that

Letter to Chair Bryan Hughes
December 3, 2018
Page 2 of 2

many other states have. Texas, for example, is one of only thirteen states that does not offer online registration. The Legislature should consider this and other secure methods to facilitate voter registration.

Thank you for your dedication to the many important issues we examined during the 85th Interim. I look forward to continuing to work with you and other members of the committee during our next legislative session.

May God bless you.

Very truly yours,

Judith Zaffirini

Judith Zaffirini

Z/ah

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,       §
    *Plaintiffs,*       §
           §
*v.*       §    Case No. 5:21-cv-844-XR
           §
GREGORY W. ABBOTT, et al.,       §
    *Defendants.*       §

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX HH

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNIÓN DEL PUEBLO ENTERO, et al.,
*Plaintiffs,*

v.

GREGORY W. ABBOTT, et al.,
*Defendants.*

5:21-cv-844-XR

### DECLARATION OF CHRISTINA WORRELL ADKINS SUPPORTING DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

1.  My name is Christina Worrell Adkins. I am over 18 years old and competent to make this declaration. I currently serve as the Director of the Elections Division at the Texas Secretary of State's Office and have been in this position since March 10, 2023 (initially as the Acting Director until April 26, 2023). Prior to becoming Elections Director, I served as Legal Director of the Elections Division, and I have worked at the Secretary of State's Office since 2012.

2.  The Texas Secretary of State is the chief election officer for Texas. As the State's chief election officer, the Secretary, through the Elections Division, prepares and distributes guidance to appropriate state and local authorities in the administration of elections in Texas and provides certain administrative support.

3.  In accordance with the Texas Election Code, the Secretary of State's Elections Division assists and advises election authorities on the application, operation, and interpretation of the Election Code and other election laws. The Secretary of State also is directed to obtain and maintain uniformity in the application, operation, and interpretation of the Election Code and other election laws. Our office discharges these obligations through, among other things, election advisories, handbooks and manuals, training presentations, and email correspondence to election authorities (including mass emails to election officials across the State). In this respect, the Secretary of State serves an advice-and-assistance role; ultimately, election officials—in consultation with their own counsel—must determine whether and how their actions comply with the Election Code.

4.  In its 88th Regular Session, the Texas Legislature passed several bills involving provisions at issue in this litigation, including changes related to the procedures for applications for

ballot by mail (ABBMs), mail ballots, and in-person voting for individuals with disabilities. Among other benefits, these changes should help improve the accessibility and effectiveness of the corrective action process, which allows voters to cure various defects in their ABBMs and mail ballots.

5.  Senate Bill 1599 adopts multiple changes to the procedures for reviewing and correcting ABBMs and mail ballots. The bill creates a comprehensive corrective action process for voters to correct defects in their ABBMs, including allowing voters to utilize the Secretary of State's Ballot by Mail Tracker to complete certain corrective actions that are not available under existing law. The bill provides additional time, on a uniform basis, for early voting ballot boards (EVBBs) to meet to initiate the corrective action process sooner, thus allowing voters more time to correct defects in their mail ballots. Senate Bill 1599 simplifies the authentication provisions for accessing the Ballot by Mail Tracker by removing the requirement that a voter enter their voter registration address to utilize the tracker; a voter will now be required to enter their date of birth (in addition to the existing requirements of the voter's name, last four digits of social security number, and driver's license number or personal identification card number). The bill also changes the materials that an EVBB or signature verification committee (SVC) sends to a voter who submits a defective carrier envelope; as a result of Senate Bill 1599, voters would be mailed—and be authorized to return to the EVBB or SVC—a form to complete the corrective action process (rather than having to send the defective carrier itself) in addition to being able to utilize the Ballot by Mail Tracker or cancel their ABBM to correct the defect.

6.  House Bill 357, similar to Senate Bill 1599, amends the authentication requirements for voters to access the Ballot by Mail Tracker. The bill removes the requirement that a voter enter their registration address to enter the system. Instead, a voter would enter their date of birth and other identifying information specified in paragraph 5 above.

7.  House Bill 315 requires the Secretary of State to add a statement to the officially prescribed ABBM explaining the benefits of furnishing a telephone number on the ABBM, including how that information assists the early voting clerk. Pursuant to other provisions of the Texas Election Code, there are circumstances in which election officials may notify a voter by telephone of defects in their ABBM or mail ballot. Accordingly, in certain instances, by including their telephone number on an ABBM, a voter may be able to receive more timely notice of a defect in their balloting materials and resolve that defect prior to the specified deadlines. House Bill 315 will result in additional information being provided directly to voters regarding the State's mail ballot procedures and will allow the Secretary of State to highlight the importance of including a telephone number on balloting materials.

8.  Senate Bill 975 codifies existing processes regarding the issuance of a personal identification certificate to a person who surrenders their driver's license. The bill directs

the Department of Public Safety to notify such persons that their voter registration information will need to be updated to include the identification number of the newly issued certificate and provided an opportunity to update their voter registration information at the time of applying for the certificate to include the new identification number.

9. Senate Bill 477 requires each polling place to have an area for parking not smaller than the size of one parking space reserved for curbside voting under Section 64.009 of the Texas Election Code. The bill directs election officials to clearly mark the area with a sign indicating that the space is reserved for voters who are unable to enter the polling place and displaying a telephone number that voters can use to request assistance from election officers at the polling place (or providing a button or intercom that the voter may use to request assistance from an election officer).

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 23 2023.

Christina Worrell Adkins

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO**
**THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX II

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO,   )
et al.,   )
   )
        Plaintiffs,   )
   )
V.   ) Case No. 5:21-cv-844 (XR)
   ) (Consolidated Cases)
STATE OF TEXAS, et al.,   )
   )
        Defendants.   )

-----------------------------------------------------------

ORAL DEPOSITION OF:

CHRISTINA ADKINS

April 11, 2023

---------------------------------------------------

       Oral deposition of CHRISTINA ADKINS, produced as a

witness at the instance of the plaintiffs, and duly sworn,

was taken in the above-styled and numbered cause on the

11th day of April, 2023, before Patrick Stephens,

Certified Court Reporter, at 209 W. 14th Street,

Austin, Texas 78701.



Christina Adkins

April 11, 2023
Pages 14 to 17

Page 14

1    So you testified that your office has heard a lot of
2  complaints from voters who were unable to use the ballot tracker
3  because of the residence address field, which is required under
4  the statute, and you used your own address as an example where
5  west of West 51st Street was not coded correctly to validate
6  your address when you were trying to use the ballot tracker.  Do
7  you remember that?
8    A    I do.
9    Q    Great.  Did your office suggest that the legislature
10  enact legislation that would replace residence address with date
11  of birth for the purposes of using the ballot tracker?
12    A    No.
13        MS. HUNKER:  Objection, form.
14  BY MS. YUN (resuming):
15    Q    How did this bill come about in terms of interactions
16  between your office and any legislators who were proposing this?
17        MS. HUNKER:  Objection, form, and I'm also going
18  to object on legislative privilege.  We object today to any
19  questioning that would elicit testimony that protected -- that
20  is protected by legislative privilege.  Both the State
21  defendants and individual legislators have been diligent in
22  asserting this privilege to the fullest extent of the law.  The
23  Office of the Attorney General has represented and will continue
24  to represent many legislators for the purpose of protecting
25  their privilege.

Page 15

1        These exact issues have been and will continue to
2  be the subject of numerous appeals and emergency proceedings.
3  Nobody can question where the State stands on these issues.
4  Moreover, until the Fifth Circuit rules on these issues, it
5  would be wholly inappropriate to conduct any questioning
6  regarding any privileged information.
7        We vehemently disagree with the district court in
8  this matter and we have -- that we have improperly raised any
9  legislative-privilege objections in this litigation.  I have
10  been in touch with numerous legislators and their staff and I
11  also represent them at today's deposition for purposes of
12  protecting their legislative privilege.  These legislators have
13  instructed me to protect their privileges in this litigation to
14  the fullest extent permitted.  It is my hope and expectation
15  that privileged testimony will not be elicited from this witness
16  today.
17        MS. HUNKER:  Counsel, are you instructing
18  Ms. Adkins to not answer?
19        MS. HUNKER:  Not at this time.
20  BY MS. YUN (resuming):
21    Q    Could you answer the question?
22    Q    Could you repeat the question again?
23    Q    Sure.
24    A    Thank you.
25    Q    How -- so you just told me that you did not suggest

Page 16

1  that they propose this legislation.  To the -- to the best of
2  your knowledge, how did this bill come about?
3        MS. HUNKER:  Similar objection -- same objection,
4  also objection, form; lack of personal knowledge.
5  BY THE WITNESS (resuming):
6    A    Representative Bucy's office had a -- a profound
7  interest in this aspect of legislation from last session because
8  the ballot-by-mail tracker was something that he was heavily
9  involved in and was advocating for.  His office reached out to
10  my office to see what -- what was happening with respect to the
11  tracker, how the implementation was, and they specifically asked
12  if we had any issues that had been reported to us or any
13  problems that they needed to be aware of, you know, in dealing
14  with voter concerns, and we relayed to them that we were getting
15  a lot of calls about difficulty getting into the tracker because
16  of the residence address.  And so they, you know, initiated a
17  conversation with us about that -- several conversations about
18  that particular component to it and did ask us about, you know,
19  What are other alternatives that could be used other than
20  residence address.
21    Q    And was your office's suggestion date of birth instead
22  of residence address?
23        MS. HUNKER:  Objection, form; also objection,
24  legislative privilege.  I represent Representative Bucy for the
25  purposes of protecting his privilege today.  On behalf of

Page 17

1  Representative Bucy, I object to the question on the basis of
2  legislative privilege.  It is wholly inappropriate for this
3  question to be asked at all given the pending appeals to which
4  we are all a party.  We vehemently disagree with the district
5  court's decision to permit this kind of questioning while we
6  await a decision from the Fifth Circuit.
7        Nonetheless, the district court has wrongfully
8  made clear that attorneys who raise these objections faced the
9  possibility of contempt.  We have a duty to our clients to
10  protect their privileged information.  Because of the district
11  court's orders and threats, we cannot instruct the witness not
12  to answer this question; however, the State defendants and
13  Representative Bucy reserve all rights to challenge this
14  improper questioning, including sealing this portion of the
15  transcript, preventing its further disclosure or use at trial,
16  appealing and seeking any emergency relief from the Fifth
17  Circuit and any other relief allowed by law.  We further
18  designate this testimony as confidential under the protective
19  order in this matter.
20  BY MS. YUN (resuming):
21    Q    Please answer.
22    A    When they asked us about if there are alternatives, we
23  -- we indicated that there were alternative fields we could use,
24  looking at some of the alternatives that are used for other
25  components on our websites, like the Am I Registered box, and



Christina Adkins

April 11, 2023
Pages 66 to 69

Page 66

1        MS. HUNKER:  Objection to form.
2  BY THE WITNESS (resuming):
3     A   Again, I don't know -- I don't know what results in
4  that reduction.  All I know is that we're going to make sure
5  that we're doing our part to make -- to train on what the law is
6  and what those requirements are and what opportunities are
7  available to make corrections or to remedy those rejection
8  issues.  I don't want an election official or ballot board
9  member to be in a position of not knowing what those options
10  are, but that's the most that I can do.
11     Q   Okay.  Do you believe that there will be reductions in
12  general in -- okay.  Let me try it again.  Do you believe that
13  there will be any further reduction in mail-ballot rejections in
14  future elections?
15     A   I -- that, I don't know.  I -- I -- I don't recall the
16  actual rejection rate in November, but I remember that it was
17  pretty consistent with what we had seen in previous years prior
18  to the corrective-action process being in place -- or the ID
19  requirements being in place.  So I remember it was relatively
20  consistent with what we had in the past.  I can't really
21  speculate on future elections because I don't know what the laws
22  are going to be going forward.  I -- I don't know what changes
23  there might be that could -- that maybe are unrelated to this
24  issue but could impact rejection rates.
25     Q   Okay.  Absent any further legal changes, do you have

Page 67

1  any predictions as to what's going to happen to the rejection
2  rate?
3     A   I really don't.  I don't know.  I'm sorry.
4     Q   It's okay.  So moving on to voter education as opposed
5  to training of county officials, does your office intend to
6  conduct more -- any more voter education concerning SB1's
7  mail-ballot requirements in the future?
8     A   So I don't know the answer to that.  I'm not the
9  person that makes decisions on our voter-education campaign.
10  That's our communications director who just left and we have a
11  new one starting --
12     Q   Okay.
13     A   -- so I imagine I'll be working with that new
14  communications director to map out what we can and can't do and
15  what we have a budget for.
16     Q   I see.  And who's the new communications director?
17     A   Her name is Alicia Pierce, and she has not started
18  yet --
19     Q   Okay.
20     A   -- so don't scare her away.
21     Q   I just read a lot of E-mails from Mr. Taylor, so --
22     A   Sure.
23     Q   -- you know, I've never met him, but I just...
24     A   You feel like you know him.
25     Q   Exactly.

Page 68

1     A   Yes.
2     Q   So you said it would depend on the budget and it would
3  depend on sort of your discussions with her?
4     A   Uh-huh.  And -- and I have to throw this in:  And I
5  imagine any other subsequent law changes --
6     Q   Yes.
7     A   -- that are -- that could impact the campaign.
8     Q   Right.  So you also don't know whether it will be more
9  or less compared to what happened leading up to the November
10  election.
11     A   Correct.
12     Q   So you testified that you don't really know exactly
13  what would drive rejection rates down.  I'm just going to apply
14  that same principle to voter education and ask you the same
15  question just for the sake of completeness.  So do you expect
16  that further voter education would drive down mail-ballot
17  rejection rates in the future?
18     A   Again, I -- you know, I don't know the answer to that.
19  I'm not -- that's -- that's not my area of expertise, and I just
20  don't know what kind of data would -- we can look at that would
21  give us a sense.  I -- I think there's a lot of factors that --
22  that impact rejection rates.
23     Q   Okay.  What do you believe led to the reduction in the
24  rejection rates between the March primary and the November
25  general election in terms of mail ballots?

Page 69

1     A   I mean, again, I don't really know that I can point to
2  any one thing.  I think there's a number of factors that
3  contribute to that.  Anytime there's a change in the law, it
4  takes a few elections for voters to get used to that change.  I
5  think our county election officials were very aggressive after
6  the primary -- or even during the primary in educating people on
7  those changes.
8        I also think that our county election officials did
9  something pretty brilliant with respect to the ID number
10  requirements.  You know, one -- one of the things that we talked
11  about with our counties is that if somebody submitted an ABBM or
12  a carrier envelope that was missing an ID number or they
13  realized that the voter didn't have both numbers in the
14  statewide voter registration system, in TEAM, they didn't just
15  focus on correcting it for that election.  They were --
16  everybody was pretty aggressive about getting those folks to
17  submit a new voter registration application or go online to get
18  that update, and so we have more complete records, because that
19  is a viable cure option is updating your voter registration
20  record with that -- with that number.
21        And so rather than just doing a cure for the one election,
22  I think they were pretty good about looking at the bigger
23  picture.  And so if -- you know, they would -- they would help
24  facilitate that change, get that information to voters, which is
25  one of the things that we educated on, and I think the counties



Christina Adkins

April 11, 2023
Pages 70 to 73

Page 70

1 really, really harnessed that and -- and were aggressive in
2 realizing that that could fix problems later.
3 So I think, you know, a number of factors like that. You
4 know, lots of training, you know, education of voters,
5 addressing issues -- you know, identifying and addressing those
6 issues broadly so that they weren't problems for voters in
7 subsequent elections, and I think just better -- well, I think
8 also there was quite a bit of misinformation going up to the
9 primary -- leading up to the primary, and I think we talked
10 about that last time with respect to what those ID requirements
11 were, and I think in November, I didn't see those misstatements
12 quite as much. So the media was better educated on what the law
13 said.
14 Q Right. I would like to talk -- move on to what is
15 called EAVS, the Election Administration and Voting Survey. Do
16 you know what that is?
17 A I do know what it is.
18 Q What is it?
19 A It's a survey that's put out by the EAC every so often
20 to gather data from all of the states and the local
21 jurisdictions with issues related to election administration.
22 Q And the EAC stands for the Election Assistance
23 Commission; is that right?
24 A That's correct.
25 MS. YUN: For the court reporter.

Page 71

1 BY MS. YUN (resuming):
2 Q In Texas, who is responsible for collecting EAVS data
3 and reporting it into the EAC?
4 A So, in Texas, the secretary of state's office is the
5 clearinghouse for the data. We send out the survey, we gather
6 responses and it passes through us to the EAC.
7 Q And so is it the secretary of state who is Texas'
8 chief election officer for the purposes of the EAVS data?
9 A Well, the secretary of the state is the chief election
10 officer for the whole state, and then we have an elections
11 division by statute that -- that supports the secretary. And so
12 it's our division but within the secretary of state's office
13 that sends out the survey.
14 Q Okay. So what else other than sending out the survey
15 does your office do with regards to the EAVS survey?
16 A I don't know. You would have to talk to Kristi Hart.
17 It's -- she's the one that oversees the distribution of the
18 survey and the collection of data.
19 Q Okay.
20 A It -- I will add it's all self-reported data from the
21 counties, and so I -- I don't know how -- that there's much that
22 we do with the data other than get it back to the EAC. We do
23 hound the counties quite a bit to get them to complete the
24 survey.
25 Q Okay.

Page 72

1 A So we do that. I would say we do that.
2 Q Okay. So you --
3 A That's the only thing I can speak to.
4 Q And I'm going to mark this next exhibit, 13. So as
5 far as you know -- you're aware, so your office also sets
6 deadlines for county responses.
7 A I don't know that we set deadlines or if there's
8 deadlines set by the EAC.
9 Q Okay. So you communicate those deadlines to the
10 counties and remind them.
11 A That's correct.
12 Q Okay. And based on this E-mail that Mr. Ingram sent
13 out on this Exhibit 13, your office also serves as a resource
14 for the counties in responding to the survey.
15 A I don't know that I would say we're a resource. I
16 mean, we're a resource generally to counties on pretty much
17 everything, but I think on this -- I mean, we're -- we more
18 facilitate the information getting from the EAC to them, and
19 what I recall is actually indicated in this video. There's
20 actually some instructional videos that the EAC puts out to tell
21 counties what type of data they're looking for, so we -- I don't
22 think we answer a whole lot of data-specific questions, but we
23 just facilitate the process of them reporting their information.
24 Q Okay. So would it be fair that your office is
25 responsible for coordinating the effort across all counties to

Page 73

1 send it -- send the data over to the EAC?
2 A Yes. I think we're -- we're the contact for the state
3 to pass through that data to the EAC, that's correct.
4 Q Okay.
5 A Much to the counties' dismay.
6 Q Why do you say that?
7 A Well, it's just a lot of work to gather the data.
8 It's a common role for us to constantly hound the counties,
9 so...
10 Q Does your office use the EAVS data? Once it's been
11 delivered to the EAC and then they issue a report; right?
12 A That's correct.
13 Q And do you ever use the data from that report?
14 A I can't think of specific instances where we used it
15 for anything specific. You know, we do typically take a look at
16 it. We don't necessarily review it in great detail. There are
17 some drawbacks to the EAVS survey. One of the things is that
18 they don't standardize terminology across states. You know,
19 states refer to things in different ways, and that's always been
20 a problem with getting accurate reporting in certain categories,
21 and then again, because we don't validate that data or proof it
22 -- you know, we just -- it just passes through to us -- I have
23 -- we have seen things in the past where we think counties have
24 misreported data. You know, it's all self-reported data that's
25 not validated, and so it's -- you know, there's -- there's an



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX JJ

Confidential Transcript of the Testimony of

# Kristi Hart

## Date:

June 30, 2022

## Case:

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Kristi Hart                        CONFIDENTIAL                        June 30, 2022

Transcript of the Testimony of

Kristi Hart

Date:

June 30, 2022

Case:

LA UNION DEL PUEBLO ENTERO V. GREGORY W . ABBOTT

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900       San Antonio, Texas 78232
210-697-3400                                                     210-697-3408

Kristi Hart                          CONFIDENTIAL                          June 30, 2022
Pages 2 to 5

---

**Page 2**

Kristi Hart          CONFIDENTIAL          June 30, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,

    Plaintiffs,

V.                                    Case No. 5:21-cv-844-XR

GREGORY W. ABBOTT, et al.,

    Defendants.

OCA-GREATER HOUSTON, et al.,

    Plaintiffs,

V.                                    Case No. 1:21-cv-780-XR

JOHN SCOTT, et al.,

    Defendants.

HOUSTON JUSTICE, et al.,

    Plaintiffs,

V.                                    Case No. 5:21-cv-848-XR

GREGORY WAYNE ABBOTT, et al.,

    Defendants.

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900 San Antonio, Texas 78232

Kristi Hart          CONFIDENTIAL          June 30, 2022

LULAC TEXAS, et al.,

    Plaintiffs,

V.                                    Case No. 1:21-cv-0786-XR

JOHN SCOTT, et al.,

    Defendants.

MI FAMILIA VOTA, et al.,

    Plaintiffs,

V.                                    Case No. 5:21-cv-0920-XR

GREG ABBOTT, et al.,

    Defendants.

UNITED STATES OF AMERICA,

    Plaintiffs,

V.                                    Case No. 5:21-cv-1085-XR

THE STATE OF TEXAS, ET AL.,

    Defendants.

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900   San Antonio, Texas 78232
210-697-3400                          210-697-3408

---

**Page 3**

Kristi Hart          CONFIDENTIAL          June 30, 2022

ORAL DEPOSITION OF KRISTI HART

June 30, 2022

Oral deposition of KRISTI HART, produced as a witness at

the instance of the plaintiffs, and duly sworn, was taken

in the above-styled and numbered cause on the 30th day of

June, 2022, before Patrick Stephens, Certified

Court Reporter, at the William P. Clements Building,

10th Floor Conference Room, 300 W. 15th Street,

Austin, Texas 78701.

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900   San Antonio, Texas 78232

210-697-3400                          210-697-3408

---

**Page 4**

Kristi Hart          CONFIDENTIAL          June 30, 2022

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

    JENNIFER K. YUN, ESQ.

    RICHARD A. DELLHEIM, ESQ.

    MICHAEL E. STEWART, ESQ.

    U.S. Department of Justice, Civil Rights Division

    950 Pennsylvania Avenue NW

    Washington, DC 20530

    Telephone: (202) 305-5533

    Jennifer.yun@usdoj.gov

    Richard.dellheim@usdoj.gov

    Michael.stewart3@usdoj.gov

ON BEHALF OF THE PLAINTIFFS, MI FAMILIA VOTA:

    MARK L. BIETER, ESQ.

    Stoel Rives LLP

    101 S. Capitol Boulevard

    Suite 1900

    Boise, Idaho 83702

    Telephone: (208) 387-4217

    Mark.bieter@stoel.com

ON BEHALF OF THE DEFENDANTS:

    KATHLEEN HUNKER, ESQ.

    J. AARON BARNES, ESQ.

    Office of the Attorney General

    P.O. Box 12548 (MC-009)

    Austin, Texas 78711

    Telephone: (512) 936-2275

    Kathleen.hunker@oag.texas.gov

    Aaron.barnes@oag.texas.gov

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900   San Antonio, Texas 78232
210-697-3400                          210-697-3408

---

**Page 5**

A P P E A R A N C E S (Cont.)

ALSO PRESENT:

    ADAM BITTER, ESQ., General Counsel

    ZAC RHINES, ESQ., Assistant General Counsel

    Office of the Secretary of State

    Capitol Building, Rm 1E.8

    P.O. Box 12697

    Austin, Texas 78711

    Telephone:  (512) 475-2813

    abitter@sos.texas.gov

    zrhines@sos.texas.gov

ALSO PRESENT VIA ZOOM:

    Georgina Yeomans, Legal Defense Fund

    Leigh Tognetti, ADA Hidalgo County

    Chuck Roberts, Republican Committees

    Victoria Giese, Butler Snow Law Firm

    Wendy Olson, Stoel Rives LLP

    Barbara Nicholas, Scarpello Law Firm

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900   San Antonio, Texas 78232

---

Kristi Hart                          CONFIDENTIAL                          June 30, 2022
                                                                          Pages 38 to 41

Page 38

1    A   Again, if we receive a record and it's provided to
2  the county, then the county is going to look at that record.
3  They will then determine if that's already a person that's
4  registered or if it's a new registration by comparing that
5  information to their county voter-registration role.
6    Q   Okay. So it's the county who's making that
7  determination.
8    A   Yes.
9    Q   And the TEAM system does not automatically tell you,
10 like, Oh, hey, this might be a duplicate, or something like
11 that to the county official who's entering that information.
12   A   The duplicate process doesn't come into play with
13 that.
14   Q   Right. So on the flipside, when someone wants to
15 update their existing voter registration, how does -- how would
16 a user of the TEAM system determine whether the individual
17 already has a TEAM record?
18   A   Again, when it comes in, it's matched and it's
19 provided to the county. And so if there's one that comes in
20 and it does appear that it is similar, then they would review
21 those two records to make the determination if they are in fact
22 similar, the same or different.
23   Q   And when you say they are matched, what do you mean
24 by that sort of -- what do you mean by that?
25   A   Again, when the record comes in, we still have to

Page 39

1  match it with what's there based on the criteria set for that
2  particular process, and then if there's nothing there, it goes
3  as a new registrant.
4    Q   So we talked about the duplicate process a little bit
5  earlier, and you said that that was an annual process; right?
6    A   I'm sorry. I didn't hear.
7    Q   We talked about the duplicate batch process earlier,
8  and am I remembering correctly that you said it was an annual
9  process?
10   A   Yes.
11   Q   And so each year you run the process, and if there
12 are any possible duplicates, you send those on to the counties
13 to process.
14   A   Yes.
15   Q   And what are some scenarios -- how do duplicates get
16 created?
17       MS. HUNKER: Objection, form.
18 BY THE WITNESS (resuming):
19   A   I'm sorry. I couldn't hear you.
20   Q   Oh. How do -- how -- why are there some duplicates
21 in the TEAM system? Like, what are some ways in which those
22 get created and then they get flagged and then processed?
23       MS. HUNKER: Objection, form; ambiguous; calls
24 for speculation.
25 BY THE WITNESS (resuming):

Page 40

1    A   Yeah. I don't know that I can give specific examples
2  of that.
3    Q   And do you know when the duplicate batch process, the
4  annual process, started happening with the TEAM system?
5    A   It was prior to my time. I do not know.
6    Q   And is the annual nature of it, is that required by a
7  regulation or a state law provision? Do you know?
8    A   I do not recall. I don't know that the annual is
9  part of a requirement, but we are required, yes, to conduct a
10 comparative analysis of the system.
11   Q   Are there any circumstances that might create
12 multiple TEAM records that pertain to one Texas voter?
13       MS. HUNKER: Objection, form; vague; calls for
14 speculation, outside of personal knowledge.
15 BY THE WITNESS (resuming):
16   A   Can you repeat that again?
17   Q   Yeah. Are there any circumstances that you're aware
18 of that might create multiple TEAM records that pertain to one
19 single individual Texas voter?
20       MS. HUNKER: Same objection.
21 BY THE WITNESS (resuming):
22   A   I can't think of any particularly, if you're asking
23 for a specific example of that. I mean, I think -- I think you
24 do have to look at data entry as a possibility or different
25 information actually provided. But, again, that's why we -- we

Page 41

1  do our checks on the system for that.
2    Q   When you say data entry, you mean when someone is
3  manually entering something.
4    A   Yes.
5    Q   How common, if you know, are errors in the TEAM
6  system that are due to inaccurate data entry?
7        MS. HUNKER: Objection, form; outside of
8  personal knowledge, calls for speculation.
9  BY THE WITNESS (resuming):
10   A   I don't know. It's not information I could give you
11 off the top of my head.
12   Q   Do you know if data entry errors occur with greater
13 frequency in some places than others?
14       MS. HUNKER: Objection, form; calls for
15 speculation, outside of personal knowledge.
16 BY THE WITNESS (resuming):
17   A   And I don't know what you mean by, In some places
18 greater than others.
19   Q   Say, some counties than others.
20       MS. HUNKER: Objection, form --
21 BY THE WITNESS (resuming):
22   A   Oh. No.
23       MS. HUNKER: -- calls for speculation --
24 BY THE WITNESS (resuming):
25   A   No --

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX KK

Transcript of the Testimony of

**Jacquelyn Callanen**

**Date:**

April 20, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF TEXAS
 2                      SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO, )
     ET AL                       )
 4                               )
     vs.                         )  CASE NO. 5:21-CV-844-XR
 5                               )
     GREGORY W. ABBOTT, ET AL    )
 6   _____
     OCA-GREATER HOUSTON, ET AL  )
 7                               )
     vs.                         )  CASE NO. 1:23-CV-780-XR
 8                               )
     JOHN SCOTT, ET AL           )
 9   _____
     HOUSTON JUSTICE, ET AL      )
10                               )
     vs.                         )  CASE NO. 5:21-CV-848-XR
11                               )
     GREGORY WAYNE ABBOTT, ET AL )
12   _____
     LULAC TEXAS, ET AL   )
13                               )
     vs.                         )  CASE NO. 1:21-CV-0786-XR
14                               )
     JOHN SCOTT, ET AL           )
15   _____
     MIFAMILIA VOTA, ET AL       )
16                               )
     vs.                         )  CASE NO. 5:21-CV-0920-XR
17                               )
     GREG ABBOTT, ET AL          )
18   _____
     UNITED STATES OF AMERICA  )
19                               )
     vs.                         )  CASE NO. 5:21-CV-1085-XR
20                               )
     THE STATE OF TEXAS, ET AL   )
21   _____

22              ORAL VIDEOTAPED DEPOSITION

23                   JACQUELYN CALLANEN

24                    APRIL 20, 2022

25
```

Jacquelyn Callanen

April 20, 2022
Pages 2 to 5

Page 2

1        ORAL VIDEOTAPED DEPOSITION OF JACQUELYN CALLANEN,

2  produced as a witness at the instance of the Plaintiffs

3  and duly sworn, was taken in the above-styled and

4  numbered cause on the 20TH day of April, 2022, from

5  9:27 a.m. to 7:07 p.m., before Sarah A. Prugh, Certified

6  Shorthand Reporter in and for the State of Texas,

7  reported by machine shorthand at the Offices of The

8  Mexican American Legal Defense and Educational Fund, 110

9  Broadway Street, Suite 300, San Antonio, Texas, pursuant

10  to the Federal Rules of Civil Procedure and the

11  provisions stated on the record or attached hereto.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1             APPEARANCES
2
3  FOR PLAINTIFFS HOUSTON AREA URBAN LEAGUE; DELTA SIGMA
   THETA SORORITY, INC.; THE ARC OF TEXAS; AND JEFFREY
4  LAMAR CLEMMONS:
5    Ms. Sarah Cummings Stewart (Via Zoom)
     Reed Smith, LLP
6    2850 N. Harwood Street, Suite 1500
     Dallas, Texas 75201
7    Telephone: 469-680-4200
     E-mail: sarah.stewart@reedsmith.com
8
     Ms. Ciara A. Sisco
9    Email: csisco@naacpldf.org
     Ms. Liliana Zaragoza (Via Zoom)
10   Email: lzaragoza@naacpldf.org
     NAACP Legal Defense and Educational Fund, Inc.
11   40 Rector Street, 5th Floor
     New York, New York 10006
12   Telephone: 212-965-2200
13  FOR PLAINTIFFS LA UNION DEL PUEBLO ENTERO, SOUTHWEST
     VOTER REGISTRATION EDUCATION PROJECT, MEXICAN AMERICAN
14  BAR ASSOCIATION OF TEXAS, TEXAS HISPANICS ORGANIZED FOR
     POLITICAL EDUCATION, JOLT ACTION, WILLIAM C. VELASQUEZ
15  INSTITUTE, FIEL HOUSTON, INC.:
16   Ms. Nina Perales
     E-mail: nperales@maldef.org
17   Ms. Julia R. Longoria (Via Zoom)
     E-mail: jlongoria@maldef.org
18   Mexican American Legal Defense and Educational Fund
     110 Broadway, Suite 300
19   San Antonio, Texas 78205
     Telephone: 210-224-5476
20
     Ms. Jasmine Johnson (Via Zoom)
21   Fried, Frank, Harris, Shriver & Jacobson, LLP
     One New York Plaza
22   New York, New York 10004
     Telephone: 212-859-8000
23   E-mail: jasmine.johnson@friedfrank.com
24
25

Page 4

1  FOR PLAINTIFFS OCA-GREATER HOUSTON, LEAGUE OF WOMEN
     VOTERS OF TEXAS, REVUP-TEXAS, TEXAS ORGANIZING PROJECT
2  AND WORKERS DEFENSE ACTION FUND:
3    Mr. Thomas Buser-Clancy (Via Zoom)
     ACLU Foundation of Texas, Inc.
4    5225 Katy Freeway, Suite 350
     Houston, Texas 77007
5    Telephone: 713-942-8146
6    Ms. Lia Sifuentes Davis (Via Zoom)
     Disability Rights Texas
7    2222 West Braker Lane
     Austin, Texas 78758-1024
8    Telephone: 512-454-4816
     E-mail: ldavis@drtx.org
9
     Ms. Susana Lorenzo-Giguere (Via Zoom)
10   Asian American legal Defense and Education Fund
     99 Hudson Street, 12th Floor
11   New York, NY 10013
     Telephone: 212-966-5932
12   E-mail: slorenzo-giguere@aaldef.org
13  FOR PLAINTIFF LULAC TEXAS:
14   Mr. Graham W. White
     Elias Law Group, LLP
15   10 G Street NE, Suite 600
     Washington, DC 20002
16   Telephone: 202-968-4490
     E-mail: gwhite@elias.law
17
     FOR PLAINTIFF MI FAMILIA VOTA:
18
     Ms. Wendy Olson (Via Zoom)
19   Stoel Rivas, LLP
     101 S. Capitol Boulevard, Suite 1900
20   Boise, Idaho 83702
     Telephone: 208-387-4291
21   E-mail: wendy.olson@stoel.com
22  FOR DEFENDANT HIDALGO COUNTY ELECTIONS ADMINISTRATOR
     YVONNE RAMON:
23
     Ms. Leigh Tognetti (Via Zoom)
24   Hidalgo County District Attorney's Office
     E-mail: josephine.ramirez@da.co.hidalgo.tx.us
25

Page 5

1  FOR DEFENDANT HIDALGO COUNTY CRIMINAL DISTRICT ATTORNEY
     RICARDO RODRIGUEZ, JR.:
2
     Ms. Jacqueline Villarreal (Via Zoom)
3    Assistant District Attorney
4  FOR DALLAS COUNTY:
5    Ms. Barbara Nicholas (Via Zoom)
     Dallas District Attorney's Office
6
     FOR DEFENDANTS GUERRERO & GARZA:
7
     Mr. Anthony "Tony" Nelson (Via Zoom)
8    Assistant Travis County Attorney
     E-mail: tony.nelson@traviscountytx.gov
9
     FOR UNITED STATES OF AMERICA:
10
     Mr. Jaywin Singh Malhi (Via Zoom)
11   Trial Attorney
     Civil Rights Division, Voting Section
12   US Department of Justice
     Telephone: 202-598-0146
13   E-mail: jaywin.malhi@usdoj.gov
14  FOR DEFENDANT BEXAR COUNTY ELECTIONS ADMINISTRATOR
     JACQUELYN CALLANEN:
15
     Ms. Lisa V. Cubriel
16   Assistant District Attorney -- Civil Division
     101 W. Nueva, 7th Floor
17   San Antonio, Texas 78205-3030
     Telephone: 210-335-2142
18   E-mail: Lisa.Cubriel@bexar.org
19  FOR DEFENDANTS:
20   Ms. Kathleen T. Hunker
     Special Counsel
21   kathleen.hunker@oag.texas.gov
     Office of the Attorney General
22   P. O. Box 12548 (MC-009)
     Austin, Texas 78711-2548
23   Telephone: 512-463-2100
24
25

Page 214

1    A.  Yes, ma'am.
2    Q.  Those were mail ballots?
3    A.  Yes, ma'am, that were returned to us and that
4  the ballot board rejected, yes, ma'am.
5    Q.  And that number is 3,940.  And then you have
6  837 that were cured.
7    A.  That came in to cure out of that 39.  So that
8  is 20 percent -- 20 some percent.
9    Q.  So I am getting 3,103.
10    A.  That did not --
11    Q.  That did not cure.
12    A.  Okay.  3,103?
13    Q.  Yeah, 3,103.  So that is 1,117 plus 2,823 minus
14  837 gets us 3,103.
15    A.  Yes, ma'am.
16    Q.  So how would we describe that 3,103?  3,103 are
17  the number of voters in Bexar County who sent you a mail
18  ballot.  You could not match the ID number and they
19  didn't cure in time so their vote was not counted.
20    A.  Correct.
21    Q.  Okay.  Now, do you have a sense of how many
22  people sent you an application for a mail ballot and you
23  couldn't match their number and you never got a cured
24  application for mail ballot from them?
25    A.  No, that we didn't track.  Like I said, we

Page 215

1  didn't have that system in place.
2    Q.  Do you know how many times you mailed out to a
3  voter a new application for ballot by mail because you
4  weren't able to verify the first time?
5    A.  Again, we didn't track that.  We didn't know it
6  would be --
7    Q.  So would you agree with me there is some number
8  of people who sent an application for ballot by mail and
9  you couldn't match their number and they were unable to
10  cure and so they never received a mail ballot?
11        MS. HUNKER:  Objection, form.
12        THE WITNESS:  Correct, although we did
13  send rejects to them and new applications up to the
14  point where the gate came down and it was closed.  So
15  again, I just don't know what that push/pull was.
16    Q.  (By Ms. Perales) It is also possible, isn't it,
17  and this would be a terrible situation.  But if the
18  voter sent you the first application for ballot by mail
19  and put the driver's license and you couldn't match the
20  driver's license, so you sent them a new application for
21  ballot by mail and they put the social down, and then
22  you couldn't match the social either, that could happen;
23  couldn't it?
24    A.  Oh, sure.
25    Q.  And do you know if it happened for anybody in

Page 216

1  particular?
2    A.  I don't.
3    Q.  Is that because you weren't tracking those
4  individual voters?
5    A.  Correct.  Again, because the system we have had
6  no coding for it in there.  Previously, it had never
7  been an issue.  It was handled manually.  If something
8  came in and we had to reject it, we sent something out
9  and we literally kept it in a box.  I mean we kept it
10  filed.  We knew where it was.  But the computer system,
11  the database didn't even have the codes in there.
12    Q.  Do you recall your office receiving any phone
13  calls from voters who said I received a second
14  application for ballot by mail from you and I filled
15  that one out too and I still got rejected?
16    A.  Yes.
17    Q.  Do you know how many voters were twice
18  rejected?
19    A.  No, no, that would have been anecdotally.  But
20  yes, we would hear it.
21    Q.  And I will represent to you that El Paso County
22  got some pretty angry phone calls from voters.
23    A.  So did we.  So did we.  And again, as I spoke
24  before, we had to have a meeting with the staff to allow
25  them to say they don't deserve to be spoken to like

Page 217

1  that.  So and again, in all of the years I have been
2  here, I have never had to have a meeting like that, to
3  even say something like that because we are a customer
4  service driven organization and that is part of who we
5  are.  And we had to do that for the first time and that
6  was sad.
7    Q.  Did you have any voters call with confusion
8  about the verifying of the numbers on the mail ballot
9  applications or mail ballots who were Spanish speaking
10  voters?
11    A.  Oh, sure.
12    Q.  Did you have a Spanish speaking staff person
13  who would talk to them on the phone?
14    A.  Yes, ma'am.  Yes, ma'am.
15    Q.  You mentioned that at some point, you started
16  sending voter registration forms to voters who had --
17  who were obviously already registered --
18    A.  Correct.
19    Q.  -- but for whom you couldn't get some kind of
20  number on them?
21    A.  Correct.
22    Q.  Did you receive any phone calls from voters who
23  were confused about why you were sending them a voter
24  registration form?
25    A.  Yes, ma'am.

Jacquelyn Callanen

Page 218

1    Q.   And they were already --
2    A.   They were already registered.
3    Q.   Do you recall whether the voter registration
4  form that you sent out was in both English and Spanish
5  or just English?
6    A.   I bet it was just English.  We had Spanish.  If
7  they request, we have Spanish ones.  But now that you
8  are saying that, I bet the staff was just picking and
9  stuffing and picking and stuffing as they -- that is a
10  great point.
11    Q.   So it is likely that when you were sending out
12  these new voter registration forms to voters, you were
13  sending the English form?
14    A.   Yes.
15    Q.   Did you get a sense from all of this of what
16  characteristics of the voter was most likely to cure
17  when you notified them that you couldn't match their ID
18  number?
19         MS. HUNKER:  Objection, form.
20    Q.   (By Ms. Perales) Anything about education level
21  or anything that you were picking up from your
22  conversations with voters on the phone that would help
23  you understand kind of the differences between the group
24  that did manage to cure and the group that just never
25  got their ballot counted?

Page 219

1         MS. HUNKER:  Objection, form.
2         THE WITNESS:  No, I didn't have a sense of
3  that.
4    Q.   (By Ms. Perales) We talked to one lady who had
5  a PhD.  And she was all fired up and she cured.
6    A.   Was she related to Tommy Calvert because he is
7  the one that tells me all of the time --
8    Q.   No, it was a different county.
9    A.   I have got to stop.  Sorry.  Bite my tongue.  I
10  am going to get myself in so much trouble, I can't stand
11  it.  Lisa, you are supposed to keep me --
12         MS. CUBRIEL:  She didn't say that.
13         MS. PERALES:  I think you are supposed to
14  kick her under the table when she mentions a county
15  commissioner.
16         THE WITNESS:  That is your job to keep me
17  out of trouble.
18         MS. CUBRIEL:  Are you doing okay?  Do you
19  need a break?
20         MS. PERALES:  Whenever you need a break,
21  you call break.
22    Q.   (By Ms. Perales) So here is a question I have.
23  There is still a signature verification requirement for
24  application for a ballot by mail and mail ballot;
25  correct?

Page 220

1    A.   No.
2    Q.   Because once an ID number matches, that is
3  presumptively then considered a match on the signature
4  side?
5    A.   That is a word I didn't understand, the one you
6  all use, legalese --
7    Q.   Presumption?
8    A.   Yeah, that.
9    Q.   You had mentioned before that when somebody --
10  pre-SB-1, that you were looking to match the signature
11  on the mail ballot to the signature on the application
12  for ballot by mail.
13    A.   Yes, ma'am.
14    Q.   But what were you matching the signature on the
15  application for ballot by mail to when you first
16  received that?
17    A.   Nothing.
18    Q.   You wouldn't match that against anything?
19    A.   No, ma'am.
20    Q.   When I am quiet, I am skipping questions.
21    A.   That is a good thing.
22         MS. CUBRIEL:  Can we go off the record
23  real quick?
24         MS. PERALES:  Can we go off the record?
25         VIDEOGRAPHER:  The time is 3:49 p.m.  We

Page 221

1  are off the record.
2         (Recess taken)
3         VIDEOGRAPHER:  The time is 3:57 p.m.  We
4  are back on the record.
5    Q.   (By Ms. Perales) Ms. Callenan, can you describe
6  a specific instance in which someone contacted your
7  office asking for an application for ballot by mail on
8  behalf of another individual and you could not send that
9  application for ballot by mail?
10    A.   Many times.
11    Q.   Okay.  And give me an example of the
12  relationship between the two people.
13    A.   Well, again, as I mentioned the last time, I
14  mean the one that really hurt was when the mother
15  reached out and she asked for the two applications.  And
16  I had her on the call and I was explaining to her that
17  we could only send the one to her and she wanted one for
18  her son.
19         And you know, first, we go through well,
20  but I always call and you always send me two.  And then
21  so we had to stop and say yes, but SB-1, now we can
22  only -- so I said just take a minute and put your son on
23  the phone.  If I can hear his voice, I will be glad to
24  send you one for him too.  And that is when she said
25  that he was paralyzed and that he did not speak.  And

Jacquelyn Callanen

April 20, 2022
Pages 278 to 281

Page 278

1    A.   Again, every one of these voters is important.
2 Every one of them is a vote.  And when we disenfranchise
3 or we lose one, that is not right.  That is not what we
4 are in business for.
5    Q.   Thank you.  And have you -- actually, scratch
6 that because you have answered it already.  Do you have
7 any reason to believe that this significantly larger
8 number of rejected of people who had their ballots
9 rejected are not otherwise eligible voters?
10        MS. HUNKER:  Objection, form.
11        THE WITNESS:  I'm sorry.  I don't
12 understand.
13    Q.   (By Ms. Sisco) I can rephrase.  Do you have any
14 reason to believe that the people -- that the majority
15 of the people whose votes weren't counted because they
16 were rejected, do you think that they are -- do you
17 think there is voter fraud going on there or do you
18 think they are eligible voters who misunderstood or
19 messed up?
20        MS. HUNKER:  Objection, form.
21        THE WITNESS:  I think they were eligible
22 voters.
23    Q.   (By Ms. Sisco) Do you think the SB-1, this ID
24 number requirement confused voters?
25    A.   Yes.

Page 279

1    Q.   Did the secretary of state provide adequate
2 guidance on this requirement to voters?
3    A.   In my opinion which is only an opinion, the
4 answer would be no.
5    Q.   And has -- do you think the secretary of state
6 has provided additional -- since the March 2022 primary,
7 do you think that now the secretary of state has
8 provided adequate guidance to voters?
9    A.   No.
10    Q.   Okay.  Thank you.  So we talked a lot about how
11 people can come in person to cure their votes?
12    A.   Yes.
13    Q.   Okay.  And I believe you said that they
14 could -- you, if their application is rejected, you were
15 just sending them a new application?
16    A.   Correct.
17    Q.   So could they have returned that by mail?
18    A.   Absolutely.
19    Q.   Okay.  Do you know how many people did that?
20    A.   No.  As I said, we weren't tracking that at the
21 time.
22    Q.   And could they provide like their number?
23 Could they cure it by email?
24    A.   They could but they didn't.
25    Q.   Okay.

Page 280

1    A.   Again, there was a strong hesitancy of sending
2 information like that over the internet in an email.
3 And I don't blame them.
4    Q.   Understood.  And would they provide an updated
5 number by phone?
6    A.   No.
7    Q.   Okay.  And we talked about they could
8 theoretically do it online but it didn't work and only
9 39 voters were able to do that?
10    A.   Correct.
11    Q.   Okay.  Can a voter -- could a voter who came in
12 person to cure their ballot, could they do that curbside
13 or would they have to physically go into your office and
14 talk to an elections worker?
15    A.   We did provide curbside for that.
16    Q.   Okay.  Great.  And we have talked a lot about
17 the steps that your office, the various steps that your
18 office has taken to help voters kind of understand and
19 cure their ballot issues.  Do you remember that?
20    A.   Yes.
21    Q.   And one of the things you mentioned is that
22 your office started advising people to just put both
23 numbers on everything?
24    A.   Correct.
25    Q.   When did you start advising that?

Page 281

1    A.   When it became apparent that we had a problem.
2    Q.   And when was that?
3    A.   You know, probably like the third week of
4 January.
5    Q.   Okay.  And why did you start advising that?
6    A.   Again, because we were noticing that we were
7 getting the wrong number.  I don't want to say it is the
8 wrong number.  The other number.
9    Q.   Got it.  Okay.  And you also mentioned that
10 your office sent voter registration cards with new
11 applications when the original was rejected; correct?
12    A.   Correct.
13    Q.   Did that require the use of resources like
14 staff or funding to do that that wasn't necessary in
15 prior elections?
16    A.   Correct.
17    Q.   Can you describe a little bit what additional
18 resources were required?
19    A.   I mean, again, you have the staff time to do
20 it.  You have the cost of the new voter registration
21 card.  You have the cost of the mailer.  You have your
22 envelopes that are nine cents a piece.  You have your
23 application, the new application.  You have the new
24 voter registration card and you are going to pay the
25 postage out.  So each one was a necessary financial

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
|     *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
|     *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX LL



# HOUSE JOURNAL

## EIGHTIETH LEGISLATURE, REGULAR SESSION

### PROCEEDINGS

#### SIXTIETH DAY — MONDAY, APRIL 23, 2007

The house met at 10 a.m. and was called to order by the speaker.

The roll of the house was called and a quorum was announced present (Record 590).

Present — Mr. Speaker; Allen; Alonzo; Anchia; Anderson; Aycock; Bailey; Berman; Bohac; Bolton; Bonnen; Branch; Brown, B.; Brown, F.; Burnam; Callegari; Castro; Chavez; Chisum; Christian; Cohen; Coleman; Cook, B.; Cook, R.; Corte; Crabb; Creighton; Crownover; Darby; Davis, J.; Davis, Y.; Delisi; Deshotel; Driver; Dukes; Dunnam; Dutton; Eiland; Eissler; Elkins; England; Escobar; Farabee; Farias; Farrar; Flores; Flynn; Frost; Gallego; Garcia; Gattis; Geren; Giddings; Gonzales; Gonzalez Toureilles; Goolsby; Guillen; Haggerty; Hamilton; Hancock; Hardcastle; Harless; Harper-Brown; Hartnett; Heflin; Hernandez; Herrero; Hilderbran; Hill; Hochberg; Hodge; Homer; Hopson; Howard, C.; Howard, D.; Hughes; Isett; Jackson; Jones; Keffer; King, P.; King, T.; Kolkhorst; Krusee; Kuempel; Latham; Laubenberg; Leibowitz; Lucio; Macias; Madden; Mallory Caraway; Martinez; Martinez Fischer; McCall; McClendon; McReynolds; Menendez; Merritt; Miles; Miller; Morrison; Mowery; Murphy; Naishtat; Noriega; O'Day; Oliveira; Olivo; Orr; Ortiz; Otto; Parker; Patrick; Paxton; Peña; Phillips; Pickett; Pierson; Pitts; Puente; Quintanilla; Raymond; Riddle; Ritter; Rodriguez; Rose; Smith, T.; Smith, W.; Smithee; Solomons; Strama; Straus; Swinford; Talton; Taylor; Thompson; Truitt; Turner; Van Arsdale; Vaught; Veasey; Villarreal; Vo; West; Woolley; Zedler; Zerwas.

Absent, Excused — King, S.; Moreno.

The invocation was offered by Steve Doles, director, Pray Lubbock, as follows:

Our Heavenly Father, your servant, Moses, not only brought law and order to his people, but provided the foundation upon which laws are established today. May each member of the house breathe in a fresh sense of divinely ordained duty and their stamina renewed as they consider legislation regarding the affairs of our state. May their noble work bring forth laws which will protect our freedoms, enhance life for individuals, and insure rule and order in our society.

We thank you that you have created the men and women in this room with passion about their opinions on appropriate governing policy. I pray that you will endow these representatives, whether on the debate floor or in the committee room, with self-control and honorable statesmanship equal to their passion allowing true corporate wisdom to prevail in this 80th Legislature.

Absent — Cook, R.; King, S.; Woolley.

## STATEMENT OF VOTE

When Record No. 617 was taken, my vote failed to register. I would have voted yes.

Woolley

## HB 218 - REMARKS

REPRESENTATIVE ANCHIA: Members, I'm going to be brief, this has been a long day. The debate has gone on for, oh boy, about six hours and this is what we learned. We've learned that the authors of this bill have provided not one shred of evidence of voter impersonation, which is the type of voter fraud this bill gets at. We have learned that upwards of two million Texans may be disenfranchised by this bill. We have learned that the sense of this body is not to prosecute the offenders and not to set up and devote resources to engage a prosecuting voter impersonation.

So, let me tell you what I know it's not about. This is clearly not about voter fraud, it's not about voter impersonation, it's not about expanding the franchise, it's not about protecting those that are least vulnerable in our society, and it's not about making sure that elections are more secure, and I'll tell you why. I've been saving this wonderful nugget for you guys until the end. If you look at the list of documents that you can offer up, it includes employee identification. No matter how much training you do with poll workers, no matter how much training you do of election judges and election officials, it will be impossible for them to discern what is a valid employment identification and what is an invalid employment identification. Mr. Talton probably has an identification for his law firm. It would be impossible for me to tell whether it was valid or invalid or whether Joe Deshotel's face was on it or whether it was correct or not. In fact, you can go down to Kinko's and have a bogus little ID made and say that you're an employee of whatever organization you want to be for about five dollars. In fact, this bill, rather than increasing the integrity of elections, makes sure that there's a huge loophole that you can drive a train through to increase voter fraud that was what was crossing the mind of a particular person.

We know that there's no evidence of it, but if this body wants to create an opportunity for voter fraud then vote for **HB 218**. In fact, that Section 3 part (a) of **HB 218** creates a wonderful opportunity for people at a low cost to be able to impersonate someone else by saying that this is a valid employee ID and no poll worker, no election worker, no election judge will be able to discern a valid from an invalid ID. Furthermore, there's another wonderful loophole in this bill that creates a glaring weakness. It essentially allows vote by mail to continue without photo identification. Vote by mail, that we know, is the greatest source of voter fraud in this state. In fact, all of the prosecutions by the attorney general—I shouldn't say all, but a great majority of the prosecutions by the attorney general occur with respect to vote by mail.

So ladies and gentlemen, you have a pig on your hands. It's an ugly bill. It creates more of an opportunity for voter fraud than current law, and I will tell you that if you vote for this without any commensurate enforcement like what was

offered up in Representative Strama's bill, you are voting for a pig with no lipstick, and it's going to be nasty. So I urge you, members of this body, to please vote against the loopholes that this bill creates and vote against the opportunities of voter fraud that this creates and vote against **HB 218**.

REPRESENTATIVE BURNAM: I particularly want to thank Rafael Anchia for the leadership role he's taken, both on the Elections Committee and today, and I'm only going to add a few words from my hometown daily paper, the *Star-Telegram* today. The opening paragraph, "An insidious scheme to turn back the clock on voting rights in Texas tragically has once again made it's way to the state house floor. The architects of this idea pitched as a noble effort to prevent voter fraud cannot be allowed to succeed with what is surely one of the greatest assaults on the right to vote in this state since the passage of The Federal Voting Rights Act in 1965." Racism is racism, xenophobia is xenophobia. It's too bad that we're going to see it enacted on the house floor again.

### REMARKS ORDERED PRINTED

Representative Thompson moved to print all closing remarks on **HB 218**.

The motion prevailed.

REPRESENTATIVE VEASEY: Mr. Speaker, members, thank you very much. I'll be very brief. I want to start off by thanking some of the folks that have helped bring attention to this voter ID, or what I call a voter suppression bill. First of all, I'd like to thank the Baptist General Convention of Texas. They put out a pamphlet, a flier today asking members to please oppose this bill. I think that's significant because the Civil Rights Movement back when we were going through a lot of these issues that we're facing today—and don't be mistaken about it—this is a Civil Rights issue that we are debating today. But back during the '60s the black ministers and everyone else that marched for freedom, that marched for voting rights, rarely did any of the white pastors from the South join in, and the fact that the Baptist General Convention joined in shows that we are making some progress in this country on racial harmony.

Unfortunately, this bill sets us back. We have heard absolutely no evidence of any voter impersonation today, absolutely none. I think that Representative Strama and Representative Anchia pointed that out very eloquently. All of the amendments and everything that Ms. Brown has offered you today is asking you to vote for this bill based on generalizations, and based on stereotypes, and based on things that are untrue. There has been absolutely not one shred of evidence, and we're voting for this bill today. It makes absolutely no sense, and especially in light of what's going on with the attorney general in the State of Texas. They were trying to force U.S. attorneys to say that there was voting fraud going on in their respective districts in there respective states so they could produce convictions that would prove voter impersonation. The panel, the U.S. panel who looked into this, found none. They had to help doctor some of the findings to make their findings more compelling. And I think that it's time that—instead of 15 or 20 years from now—because, you know, when we look down the road this is going to be embarrassing that we even voted for this. But right now people are

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
|     *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
|     *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX MM

Vice Chair, Natural Resources
and Economic Development
Texas Judicial Council
Chair, Eagle Ford Shale
Legislative Caucus



Judith Zaffirini
State Senator, District 21
President Pro Tempore, 1997

Committees
Administration
Business and Commerce
State Affairs

December 3, 2018

The Honorable
Bryan Hughes, Chair
Senate Select Committee
   on Election Security
P.O. Box 12068
Austin, TX 78711



Dear Chair Hughes:

Thank you for your leadership as Chair of the Senate Select Committee on Election Security. It is my privilege to serve with you, and I appreciate the opportunity to share my perspective regarding the Committee's Interim Report to the 86th Legislature. The report includes numerous good recommendations, and I am delighted to sign it. This letter, however, is to record my concerns regarding the need to (1.) provide concrete recommendations to address mail-in ballot fraud and (2.) reflect that Texas lags behind much of the nation in modernizing and simplifying the registration process, which is critical in offering adequate opportunities for all Texans to register to vote.

During the last several sessions many legislators have focused on voter ID laws intended to prevent in-person voter fraud, but not on the increasingly serious problem of mail-in ballot fraud. Our Committee heard troubling testimony regarding the state of election security related to the latter. The report's recommendation that the Legislature needs to find a solution to the "vexing issue" of mail-in ballot fraud at nursing homes and assisted living facilities is a good start, but we must take all possible steps to address voting irregularities caused by fraudulent mail-in ballots.

The report also states that current federal and state laws governing Texas' voter registration system "create a broad base of opportunity for registration for all Texans" and describes how eligible persons may register to vote. It does not mention, however, that we have not adopted secure voter registration reforms that

many other states have. Texas, for example, is one of only thirteen states that does not offer online registration. The Legislature should consider this and other secure methods to facilitate voter registration.

Thank you for your dedication to the many important issues we examined during the 85th Interim. I look forward to continuing to work with you and other members of the committee during our next legislative session.

May God bless you.

Very truly yours,

Judith Zaffirini

Judith Zaffirini

Z/ah