IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

1

# TABLE OF CONTENTS

Table of Contents ...................................................................................................... 2

Legal Standard ........................................................................................................ 23

Argument & Authorities ........................................................................................ 23

I.  Texas, like Other States, has a well-established right to implement evenly applied
    measures to deter and prevent voter fraud by verifying the voters' identity. ........................... 24

II.  The Materiality Provision does not invalidate evenly applied state law requirements. ........... 27

III. SB 1's ID Number Requirement is material to determining whether voters are qualified to
     vote by mail under Texas law. ................................................................................... 29

    A.  Texas law deems identification numbers material; therefore, they are material. ......... 30

    B.  The ID Number Requirement confirms that the person casting the ballot is in
        fact the eligible voter. This provides an independent basis for establishing
        materiality. ...................................................................................................... 33

IV. The Challenged Provisions do not deny Texans the right to vote. ................................. 41

    A.  OCA-GH Plaintiffs challenge multiple provisions that improve the likelihood
        of a voter's mail-ballot being accepted; other provisions they challenge have
        no effect one way or the other. ...................................................................... 47

    B.  Voters who fail to comply with the ID Number Requirement still have the
        option to cure or vote in person; hence, Sections 5.07 and 5.13 do not deny
        Texans their right to vote either. ................................................................... 42

V.  OCA-GH Plaintiffs cannot base their standing on the rights of Texas voters. ................. 51

    A.  There is no statutory standing exception for Section 1983 or Section 1971
        claims. ........................................................................................................... 52

    B.  OCA-GH Plaintiffs would not qualify for the exception in any event. ................. 54

VI. Congress did not create a private cause of action, barring Plaintiff's claim. .............. 55

Defendants Gregory W. Abbott, in his official capacity as Governor of Texas, Jane Nelson, in her official capacity as Secretary of State, John Scott, in his official capacity as the Provisional Attorney General of Texas, and the State of Texas ("State Defendants"), file this Response in Opposition to Plaintiff's Motion for Summary Judgment, and will respectfully show the Court as follows:

## INTRODUCTION

The OCA-GH Plaintiffs here seek a partial summary judgment on a single statutory claim under the 1964 Civil Rights Act, 52 U. S. C § 10101(a)(2)(B) ("Materiality Provision"). They seek to invalidate a number of provisions enacted into Texas law by SB 1 ("Challenged Provisions"), which generally require voters to provide the number from a government issued ID on any application to vote by mail ("ABBM") as well as the carrier envelope by which the ballot itself is returned. This common, and common-sense requirement that the individual returning a ballot was the individual who was registered to vote, is a vital protection against "the potential and reality of fraud," which the Fifth Circuit has recognized, "is much greater in the mail-in-ballot context than with in-person voting." *Veasey v. Abbott*, 830 F.3d 216, 239 (5th Cir. 2016) (en banc). Compliance with that voter-identification requirement is thus part of the qualifications to vote under Texas law. More to the point, it is entirely consistent with federal law. As Judge Jones stated just last year:

> It cannot be that any requirement that may prohibit an individual from voting if the individual fails to comply denies the right of that individual to vote under [the Materiality Provision]. Otherwise, virtually every rule governing how citizens vote would be suspect. Even the most permissive voting rules must contain some requirements and the failure to follow these rules constitutes the forfeiture of the right to vote, not the denial of that right.

*Vote.org v. Callanen*, 39 F.4th 297, 305 n. 6 (5th Cir. 2022) (quotation marks omitted).

In arguing otherwise, OCA-GH Plaintiffs do not claim that SB 1's voter-identification requirements were intended to discriminate against anyone or that the procedures do not apply evenly to all Texas voters, regardless of race, color, or any other protected classification. Instead, much of

their motion is based on highly disputed facts relating to the wisdom of the state law mail-voting identification requirements. But Plaintiffs' views on the wisdom of state law—or of the imperfect but improving TEAM database for that matter—are legally irrelevant, and their factual disputes are improper on a motion for summary judgment. "Common sense, as well as constitutional law," the Supreme Court has recognized, "compel[] the conclusion that government must play an active role in structuring elections," which present logistical challenges under the best of circumstances. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). Moreover, Texas has an indisputably legitimate interest in using voter-identification procedures to deter and prevent fraud, *Crawford v. Marion County Election Board*, 128 S. Ct. 1610, 1619-20 (2008), in mail voting as well as in-person voting. The Materiality Provision says nothing to the contrary—in part because compliance with the legal requirements Texas adopted in SB 1 is now "material" under state law to any Texas voter's request to vote by mail. Moreover, failure to comply deprives no one of the "right to vote" under the Materiality Provision.

### RESPONSE TO UNDISPUTED FACTS

### A. Voting by mail in Texas before SB 1 was vulnerable to fraud and irregularities.

It has been acknowledged for over a decade that, absent sufficient precautions and security measures, mail-in voting is especially vulnerable to fraud.[1] In 2005, the bipartisan Commission on Federal Election Reform noted that vote-by-mail "raises concerns about privacy, as citizens voting at home may come under pressure to vote for certain candidates, and it increases the risk of fraud."[2] Courts analyzing Texas elections have similarly recognized that "the potential and reality of fraud is much greater in the mail-in ballot context than with in-person voting." *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 239 (5th Cir. 2020) (quoting *Veasey*, 830 F.3d at 239.[3] State legislators (from both parties)

---

[1] Resp. Appx. BB (Jonathan White Decl.) at ¶¶ 17, 31.
[2] Resp. Appx. NN (STATE097689).
[3] *See also Veasey v. Perry*, 71 F. Supp. 3d 627, 641, 676 (S.D. Tex. 2014), aff'd in part, vacated in part, remanded sub nom. *Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015), on reh'g en banc, 830 F.3d 216 (5th Cir. 2016) and aff'd in part, vacated in part, rev'd in part sub nom. *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (finding that mail-in ballots were not secure).

have agreed that there was an "increasingly serious problem of mail-in ballot fraud,"[4] which constitutes "the greatest source of voter fraud in this [S]tate."[5] To the extent mail-ballot fraud succeeds, democracy fails, and legitimate voters are disenfranchised.[6] Accordingly, the Legislature decided in 2021 to remedy these gaps in the State's system of elections.

Senate Bill 1 (SB 1) was the result of those legislative efforts. SB 1 sought to address two types of fraud common to mail-in voting: voter impersonation and voter manipulation.[7] Both categories are explained in detail by declarant Jonathan White, who formerly served as chief of the Office of the Attorney General's Election Integrity Division (EID) and its predecessor, the Election Fraud Section of the Special Prosecutions Division.[8] Voter impersonation usually occurs when an individual submits applications for ballot-by-mail without voters' knowledge and then votes the resulting ballots on their behalf.[9] Voter manipulation typically features an individual directly interacting with voters under the guise of helping them vote, when in fact that individual's true motivation is to deliver votes for a particular candidate or group of candidates by nefarious means.[10] This occurs through vote harvesting schemes and abusive voter-assistance practices.[11] In either circumstance, the "central feature" of such activities "is a person with a political agenda getting between a voter and their ballot."[12]

The Office of the Attorney General has prosecuted over 800 election offenses against 126 individuals since 2015.[13] Approximately two-thirds of these election-related prosecutions involved

---

[4] Resp. Appx. NN (STATE108349).
[5] Resp. Appx. NN (STATE098261); *see also* Resp. Appx. BB (Jonathan White Decl.) at ¶ 7.
[6] Resp. Appx. R (Frank Phillips March 31, 2023 Dep.) at 99:3–18; Resp. Appx. S (Frank Phillips Decl.) at ¶ 8; Resp. Appx. BB (Jonathan White Decl.) at ¶ 22.
[7] *See* Resp. Appx. DD (El Paso Cty. Lisa Wise April 13, 2022 Dep.) at 142:3–142:12, 215:11–215:23; Resp. Appx. M (Keith Ingram April 28, 2022 Dep.) at 99:15–100:22; Resp. Appx. G (Bexar Cty. Jacquelyn Callanen April 4, 2022 Dep.) at 73:12–77:23, 219:14–220:14; Resp. Appx. V (Dallas County Michael Scarpello May 4, 2022 Dep.) at 55:9–59:3; Resp. Appx. R (Frank Phillips March 31, 2023 Dep.) at 113:24–114:23; Resp. Appx. P (Harris County Isabel Longoria April 20, 2022 Dep.) at 142:9–146:25.
[8] Resp. Appx. BB (Jonathan White Decl.) at ¶¶ 2, 3.
[9] Resp. Appx. BB (Jonathan White Decl.) at ¶ 9.
[10] *See* Resp. Appx. BB (Jonathan White Decl.) at ¶¶ 8, 24, 26.
[11] *See* Resp. Appx. BB (Jonathan White Decl.) at ¶¶ 26, 30, 43.
[12] Resp. Appx. BB (Jonathan White Decl.) at ¶ 8.
[13] Resp. Appx. BB (Jonathan White Decl.) at ¶ 16.

mail ballot fraud, often through ballot harvesting.[14] Another one-fifth of prosecutions involved both in-person and vote-by-mail voter assistance fraud, the latter of which is sometimes committed in concert with ballot harvesting.[15] By March 2021, OAG had resolved 135 counts of mail-ballot fraud since 2015, with an additional 414 counts still pending.[16] However, beginning in late 2022, prosecutions for 343 offenses against 39 defendants were placed in jeopardy due to the Court of Criminal Appeals' ruling in *State v. Stephens*, 664 S.W.3d 293 (Tex. Ct. Crim. App. 2022).[17] And these numbers only begin to hint at the scale of fraud, as none of these statistics account for prosecutions pursued independently by the federal government or counties—let alone fraud that goes undetected and unprosecuted due to the lack of visibility that is inherent in mail-in voting.[18] *See* Tex. Elec. Code § 273.001 (giving concurrent jurisdiction to counties to prosecute election crimes).

   This increased vulnerability to fraud results from two unique aspects of mail-in voting: lack of custody and lack of supervision. "[V]oting by mail lacks the security mechanisms that are inherent facets of in-person voting."[19] "[I]n any other type of voting, that ballot remains under [a state actor's] control, either . . . at the office or [in] the poll workers' control out in the field."[20] But "that doesn't happen with mail ballots."[21] To the contrary, mail-in voting allows ballots to be requested, obtained, marked, and submitted entirely through nonpersonal interactions. As one election administrator put it, "[o]nce that ballot is mailed," election officials "don't know who receives it, who intercepts it, [or] who got it out of the mailbox."[22]

---

[14] Resp. Appx. BB (Jonathan White Decl.) at ¶ 7; Resp. Appx. NN (STATE155433–155436) at 97–106; Resp. Appx. NN (STATE054634).
[15] Resp. Appx. BB (Jonathan White Decl.) at ¶ 7.
[16] Resp. Appx. NN (STATE090960); Resp. Appx. NN (STATE112177).
[17] Resp. Appx. BB (Jonathan White Decl.) at ¶ 16.
[18] *See, e.g.*, Resp. Appx. NN (STATE107785–STATE107789, STATE107844).
[19] Resp. Appx. BB (Jonathan White Decl.) at ¶ 7; *see id.* at ¶ 17.
[20] Resp. Appx. R (Frank Phillips March 31, 2023 Dep.) at 114:7–9.
[21] Resp. Appx. R (Frank Phillips March 31, 2023 Dep.) at 114:10.
[22] Resp. Appx. R (Frank Phillips March 31, 2023 Dep.) at 114:10–13.

This lack of ballot security provides unique opportunities for voter impersonation.[23] Election officials first relinquish custody of the ballot to an intermediary for delivery to the voter. And while mail-in voters have the legal option of returning the ballot in person on election day, *see* Tex. Elec. Code § 86.006 (a-1), in practice most voters again relinquish custody to someone besides an election official when returning the ballot. Before SB 1, it was relatively easy to take advantage of these opportunities to impersonate a voter. As one election administrator stated, "it would have been possible for people to send in an application for a person who they know does not vote regularly" and "has never voted"; then, that fraudster "can sign the application, get the ballot, [and] sign the ballot" without anyone "be[ing] the wiser."[24] This is not idle speculation: it has happened. For example, a mayoral candidate during the 2020 election fraudulently filled out and submitted at least 100 ABBMs and then voted or attempted to vote the ballots without voters' knowledge or consent.[25] Though the number seems small, elections in some areas of Texas can turn on a single vote.[26] And despite the relevant municipality spanning three counties, this scheme was only uncovered through the extraordinary efforts of a single county election administrator.[27] That administrator later testified "it would have been much harder for [the candidate] to successfully send applications through the process" if SB 1's ID-number requirements had been in place.[28]

Voter impersonation is primarily accomplished through vote harvesting efforts. As Former EID Chief White notes, "voting by mail is exceptionally vulnerable to fraud, particularly from vote harvesting operations."[29] Although methods can vary, typically a vote harvester "travels in person to

---

[23] Resp. Appx. BB (Jonathan White Decl.) at ¶ 17.
[24] Resp. Appx. G (Bexar County Jacquelyn Callanen April 4, 2022 Dep.) at 77:17–77:23.
[25] Resp. Appx. BB (Jonathan White Decl.) at ¶ 18; Resp. Appx. S (Frank Phillips Decl.) at ¶ 7.
[26] *Willet v. Cole*, 249 S.W.3d 585, 588 (Tex. App.—Waco 2008, no pet.); *see also, e.g., Medrano v. Gleinser*, 769 S.W.2d 687, 687-88 (Tex. App.—Corpus Christi–Edinburg 1989, no writ).
[27] Resp. Appx. BB (Jonathan White Decl.) at ¶¶ 18, 20; Resp. Appx. S (Frank Phillips Decl.) at ¶¶ 4, 5.
[28] Resp. Appx. R (Frank Phillips March 31, 2023 Dep.) at 98:11–13; *see also* Resp. Appx. S (Frank Phillips Decl.) at ¶¶ 11, 13; Resp. Appx. BB (Jonathan White Decl.) at ¶¶ 21, 23.
[29] Resp. Appx. BB (Jonathan White Decl.) at ¶ 17.

wherever the voter is located, in a nursing home, for example, or at the voter's home, and attempts to ensure that the ballot is voted for the candidate or group of candidates the harvester supports."[30] The goal is to create a large pool of ballots that can then be harvested from vulnerable targets such as elderly or disabled voters.[31] This is sometimes accomplished by fraudulently submitting ABBMs and diverting the resulting ballots away from voters, with the ballots then being voted unbeknownst to their intended target.[32]

More commonly, however, harvesters begin by "seeding" a neighborhood by convincing as many individuals to apply to vote by mail as possible,[33] then go door-to-door in order to pressure voters to the greatest degree possible.[34] These abuses can occur because "[m]ail ballots operate in an uncontrolled environment" where "there's no election officials around."[35] Harvesters' influence ranges from marking the ballot without any voter input to suggesting how to vote in down-ballot races in which the voter may be uninformed or uninterested.[36] Harvesters employing such methods often ingratiate themselves to voters by attempting warm, friendly interactions or offering a gift of negligible value as a token of good will.[37] Once trust is established, harvesters gauge the degree to which they can influence the voter and obtain the voter's signature.[38]

Unrefuted evidence shows these practices changed the outcome of elections in Texas before SB 1.[39] To offer one prominent example, the Office of the Attorney General jointly prosecuted a

---

[30] Resp. Appx. BB (Jonathan White Decl.) at ¶ 8; *see also* Resp. Appx. NN (STATE054635– STATE054652).

[31] Resp. Appx. BB (Jonathan White Decl.) at ¶ 12.

[32] Resp. Appx. BB (Jonathan White Decl.) at ¶ 9; *see also* Resp. Appx. G (Bexar County Jacquelyn Callanen April 4, 2022 Dep.) at 77:17–77:23.

[33] Resp. Appx. BB (Jonathan White Decl.) at ¶ 12; Resp. Appx. NN (STATE054638).

[34] Resp. Appx. BB (Jonathan White Decl.) at ¶¶ 14, 26; Resp. Appx. NN (STATE054638).

[35] Resp. Appx. AA (Jonathan White May 5, 2022 Dep.) at 143:7–9; *see also* Resp. Appx. BB (Jonathan White Decl.) at ¶ 14.

[36] Resp. Appx. BB (Jonathan White Decl.) at ¶¶ 8, 14, 26, 27; *see also, e.g.,* Resp. Appx. DD (El Paso County Lisa Wise April 13, 2022 Dep.) at 215:11–215:23.

[37] Resp. Appx. BB (Jonathan White Decl.) at ¶ 15.

[38] Resp. Appx. BB(Jonathan White Decl.) at ¶¶ 24, 45.

[39] Resp. Appx. M (Keith Ingram 30(b)(1) Apr. 28, 2022 Dep.) at 20:12–20; Resp. Appx. R (Frank Phillips March 31, 2023 Dep.) at 99:16–101:3; Resp. Appx. NN (STATE097980–STATE098014); Resp. Appx. NN (STATE107791– STATE107792).

candidate for county commissioner in Gregg County after he, along with three paid workers, misled voters and fraudulently marked them as disabled on their application for ballot-by-mail during the 2018 Democratic primary.[40] One of the workers also fraudulently indicated she had provided assistance with the mail-in ballot when other individuals, including the candidate himself, provided such assistance.[41] These efforts were sufficient to swing the election in the candidate's favor.[42] While the candidate lost in-person voting by over 20 percentage points, he obtained around 73 percent of the ballots cast by mail by employing these fraudulent tactics, giving him a narrow four vote victory.[43] This overt statistical anomaly ultimately led to detection, but more subtle efforts would have been unlikely to raise alarms.[44]

As demonstrated by these examples, vote-by-mail fraud often takes place in low-turnout races such as off-year elections, party primaries, and local elections.[45] Elections held in less-populous regions of the State are especially vulnerable.[46] Indeed, while much of the public discourse has revolved around statewide and national elections, the labor-intensive nature of ballot harvesting has proven much better suited for these under-the-radar events where small numbers of votes can make a real difference.[47] Larger operations would require greater coordination across a wider swath of participants, thus raising the risk of discovery and prosecution for relatively little benefit.[48] Given that 214 of the State's 254 counties contained less than 100,000 residents in 2020,[49] even small-scale vote-by-mail

---

[40] Resp. Appx. BB (Jonathan White Decl.) at ¶ 39; Resp. Appx. NN (STATE097980–STATE098014).

[41] Resp. Appx. NN (STATE097980–STATE098000).

[42] Resp. Appx. NN (STATE097980–STATE098014); *see also* Resp. Appx. NN (STATE107791–STATE107792).

[43] Resp. Appx. BB (Jonathan White Decl.) at ¶ 39.

[44] *See* Resp. Appx. BB (Jonathan White Decl.) at ¶ 13, 24.

[45] Resp. Appx. BB (Jonathan White Decl.) at ¶ 37; *see, e.g.*, Resp. Appx. M (Keith Ingram 30(b)(1) Apr. 28, 2022 Dep.) at 20:12–21:9, 153:4–154:7, 177:14–180:6, 185:10–188:22; Resp. Appx. R (Frank Phillips March 31, 2023 Dep.) at 99:16–101:3.

[46] Resp. Appx. BB (Jonathan White Decl.) at ¶ 37.

[47] Resp. Appx. BB (Jonathan White Decl.) at ¶¶ 32, 37; *see also, e.g.*, Resp. Appx. M (Keith Ingram 30(b)(1) Apr. 28, 2022 Dep.) at 20:12–21:9, 153:4–154:7, 177:14–180:6, 185:10–188:22; Resp. Appx. R (Frank Phillips March 31, 2023 Dep.) at 99:16–101:3.

[48] Resp. Appx. BB (Jonathan White Decl.) at ¶ 37.

[49] *See* Texas: 2020 Census, https://www.census.gov/library/stories/state-by-state/texas-population-change-between-census-decade.html.

fraud could have outsized deleterious results throughout much of the state. School board elections in smaller jurisdictions present a particularly attractive target.[50] Incumbents often opt for the district itself to conduct elections, which allows incumbent board members to appoint the early-voting clerk that will authenticate signatures and count ballots.[51] That these districts often serve as the county's largest employer adds a powerful motive to the means and opportunity for fraud.[52]

Fraud was not the only voting irregularity that previously defied easy detection. The record also demonstrates that even large counties failed to catch clerical errors, which sometimes resulted in unauthorized voting. Specifically, the Secretary of State's 2020 Election Audit of Collin, Dallas, Harris, and Tarrant Counties found that hundreds of ballots were issued on account of age to voters who did not qualify on that basis because they were under sixty-five.[53] While this was often the result of a data-entry error where the voters qualified on different grounds, there were multiple instances where an unqualified voter received a mail-ballot from the county in violation of state law.[54] According to the former deputy and legal director of the Forensic Audit Division, county election offices often mistakenly attached an ABBM to the wrong record in the database, such as when a "junior" and "senior" with an otherwise identical name lived at the same residence.[55] The ID number requirement would have precluded this irregularity by enabling counties to more accurately link an ABBM and mail-ballot to the correct voter.

> **B. Before SB 1, signature matching as the exclusive means of verifying the identity of mail-in voters faced serious scrutiny due to shortcomings in the method's accuracy and effectiveness.**

---

[50] Resp. Appx. BB (Jonathan White Decl.) at ¶ 38; *see also, e.g.*, Resp. Appx. M (Keith Ingram 30(b)(1) Apr. 28, 2022 Dep.) at 177:14–180:6, 186:9–188:22.
[51] Resp. Appx. BB (Jonathan White Decl.) at ¶ 38.
[52] Resp. Appx. BB (Jonathan White Decl.) at ¶ 38.
[53] Resp. Appx. NN (STATE115446–STATE115449).
[54] Resp. Appx. NN (STATE115447).
[55] Resp. Appx. J (Jacqueline Doyer March 29, 2023 Dep.) at 29:1–6.

Before SB 1, government-issued identification was only required when voting by personal appearance,[56] *see Veasey*, 830 F.3d at 238 (criticizing Texas for implementing in-person ID requirement but for voting by mail), meaning that Texas had to rely exclusively on signature comparisons to verify the identity of mail-in voters and combat these forms of fraud.[57] Under this process, an applicant first submits a signed application for ballot by mail, Tex. Elec. Code § 84.001(b), and then signs a certificate on the carrier envelope that contains the sealed ballot envelope, *id.* at § 86.005(c). Where a signature verification committee (SVC) is appointed, the SVC compares this signature "with the signature on the voter's ballot application to determine whether the signatures are those of the voter." *Id.* at § 87.027(i). The SVC then separates the voting materials received based on whether the signature is that of the voter, delivering both sets of materials to the early voting ballot board (EVBB). *Id.* Except where a witness has signed, the EVBB may accept the ballot only if "neither the voter's signature on the ballot application nor the signature on the carrier envelope certificate is determined to have been executed by a person other than the voter." *Id.* at § 87.041(b)(2). Both the SVP and EVBB may also compare the signature on the carrier envelope with signatures of the voter that are on file with the county clerk or voter registrar. *Id.* at §§ 87.027(i), 87.041(e). While these measures provided some level of detection and deterrence, they still could be circumvented by a determined bad actor.[58] By contrast, "[a]n ID number requirement for mail ballots provides needed security for vulnerable mail ballots, in a manner comparable to the existing ID requirement for in-person voting."[59]

---

[56] *See* Resp. Appx. NN (STATE098261) (remarks from Rep. Rafael Anchia pointing out the "glaring weakness" of certain proposed legislation that "allows vote by mail to continue without photo identification").

[57] Resp. Appx. BB (Jonathan White Decl.) at ¶ 33.

[58] Resp. Appx. BB (Jonathan White Decl.) at ¶ 33; *see also, e.g.*, Resp. Appx. G (Bexar County Jacquelyn Callanen April 4, 2022 Dep.) at 77:17–77:23; Resp. Appx. D (Rep. Rafael Anchia August 22, 2022 Dep.) at 94:19–99:24; Resp. Appx. V (Dallas County Michael Scarpello May 4, 2022 Dep.) at 55:9–59:3; Resp. Appx. P (Harris County Isabel Longoria April 20, 2022 Dep.) at 142:9–146:25.

[59] Resp. Appx. BB (Jonathan White Decl.) at ¶ 47.

Signature matching faced other criticisms beyond its effectiveness.[60] Many of these criticisms stemmed from the fact that signature matching is inherently "a subjective determination."[61] That subjectivity was compounded by the county-based structure of Texas elections,[62] which makes it inevitable that "[s]ome counties enforce requirements more strictly than others."[63] At one end of the spectrum, many EVBBs "will approve every signature that could conceivably be that of the voter."[64] For example, one county instituted a policy that disregarded all non-matching signatures for ballots from mail-in voters receiving assistance, instead counting the ballot as if it were "witnessed."[65] By conflating the difference between "assistance" and "witnessing," the county was able to improperly bypass the signature-verification process for a significant number of ballots. At the other end of the spectrum, an overly stringent application of signature matching could conceivably result in some ballots not being able to be authenticated, such as when a voter's signature has changed over time.[66]

Alleged uneven application of the signature-match criteria formed the basis of a separate lawsuit in 2020.[67] While the legal claims underlying that suit lacked validity, the Legislature nevertheless took notice of the practical concerns expressed through such efforts. The ID requirement in SB 1 attempted to address some of these oft-repeated concerns, as it was "designed to take the place of a less objective measure, which is the signature."[68] Following SB 1, "the signature on the ballot application and on the carrier envelope certificate shall be rebuttably presumed to be the signatures of

---

[60] Resp. Appx. BB (Jonathan White Decl.) at ¶ 36.
[61] Resp. Appx. BB (Jonathan White Decl.) at ¶ 36; *see also* Resp. Appx. N (Keith Ingram 30(b)(1) March 28, 2023 Dep.) at 23:5–23:13.
[62] *See* Resp. Appx. HH (Christina Adkins Decl.) at ¶ 3.
[63] Resp. Appx. BB (Jonathan White Decl.) at ¶ 35; *see also* Resp. Appx. N (Keith Ingram 30(b)(1) March 28, 2023 Dep.) at 21:19–22:4.
[64] Resp. Appx. BB (Jonathan White Decl.) at ¶ 36; *see also* Resp. Appx. N (Keith Ingram 30(b)(1) March 28, 2023 Dep.) at 21:19–22:4.
[65] Resp. Appx. BB (Jonathan White Decl.) at ¶ 35.
[66] Resp. Appx. BB (Jonathan White Decl.) at ¶ 36; *see also* Resp. Appx. B (Sen. Carol Alvarado October 6, 2022 Dep.) at 157:6–158:2; Resp. Appx. F (Rep. John Bucy August 9, 2022 Dep.) at 157:25–159:2.
[67] *See* Compl. for Declaratory and Injunctive Relief, ¶¶ 96-104, *Lewis v Hughs*, No. 5:20-cv-00577 (W.D. Tex.).
[68] Resp. Appx. N (Keith Ingram March 28, 2023 Sec. 30(b)(1) Dep.) at 23:7–9.

the voter" that has complied with the relevant ID number requirements. Tex. Elec. Code § 87.041(d-1).

This new objective standard for authenticating mail-in ballots allowed signature matching to be deemphasized without risking election security. Indeed, SB 1's ID number requirements provide additional assurances of voter integrity that were not possible with signature matching. For example, the requirements add an additional level of security because the information requested is not public.[69] Additionally, people are generally much more hesitant to disclose this private identifying information than they would be to provide a signature to an individual attempting to harvest their ballot.[70] And while signature matching is somewhat effective in identifying ballots that had been intercepted and voted without the applicant's knowledge, it fails to flag an obvious workaround—when the perpetrator both submits the application for ballot-by-mail and the ballot itself.[71] The mayoral race during the 2020 election discussed above is again instructive. In that case, the mayoral candidate signed both the applications and carrier envelopes, with the fraud only being identified by one of the three relevant counties on a basis other than signature match.[72] Even with an imperfect rollout, the objective ID number requirement has already proven superior to exclusive reliance on signature matching.

### C. The initial higher-than-expected rejection rates were the result of insufficient time to implement SB 1, not fundamental flaws in the statute itself.

SB 1 was signed by the governor on September 7, 2021.[73] It became effective on December 2, 2021.[74] And while the first major election after that effective date was the party primaries held on

---

[69] Resp. Appx. BB (Jonathan White Decl.) at ¶ 40; *see also* Resp. Appx. P (Isabel Longoria Apr. 20, 2022 Dep.) at 146:13–147:2; Resp. Appx. G (Bexar County Jacquelyn Callanen April 4, 2022 Dep.) at 79:21–80:11; Resp. Appx. DD (El Paso Cty. Lisa Wise April 13, 2022 Dep.) at 140:21–142:12; Resp. Appx. V (Dallas County Michael Scarpello May 4, 2022 Dep.) at 55:9–59:3.
[70] Resp. Appx. BB (Jonathan White Decl.) at ¶¶ 43, 44, 45.
[71] Resp. Appx. BB (Jonathan White Decl.) at ¶ 34.
[72] Resp. Appx. BB (Jonathan White Decl.) at ¶¶ 19, 21; Resp. Appx. S (Frank Phillips Decl.) at ¶¶ 9, 10.
[73] S.J. of Tex., 87th Leg., 2nd C.S. 280 (2021).
[74] Act of Sept. 1, 2021, 87th Leg., 2d C.S., ch. 1, § 10.04, 2021 Tex. Gen. Laws 3873, 3903 (stating Senate Bill 1 would take effect on 91st day after the last day of the Second Called Session); *see also* S.J. of Tex., 87th Leg., 2nd C.S. 280 (2021) (adjournment sine die on Sept. 2, 2021); H.J. of Tex., 87th Leg., 2nd C.S. 402 (2021) (same).

March 1, 2022, relevant deadlines for that election began before 2021 had even ended.[75] This timeframe for implementation proved inadequate.[76] As a result, rejection rates for the March 2022 primaries sometimes reached into the low double digits.[77] By the time of the 2022 General Election, those rates had dropped back down to one-to-three percent, which is "back in the zone" of historical rejection rates prior to SB 1.[78]

County election officials typically require approximately six months of preparation to administer a normal statewide election.[79] Because SB 1 made such substantial, far-reaching changes to the Election Code, election officials instead would have preferred a full year for proper implementation.[80] Indeed, any "big change" in election law, even with adequate time to implement, is likely to produce "some need to correct the implementation to make it more smooth."[81] Although no particular provision of SB 1 represented a sea-change in existing law, the former director of elections for the Texas Secretary of State testified that SB 1 was "by far the most comprehensive set of changes" he had ever seen, necessitating alterations to virtually "every single form, every single bit of educational material, every outline, every everything."[82] The bill's requirement for 24-hour video surveillance also presented significant implementation challenges.[83] Even in the spring of 2022, one elections administrator commented that "[t]here were so many pieces and parts to" SB 1 that she was "sure we haven't discovered everything yet."[84]

---

[75] *See generally* Resp. Appx. NN (STATE062358–STATE062411).
[76] Resp. Appx. G (Jacquelyn Callanen Apr. 4, 2022 Dep.) at 99:5–8.
[77] Resp. Appx. N (Keith Ingram March 28, 2023 Sec. 30(b)(1) Dep.) at 110:21-111:11.
[78] Resp. Appx. N (Keith Ingram March 28, 2023 Sec. 30(b)(1) Dep.) at 112:16-18.
[79] Resp. Appx. G (Jacquelyn Callanen Apr. 4, 2022 Dep.) at 53:24–54:12.
[80] Resp. Appx. G (Jacquelyn Callanen Apr. 4, 2022 Dep.) at 53:18–20, 54:13-20.
[81] Resp. Appx. N (Keith Ingram March 28, 2023 Sec. 30(b)(1) Dep.) at 34:23-35:1.
[82] Resp. Appx. N (Keith Ingram March 28, 2023 Sec. 30(b)(1) Dep.) at 35:9-12.
[83] Resp. Appx. G (Jacquelyn Callanen Apr. 4, 2022 Dep.) at 103:13–104:10.
[84] Resp. Appx. G (Jacquelyn Callanen Apr. 4, 2022 Dep.) at 102:13–15.

Changes to mail-in voting posed their own unique challenges.[85] For example, the Secretary of State was unable to promulgate updated ABBM forms until January 14, 2022.[86] This presented problems for repeat mail-in voters, who commonly fill out and submit their annual application in early January.[87] As a result, counties had to reject these ABBMs that were submitted on the old forms and then send out new applications in their place.[88] Other difficulties arose when several counties misapplied the number-matching requirements themselves, wrongly inserting a hierarchy of ID numbers into the statute whereby applications that included the last four digits of the voter's social security number would be rejected if that voter had a DPS-issued driver's license, EIC, or personal identification card number.[89] The Secretary of State engaged in substantial educational efforts during the end of January to correct this misunderstanding among the counties.[90] These issues, when combined with the other changes made by SB 1 and other challenges faced simultaneously—including supply-chain problems delaying the issuance of voter registration cards[91] and confusion caused by redrawn lines in redistricting that were also received later than normal[92]—combined to create a "perfect storm" of problems during the spring of 2022.[93]

### D. Once the counties had sufficient time to implement the new requirement, mail-ballot rejection rates returned to normal levels.

The undisputed facts show that, once counties had sufficient time to implement the ID number requirement, the rejection rate for mail ballots declined each successive election.[94] According to the Secretary of State, which reported numbers from its TEAM database, the statewide rejection

---

[85] Resp. Appx. G (Jacquelyn Callanen Apr. 4, 2022 Dep.) at 102:24–103:1.
[86] Resp. Appx. G (Jacquelyn Callanen Apr. 4, 2022 Dep.) at 59:7–11.
[87] Resp. Appx. G (Jacquelyn Callanen Apr. 4, 2022 Dep.) at 59:12–60:1.
[88] Resp. Appx. G (Jacquelyn Callanen Apr. 4, 2022 Dep.) at 60:1–6.
[89] Resp. Appx. A (Christina Adkins, July 20, 2022 Dep.) at 166:14–17, 170:15–19, 171:11–17.
[90] Resp. Appx. NN (STATE061151) ("Scenario 3"); Resp. Appx. NN (STATE061324) (slide 8 in "FAQs on Applications for Ballot by Mail" PowerPoint presentation).
[91] Resp. Appx. G (Jacquelyn Callanen Apr. 4, 2022 Dep.) at 105:22–106:18.
[92] Resp. Appx. G (Jacquelyn Callanen Apr. 4, 2022 Dep.) at 105:8–22.
[93] Resp. Appx. G (Jacquelyn Callanen Apr. 4, 2022 Dep.) at 106:22–23.
[94] *See, e.g.*, Resp. Appx. NN (STATE115581–115616); *see also* Resp. Appx. H (Jacquelyn Callanen February 28, 2023 Dep.) at 42:19-22; Resp. Appx. N (Keith Ingram 30(b)(1) March 28, 2023 Depo) at 20:9–16.

rate for mail-ballots dropped from its peak in the March 1, 2022 primary; to 5.02 percent in the May 7, 2022 constitutional amendment election; 4.11 percent in the May 24, 2022 primary runoff; and **2.7 percent** in the November 8, 2022 general election.[95] Based on the record, the statewide rejection rate in Texas historically has been between 1 and 3 percent depending on the election.[96] The former Director of Elections Keith Ingram testified that with the decline witnessed since the 2022 primary, rejection rates in Texas "are back in the zone."[97]

Former Director Ingram's observation that rejection rates have returned to historic levels was echoed by counties. The Denton County Administrator ("DNCEA") agreed that compared to previous elections, the mail-ballot rejection rate in his county was "virtually back to what [he] would say is normal."[98] The Bexar County Election Administrator ("BCEA"), meanwhile, testified that "in any normal election," Bexar County will "get a reject rate of three percent, four percent," but in November 2022, with all the "extra attention to it," Bexar County's rejection rate was 1.7 percent.[99] When asked how the rejection rate compared to the November 2020 general election, the BCEA testified that it was less.[100]

OCA-GH Plaintiffs disagree. In their statement of facts, OCA-GH Plaintiffs contend that mail-ballot rejection rates in Texas remain elevated compared to pre-SB1 levels and cite as evidence the expert reports submitted in the case by United States' expert Tammy Patrick as well as interrogatory response submitted by Harris County Election Administrator[101] ("HCEA") and the

---

[95] Resp. Appx. NN (STATE115581–115616).
[96] Resp. Appx. O (Keith Ingram March 28, 2023 Dep.) at 112:8–21.
[97] *Id.*
[98] Resp. Appx. R (Frank Phillips March 31, 2023 Dep.) at 47:9–15.
[99] Resp. Appx. H (Bexar Cnty. Jacquelyn Callanen February 28, 2023 Dep) at 44:2–45:25.
[100] Resp. Appx. H (Bexar Cnty. Jacquelyn Callanen February 28, 2023 Dep) at 53:14–53:20.
[101] There is evidence that mail-ballot rejection rate in Harris County for the 2020 general election does not reflect the true number of defective ballots the county received. In the absence of an official corrective action process provided by the State, Harris County implemented its own. The 2020 Election Audit found hundreds of VBM Review Worksheets, where SVCs and EVBBs in Harris County attempted to contact voters to fix errors on their ballot. Notably, "there were . . . voters whose worksheets were marked unresolved yet they received credit for voting in Harris County's final vote history record. In other words, the issues outlined in the worksheet appear to have been unresolved despite attempts to fix them but the ballot was counted anyway." Resp. Appx. NN (STATE115471 – STATE115478).

Travis County Clerk ("TCC"). ECF 611 at 14–17. The underlying data upon which they base this assertion is flawed. Prior to 2021, the State did not require counties to track or report data related to voting by mail, such as rejection rates for ABBMs and mail-ballots.[102] [103]

In 2021, however, the Legislature enacted a bill sponsored by Rep. John Bucy, HB 1382, that directed the Secretary of State to develop an online tool for tracking ABBMs and mail ballots. Tex. Elec. Code § 86.015 ("Ballot Tracker"). The legislation stipulated that the Ballot Tracker would update following certain events: namely, receipt by the early voting clerk of voter's ABBM; acceptance or rejection of the voter's ABBM; placement of the voter's mail ballot in the mail; receipt by the early-voting clerk of the person's marked ballot; and the acceptance or rejection of the voter's marked ballot. *Id.* This necessitated that counties enter the information into TEAM. Additionally, through SB 1, Texas introduced for the first time an effective cure process.[104] The cure process also compelled counties to collect and report more detailed information during the 2022 elections than was practiced in prior election cycles.

Dr. Mark Hoekstra, the Rex B. Grey Professor of Economics at Texas A&M University, specializes in analyzing methodologies and assumptions underlying various research designs used to assess the causal impact of policies. He demonstrates in his April 5, 2023 rebuttal report to Dr. Kenneth R. Mayer the dangers of conducting pre- versus post-policy comparisons when data

---

[102] *See, e.g.,* Resp. Appx. NN (STATE115444).
[103] To offer an example, the 2020 Election Audit conducted by the Secretary of State of Collin, Dallas, Harris, and Tarrant Counties found that "there were varying procedures in use by the four counties with regard to the handling and tracking of both ABBMs and BBMs. The counties were uniform in that they did not have a system or spreadsheet in place for tracking some rejected ABBMs. Additionally, a comparison between county records and TEAM revealed several instances where the dispositions of BBMs were not reported to TEAM and appeared to be inaccurate for the 2020 General Election." Resp Appx. NN (STATE115431). The Election Audit also found that "[i]n 2020 none of the four counties had a mechanism in place to log or track the mere receipt of an ABBM until the application was accepted . . . Due to the lack of recording or tracking of all ABBMS (regardless of whether a ballot was ultimately mailed to a voter) received by the counties, meaningful analysis of the figures the county provided in response to the Secretary of State request for the total number of ABBM received was not possible. Further, as the counties did not begin tracking the application until a ballot was mailed, the counties generally indicated there was no real mechanism by which to evaluate whether an ABBM was rejected." Resp Appx. NN (STATE115444).
[104] *See generally* Resp. Appx. OO (Signed Version of SB 1).

collection policies and practices change over the relevant timeframe.[105] Using data files Dr. Mayer obtained from Dallas, Harris, and Hidalgo Counties, he shows that ballot rejections for non-SB 1 reasons were 2.7 to 2.8 times higher in Dallas County and Harris County in 2022, compared to all ballot rejections for 2020.[106]

Dr. Hoekstra's findings indicate that "something is clearly wrong with the underlying data, the comparison, or both."[107] *See* Tex. Elec. Code §§ 87.0271(a), 87.0411(a) (listing five separate defects voter can cure). At best, "this casts serious doubt on the reliability" of before-versus-after comparisons in assessing the causal impact of SB 1 on ballot rejection rates.[108]

### E. Rejection rates should continue to decline as counties and voters become more accustomed to the new requirements.

Rejection rates for ABBMs and mail ballots have already returned to normal levels, and this downward trend is likely to continue as voters gain more familiarity with SB 1's requirements and cure processes. As former Director Ingram explained, each election conducted under a new voting law presents a "learning curve" for voters, but "as people learn about something and talk about it amongst themselves[,] they get better at it."[109] For example, one voter assumed a passport would be a sufficient form of identification after failing to do any personal research on the matter.[110] Another voter agreed that having been through the vote-by-mail process "will make it easier for voters just like [her] to vote more effectively in future elections in Texas."[111] Thus, the ability of voters to meet SB 1's requirements "gets better over time" as it "filters into people's consciousness."[112]

---

[105] Resp. Appx. PP (Hoekstra Suppl. Rep. to Mayer) at ¶¶ 8, 12–13.
[106] Resp. Appx. PP (Hoekstra Suppl. Rep. to Mayer) at ¶¶ 12–13, Table A.
[107] Resp. Appx. PP (Hoekstra Suppl. Rep. to Mayer) at ¶ 13.
[108] Resp. Appx. PP (Hoekstra Suppl. Rep. to Mayer) at ¶ 8(b).
[109] *See* Resp. Appx. N (Keith Ingram 30(b)(1) March 28, 2023 Dep.) at 20:9–21:17, 131:7–131:13; Resp. Appx. R (Denton Cty. Frank Phillips March 31, 2023 Dep.) at 107:3–108:16.
[110] *See, e.g.*, Resp. Appx. X (Anne Scott April 18, 2023 Dep.) at 17:15–18:21.
[111] *See, e.g.*, Resp. Appx. QQ (Yvonne Iglesias April 17, 2023 Dep.) at 51:6–51:14, 54:25–55:24.
[112] Resp. Appx. N (Keith Ingram 30(b)(1) March 28, 2023 Dep.) at 137:25–138:4.

Nor is personal experience necessary for voters to familiarize themselves with these requirements. Director Ingram observed that, apart from any formal avenues to learn the information, individuals share their knowledge and experience with peers, increasing the knowledge of all voters in the process.[113] In essence, these experienced voters become "ambassadors" for the counties by helping educate other voters.[114] Counties also played an important role, as they proactively engaged in voter-education and media-outreach efforts to inform voters of the new requirements by distributing handouts at the early voting sites, working with the community, putting on press conferences, and otherwise communicating helpful information to the public.[115] This combination of personal experience, increased secondhand knowledge, and voter outreach by counties should continue to diminish the number of mail ballot rejections in the future.[116]

The record also reflects that innovative efforts at the county level will likely be spread as best practices and reduce rejection rates going forward. For instance, Bexar County and Dallas County, among others, included an explanatory "insert" when sending ABBMs or mail ballots to voters during the March 2022 Primary Election.[117] These inserts provided "step-by-step instructions to help voters understand what [SB1's identification] requirements were" by using plain, easily understood language.[118] Bexar County went a step further, including voter registration cards with ABBMs and mail ballots to help facilitate voters providing updated identifying information to the County.[119] This proved to be a "brilliant" approach to obtaining more complete voter records, not only lowering rejection rates in the November 2022 General Election but in future elections as well.[120] Additionally,

---

[113] *See* Resp. Appx. N (Keith Ingram 30(b)(1) March 28, 2023 Depo) at 20:9–21:17.
[114] *See* Resp. Appx. G (Bexar County Jacquelyn Callanen April 4, 2022 Depo) at 114:11–115:13.
[115] *See, e.g.,* Resp. Appx. H (Bexar County Jacquelyn Callanen February 28, 2023 Depo) at 61:8–63:7.
[116] *See* Resp. Appx. N (Keith Ingram 30(b)(1) March 28, 2023 Depo) at 20:9–20:21.
[117] *See, e.g.,* Resp. Appx. G (Bexar County Jacquelyn Callanen April 4, 2022 Depo) at 63:5–63:25; Resp. Appx. W (Dallas County Michael Scarpello April 13, 2023 Depo) at 19:10–20:18.
[118] *See* Resp. Appx. W (Dallas County Michael Scarpello April 13, 2023 Depo) at 19:10–20:18.
[119] *See* Resp. Appx. G (Bexar County Jacquelyn Callanen April 4, 2022 Depo) at 138:12–139:12.
[120] *See* Resp. Appx. II (Christina Adkins April 11, 2023 Depo) at 67:23–69:13.

counties that stringently applied signature verification before SB 1 are likely to see even greater declines in rejection rates as officials begin to "rely on the [identification] number [requirement] and then give the signature the weight it's supposed to have" by only applying signature match where "there is some sort of evidence to overcome" the rebuttable presumption.[121]

Finally, any remaining gaps or errors contained in the TEAM database will also continue to decline. The Secretary of State will capture additional identification numbers through various processes, including the annual HB 2512 process.[122] New voter registrations will also play a role, as when "more voters . . . update their information with one of [SB1's identification] numbers," Texas's "data gets better over time."[123] Indeed, the Secretary of State is now directing voters to update their registration on Texas.gov if their ABBM is rejected because the number provided is not in the voter record.[124] Counties are also likely to remain "aggressive" in encouraging voters "to submit a new voter registration application or go online to get that update" to ensure there are "more complete records," as it is now widely recognized that updating voter registration with identification numbers "is a viable cure option."[125] In this way, future attempts to vote by mail will themselves lead to subsequent reductions in the rate of rejection.[126] Importantly, these means of reducing rejection rates do not even take into account—as any prospective relief demanded by plaintiffs must—substantive changes enacted by the Legislature during the most recent regular legislative session.

**F.  The 88th Texas Legislature enacted additional reforms to improve the accuracy of the TEAM database as well as the accessibility and effectiveness of the cure process.**

---

[121] Resp. Appx. N (Keith Ingram 30(b)(1) March 28, 2023 Depo) at 23:5–13.

[122] Resp. Appx. N (Keith Ingram 30(b)(6) March 28, 2023 Depo) at 37:22–39:16; Resp. Appx. RR (Keith Ingram 30(b)(6) May 6, 2022 Dep.) at 348:20–23.

[123] Resp. Appx. N (Keith Ingram 30(b)(1) March 28, 2023 Depo) at 138:7–12.

[124] Resp. Appx. N (Keith Ingram 30(b)(1) March 28, 2023 Depo) at 140:20–25.

[125] *See* Resp. Appx. II (Christina Adkins April 11, 2023 Depo) at 69:15–20.

[126] Resp. Appx. N (Keith Ingram 30(b)(1) March 28, 2023 Depo) at 141:4–6.

Just as the 87th Legislature responded to constituent concerns in 2020 by passing SB 1, the 88th Legislature has now followed up with further improvements to Texas election law based on what happened in 2022. As relevant here, these improvements generally took two broad tracks. *First*, the Legislature passed measures to ensure voters receive relevant information before a problem arises. *Second*, the Legislature sought to improve the accessibility and effectiveness of the cure process that SB 1 first introduced.

Senate Bill 975 and House Bill 315 will lead to improvements in the accuracy and comprehensiveness of voter records in the TEAM database.[127] The Transportation Code requires the Department of Public Safety to issue personal identification certificates. Tex. Transp. Code § 521.101. SB 975 amends subsection 521.101(m) to require that individuals being issued such certificates and surrendering a driver's license be "notified that the person's voter registration information will need to be updated to include the identification number."[128] This will facilitate the new identification number being included in the individual's voter record before an ABBM is submitted, resulting in fewer initial ABBM rejections. For its part, HB 315 will provide a SVB or EVBB with contact information for more voters.[129] Until now, when a carrier envelope was rejected, and it was impossible for the voter to return a corrected envelope in time, the SVB or EVBB had the option of contacting the voter by telephone and informing them that they can cancel the ABBM or correct the defect in person. *See* Tex. Elec. Code §§ 87.0271(c) (SVC), 87.0411(c) (EVBB). Section 84.011 already required that the ABBM contain a space for the voter to include their phone number. Tex. Elec. Code § 84.011(a)(4)(C). However, HB 315 now requires inclusion of a statement explaining to the applicant "the benefits of furnishing that information, including how that information assists the early voting

---

[127] *See* Resp. Appx. HH (Christina Adkins Decl.) at ¶¶ 7, 8.
[128] Act of May 22, 2023, 88th Leg. R.S., S.B. 975, § 1 (to be codified as an amendment to Tex. Transp. Code § 521.101).
[129] Resp. Appx. HH (Christina Adkins Decl.) at ¶ 7.

clerk."[130] Knowledge of the importance of including a phone number is likely to lead more applicants to include that information.[131]

House Bill 357 and Senate Bill 1599 both improve voter access to the Ballot Tracker.[132] Section 86.015 of the Election Code sets forth the information needed to access the Tracker. *See* Tex. Elec. Code § 86.015(b). This required information previously included the voter's registration address, which proved overly burdensome because the address had to be an exact match.[133] Following passage of HB 357 and SB 1599, the address requirement has been replaced with the voter's date-of-birth,[134] which—when combined with the other requirements of a voter's name, last four digits of their social security number, and either driver's license or PIC number—still provides sufficient security through authentication without denying access due to slight variations in data entry. SB 1599 creates "a comprehensive corrective action process for voters to correct defects in their ABBMs."[135] This includes expanding the scope of corrective actions for which voters can utilize the online Tracker[136] and providing voters with more time to correct ballot defects by allowing EVBBs to meet and initiate the corrective-action process sooner.[137] Finally, when a SVB or EVBB contacts a voter to inform them of their options to correct a defective ballot—perhaps by using the telephone number encouraged to be provided under HB 315—they now are empowered by SB 1599 to provide the voter with a third option besides cancelling the ABBM or correcting the defect in person: voters may instead mail in "a

---

[130] Act of May 24, 2023, 88th Leg. R.S., H.B. 315, § 1 (to be codified as an amendment to Tex. Elec. Code § 84.011).
[131] The 88th Legislature's Senate Bill 477 will provide improved accessibility should the individual choose to cancel the ABBM and qualifies to participate in curbside voting. *See* Act of May 29, 2023, 88th Leg. R.S., S.B. 477, § 2 (to be codified as an amendment to Tex. Elec. Code § 64.009).
[132] Resp. Appx. HH (Christina Adkins Decl.) at ¶¶ 5, 6.
[133] *See* Resp. Appx. II (Christina Adkins April 11, 2023 Dep.) at 16:14–20.
[134] Act of May 29, 2023, 88th Leg. R.S., H.B. 357, § 2 (to be codified as an amendment to Tex. Elec. Code § 86.015(b)); Act of May 22, 2023, 88th Leg. R.S., S.B. 1599, § 5 (to be codified as an amendment to Tex. Elec. Code § 86.015(b)).
[135] Resp. Appx. HH (Christina Adkins Decl.) at ¶ 5.
[136] Resp. Appx. HH (Christina Adkins Decl.) at ¶ 5.
[137] Resp. Appx. HH (Christina Adkins Decl.) at ¶ 5.

corrective action form" developed by the Secretary of State.[138] These legislative changes are likely to increase the effectiveness of the cure process going forward.[139]

## LEGAL STANDARD

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to show that "there is an absence of evidence to support the nonmoving party's case." *Kinnison v. City of San Antonio*, 699 F. Supp. 2d 881, 887 (W.D. Tex. 2010). On cross motions for summary judgment, the court will "review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Bitco Gen. Ins. Corp. v. Monroe Guar. Ins. Co.*, 31 F.4th 325, 329 (5th Cir. 2022). However, that is only "provided those inferences are reasonable." *Donahue v. Makar Installations, Inc.*, 33 F.4th 245 (5th Cir. 2022). Additionally, with respect to a facial challenge, the court "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–50 (2008).

## ARGUMENT & AUTHORITIES

OCA-GH Plaintiffs do not challenge in their Second Amended Complaint the appropriateness of Texas verifying voters' identity generally or even in the context of mail-in voting. To the contrary, OCA-Plaintiffs praises the benefits of signature matching—the method Texas exclusively used to verify absentee voters' identity before SB 1—and cite it as affirmative evidence that SB 1's ID number requirement is unnecessary because Texas already took steps to establish the identity of the voter. *See* ECF 611 at 52. OCA-GH Plaintiffs instead take issue with Texas's decision to bring mail-in voting into conformity with the method of voter verification already employed for in-person voting: that

---

[138] Act of May 22, 2023, 88th Leg. R.S., S.B. 1599, §§ 8 (to be codified as an amendment to Tex. Elec. Code § 87.0271), 10 (to be codified as an amendment to Tex. Elec. Code § 87.0411).
[139] Resp. Appx. HH (Christina Adkins Decl.) at ¶ 4.

voters offer proof of identification by means of a government-issued ID. OCA-GH Plaintiffs cannot have it both ways.

The Materiality Provision is only meant to guard against arbitrary deprivations of the right to vote. It does not prohibit Texas from confirming a voter's identity using the same information that Congress, through the Help America Vote Act ("HAVA"), requires voters to provide before being registered to vote for an election for federal office. *See* 52 U.S.C. § 21083(a)(5)(A)(i). Nor does it compel Texas to adopt OCA-GH Plaintiffs' preferred method of voter verification, even if some voters may find it more convenient. In arguing otherwise, OCA-GH Plaintiffs misapprehend the case law and history surrounding § 10101(a)(2), as well as the purpose that the ID Number Requirement serves in Texas's voter registration regime.

I.   **Texas, like other States, may adopt and apply neutral measures to deter and prevent voter fraud by verifying the voter's identity.**

Plaintiffs challenge two provisions in SB 1 under the Materiality Provision: Section 5.07 and 5.13, which state respectively that an ABBM and mail ballot may only be accepted if the numerical identifying information identifies the same voter identified on the voter's registration file. The prerogative of States to make such statutory rules for the conduct of their own elections is squarely rooted in the Constitution. Article I, section 4 expressly assigns this right to the legislature of each state. *See Cotham v. Garza*, 905 F. Supp. 389, 397 (S.D. Tex. 1995) (citing *Burdick*, 504 U.S. at 433). Texas and other States may—and indeed must—make election rules to deter and prevent vote fraud and protect public confidence in the integrity and legitimacy of their elections. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). As the Supreme Court has recognized:

> There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. Moreover, the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process. While the most effective method of preventing election fraud may well be debatable, the propriety of doing so is perfectly clear.

*Crawford*, 128 S. Ct. at 1619–20. As a result, it is common practice for states and the federal government to enact safeguards for both in-person and absentee voting that help verify that the person attempting to vote is in fact the person eligible to vote. *See, e.g.*, Haw. Rev. Stat. § 11-106; Me. Rev. Stat. tit. 21-A, §§ 756, 759; N.J. Stat. § 19:63-17; *see also* ECF 623 at 5–7. And time and again, courts have upheld the states' authority to require voters to present "photo identification issued by the government." *Cf Veasey v. Abbott*, 888 F.3d at 802 (upholding Texas's photo ID requirement for in- person voting).[140]

Although absentee or mail-in voting was rare in 1964, at the time § 10101(a)(2)(B) was enacted,[141] it has become an increasingly widespread practice. Adding to that, voting by mail is even more susceptible to voter fraud than in-person voting because, in most instances, no election official ever sees or communicates directly with the mail-in voter. *See Veasey*, 830 F.3d at 239; *Richardson*, 978 F.3d at 239.[142] The DNCEA explained at deposition, "in any other type of voting, that ballot remains under [the early voting clerk's] control, either . . . at the office or the poll workers' control out in the field."[143] But "that doesn't happen with mail ballots."[144] Instead, as the former head of the Election Integrity Division at the Office of Attorney General explained, "[m]ail ballots operate in an uncontrolled environment,"[145] out of sight, without clear chains of custody. Therefore, it is not

---

[140] *See, e.g.. Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1173 (11th Cir. 2008) (upholding as material requirement that ID number be checked before registration); *Common Cause v. Thomsen*, 574 F. Supp. 3d 634, 636 (W.D. Wis. 2021); *see also Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 841 (S.D. Ind. 2006); *Howlette v. City of Richmond*, 485 F. Supp. 17, 23 (E.D. Va. 1978), *aff'd*, 580 F.2d 704 (4th Cir. 1978). *See also United States v. Ward*, 345 F.2d 857, 862 (5th Cir. 1965); *Org. for Black Struggle v. Ashcroft*, No. 2:20-CV-04184-BCW, 2021 WL 1318011, at *5 (W.D. Mo. March 9, 2021) (signature is not immaterial to voter qualification); *Howlette*, 485 F. Supp. 22–23 (signature-before-notary requirement impresses upon the signatory the importance of voting for referendum). *But see Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003).

[141] Even by 1982, States still required nearly all voters to cast their ballots in person on election day and allowed only narrow and tightly defined categories of voters to cast absentee or mail-in ballots. *Brnovich v. Dem. Nat'l Comm.*, 141 S. Ct. 2321, 2338-39 (2021).

[142] *See* Resp. Appx. BB (Jonathan White Decl.) at ¶ 17; Resp. Appx. NN (STATE 112177–STATE 112193); Resp. Appx. R (Frank Phillips March 31, 2023 Dep.) at 113:24–114:23 (explaining the vulnerability of the vote-by-mail process, and stating that SB1 reduced and "definitely help[ed]" address vote-by-mail fraud). *See also* Resp. Appx. D (Rep. Rafael Anchia August 22, 2022 Dep.) at 65:20–68:3, 69:2–70:1, 71:18–73:3, 82:10–89:18; Resp. Appx. B (Sen. Carol Alvarado October 6, 2022 Dep.) at 166:12–171:20, Ex. 33, Ex. 34).

[143] Resp. Appx. R (Frank Phillips March 31, 2023 Dep.) at 114:2–9.

[144] Resp. Appx. R (Frank Phillips March 31, 2023 Dep.) at 114:2–9.

[145] Resp. Appx. AA (Jonathan White May 5, 2022 Dep.) at 143:1–12.

surprising that many states have instituted ID number requirements for mail-in voters, including: Florida, Georgia, Iowa, Kansas, Minnesota, North Carolina, Ohio, Virginia, and Wisconsin.[146] And an additional number of states rely on signature comparisons as proof of identity.[147] The Florida mail-in voter identification requirements—which are very similar to the challenged Texas requirements in SB 1[148]—were upheld against Constitutional and Voting Rights Act attacks just last year in *League of Women Voters of Fla. v. Lee*, 595 F. Supp. 1042, 1167-69 (N. D. Fla. 2022). That specific ruling was not even challenged on appeal. *League of Women Voters of Fla. V. Fla. Sec'y of State*, 2023 WL 3108161 (11th Cir. Apr. 27, 2023) (addressing other aspects of the ruling). Texas's voter-identification rules fall well within established norms.

The Federal Government too has recognized the importance and materiality of verifying a voter's identity throughout the voting process, up to and including having voters provide government-issued identification number. Congress provided in HAVA:

> an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes: (I) in the case of an applicant who has been issued a current and valid driver's license, the applicant's driver's license number; or (II) in the case of any other applicant. . . the last 4 digits of the applicant's social security number.

52 U.S.C. § 21083(a)(5)(A)(i); *see Browning*, 522 F.3d at 1174 (noting that Congress itself has "deemed the identification numbers material to determining eligibility to register and to vote"). The Department of Defense, meanwhile, includes in its Federal Post Card Application ("FPCA") for "absent Uniformed Service members, their families, and citizens residing outside the United States" a space

---

[146] Fla. Stat. § 101.62(1)(b); Ga. Code §§ 21-2-381(a)(1)(C)(i), (b)(1); Kan. Stat. §§ 25-1122(c), (e)(2); Minn. Stat. § 203B.04(d); N.C. Gen. Stat. § 163-230.2(a)(4); Ohio Rev. Code § 3509.03(B)(5); Va. Code § 24.2-701(C)(1); Wis. Stat. § 6.86(1)(ac), 6.87(1).

[147] *See, e.g.*, Haw. Rev. Stat. § 11-106; Me. Rev. Stat. tit. 21-A, §§ 756, 759); N.J. Stat. § 19:63-17.

[148] The Florida mail-in voter identification provision, § 101.62(1)(b), Fla. Stat. (2021), requires any voter seeking to vote by mail to provide their Florida driver's license number, Florida identification card number, or the last four digits of their social security number with their mail-in vote request.

for them to provide *both* their "Social Security Number" and the "Driver's License or State ID #."[149] The Acting Director of the Federal Voting Assistance Program ("FVAP") testified that these fields existed for decades before SB 1.[150]

In sum, as OCA-GH Plaintiffs do not dispute, it is common practice for both the states and the federal government to require those who vote by mail to provide identification—whether by providing government-issued ID numbers, signature verification, or otherwise. SB 1's requirement to provide ID numbers thus falls squarely within Texas's power to "preserv[e] the integrity of its election process," *Purcell*, 549 U.S. at 4, and design its election rules so that "order, rather than chaos, is to accompany the democratic processes." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).

## II.     The Materiality Provision does not invalidate evenly applied state law requirements.

Nothing in the Materiality Provision deprives the States of the ability to pass such neutral, common-sense laws to prevent voter fraud. Passed in response to the Jim Crow era, the Provision sought to prohibit abuses by which local officials sought to prevent black citizens from registering to vote, which typically were not based on state laws, but on extra-statutory requirements imposed by local officials. In a classic example, some local officials required black citizens (but not white ones) to state their age in months. *See, e.g., United States v. Crawford*, 229 F. Supp. 898 (W. D. La. 1964). State Defendants do not dispute the United States rightfully acted to eradicate such local practices that had nothing to do with voter fraud and were unevenly applied to citizens of one race or color. *But see infra*

---

[149] Resp. Appx. CC (J. Scott Wiedmann July 29, 2022 Dep.) at 50:4–51:18). The materials distributed by the FVAP to military and overseas voters acknowledge the prevalence of identification numbers in state absentee voting programs. For example, the instructions on the FPCA explain, "Most states allow you to provide a Driver's License number or the last 4 digits of your SSN. Some states require a full SSN." Resp. Appx. Q (OMB Control Number 0704-0503, FPCA) at 2. The Voting Assistance Guide advises voters that they must provide their state-issued ID number or social security number to have their FPCA and/or their Federal Write-In Absentee Ballot accepted in multiple states. Resp. Appx. NN (STATE115061, STATE115067, STATE115076, STATE115088, STATE115094, STATE115103, STATE115109, STATE115122, STATE115137, STATE115145, and STATE115205).

[150] Resp. Appx. CC (J. Scott Wiedmann July 29, 2022 Dep.) at 49:10–51:18, 74:6–17).

Part VI (explaining that Congress did not provide a private right of action to bring such suits). But that is not what the OCA-GH Plaintiffs seek to do here: they seek to overturn a neutral, evenly applied law that helps Texas and local election officials identify the person requesting and casting a mail-ballot as the registered voter. Leaving aside whether it provides private plaintiffs a cause of action (and it does not), nothing in the statute allows such a challenge.

Looking at section 10101(a)(2) as a whole—as the Court must—it becomes apparent that the Materiality Provision functions as a safeguard against the discriminatory application of state voter qualification and registration rules. In its entirety, the statute reads:

> No person acting under color of law shall –
>
> (A) in determining whether any individual is qualified under State law or laws to vote in any election, apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision which have been found by State officials to be qualified to vote;
>
> (B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election; or
>
> (C) employ any literacy test as a qualification for voting in any election unless (i) such test is administered to each individual and is conducted wholly in writing, and (ii) a certified copy of the test and of the answers given by the individual is furnished to him within twenty-five days of the submission of his request made within the period of time during which records and papers are required to be retained . . .

The Materiality Provision here is the second of the three subsections, but each serves a similar function: to prevent individuals acting under color of law from applying state laws relating to voting *differently with respect to some citizens than to others* so as to deny or abridge the right of *all* citizens to vote.

This is not surprising, as the Fifteenth Amendment provides the authorization for this federal statute to limit the authority of state and local officials to order elections. *See South Carolina v. Katzenbach*, 383 U.S. 301, 325 (1966).

Because these subsections serve a common function, ordinary tools of statutory construction require the three provisions of section 10101(a)(2) to be read *in pari materia. See In re Sanders*, 403 B. R. 435, 443 n. 13 (W. D. Tex. 2009); *BG Gulf Coast LNG, LLC v. Sabine-Neches Nav. Dist.*, 587 F. Supp. 3d 508, 525 (E. D. Tex. 2022); *Allen v. Sherman Oper. Co., LLC*, 520 F. Supp. 3d 854, 865 (E. D. Tex. 2021). Nowhere does this text allow the Court to invalidate neutrally applicable state laws; the statute was instead designed to require that voter-registration laws be applied equally to all citizens in compliance with state laws, and that is the way § 10101(a)(2)(B) must be read. OCA-GH Plaintiffs nonetheless ask that this Court *invalidate* a neutral state law without alleging—let alone showing the absence of a material question of fact—that the Challenged Provisions were racially motivated or that they have been applied unequally. Because that is necessary for OCA-GH Plaintiffs to obtain relief, their motion for summary judgment must fail. *Broyles v. Tex.*, 618 F.Supp. 2d 661, 697 (S.D. Tex. 2009), *aff'd*, 381 F. App'x 370 (5th Cir. 2010) (holding that only racially motivated deprivations of rights are actionable under section 1971). The Challenged Provisions, in short, are different in kind from the type of laws targeted by the Materiality Provision. Neither the language nor the purpose of § 10101(a)(2)(B) allows OCA-GH Plaintiffs' claim to succeed. *In re Sanders*, 403 B. R. at 443 n.13.

## III.   SB 1's ID Number Requirement is material to determining whether voters are qualified to vote by mail under Texas law.

Even if the Materiality Provision could bar facially neutral—and neutrally applied—state laws, the Challenged Provisions of SB 1 pass muster. All relate, at least tangentially, to Texas's new ID Number Requirement, which stipulates that an ABBM and mail ballot may only be accepted if the numerical identifying information identifies the same voter identified on the voter's registration file.

Intervenor-Defendants already explain in their motion for summary judgment why § 10101(a)(2)(B) has no application to such rules. *See* ECF 608 at 7–13. The Materiality Provision governs the voter registration process, while the Challenged Provisions impose procedures voters must follow to request and cast a ballot to vote by mail. When the Materiality Provision was enacted, there was already an established distinction between the right to vote and the privilege of voting by mail. *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 185 (5th Cir. 2020) ("*Tex. Democratic Party I*") (discussing congressional sources contemporaneous to the Materiality Provision). Moreover, "[w]hen a mail-in ballot is not counted because it was not filled out correctly, the voter is not denied 'the right to vote.' Rather, that individual's vote is not counted because he or she did not follow the rules for casting a ballot." *Ritter v. Migliori*, 142 S. Ct. 1824, 1825 (2022) (Alito, J., dissenting from denial of application for stay); *see Vote.org*, 39 F.4th at 305 n.6 ("It cannot be that any requirement that may prohibit an individual from voting if the individual fails to comply denies the right of that individual to vote under" the Materiality Provision.). The other provisions, meanwhile, regulate cure options and ballot design.

State Defendants concur with Intervenor-Defendants. Rather than restating those arguments here, for the purpose of judicial economy, State Defendants incorporate by reference the relevant sections of Intervenor-Defendants' motion. ECF 608 at 7–13. However, should this Court conclude that § 10101(a)(2)(B) extends to rules governing ABBM and mail-ballots, OCA-GH Plaintiffs' claim still fails because the identification numbers are material in determining whether an individual is qualified under Texas law to vote by mail.

### A.   Texas law deems identification numbers material; therefore, they are material.

In assessing whether the omission of an original signature is "material in determining whether such individual is qualified under State law to vote," courts must necessarily look to state law. 52 U.S.C. § 10101(a)(2)(B). In Texas, to be a qualified voter under state law, a person must be 18 or older, a United States citizen, a resident of Texas, and a non-felon (subject to certain exceptions), and must

not have been determined by a court to be mentally incapacitated. Tex. Elec. Code § 11.002(a)(1)-(5). Furthermore, while "any qualified voter is eligible for early voting by personal appearance," *id.* at § 82.005, to be entitled to vote an early voting ballot by mail, a person must fall under one of the specified categories, *see id.* at §§ 82.001–82.004 (i.e. 65-years of age or older), and "make an application for an early voting ballot to be voted by mail as provided by this title," *id.* at § 84.001(a). According to the Election Code, said application "must include . . . (A) the number of the applicant's driver's license, election identification certificate, or personal identification card issued by the Department of Public Safety; (B) . . . the last four digits of the applicant's social security number; or (C) a statement by the applicant that the applicant has not been issued a number described by Paragraph (A) or (B)" for it to be accepted. *Id.* at § 84.002

Thus, "[i]n Texas, an individual is qualified to vote [by mail] only if" the individual has submitted a complete ABBM, and to submit a complete ABBM, the individual must comply with the ID Number Requirement. *Vote.org,* 39 F.4th at 307. This in turn means that "to be qualified to vote [by mail] she must mail her application to the [early voting clerk] with [the required ID]." *Id.* The omission of the identification numbers when applying to vote by mail is thus "material in determining whether [an] individual is qualified under State law to vote" by mail, 52 U.S.C. § 10101(a)(2)(B). In other words, without an identification number, a person is not a qualified mail-in voter under state law. The same is true with respect to the ballot itself, as Texas has determined that for an individual to be able to cast a ballot, it must contain an identification number that "identifies the same voter identified on the voter's application for voter registration." Tex. Elec. Code § 87.041(b)(8). Accordingly, the identification requirement articulated in SB 1 necessarily cannot violate the materiality provision regardless of whether OCA-GH Plaintiffs believe the requirements serve a strong state interest, which they do.

To establish otherwise, OCA-GH Plaintiffs insist that a matching identification number is not among the listed qualifications for voting by mail. ECF 611 at 44–55. But their position ignores plain language in the Texas Election Code, which states that "[t]o be entitled to vote an early voting ballot by mail," voters must submit a complete ABBM, which includes their numerical identifying information. Tex. Elec. Code §§ 84.001, 84.002. The statute, in other words, expressly conditions voters' eligibility to vote by mail on them providing an acceptable ID number or providing a statement that they were not issued a requisite number. By arguing otherwise, OCA-GH Plaintiffs have effectively added a limitation to the Materiality Provision that does not appear in the statute—that the requirement means the *substantive* eligibility to vote. But, as noted in *Common Cause v. Thomsen*, nothing in § 10101's text limits materiality to so-called "*substantive* voting qualifications," such as age, citizenship status, or residency. 574 F. Supp. 3d 634, 636 (W.D. Wis. 2021) (emphasis in original). The statute merely stipulates that the error or omission be material to determining whether a voter is qualified to vote under state law—assuming it applies to requirements to vote by mail (and it does not, *see supra* at 30–31, ECF 608 at 7–13), that would encompass all qualifications implemented by the State, including identification requirement. *Id.*

OCA-GH Plaintiffs misinterpret § 10101(a)(2)(B) in two different ways as well. *First*, OCA-GH Plaintiffs ignore the definition of "qualified under state law" that is articulated in the statute. It reads, "the words 'qualified under state law' shall mean qualified according to the laws, customs, and usages of the State." 52 U. S. C. § 10101(e). *Second*, the OCA-GH Plaintiffs rely on inconsistent definitions of words that appear in the same sentence. The OCA-GH Plaintiffs assert throughout their motion that the word "vote" means "all action necessary to make a vote effective," ECF 611 at 43, 53, but they only apply that expansive definition to the phrases "deny the right . . . to vote" and "other act requisite to voting." They apply a narrower definition to "qualified under State law to vote." There, the OCA-GH Plaintiffs effectively cabin the term to mean qualifications for registration, as opposed

to the qualifications that Texas imposes each step of the way. This is contrary to ordinary rules of interpretation which hold that the same word used in different areas of the same statute should be interpreted to have the same meaning. *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569-70 (1995).

Taken together, § 10101 contemplates that States will impose different rules and requirements throughout the voting process; these rules and requirements, in turn, are material in determining whether a voter is qualified to take a desired action, such as casting a mail-ballot and having it count. "There is no reason," after all, "why the requirements that must be met in order to register (and thus be 'qualified') to vote should be the same as the requirements that must be met in order to cast a ballot that will be counted. Indeed, it would be silly to think otherwise." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting). Hence, the qualifications that govern prospective mail-in voters in Texas go beyond characteristics such as age, citizenship, and residence, as well as the characteristics necessary for voters to fall within one of the six categories authorized to vote by mail. The qualifications also comprise whatever neutrally applicable (and applied) rules the state decides should be mandatory. *See id.* at 1826.[151] Since SB 1, Texas has made it mandatory that voters verify their identity on their ABBM and mail-ballot by matching their identification number with one in their voter registration file before they are "entitled to vote an early voting ballot by mail," or in the alternative, provide a statement that the voters were not issued any of the requisite forms of identification. Tex. Elec. Code §§ 84.001(a),84.002(1-a). The identification numbers are therefore material in determining whether a voter is qualified to vote by mail.

> **B.    The ID Number Requirement confirms that the person casting the ballot is in fact the eligible voter. This provides an independent basis for establishing materiality.**

Even if the mandatory nature of Texas voter identification rules were not sufficient, they are

---

[151] For the avoidance of doubt, the State Defendants do not dispute that there are other limitations on the State's ability to impose requirements to vote—as the *Anderson-Burdick* line of cases amply demonstrates. At present, it is speaking only to the restriction imposed by the Materiality Provision at issue in this motion.

independently material. This inquiry turns on "the nature of the underlying information requested," not "the nature of [any] error." *Browning*, 522 F.3d at 1175. Requiring a voter provide a government-issued identification number serves to verify the voter's identity and confirm that the person requesting and ultimately casting the ballot is in fact the registered voter.[152] *Id.* at 1174 (finding that ID number mismatch makes it more likely that the applicant is not a qualified voter). This is because the other information on the ABBM and carrier envelope, such as the voter's name, residence, and date of birth, is available from public records. The former HACEA admitted at deposition that the county will produce a voter's registration file upon receiving a valid public information request.[153] Depending on how that request is worded, that disclosure could contain the voter's name, registration status, vote history, and residence.[154] She conceded that if a person wished to impersonate an eligible voter, that person would have access not only to the information needed to submit a complete ABBM, but also to target voters who are registered but vote infrequently and therefore are less likely to notice that someone sent an ABBM on their behalf—that is until SB 1.[155] By contrast, the voter's social security number and the number on the voter's driver's license, election identification certificate, or personal identification card are not public information.[156] Just the opposite. Both voters and Texas take precautions to keep such information from being disclosed.[157] *See, e.g.* Tex. Elec. Code §§

---

[152] *See, e.g.*, Resp. Appx. O (Keith Ingram March 28, 2023 Depo) at 36:2–36:9 (explaining that the purpose of SB1's mail-ballot provisions "is to identify the voter"); Resp. Appx. DD (El Paso Cnty. Lisa Wise 30(b)(1) April 13, 2022 Dep.) at 142:3-12.

[153] Resp. Appx. P (Isabel Longoria April 20, 2022 Dep.) at 142:9–147:2. The former HACEA also admitted that Harris County enables anyone to download some of this information from its website although she could not recall whether it was entire voter file or the vote record for a specific election.

[154] Resp. Appx. P (Isabel Longoria April 20, 2022 Dep.) at 142:22–143:23.

[155] Resp. Appx. P (Isabel Longoria April 20, 2022 Dep.) at 143:24–146:25; *see also* Resp. Appx. G (Jacquelyn Callanen April 4, 2022 Depo) at 77:17–77:23 (Before SB 1, "it would have been possible for people to send in an application for a person who they know does not vote regularly, has never voted[,] and they can sign the application, get the ballot, sign the ballot[,] and no one would be the wiser"—all because "the system was set up to only match the signature of the application to the signature of the ballot").

[156] Resp. Appx. P (Isabel Longoria April 20, 2022 Dep.) at 146:3–25; Resp. Appx. DD (Lisa Wise April 13, 2022 Dep.) at 140:21-141:8; Resp. Appx. V (Michael Scarpello May 4, 2022 Dep.) at 54:20–59:3; Resp. Appx. G (Jacquelyn Callanen April 4, 2022 Dep.) at 78:22-80:11.

[157] Resp. Appx. P (Isabel Longoria April 20, 2022 Dep.) at 146:3–25; Resp. Appx. DD (Lisa Wise April 13, 2022 Dep.) at 140:21-141:8; Resp. Appx. V (Michael Scarpello May 4, 2022 Dep.) at 54:20–59:3; Resp. Appx. G (Jacquelyn Callanen April 4, 2022 Dep.) at 78:22-80:11; Resp. Appx. BB (Jonathan White Decl.) ¶ 40.

13.004(c); 65.060 (exempting numbers from public information requests).

OCA-GH Plaintiffs do not dispute that a voter's name, residence, and even date of birth are public information. Instead, OCA-GH Plaintiffs protest Texas's assertion that the numbers required by the Election Code identify the voter. But to obtain summary judgment, OCA-GH Plaintiffs cite three putative facts that are subject to considerable dispute: (1) that local election officials do not utilize the identification numbers . . . to establish voters' identities; (2) that there is no evidence that counties had any trouble identifying voters prior to SB 1; and (3) that errors in the TEAM database fail to identify voters accurately due to incorrect and incomplete records. ECF 411 at 46–52. Leaving aside that summary judgment is never proper in the presence of a fact dispute, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986), none of these points are persuasive.

*First*, OCA-GH Plaintiffs conflate locating a person's registration file in the TEAM or offline county database with positively identifying the voter. Even if counties used other information on the ABBM or mail-ballot to find a voter's registration file, such as the voter's name or address, "[t]he most that [OCA-GH Plaintiffs] can fairly contend is that the [ABBM or mail-ballot] contained [information] which matched [the database file] of registered voters." *Howlette*, 485 F. Supp. at 22. OCA-GH Plaintiffs "cannot claim with certainty that the persons who signed the [ABBM or mail ballot] were in fact qualified voters." *Id.* This is where SB 1 comes in: it requires voters to provide a number that identifies them in a similar way to how a photo ID would identify the voters if they appeared in person because it is unique to them, and for reasons unrelated to voting is unlikely to be in anyone else's possession.[158] The number was also issued by a governmental authority with both the motive and the ability to certify that would-be voters are who they say they are. This is why, when the former director of elections was asked "am I correct that the numbers provided here, driver's license, social security number, they are not used to look up the voter, they are used to confirm the voter," he responded,

---

[158] Resp. Appx. BB (Jonathan White Decl.) ¶¶ 40, 45.

"[t]hey are used to make sure the voter has properly identified themself on the application, yes."[159] To offer an analogy, a receptionist at airline ticket counter can pull-up a flight reservation with the passenger's name and destination, but the airline and TSA will still direct the passenger to offer a photo or government ID to identify that the person standing before them is in fact the passenger on the reservation. So too here.

*Second*, the record shows that counties mixed-up voters' registration records when processing ABBMs and mail-ballots because they lacked identification numbers. The 2020 Election Audit conducted by the Secretary of State of Collin, Dallas, Harris, and Tarrant Counties found that hundreds of ballots were issued to voters who were under age sixty-five but were coded as having qualified to vote by mail on account of age.[160] In the majority of cases, the irregularity was caused by a data-entry error, and the voter was eligible to vote by mail on different grounds.[161] However, on multiple occasions, the voter was not entitled to vote by mail but nonetheless received a mail-ballot from the county in violation of state law.[162] The former Deputy and Legal Director of the Forensic Audit Division Jacqueline Doyer testified this happened because county election offices attached the ABBM to wrong record in the database.[163] The example she provided was a junior/senior situation, where two voters share similar names and other personal information.[164] She testified that SB 1's ID Number Requirement would preclude this irregularity from occurring in the future since it would enable counties to more accurately link an ABBM and mail-ballot to the correct voter.[165]

---

[159] Resp. Appx. O (Keith Ingram March 28, 2023 Dep.) at 69:3–8.

[160] Resp. Appx. NN (STATE115231–115232, STATE11544–STATE115449).

[161] Resp. Appx. NN (STATE115231).

[162] Resp. Appx. NN (STATE115230–STATE115232, STATE15446–STATE115448); Resp. Appx. J (Jacqueline Doyer 30(b)(6) March 29, 2023 Depo) at 28:6–24.

[163] Resp. Appx. J (Jacqueline Doyer 30(b)(6) Mar. 29, 2023 Dep.) at 29:1–29:6; *see also* Resp. Appx. NN (STATE115447, STATE115449).

[164] Resp. Appx. J (Jacqueline Doyer 30(b)(6) Mar. 29, 2023 Dep.) at 29:1–29:6.

[165] Resp. Appx. J (Jacqueline Doyer 30(b)(6) Mar. 29, 2023 Dep.) at 38:8–38:14.

In addition, despite the precautions in place at the time, counties had trouble identifying when the voter submitted an ABBM or carrier envelope versus when someone falsified the voter's information prior to SB 1. In 2020, a mayoral candidate for the City of Carrolton submitted at least a hundred ABBMs—that authorities know of—without the consent or knowledge of a single voter; he then voted or attempted to vote the mail-ballots.[166]Former EID Chief White explains in his declaration, "[t]he City of Carrolton spans three different counties and [the mayoral candidate] targeted at least Denton and Dallas counties in his scheme."[167] Nevertheless, his fraud "was detected and reported only by the Denton County Elections Office" and only after the counties had accepted fraudulent ABBMs and mail-ballots.[168] Former EID Chief White and the DNCEA both agree that signature matching—the form of identification verification Texas relied on pre-SB 1—did not identify the impersonation because the mayoral candidate signed both the ABBM and mail-ballot.[169] Had the Denton County elections office not taken additional steps to investigate and verify the nature of the address the ballots were being diverted to, the fraud would have gone unnoticed.[170]

*Third*, OCA-GH Plaintiffs overstate the impact that incomplete or erroneous records in the TEAM database have on election officials' ability to identify voters. Despite the doom and gloom predictions of Dr. Eitan Hersh, who conducted a simulated election using the TEAM database,[171] data from actual Texas elections showed that the ID Number Requirement accurately identified the voter once the State and counties had time to implement the new rule and educate voters. According to Dr.

---

[166] Resp. Appx. BB (Jonathan White Decl.) ¶ 18; *see also* Resp. Appx. S (Frank Phillips Decl.) ¶¶ 6, 7.

[167] Resp. Appx. BB (Jonathan White Decl.) ¶ 18. *see also* Resp. Appx. S (Frank Phillips Decl.) ¶ 9.

[168] Resp. Appx. BB (Jonathan White Decl.) ¶¶ 18–20. *see also* Resp. Appx. S (Frank Phillips Decl.) ¶ 10.

[169] Resp. Appx. BB (Jonathan White Decl.) ¶¶ 20–21; Resp. Appx. S (Frank Phillips Decl.) ¶ 10.

[170] Resp. Appx. BB (Jonathan White Decl.) ¶¶ 20–21, 23; Resp. Appx. S (Frank Phillips Decl.) ¶ 10.

[171] Dr. Hersh's own empirical analyses in his Second Supplemental Report directly contradicts most, if not all, of the assumptions and conclusions he made in his analyses of the TEAM database back in February 2022, before Texas conducted any elections under the new rule. The simulation he conducted then estimated that mail-ballot rejection rate would be between 15 and 16 percent. His examination of the November 2022 general election, in contrast, indicated an initial rejection rate 4.1 percent and a final rejection rate of 2.5 percent. *See also* Resp. Appx. K (Hoekstra Suppl. Rep. to Hersh) at ¶ 11.

Hersh, only 11,430 mail ballots in the 2022 November general election were initially rejected due to voters' failure to provide a matching ID number.[172] Only 6,355 mail ballots were rejected where the voter did not ultimately cure.[173] This is out of 332,281 mail-ballots cast and 8,107,575 total ballots cast once in-person voting is taken to account.[174] What's more, Dr. Hersh does not know how many of these voters failed to follow instructions as opposed to being tripped up by any alleged inaccuracy, omission, or incomplete record in the TEAM database.[175] Likewise, Dr Hersh does not know how many of 6,355 mail-ballots were submitted by legitimate voters.[176] OCA-GH Plaintiffs ask the Court to assume without evidence that SB 1 caused the rejection of ballots that were legally cast—as opposed to SB 1 accomplishing its stated aim, which is to prevent unlawful or duplicative votes from being accepted and influencing an election. Such assumptions may be permissible at the pleadings stage, but they do not permit OCA-GH Plaintiffs to carry its burden to obtain summary judgment.

The evidence also shows that the accuracy of the State's voter-registration database, TEAM, continues to improve as voters and the Secretary of State update registration records. For example, Dr. Hersh's analysis of the TEAM database and DPS database in February 2022 indicated that there were 276,405 registered voters who were listed in TEAM without a DPS ID number but who in fact possessed one.[177] *See* ECF 611 at 12 (reconstructing table). When Dr. Hersh conducted the same analysis in January 2023—less than a year later— the number had reduced by nearly a third to 189,095 registered voters.[178] *Id.* OCA-GH Plaintiffs will likely counter that the number of voters in TEAM

---

[172] ECF 611 at 17; ECF 611-1 Ex. 3 (Hersh Second Suppl. Rep.) ¶¶ 19–21.

[173] ECF 611-1 at Ex. 3 (Hersh Second Suppl. Rep.) ¶¶ 6, 14 n. 1; Resp. Appx. K (Hoekstra Suppl. Rep. to Hersh) at ¶¶ 6,7.
[174] The figure for total ballots cast was derived by adding 7,775,194 in person ballots to 332,281 mail-ballots. *See* ECF 611-1 at Ex. 3 (Hersh Second Suppl. Rep.) ¶ 15, 18; Resp. Appx. K (Hoekstra Suppl. Rep. to Hersh) at ¶ 27 n.6 (noting that 0.078 percent (6,355/8,102,908) of all votes cast were potentially "lost" due to SB1).
[175] Resp. Appx. K (Hoekstra Suppl. Rep. to Hersh) at ¶¶ 6, 16. *See, e.g.,* Resp. Appx. X (Anne Scott Apr. 18, 2023 Dep.) at 15:17–18:23 (entering passport number on ABBM)); Resp. Appx. Y (Taylor Scott Mar. 29, 2023 Dep.) at 9:13–11:21 (entering passport number on ABBM).
[176] Resp. Appx. K (Hoekstra Suppl. Rep. to Hersh) at ¶¶ 6, 16, 19.
[177] ECF 611.1 at Ex. 3 (Hersh Second Suppl. Rep.) at 5, Table A.
[178] *Id.*; *accord* Resp. Appx. R (Frank Phillips March 31, 2023 Dep.) at 101:4–22.

who had multiple DPS ID numbers issued to them increased slightly over that same timespan.[179] But whenever voters conduct a transaction at DPS, they are given the opportunity to simultaneously update their registration file.[180] Tex. Elec. Code § 20.063. DPS even notifies individuals who surrender[181] their driver's license for a personal-identification certificate that their voter registration information will need to be updated to reflect the new ID.[182] Tex. Transp. Code § 521.101(m). Hence, duplicative DPS ID numbers cannot be assumed to have a bearing on rejection rates because there is no evidence from which to infer that the records associated with these voters contain the outdated numbers. OCA-GH Plaintiffs may try to argue that voters may be confused about which identification number to enter on their ABBM or carrier envelope, but obtaining a new identification number often requires individuals to surrender their old ID. Neither Dr. Hersh nor OCA-GH Plaintiffs have estimated how many voters even have access to their old identification number, much less will be confused by which one to enter while voting. *See generally* ECF 611 at Ex. 3. Absent such evidence, OCA-GH Plaintiffs cannot carry their burden to be entitled to summary judgment.

In any event, the Materiality Provision does not require perfection. If it did, then no system of voter identification would survive review. Even under the old system, when the counties processed ABBMs and mail-ballots with minimal personal identifying information, such as name, address, and signature, errors could and did occur.[183] *Supra* at 37. Yet, OCA-GH Plaintiffs do not contest the legality of these procedures under the Materiality Provision. They instead cite these procedures as evidence that Texas already took steps to safeguard mail-in voting. ECF 611 at 46. Not only is OCA-GH

---

[179] ECF 611.1 at Ex. 3 (Hersh Second Suppl. Rep.) at 5, Table A.

[180] Resp. Appx. HH (Christina Adkins Decl.) at ¶ 8.

[181] *See* Tex. Transp. Code §§ 521.101(m), 521.1211(c), 521.315 (requiring the surrendering of divers' licenses); *see also* Resp. Appx. O (Keith Ingram March 28, 2023 Dep.) at 101:17–22 (explaining that voters only have one DPS number at time because they are required to surrender previous ID).

[182] Resp. Appx. HH (Christina Adkins Decl.) at ¶ 8; *see also* Act of May 22, 2023, 88th Leg. R.S., S.B. 975, § 1 (to be codified as an amendment to Tex. Transp. Code § 521.101).

[183] Resp. Appx. BB (Jonathan White Decl.) ¶¶ 20–21, 23; Resp. Appx. S (Frank Phillips Decl.) ¶ 10.; Resp. Appx. NN (STATE115230–STATE115232, STATE15446–STATE115448).

Plaintiffs' position logically inconsistent, but it relies on the "mistaken premise" that "the materiality provision refers to the nature of the error rather than the nature of the underlying information requested." *Browning*, 522 F.3d at 1174–75. "A more sound interpretation . . . asks whether, accepting the error as true and correct, the information contained in the error is material to determining the eligibility of the applicant." *Id.* at 1175. On that point, Congress itself has "deemed the identification numbers material to determining eligibility to register and to vote" and has made that "kind[] of information automatically material." *Id.* at 1174. And even if it had not, identification numbers establish the identity of voter, thereby ensuring that person requesting and submitting the mail-ballot is qualified under Texas law to vote.

Finally, OCA-GH Plaintiffs argue that the ID Number Requirement is redundant because the statute has voters provide their numerical identifying information twice, both at the application stage and the mail-ballot stage. ECF 611 at 52–53. This too fails. Even assuming *arguendo* that the Materiality Provision precludes redundancy, *but see Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1213 (S.D. Fla. 2006) (finding materiality irrespective of redundancy), the ID Number Requirement improves Texas's voter verification regime by addressing several vulnerabilities incumbent to signature matching.[184] *First*, prior to SB 1, Texas did not have a mechanism to corroborate that the person requesting the ballot was the registered voter.[185] The SVC and EVBB only assess signatures on carrier envelopes. They do not compare the signature on ABBMs before they are accepted. *Second*, even if the registered voter requested the ballot, the record shows that vote harvesters will attempt to get between voters and their ballot.[186] Having the voter provide their identification number at each stage of the mail-voting process therefore ensures that no one intercepted the ballot while it was en route. *Third*, the process of matching signatures can be somewhat subjective, as not all counties employ the same standard when

---

[184] Resp. Appx. BB (Jonathan White Decl.) ¶¶ 12, 21, 24, 33-36, 38.
[185] Resp. Appx. BB (Jonathan White Decl.) ¶¶ 20–21.
[186] Resp. Appx. BB (Jonathan White Decl.) ¶¶ 8–10, 25, 45.

making the comparisons.[187] The ID Number Requirement, in contrast, relies on an objective metric—
identification numbers—that is less subject to change.[188] The ID Number requirement, in short,
targets the gaps that existed in Texas law. It is anything but redundant.

## IV.   Read in context, the Challenged Provisions do not deny Texans the right to vote.

OCA-GH Plaintiffs' materiality claim fails because the Challenged Provisions do not deny
Texas voters the right to vote when read (as the Court must) in the context of other provisions of the
Election Code. Many of the provisions to which OCA-GH Plaintiffs object improve the likelihood
that a voter will successfully cast a ballot, whether by mail or in-person. Other provisions have no
effect whatsoever. Not only is this apparent from the face of the provisions, but OCA-GH Plaintiffs
had an obligation on summary judgment to establish that no genuine issue of material fact remained
as to whether these provisions caused the voter's ballot to be rejected. They have not done so. This
Court therefore should deny OCA-GH Plaintiffs summary judgment for sections 5.02, 5.03, 5.08,
5.10, 5.12, and 5.14, and dismiss the claim against section 5.06, which OCA-GH Plaintiffs voluntarily
withdraw. ECF 611 at 2, n. 1.

In addition, under existing precedent, the right to vote is only denied when the voter is "in
fact *absolutely* prohibited from voting." *Tex. Democratic Party I*, 978 F.3d at 188 (emphasis added). That
is not the case here. Texas law allows voters the opportunity to cure their ABBM and mail-ballot
should voters fail to provide an identification number that identifies the same voter identified on the
voter's registration file. Voters also have the opportunity to vote by personal appearance. While this
Court determined at the motion to dismiss stage that an initial rejection constituted a denial under the
statute, ECF 424 at 41, the Fifth Circuit has since issued additional guidance on the matter that accords

---

[187] Resp. Appx. BB (Jonathan White Decl.) ¶ 35.

[188] *See* Resp. Appx. N (Keith Ingram 30(b)(1) March 28, 2023 Depo) at 23:5–23:13 ("The [ID] number is designed to take
the place of a less objective measure, which is the signature."); *See also* Resp. Appx. T (Yvonne Ramon April 21, 2022
Depo) at 153:17-155:1 ("[W]e see the elderly especially that registered at a young age whose signature is no longer the same
signature.").

with State Defendants' position. Accordingly, this Court should deny OCA-GH Plaintiffs summary judgment on sections 5.07 and 5.13 as well.

### A. Sections 5.07 and 5.13 do not deny Texans their right to vote because they have the option to cure or vote in person.

The remaining two provisions challenged by OCA-GH Plaintiffs—sections 5.07 and 5.13—survive review as well. Under Texas law, "the early voting clerk shall review each application for a ballot to be voted by mail." Tex. Elec. Code § 86.001(a). If the numerical information required under § 84.002(a)(1-a) "does not identify the same voter identified" in the voter's registration file, "the clerk shall reject the application." *Id.* at § 86.001(f). OCA-GH Plaintiffs contend that this initial rejection is sufficient to satisfy the first factor of a materiality claim—that "[n]o person under the color of law shall. . . *deny* the right of any individual to vote." §10101(a)(2)(B) (emphasis added); ECF 611 at 53–54. However, as State Defendants have explained in earlier briefings, unlike other voting laws, the Materiality Provision does not cover voter rules that "abridge" the right to vote, and under binding Fifth Circuit case law, the right to vote has been "denied" only when the would-be voter has been "in fact absolutely prohibited from voting." ECF 145 at 10–12 (quoting *Tex. Democratic Party I*, 978 F.3d at 188). An applicant whose mail-in ballot is rejected for failure to provide identification retains a right to cure their ABBM or vote by personal appearance if their ABBM is rejected as a result of the ID Number Requirement.

In fact, Texas law provides applicants with robust opportunities to cure—in part due to SB 1. If an ABBM is rejected pursuant to the ID Number Requirement, "the clerk shall provide notice of the rejection," which "must include information regarding the ability to correct or add information." Tex. Elec. Code §§ 86.001(f), (f-1). The applicant at this point may: (1) resubmit their ABBM with a number that matches the one in his registration record, *id.* § 86.001(f-2); (2) validate or correct the required information through the Ballot Tracker, *id.* § 86.015(c)(4); (3) update their voter registration record by submitting a new registration form, *id.* § 15.021; (4) validate their personal identification

numbers on texas.gov;[189] or (5) vote in person, *id.* § 84.031(b). Military and overseas voters have the additional option of resubmitting their FPCA.[190] Because the FPCA acts as both voter registration form and an ABBM, the early voting clerk may update the voter registration record upon receipt.[191] *Id.* at § 84.014. To facilitate the cure process, the counties will often process ABBMs within 24 to 48 hours.[192] For example, the El Paso County Election Administrator does so and also encloses a voter registration form with the notice of defect because it helps voters successfully fix the defect in their ABBM.[193] Applicants have until the 11th day before election day to cure their ABBM before they receive a final rejection, at which time they may vote in person.[194] *Id.* at § 84.007(c).

Similarly, if a voter submits a mail-ballot, but the carrier envelop does not contain an identification number that identifies the same voter as the voter's registration record, *see* Tex. Elec. Code § 87.041(b)(8), that voter has the option to cure or vote by personal appearance. Any remedy the Court could issue would also have to take into account that the Election Code now also states that not later than the second day after the SVC or EVBB discovers a defect, the SVC and EVBB "shall send the voter a notice of the defect and a corrective action form . . . by mail or by common or contract carrier." Tex. S.B. 1599, 88th Legis., R.S., § 8, sec. 87.0271(b), 2023 Tex. Gen. Laws. The voter may then correct the defect in the voter's ballot by "submitting the corrective action form" by mail or by "coming in person to the early voting clerk's office not later than the sixth day after election day."[195] Tex. S.B. 1599, 88th Legis., R.S., § 8, sec. 87.0271(c), 2023 Tex. Gen. Laws. The voter also has

---

[189] ECF 609-3 at Ex. 3 (Election Advisory No. 2022-08) at 4,5, 24.
[190] Resp. Appx. I (Harris Cnty. Jennifer Colvin 30(b)(6) March 21, 2023 Depo) at 31:19–24; ECF 609.3 at Ex. 3 (Election Advisory No. 2022-08) at 16; Resp. Appx. Q (OMB Control Number 0704-0503, FPCA) at 2.
[191] ECF 609-3 at Ex. 3 (Election Advisory No. 2022-08) at 16.
[192] Resp. Appx. EE (Lisa Wise April 15, 2022 Dep.) at 36:12-20.
[193] Resp. Appx. FF (El Paso Cnty. Lisa Wise 30(b)(6) April 18, 2023 Dep.) at 40:6–20.
[194] ECF 609-3 at Ex. 2 (Election Advisory 2022-08) at 3.
[195] "Because the signature sheet is separate from the voted ballot and is authorized under state and federal law, FPCA voters who have a defect in their signature sheet have additional methods for returning this corrected or missing required documentation. Specifically, an FPCA voter may submit a corrected signature sheet by email, fax, personal delivery, or mail." ECF 609.3 at Ex. 2 (Election Advisory 2022-08) at 16.

the option of correcting the required information through the Ballot Tracker or cancelling their ABBM and voting in person.[196] Tex. Elec. Code § 87.0271(c). To facilitate this process, many counties are having the early voting clerk remove the secrecy flap so that the clerk might check whether the number on the carrier envelope matches voter's registration file and contact the voter earlier through email or phone.[197]

OCA-GH Plaintiffs argue that these options are "illusory," ECF 611 at 54, but the evidence shows otherwise. According to Dr. Hersh, even before the cure options are enhanced due to laws passed in the most recent Sessions, nearly half of the 11,430 voters whose records indicated an initial rejection on SB 1 grounds were able to cure or vote in-person.[198] Of those that did not, Dr. Hersh's data does not calculate one way or another whether the individuals who cast the ballots attempted to cure but were for some reason unable.[199] Furthermore, the updates adopted by the 88th Legislature addressed many of the hiccups that could impede a voter from curing in time. For example, SB 1599 "creates a comprehensive corrective action process for voters to correct defects in their ABBMs, including allowing voters to utilize the Secretary of State's Ballot by Mail Tracker to complete certain corrective actions that are not available under existing law."[200] It also "provides additional time, on a uniform basis, for early voting ballot boards (EVBBs) to meet to initiate the corrective action process sooner, thus allowing voters more time to correct defects in their mail ballots."[201] House Bill 357

---

[196] Section 5.10 in SB 1 made it easier for voters who wished to cancel their ABBM vote in person by clarifying that an election judge may permit a voter who appears in person to submit a provisional ballot even if that voter was sent a mail-ballot and failed to return the mail-ballot to the early voting clerk or presiding judge. Tex. Elec. Code § 86.015(c)(4).

[197] Resp. Appx. U (The Office of the Dallas County Elections Administrator April 29, 2022 Dep.) at 90:22–91:11; Resp. Appx. I (Jennifer Colvin March 21, 2023 Dep.) at 17:23-19:1 ("Q. And how do you contact the voter if you determine that the voter did not put down an ID number? A. There's multiple ways you can contact them. We normally give a phone call, and we send a letter."); *see also* Resp. Appx. NN (STATE01471).

[198] ECF 611.1 at Ex. 3 (Hersh Second Suppl. Rep.) ¶ 21.

[199] *See generally* ECF 611.1 at Ex. 3 (Hersh Second Suppl. Rep.)

[200] Resp. Appx. HH (Christina Adkins Decl.) ¶ 5; *see* Tex. S.B. 1599, 88th Legis., R.S., § 4, sec. 86.008, 2023 Tex. Gen. Laws.

[201] Resp. Appx. HH (Christina Adkins Decl.) ¶ 5; Tex. S.B. 1599, 88th Legis., R.S., § 6, sec. 87.0222, 2023 Tex. Gen. Laws.

amends the authentication requirements for voters to access the Ballot Tracker.[202] The bill removes the requirement that a voter enter their registration address to enter the system and instead allows the voter to enter their date of birth. The current Director of Elections Christina Adkins expects these changes to improve the accessibility and effectiveness of the cure process, allowing more voters to correct any defects on their ABBMs and mail-ballot.[203]

To the extent that some voters remain unable to navigate the process, any impediment would be circumstantial rather than a legal bar to the voters' right to vote. To the extent that sections 5.07 and 5.13 impose a burden on voters, that would be relevant to an *Anderson-Burdick* analysis, not § 10101(a)(2)(B). What matters in a materiality claim is whether the relevant law "disqualif[ied] potential voters," which the Challenged Provisions do not. *Schwier*, 340 F.3d at 1294. "Texas permits the plaintiffs to vote in person; that is the exact opposite of 'absolutely prohibit[ing]' them from doing so." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 404 (5th Cir. 2020) ("*Tex. Democratic Party II*"). After all, since the late 1960s, the law has distinguished between "the right to vote" and "claimed right to receive absentee ballots." *McDonald v. Bd. of Election Com'rs of Chicago*, 394 U.S. 802, 807 (1969). And even if this Court believes that the distinction does not apply here, voters retain a right to cure. Put another way, "[e]ven the most permissive voting rules must contain some requirements." *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting). So "[i]t cannot be that any requirement that may prohibit an individual from voting if the individual fails to comply denies the right of that individual to vote" under the Materiality Provision. *Vote.Org*, 39 F.4th at 306 n. 6.

The State Defendants acknowledge that this Court previously adopted a different position than the one advanced here in denying their motion to dismiss. *See* ECF 424 at 40–42. There, this Court concluded that the initial rejection of a vote-by-mail application or mail-ballot carrier envelope

---

[202] Resp. Appx. HH (Christina Adkins Decl.) ¶ 6; Tex. H.B. 357, 88th Legis., R.S., § 2, sec. 86.015(b), 2023 Tex. Gen. Laws.
[203] Resp. Appx. HH (Christina Adkins Decl.) ¶ 4.

could constitute a violation of § 10101(a)(2)(B) despite Texas giving voters the opportunity to cure or vote in person. *Id.* The ruling conflicts with intervening Fifth Circuit precedent arising from a motion to stay in a § 10101 challenge to Texas's requirement that prospective voters provide an original signature when registering to vote via fax machine. *Vote.org*, 39 F.4th at 305–07. Like here, any application deemed noncompliant was initially rejected, with the prospective voter receiving notice of the rejection, an explanation for the rejection, and an opportunity to cure the defect. *Id.* at 306. Prospective voters also had "many other means of registering, by mail or personal delivery, for instance." *Id.* Because voters were "given a second bite at the apple," the Fifth Circuit concluded in a published decision, "no applicant must comply with the wet signature requirement—there are plenty of alternative means to register. Thus, it is hard to conceive how the wet signature rule deprives anyone of the right to vote." *Id.* The same reasoning applies here.

In addition, when arriving at its ruling, this Court did not consider the entirety of § 10101(a)(2)(B)'s text. The Court noted that the statute defines the word "vote" to include "all action necessary to make a vote effective," ECF 424 at 41 (quoting 28 U. S. C. § 10101(e)), which this Court interpreted as reaching the actions contemplated under sections 5.07 and 5.13. The Court, however, did not address the meaning or implications of the word "deny," which the statute leaves undefined. As the Fifth Circuit acknowledged in *Tex. Democratic Party I*, 978 F.3d at 188, "denial" of a right, means the "deprivation" of that "right." *Denial*, Black's Law Dictionary (4th ed. 1968). For these reasons, along with the reasons that State Defendants articulated in their motion to dismiss, *see* ECF 10–12, and that Intervenor-Defendants advanced in their motion for summary judgment, *see* ECF 608 at 9–11, and the Fifth Circuit recognized in *Texas Democratic Party II*, 961 F.3d at 404, Texas's mail-in ballot laws do not deny anyone the right to vote. State Defendants respectfully ask the Court to reconsider its ruling that the Materiality Provision applies even when voters are not absolutely prohibited from

voting, ECF 424 at 41, and hold that the OCA-GH Plaintiffs has not shown that it is undisputed that

Texas violated federal law when it extended the requirement

> **B. Many of the Challenged Provisions improve the likelihood of a voter's mail-ballot being accepted; others have no effect one way or the other.**

As discussed in State Defendants' concurrently filed response, the United States confined its

(legally defective) materiality claim to the two provisions that could result in voters receiving a notice

of defect because of voters' failure to provide an identification number that matched their registration

record. *See* ECF 131 ¶¶ 71–76. OCA-GH Plaintiffs' summary judgment motion asserts that they

brought a materiality claim against nine different provisions. ECF 611 at 2 n. 1. Their request for

summary judgment on two of those provisions—sections 5.08 and 5.14—should be summarily

rejected because neither section 5.08 nor 5.14 is identified in their Second Amended Complaint. *See*

ECF 200 ¶ 125 (listing the provisions OCA-GH Plaintiffs challenge); *see Solferini as Tr. of Corradi S.p.A.*

*v. Corradi USA, Inc.*, No. 20-40645, 2021 WL 3619905, at *2 (5th Cir. Aug. 13, 2021) (determining that

a movant was precluded from raising a claim at the summary judgment stage when he failed to plead

that claim in his complaint); *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir.

2005) ("A claim which is not raised in the complaint . . . is not properly before the court.").

Apart from (and, in abundance of caution, in addition to) this partial waiver, OCA-GH

Plaintiffs' kitchen-sink strategy fares no better than the United States' more targeted approach because

52 U.S.C. § 10101(a)(2)(B) only prohibits actions that arbitrarily "*deny* the right of any individual to

vote in any election because of an error or omission on any record or paper…" (emphasis added). It

does not prevent Texas from otherwise prescribing the form of the ballot or adopting procedures that

ensure that information on mail-in ballots and ballot applications is accurate. Because none of the

cited provision denies anyone the right to vote, the Court should deny OCA-GH Plaintiffs summary

judgment for the following provisions:

**Sections 5.12 and 5.14:** Far from denying the right to vote, sections 5.12 and 5.14 do the opposite: they introduce for the first time an effective mechanism by which voters may correct defects in their mail-ballots so that their ballots may be counted.[204] *See* Tex. Elec. Code §§ 87.0271, 87.0411. When initially enacted, sections 5.12 and 5.14 instructed the SVC and EVBB, respectively, to determine within two business days of identifying a defect whether it would be possible for the voter to correct the defect and return the carrier envelope before polls closed on election day.[205] If the answer was no, sections 5.12 and 5.14 authorized the SVC and EVBB to contact voters by telephone or e-mail and inform them of their options.[206] If the answer was yes, the SVC and EVBB had the option of mailing voters back their carrier envelope or giving the carrier envelope back to the early-voting clerk to contact the voter directly.[207] The Legislature has since enacted improvements to the provisions during the last legislative session, *supra* at 21-24, such as by allowing the SVC and EVBB to mail back a corrective action form to the voter as opposed to the carrier envelope,[208] which only highlights that sections 5.12 and 5.14 increases the likelihood that a ballot ultimately will be accepted.

OCA-GH Plaintiffs may counter that not every voter can utilize the cure process successfully, but even under *Anderson/Burdick*'s undue-burden analysis, that would be insufficient to entitle OCA-GHA Plaintiffs to summary judgment because such analysis looks to effect on voters as a whole, not individual voters. *See, e.g.*, *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 601 (4th Cir. 2016) ("Every decision that a State makes in regulating an election will, inevitably, result in somewhat more inconvenience for some voters than for others,"). That some voters may be unable to take advantage of the cure provision is legally irrelevant with respect to the legality of sections 5.12 and 5.14 under the Materiality Provision because the ID number requirement does not "deny" an individual the right

---

[204] Resp. Appx. OO (Signed Version of SB 1) at 43–44, 46–48.
[205] Resp. Appx. OO (Signed Version of SB 1) at 43, 47.
[206] Resp. Appx. OO (Signed Version of SB 1) at 44, 47.
[207] *Id.*
[208] Resp. Appx. HH (Christina Adkins Decl.) ¶ 5.

to vote, as that word is understood in § 10101(a)(2)(B). Supra at IV.A. Moreover, even if section 10101(a)(2)(B) extended more broadly, the alleged denial would stem from sections 5.07 and 5.13's instruction on how to treat a noncomplying application or ballot, not from a provision that gives voters a second chance at meeting requirements. If anything, by challenging sections 5.12 and 5.14, OCA-GH Plaintiffs were successful in enjoining the provisions, the only result would be to *increase* the number of final rejections since the cure process allows voters to fix an assortment of ballot defects—the failure to provide a matching ID number is but one. *See* Tex. Elec. Code § 87.0271(a).

**Section 5.10:** OCA-GH Plaintiffs run into the same problem with respect to section 5.10, which stipulates that the Ballot Tracker, introduced in 2021 by separate legislation, must permit voters to add or correct their numerical identifying information. Tex. Elec. Code § 86.015(c)(4). The provision, in short, gives voters an additional method of curing their ABBM and mail-ballot—this time online. The undisputed evidence shows that voters utilized the Ballot Tracker to make corrections to their ballot and have that ballot be accepted.[209] OCA-GH Plaintiffs may argue that the Legislature could have designed the Ballot Tracker to be more user friendly, but again, assuming a materiality violation exists, it would stem from the provisions that instruct SVCs and EVBBs to issue notices of defect—not a provision that allows voters to cure their ABBM and mail-ballot as well as ensure that their information is accurate.

**Section 5.06:**[210] Continuing with this theme, OCA-GH Plaintiffs challenge section 5.06, which clarifies that an election judge may permit a voter who appears in person to submit a provisional ballot even if that voter was sent a mail-ballot and failed to return the mail-ballot to the early voting clerk or presiding judge. Tex. Elec. Code § 84.035(b). This claim fails for at least four reasons. *First*, section

---

[209] Resp. Appx. O (Keith Ingram March 28, 2023 Dep.) at 20:8–21:5.
[210] OCA-GH Plaintiffs assert in their motion for summary judgment that they intend to "voluntarily withdraw their challenge to SB 1 Section 5.06." ECF 611 at 2 n. 1. State Defendants addressed section 5.06 in their response out of an abundance of caution but agree that this Court should dismiss OCA-GH Plaintiffs' claim against section 5.06, as it is without merit.

5.06 merely crystalized a pre-existing rule and practice; voters who wished to cancel their ballot by mail and vote in person but failed to surrender the mail ballot or present either a notice of improper delivery or notice of surrendered ballot had the option of submitting a provisional ballot prior to SB 1.[211] *Second*, like sections 5.12 and 5.10, the provision does not result in a voter being denied their ability to vote. The provision merely confirms that voters who wish to cure their mail-ballot by voting in person or who choose to cancel their ABBM for some other reason can still vote provisionally.[212] *Third*, section 5.06 specifies the use of provisional ballots to prevent double voting. Since voters are only eligible to vote once each election, the provision "is material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B). *Fourth*, section 5.06 pertains to voting by personal appearance and therefore does not involve "an error or omission *on any record or paper*." *Id.* (emphasis added).

**Section 5.03 and 5.08:** The next challenged provisions, sections 5.03 and 5.08, stipulate that the officially prescribed ABBM form and the carrier envelope, respectively, must include a space for the voter to enter their numerical identifying information. On its own, having the form include a place for the voter to insert additional personal information—whether a government ID number or the voter's favorite color—does not alter whether a ballot will be accepted and thus cannot violate the Materiality Provision. The Materiality Provision is only implicated when the failure to include said information—assuming the information was not material such as the voter's favorite color—results in the denial of an individual's right to vote. Indeed, election forms often ask voters to provide extra information such as a telephone or email address to facilitate election administration.[213] Yet few would contend that that these forms violate federal law. After all, the FPCA, which is a federal form that acts

---

[211] Tex. Elec. Code § 84.035(b); *see also* Resp. Appx. NN (STATE115402).
[212] A provisional ballot "shall be accepted" if the EVBB determines that "the person is eligible to vote in the election and has not previously voted in that election." Tex. Elec. Code § 65.054(b).
[213] *See* ECF 609.5 at Ex. 14.

as both a voter-registration form and ABBM for military and overseas voters, has long asked voters to provide their social security number and state ID number.[214] If sections 5.03 and 5.08 contravene the Materiality Provision for requesting the same, then the FPCA is also in violation.

Section 5.02: Finally, the OCA-GH Plaintiffs challenge section 5.02, which states that ABBM must include a voter's numerical identifying information or a statement by the applicant that the applicant has not been issued a Texas ID number or a social security number. Tex. Elec. Code § 84.002(a)(1-a). Although closer to the mark than the miscellaneous provisions just discussed, section 5.02, on its own, does not result in a ballot being rejected. Director Ingram explains that section 5.02 addresses the voter.[215] Sections 5.07 and 5.13 govern the conduct of SVCs and EVBBs when reviewing the ballot and deciding whether to accept it. In other words, though State Defendants dispute that SB 1's ID number requirement results in a denial of the right to vote at all, *see infra* at Part IV.A, to the extent that it occurs, it is caused by sections 5.07 and 5.13's instruction to SVCs and EVBBs—not section 5.02 or any of the other smorgasbord of provisions OCA-GH Plaintiffs cite. Accordingly, the materiality claim fails.

## V.    OCA-GH Plaintiffs cannot base their standing on the rights of Texas voters.

State Defendants also request this Court revisit OCA-GH Plaintiffs' standing, which this Court concluded had been adequately pleaded. ECF 488 at 49–55. "Since they are not mere pleading requirements," the elements of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At summary judgment, a plaintiff may not "cit[e] only to the allegations of its complaint"; it must actually demonstrate the injury alleged therein. *Louisiana ex rel. La. Dep't of Wildlife & Fisheries v. Nat'l Oceanic*

---

[214] Resp. Appx. CC (J. Scott Wiedmann July 29, 2022 Dep.) at 49:10–51.
[215] Resp. Appx. M Keith Ingram April 28, 2022 Depo) at 101:1–22.

*& Atmospheric Admin.*, No. 22-30799, 2023 WL 4014179, at *2 (5th Cir. June 15, 2023). Even assuming OCA-GH Plaintiffs did adequately plead requisites for Article III standing—in that they show a cognizable injury that is both traceable to State Defendants and redressable—OCA-GH Plaintiffs have not satisfied their entitlement to summary judgment on the issue of standing to bring a materiality claim because they cannot show that *their own* constitutional rights were infringed by the relevant provisions in SB1, and neither section 1971 nor section 1983 empowers OCA-GH Plaintiffs to vindicate the rights of Texas voters. In addition, OCA-GH Plaintiffs do not allege, let alone establish a right to summary judgment regarding, a hinderance that would prevent Texas voters from protecting their own interests. Accordingly, they do not fit within the prudential exception to the prohibition against third-party standing (even if the exception applied to section 10101 or section 1983 claims, which it does not).

### A. There is no statutory standing exception for Section 1983 or Section 1971 claims.

As a general rule, a plaintiff "must assert his own legal rights and interests, not those of third parties." *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1341 (5th Cir. 1988). Section 1983 is no exception: it reads, "[e]very person" who deprives a U.S. citizen "or other person" of "any rights, privileges, or immunities secured by the Constitution and laws, shall be liable *to the party injured* . . . ." 42 U.S.C. § 1983 (emphasis added). Only those whose rights to vote have allegedly been infringed may pursue litigation against defendants under this section. *See Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986) ("[L]ike all persons who claim a deprivation of constitutional rights, [plaintiffs] were required to prove some violation of their personal rights."). Likewise, section 10101, which focuses on "the right of any *individual* to vote in any election," does not grant statutory standing to sue for purported violations of a third party's right to vote. 52 U.S.C. § 10101(a)(2)(B) (emphasis added).

The Supreme Court's opinion in *Conn v. Gabbert* provides a good illustration. 526 U.S. 286, 290 (1999). There, the Supreme Court found that a lawyer "clearly had no standing" to bring a section

1983 claim for an injury he suffered as a result of "the alleged infringement of the rights of his client," because a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* at 292-93. This is because section 1983 "incorporates, but without exceptions, the Court's 'prudential' principle that the plaintiff may not assert the rights of third parties." David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45 (1982). When "[t]he alleged rights at issue" belong to a third party, rather than the plaintiff, the plaintiff lacks statutory standing (or a cause of action), regardless of whether the plaintiff has suffered his own injury. *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011).

Here, OCA-GH Plaintiffs' materiality claim depends on the right to vote. *See generally* ECF 611. But OCA-GH Plaintiffs are artificial entities without voting rights. *Cf. Vieth v. Pennsylvania*, 188 F. Supp. 2d 532, 546 (M.D. Pa. 2002). Instead, OCA-GH Plaintiffs claim that they suffered a financial injury in having to expend resources to comply with the law, but this injury is different in kind from that necessary to establish standing in a voting rights case. "[A] plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Nat'l Federation of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982)); *cf. Vieth*, 188 F. Supp. 2d at 546 ("It goes without saying that political parties, although the principal players in the political process, do not have the right to vote."). OCA-GH Plaintiffs are necessarily asserting the rights of third parties and therefore cannot sue under section 1983. And because this follows from the statute itself, OCA-GH Plaintiffs cannot invoke any prudential exceptions. *See Warth v. Seldin*, 422 U.S. 490, 514 (1975).

The Court should not rely on the defunct district court ruling *Texas Democratic Party v. Hughs* ("*TDP*") to analyze the statutory standing question in this case. 474 F. Supp. 3d 849, 856 (W.D. Tex. 2020), *rev'd and remanded*, 860 F. App'x 874 (5th Cir. 2021). *TDP* assumed without analysis that section

1983 permits third-party standing when an organization files suit on behalf of its members, but the cases it cites for support either dealt with an unrelated issue, *see Schwier,* 340 F.3d at 1297, or ignored the statute's text altogether, *see Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,* 627 F.3d 547, 551 (5th Cir. 2010). The Fifth Circuit never needed to reach the question of statutory standing in *Texas Democratic Party* because there were numerous fatal flaws in the district court's order, which the court could (and did) take in a different order. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,* 549 U.S. 422, 429 (2007); *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 585 (1999). By contrast, since this Court addressed the State Defendants' motion to dismiss, the Fifth Circuit has noted that the "textual argument" that section 1983 precludes plaintiffs from invoking third-party rights is "powerful." *Vote.org,* 39 F.4th at 305. It is more than powerful: it is correct, as the language of section 1983 "plainly authorizes suit by anyone alleging that he has been deprived of rights under the Constitution or federal law, and by no one else." Currie, *supra,* at 45. Because OCA-GH Plaintiffs' claim is premised to the right to vote, and they have no right to vote to be abridged, this plain text forecloses their claim.

**B.  OCA-GH Plaintiffs would not qualify for the exception in any event.**

Even if the limited prudential exception to the general rule regarding third party standing could apply in section 1983, *but see id.,* that exception does not apply here. In rare circumstances, a plaintiff has been permitted to vindicate a third party's rights, but only if (1) "the plaintiff himself has suffered a cognizable injury" and (2) "the third party for some reason cannot assert its own rights." *McCormack,* 845 F.2d at 1341. This is not such a case. Texas voters, whose rights OCA-GH Plaintiffs' assert, can sue and do sue for any alleged deprivation of those rights caused by changes to the election laws on their own—all the time. *E.g., Richardson,* 978 F.3d at 220 (addressing a claim pursued by, among others, two individuals). In this very consolidated action, multiple voters have joined as plaintiffs, challenging SB 1 under different claims. ECF 199 ¶¶ 67–70; ECF 208 ¶ 20. OCA-GH Plaintiffs have not alleged,

much shown sufficient evidence to entitle them to summary judgment regarding, any reason why Texas voters would be unable to assert a materiality claim as well.

The court's ruling in *TDP* did not address the requisites an organization must meet to qualify for the exception to third-party standing and therefore does not control on this issue. 474 F. Supp. 3d at 859. Nor could it: apart from the fact that district court opinions are never precedential, this particular opinion has since been reversed "with instructions to dismiss for lack of subject matter jurisdiction." *Tex. Democratic Party v. Hughs*, 860 Fed. Appx. 874, 879 (5th Cir. 2021). Although the reversal was on different grounds, the court's reasoning in *TDP* lacks even persuasive authority because applying it here would result in a misstatement of law. Under binding Fifth Circuit precedent—some of which was decided since this Court's decision on the motion to dismiss— associational standing and the exception to the bar on asserting the rights of third parties have distinct tests. *Compare Ctr. for Biological Diversity v. United States Envtl. Prot. Agency*, 937 F.3d 533, 536 (5th Cir. 2019) *with Vote.Org*, 39 F.4th at 303 (*quoting, Warth,* 422 U.S. at 499). Even if the OCA-GH Plaintiffs had established a right to summary judgment on associational standing (and they have not because there is a triable question of fact regarding their injury for many of the reasons described in State Defendant's motion to dismiss), ECF 55 at 9–12, ECF 240 at 14–15, and even if the facts that establish associational standing have some relevance (and they do not), OCA-GH Plaintiffs must still demonstrate a 'hindrance' to the possessor's ability to protect his own interests, which OCA-GH Plaintiffs have not done.

## VI.    Congress did not create a private cause of action, barring Plaintiffs' claim.

Finally, Plaintiffs' claims under section 10101 of the Civil Rights Act also should be dismissed because the statute does not create a private cause of action. State Defendants have previously briefed these issues in their Motions to Dismiss. ECF 55 at 25-31, and 240 at 27-28. This Court rejected those arguments in a ruling that is currently on appeal. ECF 448 at 55-60. But courts are currently divided

on this issue. *Compare Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022) (concluding that § 1971 does secure a private right enforceable under § 1983), *and Schwier*, 340 F.3d at 1297 (same), *with McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000) (holding otherwise). And the Fifth Circuit is currently considering this issue in an unrelated case. *See Vote.Org*, 39 F.4th at 305 n.5. State Defendants respectfully disagree with this Court's prior ruling and in light of the unsettled case law, raise these arguments again to preserve them for further review.

<h3 style="text-align:center">CONCLUSION</h3>

For the reasons explained above, the Court should deny OCA-GH Plaintiff's Motion for Summary Judgment.

Date: June 24, 2023                      Respectfully submitted.

JOHN SCOTT                               /s/ KATHLEEN T. HUNKER
Provisional Attorney General of Texas    KATHLEEN T. HUNKER
                                         Special Counsel
BRENT WEBSTER                            Tex. State Bar No. 24118415
First Assistant Attorney General
                                         RYAN G. KERCHER
GRANT DORFMAN                            Tex. State Bar No. 24060998
Deputy First Assistant Attorney General  Deputy Chief, General Litigation Division

SHAWN E. COWLES                          WILLIAM D. WASSDORF
Deputy Attorney General for Civil        Assistant Attorney General
Litigation                               Tex. State Bar No. 24103022

                                         OFFICE OF THE ATTORNEY GENERAL
                                         P.O. Box 12548 (MC-009)
                                         Austin, Texas 78711-2548
                                         Tel.: (512) 463-2120
                                         Fax: (512) 320-0667
                                         kathleen.hunker@oag.texas.gov
                                         ryan.kercher@oag.texas.gov
                                         will.wassdorf@oag.texas.gov


## CERTIFICATE OF SERVICE


I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on June 24, 2023, and that all counsel of record were served by CM/ECF.

                                         /s/ KATHLEEN T. HUNKER
                                         KATHLEEN T. HUNKER