**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

_____

**STATE DEFENDANTS' BRIEF IN RESPONSE TO**
**OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX

INDEX

| A | Christina Adkins July 20, 2022 Dep. |
|---|---|
| B | Sen. Carol Alvarado October 6, 2022 Dep. |
| C | House Journal, April 23, 2007 – Remarks of Rep. Rafael Anchia |
| D | Rep. Rafael Anchia August 22, 2022 Dep. |
| E | Roberto Benavides March 30, 2023 Dep. |
| F | Rep. John Bucy August 9, 2022 Dep. |
| G | Jacquelyn Callanen April 4, 2022 Dep. |
| H | Jacquelyn Callanen Feb. 28, 2023 Dep. |
| I | Jennifer Colvin March 21, 2023 30(b)(6) Dep. |
| J | Jacqueline Doyer 30(b)(6) March 29, 2023 Dep. |
| K | Hoekstra Suppl. Rep. to Hersh |
| M | Keith Ingram April 28, 2022 Dep. |
| N | Keith Ingram 30(b)(1) March 28, 2023 Dep. |
| O | Keith Ingram March 28, 2023 Dep. |
| P | Isabel Longoria April 20, 2022 Dep. |
| Q | OMB Control Number 0704-0503, FPCA |
| R | Frank Phillips March 31, 2023 Dep. |
| S | Frank Phillips Decl. |
| T | Yvonne Ramon April 21, 2022 Dep. |
| U | The Office of the Dallas County Elections Administrator April 29, 2022 Dep. |
| V | Michael Scarpello May 4, 2022 Dep. |
| W | Dallas Cty. Michael Scarpello 30(b)(6) April 13, 2023 Dep. |
| X | Anne Scott Apr. 18, 2023 Dep. |
| Y | Taylor Scott Apr. 18, 2023 Dep. |
| Z | Jonathan White April 27, 2022 Dep. |
| AA | Jonathan White May 5, 2022 Dep. |
| BB | Johnathan White Decl. |
| CC | J. Scott Wiedmann July 29, 2022 Dep. |
| DD | Lisa Wise April 13, 2022 Dep. |
| EE | Lisa Wise April 15, 2022 Dep. |
| FF | El Paso Cnty. Lisa Wise April 18, 2023 Dep. |
| GG | December 23, 2018 Letter from Sen. Judith Zaffirini |
| HH | Christina Adkins Decl. |
| II | Christina Adkins April 11, 2023 Dep. |
| JJ | Kristi Hart June 30, 2022 Dep. |
| KK | Bexar Cnty. Jacquelyn Callanen 30(b)(6) April 20, 2022 Dep. |
| LL | Sen. Carol Alvarado October 6, 2022 Dep. Ex.33 |
| MM | Sen. Carol Alvarado October 6, 2022 Dep. Ex. 34 |
| NN | STATExxxxxx |
| OO | Signed Version of SB 1 |
| PP | Hoekstra Suppl. Rep. to Mayer |
| QQ | Yvonne Iglesias April 17, 2023 Dep. |
| RR | Keith Ingram 30(b)(6) May 6, 2022 Dep. |
| | |

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO**
**OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX A

Christina Adkins
July 20, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


LA UNION DEL PUEBLO ENTERO, ET AL )
                                  )
    PLAINTIFFS,                   )
                                  )
VS.                               )CIVIL ACTION NO.
                                  )5:21-CV-844 (XR)
                                  )(CONSOLIDATED CASES)
STATE OF TEXAS, ET AL,            )
                                  )
    DEFENDANTS.                   )


************************************************************

ORAL DEPOSITION OF

CHRISTINA ADKINS

JULY 20, 2022

************************************************************



        ORAL DEPOSITION of CHRISTINA ADKINS, produced as

a witness at the instance of the Plaintiffs, and duly

sworn, was taken in the above-styled and numbered cause

on the 20th day of July, 2022, from 9:00 a.m. to 3:06

p.m., before Gabriela S. Silva, CSR, RPR in and for the

State of Texas, reported by stenograph, at William P.

Clements Building, 300 W. 15th Street, Austin, Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

Christina Adkins
July 20, 2022

**Page 70**

1  number, they should put down the last four digits of
2  their social, and if they have neither, they should
3  check the box that says they have neither?
4        MRS. HUNKER:  Objection, form.
5     A.  I would agree that generally it says that.  I'd
6  have to look at the specific words, but conceptually,
7  yes.
8     Q.  (By Mrs. Yun) Okay.  Are there any plans to
9  change this official position of recommending voters to
10 put down both numbers?
11    A.  Just -- again, just to clarify, when asked, we
12 tell people we recommend if you have concerns to put
13 down both numbers, but you're not required to.  And that
14 -- I don't -- I'm not aware of any plans to change that.
15    Q.  Okay.  Can you think of any other instances of
16 guidance or recommendation that is inconsistent with the
17 text that is on the form?
18        MRS. HUNKER:  Objection, form.
19    A.  I don't agree that that's inconsistent with the
20 text on the form.
21    Q.  (By Mrs. Yun) Okay.
22    A.  Yeah.
23    Q.  Would you agree that it's different from what is
24 on the form?
25    A.  I don't know if I would agree with that either.

**Page 71**

1     Q.  Okay.  How would you describe the difference
2  between what is being recommended to voters about
3  putting both numbers down and what is on the -- on the
4  ABBM forms?
5        MRS. HUNKER:  Objection, form, vague,
6  ambiguous.
7     A.  Because the form itself reflects the text of the
8  law, but the corrective action process and the remedies
9  that are available to voters that have a missing or
10 incorrect personal identification number are much
11 broader than that.  And the instructions to the Early
12 Voting Clerk and the Ballot Board and/or Signature
13 Verification Committee when they're validating those
14 numbers don't say anything about prioritizing one or the
15 other.
16        So as a practical matter, there's an instruction
17 to the voter, but it's -- as far as the application of
18 the law, it's -- I think the recommendation we're giving
19 is consistent with what the law contemplates.
20    Q.  (By Mrs. Yun) Okay.  So it's your position -- am
21 I understanding your testimony just now correctly, and
22 please correct me if I'm wrong, that because there is a
23 separate provision that -- there's a provision that says
24 what should be on your -- on the form, on the two forms
25 and then there's a separate provision that instructs the

**Page 72**

1  Ballot Board how to verify or process those forms and
2  the text of those two provisions are not the same, you
3  believe, that your guidance to the voters is consistent
4  with those two provisions put together?
5        MRS. HUNKER:  Objection, form, compound,
6  ambiguous.
7     A.  If I understand correct, the law is specific with
8  the instructions that the voter is -- receives with
9  respect to the forms itself.  The law does not or the
10 law's a little bit different with respect to the person
11 evaluating the Ballot by Mail application and the Ballot
12 Board reviewing that information as to what they need to
13 validate.
14        So I think that our recommendation or our advice,
15 what we tell voters in this situation, encompasses both
16 components; both what the voter needs to put, and what
17 needs to be considered for -- to make it a legal
18 document, you know, legally compliant document.
19    Q.  (By Mrs. Yun) Would you be able to put that
20 recommendation on the form?
21        MRS. HUNKER:  Objection, form, calls for
22 speculation.
23    Q.  (By Mrs. Yun) I'm sorry.  Is it legally
24 permissible for you to put that recommendation, say --
25 saying, We recommend, but it is not required for you to

**Page 73**

1  put both numbers down?
2        MRS. HUNKER:  Objection, calls for legal
3  conclusion.
4     A.  I don't know.  I'd have to talk to my team about
5  it and probably talk to our general Counsel about it.
6  You know, there are provisions in the law that say that
7  we cannot waive, modify or suspend state law, so we have
8  to be very careful when we are prescribing an official
9  form to make sure that it accurately reflects the text
10 of the law as it relates to that situation.  And so I --
11 you know, any modification to that, I'd have to double
12 check with, like, the rest of our team and our general
13 Counsel.
14    Q.  (By Mrs. Yun) Has that idea ever been discussed?
15    A.  I don't recall if we've discussed that or not.
16 There's also space issues on these forms because the
17 legislature has prescribed very specific language in
18 certain circumstances.  When you look throughout Chapter
19 84 and 86 and 87, I think a little bit here and there,
20 there are very, very specific requirements and not a
21 whole lot of room to deviate from that on any of our
22 forms.
23    Q.  Okay.  Has your office received any complaints
24 regarding confusion as to what number they're supposed
25 to put down in the mail voting forms?

Christina Adkins
July 20, 2022

Page 78

1  speak about, you know, voting -- you know, the programs
2  that they offer to help military and overseas voters.
3  They have some voter guides on their website and so we
4  correspond with them regularly to make sure that the
5  information they have on their website is updated and
6  accurate.  And I mean, it's -- yeah, that kind of stuff.
7      Q.  Understood.
8      A.  All in the interest of helping, helping voters.
9  Yeah.
10             (Exhibit Number 10 was marked.)
11     Q.  (By Mrs. Yun) I'm handing you what's been marked
12  as Exhibit 10.  Bates-numbered 019849.  Do you recognize
13  this document?
14     A.  I do.
15     Q.  And what is it?
16     A.  It appears to be a copy of Advisory Number 22-08
17  that was issued in January of this year.
18     Q.  And we talked about election advisories in
19  general earlier.  Would you say -- you said that there's
20  some routine ones and there's some medior ones and
21  bigger ones.  Which category would you put this in?
22     A.  This is definitely in the bigger category, yes.
23     Q.  Okay.
24     A.  Anything that's a change in policy or reflective
25  of legislative changes would be big.

Page 79

1      Q.  Okay.  So you were involved in drafting this
2  advisory?
3      A.  Yes.
4      Q.  And reviewing it also?
5      A.  Yes.
6      Q.  Okay.  And is it accurate to say that election
7  advisories are intended for election officials, county
8  officials in the state of Texas?
9             MRS. HUNKER:  Objection, form.
10     A.  I would say that they're intended for a broader
11  audience than that.  It's not just counties that run
12  elections.  Local election officials also run elections,
13  cities, school districts and whatnot.  And we consider
14  our advisories, to the extent that we can, binding on
15  all the election officials that are using them.
16     Q.  (By Mrs. Yun) Okay.  Understood.  Election
17  officials, but not necessarily voters.  Would that be
18  accurate?
19     A.  It depends on the advisory.
20     Q.  Okay.
21     A.  It depends on what we're discussing.
22     Q.  I see.
23     A.  Yeah.
24     Q.  Would you say that this advisory, given that the
25  To line says, Election Officials, the intended audience

Page 80

1  is election officials and not voters?
2      A.  I think generally, but I'd have to -- if there's
3  a specific section in there, I'd, you know, I can look
4  at that specific section.  I think our audience is
5  election officials, but that doesn't mean it doesn't
6  apply broadly to other folks out there.
7      Q.  Right.
8      A.  Like, the information is not limited to other
9  folks.
10     Q.  And how is this -- how are election advisories
11  generally disseminated?
12     A.  They're disseminated in two different ways.  We
13  will send an e-mail to all of the county election
14  officials that are on our e-mail distribution list.  And
15  if it's something that's relevant to local election
16  officials, that e-mail distribution list, and that's
17  just so that they can get it directly from us.
18         In addition, to that they're posted on our
19  website so that they're available for public
20  consumption.
21     Q.  So let's turn to Page 9 of the advisory.
22     A.  Okay.
23     Q.  So under the subheading, Recommended Timelines
24  for Notification Process, it states, According to the
25  United States Postal Service, first-class delivery can

Page 81

1  take up to five business days.  Because a defective
2  carrier envelope needs to be returned to the voter, and
3  then mailed back to the Early Voting Clerk, the SOS
4  recommends that the SVC or EVBB implement a policy to
5  provide notification of a defect by phone or e-mail to
6  all voters whose ballots are reviewed by the SVC or EVBB
7  on or after the 14th day before Election Day,
8  approximately 10 business days.  Did I read that
9  correctly?
10     A.  You did.
11     Q.  So if a county were to follow this recommendation
12  that I just read, any defective carrier envelope
13  received between 20 days and 14 days before Election Day
14  will be mailed back by the SVC.  Is that right?
15             MRS. HUNKER:  Objection, form, calls for
16  legal conclusion and assuming facts not in evidence.
17     A.  It could be.  It kind of broadly depends on what
18  policy the SVC or EVBB decided to implement with respect
19  to to the process in general.
20     Q.  (By Mrs. Yun) And how does it depend on the
21  process?
22     A.  It could be that they -- that the ballot board or
23  the SVC -- EVBB or SVC was also simultaneously calling
24  people or, you know, something to that affect.  Like,
25  they're -- you know, the law defers in some instances to

Christina Adkins
July 20, 2022

Page 82

1  the Ballot Board and the SVC to determine how and when
2  they take certain steps in the corrective action
3  process.
4      Q.  Right.  So --
5      A.  And I guess just to clarify, it's a
6  recommendation, but it's not a blanket policy and the
7  law was set up to defer some of those decisions locally.
8      Q.  Okay.
9      A.  Yeah.
10     Q.  So it is not binding on the counties.  Correct?
11     A.  We call it a recommendation.
12     Q.  Yes.
13     A.  It's a strong recommendation, but that timeframe
14  that they establish, our recommendation is you come up
15  with a policy that works in your county on this
16  particular issue.  This is our recommendation, but
17  again, the way the law was set up there is to defer to
18  the local entity on what the actual decision is.
19     Q.  Okay.  So if a county were to follow this
20  particular recommendation, starting 14 days before
21  Election Day, voters would be notified by phone or
22  e-mail.  Is that -- is that correct?
23     A.  Yes.  Uh-huh.
24     Q.  Do you know how many counties followed this
25  particular recommended timeline?

Page 83

1      A.  I do not.
2      Q.  And your office cannot require counties to have
3  the Signature Verification Committee review the carrier
4  envelopes for ID errors.  Is that right?
5      A.  That's correct.
6      Q.  And because they could elect to have the Early
7  Voting Ballot Board to review them?
8      A.  It's -- whether or not you establish a Signature
9  Verification Committee, it's not mandatory.  I mean,
10  there's -- it's -- you know, it's based on -- it's a
11  county-by-county thing.
12     Q.  So if there's no SVC, then the ballot board --
13     A.  It defaults to the ballot board, correct.
14     Q.  Is it correct that in some counties the ballot
15  board only meets starting four days before Election Day?
16     A.  If there are under 100,000 in population, that's
17  correct.  The law restricts their meetings until that
18  point or rather doesn't allow them to meet up until four
19  days before Election Day.
20     Q.  Understood.  Let's turn to Page 16 of the
21  advisory.  So under, Correction of Defects by FPCA
22  voters, it says, If the FPCA voter provides missing
23  missing or incorrect identification information on their
24  carrier envelope or signature sheet, or did not include
25  the official election signature sheet for an FPCA voter,

Page 84

1  the voter must be notified of the defect in the same
2  manner as a regular ABBM voter.  Did I read that
3  correctly?
4      A.  You did.
5      Q.  So for a county that adopted the timeline, the
6  recommended timeline that we just spoke of on Page 9,
7  would you agree that that county would be mailing back
8  defective envelopes or signature sheets from FPCA voters
9  if they arrive between 20 days and 14 days before
10  Election Day?
11     A.  No.
12          MRS. HUNKER:  Objection, form.
13     A.  No.  I don't agree with that.
14     Q.  (By Mrs. Yun) Okay.  What did I get wrong?
15     A.  FPCA voters, they use what's called a Federal
16  Postcard Application, which is different from the
17  application for Ballot by Mail.  They're kind of in a
18  different category and there are some different rules
19  that apply to them.
20          So it is entirely conceivable that a ballot board
21  or a Signature Verification Committee may have a
22  slightly different policy for those voters than they
23  would for regular ABBM voters, as we would say.
24     Q.  Okay.  So could you explain to me what this
25  sentence means, on Page 16 which says, The voter must be

Page 85

1  notified of the defect in the same manner as a regular
2  ABBM voter?
3      A.  It means they also have the ability to be
4  notified of defects and receive the benefit of a
5  corrective action process.
6      Q.  Okay.  So --
7      A.  It means that it applies to them too is -- the
8  ability to correct a defect applies to FPCA voters as
9  well.
10     Q.  I see.  So in the same manner does not mean in
11  the same way of transmitting that information.  Is that
12  --
13     A.  Correct.
14     Q.  Okay.  So is there an election advisory or any
15  other document from your office that informs the
16  counties that they can institute a different
17  notification mechanism for FPCA voters than for regular
18  ABBM voters?
19     A.  Something separate and apart from this?  I don't
20  believe so.  But if I might add on there, and there's
21  language somewhere in the advisory that reflects this,
22  you know, that voters -- we always advocate that voters
23  be treated the same and as uniformly as possible.
24          And these provisions of law indicate that voters
25  need to be treated as uniformly as possible, voters in

Christina Adkins
July 20, 2022

Page 166

1  director may have, you know?  There was something that
2  we discussed earlier where it was my comments on an
3  article that was published indicating that there was bad
4  information in that article.  And I, you know, urged our
5  communications director to make sure that -- in anything
6  that he's doing that we're making sure that we're
7  communicating it correctly.
8      Q.  What were some of the inaccuracies that you saw
9  in the media about SB1?
10     A.  One of them was that voters had to match what was
11  on their written application, not their voter
12  registration record.  That was a huge problem.  And it
13  caused a lot of fear and confusion among voters that was
14  completely unnecessary.  And then other inaccuracies
15  were about the hierarchy that voters had to put one
16  number over the other and that's just not what the law
17  says.
18     Q.  How are you doing?  You need a break?
19     A.  I'm fine.
20         (Exhibit Number 19 was marked.)
21     Q.  (By Mr. Bieter) I'm going to hand you what I have
22  marked as Exhibit 19.  I'm sorry about the --
23     A.  Stapled in the wrong corner?  Trying to confuse
24  me here.
25     Q.  So Exhibit 19 is a PowerPoint that is titled FAQs

Page 167

1  on Applications for Ballot by Mail, ABBMs.  Do you
2  recognize this?
3      A.  I do.
4      Q.  Did you have a role in drafting it?
5      A.  Probably, yes.
6      Q.  Do you know who this -- whom this was presented
7  to?
8      A.  So I don't know the date that it was presented,
9  but we did a number of webinars targeted towards our
10  county election officials to help them with the
11  implementation of some of the new requirements related
12  to SB1.  We were trying to do them very regularly to
13  address those "of the moment" questions.  So I don't
14  know which one this was in the process.
15         I don't know if the date on here was the date it
16  was printed from our website or the date that it was
17  given, so my guess is it was, you know, obviously at
18  some point post -- in posteffective date of SB1 to try
19  to help our county election officials have a little more
20  clarity on the law.
21     Q.  Were there any elections after SB1 became
22  effective in December 2021 -- and -- did any elections
23  happen before the March 2022 primary?
24     A.  Yes.  Absolutely.  Yeah.
25     Q.  And so -- so did the changes in SB1 effect those

Page 168

1  elections?
2      A.  Probably not, because the language in SB1,
3  there's a provision towards the end that says that SB1
4  was in effect for elections that were ordered after a
5  certain date.  And most of the elections that would've
6  happened, like in late December, like a runoff election
7  from the November election, or what we refer to as like
8  Article 11 Section 11, like, elections that are
9  constitutionally required for cities that have
10 vacancies, those elections were typically ordered prior
11 to the implementation or prior to the effective date of
12 SB1, so they would've been under old law.
13     Q.  If we could just turn to Page 5, Slide 5.  And
14 the question is on the top, If a voter uses an old ABBM
15 form, should I reject the ABBM?  And the short answer is
16 yes.
17     A.  Uh-huh.
18     Q.  What -- what is an old ABBM form?
19     A.  An old ABBM form, what I was probably referring
20 to here, was the form that was effective prior to SB1,
21 prior to adding the requirement for personal
22 identification numbers.  This presentation, I'm pretty
23 confident, it was given with the upcoming primary in
24 mind.
25     Q.  Do you recall what the factors were that came --

Page 169

1  that entered into that response?
2      A.  Because the law required it after that point.
3      Q.  Do you recall earlier we were discussing pre-SB1
4  implementation ABBM forms that changed as to disabled
5  individuals?
6      A.  Uh-huh.
7      Q.  And in that instance, it was -- your team advised
8  that it was permissible for voters who were not using
9  the disabled category to use an old form?
10     A.  That's correct.
11     Q.  But in this instance, they can't use an old form?
12     A.  That's correct.
13     Q.  Do you know why the policy was different?
14     A.  Because the law changed.  I mean, that's all.
15 The law changed.  Like, there's now a new field on the
16 application for Ballot by Mail forms that's required and
17 that applied to all voters.  So the old forms couldn't
18 be used unless that voter proactively, you know, wrote
19 in their personal identification number on an old form.
20        One other thing to note with ABBM forms though
21 too is to remember that they're good for certain voters on
22 an annual basis.  January 1 everybody would've been
23 filling out those new forms anyway.
24     Q.  And I think I know the answer to this, but did
25 your team consult with anyone in providing this specific

Christina Adkins
July 20, 2022

Page 170

1  guidance?
2      A.  No.  The face of the law.
3      Q.  If you could turn to the next Bates page, Page 6?
4  The question is, What if a voter provides only a
5  driver's license number on the ABBM, but the voter
6  registration record does not contain a driver's license
7  number?  And the answer is, The ABBM must be rejected.
8  Do you see that?
9      A.  Uh-huh, I do.
10     Q.  Did your team also develop that guidance?
11     A.  Yes, based on the requirements in the law.
12     Q.  Do you have any concern with how the guidance --
13  this guidance has operated in practice?
14         MRS. HUNKER:  Objection, form, vague.
15     A.  Generally speaking, no.  There were some isolated
16  incidents where counties weren't following this process.
17  And I had concerns about why those counties were not
18  following this process even though we told them what the
19  law said.
20     Q.  (By Mr. Bieter) How did you communicate those
21  concerns?
22     A.  Well, there's one example specifically with
23  Travis county where Travis County had a very high ABBM
24  rejection rate and there was a little bit of a
25  hullabaloo in the media about it.  And I remember

Page 171

1  looking at that and looking at what they were reporting
2  their rejection rate to be and it was very high.  And
3  that number didn't look correct to me.
4          And I actually reached out to both Dana
5  DeBeauvoir and Elections Director Bridgette Escobedo and
6  spoke to her.  I didn't speak to Dana directly, but I
7  did speak to Bridgette about it to try to get some
8  information because her rejection number was way too
9  high.  And in talking to her, I found out that they were
10  doing two things.
11          One, they were applying a hierarchy that they
12  shouldn't have been providing.  And two, if -- they were
13  kind of misapplying this concept.  If somebody put one
14  number on their ABBM form -- if they put the SSN on
15  their ABBM form, but the voter registration record had
16  both the SSN and driver's license number, they were
17  rejecting it.  And that was improper.
18          And what I later found out when I was briefing my
19  staff on it the next day is that our team had answered
20  that question for them twice earlier in the week.  And
21  yet they still were rejecting them anyway even though
22  they spoke to members of my team about it.
23     Q.  So do you review the numbers of rejected ballots
24  for counties?
25     A.  Generally speaking, no.  But there was a lot of

Page 172

1  press about that.  It was hard to miss it.  And I think
2  there was, like, a Twitter fight between our
3  communications director and somebody from Travis County.
4  And so that's part of how -- I was -- the day that it
5  happened I was speaking at a conference, but that's how
6  it got on my radar.
7          I found out that there was some Twitter fight and
8  so I started looking at that, and what they were
9  purporting to be their numbers was vastly too high.  I
10  couldn't figure out any reason why those numbers were so
11  high.  So I reached out to them because I figured that
12  there was a problem somewhere.
13     Q.  Can you say approximately of all the rejected
14  ballots after the March 2022 primary what portion of
15  those were related to improper interpretation by
16  counties?
17     A.  I don't know the answer to that.  Yeah.  I'm
18  sorry.  We don't have -- to my knowledge, we don't that
19  kind of granular data.
20     Q.  But there -- there were more rejections than
21  usual in the March 2022 primary?
22         MRS. HUNKER:  Objection, form.
23     A.  You'd have to ask the county specifically on
24  that.  I know that varies on a county-by-county basis.
25  But I remember seeing reports of that in the news,

Page 173

1  that's -- yes.  I remember counties reporting that their
2  rejection numbers were higher.  Some of them were a lot
3  higher, a lot higher than other counties.  And like I
4  said, with Travis County, that's why I reached out to
5  them proactively because their numbers did not seem
6  accurate at all.  There was no way they could have been
7  right.
8      Q.  (By Mr. Bieter) Does your team have
9  responsibilities to respond to allegations of voter
10  fraud?
11         MRS. HUNKER:  Objection, form.
12     A.  What do you mean by voter fraud?  Kind of a broad
13  term.
14     Q.  (By Mr. Bieter) Well, I'll use the example I used
15  earlier.  If somebody's trying to vote under a deceased
16  person's name.
17     A.  So it would depend on how the information is
18  presented to us and at what point during the process.  I
19  will say generally speaking, anything that constitutes
20  potential criminal conduct or would be -- have some kind
21  of criminal penalty associated with, we're not an
22  enforcement agency so I can't really advise on those
23  areas of law and my team really can't advise on those
24  areas of law because we're not the ones that make
25  decisions on prosecutions.

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,            §
    *Plaintiffs,*                                   §
                                                §
*v.*                                            §        Case No. 5:21-cv-844-XR
                                                §
GREGORY W. ABBOTT, et al.,                      §
    *Defendants.*                                  §

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

LA UNION DEL PUEBLO ENTERO,   )
et. al.,   )
   )
     Plaintiffs,   )
   )  CIVIL ACTION NO.
   )  5:21-CV-00844-XR
v.   )
   )
GREGORY W. ABBOTT, et al.   )
------------------------------------------------------------

ORAL & VIDEO DEPOSITION OF CAROL ALVARADO

October 6, 2022
---------------------------------------------------

     Oral & video deposition of Carol Alvarado, produced

as a witness at the instance of the plaintiffs, and

duly sworn, was taken in the above-styled and numbered

cause on the 6th day of October, 2022, before

Patrick Stephens, Certified Court Reporter, at

209 West 14th Street, Ground Floor Conference Room,

Austin, Texas 78701.



Carol Alvarado

October 06, 2022
Pages 154 to 157

Page 154

1 have either a Social Security number or a driver's license
2 number in their voter-registration file decreased?
3    A   No.
4    Q   Now, when you were giving me some stats regarding
5 Harris County and some of the other rejection rates, were you
6 talking about the -- for applications to vote by mail or were
7 you -- applications or were you talking about the actual
8 ballots?
9    A   The ballots.
10    Q   Okay.  Now, did you look at the numbers for the
11 subsequent elections that occurred in 2022?
12    A   Well, the number I gave you was 20 -- the '22 primary.
13    Q   Okay.
14    A   That was the 12.4 percent statewide.
15    Q   And so that was for the March 1st, 2022, primary; is
16 that correct?
17    A   Right.
18    Q   And you're --
19    A   And -- and versus less than 1 percent in the previous
20 -- well, the 2020 presidential election, November.
21    Q   And you're aware that there have been two other
22 statewide elections since the March primary; correct?
23    A   Yes.
24    Q   There was also the primary runoff on May 24th;
25 correct?

Page 155

1    A   Yeah.  Those are much smaller turnouts, yes.
2    Q   And there was also the May 7th election.
3    A   Even smaller.
4    Q   Did you look to see what the rejection rates were for
5 mail ballots for those two elections?
6    A   No, because I was trying -- attempting to compare
7 apples to apples, so looking at, you know, 2022 primary versus
8 the 2020 presidential, the 2018.  I wouldn't see it being
9 comparing apples to apples with the very small -- I don't even
10 know -- know what the turnout was, but it was a very small
11 turnout in the May election --
12    Q   So you --
13    A   -- and runoffs are small turnouts, too.
14    Q   So you did not look to see if the rejection rate had
15 decreased --
16    A   No.
17    Q   -- during the other elections --
18    A   No.
19    Q   -- is that correct?
20    A   Right.
21    Q   Have you spoken to any of the election officials in
22 Harris County about how they tried to inform voters about the ID
23 requirement?
24    A   No.
25    Q   Have you spoken to them about whether they've gotten

Page 156

1 the feeling that voters are becoming more accustomed to the
2 requirement?
3    A   No.
4    Q   Have you spoken to them about whether there are often
5 higher rejection rates after new requirements get implemented
6 through law?
7    A   No.
8    Q   Did you talk to them about how they implemented
9 Senate Bill 1?
10    A   I don't recall that one.
11    Q   And so where did you get the rejection-rate numbers?
12    A   Oh, from my staff.
13    Q   Okay.  And do you expect similar rejection-rate
14 numbers for the 2020 general?
15    A   I don't know.
16    Q   Sorry.  Let me rephrase that.  Do you expect similar
17 rejection rates to the 2022 general?
18    A   I don't know.
19    Q   Sorry.  I realized I had given the wrong date.
20    A   I knew what you meant.
21    Q   And did you talk to any other counties about the
22 implementation of the voter-ID provision in Senate Bill 1?
23    A   Didn't -- say that again.
24    Q   Did you speak to any other county --
25    A   Oh, no.

Page 157

1    Q   And so is it fair to say that your sole understanding
2 of how the voter-ID provision [sic] effect on voters was the
3 rejection-rate numbers that your staff looked up?
4        MR. GOLANDO:  Objection, form.
5 BY THE WITNESS (resuming):
6    A   State it again, please.
7    Q   Sure.  Is it fair to say that your understanding of
8 how the ID numbers affected voters -- when I say ID numbers, I
9 mean the ID requirement --
10    A   Uh-huh.
11    Q   -- came from the rejection-rate numbers that you
12 received from staff?
13    A   Partially.
14    Q   What other information do you have regarding the
15 implementation of Senate --
16    A   Well, talking -- talking to folks in the community.
17 People -- I mean, this was a pretty high-profile bill.  Talking
18 to people that are involved in campaigns that knew of ballots
19 that had been rejected.
20    Q   And did you speak to anybody that had their own ballot
21 rejected?
22    A   I don't recall.  Yeah, I...
23    Q   And so you don't recall if you spoke to any individual
24 who had their ballot rejected as a result of the voter-ID number
25 requirement; is that correct?



Page 158

1   A   Right, I don't recall.
2   Q   Now, the 19 percent, do you know if that includes the
3   number of individuals who were later able to cure the defect in
4   their ballot?
5   A   I don't know.
6   Q   Now, you had, I believe, discussed on the floor --
7   A   Uh-huh.
8   Q   -- during your filibuster some of your concerns
9   regarding the signature-match requirement; is that right?
10   A   Yes.
11   Q   Okay.  I believe you said that individuals with
12   disabilities, that their signature can change --
13   A   Yes.
14   Q   -- is that correct?
15   A   Yes.
16   Q   And so one of your concerns is that a voter would have
17   their signature rejected because their disability would cause
18   their signature not to be the same election to election; is that
19   correct?
20   A   Right.
21   Q   A voter-ID number does not change; is that correct?
22   A   Right.
23   Q   And so do you think some voters with disabilities
24   would find it easier to include their voter-ID number as a
25   method of identification as opposed to signature match?

Page 159

1   A   I don't know.  I mean, if they are elderly, they may
2   not recall what they used on -- one each one.  I don't know.
3   Q   Let's take a quick look at Senate Bill 1.
4   A   (Complies with request.)
5       THE WITNESS:  We can put these two back over
6   there.
7       MR. GOLANDO:  (Complies with request.)
8       THE WITNESS:  Thank you.
9   BY THE WITNESS (resuming):
10   A   Okay.
11   Q   And we're going to look at Section 5.07, and I will
12   let you know it is Page 38.
13   A   (Complies with request.)
14   Q   And so if you see Subsection F of Section 5.07, which
15   amends Section 86.001 of the election code, it reads:  If the
16   information required under Section 84.002(a-1)(a)[sic] included
17   on the application does not identify the same voter identified
18   on the applicant's application for voter registration under
19   Section 13.002(c)(8), the clerk shall reject the application.
20   Did I read that correctly?
21   A   Yes.
22   Q   And so are you aware that a voter who applies for --
23   let me rephrase that.  Is it your understanding that a voter can
24   use any of the required numbers so long as one of them matches
25   and have their application accepted?

Page 160

1   A   Yes.
2   Q   And you're aware that the standard is that if the
3   number does not match something in the record as opposed to the
4   specific number that was used either on the application or
5   voter-registration form [sic].
6   A   Yes.
7   Q   All right.  We can put that down.  So we talked a
8   little bit about voter-ID requirement.
9   A   Uh-huh.
10   Q   Were there any other provisions within Senate Bill 1
11   that you thought were harmful to voters?
12   A   Well, I -- I just didn't see the -- need for the
13   bill to begin with.  It made it seem like there was -- they were
14   trying to prevent -- they were trying to say that there was
15   fraud when there wasn't.  In fact, the number of charges and
16   prosecutions, if we can look at that, from 20 -- 2004 to 2020,
17   0.0006 percent of votes cast during that time resulted any -- in
18   any type of prosecution; 534 offenses that were made that was --
19   that -- that number out of 94 million votes cast, and of those
20   534 offenses, 154 were actually charged.  So I felt that -- that
21   the bill was a solution in search of a problem.
22   Q   Okay.  And so is it that you believe that the 2020
23   general election was basically smooth and secure, and that's why
24   there was not a need for --
25   A   All along.  I mean, we've -- we've not heard of any

Page 161

1   prosecutions, anything that would demonstrate that elections
2   were -- contained fraud and that we needed this massive bill to
3   address it.
4   Q   So we had talked a little bit earlier about some of
5   the litigation in response to Harris County.
6   A   Uh-huh.
7   Q   Would you agree with me that there was at least a lot
8   of open questions about what the election code allowed in
9   regards to certain voting practices, such as drive-through
10   voting, multiple in-person delivery [sic] ballot locations and
11   24-hour voting?
12   A   To some extent.
13   Q   And so I want to introduce our next exhibit.  I
14   believe this is Exhibit 31.
15       THE WITNESS:  Can you give me a minute?  I need
16   to --
17       MS. HUNKER:  Sure.  Can we go off the record real
18   quickly?
19       THE WITNESS:  Yes.  Okay.  Thank you.
20       VIDEOGRAPHER:  Off record at 3:10.
21       (A recess is taken.)
22       VIDEOGRAPHER:  On the record at 3:16.
23   BY MS. HUNKER (resuming):
24   Q   Senator Alvarado, if you can please turn to
25   Exhibit 31.



Carol Alvarado

October 06, 2022
Pages 166 to 169

Page 166

1   Q   And would you agree with me that the Texas Attorney
2 General has brought charges against -- for illegal voting or
3 election fraud in other counties as well?
4   A   According to this, yes.
5   Q   Are you aware that election -- election-fraud
6 prosecutions are also brought by county district attorneys?
7   A   Yes.
8   Q   Do you know the amount of charges that are brought by
9 these district attorneys each year?
10   A   No.
11   Q   I also want to turn to Page 30 -- sorry -- Exhibit 32.
12   A   (Complies with request.)
13   Q   And you'll see that there's a caption, Lupe v. Texas.
14 Do you see that?
15   A   Yes.
16   Q   And do you see where it says, United States' Responses
17 to Texas' First Set of RFPs-Privilege Log?
18   A   Yes.
19   Q   And I want to look towards the privilege basis that's
20 brought for some of these documents.
21   A   Okay.
22   Q   And do you see where -- the third entry down, it says,
23 Complaint alleging voter fraud via text message.
24   A   Yes.
25   Q   And do you see the next one down says, Voicemail

Page 167

1 complaint alleging voter fraud in Texas?
2   A   Yes.
3   Q   And do you see how there are other entries here that
4 also state that there were complaints received by the United
5 States regarding election fraud in Texas?
6   A   Yes.
7   Q   We can put these two documents aside.  I'm going to
8 introduce Exhibit 33.
9        MS. HUNKER:  (Provides exhibit.)
10        MR. GOLANDO:  Thank you.
11 BY MS. HUNKER (resuming):
12   Q   Do you have the exhibit in front of you?
13   A   Yes.
14   Q   Do you see it says House Journal?
15   A   Yes.
16   Q   And do you see this is from Monday, April 23rd, 2007;
17 is that correct?
18   A   Yes.
19   Q   And so I'm going to turn -- ask you to turn the page
20 to 2224, and I will represent to you that I've only included the
21 portions of this House Journal that were relevant to our
22 deposition for today.  And so do you see where it says
23 Representative Anchia?
24   A   Yes.
25   Q   Do you know who Representative Anchia is?

Page 168

1   A   Yes.
2   Q   And he's a Democrat; correct?
3   A   Yes.
4   Q   And did you work with him when you were in the Texas
5 House?
6   A   Yes.  And just to be clear, I was not in the House
7 during this time, during 2007.
8   Q   And I want to go to the third paragraph, where it
9 starts with, Furthermore.
10   A   Okay.
11   Q   Actually, let's do the whole paragraph.  Let's start
12 with, We know.  It says:  We know that there's no evidence of
13 it, but if this body wants to create an opportunity for voter
14 fraud, then vote for HB218.  In fact, that Section 3 Part A of 2
15 -- HB218 creates a wonderful opportunity for people at a low
16 cost to be able to impersonate someone else by saying that this
17 is a valid employee ID and no poll worker, no election worker,
18 no election judge will be able to discern a ballot from invalid
19 ID.  Did I read that correctly?
20   A   Yes.
21   Q   Furthermore, there's another wonderful loophole in
22 this bill that creates a glaring weakness:  It essentially
23 allows vote by mail to continue without voter identification.
24 Vote by mail, as we know, is the greatest source of fraud --
25 voter fraud in this state.  In fact, all of the prosecutions by

Page 169

1 the attorney general -- I shouldn't say all, but a great
2 majority of the prosecutions by the attorney general occur with
3 request to vote by mail.  Did I read that correctly?
4   A   Yes.
5   Q   Would you agree with me that in this statement on the
6 floor, Representative Anchia said that vote by mail is the
7 greatest source of voter fraud in this state?
8   A   According to what I'm reading, that -- that's what he
9 said.
10   Q   Okay.  And would you agree with me that he is talking
11 about fraud in vote-by-mail context -- sorry.  Let me rephrase
12 that.  Would you agree with me that he is talking about fraud
13 through vote by mail in the context of photo ID?
14        MR. GOLANDO:  Objection, form.
15 BY THE WITNESS (resuming):
16   A   I don't know.
17   Q   Okay.  Would you agree with me that he's comparing
18 vote by mail from in-person voting with respect to photo IDs?
19        MR. GOLANDO:  Same objection.
20 BY THE WITNESS (resuming):
21   A   I don't know.
22   Q   Would you agree with me that he says that the bill
23 would create a wonderful loophole because it allows vote by mail
24 to continue without photo identification?
25   A   I'm not sure.



Carol Alvarado

October 06, 2022
Pages 170 to 173

Page 170

1    Q.   Okay.  Would you agree that he says there's another
2  wonderful loophole in this bill that creates a glaring weakness:
3  It essentially allows vote by mail to continue without photo
4  identification?
5    A.   (Reviewing.)  That's what I'm reading.
6    Q.   And let's go to introduce the next exhibit, which is
7  34.
8         MS. HUNKER:  (Provides exhibit.)
9         MR. GOLANDO:  Thank you.
10 BY MS. HUNKER (resuming):
11   Q.   And you see that this is a letter from Judith
12 Zaffirini, State Senator, District 21?
13   A.   Yes.
14   Q.   And Senator Zaffirini is a Democrat; correct?
15   A.   Yes.
16   Q.   And this letter was sent on December 3rd, 2018; is
17 that correct?
18   A.   Yes.
19   Q.   And it's directed to Senator Hughes, chair of the
20 select committee on election security.
21   A.   Yes.
22   Q.   Okay.  I want to look at page -- Paragraph 1 where it
23 says, This letter, however, let me know when you've arrived.
24   A.   Yes, I have it.
25   Q.   Okay.  It reads:  This letter however is to record my

Page 171

1  concerns regarding the need to, one, provide concrete
2  recommendations to address mail-in ballot fraud.  Did I read
3  that correctly?
4    A.   Yes.
5    Q.   And now let's look at the next paragraph:  During the
6  last several sessions, many legislators have focused on voter-ID
7  laws intended to prevent in-person voter fraud, but not on [sic]
8  increasingly serious problem of mail-in ballot fraud.  Our
9  committee heard troubling testimony regarding the state of
10 election security related to the latter.  Did I read that
11 correctly?
12   A.   Yes.
13   Q.   It continues:  The report's recommendation that the
14 legislature needs to find a solution to the vexing issue of
15 mail-in ballot fraud.  At nursing homes and assisted-living
16 facilities is a good start, but we must take all possible steps
17 to address voting irregularities caused by fraudulent mail-in
18 ballots.  Did I read that correctly?
19   A.   Yes.
20   Q.   And so would you agree that in this letter she states
21 that the legislature needs to provide concrete recommendations
22 to address mail-in ballot fraud?
23   A.   (Reviewing.)
24   Q.   Based on the first paragraph.
25   A.   Well, if the -- that's what it reads here.

Page 172

1    Q.   Would you agree with me that she said that:
2  Legislators are focused on voter-ID laws intended to prevent
3  in-person voter fraud, but not on the increasing serious problem
4  of mail-in ballot fraud.
5    A.   That's what I read.
6    Q.   And you'd agree that she said that she heard troubling
7  testimony regarding the state of election security related to
8  mail-in ballot fraud.
9    A.   That's what it reads here.
10   Q.   The voter-ID number requirement introduces a voting --
11 let me take -- let rephrase that.  The requirement that a voter
12 provide either their Social Security number or driver's license
13 or voter ID on their mail-in ballot adds a voter-ID component to
14 mail-in ballots; is that correct?
15   A.   I suppose so.
16   Q.   Would you agree that it addresses the concern raised
17 by Senator Zaffirini that legislators are focused on voter-ID
18 laws intended to prevent in-person voter fraud, but not on the
19 increasing serious problem of mail-in ballot fraud?
20   A.   I -- I don't know.  I can't say.
21   Q.   We can put that document aside.  So we had discussed
22 earlier about some of your concerns regarding poll watchers;
23 correct?
24   A.   Yes.
25   Q.   And do you have concerns regarding poll watchers with

Page 173

1  respect to Senate Bill 1?
2    A.   Yeah, there are some.  I mean, obviously we've talked
3  quite a bit about the -- training.
4    Q.   Uh-huh.
5    A.   But if I recall, I don't know if there are provisions
6  in there on what exactly a poll watcher can do, if they can
7  speak at any moment or get up and wander around at any moment.
8  I -- I don't recall.
9    Q.   Okay.
10   A.   But I know that -- that was a concern as well of mine.
11   Q.   Okay.  And so we did talk a little bit about training,
12 and so just out of curiosity, have you at any point looked at
13 the training that was provided by the secretary of state for
14 poll watchers?
15   A.   After the bill?
16   Q.   Yes.
17   A.   No, no.
18   Q.   Have you talked to any of the new poll watchers
19 regarding the training and their experience going through the
20 training?
21   A.   No.
22   Q.   And have you talked to any election administrators or
23 county election officials about how the training has worked with
24 respect to poll watchers at their locations?
25   A.   No, not yet.



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# APPENDIX C



# HOUSE JOURNAL

## EIGHTIETH LEGISLATURE, REGULAR SESSION

### PROCEEDINGS

#### SIXTIETH DAY — MONDAY, APRIL 23, 2007

The house met at 10 a.m. and was called to order by the speaker.

The roll of the house was called and a quorum was announced present (Record 590).

Present — Mr. Speaker; Allen; Alonzo; Anchia; Anderson; Aycock; Bailey; Berman; Bohac; Bolton; Bonnen; Branch; Brown, B.; Brown, F.; Burnam; Callegari; Castro; Chavez; Chisum; Christian; Cohen; Coleman; Cook, B.; Cook, R.; Corte; Crabb; Creighton; Crownover; Darby; Davis, J.; Davis, Y.; Delisi; Deshotel; Driver; Dukes; Dunnam; Dutton; Eiland; Eissler; Elkins; England; Escobar; Farabee; Farias; Farrar; Flores; Flynn; Frost; Gallego; Garcia; Gattis; Geren; Giddings; Gonzales; Gonzalez Toureilles; Goolsby; Guillen; Haggerty; Hamilton; Hancock; Hardcastle; Harless; Harper-Brown; Hartnett; Heflin; Hernandez; Herrero; Hilderbran; Hill; Hochberg; Hodge; Homer; Hopson; Howard, C.; Howard, D.; Hughes; Isett; Jackson; Jones; Keffer; King, P.; King, T.; Kolkhorst; Krusee; Kuempel; Latham; Laubenberg; Leibowitz; Lucio; Macias; Madden; Mallory Caraway; Martinez; Martinez Fischer; McCall; McClendon; McReynolds; Menendez; Merritt; Miles; Miller; Morrison; Mowery; Murphy; Naishtat; Noriega; O'Day; Oliveira; Olivo; Orr; Ortiz; Otto; Parker; Patrick; Paxton; Peña; Phillips; Pickett; Pierson; Pitts; Puente; Quintanilla; Raymond; Riddle; Ritter; Rodriguez; Rose; Smith, T.; Smith, W.; Smithee; Solomons; Strama; Straus; Swinford; Talton; Taylor; Thompson; Truitt; Turner; Van Arsdale; Vaught; Veasey; Villarreal; Vo; West; Woolley; Zedler; Zerwas.

Absent, Excused — King, S.; Moreno.

The invocation was offered by Steve Doles, director, Pray Lubbock, as follows:

Our Heavenly Father, your servant, Moses, not only brought law and order to his people, but provided the foundation upon which laws are established today. May each member of the house breathe in a fresh sense of divinely ordained duty and their stamina renewed as they consider legislation regarding the affairs of our state. May their noble work bring forth laws which will protect our freedoms, enhance life for individuals, and insure rule and order in our society.

We thank you that you have created the men and women in this room with passion about their opinions on appropriate governing policy. I pray that you will endow these representatives, whether on the debate floor or in the committee room, with self-control and honorable statesmanship equal to their passion allowing true corporate wisdom to prevail in this 80th Legislature.

Absent — Cook, R.; King, S.; Woolley.

## STATEMENT OF VOTE

When Record No. 617 was taken, my vote failed to register. I would have voted yes.

Woolley

## HB 218 - REMARKS

REPRESENTATIVE ANCHIA: Members, I'm going to be brief, this has been a long day. The debate has gone on for, oh boy, about six hours and this is what we learned. We've learned that the authors of this bill have provided not one shred of evidence of voter impersonation, which is the type of voter fraud this bill gets at. We have learned that upwards of two million Texans may be disenfranchised by this bill. We have learned that the sense of this body is not to prosecute the offenders and not to set up and devote resources to engage a prosecuting voter impersonation.

So, let me tell you what I know it's not about. This is clearly not about voter fraud, it's not about voter impersonation, it's not about expanding the franchise, it's not about protecting those that are least vulnerable in our society, and it's not about making sure that elections are more secure, and I'll tell you why. I've been saving this wonderful nugget for you guys until the end. If you look at the list of documents that you can offer up, it includes employee identification. No matter how much training you do with poll workers, no matter how much training you do of election judges and election officials, it will be impossible for them to discern what is a valid employment identification and what is an invalid employment identification. Mr. Talton probably has an identification for his law firm. It would be impossible for me to tell whether it was valid or invalid or whether Joe Deshotel's face was on it or whether it was correct or not. In fact, you can go down to Kinko's and have a bogus little ID made and say that you're an employee of whatever organization you want to be for about five dollars. In fact, this bill, rather than increasing the integrity of elections, makes sure that there's a huge loophole that you can drive a train through to increase voter fraud that was what was crossing the mind of a particular person.

We know that there's no evidence of it, but if this body wants to create an opportunity for voter fraud then vote for **HB 218**. In fact, that Section 3 part (a) of **HB 218** creates a wonderful opportunity for people at a low cost to be able to impersonate someone else by saying that this is a valid employee ID and no poll worker, no election worker, no election judge will be able to discern a valid from an invalid ID. Furthermore, there's another wonderful loophole in this bill that creates a glaring weakness. It essentially allows vote by mail to continue without photo identification. Vote by mail, that we know, is the greatest source of voter fraud in this state. In fact, all of the prosecutions by the attorney general—I shouldn't say all, but a great majority of the prosecutions by the attorney general occur with respect to vote by mail.

So ladies and gentlemen, you have a pig on your hands. It's an ugly bill. It creates more of an opportunity for voter fraud than current law, and I will tell you that if you vote for this without any commensurate enforcement like what was

offered up in Representative Strama's bill, you are voting for a pig with no lipstick, and it's going to be nasty. So I urge you, members of this body, to please vote against the loopholes that this bill creates and vote against the opportunities of voter fraud that this creates and vote against **HB 218**.

REPRESENTATIVE BURNAM: I particularly want to thank Rafael Anchia for the leadership role he's taken, both on the Elections Committee and today, and I'm only going to add a few words from my hometown daily paper, the *Star-Telegram* today. The opening paragraph, "An insidious scheme to turn back the clock on voting rights in Texas tragically has once again made it's way to the state house floor. The architects of this idea pitched as a noble effort to prevent voter fraud cannot be allowed to succeed with what is surely one of the greatest assaults on the right to vote in this state since the passage of The Federal Voting Rights Act in 1965." Racism is racism, xenophobia is xenophobia. It's too bad that we're going to see it enacted on the house floor again.

### REMARKS ORDERED PRINTED

Representative Thompson moved to print all closing remarks on **HB 218**.

The motion prevailed.

REPRESENTATIVE VEASEY: Mr. Speaker, members, thank you very much. I'll be very brief. I want to start off by thanking some of the folks that have helped bring attention to this voter ID, or what I call a voter suppression bill. First of all, I'd like to thank the Baptist General Convention of Texas. They put out a pamphlet, a flier today asking members to please oppose this bill. I think that's significant because the Civil Rights Movement back when we were going through a lot of these issues that we're facing today—and don't be mistaken about it—this is a Civil Rights issue that we are debating today. But back during the '60s the black ministers and everyone else that marched for freedom, that marched for voting rights, rarely did any of the white pastors from the South join in, and the fact that the Baptist General Convention joined in shows that we are making some progress in this country on racial harmony.

Unfortunately, this bill sets us back. We have heard absolutely no evidence of any voter impersonation today, absolutely none. I think that Representative Strama and Representative Anchia pointed that out very eloquently. All of the amendments and everything that Ms. Brown has offered you today is asking you to vote for this bill based on generalizations, and based on stereotypes, and based on things that are untrue. There has been absolutely not one shred of evidence, and we're voting for this bill today. It makes absolutely no sense, and especially in light of what's going on with the attorney general in the State of Texas. They were trying to force U.S. attorneys to say that there was voting fraud going on in their respective districts in there respective states so they could produce convictions that would prove voter impersonation. The panel, the U.S. panel who looked into this, found none. They had to help doctor some of the findings to make their findings more compelling. And I think that it's time that—instead of 15 or 20 years from now—because, you know, when we look down the road this is going to be embarrassing that we even voted for this. But right now people are

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX D

Transcript of the Testimony of

**Rafael Anchia**

**Date:**

August 22, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

1        IN THE UNITED STATES DISTRICT COURT
                    FOR THE
2            WESTERN DISTRICT OF TEXAS

3  LA UNION DEL PUEBLO          )
   ENTERO, et al,               )
4                               )
      Plaintiff,                )
5                               )    Civil Action No.
   v.                           )    5:21-cv-00844-XR
6                               )
   GREGORY W. ABBOTT, et al,    )
7                               )
      Defendant.                )
8

9

10      ----------------------------------------------
              ORAL AND VIDEOTAPED DEPOSITION OF
11
            REPRESENTATIVE RAFAEL ANCHIA
12
                  AUGUST 22, 2022
13      ----------------------------------------------

14

15        ORAL DEPOSITION OF REPRESENTATIVE RAFAEL ANCHIA,

16  produced as a witness at the instance of the state

17  defendants and duly sworn, was taken in the above-styled

18  and numbered cause on August 22, 2022, from 9:20 a.m. to

19  12:02 p.m. before Brent Sturgess, CSR in and for the

20  State of Texas, reported by machine shorthand at the

21  offices of Civitas Capital Group, 1722 Routh Street,

22  Suite 800, Dallas, Texas, 75201, pursuant to Notice, the

23  Federal Rules of Civil Procedure and the provisions

24  stated on the record or attached hereto.

25

Page 62

1    Q.  Have you ever voted by mail?
2    A.  I don't believe so.
3    Q.  You haven't voted by mail since Senate Bill
4  1 took effect; correct?
5    A.  No.
6    Q.  And you haven't attempted to vote by mail
7  since Senate Bill 1 took effect; correct?
8    A.  No.
9    Q.  Have you witnessed anyone attempting to vote
10  by mail since Senate Bill 1 took effect?
11    A.  No.
12    Q.  Can you identify any voters who were
13  prevented from voting as a result of Senate Bill 1's
14  provisions related to voting by mail?
15    A.  No.
16    Q.  Do you have any personal knowledge of any
17  problems related to voting by mail that you would
18  attribute to Senate Bill 1?
19    A.  No.
20    Q.  You're represented by counsel for purposes
21  of this litigation; right?
22    A.  Say -- say it one more time.
23    Q.  You're represented by counsel for purposes
24  of this litigation --
25        MR. QUESADA:  Well, for this --

Page 63

1    Q.  (By Mr. Thompson)  -- correct?
2        MR. QUESADA:  For this deposition.
3        MR. THOMPSON:  Okay.
4    A.  Yes.
5        MR. THOMPSON:  And I'm not trying to
6  broaden the scope of your representation or anything.
7        MR. QUESADA:  Fine.
8    Q.  (By Mr. Thompson)  So I see that Tex here is
9  a lawyer for you; correct?
10    A.  That is correct.
11    Q.  Do you have any other lawyers related to
12  this matter other than Tex?
13        MR. QUESADA:  I'm going to object to
14  the form of the question.
15    A.  I would answer Sean McCaffity and --
16        MR. THOMPSON:  I just want to know who
17  represents him.
18        MR. QUESADA:  In -- for purposes of
19  this deposition my firm -- the lawyers in my firm do.
20        THE WITNESS:  Yeah.
21        MR. QUESADA:  Including Mr. McCaffity.
22    Q.  (By Mr. Thompson)  Do you remember the name
23  of that law firm?
24    A.  Sommerman, Quesada -- or, no -- So -- I
25  think Quesada comes first.

Page 64

1        MR. QUESADA:  It should, but it comes
2  third.
3        THE WITNESS:  It should, it should.
4    Q.  (By Mr. Thompson)  If you --
5    A.  Sommerman, Quesada, McCaffity...
6    Q.  Sure.
7    A.  In some order.
8    Q.  Do you want to just confirm that --
9        MR. QUESADA:  Well, I think ours has
10  four.  My card's there.  Sommerman, McCaffity --
11        THE WITNESS:  Sommerman, McCaffity,
12  Quesada & Geisler.
13    Q.  (By Mr. Thompson)  Other than lawyers at
14  that law firm, are you represented by any other
15  attorneys related to this matter?
16    A.  Not that I'm aware of.
17    Q.  Have you communicated with anyone other than
18  attorneys at that law firm about testifying in a trial
19  in this matter?
20    A.  No.
21    Q.  Are you aware that some of the plaintiffs in
22  this case identified you as a potential witness at
23  that trial?
24    A.  Yes.
25    Q.  How did you become aware of that?

Page 65

1    A.  My counsel.
2        MR. QUESADA:  Yeah.  Don't answer if
3  it -- if it involves attorney-client.
4        THE WITNESS:  Okay.
5        MR. QUESADA:  Just tell him it involves
6  attorney-client.
7        THE WITNESS:  It involves
8  attorney-client.
9    Q.  (By Mr. Thompson)  Other than conversations
10  with counsel, you don't have any knowledge about being
11  listed as a witness; is that fair?
12    A.  That's fair.
13    Q.  Do you have any plans to testify at the
14  trial in this matter?
15    A.  Not at the present time.
16        (Exhibit Number 12 marked.)
17    Q.  (By Mr. Thompson)  I'll hand you Exhibit 12.
18    A.  Thank you.
19        MR. QUESADA:  Thank you.
20    Q.  (By Mr. Thompson)  Representative Anchia,
21  does the front of Exhibit 12 say "House Journal,
22  Eighty-Second Legislature, Regular Session"?
23    A.  It does.
24    Q.  Is it dated Monday, March 21, 2011?
25    A.  It is.

Rafael Anchia

Page 66

1    Q.   Does this appear to be a copy of the House
2  Journal published by the Texas Legislature?
3    A.   It does.
4    Q.   Can you flip to Page 914?
5         The page numbers are on the top-left
6  and right-hand corners, sort of booklet style.
7    A.   I'm on Page 914.
8    Q.   According to this excerpt from the House
9  Journal, about the middle of the page you are quoted
10  as saying "Yet this bill doesn't deal with the type of
11  voter fraud that we've seen most prevalently in the
12  state of Texas, which is mail-in ballots."
13         Do you see that?
14    A.   Yes.
15    Q.   Is that an accurate reporting of what you
16  said?
17    A.   Yes.  Those are the words I said in the
18  journal, as reflected in the journal.
19    Q.   This was in the context of a debate about a
20  voter ID bill; correct?
21    A.   Yes.  A strict photo ID bill, correct.
22    Q.   And you were opposing that bill; correct?
23    A.   That's correct.
24    Q.   That bill dealt with a voter showing photo
25  identification in order to vote in person; correct?

Page 67

1    A.   Correct.
2    Q.   And I believe some supporters of the bill
3  said that the bill would be helpful for combating or
4  preventing in-person voter-impersonation fraud --
5    A.   Right.
6    Q.   -- is that right?
7    A.   Correct.
8    Q.   And you explained to your colleagues that
9  that type of voter-impersonation fraud was less common
10  than fraud related to voting by mail; correct?
11    A.   Virtually nonexistent.
12         MR. THOMPSON:  Do you want to --
13         MR. QUESADA:  I'm sorry, go ahead.  It
14  says whatever it says.  I'm going to object to the
15  form of the question.  I don't think that's -- I don't
16  think that's what Chairman Anchia said on the record.
17    Q.   (By Mr. Thompson)  Now, at the bottom of
18  this Page 914 --
19    A.   Yes.
20    Q.   -- you're quoted saying, "If you have opened
21  the door to the integrity of elections, then I think
22  it's fair game to discuss that type of fraud, which we
23  actually do see in the state of Texas."
24         Do you see that?
25    A.   Yes.

Page 68

1    Q.   And you were referring to mail-in ballot
2  fraud; correct?
3    A.   Yes.
4    Q.   Can you flip to Page 915?
5         The second set of remarks from you on
6  this page says, "I actually chair the select committee
7  on that, and I've had in the past mail-in ballot
8  bills.
9         Do you see that?
10    A.   Yes.
11    Q.   Do you recall what bills you were referring
12  to in those remarks?
13    A.   I don't.
14    Q.   Based on what you remember today, have you
15  offered bills in the past related to mail-in ballots?
16    A.   I think I was a joint author on mail-in
17  ballot bills in the past.
18    Q.   Would this have been a bill authored by
19  Representative Oliverson...
20    A.   I don't recall.
21    Q.   ...where he would have --
22    A.   I don't recall.
23    Q.   To the best of your recollection, what was
24  the purpose of the bills related to mail-in ballots
25  that you were offering?

Page 69

1    A.   I don't recall.
2    Q.   Let me go to the next comment from you on
3  that page.  It's the third one, "Here's the quandary
4  for this body.  If you say passing this bill is going
5  to restore integrity of elections, you do nothing in
6  this bill to deal with mail-in ballots and 70 percent
7  of all the prosecutions by the Attorney General have
8  been mail-in ballots, then you're really not restoring
9  integrity of elections because people, like they have
10  for the last six years, will be reading about mail-in
11  ballot fraud, mail-in ballot fraud, mail-in ballot
12  fraud."
13         Do you see that?
14    A.   I do.
15    Q.   Do you generally conduct research to support
16  the factual statements that you make on the floor of
17  the House of Representatives?
18    A.   Yes.
19    Q.   Do you think you've researched the
20  prosecutions brought by the Attorney General related
21  to voter fraud?
22    A.   Yes.
23    Q.   And your research showed that 70 percent of
24  the Attorney General's prosecutions related to voter
25  fraud were about mail-in ballots?

Rafael Anchia

Page 70

1    A.   At the time.
2    Q.   Do you know whether those numbers are
3  similar or different now?
4    A.   I don't, I don't.  I recall that they were
5  low -- very low at the time.  So 70 percent of a low
6  number.  I don't recall that exact number.  But my
7  whole point in -- just for further context because,
8  you know, folks have tried to take this language out
9  of context on the House floor.  So I figured I'd offer
10  an explanation, some context here.
11         Number one is an acknowledgment that
12  voter fraud in the state of Texas is a very s -- a
13  very small number.  It's like a rou -- I think I
14  described it at one point as a rounding error of a
15  rounding error.  You're more -- you're more likely to
16  get struck by lightning.  To the extent it exists, it
17  is not in -- it was not found in voter impersonation,
18  which undercut the -- the pretext that was being given
19  by the legislature at that time about the need to have
20  strict -- a strict photo ID standard in the state, and
21  ultimately we won this in court.
22         But it undercut their argument to
23  suggest that in-person voter impersonation was about
24  the integrity of election when at the time they were
25  not doing anything about mail-in ballot fraud, which

Page 71

1  was the one place where we did see some, not much, but
2  some.
3         And of the cases that the Attorney
4  General had prosecuted, they had all been in that
5  area.  So it seemed to suggest that their pretext for
6  bringing that photo identification bill was -- was not
7  sincere, and that's what I was pointing out here.
8    Q.   I certainly don't mind you offering context.
9         MR. THOMPSON:  I will, nonetheless,
10  have to object as nonresponsive.
11    A.   Okay.
12    Q.   (By Mr. Thompson)  It's nothing personal, of
13  course.
14    A.   No, of course.  None -- no personal...
15    Q.   Okay.
16    A.   Nothing -- nothing personal taken, Will.
17         (Exhibit Number 13 marked.)
18    Q.   (By Mr. Thompson)  Good.  I'm going to hand
19  you what's been marked as Exhibit 13.
20         Exhibit 13 is an excerpt from the House
21  Journal of the Eightieth Legislature, Regular Session;
22  correct?
23    A.   Yes.
24    Q.   And it's dated Monday, April 23, 2007;
25  correct?

Page 72

1    A.   Yes.
2    Q.   If you could flip to Page 2224, please.
3    A.   I am with you.
4    Q.   That Page 2224 contains remarks from you
5  about House Bill 218; correct?
6    A.   Yes.
7    Q.   Take a look down at the third paragraph of
8  your remarks, and then halfway through that paragraph
9  there's a sentence that begins "Furthermore..."
10         Do you see that?
11    A.   Yes.
12    Q.   I'm going to read that and ask you to
13  confirm that I read it correctly.
14    A.   Yes.
15    Q.   "Furthermore, there's another wonderful
16  loophole in this bill that creates a glaring weakness
17  that essentially allows vote by mail to continue
18  without photo identification.  Vote by mail, that we
19  know, is the greatest source of voter fraud in this
20  state.  In fact, all of the prosecutions by the
21  Attorney General -- I shouldn't say all, but a great
22  majority of the prosecutions by the Attorney General
23  occur with respect to vote by mail."
24         Do you see that?
25    A.   Correct.

Page 73

1    Q.   And this is an accurate transcription of
2  what you said in those remarks; correct?
3    A.   Correct.
4         (Exhibit Number 14 marked.)
5    Q.   (By Mr. Thompson)  I'd like to show you a
6  new exhibit.  This is marked Exhibit 14.
7    A.   Thank you.
8         MR. QUESADA:  Thank you, guy.
9    Q.   (By Mr. Thompson)  Representative Anchia, is
10  Exhibit 14 -- I'm sorry.  Before we get going, I just
11  want to make sure.  There's a printer error on my
12  copy, and it's a little bit hard to read.
13         Does your copy look clear?
14    A.   It does.
15    Q.   Okay, perfect.  Then I'll just use a
16  different copy.
17         Exhibit 14 is an excerpt from the House
18  Journal of the Eighty-Seventh Legislature, Second
19  Called Session; correct?
20    A.   Yes.
21    Q.   And it's dated Tuesday, August 31, 2021;
22  correct?
23    A.   Yes.
24    Q.   Okay.  If you flip to Pa -- the next page is
25  Page 316 in the top left-hand corner.

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900    San Antonio, Texas 78232
210-697-3400                                                   210-697-3408

Rafael Anchia

Page 82

1  an honest man?
2      A.  I don't know.
3          MR. QUESADA:  He said he was a Cubs
4  fan.
5          (Exhibit Number 15 marked.)
6      Q.  (By Mr. Thompson)  I'm going to hand to you
7  what's been marked as Exhibit 15.
8      A.  Yeah.
9          MR. QUESADA:  Thank you.
10     Q.  (By Mr. Thompson)  Is Exhibit 15 an article
11 from the Dallas Morning News entitled "Texas needs
12 tougher laws to reel in mail-in vote fraud"?
13     A.  Yes.
14     Q.  Is it written by Gromer Jeffers, Jr.?
15     A.  Yes.
16     Q.  Is it dated April 26th, 2017?
17     A.  Yes.
18     Q.  Do you see in the first paragraph of
19 Mr. Jeffers it says "Let's face it.  Mail-in ballot
20 voting, a necessary and noble process, is vulnerable
21 to fraud"?
22     A.  Yes.
23     Q.  Do you see in the second paragraph he says
24 "Residents --," referring to residents of West
25 Dallas, "-- there have complained about receiving

Page 83

1  absentee ballots they didn't request, raising the
2  possibility that someone is casting votes for them."
3          Do you see that?
4      A.  Yes.
5      Q.  Do you have any knowledge one way or the
6  other about whether residents were receiving absentee
7  ballots they didn't request?
8      A.  I'm unaware.
9      Q.  Do you know one way or the other whether
10 someone was casting votes for them?
11     A.  I'm unaware.
12     Q.  If you could flip to Page 2, please.  Up at
13 the top says -- it has a quote from Mayor Mike
14 Rawlings.
15          Do you see that?
16     A.  Yes.
17     Q.  Excuse me.  The quote is also jointly
18 authored by Representative Eric Johnson; correct?
19     A.  Yes.
20     Q.  And they said, "We ask that you devote
21 additional resources to verify the integrity of each
22 mail-in ballot in Texas."
23          Do you see that?
24     A.  Yes.
25     Q.  And they wrote that in a letter to the

Page 84

1  Dallas County Elections Department; correct?
2      A.  Yes.
3      Q.  Were you involved at all in the Dallas
4  County Elections Department's response to that letter?
5      A.  Not that I recall.
6      Q.  Do you recall communicating with Mayor
7  Rawlings, Representative Johnson or anyone from the
8  Dallas County government about this issue at the time?
9      A.  Not that I recall.
10     Q.  If you'll look in Paragraph 3, Mr. Jeffers
11 says, "Voter fraud, even with mail-in ballots, does
12 not occur on a large scale.  But in low-turnout
13 elections, stealing just a few votes can be the
14 difference between winning and losing."
15          Do you see that?
16     A.  I do.
17     Q.  Are you aware of the fact that some elected
18 officials in Texas are elected by just a few votes in
19 a very close race?
20     A.  Yes.
21     Q.  You've had colleagues in the House of
22 Representatives who won by just a handful of votes;
23 right?
24     A.  Yes.
25     Q.  And so even a very small amount of mail-in

Page 85

1  ballot fraud in those elections could alter the
2  outcome; correct?
3      A.  Certainly, or a small amount of voters being
4  turned away at the polls.
5      Q.  Who is Representative Steve Wolens?
6      A.  Steve Wolens is a lawyer, a former state
7  representative and my predecessor in office.  I
8  call -- I would consider him a friend.
9      Q.  He was a knowledgeable public servant?
10     A.  Quite.
11     Q.  He's quoted in the fourth paragraph on Page
12 2 as saying "'You have to have a conversation in order
13 to prevent coercion and fraud,' said former Rep --
14 former State Rep. Steve Wolens, who in 2003 sponsored
15 legislation to overhaul the state's mail-in ballot
16 system, 'Then you tailor-make a new law that deals
17 with abuse and opens up voting.'"
18          Do you see that?
19     A.  I do.
20     Q.  If you look at the seventh paragraph on Page
21 2, it uses a Spanish term "politiqueros".
22          Do you see that?
23     A.  Yes.
24     Q.  Are you familiar with that term?
25     A.  Vaguely.

Rafael Anchia                                        August 22, 2022
                                                    Pages 86 to 89

Page 86

1    Q.  What is your understanding of the term
2    "politiqueros"?
3    A.  People who are involved in political
4    campaigns.
5    Q.  Here Mr. Jeffers says "The law also devised
6    ways to track mail-in vote operatives, called
7    "politiqueros," in Hispanic neighborhoods where
8    absentee campaigns are aggressive."
9        Do you see that?
10   A.  I do.
11   Q.  Are you familiar with allegations that
12   people identified as "politiqueros" have
13   inappropriately stolen people's votes?
14   A.  No.
15   Q.  You don't know one way or the other?
16   A.  No.  I'm unaware of any allegations.
17   Q.  Do you know whether any of your colleagues
18   in the Texas Legislature read this piece by
19   Mr. Jeffers in the Dallas Morning News?
20   A.  I don't.
21   Q.  Do you recall Representative Lozano
22   referring to it on the floor when the legislature was
23   debating SB 1?
24   A.  To this specific piece?  Is that the
25   question?

Page 87

1    Q.  Yeah.
2    A.  No.
3    Q.  Do you recall your colleagues more generally
4    talking about newspaper articles on the topic of
5    mail-in ballot fraud?
6    A.  I don't.
7        (Exhibit Number 16 marked.)
8    Q.  (By Mr. Thompson)  I'm going to hand you
9    what's been marked as Exhibit 16.
10   A.  Thank you.
11       MR. QUESADA:  Thank you, sir.
12   Q.  (By Mr. Thompson)  Does Exhibit 16 appear to
13   be an article from the Dallas Observer entitled "City,
14   County Investigate Possible Voter Fraud In Upcoming
15   Council Election"?
16   A.  Yes.
17   Q.  Is it authored by Stephen Young?
18   A.  Yes.
19   Q.  Is it dated April 24, 2017?
20   A.  Yes.
21   Q.  And in the bottom right-hand corner on Page
22   1, do you see a Bates stamp MS007397?
23   A.  Yes.
24   Q.  And I'll just represent to you that there's
25   some highlighting in this document.  My understanding

Page 88

1    is that this highlighting came from the party that
2    produced the document and that the highlighting
3    probably was not in the original publication.
4        Are you able to read the document okay
5    despite the highlighting?
6    A.  Correct.
7    Q.  Okay.  Do you read the Dallas Observer?
8    A.  On occasion.
9    Q.  Do you know whether any of your colleagues
10   in the legislature read the Dallas Observer?
11   A.  I don't.
12   Q.  If you could turn to the second page of this
13   exhibit, which is Bates stamped MS007398, in the
14   second full paragraph it says "Earlier this month
15   several senior citizens in West Dallas and Oak Cliff
16   complained to WFAA-TV that they'd received mail-in
17   ballots without having asked for one."
18       Do you see that?
19   A.  I do.
20   Q.  You represent part of West Dallas; correct?
21   A.  Correct.
22   Q.  Do you represent Oak Cliff?
23   A.  I do.
24   Q.  Did your office receive any complaints on
25   this topic?

Page 89

1    A.  Not that I'm aware.
2    Q.  Do you have any reason to doubt that senior
3    citizens from West Dallas and Oak Cliff complained to
4    the local TV station that they had received mail-in
5    ballots without having asked for one?
6    A.  No.
7    Q.  Would you agree that receiving a mail-in
8    ballot that you did not request would reasonably cause
9    one to wonder whether some sort of irregularity was
10   occurring?
11   A.  Error or irregularity.  Certainly error.
12   Q.  In Texas you're not supposed to receive a
13   mail-in ballot without having asked for one; right?
14   A.  That's right.
15   Q.  So when senior citizens receive a mail-in
16   ballot without having asked for one, they know
17   something's gone wrong; correct?
18   A.  Yes.
19       MR. THOMPSON:  Do you need to take a
20   break or anything?
21       MR. QUESADA:  Nope.
22   Q.  (By Mr. Thompson)  If you look toward the
23   bottom of this page, the second-to-the-last paragraph,
24   second sentence, it says "As the Dallas Observer has
25   documented for well over a decade, Dallas' council

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX E

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
 2                 SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO        *
     ENTERO, et al.            *
 4                             *
                               *
 5   VS.                       *   Civil Action No.
                               *   5:51-cv-00844-XR
 6                             *
     GREGORY W. ABBOTT, et al.  *
 7

 8   *********************************************************

 9            ORAL AND VIDEOTAPED DEPOSITION OF
                    ROBERTO BENAVIDES
10                   MARCH 30, 2023
                  (Reported Remotely)
11
     *********************************************************
12

13            ORAL AND VIDEOTAPED DEPOSITION of ROBERTO
     BENAVIDES, produced as a witness at the instance of the
14   Defendants, and duly sworn, was taken remotely in the
     above-styled and numbered cause on the 30th day of
15   March, 2023, between the hours of 9:03 a.m. and
     11:06 a.m., before TRICIA FOX WILLIAMS, CSR, in and for
16   the State of Texas, reported by machine shorthand, with
     the witness located in Austin, Texas, in accordance with
17   the Federal Rules of Civil Procedure and the provisions
     stated on the record or attached hereto.
18

19

20

21

22

23

24

25
```



Roberto Benavides                                          March 30, 2023
                                                           Pages 26 to 29

Page 26

1  it again.
2      Q.  Okay.  And is that true today, that you don't
3  know?
4      A.  I do know now.
5      Q.  Okay.  Well, we'll get to that a little bit
6  later.
7      A.  Yes.
8      Q.  So once you received a second mail in ballot,
9  what did you do?
10     A.  Filled it out exactly the same, the same voter
11 ID number, license driver's number, the same one that I
12 had because it's the one that's on my license, and the
13 last four numbers of my social security card.
14     Q.  Okay.  And did you check to make sure that you
15 had both your social security number and your driver's
16 license number written down exactly correctly?
17     A.  I checked extra carefully this time.
18     Q.  And once you completed your second mail in
19 ballot and the envelope, what did you do?
20     A.  Mailed it back as soon as I could.
21     Q.  Okay.  And when did you next hear anything
22 about your ballot after mailing in the second one?
23     A.  That was it, I thought it was all done.
24     Q.  Okay.  And so did there come a time when you
25 concluded or learned that your ballot had not been

Page 27

1  counted or cast?
2      A.  Yes, when Dana called me at home and she said
3  that there had been a problem with the ballot.
4      Q.  Approximately when was that?
5      A.  Two months ago.  Maybe two months ago, three, I
6  don't know.
7      Q.  And what other conversation did you have with
8  Dana at that time?
9      A.  I just told her I was not aware that there had
10 been problems.  I knew that I had voted twice, but I
11 didn't know that, you know, there was other problems.
12     Q.  Okay.  All right.  You mentioned that you
13 learned something about whether the initial rejection
14 was because of an error in your writing down one of your
15 numbers, or an error in the state database that
16 contained those numbers; is that correct?
17     A.  That's correct.
18     Q.  When did you learn of that problem?
19     A.  About three or four days ago.
20     Q.  Okay.  And what did you learn at that time?
21     A.  I called the voter's office, and the lady said
22 that their records show that my driver's license number
23 ends in a five, and my actual driver's license number
24 ends in a four.
25     Q.  Did you have any conversation with the election

Page 28

1  officials at any time relating to the numbers that you'd
2  provided for your social security number?
3      A.  No, not the social security.  She said
4  everything -- the social security number was okay, the
5  voter ID number was okay, my address is okay, it's just
6  a problem with the driver's license number, that was the
7  only problem.
8      Q.  Okay.  Do you know the name of the person that
9  you spoke to on that occasion?
10     A.  No, I don't.
11     Q.  How did you and that person get in touch with
12 each other?
13     A.  I was told to call voter -- the Travis County
14 voter office, or whatever they call it.
15     Q.  Who told you to do that?
16         MS. WARMS:  Objection, privileged.
17     Q.  (By Mr. Bryant)  Did one of your attorneys tell
18 you to do that?
19     A.  Yes.  Excuse me.  Because I wanted to find out
20 why it was rejected.
21         MR. DOLLING:  Mr. Benavides, we're going
22 to instruct you not to disclose the content of any of
23 the conversations that we have had with you.
24         THE WITNESS:  All right.
25         THE REPORTER:  Who's speaking?

Page 29

1          MR. DOLLING:  This is Zach Dolling for the
2  OCA plaintiffs and for the witness.
3      Q.  (By Mr. Bryant)  Have you ever heard of
4  something called ballot tracker?
5      A.  No.
6      Q.  Do you -- so is it fair to say that you have no
7  information about ballot tracker even as we sit here
8  today?
9      A.  No, I don't.
10     Q.  Do you have any information about any method by
11 which you could have checked on the status of your
12 ballot in the November 2022 general election?
13     A.  No.
14     Q.  Have you ever gone online to a website called
15 votetexas.org or Vote Texas?
16     A.  I might have, but -- you know.  Yes, I did, I
17 guess.  Yeah.
18     Q.  You did.  Approximately when did you do that?
19     A.  Probably, I don't know, before the election
20 maybe.
21     Q.  When you say before the election, are you
22 referring to before the November 2022 election?
23     A.  Right.
24     Q.  Do you have any recollection as to how many
25 times you went online to that website, Vote Texas?



Roberto Benavides

March 30, 2023
Pages 42 to 45

Page 42

1 whether any have occurred. I'm not getting into the
2 content of them. So you can answer that question.
3    A.   Yes.
4    Q.   And how many occasions?
5    A.   Once.
6    Q.   And was that in preparation for this
7 deposition, or on a different occasion?
8    A.   Preparation.
9    Q.   So this is the conversation that you mentioned
10 earlier that has occurred in the last two days?
11    A.   Yes.
12    Q.   Was that the first time that you met Dana, or
13 was she on the phone or otherwise not present?
14    A.   I had talked to her on the phone before, Dana.
15    Q.   And you met her in person for the first time?
16    A.   Yes.
17    Q.   When?
18    A.   The same day, two or three days ago.
19    Q.   Okay. And was Dana present throughout that
20 deposition preparation meeting?
21    A.   Yes.
22    Q.   Did you ever consider voting in person in the
23 November 2022 general election, either early voting or
24 on election day itself?
25    A.   No, I did not.

Page 43

1    Q.   Is there any reason why that would not have
2 been possible?
3    A.   Taking care of my wife, I guess. I didn't want
4 to leave her alone for too long of a time.
5    Q.   Well, is it correct that your wife passed away
6 several weeks before the election day?
7    A.   Correct.
8       MR. MIRZA: Objection, form.
9    A.   I had already voted by mail.
10    Q.   (By Mr. Bryant) Is there any reason why you
11 could not have either voted in person on election day or
12 voted in person in early voting sometime after your
13 wife's passing?
14       MR. MIRZA: Objection, form.
15       MS. WARMS: Objection, form.
16    A.   I had already voted by mail, so I didn't even
17 think about it.
18    Q.   (By Mr. Bryant) Had you thought about it, is
19 there anything that would have prevented you? Had you
20 known that your -- that there was some issue with your
21 ballot being counted, referring to your second mail in
22 ballot, is there any reason why you could not have cast
23 your ballot in person on election day, or in the week or
24 two prior thereto during the early voting period?
25       MS. WARMS: Objection, form. You can

Page 44

1 answer.
2    A.   I didn't think about it because I had voted by
3 mail the last three times, so I figured I'll just do it.
4    Q.   (By Mr. Bryant) Okay. My question was -- I
5 understand your thought process, why you didn't think it
6 was necessary, but my question is if you had known that
7 there was an issue with your mail in ballot, is there
8 any reason why you couldn't have cast a ballot in person
9 on election day or in the early voting period after your
10 wife passed?
11       MS. WARMS: Objection, form. You can
12 answer.
13    A.   I didn't think about it, I guess because I was
14 busy taking care of my wife and I didn't want to leave
15 her. So that was the main thought in my head. So
16 you're saying when I -- I should have just went and
17 voted in person?
18    Q.   (By Mr. Bryant) My question is whether -- had
19 you known that you -- that your mail in ballot had not
20 been --
21    A.   I didn't know.
22    Q.   -- counted -- I understand that, but if you had
23 known, is there any reason why you couldn't have voted
24 in person on November 8th, 2022, election day?
25    A.   Because I didn't want to leave my wife alone.

Page 45

1    Q.   Your wife had passed already at that point,
2 right?
3       MS. WARMS: Okay.
4    A.   Yeah, but I had already voted by mail.
5       MS. WARMS: Objection, cumulative.
6       MR. BRYANT: I'm trying to get an answer
7 to my actual question.
8       MS. WARMS: He's answered your question.
9    Q.   (By Mr. Bryant) Was there any physical
10 obstacle to your voting in person after your wife passed
11 in mid October 2022?
12    A.   I had already voted, so I didn't even consider
13 that.
14       MS. WARMS: Objection, form.
15       MR. BRYANT: Objection, nonresponsive.
16    Q.   (By Mr. Bryant) During the period in September
17 and October of 2022 prior to your wife's passing, did --
18 were there times when your son looked after your wife
19 and you took care of other necessary tasks?
20    A.   Very shortly, just for a very small amount of
21 time.
22    Q.   And --
23    A.   Because she wanted me there. There's things
24 that I can do that he couldn't do.
25    Q.   And did -- during that period, how did you take



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX F

Transcript of the Testimony of

# John Bucy III

## Date:

August 09, 2022

## Case:

LA UNION DEL PUEBLO ENTERO V. GREGORY W. ABBOTT

```
                     IN THE UNITED STATES DISTRICT COURT
                     FOR THE WESTERN DISTRICT OF TEXAS
                             SAN ANTONIO DIVISION


LA UNION DEL PUEBLO ENTERO,      )
et al.,                          )
                                 )
          Plaintiffs,            )
                                 )
V.                               ) Case No. 5:21-cv-844-XR
                                 )
GREGORY W. ABBOTT, et al.,       )
                                 )
          Defendants.            )
          -------------------------------------------------------
OCA-GREATER HOUSTON, et al.,     )
                                 )
          Plaintiffs,            )
                                 )
V.                               ) Case No. 1:21-cv-780-XR
                                 )
JOHN SCOTT, et al.,              )
                                 )
          Defendants.            )
          -------------------------------------------------------
HOUSTON JUSTICE, et al.,         )
                                 )
          Plaintiffs,            )
                                 )
V.                               ) Case No. 5:21-cv-848-XR
                                 )
GREGORY WAYNE ABBOTT, et al.,    )
                                 )
          Defendants.            )
          -------------------------------------------------------
```

John Bucy III

August 09, 2022
Pages 2 to 5

Page 2

LULAC TEXAS, et al.,                )
                                    )
          Plaintiffs,               )
                                    )
V.                                  ) Case No. 1:21-cv-0786-XR
                                    )
JOHN SCOTT, et al.,                 )
                                    )
          Defendants.               )
------------------------------------
MI FAMILIA VOTA, et al.,            )
                                    )
          Plaintiffs,               )
                                    )
V.                                  ) Case No. 5:21-cv-0920-XR
                                    )
GREG ABBOTT, et al.,                )
                                    )
          Defendants.               )
------------------------------------
UNITED STATES OF AMERICA,           )
                                    )
          Plaintiffs,               )
                                    )
V.                                  ) Case No. 5:21-cv-1085-XR
                                    )
THE STATE OF TEXAS, ET AL.,         )
                                    )
          Defendants.               )
------------------------------------

Page 4

A P P E A R A N C E S
ON BEHALF OF THE DEFENDANTS:
    PATRICK K. SWEETEN, ESQ.
    KATHLEEN HUNKER, ESQ.
    Office of the Attorney General
    P.O. Box 12548
    Austin, Texas 78711
    Telephone: (512) 463-4139
    patrick.sweeten@oag.texas.gov
    kathleen.hunker@oag.texas.gov
ON BEHALF OF THE WITNESS:
    SCOTT BRAZIL, ESQ.
    Brazil & Dunn, LLP
    13231 Champion Forest, Dr.
    Suite 406
    Houston, Texas 77069
    Telephone: (281) 580-6310
    scott@brazilanddunn.com
VIDEOGRAPHER:
    Manuel Martin
    Mamartin73@gmail.com
ALSO PRESENT VIA ZOOM:
    Elijah Watkins, Stoel Rives, LLP, Mi Familia Vota
    Leigh Ann Tognetti, Hidalgo County DA's Office
    Michael Stewart, Department of Justice
    Lauren Smith, Department of Justice
    Nicholas Adkins, Fried Frank
    Sameer Birring, Harris County Elections Admin.
    Rachel Miller, Jones Day
    Abigail Schultz, TX Office of Attorney General
    Georgina Yeomans, NAACP LDF, HAUL Plaintiffs
    Will Wilder, Brennan Center, LUPE Plaintiffs

Page 3

ORAL & VIDEO DEPOSITION OF JOHN BUCY III

August 9, 2022

-----------------------------------------------------

Oral deposition of JOHN BUCY III, produced as a witness at

the instance of the defendants, and duly sworn, was taken

in the above-styled and numbered cause on the 9th day of

August, 2022, before Patrick Stephens, Certified

Court Reporter, at 1717 N Interstate Hwy 35, Suite 305,

Round Rock, Texas 78664.

Page 5

1                I N D E X
2  APPEARANCES ............................... 04
3  JOHN BUCY III
4        Cross-Examination by Mr. Sweeten ............... 08
5
6
7
8
9
10
11
12
13
14  Reporter's Certificate .................... 169
15
16
17
18
19
20
21
22
23
24
25

John Bucy III

August 09, 2022
Pages 154 to 157

Page 154

1    A    And -- and I remember speaking to this provision some
2 during these ongoing hearings.
3    Q    And you agree that B says:  A watcher may not be
4 present at the voting station when a voter is preparing the
5 voter's ballot or is being assisted by a person of the voter's
6 choice; correct?
7    A    Correct.
8    Q    And that -- that existed, again, since 1997 at least;
9 right?
10    A    Yep.
11    Q    And you would agree with me that that provides
12 protections about what the poll watcher may or may not do;
13 right?
14    A    Yes.
15    Q    And then if we look at 33.05(a), it says:  While on
16 duty, a watcher may not converse with an election officer
17 regarding the election except to call attention to an
18 irregularity or violation of the law; right?
19    A    Yes.
20    Q    You would agree that it says:  You may also converse
21 -- you may not converse with a voter and may not communicate in
22 any manner with a voter regarding the election.  That's what
23 the existing provision says; right?
24    A    Yes.
25    Q    And that's been in existence, if we look below, at

Page 155

1 least since 1986; correct?
2    A    Yes.
3    Q    SB1 neither changed that provision or the preceding
4 provision, did it?
5    A    Correct, and I think it even references this.
6    Q    Okay.  And, in fact, SB1 provides that a poll watcher
7 can be ejected for breach of the peace or for a violation of
8 law, can't they?
9    A    I think that's some areas we really fought for, yeah.
10    Q    And that's in SB1; right?
11    A    Correct.
12    Q    Okay.  Now, you would agree with me that the
13 implementation -- had -- let me ask it this way:  The quorum
14 break lasted for about six weeks; correct?
15    A    That sounds right.
16    Q    Okay.  And that was -- and -- and ultimately SB1
17 passed sometime in August of 2021; right?
18    A    Yes.
19    Q    Okay.  Have you had -- heard any concerns about the
20 amount of time to implement SB1?
21    A    Not that I can think of at the moment.
22    Q    Okay.  Have you heard any complaints from election
23 workers about how much time it took to implement -- or not
24 being given enough time to implement SB1?
25    A    I haven't, but I don't -- we haven't had those

Page 156

1 interim hearings yet, where I'm sure, if those are out there,
2 we'll hear them.
3    Q    Okay.  Has -- has any election official reached out
4 to you to discuss issues related to the implemission (ph) --
5 implementation of SB1?
6    A    I've -- I've heard some concerns about who can send
7 out ballot by mails and what can be posted on our website and
8 that kind of thing.
9    Q    From whom?
10    A    Just generically reading press articles,
11 conversations around, you know, what organizations have that
12 authority now, what's been restricted.  I think there was
13 conversations around Dan Patrick sending out a whole bunch of
14 ballot-by-mail applications and where did that fall into the
15 provisions, and I'm just thinking more generically kind of
16 press articles and things we've seen.
17    Q    Okay.  Other than what you've read in the press, have
18 you had any specific conversations with any of the county
19 election officials in this state about difficulties or feedback
20 regarding SB1 and its implementation?
21    A    I'm not recalling any specific conversations at this
22 time.
23    Q    Have you talked to any election officials since the
24 -- since SB1 was implemented about SB1 or its contents?
25    A    You know, I -- I occasionally speak to Chris Davis

Page 157

1 with Williamson County.  I don't remember any specific details
2 of any conversation at this moment.
3    Q    Okay.  So is it fair to say that as you're sitting
4 here today you cannot recount any conversations with any Texas
5 election officials regarding SB1 since its passage?
6    A    Man, I'm -- I'm trying to remember.  I don't want to
7 mislead you just because I do speak to Chris Davis somewhat
8 periodically, but I don't -- I'm not remembering any specific
9 conversation.
10    Q    Okay.  And that's with Chris Davis or any -- any
11 other county election official.
12    A    Yeah.  I mean, we've only had the one interim
13 hearing, and -- and it didn't deal with -- I mean, it dealt
14 with the poll-watcher training, so we talked to Keith Ingram
15 about that and some of the challenges about how we can make the
16 training -- you know, it was a good start, right?  We got it,
17 we wanted it, how do we make it better.  So there's been some
18 conversations through that hearing.  I'd have to go back and
19 reference that hearing.
20    Q    Okay.  So -- so --
21    A    Outside of that hearing, I can't remember any
22 specific conversations that I had.
23    Q    When was there a hearing?  What are you -- what
24 hearing are you talking about?
25    A    The elections committee had an interim hearing maybe

John Bucy III

Page 158

1 two months ago, roughly.

2    Q    And -- and the elections committee had -- was SB1

3 discussed at that hearing?

4    A    To some extent, because we talked about the -- the

5 poll-watcher training.

6    Q    Did you -- were any county election administrators

7 present?  Yes or no or I don't know.

8    A    I believe there were.  I know Chris Davis wasn't

9 there, which I thought was --

10    Q    Okay.

11    A    You know, he -- he had a conflict.

12    Q    So outside of the single hearing that you've had with

13 the elections committee --

14    A    I don't remember any specific conversations outside

15 of that.

16    Q    Representative Bucy, I've got to ask --

17    A    Oh, I'm sorry.

18    Q    -- the whole question.

19    A    Go ahead.  Yeah.

20    Q    That's okay.  All right.  Outside of the hearing that

21 you attended sometime after the passage of SB1, are there --

22 are there any specific county election officials that you've

23 talked to about SB1?  And that's a yes or no.

24    A    Not that I recall.

25    Q    Okay.  A signature verification.  In the old days

Page 159

1 prior to SB1, when you sent in a mail-in ballot, the method

2 that was utilized was signature verification; correct?

3    A    Correct.

4    Q    And that -- that was utilized to determine whether or

5 not the person that sent in the ballot was the -- in fact the

6 person that was registered to vote for that ballot; correct?

7    A    Correct.

8    Q    Okay.  And signature verification was the only method

9 -- mechanism for verifying; correct?

10    A    I'll take your word for it.

11    Q    Okay.  Can you think of any others?

12    A    No, no.

13    Q    Okay.  Now, you would agree that there's some

14 significant issues with signature verification as being a -- a

15 -- an objective verifier; correct?

16    A    I would agree, and we heard from disability groups

17 and senior groups and others with concerns around it.

18    Q    Okay.  And you would agree with me that signatures

19 sometimes change in people's lives.

20    A    Yes.

21    Q    You would agree with me that because of disabilities,

22 signatures can be different than the original signature.

23    A    Yes.

24    Q    Okay.  And you would agree with me that signatures

25 are -- are a far more subjective measure than placing and

Page 160

1 affixing ID numbers on ballots by mail.

2    A    Yes.

3    Q    Okay.  Now, you opposed, though, having -- having

4 verification by ID on ballots by mail; is that correct?

5    A    Voting is a fundamental right, and so adding

6 restrictions that will make it harder, I oppose those, yes.

7    Q    Okay.  So any match of any ID, you opposed.

8    A    I mean, I don't know if that's true.  I -- I'm not

9 sure we -- we -- that was even on the table.  We have some

10 policies and law around voter ID that are set right now, and,

11 in fact, I tried to expand on some of the voter ID.  I had a

12 bill to do that would have allowed, you know, like student IDs,

13 for example, to use, and -- and that was fought back and -- and

14 not passed.  So -- so I don't -- I don't think I would say

15 that.  I just think we want to make sure we're very careful

16 when you add any provisions around our fundamental right to the

17 ballot box.

18    Q    Okay.  Is there any verification system outside of

19 signatures that you advocated for implementing?

20    A    I don't know if it would directly speak to that.

21 I've been very passionate for online voter registration, which

22 I think would lead to better data and therefore better rolls

23 and information around voting because it's put in directly by

24 the individual, it's typed in so there's not -- as you just

25 talked about with signatures, there's not interpretation or

Page 161

1 handwriting, there's not a middle person to -- to deliver it,

2 so that's one area that I fought for that I think would

3 modernize and create safer and more accurate data.

4        MR. SWEETEN:  Okay.  I might have to object as

5 nonresponsive because my question is something different.

6        THE WITNESS:  Oh.

7 BY MR. SWEETEN (resuming):

8    Q    My question is:  Did you advocate for any other sort

9 of verification for mail-in ballots?

10    A    Not that I recall at this moment.

11    Q    Can -- are there any that you have in mind right now

12 outside of signature verifications that you believe would

13 improve the system and -- and make sure that those that are

14 sending in the ballots are in fact those who were entitled to

15 cast their ballot?

16    A    I -- I have a bill that would allow for, like,

17 individuals with disability to be able to use -- kind of like

18 we do with the military overseas, send the ballot and therefore

19 they can use their computer to fill it out.  So let's say if

20 they -- if they -- if they're blind, visually challenged, they

21 could use their technology to fill out their ballot and then

22 still send back and -- a specific -- you know, they can still

23 send -- print and send back a paper ballot, but like we do with

24 the military, be able to E-mail that ballot through a secured

25 network that we've been using.  So I've propose that, and that

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

## STATE DEFENDANTS' BRIEF IN RESPONSE TO
## OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# APPENDIX G

Transcript of the Testimony of

**Jacquelyn Callanen**

**Date:**

April 04, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO, )
     ET AL                       )
 4                               )
     vs.                         )   CASE NO. 5:21-CV-844-XR
 5                               )
     GREGORY W. ABBOTT, ET AL    )
 6   _____
     OCA-GREATER HOUSTON, ET AL  )
 7                               )
     vs.                         )   CASE NO. 1:23-CV-780-XR
 8                               )
     JOHN SCOTT, ET AL           )
 9   _____
     HOUSTON JUSTICE, ET AL      )
10                               )
     vs.                         )   CASE NO. 5:21-CV-848-XR
11                               )
     GREGORY WAYNE ABBOTT, ET AL )
12   _____
     LULAC TEXAS, ET AL  )
13                               )
     vs.                         )   CASE NO. 1:21-CV-0786-XR
14                               )
     JOHN SCOTT, ET AL           )
15   _____
     MIFAMILIA VOTA, ET AL       )
16                               )
     vs.                         )   CASE NO. 5:21-CV-0920-XR
17                               )
     GREG ABBOTT, ET AL          )
18   _____
     UNITED STATES OF AMERICA  )
19                               )
     vs.                         )   CASE NO. 5:21-CV-1085-XR
20                               )
     THE STATE OF TEXAS, ET AL   )
21   _____

22              ORAL VIDEOTAPED DEPOSITION

23                  JACQUELYN CALLANEN

24                   APRIL 4, 2022

25
```

Jacquelyn Callanen

April 04, 2022
Pages 2 to 5



**Page 2**

1      ORAL VIDEOTAPED DEPOSITION OF JACQUELYN CALLANEN,

2 produced as a witness at the instance of the Defendant

3 and duly sworn, was taken in the above-styled and

4 numbered cause on the 4TH day of April, 2022, from

5 9:11 a.m. to 4:38 p.m., before Sarah A. Prugh       ,

6 Certified Shorthand Reporter in and for the State of

7 Texas, reported by machine shorthand at the Offices of

8 The Texas Attorney General, Consumer Protection

9 Division, San Antonio Regional Office, 112 E. Pecan,

10 Suite 735, San Antonio, Texas, pursuant to the Federal

11 Rules of Civil Procedure and the provisions stated on

12 the record or attached hereto.

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 3**

1          APPEARANCES

2

3 FOR PLAINTIFFS HOUSTON AREA URBAN LEAGUE; DELTA SIGMA
    THETA SORORITY, INC.; THE ARC OF TEXAS; AND JEFFREY

4 LAMAR CLEMMONS:

5    Mr. Kenneth E. Broughton (Via Zoom)
     E-mail: kbroughton@reedsmith.com

6

    Mr. Jarrett Dillard (Via Zoom)

7    Ms. Harneet Kaur (Via Zoom)
    Reed Smith, LLP

8    811 Main Street, Suite 1700

9    Houston, Texas 77002-6110
    Telephone: 713-469-3800

10

    Ms. Danielle Ahlrich

11    401 Congress Avenue, Suite 1800
    Austin, Texas 78701

12    Telephone: n512-623-1777
    E-mail: dahlrich@reedsmith.com

13

    Ms. Ciara A. Sisco

14     Email: csisco@naacpldf.org
    Ms. Liliana Zaragoza (Via Zoom)

15     Email: lzaragoza@naacpldf.org
    NAACP Legal Defense and Educational Fund, Inc.

16    40 Rector Street, 5th Floor
    New York, New York 10006

17    Telephone: 212-965-2200

18    Ms. Shira Wakschlag (Via Zoom)
    The Arc of the United States, Inc.

19    1825 K Street, NW, Suite 1200
    Washington, DC 20006

20    Telephone: 202-534-3708
    E-mail: wakschlag@thearc.org

21

22

23

24

25

**Page 4**

1 FOR PLAINTIFFS LA UNION DEL PUEBLO ENTERO, SOUTHWEST
    VOTER REGISTRATION EDUCATION PROJECT, MEXICAN AMERICAN

2 BAR ASSOCIATION OF TEXAS, TEXAS HISPANICS ORGANIZED FOR
    POLITICAL EDUCATION, JOLT ACTION, WILLIAM C. VELASQUEZ

3 INSTITUTE, FIEL HOUSTON, INC.:

4    Ms. Nina Perales
    E-mail: nperales@maldef.org

5    Ms. Julia R. Longoria (Via Zoom)
    E-mail: jlongoria@maldef.org

6    Mexican American Legal Defense and Educational Fund
    110 Broadway, Suite 300

7    San Antonio, Texas 78205
    Telephone: 210-224-5476

8

    Ms. Breanna Williams (Via Zoom)

9    Fried, Frank, Harris, Shriver & Jacobson, LLP
    One New York Plaza

10    New York, New York 10004
    Telephone: 212-859-8000

11    E-mail: breanna.williams@friedfrank.com

12    Mr. Patrick Berry (Via Zoom)
    E-mail: patrick.berry@nyu.edu

13    Ms. Jasleen Singh (Via Zoom)
    E-mail: jasleen.singh@nyu.edu

14    Brennan Center for Justice at NYU School of Law
    120 Broadway, Suite 1750

15    New York, New York 10271
    Telephone: 646-292-8389

16

    Mr. Will Wilder (Via Zoom)

17    Brennan Center for Justice at NYU School of Law
    1140 Connecticut Avenue, NW, Suite 1150

18    Washington DC, 20036
    Telephone: 205-540-0362

19    E-mail: wilderw@brennan.law.nyu.edu

20 FOR PLAINTIFFS OCA-GREATER HOUSTON, LEAGUE OF WOMEN
    VOTERS OF TEXAS, REVUP-TEXAS, TEXAS ORGANIZING PROJECT

21 AND WORKERS DEFENSE ACTION FUND:

22    Ms. Lia Sifuentes Davis (Via Zoom)
    Disability Rights Texas

23    2222 West Braker Lane
    Austin, Texas 78758-1024

24    Telephone: 512-454-4816
    E-mail: ldavis@drtx.org

25

**Page 5**

1 FOR PLAINTIFF LULAC TEXAS:

2    Mr. Graham W. White
    Elias Law Group, LLP

3    10 G Street NE, Suite 600
    Washington, DC 20002

4    Telephone: 202-968-4490
    E-mail: gwhite@elias.law

5

   FOR PLAINTIFF MI FAMILIA VOTA:

6

    Ms. Wendy Olson (Via Zoom)

7    Stoel Rivas, LLP
    101 S. Capitol Boulevard, Suite 1900

8    Boise, Idaho 83702
    Telephone: 208-387-4291

9    E-mail: wendy.olson@stoel.com

10 FOR DEFENDANT HIDALGO COUNTY ELECTIONS ADMINISTRATOR
    YVONNE RAMON:

11

    Ms. Josephine Ramirez (Via Zoom)

12    Ms. Leigh Tognetti (Via Zoom)
    Hidalgo County District Attorney's Office

13    E-mail: josephine.ramirez@da.co.hidalgo.tx.us

14 FOR DALLAS COUNTY:

15    Mr. Jason G. Schuette (Via Zoom)
    Dallas District Attorney's Office

16

   FOR DEFENDANTS GUERRERO & GARZA:

17

    Mr. Anthony "Tony" Nelson (Via Zoom)

18    Assistant Travis County Attorney
    E-mail: tony.nelson@traviscountytx.gov

19

   FOR UNITED STATES OF AMERICA:

20

    Mr. Michael E. Stewart (Via Zoom)

21    Trial Attorney
    Civil Rights Division, Voting Section

22    US Department of Justice
    Telephone: 202-598-7233

23    E-mail: michael.stewart3@usdoj.gov

24

25

Jacquelyn Callanen

Page 50

1    A.   Yes.

2    Q.   Are those sections describing the initiatives

3  that they wanted you to undertake?

4    A.   Correct.

5         MS. CUBRIEL:  Hold on a second.  Somebody

6  is not on mute.

7         REPORTER:  I think they have muted now.

8    Q.   (By Mr. Jeff White) Yeah, I understand.  The

9  technology, one of the gifts of the pandemic; right?

10 Zoom meetings?

11   A.   Right.

12   Q.   So to reset, we are on the second page of

13 Exhibit 3 where it says Section I.  Do you see that?

14   A.   Uh-huh.

15   Q.   Is it correct that this section lists a number

16 of changes to election procedures that the commissioners

17 were hoping you would consider?

18   A.   Correct.

19   Q.   And we have discussed this previously I believe

20 but did you implement any of the procedures listed here?

21   A.   Again, we did stay open until 10:00 o'clock for

22 two days.

23   Q.   And that would be under the sub-bullet lower

24 case V; correct?

25   A.   Yes.

Page 51

1    Q.   What would you have told the commissioners if

2  they had consulted you before passing this resolution?

3         MS. CUBRIEL:  Objection, form.

4         THE WITNESS:  This was not timely as far

5  as mailing out the mail ballot applications.  It was a

6  waste of time, money, added a level of confusion for the

7  voters and doubled our work load.

8    Q.   (By Mr. Jeff White) Why was it not timely?

9    A.   This was at the end of August when we had

10 already as of -- I want to say September 15th, we were

11 mailing ballots.  So this came in at the 11th hour.

12        Again, Texas has been very very very

13 strong on mail balloting and Texas implements -- it is

14 called an annual ballot by mail which is, again, so

15 accepted by our voters.  And that means they put in one

16 application at the beginning of the year and that gets

17 them every single election that they are eligible for.

18        And it is a win-win for everyone.  It is a

19 win for the voter.  They don't have to remember to send

20 it in.  They don't have to go find a stamp for each

21 election.  It comes in.  It is a win-win for us because

22 if we have three or five or seven elections in a year,

23 we don't have to pound in that same application each

24 time.  So we enter it once in the year and it rolls over

25 for each one.  So we already had the majority of our

Page 52

1  applications already signed, sealed and delivered, so to

2  speak.

3    Q.   So if you go to page -- I believe it is the

4  third page of Exhibit Number 3, do you see at the bottom

5  where it says approved?

6    A.   Uh-huh.

7    Q.   And can you read that line, please?

8    A.   Approved this 14th day of August 2020.

9    Q.   So this resolution passed the commissioners

10 court in August of 2020?

11   A.   Correct.

12   Q.   And I believe you just said that you would be

13 emailing ballots September 2020?

14   A.   15th, uh-huh.

15   Q.   So there is a month between this resolution and

16 the date you are mailing ballots.  Is that not enough

17 time to make changes?

18   A.   Again, I don't -- I don't want to be

19 dismissive.  But if you understand the way the wheels of

20 county government turn, they turn rather slowly.  If

21 this was signed on the 14th, then they would have had to

22 go.  And our vendor, they would have had to notify a

23 vendor, get the database, get a permit number from the

24 post office, put in a check which takes about two weeks

25 to get from the county so that the county could start

Page 53

1  placing these.

2         So again, because it was signed on the

3  14th does not mean it was implemented on the 14th,

4  county government moves quite slowly.

5    Q.   If you were going to make changes to election

6  procedures, in order to do them correctly, how much lead

7  time do you need?

8    A.   Are you asking me as we sit here in the midst

9  of SB-1?  We needed at least a year, at least a year

10 when we are making major changes, at least a year, you

11 know, maybe six months because there are only so many

12 vendors that are certified by the State of Texas to

13 produce election records.

14        So it is like we can't go run down to

15 Kinko's to have, you know, 75,000-100,000 of these

16 applications made.  And again, to go to the post office

17 to get a permit number, and then to get the check cut to

18 put in there and mail them all out, it takes time.  And

19 again, for us, again, just coming off of this SB-1, we

20 would have loved to have had a year.

21   Q.   So would it be fair to say that for a normal

22 election, you would get going on implementing it a year

23 in advance?

24   A.   We run on six months.  The project management

25 system we run is six months.  Can we do an election in

Jacquelyn Callanen

April 04, 2022
Pages 54 to 57

Page 54

1 one month? Yes, but it is really stressful for the
2 staff. You know, when we get a special election called,
3 for instance, I mean it is all hands on deck. And it
4 can be done.
5          But for large elections, I mean, again,
6 you have to think. We have got to get/reach out to the
7 facilities so that we can reserve them. There are just
8 so many pieces to this puzzle that six months is
9 perfect.
10   Q.   So six months is the time for preparation for a
11 normal election; correct?
12   A.   Yes, sir.
13   Q.   And when you are referring to saying you would
14 have preferred a year, was that because the laws were
15 changing?
16   A.   So many of the laws were changing at the same
17 time.
18   Q.   So when laws change, the six months an go up to
19 a year to try to implement them?
20   A.   That is a nice way to put it, yes, sir.
21   Q.   So just kind of wrapping up on the
22 November 2020, what happened to turn out in that
23 election?
24   A.   We had the turn out that we were expecting. I
25 mean we really did -- the mail ballots went up, way up.

Page 55

1 But again, the people voted by mail. They didn't vote
2 in person. But as far as the percentage of the people
3 who voted, it did not change much. The method changed
4 but the number of people didn't change that much.
5   Q.   And would you agree that November 2020 was not
6 a normal election in Bexar County?
7   A.   It was not a normal election, yes, sir.
8   Q.   And a lot of these changes were due to the
9 pandemic; correct?
10   A.   Correct.
11   Q.   And the Election Code didn't change in November
12 of 2020; did it?
13      MS. CUBRIEL:  Objection, form.
14   Q.   (By Mr. Jeff White) Let me strike that. We
15 talked about changes to the early voting period;
16 correct?
17   A.   Yes, sir.
18   Q.   And we talked about extended days for dropping
19 off ballots in person; correct?
20   A.   Yes, sir.
21   Q.   Those changes were not changes made in the
22 Election Code but changes made through governor
23 proclamation; correct?
24   A.   Yes, sir.
25   Q.   And in normal circumstances when you are not in

Page 56

1 a pandemic, who has the authority to specify what the
2 voting procedures are going to be in Texas elections?
3   A.   Well, I mean it obviously comes from the
4 Secretary of State's office when you have an elections
5 administrator. The elections administrator sets the
6 elections.
7   Q.   Let me step back a bit I guess. As an election
8 administrator, is it your duty to operate in accordance
9 with the Texas Election Code?
10   A.   Absolutely.
11   Q.   And who can modify the Election Code?
12   A.   The governor.
13   Q.   When?
14   A.   The legislature.
15      MS. CUBRIEL:  We have been going for about
16 an hour I think. Do you need to take a break?
17      MR. JEFF WHITE:  It would be fine. If you
18 need a break, it would be fine for me.
19      MS. CUBRIEL:  Does anybody else need to
20 take a break?
21      MS. PERALES:  Yeah, I think a break would
22 be good.
23      MR. JEFF WHITE:  Why don't we go off the
24 record?
25      VIDEOGRAPHER:  The time is 10:21 a.m. and

Page 57

1 we are off the record.
2          (Recess taken)
3      VIDEOGRAPHER:  The time is 10:32 a.m. and
4 we are back on the record.
5   Q.   (By Mr. Jeff White) Ms. Callanen or Jackie, I
6 am going to shift a little bit now and get to the meat
7 of this case. Senate Bill-1. And I just wanted to ask.
8 You reviewed Senate Bill-1 to prepare for today;
9 correct?
10   A.   Correct.
11   Q.   And what is your impression of the bill or your
12 thoughts in your own words?
13      MS. CUBRIEL:  Object to form.
14   Q.   (By Mr. Jeff White) What do you think about
15 Senate Bill-1?
16      MS. CUBRIEL:  Object to form. You can
17 answer.
18      THE WITNESS:  I am trying to figure out
19 how to answer. There is a lot in my opinion. In my
20 opinion, there is a lot of unnecessary items in here.
21 There is a lot of good things in here and there is a lot
22 of not so good things here.
23   Q.   (By Mr. Jeff White) I am kind of writing those
24 down. What would you say are unnecessary in Senate
25 Bill-1?

Jacquelyn Callanen

Page 58

1  A.  Again, I guess if we go back, Jeff, to before
2  we took a break and things, the big one that we talked
3  about for the length of time to implement things, it was
4  onerous and an undue stress point for us and many of the
5  counties to have to get all of the videotaping, to turn
6  on the video cameras.  The expense is outrageous.  There
7  were a lot of unfunded mandates in this that we had to
8  really scramble to implement.  And I guess what I am
9  saying is just in the natural progression in the natural
10  preparation for each election to put this many changes
11  in this short of time was -- I will just say it -- a
12  disaster waiting to happen.
13  Q.  So would it be fair to say if there was more
14  lead time to implement the changes, you would have been
15  more comfortable with them?
16  A.  Yes.
17  Q.  You said there were three types of the bill,
18  unnecessary, good and not so good.  I think we talked
19  about unnecessary.  What would you say are the not so
20  good provisions?
21  A.  Again, probably if not the biggest not so good
22  was in the implementation time line.  You know, when it
23  takes effect in December, I think December 2nd, it was
24  to take effect.  And we weren't getting any directives
25  or information or new forms or new envelopes or anything

Page 59

1  from the Secretary of State to come in.  Our voters, you
2  know, it is -- it has been -- it has been unbelievably
3  trying to answer all of the media because everybody is
4  just spinning about how many applications we rejected.
5  I mean that's the hot topic, how many we rejected, how
6  many we rejected.
7      Well, again, again, the forms were
8  changed.  The law was changed.  The forms didn't come
9  down until January.  January 14th was the first time
10  that we had the ability to look at the new application
11  for ballot by mail.
12      So again, you will hear me say these are
13  my voters, my Bexar County -- they are our voters.  And
14  for years and years and years, we have these wonderful
15  people who -- 25,000, 40,000, they know how to vote by
16  mail.  They have done it.  They keep their applications
17  for ballots by mail.
18      I mean it is like okay, I know I am going
19  to need one in January so they will put one with their
20  important papers.  That is what they tell us.  So come
21  January 1, they fill out that application and they put
22  it in the mail.  They love that.  Now they don't have to
23  worry for the entire year.
24      All of a sudden, these regular voters of
25  ours did that.  They woke up after New Year's and said

Page 60

1  okay, I am going to do this.  It was the wrong
2  application.  It wasn't their fault.  But all of a
3  sudden, we had our normal applications coming in.
4  Again, a county the size of ours, it is thousands of
5  that come in.  We had to reject these.  With had to
6  send them a new application once we received them.
7      Like I said, they were approved in
8  January.  So again, by the time we got them from our
9  printer, had to set it up, start sending it back out,
10  did huge media blitzes, tried to get the word out, it
11  was monumental.
12      And piece that I personally -- I guess
13  that is what this is about -- that I personally abhor,
14  and that is a strong word, is that in SB-1, it is
15  written that I or my staff, anyone, you know, can only
16  send an application, not a ballot, an application to the
17  person that requests it.  That has been the most onerous
18  part of this entire -- entire SB-1 in my opinion.
19      If you would have to sit on the end of a
20  phone call from one of our long-standing mail ballot
21  applicants, and this mother calls me and says hey, blah,
22  blah, blah, can I have -- it is time for us.  Would you
23  please mail myself and my son an application for a
24  ballot by mail?  I have to say I will sure send yours
25  but I need to talk to your son.  Can I please talk to

Page 61

1  him on the phone?  Just put him on the phone so he can
2  ask me for one.
3      He is disabled and he can't speak.  I
4  can't send him an application.  So what I said to her
5  was well, if you have a computer, go online and download
6  it.  I can't send him one.
7      So then I go out and I tell people well,
8  just go online and get this application.  And then I am
9  accused of being insensitive because not everyone has a
10  computer.  And I know that, I have walked right into
11  that and that's not fair.
12      We have a phone system, an IVR system and
13  I know people hate those phone trees, press one, press
14  two, press three.  And it has been so successful for us.
15  Our voters 24 hours a day in this mailbox, if you want a
16  mail ballot application, leave your name and address,
17  phone number and we will mail one out to you.
18      Well, the husband, one or the other says
19  okay, please send me two applications.  We can send one.
20  We can send one.  If we have the phone number, we call
21  them and say can we please speak to whoever the other
22  one is.
23      Well, again, just stop, Jeff, and think,
24  we didn't have the staff ramped up to do that.  I didn't
25  have 20 temps hired and trained and everything else to

Page 62

1 do his.  I had no idea of the impact that one part of
2 SB-1 was going to have on us.
3          I'm sorry.  I will let it go at that.
4          REPORTER:  Trey, there is a note in the
5 chat that their audio is fine but the sound is low.
6          THE WITNESS:  Could you turn that down?
7          VIDEOGRAPHER:  The only way I can fix it,
8 we have to go off the record and I have to get the phone
9 set up.
10         REPORTER:  I am just letting you know what
11 is there.
12         MS. CUBRIEL:  Do you want to go off the
13 record to --
14         MR. JEFF WHITE:  Yeah, let's go off the
15 record.
16         VIDEOGRAPHER:  The time is 10:41 a.m.  We
17 are off the record.
18         (Recess taken)
19         VIDEOGRAPHER:  The time is 10:43 a.m. and
20 we are back on the record.
21    Q.   (By Mr. Jeff White) Just to get reset, I
22 believe you were telling me about the problems that you
23 have had with voters calling in to request applications
24 for ballot by mail; correct?
25    A.   Yes, sir.

Page 63

1    Q.   And you said that there have been a lot of
2 problems in this last March 22 primary with that
3 provision; correct?
4    A.   Correct.
5    Q.   Are you doing things now to make sure that goes
6 better in May and in later elections?
7    A.   Yes.
8    Q.   And what are you doing?
9    A.   We are -- we have developed our own insert that
10 we are going to put with the application when we send it
11 to the voter and also with the mail ballots so that we
12 can get those two numbers.  We want them to give us both
13 numbers, not just one.  Done, again, a lot of media,
14 media blitzes, worked with radio stations, TV stations.
15 Everybody has the application.  Everyone, every time we
16 have a chance to speak, we say we can only send one.
17         It's counterintuitive.  It really is
18 because we have quote/unquote the official mail ballot
19 application which is large enough.  It is readily
20 available.  You know, we have tens of thousands of them
21 in our office.  But SB-1 did not put any of those
22 requirements on consultants or parties.  They only put
23 it on people whose business it is to get the voter their
24 ballot and to protect it.  And for that, it just doesn't
25 make sense.

Page 64

1    Q.   Do you know why they implemented that provision
2 as applicable to election administrators?
3          MS. CUBRIEL:  Objection, form.
4          THE WITNESS:  Absolutely I do not.
5    Q.   (By Mr. Jeff White) Do you think it might be
6 tied to what happened in Harris County in 2020?
7          MS. CUBRIEL:  Objection, form.
8          THE WITNESS:  I do not.
9    Q.   (By Mr. Jeff White) If a voter comes in to your
10 office, are they allowed to pick up applications for
11 ballots by mail?
12    A.   One.
13    Q.   If somebody is in the car with them, would they
14 be able to pick up for that other person?
15    A.   (Shakes head from side to side.)
16         MS. CUBRIEL:  You need to say it out loud.
17         THE WITNESS:  I'm sorry.  No, we have to
18 see the person and they have to request it.
19    Q.   (By Mr. Jeff White) But if they do have access
20 to a computer, they can download them and you don't have
21 any limits there on number of downloads; do you?
22    A.   Correct.
23    Q.   Okay.  You have also said that there were some
24 good provisions in SB-1; right?
25    A.   Yes.

Page 65

1    Q.   And what are those provisions?
2    A.   Again, for the protection of the voters, I
3 personally really appreciate the portion of SB-1 that
4 speaks to campaigns driving voters to the polls, and
5 where we have to get the name and address and everyone
6 of the driver and the relationship of the driver if they
7 bring, you know, the six or seven people.
8          It has historically been the role of the
9 campaigns where they will rent a van and like go to a
10 senior center and fill up the van.  And then they ask
11 for curbside where the driver of the van stays in there
12 and the election official then assists all of those
13 voters so that they can cast their ballot.  But at that
14 point, it is not private.  It is not private.
15         So I really appreciate that.  I think that
16 was one of the strongest pieces that was in here.
17    Q.   And how does SB-1 improve the privacy of that
18 form of voting?
19    A.   Well, then at least we have the name of the
20 person who drove all of those people to the polls.  And
21 again, I don't know what they are going to do with them.
22 It is legal to do that.  But maybe just the idea that
23 they now have to fill out an official form and take an
24 oath may give those voters a little bit more privacy.  I
25 don't know.

Jacquelyn Callanen

April 04, 2022
Pages 70 to 73

Page 70

1  Q.  Cary Roberts?
2  A.  Carry Roberts.
3  Q.  And I believe you said you reach out to a
4  representative named Jose.  Can you give me his full
5  name?
6  A.  Senator Jose Menendez.  He is very actively
7  involved in elections for us.
8  Q.  And I believe you said one other name.
9  Barbara -- I didn't catch the last name.
10  A.  Representative Barbara Gervin-Hawkins.  I want
11  to say she is 125 I think.
12  Q.  And so in the last legislative session and
13  special session, if you were talking to a representative
14  or senator, it would have been those two people?
15  A.  Correct.
16  Q.  Through your lobbying?
17  A.  Yes, sir.
18  Q.  Was that usually by phone or by email?
19  A.  With Senator Menendez, it is mainly in person.
20  But again, phone, email.  And with Barbara
21  Gervin-Hawkins, it was Zoom or by phone or emails, you
22  know.
23  Q.  Did you testify at any hearings?
24  A.  I did not.  I did not go up at this time.  Our
25  spokesman was Chris Davis and he is the EA for

Page 71

1  Williamson County.  So he was the closest so he got
2  nominated.  He could get there a lot faster than a bunch
3  of us.
4  Q.  So the testimony he gave at the hearings would
5  have been on behalf of the Texas Association of Election
6  Administrators?
7  A.  Yes, sir.
8  Q.  So he wasn't testifying just as Williamson
9  County; correct?
10  A.  Correct.  He may have at other times.  But
11  yeah, normally, he was -- he carried our voice.
12  Q.  And can you just kind of give me an overview of
13  what this association does on an on-going basis, the
14  Texas Association of Election Administrators?
15  A.  We are a group, again, Jeff, I don't want to
16  belabor the point.  But you know, Texas has 254
17  counties.  And in Texas, elections can be run by three
18  different models where the county clerk does the
19  election side of the house, the tax assessor does the
20  voter registration side of the house.  And depending on
21  the county, either one of those can handle elections.
22  Then the third model is the elections
23  administrator.  We are non-partisan appointed officials
24  and we have both hats under one office which makes it
25  much more efficient.  And Texas has been, again, going

Page 72

1  towards the EA model more and more.  And I think at last
2  count, we had like 112 counties now had EAs, 110, 112
3  where it is under one office.
4  Q.  Who appointed you for Bexar County?
5  A.  I with appointed by what is known as the
6  Election Commission.  That is for everyone in the State
7  of Texas.  It is a five member board.  It is the county
8  judge, it is the country clerk and the tax assessor, the
9  two people who would have to give up elections or voter
10  registration, and the chair of the Democratic and
11  Republican party.  Those five members.  And it is three
12  to hire and four to fire.
13  Q.  What is the term for that appointment?
14  A.  Until they fire you or you retire or resign.
15  Basically, it is when, you know, we are all one bad
16  election away from not being there anymore in reality.
17  Q.  So of what you know of SB-1, what do you think
18  the purpose of the bill was when the legislature passed
19  it?
20  MS. CUBRIEL:  Objection, form.
21  THE WITNESS:  I know it spoke to the
22  integrity and voter fraud.  I think that was the basis
23  of it.  You know, I think, you know, it has all of the
24  pieces from voter registration through the by-mail
25  process.

Page 73

1  Again, early voting, election day, the
2  poll watchers, the video cameras, the video.  In the
3  name of integrity, I think -- and I say I think -- I
4  think SB-1 casts all of us that hold elections in a very
5  bad way because it was like, look, we are coming in to
6  protect everybody because this is what these terrible
7  people do.
8  Q.  (By Mr. Jeff White) Do you think some of that
9  was driven from what happened in Harris County in 2020?
10  MS. CUBRIEL:  Objection, form.
11  THE WITNESS:  I think so.
12  Q.  (By Mr. Jeff White) And you mentioned that you
13  thought SB-1 may have been based on election integrity;
14  correct?
15  A.  That is exactly what it says, yes, sir.
16  Q.  And the prevention of fraud?
17  A.  Yes, sir.
18  Q.  What about uniformity in elections?
19  A.  Again, I can't -- I can't speak to that because
20  in all of my years, we all have our procedures and our
21  codes and everything set by the Secretary of State.  I
22  mean as I said, we all go to, you know, an election law
23  seminar once a year and everybody has the same programs,
24  the same guides, the same procedures.  So that
25  doesn't -- that doesn't work.

Page 74

1   Q.   So on the issue of preventing fraud, do you
2   believe election fraud has occurred in Texas in past
3   elections?
4        MS. CUBRIEL:  Objection, form.
5        THE WITNESS:  Anecdotally, yes.
6   Q.   (By Mr. Jeff White)  What types of election
7   fraud have you heard about?
8   A.   Again, mail ballot.  I mean that seems to be
9   the catch all.
10  Q.   And how would this fraud occur with the use of
11  mail ballots?
12  A.   This is where I am going to go down another
13  path.  Again, historically, our voters fill out that
14  mail ballot application and they sign it.  And we -- and
15  that signature on the application must match the
16  signature on the return ballot.  And the early ballot
17  board determines that.
18       Now just like today, technology is our
19  friend.  So in the larger counties, when we get the
20  application in, we scan it.  We scan it right then and
21  there and we clip the signature.  Then when the mail
22  ballot comes back in, we scan both sides of the mail
23  ballot and we clip that signature.
24       And then we have a program that when it is
25  time to accept, when the early ballot board is doing

Page 75

1   their job, the program puts the application signature in
2   the mail ballot envelope signature one on top of the
3   other.  And they decide sitting at a computer, Democrat
4   in one chair, Republican in another chair, and they
5   decide if that signature is substantially the same.
6        And as we have all moved forward with
7   this, numerous counties do it numerous ways.  I mean
8   whether you are looking and matching, the Election Code
9   still speaks to a ballot -- a jacket envelope where you
10  keep both signatures, the physical signature.  And the
11  person will sit at the table and just do this, you know,
12  to match the signatures to say okay, they look --
13       But the system we have now makes a huge
14  responsibility because the people who are accepting
15  those signatures and accepting the mail ballots now sign
16  in so we actually know who accepted it.  Which again,
17  great paper trail, great paper trail.
18       But the Election Code has grown over the
19  years to say well, maybe the signatures don't quite look
20  alike.  But you can now go back and look at the last six
21  signatures.  You can go back and look at the last six
22  signatures to see.  And you can usually tell if there is
23  a letter or somebody signs, you know, the capital or
24  whatever.
25       But it is a recognition that our senior

Page 76

1   citizens, much like myself with arthritis, my signature
2   may not look the same in the morning as it looks in the
3   afternoon or it looks in the evening.  So it gives the
4   benefit of the doubt.  It allows them to get more
5   information and to check the signatures.
6        Well, now SB-1 says let's use numbers
7   instead of signatures.  So they are asking for Texas
8   driver's license or their election ID card or the last
9   four of their SSN.  And where the breakdown came this
10  time for SB-1 -- and you have heard me say we didn't
11  have enough time to implement it.
12       When you look in our database, our
13  database, who can get ballots by mail?  Anyone over 65.
14  Well, anyone over 65, a lot of times, myself included,
15  registered 40 years ago.  When you register 40 years
16  ago, nobody asked you for your Texas driver's license
17  number.  Nobody asked you for the last four of your SSN.
18       So now SB-1 comes.  And once we get them
19  the right application because they have sent in the
20  wrong one, then they have to put in driver's license or
21  SSN.  We get it back, we have nothing to match it
22  against.  It is not there.  They never gave it to us.
23  So now we have to reach out to them again and send them
24  a voter registration card because SB-1 doesn't allow us
25  to update those rules based on the ABBM.

Page 77

1   Q.   So I just --
2   A.   Are you with me?  Do you see -- do you see
3   where we are and why we are saying we needed such time
4   to do this?
5   Q.   And I think we will get to this.  I think we
6   may have gone down one of these rabbit holes so I kind
7   of want to step back a little bit.
8   A.   Okay.  I'm sorry.
9   Q.   No, no need to apologize.  We were talking
10  about history and some of the issues that SB-1 may have
11  been trying to address.  And we were talking about
12  frauds in mail-in balloting.  And I think they is where
13  we got down the trail of signature match and now
14  numerical match.
15       But what is the way that a mail-in ballot
16  could be used to fraudulently vote?
17  A.   Again, the system was set up to only match the
18  signature of the application to the signature of the
19  ballot.  And at that time, it would have been possible
20  for people to send in an application for a person who
21  they know does not vote regularly, has never voted and
22  they can sign the application, get the ballot, sign the
23  ballot and no one would be the wiser.
24  Q.   What information other than the signature goes
25  on to the registration application when you submit it?

Jacquelyn Callanen

Page 78

1    A.   Now it is those two numbers.  Now we need
2  either the Texas driver's license number, election ID,
3  personal ID or the last four.
4    Q.   Let me be more specific.  Prior to SB-1 when
5  somebody wanted to register to vote, how do they do
6  that?
7    A.   To register to vote.  Okay.  Again,
8  registration, different animal.  That's -- NVRA has set
9  that up.  We have a registration card that they must
10  fill out, postage paid free we do it.  Texas also allows
11  DVRs, deputy voter registrars.  They come in for
12  training.  We train them for about an hour.  They take a
13  test and then they are permitted to register people to
14  vote.  They will be campaigns that will do that.  League
15  of Women Voters is really good.  High school principals
16  are to register the students.  Registration cards are
17  out at the social services.  They are out at the
18  libraries.  They are readily available.
19           People can register to vote.  And the day
20  we goat the card, time stamped in, you are registered 30
21  days after that.
22    Q.   And is information on who is registered to vote
23  available to the public?
24    A.   Yes.
25    Q.   Now, if you -- prior to SB-1, if you are

Page 79

1  applying for ballot by mail, what information goes on
2  that application prior to SB-1?
3    A.   Name, address.  There is a space to mail my
4  ballot to if you are not at home or in a nursing home or
5  going to be out of the county on that election day, that
6  you must check a reason.  We have four reasons in Texas,
7  over 65, disabled, out of the county on election day.
8  And then, again, I am just being silly.  But my favorite
9  one is confined in jail.  And we see a whole lot of that
10  when the sheriff is on the ballot.  But normally, not so
11  much.  And those are the four reasons.
12           So they have to check a reason.  And
13  obviously, if they check over 65, when we go to put
14  their application in, the computer is going to tell us
15  their age.  And so mail my ballot to and they have to
16  sign it.  And for this March election, Jeff, I mean they
17  had to pick a party.  So if they want a party, they had
18  to mark that.  If they did not mark a party, then we set
19  it aside and we put it in for the May election because a
20  lot of people don't vote in primaries as we all know.
21    Q.   So prior to SB-1, for a registered voter to
22  submit an application for ballot by mail, they needed a
23  name, address, check a reason and then sign the
24  application; correct?
25    A.   Yes.

Page 80

1    Q.   And the names of registered voters were
2  publicly available?
3    A.   Yes.
4    Q.   Were the addresses of registered voters
5  publicly available?
6    A.   Yes.
7    Q.   So is it correct that in theory, somebody could
8  look at the publicly available information and identify
9  name, address and then all they would have left to do is
10  check a box and sign prior to SB-1?
11    A.   Yes.
12    Q.   Is information on registered voters who vote in
13  certain elections publicly available?
14    A.   Yes.
15    Q.   So from that publicly available information,
16  somebody could figure out whose registered but who
17  hasn't voted in a long time?
18    A.   Yes.
19    Q.   Is publicly -- strike that.  Does publicly
20  available information let you know if a registered voter
21  has previously requested to vote by mail?
22    A.   Yes, consultants can keep that database, our
23  information will tell you per voter.  So the people that
24  request our information will give us an election.  They
25  will say, you know, they would like to see all of the

Page 81

1  people who voted by mail in the Democratic or Republican
2  party for March 18, March 20th.  And they get those
3  names.
4           Then, again, I am sure that all of the
5  consultants have large computer programs where they can
6  keep track of this election after election.
7    Q.   Who are these consultants?  Strike that.  I am
8  not asking you to name every consultant.  But do you
9  know who employs these consultants that request this
10  voter information?
11    A.   Sure.  Candidates or -- what do we call them --
12  packs, you know, like bond, if they are running a bond,
13  they go to -- like right now, the attorneys are the ones
14  that are in charge of the bonds.  And so they go to them
15  and get that information.
16    Q.   Okay.  So now SB-1 is in effect.  And when a
17  voter wants to request an application to vote my mail,
18  what new information do they have to provide?
19    A.   Again, now they must provide either their Texas
20  driver's license, their personal ID, their election ID
21  or the last four of their social.
22    Q.   Is there a third option if somebody doesn't
23  have either of those two numbers?
24    A.   There is -- they can check that they do not
25  have one.  But then that takes another set of documents

Jacquelyn Callanen

April 04, 2022
Pages 98 to 101

Page 98

1    Q.   If they want to change that Election Code to
2  prevent fraud, do you think they have to actually have
3  proof of actual fraud before they do that or is trying
4  to prevent it okay?
5         MS. CUBRIEL:  Objection, form.
6         THE WITNESS:  I don't know how to answer
7  that.
8    Q.   (By Mr. Jeff White) But you would you agree the
9  legislature, it is their purview to modify the Election
10 Code?
11   A.   Correct.
12   Q.   I believe you said that in the climate we are
13 in now, you are getting a lot of reports of suspected
14 fraud; is that correct?
15   A.   Correct.
16   Q.   And if people think fraud is occurring, does
17 that affect their competence in the elections
18 themselves?
19        MS. CUBRIEL:  Objection, form.
20        THE WITNESS:  That is what it feels like.
21   Q.   (By Mr. Jeff White) So if people think fraud is
22 occurring and have lower confidence in the elections, do
23 you think putting in additional procedures to try to
24 prevent fraud, conserve to improve the competence of the
25 voters?

Page 99

1         MS. CUBRIEL:  Objection, form.
2         THE WITNESS:  If it is done in a timely
3  manner.
4    Q.   (By Mr. Jeff White) And following up on that --
5  strike that.  You don't think SB-1 making changes to a
6  large 2022 primary was enough time for you to implement;
7  is that correct?
8    A.   Correct.
9    Q.   If SB-1 had allotted Bexar County more time to
10 implement it before it went into effect for an election,
11 could it have been done better?
12   A.   Yes.
13   Q.   And do you think that because you didn't have a
14 lot of time, that there were issues?
15   A.   Yes.
16   Q.   And the issues created by that lag of time did
17 not create confidence; is that correct?
18   A.   Correct.
19        MS. CUBRIEL:  When you get to a good
20 stopping point, I think it would be a good time for
21 another break.
22   Q.   (By Mr. Jeff White) Okay.  But if you had more
23 time to implement SB-1, do you think it could have been
24 more effective at improving voter confidence?
25        MS. CUBRIEL:  Objection, form.

Page 100

1         THE WITNESS:  Yes.
2         MR. JEFF WHITE:  We can take a quick break
3  now.
4         VIDEOGRAPHER:  The time is 11:42 a.m.  We
5  are off the record.
6         (Recess taken)
7         VIDEOGRAPHER:  The time is 12:00 p.m. and
8  we are back on the record.
9    Q.   (By Mr. Jeff White) Ms. Callanen, Jackie, I
10 just wanted to quickly talk about -- we had previously
11 talked about some of the improvements in SB-1.  And
12 there was one topic I wanted to ask you about that I
13 don't think came up.  Didn't SB-1 extend early voting
14 hours?
15   A.   Excuse me.  Yes, it did.  It is up until I
16 think 10:00 o'clock but here in Bexar County.  I mean
17 like I didn't -- I don't want to say I dismissed that
18 part but we have always been ahead of the curve.  We
19 have always had our 10 hour days and our 12 hour days so
20 I sort of skipped that part of it.
21   Q.   Are you aware that it also extended mandatory
22 hours for early voting to smaller counties?
23   A.   Yes.
24   Q.   And do you view that as an improvement in SB-1?
25   A.   I would say so.

Page 101

1    Q.   And are you aware of the provision in SB-1 --
2  strike that.  Prior to SB-1, are you aware that the
3  Election Code protected workers who needed time off from
4  work on election day?
5    A.   Yes, sir.
6    Q.   And are you aware of SB-1 changing that
7  provision?
8    A.   I think it -- yes, yes, because I think it
9  extended it now to early voting.  They could have the
10 time off during early voting.  Prior to that, I think it
11 was just election day.
12   Q.   Would you view that as something that made it
13 easier to vote?
14   A.   Yes and no.  I mean I am split on that because
15 I believe with our 10 hours a day and with our weekend
16 availability, that there would be enough time for
17 someone to go.
18   Q.   So what you are saying is that the early voting
19 hours that you offer in Bexar County make it pretty easy
20 for someone to vote if they want to during the early
21 period?
22   A.   Yes, sir.
23   Q.   So we briefly touched on this issue of how you
24 got ready, maybe not briefly, how you have been
25 implementing the changes in SB-1.  And I just kind of

Page 102

1 wanted to step back and kind of talk a little bit more
2 about the training that you had to do to implement it.
3 So we may have talked about this before.  But what
4 training did you receive from the Secretary of State's
5 office?
6     A.   I think we had webinars available to us and
7 some advisories that would come down.
8     Q.   And did they -- strike that.  Did the Secretary
9 of State's office cover all of the changes in SB-1 that
10 were relevant to you as Bexar County administrator?
11    A.   I would say yes, but again, with reservations.
12    Q.   What are the reservations?
13    A.   There were so many thing ins SB-1.  There were
14 so many pieces and parts to it that I am sure we haven't
15 discovered everything yet.
16    Q.   So on your own end for the county, I think you
17 said that you had to do your own training; correct?
18    A.   Correct.
19    Q.   And who did you have to train?
20    A.   Well, we have internal staff we have to train
21 and then our 1200 workers that we have to train so it is
22 an on-going thing.  The temps that come in have to have
23 training so it is quite, quite a lot.
24    Q.   And what changes in SB-1 were the hardest to
25 train them to implement?

Page 103

1     A.   The by-mail process definitely.
2     Q.   And why is that?
3     A.   Again, as we have talked about, with the number
4 of rejections that we had and the number of steps we had
5 to take so that we could handle our by-mail voters and
6 the actions in the time that we normally handled them.
7 So it put a push to it.
8     Q.   And in addition to training, did you have to
9 implement new processes and procedures?
10    A.   Absolutely.
11    Q.   So what kind of processes and procedures do you
12 maintain as election administrator?
13    A.   I would say pick one.  The one we had to -- and
14 I think I alluded to it earlier -- was that with the --
15 the necessity to have parts of our office under 24 hour
16 video surveillance, that was quite a last minute, I mean
17 again, emergency kind of thing.  As I said before, the
18 wheels of county government go very slowly.
19           And we were still living with it because
20 not only did the video 24 hours a day, seven days a week
21 streaming -- and I can't believe I am saying this -- but
22 the only way we did it was to have it up on YouTube.
23 And unbeknownst to myself, as we were getting into the
24 planning stages and with my technical support people,
25 YouTube only allows you to stream for 12 hours and then

Page 104

1 you have to stop and then you have to restart.  Well,
2 that sounds fine.  But now, all of a sudden, I have a
3 staff member and we have to get a special computer that
4 we had to hurry up and buy so that they could go online
5 and stop and start it.  And so it just was an added
6 burden to these people whether, you know, it is like oh,
7 my God, I forgot, setting alarms, handing off the
8 computer so see who could do it because one person
9 wasn't going to step up til midnight each night.
10 However, it was just a complication.
11    Q.   And when you implemented these processes, are
12 they documented in written form?
13    A.   The instructions on the YouTube is yes.
14    Q.   What about for other changes in SB-1, do you
15 have procedure documents that kind of --
16    A.   Incomplete ones, incomplete ones.  We had
17 fantastic -- really proud of the documentations.  But
18 because of all of the changes and as we have learned
19 through time, that when you set a process up, you have
20 to live a process before you can document a process
21 because what looks good on paper may not work in
22 reality.  And so we are still at that point right now
23 because we just came off of the March election.
24    Q.   So are these procedural documents that are
25 maintained at your office on the computer?

Page 105

1     A.   Yes, sir.
2     Q.   And you are those based on what happened in
3 March 2022?
4     A.   We are now, yes, sir.
5     Q.   And so in addition to SB-1, at the same time,
6 we just had restricting in Texas.  How does that impact
7 your ability to implement in changes in SB-1?
8     A.   The restricting came down so late we all know.
9 And I think just, you know, as we have been sitting here
10 just all of us talking about what had happened and the
11 pandemic and how it changed our lives and, you know, it
12 was easy to sit at home and say and hear on the news
13 that there were supply chain problems.  There were
14 supply chain problems.  It hit us really hard.
15           The redistricting came along and it was
16 months later than normal.  As you heard me say before,
17 we always sent our cards out November 15th to
18 December 15th every odd year.  And this year, we were
19 all still in the throws of redistricting when it was
20 time to mail out our cards.  So now we have the perfect
21 storm because we are changing districts, we are changing
22 voter registration cards.  We need to get our voter
23 registration cards in the hands of our voters who are
24 going to vote in the primary.  And we all ran up against
25 a wall that there was absolutely no blue paper to

Jacquelyn Callanen

April 04, 2022
Pages 106 to 109

Page 106

1  vote -- to print our voter registration cards, our
2  1,194,000 voter registration cards.
3          And it makes you crazy when you have it
4  ready and you call and we don't have the paper yet, we
5  don't have the paper yet, we don't have the paper yet.
6  And now we are into January, January 15th, we don't have
7  the paper yet.
8          And then one day, you get this call and
9  you have this bright spot that your vendor says, we know
10 the paper is in a warehouse in New Jersey.  Our blue
11 paper was printed in Slovakia.  So it is on
12 a boat from Slovakia and it is now in a warehouse in New
13 Jersey.  And so now we are waiting for our paper to get
14 to San Antonio.  That is where our vendor is.  And we
15 wait and we wait and we wait.
16         So our voter registration cards were
17 mailed out the first week of February, which as you can
18 imagine, was the perfect storm.  Because now we are in
19 the throws of SB-1 with rejecting applications.  People
20 were getting their new cards.  They are calling to tell
21 us like we had the discussion before, that I got this
22 card, these people don't live here.  So just for a
23 management situation, it was the perfect storm.
24         But the voters had their cards in time to
25 vote in the registration, you know, the primary with

Page 107

1  their registration cards.  We are still working through
2  the return voter registration cards and sending out the
3  confirmation cards, getting all of that done.
4          And again, when redistricting occurs, Nina
5  and I can smile because we have been down this road -- I
6  think this will be our third one which was very nice.
7  But a lot of the voters have no idea that their district
8  has been moved.  And so they go to the polls in the
9  primary and then they are fighting with our election
10 judges because they know that they vote in this district
11 and why are they giving them this ballot and they are
12 given them the wrong ballot.  It just sort of snowballs.
13 Q.  So did the restricting effort, did that --
14 strike that.  Was your ability to send out these
15 registration cards to voters in February, did that
16 impact the time available for those voters to request
17 mail-in ballots?
18 A.  No, it was on a different track.  It was on a
19 collision course but it did not affect them.
20 Q.  Why did it not affect that?
21 A.  Like again, they are separate processes.  The
22 difference -- and when I said it was a perfect storm is
23 when some of our voters received their ballot at home,
24 after we had got through the process, then they were
25 calling because they were unfamiliar with the people

Page 108

1  that were on their ballot.  They had always been in this
2  district and why did we sent them a ballot with this
3  name on it, that we were wrong.  So we had to finesse
4  that and explain to them that yes, the census was --
5  because of the pandemic, the census wasn't done in a
6  timely fashion, restricting wasn't done in a timely
7  fashion, and so on and so forth.
8  Q.  So I think I understand.  So when they request
9  a mail-in ballot, it doesn't matter what is on the
10 ballot at that time; is that correct?  Strike that.
11         Is it correct to say that a voter can
12 request to receive a mail-in ballot before the
13 redistricting process is complete?
14 A.  Yes, sure, depending on whenever.  I mean in
15 2010 I think it was, it took years for us to get through
16 the legal parameters.
17 Q.  But when they ask for they mail-in ballot, they
18 are not specifying what ballot that they want to return;
19 is that correct?
20 A.  Correct.
21 Q.  So if the restricting boundaries changed after
22 they send in the request, when it is time to send them
23 the ballot, you send them the correct ballot?
24 A.  We send them the correct one, yes, sir.
25 Q.  So is that how these were on separate tracks

Page 109

1  and they weren't affected by this delay of blue paper?
2  A.  Correct.
3  Q.  Do you know if some voters rely on receiving
4  the registration card before they ask for a mail-in
5  ballot?
6  A.  Absolutely.
7  Q.  So for those voters, would getting that late
8  have made them apply for the mail-in ballot late?
9  A.  No.  Well, because when they called and said
10 where is my registration card, you know, then we had to
11 explain to them this and this and this.  So no, they
12 knew the had to get their applications in.
13 Q.  What was the deadline for requesting a mail-in
14 ballot for the March primary?
15 A.  February 18th.
16 Q.  So if they were waiting for that card to do it,
17 they would have missed out; correct?
18 A.  Correct.
19 Q.  So these individuals who didn't get the card,
20 you said some of them called in to ask you why?
21 A.  Yes.
22 Q.  So would those individuals have applied for the
23 mail-in ballot later than usual?
24 A.  No.  Again, I don't -- I don't -- when they
25 called, we were speaking to them and telling them to get

Jacquelyn Callanen

April 04, 2022
Pages 114 to 117

Page 114

1 come back in and vote. It is what we do.
2    Q.  So you are planning to update your processes
3 based on lessons learned from March; correct?
4    A.  That's right, and that is my phrase, lessons
5 learned.
6    Q.  Are you planning to do more voter outreach?
7    A.  Yes, sir.
8    Q.  Did you see a lot of issues caused by voters
9 not being familiar with the new requirements?
10    A.  Yes, sir.
11    Q.  So is the hope that this new outreach will get
12 over some of these issues?
13    A.  Well, yes, sir. And I mean, again, we -- for
14 the March election, the primary that we just came
15 through, we had 23,339 applications come into our
16 office, 23,339. When it was all said and done, we
17 counted 14,180 ballots.
18        Now, that looks like there is a big chunk
19 that did not come in. But we always have a drop off
20 from the people who decide to vote in person. We have a
21 drop off for the people that look at the ballot and say
22 oh, there is nobody on here I want to vote for and they
23 never sent it back in. But we did have a larger than
24 normal drop off on this one.
25        But for us and as we talk in the office,

Page 115

1 it is sort of like a win-win because we now have 14,180
2 people that know how to do it and they are going to be
3 our ambassadors as we go forward.
4        So you know, it is -- again, it is sort of
5 like baby steps. Like I told you, it is the lessons
6 learned. So we will move forward from that. So we know
7 at this next election, we have almost 15,000 people now
8 that will get their mail ballot, do what they have to do
9 and get it back without a problem. And it is going to
10 be up to us for all of the people that we notified on
11 the rejections, whether we did it by phone or email or
12 sent them letters, those 23,000 people have some inkling
13 of what is going on.
14    Q.  So if you were assessing whether the changes in
15 SB-1 make it more difficult, apart from these education
16 and training issues, would you agree it would be a more
17 fair assessment if you did it two years down the road
18 after you had had time to go through it?
19    A.  Absolutely.
20    Q.  So now I want to go into some of the changes in
21 SB-1. And since we have I think talked about it the
22 most, I think I will start with the changes to the
23 application for ballot by mail.
24    A.  Okay.
25    Q.  And then when the voters submit the ballot. So

Page 116

1 the changes the carrier envelope, are you familiar with
2 that?
3    A.  Yes, sir.
4    Q.  So just to recap, what is the new requirement
5 in SB-1 for mail ballot applications?
6    A.  They have the addition on the application for
7 the voter to write down either their TDL, Texas driver's
8 license. It can be their personal ID. It can be their
9 election ID. But basically, it is the number have
10 received from any document they have received from DPS.
11 Then if they don't have one of those, they may give us
12 the last four of their social. And barring neither of
13 those, they can check the box that says I have neither
14 of these.
15    Q.  And then when those applications come in, are
16 you required to verify those numbers?
17    A.  Absolutely, against what is on their voter
18 registration record.
19    Q.  And where is that record that you are checking
20 the application against, where is that maintained?
21    A.  In our office.
22    Q.  So I understand that different counties have
23 different registration record systems; is that correct?
24    A.  Correct.
25    Q.  And I have heard of online and offline

Page 117

1 counties. Can you explain what that is?
2    A.  Very good, terrific. That is what we talked
3 about a little bit ago. On the TEAM system, the 254
4 counties were all to use that system in real time
5 meaning that we took the application, you were on their
6 system and you put it directly into that database. And
7 they discovered that, again, it is either somewhere
8 between 15 or 30 counties, I am not sure how many, the
9 big boys, that number fluctuates and we had to go get an
10 outside vendor. So we do our work in-house so we are
11 called offline counties. And those offline counties
12 have 75 percent of the registered voters. So the other
13 counties obviously are much smaller and they use it in
14 real time.
15        Again, we have a delay just like I
16 explained where I have a person that wraps up the work
17 product of the day and sends it up to the Secretary of
18 State's office. It is a TEAM system.
19    Q.  So your offline system, is it linked to the
20 statewide TEAM system?
21    A.  No, sir.
22    Q.  Do you get any updates from the state that you
23 have to load into your offline system?
24    A.  It goes through our vendor first and then it is
25 loaded. So they have to make sure that everything

Jacquelyn Callanen                                    April 04, 2022
                                                      Pages 138 to 141

Page 138

1 get a lot smarter because, you know, a lot of people
2 want the metrics on this and understandably so.
3    Q.   Is that one of the lessons learned from this
4 election?
5    A.   It certainly is.
6    Q.   So if we are now only -- strike that.  So if
7 somebody is just looking at the rate of rejection for
8 applications for by mail in Bexar County, that is going
9 to be inflated because of this change in form issue;
10 correct?
11   A.   Yes.
12   Q.   So now if we are just looking at people who
13 send in the updated form, can you explain what issues
14 you were seeing there that might have led to rejection?
15   A.   Again, it was -- they were sending them in.
16 They were either sending in the opposite number from
17 what we had on file or they were sending it in and we
18 had no number on file.  So again, like I said, I think
19 and I know and I feel that we got smarter.  Because as
20 we started to send out the new application, after the
21 original one was rejected, we started to put voter
22 registration cards in there.
23   Q.   And why did you do that?
24   A.   Again, so that the voter could give us updated
25 information.

Page 139

1    Q.   And was that your idea to do that?
2    A.   (Nods head up and down.)
3         MS. CUBRIEL:  Can you say yes or no?
4         THE WITNESS:  Yes.  I'm sorry.
5    Q.   (By Mr. Jeff White) So it was your idea to send
6 out registration cards when you sent the new forms to
7 people that had sent in the wrong forms?
8    A.   Yes, anything we could do to try to mitigate
9 this.
10   Q.   Would those be more lessons that you will apply
11 in the future?
12   A.   Absolutely.
13   Q.   So you said when people submitted the correct
14 form, that you were seeing either a number that wasn't
15 in your system, the opposite number; correct?
16   A.   Correct.
17   Q.   Or they would put a number down on the
18 application that you didn't have on file; correct?
19   A.   Yes.
20   Q.   So you wouldn't have had it on file in the
21 offline and wouldn't check TEAM.  It wasn't there
22 either; correct?
23   A.   Right, in the beginning with -- we were not,
24 yes, you are correct.
25   Q.   Did you have people that didn't put any number

Page 140

1 down on the application provided by mail?
2    A.   Absolutely.
3    Q.   Do you have any idea why they didn't complete
4 that part of the form?
5         MS. CUBRIEL:  Objection, form.
6         THE WITNESS:  Well, again, I can only
7 speak anecdotally.  They were the people that were so
8 very very concerned about identity theft.
9    Q.   (By Mr. Jeff White) And what is your basis for
10 thinking that it was an identify theft issue?
11   A.   They would tell us.
12   Q.   When would they tell you?
13   A.   When they, again, SB-1 said we can contact them
14 by telephone.
15   Q.   Is there any chance that they just didn't read
16 the instructions?
17   A.   Probably.
18   Q.   Did you hear anything like that when you were
19 contacting them that they hadn't read it?
20   A.   No, no.  Because I mean, we, again, I don't
21 want to say jokingly but we say, you know, that they
22 don't read.  You have seen the carrier envelope and the
23 font on it is ridiculously small.  And it has so much
24 legal ease on it, that I don't think many of the voters
25 read it.  I really don't.

Page 141

1    Q.   This might be a joke.  Are you going to send
2 them a magnifying glass next time?
3    A.   We have talked about it.
4    Q.   So I think I characterized it as they didn't
5 read the instructions.  But is there a chance some of
6 them couldn't read the instructions and therefore didn't
7 put a number down on the application?
8    A.   Again, I am assuming that is the case because
9 as I said, we have developed an insert that we are going
10 to do for future elections that is a quarter of a page
11 that has that exact space where it asks for the TDL or
12 SSN blown up so that it covers that entire block with a
13 red thing and a highlight here and they can actually see
14 what that says.  So we are going to put that quarter
15 sheet in English on one side, Spanish in the other and
16 stick it in every mail ballot that we send out.
17   Q.   So we have talked about your rejection rates,
18 include people who sent the wrong form.  And then we
19 just talked about people who you couldn't match their
20 numbers; correct?
21   A.   Uh-huh.
22   Q.   And we talked about people who just didn't put
23 anything down; correct?
24   A.   Correct.
25   Q.   Can you answer?

Jacquelyn Callanen

April 04, 2022
Pages 218 to 221

Page 218

1    Q.   (By Mr. Jeff White) And when you are referring
2 to your commissioners, you are referring to the Bexar
3 County commissioners?
4    A.   Yes, sir.
5    Q.   And is that part of the smart initiative that
6 we talked about earlier?
7    A.   Yes, sir.  Yes, sir.
8    Q.   And so the commissioners actually sent out
9 ballots in November 2020; correct?
10    A.   Correct.
11    Q.   Would you agree that sending out applications
12 for that --
13    A.   That was in 2020.
14    Q.   Okay.  Let me restate my question.  So in the
15 November 2020 election, the commissioners in Bexar
16 County sent out applications unsolicited to voters, not
17 you?
18       MS. CUBRIEL:  Objection form.
19       THE WITNESS:  Correct.
20    Q.   (By Mr. Jeff White) Would you acknowledge that
21 there is a difference between sending out applications
22 for ballot by mail to everybody in the system
23 unsolicited versus the scenario you brought up where a
24 mother calls and asks for hers and her sons?
25    A.   I see those as two different things.

Page 219

1    Q.   And how are they different?
2    A.   Well, I mean, again, one is a request and that
3 is how we have always handled it, that someone can
4 request.  And it was at that point, we don't send out
5 unsolicited cards.
6    Q.   And when you say cards, are you referring --
7    A.   The applications.
8    Q.   You send out cards.  You are referring to the
9 applications for ballot by mail?
10    A.   Yes, sir.
11    Q.   And you have never in the past sent those out
12 without somebody asking?
13    A.   Correct.
14    Q.   Are there any risks of fraud associated with
15 sending out applications for ballot by mail when people
16 don't ask for them?
17       MS. CUBRIEL:  Objection, form.
18       THE WITNESS:  There is a possibility, yes,
19 sir.
20    Q.   (By Mr. Jeff White) And what is that risk?
21    A.   Well, again, I think maybe this morning, it
22 seems like it is a long time ago.  But when we talked
23 about the voter registration cards going to homes.  And
24 occasionally, we would be notified that a homeowner or
25 someone who lives in the home got application, got our

Page 220

1 voter registration cards for people who had lived there
2 previously or had been registered there previously.  So
3 that if that were the case, if we would send everyone in
4 our database, then we would automatically send one to
5 that same home to those same people who aren't there.
6    Q.   So sending out unsolicited applications for
7 ballot by mail could put them in the hands of people who
8 live in the home but aren't the person that is on the
9 application?
10    A.   Correct.
11    Q.   And prior to SB-1, if you had the application,
12 you could look up the information on it and fill it out
13 theoretically from public records; correct?
14    A.   Correct, that is what campaigns do, yes.
15    Q.   So if -- strike that.  The March 2022 primary
16 is in the past now; correct?
17    A.   Yes, sir.
18    Q.   Have you had a time to reflect on these
19 experience?
20    A.   There is a difference between reflecting on it
21 and doing the data mining.  We still have not dug into
22 any of the metrics and the deep dives that we need to
23 do.  And so that will be on-going.  The reason we
24 haven't done it is because as the primary was being
25 held, we had just passed the filing deadline for the May

Page 221

1 7th election so we had to -- our focus went to
2 programming the May 7th election and then the May 24th.
3 So it may be a while until we get to actually sit down
4 and dig deep.
5    Q.   And is it your duty to report the voting
6 history to the state after an election like the March
7 primary?
8    A.   Absolutely, yes, sir.
9    Q.   And have you collected and reported that data?
10    A.   Yes, yes, that goes right away.
11    Q.   Do you know when you did that?
12    A.   We beat the deadline but I don't know when it
13 was.
14    Q.   Is the deadline 30 days after the election?
15    A.   I think that is when you can make your last
16 changes to it, yes.
17    Q.   And what does that history data -- what is
18 recorded in that data that you reported to the state?
19    A.   Again, the voter registration number of the
20 person, their name, their address, the year of their
21 birth and the party that they voted in.
22    Q.   Does it tell you what method of voting they
23 used?
24    A.   Yes.
25    Q.   Does it tell you what precinct they voted in?

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX H

Jacquelyn Callanen                                        February 28, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3
   LA UNION DEL PUEBLO          )
 4 ENTERO, ET AL.,              )
                                )
 5          Plaintiffs,         )
                                ) Case No. 5:21-CV-844-XR
 6 vs.                          )
                                )
 7 GREGORY W. ABBOTT, ET AL.,)
                                )
 8          Defendants.         )
   _____)
 9 OCA-GREATER HOUSTON,         )
   ET AL.,                      )
10                              )
            Plaintiffs,         )
11                              ) Case No. 1:21-CV-780-XR
   vs.                          )
12                              )
   JANE NELSON, ET AL.,         )
13                              )
            Defendants.         )
14 _____)
   HOUSTON JUSTICE, ET AL.,     )
15                              )
            Plaintiffs,         )
16                              ) Case No. 5:21-CV-848-XR
   vs.                          )
17                              )
   GREGORY WAYNE ABBOTT,        )
18 ET AL.,                      )
                                )
19          Defendants.         )
   _____)
20 LULAC TEXAS, ET AL.,         )
                                )
21          Plaintiffs,         )
                                ) Case No. 1:21-CV-0786-XR
22 vs.                          )
                                )
23 JANE NELSON, ET AL.,         )
                                )
24          Defendants.         )
   _____)
25 MI FAMILIA VOTA, ET AL.,     )
                                )
```



Jacquelyn Callanen

February 28, 2023
Pages 2 to 5

## Page 2

```
 1          Plaintiffs,   )
                          )
 2  vs.                   )
                          ) Case No. 5:21-CV-0920-XR
 3  GREG ABBOTT, ET AL.,  )
                          )
 4          Defendants.   )
    _____)
 5  UNITED STATES OF AMERICA, )
                          )
 6          Plaintiff,    )
                          )
 7  vs.                   )
                          ) Case No. 5:21-CV-1085-XR
 8  THE STATE OF TEXAS,   )
    ET AL.,               )
 9                        )
            Defendants.   )
10  _____)
11
12  ***************************************
13       ORAL AND VIDEOTAPED DEPOSITION OF
14            JACQUELYN CALLANEN
15              FEBRUARY 28, 2023
16  ***************************************
17
18         THE ORAL AND VIDEOTAPED DEPOSITION of
19  JACQUELYN CALLANEN, produced as a witness at the
20  instance of the Defendant, and duly sworn, was taken
21  in the above styled and numbered cause on Tuesday,
22  the 28th day of February, 2023 from 9:10 a.m. to
23  3:51 p.m., before PAMELA SUE PETERSON, Certified
24  Shorthand Reporter in and for the State of Texas,
25  reported by stenographic and computer-aided
```

## Page 3

```
 1  transcription, at the Office of the Texas Attorney
 2  General, Weston Centre, 112 East Pecan Street,
 3  3rd Floor, San Antonio, Texas 78205, pursuant to the
 4  Federal Rules of Civil Procedure and the provisions
 5  stated on the record or attached hereto.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1  APPEARANCES OF COUNSEL:
 2  For Plaintiff HOUSTON JUSTICE, HOUSTON AREA URBAN
    LEAGUE, DELTA SIGMA BETA SORORITY, INC., THE ARC OF
 3  TEXAS, MI FAMILIA VOTA, MARLA LOPEZ, MARLIN LOPEZ,
    PAUL RUTLEDGE, JEFFREY LAMAR CLEMENS:
 4
    NAACP LEGAL DEFENSE FUND
 5  BY:  VICTOR GENECIN, ESQUIRE
    40 Rector Street
 6  5th floor
    New York, New York 10006
 7  (929) 388-9246
    vgenecin@naacpldf.org
 8
 9  For Defendant GREGORY W. ABBOTT AND JANE NELSON, ET
    AL:
10
    KEN PAXTON, ATTORNEY GENERAL OF TEXAS
11  OFFICE OF THE ATTORNEY GENERAL
    BY:  DAVID BRYANT, ESQUIRE
12       KATHLEEN T. HUNKER, ESQUIRE (Via Zoom
    Videoconference)
13  P.O. Box 12548
    Austin, Texas 78711-2548
14  (512) 936-2275
    david.bryant@oag.texas.gov
15
16  For Defendant UNITED STATES OF AMERICA:
17  U.S. DEPARTMENT OF JUSTICE
    CIVIL RIGHTS DIVISION
18  BY:  DANA PAIKOWSKY, ESQUIRE
    Robert F. Kennedy Building
19  950 Pennsylvania Avenue NW
    Washington, District of Columbia 20530
20  (202) 353-5225
    dana.paikowsky@usdoj.gov
21
22
23
24
25
```

## Page 5

```
 1  APPEARANCES OF COUNSEL (Continued):
 2  For Witness JACQUELYN F. CALLANEN, CERA:
 3  JOE D. GONZALES, CRIMINAL DISTRICT ATTORNEY
    OFFICE OF BEXAR COUNTY CRIMINAL DISTRICT ATTORNEY
 4  BY:  LISA V. CUBRIEL, ESQUIRE
    Paul Elizondo Tower
 5  101 West Nueva
    7th Floor
 6  San Antonio, Texas 78205-3030
    (210) 335-2142
 7  lisa.cubriel@bexar.org
 8
    Also Present:
 9
    JACQUELYN F. CALLANEN, CERA
10       Witness
11  JULIA R. LONGORIA (Via Zoom Videoconference)
         Mexican American Legal Defense and Educational
12       Fund, Inc.
13  CAROLINE LEBAL (Via Zoom Videoconference)
    NATALIE FELSEN (Via Zoom Videoconference)
14       Cooley, LLP
         On behalf of El Paso County Elections
15       Administrator Lisa Wise
16  MARINA EISNER (Via Zoom Videoconference)
         States United Democracy Center
17
    LOUIS J. CAPOZZI (Via Zoom Videoconference)
18       Jones Day
         On behalf of intervenors
19
    KEVIN ZHEN (Via Zoom Videoconference)
20       Fried, Frank, Harris, Shriver & Jacobson, LLP
         On behalf of LUPE Plaintiffs
21
    JOSEPHINE RAMIREZ SOLIS (Via Zoom Videoconference)
22       Office of Criminal District Attorney
         Hidalgo County
23       On behalf of Hidalgo County Elections
         Administrator
24
    GABE HODGE (Via Zoom Videoconference)
25       Observer
```



Page 38

1  other site, sir.  We have a fantastic relationship
2  with the City of San Antonio.  And so, when they open
3  a library, a public library, we're there.
4       Well, a few years ago the City of
5  San Antonio passed a bond election.  And the bond
6  election was for remodeling their libraries.  And
7  so, we had issues -- I hate that word.  We had issues
8  with one of their time schedules on their library.
9  We were to be able to be moved back into Memorial
10 Library.  And due to supply chain issues, they didn't
11 open.  They -- they didn't complete their work in
12 time.
13      So at the last minute, where we thought we
14 would be at Memorial Library, we had to go back to
15 our alternate site of West Point.  So, it's issues
16 like that that we just take it right up to the wall
17 because we -- we -- the voters know to go to Memorial
18 Library.  So, we had to post a big sign and move them
19 on.
20     Q.  Did you become aware of any complaints in
21 connection with the general election in November of
22 2022 regarding the number or distribution of polling
23 places or vote centers?
24     A.  Yes, sir.
25     Q.  Could you describe what you became aware

Page 39

1  of?
2      A.  I'm -- I'm respectful of the fact, and we
3  have to keep ever most in our mind, that on May 24th
4  we had the shooting in Uvalde.  And so here in Bexar
5  County, 68 percent of our poll sites are in schools,
6  and the schools didn't want us.  They -- after --
7  after the Uvalde, you know, the horrendous shooting
8  over there, they didn't want the elections to be
9  on-site when the students were there.
10     So, we met with Region 20, which is our --
11 all of our school districts, and we had some great
12 leadership.  We have 13 different school districts in
13 Bexar County, and we had great leadership from some
14 of ours, and they chose to make election day an
15 in-service day so there would not be students.  So,
16 for a portion of our normal sites we were --
17 everything was fine.
18     But for the school districts that chose not
19 to make it an in-service day, the students were
20 there.  And so, what happened in a few of our sites
21 is, now we're trying make amends.  You know, they --
22 they want to keep the students safe.  We need to say,
23 and of course, they can't refuse us if we ask them.
24     And so, the accommodation was, okay,
25 instead of putting you in the foyer where, you know,

Page 40

1  you pull up and you go in and you're right in the
2  foyer, we're going to put you back around into the
3  gymnasium or we're going to allow you to have access
4  to the library.
5      So, that complied with it, so we have the
6  voting site there.  But what we ended up finding out
7  was, for a lot of our senior citizens and a lot of
8  our ADA, the longer walk then became problematic.
9  They did it, but then we took calls of they -- you
10 know, weren't -- why did we do it?  Why did we move
11 it there?  And so, again, lessons learned.
12     So, you know, we went back and have worked
13 with the school districts.  And so, with the
14 legislative session up there now, we are hoping and
15 praying that they will mandate that election day is a
16 school holiday or an in-service day because there
17 shouldn't be that angst.
18     Q.  Are you aware of anyone who was unable to
19 vote or was dissuaded from voting on election day in
20 November of 2022 in Bexar County because of the issue
21 that you just described?
22     A.  No.
23     Q.  Okay.  Let's talk about mail-in ballots.
24     A.  Uh-huh.
25     Q.  Have there been procedure changes since the

Page 41

1  primaries in the first half of 2022 with respect to
2  mail-in ballots in Bexar County that were in place in
3  connection with the general election in November of
4  2022?
5      A.  Huge changes.
6      Q.  Okay.  Could you generally describe those.
7      A.  SB-1 when it was first rolled out,
8  obviously, for the primary, came very late into our
9  world.  And I had just said the supply chain issue.
10 We -- SB-1 mandated that we needed all new election
11 envelopes and all -- everything new because of the
12 requirement and the language and -- and the ID and
13 the ID requirements and the perf lines on them.
14     And so, we -- we managed to get -- we got
15 them at the 11th hour, but we did it and it caused us
16 stress and the voters were anxious because their
17 ballots weren't getting there.
18     So -- and we had a number of our voters in
19 March and -- and May that their ballots were
20 rejected, the applications were rejected, because
21 SB-1 required either the TDL or the SSN.
22     And I would like to remind you that most of
23 our voters by mail are senior citizens who registered
24 years and years ago when it was not required to give
25 either an SSN or a TDL.



Jacquelyn Callanen                                    February 28, 2023
                                                      Pages 42 to 45

Page 42

1        So, the way the law was written is, the
2   ABBM had to have one of those numbers and we had to
3   match one of those numbers with the original voter
4   registration card, well, we couldn't do it.  We
5   didn't have it.  We didn't have it on record.
6        And so then we would -- as we rejected it,
7   we had to send them a new ABBM and a new voter
8   registration card so that they could send it back and
9   update their records.
10       Well, as -- as you know, I mean, I'm not
11  going to go back and beat a dead horse.  But that
12  procedure, because of the problematic rollout of it,
13  was worked on and worked on and worked on, and the --
14  the State was able to work with DPS somehow and we
15  were able to get...
16       I'm not technical, but they were able to
17  take all of our voters and mash them against DPS and
18  get the license numbers, or TDLs for a number of our
19  voters.  So, by the time we were into the May
20  elections, we had a much more robust database.  And
21  so, we were able to make these matches much -- much,
22  much better.
23       And then there was a court case that the
24  State lost that required the language on the
25  envelopes that we had to be changed.  Again, now

Page 43

1   we're problematic.  We have -- we have the old ones.
2   And so, do we sit there with a Sharpie and black out
3   all of these or do we order more?
4        And so, again, I mean, we're not the only
5   county that was doing this.  I mean, everyone was,
6   sort of, you know, really, really pushing it and it
7   worked.  I mean, we were -- we were able to do it.
8        I think the blessing in all of this is that
9   in 2022, which is, you know, the gubernatorial
10  elections, those election have --
11       Q.  You're talking about the general elections?
12       A.  General elections from the primary, that
13  whole year is much smaller than a presidential year.
14  And so, you know, we had 40,000 mail ballots, mail
15  ballot applications in 2022.  Where in 2020, we had
16  124,000.  So, again, you can see that it was an
17  economy of scale, and we were much -- it was much
18  easier to manage the -- the economy of scale that we
19  did.  But it was -- it was strenuous.
20       Q.  Have you described all of the changes that
21  occurred in the -- the mail-in ballot procedures
22  between the primaries in the first half of 2022 and
23  the procedures that were in place for the general
24  election in November -- in October of 2022 in Bexar
25  County?

Page 44

1        A.  Yes.
2        Q.  Okay.  And what was the overall effect of
3   the changes as you observed them in October and
4   November of 2022 as compared to the previous -- the
5   first half of 2022?
6        A.  I -- I'm proud to say that -- that the
7   changes that we effected here in Bexar County we did
8   a lot of it on our own from our media outreach, to --
9   to -- I'll show you how we -- we developed an insert
10  for the ballot.  I mean, we did a lot of outreach on
11  our own, and we had a much, much higher success rate
12  in November.  So, it was -- it was a huge relief.
13       Q.  And when you refer to a success rate, could
14  you explain what you mean by that.
15       A.  Well, again, in -- in every -- in every
16  election, in the mail balloting process, we'll send
17  out -- I mean, let's just say on this one, like,
18  we'll send out 40,000.  And when it's time to
19  actually count the mail ballots, you're down to
20  30,000, 30-, 32,000.
21       And to a layperson out there, they're like,
22  where did the other ones go?  Well, you sent out this
23  many, why don't you have this many back?  Well, human
24  nature enters into it a lot.
25       And about probably anywhere eight to

Page 45

1   10 percent of the people who get a mail ballot will
2   return that mail ballot and go vote in person because
3   they use that mail ballot as a sample ballot.  We
4   have issues with that because, obviously, the mail
5   ballots cost a lot of money, time, you know, people.
6   Anyhow, I won't go into all those details.  So, we
7   don't get those back.
8        Then you have the ones that are mailed in
9   that are rejected for obvious reasons.  You know,
10  they didn't sign it.  They signed -- what we see in a
11  number of things is, a husband and wife will each get
12  their ballot, but when it comes back in to us, the
13  husband has signed the wife's ballot and vice versa.
14  And so, those have to go out and be rejected to come
15  back so that we have the right signature with the
16  right ballot.
17       So, there's any number of reasons why this
18  happens.  And in any normal election, we're going to
19  get a reject rate of three percent, four percent.
20  That's normal for -- for any election for us.  But
21  when we did November 2022, with all of our extra
22  attention to it, we had a 1.7.  So we were, like,
23  yes.
24       Q.  You had a 1.7?
25       A.  Rejection rate.



Jacquelyn Callanen
February 28, 2023
Pages 50 to 53

Page 50

1   So, because we have that vendor, we use it
2  for our mail ballots.  We use it for our early
3  voting.  It's a wonderful system.  And they have
4  codes that we can put in for no signature, no
5  matching TDL, SSN.  And we -- we have those codes
6  that come out.
7        And so, we can differentiate if -- if
8  needed to exactly how many didn't sign it, you know,
9  how many -- the -- we're still working on -- working
10 with the vendor to update the codes so that we can
11 capture more of the information from SB-1 on the
12 cure, not cured, you know.
13       We sent it by, we called them on the phone
14 or that detail's not in our system yet, so it's not
15 mat- -- it doesn't match up -- the State doesn't have
16 it in their system.  So, this is a work in progress.
17 We're all learning and it's only getting better.
18       But again, there are third-party vendors
19 involved in, I think they said -- I think I'll
20 probably be wrong, but I think they said there were
21 31 counties that were not on TEAM real time.  That
22 may have changed, but don't hold me to that 31.
23    Q.  Is the information that Bexar County
24 captures on its software regarding the specific
25 reasons a mail-in ballot is rejected provided to the

Page 51

1  State?
2    A.  Yes.  It -- it goes up every day in that
3  export and that import.
4    Q.  Okay.  You testified that the rejection
5  rate for Bexar County in the -- the general election
6  in November of 2022, if I understand correctly, was
7  approximately 1.7 percent?
8    A.  Yes, sir.
9    Q.  And my impression is that you take some
10 satisfaction in having gotten the number down to that
11 point; is that correct?
12   A.  Absolutely.  I'm so proud of my staff.
13   Q.  How does that compare with the rejection
14 rate in 2020 in Bexar County?
15   A.  Again, as -- as -- as I said, 2020 had a
16 higher rejection rate because just on the economy of
17 scale, when we're talking approximately 40,000 in
18 2022, but 124,000 in 2020, you can see you're going
19 to have a higher rejection rate based on -- you know,
20 the rejection's are the same no matter what election
21 you're doing.
22       If somebody doesn't sign their ballot, they
23 don't sign their ballot and that happens every time.
24 The only new thing this time was the TDL or the SSN,
25 the missing -- the missing information, but we have

Page 52

1  those.  We have those.  And again, it's human nature.
2  If we have time to correct it, if the voter has time
3  to correct it, they can do it.
4    Q.  What was the rejection rate in Bexar County
5  for 2020, if you recall?
6    A.  I don't have that exactly, but I know it's
7  going to be in the three to four percent range.
8    Q.  Okay.
9    A.  I mean, that -- that was like our happy
10 zone.
11   Q.  What was your -- well, explain to me what
12 you mean by the "happy zone."
13   A.  Again, if one person doesn't get to vote,
14 that hits us.  I mean, that's what we do.  But if
15 you've gone through and you've had, you know, 124,000
16 ballots mailed out and -- and you've counted 92,000
17 and these others have been, you know, brought back to
18 you and not -- they just sit them on the shelf,
19 that's a good feeling.
20       But again, when the reject -- rejected
21 rate -- and again, please understand that the
22 rejected rate comes from partisan people because
23 we -- the election's office handles the manual part
24 of it.  You know, we print the ballots.  We take the
25 applications.  We data enter.  We mail them.  We

Page 53

1  bring them back in.  We scan them.
2        And then once they're back, they get turned
3  over to the early ballot board.  And that early
4  ballot board is a group of people that are appointed
5  by the Democrat and the Republican party.  They are
6  not our employees.  They are independent -- an
7  independent body.
8        And so, once we turn these over to them,
9  they are the ones who will make the decision that
10 there's no signature, or this person didn't sign it,
11 that signature doesn't match, whatever that's that
12 group.  And then that's where we get the rejection
13 rate, the final rejection rate.
14   Q.  How did Bexar County's 1.7 percent
15 rejection rate in the general election in 2022
16 compare to the rejection rate in general election
17 years prior to 2020?
18   A.  It was less.  It was less.  I -- I can't
19 give you a number.  I didn't do all the data mining,
20 but we can find it out.
21   Q.  Can -- can you say that it was
22 significantly less?
23   A.  It -- you know, I would feel like if you're
24 looking at just raw numbers it would appear to be
25 down 50 percent.  But the difference between a three



Jacquelyn Callanen

February 28, 2023
Pages 58 to 61

Page 58

1    MR. GENECIN: Thank you.
2    MS. CUBRIEL: This is counsel for Bexar
3 County. I just want to say, at her last deposition,
4 she brought an earlier version of the form --
5    THE WITNESS: Uh-huh. Yes.
6    MS. CUBRIEL: -- that was an exhibit. And
7 so, our intent, and why I had her pull it out is, we
8 do wish to make this an exhibit because this is the
9 updated version.
10    MR. BRYANT: Okay.
11    THE WITNESS: It worked better.
12    MS. CUBRIEL: Yeah.
13    MR. BRYANT: Right.
14    MS. CUBRIEL: And can you pass those extra
15 ones down.
16    MR. BRYANT: I will do that.
17    (Exhibit 9 was marked.)
18    Q.  BY MR. BRYANT: Miss Callanen, let me show
19 you what was marked Exhibit C at an earlier
20 deposition that you gave in this case, and I've
21 marked it as JC3, Exhibit 9.
22    A.  Uh-huh.
23    Q.  Can you describe what that is.
24    A.  This is an earlier version of -- of what we
25 have there. And again, black and white. And you can

Page 59

1 see, if you want to just -- to make the difference on
2 it, when we did it this time, we wrote on here. It
3 says, "Under the flap on your teal envelope." But we
4 took "teal" off. We didn't -- people want to mess
5 with what the color was.
6    So the new ones just say, "Under the flap."
7 So, again, we just -- again, in our office, we use it
8 for not -- we were, like -- can I -- dare I say, we
9 were dumbing it down. We wanted to make it as simple
10 as possible, so we took out extra -- I think, she
11 wants to see it.
12    MS. PAIKOWSKY: Would you mind if I see it?
13    MR. BRYANT: Absolutely.
14    MS. PAIKOWSKY: Thanks so much.
15    Q.  BY MR. BRYANT: And the -- Miss Miss
16 Callanen are all -- you -- you handed me three --
17    A.  Here's another one.
18    Q.  -- examples. Are those all the same?
19    A.  Yes, sir.
20    Q.  Okay.
21    A.  That's all I brought.
22    MS. PAIKOWSKY: And if it's helpful, I
23 actually have a color version of the previous
24 exhibit.
25    MR. BRYANT: That's great. Okay.

Page 60

1    THE WITNESS: Yeah.
2    MR. GENECIN: Are we going to mark this?
3    MR. BRYANT: Yes, we will. I'm just trying
4 to figure out what number I have not yet used.
5    (Exhibit 13 was marked.)
6    Q.  BY MR. BRYANT: All right. Miss Miss
7 Callanen I'm handing you what's been marked as JC3,
8 Exhibit 13. Could you describe what that is.
9    A.  Yes, sir. This is the insert that we used
10 for the November 2022 mail ballots.
11    Q.  Okay. And the -- the earlier exhibit that
12 I showed you which is marked JC3, Exhibit 9, and also
13 Exhibit C to your earlier deposition, when was that
14 one in use?
15    A.  The black and white one came into use for
16 the May elections, the city and school elections.
17 Then the colored one came into use where it says the
18 teal, that was for the primary runoff, which was also
19 at the end of May. So May --
20    Q.  May of 2022?
21    A.  -- of '22. Yes, sir. We had the primary
22 in March, and then we had the city and school
23 elections the first Saturday, and then we had the
24 primary runoff at the end of May. And so then in the
25 next couple of months, then we went back and did

Page 61

1 another deep dive on it and we think this is simpler.
2 We -- we changed it a little bit.
3    Q.  And when you say, "this," you're referring
4 to JC3, Exhibit 13?
5    A.  Yes, sir.
6    Q.  Okay.
7    A.  I'm sorry.
8    Q.  It's just -- it's often a written --
9 written process, so we got to refer to exhibits. Did
10 you observe in -- in Bexar County, in connection with
11 the November 2022 general election, changes in the
12 level of voter understanding of the mail-in voting
13 process?
14    A.  Absolutely.
15    Q.  Could you describe what you observed in
16 that regard.
17    A.  Again, anecdotally, if you want to say,
18 number one, you know, the reject rate proves that --
19 that we did see that.
20    But number two, in the course of the
21 election, we noticed that we were having a lessening
22 of the phone calls where they were asking for
23 assistance. You know, that -- but again, we were
24 doing major media. We were doing handouts
25 everywhere. We had handouts out at the early voting



Jacquelyn Callanen                                    February 28, 2023
                                                      Pages 62 to 65

Page 62
1  sites. We -- we were -- we just sort of threw
2  everything at it that we could because it was just so
3  important.
4       Q.  Okay. You were describing some media
5  outreach and voter education efforts that occurred in
6  connection with the November 2022 general election;
7  is that right?
8       A.  Yes, sir.
9       Q.  Were those efforts that were made
10 specifically in and by Bexar County or were they a
11 broader effort, or both?
12      A.  We, the election's office, had our own
13 outreach. But again, members of my commissioner's
14 court entered into it and they did their own outreach
15 for it also, separate and apart from the elections
16 office.
17      Q.  Okay. Could you describe as -- as much as
18 you recall, the media outreach that was done to
19 educate voters about mail-in balloting in connection
20 with the November 2022 general election process in
21 Bexar County.
22      A.  Sure. I mean, we -- we did press
23 conferences twice a week. We did, again, outreach
24 everywhere we went, every -- every presentation we
25 put on, every meeting we went to. We worked with the

Page 63
1  AARP. We worked with Oasis. We -- we did outreach
2  with the organizations that -- that go to the senior
3  citizens to -- to try and -- we worked very heavily
4  with the disability community. In fact, we're still
5  working with the disability community at this time.
6  So, we -- we -- we just tried to do as much as we
7  could.
8       Q.  And during what period of time were those
9  efforts undertaken with respect to the November 2022
10 general election process?
11      A.  They started the middle of September
12 through Novem- -- November. Because, again, the
13 middle of September is basically, again, for us is
14 when that's the go button, because we all have to
15 abide by the MOVE Act, which is the federal military
16 MOVE Act, and that's always 45 days before an
17 election. So, once our ballots go out, it's --
18 somebody's hit the go button.
19      Q.  Did Bexar County comply with that 45-day
20 requirement in connection with the general
21 election --
22      A.  Absolutely.
23      Q.  -- in 2022?
24      A.  Absolutely.
25          MR. GENECIN:  David, would this be a good

Page 64
1  time for a break?
2          MR. BRYANT:  Certainly. Let's take a
3  break.
4          THE VIDEOGRAPHER:  Time is 10:21.
5  Correction, 10:28 a.m. and we are off the record.
6          (A brief recess was taken.)
7          THE VIDEOGRAPHER:  Time is 10:38 a.m. and
8  we are on the record.
9       Q.  BY MR. BRYANT:  Miss Callanen, you were
10 testifying before the break about outreach and voter
11 education efforts that were made in connection with
12 the November 2022 general election. And it sounded
13 to me as if those were fairly extensive and ramped up
14 from previous elections; is that correct?
15      A.  Yes, sir. Yes, sir.
16      Q.  Do you anticipate looking forward that
17 it'll be necessary to continue to increase and
18 increase the level of effort and expense that Bexar
19 County does on -- on voter education and outreach?
20 Or do you believe that over time the need to do that
21 will level off or decline as people understand better
22 the -- the procedures?
23          MS. PAIKOWSKY:  Objection; form.
24          THE WITNESS:  I -- I understand your
25 question. I -- again, this is an odd number year, so

Page 65
1  we will have so many less people. And I think we
2  will have to duplicate our media outreach for 2024.
3  Because, again, you keep hearing me say we had 40,000
4  now and 124,000. So that, to me, is there's another
5  80,000 that have not used the new method.
6          So, we're going to stay attuned to that and
7  stay focused on that. So, I expect that when we get
8  to the 2024 we'll duplicate what we've done.
9       Q.  BY MR. BRYANT:  Okay. Do you have any
10 expectations on that subject beyond 2024?
11      A.  No, sir.
12      Q.  Okay. You testified earlier about efforts
13 that your office makes to contact people whose
14 mail-in ballots have initially been rejected. And I
15 believe you indicated that sometimes that's by
16 e-mail, sometimes that's by phone.
17          Could you describe the extent and
18 regularity of those efforts that were undertaken in
19 connection with the November 2022 general election.
20      A.  Yes, sir. Well, in SB-1 it opened up the
21 door for us to be able to have outreach so that they
22 could cure their -- their ballots, that's the phrase
23 we use, they could cure their ballots. And they
24 opened up the avenue of the phone and by e-mail as
25 opposed to sending them the hard copy reject and



Jacquelyn Callanen

February 28, 2023
Pages 142 to 145

Page 142

1    Q.  BY MS. PAIKOWSKY:  Why do you think your
2  county's rejection rate was lower than the statewide
3  rate?
4    A.  Because I'm proud of our insert and the
5  work we did.
6    Q.  Do you think that other counties have the
7  same level of resources and expertise as Bexar County
8  to implement the kinds of interventions you
9  discussed?
10    MS. CUBRIEL:  Objection; form.
11    THE WITNESS:  I had made reference to that
12  before that, you know, prior to 2020, I would have
13  answered, yes.  But since we've had such a turnover
14  in election leadership, I -- I think it's really hard
15  for a new person to get all the nuances and
16  understand how you have to touch your voters.
17    Q.  BY MS. PAIKOWSKY:  Do economic resources
18  factor into county's ability to implement the kinds
19  of solutions you did in Bexar County in November of
20  2022?
21    A.  I would say absolutely.
22    Q.  So, earlier, you mentioned that the
23  November 2022 general election ran more smoothly than
24  the November 2020 election.  Can you describe more
25  about why that was.

Page 143

1    A.  Again, just sheer numbers.  It -- it -- it
2  basically was just a numbers thing.  Because as we
3  talked about mainly, you know, the mail ballots, when
4  you're dealing with 124,000 going out and 92,000
5  coming back, our office, because we do, we handle
6  everything in house, every single piece of it is
7  handled in house, in 2020 my office, we were -- we
8  were working two shifts.  We didn't have to do that
9  in 2022.
10    In 2020, we were, I think, since you had
11  asked, we did, like, 1,200 voters that we had --
12  workers that we had to put out there.  Well, in
13  2022 -- or 2020, because we expected more voters, we
14  had more workers.  And so we were, like, at 1,800.
15    And so, that's what I'm speaking to, the
16  more complexities, it's -- takes longer to get 1,800
17  people than it does to get 1,200.  It takes longer to
18  do 124 applications than it does to do 40.
19    Q.  And in the differences between the
20  November '22 general election and the November '20
21  general election, would you say that COVID-19 also
22  impacted the smoothness of one election as compared
23  to the other?
24    A.  No, because we had that figured out prior
25  to that November.

Page 144

1    Q.  Do you believe that the November 2022
2  general election was smoother than the 2018 general
3  election?
4    A.  No.  They were the same.
5    Q.  Okay.  As compared to the 2018 general
6  election, was mail voting more difficult in the 2022
7  general election?  And I'm referring to both
8  processing mail ballots and voter education.
9    A.  Yes.
10    Q.  Why is that?
11    A.  With the ID requirement.  The new -- you
12  know, the new -- relatively new ID requirement that
13  we didn't have in prior elections.
14    Q.  Was there any information that would have
15  been useful to administering mail voting in the
16  general election that was not captured in the TEAM
17  database?
18    A.  No.  My initial reaction would be, no.  But
19  in hindsight, during this back and forth -- I mean,
20  if -- if you were looking for multiples, you know,
21  maybe we would open up that for multiples.  But as an
22  administrator doing the election at the time, no.
23    Q.  Does your county keep any data on ABBM
24  rejections that is not reflected in TEAM?
25    A.  No.

Page 145

1    Q.  Does your county keep any data on carrier
2  envelope rejections that is not reflected in TEAM?
3    A.  No.
4    Q.  I think that is all my questions.
5    MS. PAIKOWSKY:  I would like to go off the
6  record if that's okay for just maybe five minutes and
7  we can chat and then come back on.
8    THE VIDEOGRAPHER:  The time is 1:27 p.m.
9  and we are off the record.
10    (A brief recess was taken.)
11    THE VIDEOGRAPHER:  The time is 1:33 p.m.
12  and we are on the record.
13    MS. PAIKOWSKY:  And I am going to pass the
14  witness at this time.
15    MR. GENECIN:  Thank you.
16
17    EXAMINATION
18  BY MR. GENECIN:
19    Q.  Good afternoon, Miss Callanen.
20    A.  Good afternoon, sir.
21    Q.  My name is Victor Genecin.
22    A.  Victor.  I said, "Dennis."  I'm sorry.
23    Q.  And I've got a few questions for you.  Just
24  a little while ago, when you were answering
25  Ms. Paikowsky's questions, you cited the number



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

### STATE DEFENDANTS' BRIEF IN RESPONSE TO
### OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# APPENDIX I

Jennifer Colvin                                          March 21, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3

   LA UNION DEL PUEBLO        §
 4 ENTERO, et al.,            §
          Plaintiffs,         §
 5                            §
   v.                         §   Case No. 5:21-cv-844-XR
 6                            §
   GREGORY W. ABBOTT, et      §
 7 al.,                       §
          Defendants,         §
 8 _____  §
                              §
 9                            §
   OCA-GREATER HOUSTON, et    §
10 al.,                       §
          Plaintiffs,         §
11                            §
   v.                         §   Case No. 1:21-cv-780-XR
12                            §
   JANE NELSON, et. al.,      §
13        Defendants,         §
                              §
14 _____  §
                              §
15 HOUSTON JUSTICE, et        §
   al.,                       §
16        Plaintiffs,         §
                              §
17 v.                         §   Case No. 5:21-cv-848-XR
                              §
18 GREGORY WAYNE ABBOTT,      §
   et al.,                    §
19        Defendants,         §
                              §
20 _____  §
                              §
21 LULAC Texas, et al.,       §
          Plaintiffs,         §
22                            §
   v.                         §   Case No. 1:21-cv-0786-XR
23                            §
   JANE NELSON, et al.,       §
24        Defendants,         §
                              §
25 _____  §
```



Jennifer Colvin

March 21, 2023
Pages 2 to 5

## Page 2

```
 1   MI FAMILIA VOTA, et      §
     al.,                     §
 2        Plaintiffs,         §
                              §
 3   v.                       §   Case No. 5:21-cv-0920-XR
                              §
 4   GREG ABBOTT, et al.,     §
          Defendants.         §
 5
 6
 7
 8
 9            ORAL AND VIDEOTAPED DEPOSITION OF
10                     JENNIFER COLVIN
11                     MARCH 21, 2023
12
13
14
15       ORAL AND VIDEOTAPED DEPOSITION OF JENNIFER COLVIN,
16   produced as a witness at the instance of the Defendants
17   and duly sworn, was taken in the above styled and
18   numbered cause on Tuesday, March 21, 2023, from
19   12:20 p.m. to 3:43 p.m., before DONNA QUALLS, Notary
20   Public in and for the State of Texas, reported by
21   computerized stenotype machine, at the offices of Harris
22   County Attorney's Office, 1019 Congress, 15th
23   Floor, Houston, Texas, pursuant to the Federal Rules of
24   Civil Procedure, and any provisions stated on the record
25   or attached hereto.
```

## Page 3

```
 1
 2              A P P E A R A N C E S
 3   FOR THE HARRIS COUNTY ELECTIONS ADMINISTRATOR:
         SAMEER S. BIRRING
 4       TIFFANY BINGHAM
         OFFICE OF THE HARRIS COUNTY ATTORNEY CHRISTIAN
 5       D. MENEFEE
         1019 Congress, 15th Floor
 6       Houston, Texas  77002
         (713) 274-5142
 7       sameer.birring@harriscountytx.gov

 8   FOR THE HOUSTON AREA URBAN LEAGUE (HAUL) PLAINTIFFS:
         JENNIFER A. HOLMES
 9       NAACP Legal Defense and Educational Fund, Inc.
         700 14th Street N.W., Suite 600
10       Washington, District of Columbia  20005
         (347) 573-0197
11       jholmes@naacpldf.org
12
     FOR THE UNITED STATES:
13       DANA PAIKOWSKY
         U.S. DEPARTMENT OF JUSTICE
14       950 Pennsylvania Avenue, NW
         Washington, District of Columbia  20530
15       (202) 353-5225
         dana.paikowsky@usdoj.gov
16
17   FOR THE STATE DEFENDANTS:
         KATHLEEN T. HUNKER
18       OFFICE OF THE ATTORNEY GENERAL
         P.O. BOX 12548 (MC-009)
19       AUSTIN, TEXAS  78711-2548
         (512) 463-2100
20       kathleen.hunker@oag.texas.gov
21
     Also Present:
22       STEPHEN KENNY (Via Zoom)
         BRADLEY PROWANT (Via Zoom)
23       BREANNA WILLIAMS, NAACP (Via Zoom)
         CARRIE LEBEL (Via Zoom)
24       GERMAINE HABELL (Via Zoom)
         JOHN GORE, GOP (Via Zoom)
25       JOHN SULLIVAN BAKER, DOJ (Via Zoom)
```

## Page 4

```
 1   LEIGH TOGNETTI (Via Zoom)
     LISA CUBRIEL, BEXAR COUNTY (Via Zoom)
 2   LUCIA ROMANO (Via Zoom)
     MIKE STEWART, DOJ (Via Zoom)
 3   URUJ SHEIKH, LDF (Via Zoom)
     ZACHARY DOLLING, TCRP, OCA (Via Zoom)
 4   REGGIE WRIGHT, THE VIDEOGRAPHER
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1                         INDEX
 2                                                    PAGE
 3
     Appearances..................................     3
 4
 5   JENNIFER COLVIN
 6   Examination by Ms. Hunker.....................     7
     Examination by Ms. Paikowsky..................    47
 7   Examination by Ms. Holmes.....................    74
     Further Examination by Ms. Hunker.............    92
 8
 9   Corrections & Signature.......................   104
10
     Reporter's Certificate........................   106
11
12                    EXHIBIT INDEX
13
     NUMBER       DESCRIPTION                        PAGE
14   Exhibit 11   Election reconciliation             24
                  official totals
15   Exhibit 12   Defendant Harris County             38
                  Elections Administrator,
16                Clifford Tatum's responses and
                  objections to state defendants'
17                second set of interrogatories,
                  and third set of requests for
18                Production
     Exhibit 13   Ballot insert                       41
19   Exhibit 14   Ballot insert                       53
     Exhibit 15   Call log spreadsheet                77
20   Exhibit 16   Harris County Elections             89
                  Administrator, Clifford Tatum's
21                supplemental responses to state
                  defendants' second set of
22                interrogatories
23
24
25
```



Jennifer Colvin

March 21, 2023
Pages 14 to 17

Page 14

1    A.  Yes.
2    Q.  And you also occupied this position for the May
3   local election and primary runoff that were both held in
4   May?
5    A.  Correct.
6    Q.  And then you also occupied this position for
7   the 2022 general election; is that right?
8    A.  Correct.
9    Q.  And approximately how many full-time employees
10  work under your supervision?
11   A.  Sixteen.
12   Q.  And do you know how many full-time employees
13  work for the Harris County Elections Administrator's
14  Office generally?
15   A.  I don't have that number.
16   Q.  And did you increase the number from 16 in the
17  lead-up for the November 2022 election?
18   A.  Full-time employees, no.
19   Q.  Did you hire temporary employees?
20   A.  We did.
21   Q.  And is that common practice in your office?
22   A.  It is for every election.
23   Q.  And how many did you add?
24   A.  For the November?
25   Q.  That's correct.

Page 15

1    A.  In total, approximately 100.
2    Q.  And is that about expected for a general
3   election?
4    A.  It depends on the number of applications we
5   receive, but, yes.
6    Q.  And so let's start with Topic No. 4.  Topic 4
7   reads:  "Your policies, practices, and procedures
8   regarding mail-in voting during the November 8, 2022,
9   general election.
10       Did I read that correctly?
11   A.  Yes.
12   Q.  And to do that, I want you to turn your
13  attention to Exhibit 4.  This is -- should be in your
14  pile.
15   A.  Exhibit 4?
16   Q.  Uh-huh.
17   A.  Okay.
18   Q.  Do you have the exhibit in front of you?
19   A.  I do.
20   Q.  And do you recognize this exhibit?
21   A.  I do.
22   Q.  And what is it?
23   A.  It's the Harris County Administrator's report
24  on the election.
25   Q.  Did you participate at all in the drafting of

Page 16

1   this particular report?
2    A.  I provided some information for this report.
3    Q.  And what information would that have been?
4    A.  Any numbers -- anything pertaining to ballot by
5   mail.
6    Q.  So let's turn to page 15.  And do you see where
7   it has "Subsection 4, Early Voting Operations"?
8    A.  I do.
9    Q.  And the first sentence reads:  "Early Voting
10  operations include ballot by mail and in-person voting
11  at EVCs."
12       Did I read that correctly?
13   A.  Correct.
14   Q.  And then let's go to the next subsection which
15  is "Subsection A, Ballot By Mail."
16       Do you see that?
17   A.  I do.
18   Q.  Okay.  And so my first question is going to be
19  quite general.  Did you implement any changes in your
20  voting-by-mail procedures between the May elections and
21  the November 2022 general election?
22   A.  The only change would be the form that we
23  mailed out with our ballots.
24   Q.  Okay.  And I will address that in a little bit.
25   A.  Okay.

Page 17

1    Q.  And you're referring to the ballot insert; is
2   that right?
3    A.  Yes.
4    Q.  So the first sentence reads:  "All mail ballots
5   returned by voters were delivered to the NRG Arena and
6   reviewed and processed by the Signature Verification
7   Committee."
8        Did I read that correctly?
9    A.  You did.
10   Q.  And just for clarification, can you please tell
11  me what is a signature verification committee?
12   A.  It's a group of both political parties.
13  They're appointed by their -- the parties, and they come
14  in to review -- it'll -- for instance, it's five Dems,
15  five Reps.  You have a judge, a presiding judge and an
16  alternate judge, one of each party.  And then they come
17  in and review the ballots to make sure the ID and
18  signature match.
19   Q.  And so I just want to understand the procedure.
20  So when a ballot by mail is delivered to the early
21  voting clerk, what happens to that particular ballot?
22  Like how is it processed?
23   A.  We receive the ballot in, and we image it.
24  We -- once we image it, it goes to -- it gets put in a
25  tub for the board.  It's sealed, and we log it.  Once



Jennifer Colvin

Page 18

1  the board sends members, we start -- they send in a
2  couple of members to help our team -- they designate our
3  team to pull the flaps to check for IDs.  Once we start
4  doing that, we process any that don't have IDs -- we
5  mail back to the voters to get them a chance to cure
6  that ballot.  Any -- all the rest of them are put back
7  in the tubs, and we hold them until the SVC convenes.
8    Q.  Okay.  And so you mentioned that in your county
9  the early voting clerk removes the flap to determine
10  whether or not the numbers were added; is that correct?
11    A.  Correct.  Well, us and some of the board
12  members.  It's a group effort depending on the quantity.
13    Q.  And this is to determine whether or not the
14  voter put down their either their social security or
15  Texas ID number?
16    A.  Correct.
17    Q.  And how do you contact the voter if you
18  determine that the voter did not put down an ID number?
19    A.  There's multiple ways you can contact them.  We
20  normally give a phone call, and we send a letter.  If
21  it's before the ballot board meets, the EVBB convenes,
22  we mail them the ballot back.
23    Q.  Okay.  And so are you doing this before this --
24  when I say "doing this," I mean removing the flap before
25  the signature verification committee meets?

Page 19

1    A.  Yes.
2    Q.  And so you can contact the voter before the
3  signature verification committee meets; is that correct?
4    A.  Correct.
5    Q.  And the signature verification committee, they
6  then -- how do they then handle the ballot?
7    A.  The one without the ID or the ones with the ID?
8    Q.  The ones -- first without the ID.  We'll start
9  there.
10    A.  They designate us to send the ballot back to
11  the voter on their behalf.
12    Q.  Okay.  And the ones with ID?
13    A.  The ones with ID, they go through the process
14  to compare the numbers to the -- statements in the
15  system to make sure that the two match, and then they
16  can okay the ballot.
17    Q.  And do they, too, call the voter?
18    A.  Go ahead.
19    Q.  Do they, too, call the voter if they notice
20  that they're -- let me strike that.
21      How does the Signature verification
22  committee contact the voter?
23    A.  They delegated that to our office.
24    Q.  And is that when your office would also call
25  or --

Page 20

1    A.  We call on their behalf.
2    Q.  And according to this report, the signature
3  verification committee convened on October 9th; is that
4  correct?
5    A.  Yes.
6      MS. BINGHAM:  Object to form.  It was the
7  19th.
8      THE REPORTER:  Can you speak up?
9      MS. BINGHAM:  Tiffany Bingham.
10    A.  It was October 19th.
11    Q.  (BY MS. HUNKER)  Okay.  And do they meet each
12  day after that?
13    A.  Depending on volume.  It's not a set schedule.
14    Q.  And you were -- your office was removing the
15  flap.  Did you notice that less voters as compared to
16  the primary and the May elections were not at --
17  including their ID number or social security number?
18      MS. HOLMES:  Objection to form.
19      MS. BINGHAM:  Objection to form.
20      MS. HUNKER:  You can answer the question.
21    A.  There were less voters that left off the ID.
22    Q.  (BY MS. HUNKER)  And the signature verification
23  committee, do they also review the ballot to determine
24  whether or not there is a signature match?
25    A.  They do.

Page 21

1    Q.  And are they contacted -- the individual voters
2  who, let's say, either failed to put their signature or
3  had a mismatch, are they contacted the same way?
4    A.  They are.
5    Q.  And then what happens when a -- the signature
6  verification committee processes the ballot, and then it
7  goes to the early voting ballot board?
8    A.  The signature verification committee can okay
9  the ballot.  If they have a questionable ballot, that's
10  when it -- that goes over to the ballot board.
11    Q.  So if a ballot is accepted by the signature
12  verification committee, it is accepted?
13    A.  Yes.
14    Q.  And it only the questionable ballots that move
15  to the early voting ballot board; is that correct?
16    A.  Correct.
17    Q.  Does the early voting ballot board then have
18  any role with respect to matching ID numbers?
19    A.  They do.
20    Q.  What is that role?
21    A.  They take -- they assume the same process as
22  the SVC.
23    Q.  And how do you contact the voter once the early
24  voting ballot board meets?
25    A.  We keep the ballot in our possession and notify



Jennifer Colvin                                    March 21, 2023
                                                   Pages 30 to 33

Page 30

1  returned -- those are ballots that were just not
2  returned by the voter, correct?
3      A. Right. They had no return status in our
4  system.
5      Q. What about mail ballots surrendered?
6      A. Those are voters that surrendered their ballots
7  at the poll if they wanted to vote early on Election
8  Day.
9      Q. And for a voter who did not include their ID
10 number or had a mismatched ID number, were they then
11 able to return their ballot and vote in person if they
12 had time?
13     A. Yes.
14     Q. And so the mail ballot surrendered, does that
15 include those individuals?
16     A. It could possibly.
17     Q. Okay. And then mail ballots not countable,
18 what does that mean?
19     A. That would mean they either came in after the
20 election. They were late ballots. They're not
21 countable ballots.
22     Q. And so the -- with the exception of the mail
23 ballots not countable, the other numbers are all ballots
24 that would have been received before the ballot-received
25 deadline the day after the election?

Page 31

1      A. Yes.
2      Q. Thank you. And let's go back to page 16. And
3  so it says "The EOA processed over 80,000 mail ballot
4  applications as reflected in the table below."
5          Did I read that correctly?
6      A. Yes.
7      Q. Okay.
8      A. EAO.
9      Q. EAO.
10     A. Yes.
11     Q. Thank you. And so we have domestic versus
12 UOCAVA voters, correct?
13     A. Yes.
14     Q. When a military or overseas voter did not
15 include an ID or had -- let's say had a defect in their
16 ballot, how would you go about contacting that military
17 voter?
18     A. Via e-mail or phone.
19     Q. And a military voter has the option of
20 resubmitting their signature sheet; is that correct?
21     A. Correct.
22     Q. And can they resubmit -- resubmit that
23 signature sheet via e-mail?
24     A. Correct.
25     Q. And so you can contact a military voter about a

Page 32

1  ID number defect by e-mail and have it resolved by
2  e-mail and returned?
3      A. Correct.
4      Q. And did you observe that, looking at the
5  rejected ballot, generally, that some ballots had
6  multiple defects, not just one?
7      A. Yes.
8      Q. Now, when you're reporting that defect, do you
9  put only one reason, or do you put the fact that there
10 were multiple defects?
11     A. VOTEC only allows us to put one reason. The
12 voter will get a letter for both reasons.
13     Q. So there are some voters who may be listed as
14 having one defect but their ballot in fact had
15 multiple -- is that correct? -- in your system?
16         MS. HOLMES: Objection to form.
17         MS. HUNKER: You can answer the question.
18     A. Correct. Well, let me -- let me elaborate.
19 Both of the letters will be in the system. So if a
20 voter were to call us, we can see both letters that were
21 sent. So we can tell them, yes, there was more than one
22 defect. But as far as reporting to the State, you can
23 only send one code.
24     Q. (BY MS. HUNKER) And so your reports to the
25 State only reflect one defect, not the -- not if there

Page 33

1  were multiple defects?
2      A. Correct.
3      Q. And looking specifically at the UOCAVA voters
4  who had their ballots rejected, did you look at the
5  reasons why those ballots were rejected?
6      A. Not each one individually, no.
7      Q. Were they rejected for a variety of reasons?
8      A. Yes.
9      Q. And so I just want to talk a little bit about a
10 little later on page where it says "Mail ballot problems
11 encountered," second paragraph specifically. It says:
12 "During the mail ballot period, the EAO received reports
13 that voters were not receiving" bal- -- "mail ballots
14 and that voters were being charged extra postage because
15 of the size of the carrier envelope."
16         Did I read that correctly?
17     A. Yes.
18     Q. And did your office ever determine why certain
19 voters were not receiving their ballots?
20     A. No.
21     Q. And for the voters who were not receiving their
22 ballots, the ballot was sent. It just was not received;
23 is that correct?
24     A. Correct.
25     Q. And so there was some issue with the postal



Jennifer Colvin                                                    March 21, 2023
                                                                Pages 98 to 101

Page 98

1    A.  We had less.  There were more rejects due to ID
2  in previous elections.
3    Q.  (BY MS. HUNKER)  Now, you had spoken a little
4  bit with counsel about the different codes for when a
5  ballot was rejected for an ID requirement.  Is there a
6  separate code if there's a rejection due to lack of
7  signature?
8    A.  Yes.
9    Q.  Do you recommend that voters put down their
10  phone number or e-mail when they're applying to vote by
11  mail?
12    A.  Does our office recommend it?
13    Q.  Yes.
14    A.  Yes.  So we can reach out to the voters if
15  there's a problem with their application.
16    Q.  And do you find that most voters follow through
17  on your recommendation?
18    A.  We get a lot of phone numbers and e-mails.
19    Q.  You also discussed with counsel about that
20  there were occasions where the county voting system had
21  two IDs but the TEAM's database only had one.
22          Do you recall that conversation?
23    A.  Yes.
24    Q.  When you notice that the county database has
25  two ID numbers but the TEAM's database only has one, do

Page 99

1  you inform the secretary of state's office to update the
2  TEAM's database?
3    A.  No.
4    Q.  And do you know if there's -- if there's a
5  policy or procedure that perhaps your tech division has
6  with respect to updating?
7    A.  I don't know.
8    Q.  Okay.  If the county database only has one
9  number but the TEAM's database has two numbers and the
10  number the voter put is the one that was in the TEAM's
11  database but not the one in the county's database, you
12  would accept that ballot; is that correct?
13    A.  Correct.
14    Q.  There's an option for voters with disabilities
15  as well as voters over 65 to submit an application for
16  ballot by mail for the entire year, correct?
17    A.  Correct.  Annual.
18    Q.  And you've already started receiving annual
19  applications for the 2023?
20    A.  That's correct.
21    Q.  And did you notice fewer rejections for the
22  applications that were submitted this year due to the ID
23  mismatch or lack of ID as compared to previous elections
24  in 2022?
25    A.  I haven't analyzed that data, but we're

Page 100

1  receiving very minimal applications right now.
2    Q.  Okay.  To your knowledge, has Harris County
3  ever had a rejection rate for ballots by mail that was
4  zero?
5    A.  No.
6    Q.  And so I want to turn to Exhibit 16 which was
7  provided by your office during this deposition.
8    A.  16.
9    Q.  Yes.  This is the updated...
10    A.  Oh, my apologies.  It's right in front of me.
11    Q.  So looking at -- let me take a step back.
12          Are you using the same database, offline
13  database, in 2022, as you were in these previous
14  elections?
15    A.  Yes.
16    Q.  And how did you come to these rejection rates
17  for previous elections?
18    A.  From numbers within the voter management
19  system.
20    Q.  Were you required to report rejections prior to
21  2022?
22    A.  Yes.
23    Q.  And was that reported to the secretary of
24  state's office?
25    A.  Yes.

Page 101

1    Q.  And so in previous elections, Texas utilized
2  signature verification, correct?
3    A.  Yes.
4    Q.  And do you know if the signature verification
5  committee utilized the same standard election from
6  election?
7          MS. HOLMES:  Objection to form.
8    A.  Yes.
9    Q.  (BY MS. HUNKER)  And did they utilize the same
10  standard election to election?
11          MS. HOLMES:  Objection to form.
12    A.  Repeat that.
13    Q.  (BY MS. HUNKER)  So my first question was did
14  you know if they did, and then I realized that was maybe
15  not clear.  And so I just wanted to clarify, did they
16  use the same standard for signature verification
17  election from election?
18    A.  Prior to SB1, they didn't have to compare IDs.
19  But after SB1, they had to compare IDs.  That's the
20  difference in their processes.
21    Q.  So I think I maybe, then, asked a confusing
22  question.  So I'm talking about the signature
23  verification, not ID --
24    A.  Only their signature verification?
25    Q.  Only their signature verification.  So there



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX J

Jacqueline Doyer                                    March 29, 2023

1        IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF TEXAS
2              SAN ANTONIO DIVISION

3   LA UNION DEL PUEBLO      )
    ENTERO, ET AL.,          )
4        Plaintiffs,     )
                         )
5   VS.              ) CIVIL ACTION NO.
                 ) 5:21-CV-844 (XR)
6   STATE OF TEXAS, ET AL.,   )
        Defendants.     )
7

8        ----------------------------------

9            ORAL DEPOSITION OF

10           JACQUELINE DOYER

11            MARCH 29, 2023

12       ----------------------------------

13

14

15

16

17        ORAL DEPOSITION OF JACQUELINE DOYER,

18   produced as a witness at the instance of the Defendants,

19   and duly sworn, was taken in the above-styled and

20   numbered cause on the 29th day of March, 2023, from

21   3:14 p.m. to 4:03 p.m., before JAZZMEN CANALES, CSR, in

22   and for the State of Texas, reported by machine

23   shorthand at 209 West 14th Street, Austin, Texas 78701,

24   pursuant to the Texas Rules of Civil Procedure and the

25   provisions stated on the record or attached hereto.



Jacqueline Doyer

March 29, 2023
Pages 2 to 5

Page 2

1  A P P E A R A N C E S
2  FOR THE PLAINTIFFS:
3    MS. NINA PERALES
     MALDEF
4     110 Broadway, Suite 300
      San Antonio, Texas 78205
5     210-224-5476
      E-mail: nperales@maldef.org
6
   FOR THE HOUSTON AREA URBAN LEAGUE PLAINTIFFS:
7
     MR. VICTOR GENECIN (Via Videoconference)
8    NAACP Legal Defense and Educational Fund, Inc.
     40 Rector Street, 5th Floor
9    New York, New York 10006
     929-388-9246
10    E-mail:  vgenecin@naacpldf.org
11 FOR THE DEFENDANTS:
12   MS. KATHLEEN HUNKER
     MR. ETHAN SZUMANSKI
13   MR. ADAM BITTERS
     Office of the Attorney General of Texas
14   P.O. Box 12548
     Austin, Texas 78711
15    512-936-2275
     E-mail: kathleen.hunker@oag.texas.gov
16
   FOR THE UNITED STATES:
17
     MR. MICHAEL STEWART
18   MR. DANIEL FREEMAN
     MR. RICHARD DELLHEIM
19   U.S. Department of Justice
     950 Pennsylvania Avenue NW
20   Washington, D.C. 20530
     202-307-2767
21    E-mail:  michael.stewart3@usdoj.gov
22
23
24
25

Page 3

1         I N D E X
2                            PAGE
3  Appearances.....................................  2
4  JACQUELINE DOYER
5    Examination By Mr. Stewart................  5
     Examination By Mr. Genecin...............  36
6
   Changes and Signature Page ...................  41
7
   Reporter's Certificate .......................  43
8
9         E X H I B I T S
10 NUMBER  DESCRIPTION                     PAGE
11  23   Audit report                        9
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1         THE COURT REPORTER:  At this time, the
2  deposition of Jacqueline Hagan Doyer is being taken in
3  the United States District Court For the Western
4  District of Texas, San Antonio Division, Civil Action
5  No. 5:21-cv-844 (XR), styled La Unión Del Pueblo Entero,
6  et al. vs. State of Texas, et al.  This deposition is
7  being taken at The Price Daniel Sr. State Office
8  Building, 209 West 14th Street, Austin, Texas 78701.
9  The court reporter is Jazzmen Canales.  May counsel
10 please state your appearances,
11         MR. STEWART:  Michael Stewart for the
12 United States.  With me is Daniel Freeman and Richard
13 Dellheim.
14         MS. PERELAS:  Nina Perales of Plaintiff
15 LUPE, L-U-P-E, et al.
16         MR. STEWART:  Anyone who plans to ask
17 questions to the Zoom?
18         MS. HUNKER:  Kathleen Hunker with Ethan
19 Szumanski from the Office of the Texas Attorney General
20 representing State Defendants individual legislators.
21 With me is Adam Bitter and Zina Chala from the Office of
22 the Secretary of State.
23         JACQUELINE HAGAN DOYLE,
24 having been first duly sworn, testified as follows:
25

Page 5

1         EXAMINATION
2  BY MR. STEWART:
3     Q.  Good afternoon.  Do you prefer Doyer or Hagan
4  Doyer?
5     A.  Doyer.
6     Q.  First question, you did great.  So as we just
7  said, I am here on behalf of the United States.  My name
8  is Mike Stewart.  My understanding you are here as
9  representative of the Secretary of State's office today;
10 is that correct?
11    A.  That's correct.
12    Q.  Okay.  Thank you.  And I am understanding that
13 you are here to testify about the audit-related
14 questions in the notice of deposition; is that correct?
15    A.  I understood with regard to the audit report
16 and the specified sections of the report.
17    Q.  Great.  Thank you.  Have you been deposed
18 before?
19    A.  I have not.
20    Q.  Okay.  So before we start, I just want to real
21 quickly go through ground rules that will set us up
22 smoothly.  So a deposition, as you probably see, it goes
23 by question and answer.  The reporter can only take down
24 what you say out loud, so all your answers need to be
25 verbal.  Is that okay?



Jacqueline Doyer

March 29, 2023
Pages 6 to 9

Page 6

1   A. Yes, sir.
2   Q. I will try my best not to talk over you, and if
3 you can wait until I am finished asking the question,
4 that will work best.  If ever I cut you off, just let me
5 know, and we can make sure your full answer gets on the
6 record.  Okay?
7   A. Yes.
8   Q. So it is important to answer completely and
9 accurately to the best of your ability.  Do you
10 understand that?
11   A. Yes.
12   Q. Great.  If I ever ask a question that is
13 unclear, you can ask me for clarification.  Okay?
14   A. Yes.
15   Q. Your attorney or attorney for another party may
16 object.  That's fine.  And I will give them a second
17 before you answer to allow them to object.  But unless
18 you are instructed not to answer or there is a privilege
19 basis not to answer, you can go ahead and answer the
20 question regardless.  Okay?
21   A. Yes.
22   Q. Once the question is pending, I will just ask
23 that you answer that question before you consult with
24 your attorney or anything.  Is that okay?
25   A. I understand.

Page 7

1   Q. And then if you need a break -- this should be
2 short -- but just let me know, and we can see about
3 that.  If you later remember something you forgot
4 earlier or want to add, just let me know, we can get
5 that on the record.  Okay?
6   A. Understand.
7   Q. If you can think of a document that would help
8 refresh your recollection, we may have it.  Just let me
9 know.  Okay?
10   A. It looks like.
11   Q. This is just one, I will say that.  And then
12 just -- this is a necessary question.  But have you
13 taken any medication, alcohol, drugs, anything that
14 would affect your ability to understand what I am asking
15 or give a complete answer today?
16   A. No, sir.
17   Q. Okay.  And then you understand you are under
18 oath, subject to penalties for false or misleading
19 testimony, correct?
20   A. I understand.
21   Q. Okay.  Great.  So how did you prepare to
22 testify for this deposition?
23   A. I met with my attorneys.
24   Q. And who would that be?
25   A. I met with Kathleen Hunker.

Page 8

1   Q. Anyone else?
2   A. I met with Adam Bitter.
3   Q. And anyone else?
4   A. I met with Zina Chala.
5   Q. Is that all?
6   A. I also met with the members of the FAD team.
7   Q. Okay.  And those would be -- and do those
8 individuals report to you on the FAD team?
9   A. Some of them.
10   Q. Some of them.  And what were their roles?
11   A. I have auditors that report to me, and then I
12 also have a legal assistant that reports to me.
13   Q. Okay.  And when we say -- when you say FAD
14 team, that's the Forensic Audit Division of the
15 Secretary of State?
16   A. That is correct.
17   Q. Great.  Thank you.  Did you review any
18 documents in the course of your preparation?
19   A. I did.
20   Q. What documents were those?
21   A. I reviewed the audit report.
22   Q. Okay.  Anything else?
23   A. I reviewed portions of the election code.
24   Q. Okay.  And then did you bring any documents
25 with you here today?

Page 9

1   A. I did.
2   Q. What did you bring with you?
3   A. I brought a copy of the audit report and a copy
4 of the letter we sent to Harris County.
5   Q. Okay.  Thank you.  So -- and then just real
6 quickly.  Can you tell me what your role is in the
7 Forensic Audit Division?
8   A. I am the deputy and legal director for the
9 division.
10   Q. And how long have you been in that role?
11   A. I was promoted in that role in November of
12 2022.
13   Q. Okay.  Thank you.  Were you with the Forensic
14 Audit Division before that?
15   A. I was.
16   Q. What was your role then?
17   A. I served as the attorney to the division.
18   Q. And when did you begin that?
19   A. April of 2022.
20   Q. Is that when you first joined the audit
21 division?
22   A. It is.
23   Q. Okay.  So I am going to mark Exhibit 23.
24       (Exhibit 23 marked.)
25   Q. (BY MR. STEWART)  Do you recognize this



Page 10

1 document?
2    A. I do.
3    Q. What is it?
4    A. It appears to be a copy of our final report
5 issued in December of 2022.
6    Q. Thank you. So what were the goals of the
7 forensic audit for which this is the final report?
8    A. I believe that's reflected in the executive
9 summary.
10    Q. Is the executive summary complete and accurate
11 as to the goals of the audit?
12    A. Yes.
13    Q. Who was involved in designing the audit?
14    A. I don't understand your question.
15    Q. So what individuals within the audit division
16 were involved in designing the, shall I say,
17 investigative task of the audit?
18       MS. HUNKER: Objection. Form.
19    A. Can you specify what you mean by design?
20    Q. (BY MR. STEWART) Sure. So I guess to say,
21 when you determined -- or as the Forensic Audit Division
22 was determining, sort of, what to examine and how they
23 were going to examine it, who was involved in those
24 conversations?
25    A. I was involved in those conversations.

Page 11

1    Q. Who else?
2    A. Our director.
3    Q. Anyone else?
4    A. Auditors.
5    Q. Anyone outside the division involved in those
6 conversations?
7    A. The secretary.
8    Q. The secretary. Anyone outside the Secretary of
9 State's office involved in those conversations?
10    A. No.
11    Q. Okay. How were the topics for the audit
12 chosen?
13    A. They were data driven.
14    Q. And by data driven, what does that mean?
15    A. Based on the records that were provided, we
16 evaluated what areas had auditable points.
17    Q. And by the records you provided, provided by
18 whom?
19    A. Provided by the counties to -- directly to the
20 Forensic Audit Division or provided by the counties to
21 the elections division and then passed on to our
22 division.
23    Q. Were those records from the 2022 general
24 election?
25    A. Yes, they were.

Page 12

1    Q. Were there other types of records you are
2 referring to there?
3    A. Not that I am aware of.
4    Q. Were those records the counties required to
5 maintain or additional materials as well?
6    A. I want to correct something.
7    Q. Sure.
8    A. We did get some records from Tarrant County for
9 2022. They submitted those in error.
10    Q. Okay. But then going back to the previous
11 question, were those all records the counties were
12 required to maintain, or were there additional materials
13 they had that were also provided to you?
14    A. They were records they were required to
15 maintain, for the most part, or things that they kept as
16 a regular practice.
17    Q. Got it. Were there any -- besides your review
18 of the records provided by the counties, were there any
19 specific issues with the 2020 general election that were
20 identified as a reason for the audit?
21       MS. HUNKER: Objection. Form.
22    A. Can you maybe specify what you mean by that?
23    Q. (BY MR. STEWART) Yeah. Was there some sort of
24 imminence for the audit, either an error or mistake you
25 noticed or something that you thought merit an

Page 13

1 investigation that was a reason for the audit?
2    A. The reason for the audit is reflected in the
3 executive summary.
4    Q. Okay.
5    A. To ensure that all Texas voters can have
6 confidence in the election systems in our state.
7    Q. Was there a feeling that Texas voters did not
8 have confidence?
9       MS. HUNKER: Objection. Form.
10    A. I am not aware of the feelings that were
11 present. I am just here to testify about what's in the
12 report.
13    Q. (BY MR. STEWART) Fair. The question I am
14 trying to ask is, was that statement included in the
15 audit report based on an understanding in the Secretary
16 of State's office that voters did not have confidence in
17 the 2020 general election?
18       MS. HUNKER: Objection. Form.
19    A. This -- the audit was to ensure that Texas
20 voters can have confidence in the election systems in
21 our state.
22    Q. (BY MR. STEWART) Well, did the Secretary of
23 State's office and the Forensic Audit Division have any
24 specific information that voters did not have
25 confidence?



Jacqueline Doyer

March 29, 2023
Pages 14 to 17

Page 14

1    A.  I don't believe the agency has an official
2  position on that.
3    Q.  Okay.  Were there any information requests sent
4  to counties that were not reflected in the final report?
5    A.  When you say information requests, what do you
6  mean?
7    Q.  So let me back up then.  You -- you mentioned
8  that the audit was based on data and records sent to the
9  audit division by the counties, correct?
10    A.  Sent to our division by the counties or sent to
11  the election division and then provided to us.
12    Q.  Okay.  So I will broadly refer to the Secretary
13  of State's office, to be clear, because those are both
14  under the Secretary of State, right?
15    A.  Yes.
16    Q.  Okay.  Was that all items that were reported by
17  the counties in due course, or were there items
18  specifically requested by the Secretary of State's
19  office for the purpose of the audit?
20    A.  Some of the items reviewed were provided in due
21  course.  Some of the items reviewed were provided in
22  response to the request.
23    Q.  Okay.  And were there any specifically
24  requested items by the Secretary of State's office that
25  aren't reflected -- that their requests are not

Page 15

1  reflected somewhere in the body of this report?
2    A.  I am not sure what you mean by that.
3    Q.  I guess I am saying, was -- was each
4  information request you made, like a cataloging of it,
5  reflected somewhere in this report?
6    A.  Information requests are not cataloged in the
7  report.
8    Q.  So there are -- are there information you
9  received from counties that didn't lead into the final
10  audit report?
11        MS. HUNKER:  Objection.  Form.
12    A.  We received 369 gigabytes of data, and this is
13  a 359-page report.
14    Q.  (BY MR. STEWART)  Fair.
15    A.  Not everything is included in the report.
16    Q.  Let's talk about more categorically.  So were
17  there sort of areas -- you know, there's a list of
18  topics here.  So sort of topically, was there anything
19  investigated that did not -- or audited, I should say,
20  that did not end up in the final report?
21    A.  When you say audited that did not end up in the
22  final report, what do you mean by that?
23    Q.  Let me rephrase it this way.  Were there any
24  conclusions the audit division came to that were not
25  included in the final record?

Page 16

1    A.  No.  The audit division's conclusions are
2  reflected in the report.
3    Q.  Okay.  Which entities were being evaluated in
4  the audit report?
5    A.  When you say entities, do you mean counties?
6    Q.  Yes.
7    A.  The counties were Collin County, Dallas County,
8  Harris County, and Tarrant County.
9    Q.  Was any state governmental entity, other than
10  those four counties, evaluated by the report?
11    A.  What do you mean by state governmental entity?
12    Q.  Sure.  Whether it is at the state level, county
13  level, municipal level.  So taking state agencies, like
14  the AOG's office or the SOS, other counties, or, you
15  know, subdivision of counties, municipalities.  Was
16  anything other than those four counties you've
17  identified evaluated by the audit report?
18        MS. HUNKER:  Objection.  Form.
19    A.  I still don't understand the question.
20    Q.  (BY MR. STEWART)  Sure.  Are there any
21  conclusions about the performance of the Secretary of
22  State's office in the 2020 general election in this
23  audit report?
24    A.  We did not evaluate the Secretary of State's
25  office.

Page 17

1    Q.  Did you evaluate the Attorney General's office?
2    A.  We did not evaluate the Attorney General's
3  office.
4    Q.  Did you evaluate any counties other than the
5  four counties identified in the report?
6    A.  In the report, we only identified the four
7  counties, Collin, Dallas, Harris, and Tarrant County.
8    Q.  And those were the only counties evaluated by
9  the report?
10    A.  That's correct.
11    Q.  Okay.  Was the performance of early voting
12  ballot boards in those counties evaluated?
13        MS. HUNKER:  Objection.  Form.
14    A.  What do you mean by performance?
15    Q.  (BY MR. STEWART)  Well, let me rephrase it.
16  Were aspects of the activities of the early voting
17  ballot boards in those counties evaluated?
18        MS. HUNKER:  Objection.  Form.
19    A.  What do you mean by evaluated?
20    Q.  (BY MR. STEWART)  Sure.  Audited.  Did you
21  audit any aspect of, you know, how early voting ballot
22  boards performed their duties?
23        MS. HUNKER:  Same objection.
24    A.  When you say audit, can you be more specific?
25    Q.  (BY MR. STEWART)  Yeah.  All the activities



Jacqueline Doyer

March 29, 2023
Pages 18 to 21

Page 18

1 conducted in order to prepare this final report.
2        MS. HUNKER: Objection. Form.
3    A. I still don't understand the question.
4    Q. (BY MR. STEWART) Sure. Did you send any
5 information requests specifically regarding early voting
6 ballot boards?
7    A. We did send those type of requests.
8    Q. And did you come to any conclusions about the
9 performance of early voting ballot boards?
10    A. We did not evaluate the performance of early
11 voting ballot boards.
12    Q. Did you evaluate the performance of any
13 signature verification committees?
14        MS. HUNKER: Objection. Form.
15    A. What do you mean by performance?
16    Q. (BY MR. STEWART) I guess I put that back to
17 you. When you say you did not evaluate the performance
18 of early voting ballot boards, what did you mean by
19 that?
20    A. We didn't evaluate how they did things.
21    Q. Okay.
22    A. We evaluated the processes and procedures that
23 each county used.
24    Q. And by evaluated, were you saying whether they
25 were good or bad, or what do you mean by evaluated in

Page 19

1 this context?
2    A. We asked questions, and then we reported on the
3 procedures.
4    Q. Okay. And so using that same definition of
5 performance you've used for the early voting ballot
6 boards, did you evaluate the performance of the
7 signature verification committees?
8    A. We asked questions for the counties that has
9 signature verification committees as to how they did
10 things and reported on those procedures.
11    Q. Okay. I want to turn to the mail voting
12 section of this audit report, which I believe starts on
13 Page 198. And just so we are clear for the record, the
14 word "TEAM" appears in this report. Does that refer to
15 the Texas Election Administration Management database?
16    A. It does.
17    Q. Okay. And then when you use -- not you, but
18 when the SOS uses ABBM in this report, is that
19 application for ballot by mail?
20    A. Yes, sir.
21    Q. And BBM is just the ballot by mail, correct?
22    A. Yes, sir.
23    Q. Okay. I am going to turn quickly to Page 210
24 then. The second paragraph, it says, the counties were
25 unform in that they did not have a system or spreadsheet

Page 20

1 in place for tracking some rejected ABBMs. This refers
2 to the pre-Senate Bill 1 system, correct?
3        MS. HUNKER: Objection. Form.
4    A. The law contained in the code -- for the law
5 contained in the report that we were evaluating the
6 counties on was pre-SB1.
7    Q. (BY MR. STEWART) Okay.
8    A. That existed in 2020.
9    Q. So that's generally applicable to the audit,
10 right, that this all from before SB1?
11    A. That's correct.
12    Q. Okay. Did you make any conclusions in the
13 audit report about how the processes or procedures
14 evaluated would comply with SB1?
15    A. We did not.
16    Q. Okay. So in the next paragraph, it says, one
17 of the limitations with counties that are not online
18 with the TEAM database is the fact that the counties
19 must provide uploads to update the data that populates
20 TEAM. And then it says, there could be delays between
21 the counties reporting and upload to the database,
22 attributable to the action of the counties, actions of
23 the counties, or their offline vendors. This can
24 negatively affect the accuracy of the records contained
25 in TEAM. Did I read that correctly?

Page 21

1    A. You did.
2    Q. Okay. Were all of the audited counties offline
3 counties?
4    A. Yes, they were all offline counties.
5    Q. Did all of them have delays in uploading
6 records to TEAM?
7    A. That would not be within my knowledge.
8    Q. Okay. Do you know who would know that?
9    A. Somebody who has more knowledge of the TEAM
10 system.
11    Q. Would it be someone within the Forensic Audit
12 Division who would know that?
13    A. No.
14    Q. Was any aspect of TEAM evaluated or considered
15 during the audit?
16    A. What do you mean by that?
17    Q. Sure. Was the performance of TEAM evaluated?
18    A. Could you specify --
19        MS. HUNKER: Objection. Form.
20    Q. (BY MR. STEWART) Yeah. Was there anything
21 about the accuracy of the records in TEAM that was
22 evaluated in the course of the audit?
23    A. We were not evaluating TEAM. However, if
24 somebody's vote history, as uploaded by the county, was
25 inaccurate in TEAM, that's tied to the voter


MAGNA ▶
LEGAL SERVICES

Jacqueline Doyer

March 29, 2023
Pages 22 to 25

Page 22
1 participating history that's uploaded by the county.
2    Q. Okay. Did you find instances where the vote
3 history was inaccurate in TEAM?
4    A. Yes.
5    Q. How frequently did that occur?
6        MS. HUNKER: Objection. Form.
7    A. The frequency is not in the report.
8    Q. (BY MR. STEWART) For the purposes of preparing
9 this report, did the Forensic Audit Division look into
10 mail ballot impersonation fraud?
11    A. What do you mean by that?
12    Q. Did you conduct any activities or investigation
13 that would reveal mail ballot impersonation fraud?
14        MS. HUNKER: Objection. Form.
15    A. What type of activities?
16    Q. (BY MR. STEWART) I guess that's my question to
17 you. Is that something that was being audited? Was
18 that within the scope -- let me withdraw that question.
19        Was mail ballot fraud within the scope of
20 this audit?
21        MS. HUNKER: Objection. Form.
22    A. I am not sure I understand that question.
23    Q. (BY MR. STEWART) Sure. Was -- did you reach
24 any conclusions regarding the existence or nonexistence
25 of mail ballot fraud in any of these counties?

Page 23
1        MS. HUNKER: Objection. Form.
2    A. We did not reach any conclusions as to whether
3 or not there was mail ballot fraud.
4    Q. (BY MR. STEWART) Did you assess any procedures
5 that might identify whether or not there was mail ballot
6 fraud in any of these counties?
7    A. Procedures by whom?
8    Q. By the counties.
9    A. I am not sure that procedures by the counties
10 would indicate whether or not there was mail voter
11 fraud.
12    Q. Okay. Did you assess any procedures by any
13 other entity that might indicate whether or not there
14 was mail voter fraud?
15    A. No. We only assessed the four counties.
16    Q. Okay. And so did -- you did assess county
17 procedures, though, correct?
18    A. Yes.
19    Q. And so I am correct in saying -- your testimony
20 here today is that none of those procedures would
21 indicate positively or negatively the existence of mail
22 voter fraud?
23        MS. HUNKER: Objection. Form. Misstates
24 testimony.
25    A. Procedures themselves did not indicate whether

Page 24
1 or not mail voter fraud occurred in 2020 for those four
2 counties.
3    Q. (BY MR. STEWART) I want to look at this
4 section on Dallas County, which is on Page 214. And I
5 think in that sentence you mentioned difficulties in
6 processing the high volume of mail ballots; is that
7 correct?
8    A. Yes. Dallas County experienced difficulties in
9 processing the high volume of ballots by mail due to
10 staff turnover that occurred just prior to the 2020
11 general election.
12    Q. All right. Is there any other reason you
13 identified that wasn't included in here, or is that sort
14 of the only conclusion made as to the reason for
15 difficulty in processing mail ballots in 2020 in Dallas?
16    A. I'm sorry. Can you rephrase that?
17    Q. Sure. So this mentions the conclusion, you
18 know, it gives the reason why there was difficulty in
19 processing the high volume of mail ballots. Was there
20 any reasons that you discovered that weren't reflected
21 in the final report?
22    A. No. There's additional reasons reflected on
23 214, but not that are absent from the report.
24    Q. Nothing that's not in the report?
25    A. That's correct.

Page 25
1    Q. Okay. And then turning to Harris County, which
2 is on 216, there's a -- the second sentence here says,
3 the BBM process was described to FAD as chaotic. Do you
4 know who made that description as chaotic?
5    A. It was one of the witnesses or individuals that
6 we spoke to during the course of the audit.
7    Q. Do you know if that would be someone who worked
8 for the Harris County elections office?
9    A. Honestly, I can't remember.
10    Q. When it says the BBM process, is there any
11 specific processes it is referring to?
12    A. I think it is the whole process.
13    Q. And it says one of the reasons attributed to
14 this description was the volume of ballots by mail.
15 Were there any other reasons attributed to the
16 description of the process as chaotic that aren't
17 reflected here?
18        MS. HUNKER: Objection. Form.
19    A. There aren't any other reasons reflected in the
20 report.
21    Q. (BY MR. STEWART) Are there any reasons that
22 are not reflected in the report but of which the
23 Forensic Audit Division is aware?
24    A. What is in the report is what the final
25 determinations were.



Jacqueline Doyer

March 29, 2023
Pages 26 to 29

Page 26

1    Q.  Okay.  Was there any evaluation of ABBM
2 processes in Harris County?
3    A.  What do you mean when you say evaluation?
4    Q.  Sure.  Was there any auditing of ABBM processes
5 in Harris County?
6    A.  We were not able to discuss the ABBM processes
7 in Harris County because Harris County staff was not
8 made available regarding that matter.
9    Q.  Looking at now the last paragraph on 216 but
10 then rolls over into 217.  On the first line of 217, it
11 describes questionable carrier envelope in the sentence.
12 Any questionable carrier envelope is removed from a
13 batch and wrapped in a separate sheet for further
14 review.  Do you see where I am?
15    A.  Yes, sir.
16    Q.  What is meant by questionable carrier envelope
17 in that sentence?
18    A.  From our understanding out in the field,
19 questionable carrier envelope could be one that maybe
20 didn't have a matching signature or there was something
21 that needed to go on for further review by a ballot
22 board or another TEAM.  Harris County had a very
23 specific system that used multiple TEAMs.
24    Q.  Is the -- is the description as questionable
25 there meant to indicate potential fraud?

Page 27

1         MS. HUNKER:  Objection.  Form.
2    A.  The description of questionable is the word
3 that was used by the witnesses or individuals we were
4 able to speak with.
5    Q.  (BY MR. STEWART)  So you are reflecting exactly
6 what was said by the individuals interviewed?
7    A.  I wouldn't say exactly because obviously things
8 have been paraphrased.  But that was the term that was
9 used, and they used in other counties as well,
10 questionable or questioned.
11    Q.  Did the Forensic Audit Division have any
12 understanding that the term "questionable" meant a
13 ballot could be fraudulent?
14    A.  We didn't have an understanding of that.
15 Questionable usually meant that they couldn't agree, so
16 they asked another set of eyes to look at it.
17    Q.  Couldn't agree on what specifically?
18    A.  The signatures.
19    Q.  The signature.  Is a signature itself
20 potentially indicative of fraud?
21         MS. HUNKER:  Objection.  Form.  And how you
22 phrase it is outside the scope of her deposition topics.
23    A.  I don't know that I can speak to that.  It is
24 not reflected in the report.
25    Q.  (BY MR. STEWART)  Let me ask it that way.  Is

Page 28

1 there any indication either way of whether a signature
2 itself can be potentially indicative of fraud in the
3 audit report?
4    A.  We did not evaluate whether signatures
5 themselves could be potentially indicative of fraud.
6    Q.  Okay.  All right.  Turning to Page 224, there
7 is a section that begins, reason for requesting ballot
8 by mail.  I would say that -- is it correct to
9 characterize that in each county in which you had data,
10 the FAD determined that at least some voters who were
11 not eligible were permitted to vote by mail; is that
12 correct?
13    A.  So in the data available from the counties, we
14 were able to determine there were some individuals that
15 were not entitled to vote by mail for the reason of age
16 that did appear to have received a ballot.
17    Q.  Did the audit division conduct any analysis of
18 the root cause of why that occurred?
19    A.  Yes.
20    Q.  And what was the audit division's
21 determination?
22    A.  There were multiple reasons.
23    Q.  And what were they?
24    A.  One of the reasons was miscoding by the county.
25    Q.  What other reasons?

Page 29

1    A.  Another reason would be attaching a record, for
2 example, in a junior, senior situation, to the wrong
3 individual.  So it -- the record may have reflected that
4 a ballot by mail was issued to the junior when in fact
5 the senior had requested it, and the senior was the one
6 who wanted to vote by mail.
7    Q.  Were there any reasons that would have been
8 based on an action of the voter as opposed to county
9 election officials?
10    A.  Yes.
11    Q.  What were those?
12    A.  Not including information on the application
13 for a ballot by mail that would have indicated they were
14 eligible to vote by mail.
15    Q.  Any others?
16    A.  Yes.  For example -- let's see here.  On
17 Page 226, 42 voters had applications that requested to
18 vote by mail due to being 65 or older, but date of birth
19 records indicated the voters were not 65.
20    Q.  Any reasons that aren't reflected here on the
21 report?
22    A.  No.
23    Q.  Turning to Page 229.  It appears that with
24 respect to Dallas County you identified an issue
25 described here as bulk applications for ballot by mail,



Page 30

1 correct?
2   A.  Yes.
3   Q.  Can you describe just briefly for me what that
4 issue was?
5   A.  We identified from their record that they had
6 boxes containing applications received in bundle for
7 ballots by mail.
8   Q.  Did you determine whether those applications
9 received in bundle for ballots by mail violated state
10 law?
11   A.  We do not make those determinations.
12   Q.  Okay.  Did you refer this matter to the
13 Attorney General's office?
14       MS. HUNKER:  Objection.  I am going to
15 raise investigative privilege.  This is not saying you
16 can't answer, but I am going to advise you to only
17 answer information that either would be publicly
18 available or would not compromise the integrity of the
19 investigation as well as any specific information or
20 details that would be related to an ongoing prosecution
21 or one that was referred.
22       MR. STEWART:  Just for the clarity of the
23 record, would that include information whether it was
24 referred at all?  Just a yes or no.
25       MS. HUNKER:  If she is talking about

Page 31

1 specifics, yes.  If she is talking about like the
2 generality of like a subject area --
3       MR. STEWART:  Okay.
4       MS. HUNKER:  -- then no.  I just want to
5 make sure she doesn't get into the nitty-gritty.
6       MR. STEWART:  Yeah.  I just want to
7 understand the line.
8   A.  The Office of the Attorney General had agreed
9 to assist with providing additional information so that
10 occurrence in Dallas County could be referred to the
11 local authorities for investigation and potential
12 prosecution.
13   Q.  (BY MR. STEWART)  I see.  Do you know whether
14 there have been any prosecutions based on this issue
15 identified in this report here?
16   A.  That is not within the scope of my knowledge.
17   Q.  Okay.  Did the Forensic Audit Division speak
18 with the -- any individuals involved or described here?
19   A.  Can you be more specific?
20   Q.  Sure.  So I think it identifies an assistant
21 who signed multiple ABBMs as an assistant.  Did you
22 speak with that individual?
23   A.  Which page are we on?
24   Q.  I think we are on 230.  One address in
25 particular identified as an assisted living facility was

Page 32

1 the source of 55 ABBMs submitted with the same
2 individual's name as the assistant on all 55
3 applications.  Did the audit division speak with that
4 assistant?
5   A.  We did not.
6   Q.  Did you speak with any of the voters?
7   A.  We did not.
8   Q.  Did you visit that facility?
9   A.  We did not.
10   Q.  Okay.  Did you determine whether this -- did
11 you attempt to determine, let me say, whether the same
12 assistant also attempted to assistant the same voters
13 with their ballots?
14   A.  We attempted to locate the carrier envelopes
15 associated with the voters with that subset of data.
16   Q.  Did the Forensic Audit Division find any
17 evidence that the ABBMs at issue were not personally
18 signed by the voters or at their direction?
19   A.  What do you mean by evidence?
20   Q.  Did you conduct any investigation into whether
21 the voters, the 55 voters identified, personally signed
22 these ABBMs, or they were signed by an assistant at
23 their direction?
24   A.  We just reviewed the records.
25   Q.  Okay.  All right.  I want to turn quickly to

Page 33

1 the voter register topic, which is back on Page 42.
2       MR. STEWART:  Where are we on record time?
3       MS. HUNKER:  You said 42?
4       MR. STEWART:  42, yes.
5       MS. HUNKER:  I have you at five minutes
6 remaining.
7       MR. STEWART:  What's that?
8   Q.  (BY MR. STEWART)  Actually, you know what, I
9 asked this question already, so I don't think we need to
10 go there.  Actually, I will ask briefly about the
11 complaint section beginning on 351, but I don't think we
12 need to turn there.  I just want to ask.  Did the
13 Forensic Audit Division analyze the substance of any of
14 the complaints as to whether they were accurate or not?
15       MS. HUNKER:  Objection.  Form.
16   A.  We did not evaluate the accuracy of the
17 complaints.
18   Q.  (BY MR. STEWART)  Okay.  Who reviewed the audit
19 report before it was filed?
20   A.  I reviewed the report.
21   Q.  Did anyone else?
22   A.  Yes.
23   Q.  Who else reviewed it?
24   A.  Our director.
25   Q.  Anyone else outside the audit division review



Jacqueline Doyer                                      March 29, 2023
                                                      Pages 34 to 37

Page 34

1 it before it was finalized?
2      A.  The secretary.
3      Q.  Anyone outside the Secretary of State's office
4 review it before it was finalized?
5      A.  I believe the governor's office reviewed parts
6 of it.
7      Q.  Did the governor's office recommend any
8 changes?
9      A.  I believe so, yes.
10     Q.  Were they substantive as to the conclusions?
11     A.  No.
12     Q.  What was the nature of those changes?
13     A.  I do not recall.  It's been several months
14 since the nature of those changes were.
15     Q.  Do you know who would know that?
16     A.  I can probably try to find an answer for you on
17 that.
18     Q.  I would appreciate that.  Thank you.
19     A.  Okay.
20     Q.  Was there anyone -- leaving aside the governor
21 and the governor's office, was there anyone outside the
22 Secretary of State's office who requested or directed
23 that conclusions be changed before the audit report was
24 finalized?
25         MS. HUNKER:  Objection.  Form.

Page 35

1      A.  No.
2      Q.  (BY MR. STEWART)  Okay.  Were there any
3 topics -- topical areas that were included in the audit
4 design but are not reflected in the final report?
5      A.  What do you mean by audit design?
6      Q.  Sure.  So when you were coming up with the
7 scope of the audit and the activities that would be
8 undertaken to, you know, evaluate the counties'
9 processes, were there subject areas that were planned
10 for evaluation but ultimately were not included in the
11 final report?
12     A.  Yes.
13     Q.  What were those?
14     A.  We wanted to look at, for example, poll worker
15 staffing at polling locations.
16     Q.  Anything related to mail balloting?
17     A.  Like I said, it was data driving.  So if the
18 data was there, we were able to evaluate and make a
19 report of the conclusions and decisions.
20     Q.  So there is nothing specific you can recall
21 that related to mail balloting that was sort of dropped
22 from the scope of the report between the audit design
23 and the final report?
24     A.  No.
25     Q.  Okay.

Page 36

1         MR. STEWART:  With that, I have no further
2 questions.  I don't know if anyone on the Zoom has a
3 question that will take one minute.
4         All right.  Thank you.  I will pass the
5 witness.
6         THE WITNESS:  I think one person just
7 popped up.  But you are muted, sir.
8         MS. PERELAS:  No questions here.
9         MR. GENECIN:  Am I unmuted?  Can you hear
10 me?
11        MR. STEWART:  You are, Victor.
12        MR. GENECIN:  Good.
13            EXAMINATION
14 BY MR. GENECIN:
15     Q.  Ms. Doyer, my name is Victor Genecin.  I am a
16 lawyer with the NAACP Legal Defense Fund, and I
17 represent the Houston Area Urban League Plaintiff, and I
18 just have a few questions for you.  I would like to draw
19 your attention to Page 6 of Exhibit 23, the section
20 labeled key findings.
21        MS. HUNKER:  So I am going to interject.
22 We have reached the seven-hour limit for the 30(b)(6)
23 deposition, and so I am going to ask that we go off the
24 record and close out the deposition.
25        (Off the record.)

Page 37

1         MS. HUNKER:  After consulting with my
2 client, we've agreed to give an additional 15 minutes so
3 that the OCA greater Plaintiff's counsel can ask his
4 line of questions.
5         MR. GENECIN:  Thank you very much.
6      Q.  (BY MR. GENECIN)  Ms. Doyer, I would like to
7 draw your attention to Page 6 of the -- of Exhibit 23,
8 section called key findings.  Are you there?
9      A.  I am.
10     Q.  And specifically the next to last sentence of
11 that section reads, many of the irregularities observed
12 in the audit are less likely to occur in future
13 elections due to legislative changes made following the
14 2020 general election including Senate Bill 1.  Did I
15 read that section correctly?
16     A.  Yes, sir.
17     Q.  What is the basis in the audit for the sentence
18 that I just read?
19     A.  There were many improvements that came
20 legislatively that can preclude the volume in some of
21 what we saw in the records that we reviewed in those
22 four counties.
23     Q.  What are those changes?
24     A.  The mail ballot tracker, for example.
25     Q.  Any others?



Jacqueline Doyer

March 29, 2023
Pages 38 to 41

---

**Page 38**

1   A.  Yes.  Senate Bill 1 added Section 127, I want
2  to say, 009 that requires counties to submit a
3  tabulation audit log to the Secretary of State's office.
4   Q.  Anything else?
5   A.  The addition of the requirement for counties to
6  put zero tapes at the polling location.
7   Q.  Anything else?
8   A.  The identifiers on the carrier envelopes would
9  preclude issues like we saw in Dallas where the --
10  Dallas and Collin where a voter had been attached to a
11  ballot by mail that had the identifiers been included,
12  then perhaps the voter record would have been more
13  accurate and the correct voter would have been reflected
14  as having voted by mail.
15   Q.  Anything else?
16   A.  Yeah, the reconciliation forms.
17   Q.  What are those?
18   A.  There are two forms that must be filled out.
19  One will include unofficial results and one would
20  include official records.  And -- but it gives a
21  county-wide look at reconciling ballots versus voters so
22  it can identify any issues at a high level early on that
23  can be addressed.
24   Q.  Anything else?
25   A.  It is not fully implemented yet, but the

---

**Page 39**

1  paper-based audit trail that's going to be required by
2  virtue of SB1 that will significantly assist with any
3  issues that we saw, for example, in Harris County with
4  the DREs.
5   Q.  What were those issues?
6   A.  One of the issues was the lack of the paper
7  ballot trail, which, because there was no way to access
8  the content of the mobile ballot boxes, we were unable
9  to verify the contents of those mobile ballot boxes.
10  The equipment had been destroyed.  There was no way to
11  access them.  And there was a significant chain of
12  custody issue that affected, you know, the whole
13  process.  And I think there were at least 1,084 ballots
14  that lacked proper chain of custody.
15   Q.  Are there any other irregularities you observed
16  in the audit that are less likely to occur at future
17  elections because of legislative changes made following
18  the 2020 general election including Senate Bill 1?
19   A.  The corrective action process will -- should
20  help with mail ballots.  That didn't exist prior to
21  Senate Bill 1.  Harris County had a sort of informal
22  review process that they engaged in, which was helpful
23  in assisting the voters.  Any irregularity we observed,
24  however, was that there were several instances where
25  Harris County marked a ballot as unresolved, yet that

---

**Page 40**

1  voter appeared to have voted and had vote history.  So
2  hopefully the corrective action process would eliminate
3  some of those irregularities.
4   Q.  Are there any other irregularities that would
5  be alleviated by Senate Bill 1?
6   A.  There may be.  That's -- those are the ones I
7  can recall off the top of my head.
8  _____
9   Q.  Why don't we leave a blank in the transcript,
10  and if you are able to think of any others when you
11  review the transcript and sign it, you will add them in.
12  All right?
13   A.  Yes, sir.
14   Q.  Thanks very much.
15       MR. GENECIN:  I will pass the witness.
16       THE WITNESS:  Thank you.
17       MS. HUNKER:  We can close out then the
18  deposition and dismiss the witness, and we ask for read
19  and sign.
20       (Proceedings ended at 4:03 p.m.)
21
22
23
24
25

---

**Page 41**

1           CHANGES AND SIGNATURE
2  PAGE/LINE           CHANGE           REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____



Jacqueline Doyer

March 29, 2023
Pages 42 to 44

Page 42

```
1            I, JACQUELINE DOYER, have read the
   foregoing deposition and hereby affix my signature that
2  same is true and correct, except as noted above.
3            _____
                 JACQUELINE DOYER
4
5
6
7  THE STATE OF TEXAS)
8  COUNTY OF _____)
9            Before me, _____, on
   this day personally appeared JACQUELINE DOYER, known to
10 me (or proved to me under oath or through
   _____) (description of identity card
11 or other document) to be the person whose name is
   subscribed to the foregoing instrument and acknowledged
12 to me that they executed the same for the purposes and
   consideration therein expressed.
13
14           Given under my hand and seal of office
   this _____ day of _____, 2023.
15
16
17
18
19
20           _____
                 NOTARY PUBLIC IN AND FOR
21               THE STATE OF TEXAS
                 MY COMMISSION EXPIRES:
22           _____
23
24
25
```

Page 43

```
1            IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
2                  SAN ANTONIO DIVISION
3  LA UNION DEL PUEBLO      )
   ENTERO, ET AL.,          )
4          Plaintiffs,      )
                            )
5  VS.                      ) CIVIL ACTION NO.
                            ) 5:21-CV-844 (XR)
6  STATE OF TEXAS, ET AL.,  )
           Defendants.      )
7
8            REPORTER'S CERTIFICATION
                  ORAL DEPOSITION OF
9               JACQUELINE DOYER
                  MARCH 29, 2023
10
11           I, JAZZMEN CANALES, Certified Shorthand
   Reporter in and for the State of Texas, hereby certify
12 to the following:
13           That the witness, Jacqueline Doyer, was
   duly sworn by the officer and that the transcript of the
14 oral deposition is a true record of the testimony given
   by the witness;
15
             I further certify that pursuant to FRCP
16 Rule 30(f)(1) that the signature of the deponent
17   __X__ was requested by the deponent or a party
   before the completion of the deposition and returned
18 within 30 days from date of receipt of the transcript.
   If returned, the attached Changes and Signature Page
19 contains changes and the reasons therefor;
20   _____ was not requested by the deponent or a party
   before the completion of the deposition.
21
             I further certify that I am neither
22 attorney nor counsel for, related to, nor employed by
   any of the parties to the action in which this testimony
23 was taken.
24           Further, I am not a relative or employee
   of any attorney of record in this cause, nor do I have a
25 financial interest in the action.
```

Page 44

```
1            Subscribed and sworn to on this _____ day
   of _____, 2023.
2
3
4
5
6
7            JAZZMEN C. CANALES, Texas CSR 9344
             Expiration Date: 04/30/2025
8            MAGNA LEGAL SERVICES
             Firm Registration No. 633
9            1635 Market Street
             Suite 800
10           Philadelphia, Pennsylvania 19103
             Telephone:  866-624-6621
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Jacqueline Doyer

**0**

**009** 38:2

**1**

**1** 20:2 37:14 38:1 39:18,21 40:5

**1,084** 39:13

**10006** 2:9

**110** 2:4

**12548** 2:14

**127** 38:1

**14th** 1:23 4:8

**15** 37:2

**198** 19:13

**2**

**2** 3:3

**2020** 12:19 13:17 16:22 20:8 24:1, 10,15 37:14 39:18

**2022** 9:12,19 10:5 11:23 12:9

**2023** 1:11,20

**20530** 2:20

**209** 1:23 4:8

**210** 19:23

**210-224-5476** 2:5

**214** 24:4,23

**216** 25:2 26:9

**217** 26:10

**224** 28:6

**226** 29:17

**229** 29:23

**23** 3:11 9:23,24 36:19 37:7

**230** 31:24

**29** 1:11

**29th** 1:20

**3**

**30(b)(6)** 36:22

**300** 2:4

**351** 33:11

**359-page** 15:13

**36** 3:5

**369** 15:12

**3:14** 1:21

**4**

**41** 3:6

**42** 29:17 33:1,3,4

**43** 3:7

**4:03** 1:21 40:20

**5**

**5** 3:5

**512-936-2275** 2:15

**55** 32:1,2,21

**5:21-cv-844** 1:5 4:5

**5th** 2:8

**6**

**6** 36:19 37:7

**65** 29:18,19

**7**

**78205** 2:4

**78701** 1:23 4:8

**78711** 2:14

**9**

**9** 3:11

**A**

**ABBM** 19:18 26:1,4,6

**ABBMS** 20:1 31:21 32:1,17,22

**ability** 6:9 7:14

**above-styled** 1:19

**absent** 24:23

**access** 39:7,11

**accuracy** 20:24 21:21 33:16

**accurate** 10:10 33:14 38:13

**accurately** 6:9

**action** 1:5 4:4 20:22 29:8 39:19 40:2

**actions** 20:22

**activities** 17:16,25 22:12,15 35:7

**Adam** 2:13 4:21 8:2

**add** 7:4 40:11

**added** 38:1

**addition** 38:5

**additional** 12:5,12 24:22 31:9 37:2

**address** 31:24

**addressed** 38:23

**Administration** 19:15

**advise** 30:16

**affect** 7:14 20:24

**affected** 39:12

**afternoon** 5:3

**age** 28:15

**agencies** 16:13

**agency** 14:1

**agree** 27:15,17

**agreed** 31:8 37:2

**ahead** 6:19

**alcohol** 7:13

**alleviated** 40:5

**analysis** 28:17

**analyze** 33:13



Jacqueline Doyer

answers 5:24

Antonio 1:2 2:4 4:4

AOG's 16:14

appearances 3:3 4:10

appeared 40:1

appears 10:4 19:14 29:23

applicable 20:9

application 19:19 29:12

applications 29:17,25 30:6,8 32:3

April 9:19

area 2:6 31:2 36:17

areas 11:16 15:17 35:3,9

aspect 17:21 21:14

aspects 17:16

assess 23:4,12,16

assessed 23:15

assist 31:9 39:2

assistant 8:12 31:20,21 32:2,4,12,
22

assisted 31:25

assisting 39:23

attached 1:25 38:10

attaching 29:1

attempt 32:11

attempted 32:12,14

attention 36:19 37:7

attorney 2:13 4:19 6:15,24 9:17
17:1,2 30:13 31:8

attorneys 7:23

attributable 20:22

attributed 25:13,15

audit 3:11 5:15 8:14,21 9:3,7,14,20
10:7,11,13,15,17,21 11:11,20 12:20,
24 13:1,2,15,19,23 14:8,9,19 15:10,
24 16:1,4,17,23 17:21,24 19:12
20:9,13 21:11,15,22 22:9,20 25:6,23
27:11 28:3,17,20 31:17 32:3,16
33:13,18,25 34:23 35:3,5,7,22
37:12,17 38:3 39:1,16

audit-related 5:13

auditable 11:16

audited 15:19,21 17:20 21:2 22:17

auditing 26:4

auditors 8:11 11:4

Austin 1:23 2:14 4:8

authorities 31:11

Avenue 2:19

aware 12:3 13:10 25:23

B

back 12:10 14:7 18:16 33:1

bad 18:25

ballot 17:12,17,21 18:6,9,11,18
19:5,19,21 22:10,13,19,25 23:3,5
26:21 27:13 28:7,16 29:4,13,25
37:24 38:11 39:7,8,9,25

balloting 35:16,21

ballots 24:6,9,15,19 25:14 30:7,9
32:13 38:21 39:13,20

based 11:15 13:15 14:8 29:8 31:14

basis 6:19 37:17

batch 26:13

BBM 19:21 25:3,10

begin 9:18

beginning 33:11

begins 28:7

behalf 5:7

Bill 20:2 37:14 38:1 39:18,21 40:5

birth 29:18

Bitter 4:21 8:2

BITTERS 2:13

blank 40:9

board 26:22

boards 17:12,17,22 18:6,9,11,18
19:6

body 15:1

Box 2:14

boxes 30:6 39:8,9

break 7:1

briefly 30:3 33:10

bring 8:24 9:2

broadly 14:12

Broadway 2:4

brought 9:3

Building 4:8

bulk 29:25

bundle 30:6,9

C

called 37:8

Canales 1:21 4:9

carrier 26:11,12,16,19 32:14 38:8

cataloged 15:6

cataloging 15:4

categorically 15:16

Certificate 3:7

chain 39:11,14

Chala 4:21 8:4

changed 34:23

chaotic 25:3,4,16

characterize 28:9

chosen 11:12

Civil 1:5,24 4:4

clarification 6:13

clarity 30:22

clear 14:13 19:13

client 37:2

close 36:24 40:17

code 8:23 20:4

Collin 16:7 17:7 38:10

committees 18:13 19:7,9

complaint 33:11

complaints 33:14,17



Jacqueline Doyer

March 29, 2023
Index: complete..election

**complete** 7:15 10:10

**completely** 6:8

**comply** 20:14

**compromise** 30:18

**conclusion** 24:14,17

**conclusions** 15:24 16:1,21 18:8
20:12 22:24 23:2 34:10,23 35:19

**conduct** 22:12 28:17 32:20

**conducted** 18:1

**confidence** 13:6,8,16,20,25

**considered** 21:14

**consult** 6:23

**consulting** 37:1

**contained** 20:4,5,24

**content** 39:8

**contents** 39:9

**context** 19:1

**conversations** 10:24,25 11:6,9

**copy** 9:3 10:4

**correct** 5:10,11,14 7:19 8:16 12:6
14:9 17:10 19:21 20:2,11 23:17,19
24:7,25 28:8,12 30:1 38:13

**corrective** 39:19 40:2

**correctly** 20:25 37:15

**counsel** 4:9 37:3

**counties** 11:19,20 12:4,11,18 14:4,
9,10,17 15:9 16:5,7,10,14,15,16
17:4,5,7,8,12,17 19:8,24 20:6,17,18,
21,22,23 21:2,3,4 22:25 23:6,8,9,15
24:2 27:9 28:13 37:22 38:2,5

**counties'** 35:8

**county** 9:4 12:8 16:7,8,12 17:7
18:23 21:24 22:1 23:16 24:4,8 25:1,
8 26:2,5,7,22 28:9,24 29:8,24 31:10
39:3,21,25

**county-wide** 38:21

**court** 1:1 4:1,3,9

**CSR** 1:21

**custody** 39:12,14

**cut** 6:4

---

**D**

**D.C.** 2:20

**Dallas** 16:7 17:7 24:4,8,15 29:24
31:10 38:9,10

**Daniel** 2:18 4:7,12

**data** 11:13,14 14:8 15:12 20:19 28:9,
13 32:15 35:17,18

**database** 19:15 20:18,21

**date** 29:18

**day** 1:20

**December** 10:5

**decisions** 35:19

**Defendants** 1:6,18 2:11 4:20

**Defense** 2:8 36:16

**definition** 19:4

**Del** 1:3 4:5

**delays** 20:20 21:5

**Dellheim** 2:18 4:13

**Department** 2:19

**deposed** 5:17

**deposition** 1:9,17 4:2,6 5:14,22
7:22 27:22 36:23,24 40:18

**deputy** 9:8

**describe** 30:3

**describes** 26:11

**description** 3:10 25:4,14,16 26:24
27:2

**design** 10:19 35:4,5,22

**designing** 10:13,16

**destroyed** 39:10

**details** 30:20

**determination** 28:21

**determinations** 25:25 30:11

**determine** 28:14 30:8 32:10,11

**determined** 10:21 28:10

**determining** 10:22

**difficulties** 24:5,8

**difficulty** 24:15,18

**directed** 34:22

**direction** 32:18,23

**directly** 11:19

**director** 9:8 11:2 33:24

**discovered** 24:20

**discuss** 26:6

**dismiss** 40:18

**District** 1:1 4:3,4

**division** 1:2 4:4 8:14 9:7,9,14,17,21
10:15,21 11:5,20,21,22 13:23 14:9,
10,11 15:24 21:12 22:9 25:23 27:11
28:17 31:17 32:3,16 33:13,25

**division's** 16:1 28:20

**document** 7:7 10:1

**documents** 8:18,20,24

**Doyer** 1:10,17 3:4 4:2 5:3,4,5 36:15
37:6

**DOYLE** 4:23

**draw** 36:18 37:7

**DRES** 39:4

**driven** 11:13,14

**driving** 35:17

**dropped** 35:21

**drugs** 7:13

**due** 14:17,20 24:9 29:18 37:13

**duly** 1:19 4:24

**duties** 17:22

---

**E**

**E-MAIL** 2:5,10,15,21

**earlier** 7:4

**early** 17:11,16,21 18:5,9,10,18 19:5
38:22

**Educational** 2:8

**election** 8:23 11:24 12:19 13:6,17,



20 14:11 16:22 19:15 24:11 29:9 37:14 39:18

**elections**  11:21 25:8 37:13 39:17

**eligible**  28:11 29:14

**eliminate**  40:2

**end**  15:20,21

**ended**  40:20

**engaged**  39:22

**ensure**  13:5,19

**Entero**  1:3 4:5

**entities**  16:3,5

**entitled**  28:15

**entity**  16:9,11 23:13

**envelope**  26:11,12,16,19

**envelopes**  32:14 38:8

**equipment**  39:10

**error**  12:9,24

**et al**  4:6,15

**Ethan**  2:12 4:18

**evaluate**  16:24 17:1,2,4 18:10,12, 17,20 19:6 28:4 33:16 35:8,18

**evaluated**  11:16 16:3,10,17 17:8, 12,17,19 18:22,24,25 20:14 21:14, 17,22

**evaluating**  20:5 21:23

**evaluation**  26:1,3 35:10

**evidence**  32:17,19

**Examination**  3:5 5:1 36:13

**examine**  10:22,23

**executive**  10:8,10 13:3

**exhibit**  9:23,24 36:19 37:7

**exist**  39:20

**existed**  20:8

**existence**  22:24 23:21

**experienced**  24:8

**eyes**  27:16

**F**

**facility**  31:25 32:8

**fact**  20:18 29:4

**FAD**  8:6,8,13 25:3 28:10

**Fair**  13:13 15:14

**false**  7:18

**feeling**  13:7

**feelings**  13:10

**field**  26:18

**filed**  33:19

**filled**  38:18

**final**  10:4,7 14:4 15:9,20,22,25 18:1 24:21 25:24 35:4,11,23

**finalized**  34:1,4,24

**find**  22:2 32:16 34:16

**findings**  36:20 37:8

**fine**  6:16

**finished**  6:3

**Floor**  2:8

**forensic**  8:14 9:7,13 10:7,21 11:20 13:23 21:11 22:9 25:23 27:11 31:17 32:16 33:13

**forgot**  7:3

**Form**  10:18 12:21 13:9,18 15:11 16:18 17:13,18 18:2,14 20:3 21:19 22:6,14,21 23:1,23 25:18 27:1,21 33:15 34:25

**forms**  38:16,18

**fraud**  22:10,13,19,25 23:3,6,11,14, 22 24:1 26:25 27:20 28:2,5

**fraudulent**  27:13

**Freeman**  2:18 4:12

**frequency**  22:7

**frequently**  22:5

**full**  6:5

**fully**  38:25

**Fund**  2:8 36:16

**future**  37:12 39:16

**G**

**Genecin**  2:7 3:5 36:9,12,14,15 37:5, 6 40:15

**general**  2:13 4:19 11:23 12:19 13:17 16:22 24:11 31:8 37:14 39:18

**General's**  17:1,2 30:13

**generality**  31:2

**generally**  20:9

**gigabytes**  15:12

**give**  6:16 7:15 37:2

**goals**  10:6,11

**good**  5:3 18:25 36:12

**governmental**  16:9,11

**governor**  34:20

**governor's**  34:5,7,21

**great**  5:6,17 6:12 7:21 8:17

**greater**  37:3

**ground**  5:21

**guess**  10:20 15:3 18:16 22:16

**H**

**Hagan**  4:2,23 5:3

**Harris**  9:4 16:8 17:7 25:1,8 26:2,5,7, 22 39:3,21,25

**head**  40:7

**hear**  36:9

**helpful**  39:22

**hereto**  1:25

**high**  24:6,9,19 38:22

**history**  21:24 22:1,3 40:1

**Honestly**  25:9

**Houston**  2:6 36:17

**Hunker**  2:12 4:18 7:25 10:18 12:21 13:9,18 15:11 16:18 17:13,18,23 18:2,14 20:3 21:19 22:6,14,21 23:1, 23 25:18 27:1,21 30:14,25 31:4



33:3,5,15 34:25 36:21 37:1 40:17

## I

**identified** 12:20 16:17 17:5,6 24:13 29:24 30:5 31:15,25 32:21

**identifiers** 38:8,11

**identifies** 31:20

**identify** 23:5 38:22

**imminence** 12:24

**impersonation** 22:10,13

**implemented** 38:25

**important** 6:8

**improvements** 37:19

**inaccurate** 21:25 22:3

**include** 30:23 38:19,20

**included** 13:14 15:15,25 24:13 35:3,10 38:11

**including** 29:12 37:14 39:18

**indication** 28:1

**indicative** 27:20 28:2,5

**individual** 4:20 29:3 31:22

**individual's** 32:2

**individuals** 8:8 10:15 25:5 27:3,6 28:14 31:18

**informal** 39:21

**information** 13:24 14:3,5 15:4,6,8 18:5 29:12 30:17,19,23 31:9

**instance** 1:18

**instances** 22:2 39:24

**instructed** 6:18

**integrity** 30:18

**interject** 36:21

**interviewed** 27:6

**investigated** 15:19

**investigation** 13:1 22:12 30:19 31:11 32:20

**investigative** 10:17 30:15

**involved** 10:13,16,23,25 11:5,9

31:18

**irregularities** 37:11 39:15 40:3,4

**irregularity** 39:23

**issue** 29:24 30:4 31:14 32:17 39:12

**issued** 10:5 29:4

**issues** 12:19 38:9,22 39:3,5,6

**items** 14:16,17,20,21,24

## J

**Jacqueline** 1:10,17 3:4 4:2,23

**Jazzmen** 1:21 4:9

**joined** 9:20

**junior** 29:2,4

**Justice** 2:19

## K

**Kathleen** 2:12 4:18 7:25

**kathleen.hunker@oag.texas.gov** 2:15

**key** 36:20 37:8

**knowledge** 21:7,9 31:16

## L

**L-U-P-E** 4:15

**La** 1:3 4:5

**labeled** 36:20

**lack** 39:6

**lacked** 39:14

**law** 20:4 30:10

**lawyer** 36:16

**lead** 15:9

**League** 2:6 36:17

**leave** 40:9

**leaving** 34:20

**legal** 2:8 8:12 9:8 36:16

**legislative** 37:13 39:17

**legislatively** 37:20

**legislators** 4:20

**letter** 9:4

**level** 16:12,13 38:22

**limit** 36:22

**limitations** 20:17

**list** 15:17

**living** 31:25

**local** 31:11

**locate** 32:14

**location** 38:6

**locations** 35:15

**log** 38:3

**long** 9:10

**loud** 5:24

**LUPE** 4:15

## M

**machine** 1:22

**made** 15:4 24:14 25:4 26:8 37:13 39:17

**mail** 19:11,19,21 22:10,13,19,25 23:3,5,10,14,21 24:1,6,9,15,19 25:14 28:8,11,15 29:4,6,13,14,18,25 30:7,9 35:16,21 37:24 38:11,14 39:20

**maintain** 12:5,12,15

**make** 6:5 20:12 30:11 31:5 35:18

**MALDEF** 2:3

**Management** 19:15

**March** 1:11,20

**mark** 9:23

**marked** 9:24 39:25

**matching** 26:20

**materials** 12:5,12

**matter** 26:8 30:12

**meant** 26:16,25 27:12,15

**medication** 7:13



**members** 8:6

**mentioned** 14:7 24:5

**mentions** 24:17

**merit** 12:25

**met** 7:23,25 8:2,4,6

**Michael** 2:17 4:11

**michael.stewart3@usdoj.gov** 2:21

**Mike** 5:8

**minute** 36:3

**minutes** 33:5 37:2

**miscoding** 28:24

**misleading** 7:18

**Misstates** 23:23

**mistake** 12:24

**mobile** 39:8,9

**months** 34:13

**multiple** 26:23 28:22 31:21

**municipal** 16:13

**municipalities** 16:15

**muted** 36:7

**N**

**NAACP** 2:8 36:16

**nature** 34:12,14

**needed** 26:21

**negatively** 20:24 23:21

**Nina** 2:3 4:14

**nitty-gritty** 31:5

**nonexistence** 22:24

**notice** 5:14

**noticed** 12:25

**November** 9:11

**nperales@maldef.org** 2:5

**NUMBER** 3:10

**numbered** 1:20

**NW** 2:19

**O**

**oath** 7:18

**object** 6:16,17

**objection** 10:18 12:21 13:9,18 15:11 16:18 17:13,18,23 18:2,14 20:3 21:19 22:6,14,21 23:1,23 25:18 27:1,21 30:14 33:15 34:25

**observed** 37:11 39:15,23

**OCA** 37:3

**occur** 22:5 37:12 39:16

**occurred** 24:1,10 28:18

**occurrence** 31:10

**office** 2:13 4:7,19,21 5:9 11:9 13:16, 23 14:13,19,24 16:14,22,25 17:1,3 25:8 30:13 31:8 34:3,5,7,21,22 38:3

**official** 14:1 38:20

**officials** 29:9

**offline** 20:23 21:2,4

**older** 29:18

**ongoing** 30:20

**online** 20:17

**opposed** 29:8

**ORAL** 1:9,17

**order** 18:1

**P**

**p.m.** 1:21 40:20

**P.O.** 2:14

**paper** 39:6

**paper-based** 39:1

**paragraph** 19:24 20:16 26:9

**paraphrased** 27:8

**part** 12:15

**participating** 22:1

**parts** 34:5

**party** 6:15

**pass** 36:4 40:15

**passed** 11:21

**penalties** 7:18

**pending** 6:22

**Pennsylvania** 2:19

**Perales** 2:3 4:14

**PERELAS** 4:14 36:8

**performance** 16:21 17:11,14 18:9, 10,12,15,17 19:5,6 21:17

**performed** 17:22

**permitted** 28:11

**person** 36:6

**personally** 32:17,21

**phrase** 27:22

**place** 20:1

**Plaintiff** 4:14 36:17

**Plaintiff's** 37:3

**Plaintiffs** 1:4 2:2,6

**planned** 35:9

**plans** 4:16

**points** 11:16

**poll** 35:14

**polling** 35:15 38:6

**popped** 36:7

**populates** 20:19

**portions** 8:23

**position** 14:2

**positively** 23:21

**potential** 26:25 31:11

**potentially** 27:20 28:2,5

**practice** 12:16

**pre-sb1** 20:6

**pre-senate** 20:2

**preclude** 37:20 38:9

**prefer** 5:3



**preparation** 8:18

**prepare** 7:21 18:1

**preparing** 22:8

**present** 13:11

**previous** 12:10

**Price** 4:7

**prior** 24:10 39:20

**privilege** 6:18 30:15

**Procedure** 1:24

**procedures** 18:22 19:3,10 20:13
23:4,7,9,12,17,20,25

**proceedings** 40:20

**process** 25:3,10,12,16 39:13,19,22
40:2

**processes** 18:22 20:13 25:11 26:2,
4,6 35:9

**processing** 24:6,9,15,19

**produced** 1:18

**promoted** 9:11

**proper** 39:14

**prosecution** 30:20 31:12

**prosecutions** 31:14

**provide** 20:19

**provided** 11:15,17,19,20 12:13,18
14:11,20,21

**providing** 31:9

**provisions** 1:25

**publicly** 30:17

**Pueblo** 1:3 4:5

**purpose** 14:19

**purposes** 22:8

**pursuant** 1:24

**put** 18:16 38:6

---

**Q**

**question** 5:6,23 6:3,12,20,22,23
7:12 10:14 12:11 13:13 16:19 18:3
22:16,18,22 33:9 36:3

**questionable** 26:11,12,16,19,24
27:2,10,12,15

**questioned** 27:10

**questions** 4:17 5:14 19:2,8 36:2,8,
18 37:4

**quickly** 5:21 9:6 19:23 32:25

---

**R**

**raise** 30:15

**reach** 22:23 23:2

**reached** 36:22

**read** 20:25 37:15,18 40:18

**reads** 37:11

**real** 5:20 9:5

**reason** 12:20 13:1,2 24:12,14,18
28:7,15 29:1

**reasons** 24:20,22 25:13,15,19,21
28:22,24,25 29:7,20

**recall** 34:13 35:20 40:7

**received** 15:9,12 28:16 30:6,9

**recognize** 9:25

**recollection** 7:8

**recommend** 34:7

**reconciliation** 38:16

**reconciling** 38:21

**record** 1:25 6:6 7:5 15:25 19:13
29:1,3 30:5,23 33:2 36:24,25 38:12

**records** 11:15,17,23 12:1,4,8,11,14,
18 14:8 20:24 21:6,21 29:19 32:24
37:21 38:20

**Rector** 2:8

**refer** 14:12 19:14 30:12

**referred** 30:21,24 31:10

**referring** 12:2 25:11

**refers** 20:1

**reflected** 10:8 13:2 14:4,25 15:1,5
16:2 24:20,22 25:17,19,22 27:24
29:3,20 35:4 38:13

**reflecting** 27:5

**refresh** 7:8

**regard** 5:15

**register** 33:1

**regular** 12:16

**rejected** 20:1

**related** 30:20 35:16,21

**remaining** 33:6

**remember** 7:3 25:9

**removed** 26:12

**rephrase** 15:23 17:15 24:16

**report** 3:11 5:15,16 8:8,11,21 9:3
10:4,7 13:12,15 14:4 15:1,5,7,10,13,
15,20,22 16:2,4,10,17,23 17:5,6,9
18:1 19:12,14,18 20:5,13 22:7,9
24:21,23,24 25:20,22,24 27:24 28:3
29:21 31:15 33:19,20 34:23 35:4,11,
19,22,23

**reported** 1:22 14:16 19:2,10

**reporter** 4:1,9 5:23

**Reporter's** 3:7

**reporting** 20:21

**reports** 8:12

**represent** 36:17

**representative** 5:9

**representing** 4:20

**request** 14:22 15:4

**requested** 14:18,24 29:5,17 34:22

**requesting** 28:7

**requests** 14:3,5,25 15:6 18:5,7

**required** 12:4,12,14 39:1

**requirement** 38:5

**requires** 38:2

**respect** 29:24

**response** 14:22

**results** 38:19

**reveal** 22:13

**review** 8:17 12:17 26:14,21 33:25
34:4 39:22 40:11



MAGNA
LEGAL SERVICES

Jacqueline Doyer

March 29, 2023
Index: reviewed..topical

**reviewed** 8:21,23 14:20,21 32:24
33:18,20,23 34:5 37:21

**Richard** 2:18 4:12

**role** 9:6,10,11,16

**roles** 8:10

**rolls** 26:10

**root** 28:18

**rules** 1:24 5:21

---

**S**

**San** 1:2 2:4 4:4

**SB1** 20:10,14 39:2

**scope** 22:18,19 27:22 31:16 35:7,22

**secretary** 4:22 5:9 8:15 11:7,8
13:15,22 14:12,14,18,24 16:21,24
34:2,3,22 38:3

**section** 19:12 24:4 28:7 33:11 36:19
37:8,11,15 38:1

**sections** 5:16

**Senate** 37:14 38:1 39:18,21 40:5

**send** 18:4,7

**senior** 29:2,5

**sentence** 24:5 25:2 26:11,17 37:10,
17

**separate** 26:13

**served** 9:17

**set** 5:21 27:16

**seven-hour** 36:22

**sheet** 26:13

**short** 7:2

**shorthand** 1:23

**sign** 40:11,19

**signature** 3:6 18:13 19:7,9 26:20
27:19 28:1

**signatures** 27:18 28:4

**signed** 31:21 32:18,21,22

**significant** 39:11

**significantly** 39:2

**sir** 6:1 7:16 19:20,22 26:15 36:7
37:16 40:13

**situation** 29:2

**smoothly** 5:22

**somebody's** 21:24

**sort** 10:22 12:23 15:17,18 24:13
35:21 39:21

**SOS** 16:14 19:18

**source** 32:1

**speak** 27:4,23 31:17,22 32:3,6

**specific** 12:19 13:24 17:24 25:11
26:23 30:19 31:19 35:20

**specifically** 14:18,23 18:5 27:17
37:10

**specifics** 31:1

**spoke** 25:6

**spreadsheet** 19:25

**Sr** 4:7

**staff** 24:10 26:7

**staffing** 35:15

**start** 5:20

**starts** 19:12

**state** 1:6,22 4:6,7,10,20,22 8:15
13:6,21 14:14 16:9,11,12,13 30:9

**State's** 5:9 11:9 13:16,23 14:13,18,
24 16:22,24 34:3,22 38:3

**stated** 1:25

**statement** 13:14

**States** 1:1 2:16 4:3,12 5:7

**Stewart** 2:17 3:5 4:11,16 5:2,8 9:25
10:20 12:23 13:13,22 15:14 16:20
17:15,20,25 18:4,16 20:7 21:20
22:8,16,23 23:4 24:3 25:21 27:5,25
30:22 31:3,6,13 33:2,4,7,8,18 35:2
36:1,11

**Street** 1:23 2:8 4:8

**styled** 4:5

**subdivision** 16:15

**subject** 7:18 31:2 35:9

**submit** 38:2

**submitted** 12:9 32:1

**subset** 32:15

**substance** 33:13

**substantive** 34:10

**Suite** 2:4

**summary** 10:9,10 13:3

**sworn** 1:19 4:24

**system** 19:25 20:2 21:10 26:23

**systems** 13:6,20

**Szumanski** 2:12 4:19

---

**T**

**tabulation** 38:3

**taking** 16:13

**talk** 6:2 15:16

**talking** 30:25 31:1

**tapes** 38:6

**Tarrant** 12:8 16:8 17:7

**task** 10:17

**team** 8:6,8,14 19:14 20:18,20,25
21:6,9,14,17,21,23,25 22:3 26:22

**TEAMS** 26:23

**term** 27:8,12

**testified** 4:24

**testify** 5:13 7:22 13:11

**testimony** 7:19 23:19,24

**Texas** 1:1,6,22,23,24 2:4,13,14 4:4,
6,8,19 13:5,7,19 19:15

**things** 12:15 18:20 19:10 27:7

**thought** 12:25

**tied** 21:25

**time** 4:1 33:2

**today** 5:9 7:15 8:25 23:20

**top** 40:7

**topic** 33:1

**topical** 35:3



Jacqueline Doyer

March 29, 2023
Index: topically..Zoom

**topically** 15:18

**topics** 11:11 15:18 27:22 35:3

**tracker** 37:24

**tracking** 20:1

**trail** 39:1,7

**transcript** 40:9,11

**turn** 19:11,23 32:25 33:12

**turning** 25:1 28:6 29:23

**turnover** 24:10

**type** 18:7 22:15

**types** 12:1

**U**

**U.S.** 2:19

**ultimately** 35:10

**unable** 39:8

**unclear** 6:13

**understand** 6:10,25 7:6,14,17,20 10:14 16:19 18:3 22:22 31:7

**understanding** 5:8,12 13:15 26:18 27:12,14

**understood** 5:15

**undertaken** 35:8

**unform** 19:25

**UNION** 1:3

**United** 1:1 2:16 4:3,12 5:7

**Unión** 4:5

**unmuted** 36:9

**unofficial** 38:19

**unresolved** 39:25

**update** 20:19

**upload** 20:21

**uploaded** 21:24 22:1

**uploading** 21:5

**uploads** 20:19

**Urban** 2:6 36:17

**V**

**vendors** 20:23

**verbal** 5:25

**verification** 18:13 19:7,9

**verify** 39:9

**versus** 38:21

**vgenecin@naacpldf.org** 2:10

**Victor** 2:7 36:11,15

**Videoconference** 2:7

**violated** 30:9

**virtue** 39:2

**visit** 32:8

**volume** 24:6,9,19 25:14 37:20

**vote** 21:24 22:2 28:11,15 29:6,14,18 40:1

**voted** 38:14 40:1

**voter** 21:25 23:10,14,22 24:1 29:8 33:1 38:10,12,13 40:1

**voters** 13:5,7,16,20,24 28:10 29:17, 19 32:6,12,15,18,21 38:21 39:23

**voting** 17:11,16,21 18:5,9,11,18 19:5,11

**W**

**wait** 6:3

**wanted** 29:6 35:14

**Washington** 2:20

**West** 1:23 4:8

**Western** 1:1 4:3

**withdraw** 22:18

**witnesses** 25:5 27:3

**word** 19:14 27:2

**work** 6:4

**worked** 25:7

**worker** 35:14

**wrapped** 26:13

**wrong** 29:2

**X**

**XR** 1:5 4:5

**Y**

**York** 2:9

**Z**

**Zina** 4:21 8:4

**Zoom** 4:17 36:2

