IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX K

Subject to Protective Order

EXPERT WITNESS REPORT

*La Union del Pueblo Entero v. Abbott*, No. 5:21-cv-844 (W.D. Tex.) (lead case)

Submitted by

Mark Hoekstra, PhD

Date of Report

March 3, 2023

## I.        Introduction

1.        I have been engaged to respond to the second supplemental report dated February 10, 2023, that was written by Professor Eitan Hersh in the consolidated case *La Union del Pueblo Entero v. Abbott*, No. 5:21-cv-844 (W.D. Tex.). My analysis is based on my knowledge and experience as an active research economist who is well versed in the frontier empirical methods used in causal analyses.

## II.       Qualifications and Compensation

2.        I am the Rex B. Grey Professor of Economics at Texas A&M University in College Station, Texas, where I have been on the faculty since 2011. Prior to arriving at Texas A&M, I was an assistant professor of economics at the University of Pittsburgh. I received my PhD in Economics from the University of Florida in 2006. I have published more than 20 papers in peer-reviewed journals in economics, including the American Economic Association's (AEA) top journal of *American Economic Review* as well as the top AEA journals relevant to my field (*American Economic Journal: Applied Economics* and *American Economic Journal: Economic Policy*) and top field journals (*Journal of Labor Economics; Journal of Public Economics; Journal of Human Resources*). These studies have used a wide variety of administrative datasets, including data on voting. I serve as a reviewer for approximately 20 paper submissions per year, including for top economics journals. I serve as an Associate Editor at the *Journal of Labor Economics* (since 2018) and at the J*ournal of Human Resources* (since 2015), which are the top two field journals in labor economics.

3.        The common theme throughout both my research and my teaching is careful attention to the assumptions underlying various research designs used to assess the causal impact of policies. Some of my research is used as examples in the textbook *Causal Inference: The Mixtape* by Scott Cunningham, which is a leading graduate-level book on empirical methods used in economics. I teach a PhD-level field course in labor economics, the focus of which is on understanding and assessing the

various research methodologies used by economists and other social scientists. These include the methods used to test for racial and gender bias in different settings. I also teach part of the core 1st-year PhD sequence in econometrics, in which I focus on how to assess causality in non-experimental contexts.  I am perhaps best known among the PhD students as someone who offers advice on research projects, including whether the proposed method is sufficient to answer the question at hand. I recently won department-level awards for both the quality of graduate teaching and the quality of feedback given to students. During my time at Texas A&M, I have chaired more than 10 dissertation committees, and many of my students have gone on to careers at R-1 research universities. I have served on the committees of countless more PhD students.

4.      I also hold an appointment as a Research Fellow at the National Bureau of Economic Research based in Cambridge, Massachusetts, and as a Research Fellow at the Institute for Labor Economics (IZA) based in Bonn, Germany. In 2012 I received the IZA Young Labor Economist Award.

5.      I am being compensated for my time at the rate of $600/hour. I have not previously testified as an expert witness.

III.    Assessment of Professor Hersh's second supplemental report – Overview

6.      What does the November 2022 election—the first federal election since the passage of SB1—tell us about the actual impact of SB1 on mail-in voting?  To what extent did the new identification requirements impose a sufficiently large burden on voters as to deter voting?  A useful upper-bound for the right answer to that question is buried deep inside Professor Hersh's Second Supplemental Report.  In it, he calculates that among the more than 8.1 million votes cast, there were only 6,355 mail-in ballots that were rejected for a reason relating to identification, and where the voter did not cure the ballot or vote in person.  That is well less than one out of every one thousand votes

statewide.  Importantly, even this figure of 6,355 votes overstates the extent to which election officials failed to count mail-in votes that had been legally and properly cast, for two reasons:

A.  Some, and potentially all, of these ballots may have been illegitimate.  There is nothing in Professor Hersh's report, or in the underlying data, to indicate whether or not those rejected mail-in votes were cast legally.  To the extent that some or all of those votes were illegitimate, Professor Hersh consistently misinterprets illegitimate votes as evidence that SB1 improperly caused a reduction in legitimate voting.

B.  Some, and potentially all, of these 6,355 ballots could have been rejected because voters failed to write down *any* identification number on the ballot.  Professor Hersh cannot distinguish between ballots that were cast without writing down any identification number at all, from those that were cast, to quote his first report, "in perfect accordance with the state's instructions under SB 1".  In fact, there is nothing in Professor Hersh's report, save for one flawed analysis that I discuss below, that suggests the database issues he emphasizes are responsible for *any* of these 6,355 mail-in vote rejections under SB1.

7.      As a result of these factors, the proper interpretation of Professor Hersh's analysis is that there were *at most* 6,355 fewer legitimate votes cast and counted as a result of SB1, out of more than 8.1 million total votes.  For the reasons described above, the true number of legally cast mail-in votes that went uncounted—and especially the true number of legally and properly cast votes that went uncounted—is almost certainly smaller than that, and possibly zero.

8.      Moreover, the identification requirements of SB1 are still relatively new, and as with any new process, there is a learning curve for both election administrators and voters.  That fact, combined with the likelihood that at least some of the rejected votes counted by Professor Hersh were rejected due to voter error, suggests that the effect of SB1 going forward will likely be smaller than it was for the November 2022 election.  And as described above, the impact on that election was less than, and possibly much less than, 0.078 percent of all votes cast and counted.

9.      As alluded to above, there is only one analysis in Professor Hersh's Second Supplemental report that claims to provide any evidence that ballot rejections were "likely to be related to SB 1 requirements".  I demonstrate below that this analysis is based on three faulty assumptions. The consequence of those assumptions is that Professor Hersh would improperly conclude that the

Hoekstra                                                                                              4

higher rejection rates among those he classifies as "at risk" are caused by the database issues. Instead, the higher rejection rates could be due to differences in failing to provide a signature, or in failing to include a statement of residence. Alternatively, some or all of the differential could be due to "at risk" voters viewing in-person voting as a close-if-not-perfect substitute, consistent with empirical evidence I documented in my first report. Third, the differential could be due to other differences between the two groups of people, who are likely different in many ways, including those not observed in the data.

10.     Finally, in his Second Supplemental report, Professor Hersh also replicates the analysis of the state databases that he performed in his previous reports. In doing so, he addresses the following question: How many Texans would need to, in Professor Hersh's words, "be lucky", in order to cast a mail ballot without their application or ballot being rejected? As I documented in my response to his initial report, there are numerous flawed assumptions in that analysis. Put simply, that analysis assumed that everything that can go wrong with absentee voting will go wrong, ignored important aspects of the voting process, and did so for a population of mail-in voters that is vastly larger than anything observed in Texas history, including during the worst pandemic in 100 years.

11.     Strikingly, Professor Hersh's own empirical analyses in his Second Supplemental Report directly contradict most, if not all, of the assumptions and conclusions he made in his analyses of the voter databases.

A.  For example, his simulation of voting using the voter databases ignored the ballot curing process, and assumed that would-be absentee voters are never willing to vote in person instead. In contrast, Professor Hersh's analysis of actual voting in the 2022 election indicated that a large fraction of initially-rejected mail-in ballots were in fact cured, and that nearly half of mail-in ballots rejected for identification reasons are associated with a registrant whose record also shows they subsequently chose to, and were able to, vote successfully either by mail or in person.

B.  In assuming that everything that can go wrong will go wrong, Professor Hersh's simulation of voter databases also concluded that 15 percent of absentee ballots would be rejected. His analysis of actual voting in the 2022 general election shows that only 4.1 percent of mail-in ballots were initially rejected.

Hoekstra                                                                                     5

12. The net result of these, and other, unfounded assumptions is that Professor Hersh's analyses of voter databases, both in his second supplemental report and earlier reports, make the dire warning that as many as 2.7 million voters could be impacted by SB1's identification restrictions. His analysis of actual voting directly contradicts this and shows that at most—*at most*—6,355 fewer votes were cast and counted than would have been otherwise. Moreover, some or all of these may have been illegitimate, or may have been caused by a voter's failure to write down any identification number, rather than being caused by the database issues emphasized by Professor Hersh.

## IV.   The maximum number of votes not counted in the November 2022 federal election due to SB1's identification requirements

13. To what extent did SB1's identification requirements result in fewer legitimate votes being cast and counted during the 2022 federal election? This is an important question for understanding the likely burden that SB1 places on would-be absentee voters. Were SB1's identification rules so stringent, and the voter databases so insufficient, as to burden would-be legitimate absentee voters so much that they were unable to cast votes? If the answer were yes, this would indeed be problematic. But the data do not support such a conclusion.

14. It turns out that Professor Hersh's analysis of the 2022 election data contains a useful estimate of the maximum number of legally and properly cast votes that election officials failed to count, though it is buried deep in Professor Hersh's report. Despite the dire warnings that Professor Hersh had issued and continues to issue regarding the likely impact of the database issue on absentee voting—namely, that 2.7 million registered voters in Texas could be impacted—Professor Hersh's own analysis indicates there were only 6,355 absentee votes that were rejected, where the voter also did not subsequently cast a ballot successfully either by mail or in person. This is shown in paragraph 21 of Professor Hersh's Second Supplemental report. Professor Hersh states there are 11,430 records indicating votes that were rejected due to reasons relating to identification verification. However,

nearly half of the registered voters associated with these rejections—44.6 percent—were subsequently able to vote successfully either in person or by curing their ballot.  That suggests that out of the more than 8.1 million votes cast in Texas during the 2022 federal election, only 6,355 mail-in votes were rejected due to an identification-related reason, and associated with names of individuals who were not subsequently observed to vote successfully either by mail or in person.[1]

15.     Put another way, when put into practice, the concerns Professor Hersh identified reduced the total number of votes cast and counted in the general election by, at most, 0.078 percent.

16.     Moreover, even this figure of 6,355 votes overstates the true extent to which SB1's identification requirements reduced the total number of legitimate votes cast by voters who, in Professor Hersh's words, voted "in perfect accordance with the state's instructions under SB 1", for two reasons:

A.  Some, and potentially all, of these ballots may have been illegitimate.  Put simply, there is nothing in Professor Hersh's report, or in the underlying data, to indicate whether or not those rejected mail-in votes were legitimate mail-in ballots cast by the person who was registered to vote under that name.  To be clear, I do not know whether these 6,355 votes were cast legally.  But neither can Professor Hersh know, based on the data available to him.  What I know is that it is possible for some or all of those votes to have been illegitimate, in which case Professor Hersh consistently misinterprets illegitimate votes as evidence that SB1 improperly caused a reduction in legitimate voting.

This error leads to perverse consequences for the evaluation of SB1, given that the Texas Legislature's stated purpose for passing the law was to reduce the likelihood of illegally cast ballots.  Even if the only effect of the identification restrictions imposed by SB1 is to prevent fraudulent votes from being counted, Professor Hersh misinterprets those ballot rejections as evidence that SB1 is improperly reducing legitimate voting, rather than accomplishing its stated aim.

B.  Some, and potentially all, of these 6,355 ballots could have been rejected because voters failed to write down *any* identification number on the ballot.  Put simply, Professor Hersh cannot distinguish between ballots that were cast without writing down any identification number at all, and those that were rejected because the number written down did not match the number in the state database due to the issues he emphasizes.  That is because all of the codes that he uses to infer the rejection was due to identification verification, which are listed in footnote 7 of his second supplemental report, indicate things like "Incorrect or Missing SSN/TDL #".  None of them distinguish between not writing down

---

[1] 11,430*(1-0.446) = 6,355.

one's ID number at all and writing down a number that does not match the state database. That information is simply not recorded in the data.

17.     In fact, there is nothing in Professor Hersh's report, save for one flawed analysis that I discuss in the following section, that suggests the database issues he emphasizes are responsible for *any* mail-in ballot rejections, including for these 6,355 cases.

18.     In short, the problem is that Professor Hersh (mis)classifies any ballot rejection as due to SB1, even if that is a rejection due to voter error, or if the vote itself is illegitimate.  This is particularly misleading given that Professor Hersh uses the same language in attributing blame for the ballot rejections in the actual data as he does when he describes potential ballot rejections based on his simulation using voter databases.  For example, in his second supplemental report, Professor Hersh asserts that 2.7 million registered voters in Texas could run into problems when voting absentee due to the "SB 1 identification verification rule", or due to "SB 1's verification procedures".  His empirical analysis of actual voting echoes this language in that it makes no fewer than six references to ballots being rejected on account of "SB 1 identification rules", "SB 1 identification issues", or "SB 1 grounds".   Yet the empirical analysis cannot distinguish between rejections due to state database issues from rejections due to voter error, or even due to fraudulent voting.

19.     Professor Hersh's inability to distinguish voters' failures to follow instructions from rejections caused by the database issue he emphasizes also has important implications going forward. To the extent that some or all of the rejections he documents are due to voters failing to write down an identification number, we should expect to see further declines in mail-in ballot rejections in future elections.  That is because as with most new rules, there is a learning curve for both election administrators and voters.  This was evident in the fact that the mail-in ballot rejection rate fell from 12.4 percent to 2.7 percent from the 2022 primary election to the 2022 general election.[2]  It was also

---

[2] Rejections of Texans' mail ballots decline markedly from big surge in March primary (dallasnews.com)

explicitly acknowledged by the Brazos County Elections Administrator, who indicated that many of the November 2022 mail-in ballot rejections for the November 2022 election she had seen at the time of the interview were from voters who had not yet learned, despite election administrators' best efforts, to follow the new rules.[3]

## V.    The only evidence offered by Professor Hersh suggesting ballot rejections are due to the database issue is deeply flawed

20.    Professor Hersh's main argument, throughout all of his reports, is that imperfections in the state databases used to verify a mail-in voter's identity will cause officials to reject legitimate votes, even if individuals fill out the ballot properly.  The problem, which is both unacknowledged and unaddressed by Professor Hersh, is that Professor Hersh cannot discern in the data whether a mail-in ballot was rejected because the voter did not write down an identification number (or wrote the identification number incorrectly), or if the number was correctly written down by the voter but did not match the number in the state database.  Thus, as described in the previous section, it is not clear that *any* of the rejected mail-in ballots that Professor Hersh identifies in his data are due to the database issue he emphasizes so much.

21.    Professor Hersh only provides one analysis claiming to provide evidence that it is this database issue, rather than voter error or even illegitimate voting, that causes the mail-in vote rejections.  Unfortunately, this analysis is deeply flawed.  In paragraph 27, Professor Hersh compares the mail-in ballot rejection rates of those 2.7 million Texans who he identifies as "at-risk" (mostly because they are associated with two ID numbers in the system), versus the rest of registered voters.

---

[3] Of the voters who had voted in the primary, Ms. Hancock said "This is a new process for them.  Those who voted in the primary and the runoff know what they need to do, as opposed to someone who is only voting in the November election."  *See* https://www.texastribune.org/2022/10/20/voting-texas-ballot-rejections/.

While this may seem intuitively sensible, there are three critical flaws in Professor Hersh's execution of this analysis, any one of which is sufficient to be fatal.

A. The first problem is that in comparing the rate at which the two groups never cast a successful ballot, Professor Hersh inexplicably counts all of the mail-in ballots that were not counted, even though many, if not most, of these ballots were not counted for reasons that have nothing to do with the identification requirements of SB1. For example, Professor Hersh counts those whose ballots were rejected for reasons that have nothing to do with the identification requirements of SB1, as well as those whose ballots were returned late, or even not returned at all. As a result, the resulting analysis provides no evidence that the difference in the mail-in ballot success rates of the two groups is due to SB1, rather than other unrelated differences in behavior across the two groups.

B. The second problem is that, as in his analyses of voter databases, Professor Hersh ignores the issue of substitution. As I noted in my first report, the best research on this topic, published in a top journal by Stanford and UCLA researchers, indicates that Texas absentee voters view absentee and in-person voting as close-if-not-perfect substitutes. In this analysis, Professor Hersh does not account for this, at all. Thus, it is possible the entire differential documented by Professor Hersh is driven by the fact that the voters deemed to be "at-risk" by Professor Hersh subsequently vote in person at higher rates than those deemed "not at-risk". Indeed, this would be unsurprising, if Professor Hersh is correct that these individuals are somewhat more likely to encounter a problem when attempting to vote absentee. Yet Professor Hersh's analysis ignores this issue.

C. The third problem is that Professor Hersh ignores the fact that correlation is not causation. That is, anytime there are two groups of individuals that differ in one dimension—in this case, whether they qualify as "at risk" in Professor Hersh's analysis—they can differ in other ways as well, such as the likelihood of voting by mail, for reasons that have nothing to do with the first factor.[4]

22. To be clear, Professor Hersh's analysis on this issue would conclude that the difference in mail-in voting rejection rates "is likely to be related to SB 1 requirements" *even if* the entire differential were due to the one group of people being more likely to forget to write down a number or sign their name on the ballot, or even remembering to return the ballot at all, none of which have anything to do with the database issue he emphasizes. Similarly, Professor Hersh's analysis would conclude the difference "is likely to be related to SB 1 requirements" *even if* the entire differential were

---

[4] A trivial example is that while people who live in rural areas may vote for Republicans more often than people who live in urban areas, that does not mean that the locational difference is causing the difference in voting preferences. Rather, it is possible that these individuals differ in other ways, such as views on the appropriate size of government, or any number of other factors, that could influence both locational choice and voting preferences.

due to "at-risk" voters choosing the close-if-not-perfect substitute of voting in person more often than not-at-risk voters.  Finally, Professor Hersh's analysis would conclude the difference "is likely to be related to SB 1 requirements" *even if* the difference in successful mail voting is caused by other differences between "at-risk" and "not at-risk" groups, which likely differ in many ways, including those unobserved in the data.

**VI.    Professor Hersh's assumptions and conclusions from his analysis of state databases are directly contradicted by his own analysis of the data from the 2022 federal election**

23.    In his second supplemental report, Professor Hersh replicates an analysis previously performed in earlier reports aimed at assessing the fraction and number of registered voters in Texas who could encounter a problem when attempting to vote absentee under SB1.  He did this by attempting to simulate what would hypothetically happen if every registered voter in Texas were to vote absentee, under a range of assumptions about voting laid out in several thousand lines of code.

24.    In my response, I documented many of the implausible assumptions of that analysis. Put simply, Professor Hersh assumed that everything that could go wrong in absentee voting would go wrong, and did so for a population of absentee voters that is vastly larger than anything Texas has ever observed in history.  In addition, the assumptions he used ignored important aspects of actual absentee voting in Texas, such as the fact that the Texas Secretary of State recommends that voters write down two numbers, which would solve nearly all of the database issues emphasized by Professor Hersh; the ballot curing process; and the fact that existing empirical evidence indicates in-person voting is a close-if-not-perfect substitute for absentee voting.

25.    It turns out that Professor Hersh's own empirical analyses in his Second Supplemental Report directly contradict the conclusions from his analyses of the voter databases, and the assumptions used to generate those conclusions.  These contradictions include the following:

A. Professor Hersh's simulations assumed that zero mail-in voters who encountered problems would cure their ballots. That assumption is refuted by his own analysis of actual voting in the 2022 federal election. In Paragraph 19, he points out that of the 13,638 mail-in ballot rejections, "about 40%" have a status code that indicates the ballot was accepted, which Professor Hersh attributes to the ballot being initially rejected but eventually cured and accepted.

B. Similarly, Professor Hersh's simulations of voting assume that zero absentee voters who encounter difficulties will vote in person. In contrast, while he does not break down in-person voting separately from the curing of ballots, his analysis of actual voting in the 2022 federal election indicates this likely happened. In Paragraph 21, he states that of the 11,430 records indicating voters who were rejected due to an identification-related reason, nearly half of them (44.4 percent) are associated with a registrant whose record also shows they were able to vote successfully either by mail or in person. Importantly, as noted earlier, neither Professor Hersh nor I can rule out the possibility that the voters who voted successfully were the *only* ones among these 11,430 rejections who were attempting to cast legitimate votes.

C. As I demonstrated in my first report, Professor Hersh's analysis of voter records assumes that every Texan who has more than one DPS identification number writes down the number they did *not* register with. Put differently, faced with deciding which of two DPS numbers to put down on the ballot, Professor Hersh assumes that not only will every Texan fail to remember the number they registered with, but they will also guess wrong, every time. Similarly, Professor Hersh assumes that every absentee voter will write down only one number, even though the Texas Secretary of State, and at least some local election officials, strongly recommend writing down both a DPS number and the last four digits of the Social Security Number.[5]

26.   Professor Hersh's analysis of actual voting in 2022 also directly contradicts these assumptions. While Professor Hersh's simulations indicated that up to 16 percent of absentee voters would encounter problems, his analysis of actual voting in Paragraph 19 of his report indicates that the initial rejection rate was one-fourth of that.

27.   What is the net effect of all of the assumptions of Professor Hersh's analysis of state voter databases? Professor Hersh would have you believe his dire warnings, both in the second supplemental report and earlier reports, that 2.6 to 2.7 million registered voters in Texas could be disenfranchised due to the identification requirements imposed by SB1. And indeed, in a hypothetical world that operated according to the implausible assumptions he lays out, that may well be true. But

---

[5] For example, see https://www.sos.state.tx.us/about/newsreleases/2022/101222.shtml.

in the real world of voting in Texas, Professor Hersh's own analysis indicates that out of more than 8.1 million votes cast, there are at most 6,355 ballots that went uncounted.  That is 0.078 percent of all votes cast, or 0.036 percent of all registered voters in Texas.[6]  In short, Professor Hersh's simulation estimate of failed mail-in voting was 417 times as large as his own empirical estimate based on actual voting.[7]   And as noted earlier, this much lower number is itself inflated, given some or all of these rejections could have been fraudulent votes, or even if not, could be due to voters failing to write down any identification number.

## VII.    Conclusion

28.    In the conclusion of my first report in response to Professor Hersh, I stated that the burden imposed by SB1 on the handful of voters impacted by SB1 is likely minimal, and quite possibly zero.  Professor Hersh's own empirical analyses in his second supplemental report provides direct evidence in support of that opinion.  In addition, his empirical analyses of the 2022 election directly contradict both the assumptions used in his analyses of voter databases, and his conclusion that 2.7 million registered Texan voters could have their mail-in ballots rejected even if they fill out the ballot correctly.  In particular, Professor Hersh's empirical analysis demonstrates that in the 2022 federal election, there were *at most* 6,355 mail-in votes that were rejected for identification reasons and were not cured or cast in person.  By comparison, over 8.1 million votes were cast in that election.  Moreover, given the clear learning curve associated with new regulations such as those imposed by SB1, as demonstrated by the decline in rejections from the primary to the general election of 2022, as

---

[6] Per the Secretary of State Website, there were 8,102,908 votes cast and counted in the 2022 federal election.  Thus, as a fraction of total votes cast and counted, 0.078 percent (6,355/8,102,908) of all votes cast were potentially "lost" due to SB1, or 0.036 percent of all registered voters in Texas (6,355/17,672,143).   See https://www.sos.state.tx.us/elections/historical/70-92.shtml.

[7] Professor Hersh's estimate of the potential mail-in ballot rejections was 15 to 16 percent of all registered voters; 15/0.036 = 417.

Hoekstra                                                                                                                        13

well as factors laid out in my previous report, I believe it is likely that if anything, the rate of rejections will continue to decline going forward.

29.     Importantly, even that figure of 6,355 exceeds the actual number of legally and properly cast votes that were not counted.  This is because some, and potentially all, of those rejections could have occurred because the vote was illegally cast.  Similarly, some, and potentially all, of those ballots could have been rejected because voters did not write down any identification number (or mistakenly wrote down an incorrect number).  Professor Hersh cannot distinguish between either of those interpretations and his own hypothesis that the rejections were all due to the database issue deficiencies he asserts.  Put differently, Professor Hersh's own analysis is consistent with a belief that exactly zero legitimate votes were lost in the 2022 federal election due to SB1's identification requirements.  Similarly, even if one were to assume away the possibility of fraudulent voting, Professor Hersh's analysis is consistent with the belief that exactly zero votes failed to be cast and counted because of state voter database issues.   As a result, I again conclude that the impact of SB1 on mail-in voting is almost certainly minimal, and very possibly zero.

Respectfully Submitted,

Mark Hoekstra, PhD

CURRICULUM VITAE

Mark Hoekstra

| | |
|---|---|
| Texas A&M University | Office Phone:  979.845.7302 |
| Department of Economics | Email: markhoekstra@tamu.edu |
| 275 Liberal Arts Social Sciences Building | https://sites.google.com/view/markhoekstra |
| College Station, TX  77840-4228 | Google Scholar Profile (link) |

## Academic Appointments

| | |
|---|---|
| 2018 – Present | Professor of Economics |
| 2015 – Present | Private Enterprise Research Center Rex B. Grey Professor of Economics, Texas A&M University |
| 2011 – 2018 | Associate Professor of Economics, Texas A&M University |
| 2006 – 2011 | Assistant Professor of Economics, University of Pittsburgh |

## Research Appointments

| | |
|---|---|
| 2015 – Present | Research Associate, National Bureau of Economic Research |
| 2013 – Present | Research Fellow, IZA |
| 2011 – 2015 | Faculty Research Fellow, National Bureau of Economic Research |

## Editorial Positions

| | |
|---|---|
| 2018 – Present | Associate Editor, *Journal of Labor Economics* |
| 2015 – Present | Associate Editor, *Journal of Human Resources* |

## Education

Ph.D.   Economics, University of Florida, August 2006
Dissertation Advisor: David Figlio

B.A.   Economics, Hope College (*summa cum laude*), June 2001

## Research Interests

Applied Microeconomics, including Labor Economics, Law and Economics, and the Economics of Education

## Publications

"The Effect of Open-Air Waste Burning on Infant Health: Evidence from Government Failure in Lebanon" (with Pierre Mouganie and Ruba Ajeeb), forthcoming in *Journal of Human Resources*

"The Effect of School and Neighborhood Peers on Achievement, Misbehavior, and Adult Crime" (with Stephen B. Billings), forthcoming in *Journal of Labor Economics*

"Does Race Matter for Police Use of Force?  Evidence from 911 Calls" (with CarlyWill Sloan), *American Economic Review* 2022, 112(3): 827-860.

"The Effect of Own-Gender Jurors on Conviction Rates" (with Brittany Street), *Journal of Law and Economics* 2021, 64(3): 513-537.

"(Almost) No One Votes Without ID, Even When They Can" (with Vijetha Koppa), *Economics Letters* 2021, 205: 1-3.

"The Impact of College Diversity on Behavior Toward Minorities" (with Scott E. Carrell and James West), *American Economic Journal: Economic Policy* 2019, 11(4): 159-182.

"The Long-Run Effects of Disruptive Peers" (with Elira Kuka and Scott E. Carrell), *American Economic Review* 2018, 108(11): 3377-3415.

"Peer Quality and the Academic Benefits to Attending Better Schools (with Pierre Mouganie and Yaojing Wang), *Journal of Labor Economics* 2018, 36(4): 841-884.

"Cash for Corollas: When Stimulus Reduces Spending" (with Steven L. Puller and Jeremy West), *American Economic Journal: Applied Economics* 2017, 9(3): 1 − 35.

"Illegal Immigration, State Law, and Deterrence" (with Sandra Orozco-Aleman), *American Economic Journal: Economic Policy* 2017, 9(2): 228-252.

"Vehicle Miles (Not) Traveled: Why Fuel Economy Requirements Don't Increase Household Driving" (with Jeremy West, Jonathan Meer, and Steven L. Puller), *Journal of Public Economics* 2017, 145: 65-81.

"Are School Counselors an Effective Education Input?" (with Scott E. Carrell), *Economics Letters* 2014, 125(1): 66-69.

"Bank Privatization, Finance, and Growth" (with Daniel Berkowitz and Koen Schoors), *Journal of Development Economics* 2014, 110: 93-106.

"Does Strengthening Self-Defense Law Deter Crime or Escalate Violence?  Evidence from Expansions to Castle Doctrine (with Cheng Cheng) *Journal of Human Resources* 2013, 48(3): 821-854.

"Family Business or Social Problem?  The Cost of Unreported Domestic Violence" (with Scott E. Carrell) *Journal of Policy Analysis & Management* 2012, 31(4): 861-875.

"Is Poor Fitness Contagious?  Evidence from Randomly Assigned Friends" (with Scott E. Carrell and James West) *Journal of Public Economics* 2011, 95(7-8): 657-663.

"The Ticket to Easy Street?  The Financial Consequences of Winning the Lottery" (with Scott Hankins and Paige Marta Skiba) *Review of Economics and Statistics* 2011, 93(3): 961-969.

"Does Drinking Impair College Performance?  Evidence from a Regression Discontinuity Approach" (with Scott E. Carrell and James West) *Journal of Public Economics* 2011, 95 (1-2): 54-62.

"Does High School Quality Matter?  Evidence from Admissions Data" (with Daniel Berkowitz) *Economics of Education Review* 2011, 30(2): 280-288.

"Lucky in Life, Unlucky in Love?  The Effect of Random Income Shocks on Marriage and Divorce" (with Scott Hankins) *Journal of Human Resources* 2011, 46(2): 403-426.

"Externalities in the Classroom: How Children Exposed to Domestic Violence Affect Everyone's Kids" (with Scott E. Carrell) *American Economic Journal: Applied Economics* 2010, 2(1): 211-228.

"The Effect of Attending the Flagship State University on Earnings: A Discontinuity-Based Approach" *Review of Economics and Statistics* 2009, 91(4):  717-724.

**Other Publications**

"Returns to Education Quality".  2020.  In Steve Bradley and Colin Green (Eds.), *The Economics of Education: A Comprehensive Overview, 2nd edition*.  Edited by Steve Bradley and Colin Green.  Elsevier Academic Press.

"Domino Effect" (with Scott E. Carrell).  2009.  *Education Next:* 9(3).  Available at http://www.hoover.org/publications/ednext/Domino_Effect.html.

**Working Papers**

"The Scale and Nature of Neighborhood Effects on Children: Evidence from a Danish Social Housing Experiment" (with Stephen B. Billings and Gabriel Pons Rotger)

"Illegal Immigration: The Trump Effect" (with Sandra Orozco-Aleman)

"When Should We Trust Weighted Least Squares Estimates?" (with Cheng Cheng)

**Awards**

IZA Young Labor Economist Award, 2012 (with Scott E. Carrell)

**Teaching Experience**

Texas A&M University:
   Sports Economics, Public Economics I (PhD-level), Econometrics II (1st-year PhD), Labor Economics I (2nd-year PhD)

University of Pittsburgh:
   Labor Economics (PhD-level), Sports Economics, Intermediate Public Finance, Industrial Organization, and Research Methods in Empirical Microeconomics

University of Florida:
   Public Finance and Managerial Economics

**Department Service**

Executive Committee (Fall 2011 – Fall 2014; Fall 2016 – Spring 2017)
Graduate Instruction Committee (Fall 2012 – Spring 2019)
Director of PhD Admissions (Fall 2012 – Spring 2015; Fall 2018 – Spring 2019; Spring 2023)
Director of PhD Program (Fall 2012 – Fall 2014)
Applied Microeconomics Search Committee (2011-12, 2012-13, 2014-15)

**Primary Dissertation Advisor (Initial Placement, Current Position)**
(Non-tenure track positions and co-advisor roles are noted if applicable; excludes committee memberships)

| | |
|---|---|
| Suhyeon Oh | (expected 2025) |
| Maya Mikdash | (expected 2024) |
| Adam Bestenbostel | (2022, Air Force Academy, non-tenure-track Assistant Professor) |
| Meradee Tangvatcharapong | (2021, 5-year non-tenure-track Assistant Professor, Hitotsubashi University's Institute of Economic Research)) |
| CarlyWill Sloan | (2020, Claremont Graduate University, now at United States Military Academy West Point) |
| Brittany Street | (2019, University of Missouri) |
| Abigail Peralta | (2018, Louisiana State University) |
| Yaojing Wang | (2017, Bank of America, co-advised with Li Gan, now at Peking University) |
| Vijetha Koppa | (2016, Stephen F. Austin State University, now at Institute of Management |

|                   | Technology, Dubai)                                                         |
|-------------------|----------------------------------------------------------------------------|
| Jillian Carr      | (2015, Purdue University)                                                  |
| Pierre Mouganie   | (2015, American University of Beirut, now at Simon Fraser University)     |
| Gonzalo Sanchez   | (2015, Pontificia Universidad Católica de Ecuador)                        |
| Cheng Cheng       | (2014, University of Mississippi, now at Amazon)                          |

## Presentations

*Essen Health Conference (keynote speaker, scheduled May 2023); Clemson University (November 2022); Berlin Applied Micro Seminar, October 2022; Simon Fraser University, April 2022, Jinan University, October 2021; National University of Singapore, April 2021; University of Florida, April 2021; ASSA American Economic Association Annual Meeting (x2), January 2021; San Diego State University, October 2020; Boston University, September 2020; University of Maryland, September 2020; Notre Dame, September 2020; NBER Summer Institute – Crime, July 2020; Claremont McKenna College, February 2020; Claremont Graduate University, January 2020; American Economic Association Annual Conference, January 2020; Southern Economic Association Annual Conference, November 2019; Victoria University of Wellington Applied Econometrics Workshop, October 2019 (keynote speaker); University of Mississippi, October 2019; Mississippi State University, October 2019; Stata/Texas Applied Microeconomics Conference, October 2019; University of Florida, May 2019; Georgia Tech, March 2019; West Virginia University, March 2018; University of Tennessee, January 2018, Purdue University, January 2018; University of Kentucky, October 2017; Annual Meeting of the Western Economic Association, June 2017; University of Leicester, June 2017; University of Leicester Domestic Violence Workshop, June 2017; American University of Beirut, March 2017; University of Uppsala, March 2017; Montana State University, April 2016; American University of Beirut, March 2016; Columbia University, February 2016; Annual Meeting of the American Economic Association Meeting (January 2016); Annual Meeting of the Southern Economic Association (November 2015); NBER Education Program Meeting (November 2015); Brigham Young University, February, 2015; Federal Reserve Bank of New York, February, 2015; Stata/Texas Applied Microeconomics Conference, November 2014; University of Florida, November, 2014; Louisiana State University, October 2014; Institute for the Study of Labor (IZA), October 2014; University of Wisconsin-Milwaukee, October 2013; Ghent University, September 2013; University of Texas – Dallas, April 2013; Stata/Texas Applied Microeconomics Conference, December 2012; Southern Economic Association Annual Meeting, November 2012; University of Texas-Austin, April 2012; Georgetown Public Policy Institute, April 2012; University of Missouri, October 2011; Baylor University, August 2011; Texas A&M University, November 2010; University of Houston, October 2010; University of Pittsburgh School of Medicine, Psychiatry and Epidemiology Seminar, October 2009; NBER Summer Institute, Law and Economics Program, July 2009; University of California at Davis, April 2009; University of California at Berkeley Labor Lunch, March 2009; American Economic Association Annual Meetings, January 2009; Texas A&M University, September 2008; Carnegie Mellon University, September 2008; NBER Summer Institute, Economics of Education Program, July 2008; Society of Labor Economists Annual Meeting, May 2008; Vanderbilt University, April 2008; NBER Education Working Group, November 2006*

## Other Information

Referee: *American Economic Journal: Applied Economics, American Economic Journal: Economic Policy, American Economic Review, American Journal of Health Economics, American Sociological Review, Berkeley Electronic Press, Contemporary Economic Policy, Economic Development and Cultural Change, Economic Inquiry, Economic Journal, Economics of Transition, Education Economics, Education Finance and Policy, Empirical Economics, European Journal of Law & Economics; Journal of Applied Econometrics, Journal of Comparative Economics, Journal of Demographic Economics, Journal of the European Economic Association, Journal of Health Economics, Journal of Human Resources, Journal of Labor Economics, Journal of Policy Analysis and Management, Journal of Political Economy, Journal of Population Economics, Journal of Public Economics, Journal of Sports Economics, Journal of Urban Economics, Labour Economics, Proceedings of the National Academy of Sciences (PNAS), Quantitative Finance, Quarterly Journal of Economics, Regional Science and Urban Economics, Review of Economics and the Household, Review of Economics and Statistics, and Southern Economic Journal.*

Reviewer: Israel Science Foundation, National Science Foundation, Marsden Fund (New Zealand), Dutch Research Council

Citizenship: United States

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

## STATE DEFENDANTS' BRIEF IN RESPONSE TO
## OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# APPENDIX M



**In The Matter Of**

**La Union Del Pueblo Entero, et al.,**

**Plaintiffs**

**v**

**State Of Texas, et al.,**

**Defendants**

**CASE**

**5:21-cv-844**

**Date**

**4-28-2022**

**Witness**

**Brian Keith Ingram, J.D.**

**Certified Copy
Transcript**

**National Court Reporters Inc.  ·  888.800.9656  ·
NationalCourtReporters.com
NCRNetwork@nationalcourtreporters.com**
Serving Legal Professionals From Coast To Coast and Internationally

5:21-cv-844 (XR)
4/28/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 5 (17 - 20)

5 (17 - 20)

Page 17

1  Q. Okay. And had those concerns taken hold among
2  voters in a significant way?
3  A. I don't know, but I was glad for the
4  opportunity to talk to the reporter to disabuse folks of
5  those notions if I could.
6  Q. Were there any groups of voters that you
7  observed in your role who were exhibiting concerns about
8  voting by mail?
9  A. I had a friend of mine who was asking me
10 questions about voting by mail and whether it was safe
11 and I referred him to that article.
12 Q. Anyone else?
13 A. Can't think of anybody.
14 Q. Prior to the 2020 election, what were the
15 built-in security checks for Texas's mail ballot system?
16 A. The -- well, you've got an application for
17 ballot by mail, the application goes through the process
18 of making sure that that voter is actually registered
19 and that the address listed is the address on file for
20 that voter, if not, then a -- with the balloting
21 materials they are going to give a statement of
22 residence, and so you get the application with the
23 signature and then, of course, you get the carrier
24 envelope and it is put in a jacket envelope with the
25 application so that all of that material is kept

Page 18

1  together. I mean there was -- there was, apparently, a
2  belief that you could just have ballots come in from
3  anywhere, you know, you could just get your mail ballot,
4  have it photocopied and 15 people could send in a
5  ballot. Well, that's not the way it works; you have got
6  an application that goes with the ballot, so it is an
7  one-to-one ratio. And then, of course, they do the
8  signature checks and they make sure that the carrier
9  envelope is filled out properly, if there is an
10 assistant, and then the ballot is not counted unless
11 those things are approved by the Ballot Board. And if
12 the Ballot Board or the Signature Verification Committee
13 needs further confirmation that the signatures are those
14 of the voter, they can look at any signatures on file
15 for the last six years to either confirm that it is the
16 voter or to confirm that it is not the voter and it
17 works both ways, but anyway, they can use any signature
18 from the voter registration file or any election files.
19 So any previous applications for ballot by mail or voter
20 registration application, all of those signatures are
21 available for comparison to identify the voter, and so
22 that's -- those were the measures that were in place at
23 that time.
24 Q. That's the complete set, just to be clear?
25 A. That's right.

Page 19

1  Q. Okay. And then prior to the 2020 election, why
2  did you describe that complete set of built-in security
3  checks as robust?
4  A. Well, because -- well, there is not -- I mean
5  there were also the ballot -- the ballot has a serial
6  number, the -- so you know what ballot went to which
7  voter so, you know, you can -- you can keep track of
8  things in a way that you don't have to worry about
9  extraneous votes coming in or somebody voting by mail
10 that shouldn't be.
11 Q. And put together, you considered all those
12 security checks to be robust?
13 A. Sure.
14 MS. HUNKER: Objection, form.
15 Q. Did concerns about the mail ballot system
16 persist after the 2020 general election?
17 A. They did.
18 Q. And why do you think that was?
19 MS. HUNKER: Objection, form. Lack of
20 personal knowledge.
21 A. Yeah. I don't know.
22 Q. On the basis of your personal knowledge as the
23 Chief Elections Administrator for the State of Texas,
24 what was your understanding, if you understood that
25 there were these concerns, why those concerns persisted?

Page 20

1  MS. HUNKER: Same objection.
2  A. I don't know why the concerns persist, that's a
3  very difficult question to answer.
4  Q. Are there individuals who continue to advance
5  messaging contrary to your messaging that the security
6  checks are not robust?
7  MS. HUNKER: Objection, form. Vague, lack
8  of personal knowledge.
9  A. Yeah. There are people out there in the world
10 who want to cast doubt on the legitimacy of our
11 electoral system, our electoral processes.
12 Q. Are you aware of any fraud concerning mail
13 ballots in Texas at a scale that could impact statewide
14 contests?
15 MS. HUNKER: Objection, form. Lack of
16 foundation. Lack of personal knowledge.
17 A. Yeah. Not in a scale that could impact the
18 statewide election, but they definitely -- there is
19 definitely fraud that impacts local elections and
20 changes outcomes.
21 Q. Are you aware of any fraud concerning mail
22 ballots in Texas at a scale that could impact a state
23 Senate race?
24 MS. HUNKER: Objection, form.
25 A. Like I said, I am not aware of mail ballot

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

5 (17 - 20) Brian Keith Ingram JD

Page: 5 (17 - 20)

5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 6 (21 - 24)

6 (21 - 24)

Page 21

1  fraud at a scale that could impact a statewide race so
2  far.  Now, if we have a close statewide race then
3  obviously we could.  But so far, since I have been in
4  this job for the last 10 years the only -- the closest
5  race was 200,000 statewide, so I guess the Land
6  Commission at one time or the Comptroller was a little
7  closer to that on the primary, but anyway, no, the mail
8  ballot fraud that we see affects the local races
9  primarily.
10  Q.   Okay.  And I apologize if I was unclear.  I had
11  meant a race for the Texas Senate not the U.S. Senate.
12  I was trying to -- trying to get a little smaller, but I
13  think that your answer was clear, so thank you for that.
14      Did the 2020 election reveal any systemic
15  fraud concerning mail ballots in Texas?
16  A.   Not anymore than any other election, no.
17  Q.   Let me repeat myself and try and be a little
18  clearer.  Did the 2020 election reveal any broad
19  systemic statewide fraud concerning mail ballots in
20  Texas?
21  A.   No.
22  Q.   Did the rate of fraud concerning mail ballots
23  in Texas increase, to your knowledge, during the 2020
24  election?
25  A.   Not that I know of.

Page 22

1  Q.   Were concerns about the mail ballot system that
2  we have discussed based in fact?
3      MS. HUNKER:  Objection, form, vague.
4  A.   There is definitely --
5      MS. HUNKER:  Compound question and lack of
6  personal knowledge.
7  Q.   Yeah.  You may answer.
8  A.   There is definitely a well-founded concern
9  about the mail ballot process, yes.  There are
10  well-founded concerns that predated 2020 that -- that
11  persist.
12  Q.   Were concerns about the magnitude of fraud
13  within the mail ballot system based in fact?
14      MS. HUNKER:  Objection, form, vague, lack
15  of personal knowledge.
16  Q.   You can answer.
17  A.   Yeah, I don't know what that means.
18  Q.   Were -- let me try and rephrase that.  Were
19  concerns of which you were aware among voters about the
20  scale or magnitude of fraud in the mail ballot system in
21  Texas based in fact during the 2020 election?
22      MS. HUNKER:  Objection, form, vague,
23  compound, lack of personal knowledge.
24  Q.   You may answer.
25  A.   Except for I can't.  I don't how to answer that

Page 23

1  question.
2  Q.   If a voter were to have walked up to you prior
3  to the 2020 election and said, "I am concerned that
4  there is so much fraud in mail ballots that it is going
5  to change the outcome of the presidential election,
6  would you consider those concerns to be based on facts
7  about the mail ballot system in Texas?
8      MS. HUNKER:  Objection, form.  Improper
9  hypothetical.
10  A.   Yeah, I would have to ask -- I would have to
11  ask them what specifically their concerns were and how
12  specifically they thought the mail ballot process was
13  capable of being manipulated to that extent.  I would
14  need to know what their fear was to know how I could
15  disabuse them of it, if I could.
16  Q.   Okay.  We can move on.  I would like to move to
17  your legislative testimony.  In March of 2021, did you
18  testify to the Texas House Committee on Elections that
19  Texas elections are in good shape?
20  A.   I did.
21  Q.   What did you mean by "good shape"?
22  A.   I meant that -- that generally the election
23  framework is working the way it is supposed to.  The
24  county election officials are doing their job properly
25  and that the Texas elections are in good shape.

Page 24

1  Q.   Anything else?
2  A.   That's it.
3  Q.   When you said that Texas elections are in good
4  shape, did that reflect on the security of Texas
5  elections?
6  A.   Partly.
7  Q.   Would you -- is an election that is in good
8  shape free and fair?
9      MS. HUNKER:  Objection, form, vague.
10  A.   I agree.  Texas always has free and fair
11  elections.
12  Q.   Okay.  And you also -- am I correct that you
13  testified with respect to the 2020 presidential election
14  that, in spite of all the circumstances, Texas had an
15  election that was smooth and secure?
16  A.   That's not the entire context of that quote.
17  The point is that, we were trying to pat the county
18  election officials on the back for having a successful
19  election in a pandemic.  So people have taken that quote
20  out of context and made a drinking game out of it, but
21  that's not all I said in that sentence, and it is
22  certainly not consistent with the example that I gave
23  which was how my personal election administrator
24  reconfigured my particular polling place to make it safe
25  for activities so that the voters and the workers were

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

6 (21 - 24) Brian Keith Ingram JD

Page: 6 (21 - 24)

5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 25 (97 - 100)

**25 (97 - 100)**

Page 97

1  A.  It was consistent --
2      MS. HUNKER:  Objection, form.
3  A.  -- with the law and what was required at that
4  time.  The Legislature now requires a number be provided
5  as well.
6  Q.  Okay.  Do you know if family members tend to
7  have access to each other's driver's license numbers or
8  social security numbers?
9      MS. HUNKER:  Objection, form.
10  A.  And like I said in my earlier answer, this idea
11  of requesting mail ballots in the name of somebody else
12  was a live issue and very much on the minds of the
13  Elections Committee as they were working.
14  Q.  Okay.  Do you happen to know if family members
15  tend to have access to each's other's drivers license
16  numbers or social security numbers?
17  A.  I don't know.
18  Q.  Have you ever submitted a joint tax return with
19  a family member?
20  A.  I have a wife that I do joint returns with,
21  yes.
22  Q.  And do you know if your wife's social security
23  number is on your tax return?
24  A.  It is.
25  Q.  And so would it be possible for you to request

Page 98

1  an absentee ballot on your wife's behalf using the
2  social security number that's on your tax returns?
3      MS. HUNKER:  Objection, form.
4  A.  I could.
5  Q.  Would you say that it is easier or harder for a
6  family member to provide a Texas driver's license number
7  or social security number than it is for a family member
8  to forge a signature of another voter?
9      MS. HUNKER:  Objection, form.  Lack of
10  personal knowledge.
11  Q.  If you know.
12  A.  And again, I don't know.
13  Q.  Well, could you forge your wife's signature, do
14  you think?
15  A.  I don't know, never tried.
16  Q.  Fair enough.
17  A.  I can't imagine a set of circumstances where I
18  would.
19  Q.  Do you think sitting here today that you could
20  create a facsimile of your wife's signature?
21  A.  I don't know.
22  Q.  I won't make you try, tempted but I won't.
23      Do caregivers tend to have access to
24  senior citizen's driver's license numbers or social
25  security numbers?

Page 99

1  A.  I don't know.
2      MS. HUNKER:  Objection, form.  Lack of
3  personal knowledge.
4  Q.  Do you know if it is easier for a nursing home
5  resident -- strike that.
6      Do you know if it's easier for a nursing
7  home provider to put a resident's Texas driver's license
8  or social security number on an ABBM than it is for the
9  nursing home provider to forge a resident's signature?
10      MS. HUNKER:  Objection, form.  Vague,
11  compound.  Calls for information that's not personal
12  knowledge.
13  Q.  If you know.
14  A.  Yeah, I don't have any idea.
15  Q.  Okay.  Are you aware of any instances in which
16  an individual intended or attempted to impersonate a
17  mail voter as worded by this SB 1 identification number
18  requirement?
19  A.  I don't know.  Just had one election so far.
20  Q.  Sitting here today, though, you can't say that
21  you're aware of any acts of voter fraud being thwarted
22  by this requirement; is that right?
23      MS. HUNKER:  Objection, form.
24  A.  Well, what I know is that, we have had
25  testimony in committees on this bill about deceased

Page 100

1  persons, you know, who have mail ballot request in their
2  name years after they have died.
3      We also had testimony about people who had
4  mail ballot requests in their name even though they
5  didn't, they swore under oath that they didn't request
6  that mail ballot, and that wasn't their signature; so
7  that was the testimony in front of the Legislature at
8  the committees.  And that's what this is trying to stop.
9  Now we don't know, yet, whether those kinds of things
10  continued.  That's going to be something we will have to
11  see as upcoming elections happen and people do their due
12  diligence and their investigations.
13  Q.  But sitting here right now, you are not able to
14  identify any instances in which these requirements
15  awarded an act of voter fraud; is that right?
16      MS. HUNKER:  Objection, form.
17  A.  What I am trying to say is that, the evidence
18  in front of the Legislature in committee was that there
19  are circumstances that exist where this kind of
20  requirement could thwart, and that's what we have got
21  right now.  We don't have actual thwarted.
22  Q.  Got it.
23      MS. HUNKER:  Just ask my client to wait
24  until I can give my objection.
25  A.  Sorry.  I'm trying real hard.

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

25 (97 - 100) Brian Keith Ingram JD

**Page: 25 (97 - 100)**

5:21-cv-844 (XR)
4/28/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 26 (101 - 104)

26 (101 - 104)

Page 101

1  Q.  I have a few follow-up questions about the form
2  of identification hierarchy as you discussed with my
3  colleague, Mike, on Tuesday.  I am not going to ask you
4  to run through all of it.  But if you could turn to
5  Section 5.02 of SB 1.  Are you there?
6  **A.  Uh-huh.**
7  Q.  Just focusing on Section 5.02.  For a voter who
8  has been issued a Texas driver's license number, what
9  information does Section 5.02 require?
10        MS. HUNKER:  Objection, form.  Calls for a
11  legal conclusion.
12  **A.  So it requires that the voter provide their**
13  **driver's license number or their social security number,**
14  **last four, or a statement that they don't have either**
15  **one of those.**
16  Q.  But for a voter who has been issued a Texas
17  driver's license number does 5.02 require anything
18  different than the Texas driver's license number?
19        MS. HUNKER:  Objection, form.
20  **A.  It does not.**
21  Q.  Does it require anything else besides the Texas
22  driver's license number?
23  **A.  There is no requirement for anything further.**
24  **We suggest and we strongly suggest that they go ahead**
25  **and put the last four of the social.**

Page 102

1  Q.  My question, though, is the ballot --
2  **A.  We cannot require it because the law doesn't**
3  **require it.**
4  Q.  And focusing on Section 5.08 of SB 1, for a
5  voter who -- for a voter who has been issued a Texas
6  driver's license number, what information does
7  Section 5.08 of SB 1 require?
8  **A.  It requires the driver's license number.**
9  Q.  Okay.  I would like to turn then to the HB 2512
10  process.
11  **A.  Okay.**
12  Q.  When I use the term HB 2512 process, what does
13  that mean?
14  **A.  There was a bill in the 83rd Session, I believe**
15  **it is, in 2013, that was HB 2512, and it provided that**
16  **any information in the driver's license file could be**
17  **used for voter registration purposes; it amended the**
18  **Transportation Code to provide for us to have**
19  **information in the driver's license file to assist with**
20  **voter registration.**
21  Q.  Prior to last year, how did you go about
22  importing DPS data into TEAM?  What was that process?
23  **A.  I don't know what that means.**
24  Q.  Prior to last year, what was the HB 2512
25  process?

Page 103

1  **A.  Because we get -- we get a lot of information**
2  **from DPS from a lot of ways, and so I just want to make**
3  **sure we are talking about the same thing.  If we are**
4  **talking about the ad hoc process, is that what you're**
5  **talking about?**
6  Q.  Well, let me rephrase if it is not clear to
7  you.  And I appreciate you letting me know.
8  **A.  Because 2512 covers the non-citizen process, it**
9  **covers felons, you know, it is information that DPS has**
10  **that we can use.**
11  Q.  Prior to last year, what was the process for
12  importing either social security numbers or DPS numbers
13  into TEAM from DPS databases?
14  **A.  So is what we instituted after the passage of**
15  **HB 2512 is an annual process where we would try to**
16  **maximize the number of full nines that we have in our**
17  **database, full nine of social security number in our**
18  **database.**
19  Q.  And prior to last year, am I correct that a
20  match as part of that process required a match of Texas
21  driver's license numbers that any sort of set of
22  matching criteria at least included a Texas driver's
23  license number?
24  **A.  I don't believe that's the case, no, sir.**
25  Q.  Do you know, prior to last year, that process

Page 104

1  of infilling SSN-9s, do you know what the criteria were?
2  **A.  Well, I mean it's the same as we always do.**
3  **You start out with matching social security numbers,**
4  **take those off the list, then you match the DLs and take**
5  **those off the list, and then you match the first and**
6  **last name, former last name, date of birth, and whatever**
7  **you got and see if you get more matches.**
8  Q.  So sitting here today, prior to last year, it
9  is your understanding that there were matches conducted
10  on a basis that did not include a Texas driver's license
11  number that resulted in the implication of an SSN-9?
12  **A.  Yes.**
13        MR. FREEMAN:  Can we go off the record for
14  a moment?
15        (Brief pause.)
16  Q.  (By Mr. Freeman)  If there were a document that
17  stated that, prior to last year, the criteria for
18  importation of an SSN-9 rested on only two document
19  match criteria, both of which included a Texas driver's
20  license number, would that surprise you?
21  **A.  I would have to go talk to my voter**
22  **registration manager and see if that's the way they did**
23  **it.**
24  Q.  So sitting here today, are you 100 percent
25  confident that SSN-9s were imported without a driver's

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

26 (101 - 104) Brian Keith Ingram JD
Page: 26 (101 - 104)

5:21-cv-844 (XR)
4/28/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 38 (149 - 152)

38 (149 - 152)

Page 149

1  A.  Yes.
2  Q.  Is that a document that, to your knowledge, has
3  been produced to the plaintiffs in discovery in this
4  case?
5  A.  I would be surprised if it had.  It has
6  confidential information in it, but it might.
7  Q.  So if I were to use the term "complaint log"
8  would that have a specific meaning to the folks in your
9  office?
10  A.  It would.
11  Q.  And is there only one complaint log that is
12  kept by your office?
13  A.  Should be.
14  Q.  How is that document updated?
15  A.  By my assistant when the complaints come in.
16  Q.  And so walk me through that process if you
17  would, please.
18  A.  A complaint comes in, it is recorded in the
19  complaint log, it is scanned and emailed to me for
20  review.
21  Q.  And do you review every complaint that does
22  come in?
23  A.  I do.
24  Q.  What happens after you conduct that review?
25  A.  Either a disposition letter will be put

Page 150

1  together by my assistant and mailed to the complainant
2  or it will be assigned to an attorney for either
3  referral to the Attorney General or for a letter back to
4  the complainant.
5  Q.  Who makes the decision, the ultimate decision
6  about whether it is issued a -- whether a disposition
7  letter is issued or if it is referred it an attorney for
8  further follow-up?
9  A.  Me.
10  Q.  Anybody else?
11  A.  No.
12  Q.  What type of information would appear on the
13  complaint log for each complaint that is sent in to your
14  office?
15  A.  I am not sure.  I haven't ever seen the
16  document myself, so I don't know all of the boxes that
17  it has, but it will have -- generally, it will have the
18  date the complaint was received, the nat -- the broad
19  general nature description of the complaint.  The person
20  bringing the complaint and I think usually the person
21  complained of.  It will also have --
22  Q.  Any others?
23  A.  -- a column for attorney assigned and then
24  disposition.
25  Q.  Thank you.  And forgive me, please, for

Page 151

1  speaking over you.
2  Any other information that you could think
3  of that might be captured on that document?
4  A.  Like I said, I don't know.  I haven't seen the
5  document myself.  I think those are the categories.
6  Q.  Having never seen the document, do you have any
7  information about whether it is in fact complete with
8  every complaint that has come in or not?
9  MS. HUNKER:  Objection, form.
10  A.  I believe it to be complete at least for the
11  last several years.  It has in the past been the
12  responsibility of the legal -- paralegal, legal
13  assistant to keep up with that document.  Our legal
14  assistant recently left us and so it's -- my assistant
15  has been doing it.  And I am pretty confident that the
16  legal assistants that we have had in the last four or
17  five years have done a good job of documenting every
18  complaint, so that's what I would say about that.
19  Q.  And so sitting here today, you have reason to
20  believe that if a complaint is submitted to your office
21  about some unlawful voting activity, the -- that
22  complaint has been recorded on the complaint log and a
23  scan of it has been saved to your system; is that fair?
24  MS. HUNKER:  Objection, form.
25  A.  I believe so.

Page 152

1  Q.  Ms. Hunker, a this point, I do believe the
2  witness testified he would be surprised if it were
3  produced in discovery.  I will make a formal request
4  that we do obtain a copy of that and your office try to
5  produce it to us.  I recognize that there might be,
6  based on the witness' testimony, some material that will
7  require redaction.  But we, obviously, take no position
8  until we have seen it.  But if you have to produce it in
9  a redacted form of the privilege log, please do so.
10  MS. HUNKER:  I will note your request and
11  do inquiries into the matter.  However, to the extent
12  that it has confidential information, particularly, if
13  that information cannot be redacted without comprising
14  the document or can't be redacted at all, we would be
15  alleging privilege.
16  MR. KANTERMAN:  Noted and certainly happy
17  to follow-up after the deposition.  I certainly
18  appreciate the courtesy of taking a look though.  Thank
19  you.
20  Q.  (By Mr. Kanterman)  Mr. Ingram, moving on to my
21  next lines of questions if we could.
22  Did you or your office have any
23  communications with the Texas Governor and/or the Office
24  of the Texas Governor regarding any incidents of illegal
25  voting?

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

38 (149 - 152) Brian Keith Ingram JD
Page: 38 (149 - 152)

5:21-cv-844 (XR)
4/28/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 39 (153 - 156)

39 (153 - 156)

Page 153

1     MS. HUNKER:  Objection, form.  Vague and
2  ambiguous.
3     **A.  Yeah.  I don't think so.**
4     Q.   Have you or your office have had any
5  communication was the Texas Governor or its office
6  regarding incidents of election fraud?
7     MS. HUNKER:  Objection, form, vague.
8     **A.  Yeah.  I -- I don't know.  I mean -- I have had**
9  **a ton of conversations with the Governor's office over**
10 **the last 10 years, I don't know, thousands of hours; so**
11 **have we talked about incidents of election fraud in that**
12 **probably.  Probably we talked about Gregg County, but I**
13 **don't have a specific recollection of the specific**
14 **conversation as we sit here today.**
15    Q.   And you said a conversation -- particularly a
16 conversation with Gregg County?
17    **A.  Gregg County, right.**
18    Q.   If you have a memory of that communication
19 generally, what would it have been?
20    **A.  Well, Gregg County is a circumstance where in a**
21 **primary election one candidate for County Commissioner,**
22 **one race for County Commissioner had a disproportionate**
23 **number of mail ballots cast in it and those mail ballots**
24 **went overwhelmingly for one candidate.  The early votes**
25 **in-person and the election day in-person actually went**

Page 154

1  **for the other candidate by some margin.  But because of**
2  **the overwhelming number of mail ballots that went**
3  **overwhelmingly for the one candidate, he ended up**
4  **winning the race by a few votes, and that has been the**
5  **subject of investigation by the Attorney General and it**
6  **has been the subject of indictments by the Attorney**
7  **General.**
8     Q.   And do you have any recollection sitting here
9  today the particulars of the conversations you had with
10 the Governor's office about that situation?
11    **A.  Just what we are talking about here today that**
12 **it happened and it was investigated.**
13    Q.   You mentioned you had thousands of hours of
14 communications with the Governor's office over your --
15 the course of your time with the Secretary of State's
16 Office; is that right?
17    **A.  That's right.**
18    Q.   Are those conversations generally in written
19 form in some other form?
20    **A.  No.  We talk.**
21    Q.   When you say "talk," are those in-person
22 communications, telephone communications or something
23 else?
24    **A.  Both.  Mostly on the phone but we do talk**
25 **in-person.**

Page 155

1     Q.   Did you have any additional communications with
2  the Texas Governor or his office about violations of
3  Texas election laws besides those we have already
4  discussed?
5     MS. HUNKER:  Objection, form.  Asked and
6  answered.
7     **A.  Yeah.  Again, I -- I can't remember any**
8  **specific conversations, but we talk a lot and we talk**
9  **about violations of the law a lot.  We talk about all**
10 **kinds of things.**
11    Q.   Have you had any communications with the Texas
12 Attorney General or his office regarding incident of or
13 investigation into illegal voting in the State of Texas?
14    MS. HUNKER:  I am going to object to the
15 extent this calls for investigative privilege and
16 instruct my witness not to reveal any information
17 concerning complaints that have been referred to the OAG
18 but have yet to be resolved through a final matter.
19    **A.  Yes.  I talk to the Attorney General's**
20 **investigative team on a regular basis.**
21    Q.   And, sir, I am not asking you for specifics of
22 any individual circumstances at the moment, generally,
23 what are those conversations about?
24    MS. HUNKER:  Same objection with the same
25 advice that my witness not communicate anything specific

Page 156

1  with respect to a complaint that has been referred to
2  the Attorney General but has yet to be resolved through
3  every conviction or dismissal.
4     **A.  Yeah.  We talk about a lot of stuff.  I mean,**
5  **we talk about complaints that we have sent over.  We**
6  **talk about the language of the statute and what we think**
7  **it means versus what they think it means.  We talk about**
8  **bills that get filed in the legislative process, so I**
9  **mean, we talk to them about a variety of things.**
10    Q.   But two of those items that you just mentioned
11 I wanted to discuss a little bit further.  If I heard
12 you correctly, first, that you discussed with the
13 Attorney General's Office your interpretation and their
14 interpretation of certain provisions of the law; is that
15 right?
16    **A.  That's right.**
17    Q.   Have you discussed with the Attorney General's
18 Office your interpretation and their interpretation of
19 provisions of SB 1.
20    MS. HUNKER:  Objection to the extent it
21 calls for investigative privilege as well as
22 attorney-client privilege, specifically where the
23 Secretary of State's Office is requesting advice from
24 the Attorney General, I would advise my client to
25 refrain from any of those type of communications.

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

39 (153 - 156) Brian Keith Ingram JD
Page: 39 (153 - 156)

Case 5:21-cv-00844-XR   Document 646-2   Filed 06/24/23   Page 28 of 247

5:21-cv-844 (XR)
4/28/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 40 (157 - 160)

40 (157 - 160)

Page 157

1   A.   No.
2   Q.   Sir, when you are discussing -- when you are
3   having these conversations with the Attorney General's
4   Office that you mentioned, those in which they are
5   seeking your input on the interpretation of statutory
6   language and you are discussing their interpretation,
7   are you doing so in furtherance of seeking their legal
8   advice?
9   A.   No.  The one instance I can think of, it was
10  them explaining to me their interpretation of the Penal
11  Code 36.02 so that I would quit sending them complaints
12  that they didn't think warranted investigation.
13  Q.   And in your view was that conversation in
14  furtherance of seeking or receiving legal advice from
15  them?
16  A.   No.
17  Q.   Let's talk about -- let's talk about the scope
18  of that conversation then.  And can you repeat for me,
19  please, the code section you just referred to, 38?
20  A.   36.02 of the Penal Code.
21  Q.   And was it just a single conversation that you
22  can recall at the Attorney General's Office in which you
23  discuss their interpretation of Section 36.02 of the
24  Penal Code?
25  A.   That's right.

Page 158

1   Q.   And when was that conversation?
2   A.   Several years ago.
3   Q.   Do you have a more specific approximation of a
4   date?
5   A.   No.
6   Q.   Would it be before or after 2020?
7   A.   It would be before '20.  Several years ago, it
8   was before '20.
9   Q.   Do you think it was before 2018?
10  A.   Don't know.
11  Q.   Was this a conversation you had in-person, over
12  the telephone, by email or some other -- through some
13  other media?
14  A.   It was a phone call.
15  Q.   And approximately how long did that phone call
16  last?
17  A.   Five, 10 minutes.
18  Q.   And who attended that phone call, if you
19  recall?
20  A.   Jonathan White and myself.
21       THE REPORTER:  And excuse me, we had
22  someone come in the room.
23  Q.   Anybody else?
24       THE REPORTER:  Excuse me just a moment,
25  Mr. Kanterman.  May I get your name?

Page 159

1        MR. THOMPSON:  Will Thompson from the
2   Office of the Attorney General.
3        THE REPORTER:  Okay.  We are ready to go
4   back, Mr. Kanterman.
5        MR. FREEMAN:  Actually if we could go off
6   the record for a moment.
7        MR. KANTERMAN:  Thank you very much.
8        THE REPORTER:  Can we go off the record
9   for a moment?
10       MR. KANTERMAN:  Absolutely.  Off the
11  record, please.
12       (Brief recess.)
13       MR. KANTERMAN:  Thank you.  Just to be
14  clear on the record, if I can.  The last answer, I
15  believe the witness said was in response to my question
16  about who attended a phone call, is that -- has that
17  been recorded?
18       THE REPORTER:  Yes, sir.
19       MR. KANTERMAN:  Thank you very much.
20  Q.   (BY Mr. Kanterman)  Other than yourself and
21  Mr. White, Mr. Ingram, was there anyone else present on
22  that phone call?
23  A.   No.
24  Q.   Do you recall the content of that phone call?
25  A.   Yes.

Page 160

1   Q.   And tell me what it was, please.
2   A.   So 36.02 is the anti-bribery statute, and it
3   says that -- that the crime consists of giving anything
4   of value to, in part, there is a lot of categories, but
5   one of the categories is a voter for that -- that you
6   anticipate influencing the voter's discretion in any
7   way, right.  So to us at the Secretary of State's
8   Office, that means the decision whether to vote or not
9   is part of the discretion of a voter.  And if somebody
10  gives, you know, like Free Blue Jean Day on Friday, if
11  we all have 100 percent turn out and vote, that to us
12  would be a violation of 36.02 because you're influencing
13  the discretion of a voter to turn out to actually vote
14  or not.
15       Jonathan says that the way that they -- or
16  said that the way that they interpret that statute is,
17  it has to be influencing the voter's discretion in the
18  booth in a particular way, so to vote for or against a
19  measure, for or against a candidate, and that the meer
20  enticement of voting by an offer of a free beer with
21  your out voted sticker, or whatever, is not sufficient
22  to constitute the crime; that there has been to be an
23  actual influencing of the voter's vote itself not their
24  decision to vote or not.  I still think he is --
25  Q.   Beyond --

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

40 (157 - 160) Brian Keith Ingram JD
Page: 40 (157 - 160)

5:21-cv-844 (XR)
4/28/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 45 (177 - 180)

45 (177 - 180)

Page 177

1    A.   I don't know.  The Forensic Audit Division is
2  doing that process.  I assume it is four separate audits
3  but you would have to ask the FAD.
4    Q.   And to your understanding, this audit or these
5  audits remain ongoing; is that right?
6    A.   That's correct.
7    Q.   Has your office received any final
8  determinations or information from which it could draw
9  final conclusions about the outcome of these audits?
10    A.   No.
11    Q.   When do you anticipate, if ever, that you will
12  receive such information?
13    A.   I don't know.
14    Q.   Based on your experience with the Secretary of
15  State's Office, do you believe that illegal voting has
16  had an outcome determinative impact on any election in
17  Texas?
18    A.   Yes.
19         MS. HUNKER:  Objection, form.
20    Q.   I am sorry.  I didn't hear the witness' answer.
21    A.   Yes.
22    Q.   What election do you believe that illegal
23  voting had an outcome determinative impact in?
24    A.   Well, there is several of them, but at least
25  that County Commissioner's primary in Gregg County.

Page 178

1    Q.   And in what year is the Gregg County County
2  Commissioner election that you are referring to?
3    A.   I believe it was in March of '18, but I could
4  be wrong about that.
5    Q.   And I believe you said there are several, what
6  other elections other than the County Commissioner
7  election in Gregg County, possibly in March of 2018, do
8  you believe illegal voting has an outcome determinative
9  impact on?
10    A.   The City of Edinburg mayor's race.  Weslaco
11  Independent School District's Trustee race.  Maybe
12  Sheriff in Webb County.
13    Q.   So that -- I am missing one, forgive me.
14  Sheriff in Webb County.  In what year are we referring
15  to?
16    A.   The same year as the Gregg County -- it was the
17  same election primary of '18.
18    Q.   And was the city of -- there was a city school
19  district election you mentioned, correct?
20    A.   That's right.  Mayor of Edinburg.  And Weslaco.
21    Q.   And what year was that election?
22    A.   I don't know, maybe November of '18.
23    Q.   I believe you mentioned one other election with
24  the same thing, illegal voting had an outcome
25  determinative impact on, sir.  Can you --

Page 179

1    A.   Oh, another one, too.
2    Q.   -- remind me of that?
3    A.   Yeah, Weslaco Independent School District's
4  Trustee race, and then a Justice of the Peace Court race
5  in South Dallas County.
6    Q.   Yeah.  And so turning back to the Weslaco
7  Independent School District race election, what year was
8  that?
9    A.   I don't know for sure.  It was older, maybe
10  2013 or 2014, maybe 2012.
11    Q.   And the Justice of the Peace race, I believe
12  you said in South Dallas County, when was that election?
13    A.   I don't know for sure, it was before I got here
14  in January of '12, so it was sometime before then.
15  Prosecutions were well underway.
16    Q.   And so let's work through each of these.  The
17  County Commissioner election in Gregg County in what may
18  be March of 2018, why do you believe illegal voting had
19  an outcome determinative impact on that election?
20    A.   Because it did.
21    Q.   And what's your basis for that?
22    A.   I told you before, the ballot harvesting
23  operation resulted in, I think, 700 mail ballots for
24  that County Commissioner's race which was substantially
25  more than any other commissioner's race in that same

Page 180

1  election.  The mail ballots in that race were
2  predominantly in favor of one candidate.  The votes
3  in-person were in favor of the other candidate, but the
4  huge number of mail ballots in that race swung the
5  election by a few votes to the one who was indicted and
6  charged with ballot harvesting.
7    Q.   And who was the one indicted with ballot
8  harvesting?
9    A.   I don't know his name.  You can look in the
10  newspaper, it is out there.
11    Q.   Do you know whether that individual was
12  ultimately convicted or otherwise pled guilty to a
13  criminal offense?
14    A.   I do not.
15    Q.   Is the only basis that you're offering for your
16  conclusion that the Gregg County race in 2018 had been
17  impacted by illegal voting -- let me ask it differently.
18         Other than the allegation of ballot
19  harvesting in the March 2018 Gregg County election that
20  we are discussing, do you have any other basis upon
21  which you rested your conclusion that illegal voting had
22  an outcome determinative impact on an election?
23         MS. HUNKER:  Objection, form.
24    A.   Yeah.  I don't know what you mean.
25    Q.   What I am trying to understand, and hopefully

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

45 (177 - 180) Brian Keith Ingram JD

Page: 45 (177 - 180)

5:21-cv-844 (XR)
4/28/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 46 (181 - 184)

46 (181 - 184)

Page 181

1 this will help clarify is:  Why do you think that
2 illegal voting had an outcome determinative impact on
3 the Gregg County election in March of 2018?
4        You mentioned to me that there was a
5 ballot harvesting incident and that charges were brought
6 against an individual; is that right?
7 **A.  There were charges brought against four**
8 **individuals.**
9   Q.  And are you aware of whether any of those four
10 individuals had pled guilty or been convicted of ballot
11 harvesting or another crime?
12        MS. HUNKER:  Objection, form.  Asked and
13 answered.
14 **A.  Yeah, I don't know.**
15   Q.  And so other than the fact that four
16 individuals were indicted based upon alleged crimes that
17 had occurred relating to ballot harvesting, do you have
18 any other basis for concluding that illegal voting had
19 an outcome determinative impact on the Gregg County
20 election in March of 2018?
21        MS. HUNKER:  Objection, form, vague,
22 ambiguous.
23 **A.  I don't know why you're even asking that**
24 **question.  That's kind of ludicrous.  Other than, you**
25 **know, the crime occurring and causing the outcome is**

Page 182

1 **there any other evidence?  No.  The crime that occurred**
2 **and caused the outcome is all the evidence, that's all I**
3 **need.**
4        **What are you asking?**
5        **Why are you even asking that?  That makes**
6 **no sense.**
7   Q.  And so is it fair to say that if none of the
8 four individuals who were indicted with criminal -- let
9 me step back.
10        Is it fair to say that, if neither -- if
11 none of the four individuals that were indicted with
12 ballot harvesting in relation to the Gregg County, March
13 2018 election were either -- were ever convicted or
14 found guilty, that there was, in fact, no proof that
15 illegal voting activities had an outcome determinative
16 impact on the Gregg County election?
17        MS. HUNKER:  Objection, form.  Ambiguous,
18 vague, compound, and misstates testimony.
19 **A.  Yeah, of course not.  Don't need a conviction**
20 **to know what happened.**
21   Q.  Let's move on to the Mayor of Edinburg March --
22 maybe November 2018 election.  What is your basis for
23 concluding that illegal voting had an outcome
24 determinative impact on that election?
25 **A.  Because the Mayor and his wife were indicted in**

Page 183

1 **an illegal voting scheme, along with several other**
2 **individuals, and the race margin was close.**
3   Q.  Do you know if any of the individuals indicted
4 for activity relating to the Mayor of Edinburg election
5 were ever convicted or found guilty of voting rights?
6 **A.  I don't know.  I don't know what the outcome**
7 **was.  I think it is still pending.  I thought of another**
8 **election.  There was a road utility district election**
9 **down in Montgomery County that was affected by and**
10 **swayed by fraud, illegal voting.**
11   Q.  Thank you for that clarification.  And when was
12 that utility election in Montgomery County that you
13 know?
14 **A.  It was a while back.  It would have been maybe**
15 **'12 or '13, maybe '14.**
16   Q.  So let me ask you this:  I believe you have
17 listed six elections in Texas that you think have been
18 influenced in an outcome determining fashion by illegal
19 voting in Texas.  Other than those six, can you think of
20 any others as you sit here today?
21 **A.  I can't as I sit here right now, but I could**
22 **maybe given time.  I just -- I don't know off the top of**
23 **my head.**
24   Q.  Let's return to the Mayor of Edinburg election
25 we were just talking about, which you say might have

Page 184

1 been in November of 2018.  If I recall, sir, it was
2 that -- a number of individuals had been indicted but
3 you were unsure whether any of them had been convicted
4 or found guilty of any election-related crime; is that
5 right?
6        MS. HUNKER:  Objection, form.
7 **A.  That's right.**
8   Q.  If you learned that none of those individuals
9 were found guilty of or ultimately convicted of
10 election-related crimes, would that alter your
11 conclusion that the Edinburg Mayor election, in November
12 of 2018, had been influenced in an outcome determinative
13 fashion by illegal voting?
14 **A.  No.**
15   Q.  Why not?
16 **A.  Because it doesn't matter.  Whether or not**
17 **there is ultimately a conviction doesn't matter.  I saw**
18 **the evidence.  I referred the complaint.  There was**
19 **fraud.  There was illegal voting.**
20   Q.  So it is your testimony that a fact finder
21 ultimately concludes there was no fraud as presented.
22 **A.  That's not --**
23        MS. HUNKER:  Objection, form.
24 **A.  That's not what a -- that's not what a failure**
25 **to convict means.  That's not at all what a failure to**

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

46 (181 - 184) Brian Keith Ingram JD

Page: 46 (181 - 184)

Case 5:21-cv-00844-XR   Document 646-2   Filed 06/24/23   Page 31 of 247

5:21-cv-844 (XR)
4/28/2022

Entero v Texas
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 47 (185 - 188)

47 (185 - 188)

Page 185

1 convict means.  A failure to convict means that they
2 didn't carry their burden of proof by beyond a
3 reasonable doubt, it doesn't mean that they were
4 actually innocent.  Doesn't mean they are innocent at
5 all.
6    Q.  I am sorry.  I heard something.  I just want to
7 make sure that I should continue and there is no reason
8 to stop?
9    A.  Everything is fine.  We got a thumbs up.
10    Q.  Okay.  Thank you very much.
11         Turning next, sir, to the Webb County
12 Sheriff's election in March of 2018.
13    A.  That one --
14    Q.  What is your basis in that regard?
15    A.  I had a long conversation with Senator
16 Zaffirini, she was convinced and, therefore, I was
17 convinced, I don't believe any criminal charges were
18 ever brought in connection with that matter, but it was
19 a similar kind of scheme to the one in Gregg County in
20 that Commissioner's race where the mail ballots were
21 heavily one way and a lot more of them than normal.
22    Q.  You would agree with me, wouldn't you, that
23 increased number of mail ballots in a particular
24 election does not necessarily yield a conclusion that
25 fraud or illegal voting has occurred; is that right?

Page 186

1         MS. HUNKER:  Objection, form.
2    A.  Not necessarily, but whenever the
3 disproportionate number also is matched by a
4 disproportionate proportion in favor of one candidate
5 over another and that disproportionate sort of
6 favoritism for that candidate isn't reflected in the
7 in-person votes, that leads a reasonable person to
8 believe that fraud is occurring.
9    Q.  Let's turn next to the Weslaco Independent
10 School District election in what I think you said might
11 have been on or before 2017.  What basis do you have for
12 concluding that that election was influenced in an
13 outcome determinative fashion by illegal voting?
14    A.  There were a couple of PolitiCares who were
15 convicted of ballot harvesting in that case and,
16 unfortunately, the Trustee who was elected eventually
17 committed suicide.
18    Q.  Any other reasons for your conclusion that that
19 race was outcome determinatively impacted by illegal
20 voting?
21    A.  No.  That's it.
22    Q.  You mentioned next the Justice of the Peace
23 race in South Dallas County which might have been before
24 January of 2012.  Do you remember that?
25    A.  It was definitely before January of 2012.

Page 187

1    Q.  And what's your basis that that election was
2 influenced in an outcome determinative way by illegal
3 voting?
4    A.  The Justice of the Peace who was elected and
5 several of his family members were charged with and
6 convicted of crimes including illegal voting and mail
7 ballot harvesting.
8    Q.  And so I recognize you say they were convicted.
9 But I guess my question is a little bit more specific,
10 which is, whether or not those convictions reflect an
11 outcome determinative impact on the election?
12         Do you have any more specific reason to
13 conclude that the acts of these individuals had an
14 outcome determinative impact on that election?
15    A.  No.  It was before my time, and I didn't refer
16 that complaint, so I don't have any more details other
17 than what was in the newspaper.
18    Q.  So I am actually going to circle back briefly
19 for a moment.  So the Gregg County election that we
20 talked about in March of 2018, you said that there were
21 some, in your view, ballot harvesting activities.
22         What basis do you have for concluding that
23 those activities had an outcome determinative impact on
24 the election?
25    A.  Have I not said this twice already?

Page 188

1         MS. HUNKER:  Objection, form.  Asked and
2 answered.
3    A.  Yeah.  I am not going over that again.
4    Q.  Are you refusing to answer the question, sir?
5    A.  I have answered the question twice already in
6 detail.
7    Q.  If you would just indulge me then and forgive
8 my possible repetition.  What is the outcome deter --
9 what is the basis of that impact was outcome
10 determinative of that election?
11    A.  For the third time, here we go.  There were a
12 disproportionate number of mail ballots in that race.
13 There was something over 700 instead of the 120 or so
14 that were in the other County Commissioner Court races,
15 so seven times as many mail ballots.  They were
16 disproportionately 80/20, 85/15 for one candidate over
17 the other.  Their early votes in-person -- the election
18 day votes in-person went for the other candidate, but
19 the margin built up in the mail ballots was such a
20 degree that it flipped the race for the one who was
21 getting the disproportionate number of mail ballots by a
22 few votes.  It was a close election.
23    Q.  Okay.  Thank you.  Let's go to the last of the
24 elections you pointed to.  I think you said it was road
25 utility in Montgomery County sometime between 2012 and

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

Entero v Texas
National Court Reporters Inc. 888.800.9656

47 (185 - 188) Brian Keith Ingram JD

Page: 47 (185 - 188)

5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Brian Keith Ingram JD 48 (189 - 192)

48 (189 - 192)

Page 189

```
2014.  Do I have that right?
    A.  You do.
    Q.  And what is your basis for concluding that that
election was impacted in an outcome determinative
fashion by illegal voting?
    A.  Well, the road utility district had only two or
three registered voters in the whole district, and so
what a group of Montgomery County folks decided to do is
register to vote at a Roadway Inn and run for office in
that road utility district so that they could influence
the letting of bonds; and so they -- they did that, the
ten of them registered at a Roadway Inn that they didn't
live at, and they proceeded to -- a couple of them filed
for office on the district trustees that were up for
election, and they voted their compadres in as trustees
on the road utility district.  There was an election
contest filed.  The election was overturned because of
illegal voting.  The complaint was sent to the Attorney
General and seven of those ten persons were convicted of
illegal voting and sentenced to prison.
    Q.  Changing subjects again.  Are you aware of any
instances of violence, intimidation, harassment, or
other misconduct from a poll watcher?
        MS. HUNKER:  Objection, form.  Vague as to
the determine "other misconduct."
```

Page 190

```
    Q.  I will try to finish my question and ask it --
maybe I will just ask it differently at this point.
        Are you aware of any instances of violence
involving either a poll watcher, poll worker, clerk, or
election judge in Texas since SB 1 was enacted?
    A.  No.
    Q.  Are you aware of any complaint about the
behavior of poll watchers from January 2018 through
present day?
    A.  Yes.
        MS. HUNKER:  Objection, form.
    Q.  Approximately how many complaints are you aware
of?
    A.  I don't know.
    Q.  Less than 100?
    A.  Probably.
    Q.  Less than 50?
    A.  I don't know about that.
    Q.  Are there any materials that would help refresh
your recollection or inform your opinion about how many
such complaints there might be?
        THE REPORTER:  I'm sorry.  You cut out
there.  "Opinion about how many" ...
    Q.  Such complaints there might be?
    A.  No.
```

Page 191

```
    Q.  Of the somewhere between 50 and 100 complaints,
have any been referred to the Attorney General's Office
for further investigation?
    A.  Yes.
    Q.  Do you know how many?
    A.  Oh, you're talking about complaints about poll
watchers, no.  Complaints about election officials
obstructing poll watchers, yes.
    Q.  And so the "no" is modifying your last answer.
You have not referred any complaint about the behavior
of poll watchers to the Attorney General's Office for
investigation from January 2018 to present?
    A.  I don't think so, no.  Those are usually
handled locally.
    Q.  Did your office maintain any policies,
practices, or procedures regarding the Americans With
Disabilities Act or other laws protecting individuals
with disabilities as those laws pertain to voting in an
election?
    A.  I don't know what that question means.
    Q.  Is there anyone specific in your office who
handled the intake of complaints or requests relating to
ADA accommodations or voters with disabilities in Texas?
        MS. HUNKER:  Objection, form, lack of
foundation, vague, and assumes facts not in evidence.
```

Page 192

```
    A.  One of my lawyers that recently left us was the
one who headed up sort of the disability function of our
office.  So what happens is, Disability Rights of Texas
will go out and audit counties in an election to find
out if their polling places are acceptable and if they
are meeting the requirements of the Help America Vote
Act with regard to voting machine accessibility, and
they send a copy of those audits to our office as well
as to the county election official, and I usually have a
lawyer -- I don't have one designated currently because,
like I said, she recently left -- who will go over that
audit and call the county and see if we can offer any
help or assistance in remedying some of the things that
Disability Rights of Texas finds.
    Q.  And so you mentioned offering the county help
or assistance.  What sort of help and assistance have
you offered in the past?
    A.  We have got the original -- we have got the
ability now that we didn't used to have to send trainers
to go talk to the county about the specific issues and
to work with them to come up with remediations;
sometimes the polling place can't be salvaged and they
will have to find a different polling place.
    Q.  And the individuals you say you send to, I
guess, provided by you, are those individuals sponsored
```

Entero v Texas 5:21-cv-844 (XR)
4/28/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

48 (189 - 192) Brian Keith Ingram JD

**Page: 48 (189 - 192)**

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

## STATE DEFENDANTS' BRIEF IN RESPONSE TO
## OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# APPENDIX N

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION
      LA UNION DEL PUEBLO ENTERO,      )
 3    et al.,                          )
                        Plaintiffs,    )
 4          vs.                        )Civil Action No.
      STATE OF TEXAS, et al.,          )5:21-cv-844(XR)
 5                      Defendants.    )(Consolidated Cases)

 6
                       ------------------------
 7                      ORAL DEPOSITION OF
                        KEITH INGRAM
 8                      March 28, 2023
                           Volume 1
 9                     ------------------------

10

11          ORAL 30(b)(1) DEPOSITION OF KEITH INGRAM, Volume

12    1, produced as a witness at the instance of the

13    Plaintiffs, and duly sworn, was taken in the

14    above-styled and numbered cause on March 28, 2023, from

15    9:15 a.m. to 4:18 p.m., before Dana Shapiro, CSR, in

16    and for the State of Illinois, reported by machine

17    shorthand, at 209 W. 14th Street, Austin, Texas 78701,

18    pursuant to the Federal Rules of Civil Procedure and

19    any provisions stated on the record or attached

20    hereto.

21

22

23

24

25
```



Keith Ingram                                         March 28, 2023
                                                     Pages 18 to 21

Page 18

1  if she was called up in that.  There was elections bill
2  there, but I don't know if she actually had to testify.
3      Q.    What's a sec -- did you -- sorry.
4      A.    Oh, she did have to testify.  It was on
5  Tuesday, that's right.  Tuesday a week ago.
6      Q.    Did you help her prepare for any of those
7  committee hearings?
8      A.    We discussed some of the bills that were
9  going to get heard at some of those hearings just
10 generally.
11     Q.    Did any of those bills impact or modify the
12 provisions of SB 1?
13     A.    Yes.
14     Q.    Which one is that?
15     A.    Well, it's not a direct impact on SB 1.  It
16 was more modification of House Bill 1382 in the regular
17 session of last time, but it was a Bucy bill and house
18 elections that modifies the requirements for accessing
19 the ballot tracker.
20     Q.    Is that HB 357?
21     A.    I don't know.
22     Q.    Anything else?
23     A.    I think that might be it.
24     Q.    What's a Secretary of State clean up bill?
25     A.    That's usually we will have a bill with

Page 19

1  some suggested small tweaks and changes throughout the
2  election code to make it more harmonious or to get rid
3  of obsolete language.  We don't have a clean up bill
4  this time.
5      Q.    Getting ahead of me, which is helpful.
6            At any time did you expect to testify on
7  March 16 before the House Elections Committee?
8      A.    No.
9      Q.    Let's turn to March 9 hearing.  During your
10 testimony before the House Elections Committee on March
11 9, did you testify concerning the statewide mail ballot
12 rejection rate in Texas; do you recall?
13     A.    I did.
14     Q.    Did you say that it was under 3 percent?
15     A.    I did for the general election, yes.
16     Q.    Am I correct this figure represents only
17 final rejections of mail ballots?
18     A.    That's correct.
19     Q.    Does it exclude those that were rejected,
20 then cured?
21     A.    It does.
22     Q.    Does it exclude those that were rejected,
23 then cancelled?
24     MS. HUNKER:  Objection, form.
25 BY THE WITNESS:

Page 20

1      A.    You mean if a voter decided to vote in
2  person and cancelled the mail ballot?
3      Q.    Yes.
4      A.    I don't know.
5      Q.    Do you know if it excludes any other forms
6  of rejections?
7      A.    It shouldn't.  I mean ballots that came in
8  late aren't technically rejected, they are just late.
9      Q.    Did you testify to the notion that you
10 expected that the number of statewide mail ballot
11 rejections would continue to improve as you go forward
12 in implementation of SB 1?
13     A.    That's my belief.
14     Q.    What's your basis for that belief?
15     A.    The trend that we've got so far, and past
16 experience.
17     Q.    Why do you expect that the trend will
18 necessarily continue?
19     A.    Because voters get more used to it and
20 ballot boards get more used to it as it goes through
21 election, continuous elections.
22     Q.    With respect to voters, are there a
23 different set of voters in every election that are
24 eligible to vote by mail in Texas?
25     A.    Well, yes, I presume so.

Page 21

1      Q.    New voters turned 65?
2      A.    But there is overlap as well.  People that
3  voted by mail continue to vote by mail.
4      Q.    Will the new voters who are eligible have
5  had an opportunity to learn about the process?
6      A.    Well, they will learn about it as they vote
7  by mail for the first time.
8      Q.    But the first time they won't have had
9  experience or a learning curve?
10     MS. HUNKER:  Objection, form.
11 BY THE WITNESS:
12     A.    They have peers who experience and a
13 learning curve.  They talk to each other at Sunday
14 school, they talk to each other at church, and at the
15 rotary club.  So the fact is that the experience of all
16 of the voters increases even as new voters vote by
17 mail.
18 BY MR. FREEMAN:
19     Q.    With respect to the ballot boards, were
20 there errors of any kind by the ballot boards that
21 contributed to the rejection rate in the November
22 general election?
23     A.    I don't know for sure because, you know,
24 obviously we are not on the ground other than in a few
25 counties observing the ballot boards.  Anecdotally I



Keith Ingram

March 28, 2023
Pages 22 to 25

Page 22

1  heard some ballot boards weren't comparing signatures
2  at all, and some ballot boards were still giving
3  rigorous examination of signatures.  So those two
4  things probably offset each other.
5      Q.    So what further learning by the ballot
6  boards do you expect will contribute to reductions of
7  the mail ballot rejection rate?
8      A.    We have been training -- doing direct
9  trainings for ballot boards for a couple years now and
10  we will continue that.  And in the context of that
11  training, we talk about the rebuttable presumption
12  that's in place after SB 1.
13          So, you know, if a signature -- if a voter
14  has a number on their carrier envelope that matches a
15  number in voter registration record, and then there is
16  a rebuttal presumption that signatures are of the same
17  voter.  Of course we know as lawyers rebuttal
18  presumption means it shifts the burden of proof.  Well,
19  ballot boards don't think that way.  But they do need
20  to understand the signatures are starting from a
21  position of you've got to accept it unless there is
22  evidence to reject it.  So that doesn't mean you don't
23  look at the signature at all.  It doesn't mean you do
24  the same level of comparison that you would have done
25  before.

Page 23

1      Q.    Is there any learning by the ballot boards
2  that you think you anticipate will lead to reductions
3  in rejections based on the driver's license numbers or
4  Social Security number requirement of SB 1?
5      A.    Yes, I think as the ballot boards get more
6  used to this they will accord the number the
7  appropriate way.  The number is designed to take the
8  place of a less objective measure, which is the
9  signature.  So they -- as they rely on the number and
10  then give the signature the weight it's supposed to
11  have and only overcome it if there is some sort of
12  evidence to overcome it then I think more ballots will
13  get accepted.
14      Q.    Were some ballot boards not recording the
15  information the appropriate way.
16      A.    No.  They weren't giving it the weight it's
17  supposed to be given.
18      Q.    I see. Any rejection -- just so I'm clear.
19  Any reduction in the mail ballot rejection rate based
20  on learning from the ballot boards will be related to
21  this signature, and not a reduction in rejections for
22  failure to match a number for the driver's license
23  field or Social Security number field?
24      MS. HUNKER:  Objection, form.
25  BY THE WITNESS:

Page 24

1      A.    That is not exactly true, but because they
2  also have to integrate the early voting clerk process
3  from 86011D.  From previous law, not SB 1, early voting
4  clerk has the ability to intervene if a voter has some
5  sort of facial compliance issue on their carrier
6  envelope.  What we have discussed with counties and
7  with ballot boards is that if a ballot board sees
8  something that could be corrected by the early voting
9  clerk, they can pass that carrier envelope back to the
10  early voting clerk.  You know, something like missed
11  number or mismatched number.  Then the early voting
12  clerk can have either a personal trip to the voter or a
13  telephone call to the voter, email to the voter.  They
14  can do all of those things that the ballot board can't
15  necessarily do.  They have more flexibility in talking
16  to the voters and curing the problem.
17          So as we communicate that to the ballot
18  boards, I expect that there is going to be more of a
19  shift from the ballot board whenever they have got a
20  preliminary rejection back to the early voting clerks
21  because the early voting clerks has more flexibility in
22  dealing with that preliminary rejection and getting the
23  voter successfully in place with the vote.  So they
24  want to make sure that that happens.  And so I think
25  that's going to increase over time as well.

Page 25

1      Q.    Are you aware of any counties where the
2  early voting clerks were not engaged in this
3  preliminary review of SB 1 compliance?
4      A.    Well, I don't know if early voting clerks
5  are aware that they can do that.  It's something that
6  we wanted to make sure that they understood, that
7  really the general election in '22 was the first time
8  we had a full fledged effort into educating with regard
9  to that.  And so we expect that that education will
10  penetrate more as we go from election to election in
11  the future.
12      Q.    Certainly early voting clerks in large
13  counties were engaged in this effort throughout the
14  November 2022 general election period, correct?
15      A.    I don't know if every large county, but I
16  would assume the larger counties, they are more plugged
17  into our advice.  And so yes, generally I would agree
18  with that.
19      Q.    Any improvement in terms of the actions
20  early voting clerk be mostly concentrated in smaller
21  counties; is that right?
22      MS. HUNKER:  Objection, form.
23  BY THE WITNESS:
24      A.    Most of the counties in Texas are smaller
25  counties.  We need to penetrate to the smaller



Keith Ingram

March 28, 2023
Pages 34 to 37

Page 34

1    Q.    So the changes that you suggest, the three
2  changes to SB 1?
3    A.    Well, three changes to SB 1, one to the
4  ballot tracker, so four changes.
5    Q.    How would you describe those if they are
6  sort of suggestions coming out of your office, but you
7  are never for a bill?  How does that fit?
8    A.    It's our office's role to advise on
9  technical implementation process.  And any time you
10  have got a new thing like a corrective ballot,
11  corrective action procedure for mail ballots, you are
12  going to have some kinks in it that need to be worked
13  out.  It's our office's role to point out those kinks
14  and suggest ways to work those out.
15           Whenever we implemented annual ballots by
16  mail, the first law was House Bill 666 in 2013.  It was
17  about this long, and it just said that a voter can ask
18  one time for all of the ballots by mail.  So there were
19  so many things.  That was the hardest thing we've ever
20  had to implement before SB 1.  It was so complicated.
21  The next session there was a bigger -- much bigger bill
22  to correct that process and make it more uniform.  And
23  then there was another bill the next session.  So any
24  time that there is a big change like that you expect
25  there is going to be some need to correct the

Page 35

1  implementation to make it more smooth.  And that's our
2  office's role to suggest those changes.  Not that they
3  were for or against them.  If you want to make a
4  change, here's something you might think about.
5    Q.    Thank you for clarifying.  I appreciate it.
6           Would you say then that during your time in
7  the elections division at the Office of the Secretary
8  of State, SB 1 has been the hardest bill to implement?
9    A.    It was by far the most comprehensive set of
10  changes we ever had.  It was every single form, every
11  single bit of educational material, every outline,
12  every everything had to change.
13    Q.    Going back to the March 9 hearing.  Did you
14  testify that statewide there were 163 ballots rejected
15  based on SB 1 requirements for voters who did not have
16  either a Social Security number or a driver's license
17  number in the system?
18    A.    I did.
19    Q.    Were those ballots or were those ballot
20  requests?
21    A.    Those were ballots.
22    Q.    How did those voters get ballots sent to
23  them if they didn't have driver's license numbers or
24  Social Security numbers in the system?
25    A.    That I don't know.  You would have to talk

Page 36

1  to the counties.
2    Q.    With respect to the voter who lacked
3  driver's license or Social Security number information
4  in their voter registration files, what purpose do the
5  mail ballots provisions of SB 1 serve?
6    MS. HUNKER:  Objection, form.
7  BY THE WITNESS:
8    A.    The same as they serve for any other
9  person, which is to identify the voter.
10  BY MR. FREEMAN:
11    Q.    Is it possible for SB 1 to serve that
12  purpose if the voter doesn't have a driver's license
13  number or Social Security number on file?
14    A.    Sure.
15    Q.    How would that happen?
16    A.    They put one on file as part of the
17  corrective action process.
18    Q.    So absent the voter taking further action
19  to supplement their registration file, can it serve any
20  purpose?
21    A.    Absolutely.  It serves the purposes of
22  making them supplement their voter registration file so
23  we have a more complete file.  That helps us with all
24  kinds of matching on our list maintenance.  It serves a
25  purpose, absolutely.

Page 37

1    Q.    With respect to voters who do not currently
2  have a driver's license number or Social Security
3  number on file, is there any connection between those
4  numbers and the voter's qualifications to vote in Texas
5  elections?
6    MS. HUNKER:  Objection, form.
7  BY THE WITNESS:
8    A.    Well, I mean obviously to vote successfully
9  they are going to have produce an ID when they vote in
10  person, and they are going to have to do the same thing
11  when they vote by mail.
12  BY MR. FREEMAN:
13    Q.    Not produce an ID, but produce a number?
14    A.    Produce an ID.
15    Q.    When they vote by mail?
16    A.    That's right, that's what the number is
17  it's an ID number.
18    Q.    Sorry.  When you say ID I thought you meant
19  like a copy of a card.
20           With respect to a voter who does not have a
21  Social Security number or driver's license number on
22  file, is there any connection between that number and
23  establishing the voter's identity prior to any
24  supplementation of their registration record?
25    A.    I'm not sure I understand that question.



Keith Ingram

March 28, 2023
Pages 38 to 41

Page 38

1    Q.    Well, if they don't have a driver's license
2  number or Social Security number on record, is there a
3  connection between the voter providing that number and
4  the voter establishing their identity?
5    A.    Yes.
6    Q.    Does the voter establish their identity
7  when they submit a mail ballot request with their
8  driver's license number if the driver's license number
9  isn't on TEAM?
10    MS. HUNKER:  Objection, form, asked and answered.
11  BY THE WITNESS:
12    A.    I don't know what you are getting at.  Yes.
13  BY MR. FREEMAN:
14    Q.    So switching gears, and we don't need to
15  take a break yet, that's good.
16         How long did you serve as director of the
17  elections division in the Office of the Texas Secretary
18  of State?
19    A.    11 years, two months, five days.
20    Q.    Based on your experience would you agree --
21    A.    Not that I was counting.
22    Q.    Based on your experience, would you agree
23  that a form provided to voters should be designed so
24  that a voter who follows the instructions will have the
25  form accepted?

Page 39

1    MS. HUNKER:  Objection, form.
2  BY THE WITNESS:
3    A.    Yes, that's true.  That's the goal of the
4  form.
5  BY MR. FREEMAN:
6    Q.    Since the May 2022 runoff, did the Office
7  of the Secretary of State make any changes to the
8  absentee ballot by mail application?
9    A.    We changed several forms.  I'm pretty sure
10  the application if it's got an oath of assistance on it
11  it changed, yes.
12    MR. FREEMAN:  Mark this as Exhibit 2.
13         (WHEREUPON, a certain document was
14         marked Deposition Exhibit No. 2,
15         for identification, as of 3/28/23.)
16  BY MR. FREEMAN:
17    Q.    Mr. Ingram, is this the current absentee
18  ballot by mail form?  I will represent to you this
19  form, I don't believe the date is on it, but it's the
20  form that's currently on your website and it's dated
21  December 9, 2021.
22    A.    Yes.  I mean it looks like it, yes.
23    Q.    Okay.  This form is still in effect, the
24  form that's on the website?
25    A.    It is.

Page 40

1    Q.    Any current plans to alter the form?
2    A.    No.
3    Q.    Has your office considered altering the
4  form since it was issued?
5    A.    No, not this form.
6    Q.    Why not?
7    A.    There is not a need to.
8    Q.    Is there a statutory reason this form could
9  not inform voters that they may provide both a Texas
10  driver's license number and a partial Social Security
11  number?
12    MS. HUNKER:  Objection, form.
13  BY THE WITNESS:
14    A.    It's not what the law says.  The form
15  outlines the law.
16  BY MR. FREEMAN:
17    Q.    Okay.  And so if the form outlines the law,
18  is it not allowed for the form to inform voters that
19  they may provide both numbers?
20    A.    Not on the form.  It's not the law.
21    Q.    Understood.
22         Has your office suggested any kind of
23  amendments to SB 1 that would permit including that
24  information on this form?
25    A.    No.  There is plenty of outside channels

Page 41

1  that emphasize that point.
2    Q.    So is it not necessary to your mind?
3    A.    Agree with that.
4    Q.    This form does clarify that the Texas
5  driver's license number is not your voter registration
6  VUID number, correct?
7    A.    Agree.
8    Q.    Is that in the law --
9    MS. HUNKER:  Objection, form.
10  BY MR. FREEMAN:
11    Q.    -- that clarification?
12    A.    Well, it's in the law is Texas election
13  identification certificate number.  People think that
14  means their voter registration number.
15    Q.    Why is it permissible to include this
16  clarification and not the clarification that a voter
17  may include both numbers if they wish?
18    A.    Because if we did that you would be sitting
19  there asking me questions about why we are requiring
20  people to do something the law doesn't require.  That
21  would be a different lawsuit, but it would still be a
22  lawsuit.
23    Q.    Do other forms promulgated by your office
24  include a red box around required information
25  frequently omitted by voters?



Page 62

1  provisions of SB 1?
2      A.   We try to say things in a more English and
3  flowing manner.
4      MR. FREEMAN: I think it's a good time to take a
5  quick break.
6              (WHEREUPON, a recess was had.)
7  BY MR. FREEMAN:
8      Q.   Mr. Ingram, since the May 2022 runoff, did
9  The Office of the Secretary of State make any changes
10  to the FPCA signature sheet?
11      A.   Yes.
12      MR. FREEMAN: Mark this as Exhibit 10.
13              (WHEREUPON, a certain document was
14              marked Deposition Exhibit No. 10,
15              for identification, as of 3/28/23.)
16  BY MR. FREEMAN:
17      Q.   Mr. Ingram, what's this document?
18      A.   This is the signature sheet for voters from
19  overseas or military who's domestic or oversees.
20      Q.   Is this the up-to-date version of that
21  form?
22      A.   It is.
23      Q.   What changes were made during the general
24  election period?
25      A.   The oath language was changed.

Page 63

1      Q.   That's all?
2      A.   That's it.
3      Q.   Did you or your staff consider any further
4  changes to the FPCA signature sheet during the general
5  election period?
6      A.   We did not.
7      Q.   Why not?
8      A.   There was no need.
9      Q.   Is there a statutory reason, just to
10  confirm, that the FPCA signature sheet could not inform
11  military overseas voters that they may provide both a
12  Texas driver's license number and a four digit Social?
13      A.   That's not required by the law.
14      Q.   Just to close the loop, if it's not
15  required by the law it can't be on this form, correct?
16      MS. HUNKER: Objection, form.
17  BY THE WITNESS:
18      A.   The form is a map to the law.
19  BY MR. FREEMAN:
20      Q.   Any current plans to alter the signature
21  sheet?
22      A.   No.
23      Q.   Are you aware of how many FPCA voters had
24  their ballot rejected during the 2022 general election
25  because of SB 1 requirements related to numbers

Page 64

1  associated with the voter registration record?
2      A.   I don't know.
3      Q.   Are you aware of how many active duty
4  members of the military had their ballots rejected
5  during the 2022 general because of SB 1 number
6  requirements?
7      A.   I don't know.
8      Q.   Do you have any practical basis to believe
9  that any rejected ballots submitted by FPCA voters were
10  not returned by eligible Texas voters who were who they
11  said they were?
12      MS. HUNKER: Objection, form.
13  BY THE WITNESS:
14      A.   I'm sorry.  I don't understand the
15  question.
16  BY MR. FREEMAN:
17      Q.   Do you have any reason to believe that any
18  FPCA voters -- strike that.
19          Do you have any reason to believe that any
20  FPCA ballots that were rejected due to SB 1 were
21  submitted by individuals who were not eligible Texas
22  voters?
23      MS. HUNKER: Objection, form.
24  BY THE WITNESS:
25      A.   I don't know.

Page 65

1  BY MR. FREEMAN:
2      Q.   Do you have any future plans to address
3  ballot rejections among active duty military
4  specifically?
5      A.   Not other than, you know, the what we are
6  going to do with ballot boards, educate them on the
7  early voting process and their opportunities there.
8      Q.   My colleague intends to address training
9  conducted by The Office of the Secretary of State
10  during Rule 30(b)(6) deposition, but I have a few quick
11  questions about updates to the training prior to the
12  end of last year.  So if we could mark this document as
13  Exhibit 11 I promise we will only talk about a few
14  pages.
15              (WHEREUPON, a certain document was
16              marked Deposition Exhibit No. 11,
17              for identification, as of 3/28/23.)
18  BY MR. FREEMAN:
19      Q.   Mr. Ingram, what's this document?
20      A.   It appears to be a presentation on ballot
21  by mail.
22      Q.   Is this the most recent presentation on
23  ballot by mail that your office has provided?
24      A.   I believe so.  I mean what I find on those
25  power points is the date that it's printed is the date



Keith Ingram

March 28, 2023
Pages 66 to 69

Page 66

1  that shows up on here. So it's not really a very
2  useful guide. But as far as I know, we didn't change
3  our guidance or instructions in our presentations
4  throughout the '22 year.
5      Q.   It's from the election law seminar. Do you
6  know when that was held?
7      A.   I don't. It was in July or August.
8      Q.   Okay. Did you participate in the drafting
9  of this document?
10     A.   I did review it, yes.
11     Q.   So others drafted, but you reviewed after
12  it had been drafted; would that be right?
13     A.   That's correct.
14     Q.   Did you give the training based on this
15  document?
16     A.   No, sir.
17     Q.   Who did?
18     A.   I don't remember, maybe Heidi Martinez.
19     Q.   Who is Ms. Martinez?
20     A.   She is one of our staff attorneys.
21     Q.   Does this presentation -- are you aware of
22  whether this presentation instructed local clerks to
23  inform voters upon request whether they had a driver's
24  license or SSN on file?
25     A.   As I stated before, we don't have to tell

Page 67

1  them to do that. That's something they do, they answer
2  voter's questions.
3      Q.   Just to be clear, they -- you don't train
4  them to do that, that's just something you expect them
5  to do?
6      MS. HUNKER: Objection, form.
7  BY THE WITNESS:
8      A.   I expect county election officials to
9  answer voter questions, yes, I do.
10  BY MR. FREEMAN:
11     Q.   Including that question?
12     A.   Yes, including that question very much so.
13     Q.   Turning to page 31. What are the matters
14  set on page 31?
15     A.   The best practices when reviewing an
16  application for ballot by mail.
17     Q.   So this is the review conducted by the
18  early voting clerk?
19     A.   Early voting clerk is the one who reviews
20  applications for ballot by mail, yes.
21     Q.   The early voting clerk has to look up the
22  registration status of the voter as part of that
23  process?
24     A.   That's correct.
25     Q.   And do you suggest as part of that training

Page 68

1  how they should look up the voter registration status
2  of an applicant?
3      A.   No.
4      Q.   Do you have an understanding of how they
5  typically go about doing that?
6      A.   They either use TEAM or they use their
7  local system. And some off-line counties use TEAM for
8  this.
9      Q.   What information do they plug in when they
10  are trying to pull up the registration status like
11  name?
12     A.   Well, I mean if you're using TEAM you can
13  search by voter name. That's probably the way they do
14  it. They are limited to their county.
15     Q.   If we turn to page 32. What are the
16  matters set out here?
17     A.   This talks about the new law.
18     Q.   This is talking about looking up
19  identification numbers; is that correct?
20     A.   That's correct.
21     Q.   That is separate from looking up
22  registration status?
23     A.   It's part of the registration status.
24     Q.   But it's --
25     A.   That's what it says at the last sentence

Page 69

1  you talk to the voter registrar to confirm the voter
2  registration and status.
3      Q.   But am I correct that the numbers provided
4  here, driver's license, Social Security number, they
5  are not used to look up the voter, they are used to
6  confirm the voter; is that correct?
7      A.   They are used to make sure the voter has
8  properly identified themself on the application, yes.
9      Q.   Those numbers are not used to find the
10  voter in TEAM as part of the ABBM processing, correct?
11     A.   No, sir. I mean not usually. I guess they
12  could look it up by DL number if they wanted to.
13     Q.   Do you have any understanding as to
14  whether -- strike that.
15         Do you instruct local officials to do that?
16     MS. HUNKER: Objection, form.
17  BY THE WITNESS:
18     A.   We don't tell them how they use TEAM. All
19  of the fields are available to look up anything they
20  want to look up.
21  BY MR. FREEMAN:
22     Q.   Are you aware of any local officials using
23  the Texas driver's license number or Social Security
24  number to look up a voter as part of the initial
25  determination of their registration status?



Page 98

1 through Texas.gov.
2      Q.   Is this the page that voters would use to
3 update their Texas driver's license number or Social
4 Security number on their voter file?
5      A.   If they wanted to add to voter file this
6 was the one that replaces zero, no value with a number.
7      Q.   Is there any indication on this website
8 that this is the page that can be used to update Texas
9 driver's license number or Social Security number on
10 voter registration record?
11      A.   No.  But if you fill this out, the next
12 page in says, "If your purpose is to update your voter
13 record with your numbers you have done it so log out.
14 You are finished."
15      Q.   Okay.  In some are there any instructions
16 prior --
17      A.   Act of logging in supplies no values.
18      Q.   Understood.  In some are there any
19 instructions on Texas.gov prior to logging in that this
20 site may be used to add a Texas driver's license number
21 or Social Security number to voter registration
22 records?
23      A.   I don't think so.
24      Q.   We previously discussed a number of ways
25 voters can add or correct identification numbers on a

Page 99

1 ballot envelope or FCPA signature sheet.  Is there any
2 change in those procedures since May of 2022?
3      A.   There is not.
4      Q.   So I'm clear, a voter can correct on the
5 envelope or signature sheet and send it back, they can
6 hand return the envelope or they can cancel the mail
7 ballot and vote in person; is that right?
8      A.   Those are some of the options.
9      Q.   What are the other options?
10      A.   They can correct the ballot tracker and add
11 numbers to Texas.gov.
12      Q.   But if a mail ballot has been sent back to
13 them, they have to physically return the ballot; is
14 that right?
15      A.   They have to physically return a ballot,
16 yes.
17      Q.   They can only correct on the ballot tracker
18 if the early voting ballot board has retained the
19 ballot; is that right?
20      MS. HUNKER:  Objection, form.
21 BY THE WITNESS:
22      A.   Well, if they've got the ballot they've got
23 to get it back, but they can also correct the
24 information on the ballot tracker.  Those are not
25 mutually exclusive.

Page 100

1 BY MR. FREEMAN:
2      Q.   The ballot tracker is only accessible to
3 voters who have both a Texas driver's license number
4 and a Social Security number on their TEAM file,
5 correct?
6      A.   Right.
7      Q.   As of right now?
8      A.   That's correct.  Which is over 96 percent
9 of voters.
10      Q.   Mr. Ingram, do you recall when we met back
11 in April of 2022 that we discussed whether a single
12 voter could be issued more than one DPS number?
13      A.   Yes.
14      Q.   Do you recall whether you knew at the time
15 whether DPS had in fact issued multiple numbers to
16 particular individuals over the course of their
17 lifetime?
18      A.   If I didn't say that's a DPS question I am
19 saying it now, it's a DPS question.
20      Q.   Do you know whether DPS has done that in
21 the past?
22      A.   To my knowledge, you get one number.
23      Q.   I have some document I'm hoping can clear
24 this up.  We can mark this as Exhibit 19.
25          (WHEREUPON, a certain document was

Page 101

1          marked Deposition Exhibit No. 20,
2          for identification, as of 3/28/23.)
3      MR. FREEMAN:  This is 20.
4 BY MR. FREEMAN:
5      Q.   What's this document?
6      A.   It appears to be an email exchange with
7 Mr. or Mrs. Mickey Marvins and our office.
8      Q.   If you go to the original email on page 3
9 what's the problem that Ms. Marvins describes.
10      A.   That she got an ID to replace her driver's
11 license, and the ID number wasn't in her voter record.
12      Q.   As a result, her friend who had this
13 experience had a problem getting an absentee ballot
14 because the number on her DPS identification was
15 different when she went from a driver's license to an
16 ID card; is that right?
17      A.   Agree with that.  Just in case you are
18 wondering, that's not inconsistent with what I said.
19 You get one number.  You surrender your DL and you get
20 the ID number.  I don't want you under the impression
21 you got two numbers.  You got one number.  It just
22 changed.
23      Q.   I see.  Okay.  Bit of a clarification.
24      A.   I want to make sure we are clear.
25      Q.   Over the course of a lifetime, is what I



Keith Ingram                                          March 28, 2023
                                                      Pages 102 to 105

Page 102

1  asked before, a voter can be issued more than one ID
2  number by DPS; is that correct?
3      A.    If you change from one form of ID to
4  another then yes.
5      Q.    When did you first become aware of that
6  fact?
7      A.    I have always known that.  I don't know --
8  it's not a strange or unusual piece of information.  I
9  went to Arkansas, I had to surrender my driver's
10 license.  I came back, I had to surrender my Arkansas
11 license.
12     Q.    Am I correct that SB 1 permits voters to
13 submit a driver's license number that is expired,
14 correct?
15     A.    That's correct.
16     Q.    Even if I have surrendered my driver's
17 license number, if that's the number -- if I have
18 surrendered my driver's license and gotten an ID, if my
19 driver's license is still on file with TEAM, I can vote
20 using the number on my driver's license; is that right?
21     A.    You can for up to four years for a person
22 under 70.  Then for a person over 70 it can be expired
23 for however long you need it.
24     Q.    Are you sure that's the rule for SB 1 and
25 not for the voter ID?

Page 103

1      A.    It's the same.  It incorporates 63101 into
2  mail ballots.
3      Q.    In any case, has your office taken any
4  actions to address issues created by voters who have
5  and hold DPS ID number on file and who have received a
6  new DPS ID number on a new form of ID?
7      A.    That's voter responsibility to update their
8  information in TEAM.  And they can do that very
9  conveniently, they are at DPS, say, "Use this
10 information to update my voter record."  They just have
11 to check yes on a box.
12     MR. FREEMAN:  Off the record for a moment.
13           (WHEREUPON, a discussion was had
14           off the record.)
15 BY MR. FREEMAN:
16     Q.    Has your office done anything to address
17 the issue of voters who submit the number of old
18 identification that's no longer the number on TEAM, but
19 remains valid for SB 1 purposes?
20     A.    I don't know what that question means.
21     Q.    Sure.  Let's say a voter had a driver's
22 license, surrenders it, gets an ID card and does update
23 TEAM with the ID card number -- thumbs up from the
24 witness -- but then they submit their old driver's
25 license number because they are concerned or

Page 104

1  misunderstand and think that's what they have to
2  submit.  Has your office done anything to address that
3  specific scenario?
4      A.    You would have to talk to Sam about our
5  education campaign.  But, you know, what we tell voters
6  if they call our office is that they need to use
7  whatever is currently in their voter registration, and
8  that's why we encourage them to use both numbers so
9  that if one of them hits they are good.
10     Q.    Is a voter able, to your knowledge, to call
11 their local clerk or election administrator and ask
12 specifically what number is on their registration
13 record?
14     A.    Of course.
15     Q.    So I could call and say what's the driver's
16 license on my registration record and then fill that in
17 on an ABBM?
18     A.    Sure.
19     MS. HUNKER:  Objection, form.
20 BY THE WITNESS:
21     A.    It would go through some questions to
22 validate that it's you and not some vote harvester
23 trying to steal your vote, but yes.
24 BY MR. FREEMAN:
25     Q.    What questions would they use?

Page 105

1      A.    I don't know.  Whatever the county uses
2  whenever they validate someone's identity on the phone.
3      Q.    Any information that isn't also on the
4  ABBM?
5      A.    Well, it's information that would be in
6  their voter record.
7      Q.    But it's information that was on the
8  application prior to SB 1, right, name, date of birth,
9  address, things like that, correct?
10     A.    That's correct.
11     Q.    In theory if a voter -- strike that.
12     So if an individual wanted to cast an ABBM
13 in someone else's name, the only security addition
14 created by SB 1 is the driver's license number or a
15 Social Security number, correct?
16     MS. HUNKER:  Objection, form.
17 BY THE WITNESS:
18     A.    Well, I mean signature still counts.
19 BY MR. FREEMAN:
20     Q.    Sure.  That was pre -- signature counted
21 pre-SB 1, right?
22     A.    Agreed.
23     Q.    In fact, it's easier to meet the signature
24 requirement after SB 1?
25     A.    Agreed.



Page 106

1    Q.    All the voter needs to do to get that
2  driver's license number is to call the clerk with
3  pre-SB 1 information and ask for which driver's license
4  number is on file, no?
5        MS. HUNKER:  Objection, form.
6  BY THE WITNESS:
7    A.    No.
8  BY MR. FREEMAN:
9    Q.    Why not?
10   A.    Because they can call and ask, "What do I
11 have on file?"  They will say DL or SSN or both.
12   Q.    What if they say what number is on file?
13   A.    If the voter -- then I would imagine, I
14 don't know because I'm not a county, but if I was a
15 county voter registrar I would say, "What driver's
16 license number -- what's your driver's license number?"
17 They would look and say, "Yup that's what you got."
18   Q.    Okay.  Thank you for that clarification.
19        How many DPS ID numbers can be associated
20 with a voter's TEAM record?
21   A.    One.
22   Q.    Has there been any discussion, to your
23 knowledge, of adding a field to TEAM so that additional
24 driver's license numbers could be listed?
25   A.    That's something that we have recently

Page 107

1  discussed to think about the next iteration of TEAM,
2  and whether or not they want to have another field for
3  an ID number.  That decision has not been made yet.
4    Q.    What's the stage of the procurement process
5  for the next iteration of TEAM at this point?
6    A.    We are going through the drafting of the
7  RFP, RFO, whatever we are calling it.
8    Q.    Do you know when that will be complete?
9    A.    Soon.  If I had my way it would have been
10 two weeks ago.
11   Q.    To be clear, if a voter has been issued
12 multiple DPS numbers and provides a DPS ID number
13 different from the one listed in TEAM on an ABBM and
14 does not also provide a Social Security number, that
15 ABBM will be rejected, correct?
16   A.    If they don't provide a number that's in
17 their voter registration record they will be rejected,
18 yes, at least temporarily.
19   Q.    Same thing on mail ballot?
20   A.    Same thing on mail ballot.
21   Q.    Would you agree a duly registered voter
22 whose ballot was rejected under these circumstances was
23 not at fault?
24        MS. HUNKER:  Objection, form.
25 BY THE WITNESS:

Page 108

1    A.    I'm not going to get into assignment of
2  fault.
3  BY MR. FREEMAN:
4    Q.    Do you know if the fact that DPS has issued
5  multiple ID numbers to the same individuals over their
6  lifetimes has led to the rejection of mail ballot
7  materials under SB 1?
8        MS. HUNKER:  Objection, form.
9  BY THE WITNESS:
10   A.    It's my understanding that's happened at
11 least in Bexar County because I have a member of the
12 ballot board who has been coming up here for the
13 election meetings because of it.
14 BY MR. FREEMAN:
15   Q.    Have you conducted any further inquiry into
16 the extent to which such voters have had their mail
17 ballot materials rejected?
18   A.    Just what she says.
19   Q.    Is there anything else that could have been
20 done for voters who have multiple DPS ID numbers to
21 ensure their ballots are counted?
22   A.    I don't know how to answer that question.
23   Q.    I don't run an elections office.  I'm
24 asking if you know of anything else that could have
25 been done by your office to help those voters?

Page 109

1    A.    I don't know how to answer that question.
2    Q.    Okay.  Is there anything else that the
3  voter could have done if they have an old number on
4  TEAM and submit number on their new ID card or vice
5  versa?
6    A.    Well, the voter has the responsibility to
7  make sure their information in the voter registration
8  record is correct and accurate and updated.  The voter
9  bears that responsibility.
10   Q.    Do you know how many registered voters in
11 Texas have been issued multiple numbers in their
12 lifetimes?
13   A.    I do not.
14   Q.    Do you know how many ABBM or mail ballots
15 have been rejected on account of the voters submitting
16 a correct DPS ID number that was not listed on TEAM?
17   A.    I don't.
18   Q.    Have there been any actions taken by your
19 office other than in-filling driver's license numbers
20 as part of the HB2515 process to address the absence of
21 driver's license numbers or up-to-date driver's license
22 numbers on voter registration records?
23   A.    We have made sure we have got a pipeline
24 from Texas.gov so that we can capture that log-in
25 information whenever someone logs in to fill in the



Keith Ingram

Page 110

1 values for us.
2    Q.   Anything else?
3    A.   That's not an unsubstantial thing.
4    Q.   Understood.  Is there anything else so I
5 have your full testimony?
6    A.   I mean we have told the voters they need to
7 use both.  We told voters the way they can add numbers
8 if they want to add numbers.
9    Q.   Anything else?
10    A.   That's it, I think.
11    MS. HUNKER:  I know we took a short break before,
12 but sort of a good place to take five if that's all
13 right?
14    MS. HUNKER:  Yes.
15         (WHEREUPON, a recess was had.)
16    MR. FREEMAN:  Back on the record.
17 BY MR. FREEMAN:
18    Q.   Mr. Ingram, to the extent you know, what
19 was the final mail ballot rejection rate in the 2022
20 primarily?
21    A.   You know, it's obviously two different
22 primaries, and there were different -- democrats were
23 higher than the republicans, but I believe the
24 composite rate was under 13 percent, under 12.8, 12.7,
25 something like that.

Page 111

1    Q.   Do you know what the rate in the democratic
2 primary was?
3    A.   No.  I think it was a little over 13 maybe.
4    Q.   It's not a quiz.  It's all right.
5    A.   We can look it up.
6    Q.   So the republican rate was a little bit
7 lower than that?
8    A.   It was a little under 12.
9    Q.   In the primary runoff, do you know what the
10 aggregate rate was?
11    A.   Right at 12 percent.
12    Q.   The democratic runoff, do you know what the
13 rate was then?
14    A.   I don't.
15    Q.   Was the democratic rate higher than the
16 republican rate in the primary runoff as well?
17    A.   I think in the runoff it went the other
18 way.  I just have to go look and make sure, but it was
19 close.
20    Q.   Then we already discussed, but just so we
21 have it here, what was the final rejection rate in the
22 2022 general election?
23    A.   2.7 percent.
24    Q.   Based on your knowledge and experience, how
25 do these figures compare, 2.7 for 13 or so to the rate

Page 112

1 of mail ballot impersonation in Texas elections before
2 passage of SB 1?
3    MS. HUNKER:  Objection, form.
4 BY THE WITNESS:
5    A.   I have no idea what the rate of mail ballot
6 impersonation is or ever has been.
7 BY MR. FREEMAN:
8    Q.   After serving for over a decade as the
9 director of elections for the State of Texas, do you
10 know whether or not 2.7 percent of mail ballots cast in
11 elections pre-SB 1 were actually cast by individuals
12 other than the registered voter on whose behalf the
13 ballots were cast?
14    MS. HUNKER:  Objection, form.
15 BY THE WITNESS:
16    A.   The rejection rate of 1 to 3 percent is
17 historically what it's always been.  So we are back in
18 the zone.  One of the reasons for rejection is that the
19 mail ballot was not signed by the voter.  It was signed
20 by somebody other than the voter.  The voter was not
21 the one who signed the carrier and the application.
22 BY MR. FREEMAN:
23    Q.   So that wasn't the answer to my question.
24 My question was, to your knowledge, were 2.7 percent or
25 more of mail ballots cast in any statewide election in

Page 113

1 Texas fraudulent because they were cast by someone
2 else?
3    MS. HUNKER:  Objection, form.
4 BY THE WITNESS:
5    A.   Again, I don't know how many were
6 fraudulent because they were cast by somebody else.  I
7 know ballot boards reject mail ballots because the
8 voter was not the one who signed them.
9 BY MR. FREEMAN:
10    Q.   Do you have any basis to believe based on
11 your knowledge and experience that over 2 percent of
12 mail ballots in any statewide election were cast by
13 someone other than the voter in whose name the ballot
14 was cast?
15    A.   Again, I don't know the answer to that
16 question.  The answer I have got is rejection, and
17 rejection because they're not the same person is the
18 most common rejection reason.
19    Q.   Because they are not the same person or
20 because they didn't sign?
21    A.   Because they are not the voter.  The
22 signatures don't match.
23    Q.   When a signature doesn't match -- strike
24 that.
25         If an election administrator or ballot



Keith Ingram

March 28, 2023
Pages 126 to 129

Page 126

1    Q.    Okay.  How often in the past did you
2  provide templates for op-eds?
3    A.    I don't know.  Several times.  It's -- what
4  we have done them for is the ID requirements.  The ID
5  requirements when they changed for photo ID, and they
6  changed again in 2017 --
7    Q.    So --
8    A.    -- or 2016.
9    Q.    -- for SB 14 the voter ID law, the change
10 to voter ID law, and SB 1, those are the three times
11 you can recall?
12    A.    That we have tried to use this form of
13 communication to get the counties to propagate
14 something, yes.  I mean we offer templates to the
15 counties for everything every year, every election
16 year, but the ones that we specifically drafted, you
17 know, for part of voter education were usually ID
18 related.
19    Q.    Do you know whether any other election
20 administrators or officials were able to place op-eds
21 about these requirements after this email went out?
22    A.    I don't know.
23    Q.    So you can't -- can you identify any other
24 counties that did manage to place op-eds?
25    A.    I don't know.

Page 127

1    Q.    Do you intend to submit templates or
2  examples to county officials about SB 1 ID requirements
3  again in the future?
4    A.    Sure.
5    Q.    Do you expect newspapers to be receptive to
6  op-eds when the requirements are no longer new?
7    A.    It's not just the op-eds.  It's also
8  talking to them about how to approach their local news
9  media and getting a story placed.  It's also handouts
10 and colorful material they can use to give to the
11 voters.  So it's a full fledged campaign that Sam would
12 know more about than I do.
13    Q.    Do you expect newspapers to be as receptive
14 to similar op-eds in the future when the requirements
15 are no longer new?
16    MS. HUNKER:  Objection, form.
17 BY THE WITNESS:
18    A.    Sure.
19 BY MR. FREEMAN:
20    Q.    Why is that?
21    A.    Because they are always hungry for content.
22 Local news needs content.  This is good content for
23 them.  They like it.
24    Q.    Do you expect substantial further
25 reductions in mail ballot rejections due to voter

Page 128

1  education?
2    A.    I don't know.  I mean I think as voters
3  talk amongst themselves it's going to get better, yes.
4  I don't know if it's substantial.  You say substantial
5  reductions.  I don't know about that.
6    Q.    Does your office have plans to reach
7  different voters from those reached previously by voter
8  education efforts on SB 1?
9    MS. HUNKER:  Objection, form.
10 BY THE WITNESS:
11    A.    That again is going to be part of the
12 request for proposal.  Depends on how much money the
13 legislature gives us.
14 BY MR. FREEMAN:
15    Q.    Do you have any knowledge of targeted plans
16 to reach voters who didn't understand prior voter
17 registration efforts?
18    A.    No.  I mean part of every education
19 campaign is the feedback loop.  And, you know,
20 determination of what can be done better next time.
21 But again, that's all done by the communications team
22 and the vendor.
23    Q.    Going back to Exhibit 21.  Did Mr. Taylor
24 attribute the decrease in voters -- strike that.
25    Did Mr. Taylor attribute the decrease in

Page 129

1  mail ballot rejection rates to voters getting used to
2  SB 1 requirements?
3    A.    Yes.
4    Q.    Do you agree --
5    A.    He said that, you know, one of the things
6  we have always expected was that the voters would get
7  used to it.
8    Q.    Do you agree?
9    A.    Absolutely.
10    Q.    If a voter had their ballot rejected, they
11 failed to cure, correct?
12    A.    If it's finally rejected, yes.
13    Q.    So the cure process affords a voter an
14 additional opportunity code to comply with SB 1
15 requirements during a single election; is that right?
16    MS. HUNKER:  Objection, form.
17 BY THE WITNESS:
18    A.    If that was the reason for the initial
19 rejection or notice of defect.
20 BY MR. FREEMAN:
21    Q.    Would you agree then that even when
22 presented with multiple opportunities to comply with SB
23 1, each final rejection represents a voter who failed
24 to learn and comply even with multiple opportunities?
25    MS. HUNKER:  Objection, form.



Page 130

1   BY THE WITNESS:
2       A.    Sometimes the clock runs out on folks.
3   But, you know, I don't know what you are trying to get
4   at. But you are assuming that the rejections were all
5   because of SB 1. That's not a safe assumption. There
6   are lots of reasons why mail ballots get rejected. If
7   you want to know the list, you should go to a county
8   and ask them.
9   BY MR. FREEMAN:
10      Q.    Let's just bracket to SB 1 rejections. And
11  say with respect to SB 1 rejections, because of the
12  cure opportunity, everyone has multiple chances to get
13  down their voter information, right, their ID numbers?
14      A.    I don't necessarily agree with that because
15  again the clock runs out.
16      Q.    But prior to the clock running out, there
17  is supposed to be an opportunity to cure, correct?
18      A.    If they got notice before the clock ran
19  out.
20      Q.    Some voters get notice after the clock runs
21  out?
22      A.    That's right.
23      Q.    With respect to the voters who did get
24  notice before the clock ran out, many of them had a
25  second opportunity, and nonetheless failed to get the

Page 131

1   information required by SB 1 on to their ballot,
2   correct?
3       A.    Maybe. Maybe they decided not to. Maybe
4   they deeded to cancel their mail ballot and vote in
5   person. You know, I don't know what happened with
6   those.
7       Q.    In light of the cure opportunity, why do
8   you expect that yet more exposure to the SB 1
9   requirements would continue to drive down rejection
10  rates?
11      A.    Because as people learn about something and
12  talk about it amongst themselves they get better at it.
13  It's just a fact.
14      Q.    In each new election cycle, do a new batch
15  of voters turn 65?
16      A.    We have talked about that before.
17      Q.    We have. They won't have to get used to SB
18  1 mail ballot requirements?
19      MS. HUNKER: Objection, form.
20  BY THE WITNESS:
21      A.    No. But they would have heard about it
22  from their peers.
23  BY MR. FREEMAN:
24      Q.    Have additional trainings of state and
25  local election officials helped to reduce ballot

Page 132

1   rejection rates between the March primary and November
2   general?
3       A.    Yes.
4       Q.    What's the county election seminar?
5       A.    That's a seminar that we do every year for
6   county election officials to teach them about election
7   law requirements and how to implement them in their
8   county.
9       Q.    When was the county election seminar in
10  2021?
11      A.    I don't remember.
12      Q.    Was it before --
13      A.    July or August.
14      Q.    So before SB 1 was passed?
15      A.    In '21, yes.
16      Q.    When was the seminar in '22?
17      A.    July or August.
18      Q.    After the March primary, before the
19  November general, correct?
20      A.    Agree with that.
21      Q.    So based on your experience as director of
22  elections, during the 2022 election cycle do you do
23  most -- sorry. Did most county election officials
24  understand the SB 1 acceptance and cure process during
25  the November 2022 general?

Page 133

1       A.    I don't know. That's a hard question. I
2   don't know what they hear. I only know what we say.
3   We had an election official email us a question in
4   2017, 2017, four years after photo ID requirements were
5   in place, asking if photo ID was required for voting.
6       Q.    That was after there had been --
7       A.    No.
8       Q.    -- a decision by the Federal court saying
9   that the original law violated the Voting Rights Act,
10  right?
11      A.    She was asking if photo ID was required at
12  all. She didn't have any clue. She had been in office
13  the whole four years. She had been to our seminars,
14  read our materials, I presume. I don't know. But I'm
15  saying I don't have any control at all over what the
16  counties hear and how they interpret it.
17      Q.    Are you aware of any ballot rejection in
18  the November general that resulted from misapplication
19  of SB 1 by local officials?
20      A.    Any what?
21      Q.    Ballot rejections, mail ballot rejections
22  in November that resulted -- that were the result of
23  misapplication of SB 1 by local officials?
24      A.    I think we have talked about the
25  misapplication of the signature requirement after the



Keith Ingram                                                           March 28, 2023
                                                                    Pages 134 to 137

Page 134

1  introduction of rebuttal presumption.
2      Q.   I mean the rejection of mail ballots based
3  on the driver's license or Social Security number
4  requirements?
5      A.   I don't know how you can separate the two.
6  The driver's license and Social Security number being
7  in the voter's record is supposed to create a
8  rebuttable presumption that the signatures are of the
9  voter.  So that signature comparison requirement, that
10 the degree of scrutiny that's applied to the signatures
11 part and parcel of SB 1 requirements.  If the
12 signatures were overanalyzed even though the number
13 already matched the number in their system, then that
14 results in a rejection because of a mistake by the
15 ballot board.
16     Q.   Okay.  Are you aware of any rejections of
17 ballots for failure to put a driver's license number,
18 Social Security number on the carrier envelope that
19 matches TEAM where the rejection was a result of
20 misapplication of SB 1 by local officials?
21     A.   So a voter puts a number on the envelope,
22 that number is in their TEAM record, and they still
23 rejected it --
24     Q.   Any rejection --
25     A.   -- because of that?

Page 135

1      Q.   Are you aware of any rejection of a mail
2  ballot based on the number requirements because of some
3  kind of error by a local official?
4      MS. HUNKER:  Objection, form.
5  BY THE WITNESS:
6      A.   I have already told you what I know about
7  rebuttable presumption not being evenly applied.
8  BY MR. FREEMAN:
9      Q.   Separate from the rebuttable presumption,
10 just the number requirements?
11     A.   I don't even know how that would be.  I
12 don't know what you are talking about.
13     Q.   Okay.  Let's try and ask in a way that
14 works for you then.
15          Just a yes/no requirement, you have to have
16 a number that matches TEAM, driver's license number,
17 Social Security number, that requirement standing
18 alone, that sort of bar to acceptance, are you aware of
19 any rejection based on that bar to acceptance the
20 ballot where the rejection was a result of a
21 misapplication of SB 1 by local officials?
22     MS. HUNKER:  Objection, form.
23 BY THE WITNESS:
24     A.   I don't even know how that would be.  I
25 don't know what you are talking about.

Page 136

1  BY MR. FREEMAN:
2      Q.   Are you aware of any instances where the
3  official rejected a mail ballot where a voter had put
4  down their SSN, and had a driver's license number, and
5  SSN on TEAM and they applied the hierarchy, for
6  example, and shouldn't have, would that be an error by
7  a local official in applying SB 1 to the numbers?
8      MS. HUNKER:  Objection, form.
9  BY THE WITNESS:
10     A.   I'm not aware of anything like that
11 happening.  What we've told them is if the number that
12 the voter puts is in the record, they are supposed to
13 accept it.  I'm not aware of any county rejecting it
14 with a number in the record.  That would be crazy.
15 BY MR. FREEMAN:
16     Q.   Good.  Are you aware of any other similar
17 types of errors by local officials where they rejected
18 a ballot and they shouldn't have in relation to the
19 numbers themselves?
20     A.   No.
21     Q.   Okay.  Would you agree then you don't
22 expect any substantial further rejection or further
23 reductions in mail ballot rejections based on the
24 numbers alone from training of local officials --
25     MS. HUNKER:  Objection, form.

Page 137

1  BY MR. FREEMAN:
2      Q.   -- not based on signature?
3      A.   No, I wouldn't agree with that at all.
4  Because we also train ballot boards now.  We do
5  webinars for the ballot boards themselves.  Ballot
6  boards themselves are the ones who make the call
7  whether to accept or reject.  Now I'm not aware of a
8  ballot board rejecting a carrier envelope because
9  somebody had a number and they should have used the
10 other number.  That's crazy talk.  But there are a lot
11 of ballot boards who either didn't give the signatures
12 any weight at all or gave them too much weight and then
13 rejected even though the number was in the system.  So
14 that's the part that we are going to work on educating
15 and correcting.
16     Q.   But nothing related to the numbers standing
17 alone and not in relation to signatures?
18     A.   Again, I don't know what that means.  I
19 don't know how you would do that.
20     Q.   Okay.  Are there any other reasons why mail
21 ballot rejection rates decreased from the March primary
22 to the November general that we haven't talked about?
23     A.   You know, I just think -- I mean Sam calls
24 it getting used to, but it's a process of permeating
25 the side geist.  You know what I mean?  It's something



Keith Ingram

March 28, 2023
Pages 138 to 141

Page 138

1 that filters into people's consciousness over time,
2 that that is something that I don't know if we just
3 call it getting used to it. But whatever it is it gets
4 better over time, the requirements.
5    Q.    Mr. Ingram, do you know what share of
6 voters cast ballots by mail in November of 2022?
7    A.    I did think of another reason they get
8 better over time. It's because our data gets better
9 over time. You know, the more voters that update their
10 information with one of the numbers, the better we are
11 going to have. If they make the ballot tracker easier
12 to access, that's an easier way to correct the defect.
13    Q.    Do you know how many voters added driver's
14 license numbers or Social Security numbers to their
15 voter registration file using Texas.gov during the
16 general election period?
17    A.    I don't know. I know we had over 40,000
18 people update their registration using Texas.gov. I
19 don't know how many of those were numbers only.
20    Q.    A lot could have been address changes?
21    A.    A lot could have been address changes and a
22 lot of them could have been numbers. I don't know how
23 many of each there are.
24    Q.    You are not getting new registrants who
25 don't provide either a driver's license number or

Page 139

1 Social Security number anymore into the system; is that
2 right?
3    A.    Well --
4    MS. HUNKER: Objection, form.
5 BY THE WITNESS:
6    A.    -- they've got the opportunity to have
7 registration without either one of the numbers.
8 BY MR. FREEMAN:
9    Q.    Other than the very small fraction of
10 people who check that box, you are not getting --
11 everyone is providing either a driver's license number
12 or a Social Security number on their voter registration
13 applications now, correct?
14    A.    There is a box for them, but there is also
15 a box for "I don't have either one of those."
16    Q.    Do you know how many folks that you
17 register with the box that says, "I don't have a
18 driver's license number or Social"?
19    A.    I don't. I'd agree with you it would be a
20 small number.
21    Q.    Prior to Helping America Vote Act, you
22 could register without a driver's license number or
23 Social?
24    A.    I don't know if you could in Texas. I know
25 there was a period of time a long time ago. But before

Page 140

1 the Help America Vote Act you had to have one of those.
2 I think we required the full nine, not the last four.
3 Help America Vote Act made us reduce it to the last
4 four only.
5    Q.    Okay. But you are not getting a large
6 influx of additional voters now with no SSN, no DL?
7    A.    Agree with that.
8    Q.    And so attempts to add information are not
9 going to make further substantial changes in the future
10 because you have that for most of them already, right?
11    A.    Well, I mean that's the whole issue, right.
12 We have got less than half a percent who have neither
13 one of those numbers in the record, right. Only if
14 that half of a percent tries to vote by mail and then
15 adds the number, we will get it, but that does happen,
16 and we will work on that last 93,800 folks to get them
17 a number.
18    Q.    What are you doing affirmatively to work to
19 get them a number?
20    A.    Well, what I talked about. We have changed
21 Texas.gov where we get no value supplied to us if
22 anybody logs on to us. We are telling voters if they
23 have their application rejected for lack of a number in
24 the system that's how you add the numbers to your
25 record. I mean I don't know how else you would do it.

Page 141

1 The voter has to take responsibility to do that
2 themselves. They have a mechanism for doing it
3 electronically or they can fill out a paper
4 application. But over time as they try to vote by
5 mail, that number is going to decrease. It will not
6 get bigger.
7    Q.    Did you see substantial movement in that
8 number between the March primary and the November
9 general?
10    A.    Not then, no. We didn't check then.
11    Q.    You didn't check to see how many people had
12 no driver's license number and no Social Security
13 number?
14    A.    That's right. We had already checked it at
15 the end of '21. And then we added as many as we could
16 so we knew what the number was going into the end of
17 the year, and we did it at the end of December '22?
18    Q.    What was the change from the end of '21 to
19 the end of '22?
20    A.    I don't know. I have got the end of '22
21 numbers in my head, but I don't remember what they are.
22 I mean before we did anything at all, we had about a
23 million records that didn't have a driver's license,
24 and a million that didn't have a Social, right. We
25 had, I don't know, 160,000 that didn't have either one.



Page 142

1  At the end of '22 we have got 389 that have a DL, but
2  no Social, and we have got 298 that have a Social but
3  no DL. We have got 93,000 that don't have either one.
4      Q.   Do you expect substantial further changes
5  in decreasing that -- those numbers moving forward?
6      MS. HUNKER:  Objection, form.
7  BY THE WITNESS:
8      A.   I don't know what you mean by substantial.
9  I expect that the numbers are going to decrease over
10  time. They are never going to get bigger than they are
11  now. They will decrease.
12  BY MR. FREEMAN:
13      Q.   Okay. Did the rate at which they
14  decreased -- strike that.
15          Did the share of numbers that you
16  decreased -- you know what, we will move on then.
17          Mr. Ingram, do you know what share of
18  voters cast ballots by mail in November of '22?
19      A.   I don't.
20      Q.   Do you know if it was greater or lessor
21  than the share that cast ballots by mail in November of
22  2018?
23      A.   I don't know. I think it would probably be
24  comparable number to 2018. It was less than 2020.
25      Q.   Do you know whether turnout in general was

Page 143

1  higher in 2022 or lower in 2018?
2      A.   I don't remember. They were both quite a
3  lot higher than normal mid-term elections, but I think
4  '22 may have been a little less.
5      Q.   To your knowledge, did March 2022 ballot
6  rejection deter some eligible voters from trying to
7  vote by mail in November?
8      A.   No idea.
9      Q.   Did any election administrators or clerks
10  indicate to you that voters were concerned about mail
11  ballot rejection in November of 2022?
12      A.   Well, as you can see from the email, voters
13  aren't shy about expressing directly to us. I don't
14  know if we have to rely on county officials for that.
15      Q.   Did any county officials indicate to you
16  that voters were concerned in November of 2022 about
17  ballot rejection?
18      A.   Not any more than normal.
19      Q.   What's normal in terms of those types of
20  concerns?
21      A.   Well, I mean whenever you send mail ballots
22  you are relying on the post office and you are relying
23  on whatever else. There is always trepidation until
24  you get confirmed that your ballot was accepted.
25      Q.   Are these concerns valid?

Page 144

1      A.   Sure. Absolutely.
2      Q.   Do you trust the post office? We already
3  discussed concerns that were raised with your office
4  directly about rejection of mail ballots. Were these
5  concerns valid?
6      A.   I don't know.
7      MR. FREEMAN:  Take a break for a minute.
8          (WHEREUPON, a recess was had.)
9  BY MR. FREEMAN:
10      Q.   Thank you, Mr. Ingram. I will pass you to
11  Ms. Perales. But I think we all need a lunch break
12  before then.
13      A.   Great.
14          (WHEREUPON, a recess was had.)
15          EXAMINATION
16  BY MS. PERALES:
17      Q.   We are back on the record. Mr. Ingram, my
18  name is Nina Perales and I represent the LUPE
19  Plaintiffs. I'm with MALDEF. We know each other,
20  don't we?
21      A.   We do.
22      Q.   We have met in the past usually at the
23  legislature?
24      A.   Agreed.
25      Q.   Yes. You have been to so many more

Page 145

1  hearings than I have, much to your credit.
2          I am going to endeavor not to tread the
3  same ground as Mr. Freeman did, but if that means that
4  from time to time I'm pausing or flipping pages
5  forward, it's only because I'm trying to make sure I
6  don't re-ask any questions that are in my outline. I
7  hope you don't take it as me trying to delay or
8  anything. If I'm quiet, I'm skipping questions. How
9  about that?
10      A.   That's fine. Yes.
11      Q.   Thank you. Thank you. Just a few more
12  emails to go over with you along the same lines of
13  emails that Mr. Freeman went over with you?
14      A.   Okay.
15      Q.   I'm going to mark those.
16      MS. PERALES:  Can we mark this one, please.
17          (WHEREUPON, a certain document was
18          marked Deposition Exhibit No. 23,
19          for identification, as of 3/28/23.)
20  BY MS. PERALES:
21      Q.   Mr. Ingram, can you identify this document?
22      A.   It looks like an email to our office from
23  Barry Brandt, and the response.
24      Q.   Was it an email to -- well, it says the
25  email is addressed to elections internet. Is that the



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,          §
     *Plaintiffs,*                                   §
                                              §
*v.*                                          §          Case No. 5:21-cv-844-XR
                                              §
GREGORY W. ABBOTT, et al.,                    §
     *Defendants.*                                  §

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX O

Keith Ingram                                    March 28, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION
    LA UNION DEL PUEBLO ENTERO,     )
 3  et al.,                         )
                    Plaintiffs,     )
 4       vs.                        )Civil Action No.
    STATE OF TEXAS, et al.,         )5:21-cv-844(XR)
 5                  Defendants.     )(Consolidated Cases)

 6
                    ------------------------
 7                     ORAL DEPOSITION OF
                          KEITH INGRAM
 8                       March 28, 2023
                          Volume 1
 9                  ------------------------

10

11       ORAL 30(b)(6) DEPOSITION OF KEITH INGRAM, Volume

12  1, produced as a witness at the instance of the

13  Plaintiff, and duly sworn, was taken in the

14  above-styled and numbered cause on March 28, 2023, from

15  4:22 p.m. to 7:22 p.m., before Dana Shapiro, CSR, in

16  and for the State of Illinois, reported by machine

17  shorthand, at 209 W. 14th Street, Austin, Texas 78701,

18  pursuant to the Federal Rules of Civil Procedure and

19  any provisions stated on the record or attached

20  hereto.

21

22

23

24

25
```



Page 14

1    Q.    That remain -- does that remain accurate
2 today?
3    A.    It does.
4    Q.    Does the statement that -- strike that.
5        Are these the only limitations on providing
6 cure data through the general election period?
7    MS. HUNKER:  Objection, form.
8 BY THE WITNESS:
9    A.    Well, I mean it's subject to the obvious
10 limitation of whether or not the counties reported it.
11 BY MR. STEWART:
12    Q.    Besides the -- whether the counties
13 reported it and the limitations stated here, any other
14 limitations you are aware of?
15    A.    Those would be them.
16    Q.    Then looking now at the supplemental
17 response on page 12.  To the best of your knowledge,
18 does this response remain accurate today?
19    A.    Yes.
20    Q.    Focusing on the November 8, 2022 general
21 election.  I want to focus on the final number under
22 here where it says total number of voters who use the
23 ballot by mail tracker to correct the defects in their
24 ABBM, and had their ABBM accepted or cancelled, their
25 application and voted in person:  419.

Page 15

1        Do you see that?
2    A.    I see that, but I don't think that's what
3 it says.
4    Q.    Sorry.  Could you restate it accurately.
5    A.    Well, I just want to make sure you
6 understand there are two different categories of folks
7 who are in here.  There is some that corrected a defect
8 and had their application for ballot by mail accepted,
9 and there are some who just canceled the application
10 and voted in person.  There is two different categories
11 of folks in this number.
12    Q.    That 419 response does that capture both of
13 those categories conjunctively?
14    A.    It does.
15    Q.    Does The Secretary of State maintain data
16 that could separately identify those two categories?
17    A.    No.  Because what we know is that they
18 either had a vote history that was successful or not.
19    Q.    I see.  There is no way to separate out the
20 ones who had either been accepted or those that
21 canceled and voted in person?
22    A.    There might be a way to do it.  It might
23 require a query for, you know, early voting in person
24 or election day in person as opposed to voting by mail.
25    Q.    Who would know whether that could be

Page 16

1 determined or not?
2    A.    Well, Kristi Hart would be the one to ask
3 the detailed information like that.
4    Q.    When --
5    A.    Don't tell her I used her name.  I will get
6 killed.
7    Q.    During your prior deposition today when
8 Mr. Freeman was asking questions, you spoke about the
9 ballot tracker at votetexas.gov, correct?
10    MS. HUNKER:  Objection, form.
11 BY THE WITNESS:
12    A.    So the ballot by mail tracker I don't think
13 is -- I mean I know it's not at votetexas.gov.  You can
14 get to it from there and you can get to it from SOS
15 website, but it's hosted actually by our third party
16 vendor who does TEAM for us.
17 BY MR. STEWART:
18    Q.    Understood.  Can that tracker be used to
19 cancel an ABBM?
20    A.    No.
21    Q.    No.  It can be used to correct information,
22 right?
23    A.    Well, it can be used to correct a defective
24 number so if somebody transposed digits, whenever they
25 send in their application for ballot by mail that can

Page 17

1 be corrected in the tracker.
2    Q.    Is there anything else that can be
3 corrected in the tracker?
4    A.    If they left off the information but TEAM
5 has it, they can do that in the tracker as well.
6    Q.    How can a voter cancel ABBM?
7    A.    So cancellation is not one of those things
8 I want to talk about off the top of my head.  Do you
9 want me to go up election code and talk about the
10 different ways of cancelling?
11    Q.    If you could tell me where in the election
12 code it is.
13    A.    Chapter 84.
14    Q.    The law I guess -- withdraw that.
15        What is in chapter 84 details all of the
16 ways by which an ABBM canceled?
17    A.    That's correct.  You know, generally a
18 voter can do it by surrendering their mail ballot in
19 person at the polling place and voting in person or go
20 to voting clerk office and fill out a cancellation form
21 and then go vote in person.
22    Q.    Would you say those are the two most common
23 ways it's done?
24    A.    That's generally what it is and there is
25 other permeations of those two that get very



Keith Ingram

March 28, 2023
Pages 18 to 21

Page 18

1 complicated.
2      Q.    Does the Secretary of State's Office
3 consider cancellation of ABBM to be a form of cure?
4      A.    Well, it's choice of voter as to whether or
5 not to pursue voting by mail or decide to vote in
6 person. From my perspective if the voter successfully
7 votes that's a win.
8      Q.    You haven't considered specifically to put
9 that under the umbrella of cure, if it's aimed towards
10 successful voting?
11      MS. HUNKER:  Objection, form.
12 BY THE WITNESS:
13      A.    Right.  It's not a cure of application if
14 they decide to vote by person, but it is a successful
15 vote.
16 BY MR. STEWART:
17      Q.    So then turning back to the same language
18 you looked at on page 12.  This was presented this way
19 and then as use ballot by mail tracker to correct the
20 defects and have ABBM corrected or canceled their
21 application and voted in person because that's the way
22 data is maintained with those two things together,
23 right?
24      A.    The data is maintained as to whether or not
25 there was successful vote, yes.

Page 19

1      Q.    Turning to Exhibit 8 beginning on the
2 bottom of page 12 on the same exhibit.  Do you see
3 where I am?
4      A.    Yes.
5      Q.    There is a portion where that asks state
6 the number of voters who have cured carrier envelope
7 identification defects using any on-line portal
8 provided pursuant to SB1 from February 9, 2022 to
9 present, correct?
10      A.    Correct.
11      Q.    The original response identified that TEAM
12 captures only the current or most recent status sought
13 with any information in voter records, correct?
14      A.    That's correct.
15      Q.    Does that remain true for data collected
16 through the November 8, 2022 general election?
17      A.    That's correct.
18      Q.    Looking at the supplemental response on
19 page 13 and take a moment if you need to.  But does the
20 data information here remain accurate, to the best of
21 your understanding today?
22      A.    From the first answer, yes.
23      Q.    By the first answer which one are you
24 identifying?
25      A.    I'm talking about the response and not the

Page 20

1 supplement response as far as I know supplemental
2 response is accurate as well.  I want to separate the
3 two.
4      Q.    For the clean record, specifically for the
5 supplemental response do the numbers there appear
6 accurate to you?
7      A.    Yes.
8      Q.    So if we turn to page 14 what appears to be
9 the final item or the final paragraph says total number
10 of voters who use the ballot by mail tracker to correct
11 defective carrier envelope and had their mail ballot
12 accepted or cancelled --  withdraw that.
13      Total number of voters who use the ballot
14 by mail tracker to correct a defective carrier envelope
15 and had their mail ballot accepted or cancel their mail
16 ballot voted in person: 1,496.
17      Do you see where I am?
18      A.    I do.
19      Q.    I may know the answer to this, but similar
20 question as before, does the Secretary of State
21 maintain data that could separately show the number of
22 voters who used the tracker to correct a carrier
23 envelope and separately the number of voters who
24 cancelled?
25      A.    I think we could get there.

Page 21

1      Q.    How would you get there?
2      A.    With a separate query for people who using
3 this universe of numbers at 1531, if we still have that
4 list, and using it to who voted to decide to check who
5 voted in person.
6      Q.    Is it Ms. Hart who would know how to do
7 that as well?
8      A.    Well, she would know if there is a query
9 they could get that info.
10      Q.    Is it correct that similar to an ABBM, the
11 tracker cannot be used to cancel a mail ballot request?
12      A.    That's correct.
13      Q.    What was the overall statewide rejection
14 rate of ABBM for the November 22 general election?
15      MS. HUNKER:  Objection, form.
16 BY THE WITNESS:
17      A.    I don't know.
18 BY MR. STEWART:
19      Q.    Do you know if there was somewhere we could
20 find that information?
21      A.    We can check and see what TEAM says, but
22 it's not accurate.
23      Q.    Why is it inaccurate?
24      A.    Because not all of the counties entered the
25 information.



Keith Ingram

March 28, 2023
Pages 34 to 37

Page 34

1 one voter a certain way they have got to treat all
2 voters similarly situated the same way.
3     Q.   Did the Secretary of State's Office issue,
4 leaving aside those responses to those questions, any
5 new guidance regarding the ID number requirements after
6 the primary runoff?
7     A.   No.
8     Q.   Nothing about the implementation should
9 have changed following the primary runoff, correct?
10     A.   I don't believe so. I mean we sent
11 reminders about that implementation, we had seminar
12 presentations about that implementation. We sent, you
13 know, materials that they could print and distribute to
14 voters about that implementation, but the guidance
15 itself didn't change after that.
16     Q.   Did any county request to modify a form
17 used to implement the ID number requirement following
18 the primary runoff?
19     A.   We had some requests for different sizes
20 and shapes and orientations of the carry envelope. I
21 believe all of those were before the runoff.
22     Q.   Anything that would have changed the
23 substance of either the carrier envelope or the ABBM
24 form?
25     A.   No.

Page 35

1     Q.   Anything that would have changed the
2 substance of any of the instruction forms that the SOS
3 prepares?
4     A.   No.
5     MR. STEWART: I think this is SOS 4.
6           (WHEREUPON, a certain document was
7            marked Deposition Exhibit No. 4,
8            for identification, as of 3/28/23.)
9 BY MR. STEWART:
10     Q.   You should have document SOS 4, state
11 122242. I will give you a second to read that. That's
12 the double-sided. Let me know when you have had a
13 chance to read it. Are you good?
14     A.   Yes.
15     Q.   This appears to be an email from a voter to
16 Secretary of State's Office, correct?
17     A.   I agree with that.
18     Q.   The voter identifies, would you agree with
19 the characterization, that they say the Tarrant County
20 election office said the numbers in the voter
21 registration database, I take that to mean their ID
22 numbers were transposed.
23     A.   That's what she says that her Social
24 Security number was entered incorrectly when she
25 originally registered back in 1980.

Page 36

1     Q.   She says that Tarrant's reply was that the
2 voter had to come to their office to fix the issue,
3 correct?
4     A.   That's what she says.
5     Q.   Would advice be correct, to the best of
6 your knowledge?
7     A.   Well, it kind of depends what issue they
8 were telling her that she needed to correct. If she
9 needed to correct the number in the voter registration
10 record obviously she could do that with a voter
11 registration application and she doesn't need to come
12 in person. If she's trying to fix the problem with the
13 application for ballot by mail then probably she needs
14 to show up in person or fill out a new application with
15 the transposed digits.
16     Q.   I see. So if the problem were with the
17 ABBM, would she be able to correct that in the portal?
18     A.   If the problem was that the original number
19 was transposed, the only way to fix it in the portal
20 was to create the transposed numbers are correct.
21     Q.   The portal can't be used to change what's
22 in TEAM, it only be used to change what's on the ABBM?
23     A.   That's correct.
24     Q.   So how would she fix the issue -- if it is
25 correct that the issue in TEAM, what ways could she be

Page 37

1 directed to fix that?
2     A.   I think the only way you can fix that to
3 fill out a new voter registration application with the
4 correct number.
5     Q.   So if TEAM then is the source of
6 transposition, it would be correct from Tarrant that
7 she would need to go into the office to correct that?
8     MS. HUNKER: Objection, form.
9 BY THE WITNESS:
10     A.   You don't need to fill out a voter
11 registration application in person.
12 BY MR. STEWART:
13     Q.   That's something she also could have done
14 remotely, correct?
15     A.   That's correct.
16     Q.   If it's correct in fact that the numbers
17 are transposed in TEAM, she would not be able to enter
18 the portal entering the correct number, right?
19     A.   That's correct. She would have to enter
20 the transposed number and agree it's the correct number
21 for her mail ballot application to be accepted.
22     Q.   Got it. I want to turn to -- I think last
23 year when we spoke we discussed the HB2512 process; do
24 you recall?
25     A.   I do.



Keith Ingram

March 28, 2023
Pages 38 to 41

Page 38

1    Q.    That's the process for present purposes by
2  which driver's license, ID number or SSN data is
3  imported from DPS database into team, correct?
4    A.    That's correct.
5    Q.    Was the HB2512 process run at any point in
6  2022 following the primary election?
7    A.    No.
8    Q.    Was it --
9    A.    It was in December.
10    Q.    In December following the general election?
11    A.    Not before the general.
12    Q.    Not before the general, but in 2022
13  following -- let me withdraw that.  It was not run
14  between the primary and the general, correct?
15    A.    That's correct.
16    Q.    It was run following the general before the
17  end of the year?
18    A.    I agree.
19    Q.    Has it been run again since then?
20    A.    No, sir.
21    Q.    Is that a regular annual process is that
22  why it was run in December?
23    A.    It has historically been run in December,
24  not every December, but obviously the last two.
25    Q.    I'm going to hand you what will be SOS 5.  I

Page 39

1  will state I don't know why this document presented
2  without a Bates number.  You Bates number on it.  It is
3  state 137751.  Just to put that on the record.
4                (WHEREUPON, a certain document was
5              marked Deposition Exhibit No. 5,
6              for identification, as of 3/28/23.)
7    MS. HUNKER:  Thank you.
8  BY MR. STEWART:
9    Q.    Do you recognize this document, Mr. Ingram?
10    A.    I do.
11    Q.    What is this?
12    A.    This is the result of the comparison
13  process from December of '22.
14    Q.    That's the same HB2512 process we were just
15  discussing?
16    A.    That's correct.
17    Q.    So the initial numbers, would they reflect
18  the state of the database following the 2021 process?
19    A.    Plus whatever changes were made in the
20  course of the 2022.
21    Q.    So they wouldn't reflect any changes from a
22  systemic process, but they could represent -- reflect
23  what I will call ad hoc changes to individual records?
24    MS. HUNKER:  Objection, form.
25  BY THE WITNESS:

Page 40

1    A.    That's correct.  If an individual went to
2  DPS to renew driver's license and supplied a new number
3  or changed a number, it would be reflected in this.
4  BY MR. STEWART:
5    Q.    And then the post numbers reflect the state
6  of the database following the HB2512 process in
7  December of 2022, correct?
8    A.    Agree with that.
9    Q.    Looking at these numbers.  There would be
10  some organic change in these numbers without the HP2512
11  process perhaps not to this degree, but they wouldn't
12  look the same as the 2021 numbers, correct?
13    A.    Agree with that.
14    Q.    Would you agree that though the HP2512
15  process did change these numbers to some extent?
16    A.    Yes.
17    Q.    Do you think the majority of this change is
18  due to HP2512?
19    MS. HUNKER:  Objection, form.
20  BY THE WITNESS:
21    A.    When you say this change what do you mean?
22  BY MR. STEWART:
23    Q.    From the initial numbers on the left to the
24  post numbers on the right, each of which decreased.
25  For each of those categories, would you say the

Page 41

1  majority of the decrease is attributable to the HP2512
2  process?
3    A.    I would say the changes exclusively related
4  to 2512 process.
5    Q.    Why do you think additional numbers were
6  caught in the 2022 process that were not caught in the
7  2021 process?
8    A.    Because database is not the same.
9    Q.    You are saying some individuals may have,
10  for example, added an SSN or a driver's license to the
11  DPS database during the year 2022 before this was run
12  that are then pulled into the team database?
13    A.    No.  I mean that could happen.  But more
14  likely is the information in the TEAM database changed
15  so our matching was more efficient.
16    Q.    I see.  So do you think it was mostly
17  attributable to improvement in matching on these
18  records?
19    A.    Not -- the matching criteria didn't change.
20  So the data that we use improves and the matching gets
21  better.  So if a voter supplied one or the other of the
22  numbers then it's easier to pull in the other number.
23    Q.    You anticipated my next question.  The
24  matching criteria was the same in the 2022 process as
25  in the 2021 process?

Page 42

1   A.   Yes.
2   Q.   Would there have been any new registrants
3 who were able to register with only one of the driver's
4 license or SSN numbers?
5   A.   One of those numbers is the only thing
6 that's required so definitely we could have had new
7 registrants who registered with one number or the
8 other, and we were able to get the other number for
9 that voter pulled in through that process.
10   Q.   Just so it's clear in my mind, this would
11 have -- the change in these numbers from initial to
12 post would capture 2021 first time registrants who
13 registered with one number, and then had the other
14 number pulled in through this HP2512 process?
15   A.   I agree with that. I think you meant to
16 say '22 in that question.
17   Q.   I appreciate that correction.
18       Looking at these individual categories,
19 looking at the third category, number of active and
20 suspense, I'm going from top to bottom, the third
21 category number of active and suspense voters that have
22 neither a TDL or SSN on their voter record, no value
23 for both fields. So those are the individuals in TEAM
24 who did not have either the TDL or the -- any portion
25 of an SSN, correct?

Page 43

1   A.   Agree with that.
2   Q.   That number moved by less than 2,000,
3 correct?
4   A.   It looks like about 1,300 maybe.
5   Q.   Why do you think the movement in that was
6 smaller than in the other categories?
7   A.   Because it's the hardest category to do
8 anything with.
9   Q.   Have you discussed any way to capture more,
10 improve the HP2512 process for that category of voters
11 in the future?
12   A.   No.
13   Q.   Just a couple quick questions. After the
14 HP2512 process is run, how are those changes filtered
15 out to off-line counties?
16   A.   They are supposed to sync their data with
17 ours on a monthly basis.
18   Q.   That occurs monthly?
19   A.   It does or it's supposed to.
20   Q.   Is that a two-way sync? So, for example,
21 if something gets changed in the county's off-line
22 database more recently than the information in TEAM,
23 should that be then filtering into TEAM as well?
24   A.   So there is two different things that you
25 might be confusing here. Any changes in voter

Page 44

1 registration record that the county gets from the voter
2 is supposed to be reported nightly. So that's what we
3 call our batch process. That's not the same as syncing
4 the data. Syncing the data means we want to make sure
5 everything we have got in our system is captured in
6 off-line system so the databases are identical, right.
7 So the goal is to have zero differences in the sync
8 file. This kind of change in the SOS file is what we
9 are trying to sync to the voters. Then of course there
10 are other kinds of changes the county makes with regard
11 to pre-syncing in particular that aren't reflected in
12 an individual voter change that we would get in a batch
13 process. We want to sync those up as well. So those
14 are the two things that we are syncing is making sure
15 that everything from our database is in theirs and
16 making sure all of their precinct lines they may have
17 re-drawn are in ours.
18   Q.   Taking those two processes separately
19 because I assume -- do those processes run at the same
20 time?
21   A.   Yes.
22   Q.   They do?
23   A.   The sync is simultaneous.
24   Q.   So the sync is referring to information
25 from TEAM filtering down to the counties?

Page 45

1   A.   That's right.
2   Q.   That occurs monthly?
3   A.   It's supposed to occur monthly. We have to
4 do it much less often. With this change in law it
5 became expedient to do it more often.
6   Q.   All new registrations are entered by the
7 county into their databases, correct?
8   A.   That's right, many changes to registration
9 is entered.
10   Q.   Those changes are coming upward to TEAM
11 daily?
12   A.   That's right.
13   Q.   Then new information from HP2512 is going
14 from TEAM to the counties monthly?
15   A.   Well, we sync the database monthly. The
16 new information from 2512 is obviously an annual thing.
17   Q.   I see. It would be part of that monthly
18 sync process?
19   A.   It would.
20   Q.   Information entered into the texas.gov
21 portal that gets pulled over, where does that go first?
22   A.   To TEAM.
23   Q.   That will to the counties as part of the
24 monthly process?
25   A.   That's right.



Keith Ingram

March 28, 2023
Pages 46 to 49

Page 46

1      Q.    If there is any difference in the county
2  and state databases, would those likely be due to a lag
3  in time between basically the monthly process
4  occurring?
5      MS. HUNKER:  Objection, form.
6  BY THE WITNESS:
7      A.    That's right, or they haven't resolved
8  everything that was a difference in the last sync file.
9  BY MR. STEWART:
10     Q.    What does it mean to resolve it?
11     A.    To choose one or the other.
12     Q.    When something comes down from the sync
13 file from TEAM to the county, the county needs to
14 resolve each of those in their own database?
15     A.    That's correct.
16     Q.    If there is an import from Texas.gov, those
17 cannot be used by the county in the cure process until
18 the next sync occurs; is that correct?
19     A.    No, they can use TEAM.  They are -- all
20 have access to TEAM and we told them to use tell.
21     Q.    They wouldn't be reflected in the county,
22 but the instruction from the SOS is to also look in the
23 TEAM database?
24     A.    That's right.
25     Q.    Do you know if all counties follow that

Page 47

1  instruction?
2      A.    I don't know that for sure.  I'm pretty
3  sure Bexar County didn't.  Jackie does what Jackie
4  does.
5      Q.    Any others you think may not have?
6      A.    No, I'm pretty sure they mostly did.
7      Q.    Are you aware of any counties -- withdraw
8  that.  Good news is I'm shortening my questions here.
9            Did any county report -- rephrase that.
10           Did any off-line counties report to the SOS
11 their vendors having issues with information keeping
12 for mail ballots for the general election?
13     A.    Not for the general.
14     Q.    For the primary?
15     A.    Yes.
16     Q.    Which counties were those if you recall?
17     A.    The VOTEC counties.
18     MR. STEWART:  Could we take a short break.
19           (WHEREUPON, a recess was had.)
20 BY MR. STEWART:
21     Q.    I'm going to show you, Mr. Ingram, the next
22 document if I can find it.
23     MR. STEWART:  I believe we are at SOS 6.  It's
24 Bates stamped 123228.
25           (WHEREUPON, a certain document was

Page 48

1            marked SOS Exhibit No. 6, for
2            identification, as of 3/28/23.)
3  BY MR. STEWART:
4      Q.    Give you a second to read, Mr. Ingram.
5      A.    Okay.
6      Q.    This is a mass email from the Secretary of
7  State's Office to county election officials?
8      A.    That's correct.
9      Q.    That's with instructions on finalizing
10 election reporting for the March 1 primary, correct?
11     A.    That's correct.
12     Q.    I want to focus on the section that
13 bulleted incomplete or missing TDL/SSN/on-line cure
14 available.  I'm going to look at the last paragraph
15 there to make sure I understand what it's saying.  Are
16 these directions on how ABBM information should be
17 entered into TEAM?
18     A.    Yes.
19     Q.    It says, "For ballots marked incomplete or
20 missing TDL/SSN on-line cure available following the
21 deadline for correction the ABBM records will need to
22 be updated to received after deadline.  Off-line
23 counties will need to submit status update for these
24 records.  Please verify correct coding for these
25 statuses with your vendors."

Page 49

1            Did I read that right?
2      A.    You did.
3      Q.    Does this mean that in TEAM no ABBM would
4  ultimately be identified as incomplete or missing
5  TDL/SSN on-line cure available once the cure deadline
6  has passed?
7      A.    That's what it looks like.  I'm not sure
8  why it says for ballots marked and then talks about
9  ABBMs.
10     Q.    So you are saying there's a mismatch there
11 between describing ballots on the one hand and ABBM on
12 the other?
13     A.    Agreed.
14     Q.    Would these instructions effect ballot
15 recordkeeping?
16     A.    Well, they reflect final status.
17     Q.    The final status of ABBMs?
18     A.    Exactly.
19     Q.    Would any -- I'm sorry.
20     A.    It's got the same discrepancy in the first
21 paragraph.  Not sure.
22     Q.    What I'm trying to understand is would you
23 be able to tell using TEAM then whether any ABBM was
24 rejected for incomplete or missing TDL/SSN on-line cure
25 available after the cure deadline has passed using the



Keith Ingram                                               March 28, 2023
                                                           Pages 82 to 85

Page 82

1     MS. HUNKER:  Objection, form.
2  BY THE WITNESS:
3     A.     The absolute number probably has increased,
4  but the percentage has probably gone down.
5  BY MS. PERALES:
6     Q.     Understood.  Do you keep track of number of
7  referrals you make to law enforcement?
8     A.     Yes.
9     Q.     With respect to section 2.11.
10    A.     Yes.
11    Q.     This is also related to persons excused
12  from jury duty for non-residence in the county.  And it
13  adds a requirement for the clerk to report not only to
14  the voter registrar, but also to the Secretary of
15  State.  So in some ways it's connected to that previous
16  provision that we looked at together.  And is your
17  testimony the same then that with respect to section
18  2.11 you, the Secretary of State, have not received any
19  referrals or lists from county jury clerks?
20    A.     That's correct of people who have been
21  excused because of non-residence in the county.
22    Q.     Thank you.  Section 3.04 on page 14.  I feel
23  bad for massacring some of my descriptions of these
24  provisions.  But this is basically a requirement that
25  polling places be located inside a building, and

Page 83

1  essentially a prohibition on what people might call
2  drive-thru voting; is that right?
3     MS. HUNKER:  Objection, form.
4  BY THE WITNESS:
5     A.     I agree it's a prohibition on generalized
6  drive-thru voting and says that only people who qualify
7  for curbside voting can vote from a car.
8  BY MS. PERALES:
9     Q.     I accept your distinction between curbside
10  voting and drive-thru --
11    A.     Right.
12    Q.     -- voting.
13            Since the primary runoff election in 2022,
14  have you -- has your office received any expressions of
15  concern or opposition to the elimination of drive-thru
16  voting?
17    A.     Not that I'm aware of, no, ma'am, from
18  either the public or counties?
19    Q.     For you -- sorry?
20    A.     From either the public or counties.
21    Q.     Okay.
22            Did you have any communications from the
23  Secretary of State with, for example, the Office of
24  Attorney General that's separate and apart from
25  attorney-client stuff related to this litigation

Page 84

1  related to the prohibition on drive-thru voting?
2     A.     No.
3     MS. HUNKER:  I'm going to remind my client to
4  give me a second to object.
5  BY MS. PERALES:
6     Q.     We had talked earlier about a provision of
7  SB 1 that was given an effective date of 2026 that you
8  had some concerns might be problematic to carry out.
9  And so I wanted to ask you a similar question with
10  respect to section 3.04.  Since May of 2022, which
11  takes us into the March of 2023, have you had
12  conversations with legislators or legislative staff
13  about making changes to SB 1 other than that provision
14  that we were talking about that has an effective date
15  of 2026?
16    MS. HUNKER:  Objection, form.
17  BY THE WITNESS:
18    A.     Yes.
19  BY MS. PERALES:
20    Q.     Can you describe those?
21    A.     Yes.  Well, what we have talked about is the
22  corrective action procedure needs a little bit of
23  tweaking for better implementation, smoother
24  implementation, more uniform implementation.  The main
25  change would be to stop the possibility of sending the

Page 85

1  ballot back to the voter instead of just sending a
2  corrective action form and having them mail it back.
3            The second thing is standardizing the cure
4  period so that it is not the case that some people have
5  until 7:00 p.m. on election day and other people have
6  six days after election day.  Have everybody have the
7  same cure period.  Then to allow the ballot boards more
8  time on the front end to start meeting earlier so that
9  they get notice to the voters sooner.
10    Q.     Do you think that with respect to item
11  number one, the cure procedure, do you think that if
12  the ballot board is able to retain custody of the
13  ballot and send the cure form, do you think that will
14  result in more ballots being cured?
15    A.     Yes, fewer ballots being lost in the mail.
16    Q.     Why would it result in more ballots being
17  cured?
18    A.     Because the opportunity to mail back the
19  correction form instead of having to deliver it in
20  person makes it more available.
21    Q.     Is that because a voter is more likely to
22  mail back the cure form than they are to physically
23  travel to the election administrator's office to
24  personally drop off the ballot?
25    MS. HUNKER:  Objection, form.



Keith Ingram

Page 86

BY THE WITNESS:

1   A.   I mean we don't know.  I mean some voters
2   can drive it in as easily as they can mail it, but
3   there is a reason why people vote by mail.  Generally
4   it's because they are not as mobile.  So to increase
5   the odds of them curing we need to have a mail back
6   form.
7   BY MS. PERALES:
8       Q.   Texas vote by mail eligibility involves
9   being for the most part either over age 65 or
10  physically disabled, is that correct -- or disabled in
11  some way?
12      A.   Agreed.
13      Q.   So you had listed basically four things,
14  the 2026 effective date provision, and then the three
15  things you just talked to me about now.  Have you had
16  any discussions with members of the legislator or
17  legislative staff about amending any of the provisions
18  in SB 1 that are the subject of this lawsuit?
19      A.   No.
20      Q.   So then I won't have to ask it for each
21  individual provision.
22          Let's look at --
23      A.   Oh, we did talk to one senator's office
24  about possible changes to poll watchers.

**Page 86**

1   BY THE WITNESS:
2       A.   I mean we don't know.  I mean some voters
3   can drive it in as easily as they can mail it, but
4   there is a reason why people vote by mail.  Generally
5   it's because they are not as mobile.  So to increase
6   the odds of them curing we need to have a mail back
7   form.
8   BY MS. PERALES:
9       Q.   Texas vote by mail eligibility involves
10  being for the most part either over age 65 or
11  physically disabled, is that correct -- or disabled in
12  some way?
13      A.   Agreed.
14      Q.   So you had listed basically four things,
15  the 2026 effective date provision, and then the three
16  things you just talked to me about now.  Have you had
17  any discussions with members of the legislator or
18  legislative staff about amending any of the provisions
19  in SB 1 that are the subject of this lawsuit?
20      A.   No.
21      Q.   So then I won't have to ask it for each
22  individual provision.
23          Let's look at --
24      A.   Oh, we did talk to one senator's office
25  about possible changes to poll watchers.

**Page 87**

1       Q.   Which senator's office was that?
2       A.   Royce West.
3       Q.   Now I will take a deep breath and I will
4   put my question on the record.  My question is what
5   communications if you could describe the substance of
6   the communication with Senator West's office regarding
7   making changes to SB 1's provisions related to poll
8   watchers?
9           MS. HUNKER:  I object on legislative privilege
10  grounds.  I represent Senator West for the purposes of
11  protecting his privilege today.  On behalf of Senator
12  West I object to that on the basis of legislative
13  privilege.  It's wholly inappropriate for this question
14  to be asked at all given the pending appeals to which
15  we are all a party.  We vehemently disagree with the
16  district court's decision to permit this kind of
17  questioning while we await a decision from the Fifth
18  Circuit.  Nonetheless the district court has wrongly
19  made clear that attorneys who raise these objections
20  face the possibility of contempt.  We have a duty to
21  our clients to protect their privileged information.
22  Because of the district court's orders and threat we
23  cannot instruct the witness not to answer this
24  question.  However, the State Defendants and Senator
25  West reserve all rights to challenge this improper

**Page 88**

1   questioning including sealing this portion of the
2   transcript, preventing its further disclosure or use at
3   trial, appealing or seeking any emergency relief from
4   the Fifth Circuit, and any other relief allowed by law.
5   We further designate this testimony as confidential
6   under the protected order in this matter.
7   BY THE WITNESS:
8       A.   So what we talked to him about was the
9   incident in Dallas County where the poll watcher had a
10  certificate that -- of appointment and had a
11  certificate that they had been trained, but they didn't
12  have to show an ID they were the same person on those
13  certificates.  So he wondered if maybe an ID
14  requirement for poll watchers should be added to the
15  code.  And we told him that was his choice.  But, you
16  know, that's an incident that we had with a poll
17  watcher that blew up into a confrontation that probably
18  didn't need to happen.
19  BY MS. PERALES:
20      Q.   Do you know where the precinct was located
21  in Dallas County?
22      A.   I don't.
23      Q.   Do you know if the poll worker and the poll
24  watcher were of different races?
25      A.   I don't know.

**Page 89**

1           MS. HUNKER:  Objection, form.
2   BY MS. PERALES:
3       Q.   When you say that you told Senator West
4   that it was ultimately up to him whether he wanted to
5   propose such a change, did you make a recommendation
6   either way?
7           MS. HUNKER:  I'm going to object on legislative
8   privilege grounds.
9   BY THE WITNESS:
10      A.   No.
11          MS. PERALES:  I will give you your fully
12  expressed objection.
13          MS. HUNKER:  Thank you.
14          THE WITNESS:  Sorry.
15  BY THE WITNESS:
16      A.   No.
17  BY MS. PERALES:
18      Q.   So having recalled that discussion with
19  Senator West related to poll watchers, do you recall
20  having any discussions with any other members of the
21  legislator or legislative staff about changing any of
22  the language in SB 1 related to poll watchers?  Anybody
23  else besides Senator West?
24      A.   No, that was -- that would be the only one.
25      Q.   Then so just to see if I can jog your



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
|     *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
|     *Defendants.* | § | |

STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT

# APPENDIX P

Transcript of the Testimony of

**Isabel Longoria**


**Date:**

April 20, 2022


**Case:**

LA UNION DEL PUEBLO ENTERO V. GREGORY W. ABBOTT

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 WESTERN DISTRICT OF TEXAS

 3                   SAN ANTONIO DIVISION

 4

 5   * * * * * * * * * * * * * * * * * * * * * * * * * *

 6   LA UNION DEL PUEBLO ENTERO, et al *

 7   v.                         *      CASE NO. 5:21-cv-844-XR

 8   GREGORY W. ABBOTT, et al       *

 9   * * * * * * * * * * * * * * * * * * * * * * * * * *

10   OCA-GREATER HOUSTON, et al       *

11   v.                         *      CASE NO. 1:21-cv-780-XR

12   JOHN SCOTT, et al             *

13   * * * * * * * * * * * * * * * * * * * * * * * * * *

14   HOUSTON JUSTICE, et al         *

15   v.                         *      CASE NO. 5:21-cv-848-XR

16   GREGORY WAYNE ABBOTT, et al     *

17   * * * * * * * * * * * * * * * * * * * * * * * * * *

18   LULAC TEXAS, et al             *

19   v.                         *      CASE NO. 1:21-cv-0786-XR

20   JOHN SCOTT, et al             *

21   * * * * * * * * * * * * * * * * * * * * * * * * * *

22   MI FAMILIA VOTA, et al         *

23   v.                         *      CASE NO. 5:21-cv-0920-XR

24   GREG ABBOTT, et al             *

25   * * * * * * * * * * * * * * * * * * * * * * * * * *
```

Isabel Longoria                                              April 20, 2022
                                                              Pages 2 to 5

Page 2
1  UNITED STATES OF AMERICA        *
2  v.                              *    CASE NO. 5:21-cv-1085-XR
3  THE STATE OF TEXAS, et al       *
4  * * * * * * * * * * * * * * * * * * * * * * * * * * *
5
6              ORAL AND VIDEOTAPED DEPOSITION OF
7                      ISABEL LONGORIA
8                      APRIL 20, 2022
9                       VOLUME 1 OF 1
10
11          Oral and videotaped deposition of Isabel Longoria,
12  produced as a witness at the instance of the defense, and duly
13  sworn, was taken in the above-styled and numbered cause on April
14  20, 2022, from 9:24 a.m. to 2:32 p.m., before Terrie Doyle
15  Escobar, CSR in and for the State of Texas, reported by oral
16  stenography, at the Office of the Texas Attorney General,
17  Consumer Protection Division, Houston Regional Office, 808 Travis
18  Street, Suite 1520, Houston, Texas  77002, pursuant to Rule 30 of
19  the Federal Rules of Civil Procedure.
20
21
22
23
24
25

Page 3
1                   A P P E A R A N C E S
2
3  FOR THE HAUL PLAINTIFFS:
4       MR. KENNETH E. BROUGHTON
5       REED SMITH, LLP
6       811 MAIN STREET, SUITE 1700
7       HOUSTON, TEXAS  77002
8       PHONE: 713-806-8434
9       EMAIL: kbroughton@reedsmith.com
10
11  FOR STATE DEFENDANTS:
12       MR. WILLIAM T. THOMPSON
13       OFFICE OF THE ATTORNEY GENERAL
14       DEPUTY CHIEF, SPECIAL LITIGATION UNIT
15       POST OFFICE BOX 12548
16       AUSTIN, TEXAS  78711
17       PHONE: 512-936-2567
18       EMAIL: will.thompson@oag.texas.gov
19
20  FOR DEFENDANT ISABEL LONGORIA:
21       MS. CHRISTINA BEELER
22       MR. JONATHAN FOMBONNE
23       OFFICE OF THE HARRIS COUNTY ATTORNEY
24       1019 CONGRESS PLAZA, 15TH FLOOR
25       HOUSTON, TEXAS  77002

Page 4
1       PHONE: 713-274-5101
2       EMAIL: Jonathan.Fombonne@cao.hctx.net
3
4  FOR DEFENDANT YVONNE RAMON:
5       MS. JOSEPHINE RAMIREZ SOLIS (Present via Zoom)
6       OFFICE OF CRIMINAL DISTRICT ATTORNEY - HIDALGO COUNTY, TEXAS
7       CHIEF, CIVIL DIVISION
8       100 E. CANO
9       EDINBURG, TEXAS  78539
10      PHONE: 956-292-7609
11      EMAIL: josephine.ramirez@da.co.hidalgo.tx.us
12
13  FOR PLAINTIFFS LULAC TEXAS and VOTO LATINO:
14      MR. MIKE JONES (Present via Zoom)
15      ELIAS LAW GROUP, LLP
16      10 G ST. NE, STE. 600
17      WASHINGTON, D.C.  20002
18      PHONE: 202-985-1752
19      EMAIL: mjones@elias.law
20
21  FOR PLAINTIFF UNITED STATES OF AMERICA:
22      MS. L. BRADY BENDER (Present via Zoom)
23      UNITED STATES DEPARTMENT OF JUSTICE
24      CIVIL RIGHTS DIVISION, VOTING SECTION
25      950 PENNSYLVANIA AVENUE NW

Page 5
1       4CON 8TH FLOOR
2       WASHINGTON, DC  20530
3       PHONE: 202-353-5373
4       EMAIL: laura.bender@usdoj.gov
5
6  ALSO PRESENT:
7       MR. TERRY HARRISON, VIDEOGRAPHER
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Isabel Longoria                                          April 20, 2022
                                                    Pages 142 to 145

---

Page 142

1  voters or were registered voters, perhaps, at the time they
2  applied, but for whatever reason, their voter registration lapsed
3  or, you know, for example, provisional voters weren't able to
4  then cure whatever provisional defect there was, so, ultimately,
5  they were unable to vote by mail.
6       Q.  Are you aware of instances in which someone has tried
7  to vote by mail but pretending to be somebody else?
8       A.  Not to my knowledge, no.
9       Q.  Before SB1 took effect, what information would someone
10  need to apply for a ballot by mail?
11      A.  Someone would need to submit an application to vote by
12  mail that contains their name, residential address, mailing
13  address -- name, address -- the reason for their qualification to
14  vote by mail -- for example, being in the military, disabled, or
15  over the age of 65 -- they had to sign the form essentially
16  saying, you know, I swear I am who I say I am, and then
17  submitting the election that they needed a ballot for.  I think
18  those are the general categories on there.
19      Q.  Right.  And so the kind of identifying information on
20  there would be the name and address; right?
21      A.  Yes.
22      Q.  Are voters' names and addresses publicly available in
23  Harris County?
24      A.  Yes.
25      Q.  They're available through the voter file, for example;

---

Page 143

1  right?
2       A.  Yes.
3       Q.  And your office will give out copies of the voter file
4  when requested; right?
5       A.  If the request is eligible for such information, yes.
6       Q.  Are political parties eligible to request the voter
7  file?
8       A.  Yes.
9       Q.  Who else is eligible to request the voter file?
10      A.  As I believe, if I understand correctly or remember
11  correctly, any eligible citizen is able to, you know, public
12  information request, request a copy of the voter file.  And I
13  believe you may even be able to download it from our website.  I
14  just can't remember if it's the voter file or the vote record for
15  any given election.
16      Q.  And for publicly available records, one could determine
17  whether another individual is registered to vote; right?
18      A.  Yes.
19      Q.  And one could determine whether someone who is
20  registered to vote has in fact voted in recent elections; right?
21      A.  If you got the vote history file, yes.
22      Q.  And that's publicly available?
23      A.  Yes.
24      Q.  So based on publicly available information, someone
25  could submit before SB1 an application to vote by mail with

---

Page 144

1  another registered voter's name and address; right?
2       A.  Their name and address?  Yes.
3       Q.  And, you know, if they wanted to be clever, they could
4  even do it for someone who's registered to vote but who has a
5  practice of not voting in recent elections; right?
6            MR. FOMBONNE:  Objection to form.
7  (BY MR. THOMPSON:)
8       A.  To the extent that they would have access to that kind
9  of information to determine that, yes.
10      Q.  Right.  So if someone got access to the publicly
11  available information from Harris County, he'd be able to submit
12  all the information required to request a ballot by mail on
13  someone else's behalf and do so in a way that targets people who
14  are registered to vote but who have not, in fact, voted recently;
15  right?
16      A.  No.  No.
17      Q.  Why?
18      A.  The voter file would not contain information about a
19  voter's age, and, so, if -- again, I can't 100 percent remember,
20  but I'm trying to remember -- if you -- if you need -- to the
21  extent you need to include your date of birth on the application,
22  an individual would have to find that date of birth not through
23  the voter file or some other means, in addition to which you
24  would still have to fill out the reason for which you could apply
25  to vote by mail, which would not be found in a voter file.

---

Page 145

1       Q.  Of course, the reason to vote by mail could just be a
2  lie; right?
3       A.  Uh, any -- sure.
4       Q.  It's not something you verify; right?
5       A.  Our office couldn't determine what is a lie or not a
6  lie, but, yes, a -- you know, an individual could fill out a
7  form.
8       Q.  If someone submits an application to vote by mail and
9  the reason given for voting by mail is that he expects to be out
10  of the county when in-person voting is happening, you wouldn't
11  have any way of verifying or not verifying that information;
12  right?
13      A.  Correct.
14      Q.  Are you aware that on an application to vote by mail
15  providing a date of birth is optional?
16      A.  I did not remember, but --
17            MR. FOMBONNE:  Objection to form.
18  (BY MR. THOMPSON:)
19      Q.  Do you have any reason to disagree with that?
20      A.  No.
21      Q.  So if a person wanted to submit an application to vote
22  by mail using someone else's information, he could gather the
23  required personal information from publicly available sources;
24  right?
25      A.  Yes.

---

Isabel Longoria

April 20, 2022
Pages 146 to 149

Page 146

1    Q.   At least, before SB1; right?
2    A.   Yes.
3    Q.   But with SB1, the application to vote by mail is
4  supposed to include some ID numbers; right?
5    A.   Yes.
6    Q.   And what are those numbers?
7    A.   The last four digits of your Social Security number,
8  your driver's license number; absent of either of those, a Texas
9  election ID number or a statement certifying that you have access
10  to neither of those documents -- or not access, but you don't
11  have either a Social Security, driver's license, or election ID
12  number.
13    Q.   To the best of your knowledge, are driver's license
14  numbers publicly available?
15    A.   No.
16    Q.   To the best of your knowledge, are Social Security
17  numbers publicly available?
18    A.   No.
19    Q.   To the best of your knowledge, are the last four digits
20  of a Social Security number publicly available?
21    A.   No.
22    Q.   So would it be fair to say that SB1, by imposing an ID
23  number requirement on an application to vote by mail, now
24  requires information that is not publicly available?
25    A.   Yes.

Page 147

1    Q.   And that's change from the pre-SB1 law; right?
2    A.   Yes.
3    Q.   Do people in Harris County ever express concerns about
4  election integrity to you?
5    A.   Yes.
6    Q.   Can you tell me about those.
7    A.   Broadly, calls -- again, calls that might come into the
8  office in broad buckets expressing voters who are worried
9  Russians are hacking elections in Harris County, are worried
10  that, you know, broadly, they hear claims of national election
11  stories and worried that somehow Harris County is also, you know,
12  prone or could be a victim of hacking or other issues related to
13  elections.
14    Q.   So are all of the concerns about election integrity
15  that you receive related to hacking?
16    A.   Hacking?  Yes, and, you know, can the machines be
17  hacked, are the machines connected to the internet, are the
18  machines faxing my vote to the Russians, broadly based conspiracy
19  or -- or hacking questions.
20    Q.   Do you ever receive calls expressing concerns about
21  election integrity related to ballot harvesting, for example?
22    A.   Ballot harvesting?  No.  Again, only related to
23  complaints of voters sharing that they prefer not to put their ID
24  numbers in mail as they have worries about identity theft, if
25  they include, you know, sensitive information that is then put in

Page 148

1  the mail.
2    Q.   When voters call to express concerns about election
3  integrity to your office, do you know whether they are sincere?
4         MR. FOMBONNE:  Objection to form.
5  (BY MR. THOMPSON:)
6    A.   To the extent that anyone -- that we assume anyone who
7  calls our office has a valid concern, and so we share the
8  information we can with them to alleviate any concerns they might
9  have.
10    Q.   That's not quite what I was asking.  Let me try again.
11    A.   Sure.
12    Q.   You've spoken on the phone with people who are
13  expressing concerns about election integrity; right?
14    A.   I have not; the call center that we run as part of the
15  office has.
16    Q.   So people in your call center have spoken on the phone
17  with Harris County residents who are expressing concern about
18  election integrity; right?
19    A.   Yes.
20    Q.   Do the people in this call center ever tell you whether
21  they think the callers are expressing sincere concerns?
22         MR. FOMBONNE:  Objection to form.
23  (BY MR. THOMPSON:)
24    A.   Yes, as in the voters are sincerely expressing those
25  concerns.

Page 149

1    Q.   The voters may be saying something that's inaccurate;
2  right?
3    A.   Yes.
4    Q.   But they honestly believe it when they say it; right?
5    A.   Yes.
6    Q.   And your office tries to alleviate those concerns?
7    A.   Yes.
8    Q.   Why?
9    A.   If voters have concerns about voting, whether or not be
10  about election integrity or anything else, it's our duty to make
11  sure that we give voters the most accurate information we have to
12  help them feel, you know, good and taken care of, just in general
13  customer service and constituent responses.
14    Q.   Do you think it's important for voters to believe that
15  the system is secure?
16    A.   Yes.
17    Q.   What is the purpose of having poll watchers in Harris
18  County elections?
19    A.   As I understand it, poll watchers are representatives
20  of campaigns who are there to observe that election clerks and
21  election judges and workers broadly are upholding the Texas
22  Election Code in the administration of elections.
23    Q.   So is the idea that someone were violating the law in
24  the administration of the election, a poll watcher might be able
25  to observe it and report it?

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| Defendants. | § | |

STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT

# APPENDIX Q

# Voter Registration and Absentee Ballot Request

Federal Post Card Application (FPCA)

**This form is for absent Uniformed Service members, their families, and citizens residing outside the United States. It is used to register to vote, request an absentee ballot, and update your contact information. See your state's guidelines at FVAP.gov.**

Print clearly in blue or black ink, please see back for instructions.

## 1. Who are you? Pick one.

I request an absentee ballot for all elections in which I am eligible to vote AND:

- ☐ I am on active duty in the Uniformed Services or Merchant Marine  **-OR-**  ☐ I am an eligible spouse or dependent.
- ☐ I am a U.S. citizen living outside the country, and I intend to return.
- ☐ I am a U.S. citizen living outside the country, and my intent to return is uncertain.
- ☐ I am a U.S. citizen living outside the country, I have never lived in the United States.

| | |
|---|---|
| Last name | Suffix (Jr., II)    ☐ Mr.  ☐ Miss   ☐ Mrs.  ☐ Ms. |
| First name | Previous names (if applicable) |
| Middle name | Birth date (MM/DD/YYYY) |
| Social Security Number | Driver's license or State ID# |

## 2. What is your address in the U.S. state or territory where you are registering to vote and requesting an absentee ballot?

Your voting materials will not be sent to this address.  See instructions on the other side of form.

| | |
|---|---|
| Street address | Apt # |
| City, town, village | State |
| County | ZIP |

## 3. Where are you now?  You MUST give your CURRENT address to receive your voting materials.

Your mailing address. (Different from above)        Your mail forwarding address. (If different from mailing address)

## 4. What is your contact information? This is so election officials can reach you about your request.

Provide the country code and area code with your phone and fax number. Do not use a Defense Switched Network (DSN) number.

| | |
|---|---|
| Email: | Phone: |
| Alternate email: | Fax: |

## 5. What are your preferences for upcoming elections?

A. How do you want to receive voting materials from your election office? (Select One)
- ☐ Mail
- ☐ Email or online
- ☐ Fax

B. What is your political party for primary elections?

## 6. What additional information must you provide?

Puerto Rico and Vermont require more information, see back for instructions. *Additional state guidelines* may be found at FVAP.gov. You may also use this space to clarify your voter information.

STATE'S EXHIBIT
3
PENGAD 800-631-6989

## 7. You must read and sign this statement.

**I swear or affirm, under penalty of perjury, that:**

- The information on this form is true, accurate, and complete to the best of my knowledge. I understand that a material misstatement of fact in completion of this document may constitute grounds for conviction of perjury.
- I am a U.S. citizen, at least 18 years of age (or will be by the day of the election), eligible to vote in the requested jurisdiction, and
- I am not disqualified to vote due to having been convicted of a felony or other disqualifying offense, nor have I been adjudicated mentally incompetent; or if so, my voting rights have been reinstated; and
- I am not registering, requesting a ballot, or voting in any other jurisdiction in the United States, except the jurisdiction cited in this voting form.

**Sign here  X** _____    **Today's date** (MM/DD/YYYY)

This information is for official use only. Any unauthorized release may be punishable by law. Previous editions are obsolete. Standard Form 76 (Rev.09-2021), OMB No. 0704-0503, NSN 7540-00-643-5053

# You can vote wherever you are.

### 1. Fill out your form completely and accurately.

- Your U.S. address is used to determine where you are eligible to vote absentee. For military voters, it is usually your last address in your state of legal residence. For overseas citizens, it is usually the last place you lived before moving overseas. You do not need to have any current ties with this address. DO NOT write a PO Box # in section 2.

- Most states allow you to provide a Driver's License number or the last 4 digits of your SSN. New Mexico, Tennessee, and Virginia require a full SSN.

- If you cannot receive mail at your current mailing address, please specify a mail forwarding address.

- Many states require you to specify a political party to vote in primary elections. This information may be used to register you with a party.

- **Section 6 Requirements:** If your voting residence is Vermont, you must acknowledge the following by writing in section 6: "I swear or affirm that I have taken the Vermont Voter's Oath." If your voting residence is in Puerto Rico, you must list your mother's and father's first name.

- We recommend that you complete and submit this form every year while you are an absentee voter.

### 2. Remember to sign this form!

### 3. Return this form to your election official. You can find their contact information at FVAP.gov.

- Remove the adhesive liner from the top and sides. Fold and seal tightly. If you printed the form, fold it and seal it in an envelope.

- All states accept this form by mail and many states accept this form by email and fax. See your state's guidelines at FVAP.gov.

## Agency Disclosure Statement

The public reporting burden for this collection of information, OMB Control Number 0704-0503, is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or burden reduction suggestions to the Department of Defense, Washington Headquarters Services, at whs.mc-alex.esd.mbx.dd-dod-information-collections@mail.mil. Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number. DO NOT SUBMIT YOUR FORM TO THE E-MAIL ADDRESS ABOVE.

## Privacy Advisory

**When completed, this form contains personally identifiable information and is protected by the Privacy Act of 1974, as amended.**

**Questions?**
**Email: vote@fvap.gov**

---

(The address of your election office.)
(Fill in the address of your election office.)
The address can be found online at FVAP.gov.)

**To**

NO POSTAGE NECESSARY IN THE U.S. MAIL – DMM 703.8.0

OFFICIAL ABSENTEE BALLOTING MATERIAL – FIRST CLASS MAIL



International airmail postage is required if not mailed using the U.S. Postal Service, APO/FPO/DPO system, or diplomatic pouch.

(Your name and mailing address)

**From**



PAR AVION

U.S. Postage Paid
39 USC 3406

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,          §
          *Plaintiffs,*                       §
                                              §
*v.*                                          §        Case No. 5:21-cv-844-XR
                                              §
GREGORY W. ABBOTT, et al.,                    §
          *Defendants.*                       §

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX R

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                      SAN ANTONIO DIVISION

 3    LA UNIÓN DEL PUEBLO     §
      ENTERO, ET AL.,         §
 4                            §
           PLAINTIFFS,        §
 5                            §
           V.                 §   CIVIL ACTION NO.5:21-CV-844 (XR)
 6                            §   (CONSOLIDATED CASES)
      STATE OF TEXAS, ET      §
 7    AL.,                    §
                              §
 8         DEFENDANTS.        §

 9
      ********************************************************
10
                      ORAL DEPOSITION OF
11
                       FRANK PHILLIPS
12
                       MARCH 31, 2023
13
      ********************************************************
14

15         ORAL DEPOSITION OF FRANK PHILLIPS, PRODUCED AS A

16    WITNESS AT THE INSTANCE OF THE PLAINTIFF, AND DULY

17    SWORN, WAS TAKEN IN THE ABOVE-STYLED AND -NUMBERED CAUSE

18    ON THE 31ST DAY OF MARCH, 2023, FROM 9:14 A.M. TO

19    12:40 P.M., BEFORE KAREN A. GONZALEZ, COMMISSIONED

20    NOTARY, IN AND FOR THE STATE OF TEXAS, REPORTED BY

21    MACHINE SHORTHAND, FROM DALLAS COUNTY, TEXAS, PURSUANT

22    TO THE TEXAS RULES OF CIVIL PROCEDURE, THE TEXAS SUPREME

23    COURT EMERGENCY ORDER REGARDING THE COVID-19 STATE OF

24    DISASTER AND THE PROVISIONS STATED ON THE RECORD OR

25    ATTACHED HERETO.
```



Frank Phillips

March 31, 2023
Pages 94 to 97

## Page 94

1  Q. LET'S GO WITH DENTON COUNTY FIRST, AND THEN YOU
2  CAN TALK ABOUT IN GENERAL.
3       MS. HUNKER: OBJECTION; FORM.
4  A. SURE. ONE WOULD BE JUST OUR GENERAL INCREASE IN
5  POPULATION.
6  Q. (BY MS. YUN) UH-HUH.
7  A. AND I THINK IT'S JUST BECOME MORE -- I HATE TO
8  SAY ADVERTISED. I THINK IT'S PROMOTED MORE THAN IT USED
9  TO BE.
10  Q. UH-HUH.
11  A. I THINK PEOPLE TAKE ADVANTAGE OF MAIL VOTING. I
12  MEAN, I JUST THINK PEOPLE -- A LOT OF PEOPLE DO IT JUST
13  BECAUSE IT'S CONVENIENT. SO A POPULATION INCREASE AND
14  THE GENERAL PROMOTION OF VOTING BY MAIL IS CAUSING AN
15  INCREASE.
16  Q. UH-HUH.
17       AND WOULD YOU AGREE THAT FOR SOME FOLKS IN DENTON
18  COUNTY, THAT IT IS THE ONLY WAY FOR THEM TO VOTE?
19       MS. HUNKER: OBJECTION; FORM.
20  A. FOR SOME FOLKS, YES.
21  Q. (BY MS. YUN) DUE TO DISABILITY, FOR EXAMPLE?
22       MS. HUNKER: OBJECTION; FORM.
23  A. PROBABLY DISABILITY, YES.
24  Q. (BY MS. YUN) AND WOULD YOU AGREE THAT FOR SOME
25  FOLKS, IT IS VERY DIFFICULT FOR THEM TO CURE THEIR MAIL

## Page 95

1  BALLOT ERROR?
2       MS. HUNKER: OBJECTION; FORM.
3  A. I WOULD SAY YES.
4  Q. (BY MS. YUN) OKAY. AND I THINK YOU TESTIFIED
5  EARLIER -- AND CORRECT ME IF I'M WRONG -- THAT SOMETIMES
6  FOLKS DON'T GET NOTIFIED IN TIME TO CURE THEIR MAIL
7  BALLOT IN ORDER FOR THEIR BALLOT TO COUNT; IS THAT
8  RIGHT?
9  A. YEAH, ESPECIALLY IF THEY TURN IT IN NEAR THE END,
10  YOU KNOW, THE LAST DAY OF EARLY VOTING, THEN, YES, IT'S
11  GOING TO BE TOUGH.
12       MS. YUN: I THINK I AM ALMOST DONE. I JUST
13  WANT TO TAKE A QUICK BREAK.
14       THE REPORTER: THE TIME IS 11:58 A.M. WE
15  ARE OFF THE RECORD.
16       (OFF THE RECORD.)
17       THE REPORTER: THE TIME IS 12:05 P.M. WE
18  ARE BACK ON THE RECORD.
19       MS. YUN: OKAY. JUST FOR THE RECORD, SO
20  WE'RE GOING TO MARK THE ABBM FORM THAT MR. PHILLIPS
21  LOOKED AT AS EXHIBIT 8. AND THEN THE CARRIER ENVELOPE
22  THAT HE LOOKED AT TO REFRESH HIS RECOLLECTION AS EXHIBIT
23  NO. 9.
24       (EXHIBITS 8 AND 9 MARKED.)
25  Q. (BY MS. YUN) SO JUST TO WRAP UP, IS THERE

## Page 96

1  ANYTHING ELSE THAT YOU DISCUSSED WITH THE STATE ABOUT
2  YOUR TRIAL TESTIMONY THAT WE HAVEN'T DISCUSSED THUS FAR
3  TODAY?
4  A. I HAVEN'T DISCUSSED WITH THE STATE ABOUT MY --
5       THE WITNESS: OH, ARE YOU THE STATE?
6       MS. HUNKER: I'M THE STATE.
7  Q. (BY MS. YUN) SORRY. THE AG'S OFFICE,
8  MS. HUNKER.
9  A. NO.
10       MS. YUN: NOTHING ELSE. AND SO I'LL PASS
11  THE WITNESS.
12       MS. HUNKER: ARE THERE ANY OTHER PLAINTIFF
13  GROUP THAT WOULD LIKE TO ASK QUESTIONS OF THE WITNESS ON
14  THE ZOOM CALL?
15       MR. D'ANGELO: NOT FOR ME, THANK YOU.
16       MS. HUNKER: THAT WAS WILLIAM D'ANGELO.
17       ANY OTHER PLAINTIFF GROUPS HAVE ANY
18  QUESTIONS FOR THE WITNESS?
19       HEARING NONE, THE STATE IS GOING TO DO A
20  SHORT DIRECT EXAMINATION.
21       EXAMINATION
22  BY MS. HUNKER:
23  Q. MR. PHILLIPS, HAVE VOTERS CONVEYED TO YOU
24  CONCERNS ABOUT VOTER FRAUD?
25  A. YES.

## Page 97

1  Q. HAVE VOTERS CONVEYED TO YOU CONCERNS ABOUT MAIL
2  BALLOT VOTER FRAUD SPECIFICALLY?
3  A. YES.
4  Q. IN YOUR EXPERIENCE, DOES VOTERS' PERCEPTION THAT
5  VOTER FRAUD, INCLUDING MAIL BALLOT VOTING FRAUD, EXISTS
6  UNDERMINE THEIR CONFIDENCE IN ELECTION RESULTS?
7  A. ABSOLUTELY.
8  Q. IN YOUR EXPERIENCE, DOES VOTERS' PERCEPTION THAT
9  VOTER FRAUD, INCLUDING MAIL VOTER FRAUD, EXISTS
10  UNDERMINE THEIR TRUST IN THE ELECTORAL PROCESS?
11  A. YES.
12  Q. HAVE YOU SEEN AN INCREASE IN THE LACK OF TRUST IN
13  THE ELECTORAL PROCESS OVER THE LAST FEW YEARS?
14  A. WITHOUT A DOUBT.
15  Q. DO YOU RECALL TALKING WITH COUNSEL ABOUT HOW THE
16  SB 1 ID REQUIREMENT FOR MAIL-IN BALLOTS ADDED ANOTHER
17  LAYER OF PROTECTION?
18  A. YES.
19  Q. WHAT DID YOU MEAN BY THAT?
20  A. I BELIEVE WE WERE TALKING ABOUT PRIOR TO SB 1 AND
21  THE ID REQUIREMENTS, YOU KNOW, HAD WE DISCOVERED ANY
22  MAIL FRAUD. AND THE ANSWER WAS NO. BUT, IN MY MIND,
23  THAT DOESN'T MEAN YOU DON'T ADD ANOTHER SECURITY --
24  ANOTHER LEVEL OF SECURITY, ESPECIALLY WHEN IT COMES TO
25  WHAT YOU WERE JUST TALKING ABOUT, ABOUT THE PERCEPTION

Frank Phillips

March 31, 2023
Pages 98 to 101

Page 98

1 OF THE INTEGRITY OF THE VOTING PROCESS. AND ANYTHING WE
2 CAN DO TO STRENGTHEN THE INTEGRITY OF THE VOTING PROCESS
3 OR EVEN THE APPEARANCE OF IT I'M FOR.
4     Q. BASED ON YOUR EXPERIENCE, HAD SB 1'S MAIL BALLOT
5 ID REQUIREMENTS BEEN IN PLACE IN 2020, WOULD IT HAVE
6 HELPED YOU IDENTIFY THE MAIL VOTING FRAUD INITIATED BY
7 THE CARROLLTON MAYORAL CANDIDATE?
8     A. I THINK IT WOULD HAVE HELPED IDENTIFY IT, BECAUSE
9 HE WOULD HAVE HAD A MUCH HARDER TIME SUBMITTING THAT
10 MANY APPLICATIONS THAT COULD HAVE POTENTIALLY MADE IT
11 THROUGH THE PROCESS. I THINK IT WOULD HAVE BEEN MUCH
12 HARDER FOR HIM TO SUCCESSFULLY SEND APPLICATIONS THROUGH
13 THE PROCESS.
14     Q. I WANT TO TURN BACK TO EXHIBIT 1 THAT WAS
15 INTRODUCED BY THE UNITED STATES.
16     A. OKAY.
17     Q. DO YOU HAVE THAT EXHIBIT IN FRONT OF YOU?
18     A. I DO.
19     Q. PLEASE TURN TO PAGE 2.
20     A. OKAY.
21     Q. CAN YOU PLEASE READ OUT LOUD THE PARAGRAPH JUST
22 BEFORE THE PICTURE.
23     A. "INVESTIGATORS MADE CONTACT WITH THE CARROLLTON
24 RESIDENTS WHOSE BALLOTS HAD BEEN REQUESTED AND LEARNED
25 THE RESIDENTS TOLD THEM THAT THEY HAD NOT REQUESTED ANY

Page 99

1 BALLOTS BE MAILED TO THE P.O. BOX,' THE SHERIFF'S OFFICE
2 SAID."
3     Q. THANK YOU. CAN YOU PLEASE READ THE PARAGRAPH
4 IMMEDIATELY FOLLOWING THE PHOTO.
5     A. "THESE INDIVIDUALS IN CARROLLTON, IF THIS GUY
6 HAD BEEN SUCCESSFUL, THEY COULD HAVE SHOWN UP ON
7 ELECTION DAY AND BEEN DENIED THEIR RIGHT TO VOTE BECAUSE
8 IT WOULD HAVE SHOWN THAT THEY'D ALREADY VOTED,' SAID
9 DENTON COUNTY SHERIFF TRACY MURPHREE."
10     Q. BASED ON YOUR EXPERIENCE IN THE ELECTIONS OFFICE
11 AND YOUR UNDERSTANDING OF TEXAS ELECTION LAW, WAS THE
12 DENTON COUNTY SHERIFF CORRECT THAT IF THIS GUY HAD BEEN
13 SUCCESSFUL, VOTERS COULD HAVE BEEN DENIED THEIR RIGHT TO
14 VOTE?
15     A. ABSOLUTELY.
16     Q. CAN INCIDENTS OF VOTER FRAUD DENY VOTERS THEIR
17 RIGHT TO VOTE?
18     A. YES.
19     Q. ARE YOU AWARE OF ANY ELECTION DECIDED BY A
20 HANDFUL OF VOTES?
21     A. OH, YES.
22     Q. CAN YOU PERHAPS GIVE ME AN EXAMPLE?
23     A. YES. IN NOVEMBER, WE HAD A CITY THAT HAD -- THE
24 CITY OF PILOT POINT HAD A MAYORAL RACE. AND AT THE END
25 OF THE ELECTION, THEY WERE -- THEY WERE TIED. AND WE --

Page 100

1 SO THEY WERE TIED, SO THAT LEFT THEM THE OPPORTUNITY FOR
2 ONE OF THEM TO ASK FOR A RECOUNT.
3     WE CAN LOOK AT OUR RESULTS AND SEE THAT EVEN
4 THOUGH THEY WERE TIED, THERE WAS A PERSON WHO SUBMITTED
5 A BALLOT THAT DIDN'T VOTE. SO IT WAS UNDERVOTE -- OR
6 OVERVOTE -- I'M SORRY. IT WAS NOT AN UNDERVOTE. IT WAS
7 AN OVERVOTE, MEANING ON THEIR BALLOT, THEY HAD SOMEHOW
8 MARKED THE BALLOT THAT MADE THE SCAN THINK THIS PERSON
9 HAD VOTED FOR BOTH CANDIDATES.
10     SO WE TOLD BOTH THE CANDIDATES THAT THEY COULD
11 HAVE AN OPTION OF REQUESTING A RECOUNT. "IF ONE OF YOU
12 REQUESTS A RECOUNT, WE CAN FIND THAT OVERVOTE. AND
13 UNDER THE TEXAS ELECTION CODE, DURING A RECOUNT, IF YOU
14 CAN LOOK AT AN OVERVOTE AND MAKE THE VOTER'S INTENT
15 DETERMINATION, THEN THAT VOTE CAN BE AWARDED TO A
16 CANDIDATE. SO POTENTIALLY, WITHOUT HAVING TO GO TO A
17 NEW ELECTION, WE CAN SOLVE THIS."
18     NEITHER ONE OF THEM WANTED TO, I GUESS, RISK
19 GOING FOR IT. SO WE ENDED UP HAVING A SECOND ELECTION,
20 WHICH WAS DECIDED BY THREE VOTES.
21     Q. BASED IN YOUR EXPERIENCE, IN THE CASE OF A CLOSE
22 ELECTION AS THE ONE YOU JUST DESCRIBED, IS IT MORE
23 LIKELY THAN OTHER ELECTIONS THAT VOTER FRAUD COULD
24 CHANGE THE OUTCOME OF THE ELECTION?
25     A. ABSOLUTELY, JUST BASED ON THE NUMBERS.

Page 101

1     Q. AND IS THAT TRUE EVEN IF VOTER FRAUD ONLY HAPPENS
2 ON OCCASION AS OPPOSED TO SYSTEMATICALLY?
3     A. YES.
4     Q. DO YOU RECALL DISCUSSING WITH COUNSEL THE
5 DIFFERENT POSSIBLE REASONS FOR A MISMATCH WITH RESPECT
6 TO THE ID REQUIREMENT?
7     A. YES.
8     Q. AND DO YOU RECALL THAT THAT DISCUSSION TALKED
9 ABOUT VOTERS WHO FAILED TO PUT AN ID NUMBER DOWN, PUT
10 THE -- PUT A TYPO OR TRANSPOSED NUMBERS ON THEIR
11 APPLICATION OR BALLOT OR HAD A TRANSPOSED NUMBER INSIDE
12 THE SYSTEM?
13     A. YES.
14     Q. WERE THERE FEWER INSTANCES OF THAT IN THE
15 NOVEMBER ELECTION AS COMPARED TO THE MARCH PRIMARY? AND
16 I CAN REPHRASE IF YOU NEED ME TO.
17     A. NO. I BELIEVE THE ANSWER TO THAT IS YES, BECAUSE
18 THERE WAS A MUCH HIGHER REJECTION RATE. SO I WOULD SAY
19 YES.
20     Q. DID YOU OBSERVE FEWER DATABASE ERRORS WHERE THE
21 REGISTRATION RECORD HAD THE WRONG NUMBER?
22     A. YES.
23     Q. DID YOU OBSERVE FEWER INSTANCES OF VOTERS HAVING
24 A TEXAS ID, BUT NOT THEIR SSN IN THEIR SYSTEM OR
25 VICE-VERSA? IN OTHER WORDS -- DO YOU NEED A



Frank Phillips

March 31, 2023
Pages 102 to 105

Page 102

1 CLARIFICATION?
2   A. NO. THEY PRESENTED A NUMBER THAT WE DIDN'T HAVE.
3   Q. THAT'S CORRECT.
4   A. I CAN'T SAY DEFINITIVELY ON THAT ONE.
5   Q. OKAY. WHEN A BALLOT ARRIVES TO YOUR OFFICE, DOES
6 THE DENTON COUNTY ELECTIONS OFFICE USE THE ID NUMBER,
7 WHETHER IT BE THE SOCIAL SECURITY NUMBER OR TEXAS ID
8 NUMBER, TO CONFIRM THE VOTER'S IDENTITY?
9   A. WE DO.
10   Q. DO YOU REMEMBER TALKING ABOUT YOUR EFFORTS TO
11 EDUCATE VOTERS ABOUT THE ID REQUIREMENT?
12   A. YES.
13   Q. WOULD YOU CONSIDER YOUR EFFORTS TO EDUCATE VOTERS
14 ABOUT THE ID REQUIREMENT SUCCESSFUL?
15   A. YES.
16   Q. WERE YOU ABLE TO REDUCE THE REJECTION RATE FROM
17 THE MARCH PRIMARY TO THE NOVEMBER ELECTION?
18   A. YES.
19   Q. DO YOU RECALL WHAT THE REJECTION RATE IN NOVEMBER
20 WAS?
21   A. I BELIEVE -- IT WAS A PRIMARY, WAS IT NOT?
22   Q. THIS DOCUMENT IS, YES.
23   A. I DON'T REMEMBER THE EXACT NUMBER IN NOVEMBER.
24   Q. DO YOU RECALL WHERE IT ROUGHLY FELL?
25   A. I'M GOING TO SAY ROUGHLY IN THE 8 TO 10 PERCENT

Page 103

1 RANGE. ROUGHLY. AND THAT COULD BE HIGH.
2       MS. HUNKER: CAN WE GO OFF THE RECORD FOR A
3 MOMENT?
4       MS. YUN: SURE.
5       THE REPORTER: OFF THE RECORD AT 12:17 P.M.
6       (OFF THE RECORD.)
7       THE REPORTER: THE TIME IS 12:19 P.M. WE
8 ARE BACK ON THE RECORD.
9   Q. (BY MS. HUNKER) MR. PHILLIPS, YOU MENTIONED YOU
10 WERE NOT SURE ABOUT THE REJECTION RATE FOR THE GENERAL
11 ELECTION, CORRECT?
12   A. CORRECT.
13   Q. I'M GOING TO REFRESH YOUR RECOLLECTION -- OR SEE
14 IF SOMETHING WOULD REFRESH YOUR RECOLLECTION.
15       CAN YOU PLEASE DESCRIBE WHAT YOU ARE SEEING ON MY
16 COMPUTER SCREEN.
17   A. IT'S AN EXCEL SPREADSHEET THAT HAS THE NOVEMBER
18 GENERAL ELECTION REJECTION RATES --
19   Q. OKAY.
20   A. -- BY COUNTY.
21       MS. HUNKER: AND I'M GOING TO REPRESENT, FOR
22 THE CLARITY OF THE RECORD, THAT THIS IS THE REJECTION
23 RATE SPREADSHEET THAT WAS PRODUCED BY THE STATE
24 DEFENDANTS AND WILL BE SENT TO THE COURT REPORTER FOR
25 HER TO INCLUDE IN THE TRANSCRIPT.

Page 104

1   Q. (BY MS. HUNKER) LET'S TAKE A LOOK AT DENTON
2 COUNTY.
3       MS. YUN: COUNSEL, COULD YOU CLARIFY ON THE
4 RECORD, WHERE THE REJECTION RATE DOCUMENT CAME FROM?
5       MS. HUNKER: THIS WAS PROVIDED BY THE
6 SECRETARY OF STATE'S OFFICE AND PRODUCED I BELIEVE IN
7 NOVEMBER.
8       MS. YUN: OKAY. THANK YOU.
9       MS. HUNKER: I BELIEVE NOVEMBER OR DECEMBER.
10   Q. (BY MS. HUNKER) DO YOU SEE WHERE IT SAYS DENTON
11 COUNTY?
12   A. I DO.
13   Q. CAN YOU PLEASE TELL ME WHAT THE REJECTION RATE IS
14 STATED ON THE SPREADSHEET?
15   A. 1.66 PERCENT.
16   Q. AND DOES THAT REFRESH YOUR RECOLLECTION?
17   A. IT DOES. BEFORE I WAS JUST GENERALLY SPEAKING
18 OFF OF A GUT FEELING, BUT THIS MAKES MORE SENSE.
19   Q. IS 1.66 PERCENT COMPARABLE TO PREVIOUS
20 ELECTIONS -- GENERAL ELECTIONS AT YOUR OFFICES?
21   A. I WOULD DEFINITELY SAY YES.
22   Q. ARE YOU AWARE OF ANY ELECTION WHERE THE REJECTION
23 RATE WAS ZERO PERCENT?
24   A. NO.
25   Q. IF SB 1 WAS ENJOINED OR REPEALED, WOULD THE NEXT

Page 105

1 ELECTION HAVE A REJECTION RATE OF ZERO PERCENT?
2   A. NO.
3   Q. WERE VOTERS ABLE TO CURE BALLOT DEFECTS BEFORE
4 SB 1?
5   A. NOT IN THE SAME MANNER. I MEAN, WE -- IF SOMEONE
6 LEFT A SIGNATURE OFF, WE WOULD CONTACT THEM TO SEE IF WE
7 COULD GET THEM TO FIX THEM. BUT IT WAS CODIFIED IN THE
8 SAME MANNER.
9   Q. WAS THERE ANY ESTABLISHED PROCESS THAT THE STATE
10 PROVIDED FOR A CURE PRIOR TO SB 1?
11   A. I DON'T REMEMBER WHAT IT WAS.
12   Q. ARE THERE OTHER DEFECTS BESIDES ID -- LET ME
13 REPHRASE THAT QUESTION.
14       CAN OTHER DEFECTS BESIDES FAILING TO PUT YOUR ID
15 NUMBER OR HAVING AN ID MISMATCH BE CURED THROUGH THE
16 CURE PROCESS PROVIDED BY SB 1?
17   A. SURE. SIGNATURES, MISMATCHED SIGNATURES, NO
18 SIGNATURES, THINGS LIKE THAT.
19   Q. HAD VOTERS UTILIZED THAT CURE PROCESS FOR DEFECTS
20 OTHER THAN FAILING TO PUT THEIR ID OR HAVING A
21 MISMATCHED ID NUMBER?
22   A. YES.
23   Q. DO YOU RECALL TALKING TO COUNSEL ABOUT THE PERSON
24 YOU ADDED FOR THE CURE PROCESS?
25   A. YES.



Frank Phillips

March 31, 2023
Pages 106 to 109

Page 106

1 Q. THAT EMPLOYEE, DOES SHE HANDLE CURES OF BALLOTS
2 WITH DEFECTS OTHER THAN ID NUMBER REQUIREMENTS?
3 A. YES.
4 Q. DO YOU RECALL TALKING TO COUNSEL ABOUT HOW
5 SOMETIMES NOTICE OF DEFECT ARRIVES TOO LATE FOR THE
6 VOTER TO CURE?
7 A. YES.
8 Q. WOULD THAT BE TRUE OF VOTERS WHOSE BALLOTS WERE
9 REJECTED FOR REASONS OTHER THAN A MAIL ID NUMBER
10 REQUIREMENT?
11 A. YES.
12 Q. WOULD THAT BE TRUE OF VOTERS WHOSE BALLOTS WERE
13 REJECTED FOR REASONS OTHER THAN THE MAIL ID NUMBER
14 REQUIREMENT BEFORE SB 1?
15 A. YES.
16 Q. FOR SOME VOTERS WHO DECIDE TO VOTE BY MAIL, IN
17 YOUR EXPERIENCE, ARE THEY EQUALLY ABLE TO ACCESS VOTING
18 IN PERSON?
19 A. REPEAT IT ONE MORE TIME.
20 Q. SURE.
21 IN YOUR EXPERIENCE, FOR AT LEAST SOME VOTERS WHO
22 VOTE BY MAIL, ARE THEY ABLE TO EQUALLY ACCESS VOTING IN
23 PERSON?
24 A. YES.
25 Q. DOES DENTON COUNTY GIVE VOTERS IN DENTON COUNTY

Page 107

1 AMPLE OPPORTUNITIES TO VOTE IN PERSON?
2 A. YES.
3 Q. IN YOUR EXPERIENCE, DID VOTERS EXHIBIT LESS
4 CONFUSION ABOUT SB 1'S MAIL-IN VOTING REQUIREMENT IN
5 NOVEMBER OF 2022 COMPARED TO THE MARCH PRIMARY?
6 A. YES.
7 Q. IN YOUR EXPERIENCE, IS THERE ALWAYS A LEARNING
8 CURVE WHEN NEW VOTING REQUIREMENTS ARE INTRODUCED?
9 A. ABSOLUTELY.
10 Q. DO YOU EXPECT THE TREND TO CONTINUE OF VOTERS
11 HAVING LESS CONFUSION ABOUT SB 1'S MAIL-IN VOTING
12 REQUIREMENTS?
13 A. YES.
14 MS. HUNKER: NO FURTHER QUESTIONS. I PASS
15 THE WITNESS.
16 FURTHER EXAMINATION
17 BY MS. YUN:
18 Q. JUST A FEW FOLLOW-UP QUESTIONS BASED ON WHAT YOU
19 JUST TESTIFIED.
20 YOU JUST TESTIFIED THAT YOU BELIEVE THAT THERE
21 WILL BE LESS CONFUSION GOING FORWARD ABOUT ID NUMBER
22 REQUIREMENTS.
23 SO FOR EACH ELECTION, THERE WILL BE NEW VOTERS
24 WHO QUALIFY TO VOTE BY MAIL FOR THE FIRST TIME; IS THAT
25 RIGHT?

Page 108

1 A. CORRECT.
2 Q. SO THOSE VOTERS WOULD NOT HAVE HAD ANY
3 OPPORTUNITY TO -- THOSE VOTERS WOULD NOT HAVE
4 EXPERIENCED ANY ID REQUIREMENT PRIOR TO THAT; IS THAT
5 RIGHT?
6 A. CORRECT.
7 Q. AND DO YOU HAVE ANY REASON TO BELIEVE THAT THOSE
8 VOTERS WOULD HAVE LESS DIFFICULT TIMES GOING FORWARD
9 WITH THE ID NUMBER REQUIREMENTS?
10 A. I MEAN, I WOULD SAY YES BECAUSE IT'S -- IT'S OUT
11 IN THE COMMON ARENA NOW, YOU KNOW. WHEN IT FIRST
12 STARTED, IT WAS NEW TO EVERYBODY. AND NOW THERE'S BEEN
13 SO MUCH DISCUSSION ABOUT IT THAT IT'S NOT ONLY US THAT
14 EDUCATE PEOPLE ON IT. THE POLITICAL PARTIES EDUCATE
15 PEOPLE ON IT. SO YEAH, I THINK THEY'LL HAVE A LESS
16 DIFFICULT TIME.
17 Q. AND WE TALKED -- YOU TALKED BRIEFLY WITH
18 MRS. HUNKER ABOUT VOTERS LOSING TRUST IN THE INTEGRITY
19 OF THE ELECTORAL SYSTEM.
20 WHAT IS YOUR -- WHAT IS THE BASIS FOR YOUR
21 STATEMENT THAT YOU BELIEVE THAT THAT IS THE CASE?
22 A. SO -- OKAY. FROM 2009 TO 2016, WE RARELY HEARD
23 ANYTHING THAT QUESTIONED THE INTEGRITY OF THE SYSTEM.
24 2016, THE QUESTIONING BEGAN. AND IT WAS AMPLIFIED IN
25 2020, SO MUCH SO THAT I SPEND PROBABLY THE MAJORITY OF

Page 109

1 MY TIME NOW DEBUNKING CONSPIRACY THEORIES OR ANSWERING
2 PUBLIC INFORMATION REQUESTS RELATED TO CONSPIRACY
3 THEORIES. SO THAT'S WHAT I BASE THAT ON, IS HOW MUCH
4 TIME I SPEND ON THOSE MATTERS NOW VERSUS WHAT I USED TO.
5 Q. OAK. AND WERE THOSE CONCERNS RELATED TO ANYTHING
6 THAT HAPPENED IN DENTON COUNTY OR IN TARRANT COUNTY
7 WHILE YOU WERE WORKING THERE?
8 MS. HUNKER: OBJECTION; FORM.
9 A. I MEAN, NOT NECESSARILY. I MEAN, I THINK THEY'RE
10 -- THEY TEND TO COME MORE FROM A NATIONAL PERSPECTIVE.
11 Q. (BY MS. YUN) OKAY. DID THE IMPLEMENTATION OF
12 SB 1'S ID REQUIREMENTS DO ANYTHING TO THOSE -- THE
13 AMOUNT OF THE CONSPIRACY THEORIES OR OTHER
14 MISINFORMATION OUT THERE ABOUT THE INTEGRITY OF THE
15 SYSTEM?
16 MS. HUNKER: OBJECTION; FORM.
17 A. I THINK IT MAY HAVE SLIGHTLY LESSENED THE
18 CONSPIRACY THEORIES AROUND MAIL BALLOTS. THERE'S
19 CERTAINLY BEEN NOTHING ABOUT VOTING SYSTEMS, THE
20 CONSPIRACY THEORIES SURROUNDING VOTING SYSTEMS.
21 Q. (BY MS. YUN) DID YOUR OFFICE IN DENTON COUNTY OR
22 TARRANT COUNTY WHEN YOU WERE THERE DO ANYTHING TO
23 ADDRESS THIS LOSS IN -- LOSS OF TRUST IN THE ELECTORAL
24 PROCESS?
25 A. WE HAVE. I MEAN, WE'VE -- I'VE MET WITH THESE



Frank Phillips                                           March 31, 2023
                                                         Pages 110 to 113

Page 110

1 GROUPS TO ADDRESS THEIR CONCERNS. I'VE INVITED PEOPLE
2 TO OUR OFFICE TO SHOW THEM HOW THINGS REALLY WORK VERSUS
3 HOW THEY THINK THEY WORK. AND I'VE DONE THAT AS
4 RECENTLY AS YESTERDAY.
5     Q. ARE THESE CONCERNS THAT YOU'VE BEEN -- YOU'RE NOW
6 SPENDING THE MAJORITY OF YOUR TIME ADDRESSING, ARE THESE
7 SPECIFICALLY ABOUT -- HOW MUCH OF IT IS ABOUT MAIL
8 VOTING VERSUS SOMETHING ELSE?
9     A. IT'S PROBABLY 10 PERCENT MAIL VOTING, 90 PERCENT
10 VOTING SYSTEM.
11    Q. AND DO YOU BELIEVE THAT THE ID REQUIREMENTS FROM
12 SB 1 ADDRESS THOSE CONCERNS?
13        MS. HUNKER: OBJECTION; FORM.
14    Q. (BY MS. YUN) THE 10 PERCENT CONCERNS.
15    A. I THINK THEY HELP. BUT TOTALLY, NO. I DON'T
16 THINK ANYTHING YOU DO WILL TOTALLY CONVINCE SOME PEOPLE.
17    Q. SO IF YOU WERE TO SORT OF QUANTIFY HOW MUCH IT
18 HELPS, WHAT WOULD YOU SAY?
19        MS. HUNKER: OBJECTION; FORM.
20    A. I MEAN, THAT'S -- OF THE 10 PERCENT THAT'S A BAD
21 MAIL BALLOTS, IT PROBABLY HELPS HALF OF THOSE PEOPLE
22 MAYBE.
23    Q. (BY MS. YUN) SO DO YOU -- SO YOU TELL THESE
24 FOLKS ABOUT THE MAIL BALLOT -- THE MAIL VOTING ID
25 REQUIREMENTS?

Page 111

1     A. I DO.
2     Q. AND YOU'D SAY HALF OF THOSE VOTERS WOULD SAY
3 LIKE, "OH, OKAY. THAT WOULD PROBABLY -- THAT ALLAYS MY
4 CONCERN"?
5     A. IT'S JUST A GUESS. I MEAN, THEY PROBABLY DON'T
6 RELAY THAT IN THE MANNER YOU JUST DID. IT'S JUST --
7 IT'S JUST A GUESS.
8     Q. OKAY. SO YOU TESTIFIED EARLIER, I BELIEVE -- AND
9 CORRECT ME IF I'M WRONG -- THAT THERE'S SOME MEASURES
10 THAT -- THAT WE SHOULD IMPLEMENT MEASURES THAT
11 STRENGTHEN VOTERS' CONFIDENCE IN THE SYSTEM.
12        IS THAT -- DO YOU RECALL THAT?
13    A. I DO.
14    Q. YEAH.
15        IS THERE ANY LIMIT TO WHAT YOU WOULD DO TO
16 STRENGTHEN VOTERS' CONFIDENCE IN THE INTEGRITY OF THE
17 SYSTEM?
18    A. I'M SURE THERE IS, BUT I DON'T KNOW WHAT THAT
19 WOULD BE, THE SPECIFIC EXAMPLE.
20    Q. SURE.
21        WOULD YOU BE COMFORTABLE -- OR WOULD YOU BE IN
22 FAVOR OF IMPLEMENTING MEASURES THAT REJECT BALLOT VOTES
23 IN ORDER TO SIMPLY SATISFY SOME VOTERS' CONCERNS ABOUT
24 THE INTEGRITY OF THE SYSTEM?
25    A. I MEAN, SIMPLY TO SATISFY SOMEBODY'S DESIRE? IS

Page 112

1 THAT WHAT --
2     Q. SIMPLE TO SATISFY OTHER VOTERS' CONCERN ABOUT THE
3 INTEGRITY OF THE SYSTEM.
4        MS. HUNKER: OBJECTION; FORM.
5     A. I MEAN, HONESTLY, THAT'S A LITTLE BROAD. BUT I
6 THINK, SURE, THERE WOULD BE SOME THINGS I WOULD NOT
7 AGREE WITH. I'M SURE SOMEBODY COULD THINK OF SOMETHING
8 I WOULDN'T AGREE WITH TO REJECT -- IF I UNDERSTAND WHAT
9 YOU'RE ASKING.
10    Q. (BY MS. YUN) YEAH. I GUESS I'M TALKING A LITTLE
11 BIT MORE GENERALLY THAT -- WHETHER IT WOULD BE -- YOU
12 WOULD BE IN FAVOR OF A POLICY OR A MEASURE THAT REJECTS
13 VALID VOTES THAT IS IMPLEMENTED SIMPLY IN ORDER TO ALLAY
14 CONCERNS ABOUT THE INTEGRITY OF THE VOTING PROCESS.
15        MS. HUNKER: OBJECTION; FORM.
16    A. YEAH. I MEAN, MY GUT REACTION IS I WOULDN'T BE
17 FOR THAT, BUT IT'S HARD TO SAY WITH THAT SPECIFIC
18 EXAMPLE.
19    Q. (BY MS. YUN) SURE.
20        WOULD YOU AGREE -- WOULD IT BE A FAIR STATEMENT
21 OR WOULD YOU AGREE WITH THE STATEMENT THAT SAYS IT'S A
22 BALANCING THAT YOU WOULD CONSIDER WHETHER A MEASURE HAS
23 NEGATIVE IMPACTS ON VALID VOTES VERSUS THE STRENGTHENING
24 OF VOTERS' FAITH IN THE SYSTEM?
25        MS. HUNKER: OBJECTION; FORM.

Page 113

1     A. I THINK THAT'S FAIR. IT IS A BALANCE. SO YOU'VE
2 GOT -- NOT ME, THE LEGISLATURE HAS TO PICK THEIR -- YOU
3 KNOW, WHAT THEY THINK IS A FAIR BALANCE.
4     Q. (BY MS. YUN) YOU SPOKE WITH MS. HUNKER ABOUT
5 VERY CLOSE ELECTIONS THAT YOU HAVE OVERSEEN.
6     A. UH-HUH.
7     Q. AND REJECTING A VALID VOTE CAN ALSO IMPACT THE
8 OUTCOME OF SUCH CLOSE ELECTIONS; RIGHT?
9     A. CORRECT.
10    Q. SO, FOR EXAMPLE, IF A BALLOT WHOSE ID NUMBER DID
11 NOT MATCH THE VOTER REGISTRATION RECORD, BUT IT IS A
12 VALID ID NUMBER AND IF THAT VOTE DID NOT COUNT, THE FACT
13 THAT IT DID NOT COUNT WOULD IMPACT A VERY CLOSE
14 ELECTION, CORRECT?
15        MS. HUNKER: OBJECTION; FORM, INCOMPLETE
16 HYPOTHETICAL.
17    A. YES.
18        MS. YUN: OKAY. JUST A SECOND.
19        I THINK THAT'S IT. DID YOU HAVE ANY?
20        MS. HUNKER: YEAH, JUST A VERY SMALL NUMBER.
21        MS. YUN: OKAY.
22        FURTHER EXAMINATION
23 BY MS. HUNKER:
24    Q. HAS SB 1 REDUCED CONCERNS AMONG VOTERS ABOUT MAIL
25 VOTING FRAUD?



Frank Phillips

March 31, 2023
Pages 114 to 117

Page 114

1   A. I WOULD SAY YES.
2   Q. DO YOU RECALL EARLY IN THE DEPOSITION MENTIONING
3   THAT YOU THOUGHT THAT MAIL VOTING WAS VULNERABLE TO
4   FRAUD?
5   A. YES.
6   Q. HOW IS MAIL VOTING VULNERABLE TO FRAUD?
7   A. BECAUSE IN ANY OTHER TYPE OF VOTING, THAT BALLOT
8   REMAINS UNDER OUR CONTROL, EITHER OUR CONTROL AT THE
9   OFFICE OR THE POLL WORKERS' CONTROL OUT IN THE FIELD.
10     THAT DOESN'T HAPPEN WITH MAIL BALLOTS. ONCE THAT
11  BALLOT IS MAILED, I DON'T KNOW WHAT HAPPENS TO IT. I
12  DON'T KNOW WHO RECEIVES IT, WHO INTERCEPTS IT, WHO GOT
13  IT OUT OF A MAILBOX. AND SO THAT'S WHY I SAY IT'S
14  SUSCEPTIBLE.
15     SO THERE HAS TO BE A WAY OF DETERMINING WHEN IT
16  COMES BACK THAT THE PERSON WHO GOT THE BALLOT AND
17  RETURNED IT IS THE PERSON WHO IT WAS MEANT TO GO TO.
18     MS. YUN: I WILL JUST NOTE THAT IT'S OUTSIDE
19  THE SCOPE OF THE REDIRECT, BUT KEEP GOING.
20  Q. (BY MS. HUNKER) IN YOUR OPINION, DOES SB 1
21  ADDRESS THAT VULNERABILITY OR SUSCEPTIBILITY?
22     MS. YUN: SAME OBJECTION.
23  A. YES, IT DEFINITELY HELPS.
24     MR. HUNKER: NO FURTHER QUESTIONS.
25     MS. YUN: OKAY.

Page 115

1      THE REPORTER: ARE WE DONE?
2      MS. YUN: YES.
3      THE REPORTER: IS ANYONE REQUESTING A COPY
4   OF THE TRANSCRIPT?
5      MS. YUN: YES.
6      AND, COUNSEL, I'LL JUST REQUEST THAT YOU
7   COPY ME WHEN YOU E-MAIL THE EXHIBIT.
8      THE REPORTER: NO ONE ONLINE -- OR THROUGH
9   ZOOM?
10     MR. KENNY: THIS IS STEPHEN KENNY. I'D LIKE
11  TO REQUEST A COPY OF THE TRANSCRIPT, PLEASE.
12     MR. D'ANGELO: THIS IS WILLIAM D'ANGELO ALSO
13  REQUESTING A COPY OF THE TRANSCRIPT.
14     THE REPORTER: THE TIME IS NOW 12:40. THIS
15  CONCLUDES OUR DEPOSITION FOR TODAY.
16
17
18     (DEPOSITION CONCLUDED AT 12:40 P.M.)
19
20
21
22
23
24
25

Page 116

1   C H A N G E S   A N D   S I G N A T U R E
2   WITNESS NAME: FRANK PHILLIPS
3   DATE OF DEPOSITION: MARCH 31, 2023
4
5      PLEASE INDICATE CHANGES ON THIS SHEET OF PAPER,
    GIVING THE CHANGE, PAGE NUMBER, LINE NUMBER, AND REASON
    FOR THE CHANGE. PLEASE SIGN EACH PAGE OF CHANGES.
6
7   PAGE/LINE      CORRECTION      REASON FOR CHANGE
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 117

1      J U R A T
2      I, _____, HAVE READ THE FOREGOING
3   DEPOSITION AND HEREBY AFFIX MY SIGNATURE THAT SAME IS
4   TRUE AND CORRECT, EXCEPT AS NOTED ABOVE;
5
6
7                   FRANK PHILLIPS
8
9   THE STATE OF TEXAS   )
10  COUNTY OF DALLAS     )
11
12     BEFORE ME, _____, ON THIS DAY
13  PERSONALLY APPEARED _____     _____, KNOWN TO ME OR
14  PROVED TO ME UNDER OATH OR THROUGH IDENTITY CARD OR
15  OTHER DOCUMENT TO BE THE PERSON WHOSE NAME IS SUBSCRIBED
16  TO THE FOREGOING INSTRUMENT AND ACKNOWLEDGED TO ME THAT
17  THEY EXECUTED THE SAME OF THE PURPOSES AND CONSIDERATION
18  THEREIN EXPRESSED.
19     GIVEN UNDER MY HAND AND SEAL OF OFFICE THIS _____
20  DAY OF _____, 2023.
21
22     _____
23          NOTARY PUBLIC IN AND FOR
24          THE STATE OF TEXAS
25



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX S

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
|     *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
|     *Defendants.* | § | |

---

## DECLARATION OF FRANK PHILLIPS

I, Frank Phillips, pursuant to 28 U.S.C. 1746, am executing this declaration. I declare under penalty of perjury that the facts stated below are true and correct to the best of my personal knowledge and belief.

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration.  The evidence set out in the foregoing Declaration is based on my personal knowledge and experience.

2. I am the Election Administrator of Denton County, Texas, a position I have held since 2016 and previously held from 2009 to 2014. From 2014 to 2016, I was the Election Administrator of Tarrant County, Texas.

3. My experience gives me substantial insight into the procedures, administration, and the various complexities of conducting elections in Texas.

4. In 2020, in my capacity as Denton County Election Administrator, I identified irregularities that led to an investigation into a major vote harvesting scheme.

5. That investigation indicated that Zul Mirza Mohamed, a 2020 candidate for Mayor of Carrollton, Texas, sought to improperly influence the outcome of that election by engaging in an illicit vote harvesting scheme. Mohamed was prosecuted for the fraud and currently awaits trial.

6. All available evidence uncovered in the course of investigation tend to establish that Mr. Mohamed forged several dozen applications for ballot by mail (ABBMs), which directed

my office to issue mail-ballots to a single post office box that Mr. Mohamed had obtained with false identification.

7. At the time of his arrest, Mr. Mohamed was found stuffing envelopes with applications for ballot by mail and appears to have sent fraudulent mail-in ballots prior to his arrest.

8. If Mr. Mohamed succeeded in his efforts, Denton County voters would have been disenfranchised by his scheme—legitimate Denton County voters could have shown up to the polls on election day and been told that their ballots had already been cast. As it was, multiple voters who Mr. Mohamed impersonated attempted to request their own mail-ballot. My office had to confirm with them which ABBM was legitimate.

9. While my office in Denton County sequestered any fraudulent ABBM or ballot cast by Mr. Mohamed, the City of Carrollton spans two other counties (Dallas County and Collin County), and I cannot confirm that fraudulent ABBMs or mail-ballots submitted as part of Mr. Mohamed's scheme were appropriately sequestered in those other two counties.

10. The signature requirements did not adequately prevent or detect the voter fraud scheme perpetrated by Mr. Mohamed. Only one county out of the three counties covered by the voting district in question detected the fraud scheme. If Mr. Mohamed had not routed so many voter registration documents through a single post office box, the attempted fraud may have gone undetected.

11. Based on my experience, SB 1's mail ballot identification requirements would have helped me identify the mail voting fraud scheme initiated by the Carrollton mayoral candidate earlier or would have prevented the scheme altogether.

12. Since SB 1's identification number requirement has been passed, my office's standard operating procedure has been to use that unique identifier as a reliable way to positively identify voters and help ensure that each person casting a ballot is in fact a qualified and registered Texas voter.

13. Because the identification number requirement was not in place in 2020, it was significantly easier for Mr. Mohamed to complete fraudulent ABBMs and actually receive illegitimate mail-ballots.

Executed in Denton County on the 21st day of June, 2023.

Frank Phillips
Denton County Election Administrator

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX T

Transcript of the Testimony of

**Yvonne Ramon**

**Date:**

April 21, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Yvonne Ramon                                                    April 21, 2022

```
 1              IN THE UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO,    )(
     ET AL.,                        )(
 4             PLAINTIFFS,          )(
                                    )(
 5   VS.                            )(    CASE NO.
                                    )(    5:21-cv-844-XR
 6   GREGORY W. ABBOTT, ET AL.,     )(
               DEFENDANTS.          )(
 7   _____   ___   _____

 8   OCA-GREATER HOUSTON, ET        )(
     AL.,                           )(
 9             PLAINTIFFS,          )(    CASE NO.
                                    )(    1:21-cv-780-XR
10   VS.                            )(
                                    )(
11   JOHN SCOTT, ET AL.,            )(
               DEFENDANTS.          )(
12   _____   ___   _____
                                    )(
13   HOUSTON JUSTICE, ET AL.,       )(
               PLAINTIFFS,          )(
14                                  )(    CASE NO.
     VS.                            )(    5:21-cv-848-XR
15                                  )(
     GREGORY WAYNE ABBOTT, ET       )(
16   AL.,                           )(
               DEFENDANTS.          )(
17   _____   ___   _____
                                    )(
18   LULAC TEXAS, ET AL.,           )(
               PLAINTIFFS,          )(
19                                  )(    CASE NO.
     VS.                            )(    1:21-cv-0786-XR
20                                  )(
     JOHN SCOTT, ET AL.,            )(
21             DEFENDANTS.          )(
     _____   ___   _____
22                                  )(
     MI FAMILIA VOTA, ET AL.,       )(
23             PLAINTIFFS,          )(
                                    )(    CASE No.
24   VS.                            )(    5:21-cv-0920-XR
                                    )(
25   GREG ABBOTT, ET AL.,           )(
               DEFENDANTS.          )(
```

Yvonne Ramon

## Page 2

```
 1  _____  __  _____
                            )(
 2  UNITED STATES OF AMERICA, )(
           PLAINTIFF,        )(
 3                           )(  CASE NO.
    VS.                      )(  5:21-cv-1085-XR
 4                           )(
    THE STATE OF TEXAS, ET AL., )(
 5        DEFENDANTS.        )(
    _____  __  _____
 6
 7         ------------------------------------
 8          ORAL AND VIDEOTAPED DEPOSITION OF
 9                     YVONNE RAMON
10                    APRIL 21, 2022
11         ------------------------------------
12          ORAL AND VIDEOTAPED DEPOSITION OF YVONNE
13  RAMON, produced as a witness at the instance of the
14  STATE DEFENDANT, and duly sworn, was taken in the
15  above-styled and numbered cause on April 21, 2022, from
16  10:06 a.m. to 4:26 p.m., before Maribel Hernandez, CSR
17  in and for the State of Texas, reported by machine
18  shorthand at the Offices of Texas Attorney General,
19  Child Support Division, Pharr Regional Office, 3508
20  North Jackson Road, Pharr, Texas, pursuant to the
21  Federal Rules of Civil Procedure and the provisions
22  stated on the record or attached hereto.
23
24
25
```

## Page 3

```
 1                A P P E A R A N C E S
 2  FOR THE PLAINTIFF LA UNION DEL PUEBLO ENTERO:
        Nina Perales
 3      MALDEF
        110 Broadway Street
 4      Suite 300
        San Antonio, Texas 78202
 5      (210) 224-5476
 6  FOR THE PLAINTIFF OCA-GREATER HOUSTON:
        Susana Lorenzo
 7      ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND
        99 Hudson St, 12th Floor
 8      New York New York 10013
        (212) 966-5932
 9      info@aaldef.org
10  FOR THE PLAINTIFF LULAC TEXAS:
        Graham White
11      ELIAS LAW GROUP
        10 G St NE
12      Washington, DC 20002
        (202) 968-4507
13      gwhite@elias.law
14  FOR THE DEFENDANT YVONNE RAMON:
        Josephine Ramirez Solis
15      Leigh Ann Tognetti
        HIDALGO COUNTY DISTRICT ATTORNEY'S OFFICE
16      100 E. Cano, First Floor
        Hidalgo County Courthouse Annex III
17      Edinburg, Texas  78539
        Phone: (956) 292-7609
18      josephine.ramirez@da.co.hidalgo.tx.us
        leigh.tognetti@da.co.hidalgo.tx.us
19
    FOR THE DEFENDANTS:
20      Eric A. Hudson
        OFFICE OF ATTORNEY GENERAL OF TEXAS
21      Senior Special Counsel
        P.O. Box 12548
22      Austin, Texas 78711
        (512) 463-2100
23      eric.hudson@oag.texas.gov
24  ALSO PRESENT:
        David Diaz, Videographer (Zoom Video Conference)
25      Brady Bender, DOJ (Zoom Video Conference)
        Juan Estrada, Fried Frank Law Clerk (Zoom Video
```

## Page 4

```
 1  Conference)
        Julia Longoria (Zoom Video Conference)
 2      Knychelle Passmore, DOJ (Zoom Video Conference)
        Lisa Cubriel, Bexar County (Zoom Video Conference)
 3      Tony Nelson, Travis County (Zoom Video Conference)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1                       INDEX
 2                                                   PAGE
 3  Appearances ....................................    3
 4  YVONNE RAMON
        Examination by Mr. Hudson ..................    7
 5
    Signature and Changes ..........................  229
 6
    Reporter's Certificate .........................  232
 7
 8                     EXHIBITS
 9
10  NO.  DESCRIPTION                                 PAGE
11  1    Notice of Deposition .......................   10
12  2    S.B. No. 1 .................................   77
13  3    Fed Ex envelope ............................  161
14  4    Cancellation of Ballot by Mail PowerPoint
         Presentation ..............................  190
15  5    Early Voting In Person Changes PowerPoint
         Presentation ..............................  191
16
17  6    Election Advisory No. 2022-07 ..............  192
18  7    Election Advisory No. 2022-08 ..............  194
19  8    Election Advisory No. 2022-09 ..............  195
20  9    Election Advisory No. 2022-12 ..............  196
21  10   Elections Division Advisories ..............  198
22  11   Training for EVBB/SVC Members on New Ballot
         by Mail Procedures ........................  200
23  12   FAQs on Applications for Ballot by Mail
         (ABBMs) ...................................  203
24  13   FAQs with the Elections Division 02/17/2022 .  204
25  14   FAQs with the Elections Division 02/24/2022 .  204
```

Yvonne Ramon

Page 150

1 has changed, so -- but prior to Senate Bill 1.
2         As soon as the second week of early vote,
3 so we bring them in because there are various processes
4 that I can speak to if you want me to after this.  So
5 they start to meet early enough, and -- and then they
6 make the determination.  It's the early voting ballot
7 board, not my office, that makes the determination to
8 accept or reject a carrier envelope with the ballot that
9 is inside.
10    Q.  Have you ever served as a member of a early
11 voting ballot board?
12    A.  I have not.
13    Q.  Have you ever witnessed an early voting ballot
14 board processing mail-in ballots?
15    A.  When I started, I did, and as per the Election
16 Code, I am not involved.  It is the early voting ballot
17 board, the members who are part of the ballot board that
18 make these determinations, not mine.  So I have a person
19 who is in charge of and over -- and helping in
20 overseeing because the law does allow a tabulator, is in
21 a sense it's called because we have to help them.
22 But -- but basically, that's the extent of our
23 involvement.
24    Q.  Does the Hidalgo County Elections
25 Administrator's office assist in any way with cure

Page 151

1 process for --
2    A.  Yes.
3    Q.  -- carrier envelopes?
4    A.  Yes, we do.  When the ballot board has advised
5 us that there is a ballot to be cured, then we do create
6 a list and that voter comes to our office, and we then
7 set the process for curing and assisting the voter to
8 cure the ballot, and then that ballot carrier/envelope
9 is returned to ballot board.
10    Q.  So you do have a process in place to cure
11 defective mail ballots?
12    A.  Yes.
13    Q.  All right.  Have you used that process prior to
14 Senate Bill 1?
15    A.  No.  There was no curing of the -- of the
16 carrier envelope.  Once it's with ballot board, that --
17 those laws were completely different from now.
18    Q.  And so since Senate Bill 1, you don't have this
19 cure process?
20    A.  Yes.
21    Q.  Have you used the cure process since the
22 passage of Senate Bill 1?
23    A.  Yes.
24    Q.  Was it effective in your opinion?
25    A.  I believe for being the first time it was, yes.

Page 152

1    Q.  Okay.  Do you have any idea of the number of
2 mail ballots that were cured through the process that
3 you put in place under Senate Bill 1?
4    A.  I do.
5    Q.  What's the number?
6    A.  95.
7    Q.  Okay.  So it's 95 voters that prior to Senate
8 Bill 1 would have their ballots rejected?
9    A.  Yes.
10    Q.  Okay.  To your understanding, what is the
11 method for matching identification numbers on a carrier
12 envelope at a ballot -- a mail ballot?
13    A.  So the process has changed from when senate
14 bill was enacted on December the 2nd to now.
15    Q.  Well -- well, let's start with the before time
16 if we can.  So can you walk the Court through the
17 process for examining a mail ballot by the early voting
18 ballot board prior to the passage of Senate Bill 1?
19    A.  So the -- the process is quite extensive
20 because the law requires that once the application has
21 been reviewed and deemed to be a qualified voter to vote
22 by mail, there is -- and I don't want to call it a kit,
23 but there -- there are envelopes that are created,
24 pocket envelopes that now hold that application in place
25 while the carrier envelope, which has various pieces, is

Page 153

1 sent to the voter.
2         Then when that carrier envelope is
3 returned, then it's matched up with the application,
4 because prior to Senate Bill 1, what needed to be
5 matched were the signatures, the signatures on the
6 application and the signature on the back of the carrier
7 envelope.
8    Q.  Now, let's talk about that for a moment.  So
9 prior to Senate Bill 1, the only way to marry up an
10 application and a ballot was by looking at the
11 signature, right?
12    A.  Yes.
13    Q.  Okay.  Do you know if Hidalgo County had ever
14 been sued over the signature match requirements prior to
15 passage of Senate Bill 1?
16    A.  Not to my knowledge.
17    Q.  Okay.  Let me ask you, in -- in your opinion,
18 do you think the signature match is the best way to
19 match ballots and applications?
20         MR. WHITE:  Objection; form.
21         MS. RAMIREZ:  Object to form.
22    A.  It's my opinion, not the law, but I don't
23 believe it is.  I -- I always have wanted there to be a
24 new signature on file every so many years.  I don't know
25 what that length of time would be, but we see the

Yvonne Ramon

April 21, 2022
Pages 154 to 157

Page 154

1 elderly especially that registered at a young age whose
2 signature is no longer the same signature.
3         Mine isn't the same signature now that
4 they're voting by mail. So that in and of itself was a
5 difficult process sometimes.
6     Q. (BY MR. HUDSON) Okay. Now, under Senate Bill
7 1, you have the signature, but you also have the
8 alternative of the identification numbers, right?
9     A. Yes.
10    Q. Assuming that somebody doesn't get a second
11 driver's license, are they going to have the same
12 driver's license number throughout their voting history
13 in Hidalgo County?
14        MS. RAMIREZ: Object to form.
15    A. Yes.
16    Q. (BY MR. HUDSON) What about Social Security
17 numbers? Are you aware of anybody getting a different
18 Social Security number over the course of their
19 lifetime?
20    A. I am not aware. I don't know that process.
21    Q. Okay. So if someone were, for instance, to use
22 a Social Security number as opposed to a signature, in
23 your experience and in your opinion, you would assume
24 that that Social Security number belonged to the person
25 who used it, right?

Page 155

1     A. Yes.
2     Q. Okay. Do you think that that's a more
3 effective way to match ballots and applications?
4        MR. WHITE: Objection; form.
5        MS. RAMIREZ: Object to form.
6     A. It is effective. It doesn't -- this Senate
7 Bill 1 does not exclude the signature, because if there
8 is no signature on that carrier envelope, it is also
9 rejected.
10    Q. (BY MR. HUDSON) Uh-huh.
11    A. But it is not the bate -- primary basis for the
12 acceptance of that carrier envelope.
13    Q. Okay. Do you think that the identification
14 number system is superior to the signature match system?
15        MR. WHITE: Objection; form.
16    A. As we have -- as we have worked with the
17 Secretary of State to -- to work out all the bumps and
18 bruises along the way, eventually we hope that it will
19 be a more effective way.
20    Q. (BY MR. HUDSON) Okay.
21    A. To begin with, it was difficult.
22    Q. Okay. Why was it difficult?
23    A. Because -- because not all IDs were in offline
24 county, which is a Hidalgo County databases. The
25 Secretary of State has the official data -- database,

Page 156

1 which is called Team, and they work with DPS directly
2 and they upload to Team, but we had to work out to the
3 process of also uploading to the offline counties.
4     Q. Well, let's explain to the court what you mean
5 by offline county. So can you describe what that term
6 means, offline --
7     A. Yes.
8     Q. -- so that the judge understands?
9     A. Yes. So as I mentioned, the official voter
10 registration database is called Team, and it is managed
11 by the Secretary of State's office. They have a whole
12 department on this.
13        So when we are an offline county, and if
14 this was before my time that I came in, we were already
15 deemed an offline county. Apparently at that time, the
16 Secretary of State's team division was not strong enough
17 to handle all 254 counties.
18        So the larger counties broke away and, in
19 fact, we pay for a voter registration vendor while Team
20 is still providing that service to the counties that are
21 with them, I believe at no cost still. I'm not sure
22 because I'm not an online county.
23        Regardless, every day we have to submit to
24 the State whatever has been processed. So every day
25 there is an upload to the State, and we work very hard

Page 157

1 at synchronizing our data so that both Team and our
2 vems, is our vendor under VOTEC, databases are
3 synchronized and the same.
4     Q. Okay. So if that it's clear, when you say
5 offline, what you're referring to is your offline from
6 the Teams database?
7     A. Yes. And we -- they, that are online, actually
8 go into the team portal and set up their election. We
9 also do that, but as an upload --
10    Q. Okay.
11    A. -- when it comes to voter records.
12    Q. Now, the third-party vendor that Hidalgo County
13 uses to manage its voter registration information, does
14 that synchronize with the Team database operated by the
15 Texas Secretary of State?
16    A. We do. We utilize their software, but we are
17 the ones that have to synchronize with the state, not
18 our vendor.
19    Q. Okay.
20    A. We manage our -- our software.
21    Q. So Hidalgo County has access to the Team
22 database --
23    A. Yes.
24    Q. -- to identify voter identification numbers,
25 right?

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX U

Transcript of the Testimony of

# The Office of the Dallas County Elections Administrator

## Date:

April 29, 2022

## Case:

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

The Office of the Dallas County Elections Administrator          April 29, 2022

1           UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF TEXAS
2             SAN ANTONIO DIVISION

3  LA UNION DEL PUEBLO ENTERO,)(
   ET AL.,            )(
4                     )(
     PLAINTIFFS,      )(
5                     )(  CIVIL ACTION
   VS.                )(   NO. SA-21-CV-00844-XR
6                     )(
   GREGORY W. ABBOTT, ET AL., )(
7                     )(
                      )(
8  DEFENDANTS.        )(
   --------------------------------------------------------
9
            VIDEOTAPED AND VIDEOCONFERENCED
10             ORAL DEPOSITION OF
            RIVELINO LOPEZ, TACOMA PHILLIPS
11           AND MICHAEL SCARPELLO
                APRIL 29, 2022
12

13       VIDEOTAPED AND VIDEOCONFERENCED ORAL DEPOSITION

14  OF RIVELINO LOPEZ, TACOMA PHILLIPS AND MICHAEL

15  SCARPELLO, produced as witnesses at the instance of the

16  Plaintiff LUPE, and duly sworn, was taken in the

17  above-styled and numbered cause on the 29th day of

18  April, 2022, from 10:47 a.m. to 8:02 p.m., before Holly

19  R. Swinford, CSR in and for the State of Texas, reported

20  by machine shorthand, at the Office of the Dallas

21  Elections Administrator, located at the Records

22  Building, 500 Elm Street, 7th Floor, Room 7Y11, in the

23  City of Dallas, County of Dallas, State of Texas,

24  pursuant to Notice, the Federal Rules, and the

25  provisions stated on the record or attached hereto.

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                        Pages 2 to 5

Page 2

```
1            A P P E A R A N C E S
             – – – – – – – – – – –
2
3  APPEARING FOR THE PLAINTIFF LUPE:
4    MS. NINA PERALES
     MALDEF
5    110 Broadway, Suite 300
     San Antonio, Texas 78205
6    (210) 224-5476 ext. 206
     nperales@maldef.org
7
8  APPEARING FOR THE PLAINTIFF LULAC
9    MR. GRAHAM W. WHITE
     ELIAS LAW GROUP
10   10 G Street, NE Suite 600
     Washington, DC  20002
11   (202) 968-4507
     GWhite@elias.law
12
13 APPEARING FOR THE OCA-GH PLAINTIFFS:  (VIA ZOOM)
14   MS. SOPHIA L. CAI
     JENNER & BLOCK LLP
15   455 Market Street
     Suite 2100
16   San Francisco, CA  94105-2453
     (628) 267-6835
17   SCai@jenner.com
18
   APPEARING FOR DALLAS COUNTY, TEXAS
19
   MR. BEN L. STOOL
20   ASSISTANT DISTRICT ATTORNEY
   MR. JASON SCHUETTE
21   ASSISTANT DISTRICT ATTORNEY
   CIVIL DIVISION
22   CRIMINAL DISTRICT ATTORNEY'S OFFICE
   Records Building
23   500 Elm Street, Suite 6300
   Dallas, Texas  75202
24   (214) 653-7358
   Ben.Stool@dallascounty.org
25   J.Schuette@dallascounty.org
```

Page 3

```
1            A P P E A R A N C E S
             – – – – – – – – – – –
2          (Continued)
3
   APPEARING FOR THE STATE DEFENDANTS:
4
   MS. KATHLEEN HUNKER
5    TEXAS OFFICE OF ATTORNEY GENERAL
     P.O. Box 12548  Mail Code:009
6    Suite 3550
     Austin, Texas  78711
7    (512) 936-2275
     Kathleen.Hunker@oag.texas.gov
8
9  APPEARING FOR THE UNITED STATES (VIA ZOOM)
10   MS. L. BRADY BENDER
     CIVIL RIGHTS DIVISION, VOTING SECTION
11   UNITED STATES DEPARTMENT OF JUSTICE
     950 Pennsylvania Avenue NW
12   Washington, DC  20530
     laura.bender@usdoj.gov
13   (202) 353-5373
14
   APPEARING FOR THE DEFENDANT HIDALGO COUNTY CRIMINAL
15 DISTRICT ATTORNEY RICARDO RODRIGUEZ, JR.   (VIA ZOOM)
16   MS. JACQUELINE VILLAREAL
     ASSISTANT DISTRICT ATTORNEY
17   CIVIL LITIGATION DIVISION
     OFFICE OF THE CRIMINAL DISTRICT ATTORNEY
18   HIDALGO COUNTY, TEXAS
     100 E. Cano
19   Edinburg, Texas  78539
     (956) 292-7609
20   jacqueline.villareal@da.co.hidalgo.tx.us
21
   ALSO PRESENT:  MR. JEREMY ROVNY, VIDEOGRAPHER
22
23
24
25
```

Page 4

```
1                I N D E X
2                            PAGE
3  Appearances...................................   2-3
4  Stipulations..................................   1/6
5  Exhibit Index.................................    5
6  Proceedings...................................    6
7  WITNESS:  RIVELINO LOPEZ
      Examination by Ms. Perales.................    10
8     Examination by Mr. White...................    41
      Examination by Ms. Hunker..................    45
9     Reexamination by Ms. Perales...............    54
      Reexamination by Ms. Hunker................    57
10    Reexamination by Ms. Perales (cont)........    59
      Reexamination by Ms. Perales...............    61
11    Reexamination by Ms. Hunker................    66
12 WITNESS:  TACOMA PHILLIPS
      Examination by Ms. Perales.................    68
13    Examination by Ms. Perales (cont)..........    69
      Examination by Ms. Bender..................   149
14    Examination by Ms. Cai.....................   154
      Examination by Ms. Hunker..................   160
15    Reexamination by Ms. Perales...............   179
      Reexamination by Ms. Hunker................   182
16
   WITNESS:  MICHAEL SCARPELLO
17    Examination by Ms. Perales.................   184
      Examination by Mr. White...................   254
18    Examination by Ms. Cai.....................   282
      Examination by Ms. Hunker..................   295
19
20 Corrigendum and Signature for Mr. Lopez........ 333/334
   Corrigendum and Signature for Ms. Phillips..... 335/336
21 Corrigendum and Signature for Mr. Scarpello.... 337/338
22 Reporter's Certificate.........................   339
23
24
25
```

Page 5

```
1           EXHIBIT INDEX
2
   DEPOSITION
3  EXHIBIT NO.    IDENTIFICATION         MARKED/ID'D
   1    Plaintiffs' Third Amended Notice of
4       Rule 30(b)(6) Deposition of the Office of
        the Dallas County Elections Administrator     18
5  2    Chart received from attorneys at Dallas County
        designating topics and witnesses to speak
6       to topics regarding Dallas County Elections
        Department                                    19
7  3    Summary Report GRP-Detail dated
        November 6, 2018                              59
8  4    S.B. No. 1 as passed by the Legislature      202
   5    Oaths Prescribed by Secretary of State       207
9  6    Oath of Assistance Prescribed by Secretary
        of State                                     207
10 7    Emails provided in supplemental production   232
   8    Legislative Summary 2021 - Special Sessions  249
11 9    News article from KERA published
        April 12, 2022, regarding worker shortage
12      in March                                     263
13
14
15
16
17
18
19
20
21
22
23
24
25
```

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                          Pages 6 to 9

Page 6

1           P R O C E E D I N G S
2           THE VIDEOGRAPHER:  Okay.  We are now on
3  record for the video deposition of Michael Scarpello,
4  Tacoma Phillips and Rivelino Lopez on April 29th, 2022,
5  at 10:47 a.m.  Would Counsel state your appearances for
6  the record?
7           MS. PERALES:  For Plaintiff LUPE, Nina
8  Perales of MALDEF.
9           MR. WHITE:  For -- for the LULAC
10  Plaintiffs, Graham White of the Elias Law Group.
11          MS. HUNKER:  For the State Defendants,
12  Kathleen Hunker.
13          MR. STOOL:  For Dallas County, Texas, Ben
14  Stool, Assistant District Attorney, Dallas County,
15  Texas.
16          MR. SCHUETTE:  And Jason Schuette,
17  Assistant District Attorney.
18          MS. PERALES:  Before we swear in the
19  witness, I would like to get a couple of agreements on
20  the record.  First, Plaintiffs have agreed to waive
21  the -- the reading, under Rule 30, by the court
22  reporter.
23          Defense Counsel, do you have any -- do you
24  also agree to waive that initial reading?
25          MR. STOOL:  Dallas County agrees to waive

Page 7

1  the reading.
2           MS. HUNKER:  State Defendants agree to
3  waive.
4           MS. PERALES:  And the second item I want
5  to address is the order of the witnesses today.
6           Mr. Stool, you've designated three
7  witnesses in response to the Notice of Topics for the
8  Notice of Deposition under Rule 30(b)(6), Michael
9  Scarpello, Tacoma Phillips and Rivelino Lopez.  And is
10  it correct to say Mr. Lopez is here.  He's being
11  produced first, and it's your plan, then, to provide
12  Ms. Phillips and then, at the end, Mr. Scarpello?
13          MR. STOOL:  That is correct.
14          MS. PERALES:  All right.  If -- and -- and
15  just for the purpose of the record, it was my plan to
16  start with Mr. Scarpello to try to cover as much ground
17  as possible before having to bring in these additional
18  witnesses.  And so, because we are starting with Mr.
19  Lopez and
20  Ms. Phillips, I just want to say on the record, that if
21  we get to Mr. Scarpello and he can't answer something,
22  we want to reserve the ability today to bring back
23  either Mr. Lopez or Ms. Phillips to answer those
24  questions.
25          RIVELINO LOPEZ:  Or whatever.

Page 8

1           MR. STOOL:  I understand.
2           MS. PERALES:  Okay.  And then, finally,
3  the last thing is that I wanted to note for the record
4  that Counsel for Dallas County brought some documents
5  with them today to the deposition, which I understand
6  are additional responsive production to a number of
7  Requests for Production by Plaintiffs.  The documents --
8  and I don't know, there's got to be at least 50 pages
9  here -- they are not Bates stamped.
10          Is it -- can you clarify on the record
11  whether you plan or have already sent these in
12  electronic form to Plaintiffs?
13          MR. STOOL:  They have already been sent in
14  electronic form to Plaintiffs this morning.
15          MS. PERALES:  And --
16          MR. STOOL:  The --
17          MS. PERALES:  -- can you tell me who the
18  sender was because I did not see --
19          MR. STOOL:  Barbara Nicholas.
20          MS. PERALES:  Barbara -- Barbara
21  Nicholas --
22          MR. STOOL:  Yes.
23          MS. PERALES:  -- is the sender?  Okay.
24  I'll look for that, and --
25          MR. STOOL:  9:53 this morning.

Page 9

1           MS. PERALES:  Okay.  9:53 a.m.  And
2  then --
3           MS. HUNKER:  The State Defense can confirm
4  that we received the email at that time.
5           MS. PERALES:  Okay.  Thank you.
6           And then is -- can you give me any
7  information on when you plan to produce these documents
8  with Bates stamps?  Would that be by the end of the day
9  or, more likely, at some other time?
10          MR. STOOL:  No.  I very much hope that it
11  will be by the end of the day, as a matter of fact, yes.
12          MS. PERALES:  Okay.  And just, for the
13  record -- and you and I have spoken off the record about
14  this -- I'm going to need some time to go through these
15  documents and decide whether I want to ask questions
16  about them.  So that may require us to take either a
17  longer break for lunch off the record or take some other
18  kind of break.
19          Is there anything else that we should
20  discuss on the record before we swear in the witness?
21          MR. STOOL:  I don't think so.  Not from
22  Dallas County.
23          MS. PERALES:  Okay.  Will you swear in the
24  witness, please?
25          THE REPORTER:  Yes.

Page 10
1        Would you raise your right hand, please?
2        (Witness sworn by the court reporter.)
3        THE REPORTER:  Thank you.
4        And statements -- you can put your hand
5 down --
6        THE WITNESS:  Okay.
7        THE REPORTER:  Statements by the court
8 reporter, according to Rule 30(b) have been waived by
9 all parties present.
10        Would Counsel please state any agreements
11 that haven't already been stated on the record, on the
12 record.  Just according to the Federal Rules, correct?
13        MS. PERALES:  We have no additional
14 agreements to state.
15        THE REPORTER:  Thank you.
16        MS. PERALES:  Are you ready, Mr. Lopez?
17        THE WITNESS:  Oh, yeah.
18        REVELINO LOPEZ,
19 having being first duly sworn, testified as follows:
20        EXAMINATION
21 BY MS. PERALES:
22    Q.  Can you please state your name for the record?
23    A.  Rivelino Lopez.
24    Q.  Thank you.  My name is Nina Perales, and I
25 represent some of the Plaintiffs in this case.  I'm with

Page 11
1 the Mexican American Legal Defense and Educational Fund,
2 MALDEF, and I represent organizations and voters in this
3 case who are challenging the law we refer to as SB 1.
4    A.  Okay.
5    Q.  Have you ever had your deposition taken before?
6    A.  Before February, I had zero.  Now this is my
7 third one in the last two months, yeah, so...
8    Q.  Well, then you're an expert.
9    A.  Yeah.
10    Q.  I'm just going to, quickly, because you are
11 experienced, go through some of the ground rules to
12 refresh your memory of how we do some of this.
13    A.  All right.
14    Q.  Do you understand that you are under oath?
15    A.  Yes.
16    Q.  And that the testimony that you provide today
17 in this deposition is as if you were sitting in court
18 giving that testimony to a Judge?  Do you understand
19 that?
20    A.  Yes.
21    Q.  Okay.  Is there anything today that would
22 prevent you from giving me your full attention and
23 responding accurately?  For example, are you ill, or are
24 you taking any medication that makes your head fuzzy?
25 Is there anything that would prevent you from

Page 12
1 understanding and answering accurately?
2    A.  No.  I'm ready.
3    Q.  Okay.  Thank you.  This is your deposition.
4 You are not noticed for very many topics, so I don't --
5 I don't see this going too long, but I want you to know
6 that if you have a need for a break at any time, you are
7 not my hostage; you can take a break.  The only thing I
8 ask is that we take the break after you answer my
9 question.  So if there's a question still out there on
10 the table, that you answer it before we go on the break.
11        Is that all right with you?
12    A.  Yes.
13    Q.  All right.  And you're doing a great job of
14 answering out loud, but I'm going to remind you that the
15 court reporter cannot take down head nods or shakes or
16 shrugs, so will you agree to make your answers out loud?
17    A.  Yes.
18    Q.  Thank you.  And then, of course, if you would,
19 wait for me to finish my question before you start your
20 answer and I'll wait for you to finish your answer
21 before I start my next question so we don't talk over
22 each other.  Is that okay?
23    A.  Yes.
24    Q.  Thank you.  I'm entitled to your best estimate
25 but I don't want you to guess on anything.

Page 13
1        Do you understand that instruction?
2    A.  Yes.
3    Q.  Okay.  Thank you.  If you don't understand a
4 question, will you please ask me to rephrase it or
5 repeat it.
6    A.  Okay.
7    Q.  All right.  So I want to make sure if you give
8 me an answer, that you have a good understanding of what
9 I'm asking.  Okay?
10    A.  Okay.
11    Q.  And then, finally, I might use some terms
12 interchangeably.  So, for example, if I use the term
13 "Hispanic" or "Latino," will you understand those two
14 terms to mean the same thing for the purpose of this
15 deposition?
16    A.  Yes.
17    Q.  And if I use the term "limited English
18 proficient," will you understand, for the purpose of
19 this deposition, that I mean that it is a person for
20 whom English is not their primary language and they have
21 difficulty communicating in English?
22    A.  Okay.  Yes.
23    Q.  All right.  And then if I use the term "ABBM,"
24 do you understand that to mean application for ballot by
25 mail, or is that not a term you're familiar with?

The Office of the Dallas County Elections Administrator           April 29, 2022
                                                                 Pages 14 to 17

Page 14

1   A.   Yes, I'm familiar.
2   Q.   Okay.  And would that be any application for
3  ballot by mail, annual or just for a single election?
4   A.   I just take it as a application; it could be
5  either-or.
6   Q.   Okay.  Thank you.
7   A.   Yes.
8   Q.   Thank you.
9   A.   Okay.
10   Q.   Are the attorneys who are here today for Dallas
11  County, Mr. Stool and Mr. Schuette, are they your
12  attorneys for this deposition?
13   A.   Yes.
14   Q.   Okay.  Thank you.  Now, I'm not going to ask
15  you to tell me any conversation or any communication
16  (indicating) that you had with your attorneys, but I
17  will ask you whether you met with your attorneys to
18  prepare for this deposition?
19   A.   Yes.
20   Q.   Okay.  And for about how long did you meet with
21  your attorneys, just time?
22   A.   Probably about two hours.
23   Q.   Okay.  Thank you.  Did you talk with anyone to
24  prepare for this deposition who is an attorney with the
25  Texas Attorney General's Office?

Page 15

1   A.   No.
2   Q.   Did you review any information to prepare for
3  this deposition?
4   A.   Yes.
5   Q.   Tell me, generally, what you reviewed to
6  prepare.
7   A.   I reviewed the topics that I'm going to be
8  asked questions on and -- just to prepare.
9   Q.   Okay.  Thank you.  Did you talk to anybody
10  besides your attorneys to prepare for the deposition?
11   A.   Yes, we had a get-together, a Zoom call; and it
12  was also Ms. Phillips and Mr. Scarpello.
13   Q.   Okay.  Anybody else besides Ms. Phillips and
14  Mr. Scarpello on the Zoom and your attorneys --
15   A.   No.
16   Q.   -- if they were there?
17       Okay.  So here, on my outline (pointing), I
18  usually will ask if you brought anything here with you
19  that's related to the case, and I do see a little bit of
20  paperwork there in front of you.
21       Can you just show me?  It looks like that --
22   A.   Well, this --
23   Q.   -- you've got a little chart there right on top
24  that has yellow and orange.  What's that?
25   A.   This is what I'm going to be asked.  I

Page 16

1  highlighted my part.  This whole binder is kind of all
2  the reference material from the case.  I haven't really
3  gone through; but yeah, this is just my -- my stuff
4  (indicating) I brought.
5   Q.   Okay.  Thank you.  And when you say "a binder
6  of reference material" -- I just want to be sure I'm
7  following the rules when I ask you that question.
8       Is -- that's -- can you tell me where those --
9  how do -- how did those materials get to you?  How did
10  you get those materials?
11   A.   They were on my desk when I walked in this
12  morning, so I'm not sure, yeah, who put it there or --
13   Q.   So you don't know who the source is --
14   A.   No.
15   Q.   -- of that?
16   A.   No.
17   Q.   Okay.  So we might -- do you know if there's
18  anything in there that is going to help you that you
19  would refer to it during this deposition?
20   A.   Huh-uh.  My stuff's right here, what I brought.
21   Q.   Oh, okay.
22   A.   Yeah.  This is, like, 200 pages (indicating).
23  I -- yeah, I didn't have time for all that.
24   Q.   You haven't looked at that yet.
25   A.   Huh-uh.

Page 17

1   Q.   So underneath the piece of paper that you said
2  has your designated topics, it looks like there's
3  another maybe couple of pieces of paper.
4       Can you tell me what those are?
5   A.   Statistical data, early voting counts from a
6  couple of elections.
7   Q.   Okay.  So just straight how many early votes
8  were cast --
9   A.   Yes.
10   Q.   -- information?
11   A.   Uh-huh.
12   Q.   Anything in there about whether it was broken
13  down by mail ballot or early voting by personal
14  appearance, anything like that?
15   A.   It has -- it's broken down -- it's just for the
16  primary election comparison, so it's broken down by
17  party.
18   Q.   Okay.  Okay.  So just the number of votes or
19  voters who turned out or the number of ballots cast?
20   A.   Right.
21   Q.   Does it break down the means that the voter
22  voted, like in-person early or mail?
23   A.   It breaks down early voting and election day.
24   Q.   Does it break down early voting by in-person or
25  mail ballot?

Page 18

1   A.   In-person early voting, in-person election day
2 and then other, which includes mail ballot and
3 provisionals.
4   Q.   Okay.  And does that have just data for 2022?
5   A.   '22, 2018 and 2014.
6   Q.   Okay.
7   A.   Yeah.
8   Q.   Thank you.  And later on, when we're on a
9 break, I'll ask your lawyers if that's been produced to
10 us.  And if it hasn't been produced to us, I'll ask to
11 take a copy of that.  Okay?
12   A.   Okay.
13   Q.   And then I'll also ask you some questions about
14 it, too.
15   A.   Okay.
16   Q.   Okay?
17        MS. PERALES:  I'd like to mark this
18 Exhibit 1.
19        (Deposition Exhibit Number 1 marked.)
20        THE REPORTER:  Would you like me to hand
21 it to him?
22        MS. PERALES:  Yes, please.
23        THE REPORTER:  Okay.
24        MS. PERALES:  My arms are not long enough.
25        (Document handed to the witness and Counsel.)

Page 19

1   Q.   Mr. Lopez, I have handed you what has been --
2 or you -- you have received what has been marked Exhibit
3 1 for this deposition.
4        Do you recognize this document?
5   A.   I think I have seen it.  I haven't gone through
6 it; but I have seen it, yes.
7   Q.   Okay.  Do you understand that you're testifying
8 today in response to this Notice of Deposition?
9   A.   Yes.
10   Q.   Okay.  And if you'll turn with me to Page 9, do
11 you see up at the top it's marked Exhibit A?
12   A.   Yes.
13   Q.   Okay.  And then if you just look through it,
14 there are some definitions and then there are some
15 topics, some numbered topics that begin on Page 12, but
16 I will -- yeah.  They begin on Page 12.
17        Do you see those there?
18   A.   Yes.
19   Q.   Okay.
20        MS. PERALES:  Can we mark this Number 2?
21        (Deposition Exhibit Number 2 marked.)
22        (Document handed to the witness and Counsel.)
23   Q.   And Mr. Lopez, you -- you have been handed what
24 has been marked Deposition Exhibit Number 2, and I'll
25 represent to you that this is a chart that we received

Page 20

1 (indicating) from your attorneys at Dallas County.
2   A.   Okay.
3   Q.   And do you see --
4   A.   Do I need to hold it up or -- so that --
5   Q.   No.
6   A.   -- everybody -- oh.
7   Q.   It's okay --
8   A.   Okay.
9   Q.   -- but it's very kind of you to offer.
10   A.   Okay.
11   Q.   Do you see that your name is listed on here, on
12 the far right column (indicating) next to certain
13 topics?
14   A.   Yes.
15   Q.   Okay.  And are you prepared to speak on those
16 topics that your name is associated with?
17   A.   Yes.
18   Q.   Now, do you understand that because you are
19 designated on certain topics, the answers that you give
20 are on behalf of the Dallas County Elections Department?
21   A.   Yes.
22   Q.   Tell me your current job title.
23   A.   Voter Registration Manager.
24   Q.   Okay.  How long have you held that position?
25   A.   11 years.

Page 21

1   Q.   And what was your job before you became the
2 Voter Registration Manager?
3   A.   I worked with the City of Dallas.
4   Q.   And what were you doing there?
5   A.   I was a supervisor at one of the local rec
6 centers.
7   Q.   And where was that rec center?
8   A.   At Harry Stone Recreation Center.
9   Q.   And what neighborhood is that in?
10   A.   Kind of far East Dallas.
11   Q.   Okay.  And so you went from that position with
12 the City of Dallas to become the Voter Registration
13 Manager --
14   A.   Uh-huh.
15   Q.   -- for Dallas --
16   A.   Yes.
17   Q.   -- County?
18   A.   Yes.
19   Q.   Okay.  Are you from Dallas originally?
20   A.   Born and raised, yes.
21   Q.   Where did you go to high school?
22   A.   I lived in Houston about five years, so I did
23 my whole high school career down in Houston at Clear
24 Creek High School.
25   Q.   Okay.  Clear Creek.

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                 Pages 22 to 25

Page 22

1    A.   And then I came back to Dallas.
2    Q.   Then you came back here?
3    A.   Uh-huh.
4    Q.   Did you do any schooling after high school?
5    A.   Yes.  I went to Mountain View College for a few
6  years and then I transferred over to Dallas Baptist
7  University and that's where I graduated.
8    Q.   Okay.  And you got a bachelor's degree?
9    A.   Yes.
10   Q.   Have you done any schooling after that?
11   A.   No.
12   Q.   So, with respect to your current position as
13  the Voter Registration Manager, what are your duties?
14   A.   I oversee the voter registration area, and we
15  maintain voter lists, add and update voter information,
16  whether they're changing their address, changing their
17  name.  We work with the Secretary of State, uploading
18  files, downloading files, sending voter history over to
19  the Secretary of State, working on mapping, you know,
20  precincts and -- and stuff like that.  So we just --
21  just maintain all the voters, 1.4 million voters in
22  Dallas County.
23   Q.   That's a lot of voters.
24   A.   Oh, yeah.
25   Q.   Earlier I was telling you that the Bexar County

Page 23

1  Elections Administrator refers to the big counties as
2  "the big boys."  Have you heard that before?
3    A.   Yes.
4    Q.   Yeah.  Dallas County is one of the big boys,
5  isn't it?
6    A.   Oh, yeah.
7    Q.   Yeah.  Are you familiar with the TEAM system?
8    A.   Yes.
9    Q.   Is Dallas County an online county or an offline
10  county?
11   A.   Offline.
12   Q.   Do you know why Dallas County is an offline
13  county?
14   A.   I think the larger counties, it would be too
15  much for the State system to handle.  So I guess about
16  half the state, especially the larger ones, have their
17  own VR database.
18   Q.   Okay.  I'm going to ask these questions just --
19  not because I'm going to go into them deeply with you.
20  I just want to make sure I understand what you know --
21   A.   Okay.
22   Q.   -- about your relationship with the TEAM
23  system.  And like I said, I'm not going to go deep, but
24  I just want to make sure --
25   A.   Okay.

Page 24

1    Q.   -- I understand.
2         Do you know how many voters in Dallas County
3  you do not have either a driver's license number or the
4  last four of the Social?
5    A.   It's -- I know 99.46 percent do have a driver's
6  license or a Social on record.  So about a half a
7  percent of our -- our registered voters.  I guess it
8  would be close to 70,000.
9    Q.   Do you know how many people only have one
10  number and not both numbers?
11   A.   97.13 percent have at least one.
12   Q.   Have at least one?
13   A.   Uh-huh.
14   Q.   But do you -- can you tell me how many lack
15  both numbers?
16   A.   Probably close to 70,000.
17   Q.   Okay.  Yes.  I asked that question --
18   A.   Yeah.
19   Q.   -- wrong.  Let me try again.
20         How many of your registered voters only have
21  one number and not a second number?
22   A.   That would be -- I want to say -- well, because
23  97 percent of them have either a Texas Driver's License
24  or --
25   Q.   Uh-huh.

Page 25

1    A.   -- an ID.
2    Q.   Uh-huh.
3    A.   So, yeah, I'll have to look at that.  I don't
4  know that number off the top of my head.
5    Q.   Okay.  And so what you -- just so you
6  understand what I'm getting at, if you have a driver's
7  license number for me --
8    A.   Uh-huh.
9    Q.   -- but you don't have my Social --
10   A.   Right.
11   Q.   -- or you have my Social, but you don't have my
12  driver's license.
13         So people for whom you have one number filled
14  in, but you don't have a second number for them, you
15  would have to go back and try to see how many that were?
16   A.   Uh-huh.
17   Q.   Okay.
18   A.   Yes.
19   Q.   Okay.  And now with respect to TEAM, do you
20  have knowledge of whether you received an update from
21  TEAM -- "you," meaning Dallas County -- received an
22  update for TEAM sometime around December or January that
23  was from the Secretary of State that went into your
24  system that had additional ID numbers for your
25  registered voters?

The Office of the Dallas County Elections Administrator
April 29, 2022
Pages 26 to 29

Page 26

1    A.  Not in December and January.  On February 22nd,
2  we received an import that contained driver's license or
3  Socials.  And our vendor matched those up, and whatever
4  voters didn't have a driver's license or Social, they
5  applied it to their record.
6    Q.  And you were able to bring that import in; you
7  didn't have any problems with your data coming in?
8    A.  No.
9    Q.  And that was on February 22nd?
10   A.  Yes.
11   Q.  Okay.  Okay.  Okay.  I'm going to ask you some
12 questions about the period 2018 to the present.
13   A.  Okay.
14   Q.  First, let me ask you whether, in 2018, you
15 used what are sometimes called vote centers or
16 countywide polling places.  Let's just start with for
17 early voting.
18   A.  Uh-huh.
19   Q.  Did you use vote centers or countywide polling
20 places for early voting since 2018?
21   A.  Yes.  Where anybody can vote at any early
22 voting location, yes.
23   Q.  Yes.  Do you have a phrase that you use for
24 that here in Dallas?
25   A.  Well, before we went to vote centers for

Page 27

1  election day, we just called it early voting, yeah.  So,
2  yeah.
3    Q.  Okay.  And so you've mentioned vote centers for
4  election day.
5    A.  Uh-huh.
6    Q.  Do you use vote centers for election day now?
7    A.  Yes.
8    Q.  And can you tell me when you started using vote
9  centers for election day?
10   A.  2019.
11   Q.  Okay.  Have you closed any precinct polling
12 places since you implemented vote centers on election
13 day?
14   A.  Me, personally (pointing), like --
15   Q.  Dallas County.
16   A.  Oh, Dallas County?
17   Q.  Yeah.
18   A.  Yes.  Each election, polling places sometimes
19 have to be closed, yes.
20   Q.  So I know that, for some counties, they are
21 bringing in vote centers for election day; but they
22 haven't yet started closing or eliminating (indicating)
23 precinct-based polling places.  They are trying to, I
24 think, get the vote center thing in there --
25   A.  Oh, okay.

Page 28

1    Q.  -- before they start closing precinct-based
2  polling places.
3        Is that an approach that Dallas County is
4  taking place, as well; or have you started closing
5  precinct-based in-person polls systematically?
6    A.  Right.  We don't have any precinct-based
7  anymore.  We just went straight to vote centers.
8    Q.  Okay.  So if there's a particular elementary
9  school, for example, that people know that they -- that
10 they historically would vote at, from that
11 neighborhood -- let's say they would all go to that
12 elementary school -- have you started closing those
13 types of, you know, polling places and redirecting
14 (indicating) voters to the vote centers that might be
15 fewer?
16   A.  That is currently happening right now.  In
17 2019, they decided to keep all polling places open for
18 vote centers.
19   Q.  Uh-huh.
20   A.  So right now, they are in the process of doing
21 that --
22   Q.  Okay.
23   A.  -- yes.
24   Q.  Got it.  Thank you.  And so for the March 1st,
25 2022, primary, all your polling places were vote

Page 29

1  centers; is that correct?
2    A.  Correct.
3    Q.  And you expect to do that, as well, for the
4  November 2022 general election?
5    A.  Yes.
6    Q.  Okay.  In -- do you recall -- do you recall the
7  hours that you had polling places open in 2018?
8    A.  No.  I'd have to look at the time, but it's --
9  it's pretty standard.  Usually the first week's 8:00 to
10 5:00; second week, 7:00 to 7:00 and then Saturdays,
11 usually 7:00 to 7:00 and Sundays 12:00 to 6:00.  It's
12 pretty -- that's our pretty standard hours each
13 election.
14   Q.  Uh-huh.  Okay.  And did you do anything with
15 extended hours for voting in 2020?
16   A.  They extended an extra week of early voting --
17   Q.  Uh-huh.
18   A.  -- so we had an extra week, and every day was
19 7:00 to 7:00.  So they extended -- instead of 8:00 to
20 5:00, it was 7:00 to 7:00 --
21   Q.  Okay.
22   A.  -- with the exception of Sunday, which was
23 still 12:00 to 6:00.
24   Q.  Okay.  So for -- we were just talking about
25 2020 --

Page 30

1    A.   (Witness moves head up and down.)
2    Q.   -- when you did that.
3         Have you then, with respect to 2022, for the
4    March primary, did you keep those same hours as you had
5    in 2020; or did you make any adjustments?
6    A.   No.   Went back to our standard 8:00 to 5:00,
7    7:00 to 7:00.   We did extend the last day of early
8    voting for the primary to 10:00 o'clock.
9    Q.   To 10:00 p.m.?
10   A.   Uh-huh.
11   Q.   And that was --
12   A.   I believe it was the 25th of February.   I
13   believe that was the last day of early voting.
14   Q.   And why did you extend voting until 10:00 p.m.
15   on February 25th, 2022?
16   A.   It was ordered by the County Judge.   We kind of
17   found out at the last minute.   They let us know, Hey
18   we're staying opened till 10:00.
19        And I don't even know if they advertised it or
20   whatever.   But yeah, we found out at the last minute, so
21   we just kept the polls open till 10:00.
22   Q.   You asked the poll workers to stay and --
23   A.   Yeah.   We had to send, like, a mass -- our
24   ePollbook has a messaging.   So we sent a mass message,
25   and we were also calling them, too, so -- to let them

Page 31

1    know.
2    Q.   Okay.   And do you know if staying open until
3    10:00 p.m. on February 25th afforded voters in Dallas
4    County an additional opportunity to go to the polls and
5    cast their ballot that day?
6         MS. HUNKER:   Objection, form.
7    A.   It did, yes.
8    Q.   (By Ms. Perales)   Do you know or do you have a
9    sense of why the County Judge ordered you to stay open
10   till 10:00 p.m. on the last day?
11   A.   I do not.
12   Q.   Okay.
13   A.   Can't recall.
14   Q.   All right.   Do you know if there were voters
15   who were trying to vote mail ballots who were then
16   coming to the polls on that last day, including up till
17   10:00 p.m., to -- to hand drop-off their mail ballots?
18        MS. HUNKER:   Objection to form.
19   A.   I don't know.
20   Q.   (By Ms. Perales)   Okay.   So I have a question
21   about your involvement in kind of voting during the
22   election days when people are voting.
23        You're the Voter Registration Manager --
24   A.   Uh-huh.
25   Q.   -- but it sounds like you've also got some

Page 32

1    duties that are related to the actual casting of
2    ballots; is that right?
3    A.   No.   I stick to voter registration.   So we
4    help -- like, if a judge calls, has a voter that's
5    having an issue, they can't find them in the poll book,
6    we look them up and help them.   Like, during early
7    voting, we offer limited ballot process.   Election Day,
8    they offer the provisional process, so we help them,
9    help the judge and the voter through that.
10   Q.   Okay.   And then, as the Voter Registration
11   Manager, were you involved in trying to process, for
12   March 2022, people's applications for ballot by mail and
13   mail ballots to the extent that there was this new
14   requirement to match the ID number, that was being
15   provided, to the voter?
16   A.   No.
17   Q.   You weren't doing any of that matching work?
18   A.   No.   If they -- if the ballot by mail
19   department gave us a form, we -- like, because it had a
20   Statement of Residence, also --
21   Q.   Uh-huh.
22   A.   -- on the form.   So if they filled out a form,
23   they would give it to us and we would update their
24   information.
25   Q.   Okay.   So that's if you had the person at the

Page 33

1    wrong address.
2         Do you have any knowledge, in March of 2022,
3    this most recent primary election, of voters having to
4    put an ID number, either driver's license or last four
5    of the Social, on their application for ballot by mail
6    or on the carrier envelope?
7    A.   Yes, I knew about that.
8    Q.   Okay.
9    A.   Yes.
10   Q.   Were you involved in doing any of the checking
11   of those numbers or trying to match those numbers to the
12   voter roll?
13   A.   No, I wasn't.
14   Q.   Okay.   You've been designated to talk about
15   Dallas County's experience with voters who vote with
16   assistance in person from 2018 to the present.
17        Do you have knowledge about Dallas County
18   Election's experience with voters who come with another
19   person to vote in person, so at the polls?
20   A.   When we were preparing, they asked if we can
21   pull statistics.   And so I went into our ePollbook, and
22   we -- we can.   We do track that with our new ePollbook,
23   our current one.   Before, we weren't tracking it; but I
24   was able to pull statistics to show how many people
25   requested assistance.

Page 34

1    Q.   Uh-huh.  And I just learned yesterday that the
2  ePollbook can be handy for figuring that information
3  out.
4    A.   Yeah.
5    Q.   So a couple of questions.  When you say that
6  you didn't track it before, what does "before" mean?
7    A.   Before we implement our current ePollbook,
8  which is before 2020.
9    Q.   Okay.  But for -- at least for 2020 onward, you
10  can run a report that tells you how many voters voted at
11  the polling place with assistance; is that right?
12    A.   Yes.
13    Q.   And the poll book, the ePollbook is used in the
14  polling places where the people come personally to vote;
15  is that right?
16    A.   Yes.
17    Q.   Would you have that same information for who
18  voted with assistance by mail ballot, where the assistor
19  signs on the mail ballot --
20    A.   I wouldn't have that, no.
21    Q.   Okay.  Did you run any reports about how many
22  voters used assistants in either this most recent 2022
23  or prior elections?
24    A.   I did.  I didn't -- I -- I ran the reports to
25  get the numbers.  I wrote the numbers down, but I don't

Page 35

1  have the reports.
2    Q.   Okay.  So I'm going to ask you for the numbers
3  so you can --
4    A.   Okay.
5    Q.   -- tell me them, and then I'm going to ask for
6  the reports, themselves, to be produced because I
7  believe that information is responsive to at least one
8  of our Requests for Production.
9    A.   Okay.
10    Q.   Okay.  So tell me the numbers that you have.
11    A.   For this recent primary election, 2022, there
12  was 752 voters requested assistance.  For November 2021,
13  there was a hundred and thirty.  For June 2021, we had
14  88.  For May 2021, we had 228.  And for November 2020,
15  we had 4,335.  And we had a small run-off election
16  December '21.  We only had one.
17    Q.   That must have been a very small run-off.
18    A.   Yeah.
19    Q.   December of 2021.  I'm just trying to think of
20  what office would have been in a run-off in December of
21  2021, but it must --
22    A.   I --
23    Q.   -- must have been something special.
24    A.   Yeah.
25    Q.   Okay.  Thank you.

Page 36

1    A.   All right.
2    Q.   So since it sounds like you've already run a
3  few reports, so you're familiar with how to run these
4  reports, is that right, on the ePollbook?
5    A.   Yes.
6    Q.   Okay.  Can you also get the names of the
7  voters?
8    A.   Yes.  The names are on the report.
9    Q.   Okay.  Okay.  So, for example, you could see
10  which voters have a Spanish surname, like Lopez or
11  Perales versus another kind of name?
12    A.   Yes.
13    Q.   Okay.  What is the software that you're using
14  now that allows you to run the report?
15    A.   It's called ExpressPoll Connect, and the vendor
16  is ES&S, which is Election Systems & Software.
17    Q.   Have you ever assisted a voter to vote?  Have
18  you ever gone with someone and helped them?
19    A.   I have not.
20    Q.   Okay.  Do you have anyone in your family here
21  in Dallas County who uses assistants to vote?
22    A.   No.
23    Q.   No viejitos?
24    A.   No.
25    Q.   Okay.  Does Dallas County -- or from January of

Page 37

1  2018 until now, has Dallas County done any kind of voter
2  registration or voter outreach to specific communities
3  within Dallas County, either aiming the outreach at
4  particular neighborhoods or particular populations,
5  either voter registration outreach or voter outreach?
6    A.   Not specifically.  Anytime we've gone out to do
7  voter drives, we go to high schools, we go to colleges,
8  college campuses.  If somebody invites us because they
9  are having a big event -- it could be in the southern
10  sector, west side, east, we attend those.  And so we
11  don't specifically target one area over the other.
12    Q.   Okay.  Have you ever done any special outreach,
13  for either registration or voting, to disabled folks in
14  the community, any special disability outreach?
15    A.   No.
16    Q.   Let's talk about immigrants to the United
17  States.
18       Do you do any voter registration drives outside
19  of naturalization ceremonies?
20    A.   No.  We do inside.  We -- we go inside to the
21  naturalization ceremony.
22    Q.   Okay.  So --
23    A.   -- so...
24    Q.   -- somewhere in the building, you set up a
25  table.  Is that it?

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                       Pages 38 to 41

Page 38

1    A.  Yes.  We used to, in the past, me and my staff,
2  we'd go to -- I mean, a couple of times a week
3  sometimes -- and we would register newly citizens.  Now
4  we have an Outreach Coordinator that kind of handles
5  that.  She was hired to do that, so she has volunteer
6  deputy registrars that go out to those locations now.
7    Q.  Do you have any records on how many people you
8  have registered to vote in connection with
9  naturalization ceremonies?
10    A.  I don't.
11    Q.  Nowhere do you -- do you have, like, something
12  in your office that says, okay, for this past year, this
13  is how many people we registered outside of
14  naturalization ceremonies, just to --
15    A.  Right.
16    Q.  -- show like how much work you're doing?
17    A.  Right.  Maybe our Outreach Coordinator would.
18  I just wouldn't have that right now.
19    Q.  Okay.  Do you do any outreach for voter
20  registration or voting in languages other than English?
21    A.  Spanish, yes.  And we just got a third
22  language, so I'm sure we'll be doing Vietnamese
23  outreach, as well.
24    Q.  You're newly covered for Vietnamese, right?
25    A.  Yes.

Page 39

1    Q.  And what's your other language?  You said it's
2  the third, so Spanish, Vietnamese --
3    A.  And English.
4    Q.  Oh.  Okay.  Have you ever done any voter
5  registration or voter outreach in minority neighborhoods
6  (indicating) specifically, or that just happens
7  naturally as a result of your regular work?
8    A.  Right.  It happens --
9        MS. HUNKER:  Objection, form.
10    A.  -- naturally.  I mean, if the high school or
11  the college is in a minority area, I mean, yes, we're --
12  we're there.
13    Q.  (By Ms. Perales)  Okay.  Do you -- do you have
14  any involvement in where you choose to locate polling
15  places for voting?
16    A.  I don't.
17        MS. PERALES:  I would like to take a
18  couple of minutes off the record, if I could.
19        THE VIDEOGRAPHER:  Okay.  We're going off
20  the record.  The time is 11:29 a.m.
21        (Break taken.)
22        THE VIDEOGRAPHER:  Okay.  We are back on
23  the record.  The time is 11:33 a.m.
24        MS. PERALES:  Okay.  Before I pass the
25  witness, Mr. Lopez, I want to thank you for your

Page 40

1  patience with us today.  You are not done, but you
2  are done with me, and I'm going to pass you along to
3  Mr. White here.  But I did want to note for the record
4  that, based on our discussion, that the ExpressPoll Pad
5  Connect software can run reports on how many voters
6  voted in person with an assistor, that we believe that
7  that information is responsive to some of our request
8  for production.  And we are happy to continue this
9  conversation, but I want to note for the record that we
10  believe that the reports that Mr. Lopez is referencing
11  is something that we've asked for in the case, and that
12  Mr. Lopez also suggested there might be records
13  maintained by the Outreach Coordinator on voters --
14  voter outreach at naturalization ceremonies, which may
15  also be responsive to our discovery requests.  And I'd
16  be happy to sort of pinpoint that for you at a later
17  point, but I want to make sure that I get that on the
18  record before I pass the witness.
19        MR. STOOL:  Understood.
20        MS. PERALES:  And now I pass the witness.
21        MR. STOOL:  All right.
22        MS. PERALES:  And we're just going to --
23        MR. WHITE:  Yeah, I'll --
24        MS. PERALES:  -- hand this microphone to
25  Mr. White.

Page 41

1            EXAMINATION
2  BY MR. WHITE:
3    Q.  Mr. Lopez, how are you?
4    A.  Doing good.
5    Q.  I just have a couple of questions about your
6  testimony earlier about extended hours in voting.
7        And you testified earlier that polling places
8  were open until 10:00 p.m. on February 25th, 2022 --
9    A.  Yes.
10    Q.  -- is that right?
11        And was that because of a Court Order?
12    A.  Yes.
13    Q.  And do you remember what the reason was for the
14  judge ordering the extended voting hours?
15    A.  I don't.
16    Q.  Okay.  And how late were polling places
17  supposed to stay open prior to that Court Order?
18    A.  7:00.
19    Q.  Until 7:00 p.m.?
20    A.  Well, If there's no voters in line at 7:00
21  o'clock.  But if there's voters, they got to vote.
22    Q.  Were you concerned that having polling places
23  open until 10:00 p.m. on that day would lead to a voter
24  fraud?
25    A.  No.

The Office of the Dallas County Elections Administrator                     April 29, 2022
                                                                            Pages 42 to 45

Page 42

1    Q.  Why not?
2           MS. HUNKER:  Objection, form.
3    A.  I have no reason to believe that, no.
4    Q.  (By Mr. White)  Was anyone in your office
5  concerned that having the polling places open until
6  10:00 p.m. would lead to voter fraud?
7           MS. HUNKER:  Objection, form.
8    A.  I can't speak for them, no.
9    Q.  (By Mr. White)  Did you hear anyone in your
10 office express concerns to you that these extended hours
11 would lead to voter fraud?
12   A.  No.
13   Q.  Did your office receive any complaints from
14 voters that these extended hours would lead to voter
15 fraud?
16          MS. HUNKER:  Objection, form.
17   A.  I don't know if we received any complaints.
18   Q.  (By Mr. White)  Are you aware of any voter
19 fraud that occurred during these extended hours on
20 February 25th?
21   A.  I'm not aware of any.
22   Q.  Do you know how many voters showed up to vote
23 during these extended hours on February 25th?
24   A.  I do not have those numbers.
25   Q.  Okay.  Do you know if there were particular

Page 43

1  precincts in Dallas County where voters were more likely
2  to show up during these extended hours on February 25th?
3    A.  I don't --
4           MS. HUNKER:  Objection, form.
5    A.  -- know that.
6    Q.  Okay.
7           THE REPORTER:  I'm sorry.  Okay.  Thank
8  you.
9    Q.  (By Mr. White)  As a general matter, are there
10 voters in Dallas County who struggle to make it to the
11 polls during normal voting hours?
12          MS. HUNKER:  Objection, form.
13   A.  Repeat the question.
14   Q.  As a general matter, are there voters in Dallas
15 who struggle to make it to the polls during normal
16 voting hours?
17          MS. HUNKER:  Objection, form.
18   A.  I don't know.
19          MR. WHITE:  Okay.  I have no further
20 questions.
21          THE REPORTER:  Just a --
22          MR. WHITE:  And I will pass the --
23          THE REPORTER:  Just a second.  Okay.
24 Thank you.
25          MR. WHITE:  Okay.  Well, I will pass the

Page 44

1  witness, I guess, to anyone on the Zoom who wants to ask
2  questions remotely --
3           MS. PERALES:  Plaintiffs' side on the
4  Zoom.
5           MR. WHITE:  -- on the Plaintiffs' side.
6           MS. PERALES:  So I'm not tethered.  Just
7  give me a second to come down the table.
8           MS. BENDER:  The United States has no
9  questions at this time.  Thank you.
10          MS. PERALES:  Thank you.  This is Nina
11 Perales talking to you now.  Is there anybody on the
12 Zoom who has questions for the witness from the
13 Plaintiffs' side?
14          MS. CAI:  No questions from us at this
15 time.  Thank you.
16          THE REPORTER:  And can you identify?
17          MS. PERALES:  Yeah.  And just let me know
18 who said "No questions for the United States."
19          MS. BENDER:  This is Brady Bender.
20          MS. PERALES:  Brady Bender.
21          THE REPORTER:  Thank you.
22          MS. BENDER:  Yes.
23          MS. PERALES:  Thank you so much.  It just
24 sounds like --
25          MS. BENDER:  Thank you.

Page 45

1           MS. PERALES:  -- none of the other
2  Plaintiffs have questions.  So I think it's coming
3  around the table to Ms. Hunker.
4                 EXAMINATION
5  BY MS. HUNKER:
6    Q.  All right.  Hello, Mr. Lopez.
7    A.  Hello.
8    Q.  It's good seeing you again.
9    A.  You, too.
10   Q.  So I have only a handful of questions for you.
11 To give you a precursor, my questions are mostly in
12 response to what the Plaintiffs have asked, and so
13 there's going to be a little bit of jumping around.
14       If at any point you get confused by my
15 switching subject or I'm not clear, can you please let
16 me know?  I am happy to lay either more foundation or to
17 rephrase the question.
18   A.  Okay.
19   Q.  Excellent.  So you had spoken about the
20 extended hours on February 25th, 2022; is that correct?
21   A.  Yes.
22   Q.  And the extended hours was based off of
23 decision from a Court; is that correct?
24   A.  Yes.  The County Judge, yes.
25   Q.  So when you say "a court" and you say "the

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                       Pages 46 to 49

Page 46

1 County Judge," are you referring to a judicial action,
2 or are you referring to the County Judge acting in his
3 executive capacity in Dallas County?
4     A.   The County Judge from the Commissioners Court.
5     Q.   Okay.  So you're referring to the Commissioners
6 Court made the decision to have extended hours?
7     A.   Yes.
8     Q.   Okay.  So this was not imposed on Dallas
9 County.  This was a decision that Dallas County made,
10 itself; is that correct?
11    A.   Yes.
12    Q.   And they did not communicate why they asked for
13 extended hours on February 25th?
14    A.   They may have.  I just don't know that answer.
15    Q.   And so let me break that question down twice,
16 just to -- to clarify.
17         You were not aware of the reasons they
18 requested extended hours at all during that election; is
19 that correct?
20    A.   Correct.
21    Q.   And you do not know why they requested extended
22 hours on the specific day of February 25th; is that
23 correct?
24    A.   Correct.
25    Q.   When you extended hours from -- ending at 7:00

Page 47

1 moving it to 10:00 p.m., were there any logistical
2 challenges that you faced with that?
3     A.   Not that I'm aware of.
4     Q.   And when you're answering this question, are
5 you speaking about your specific subdivision within the
6 Election Administrator's Office, or are you talking
7 about the Election Administrators as a whole?
8     A.   As a whole.
9     Q.   Okay.  And so did you have problems, for
10 example, securing additional poll watcher- -- poll
11 workers?
12    A.   Not that I'm aware of.
13    Q.   And did you have any problem securing any
14 election judges?
15    A.   Not that I'm aware of.
16    Q.   Did you consider hosting 24-hour voting
17 locations during November 2020?
18    A.   No.
19    Q.   And do you know if your office considered
20 hosting extended hours during November 2020 at all?
21    A.   Not that I'm aware of.
22    Q.   So Ms. Perales had mentioned county-wide
23 voting, and you said you had -- Dallas County started
24 county-wide voting on Election Day in 2019; is that
25 right?

Page 48

1     A.   Yes.
2     Q.   And you had also discussed the process of
3 eliminating precincts; is that right?
4     A.   Yes.
5     Q.   Will precincts be closed in November of 2020
6 based on the -- let me rephrase that question because I
7 used the wrong year.
8     A.   Uh-huh.
9     Q.   Will precincts be closed in November 2022 based
10 on the switch to countywide voting in 2019?
11    A.   That is a plan, to close --
12    Q.   Okay.
13    A.   -- those centers, yes.
14    Q.   Do you know how many?
15    A.   I don't have that number yet.
16    Q.   Do you know how many early voting locations
17 were available for voters in November 2018?
18    A.   I don't know that number.
19    Q.   Okay.  What about November 2020?
20    A.   I don't have that number either.
21    Q.   Okay.  And you wouldn't know the amount of
22 election day locations on either of those years, would
23 you?
24    A.   No, not off the top of my head.  No.
25    Q.   Do you know if they'll be -- let's start with

Page 49

1 early voting -- if it will be the same number or
2 approximately the same number of polling locations in
3 the early voting period in November 2022 as there was in
4 November 2018?
5     A.   Approximately, yes, it should be close.
6     Q.   Okay.  And I'm going to ask the same question
7 with respect to November 2020.
8         Do you know if this might be approximately the
9 same number of locations in 2022, November, as there
10 were in November 2020?
11    A.   Approximately, yes, should be close.
12    Q.   And I'm going to ask the same question with
13 respect to Election Day.
14         To your knowledge, are there going to be
15 approximately the same number of polling locations on
16 Election Day in November 2022 as there were in November
17 2020?
18    A.   No.  It will be less.
19    Q.   And do you know by how much, roughly?
20    A.   I don't.
21    Q.   And what about based on 2018?  Would there be
22 approximately the same number of polling locations in
23 November 2022 as there would be -- as there were in
24 '20 -- November 2020?  Let me rephrase that question
25 because I completely messed up while stating it.

The Office of the Dallas County Elections Administrator                April 29, 2022
Pages 50 to 53

Page 50

1       Do you know if it will be approximately the
2  same number of polling locations in November 2022 as
3  there were in November 2018?
4       A.   It will be less.
5       Q.   It will be less.
6       A.   Yes.
7       Q.   And what was the reason for the decline?
8       A.   It was -- in 2019, they decided to keep all of
9  them open, when we went to vote centers.  They wanted to
10 keep every single precinct open.  And then they said
11 after a two-year cycle, they would go down.  They
12 would -- the Commissioners Court would decide on
13 decreasing the number of locations to save on cost and
14 number of poll workers --
15      Q.   Uh-huh.
16      A.   -- so...
17      Q.   And did they have voter input with this, or did
18 they open the -- the decision-making process to voter
19 input?
20      A.   They opened it up.
21      Q.   And so voters were able to voice their concerns
22 or their support for the initiative?
23      A.   They have.
24           MR. WHITE:  Objection to form.
25      A.   They have -- they put a committee together,

Page 51

1  Vote Center Advisory Committee.
2       Q.   (By Ms. Hunker)  Do you know if any of the vote
3  center committees findings or discussions are online?
4       A.   I don't know if they are online.
5       Q.   Now, you had also discussed the ePad or the --
6  where you sign in on -- when in-person voting.  And I
7  believe you said that that picks up who has requested
8  assistance, all for the last few years; is that right?
9       A.   Yes.
10      Q.   How does that work exactly?
11      A.   The ePollbook has -- you can sign on the
12 ePollbook, so there's a oath on there if somebody
13 requests assistance, and then the person giving the
14 assistance signs the oath on there.  And so when we do
15 the report, even the signature comes on the report, as
16 well.
17      Q.   Okay.  And so when it comes to assistants, it's
18 only picking up individuals who took the oath; is that
19 correct?
20      A.   Yes.
21      Q.   And so it's only taking individuals who assist
22 with the actual marking of the ballot; is that correct?
23           MS. PERALES:  Objection, vague.
24      A.   The -- for the ballot-marking device, yes.
25      Q.   (By Ms. Hunker)  So if, let's say, I were to

Page 52

1  bring my grandmother in to vote and she's in a
2  wheelchair and I helped push her to the polling
3  location, but then she voted on her own, would she --
4  would I have had to sign the poll book?
5           MR. WHITE:  Objection --
6           MS. PERALES:  Objection --
7           MR. WHITE:  -- form.
8       A.   No.
9           THE REPORTER:  I'm sorry.  Thank you.
10      Q.   (By Ms. Hunker)  And so only certain types of
11 assistance are marked on the poll book; is that correct?
12           MS. PERALES:  Objec- --
13      A.   Voting assistance.
14           MS. PERALES:  -- -tion --
15      Q.   (By Ms. Hunker)  Voting assistance.
16           MS. PERALES:  -- this is --
17      A.   Yes.
18           THE REPORTER:  Sorry.
19           MS. PERALES:  Objection -- hold up --
20           THE WITNESS:  Okay.
21           MS. PERALES:  -- for one second --
22           THE WITNESS:  Okay.
23           MS. PERALES:  -- if you would.
24           First, objection, form; second, I want to
25 object that this is outside the scope of the designated

Page 53

1  topic of this witness and possibly outside the scope of
2  his knowledge as the Voter Registration Director.
3           THE REPORTER:  And I didn't hear your
4  answer.  Can you say your answer again?  You just said a
5  few words, I know, but I did not hear you.
6           THE WITNESS:  Yes.
7           THE REPORTER:  Thank you.
8       Q.   (By Ms. Hunker)  And so let me ask the question
9  again because I actually lost my place of thought.
10          MS. HUNKER:  And I would ask that we keep
11 speaking objections to a minimum under local rules, 30,
12 only because it does disrupt my thought process.
13          MS. PERALES:  And I will, however, be
14 making the same objections again.
15          Go ahead, Ms. Hunker.
16      Q.   (By Ms. Hunker)  So only certain types of
17 voting assistance are -- let me -- let me rephrase the
18 question.
19          Only people who are offering certain types of
20 voting assistance sign on the ePad; is that correct?
21      A.   Yes.
22          MS. PERALES:  Same objection.
23      Q.   (By Ms. Hunker)  And how much familiarity do
24 you have with the ePad or the process in which an
25 assistor would sign the ePad?

Page 54

1    A.  I've been trained on it, and I've helped --
2  I've trained others on my staff.  I've trained them on
3  it, as well.
4    Q.  So is this part of your responsibilities?
5    A.  Not at the polls.
6    Q.  But you said you have trained on this
7  particular device; is that correct?
8    A.  Yes.
9    Q.  And you've trained others?
10   A.  Right.
11   Q.  And have you seen it work and function?
12   A.  Yes.
13   Q.  And are you familiar with how it operates?
14   A.  Yes.
15   Q.  And you're familiar with the procedures in
16  which it -- it operates on this?
17   A.  Yes.
18       MS. HUNKER:  All right.  No further
19  questions.
20       MS. PERALES:  I have questions if Defense
21  Counsel don't.
22       MR. STOOL:  No, I don't have any.
23       MS. PERALES:  Okay.
24           REEXAMINATION
25  BY MS. PERALES:

Page 55

1    Q.  Well, Mr. Lopez, I spoke too soon when I said I
2  was done with you.
3        Do you work at the polling place on Election
4  Day?
5    A.  No.
6    Q.  Do you make a decision or have you ever made
7  the decision whether somebody who is coming into the
8  polling place to assist another voter has to sign the
9  Oath of Assistance?
10   A.  Not at the polls, no.
11   Q.  Are you aware of the criteria that poll workers
12  and election judges use to decide who has to sign the
13  Oath of Assistance when they come with a voter to the
14  polling place?
15       MS. HUNKER:  Ob- --
16   A.  Yes.
17       MS. HUNKER:  -- -jection, form.
18   A.  Yes.
19   Q.  (By Ms. Perales)  Say that again.
20   A.  Yes.
21   Q.  And what is that criteria, then?
22   A.  If they are -- if the voter requests
23  assistance, that's the person that will be signing the
24  ePollbook.
25   Q.  Okay.  And so the voter comes with the

Page 56

1  assistor?
2    A.  Uh-huh.
3    Q.  The voter says, I -- I want to bring this
4  person here to help me vote, and then the assistor signs
5  the oath; is that correct?
6    A.  Yes.
7    Q.  And are -- do you know if there's criteria that
8  election judges and poll workers use to decide whether
9  someone who's pushing a wheelchair, for example, is or
10  isn't an assistor?
11   A.  Is there a criteria?
12   Q.  Yeah.  Do the poll workers make the decision,
13  who is an assistor?  You know, what kind of help makes
14  you an assistor or not?  Do -- are you aware of any
15  criteria that the poll workers use to make that
16  decision?
17   A.  They have a training guide, yes.
18   Q.  Okay.  And so do you -- can you say, sitting
19  here today, whether someone who's pushing a wheelchair
20  with a voter and then comes in with them and over to the
21  voting station, can you say whether, sitting here today,
22  you know whether the poll workers would ask that person
23  who was pushing a wheelchair to sign the oath or not?
24       MS. HUNKER:  Objection, form.
25   A.  Yes, because that person would have to say, "I

Page 57

1  need assistance, and here's my assistor" --
2    Q.  (By Ms. Perales)  Okay.
3    A.  -- yes.
4    Q.  So, in that instance, the person pushing the
5  wheelchair and going over to the voting station with the
6  voter is the assistor who would sign the oath; is that
7  right?
8    A.  Yes.
9        MS. PERALES:  Okay.  Thank you.
10       I pass the witness.
11       MR. WHITE:  I have no further questions.
12       MS. HUNKER:  Just to quickly clarify on a
13  point, assuming there's no other questions from the
14  attorneys on Zoom.  Hearing none --
15       MS. BENDER:  No questions.
16       MR. STOOL:  ID.  ID.  Who said that?
17       MS. PERALES:  Oh, that's -- that's Brady.
18       THE REPORTER:  Thank you.
19       MS. BENDER:  I'm sorry.  That's right.  No
20  questions at this time.  Thank you.
21           REEXAMINATION
22  BY MS. HUNKER:
23   Q.  So in the example where an individual is being
24  pushed, the way that the as- -- the way they would sign
25  the eBook or ePad is if they were announced, "This is my

The Office of the Dallas County Elections Administrator     April 29, 2022
                                                            Pages 58 to 61

Page 58

1  assistor"; is that correct?
2     A.   Correct.
3     Q.   And so if the person who is voting chooses not
4  to state, "This is my assistor," that person would not
5  sign the eBook; is that correct?
6     A.   Correct.
7        MS. HUNKER:  Thank you.
8        MS. PERALES:  And so subject to another
9  witness saying that they can't testify on a topic that
10 Mr. Lopez says he has knowledge of, then I think we can
11 switch over to the next witness now.
12       MR. STOOL:  Okay.  Mr. Lopez needs to get
13 back to the Elections Department, which is not that far
14 from here, but -- so if he has to come back, he'll have
15 to drive back down here.  But he's got duties he's got
16 to take care of because early voting is going on as
17 we're having this conversation.
18       MS. PERALES:  Understood.
19       MR. STOOL:  Okay.  So --
20       MS. PERALES:  Shall we take a moment off
21 the record --
22       MR. STOOL:  Sure.
23       MS. PERALES:  -- to switch out our
24 witnesses.
25       MR. STOOL:  Yes.

Page 59

1        THE VIDEOGRAPHER:  Okay.  We're going off
2  the record.  The time is 11:53 a.m.
3        (Break taken.)
4        (Deposition Exhibit Number 3 marked.)
5        THE VIDEOGRAPHER:  Okay.  We're back on
6  the record.  The time is 12:06 p.m.
7           REEXAMINATION
8        (Continued)
9  BY MS. HUNKER:
10    Q.   Hi, Mr. Lopez.
11    A.   Hi.
12    Q.   I am sorry to bring you back onto the hot seat,
13 but I had one or two more questions for you in relation
14 to the document that you and your Counsel had produced
15 to us during the deposition.
16    A.   (Witness moves head up and down.)
17    Q.   So you see -- do you have in front of you the
18 document that says "Summary Report GRP-Detail," and then
19 it says "2018 General & Joint Election"?
20    A.   Yes.
21    Q.   And this is for November 6, 2018, correct?
22    A.   Correct.
23    Q.   And then there's a part here that says straight
24 ticket; is that right?
25    A.   Yes.

Page 60

1     Q.   What does that mean?
2     A.   That means a voter can go into the polls and
3  just select a party, and it would select all those
4  candidates on that party.
5     Q.   So voters had an opportunity to vote straight
6  ticket in 2018, correct?
7     A.   Yes.
8     Q.   They did not have that opportunity in November
9  2020; is that correct?
10    A.   That's correct.
11    Q.   And they will not have that opportunity in
12 November 2022; is that correct?
13    A.   That's correct.
14    Q.   And that's because the law changed in
15 between -- or I should say before November 2020
16 election; is that correct?
17    A.   Correct.
18    Q.   And so Texas no longer allows straight ticket
19 voting; is that correct?
20    A.   Yes.
21       MS. HUNKER:  Thank you.
22       THE WITNESS:  Okay.  Thanks.
23       MS. PERALES:  And --
24       THE REPORTER:  I'm sorry.  Can you wait
25 one second?  Thank you.

Page 61

1           REEXAMINATION
2  BY MS. PERALES:
3     Q.   And just a couple of questions also about this
4  document, which I would like the court reporter to hand
5  to you, and it has been marked as Exhibit 3.
6        (Document handed to the witness.)
7     Q.   So, Mr. Lopez, you've been handed what has been
8  marked Exhibit 3, and do you recognize those as the two
9  pages that you brought with you today to the deposition?
10    A.   Yes.
11    Q.   And you described them a little bit earlier in
12 the deposition; is that right?
13    A.   Yes.
14    Q.   And just for the sake of the record, on this
15 first page of the exhibit, which is dated November 6th,
16 2018, can you tell me what that last column is that is
17 titled ED, underscore, ADA?
18    A.   ED's for Election Day.  ADA is for America's
19 Disability Act, and that's for voters with disabilities
20 that are voting.
21    Q.   And is it voters who used a special machine to
22 vote?
23    A.   Yes.  An ADA machine, yes.
24    Q.   All right.  So if a voter came in with an
25 assistant to help that voter vote on a regular machine,

Page 62

1  would the voter be listed in this column, ED,
2  underscore, ADA?
3    A.  If they had a disability and had to use that
4  machine, they would be listed on that column.
5    Q.  Okay.  Let's say they don't use an ADA machine;
6  they use a regular machine, because they bring someone
7  with them to help them.  If the voter uses a regular
8  machine --
9    A.  Okay.
10   Q.  -- non-ADA machine, with an assistor, would
11 that voter turn up here (pointing) in the column ED,
12 underscore, ADA?
13   A.  No.
14   Q.  Let me just check and see if I have any other
15 questions.
16   A.  Okay.
17   Q.  Is it correct to say that the column EV-ED,
18 underscore, PROV is for provisional ballots that were
19 cast and counted in the election?
20   A.  Yes, for both early voting and Election Day.
21 Yes.
22   Q.  And then I recognize the column, Election Day.
23      Now, that would be votes cast in person on
24 Election Day; is that right?
25   A.  Yes.

Page 63

1    Q.  And then the column, EV, underscore, Mail is
2  mail ballots that you counted?
3    A.  Yes.
4    Q.  And the column, EV, underscore, in Person is
5  people who voted in person early; is that correct?
6    A.  Yes.
7    Q.  And then under Total Votes, I see the number
8  there, 731,576.
9       Is that the total number of ballots cast in
10 that election?
11   A.  Yes.
12   Q.  And then I -- is it correct to say that the
13 orange highlighting on "Straight Party" and some of
14 those numbers, that came from you; is that right?
15   A.  Yes.
16   Q.  Okay.  On the second page of the exhibit, which
17 says:  "Primary Election Comparison," is that the
18 document you mentioned earlier that totals up how many
19 votes were cast in either the Democratic Primary or the
20 Republican Primary?
21   A.  Yes.
22   Q.  And there's a -- there is a list of days here,
23 Day 1, Day 2; and then towards the bottom, it says Day
24 12.  Is that right?
25   A.  Yes.

Page 64

1    Q.  Okay.  But this is only for primary elections
2  in 2022, 2018 and 2014; is that right?
3    A.  Yes.
4    Q.  We were talking earlier about the polls staying
5  open until 10:00 p.m. on the last day of Early Voting in
6  a particular election.
7       And are the number of votes cast in each party
8  primary for that day that the polls stayed open until
9  10:00 p.m., is that represented on this chart here?
10   A.  Yes, that's Day 12.
11   Q.  For which year?
12   A.  2022.
13   Q.  So is it correct to say that for Day 12 in the
14 2022 primary, the number of ballots cast was 18,101 --
15   A.  Yes.
16   Q.  -- for Democrat, and 10,270 for Republican?
17   A.  Yes.
18   Q.  Are those numbers just of in-person Early
19 Voting?
20   A.  Yes.
21   Q.  So that doesn't include any tabulation of mail
22 ballots, correct --
23   A.  Correct.
24   Q.  -- or Election Day votes?
25   A.  Correct.

Page 65

1    Q.  Would it be fair to say, then, that for both
2  the Democratic and Republican Primaries in November
3  2022, that on that day that you held the polls open
4  until 10:00 p.m., more votes were cast than in the two
5  previous comparison years?
6       MS. HUNKER:  Objection to form.
7    A.  Can you repeat?  Did you say in November?  Will
8  you repeat?
9    Q.  (By Ms. Perales)  No.  I was asking if in
10 Nov-- -- I did say November of --
11   A.  Yeah.
12   Q.  -- 2022.
13   A.  Okay.
14   Q.  That's my mistake.
15      Would it be fair to say that for the March
16 primary in 2022 on Day 12, Friday, which was the day the
17 polls stayed open until 10:00 p.m., that more votes were
18 cast in both the Democratic and Republican Primaries
19 when compared to previous years?
20   A.  Yes.
21      MS. HUNKER:  Objection to form.
22      MS. PERALES:  I pass the witness.
23      MR. WHITE:  I have no further questions.
24      MS. HUNKER:  I --
25      THE REPORTER:  Can you slow down just a

Page 66

1 little bit for me, please?  Can you slow down?
2          MS. HUNKER:  Yes.
3          THE REPORTER:  Thank you.  Okay.  I'm
4 ready.
5          MS. HUNKER:  Ready?
6          THE REPORTER:  Uh-huh.
7                REEXAMINATION
8 BY MS. HUNKER:
9    Q.  Mr. Lopez, when we were talking about the
10 document just earlier, we were referencing the
11 Plaintiff's Exhibit Number 3, correct?
12    A.  Number 3?
13          (Ms. Perales holding document up.)
14    A.  Yes.
15    Q.  And so let's look on the second page of that
16 exhibit.
17    A.  Okay.
18    Q.  And this is where it says "Primary Election
19 Comparison," correct?
20    A.  Yes.
21    Q.  And you were speaking to Counsel about Day 12,
22 correct?
23    A.  Yes.
24    Q.  And that was February 25th, 2022, correct?
25    A.  Yes.

Page 67

1    Q.  And that is the day that the polls were
2 extended an additional three hours; is that correct?
3    A.  Yes.
4    Q.  This chart does not list the times in which
5 voters voted, correct?
6    A.  Correct.
7    Q.  And so you don't know when the voters voted
8 that day, is that correct?
9    A.  That's correct.
10    Q.  And if we look at 2018 and 2014, it appears
11 that the last day of Early Voting has the most number of
12 in-person votes for the Early Voting period; is that
13 correct?
14    A.  That's correct.
15          MS. PERALES:  Objection.
16          MS. HUNKER:  No more questions.
17          MS. PERALES:  No more questions here.
18          MR. STOOL:  We don't have any questions.
19          MS. PERALES:  Shall we go off the record
20 while they switch microphones?
21          MS. HUNKER:  I think so.
22          MR. STOOL:  Yes.
23          THE VIDEOGRAPHER:  Okay.  We're going back
24 off the record.  The time is 12:16 p.m.
25          (Discussion off the record.)

Page 68

1          THE VIDEOGRAPHER:  Okay.  We're back on
2 the record.  The time is 12:19 p.m.
3                EXAMINATION
4 BY MS. PERALES:
5    Q.  Good afternoon, Ms. Phillips.
6    A.  Hello.
7    Q.  Can you please --
8          THE REPORTER:  Oh, I forgot to swear her
9 in.
10          MS. PERALES:  I know.  I just thought of
11 that.
12    Q.  Can you please give us a second because we want
13 to make sure that you're sworn in.
14    A.  Okay.
15          THE REPORTER:  Okay.  Can you please raise
16 your right hand?
17          (Witness sworn by the court reporter.)
18          THE REPORTER:  Okay.  Thank you.
19          MS. PERALES:  Do we know -- can we mute
20 that participant?
21          (The Videographer moves head up and down.)
22          MS. PERALES:  We're going to take a minute
23 to mute someone.
24          THE WITNESS:  Okay.
25          THE VIDEOGRAPHER:  I don't have the

Page 69

1 permission to mute them, so we'll just have to ask them.
2          MR. STOOL:  Just to --
3          THE VIDEOGRAPHER:  Never mind.  We're
4 good.
5          MS. PERALES:  Thank you.
6             TACOMA PHILLIPS,
7 having being first duly sworn, testified as follows:
8                EXAMINATION
9                (Continued)
10 BY MS. PERALES:
11    Q.  Ms. Phillips, you've been here since the start
12 of Mr. Lopez's testimony; is that correct?
13    A.  Yes.
14    Q.  And so you've already heard me introduce myself
15 and walk him through some of the rules of the road for a
16 deposition; is that right?
17    A.  Yes.
18    Q.  So I'll -- I'll ask you a shorter version of
19 those questions --
20    A.  Okay.
21    Q.  -- which is, first:  Have you ever had your
22 deposition taken?
23    A.  No.
24    Q.  Okay.  First time.  It's an honor to be taking
25 your deposition.

The Office of the Dallas County Elections Administrator                 April 29, 2022
                                                                        Pages 70 to 73

Page 70

1      Do you understand that the testimony that
2 you're giving is under oath?
3   A.  Yes.
4   Q.  And that your testimony today is as if you are
5 sitting in the courtroom testifying to the Judge?
6   A.  Yes.
7   Q.  Is there any reason for you, either that you're
8 taking medication or you don't feel well, that you
9 cannot understand my questions or testify accurately?
10   A.  No.
11   Q.  From time to time, you may hear one of the
12 lawyers making an objection during the deposition, and I
13 think you've probably already heard that.
14   A.  Yes.
15   Q.  In general, unless your lawyer instructs you
16 not to answer, you can go ahead and answer.  And so I
17 just want to leave you with that instruction.  Okay?
18   A.  Okay.
19   Q.  If I use the term "ABBM," will you understand
20 that to mean application for ballot by mail?
21   A.  Yes.
22   Q.  Do you understand that to mean all applications
23 for ballot by mail, both annual, as well as just for a
24 single election; or do you understand ABBM, for example,
25 to just be limited to the annual?

Page 71

1   A.  Application for ballot by mail, no.  It's just
2 the -- it's the same.  Everything's the same.
3   Q.  Okay.  Thank you.
4      What steps did you take to prepare for the
5 deposition today?
6   A.  We met, I believe it was Tuesday, I believe,
7 for two hours --
8   Q.  Okay.
9   A.  -- to go over --
10   Q.  Don't tell me --
11   A.  -- the questions.
12   Q.  Don't tell me what you said if your lawyers
13 were there.
14   A.  No, no, no, just to go over --
15   Q.  Okay.
16   A.  -- the questions that I'm responsible for.
17   Q.  Okay.  Thank you.
18   A.  Uh-huh.
19   Q.  Thank you.  I'm trying to play by the Rules.
20      Did you talk to anybody else besides Mr. Lopez,
21 Mr. Scarpello and your attorneys to prepare for this
22 deposition?
23   A.  Yes.
24   Q.  And can you just name that individual or
25 individuals?

Page 72

1   A.  Robert Heard.  He's in -- a contractor in our
2 office.  And it's another gentleman, the gentleman's
3 name -- I cannot remember his name.
4   Q.  And Mr. Heard, who is a contractor, is he what
5 somebody might call a temp?
6   A.  Yes, a temp contractor.
7   Q.  Okay.
8   A.  He's helping with the PIAs in our office.
9   Q.  Okay.  And when you say "PIA," you mean Public
10 Information --
11   A.  Yes --
12   Q.  -- for --
13   A.  Public Information Act, yes.
14   Q.  Okay.  So you're responding to requests for
15 information?
16   A.  Yes.
17   Q.  And then you mentioned one other individual.
18   A.  Yes, I did.  I do not remember his name.
19   Q.  Okay.  And he works in your office, as well?
20   A.  I believe he's a contractor, also.
21   Q.  Okay.  Did you talk to anybody from the Office
22 of the Attorney General for Texas?
23   A.  No.
24   Q.  Did you review any paperwork in preparation for
25 this deposition?

Page 73

1   A.  Just the paperwork that was given to answer my
2 portion of the questions.
3   Q.  Okay.  And who gave that paperwork to you?
4   A.  Ben Stool.
5   Q.  Did you bring anything here with you today
6 related to the case, any personal notes or charts or
7 other paperwork?
8   A.  Yes.  I brought the paperwork that was
9 provided -- given to me by Ben Stool, but I just jotted
10 down notes on that.
11   Q.  And do you mean that you jotted notes on the --
12 the chart that lists the topic and has your name across
13 from those topics?
14   A.  Yes.
15   Q.  Okay.  So let's go ahead and just refer back to
16 Exhibit 1.  It should be somewhere --
17      THE REPORTER:  It's over here (handing).
18   Q.  You have been handed what has been marked
19 Deposition Exhibit Number 1 (holding up a copy of
20 document), and it says Plaintiffs' Third Amended Notice
21 of Rule 30(b)(6) Deposition.
22      Do you see that at the top?
23   A.  I see that, yes.
24   Q.  Do you recognize this document; have you ever
25 seen it before?

Page 74

1    A.  It was sent to me.  Are you --
2    Q.  Do you recognize, starting on Page 12 -- no --
3  yes.
4        Starting on Page 12, do you recognize the items
5  listed under the heading "Deposition Topics"?
6    A.  Yes.
7    Q.  And then let's turn to Deposition Exhibit
8  Number 2.
9        THE REPORTER:  Oh, I'm sorry (handing).
10   Q.  Can you look at the places where your name is
11 listed in the right-hand column?
12   A.  Yes.
13   Q.  And that's on Page 1, Page 2, Page 3.
14       It looks like just pages 1, 2 and 3; is that
15 right?
16   A.  Yes.
17   Q.  Are you prepared to testify on those topics
18 today?
19   A.  Yes.
20   Q.  And do you understand that when you're
21 answering questions on these topics, that you're
22 speaking for the Dallas County Elections Department?
23   A.  Yes.
24   Q.  Because you are designated representative of
25 the department.  Yes?

Page 75

1    A.  Yes.
2    Q.  Okay.  And so when I say "you" or "yours,"
3  please understand that to mean Dallas County Elections
4  Department.
5    A.  Yes.
6    Q.  Now, if there is something outside your
7  knowledge, it's perfectly okay to say that.
8    A.  Okay.
9    Q.  And we can talk through whether there's
10 somebody else who maybe has more knowledge and -- and
11 then we can work through that with the attorneys.  Okay?
12   A.  Okay.
13   Q.  So even though you're testifying for Dallas
14 County Elections, I want to make sure that if something
15 is simply outside the scope of your knowledge, that you
16 feel comfortable saying that.
17   A.  Okay.
18   Q.  What is your title and your job?
19   A.  Mail Ballot Supervisor.
20   Q.  How long have you held that position?
21   A.  One year.
22   Q.  What did you do before you became the Mail
23 Ballot Supervisor?
24   A.  I was the Assistant Voter Registration
25 Supervisor.

Page 76

1    Q.  Did you work under the supervision of
2  Mr. Lopez?
3    A.  Yes.
4    Q.  How long were you an Assistant Voter
5  Registration Supervisor?
6    A.  I'm thinking.  I will say since 2014 through
7  2021, March of 2021.
8    Q.  So, roughly, seven years?
9    A.  Yes.
10   Q.  And then prior to becoming the Assistant Voter
11 Registration Supervisor, what were you doing?
12   A.  I was -- I was a Lead Clerk in Voter
13 Registration.
14   Q.  And do you know about how many years you did
15 that?
16   A.  I did that for probably a year.
17   Q.  And then before that?
18   A.  I was a clerk in Voter Registration.
19   Q.  I think they call those battlefield promotions.
20   A.  Yes.
21   Q.  Okay.  And how long were you a clerk in Voter
22 Registration?
23   A.  Since 1998, August of 1998.
24       THE REPORTER:  You said August of nineteen
25 ninety- --

Page 77

1        THE WITNESS:  1998, yes.
2        THE REPORTER:  Thank you.
3    Q.  So that would be -- and before you were a clerk
4  in Voter Registration, were you working for Dallas
5  County?
6    A.  No.
7    Q.  Okay.  So all in all, about how many years have
8  you been working for Dallas County Elections?
9    A.  August of 2022 would be 24 years.
10   Q.  Wonderful.  Congratulations.
11   A.  Thank you.
12   Q.  Before you became Mail Ballot Supervisor a year
13 ago, did somebody else hold that job?
14   A.  Yes.
15   Q.  Who was that?
16   A.  Brylon Franklin.
17   Q.  Spell the first name.
18   A.  B-r-y-l-o-n.
19   Q.  Brylon.  And then the last name?
20   A.  Franklin.
21   Q.  Franklin.  Do you know how long Brylon Franklin
22 was in the position of Mail Ballot Supervisor?
23   A.  No, I do not.
24   Q.  Was it more than a year?
25   A.  Yes.  Yes, it was more than a year, but I can't

Page 78

1 tell you how long.
2    Q.   Who does the Mail Ballot Supervisor report to?
3    A.   Michael Scar- -- oh, I'm sorry.  Let me -- it's
4 Malissa Kouba.
5    Q.   And who is Malissa Kouba?
6    A.   Assistant Administrator Deputy.  I don't know
7 the exact title, the name of the title, but I know she's
8 the Assistant Administrator Deputy.
9    Q.   So do you report to Malissa Kouba?
10    A.   I report to Malissa Kouba, yes.
11    Q.   Do you know how long she's been in her
12 position?
13    A.   A year -- less than a year, I believe.
14    Q.   Less than a year.  So then who did Brylon
15 Franklin report to?
16    A.   Tony Pippin-Poole.
17         THE REPORTER:  Tony -- what was the last
18 name?
19         THE WITNESS:  Pippins-Poole (sic).
20    Q.   Was Tony Pippins-Poole the Elections
21 Administrator since you joined the Elections Department
22 in 1998?
23    A.   No.
24    Q.   When you first got to the Elections Department,
25 who was the Election Administrator, if anybody?

Page 79

1    A.   Bruce R. Sherbert.
2    Q.   Bruce R., like the letter R --
3    A.   Like the letter.
4    Q.   And then --
5    A.   Sherbert --
6    Q.   -- Sherbert --
7    A.   -- yes.
8    Q.   -- like the dessert?  Yeah, got it.
9         Are you from Dallas County?
10    A.   Yes.
11    Q.   Where did you go to high school?
12    A.   I went to Business Management High School,
13 Business Management Magna High School.
14    Q.   Okay.  That's here in Dallas?
15    A.   That was here in Dallas.
16    Q.   Did you do any education after high school?
17    A.   No.
18    Q.   Okay.  Did you start working for Dallas County
19 Elections after you completed high school?
20    A.   No.
21    Q.   Okay.  Sometimes I ask people, like what was
22 the most interesting thing they did before they got to
23 their position.  Senator Hughes told me he sold
24 appliances door to door, but I will not ask you that
25 question in the interest of time.

Page 80

1    When I'm quiet, it's because I'm not going to
2 ask you questions, so I'm just moving through my list.
3    A.   Okay.
4    Q.   Do you know, in general, what percent of votes
5 that are cast in Dallas County are vote by mail?
6    A.   In general, no, I do not.
7    Q.   For -- well, let me ask you this:  In the past,
8 to the best of your knowledge or from 2018 (indicating)
9 up until now, has Dallas County ever sent voters
10 application for ballot by mail on Dallas County's
11 initiative?
12         MS. HUNKER:  Objection, form.
13    A.   Not to my knowledge.
14    Q.   (By Ms. Perales)  So is it correct to say,
15 then, that Dallas County, from 2018 forward, has only
16 ever sent somebody an application for ballot by mail
17 because that voter requested it first?
18    A.   To my knowledge, yes.
19    Q.   So, for example, Dallas County never did a
20 mailing out to voters over 65, saying, Here's an
21 application for ballot by mail in case you want to use
22 it, or something like that?
23    A.   Not to my knowledge.
24    Q.   Before you became -- or before you were in your
25 current position, were you involved in processing or

Page 81

1 accepting applications for ballot by mail?
2    A.   No.
3    Q.   Okay.  And before you took your current
4 position, were you involved in processing or accepting
5 mail ballots?
6    A.   No.
7    Q.   Do you have any personal experience with
8 processing applications for ballot by mail or mail
9 ballots prior to the March 2022 election?
10    A.   Yes.
11    Q.   And which elections would that be for?
12    A.   That would be for the elections that was in May
13 of 2021 and November of 2021.
14    Q.   Okay.  So it would be fair to say that you
15 don't have personal experience with processing
16 applications for ballot by mail or mail ballots in
17 either 2020 or 2018; is that correct?
18    A.   I did not process in 2020, November 2020, but I
19 did assist in the Mail Ballot Department in '20 -- in
20 November of 2020.
21    Q.   Okay.  Did you assist in the Mail Ballot
22 Department in March of 2018 for the primary?
23    A.   No.
24    Q.   So you have some experience with the procedures
25 of the office handling the applications for ballot by

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                            Pages 82 to 85

Page 82

1  mail and the mail ballots from November 2020?
2     A.  Yes.
3     Q.  So I'm going to ask you some questions about
4  the procedures of the office --
5     A.  Okay.
6     Q.  -- that were used prior to SB 1 --
7     A.  (Witness moves head up and down.)
8     Q.  -- so before this March primary.
9        Were there changes in the way the Elections
10 Department processed applications for ballot by mail or
11 mail ballots between November 2020 and November 2021
12 that you're aware of?
13    A.  Can you repeat that question again?
14    Q.  Yeah.  I want to ask some questions about the
15 procedures of your office in handling applications for
16 ballot by mail, processing them, and also mail ballots.
17 But I want to make sure that when I ask those questions,
18 I'm sort of capturing what your office does.
19       And so my first question is whether you changed
20 (indicating) any of the ways that you processed
21 applications for ballot by mail or mail ballots between
22 November 2020 and November 2021.
23       Did your office undergo any kind of changes in
24 the way you handled these materials or processed them?
25    A.  Not to my knowledge.

Page 83

1     Q.  So then I will ask you:  Prior to SB 1, prior
2  to the March 2022 primary, when you received an
3  application for ballot by mail in the mail, what would
4  you do from the moment that you opened it (indicating)?
5     A.  We'll open it, look to see -- date-stamp it,
6  and then we'll put it in a category of how it came in.
7  If it was a Y65, which is yearly person who's over the
8  age -- anyone over the age of 65, or is disabled, or if
9  they are going to be a RM, which is regular mail, out of
10 county, or they just particularly want one particular
11 election, they're -- they're selecting, or if it's a
12 military or something like that, well, then, we'll put
13 it in its category (indicating).
14       And then we will put a bar code label on there.
15 That way we can scan or capture the image of the
16 application and put it into the VR system.
17    Q.  What would you be checking when you first open
18 it, or would you scan it even if it was, for example,
19 incomplete or unsigned?  Is there a point at which
20 you're checking to make sure it's complete?
21       MS. HUNKER:  Objection, form.
22    A.  We are actually doing -- I believe -- first, we
23 will scan it.  The process of it -- the process now
24 would be still to image it, to capture the image of it.
25    Q.  Okay.

Page 84

1     A.  That way, we will have the image of the either
2  completed application or the incomplete application.
3     Q.  Does it also get a bar code?
4     A.  Yes.
5     Q.  Okay.  So, then, after it gets the bar code,
6  what happens next?
7     A.  Once it gets the bar code, then we would go
8  ahead and process that application in the -- in the
9  Vemacs voter registration system.  And we will process
10 it if it's complete.  If the application's complete,
11 then we will process it and prepare it for the election.
12       If it's not complete, then we will process it
13 still and then send the voter a notice letting them know
14 what was incomplete about the application.
15    Q.  Okay.  And when you're -- let's assume that
16 you've got an application for ballot by mail and it is
17 complete.  How -- what would your office do to make sure
18 that you knew this was coming from a real voter?  Is --
19 was there anything you would check about the voter
20 besides that you have a voter registration record for
21 that voter?
22    A.  Just -- just checking them in that voter
23 registration system.  They have to be a registered voter
24 in order -- and if they are not a registered voter, then
25 we will send them a letter letting them know, You are

Page 85

1  not a registered voter, and also a voter registration
2  application.
3     Q.  Okay.  And so assuming the application for
4  ballot by mail makes it through the system, is it fair
5  to say you would then send that voter a mail ballot?
6     A.  We'll send them a ballot for every election
7  that they are eligible to vote in.
8     Q.  So if you got an application for ballot by mail
9  in January, for example, and the voter had checked
10 "annual," you would put that person in the system and
11 send them mail ballots for the rest of the year; is that
12 right?
13    A.  Uh-huh.  You said just check annual, so we'll
14 just send them a ballot for an election that's not a
15 political party election because they have to declare.
16    Q.  Okay.  So if they wanted to vote in one primary
17 or another, they would still -- they'd have to send you
18 another --
19    A.  No.
20    Q.  -- application?
21    A.  They would have to state that on the
22 application.
23    Q.  Okay.  Got it.  Now, walk me through the
24 process pre-SB 1 (indicating) --
25    A.  Okay.

The Office of the Dallas County Elections Administrator

April 29, 2022
Pages 86 to 89

Page 86

1    Q. -- of rece- -- your office would receive a mail
2 ballot now from a voter.
3       What would you -- what would be the process of
4 dealing with that?
5    A. We'll take the actual carrier envelope, which
6 contains the ballot inside the carrier envelope. We
7 will datestamp that carrier envelope, and then we will
8 run it through our Agilis machine to capture the image
9 of the side of the envelope that would contain the
10 voter's signature on there, and then we will wait for
11 SVC, which is Signature Verification Committee to verify
12 the signature.
13   Q. Okay. Have you ever done work to verify
14 signatures, yourself?
15   A. No.
16   Q. And who's on the Signature Verification
17 Committee?
18   A. That's a committee that is determined by, I
19 believe, the political parties, the Republican party and
20 Democratic party. And then they have a -- they have a
21 elect- -- Early Voting Ballot Board, which has a judge
22 and they determine who is the judge in -- in the ballot
23 board and who are selected to be on the committee for
24 signature verification.
25   Q. And then, once the -- so do you have any

Page 87

1 understanding of what the Signature Verification
2 Committee does to verify the signature?
3    A. Say that again, please.
4    Q. Do you know what the Signature Verification
5 Committee would do to verify the signature?
6    A. No.
7    Q. Do you know if they compare the signature to
8 anything?
9       MS. HUNKER: Objection to form.
10   A. The law states that the Signature Verification
11 Committee is to verify the signature of the voter,
12 compare the signature of the voter's ABBM application
13 and compare the signature on the carrier envelope.
14   Q. (By Ms. Perales) Okay. If you received a mail
15 ballot and the signature is missing on the carrier
16 envelope --
17   A. (Witness moves head up and down.)
18   Q. -- what would you do?
19   A. If it's within the time frame of bef- -- if
20 it's within the time frame before the Signature
21 Verification Committee convenes, we will take that
22 carrier envelope and resubmit it back to the voter for
23 them to be able to either put their signature on that
24 carrier envelope, mail it back to us; or they can take
25 that carrier envelope and take it to the polls, either

Page 88

1 during early -- when Early Voting begins or Election
2 Day, and they can turn that carrier envelope in and vote
3 ballot for ballot.
4    Q. So would you have a letter, like a form letter,
5 that you would send the carrier envelope back to the
6 voter with the letter explaining kind of what their
7 options are?
8    A. And you're still asking the questions before --
9 prior to 20- --
10   Q. Before SB 1.
11      (Simultaneously speaking.)
12   A. SB 1.
13      THE REPORTER: I'm sorry. Can you slow
14 down just a little bit, and can you repeat the last
15 thing you just said.
16      THE WITNESS: I asked -- I asked -- I
17 said, Are you still asking the questions before SB 1.
18      THE REPORTER: Thank you.
19   A. That works -- yes, we did send a notice back
20 with the carrier envelope to the voter explaining to
21 them that they failed to put their signature on the
22 carrier envelope and give it -- and -- and explain it to
23 them, there's the steps they can do next in order for
24 their vote or ballot to be cast.
25   Q. What would you do if there wasn't enough time

Page 89

1 before the Election Day to mail the mail ballot back to
2 the voter?
3    A. It would be turned over to the SVC.
4    Q. The Signature Verifi- --
5    A. Signature Verification --
6    Q. -- -cation?
7    A. -- Committee.
8    Q. But if the signature was missing, you would
9 just turn it over anyway?
10   A. If they're -- if Signature Verification
11 Committee has convened, everything is turned over to
12 them.
13   Q. Did you have a process before SB 1 of trying to
14 reach out to a voter, either by phone or some other way,
15 to tell them what their options might be if there wasn't
16 enough time to mail back the mail ballot?
17   A. No.
18   Q. You have a big county.
19      Okay. Now I'm ready to move to SB 1.
20   A. Okay.
21   Q. You'll agree with me that SB 1 created new
22 requirements for verification of application for ballot
23 by mail and mail ballots, correct?
24   A. Yes.
25   Q. And in your words, could you explain to me what

The Office of the Dallas County Elections Administrator     April 29, 2022
                                                            Pages 90 to 93

Page 90

1 these new requirements are as they apply to ABBMs and
2 mail ballots?
3    A.   Okay.  For an ABBM application, now we are
4 required to look into the voter registration system, not
5 only to verify that they are a registered voter, but to
6 look at the voter registration identification, Texas
7 Driver's License, Texas ID or the Soc- -- last four
8 digits of the Social Security number and see if it
9 matches what the voter has provided on the ABBM
10 application.  Also -- we are also looking for the reason
11 why they are voting by mail --
12    Q.   (Moving moves head up and down.)
13    A.   -- and also if they provided a signature.
14    Q.   All right.
15    A.   And then if they met all those requirements,
16 then they will get inputted into the system, processed
17 as -- this first step as beginning to get a appli- -- I
18 mean, a ballot by mail.  If they do not meet those
19 requirements, then we will send them, the voter, a
20 notice, letting them know which requirements were not
21 met.
22       If a carrier envelope comes into our office
23 now, we have a secrecy flap on that envelope, carrier
24 envelope, that we do remove.  The mail ballot staff does
25 remove that secrecy flap, and we do check to see if that

Page 91

1 voter does have either one of those numbers on there or
2 they have signed an applica- -- I mean, signed a carrier
3 envelope.
4       If any of the items are missing, then we would
5 go ahead and do a Corrective Action Form of a defect of
6 a carrier envelope, send that voter a notice with that.
7 And on that notice, if it's a Corrective Action Form and
8 if it's not a Number 4 that states that the voter has a
9 incorrect driver's license or Social Security or a
10 missing driver's license or Social Security, they will
11 send that form and that ballot back to the voter --
12    Q.   Okay.
13    A.   -- by mail.
14    Q.   Thank you.  I'm going to ask you some questions
15 about Dallas County's experience with these new
16 requirements --
17    A.   Okay.
18    Q.   -- for the March 2022 primary election.
19    A.   Okay.
20    Q.   Is it correct to say that the March 2022
21 primary election was the first election that Dallas
22 County was implementing the new ID requirements for mail
23 voting?
24    A.   Yes.
25    Q.   So starting with the first week in January of

Page 92

1 2022, did your office begin to receive applications for
2 ballot by mail?
3    A.   The first week in January?  I -- maybe.
4    Q.   Okay.
5    A.   I don't -- I do not recall when we really start
6 receiving applications then.
7    Q.   Would you say that you receive applications for
8 ballot by mail in January or --
9    A.   Yes.
10    Q.   -- did?
11    A.   Yes, we did.
12    Q.   Did you keep track of how many applications for
13 ballot by mail that you were receiving either daily,
14 weekly or monthly?
15    A.   Yes, daily or weekly.
16    Q.   And how -- how is that information recorded?
17    A.   It's recorded by hand count.
18    Q.   Is that in a chart somewhere?
19    A.   Yes.
20    Q.   Okay.  So we are in January.  Your office is
21 receiving applications for ballot by mail and because of
22 SB 1, it's fair to say that you were opening these
23 applications for ballot by mail and attempting to match
24 the ID number that was provided on the ABBM to your
25 records on voter registration; is that right?

Page 93

1    A.   Yes.
2    Q.   Tell me about what that experience was like in
3 January.
4       For example, were there times when you could
5 not match the information that was provided on the ABBM
6 to the voter registration record?
7    A.   Well, when we --
8       MS. HUNKER:  Objection, form.
9    A.   When we received a application, one of our
10 processes were to look at the application and if it was
11 missing any of the information, it automatically went
12 aside to one pile; and then all the other information,
13 anything that had other information, went to another.
14 And they'll still get the same bar code, everything.
15    Q.   (By Ms. Perales)  Okay.  So let's take the
16 example of an ABBM that you received that didn't have
17 either a driver's license number or the last four of the
18 Social.
19    A.   Okay.
20    Q.   It's correct to say that you described that you
21 would put that ABBM that was missing ID, missing any ID
22 information, over to a pile; is that right?
23    A.   Yes.
24    Q.   But would you still scan and barcode that ABBM?
25    A.   Yes.

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                       Pages 94 to 97

Page 94

1   Q.  After you did that for that particular ABBM,
2   what would you do with it next?
3   A.  We would submit it into the -- put it into the
4   system because the person is already a registered voter.
5   So what we did was we created a notice, and the notice
6   would state that it was either missing your Texas
7   Driver's License, Social Security or Texas ID.
8   Q.  When you say "we created a notice," you mean
9   Dallas County created a notice?
10  A.  Dallas -- Dallas County mail ballot staff, yes.
11  Q.  And that was because you didn't have a notice
12  from the Secretary of State that included informing the
13  voter that the ID number was missing or couldn't be
14  matched; isn't that right?
15      MS. HUNKER:  Objection, form.
16  A.  I do not remember when the notice was given to
17  us, so...
18  Q.  (By Ms. Perales)  Do you --
19  A.  I know the notice was given to us in January,
20  but I do not remember the date that the notice was given
21  to us.
22  Q.  Do you remember creating your own form before
23  you received the notice from the Secretary of State?
24  A.  No, we did not create our form.
25  Q.  All right.  So before you received the notice

Page 95

1   or form notice from the Secretary of State, how were you
2   responding with these mail ballot applications that were
3   missing ID numbers?
4   A.  We already had forms, and that was already
5   created in our voter registration system, VEMACS.  So
6   what we did was just put "other," and then we'll just
7   write on there, stating the fact -- what was missing.
8   Q.  Okay.  Did you keep track of how many mail
9   ballot applications you were unable to process because
10  the ID numbers were either missing or you could not
11  match them to the voter's registration record?
12  A.  Yes.
13  Q.  Okay.  And where did you keep that information?
14  A.  In the VEMACS voter registration system.  And
15  let me -- let me go back to say we did create a notice.
16  We just created a notice in VEMACS, so...
17  Q.  When you say that in VEMACS you were able to
18  keep track of how many ABBMs you were not processing,
19  was VEMACS specific to which ABBMs you couldn't process
20  because of an ID number issue versus an ABBM that you
21  couldn't process because it was missing a signature or
22  something like that?
23  A.  Yes.  Yes and no, because if it was a multiple
24  incompletion, like someone failed to put their signature
25  or failed to put their driver's license and Social

Page 96

1   Security, we create a notice in VEMACS to say, Hey, this
2   is a multiple request, and the reason why.
3   Q.  Okay.  And so would it be fair to say, then,
4   that there were notices created in VEMACS specifically
5   for people who didn't have an ID number on there or that
6   you couldn't match the ID number?
7   A.  Yes.
8   Q.  Okay.  And does VEMACS -- now could you run a
9   report on VEMACS and ask it how many of those particular
10  ID-number-related notices went out?
11  A.  Yes.
12  Q.  Okay.  So I understand that you would then
13  notify the voter that you were missing an ID number that
14  you could match for -- for their ABBM; is that correct?
15  A.  Yes.
16  Q.  Do you know, sitting here today, about how many
17  of those notices you sent out to voters -- or let me
18  phrase it another way.  Do you know, sitting here today,
19  how many applications for ballot by mail you were unable
20  to process because they were missing an ID number or the
21  ID number that was provided by the voter could not be
22  matched to the registration record?
23  A.  Not offhand, no, I do not know the number.
24  Q.  Do you have that number somewhere in your
25  office?

Page 97

1   A.  Yes.
2   Q.  My next question is whether you know -- let me
3   see.
4       You know how many people submitted an
5   application for ballot by mail that you were able to
6   process and send a mail ballot, correct?
7   A.  Yes.
8   Q.  Do you know how many people initially sent you
9   an ABBM that you couldn't match the ID number and they
10  managed to cure that defect somehow by sending you
11  another ABBM that you could process?
12  A.  No, I do not know that number.
13  Q.  Do you know how many people sent you an ABBM
14  where you couldn't verify the ID number and, ultimately,
15  you never sent that person a mail ballot?
16  A.  Say that again.
17  Q.  I'll ask it a different way.
18      Is it fair to say that some voters submitted an
19  ABBM and you weren't able to verify their number because
20  it was either missing or you didn't have that number in
21  your records and you sent that voter a notice with a new
22  ABBM and they were able to submit to you information
23  that you could verify and you sent them a mail ballot?
24      MS. HUNKER:  Objection, form.
25  A.  If they completed it and then everything was in

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                          Pages 98 to 101

Page 98

1 the system, correct, yes.
2     Q.  (By Ms. Perales)  Okay.  Now I'm asking about
3 the other group of people.
4         Do you have any idea about the number of people
5 who submitted an ABBM and you couldn't verify their ID
6 number and, ultimately, they were just never able to get
7 a mail ballot; they never received a mail ballot from
8 you?
9             MS. HUNKER:  Objection to form.
10    A.  I don't have a number for that, no.
11    Q.  (By Ms. Perales)  Is there any way that we
12 could figure out what that number is?
13    A.  Possibly, yes.
14    Q.  Okay.  How would we try to figure out what that
15 number is?
16    A.  Well, we can take a look at the list of
17 rejection letters, a list of voters on the rejection
18 list, compare them to the list of voters and to compare
19 them, see if they went to the polls to vote or if they,
20 in fact, did vote or if, in fact, they did re- -- submit
21 another ABBM application.
22    Q.  So we could compare the list of voters on the
23 rejection list for ABBM and -- and compare them to
24 voters who voted.
25         Could we also compare the list of voters on the

Page 99

1 rejection list for ABBMs with the list of voters who,
2 ultimately, got mail ballots?
3    A.  Yes.
4    Q.  Did you communicate with voters in the weeks
5 and months leading up to the March primary regarding
6 this new requirement to match the ID number?
7    A.  No.
8    Q.  Who would be talking -- who in your office
9 would be talking to voters who were contacting your
10 office, for example, when they received a notice saying
11 that their ID number could not be matched?
12    A.  Okay.  Repeat the first question.
13    Q.  You -- if a voter received one of these
14 notices --
15    A.  Uh-huh.
16    Q.  -- saying you couldn't verify their ID
17 number --
18    A.  Uh-huh.
19    Q.  -- would it be fair to say that the voter was
20 also receiving a new application for ballot by mail?
21    A.  Yes.
22    Q.  Okay.  Did you ever send voter registration
23 forms out to the voters, as well?
24    A.  A voter registration --
25    Q.  Form to -- a voter registration form to a voter

Page 100

1 whose ID number you couldn't verify.
2    A.  When you say "voter registration form," what
3 kind of form are you asking about?
4    Q.  Update.
5             MS. HUNKER:  Objection, form.
6    A.  Can you explain to me what type of form?  There
7 are multiple forms for voter registrations.
8    Q.  (By Ms. Perales)  Okay.  Tell me how many voter
9 registration forms you use here in Dallas County.
10    A.  We use a Statement of Residence, and we use
11 a -- they have a Address Confirmation Form.  They have
12 the Voter Registration Application.  That's a form,
13 also, so...
14    Q.  Did you ever send a Voter Registration
15 Application to a voter with a notice that you could not
16 verify their ID number on their ABBM?
17    A.  Yes.
18    Q.  Do you know how many of those you sent out?
19    A.  No.
20    Q.  So you did not keep track --
21    A.  No.
22    Q.  -- of that?
23         At what point did you start sending
24 applications for voter registration with the notice to
25 the voter saying you couldn't match the ID number on the

Page 101

1 ABBM?
2    A.  That's hard.  We've always sent Voter
3 Registration Application forms with the ABBM if the
4 voter -- even back then, if the voter's address wasn't
5 the same address in the voter registration system as on
6 the application, we would send a Voter Registration
7 Form, so...
8    Q.  In terms of what was happening starting in
9 January --
10    A.  Okay.
11    Q.  -- when you realized that there were voters who
12 had submitted ABBMs and for whom you could not verify
13 their number --
14    A.  Okay.
15    Q.  -- you -- you -- testified before you started
16 sending them notices.  But at what point, in either
17 January or February, did you make the decision or did
18 somebody make the decision at Dallas County to start
19 sending Voter Registration Applications along with the
20 notice, or was it simply from Day 1 you were doing that?
21    A.  We've always done it, Day 1.
22    Q.  Okay.  And even with respect to the ID numbers.
23         So are you saying that for every voter that you
24 could not match the ID number on the ABBM, you were
25 sending them Application for Voter Registration?

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                       Pages 102 to 105

Page 102

1    A.   That's what we're -- yes, that's what we're
2    supposed to do.  Yes.
3    Q.   I'm going to go back to my question about
4    the -- the human beings in your office that communicate
5    with voters.
6         If a voter --
7    A.   Uh-huh.
8    Q.   -- submitted an ABBM and then received back
9    from your office a notice saying that you couldn't
10   process their ABBM and then there's a Voter Registration
11   Application in there --
12   A.   Uh-huh.
13   Q.   -- and also a new ABBM --
14   A.   Uh-huh.
15   Q.   -- and that person wanted to call Dallas County
16   Elections and ask questions about that --
17   A.   Uh-huh.
18   Q.   -- who would that person have spoken to; who
19   would the voter have spoken to?
20   A.   Anyone who answered the telephone.
21   Q.   Okay.  And you mentioned that you did not speak
22   to voters about that?
23   A.   I -- yes, I did speak to voters about that.  I
24   maybe misunderstood your question.
25   Q.   Okay.

Page 103

1    A.   I'm sorry.
2    Q.   So you were getting phone calls from voters
3    with questions about this process; is that right?
4    A.   Yes.
5    Q.   And generally, what were voters communicating
6    to you?
7    A.   The reason why they received the letter, what
8    was the letter for.  If it was for missing their Social
9    Security or driver's license, we explained to the voter
10   that the only thing they had to do was put that on their
11   ABBM application.
12   Q.   Did you get any voters asking why they were
13   being sent a Voter Registration Application when they
14   knew they were already registered to vote?
15   A.   Yes.  We informed them that their -- if, in
16   fact, if their voter registration record did not have
17   the Texas Driver's License or ID or Social Security,
18   that they would need to put that on their information --
19   on their application.  I'm sorry.  We need to put it --
20   have it on their voter registration record, also have it
21   on their ABBM application.  But it was a very rarity
22   that we did get any of those and we had to send those
23   applications out to a voter, because most of the time we
24   will have the information on the voter registration
25   file, but it wasn't on the ABBM application.

Page 104

1    Q.   Okay.  So, in your experience, many ABBMs were
2    coming to your office and the voter had failed to put
3    either a driver's license number or the last four of the
4    Social?
5    A.   Yes, or they forgot to put the correct
6    information that was on the voter registration file.
7    Q.   All right.  So they might have put a driver's
8    license number when you had the last four of the Social?
9    A.   Yes.
10   Q.   Or vice versa?
11   A.   Or vice versa.
12   Q.   They might have put the last four of the Social
13   and you only had the driver's license --
14   A.   Yes.
15   Q.   -- number?
16   A.   Yes.
17   Q.   Did your office keep track of the number of
18   communications you got from voters with questions about
19   the new ID verification requirements?
20   A.   No, we did not.
21   Q.   Would you say that your office spent a
22   significant amount of time answering questions from
23   voters or responding to their inquiries about the new ID
24   requirements?
25   A.   Yes.

Page 105

1         MS. HUNKER:  Objection, form.
2    Q.   (By Ms. Perales)  Is there any way to get a
3    sense of how much time that was taking out of your
4    regular day?  Can you describe that for me since you
5    didn't necessarily keep track of the number of calls?
6    A.   Repeat that again.
7    Q.   How can I -- how can I get a sense from you of
8    exactly how much time it was taking to respond to voter
9    inquiries if you're telling me you didn't necessarily
10   keep track of the number of phone calls that you were
11   getting?  How can I understand how much time or how much
12   resources of your office were dedicated in the lead-up
13   to the March 2022 primary to answering questions from
14   voters who had rejected ABBMs, for example?
15   A.   That's hard to say.  A call could take a
16   minute.  Another call could take ten minutes.  It's hard
17   to say.
18   Q.   Did you have particular staff that would --
19   that these calls would get transferred to so they could
20   explain to the voters what the new requirements were?
21   A.   No.  We have -- the way the system works is:
22   You call into our office.  You can pick who you want to
23   speak to:  mail ballot, absent- -- absentee, early
24   voting, voter registration.  So if they had a absentee
25   or mail ballot question, they would click Number 1.  And

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                    Pages 106 to 109

Page 106

1 then they'll get a person that's in mail ballot in my
2 office section.
3    Q.   Would you say that you were spending more than
4 an hour a week responding to voters who were calling
5 with questions about the new ID requirements?
6    A.   Yes.
7    Q.   Can you give me a sense of how many hours a
8 week you spent responding to voter inquiries?
9    A.   You get phone calls every day, all day long,
10 so...
11   Q.   And specifically --
12   A.   That's more than an hour.
13   Q.   Yes.  And specifically, for these SB 1
14 ID requirements, can you tell me about how many hours
15 you might have spent either on a daily basis or a weekly
16 basis?
17   A.   It could be first time we sign in the morning,
18 8:00 o'clock until we sign out at 4:30, we'll be getting
19 a phone call.  So I don't -- I -- I don't understand the
20 question, how you're asking it.
21   Q.   Uh-huh.  So I'm hoping to get an understanding
22 of how these new ID number matching requirements under
23 SB 1 affected the workflow of your office.
24        So you'll agree with me that in elections prior
25 to the March primary 2022, you didn't have to answer any

Page 107

1 questions from voters about their driver's license or
2 Social matching for their ABBM or their ballot, right?
3    A.   Correct.  We didn't have to answer those
4 questions before SB 1.
5    Q.   And then after SB 1 and for the March 2022
6 primary, you did have to answer questions from voters
7 about those requirements, correct?
8    A.   Yes.
9    Q.   So how much time did it take you to answer
10 those types of questions from voters on SB 1-related
11 requirements once you started putting them into effect
12 for the March primary?
13   A.   Are you asking me how long it took to answer a
14 phone call?
15   Q.   Answer -- if we add it up, the time that you
16 spent talking to voters and responding to their
17 inquiries about the ID-matching-number requirements, if
18 we added up those minutes, what would that be like for
19 you?
20   A.   Again, that's every day, all day.
21   Q.   Okay.
22   A.   I can't give you a -- a number, specific
23 number, because I don't have it.
24   Q.   Okay.
25   A.   We answer phone calls every day, all day long.

Page 108

1    Q.   Would --
2    A.   I have a staff of eight in my office.  All
3 eight will answer the phone.  All eight would get a
4 phone call.
5    Q.   Would --
6    A.   So that person may get ten calls in one day.
7 That person may get 20 calls in one day.  I do not know.
8    Q.   Would it be fair to say that most of the calls
9 that you were getting from voters with questions about
10 why their ABBM or mail ballot was rejected were calls
11 that were related to the new ID requirements for SB 1?
12   A.   Yes.
13        MS. HUNKER:  Objection, form.
14   Q.   (By Ms. Perales)  You mentioned there are eight
15 people in your office.  Those are -- would that be
16 correct, then, to say that there are eight people whose
17 work is primarily dedicated to processing either
18 application for ballot by mail or mail ballots?
19   A.   Yes.
20   Q.   Were there voters who provided a number on
21 their ABBM that you were able to match and that you sent
22 them a mail ballot and then when you got the mail
23 ballots back, you could not match the ID number that had
24 been provided on the mail ballot envelope?
25   A.   Yes.

Page 109

1    Q.   Okay.  Do you know about how many those were?
2    A.   I do not know.
3    Q.   Would we be able to figure it out by -- did
4 you -- I answered my own question.  Let me start again.
5        Did you keep track of the voters for whom you
6 received a mail ballot, but you could not verify their
7 ID number in order to count that mail ballot?
8    A.   Yes.
9    Q.   Okay.  And presumably, if they were sending you
10 a mail ballot, they had already managed to get
11 themselves through the ABBM process, right, by giving
12 you a number you could match?
13   A.   Yes.
14   Q.   Okay.  But then, we have the number of people
15 who were sent mail ballots and then you get these mail
16 ballot back and you can't verify the number.  That's
17 a -- that's, like, a known -- we could figure that out?
18   A.   Yes.
19   Q.   Okay.  Did you ever advise a voter over the
20 phone what to do when they received a notice and a new
21 ABBM and maybe also a new Voter Registration
22 Application?  Did you ever advise a voter on the phone,
23 like, This is what you have to do with these papers and
24 get them back to us so we can send you a mail ballot?
25   A.   Yes.

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                       Pages 110 to 113

Page 110

1    Q.  Did you ever -- did you ever talk to a voter
2  for whom there wasn't enough time left, either for you
3  to send them those new materials or for them to return
4  those materials, and did you offer those voters a
5  different advice?
6    A.  Yes.
7    Q.  Okay.  Tell me how that situation would come to
8  pass?
9    A.  Let's say if you sent in your information and
10 we sent you a notice back, and it was past the deadline
11 or you wouldn't have enough time to get into the mail,
12 if you received a ABBM, sent a ABBM in and a notice was
13 sent to you, then I would advise that voter to go to an
14 Early Voting location or go to the polls on Election Day
15 to vote in person.  And then the ABBM application that I
16 sent back to you, just go ahead -- and I will let them
17 know to fill out everything completely, answer all the
18 questions, and mail it back to us, and then we'll get
19 you ready for the next election.
20   Q.  Okay.  Did you ever have a voter tell you, in
21 response to that advice, that they -- they weren't
22 physically able to get to the poll to vote in person?
23   A.  Yes.
24   Q.  Do you remember what some of those reasons were
25 that the people were describing about themselves that

Page 111

1  they weren't physically able to get --
2    A.  They said --
3    Q.  -- to the poll?
4    A.  -- they could not walk or they couldn't --
5  didn't have a way or a car to get to the polls.
6    Q.  Okay.  Were most of the people that you were
7  talking to over age 65?
8    A.  Yes.
9    Q.  Do you have data on what -- let's say for
10 pre-SB 1, what proportion of your mail voters fall into
11 the over-65 category versus disability versus absent
12 from the jurisdiction on Election Day?
13   A.  Yes.
14   Q.  For pre-SB 1?
15   A.  Yes, because, you know, we have the category.
16 We have -- they have to tell us how they are vot- -- why
17 they're voting mail ballot, so we have -- we put that
18 into our system, Y65, which is annual 65; YDS, which is
19 disabled; or REM (phonetics), out of county.
20   Q.  Okay.
21   A.  Uh-huh.
22   Q.  And that's because they check a box; isn't
23 that --
24   A.  They check --
25   Q.  -- right --

Page 112

1    A.  -- a box, yes.
2    Q.  -- on the ABBM?
3    A.  Yes.
4    Q.  Okay.  And that continues through -- even
5  through the March primary of 2022?
6    A.  Yes.
7    Q.  And does that information go into your computer
8  system in any way?
9    A.  Yes.
10   Q.  So you could run a report, for example, how
11 many of your mail voters were sent a ballot because they
12 checked off over 65 versus disabled versus absent; is
13 that right?
14   A.  Yes.
15   Q.  What system would produce that report; what's
16 the name of your system?
17   A.  VEMACS.
18   Q.  VEMACS.
19       THE WITNESS:  It's V-E-M-A-C-S.
20       THE REPORTER:  Thank you.
21   Q.  Thank you.  I had completely gotten that wrong.
22   A.  A lot of people do.  I'm sorry.  And the
23 corporation is Votec that owns the VEMACS.
24       THE REPORTER:  I'm sorry?
25       THE WITNESS:  VOTEC, V-O-T-E-C.

Page 113

1    Q.  Did you find yourself unable to process
2  applications for ballot by mail at a greater number
3  following SB 1's requirement to match an ID number?
4    A.  Yes.
5    Q.  And how do you know the numbers are greater
6  post SB 1?
7    A.  Because of the requirements of the driver's
8  license and the ID it didn't ask before.
9    Q.  All right.  How do you know you were rejecting
10 more ABBMs and more mail ballots post SB 1?  Like, how
11 do you know the volume was greater?
12       MS. HUNKER:  Objection, form.
13   A.  How do I know the volume was greater?
14   Q.  (Moving head up and down.)
15   A.  By the numbers that we was putting into the
16 system of the notice codes, notices that we sending out.
17       THE REPORTER:  I'm sorry.  Can you repeat
18 your answer, and can you speak up just a little bit --
19       THE WITNESS:  I'm sorry.
20       THE REPORTER:  -- please.
21       THE WITNESS:  About how -- the
22 applications that we was -- put in the systems, the
23 notices that we were generating to the voters.
24       THE REPORTER:  Thank you.
25   Q.  And I think you said notice codes?

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                      Pages 114 to 117

Page 114

1   A.  Notice codes.
2   Q.  Were you here when Mr. Lopez testified that, at
3   some point, Dallas County received an update from the
4   Secretary of State in TEAMS or through TEAMS that gave
5   you more ID numbers?
6   A.  Yes.
7   Q.  Were you familiar with that when it happened?
8   A.  He told me that it happened.
9   Q.  Okay.  So do you know whether it got any easier
10  to find a matching ID number at that point?  Or -- I
11  understand it was February.
12       Was it too late at that point?  Do you -- do
13  you have any recollection of that?
14  A.  I do --
15       MS. HUNKER:  Objection, form.
16  A.  -- not know if it got easier or not.
17  Q.  (By Ms. Perales)  Okay.  Let me ask you another
18  question about verifying the ID number.
19       Would it be fair to say that when you received
20  either an ABBM or a mail ballot, that you would take
21  that number that was provided to you by the voter and
22  look it up in the Dallas County voter roll for that
23  voter?  You would look up that voter in your own voter
24  registration records to see if you could find a matching
25  number?

Page 115

1   A.  Repeat that again.
2   Q.  Okay.  Let's say you get either an ABBM or a
3   mail ballot from Susan Smith, and there's a -- Susan has
4   provided an ID number.  It's either an ABBM or a mail
5   ballot.
6       What would you be looking at to try to match
7   that number?  You -- I think you said it would be Susan
8   Smith's voter registration record; is that correct?
9   A.  Yes.
10  Q.  And is that Susan Smith's voter registration
11  record as maintained by Dallas County?
12  A.  Yes.
13  Q.  If you couldn't find a matching number in your
14  Dallas County voter roll or voter registration record
15  for Susan Smith, did you have another part of your
16  process where you would try to find that number for
17  Susan Smith maybe by doing an inquiry into TEAM?
18  A.  No, we wouldn't do a inquiry into TEAM.  It had
19  to be on our voter registration record roll.
20       THE REPORTER:  I'm sorry.  It would have
21  to be what?
22  A.  On our voter registration in VEMACS.  So how we
23  look it up is -- how we enter in the absentee
24  application is the same way how we will look up a voter
25  registration, the same way.  So it's on the same screen.

Page 116

1   Q.  I see.  So you would eith- -- you would -- you
2   would find that voter as you were entering the
3   information for the application --
4   A.  Yes.
5   Q.  -- for ballot by mail?
6   A.  Yes.
7   Q.  And she would -- Susan Smith, she would appear
8   with the information that is associated with her voter
9   registration record as maintained by Dallas County; is
10  that right?
11  A.  Yes.
12  Q.  Do you know if TEAMS does any automatic updates
13  into your voter roll at Dallas County?
14  A.  That is a question for Rive Lopez.
15  Q.  Okay.  I have a question about what we call the
16  carrier envelope.
17  A.  Okay.
18  Q.  Is it fair to say that the mail ballot, itself,
19  goes inside an envelope and then that envelope goes
20  inside a mailing envelope?
21       MS. HUNKER:  Objection to form.
22  Q.  (By Ms. Perales)  Help me understand because
23  I've always had a sense that there are two envelopes
24  involved, but I need some help understanding which one
25  is the carrier envelope.

Page 117

1   A.  Okay.  So what we do is we have a mail ballot
2   packet (indicating).  We have -- for the primary 2020
3   election, we had to use the white envelope.  So we had a
4   white mailing envelope.  Then we had the white secrecy
5   or ballot envelope.  Then we have a carrier envelope,
6   and then we have inserts.
7       We put all those in a packet, along with the
8   ballot, to the voter.  The voter is -- are to return
9   their voted ballot inside the ballot secrecy envelope,
10  seal that, and take that and put it inside the carrier
11  envelope.  Before they close the carrier envelope, they
12  are to put their identification there, close
13  (indicating) the carrier envelope and, over the seal,
14  sign their signature, and then mail that to us.
15  Q.  So the carrier envelope is the envelope that's
16  handled, for example, by the US mail --
17  A.  Yes.
18  Q.  -- is that right?
19  A.  Yes.
20  Q.  And the secrecy envelope is the envelope that
21  contains the voted ballot?
22  A.  Yes.
23  Q.  Thank you.  Did you have any problems opening
24  the envelope that had the flap (indicating) with the ID
25  number written on it?

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                      Pages 118 to 121

Page 118

1   A.  I do not open the envelope with the flap with
2 the ID number on it.
3   Q.  Who does?
4   A.  SVC.
5   Q.  Okay.  Did you hear of any problems the
6 Signature Verification Committee had getting those
7 envelopes open without destroying the number underneath?
8   A.  Are you asking about opening the flap, or are
9 you asking about opening the envelope?
10   Q.  Opening the flap.  Who opens the flap?
11   A.  I do.
12   Q.  Okay.
13   A.  I do.
14   Q.  Did you have any problems opening the flap?
15   A.  I hope not.  I designed that flap --
16   Q.  Okay.
17   A.  -- helped design it.  No, just kidding.  No.
18   Q.  I just -- as we go around this day and we
19 talked to all these counties --
20   A.  Uh-huh.
21   Q.  -- we get all kinds of stories.
22   A.  We have -- we have -- the way we designed the
23 flap was pre-perf, and we just pull it back.
24       THE REPORTER:  You said pre --
25       THE WITNESS:  Perf.

Page 119

1       THE REPORTER:  Pre-perf.
2       THE WITNESS:  Uh-huh.
3       THE REPORTER:  Thank you.
4   Q.  Pre-perforated?
5   A.  Pre-perforated.  I'm sorry.  Yes.
6   Q.  So you didn't have to use any tools or
7 implements to try to get that open?
8   A.  No.
9   Q.  That's probably worth a phone call with some
10 counties that I can recommend to.
11       And so do you think that there are voters in
12 Dallas County who submitted an ABBM, you couldn't match
13 their ID number and you sent them the notice and the new
14 materials, but they were never able to cure the ABBM
15 and, thus, did not vote?
16       MS. HUNKER:  Objection, form.
17   A.  Yes.
18   Q.  (By Ms. Perales)  Okay.  And what would be the
19 reasons that they couldn't cure the ABBM?
20   A.  What would be the reasons why?
21   Q.  Yes.  So, for example, one reason might be they
22 just didn't have enough time; they just didn't get it
23 done in time.
24       But were there people who gave you a number,
25 and you just simply weren't able to match it, even after

Page 120

1 you sent them the notice and --
2   A.  Yes.
3   Q.  Okay.  And would that be because you just
4 didn't have their ID number that they provided in your
5 system?
6   A.  Yes.
7   Q.  And now I'm going to ask on the mail ballot
8 side, were there people who submitted a mail ballot to
9 you and you weren't able to verify that number and,
10 thus, you were not able to have that ballot counted?
11       MS. HUNKER:  Objection, form.
12   A.  I -- I don't feel comfortable answering that
13 question because I don't, you know, make the decisions
14 on that.  Ballot Board does.  Early Voting Ballot Board
15 does.
16       THE WITNESS:  I'm sorry.  Early Voting
17 Ballot Board.
18       THE REPORTER:  Okay.
19   Q.  Did you or anyone in your office speak to any
20 voters who told you that they just hadn't been able to
21 vote in the election because of the voter ID number
22 matching requirements or as a result of the voter ID
23 number matching requirements?
24       MS. HUNKER:  Objection, form.
25   A.  Yes.

Page 121

1   Q.  (By Ms. Perales)  Can you give me an example of
2 a person like that?  Do you recall any specific --
3   A.  Of a voter who just could not get to the polls?
4   Q.  Yes.
5   A.  That's it.  They couldn't -- they couldn't get
6 out of the house to get to the polls and that is their
7 only way of voting, was voting by mail.
8   Q.  And a voter who you couldn't match their ID
9 number?
10   A.  Yes.  A lot of voters just got frustrated and
11 didn't -- wouldn't turn it back in.
12   Q.  Do you receive mail ballots where another
13 individual has helped the voter, provided assistance to
14 that voter, and then signed that spot on the envelope
15 where they are supposed to sign?
16   A.  Do I receive -- ask me that again.
17   Q.  Yeah.  Do you receive mail ballots that come
18 back to you and you can see that an assistor has
19 provided assistance to that voter?
20   A.  Are you asking me do I receive the ABBM
21 application or the mail ballot?
22   Q.  I was asking just about the mail ballot.
23   A.  Do we see receive -- I can see that, yes.
24   Q.  Do you record anywhere that a mail ballot came
25 to you and there's an indication that the voter received

Page 122

1 assistance?
2    A.  No, I do not.
3    Q.  So the only way we could figure out that number
4 would be to go back through the envelopes; is that
5 right?
6    A.  Yes.
7    Q.  Okay.  That sounds time-consuming.
8    A.  Yes.
9    Q.  And now let me ask you about the application
10 for ballot by mail.  If a voter receives assistance in
11 filling out the application for ballot by mail, do you
12 keep track of that number anywhere?
13    A.  No.
14    Q.  Okay.
15    A.  No, we do not keep track, but what I can say
16 is:  If a application come into our office and the --
17 they have a witness here (indicating), but they didn't
18 sign, then we send them that notice to the voter that
19 it's not signed; or if they signed it down here and
20 didn't fill out the information, then we send a notice
21 (indicating) to that, but...
22    Q.  So only in a situation where you can tell that
23 somebody provided assistance, but they didn't fill out
24 the paperwork --
25    A.  If it's --

Page 123

1    Q.  -- correctly?
2    A.  -- incomplete, yes.
3    Q.  Okay.  Do you send out mail ballots in Spanish?
4    A.  If it's requ- -- if it's requested, yes.
5    Q.  Is your mail ballot bilingual in the sense
6 that --
7    A.  Well, let me --
8    Q.  -- it has English and Spanish?
9    A.  I'm sorry.  Rephrase that.  Let me say:  Are
10 you asking the ballot or the mail ballot?
11    Q.  So let me ask you first about the mai- -- the
12 ballot, itself.
13    A.  The ballot, itself?
14    Q.  Is the ballot bilingual, or does it kind --
15    A.  Trilingual.
16    Q.  It's trilingual.
17    A.  English, Spanish and Vietnamese now.
18    Q.  Okay.  And so the mail ballot has all three of
19 those languages on it?
20    A.  The ballot has it, yes.
21    Q.  Okay.  Now, for application for ballot by mail,
22 if somebody is Spanish-speaking --
23    A.  Yes.
24    Q.  -- how could they make sure that you send them
25 a Spanish language application for ballot by mail?

Page 124

1    A.  Either they can call us on the phone and ask --
2 request -- that person requesting for their ballot, can
3 request a Spanish version of the ballot; or if it's a
4 Vietnamese, they can call and request that; or they can
5 submit a court request to us in writing, and they can
6 also state that in writing, asking for that.
7    Q.  If someone calls your -- your mail voting
8 group --
9    A.  Uh-huh.
10    Q.  -- and they're just speaking Spanish on the
11 phone --
12    A.  Uh-huh.
13    Q.  -- what would -- how would you handle that
14 call?
15    A.  Well, two ways, through the prompts in the
16 system they call, we have a Spanish version.  If they
17 say, I would like to speak to a Spanish speaker, then
18 they can still like that and then the phone call will go
19 to a Spanish-speaker.
20        If not, if we do get that call, then they'll
21 ask us -- either speak to us in English or ask if they
22 speak to someone in Spanish, and then we'll transfer
23 that call to the person who's speaking Spanish.
24    Q.  Between you and the eight people that work with
25 you --

Page 125

1    A.  Uh-huh.
2    Q.  -- in the mail-ballot group, do you have any
3 Spanish speakers?
4    A.  Yes.
5    Q.  Do you have any Vietnamese speakers?
6    A.  In my department, no.  But in the office, yes,
7 we have one.
8    Q.  Are the language prompts in your system yet for
9 someone to call Dallas County Elections and get a prompt
10 for -- if you need to speak -- if you need to hear this
11 message in Vietnamese, press whatever?
12    A.  I do not know.
13    Q.  Because it's new?
14    A.  It's new.
15    Q.  Okay.
16    A.  It may be.  I just don't know.
17    Q.  I want to ask you now about guidance from the
18 Secretary of State's office during this process,
19 starting January 1 of 2022.
20    A.  Okay.
21    Q.  Was there a time when your office was making
22 decisions about how to implement the new ID number
23 matching requirements and you had not yet received
24 guidance from the Secretary of State's office?
25    A.  Yes.

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                       Pages 126 to 129

Page 126

1          MS. HUNKER:  Objection, form.
2     Q.   (By Ms. Perales)  Give me an example of that.
3     A.   How we were going to handle the notices for the
4  missing or incorrect driver license, Texas ID or Social
5  Security; that was mostly that there.
6     Q.   Okay.
7     A.   And then how we was notifying the voters,
8  sending the notices out.
9     Q.   So you had to make those decisions as Dallas
10  County, correct?
11     A.   Yes.
12     Q.   Do you, in your job, ever talk to people at the
13  Secretary of State's office?
14     A.   Yes.
15     Q.   And did you ask for guidance on some of these
16  ID matching requirements for SB 1 from the Secretary of
17  State?
18     A.   Did I ask for guidance from the Secretar- --
19  no.
20     Q.   Did you have communications with anyone in the
21  Secretary of State's office, from January 1 until the
22  March primary date, about the signature -- or not the
23  signature, about the ID number matching requirements and
24  how to implement them in Dallas County?
25     A.   Repeat that again.

Page 127

1     Q.   Did you ever have communication with the
2  Secretary of State's office about implementing these ID
3  number matching requirements between January 1 and the
4  date of the election?
5     A.   Yes, emails and web- -- webinars and some --
6          THE REPORTER:  I'm sorry.  Emails and
7  what?
8          THE WITNESS:  Webinar- -- webinars.
9  Webinars.
10     Q.   And so at some point, the Secretary of State
11  offered a webinar for implementing SB 1?
12     A.   Yes.
13     Q.   Do you remember about when that was?
14     A.   No, I do not.
15     Q.   Was it already when early voting or mail voting
16  was underway for you in Dallas County?
17     A.   Mail voting began on January 1st, 2022.  We did
18  receive a template and guidelines on how to do the
19  carrier envelopes, and we received that in December of
20  2021, so...
21     Q.   Okay.  And then from January 1 to the March
22  primary election day, you mentioned a webinar.
23          Do you remember more or less when that
24  happened?
25     A.   No, I do not.

Page 128

1     Q.   And then you also mentioned emails.
2     A.   Yes.
3     Q.   So, in your email account for where you are at
4  your office, there's going to be emails going back and
5  forth between you and people who work for the Secretary
6  of State about implementing SB 1?
7     A.   Yes.  They would send us the elections intranet
8  advisories, emails --
9     Q.   Okay.
10     A.   -- letting us know the new notices --
11     Q.   Uh-huh.
12     A.   -- giving us the webinar dates that they was
13  holding to put out --
14     Q.   Okay.
15     A.   -- and sending out the -- like I said, the
16  notices and the dates and the deadlines.
17     Q.   So there are emails from the Secretary of
18  State's office that kind of went to all the counties on
19  the same basis with --
20     A.   Yes.
21     Q.   -- this new information?
22     A.   Yes.
23     Q.   Did you ever have email or -- or other
24  communication back and forth with the Secretary of State
25  between January 1 and the March primary that was just

Page 129

1  you and somebody over there, that was not to all the
2  counties?
3     A.   Yes.
4     Q.   And what -- what were those types of emails
5  that were just specific to you and them?
6     A.   One of the -- Emily Harwell (phonetics) -- I
7  believe that's her name -- she's the representative for
8  Dallas County.  She would send us back email- --
9  actually, me a email to let me know if something needed
10  to be done in TEAMS or I needed to fix something in
11  TEAMS or fix something with my county to send to TEAMS.
12     Q.   And Emily Harwell is with the Secretary of
13  State?
14     A.   Yes.
15     Q.   Okay.  And she would send you that message
16  about fixing things in TEAMS?
17     A.   She would send me that message and others in
18  the office that message.
19     Q.   Including Mr. Lopez?
20     A.   Sometime Mr. Lopez, sometime Mr. Scarpello --
21     Q.   Okay.
22     A.   -- and to me, also.
23     Q.   And when you were interacting with TEAMS, this
24  was specific to mail ballots or ABBMs, or it just was --
25     A.   ABBMs, mail ballots, the ballot tracker, yes --

The Office of the Dallas County Elections Administrator                          April 29, 2022
                                                                                 Pages 130 to 133

Page 130

1    Q.  So --
2    A.  -- because we have to send something to the
3  TEAMS so it can get submitted to the ballot tracker, on
4  the ballot tracker.
5    Q.  So she was telling you to put something in
6  TEAMS?
7    A.  She was saying something I had missing, if I --
8  if I failed to have something, like, if -- let's say you
9  sent in an application for ballot by mail and the
10 request didn't go through first and then it said that I
11 mailed the ballot out to you, there's a order of steps
12 to send stuff to TEAMS.
13       So first I have to send in that say, Hey, Nina
14 Perales requested a application for ballot by mail.
15 Then the next thing I have to send is that I sent Nina
16 her ballot.  And then -- then I have to send something
17 back that's saying that Nina did, in fact, send her
18 ballot to us.
19   Q.  Uh-huh.
20   A.  Or I had one of the situations where, when we
21 was trying to get a clear understanding of our voter
22 registration system cancel -- like, say -- let's say if
23 you did receive a request for a ballot by mail and you
24 decided to go to polls to vote, we had to clear you out
25 the system.

Page 131

1    Q.  Uh-huh.
2    A.  Well, our voter registration system at the time
3  wouldn't -- didn't send that information to TEAMS
4  because it didn't have to.  But now -- now with the SB 1
5  law, you have to; so she let us know about that, told us
6  about that.
7    Q.  And would you have to do that in TEAMS voter by
8  voter, individually?
9    A.  Oh, no, no.
10   Q.  Okay.
11   A.  No, we would just have to send an export to
12 TEAMS.
13   Q.  Okay.  So there was some point at which the
14 export would be sent out to TEAMS?
15   A.  Yes.
16   Q.  And you could do more than one voter at a time?
17   A.  We could -- yes.
18   Q.  So when you were -- is it correct to say that
19 you were using VEMACS to record, for example, when you
20 received a request for application for ballot by mail or
21 that you sent out an application for ballot by mail, you
22 would be using VEMACS; is that --
23   A.  Yes.
24   Q.  -- right?
25       So VEMACS wasn't automatically talking to TEAM?

Page 132

1    A.  Yes, when we would send the report.  So what --
2  what I have to do is anything that we deal with a
3  particular election.  So let's say we were dealing with
4  the March primary; we associated that voter to that
5  March primary election.
6    Q.  Uh-huh.
7    A.  What we did was doing an export out of TEAM- --
8  out of VEMACS.
9    Q.  Uh-huh.
10   A.  And then once we created the export out of
11 VEMACS, it captured everything that we did to touch that
12 one particular voter.  And then we submit that
13 information to TEAMS, through an import through TEAMS.
14   Q.  And is it fair to say that Emily Harwell --
15   A.  Yes.
16   Q.  -- would contact you because there was
17 something missing with respect to just one individual
18 voter?
19   A.  It was -- there was one or a group.
20   Q.  Okay.  And there would be a step missing, for
21 example, in their process towards getting a mail ballot?
22   A.  Yes.
23   Q.  Okay.  Did you ever have a situation where a
24 voter or an individual was trying to request an
25 application for ballot by mail on behalf of another

Page 133

1  person?
2    A.  Yes.
3        MS. HUNKER:  Objection to form.
4    Q.  (By Ms. Perales)  And how did you handle that
5  situation when you would get contacted by someone who
6  says, I need to request an application for ballot by
7  mail for this other individual?
8    A.  I'll tell them, Unfortunately, I wouldn't be
9  able to do that; I will need to speak with the voter
10 that -- who needs the mail ballot.
11   Q.  And would sometimes, then, the voter who needs
12 the ballot get on the phone?
13   A.  Yes.
14   Q.  Was there ever an instance where the person who
15 needed the ballot could not get on the phone and tell
16 you, themselves?
17   A.  Yes.
18   Q.  Give me that instance, if you could --
19   A.  Husband and wife --
20       THE REPORTER:  I'm sorry.
21       THE WITNESS:  I'm sorry.
22   A.  With the husband --
23       THE REPORTER:  Wait just a second.
24       THE WITNESS:  Uh-huh.
25       THE REPORTER:  I'm still -- okay.  Go

Page 134

1 ahead. Now start. Thank you.
2    A.   With the husband and wife situation, husband
3 calls, requests for a ballot by mail. He wants to
4 request one for his wife. We would tell him, no, we
5 have to speak to the wife. Wife -- and he would say,
6 "The wife is at work."
7        And I said, "Well, she'll have to call us back
8 later."
9    Q.   Okay. Was there ever an instance where the
10 person could not tell you over the phone -- that they
11 were there, but they could not communicate to you?
12   A.   No, not -- not to my knowledge (indicating).
13   Q.   Okay. And then have you heard from anybody
14 else in your staff that they had a situation where the
15 voter could not communicate that they needed the ballot
16 and that's why this other person was calling on their
17 behalf?
18       MS. HUNKER: Objection, form.
19   A.   Not to my knowledge.
20   Q.   (By Ms. Perales) Okay. Let me ask you about
21 the ballot tracker because that's --
22   A.   Okay.
23   Q.   -- the next thing on my list.
24       To the best of your knowledge, when did the
25 ballot tracker become available for Dallas County people

Page 135

1 to use to track their ballots?
2    A.   I do not know.
3    Q.   Okay. Did you ever advise a voter to try to
4 use the ballot tracker to put ID number information in
5 there so that they could vote by mail?
6    A.   From my knowledge, you cannot put ID
7 information in the ballot tracker.
8    Q.   So what do you know about the ballot tracker?
9 What is --
10   A.   The ballot tracker is a device that the voter
11 can look up to track their ballot to see if their
12 application was accepted, if their ballot was mailed to
13 them and when the ballot was returned -- when they
14 mailed the ballot back to the county, and if the ballot
15 was received.
16   Q.   Do you know what information the voter has to
17 put into the ballot tracker to access that information?
18   A.   Yes.
19   Q.   What is that information?
20   A.   They have to put their name -- first name, last
21 name, date of birth, driver's license, Social Security,
22 address, the county that they live in.
23   Q.   Uh-huh. Do you know if, in order to get into
24 the ballot tracker, that the system, the ballot tracker
25 system, had to match the voter's driver's license and

Page 136

1 last four of the Social in order for the voter to get
2 into the system?
3    A.   Yes.
4    Q.   Okay. And so if the voter put in their
5 driver's license number and the last four of their
6 Social, but one of those numbers was missing from their
7 voter registration record, is it correct to say, then,
8 that they could not access the ballot tracker?
9    A.   Yes.
10   Q.   Did you have anybody contact your office to
11 tell you about that?
12   A.   Yes.
13   Q.   More than ten people?
14   A.   Yes.
15   Q.   Did you offer any advice to those voters about
16 how to access the ballot tracker system when they were
17 providing their ID numbers, but it -- it just wasn't
18 letting them in?
19   A.   Yes.
20   Q.   And what did you tell them?
21   A.   Well, if I was speaking to the voter, then I
22 would look up their voter registration information, and
23 I advised them what they had in the system.
24   Q.   And did you ever look up a voter and find that
25 there was a driver's license number, but no last four of

Page 137

1 the Social?
2    A.   Yes.
3    Q.   Did you ever look up a voter and see that there
4 was the last four of the Social, but no driver's license
5 number?
6    A.   I don't recall doing that, remember that one.
7    Q.   Was it more the -- more often the case that a
8 voter's driver's license number was in their
9 registration record, but not the last four of their
10 Social?
11   A.   Yes.
12   Q.   Do you know, when a person fills out a voter
13 registration application, whether they have to provide
14 both the driver's license number and the last four of
15 the Social or if they can just provide the driver's
16 license number and be accepted for voter registration?
17       MS. HUNKER: Objection, form.
18   A.   On the voter registration application, it
19 does -- it has the question for both, but it says "or,"
20 either-or.
21   Q.   Is it also the case that you have voters
22 registered to vote in Dallas County who registered to
23 vote before the voter registration application asked for
24 either the driver's license number or the last four of
25 the Social?

Page 138

1    A.   Yes.
2    Q.   And do you know when the voter registration
3  form started asking for that information?
4    A.   No.
5    Q.   And so did you ever hear that somebody could
6  access the ballot tracker to try to cure their
7  application for a ballot by mail or cure the ID number
8  information for a mail ballot?
9    A.   Say that again, please.
10   Q.   Did you ever hear that somebody could access
11 the ballot tracker and then provide ID number
12 information that would allow them to, essentially, cure
13 either an ABBM or a mail ballot for which you could not
14 match (indicating) the ID number?
15   A.   No --
16        MS. HUNKER:  Objection, form.
17   A.   -- I did not hear anyone be able to access the
18 ballot tracker to cure.
19   Q.   (By Ms. Perales)  I see.  So you received
20 information from voters saying they could not get into
21 the ballot tracker?
22   A.   Yes.
23        MS. HUNKER:  Objection, form.
24   Q.   (By Ms. Perales)  Did you ever talk to a voter
25 who said, Yes, I am in the ballot tracker, but had some

Page 139

1  other question for you --
2    A.   Yes.
3    Q.   -- that they -- okay.
4        So some people you did hear from were able to
5  get into the ballot tracker?
6    A.   Yes.
7    Q.   And why would they be calling you at that point
8  if they were already in?
9    A.   They wanted to know why their ballot or their
10 application was in question.
11   Q.   Okay.  And when you say "in question," do you
12 know how they would see that in the ballot tracker?
13   A.   It would say, I believe, it was under review.
14   Q.   Under review.  Okay.  And what were -- was the
15 ID number mismatch a reason why it would be under
16 review, or what would typically be a reason that it
17 would be under review?
18   A.   With the new SB law, it gives a lot of options
19 to cure your absentee ballot by mail --
20   Q.   Uh-huh.
21   A.   -- or your -- I mean, your application or your
22 ballot by mail.  No driver license, no Social Security,
23 mismatched driver license and mismatched Social
24 Security, no signature.  If no signature, then -- if it
25 was a mismatched signature, a witness statement.  It

Page 140

1  gives a lot of ways for you to cure.  So I couldn't
2  really tell you more about the ballot tracker because I
3  didn't design it or --
4    Q.   Okay.
5    A.   -- work on it that much.
6    Q.   Would you say that Dallas County experienced
7  problems associated with the new voter ID number
8  matching requirements in SB 1?
9        MS. HUNKER:  Objection to form.
10   A.   What type of problems?
11   Q.   (By Ms. Perales)  Well, really, any kind of
12 problem.  So the topic on which you've been designated
13 is, quote, any issues, problems, concerns, or
14 difficulties you experienced because of the challenged
15 provisions of the SB 1, unquote.
16       So there's a lot of SB 1 that's at issue in
17 this lawsuit, but I wanted to ask specifically for
18 mail -- just for now, mail ballot ID matching
19 requirements, whether your office experienced any
20 issues, problems, concerns with that?
21   A.   I would say educating the voters that call on a
22 telephone, explaining to them why they have to have
23 their Texas Driver's License or their Social Security on
24 their application now in order to vote by mail.
25       I would say talking to them about -- talking to

Page 141

1  the voter on the telephone, trying to get them to -- on
2  the ballot tracker, how to access the ballot tracker,
3  what information to put on the ballot tracker, that
4  concern.  The longer hours that we probably worked for
5  filling -- doing the -- doing the notices, putting in
6  the notices, that right there.  I'd -- I'd -- I would
7  say something like that.
8    Q.   Did you ever try -- well, let me ask you this.
9        Was Dallas County receiving inquiries from
10 either the public or the media about the impact of SB
11 1's ID matching requirements on mail voting?
12       MS. HUNKER:  Objection, form.
13   A.   Yes.
14   Q.   (By Ms. Perales)  And were you responsible for
15 pulling together some of the information to respond to
16 these inquiries?
17   A.   Yes.
18   Q.   Did you ever pull together information that
19 would allow you to understand how many people ended up
20 not voting as a result of your inability to match their
21 ID number?
22   A.   No.
23   Q.   Okay.  What were the sorts of requests that
24 were coming from either the media or the public?
25   A.   They just wanted to know how many people were

Page 142

1  being rejected for -- they wanted to know the rates and
2  the number of how many people were being rejected for --
3  because of the SB 1.
4      Q.  Okay.  And you put that information together
5  for them when they would ask?
6      A.  I ran the report, yes.
7      Q.  But on those rejections, is it fair to say that
8  some of those people would have gotten something from
9  you in the mail and may or may not have been able to,
10 for example, submit an ABBM that you could process?
11     A.  Yes.
12     Q.  Okay.  Looking forward to the November 2022
13 election, do you anticipate that there are going to be
14 voters who submit ABBMs and you cannot match the number
15 that they provide on the ABBM to the voter registration
16 record?
17     A.  Yes.
18     Q.  Is it true that more voters vote in the general
19 than in the primary?
20     A.  Yes.
21     Q.  So there might be people who haven't even
22 encountered these SB 1 requirements yet because they
23 chose not to vote in the primary, but they plan to vote
24 in the general?
25             MS. HUNKER:  Objection --

Page 143

1      A.  There might --
2             MS. HUNKER:  -- form.
3      A.  There might be.
4      Q.  (By Ms. Perales)  And similarly, do you
5  anticipate that you're going to receive mail ballots
6  from voters that you cannot count because you can't
7  match their ID number?
8             MS. HUNKER:  Objection, form.
9      A.  Are you asking me about the ballots?
10     Q.  (By Ms. Perales)  Yes.  Do you anticipate --
11     A.  Ma'am, I -- I'm not Early Voting Ballot Board,
12 so I don't count ballots.
13     Q.  Okay.  Do you have a sense right now of how
14 many voters in Dallas County for whom you have a
15 driver's license number, but no last four of the Social?
16     A.  No.
17     Q.  Is there a way to run a report that shows you
18 the voters for whom you have a driver's license number,
19 but no last four of the Social?
20     A.  That would be for the Voter Registration
21 Manager, Rivelino Lopez.
22     Q.  And then I just have to ask this question vice
23 versa.  Do you -- do you know whether it's possible to
24 figure out how many voters in Dallas County for whom you
25 have the last four of the Social, but no driver's

Page 144

1  license number?
2      A.  That would be for the Voter Registration
3  Manager, Rivelino Lopez.
4      Q.  And then finally, do you know if it's possible
5  to identify the number of voters who lack both numbers
6  in your voter registration records?
7      A.  Voter Registration Manager, Rivelino Lopez.
8      Q.  Are you taking any steps, looking forward to
9  the November 2022 election and these SB 1 requirements
10 for mail voting, to try to prepare your office for what
11 you are anticipating will happen in November?  So, for
12 example, are you doing anything different, in terms of
13 either training or who -- how many people you're
14 planning to hire, either for temp or permanent because
15 of what you anticipate will be happening with mail
16 voting and this ID number matching requirement?
17     A.  We always prepare for the election the same
18 steps.  So if it's for the November '22 or for this
19 upcoming primary election, March runoff --
20     Q.  Uh-huh.
21     A.  -- the same steps.
22     Q.  Do you have local elections on May 7?
23     A.  May 7, yes.
24     Q.  Are you in --
25     A.  Like, it's a May -- it's a local and a state

Page 145

1  election.
2      Q.  Yes, local and state for May 7.
3         Are you currently rejecting ABBMs for the May 7
4  election?
5      A.  ABBM applications?
6      Q.  Yes, ABBM applications.
7      A.  That would have already occurred.  The deadline
8  for that cutoff was April the 26th.
9      Q.  Okay.  So about three days ago?
10     A.  Yes.
11     Q.  Did you find yourself rejecting applications
12 for ballot by mail because you were unable to match the
13 ID number?
14     A.  Maybe so.  I do not know.
15     Q.  Okay.
16     A.  I didn't run the numbers on that.
17     Q.  All right.  Do you know if your office was
18 sending out any notices with new application for ballot
19 by mail forms on the basis of being unable to match the
20 ID number?
21     A.  Maybe.  Probably so.
22     Q.  Okay.  And have you received any mail ballots
23 that you know were not counted because of an inability
24 to match the ID number for the May 7 election?
25     A.  For the mail ballots?

The Office of the Dallas County Elections Administrator
April 29, 2022
Pages 146 to 149

Page 146
1   Q.  Yes.  If any mail ballots have not been able to
2 get counted because of the inability to match the ID
3 number.
4   A.  Technically --
5       MS. HUNKER:  Objection, form.
6   A.  -- we cannot count the ballots yet.  And also
7 we -- they have a cure period, so there's no final
8 rejection until after the cure period.
9   Q.  (By Ms. Perales)  Thank you for that.
10   A.  Uh-huh.
11       THE REPORTER:  Now, you said there's no
12 final -- there's no --
13       THE WITNESS:  No final rejection until
14 after the cure period.
15   Q.  And the cure period is a certain number of days
16 after --
17   A.  Six days after the election.
18       THE REPORTER:  I'm sorry.
19       THE WITNESS:  I'm sorry.
20       THE REPORTER:  If you'll please let her
21 get the whole question out -- thank you -- before you
22 start your answer.
23       THE WITNESS:  Do you need me to say --
24       THE REPORTER:  It's okay, I think.
25       THE WITNESS:  You got it.

Page 147
1   Q.  Are you receiving any applications for ballot
2 by mail for the May 24 election?
3   A.  Yes.
4   Q.  All right.  Do you know if you've had any
5 applications for ballot by mail for May 24 that you were
6 unable to process because you couldn't match the ID
7 number?
8   A.  Yes.
9   Q.  And have you been sending out notices and new
10 application for ballot by mail forms to those voters?
11   A.  Yes.
12   Q.  And could you run a report, for example, today
13 that tells you how many of these voters you've sent that
14 notice to?
15   A.  Yes.
16   Q.  And the reason code would be there for not
17 being able to match that ID number?
18   A.  Yes.
19   Q.  Okay.
20   A.  But I couldn't give you that information until
21 after the election.
22   Q.  Oh, okay.  Good to know.
23       Do you have any knowledge about any issues or
24 problems or concerns that your office would have had
25 related to other parts of SB 1 besides mail voting?  So,

Page 148
1 for example, changes to how someone provides assistance
2 to a voter in the polling place?
3   A.  I do not --
4       MS. HUNKER:  Objection --
5   A.  -- know.
6       MS. HUNKER:  -- form.
7   Q.  (By Ms. Perales)  Okay.  Would you say, then,
8 that your knowledge of any issues, problems or concerns
9 your department has experienced or Dallas County
10 Elections has experienced because of the challenge
11 provisions of SB 1 are limited to mail voting?
12   A.  Can you repeat that, please?
13   Q.  Uh-huh.  Would you say that your knowledge of
14 issues, problems or concerns, experienced by Dallas
15 County Elections because of SB 1 is limited to mail
16 voting?
17   A.  I don't know if I can say that.
18   Q.  Are you aware of any issues, problems or
19 concerns that Dallas County Elections has with SB 1
20 beyond mail voting?
21   A.  No, I'm not aware.
22   Q.  Would you -- would you necessarily know, for
23 example, if Dallas County Elections was having problems,
24 for example, with implementing SB 1's new requirements
25 on providing assistance to voters inside the polling

Page 149
1 place?  Would you be the person that would know if there
2 were problems --
3   A.  No --
4   Q.  -- with that?
5   A.  -- I would not be.
6   Q.  Okay.
7       MS. PERALES:  I need to go off the record
8 for a couple of minutes.
9       THE WITNESS:  Okay.
10       THE VIDEOGRAPHER:  Okay.  We're going off
11 the record.  The time is 2:02 p.m.
12       (Break taken.)
13       THE VIDEOGRAPHER:  All right.  We're back
14 on the record.  The time is 12 -- 2:12 p.m.
15       MS. PERALES:  I pass the witness.
16       MR. WHITE:  I don't have any questions for
17 Ms. Phillips.
18       MS. HUNKER:  Does anybody on the Zoom call
19 have any questions for Ms. Phillips?
20       MS. BENDER:  I would like to ask a few
21 questions on behalf of the United States.
22       MS. PERALES:  Would you mind flipping it
23 around (to the Videographer)?
24       (Laptop adjusted.)
25       EXAMINATION

Page 150

1  BY MS. BENDER:
2     Q.  Okay.  Ms. Phillips, thank you for being here
3  today.  I just had a few follow-up questions for you
4  based upon your conversation earlier.
5        So you talked earlier about looking up an
6  individual --
7           (Lights went off in the room.)
8           THE REPORTER:  Do y'all want to go off the
9  record?
10          MR. BENDER:  Yeah.
11          MS. PERALES:  Yeah.
12          THE REPORTER:  Can we go off the record?
13          THE VIDEOGRAPHER:  Okay.  We're going off
14  record at 2:13.
15          (Discussion off the record.)
16          THE VIDEOGRAPHER:  Okay.  We are back on
17  the record at 2:15 p.m.
18          MS. PERALES:  Brady, we need you to start
19  again, but also to start by saying who you are.
20          MS. BENDER:  Yes.  Hi.  So this is Brady
21  Bender.  I represent the United States.
22     Q.  (By Ms. Bender)  So I just have a few questions
23  to follow up on the conversation from earlier.  You had
24  talked earlier about looking up an individual voter in
25  VEMAC when you were -- received an ABBM or carrier

Page 151

1  envelope.
2        When you received an application for ballot by
3  mail or a carrier envelope before SB 1, how would you
4  find the voter in your database to confirm eligibility
5  and registration?
6     A.  By looking them up in VEMACS, the same way --
7     Q.  So what do you confirm --
8     A.  We will use the voter's last name, first name.
9  The application always asks for a date of birth.  It
10  wasn't required, but they can put it on there, or we
11  will look up through their address.
12     Q.  Okay.  And when you receive an ABBM or mail
13  ballot carrier envelope after SB 1, how do you find the
14  voter in your database?
15     A.  Are you asking for the ABBM or the carrier
16  envelope?
17     Q.  Either one.  If they are different, then let's
18  start with the ABBM.
19     A.  Okay.  If we are looking up for ABB- -- ABBM
20  application, we would still look them up by the first
21  name, last name, date of birth.  Since they did provide
22  a driver's license or the last four digits of Social
23  Security, we can also look that voter up by their
24  driver's license.
25     Q.  And for the -- if mail ballot carrier envelope,

Page 152

1  would you look them up using different information?
2     A.  With the mail ballot carrier envelope, with the
3  VEMACS voter reg- -- VEMAC system, it creates a label;
4  and the label has a bar code on there.  Also it has the
5  voter's -- voter's certificate, which is in-house in
6  V- -- in VR system.
7     Q.  Okay.  And you said you would use the label
8  information --
9     A.  Yes.
10    Q.  -- to look them up?
11    A.  Yes.
12    Q.  Before SB 1, how long, on average, would you
13  estimate that it took your office to process an ABBM?
14    A.  Maybe a minute or less.
15    Q.  And after SB 1, how long would you estimate for
16  your office to process an ABBM?
17    A.  Maybe a minute or less.  About the same time.
18  It's actually --
19    Q.  Okay.
20    A.  -- verifying, looking up the voter.
21    Q.  Okay.  Before SB 1, how long would you estimate
22  it took to process a mail ballot carrier en- --
23    A.  I --
24          MS. HUNKER:  Objection, form.
25    A.  -- could not guess on that because I do not

Page 153

1  verify the carrier envelope.  Signature verification
2  does.
3     Q.  (By Ms. Bender)  Okay.  Okay.  During the March
4  2022 primary, if mail ballot materials did not list a
5  driver's license number that appeared in the database,
6  but it had the last four digits of the social security
7  number and it matched the database, would you accept it?
8     A.  Yes.
9     Q.  And is this always your interpretation of the
10  law?
11          MS. HUNKER:  Objection to form.
12    A.  Yes, either-or, whichever they put on there.
13  And if it's in our voter registration system, we -- we
14  picked either-or, either one.
15    Q.  (By Ms. Bender)  Okay.  So throughou- -- so
16  throughout the time that you were processing ballots for
17  March '22 -- '22 primary, you would accept it if it had
18  either a driver's license number or a Social Security
19  number?
20    A.  Yes.
21    Q.  Okay.  And if it listed an incorrect driver's
22  license number compared to what you had in the database,
23  but it had the last four digits of the Social Security
24  number that matched the database, would you accept that?
25    A.  Yes.

The Office of the Dallas County Elections Administrator     April 29, 2022
                                                            Pages 154 to 157

Page 154

1   Q.  And is this always the way that you interpreted
2 the law?
3           MS. HUNKER:  Objection, form.
4   A.  Yes.
5   Q.  (By Ms. Bender)  Okay.  So, again, throughout
6 the entire time that you were processing ballots for the
7 March 2022 primary --
8   A.  (Witness moves head up and down.)
9   Q.  -- you would accept it if the driver's license
10 number was incorrect, but the Social Security number was
11 correct?
12  A.  Yes.
13          MS. BENDER:  Okay.  That's all of my
14 questions.  Thank you.
15          THE WITNESS:  Thank you.
16          THE REPORTER:  Just a second.
17              EXAMINATION
18 BY MS. CAI:
19  Q.  Hello, Ms. Phillips.
20          MS. CAI:  Oh.  Go ahead.
21  A.  Hi.
22          MS. PERALES:  One second, please.  One
23 second, please.
24          THE REPORTER:  Okay.  And who is this,
25 please?

Page 155

1           MS. CAI:  My name is Sophia Cai, and I'm
2 representing the OCA Plaintiffs.
3           MS. PERALES:  Slow down for one second.
4 Can you just say that more slowly?
5           MS. CAI:  Of course.  My name is Sophia
6 Cai, spelled S-o-p-h-i-a.  Last name, Cai, C-a-i.
7           THE REPORTER:  Okay.  And you're
8 representing who?
9           MS. CAI:  The OCA-Greater Houston
10 Plaintiffs.
11          THE REPORTER:  Okay.  Thank you.
12          Okay.  Thank you.
13          MS. CAI:  Great.
14  Q.  (By Ms. Cai)  Hi, Ms. Phillips.  Thank you --
15  A.  Hi.
16  Q.  -- for bearing with us.  I just have a few
17 questions for you.
18      You testified earlier that you didn't know off
19 the top of your head the number of people who submitted
20 an application for ballot by mail that was incomplete
21 because you could not verify their ID number.
22      Even without that exact number off the top of
23 your head, do you know whether the number of ABBMs that
24 were rejected in the March primary was greater than in
25 past years?

Page 156

1           MS. HUNKER:  Objection, form.
2   A.  Yes, it was greater.
3   Q.  (By Ms. Cai)  What accounts for that greater
4 number of rejections?
5           MS. HUNKER:  Objection, form.
6   A.  The new requirements, the missing driver's
7 license or the missing Social Security numbers.
8   Q.  (By Ms. Cai)  Do you have reason to believe
9 that some individuals whose applications for ballot by
10 mail or mail ballots are being rejected -- excuse me --
11 that have been rejected are, in fact, eligible voters
12 who made errors while filing -- filling out their ID
13 numbers?
14          MS. HUNKER:  Objection, form.
15  A.  Yes.
16  Q.  (By Ms. Cai)  Are you or your office concerned
17 by the greater number of rejected applications for
18 ballot by mail or mail ballots in the March primary?
19          MS. HUNKER:  Objection, form.
20  A.  Yes.
21  Q.  (By Ms. Cai)  Why are you concerned?
22  A.  Because voters before the SB 1 law were able to
23 vote and cast their ballots, and ballots counted.
24  Q.  Have you or your office conveyed that concern
25 to the Secretary of State?

Page 157

1   A.  I have not; but my office -- some people in my
2 office probably have, yes.
3   Q.  Do you know what they have said?
4   A.  No, I don't.
5   Q.  Have you or your office conveyed that same
6 concern to other election officials?
7           MS. HUNKER:  Objection, form.
8   A.  Probably so.  I do not know.
9   Q.  (By Ms. Cai)  Have you personally conveyed that
10 concern to anyone?
11  A.  No.
12  Q.  Turning to SB 1 requirements next, are you
13 aware that SB 1 adds additional requirements in order to
14 register to vote by mail or to actually vote by mail?
15          MS. HUNKER:  Objection, form.
16  A.  Repeat that again.
17  Q.  (By Ms. Cai)  This has probably been covered,
18 but is it correct that you are aware that SB 1 adds
19 requirements to register to vote by mail or to actually
20 vote by mail?
21  A.  Yes.
22          MS. HUNKER:  Objection, form.
23  Q.  (By Ms. Cai)  Is a registered voter with a
24 disability able to get a modification or accommodation
25 to the ID requirement for voting by mail?

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                       Pages 158 to 161

Page 158

1          MS. HUNKER: Objection, form.
2     A.  No.
3     Q.  (By Ms. Cai)  So even if they request an
4  accommodation or a modification, a voter with disability
5  would not be able to have any different rules apply to
6  them for the ID requirement?
7          MS. HUNKER: Objection, form.
8     A.  No, not to my knowledge.
9     Q.  (By Ms. Cai)  Have you received any requests
10 from voters with disabilities for any sort of
11 accommodation or modification to the ID requirement in
12 the March primary?
13    A.  No, not to my kno- -- not to my knowledge.
14    Q.  Who would a voter with a disability go to
15 to make such a request for their application for vote by
16 mail or their mail ballot?
17    A.  They would request the application from my
18 office, the Mail Ballot Office with Dallas County.
19    Q.  If they wanted some sort of accommodation or
20 modification so that they could vote by mail, would they
21 be able to ask somebody in your office for such
22 accommodation or modification?
23    A.  What type of accommodation or modification are
24 we asking about?
25    Q.  Any type.  It might vary by the type of

Page 159

1  disability a person has.  Would they be able to ask for,
2  for instance, assistance filling out their ID number?
3     A.  If a voter is in our office, come to our office
4  at the counter and asks for help with assisting with
5  filling out their application, yes, we can help them
6  fill out their application.
7     Q.  Would they be able to request any other sorts
8  of modifications or accommodations?
9     A.  What modification are we asking about?
10    Q.  It would likely depend on the voter, but can
11 you think of any examples of people who have asked for
12 any assistance?
13    A.  No one has asked for any assistance or
14 modifications in our office, so I wouldn't know which
15 one you are referring to.
16    Q.  Have they called in or written in for any such
17 modifications?
18    A.  I have not received any, not to my knowledge.
19         MS. CAI:  Okay.  Thank you very much,
20 Ms. Phillips.  That's all my questions.
21         THE WITNESS:  Thank you.
22         THE REPORTER:  Just a second, please.
23 Okay.  Thank you.
24         MS. HUNKER:  Does any other Plaintiff
25 group want to ask questions before I begin?

Page 160

1          Hearing none.
2              EXAMINATION
3  BY MS. HUNKER:
4     Q.  Hi, Ms. Phillips.  How with you?
5     A.  I'm okay.  How are you?
6     Q.  My name is Kathleen Hunker.  I represent the
7  State Defendants in this matter.  I'm going to ask a few
8  questions, mostly in response to what Plaintiffs have
9  asked.  Because of that, I'm going to be jumping around
10 a little bit with respect to topics.  If at any point
11 you're confused or you don't follow when I transition to
12 topics, will you please let me know?
13    A.  Okay.
14    Q.  And I will be more than willing to either lay a
15 greater foundation or to rephrase the question.  Okay?
16    A.  Okay.
17    Q.  Also if you don't understand any of my
18 questions or you think you need additional
19 clarification, please let me know; and I'm happy to do
20 so.  Okay?
21    A.  Okay.
22    Q.  Excellent.  So I'm going to start with the last
23 topic of conversation, which was regarding the ADA
24 accommodation.  I believe Plaintiffs' Counsel for
25 OCA-Greater Houston, asked you a few questions on that,

Page 161

1  correct?
2     A.  Yes.
3     Q.  And you had mentioned that no one had come into
4  your office asking a -- for assistance or an
5  accommodation with respect to the ID requirements; is
6  that correct?
7     A.  Correct, not to my knowledge.
8     Q.  Okay.  So when she was asking about whether or
9  not your office would accommodate, you don't have a
10 policy in place about the accommodation; is that
11 correct?
12    A.  That is correct.
13    Q.  And that would only be decided once you
14 actually received a request; is that right?
15    A.  Yes.
16    Q.  And I think you had mentioned that if somebody
17 came in requesting assistance, you would do your best to
18 aid them; is that correct?
19    A.  Yes.
20    Q.  You also spoke with Counsel regarding
21 communications with the Secretary of State's office, and
22 so let me get a little bit of clarification there.
23         You have not contacted the Secretary of State's
24 office regarding SB 1, is that right?  And when I say
25 "you" in this case, I'm referring to you as an

Page 162

1  individual.
2      A.  No.
3      Q.  Okay.  And what about your particular division,
4  have they contacted the Secretary of State's office
5  regarding SB 1?
6      A.  Possible.
7      Q.  But not to your knowledge?
8      A.  Not to my knowledge.
9      Q.  And so you don't know if you're division
10 contacted the Secretary of State's office to request
11 clarifications about maybe a provision of SB 1; is that
12 right?
13     A.  That's correct.
14     Q.  And you wouldn't know if they contacted
15 Secretary of State's office on a complaint or a
16 criticism of SB 1; is that correct?
17     A.  That is correct.
18     Q.  And you wouldn't know if they communicated any
19 problems that they had to the Secretary of State's
20 office; is that right?
21     A.  That's correct.
22     Q.  Now let's talk about the Elections Department
23 as a whole.
24         Are you aware of the Elections Department
25 contacting the Secretary of State's office regarding a

Page 163

1  provision about SB 1?
2      A.  I am not aware.
3      Q.  And what about SB 1 as a general matter, not
4  necessarily talking about a specific provision?
5      A.  Contacting the --
6      Q.  Secretary of State's office.
7      A.  I'm not aware.
8      Q.  And so you wouldn't know the contents of any
9  communications or even if those communications existed
10 by the Elections Department contacting Secretary of
11 State's office about problems implementing SB 1; is that
12 correct?
13     A.  That's correct.
14     Q.  And you also wouldn't know the contents of any
15 communications of them -- of the Elections Department
16 expressing concerns about SB 1; is that correct?
17     A.  That's correct.
18     Q.  Or complaints about SB 1; is that correct?
19     A.  That's correct.  I don't have any knowledge of
20 it.
21     Q.  Okay.  And you have no knowledge about any
22 communications about questions about interpretation of
23 specific provisions; is that right?
24     A.  That's correct.
25     Q.  When you were speaking with Counsel, one of the

Page 164

1  questions also referred to election officials.
2         Now, how did you interpret the word election
3  officials in that question?
4      A.  In what question, and where at?
5      Q.  She had asked if you had communicated your
6  concerns or problems about SB 1 to election officials.
7  And I believe she asked that question.  I might have put
8  that down wrong in my notes.
9         But do you remember her discussing about your
10 communication with election officials?
11     A.  I don't remember --
12     Q.  Okay.
13     A.  -- if she said election officials or if she
14 said concerns that we had.
15     Q.  Okay.  Then let me ask the question
16 differently.
17         To your knowledge -- and let's start with you
18 as an individual --
19     A.  Uh-huh.
20     Q.  -- have you contacted any election official
21 regarding SB 1?
22     A.  And when you say an "election official," are
23 you saying -- who's an election official?
24     Q.  Well, that was actually --
25     A.  What's the meaning of the election official?

Page 165

1      Q.  That was one of the reasons I was asking for
2  clarification, when I thought she had asked that
3  question.  So what's the meaning of the election official?
4      A.  So what's the meaning of the election official?
5      Q.  Okay.  So I'll ask:  Have you contacted the
6  Legislature?
7      A.  No.
8      Q.  Have you contacted another member of an
9  Elections Department in a different county?
10     A.  Yes.
11     Q.  In what capacity?
12     A.  Asking how did they handle the situation,
13 handle something.
14     Q.  And so you've contacted other counties, and
15 you've gotten a sense of best practices?
16     A.  Yes.
17     Q.  And what was that over, specifically?
18     A.  How they handle the notice codes or the codings
19 of the SB 1 laws on sending information to the ballot
20 tracker.
21     Q.  So it was a data entry question?
22     A.  Yes.
23     Q.  So you also spoke with the DOJ Counsel about
24 VEMAC, correct?
25     A.  DOJ Counsel?

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                Pages 166 to 169

Page 166

1   Q.   Yes, Brady.
2   A.   Oh, Brady.  Okay.  Yes.
3   Q.   And you talked about the verification once a
4   application to vote by mail was received --
5   A.   Yes.
6   Q.   -- correct?
7   A.   Yes.
8   Q.   And I believe you had said that you, when
9   verifying, would look at:  first name, last name,
10  address, and, if available, date of birth?
11  A.   Yes.
12  Q.   So date of birth was not required on the form;
13  it was simply --
14  A.   Optional, yeah --
15  Q.   -- optional?
16  A.   -- yes.
17  Q.   So some had it, and some did not?
18  A.   Yes.
19  Q.   When you were doing it that way, did you have
20  problems with the verification, let's say, having a
21  false positive?
22  A.   Can you rephrase that question, please?
23  Q.   Sure.  When you were using the old format,
24  looking at first name, last name --
25  A.   Uh-huh.

Page 167

1   Q.   -- and address --
2   A.   Uh-huh.
3   Q.   -- did you have false positives?  Let's say you
4   had found there were two people with the same name.
5   A.   (Witness moves head up and down.)  Yes.  We
6   would find two people with the same name, yes.
7   Q.   And if they did not provide a date of birth,
8   how would you distinguish between the two?
9   A.   The address.
10  Q.   The address.  And so let's say about a father
11  and son.  I know my brother and father share the same
12  name.
13  A.   (Witness moves head up and down.)
14  Q.   What about in that type of a situation, how
15  would you verify?
16  A.   Well, it -- we would look at the application
17  and if they put down over 65, then we would look at the
18  date of birth on the voter registration system.  If the
19  voter -- if one of the voters was over 65 with the same
20  name, same address, then we knew that that was that
21  voter there.
22  Q.   Okay.  So you had to look at optional
23  information in order to make a distinction; is --
24  A.   Yes.
25  Q.   -- that correct?

Page 168

1   A.   Yes.
2   Q.   And with SB 1, you now have a Social Security
3   number or driver's license; is that right?
4   A.   Yes.
5   Q.   Have you found it easier to do the verification
6   with that number?
7   A.   Yes, I have.
8   Q.   In your experience, do voters typically call
9   with questions about changes to voting laws?
10  A.   When?
11  Q.   Okay.  So I'm shifting topics.  I'm talking
12  about the calls that you receive from voters, either
13  with questions or concerns --
14  A.   (Witness moves head up and down.)
15  Q.   -- or about how to submit an application to
16  vote by mail or how to submit their ballot, and I'm
17  curious -- let me put it this way:  Have you implemented
18  previous legislation before?
19  A.   A voter will call.  They request an ABBM
20  application, and we will ask to mail it out to a voter.
21  Q.   So when I -- let me rephrase that.
22       I'm talking about new legislation coming from
23  the Legislature.  So you have a new law on the books.
24  A.   Uh-huh.
25  Q.   Have you ever had to implement a new law that

Page 169

1   was recently passed by the Legislature outside of SB 1?
2   A.   Probably so, just don't recall which law that
3   was.
4   Q.   Okay.  None that were as, we'll say,
5   significant or multifaceted as SB 1?  Would that be
6   right?
7   A.   Yes.  I will say that, yes.
8   Q.   So SB 1 had a lot of changes to it --
9   A.   Yes --
10  Q.   -- is that right?
11  A.   -- it did.
12  Q.   So when I asked, in your experience, do voters
13  typically call with questions about changes to the laws,
14  do you know if you have, let's say, a change of
15  requirement that voters would contact you with questions
16  about, outside of the context of SB 1?
17  A.   No, no.
18  Q.   And is that because you don't -- you don't
19  remember a change in the requirements?
20  A.   I don't remember a change in the requirements
21  nor do I remember a voter calling and asking about the
22  changes of the laws, of a new law.
23  Q.   Okay.  And so you don't have a point of
24  comparison to note whether or not it's common practice
25  for voters to call frequently with questions when you

Page 170

1 have a dramatic change in the law regarding voting; is
2 that correct?
3          MR. WHITE:  Objection, form.
4     A.  Repeat that again, please.
5     Q.  (By Ms. Hunker)  You don't have a point of
6 reference when it comes to the number of voters who
7 would call about a cha- -- a dramatic change in the law;
8 is that correct?
9     A.  That's correct.
10    Q.  But you had also said, during the March
11 primary, that you were receiving phone calls all day
12 every day; is that right?
13    A.  Yes.
14    Q.  Is that typical in an election?
15    A.  Yes.
16    Q.  And so for, like, the November constitutional
17 election in 2021, you would have been receiving phone
18 calls all day every day?
19    A.  Well, I got phone calls from voters who
20 actually were voting or concerned about voting.
21    Q.  You also spoke with Ms. Perales about comparing
22 the list of individuals who did not list their voter ID
23 number to a list of individuals who ultimately
24 resubmitted their application and had it accepted; is
25 that correct?

Page 171

1          MS. PERALES:  Objection, form.
2     A.  Did we speak about it?
3     Q.  (By Ms. Hunker)  Yes.
4     A.  Yes.
5     Q.  That's what I was asking, if you spoke about
6 it.
7          And you had said that if you do a comparison,
8 that would help get at the number of individuals who --
9 who had their application rejected or at least a notice
10 was sent; is that correct?
11    A.  I believe she -- I believe she asked was there
12 a way for the comparison, yes.
13    Q.  Okay.  For voters who chose not to resubmit
14 their ABBM application or who chose -- you don't
15 personally know why they did not do so; is that correct?
16    A.  That's correct.
17    Q.  And you also do not -- let me take that -- let
18 me strike that question.
19          And for voters who chose to vote by personal
20 appearance as opposed to resubmitting their ABBM, you do
21 not personally know why they did not do so, why they
22 chose that option; is that correct?
23    A.  I don't know why.
24    Q.  So we are in the midst of Early Voting for the
25 May 7th election, correct?

Page 172

1     A.  Yes.
2     Q.  And I think you had mentioned earlier that the
3 application to vote by mail has passed, correct?
4     A.  Yes.
5     Q.  Okay.  And so you've already, at this point,
6 processed all the applications to vote by mail that you
7 have -- you will receive or, ultimately, receive for the
8 May 7th election; is that right?
9     A.  Yes.
10    Q.  So I want to compare your experience in March
11 2022 with the May 7th election.
12          In your experience, did you receive fewer
13 rejections of applications this round?
14          MR. WHITE:  Objection, form.
15    A.  I do not know if I can talk about that yet
16 because the election is not over with.
17    Q.  (By Ms. Hunker)  Okay.  When you say you can't
18 talk about that --
19    A.  Well, legally, normally, we cannot give out any
20 information until after the election, like, say, if it's
21 a PIA and a person asks for how many -- who requested
22 ABBMs --
23    Q.  Uh-huh.
24    A.  -- we can't give that out, or who has already
25 asked for a ballot by mail, we can't give that out.  So

Page 173

1 if we can't give that information out, I don't think we
2 can talk about that information either right now.
3     Q.  Okay.  So I understand maybe that you won't
4 feel comfortable giving specific numbers.
5          Would you be able to give impressions about the
6 numbers, like fewer or lessor, greater?
7     A.  Will that be the same thing, on the same level?
8     Q.  I do not view it the same, but you're the one
9 who's answering the questions.
10    A.  I view it the same.  So, obviously, I can't.
11 But you can ask me on May the 8th.
12    Q.  You probably don't want to sit down for another
13 deposition.
14    A.  No, I do not.
15    Q.  What about phone calls?
16    A.  Okay.
17    Q.  Okay.  So you had talked about receiving
18 concerns from voters or questions from voters about the
19 new ID requirements in the March primary, correct?
20    A.  Yes.
21    Q.  Okay.  And so I assume you also received phone
22 calls in the May 7th election, correct?
23    A.  Yes.
24    Q.  Did you receive fewer phone calls about the ID
25 requirements in the May 7th election?

The Office of the Dallas County Elections Administrator
April 29, 2022
Pages 174 to 177

Page 174

1 A. At the present moment, I don't recall receiving
2 phone calls about the identification. I'm receiving a
3 lot of phone calls about why I receiv- -- receiving --
4 Where is my second ballot?
5 Q. Is it --
6 A. Because we have two elections in May.
7 Q. Yes. So for the March primary, you clearly
8 remembered receiving phone calls about the ID
9 requirements; is that correct?
10 A. Yes.
11 Q. And you do not, for the May 7th, remember phone
12 calls --
13 A. I do not recall --
14 Q. Okay.
15 A. -- if we received any. We might have. I just
16 don't know yet that --
17 Q. That's fair.
18 A. Uh-huh.
19 Q. Based on your observations, are voters having
20 an easier time in the May 7th election with the voter ID
21 number requirement than they did in the March primary?
22 A. I don't feel comfortable asking that question
23 until after the election.
24 Q. Okay. I believe you also had spoken to Counsel
25 about phone calls of people who couldn't vote in person;

Page 175

1 is that right?
2 A. Yes.
3 Q. You do not know whether those individuals
4 ultimately voted; is that right?
5 A. That is correct.
6 Q. Now, I believe you made a distinction between
7 your role and the Early Voting Ballot Board, correct?
8 A. Yes.
9 Q. And so you focus on the application side, the
10 Early Voting Board focuses on the mail ballot side?
11 A. They focus on the verification of the
12 signatures and also the rejection of the bal- -- the
13 mail ballots.
14 Q. Okay. So you wouldn't have a sense on whether
15 ID number comparison is a more accurate identification
16 verification mechanism than signature match?
17 MR. WHITE: Objection, form.
18 A. I wouldn't know.
19 MS. HUNKER: If we can go off record and
20 let me just consult my notes for a few minutes.
21 THE VIDEOGRAPHER: Okay. We're going off
22 the record. The time is 2:43 p.m.
23 (Break taken.)
24 THE VIDEOGRAPHER: We're back on the
25 record. The time is 2:58 p.m.

Page 176

1 Q. (By Ms. Hunker) Ms. Phillips, over the break,
2 I believe you spoke to your Counsel; is that correct?
3 A. Yes.
4 Q. Okay. And we're not going to get into the
5 substance of that, but after your communications, you're
6 now -- feel comfortable answering some of my questions
7 comparing the March primary with the May 7th election;
8 is that correct?
9 A. Yes.
10 Q. And for some of these questions, I know that
11 you are going to be answering more your personal
12 observations as opposed to a official pronouncement from
13 the Dallas County Election Administrator's Office. I
14 simply ask that if I'm not clear in my question, that
15 when you're speaking in your individual capacity, simply
16 let me know.
17 A. Okay.
18 Q. Does that make sense?
19 A. Yes, it does.
20 Q. Okay. So we had already spoken that May 7th
21 election early voting has begun, correct?
22 A. That's correct.
23 Q. And the deadline in which you -- in which
24 voters may send applications to vote by mail has already
25 passed, correct?

Page 177

1 A. Yes.
2 Q. And so your office has processed all the
3 applications it will have received for the May 7th
4 election, correct, to vote by mail?
5 A. To -- vote by mail in order to be qualified
6 to vote in the May 7th election, yes.
7 Q. Okay. So based on your personal observations
8 in your office, have you received -- have you issued
9 fewer rejections for vote by mail applications?
10 A. Yes.
11 Q. And you've issued fewer notices as compared,
12 again, to the March primary; is that correct?
13 A. Repeat that again.
14 Q. Fewer notices. You sent fewer notices that --
15 let me -- let me start over from the beginning.
16 A. Okay.
17 Q. The May 7th election compared to the March
18 primary, you have issued fewer rejection applications,
19 to your knowledge, based on voters having a mismatch or
20 not putting their voter ID number; is that correct?
21 A. Yes.
22 Q. And so you've issued fewer notices to voters
23 stating that the reason that their ballot -- I'm
24 sorry -- that their application has been rejected is
25 because of their failure to either put a voter ID, an ID

The Office of the Dallas County Elections Administrator                April 29, 2022
Pages 178 to 181

Page 178

1 number net down or to match correctly their ID number;
2 is that correct?
3    A.   Yes.
4    Q.   And you do not work on the ballot verification
5 process, correct?
6    A.   That is correct.
7    Q.   And so you don't have any personal knowledge if
8 there have been fewer rejections of vote by mail
9 ballots; is that right?
10   A.   There hasn't been any rejections yet because
11 the rejections are not till after the cure period.
12   Q.   Thank you for that clarification.
13   A.   Uh-huh.
14   Q.   So based on your personal experience, in the
15 March primary and in the May 7th election, have voters
16 become more accustomed to the rules for voter ID, for
17 voter ID numbers?
18        MR. WHITE:   Objection, form.
19   Q.   (By Ms. Hunker) On their application.
20   A.   I wouldn't say that.
21   Q.   What would you say?
22   A.   One of the reasons -- the main reason why we
23 have fewer rejections, I mean -- yeah, fewer rejection
24 notices going out is because we pull annual voters 65
25 years of age or the disabled.  So the majority of our

Page 179

1 voters now are people who have already submitted their
2 applications beginning of the year.
3    Q.   Okay.  And you don't have any knowledge, with
4 respect to individuals who have not submitted an annual
5 vote by mail application, whether or not they are
6 receiving --
7    A.   Say that again, please.  I'm sorry.
8    Q.   Yeah.  So with respect to individuals who have
9 not submitted --
10   A.   Okay.
11   Q.   -- an annual vote by mail application --
12   A.   Uh-huh.
13   Q.   -- do you have any knowledge on whether there
14 are fewer rejections for that group?
15   A.   I have not ran the numbers, no.
16   Q.   Okay.  That's fine.  And so you don't know one
17 way or the other of whether voters are becoming more
18 familiar or accustomed to the rules; is that correct?
19   A.   That is correct.
20        MS. HUNKER:   No further questions.
21        THE WITNESS:   Thank you.
22        MR. STOOL:   No, I don't have any
23 questions.  Pardon me.
24        REEXAMINATION
25 BY MS. PERALES:

Page 180

1    Q.   I have just three small areas -- two small
2 areas.
3        Earlier, when you and I were speaking, you
4 mentioned that there were voters who had given up -- and
5 I think you used the words "given up" --
6    A.   Yes.
7    Q.   -- trying to get a mail ballot for the March
8 primary election.
9    A.   Yes.
10   Q.   And I just want to make clear that this was
11 because of the ID number matching requirements that you
12 were newly implementing for this election; is that
13 correct?
14        MS. HUNKER:   Objection to form.
15   A.   I would say so, yes.
16   Q.   (By Ms. Perales)  Okay.  And did you ever speak
17 to a voter or have a staff member tell you they spoke to
18 a voter who indicated that it was -- that they were
19 going to stop trying to get the information to you that
20 would allow you to send them a mail ballot?
21   A.   Yes.
22   Q.   And then, finally, I just want to return to the
23 hypothetical of the father and son with the same name.
24   A.   Okay.
25   Q.   You mentioned that you would look to see

Page 181

1 whether the voter had indicated they were requesting the
2 mail ballot because they were over age 65; is that
3 correct?
4    A.   Yes.
5    Q.   And then you would look at the voter's date of
6 birth in the voter registration record to confirm that
7 person's over 65, yes?
8    A.   Yes.
9    Q.   And in that instance you would be fairly
10 confident that the voter is over 65, right?
11   A.   Yes.
12   Q.   And the over 65 reason to request a mail
13 ballot, that's -- that's required information on the
14 ABBM, correct?
15   A.   Yes, they have to let us know why they are
16 voting, the reason why they are voting ballot by mail.
17   Q.   And the app- -- and the voter registration
18 record that you have also has the date of birth in it as
19 mandatory with voter registration, correct?
20   A.   Yes.  You have to -- you have -- that's a
21 requirement on the voter registration application in
22 order to get registered to vote.
23        MS. PERALES:   Okay.  Thank you.
24        I have no further questions.
25        MR. WHITE:   None for me.

Page 182

1          THE REPORTER:  Wait just a second, please.
2 Okay.  Thank you.
3          MS. HUNKER:  Okay.
4               REEXAMINATION
5 BY MS. HUNKER:
6     Q.   Going back to that scenario, the father and the
7 son --
8     A.   Uh-huh.
9     Q.   -- the father may not be over 65, correct?
10    A.   Uh-huh.
11         THE REPORTER:  Was that a "yes"?
12         THE WITNESS:  I'm sorry.  I'm sorry.
13 "Yes."
14    Q.   And so if the father were not over 65, he would
15 not have to put his date of birth, correct?
16         MS. PERALES:  Objection.
17    A.   That --
18    Q.   (By Ms. Hunker)  I can rephrase the question.
19    A.   Yes, please.
20    Q.   You had mentioned earlier that date of birth
21 was not required on the application form, correct?
22    A.   Beforehand, yes.
23    Q.   Yes.  And so if the father was not over 65,
24 there would be no requirement for him to put -- put his
25 date of birth on the application; is that correct?

Page 183

1     A.   I believe there's no requirement on the
2 application now.  I believe it's optional.  I'm not
3 quite sure.  I have to look at a application.
4     Q.   Pre-SB 1?
5     A.   I believe on pre -- I believe SB 1 is optional.
6 I have to look at the application.  I -- to my
7 recollection, I don't remember; but I believe it's not a
8 requirement.
9     Q.   Okay.  And so you had spoken about voters who
10 you thought had given up and would not be requesting a
11 mail in ballot; is that correct?
12    A.   That's correct.
13    Q.   You don't know if those individuals decided to
14 vote by personal appearance?
15    A.   I do not know.
16    Q.   How do you know that they, first, gave up?
17    A.   They said so.
18    Q.   Okay.  And second, that it was connected to the
19 ID requirement?
20    A.   They said so.
21    Q.   Okay.  Do you know if they, in fact, decided to
22 resubmit --
23    A.   I do not know.
24    Q.   -- their application to vote by mail?
25    A.   I don't know.

Page 184

1          MS. HUNKER:  That's all.
2          MS. PERALES:  Let's go off the record.
3          MR. SCHUETTE:  Do we need to ask the
4 assembled --
5          MS. PERALES:  Assembled people on Zoom,
6 are we ready to go off the record?
7          MS. BENDER:  No questions.  Thank you.
8          MS. PERALES:  That was Brady.
9          THE VIDEOGRAPHER:  We're going off the
10 record.  The time is 3:07 p.m.
11         (Lunch recess.)
12         THE VIDEOGRAPHER:  Okay.  We are back on
13 the record.  The time is 4:17 p.m.
14         MS. PERALES:  I think we are ready to
15 swear the witness.
16         THE REPORTER:  Okay.
17         Sir, would you raise your right hand,
18 please?
19         (Witness sworn by the court reporter.)
20         THE REPORTER:  Thank you.
21         MICHAEL SCARPELLO,
22 having being first duly sworn, testified as follows:
23              EXAMINATION
24 BY MS. PERALES:
25    Q.   Good afternoon.

Page 185

1     A.   Good afternoon.
2     Q.   Will you state your name for the record,
3 please?
4     A.   Michael Scarpello.
5     Q.   Thank you.  I'll introduce myself to you
6 because you weren't here before.
7     A.   Okay.
8     Q.   My name is Nina Perales.  I'm with the Mexican
9 American Legal Defense and Educational Fund, and I
10 represent the LUPE group of Plaintiffs --
11    A.   Okay.
12    Q.   -- in this matter.
13         Have you ever had your deposition taken before?
14    A.   Yes.
15    Q.   Have you ever taken a deposition before?
16    A.   Yes.
17    Q.   Okay.  Let's start with:  Have you had your
18 deposition taken before.
19         Can you tell me the most recent time you had
20 your deposition taken?
21    A.   Two -- two weeks ago or something.
22    Q.   Okay.
23    A.   Two or three weeks -- I'm not sure --
24    Q.   All right.
25    A.   -- but in there.

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                 Pages 186 to 189

Page 186

1    Q.   So I'm sure that you remember the rules of the
2  road.
3    A.   Uh-huh.
4    Q.   I'm only going to ask you a condensed version
5  of questions related to that.
6    A.   (Witness moves head up and down.)
7    Q.   First of all, do you understand that you are
8  under oath today?
9    A.   I do.
10   Q.   And is there anything that would prevent you
11 from giving me your full attention or responding
12 accurately today, such as a medication --
13   A.   No.
14   Q.   -- or a medical condition?
15   A.   No, ma'am
16   Q.   Okay.  As I'm sure you know, this is your
17 deposition.  You can take a break at any time.  I would
18 only ask that you answer a question if it's out there on
19 the table before asking for the break.  Is that all
20 right?
21   A.   That's all right.
22   Q.   Thank you.  What steps did you take to prepare
23 for this deposition today?
24   A.   Reviewed briefly -- very briefly reviewed some
25 of the discovery documents that were produced some time

Page 187

1  ago and did a quick read through SB 1.
2    Q.   I'm not sure it's even possible to do a quick
3  read of such --
4    A.   Right.
5    Q.   -- a long document.
6    A.   Uh-huh.
7    Q.   But let me promise you that if we talk about
8  any part of SB 1 today, we'll mark the bill and --
9    A.   Okay.
10   Q.   -- go through it together.
11        Did you meet with your attorneys in order to
12 prepare for this deposition?
13   A.   Yes.
14   Q.   And did you meet with or talk to anybody from
15 the Attorney General's Office of Texas to prepare for
16 this --
17   A.   No.
18   Q.   -- deposition?
19        Did you have an opportunity to review documents
20 that were produced to us this morning?
21   A.   I did not get a chance to review those.
22   Q.   Okay.  If we discuss any of them, we'll be sure
23 to mark it so you can have it in front of you before we
24 ask questions.
25   A.   You bet.

Page 188

1        MS. PERALES:  If you wouldn't mind handing
2  Exhibit 1 to the witness.
3        (Document handed to the witness.)
4    Q.   Mr. Scarpello, do you recognize Exhibit 1 as
5  the Notice of Deposition for today's deposition?
6    A.   Yes.
7    Q.   And if you flip forward, you'll see around Page
8  9, there is an Attachment A; and then on Page 12 begins
9  a list of topics?
10   A.   Yes.
11   Q.   Have you seen these topics before?
12   A.   Yes.
13   Q.   Do you understand that you are testifying
14 pursuant to this Notice today?
15   A.   Yes.
16        MS. PERALES:  And if you wouldn't mind
17 handing the witness Exhibit 2.
18        (Document handed to the witness.)
19   Q.   Have you seen this document, Exhibit 2?
20   A.   Yes.
21   Q.   And do you see your name on the chart as being
22 the witness designated for certain topics?
23   A.   Yes.
24   Q.   Are you prepared to talk about those topics --
25   A.   Yes.

Page 189

1    Q.   -- today?
2        Do you understand that because this is a
3  30(b)(6) deposition --
4    A.   Uh-huh.
5    Q.   -- as we call it --
6    A.   (Witness moves head up and down.)
7    Q.   -- that when you're testifying that you are
8  speaking on behalf of the Elections Department?
9    A.   Yes.
10   Q.   Okay.  And so if I say "you" or "yours," will
11 you understand that I'm referring to your department?
12   A.   Yes.
13   Q.   Are you from Dallas County originally?
14   A.   No.
15   Q.   Where were you -- where did you grow up?
16   A.   Omaha, Nebraska.
17   Q.   When did you come to Dallas County?
18   A.   December of 2020.
19   Q.   Did you graduate high school in Omaha?
20   A.   Yes, Cathedral High School.
21   Q.   Sounds Catholic.
22   A.   Yes.
23   Q.   And did you do any schooling after you
24 graduated from high school?
25   A.   I went to the University of Nebraska at Omaha

Page 190

1 and graduated there in 1991 and then the University of
2 Nebraska, College of Law in Lincoln in 1995.
3     Q.   The same year my husband graduated from law
4 school.
5         Did you do any other degrees or other study
6 besides what you've described to me?
7     A.   Only things related to elections, cer- --
8 certificates --
9     Q.   Okay.
10     A.   Certified Election & Registration Administrator
11 from Election Center.
12     Q.   And before you came to Dallas -- oh, so you
13 came to Dallas County in December 2020.
14         Was that when you took the job as Election
15 Administrator?
16     A.   Yes.
17     Q.   Okay.  So prior to that, December 2020, what
18 job did you have?
19     A.   Prior to that, I was the Vice-President of
20 Voter -- of Election Management Systems for Runbeck
21 Election Services.
22     Q.   And tell me what Runbeck Election Services
23 does.
24     A.   The majority of their business is they're an
25 election ballot printer, and then they're -- they delve

Page 191

1 into certain areas like voter registration or election
2 management systems.
3     Q.   Would they be considered, for example, a vendor
4 for a county to maintain its voter registration rolls?
5     A.   They aren't -- currently have no accounts to do
6 that.  They are trying to become that.
7     Q.   Okay.  And you are the VP of Election --
8     A.   Election Management --
9     Q.   Management.
10     A.   -- Systems.  It's, basically, a voter
11 registration system.
12     Q.   And is Runbeck a -- like, would you call it a
13 software company or it's software plus kind of
14 management?
15     A.   I'd say they are a mail ballot -- mail ballot
16 service provider that dabbles in other areas of election
17 services.
18     Q.   Does Runbeck have contracts in Texas or did at
19 the time you were there?
20     A.   The only ones that I know of is there -- they
21 have -- in Harris County and in Dallas County, they
22 have -- they sold a mail ballot sorter, an Agilis mail
23 ballot sorter.
24     Q.   Was that a piece of hardware?
25     A.   Yes.

Page 192

1     Q.   Where are most of Runbeck's clients, then,
2 physically located?
3     A.   Throughout the country,
4     Q.   Okay.
5     A.   All around the country.
6     Q.   How long did you serve as VP of Election
7 Management for Runbeck?
8     A.   About a year and a half.
9     Q.   And what did you do before that?
10     A.   I was the Registrar of Voters for San
11 Bernardino, California.
12     Q.   How long did you do that job?
13     A.   About seven years, three -- seven years, four
14 months, something like that.
15     Q.   And what job did you have before that?
16     A.   I was the Director of Elections for the City
17 and County of Denver, Colorado.
18     Q.   How long did you do that job?
19     A.   About four years.
20     Q.   That's a beautiful place to live.
21     A.   It sure is.
22     Q.   And before that job, what were you doing?
23     A.   I was the Elections Manager for Douglas County,
24 Nebraska.  Omaha, Nebraska.
25     Q.   Douglas County produces a disproportionately

Page 193

1 high number of really good elections people because I
2 took the deposition of Lisa Wise a couple --
3     A.   Uh-huh.
4     Q.   -- of weeks ago.  She's also from Douglas
5 County.
6     A.   Uh-huh.  She worked with me.
7     Q.   Oh, so you were --
8     A.   Uh-huh.
9     Q.   You were at that office at the same time?
10     A.   For a brief time, yeah.
11     Q.   Okay.  So if we were to sort of add up the
12 years that you've been involved in administration of
13 either elections or voter registration, what would the
14 sum total number of years be?
15     A.   Twenty-two and a half years.
16     Q.   And it's fair to say that prior to December
17 2020, when you came here to Dallas, that you had
18 experience, hands-on experience, administering both
19 registration and voting; is that right?
20     A.   That's correct.
21     Q.   What is your current title?
22     A.   I'm the Elections Administrator for Dallas
23 County.
24     Q.   Is Dallas County the largest jurisdiction where
25 you've worked on election administration?

Page 194

1    A.  It has the largest number of registered voters,
2 yes, not the largest in physical area.
3    Q.  So having lived in Dallas County for about a
4 year and a half --
5    A.  Uh-huh.
6    Q.  -- would you agree with me that Dallas County
7 has a substantial Latino or Hispanic population?
8    A.  Yes.
9    Q.  And would you agree with me that Dallas County
10 has a substantial black or African-American population?
11   A.  Yes.
12   Q.  And would you agree with me that Dallas County
13 has a substantial number of voters who are -- for whom
14 English is not their first language and who might
15 experience some barriers communicating in English?
16       MS. HUNKER:  Objection, form.
17   A.  I don't know.  It depends on how you define
18 "substantial."  They are certainly large enough to
19 re- -- trigger the SO- -- or the Department of Labor's
20 five-percent rule, to require us to provide alternate
21 language services to Vietnamese and Spanish speakers.
22   Q.  (By Ms. Perales)  And we talked a little bit
23 earlier today -- I don't think you were here -- that
24 Dallas County is newly covered for Vietnamese.
25   A.  That's correct.

Page 195

1    Q.  Would you say, just based on your observations,
2 that Dallas County has a substantial portion of
3 residents who are low income?
4    A.  I don't know that I -- I don't know.
5    Q.  Okay.
6    A.  I mean, that's in comparison to what, right,
7 so...
8    Q.  Uh-huh.  Well, let's not compare Dallas County
9 to anywhere else.  Dallas County is a big County.
10       Would you say you also happen to contain a
11 large number of people who are low income?
12   A.  Yes.
13   Q.  When I'm quiet, I'm skipping questions --
14   A.  It's okay.
15   Q.  -- because I have covered them already earlier
16 today.
17       Is it correct to say that Dallas County has not
18 used what's called drive-thru voting in the past?
19       MS. HUNKER:  Object --
20   A.  It's my --
21       MS. HUNKER:  -- to form.
22   A.  It's my understanding that they have not.
23   Q.  (By Ms. Perales)  Okay.  And tell me what your
24 understanding is of drive-thru voting.
25   A.  Drive-thru voting as employed in Texas, most

Page 196

1 recently in Harris County and in the 2020 Presidential
2 Election, was a method for people to, without excuse, to
3 be able to drive through and vote from their vehicle.
4    Q.  So similar to curbside voting, but without any
5 eligibility criteria?
6    A.  Correct.
7    Q.  Okay.
8       MS. HUNKER:  Objection, form.
9    Q.  (By Ms. Perales)  Has Dallas County, in the
10 past, allowed voters to drop off mail ballots at
11 locations other than your Elections Administration
12 Office?
13   A.  I don't believe so.
14   Q.  To your knowledge, has Dallas County used
15 movable structures for polling places?  And by "movable
16 structure," I mean, nonpermanent such as a tent or
17 something else that can be put up and then taken back
18 down?
19       MS. HUNKER:  Objection, form.
20   A.  I don't know, but I believe they may have.
21   Q.  (By Ms. Perales)  Okay.
22   A.  But I don't know.
23   Q.  Who would be the best person to testify on
24 that?
25   A.  Someone who's been around for a while.  I --

Page 197

1 I -- probably Robert Heard.  He's in our office right
2 now working as a contractor, and he was previously the
3 Assistant Elections Administrator.
4    Q.  Okay.  I'm going to ask you some questions
5 about voters who use assistants when they vote.
6    A.  Okay.
7    Q.  If -- if we get to something where you just
8 don't know the answer, I -- I want to make sure you
9 don't guess.
10   A.  (Witness moves head up and down.)
11   Q.  And just let me know if you don't know the
12 answer.
13   A.  Okay.
14   Q.  I'll probably ask you, then, like, who would be
15 the best person --
16   A.  Sure.
17   Q.  -- to talk about that; but we'll get there.
18 Okay?
19       Would you agree with me that voters who use
20 assistance include those voters who are disabled?
21       MS. HUNKER:  Objection to form.
22   A.  Yes.
23   Q.  (By Ms. Perales)  Okay.  And would you agree
24 with me that voters who use assistance include voters
25 who are illiterate in any language?

Page 198

1        MS. HUNKER:  Objection, form.
2    A.  Yes.
3    Q.  (By Ms. Perales)  And would you agree with me
4  that voters who use assistance also include those who we
5  call "limited English proficient"?
6        MS. HUNKER:  Objection --
7    A.  Yes.
8        MS. HUNKER:  -- form.
9    Q.  (By Ms. Perales)  Can you describe for me the
10  sort of people who would go with a voter to help them
11  vote, to provide assistance?
12    A.  I would -- I don't have any statistics to say
13  this; but generally speaking, I think friends, family,
14  et cetera.
15    Q.  A neighbor maybe?
16    A.  Maybe.
17    Q.  Okay.  And then also are you aware whether any
18  community-based nonprofit organizations might provide
19  assistors for voters?
20    A.  I'm not aware.
21    Q.  Would you agree with me that assistors in the
22  polling place provide assistance to voters in physically
23  navigating the space of the polling place?
24        MS. HUNKER:  Objection, form.
25    A.  I don't think that -- probably doesn't meet the

Page 199

1  legal definition of what an "assistor" is --
2    Q.  (By Ms. Perales)  Uh-huh.
3    A.  -- by Texas laws.
4    Q.  Okay.  So let me ask it in a less legal way.
5    A.  Okay.
6    Q.  Are you aware whether a voter, for example, who
7  might be elderly or just not great at walking around --
8    A.  Uh-huh.
9    Q.  -- could come with a friend or a relative and
10  lean on that person while they're entering the polling
11  place and moving up to the table with the poll workers
12  or moving over to the voting machine?
13        MS. HUNKER:  Objection to form.
14    A.  Can you repeat the question?
15    Q.  (By Ms. Perales)  Yes.  Would you agree with me
16  that a voter could come to the polling place and this
17  voter could be either elderly or, otherwise, not very
18  good at walking steadily --
19    A.  Uh-huh.
20    Q.  -- and the voter would lean on or use the
21  assistance of their helper to physically move through
22  the polling place, to walk up to approach the table and
23  also the voting machine?
24    A.  I would imagine that happens, yes.
25    Q.  Okay.  Would you agree with me that some voters

Page 200

1  would use assistance of another individual in order to
2  interact with poll workers, to exchange information with
3  poll workers?
4    A.  Yes.
5    Q.  Would you agree with me that a voter could use
6  an assistor to help explain to the voter how to use the
7  voting machine equipment?
8        MS. HUNKER:  Objection to form.
9    A.  I believe there's people that would want that
10  sort of assistance, yes.
11    Q.  (By Ms. Perales)  And I do understand from
12  taking other depositions in other counties that there
13  might be a disabled voter who wants to do it all on
14  their own --
15    A.  Uh-huh.
16    Q.  -- right, and might use, for example, special
17  equipment to do that?
18    A.  That's correct.
19    Q.  But you will agree with me that there might be
20  a voter who isn't -- you know, who isn't insisting on
21  doing it all themselves and who might bring a trusted
22  assistor with them to help them vote?
23    A.  I believe that there's most likely people that
24  do that, yes.
25    Q.  Okay.  Would you agree with me that a voter

Page 201

1  might also rely on an assistor to help the voter
2  understand the questions on the ballot?
3        MS. HUNKER:  Objection to form.
4    A.  Can you repeat the question, because I want to
5  make sure I understand?
6    Q.  (By Ms. Perales)  Would you agree with me that
7  a voter might use an assistor to help the voter
8  understand the questions on the ballot?
9        MS. HUNKER:  Objection, form.
10    A.  Well, I believe that current law would prevent
11  them from doing that.
12    Q.  (By Ms. Perales)  Current law under SB 1?
13    A.  Yes.
14    Q.  Okay.  So let me ask that question in the
15  setting of prior to SB 1.
16    A.  Okay.
17    Q.  Do you imagine there would be a voter who would
18  use an assistor to help that voter understand the
19  questions on the ballot?
20    (Mr. Stool and Mr. Schuette confer off the record.)
21    A.  I be- --
22        MS. HUNKER:  Objection, form.
23    A.  I -- I believe the language be- -- prior to
24  SB 1 would have allowed that.
25    (Mr. Stool and Mr. Schuette confer off the record.)

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                Pages 202 to 205

Page 202

1        MS. PERALES:  Let's mark this.
2        THE REPORTER:  Okay.
3        MS. PERALES:  Can you tell me what number
4 this is?
5        THE REPORTER:  Number 4.
6     (Deposition Exhibit Number 4 marked.)
7    (Document handed to the witness and Counsel.)
8    Q.  (By Ms. Perales)  Turn with -- oh, you have
9 been handed what has been marked Deposition Exhibit
10 Number 4, and I will represent to you that this is SB 1
11 as passed by the Legislature.
12    A.  (Witness moves head up and down.)
13    Q.  And I'm going to ask you to turn with me first
14 to Page 52.
15    A.  Okay.
16    Q.  You will see, beginning on Line 22, the bill --
17 actually, Line 20 -- the bill Section 6.04.
18        Do you see that there?
19    A.  Yes.
20    Q.  And then a couple of lines down, you see
21 Sections 64.034.  Do --
22    A.  Yes.
23    Q.  -- you see that?
24    A.  Uh-huh.
25    Q.  Okay.  So as we get started on this, will

Page 203

1 you -- will you understand with me that if text is
2 underlined, it's being added to the statute --
3    A.  Yes.
4    Q.  -- and if text is struck out, it's being taken
5 out of the statute?
6    A.  Yes.
7    Q.  Okay.  Now we're ready to go.
8        If you will look with me, starting sort of
9 close to the bottom of the page, would you agree with me
10 that SB 1 is adding language to the Oath of Assistance?
11    A.  Yes.
12    Q.  Okay.  And that language includes, quote, under
13 penalty of perjury --
14    A.  Yes.
15    Q.  -- unquote?
16    A.  Yes.
17    Q.  And then also the language includes, quote, the
18 voter I am assisting represented to me they are eligible
19 to receive assistance, unquote?
20    A.  I'm sorry.  I lost where you're at.
21    A.  Oh, okay.
22    A.  What line are you on?
23    A.  I'm on Line 26.
24    A.  Yes.  Okay.  Got it.
25    Q.  And I'll ask the question again.  SB 1 adds

Page 204

1 language to the assistor oath, quote, the voter I am
2 assisting represented to me they are eligible to receive
3 assistance --
4    A.  Yes.
5    Q.  -- unquote?
6    A.  Yes.
7    Q.  And then on Line 2, there is some new language
8 added related to the assistor confining assistance.
9        Do you see that?
10    A.  Yes.
11    Q.  And would you agree with me that SB 1 adds the
12 following language to confining assistance:  quote,
13 reading the ballot to the voter, directing the voter to
14 read the ballot, marking the voter's ballot, or
15 directing the voter to mark the ballot, unquote?
16    A.  Yes.
17    Q.  All right.  And will you agree with me that
18 those are four specific acts?
19    A.  Yes.
20    Q.  Now, will you agree with me on Line 5 -- and I
21 think you may have been talking about this a little
22 while ago -- that SB 1 removes from the assistor oath
23 that the assistor will confine assistance to, quote,
24 answering the voter's questions, unquote?
25    A.  Yes.

Page 205

1    Q.  Okay.  And then there's some additional
2 language that's also coming out of the assistor oath,
3 such as stating propositions on the ballot, naming
4 candidates and their political parties?
5    A.  Yes.
6    Q.  Okay.  Will you agree with me that, starting on
7 Line 7, that the SB 1 adds to the assistor oath, quote,
8 I did not pressure or coerce the voter into choosing me
9 to provide assistance, unquote?
10    A.  Yes.
11    Q.  And then, finally, on Line 12, do you agree
12 with me that SB 1 adds the language after the semicolon,
13 quote, and I understand that if assistance is provided
14 to a voter who is not eligible for assistance, the
15 voter's ballot may not be counted, unquote?
16    A.  Yes.
17    Q.  Would you agree with me that, now that the
18 assistor is signing the oath under penalty of perjury,
19 that the assistor would face a perjury prosecution for
20 lying or not doing what the oath says a person will do?
21        MS. HUNKER:  Objection to form.
22    A.  Can you repeat the question?
23    Q.  (By Ms. Perales)  Sure.  I'll ask a better
24 question.
25    A.  Okay.

Page 206

1   Q.  Do you think that an assistor, looking at this
2  new oath, would want to make sure, because the assistor
3  is signing under penal of perjury, that they follow
4  the -- the commands of the oath very closely?
5   A.  Yes.  I think it --
6        MS. HUNKER:  Objection, form.
7   A.  I think anyone who signs under penalty of
8  perjury considers they're -- that -- that it's a serious
9  business, so...
10  Q.  And perjury is a crime, is it not?
11  A.  Yes.
12  Q.  So taking the first language that I reviewed
13  with you, if an assistor wants to make sure they comply
14  with the oath closely, how will the assistor obtain a
15  representation from the voter that the voter is eligible
16  to receive assistance?
17  A.  Give me a second.  I'm not sure, other than the
18  oral representation -- oral or written representation
19  from the voter that they qualify.
20  Q.  Okay.  So to secure an oral representation, the
21  assistor would ask the voter; and then the voter would
22  have to make that representation, correct?
23  A.  Yes.
24  Q.  Okay.
25        MS. PERALES:  I'm going to mark two more

Page 207

1  exhibits.
2        What number is this?
3        THE REPORTER:  It's 5.
4        (Deposition Exhibit Number 5 marked.)
5        MS. PERALES:  This will be 6 (handing).
6        THE REPORTER:  Okay.
7        (Deposition Exhibit Number 6 marked.)
8  (Documents handed to the witness and Counsel.)
9        MR. SCHUETTE:  Thank you.
10        MS. HUNKER:  Thank you.
11  Q.  (By Ms. Perales)  The court reporter has handed
12  you what has been marked Deposition Exhibit Number 5 and
13  Deposition Exhibit Number 6, and I thought it might just
14  be a little bit easier for us to go through the oaths.
15        So I will ask you first, with respect to
16  Exhibit 5, do you see in the upper left-hand corner, the
17  language prescribed by the Secretary of State?
18  A.  Yes.
19  Q.  And then, in that little section there at the
20  bottom, 9, slash, 13 --
21  A.  Yes.
22  Q.  Okay.  Now, if you look at the oath, you'll
23  notice it does not have the language about penalty of
24  perjury or securing a representation from the voter.
25        Do you see that?

Page 208

1   A.  Yes.
2   Q.  So will you understand with me this is what
3  we'll call the old oath --
4   A.  Yes.
5   Q.  -- the pre-SB 1 oath?
6   A.  Yeah.
7        MS. HUNKER:  Objection, form.
8   Q.  (By Ms. Perales)  And then on Exhibit 6, do you
9  see, in the upper left-hand corner, it says Prescribed
10  by the Secretary of State?
11  A.  Yes.
12  Q.  And then, at the very bottom of that, it has a
13  1, slash, 2022?
14  A.  Yes.
15  Q.  And do you see where it says "Oath of Person
16  Assisting Voter," and then, if you follow along, it has
17  that language "under penalty of perjury"?
18  A.  Yes.
19  Q.  Will you understand with me that this is the
20  new post SB 1 oath?
21  A.  That's --
22        MS. HUNKER:  Objection --
23  A.  -- correct?
24        MS. HUNKER:  -- form.
25  Q.  (By Ms. Perales)  Okay.  So let's stick with

Page 209

1  Exhibit 6 so that we can go through the oath together.
2   A.  Okay.
3   Q.  There's the -- the language about confining
4  assistance.  It now is specific to four things.
5        Do you understand the removal of the language
6  answering questions of the voter --
7   A.  Yes.
8   Q.  -- and the replacement with these four specific
9  actions?
10  A.  Yes.  That's my memory of it, yes.
11  Q.  Okay.  And do you understand that, then, to
12  mean that the assistor may not answer questions of the
13  voter beyond directing the voter to read the ballot or
14  reading the ballot to the voter?
15  A.  Yes.
16        MS. HUNKER:  Objection, form.
17  Q.  (By Ms. Perales)  Can you tell me the machines
18  that you use here in Dallas County, if you use machines
19  to vote?
20  A.  There's multiple machines and to -- which --
21  which piece of the -- there-- do you want me to
22  describe all the machinery?
23  Q.  No.
24  A.  Okay.
25  Q.  I want to ask:  When the voter is marking and

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                           Pages 210 to 213

Page 210

1  casting the ballot --
2      A.  Uh-huh.
3      Q.  -- here in Dallas County, whether that is done
4  on a machine.
5      A.  Yes.  That's the ES&S ExpressVote ballot
6  marking device.
7      Q.  Now, does that device -- scratch that.
8          When a voter is marking the ballot on that
9  device here in Dallas County, is the voter using a
10  touchscreen or a wheel or something else?
11     A.  They can use a touchscreen, or they can use
12  a -- an assistive device for hearing impaired or
13  alternate languages.
14     Q.  Okay.  And when the voter has cast the ballot,
15  does the machine in Dallas County spit out a piece of
16  paper?
17     A.  It -- it does.  It marks the voter's choices on
18  that piece of paper for that voter to be able to review.
19     Q.  And then does the voter take that piece of
20  paper and drop it into a separate machine called the
21  tabulator?
22     A.  They drop it into a separate machine called the
23  ES&S Dallas -- I mean, ES&S DS200 vote tabulator.
24     Q.  Wonderful.  And not called a trash can?
25     A.  That's right.

Page 211

1      Q.  I have seen some alarmed expressions, so I want
2  to explore with you more the confining of assistance.
3          Do you -- do you understand the oath now to
4  foreclose an assistor from explaining to the voter how
5  to use the voting machine aside from pointing out
6  anything that might be on the screen, itself, in terms
7  of instructions?
8          MS. HUNKER:  Objection to form.
9      A.  I believe the -- I believe the language would
10  be liberal enough to allow them to assist that voter in
11  how to mark that because it says "marking the voter's
12  ballot," one of them.
13     Q.  (By Ms. Perales)  So if the -- the assistor
14  could mark the ballot for the voter at the voter's
15  request?
16     A.  (Witness moves head up and down.)  That's my
17  interpretation in reading the -- the plain language of
18  this, this oath.
19     Q.  Okay.  If the voter had a question of the
20  assistor about what to do with the piece of paper, in
21  terms of putting it in the tabulator and that question
22  was not answered by reading the ballot, do you
23  understand the oath to foreclose the assistor's
24  explanation of the fact that this piece of paper is
25  going to come out of the machine and then must be

Page 212

1  reviewed and taken over and placed inside the tabulator?
2      A.  I'm sorry.  This is really difficult to read;
3  it's so small.
4      Q.  (Moving head up and down.)
5      A.  I would agree that the language could be
6  interpreted -- interpreted to be so narrow in -- in
7  its scope, that it would foreclose letting some -- you
8  know, telling -- assisting someone in dropping that into
9  the vote tabulator.
10     Q.  With an explanation about what to do?
11     A.  Yes.
12     Q.  Okay.  Would you agree with me that the Oath of
13  Assistance does not include the criteria for who is
14  eligible for assistance?
15         MS. HUNKER:  Objection, form.
16     A.  Yes.
17     Q.  (By Ms. Perales)  I want to ask you about the
18  language on Line 3.  I did not pressure -- use of the
19  term "pressure" -- the voter into choosing.
20         Would you agree with me that the Oath of
21  Assistance does not include a definition of "pressure"?
22     A.  Yes.
23         MS. HUNKER:  Objection, form.
24     Q.  (By Ms. Perales)  If a -- if someone called
25  your office and asked you if it was okay to remind his

Page 213

1  neighbor for three days in a row, during Early Voting,
2  that it was coming up and he was available to assist --
3  if someone called and asked you, "If I remind that voter
4  three times that I'm available to assist them, is that
5  pressuring," how would you answer that question?
6          MS. HUNKER:  Objection to form.
7      A.  We don't provide legal advice.  But I would
8  state -- I'll just leave it at that.  We don't provide
9  legal advice.
10     Q.  (By Ms. Perales)  Okay.  Would it also be fair
11  to say that you wouldn't have a definition of "pressure"
12  in this context to fall back on?
13     A.  That's correct.
14     Q.  One more question about confining assistance to
15  the four specific actions.
16     A.  Uh-huh.
17     Q.  If a voter wants -- okay.  Let me -- let me ask
18  it this way.
19         Do you have a Spanish-speaking poll worker at
20  every single polling place in Dallas County?
21     A.  That is our goal, to have one.  We don't always
22  have one, but we have a substantial number.
23     Q.  And then let me ask the same question for your
24  new language, Vietnamese.
25     A.  Uh-huh.

The Office of the Dallas County Elections Administrator                    April 29, 2022
Pages 214 to 217

Page 214

1    Q.   Are you aiming to try to have a Vietnamese
2  speaker in every polling place or certain polling
3  places?
4    A.   It usually takes a while to establish a network
5  of poll workers to be in every location.  So what we
6  will do, initially, is to -- to focus on those areas of
7  the county where there's high concentrations of
8  Vietnamese speakers and then grow that; but the goal --
9  with the goal to have one in every location.
10   Q.   Okay.  Thank you.  So let's pick a situation in
11 which the voter speaks a language and only that
12 language --
13   A.   Uh-huh.
14   Q.   -- and it's not English, so the voter is
15 limited English proficient and this particular polling
16 place does not have an election judge or a poll worker
17 who speaks this language --
18   A.   Uh-huh.
19   Q.   -- so the voter comes in with an assistor to
20 help -- help the voter.
21   A.   Uh-huh.
22   Q.   Would you agree with me that helping the voter
23 communicate with the poll workers and the election judge
24 is outside the scope of the four specific actions:  read
25 the ballot, mark the ballot, direct the voter to read

Page 215

1  the ballot, direct the voter to mark the ballot?
2          MS. HUNKER:  Objection, form.
3    A.   I think -- I think that you could -- you could
4  interpret that -- that some of the language of those
5  four pieces, in a very narrow way; and that would
6  prevent that.  And I think you could read it in a more
7  liberal way that would allow that and, in particular, or
8  you know -- or directing the voter to mark the ballot.
9          I mean, in a practical -- from a practical
10 perspective, it would be the more liberal interpretation
11 to -- you know, common sense would tell you we've got to
12 try to assist voters.
13   Q.   (By Ms. Perales)  Understood.  You would agree
14 with me that these four specific acts, that the assistor
15 confines assistance to, all involve interaction with the
16 ballot?
17         MS. HUNKER:  Objection, form.
18   A.   Well, in -- on Number 4, or directing the voter
19 to mark the ballot, yes.
20   Q.   (By Ms. Perales)  But -- and you would agree
21 with me that in all four of these actions, someone is
22 interacting with the ballot, either the assistor or the
23 voter; is that right?
24         MS. HUNKER:  Objection, form.
25   A.   Yes.

Page 216

1    Q.   (By Ms. Perales)  Okay.  And you would also
2  agree with me that voting, more generally, encompasses
3  actions that go beyond reading and marking the ballot?
4  For example, checking in and signing in to vote, yes?
5    A.   Yes.
6    Q.   And being accepted to vote by the poll workers?
7    A.   Yes.
8    Q.   And also includes being shown how to use the
9  voting machine and understanding how to use the voting
10 machine?
11   A.   Yes.  It depends on which machine we're talking
12 about.  I mean, the marking the ballot, it's clear that
13 the -- the vote, the ExpressVote, would be marking the
14 ballot, as opposed to using the vote tabulator, dropping
15 the ballot in, and confirming your choices.
16   Q.   And you would agree with me that the act of
17 voting also includes moving around the polling place,
18 going from one, kind of, spot to another?
19   A.   There's three distinct stations in our method
20 of voting -- actually, four:  checking in, potentially
21 further dealing with exceptions to the standard voting
22 procedure at the -- at the judge's table, marking your
23 ballot, and depositing your ballot.
24   Q.   And would it be fair to say that, while moving
25 through those four stages of voters, typically moving

Page 217

1  through space in the polling place, itself?
2    A.   That's correct.
3    Q.   This is a dumb question --
4    A.   Uh-huh.
5    Q.   -- but would it be fair to say that you would
6  not be aware of what a voter and an assistor would say
7  to each other, prior to coming to vote, about whether
8  the assistor is willing to vote?
9    A.   Fair.
10   Q.   To --
11   A.   That's fair to say.
12   Q.   Okay.  Thank you.  Have you done any training
13 of poll workers on the changes created by SB 1 with
14 respect to the Oath of Assistance?
15   A.   I believe we direct -- we point out the fact
16 that there is a new Oath of Assistance in that -- and
17 how to use that, that oath.
18   Q.   And -- okay.  And would those training
19 materials have been produced in this case?  So, for
20 example, you said you had reviewed some material prior
21 to this deposition --
22   A.   Uh-huh.
23   Q.   -- that you think was disclosed in the first
24 round of disclosures.
25   A.   Uh-huh.

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                         Pages 218 to 221

Page 218

1    Q.  Do you recall whether any of your training
2  materials were in there?
3    A.  I don't recall.
4    Q.  Okay.
5    A.  I will point out, though, that there is also --
6  the reference materials that we have at a polling place
7  include, not only our materials (indicating), but also
8  the Secretary of State's guide on how to conduct -- it's
9  a little bit thicker, more detailed, guide for those
10  activities at the polling place.
11       (Ms. Perales confers with Mr. White.)
12    Q.  So SB 1 also created a new form for assistors
13  to provide additional information, and I'm going to ask
14  you about that separately.
15    A.  (Witness moves head up and down.)
16    Q.  But do you recall, specifically, having
17  training for your poll workers on the changes in the
18  language of the oath?
19    A.  I -- I don't know.
20    Q.  Okay.  Do you recall receiving any specific
21  training or guidance from the Texas Secretary of State
22  about how to implement the changes in the assistor oath?
23    A.  The Secretary of State provides various
24  election advisories, webinars, et cetera.  I don't
25  recall if there was one, in particular, that covered

Page 219

1  this (indicating) area.
2    Q.  (Moving head up and down.)  Are you aware of
3  any incidents of voter fraud associated with in-person
4  assistance of voters at the polling place?
5    A.  No.
6    Q.  Are you aware whether Texas has other laws that
7  existed prior to SB 1 that criminalize unlawful voter
8  assistance?
9    A.  In the context of an assistant (indicating)
10  providing assistance at a polling place?
11    Q.  Yeah.  So, for example, do you know if it was
12  illegal before SB 1 to mark the ballot on behalf of the
13  voter, not the way the voter is -- is intending?
14       MS. HUNKER:  Objection, form.
15    A.  I -- I don't know.
16    Q.  (By Ms. Perales)  Okay.  Looking at the new
17  assistor oath, (indicating) do you know whether Dallas
18  County uses a hard copy form or whether Dallas County
19  uses the Poll Pad to collect the information?
20    A.  I believe we use both because the Poll Pad
21  software was not able to be updated in a timely fashion
22  to cha- -- have the -- the modified language.
23    Q.  And there's a -- there's an additional
24  requirement to state the relationship and --
25    A.  Uh-huh.

Page 220

1    Q.  So that's what you're referring to?
2    A.  Yes.
3    Q.  Okay.  Who's --
4    A.  And I -- I believe there's new software that's
5  been -- that's pending approval by the Secretary of
6  State before we can use it.
7    Q.  Okay.  So you would have to get approval from
8  the Secretary of State before implementing that new
9  software?
10    A.  I believe so, yes.
11    Q.  Do you have a sense of the timeline for that
12  new software getting approved?
13    A.  I wish I knew because that new software has
14  other features that we're very anxious to use.
15    Q.  Turning back to SB 1, I'm going to ask you now
16  about this new form.  If you will turn again with me to
17  Page 52 of the bill.
18    A.  Okay.
19    Q.  You'll see that starting on Line 2, there is a
20  new section, because it's all underlined, titled
21  "Submission of Form by Assistant."
22       Do you see that?
23    A.  Uh-huh.
24    Q.  And would you agree with me that this is a new
25  provision that says that an assistor who is not an

Page 221

1  election official is required to complete a form stating
2  certain information about the assistor?
3       MS. HUNKER:  Objection to form.
4    A.  Yes.
5    Q.  (By Ms. Perales)  Okay.  At this point in time,
6  are you using the new form required under this section
7  in hard copy at the polling place?  Are -- do you know?
8    A.  I believe so, but I can't -- I'd have to
9  confirm that.
10    Q.  So if that were the case, help me understand,
11  given the stages that you were describing before, at
12  what point the assistor signs the Oath of Assistance and
13  fills out the new form.
14       Is it after the voter checks in?
15    A.  It would be at the check-in table during
16  that -- that point in time.
17    Q.  And would you agree with me that filling out a
18  new form is going to take additional time compared to
19  the time period when the form was not required?
20    A.  Yes.
21    Q.  Would you agree with me that at a polling place
22  where there are more voters voting with assistors, the
23  new requirement of a form is going to take more time for
24  each instance in which an assistor has to fill out that
25  form?

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                       Pages 222 to 225

Page 222

1   A.  Yes.
2          MS. HUNKER:  Objection, form.
3   Q.  (By Ms. Perales)  And you would understand with
4   me, wouldn't you, that this form has to be completed by
5   the assistor for each instance of assistance?
6   A.  Yes.
7   Q.  All right.  So if I come to the polls and I'm
8   helping my mother and my aunt, I'm going to have to fill
9   out this information twice, correct?
10  A.  Yes.
11  Q.  And I will have to take the oath twice?
12  A.  Yes.
13  Q.  Have you ever assisted a voter at the polling
14  place?
15  A.  Many, many, many years ago.  Probably 2001.
16  Q.  Okay.  Tell me what assistance you provided.
17  A.  I -- I don't recall.  This was in Nebraska --
18  Q.  Uh-huh.
19  A.  -- when I was working a polling place.  I
20  couldn't -- it's a vague memory.
21  Q.  Were you a poll worker at that time?
22  A.  I was the Chief Deputy Election Commissioner,
23  but I made my whole staff go work a polling place so we
24  could experience what it was like.
25  Q.  So, in that moment, you were fulfilling the

Page 223

1   roll of a poll worker?
2   A.  That's correct.
3   Q.  Okay.  Do you happen to recall whether the --
4   whether the voter was elderly or disabled --
5   A.  I believe --
6   Q.  -- or --
7   A.  -- elderly.
8   Q.  Okay.  Do you -- and you don't -- I don't want
9   to put words in your mouth about what assistance you
10  might have offered the elderly voter, but do you recall
11  any details about it?
12  A.  I don't.
13  Q.  Turn with me, if you would, to Page 50 --
14  A.  Okay.
15  Q.  -- where it starts on Line 19 with Section 6.01
16  and then Line 27 where it says f, in parentheses --
17  A.  (Witness moves head up and down.)
18  Q.  -- then, quote, A person who simultaneously
19  assists seven or more voters voting under this section
20  by providing the voters with transportation to the
21  polling place must complete and sign a form, unquote.
22  And it continues from there.
23      Do you see that?
24  A.  Yes.
25  Q.  Are you aware of any instances in Dallas County

Page 224

1   where an assistor has provided transportation to seven
2   or more curbside voters at a ti- -- at one time?
3          MS. HUNKER:  Objection, form.
4   A.  I'm not aware of any that have taken place
5   since the enactment of SB 1.
6   Q.  (By Ms. Perales)  How about before the
7   enactment of SB 1?  Are you familiar with any instances
8   where an assistor or a person brings seven or more
9   curbside voters at one time to vote curbside?
10         MS. HUNKER:  Same objection.
11  A.  To vote curbside?
12  Q.  (By Ms. Perales)  Yes.
13  A.  No.
14  Q.  Okay.  Turn with me, if you would, to Page 54.
15  A.  Okay.
16  Q.  Page 54, Line 20, the beginning, Section 6.06.
17      Do you see that?
18  A.  Yes.
19  Q.  Are you familiar with this provision which
20  creates an offense for compensating or accepting
21  compensation to assist a voter to vote by mail?
22  A.  Yes.
23  Q.  And would you agree with me that, at the bottom
24  of Page 54, the language that is coming out of the
25  statute is language related to a performance-based

Page 225

1   compensation scheme?  Do you see that?
2   A.  Yes.
3   Q.  So would you agree with me that the -- the
4   prohibition on compensating or accepting compensation to
5   assist mail voters is being broadened beyond the
6   compensation for performance-based activity?
7          MS. HUNKER:  Objection --
8   A.  I --
9          MS. HUNKER:  -- form.
10  A.  -- don't understand the question.
11  Q.  (By Ms. Perales)  Okay.  So would you
12  understand with me that before SB 1, if we look at the
13  bottom of Page 54, this prohibition on paying people --
14  A.  Uh-huh.
15  Q.  -- to help voters vote by mail was limited to
16  performance-based compensation schemes?
17         MS. HUNKER:  Objection, form.
18  A.  Yes.
19  Q.  (By Ms. Perales)  Okay.  And do you understand
20  with me a performance-based compensation scheme is where
21  you're going to pay somebody by the head to provide
22  assistance?
23  A.  Yes.
24  Q.  So now with the -- with this language coming
25  out of the statute on the bottom of Page 54, do you now

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                          Pages 226 to 229

Page 226

1 understand that the prohibition to either pay someone or
2 to accept payment to assist a voter vote by mail is now
3 expanded to all people who are either paying or getting
4 paid to assist a voter to vote by mail, regardless of
5 whether it is a performance-based scheme?
6          MS. HUNKER: Objection to form.
7 A.    Yes.
8 Q.    (By Ms. Perales)  Okay.  And we see on Page 55,
9 on Line 18, there's an exception here for an attendant
10 or a caregiver who is known to the voter?
11 A.    (Witness moves head up and down.)  Yes.
12 Q.    Do you see that?
13 A.    Uh-huh.
14 Q.    Would you agree with me, though, that beyond --
15 well, would you agree with me, then, that somebody who
16 is paid by a nonprofit community engagement organization
17 to assist voters to vote by mail would fall under the
18 prohibitions of this statute?
19          MS. HUNKER: Objection, form.
20 A.    It appears so, yes.
21 Q.    (By Ms. Perales)  Going to turn forward now to
22 Section 7.04 on Page Fif- -- well, it starts on Page 58,
23 and then it flows over onto Page 59.
24          If you look with me, starting on Line 7,
25 there's a definition of "vote harvesting services" on

Page 227

1 Page 59.
2 A.    Oh, okay.  Here we go.  Yes.
3 Q.    And would you agree with me that the definition
4 of "vote harvesting services" requires an in-person
5 interaction with the voter?
6 A.    Yes.
7 Q.    And that interaction has to be in the physical
8 presence of an official ballot or a ballot voted by
9 mail?
10 A.    Yes.
11 Q.    And then there has to be the intent to deliver
12 votes for a specific candidate or measure?
13 A.    Yes.
14 Q.    Would you agree with me that if a canvasser
15 who's going house-to-house to encourage people to vote
16 for -- well, before I ask my question, I want to know
17 whether you have any bond issues on the ballot for
18 Dallas County for this May 7 election.
19 A.    There's no Dallas County bond issues.  There's
20 city bond issues, and I think there's some school --
21 Q.    Some school --
22 A.    -- district bond issues.
23 Q.    -- or city?
24 A.    Yeah.
25 Q.    Okay.  So I want to make my hypothetical

Page 228

1 specific to that.
2 A.    Okay.
3 Q.    Somebody is going door-to-door canvassing
4 voters to encourage them to vote for the bond for the
5 school district.
6 A.    Uh-huh.
7 Q.    Their intent is to convince the voter to vote
8 for the bond because it means new schools, better
9 facilities.  And the voter says, Sure, I'll talk with
10 you; I have my mail ballot right here; it's right --
11 it's right here inside the door.  It's right here on the
12 kitchen table.
13          Would you agree with me that that would be an
14 in-person interaction with the voter, that -- that
15 canvassing, that conversation?
16 A.    Yes.
17 Q.    And would you agree with me that if the voter
18 said the ballot was right there, that that would mean in
19 the physical presence of the ballot?
20 A.    I guess it --
21          MS. HUNKER: Objection, form.
22 A.    -- depends on how you define physical presence.
23 Q.    (By Ms. Perales)  And would you agree with me
24 that the canvasser, who's urging to voter to vote for
25 the school bond, is intending to get the voter to vote

Page 229

1 for the school bond?
2 A.    Yes.
3 Q.    Okay.  And if the -- if the voter says, "Well,
4 I have -- I have the ballot right here," and it's let's
5 say within a foot or two of the voter, that would be in
6 the presence of the ballot?
7          MS. HUNKER: Objection, form.
8 A.    I don't think that the statute defines -- and,
9 I mean, it could be in the same house, could be in the
10 same block.
11 Q.    (By Ms. Perales)  Uh-huh.
12 A.    I mean, it's -- it's vague, so I -- I don't
13 know how to answer that question with specificity.
14 Q.    Okay.  Since we're very close to there, I would
15 like you to flip forward to Page 60, Line 15, which is a
16 section titled "Unlawful Solicitation and Distribution
17 of Application to Vote by Mail."
18          Do you see that there?
19 A.    Yes.
20 Q.    Do you understand this to be a prohibition on
21 you to send out to voters application for ballot by
22 mail --
23 A.    Ye- --
24 Q.    -- when they are not requested?
25 A.    Yes.

Page 230

1    Q.   And when the language says "commits an
2  offense," do you understand that to be a criminal act?
3    A.   Yes.  I believe they go on to say the State
4  Jail Felony.
5    Q.   Ye- -- and I imagine you -- you've become aware
6  of that language?
7    A.   Yes.  Uh-huh.
8    Q.   Are you -- are you concerned that certain
9  things that your office might do or might have done in
10  the past would run afoul of this provision and possibly
11  create criminal liability for you?
12          MS. HUNKER:  Objection --
13    A.   Yes.
14          MS. HUNKER:  -- form.
15    Q.   (By Ms. Perales)  Can you describe that for me?
16    A.   We have, historically, distributed
17  applications, you know, when someone comes in and says,
18  "Hey, I want to provide application; you know, I want to
19  distribute applications for vote by mail," we provide
20  those to them.
21    Q.   Uh-huh.
22    A.   And we no longer can do that.
23    Q.   Uh-huh.  So if someone came to your office and
24  said, "I regularly go to church on Sundays, and we have
25  a great group of congregants; I'd love to bring 25

Page 231

1  applications for ballot by mail to my next church
2  service, give them to the old folks, the folks over 65,"
3  in that situation, would you give the individual the 25
4  applications for ballot by mail?
5    A.   Not since the passage of SB 1.
6    Q.   And in fact, you would require a voter to
7  request of you the application for ballot by mail before
8  you would send it out, correct?
9    A.   That's correct.
10    Q.   Are you aware of voters who may have, in the
11  past, gotten their application for ballot by mail
12  without having to ask for it from you?
13    A.   Yes.
14    Q.   Do you know of any specific instances like
15  that?
16    A.   No.
17    Q.   Okay.  But you're familiar with individuals
18  having come for, let's say, batches of application for
19  ballot by mail because they intend to deliver those to
20  voters who are eligible so that the voter can submit it?
21    A.   Yes.
22    Q.   So I only have one copy of this, so we're going
23  to mark it; and then I'm going to do my best to remember
24  what it says.
25    A.   Okay.

Page 232

1          THE REPORTER:  That's Number 7.
2          MS. PERALES:  7.
3          (Deposition Exhibit Number 7 marked.)
4          MS. HUNKER:  Since I can't see it, can you
5  describe what it is?
6          MS. PERALES:  Yes, or maybe I'll ask the
7  witness to do that.
8          MS. HUNKER:  That's fine.
9          (Document handed to the witness.)
10    Q.   (By Ms. Perales)  And I'll represent to you
11  that this is a couple of emails that were provided to us
12  today in the supplemental production, and they don't
13  have Bates stamp numbers on them yet.
14          But would it be -- would it be correct to say
15  that this is an exchange of emails in which you are
16  inquiring about prepaying the postage for applications
17  for ballot by mail?
18    A.   If you can give me a moment to review it.
19    Q.   Please take your time.
20    A.   (Witness reviews document.)  Okay.
21          (Ms. Perales confers with Mr. White.)
22    Q.   Okay.  So would it be correct to say that this
23  is an exchange of emails in which you are inquiring
24  about paying the postage or putting the -- Dallas County
25  putting the postage on an application for a ballot by

Page 233

1  mail so that the voter doesn't have to pay the postage
2  to send it to you?
3    A.   Yes.
4    Q.   Okay.  And are you expressing a concern, in
5  these emails, about whether paying that postage could,
6  potentially, get you too close to the prohibited
7  practice under SB 1?
8    A.   Yes.
9    Q.   Okay.  So would it be fair to say that this
10  communication is an expression of your concern that
11  paying the postage on an application for ballot by mail
12  to come back to you is now prohibited?
13    A.   Yes.
14    Q.   Okay.  So you may have resolved your concern?
15    A.   (Witness moves head up and down.)
16    Q.   But would it be fair to say that, because of
17  the criminal offenses and heavy penalties associated
18  with SB 1, that it caused you to doubt whether some of
19  the practices in Dallas County were going to expose you
20  to criminal prosecution or cause you to worry that some
21  of the practices in Dallas County might expose you to
22  criminal prosecution?
23          MS. HUNKER:  Objection to form.
24    A.   I would say that it caused us to question the
25  practices to make sure that we weren't getting our --

Page 234

1 any of our staff in trouble.
2    Q.   (By Ms. Perales) And so besides refraining
3 from handing out multiple applications for ballot by
4 mail, can you tell me if you changed any of your other
5 practices at Dallas County?
6    A.   Well, we were very concerned about anything
7 having to do with vote by mail applications.  For
8 instance, I, specifically, remember a candidate wanted
9 us to review their application for a vote by mail.  And
10 it's something that we would normally do, to make sure
11 that they've got the right information, dates, et
12 cetera.  And I said, "Well, even something as simple as
13 that, does that put us in legal jeopardy?"
14    Q.   Uh-huh.
15    A.   And so, you know, when it comes to state jail
16 penalties, you know, I -- I need to try to do as much as
17 I can to protect my staff.
18    Q.   Understood.  And I believe this came out
19 January 12th.  This was before we pro- -- we got
20 guidance from the Secretary of State in their election
21 advisory on SB 1.
22         Okay.  And so, as you received guidance from
23 the Secretary of State, you are understanding better
24 kind of what you can do and -- and what you can't do; is
25 that right?

Page 235

1    A.   As time went on, we -- we got a better
2 understanding as more election advisories and webinars,
3 et cetera, came out.
4    Q.   Is there still guidance that you've requested
5 that you're still waiting to come from the Secretary of
6 State's office related to SB 1 implementation?
7    A.   Off the top of my head, no.
8    Q.   Okay.  You're waiting for approval of new
9 software that incorporates some of the SB 1
10 requirements, correct?
11    A.   Correct.
12    Q.   All right.
13    A.   And I believe, in this particular case, with
14 the solicitation and distribution, there's a pending
15 court case on that also, so...
16    Q.   And you might get more guidance from the
17 Secretary of State, also, depending on how litigation
18 unfolds?
19    A.   Correct.
20    Q.   Okay.  And then on -- oh, let me ask you this.
21         Would you agree with me that, although you're
22 not allowed to send out unsolicited applications for
23 ballot by mail, that political party officials can still
24 do that under --
25    A.   That is correct.

Page 236

1    Q.   -- the law?
2    A.   Interesting enough.
3    Q.   Do you think that political party officials are
4 more likely to -- are more likely to send out
5 application for ballot by mail unsolicited in a way
6 that's fair and responsible, more likely than you, to do
7 that function?
8         MS. HUNKER:  Objection, form.
9    A.   I've always found the restrictions on election
10 officials as compared to other individuals to be very
11 strange.
12    Q.   (By Ms. Perales)  Okay.  Do you think political
13 party officials are better equipped than you to send out
14 applications for ballot by mail?
15         MS. HUNKER:  Objection, form.
16    A.   Apparently, the Legislature thinks so.
17    Q.   (By Ms. Perales)  If you turn with me to Page
18 62 --
19    A.   (Witness complies.)
20    Q.   -- and with the -- beginning on Line 26,
21 Section 31.129, you'll see a "Civil Penalty" provision
22 there.
23    A.   Yes.
24    Q.   And then if we turn to the next page, it
25 says -- and I'm starting on Line 1 -- quote, An election

Page 237

1 official may be liable to this State for a civil penalty
2 if the official -- and then it continues on to Sub 2 --
3 violates a provision of this code, unquote?
4    A.   (Witness moves head up and down.)
5    Q.   Do you understand that to create a new civil
6 penalty, meaning money penalties against you as an
7 election official for violating the Election Code?
8    A.   Yes.
9    Q.   Are -- are you concerned about liability for
10 civil penalties for mistakenly violating the election
11 code?
12         MS. HUNKER:  Objection, form.
13    A.   Yes.  Every election official I know is
14 concerned about that provision.
15    Q.   (By Ms. Perales)  And are you aware of an
16 Elections Administrator who got sued during the November
17 2020 election for election procedures that she
18 implemented?
19    A.   I'm not aware.
20    Q.   Okay.  Are you -- okay.  Not sued.
21         Are you aware of an Election Administrator who
22 was indicted for actions that she took as an Election
23 Administrator?  And particularly, I'll point your
24 attention to the Travis County Elections Administrator
25 Dana DeBeauvoir?

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                 Pages 238 to 241

Page 238

1          MS. HUNKER:  Objection to form.
2   A.  I'm not aware of the details of that.
3   Q.  (By Ms. Perales)  Okay.  Do you know if an
4   indictment was sought against her, if she wasn't
5   indicted?
6          MS. HUNKER:  Objection to form.
7   A.  I'm not aware of the details of that.
8   Q.  (By Ms. Perales)  Would it concern you if you
9   knew that the Attorney General's Office had sought to
10  bring criminal charges against the Travis County
11  Elections Administrator in the past?
12  A.  Yes, it would.
13         MS. HUNKER:  Objection, form.
14  Q.  (By Ms. Perales)  Do you happen to know -- and
15  I know you haven't been here that long.  But do you
16  happen to know if -- if there are circumstances under
17  which a voter could be excused from jury duty because
18  they are not physically present in the county, for
19  example, if they are away taking care of a family member
20  or doing some work out in the oil fields, whether that
21  voter could still consider Dallas County their domicile
22  and their intended place of return?
23  A.  I think that's a bit of a compound question.
24  I'm not sure I understand which part --
25  Q.  So there are parts of SB 1 that have to do with

Page 239

1   registered voters who are excused from jury duty because
2   of nonresidence.
3   A.  Uh-huh.
4   Q.  And I'm wondering whether you think it's
5   possible that a registered voter in Dallas County
6   considers Dallas County to be their actual home, where
7   they live, could also be excused from jury duty for not
8   being in the county when they are called up, besides a
9   college student.  Put away the college students because
10  we can think of that scenario right away.
11  A.  I'm not familiar with the -- the laws around
12  jury duty.
13  Q.  Okay.  Were you aware of either SB 1 or similar
14  predecessor legislation moving through the Texas
15  Legislature in the -- in the spring of 2021 during the
16  regular session?  Did you become aware?
17  A.  Yes.
18  Q.  And then, of course, we know that similar
19  legislation, then, was considered in the first special
20  session in the summer.
21  A.  Uh-huh.
22  Q.  And then finally SB 1 passes in the second
23  special session.
24      Are you sort of generally aware --
25  A.  And there was --

Page 240

1   Q.  -- of that?
2   A.  -- a series of Senate and House bills that were
3   introduced and, subsequently, died; and SB 1 was the --
4   kind of the culmination of all of those, yes.
5   Q.  All right.  Thank you.
6       So during that process, including the regular
7   session and the special sessions, did you communicate
8   with any members of the Texas Legislature regarding SB 1
9   or its predecessors?
10  A.  Yes.
11  Q.  Do you remember who in the Texas Legislature
12  you communicated with?
13  A.  I do not.  I know that we had -- there was
14  multiple sessions with multiple legislators and multiple
15  election officials.  So there was at least two -- two or
16  three of those.
17  Q.  Were those sessions in person or --
18  A.  No.
19  Q.  Okay.  So, like, a Zoom meeting?
20  A.  Yes.
21  Q.  And do you know if this was facilitated by the
22  Association of Elections Administrators?
23  A.  I don't know who the organizers were, but I
24  know that there was participants from that.  And there
25  was also -- yeah, so -- so participants from TAEA.

Page 241

1   Q.  TAEA.
2   A.  Texas Association of Elections Administrators.
3   Q.  How quickly I've forgotten because we were just
4   talking about this in a previous -- you are not the
5   first county.
6   A.  Okay.
7   Q.  So do you remember sharing, personally sharing,
8   any concerns that you might have about this legislation
9   with the legislators on that Zoom call?
10  A.  Yes.  And I -- I believe -- yes.
11  Q.  Do you recall the Tarrant County Elections
12  Administrator talking about specific numbers of voters
13  on his voter roll that he was saying lacked either a
14  driver's license number or the last four of the Social?
15  A.  I recall conversations about that subject.  I
16  don't recall who said what.
17  Q.  Okay.  And -- okay.  So I just want to put that
18  aside for a second because I don't want to forget about
19  the legislators.
20      Do you remember which -- the legislators on the
21  Zoom call, were they from all over the state or just
22  from Dallas County?
23  A.  I don't recall.
24  Q.  Do you remember ever sharing any concerns about
25  SB 1 with any local legislators, ones that represent

Page 242

1 Dallas County?
2   A.  Yes.
3   Q.  And do you remember who those legislators were?
4   A.  I don't recall.
5   Q.  Okay.  Do you remember whether they were State
6 House members or State Senator or some combi- --
7   A.  I believe --
8   Q.  -- nation?
9   A.  -- some combination.
10  Q.  Okay.  And can you give me a sense of the type
11 of concern that you were sharing with the elected
12 officials when you spoke with them?
13  A.  I think there was a series of concerns
14 considering that -- what we (indicating) just talked
15 about, criminal penalties for election -- election
16 officials, penalties for poll workers for their
17 interactions with poll watchers.  We were very concerned
18 that it would have a chilling effect on being able to
19 recruit and retain poll workers, as well as election
20 officials, themselves.
21  Q.  Did you --
22  A.  As well as other subject- -- I mean, it's --
23 it's a big bill, right.
24  Q.  Did you express any concerns about not being
25 able to process applications for ballot by mail or mail

Page 243

1 ballots because of the new requirements to match ID
2 number?
3   A.  Yes.
4   Q.  Did you ever express any of the concerns that
5 we were just talking about a moment ago to anybody in
6 the office of the Secretary of State?
7   A.  I believe -- we have biweekly meetings.
8 There's an elections advisory group of election
9 officials.  And I believe, on more than one occasion, we
10 shared our concerns --
11  Q.  Are you --
12  A.  -- with them.
13  Q.  Are you a member of the Election Advisory
14 Committee?
15  A.  Yes.
16  Q.  We were talking to Yvonne Ramon a week or so
17 ago, and she said she was also a member.
18  A.  Okay.
19  Q.  She's also on there, do you know?
20  A.  I don't know who --
21  Q.  From Hidalgo County.
22  A.  I believe so, but I don't know the whole list
23 of people on that committee.  It varies, depends on who
24 makes the meeting.
25  Q.  So do you recall any meetings in which either

Page 244

1 Keith Ingram or Christina Adkins were present and you
2 were expressing these types of concerns about SB 1?
3   A.  I know that Christina always leads those
4 meetings.  I believe Keith is on sometimes.  I don't --
5 he never typically leads those meetings.  He'll chime in
6 every so often.
7   Q.  And so do -- do you recall whether you were
8 ever expressing a concern about SB 1, either with
9 respect to penalties on election officials, the
10 poll-watcher issue or the matching-the-ID-number issue
11 when Christina Adkins was on the call?
12  A.  Most likely, yes.
13  Q.  All right.
14  A.  I don't remember the exact specific instance,
15 but most likely.
16  Q.  And would it be fair to say that Elections
17 Administrators on the advisory committee were largely
18 expressing similar concerns about SB 1 to Ms. Adkins
19 and, to the extent he was there, Mr. Ingram?
20      MS. HUNKER:  Objection --
21  A.  Ye- --
22      MS. HUNKER:  Objection, form.
23  A.  Yes.
24  Q.  (By Ms. Perales)  Did you ever have
25 communications with Governor Greg Abbott or his office

Page 245

1 or staff regarding SB 1 or its predecessors?
2   A.  No.
3   Q.  Did you ever have communications with the
4 Attorney General, Ken Paxton, or his staff regarding SB
5 1 or its predecessors?
6   A.  No.
7   Q.  All right.  You never called them up and said,
8 Okay, so if I did this, are you going to prosecutor me?
9   A.  No.
10  Q.  Okay.  Have you, personally, had communications
11 with Dallas County voters regarding any problems that
12 have come up in the implementa- -- problems for them
13 that have come up in the implementation of SB 1?
14      MS. HUNKER:  Objection, form.
15  A.  Yes.
16  Q.  (By Ms. Perales)  Okay.  Tell me about those
17 communications.
18  A.  Well, I think -- you know, we interact with a
19 lot of voter groups, Dallas Votes, Legal Women Voters,
20 et cetera.  And through those groups -- or in our
21 Citizen Election Advisory Committee, through those
22 groups, we've had discussions about the problematic
23 aspects of SB 1.
24  Q.  And would it be fair to say that, in those
25 meetings, the -- the groups that you're talking about

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                           Pages 246 to 249

Page 246

1 have expressed to you concerns about people -- voters
2 having a harder time voting under SB 1?
3    A.   Yes.
4         MS. HUNKER:  Objection, form.
5    Q.   (By Ms. Perales)  Have you spoken to any
6 individual voters who had problems voting under SB 1?
7    A.   I have to think.  I'm not sure.  Yes, yes.  Now
8 that I'm thinking about it, yes.
9    Q.   Tell me about what you can remember of those
10 communications.
11   A.   I was trying to remember.  This one had to do
12 with a particular constituent's mother not being able to
13 get a replacement mail ballot.  Gosh, I'm -- I'm trying
14 to remember the details, but having to do with the --
15 the mail ballot aspects, as far as providing the IDs, et
16 cetera.
17   Q.   So this was a voter who was trying to fulfill
18 the ID number requirement --
19   A.   Yes.
20   Q.   -- that was created by SB 1 --
21   A.   Uh-huh.
22   Q.   -- and through -- using the mail ballot and was
23 having a hard time --
24   A.   Yes.
25   Q.   -- voting?

Page 247

1    A.   Uh-huh.
2    Q.   Do you know if that voter ever successfully
3 voted?
4    A.   Yes.
5    Q.   You do know?
6    A.   This one I'm thinking of, yes.
7    Q.   And did that voter successfully vote?
8    A.   Yes.
9    Q.   Okay.  Do you know how the voter voted, like,
10 did the -- did the voter, for example, end up having to
11 go to the polling place and vote in person?
12   A.   No.  I think they got a replacement -- a
13 replacement ballot, I believe.
14   Q.   Okay.  So you -- you were not getting all the
15 phone calls that Tacoma Phillips was getting?
16   A.   I typically don't.  I mean, that's why Tacoma's
17 there.
18   Q.   Right.  Would it be correct to say that you did
19 not work for Dallas County Elections in the November
20 2020 election?
21   A.   That's correct.
22   Q.   That saves us a few questions.
23   A.   Uh-huh.
24   Q.   Would you say that, as a general matter, voter
25 turnout in the partisan primary is lower than voter

Page 248

1 turnout in the general election?
2    A.   Yes.
3    Q.   And would you say, as a general matter, that
4 voter turnout in a spring election, like the one that
5 will happen in May, on May 7th, would typically be lower
6 than the turnout in a primary election?
7    A.   Yes.
8    Q.   Do you have any concerns about the impact of SB
9 1 on the upcoming November 2022 midterm election?
10        MS. HUNKER:  Objection, form.
11   A.   Yes.
12   Q.   (By Ms. Perales)  Okay.  And can you list what
13 those concerns are?
14   A.   I have continuing concerns about the provisions
15 of the -- the ID requirements for mail ballots, in that
16 the high rejection rate for applications and the
17 ballots, themselves.  I have concerns about the chilling
18 effect that the poll watcher provisions have on poll
19 worker recruitment and retention.  I'd have to kind of
20 think a little bit deeper about some of the other
21 provisions of SB 1, but those are my main ones.
22   Q.   Do you believe that there are voters who will
23 attempt to vote by mail in the November general election
24 who have not yet encountered the ID matching
25 requirements of SB 1 because they didn't vote in the

Page 249

1 primary?
2    A.   Absolutely.
3    Q.   All right.  And do you anticipate that, at
4 least for some of those voters, for the first time, they
5 are going to have either their application for ballot by
6 mail or their mail ballot rejected because there is not
7 a matching ID number in your records?
8    A.   Yes.
9         MS. PERALES:  Can we go off the record for
10 a few minutes?
11        (Mr. Stool moves head up and down.)
12        THE VIDEOGRAPHER:  Going off the record.
13 The time is 5:53.
14        (Break taken.)
15        (Deposition Exhibit Number 8 marked.)
16        THE VIDEOGRAPHER:  We are back on the
17 record.  The time is 6:08.
18   Q.   (By Ms. Perales)  I'm handing you what has been
19 marked Deposition Exhibit Number 8.
20        (Document handed to the witness and Counsel.)
21   Q.   Do you -- do you recognize this document?
22   A.   Yes.
23   Q.   And do you -- do you see it's got some Bates
24 stamp numbers on it starting with "MS" in the bottom
25 right-hand -- oh, the -- yes, the Bates stamp MS, and

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                 Pages 250 to 253

Page 250

1 the first page is many zeros and then the --
2     A.   Yes.
3     Q.   -- number, 2?
4     A.   Yes.
5     Q.   And is "MS," is that for your initials?
6     A.   I don't know.
7     Q.   Okay.  Do you -- do you, generally, know what
8 this document is?
9     A.   Yes.
10    Q.   And do you know who prepared it?
11    A.   Yes.
12    Q.   Who prepared it?
13    A.   We -- I hired a -- created a position called an
14 Elections Analyst, hired a young attorney to fill that
15 position.  And one of her roles is to monitor
16 legislation and to assist our managers in interpreting
17 or being aware of that legislation and incorporating the
18 changes into their procedures.
19    Q.   Okay.  And --
20    A.   And this is a document (indicating) that she
21 produced to help with that.
22    Q.   And when she was preparing comments for the
23 column titled, quote, Possible Impacts, slash, Changes,
24 slash, Comments, unquote, was she also receiving some
25 input from staff in the Elections Department --

Page 251

1     A.   Ye- --
2     Q.   -- in order to do that?
3     A.   Yes.  She would meet with each department and
4 kind of go over these changes and get their feedback, et
5 cetera.
6     Q.   I'm going to draw your attention to the very
7 last page of this document (indicating).
8     A.   Okay.
9     Q.   Now, I'll represent to you that, when I
10 received this document -- it's been produced more than
11 once, but the one that has the Bates stamp on it from
12 before --
13    A.   (Witness moves head up and down.)
14    Q.   -- also had legislation attached to the back --
15    A.   (Witness moves head up and down.)
16    Q.   -- but I only copied the slide's portion.
17    A.   Okay.
18    Q.   So I'm going to refer you to the back page.  It
19 doesn't have a Bates stamp number, but it -- it has
20 Assistance of Voters (pointing) across the top.  And
21 then I'm going to point your attention to the -- one,
22 two -- third row down, which is in gray and is talking
23 about the changes (pointing) related to Section 64.031.
24    A.   (Witness moves head up and down.)
25    Q.   Do you see that there?

Page 252

1     A.   Uh-huh.  Yes.
2     Q.   And will you read with me in the box on the
3 right, at the first dot?  Tell me if I'm reading this
4 correctly, quote, need clarity on whether this law guts
5 cognitive disabilities, if any, unquote.
6     A.   Yes.
7     Q.   Do you recall having a conversation with
8 anybody in your department about whether the
9 restrictions on assistance were going to make it
10 difficult to assist a voter with cognitive disabilities?
11    A.   If you give me a moment, I want to read the --
12 the left-hand side and then see if I can refresh my
13 memory here.
14    Q.   (Moving head up and down.)
15    A.   (Witness reviewing document.)  I don't have any
16 specific memories of this particular section, just of
17 the document overall and covering the various subjects
18 with various department heads.
19    Q.   Do you know who the preparer of the document
20 might have spoken to that would have caused her to
21 write, in the comments section, needing clarity about
22 whether the law guts cognitive disabilities?
23    A.   In addition to reading the legislation, she was
24 also keeping abreast of other analysis of the law.  And
25 it could have come from that.  It could have come from

Page 253

1 her own mind.  It could have come from conversations
2 with staff.  I don't know.
3     Q.   My last question to you is whether you've done
4 any examination of Dallas County's practices with
5 respect to voters who need assistance, specifically with
6 the goal of making sure that you are providing
7 assistance to voters who need it?
8     A.   Since I've come here, my MO as an Elections
9 Administrator, is -- is to -- is someone who rebuilds an
10 organization, and so we have looked at the practices in
11 Dallas County and -- from A to Z and are retaking a look
12 at all of those practices and starting with the ones
13 that -- where we're most vulnerable and have made
14 significant changes to the -- the practices in the
15 county.  But we're not -- it takes a long time to do
16 that.  It takes years.
17         And so, it certainly -- that is one of the many
18 things that's on our list of things to do that we
19 haven't been able to do yet.  So until we get there,
20 it's status quo from the county's previous practices.
21 But it's certainly something that's high on our priority
22 to do in the future.
23    Q.   Thank you.
24         MS. PERALES:  And I want to thank you for
25 your time and your patience today.

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                 Pages 254 to 257

Page 254

1        I'm going to pass the witness to
2 Mr. White.
3        MR. WHITE:  Thank you.
4            EXAMINATION
5 BY MR. WHITE:
6    Q.  Mr. Scarpello, thank you for your patience.  I
7 wanted to ask a few questions about SB 1's provisions
8 relating to poll watchers.
9    A.  Yes.
10   Q.   But before we even turn to SB 1, did poll
11 watchers serve at Dallas County polling sites before
12 SB 1 took effect?
13   A.  Yes.
14   Q.   Does your office track the amount of poll
15 watchers who report to polling sites?
16   A.  I believe we have documentation, from those
17 poll watcher certificates, that are collected in -- in
18 the elections, yes.
19   Q.   And when you refer to the "poll watcher
20 certificates," are you referring to the training
21 certificates that they are required to --
22   A.  Yes --
23   Q.  -- complete?
24   A.  -- the documents that they turn in to us.
25   Q.  Okay.  And the certificates that you're

Page 255

1 referring to, that was -- poll watchers were required to
2 present those as a result of SB 1, right?
3    A.  Yes.
4    Q.   And so before SB 1 was enacted, did your office
5 have any way of tracking how poll watchers --
6    A.  I --
7    Q.  -- how many poll watchers reported for service?
8    A.  I don't know that we have reliable information
9 on the number of poll watchers that we had in the past.
10   Q.  Okay.  Are you aware of any instance of poll
11 watchers harassing voters at Dallas County polling sites
12 prior to SB 1 being enacted?
13   A.  None that I'm aware -- no specific ones that
14 I'm aware of.
15   Q.  Is that because -- I'm sorry.  Can you remind
16 me when you first started working at the Dallas
17 County --
18   A.  December 7th, 2020.
19   Q.  Okay.  Are you aware of any incidents of poll
20 watchers harassing election workers at Dallas County
21 polling sites before SB 1?
22       MS. HUNKER:  Objection, form.
23   A.  Not that I'm aware of.
24   Q.  (By Mr. White)  Are you aware of any instances
25 prior to Senate Bill 1 where poll watchers discovered

Page 256

1 election irregularities and reported those
2 irregularities to poll -- poll officials?
3    A.  Not that I'm aware of.
4    Q.  Okay.  Did you train election workers about
5 SB 1's provisions relating to poll watchers?
6    A.  Yes.
7    Q.  You trained them, personally --
8    A.  No.
9    Q.  -- or your office?
10   A.  No.
11   Q.  At home?
12   A.  We have a training program.
13   Q.  Okay.  Who in your office conducted the
14 training?
15   A.  We have a -- we have a training staff -- that
16 was two people until recently; a third person was just
17 added -- of full-time staff members.  But the people
18 that actually do the training, for the most part, are
19 temporary workers that were -- I think we hired about
20 eight or nine temporary staff that facilitate our
21 training classes.  For the most part, though, our
22 training is recorded so that we have a consistence --
23 consistency between classes.
24   Q.  Okay.  And when did this training occur?  I'm
25 sorry.  When did this training of election workers about

Page 257

1 the SB 1's provisions relating to poll watchers occur?
2    A.  I believe -- so we revised a lot of our
3 training materials, a significant amount of our training
4 materials, going into the November election and -- and
5 made further modifications in preparations for the March
6 elections because of SB 1.
7    Q.  Okay.  And what was covered -- can you describe
8 what was covered during the most recent training that
9 you conducted?
10   A.  I -- I don't know -- I can't tell you that -- I
11 can't quote verbatim what was said, but I can tell you
12 the -- the gist of it was that -- to warn poll workers
13 not to interfere with the movement of poll watchers;
14 otherwise, they could face legal jeopardy.
15   Q.  Okay.  I want to talk about some of those
16 specific provisions.
17       Do you have the exhibit that -- like, Holly
18 gave you a copy of SB 1 --
19   A.  Uh-huh.
20   Q.  -- in front of you?
21       Can you turn to Page 27 of that?
22   A.  (Witness complies.)  Okay.
23   Q.  And let's take a look at Lines 12 through 15,
24 which I believe is Subsection g, and you can read it to
25 yourself and just let me know when you're finished.

Page 258

1    A.  (Witness reviewing document.)  Okay.
2    Q.  What is your understanding of what this -- or
3 sorry.  Strike that.
4        Are you familiar with this provision?
5    A.  Yes.
6    Q.  And what is your understanding of what it
7 requires?
8    A.  That -- that interfering -- you know, that an
9 election officer commits an offense if they interfere
10 with a poll -- a poll watcher and it's a Class A
11 misdemeanor and that there's certain paperwork and oaths
12 that need to be taken by that poll watcher.
13   Q.  Did your office adopt any new policies or
14 procedures to address this provision?
15   A.  I believe so, yes.
16   Q.  And what were those?
17   A.  To accept that -- to be aware of this new
18 provision and to -- to accept that certificate, et
19 cetera.
20   Q.  Okay.  Let me ask you about other provisions,
21 and that's one relating to poll watchers.
22       Can you flip to the next page, Page 28; and
23 look at Lines 3 through 5?
24   A.  (Witness complies.)  Okay.
25   Q.  Have you seen this provision before?

Page 259

1    A.  Yes.
2    Q.  And what does it mean?
3    A.  That a poll watcher cannot be limited in where
4 they -- their activities as a watcher.
5    Q.  What is your understanding of what the phrase
6 "free movement" means?
7    A.  I think kind of what I just said, where they --
8 they can go where they want in order to observe election
9 activities.
10   Q.  Did you receive guidance from the Secretary of
11 State's office about the meaning of "free movement" or
12 the lengths to which poll watchers are allowed to
13 operate within polling places?
14   A.  I believe --
15       MS. HUNKER:  Objection, form.
16   A.  I believe there's an elections advisory,
17 that -- if I remember correctly, that there's an
18 elections advisory that kind of outlines this particular
19 section.
20   Q.  (By Mr. White)  Okay.  Is it your understanding
21 that -- under this provision of Senate Bill 1, can a
22 poll watcher follow a voter through a polling place?
23       MS. HUNKER:  Objection, form.
24   A.  I believe so.
25   Q.  (By Mr. White)  Can poll watchers stand by the

Page 260

1 machine where voters cast their ballot?
2        MS. HUNKER:  Objection, form.
3    A.  That is something that we would not allow.
4    Q.  (By Mr. White)  And why wouldn't you allow
5 that?
6    A.  The privacy of a voter, being able to cast a
7 ballot in privacy.
8    Q.  Is there anything in SB 1, that you're aware
9 of, that would prohibit that?
10   A.  No.
11   Q.  And let me also ask you if you could flip
12 back -- backwards to Page 25, Lines 3 through 7.
13   A.  (Witness complies.)
14   Q.  Maybe you can just take a second to read that.
15       MS. HUNKER:  What page?
16       MR. WHITE:  Page 25.
17       MS. HUNKER:  Thank you.
18   A.  (Witness reviews document.)  Okay.
19   Q.  (By Mr. White)  Have you seen this provision
20 before?
21   A.  Yes.
22   Q.  Is it fair to say that this provision requires
23 poll workers to report suspected irregularities to
24 election officials?
25   A.  Yes.

Page 261

1    Q.  Who are the election officials to whom poll
2 watchers are obligated to report irregularities?
3    A.  We encourage them to talk to the election
4 judge, the presiding judge --
5    Q.  And to --
6    A.  -- and to not -- not interact with the clerks.
7    Q.  And why -- why do you encourage them to not
8 interact with the clerks?
9    A.  Because the judge has more thorough training
10 and knowledge of what is allowed and what is not
11 allowed, whereas the clerks do not.
12   Q.  And --
13   A.  As well as just the general procedures; they
14 have a deeper understanding of how the conduct -- and
15 they are responsible for the conduct of the election at
16 that polling place.
17   Q.  And do election judges and clerks have
18 responsibilities on Election Day apart from waiting to
19 hear complaints from poll watchers?
20   A.  Yes.
21   Q.  And what are some of those responsibilities?
22   A.  Generally speaking, the judge is responsible
23 for all activities within that polling place, including
24 directing the activities to open it, close it, to run
25 it, as well as the specific responsibilities to handle

Page 262

1 what we call exceptions to the standard voting
2 procedure. Clerks handle the 80 percent that are easy.
3 judges handle the 20 percent that are difficult.
4     Q.   Okay. So when a poll watcher is reporting a
5 suspected irregularity to an election official, is it
6 fair to say that the election official will be unable to
7 handle their other responsibilities while they are
8 dealing with the -- a watcher.
9          MS. HUNKER: Objection, form.
10    A.   I don't know that that's -- I mean, being a
11 judge is difficult, and they have to juggle. And -- and
12 so that's just another piece of their job that they have
13 to juggle, as well as dealing with difficult voters and
14 dealing with signs and, you know, dealing with the --
15 all the other things that someone who's running a
16 polling place has to deal with.
17    Q.   (By Mr. White) Well, would you agree that
18 while an election official is talking to or interacting
19 with a poll watcher, they are not able to do any of the
20 other tasks they're assigned to do?
21         MS. HUNKER: Objection, form.
22    A.   I would agree that most people can -- they have
23 to deal with one thing at a time.
24    Q.   (By Mr. White) Okay. During the March primary
25 of this year, did Dallas County experience a shortage of

Page 263

1 poll workers at polling sites?
2     A.   Yes.
3     Q.   How significant of a shortage?
4     A.   It was very significant.
5     Q.   Can you explain more what you mean by that?
6     A.   We had a big shortage of judges, in particular,
7 where judges had committed to working and then didn't
8 show up two days prior to the election to pick up their
9 supplies. I think we had 71 no-shows on the Sunday
10 before the election, then some more on Election Day.
11    Q.   Okay. I want to pass you exhibits. I'm not
12 sure what exhibit number we are up to, but --
13         THE REPORTER: 9.
14         MR. WHITE: 9.
15    Q.   Okay. I'll pass you what I would ask the court
16 reporter to mark as Exhibit 9.
17         (Document handed to the court reporter.)
18    Q.   And I'll represent to you this is a news
19 article about some of the --
20         MR. WHITE: Oh, I'm sorry. Could you --
21         THE REPORTER: I've got -- you've got to
22 quit talking for me to mark it. I'm sorry.
23         (Deposition Exhibit Number 9 marked.)
24         THE REPORTER: Okay. Thank you.
25         MR. WHITE: Thanks.

Page 264

1         (Document handed to the witness.)
2     Q.   So I'll just represent to you this is a news
3 article about some of, like, the wait times and worker
4 shortages during the March primary in Dallas County,
5 which I'm sure you're familiar with.
6          And if I could ask you to turn to Page 5 of
7 this article.
8     A.   (Witness complies.)
9     Q.   And the last full paragraph on Page 5 -- I'll
10 just read it aloud -- says: "Scarpello also said some
11 election judges were afraid of being prosecuted under a
12 provision of the law related to partisan poll watchers."
13         Did I read that correctly?
14    A.   Yes.
15    Q.   And then it goes on to say: (Reading) SB 1
16 makes it a misdemeanor offense for a worker to knowingly
17 prevent (sic) a watcher from observing an activity or
18 procedure the person knows the watcher is entitled to
19 observe.
20         Did I read that correctly?
21    A.   Yes.
22    Q.   How did you become aware that election judges
23 were afraid of being prosecuted under this provision?
24    A.   We had several judges tell us that.
25    Q.   How many judges?

Page 265

1     A.   I don't know.
2     Q.   And who did they speak to about these concerns?
3     A.   Staff -- county -- our staff -- voting site
4 staff.
5     Q.   And so is it fair to say that this provision
6 was a cause of election judges not reporting for duty --
7 or, sorry. Strike that.
8          Is it fair to say that this provision was a
9 cause of the poll worker shortages that we were just
10 discussing?
11         MS. HUNKER: Objection, form.
12    A.   My speculation is that it was a contributing
13 factor.
14    Q.   (By Mr. White) And what other factors do you
15 believe led to the poll shortage, poll worker shortage?
16    A.   There's a general -- there's a general degree
17 of people not wanting to volunteer or not wanting to
18 work. We have difficulties getting temporary workers,
19 full time workers, poll workers. And so I think that,
20 you know, there's a -- wherever you go, we see that,
21 right? You go to McDonald's. You can't -- they don't
22 have workers.
23         And so I think that's a contributing factor. I
24 think this -- this legislation's a contributing factor.
25 I think there's lots of factors.

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                          Pages 266 to 269

Page 266

1    Q.   Did you have to close polling sites as a result
2  of the shortage of poll workers?
3    A.   Yes.
4    Q.   How many?
5    A.   I believe it was -- gosh, don't -- I think it
6  was nine, and then we ended up open -- opening one of
7  those nine later in the -- the morning.
8    Q.   Where, in Dallas County, were these nine poll
9  sites --
10   A.   Scattered throughout the county.
11   Q.   Scattered throughout.  Who decided to close
12 them?
13   A.   I did.
14   Q.   Did you attempt to recruit other poll workers
15 or election judges before making that decision?
16   A.   Yes.  I mean, remember, I said 71 didn't show
17 up on Sunday to pick up their supplies.  So, on Monday,
18 we scrambled and reassigned judges and moved alternate
19 judges and successfully patched most of those holes
20 except for those eight or nine.
21   Q.   Did the shortage of poll workers cause longer
22 wait times for voters at polling sites?
23   A.   Yes.
24         MS. HUNKER:  Objection, form.
25   Q.   (By Mr. White)  If you could turn to Page 2 of

Page 267

1  the article that I just gave you.
2    A.   Uh-huh.
3    Q.   At the bottom, there are a couple of paragraphs
4  talking about a voter named Gladys Ivy who says that she
5  waited for four hours to vote at the Disciple Central
6  Community Church in DeSoto.
7         Are you aware of that polling site?
8    A.   I am.
9    Q.   And are you familiar with -- oh, strike that.
10        Are you familiar with this story about Gladys
11 Ivy having to wait four hours?
12   A.   I am familiar with it, and I have my doubts
13 about it.  We're investigating it.  It's highly
14 unlikely someone waited four hours.
15   Q.   Okay.  Why do you have your doubts?
16   A.   Because it's highly unlikely someone waited
17 four hours.  It's -- the math just doesn't add up.
18   Q.   Okay.  What do you -- were there other -- I'm
19 sorry.  Strike that.
20        Why -- why do you think the math doesn't add
21 up?
22   A.   Because it's -- it would be nearly impossible
23 for someone to wait four hours for that curbside voting
24 that she claims.
25   Q.   I guess I'm just trying to understand why

Page 268

1  you -- what is your basis for saying that's impossible
2  as someone, personally, who has not worked at an
3  election -- an election site.
4    A.   Given the time it takes to process a voter and
5  for a voter to cast a vote and that the potential line,
6  physical area, for the line to -- to, actually, line
7  up --
8    Q.   Uh-huh.
9    A.   -- it's unlikely.  And that's why we're
10 investigating.
11   Q.   Okay.
12   A.   Yeah.  People -- people have their own
13 perception of reality --
14   Q.   Sure.
15   A.   -- many times.
16   Q.   Did you -- are you aware of -- sorry.  Strike
17 that.
18        Did you talk to other voters about wait times
19 during the March 2022 primary?
20   A.   Yes.
21   Q.   And what is your understanding of how much
22 longer than usual wait times were during the primary
23 election?
24   A.   I think that, in some instances when we had
25 poll worker shortages, that there were less people to

Page 269

1  check in workers.  And at those locations, they had to
2  wait longer to check in.  And so then there -- there
3  would be waits at those locations.  But generally
4  speaking, there were -- when -- when we had a compliment
5  of voter -- poll workers, there were no waits.
6    Q.   Okay.  So when there were poll worker
7  shortages, the wait times were longer, if I'm --
8    A.   Correct.
9    Q.   -- understanding you correctly.  Okay.
10        And do you have a sense of how much longer
11 people typically had to wait because of these poll
12 worker shortages?
13   A.   No.
14   Q.   Okay.  Is there anyone in your office that
15 would know that --
16   A.   No.
17   Q.   -- answer?
18   A.   We don't have metrics on that.
19   Q.   Okay.  Did your office receive complaints about
20 wait times following the March 2022 primary election?
21   A.   A handful.
22   Q.   And when you say "a handful" (indicating), how
23 many are you thinking?
24   A.   I don't -- I couldn't quantify.
25   Q.   More than five?

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                           Pages 270 to 273

Page 270

1    A.  Yes.
2    Q.  More than 20?
3    A.  Probably not.
4    Q.  Okay.  In the March 2022 primary, did poll
5    watchers appear at Dallas County polling locations?
6    A.  Poll watchers?
7    Q.  Yeah.
8    A.  Yes.
9    Q.  And I think I asked you this before, but do you
10   know how many appeared during the March 2022 primary?
11   A.  I don't have that information.  I don't know
12   that information.
13   Q.  Okay.  Were there particular precincts where
14   poll watchers were more likely to report for service in
15   Dallas County?
16       MS. HUNKER:  Objection, form.
17   A.  I -- I'm not aware of any particular location
18   where there was a significant amount of -- of poll
19   watchers.
20   Q.  (By Mr. White)  Okay.  In the March 2022
21   primary, are you aware of any instance where poll
22   watchers intimidated voters?
23       MS. HUNKER:  Objection, form.
24   A.  We had one location where we had a conflict
25   between a poll watcher and a judge.  I don't know that

Page 271

1    there was a conflict between the poll watcher and any
2    voters.
3    Q.  (By Mr. White)  Okay.  And what was -- what
4    location was this?
5    A.  Early voting site.  The -- the name escapes me
6    right now, but it's on the tip of my tongue.  I can't
7    remember.
8    Q.  Okay.  What was the nature of the conflict
9    between the poll watcher and the judge?
10   A.  There's -- they were co-judges for this
11   election because it was a joint election.  There was a
12   Republican co-judge and a Democratic co-judge.  The
13   Republican co-judge and the poll watcher were -- the
14   Republican co-judge was letting the poll watcher have
15   access to things that she should not have, and the
16   Democratic co-judge had a problem with that.  And so
17   there was a conflict there.
18   Q.  Okay.  And when you say the Democratic co-judge
19   had a problem with it, how did the situation resolve
20   itself?
21   A.  They called our office.  We sent a -- a
22   technician to try to calm -- to negotiate -- mediate, if
23   you will.  The conflict just kept going until, I think,
24   later on.  One of the two parties called the Sheriff's
25   Office, and the Sheriff's Deputies, actually, went to

Page 272

1    that location.
2    Q.  And when the Sheriff Deputies arrived at the
3    location, what happened next?
4    A.  I -- I don't know the specifics of who did what
5    at that point.  I know the Sheriff's Deputies worked
6    with the judge to -- to make sure that she felt safe
7    and -- and that there weren't any further problems.
8    Q.  Do you know if the poll watcher was removed
9    from the polling site?
10   A.  I don't think -- I think some of this conflict
11   happened after the polling place was already closed.
12   Q.  Okay.  Before the polling place was closed, did
13   this conflict lead to any disruptions in the
14   administration of the election at the polling site?
15       MS. HUNKER:  Objection, form.
16   A.  I don't believe so.
17   Q.  (By Mr. White)  And you said that this conflict
18   arose from the Republican co-judge giving potentially
19   unwarranted access to the poll watcher.
20       Am I describing your testimony correctly?
21   A.  That's correct.
22   Q.  And what kind of access was being given to the
23   poll watcher?
24   A.  I believe they were -- they were attempting to
25   open up the ballot box on the vote tabulator.

Page 273

1    Q.  Did the poll watcher succeed in opening up the
2    ballot box?
3    A.  I don't believe so.
4    Q.  Okay.  Are you aware of any other problems
5    caused by poll watchers during the March 2022 primary?
6    A.  No.
7    Q.  Do you recall testifying earlier that one of
8    your biggest concerns with SB 1 was the deterrent effect
9    that poll watchers would potentially have on poll worker
10   recruitment?
11   A.  Yes.
12   Q.  Are you taking any steps to sort of address
13   that going forward?
14   A.  In the March election, we -- we actually hired
15   a firm to produce a video that we put -- that we show
16   during our training, to talk about the importance of
17   teamwork, the importance of getting along with poll
18   co-workers, the importance of getting along with poll
19   watchers and -- and with voters, as well as, you know,
20   having discussions during training about that importance
21   of not -- of de-escalating conflict.
22       We're going to continue to do that going into
23   the -- to the November election where -- where it's
24   contested, races where there's most likely going to be
25   more poll watchers and the potential for more conflict.

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                           Pages 274 to 277

Page 274

1    Q.   This video that you just mentioned that you
2  produced, is this something for -- is this part of your
3  training materials?
4    A.   Yes.
5    Q.   Okay.  When Senate Bill 1 was being debated in
6  the Legislature, did you take a position supporting or
7  opposing these provisions relating to poll watchers?
8    A.   As an Elections Administrator, I don't really
9  take positions on legislation.  I do add my expertise as
10  an administrator to -- to advise legislators on what I
11  think the effects of that legislation might -- it might
12  have.
13    Q.   And did you advise legislators about the
14  provisions relating to poll watchers?
15    A.   Yes.
16    Q.   And what did you advise them, or how did you
17  advise them?
18    A.   I thought it would have a chilling effect on
19  the recruitment and retention of poll workers.  I said
20  that I thought that it could create conflict at -- at
21  polling places between poll watchers and poll workers
22  and, potentially, voters.
23    Q.   Okay.  And you mentioned that you didn't start
24  working at the Dallas County Election Administrator's
25  office until November of 2020, right?

Page 275

1    A.   Yes.  December 7th of 2020.
2    Q.   December 7th.  And so what was your basis for
3  believing that these poll watching provisions would have
4  a chilling effect on recruitment?
5    A.   Just my experience in the industry.
6    Q.   Okay.  Have you had experiences prior to your
7  service here in Dallas with the poll watchers that sort
8  of informed that opinion?
9    A.   Yes.
10    Q.   And what were those experiences?
11    A.   22 years of dealing with poll workers and poll
12  watchers and knowing the nature of elections, especially
13  as they've gotten more partisan and a little less polite
14  as the years have gone on.
15    Q.   Okay.  I'm going to shift gears and ask
16  about -- a few questions about curbside voting and
17  drive-thru voting.
18    A.   Uh-huh.
19    Q.   Does Dallas County offer curbside voting?
20    A.   Yes.
21    Q.   And how long has Dallas County offered curbside
22  voting?
23    A.   I don't know that answer.  For as long as Texas
24  state law has allowed it, I'm sure.
25    Q.   Sure.  Who's eligible to vote curbside in

Page 276

1  Dallas County?
2    A.   There are certain specified requirements.
3  Generally speaking, the disabled people not able to
4  readily get into a polling place.
5    Q.   Can you walk me through the steps of how a
6  voter casts a ballot when they vote using curbside
7  voting?
8    A.   We have a sign out on the -- on the outside of
9  the polling place that has a phone number.  When someone
10  pulls up, if there's not voter- -- if there's not
11  workers already outside, they call that number, which
12  rings into the judge's cell phone.  And they say, "Hey,
13  I'm here to vote curbside."
14        And so the judge sends a worker out with an
15  electronic poll book.  The voter -- they -- they find
16  the voter, and the voter signs the Epollbook.  They go
17  back inside; and they get the voting machine, bring that
18  out to the voter.  They -- they cast their ballot on
19  that voting machine.
20    Q.   Do you think there's an increased risk of fraud
21  with respect to the curbside voting?
22    A.   No.
23    Q.   Why not?
24    A.   It's the same procedure that takes place inside
25  the building as outside the building.

Page 277

1    Q.   And are you familiar with the provisions in
2  SB 1 relating to drive-thru voting?
3    A.   Yes.
4    Q.   What is the difference between curbside voting
5  and drive-thru voting?
6    A.   Curbside voting, there is certain requirements
7  that allows someone to be a curbside voter as opposed to
8  drive-thru voting where there would not be those
9  requirements.
10    Q.   Requirements on who is eligible?
11    A.   Yes.
12    Q.   Has Dallas County ever offered drive-thru
13  voting?
14    A.   Not that I'm aware of.
15    Q.   Have you ever considered implementing it?
16    A.   I would say if SB 1 hadn't been implemented, we
17  would have aggressively had drive-thru voting.
18    Q.   And why -- why is that?
19    A.   I've got a long history of making voter --
20  voting more accessible to voters, including the
21  introduction of drop boxes, vote center voting, allowing
22  mail ballots to be dropped off at polling places, et
23  cetera, et cetera.  And so when I saw what Harris County
24  was doing in 2020, I really applauded that.  I thought
25  it was great.  And I -- when I got to Texas, I thought

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                       Pages 278 to 281

Page 278

1 we're going to do that in Dallas.
2    Q.  And so is it your opinion that drive-thru
3 voting would make voting more accessible?
4         MS. HUNKER:  Objection, form.
5    A.  Absolutely.
6    Q.  (By Mr. White)  I meant to ask this earlier.
7 So I had asked you earlier about whether you thought
8 there was an increased risk of fraud with respect to
9 curbside voting.
10        Are you aware of any instances of voter fraud
11 in Dallas County that have happened with respect to
12 curbside voting?
13   A.  No.
14   Q.  I also want to turn your attention back to this
15 article that I gave you.
16   A.  Uh-huh.
17   Q.  If you could flip to Page 4.
18   A.  (Witness complies.)
19   Q.  The middle of the page, there's a paragraph
20 that says -- and I'll just read it aloud -- "Noble" --
21 who appears to be a Democratic party official -- "noted
22 over 6 percent of mail-in ballots in the county were
23 rejected because of the new identification requirements.
24 Those voters, she said, had to show up in person if they
25 wanted to vote, leading to longer queues to vote

Page 279

1 curbside."
2         Did I read that correctly?
3    A.  Yes.
4    Q.  Are you aware of any voters who showed up to
5 vote curbside because of SB 1's identification
6 requirements for mail-in ballots?
7    A.  I --
8         MS. HUNKER:  Objection, form.
9    A.  I speculate, just like Kristy Noble, that
10 that -- that was the case.
11   Q.  (By Mr. White)  And what is the reason for you
12 speculating in that way?
13   A.  Because a disabled voter or someone who is not
14 likely to -- less likely to be able to go in to a
15 polling place, is going to look for an alternative to
16 vote.  And one of those would be mail ballot, but
17 because of the provisions of SB 1 making mail ballots
18 that much more difficult in the high rejection rate, I
19 think that more people said, "Well, what are my --
20 what's my next alternative?"
21        And that would be drive-thru voting or curbside
22 voting.  I have no evidence of that, but I'm
23 speculating.
24   Q.  Yeah.  Now, a moment ago you mentioned that you
25 were aware that Harris County implemented drive-thru

Page 280

1 voting in the 2020 election.
2         During the 2020 election, did voters ever call
3 your office to ask about drive-thru voting?
4    A.  I wasn't there.
5    Q.  Oh, that's right.
6    A.  But I believe that -- my staff has told me that
7 there was lots of questions:  Why was Dallas not doing
8 it when Harris was?
9    Q.  And so is it fair to say that, just of those
10 complaints, were that Dallas County voters wanted to
11 have drive-thru voting in Dallas County?
12        MS. HUNKER:  Objection, form.
13   A.  That is my understanding.
14   Q.  (By Mr. White)  Did the availability -- I'm
15 sorry.  Strike that.
16        Apart from those calls that you received that
17 we just -- that I just asked you about, did the
18 availability of drive-thru voting in Harris County cause
19 other administrative difficulties for your office?
20        MS. HUNKER:  Objection, form.
21   A.  Not that I'm aware of.
22   Q.  (By Mr. White)  And earlier we were talking
23 about the poll watcher provisions.  I had asked you
24 whether you had any conversations with legislators, you
25 know, supporting or opposing or advising with respect to

Page 281

1 those provisions.
2    A.  Uh-huh.
3    Q.  Did you have any communications with
4 legislators about the prohibition of drive-thru voting
5 while SB 1 was being enacted?
6    A.  I don't recall, but I -- if -- the timing of it
7 was during the legislative session, but I always -- I
8 always spoke fondly of -- of the concept.
9         MR. WHITE:  Can we go off the record just
10 for a minute?  Thanks.
11        THE VIDEOGRAPHER:  Going off the record.
12 The time is 6:48 p.m.
13        (Discussion off the record.)
14        THE VIDEOGRAPHER:  Back on the record.
15 The time is 6:49 p.m.
16        MR. WHITE:  Mr. Scarpello, thank you.  I
17 don't have any further questions for you.  So I will
18 pass the witness first, I think, to any other attorneys
19 for the Plaintiffs who are appearing over Zoom, who'd
20 like to ask questions.
21        MS. BENDER:  No questions from the United
22 States.  Thank you.
23        THE REPORTER:  I'm sorry.  What was the
24 name again?
25        MS. PERALES:  Brady.

Page 282

1          MS. BENDER:  This is --
2          THE REPORTER:  Okay.  Thank you.
3          MS. BENDER:  This is Brady.  No questions
4   at this time.  Thank you.
5          EXAMINATION
6   BY MS. CAI:
7      Q.  Hello, Ms. Scarpello.  This is Sophia Cai on
8   behalf of the OC Plaintiffs
9      A.  I'm sorry.  I can't hear.
10     Q.  I was just going to ask you if you could hear
11  me okay.
12         How is this?
13     A.  That's better.
14     Q.  Great.  I'll just reintroduce myself.  My name
15  is Sophia Cai on behalf of the OCA Plaintiffs.
16         First I just wanted to ask you a few questions
17  about matching voters who apply for a ballot by mail.
18     A.  Okay.
19     Q.  If an individual applies to vote by mail, but
20  is not a registered voter, will their application for
21  ballot by mail be approved?
22     A.  If they apply to vote by mail, but they are not
23  a registered voter, no.
24     Q.  And that was also true prior to SB 1; is that
25  correct?

Page 283

1      A.  That's correct.
2      Q.  Put another way, everyone who successfully
3   applies for a ballot by mail has already registered to
4   vote in the county; is that right?
5          MS. HUNKER:  Objection, form.
6          (The lights go out in the room.)
7          THE REPORTER:  Can we go --
8      A.  I think we might pause.
9          THE REPORTER:  -- off the record, please?
10  Can we go off the record for a second, please?
11         THE VIDEOGRAPHER:  Going off the record at
12  6:51 p.m.
13         (Discussion off the record.)
14         THE VIDEOGRAPHER:  Okay.  We're back on
15  the record.  The time is 6:52 p.m.
16     Q.  I'll just reask my most recent question.  How's
17  that?
18         Everyone who successfully applies for a ballot
19  by mail has already registered to vote in the county?
20         MS. HUNKER:  Objection, form.
21     A.  That -- that's correct.
22     Q.  Prior to SB 1, how did your office check to see
23  if an individual applying to vote by mail was a
24  registered voter?
25     A.  They checked the voter registration, the VEMACS

Page 284

1   voter registration system.
2      Q.  And was that system meant to ensure that the
3   individuals were already registered?
4      A.  Yes.
5      Q.  Prior to SB 1 being granted an application for
6   ballot by mail, what would happen next?
7      A.  The vote by mail ballot would be sent.
8      Q.  Would the voter be assigned a unique
9   identification number?
10     A.  Yes.
11     Q.  And would that identification number be
12  associated with the ballot sent to the voter?
13     A.  Yes.  Not --
14     Q.  So --
15     A.  -- to the -- not to the ballot, but to the
16  ballot carrier envelope.
17     Q.  Okay.  I see.  Thank you for that
18  clarification.
19         So someone who successfully voted by mail would
20  then have to return that specific ballot envelope issue
21  to them, not any ballot envelope?
22     A.  That's correct.
23     Q.  Prior to SB 1, what information was the voter
24  required to include on the carrier envelope or ballot
25  envelope?

Page 285

1      A.  I believe their name, address.  I can't recall
2   all the specifics, but most likely, the name, address.
3      Q.  Okay.  And was the voter required to sign the
4   carrier envelope?
5      A.  Yes.
6      Q.  Was there a process in place to make sure that
7   the signature matched the voter signature on file?
8      A.  Yes.  There's the Signature Verification
9   Committee that compares the signature of the -- on the
10  carrier envelope to the signature on the application, as
11  well as they -- they have the ability to check other
12  signatures within the voter registration system.
13     Q.  And just to clarify, that answer also applies
14  prior to SB 1 --
15     A.  Yes.
16     Q.  -- is that correct?
17     A.  Yes.
18     Q.  Thank you.  Okay.  Next I want to ask you some
19  questions about voters with disabilities.
20         Are you familiar with your office's obligations
21  under the Americans with Disabilities Act or ADA?
22     A.  I'm -- I'm vaguely familiar, yes.
23     Q.  And what do you understand those obligations to
24  be?
25     A.  Most importantly, it's to provide voting

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                       Pages 286 to 289

Page 286

1 locations that have been -- that are ADA compliant,
2 basically.
3     Q.  Does your office have written ADA policies or
4 procedures?
5     A.  No, we don't.
6     Q.  So these are -- how are they communicated to
7 your employees or poll watchers?
8     A.  The -- the polling places, the county has
9 traditional polling places (indicating) that they've
10 been using for years, and those polling places, we -- in
11 earlier testimony, someone testified -- Revi testified
12 that those polling places were, when we moved to
13 countywide vote centers, they used those same polling
14 places.
15     In August of 2021, I proposed that we take a
16 look at those polling places in an effort to reinspect
17 them and to get the votes in our advisory committee to
18 look at the official locations of the county so that we
19 could modernize or be more compliant with ADA, as well
20 as other practical locations, you know, aspects of
21 those -- how many we have, where they're located and do
22 a deep dive in -- in the placement and quality of our
23 polling places.  But because of redistricting that was
24 taking place at the time, that effort was delayed; and
25 we will take that up again in June of this year.

Page 287

1     Q.  And when you say "accessible polling places,"
2 what do you mean by that?
3     A.  There's -- when there's -- when a polling place
4 is contemplated for use, there are checklists that we go
5 through where you -- you know, best practices call for a
6 checklist to inspect a location.  You -- you're --
7 there's a whole laundry list of things that make a
8 location ADA compliant:  ramps, pressure on the doors
9 (indicating), the types of knobs, access to drinking
10 fountains.  I mean, it's a very comprehensive list that,
11 basically, gives a grade to a location for ADA
12 compliance.
13     Q.  It sounds like you're very familiar with this
14 list, but if it's not written down anywhere, how do the
15 various locations go through this checklist?
16     A.  There -- there were the -- there were
17 inspections in 2019, and so we do have records of those
18 locations.  I just think that -- that we need to pay a
19 little bit better attention to the results of those
20 inspections and upgrade or eliminate those that are not
21 in compliance because I think we have some that are not
22 as compliant as they need to be.
23     Q.  That makes a lot of sense.  Thank you for that
24 on an accessibility point.
25     Broadly speaking, is your understanding that

Page 288

1 individuals with disabilities can, within reason, ask
2 for modifications or accommodations so that they can
3 vote?
4     A.  Yes.
5     Q.  And does your office have policies for sort of
6 changing the typical voting procedures, if needed, for
7 voters with disabilities to vote?
8     A.  Yes.  But I mean, number one, there's curbside
9 voting for people with disabilities; but there's also
10 certain procedures prescribed by the State that allow
11 preferential treatment to those who come into a polling
12 place (indicating), you know.  They get to cut the line,
13 if you will.  And so that's -- that's also allowed.
14     Q.  And so aside from this sort of cutting-the-line
15 feature, who has the authority to decide whether or not
16 to grant a voter's request for a reasonable modification
17 based on their disability?
18     A.  I believe Texas law gives that authority to the
19 presiding judge at a location.
20     Q.  And so would a person with a disability just
21 sort of ask at the location and then it would go to the
22 judge; how would that procedure work?
23     A.  Yes, they would ask at the location.
24     Q.  And that's the final say whether or not they
25 can have that modification?

Page 289

1     A.  Yes.  That's --
2         MS. HUNKER:  Objection, form.
3     A.  That's the -- in Texas, the presiding judge has
4 the last say as opposed to the Elections Administrator,
5 like in other states that I've been in.
6     Q.  (By Ms. Cai)  So how are either the election
7 judge you speak of or any of the employees or poll
8 workers who might be asked on a modification, what are
9 they trained to do when deciding whether that
10 modification is reasonable?
11     A.  We provide them with the language, as it's laid
12 out in the Texas Election Code; and there's certain
13 signage that's required.  And then we provide them with
14 that mater- -- the training materials and signage that
15 tell them if and when someone should have that
16 preferential treatment.
17     Q.  What are some of the asked-for modification
18 that's not on this list?
19         MS. HUNKER:  Objection, form.
20     A.  I'm not sure I understand the question.
21     Q.  (By Ms. Cai)  Let me rephrase.  What kinds of
22 modifications or changes to the typical voting
23 procedures would be allowed to be provided?
24     A.  The curbside voting, as well as the
25 preferential treatment when it comes to lines inside the

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                 Pages 290 to 293

Page 290

1 polling place.
2    Q.  Okay.  And those are the only two you can think
3 of --
4    A.  That's the only --
5    Q.  -- off the top of your head?
6    A.  Off the top of my head, yes.
7    Q.  So to give a sort of comparable
8 example of something different, earlier today you
9 discussed the oath requirement of SB 1.
10   A.  (Witness moves head up and down.)
11   Q.  So what would you do if a voter with a
12 disability asked for their assistor to answer questions
13 or provide assistance beyond what the vote allows?
14        MS. HUNKER:  Objection, form.
15   A.  I think that -- that's a situational question.
16 I mean, if on Election Day we got a call from a -- an
17 election judge asking for, you know, telling us that
18 someone was asking for an accommodation, we would look
19 and see what that -- what they are asking for and we
20 would provide our recommendation and we'd do our
21 research, talk to our attorneys, talk to the Secretary
22 of State, et cetera, and find out what our -- what our
23 options are, if any, to offer to that voter.
24   Q.  (By Ms. Cai)  So would you do that procedure
25 for any question that an election judge called you with?

Page 291

1    A.  Yes.
2    Q.  So, for instance, if a voter with a disability
3 can't see where to put their ID on a mail ballot and you
4 got a call about that, you would then do the same
5 procedure?
6    A.  If -- if the -- I mean, it's kind of a
7 hypothetical, you know, a very generic --
8    Q.  Of course.
9    A.  -- hypothetical.  I mean, if -- if the -- if
10 the law is not clear, if the election's advisories that
11 have been promulgated by the Secretary of State are not
12 clear, then we would do that escalation procedure to
13 see, you know, what our options are.
14   Q.  Okay.  So the general sense is if there's not a
15 clear-cut answer, you would talk to your attorneys or
16 the Secretary of State to see whether that modification
17 could be provided for a voter with a disability in real
18 time?
19   A.  Yes.
20   Q.  And same question for the care procedure.
21 Let's say somebody with a disability has their ballot or
22 ballot -- final application rejected, but they can't
23 drive and, therefore, cannot go in person to carry their
24 ballot.
25        Would you consider granting a request for a

Page 292

1 modification so that their ballot could be cured in a
2 different way than is specifically, provided for by
3 SB 1?
4        MS. HUNKER:  Objection, form.
5    A.  I think that it's hard for me to speculate on,
6 you know, a vague hypothetical.  You know, I -- these --
7 these -- like I said before, this would be handled on a
8 case-by-case basis with, you know, true, you know,
9 facts.  And it would be a fact-based decision.
10   Q.  That makes a lot of sense.  Thank you.
11   A.  Uh-huh.
12   Q.  Has -- so moving away from hypotheticals,
13 then --
14   A.  Okay.
15   Q.  -- has your office received requests for
16 regional (phonetics) modifications for changes in voting
17 procedures from voters with disabilities post enactment
18 of SB 1?
19   A.  No, I don't believe so.
20   Q.  Okay.  I have one last set of questions about
21 the voter identification requirements.
22        After SB 1, does your office advise mail ballot
23 voters to provide both their Social Security number and
24 driver's license numbers?
25   A.  Yes.  After -- in February of 2022, as we were

Page 293

1 having a high rejection rate, we went to extraordinary
2 measures to try to educate the public, and we got -- I
3 think we got an allotment of $87,000 from the
4 Commissioners Court where we reached out directly to
5 voters who had rejected mail ballot applications.
6        We did some radio ads.  We did some Facebook
7 educational efforts to try to, number one, help people
8 who had already had rejected mail ballots or rejected
9 applications, as well as preventing those problems from
10 happening.  So, yes, you know, we do what we can to try
11 to prevent and solve the problem once it occurs.
12   Q.  So, to be clear, the recommendation to put both
13 the Social Security number and driver's license number
14 began around February; is that correct?
15   A.  Yes.
16   Q.  And you may have already answered this, but why
17 did you start advising to put both numbers?
18   A.  We kind of used the tag line, "When in doubt,
19 fill them both out," and -- because it's just, you know,
20 to be as safe as possible to try to get both of those
21 numbers down with the idea that someone is -- is likely
22 to have one of those two numbers on their voter
23 registration record.
24   Q.  So, in the circumstances where an individual
25 puts down only their driver's license number on their

Page 294

1 mail ballot, but you only have their Social Security
2 numbers on file, what would happen?
3    A.  That would be rejected, and they would -- they
4 would get a reject letter asking for more information;
5 or the form provided by the Secretary of State, we would
6 send them that form.
7    Q.  So they would get a reject letter, but the law
8 does not require that an individual write down both
9 numbers; is that correct?
10    A.  No.
11    Q.  So is it fair to say that, under the new
12 system, many people who put down a correct identifying
13 number for themselves are still at risk of having their
14 application for ballot by mail or mail ballot rejected?
15        MS. HUNKER:  Objection, form.
16    A.  That would be the case.  If they have -- if we
17 have a voter registra- -- or a driver's license on file,
18 but they send in a correct Social Security number, if
19 the two don't match, then we can't accept.
20        MS. CAI:  Thank you.  That's all my
21 questions.
22        THE REPORTER:  Just a second, please.
23 Okay.  Thank you.
24        MS. HUNKER:  How much time for the
25 Plaintiffs.

Page 295

1        THE REPORTER:  I couldn't tell you right
2 this second.
3        MR. WHITE:  Should we go off record for a
4 second?
5        THE VIDEOGRAPHER:  Off the record.  Time
6 is 7:08 p.m.
7        (Discussion off the record.)
8        THE VIDEOGRAPHER:  Okay.  We're back on
9 the record.  The time is 7:09 p.m.
10        EXAMINATION
11 BY MS. HUNKER:
12    Q.  Good evening, Mr. Scarpello.  How are you
13 today?
14    A.  Very good.
15    Q.  My name is Kathleen Hunker.  I represent the
16 State Defendants.  I am going to be asking you a series
17 of questions mostly in response to what Plaintiffs'
18 Counsel had asked you, so I'm going to be jumping around
19 a little bit with respect to topics.
20        If at any point, my switch of topics confuses
21 you or you don't understand the switch, would you please
22 let me know?
23    A.  Sure.
24    Q.  If you do, I'll be happy to provide additional
25 foundation or to restate the question as needed.  Okay?

Page 296

1    A.  Okay.
2    Q.  So I believe you testified that you started
3 this position December 7th, 2020; is that correct?
4    A.  That's correct.
5    Q.  How many elections have transpired since that
6 date, if you know?
7    A.  I can count.  I believe six.
8    Q.  And so that would include the November
9 constitutional --
10    A.  Yes.
11    Q.  -- is that correct?
12        And that would include the primary, correct?
13    A.  Yes.
14    Q.  Did you include in that number the May 7th
15 election that's --
16    A.  Yes.
17    Q.  -- ongoing?
18    A.  No, no.  The upcoming May 7th?
19    Q.  The upcoming.
20    A.  No.
21    Q.  Okay.  And what about the May 24th?  I
22 assume --
23    A.  No.
24    Q.  -- no.
25        Did the other elections consist of special

Page 297

1 elections?
2    A.  Yeah.  I think there was a couple of special
3 elections in February and March, then a May-joint-June,
4 runoff, November constitutional and --
5    Q.  Okay.
6    A.  -- March election primary.
7    Q.  And so would the March 2022 election be the
8 first federal election in which you are administrator
9 of?
10    A.  Yes.
11    Q.  Did you assess voting assistance laws prior to
12 the enactment of SB 1?
13    A.  Assistance in what form?  At curbside, inside
14 the polling place?  Could you be more specific?
15    Q.  So I was referring to generally.  If you
16 remember very early in your testimony, you were talking
17 with Ms. -- Ms. Perales about voter assistance.
18    A.  Uh-huh.
19    Q.  In that sense, she wasn't specifically limiting
20 it to in-person voting or curbside voting.  And so I'm
21 just trying to get a sense of what your familiarity was
22 with voting assistance law in Texas, generally, prior to
23 the enactment of SB 1.
24    A.  I think I mentioned earlier that elections in
25 Dallas needed a lot of work and -- and so when -- when

Page 298

1 evaluating where we needed to spend our time, I don't
2 think that the assistance piece was a high priority.
3   Q.  So is it fair to say -- and please correct me
4 if I'm wrong -- the first time that you really inquired
5 into voting assistance law in Texas was post the
6 enactment of SB 1?
7   A.  I think that's probably fair to say.
8   Q.  And so I want you to turn to the copy of SB 1
9 that Ms. Perales had given you.
10   A.  (Witness complies.)  Okay.
11   Q.  I, unfortunately, don't remember the exact
12 exhibit number, but I think it might have been 4.
13   A.  7.
14   Q.  Oh.  7?
15   A.  No.  I'm sorry.  It's -- no, that's not it.  4.
16   Q.  4.  And if you can please turn to Page 52 and
17 53, and it's specifically Section 6.04.
18   A.  Do you have a line number?
19   Q.  Yes.  The section starts on Line 20.
20   A.  Got it.
21   Q.  Okay.  And so this section relates to the oath,
22 correct?
23   A.  Yes.
24   Q.  Okay.  Now, let's look to Page 53, Line 2,
25 where it says:  "I will confine my assistance to reading

Page 299

1 the ballot to the voter, directing the voter to read the
2 ballot, marking the voter's ballot, or directing the
3 voter to mark the ballot."
4       Do you see that section?
5   A.  Yes.
6   Q.  Okay.  I believe you had testified to
7 Mrs. -- Ms. Perales that you interpreted this language
8 as limiting the assistor to the four actions stipulated;
9 is that correct?
10   A.  I believe I actually said that -- as she asked
11 further, I said that -- that you could read those four
12 confinements in a liberal way or a very conservative way
13 and that, depending on how -- the situation, you could
14 interpret it to be very broad or very narrow.
15   Q.  Okay.  Does Dallas County take the liberal
16 approach to this language?
17   A.  I would say that Dallas County has a policy
18 that we're always going to be as voter-friendly as
19 possible.
20   Q.  And do you know if the Secretary of State's
21 office, for example, also has a policy of being as
22 friendly to the voter as possible?
23   A.  I don't know.
24   Q.  Do you know if other counties have that policy
25 of being as friendly to the voter as possible?

Page 300

1   A.  I don't know.
2   Q.  But Dallas County does, correct?
3   A.  That's our general approach.
4   Q.  And when you're interpreting this particular
5 provision, how did you come to your interpretation?
6   A.  My general approach, my philosophy, if you
7 will, is to try to make voting as easy as possible, as
8 long as we're following the law.
9   Q.  So, in the case of, let's say, applying Section
10 6.04, would you contact Dallas County attorneys?
11   A.  If -- if posed with a question, we would
12 consult with our attorneys.  We would -- well, first off
13 we would check the law.
14   Q.  Uh-huh.
15   A.  We would check the elections advisories.  We
16 would consult with our attorneys, and we would consult
17 with the Secretary of State.
18   Q.  With respect to Section 6.04 and, specifically,
19 these provisions regarding the oath, have you had a need
20 to go to the county attorneys?
21   A.  No.
22   Q.  Have you had a need to go to the Secretary of
23 State's office?
24   A.  Not that I can recall.
25   Q.  Okay.  And would you agree with me that not

Page 301

1 every assistance provided to a voter actually falls
2 under the term "assistor" in the -- the context of Texas
3 election laws?
4   A.  I don't understand the question.
5   Q.  Let me give you an example.  So if I were to
6 come to the polling location with my grandmother --
7   A.  Uh-huh.
8   Q.  -- who's confined to a wheelchair --
9   A.  Uh-huh.
10   Q.  -- and I helped wheel her in into the
11 location --
12   A.  Uh-huh.
13   Q.  -- and then brought her to the polling site, to
14 the place where the polling machine is, but then I left
15 and she handled voting herself --
16   A.  Uh-huh.
17   Q.  -- would that constitute -- or would I be
18 constituted as an assistor?
19       MR. WHITE:  Objection, form.
20   A.  Well, I think that that -- keep in mind that
21 that is up to the presiding judge, to make that
22 interpretation.  They're the boss --
23   Q.  (By Ms. Hunker)  Okay.
24   A.  -- in the state of Texas.  I'm not.  If asked
25 by a presiding judge my opinion, my opinion would be

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                            Pages 302 to 305

Page 302

1 that that would not fall into the category of an
2 assistor.
3     Q.   Thank you.  And so when I was asking you the
4 question before, I was trying to get at that, but there
5 are actions that people might take to aid voters that
6 you would not necessarily characterize as voting
7 assistance under Texas Election Code?
8     A.   Yes.
9     Q.   You also spoke with Ms. Perales regarding how
10 bills work.
11        You had talked about that language that is
12 underlined is new text, correct?
13    A.   Yes.
14    Q.   And that language that is stricken -- I'm
15 sorry -- that has a line through it, has been stricken
16 from the statute; is that correct?
17    A.   Yes.  That's correct.
18    Q.   All right.  Bills only show the sections that
19 were changed; is that right?
20    A.   That's correct.
21    Q.   And so they don't show other provisions in the
22 Election Code; is that correct?
23    A.   Most of the time, yes.
24    Q.   And so you would have to consult with the
25 Election Code to see how they interact with the other

Page 303

1 provisions; is that right?
2     A.   Yes.  When we -- when we interpret a new bill,
3 we don't just look at the bill; we look at the Election
4 Code, itself.  In fact, what we have done is
5 incorporated strike and add language into a different
6 version where we see the full context, the full Election
7 Code, itself.
8     Q.   Okay.  And to continue with this line of
9 questioning, the bills also don't show any Court Opinion
10 that interprets the language?
11    A.   That's correct.
12    Q.   And so it's a very narrow snapshot of what
13 Texas law is; is that correct?
14    A.   That's correct.  Neither does -- it doesn't
15 show legislation.  I mean, we all know there's --
16 there's certain layers that you have to go through to --
17 to interpret legislation or their laws.
18    Q.   No objection there.
19    A.   Right.
20    Q.   So if we go to Page 52, Line 26.  And you see
21 where it says:  under the penalty of perjury?
22    A.   Yes.
23    Q.   Do you know whether assistors who took the,
24 oath prior to SB 1, were subject to perjury?
25    A.   I don't know.

Page 304

1     Q.   And would you agree with me that sometimes
2 statutes are clarifying a preexisting rule as opposed to
3 introducing a new rule?
4     A.   Sometimes they are codifying rules, yes.
5     Q.   And you had spoken that the eligibility
6 criteria is not included within this oath.
7        Do you remember that testimony with
8 Ms. Perales?
9     A.   Refresh my memory.
10    Q.   Let's turn the page to 53.
11    A.   (Witness complies.)
12    Q.   And so you see on Line 12 where it says:  "and
13 I understand that if assistance is provided to a voter
14 who is not eligible for assistance, the voter's ballot
15 may not be counted"?
16    A.   Yes.
17    Q.   During your conversation with Ms. Perales, she
18 had asked you whether or not the eligibility criteria
19 was included within this particular section, and you had
20 replied that it was not?
21    A.   That's correct.
22    Q.   Would you agree that the previous oath also did
23 not include eligibility criteria?
24    A.   Yes.
25    Q.   And would you agree with me that eligibility

Page 305

1 criteria could be listed in another provision of the
2 Texas Election Code?
3     A.   Absolutely.
4     Q.   Let's jump to Page 54, and let me know if you
5 need to refresh your recollection by rereading the
6 section.  But I'm particularly looking at Section 6.06,
7 Line 20.
8     A.   Okay.
9     Q.   And if you notice on Line 24, it says:
10 "compensates or offers to compensate another person for
11 assisting voters as provided by Section 86.010."
12    A.   (Witness moves head up and down.)
13    Q.   Do you see that on the --
14    A.   Yes.
15    Q.   And so this has to do with compensation for
16 assisting voters; is that correct?
17    A.   Yes.
18    Q.   Okay.  Do you remember speaking with
19 Ms. Perales about nonprofits assisting voters?
20    A.   Yes.
21    Q.   Okay.  And I believe you stated that you
22 thought the statute would apply to a nonprofit assisting
23 voters; is that correct?
24    A.   I believe so, if I'm -- if I'm remembering
25 correctly.  I don't remember the context of her

Page 306

1 question, but I remember the discussion about
2 nonprofits.
3     Q.   You do not enforce criminal laws as the Dallas
4 County Election Administrator; is that --
5     A.   That's --
6     Q.   -- correct?
7     A.   -- correct.
8     Q.   And so your office does not enforce this
9 particular provision; is that correct?
10     A.   That's correct.
11     Q.   And I don't believe the election judges enforce
12 this provision either, correct?
13     A.   That's correct.
14     Q.   And so this would be left to the Dallas County
15 DA's Office; is that --
16     A.   That's correct.
17     Q.   -- right?
18     A.   Correct.
19     Q.   And you're not aware of how they would
20 interpret this provision, correct?
21     A.   Correct.
22     Q.   And you wouldn't be aware if they have
23 contacted the Secretary of State's office to seek
24 clarification on how to interpret this provision; is
25 that correct?

Page 307

1     A.   That's correct.
2     Q.   And you wouldn't know if they contacted the
3 Office of Attorney General in order to seek
4 clarification on how to interpret this provision; is
5 that correct?
6     A.   I'm not aware of them contacting them.
7     Q.   And are you aware of the DA pursuing any
8 charges related to the specific provision against a
9 nonprofit?
10     A.   I'm not aware of any.
11     Q.   Thank you.  Let's jump to Page 60.
12 Specifically, I'm looking at the section that begins on
13 Line 15, which states:  "Unlawful solicitation and
14 Distribution of Application to Vote by Mail."
15         THE REPORTER:  I'm sorry.  Could you read
16 the very last few words again, please?
17         MS. HUNKER:  Of course.
18     Q.   Specifically, I am looking at Section -- on
19 Line 15 where it reads:  "Unlawful Solicitation and
20 Distribution of Application to Vote by Mail."
21         Do you see that?
22     A.   Yes.
23     Q.   If you need any time to reread the section,
24 please let me know.  Otherwise, I'm going to proceed
25 with asking some questions.

Page 308

1     A.   Go ahead.
2     Q.   Okay.  Do you know if voters need to use the
3 Dallas application -- sorry -- the application provided
4 by Dallas County to vote by mail?
5     A.   No.
6     Q.   And so a nonprofit can create their own
7 application form; is that correct?
8     A.   Yes.
9     Q.   And a voter can also create their own
10 application form, if needed; is that correct?
11     A.   Yes.
12     Q.   And so I believe you had spoken with Ms. --
13 Ms. Perales regarding nonprofits that used to come to
14 Dallas County and would take copies of the Dallas County
15 application; is that right?
16     A.   That's correct.
17     Q.   Okay.  These nonprofits have the option of
18 creating their own application; is that correct?
19     A.   That's correct -- correct.
20     Q.   You also discussed a little bit about your
21 confusion, for lack of a better term, about the
22 Legislature's decision to bar Election Administrators
23 from issuing the applications unsolicited as opposed to
24 private parties; is that right?
25     A.   I don't know if "confusion" is the right word.

Page 309

1 I think uncertainty about the language used and the
2 uncertainty of the meaning of their words.
3     Q.   Okay.  Have you checked the legislative record
4 to learn the Legislature's reasoning for permitting
5 private parties to distribute applications to vote by
6 mail and not election officials?
7     A.   No.
8     Q.   And so, therefore, you're not aware of any
9 incidence that would have instigated the change in the
10 provision; is that right?
11     A.   That's correct.
12     Q.   Under your conversation with Ms. Perales, she
13 had raised an incident regarding of Travis County Clerk,
14 Dana DeBeauvoir; is that right?
15     A.   Yes.
16     Q.   Okay.  And she had mentioned that the Office of
17 Attorney General had pursued an indictment against her;
18 is that correct?
19     A.   Yes.
20     Q.   Okay.  You do not know the reason for Office of
21 Attorney General to pursue the indictment, correct?
22     A.   No.
23     Q.   And you do not know what provision of the
24 Election Code that she would have violated; is that
25 right?

The Office of the Dallas County Elections Administrator

April 29, 2022
Pages 310 to 313

Page 310

1    A.  That's correct.
2    Q.  And you don't know if it was even about
3  applications to vote by mail?
4    A.  That's correct.
5    Q.  I am going to turn to what I believe is Exhibit
6  7, and this were the emails that were distributed to
7  myself and private Plaintiffs earlier this morning.  I
8  have mine on the laptop, but I believe you have a hard
9  copy in front of you.
10   A.  Okay.  Got it.  Exhibit 7?
11   Q.  Yes.  This is the emails?
12   A.  Yes.
13   Q.  And so this says an email dated Wednesday,
14  January 12th, 2022; is that correct?
15   A.  Yes.
16        MS. HUNKER:  The correct Bates number for
17  this?
18        MR. STOOL:  Number 7.
19        MS. HUNKER:  Yes.
20        MR. STOOL:  Uh-huh.
21   Q.  (By Ms. Hunker)  And so based on -- my -- the
22  form I have in front of me does not have a Bates number.
23  However, that was provided later.  And I believe the
24  Bates number is MS015753 for the first page and MS015754
25  on the second page, and that's just to clarify, for the

Page 311

1  record.
2    A.  (Witness moves head up and down.)
3    Q.  Now, this had to do with a conversation you had
4  with your staff on whether or not you could provide
5  return postage for both ballots and mail ballot
6  applications; is that correct?
7    A.  Yes.
8    Q.  And you -- I think in the bottom, it says:
9  (Reading)  Malissa, did the Secretary of State weigh in
10  on this at the conference?  Or were the new restrictions
11  only limited to solicitation aspects like providing
12  applications to those who did not ask for an
13  application?
14        Did I read that correctly?
15   A.  Yes.
16   Q.  Okay.  Did your office make a determination
17  that you were permitted to send return postage for
18  applications?
19   A.  I believe so.
20   Q.  Do you try to comply with state law in your
21  capacity as the Dallas County Election Administrator?
22   A.  Yes.
23   Q.  And do you try to comply with state law even
24  when it doesn't have a criminal penalty connected to it?
25   A.  Yes.

Page 312

1    Q.  And if you were uncertain of interpretation of
2  a provision, you would engage in this type of
3  conversation with your staff to try to ascertain the
4  meaning of a provision?
5    A.  Yes.
6    Q.  And so the discussion you had here was not very
7  different from any other conversation you would have
8  about a new provision of which you were uncertain?
9    A.  This is one of the many methods in which we
10  would communicate: orally, through email, through
11  TEAMS, through all sorts of communications, yes.
12   Q.  Okay.  I am going to shift our conversation to
13  talk about poll workers.
14   A.  Okay.
15   Q.  Were you aware of the rights of poll workers to
16  observe election activities prior to SB 1?
17   A.  Poll workers or poll watchers?
18   Q.  Sorry.  That is -- that is correct.  I make
19  this mistake very often when speaking, so my apologies.
20        Were you aware of the rights of poll watchers
21  to observe election activities prior to SB 1?
22   A.  Yes.
23   Q.  And were you aware of the rights of poll
24  watchers to move around the polling place prior to SB 1?
25   A.  Yes.

Page 313

1    Q.  And were you aware of the limits that election
2  judges had to obstruct the view of poll watchers prior
3  to SB 1?
4    A.  I don't know that that terminology was -- is
5  used any -- was used in the prior code, so I -- I don't
6  know if I agree with that statement.
7    Q.  Okay.  Do you know what authority election
8  judges had -- let me put it this way, then.
9        Do you know what the limits were for the right
10  of a poll watcher to observe an election activity?
11   A.  I bele-- -- I believe it was -- oh, gosh, I'd
12  have to look at the Election Code before SB 1, but I
13  believe it was something along the lines of, you know,
14  to maintain the orderly conduct-- -- conducting of
15  business at a polling place.
16   Q.  And so had you done a comparison of the
17  language between SB 1, these sections, versus prior to
18  SB 1?
19   A.  I'm sure I did at some point, yes.
20   Q.  Are you aware -- strike that.  Let me ask a
21  different question.
22        Is it your opinion that the rights of poll
23  workers to observe election activities changed post
24  SB 1?
25        MR. WHITE:  Objection, form.

Page 314

1    A.  There was -- let's put it this way.  As we
2  talked about this process, there were various iterations
3  of SB 1, some of which had more -- the line in the sand
4  was moving.  And we ended up with -- and so there was a
5  lot of concerns about some of that previous language.
6  And in the end, the language was better, but it was
7  still problematic.
8    Q.  (By Ms. Hunker)  Okay.  But you would view
9  SB 1 as -- let's -- looking in the context of the
10  legislation that was proposed --
11    A.  Uh-huh.
12    Q.  -- you would view the language in SB 1 as an
13  improvement from the predecessor bills?
14    A.  Yes.
15         MR. WHITE:  Objection, form.
16    Q.  (By Ms. Hunker)  Do you know if poll workers --
17  do you know if poll watchers reported irregularities
18  prior to SB 1?
19    A.  I have no specific knowledge of any complaints.
20  I know that -- well, I take that back.  I know that
21  there was ongoing litigation in Dallas County from years
22  ago with complaints from poll watchers, mostly in
23  central account rather than as opposed to at polling
24  places.
25    Q.  And do you know if they would -- if poll

Page 315

1  watchers would have reported irregularities that they
2  saw to the election judge that was on hand?
3    A.  I believe they would.
4    Q.  And so SB 1 didn't change that, to your
5  knowledge?
6    A.  No -- well, I know that our implementation of
7  SB 1, what we have done, is:  We've reached out to the
8  political parties to activists, et cetera, to try to
9  give them more avenues to report problems.  It can be to
10  the judge; it can be to what we call a VIP hotline,
11  which is given to the parties, poll watchers, et cetera,
12  for them to report those, as well as there's also
13  certain signage at a polling place that provides
14  different numbers to the Attorney General, Secretary of
15  States in Federal elections, another DOJ number, et
16  cetera.
17    Q.  So I just wanted to talk about the hotline
18  because this is the first time you've raised it.
19         If a poll watcher saw an irregularity --
20    A.  Uh-huh.
21    Q.  -- they would be able to call the hotline; is
22  that right?
23    A.  Correct.
24    Q.  And so there are other avenues besides
25  interrupting the election judge during the election --

Page 316

1    A.  Yes.
2    Q.  -- while voting is ongoing?
3    A.  Yeah.
4    Q.  And are you aware if any poll watcher utilized
5  the hotline this last election?
6    A.  I don't think so.  I'd have to check the
7  records, but not off the top of my head, I don't think
8  so.  Parties did, the parties.  You know, sometimes the
9  poll watchers talked to the parties, and the parties
10  talked to us.
11    Q.  So the parties utilized the hotline, but you're
12  not aware of any specific poll watcher that would have?
13    A.  Correct.
14    Q.  And it's possible that the parties contacted
15  the hotline in response to an observation of a poll
16  watcher?
17    A.  Correct.
18         MR. WHITE:  Objection, form.
19    Q.  (By Ms. Hunker)  I believe you had spoken to
20  Mr. -- Graham about a poll watcher standing close to the
21  voter while casting their ballot.
22         Do you remember that part of the --
23    A.  Yes.
24    Q.  -- conversation?
25         I believe you said that was prohibited; is that

Page 317

1  right?
2    A.  In my eyes, that would be prohibited.
3    Q.  And I believe you said that was not included in
4  SB 1; is that correct?
5    A.  I don't know that SB 1 provides guidance for
6  that situation.
7    Q.  My next question kind of connects to what you
8  just said.
9         Are you aware if that prohibition or the
10  restrictions would be in other provisions of the
11  Election Code that were not changed by SB 1?
12    A.  That -- it may be.  I don't know.
13    Q.  So you haven't looked to determine whether or
14  not there are other provisions in SB 1 -- sorry -- other
15  provisions in the election --
16    A.  I don't recall.
17    Q.  You don't recall.  And I want to turn to
18  Exhibit 9, which was the news article --
19    A.  Uh-huh.
20    Q.  -- specifically turning to Page 5.  So there's
21  a paragraph that reads:  "Scarpello also said some
22  election judges were afraid of being prosecuted under a
23  provision of the law related to partisan poll watchers."
24         Did I read that correctly?
25    A.  Yes.

The Office of the Dallas County Elections Administrator | April 29, 2022
Pages 318 to 321

Page 318

1    Q.  It then continues:  (Reading) "SB 1 makes it a
2  misdemeanor offense for a worker to" -- in quotation
3  marks -- "knowingly prevents a watcher from observing an
4  activity or procedure the person knows the watcher is
5  entitled to observe," end quote.
6       Did I read that correctly?
7    A.  Yes.
8    Q.  Okay.  My question is actually going to be
9  about -- actually, I'm going to ask a question about
10  that particularly.
11      What was your basis for this observation?
12    A.  I don't think that -- that's not a quote from
13  me.
14    Q.  Oh, it's not?
15    A.  No.
16    Q.  So the only statement attributed to you, then,
17  is the first sentence; is that right?
18    A.  Yes.
19    Q.  Okay.  And so we go to the next paragraph.  It
20  reads:  "Election judge Kris Farrell said some of her
21  colleagues had heard about an earlier bill consequences
22  for election workers."
23      Did I read that correctly?
24    A.  Yes.
25    Q.  And so she was in this case, it sounds like,

Page 319

1  talking about the predecessor bills; is that right?
2    A.  That's what it sounds like, yes.
3    Q.  Okay.  When you had mentioned that you thought
4  some of the election judges were afraid of being
5  prosecuted under a provision of the law, do you know if
6  they were basing it off of the old language that was not
7  included in SB 1, so the language that would have come
8  from the predecessor bills?
9    A.  I don't think I can get in the head of the
10  poll -- of the poll workers.
11    Q.  Okay.  So when you were talking, then, about
12  poll workers who chose not to become a poll worker --
13    A.  Uh-huh.
14    Q.  -- because of this provision SB 1, how, then,
15  did you know what their motivation was if you can't be
16  in the head of the poll worker?
17    A.  When I said couldn't get in -- be in the head,
18  I don't know which version of SB 1 that they were
19  worried about.  I know that they were worried about
20  being prosecuted.
21    Q.  Okay.  So you don't know if it was based on the
22  language that actually passed the Legislature versus the
23  language that was discussed in the immediate and
24  predecessor bills?
25    A.  I do not know.

Page 320

1    Q.  And if we continue to the -- not the next
2  paragraph, but the one after where it begins with
3  "Farrell."
4       Do you see that?
5    A.  Yes.
6    Q.  The last sentence reads:  "But long hours and
7  bad weather at the end of February also contributed to a
8  shortage of workers."
9       Is that your experience, as well, with respect
10  to the shortage?  You had -- let me take that back.
11      You had mentioned, during your testimony, there
12  were other factors that led to the shortage of poll
13  workers; is that correct?
14    A.  Yes.
15    Q.  Okay.  Were long hours and bad weather part of
16  those factors?
17    A.  Well, I can't -- I can't get in the head of
18  this writer, the person who wrote this article.  So I'm
19  not sure where that -- that particular information came
20  from.  I can tell you that "long hours," he may be
21  referring to the fact that poll workers work long hours
22  and that they -- you know, it's a grueling 15-, 16-hour
23  day and that -- that, certainly, has an effect.
24      As far as the bad weather, the bad weather,
25  having to do with our election, is that we lost three

Page 321

1  days of preparation because of ice days.  And so that
2  affected the recruitment, the paperwork involved in --
3  in obtaining and retaining poll workers.
4    Q.  The next sentence -- sorry -- next paragraph
5  reads:  "Plus, there was a lack of familiar faces -- the
6  people who poll workers used to call directly to ask for
7  help or clarification."
8       Did I read that correctly?
9    A.  Yes.
10    Q.  And then it continues:  (Reading) There was a
11  new TEAM at the elections department.  There was a new
12  TEAM at the Democratic office.  There was a new TEAM at
13  the Republican office, Farrell said.  These were not
14  people that you knew.  You didn't have a relationship
15  with them.
16      Did I read that correctly?
17    A.  Yes.
18    Q.  To your knowledge, was there, in fact, new
19  TEAMS at the elections department?
20    A.  There is -- yes.  The Voting Sites Manager, who
21  was here until September of last year, she became the
22  Elections Administrator for a different county.  And so
23  there was a new -- and then there was a couple of
24  retirements out of that department, so there was new --
25  new people within that department.

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                           Pages 322 to 325

Page 322

1    Q.   And you may not know this, but are you aware if
2  there was a new TEAM at the Democratic Party office?
3    A.   There's a new Republican Party Chair and a new
4  Democratic Party Chair.
5    Q.   And so poll workers would have been interacting
6  with new individuals as opposed to established faces; is
7  that correct?
8    A.   Yes.
9    Q.   And based on your conversations with poll
10 workers in Dallas County or, perhaps, the individuals
11 who were recruiting and training poll workers, do you
12 know if this was a concern expressed by any poll
13 workers?
14   A.   What's "this"?
15   Q.   "This" was just referring to the fact that they
16 were new faces, and they wouldn't be interacting with
17 established personnel.
18   A.   I don't recall that being an issue.
19   Q.   Okay.  We can put this aside.
20        THE REPORTER:  And if you're at a breaking
21 point, I really need a break.  I'm sorry --
22        MS. HUNKER:  Yeah, we can take --
23        THE REPORTER:  -- but we've been going for
24 a good while.
25        MS. HUNKER:  -- a five-minute break --

Page 323

1         THE REPORTER:  Thank you.
2         MS. HUNKER:  -- or a ten-minute break.
3         THE WITNESS:  Okay.
4         THE VIDEOGRAPHER:  We're going off the
5  record.  The time is 7:43 p.m.
6         (Break taken.)
7         THE VIDEOGRAPHER:  We're back on the
8  record.  The time is 7:50 p.m.
9    Q.   (By Ms. Hunker)  Mr. Scarpello, before the
10 break, we were talking about poll watchers.
11 Specifically, we were looking at a news article that was
12 talking about possible poll worker shortage.
13        Do you remember that part of the con- --
14   A.   Yes.
15   Q.   -- -versation?
16        So that was in reference to the March primary
17 in 2022, correct?
18   A.   Correct.
19   Q.   So we are actually in Early Voting for the May
20 7th election; is that correct?
21   A.   That's correct.
22   Q.   Is there still a poll worker shortage in
23 Dallas?
24   A.   We're very worried about a poll worker shortage
25 for the May 7th and May 24th election for various

Page 324

1  reasons, including the fact that it's a Saturday in May
2  and the day before Mother's Day and that -- Texas
3  still -- or Dallas still has an extraordinarily high
4  number of polling places compared to other jurisdictions
5  and -- and because of SB 1.
6    Q.   Okay.  And have you had to close polling
7  locations for the May 7th election?
8    A.   We went to Commissioners Court, and we talked
9  about the issues with poll workers.  And we brought to
10 them several suggestions on what we might be able to do
11 about that, including increasing poll worker pay, which
12 we did, about recruiting more -- you know, that rather
13 than relying solely on the parties to recruit poll
14 workers, for our elections office to recruit poll
15 workers, which we -- we started to do.
16        We've talked about using county workers more
17 aggressively, adding some financial incentive to use
18 county poll workers as backup poll workers, which we're
19 doing.  And then we talked about reducing the number of
20 polling places because Dallas has so many compared to
21 other jurisdictions of similar size.
22        And -- and so we -- we got together with our
23 Citizen Election Advisory Committee, our Vote Center
24 Advisory Committee, and we got a consensus amongst all
25 those organizations to reduce the number by -- of

Page 325

1  polling places by 40.  Having said that, we still have
2  an extraordinarily high number of polling places for an
3  election of this predict- -- projected turnout, so we're
4  still concerned.
5    Q.   And was this also in relation to the transfer
6  to countywide polling places?  If you need me to provide
7  some foundation, I'm happy to do so.
8    A.   Could you, please?
9    Q.   So when Mr. Lopez was testifying, he was
10 explaining that, in 2019, Dallas County started
11 countywide polling locations on Election Day.
12   A.   Correct.
13   Q.   He also said that, attendant to that decision,
14 Dallas County intended to reduce, on Election Day,
15 polling locations at certain precincts and rely instead
16 on the ability of individuals to vote wherever they were
17 in the county.
18   A.   Texas law allows a county that moves from
19 precinct polling places to countywide polling places,
20 otherwise known as vote centers, to reduce the number of
21 locations because that's kind of the intent of vote
22 centers.  You have less locations, but better quality,
23 larger locations.
24        In 2019, Dallas County chose not to reduce the
25 simply -- every location that was a precinct polling

The Office of the Dallas County Elections Administrator

April 29, 2022
Pages 326 to 329

Page 326

1 place, they made a countywide vote center. In fact,
2 they increased the number. Instead of just having the
3 same number, they had even more, which led to too
4 many -- too many vote centers. And so that's why we're
5 where we're at today with this very large number of vote
6 centers because, like I said in my earlier testimony,
7 after that two-year period from 2019 to 2021, we tried
8 to reform the Vote Center Advisory Committee and to
9 bring a new proposal to study the use of vote centers
10 and either keep the number the same, increase the number
11 or decrease the number.
12      It -- we were going to go where the facts led
13 us and where the Vote Center Advisory Committee led us.
14 But unfortunately, we never got that committee together
15 because the county chose not to because we're in the
16 middle of redistricting.
17   Q.   Okay. And so are you not reducing, for
18 November 2022, the number of vote centers on Election
19 Day?
20   A.   We have no plans to reduce for November. The
21 proposal that was passed by Commissioners Court recently
22 was to reduce by 40 for the May elections only.
23   Q.   Do you know if you usually have a harder time
24 recruiting poll workers for the May election than you
25 would for a November election?

Page 327

1   A.   Recruiting poll workers usually mirrors -- the
2 interest in being a poll worker usually mirrors the
3 interest in participation of an election. So a
4 Presidential election, a lot of voters, a lot of poll
5 workers. A May election in -- in -- on a Saturday, not
6 a lot of voters, not a lot of poll workers.
7   Q.   And are you aware if the May local tends to
8 have the lowest interest of voters compared to the other
9 elections held?
10   A.   I'd have to kind of consult the -- the history,
11 but I -- generally speaking, yes, the May joint
12 election; or the May 24th election, for instance, the
13 joint runoff election for the primary, that's going to
14 be extraordinarily low turnout.
15   Q.   So the May 7th election has low interest for
16 individuals becoming a poll worker, is that correct,
17 lower?
18   A.   Yes, lower than -- than, say, the primary,
19 which would be lower than a general.
20   Q.   And the same is true of the primary runoff;
21 there will be a lower interest in becoming a poll worker
22 for the May 20 -- May runoff in '24?
23   A.   That's correct.
24   Q.   Do you remember your conversation with
25 OCA-Greater Houston's Counsel? She was the individual

Page 328

1 who was on -- on the Zoom call --
2   A.   Yes.
3   Q.   -- where --
4   A.   Okay. Yes.
5   Q.   Where she had asked you if everyone who
6 successfully applied to vote by mail was registered to
7 vote. Do you remember that?
8   A.   Yes.
9   Q.   And do you remember you had said "yes"?
10   A.   Yes.
11   Q.   That assumes it was the voter who submitted the
12 application; is that correct?
13   A.   Yes.
14   Q.   You also had discussed drive-thru voting
15 earlier in your testimony.
16      Do you remember that?
17   A.   Yes.
18   Q.   And you said you would have pursued drive-thru
19 voting --
20   A.   (Witness moves head up and down.)
21   Q.   -- the option, but for SB 1; is that correct?
22   A.   Correct.
23   Q.   How far had you gotten into looking at
24 drive-thru voting before the enactment of SB 1?
25   A.   Not too far because we had heard rumblings in

Page 329

1 the Legislature that they were going to get rid of
2 drive-thru voting.
3   Q.   Had you looked at the logistics of drive-thru
4 voting?
5   A.   Not necessarily, no.
6   Q.   And did you inquire into the logistics of how
7 Harris County implemented their drive-thru voting
8 turnout?
9   A.   I read about it. I didn't talk to anyone
10 firsthand in Harris.
11   Q.   Did you inquire about any irregularities that
12 occurred in Harris County related to drive-thru voting?
13   A.   No.
14   Q.   And did you -- did you inquire about any
15 possible vote discrepancies that occurred during
16 drive-thru voting?
17   A.   I don't imagine -- I'm trying to imagine why
18 there would be any vote discrepancies. Drive-thru
19 voting is no different than -- you're just sitting in
20 your car instead of standing up, walking into a
21 building. So that -- that wouldn't be at the top of my
22 list of -- the logistics, of course, are the bigger
23 concern.
24   Q.   Okay. So you wouldn't know about any vote
25 discrepancies that would have occurred in Harris County

Page 330

1 in relation to --
2    A.  No.
3    Q.  -- drive-thru voting?
4        And you hadn't troubleshooted whether or not
5 there would be difficulties in implementing it through
6 logistics with drive-thru voting?
7    A.  We had not gotten that deep into it, no.
8    Q.  You also had discussed communications that your
9 office had received from voters about drive-thru voting.
10       Do you remember this part of your testimony?
11   A.  Yes.
12   Q.  And I believe you said voters had questions
13 about drive-thru voting.
14   A.  That's my memory, is that people were asking:
15 If Harris is doing it, how come Dallas is not doing it?
16   Q.  You were not in Dallas County at the time this
17 occurred, correct?
18   A.  That's correct.
19   Q.  And so you would have only heard about these
20 conversations second-hand; is that right?
21   A.  That's correct.
22   Q.  And this would have been months after those
23 conversations took place, correct?
24   A.  That's correct.
25       MS. HUNKER:  I do not believe I have

Page 331

1 anymore questions for you.
2        MR. WHITE:  I have no further questions.
3        MR. STOOL:  I have no questions.
4        MS. HUNKER:  Does anybody on the Zoom call
5 have anymore questions for the witness?
6        MS. CAI:  None here.  Thank you.
7        MS. BENDER:  No.  Thank you.
8        THE REPORTER:  Let's see.  And which order
9 was that in just now for the --
10       MS. CAI:  That was Ms. Cai followed by
11 Brady.
12       THE REPORTER:  You were first and then
13 Ms. Brady?
14       MS. CAI:  Yeah.
15       THE REPORTER:  Okay.  Thank you.
16       THE VIDEOGRAPHER:  Okay.  We're going off
17 the record.  The time is 8:00 o'clock p.m.
18       (Discussion off the record.)
19       THE VIDEOGRAPHER:  Okay.  We're on record
20 at 8:02 p.m.
21       THE REPORTER:  Okay.  Would Counsel please
22 state any stipulations about custody of the original,
23 the exhibits or any other pertinent matters, on the
24 record?
25       MR. STOOL:  Opportunity to review and

Page 332

1 sign.
2        THE REPORTER:  Okay.  Thank you.  That's
3 all.
4        THE VIDEOGRAPHER:  Okay.  We're going off
5 record at 8:02 p.m.
6
7        (Deposition concluded at 8:02 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 333

1                  CORRIGENDUM
2 WITNESS NAME:  RIVELINO LOPEZ          4/29/22
3 PAGE  LINE  CHANGE              REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                 Pages 334 to 337

Page 334

1      I, RIVELINO LOPEZ, have read the foregoing
2 deposition and hereby affix my signature that same is
3 true and correct, except as noted above.
4
5
       _____
6          RIVELINO LOPEZ
7
8 THE STATE OF TEXAS        )
9 COUNTY OF _____)
10
       Before me, _____, on
11 this day personally appeared RIVELINO LOPEZ, known to me
   (or proved to me under oath or through _____
12 _____) (description of identity
   card or other document) to be the person whose name is
13 subscribed to the foregoing instrument and acknowledged
   to me that they executed the same for the purposes and
14 consideration therein expressed.
15    Given under my hand and seal of office, this _____
   day of _____, 2022.
16
17
       _____
18      NOTARY PUBLIC IN AND FOR
       THE STATE OF _____
19
20 My commision expires: _____
21
22
23
24
25

Page 335

1            CORRIGENDUM
2 WITNESS NAME: TACOMA PHILLIPS          4/29/22
3 PAGE  LINE  CHANGE          REASON
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 336

1      I, TACOMA PHILLIPS, have read the foregoing
2 deposition and hereby affix my signature that same is
3 true and correct, except as noted above.
4
5
       _____
6          TACOMA PHILLIPS
7
8 THE STATE OF TEXAS        )
9 COUNTY OF _____)
10
       Before me, _____, on
11 this day personally appeared TACOMA PHILLIPS, known to
   me (or proved to me under oath or through
12 _____
   (description of identity card or other document) to be
13 the person whose name is subscribed to the foregoing
   instrument and acknowledged to me that they executed the
14 same for the purposes and consideration therein
   expressed.
15
       Given under my hand and seal of office, this _____
16 day of _____, 2022.
17
18
       _____
19      NOTARY PUBLIC IN AND FOR
       THE STATE OF _____
20
   My commision expires: _____
21
22
23
24
25

Page 337

1
2              CORRIGENDUM
3 WITNESS NAME:  MICHAEL SCARPELLO          4/29/22
4 PAGE    LINE    CHANGE              REASON
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

The Office of the Dallas County Elections Administrator
April 29, 2022
Pages 338 to 341

## Page 338

```
1   _____
2         I, MICHAEL SCARPELLO, have read the foregoing
3   deposition and hereby affix my signature that same is
4   true and correct, except as noted above.
5
6
7                         MICHAEL SCARPELLO
8
9   THE STATE OF TEXAS          )
10  COUNTY OF _____)
11
        Before me, _____, on
12  this day personally appeared MICHAEL SCARPELLO, known to
    me (or proved to me under oath or through
13  _____)
    (description of identity card or other document) to be
14  the person whose name is subscribed to the foregoing
    instrument and acknowledged to me that they executed the
15  same for the purposes and consideration therein
    expressed.
16
        Given under my hand and seal of office, this _____
17  day of _____, 2022.
18
19  _____
                        NOTARY PUBLIC IN AND FOR
20                      THE STATE OF _____
21
    My commision expires:  _____
22
23
24
25
```

## Page 339

```
1
2
                    REPORTER'S_CERTIFICATION
                    _____  _____
3
                    UNITED STATES DISTRICT COURT
4                   WESTERN DISTRICT OF TEXAS
                        SAN ANTONIO DIVISION
5
    LA UNION DEL PUEBLO ENTERO,)(
6   ET AL.,                    )(
                               )(
7      PLAINTIFFS,             )(
                               )(   CIVIL ACTION
8   VS.                        )(   NO. SA-21-CV-00844-XR
                               )(
9   GREGORY W. ABBOTT, ET AL., )(
                               )(
10     DEFENDANTS.             )(
11  ---------------------------------------------------
12
13
14
15      ORAL DEPOSITION OF RIVELINO LOPEZ,
16    TACOMA PHILLIPS AND MICHAEL SCARPELLO
17              APRIL 29, 2022
18
19
20      I, Holly R. Swinford, Certified Shorthand
21  Reporter in and for the State of Texas, do hereby
22  certify to the following:
23      That the witnesses, Rivelino Lopez, Tacoma
24  Phillips and Michael Scarpello, were by me duly sworn
25  and that the transcript of the oral deposition is a true
```

## Page 340

```
1   record of the testimony given by the witnesses.
2       I further certify that pursuant to Federal
3   Rules of Civil Procedure, Rule 30(e)(1)(A) and (B) as
4   well as Rule 30(e)(2), that review of the transcript and
5   signature of the deponent:
6       _____ was requested by the deponent and/or a
7   party before completion of the deposition.
8       _____ was not requested by the deponent and/or
9   a party before the completion of the deposition.
10      I further certify that I am neither attorney or
11  counsel for, nor related to or employed by any of the
12  parties to the action in which this deposition is taken
13  and further that I am not a relative or employee of any
14  attorney of record in this cause, nor am I financially
15  or otherwise interested in the outcome of the action.
16      The amount of time used by each party at the
17  deposition is as follows.
18
19  1.   MS. NINA PERALES
         TIME:  04:16
20  2.   MR. GRAHAM W. WHITE
         TIME:  00:37
21  3.   MS. KATHLEEN HUNKER
         TIME:  01:23
22  4.   BEN L. STOOL
         TIME:  00:00
23  5.   MS. BRADY BENDER
         TIME:  00:06
24  6.   MS. SOPHIA CAI
         TIME:  00:24
25  7.   MS. JACQUELINE VILLAREAL
```

## Page 341

```
1       TIME:  00:00
2       Subscribed and sworn to on the _____ day
3   of May, 2022.
4
5   _____
6   Holly R. Swinford
    Texas CSR 3356
7   Expiration:  2/1/2024
    Magna Legal Services
8   Firm Registration No. 633
    16414 San Pedro Ave., Suite 900
9   San Antonio, Texas  78232
    (866) 672-7880
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

The Office of the Dallas County Elections Administrator

**$**

**$87,000** 293:3

**-**

**-cation** 89:6

**-jection** 55:17

**-tion** 52:14

**-versation** 323:15

**1**

**1** 5:8 11:3 18:18,19 19:3 63:23 73:16, 19 74:13,14 82:6 83:1 85:24 88:10, 12,17 89:13,19,21 92:22 101:20,21 105:25 106:13,23 107:4,5 108:11 111:10,14 113:6,10 125:19 126:16, 21 127:3,11,21 128:6,25 131:4 140:8,15,16 142:3,22 144:9 147:25 148:11,15,19 151:3,13 152:12,15,21 156:22 157:12,13,18 161:24 162:5, 11,16 163:1,3,11,16,18 164:6,21 165:19 168:2 169:1,5,8,16 183:4,5 187:1,8 188:2,4 201:12,15,24 202:10 203:10,25 204:11,22 205:7, 12 208:5,13,20 217:13 218:12 219:7,12 220:15 224:5,7 225:12 231:5 233:7,18 234:21 235:6,9 236:25 238:25 239:13,22 240:3,8 241:25 244:2,8,18 245:1,5,13,23 246:2,6,20 248:9,21,25 254:10,12 255:2,4,12,21,25 257:6,18 259:21 260:8 264:15 273:8 274:5 277:2,16 279:17 281:5 282:24 283:22 284:5, 23 285:14 290:9 292:3,18,22 297:12,23 298:6,8 303:24 312:16, 21,24 313:3,12,17,18,24 314:3,9,12, 18 315:4,7 317:4,5,11,14 318:1 319:7,14,18 324:5 328:21,24

**1's** 113:3 141:11 148:24 254:7 256:5 257:1 279:5

**1-related** 107:10

**1.4** 22:21

**1/6** 4:4

**10** 2:10 4:7

**10,270** 64:16

**10:00** 30:8,9,14,18,21 31:3,10,17 41:8,23 42:6 47:1 64:5,9 65:4,17

**10:47** 1:18 6:5

**11** 20:25

**110** 2:5

**11:29** 39:20

**11:33** 39:23

**11:53** 59:2

**12** 5:11 19:15,16 63:24 64:10,13 65:16 66:21 74:2,4 149:14 188:8 205:11 257:23 304:12

**12548** 3:5

**12:00** 29:11,23

**12:06** 59:6

**12:16** 67:24

**12:19** 68:2

**12th** 234:19 310:14

**13** 207:20

**149** 4:13

**15** 229:15 257:23 307:13,19

**15-** 320:22

**154** 4:14

**16-hour** 320:22

**160** 4:14

**179** 4:15

**18** 5:4 226:9

**18,101** 64:14

**182** 4:15

**184** 4:17

**19** 5:6 223:15

**1991** 190:1

**1995** 190:2

**1998** 76:23 77:1 78:22

**1st** 28:24 127:17

**2**

**2** 5:5 19:20,21,24 63:23 74:8,13,14 188:17,19 204:7 220:19 237:2 250:3

266:25 298:24

**2-3** 4:3

**20** 49:24 81:19 108:7 202:17 224:16 262:3 270:2 298:19 305:7 327:22

**20-** 88:9

**200** 16:22

**20002** 2:10

**2001** 222:15

**2014** 18:5 64:2 67:10 76:6

**2018** 5:7 18:5 26:12,14,20 29:7 33:16 37:1 48:17 49:4,21 50:3 59:19,21 60:6 61:16 64:2 67:10 80:8,15 81:17,22

**2019** 27:10 28:17 47:24 48:10 50:8 287:17 325:10,24 326:7

**202** 5:8

**202 353-5373** 3:13

**202 968-4507** 2:11

**2020** 29:15,25 30:5 34:8,9 35:14 47:17,20 48:5,19 49:7,10,17,24 60:9,15 81:17,18,20 82:1,11,22 117:2 189:18 190:13,17 193:17 196:1 237:17 247:20 255:18 274:25 275:1 277:24 280:1,2 296:3

**2021** 5:10 35:12,13,14,19,21 76:7 81:13 82:11,22 127:20 170:17 239:15 286:15 326:7

**2022** 1:11,18 5:11 6:4 18:4 28:25 29:4 30:3,15 32:12 33:2 34:22 35:11 41:8 45:20 48:9 49:3,9,16,23 50:2 60:12 64:2,12,14 65:3,12,16 66:24 77:9 81:9 83:2 91:18,20 92:1 105:13 106:25 107:5 112:5 125:19 127:17 142:12 144:9 153:4 154:7 172:11 208:13 248:9 268:19 269:20 270:4, 10,20 273:5 292:25 297:7 310:14 323:17 326:18 334:15 336:16

**20530** 3:12

**206** 2:6

**207** 5:8,9

**21** 35:16

**210 224-5476** 2:6

**2100** 2:15

**214 653-7358** 2:24

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                           Index: 22..78711

**22** 18:5 144:18 153:17 202:16
275:11

**228** 35:14

**22nd** 26:1,9

**232** 5:10

**24** 77:9 147:2,5 305:9 327:22

**24-hour** 47:16

**249** 5:10

**24th** 296:21 323:25 327:12

**25** 230:25 231:3 260:12,16

**254** 4:17

**25th** 30:12,15 31:3 41:8 42:20,23
43:2 45:20 46:13,22 66:24

**26** 203:23 236:20 303:20

**263** 5:12

**26th** 145:8

**27** 223:16 257:21

**28** 258:22

**282** 4:18

**29** 1:11

**295** 4:18

**29th** 1:17 6:4

**2:02** 149:11

**2:12** 149:14

**2:13** 150:14

**2:15** 150:17

**2:43** 175:22

**2:58** 175:25

---

**3**

**3** 5:7 59:4 61:5,8 66:11,12 74:13,14
212:18 258:23 260:12

**30** 6:21 53:11

**30(b)** 10:8

**30(b)(6)** 5:4 7:8 73:21 189:3

**300** 2:5

**31.129** 236:21

**333/334** 4:20

**335/336** 4:20

**337/338** 4:21

**339** 4:22

**3550** 3:6

**3:07** 184:10

---

**4**

**4** 5:8 91:8 202:5,6,10 215:18 278:17
298:12,15,16

**4,335** 35:15

**4/29/22** 333:2 335:2

**40** 325:1 326:22

**41** 4:8

**45** 4:8

**455** 2:15

**4:17** 184:13

**4:30** 106:18

---

**5**

**5** 4:5 204:20 207:3,4,12,16 258:23
264:6,9 317:20

**50** 8:8 223:13

**500** 1:22 2:23

**512 936-2275** 3:7

**52** 202:14 220:17 298:16 303:20

**53** 298:17,24 304:10

**54** 4:9 224:14,16,24 225:13,25 305:4

**55** 226:8

**57** 4:9

**58** 226:22

**59** 4:10 5:7 226:23 227:1

**5:00** 29:10,20 30:6

**5:53** 249:13

---

**6**

**6** 4:6 5:7,9 59:21 207:5,7,13 208:8
209:1 278:22

**6.01** 223:15

**6.04** 202:17 298:17 300:10,18

**6.06** 224:16 305:6

**60** 229:15 307:11

**600** 2:10

**61** 4:10

**62** 236:18

**628 267-6835** 2:16

**6300** 2:23

**64.031** 251:23

**64.034** 202:21

**65** 80:20 83:8 111:7,18 112:12
167:17,19 178:24 181:2,7,10,12
182:9,14,23 231:2

**66** 4:11

**68** 4:12

**69** 4:13

**6:00** 29:11,23

**6:08** 249:17

**6:48** 281:12

**6:49** 281:15

**6:51** 283:12

**6:52** 283:15

**6th** 61:15

---

**7**

**7** 5:10 144:22,23 145:2,3,24 205:7
226:24 227:18 232:1,2,3 260:12
298:13,14 310:6,10,18

**7.04** 226:22

**70,000** 24:8,16

**71** 263:9 266:16

**731,576** 63:8

**752** 35:12

**75202** 2:23

**78205** 2:5

**78539** 3:19

**78711** 3:6

---

The Office of the Dallas County Elections Administrator

**7:00** 29:10,11,19,20 30:7 41:18,19, 20 46:25

**7:08** 295:6

**7:09** 295:9

**7:43** 323:5

**7:50** 323:8

**7th** 1:22 171:25 172:8,11 173:22,25 174:11,20 176:7,20 177:3,6,17 178:15 248:5 255:18 275:1,2 296:3, 14,18 323:20,25 324:7 327:15

**7Y11** 1:22

**8**

**8** 249:15,19

**80** 262:2

**86.010** 305:11

**88** 35:14

**8:00** 29:9,19 30:6 106:18 331:17

**8:02** 1:18 331:20 332:5,7

**8th** 173:11

**9**

**9** 5:11 19:10 188:8 207:20 263:13,14, 16,23 317:18

**94105-2453** 2:16

**956 292-7609** 3:19

**97** 24:23

**97.13** 24:11

**99.46** 24:5

**9:53** 8:25 9:1

**A**

**a.m.** 1:18 6:5 9:1 39:20,23 59:2

**ABB-** 151:19

**ABBM** 13:23 70:19,24 87:12 90:3,9 92:24 93:5,16,21,24 94:1 95:20 96:14 97:9,11,13,19,22 98:5,21,23 100:16 101:1,3,24 102:8,10,13 103:11,21,25 107:2 108:10,21 109:11,21 110:12,15 112:2 114:20

115:2,4 119:12,14,19 121:20 138:13 142:10,15 145:5,6 150:25 151:12, 15,18,19 152:13,16 168:19 171:14, 20 181:14

**ABBMS** 90:1 95:18,19 99:1 101:12 104:1 105:14 113:10 129:24,25 142:14 145:3 155:23 172:22

**Abbott** 1:6 244:25

**ability** 7:22 285:11 325:16

**above-styled** 1:17

**abreast** 252:24

**absent** 111:11 112:12

**absent-** 105:23

**absentee** 105:23,24 115:23 139:19

**Absolutely** 249:2 278:5 305:3

**accept** 153:7,17,24 154:9 226:2 258:17,18 294:19

**accepted** 135:12 137:16 170:24 216:6

**accepting** 81:1,4 224:20 225:4

**access** 135:17 136:8,16 138:6,10, 17 141:2 271:15 272:19,22 287:9

**accessibility** 287:24

**accessible** 277:20 278:3 287:1

**accommodate** 161:9

**accommodation** 157:24 158:4,11, 19,22,23 160:24 161:5,10 290:18

**accommodations** 159:8 288:2

**account** 128:3 314:23

**accounts** 156:3 191:5

**accurate** 175:15

**accurately** 11:23 12:1 70:9 186:12

**accustomed** 178:16 179:18

**acknowledged** 334:13 336:13

**act** 61:19 72:13 216:16 230:2 285:21

**acting** 46:2

**action** 1:5 46:1 91:5,7

**actions** 209:9 213:15 214:24 215:21 216:3 237:22 299:8 302:5

**activists** 315:8

**activities** 218:10 259:4,9 261:23,24 312:16,21 313:23

**activity** 225:6 264:17 313:10 318:4

**acts** 204:18 215:14

**actual** 32:1 51:22 86:5 239:6

**ADA** 61:17,18,23 62:2,5,12 160:23 285:21 286:1,3,19 287:8,11

**add** 22:15 107:15 193:11 267:17,20 274:9 303:5

**added** 107:18 203:2 204:8 256:17

**adding** 203:10 324:17

**addition** 252:23

**additional** 7:17 8:6 10:13 25:24 31:4 47:10 67:2 157:13 160:18 205:1 218:13 219:23 221:18 295:24

**address** 7:5 22:16 33:1 100:11 101:4,5 135:22 151:11 166:10 167:1,9,10,20 258:14 273:12 285:1, 2

**adds** 157:13,18 203:25 204:11 205:7,12

**adjusted** 149:24

**adjustments** 30:5

**Adkins** 244:1,11,18

**administering** 193:18

**administration** 193:12,25 196:11 272:14

**administrative** 280:19

**administrator** 1:21 5:4 23:1 78:6,8, 21,25 190:10,15 193:22 197:3 237:16,21,23,24 238:11 241:12 253:9 274:8,10 289:4 297:8 306:4 311:21 321:22

**Administrator's** 47:6 176:13 274:24

**Administrators** 47:7 240:22 241:2 244:17 308:22

**adopt** 258:13

**ads** 293:6

**advertised** 30:19

**advice** 110:5,21 136:15 213:7,9

**advise** 109:19,22 110:13 135:3 274:10,13,16,17 292:22

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: advised..as-

advised 136:23

advising 280:25 293:17

advisories 128:8 218:24 235:2 291:10 300:15

advisory 51:1 234:21 243:8,13 244:17 245:21 259:16,18 286:17 324:23,24 326:8,13

affected 106:23 321:2

affix 334:2 336:2

afforded 31:3

afoul 230:10

afraid 264:11,23 317:22 319:4

African-american 194:10

afternoon 68:5 184:25 185:1

age 83:8 111:7 178:25 181:2

aggressively 277:17 324:17

Agilis 86:8 191:22

agree 6:24 7:2 12:16 89:21 106:24 194:6,9,12 197:19,23 198:3,21 199:15,25 200:5,19,25 201:6 203:9 204:11,17,20 205:6,11,17 212:5,12, 20 214:22 215:13,20 216:2,16 220:24 221:17,21 224:23 225:3 226:14,15 227:3,14 228:13,17,23 235:21 262:17,22 300:25 304:1,22, 25 313:6

agreed 6:20

agreements 6:19 10:10,14

agrees 6:25

ahead 53:15 70:16 73:15 84:8 91:5 110:16 134:1 154:20 308:1

aid 161:18 302:5

aiming 37:3 214:1

alarmed 211:1

allotment 293:3

allowed 196:10 201:24 235:22 259:12 261:10,11 275:24 288:13 289:23

allowing 277:21

aloud 264:10 278:20

alternate 194:20 210:13 266:18

alternative 279:15,20

Amended 5:3 73:20

America's 61:18

American 11:1 185:9

Americans 285:21

amount 48:21 104:22 254:14 257:3 270:18

analysis 252:24

Analyst 250:14

announced 57:25

annual 14:3 70:23,25 85:10,13 111:18 178:24 179:4,11

answering 12:1,14 47:4 74:21 104:22 105:13 120:12 173:9 176:6, 11 204:24 209:6

answers 12:16 20:19

anticipate 142:13 143:5,10 144:15 249:3

anticipating 144:11

Antonio 1:2 2:5

anxious 220:14

anymore 28:7 331:1,5

Anytime 37:6

apologies 312:19

app- 181:17

Apparently 236:16

appearance 17:14 171:20 183:14

appearances 4:3 6:5

appeared 153:5 270:10 334:11 336:11

appearing 2:3,8,13,18 3:3,9,14 281:19

appears 67:10 226:20 278:21

applauded 277:24

appli- 90:17

appliances 79:24

applica- 91:2

application 13:24 14:2,4 33:5 70:20 71:1 80:10,16,21 83:3,16 84:2,8,14, 16 85:2,3,8,20,22 87:12 89:22 90:3,

10 93:9,10 97:5 98:21 99:20 100:12, 15 101:3,6,25 102:11 103:11,13,19, 21,25 108:18 109:22 110:15 115:24 116:3 121:21 122:9,11,16 123:21,25 130:9,14 131:20,21 132:25 133:6 135:12 137:13,18,23 138:7 139:10, 21 140:24 145:18 147:10 151:2,9,20 155:20 158:15,17 159:5,6 166:4 167:16 168:15,20 170:24 171:9,14 172:3 175:9 177:24 178:19 179:5,11 181:21 182:21,25 183:2,3,6,24 229:17,21 230:18 231:7,11,18 232:25 233:11 234:9 236:5 249:5 282:20 284:5 285:10 291:22 294:14 307:14,20 308:3,7,10,15,18 311:13 328:12

application's 84:10

applications 32:12 70:22 81:1,8, 16,25 82:10,15,21 92:1,6,7,12,21,23 95:2,9 96:19 100:24 101:19 103:23 113:2,22 145:5,6,11 147:1,5 156:9, 17 172:6,13 176:24 177:3,9,18 179:2 230:17,19 231:1,4 232:16 234:3,7 235:22 236:14 242:25 248:16 293:5,9 308:23 309:5 310:3 311:6,12,18

applied 26:5 328:6

applies 282:19 283:3,18 285:13

apply 90:1 158:5 282:17,22 305:22

applying 283:23 300:9

approach 28:3 199:22 299:16 300:3,6

approval 220:5,7 235:8

approved 220:12 282:21

approximately 49:2,5,8,11,15,22 50:1

April 1:11,18 5:11 6:4 145:8

area 22:14 37:11 39:11 194:2 219:1 268:6

areas 180:1,2 191:1,16 214:6

arms 18:24

arose 272:18

arrived 272:2

article 5:11 263:19 264:3,7 267:1 278:15 317:18 320:18 323:11

as- 57:24

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: ascertain..ballot

**ascertain** 312:3

**asked-for** 289:17

**asks** 151:9 159:4 172:21

**aspects** 245:23 246:15 286:20 311:11

**assembled** 184:4,5

**assess** 297:11

**assigned** 262:20 284:8

**assist** 51:21 55:8 81:19,21 211:10 213:2,4 215:12 224:21 225:5 226:2, 4,17 250:16 252:10

**assistance** 5:9 33:16,25 34:11,18 35:12 51:8,13,14 52:11,13,15 53:17, 20 55:9,13,23 57:1 121:13,19 122:1, 10,23 148:1,25 159:2,12,13 161:4, 17 197:20,24 198:4,11,22 199:21 200:1,10 203:10,19 204:3,8,12,23 205:9,13,14 206:16 209:4 211:2 212:13,14,21 213:14 215:15 217:14, 16 219:4,8,10 221:12 222:5,16 223:9 225:22 251:20 252:9 253:5,7 290:13 297:11,13,17,22 298:2,5,25 301:1 302:7 304:13,14

**assistant** 2:20,21 3:16 6:14,17 61:25 75:24 76:4,10 78:6,8 197:3 219:9 220:21

**assistants** 34:22 36:21 51:17 197:5

**assisted** 36:17 222:13

**assisting** 159:4 203:18 204:2 208:16 212:8 305:11,16,19,22

**assistive** 210:12

**assistor** 34:18 40:6 53:25 56:1,4, 10,13,14 57:1,6 58:1,4 62:10 121:18 199:1 200:6,22 201:1,7,18 204:1,8, 22,23 205:2,7,18,19 206:1,2,13,14, 21 209:12 211:4,13,20 214:19 215:14,22 217:6,8 218:22 219:17 220:25 221:2,12,24 222:5 224:1,8 290:12 299:8 301:2,18 302:2

**assistor's** 211:23

**assistors** 198:19,21 218:12 221:22 303:23

**assists** 223:19

**Association** 240:22 241:2

**assume** 84:15 173:21 296:22

**assumes** 328:11

**assuming** 57:13 85:3

**attached** 1:25 251:14

**Attachment** 188:8

**attempt** 248:23 266:14

**attempting** 92:23 272:24

**attend** 37:10

**attendant** 226:9 325:13

**attention** 11:22 186:11 237:24 251:6,21 278:14 287:19

**attorney** 2:20,21 3:5,15,16,17 6:14, 17 14:24,25 72:22 187:15 238:9 245:4 250:14 307:3 309:17,21 315:14

**ATTORNEY'S** 2:22

**attorneys** 5:5 14:10,12,16,17,21 15:10,14 20:1 57:14 71:21 75:11 187:11 281:18 290:21 291:15 300:10,12,16,20

**attributed** 318:16

**August** 76:23,24 77:9 286:15

**aunt** 222:8

**Austin** 3:6

**authority** 288:15,18 313:7

**automatic** 116:12

**automatically** 93:11 131:25

**availability** 280:14,18

**Avenue** 3:11

**avenues** 315:9,24

**average** 152:12

**aware** 42:18,21 46:17 47:3,12,15,21 55:11 56:14 82:12 148:18,21 157:13,18 162:24 163:2,7 198:17,20 199:6 217:6 219:2,6 223:25 224:4 230:5 231:10 237:15,19,21 238:2,7 239:13,16,24 250:17 255:10,13,14, 19,23,24 256:3 258:17 260:8 264:22 267:7 268:16 270:17,21 273:4 277:14 278:10 279:4,25 280:21 306:19,22 307:6,7,10 309:8 312:15, 20,23 313:1,20 316:4,12 317:9 322:1 327:7

---

**B**

**B-R-Y-L-O-N** 77:18

**bachelor's** 22:8

**back** 7:22 22:1,2 25:15 30:6 39:22 58:13,14,15 59:5,12 67:23 68:1 73:15 87:22,24 88:5,19 89:1,16 91:11 95:15 101:4 102:3,8 108:23 109:16,24 110:10,16,18 118:23 121:11,18 122:4 128:4,24 129:8 130:17 134:7 135:14 149:13 150:16 175:24 182:6 184:12 196:17 213:12 220:15 233:12 249:16 251:14,18 260:12 276:17 278:14 281:14 283:14 295:8 314:20 320:10 323:7

**backup** 324:18

**backwards** 260:12

**bad** 320:7,15,24

**bal-** 175:12

**ballot** 13:24 14:3 17:13,25 18:2 31:5 32:7,12,18 33:5 34:18,19 51:22 70:20,23 71:1 75:19,23 77:12,22 78:2 80:10,16,21 81:1,8,16,19,21,25 82:10,16,21 83:3 84:16 85:4,5,6,8, 14 86:2,6,21,22 87:15 88:3,24 89:1, 16,22 90:18,24 91:11 92:2,8,13,21, 23 94:10 95:2,9 96:19 97:5,6,15,23 98:7 99:20 105:23,25 106:1 107:2 108:10,18,22,24 109:6,7,10,16,24 111:17 112:11 113:2 114:20 115:3,5 116:5,18 117:1,5,8,9,21 120:7,8,10, 14,17 121:21,22,24 122:10,11 123:5,10,12,13,14,18,20,21,25 124:2,3 129:25 130:3,4,9,11,14,16, 18,23 131:20,21 132:21,25 133:6, 10,12,15 134:3,15,21,25 135:4,7,8, 10,11,12,13,14,17,24 136:8,16 138:6,7,8,11,13,18,21,25 139:5,9, 12,19,22 140:2,18 141:2,3 143:11 145:12,18 147:1,5,10 151:2,13,25 152:2,22 153:4 155:20 156:9,18 158:16,18 165:19 168:16 172:25 174:4 175:7,10 177:23 178:4 180:7, 20 181:2,13,16 183:11 190:25 191:15,22,23 201:2,8,19 204:13,14, 15 205:3,15 209:13,14 210:1,5,8,14 211:12,14,22 214:25 215:1,8,16,19, 22 216:3,12,14,15,23 219:12 227:8, 17 228:10,18,19 229:4,6,21 231:1,4, 7,11,19 232:17,25 233:11 234:3 235:23 236:5,14 242:25 246:13,15,

The Office of the Dallas County Elections Administrator

22 247:13 249:5,6 260:1,7 272:25
273:2 276:6,18 279:16 282:17,21
283:3,18 284:6,7,12,15,16,20,21,24
291:3,21,22,24 292:1,22 293:5
294:1,14 299:1,2,3 304:14 311:5
316:21

**ballot-marking** 51:24

**ballots** 17:19 31:15,17 32:2,13
62:18 63:2,9 64:14,22 81:5,9,16
82:1,11,16,21 85:11 89:23 90:2 99:2
108:18,23 109:15 113:10 121:12,17
123:3 129:24,25 135:1 143:5,9,12
145:22,25 146:1,6 153:16 154:6
156:10,18,23 175:13 178:9 196:10
243:1 248:15,17 277:22 278:22
279:6,17 293:8 311:5

**Baptist** 22:6

**bar** 83:14 84:3,5,7 93:14 152:4
308:22

**Barbara** 8:19,20

**barcode** 93:24

**barriers** 194:15

**based** 40:4 45:22 48:6,9 49:21
150:4 174:19 177:7,19 178:14 195:1
288:17 310:21 319:21 322:9

**basically** 191:10 286:2 287:11

**basing** 319:6

**basis** 106:15,16 128:19 145:19
268:1 275:2 292:8 318:11

**batches** 231:18

**Bates** 8:9 9:8 232:13 249:23,25
251:11,19 310:16,22,24

**battlefield** 76:19

**be-** 201:21,23

**bearing** 155:16

**beautiful** 192:20

**bef-** 87:19

**began** 127:17 293:14

**begin** 19:15,16 92:1 159:25

**beginning** 90:17 177:15 179:2
202:16 224:16 236:20

**begins** 88:1 188:8 307:12 320:2

**begun** 176:21

**behalf** 20:20 132:25 134:17 149:21
189:8 219:12 282:8,15

**beings** 102:4

**bele-** 313:11

**believing** 275:3

**Ben** 2:19 6:13 73:4,9

**Ben.stool@dallascounty.org**
2:24

**Bender** 3:10 4:13 44:8,19,20,22,25
57:15,19 149:20 150:1,10,20,21,22
153:3,15 154:5,13 184:7 281:21
282:1,3 331:7

**Bernardino** 192:11

**bet** 187:25

**Bexar** 22:25

**big** 23:1,2,4 37:9 89:18 195:9 242:23
263:6

**bigger** 329:22

**biggest** 273:8

**bilingual** 123:5,14

**bill** 187:8 202:16,17 220:17 242:23
255:25 259:21 274:5 303:2,3 318:21

**bills** 240:2 302:10,18 303:9 314:13
319:1,8,24

**binder** 16:1,5

**birth** 135:21 151:9,21 166:10,12
167:7,18 181:6,18 182:15,20,25

**bit** 15:19 45:13 61:11 66:1 88:14
113:18 160:10 161:22 194:22
207:14 218:9 238:23 248:20 287:19
295:19 308:20

**biweekly** 243:7

**black** 194:10

**block** 2:14 229:10

**board** 86:21,23 120:14,17 143:11
175:7,10

**bond** 227:17,19,20,22 228:4,8,25
229:1

**book** 32:5 34:13 52:4,11 276:15

**books** 168:23

**Born** 21:20

**boss** 301:22

**bottom** 63:23 203:9 207:20 208:12
224:23 225:13,25 249:24 267:3
311:8

**box** 3:5 111:22 112:1 252:2 272:25
273:2

**boxes** 277:21

**boys** 23:2,4

**Brady** 3:10 44:19,20 57:17 150:18,
20 166:1,2 184:8 281:25 282:3
331:11,13

**break** 9:17,18 12:6,7,8,10 17:21,24
18:9 39:21 46:15 59:3 149:12
175:23 176:1 186:17,19 249:14
322:21,25 323:2,6,10

**breaking** 322:20

**breaks** 17:23

**briefly** 186:24

**bring** 7:17,22 26:6 52:1 56:3 59:12
62:6 73:5 200:21 230:25 238:10
276:17 326:9

**bringing** 27:21

**brings** 224:8

**broad** 299:14

**broadened** 225:5

**Broadly** 287:25

**Broadway** 2:5

**broken** 17:12,15,16

**brother** 167:11

**brought** 8:4 15:18 16:4,20 61:9 73:8
301:13 324:9

**Bruce** 79:1,2

**Brylon** 77:16,19,21 78:14

**building** 1:22 2:22 37:24 276:25
329:21

**business** 79:12,13 190:24 206:9
313:15

## C

**C-A-I** 155:6

**CA** 2:16

The Office of the Dallas County Elections Administrator

**Cai** 2:14 4:14,18 44:14 154:18,20 155:1,5,6,9,13,14 156:3,8,16,21 157:9,17,23 158:3,9 159:19 282:6,7, 15 289:6,21 290:24 294:20 331:6, 10,14

**California** 192:11

**call** 15:11 72:5 76:19 102:15 105:15, 16,22 106:19 107:14 108:4 116:15 119:9 124:1,4,14,16,18,20,23 125:9 134:7 140:21 149:18 168:8,19 169:13,25 170:7 189:5 191:12 198:5 208:3 241:9,21 244:11 262:1 276:11 280:2 287:5 290:16 291:4 315:10,21 321:6 328:1 331:4

**called** 26:15 27:1 36:15 159:16 195:18 210:20,22,24 212:24 213:3 239:8 245:7 250:13 271:21,24 290:25

**calling** 30:25 106:4 134:16 139:7 169:21

**calls** 32:4 103:2 105:5,10,19 106:9 107:25 108:6,7,8,10 124:7 134:3 168:12 170:11,18,19 173:15,22,24 174:2,3,8,12,25 247:15 280:16

**calm** 271:22

**campuses** 37:8

**cancel** 130:22

**candidate** 227:12 234:8

**candidates** 60:4 205:4

**Cano** 3:18

**canvasser** 227:14 228:24

**canvassing** 228:3,15

**capacity** 46:3 165:11 176:15 311:21

**capture** 83:15,24 86:8

**captured** 132:11

**capturing** 82:18

**car** 111:5 329:20

**card** 334:12 336:12

**care** 58:16 238:19 291:20

**career** 21:23

**caregiver** 226:10

**carrier** 33:6 86:5,6,7 87:13,15,22, 24,25 88:2,5,20,22 90:22,23 91:2,6 116:16,25 117:5,10,11,13,15 127:19

150:25 151:3,13,15,25 152:2,22 153:1 284:16,24 285:4,10

**carry** 291:23

**case** 10:25 11:3 15:19 16:2 40:11 73:6 80:21 137:7,21 161:25 217:19 221:10 235:13,15 279:10 294:16 300:9 318:25

**case-by-case** 292:8

**cast** 17:8,19 31:5 62:19,23 63:9,19 64:7,14 65:4,18 80:5 88:24 156:23 210:14 260:1,6 268:5 276:18

**casting** 32:1 210:1 316:21

**casts** 276:6

**category** 83:6,13 111:11,15 302:1

**Cathedral** 189:20

**Catholic** 189:21

**caused** 233:18,24 252:20 273:5

**cell** 276:12

**center** 21:7,8 27:24 51:1,3 190:11 277:21 324:23 326:1,8,13

**centers** 21:6 26:15,19,25 27:3,6,9, 12,21 28:7,14,18 29:1 48:13 50:9 286:13 325:20,22 326:4,6,9,18

**central** 267:5 314:23

**cer-** 190:7

**ceremonies** 37:19 38:9,14 40:14

**ceremony** 37:21

**certificate** 4:22 152:5 258:18

**certificates** 190:8 254:17,20,21,25

**Certified** 190:10

**cetera** 198:14 218:24 234:12 235:3 245:20 246:16 251:5 258:19 277:23 290:22 315:8,11,16

**cha-** 170:7 219:22

**Chair** 322:3,4

**challenge** 148:10

**challenged** 140:14

**challenges** 47:2

**challenging** 11:3

**chance** 187:21

**change** 169:14,19,20 170:1,7 309:9 315:4 333:3 335:3

**changed** 60:14 82:19 234:4 302:19 313:23 317:11

**changing** 22:16 288:6

**characterize** 302:6

**charges** 238:10 307:8

**chart** 5:5 15:23 19:25 64:9 67:4 73:12 92:18 188:21

**charts** 73:6

**check** 62:14 84:19 85:13 90:25 111:22,24 269:1,2 283:22 285:11 300:13,15 316:6

**check-in** 221:15

**checked** 85:9 112:12 283:25 309:3

**checking** 33:10 83:17,20 84:22 216:4,20

**checklist** 287:6,15

**checklists** 287:4

**checks** 221:14

**Chief** 222:22

**chilling** 242:18 248:17 274:18 275:4

**chime** 244:5

**choices** 210:17 216:15

**choose** 39:14

**chooses** 58:3

**choosing** 205:8 212:19

**chose** 142:23 171:13,14,19,22 319:12 325:24 326:15

**Christina** 244:1,3,11

**church** 230:24 231:1 267:6

**circumstances** 238:16 293:24

**Citizen** 245:21 324:23

**citizens** 38:3

**city** 1:23 21:3,12 192:16 227:20,23

**civil** 1:5 2:21 3:10,17 236:21 237:1, 5,10

**claims** 267:24

**clarification** 160:19 161:22 165:2 178:12 284:18 306:24 307:4 321:7

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                      Index: clarifications..concluded

clarifications 162:11

clarify 8:10 46:16 57:12 285:13
310:25

clarifying 304:2

clarity 252:4,21

Class 258:10

classes 256:21,23

clear 21:23,25 45:15 130:21,24
176:14 180:10 216:12 291:10,12
293:12

clear-cut 291:15

clerk 76:12,18,21 77:3 309:13

clerks 261:6,8,11,17 262:2

click 105:25

clients 192:1

close 24:8,16 48:11 49:5,11 117:11,
12 203:9 229:14 233:6 261:24
266:1,11 316:20 324:6

closed 27:11,19 48:5,9 272:11,12

closely 206:4,14

closing 27:22 28:1,4,12

co-judge 271:12,13,14,16,18
272:18

co-judges 271:10

co-workers 273:18

code 83:14 84:3,5,7 93:14 147:16
152:4 237:3,7,11 289:12 302:7,22,
25 303:4,7 305:2 309:24 313:5,12
317:11

Code:009 3:5

codes 113:16,25 114:1 165:18

codifying 304:4

codings 165:18

coerce 205:8

cognitive 252:5,10,22

colleagues 318:21

collect 219:19

collected 254:17

college 22:5 37:8 39:11 190:2 239:9

colleges 37:7

Colorado 192:17

column 20:12 61:16 62:1,4,11,17,22
63:1,4 74:11 250:23

combi- 242:6

combination 242:9

comfortable 75:16 120:12 173:4
174:22 176:6

commands 206:4

comments 250:22,24 252:21

commision 334:20 336:20

Commissioner 222:22

Commissioners 46:4,5 50:12
293:4 324:8 326:21

commits 230:1 258:9

committed 263:7

committee 50:25 51:1 86:11,17,18,
23 87:2,5,11,21 89:7,11 118:6
243:14,23 244:17 245:21 285:9
286:17 324:23,24 326:8,13,14

committees 51:3

common 169:24 215:11

communicate 46:12 99:4 102:4
134:11,15 214:23 240:7 312:10

communicated 162:18 164:5
240:12 286:6

communicating 13:21 103:5
194:15

communication 14:15 127:1
128:24 164:10 233:10

communications 104:18 126:20
161:21 163:9,15,22 176:5 244:25
245:3,10,17 246:10 281:3 312:11
330:8

communities 37:2

community 37:14 226:16 267:6

community-based 198:18

company 191:13

comparable 290:7

compare 87:7,12,13 98:18,22,23,25
172:10 195:8

compared 65:19 153:22 177:11,17
221:18 236:10 324:4,20 327:8

compares 285:9

comparing 170:21 176:7

comparison 17:16 63:17 65:5
66:19 169:24 171:7,12 175:15 195:6
313:16

compensate 305:10

compensates 305:10

compensating 224:20 225:4

compensation 224:21 225:1,4,6,
16,20 305:15

complaint 162:15

complaints 42:13,17 163:18 261:19
269:19 280:10 314:19,22

complete 83:20 84:10,12,17 221:1
223:21 254:23

completed 79:19 84:2 97:25 222:4

completely 49:25 110:17 112:21

compliance 287:12,21

compliant 286:1,19 287:8,22

complies 236:19 257:22 258:24
260:13 264:8 278:18 298:10 304:11

compliment 269:4

comply 206:13 311:20,23

compound 238:23

comprehensive 287:10

computer 112:7

con- 323:13

concentrations 214:7

concept 281:8

concern 141:4 156:24 157:6,10
233:4,10,14 238:8 242:11 244:8
322:12 329:23

concerned 41:22 42:5 156:16,21
170:20 230:8 234:6 237:9,14 242:17
325:4

concerns 42:10 50:21 140:13,20
147:24 148:8,14,19 163:16 164:6,14
168:13 173:18 241:8,24 242:13,24
243:4,10 244:2,18 246:1 248:8,13,
14,17 265:2 273:8 314:5

concluded 332:7

condensed 186:4

condition 186:14

conduct 218:8 261:14,15

conduct- 313:14

conducted 256:13 257:9

conducting 313:14

confer 201:20,25

conference 311:10

confers 218:11 232:21

confident 181:10

confine 204:23 298:25

confined 301:8

confinements 299:12

confines 215:15

confining 204:8,12 209:3 211:2
213:14

confirm 9:3 151:4,7 181:6 221:9

Confirmation 100:11

confirming 216:15

conflict 270:24 271:1,8,17,23
272:10,13,17 273:21,25 274:20

confused 45:14 160:11

confuses 295:20

confusion 308:21,25

Congratulations 77:10

congregants 230:25

Connect 36:15 40:5

connected 183:18 311:24

connection 38:8

connects 317:7

consensus 324:24

consequences 318:21

conservative 299:12

consideration 334:14 336:14

considered 47:19 191:3 239:19
277:15

considers 206:8 239:6

consist 296:25

consistence 256:22

consistency 256:23

constituent's 246:12

constitute 301:17

constituted 301:18

constitutional 170:16 296:9 297:4

consult 175:20 300:12,16 302:24
327:10

cont 4:10,13

contact 132:16 136:10 169:15
300:10

contacted 133:5 161:23 162:4,10,
14 164:20 165:5,8,14 306:23 307:2
316:14

contacting 99:9 162:25 163:5,10
307:6

contained 26:2

contemplated 287:4

contents 163:8,14

contested 273:24

context 169:16 213:12 219:9 301:2
303:6 305:25 314:9

continue 40:8 273:22 303:8 320:1

Continued 3:2 59:8 69:9

continues 112:4 223:22 237:2
318:1 321:10

continuing 248:14

contractor 72:1,4,6,20 197:2

contracts 191:18

contributed 320:7

contributing 265:12,23,24

convened 89:11

convenes 87:21

conversation 14:15 40:9 58:17
150:4,23 160:23 228:15 252:7
304:17 309:12 311:3 312:3,7,12
316:24 327:24

conversations 241:15 253:1
280:24 322:9 330:20,23

conveyed 156:24 157:5,9

convince 228:7

Coordinator 38:4,17 40:13

copied 251:16

copies 308:14

copy 18:11 73:19 219:18 221:7
231:22 257:18 298:8 310:9

corner 207:16 208:9

corporation 112:23

correct 7:10,13 10:12 29:1,2 45:20,
23 46:10,19,20,23,24 51:19,22
52:11 53:20 54:7 56:5 58:1,2,5,6
59:21,22 60:6,9,10,12,13,16,17,19
62:17 63:5,12 64:13,22,23,25 66:11,
19,22,24 67:2,5,6,8,9,13,14 69:12
80:14 81:17 89:23 91:20 93:20
96:14 97:6 98:1 104:5 107:3,7
108:16 115:8 126:10 131:18 136:7
154:11 157:18 161:1,6,7,11,12,18
162:13,16,17,21 163:12,13,16,17,
18,19,24 165:24 166:6 167:25
170:2,8,9,25 171:10,15,16,22,25
172:3 173:19,22 174:9 175:5,7
176:2,8,21,22,25 177:4,12,20 178:2,
5,6 179:18,19 180:13 181:3,14,19
182:9,15,21,25 183:11,12 193:20
194:25 195:17 196:6 200:18 206:22
208:23 213:13 217:2 222:9 223:2
231:8,9 232:14,22 235:10,11,19,25
247:18,21 269:8 272:21 282:25
283:1,21 284:22 285:16 293:14
294:9,12,18 296:3,4,11,12 298:3,22
299:9 300:2 302:12,16,17,20,22
303:11,13,14 304:21 305:16,23
306:6,7,9,10,12,13,16,18,20,21,25
307:1,5 308:7,10,16,18,19 309:11,
18,21 310:1,4,14,16 311:6 312:18
315:23 316:13,17 317:4 320:13
322:7 323:17,18,20,21 325:12
327:16,23 328:12,21,22 330:17,18,
21,23,24 334:3 336:3

Corrective 91:5,7

correctly 123:1 178:1 252:4 259:17
264:13,20 269:9 272:20 279:2
305:25 311:14 317:24 318:6,23
321:8,16

Corrigendum 4:20,21 333:1 335:1

cost 50:13

Counsel 6:5,23 8:4 10:10 18:25
19:22 54:21 59:14 66:21 160:24
161:20 163:25 165:23,25 174:24

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: count..day

176:2 202:7 207:8 249:20 295:18
327:25 331:21

**count** 92:17 109:7 143:6,12 146:6
296:7

**counted** 62:19 63:2 120:10 145:23
146:2 156:23 205:15 304:15

**counter** 159:4

**counties** 23:1,14 27:20 118:19
119:10 128:18 129:2 165:14 200:12
299:24

**country** 192:3,5

**counts** 17:5

**county** 1:23 2:18 3:14,18 5:4,5,6
6:13,14,25 8:4 9:22 14:11 20:1,20
21:17 22:22,25 23:4,9,10,12,13 24:2
25:21 27:15,16 28:3 30:16 31:4,9
33:17 36:21,25 37:1,3 43:1,10 45:24
46:1,2,3,4,9 47:23 74:22 75:3,14
77:5,8 79:9,18 80:5,9,15,19 83:10
89:18 91:22 94:9,10 100:9 101:18
102:15 111:19 114:3,22 115:11,14
116:9,13 119:12 125:9 126:10,24
127:16 129:8,11 134:25 135:14,22
137:22 140:6 141:9 143:14,24
148:9,15,19,23 158:18 165:9 176:13
189:13,17 190:13 191:4,21 192:17,
23,25 193:5,23,24 194:3,6,9,12,24
195:2,8,9,17 196:1,9,14 209:18
210:3,9,15 213:20 214:7 219:18
223:25 227:18,19 232:24 233:19,21
234:5 237:24 238:10,18,21 239:5,6,
8 241:5,11,22 242:1 243:21 245:11
247:19 253:11,15 254:11 255:11,17,
20 262:25 264:4 265:3 266:8,10
270:5,15 274:24 275:19,21 276:1
277:12,23 278:11,22 279:25 280:10,
11,18 283:4,19 286:8,18 299:15,17
300:2,10,20 306:4,14 308:4,14
309:13 311:21 314:21 321:22
322:10 324:16,18 325:10,14,17,18,
24 326:15 329:7,12,25 330:16 334:9
336:9

**county's** 33:15 80:10 91:15 253:4,
20

**county-wide** 47:22,24

**countywide** 26:16,19 48:10 286:13
325:6,11,19 326:1

**couple** 6:19 17:3,6 34:5 38:2 39:18
41:5 61:3 149:8 193:2 202:20
232:11 267:3 297:2 321:23

**court** 1:1 6:21 10:2,7 11:17 12:15
41:11,17 45:23,25 46:4,6 50:12 61:4
68:17 124:5 184:19 207:11 235:15
263:15,17 293:4 303:9 324:8 326:21

**courtroom** 70:5

**cover** 7:16

**covered** 38:24 157:17 194:24
195:15 218:25 257:7,8

**covering** 252:17

**create** 94:24 95:15 96:1 230:11
237:5 274:20 308:6,9

**created** 89:21 94:5,8,9 95:5,16 96:4
132:10 217:13 218:12 246:20
250:13

**creates** 152:3 224:20

**creating** 94:22 308:18

**Creek** 21:24,25

**crime** 206:10

**criminal** 2:22 3:14,17 230:2,11
233:17,20,22 238:10 242:15 306:3
311:24

**criminalize** 219:7

**criteria** 55:11,21 56:7,11,15 196:5
212:13 304:6,18,23 305:1

**criticism** 162:16

**CSR** 1:19

**culmination** 240:4

**curbside** 196:4 224:2,9,11 267:23
275:16,19,21,25 276:6,13,21 277:4,
6,7 278:9,12 279:1,5,21 288:8
289:24 297:13,20

**cure** 97:10 119:14,19 138:6,7,12,18
139:19 140:1 146:7,8,14,15 178:11

**cured** 292:1

**curious** 168:17

**current** 20:22 22:12 33:23 34:7
80:25 81:3 193:21 201:10,12

**custody** 331:22

**cut** 288:12

**cutoff** 145:8

**cutting-the-line** 288:14

**cycle** 50:11

**DA** 307:7

**DA's** 306:15

**dabbles** 191:16

**daily** 92:13,15 106:15

**Dallas** 1:20,23 2:18,23 5:4,5,6 6:13,
14,25 8:4 9:22 14:10 20:1,20 21:3,
10,12,15,19 22:1,6,22 23:4,9,12
24:2 25:21 26:24 27:15,16 28:3 31:3
33:15,17 36:21,25 37:1,3 43:1,10,14
46:3,8,9 47:23 74:22 75:3,13 77:4,8
79:9,14,15,18 80:5,9,10,15,19
91:15,21 94:9,10 100:9 101:18
102:15 114:3,22 115:11,14 116:9,13
119:12 125:9 126:9,24 127:16 129:8
134:25 137:22 140:6 141:9 143:14,
24 148:9,14,19,23 158:18 176:13
189:13,17 190:12,13 191:21 193:17,
22,24 194:3,6,9,12,24 195:2,8,9,17
196:9,14 209:18 210:3,9,15,23
213:20 219:17,18 223:25 227:18,19
232:24 233:19,21 234:5 238:21
239:5,6 241:22 242:1 245:11,19
247:19 253:4,11 254:11 255:11,16,
20 262:25 264:4 266:8 270:5,15
274:24 275:7,19,21 276:1 277:12
278:1,11 280:7,10,11 297:25
299:15,17 300:2,10 306:3,14 308:3,
4,14 311:21 314:21 322:10 323:23
324:3,20 325:10,14,24 330:15,16

**Dana** 237:25 309:14

**data** 17:5 18:4 26:7 111:9 165:21

**database** 23:17 151:4,14 153:5,7,
22,24

**date** 94:20 126:22 127:4 135:21
151:9,21 166:10,12 167:7,18 181:5,
18 182:15,20,25 296:6

**date-stamp** 83:5

**dated** 5:7 61:15 310:13

**dates** 128:12,16 234:11

**datestamp** 86:7

**day** 1:17 9:8,11 17:23 18:1 27:1,4,6,
9,13,21 29:18 30:7,13 31:5,10,16
32:7 41:23 46:22 47:24 48:22 49:13,
16 55:4 61:18 62:20,22,24 63:23
64:5,8,10,13,24 65:3,16 66:21 67:1,
8,11 88:2 89:1 101:20,21 105:4

The Office of the Dallas County Elections Administrator

106:9 107:20,25 108:6,7 110:14
111:12 118:18 127:22 170:11,12,18
261:18 263:10 290:16 320:23 324:2
325:11,14 326:19 334:11,15 336:11,
16

**days** 31:22 63:22 145:9 146:15,17
213:1 263:8 321:1

**DC** 2:10 3:12

**de-escalating** 273:21

**deadline** 110:10 145:7 176:23

**deadlines** 128:16

**deal** 132:2 262:16,23

**dealing** 86:4 132:3 216:21 262:8,13,
14 275:11

**debated** 274:5

**Debeauvoir** 237:25 309:14

**December** 25:22 26:1 35:16,19,20
127:19 189:18 190:13,17 193:16
255:18 275:1,2 296:3

**decide** 9:15 50:12 55:12 56:8
288:15

**decided** 28:17 50:8 130:24 161:13
183:13,21 266:11

**deciding** 289:9

**decision** 45:23 46:6,9 55:6,7 56:12,
16 101:17,18 266:15 292:9 308:22
325:13

**decision-making** 50:18

**decisions** 120:13 125:22 126:9

**declare** 85:15

**decline** 50:7

**decrease** 326:11

**decreasing** 50:13

**dedicated** 105:12 108:17

**deep** 23:23 286:22 330:7

**deeper** 248:20 261:14

**deeply** 23:19

**defect** 91:5 97:10

**DEFENDANT** 3:14

**Defendants** 1:8 3:3 6:11 7:2 160:7
295:16

**Defense** 6:23 9:3 11:1 54:20 185:9

**define** 194:17 228:22

**defines** 229:8

**definition** 199:1 212:21 213:11
226:25 227:3

**definitions** 19:14

**degree** 22:8 265:16

**degrees** 190:5

**DEL** 1:3

**delayed** 286:24

**deliver** 227:11 231:19

**delve** 190:25

**Democrat** 64:16

**Democratic** 63:19 65:2,18 86:20
271:12,16,18 278:21 321:12 322:2,4

**Denver** 192:17

**department** 3:11 5:6 20:20 32:19
58:13 74:22,25 75:4 78:21,24 81:19,
22 82:10 125:6 148:9 162:22,24
163:10,15 165:9 189:8,11 194:19
250:25 251:3 252:8,18 321:11,19,
24,25

**depend** 159:10

**depending** 235:17 299:13

**depends** 194:17 216:11 228:22
243:23

**depositing** 216:23

**deposition** 1:10,13 5:2,4 6:3 7:8 8:5
11:5,17 12:3 13:15,19 14:12,18,24
15:3,10 16:19 18:19 19:3,8,21,24
59:4,15 61:9,12 69:16,22,25 70:12
71:5,22 72:25 73:19,21 74:5,7
173:13 185:13,15,18,20 186:17,23
187:12,18 188:5 189:3 193:2 202:6,
9 207:4,7,12,13 217:21 232:3
249:15,19 263:23 332:7 334:2 336:2

**depositions** 200:12

**Deputies** 271:25 272:2,5

**deputy** 38:6 78:6,8 222:22

**describe** 105:4 198:9 209:22
230:15 232:5 257:7

**describing** 110:25 221:11 272:20

**description** 334:12 336:12

**design** 118:17 140:3

**designated** 7:6 17:2 20:19 33:14
52:25 74:24 140:12 188:22

**designating** 5:5

**designed** 118:15,22

**desk** 16:11

**Desoto** 267:6

**dessert** 79:8

**destroying** 118:7

**detailed** 218:9

**details** 223:11 238:2,7 246:14

**determination** 311:16

**determine** 86:22 317:13

**determined** 86:18

**deterrent** 273:8

**device** 51:24 54:7 135:10 210:6,7,9,
12

**died** 240:3

**difference** 277:4

**differently** 164:16

**difficult** 212:2 252:10 262:3,11,13
279:18

**difficulties** 140:14 265:18 280:19
330:5

**difficulty** 13:21

**digits** 90:8 151:22 153:6,23

**direct** 214:25 215:1 217:15

**directing** 204:13,15 209:13 215:8,
18 261:24 299:1,2

**directly** 293:4 321:6

**Director** 53:2 192:16

**disabilities** 61:19 158:10 252:5,10,
22 285:19,21 288:1,7,9 292:17

**disability** 37:14 61:19 62:3 111:11
157:24 158:4,14 159:1 288:17,20
290:12 291:2,17,21

**disabled** 37:13 83:8 111:19 112:12
178:25 197:20 200:13 223:4 276:3
279:13

The Office of the Dallas County Elections Administrator

**Disciple** 267:5

**disclosed** 217:23

**disclosures** 217:24

**discovered** 255:25

**discovery** 40:15 186:25

**discrepancies** 329:15,18,25

**discuss** 9:20 187:22

**discussed** 48:2 51:5 290:9 308:20
319:23 328:14 330:8

**discussing** 164:9 265:10

**discussion** 40:4 67:25 150:15
281:13 283:13 295:7 306:1 312:6
331:18

**discussions** 51:3 245:22 273:20

**disproportionately** 192:25

**disrupt** 53:12

**disruptions** 272:13

**distinct** 216:19

**distinction** 167:23 175:6

**distinguish** 167:8

**distribute** 230:19 309:5

**distributed** 230:16 310:6

**distribution** 229:16 235:14 307:14,
20

**district** 1:1 2:20,21,22 3:15,16,17
6:14,17 227:22 228:5

**dive** 286:22

**division** 1:2 2:21 3:10,17 162:3,9

**document** 18:25 19:4,22 59:14,18
61:4,6 63:18 66:10,13 73:20,24
187:5 188:3,18,19 202:7 232:9,20
249:20,21 250:8,20 251:7,10
252:15,17,19 258:1 260:18 263:17
264:1 334:12 336:12

**documentation** 254:16

**documents** 8:4,7 9:7,15 186:25
187:19 207:8 254:24

**DOJ** 165:23,25 315:15

**domicile** 238:21

**door** 79:24 228:11

**door-to-door** 228:3

**doors** 287:8

**dot** 252:3

**doubt** 233:18 293:18

**doubts** 267:12,15

**Douglas** 192:23,25 193:4

**downloading** 22:18

**dramatic** 170:1,7

**draw** 251:6

**drinking** 287:9

**drive** 58:15 196:3 291:23

**drive-thru** 195:18,24,25 275:17
277:2,5,8,12,17 278:2 279:21,25
280:3,11,18 281:4 328:14,18,24
329:2,3,7,12,16,18 330:3,6,9,13

**driver** 126:4 139:22,23

**driver's** 24:3,5,23 25:6,12 26:2,4
33:4 90:7 91:9,10 93:17 94:7 95:25
103:9,17 104:3,7,13 107:1 113:7
135:21,25 136:5,25 137:4,8,14,15,
24 140:23 143:15,18,25 151:22,24
153:5,18,21 154:9 156:6 168:3
241:14 292:24 293:13,25 294:17

**drives** 37:7,18

**drop** 196:10 210:20,22 277:21

**drop-off** 31:17

**dropped** 277:22

**dropping** 212:8 216:14

**DS200** 210:23

**duly** 1:16 10:19 69:7 184:22

**dumb** 217:3

**duties** 22:13 32:1 58:15

**duty** 238:17 239:1,7,12 265:6

---

**E**

**earlier** 22:25 41:6,7 61:11 63:18
64:4 66:10 150:4,5,23,24 155:18
172:2 180:3 182:20 194:23 195:15
273:7 278:6,7 280:22 286:11 290:8
297:24 310:7 318:21 326:6 328:15

**early** 17:5,7,13,22,23,24 18:1 26:17,
20,21 27:1 29:16 30:7,13 32:6 48:16

49:1,3 58:16 62:20 63:5 64:5,18
67:11,12 86:21 88:1 105:23 110:14
120:14,16 127:15 143:11 171:24
175:7,10 176:21 213:1 271:5 297:16
323:19

**easier** 114:9,16 168:5 174:20
207:14

**east** 21:10 37:10

**easy** 262:2 300:7

**ebook** 57:25 58:5

**ED** 61:17 62:1,11

**ED's** 61:18

**Edinburg** 3:19

**educate** 293:2

**educating** 140:21

**education** 79:16

**educational** 11:1 185:9 293:7

**effect** 107:11 242:18 248:18 254:12
273:8 274:18 275:4 320:23

**effects** 274:11

**effort** 286:16,24

**efforts** 293:7

**eith-** 116:1

**either-or** 14:5 137:20 153:12,14

**elderly** 199:7,17 223:4,7,10

**elect-** 86:21

**elected** 242:11

**election** 14:3 17:16,23 18:1 27:1,4,
6,9,12,18,21 29:4,13 31:22 32:7
33:3 35:11,15 36:16 46:18 47:6,7,
14,24 48:22 49:13,16 55:3,12 56:8
59:19 60:16 61:18 62:19,20,22,24
63:10,17 64:6,24 66:18 70:24 78:25
81:9 83:11 84:11 85:6,14,15 88:1
89:1 91:18,21 110:14,19 111:12
117:3 120:21 127:4,22 132:3,5
142:13 144:9,17,19 145:1,4,24
146:17 147:2,21 157:6 164:1,2,6,10,
13,20,22,23,25 165:4 170:14,17
171:25 172:8,11,16,20 173:22,25
174:20,23 176:7,13,21 177:4,6,17
178:15 180:8,12 190:10,11,14,20,
21,22,25 191:1,7,8,16 192:6 193:25
196:2 214:16,23 218:24 221:1
222:22 227:18 234:20 235:2 236:9,

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: election's..experience

25 237:7,10,13,17,21,22 240:15
242:15,19 243:8,13 244:9 245:21
247:20 248:1,4,6,9,23 255:20 256:1,
4,25 257:4 258:9 259:8 260:24
261:1,3,15,17,18 262:5,6,18 263:8,
10 264:11,22 265:6 266:15 268:3,23
269:20 271:11 272:14 273:14,23
274:24 280:1,2 289:6,12 290:16,17,
25 296:15 297:6,7,8 301:3 302:7,22,
25 303:3,6 305:2 306:4,11 308:22
309:6,24 311:21 312:16,21 313:1,7,
10,12,23 315:2,25 316:5 317:11,15,
22 318:20,22 319:4 320:25 323:20,
25 324:7,23 325:3,11,14 326:18,24,
25 327:3,4,5,12,13,15

**election's** 33:18 291:10

**elections** 1:21 5:4,6 17:6 20:20
23:1 34:23 58:13 64:1 74:22 75:3,14
77:8 78:20,21,24 79:19 81:11,12
82:9 102:16 106:24 125:9 128:7
144:22 148:10,15,19,23 162:22,24
163:10,15 165:9 174:6 189:8 190:7
192:16,23 193:1,13,22 196:11 197:3
237:16,24 238:11 240:22 241:2,11
243:8 244:16 247:19 250:14,25
253:8 254:18 257:6 259:16,18 274:8
275:12 289:4 296:5,25 297:1,3,24
300:15 315:15 321:11,19,22 324:14
326:22 327:9

**electronic** 8:12,14 276:15

**elementary** 28:8,12

**Elias** 2:9 6:10

**eligibility** 151:4 196:5 304:5,18,23,
25

**eligible** 85:7 156:11 203:18 204:2
205:14 206:15 212:14 231:20
275:25 277:10 304:14

**eliminate** 287:20

**eliminating** 27:22 48:3

**Elm** 1:22 2:23

**email** 9:4 128:3,23 129:9 310:13
312:10

**email-** 129:8

**emails** 5:10 127:5,6 128:1,4,8,17
129:4 232:11,15,23 233:5 310:6,11

**Emily** 129:6,12 132:14

**employed** 195:25

**employees** 286:7 289:7

**en-** 152:22

**enacted** 255:4,12 281:5

**enactment** 224:5,7 292:17 297:12,
23 298:6 328:24

**encompasses** 216:2

**encountered** 142:22 248:24

**encourage** 227:15 228:4 261:3,7

**end** 7:12 9:8,11 247:10 314:6 318:5
320:7

**ended** 141:19 266:6 314:4

**ending** 46:25

**enforce** 306:3,8,11

**engage** 312:2

**engagement** 226:16

**English** 13:17,20,21 38:20 39:3
123:8,17 124:21 194:14,15 198:5
214:14,15

**ensure** 284:2

**enter** 115:23

**entering** 116:2 199:10

**entire** 154:6

**entitled** 12:24 264:18 318:5

**entry** 165:21

**envelope** 33:6 86:5,6,7,9 87:13,16,
22,24,25 88:2,5,20,22 90:22,23,24
91:3,6 108:24 116:16,19,20,25
117:3,4,5,9,11,13,15,20,24 118:1,9
121:14 151:1,3,13,16,25 152:2
153:1 284:16,20,21,24,25 285:4,10

**envelopes** 116:23 118:7 122:4
127:19

**epad** 51:5 53:20,24,25 57:25

**epollbook** 30:24 33:21,22 34:2,7,13
36:4 51:11,12 55:24 276:16

**equipment** 200:7,17

**equipped** 236:13

**errors** 156:12

**ES&S** 36:16 210:5,23

**escalation** 291:12

**escapes** 271:5

**essentially** 138:12

**establish** 214:4

**established** 322:6,17

**estimate** 12:24 152:13,15,21

**EV** 63:1,4

**EV-ED** 62:17

**evaluating** 298:1

**evening** 295:12

**event** 37:9

**Everything's** 71:2

**evidence** 279:22

**exact** 78:7 155:22 244:14 298:11

**examination** 4:7,8,12,13,14,17,18
10:20 41:1 45:4 68:3 69:8 149:25
154:17 160:2 184:23 253:4 254:4
282:5 295:10

**examples** 159:11

**Excellent** 45:19 160:22

**exception** 29:22 226:9

**exceptions** 216:21 262:1

**exchange** 200:2 232:15,23

**excuse** 156:10 196:2

**excused** 238:17 239:1,7

**executed** 334:13 336:13

**executive** 46:3

**exhibit** 4:5 5:1,3 18:18,19 19:2,11,
21,24 59:4 61:5,8,15 63:16 66:11,16
73:16,19 74:7 188:2,4,17,19 202:6,9
207:4,7,12,13,16 208:8 209:1 232:3
249:15,19 257:17 263:12,16,23
298:12 310:5,10 317:18

**exhibits** 207:1 263:11 331:23

**existed** 163:9 219:7

**expanded** 226:3

**expect** 29:3

**experience** 33:15,18 81:7,15,24
91:15 93:2 104:1 168:8 169:12
172:10,12 178:14 193:18 194:15
222:24 262:25 275:5 320:9

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: experienced..flip

**experienced** 11:11 140:6,14,19 148:9,10,14

**experiences** 275:6,10

**expert** 11:8

**expertise** 274:9

**expires** 334:20 336:20

**explain** 88:22 89:25 100:6 105:20 200:6 263:5

**explained** 103:9

**explaining** 88:6,20 140:22 211:4 325:10

**explanation** 211:24 212:10

**explore** 211:2

**export** 131:11,14 132:7,10

**expose** 233:19,21

**express** 42:10 242:24 243:4

**expressed** 246:1 322:12 334:14 336:14

**expressing** 163:16 233:4 244:2,8, 18

**expression** 233:10

**expressions** 211:1

**Expresspoll** 36:15 40:4

**Expressvote** 210:5 216:13

**ext** 2:6

**extend** 30:7,14

**extended** 29:15,16,19 41:6,14 42:10,14,19,23 43:2 45:20,22 46:6, 13,18,21,25 47:20 67:2

**extent** 32:13 244:19

**extra** 29:16,18

**extraordinarily** 324:3 325:2 327:14

**extraordinary** 293:1

**eyes** 317:2

---

**F**

---

**face** 205:19 257:14

**Facebook** 293:6

**faced** 47:2

**faces** 321:5 322:6,16

**facilitate** 256:20

**facilitated** 240:21

**facilities** 228:9

**fact** 9:11 95:7 98:20 103:16 130:17 156:11 183:21 211:24 217:15 231:6 303:4 320:21 321:18 322:15 324:1 326:1

**fact-based** 292:9

**factor** 265:13,23,24

**factors** 265:14,25 320:12,16

**facts** 292:9 326:12

**failed** 88:21 95:24,25 104:2 130:8

**failure** 177:25

**fair** 65:1,15 81:14 85:4 92:22 96:3 97:18 99:19 108:8 114:19 116:18 132:14 142:7 174:17 193:16 213:10 216:24 217:5,9,11 233:9,16 236:6 244:16 245:24 260:22 262:6 265:5,8 280:9 294:11 298:3,7

**fairly** 181:9

**fall** 111:10 213:12 226:17 302:1

**falls** 301:1

**false** 166:21 167:3

**familiar** 13:25 14:1 23:7 36:3 54:13, 15 114:7 179:18 224:7,19 231:17 239:11 258:4 264:5 267:9,10,12 277:1 285:20,22 287:13 321:5

**familiarity** 53:23 297:21

**family** 36:20 198:13 238:19

**Farrell** 318:20 320:3 321:13

**fashion** 219:21

**father** 167:10,11 180:23 182:6,9,14, 23

**feature** 288:15

**features** 220:14

**February** 11:6 26:1,9 30:12,15 31:3 41:8 42:20,23 43:2 45:20 46:13,22 66:24 101:17 114:11 292:25 293:14 297:3 320:7

**federal** 1:24 10:12 297:8 315:15

**feedback** 251:4

**feel** 70:8 75:16 120:12 173:4 174:22 176:6

**Felony** 230:4

**felt** 272:6

**fewer** 28:15 172:12 173:6,24 177:9, 11,14,18,22 178:8,23 179:14

**fields** 238:20

**Fif-** 226:22

**figure** 98:12,14 109:3,17 122:3 143:24

**figuring** 34:2

**file** 103:25 104:6 285:7 294:2,17

**files** 22:18

**filing** 156:12

**fill** 110:17 122:20,23 159:6 221:24 222:8 250:14 293:19

**filled** 25:13 32:22

**filling** 122:11 141:5 156:12 159:2,5 221:17

**fills** 137:12 221:13

**final** 146:7,12,13 288:24 291:22

**finally** 8:2 13:11 144:4 180:22 205:11 239:22

**financial** 324:17

**find** 32:5 113:1 114:10,24 115:13,16 116:2 136:24 145:11 151:4,13 167:6 276:15 290:22

**findings** 51:3

**fine** 179:16 232:8

**finish** 12:19,20

**finished** 257:25

**firm** 273:15

**firsthand** 329:10

**five-minute** 322:25

**five-percent** 194:20

**fix** 129:10,11

**fixing** 129:16

**flap** 90:23,25 117:24 118:1,8,10,14, 15,23

**flip** 188:7 229:15 258:22 260:11

278:17

**flipping** 149:22

**Floor** 1:22

**flows** 226:23

**focus** 175:9,11 214:6

**focuses** 175:10

**folks** 37:13 231:2

**follow** 150:23 160:11 206:3 208:16 259:22

**follow-up** 150:3

**fondly** 281:8

**foot** 229:5

**foreclose** 211:4,23 212:7

**foregoing** 334:1,13 336:1,13

**forget** 241:18

**forgot** 68:8 104:5

**forgotten** 241:3

**form** 8:12,14 31:6,18 32:19,22 39:9 42:2,7,16 43:4,12,17 50:24 52:7,24 55:17 56:24 65:6,21 80:12 83:21 87:9 88:4 91:5,7,11 93:8 94:15,22, 24 95:1 97:24 98:9 99:25 100:2,3,5, 6,11,12 101:7 105:1 108:13 113:12 114:15 116:21 119:16 120:11,24 126:1 133:3 134:18 137:17 138:3, 16,23 140:9 141:12 143:2,8 146:5 148:6 152:24 153:11 154:3 156:1,5, 14,19 157:7,15,22 158:1,7 166:12 170:3 171:1 172:14 175:17 178:18 180:14 182:21 194:16 195:21 196:8, 19 197:21 198:1,8,24 199:13 200:8 201:3,9,22 205:21 206:6 208:7,24 209:16 211:8 212:15,23 213:6 215:2,17,24 218:12 219:14,18 220:16,21 221:1,3,6,13,18,19,23,25 222:2,4 223:21 224:3 225:9,17 226:6,19 228:21 229:7 230:14 233:23 236:8,15 237:12 238:1,6,13 244:22 245:14 246:4 248:10 255:22 259:15,23 260:2 262:9,21 265:11 266:24 270:16,23 272:15 278:4 279:8 280:12,20 283:5,20 289:2,19 290:14 292:4 294:5,6,15 297:13 301:19 308:7,10 310:22 313:25 314:15 316:18

**format** 166:23

**forms** 95:4 99:23 100:7,9 101:3 145:19 147:10

**forward** 80:15 142:12 144:8 188:7 226:21 229:15 273:13

**found** 30:17,20 167:4 168:5 236:9

**foundation** 45:16 160:15 295:25 325:7

**fountains** 287:10

**frame** 87:19,20

**Francisco** 2:16

**Franklin** 77:16,20,21 78:15

**fraud** 41:24 42:6,11,15,19 219:3 276:20 278:8,10

**free** 259:6,11

**frequently** 169:25

**Friday** 65:16

**friend** 199:9

**friendly** 299:22,25

**friends** 198:13

**front** 15:20 59:17 187:23 257:20 310:9,22

**frustrated** 121:10

**fulfill** 246:17

**fulfilling** 222:25

**full** 11:22 186:11 264:9 265:19 303:6

**full-time** 256:17

**function** 54:11 236:7

**Fund** 11:1 185:9

**future** 253:22

**fuzzy** 11:24

---

**G**

**gave** 32:19 73:3 114:4 119:24 183:16 257:18 267:1 278:15

**gears** 275:15

**general** 3:5 29:4 43:9,14 59:19 70:15 72:22 80:4,6 142:18,24 163:3 245:4 247:24 248:1,3,23 261:13 265:16 291:14 300:3,6 307:3 309:17,21 315:14 327:19

**General's** 14:25 187:15 238:9

**generally** 15:5 103:5 198:13 216:2 239:24 250:7 261:22 269:3 276:3 297:15,22 327:11

**generating** 113:23

**generic** 291:7

**gentleman** 72:2

**gentleman's** 72:2

**get all** 118:21

**get-together** 15:11

**gist** 257:12

**give** 9:6 13:7 20:19 32:23 44:7 45:11 68:12 88:22 106:7 107:22 121:1 126:2 133:18 147:20 172:19,24,25 173:1,5 206:17 231:2,3 232:18 242:10 252:11 290:7 301:5 315:9

**giving** 11:18,22 51:13 70:2 109:11 128:12 173:4 186:11 272:18

**Gladys** 267:4,10

**goal** 213:21 214:8,9 253:6

**good** 13:8 41:4 45:8 68:5 69:4 147:22 184:25 185:1 193:1 199:18 295:12,14 322:24

**gosh** 246:13 266:5 313:11

**Governor** 244:25

**grade** 287:11

**graduate** 189:19

**graduated** 22:7 189:24 190:1,3

**Graham** 2:9 6:10 316:20

**grandmother** 52:1 301:6

**grant** 288:16

**granted** 284:5

**granting** 291:25

**gray** 251:22

**great** 12:13 155:13 199:7 230:25 277:25 282:14

**greater** 113:2,5,11,13 155:24 156:2, 3,17 160:15 173:6

**Greg** 244:25

**GREGORY** 1:6

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: ground..Hunker

**ground** 7:16 11:11

**group** 2:9 6:10 98:3 124:8 125:2 132:19 159:25 179:14 185:10 230:25 243:8

**groups** 245:19,20,22,25

**grow** 189:15 214:8

**GRP-DETAIL** 5:7 59:18

**grueling** 320:22

**guess** 12:25 23:15 24:7 44:1 152:25 197:9 228:20 267:25

**guidance** 125:17,24 126:15,18 218:21 234:20,22 235:4,16 259:10 317:5

**guide** 56:17 218:8,9

**guidelines** 127:18

**guts** 252:4,22

**GWHITE@ELIAS.LAW** 2:11

**H**

**half** 23:16 24:6 192:8 193:15 194:4

**hand** 10:1,4 18:20 31:17 40:24 61:4 68:16 92:17 184:17 315:2 334:15 336:15

**handed** 18:25 19:1,22,23 61:6,7 73:18 188:3,18 202:7,9 207:8,11 232:9 249:20 263:17 264:1

**handful** 45:10 269:21,22

**handing** 73:17 74:9 188:1,17 207:5 234:3 249:18

**handle** 23:15 124:13 126:3 133:4 165:12,13,18 261:25 262:2,3,7

**handled** 82:24 117:16 292:7 301:15

**handles** 38:4

**handling** 81:25 82:15

**hands-on** 193:18

**handy** 34:2

**happen** 144:11 195:10 223:3 238:14,16 248:5 284:6 294:2

**happened** 114:7,8 127:24 272:3,11 278:11

**happening** 28:16 101:8 144:15 293:10

**happy** 40:8,16 45:16 160:19 295:24 325:7

**harassing** 255:11,20

**hard** 101:2 105:15,16 219:18 221:7 246:23 292:5 310:8

**harder** 246:2 326:23

**hardware** 191:24

**Harris** 191:21 196:1 277:23 279:25 280:8,18 329:7,10,12,25 330:15

**Harry** 21:8

**harvesting** 226:25 227:4

**Harwell** 129:6,12 132:14

**he'll** 58:14 244:5

**head** 11:24 12:15 25:4 30:1 48:24 59:16 68:21 82:7 87:17 90:12 113:14 154:8 155:19,23 167:5,13 168:14 186:6 189:6 197:10 202:12 211:16 212:4 218:15 219:2 223:17 225:21 226:11 233:15 235:7 237:4 249:11 251:13,15,24 252:14 290:5, 6,10 305:12 311:2 316:7 319:9,16, 17 320:17 328:20

**heading** 74:5

**heads** 252:18

**hear** 42:9 53:3,5 70:11 118:5 125:10 138:5,10,17 139:4 261:19 282:9,10

**heard** 23:2 69:14 70:13 72:1,4 134:13 197:1 318:21 328:25 330:19

**hearing** 57:14 160:1 210:12

**heavy** 233:17

**held** 20:24 65:3 75:20 327:9

**helped** 36:18 52:2 54:1 118:17 121:13 301:10

**helper** 199:21

**helping** 72:8 214:22 222:8

**hereto** 1:25

**Hey** 30:17 96:1 130:13 230:18 276:12

**Hidalgo** 3:14,18 243:21

**high** 21:21,23,24 22:4 37:7 39:10 79:11,12,13,16,19 189:19,20,24 193:1 214:7 248:16 253:21 279:18 293:1 298:2 324:3 325:2

**highlighted** 16:1

**highlighting** 63:13

**highly** 267:13,16

**hire** 144:14

**hired** 38:5 250:13,14 256:19 273:14

**Hispanic** 13:13 194:7

**historically** 28:10 230:16

**history** 22:18 277:19 327:10

**hold** 20:4 52:19 77:13

**holding** 66:13 73:19 128:13

**holes** 266:19

**Holly** 1:18 257:17

**home** 239:6 256:11

**honor** 69:24

**hope** 9:10 118:15

**hoping** 106:21

**hostage** 12:7

**hosting** 47:16,20

**hot** 59:12

**hotline** 315:10,17,21 316:5,11,15

**hour** 106:4,12

**hours** 14:22 29:7,12,15 30:4 41:6,14 42:10,14,19,23 43:2,11,16 45:20,22 46:6,13,18,22,25 47:20 67:2 71:7 106:7,14 141:4 267:5,11,14,17,23 320:6,15,20,21

**house** 121:6 229:9 240:2 242:6

**house-to-house** 227:15

**Houston** 21:22,23 155:9 160:25

**Houston's** 327:25

**How's** 283:16

**Hughes** 79:23

**Huh-uh** 16:20,25

**human** 102:4

**hundred** 35:13

**Hunker** 3:4 4:8,9,10,11,14,15,18 6:11,12 7:2 9:3 31:6,18 39:9 42:2,7, 16 43:4,12,17 45:3,5 51:2,25 52:10, 15 53:8,10,15,16,23 54:18 55:15,17 56:24 57:12,22 58:7 59:9 60:21

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: husband..individually

65:6,21,24 66:2,5,8 67:16,21 80:12
83:21 87:9 93:8 94:15 97:24 98:9
100:5 105:1 108:13 113:12 114:15
116:21 119:16 120:11,24 126:1
133:3 134:18 137:17 138:16,23
140:9 141:12 142:25 143:2,8 146:5
148:4,6 149:18 152:24 153:11 154:3
156:1,5,14,19 157:7,15,22 158:1,7
159:24 160:3,6 170:5 171:3 172:17
175:19 176:1 178:19 179:20 180:14
182:3,5,18 184:1 194:16 195:19,21
196:8,19 197:21 198:1,6,8,24
199:13 200:8 201:3,9,22 205:21
206:6 207:10 208:7,22,24 209:16
211:8 212:15,23 213:6 215:2,17,24
219:14 221:3 222:2 224:3,10 225:7,
9,17 226:6,19 228:21 229:7 230:12,
14 232:4,8 233:23 236:8,15 237:12
238:1,6,13 244:20,22 245:14 246:4
248:10 255:22 259:15,23 260:2,15,
17 262:9,21 265:11 266:24 270:16,
23 272:15 278:4 279:8 280:12,20
283:5,20 289:2,19 290:14 292:4
294:15,24 295:11,15 301:23 307:17
310:16,19,21 314:8,16 316:19
322:22,25 323:2,9 330:25 331:4

**husband** 133:19,22 134:2 190:3

**hypothetical** 180:23 227:25 291:7,
9 292:6

**hypotheticals** 292:12

---

**I**

**ice** 321:1

**ID** 25:1,24 32:14 33:4 57:16 90:7
91:22 92:24 93:21 94:7,13 95:3,10,
20 96:5,6,13,20,21 97:9,14 98:5
99:6,11,16 100:1,16,25 101:22,24
103:17 104:19,23 106:5,14,22
108:11,23 109:7 113:3,8 114:5,10,
18 115:4 117:24 118:2 119:13
120:4,21,22 121:8 125:22 126:4,16,
23 127:2 135:4,6 136:17 138:7,11,
14 139:15 140:7,18 141:11,21 143:7
144:16 145:13,20,24 146:2 147:6,17
155:21 156:12 157:25 158:6,11
159:2 161:5 170:22 173:19,24
174:8,20 175:15 177:20,25 178:1,
16,17 180:11 183:19 243:1 246:18
248:15,24 249:7 291:3

**ID-MATCHING-NUMBER** 107:17

**ID-NUMBER-RELATED** 96:10

**idea** 98:4 293:21

**identification** 5:3 90:6 117:12
174:2 175:15 278:23 279:5 284:9,11
292:21

**identify** 44:16 144:5

**identifying** 294:12

**identity** 334:12 336:12

**IDS** 246:15

**ill** 11:23

**illegal** 219:12

**illiterate** 197:25

**image** 83:15,24 84:1 86:8

**imagine** 199:24 201:17 230:5
329:17

**immigrants** 37:16

**impact** 141:10 248:8

**Impacts** 250:23

**impaired** 210:12

**implement** 34:7 125:22 126:24
168:25 218:22

**implementa-** 245:12

**implementation** 235:6 245:13
315:6

**implemented** 27:12 168:17 237:18
277:16 279:25 329:7

**implementing** 91:22 127:2,11
128:6 148:24 163:11 180:12 220:8
277:15 330:5

**implements** 119:7

**import** 26:2,6 132:13

**importance** 273:16,17,18,20

**importantly** 285:25

**imposed** 46:8

**impossible** 267:22 268:1

**impressions** 173:5

**improvement** 314:13

**in-house** 152:5

**in-person** 17:22,24 18:1 28:5 51:6
64:18 67:12 219:3 227:4 228:14

297:20

**inability** 141:20 145:23 146:2

**incentive** 324:17

**incidence** 309:9

**incident** 309:13

**incidents** 219:3 255:19

**include** 64:21 197:20,24 198:4
212:13,21 218:7 284:24 296:8,12,14
304:23

**included** 94:12 304:6,19 317:3
319:7

**includes** 18:2 203:12,17 216:8,17

**including** 31:16 129:19 240:6
261:23 277:20 324:1,11

**income** 195:3,11

**incomplete** 83:19 84:2,14 123:2
155:20

**incompletion** 95:24

**incorporated** 303:5

**incorporates** 235:9

**incorporating** 250:17

**incorrect** 91:9 126:4 153:21 154:10

**increase** 326:10

**increased** 276:20 278:8 326:2

**increasing** 324:11

**Index** 4:5 5:1

**indicating** 14:16 16:4,22 20:1,12
27:22 28:14 39:6 80:8 82:20 83:4,13
85:24 117:2,13,24 122:17,21 134:12
138:14 218:7 219:1,9,17 242:14
250:20 251:7 269:22 286:9 287:9
288:12

**indication** 121:25

**indicted** 237:22 238:5

**indictment** 238:4 309:17,21

**individual** 57:23 71:24 72:17
121:13 132:17,24 133:7 150:6,24
162:1 164:18 176:15 200:1 231:3
246:6 282:19 283:23 293:24 294:8
327:25

**individually** 131:8

The Office of the Dallas County Elections Administrator                                April 29, 2022
Index: individuals..judge

**individuals** 51:18,21 71:25 156:9 170:22,23 171:8 175:3 179:4,8 183:13 231:17 236:10 284:3 288:1 322:6,10 325:16 327:16

**industry** 275:5

**information** 9:7 15:2 17:10 22:15 32:24 34:2,17 35:7 40:7 72:10,13,15 92:16 93:5,11,12,13,22 95:13 97:22 103:18,24 104:6 110:9 112:7 116:3, 8 122:20 128:21 131:3 132:13 135:4,7,16,17,19 136:22 138:3,8,12, 20 141:3,15,18 142:4 147:20 152:1, 8 165:19 167:23 172:20 173:1,2 180:19 181:13 200:2 218:13 219:19 221:2 222:9 234:11 255:8 270:11,12 284:23 294:4 320:19

**informed** 103:15 275:8

**informing** 94:12

**Ingram** 244:1,19

**initial** 6:24

**initially** 97:8 214:6

**initials** 250:5

**initiative** 50:22 80:11

**input** 50:17,19 250:25

**inputted** 90:16

**inquire** 329:6,11,14

**inquired** 298:4

**inquiries** 104:23 105:9 106:8 107:17 141:9,16

**inquiring** 232:16,23

**inquiry** 115:17,18

**inserts** 117:6

**inside** 37:20 86:6 116:19,20 117:9, 10 148:25 212:1 228:11 276:17,24 289:25 297:13

**insisting** 200:20

**inspect** 287:6

**inspections** 287:17,20

**instance** 1:15 57:4 133:14,18 134:9 159:2 181:9 221:24 222:5 234:8 244:14 255:10 270:21 291:2 327:12

**instances** 223:25 224:7 231:14 255:24 268:24 278:10

**instigated** 309:9

**instruction** 13:1 70:17

**instructions** 211:7

**instructs** 70:15

**instrument** 334:13 336:13

**intend** 231:19

**intended** 238:22 325:14

**intending** 219:13 228:25

**intent** 227:11 228:7 325:21

**interact** 200:2 245:18 261:6,8 302:25

**interacting** 129:23 215:22 262:18 322:5,16

**interaction** 215:15 227:5,7 228:14

**interactions** 242:17

**interchangeably** 13:12

**interest** 79:25 327:2,3,8,15,21

**interesting** 79:22 236:2

**interfere** 257:13 258:9

**interfering** 258:8

**interpret** 164:2 215:4 299:14 303:2, 17 306:20,24 307:4

**interpretated** 212:6

**interpretation** 153:9 163:22 211:17 215:10 300:5 301:22 312:1

**interpreted** 154:1 212:6 299:7

**interpreting** 250:16 300:4

**interprets** 303:10

**interrupting** 315:25

**intimidated** 270:22

**intranet** 128:7

**introduce** 69:14 185:5

**introduced** 240:3

**introducing** 304:3

**introduction** 277:21

**investigating** 267:13 268:10

**invites** 37:8

**involve** 215:15

**involved** 32:11 33:10 80:25 81:4 116:24 193:12 321:2

**involvement** 31:21 39:14

**irregularities** 256:1,2 260:23 261:2 314:17 315:1 329:11

**irregularity** 262:5 315:19

**issue** 32:5 95:20 140:16 244:10 284:20 322:18

**issued** 177:8,11,18,22

**issues** 140:13,20 147:23 148:8,14, 18 227:17,19,20,22 324:9

**issuing** 308:23

**item** 7:4

**items** 74:4 91:4

**iterations** 314:2

**Ivy** 267:4,11

---

## J

J.schuette@dallascounty.org 2:25

**JACQUELINE** 3:16

jacqueline.villareal@da.co. hidalgo.tx.us 3:20

**jail** 230:4 234:15

**January** 25:22 26:1 36:25 85:9 91:25 92:3,8,20 93:3 94:19 101:9,17 125:19 126:21 127:3,17,21 128:25 234:19 310:14

**Jason** 2:20 6:16

**JENNER** 2:14

**jeopardy** 234:13 257:14

**JEREMY** 3:21

**job** 12:13 20:22 21:1 75:18 77:13 126:12 190:14,18 192:12,15,18,22 262:12

**joined** 78:21

**joint** 59:19 271:11 327:11,13

**jotted** 73:9,11

**JR** 3:15

**judge** 11:18 30:16 31:9 32:4,9 41:14 45:24 46:1,2,4 70:5 86:21,22

The Office of the Dallas County Elections Administrator

214:16,23 261:4,9,22 262:11 270:25
271:9 272:6 276:14 288:19,22
289:3,7 290:17,25 301:21,25 315:2,
10,25 318:20

**judge's** 216:22 276:12

**judges** 47:14 55:12 56:8 261:17
262:3 263:6,7 264:11,22,24,25
265:6 266:15,19 306:11 313:2,8
317:22 319:4

**judicial** 46:1

**juggle** 262:11,13

**jump** 305:4 307:11

**jumping** 45:13 160:9 295:18

**June** 35:13 286:25

**jurisdiction** 111:12 193:24

**jurisdictions** 324:4,21

**jury** 238:17 239:1,7,12

**JUSTICE** 3:11

───────────────

**K**

───────────────

**Kathleen** 3:4 6:12 160:6 295:15

**Kathleen.hunker@oag.texas.
gov** 3:7

**keeping** 252:24

**Keith** 244:1,4

**Ken** 245:4

**KERA** 5:11

**kidding** 118:17

**kind** 9:18 16:1 20:9 21:10 30:16
31:21 36:11 37:1 38:4 56:13 82:23
88:6 100:3 123:14 128:18 140:11
191:13 216:18 234:24 240:4 248:19
251:4 259:7,18 272:22 291:6 293:18
317:7 325:21 327:10

**kinds** 118:21 289:21

**kitchen** 228:12

**knew** 33:7 84:18 103:14 167:20
220:13 238:9 321:14

**kno-** 158:13

**knobs** 287:9

**knowing** 275:12

**knowingly** 264:16 318:3

**knowledge** 25:20 33:2,17 49:14
53:2 58:10 75:7,10,15 80:8,13,18,23
82:25 134:12,19,24 135:6 147:23
148:8,13 158:8,13 159:18 161:7
162:7,8 163:19,21 164:17 177:19
178:7 179:3,13 196:14 261:10
314:19 315:5 321:18

**Kouba** 78:4,5,9,10

**Kris** 318:20

**Kristy** 279:9

───────────────

**L**

───────────────

**LA** 1:3

**label** 83:14 152:3,4,7

**Labor's** 194:19

**lack** 24:14 144:5 308:21 321:5

**lacked** 241:13

**laid** 289:11

**language** 13:20 38:22 39:1 123:25
125:8 194:14,21 197:25 201:23
203:10,12,17 204:1,7,12 205:2,12
206:12 207:17,23 208:17 209:3,5
211:9,17 212:5,18 213:24 214:11,
12,17 215:4 218:18 219:22 224:24,
25 225:24 230:1,6 289:11 299:7,16
302:11,14 303:5,10 309:1 313:17
314:5,6,12 319:6,7,22,23

**languages** 38:20 123:19 210:13

**laptop** 149:24 310:8

**large** 194:18 195:11 326:5

**largely** 244:17

**larger** 23:14,16 325:23

**largest** 193:24 194:1,2

**late** 41:16 114:12

**Latino** 13:13 194:7

**laundry** 287:7

**laura.bender@usdoj.gov** 3:12

**law** 2:9 6:10 11:3 60:14 87:10 131:5
139:18 153:10 154:2 156:22 168:23,
25 169:2,22 170:1,7 190:2,3 201:10,
12 236:1 252:4,22,24 264:12 275:24
288:18 291:10 294:7 297:22 298:5

300:8,13 303:13 311:20,23 317:23
319:5 325:18

**laws** 165:19 168:9 169:13,22 199:3
219:6 239:11 297:11 301:3 303:17
306:3

**lawsuit** 140:17

**lawyer** 70:15

**lawyers** 18:9 70:12 71:12

**lay** 45:16 160:14

**layers** 303:16

**lead** 41:23 42:6,11,14 76:12 272:13

**lead-up** 105:12

**leading** 99:5 278:25

**leads** 244:3,5

**lean** 199:10,20

**learn** 309:4

**learned** 34:1

**leave** 70:17 213:8

**led** 265:15 320:12 326:3,12,13

**left** 110:2 301:14 306:14

**left-hand** 207:16 208:9 252:12

**legal** 11:1 185:9 199:1,4 213:7,9
234:13 245:19 257:14

**legally** 172:19

**legislation** 168:18,22 239:14,19
241:8 250:16,17 251:14 252:23
274:9,11 303:15,17 314:10

**legislation's** 265:24

**legislative** 5:10 281:7 309:3

**legislators** 240:14 241:9,19,20,25
242:3 274:10,13 280:24 281:4

**Legislature** 5:8 165:6 168:23 169:1
202:11 236:16 239:15 240:8,11
274:6 319:22 329:1

**Legislature's** 308:22 309:4

**lengths** 259:12

**lessor** 173:6

**letter** 79:2,3 84:25 88:4,6 103:7,8
294:4,7

**letters** 98:17

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: letting..make

**letting** 84:13,25 90:20 128:10
136:18 212:7 271:14

**level** 173:7

**liability** 230:11 237:9

**liable** 237:1

**liberal** 211:10 215:7,10 299:12,15

**license** 24:3,6,23 25:7,12 26:2,4
33:4 90:7 91:9,10 93:17 94:7 95:25
103:9,17 104:3,8,13 107:1 113:8
126:4 135:21,25 136:5,25 137:4,8,
14,16,24 139:22,23 140:23 143:15,
18 144:1 151:22,24 153:5,18,22
154:9 156:7 168:3 241:14 292:24
293:13,25 294:17

**lights** 150:7 283:6

**limited** 13:17 32:7 70:25 148:11,15
198:5 214:15 225:15 259:3 311:11

**limiting** 297:19 299:8

**limits** 313:1,9

**Lincoln** 190:2

**lines** 202:20 257:23 258:23 260:12
289:25 313:13

**Lisa** 193:2

**list** 63:22 67:4 80:2 98:16,17,18,22,
23,25 99:1 134:23 153:4 170:22,23
188:9 243:22 248:12 253:18 287:7,
10,14 289:18 329:22

**listed** 20:11 62:1,4 74:5,11 153:21
305:1

**lists** 22:15 73:12

**litigation** 3:17 235:17 314:21

**live** 135:22 192:20 239:7

**lived** 21:22 194:3

**LLP** 2:14

**local** 21:5 53:11 144:22,25 145:2
241:25 327:7

**locate** 39:14

**located** 1:21 192:2 286:21

**location** 26:22 52:3 110:14 214:5,9
270:17,24 271:4 272:1,3 287:6,8,11
288:19,21,23 301:6,11 325:25

**locations** 38:6 47:17 48:16,22 49:2,
9,15,22 50:2,13 196:11 269:1,3

**270:5** 286:1,18,20 287:15,18 324:7
325:11,15,21,22,23

**logistical** 47:1

**logistics** 329:3,6,22 330:6

**long** 12:5 14:20 18:24 20:24 75:20
76:4,21 77:21 78:1,11 106:9 107:13,
25 152:12,15,21 187:5 192:6,12,18
238:15 253:15 275:21,23 277:19
300:8 320:6,15,20,21

**longer** 9:17 60:18 141:4 230:22
266:21 268:22 269:2,7,10 278:25

**looked** 16:24 253:10 317:13 329:3

**Lopez** 1:10,14 4:7,20 6:4 7:9,10,19,
23,25 10:16,18,23 19:1,23 36:10
39:25 40:10,12 41:3 45:6 55:1
58:10,12 59:10 61:7 66:9 71:20 76:2
114:2 116:14 129:19,20 143:21
144:3,7 325:9 333:2 334:1,6,11

**Lopez's** 69:12

**lost** 53:9 203:20 320:25

**lot** 22:23 112:22 121:10 139:18
140:1,16 169:8 174:3 245:19 257:2
287:23 292:10 297:25 314:5 327:4,6

**lots** 265:25 280:7

**loud** 12:14,16

**love** 230:25

**low** 195:3,11 327:14,15

**lower** 247:25 248:5 327:17,18,19,21

**lowest** 327:8

**LULAC** 2:8 6:9

**lunch** 9:17 184:11

**LUPE** 1:16 2:3 6:7 185:10

**lying** 205:20

_____

**M**

**machine** 1:20 61:21,23,25 62:4,5,6,
8,10 86:8 199:12,23 200:7 210:4,15,
20,22 211:5,25 216:9,10,11 260:1
276:17,19 301:14

**machinery** 209:22

**machines** 209:17,18,20

**made** 46:6,9 55:6 156:12 175:6
222:23 253:13 257:5 326:1

**Magna** 79:13

**mai-** 123:11

**mail** 3:5 13:25 14:3 17:13,22,25 18:2
31:15,17 32:12,13,18 33:5 34:18,19
63:1,2 64:21 70:20,23 71:1 75:19,22
77:12,22 78:2 80:5,10,16,21 81:1,5,
8,16,19,21 82:1,10,11,16,21 83:3,9
84:16 85:4,5,8,11 86:1 87:14,24
89:1,16,23 90:2,11,18,24 91:13,22
92:2,8,13,21,23 94:10 95:2,8 96:19
97:5,6,15,23 98:7 99:2,20 105:23,25
106:1 108:10,18,22,24 109:6,7,10,
15,24 110:11,18 111:10,17 112:11
113:2,10 114:20 115:3,4 116:5,18
117:1,14,16 120:7,8 121:7,12,17,21,
22,24 122:10,11 123:3,5,10,18,21,
25 124:7 127:15,17 129:24,25
130:9,14,23 131:20,21 132:21,25
133:7,10 134:3 135:5 138:7,8,13
139:19,22 140:18,24 141:11 142:9
143:5 144:10,15 145:12,19,22,25
146:1 147:2,5,10,25 148:11,15,20
151:3,12,25 152:2,22 153:4 155:20
156:10,18 157:14,19,20,25 158:16,
18,20 166:4 168:16,20 172:3,6,25
175:10,13 176:24 177:4,5,9 178:8
179:5,11 180:7,20 181:2,12,16
183:11,24 191:15,22 196:10 224:21
225:5,15 226:2,4,17 227:9 228:10
229:17,22 230:19 231:1,4,7,11,19
232:17 233:1,11 234:4,7,9 235:23
236:5,14 242:25 246:13,15,22
248:15,23 249:6 277:22 279:16,17
282:17,19,21,22 283:3,19,23 284:6,
7,19 291:3 292:22 293:5,8 294:1,14
307:14,20 308:4 309:6 310:3 311:5
328:6

**mail-ballot** 125:2

**mail-in** 278:22 279:6

**mailed** 130:11 135:12,14

**mailing** 80:20 116:20 117:4

**main** 178:22 248:21

**maintain** 22:15,21 191:4 313:14

**maintained** 40:13 115:11 116:9

**majority** 178:25 190:24

**make** 12:16 13:7 23:20,24 30:5
40:17 43:10,15 55:6 56:12,15 68:13
75:14 82:17 83:20 84:17 101:17,18
120:13 123:24 126:9 158:15 167:23
176:18 180:10 197:8 201:5 206:2,

The Office of the Dallas County Elections Administrator

13,22 227:25 233:25 234:10 252:9
272:6 278:3 285:6 287:7 300:7
301:21 311:16 312:18

**makes** 11:24 56:13 85:4 243:24
264:16 287:23 292:10 318:1

**making** 53:14 70:12 125:21 253:6
266:15 277:19 279:17

**MALDEF** 2:4 6:8 11:2

**Malissa** 78:4,5,9,10 311:9

**managed** 97:10 109:10

**management** 79:12,13 190:20
191:2,8,9,14 192:7

**Manager** 20:23 21:2,13 22:13 31:23
32:11 143:21 144:3,7 192:23 321:20

**managers** 250:16

**mandatory** 181:19

**mapping** 22:19

**March** 5:12 28:24 30:4 32:12 33:2
65:15 76:7 81:9,22 82:8 83:2 91:18,
20 99:5 105:13 106:25 107:5,12
112:5 126:22 127:21 128:25 132:4,5
144:19 153:3,17 154:7 155:24
156:18 158:12 170:10 172:10
173:19 174:7,21 176:7 177:12,17
178:15 180:7 257:5 262:24 264:4
268:19 269:20 270:4,10,20 273:5,14
297:3,6,7 323:16

**mark** 18:17 19:20 187:8,23 202:1
204:15 206:25 211:11,14 214:25
215:1,8,19 219:12 231:23 263:16,22
299:3

**marked** 18:19 19:2,11,21,24 52:11
59:4 61:5,8 73:18 202:6,9 207:4,7,
12 232:3 249:15,19 263:23

**MARKED/ID'D** 5:3

**Market** 2:15

**marking** 51:22 204:14 209:25
210:6,8 211:11 216:3,12,13,22
299:2

**marks** 210:17 318:3

**mass** 30:23,24

**match** 32:14 33:11 92:23 93:5 95:11
96:6,14 97:9 99:6 100:25 101:24
108:21,23 109:12 113:3 115:6
119:12,25 121:8 135:25 138:14
141:20 142:14 143:7 145:12,19,24

146:2 147:6,17 175:16 178:1 243:1
294:19

**matched** 26:3 94:14 96:22 99:11
153:7,24 285:7

**matches** 90:9

**matching** 32:17 106:22 107:2
114:10,24 115:13 120:22,23 125:23
126:16,23 127:3 140:8,18 141:11
144:16 180:11 248:24 249:7 282:17

**matching-the-id-number** 244:10

**mater-** 289:14

**material** 16:2,6 217:20

**materials** 16:9,10 82:24 110:3,4
119:14 153:4 217:19 218:2,6,7
257:3,4 274:3 289:14

**math** 267:17,20

**matter** 9:11 43:9,14 160:7 163:3
185:12 247:24 248:3

**matters** 331:23

**May-joint-june** 297:3

**Mcdonald's** 265:21

**meaning** 25:21 164:25 165:4 237:6
259:11 309:2 312:4

**means** 17:21 60:2 228:8 259:6

**meant** 278:6 284:2

**measure** 227:12

**measures** 293:2

**mechanism** 175:16

**media** 141:10,24

**mediate** 271:22

**medical** 186:14

**medication** 11:24 70:8 186:12

**meet** 14:20 90:18 187:11,14 198:25
251:3

**meeting** 240:19 243:24

**meetings** 243:7,25 244:4,5 245:25

**member** 165:8 180:17 238:19
243:13,17

**members** 240:8 242:6 256:17

**memories** 252:16

**memory** 11:12 209:10 222:20
252:13 304:9 330:14

**mentioned** 27:3 47:22 63:18 72:17
102:21 108:14 127:22 128:1 161:3,
16 172:2 180:4,25 182:20 274:1,23
279:24 297:24 309:16 319:3 320:11

**message** 30:24 125:11 129:15,17,
18

**messaging** 30:24

**messed** 49:25

**met** 14:17 71:6 90:21

**met all** 90:15

**method** 196:2 216:19

**methods** 312:9

**metrics** 269:18

**Mexican** 11:1 185:8

**Michael** 1:11,14 4:16 6:3 7:8 78:3
184:21 185:4

**microphone** 40:24

**microphones** 67:20

**middle** 278:19 326:16

**midst** 171:24

**midterm** 248:9

**military** 83:12

**million** 22:21

**mind** 69:3 149:22 188:1,16 253:1
301:20

**mine** 310:8

**minimum** 53:11

**minority** 39:5,11

**minute** 30:17,20 68:22 105:16
152:14,17 281:10

**minutes** 39:18 105:16 107:18 149:8
175:20 249:10

**mirrors** 327:1,2

**misdemeanor** 258:11 264:16 318:2

**mismatch** 139:15 177:19

**mismatched** 139:23,25

**missing** 87:15 89:8 91:4,10 93:11,
21 94:6,13 95:3,7,10,21 96:13,20
97:20 103:8 126:4 130:7 132:17,20

The Office of the Dallas County Elections Administrator

136:6 156:6,7

**mistake** 65:14 312:19

**mistakenly** 237:10

**misunderstood** 102:24

**MO** 253:8

**modernize** 286:19

**modification** 157:24 158:4,11,20, 22,23 159:9 288:16,25 289:8,10,17 291:16 292:1

**modifications** 159:8,14,17 257:5 288:2 289:22 292:16

**modified** 219:22

**moment** 58:20 83:4 174:1 222:25 232:18 243:5 252:11 279:24

**Monday** 266:17

**money** 237:6

**monitor** 250:15

**monthly** 92:14

**months** 11:7 99:5 192:14 330:22

**morning** 8:14,25 16:12 106:17 187:20 266:7 310:7

**mother** 222:8 246:12

**Mother's** 324:2

**motivation** 319:15

**Mountain** 22:5

**mouth** 223:9

**movable** 196:15

**move** 89:19 199:21 312:24

**moved** 266:18 286:12

**movement** 257:13 259:6,11

**moves** 30:1 59:16 68:21 82:7 87:17 90:12 154:8 167:5,13 168:14 186:6 189:6 197:10 202:12 211:16 218:15 223:17 226:11 233:15 237:4 249:11 251:13,15,24 290:10 305:12 311:2 325:18 328:20

**moving** 47:1 80:2 90:12 113:14 199:11,12 212:4 216:17,24,25 219:2 239:14 252:14 292:12 314:4

**MS015753** 310:24

**MS015754** 310:24

**multifaceted** 169:5

**multiple** 95:23 96:2 100:7 209:20 234:3 240:14

**mute** 68:19,23 69:1

---

## N

**named** 267:4

**names** 36:6,8

**naming** 205:3

**narrow** 212:6 215:5 299:14 303:12

**nation** 242:8

**naturalization** 37:19,21 38:9,14 40:14

**naturally** 39:7,10

**nature** 271:8 275:12

**navigating** 198:23

**NE** 2:10

**Nebraska** 189:16,25 190:2 192:24 222:17

**necessarily** 105:5,9 148:22 163:4 302:6 329:5

**needed** 129:9,10 133:15 134:15 288:6 295:25 297:25 298:1 308:10

**needing** 252:21

**negotiate** 271:22

**neighbor** 198:15 213:1

**neighborhood** 21:9 28:11

**neighborhoods** 37:4 39:5

**net** 178:1

**network** 214:4

**newly** 38:3,24 180:12 194:24

**news** 5:11 263:18 264:2 317:18 323:11

**Nicholas** 8:19,21

**Nina** 2:4 6:7 10:24 44:10 130:13,15, 17 185:8

**nineteen** 76:24

**ninety-** 76:25

**no-shows** 263:9

**Noble** 278:20 279:9

**nods** 12:15

**non-ada** 62:10

**nonpermanent** 196:16

**nonprofit** 198:18 226:16 305:22 307:9 308:6

**nonprofits** 305:19 306:2 308:13,17

**nonresidence** 239:2

**normal** 43:11,15

**NOTARY** 334:18 336:18

**note** 8:3 40:3,9 169:24

**noted** 278:21 334:3 336:3

**notes** 73:6,10,11 164:8 175:20

**notice** 1:24 5:3 7:7,8 19:8 73:20 84:13 88:19 90:20 91:6,7 94:5,8,9, 11,16,19,20,23,25 95:1,15,16 96:1 97:21 99:10 100:15,24 101:20 102:9 109:20 110:10,12 113:16,25 114:1 119:13 120:1 122:18,20 147:14 165:18 171:9 188:5,14 207:23 305:9

**noticed** 12:4

**notices** 96:4,10,17 99:14 101:16 113:16,23 126:3,8 128:10,16 141:5, 6 145:18 147:9 177:11,14,22 178:24

**notify** 96:13

**notifying** 126:7

**Nov-** 65:10

**November** 5:7 29:4 35:12,14 47:17, 20 48:5,9,17,19 49:3,4,7,9,10,16,23, 24 50:2,3 59:21 60:8,12,15 61:15 65:2,7,10 81:13,18,20 82:1,11,22 142:12 144:9,11,18 170:16 237:16 247:19 248:9,23 257:4 273:23 274:25 296:8 297:4 326:18,20,25

**nperales@maldef.org** 2:6

**number** 8:6 17:18,19 18:19 19:20, 21,24 24:3,10,21 25:4,7,13,14 32:14 33:4 48:15,18,20 49:1,2,9,15,22 50:2,13,14 59:4 63:7,9 64:7,14 66:11,12 67:11 73:19 74:8 90:8 91:8 92:24 93:17 94:13 95:20 96:5,6,13, 20,21,23,24 97:9,12,14,19,20 98:4, 6,10,12,15 99:6,11,17 100:1,16,25 101:13,24 104:3,8,15,17 105:5,10, 25 106:22 107:22,23 108:20,23

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: numbered..opened

109:7,12,14,16 113:2,3 114:10,18,
21,25 115:4,7,13,16 117:25 118:2,7
119:13,24 120:4,9,21,23 121:9
122:3,12 125:22 126:23 127:3 135:4
136:5,25 137:5,8,14,16,24 138:7,11,
14 139:15 140:7 141:21 142:2,14
143:7,15,18 144:1,5,16 145:13,20,
24 146:3,15 147:7,17 153:5,7,18,19,
22,24 154:10 155:19,21,22,23
156:4,17 159:2 168:3,6 170:6,23
171:8 174:21 175:15 177:20 178:1
180:11 193:1,14 194:1,13 195:11
202:3,5,6,10 207:2,4,7,12,13 213:22
215:18 232:1,3 241:14 243:2 246:18
249:7,15,19 250:3 251:19 255:9
263:12,23 276:9,11 284:9,11 288:8
292:23 293:7,13,25 294:13,18
296:14 298:12,18 310:16,18,22,24
315:15 324:4,19,25 325:2,20 326:2,
3,5,10,11,18

**numbered** 1:17 19:15

**numbers** 24:10,15 25:24 33:11
34:25 35:2,10 42:24 63:14 64:18
91:1 95:3,10 101:22 113:5,15 114:5
136:6,17 144:5 145:16 156:7,13
173:4,6 178:17 179:15 232:13
241:12 249:24 292:24 293:17,21,22
294:2,9 315:14

**NW** 3:11

---

## O

**oath** 5:9 11:14 51:12,14,18 55:9,13
56:5,23 57:6 70:2 186:8 203:10
204:1,22 205:2,7,18,20 206:2,4,14
207:22 208:3,5,15,20 209:1 211:3,
18,23 212:12,20 217:14,16,17
218:18,22 219:17 221:12 222:11
290:9 298:21 300:19 303:24 304:6,
22 334:11 336:11

**oaths** 5:8 207:14 258:11

**Ob-** 55:15

**Objec-** 52:12

**object** 52:25 195:19

**objection** 31:6,18 39:9 42:2,7,16
43:4,12,17 50:24 51:23 52:5,6,19,24
53:22 56:24 65:6,21 67:15 70:12
80:12 83:21 87:9 93:8 94:15 97:24
98:9 100:5 105:1 108:13 113:12
114:15 116:21 119:16 120:11,24
126:1 133:3 134:18 137:17 138:16,

23 140:9 141:12 142:25 143:8 146:5
148:4 152:24 153:11 154:3 156:1,5,
14,19 157:7,15,22 158:1,7 170:3
171:1 172:14 175:17 178:18 180:14
182:16 194:16 196:8,19 197:21
198:1,6,24 199:13 200:8 201:3,9,22
205:21 206:6 208:7,22 209:16 211:8
212:15,23 213:6 215:2,17,24 219:14
221:3 222:2 224:3,10 225:7,17
226:6,19 228:21 229:7 230:12
233:23 236:8,15 237:12 238:1,6,13
244:20,22 245:14 246:4 248:10
255:22 259:15,23 260:2 262:9,21
265:11 266:24 270:16,23 272:15
278:4 279:8 280:12,20 283:5,20
289:2,19 290:14 292:4 294:15
301:19 303:18 313:25 314:15
316:18

**objections** 53:11,14

**obligated** 261:2

**obligations** 285:20,23

**observation** 316:15 318:11

**observations** 174:19 176:12 177:7
195:1

**observe** 259:8 264:19 312:16,21
313:10,23 318:5

**observing** 264:17 318:3

**obstruct** 313:2

**obtain** 206:14

**obtaining** 321:3

**OC** 282:8

**OCA** 155:2 282:15

**OCA-GH** 2:13

**OCA-GREATER** 155:9 160:25
327:25

**occasion** 243:9

**occur** 256:24 257:1

**occurred** 42:19 145:7 329:12,15,25
330:17

**occurs** 293:11

**offense** 224:20 230:2 258:9 264:16
318:2

**offenses** 233:17

**offer** 20:9 32:7,8 110:4 136:15
275:19 290:23

**offered** 127:11 223:10 275:21
277:12

**offering** 53:19

**offers** 305:10

**offhand** 96:23

**office** 1:20 2:22 3:5,17 5:4 14:25
35:20 38:12 42:4,10,13 47:6,19
72:2,8,19,21 81:25 82:4,15,18,23
84:17 86:1 90:22 92:1,20 96:25
99:8,10 102:4,9 104:2,17,21 105:12,
22 106:2,23 108:2,15 120:19 122:16
125:6,18,21,24 126:13,21 127:2
128:4,18 129:18 136:10 140:19
144:10 145:17 147:24 152:13,16
156:16,24 157:1,2,5 158:18,21
159:3,14 161:4,9,21,24 162:4,10,15,
20,25 163:6,11 176:13 177:2,8
187:15 193:9 196:12 197:1 212:25
230:9,23 235:6 238:9 243:6 244:25
254:14 255:4 256:9,13 258:13
259:11 269:14,19 271:21,25 274:25
280:3,19 283:22 286:3 288:5
292:15,22 299:21 300:23 306:8,15,
23 307:3 309:16,20 311:16 321:12,
13 322:2 324:14 330:9 334:15
336:15

**office's** 285:20

**officer** 258:9

**official** 164:20,22,23,25 165:4
176:12 221:1 227:8 237:1,2,7,13
262:5,6,18 278:21 286:18

**officials** 157:6 164:1,3,6,10,13
235:23 236:3,10,13 240:15 242:12,
16,20 243:9 244:9 256:2 260:24
261:1 309:6

**offline** 23:9,11,12

**oil** 238:20

**Omaha** 189:16,19,25 192:24

**ongoing** 296:17 314:21 316:2

**online** 23:9 51:3,4

**onward** 34:9

**open** 28:17 29:7 30:21 31:2,9 41:8,
17,23 42:5 50:9,10,18 64:5,8 65:3,
17 83:5,17 118:1,7 119:7 261:24
266:6 272:25

**opened** 30:18 50:20 83:4

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: opening..Perales

**opening** 92:22 117:23 118:8,9,10, 14 266:6 273:1

**opens** 118:10

**operate** 259:13

**operates** 54:13,16

**opinion** 275:8 278:2 301:25 303:9 313:22

**opportunity** 31:4 60:5,8,11 187:19 331:25

**opposed** 171:20 176:12 216:14 277:7 289:4 304:2 308:23 314:23 322:6

**opposing** 274:7 280:25

**option** 171:22 308:17 328:21

**optional** 166:14,15 167:22 183:2,5

**options** 88:7 89:15 139:18 290:23 291:13

**oral** 1:10,13 206:18,20

**orally** 312:10

**orange** 15:24 63:13

**order** 7:5 41:11,17 84:24 88:23 109:7 130:11 135:23 136:1 140:24 157:13 167:23 177:5 181:22 187:11 200:1 251:2 259:8 307:3 331:8

**ordered** 30:16 31:9

**ordering** 41:14

**orderly** 313:14

**organization** 226:16 253:10

**organizations** 11:2 198:18 324:25

**organizers** 240:23

**original** 331:22

**originally** 21:19 189:13

**outline** 15:17

**outlines** 259:18

**outreach** 37:2,3,5,12,14 38:4,17,19, 23 39:5 40:13,14

**over-65** 111:11

**oversee** 22:14

**owns** 112:23

---

## P

**p.m.** 1:18 30:9,14 31:3,10,17 41:8, 19,23 42:6 47:1 59:6 64:5,9 65:4,17 67:24 68:2 149:11,14 150:17 175:22,25 184:10,13 281:12,15 283:12,15 295:6,9 323:5,8 331:17, 20 332:5,7

**P.O.** 3:5

**packet** 117:2,7

**Pad** 40:4 219:19,20

**pages** 8:8 16:22 61:9 74:14

**paid** 226:4,16

**paper** 17:1,3 210:16,18,20 211:20, 24

**papers** 109:23

**paperwork** 15:20 72:24 73:1,3,7,8 122:24 258:11 321:2

**paragraph** 264:9 278:19 317:21 318:19 320:2 321:4

**paragraphs** 267:3

**Pardon** 179:23

**parentheses** 223:16

**part** 16:1 54:4 59:23 115:15 187:8 238:24 256:18,21 274:2 316:22 320:15 323:13 330:10

**participant** 68:20

**participants** 240:24,25

**participation** 327:3

**parties** 10:9 86:19 205:4 271:24 308:24 309:5 315:8,11 316:8,9,11, 14 324:13

**partisan** 247:25 264:12 275:13 317:23

**parts** 147:25 238:25

**party** 17:17 60:3,4 63:13 64:7 85:15 86:19,20 235:23 236:3,13 278:21 322:2,3,4

**pass** 39:24 40:2,18,20 43:22,25 57:10 65:22 110:8 149:15 254:1 263:11,15 281:18

**passage** 231:5

---

**passed** 5:8 169:1 172:3 176:25 202:11 319:22 326:21

**passes** 239:22

**past** 38:1,12 80:7 110:10 155:25 195:18 196:10 230:10 231:11 238:11 255:9

**patched** 266:19

**patience** 40:1 253:25 254:6

**pause** 283:8

**Paxton** 245:4

**pay** 225:21 226:1 233:1 287:18 324:11

**paying** 225:13 226:3 232:24 233:5, 11

**payment** 226:2

**penal** 206:3

**penalties** 233:17 234:16 237:6,10 242:15,16 244:9

**penalty** 203:13 205:18 206:7 207:23 208:1 236:21 237:1,6 303:21 311:24

**pending** 220:5 235:14

**Pennsylvania** 3:11

**people** 24:9 25:13 28:9 31:22 33:24 34:14 38:7,13 53:19 63:5 79:21 96:5 97:4,8,13 98:3,4 108:15,16 109:14 110:25 111:6 112:22 119:24 120:8 124:24 126:12 128:5 134:25 136:13 139:4 141:19,25 142:2,8,21 144:13 155:19 157:1 159:11 167:4,6 174:25 179:1 184:5 193:1 195:11 196:2 198:10 200:9,23 225:13 226:3 227:15 243:23 246:1 256:16,17 262:22 265:17 266:18 268:12,25 269:11 276:3 279:19 288:9 293:7 294:12 302:5 321:6,14,25 330:14

**people's** 32:12

**Perales** 2:4 4:7,9,10,12,13,15,17 6:7,8,18 7:4,14 8:2,15,17,20,23 9:1, 5,12,23 10:13,16,21,24 18:17,22,24 19:20 31:8,20 36:11 39:13,17,24 40:20,22,24 44:3,6,10,11,17,20,23 45:1 47:22 51:23 52:6,12,14,16,19, 21,23 53:13,22 54:20,23,25 55:19 57:2,9,17 58:8,18,20,23 60:23 61:2 65:9,22 66:13 67:15,17,19 68:4,10, 19,22 69:5,10 80:14 87:14 93:15

---

94:18 98:2,11 100:8 105:2 108:14
114:17 116:22 119:18 121:1 126:2
130:14 133:4 134:20 138:19,24
140:11 141:14 143:4,10 146:9 148:7
149:7,15,22 150:11,18 154:22 155:3
170:21 171:1 179:25 180:16 181:23
182:16 184:2,5,8,14,24 185:8 188:1,
16 194:22 195:23 196:9,21 197:23
198:3,9 199:2,15 200:11 201:6,12
202:1,3,8 205:23 206:25 207:5,11
208:8,25 209:17 211:13 212:17,24
213:10 215:13,20 216:1 218:11
219:16 221:5 222:3 224:6,12
225:11,19 226:8,21 228:23 229:11
230:15 232:2,6,10,21 234:2 236:12,
17 237:15 238:3,8,14 244:24 245:16
246:5 248:12 249:9,18 253:24
281:25 297:17 298:9 299:7 302:9
304:8,17 305:19 308:13 309:12

**percent** 24:5,7,11,23 80:4 262:2,3
278:22

**perception** 268:13

**Perf** 118:25

**perfectly** 75:7

**performance-based** 224:25 225:6,
16,20 226:5

**period** 26:12 49:3 67:12 146:7,8,14,
15 178:11 221:19 326:7

**perjury** 203:13 205:18,19 206:3,8,
10 207:24 208:17 303:21,24

**permanent** 144:14

**permission** 69:1

**permitted** 311:17

**permitting** 309:4

**person** 13:19 32:25 33:16,19 40:6
51:13 55:23 56:4,22,25 57:4 58:3,4
62:23 63:4,5 83:7 85:10 94:4 97:15
102:15,18 106:1 108:6,7 110:15,22
121:2 124:2,23 133:1,14 134:10,16
137:12 149:1 159:1 172:21 174:25
196:23 197:15 199:10 205:20
208:15 223:18 224:8 240:17 247:11
256:16 264:18 278:24 288:20
291:23 305:10 318:4 320:18 334:12
336:13

**person's** 181:7

**personal** 17:13 73:6 81:7,15 171:19
176:11 177:7 178:7,14 183:14

**personally** 27:14 34:14 157:9
171:15,21 241:7 245:10 256:7 268:2
334:11 336:11

**personnel** 322:17

**perspective** 215:10

**pertinent** 331:23

**Phillips** 1:10,14 4:12,20 6:4 7:9,12,
20,23 15:12,13 68:5 69:6,11 149:17,
19 150:2 154:19 155:14 159:20
160:4 176:1 247:15 335:2 336:1,6,
11

**philosophy** 300:6

**phone** 89:14 103:2 105:10 106:9,19
107:14,25 108:3,4 109:20,22 119:9
124:1,11,18 133:12,15 134:10
170:11,17,19 173:15,21,24 174:2,3,
8,11,25 247:15 276:9,12

**phonetics** 111:19 129:6 292:16

**phrase** 26:23 96:18 259:5

**physical** 194:2 227:7 228:19,22
268:6

**physically** 110:22 111:1 192:2
198:22 199:21 238:18

**PIA** 72:9 172:21

**PIAS** 72:8

**pick** 105:22 214:10 263:8 266:17

**picked** 153:14

**picking** 51:18

**picks** 51:7

**piece** 17:1 191:24 209:21 210:15,18,
19 211:20,24 262:12 298:2

**pieces** 17:3 215:5

**pile** 93:12,22

**pinpoint** 40:16

**Pippin-poole** 78:16

**Pippins-poole** 78:19,20

**place** 28:4 34:11 53:9 55:3,8,14
148:2 149:1 161:10 192:20 198:22,
23 199:11,16,22 213:20 214:2,16
216:17 217:1 218:6,10 219:4,10
221:7,21 222:14,19,23 223:21 224:4
238:22 247:11 259:22 261:16,23
262:16 272:11,12 276:4,9,24 279:15
285:6 286:24 287:3 288:12 290:1

297:14 301:14 312:24 313:15
315:13 326:1 330:23

**placement** 286:22

**places** 26:16,20 27:12,18,23 28:2,
13,17,25 29:7 34:14 39:15 41:7,16,
22 42:5 74:10 196:15 214:3 259:13
274:21 277:22 286:8,9,10,12,14,16,
23 287:1 314:24 324:4,20 325:1,2,6,
19

**plain** 211:17

**Plaintiff** 1:16 2:3,8 6:7 159:24

**Plaintiff's** 66:11

**Plaintiffs** 1:4 2:13 6:10,20 8:7,12,14
10:25 45:2,12 155:2,10 160:8
185:10 281:19 282:8,15 294:25
310:7

**Plaintiffs'** 5:3 44:3,5,13 73:20
160:24 295:17

**plan** 7:11,15 8:11 9:7 48:11 142:23

**planning** 144:14

**plans** 326:20

**play** 71:19

**point** 40:17 45:14 57:13 83:19
100:23 101:16 114:3,10,12 127:10
131:13 139:7 160:10 169:23 170:5
172:5 217:15 218:5 221:5,12,16
237:23 251:21 272:5 287:24 295:20
313:19 322:21

**pointing** 15:17 27:14 62:11 211:5
251:20,23

**policies** 258:13 286:3 288:5

**policy** 161:10 299:17,21,24

**polite** 275:13

**political** 85:15 86:19 205:4 235:23
236:3,12 315:8

**poll** 30:22 32:5 34:13 47:10 50:14
52:4,11 55:11 56:8,12,15,22 110:22
111:3 199:11 200:2,3 213:19 214:5,
16,23 216:6 217:13 218:17 219:19,
20 222:21 223:1 242:16,17,19
248:18 254:8,10,14,17,19 255:1,5,7,
9,10,19,25 256:2,5 257:1,12,13
258:10,12,21 259:3,12,22,25 260:23
261:1,19 262:4,19 263:1 264:12
265:9,15,19 266:2,8,14,21 268:25
269:5,6,11 270:4,6,14,18,21,25

The Office of the Dallas County Elections Administrator

271:1,9,13,14 272:8,19,23 273:1,5,
9,18,25 274:7,14,19,21 275:3,7,11
276:15 280:23 286:7 289:7 312:13,
15,17,20,23 313:2,10,22 314:16,17,
22,25 315:11,19 316:4,9,12,15,20
317:23 319:10,12,16 320:12,21
321:3,6 322:5,9,11,12 323:10,12,22,
24 324:9,11,13,14,18 326:24 327:1,
2,4,6,16,21

**poll-watcher** 244:10

**polling** 26:16,19 27:11,18,23 28:2,
13,17,25 29:7 34:11,14 39:14 41:7,
16,22 42:5 49:2,15,22 50:2 52:2
55:3,8,14 148:2,25 196:15 198:22,
23 199:10,16,22 213:20 214:2,15
216:17 217:1 218:6,10 219:4,10
221:7,21 222:13,19,23 223:21
247:11 254:11,15 255:11,21 259:13,
22 261:16,23 262:16 263:1 266:1,22
267:7 270:5 272:9,11,12,14 274:21
276:4,9 277:22 279:15 286:8,9,10,
12,13,16,23 287:1,3 288:11 290:1
297:14 301:6,13,14 312:24 313:15
314:23 315:13 324:4,6,20 325:1,2,6,
11,15,19,25

**polls** 28:5 30:21 31:4,16 33:19
43:11,15 54:5 55:10 60:2 64:4,8
65:3,17 67:1 87:25 98:19 110:14
111:5 121:3,6 130:24 222:7

**population** 194:7,10

**populations** 37:4

**portion** 73:2 195:2 251:16

**posed** 300:11

**position** 20:24 21:11 22:12 75:20
77:22 78:12 79:23 80:25 81:4
250:13,15 274:6 296:3

**positions** 274:9

**positive** 166:21

**positives** 167:3

**possibly** 53:1 98:13 230:10

**post** 113:6,10 208:20 292:17 298:5
313:23

**postage** 232:16,24,25 233:1,5,11
311:5,17

**potential** 268:5 273:25

**potentially** 216:20 233:6 272:18
273:9 274:22

**practical** 215:9 286:20

**practice** 169:24 233:7

**practices** 165:15 233:19,21,25
234:5 253:4,10,12,14,20 287:5

**pre** 118:24 183:5

**pre-perf** 118:23 119:1

**Pre-perforated** 119:4,5

**pre-sb** 85:24 111:10,14 183:4 208:5

**precinct** 27:11 50:10 325:19,25

**precinct-based** 27:23 28:1,5,6

**precincts** 22:20 43:1 48:3,5,9
270:13 325:15

**precursor** 45:11

**predecessor** 239:14 314:13 319:1,
8,24

**predecessors** 240:9 245:1,5

**predict-** 325:3

**preexisting** 304:2

**preferential** 288:11 289:16,25

**preparation** 72:24 321:1

**preparations** 257:5

**prepare** 14:18,24 15:2,6,8,10 71:4,
21 84:11 144:10,17 186:22 187:12,
15

**prepared** 20:15 74:17 188:24
250:10,12

**preparer** 252:19

**preparing** 33:20 250:22

**prepaying** 232:16

**prescribed** 5:8,9 207:17 208:9
288:10

**presence** 227:8 228:19,22 229:6

**present** 3:21 10:9 26:12 33:16
174:1 238:18 244:1 255:2

**Presidential** 196:1 327:4

**presiding** 261:4 288:19 289:3
301:21,25

**press** 125:11

**pressure** 205:8 212:18,19,21
213:11 287:8

**pressuring** 213:5

**pretty** 29:9,12

**prevent** 11:22,25 186:10 201:10
215:6 264:17 293:11

**preventing** 293:9

**prevents** 318:3

**previous** 65:5,19 168:18 241:4
253:20 304:22 314:5

**previously** 197:2

**Primaries** 65:2,18

**primarily** 108:17

**primary** 13:20 17:16 28:25 30:4,8
33:3 35:11 63:17,19,20 64:1,8,14
65:16 66:18 81:22 82:8 83:2 85:16
91:18,21 99:5 105:13 106:25 107:6,
12 112:5 117:2 126:22 127:22
128:25 132:4,5 142:19,23 144:19
153:4,17 154:7 155:24 156:18
158:12 170:11 173:19 174:7,21
176:7 177:12,18 178:15 180:8
247:25 248:6 249:1 262:24 264:4
268:19,22 269:20 270:4,10,21 273:5
296:12 297:6 323:16 327:13,18,20

**printer** 190:25

**prior** 34:23 41:17 76:10 81:9 82:6
83:1 88:9 106:24 190:17,19 193:16
201:15,23 217:7,20 219:7 255:12,25
263:8 275:6 282:24 283:22 284:5,23
285:14 297:11,22 303:24 312:16,21,
24 313:2,5,17 314:18

**priority** 253:21 298:2

**privacy** 260:6,7

**private** 308:24 309:5 310:7

**pro-** 234:19

**problem** 47:13 140:12 271:16,19
293:11

**problematic** 245:22 314:7

**problems** 26:7 47:9 117:23 118:5,
14 140:7,10,13,20 147:24 148:8,14,
18,23 149:2 162:19 163:11 164:6
166:20 245:11,12 246:6 272:7 273:4
293:9 315:9

**procedure** 216:22 262:2 264:18
276:24 288:22 290:24 291:5,12,20
318:4

The Office of the Dallas County Elections Administrator

**procedures** 54:15 81:24 82:4,15
237:17 250:18 258:14 261:13 286:4
288:6,10 289:23 292:17

**proceed** 307:24

**Proceedings** 4:6

**process** 28:20 32:7,8,11 48:2 50:18
53:12,24 81:18 83:23 84:8,9,11,12
85:24 86:3 89:13 95:9,19,21 96:20
97:6,11 102:10 103:3 109:11 113:1
115:16 125:18 132:21 142:10 147:6
152:13,16,22 178:5 240:6 242:25
268:4 285:6 314:2

**processed** 82:10,20,24 90:16 172:6
177:2

**processes** 93:10

**processing** 80:25 81:4,8,15 82:16
95:18 108:17 153:16 154:6

**produce** 9:7 112:15 273:15

**produced** 1:15 7:11 18:9,10 35:6
59:14 186:25 187:20 217:19 250:21
251:10 274:2

**produces** 192:25

**production** 5:10 8:6,7 35:8 40:8
232:12

**proficient** 13:18 198:5 214:15

**program** 256:12

**prohibit** 260:9

**prohibited** 233:6,12 316:25 317:2

**prohibition** 225:4,13 226:1 229:20
281:4 317:9

**prohibitions** 226:18

**projected** 325:3

**promise** 187:7

**promotions** 76:19

**prompt** 125:9

**prompts** 124:15 125:8

**promulgated** 291:11

**pronouncement** 176:12

**proportion** 111:10

**proposal** 326:9,21

**proposed** 286:15 314:10

**propositions** 205:3

**prosecuted** 264:11,23 317:22
319:5,20

**prosecution** 205:19 233:20,22

**prosecutor** 245:8

**protect** 234:17

**PROV** 62:18

**proved** 334:11 336:11

**provide** 7:11 11:16 137:13,15
138:11 142:15 151:21 167:7 194:20
198:11,18,22 205:9 213:7,8 218:13
225:21 230:18,19 285:25 289:11,13
290:13,20 292:23 295:24 311:4
325:6

**provided** 5:10 32:15 73:9 90:9,13
92:24 93:5 96:21 108:20,24 114:21
115:4 120:4 121:13,19 122:23
205:13 222:16 224:1 232:11 289:23
291:17 292:2 294:5 301:1 304:13
305:11 308:3 310:23

**provider** 191:16

**providing** 136:17 148:25 219:10
223:20 246:15 253:6 311:11

**provision** 162:11 163:1,4 220:25
224:19 230:10 236:21 237:3,14
258:4,14,18,25 259:21 260:19,22
264:12,23 265:5,8 300:5 305:1
306:9,12,20,24 307:4,8 309:10,23
312:2,4,8 317:23 319:5,14

**provisional** 32:8 62:18

**provisionals** 18:3

**provisions** 1:25 140:15 148:11
163:23 248:14,18,21 254:7 256:5
257:1,16 258:20 274:7,14 275:3
277:1 279:17 280:23 281:1 300:19
302:21 303:1 317:10,14,15

**public** 72:9,13 141:10,24 293:2
334:18 336:18

**published** 5:11

**PUEBLO** 1:3

**pull** 33:21,24 118:23 141:18 178:24

**pulling** 141:15

**pulls** 276:10

**purpose** 7:15 13:14,18

**purposes** 334:13 336:14

**pursuant** 1:24 188:14

**pursue** 309:21

**pursued** 309:17 328:18

**pursuing** 307:7

**push** 52:2

**pushed** 57:24

**pushing** 56:9,19,23 57:4

**put** 10:4 16:12 33:4 50:25 83:6,12,
14,16 85:10 87:23 88:21 93:21 94:3
95:6,24,25 103:10,18,19 104:2,5,7,
12 111:17 113:22 117:7,10,12
128:13 130:5 135:4,6,17,20 136:4
141:3 142:4 151:10 153:12 164:7
167:17 168:17 177:25 182:15,24
196:17 223:9 234:13 239:9 241:17
273:15 283:2 291:3 293:12,17
294:12 313:8 314:1 322:19

**puts** 293:25

**putting** 107:11 113:15 141:5 177:20
211:21 232:24,25

**Q**

**qualified** 177:5

**qualify** 206:19

**quality** 286:22 325:22

**quantify** 269:24

**question** 12:9,19,21 13:4 16:7
24:17 31:20 43:13 45:17 46:15 47:4
48:6 49:6,12,24 53:8,18 79:25
82:13,19 97:2 99:12 102:3,24
105:25 106:20 109:4 114:18 116:14,
15 120:13 137:19 139:1,10,11
143:22 146:21 160:15 164:3,4,7,15
165:3,21 166:22 171:18 174:22
176:14 182:18 186:18 199:14 201:4,
14 203:25 205:22,24 211:19,21
213:5,14,23 217:3 225:10 227:16
229:13 233:24 238:23 253:3 283:16
289:20 290:15,25 291:20 295:25
300:11 301:4 302:4 306:1 313:21
317:7 318:8,9

**questioning** 303:9

**questions** 7:24 9:15 15:8 18:13
23:18 26:12 34:5 41:5 43:20 44:2,9,
12,14,18 45:2,10,11 54:19,20 57:11,

13,15,20 59:13 61:3 62:15 65:23
67:16,17,18 69:19 70:9 71:11,16
73:2 74:21 80:2 82:3,14,17 88:8,17
91:14 102:16 103:3 104:18,22
105:13 106:5 107:1,4,6,10 108:9
110:18 149:16,19,21 150:3,22
154:14 155:17 159:20,25 160:8,18,
25 163:22 164:1 168:9,13 169:13,
15,25 173:9,18 176:6,10 179:20,23
181:24 184:7 186:5 187:24 195:13
197:4 201:2,8,19 204:24 209:6,12
247:22 254:7 275:16 280:7 281:17,
20,21 282:3,16 285:19 290:12
292:20 294:21 295:17 307:25
330:12 331:1,2,3,5

**queues** 278:25

**quick** 187:1,2

**quickly** 11:10 57:12 241:3

**quiet** 80:1 195:13

**quit** 263:22

**quo** 253:20

**quotation** 318:2

**quote** 140:13 203:12,17 204:1,12,23
205:7,13 223:18 236:25 250:23
252:4 257:11 318:5,12

---

### R

**races** 273:24

**radio** 293:6

**raise** 10:1 68:15 184:17

**raised** 21:20 309:13 315:18

**Ramon** 243:16

**ramps** 287:8

**ran** 34:24 142:6 179:15

**rarity** 103:21

**rate** 248:16 279:18 293:1

**rates** 142:1

**re-** 98:20 194:19

**reach** 89:14

**reached** 293:4 315:7

**read** 187:1,3 204:14 209:13 212:2
214:24,25 215:6 252:2,11 257:24
260:14 264:10,13,20 278:20 279:2

299:1,11 307:15 311:14 317:24
318:6,23 321:8,16 329:9 334:1
336:1

**readily** 276:4

**reading** 6:21,24 7:1 204:13 209:14
211:17,22 216:3 252:3,23 264:15
298:25 311:9 318:1 321:10

**reads** 307:19 317:21 318:20 320:6
321:5

**ready** 10:16 12:2 66:4,5 89:19
110:19 184:6,14 203:7

**real** 84:18 291:17

**reality** 268:13

**realized** 101:11

**reask** 283:16

**reason** 41:13 42:3 50:7 70:7 90:10
96:2 103:7 119:21 139:15,16 147:16
156:8 177:23 178:22 181:12,16
279:11 288:1 309:20 333:3 335:3

**reasonable** 288:16 289:10

**reasoning** 309:4

**reasons** 46:17 110:24 119:19,20
165:1 178:22 324:1

**reassigned** 266:18

**rebuilds** 253:9

**rec** 21:5,7

**recall** 29:6 31:13 92:5 121:2 137:6
169:2 174:1,13 218:1,3,16,20,25
222:17 223:3,10 241:11,15,16,23
242:4 243:25 244:7 252:7 273:7
281:6 285:1 300:24 317:16,17
322:18

**rece-** 86:1

**receiv-** 174:3

**receive** 42:13 86:1 92:1,7 121:12,
16,17,20,23 127:18 130:23 143:5
151:12 168:12 172:7,12 173:24
203:19 204:2 206:16 259:10 269:19

**received** 5:5 9:4 19:2,25 25:20,21
26:2 42:17 83:2 87:14 93:9,16
94:23,25 98:7 99:10,13 102:8 103:7
109:6,20 110:12 114:3,19 121:25
125:23 127:19 131:20 135:15
138:19 145:22 150:25 151:2 158:9
159:18 161:14 166:4 173:21 174:15

177:3,8 234:22 251:10 280:16
292:15 330:9

**receives** 122:10

**receiving** 92:6,13,21 99:20 141:9
147:1 170:11,17 173:17 174:1,2,3,8
179:6 218:20 250:24

**recent** 33:3 34:22 35:11 185:19
257:8 283:16

**recently** 169:1 196:1 256:16 326:21

**recess** 184:11

**recognize** 19:4 61:8 62:22 73:24
74:2,4 188:4 249:21

**recollection** 114:13 183:7 305:5

**recommend** 119:10

**recommendation** 290:20 293:12

**record** 1:25 6:3,6,20 7:15,20 8:3,10
9:13,17,20 10:11,12,22 24:6 26:5
39:18,20,23 40:3,9,18 58:21 59:2,6
61:14 67:19,24,25 68:2 84:20 93:6
95:11 96:2 103:16,20 115:8,11,14,
19 116:9 121:24 131:19 136:7 137:9
142:16 149:7,11,14 150:9,12,14,15,
17 175:19,22,25 181:6,18 184:2,6,
10,13 185:2 201:20,25 249:9,12,17
281:9,11,13,14 283:9,10,11,13,15
293:23 295:3,5,7,9 309:3 311:1
323:5,8 331:17,18,19,24 332:5

**recorded** 92:16,17 256:22

**records** 1:21 2:22 38:7 40:12 92:25
97:21 114:24 144:6 249:7 287:17
316:7

**Recreation** 21:8

**recruit** 242:19 266:14 324:13,14

**recruiting** 322:11 324:12 326:24
327:1

**recruitment** 248:19 273:10 274:19
275:4 321:2

**redirecting** 28:13

**redistricting** 286:23 326:16

**reduce** 324:25 325:14,20,24 326:20,
22

**reducing** 324:19 326:17

**Reexamination** 4:9,10,11,15 54:24
57:21 59:7 61:1 66:7 179:24 182:4

The Office of the Dallas County Elections Administrator

**refer** 11:3 16:19 73:15 251:18 254:19

**reference** 16:2,6 170:6 218:6 323:16

**referencing** 40:10 66:10

**referred** 164:1

**referring** 46:1,2,5 159:15 161:25 189:11 220:1 254:20 255:1 297:15 320:21 322:15

**refers** 23:1

**reform** 326:8

**refraining** 234:2

**refresh** 11:12 252:12 304:9 305:5

**reg-** 152:3

**regional** 292:16

**register** 38:3 157:14,19

**registered** 24:7,20 25:25 38:8,13 84:23,24 85:1 90:5 94:4 103:14 137:22 157:23 181:22 194:1 239:1,5 282:20,23 283:3,19,24 284:3 328:6

**registra-** 294:17

**Registrar** 192:10

**registrars** 38:6

**registration** 20:23 21:2,12 22:13,14 31:23 32:3,10 37:2,5,13,18 38:20 39:5 53:2 75:24 76:5,11,13,18,22 77:4 84:9,20,23 85:1 90:4,6 92:25 93:6 95:5,11,14 96:22 99:22,24,25 100:2,9,12,14,24 101:3,5,6,19,25 102:10 103:13,16,20,24 104:6 105:24 109:21 114:24 115:8,10,14, 19,22,25 116:9 130:22 131:2 136:7, 22 137:9,13,16,18,23 138:2 142:15 143:20 144:2,6,7 151:5 153:13 167:18 181:6,17,19,21 190:10 191:1,4,11 193:13,19 283:25 284:1 285:12 293:23

**registrations** 100:7

**regular** 39:7 61:25 62:6,7 83:9 105:4 239:16 240:6

**regularly** 230:24

**reinspect** 286:16

**reintroduce** 282:14

**reject** 294:4,7

**rejected** 105:14 108:10 142:1,2 155:24 156:10,11,17 171:9 177:24 249:6 278:23 291:22 293:5,8 294:3, 14

**rejecting** 113:9 145:3,11

**rejection** 98:17,23 99:1 146:8,13 175:12 177:18 178:23 248:16 279:18 293:1

**rejections** 142:7 156:4 172:13 177:9 178:8,10,11,23 179:14

**related** 15:19 32:1 73:6 108:11 147:25 186:5 190:7 204:8 224:25 235:6 251:23 264:12 307:8 317:23 329:12

**relates** 298:21

**relating** 254:8 256:5 257:1 258:21 274:7,14 277:2

**relation** 59:13 325:5 330:1

**relationship** 23:22 219:24 321:14

**relative** 199:9

**reliable** 255:8

**rely** 201:1 325:15

**relying** 324:13

**REM** 111:19

**remember** 41:13 72:3,18 94:16,20, 22 110:24 127:13,23 137:6 164:9,11 169:19,20,21 174:11 183:7 186:1 231:23 234:8 240:11 241:7,20,24 242:3,5 244:14 246:9,11,14 259:17 266:16 271:7 297:16 298:11 304:7 305:18,25 306:1 316:22 323:13 327:24 328:7,9,16 330:10

**remembered** 174:8

**remembering** 305:24

**remind** 12:14 212:25 213:3 255:15

**remotely** 44:2

**removal** 209:5

**remove** 90:24,25

**removed** 272:8

**removes** 204:22

**repeat** 13:5 43:13 65:7,8 82:13 88:14 99:12 105:6 113:17 115:1 126:25 148:12 157:16 170:4 177:13 199:14 201:4 205:22

**rephrase** 13:4 45:17 48:6 49:24 53:17 123:9 160:15 166:22 168:21 182:18 289:21

**replacement** 209:8 246:13 247:12, 13

**replied** 304:20

**report** 5:7 34:10 36:8,14 51:15 59:18 78:2,9,10,15 96:9 112:10,15 132:1 142:6 143:17 147:12 254:15 260:23 261:2 270:14 315:9,12

**reported** 1:19 255:7 256:1 314:17 315:1

**reporter** 6:22 9:25 10:2,3,7,8,15 12:15 18:20,23 43:7,21,23 44:16,21 52:9,18 53:3,7 57:18 60:24 61:4 65:25 66:3,6 68:8,15,17,18 73:17 74:9 76:24 77:2 78:17 88:13,18 112:20,24 113:17,20,24 115:20 118:24 119:1,3 120:18 127:6 133:20,23,25 146:11,18,20,24 150:8,12 154:16,24 155:7,11 159:22 182:1,11 184:16,19,20 202:2,5 207:3,6,11 232:1 263:13,16,17,21, 24 281:23 282:2 283:7,9 294:22 295:1 307:15 322:20,23 323:1 331:8,12,15,21 332:2

**Reporter's** 4:22

**reporting** 262:4 265:6

**reports** 34:21,24 35:1,6 36:3,4 40:5, 10

**represent** 10:25 11:2 19:25 150:21 160:6 185:10 202:10 232:10 241:25 251:9 263:18 264:2 295:15

**representation** 206:15,18,20,22 207:24

**representative** 74:24 129:7

**represented** 64:9 203:18 204:2

**representing** 155:2,8

**Republican** 63:20 64:16 65:2,18 86:19 271:12,13,14 272:18 321:13 322:3

**requ-** 123:4

**request** 40:7 96:2 124:2,3,4,5 130:10,23 131:20 132:24 133:6 134:4 158:3,15,17 159:7 161:14 162:10 168:19 181:12 211:15 231:7 288:16 291:25

**requested** 33:25 35:12 46:18,21 51:7 80:17 123:4 130:14 172:21 229:24 235:4

**requesting** 124:2 161:17 181:1 183:10

**requests** 8:7 35:8 40:15 51:13 55:22 72:14 134:3 141:23 158:9 292:15

**require** 9:16 194:20 231:6 294:8

**required** 90:4 151:10 166:12 181:13 182:21 221:1,6,19 254:21 255:1 284:24 285:3 289:13

**requirement** 32:14 99:6 113:3 144:16 157:25 158:6,11 169:15 174:21 181:21 182:24 183:1,8,19 219:24 221:23 246:18 290:9

**requirements** 89:22 90:1,15,19,20 91:16,22 104:19,24 105:20 106:5, 14,22 107:7,11,17 108:11 113:7 120:22,23 125:23 126:16,23 127:3 140:8,19 141:11 142:22 144:9 148:24 156:6 157:12,13,19 161:5 169:19,20 173:19,25 174:9 180:11 235:10 243:1 248:15,25 276:2 277:6,9,10 278:23 279:6 292:21

**requires** 227:4 258:7 260:22

**reread** 307:23

**rereading** 305:5

**research** 290:21

**reserve** 7:22

**Residence** 32:20 100:10

**residents** 195:3

**resolve** 271:19

**resolved** 233:14

**resources** 105:12

**respect** 22:12 25:19 30:3 49:7,13 101:22 132:17 160:10 161:5 179:4,8 207:15 217:14 244:9 253:5 276:21 278:8,11 280:25 295:19 300:18 320:9

**respond** 105:8 141:15

**responding** 11:23 72:14 95:2 104:23 106:4,8 107:16 186:11

**response** 7:7 19:8 45:12 110:21 160:8 295:17 316:15

**responsibilities** 54:4 261:18,21,25 262:7

**responsible** 71:16 141:14 236:6 261:15,22

**responsive** 8:6 35:7 40:7,15

**rest** 85:11

**restate** 295:25

**restrictions** 236:9 252:9 311:10 317:10

**resubmit** 87:22 171:13 183:22

**resubmitted** 170:24

**resubmitting** 171:20

**result** 39:7 120:22 141:20 255:2 266:1

**results** 287:19

**retain** 242:19

**retaining** 321:3

**retaking** 253:11

**retention** 248:19 274:19

**retirements** 321:24

**return** 110:3 117:8 180:22 238:22 284:20 311:5,17

**returned** 135:13

**REVELINO** 10:18

**Revi** 286:11

**review** 15:2 72:24 139:13,14,16,17 187:19,21 210:18 232:18 234:9 331:25

**reviewed** 15:5,7 186:24 206:12 212:1 217:20

**reviewing** 252:15 258:1

**reviews** 232:20 260:18

**revised** 257:2

**RICARDO** 3:15

**rid** 329:1

**right-hand** 74:11 249:25

**rights** 3:10 312:15,20,23 313:22

**rings** 276:12

**risk** 276:20 278:8 294:13

**Rive** 116:14

**Rivelino** 1:10,14 4:7 6:4 7:9,25 10:23 143:21 144:3,7 333:2 334:1,6, 11

**RM** 83:9

**road** 69:15 186:2

**Robert** 72:1 197:1

**RODRIGUEZ** 3:15

**role** 175:7

**roles** 250:15

**roll** 33:12 114:22 115:14,19 116:13 223:1 241:13

**rolls** 191:4

**room** 1:22 150:7 283:6

**roughly** 49:19 76:8

**round** 172:13 217:24

**ROVNY** 3:21

**row** 213:1 251:22

**rule** 5:4 6:21 7:8 10:8 73:21 194:20 304:2,3

**rules** 1:24 10:12 11:11 16:7 53:11 69:15 71:19 158:5 178:16 179:18 186:1 304:4

**rumblings** 328:25

**run** 34:10,21 36:2,3,14 40:5 86:8 96:8 112:10 143:17 145:16 147:12 230:10 261:24

**run-off** 35:15,17,20

**Runbeck** 190:20,22 191:12,18 192:7

**Runbeck's** 192:1

**running** 262:15

**runoff** 144:19 297:4 327:13,20,22

**S**

**S-O-P-H-I-A** 155:6

**S.B.** 5:8

**SA-21-CV-00844-XR** 1:5

**safe** 272:6 293:20

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                            Index: sake..shifting

**sake** 61:14

**San** 1:2 2:5,16 192:10

**sand** 314:3

**Saturday** 324:1 327:5

**Saturdays** 29:10

**save** 50:13

**saves** 247:22

**SB** 11:3 82:6 83:1 88:10,12,17 89:13,19,21 92:22 106:13,23 107:4, 5,10 108:11 113:3,6,10 126:16 127:11 128:6 131:4 139:18 140:8, 15,16 141:10 142:3,22 144:9 147:25 148:11,15,19,24 151:3,13 152:12, 15,21 156:22 157:12,13,18 161:24 162:5,11,16 163:1,3,11,16,18 164:6, 21 165:19 168:2 169:1,5,8,16 183:5 187:1,8 201:12,15,24 202:10 203:10,25 204:11,22 205:7,12 208:20 217:13 218:12 219:7,12 220:15 224:5,7 225:12 231:5 233:7, 18 234:21 235:6,9 238:25 239:13,22 240:3,8 241:25 244:2,8,18 245:1,4, 13,23 246:2,6,20 248:8,21,25 254:7, 10,12 255:2,4,12,21 256:5 257:1,6, 18 260:8 264:15 273:8 277:2,16 279:5,17 281:5 282:24 283:22 284:5,23 285:14 290:9 292:3,18,22 297:12,23 298:6,8 303:24 312:16, 21,24 313:3,12,17,18,24 314:3,9,12, 18 315:4,7 317:4,5,11,14 318:1 319:7,14,18 324:5 328:21,24

**SCAI@JENNER.COM** 2:17

**scan** 83:15,18,23 93:24

**Scar-** 78:3

**Scarpello** 1:11,15 4:16,21 6:3 7:9, 12,16,21 15:12,14 71:21 129:20 184:21 185:4 188:4 254:6 264:10 281:16 282:7 295:12 317:21 323:9

**Scattered** 266:10,11

**scenario** 182:6 239:10

**scheme** 225:1,20 226:5

**schemes** 225:16

**school** 21:21,23,24 22:4 28:9,12 39:10 79:11,12,13,16,19 189:19,20, 24 190:4 227:20,21 228:5,25 229:1

**schooling** 22:4,10 189:23

**schools** 37:7 228:8

**Schuette** 2:20 6:16 14:11 184:3 201:20,25 207:9

**scope** 52:25 53:1 75:15 212:7 214:24

**scrambled** 266:18

**scratch** 210:7

**screen** 115:25 211:6

**seal** 117:10,13 334:15 336:15

**seat** 59:12

**second-hand** 330:20

**secrecy** 90:23,25 117:4,9,20

**Secretar-** 126:18

**Secretary** 5:8,9 22:17,19 25:23 94:12,23 95:1 114:4 125:18,24 126:13,16,21 127:2,10 128:5,17,24 129:12 156:25 161:21,23 162:4,10, 15,19,25 163:6,10 207:17 208:10 218:8,21,23 220:5,8 234:20,23 235:5,17 243:6 259:10 290:21 291:11,16 294:5 299:20 300:17,22 306:23 311:9 315:14

**section** 3:10 106:2 202:17 207:19 220:20 221:6 223:15,19 224:16 226:22 229:16 236:21 251:23 252:16,21 259:19 298:17,19,21 299:4 300:9,18 304:19 305:6,11 307:12,18,23

**sections** 202:21 302:18 313:17

**sector** 37:10

**secure** 206:20

**securing** 47:10,13 207:24

**security** 90:8 91:9,10 94:7 96:1 103:9,17 126:5 135:21 139:22,24 140:23 151:23 153:6,18,23 154:10 156:7 168:2 292:23 293:13 294:1,18

**seek** 306:23 307:3

**select** 60:3

**selected** 86:23

**selecting** 83:11

**semicolon** 205:12

**Senate** 240:2 255:25 259:21 274:5

**Senator** 79:23 242:6

**send** 30:23 84:13,25 85:5,6,11,14, 17 88:5,19 90:19 91:6,11 97:6 99:22 100:14 101:6 103:22 109:24 110:3 122:18,20 123:3,24 128:7 129:8,11, 15,17 130:2,12,13,15,16,17 131:3, 11 132:1 176:24 180:20 229:21 231:8 233:2 235:22 236:4,13 294:6, 18 311:17

**sender** 8:18,23

**sending** 22:18 97:10 100:23 101:16,19,25 109:9 113:16 126:8 128:15 145:18 147:9 165:19

**sends** 276:14

**sense** 31:9 105:3,7 106:7 116:23 123:5 143:13 165:15 175:14 176:18 215:11 220:11 242:10 269:10 287:23 291:14 292:10 297:19,21

**sentence** 318:17 320:6 321:4

**separate** 210:20,22

**separately** 218:14

**September** 321:21

**series** 240:2 242:13 295:16

**serve** 192:6 254:11

**service** 191:16 231:2 255:7 270:14 275:7

**services** 190:21,22 191:17 194:21 226:25 227:4

**session** 239:16,20,23 240:7 281:7

**sessions** 5:10 240:7,14,17

**set** 37:24 292:20

**setting** 201:15

**shakes** 12:15

**share** 167:11

**shared** 243:10

**sharing** 241:7,24 242:11

**she'll** 134:7

**Sherbert** 79:1,5,6

**Sheriff** 272:2

**Sheriff's** 271:24,25 272:5

**shift** 275:15 312:12

**shifting** 168:11

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: shortage..specificity

**shortage** 5:11 262:25 263:3,6 265:15 266:2,21 320:8,10,12 323:12,22,24

**shortages** 264:4 265:9 268:25 269:7,12

**shorter** 69:18

**shorthand** 1:20

**show** 15:21 33:24 38:16 43:2 263:8 266:16 273:15 278:24 302:18,21 303:9,15

**showed** 42:22 279:4

**shown** 216:8

**shows** 143:17

**shrugs** 12:16

**sic** 78:19 264:17

**side** 37:10 44:3,5,13 86:9 120:8 175:9,10 252:12

**sign** 51:6,11 52:4 53:20,25 55:8,12 56:23 57:6,24 58:5 106:17,18 117:14 121:15 122:18 223:21 276:8 285:3 332:1

**signage** 289:13,14 315:13

**signature** 4:20,21 51:15 86:10,11, 12,16,24 87:1,2,4,5,7,10,11,12,13, 15,20,23 88:21 89:4,5,8,10 90:13 95:21,24 117:14 118:6 126:22,23 139:24,25 153:1 175:16 285:7,8,9, 10 334:2 336:2

**signatures** 86:14 175:12 285:12

**signed** 91:2 121:14 122:19

**significant** 104:22 169:5 253:14 257:3 263:3,4 270:18

**signing** 55:23 205:18 206:3 216:4

**signs** 34:19 51:14 56:4 206:7 221:12 262:14 276:16

**similar** 196:4 239:13,18 244:18 324:21

**similarly** 143:4

**simple** 234:12

**simply** 75:15 101:20 119:25 166:13 176:14,15 325:25

**simultaneously** 88:11 223:18

**single** 14:3 50:10 70:24 213:20

**Sir** 184:17

**sit** 173:12

**site** 265:3 267:7 268:3 271:5 272:9, 14 301:13

**sites** 254:11,15 255:11,21 263:1 266:1,9,22 321:20

**sitting** 11:17 56:18,21 70:5 96:16,18 329:19

**situation** 110:7 122:22 132:23 133:5 134:2,14 165:12 167:14 214:10 231:3 271:19 299:13 317:6

**situational** 290:15

**situations** 130:20

**size** 324:21

**skipping** 195:13

**slash** 207:20 208:13 250:23,24

**slide's** 251:16

**slow** 65:25 66:1 88:13 155:3

**slowly** 155:4

**small** 35:15,17 180:1 212:3

**Smith** 115:3,15,17 116:7

**Smith's** 115:8,10

**snapshot** 303:12

**SO-** 194:19

**Soc-** 90:7

**social** 24:4,6 25:9,11 26:4 33:5 90:8 91:9,10 93:18 94:7 95:25 103:8,17 104:4,8,12 107:2 126:4 135:21 136:1,6 137:1,4,10,15,25 139:22,23 140:23 143:15,19,25 151:22 153:6, 18,23 154:10 156:7 168:2 241:14 292:23 293:13 294:1,18

**Socials** 26:3

**software** 36:13,16 40:5 191:13 219:21 220:4,9,12,13 235:9

**sold** 79:23 191:22

**solely** 324:13

**solicitation** 229:16 235:14 307:13, 19 311:11

**solve** 293:11

**son** 167:11 180:23 182:7

**Sophia** 2:14 155:1,5 282:7,15

**sort** 40:16 82:18 158:10,19 193:11 198:10 200:10 203:8 239:24 273:12 275:7 288:5,14,21 290:7

**sorter** 191:22,23

**sorts** 141:23 159:7 312:11

**sought** 238:4,9

**sounds** 31:25 36:2 44:24 122:7 189:21 287:13 318:25 319:2

**source** 16:13

**southern** 37:9

**space** 198:23 217:1

**Spanish** 36:10 38:21 39:2 123:3,8, 17,25 124:3,10,16,17,22,23 125:3 194:21

**Spanish-speaker** 124:19

**Spanish-speaking** 123:22 213:19

**speak** 5:5 20:15 42:8 102:21,23 105:23 113:18 120:19 124:17,21,22 125:10 133:9 134:5 171:2 180:16 265:2 289:7

**speaker** 124:17 214:2

**speakers** 125:3,5 194:21 214:8

**speaking** 47:5 53:11 66:21 74:22 88:11 124:10,23 136:21 163:25 176:15 180:3 189:8 198:13 261:22 269:4 276:3 287:25 305:18 312:19 327:11

**speaks** 214:11,17

**special** 5:10 35:23 37:12,14 61:21 200:16 239:19,23 240:7 296:25 297:2

**specific** 37:2 46:22 47:5 95:19 107:22 121:2 129:5,24 163:4,23 173:4 204:18 209:4,8 213:15 214:24 215:14 218:20 227:12 228:1 231:14 241:12 244:14 252:16 255:13 257:16 261:25 284:20 297:14 307:8 314:19 316:12

**specifically** 37:6,11 39:6 96:4 106:11,13 140:17 165:17 218:16 234:8 253:5 292:2 297:19 298:17 300:18 307:12,18 317:20 323:11

**specificity** 229:13

The Office of the Dallas County Elections Administrator

**specifics** 272:4 285:2

**speculate** 279:9 292:5

**speculating** 279:12,23

**speculation** 265:12

**Spell** 77:17

**spelled** 155:6

**spend** 298:1

**spending** 106:3

**spent** 104:21 106:8,15 107:16

**spit** 210:15

**spoke** 55:1 161:20 165:23 170:21
171:5 176:2 180:17 242:12 281:8
302:9

**spoken** 9:13 45:19 102:18,19
174:24 176:20 183:9 246:5 252:20
304:5 308:12 316:19

**spot** 121:14 216:18

**spring** 239:15 248:4

**staff** 38:1 54:2 90:24 94:10 105:18
108:2 134:14 180:17 222:23 234:1,
17 245:1,4 250:25 253:2 256:15,17,
20 265:3,4 280:6 311:4 312:3

**stages** 216:25 221:11

**stamp** 232:13 249:24,25 251:11,19

**stamped** 8:9

**stamps** 9:8

**stand** 259:25

**standard** 29:9,12 30:6 216:21 262:1

**standing** 316:20 329:20

**start** 7:16 12:19,21 26:16 28:1 48:25
69:11 79:18 92:5 100:23 101:18
109:4 134:1 146:22 150:18,19
151:18 160:22 164:17 177:15
185:17 274:23 293:17

**started** 27:8,22 28:4,12 47:23
101:15 107:11 138:3 202:25 255:16
296:2 324:15 325:10

**starting** 7:18 74:2,4 91:25 101:8
125:19 203:8 205:6 220:19 226:24
236:25 249:24 253:12

**starts** 223:15 226:22 298:19

**state** 1:19,23 3:3 5:8,9 6:5,11 7:2

9:3 10:10,14,22 22:17,19 23:15,16
25:23 58:4 85:21 94:6,12,23 95:1
114:4 124:6 126:17 127:10 128:6,24
129:13 144:25 145:2 156:25 160:7
185:2 207:17 208:10 213:8 218:21,
23 219:24 220:6,8 230:3 234:15,20,
23 235:17 237:1 241:21 242:5,6
243:6 275:24 288:10 290:22 291:11,
16 294:5 295:16 300:17 301:24
311:9,20,23 331:22 334:8,18 336:8,
19

**State's** 125:18,24 126:13,21 127:2
128:18 161:21,23 162:4,10,15,19,25
163:6,11 218:8 235:6 259:11 299:20
300:23 306:23

**stated** 1:25 10:11 305:21

**statement** 32:20 100:10 139:25
313:6 318:16

**statements** 10:4,7

**states** 1:1 3:9,11 37:17 44:8,18
87:10 91:8 149:21 150:21 281:22
289:5 307:13 315:15

**stating** 49:25 95:7 177:23 205:3
221:1

**station** 56:21 57:5

**stations** 216:19

**Statistical** 17:5

**statistics** 33:21,24 198:12

**status** 253:20

**statute** 203:2,5 224:25 225:25
226:18 229:8 302:16 305:22

**statutes** 304:2

**stay** 30:22 31:9 41:17

**stayed** 64:8 65:17

**staying** 30:18 31:2 64:4

**steadily** 199:18

**step** 90:17 132:20

**steps** 71:4 88:23 130:11 144:8,18,
21 186:22 273:12 276:5

**stick** 32:3 208:25

**stipulated** 299:8

**stipulations** 4:4 331:22

**Stone** 21:8

**Stool** 2:19 6:13,14,25 7:6,13 8:1,13,
16,19,22,25 9:10,21 14:11 40:19,21
54:22 57:16 58:12,19,22,25 67:18,
22 69:2 73:4,9 179:22 201:20,25
249:11 310:18,20 331:3,25

**stop** 180:19

**stories** 118:21

**story** 267:10

**straight** 17:7 28:7 59:23 60:5,18
63:13

**strange** 236:11

**Street** 1:22 2:10,15,23

**stricken** 302:14,15

**strike** 171:18 258:3 265:7 267:9,19
268:16 280:15 303:5 313:20

**struck** 203:4

**structure** 196:16

**structures** 196:15

**struggle** 43:10,15

**student** 239:9

**students** 239:9

**study** 190:5 326:9

**stuff** 16:3 22:20 130:12

**stuff's** 16:20

**subdivision** 47:5

**subject** 45:15 58:8 241:15 303:24

**subject-** 242:22

**subjects** 252:17

**Submission** 220:21

**submit** 94:3 97:22 98:20 124:5
132:12 142:10,14 168:15,16 231:20

**submitted** 97:4,18 98:5 101:12
102:8 119:12 120:8 130:3 155:19
179:1,4,9 328:11

**subscribed** 334:13 336:13

**Subsection** 257:24

**subsequently** 240:3

**substance** 176:5

**substantial** 194:7,10,13,18 195:2
213:22

**succeed** 273:1

**successfully** 247:2,7 266:19 283:2, 18 284:19 328:6

**sued** 237:16,20

**suggested** 40:12

**suggestions** 324:10

**Suite** 2:5,10,15,23 3:6

**sum** 193:14

**Summary** 5:7,10 59:18

**summer** 239:20

**Sunday** 29:22 263:9 266:17

**Sundays** 29:11 230:24

**supervision** 76:1

**supervisor** 21:5 75:19,23,25 76:5, 11 77:12,22 78:2

**supplemental** 5:10 232:12

**supplies** 263:9 266:17

**support** 50:22

**supporting** 274:6 280:25

**supposed** 41:17 102:2 121:15

**surname** 36:10

**Susan** 115:3,7,10,15,17 116:7

**suspected** 260:23 262:5

**SVC** 86:11 89:3 118:4

**swear** 6:18 9:20,23 68:8 184:15

**Swinford** 1:19

**switch** 48:10 58:11,23 67:20 295:20,21

**switching** 45:15

**sworn** 1:16 10:2,19 68:13,17 69:7 184:19,22

**system** 23:7,15,23 25:24 83:16 84:9,23 85:4,10 90:4,16 94:4 95:5, 14 98:1 101:5 105:21 111:18 112:8, 15,16 113:16 120:5 124:16 125:8 130:22,25 131:2 135:24,25 136:2, 16,23 152:3,6 153:13 167:18 191:11 284:1,2 285:12 294:12

**systematically** 28:5

**systems** 36:16 113:22 190:20 191:2,10

---

## T

**table** 12:10 37:25 44:7 45:3 186:19 199:11,22 216:22 221:15 228:12

**tabulation** 64:21

**tabulator** 210:21,23 211:21 212:1,9 216:14 272:25

**Tacoma** 1:10,14 4:12 6:4 7:9 69:6 247:15 335:2 336:1,6,11

**Tacoma's** 247:16

**TAEA** 240:25 241:1

**tag** 293:18

**takes** 214:4 253:15,16 268:4 276:24

**taking** 11:24 28:4 51:21 69:24 70:8 105:3,8 144:8 200:12 206:12 238:19 273:12 286:24

**talk** 12:21 14:23 15:9 33:14 37:16 71:20 72:21 75:9 110:1 126:12 138:24 162:22 172:15,18 173:2 187:7,14 188:24 197:17 228:9 257:15 261:3 268:18 273:16 290:21 291:15 312:13 315:17 329:9

**talked** 118:19 150:5,24 166:3 173:17 194:22 242:14 302:11 314:2 316:9,10 324:8,16,19

**talking** 29:24 44:11 47:6 64:4 66:9 99:8,9 107:16 111:7 131:25 140:25 163:4 168:11,22 204:21 216:11 241:4,12 243:5,16 245:25 251:22 262:18 263:22 267:4 280:22 297:16 319:1,11 323:10,12

**target** 37:11

**Tarrant** 241:11

**tasks** 262:20

**TEAM** 23:7,22 25:19,21,22 115:17, 18 131:25 321:11,12 322:2

**TEAM-** 132:7

**TEAMS** 114:4 116:12 129:10,11,16, 23 130:3,6,12 131:3,7,12,14 132:13 312:11 321:19

**teamwork** 273:17

**Technically** 146:4

**technician** 271:22

**telephone** 102:20 140:22 141:1

**telling** 22:25 105:9 130:5 212:8 290:17

**tells** 34:10 147:13

**temp** 72:5,6 144:14

**template** 127:18

**temporary** 256:19,20 265:18

**ten** 105:16 108:6 136:13

**ten-minute** 323:2

**tent** 196:16

**term** 13:12,17,23,25 70:19 212:19 301:2 308:21

**terminology** 313:4

**terms** 13:11,14 101:8 144:12 211:6, 21

**testified** 10:19 41:7 69:7 101:15 114:2 155:18 184:22 286:11 296:2 299:6

**testify** 58:9 70:9 74:17 196:23

**testifying** 19:7 70:5 75:13 188:13 189:7 273:7 325:9

**testimony** 11:16,18 41:6 69:12 70:1,4 272:20 286:11 297:16 304:7 320:11 326:6 328:15 330:10

**tethered** 44:6

**Texas** 1:1,19,23 2:5,18,23 3:5,6,18, 19 6:13,15 14:25 24:23 60:18 72:22 90:6,7 94:6,7 103:17 126:4 140:23 187:15 191:18 195:25 199:3 218:21 219:6 239:14 240:8,11 241:2 275:23 277:25 288:18 289:3,12 297:22 298:5 301:2,24 302:7 303:13 305:2 324:2 325:18 334:8 336:8

**text** 203:1,4 302:12

**there-** 209:21

**thicker** 218:9

**thing** 8:3 12:7 13:14 27:24 79:22 88:15 103:10 130:15 134:23 173:7 262:23

**things** 129:16 190:7 209:4 230:9 253:18 262:15 271:15 287:7

**thinking** 76:6 246:8 247:6 269:23

**thinks** 236:16

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: thirty..unable

**thirty** 35:13

**thought** 53:9,12 68:10 165:2 183:10 207:13 274:18,20 277:24,25 278:7 305:22 319:3

**throughou-** 153:15

**ti-** 224:2

**ticket** 59:24 60:6,18

**till** 30:18,21 31:10,16 178:11

**time** 9:4,9,14 12:6 14:21 16:23 29:8 39:20,23 44:9,15 57:20 59:2,6 67:24 68:2 69:24 70:11 79:25 87:19,20 88:25 89:16 103:23 104:22 105:3,8, 11 106:17 107:9,15 110:2,11 119:22,23 125:21 131:2,16 149:11, 14 152:17 153:16 154:6 174:20 175:22,25 184:10,13 185:19 186:17, 25 191:19 193:9,10 221:5,16,18,19, 23 222:21 224:2,9 232:19 235:1 246:2,23 249:4,13,17 253:15,25 262:23 265:19 268:4 281:12,15 282:4 283:15 286:24 291:18 294:24 295:5,9 298:1,4 302:23 307:23 315:18 323:5,8 326:23 330:16 331:17

**time-consuming** 122:7

**timeline** 220:11

**timely** 219:21

**times** 38:2 67:4 93:4 213:4 264:3 266:22 268:15,18,22 269:7,20

**timing** 281:6

**tip** 271:6

**title** 20:22 75:18 78:7 193:21

**titled** 61:17 220:20 229:16 250:23

**today** 7:5,22 8:5 11:16,21 14:10 19:8 40:1 56:19,21 61:9 70:4 71:5 73:5 74:18 96:16,18 147:12 150:3 186:8,12,23 187:8 188:14 189:1 194:23 195:16 232:12 253:25 290:8 295:13 326:5

**today's** 188:5

**told** 79:23 114:8 120:20 131:5 280:6

**tongue** 271:6

**Tony** 78:16,17,20

**tools** 119:6

**top** 15:23 19:11 25:4 48:24 73:22 155:19,22 235:7 251:20 290:5,6 316:7 329:21

**topic** 53:1 58:9 73:12 140:12 160:23

**topics** 5:5,6 7:7 12:4 15:7 17:2 19:15 20:13,16,19 73:13 74:5,17,21 160:10,12 168:11 188:9,11,22,24 295:19,20

**total** 63:7,9 193:14

**totals** 63:18

**touch** 132:11

**touchscreen** 210:10,11

**track** 33:22 34:6 92:12 95:8,18 100:20 104:17 105:5,10 109:5 122:12,15 135:1,11 254:14

**tracker** 129:25 130:3,4 134:21,25 135:4,7,8,10,17,24 136:8,16 138:6, 11,18,21,25 139:5,12 140:2 141:2,3 165:20

**tracking** 33:23 255:5

**traditional** 286:9

**train** 256:4

**trained** 54:1,2,6,9 256:7 289:9

**training** 56:17 144:13 217:12,18 218:1,17,21 254:20 256:12,14,15, 18,21,22,24,25 257:3,8 261:9 273:16,20 274:3 289:14 322:11

**transfer** 124:22 325:5

**transferred** 22:6 105:19

**transition** 160:11

**transpired** 296:5

**transportation** 223:20 224:1

**trash** 210:24

**Travis** 237:24 238:10 309:13

**treatment** 288:11 289:16,25

**trigger** 194:19

**trilingual** 123:15,16

**trouble** 234:1

**troubleshooted** 330:4

**true** 142:18 282:24 292:8 327:20 334:3 336:3

**trusted** 200:21

**Tuesday** 71:6

**turn** 19:10 62:11 74:7 88:2 89:9 121:11 202:8,13 220:16 223:13 224:14 226:21 236:17,24 254:10,24 257:21 264:6 266:25 278:14 298:8, 16 304:10 310:5 317:17

**turned** 17:19 89:3,11

**turning** 157:12 220:15 317:20

**turnout** 247:25 248:1,4,6 325:3 327:14 329:8

**Twenty-two** 193:15

**two-year** 50:11 326:7

**type** 100:6 140:10 158:23,25 167:14 242:10 312:2

**types** 28:13 52:10 53:16,19 107:10 129:4 244:2 287:9

**typical** 170:14 288:6 289:22

**typically** 139:16 168:8 169:13 216:25 244:5 247:16 248:5 269:11

---

**U**

**Uh-huh** 17:11 21:14 22:3 24:13,25 25:2,8,16 26:18 27:5 28:19 29:14,17 30:10 31:24 32:21 34:1 48:8 50:15 56:2 66:6 71:18 85:13 99:15,18 102:7,12,14,17 106:21 111:21 118:20 119:2 124:9,12 125:1 128:11 130:19 131:1 132:6,9,15 133:24 135:23 139:20 144:20 146:10 148:13 164:19 166:25 167:2 168:24 172:23 174:18 178:13 179:12 182:8, 10 186:3 187:6 189:4 193:3,6,8 194:5 195:8 199:2,8,19 200:15 202:24 210:2 213:16,25 214:13,18, 21 217:4,22,25 219:25 220:23 222:18 225:14 226:13 228:6 229:11 230:7,21,23 234:14 239:3,21 246:21 247:1,23 252:1 257:19 267:2 268:8 275:18 278:16 281:2 292:11 297:18 300:14 301:7,9,12,16 310:20 314:11 315:20 317:19 319:13

**ultimately** 97:14 98:6 99:2 170:23 172:7 175:4

**unable** 95:9 96:19 113:1 145:12,19 147:6 262:6

**uncertain** 312:1,8

**uncertainty** 309:1,2

**undergo** 82:23

**underlined** 203:2 220:20 302:12

**underneath** 17:1 118:7

**underscore** 61:17 62:2,12,18 63:1, 4

**understand** 8:1,5 11:14,18 13:1,3, 13,18,24 19:7 20:18 23:20 24:1 25:6 70:1,9,19,22,24 74:20 75:3 96:12 105:11 106:19 114:11 116:22 141:19 160:17 173:3 186:7 188:13 189:2,11 200:11 201:2,5,8,18 203:1 205:13 208:2,19 209:5,11 211:3,23 221:10 222:3 225:10,12,19 226:1 229:20 230:2 237:5 238:24 267:25 285:23 289:20 295:21 301:4 304:13

**understanding** 12:1 13:8 87:1 106:21 116:24 130:21 195:22,24 216:9 234:23 235:2 258:2,6 259:5, 20 261:14 268:21 269:9 280:13 287:25

**Understood** 40:19 58:18 215:13 234:18

**underway** 127:16

**unfolds** 235:18

**UNION** 1:3

**unique** 284:8

**United** 1:1 3:9,11 37:16 44:8,18 149:21 150:21 281:21

**University** 22:7 189:25 190:1

**unlawful** 219:7 229:16 307:13,19

**unquote** 140:15 203:15,19 204:5, 15,24 205:9,15 223:21 237:3 250:24 252:5

**unsigned** 83:19

**unsolicited** 235:22 236:5 308:23

**unwarranted** 272:19

**upcoming** 144:19 248:9 296:18,19

**update** 22:15 25:20,22 32:23 100:4 114:3

**updated** 219:21

**updates** 116:12

**upgrade** 287:20

**uploading** 22:17

**upper** 207:16 208:9

**urging** 228:24

**usual** 268:22

**utilized** 316:4,11

---

**V**

**V-** 152:6

**V-E-M-A-C-S** 112:19

**V-O-T-E-C** 112:25

**vague** 51:23 222:20 229:12 292:6

**vaguely** 285:22

**varies** 243:23

**vary** 158:25

**vehicle** 196:3

**VEMAC** 150:25 152:3 165:24

**Vemacs** 84:9 95:5,14,16,17,19 96:1, 4,8,9 112:17,18,23 115:22 131:19, 22,25 132:8,11 151:6 152:3 283:25

**vendor** 26:3 36:15 191:3

**verbatim** 257:11

**Verifi-** 89:4

**verification** 86:11,16,24 87:1,4,10, 21 89:5,10,22 104:19 118:6 153:1 166:3,20 168:5 175:11,16 178:4 285:8

**verify** 86:11,13 87:2,5,11 90:5 97:14,19,23 98:5 99:16 100:1,16 101:12 109:6,16 120:9 153:1 155:21 167:15

**verifying** 114:18 152:20 166:9

**versa** 104:10,11 143:23

**version** 69:18 124:3,16 186:4 303:6 319:18

**versus** 36:11 95:20 111:11 112:12 313:17 319:22

**vice** 104:10,11 143:22

**Vice-president** 190:19

**video** 6:3 273:15 274:1

**VIDEOCONFERENCED** 1:9,13

**viejitos** 36:23

**Vietnamese** 38:22,24 39:2 123:17 124:4 125:5,11 194:21,24 213:24 214:1,8

**view** 22:5 173:8,10 313:2 314:8,12

**VILLAREAL** 3:16

**violated** 309:24

**violates** 237:3

**violating** 237:7,10

**VIP** 315:10

**voice** 50:21

**volume** 113:11,13

**volunteer** 38:5 265:17

**vot-** 111:16

**vote** 26:15,19,21,25 27:3,6,8,12,21, 24 28:7,10,14,18,25 31:15 33:15,19 34:14 36:17,21 38:8 41:21 42:22 50:9 51:1,2 52:1 56:4 60:5 61:22,25 80:5 85:7,16 88:2,24 98:19,20 103:14 110:15,22 119:15 120:21 130:24 135:5 137:22,23 140:24 142:18,23 156:23 157:14,19,20 158:15,20 166:4 168:16 171:19 172:3,6 174:25 176:24 177:4,5,6,9 178:8 179:5,11 181:22 183:14,24 196:3 197:5 198:11 200:22 209:19 210:23 212:9 216:4,6,13,14 217:7,8 224:9,11,21 225:15 226:2,4,17,25 227:4,15 228:4,7,24,25 229:17 230:19 234:7,9 247:7,11 248:23,25 267:5 268:5 272:25 275:25 276:6,13 277:21 278:25 279:5,16 282:19,22 283:4,19,23 284:7 286:13 288:3,7 290:13 307:14,20 308:4 309:5 310:3 324:23 325:16,20,21 326:1,4,5,8,9, 13,18 328:6,7 329:15,18,24

**Votec** 112:23,25

**voted** 17:22 34:10,18 40:6 52:3 63:5 67:5,7 98:24 117:9,21 175:4 227:8 247:3,9 284:19

**voter** 17:21 20:23 21:2,12 22:13,14, 15,18 31:23 32:3,4,9,10,15 33:12 36:17 37:1,2,5,7,18 38:19 39:4,5 40:14 41:23 42:6,11,14,18 50:17,18 53:2 55:8,13,22,25 56:3,20 57:6 60:2 61:24,25 62:1,7,11 75:24 76:4, 10,12,18,21 77:4 80:17 84:9,13,18,

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: voter's..weekly

19,20,21,22,23,24 85:1,5,9 86:2
87:11,22 88:6,20 89:2,14 90:4,5,6,9,
19 91:1,6,8,11 92:25 93:6 94:4,13
95:5,14 96:13,21 97:21 99:13,19,22,
24,25 100:2,7,8,12,14,15,24,25
101:2,4,5,6,19,23,25 102:6,10,19
103:9,13,16,20,23,24 104:2,6 105:8,
24 106:8 109:19,21,22 110:1,13,20
114:21,22,23 115:8,10,14,19,22,24
116:2,8,13 117:8 120:21,22 121:3,8,
13,14,19,25 122:10,18 130:21
131:2,7,8,16 132:4,12,18,24 133:9,
11 134:15 135:3,10,16 136:1,4,7,21,
22,24 137:3,12,16,18,23 138:2,24
140:7 141:1 142:15 143:20 144:2,6,
7 148:2 150:24 151:4,14,23 152:3,
20 153:13 157:23 158:4,14 159:3,10
167:18,19,21 168:19,20 169:21
170:22 174:20 177:20,25 178:16,17
180:17,18 181:1,6,10,17,19,21
190:20 191:1,4,10 193:13 198:10
199:6,16,17,20 200:5,6,13,20,25
201:1,7,17,18 203:18 204:1,13,15
205:8,14 206:15,19,21 207:24
208:16 209:6,13,14,25 210:8,9,14,
18,19 211:4,10,14,19 212:19 213:3,
17 214:11,14,19,20,22,25 215:1,8,
18,23 217:6 219:3,7,13 221:14
222:13 223:4,10 224:21 226:2,4,10
227:5 228:7,9,14,17,24,25 229:3,5
231:6,20 233:1 238:17,21 239:5
241:13 245:19 246:17 247:2,7,9,10,
24,25 248:4 252:10 259:22 260:6
267:4 268:4,5 269:5 276:6,15,16,18
277:7,19 278:10 279:13 282:20,23
283:24,25 284:1,8,12,23 285:3,7,12
290:11,23 291:2,17 292:21 293:22
294:17 297:17 299:1,3,22,25 301:1
304:13 308:9 316:21 328:11

**voter's** 86:10 87:12 95:11 101:4
135:25 137:8 151:8 152:5 181:5
204:14,24 205:15 210:17 211:11,14
288:16 299:2 304:14

**voter-** 276:10

**voter-friendly** 299:18

**voters** 11:2 17:19 22:21,23 24:2,7,
20 25:25 26:4 28:14 31:3,14 33:3,
15,18 34:10,22 35:12 36:7,10 40:5,
13 41:20,21 42:14,22 43:1,10,14
48:17 50:21 60:5 61:19,21 67:5,7
80:9,20 96:17 97:18 98:17,18,22,24,
25 99:1,4,9,23 101:11 102:5,22,23
103:2,5,12 104:18,23 105:14,20
106:4 107:1,6,10,16 108:9,20 109:5

110:4 111:10 112:11 113:23 119:11
120:20 121:10 126:7 136:15 137:21
138:20 140:21 142:14,18 143:6,14,
18,24 144:5 147:10,13 148:25
156:11,22 158:10 167:19 168:8,12
169:12,15,25 170:6,19 171:13,19
173:18 174:19 176:24 177:19,22
178:15,24 179:1,17 180:4 183:9
192:10 194:1,13 196:10 197:5,19,
20,24 198:4,19,22 199:25 215:12
216:25 219:4 221:22 223:19,20
224:2,9 225:5,15 226:17 228:4
229:21 231:10,20 239:1 241:12
245:11,19 246:1,6 248:22 249:4
251:20 253:5,7 255:11 260:1 262:13
266:22 268:18 270:22 271:2 273:19
274:22 277:20 278:24 279:4 280:2,
10 282:17 285:19 288:7 292:17,23
293:5 302:5 305:11,16,19,23 308:2
327:4,6,8 330:9,12

**votes** 17:7,18 62:23 63:7,19 64:7,24
65:4,17 67:12 80:4 227:12 245:19
286:17

**voting** 3:10 17:5,13,23,24 18:1
26:17,20,22 27:1 29:15,16 30:8,13,
14 31:21,22 32:7 37:13 38:20 39:15
41:6,14 43:11,16 47:16,23,24 48:10,
16 49:1,3 51:6 52:13,15 53:17,20
56:21 57:5 58:3,16 60:19 61:20
62:20 64:5,19 67:11,12 86:21 88:1
90:11 91:23 105:24 110:14 111:17
120:14,16 121:7 124:7 127:15,17
141:11,20 143:11 144:10,16 147:25
148:11,16,20 157:25 168:9 170:1,20
171:24 175:7,10 176:21 181:16
193:19 195:18,24,25 196:4 199:12,
23 200:7 211:5 213:1 216:2,9,17,20,
21 221:22 223:19 246:2,6,25 262:1
265:3 267:23 271:5 275:16,17,19,22
276:7,17,19,21 277:2,4,5,6,8,13,17,
20,21 278:3,9,12 279:21,22 280:1,3,
11,18 281:4 285:25 288:6,9 289:22,
24 292:16 297:11,20,22 298:5 300:7
301:15 302:6 316:2 321:20 323:19
328:14,19,24 329:2,4,7,12,16,19
330:3,6,9,13

**VP** 191:7 192:6

**VR** 23:17 83:16 152:6

**vulnerable** 253:13

---

**W**

---

**wait** 12:19,20 60:24 86:10 133:23

182:1 264:3 266:22 267:11,23
268:18,22 269:2,7,11,20

**waited** 267:5,14,16

**waiting** 235:5,8 261:18

**waits** 269:3,5

**waive** 6:20,24,25 7:3

**waived** 10:8

**walk** 69:15 85:23 111:4 199:22
276:5

**walked** 16:11

**walking** 199:7,18 329:20

**wanted** 8:3 50:9 85:16 102:15 139:9
140:17 141:25 142:1 158:19 234:8
254:7 278:25 280:10 282:16 315:17

**wanting** 265:17

**warn** 257:12

**Washington** 2:10 3:12

**watcher** 248:18 254:17,19 258:10,
12 259:3,4,22 262:4,8,19 264:17,18
270:25 271:1,9,13,14 272:8,19,23
273:1 280:23 313:10 315:19 316:4,
12,16,20 318:3,4

**watcher-** 47:10

**watchers** 242:17 254:8,11,15
255:1,5,7,9,11,20,25 256:5 257:1,13
258:21 259:12,25 261:2,19 264:12
270:5,6,14,19,22 273:5,9,19,25
274:7,14,21 275:7,12 286:7 312:17,
20,24 313:2 314:17,22 315:1,11
316:9 317:23 323:10

**watching** 275:3

**ways** 82:20 124:15 140:1

**weather** 320:7,15,24

**web-** 127:5

**webinar** 127:11,22 128:12

**Webinar-** 127:8

**webinars** 127:5,8,9 218:24 235:2

**Wednesday** 310:13

**week** 29:10,16,18 38:2 91:25 92:3
106:4,8 243:16

**week's** 29:9

**weekly** 92:14,15 106:15

The Office of the Dallas County Elections Administrator

April 29, 2022
Index: weeks..Zoom

**weeks** 99:4 185:21,23 193:4

**weigh** 311:9

**west** 37:10

**WESTERN** 1:1

**wheel** 210:10 301:10

**wheelchair** 52:2 56:9,19,23 57:5 301:8

**whichever** 153:12

**white** 2:9 4:8,17 6:9,10 40:3,23,25 41:2 42:4,9,18 43:9,19,22,25 44:5 50:24 52:5,7 57:11 65:23 117:3,4 149:16 170:3 172:14 175:17 178:18 181:25 218:11 232:21 254:2,3,5 255:24 259:20,25 260:4,16,19 262:17,24 263:14,20,25 265:14 266:25 270:20 271:3 272:17 278:6 279:11 280:14,22 281:9,16 295:3 301:19 313:25 314:15 316:18 331:2

**who'd** 281:19

**wife** 133:19 134:2,4,5,6

**Wise** 193:2

**witnesses** 1:15 5:5 7:5,7,18 58:24

**Women** 245:19

**Wonderful** 77:10 210:24

**wondering** 239:4

**word** 164:2 308:25

**words** 53:5 89:25 180:5 223:9 307:16 309:2

**work** 22:17 32:17 38:16 39:7 51:10 54:11 55:3 75:11 76:1 86:13 108:17 124:24 128:5 134:6 140:5 178:4 222:23 238:20 247:19 265:18 288:22 297:25 302:10 320:21

**worked** 21:3 141:4 193:6,25 268:2 272:5

**worker** 5:11 213:19 214:16 222:21 223:1 248:19 264:3,16 265:9,15 268:25 269:6,12 273:9 276:14 318:2 319:12,16 323:12,22,24 324:11 327:2,16,21

**workers** 30:22 47:11 50:14 55:11 56:8,12,15,22 199:11 200:2,3 214:5,23 216:6 217:13 218:17 242:16,19 255:20 256:4,19,25 257:12 260:23 263:1 265:18,19,22 266:2,14,21

269:1,5 274:19,21 275:11 276:11 289:8 312:13,15,17 313:23 314:16 318:22 319:10,12 320:8,13,21 321:3,6 322:5,10,11,13 324:9,14,15,16,18 326:24 327:1,5,6

**workflow** 106:23

**working** 22:19 77:4,8 79:18 197:2 222:19 255:16 263:7 274:24

**works** 72:19 88:19 105:21

**worried** 319:19 323:24

**worry** 233:20

**worth** 119:9

**write** 95:7 252:21 294:8

**writer** 320:18

**writing** 124:5,6

**written** 117:25 159:16 206:18 286:3 287:14

**wrong** 24:19 33:1 48:7 112:21 164:8 298:4

**wrote** 34:25 320:18

---

## Y

**y'all** 150:8

**Y65** 83:7 111:18

**YDS** 111:18

**Ye-** 229:23 230:5 244:21 251:1

**year** 38:12 48:7 64:11 75:21 76:16 77:12,24,25 78:13,14 85:11 179:2 190:3 192:8 194:4 262:25 286:25 321:21

**yearly** 83:7

**years** 20:25 21:22 22:6 48:22 51:8 65:5,19 76:8,14 77:7,9 155:25 178:25 192:13,19 193:12,14,15 222:15 253:16 275:11,14 286:10 314:21

**yellow** 15:24

**yesterday** 34:1

**young** 250:14

**Yvonne** 243:16

---

## Z

**zeros** 250:1

**Zoom** 2:13 3:9,15 15:11,14 44:1,4, 12 57:14 149:18 184:5 240:19 241:9,21 281:19 328:1 331:4

---

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,           §
          *Plaintiffs,*                        §
                                               §
*v.*                                           §     Case No. 5:21-cv-844-XR
                                               §
GREGORY W. ABBOTT, et al.,                     §
          *Defendants.*                        §

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX P

Transcript of the Testimony of

**Isabel Longoria**

**Date:**

April 20, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO V. GREGORY W. ABBOTT

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   WESTERN DISTRICT OF TEXAS

 3                     SAN ANTONIO DIVISION

 4

 5   * * * * * * * * * * * * * * * * * * * * * * * * * * *

 6   LA UNION DEL PUEBLO ENTERO, et al *

 7   v.                              *     CASE NO. 5:21-cv-844-XR

 8   GREGORY W. ABBOTT, et al         *

 9   * * * * * * * * * * * * * * * * * * * * * * * * * * *

10   OCA-GREATER HOUSTON, et al       *

11   v.                              *     CASE NO. 1:21-cv-780-XR

12   JOHN SCOTT, et al                *

13   * * * * * * * * * * * * * * * * * * * * * * * * * * *

14   HOUSTON JUSTICE, et al           *

15   v.                              *     CASE NO. 5:21-cv-848-XR

16   GREGORY WAYNE ABBOTT, et al      *

17   * * * * * * * * * * * * * * * * * * * * * * * * * * *

18   LULAC TEXAS, et al               *

19   v.                              *     CASE NO. 1:21-cv-0786-XR

20   JOHN SCOTT, et al                *

21   * * * * * * * * * * * * * * * * * * * * * * * * * * *

22   MI FAMILIA VOTA, et al           *

23   v.                              *     CASE NO. 5:21-cv-0920-XR

24   GREG ABBOTT, et al               *

25   * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

Isabel Longoria

April 20, 2022
Pages 2 to 5

Page 2

```
1  UNITED STATES OF AMERICA        *
2  v.                              *    CASE NO. 5:21-cv-1085-XR
3  THE STATE OF TEXAS, et al       *
4  * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
5
6              ORAL AND VIDEOTAPED DEPOSITION OF
7                      ISABEL LONGORIA
8                      APRIL 20, 2022
9                      VOLUME 1 OF 1
10
11          Oral and videotaped deposition of Isabel Longoria,
12 produced as a witness at the instance of the defense, and duly
13 sworn, was taken in the above-styled and numbered cause on April
14 20, 2022, from 9:24 a.m. to 2:32 p.m., before Terrie Doyle
15 Escobar, CSR in and for the State of Texas, reported by oral
16 stenography, at the Office of the Texas Attorney General,
17 Consumer Protection Division, Houston Regional Office, 808 Travis
18 Street, Suite 1520, Houston, Texas  77002, pursuant to Rule 30 of
19 the Federal Rules of Civil Procedure.
20
21
22
23
24
25
```

Page 3

```
1                    A P P E A R A N C E S
2
3  FOR THE HAUL PLAINTIFFS:
4      MR. KENNETH E. BROUGHTON
5      REED SMITH, LLP
6      811 MAIN STREET, SUITE 1700
7      HOUSTON, TEXAS  77002
8      PHONE: 713-806-8434
9      EMAIL: kbroughton@reedsmith.com
10
11 FOR STATE DEFENDANTS:
12     MR. WILLIAM T. THOMPSON
13     OFFICE OF THE ATTORNEY GENERAL
14     DEPUTY CHIEF, SPECIAL LITIGATION UNIT
15     POST OFFICE BOX 12548
16     AUSTIN, TEXAS  78711
17     PHONE: 512-936-2567
18     EMAIL: will.thompson@oag.texas.gov
19
20 FOR DEFENDANT ISABEL LONGORIA:
21     MS. CHRISTINA BEELER
22     MR. JONATHAN FOMBONNE
23     OFFICE OF THE HARRIS COUNTY ATTORNEY
24     1019 CONGRESS PLAZA, 15TH FLOOR
25     HOUSTON, TEXAS  77002
```

Page 4

```
1      PHONE: 713-274-5101
2      EMAIL: Jonathan.Fombonne@cao.hctx.net
3
4  FOR DEFENDANT YVONNE RAMON:
5      MS. JOSEPHINE RAMIREZ SOLIS (Present via Zoom)
6      OFFICE OF CRIMINAL DISTRICT ATTORNEY - HIDALGO COUNTY, TEXAS
7      CHIEF, CIVIL DIVISION
8      100 E. CANO
9      EDINBURG, TEXAS  78539
10     PHONE: 956-292-7609
11     EMAIL: josephine.ramirez@da.co.hidalgo.tx.us
12
13 FOR PLAINTIFFS LULAC TEXAS and VOTO LATINO:
14     MR. MIKE JONES (Present via Zoom)
15     ELIAS LAW GROUP, LLP
16     10 G ST. NE, STE. 600
17     WASHINGTON, D.C.  20002
18     PHONE: 202-985-1752
19     EMAIL: mjones@elias.law
20
21 FOR PLAINTIFF UNITED STATES OF AMERICA:
22     MS. L. BRADY BENDER (Present via Zoom)
23     UNITED STATES DEPARTMENT OF JUSTICE
24     CIVIL RIGHTS DIVISION, VOTING SECTION
25     950 PENNSYLVANIA AVENUE NW
```

Page 5

```
1      4CON 8TH FLOOR
2      WASHINGTON, DC  20530
3      PHONE: 202-353-5373
4      EMAIL: laura.bender@usdoj.gov
5
6  ALSO PRESENT:
7      MR. TERRY HARRISON, VIDEOGRAPHER
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Isabel Longoria

April 20, 2022
Pages 142 to 145

Page 142

1 voters or were registered voters, perhaps, at the time they
2 applied, but for whatever reason, their voter registration lapsed
3 or, you know, for example, provisional voters weren't able to
4 then cure whatever provisional defect there was, so, ultimately,
5 they were unable to vote by mail.
6      Q.   Are you aware of instances in which someone has tried
7 to vote by mail but pretending to be somebody else?
8      A.   Not to my knowledge, no.
9      Q.   Before SB1 took effect, what information would someone
10 need to apply for a ballot by mail?
11     A.   Someone would need to submit an application to vote by
12 mail that contains their name, residential address, mailing
13 address -- name, address -- the reason for their qualification to
14 vote by mail -- for example, being in the military, disabled, or
15 over the age of 65 -- they had to sign the form essentially
16 saying, you know, I swear I am who I say I am, and then
17 submitting the election that they needed a ballot for.  I think
18 those are the general categories on there.
19     Q.   Right.  And so the kind of identifying information on
20 there would be the name and address; right?
21     A.   Yes.
22     Q.   Are voters' names and addresses publicly available in
23 Harris County?
24     A.   Yes.
25     Q.   They're available through the voter file, for example;

Page 143

1 right?
2      A.   Yes.
3      Q.   And your office will give out copies of the voter file
4 when requested; right?
5      A.   If the request is eligible for such information, yes.
6      Q.   Are political parties eligible to request the voter
7 file?
8      A.   Yes.
9      Q.   Who else is eligible to request the voter file?
10     A.   As I believe, if I understand correctly or remember
11 correctly, any eligible citizen is able to, you know, public
12 information request, request a copy of the voter file.  And I
13 believe you may even be able to download it from our website.  I
14 just can't remember if it's the voter file or the vote record for
15 any given election.
16     Q.   And for publicly available records, one could determine
17 whether another individual is registered to vote; right?
18     A.   Yes.
19     Q.   And one could determine whether someone who is
20 registered to vote has in fact voted in recent elections; right?
21     A.   If you got the vote history file, yes.
22     Q.   And that's publicly available?
23     A.   Yes.
24     Q.   So based on publicly available information, someone
25 could submit before SB1 an application to vote by mail with

Page 144

1 another registered voter's name and address; right?
2      A.   Their name and address?  Yes.
3      Q.   And, you know, if they wanted to be clever, they could
4 even do it for someone who's registered to vote but who has a
5 practice of not voting in recent elections; right?
6           MR. FOMBONNE:  Objection to form.
7 (BY MR. THOMPSON:)
8      A.   To the extent that they would have access to that kind
9 of information to determine that, yes.
10     Q.   Right.  So if someone got access to the publicly
11 available information from Harris County, he'd be able to submit
12 all the information required to request a ballot by mail on
13 someone else's behalf and do so in a way that targets people who
14 are registered to vote but who have not, in fact, voted recently;
15 right?
16     A.   No.  No.
17     Q.   Why?
18     A.   The voter file would not contain information about a
19 voter's age, and, so, if -- again, I can't 100 percent remember,
20 but I'm trying to remember -- if you -- if you need -- to the
21 extent you need to include your date of birth on the application,
22 an individual would have to find that date of birth not through
23 the voter file or some other means, in addition to which you
24 would still have to fill out the reason for which you could apply
25 to vote by mail, which would not be found in a voter file.

Page 145

1      Q.   Of course, the reason to vote by mail could just be a
2 lie; right?
3      A.   Uh, any -- sure.
4      Q.   It's not something you verify; right?
5      A.   Our office couldn't determine what is a lie or not a
6 lie, but, yes, a -- you know, an individual could fill out a
7 form.
8      Q.   If someone submits an application to vote by mail and
9 the reason given for voting by mail is that he expects to be out
10 of the county when in-person voting is happening, you wouldn't
11 have any way of verifying or not verifying that information;
12 right?
13     A.   Correct.
14     Q.   Are you aware that on an application to vote by mail
15 providing a date of birth is optional?
16     A.   I did not remember, but --
17           MR. FOMBONNE:  Objection to form.
18 (BY MR. THOMPSON:)
19     Q.   Do you have any reason to disagree with that?
20     A.   No.
21     Q.   So if a person wanted to submit an application to vote
22 by mail using someone else's information, he could gather the
23 required personal information from publicly available sources;
24 right?
25     A.   Yes.

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900        San Antonio, Texas 78232
210-697-3400                                                              210-697-3408

Isabel Longoria

April 20, 2022
Pages 146 to 149

Page 146

1  Q.  At least, before SB1; right?
2  A.  Yes.
3  Q.  But with SB1, the application to vote by mail is
4  supposed to include some ID numbers; right?
5  A.  Yes.
6  Q.  And what are those numbers?
7  A.  The last four digits of your Social Security number,
8  your driver's license number; absent of either of those, a Texas
9  election ID number or a statement certifying that you have access
10 to neither of those documents -- or not access, but you don't
11 have either a Social Security, driver's license, or election ID
12 number.
13 Q.  To the best of your knowledge, are driver's license
14 numbers publicly available?
15 A.  No.
16 Q.  To the best of your knowledge, are Social Security
17 numbers publicly available?
18 A.  No.
19 Q.  To the best of your knowledge, are the last four digits
20 of a Social Security number publicly available?
21 A.  No.
22 Q.  So would it be fair to say that SB1, by imposing an ID
23 number requirement on an application to vote by mail, now
24 requires information that is not publicly available?
25 A.  Yes.

Page 147

1  Q.  And that's change from the pre-SB1 law; right?
2  A.  Yes.
3  Q.  Do people in Harris County ever express concerns about
4  election integrity to you?
5  A.  Yes.
6  Q.  Can you tell me about those.
7  A.  Broadly, calls -- again, calls that might come into the
8  office in broad buckets expressing voters who are worried
9  Russians are hacking elections in Harris County, are worried
10 that, you know, broadly, they hear claims of national election
11 stories and worried that somehow Harris County is also, you know,
12 prone or could be a victim of hacking or other issues related to
13 elections.
14 Q.  So are all of the concerns about election integrity
15 that you receive related to hacking?
16 A.  Hacking?  Yes, and, you know, can the machines be
17 hacked, are the machines connected to the internet, are the
18 machines faxing my vote to the Russians, broadly based conspiracy
19 or -- or hacking questions.
20 Q.  Do you ever receive calls expressing concerns about
21 election integrity related to ballot harvesting, for example?
22 A.  Ballot harvesting?  No.  Again, only related to
23 complaints of voters sharing that they prefer not to put their ID
24 numbers in mail as they have worries about identity theft, if
25 they include, you know, sensitive information that is then put in

Page 148

1  the mail.
2  Q.  When voters call to express concerns about election
3  integrity to your office, do you know whether they are sincere?
4      MR. FOMBONNE:  Objection to form.
5  (BY MR. THOMPSON:)
6  A.  To the extent that anyone -- that we assume anyone who
7  calls our office has a valid concern, and so we share the
8  information we can with them to alleviate any concerns they might
9  have.
10 Q.  That's not quite what I was asking.  Let me try again.
11 A.  Sure.
12 Q.  You've spoken on the phone with people who are
13 expressing concerns about election integrity; right?
14 A.  I have not; the call center that we run as part of the
15 office has.
16 Q.  So people in your call center have spoken on the phone
17 with Harris County residents who are expressing concern about
18 election integrity; right?
19 A.  Yes.
20 Q.  Do the people in this call center ever tell you whether
21 they think the callers are expressing sincere concerns?
22      MR. FOMBONNE:  Objection to form.
23 (BY MR. THOMPSON:)
24 A.  Yes, as in the voters are sincerely expressing those
25 concerns.

Page 149

1  Q.  The voters may be saying something that's inaccurate;
2  right?
3  A.  Yes.
4  Q.  But they honestly believe it when they say it; right?
5  A.  Yes.
6  Q.  And your office tries to alleviate those concerns?
7  A.  Yes.
8  Q.  Why?
9  A.  If voters have concerns about voting, whether or not be
10 about election integrity or anything else, it's our duty to make
11 sure that we give voters the most accurate information we have to
12 help them feel, you know, good and taken care of, just in general
13 customer service and constituent responses.
14 Q.  Do you think it's important for voters to believe that
15 the system is secure?
16 A.  Yes.
17 Q.  What is the purpose of having poll watchers in Harris
18 County elections?
19 A.  As I understand it, poll watchers are representatives
20 of campaigns who are there to observe that election clerks and
21 election judges and workers broadly are upholding the Texas
22 Election Code in the administration of elections.
23 Q.  So is the idea that someone were violating the law in
24 the administration of the election, a poll watcher might be able
25 to observe it and report it?

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX Q

# Voter Registration and Absentee Ballot Request

Federal Post Card Application (FPCA)

**This form is for absent Uniformed Service members, their families, and citizens residing outside the United States. It is used to register to vote, request an absentee ballot, and update your contact information. See your state's guidelines at FVAP.gov.**

Print clearly in blue or black ink, please see back for instructions.

## Who are you? Pick one.

I request an absentee ballot for all elections in which I am eligible to vote AND:

- ☐ I am on active duty in the Uniformed Services or Merchant Marine **-OR-** ☐ I am an eligible spouse or dependent.
- ☐ I am a U.S. citizen living outside the country, and I intend to return.
- ☐ I am a U.S. citizen living outside the country, and my intent to return is uncertain.
- ☐ I am a U.S. citizen living outside the country, I have never lived in the United States.

| Last name | Suffix (Jr., II) | ☐ Mr.  ☐ Miss |
| | | ☐ Mrs.  ☐ Ms. |
| First name | Previous names (if applicable) | |
| Middle name | Birth date (MM/DD/YYYY) | |
| Social Security Number | Driver's license or State ID# | |

## What is your address in the U.S. state or territory where you are registering to vote and requesting an absentee ballot?

Your voting materials will not be sent to this address. See instructions on the other side of form.

| Street address | Apt # |
| City, town, village | State |
| County | ZIP |

## Where are you now?  You MUST give your CURRENT address to receive your voting materials.

Your mailing address. (Different from above) | Your mail forwarding address. (If different from mailing address)

## What is your contact information? This is so election officials can reach you about your request.

Provide the country code and area code with your phone and fax number. Do not use a Defense Switched Network (DSN) number.

| Email: | Phone: |
| Alternate email: | Fax: |

## What are your preferences for upcoming elections?

A. How do you want to receive voting materials from your election office? (Select One)
- ☐ Mail
- ☐ Email or online
- ☐ Fax

B. What is your political party for primary elections?

## What additional information must you provide?

Puerto Rico and Vermont require more information, see back for instructions. *Additional state guidelines* may be found at FVAP.gov. You may also use this space to clarify your voter information.

**STATE'S EXHIBIT 3**

PENGAD 800-631-6989

## You must read and sign this statement.

**I swear or affirm, under penalty of perjury, that:**

- The information on this form is true, accurate, and complete to the best of my knowledge. I understand that a material misstatement of fact in completion of this document may constitute grounds for conviction of perjury.
- I am a U.S. citizen, at least 18 years of age (or will be by the day of the election), eligible to vote in the requested jurisdiction, and
- I am not disqualified to vote due to having been convicted of a felony or other disqualifying offense, nor have I been adjudicated mentally incompetent; or if so, my voting rights have been reinstated; and
- I am not registering, requesting a ballot, or voting in any other jurisdiction in the United States, except the jurisdiction cited in this voting form.

**Sign here** X _____  **Today's date** (MM/DD/YYYY)

This information is for official use only. Any unauthorized release may be punishable by law. Previous editions are obsolete. Standard Form 76 (Rev.09-2021), OMB No. 0704-0503, NSN 7540-00-643-5053

# You can vote wherever you are.

## 1. Fill out your form completely and accurately.

- Your U.S. address is used to determine where you are eligible to vote absentee. For military voters, it is usually your last address in your state of legal residence. For overseas citizens, it is usually the last place you lived before moving overseas. You do not need to have any current ties with this address. DO NOT write a PO Box # in section 2.

- Most states allow you to provide a Driver's License number or the last 4 digits of your SSN. New Mexico, Tennessee, and Virginia require a full SSN.

- If you cannot receive mail at your current mailing address, please specify a mail forwarding address.

- Many states require you to specify a political party to vote in primary elections. This information may be used to register you with a party.

- **Section 6 Requirements:** If your voting residence is Vermont, you must acknowledge the following by writing in section 6: "I swear or affirm that I have taken the Vermont Voter's Oath." If your voting residence is in Puerto Rico, you must list your mother's and father's first name.

- We recommend that you complete and submit this form every year while you are an absentee voter.

## 2. Remember to sign this form!

## 3. Return this form to your election official. You can find their contact information at FVAP.gov.

- Remove the adhesive liner from the top and sides. Fold and seal tightly. If you printed the form, fold it and seal it in an envelope.

- All states accept this form by mail and many states accept this form by email and fax. See your state's guidelines at FVAP.gov.

### Agency Disclosure Statement

The public reporting burden for this collection of information, OMB Control Number 0704-0503, is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or burden reduction suggestions to the Department of Defense, Washington Headquarters Services, at whs.mc-alex.esd.mbx.dd-dod-information-collections@mail.mil. Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number. DO NOT SUBMIT YOUR FORM TO THE E-MAIL ADDRESS ABOVE.

### Privacy Advisory

**When completed, this form contains personally identifiable information and is protected by the Privacy Act of 1974, as amended.**

### Questions?
### Email: vote@fvap.gov

---



The address can be found online at FVAP.gov.)
(Fill in the address of your election office.

**To**

NO POSTAGE NECESSARY IN THE U.S. MAIL – DMM 703.8.0

OFFICIAL ABSENTEE BALLOTING MATERIAL – FIRST CLASS MAIL

OFFICIAL ELECTION MAIL

International airmail postage is required if not mailed using the U.S. Postal Service, APO/FPO/DPO system, or diplomatic pouch.

(Your name and mailing address)

**From**



PAR AVION

U.S. Postage Paid
39 USC 3406

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,　　§
　　　　　　Plaintiffs,　　　　　　　　　§
　　　　　　　　　　　　　　　　　　§
v.　　　　　　　　　　　　　　　　§　　Case No. 5:21-cv-844-XR
　　　　　　　　　　　　　　　　　　§
GREGORY W. ABBOTT, et al.,　　　　　§
　　　　　　Defendants.　　　　　　　§

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX R

Frank Phillips                                    March 31, 2023

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
2                   SAN ANTONIO DIVISION

3   LA UNIÓN DEL PUEBLO         §
    ENTERO, ET AL.,             §
4                               §
         PLAINTIFFS,            §
5                               §
         V.                     §   CIVIL ACTION NO.5:21-CV-844 (XR)
6                               §   (CONSOLIDATED CASES)
    STATE OF TEXAS, ET          §
7   AL.,                        §
                                §
8        DEFENDANTS.            §

9
    *********************************************************
10
                     ORAL DEPOSITION OF
11
                      FRANK PHILLIPS
12
                      MARCH 31, 2023
13
    *********************************************************
14

15         ORAL DEPOSITION OF FRANK PHILLIPS, PRODUCED AS A

16   WITNESS AT THE INSTANCE OF THE PLAINTIFF, AND DULY

17   SWORN, WAS TAKEN IN THE ABOVE-STYLED AND -NUMBERED CAUSE

18   ON THE 31ST DAY OF MARCH, 2023, FROM 9:14 A.M. TO

19   12:40 P.M., BEFORE KAREN A. GONZALEZ, COMMISSIONED

20   NOTARY, IN AND FOR THE STATE OF TEXAS, REPORTED BY

21   MACHINE SHORTHAND, FROM DALLAS COUNTY, TEXAS, PURSUANT

22   TO THE TEXAS RULES OF CIVIL PROCEDURE, THE TEXAS SUPREME

23   COURT EMERGENCY ORDER REGARDING THE COVID-19 STATE OF

24   DISASTER AND THE PROVISIONS STATED ON THE RECORD OR

25   ATTACHED HERETO.
```



Frank Phillips

March 31, 2023
Pages 94 to 97

**Page 94**

1  Q. LET'S GO WITH DENTON COUNTY FIRST, AND THEN YOU
2  CAN TALK ABOUT IN GENERAL.
3       MS. HUNKER: OBJECTION; FORM.
4  A. SURE. ONE WOULD BE JUST OUR GENERAL INCREASE IN
5  POPULATION.
6  Q. (BY MS. YUN)  UH-HUH.
7  A. AND I THINK IT'S JUST BECOME MORE -- I HATE TO
8  SAY ADVERTISED. I THINK IT'S PROMOTED MORE THAN IT USED
9  TO BE.
10 Q. UH-HUH.
11 A. I THINK PEOPLE TAKE ADVANTAGE OF MAIL VOTING. I
12 MEAN, I JUST THINK PEOPLE -- A LOT OF PEOPLE DO IT JUST
13 BECAUSE IT'S CONVENIENT. SO A POPULATION INCREASE AND
14 THE GENERAL PROMOTION OF VOTING BY MAIL IS CAUSING AN
15 INCREASE.
16 Q. UH-HUH.
17     AND WOULD YOU AGREE THAT FOR SOME FOLKS IN DENTON
18 COUNTY, THAT IT IS THE ONLY WAY FOR THEM TO VOTE?
19     MS. HUNKER: OBJECTION; FORM.
20 A. FOR SOME FOLKS, YES.
21 Q. (BY MS. YUN)  DUE TO DISABILITY, FOR EXAMPLE?
22     MS. HUNKER: OBJECTION; FORM.
23 A. PROBABLY DISABILITY, YES.
24 Q. (BY MS. YUN)  AND WOULD YOU AGREE THAT FOR SOME
25 FOLKS, IT IS VERY DIFFICULT FOR THEM TO CURE THEIR MAIL

**Page 95**

1  BALLOT ERROR?
2       MS. HUNKER: OBJECTION; FORM.
3  A. I WOULD SAY YES.
4  Q. (BY MS. YUN)  OKAY. AND I THINK YOU TESTIFIED
5  EARLIER -- AND CORRECT ME IF I'M WRONG -- THAT SOMETIMES
6  FOLKS DON'T GET NOTIFIED IN TIME TO CURE THEIR MAIL
7  BALLOT IN ORDER FOR THEIR BALLOT TO COUNT; IS THAT
8  RIGHT?
9  A. YEAH, ESPECIALLY IF THEY TURN IT IN NEAR THE END,
10 YOU KNOW, THE LAST DAY OF EARLY VOTING, THEN, YES, IT'S
11 GOING TO BE TOUGH.
12     MS. YUN: I THINK I AM ALMOST DONE. I JUST
13 WANT TO TAKE A QUICK BREAK.
14     THE REPORTER: THE TIME IS 11:58 A.M. WE
15 ARE OFF THE RECORD.
16     (OFF THE RECORD.)
17     THE REPORTER: THE TIME IS 12:05 P.M. WE
18 ARE BACK ON THE RECORD.
19     MS. YUN: OKAY. JUST FOR THE RECORD, SO
20 WE'RE GOING TO MARK THE ABBM FORM THAT MR. PHILLIPS
21 LOOKED AT AS EXHIBIT 8. AND THEN THE CARRIER ENVELOPE
22 THAT HE LOOKED AT TO REFRESH HIS RECOLLECTION AS EXHIBIT
23 NO. 9.
24     (EXHIBITS 8 AND 9 MARKED.)
25 Q. (BY MS. YUN)  SO JUST TO WRAP UP, IS THERE

**Page 96**

1  ANYTHING ELSE THAT YOU DISCUSSED WITH THE STATE ABOUT
2  YOUR TRIAL TESTIMONY THAT WE HAVEN'T DISCUSSED THUS FAR
3  TODAY?
4  A. I HAVEN'T DISCUSSED WITH THE STATE ABOUT MY --
5       THE WITNESS: OH, ARE YOU THE STATE?
6       MS. HUNKER: I'M THE STATE.
7  Q. (BY MS. YUN)  SORRY. THE AG'S OFFICE,
8  MS. HUNKER.
9  A. NO.
10     MS. YUN: NOTHING ELSE. AND SO I'LL PASS
11 THE WITNESS.
12     MS. HUNKER: ARE THERE ANY OTHER PLAINTIFF
13 GROUP THAT WOULD LIKE TO ASK QUESTIONS OF THE WITNESS ON
14 THE ZOOM CALL?
15     MR. D'ANGELO: NOT FOR ME, THANK YOU.
16     MS. HUNKER: THAT WAS WILLIAM D'ANGELO.
17     ANY OTHER PLAINTIFF GROUPS HAVE ANY
18 QUESTIONS FOR THE WITNESS?
19     HEARING NONE, THE STATE IS GOING TO DO A
20 SHORT DIRECT EXAMINATION.
21     EXAMINATION
22 BY MS. HUNKER:
23 Q. MR. PHILLIPS, HAVE VOTERS CONVEYED TO YOU
24 CONCERNS ABOUT VOTER FRAUD?
25 A. YES.

**Page 97**

1  Q. HAVE VOTERS CONVEYED TO YOU CONCERNS ABOUT MAIL
2  BALLOT VOTER FRAUD SPECIFICALLY?
3  A. YES.
4  Q. IN YOUR EXPERIENCE, DOES VOTERS' PERCEPTION THAT
5  VOTER FRAUD, INCLUDING MAIL BALLOT VOTING FRAUD, EXISTS
6  UNDERMINE YOUR CONFIDENCE IN ELECTION RESULTS?
7  A. ABSOLUTELY.
8  Q. IN YOUR EXPERIENCE, DOES VOTERS' PERCEPTION THAT
9  VOTER FRAUD, INCLUDING MAIL VOTER FRAUD, EXISTS
10 UNDERMINE THEIR TRUST IN THE ELECTORAL PROCESS?
11 A. YES.
12 Q. HAVE YOU SEEN AN INCREASE IN THE LACK OF TRUST IN
13 THE ELECTORAL PROCESS OVER THE LAST FEW YEARS?
14 A. WITHOUT A DOUBT.
15 Q. DO YOU RECALL TALKING WITH COUNSEL ABOUT HOW THE
16 SB 1 ID REQUIREMENT FOR MAIL-IN BALLOTS ADDED ANOTHER
17 LAYER OF PROTECTION?
18 A. YES.
19 Q. WHAT DID YOU MEAN BY THAT?
20 A. I BELIEVE WE WERE TALKING ABOUT PRIOR TO SB 1 AND
21 THE ID REQUIREMENTS, YOU KNOW, HAD WE DISCOVERED ANY
22 MAIL FRAUD. AND THE ANSWER WAS NO. BUT, IN MY MIND,
23 THAT DOESN'T MEAN YOU DON'T ADD ANOTHER SECURITY --
24 ANOTHER LEVEL OF SECURITY, ESPECIALLY WHEN IT COMES TO
25 WHAT YOU WERE JUST TALKING ABOUT, ABOUT THE PERCEPTION



Frank Phillips

March 31, 2023
Pages 98 to 101

## Page 98

1  OF THE INTEGRITY OF THE VOTING PROCESS.  AND ANYTHING WE
2  CAN DO TO STRENGTHEN THE INTEGRITY OF THE VOTING PROCESS
3  OR EVEN THE APPEARANCE OF IT I'M FOR.
4      Q.  BASED ON YOUR EXPERIENCE, HAD SB 1'S MAIL BALLOT
5  ID REQUIREMENTS BEEN IN PLACE IN 2020, WOULD IT HAVE
6  HELPED YOU IDENTIFY THE MAIL VOTING FRAUD INITIATED BY
7  THE CARROLLTON MAYORAL CANDIDATE?
8      A.  I THINK IT WOULD HAVE HELPED IDENTIFY IT, BECAUSE
9  HE WOULD HAVE HAD A MUCH HARDER TIME SUBMITTING THAT
10  MANY APPLICATIONS THAT COULD HAVE POTENTIALLY MADE IT
11  THROUGH THE PROCESS.  I THINK IT WOULD HAVE BEEN MUCH
12  HARDER FOR HIM TO SUCCESSFULLY SEND APPLICATIONS THROUGH
13  THE PROCESS.
14      Q.  I WANT TO TURN BACK TO EXHIBIT 1 THAT WAS
15  INTRODUCED BY THE UNITED STATES.
16      A.  OKAY.
17      Q.  DO YOU HAVE THAT EXHIBIT IN FRONT OF YOU?
18      A.  I DO.
19      Q.  PLEASE TURN TO PAGE 2.
20      A.  OKAY.
21      Q.  CAN YOU PLEASE READ OUT LOUD THE PARAGRAPH JUST
22  BEFORE THE PICTURE.
23      A.  "INVESTIGATORS MADE CONTACT WITH THE CARROLLTON
24  RESIDENTS WHOSE BALLOTS HAD BEEN REQUESTED AND LEARNED
25  THE RESIDENTS TOLD THEM THAT THEY HAD NOT REQUESTED ANY

## Page 99

1  BALLOTS BE MAILED TO THE P.O. BOX,' THE SHERIFF'S OFFICE
2  SAID."
3      Q.  THANK YOU.  CAN YOU PLEASE READ THE PARAGRAPH
4  IMMEDIATELY FOLLOWING THE PHOTO.
5      A.  "THESE INDIVIDUALS IN CARROLLTON, IF THIS GUY
6  HAD BEEN SUCCESSFUL, THEY COULD HAVE SHOWN UP ON
7  ELECTION DAY AND BEEN DENIED THEIR RIGHT TO VOTE BECAUSE
8  IT WOULD HAVE SHOWN THAT THEY'D ALREADY VOTED,' SAID
9  DENTON COUNTY SHERIFF TRACY MURPHREE."
10      Q.  BASED ON YOUR EXPERIENCE IN THE ELECTIONS OFFICE
11  AND YOUR UNDERSTANDING OF TEXAS ELECTION LAW, WAS THE
12  DENTON COUNTY SHERIFF CORRECT THAT IF THIS GUY HAD BEEN
13  SUCCESSFUL, VOTERS COULD HAVE BEEN DENIED THEIR RIGHT TO
14  VOTE?
15      A.  ABSOLUTELY.
16      Q.  CAN INCIDENTS OF VOTER FRAUD DENY VOTERS THEIR
17  RIGHT TO VOTE?
18      A.  YES.
19      Q.  ARE YOU AWARE OF ANY ELECTION DECIDED BY A
20  HANDFUL OF VOTES?
21      A.  OH, YES.
22      Q.  CAN YOU PERHAPS GIVE ME AN EXAMPLE?
23      A.  YES.  IN NOVEMBER, WE HAD A CITY THAT HAD -- THE
24  CITY OF PILOT POINT HAD A MAYORAL RACE.  AND AT THE END
25  OF THE ELECTION, THEY WERE -- THEY WERE TIED.  AND WE --

## Page 100

1  SO THEY WERE TIED, SO THAT LEFT THEM THE OPPORTUNITY FOR
2  ONE OF THEM TO ASK FOR A RECOUNT.
3      WE CAN LOOK AT OUR RESULTS AND SEE THAT EVEN
4  THOUGH THEY WERE TIED, THERE WAS A PERSON WHO SUBMITTED
5  A BALLOT THAT DIDN'T VOTE.  SO IT WAS UNDERVOTE -- OR
6  OVERVOTE -- I'M SORRY.  IT WAS NOT AN UNDERVOTE.  IT WAS
7  AN OVERVOTE, MEANING ON THEIR BALLOT, THEY HAD SOMEHOW
8  MARKED THE BALLOT THAT MADE THE SCAN THINK THIS PERSON
9  HAD VOTED FOR BOTH CANDIDATES.
10      SO WE TOLD BOTH THE CANDIDATES THAT THEY COULD
11  HAVE AN OPTION OF REQUESTING A RECOUNT.  "IF ONE OF YOU
12  REQUESTS A RECOUNT, WE CAN FIND THAT OVERVOTE.  AND
13  UNDER THE TEXAS ELECTION CODE, DURING A RECOUNT, IF YOU
14  CAN LOOK AT AN OVERVOTE AND MAKE THE VOTER'S INTENT
15  DETERMINATION, THEN THAT VOTE CAN BE AWARDED TO A
16  CANDIDATE.  SO POTENTIALLY, WITHOUT HAVING TO GO TO A
17  NEW ELECTION, WE CAN SOLVE THIS."
18      NEITHER ONE OF THEM WANTED TO, I GUESS, RISK
19  GOING FOR IT.  SO WE ENDED UP HAVING A SECOND ELECTION,
20  WHICH WAS DECIDED BY THREE VOTES.
21      Q.  BASED IN YOUR EXPERIENCE, IN THE CASE OF A CLOSE
22  ELECTION AS THE ONE YOU JUST DESCRIBED, IS IT MORE
23  LIKELY THAN OTHER ELECTIONS THAT VOTER FRAUD COULD
24  CHANGE THE OUTCOME OF THE ELECTION?
25      A.  ABSOLUTELY, JUST BASED ON THE NUMBERS.

## Page 101

1      Q.  AND IS THAT TRUE EVEN IF VOTER FRAUD ONLY HAPPENS
2  ON OCCASION AS OPPOSED TO SYSTEMATICALLY?
3      A.  YES.
4      Q.  DO YOU RECALL DISCUSSING WITH COUNSEL THE
5  DIFFERENT POSSIBLE REASONS FOR A MISMATCH WITH RESPECT
6  TO THE ID REQUIREMENT?
7      A.  YES.
8      Q.  AND DO YOU RECALL THAT THAT DISCUSSION TALKED
9  ABOUT VOTERS WHO FAILED TO PUT AN ID NUMBER DOWN, PUT
10  THE -- PUT A TYPO OR TRANSPOSED NUMBERS ON THEIR
11  APPLICATION OR BALLOT OR HAD A TRANSPOSED NUMBER INSIDE
12  THE SYSTEM?
13      A.  YES.
14      Q.  WERE THERE FEWER INSTANCES OF THAT IN THE
15  NOVEMBER ELECTION AS COMPARED TO THE MARCH PRIMARY?  AND
16  I CAN REPHRASE IF YOU NEED ME TO.
17      A.  NO.  I BELIEVE THE ANSWER TO THAT IS YES, BECAUSE
18  THERE WAS A MUCH HIGHER REJECTION RATE.  SO I WOULD SAY
19  YES.
20      Q.  DID YOU OBSERVE FEWER DATABASE ERRORS WHERE THE
21  REGISTRATION RECORD HAD THE WRONG NUMBER?
22      A.  YES.
23      Q.  DID YOU OBSERVE FEWER INSTANCES OF VOTERS HAVING
24  A TEXAS ID, BUT NOT THEIR SSN IN THEIR SYSTEM OR
25  VICE-VERSA?  IN OTHER WORDS -- DO YOU NEED A



Frank Phillips

March 31, 2023
Pages 102 to 105

Page 102

1 CLARIFICATION?
2 A. NO. THEY PRESENTED A NUMBER THAT WE DIDN'T HAVE.
3 Q. THAT'S CORRECT.
4 A. I CAN'T SAY DEFINITIVELY ON THAT ONE.
5 Q. OKAY. WHEN A BALLOT ARRIVES TO YOUR OFFICE, DOES
6 THE DENTON COUNTY ELECTIONS OFFICE USE THE ID NUMBER,
7 WHETHER IT BE THE SOCIAL SECURITY NUMBER OR TEXAS ID
8 NUMBER, TO CONFIRM THE VOTER'S IDENTITY?
9 A. WE DO.
10 Q. DO YOU REMEMBER TALKING ABOUT YOUR EFFORTS TO
11 EDUCATE VOTERS ABOUT THE ID REQUIREMENT?
12 A. YES.
13 Q. WOULD YOU CONSIDER YOUR EFFORTS TO EDUCATE VOTERS
14 ABOUT THE ID REQUIREMENT SUCCESSFUL?
15 A. YES.
16 Q. WERE YOU ABLE TO REDUCE THE REJECTION RATE FROM
17 THE MARCH PRIMARY TO THE NOVEMBER ELECTION?
18 A. YES.
19 Q. DO YOU RECALL WHAT THE REJECTION RATE IN NOVEMBER
20 WAS?
21 A. I BELIEVE -- IT WAS A PRIMARY, WAS IT NOT?
22 Q. THIS DOCUMENT IS, YES.
23 A. I DON'T REMEMBER THE EXACT NUMBER IN NOVEMBER.
24 Q. DO YOU RECALL WHERE IT ROUGHLY FELL?
25 A. I'M GOING TO SAY ROUGHLY IN THE 8 TO 10 PERCENT

Page 103

1 RANGE. ROUGHLY. AND THAT COULD BE HIGH.
2 MS. HUNKER: CAN WE GO OFF THE RECORD FOR A
3 MOMENT?
4 MS. YUN: SURE.
5 THE REPORTER: OFF THE RECORD AT 12:17 P.M.
6 (OFF THE RECORD.)
7 THE REPORTER: THE TIME IS 12:19 P.M. WE
8 ARE BACK ON THE RECORD.
9 Q. (BY MS. HUNKER) MR. PHILLIPS, YOU MENTIONED YOU
10 WERE NOT SURE ABOUT THE REJECTION RATE FOR THE GENERAL
11 ELECTION, CORRECT?
12 A. CORRECT.
13 Q. I'M GOING TO REFRESH YOUR RECOLLECTION -- OR SEE
14 IF SOMETHING WOULD REFRESH YOUR RECOLLECTION.
15 CAN YOU PLEASE DESCRIBE WHAT YOU ARE SEEING ON MY
16 COMPUTER SCREEN.
17 A. IT'S AN EXCEL SPREADSHEET THAT HAS THE NOVEMBER
18 GENERAL ELECTION REJECTION RATES --
19 Q. OKAY.
20 A. -- BY COUNTY.
21 MS. HUNKER: AND I'M GOING TO REPRESENT, FOR
22 THE CLARITY OF THE RECORD, THAT THIS IS THE REJECTION
23 RATE SPREADSHEET THAT WAS PRODUCED BY THE STATE
24 DEFENDANTS AND WILL BE SENT TO THE COURT REPORTER FOR
25 HER TO INCLUDE IN THE TRANSCRIPT.

Page 104

1 Q. (BY MS. HUNKER) LET'S TAKE A LOOK AT DENTON
2 COUNTY.
3 MS. YUN: COUNSEL, COULD YOU CLARIFY ON THE
4 RECORD, WHERE THE REJECTION RATE DOCUMENT CAME FROM?
5 MS. HUNKER: THIS WAS PROVIDED BY THE
6 SECRETARY OF STATE'S OFFICE AND PRODUCED I BELIEVE IN
7 NOVEMBER.
8 MS. YUN: OKAY. THANK YOU.
9 MS. HUNKER: I BELIEVE NOVEMBER OR DECEMBER.
10 Q. (BY MS. HUNKER) DO YOU SEE WHERE IT SAYS DENTON
11 COUNTY?
12 A. I DO.
13 Q. CAN YOU PLEASE TELL ME WHAT THE REJECTION RATE IS
14 STATED ON THE SPREADSHEET?
15 A. 1.66 PERCENT.
16 Q. AND DOES THAT REFRESH YOUR RECOLLECTION?
17 A. IT DOES. BEFORE I WAS JUST GENERALLY SPEAKING
18 OFF OF A GUT FEELING, BUT THIS MAKES MORE SENSE.
19 Q. IS 1.66 PERCENT COMPARABLE TO PREVIOUS
20 ELECTIONS -- GENERAL ELECTIONS AT YOUR OFFICES?
21 A. I WOULD DEFINITELY SAY YES.
22 Q. ARE YOU AWARE OF ANY ELECTION WHERE THE REJECTION
23 RATE WAS ZERO PERCENT?
24 A. NO.
25 Q. IF SB 1 WAS ENJOINED OR REPEALED, WOULD THE NEXT

Page 105

1 ELECTION HAVE A REJECTION RATE OF ZERO PERCENT?
2 A. NO.
3 Q. WERE VOTERS ABLE TO CURE BALLOT DEFECTS BEFORE
4 SB 1?
5 A. NOT IN THE SAME MANNER. I MEAN, WE -- IF SOMEONE
6 LEFT A SIGNATURE OFF, WE WOULD CONTACT THEM TO SEE IF WE
7 COULD GET THEM TO FIX THEM. BUT IT WAS CODIFIED IN THE
8 SAME MANNER.
9 Q. WAS THERE ANY ESTABLISHED PROCESS THAT THE STATE
10 PROVIDED FOR A CURE PRIOR TO SB 1?
11 A. I DON'T REMEMBER WHAT IT WAS.
12 Q. ARE THERE OTHER DEFECTS BESIDES ID -- LET ME
13 REPHRASE THAT QUESTION.
14 CAN OTHER DEFECTS BESIDES FAILING TO PUT YOUR ID
15 NUMBER OR HAVING AN ID MISMATCH BE CURED THROUGH THE
16 CURE PROCESS PROVIDED BY SB 1?
17 A. SURE. SIGNATURES, MISMATCHED SIGNATURES, NO
18 SIGNATURES, THINGS LIKE THAT.
19 Q. HAD VOTERS UTILIZED THAT CURE PROCESS FOR DEFECTS
20 OTHER THAN FAILING TO PUT THEIR ID OR HAVING A
21 MISMATCHED ID NUMBER?
22 A. YES.
23 Q. DO YOU RECALL TALKING TO COUNSEL ABOUT THE PERSON
24 YOU ADDED FOR THE CURE PROCESS?
25 A. YES.



Frank Phillips

March 31, 2023
Pages 106 to 109

Page 106

1    Q. THAT EMPLOYEE, DOES SHE HANDLE CURES OF BALLOTS
2    WITH DEFECTS OTHER THAN ID NUMBER REQUIREMENTS?
3    A. YES.
4    Q. DO YOU RECALL TALKING TO COUNSEL ABOUT HOW
5    SOMETIMES NOTICE OF DEFECT ARRIVES TOO LATE FOR THE
6    VOTER TO CURE?
7    A. YES.
8    Q. WOULD THAT BE TRUE OF VOTERS WHOSE BALLOTS WERE
9    REJECTED FOR REASONS OTHER THAN A MAIL ID NUMBER
10   REQUIREMENT?
11   A. YES.
12   Q. WOULD THAT BE TRUE OF VOTERS WHOSE BALLOTS WERE
13   REJECTED FOR REASONS OTHER THAN THE MAIL ID NUMBER
14   REQUIREMENT BEFORE SB 1?
15   A. YES.
16   Q. FOR SOME VOTERS WHO DECIDE TO VOTE BY MAIL, IN
17   YOUR EXPERIENCE, ARE THEY EQUALLY ABLE TO ACCESS VOTING
18   IN PERSON?
19   A. REPEAT IT ONE MORE TIME.
20   Q. SURE.
21      IN YOUR EXPERIENCE, FOR AT LEAST SOME VOTERS WHO
22   VOTE BY MAIL, ARE THEY ABLE TO EQUALLY ACCESS VOTING IN
23   PERSON?
24   A. YES.
25   Q. DOES DENTON COUNTY GIVE VOTERS IN DENTON COUNTY

Page 107

1    AMPLE OPPORTUNITIES TO VOTE IN PERSON?
2    A. YES.
3    Q. IN YOUR EXPERIENCE, DID VOTERS EXHIBIT LESS
4    CONFUSION ABOUT SB 1'S MAIL-IN VOTING REQUIREMENT IN
5    NOVEMBER OF 2022 COMPARED TO THE MARCH PRIMARY?
6    A. YES.
7    Q. IN YOUR EXPERIENCE, IS THERE ALWAYS A LEARNING
8    CURVE WHEN NEW VOTING REQUIREMENTS ARE INTRODUCED?
9    A. ABSOLUTELY.
10   Q. DO YOU EXPECT THE TREND TO CONTINUE OF VOTERS
11   HAVING LESS CONFUSION ABOUT SB 1'S MAIL-IN VOTING
12   REQUIREMENTS?
13   A. YES.
14      MS. HUNKER: NO FURTHER QUESTIONS. I PASS
15   THE WITNESS.
16         FURTHER EXAMINATION
17   BY MS. YUN:
18   Q. JUST A FEW FOLLOW-UP QUESTIONS BASED ON WHAT YOU
19   JUST TESTIFIED.
20      YOU JUST TESTIFIED THAT YOU BELIEVE THAT THERE
21   WILL BE LESS CONFUSION GOING FORWARD ABOUT ID NUMBER
22   REQUIREMENTS.
23      SO FOR EACH ELECTION, THERE WILL BE NEW VOTERS
24   WHO QUALIFY TO VOTE BY MAIL FOR THE FIRST TIME; IS THAT
25   RIGHT?

Page 108

1    A. CORRECT.
2    Q. SO THOSE VOTERS WOULD NOT HAVE HAD ANY
3    OPPORTUNITY TO -- THOSE VOTERS WOULD NOT HAVE
4    EXPERIENCED ANY ID REQUIREMENT PRIOR TO THAT; IS THAT
5    RIGHT?
6    A. CORRECT.
7    Q. AND DO YOU HAVE ANY REASON TO BELIEVE THAT THOSE
8    VOTERS WOULD HAVE LESS DIFFICULT TIMES GOING FORWARD
9    WITH THE ID NUMBER REQUIREMENTS?
10   A. I MEAN, I WOULD SAY YES BECAUSE IT'S -- IT'S OUT
11   IN THE COMMON ARENA NOW, YOU KNOW. WHEN IT FIRST
12   STARTED, IT WAS NEW TO EVERYBODY. AND NOW THERE'S BEEN
13   SO MUCH DISCUSSION ABOUT IT THAT IT'S NOT ONLY US THAT
14   EDUCATE PEOPLE ON IT. THE POLITICAL PARTIES EDUCATE
15   PEOPLE ON IT. SO YEAH, I THINK THEY'LL HAVE A LESS
16   DIFFICULT TIME.
17   Q. AND WE TALKED -- YOU TALKED BRIEFLY WITH
18   MRS. HUNKER ABOUT VOTERS LOSING TRUST IN THE INTEGRITY
19   OF THE ELECTORAL SYSTEM.
20      WHAT IS YOUR -- WHAT IS THE BASIS FOR YOUR
21   STATEMENT THAT YOU BELIEVE THAT THAT IS THE CASE?
22   A. SO -- OKAY. FROM 2009 TO 2016, WE RARELY HEARD
23   ANYTHING THAT QUESTIONED THE INTEGRITY OF THE SYSTEM.
24   2016, THE QUESTIONING BEGAN. AND IT WAS AMPLIFIED IN
25   2020, SO MUCH SO THAT I SPEND PROBABLY THE MAJORITY OF

Page 109

1    MY TIME NOW DEBUNKING CONSPIRACY THEORIES OR ANSWERING
2    PUBLIC INFORMATION REQUESTS RELATED TO CONSPIRACY
3    THEORIES. SO THAT'S WHAT I BASE THAT ON, IS HOW MUCH
4    TIME I SPEND ON THOSE MATTERS NOW VERSUS WHAT I USED TO.
5    Q. OAK. AND ARE THOSE CONCERNS RELATED TO ANYTHING
6    THAT HAPPENED IN DENTON COUNTY OR IN TARRANT COUNTY
7    WHILE YOU WERE WORKING THERE?
8      MS. HUNKER: OBJECTION; FORM.
9    A. I MEAN, NOT NECESSARILY. I MEAN, I THINK THEY'RE
10   -- THEY TEND TO COME MORE FROM A NATIONAL PERSPECTIVE.
11   Q. (BY MS. YUN) OKAY. DID THE IMPLEMENTATION OF
12   SB 1'S ID REQUIREMENTS DO ANYTHING TO THOSE -- THE
13   AMOUNT OF THE CONSPIRACY THEORIES OR OTHER
14   MISINFORMATION OUT THERE ABOUT THE INTEGRITY OF THE
15   SYSTEM?
16      MS. HUNKER: OBJECTION; FORM.
17   A. I THINK IT MAY HAVE SLIGHTLY LESSENED THE
18   CONSPIRACY THEORIES AROUND MAIL BALLOTS. THERE'S
19   CERTAINLY BEEN NOTHING ABOUT VOTING SYSTEMS, THE
20   CONSPIRACY THEORIES SURROUNDING VOTING SYSTEMS.
21   Q. (BY MS. YUN) DID YOUR OFFICE IN DENTON COUNTY OR
22   TARRANT COUNTY WHEN YOU WERE THERE DO ANYTHING TO
23   ADDRESS THIS LOSS IN -- LOSS OF TRUST IN THE ELECTORAL
24   PROCESS?
25   A. WE HAVE. I MEAN, WE'VE -- I'VE MET WITH THESE



Frank Phillips

March 31, 2023
Pages 110 to 113

## Page 110

1 GROUPS TO ADDRESS THEIR CONCERNS.  I'VE INVITED PEOPLE
2 TO OUR OFFICE TO SHOW THEM HOW THINGS REALLY WORK VERSUS
3 HOW THEY THINK THEY WORK.  AND I'VE DONE THAT AS
4 RECENTLY AS YESTERDAY.
5    Q.  ARE THESE CONCERNS THAT YOU'VE BEEN -- YOU'RE NOW
6 SPENDING THE MAJORITY OF YOUR TIME ADDRESSING, ARE THESE
7 SPECIFICALLY ABOUT -- HOW MUCH OF IT IS ABOUT MAIL
8 VOTING VERSUS SOMETHING ELSE?
9    A.  IT'S PROBABLY 10 PERCENT MAIL VOTING, 90 PERCENT
10 VOTING SYSTEM.
11    Q.  AND DO YOU BELIEVE THAT THE ID REQUIREMENTS FROM
12 SB 1 ADDRESS THOSE CONCERNS?
13       MS. HUNKER:  OBJECTION; FORM.
14    Q.  (BY MS. YUN)  THE 10 PERCENT CONCERNS.
15    A.  I THINK THEY HELP.  BUT TOTALLY, NO.  I DON'T
16 THINK ANYTHING YOU DO WILL TOTALLY CONVINCE SOME PEOPLE.
17    Q.  SO IF YOU WERE TO SORT OF QUANTIFY HOW MUCH IT
18 HELPS, WHAT WOULD YOU SAY?
19       MS. HUNKER:  OBJECTION; FORM.
20    A.  I MEAN, THAT'S -- OF THE 10 PERCENT THAT'S A BAD
21 MAIL BALLOTS, IT PROBABLY HELPS HALF OF THOSE PEOPLE
22 MAYBE.
23    Q.  (BY MS. YUN)  SO DO YOU -- SO YOU TELL THESE
24 FOLKS ABOUT THE MAIL BALLOT -- THE MAIL VOTING ID
25 REQUIREMENTS?

## Page 111

1    A.  I DO.
2    Q.  AND YOU'D SAY HALF OF THOSE VOTERS WOULD SAY
3 LIKE, "OH, OKAY.  THAT WOULD PROBABLY -- THAT ALLAYS MY
4 CONCERN"?
5    A.  IT'S JUST A GUESS.  I MEAN, THEY PROBABLY DON'T
6 RELAY THAT IN THE MANNER YOU JUST DID.  IT'S JUST --
7 IT'S JUST A GUESS.
8    Q.  OKAY.  SO YOU TESTIFIED EARLIER, I BELIEVE -- AND
9 CORRECT ME IF I'M WRONG -- THAT THERE'S SOME MEASURES
10 THAT -- THAT WE SHOULD IMPLEMENT MEASURES THAT
11 STRENGTHEN VOTERS' CONFIDENCE IN THE SYSTEM.
12       IS THAT -- DO YOU RECALL THAT?
13    A.  I DO.
14    Q.  YEAH.
15       IS THERE ANY LIMIT TO WHAT YOU WOULD DO TO
16 STRENGTHEN VOTERS' CONFIDENCE IN THE INTEGRITY OF THE
17 SYSTEM?
18    A.  I'M SURE THERE IS, BUT I DON'T KNOW WHAT THAT
19 WOULD BE, THE SPECIFIC EXAMPLE.
20    Q.  SURE.
21       WOULD YOU BE COMFORTABLE -- OR WOULD YOU BE IN
22 FAVOR OF IMPLEMENTING MEASURES THAT REJECT BALLOT VOTES
23 IN ORDER TO SIMPLY SATISFY SOME VOTERS' CONCERNS ABOUT
24 THE INTEGRITY OF THE SYSTEM?
25    A.  I MEAN, SIMPLY TO SATISFY SOMEBODY'S DESIRE?  IS

## Page 112

1 THAT WHAT --
2    Q.  SIMPLE TO SATISFY OTHER VOTERS' CONCERN ABOUT THE
3 INTEGRITY OF THE SYSTEM.
4       MS. HUNKER:  OBJECTION; FORM.
5    A.  I MEAN, HONESTLY, THAT'S A LITTLE BROAD.  BUT I
6 THINK, SURE, THERE WOULD BE SOME THINGS I WOULD NOT
7 AGREE WITH.  I'M SURE SOMEBODY COULD THINK OF SOMETHING
8 I WOULDN'T AGREE WITH TO REJECT -- IF I UNDERSTAND WHAT
9 YOU'RE ASKING.
10    Q.  (BY MS. YUN)  YEAH.  I GUESS I'M TALKING A LITTLE
11 BIT MORE GENERALLY THAT -- WHETHER IT WOULD BE -- YOU
12 WOULD BE IN FAVOR OF A POLICY OR A MEASURE THAT REJECTS
13 VALID VOTES THAT IS IMPLEMENTED SIMPLY IN ORDER TO ALLAY
14 CONCERNS ABOUT THE INTEGRITY OF THE VOTING PROCESS.
15       MS. HUNKER:  OBJECTION; FORM.
16    A.  YEAH.  I MEAN, MY GUT REACTION IS I WOULDN'T BE
17 FOR THAT, BUT IT'S HARD TO SAY WITH THAT SPECIFIC
18 EXAMPLE.
19    Q.  (BY MS. YUN)  SURE.
20       WOULD YOU AGREE -- WOULD IT BE A FAIR STATEMENT
21 OR WOULD YOU AGREE WITH THE STATEMENT THAT SAYS IT'S A
22 BALANCING THAT YOU WOULD CONSIDER WHETHER A MEASURE HAS
23 NEGATIVE IMPACTS ON VALID VOTES VERSUS THE STRENGTHENING
24 OF VOTERS' FAITH IN THE SYSTEM?
25       MS. HUNKER:  OBJECTION; FORM.

## Page 113

1    A.  I THINK THAT'S FAIR.  IT IS A BALANCE.  SO YOU'VE
2 GOT -- NOT ME, THE LEGISLATURE HAS TO PICK THEIR -- YOU
3 KNOW, WHAT THEY THINK IS A FAIR BALANCE.
4    Q.  (BY MS. YUN)  YOU SPOKE WITH MS. HUNKER ABOUT
5 VERY CLOSE ELECTIONS THAT YOU HAVE OVERSEEN.
6    A.  UH-HUH.
7    Q.  AND REJECTING A VALID VOTE CAN ALSO IMPACT THE
8 OUTCOME OF SUCH CLOSE ELECTIONS; RIGHT?
9    A.  CORRECT.
10    Q.  SO, FOR EXAMPLE, IF A BALLOT WHOSE ID NUMBER DID
11 NOT MATCH THE VOTER REGISTRATION RECORD, BUT IT IS A
12 VALID ID NUMBER AND IF THAT VOTE DID NOT COUNT, THE FACT
13 THAT IT DID NOT COUNT WOULD IMPACT A VERY CLOSE
14 ELECTION, CORRECT?
15       MS. HUNKER:  OBJECTION; FORM, INCOMPLETE
16 HYPOTHETICAL.
17    A.  YES.
18       MS. YUN:  OKAY.  JUST A SECOND.
19       I THINK THAT'S IT.  DID YOU HAVE ANY?
20       MS. HUNKER:  YEAH, JUST A VERY SMALL NUMBER.
21       MS. YUN:  OKAY.
22          FURTHER EXAMINATION
23 BY MS. HUNKER:
24    Q.  HAS SB 1 REDUCED CONCERNS AMONG VOTERS ABOUT MAIL
25 VOTING FRAUD?



Frank Phillips

March 31, 2023
Pages 114 to 117

Page 114

1 A. I WOULD SAY YES.
2 Q. DO YOU RECALL EARLY IN THE DEPOSITION MENTIONING
3 THAT YOU THOUGHT THAT MAIL VOTING WAS VULNERABLE TO
4 FRAUD?
5 A. YES.
6 Q. HOW IS MAIL VOTING VULNERABLE TO FRAUD?
7 A. BECAUSE IN ANY OTHER TYPE OF VOTING, THAT BALLOT
8 REMAINS UNDER OUR CONTROL, EITHER OUR CONTROL AT THE
9 OFFICE OR THE POLL WORKERS' CONTROL OUT IN THE FIELD.
10    THAT DOESN'T HAPPEN WITH MAIL BALLOTS. ONCE THAT
11 BALLOT IS MAILED, I DON'T KNOW WHAT HAPPENS TO IT. I
12 DON'T KNOW WHO RECEIVES IT, WHO INTERCEPTS IT, WHO GOT
13 IT OUT OF A MAILBOX. AND SO THAT'S WHY I SAY IT'S
14 SUSCEPTIBLE.
15    SO THERE HAS TO BE A WAY OF DETERMINING WHEN IT
16 COMES BACK THAT THE PERSON WHO GOT THE BALLOT AND
17 RETURNED IT IS THE PERSON WHO IT WAS MEANT TO GO TO.
18    MS. YUN: I WILL JUST NOTE THAT IT'S OUTSIDE
19 THE SCOPE OF THE REDIRECT, BUT KEEP GOING.
20 Q. (BY MS. HUNKER) IN YOUR OPINION, DOES SB 1
21 ADDRESS THAT VULNERABILITY OR SUSCEPTIBILITY?
22    MS. YUN: SAME OBJECTION.
23 A. YES, IT DEFINITELY HELPS.
24    MS. HUNKER: NO FURTHER QUESTIONS.
25    MS. YUN: OKAY.

Page 115

1    THE REPORTER: ARE WE DONE?
2    MS. YUN: YES.
3    THE REPORTER: IS ANYONE REQUESTING A COPY
4 OF THE TRANSCRIPT?
5    MS. YUN: YES.
6    AND, COUNSEL, I'LL JUST REQUEST THAT YOU
7 COPY ME WHEN YOU E-MAIL THE EXHIBIT.
8    THE REPORTER: NO ONE ONLINE -- OR THROUGH
9 ZOOM?
10    MR. KENNY: THIS IS STEPHEN KENNY. I'D LIKE
11 TO REQUEST A COPY OF THE TRANSCRIPT, PLEASE.
12    MR. D'ANGELO: THIS IS WILLIAM D'ANGELO ALSO
13 REQUESTING A COPY OF THE TRANSCRIPT.
14    THE REPORTER: THE TIME IS NOW 12:40. THIS
15 CONCLUDES OUR DEPOSITION FOR TODAY.
16
17
18    (DEPOSITION CONCLUDED AT 12:40 P.M.)
19
20
21
22
23
24
25

Page 116

1   C H A N G E S   A N D   S I G N A T U R E
2 WITNESS NAME:  FRANK PHILLIPS
3 DATE OF DEPOSITION:  MARCH 31, 2023
4
5    PLEASE INDICATE CHANGES ON THIS SHEET OF PAPER,
  GIVING THE CHANGE, PAGE NUMBER, LINE NUMBER, AND REASON
  FOR THE CHANGE.  PLEASE SIGN EACH PAGE OF CHANGES.
6
7 PAGE/LINE      CORRECTION      REASON FOR CHANGE
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 117

1      J U R A T
2    I, _____, HAVE READ THE FOREGOING
3 DEPOSITION AND HEREBY AFFIX MY SIGNATURE THAT SAME IS
4 TRUE AND CORRECT, EXCEPT AS NOTED ABOVE;
5
6
7              FRANK PHILLIPS
8
9 THE STATE OF TEXAS   )
10 COUNTY OF DALLAS     )
11
12    BEFORE ME, _____, ON THIS DAY
13 PERSONALLY APPEARED _____   _____, KNOWN TO ME OR
14 PROVED TO ME UNDER OATH OR THROUGH IDENTITY CARD OR
15 OTHER DOCUMENT TO BE THE PERSON WHOSE NAME IS SUBSCRIBED
16 TO THE FOREGOING INSTRUMENT AND ACKNOWLEDGED TO ME THAT
17 THEY EXECUTED THE SAME OF THE PURPOSES AND CONSIDERATION
18 THEREIN EXPRESSED.
19    GIVEN UNDER MY HAND AND SEAL OF OFFICE THIS _____
20 DAY OF _____, 2023.
21
22       _____
23       NOTARY PUBLIC IN AND FOR
24       THE STATE OF TEXAS
25



IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,          §
     *Plaintiffs,*          §
               §
*v.*          §          Case No. 5:21-cv-844-XR
               §
GREGORY W. ABBOTT, et al.,          §
     *Defendants.*          §

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX S

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

## DECLARATION OF FRANK PHILLIPS

I, Frank Phillips, pursuant to 28 U.S.C. 1746, am executing this declaration. I declare under penalty of perjury that the facts stated below are true and correct to the best of my personal knowledge and belief.

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration.  The evidence set out in the foregoing Declaration is based on my personal knowledge and experience.

2. I am the Election Administrator of Denton County, Texas, a position I have held since 2016 and previously held from 2009 to 2014. From 2014 to 2016, I was the Election Administrator of Tarrant County, Texas.

3. My experience gives me substantial insight into the procedures, administration, and the various complexities of conducting elections in Texas.

4. In 2020, in my capacity as Denton County Election Administrator, I identified irregularities that led to an investigation into a major vote harvesting scheme.

5. That investigation indicated that Zul Mirza Mohamed, a 2020 candidate for Mayor of Carrollton, Texas, sought to improperly influence the outcome of that election by engaging in an illicit vote harvesting scheme. Mohamed was prosecuted for the fraud and currently awaits trial.

6. All available evidence uncovered in the course of investigation tend to establish that Mr. Mohamed forged several dozen applications for ballot by mail (ABBMs), which directed

my office to issue mail-ballots to a single post office box that Mr. Mohamed had obtained with false identification.

7.  At the time of his arrest, Mr. Mohamed was found stuffing envelopes with applications for ballot by mail and appears to have sent fraudulent mail-in ballots prior to his arrest.

8.  If Mr. Mohamed succeeded in his efforts, Denton County voters would have been disenfranchised by his scheme—legitimate Denton County voters could have shown up to the polls on election day and been told that their ballots had already been cast. As it was, multiple voters who Mr. Mohamed impersonated attempted to request their own mail-ballot. My office had to confirm with them which ABBM was legitimate.

9.  While my office in Denton County sequestered any fraudulent ABBM or ballot cast by Mr. Mohamed, the City of Carrollton spans two other counties (Dallas County and Collin County), and I cannot confirm that fraudulent ABBMs or mail-ballots submitted as part of Mr. Mohamed's scheme were appropriately sequestered in those other two counties.

10. The signature requirements did not adequately prevent or detect the voter fraud scheme perpetrated by Mr. Mohamed. Only one county out of the three counties covered by the voting district in question detected the fraud scheme. If Mr. Mohamed had not routed so many voter registration documents through a single post office box, the attempted fraud may have gone undetected.

11. Based on my experience, SB 1's mail ballot identification requirements would have helped me identify the mail voting fraud scheme initiated by the Carrollton mayoral candidate earlier or would have prevented the scheme altogether.

12. Since SB 1's identification number requirement has been passed, my office's standard operating procedure has been to use that unique identifier as a reliable way to positively identify voters and help ensure that each person casting a ballot is in fact a qualified and registered Texas voter.

13. Because the identification number requirement was not in place in 2020, it was significantly easier for Mr. Mohamed to complete fraudulent ABBMs and actually receive illegitimate mail-ballots.

Executed in Denton County on the 21st day of June, 2023.

*Frank Phillips*

Frank Phillips
Denton County Election Administrator

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,           §
    *Plaintiffs,*                                §
                                              §
*v.*                                          §   Case No. 5:21-cv-844-XR
                                              §
GREGORY W. ABBOTT, et al.,                    §
    *Defendants.*                               §

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX T

Transcript of the Testimony of

**Yvonne Ramon**

**Date:**

April 21, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Yvonne Ramon                                                    April 21, 2022

```
 1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO,    )(
     ET AL.,                        )(
 4            PLAINTIFFS,           )(
                                    )(
 5   VS.                            )(      CASE NO.
                                    )(      5:21-cv-844-XR
 6   GREGORY W. ABBOTT, ET AL.,     )(
              DEFENDANTS.           )(
 7   _____  ___  _____

 8   OCA-GREATER HOUSTON, ET        )(
     AL.,                           )(
 9            PLAINTIFFS,           )(      CASE NO.
                                    )(      1:21-cv-780-XR
10   VS.                            )(
                                    )(
11   JOHN SCOTT, ET AL.,            )(
              DEFENDANTS.           )(
12   _____  ___  _____
                                    )(
13   HOUSTON JUSTICE, ET AL.,       )(
              PLAINTIFFS,           )(
14                                  )(      CASE NO.
     VS.                            )(      5:21-cv-848-XR
15                                  )(
     GREGORY WAYNE ABBOTT, ET       )(
16   AL.,                           )(
              DEFENDANTS.           )(
17   _____  ___  _____
                                    )(
18   LULAC TEXAS, ET AL.,           )(
              PLAINTIFFS,           )(
19                                  )(      CASE NO.
     VS.                            )(      1:21-cv-0786-XR
20                                  )(
     JOHN SCOTT, ET AL.,            )(
21            DEFENDANTS.           )(
     _____  ___  _____
22                                  )(
     MI FAMILIA VOTA, ET AL.,       )(
23            PLAINTIFFS,           )(
                                    )(      CASE No.
24   VS.                            )(      5:21-cv-0920-XR
                                    )(
25   GREG ABBOTT, ET AL.,           )(
              DEFENDANTS.           )(
```

Yvonne Ramon

April 21, 2022
Pages 2 to 5

## Page 2

```
 1  _____   __
                            )(
 2  UNITED STATES OF AMERICA,  )(
            PLAINTIFF,         )(
 3                            )(   CASE NO.
    VS.                       )(   5:21-cv-1085-XR
 4                            )(
    THE STATE OF TEXAS, ET AL., )(
 5      DEFENDANTS.            )(
    _____   __
 6
 7          -----------------------------------
 8          ORAL AND VIDEOTAPED DEPOSITION OF
 9                   YVONNE RAMON
10                  APRIL 21, 2022
11          -----------------------------------
12          ORAL AND VIDEOTAPED DEPOSITION OF YVONNE
13  RAMON, produced as a witness at the instance of the
14  STATE DEFENDANT, and duly sworn, was taken in the
15  above-styled and numbered cause on April 21, 2022, from
16  10:06 a.m. to 4:26 p.m., before Maribel Hernandez, CSR
17  in and for the State of Texas, reported by machine
18  shorthand at the Offices of Texas Attorney General,
19  Child Support Division, Pharr Regional Office, 3508
20  North Jackson Road, Pharr, Texas, pursuant to the
21  Federal Rules of Civil Procedure and the provisions
22  stated on the record or attached hereto.
23
24
25
```

## Page 3

```
 1          A P P E A R A N C E S
 2  FOR THE PLAINTIFF LA UNION DEL PUEBLO ENTERO:
        Nina Perales
 3      MALDEF
        110 Broadway Street
 4      Suite 300
        San Antonio, Texas 78202
 5      (210) 224-5476
 6  FOR THE PLAINTIFF OCA-GREATER HOUSTON:
        Susana Lorenzo
 7      ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND
        99 Hudson St, 12th Floor
 8      New York New York 10013
        (212) 966-5932
 9      info@aaldef.org
10  FOR THE PLAINTIFF LULAC TEXAS:
        Graham White
11      ELIAS LAW GROUP
        10 G St NE
12      Washington, DC 20002
        (202) 968-4507
13      gwhite@elias.law
14  FOR THE DEFENDANT YVONNE RAMON:
        Josephine Ramirez Solis
15      Leigh Ann Tognetti
        HIDALGO COUNTY DISTRICT ATTORNEY'S OFFICE
16      100 E. Cano, First Floor
        Hidalgo County Courthouse Annex III
17      Edinburg, Texas  78539
        Phone: (956) 292-7609
18      josephine.ramirez@da.co.hidalgo.tx.us
        leigh.tognetti@da.co.hidalgo.tx.us
19
    FOR THE DEFENDANTS:
20      Eric A. Hudson
        OFFICE OF ATTORNEY GENERAL OF TEXAS
21      Senior Special Counsel
        P.O. Box 12548
22      Austin, Texas 78711
        (512) 463-2100
23      eric.hudson@oag.texas.gov
24  ALSO PRESENT:
        David Diaz, Videographer (Zoom Video Conference)
25      Brady Bender, DOJ (Zoom Video Conference)
        Juan Estrada, Fried Frank Law Clerk (Zoom Video
```

## Page 4

```
 1  Conference)
        Julia Longoria (Zoom Video Conference)
 2      Knychelle Passmore, DOJ (Zoom Video Conference)
        Lisa Cubriel, Bexar County (Zoom Video Conference)
 3      Tony Nelson, Travis County (Zoom Video Conference)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1                  INDEX
 2                                              PAGE
 3  Appearances ....................................    3
 4  YVONNE RAMON
        Examination by Mr. Hudson ..................    7
 5
    Signature and Changes ..........................  229
 6
    Reporter's Certificate .........................  232
 7
 8
 9              EXHIBITS
10  NO.  DESCRIPTION                               PAGE
11
    1    Notice of Deposition .......................  10
12
    2    S.B. No. 1 .................................  77
13
    3    Fed Ex envelope ............................ 161
14  4    Cancellation of Ballot by Mail PowerPoint
             Presentation ........................... 190
15  5    Early Voting In Person Changes PowerPoint
             Presentation ........................... 191
16
    6    Election Advisory No. 2022-07 .............. 192
17
    7    Election Advisory No. 2022-08 .............. 194
18
    8    Election Advisory No. 2022-09 .............. 195
19
    9    Election Advisory No. 2022-12 .............. 196
20
    10   Elections Division Advisories .............. 198
21
    11   Training for EVBB/SVC Members on New Ballot
22       by Mail Procedures ......................... 200
23  12   FAQs on Applications for Ballot by Mail
             (ABBMs) ................................ 203
24
    13   FAQs with the Elections Division 02/17/2022 . 204
25  14   FAQs with the Elections Division 02/24/2022 . 204
```

Yvonne Ramon

Page 150

1 has changed, so -- but prior to Senate Bill 1.
2          As soon as the second week of early vote,
3 so we bring them in because there are various processes
4 that I can speak to if you want me to after this.  So
5 they start to meet early enough, and -- and then they
6 make the determination.  It's the early voting ballot
7 board, not my office, that makes the determination to
8 accept or reject a carrier envelope with the ballot that
9 is inside.
10     Q.  Have you ever served as a member of a early
11 voting ballot board?
12     A.  I have not.
13     Q.  Have you ever witnessed an early voting ballot
14 board processing mail-in ballots?
15     A.  When I started, I did, and as per the Election
16 Code, I am not involved.  It is the early voting ballot
17 board, the members who are part of the ballot board that
18 make these determinations, not mine.  So I have a person
19 who is in charge of and over -- and helping in
20 overseeing because the law does allow a tabulator, is in
21 a sense it's called because we have to help them.
22 But -- but basically, that's the extent of our
23 involvement.
24     Q.  Does the Hidalgo County Elections
25 Administrator's office assist in any way with cure

Page 151

1 process for --
2     A.  Yes.
3     Q.  -- carrier envelopes?
4     A.  Yes, we do.  When the ballot board has advised
5 us that there is a ballot to be cured, then we do create
6 a list and that voter comes to our office, and we then
7 set the process for curing and assisting the voter to
8 cure the ballot, and then that ballot carrier/envelope
9 is returned to ballot board.
10     Q.  So you do have a process in place to cure
11 defective mail ballots?
12     A.  Yes.
13     Q.  All right.  Have you used that process prior to
14 Senate Bill 1?
15     A.  No.  There was no curing of the -- of the
16 carrier envelope.  Once it's with ballot board, that --
17 those laws were completely different from now.
18     Q.  And so since Senate Bill 1, you don't have this
19 cure process?
20     A.  Yes.
21     Q.  Have you used the cure process since the
22 passage of Senate Bill 1?
23     A.  Yes.
24     Q.  Was it effective in your opinion?
25     A.  I believe for being the first time it was, yes.

Page 152

1     Q.  Okay.  Do you have any idea of the number of
2 mail ballots that were cured through the process that
3 you put in place under Senate Bill 1?
4     A.  I do.
5     Q.  What's the number?
6     A.  95.
7     Q.  Okay.  So it's 95 voters that prior to Senate
8 Bill 1 would have their ballots rejected?
9     A.  Yes.
10     Q.  Okay.  To your understanding, what is the
11 method for matching identification numbers on a carrier
12 envelope at a ballot -- a mail ballot?
13     A.  So the process has changed from when senate
14 bill was enacted on December the 2nd to now.
15     Q.  Well -- well, let's start with the before time
16 if we can.  So can you walk the Court through the
17 process for examining a mail ballot by the early voting
18 ballot board prior to the passage of Senate Bill 1?
19     A.  So the -- the process is quite extensive
20 because the law requires that once the application has
21 been reviewed and deemed to be a qualified voter to vote
22 by mail, there is -- and I don't want to call it a kit,
23 but there -- there are envelopes that are created,
24 pocket envelopes that now hold that application in place
25 while the carrier envelope, which has various pieces, is

Page 153

1 sent to the voter.
2          Then when that carrier envelope is
3 returned, then it's matched up with the application,
4 because prior to Senate Bill 1, what needed to be
5 matched were the signatures, the signatures on the
6 application and the signature on the back of the carrier
7 envelope.
8     Q.  Now, let's talk about that for a moment.  So
9 prior to Senate Bill 1, the only way to marry up an
10 application and a ballot was by looking at the
11 signature, right?
12     A.  Yes.
13     Q.  Okay.  Do you know if Hidalgo County had ever
14 been sued over the signature match requirements prior to
15 passage of Senate Bill 1?
16     A.  Not to my knowledge.
17     Q.  Okay.  Let me ask you, in -- in your opinion,
18 do you think the signature match is the best way to
19 match ballots and applications?
20          MR. WHITE:  Objection; form.
21          MS. RAMIREZ:  Object to form.
22     A.  It's my opinion, not the law, but I don't
23 believe it is.  I -- I always have wanted there to be a
24 new signature on file every so many years.  I don't know
25 what that length of time would be, but we see the

Yvonne Ramon                                                    April 21, 2022
                                                         Pages 154 to 157

Page 154

1 elderly especially that registered at a young age whose
2 signature is no longer the same signature.
3        Mine isn't the same signature now that
4 they're voting by mail.  So that in and of itself was a
5 difficult process sometimes.
6    Q.  (BY MR. HUDSON)  Okay.  Now, under Senate Bill
7 1, you have the signature, but you also have the
8 alternative of the identification numbers, right?
9    A.  Yes.
10   Q.  Assuming that somebody doesn't get a second
11 driver's license, are they going to have the same
12 driver's license number throughout their voting history
13 in Hidalgo County?
14       MS. RAMIREZ:  Object to form.
15   A.  Yes.
16   Q.  (BY MR. HUDSON)  What about Social Security
17 numbers?  Are you aware of anybody getting a different
18 Social Security number over the course of their
19 lifetime?
20   A.  I am not aware.  I don't know that process.
21   Q.  Okay.  So if someone were, for instance, to use
22 a Social Security number as opposed to a signature, in
23 your experience and in your opinion, you would assume
24 that that Social Security number belonged to the person
25 who used it, right?

Page 155

1    A.  Yes.
2    Q.  Okay.  Do you think that that's a more
3 effective way to match ballots and applications?
4       MR. WHITE:  Objection; form.
5       MS. RAMIREZ:  Object to form.
6    A.  It is effective.  It doesn't -- this Senate
7 Bill 1 does not exclude the signature, because if there
8 is no signature on that carrier envelope, it is also
9 rejected.
10   Q.  (BY MR. HUDSON)  Uh-huh.
11   A.  But it is not the bate -- primary basis for the
12 acceptance of that carrier envelope.
13   Q.  Okay.  Do you think that the identification
14 number system is superior to the signature match system?
15       MR. WHITE:  Objection; form.
16   A.  As we have -- as we have worked with the
17 Secretary of State to -- to work out all the bumps and
18 bruises along the way, eventually we hope that it will
19 be a more effective way.
20   Q.  (BY MR. HUDSON)  Okay.
21   A.  To begin with, it was difficult.
22   Q.  Okay.  Why was it difficult?
23   A.  Because -- because not all IDs were in offline
24 county, which is a Hidalgo County databases.  The
25 Secretary of State has the official data -- database,

Page 156

1 which is called Team, and they work with DPS directly
2 and they upload to Team, but we had to work out to the
3 process of also uploading to the offline counties.
4    Q.  Well, let's explain to the court what you mean
5 by offline county.  So can you describe what that term
6 means, offline --
7    A.  Yes.
8    Q.  -- so that the judge understands?
9    A.  Yes.  So as I mentioned, the official voter
10 registration database is called Team, and it is managed
11 by the Secretary of State's office.  They have a whole
12 department on this.
13       So when we are an offline county, and if
14 this was before my time that I came in, we were already
15 deemed an offline county.  Apparently at that time, the
16 Secretary of State's team division was not strong enough
17 to handle all 254 counties.
18       So the larger counties broke away and, in
19 fact, we pay for a voter registration vendor while Team
20 is still providing that service to the counties that are
21 with them, I believe at no cost still.  I'm not sure
22 because I'm not an online county.
23       Regardless, every day we have to submit to
24 the State whatever has been processed.  So every day
25 there is an upload to the State, and we work very hard

Page 157

1 at synchronizing our data so that both Team and our
2 vems, is our vendor under VOTEC, databases are
3 synchronized and the same.
4    Q.  Okay.  So that it's clear, when you say
5 offline, what you're referring to is your offline from
6 the Teams database?
7    A.  Yes.  And we -- they, that are online, actually
8 go into the team portal and set up their election.  We
9 also do that, but as an upload --
10   Q.  Okay.
11   A.  -- when it comes to voter records.
12   Q.  Now, the third-party vendor that Hidalgo County
13 uses to manage its voter registration information, does
14 that synchronize with the Team database operated by the
15 Texas Secretary of State?
16   A.  We do.  We utilize their software, but we are
17 the ones that have to synchronize with the state, not
18 our vendor.
19   Q.  Okay.
20   A.  We manage our -- our software.
21   Q.  So Hidalgo County has access to the Team
22 database --
23   A.  Yes.
24   Q.  -- to identify voter identification numbers,
25 right?

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO, et al.,               §
      *Plaintiffs,*                                          §
                                                            §
*v.*                                                              §    Case No. 5:21-cv-844-XR
                                                            §
GREGORY W. ABBOTT, et al.,                         §
      *Defendants.*                                        §

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX U

Transcript of the Testimony of

**The Office of the Dallas County Elections Administrator**

**Date:**

April 29, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

The Office of the Dallas County Elections Administrator                April 29, 2022

1          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF TEXAS
2              SAN ANTONIO DIVISION

3  LA UNION DEL PUEBLO ENTERO,)(
   ET AL.,           )(
4                    )(
     PLAINTIFFS,     )(
5                    )(  CIVIL ACTION
   VS.               )(   NO. SA-21-CV-00844-XR
6                    )(
   GREGORY W. ABBOTT, ET AL., )(
7                    )(
                     )(
8  DEFENDANTS.       )(
   -----------------------------------------------------

9
           VIDEOTAPED AND VIDEOCONFERENCED
10             ORAL DEPOSITION OF
           RIVELINO LOPEZ, TACOMA PHILLIPS
11          AND MICHAEL SCARPELLO
               APRIL 29, 2022
12

13       VIDEOTAPED AND VIDEOCONFERENCED ORAL DEPOSITION

14  OF RIVELINO LOPEZ, TACOMA PHILLIPS AND MICHAEL

15  SCARPELLO, produced as witnesses at the instance of the

16  Plaintiff LUPE, and duly sworn, was taken in the

17  above-styled and numbered cause on the 29th day of

18  April, 2022, from 10:47 a.m. to 8:02 p.m., before Holly

19  R. Swinford, CSR in and for the State of Texas, reported

20  by machine shorthand, at the Office of the Dallas

21  Elections Administrator, located at the Records

22  Building, 500 Elm Street, 7th Floor, Room 7Y11, in the

23  City of Dallas, County of Dallas, State of Texas,

24  pursuant to Notice, the Federal Rules, and the

25  provisions stated on the record or attached hereto.

Page 90

1 these new requirements are as they apply to ABBMs and
2 mail ballots?
3    A.   Okay.  For an ABBM application, now we are
4 required to look into the voter registration system, not
5 only to verify that they are a registered voter, but to
6 look at the voter registration identification, Texas
7 Driver's License, Texas ID or the Soc- -- last four
8 digits of the Social Security number and see if it
9 matches what the voter has provided on the ABBM
10 application.  Also -- we are also looking for the reason
11 why they are voting by mail --
12    Q.   (Moving moves head up and down.)
13    A.   -- and also if they provided a signature.
14    Q.   All right.
15    A.   And then if they met all those requirements,
16 then they will get inputted into the system, processed
17 as -- this first step as beginning to get a appli- -- I
18 mean, a ballot by mail.  If they do not meet those
19 requirements, then we will send them, the voter, a
20 notice, letting them know which requirements were not
21 met.
22       If a carrier envelope comes into our office
23 now, we have a secrecy flap on that envelope, carrier
24 envelope, that we do remove.  The mail ballot staff does
25 remove that secrecy flap, and we do check to see if that

Page 91

1 voter does have either one of those numbers on there or
2 they have signed an applica- -- I mean, signed a carrier
3 envelope.
4       If any of the items are missing, then we would
5 go ahead and do a Corrective Action Form of a defect of
6 a carrier envelope, send that voter a notice with that.
7 And on that notice, if it's a Corrective Action Form and
8 if it's not a Number 4 that states that the voter has a
9 incorrect driver's license or Social Security or a
10 missing driver's license or Social Security, they will
11 send that form and that ballot back to the voter --
12    Q.   Okay.
13    A.   -- by mail.
14    Q.   Thank you.  I'm going to ask you some questions
15 about Dallas County's experience with these new
16 requirements --
17    A.   Okay.
18    Q.   -- for the March 2022 primary election.
19    A.   Okay.
20    Q.   Is it correct to say that the March 2022
21 primary election was the first election that Dallas
22 County was implementing the new ID requirements for mail
23 voting?
24    A.   Yes.
25    Q.   So starting with the first week in January of

Page 92

1 2022, did your office begin to receive applications for
2 ballot by mail?
3    A.   The first week in January?  I -- maybe.
4    Q.   Okay.
5    A.   I don't -- I do not recall when we really start
6 receiving applications then.
7    Q.   Would you say that you receive applications for
8 ballot by mail in January or --
9    A.   Yes.
10    Q.   -- did?
11    A.   Yes, we did.
12    Q.   Did you keep track of how many applications for
13 ballot by mail that you were receiving either daily,
14 weekly or monthly?
15    A.   Yes, daily or weekly.
16    Q.   And how -- how is that information recorded?
17    A.   It's recorded by hand count.
18    Q.   Is that in a chart somewhere?
19    A.   Yes.
20    Q.   Okay.  So we are in January.  Your office is
21 receiving applications for ballot by mail and because of
22 SB 1, it's fair to say that you were opening these
23 applications for ballot by mail and attempting to match
24 the ID number that was provided on the ABBM to your
25 records on voter registration; is that right?

Page 93

1    A.   Yes.
2    Q.   Tell me about what that experience was like in
3 January.
4       For example, were there times when you could
5 not match the information that was provided on the ABBM
6 to the voter registration record?
7    A.   Well, when we --
8       MS. HUNKER:  Objection, form.
9    A.   When we received a application, one of our
10 processes were to look at the application and if it was
11 missing any of the information, it automatically went
12 aside to one pile; and then all the other information,
13 anything that had other information, went to another.
14 And they'll still get the same bar code, everything.
15    Q.   (By Ms. Perales)  Okay.  So let's take the
16 example of an ABBM that you received that didn't have
17 either a driver's license number or the last four of the
18 Social.
19    A.   Okay.
20    Q.   It's correct to say that you described that you
21 would put that ABBM that was missing ID, missing any ID
22 information, over to a pile; is that right?
23    A.   Yes.
24    Q.   But would you still scan and barcode that ABBM?
25    A.   Yes.

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., | § | |
| *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Case No. 5:21-cv-844-XR |
| | § | |
| GREGORY W. ABBOTT, et al., | § | |
| *Defendants.* | § | |

---

**STATE DEFENDANTS' BRIEF IN RESPONSE TO
OCA-GH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# APPENDIX V

Transcript of the Testimony of

**Michael Scarpello**

**Date:**

May 04, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO et al. vs GREGORY W. ABBOTT

Michael Scarpello                                    May 04, 2022

```
1              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF TEXAS
2                 SAN ANTONIO DIVISION

3    LA UNION DEL PUEBLO ENTERO )
     et al.,                    )
4         Plaintiffs,           )
                                ) Civil Action No. SA-21-cv-
5    v.                         )       00844-XR
                                ) (Consolidated Cases)
6    STATE OF TEXAS, et al.,    )
          Defendants.           )
7

8

9         ----------------------------------------

10         ORAL AND VIDEOTAPED DEPOSITION OF
                    MICHAEL SCARPELLO
11                    MAY 4, 2022
                       Volume 1
12
           ----------------------------------------
13

14

15             ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL

16    SCARPELLO produced as a witness at the instance of

17    Plaintiff, and duly sworn, was taken in the above-styled

18    and numbered cause on the 4th day of May, 2022 from 10:21

19    a.m. to 1:11 p.m. before Nancy Newhouse, a Certified

20    Shorthand Reporter in and for the State of Texas,

21    reported by oral shorthand, located at the Dallas County

22    Records Building, 500 Elm Street, Suite 6300, Dallas,

23    Texas 75202, pursuant to the Federal Rules of Civil

24    Procedure, and the provisions stated on the record or

25    attached hereto.
```

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900    San Antonio, Texas 78232
210-697-3400                                                  210-697-3408

Michael Scarpello

May 04, 2022
Pages 18 to 21

Page 18

1 manipulation?
2     A.  Well, I think that's -- I think the
3 legislature has prescribed rules to -- to protect
4 voters, and I follow the rules.
5     Q.  Which rules do you think help protect voters
6 from manipulation, just a couple of examples, perhaps?
7     A.  Sure.  Privacy of in -- in the ballot booth,
8 for instance, so that you don't have someone standing
9 over your shoulder, telling you who to vote for; the
10 100-foot rule to keep people away from a polling place
11 as -- as far as in electioneering.
12     Q.  So you mentioned that the rules regarding
13 privacy in the ballot booth help ensure that a voter
14 won't be kind of told who to vote for by someone else,
15 is that right?
16     A.  Yes.
17     Q.  Are you familiar with instances in which
18 someone has tried to tell voters who to vote for in --
19 in an inappropriate way?
20     A.  No.
21     Q.  And the rules around privacy and other things
22 help make sure that doesn't happen?
23     A.  Yes.
24     Q.  A couple of things to confirm, you are not a
25 criminal prosecutor, are you?

Page 19

1     A.  No.
2     Q.  You don't have the authority to put anyone in
3 jail for violating a criminal law, right?
4     A.  No.
5     Q.  Do you have the authority to file civil
6 enforcement actions related to violations of the
7 Election Code?
8     A.  No.
9     Q.  I'm going to set aside Exhibit 1, if you could
10 just keep it somewhere near here for the court reporter,
11 eventually.
12         MR. THOMPSON:  I'm going to mark Exhibit
13 2.
14         (Defendant's Exhibit No. 2 was marked for
15 identification.)
16         MS. PERALES:  Oh, I get one this time.
17         MR. THOMPSON:  Oh.
18         MS. PERALES:  Did you have Exhibit 1 for
19 me?
20         MR. THOMPSON:  Oh yeah, I'm sorry.  I
21 didn't even realize --
22         MS. PERALES:  Well, thank you.
23         MR. THOMPSON:  -- you didn't get a copy,
24 hate to leave you out.
25         MS. PERALES:  Thank you so much.

Page 20

1         MR. THOMPSON:  Of course.
2     Q.  (BY MR. THOMPSON)  Mr. Scarpello, can you see
3 Exhibit 2 in front of you?
4     A.  Yes.
5     Q.  In the bottom right-hand corner does it have a
6 Bates stamp that says "MS007415"?
7     A.  Yes.
8     Q.  Do you recognize Exhibit 2?
9     A.  Yes.
10     Q.  At the bottom of Exhibit 2, it appears to show
11 an email from someone named Zachary J. Bowen to you, is
12 that right?
13     A.  Yes.
14     Q.  Who is Zachary J. Bowen?
15     A.  He's a -- I don't know what his pos -- I know
16 he's a special agent for Secret Service, well,
17 Diplomatic Security Service.
18     Q.  Now, it looks to me like he wanted to meet
19 with you to discuss voter fraud, is that right?
20     A.  Yes.
21         MR. STOOL:  I'm going to object top any
22 further questioning in this area on the grounds of law
23 enforcement privilege.  I understand you have the email,
24 and so you have that, but with regard to any
25 conversations that Agent -- Special Agent Bowen or

Page 21

1 anybody else with the federal government had concerning
2 this matter, I'll have to object to that on the grounds,
3 privilege of law enforcement privilege.
4         MR. THOMPSON:  Well, let's see if I can
5 ask some questions that you think aren't covered by
6 privilege, but maybe just to --
7         MR. STOOL:  Uh-huh.
8         MR. THOMPSON:  -- for me to understand
9 what's going on here.
10         Whose privilege are we talking about
11 right now, is this a privilege that, like, is -- I don't
12 know, could you tell me about the privilege we're
13 talking about?
14         MR. STOOL:  It would be law enforcement
15 priv -- law enforcement privilege with regard to the
16 Diplomatic Security Service of the Federal Government,
17 is whatever conversations that Mr. Scarpello has had
18 with them, I -- I would need to assert that, because I
19 don't know what they are.
20         I mean, I -- I don't know exactly what
21 else is behind this, but if -- if it's an investigation
22 being conducted, and -- and I'm just looking at this,
23 says "federal criminal investigation", then it would be
24 a privilege to not disclose matters of a federal
25 criminal investigation, that privilege under law

Michael Scarpello

May 04, 2022
Pages 54 to 57

Page 54

1  context of mail-in voting compared to in-person voting?
2      A.  I would speculate that it's higher.  I have no
3  evidence to point to that.
4      Q.  Are you familiar with any other public
5  officials elected from the State of Texas who've made
6  that claim?
7      A.  No.
8      Q.  Okay.  So we say -- we just established that
9  there is some level of risk that is there for that
10  someone will try to vote under someone else's name, even
11  if we don't know how high it is.
12          So regardless of how high it is, do you
13  think that requiring identification numbers, either a
14  driver's license, or the last four digits of the social
15  security number, to vote by mail, will increase or
16  decrease the risk of someone voting under someone else's
17  name?
18          MS. PERALES:  Objection.
19      A.  I don't know.
20      Q.  (BY MR. THOMPSON)  Are you familiar with an --
21  with the form that is often used to apply for a ballot
22  by mail?
23      A.  Yes.
24      Q.  Do you know what information is required on
25  that form?

Page 55

1      A.  Yes.
2      Q.  Before SB 1 took effect, is it fair to say
3  that the information required on that form, that
4  identifies the requesting voter, was all publicly
5  available?
6      A.  I don't know.
7      Q.  Now, let's --
8      A.  I don't recall.
9      Q.  Let's break it down.
10          The application to vote by mail before
11  SB 1 required a voter's name, right?
12      A.  Yes.
13      Q.  And it required the voter's address, right?
14      A.  Yes.
15      Q.  Do you know whether it required any other
16  identifying information?
17      A.  I don't think so.
18      Q.  Are you familiar with the term voter file?
19      A.  Uh-huh.
20      Q.  What is the voter file?
21      A.  The voter file is -- well, which voter file?
22  I mean, there -- there is a county voter file, the --
23  the list of registered voters that we maintain in Dallas
24  County, which is also imported or merged with other
25  counties at the state level, and maintained at the state

Page 56

1  level.
2      Q.  So let's start with the Dallas County one.
3          The Dallas County voter file would
4  contain the names and addresses of registered voters in
5  Dallas County, right?
6      A.  Yes.
7      Q.  Do you know whether the Dallas County voter
8  file is publically available?
9      A.  It is.
10      Q.  So putting all that together, is it fair to
11  say that the information -- excuse me, the identifying
12  information that a voter had to fill out on an
13  application to vote by mail before SB 1 took effect was
14  all publically available?
15      A.  Yes.
16      Q.  How has the application to vote by mail
17  changed, in terms of what information it requires, since
18  SB 1 took effect?
19      A.  Now, a voter has to include their driver's
20  license or last four digits of their social security
21  number, and that information on their application has to
22  match up to the information on their voter registration.
23      Q.  The voter file doesn't contain voters'
24  driver's license numbers, right?
25      A.  Can you repeat the question?

Page 57

1      Q.  Do you know whether the voter file contains
2  driver's license numbers for the voters listed?
3      A.  It does for some, for -- for most people.
4      Q.  Are you sure about that?
5      A.  Can you ask me the question again?
6      Q.  I'm talking about driver's license numbers.
7      A.  Uh-huh.
8      Q.  Perhaps I am just mistaken, but my
9  understanding is I could not discover your driver's
10  license number, for example, by requesting the Dallas
11  County voter file and pulling up your name?
12      A.  So we -- we have a different understanding of
13  voter file.  We have the voter file that -- that we
14  maintain, contains driver's license numbers.  A voter
15  file that someone would purchase, is releasable, it
16  would not contain that.
17      Q.  I'm sorry, that -- that's my fault for asking
18  the question in a poor way.  I'm trying to ask about the
19  version of the voter file that is publically available.
20      A.  Okay.
21      Q.  And this is a document that political
22  campaigns request --
23      A.  Right.
24      Q.  -- for example?
25          Right.  And other people can request it?

Michael Scarpello                                          May 04, 2022
                                                         Pages 58 to 61

Page 58

1    A.  Yes.
2    Q.  With regard to the publically-available
3  version of the voter file, does it contain voters'
4  driver's license numbers?
5    A.  Yes.  I mean no, no.
6    Q.  That's okay.  Let's get it clear on the
7  record.
8         The publically-available version of a
9  voter file doesn't contain voters' driver's license
10  numbers, correct?
11    A.  Correct.
12    Q.  And the publically-available version of the
13  voter file doesn't contain voters' social security
14  numbers, correct?
15    A.  Correct.
16    Q.  Those are personally-identifying numbers that
17  Dallas County doesn't disclose to the public, right?
18    A.  Correct.
19    Q.  So now, after SB 1, the application to vote by
20  mail requires a voter to provide information that is not
21  publically available, correct?
22    A.  Correct.
23    Q.  Given that, is it fair to say that SB 1 has
24  made it more difficult for anyone to successfully
25  request an application to vote by mail, using someone

Page 59

1  else's information?
2         MS. PERALES:  Objection.
3    A.  Probably.
4         MR. THOMPSON:  What was the objection,
5  Nina?
6         MS. PERALES:  Well, I'm limited by the
7  Rules in terms of what --
8         MR. THOMPSON:  But you're not if I ask.
9         MS. PERALES:  So, you know, I think it's
10  vague.  The witness answered, so objection, form, vague.
11         MR. THOMPSON:  Okay.
12         MS. PERALES:  I think it's probably also
13  outside the scope of the witness' knowledge.
14    Q.  (BY MR. THOMPSON)  Are you familiar with the
15  cure process established by SB 1?
16    A.  Yes.
17    Q.  Are you implementing the cure process in
18  Dallas County?
19    A.  The Ballot Board is implementing the cure
20  process.
21    Q.  Do you know how the Ballot Board is
22  implementing the cure process?
23    A.  Yes.
24    Q.  Can you tell me about it, just at a high
25  level?

Page 60

1    A.  Well, we have to be more specific.  Cure
2  processes regarding applications, or -- or regarding
3  ballots?
4    Q.  Right.  So I -- I just wanted to understand
5  the process for both, actually, and I'm happy to ask you
6  more specifically, or however you want to handle it.
7    A.  Yeah.  Why don't you go ahead and ask me --
8    Q.  Okay.
9    A.  -- more specifically.
10    Q.  Is there a cure process for applications for a
11  ballot by mail?
12    A.  Yes.
13    Q.  Does it come into play when an application is
14  otherwise going to be rejected?
15    A.  Yes.
16    Q.  What can a voter do to cure an application to
17  vote by mail that would otherwise be rejected?
18    A.  They can -- if they -- if they're missing --
19  well, it depends on what the -- the -- the flaw in the
20  application is.  If they haven't signed, they need to
21  sign.  If they haven't provided one of those two numbers
22  that we spoke of, they have to provide one of those
23  numbers.
24         There is a cure process, in theory,
25  that's supposed to work from -- to -- to have them go to

Page 61

1  the State's mail ballot tracking application, and be
2  able to cure through that.  That -- though, that has
3  been highly problematic, especially in counties what --
4  what are called offline counties.
5    Q.  There are other options for curing as well?
6    A.  Yes.
7    Q.  Do those involve, for example, a voter coming
8  to the Dallas County Elections Office?
9    A.  Yes.
10    Q.  Have any voters come to the Dallas County
11  Elections Office as part of the cure process?
12    A.  Yes.
13    Q.  Do you know whether they were able to
14  successfully cure issues with applications to vote by
15  mail?
16    A.  Yes.
17    Q.  Did they successfully cure those issues?
18    A.  Yeah.  And I don't have those numbers.
19    Q.  Do you have any high-level understanding of
20  how often they were successful?
21    A.  No.
22    Q.  All right.  So we were just talking about the
23  application to vote by mail, and the cure process
24  related to that.
25         There is also a cure process related to