IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*, | § § § | |
| *Plaintiffs*, | § § | Case No. 5:21-cv-844-XR |
| v. | § § | [Consolidated Cases] |
| GREGORY W. ABBOTT, *et al.*, | § § § | |
| *Defendants.* | § | |

### STATE DEFENDANT'S RESPONSE TO
### LUPE PLAINTIFFS' MOTION TO COMPEL

The LUPE Plaintiffs ("Plaintiffs") have moved to compel the production of two hundred and forty documents in the possession of the Office of the Secretary of State ("SOS"), as well as the Office of the Attorney General ("OAG"), collectively ("State Defendants.")

The documents that Plaintiffs seek from SOS include, among others, core attorney-client privileged material. *See generally* ECF No. 630. The attorney–client privilege is one of the most sacred tenets of our justice system, dating as far back as he 16th century.[1] Writing only 44 years ago in the *California Law Review*, Professor Geoffrey Hazard noted that the privilege has historically been recognized as "necessary to the lawyer's function as a confidential counselor in law" to their client.[2] The documents sought here relate to attorney–client communication between SOS employees and attorneys in the Elections Division and SOS' general counsel's office. The communications relate to the implementation of election procedures and compliance with Texas law.

Compelling SOS to produce these documents would incentivize agency employees to act without seeking guidance from SOS attorneys. That would undermine the attorney–client privilege as

---

[1] A. Kenneth Pye, *Fundamentals of the Attorney–Client Privilege*, THE PRACTICAL LAWYER, Nov. 1969, at 16.
[2] Geoffrey Hazard, An Historical Perspective on the Attorney-Client Privilege, 66 CAL. L. REV. 1061, 1061 (1978).

1

established by Supreme Court precedent. In addition to Texas law, SOS attorneys are also charged with ensuring compliance with court orders. The SOS Elections Divisions provides advisories to county election officials on complying with State law and court orders. All Texans have an interest in elections being conducted in a consistent and lawful manner. It is therefore in the public interest to protect communication between SOS employees and their attorneys to ensure that election procedures are compliant with current State and common law.

The other main component of the documents that Plaintiffs wish the Court to compel is documents concerning active criminal investigation related to voting. Investigative privilege is a qualified privilege, but one that should be maintained in the present dispute. On the Plaintiffs' theory, investigative privilege is so "qualified" that it provides no protection at all. Instead, they advance a single factor test, by which they can never be denied. As Judge Willett noted on another qualified privilege, however, "[w]hile 'important federal interests' may be at stake in criminal as well as 'extraordinary' civil cases, the qualifications do not subsume the rule." *La Union Del Pueblo Entero v. Abbott*, 68 F.4th 228, 238 (5th Cir. 2023), (first citing *United States v. Gillock*, 445 U.S. 360, 373 (1980); and the citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977)).

Withholding investigative files protects investigative methods, as well as safeguards the personal information of Texans who have either provided information confidentiality, or who have been accused, but not yet convicted of a crime. Both those who provide information to authorities and those who are accused of malfeasance, risk reputational harm through active criminal investigative files being released in a case with which they have no association.

In addition, these documents are not of crucial importance to Plaintiff's case. There is no lack of evidence in the record that there was a great deal of interest in election integrity following the 2020 General Election. There is likewise no lack of evidence that many people in Texas have been investigated and convicted of election crimes. State Defendants have produced many investigative

documents from closed investigations and have even provided lists to Plaintiffs that contain hundreds of concluded election criminal investigations.[3] Whether there are election crimes committed in Texas is not an open question; the documents at issue here will not elucidate to Plaintiffs the types or prevalence of election crimes in Texas. Furthermore, in response to Plaintiffs' request, State Defendants produced a supplemental privilege log on June 16, 2023, that describes the nature and locations of the crimes alleged, so Plaintiffs' need for information on election crimes could be satisfied, while maintaining the confidentiality of investigative methods and the anonymity of private residents.

Plaintiffs also seek a small number of documents withheld under the deliberative process privilege. These documents contain advice, recommendation and opinions of SOS staff regarding preliminary drafts of a report. Once completed, the final product will be made public. These documents are unlikely to have an effect on Plaintiffs' claims. The disclosure of them however, could have a chilling effect on staff at SOS and other public agencies in Texas. The balancing of the importance of the information, against the damage to open discussion among agency personnel attempting to best serve Texans, indicates that this qualified privilege should not be discarded here.

## BACKGROUND

Plaintiffs served their second request for production of documents on February 15, 2023. On February 20, 2023, State Defendants responded to establish custodians and search strings to determine the relevant documents. From February 21, 2023, to February 24, 2023, Plaintiffs and State Defendants communicated multiple times to establish custodians for document searches. From March 3, 2023, to March 17, 2023, Plaintiffs and State Defendants communicated multiple times to determine search terms.

SOS conducted a document pull based on the agreed-search terms and initial hit counts were provided to Plaintiffs on April 6, 2023. The parties negotiated for the next week until a document

---

[3] STATE078234-078237.

corpus was agreed-upon at a meet and confer on April 14, 2023. State Defendants subsequently began review of these documents. Plaintiffs requested a second meet and confer on April 27, 2023 and requested that the document review be completed in time to use the documents on potential motions for summary judgment ("MSJs"). State Defendants agreed to a rolling production of documents for use in Plaintiffs' MSJs. State Defendants made productions of documents on the following dates:

i) April 28, 2023;

ii) May 4, 2023;

iii) May 8, 2023;

iv) May 12, 2023; and

v) May 19, 2023.

State Defendants produced a privilege log for SOS documents on May 12, 2023, and a privilege log for OAG documents on May 19, 2023.

On June 9, 2023, Plaintiffs requested a meet and confer and provided a letter objecting to the various privilege claims. The meet and confer was held on June 12, 2023, and the parties went through each of Plaintiffs' concerns. State Defendants agreed to provide additional procedural details regarding documents that were legislatively privileged. *See* ECF 630-7, Ex. L. Those details were apparently sufficient, as Plaintiffs decided not to include the legislatively privileged documents in their Motion to Compel. *See generally* ECF 630. Plaintiffs also requested additional information regarding the alleged crimes listed in investigative documents that are listed in ECF 630-7, Exhibits H through K. State Defendants subsequently produced a supplemental privilege log on June 16, 2023, with this information. *Supra* at 3.

Plaintiffs further inquired at the June 12, 2023, meet and confer whether an additional, 14-page list of investigative privileged documents were still active investigations. *See* ECF 630-7, Ex. A. Because it had been about a month since the privilege logs were served, this was in effect a new

request. To provide sufficient information before Plaintiffs' deadline[4] to file their motion to compel, and because the laborious nature of what was being requested, State Defendants requested a list more focused on documents over which Plaintiffs had particularized concerns. Plaintiffs agreed to provide a more "targeted list" to State Defendants by the end of the day. Instead, Plaintiffs emailed State Defendants after midnight that they wanted the entire 14-page exhibit to be reviewed for the updated statuses of all investigations. At this point, it had become clear to State Defendants that Plaintiffs intended to resolve the matter before the court.

Despite Plaintiffs claims in their June 21, 2023, Motion to Compel, *see* ECF 630 at 3-4 (*i.e.* that State Defendants had "not sent any emails regarding the privilege logs at issue, including to provide additional information after the meet and confer"), State Defendants on June 16, 2023, produced to all parties a supplemental privilege log with all of the information they agreed to provide to Plaintiffs at the June 12, 2023, meet and confer. *See* Ex. 2. That same production email noted that during review for the June 16, 2023, supplemental privilege log, four documents were unprivileged and would be included in State Defendants' next rolling production.

State Defendants communicated timely and clearly with Plaintiffs throughout this process. At the June 12, 2023, meet and confer there was no indication that the situation could not be resolved without involving the Court. State Defendants provided all additional information agreed-upon to the Plaintiffs. The only thing that State Defendants did not provide was a list updating the status of the 14-page list of investigations. And that was only after Plaintiffs violated their agreement to provide a "targeted list."

---

[4] LUPE Plaintiffs' original deadline to file a motion to compel on the SOS privilege log was June 12, 2023, pursuant to ECF 251. This was extended by the Court in ECF 625 to June 20, 2023.

**ARGUMENT & AUTHORITIES**

**1) The Secretary of State and Office of Attorney General Properly Asserted Investigative Privilege.**

The parties appear to agree that both federal common law and this Court recognize an investigative privilege where there is an "ongoing criminal investigation." ECF 630 at 18. The questions presented to this Court then are (a) whether these documents relate to ongoing criminal investigations and, if so, (b) whether "the government's interests in confidentiality" outweighs "the litigant's need for the documents." *In re U.S. Dep't of Homeland Sec.*, 459 F.3d 565, 570 (5th Cir. 2006). Plaintiffs' motion fails on both counts.

**a) The documents are squarely covered by investigative privilege.**

The documents Plaintiffs seek are protected from disclosure because they are part of ongoing investigations into election complaints received by SOS alleging criminal violations of Texas election law.

As per the Texas Election Code, SOS has the authority to receive information from outside the agency alleging criminal conduct in connection with an election. *See* TEX. ELEC. CODE § 31.006(a). If, after receiving or discovering this information, SOS "determines that there is reasonable cause to suspect that criminal conduct occurred, the secretary shall promptly refer the information to the attorney general." *Id.* When making the referral, "the secretary shall deliver to the attorney general all pertinent documents and information in the secretary's possession." *Id.* Texas law treats that information as confidential so long as an investigation is pending. *See id.* at § 31.006(b). It remains nonpublic until "the secretary of state makes a determination that the information received does not warrant an investigation," or "if referred to the attorney general, the attorney general has completed the investigation or has made a determination that the information referred does not warrant an investigation." *Id.*

The documents identified in Exhibit K of Plaintiffs' motion to compel pertain to election

6

complaints that were submitted to SOS between May 2022 and March 2023, as reflected in State Defendants' privilege log. *See* ECF 630-12. Each entry identifies the type of criminal conduct alleged therein and where possible, the relevant provision in the Texas Election Code of which the conduct would be in violation. State Defendants have done their due diligence, and to the best of their knowledge, each document contains information about an ongoing criminal investigation. Plaintiffs argue that State Defendants did not use the phrase "ongoing investigation" in their privilege log. However, this Court has previously held "there are no magic words a party must use to invoke [a] privilege" *Doe 1 v. Baylor Univ.*, 320 F.R.D. 430, 441 (W.D. Tex. 2017) (finding work product applied even though party did not mention potential litigation in its privilege log).

During its initial review, counsel for State Defendants assessed each responsive document to determine whether the complaint and the State's investigation of it had been resolved. Any document that fell under this category was produced to Plaintiffs and the other parties in this case except where a separate privilege applied. Since then, counsel for State Defendants have reached out to SOS as well as Criminal Investigations and the Election Integrity Division at OAG to determine whether the status of any of these complaints has changed. To the extent that the investigations have closed, relevant documents will be produced promptly and before the scheduled hearing. All the remaining documents withheld on investigative privilege grounds pertain to active investigations, as defined by TEX. ELEC. CODE § 31.006(b). *See* Ex. 1 ¶ 4.

Moreover, State Defendants will continue to meet their obligations under the Federal Rules. Throughout this case, State Defendants have conferred on a recurring basis with SOS and relevant law enforcement agencies to determine whether any criminal investigations related to privileged documents have concluded. If the criminal investigation no longer remained active, State Defendants produced the documents as part of its rolling production. *See* Ex. 3 & 4. State Defendants will do the same here. Once the pending criminal investigations implicated by the documents in Exhibit K have

7

been resolved pursuant to § 31.006(b), State Defendants will produce relevant documents over which they asserted privilege—just as State Defendants have previously.

### b) Plaintiffs failed to make a showing of need strong or specific enough to overcome the privilege.

Plaintiffs have failed to establish a need for the documents that supersedes Texas's interest in confidentiality. Although not absolute, courts "begin with the proposition that there is indeed a public interest in minimizing disclosure of documents that would tend to reveal law enforcement investigative techniques or sources." *Black v. Corporation,* 564 F.2d 531 (D.C. Cir.1977). Even in the discovery context, courts have understood that "there ought to be a pretty strong presumption against lifting the privilege." *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1125 (7th Cir. 1997).

Courts have so held because investigative privilege serves numerous important interests; it "preserve[s] the integrity of law enforcement techniques and confidential sources, protects witnesses and law enforcement personnel, safeguards the privacy of individuals under investigation, and prevents interference with investigations." *Tuite v. Henry*, 181 F.R.D. 175, 176-77 (D.D.C. July 31, 1998) (unpublished), *aff'd Tuite v. Henry*, 203 F.3d 53 (D.C. Cir. 1999); *see also In re U.S. DHS.*, 459 F.3d at 569 n.1. Not only can disclosure "subject those identified to embarrassment and potentially more serious reputational harm," *Senate of P.R. ex rel. Judiciary Comm. v.* U.S. DOJ, 823 F.2d 574, 588 (D.C. Cir. 1987), but it also could compromise the State's ability to investigate and, when warranted, prosecute violations of its criminal laws.

Disclosure of the documents identified in Exhibit K would inflict serious harm on Texas and voters. The confidentiality protections stipulated in TEX. ELEC. CODE § 31.006 "help[] preserve the integrity of [the State's] ongoing review of allegations of criminal conduct in connection with an election." *See* Ex. 1 ¶ 5. Requiring SOS to publicly release information about such allegations while that review remains pending could "inhibit" both SOS and OAG's "ability to conduct a frank, comprehensive evaluation of the matter and, in certain instances, could discourage individuals from

submitting election complaints to the Secretary of State." *Id.*

Many of these complaints contain information about witnesses and suspects who could have information related to the alleged conduct, while multiple emails discuss investigators' initial mental impressions of the facts of the complaint. Should this information be released prior to the investigation's conclusion, state investigators would be at risk of having potential leads spoiled, as well as having their early thoughts color any resulting prosecution, even though these impressions were articulated before the facts were developed. Texas "indisputably has a compelling interest in preserving the integrity of its election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (*Eu v. San Francisco Cnty. Democratic Central Comm.*, 489 U.S. 214, 231 (1989)). That interest is undercut when state agencies are prevented from enforcing Texas's prohibitions against voter fraud and other election-related crimes

Furthermore, publicly releasing the requested information risks subjecting at least some of the identified individuals to possible harassment or unwanted attention by other individuals and groups. It goes without saying that the facts alleged in election complaints received by SOS reflect possible criminal conduct. The complaints do not by themselves prove that the person engaged voter fraud, voter suppression, or some other illegal activity. But if the information becomes public before the State has determined the complaint's merit, individuals and organizations will come to their own conclusions, impugning the reputations of those identified in the complaints and undermining confidence in the democratic system.

Plaintiffs do not address these concerns in their motion. Instead, they attempt to minimize the State's interest by characterizing the dispute as being over the "identities of persons who provided the agency with information." ECF 630 at 22. What Plaintiffs omit is that their motion would disclose all facts in the election complaints, not just the names of informants, as well as the thoughts and mental impressions of SOS. Accordingly, Plaintiffs' motion is distinguishable from *Roque v. City of Austin*—the principal case that Plaintiffs cite in support. No. 1-17-CV-00932-LY, 2018 WL 5848988,

at *3, 5 (W.D. Tex. Nov. 7, 2018). There, the plaintiffs sought information about the city's use of excessive force, such as video and audio footage of incidents where use of force took place. *Id.* They did not request core documents from case files that would have implicated the city's investigation into any alleged criminal activity directly.

At the same time, Plaintiffs, as "plaintiffs in [a] civil suit," have only a weak interest in obtaining the privileged documents. *Dellwood Farms*, 128 F.3d at 1125. *First*, the documents identified in Exhibit K do not implicate Plaintiffs' intent-based claims. An intent-based claim, by definition, turns on the actions and thoughts of the Texas Legislature. *See Legislative Intent*, BLACK'S LAW DICTIONARY (11th Ed. 2019) (defining "legislative intent" as "[t]he collective design or plan that the enacting legislature is posited to have had for the application of a statute to specific situations that might arise"). Complaints filed by private individuals bear little relevance on that question. The same is true of internal communications from SOS. *Second*, numerous election complaints on Exhibit K pertain to conduct that occurred pre-SB1 or involve activities not challenged by Plaintiffs. These documents have little probative value when compared to the State's interest in confidentiality. *Third*, even if the documents had some relevance to Plaintiffs' effect-based claims, any support would be ancillary to their case in chief. A mere connection cannot be sufficient to support the circumvention of the investigative privilege lest the exception becomes the rule.

**2)  The Secretary of State Properly Asserted Attorney-Client Privilege**

Contra Plaintiffs' allegations, *see* ECF 630 at 5–10, SOS properly invoked the attorney-client privilege through its privilege logs.

*First*, State Defendants only invoked the attorney-client privilege in the privilege logs when the information involved confidential communications predominantly involving the implementation of Texas election law, *see* ECF 630.8; ECF 630.9; ECF 630.10, not "policy, political, or strategic advice," *contra* ECF 630 at 6–8. Specifically, the information for which State Defendants invoked the attorney-

client privilege includes email communications with legal counsel that ask for legal advice, such as (among others) "implementation of SB1," "question[s] on election procedures," or alleged "violation[s] of [Texas Election] Code." *See* ECF 630.8; ECF 630.9; ECF 630.10. These assertions involve neither facts nor mere business, administrative, or political decisions. Rather, these communications seek information about how the law applies to specific scenarios and the resulting legal implications. Such information is thus predominantly legal in nature. *See, e.g., R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc.*, No. 99 C 1174, 2001 WL 1286727, at *5 (N.D. Ill. Oct. 24, 2001) (stating that communications with an attorney regarding legal implications are protected by the attorney-client privilege). The invocation was proper.

*Second*, Plaintiffs do not seek underlying facts; they seek conversations with attorneys or, more specifically, "[e]mail communications" between SOS attorneys and other attorneys. ECF 630.8; ECF 630.9; ECF 630.10. This is improper. After all, while the attorney-client privilege does not extend to underlying facts, it is indisputable that this privilege "protects disclosure of *communications*." *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981). Communications are precisely what the Plaintiffs seek in this case. And it bears mention that these communications do not qualify as "pre-existing" information because such information did not pre-date the invocation of legal advice but was made with the purpose of obtaining legal advice. *Contra* ECF 630 at 8–10. Indeed, this information includes legal inquiries regarding election procedures, violations of election law, and the implementation of election law in Texas, *see* ECF 630.8; ECF 630.9; ECF 630.10. This information thus qualifies as legal conversations covered by the attorney-client privilege.

*Third*, Plaintiffs' arguments construe the attorney-client privilege so narrowly that it suffocates all life and purpose that this privilege protects. Specifically, while LUPE Plaintiffs assert that the communications at issue do not qualify as attorney-client privilege because they were never shared with the client, *see* ECF 630 at 10, in this case, "the client is [the] corporation"—a legal concept

11

indisputably accepted by the Supreme Court, *see Upjohn Co.*, 449 U.S. at 389–90. Indeed, the legal communications at issue were between SOS's employees (*i.e.*, the client) and its legal counsel (*i.e.*, the attorneys). Courts have extended this logic to government agencies, where "a communication between two government attorneys may be protected by the attorney-client privilege where one attorney "play[s] the role as the requester of legal advice on behalf of the [agency]." *Greater New York Taxi Association v. City of New York*, 2017 WL 4012051, at *11 (S.D.N.Y., 2017).

In addition, Plaintiffs neglect to mention that "[t]he research undertaken by an attorney to respond to a client's request [for advice] also falls within the reaches of the [attorney-client] privilege," *Nguyen v. Excel Corp.*, 197 F.3d 200, 206 (5th Cir. 1999). Practically speaking, this research includes more than a simple Westlaw query; it also includes talking to other attorneys. Were it otherwise, clients would refuse to be fully frank with attorneys, thus hindering their own legal representation. After all, the Supreme Court has warned against such undesirable results in the attorney-client privilege context. "[I]f the client knows that damaging information could more readily be obtained from the attorney following disclosure than from [the client] in the absence of disclosure, the client would be reluctant to confide in [the] lawyer[,] and it would be difficult to obtain fully informed legal advice." *Fisher v. United States*, 425 U.S. 391, 403 (1976). Yet, this result is exactly what Plaintiffs request here. Their argument lacks merit and should be denied.

Subject to, and without waiving, these first two points, SOS nonetheless seeks to save this Court—and Plaintiffs—both time and resources by willingly engaging in an additional good faith production. Specifically, while SOS believes that it has properly invoked the attorney-client privilege and has no obligation to produce the challenged communications under controlling precedent, SOS has agreed to produce certain documents in redacted form that should hopefully resolve much, if not all of Plaintiffs' concerns.

### 3) The Secretary of State Properly Asserted Deliberative Process Privilege.

Finally, SOS withheld two documents[5] on the grounds of deliberative process privilege: DOC_080748 and DOC_080749. These two documents are quintessential deliberative materials and fall squarely with the privilege, as they both relate to "a draft report to the Texas Legislature that SOS was preparing in accordance with Section 127.305 of the Texas Election Code." Ex. 1 ¶ 2. Moreover, as Director of Elections Christina Adkins explains in her declaration, "the documents contain advice, recommendations, and opinions of SOS staff regarding preliminary drafts of the legislative report, which our office intends to release to the public in its final form." *Id.*

The deliberative process privilege protects "predecisional, deliberative" materials. *U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 785. "Documents are 'predecisional' if they were generated before the agency's final decision on the matter, and they are 'deliberative' if they were prepared to help the agency formulate its position." *Id.* "In particular, it is well-settled that '[d]raft documents, by their very nature, are typically predecisional and deliberative. They reflect only the tentative view of their authors; views that might be altered or rejected upon further deliberation either by their authors or by superiors.'" *MacNamara v. City of New York*, 249 F.R.D. 70, 78 (S.D.N.Y. 2008) (quoting *Exxon Corp. v. Dept. of Energy*, 585 F. Supp. 690, 698 (D.D.C.1983)).

That is the case here. SOS is still in the process of refining its report. Any of the opinions and facts articulated therein are subject to change and have as much likelihood to mislead as to illuminate. Director Adkins explains, "The disclosure of such pre-decisional information would discourage frank and open discussion among agency staff in connection with SOS's decision-making processes." Ex. 1 ¶ 4. SOS, therefore, not trial counsel, "maintains its assertions of deliberative process privilege as to

---

[5] LUPE Plaintiffs' Exhibit J identifies seven documents for which SOS invoked deliberative process privilege. Although State Defendants believe that SOS's invocation of deliberative process for all seven documents were appropriate, SOS intends to stand exclusively on its assertion of attorney-client privilege for five of the seven documents: specifically, DOC_0806487, DOC_0806885, DOC_0806901, DOC_0806927, and DOC_0805973.

the specified documents." *Compare* Ex. 1 *with League of United Latin Am. Citizens v. Abbott*, 2022 WL 3233406, at *3 (W.D. Tex. Aug. 10, 2022).

Plaintiffs also argue that the deliberative process should "yield." ECF at 15–17. The problem is that they cannot meet the required showing to defeat the deliberative-process privilege. The report at issue pertains a pilot program that the Texas Legislature ordered SOS to conduct of the risk-limiting audit program created under Tex. Elec. Code § 127.302.[6] This risk-limiting audit was established in the 87th Regular Session, before SB 1 was enacted, and does not address the implementation of any of the provisions challenged in this litigation. In addition, § 127.305 took effect in September 2021. Plaintiffs had ample opportunity to discover information about the report either through deposition of SOS witnesses or through production requests. They did neither. Given the lack of urgency Plaintiffs exhibited during discovery, and given the tenuous connection between the report and SB 1, Plaintiffs lack cause to override the privilege.

## CONCLUSION

For the foregoing, State Defendants respectfully request that the Court deny plaintiffs' motion to compel.

---

[6] A risk-limiting audit is a post-election tabulation audit that manually inspects randomly sampled, voter-verifiable paper ballots in order to confirm the outcome of an election to a pre-specified level of confidence (risk limit). If this level of confidence is not met, a full hand recount is triggered.

| | |
|---|---|
| Date: June 26, 2023 | Respectfully submitted. |
| | |
| JOHN SCOTT | KATHLEEN T. HUNKER |
| Provisional Attorney General of Texas | Special Counsel |
| | Tex. State Bar No. 24118415 |
| BRENT WEBSTER | |
| First Assistant Attorney General | /S/ RYAN G. KERCHER |
| | RYAN G. KERCHER |
| GRANT DORFMAN | Tex. State Bar No. 24060998 |
| Deputy First Assistant Attorney General | Deputy Chief, General Litigation Division |
| | |
| SHAWN E. COWLES | WILLIAM D. WASSDORF |
| Deputy Attorney General for Civil Litigation | Assistant Attorney General |
| | Tex. State Bar No. 24103022 |

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2120
Fax: (512) 320-0667
kathleen.hunker@oag.texas.gov
ryan.kercher@oag.texas.gov
will.wassdorf@oag.texas.gov

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on June 26, 2023, and that all counsel of record were served by CM/ECF.

/S/ KATHLEEN T. HUNKER
KATHLEEN T. HUNKER