# EXHIBIT 1

Case 5:21-cv-00844-XR   Document 656-1   Filed 07/10/23   Page 2 of 5

| 5:21-cv-844 (XR) | Entero v Texas | Jonathan Sherman White 6 (21 - 24) |
| --- | --- | --- |
| 4/27/2022 | NATIONAL COURT REPORTERS INC 888.800.9656 | 6 (21 - 24) |

**Page 21**

1  A.  I think I'm reserving -- reserving the absolute
2  "I have all knowledge of all charging decisions since
3  2018."  I think that's -- I'm trying to exclude and not
4  give you an inaccurate answer there, but I should have
5  fairly good knowledge since 2018.
6      Q.  How familiar are you with the facts relevant to
7  the ongoing election related prosecutions that the
8  Attorney General's Office is involved in?
9      A.  I would say I'm pretty familiar with those
10 facts.  I'm not, you know, lead counsel on each one of
11 those cases, so I -- and since they're pending, I
12 wouldn't be able to speak about the facts of those
13 ongoing cases other than what's been made public, but I
14 should have pretty good knowledge.
15     Q.  Do you have personal knowledge of the charging
16 decision -- charging decisions made in the cases against
17 those defendants?
18     A.  I -- I should have personal knowledge of those
19 charging decisions, yes.
20     Q.  So moving forward, I may ask you questions
21 about specific cases, prosecutions.  If there is
22 anything you don't know or are unfamiliar with, it would
23 be helpful if you -- if you pointed that out when we
24 talked about it.  Is that -- does that sound okay?
25     A.  Sure.

**Page 22**

1      Q.  In your position at the Attorney General's
2  Office, do you represent the Texas State Legislature or
3  any individual Texas legislators?
4      A.  Only to the extent that I would be asked to
5  provide guidance to them regarding a specific issue.
6      Q.  Have you ever -- in your position at the
7  Attorney General's Office, do you represent the Texas
8  Secretary of State's Office?
9      A.  I personally do not, but the agency, I believe,
10 does.
11     Q.  So you mentioned that you are sometimes called
12 to give advice to the Texas State Legislature or certain
13 individual legislators.
14         To your knowledge, have individual Texas
15 legislators ever communicated with you in confidence for
16 the purpose of obtaining legal advice?
17     A.  Yes.
18     Q.  Do you know whether legislators subsequently
19 discuss that advice publicly?
20     A.  I do not.
21     Q.  Mr. White, are you familiar with Senate Bill 1?
22     A.  I'm familiar with Senate Bill 1.
23     Q.  Were you at all involved in the legislature's
24 process of drafting Senate Bill 1 or any of its
25 predecessor bills?

**Page 23**

1      A.  I was involved to some degree with, primarily,
2  I believe some of the predecessor bills.
3      Q.  In what way were you involved with the drafting
4  of the predecessor bills of Senate Bill 1?
5      A.  In -- in being requested to provide guidance
6  regarding portions of those bills.
7      Q.  Which portions of the predecessor bills were
8  you asked to provide guidance on?
9          MR. HUDSON:  Object to the extent that it
10 calls for attorney-client privilege, attorney
11 work-product, or legislative privileged information.  To
12 the extent that you can respond without encroaching on
13 any of those privileges, you're free to do so,
14 otherwise, I'm going to instruct you not to answer.
15     A.  I don't know that I can answer that.
16     Q.  Have you been asked -- or were you -- excuse
17 me, were you asked to testify during any hearings on
18 Senate Bill 1 or any of its predecessor bills?
19     A.  I was called as a resource witness on some of
20 those hearings on the predecessor bills, and on SB 1, I
21 believe, actually, as well.
22     Q.  How many times were you asked to provide
23 testimony on Senate Bill 1 or its predecessor bills?
24     A.  As an estimate, I would say I was probably
25 asked to provide testimony or appear as a resource

**Page 24**

1  witness maybe 10 times.  And I probably actually
2  testified maybe half of that.
3      Q.  When you testified for -- excuse me --
4  withdrawn.
5          When you were called to testify, what were
6  you asked to testify about?
7          MR. HUDSON:  I'm going to object to the
8  extent that that would encroach on attorney-client or
9  attorney work-product or legislative privilege.  To the
10 extent that you can answer, you can do so.  Otherwise,
11 I'll instruct you not to answer.
12         And just for clarification of the record,
13 is your question directed at what he was asked to
14 testify about in public, or are you asking if there was
15 a specific ask made by legislators?  Because that would
16 help me instruct him so that he can actually answer your
17 question.
18         MS. PAIKOWSKY:  Of course.
19     Q.  (By Ms. Paikowsky)  I think for the moment we
20 can limit it to what you were asked to testify in a
21 public forum.
22     A.  Wow.  I -- I don't think I could even begin to
23 cover all the questions that I was asked publicly.  But
24 generally it pertained to criminal provisions within the
25 bills.

Case 5:21-cv-00844-XR   Document 656-1   Filed 07/10/23   Page 3 of 5

| 5:21-cv-844 (XR) 4/27/2022 | Entero v Texas  NATIONAL COURT REPORTERS INC 888.800.9656 | Jonathan Sherman White 19 (73 - 76) 19 (73 - 76) |

**Page 73**

1 against the voter's wishes.
2    Q. And what makes you come to that conclusion?
3    A. She was charged with violations under both
4 64.036, unlawful assistance, and 64.012, illegal voting,
5 which would involve marking the voter's ballot without
6 their direction or against their wishes.
7    Q. But you don't have specific knowledge of the
8 underlying facts of that case?
9    A. I do have some knowledge, but I would have to
10 refer -- refresh my recollection.
11       MR. HUDSON: Would you guys be okay with a
12 five-minute comfort break?
13       MS. PAIKOWSKY: Yeah, of course.
14       (Brief recess.)
15    Q. (By Ms. Paikowsky) Okay. So I believe we left
16 off with Cynthia K. Gonzales on Page 9.
17    A. Uh-huh.
18    Q. Are there any other cases on this page, again
19 where you have personal knowledge today of the
20 underlying operative facts comprising the elements of
21 the charges in cases that have resolved favorably for an
22 assister who was providing otherwise lawful assistance
23 attempting to influence or coerce the voter they were
24 assisting?
25    A. That appears to be it for Page 9.

**Page 74**

1    Q. Okay.
2    A. And mercifully, that appears to be it for the
3 rest of the resolved prosecutions.
4    Q. Thank you. So in all of the cases we
5 discussed, was your office able to secure convictions,
6 pleas, or otherwise favorably resolve the matter for all
7 of the -- the cases we've discussed?
8    A. Yes. We would have -- the disposition in those
9 cases would have either been conviction, deferred
10 adjudication, or a diversion program which would have
11 come with a stipulation to the allegations, to the
12 offense.
13    Q. Before Senate Bill 1, to your knowledge was the
14 Office of the Attorney General ever unable to prosecute
15 a defendant who you had determined beyond a reasonable
16 doubt had coerced or influenced a voter while providing
17 otherwise lawful in-person assistance?
18    A. With the -- with the understanding that our
19 resolved investigations and prosecutions are not subject
20 to a privilege that I'm aware of, we still have
21 confidentiality in terms of public release of
22 information resolving cases that didn't result in a
23 conviction or deferred adjudication, so I just want to
24 have that caveat.
25       I do recall generally that we had

**Page 75**

1 situations where voters were -- voters may have been
2 approached and pressured into receiving assistance
3 outside of a polling place or even with regards to mail
4 ballots, and we did not have an adequate statute to
5 address that interaction at that time. However, I do
6 believe there was a -- possibly an amendment made to
7 Chapter 64.036 that helped in that area, possibly with
8 SB 5 in the special session of the 85th Legislature that
9 helped in that regard, so these may have been older
10 cases.
11    Q. So was that in 2017?
12    A. Uh-huh. Yes, ma'am.
13    Q. And of all of the cases that you have pointed
14 out to me today, which of these, if any, to your
15 knowledge took place in person at a polling place?
16    A. The case that certainly didn't involve mail
17 ballots, and it was the violation of Chapter 61.008,
18 would have happened at a polling place for sure, and
19 I -- I don't recall specifically any others. I'm not
20 saying there weren't any, but I don't recall
21 specifically any others that happened at a polling place
22 that I can tell just based on these notes and without
23 refreshing my recollection.
24    Q. Sorry. One moment.
25       MS. PERALES: And just so I'm not lost,

**Page 76**

1 you're talking about Patricia Barton in Medina County on
2 Page 7?
3       THE WITNESS: That's the one that jumps
4 out to memory, yes, ma'am.
5    Q. (By Ms. Paikowsky) So based on your knowledge
6 today, other than that one case, none of those cases
7 listed in the exhibit took place in person at a polling
8 place?
9    A. I'm not recalling any from my memory, so I
10 would agree to that, to avoid having to look through
11 each one of them again, but that's my recollection.
12    Q. And the Patricia Barton case, that one you
13 noted did not involve assistance?
14    A. I don't believe it did involve assistance, no.
15    Q. And all of the cases that we discussed involved
16 violations of existing statutes that predated SB 1?
17    A. Correct, which are still in place today.
18    Q. They're still in place today. Thank you.
19       Just one minute. Okay. So I'm going to
20 move on to the mail -- the mail ballot identification
21 provisions of Senate Bill 1. So first of all, do you
22 believe that all eligible voters who want to participate
23 in an election should be able to cast a ballot and have
24 their ballot counted?
25    A. Yes.

Case 5:21-cv-00844-XR   Document 656-1   Filed 07/10/23   Page 4 of 5

5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
NATIONAL COURT REPORTERS INC 888.800.9656

Jonathan Sherman White 23 (89 - 92)
23 (89 - 92)

**Page 89**

1  or have the voter fill out their own identification
2  number?
3      A.  That's right.  Absolutely.
4          MS. PAIKOWSKY:  If it's okay, can I take a
5  five-minute break?
6      A.  Sure.
7          MR. HUDSON:  No objection.
8          (Lunch recess.)
9      Q.  (By Ms. Paikowsky) Mr. White, I'm going to go
10 back to asking questions about SB1's mail ballot
11 identification provisions.  Without SB1's mail ballot
12 identification provisions, would your office have other
13 means of detecting vote harvesting?
14         MR. HUDSON:  Object to the extent that
15 that would encroach on investigator privilege, and
16 remind you of the stipulation concerning the running
17 objection.  Just instruct the witness, to the extent
18 that that would encroach on methods of investigation or
19 practices, I'll instruct you not to answer.
20     A.  Yeah.  Without going into our mental
21 impressions and our investigative practices, I guess I
22 could say we have prosecuted vote harvesting cases in
23 the past.
24     Q.  And this, again, is not seeking specific
25 information about any investigation, but do you have --

**Page 90**

1  does your office have methods by which you would detect
2  potential illegal vote harvesting?
3          MR. HUDSON:  Same objections.
4      A.  We have --
5          MR. HUDSON:  Same instruction.
6      A.  We have other methods.
7      Q.  All right.  I'm going to show you a document
8  that we can mark Exhibit 5.
9          (Exhibit 5 marked.)
10         MS. PERALES:  What are you marking?  You
11 tell me.  This is 5?
12         MS. PAIKOWSKY:  This is 5.
13     Q.  (By Ms. Paikowsky)  Do you recognize this
14 document?  Sorry, and I should say this is marked
15 State -- Bates No. State 05462.
16     A.  Yes, I believe I do.
17     Q.  And what is this document?
18     A.  It is a PowerPoint file including some
19 information about election integrity at the Attorney
20 General's Office.
21     Q.  Who created this PowerPoint?
22     A.  I guess a collaboration involving myself and
23 some other members of our team, I'm not sure exactly
24 who.
25     Q.  What has the slide show been used for?

**Page 91**

1      A.  This specific version, I'm not 100 percent
2  sure, but -- I couldn't say for sure.
3      Q.  What are instances where you presented some
4  version of this slide show?
5      A.  The one I recall is -- would be the Secretary
6  of State's annual elections conference for elections
7  administrators.
8      Q.  And in that conference, who are you presenting
9  this slide show to?
10     A.  Elections officials.
11     Q.  What is the purpose of giving this presentation
12 to election officials?
13     A.  To inform them about election integrity efforts
14 and enforcement and to give them some information on
15 what they can look for in terms of detecting election
16 fraud and how to report it.
17     Q.  If you wouldn't mind turning to Bates
18 No. 054641.
19     A.  Okay.
20     Q.  Can you describe this slide?
21     A.  So this slide is intended to show some examples
22 or representations of examples of mail ballot
23 application activity that might be associated with --
24 with fraud or vote harvesting operations.
25     Q.  Does this slide show tools that your office

**Page 92**

1  uses to detect vote harvesting and impersonations?
2      A.  The intent was to show elections administrators
3  items that they might detect, and if looking -- if
4  looked into further might find evidence of fraud that
5  they would report to our office.
6      Q.  So is it fair to say that the examples you see
7  here might give your office or others cause to
8  investigate potential absentee ballot by mail fraud?
9      A.  They might if we received a complaint with this
10 type of information inside of it.
11     Q.  Have there been instances -- again, not going
12 into privileged information about any specific
13 investigation -- have there been instances in the past
14 where you office has received a complaint that includes
15 an example that you -- similar to those that you've
16 provided here to detect a vote harvesting?
17     A.  Yes.
18     Q.  To your knowledge, will your office continue to
19 rely on this tool to detect vote harvesting?
20     A.  We'll continue to rely on complaints that have
21 credible information about election fraud.
22     Q.  And the kinds of evidence that you might
23 consider credible evidence warranting an investigation
24 would be -- would include what's provided on this slide
25 show?

Entero v Texas 5:21-cv-844 (XR)
4/27/2022

**Entero v Texas**
National Court Reporters Inc. 888.800.9656

23 (89 - 92) Jonathan Sherman White
Page: 23 (89 - 92)

Case 5:21-cv-00844-XR   Document 656-1   Filed 07/10/23   Page 5 of 5

| 5:21-cv-844 (XR) | Entero v Texas | Jonathan Sherman White 47 (185 - 188) |
| --- | --- | --- |
| 4/27/2022 | NATIONAL COURT REPORTERS INC 888.800.9656 | 47 (185 - 188) |

### Page 185

1  unlawful voter assistance when that individual was not
2  working for a political campaign?
3       A.   And by "unlawful assistance," you mean a
4  violation of 64.036.
5       Q.   Or the other measures that we have discussed
6  before, 64.012, 276.013.
7       A.   I'm not sure.  I'm not sure on those specific
8  statutes.  But what I could tell you is that almost all
9  of the cases that we see that involve assistance fraud
10 involve individuals that we believed were associated
11 with campaigns or working directly for a candidate or a
12 slate of candidates, or were relatives of candidates or
13 the candidates themselves.
14      Q.   Thank you.  And so sitting here today, you
15 cannot recall an instance in which your office has
16 brought charges against an individual for violating
17 either 64.036 or 64.012, or 276.013, when that defendant
18 was not working for a candidate or campaign or slate of
19 candidates, correct?
20      A.   Or a relative of the candidate or the candidate
21 themself?
22      Q.   Right.
23      A.   If you include those -- if you can give me one
24 moment.  I can --
25           MR. HUDSON:  For purposes of the record, I

### Page 186

1  would point out that you were referencing -- would you
2  identify that by exhibit number?
3           THE WITNESS:  That's Exhibit 6, which is
4  the list of our pending -- includes a list of our
5  pending prosecutions.
6       A.   I can think of -- I could think of one --
7       Q.   Where you brought charges?
8       A.   -- case where charges have been brought.  There
9  could be more, but I don't have a recollection of them
10 at this time.
11      Q.   Tell me about that one case.
12      A.   I can't go into that case due to --
13      Q.   If charges have been brought, wouldn't that be
14 a public record?
15      A.   There's a pending prosecution.
16      Q.   I see.  Are there charging documents?
17      A.   There are.
18      Q.   Have they been filed?
19      A.   They have.
20      Q.   Where have they been filed?
21      A.   In the district court where the case is
22 charged.
23      Q.   What is that district court?  If it's a public
24 record, I'm entitled to know about it.
25           MR. HUDSON:  If I could have just a minute

### Page 187

1  to advise him on what he can and can't talk about.  If
2  we can go off the record just a moment.
3           (Brief recess.)
4           MR. HUDSON:  Mr. White, so I understand,
5  the case that you're referring to is on Exhibit --
6           THE WITNESS:  6.
7           MR. HUDSON:  Exhibit 6.  I'm instructing
8  you -- to the extent that there's anything in the public
9  record about the case, I'm instructing you to testify
10 about that.  To the extent that there are details that
11 are part of ongoing investigative processes,
12 attorney-client privilege, attorney work product, or any
13 other applicable privileges, I'm instructing you not to
14 answer.  But to the extent it's on the public record,
15 I'm instructing you to answer.
16      A.   The case --
17           MR. HUDSON:  Let her ask her question.
18      A.   Go ahead.
19      Q.   (By Ms. Perales)  I think we were out there,
20 the question was half answered.  But I'll go ahead and
21 make a new question for you.
22           MR. HUDSON:  Sorry about that.
23           THE WITNESS:  Sure.
24      Q.   Please describe for me the charges that you
25 mentioned a few minutes ago related to a particular

### Page 188

1  defendant and the scenario that I was describing.
2       A.   Okay.  The case that came to mind does not
3  actually involve ballot assistance, it involved voter
4  registration, and so it may not be directly applicable
5  to your -- your question, and I think it may not.  It --
6  what sparked my memory is that it did involve an offense
7  under 276.013, but it was not under the influencing the
8  voter subsection, so I don't think that it would be
9  responsive, but I have been instructed that, if it were
10 responsive, I would disclose to you --
11           MR. HUDSON:  Well, don't tell her what I
12 instructed you.
13           THE WITNESS:  I'm sorry.  I'm sorry.
14           MR. HUDSON:  That's on the record.
15      A.   But if something is in the public record, I
16 would make that available to you.
17      Q.   Yes.  So is there a reference to that on the
18 Exhibit 6 somewhere?
19      A.   The case is one of our pending -- one of our
20 pending prosecutions.
21      Q.   And since charges have been filed, can you
22 point to me which page that pending prosecution is on in
23 the exhibit?
24      A.   It's -- well, it's -- again, it's not
25 responsive to the -- to the subject area that we were