# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., *Plaintiffs*, | § § § | |
| v. | § § | Case No. 5:21-cv-844-XR |
| GREGORY W. ABBOTT, et al., *Defendants*. | § § § § | |

# DECLARATION OF JONATHAN WHITE

I, Jonathan White, pursuant to 28 U.S.C. 1746, am executing this declaration as part of my assigned duties and responsibilities. I declare under penalty of perjury that the facts stated below are true and correct to the best of my personal knowledge and belief.

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The evidence set out in the foregoing Declaration is based on my personal knowledge.

2. I am the former Division Chief of the Election Integrity Division of the Office of the Attorney General of Texas and submit this Declaration in support of the State's Motion for Summary Judgment in the above-captioned case.

3. I have been involved in election fraud prosecutions as some portion of my work since I started at the Attorney General's office 15 years ago in the White Collar Crime and Public Integrity Section of the Criminal Prosecutions Division. Through the years, our election caseload expanded, resulting in the creation of an Election Fraud Section, and ultimately the Election Integrity Division. In that time, I have reviewed hundreds of investigations, and handled approximately 100 prosecutions, many of which were complex, involving multiple, if not dozens, of election offenses.

4. The Election Integrity Division receives complaints about potential election fraud forwarded primarily from the Secretary of State's office. Our investigators then determine whether the facts support an allegation of fraud, and, if warranted, the Election Integrity Division prosecutes the offenses or assists counties in prosecuting the offenses. This prosecution role has evolved somewhat since the end of 2022.

1

5. During my tenure as Division Chief of the Election Integrity Division, I became familiar with the administration and operations of Texas elections, including the tasks, practices, and responsibilities that local Texas election authorities must fulfill; and the laws and regulations with which local election authorities must comply to plan, coordinate, manage, and execute a successful election.

6. During my tenure as Division Chief of the Election Integrity Division, I investigated and prosecuted a variety of offenses related to voter fraud, including but not limited to ballot harvesting, illegal voting, and illegal ballot assistance. Based on that experience, I believe that the ID requirement of SB1 with regard to applications for ballots by mail and mail-in ballots is both reasonably calculated and necessary to eliminate several common types of voter fraud. *See* Tex. Elec. Code §§ 84.002(1-a); 86.001(f); Section 87.041(b)(8).

7. In my investigations and prosecutions, by far the most common type of voter fraud is related to mail-in ballots. There are three main types of election violations: mail-in ballot fraud, illegal voting, and voter assistance fraud. Mail-in ballot fraud accounts for roughly 2/3 of the offenses we prosecute. Around 1/4 deal with illegal voting, and around 1/5 deal with voter assistance. These categories may overlap within the same case. In my experience, the prevalence of mail ballot fraud is attributable to the fact that voting by mail lacks the security mechanisms that are inherent facets of in-person voting.

8. The central feature of both mail ballot fraud and voter assistance fraud schemes is a person with a political agenda getting between a voter and their ballot. With mail ballots, a vote harvester travels in person to wherever the voter is located, in a nursing home, for example, or at the voter's home, and attempts to ensure that the ballot is voted for the candidate or group of candidates the harvester supports. This may be achieved by actually filling the ballot out for the voter, or suggesting to the voter how they should vote during the voting process. The degree to which a campaign worker or political operative can get access to the voters ballot is directly proportional to the degree to which they can ensure that vote gets cast according to their wishes.

9. Ballots may also be diverted from the voter, without their knowledge. A bad actor may submit applications for ballot by mail fraudulently, without the voters' permission and then vote ballots on their behalf.

10. In voter assistance fraud schemes, political operatives may transport voters to the polls and assign the voter to an "assistant" who walks them through the voting process, including physically entering the votes on the voting machine. Alternatively, "assistants" may latch on to a voter at the polling location by soliciting, or by simply informing the voter that they are providing them "voting assistance" and end up either entering votes for the candidates of their choice, or influencing the voter's choice by suggestion. In each scenario, the key element is getting in-between the voter and their ballot.

11. My office has observed that in both mail-in ballot fraud and in-person voter assistance fraud, vulnerable individuals are frequently targeted. Usually, these individuals are elderly, or occasionally, may have disabilities. The person seeking to "assist" with ballots is normally a campaign worker or someone closely affiliated with a candidate or campaign.

2

Though I use the term "campaign worker," vote harvesters are usually paid off book. On occasion, though, they may be listed on campaign reports as "canvassers," "blockwalkers," "GOTV" (get out the vote), "outreach," or some other euphemism or title. Occasionally, the harvester or "assistant" is an actual candidate on the ballot.

12. In a vote harvesting operation, harvesters will first go through a target neighborhood/precinct and sign up as many people as possible for mail-in ballots. This process, known as the "seeding" phase, can be done by collecting actual signatures from voters, but this can also be accomplished by forging signatures, having other members of a household sign for a voter, or even by misrepresenting the nature of the document the voter is signing. If the "annual application" box is checked on the application, and it normally is, voters will receive mail ballots for the entire year – including every local election. Harvesters may alter the selections or information on applications without the knowledge of a voter, or fill them in after the fact. We have seen this practice result in voters receiving ballots against their wishes, or for the wrong political party's primary and runoff elections. The fundamental goal is to generate as large a pool of mail ballots as possible that can be later harvested. In effect, voters are treated as a commodity, and their voices are lifted from them and reappropriated for use by a political campaign.

13. Depending on the number of votes needed to swing a targeted election, vote harvesters may resort to signing up young, able-bodied people who do not qualify for mail ballot voting. In one case, my office identified a district where close to half of the mail ballots for certain precincts were issued for disabilities. The investigation showed these individuals to be young, able-bodied voters. Typically, only 1-2% of mail ballots are issued to people with disabilities, and the rest to people over 65 or absentee voters.

14. At election time, a harvester will follow up door-to-door to collect ballots from the voters they signed up to receive mail ballots. In some parts of the state, this process is referred to as "following the mail truck" as mail ballots are delivered by the postal service. Harvesters may develop connections in the post office to get the best information possible on when mail ballots go out, or even illegally purchase lists from mail carriers of those receiving mail ballots. In this collection or "harvesting" phase, the harvester often presents themselves in an official or quasi-official capacity, or simply informs the voter that they are there to help the voter vote their ballot. The harvester will normally mark, or at least attempt to mark, the votes directly on the ballot. They may ask the voter their preferences for President, Vice-President or other up-ballot candidates, and may even honor the voter's request, particularly if the harvester is really interested in a down-ballot race, or races, as is usually the case. Other times a harvester may verify that the voter wants to vote a "straight-ticket" for a particular party, but in a party primary election, where that instruction provides zero direction on how the ballot will actually be voted.

15. An experienced harvester may have a warm, friendly interaction with the voter, but it is unlikely the voter will have any idea how their votes were actually cast. After collecting the ballot from the voter, the harvester may leave a gift for the voter, often a trinket, but in some cases it could be an item like a scarf, fruit basket, or bag of groceries. These gifts may also be offered up front in order to lower defenses, or trigger a sense of reciprocity in the voter.

3

16. Since 2015, the OAG has prosecuted over 800 election offenses against 126 individuals. Approximately 343 offenses against 39 defendants pending in court were placed in jeopardy in late 2022, due to the Court of Criminal Appeals' ruling in *State v. Zena Stephens*, which declared the AG's statutorily granted authority to prosecute election cases unconstitutional.

17. All mail ballots, due to their nature of being handled and voted outside of a polling location, lack significant security mechanisms available to in-person voters. In the polling location, in-person voters have election judges and poll watchers to make sure that there is no electioneering; no harassment, pressure, or persuasion being placed on the voter to vote a certain way; that no one is marking the voter's ballot without authorization; and that the vote is actually turned in, counted, and not altered by any person. Paid operatives are not allowed to loiter in the polling place, or to collect ballots from voters and remove them from the polling place, with a promise to turn them in later on behalf of the voter. Voting not conducted in a polling location lacks these protections. There are laws prohibiting many of these bad acts, but there is no monitoring and no ability to stop them from happening. The vote-by-mail process is wide open to politically interested individuals to proliferate mail ballots to targeted precincts and then pursue those ballots to ensure they get voted according to their preferences. When compared to voting by personal appearance, voting by mail is exceptionally vulnerable to fraud, particularly from vote harvesting operations.

18. My office investigated a mayoral candidate in Carrollton, Texas, named Zul Mohamed. The investigation proved that Mohamed fraudulently filled out and submitted at least 100 applications for ballot by mail, that we know of, in the 2020 election. He did this without the consent or knowledge of a single voter, and then voted or attempted to vote the ballots. He targeted elderly voters of the highest ages who had not voted in recent elections, in order to decrease his likelihood of detection. Mohamed directed the mail ballots to be sent to a virtual mailbox he acquired under a false identity. The City of Carrolton spans three different counties, and he targeted at least Denton and Dallas counties in his scheme, which was detected and reported only by the Denton County Elections Office.

19. An operation by Denton County Sheriff's Office, assisted by our investigations unit, caught Zul in the act of picking up a box of mail ballots and transporting them to his home, where he was still in the process of creating numerous fraudulent ballot applications and submitting them to Dallas County. A significant number of the voters targeted in Dallas County were deceased, but had not yet been removed from the rolls. Dallas County Elections, acting under instructions of the Dallas County District Attorney and Commissioner's Court was uncooperative with the investigation, and declined to produce certain election records for our investigation. The elections office did, however, flag a list of fraudulent ballots we provided them with, after having already accepted and counted a number of them, which minimized some of the damage. Dallas County also declined to press charges on our completed investigation, or conduct their own; however, Zul was prosecuted by the Denton County District Attorney's Office for the dozens of fraudulent ballots he attempted to case there. His case is currently set for trial.

20. It is not uncommon for dozens or perhaps even hundreds of mail ballots to be delivered to multi-family dwellings, residential care facilities, or other such locations. Had the Denton

4

County elections office not taken additional steps to investigate and verify the nature of the address the ballots were being diverted to, and then report the activity, I have no doubt that hundreds of votes would have been fraudulently cast and counted in both Denton and Dallas Counties. I am confident that Dallas County would have accepted and counted each fraudulent ballot it received, had our investigation not intervened, instead of the relatively small number that was counted before we intervened.

21. Because Zul forged voters' signatures when requesting mail ballots, and also signed the respective ballot envelopes, signature verification did not reveal the fraud. Zul would not, however, have been able to provide the identification numbers required under a mail ballot ID number requirement, either on the applications or ballot envelopes. This security measure would have prevented this fraud scheme entirely, and would have stopped it early, at the application phase.

22. Although Zul was ultimately caught in the act, and likely hundreds of fraudulent votes prevented, he was still able to successfully cast fraudulent ballots in the election. Once processed and removed from their envelopes, ballots are entirely anonymous and untraceable. They cannot be identified for removal from counting. Additionally, once a voter requests a mail ballot, they are unable to vote at a polling place without surrendering their mail ballot or going to election headquarters to file paperwork, including a sworn affidavit. Most voters will not complete this process, but even if they are willing and able, they will still not be able to vote if the mail ballot has already been processed at the elections office. Simply put, mail ballot fraud disenfranchises voters by making it impossible for them to cast their vote. Voters' voices are stolen and supplanted by those driven to make their voices heard louder than everyone else's.

23. Had Texas utilized an ID number requirement, election officials would not have accepted the fraudulent applications for ballot by mail in the first place. No voters, either in the Zul case, or any other mail ballot fraud case, would be disenfranchised by vote harvesters who do not have or cannot gain access to the voters unique ID numbers. This is a common sense security measure.

24. Other vote harvesters illegally harvest hundreds of ballots with more subtle methods than ballot diversion. Many ballot harvesters interact directly with the voters to obtain actual signatures on applications and ballot envelopes. In these cases, fraud is far more difficult to detect. Unless an opposing candidate is aware their opponent is conducting a harvesting campaign, or discovers significant statistical anomalies in the election data, vote harvesting is likely to go undetected. Even if fraud is both detected and reported, in situations where harvesters who collect authentic-looking, or actually authentic signatures from voters, it is difficult to know whether a voter's ballot was marked or influenced by a vote harvester.

25. Investigating and prosecuting mail ballot fraud violations after the fact is difficult for a number of reasons. Inadequate detection mechanisms are in place to identify mail ballot fraud and to capture and preserve evidence of it. There are typically not eyewitnesses or video recordings to capture interactions between a harvester and a voter, or a ballot being diverted from a mailbox. Additionally, victims are often elderly and sometimes disabled, and may have diminished perception or memory of the event.

5

26. Perhaps most importantly, if performed correctly, fraud committed during harvesting interactions is designed to be undetectable to the voter. An experienced harvester can gain a voter's trust by leveraging ties to the community or acquaintances they have in common. A harvester may also be able to portray themself as an election official or volunteer, with whom the voter can feel comfortable in allowing them to "assist" with or to collect a mail ballot. From there, a skilled harvester can avoid pushing a voter beyond a certain point of comfort and can settle for whatever level of influence they are able to assert over the voter's ballot. This might range from merely suggesting which candidates the voter should vote for, to physically marking the voter's ballot, to collecting a ballot—marked or unmarked, envelope sealed or unsealed—from the voter. If a voter insists on voting a ballot against the harvester's preferences, that vote can easily be reversed or cancelled by the harvester by either altering the ballot or discarding the ballot, in a worst-case scenario. The individuals we investigate and prosecute do this work not to help others, but to deliver votes.

27. A common harvesting practice, mentioned earlier, is to ask the voter whom they wish to vote for on one or two top-of-ballot candidates, and then vote the rest of the ballot without the voter's input or consent, or to simply mark the votes opposite of the voter's direction, if any is given. A harvester could theoretically go over the entire ballot with the voter if they had the time and inclination, but the only thing that matters is how the harvester actually marks the votes.

28. It was also not uncommon for our investigators to encounter voters who have been conditioned over perhaps years of vote harvesting interactions to simply hand over unmarked ballots directly to the vote harvester. While this may seem strange to outsiders, it is more understandable when one takes into consideration that some of these voters did not actually want to receive a ballot in the first place, but they signed an application when it was put in front of them by a friendly, pushy, or deceptive vote harvester.

29. Another challenge to investigators and prosecutors is that even if a voter did perceive an illegal interaction, and is willing to talk to investigators, it is common for that voter to be unable to identify who the harvester was (if they ever knew) or to recall key facts about the interaction. Given the number of times elections are conducted in even years, often just weeks or months apart, with primaries, runoffs, and local elections in rapid succession, interactions with harvesters may easily be confused or forgotten. Investigations are often conducted many months, or even a year or more after an election, given delays in reporting and investigative workload and staffing. With scant documentary evidence and the uncontrolled and unmonitored environments where mail ballot interactions take place, it is a long shot that a voter will be able to decisively remember enough detail to establish the elements of an election offense to a criminal burden of proof.

30. Organized mail ballot fraud activity is another hurdle to investigation and prosecution. When multiple people act in coordination, which is common, to divide the illegal activities among multiple players, it is more difficult to prove a case, and easy for bad actors to point to an unknown actor in the process to evade responsibility. For example, our division investigated an individual who signed as an assistant on a ballot application for a woman who had been dead for 8 years. The mail ballot was voted and counted. But when DNA on

the ballot envelope came back to an unknown actor, the illegal voting case could not be proved beyond a reasonable doubt. Furthermore, the co-conspirator who signed the application as an assistant claimed that she been provided the application by an unknown individual (but likely a member of her harvesting crew), and she merely signed the document to comply with the law. Of course, she claimed no knowledge of how the deceased voter's ballot was actually cast.

31. Because mail ballots have few safeguards, fraud is perpetrated relatively easily. But it is many orders of magnitude more difficult to prove what happened, and even in cases of clear fraud, to identify the perpetrator and prove each element of an offense beyond a reasonable doubt. Our successful prosecutions represent a tiny fraction of the number of individuals involved in vote harvesting and the number of votes and voters who have been defrauded.

32. A single ballot harvester can impact dozens or hundreds of votes, depending on the industriousness and experience of the harvester. A single ballot-harvesting scheme can result in hundreds of people being disenfranchised from their right to vote. Depending on the scale of the operation, dozens of ballot harvesters may be acting in coordination. Even if one or two are caught, many others may escape detection. Even if detected, the investigation and prosecution challenges described above ensure that cases that result in successful prosecutions represent a fraction of total ballot harvesting activity.

33. Prior to SB1, one requirement intended to protect the integrity of the mail ballot was comparing the signature on the carrier envelope with the signature on the application for ballot by mail or another signature on file. While signature matching certainly provides some measure of protection against fraud, its utility is limited, and it can be circumvented relatively easily by a determined bad actor.

34. Vote harvesting methods have evolved to avoid having ballots rejected for signature mismatch. A basic workaround is simply forging both signatures. Our office observed a scheme that captured digital signatures from voters on an iPad to request a mail ballot, which was used to populate mail ballot applications which the harvesting crew printed and mailed in bulk to the elections office. These digital signatures, some of which appeared forged by the harvester, were of such low quality as to be practically useless in a signature comparison. Yet they provided the harvesting crew with the means to automatically generate mail ballot applications in future years, while bypassing the voters entirely. It also provided harvesters a template for applying a reasonably decent forgery to a ballot. Common sense legislation was passed to address this problem, requiring wet ink signatures on mail ballot applications, but harvesters have since (and had long before) operated successfully without being thwarted by the signature matching process.

35. Another problem with mail ballot safeguards is that standards are not evenly applied across counties. Some counties enforce requirements more strictly than others. For example, one Texas county used an unorthodox interpretation in its signature verification process that negated the process completely if a ballot had been assisted. In a case of non-matching signatures, if the ballot envelope had been signed by a person "assisting" a voter, the ballot board or signature verification committee was instructed to disregard the non-matching

7

signatures and treat the ballot as if it were "witnessed." A "witnessed" signature is where a voter is physically unable to sign the ballot envelope due to disability, and a witness is required to sign an attestation in order to verify the ballot was cast by the voter. Assisting and witnessing are two entirely different processes under the law, and have different notations on the ballot envelope. By conflating these differences, non-matching signatures on untold numbers of assisted ballots (often an indicator of mail ballot fraud) bypassed the signature verification process and were counted.

36. Another challenge in the signature verification process is inconsistency or changes in handwriting due to a voter's age or infirmity. This issue has been highlighted by voter rights groups over the years in attempt to eliminate the requirement. A careful judge can consider the possible issues an elderly or disabled voter might develop and allow leeway for handwriting deterioration. Of course, it is relatively easy for a vote harvester to provide a low-quality signature that suggests deterioration. Recovery from a malady, resulting in improved handwriting quality, is also possible. Because of these issues, in practice, many, if not most, ballot boards will approve every signature that could conceivably be that of the voter. In most cases, a signature must clearly appear to be the handwriting of a different person it will be rejected. This tendency understandably limits the effectiveness of signature matching, which is a subjective determination, in preventing mail ballot fraud. Signature matching is useful, though certainly subjective in comparison to the requirement of an identifying number.

37. Ballot harvesting is most effective in low-turnout races and smaller jurisdictions, rather than large, statewide elections. This is because ballot harvesting is labor-intensive and is cost-effective generally when relatively low numbers of votes are required to secure a race. Larger operations are also more difficult to coordinate, and they leave more clues behind. In low-turnout races, a few votes can make the difference. Hundreds of votes can put many close primaries or local elections in play.  I would estimate that least ninety percent of the vote harvesting and mail-in ballot fraud cases we investigate and prosecute occur in local elections or primary elections.

38. Some of the local elections most vulnerable to ballot harvesting are independent school districts. In some parts of the state, the school district may be a county or municipality's biggest employer, and the ISD wields enormous influence in controlling jobs and valuable contracts.  These races often have the lowest turnout of any elections, many districts opting to conduct their own elections rather than contracting through the county elections office, and historically holding them on non-uniform election days. In such elections, harvested votes can easily affect the outcome. The early voting clerk who is responsible for accepting and processing mail ballots, in an election run by the district, is appointed by the officials who run the district, who are on the ballot. The incumbent candidates handpick the people that ultimately determine whether signatures match and which ballots will be counted.

39. The Election Integrity Division investigated a primary race for county commissioner in Gregg County. In that race, a candidate lost the in-person vote by 20 percentage points, but a large vote harvesting campaign generated an abnormally large number of mail ballots, of which more than 70% were cast for the harvesting candidate. That candidate ended up winning the election by four votes. Shannon Brown, Marlena Jackson, Charlie Burns, and

8

DeWayne Ward were indicted and pled guilty to election fraud offenses, in a prosecution by the Gregg County District Attorney, assisted by our office. The losing candidate, who would have won the election handily, was unable to contest her election because her attorney missed a filing deadline.

40. SB1 requires a voter to provide an ID number (either a driver's license, Texas ID, election identification certificate, DPS-issued personal identification card number, or the last 4 digits of an SSN) in order to apply for and cast a ballot by mail. The very fact of adding a unique identifier to the ballot provides security in the same way that it does for other types of applications or transactions that require ID numbers – the number is not publicly known or readily available to persons besides the voter. ID requirements help to verify that a person is who they claim to be.

41. I believe the ID number requirement is a reasonable security measure to address a significant vulnerability of mail ballots, that offers voters eligible to vote by mail a far greater degree of convenience than in-person voting. It strikes an appropriate balance between election integrity and accommodation of voters who might have difficulty or require assistance voting in person.

42. Requiring the provision of an ID number helps eliminate schemes involving direct diversion of ballots. This helps narrow the field of possible vote harvesting schemes, and of those possible schemes, it makes them more difficult.

43. Having to extract a sensitive piece of personal information from a stranger changes the dynamic of a ballot harvesting interaction in a meaningful way. It also increases the likelihood of a voter getting assistance, if needed, from a family member, trusted friend, roommate, or caregiver, instead of an opportunistic or aggressive vote harvester.

44. Vote harvesters are more successful when they can minimize intrusive requests to a voter that are necessary to gain access to a ballot. Obtaining a piece of sensitive information from a stranger is an obstacle to a bad actor.

45. By way of illustration, a harvester normally approaches a voter as someone there to help them vote or mail their ballot. The initial ask is usually "do you have your ballot handy?" An experienced harvester typically offers a stamp and mailing services, to demonstrate value to the voter. An experienced harvester will likely pick up on any physical attributes of the voter that might be helpful to the harvester's cause. Eyeglasses become an invitation for the harvester to read the ballot to the voter. Some voters are more trusting by nature, others more skeptical. The helpful harvester seeks to skillfully insert themselves between the voter and their ballot, and once they mark the voter's ballot, they will fold it, and slip it into the ballot envelope, at which point they need only collect a quick signature before whisking the ballot away from the voter. However, most people know to be wary in providing sensitive personal information like social security numbers to a person they do not know well, although they will provide it readily to a family member or trusted caregiver.

9

46. For this reason, having an ID number requirement for mail ballots makes it more likely that people who need help with filling out or returning a ballot will get that help from someone they trust, rather than a ballot harvester who might fraudulently repurpose their vote to a predetermined candidate or slate of candidates. It also bears mention that a vast swath of absentee voters, voters 65 years and older, and even individuals with disabilities have no problems filling out ballots, ballot envelopes, providing ID numbers, and sending letters without assistance. But where assistance is needed, it should be encouraged to come from a trusted friend, family member, or caregiver.

47. An ID number requirement for mail ballots provides needed security for vulnerable mail ballots, in a manner comparable to the existing ID requirement for in-person voting. However, it is even easier to provide. A mail ballot voter does not have to produce an ID card (or include a photocopy with the mail ballot, or witness affidavit of identity, as some states require), but rather simply provide a number, from a list of options, which can be as simple as the last 4 digits of an SSN.

48. Generally speaking, it is important to realize that election fraud is extremely difficult to detect, harder to prove, and even harder to rectify after the votes are counted. The reality is that the only effective way to achieve election integrity is to have adequate measures in place to prevent fraud before the votes are cast, and in the case of mail-ballots, to implement security measures that achieve the same level of security that is in place at a polling location. The ID number requirement in SB1 is a small step in that direction.

Executed in Travis County on the 22nd day of June, 2023.

Jonathan White
Former Division Chief
Election Integrity Division
Office of the Attorney General of Texas