```
1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF TEXAS
2                         SAN ANTONIO DIVISION

3
   LA UNION DEL PUEBLO ENTERO,     .
4  ET AL,                          .
                                   .
5            PLAINTIFFS,            .
         vs.                       . DOCKET NO. 5:21-CV-844-XR
6                                  .
   GREGORY W. ABBOTT, ET AL,       .
7                                  .
             DEFENDANTS.           .
8

9

10         TRANSCRIPT OF MOTION TO COMPEL PROCEEDINGS
           BEFORE THE HONORABLE XAVIER RODRIGUEZ
11              UNITED STATES DISTRICT JUDGE
                      JULY 11, 2023
12

13

14

15

16 APPEARANCES:
   FOR THE PLAINTIFFS:    NINA PERALES, ESQUIRE
17                        KENNETH PARRENO, ESQUIRE
                          FATIMA L. MENENDEZ, ESQUIRE
18                        JULIA RENEE LONGORIA, ESQUIRE
                          MALDEF
19                        110 BROADWAY, SUITE 300
                          SAN ANTONIO TX 78205
20
                          JENNIFER A. HOLMES, ESQUIRE
21                        NAACP LEGAL DEFENSE & EDUCATIONAL
                          FUND INC
22                        40 RECTOR STREET, FIFTH FLOOR
                          NEW YORK NY 10006
23

24

25
```

```
 1
 2                              DANA PAIKOWSKY, ESQUIRE
                                U.S. DEPARTMENT OF JUSTICE
 3                              950 PENNSYLVANIA AVENUE
                                4CON 8.143
 4                              WASHINGTON DC 20530
 5
 6   FOR THE DEFENDANTS:        RYAN KERCHER, ESQUIRE
                                KATHLEEN HUNKER, ESQUIRE
 7                              TEXAS ATTORNEY GENERAL
                                P.O. BOX 12548
 8                              MC 009
                                AUSTIN TX 78711
 9
10
11
12
13   REPORTED BY:              GIGI SIMCOX, RMR, CRR
                                OFFICIAL COURT REPORTER
14                              UNITED STATES DISTRICT COURT
                                SAN ANTONIO, TEXAS
15
16
17
18
19
20
21
22
23
24
25
```

1      *(San Antonio, Texas; July 11, 2023, at 1:30 p.m., in open*
2  *court.)*
3          THE COURT:  With that, let's turn to the civil
4  matter.
5          Are you-all ready?  21CR844 [sic CV], La Union Del
6  Pueblo Entero versus Gregg Abbott and others.
7          Who is here for the plaintiffs?
8          MR. PARRENO:  Good afternoon, Your Honor.
9          Kenneth Parreno from the Mexican-American Legal
10  Defense and Educational Fund on behalf of LUPE plaintiffs.
11  With me today in person as well is Fatima Menendez, Julia
12  Longoria, and remote is Nina Perales.
13          THE COURT:  Thank you.
14          MR. PARRENO:  And, I'm sorry, Your Honor.  In
15  addition, there are a number of plaintiffs' counsel on the
16  Zoom as well.
17          THE COURT:  Thank you.
18          Anybody from the DOJ, or not?
19          MISS PAIKOWSKY:  Hi, Your Honor.  Dana Paikowsky for
20  the United States.
21          THE COURT:  Thank you.
22          And for the State?
23          MR. KERCHER:  Your Honor, Ryan Kercher on behalf of
24  State defendants.  Along with me is Miss Kathleen Hunker in
25  person and numerous counsel appearing via Zoom, Your Honor.

1          THE COURT:  Thank you.

2          So the latest discovery fight.  So I guess we ought

3    to figure out first, what are we fighting over?  So from what

4    the State has stated in their pleading, the State claims out

5    of 240 total challenged documents 22 have now been produced

6    without any redactions, so those should no longer be in

7    dispute, so the State contends that we only ought to be

8    talking about 72 documents that were produced in redacted form

9    and 146 that were withheld in their entirety.

10          Is that the understanding of the plaintiffs?

11          MR. PARRENO:  Your Honor, it's actually I believe an

12    even narrower subset, in light of the plaintiffs withdrawing

13    arguments as to a number of the documents.  We included those

14    withdrawn assertions, or we noted those withdrawn assertions

15    in our amended exhibits included with the reply that was filed

16    on Friday.  Those are amended Exhibits G through K, and

17    there's a strike through that indicates them.

18          THE COURT:  So how many documents do you think are in

19    contention?  How many documents in redacted and how many

20    documents have been completely withheld from you-all?

21          MR. PARRENO:  I apologize.  I do not have a breakdown

22    by redacted or not, but approximately 150 documents appear to

23    still remain to be in dispute, some of which are redacted and

24    we believe should be produced in their entirety, others that

25    have not been produced and are still withheld.

1          THE COURT:  Okay.  Let's work through these
2    privileges a little bit, but, so glad I'm asking about these
3    numbers.  So we're down to 150.
4          I'll check with my staff but I'm not sure it's very
5    clear to my staff what exactly — so we were operating on the
6    basis of 220 last time I checked.  Now we're down to 150.  I'm
7    not certain I have a full understanding of do we have now a
8    final privilege log as to 150, or do I have to rely on the
9    privilege log that we were talking about when you-all said the
10   number was 220?
11         MR. KERCHER:  So the most recent information that we
12   provided, we provided on Friday evening shortly before the
13   plaintiffs filed their reply, and so the information we
14   supplied to the Court which included sort of condensed
15   privilege logs, to give you a sense of what the documents
16   were, will not include the changes that are made in the
17   amended exhibits to their reply.  So it's clear as mud, Your
18   Honor.
19         THE COURT:  Yeah, it is, and that's why I'm glad I'm
20   asking the questions.
21         Okay.  So we'll try to figure out amongst us all
22   which 150 we're actually now talking about.  So I understand
23   now we're still asserting though investigative privileges and
24   attorney-client privileges as to those 150, right?
25         MR. KERCHER:  That's right.  There are also two

1  documents of which we are asserting the deliberative process

2  privilege.

3       THE COURT:  Two documents on deliberative?

4       MR. KERCHER:  *(Nodding head)*

5       THE COURT:  Okay.  So let's work through these

6  privileges one at a time from the State's perspective.

7       So I highlighted for you-all last week, I'm kind of

8  confused about this investigative privilege because the State

9  sort of led me to believe based upon your filings —— so let's

10 backtrack so we all have an understanding.

11      Initially, the Secretary of State and the Office of

12 the Attorney General were trying to argue that they shouldn't

13 even be sued on these SB 1 challenges because "We have nothing

14 to do with enforcement of SB 1."

15      So I recall these conversations and which make me

16 think now all of a sudden when I see that you are now trying

17 to invoke an investigative and attorney-client privilege, if

18 your first position was, "We have nothing to do with SB 1,

19 we're not proper defendants," how are you now arguing that you

20 have some kind of investigative privilege and you have some

21 type of attorney-client privilege that you're now invoking?

22      It seems to me that you are taking two very

23 inconsistent positions.  That's a charitable way of saying it.

24 An uncharitable way of saying it is:  Did you lie to me

25 before, or are you lying to me now?

1              MR. KERCHER:  I prefer the first way you posed the
2    question, Your Honor, but I appreciate the diplomacy.
3              The short answer is that it's well-established that
4    investigation alone does not by itself provide an avenue
5    around sovereign immunity through the Ex Parte Young
6    exception.  "Investigation without prosecutorial authority
7    does not constitute the kind of restraint that constitutes the
8    sufficient enforcement connection to a statute."
9              The Fifth Circuit issued an opinion two weeks ago,
10   June 28th, on a very — on virtually the same issue, if I
11   could approach the Court with a copy of the case.
12             Your Honor, the case that I've handed you is
13   *Ostrewich versus Tatum*.  This was a case where a voter went to
14   a polling location wearing a shirt that spoke about one of the
15   issues that was on the ballot and the polling judge said you
16   can't wear that shirt here.  So the voter sued alleging that
17   that election code provision violated her First Amendment.
18             She sued the Attorney General and the Secretary of
19   State.  And the Attorney General and Secretary of State in
20   that case also pled sovereign immunity and said that they
21   lacked sufficient enforcement connection to the election code
22   provision at issue.
23             The Court lays out how in that case, just like in
24   this case, the Secretary of State receives information about
25   alleged election code violations and then makes referrals of

1  that information to the Attorney General's Office for further

2  investigation.

3          And in that context the Fifth Circuit held that that

4  kind of investigation of –– the investigation of criminal

5  violations of election code provisions does not suffice as an

6  enforcement connection pursuant to Ex Parte Young.

7          So simply because the Attorney General's Office and

8  the SOS, to a lesser degree, are performing these

9  investigations, that does not create a sufficient enforcement

10  connection in order to get around sovereign immunity under Ex

11  Parte Young.

12          THE COURT:  So that helps; thanks.

13          So now what I'm hearing you–all keep on arguing is

14  this whole lawsuit should not be occurring because we have

15  sovereign immunity.  That seems to be your argument, right?

16          MR. KERCHER:  That is one of the arguments, yes, Your

17  Honor.

18          THE COURT:  Yeah.  And so we've already disposed of

19  that one, right?

20          MR. KERCHER:  Yes, Your Honor.

21          THE COURT:  Yeah.

22          MR. KERCHER:  So, I'm sorry, my answer was designed

23  to address your concern about whether or not we were making ––

24  taking inconsistent positions.

25          THE COURT:  So it wasn't all that clear in your

1  responses to motions to dismiss that were making that kind of
2  an argument.  It sounded more like you-all were saying we've
3  had nothing to do with this, we have no enforcement at all
4  that we do.
5          And then, what's more troubling is the DOJ's filing
6  just, I guess today or yesterday, I can't remember when it
7  came in, saying that you-all were giving misleading answers in
8  depositions about what you-all do and instructing the witness
9  not to answer questions.  And I found that even more
10  troubling, and the question that was being asked was something
11  about just basically more — how does a process work, not even
12  dealing with any specifics.
13          You guys aren't giving up anything in this case.  And
14  then one of the documents that you have now withheld in its
15  entirety is just a Texas ethics form that all officeholders
16  have to file as a matter of public record, yet you-all are
17  keeping that document not produced.
18          I mean, how do you explain all of that?
19          MR. KERCHER:  Well, regarding the allegations about a
20  witness being instructed not to answer, so those have come up
21  in two places, right?  The DOJ filed notice, I believe it was
22  yesterday after the parties met and conferred.  At the end of
23  that meet and confer the parties agreed to continue to discuss
24  and I think DOJ has indicated they are going to provide us
25  with some additional specific examples so that we can hash out

1  precisely what the disagreement is or whether there is a

2  disagreement at all.  I think that we do have disagreement.

3  I'm not quite sure exactly what those parameters are because

4  we've just begun to discuss it.

5          The other place that's come up is in a reply filed by

6  the plaintiffs, and that's not, that's not duplicitousness on

7  their part, they at the time I think they filed their motions

8  the subject declaration had not yet been filed.  So we haven't

9  had an opportunity to brief that.

10          What I can tell you is that if you take a look at the

11  declaration that is at issue you will see that Mr. White,

12  Jonathan White, the declarant, talks about information that he

13  has learned based on his experience as an investigator and as

14  a prosecutor.  What he does not do is provide nonpublic

15  information about ongoing investigations.

16          There are some places where he talks about some

17  specific investigations, but either those investigations have

18  turned into prosecutions or else the information he provides

19  is public.  The plaintiffs, both — the DOJ and the plaintiffs

20  here have suggested that there are portions of that

21  declaration that get at information that they don't feel that

22  they got during the discovery period.

23          Now, keep in mind, Mr. White was deposed twice, once

24  as a 30(b)(6) witness and once in his individual capacity.

25  And it is certainly true that —

1      THE COURT:  You want to slow down just a little bit.

2      MR. KERCHER:  I'm sure.  Thank you for reminding me.

3      It is certainly true that there were times when we

4  objected to — injected and instructed the witness not to

5  answer to the extent that the answer would invade the

6  investigative and other privileges.

7      THE COURT:  But are you allowing — so I guess this

8  goes back to my harboring concerns about just the whole

9  position from the beginning.  I mean, aren't the plaintiffs,

10  and, frankly, the citizens of the state of Texas, don't we get

11  to know what the Secretary of State's Office does and what the

12  Attorney General's Office — I'm not talking about every

13  specific, but I'm talking about in generalities.

14      Don't we all have a right, and the plaintiffs in this

15  case, have a right to know what is the extent that the

16  Secretary of State investigates?  And I don't understand the

17  duplicativeness of this whole process.  Why does the Secretary

18  of State's Office even do this preliminary vetting, only then

19  to pass it on to the Attorney General, who then takes the

20  position, well, I can't actually prosecute anybody.

21      I mean, what is the purposes of the investigation and

22  the multiple aspects of this?  None of it makes any sense to

23  me.

24      MR. KERCHER:  So I hear a couple of questions there.

25  I'll try to address them in turn.

1          You are right, of course, that transparency in

2     government is important.  That is not without exceptions.

3     Think, for example, about public information requests.

4          THE COURT:  Right.  So I paraphrased this starting by

5     just general propositions of just what takes place, not any

6     specifics.  And it seems to me that you're not allowing those

7     generality discussions to be elicited in deposition.

8          MR. KERCHER:  And that part I think is where the

9     parties disagree, Your Honor, and that's why we have asked and

10    we met and conferred yesterday and DOJ was very polite and

11    forthright and very helpful in sort of setting out the buckets

12    where they have concerns, but we are trying to drill down and

13    figure out precisely what the concerns are.

14         At the moment, DOJ and perhaps plaintiffs are

15    pointing at certain places in a deposition where they feel

16    like the answer may have been cut short, and State defendants

17    are pointing to other portions of the deposition where

18    Mr. White discusses at length an exhibit, a slide show on how

19    to go about investigating these kinds of -- these kinds of

20    election fraud, or election code violations, including things

21    like vote harvesting.

22         THE COURT:  So, I mean, you've raised these

23    privileges, how am I supposed to rule on these privileges

24    though if I don't have an understanding of just what your

25    office -- what the Secretary of State's Office does?

1          I don't understand how there's an attorney-client

2    privilege when no one explains to me the Secretary of State

3    personnel, who are they actually talking to, and who is the

4    client, and what legal advice is being sought.  None of that

5    is apparent from any of the affidavits you've all provided in

6    support of your privileges.  Am I wrong, or not?

7          MR. KERCHER:  I would agree that there is not that

8    kind of level of detail in the declaration that we attached to

9    our response, but some of that information can be gleaned from

10   the privilege logs.  So, for example, there are some — you

11   seem skeptical.

12         THE COURT:  Yeah; I am.  I didn't glean it, if it's

13   there.

14         And the investigative privilege, so the investigative

15   privilege is not a wholesale privilege.  And so here the Fifth

16   Circuit *In Re: Department of Homeland*, 459 F.3d 565, it says,

17   "This privilege protects government documents relating to an

18   ongoing criminal investigation."

19         It's not apparent from the affidavit you've all

20   provided that this is an ongoing criminal investigation as

21   opposed to it could be a civil investigation that's going on.

22   You-all didn't provide any specificity to that.

23         The Fifth Circuit goes on, "The privilege is bounded

24   by relevance and time constraints."

25         So it does not apply to people who have been

1   investigated in the past but are no longer under

2   investigation.  The affidavits you-all provide to me don't

3   tell me any kind of detail about we're continuing to

4   investigate this person, and so now going — how I do back to

5   the motion to dismiss problem, is the Secretary of State, I'll

6   break up each department as opposed to the Attorney General's

7   Office, the Secretary of State has always taken the position,

8   "We have nothing to do with the criminal enforcement," so how

9   can you, how can the Secretary of State invoke this

10  investigative privilege which deals just with criminal

11  investigations?

12          MR. KERCHER:  So, again, I'll try to take that in

13  parts.

14          First, Your Honor, you mentioned that the privilege

15  is limited in time and scope, and there is no argument that

16  State defendants has, as the privilege has fallen away from

17  these criminal investigations, produced those documents.  So I

18  would respectfully push back on the idea that State defendants

19  are not producing anything.

20          As these investigations close and we go back every so

21  often and talk to criminal investigations and the election

22  fraud unit at OAG and ask can we have an updated list of these

23  to figure out whether or not they are ongoing.  As we get that

24  information, we do produce those documents.  So it's not as if

25  we're saying, no, you can't have any of this.  As those

1 investigations stop, we do turn those over and we've made I

2 think at least three supplemental productions where we've done

3 that.

4 Going to the question about how can it possibly be

5 true that SOS has said in these motions to dismiss that

6 they're not enforcing that they are nevertheless doing this

7 investigation, I want to talk first about what SOS's position

8 was in those motions to dismiss and second about what it is

9 that they are doing.

10 Their position in those motions to dismiss uses the

11 word "enforcement" as that word is legally cognizable in the

12 standing and sovereign immunity context, which means that that

13 enforcement has to constrain, which is what that *Ostrewich*

14 *versus Tatum* case talks about.

15 So it doesn't mean they are not touching it.  Doesn't

16 mean they're not doing anything.  It means that their

17 enforcement connection to the statute is insufficient for

18 those legal burdens.

19 THE COURT:  Okay.  So if I'm just dealing with right

20 now with an investigative privilege, is it the position of the

21 Texas Secretary of State that it is authorized to do criminal

22 investigations?

23 MR. KERCHER:  It is, Your Honor, in this limited

24 context which was going to be the second part of the answer.

25 The obligation of the SOS is as it receives

1    information about alleged election code violations, as it

2    reviews the four corners of that allegation and makes a

3    determination whether or not it should be referred to the OAG

4    for further investigation.

5          THE COURT:  So that's not an answer to my question.

6    My question is:  Is it the position of the Texas Secretary of

7    State that it does criminal investigations?

8          MR. KERCHER:  Within the confines of what I've

9    described, the answer is yes.

10          THE COURT:  So what you're describing to me is they

11    do not do criminal investigations, all they do is a referral

12    to the Attorney General's Office for any criminal prosecution.

13          MR. KERCHER:  That's not quite right.  What they do

14    is they make an evaluation of that four corners of the

15    allegation.  They refer it to the OAG.  The OAG then does its

16    own investigation and refers that information to local

17    prosecuting authorities.

18          THE COURT:  So it's the position of the Texas

19    Secretary of State that it does do criminal investigations and

20    that it can, it, without the Attorney General's Office, the

21    Secretary of State has the power to basically not pursue

22    criminal investigations any further after they do a

23    preliminary screening?

24          MR. KERCHER:  It makes the determination about

25    whether to refer them to the OAG, yes.

1          THE COURT:  And so it's made determinations in the
2   past not to send stuff to the OAG.
3          MR. KERCHER:  It has.
4          THE COURT:  So what does the OAG do?  It does
5   criminal investigations to what end?
6          MR. KERCHER:  So the OAG's investigation is a more
7   fulsome investigation.  It's not limited to the four corners
8   of the initial allegation of wrongdoing and they conduct a
9   full criminal investigation pursuant to the criminal
10  investigations unit which often is used in conjunction with
11  local law enforcement or with local prosecutorial authorities.
12         THE COURT:  But so how does the OAG send a criminal
13  investigation — the OAG does not bring — it's not like
14  Kentucky or other commonwealths where the OAG comes into a
15  courthouse and files suit, so what does the OAG do?
16         MR. KERCHER:  I think it's originally intended, Your
17  Honor, there was some prosecutorial authority for the OAG but
18  the *Stephens* decision from the Texas Court — from appeals has
19  been dispositive of that.  That's the language from the Fifth
20  Circuit opinion I gave you.
21         So my understanding is the OAG does not have the
22  authority to, by itself, bring that criminal prosecution.  It
23  has relationships with local prosecutors, local DAs that
24  provides those information, that case file, to local
25  prosecutors to make decisions about whether or not to bring

1  charges.

2          THE COURT:  Yeah.  And so do you stand by your

3  affidavits in support of the privileges you invoked, or do you

4  need to amend your affidavits to these 150 documents?  I give

5  you the choice.

6          MR. KERCHER:  If the Court is offering the

7  opportunity to file additional detail we will certainly take

8  it.  If the Court is asking whether we would like to change

9  our position as to the legal issue, the answer is no.

10          THE COURT:  No.  Yeah, I'm not asking you to do that

11  part.  I'm asking — I'm saying that there's been factual

12  insufficiencies.  Over here they are claiming you have waived,

13  and they ought to —

14          So I already know this is going to the Fifth Circuit

15  again and so I already know what I'm up against.  So I'm

16  giving you guys yet another opportunity to cure your defects,

17  because I've given you opportunities in the past and then I

18  get new arguments raised for the first time at the Fifth

19  Circuit, which they generously seem to take up without giving

20  me the opportunity to address them in the first instance.

21          Your affidavits have not shown that these are ongoing

22  investigations, that they are criminal investigations.  They

23  are lacking specificity.

24          And the Fifth Circuit has said, in this *Homeland*

25  *Security* case, people who are merely suspected of a violation,

1    without being part of an ongoing criminal investigation, are
2    not part of this investigative privilege, and people who have
3    violated only civil provisions are not part of this
4    investigative privilege.
5            I don't know how I can make all these kind of
6    determinations based upon the affidavits you've given me so
7    far.
8            MR. KERCHER:  I take your point, Your Honor.
9            THE COURT:  And then with regard to the
10   attorney-client privilege, so let's break this up between
11   Secretary of State and Attorney General.
12           Who is the client in the Secretary of State?
13           MR. KERCHER:  Like any corporate entity, Your Honor,
14   the Secretary of State's Office is the client, and these
15   discussions were being had in service of the allegations of
16   that organization.
17           THE COURT:  So the investigator is a nonattorney?
18           MR. KERCHER:  I think most of the attorney-client
19   documents at issue involve attorneys who are working the
20   elections division of the Attorney General's Office.  They
21   will sometimes include some additional folks who are not in
22   that section, or who were a part of a broader section, for
23   example, Kristi Hart is the Director of Voter Registration.
24   She appears in some of these documents.  Kate Fisher is an
25   Executive Assistant in charge of public information requests.

1   She appears in some of these documents.

2          So you have some nonattorneys who appear in these

3   email chains, which is mostly what we are talking about in the

4   attorney-client context, but when these attorneys are talking

5   either with these non-attorneys or as part of the elections

6   division of the Attorney General's Office making legally,

7   making legally significant decisions about how to execute the

8   Office of the Secretary of State, including providing guidance

9   to local authorities, they are talking to the organization

10  which is their client.

11         THE COURT:  And what am I to make of some of these

12  documents that you are withholding, or I thought you were

13  withholding; I'm not sure.  They're part of the 150, but one

14  document in particular that I saw was some, I'll just call it

15  concerned citizen for lack of a better — and he or she sends

16  this letter to you, to the Secretary of State's Office, it's a

17  letter, and she includes the ethics complaint form but in the

18  transmittal letter she includes all these other organizations

19  that she's gratuitously copying for.

20         Doesn't that waive any privilege?

21         MR. KERCHER:  So the — where we have redacted

22  portions of these email strains that begin with a citizen

23  complaint like you've described, we have redacted that portion

24  as part of the investigative privilege because that's how

25  sometimes these investigations start.  So what you'll see, and

1    I'm —

2            THE COURT:  My point is, isn't the whole transmittal

3    letter of that concerned citizen not privilege because it's

4    included a whole bunch of other organizations that are not

5    governmental entities at all?

6            MR. KERCHER:  To the extent that it is a part of an

7    ongoing investigation, has been provided to the State as a

8    part of that, I think the investigative privilege nevertheless

9    applies.

10           THE COURT:  Yeah, that's my whole problem with that

11   whole theory that is still up at the —

12           Is this still up at the Fifth Circuit?  Are we still

13   waiting for a decision from the Fifth Circuit?

14           MR. KERCHER:  On the enforcement connection?

15           THE COURT:  Well, on all these privilege issues.  We

16   still have a pending Fifth Circuit appeal, right?

17           MR. PARRENO:  Your Honor, if you are referring to the

18   privilege disputes from *LULAC Texas v Hughes*, that was

19   resolved.

20           THE COURT:  Yeah, one was resolved.

21           MR. PARRENO:  Yes, but the Fifth Circuit in that

22   opinion expressly did not address any of the other privileges

23   at issue from the May 25th —

24           THE COURT:  Right; that's the one I'm waiting on.

25           MR. PARRENO:  Yes.  So in the footnote the Fifth

1    Circuit says that the other privileges are not addressed, that

2    only the legislative privilege is addressed in that opinion.

3              THE COURT:  Yeah.

4              MR. KERCHER:  Sorry, Your Honor.  The Benton court

5    appeal, I believe, is still up.

6              THE COURT:  So then if I understand your position, so

7    the State of Texas can receive documents from the Harris

8    County folks and it's all now subject to the legislative

9    privilege and so now we're going to take this even one step

10   further.  As part of the investigative privilege concerned

11   citizens can send their letters to you-all and copy half the

12   world, and it still gets all covered with this privilege.

13             MR. KERCHER:  Because what matters — the answer is

14   yes, because what matters is what these State agencies do with

15   them, Your Honor.

16             The important thing to remember about these

17   investigative privileges is who is harmed if they are — if

18   the privilege goes away while things are under investigation,

19   and, yes, I've read the same Fifth Circuit opinion you are

20   looking at.  I wondered whether we read language about those

21   who are merely under suspicion of having committed a crime

22   means people who are the target of an investigation.  That's

23   not clear to me from that line.

24             THE COURT:  Well, I don't write this stuff.  I just

25   read it.

1          MR. KERCHER:  That's not a criticism.  Far be it for

2    me, Your Honor, to criticize the judge, at least while he's in

3    the room.

4          I'm just saying there is some ambiguity, I think, in

5    the language of that opinion, but there are also other people

6    who can be described in these investigations, people who may

7    be witnesses, people who may have only ancillary attachment to

8    these investigations, and so, yes, it is, of course, the State

9    that is asserting this privilege in litigation where it's a

10   defendant, that's true, but those are not the only people

11   interested in these investigations.

12         Now, I understand the need for transparency, but it

13   has long been the case that that transparency yields when

14   something is under active investigation.

15         THE COURT:  So only half of the blue-gray world gets

16   this document, and that's perfectly fine, but the other half

17   of the world does not.

18         MR. KERCHER:  It would be interesting, indeed, if

19   someone had sent the third-party subpoenas to one of those

20   other entities, but that's not where we are.

21         THE COURT:  So with regard to the two documents that

22   are subject to this deliberative process privilege, what's

23   that about?

24         MR. KERCHER:  So these are reports that are not —

25   that are preliminary and have not yet gone out that will be

1  provided I believe to the legislature under a provision of the

2  election code that's not related to SB 1.  It's 127, Chapter

3  127 that requires the creation of an audit.

4         Chapter 127 was passed in the 87th legislature's

5  regular session, so it was passed prior to SB 1.  The report

6  does not address SB 1 provisions, and I don't understand

7  plaintiffs' argument to suggest otherwise.  Their argument is,

8  instead, that the audit performed under 127 may provide some

9  information about the effects of SB 1.

10        This is classic deliberative process where the SOS is

11 trying to figure out what precisely its message is going to be

12 under these obligations under 127 where they collect this

13 information, cultivate it, and provide it to the legislature.

14 It will become public at some point, but right now they are

15 only asking for drafts, and that is deliberative process

16 because it's pre-decisional.

17        THE COURT:  So these two documents are drafts of work

18 product that originated in the Secretary of State's Office and

19 is still germinating in the Secretary of State's Office?

20        MR. KERCHER:  That's correct.

21        THE COURT:  And you-all haven't sent it out to

22 interested parties outside the office?

23        MR. KERCHER:  That's correct.

24        THE COURT:  What say you-all?

25        MR. PARRENO:  Thank you, Your Honor.

1    We will go ahead and start with the investigative
2  privilege since those are the largest bulk of the documents,
3  and for the -- again, I point to the -- the Court to LUPE
4  plaintiffs' amended exhibits to indicate the documents that we
5  believe are the narrow subset of documents that are still in
6  review.  And regarding the investigative privilege, that
7  refers to LUPE plaintiffs' amended Exhibit K, just for the
8  Court's awareness.
9         THE COURT:  So to make sure I understand what you're
10  telling me, your Exhibit K is going to tell me the 150 that
11  are at issue right now?
12         MR. PARRENO:  The documents that are at issue with
13  respect to the investigative privilege.
14         THE COURT:  Okay.
15         MR. PARRENO:  That's amended Exhibit K filed on
16  Friday with LUPE plaintiffs' reply.
17         THE COURT:  Okay.
18         MR. PARRENO:  The same will be true of the other
19  amended exhibits that accompany the reply that was filed on
20  Friday.  Based on our review, that covers -- there's no
21  document in those exhibits that is missing from or was -- that
22  is the narrow subset addressing the issues that LUPE
23  plaintiffs has.  I apologize.
24         So regarding the investigative privilege, LUPE
25  plaintiffs agree that the -- with the Court's assessment and

1  with the clear language by the Fifth Circuit that "a necessary

2  condition for the investigative privilege to apply is that

3  there is — a necessary condition for the investigative

4  privilege to apply is that there must be an active, ongoing

5  criminal investigation."  Here, the State has failed to meet

6  its burden regarding that showing.

7          THE COURT:  So how are you going to be harmed by me

8  giving them yet another chance to amend their affidavit to

9  assert that, if that is, indeed, the case.

10          MR. PARRENO:  We — given the proximity to trial,

11  that would be prejudicial, but in the event that the Court

12  does grant additional time —

13          THE COURT:  Well, we know where this is going to end

14  up, right?  If I don't do that and I order them to produce it,

15  we're going to have yet another interlocutory appeal, right?

16  That's just what's going to happen.

17          MR. PARRENO:  I won't hypothesize about what the

18  State will be doing, but we would ask for leave from the Court

19  to address any —

20          THE COURT:  You know, it doesn't take a rocket

21  scientist to figure it out.  Every time I order something

22  there's an interlocutory appeal.  So after the third time

23  around I'm expecting I'm going to order something and there

24  will be an interlocutory appeal.

25          MR. PARRENO:  Understood, Your Honor.  Thank you.

1    But we would ask for that opportunity to submit
2    briefing in response to any additional or revised affidavit,
3    if the Court does grant that opportunity to.
4        THE COURT:  Okay.  So let's assume I give them an
5    opportunity to revise their affidavits in support of their
6    privileges, the investigative privilege is not bounded -- "The
7    privilege is bounded by relevance and time constraints."  What
8    does that language in the Fifth Circuit mean and what does it
9    mean to you-all?
10        MR. PARRENO:  Yes, Your Honor.  We would say that
11    that language points to the ten Frankenhauser factors that the
12    Court must take into consideration whether determining whether
13    the investigative privilege does apply.
14        The Fifth Circuit has made clear that though an
15    active ongoing criminal investigation is a necessary condition
16    for the privilege to apply, the Court must still balance.  It
17    is not sufficient and the Court must still balance the other
18    nine factors at play in those --
19        THE COURT:  Under the ten factors in Frankenhauser?
20        MR. PARRENO:  The ten total factors, yes.
21        And so based on those ten factors on balance even if
22    these documents were still part of an active ongoing criminal
23    investigation, they should be disclosed.
24        THE COURT:  Okay.  Now get to here, why, how badly do
25    you need them, what do you believe they are going to show,

1  what's the relevance to your causes of action that you are

2  pleading.  Help me; explain why you-all need these things so

3  badly.

4          MR. PARRENO:  Of course, Your Honor.

5          So these documents are extremely relevant because

6  they show and address a number of the provisions or the

7  enforcement around a number of provisions of SB 1 that LUPE

8  plaintiffs challenge.

9          For example, as reflected in amended Exhibit K, there

10  are a number of entries that address election complaints

11  submitted regarding vote harvesting provisions.  Our clients

12  do voter outreach and it's highly relevant that we find out

13  what effect the enforcement of SB 1 is having on these

14  individuals.

15          The same is true regarding the entries related to

16  investigations about in person voter assistance, ballot by

17  mail, and some complaints submitted about Spanish-speaking

18  voters and potential discrimination as to those individuals.

19          This is the first — these documents relate to the

20  first general election in which SB 1 has been in effect and

21  that is going to be crucial or rather extremely relevant to

22  LUPE plaintiffs, at the very least, discriminatory effects

23  claims going forward and potential effects on chilling of

24  speech.

25          So given the nature of the LUPE plaintiffs' claim as

1  well, the civil rights nature of the suit, voting rights

2  implicated, the relevance and the nature of the claims in

3  balance with the other factors means that the privilege should

4  not apply in such situations.

5          Other courts, including courts in this circuit, have

6  concluded that even where there is an ongoing act of criminal

7  investigation, that the investigative privilege should not

8  shield these documents or documents like these.

9          And so, here, the same should apply, but that isn't

10  the only reason why the investigative privilege shouldn't

11  shield some of these documents.  As we noted in our reply

12  submitted on Friday, the introduction of the Jonathan White

13  declaration introduces a waiver issue regarding the privilege.

14          THE COURT:  The slight abuse of it, yeah.

15          MR. PARRENO:  Yes, Your Honor.

16          THE COURT:  Just so we're all in the same boat, he

17  opines or testifies to some matters but now they want to keep

18  out other matters.

19          MR. PARRENO:  That's correct, Your Honor.

20          And the declaration itself, and as noted in the

21  reply, in LUPE plaintiffs' reply, the declaration makes broad

22  statements about how alleged illegal activity is performed

23  noting throughout his — relying on his experiences related to

24  vote harvesting, mail ballots, in person voter assistance,

25  these are all at issue in LUPE plaintiffs' operative complaint

1    here, and the defendants can't have it both ways.  They can't

2    use this information as a sword and now rely on privilege as a

3    shield to keep that information out.

4          So, for example, in the declaration, paragraphs 18

5    through 23, the Jonathan White declaration talks about

6    prosecution of an individual named Zul, and that discusses and

7    reflects OAG's role in prosecuting at the invitation of the

8    local district attorney, and that also speaks to the

9    distinction here from some of these other Fifth Circuit cases

10   that shows the tie between the Office of Attorney General's

11   rule and enforcing SB 1 and addressing some of the immunity

12   issues that were addressed earlier, but the broader point

13   here, or rather the more relevant point to the instant motion

14   is that this declaration selectively waives some of the

15   privilege issues that are in dispute and those are

16   specifically investigative privilege assertions over documents

17   in the possession of the Office of the Attorney General.

18         THE COURT:  And the attorney-client deliberative

19   privileges, what about those?

20         MR. PARRENO:  Yes, Your Honor.

21         The attorney-client privilege has been — the State

22   has asserted, has inappropriate — or improperly asserted the

23   attorney-client privilege for three reasons.

24         First, the attorney-client privilege, as the State

25   acknowledges, applies to communications not to underlying

1  facts.  A number of the documents included in the —— in our

2  amended exhibits and notified in these —— or included in these

3  privilege logs, and specifically I would point the Court's

4  attention to amended Exhibit H, reflect documents that contain

5  underlying factual information.

6        That information is not covered by the

7  attorney-client privilege.  That information includes, for

8  example, information related to election protocols,

9  investigations, solicited information about voter misconduct,

10 the exact type of information that this Court concluded that

11 it constitutes underlying factual information in its May 25th,

12 2022 order.  That type of information is exempt from any

13 protection from the attorney-client privilege and should be

14 disclosed here.

15       THE COURT:  So are they going to, and are they

16 arguing, well, even though it may not be —— the underlying

17 factual information may not be subject to the attorney-client

18 privilege, it relates back to the investigative privilege,

19 aren't those things tied together?

20       MR. PARRENO:  In some instances the State has

21 asserted both the investigative privilege and the

22 attorney-client privilege, but, Your Honor, it looks like

23 the —— it looks like the amended Exhibit H, a number of those

24 documents ——

25       THE COURT:  Are just stand-alone ——

1          MR. PARRENO:  —— are stand—alone attorney—client

2     privilege, Your Honor, and for that, we don't need to have a

3     discussion about the propriety of the scope of investigative

4     privileges.  It is the State's burden to assert the privilege

5     at this point.  They've only asserted the attorney—client

6     privilege, so there's no question that if there's any

7     underlying factual information in those documents that

8     information must be disclosed.

9          THE COURT:  And the deliberative privilege?  I mean,

10    they are saying they created this stuff in—house at the

11    Secretary of State's Office, it's not a final product, it

12    hasn't been released to anybody yet, so why is that not

13    covered by deliberative process?

14         MR. PARRENO:  Your Honor, if I may turn back to the

15    attorney—client privilege, finish that up, and then address

16    your concerns about the deliberative process privilege.

17         We also have two additional reasons for why the

18    attorney—client privilege doesn't shield the documents at

19    issue.  The first of those two is that these documents —— the

20    State has failed to meet its burden to show that these

21    documents were created for the primary purpose of seeking

22    legal advice.

23         These documents reflect in potentially investigations

24    or discussions about election protocols like agency

25    decision—making, not information that is squarely within an

1    attorney-client communication that is sought for the purpose
2    of legal advice and primarily for the purpose of legal advice.
3    So, for example, one of the documents that's — of
4    which attorney-client privilege is asserted is the report or
5    is a report related to — a draft legislative report on the
6    November 2020 election.  This is something that is a policy or
7    strategic or political decision, something that is exempt from
8    the scope of the attorney-client privilege.
9    The State isn't even asserting in these privilege
10   logs that any of the information or any other documents are
11   sought for the primary purpose of seeking legal advice, and so
12   by not doing so and from the context of the documents
13   themselves the State has failed to show that these documents
14   qualify for the privilege in the first instance.
15   And then the second of the reasons that I addressed
16   is that a subset of these documents, about eight of them, and
17   these are on amended Exhibit I, these documents show
18   communications only between attorneys at the Secretary of
19   State's Office.
20   It goes without saying that the attorney-client
21   privilege requires communications between an attorney and a
22   client.  The State has not met its burden to show that there
23   is such a communication, showing who the client was, who the
24   requesting individual was, did not show what the purpose was,
25   why this was — this communication was tied to the purpose of

1    seeking legal advice.

2          It's the State's burden to sufficiently allege this

3    information and it has not done so, and so fails to satisfy

4    the standard for the attorney-client privilege.

5          THE COURT:  So being generous to them, I mean, would

6    it be work product?

7          MR. PARRENO:  The State has waived the ability to

8    assert the work product doctrine, and, in fact, had the

9    opportunity in some instances and withdrew the assertions of

10   the work product doctrine.

11         MR. KERCHER:  I can probably shed —

12         THE COURT:  One second.

13         You are saying they withdrew the assertions to the

14   work product?

15         MR. PARRENO:  They were — technically two documents

16   in early on — the third process of which the work product

17   doctrine was asserted, they withdrew that assertion and have

18   not since or at any point asserted the work product doctrine

19   over any of these documents that remain at issue in LUPE

20   plaintiffs' motion, so that would result in waiver of that

21   privilege.

22         THE COURT:  I'll let you — let me — let him finish

23   up and then I'll come back.

24         MR. KERCHER:  Sure.

25         MR. PARRENO:  Thank you, Your Honor.

1           And the last is the deliberative process privilege.

2    Similar to the attorney, that privilege is improperly asserted

3    for three reasons.  First, the State has only in its response

4    included an affidavit from the Secretary of State official.

5    It's the State's burden at the time the privilege is asserted

6    to include such an affidavit or information or any invocation

7    of the privilege by an agency official, not trial counsel, and

8    by belatedly doing so, including such a declaration, the State

9    has waived any entitlement to the privilege.

10          Second, similar to the attorney-client privilege, the

11   deliberative process privilege does not cover underlying

12   factual information.  The State actually concedes in its

13   response that there is factual information in these two

14   documents but doesn't make the necessary showing to indicate

15   that these facts are inextricably intertwined with agency

16   decision-making, the necessary standards to meet in order to

17   invoke the deliberative process privilege.

18          And then finally, for the reasons that we've

19   articulated in our motion and our reply, the qualified

20   deliberative process privilege yield, given the relevance of

21   the information to LUPE plaintiffs' claims, and the balance of

22   the remaining factors under the five-factor test.

23          THE COURT:  So before I go back to the State, DOJ, do

24   you want to chime in, or not?

25          MISS PAIKOWSKY:  Your Honor, we filed our notice

1  yesterday for the limited purpose of informing the Court that
2  this issue was occurring, that we were engaging in the meet
3  and confer process, and because we recognize there might be
4  some substantive overlap with the motion before you today and
5  we didn't want to have to come back, you know, unnecessarily
6  or retread ground, but we're not a party to the LUPE
7  plaintiffs' motion to compel and we see these issues as, you
8  know, as I said, there are some substantive overlap but
9  distinct.
10          THE COURT:  Thank you.
11          So for the State.  Now, so what I'm thinking about
12  doing is giving you until Friday, close of business this
13  Friday, the 14th, to file new affidavits, if you so desire, to
14  specify with greater detail why you may properly invoke
15  investigative attorney-client privilege or deliberative
16  privileges to these 150 documents in dispute, and, to be
17  generous, because I've been accused otherwise, of letting you
18  assert work product, if that's what you meant and
19  inadvertently left out.
20          So you have until — and this is just thoughts right
21  now.  This isn't the order yet.  You-all doing this by close
22  of business this Friday.  Perhaps that will bring down the 150
23  documents even further, because upon re-evaluation maybe the
24  State will concede that some of these documents were not —
25  are not reflective of ongoing criminal investigations.

1          Perhaps upon further review you'll also decide
2    whether or not some underlying factual information, instead of
3    a whole redaction, maybe can be a partial redaction.
4          What's wrong with that idea, and what else do you
5    want to tell me?
6          MR. KERCHER:  I think that idea makes sense from our
7    perspective, Your Honor.  I do think that, and I appreciate
8    plaintiffs having been willing to work with us on this, I
9    think we've whittled this down from what was a whole lot more
10   to a whole lot fewer.
11         On that, there is a question in my mind that talked
12   about 150 documents.  I don't know because the way that they
13   have broken them out in their exhibits they don't show which
14   documents have two exhibits, have two, so it could be fewer
15   than that.
16         THE COURT:  Yeah.  It is very muddy for me.
17         I, frankly, I think after close of business — well,
18   so Friday you do whatever you're going to do by close of
19   business Friday, and then perhaps that following Monday close
20   of business you-all tell me what's left for me to rule on and
21   which exhibits specifically I need to review further in camera
22   to make a decision based upon any new affidavits that may be
23   filed.
24         If the Secretary of State and the Attorney General
25   take the position we're going to rely on our existing

1  affidavits, well, then so be it.  I'll make a decision on that

2  basis.  But it's confusing to me what 150 we are talking

3  about.

4          MR. KERCHER:  And we will see if we cannot work with

5  plaintiffs to provide a single document to the Court that

6  clarifies what exactly is at issue so we can all sort of look

7  at one piece of paper or one list anyway and figure that out.

8          THE COURT:  Anything else you want to argue?

9          MR. KERCHER:  No, Your Honor.

10          With trial now 60 days away, we look forward to

11  additional guidance from the Court about time allocation and

12  all the good stuff that we need to get down to nuts and bolts

13  on in order to try this if we're going to go forward on

14  September 11th.

15          THE COURT:  So, you know, the fact that we're still

16  waiting on the Fifth Circuit to make a significant ruling, I

17  don't know what that means for you-all in terms of trial

18  preparation.

19          So last time I talked the Fifth Circuit came out with

20  a decision the next day, so maybe my talking will move things

21  along, but let's assume for argument's sake we're two weeks

22  out from trial and the Fifth Circuit hasn't ruled yet, what's

23  the plaintiffs' intentions?

24          Are you going to seek a continuance?  Are you going

25  to go forward without the discovery you've requested?  You

1 know, just have you guys even thought about how this is all

2 going to play out?

3          MR. PARRENO:  With respect to the instant motion,

4 or —

5          THE COURT:  No.  No.  No.  He's bringing up trial.

6          So have you guys even thought about if the Fifth

7 Circuit has decided it's just not going to rule and we're two

8 weeks before trial and you-all haven't gotten the documents

9 you-all want, what do you think you're going to do?

10          MR. PARRENO:  Your Honor, I'm here to argue the

11 instant motion, if I could please turn to Miss Perales, who is

12 on the Zoom to addresses that question.

13          THE COURT:  So, Miss Perales, you've been given the

14 hard questions.

15          MISS PERALES:  Thank you, Your Honor.  I'm trying to

16 figure out how to turn on my camera and hopefully the Court

17 can hear me.  Thank you very much.

18          Our plan, Your Honor, is to go forward on

19 September 11 with the Court's suggestion of the bifurcated

20 trial and going forward on effects claims as we discussed in a

21 previous hearing.

22          THE COURT:  Does that answer your question?

23          MR. KERCHER:  That's fine with us, Your Honor.

24          As you recall, the parties put together a joint

25 submission about what claims probably could work out and we

1  haven't heard from the Court so we assume the Court has

2  effectively adopted that, is that true?

3         THE COURT:  So now I am, now that I'm hearing that.

4         I mean, that's only viable option I see, given that

5  I'm still not hearing anything from the Fifth Circuit on

6  discovery on what could potentially affect the other aspects

7  of this case.  My hands are kind of tied.

8         MR. KERCHER:  I understand.  And in that vein, I

9  understand there have been some discussions we'll start on the

10  11th, and some days we'll be out, on the 18th and 25th and a

11  couple of other days.  Has the Court considered allocation of

12  time, directly the amount of time the parties will have to try

13  the case?

14         THE COURT:  You know, I was hoping you-all would sit

15  and confer and hash this out.  You-all know this case better

16  than I do.  And if you can't reach agreements, I'll just

17  unilaterally impose stuff on you-all but you-all should be

18  able to talk about this.

19         MR. KERCHER:  Okay.  We'll do it.

20         MISS PERALES:  Thank you, Your Honor.

21         That is the plan.  My friends Mr. Kercher and Miss

22  Hunker and plaintiffs and the United States will confer and

23  come up with something for the Court.

24         THE COURT:  And so, just so we don't leave things

25  dangling, why don't you-all in the next -- let's say by the

1   end of the month, July 28th, close of business, you-all come

2   up with what you-all believe is the results of your meet and

3   confer and what issues remain.  Then we all probably need to

4   sit in a video and hash out amongst us all.

5           Anything else?

6           MISS PERALES:  Your Honor, yes, Your Honor.

7           Mr. Parreno has two additional quick things he wanted

8   to mention not related to the motion.

9           MR. PARRENO:  Actually —

10          MISS PAIKOWSKY:  I'm sorry.  Really quickly, on

11  behalf of the United States.

12          You mentioned July 28th as a deadline to hash out

13  these issues.  Is that a deadline also applicable to the

14  late-stage waiver issues the United States waived in its

15  notice as well, or is that solely applicable to the LUPE

16  plaintiffs' motion to compel?

17          THE COURT:  So I didn't review back my notes in

18  preparation for that point.  The issue of trial just came up

19  here.  Did we talk about including those claims as part of the

20  first trial in this matter, or not?

21          MISS PAIKOWSKY:  United States claim under Section

22  101 of the Civil Rights Act is proceeding to trial.  United

23  States feels it is ready to proceed to trial on

24  September 11th.

25          THE COURT:  The 28th deadline is then applicable to

1  you to talk with the other parties here and figure out how
2  we're going to do that trial.
3          MISS PAIKOWSKY:  Thank you very much, Your Honor.
4          THE COURT:  Yes, sir.
5          MR. PARRENO:  I apologize, Your Honor, just two more
6  things.
7          First, with respect to the Court's opportunity to —
8  or opportunity for the State to assert the work product
9  doctrine, we would respectfully request that the — object to
10 that request, given that the State has had numerous
11 opportunities as revised supplemental privilege on multiple
12 times, has had opportunities to assert that privilege, and
13 here should not be given the opportunity to assert a privilege
14 that it has waived, so we wanted to make sure to —
15         THE COURT:  Yeah.  Your objection is noted and
16 overruled.
17         MR. PARRENO:  Thank you, Your Honor.
18         And here, regarding the one other point, Miss Holmes
19 from the HAUL plaintiffs intends to address the scheduling
20 matter related to future proceedings in the court, so could I
21 turn to her to address that, please?
22         THE COURT:  Go ahead.
23         MISS HOLMES:  Your Honor, Jennifer Holmes on behalf
24 of the HAUL plaintiffs, and thank you for passing the mike to
25 me, Kenneth.

1            I just wanted to raise issue of the pretrial

2    deadlines.  You may recall that the parties submitted a joint

3    advisory, I believe it's ECF Number 615, on May 26th, and in

4    that advisory the parties recommended that the court maintain

5    the pretrial deadlines that were in the -- that were

6    previously in place under the second-amended scheduling order.

7            And I believe the parties are currently operating

8    under those pretrial deadlines but I hope to get clarity about

9    whether the Court took that recommendation to keep them in

10   place and whether they do apply, and, second, we would like to

11   request a limited modification to those deadlines.

12           The parties have conferred and the private

13   plaintiffs, the State defendants, and the intervenors would

14   like to request an extension of the deadlines for the Rule

15   26(a)(3) disclosures, moving that deadline from July 25th to

16   July 28th to give the parties a little bit more time to

17   prepare our disclosures.

18           The United States and the county defendants have

19   advised that they do not oppose this request, and so we would

20   just like to make that request to you, and if you prefer, we

21   can of course put this in writing to the Court.

22           THE COURT:  No, let's just go ahead and hash it out

23   now.

24           Does the State have any objection?

25           MR. PARRENO:  No, Your Honor, we agree.

1              THE COURT:  So that extension is granted.

2              So I was intending that all the -- that what we just

3    discussed on that document number was going to just go

4    forward.  If all of you can agree amongst yourselves about

5    extending anything in the scheduling order, that's approved.

6    If it's opposed, then bring it to my attention.

7              MISS HOLMES:  Understood.  Thank you, Your Honor.

8              MR. PARRENO:  Your Honor, if the Court will indulge

9    one more matter.

10             Your Honor, we want to make sure to alert the Court

11   that the relief in the plaintiffs' instant motion doesn't

12   resolve the entire dispute created by the Jonathan White

13   declaration.  As alluded to by the Department of Justice,

14   there are broader sword and shield issues at issue here.

15             THE COURT:  So let's stop there.  So maybe I'm wrong,

16   I thought there was going to be an agreement to redepose

17   Mr. White.  No?  Yes?

18             MR. KERCHER:  No, not that I'm aware of, Your Honor.

19   No.

20             THE COURT:  Is the DOJ or any plaintiff seeking to

21   redepose Mr. White?

22             MR. KERCHER:  I think at this point the parties

23   have -- we had a first meet and confer on this yesterday and

24   we agreed to continue talking.  We're going to try to drill

25   down to find specific points of disagreement and then we'll

1  have discussions about various ways that there might be,

2  assuming there is a sort of deficit of information, various

3  ways there might be to fill that.

4          Right now we are trying to figure out whether we even

5  agree that there is a — deficit is not the right word, but a

6  deficit of information as a result of this.

7          THE COURT:  This isn't a ruling, but just to tip my

8  hand, I thought you — not you personally.  I don't know who

9  was representing the State.  I thought there was an

10  overassertion of privilege being made because the one question

11  at least that's quoted from the DOJ was an innocuous sort of

12  broad general question about generally how does the operations

13  work, and I thought that was, the instruction not to answer

14  was inappropriate.

15          MR. KERCHER:  I take your point, which is why I think

16  the parties are going to drill down and see if they can figure

17  out whether or not there may be information that was not and

18  that can be supplemented and figure out precisely what those

19  points of disagreement and what appropriate remedies might be.

20          THE COURT:  The appropriate remedy may be redepose

21  him, maybe under a limited number of questions to be asked,

22  but that's what I would highly suggest.

23          MR. KERCHER:  Thank you, Your Honor.

24          THE COURT:  Anything else?

25          MR. PARRENO:  I'm sorry.  That meet and confer

1  process that Mr. Kercher alluded to involves not just the

2  redeposition and reopening the deposition, maybe other

3  discovery matters, and we are, private plaintiffs along with

4  the United States, are going through that meet and confer

5  process with the State to discuss those broader concerns and

6  it may become necessary to file an additional motion for

7  further discovery to remedy the selective waiver by the State

8  here.

9            And as you-all know, the Department of Justice is

10  here to speak on that if the Court wants to hear anything

11  additional about this issue.

12            THE COURT:  So I really don't like — well, I can

13  talk generally, but I'm certainly not going to make any

14  rulings on discovery motions that are not before me yet.

15            Does DOJ want to say anything else?

16            MISS PAIKOWSKY:  No, Your Honor.

17            We would just echo a lot of what has been said.

18  We're in the process of meeting and conferring with the

19  parties to nail down the scope of the issue.  We do think that

20  there was a selective disclosure.  We think that the bulleted

21  disclosure was likely improper and prejudicial and we're

22  hoping to come to a solution without further motions practice,

23  but in the event we're not able to we might come back seeking

24  from this Court perhaps in the form of a motion in limine to

25  exclude or —

1          THE COURT:  You're heading to where I was heading.

2          So, again, this is not any rulings.  This is just

3    off-the-cuff comments.  I mean, if you, the State, doesn't

4    make some accommodations here on, like I have already said I

5    think you were overly aggressive, if there's not some

6    accommodations made here, you're ultimately going to be

7    leading me down the road where I'm going to have to strike or

8    limit portions of this testimony that you-all might need in,

9    so this is not going down a favorable path.

10          And then all that — now, from the plaintiffs'

11   perspective is going to have yet another issue for a possible

12   appeal, so you-all need to sit and hash this out.

13          MR. KERCHER:  It's not our intention to play a shield

14   game with the privilege, Your Honor.  We are confident we can

15   come to some agreement.  There may be some small portion that

16   gets left over but I'm sure we can find something.

17          THE COURT:  And, you know, we're talking already a

18   trial date in September, and it's like, it's late July.  So we

19   have a lot of work to do.

20          MR. KERCHER:  Agreed.

21          THE COURT:  Anything else?

22          MR. PARRENO:  No, Your Honor.  Thank you.

23          THE COURT:  Anything else?

24          MR. KERCHER:  No, Your Honor.  May we be excused?

25          THE COURT:  Anything else from the DOJ?

1          MISS PAIKOWSKY:  Nothing, Your Honor.  Thanks very

2    much.

3          THE COURT:  With that, we're adjourned.

4          Thank you.

5      *(Concludes proceedings)*

6                              -o0o-

7      I certify that the foregoing is a correct transcript from

8    the record of proceedings in the above-entitled matter.  I

9    further certify that the transcript fees and format comply

10   with those prescribed by the Court and the Judicial Conference

11   of the United States.

12

13   Date:  07/13/23          /s/  *Gigi Simcox*
                              United States Court Reporter
14                            262 West Nueve Street
                              San Antonio TX 78207
15                            Telephone:  (210)244-5037

16

17

18

19

20

21

22

23

24

25