**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| La Unión Del Pueblo Entero, *et al.*, | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | No. 5:21-cv-00844-XR |
| | § | |
| Gregory W. Abbott, *et. al.*, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**INTERVENOR-DEFENDANTS' REPLY IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

ARGUMENT ................................................................................................................ 1

I.    SB 1 DOES NOT VIOLATE THE FEDERAL MATERIALITY PROVISION
(United States Count 2, OCA Count 1) ................................................................. 1

    A.    *Sections 5.02 And 5.08 Do Not Deny Anyone The Right To Vote* ............................. 1

    B.    *Sections 5.02 And 5.08 Do Not Affect A Voter Qualification Determination* ............. 4

    C.    *Sections 5.02 And 5.08 Do Not Relate To Voter Registration Materials* .................. 9

II.   SB 1 IS NOT UNCONSTITUTIONALLY VAGUE (LUPE Counts 7 and 8, HAUL
Count 6, OCA Count 8) ...................................................................................... 12

    A.    *Plaintiffs' Pre-Enforcement Facial Challenges Are Premature* ............................... 13

    B.    *The Challenged Provisions Are Not Unconstitutionally Vague* ............................... 15

III.  SECTION 7.04 DOES NOT VIOLATE FREE SPEECH RIGHTS (LUPE Count 7,
OCA Count 7, LULAC Count 3) ......................................................................... 22

IV.   SB1 DOES NOT VIOLATE SECTION 208 OF THE VRA (LUPE Count 5, HAUL
Count 5, OCA Count 4, LULAC Count 4) ........................................................... 27

CONCLUSION .......................................................................................................... 29

CERTIFICATE OF SERVICE .................................................................................... 31

# TABLE OF AUTHORITIES

Page

CASES

*Ali v. Federal Bureau of Prisons*,
  552 U.S. 214 (2008)...................................................................................................10

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983)...................................................................................................22

*Arcadia v. Ohio Power Co.*,
  498 U.S. 73 (1990).....................................................................................................10

*Babbitt v. United Farm Workers Nat. Union*,
  442 U.S. 289 (1979)...................................................................................................15

*Baggett v. Bullitt*,
  377 U.S. 360 (1964)...................................................................................................21

*Ball v. Chapman*,
  289 A.3d 1 (Pa. 2023)..................................................................................................4

*Bernbeck v. Moore*,
  126 F.3d 1114 (8th Cir. 1997) ...................................................................................25

*Brnovich v. Democratic Nat'l Comm.*,
  141 S. Ct. 2321 (2021)...............................................................................................26

*Burdick v. Takushi*,
  504 U.S. 428 (1992)...................................................................................................23

*Burson v. Freeman*,
  504 U.S. 191 (1992)............................................................................................. *passim*

*Center for Individual Freedom v. Carmouche*,
  449 F.3d 655 (5th Cir. 2006) ....................................................................................13

*Circuit City Stores v. Adams*,
  532 U.S. 105 (2001)...................................................................................................10

*City of Chicago v. Morales*,
    527 U.S. 41 (1999)......................................................................................21

*Coates v. City of Cincinnati*,
    402 U.S. 611 (1971)....................................................................................21

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008)..................................................................................3, 8

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985)....................................................................................11

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991)......................................................................................9

*Harrison v. PPG Indus., Inc.*,
    446 U.S. 578 (1980)................................................................................10, 11

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)...................................................................................13, 15

*In re Gordon*,
    218 F. Supp. 826 (S.D. Miss. 1963)............................................................12

*Johnson v. United States*,
    576 U.S. 591 (2015)....................................................................................20

*Kennedy v. Lynd*,
    306 F.2d 222 (5th Cir. 1962) ......................................................................11

*Kramer v. Price*,
    712 F.2d 174 (5th Cir. 1983) ......................................................................21

*League of Women Voters of Fla. v. Fla. Sec'y of State*,
    66 F.4th 905 (11th Cir. 2023) ............................................................. *passim*

*League of Women Voters of Tenn. v. Hargett*,
    400 F. Supp. 3d 706 (M.D. Tenn, 2019).....................................................17

*McBoyle v. United States*,
    283 U.S. 25 (1931)......................................................................................10

*McFadden v. United States*,
    576 U.S. 186 (2015)........................................................................................28

*McIntyre v. Ohio Elecs. Comm'n*,
    514 U.S. 334 (1995)................................................................................22, 23

*Mellouli v. Lynch*,
    575 U.S. 798 (2015)........................................................................................10

*Meyer v. Grant*,
    486 U.S. 414 (1988)................................................................................15, 25

*Migliori v. Cohen*,
    36 F.4th 153 (3d Cir. 2022) ...........................................................................4

*Minn. Voters All. v. Mansky*,
    138 S. Ct. 1876 (2018)..............................................................14, 23, 24, 25

*New Prime Inc. v. Oliveira*,
    139 S. Ct. 532 (2019).......................................................................................9

*OCA-Greater Houston v. Texas*,
    867 F.3d 604 (5th Cir. 2017) ......................................................................28

*Pa. State Conf. of NAACP v. Schmidt*,
    2023 WL 3902954 (W.D. Pa. June 8, 2023).................................................4

*Priorities USA v. Nessel*,
    487 F. Supp. 3d 599 (E.D. Mich. 2020).....................................................28

*Ritter v. Migliori*,
    142 S. Ct. 1824 (2022)...................................................................1, 2, 4, 12

*Rosario v. Rockefeller*,
    410 U.S. 752 (1973).........................................................................................2

*Schwier v. Cox*,
    340 F.3d 1284 (11th Cir. 2003) ....................................................................3

*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018)..............................................................................15, 20

*Shelby Cnty v. Holder*,
   570 U.S. 529 (2013)................................................................................................9

*Tex. Democratic Party v. Abbott*,
   961 F.3d 389 (5th Cir. 2020) .................................................................................3

*Texas v. Johnson*,
   491 U.S. 397 (1989)..............................................................................................14

*United States v. Clinical Leasing Serv., Inc.*,
   925 F.2d 120 (5th Cir. 1991) ...............................................................................19

*United States v. Hansen*,
   No. 22-179 (U.S. June 23, 2023) ..........................................................................22

*United States v. Petrillo*,
   332 U.S. 1 (1947).................................................................................................16

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982).............................................................................17, 18, 19, 20

*Vote.Org v. Callanen*,
   39 F.4th 297 (5th Cir. 2022) ..........................................................................1, 2, 4

*Voting for Am., Inc. v. Steen*,
   732 F.3d 382 (5th Cir. 2013) .........................................................................14, 23

*Wash. State Grange v. Wash. State Republican Party*,
   552 U.S. 442 (2008)..............................................................................................13

**STATUTES**

52 U.S.C. § 10101(a) ..................................................................................... *passim*

52 U.S.C. § 10101(b) .............................................................................................5

52 U.S.C. § 10101(e) .............................................................................................6

52 U.S.C. § 10508.................................................................................................28

Fla. Stat. § 101.64      .............................................................................................8

Idaho Stat. § 34-1106............................................................................................8

Ind. Rev. Stat. § 3-11.5-4-13 ............................................................................8

Ohio Rev. Code § 3505.18 .................................................................................8

Tex. Crim. Code § 6.03 ...................................................................................18

Tex. Elec. Code § 32.075 ................................................................................18

Tex. Elec. Code § 33.061 (2020) .....................................................................20

Tex. Elec. Code § 276.013 ..............................................................................16

Tex. Penal Code § 6.02 ..............................................................................17, 24

**OTHER AUTHORITIES**

Fed. R. Civ. P. 30(b)(6) ...................................................................................21

Fed. R. Civ. P. 56(a) .........................................................................................1

H.R. Rep. No. 88-914, pt. 2 (1963) ...................................................................6

*Oxford English Dictionary* (3d ed. 2021, rev. online Mar. 2023) .....................5

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .........................10

Senate Bill 1 .............................................................................................. *passim*

Texas Office of the Attorney General Opinion No. KP-0411 (2022) ...........................12

*Webster's Third New International Dictionary* (1961) ...................................7

The opposition briefs filed by OCA-Greater Houston Plaintiffs (ECF No. 636), the United States (ECF No. 637), LULAC Plaintiffs (ECF No. 639), HAUL Plaintiffs (ECF No. 643), and the LUPE Plaintiffs (ECF No. 644) confirm that various challenges to the Texas Legislature's duly enacted election laws in Senate Bill 1 ("SB 1") fail "as a matter of law." Fed. R. Civ. P. 56(a). Accordingly, the Court should grant Intervenor-Defendants' motion for summary judgment (ECF No. 608; *see also* ECF No. 634, 635).

**ARGUMENT**

The Court should grant summary judgment on Plaintiffs' materiality, vagueness, First Amendment, and Section 208 claims because each fails "as a matter of law." Fed. R. Civ. P. 56(a); *see also* ECF No. 637 at 6–30.

**I.    SB 1 DOES NOT VIOLATE THE FEDERAL MATERIALITY PROVISION (United States Count 2, OCA Count 1)**

The United States' and OCA Plaintiffs' materiality claims fail as a matter of law because sections 5.02 and 5.08 of SB 1 do not even implicate, let alone violate, the federal materiality provision. Indeed, the materiality claims flunk at least three essential elements because sections 5.02 and 5.08 do not (1) "deny the right of any individual to vote," 52 U.S.C. § 10101(a)(2)(B); (2) affect a "determin[ation] whether such individual is qualified under State law to vote," *id.*; or (3) pertain to an "application, registration, or other act requisite to voting," *id.*; *see also Ritter v. Migliori*, 142 S. Ct. 1824, 1824–25 (2022) (Alito, J., dissenting from the denial of the application for stay); *Vote.Org v. Callanen*, 39 F.4th 297, 305 n.6 (5th Cir. 2022). Accordingly, the Court should grant summary judgment against the United States and OCA Plaintiffs on these claims. *See* ECF No. 608 at 6–16; ECF No. 634 at 2–19; ECF No. 635 at 2–15.

**A.    *Sections 5.02 And 5.08 Do Not Deny Anyone The Right To Vote.***

Sections 5.02 and 5.08 do not violate the materiality provision because mandatory application

of their personal-identification-number requirements does not "deny the right of any individual to vote in any election." 52 U.S.C. § 10101(a)(2)(B); *see also* ECF No. 608 at 9–11; ECF No. 634 at 3–9; ECF No. 635 at 2–8.

The United States and OCA Plaintiffs offer three arguments in support of their position that sections 5.02 and 5.08 violate a "statutory right to vote" in the materiality provision.  ECF No. 637 at 2.  None is persuasive.

*First*, the United States and OCA Plaintiffs assert that sections 5.02 and 5.08 "disenfranchise" voters who do not comply with the personal-identification-number requirements.  *See, e.g.*, *id.* at 28; ECF No. 636 at 2, 8.  Nothing could be further from the truth: evenhanded, mandatory state voting rules that regulate how individuals cast their ballots do not "disenfranchise" anyone or deny anyone the right to vote, even when such rules require election officials to decline to count a noncompliant ballot.  *See, e.g.*, *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay); *Vote.Org*, 39 F.4th at 305 n.6; ECF No. 608 at 7–11; *see also Rosario v. Rockefeller*, 410 U.S. 752, 757 (1973) (application of neutral state-law voting requirements does not "disenfranchise" voters).

The United States and OCA Plaintiffs attempt to bolster their construction by invoking the statutory definition of "vote."  *See* ECF No. 637 at 14–16; ECF No. 636 at 6–7.  But the materiality provision reaches only denials of the "*right*" to vote—not a state's application of neutral and mandatory rules that govern the *act* of voting.  52 U.S.C. § 10101(a)(2)(B) (emphasis added); *see* ECF No. 635 at 2–4; ECF No. 634 at 2–4; ECF No. 608 at 10–11.  In other words, the question is not whether mandatory application of SB 1's personal-identification-number requirements can result in a ballot not being "counted," as the Plaintiffs argue.  ECF No. 637 at 14; ECF No. 636 at 3.  The question instead is whether those rules deprive any individual of the *right* to cast a ballot

in accordance with state law.  Because sections 5.02 and 5.08 do not prevent (qualified and registered) voters from casting ballots on equal terms with all other voters, they do not violate the materiality provision.  *See* ECF No. 635 at 2–4; ECF No. 634 at 2–4; ECF No. 608 at 9–11.

*Second*, the United States' and OCA Plaintiffs' assertion that Texas cannot "initially deny the right to vote" if it allows in-person voting or "institute[s] cure processes," ECF No. 637 at 17; ECF No. 636 at 7, simply begs the question.  In fact, that Texas law provides in-person voting and cure opportunities to voters who fail to comply with sections 5.02 and 5.08 reinforces that those sections do not deny the right to vote.  *See* ECF No. 634 at 3–4; ECF No. 635 at 3–4; 608 at 9–11.  Indeed, there is no denial of the right to vote because sections 5.02 and 5.08 do not "disqualify potential voters" who fail to comply with the personal-identification-number requirements, *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003), but instead "permit[] [such voters] to vote" in the current and future elections, *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 404 (5th Cir. 2020); *see* ECF No. 635 at 3–4; ECF No. 634 at 3–4; ECF No. 608 at 9–11.

Moreover, the United States' and OCA Plaintiffs' discussion of the alleged burdens of in-person voting and curing, *see* ECF No. 637 at 18–19; ECF No. 636 at 8, misses the point.  In the first place, the materiality provision does not regulate the burdens of in-person voting or curing or guarantee a right to vote by mail.  In addition, even on the Plaintiffs' description, Texas's in-person voting and cure procedures are far *less* burdensome than the cure procedures upheld by the Supreme Court in a constitutional right-to-vote case.  *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 199 (2008) (plurality op.) (emphasizing that failure to provide photo identification could be cured by "travel[ing] to the circuit court clerk's office within 10 days to execute the required affidavit"); *but see* ECF No. 609-1 ¶ 206 (hinting such burdens are unlawful).  And the proof is in the pudding—even the United States and the OCA Plaintiffs acknowledge that

thousands of Texans successfully utilized SB 1's cure procedures during the 2022 General Elections. *See* ECF No. 611 at 17; ECF No. 609-1 ¶ 158.

*Third*, the United States and OCA Plaintiffs invoke *Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022) ("*Ritter*"), and various district court decisions as support for their reading. ECF No. 637 at 16–18; ECF No. 636 at 6–8. But the Supreme Court vacated *Ritter*, *see* 143 S. Ct. 297 (2022), and the cited district court opinions are all interlocutory decisions with scant analysis of the materiality provision's text, *see Pa. State Conf. of NAACP v. Schmidt*, 2023 WL 3902954, at *5–7 (W.D. Pa. June 8, 2023) (denying motion to dismiss); ECF No. 635 at 7–8 & n.1 (cataloguing the other district court decisions); ECF No. 634 at 8–9 & n.1 (same). The contrary views of three Supreme Court Justices and a published decision of a Fifth Circuit motions panel are far more persuasive predictors of how higher courts will ultimately rule. *See Ritter*, 142 S. Ct. at 1824–25 (Alito, J., dissenting from the denial of the application for stay); *Vote.Org*, 39 F.4th at 305 n.6.

**B.    *Sections 5.02 And 5.08 Do Not Affect A Voter Qualification Determination.***

Sections 5.02 and 5.08 do not implicate, let alone violate, the materiality provision for another reason: they do not affect a "determin[ation] whether [any] individual is qualified under State law to vote." 52 U.S.C. § 10101(a)(2)(B); *see* ECF No. 635 at 8–12; ECF No. 634 at 9–12; ECF No. 608 at 11–12. The United States and the OCA Plaintiffs give five reasons why the materiality provision applies outside of voter-eligibility determinations. ECF No. 637 at 19–22; ECF No. 636 at 11–14. All fail.

*First*, the United States and OCA Plaintiffs claim the materiality provision preempts all paper-based requirements "not material *to* determining qualifications of the voter." ECF No. 637 at 20 (emphasis altered); *see* ECF No. 636 at 11. But according to the plain statutory text, "it is not enough that the error or omission be immaterial *to* whether the individual is qualified to vote; the paper or record must also be used 'in determining' the voter's qualifications." *Ball v.*

*Chapman*, 289 A.3d 1, 38 (Pa. 2023) (opinion of Brobson, J.) (quoting 52 U.S.C. § 10101(a)(2)(B)).  When used with "verbal nouns" (here, "determining"), the word "in" is typically "equivalent in sense to a temporal clause introduced by *when*, *while*, *if*."  *In*, prep., def. 21(b), *Oxford English Dictionary* (3d ed. 2021, rev. online Mar. 2023).  The materiality provision thus is implicated only *when determining* a voter's qualifications.  ECF No. 635 at 8–9; ECF No. 634 at 9–10; ECF No. 608 at 11–12.

Statutory structure confirms this meaning.  The immediately preceding subparagraph uses the same construction—"in determining whether any individual is qualified under State law or laws to vote"—to introduce a prohibition that is limited to voter-eligibility determinations.  52 U.S.C. § 10101(a)(2)(A).  The United States recognizes that "Congress used [this] language specifically to target determinations of voter qualifications."  ECF No. 637 at 21.  Yet bizarrely, it claims "Congress omitted that language" in the materiality provision, so the provision is not similarly limited in reach.  *Id.*  In fact, the materiality provision contains substantially identical language, limiting its reach to actions made "in determining whether such individual is qualified under State law to vote."  *See* 52 U.S.C. § 10101(a)(2)(B).  The United States' position rests on a plain oversight.

Other provisions of section 10101 provide further support.  As the United States concedes, the subparagraph immediately following the materiality provision is also expressly limited to voter-qualification determinations.  *Id.* § 10101(a)(2)(C); ECF No. 637 at 21.  And it too is similarly worded to the materiality provision.  *Compare* 52 U.S.C. § 10101(a)(2)(C) (applying to state "qualification[s] for voting"), *with id.* § 10101(a)(2)(B) (applying to "determin[ations]" of whether an "individual is qualified under State law to vote").  Further, the next subsection of section 10101 prohibits voter intimidation, *id.* § 10101(b), demonstrating that when Congress

intended to address a topic other than voter-eligibility determinations, it sensibly set that topic apart in its own subsection, rather than cram it in the middle of the voter-eligibility subsection. Finally, subsection (e) empowers courts and referees to address systemic violations of "*any* right or privilege secured by subsection (a)," which includes the materiality provision. *Id.* § 10101(e) (emphasis added).  Yet the only remedy authorized by that subsection is a declaration that an individual "is qualified under State law to vote" but has been denied the opportunity "to register … or otherwise qualify to vote" or has been wrongly "found not qualified to vote." *Id.*  If the materiality provision extended beyond voter-qualification determinations, this subsection would not enable courts to address the violation of "*any* right" secured by it.  *Id.* (emphasis added).

*Second*, the United States contends that Intervenor-Defendants' reading of the materiality provision would "cover a null set of errors or omissions."  ECF No. 637 at 22.  Not so.  The provision prohibits states from rejecting voter registration applications based on errors or omissions that are not related to whether the individual is qualified to vote under state law.  Far from "repeal[ing]" the materiality provision, *id.*, this reading perfectly tailors its scope to the evil Congress sought to remedy—the use of "minor misspelling errors or mistakes" by "registrars" as a pretext "to defeat [African-American] registration."  H.R. Rep. No. 88-914, pt. 2, at 5 (1963); *see* ECF No. 635 at 4; ECF No. 634 at 4.

*Third*, the United States and OCA Plaintiffs deny that their reading would have the inevitable effect of invalidating scores of state law election rules serving legitimate interests other than determining voter qualifications.  ECF No. 637 at 24–28; ECF No. 636 at 9–10.  But they identify no principled basis for distinguishing the laws they do not challenge from sections 5.02 and 5.08.

The United States and OCA Plaintiffs suggest a signature may be material because it "certif[ies] the voter's eligibility to cast a mail ballot …, and that the enclosed ballot is valid, legally sound, and was voted by the eligible voter."  ECF No. 637 at 25; *see* ECF No. 636 at 9–10. But as both Plaintiffs earlier explained, materiality is established by comparing "the information required … to qualifications to vote under state law."  ECF No. 609 at 20; *see* ECF No. 611 at 44. As the United States explained, the materiality provision "distinguishes between the few prerequisites that one must meet to be 'qualified' to vote and the many additional procedural requirements that merely enforce, measure, or confirm those underlying qualifications."  ECF No. 609 at 20.  Those prerequisites are "certain substantive characteristics, like age and citizenship, that are 'germane to one's ability to participate intelligently in the electoral process.'"  *Id.* "Although [signature] requirements might help officials enforce the states' qualifications, they are not themselves voter qualifications simply because state law mandates them."  *Id.*  Thus, under the United States' own reasoning, a signature cannot be material to whether an individual is qualified under state law to vote, even if it certifies a voter's identity.

Alternatively, if the Plaintiffs' new defense of the signature requirement is correct, sections 5.02 and 5.08 must also be material.  Like the signature requirement, they confirm a voter's identity, thereby "certify[ing] the voter's eligibility to cast a mail ballot …, and that the enclosed ballot is valid, legally sound, and was voted by the eligible voter."  ECF No. 637 at 25.  The United States and OCA Plaintiffs may believe that a signature is more necessary for confirming identity than a driver's license number.  But that makes no difference.  The statutory standard is that the requirement be "*material*"—that is, "relevant"—not *necessary*.  *See* 52 U.S.C. § 10101(a)(2)(B) (emphasis added); *Material*, *Webster's Third New International Dictionary* (1961).  And an

identification-number requirement is "unquestionably relevant" to establishing a voter's identity. *Crawford*, 553 U.S. at 191 (plurality op.); *id.* at 209 (Scalia, J., concurring in the judgment).

The United States' attempts to distinguish other requirements do not fare any better. Invalidating an overvote provision may "grant the voter additional votes." ECF No. 637 at 26. But the rule that a voter can vote for only one candidate is itself a state law rule unrelated to a voter's qualifications, so, under Plaintiffs' reading, it must give way to the federal materiality provision. In many states, a voter must sign or fill out information on the exterior of a secrecy envelope. *E.g.*, Fla. Stat. § 101.64(1). So, contrary to the United States' assertion, failure to use one is an "omission *on* a paper or record." ECF No. 637 at 26. Likewise, the United States is wrong to claim that pollbook requirements "do not … impose any paperwork requirements on voters." *Id.* In many states, *the voter* must sign the pollbook before she can cast ballot. *E.g.*, Idaho Stat. § 34-1106(2); Ohio Rev. Code § 3505.18(B). And in any event, the materiality provision is not limited to an "error or omission" *by the voter.* 52 U.S.C. § 10101(a)(2)(B). Finally, despite what the United States claims, in some states, the failure to complete a voter assistance form *does* result in a vote not being counted. *E.g.*, Ind. Rev. Stat. § 3-11.5-4-13.

The OCA Plaintiffs claim overvote provisions would survive on their reading because overvoting is an error made "on *the ballot itself.*" ECF No. 636 at 9. But filling out a ballot is surely an "act requisite to" "having such ballot counted," 52 U.S.C. § 10101(a)(2)(B), (e), so ballots would necessarily fall within the materiality provision's scope if the OCA Plaintiffs' reading were adopted.

*Fourth*, the OCA Plaintiffs claim their interpretation does not trigger the federalism canon because it would not "threaten to invalidate 'election rules across the country.'" ECF No. 636 at 10 n.5. But it does in fact have this consequence, and neither they nor the United States has any

answer to the point that Congress has not spoken with the "unmistakably clear" language needed to "alter the usual constitutional balance between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991); *see* ECF No. 635 at 12; ECF No. 634 at 12; ECF No. 608 at 15.

*Fifth*, the United States and OCA Plaintiffs deny that their reading puts the materiality provision's constitutionality in jeopardy. ECF No. 637 at 28; ECF No. 636 at 12–14. But when legislating under the Fifteenth Amendment, Congress must justify stark departures from the traditional federal-state balance of powers to show that "current needs" justify the "statute's 'current burdens.'" *Shelby Cnty v. Holder*, 570 U.S. 529, 550–51 (2013). As both Plaintiffs concede, the legislative record concerns only registration. ECF No. 637 at 28; ECF No. 636 at 13. It contains nothing at all about state rules outside the voter-registration context. The United States and OCA Plaintiffs thus cannot establish solid constitutional footing for their reading. *See* ECF No. 635 at 12; ECF No. 634 at 12; ECF No. 608 at 15–16.

**C.** ***Sections 5.02 And 5.08 Do Not Relate To Voter Registration Materials.***

Sections 5.02 and 5.08 also do not implicate, let alone violate, the materiality provision because they do not relate to an "application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B); *see* ECF No. 634 at 13–16; ECF No. 608 at 12–13. The United States and the OCA Plaintiffs make five arguments that the provision covers all papers related to voting. ECF No. 637 at 13–16; ECF No. 636 at 14–16. All fall short.

*First*, the United States argues that mail-ballot applications are "applications" under the materiality provision. ECF No. 637 at 10–11. But as the United States concedes, the fact that Texas labels certain documents "applications" does not automatically make them "applications" under the statute. *Id.* at 11. The term must be "interpreted as" it was understood "at the time Congress enacted the statute," *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019), and with

due attention to "[c]ontext," *Mellouli v. Lynch*, 575 U.S. 798, 812 (2015).   At the time of enactment, the term "application" in the voting context was used interchangeably with "registration" to refer to the voter-registration process, as the materiality provision's legislative history makes clear.  *See* ECF No. 634 at 13–14.  It did not commonly refer to requests to vote by mail, as voting by mail was not widespread.  *Id.* at 14.  Indeed, given that "application" immediately precedes "registration" in the materiality provision and is nestled between two subparagraphs dealing with registration, the most natural reading in context is that "application" refers to an application to register.  *See* 52 U.S.C. § 10101(a)(2)(A)–(C).

*Second*, the United States and OCA Plaintiffs claim the *ejusdem generis* canon does not apply to the catch-all phrase "any … other acts requisite to voting" because "any" is a term of enlargement.  ECF No. 637 at 10; ECF No. 636 at 14–15.  But there is no rule or presumption that the word "any" makes the canon inapplicable; courts regularly apply *ejusdem generis* to phrases containing it.  *See, e.g.*, *Circuit City Stores v. Adams*, 532 U.S. 105, 109 (2001); *Arcadia v. Ohio Power Co.*, 498 U.S. 73, 77–78 (1990); *McBoyle v. United States*, 283 U.S. 25, 26–27 (1931) (Holmes, J.); A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 200–02 (2012) (citing with approval several cases applying the canon to phrases including "any").

Plaintiffs' cited cases are not to the contrary.  *Ali v. Federal Bureau of Prisons* found *ejusdem generis* inapplicable because the phrase at issue did not consist of "a list of specific items separated by commas and followed by a general or collective term," not because it included "any." 552 U.S. 214, 225 (2008); *see* Scalia & Garner, *supra*, at 206–07 (explaining the canon did not apply in *Ali* because there were not "at least two words to establish a genus … before the *other* phrase").  *Harrison v. PPG Indus., Inc.*, 446 U.S. 578 (1980), which refused to apply the canon to the phrase "any other final action" in a statute establishing judicial review of certain EPA

determinations, is likewise distinguishable for at least three reasons.  First, the preceding terms in the list did not have any unifying characteristic that would "significantly narrow the ambit of 'any other final action.'"  *Id.* at 588.  Second, unlike the phrase "act requisite to voting," the phrase "final agency action" has a well-established legal meaning drawn from the Administrative Procedure Act, making the term genuinely unambiguous.  *Id.* at 586, 588–89.  Third, the statute authorized initial review in the court of appeals, and courts "will not presume" that "Congress intended to locate APA review of agency action in the district courts" "[a]bsent a firm indication" of that intent.  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 745 (1985).  No comparable substantive canon applies here.

*Third*, the United States and OCA Plaintiffs contend that applying *ejusdem generis* makes the catch-all phrase superfluous.  ECF No. 637 at 9; ECF No. 636 at 16.  Not so.  This language prevents state and local election officials from circumventing the materiality provision on technicalities:  Referring to a qualification-determining practice as something other than a voter "application" or "registration" does not liberate such officials to disqualify voters for immaterial "error[s] or omission[s]."  52 U.S.C. § 10101(a)(2)(B); *see* ECF No. 634 at 15–16.  In addition, the phrase may cover any forms citizens must submit to remain registered to vote besides initial applications and registrations, such as a declaration by a released felon that he has paid all outstanding fines or by an inactive voter that she continues to reside at her registered address.

*Fourth*, the United States attempts to bolster its broad reading by citing two judicial opinions and a Texas Attorney General opinion, all concerning a *different statute*—one governing requests by the United States for state voter records.  ECF No. 637 at 12–13.  *Kennedy v. Lynd* dealt only with procedural disputes and did not address substantive arguments that certain voter records were beyond the statute's reach.  306 F.2d 222, 227–28, 230–31 (5th Cir. 1962); *see* ECF

No. 634 at 16.  *In re Gordon* likewise did not specify the statute's scope, noting only that the statute was *not* "an unlimited discovery device" for investigating "the administration of the registration and voting laws of the state."  218 F. Supp. 826, 827 (S.D. Miss. 1963).  And the Attorney General opinion, while discussing *state law* retention requirements, merely included a "see also" citation stating that this federal statute also required retention of certain "election records," which the opinion did not define.  Texas Office of the Attorney General Opinion No. KP-0411, at 2 (2022).

*Fifth*, the United States and OCA Plaintiffs argue that Intervenors' reading "would undermine Congress's goal in enacting" the materiality provision by allowing for arbitrary restrictions on voting.  ECF No. 637 at 12; *see* ECF No. 636 at 7–8.  All evidence indicates, however, that Congress was concerned with registration when it passed the materiality provision, not other stages of the electoral process.  *See* ECF No. 635 at 4; ECF No. 634 at 4.  Even the United States admits that "most electoral regulations fall outside of [the materiality provision's] scope," so it is not surprising that the materiality provision does not prevent every conceivable election law it deems unwise.  ECF No. 609 at 21 n.6. And in any event, the materiality provision would not be a sensible way to ensure fairness at later stages of the electoral process, since "[e]ven the most permissive voting rules must contain some requirements" concerning subjects other than a voter's qualifications.  *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from the denial of the application for stay).  The Court should grant summary judgment.

## II.     SB 1 IS NOT UNCONSTITUTIONALLY VAGUE
##         (LUPE Counts 7 and 8, HAUL Count 6, OCA Count 8).

The LUPE Plaintiffs', HAUL Plaintiffs', and OCA Plaintiffs' claims that various of SB 1's vote-harvesting and poll-worker provisions are unconstitutionally vague are both premature facial

challenges and doomed on the merits.  *See* ECF No. 608 at 16–22.  The Court should grant summary judgment against Plaintiffs on those claims.  *See id.*

### A.     *Plaintiffs' Pre-Enforcement Facial Challenges Are Premature.*

At the threshold, the Court should grant summary judgment because Plaintiffs' pre-enforcement facial vagueness challenges are premature.  *See* ECF No. 608 at 16–17; *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008) ("[F]acial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution.").  Plaintiffs offer two arguments that their facial challenges do not require them to show that the provisions they challenge are "impermissibly vague in all applications."  ECF No. 643 at 18; *see also* ECF No. 644 at 28.  Both fail.

*First*, Plaintiffs assert that they need not show unconstitutional vagueness in all applications because their void-for-vagueness challenges allegedly implicate First Amendment rights.  ECF No. 644 at 28; ECF No. 643 at 14.  But the case the LUPE and OCA Plaintiffs cite establishes no such thing: to the contrary, it did not even present "a facial vagueness challenge." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) (cited at ECF No. 644 at 27).  And in the case the HAUL Plaintiffs cite, the Fifth Circuit rejected the facial void-for-vagueness challenge.  *See Center for Individual Freedom v. Carmouche*, 449 F.3d 655, 663–66 (5th Cir. 2006) (cited at ECF No. 643 at 14).

Moreover, Plaintiffs' various contentions that section 7.04's ban on vote harvesting and sections 4.06's, 4.07's, and 4.09's regulation of poll workers' actions toward poll watchers violate the First Amendment fail.  *See infra* Part III.  Indeed, section 7.04 comports with the First Amendment: its ban on ballot harvesting is functionally equivalent to the laws in every state

requiring a secret ballot and law preventing electioneering at or near the polling place. *See* ECF No. 608 at 24–25; *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1883 (2018); *Burson v. Freeman*, 504 U.S. 191 (1992).

Plaintiffs' contentions that sections 4.06, 4.07, and 4.09 implicate "expressive conduct in which Plaintiff poll workers engage," ECF No. 644 at 28; *see also* ECF No. 643 at 14, is even farther off base. Plaintiffs cite no authority for the proposition that poll workers' discharge of their official duties as government agents is protected by the First Amendment. *See* ECF No. 644 at 28; ECF No. 643 at 14. And with good reason: no such authority exists. Poll workers' discharge of their official duties on behalf of the government is not expressive conduct because it is not intended "to convey a particular[] message" and, in any event, carries no "great" likelihood that any such message "would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404 (1989); *cf. Voting for Am., Inc. v. Steen*, 732 F.3d 382, 392 (5th Cir. 2013) (processing voter registrations is regulable "election-related conduct," not "inherently expressive" activity).

The LUPE Plaintiffs and OCA Plaintiffs suggest that section 7.04 and section 4.09 "jeopardize the constitutional rights of voters" to receive "assist[ance]" in voting. ECF No. 644 at 28. But neither section 7.04 nor section 4.09 prohibits voters from receiving—or Plaintiffs from providing—assistance to voters. Instead, they prohibit political advocacy in the presence of an uncompleted ballot (section 7.04) and poll worker obstruction of poll watchers' statutory observation rights (section 4.09).

*Second*, the HAUL Plaintiffs argue that their void-for-vagueness challenges are not premature because section 4.09 has "chill[ed] [the] political activity of" poll workers. ECF No. 643 at 15. But, as explained, the HAUL Plaintiffs have cited no authority—and have failed to establish—their proposition that poll workers engage in constitutionally protected speech when

they discharge their official duties. *See, e.g.*, *id.* at 14–15. Moreover, even if Plaintiffs had shown a chilling of First Amendment activities, that would not be enough to allow the Court to adjudicate the pre-enforcement facial challenges: Plaintiffs must also establish that they face "a credible threat of prosecution" under each challenged provision. *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979). Plaintiffs, however, do not even mention that requirement, let alone point to record evidence demonstrating satisfaction of it. *See* ECF No. 643 at 14–15; ECF No. 644 at 27–28. The Court should grant summary judgment against Plaintiffs on their pre-enforcement facial vagueness challenges. *See* ECF No. 608 at 16–17.

       **B.**    ***The Challenged Provisions Are Not Unconstitutionally Vague.***

      The SB 1 provisions challenged on vagueness grounds—section 7.04's vote harvesting ban and sections 4.06's, 4.07's, and 4.09's regulation of poll workers' actions toward poll watchers— are not unconstitutionally vague because they provide more than "fair notice of the conduct" they "proscribe[]." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018); ECF No. 608 at 17–22. Indeed, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Holder*, 561 U.S. at 19 (cited at ECF No. 643 at 15 and ECF No. 644 at 27). The provisions Plaintiffs challenge as void for vagueness are constitutional under any proper formulation of the governing standard. *See* ECF No. 608 at 17–22.

      1.    The LUPE Plaintiffs and OCA Plaintiffs attempt to salvage their vagueness challenge to section 7.04's vote harvesting ban with four arguments, all of which fail. *First*, the LUPE Plaintiffs and OCA Plaintiffs cite the Eleventh Circuit's recent decision in *League of Women Voters of Fla. v. Fla. Sec'y of State*, 66 F.4th 905 (11th Cir. 2023), *see* ECF No. 644 at 21, but that decision underscores that the Court should *grant* summary judgment *against* Plaintiffs. To be sure, the Eleventh Circuit struck down on vagueness grounds a statutory provision that

prohibited soliciting voters near polling places "with the . . . effect of influencing a voter." *LWV*, 66 F.4th at 947. But the Eleventh Circuit also *rejected* a vagueness challenge to a provision substantially similar to section 7.04: in particular, it upheld a prohibition on soliciting voters near polling places "with the *intent* to influence . . . a voter." *Id.* at 946–47. The Eleventh Circuit reasoned that the *mens rea* requirement of "intent to influence a voter . . . undermines any assertion" that the provision "is unconstitutionally vague." *Id.* at 947. Here as well, section 7.04's ban on advocacy in the physical presence of an uncompleted ballot with the intent "to deliver votes for a specific candidate or measure" is not unconstitutionally vague. *See* ECF No. 608 at 18–19.

*Second*, the LUPE Plaintiffs and OCA Plaintiffs take issue with section 7.04's requirement that paid advocacy take place "in the physical presence of the ballot." ECF No. 644 at 21. Building on that premise, they offer hypotheticals about ballots in "plain view," in "the same room," or on "the entryway table." *Id.* Of course, "presence" is a common statutory term in Texas: for example, the Election Code's prohibition on election fraud that another set of Plaintiffs cites favorably, *see* Tex. Elec. Code § 276.013 (cited at ECF No. 639 at 20), already bans "any effort to influence the independent exercise of the vote of another in the *presence* of the ballot," *id.* (emphasis added). Like "presence," the term "physical presence" is easily understood by "persons of ordinary intelligence." *United States v. Petrillo*, 332 U.S. 1, 6 (1947).

Moreover, the LUPE Plaintiffs' and OCA Plaintiffs' undeveloped hypotheticals miss the point: the issue is not whether the uncompleted ballot is in the "physical presence" of a vote harvester, but whether the individual intending to deliver votes for a specific candidate or measure knows or should know about the ballot's "proximity" when engaging the voter. *See* ECF No. 644 at 21; ECF No. 608 at 18. Indeed, the LUPE Plaintiffs and OCA Plaintiffs do not dispute that section 7.04 requires a showing of scienter as to every element, including the physical presence

element, with recklessness as the default *mens rea*.  *See* Tex. Penal Code § 6.02(c).  Thus, there is no need for the Court to "assum[e]" that Texas courts would apply a scienter requirement, ECF No. 644 at 21, because they are statutorily required to do so, *see* Tex. Penal Code § 6.02(c).  This robust "scienter requirement … mitigate[s]" any vagueness concerns.  *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *LWV*, 66 F.4th at 946–47.  That the LUPE Plaintiffs and OCA Plaintiffs wish to influence voters even when their volunteers "know[]" that an uncompleted ballot is "in the vicinity," ECF No. 644 at 21, is a policy preference that does not render section 7.04 unconstitutionally vague.

*Third*, the LUPE Plaintiffs and OCA Plaintiffs contend that section 7.04 "provides no clarity about what 'compensation or other benefit'" satisfies that element.  ECF No. 644 at 22.  The LUPE Plaintiffs and OCA Plaintiffs, however, do not substantiate this contention.  Nor could they: section 7.04 specifically defines "compensation" as "anything reasonably regarded as a gain or advantage, including a promise or offer of employment, a political favor, or an official act of discretion."  SB 1 § 7.04.  Thus, section 7.04 bears no resemblance to the provision at issue in the case Plaintiffs cite, *League of Women Voters of Tenn. v. Hargett*, 400 F. Supp. 3d 706, 728 (M.D. Tenn, 2019) (cited at ECF No. 644 at 22), which contained *no* definition of the term "payment."  Moreover, the LUPE Plaintiffs and OCA Plaintiffs acknowledge that "if any benefit will do" under section 7.04, "that might reduce the [alleged] vagueness."  ECF No. 644 at 22.  The LUPE Plaintiffs' and OCA Plaintiffs' complaints about the *breadth* of section 7.04's crystal-clear definition does not suggest, much less establish, unconstitutional *vagueness*.

*Finally*, Plaintiffs argue that section 7.04 "fails to provide reasonable notice of what constitutes an interaction 'intended to deliver votes for a specific candidate or measure.'"  ECF No. 644 at 22.  But, as explained, this *mens rea* requirement is a constitutional *feature* of section

7.04, not an unconstitutional *bug*.  *See* ECF No. 608 at 18; *Vill. of Hoffman Ests.*, 455 U.S. at 499 & n.14; *LWV*, 66 F.4th at 946–47.   Indeed, under Texas law, a canvasser harbors the intent proscribed by section 7.04 only if her "conscious objective or desire" is to deliver votes for a candidate or measure.  Tex. Crim. Code § 6.03(a).  Thus, the LUPE Plaintiffs' and OCA Plaintiffs' hypotheticals about volunteer canvassers not "know[ing] if" their communication is "intended to deliver votes" or how to "communicate their intent," ECF No. 644 at 22–23, sail wide of the mark.   That the speaker's *mens rea* is a touchstone of section 7.04 proves, rather than disproves, its constitutionality.  *See* ECF No. 608 at 18; *Vill. of Hoffman Ests.*, 455 U.S. at 499 & n.14; *LWV*, 66 F.4th at 946–47.

2.   The LUPE Plaintiffs, HAUL Plaintiffs, and OCA Plaintiffs assert a variety of arguments in support of their vagueness challenge to various of SB 1's poll watcher provisions.  None is persuasive.

*First*, the HAUL Plaintiffs challenge section 4.06, which prohibits an election judge from "intentionally or knowingly refusing to accept a watcher for service when acceptance … is required by this section."  ECF No. 643 at 15–16.  The HAUL Plaintiffs contend that the "section is silent on whether election judges may refuse to accept a poll watcher whose behavior violates other provisions of the Election Code."  *Id.* at 15.  But Texas law already supplies the answer: the presiding judge "*shall* preserve order and prevent breaches of the peace" and "has the power of a district judge to enforce order and preserve the peace."  Tex. Elec. Code § 32.075(a), (c) (emphasis added).  Thus, there is no question about the HAUL Plaintiffs' hypotheticals: presiding judges are *required* not to accept "a disorderly, threatening, or violent poll watcher."  ECF No. 643 at 16; *see also* ECF No. 608 at 19–20.  And, of course, section 4.06's *mens rea* requirement underscores the reality that declining to accept a disorderly, threatening, or violent poll watcher does not violate

section 4.06.  *See* ECF No. 608 at 18; *Vill. of Hoffman Ests.*, 455 U.S. at 499 & n.14; *LWV*, 66 F.4th at 946–47.

*Second*, the HAUL Plaintiffs assert that section 4.07 is unconstitutionally vague because it directs that poll watchers "may not be denied free movement."  ECF No. 643 at 16.  They complain that section 4.07 does not define "free movement," *id.*, but section 4.07 amply clarifies that that poll watchers are entitled to "free movement *where election activity is occurring*," SB 1 § 4.07 (emphasis added).  Section 4.07 therefore *adds* detail to pre-SB 1 law and remains subject to the Election Code's other, more specific provisions.  *See* ECF No. 608 at 21–22.

Moreover, only civil remedies are available for violations of section 4.07, *see* SB 1 § 4.10, so the HAUL Plaintiffs bear a heightened burden to prove that section 4.07 is void for vagueness, *see* ECF No. 608 at 21; *Vill. of Hoffman Ests.*, 455 U.S. at 498–99.  The HAUL Plaintiffs contend that section 4.07 is "quasi-criminal" and, thus, triggers the more exacting vagueness standard applicable to criminal laws.  ECF No. 643 at 19–20.  But the cases they cite involved illegal drugs or controlled substances—and in both, the courts rejected the void-for-vagueness challenges.  *See Vill. of Hoffman Ests.*, 455 U.S. at 499–503 (cited at ECF No. 643 at 19–20); *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122–23 (5th Cir. 1991) (rejecting void-for-vagueness challenge even though challenged provision "may engender some limited amount of confusion") (cited at ECF No. 643 at 20).  Here as well, section 4.07's pellucid terms pass constitutional muster under any proper formulation of the governing standard.  *See* ECF No. 608 at 21–22.

*Third*, Plaintiffs take aim at section 4.09's prohibition on poll workers "taking any action to obstruct the view of a watcher or distance the watcher from the activity or procedure in a manner that would make observation reasonably effective."  ECF No. 644 at 23; *see also* ECF No. 643 at 16–19.  As the LUPE Plaintiffs and OCA Plaintiffs admit, however, this provision *adds to* pre-SB

1 law.  *See* ECF No. 644 at 23; *see also* ECF No. 608 at 20.  Prior to SB 1's enactment, Texas law prohibited poll workers from "knowingly prevent[ing] a watcher from observing an activity or procedure the person knows the watcher is entitled to observe," without further clarification.  Tex. Elec. Code § 33.061(a) (2020) (quoted at ECF No. 644 at 23).  Section 4.09 thus clarifies that "knowing[] prevent[ion]" of a watcher's exercise of her statutory observation rights extends to making such observation "not reasonably effective."

It therefore provides "fair notice of the conduct [it] proscribes."  *Sessions*, 138 S. Ct. at 1212.  Because—as Plaintiffs admit—Texas law requires poll workers to permit poll watchers "to sit or stand near enough to see and hear" an election activity, ECF No. 643 at 16; *see also* ECF No. 644 at 26, section 4.09 prohibits poll workers from knowingly making such seeing or hearing ineffective.  This would occur, for example, if a poll worker stood in the way and blocked the poll watcher's view when the poll watcher otherwise was "near enough" to see election activity.  ECF No. 643 at 16; *see also* SB 1 § 4.09.  More generally, a poll worker violates section 4.09 when she knowingly prevents a poll watcher from "be[ing] able to see and hear an activity that [the watcher] is permitted to observe."  ECF No. 644 at 26.

In all events, many laws incorporate "qualitative" standards that must be applied "on a particular occasion" without creating any constitutional problem.  *Johnson v. United States*, 576 U.S. 591, 603–04 (2015).  A contrary conclusion would force the Legislature to impose a one-size-fits-all distance rule ill-suited to the varied circumstances of polling locations.

Moreover, once again, the "knowingly" *mens rea* requirement sweeps away Plaintiffs' hypotheticals about poll workers "not know[ing]" that they have rendered poll watchers' observation "not reasonably effective," ECF No. 644 at 24; ECF No. 643 at 17–18, and vitiates any vagueness concerns in section 4.09, *see* ECF No. 608 at 20; *Vill. of Hoffman Ests.*, 455 U.S.

at 499 & n.14; *LWV*, 66 F.4th at 946–47.  Section 4.09 therefore satisfies the constitutional standard applied in the cases Plaintiffs cite.  Indeed, as with section 7.04, section 4.09's *mens rea* requirement resembles the "intent" voter-solicitation provision that the Eleventh Circuit upheld against a vagueness challenge in *League of Women Voters*.  *See* 66 F.4th at 946–47.  And section 4.09 does not require a "subjective judgment" into the effect of one's actions on another person, ECF No. 643 at 17; ECF No. 644 at 25; instead, it requires an action that the poll worker knows will result in the poll watcher's observation not being "reasonably effective," SB 1 § 4.09; *see also City of Chicago v. Morales*, 527 U.S. 41, 55 (1999) (plurality op.) (involving "a criminal law that contains no *mens rea* requirement") (cited at ECF No. 644 at 25); *Coates v. City of Cincinnati*, 402 U.S. 611, 613–14 (1971) (statute requiring inquiry into whether conduct had effect of "annoying . . . persons passing by") (cited at ECF No. 643 at 17 and ECF No. 644 at 25); *Kramer v. Price*, 712 F.2d 174, 178 (5th Cir. 1983), *reh'g granted*, 723 F.2d 1164 (5th Cir. 1984) ("annoy" or "alarm" another person) (cited at ECF No. 644 at 25); *Baggett v. Bullitt*, 377 U.S. 360, 368–69 (1964) (striking down statute with unclear *mens rea* requirement) (cited at ECF No. 644 at 25).

*Finally*, the LUPE Plaintiffs and OCA Plaintiffs contend that "Intervenors themselves have acknowledged how . . . imprecise Section 4.09 is."  ECF No. 644 at 24.  That is incorrect, as Intervenor-Defendants consistently have maintained that section 4.09, like the rest of SB 1, is constitutional.  *See, e.g.*, ECF No. 608 at 20–21.  The LUPE Plaintiffs and OCA Plaintiffs cite to the deposition of the late Alan Vera, who testified as a fact witness, not a Rule 30(b)(6) witness.  *See* ECF No. 644-27.  Mr. Vera, moreover, did not agree that section 4.09 is "imprecise"; instead, he clarified that, where poll watchers observe poll workers assisting voters, Texas law permits the poll watchers to get as close as necessary to "see and hear" that assistance without making contact with the poll worker or voter.  *See id.* at 54:4–25.  Mr. Vera's testimony thus confirms the LUPE

Plaintiffs' and OCA Plaintiffs' admission that Texas law requires poll workers to permit "a poll watcher . . . to see and hear an activity that he or she is permitted to observe."  ECF No. 644 at 26. The Court should grant summary judgment.

## III.   SECTION 7.04 DOES NOT VIOLATE FREE SPEECH RIGHTS (LUPE Count 7, OCA Count 7, LULAC Count 3).[1]

Summary judgment is also warranted on the LUPE, OCA, and LULAC Plaintiffs' First Amendment challenges to SB 1 section 7.04's vote-harvesting ban.  *See* ECF No. 608 at 22–27. Those challenges are unfounded facial challenges, and the Court should decline to adjudicate them to afford the Texas courts the opportunity to construe section 7.04 in the first instance.  *See id.*; *compare United States v. Hansen*, No. 22-179, slip. op. 4–20 (U.S. June 23, 2023) (adopting a limiting construction to save statute from alleged facial invalidity).   In all events, Plaintiffs' First Amendment challenges fail on the merits: section 7.04 is functionally equivalent to constitutional laws, such as bans on electioneering in, at, or near polling places, that preserve voters' "right to cast a ballot in an election free from the taint of intimidation and fraud" and from "confusion and undue influence." *Burson*, 504 U.S. at 199, 211; *see also* ECF No. 608 at 22–27.

The LUPE Plaintiffs', OCA Plaintiffs', and LULAC Plaintiffs' arguments against summary judgment uniformly fail.  *First*, Plaintiffs argue that the *Anderson/Burdick* framework does not govern their First Amendment challenges.  *See* ECF No. 639 at 11–12; ECF No. 644 at 14–16.  Plaintiffs' own cases recognize, however, that the *Anderson/Burdick* framework governs constitutional challenges to laws establishing "the mechanics of the electoral process," even when those laws implicate political speech. *McIntyre v. Ohio Elecs. Comm'n*, 514 U.S. 334, 345 (1995) (cited at ECF No. 639 at 12–13); *see also Anderson v. Celebrezze*, 460 U.S. 780, 794 (1983) (not

---

[1] Intervenor-Defendants also moved for summary judgment on LUPE Plaintiffs' Count IX, but that claim has been voluntarily dismissed.  *See* ECF No. 644 at 14 n.7.

applying strict scrutiny to ballot-access restriction on independent candidates even though "the primary values protected by the First Amendment . . . are served when election campaigns are not monopolized by the existing political parties") (cited at ECF No. 639 at 14 n.5); *Burdick v. Takushi*, 504 U.S. 428 (1992) (involving a free-speech challenge to law prohibiting write-in voting) (cited at ECF No. 639 at 14 n.5).  Moreover, the LULAC Plaintiffs read only half of the Fifth Circuit's decision in *Steen*, 732 F.3d 382, when they suggest that the law at issue there did not implicate core political speech.  *See* ECF No. 639 at 13.  In fact, the Fifth Circuit recognized that the "voter registration drives" regulated by that law "involve[d] core protected speech"—and that the law required advocacy organizations engaged in such drives to deploy "appropriate division of labor and organizational forethought" to exercise their right to "urge, advocate, interact, and persuade." *Steen*, 732 F.3d at 390; *see also id.* at 393 ("Even assuming *arguendo* that [the challenged law] implicate[s] First Amendment interests, [it] pass[es] the *Anderson/Burdick* balancing test.").

Section 7.04 likewise regulates the "mechanics of the electoral process" and how voters perform the weighty act of completing their ballot.  *McIntyre*, 514 U.S. at 345; *see also Burdick*, 504 U.S. 428.  Plaintiffs' First Amendment claims therefore are governed by—and fail under— the *Anderson/Burdick* framework.  *See* ECF No. 608 at 23–24.

Nonetheless, for their part, the LUPE Plaintiffs and OCA Plaintiffs argue that section 7.04 "triggers strict scrutiny" because it prohibits speech based on "both the content and viewpoint expressed."  ECF No. 644 at 15.  The LUPE Plaintiffs and OCA Plaintiffs are simply incorrect.  In the first place—as the LULAC Plaintiffs agree, *see* ECF No. 639 at 11—section 7.04 is viewpoint-neutral, not viewpoint-based, because it "makes no distinction based on" *which* candidates or measures on whose behalf the speaker intends to deliver votes.  *Mansky*, 138 S. Ct. at 1886. Moreover, even though section 7.04 is content-based, Plaintiffs are incorrect that strict scrutiny

applies to it.  *See* ECF No. 639 at 11–12; ECF No. 644 at 14–16.  To the contrary, when regulating the "weighty civic act" of casting a ballot, the State can impose reasonable "content-based restrictions on speech …, including restrictions that exclude political advocates and forms of political advocacy," without triggering strict scrutiny.  *Mansky*, 138 S. Ct. at 1885–87.  And if the State may "set aside an island of calm" free from electioneering and political advocacy for voters at the polling place, *id.* at 1887, it surely can extend that island to voters who fill out their ballots elsewhere, *see* ECF No. 608 at 24–25.

*Second*, Plaintiffs argue that section 7.04 "severely burdens 'core political speech.'"  ECF No. 644 at 16; *see also* ECF No. 639 at 11–12.  But their own statements and submissions prove otherwise.  The LUPE Plaintiffs and OCA Plaintiffs cite a putative expert political scientist's opinion that section 7.04 "is so broad that it can encompass almost any interaction with persons just discussing voting, whether a mail ballot is visible or not."  ECF No. 644 at 16 (quoting ECF No. 644-16 at 7).  Not only is such putative expert opinion inadmissible; it is also wrong as a matter of law.  Section 7.04 does not cover "almost any interaction with persons," but instead only in-person interactions.  *See* SB 1 § 7.04.  It also does not cover "just discussing voting," but advocacy intended to deliver votes for a specific candidate or measure.  *See id.*  And it does not apply unless the vote harvester knows or should know that an uncompleted ballot is physically present.  *See id.*; Tex. Penal Code § 6.02(c).

Thus, section 7.04's *mens rea* requirement means that section 7.04 does not apply "merely" when a ballot is "in the same room or in the voter's purse."  ECF No. 644 at 17.  And while section 7.04 applies to locations other than polling places, *see, e.g.*, *id.* at 18, polling places could also be placed in a variety of locations such as "school[s], house[s] of worship, [and] librar[ies]," *id.* at 16.

And, like polling places where the State creates an "island of calm," *Mansky*, 138 S. Ct. at 1886, so too is section 7.04 triggered by the physical presence and sanctity of the ballot.

Accordingly, section 7.04 bears no resemblance to the law struck down in *Meyer v. Grant*, 486 U.S. 414 (1988), which prohibited campaigns from paying persuaders to approach potential voters under *any* circumstances. *See id.* at 424 (cited at ECF No. 639 at 15 and ECF No. 644 at 15); *see also Bernbeck v. Moore*, 126 F.3d 1114, 1115–16 (8th Cir. 1997) (involving regulation of circulation of petitions, not completing and casting of ballots) (cited at ECF No. 639 at 15). Section 7.04, by contrast, applies only in an inherently narrow range of scenarios. *See* ECF No. 608 at 23–24. It therefore does not significantly burden speech, let alone trigger strict scrutiny. *See id.* Nor does section 7.04, properly construed, deprive voters of lawful and appropriate assistance, *see* ECF No. 644 at 19–20, because the vote harvesting it prohibits is not voter assistance.

*Third*, Plaintiffs argue that section 7.04 fails strict scrutiny because Intervenor-Defendants have not established that section 7.04 "is necessary to serve a compelling state interest and that the law is narrowly tailored to serve that interest." ECF No. 644 at 18; *see also* ECF No. 639 at 17–21. But, as explained, section 7.04 does not trigger strict scrutiny. *See* ECF No. 608 at 23–24. Even if it did, however, section 7.04 would satisfy such scrutiny. *See id.* at 24–25. In the first place, Plaintiffs misconstrue the strict scrutiny standard in this context. When, as now, the state is pursuing its "compelling interest in securing the right to vote freely and effectively," the strict scrutiny standard is relaxed. *Burson*, 504 U.S. at 208–09 (plurality op.). After all, requiring proof that an election law "is perfectly tailored to deal with voter intimidation and election fraud would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action." *Id.* at 209. Legislatures "should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the

response is reasonable and does not significantly impinge on constitutionally protected rights." *Id.*; *accord Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2347–48 (2021).

Thus, the State was not required to wait for "undue influence in connection with mail voting" to become "a problem in Texas," ECF No. 644 at 19, before taking action to address it. It also did not need to identify an "actual problem" in a past election and demonstrate that section 7.04 was "*necessary* to the solution." ECF No. 639 at 17. Section 7.04 is constitutional because it represents a "reasonable" effort to advance the State's "obviously . . . compelling" interest in "protecting voters from confusion and undue influence" and in protecting "the right to cast a ballot in an election free from the taint of intimidation and fraud"—and it does so without "significantly imping[ing] on constitutionally protected rights." *Burson*, 504 U.S. at 198–99, 209 (plurality op.); *see also id.* at 200 (acknowledging "the necessity of restricted areas in or around polling places"); ECF No. 608 at 23–25.

Moreover, section 7.04 satisfies strict scrutiny under any proper formulation of the standard because it is narrowly tailored to fulfill Texas's interests in preventing undue influence and pressure on voters completing their ballots. *See* ECF No. 608 at 23–25. After all, that Plaintiffs apparently want their paid agents to knowingly take actions intended to deliver votes for a specific candidate or measure in the physical presence of an uncompleted ballot, *see* ECF No. 639 at 16–17; ECF No. 644 at 17–18, is reason to *uphold*, not strike down, section 7.04, *see* ECF No. 608 at 23–25.

The LULAC Plaintiffs' argument that section 7.04 is not narrowly tailored because individuals "will unwittingly subject themselves to criminal penalty," ECF No. 639 at 19, overlooks that section 7.04's robust scienter requirement forecloses an "unwitting[]" violation. Moreover, the LULAC Plaintiffs' various suggestions that the Legislature could have drafted

section 7.04 differently do not disprove that it is narrowly tailored.  *See Burson*, 504 U.S. at 210

(plurality op.) (narrow tailoring of ban on electioneering outside polling place did not require the

State to justify its decision to adopt a "100-foot boundary line" rather than a 25-foot boundary

line).  Indeed, the LULAC Plaintiffs disregard that the State's interests sweep more broadly than

the prevention of "fraudulent speech," ECF No. 639 at 19, and they also encompass the State's

"obviously . . . compelling" interests in "protecting voters from confusion and undue influence"

and in protecting "the right to cast a ballot in an election free from the taint of intimidation,"

*Burson*, 504 U.S. at 198–99, 209 (plurality op.).  And the LULAC Plaintiffs' suggestion that

"existing laws prohibit the very conduct that [section 7.04] supposedly targets," ECF No. 639 at

19, ignores that *Burson* rejected an identical argument, *see* 504 U.S. at 206–07 (upholding ban on

electioneering even though the State also outlawed "[i]ntimidation and interference").  The Court

should grant summary judgment.

## IV.    SB1 DOES NOT VIOLATE SECTION 208 OF THE VRA (LUPE Count 5, HAUL Count 5, OCA Count 4, LULAC Count 4).

Finally, the Court should grant summary judgment on Plaintiffs' claims under Section 208

of the Voting Rights Act because Plaintiffs lack a private right of action to enforce Section 208,

and SB 1's vote harvesting ban (SB 1 section 7.04) and voter assistance provisions (SB 1 sections

6.01, 6.03, 6.05, 6.06, and 6.07) do not violate Section 208 in any event.  *See* ECF No. 608 at 27–

30.

The LUPE Plaintiffs and HAUL Plaintiffs offer four main arguments in an effort to avoid

summary judgment on their Section 208 claims, all of which fail.  *First*, Plaintiffs argue that

Section 208 prohibits States from imposing *any* restrictions on who can serve as a voter assistant.

*See* ECF No. 643 at 22–25; ECF No. 644 at 9–11 (citing *Disability Rts. N.C. v. N.C. State Bd. of

Elecs.*, 602 F. Supp. 3d 872, 878 (E.D.N.C. 2022) and *Ark. United v. Thurston*, 626 F. Supp. 1064,

1087 (W.D. Ark. 2022)).  Section 208's plain language, however, protects a voter's right to "assistance by *a* person of the voter's choice," 52 U.S.C. § 10508 (emphasis added), not *the* person of her choice, *see Priorities USA v. Nessel*, 487 F. Supp. 3d 599, 619 (E.D. Mich. 2020); *see also McFadden v. United States*, 576 U.S. 186, 191 (2015) ("When used as an indefinite article, 'a' means '[s]ome undetermined or unspecified particular.'").  The SB 1 provisions Plaintiffs challenge are well within the "state law limitations on the identity of persons who may assist voters" that Congress left intact when it enacted Section 208.  *Priorities USA*, 487 F. Supp. 3d at 619; *see also* ECF No. 608 at 27–29.

*Second*, Plaintiffs cite the Fifth Circuit's decision in *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017) (ECF No. 643 at 22, 26 and ECF No. 644 at 12), but that decision addressed a state law purporting to limit the *scope* of assistance an individual could provide a voter, not a limitation on *who* may serve as an assistant, *see id.* at 614–15.  In fact, if anything, that decision underscores that Section 208 does not preempt SB 1 section 7.04.  In particular, the Fifth Circuit concluded that the type of voter assistance Section 208 protects is assistance in completing "all action[s] necessary to make a vote effective." *Id.* at 614–15 (quoting 52 U.S.C. § 10310(c)(1)); *see also* ECF No. 424 at 27–30.  Vote harvesting—paid advocacy intended to deliver votes for a particular candidate or measure—is not an "action necessary to make a vote effective," so it is not "assistance" within the meaning of Section 208.  *OCA-Greater Houston*, 867 F.3d at 614–15; *see also* ECF No. 424 at 27–30.  Thus, in all events, the Court should grant summary judgment against the LUPE Plaintiffs on their Section 208 challenge to SB 1 section 7.04.

*Third*, the HAUL Plaintiffs attempt to manufacture a triable issue of fact with respect to their Section 208 claims, but to no avail.  For example, the HAUL Plaintiffs contend that, as a result of SB 1 section 6.01, "individuals and organizations that have provided rides to the polls in

the past have limited transportation since SB 1 went into effect."  ECF No. 643 at 28.  But the paragraph in their statement of facts they cite to support this assertion says nothing about "rides" or "transportation."  *Id.* at 6–7 (¶ 12).  Nor does any other paragraph in their statement of facts. *See id.* at 2–12.  Moreover, the HAUL Plaintiffs' various factual submissions do not identify any voter who was unable to obtain assistance or to vote because of SB 1.  *See id.* at 28–30.  Instead, they at most identify voters who declined to ask a specific individual for assistance but who successfully voted with or without assistance.  *See id.*

*Finally*, the LUPE Plaintiffs misrepresent the "record" when they contend that the "evidence" shows that section 6.04's revised oath requirement for assistors limits a voter's choice of assistor.  ECF No. 644 at 13.  The LUPE Plaintiffs do not identify *any* voter who was unable to receive assistance or to complete the act of voting.  Instead, at most they identify individuals who decided not to offer assistance in recent elections.  *See id.* (citing various depositions).  And the LUPE Plaintiffs' representation that "extensive record evidence supports th[eir] allegations" that their paid canvassers "could potentially be prosecuted" under section 7.04 merely for assisting voters, *id.* at 14, is equally inaccurate.  The depositions that the LUPE Plaintiffs cite establish only that LUPE engages in get-out-the vote operations, *see* ECF No. 644-19 at 66:2–67:15, 69:8–70:17 (cited at ECF No. 644 at 14), and has trained its paid agents about SB 1, *see* ECF No. 644-21 at 25:18–26:7, 55:3–56:35, not that individuals "could potentially be prosecuted" under section 7.04 for assisting voters, ECF No. 644 at 14.

## CONCLUSION

The Court should grant summary judgment for Defendants on Plaintiffs' materiality, vagueness, First Amendment, and Section 208 claims.

Dated: July 14, 2023

Respectfully submitted,

*/s/ John M. Gore*
John M. Gore
E. Stewart Crosland (*pro hac vice*)
Stephen J. Kenny (*pro hac vice*)
Louis J. Capozzi III (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
jmgore@jonesday.com
scrosland@jonesday.com
skenny@jonesday.com
lcapozzi@jonesday.com

*Counsel for Intervenor-Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 14, 2023, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send notification of this filing to all counsel of record.

*/s/ John M. Gore*