**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | |
| *Plaintiffs,* | |
| v. | 5:21-cv-844-XR |
| | |
| GREGORY W. ABBOTT, et al., | |
| *Defendants.* | |
| OCA-GREATER HOUSTON, et al., | |
| *Plaintiffs,* | |
| v. | 1:21-cv-0780-XR |
| | |
| JANE NELSON, et al., | |
| *Defendants.* | |

## OCA PLAINTIFFS' REPLY IN SUPPORT OF OCA PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT .................................................................................. 1

ARGUMENT .............................................................................................................. 3

I.  There is No Dispute of Material Fact that SB 1 Causes Denials of the Right to Vote Based on Errors and Omissions. .................................................................................. 3

   A.  The Materiality Provision Broadly Defines the Denial of the Right to Vote. ................. 4

     i.  The Materiality Provision does not require showing an absolute prohibition on voting. 4

     ii.  There is no dispute that voters were disenfranchised despite SB 1's cure processes and that in-person voting is not an option for all voters. ............................... 9

   B.  State Defendants' attempts to minimize the impact of SB 1's matching-number requirement are meritless. .......................................................................... 11

   C.  State Defendants' prognostications regarding "better" rejection rates in the future do not preclude summary judgment. ........................................................................ 13

II.  There is No Dispute of Material Fact that Denials are Based on Errors or Omissions that Occur on Voting Paperwork .............................................................................. 15

III.  The Undisputed Facts Establish That SB 1's Matching-Number Requirement is Not Material to Establishing Qualifications to Vote ........................................................ 16

   A.  Texas cannot define away the Materiality Provision's protections. ........................... 17

   B.  Defendants Fail to Show That SB 1's Matching Number Requirement Is Necessary to Identify Voters. .................................................................................... 19

   C.  Neither the Help America Vote Act's voter registration requirements nor the Eleventh Circuit's holding in *Browning* apply here. ........................................................ 22

   D.  Texas's interest in deterring voter fraud is not relevant here. ................................. 25

   E.  State Defendants' identification of minor clerical errors committed by election officials prior to SB 1 has no impact on OCA Plaintiffs' claim. .......................................... 28

IV.  Defendants' Remaining Legal Arguments Fail. ................................................... 29

   A.  The Materiality Provision does not require a showing of racial discrimination or other unequal treatment. .................................................................................. 29

   B.  OCA Plaintiffs challenge the provisions of SB 1 that collectively implement its matching-number requirement. ...................................................................... 30

   C.  OCA Plaintiffs have standing to challenge SB 1's matching-number requirement. ....... 35

CONCLUSION ......................................................................................................... 40

**TABLE OF AUTHORITIES**

CASES

*ACORN v. Fowler*, 178 F.3d 350 (5th Cir. 1999) .................................................................. 36, 37

*Andujar v. Gen. Nutrition Corp.*, 2018 WL 3999569 (D.N.J. Aug. 20, 2018) ............................ 34

*Arcia v. Fla. Sec'y of State*, 772 F.3d 1335 (11th Cir. 2014) .................................................. 35,36

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547 (5th Cir. 2010) .. 36, 38

*Ball v. Chapman,* 289 A.3d 1 (Pa. Feb. 8, 2023) ...................................................................... 16

*Black Voters Matter Fund v. Raffensperger*, 478 F. Supp. 3d 1278, 1298–99 (N.D. Ga. 2020),
     *aff'd sub nom.*, *Black Voters Matter Fund v. Sec'y of State for Ga.*, 11 F.4th 1227 (11th Cir.
     2021). ........................................................................................................................ 36

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021) .................................................. 26

*Broyles v. Texas*, 618 F. Supp. 2d 661 (S.D. Tex. 2009) .......................................................... 30

*Carter v. Cnty. of Hays*, 2019 WL 436556 (W.D. Tex. Feb. 4, 2019) ........................................ 35

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................ 35

*Church of Scientology v. Cazares*, 638 F.2d 1272 (5th Cir. 1981).............................................. 38

*Coggins v. Carpenter*, 468 F. Supp. 270 (E.D. Pa. 1979)......................................................... 37

*Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009) .......................................... 35

*Conley v. Gibson,* 355 U.S. 41 (1957) ..................................................................................... 33

*Craig v. Boren*, 429 U.S. 190 (1976).................................................................................. 39, 40

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) ....................................................... 9

*Democratic Executive Comm. of Fla. v. Lee*, 915 F.3d 1312 (11th Cir. 2019) ............................ 12

*Deutsch v. N.Y. State Bd. of Elections*, 2020 WL 6384064 (S.D.N.Y. Oct. 30, 2020)........... 31, 32

*Down E. Energy Corp. v. Niagara Fire Ins. Co.*, 176 F.3d 7 (1st Cir. 1999) .............................. 34

*Edwards Fam. P'ship, LP v. BancorpSouth Bank*, 236 F. Supp. 3d 964 (S.D. Miss.), *aff'd*, 699 F.
     App'x 312 (5th Cir. 2017) ........................................................................................... 35

*Fed. Election Comm'n v. Akins*, 524 U.S. 11 (1998)................................................................. 37

*Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153 (11th Cir. 2008 ...................... passim

*Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544 (1996)................... 36

*Ford v. Tenn. Senate*, 2006 WL 8435145 (W.D. Tenn. Feb. 1, 2006) ......................................... 6

*Friedman v. Snipes*, 345 F. Supp. 2d 1356 (S.D. Fla. 2004) .................................................... 16

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ............... 15

*Globeranger Corp. v. Software AG*, 2014 WL 4968053 (N.D. Tex. Oct. 6, 2014)...................... 34

*Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002) ........................................................................... 40

*Homoki v. Conversion Servs., Inc.*, 717 F.3d 388 (5th Cir. 2013)........................................ 33, 34

*Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421 (5th Cir. 2021)................................................... 30

*Keene Corp. v. United States*, 508 U.S. 200 (1993) ................................................................. 30

*Kirksey* v. *City of Jackson*, 663 F.2d 659 (5th Cir. 1981)......................................................... 30

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) .............................................................................. 39

*La Union del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512 (W.D. Tex. 2022)...................... 4, 5

*La Union del Pueblo Entero v. Abbott*, 614 F. Supp. 3d 509 (W.D. Tex. 2022)........................ 36

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) ................... 12

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) .... 38

*McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465 (5th Cir. 2014)................................. 36

*McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338 (5th Cir. 1988) .......................... 39

*McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802 (1969) .......................................... 7

*Melot v. Bergami*, 970 F.3d 596 (5th Cir. 2020)............................................................................ 12

*Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022), *vacated as moot*, *Ritter v. Migliori*, 143 S. Ct.
 297 (2022)............................................................................................................................ passim

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617 (2018) ....................................................... 29

*Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012)........................................ 12

*OCA-Greater Houston v. Texas,* 867 F.3d 604 (5th Cir. 2017)....................................................... 6

*Planned Parenthood v. Danforth*, 428 U.S. 52 (1975) ................................................................. 39

*Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786 (7th Cir. 2013).......................... 39

*Polychrome Int'l Corp. v. Krigger*, 5 F.3d 1522 (3d Cir. 1993).................................................... 12

*Powers v. Ohio*, 499 U.S. 400 (1991) .......................................................................................... 40

*Quarles v. United States*, 139 S. Ct. 1872 (2019)................................................................. 19, 25

*Richardson v. Tex. Sec'y of State*, 485 F. Supp. 3d 744, 773 (W.D. Tex. 2020), *rev'd in part on
 other grounds*, 28 F.4th 649 (5th Cir. 2022)......................................................................... 40

*Richardson v. Tex. Sec'y of State*, 978 F.3d 220 (5th Cir. 2020)............................................... 7, 8

*Riley v. Sch. Bd. Union Par.,* 379 F. App'x 335 (5th Cir. 2010) ................................................... 35

*Ritter v. Migliori*, 142 S. Ct. 1824 (2022)..................................................................................... 16

*Ryals v. El Paso Cty.*, 2015 WL 4589740 (W.D. Tex. Jan. 26, 2015), *aff'd*, 630 F. App'x 332
 (5th Cir. 2016)........................................................................................................................ 35

*Schwier v. Cox*, 412 F. Supp. 2d 1266 (N.D. Ga. 2005), *aff'd*, 439 F.3d 1285
 (11th Cir. 2006).................................................................................................................. 5, 26

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) ....................................................................... 5, 18

*Schwier v. Cox*, 439 F.3d 1285 (11th Cir. 2006) .......................................................................... 5

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ...................... 37, 38

*Singh v. Garland*, 855 F. App'x 958 (5th Cir. 2021)...................................................................... 7

*Singleton v. Wulff*, 428 U.S. 106 (1976)....................................................................................... 39

*Stover v. Hattiesburg Pub. Sch. Dist.*, 549 F.3d 985 (5th Cir. 2008) ..................................... 34, 35

*Stringer v. Hughs*, 2020 WL 6875182 (W.D. Tex. Aug. 28, 2020)............................................... 35

*Tex. All. for Retired Americans v. Hughs*, 489 F. Supp. 3d 667 (S.D. Tex. 2020), *rev'd in part on
 other grounds*, 28 F.4th 669 (5th Cir. 2022)..................................................................... 38, 39

*Tex. Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020) .............................................. 7, 11

*Tex. Democratic Party v. Abbott*, 978 F.3d 168 (5th Cir. 2022) ................................................... 5

*Tex. Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006) ............................................... 35

*Tex. League of United Latin Am. Citizens v. Abbott*, 493 F. Supp. 3d 548 (W.D. Tex. 2020),
 *vacated on other grounds*, 2021 WL 1446828 (5th Cir. Feb. 22, 2021) ........................... 38, 39

*Thompson v. N. Am. Stainless, LP*, 562 U.S. 170 (2011) ............................................................. 38

*Thrasher v. Ill. Republican Party*, 2013 WL 442832 (C.D. Ill. Feb 5, 2013) .............................. 16
*Thrift v. Estate of Hubbard*, 44 F.3d 348 (5th Cir. 1995) ............................................................ 33
*United States v. Mississippi*, 380 U.S. 128 (1965).................................................................... 18
*Veasey v. Perry*, 29 F. Supp. 3d 896 (S.D. Tex. 2014)....................................................... 39, 40
*Vote.org v. Callanen*, 2021 WL 5987152 (W.D. Tex. Dec. 17, 2021)...................................... 30
*Vote.Org v. Callanen*, 39 F.4th 297 (5th Cir. 2022) .......................................................... 7, 8, 38
*Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264 (W.D. Wash. 2006).................... passim
*Young v. United Parcel Serv., Inc.,* 575 U.S. 206 (2015) ............................................................ 30

## STATUTES

42 U.S.C. § 1983 ....................................................................................................... passim
52 U.S.C. § 10101 ..................................................................................................... passim
52 U.S.C. § 10101(a)(3)(A) ................................................................................... 4, 5, 6
52 U.S.C. § 10101(a)(2)(B) ........................................................................................ passim
52 U.S.C. § 10101(d) ...................................................................................................... 37
52 U.S.C. § 10101(e) .................................................................................................... 4, 6
52 U.S.C. § 21083(a)(5)(A)(i) ................................................................................... 22, 23
52 U.S.C. § 21083(a)(5)(A)(ii) ........................................................................................ 23
O.C.G.A. § 21-2-216 ...................................................................................................... 19
Tex. Elec. Code § 13.002 ................................................................................................ 22
Tex. Elec. Code § 13.007 ................................................................................................ 26
Tex. Elec. Code § 64.012 ................................................................................................ 26
Tex. Elec. Code § 64.036 ................................................................................................ 26
Tex. Elec. Code § 82.001 ................................................................................................ 10
Tex. Elec. Code § 82.002 ................................................................................................ 10
Tex. Elec. Code § 82.003 ................................................................................................ 10
Tex. Elec. Code § 82.004 ................................................................................................ 10
Tex. Elec. Code § 82.007 ................................................................................................ 10
Tex. Elec. Code § 82.008 ................................................................................................ 10
Tex. Elec. Code § 84.002 ................................................................................................ 31
Tex. Elec. Code § 84.0041 .............................................................................................. 26
Tex. Elec. Code § 84.011(a) ........................................................................................... 31
Tex. Elec. Code § 86.001(f) .............................................................................................. 3
Tex. Elec. Code § 86.002 ................................................................................................ 31
Tex. Elec. Code § 86.002(g) ........................................................................................... 32
Tex. Elec. Code § 86.0051 .............................................................................................. 26
Tex. Elec. Code § 86.006 ................................................................................................ 26
Tex. Elec. Code § 86.015(c)(4) ....................................................................................... 32
Tex. Elec. Code § 87.0411 ......................................................................................... 32, 33
Tex. Elec. Code § 87.041(b)(8) ......................................................................................... 3
Tex. Elec. Code § 87.0271 .............................................................................................. 32

Tex. Elec. Code § 87.0411(a)(4) ................................................................................. 32

**OTHER AUTHORITIES**

*Excuses to Vote Absentee*, Nat'l Conference of State Legislatures (July 12, 2022),
    https://www.ncsl.org/elections-and-campaigns/table-2-excuses-to-vote-absentee. ................ 10
H.R. Rep. No. 88-914 (1963), *reprinted in* 1964 U.S.C.C.A.N. 2391 ....................................... 18
H.R. Rep. No. 107-329(I) (2001), 2001 WL 1579545 ............................................................... 22
Standard Form 76, *Federal Post Card Application*,
    https://www.fvap.gov/uploads/FVAP/Forms/fpca.pdf ............................................................ 31
Warren M. Christopher, *The Constitutionality of the Voting Rights Act of 1965*, 18 Stan. L. Rev.
    1 (1965) ................................................................................................................... 16

**RULES**

Fed. R. Civ. P. 56(e) ................................................................................................... 35

## PRELIMINARY STATEMENT

The Materiality Provision prohibits (1) denial of the right to vote; (2) based on an error or omission; (3) "on [a] record or paper relating to any application, registration, or other act requisite to voting"; (4) where that error or omission is "not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101. As OCA Plaintiffs[1] established in their motion for summary judgment (ECF 611, "OCA MSJ"), the undisputed facts show that SB 1's matching-number requirement is a clear violation of the Materiality Provision. The State Defendants' (ECF 646, "State's Br.") and Intervenor-Defendants' (ECF 635, "GOP's Resp. Br.") responses attempt to muddy the waters by pointing to irrelevant factual disputes and rejected legal theories, but their arguments are unavailing.

First, the OCA MSJ establishes that SB 1's matching-number requirement clearly denies the right to vote by requiring the rejection of applications for a ballot by mail ("ABBMs") and mail ballots that fail to comport with it. There is no dispute that these rejections are caused by errors (failure to enter the precise ID number that matches what is contained in the State voter database) or omissions (failure to enter any number). And the undisputed evidence shows that SB 1's matching-number requirement disenfranchised approximately 40,000 mail voters during statewide elections in 2022. The State and GOP argue that a denial of the right to vote is only an absolute legal prohibition on voting, and so the rejection of mail ballots and applications does not qualify as a denial. But as this Court and others have recognized, the Materiality Provision's plain text refutes Defendants' argument because it broadly defines the "right to vote." Defendants further argue that their "fixes" will result in *fewer* voters being disenfranchised under SB 1's ID matching provisions, but a vague

---

[1] OCA-Greater Houston (OCA-GH), League of Women Voters of Texas (LWVTX), and REVUP-Texas (REVUP).

promise of violating the law less often in the future is no basis to avoid summary judgment—especially not here, where defendants do not contest that even if the TEAM database[2] were flawless, numerous voters would still be denied the right to vote for omitting a matching number that the undisputed facts make clear is entirely superfluous.

Second, undisputed facts show that the errors or omissions leading to the denial of the right to vote occur on "[a] record or paper relating to any application, registration, or other act requisite to voting"—here, ABBMs and carrier envelopes for mail ballots. 52 U.S.C. § 10101. Defendants argue that the Materiality Provision is limited only to registration, but that argument is belied by the plain language of the statute which refers to "any . . . other act requisite to voting." *Id.*

Third, the OCA MSJ establishes that the errors or omissions here are "not material in determining whether such individual is qualified under State law to vote in such election." *Id.* The undisputed facts show that SB 1's matching-number requirement is not part of the statutorily enumerated eligibility qualifications to vote—a fact that Intervenors concede. Further, the matching-number requirement does not even serve to identify the voter; the undisputed evidence shows that, before and after SB 1, voters are identified using the other personalized information they enter on their applications and ballots. And even if providing a *valid* number could be considered material (which on this record it cannot be), providing an ID number that *matches* the TEAM database cannot, because that database is riddled with errors. Defendants' response is that the matching-number requirement is a qualification to vote because the State says it is, but this tautology would make the Materiality Provision a dead letter. The State's other argument is that the ID provision could be an

---

[2] TEAM is the Texas Election Administration Management system, against which the ID number supplied by a voter must be matched. OCA MSJ at 8–9.

2

extraneous attempt to "confirm" a voter's identity *after* the voters' identity has already been established, but this superfluous step is immaterial to determining the voter's qualifications and instead compounds the chance for errors and disenfranchisement. Defendants also argue that the matching-number requirement serves to deter voter fraud, but the Materiality Provision is not a burden-interest balancing statute. Materiality Provision violations are prohibited no matter their purposed policy aim. Regardless, the evidence doesn't show that the matching-number requirement serves the State-claimed anti-fraud purpose.

Finally, Defendants offer a hodge podge of other arguments that have either already been rejected or are legally irrelevant. They claim that the Materiality Provision is limited to instances of racial discrimination, but the provision's plain text refutes this claim. They claim that OCA Plaintiffs' suit takes aim at too many sections of SB 1, but OCA Plaintiffs properly challenged the whole SB 1 ID- matching-number statutory scheme. And lastly, they incorrectly claim that OCA Plaintiffs lack statutory and third-party standing, but don't seriously dispute OCA Plaintiffs' organizational and associational standing. Summary judgment should be granted.

## ARGUMENT

## I.     There is No Dispute of Material Fact that SB 1 Causes Denials of the Right to Vote Based on Errors and Omissions.

The OCA MSJ establishes that there is no dispute of material fact that SB 1's matching-number requirement denies the right to vote based on errors or omissions. The statute's plain text requires the rejection of ABBMs and mail ballots when a voter fails to correctly include the requisite matching ID number. Tex. Elec. Code ("TEC") § 86.001(f); TEC 87.041(b)(8). The undisputed facts also show that in 2022 these requirements disenfranchised tens of thousands of voters. OCA MSJ at 14–18. OCA Plaintiffs provided, among other things, deposition and declaration testimony from

3

themselves as well as 19 individual witnesses—all of whom have valid ID numbers and were previously registered to vote, and most of whom previously voted by mail with no issue—setting out how SB 1 has disenfranchised or injured them. OCA MSJ at 25–26, 31, 35, 38–39.[3] Defendants' arguments to the contrary are unavailing.

### A.  The Materiality Provision Broadly Defines the Denial of the Right to Vote.

Relying on legal arguments this Court has already rejected, Defendants again argue that the rejection of ABBMs and mail ballots due to SB 1 are not "denials" of the right to vote under the Materiality Provision because voters are not "absolutely prohibited from voting" and can in theory cure the rejection by submitting another ABBM or mail ballot or voting in person. State's Br. at 41–47, GOP Resp. Br. at 3. But this ignores the statute's plain text, court precedent, and congressional intent, all of which confirm that the "right to vote" is denied under the statute each time an ABBM or mail ballot is rejected for immaterial paperwork errors or omissions.

### i.  The Materiality Provision does not require showing an absolute prohibition on voting.

The Materiality Provision forbids "deny[ing] the right of any individual to vote," and broadly defines "vote" as "all action necessary to make a vote effective including, but not limited to . . . casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast." 52 U.S.C. §§ 10101(a)(2)(B), (a)(3)(A), (e). This Court and others have held this language to mean that paperwork with an immaterial error or omission must be accepted, not rejected with an invitation to try again. *See, e.g.*, *La Union del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 541 (W.D. Tex. 2022) (the Materiality Provision "does not say that state actors may initially deny the right to vote

---

[3] OCA Plaintiffs additionally included e-mails from twelve individual voters who e-mailed the SOS's office with similar stories. OCA MSJ at 24–25.

based on errors or omissions that are not material as long as they institute cure processes"); *Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1266–67, 1271 (W.D. Wash. 2006) (finding it irrelevant that voters denied the right to vote due to an immaterial ID number mismatch could cure). Each time a voter's paperwork is denied because of SB 1's immaterial matching-number requirement, their statutory right to vote has been denied.

Nonetheless, Defendants reassert their already-rejected legal argument that a "denial" under the Materiality Provision occurs only when a person is "absolutely prohibited" from voting. State Br. at 41; GOP Resp. Br. at 3, 6 (equating "denial" with "disqualification" and "removal from the list of registered voters"). Defendants try to import a definition of "denial" used in other contexts, and which this Court has already declined to transpose into the Materiality Provision. *Compare* States' Br. at 42 (citing *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 188 (5th Cir. 2022) (interpreting language in the Twenty-Sixth Amendment)) *with La Union del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 541 (W.D. Tex. 2022) ("*Texas Democratic Party[]*, however, is inapposite. There, the Fifth Circuit analyzed whether the right to vote had been denied under the Constitution, not a statute.").[4]

---

[4]     State Defendants also incorrectly rely on *Schwier I* in the 11th Circuit for language that the Materiality Provision applies where potential voters have been "disqualified." State's Br. at 45 (citing *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003)). However, that opinion did not interpret the Provision or reach the merits of the Materiality Provision claim at all. *Schwier*, 340 F.3d at 1297 (remanding for further consideration). In *Schwier II*, the 11th Circuit subsequently affirmed that rejecting voter registration forms for lack of social security numbers violated the Materiality Provision. *Schwier v. Cox*, 439 F.3d 1285, 1286 (11th Cir. 2006) (affirming *Schwier v. Cox*, 412 F. Supp. 2d 1266 (N.D. Ga. 2005)). Notably, *Schwier* found a Materiality Provision violation although plaintiffs were not prohibited from attempting to register to vote again, and in fact one plaintiff had been offered thirty days to correct their voter registration application after it was rejected. *Schwier*, 412 F. Supp. 2d at 1267–68.

     Intervenor Defendants' argument that the "right" to vote has not been denied when voter's ballot is not counted because of a matching-number error fails for similar reasons. GOP's Resp. Br. at 5 (labeling this instead, without citation, the "act" of voting). OCA Plaintiffs have already addressed these arguments in their opposition to Intervenor-Defendants' Motion for Summary Judgment, and fully incorporate those arguments here. ECF 636 at 10–12. The Materiality Provision defines voting as "all action necessary to make a vote effective including, but not limited to . . . casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast." 52 U.S.C.

Accepting Defendants' atextual rewriting of the statute's terms would effectively nullify the Materiality Provision by allowing rejections for immaterial paperwork requirements if voters could theoretically try to meet the requirements in the future. Texas could require that voters correctly list their license plate number, or their kindergarten teacher's name, or their age in days on their ABBM or mail ballot materials, reject voters' paperwork for failure to do so, and end-run the Materiality Provision by pointing to the fact that these voters have not been outright prohibited from voting and, in theory, might yet comply with the patently immaterial requirements.

Defendants' definition of "denial" would subsume the Materiality Provision's effectiveness entirely, which can be demonstrated by looking at voter registration. There, potential voters may resubmit a voter registration form even after a prior rejection. According to the State's argument, it could require patently immaterial information when registering to vote, such as listing the months and days in someone's age, because the voter could continue to try to register once the State rejects their application. But even Defendants admit that the Materiality Provision was meant to stop such immaterial voter registration rejections, *see* State Br. at 30, GOP Resp. Br. at 4—although, as explained below, they incorrectly try to confine the provision's application to registration, *see* States' Br. at 30; GOP Resp. Br. at 4. But by conceding that the Materiality Provision applies in the registration context, Defendants completely undercut their argument that "denial" is limited to an

---

§§ 10101(a)(3)(A), 10101(e). The Provision "by definition includes not only the registration and eligibility to vote, but also the right to have that vote counted." *E.g.*, *Ford v. Tenn. Senate*, 2006 WL 8435145, at *11 (W.D. Tenn. Feb. 1, 2006); *accord Migliori v. Cohen*, 36 F.4th 153, 162 (3d Cir. 2022), *vacated as moot*, *Ritter v. Migliori*,143 S. Ct. 297 (Mem) (2022); *see also OCA-Greater Houston v. Texas,* 867 F.3d 604, 615 (5th Cir. 2017) (interpreting materially identical language in Section 208 of the VRA as extending well beyond "the mechanical act of filling out the ballot sheet"). As a matter of plain text, rejecting a voter's application or "declining to count" their actual mail ballot merely because of an irrelevant paperwork error (GOP Resp. Br. 3) is denying their "right to vote" under the statute.

outright statutory prohibition on voting, since individuals can generally resubmit and correct paperwork in the registration context.

Defendants' last attempt to limit the definition of "denial" extrapolates from a non-precedential[5] motions panel decision in *Vote.org v. Callanen*, which predicted that rejecting certain faxed registration forms wouldn't violate the Materiality Provision because applicants could try to register again through other means. States' Br. at 46 (citing 39 F.4th 297, 305–07 (5th Cir. 2022)). But the *Vote.org* panel decision doesn't engage with the broad definition of "right to vote" in the Materiality Provision, which as explained above refutes the notion that a permanent prohibition on voting is needed to violate the Materiality Provision. *See* 39 F.4th at 305. Moreover, *Vote.org* is inapposite. While the *Vote.org* panel asserted that voters could try to register again through other means, voters here in fact *must* comply with SB 1's immaterial matching-number requirement to vote by mail, even during a subsequent cure attempt. The cure process does not negate prior violations of the Materiality Provision, and it traps voters into a loop of having to repeatedly try to comply with the matching-number requirement to vote by mail. *Infra* at 9–11. As set out below, both common sense and the undisputed facts demonstrate that voting in person is an insufficient alternative for many people able to vote by mail under state law. *Id.*[6]

---

[5] "[A]ny opinion on a motions panel is essentially written in sand with no precedential value." *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 244 (5th Cir. 2020) (Higginbotham, J., concurring) (citation omitted). Intervenor-Defendants' argument to the contrary, GOP Resp. Br. at 7, takes subsequent language from the Fifth Circuit out of context, which in fact affirms that a "decision 'granting a stay settles no law . . .and is not binding on the merits panel, leaving it as a writing in water," and observing only that the merits panel is "free to consider any persuasive force" it may find in a stay opinion. *Singh v. Garland*, 855 F. App'x 958 (5th Cir. 2021) (citing *Richardson*, 978 F.3d at 244).

[6] Case law likewise does not indicate that the existence of in-person voting allows the arbitrary rejection of mail voting paperwork without violating the Materiality Provision. Defendants rely only on cases where plaintiffs sought to expand the categories of people able to vote by mail under state law. *See McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 803 (1969) (plaintiffs were incarcerated voters where state law did not allow them to vote by mail); *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 402 (5th Cir. 2020) (plaintiffs were under 65 and not otherwise eligible to vote by mail under Texas law). Here, having already statutorily established voting by mail as an option to cast a ballot for certain voters, Texas is not permitted to reject those voters' ABBMs and mail ballots solely because of immaterial paperwork

State Defendants also cite to a footnote in the non-binding *Vote.Org* decision saying "[i]t cannot be that any requirement that may prohibit an individual from voting if the individual fails to comply denies the right of that individual to vote under" under the Materiality Provision. State's Br. at 45 (citing 39 F.4th at 305 n.6); *see also* GOP Resp. Br. at 10 (making similar arguments). But the Materiality Provision's plain terms are narrower than "any requirement" related to voting. The statute applies only to immaterial errors and omissions on voting-related paperwork. *See* 52 U.S.C. § 10101(a)(2)(B). It doesn't apply to numerous rules concerning when or where or how to vote, or concerning the manner of voting itself, by mail or otherwise. As such, the State may enact myriad voting requirements that would not be subject to the Materiality Provision. For instance—and leaving aside the potential for other statutory or constitutional challenges—the Materiality Provision wouldn't prevent a State from enacting a date by which vote by mail applications must be turned in, or establishing that only certain subsets of individuals are eligible to vote by mail (over 65, out of the state, etc.), or establishing specific times for in-person voting.[7] But this case involves precisely what the statute forbids: denying the right to vote based on an irrelevant paperwork error or omission.[8]

---

errors and omissions—regardless of whether voters are legally permitted to attempt to cure their paperwork or vote in person.

[7] OCA Plaintiffs have also previously responded to the scenarios that the Intervenor-Defendants offer (GOP Resp. Br. at 11) and incorporate their response fully here. *See* ECF 636 at 14. The Materiality Provision would not apply to a requirement that a mail ballot be placed in a secrecy envelope, because that is not "an error or omission *on* any record or paper." 52 U.S.C. § 10101(a)(2)(B) (emphasis added). It would not apply to prohibitions on overvoting a ballot, because that error is not on some "paper" that is made "requisite to voting," but rather on the ballot itself. Because the statute does not in fact threaten to invalidate "election rules across the country," its application in this case would not disturb (let alone upend) the federal-state balance, GOP Resp. Br. 12 (citation omitted).

[8] State Defendants also appear to assert that any denials of the right to vote caused by SB 1's flawed cure processes should be considered under the *Anderson-Burdick* framework, States' Br. at 45, which is limited to "address[ing] constitutional challenges to specific provisions of a State's election laws." *Richardson v. Texas Sec'y of State*, 978 F.3d 220, 233 (5th Cir. 2020) (emphasis added). They provide no basis for importing this framework into a Materiality Provision challenge, nor could there be one. Congress created a specific statute that prohibits the denial of voting rights on paperwork for immaterial reasons, and its plain language should control the outcome here.

8

### ii.   There is no dispute that voters were disenfranchised despite SB 1's cure processes and that in-person voting is not an option for all voters.

State Defendants try to create a fact issue on the cure process's efficacy, States' Br. at 20–23, 43–45, 48–49, but the cure process's efficacy is irrelevant because the Materiality Provision is violated every time an ABBM or mail ballot is rejected because of SB 1. Even were that not true, State Defendants do not dispute that many voters were and are unable cure their ABBMs and mail ballots. OCA MSJ at 19–24. Indeed, State Defendants acknowledge that during the November 2022 election, over half of the 11,430 voters whose mail ballots were rejected due to SB 1 couldn't cure or cast an effective vote by any other means. State's Br. at 44; *see* OCA MSJ at 17.[9]

State Defendants do not dispute evidence proving the point. For instance, it is undisputed that REVUP member Teri Saltzman is legally blind, had her ABBM rejected once and mail ballot rejected twice and not counted during the March 2022 election, and her mail ballot rejected *again* and not counted during the November 2022 election, despite trying to use the online cure process. OCA MSJ at 38–39 & n.163.[10] Each rejection was due to immaterial errors on her paperwork, and each violated the Materiality Provision regardless of whether she tried to vote *ad infinitum*.

State Defendants instead allege that new legislation may, once implemented, reduce some of the cure process's documented flaws. State's Br. at 20–23, 43. But, again, that a cure process exists

---

Intervenor-Defendants appear to agree that importing the *Anderson-Burdick* burden framework is inappropriate in this statutory context. GOP's Resp. Br. at 6 ("[T]he materiality provision does not regulate the *burdens* of in-person voting or curing." (emphasis added)). Accordingly, their discussion of burdens under *Anderson-Burdick* in *Crawford v. Marion* is inapplicable in this context. *See id.* (citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 199 (2008)).

[9] That *some* voters were able to cure their ABBMs or mail ballots does not negate that their paperwork was initially rejected in violation of the Materiality Provision, or that other voters who received rejections were unable to successfully use the cure process. OCA MSJ at 53.

[10] *See also*, *e.g.*, OCA MSJ at 39 & n.164 (REVUP-Texas member Yvonne Iglesias had her ABBM rejected twice despite attempted cure during the November 2022 election), 25–26 (Roberto Benavides attempted to cure his mail ballot but was unsuccessful), 26 n.105 (Bernadette Maloney attempted to cure her rejected mail ballot but was unsuccessful).

in no way negates a rejection's legal significance. And none of these future changes will fix *ongoing* systemic and chronic errors in the TEAM database, which are difficult for voters to correct and which the State has been unable to resolve. *See* OCA MSJ at 10–13, 22–24. These errors make the option to "try again" ineffective for these voters, because they won't be able to match their valid ID number to the incorrect or missing information in their TEAM voter file. For them, the cure process will remain flawed and limited, even if these legislative changes are implemented.

Finally, Defendants' insistence that a voter whose ABBM or mail ballot is rejected due to SB 1 can always vote in person, State's Br. at 43–45; GOP Resp. Br. at 5–6, 14, is legally irrelevant and factually incorrect. First, the Materiality Provision is violated every time an ABBM or mail ballot is rejected due to SB 1, even if a voter subsequently votes in person. Second, it is undisputed that for some people, voting in person is not an option. Texas law recognizes this reality by allowing enumerated classes of people who face impracticable challenges to vote in person (*e.g.*, because they are away from their county of residence) or who cannot vote in person at all (*e.g.*, due to disability) to vote by mail. *See* TEC §§ 82.001–.004, .007–.008.[11] For example, it is undisputed that REVUP-Texas member Yvonne Iglesias can't vote in person because she is a person who is paralyzed, experiences consistent muscle spasms, and is blind in one eye. OCA MSJ at 39 & n.164. Ms. Iglesias had her ABBM rejected twice due to SB 1's matching-number requirement during the November 2022 election and was unable to vote because voting by mail is the only form of voting that is

---

[11] The Texas Election Code's categories of people who may vote by mail are consistent with a nationwide recognition of the necessity of voting by mail for certain categories of people. *See Excuses to Vote Absentee*, Nat'l Conference of State Legislatures (July 12, 2022), https://www.ncsl.org/elections-and-campaigns/table-2-excuses-to-vote-absentee. ("All states permit voters who will be outside of their home county to vote absentee, as well as voters with an illness or disability who know ahead of time that they won't be able to make it to the polls. Many other states allow elderly voters to vote absentee."); *cf.* GOP's Resp. Br. at 5 (looking to how states historically offered VBM and acknowledging that most states historically offered voters with disabilities the option to vote by mail).

accessible to her. *Id.*[12] In other words, "[t]he mail-in ballot . . . [is her] only shot at exercising the franchise." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 405 (5th Cir. 2020). OCA Plaintiffs have also identified voters who were technically able to vote in person but for whom doing so would be a substantial health risk.[13] The argument that every person who suffers a rejection under SB 1 can simply vote in person ignores the Texas Election Code's longstanding provision of mail voting options to those who cannot (seniors, those with disabilities, or out of town, or serving in the army, etc.). It also defies common sense.

### B. State Defendants' attempts to minimize the impact of SB 1's matching-number requirement are meritless.

State Defendants manufacture a fact issue on the number of voters disenfranchised due to SB 1's ID matching provisions. But the undisputed material facts bear out that these provisions have disenfranchised and will continue to disenfranchise voters. Whether the precise number is in the thousands, hundreds, or even smaller is of no matter.[14] Defendants assert that "only" 6,355 mail

---

[12] OCA Plaintiffs provide numerous other undisputed factual examples of voters who were rejected under SB 1 and could not have subsequently voted in person absent substantial hardship. For instance, Texas resident Bernadette Maloney voted by mail from New York during the November 2022 election because she was there caring for her elderly mother and was unable to cure the rejection of her mail ballot online, OCA MSJ at 26 n. 105, while LWVTX member and Texas resident Milan Suarez voted by mail from Washington State during the November 2022 election because they are attending college there, had their ABBM rejected due to SB 1, and are unsure if their vote was counted, *id.* at 32 n.129.

[13] For example, because of SB1's matching-number requirement, Taylor Scott, who is diagnosed with Cerebral Palsy, is blind in one eye, and uses a power wheelchair, had to vote in person. OCA MSJ at 39 & n.165. Due to her disabilities and medical fragility, voting in person placed Ms. Scott at heightened risk of contracting Covid. *Id.*

[14]     State Defendants argue that the number of rejected mail ballots during the November 2022 election did not reflect the "the doom and gloom predictions" of Dr. Hersh's "simulated election using the TEAM database." State's Br. at 37 & n.171. This is both inaccurate and irrelevant. First, Dr. Hersh did not run a "simulation." He assessed the TEAM database and identified that 15–16% of voters in TEAM—were they to vote by mail—would be "at risk" of an ABBM or mail ballot rejection due to SB 1's matching-number requirement. OCA MSJ at 10–13, 50–51; ECF 611-1 Ex. 2, Hersh First Suppl. Expert Rep., May 4, 2022, ¶¶ 44–47 (rejecting characterization of his analysis as a "simulation"). Second, as set out immediately below in the text, the Materiality Provision does not require some threshold number of votes denied prior to its violation, and even if it did, thousands of votes would certainly qualify.

        For the same reasons, State Defendants' (State's Br. at 16) and the GOP's (GOP Resp. Br. at 14–15) nitpicking over whether the November 2022 mail ballot rejection rate was within the "normal" range, or lesser than some other specific state's, are irrelevant. State Defendants' attack on the accuracy of the Harris County Election Administrator's and Travis County Clerk's interrogatory answers regarding the pre- and post-SB 1 ABBM and mail ballot rejection rates is similarly beside the point. State's Br. at 16–17. OCA Plaintiffs further note that simply because "the State did not

ballots were ultimately rejected during the November 2022 election due to SB 1 and criticize OCA Plaintiffs' inability to state *exactly how many* were rejected due to voters "fail[ing] to follow instructions" as opposed to database errors. State's Br. at 37–38. They quibble that OCA Plaintiffs must say *exactly* how many of the millions of voters with SB 1-rejection-generating-errors in their TEAM voter records are *certain* to have their ballots rejected on that particular basis, *id.* at 38–39. None of that is the basis for a dispute of material fact.

First, the undisputed fact that "only" 6,355 ballots were finally rejected during the November 2022 general election due to SB 1 *supports* granting summary judgment. State's Br. at 37–38. The Materiality Provision doesn't demand OCA Plaintiffs satisfy a balancing test or demonstrate some threshold number of votes denied. *See* 52 U.S.C. § 10101(a)(2)(B). For instance, that *some* voters may "simply remember which [ID] number they registered with," (GOP Resp. Br. at 13), and potentially avoid rejection, is irrelevant. It is a "basic truth that even one disenfranchised voter—let alone several thousand—is too many." *See, e.g.*, *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014); *Democratic Executive Comm. of Fla. v. Lee*, 915 F.3d 1312, 1321 (11th Cir. 2019) (same); *see also Migliori v. Cohen*, 36 F.4th 153, 158, 162–64 (3d Cir. 2022), *vacated as moot*, *Ritter v. Migliori*, 143 S. Ct. 297 (2022) (finding Materiality Provision violation where 257 of about 22,000 ballots rejected) [15]; *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591–93 (6th Cir. 2012) (law likely unconstitutional even if rejections were "small percentage" (0.248%) of ballots cast).

---

require counties to track" certain data before SB 1 does not mean that counties did not, and that the evidence cited by State Defendants in support of this argument pertains primarily to tracking of ABBMs rather than mail ballots. *See id.* & nn. 101–103. That evidence also has nothing to say about Travis County. *Id.*

[15] Although *Migliori* was vacated as moot in a procedural order, it nonetheless remains "persuasive" authority. *E.g.*, *Polychrome Int'l Corp. v. Krigger*, 5 F.3d 1522, 1534 (3d Cir. 1993); *Melot v. Bergami*, 970 F.3d 596, 599 (5th Cir. 2020) (treating a "thoughtful opinion" from the Tenth Circuit as persuasive even though it had been vacated as moot).

Second, the distinction State Defendants draw between an SB 1 rejection due to a voter's failure to "follow instructions" (*i.e.*, their omission of the superfluous matching number) versus due to a database error is irrelevant.[16] As an initial matter, the Materiality Provision prohibits denying the right to vote for both errors *and* omissions that are immaterial, so rejecting an ABBM or ballot for a failure to supply the ID number still violates the provision. Moreover, the undisputed evidence shows that election officials *do not use or need to match the ID numbers* to identify voters. In other words, SB 1's matching-number requirement violates the Materiality Provision irrespective of the errors in TEAM. Rather, the fact that, even when a qualified voter supplies the "right" ID number, they can still be rejected due to errors in the TEAM database only highlights that the matching-number requirement is superfluous and immaterial. And even if it were otherwise, State Defendants fail entirely to dispute any of the direct evidence OCA Plaintiffs have provided that voters who did legally cast or submit ABBMs and mail ballots were rejected under SB 1 due to errors in the TEAM database. *See* OCA MSJ at 51 & n.190 (identifying witnesses to whom this occurred), 24–25 (e-mails from voters regarding TEAM errors).[17]

### C. State Defendants' prognostications regarding "better" rejection rates in the future do not preclude summary judgment.

---

[16] Intervenor-Defendants appear to make a similar argument by pointing to voters who were able to successfully meet the matching-number requirements to apply to vote by mail, but then had their ballot rejected. GOP Resp. Br. at 14. But the Materiality Applies specifically applies when a voter *omits* the ID number on their carrier envelope or makes an *error* including the number, as described above.

[17]     State Defendants argue that OCA Plaintiffs must show with certainty that voters with multiple DPS ID numbers, some of which are not in TEAM, will attempt to vote using one of their DPS ID numbers that is *not* the number in TEAM, resulting in an mail voting rejection. State's Br. at 39; GOP Resp. Br. at 13. But OCA Plaintiffs have shown that such errors have caused and will continue to cause the rejection of mail balloting materials under SB 1. Dr. Hersh's report merged the "at risk" pool of voter records with such errors with those of voters who requested a mail-in ballot during the November 2022 election, finding that "at risk" voters were substantially more likely to have their mail ballots materials rejected and that more than double the percentage of "at risk" voters as compared to non-at risk voters had their mail ballots rejected due to SB 1. OCA MSJ at 51 & n. 188–89. And even if multiple-DPS-ID voter files were discounted (which they should not be), the undisputed facts demonstrate that there would still be hundreds of thousands of voter files in TEAM with various other SB-1-rejection-generating errors. OCA MSJ at 12.

Defendants next argue that the number of ABBM and mail ballot rejections due to SB 1's matching-number requirement will "get[] better over time" because of improvements in voters' familiarity with the matching-number requirement and improvements in the accuracy of TEAM as the SOS updates voter registration records. State's Br. at 18–20, 38.

Notably absent from Defendants' prognostications is any claim that SB 1's matching-number requirement will ever stop disenfranchising voters. As county elections officials from Harris, Travis, Dallas, Bexar, and El Paso counties testified, it will never be possible to eliminate all instances in which qualified and eligible voters have mail ballot materials rejected as a result of SB 1.[18] Indeed, every year, some number of voters unfamiliar with the matching-number requirements will turn 65, and an unknown but meaningful number will become sick, or disabled, or pregnant, or be out of town for a family or work obligation, or be called overseas, or experience any of the other myriad reasons that would require them, and render them eligible, to vote by mail for the first time. OCA MSJ at 50 & n.187. Those new mail voters will face the chance—inherent in SB 1's scheme—that if they fail to correctly guess and provide their corresponding ID number in TEAM, their ABBMs or ballots will be rejected.

Moreover, as Dr. Hersh's undisputed analyses demonstrate, the overall number of SB-1-rejection-generating-errors in the TEAM database has not meaningfully decreased in the last two years despite the SOS's efforts even if the number of each type has changed. *See* State's Br. at 38–39 (accepting numbers set out in Dr. Hersh's analyses).[19] Defendants excuse these deficiencies by

---

[18] *See* ECF 609-1 ¶ 129; OCA MSJ at 52 & n.193 (Harris County Elections Administrator testimony that voters understandably think that they don't need to re-include their ID numbers on their carrier envelopes if they already did so on their ABBMs), 6 & n.11 (Harris County Elections Administrator testimony that despite robust voter education efforts Harris County was only partially successful at alleviating voters' confusion regarding SB 1's matching-number requirement given that mail ballots continued to be rejected).

[19] *See* OCA MSJ at 10–13 & nn.30–45

arguing that "the Materiality Provision does not require perfection" and that errors are inevitable. State's Br. at 39; GOP Resp. Br. at 14–15. But this misrepresents the issue. While the Materiality Provision may not demand perfection, it *does* require that Texas not refuse to count a person's vote just because they made an irrelevant error or omission on voting-related paperwork, which is exactly what the undisputed facts show that SB 1's matching-number requirement does.

Finally, State Defendants argue that errant counties "wrongly" enforced a hierarchy of ID numbers wherein "applicants that included [an SSN4] would be rejected if that voter had a DPS [ID number]" and elevated rejection rates before the SOS imposed the "correct" reading. State's Br. at 15–16. But as explained in the OCA MSJ, the ABBM, carrier envelope, and carrier envelope insert prescribed by the SOS still reflect this hierarchy—a fact that causes confusion for voters. OCA MSJ at 6–8 & nn. 9–16. Nevertheless, even *after* the SOS instructed counties to apply a *more permissible* standard, thousands of mail voters still had their right to vote denied. *Cf.* GOP Resp. Br. at 13 (arguing that ignoring SB 1's hierarchy "mitigates any risk of prejudicial database errors"). Moreover, State Defendants have made no guarantee that they will always enforce this more permissive interpretation of SB 1's provisions. Even if State Defendants' attempted mitigation efforts had succeeded (rather than allowing additional thousands to be disenfranchised), the voluntary decision to read the statute this way would not be a basis for avoiding summary judgment. *Cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." (cleaned up)).

## II.     There is No Dispute of Material Fact that Denials are Based on Errors or Omissions that Occur on Voting Paperwork

The undisputed facts show that the errors or omissions at issue here occur on ABBMs and mail ballots. These are clearly "papers" "relating to any application . . . or other act requisite to voting." 52 U.S.C. § 10101. Intervenors wrongly suggest that OCA Plaintiffs have forfeited this argument, but the OCA MSJ establishes that ABBMs and carrier envelopes are voting-related paperwork. OCA MSJ at 4–5, 44. OCA Plaintiffs need not preempt every argument to the contrary.

Defendants' sole response on the merits is to argue that the Materiality Provision is limited to the registration context. GOP Resp. Br. at 12. OCA Plaintiffs have already thoroughly refuted this atextual assertion in their response to the Intervenor-Defendants' Motion for Summary Judgment and incorporate that answer here. *See* ECF 636 at 15–19. In short, Defendants' interpretation is refuted by the plain text of the statute, which includes applications and "any . . . act requisite to voting." It should therefore be rejected.[20]

## III. The Undisputed Facts Establish That SB 1's Matching-Number Requirement is Not Material to Establishing Qualifications to Vote

The OCA MSJ established that the ability to present a matching ID number is not a substantive eligibility requirement under Texas law. Intervenor-Defendants repeatedly concede and

---

[20]     The cases Intervenor-Defendants rely on to support this point are inapplicable. For instance, Intervenor-Defendants cite to a dissent in *Ball v. Chapman,* 289 A.3d 1 (Pa. Feb. 8, 2023), but fail to note that the majority opinion explicitly held that "Congress made clear that, though registering to vote and applying for an absentee ballot unquestionably are acts requisite to voting, the [Materiality Provision] sweeps more broadly than that." *Compare* GOP Resp. Br. at 8 (citing *Chapman*, 289 A.3d at 37–39 (Brobson, J. dissenting)), *with* Chapman, 289 A.3d at 26. Intervenor-Defendants likewise rely on a dissent from the Supreme Court's denial of a stay in *Ritter v. Migliori*, where the Court effectively allowed contested votes to be counted after the Third Circuit affirmed the application of the Materiality Provision. *See* GOP Resp. Br. at 8 (citing *Ritter v. Migliori*, 142 S. Ct. 1824, 1825 (2022) (Alito, J., dissenting)).
        Intervenors also rely on cases that don't involve paperwork requirements at all. GOP Resp. Br. at 8 (citing *Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1371–72 (S.D. Fla. 2004) (challenge to mail ballot deadline, which is not a paperwork requirement)); *id.* (citing *Thrasher v. Ill. Republican Party*, 2013 WL 442832 at * 3 (C.D. Ill. Feb 5, 2013)) ("[Plaintiff does not claim that the [defendant] prevented him from registering to vote or from casting a ballot . . . nor that his vote in the primary was not counted."). They also cite a law review article for the uncontroversial fact that the Materiality Provision applies to registration forms. GOP Resp. Br. at 4 (citing Warren M. Christopher, *The Constitutionality of the Voting Rights Act of 1965*, 18 Stan. L. Rev. 1, 7 (1965)). But the article does not say—nor could it—that the Materiality Provision applies *only* to registration forms.

emphasize this point, and State Defendants join the Intervenors' brief.[21] Under the text of the Materiality Provision, this alone is sufficient to demonstrate that the ID numbers are not material.

What's more, even if information that did not go directly to qualifications but instead was used to identify a voter was considered material, the undisputed material facts show that is not what the ID numbers under SB 1 are used for. SB 1 itself permits voters who do not have a DPS ID number or SSN4[22] to obtain an ABBM and a carrier envelope. OCA MSJ at 45. Election officials do not use or need these ID numbers to identify applicants and voters. OCA MSJ at 46–49. Further, SB 1's specific scheme—which requires that the voter correctly guess which number is contained in Texas's flawed voter database and which guarantees the rejection of some number of voters who do everything right and follow the exact letter of the law—is clearly immaterial. OCA MSJ at 10–13, 50–51. And finally, even if SB 1 does not violate the Materiality Provision at the ABBM stage, it surely does at the mail ballot stage, by requiring voters who have already navigated SB 1 in applying to vote by mail to *again* match the ID number on their carrier envelope to have their vote counted. OCA MSJ at 52–53. Defendants fail to create a dispute of material fact.

### A. Texas cannot define away the Materiality Provision's protections.

---

[21] GOP Resp. Br. at 8, 11; ECF 608 (GOP MSJ); ECF 610 (State Notice of Joinder). OCA Plaintiffs refute the inconsistency demonstrate the in illogical nature of this argument in their response to Intervenor-Defendants' motion for summary judgment and fully incorporate those arguments here. ECF 636 at 16. Namely, that the Materiality Provision prohibits refusing to count a person's vote based on a paperwork error or omission whenever the erroneous or omitted information "is *not* material" to determining a voter's qualifications. 52 U.S.C. § 10101(a)(2)(B) (emphasis added). Intervenors' attempt to limit the statute to instances where the error or omission *is* used in determining voter qualifications would allow all manner of irrelevant paperwork errors to be used to disenfranchise voters. Instead, Intervenors concede that the matching-number requirement prevents voters' ballots from being accepted and counted based on paperwork errors and omissions that have nothing to do with a voter's qualifications—precisely what the Materiality Provision forbids.

[22] "DPS ID number" refers to the number on a driver's license, election identification certificate, or personal identification card issued by the Texas Department of Public Safety. SSN4 refers to the last four digits of a social security number.

State Defendants tautologically argue that "Texas law deems [ID] numbers material; therefore, they are material." State's Br. at 30–33. This logic would erase the Materiality Provision from existence, by defining *whatever* requirements might be imposed by state law in order to vote, no matter how trivial, as being "material in determining whether such individual is qualified under State law to vote in such election." *See* 52 U.S.C. § 10101(a)(2)(B); *cf. United States v. Mississippi*, 380 U.S. 128, 137–38 (1965) (phrase "otherwise qualified by law" in Section 10101(a)(1) cannot include invalid statutes; Congress "obviously" meant "qualifications required of all voters by valid state or federal laws"). In fact, under State Defendants' interpretation, the Materiality Provision would not cover some of the very mechanisms of vote denial that Congress passed the Provision to override. Congress added the Materiality Provision to Section 10101 in response to the practice of rejecting voters' paperwork for typos and other "trivial reasons" in filling out the requisite forms, H.R. Rep. No. 88-914 (1963), *reprinted in* 1964 U.S.C.C.A.N. 2491, such as "disqualify[ing] an applicant who failed to list the exact number of months and days in his age," *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003) (cleaned up)). Yet under State Defendants' interpretation, even this requirement would pass muster under the Materiality Provision.[23]

The commonsense reading of the phrase "qualified under State law to vote in such election" instead refers to the substantive characteristics that make one eligible to register and vote, such as age, residence, and the like. *See* OCA MSJ at 44–45 (setting out Texas state law qualifications to register to vote and to vote by mail); *e.g.*, *Schwier v. Cox*, 340 F.3d 1284, 1297 (11th Cir. 2003) (stating that "the only *qualifications* for voting in Georgia are U.S. Citizenship, Georgia residency,

---

[23] This argument also contradicts the Intervenors' concession, joined by the State, that the ID numbers have nothing to do with voter qualifications.

being at least eighteen years of age, not having been adjudged incompetent, and not having been convicted of a felony" (citing O.C.G.A. § 21-2-216)).[24]

If any procedural requirement a legislature imposes becomes a voter qualification, then errors or omissions in meeting *any* aspect of state election law automatically would be material to determining whether the voter was qualified. The Court should reject this "self-defeating" interpretation of the Materiality Provision, which not only "def[ies] common sense, but also would defeat Congress' stated objective." *See Quarles v. United States*, 139 S. Ct. 1872, 1879 (2019).

### B.  Defendants Fail to Show That SB 1's Matching Number Requirement Is Necessary to Identify Voters

State Defendants' primary argument for why the matching-number requirements is material is that it "serves to verify the voter's identity and confirm that the person . . . is in fact the registered voter . . . because the other information on [mail ballot materials] is available from public records." State's Br. at 34.[25] But this ignores the undisputed facts set forth in the OCA MSJ that under SB 1, the ID numbers provided by voters *are not used or needed to identify voters*.

The OCA MSJ establishes that (a) counties do not use or need the ID number provided by voters to identify them, OCA MSJ 46–49; (b) the explicit guidance from the SOS is that if a voter fails to provide the correct ID number, the county may provide it for them after identifying the voter using "information that would be in their voter record," like "name, date of birth, address, things like

---

[24] *See also Reed*, 492 F. Supp. 2d at 1270 (W.D. Wash. 2006) (qualifications to vote are those which "bear on a person's eligibility to vote"); *Migliori*, 36 F.4th at 162–63 & n. 57 (qualifications to vote under Pennsylvania law related to age, citizenship, residency, and current imprisonment for a felony); *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, at 1176–77 & n.7 (11th Cir. 2008) (describing provision of information establishing "qualifications to register to vote," versus requirement to provide a matching ID number, as elements that were both required to "complete" a voter registration application under laws at issue).

[25] In support of this statement State Defendants cite to only a single line of testimony from Keith Ingram and the deposition of Lisa Wise, the El Paso County Elections Administrator, in which she agreed that "adding an additional requirement to the [ABBM] that's not in the public file" would make voter impersonation more difficult but added that she had never in her experience seen that happen. States' Br. at 34 n.162, Appx. DD at 142:3-12.

that," all of which is "information that was on the [ABBM] prior to SB 1," *id.* at 49 & nn. 185–186; (3) the SOS instructs county officials to "confirm the voter's identity using publicly available information" in carrying out the cure processes, *i.e.*, without the use of ID numbers, *id.* at 48 & nn. 181–182; and (4) voters without either ID number can still vote, *id.* at 45.[26]

State Defendants attempt to sidestep the fact that county officials use means other than the ID numbers required by SB 1 to identify voters. They argue that when "locating a person's registration file" without the use of an ID number, elections officials do not "identify" the person, because doing so shows only that the person's pre-SB 1 information "matched the database file of registered voters" but does not establish "with certainty that the persons . . . were in fact qualified voters.'" State's Br. at 35–36 (citation omitted).

This argument defeats itself. Under SB 1's matching-number regime—or any other that compares voter-provided information to information that the government already has—all election officials *can* do is "match [the provided information to] the database file of registered voters." State's Br. at 35. If this inescapable fact were enough to make pre-SB 1 information inadequate to "identify" a voter, the conclusion would equally apply to the use of ID numbers. The Court should instead credit the undisputed facts set out in the record: that "before SB 1," election officials did not "have

---

[26] OCA Plaintiffs presented undisputed evidence on these points from the Harris County Elections Administrator and the Travis County Clerk, as well as from Keith Ingram, the former Director of the Elections Division for the Secretary of State. OCA MSJ at 46–49 & nn. 176–186. The United States, which has also moved for summary judgment on its Materiality Provision claim, presented additional undisputed testimony on this point from the elections administrators for Dallas, Hidalgo and Bexar counties. ECF 609 at 22; ECF 609-1 ¶¶ 119–120; *see also id.* at ¶ 15 (testimony from Keith Ingram that individual eligibility criteria "have nothing to do with" ID numbers), ¶ 118 (testimony from Keith Ingram that SOS does not direct or advise counties to use ID numbers to look up voter records).

any problems identifying who was requesting a mail-in ballot,"[27] and that after SB 1, elections officials do not use or need the ID numbers to identify voters.[28]

State Defendants do not refute that counties don't use or need the ID numbers to identify voters. Instead, they rely on Keith Ingram's testimony that the ID numbers are used to "make sure the voter has properly identified himself." State's Br. at 35–36. But Mr. Ingram's prior testimony makes clear that this is only a functional description of what SB 1 requires in order for a voter to comply with the statute, given his statement that a voter who correctly provides an SSN4 that is not in TEAM "hasn't identified themselves as the voter" but prior to SB 1 "would have . . . identif[ied] themselves at the voter]."[29] Indeed, Mr. Ingram specifically disclaims having knowledge of how counties use the TEAM database to look up voters.[30] What's more, Mr. Ingram also testified that even under SB 1, a county clerk may provide a voter over the phone with their ID number on file so long as the voter validates their identity by providing information required on the ABBM prior to SB 1. OCA MSJ at 49 & nn. 185–186. A similar process plays out for the cure process. *Id.* at 48 & nn. 181–182. As such, there is no dispute of material fact that SB 1's ID number requirements are not necessary to identify voters.

Once election officials have determined a voter's identity and eligibility, additional requirements that superfluously "confirm" identity are immaterial to determining the voter's qualifications. Instead, they compound the chance for errors and disenfranchisement. *See* OCA MSJ

---

[27] OCA MSJ at 46 & n.172; 611-1, Ex. 16, TCC 30(b)(6) Dep. May 11, 2022, Johnson, at 12:11–18.

[28] *Supra* n.26. State Defendants devote much space to arguing the inadequacies of signature matching, but this is a red herring. The efficacy of signature matching is not at issue in this lawsuit, and the undisputed evidence shows that counties identify voters based on name, date of birth, and similar information, which the SOS has also instructed counties to use to identify voters during the cure process.

[29] OCA Reply Ex. 1, Ingram Dep., April 28, 2023, at 91:22–93:2.

[30] OCA Reply Ex. 2, Ingram Dep. March 28, 2023, at 69:22–70:5.

at 52–53.[31] This is especially true at the mail ballot stage, once voters have already provided their

ID numbers one time. State Defendants also fail to address the undisputed fact that SB 1's matching-

number requirement *punishes* voters with preexisting SB-1-rejection-generating-errors in their

TEAM voter files. These voters may follow SB 1 to the letter, provide a *valid* ID number, yet still

see their ABBM or mail ballot rejected *because* they supplied that number—even when they had

voted by mail and identified themselves with no issue pre-SB 1. *See* OCA MSJ at 51 (identifying

witnesses to whom this occurred).[32]

### C. Neither the Help America Vote Act's voter registration requirements nor the Eleventh Circuit's holding in *Browning* apply here.

State Defendants incorrectly assert that SB 1 doesn't contravene the Materiality Provision

because it "confirm[s] a voter's identity using the same information that Congress, through the Help

American Vote Act ("HAVA"), requires voters to provide before being registered to vote for an

election for federal office." State's Br. at 24 (citing 52 U.S.C. § 21083(a)(5)(A)(i)).

State Defendants' argument fails most clearly because the plain text of HAVA itself does not

support it. The HAVA provision State Defendants cite governs voter registration and says nothing

about ABBMs or mail ballots. *See* 52 U.S.C. § 21083(a)(5)(A)(i); *see also* TEC § 13.002 (setting

out similar requirements for voter registration under Texas law). One of HAVA's main goals was to

"modernize and improve registration nationwide" by "[r]equiring states to develop statewide

databases" to track voter registration. H.R. REP. 107-329(I), 2001 WL 1579545, at *35–36.

---

[31] *See also* United States MSJ, ECF 609, at 22–23. Moreover, State Defendants do not address or acknowledge Mr. Ingram's admission that "individual criteria ha[ve] nothing to [d]o with the [ID] number[s]," ECF 609-1 ¶ 15, 609-10, Ex. 79 at 86:10–11.

[32] *See also* ECF 611-1, Ex. 35 ¶ 6 (Cynthia Edmonson has voted by mail since 2008); ECF 609-11, Ex. 105 at 14:2–15:8 (Roberto Benavides voted by mail in the 2020 general and 2016 general elections); OCA Reply Ex. 13, Gaskin Dep. at 20:13, 77:9–12 ((Pam Gaskin is approximately 75 years old and has voted by mail since she turned 65).

Accordingly, HAVA includes the requirement that voters provide driver's license numbers or SSN4s when registering to vote to promote the assignment of a unique identifying number to the voter in each state's modernized, HAVA-compliant voter registration database. *See* 52 U.S.C. 21083(a)(5)(A)(i). It also allows for those without either type of number to register to vote by requiring states to assign them a separate unique identifying number for that purpose. *Id.* § 21083(a)(5)(A)(ii). Contrary to State Defendants' argument, there is no matching requirement: It is "the assignment of some kind of unique identifying number to the voter that is the requirement of [HAVA], not the 'match.'" *Reed*, 492 F. Supp. 2d at 1268–69 (citations omitted); *see also Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1174 & n.21 (11th Cir. 2008) (HAVA "does not require that states authenticate these numbers by matching them against existing databases").

State Defendants rely heavily on *Browning*, in which a divided panel of the Eleventh Circuit held that the Materiality Provision did not prohibit Florida from requiring individuals to provide a matching driver's license number or SSN4 on their voter registration applications. 522 F.3d at 1174; State's Br. at 25–26, 34, 40. But whatever the *Browning* panel's decision's force with respect to the materiality of providing or being assigned some form of ID number at the registration stage, that is not what is at issue in this case. Voters who seek to vote by mail in Texas have already complied with HAVA and the Texas Election Code when they registered to vote. SB 1's matching-number requirement superfluously duplicates HAVA's registration stage requirement to *provide* an ID number at *both* the ABBM and mail ballot stages, and it then *also* requires the number to match the voter's file in the TEAM database, which is uniquely riddled with errors.[33] In multiplying the ways

---

[33]   The record in this case further distinguishes *Browning*. There the Eleventh Circuit was not presented with argument or evidence regarding, and did not address, how election officials actually used the challenged ID numbers. *See generally Browning*, 552 F.3d 1153. Here, in comparison, the undisputed evidence shows that election officials

in which a voter might commit an error or omission that leads to disenfranchisement, OCA MSJ at 52–53, SB 1 extends far beyond HAVA's limited and ministerial provisions relating to registration database modernization.

Finally, even if *Browning* were not distinguishable for the reasons set out above, the Eleventh Circuit's holding was likely wrongly decided and is not binding on this Court. As the dissent in *Browning* correctly reasoned, HAVA "cannot" render ID numbers "per se material" even at the voter registration stage both because "a state is not required to verify an applicant's [ID] number" under HAVA and because HAVA "provides for the assignment of a unique identifying number, which does not have to [and cannot] be matched, for those individuals who do not have a driver's license or social security number." *Browning*, 522 F.3d at 1183 n.17 (Barkett, J., dissenting in part). ID numbers "also cannot be per se material if a state such as North Dakota is allowed to hold federal elections without *any* registration requirements." *Id.* At least one other court presented with a similar matching-number scheme thus reached a different outcome than the Eleventh Circuit. *See Reed*, 492 F. Supp. 2d at 1268–1271 (preliminarily enjoining voter-registration matching-number scheme as preempted by HAVA and the Materiality Provision).

---

simply do not use or need the ID numbers to identify voters. For the same reason, the Eleventh Circuit's statement that the Materiality Provision asks whether, "accepting the error as true and correct, the information contained in the error is material to determining the eligibility of the applicant," is inapposite—whatever the force of that interpretation on the facts presented in Browning, it makes no sense where, as here, it is undisputed that election officials do not use or need the ID numbers to establish a voter's identity. *See Browning*, 522 F.3d at 1175.

Nor in *Browning* was the Eleventh Circuit presented with any evidence or argument regarding systemic deficiencies in the databases against which Florida compared applicant-provided ID numbers—the Florida Department of Highway Safety and Motor Vehicles' database and the federal Social Security Administration's database. *Browning*, 522 F.3d at 1156–57 & n.2 ("Both state and federal agencies participate in the matching process."). Here, in comparison, the undisputed evidence shows that Texas voters must match their ID number to a number contained in the SOS's error-riddled TEAM database, entirely separate from the Texas Department of Public Safety's or the Social Security Administration's databases. OCA MSJ at 10–13.

As the *Browning* dissent also recognized, the majority's formulation of materiality, which "ignores the nature of the error and asks solely whether the underlying information containing the error is relevant" and on which State Defendants also rely, State's Br. at 34, 40, produces results that clearly contravene the purpose of the Materiality Provision:

> Congress recognized in passing the VRA that discriminatory registration requirements are more sophisticated and pernicious than simply asking applicants for immaterial information. Its concern was not merely with overtly discriminatory requirements that ask for irrelevant information, but also with requirements that ask for relevant information but disproportionately penalize applicants for trivial mistakes.
>
> For example, the court in *Condon* recognized that Congress intended the VRA to eliminate the practice of disqualifying applicants who make mistakes when asked to "list the exact number of months and days in [their] age." 913 F. Supp. at 950. The majority recognizes that Congress sought to end such insidious practices, (*see* Maj. Op. at 1172–73), but under its test for materiality, it would have to find the practice discussed in *Condon permissible* because the underlying substantive information sought—the age of the applicant—is material in determining whether the applicant is eligible. As this application of the majority's test makes clear, it is insufficient to look solely at the "nature of the underlying information requested," (*id.* at 1174–75), to determine the materiality of an error or omission.

*Browning*, 522 F.3d at 1181–82 (Barkett, J., dissenting in part). It therefore cannot be the case that the Materiality Provision is concerned only with the nature of the underlying information. Accordingly, to the extent this Court finds it cannot otherwise distinguish *Browning*, it should again reject this "self-defeating" interpretation of the statute, which not only "def[ies] common sense, but also would defeat Congress' stated objective." *See Quarles*, 139 S. Ct. at 1879.

### D.  Texas's interest in deterring voter fraud is not relevant here.

Finally, State Defendants devote a substantial portion of their response to spinning a narrative that widespread mail voter fraud in Texas necessitates SB 1's matching-number requirement. *See*

State's Br. at 4–13, 24–25, 27, 37. While OCA Plaintiffs dispute this narrative,[34] it is irrelevant here. Because the Materiality Provision's text provides for no burden-interest balancing or affirmative defenses, the fact that state action that disenfranchises voters has some supposed, generalized anti-fraud purpose does not insulate it from the Provision.[35] If an error or omission is not "material in determining whether [an] individual is qualified under State law to vote," 52 U.S.C. § 10101(a)(2)(B), it may not be used to disenfranchise voters based on some freestanding anti-fraud rationale. *See Schwier v. Cox*, 412 F. Supp. 2d 1266, 1276 (N.D. Ga. 2005), *aff'd*, 439 F.3d 1285 (11th Cir. 2006) (agreeing that requiring social security numbers "could help to prevent voter fraud" but holding that doing so violated the Materiality Provision); *Reed*, 492 F. Supp. 2d at 1270 (rejecting

---

[34]    *See, e.g.*, LUPE and OCA Plaintiffs' Response in Opposition to Intervenor-Defendants' Motion for Summary Judgment, ECF 644, at 3–4 (Texas Attorney General spent over 22,000 staff hours investigating voter fraud in the 2020 election and identified only 16 minor voting offenses out of more than 11,000,000 ballots cast).

State Defendants state that the Office of the Attorney General "has prosecuted over 800 election offenses against 126 individuals since 2015" and that "two-thirds" of those prosecutions "involved mail ballot fraud." State's Br. at 5–6. Not only is this number of alleged instances of mail ballot fraud vanishingly small when compared to the millions of ballots cast in Texas elections since 2015, but as the spreadsheet of pending and resolved prosecutions provided by State Defendants indicates, both the descriptions and numbers of these prosecutions are potentially misleading with respect to SB 1. *Id.*, Resp. Appx. NN (STATE112177).

For example, it is entirely unclear how many of the offenses labeled as "mail ballot fraud" offenses on this spreadsheet involved or are alleged to involve impersonation of another. The Texas Election Code provisions referenced in connection with each prosecution labeled as involving a "mail ballot fraud" offense in the spreadsheet—Sections 13.007, 64.012, 64.036, 84.0041, 86.0051, and 86.006—all either do not involve impersonation (*e.g.*, Section 86.0051), or are defined to include numerous alternative ways of completing the offense, some of which have nothing to do with impersonation (*e.g.*, Section 84.0041). And State Defendants do not explain how, for example, SB 1's matching-number requirement could have at all prevented the mail ballot fraud they describe wherein paid workers for a candidate incorrectly marked voters as disabled on their ABBMs. *See* State's Br. at 8-9.

Additionally, in response to an interrogatory asking them to identify cases in which "a person has been convicted of violating Texas law by voting or attempting to vote by impersonation using a mail ballot," State Defendants were only able to identify a single conviction, which occurred in 2005. OCA Reply Ex. 6 at 9–10 (State Defendants' Supplemental Objections and Responses to the United States' Second Set of Interrogatories). Other evidence cited by the State is meaningfully different than their representation. For example, they cite to testimony from the Denton County Elections Administrator, Frank Phillips, for his purported statement that "SB1 reduced and 'definitely help[ed]' address vote-by-mail fraud." State's Br. at 25 n.142 (citing State's Resp. Appx. R at 113:24–114:23). But Mr. Phillips actually testified that SB 1 "reduced *concerns* among voters about mail voting fraud," not that it reduced mail fraud itself. *Id.* (emphasis added).

[35] Intervenor-Defendants also point to the consideration of fraud deterrence as a factor when a statute requires a "totality of the circumstance analysis," but the Materiality Provision does not require such an analysis. GOP Resp. Br. At 10 (citing *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2340 (2021)).

state's argument that matching–number voter registration scheme would help prevent voter fraud); *Migliori*, 36 F.4th at 163 ("[W]hatever sort of fraud deterrence or prevention [a] requirement may serve," it is irrelevant under Materiality Provision if it is not material to determining voter qualifications).

That is not to say that all measures purportedly aimed at deterring voter fraud run afoul of the Materiality Provision. For instance, increasing criminal penalties for voter fraud would not implicate the Materiality Provision; nor would providing limits on counties mailing out ABBMs. The Materiality Provision applies only where the State denies the right to vote due to an irrelevant paperwork error or omission. Here, it is undisputed that the ID numbers are not used for or needed to establish a voter's identity. Once election officials have determined a voter's identity, additional requirements that gratuitously "confirm" identity are not material to determining the voter's qualifications, and instead only compound the chance for errors and disenfranchisement.

Nor does any record evidence support the State Defendants' anti-fraud argument. Both the SOS and numerous county election officials have said they do not consider a missing or incorrect ID number on mail voting materials to be potentially indicative of voter fraud, and the SOS has stated that a missing or incorrect ID number is not a factor considered when determining whether to refer a case to the Texas Attorney General as potentially fraudulent.[36] Nor has the SOS publicly identified any cases of potential voter fraud that have been referred to law enforcement based on an incorrect or missing ID number.[37] Election officials from Hidalgo, Denton, Bexar, Travis, Harris, Dallas, and El Paso Counties have not referred any individuals to law enforcement for investigation or

---

[36] ECF 609-1 ¶¶ 188–189, 191.
[37] 609-1 ¶ 187.

27

prosecution for voter fraud based on an incorrect or missing ID number,[38] and neither the Harris nor Travis County District Attorney has identified the existence of any investigation or prosecution involving voting or attempting to vote by impersonation by mail.[39] State Defendants cannot point to a single instance in which SB 1's matching-number requirement was or would have been needed to identify a voter, and their speculation that the ID numbers *might* be necessary in some hypothetical instance to identify a voter does not create a dispute of fact.[40]

Finally, SB 1's matching-number requirement can never be material to determining a voter's identity for the millions of voters whose TEAM voter files contain SB-1-rejection-generating-errors. For these voters the ability to match the ID number provided to the TEAM database is entirely irrelevant to even establishing, let alone "confirming," their identity.

### E. State Defendants' identification of minor clerical errors committed by election officials prior to SB 1 has no impact on OCA Plaintiffs' claim.

As a last resort, State Defendants argue that SB 1's matching-number requirement may have prevented an "irregularity" wherein county election officials, during the 2020 general election, "often mistakenly attach[ed] an ABBM to the wrong record in the database, such as when a 'junior' and 'senior' with an otherwise identical name lived at the same residence." State's Br. at 10, 36. But

---

[38] 609-1 ¶ 190.

[39] OCA Reply Ex. 7 (Defendant Harris County District Attorney Kim Ogg's First Amended Responses to Plaintiff OCA-Greater Houston's Second Set of Interrogatories); Ex. 8 (Defendant Jose Garza's Amended Objections and Responses to Plaintiff OCA-Greater Houston's First Set of Interrogatories).

[40] State Defendants repeatedly refer to an ongoing prosecution for mail voter fraud that occurred during the 2020 mayoral race in Carrolton, Texas, to buttress their claim that SB 1's matching-number requirement is necessary to identify voters and to prevent voter impersonation. State's Br. at 7, 13, 37. But the fact that this alleged fraud was detected *without* the need for SB 1's matching-number requirement undercuts any suggestion that SB 1 was or is necessary to prevent such fraud. As Mr. Phillips, the Elections Administrator for Denton County, stated at deposition, his office was able to identify the alleged fraud after noticing that a "large number [of ABBMs were] going to one address." OCA Reply Ex. 3, Frank Phillips Dep., at 20:17–21:24. He agreed that Denton County had "processes in place to help identify" mail-in voter impersonation and "those processes were [able] to stop the fraudulent votes in Carrollton from actually counting in 2020." *Id.* at 25:10–26:7. He further answered "no" when asked if he believed that "SB 1's ID number requirements for mail voting are necessary to prevent mail voter impersonation" because "we've proven we can do it without [SB 1]." *Id.* at 40:22–41:8.

nowhere in the evidence cited for these conclusions is it stated that this occurred "often," that it was for individuals with "otherwise identical names," or that they "lived at the same residence"—instead, according to the evidence cited, these errors occurred a total of four times due to voters sharing "similar names."[41] There is no indication that SB 1's matching-number requirement would be necessary to avoid these clerical errors, which would be prevented by election officials being more careful in the first place.[42] And in all events, the Materiality Provision contains no exception that allows voters to be denied the right to vote based on immaterial paperwork errors in order to guard against infrequent and otherwise avoidable clerical mistakes.

### IV.   Defendants' Remaining Legal Arguments Fail.

Defendants' remaining legal arguments all lack merit and should be rejected.

### A.   The Materiality Provision does not require a showing of racial discrimination or other unequal treatment.

State Defendants further misread the Materiality Provision to apply only to laws that are "racially motivated or . . . have been applied unequally." State's Br. at 27–29. But in interpreting an unambiguous statute, a court's "inquiry begins with the statutory text, and ends there as well." *E.g.*, *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 631 (2018) (citations omitted). Here, the relevant statutory text is unambiguous: Nothing in the Materiality Provision's language mentions unequal treatment, race, or racial animus. *See* 52 U.S.C. § 10101(a)(2)(B).

---

[41] *See* State's Br. at 36 & nn. 160–165, Appx. J at 29:1–6 (no mention of "often," "identical names," or "same residence"), 38:8–14 (same); 646-4, Appx. NN at STATE115447 (during 2020 general election in Collin County, two under-65 voters "had been improperly coded as being associated with a [mail ballot]" each due to a request from another voter with "a similar name who was actually 65 or older"), STATE1115449 (same, for Dallas County).

[42] Other than the similar-name-scenario described above, State Defendants admit that other irregularities in mistakenly-issued mail ballots were "caused by a data-entry error" on the part of the counties, and do not suggest that SB 1 would have prevented such errors. State's Br. at 36. Indeed, as the evidence sets forth, SB 1 creates vastly more opportunities for data entry errors to disenfranchise mail voters.

State Defendants point out that *other* subdivisions of Section 10101(a)(2) appear to focus on differential treatment. But this undermines their interpretation of the Materiality Provision, because "[w]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (citation omitted); *see also, e.g.*, *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 441 & n.44–45 (5th Cir. 2021). Moreover, inserting a discrimination requirement into the Materiality Provision would render meaningless the words "*any* individual," 52 U.S.C. 10101(a)(2)(B) (emphasis added), even though the statute must be interpreted so that "no clause is rendered superfluous, void, or insignificant," *see Young v. United Parcel Serv., Inc.,* 575 U.S. 206, 226 (2015) (cleaned up).

Congress knew how to make racial discrimination an element of a statutory violation but did not do so here. The Court should reject State Defendants' invitation to write into the statute substantive language that Congress deliberately left out. *See, e.g.*, *Migliori*, 36 F.4th at 162 n.56 (the Materiality Provision "does not mention racial discrimination" and "we cannot find that Congress intended to limit this statute to either instances of racial discrimination or registration").[43]

### B. OCA Plaintiffs challenge the provisions of SB 1 that collectively implement its matching-number requirement.

---

[43] State Defendants rely on *Broyles v. Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009), for the proposition that "only racially motivated deprivations of rights are actionable" under the Materiality Provision. State's Br. at 29. But *Broyles* mistakenly cited *Kirksey* v. *City of Jackson*, 663 F.2d 659 (5th Cir. 1981)—which involved claims under Section 2 of the Voting Rights Act—for its conclusion that 42 U.S.C. § 1971 (now 52 U.S.C. § 10101) requires a showing of racial discrimination. *See Broyles*, 618 F. Supp. 2d at 697; *Kirksey*, 663 F.2d at 664–665; *see also Vote.org v. Callanen*, 2021 WL 5987152, at *3 (W.D. Tex. Dec. 17, 2021) (rejecting argument that Materiality Provision claims require showing of racial discrimination and noting that *Broyles* mistakenly invoked *Kirksey* in stating otherwise). To the extent State Defendants suggest the Materiality Provision is limited to cases of racial discrimination because it is authorized by the Fifteenth Amendment, States' Br. at 29, they are incorrect. *See Browning*, 522 F.3d at 1173 ("[W]e recognize that Congress in combating specific evils might choose a broader remedy. . . . The text of the [Materiality Provision], and not the historically motivating examples of intentional and overt racial discrimination, is thus the appropriate starting point of inquiry in discerning congressional intent.").

State Defendants next take issue with the fact that OCA Plaintiffs' Materiality Provision challenges target SB 1 Sections 5.02, 5.03, 5.07, 5.08, 5.10, 5.12, 5.13, and 5.14, all of which work in tandem to enable the statutory scheme that results in the rejection of ABBMs and mail ballots pursuant to SB 1's matching-number requirement.[44] Nonetheless, State Defendants argue that only Sections 5.07 and 5.13 are properly challenged because the other sections do not *directly* require such rejections. State's Br. at 47–51, while the GOP's discussion paradoxically focuses instead on Sections 5.02 and 5.08 as the most relevant challenged provisions. *E.g.*, GOP's Resp. Br. at 1.

Both approaches ignore that each of the other challenged sections of Article 5 of SB 1 also contribute to the implementation and enforcement of SB 1's matching-number requirement—such as by including mandatory identification requirements on ABBMs and carrier envelopes, requiring that voters must be notified of ID-related rejections, and permitting voters to attempt to vote again if they are rejected.[45] OCA Plaintiffs appropriately challenge and seek relief from each of these

---

[44] *See, e.g.*, OCA Plaintiffs' 2nd Am. Complaint, ECF 200 at 37 ("Pursuant to [Section 5 Provisions] voters must additionally provide the number on either their Texas driver's license, Texas election identification certificate, or Texas personal ID card on their mail-in ballot applications and on the ballot carrier envelopes used to return their voted ballot."); *id.* ("SB 1 provides that if the information the voter provides does not 'identify the same voter identified' on the voter's registration application, then the mail-in ballot application and/or ballot contained in the voter's carrier envelope must be rejected.").

[45]       Specifically, Section 5.02 requires ABBMs to include the new ID numbers, which imposes an immaterial requirement that is used to reject ABBMs. TEC § 84.002.

      Sections 5.03 and 5.08 cause the SOS and Texas counties to create and utilize ABBMs and ballot carrier envelopes that require voters to include ID numbers that match numbers in their voter file. TEC §§ 84.011(a), 86.002; Order, ECF 448 at 13–14 ("The challenged provisions, therefore, can be enforced only if and when the Secretary [of State] modifies vote-by-mail applications and mail ballot carrier envelopes to integrate the new identification requirements delineated in S.B. 1."); ECF 609-5, Ex. 15, Carrier Envelope (instructing voters "YOU *MUST* PROVIDE ONE OF THE FOLLOWING NUMBERS AND IT *MUST* BE ASSOCIATED WITH YOUR VOTER REGISTRATION RECORD" (emphasis added)); ECF 609-5, Ex. 14, ABBM (instructing voters "YOU *MUST* PROVIDE ONE of the following numbers" (emphasis added)). This contrasts sharply with State Defendants' reference to the *optional* information requested on an ABBM, such as a phone number or e-mail address, neither of which causes rejections. *See* States's Br. at 42–43 (citing ECF 609-5, Ex. 14); ECF 609-5, Ex. 14, ABBM (requesting telephone number that is "**Optional Information** . . . not required") (emphasis in original). Likewise, federal law does not mandate the rejection of Federal Post Card Applications based on immaterial errors or omissions, because the requirements and procedures instead vary based on state election law. *See* OCA Reply Ex. 12 at 2, (Federal Postcard Application), (discussing differences in state requirements for voter registration and mail ballot applications regarding ID numbers), *also available at* https://www.fvap.gov/uploads/FVAP/Forms/fpca.pdf; *Deutsch v. New York State Bd. of Elections*, 2020

challenged provisions to the extent they implement SB 1's matching-number requirement. *See, e.g.*, OCA MSJ at 4–6, 18 nn.70–71.[46] Regardless, even if State Defendants are correct that only Sections 5.07 and 5.13 implicate the Materiality Provision, for all the reasons discussed above, the rejection of ABBMs and mail ballots pursuant to those sections and supported by the entire statutory scheme violates the Materiality Provision.

State Defendants additionally argue, State's Br. at 47, that the OCA Plaintiffs have waived their challenges to Sections 5.08 and 5.14 because those sections were inadvertently not specified by number in the Complaint. However, the Complaint meets the fair notice pleading requirements by consistently referring to the totality of the statutory scheme that implements the challenged matching-number requirement, including specifically the contents of 5.08 and 5.14.

For instance, Section 5.08 requires that the "[t]he carrier envelope must include a space," for the required ID numbers. TEC § 86.002(g). Plaintiffs' Complaint describes a challenge to this requirement by specifying that "voters must additionally provide [their ID number] . . . on the ballot carrier envelopes," OCA Plaintiffs' 2nd Am. Complaint (SAC), ECF 200 at 37, and pleading that the SOS enforces the challenged provisions because she "is required to prescribe the design and

---

WL 6384064, at *1 (S.D.N.Y. Oct. 30, 2020) ("Generally, a Special Federal Voter registers to vote by sending an FPCA to the appropriate local state election board. If the applicant meets statutory requirements, the local board sends an absentee ballot . . ."); 646-3, State Defs.' Resp. Appx. CC, J. Scott Wiedmann July 29, 2022 Dep., at 48:16–49:19 ("I would say it depends on the state and what their procedures are as to what to do with a Federal Post Card Application. They may not reject it.").

Sections 5.12 and 5.14 outline procedures for election officials to notify voters how to attempt to vote by mail again after they are rejected because of the matching-number requirement. TEC §§ 87.0271, 87.0411.

Section 5.10 implements SB 1's matching-number requirement by requiring voters to add or correct ID numbers after being rejected to re-submit their ABBM or re-cast their mail ballot. *See* TEC § 86.015(c)(4).

Finally, OCA Plaintiffs have voluntarily withdrawn their challenge to Section 5.06. *See* OCA MSJ at 2 n.1.

[46] For instance, State Defendants argue that if OCA Plaintiffs are successful in enjoining the enforcement of SB 1 Section 5.14, "the only result would be to *increase* the number of final rejections since the cure process allows voters to fix an assortment of ballot defects—the failure to provide a matching ID number is but one." States' Br. at 49. But as stated in their motion, OCA Plaintiffs seek only to enjoin enforcement of the portion of Section 5.14 that implements the matching-number requirement: Texas Election Code Section 87.0411(a)(4). *See* OCA MSJ at 2 n.1; *id.* at 55.

content of the [ABBM] and mail-in carrier envelope, both of which SB 1 requires the SOS to modify in order to incorporate the onerous new mail-in voter identification" requirements, *id.* at 15–16.[47] Indeed, while Intervenor-Defendants discuss only some of OCA Plaintiffs' challenged provisions, they focus largely on Section 5.08, reflecting that they were on fair notice of the challenge to 5.08. *See* GOPs' Resp. Br at 1 (discussing Sections 5.02 and 5.08).

Similarly, Section 5.14 outlines procedures for notifying voters how to attempt to re-submit their mail ballot if they are rejected due to the matching-number requirement. TEC § 87.0411. OCA Plaintiffs' complaint outlines a challenge to these procedures by alleging that "SB 1 also fails to provide an adequate cure . . . SB 1 provides that a voter may be notified by telephone or e-mail of the defect and that the voter may request to have the voter's application to vote by mail canceled or go to the voting clerk's office in-person to correct the defect" and describing problems with these procedures as outlined, in part, in Section 5.14. SAC, ECF 200 at 39–40.[48]

These detailed facts were sufficient to provide State Defendants with fair notice that OCA Plaintiffs challenged Sections 5.08 and 5.14. "[A] pleading . . . need not specify in exact detail every possible theory of recovery—it must only 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Thrift v. Estate of Hubbard*, 44 F.3d 348 (5th Cir. 1995) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *see also Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 404 (5th Cir. 2013) ("It does not matter that [plaintiff] did not use the words 'breach of

---

[47] *See also, e.g.*, SAC, ECF 200, ¶ 125 ("The omission or error on the application or carrier envelope is not material in determining whether the individual named on that application or carrier envelope is an eligible voter."); *id.* ¶ 116 ("Moreover, in order to prevent rejection of their ballots, OCA-GH will need to provide additional education to ensure that members and the community are especially careful when writing down numbers to be sure not to invert or omit any particular digit.").

[48] OCA Plaintiffs also generally pleaded that they are challenging that the provisions in Article 5 that "result in the rejection of applications and ballots cast by qualified voters." SAC, ECF 200, ¶ 107.

fiduciary duty' in the section of their amended complaint alleging conspiracy because [plaintiff] alleged facts upon which relief can be granted on that theory.").[49]

The course of discovery in this case further confirms that State Defendants had fair notice of the challenges against Sections 5.08 and 5.14. *See Globeranger Corp. v. Software AG*, 2014 WL 4968053, at *4 (N.D. Tex. Oct. 6, 2014) (looking beyond pleadings to establish fair notice at summary judgment stage).[50] State Defendants' interrogatories specifically asked OCA Plaintiffs to list each statutory provision being challenged, and OCA Plaintiffs included Sections 5.08 and 5.14 in their answers.[51] State Defendants acknowledged receipt of these interrogatory responses and conducted discovery consistent with those answers, including explicitly asking questions about those sections while taking the Rule 30(b)(6) depositions of OCA Plaintiffs.[52]

Finally, even if this Court determines that Sections 5.08 and 5.14 were not properly contested, it has the discretion to grant leave to amend. *Stover v. Hattiesburg Pub. Sch. Dist.*, 549

---

[49] *See also Homoki*, 717 F.3d at 404 ("While [defendant's] pleading was perhaps inartful, it adequately stated a claim for relief and EPS chose not to request clarification."); *Globeranger Corp. v. Software AG*, 2014 WL 4968053, at *2 (N.D. Tex. Oct. 6, 2014) (broadly interpreting a complaint to have provided "fair notice" of plaintiffs' claim).

[50] *See also Down E. Energy Corp. v. Niagara Fire Ins. Co.,* 176 F.3d 7, 12 (1st Cir. 1999) ("[W]e conclude that both the general factual allegations in the amended complaint as well as the interrogatory answers put Niagara on fair notice of Down East's estoppel by agency theory."); *Andujar v. Gen. Nutrition Corp.*, 2018 WL 3999569, at *9 (D.N.J. Aug. 20, 2018) ("[T]he Court finds defendant was put on fair notice that plaintiff would make a *Ferrante* claim. *See* Plaintiffs Motion, Exhibit G (Plaintiff's Answers to Interrogatories).").

[51] *See* OCA Plaintiffs' First Amended Objections and Responses to State Defendants' Interrogatories, OCA Reply Ex. 9 at APPX-120 (OCA-GH), Ex. 10 at APPX-162 (LWVTX), Ex. 11 at APPX-206 (REVUP) (each listing Sections 5.08 and 5.14 in response to interrogatory asking them to "[i]dentify each Texas Election Code provision that Senate Bill 1 amended and that you are challenging"); *see also* OCA Plaintiffs' Third Amended Objections and Responses to State Defendants' Interrogatories, Ex. 9 at APPX-148 (OCA-GH), Ex. 10 at APPX-192–193 (LWVTX), Ex. 11 at APPX-234 (REVUP) ( each stating that "Plaintiff seeks mandatory injunctive relief against the Texas Secretary of State requiring it to . . . issue guidance that lack of an ID number or an ID-number mismatch on an [ABBM] or a ballot is not grounds for rejecting the application or ballot . . . [and] prescribe the design and content of the [ABBM] and mail-in envelope that no longer contain the ID provisions.");

[52] OCA Reply Ex. 4, REVUP 30(b)(6) Dep. at 125:13–19 ("I have got a copy of your amended [interrogatory] responses in front of me. And in addition to the counts that are included in your live complaint, it adds some -- some sections. And I want to put those on the record, too. We have Sections 5.02, 5.03, 5.06, 5.07, *5.08*, 5.10, 5.12, 5.13 and *5.14* of Senate Bill 1.") (emphases added)); OCA Reply Ex. 5, OCA-GH 30(b)(6) Dep. at 175:22–177:15, 199:9–200:17 (State Defendants asking OCA-GH representative about impact of Sections 5.08 and 5.14).

F.3d 985, 989 n.2 (5th Cir. 2008) (concluding district court did not err by considering new claim as

a motion to amend under Rule 15(a) and resolve claim on summary judgment).[53] Defendants would

not be prejudiced because they have acknowledged and conducted discovery on these exact

provisions as part of the statutory scheme that OCA Plaintiffs have consistently challenged.

### C.   OCA Plaintiffs have standing to challenge SB 1's matching-number requirement.

State Defendants do not meaningfully challenge the Article III standing of *any* OCA Plaintiff,

each of whom provided ample undisputed evidence establishing both organizational standing in their

own right and associational standing based on the standing of their members,[54] thereby substantiating

---

[53] *See also Ryals v. El Paso Cty.*, 2015 WL 4589740, at *4 (W.D. Tex. Jan. 26, 2015), *aff'd*, 630 F. App'x 332 (5th Cir. 2016) ("[T]he Court [] construed Plaintiff's reference to defamation [in his motion for summary judgment] as a motion by him to amend his Complaint."); *Riley v. Sch. Bd. Union Par.*, 379 F. App'x. 335, 341 (5th Cir. 2010); *Carter v. Cnty. of Hays*, 2019 WL 436556, at *4–5 (W.D. Tex. Feb. 4, 2019); *Edwards Fam. P'ship, LP v. BancorpSouth Bank*, 236 F. Supp. 3d 964, 969–70 (S.D. Miss.), *aff'd*, 699 F. App'x 312 (5th Cir. 2017).

[54] State Defendants offhandedly assert, in only one sentence, that OCA Plaintiffs have not established associational standing "because there is a triable question of fact regarding their injury for many of the reasons described in State Defendant's motion to dismiss." State's Br. at 55. But this response simply ignores OCA Plaintiffs' extensive factual evidence demonstrating associational standing, which is undisputed. *See* OCA MSJ at 26–39. At summary judgment, Defendants must either set forth facts to create a material issue or specifically demonstrate why OCA Plaintiffs' undisputed material facts do not entitle OCA Plaintiffs to judgment; they cannot simply assert that an issue remains. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (Rule 56(e) of the Federal Rules of Civil Procedure "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial" (cleaned up)). That burden is not discharged by "mere allegations or denials." *Id.* at 322, n.3; Fed. R. Civ. P. 56(e). Nevertheless, out of an abundance of caution, OCA Plaintiffs will respond to State Defendants' unsupported assertion.

OCA Plaintiffs have associational standing because they have established that "(1) [their] members would independently meet the Article III standing requirements; (2) the interests [each] seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members." *See Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006).

First, OCA Plaintiffs have presented undisputed evidence that they have members have who have been and are at substantial risk of again being disenfranchised entirely or denied the right to vote by SB 1's matching-number requirement in violation of the Materiality Provision. OCA MSJ at 27–28 & nn.113–114, 31 & n. 127–129, 38–39 & nn. 163–165. Some of OCA Plaintiffs' members have additionally been forced to vote in person due to a reasonable fear that their mail ballot materials will be rejected. *Id.* at 27–28 & nn.113–114, 34–35 & nn. 144–146. These are sufficient injuries to confer Article III standing. *See, e.g.*, *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009) ("Requiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing," as is requiring a registered voter to obtain a photo identification, irrespective of how easy it may be to comply with that requirement); *Stringer v. Hughs*, 2020 WL 6875182, at *9 (W.D. Tex. Aug. 28, 2020) (violation of federal statutory right to simultaneously apply for voter registration and driver's license constituted injury "regardless of whether the individual plaintiffs have been registered to vote by alternative means"); *see also Arcia*

many of the allegations this Court credited previously in denying Defendants' motions to dismiss. OCA MSJ at 26–39; Order, ECF 448 at 49–50; *see McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014) ("[O]nce [the Court] determine[s] that at least one plaintiff has standing, [it] need not consider whether the remaining plaintiffs have standing to maintain the suit." (citation omitted)). State Defendants instead argue that OCA Plaintiffs do not have statutory standing to bring their claims on their own behalf or third-party standing to bring claims on behalf of others, including their members. State's Br. at 52–55.

First, as this Court has previously recognized, OCA Plaintiffs may bring their claims on their own behalf under either, or both, the Materiality Provision and 42 U.S.C. § 1983 because the texts of both statutes reveal Congress's intent to allow broad jurisdiction for claims from organizations like OCA Plaintiffs. *See* Order, ECF 448 at 60 ("[C]aselaw clearly establishes that organizations, like the OCA-GH Plaintiffs, have historically been able to enforce [Section 101].").

---

*v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014); *Black Voters Matter Fund v. Raffensperger*, 478 F. Supp. 3d 1278, 1298–99 (N.D. Ga. 2020), *aff'd sub nom. Black Voters Matter Fund v. Sec'y of State for Georgia*, 11 F.4th 1227 (11th Cir. 2021)).

Second, OCA Plaintiffs are organizations whose missions include promoting civic participation, expanding voter registration and voter turnout, and protecting democracy. OCA MSJ at 26 (LWVTX), 32–33 (OCA GH), 35 (REVUP Texas). There "can be no question" that the interests each seeks to protect are germane to their purpose. *See La Union del Pueblo Entero v. Abbott*, 614 F. Supp. 3d 509, 526 (W.D. Tex. 2022).

Finally, OCA Plaintiffs' claims do not require the participation of their members. This "prong of the associational standing test" focuses on "matters of administrative convenience and efficiency," *Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 557 (1996), and is "solely prudential," *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010). OCA Plaintiffs' claims "can be proven by evidence from representative injured members, without a fact-intensive-individual inquiry," *id.* at 552, and there is no question that it is "more administratively convenient and efficient to assert such a challenge in a representative capacity." *La Union del Pueblo Entero*, 614 F. Supp. 3d at 527.

Plaintiffs also have organizational standing. An organization has standing to sue on its own behalf if it meets the same standing test that applies to individuals. *ACORN v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999). An organization may plead the requisite injury by alleging that the challenged practice will frustrate its activities and that it will need to "devote resources to counteract a defendant's allegedly unlawful practices." *E.g., id.* at 360. OCA Plaintiffs provide undisputed evidence that their organizations' missions have been frustrated by, and they have had to divert resources to counteract, the immaterial matching-number provisions. OCA MSJ at 26–30 (LWVTX); 32–34 (OCA GH); 35–38 (REVUP Texas).

Section 101 states that federal jurisdiction exists over actions to enforce the Materiality Provision by the "party aggrieved," 52 U.S.C. 10101(d), a term indicating Congress's intent "to extend standing under the [statute] to the maximum allowable under the Constitution," thereby "allowing any plaintiff meeting Article III standing requirements to sue under the law," *see ACORN v. Fowler*, 178 F.3d 350, 363–64 (5th Cir. 1999); *see also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 19 (1998). Congress also left the term "party aggrieved" undefined, which weighs in favor of applying its broad historical understanding, *i.e.*, to "cast the standing net broadly." *See ACORN*, 178 F.3d at 363 (citing *Akins*, 524 U.S. at 19). Likewise, "several circuit courts have interpreted the term 'person aggrieved,' an almost identical term to ['party aggrieved'], to have eliminated prudential standing requirements in the context of other federal laws." *Id.* at 364 (collecting cases). Section 101's use of the term "party aggrieved" thus reveals Congress's intent to grant a cause of action to parties injured by violations of the Materiality Provision, like OCA Plaintiffs. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014).

If that were not enough, Section 1983 separately provides a remedy against state actors who cause "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Nothing in Section 1983 requires a plaintiff to be "the object of the conduct allegedly in violation of 42 U.S.C. § 1983" to assert a claim. *Coggins v. Carpenter*, 468 F. Supp. 270, 282 (E.D. Pa. 1979) ("[A] person has standing to assert claims under 42 U.S.C. § 1983 if that person was aggrieved or injured by the conduct, even if that person was not the object of the conduct allegedly in violation of 42 U.S.C. § 1983."). Accordingly, OCA Plaintiffs are appropriate aggrieved parties under the Materiality Provision and Section 1983 and may assert their claims on their own behalf because they have provided undisputed evidence demonstrating that their resources have been

37

diverted and their missions have been impaired because of the matching-number requirement. *See supra* note 54; OCA MSJ at 26–39.[55]

Second, and contrary to State Defendants' assertions, both the Fifth Circuit and Texas district courts have repeatedly permitted organizations like OCA Plaintiffs to assert associational standing to bring claims on behalf of their members under Section 1983. *See, e.g.*, *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550–53 (5th Cir. 2010); *Church of Scientology v. Cazares*, 638 F.2d 1272, 1276–80 (5th Cir. 1981); *Tex. All. for Retired Americans v. Hughs*, 489 F. Supp. 3d 667, 685 (S.D. Tex. 2020), *rev'd in part on other grounds*, 28 F.4th 669 (5th Cir. 2022); *Texas League of United Latin Am. Citizens v. Abbott*, 493 F. Supp. 3d 548, 571 (W.D. Tex. 2020), *vacated on other grounds*, No. 20-50867, 2021 WL 1446828 (5th Cir. Feb. 22, 2021).[56] OCA Plaintiffs, who have established associational standing, *supra* note 54, may therefore bring claims on behalf of their members separate and in addition to claims on their own behalf.

State Defendants nevertheless argue that OCA Plaintiffs are not permitted to vindicate a "third party's rights" in this case. States' Br. at 54–55. However, "the successful assertion" of

---

[55] To the extent State Defendants still argue that OCA Plaintiffs' claims do not fall "within the zone of interests sought to be protected by" the Materiality Provision and Section 1983, *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011), they are wrong. The zone of interest standard "is not meant to be especially demanding," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012), and requires only that a claim not be "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Thompson*, 562 U.S. at 178 (citation omitted). OCA Plaintiffs are voting rights organizations that seek relief from injuries caused by an immaterial voting qualification imposed on their members and other voters in the communities they serve, which is at the core of the Materiality Provision's promise to "parties aggrieved" and Section 1983's protection from violations of federally protected rights. OCA MSJ at 26–29. Because both statutes encompass OCA Plaintiffs' claims, third-party standing prudential considerations do not apply. *See Lexmark*, 572 U.S. at 128 (acknowledging courts "cannot limit a cause of action that Congress has created merely because 'prudence' dictates").

[56] Even the stay panel's decision in *Vote.org*, on which State Defendants again rely, recognizes that membership "associations representing . . . voters," just like OCA Plaintiffs here, "bring such lawsuits all the time." *See Vote.Org v. Callanen*, 39 F.4th 297, 304 (5th Cir. 2022). Thus, to the extent that the non-binding *Vote.org* panel decision expressed skepticism about organizations having statutory standing to sue under Section 1983, it did so only with regard to non-membership organizations that are distinguishable from membership organizations, like OCA Plaintiffs, which commonly bring similar claims. *See* 39 F.4th at 304.

38

associational standing "fulfills prudential standing concerns and obviates the need to apply concepts of third-party standing." *Veasey v. Perry*, 29 F. Supp. 3d 896, 905 (S.D. Tex. 2014). As a result, numerous courts have rejected identical arguments raised by State Defendants in other voting rights cases. *See, e.g.*, *Tex. All. for Retired Americans v. Hughs*, 489 F. Supp. 3d at 685 (where plaintiffs had established associational standing, the SOS's argument that they "may not bring their suit under Section 1983 because they are relying on the rights of others . . . lack[ed] merit"); *Texas League of United Latin Am. Citizens*, 493 F. Supp. 3d at 571 (same).

Third, and again contrary to State Defendants' assertions, the "cases are legion" that permit a plaintiff to assert third-party standing under Section 1983. *See Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786, 793–94 (7th Cir. 2013)).[57] Thus, even if OCA Plaintiffs were required to meet traditional third-party standing requirements to bring their claims under Section 1983, they both could and would. Third-party standing considers "whether the party asserting the right has a close relationship with the person who possesses the right" and "whether there is a hindrance to the possessor's ability to protect his own interests." *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (assessing plaintiffs' third-party standing to bring Section 1983 claims on behalf of indigent criminal defendants (cleaned up)). OCA Plaintiffs offer uncontested evidence that they have close relationships with their current members and voters they directly interact with in their communities, and that the rights they seek to vindicate are related to their organizational missions of protecting voting rights. OCA MSJ at 26–39. OCA Plaintiffs have named members and other voters

---

[57] *See, e.g.*, *Kowalski v. Tesmer*, 543 U.S. 125 (2004); *Craig v. Boren*, 429 U.S. 190 (1976); *Singleton v. Wulff*, 428 U.S. 106 (1976); *Planned Parenthood v. Danforth*, 428 U.S. 52 (1975). Indeed, even in the case relied upon by State Defendants, *McCormack v. Nat'l Collegiate Athletic Ass'n*, the Fifth Circuit accepted that third-party standing was available under Section 1983 (even though it found the plaintiff had not met the requirements). 845 F.2d 1338, 1341 (5th Cir. 1988) (cited in State's Br. at 52, 54).

in their communities who have had their right to vote denied because of SB 1's matching-number requirement. *Id.* at 24–26, 31, 34–35, 38–39; *see Richardson v. Texas Sec'y of State*, 485 F. Supp. 3d 744, 773–74 (W.D. Tex. 2020), *rev'd in part on other grounds*, 28 F.4th 649 (5th Cir. 2022) (finding close relationship between plaintiff and identified members). These members and voters face a significant financial hindrance in asserting their own rights through litigation. *See Powers v. Ohio*, 499 U.S. 400, 411, 415 (1991) ("[T]here exist considerable practical barriers to suit by the excluded juror because of the small financial stake involved and the economic burdens of litigation.").[58] OCA Plaintiffs have therefore established third-party standing to bring claims on behalf of their organizational members and the members of the community they serve, separate and in addition to their standing to bring claims on their own behalf and on behalf of their members.[59]

## CONCLUSION

Neither State Defendants nor Intervenor-Defendants have demonstrated a genuine dispute of material fact, nor have they raised any legal argument that precludes summary judgment. The Court should grant OCA Plaintiffs' motion for summary judgment. *See* ECF 611.

Dated: July 14, 2023.

Respectfully submitted,

*/s/ Zachary Dolling*

---

[58] Additionally, when OCA Plaintiffs learn of new members and voters who are harmed by the matching-number requirement, the limited time constraints around elections make it difficult for voters to file lawsuits in time to vindicate their rights. *See Craig v. Boren*, 429 U.S. 190, 192–9 (1976) (plaintiff could represent interests of third-party that would always risk aging-out before case was completed.); *Veasey*, 29 F. Supp. 3d at 909 (discussing *Craig*).

[59] State Defendants additionally re-raise their flawed argument that OCA Plaintiffs lack a private right of action to enforce the Materiality Provision. This Court has already correctly rejected that argument and should do so again. *See* Order, ECF 448 at 55–58. Even if the Materiality Provision did not include an implied private right of action, OCA Plaintiffs would still have a right to sue under Section 1983. *See* SAC, ECF 200, at 45–46 (cause of action under 42 U.S.C. § 1983); ECF 636 at 5 n.1 (OCA Plaintiffs' response to GOP's MSJ). A plaintiff proceeding under § 1983 need only show that the federal law includes a private *right*; after that, § 1983 presumptively supplies a remedy. *See, e.g., Gonzaga Univ. v. Doe*, 536 U.S. 273, 284–85 (2002). Here, there can be no doubt that the Materiality Provision safeguards "the right of any individual to vote in any election." 52 U.S.C. § 10101(a)(2)(B); *see* Order, ECF 448 at 57.

Zachary Dolling
Texas Bar No. 24105809
Hani Mirza
Texas Bar No. 24083512
Sarah Chen*
California Bar No. 325327
Veronikah Warms*
Texas Bar No. 24132682
**TEXAS CIVIL RIGHTS PROJECT**
1405 Montopolis Drive
Austin, TX 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)
zachary@texascivilrightsproject.org
hani@texascivilrightsproject.org
schen@texascivilrightsproject.org
veronikah@texascivilrightsproject.org

Thomas Buser-Clancy
Texas Bar No. 24078344
Edgar Saldivar
Texas Bar No. 24038188
Savannah Kumar
Texas Bar No. 24120098
Ashley Harris
Texas Bar No. 24123238
**ACLU FOUNDATION OF TEXAS, INC.**
5225 Katy Freeway, Suite 350
Houston, TX 77007
Telephone: (713) 942-8146
Fax: (915) 642-6752
tbuser-clancy@aclutx.org
esaldivar@aclutx.org
skumar@aclutx.org
aharris@aclutx.org

Adriel I. Cepeda Derieux*
Ari Savitzky*
Sophia Lin Lakin*
Dayton Campbell-Harris
*admitted *pro hac vice*

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad St., 18th Floor
New York, NY 10004
(212) 284-7334
acepedaderieux@aclu.org
asavitzky@aclu.org
slakin@aclu.org
dcampbell-harris@aclu.org

Susan Mizner*
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
39 Drumm St.
San Francisco, CA 94111
(415) 343-0781 (phone)
smizner@aclu.org

Brian Dimmick*
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
915 15th St. NW
Washington, DC 20005
(202) 731-2395 (phone)
bdimmick@aclu.org

LUCIA ROMANO
Texas State Bar No. 24033013
PETER HOFER
Texas State Bar No. 09777275
CHRISTOPHER MCGREAL
Texas State Bar No. 24051774
**DISABILITY RIGHTS TEXAS**
2222 West Braker Lane

Austin, Texas 78758-1024
(512) 454-4816 (phone)
(512) 454-3999 (fax)
lromano@drtx.org
phofer@drtx.org
cmcgreal@drtx.org

Jerry Vattamala*
Susana Lorenzo-Giguere*
Patrick Stegemoeller*
**ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND**
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932 (phone)
(212) 966 4303 (fax)
jvattamala@aaldef.org
slorenzo-giguere@aaldef.org
pstegemoeller@aaldef.org

Jessica Ring Amunson*
Alyssa G. Bernstein*
**JENNER & BLOCK LLP**
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000
jamunson@jenner.com
abernstein@jenner.com

Gregory D. Washington*
**JENNER & BLOCK LLP**
455 Market St. Suite 2100
San Francisco, CA 94105
gwashington@jenner.com

***COUNSEL FOR OCA-GREATER HOUSTON PLAINTIFFS.***

**CERTIFICATE OF SERVICE**

On July 14, 2023, I filed the foregoing using the CM/ECF system of the Western District of Texas, which will send notification of this filing to counsel of record.

/s/ *Zachary Dolling*