IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

|  |  |
|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 5:21-cv-844 (XR) (consolidated cases) |
| GREGORY W. ABBOTT, et al., | |
| Defendants. | |

## UNITED STATES' REPLY MEMORANDUM
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Introduction .................................................................................................................... 1

Argument ........................................................................................................................ 1

I.     Section 101 Does Not Require Proof of Disparate Treatment or Racial
       Discrimination. ..................................................................................................... 1

II.    The Undisputed Facts Establish that SB 1 Violates Section 101. ............................ 4

   A.     SB 1 Denies the Statutory Right to Vote in an Election. ......................................... 6

   B.     SB 1 Regulates Materials Related to Any Application, Registration, or Other
          Act Requisite to Voting. .......................................................................................... 11

   C.     SB 1 Requires Identification Numbers That Are Not Material to Voter
          Qualifications. ......................................................................................................... 14

III.   Defendants Have Failed to Identify a Genuine Dispute of Material Fact. ............. 22

Conclusion ...................................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*Adkins v. Silverman*, 899 F.3d 395 (5th Cir. 2018)...................................................... 12

*Ali v. Fed. Bureau of Prisons*, 552 U.S. 214 (2008) ..................................................... 13

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................... 22, 23

*Arcadia v. Ohio Power Co.*, 498 U.S. 73 (1990) .......................................................... 13

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ................................ 14

*Ball v. Chapman*, 289 A.3d 1 (Pa. 2023) ................................................................. 8, 21

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002) ...................................................... 3

*Blessing v. Freestone*, 520 U.S. 329 (1997) ................................................................. 10

*Boudreaux v. Swift Transp. Co.*, 402 F.3d 536 (5th Cir. 2005) ................................... 23

*Brick v. Brick*, 98 U.S. 514 (1878)............................................................................... 18

*Bright Harvest Sweet Potato Co. v. H.J. Heinz Co., L.P.*, No. 1:13-cv-296,
 2015 WL 1020644 (D. Idaho Mar. 9, 2015) ........................................................... 24

*Broyles v. Texas*, 618 F. Supp. 2d 661 (S.D. Tex. 2009)................................................ 4

*Calpecto 1981 v. Marshall Expl., Inc.*, 989 F.2d 1408 (5th Cir. 1993) ........................... 6

*Carcieri v. Salazar*, 555 U.S. 379 (2009) ...................................................................... 3

*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001) ............................................. 13

*Common Cause v. Thomsen*, 574 F. Supp. 3d 634 (W.D. Wis. 2021)........................... 15

*Corley v. United States*, 556 U.S. 303 (2009)................................................................. 9

*Diaz v. Cobb*, 435 F. Supp. 2d 1206 (S.D. Fla. 2006) ................................................. 16

*Erlenbaugh v. United States*, 409 U.S. 239 (1972)......................................................... 2

*Exec. Jet Aviation, Inc. v. United States*, 125 F.3d 1463 (Fed. Cir. 1997) ................... 9

*Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008)........... 9, 11, 19, 20

*Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1372-73 (S.D. Fla. 2004)........................ 11

*Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966) ......................................... 14

*Harrison v. PPG Indus., Inc.*, 446 U.S. 578 (1980)..................................................... 13

*Hibbs v. Winn*, 542 U.S. 88 (2004)............................................................................... 15

*Howlette v. City of Richmond*, 485 F. Supp. 17 (E.D. Va. 1978) ................................. 18

*In re Itron, Inc.*, 883 F.3d 553 (5th Cir. 2018)............................................................. 24

*Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775 (S.D. Ind. 2006)........... 4, 18

*Kaswatuka v. U.S. Dep't of Homeland Security*, 7 F.4th 327 (5th Cir. 2021) .............. 19

*Kirksey v. City of Jackson*, 663 F.2d 659 (5th Cir. Unit A 1981),
 *clarified on denial of reh'g*, 669 F.2d 316 (5th Cir. Unit A 1982) ............................ 4

*La Unión del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512 (W.D. Tex. 2022).............. passim

*Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45 (1959)........................... 14

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) ...................................... 23, 24

*Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018)............................... 10, 16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)................... 22

*Norfolk & Western R. Co. v. Train Dispatchers*, 499 U.S. 117 (1991) ....................... 12

*Oregon v. Mitchell*, 400 U.S. 112 (1970) ................................................................. 3, 4

*Pa. State Conf. of NAACP v. Schmidt*, No. 1:22-cv-339, 2023 WL 3902954
 (W.D. Pa. June 8, 2023).............................................................................. 9, 10, 21

*Richardson v. Tex. Sec'y of State*, 978 F.3d 220 (5th Cir. 2020)................................... 7

*Ritter v. Migliori*, 142 S. Ct. 1824 (2022)................................................... 8, 9, 11, 21

*Rosario v. Rockefeller*, 410 U.S. 752  (1973) .......................................................... 10

*Schwier v. Cox* (*Schwier I*), 340 F.3d 1284 (11th Cir. 2003) ..................... 8, 9, 11, 19

*Schwier v. Cox* (*Schwier II*), 412 F. Supp. 2d 1266 (N.D. Ga. 2005),
    *aff'd*, 439 F.3d 1285 (11th Cir. 2006) .............................................................. 16

*Singh v. Garland*, 855 F. App'x 958 (5th Cir. 2021) (per curiam) ............................ 7

*Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d
    1260 (N.D. Ga. 2021) ......................................................................................... 10

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ............................................ 3, 13

*Tanzin v. Tanvir*, 141 S. Ct. 486 (2020) ..................................................................... 7

*Tex. Democratic Party v. Abbott*, 978 F.3d 168 (5th Cir. 2020) ............................ 6, 7

*Thrasher v. Ill. Republican Party*, No. 4:12-cv-4071, 2013 WL 442832
    (C.D. Ill. Feb. 5, 2013) ....................................................................................... 11

*United States v. Bob Lawrence Realty, Inc.*, 474 F.2d 115 (5th Cir. 1973) ............. 13

*United States v. Duke*, 332 F.2d 759 (5th Cir. 1964) ............................................... 15

*United States v. Elashi*, 789 F.3d 547 (5th Cir. 2015) ............................................. 19

*United States v. Gonzales*, 520 U.S. 1 (1997) ......................................................... 12

*United States v. Stewart*, 311 U.S. 60 (1940) ............................................................ 2

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc) ........................................ 8

*Veasey v. Abbott*, 888 F.3d 792 (5th Cir. 2018) ...................................................... 22

*Vote.org v. Callanen*, 39 F.4th 297 (5th Cir. 2022) ........................................ 7, 8, 11

*Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264 (W.D. Wash. 2006) ... 19, 21

*Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206 (5th Cir. 2009) ....................... 23

**Statutes**

52 U.S.C. § 10101 ............................................................................................ passim

52 U.S.C. § 20504 ................................................................................................... 19

52 U.S.C. § 20507 ..................................................................................................... 9

52 U.S.C. § 20508 ................................................................................................... 19

52 U.S.C. § 20701 ................................................................................................... 13

52 U.S.C. § 21083 ................................................................................................... 19

52 U.S.C. § 21145 ................................................................................................... 19

Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241 (1964) .......................... 2

Tex. Elec. Code § 11.001 ......................................................................................... 15

Tex. Elec. Code § 11.002 ............................................................................... 14, 15, 17

Tex. Elec. Code § 86.001 ........................................................................................... 7

Tex. Elec. Code § 87.027 ......................................................................................... 16

Tex. Elec. Code § 87.041 ..................................................................................... 7, 16

Tex. H.B. 357, 87th Leg. (2023) .............................................................................. 24

Tex. S.B. 1599, 87th Leg. (2023) ............................................................................ 24

**Constitutional Provisions**

Tex. Const. art. 3, § 27 ............................................................................................ 14

Tex. Const. art. 6, § 2 .............................................................................................. 14

U.S. Const. art. I, § 2, cl. 1 ...................................................................................... 14

U.S. Const. art. I, § 4 cl. 1 ....................................................................................... 14

**Legislative History**

Comm'n on Civil Rights, Voting: 1961 Commission on Civil Rights Report (1961) ................ 17

H.R. Rep. No. 88-914 (1963), *as reprinted in* 1964 U.S.C.C.A.N. 2391 .................................... 13

Literacy Tests and Voter Requirements in Federal and State Elections: Hearings Before the Subcomm. on Const. Rights of the Comm. on the Judiciary, 87th Cong., 2d Sess. (1962) ..... 17

Miscellaneous Proposals Regarding the Civil Rights of Persons Within the Jurisdiction of the United States: Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary, 88th Cong., 1st Sess. (1963) .......................................................................................................... 17

**INTRODUCTION**

The United States has established that SB 1 violates the Materiality Provision of Section 101 of the Civil Rights Act of 1964 (Section 101), 52 U.S.C. § 10101(a)(2)(B).  *See* U.S. Mot., ECF No. 609.  Undisputed facts show that SB 1 requires officials to reject mail ballot applications and mail ballots lacking a DPS number or SSN4 that matches voter registration records, a criterion not material to determining voter qualifications.  *See id.* at 9-25.  In response, State Defendants and Intervenor-Defendants conjure myriad arguments designed to limit Section 101's protections and place SB 1 outside its scope.  Tex. Opp., ECF No. 645; Int.-Def. Opp., ECF No. 634.  None comport with Section 101's text and structure.  The statute does not merely protect voters from disparate treatment, and its protections should not be eliminated by relabeling errors as "forfeiture" of the right to vote, Int.-Def. Opp. 3, and procedural requirements as "non-substantive qualifications," Tex. SUF Response ¶¶ 5-6, 18, 30, ECF No. 645-1.  Nor is Section 101's coverage limited to voter registration only.  Moreover, Defendants' few arguments concerning material facts do not create a genuine dispute necessitating trial.  This Court should grant the United States summary judgment.

**ARGUMENT**

**I.      Section 101 Does Not Require Proof of Disparate Treatment or Racial Discrimination.**

Before reaching the elements of a valid claim, State Defendants first argue that Section 101's Materiality Provision cannot apply when an official denies the right to vote pursuant to a "neutral, evenly applied" state law.  *See* Tex. Opp. 9.  They identify no basis for this proposed carveout in the statutory text—Subsection (B) of 52 U.S.C. § 10101(a)(2)—because there is none.  *See* Tex. Opp. 9-11.  And rather than apply the plain text, they invoke the *in pari materia* canon to suggest that an exception must be imported from unrelated language in Subsection (A)

1

of 52 U.S.C. § 10101(a)(2).  *See generally Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) ("The rule of *in pari materia*—like any canon of statutory construction—is a reflection of practical experience in the interpretation of statutes: a legislative body generally uses a particular word with a consistent meaning in a given context.").[1]  This stretch fails primarily because the *in parti materia* canon is inapplicable given the Materiality Provision's clear commands.  The *in pari materia* canon is used to *resolve* ambiguity, not create it.  *See Erlenbaugh*, 409 U.S. at 245; *see also United States v. Stewart*, 311 U.S. 60, 64-65 (1940) (describing use of *in pari materia* statute on "precisely the same subject matter" in "resolving any ambiguities and doubts" (citations omitted)).  Indeed, even where two provisions were "both parts of a comprehensive federal legislative effort" and "enacted by the same legislative body at the same time," one provision cannot be leveraged through the *in pari materia* canon "to introduce an exception to the coverage of the [other] where none is now apparent."  *Erlenbaugh*, 409 U.S. at 244-45.  Even though Subsection (A) and the Materiality Provision may have been enacted to address a common problem, one should not limit the other where they "play different roles in achieving these broad, common goals."  *Id.  But see* Tex. Opp. 10 (suggesting Materiality Provision must be limited because it "serves a similar function" as other provisions).

By selectively applying language in Subsection (A) to other provisions, State Defendants would restrict all three subsections of 52 U.S.C. § 10101(a)(2) to accomplish only the purpose of Subsection (A), rendering the other provisions fully redundant.  *Compare* 52 U.S.C.

---

[1] The Civil Rights Act of 1964 put in place the three subsections of 52 U.S.C. § 10101(a)(2).  *See* Pub. L. No. 88-352, § 101, 78 Stat. 241, 241 (1964).  Each accomplishes separate ends using distinct language: Subsection (A) prohibits differential treatment of qualified voters in applying state laws, Subsection (B) (the Materiality Provision) prohibits refusing to allow voters to cast a counted ballot based on immaterial paperwork errors, and Subsection (C) establishes limitations on the use of literacy tests.  *See* 52 U.S.C. § 10101(a)(2)(A)-(C).

§ 10101(a)(2)(A) (preventing an official from applying "any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals") *with* Tex. Opp. 10 (suggesting the Materiality Provision is applicable only to "prevent individuals acting under color of law from applying state laws relating to voting *differently with respect to some citizens than to others* so as to deny or abridge the right of *all* citizens to vote" (emphasis in original)).  State Defendants' attempt to cabin the Materiality Provision out of independent existence violates the "obligation to give effect to every provision of [a] statute." *Carcieri v. Salazar*, 555 U.S. 379, 395 (2009).  And Congress's choice not to include the same disparate treatment requirement of Subsection (A) when drafting the Materiality Provision must be given effect because "when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (citation and internal quotation marks omitted).

State Defendants also suggest that the Materiality Provision requires proof of racially discriminatory intent or racially discriminatory application, *see* Tex. Opp. 11, but this too lacks a textual basis.[2]  Indeed, no subsection of 52 U.S.C. § 10101(a)(2) contains a racial discrimination

---

[2] State Defendants correctly recognize that Congress was authorized to enact Section 101 pursuant to enforcement powers under the Fifteenth Amendment.  *See* Tex. Opp. 10; *see also* U.S. Opp. 27-28, ECF No. 637.  And they do not suggest that Congress was constitutionally required to make intentional racial discrimination an element of a Section 101 claim.  *See* Tex. Opp. 9-11.  Instead, they reference the Fifteenth Amendment only to suggest that the authority under which Congress enacted the Civil Rights Act counsels narrowing Section 101 beyond its plain text.  *See* Tex. Opp. 10.  But the Fifteenth Amendment neither requires nor suggests that Congress must demand proof of discrimination in each application a statute that validly enforces the prohibition on denial or abridgment of the right to vote on account of race.  *See, e.g.*, *Oregon v. Mitchell*, 400 U.S. 112, 131-134 (1970) (upholding a race-neutral literacy test ban as a valid exercise of Congress's power to enforce the Fifteenth Amendment); *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966) ("As against the reserved powers of the States, Congress

element, making their broader *in pari materia* argument inapplicable.  State Defendants' sole

support for the proposition that proof of racial discrimination is required is *Broyles v. Texas*, 618

F. Supp. 2d 661 (S.D. Tex. 2009), which turns on an overt error.[3]  To be sure, *Broyles* states that

"only racially motivated deprivations of rights are actionable under 42 U.S.C. § 1971," relying

on *Kirksey v. City of Jackson*, 663 F.2d 659, 664-65 (5th Cir. Unit A 1981), *clarified on denial of*

*reh'g*, 669 F.2d 316 (5th Cir. Unit A 1982).  But State Defendants fail to note that the portion of

*Kirksey* on which *Broyles* relied did not construe Section 101.  Instead, this portion of *Kirksey*

pertained only to "rights secured under section 2 of the Voting Rights Act of 1965."  663 F.2d at

664.  Thus, while *Kirksey* opined on "the proper view of section 2 of the Voting Rights Act," *id.*,

the Fifth Circuit neither considered nor spoke to proof requirements under Section 101 of the

Civil Rights Act.  *Broyles* mixed up the two statutes, and this Court should decline the invitation

to compound that error.[4]

## II.     The Undisputed Facts Establish that SB 1 Violates Section 101.

Undisputed facts establish that SB 1 violates Section 101.  U.S. Mot. 9-25.  Specifically,

SB 1 (1) denies the right to "vote" in an election, (2) based on an "error or omission," (3) on a

"record or paper," (4) "relating to an[] application, registration, or other act requisite to voting,"

---

may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting.").  To the extent State Defendants suggest the Court should limit Section 101 against its text as a matter of constitutional avoidance, that avoidance is neither warranted nor necessary. *See* U.S. Opp. 27-28.

[3] State Defendants elsewhere cite *Indiana Democratic Party v. Rokita*, which erroneously concluded that all statutes enacted pursuant to the Fifteenth Amendment require proof of racial discrimination.  *See* 458 F. Supp. 2d 775, 839 (S.D. Ind. 2006).  *But see Mitchell*, 400 U.S. at 131-134 (upholding race-neutral ban on literacy tests).

[4] By the time of *Broyles*, *Kirksey* also no longer articulated the Section 2 standard.  *Kirksey*'s interpretation of Section 2 was based on *City of Mobile v. Bolden*, 446 U.S. 55 (1980), which was superseded by the 1982 amendments to the Voting Rights Act, Pub. L. No. 97-205, § 3, 96 Stat. 131, 134 (1982).  *See Thornburg v. Gingles*, 478 U.S. 30, 35 (1986).

(5) that is not "material in determining whether" an "individual is qualified under State law to vote in such election," meeting the five elements of a Section 101 claim.  52 U.S.C. § 10101(a)(2)(B); *see also id.* § 10101(a)(3), (e) (defining "vote").  Defendants largely seek to relitigate legal issues already resolved by this Court's denial of State Defendants' motion to dismiss.

Defendants resurrect a litany of arguments already rejected by this Court.  For example, under the rubric of the statutory "right to vote," Defendants suggest that mail ballot materials are not covered by Section 101.  Tex. Opp. 22, 25-26; Int.-Def. Opp. 5-6, 9 n.2.  As this Court has already explained, however, the "preparation and submission" of such materials are "actions that voters must take in order to make their votes effective," and so Section 101 "reaches actions contemplated under" the challenged provisions of SB 1.  *La Unión del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 541 (W.D. Tex. 2022).  Defendants also reassert that the opportunity to cure a rejection or vote in person after a rejection satisfies their obligation not to deny the statutory right to vote protected by Section 101.  Tex. Opp. 22-24; Int.-Def. Opp. 3, 6.  But this Court has already recognized that cure procedures do not absolve an initial violation.  *See La Unión del Pueblo Entero*, 604 F. Supp. 3d at 541.

Turning to the requirement that the error or omission at issue related to "any application, registration, or other act requisite to voting," 52 U.S.C. § 10101(a)(2)(B), Defendants argue that this phrase reaches only registration materials.  Tex. Opp. 11-12, Int.-Def. Opp. 13-16.  This too is inconsistent with this Court's articulation of the requirements of Section 101, otherwise the United States could not have articulated a plausible claim here and survived State Defendants' motion to dismiss.  *See La Unión del Pueblo Entero*, 604 F. Supp. 3d at 540-42.  This argument also cannot be squared with the statute's expansive text.

Finally, when addressing the determination whether a voter "is qualified under State law to vote in such election," 52 U.S.C. § 10101(a)(2)(B), State Defendants attempt to recast completing a "record or paper" needed to vote by mail as a "qualification" to do so.  Tex. Opp. 12-15.  This argument runs up against the Court's earlier recognition that qualifications extend only to substantive voter attributes and categories of voters qualified to vote by mail.  *See La Unión del Pueblo Entero*, 604 F. Supp. 3d at 540 (citing Tex. Elec. Code §§ 11.002, 82.001-.004, 82.007-.008).  Beyond procedural requirements, State Defendants attempt to expand materiality to cover anything that could connect with an individual's identity.  Tex. Opp. 15-22.  However, the Court has already determined that "information that is unnecessary" to establishing qualifications—including information redundant with procedures to ascertain and verify voter identity—is "not material to determining an individual's qualifications to vote under Texas law." *La Unión del Pueblo Entero*, 604 F. Supp. 3d at 542.  And Intervenor-Defendants' contention that a lack of materiality to qualifications excludes denial of the right to vote from the protections of Section 101—rather than triggering a violation—has no relationship to the text or function of the statute.  *See also* Int.-Def. Opp. 9-12.

Defendants' repurposed arguments—already rejected by this Court—do not warrant a "cycle of reconsideration."  *Calpecto 1981 v. Marshall Expl., Inc.*, 989 F.2d 1408, 1415 (5th Cir. 1993).  And, in any case, Defendants' recasting of Section 101's straightforward requirements fails on the merits.

### A.     SB 1 Denies the Statutory Right to Vote in an Election.

Taking aim at the statutory right to vote, Defendants repeat their request that this Court apply the constitutional analysis in *Texas Democratic Party v. Abbott*, 978 F.3d 168 (5th Cir. 2020), to the "right to vote" under Section 101—rendering Section 101 inapplicable unless a voter is "absolutely prohibited from voting," Tex. Opp. 22.  This Court has already rejected that

argument, concluding that *Texas Democratic Party* "is inapposite." *La Unión del Pueblo Entero*,

604 F. Supp. 3d at 541. The Equal Protection Clause standard remains inapplicable to a statutory

claim under Section 101, which expressly defines when the protected right is violated. *See, e.g.*,

*Tanzin v. Tanvir*, 141 S. Ct. 486, 490 (2020) ("When a statute includes an explicit definition, we

must follow that definition, even if it varies from a term's ordinary meaning." (citation and

internal quotation marks omitted)); *see also* U.S. Opp. MTD 23, ECF No. 195. For purposes of

Section 101, the right to vote includes the right to complete "all action necessary to make a vote

effective including, but not limited to, registration or other action required by State law

prerequisite to voting, casting a ballot, and having such ballot counted and included in the

appropriate totals of votes cast." 52 U.S.C. § 10101(e). Texas law provides for mail balloting by

eligible individuals, and rejection under SB 1 prevents voters from casting those ballots or from

having their ballots counted. It thus denies the right to "vote" as defined in Section 101 because

it prevents making those votes effective. *See* Tex. Elec. Code §§ 86.001(f), 87.041(b)(8). This

meets the first element of a Section 101 claim.

The decision of a Fifth Circuit motions panel in *Vote.org v. Callanen*, 39 F.4th 297 (5th

Cir. 2022), should not disturb this reading of Section 101. *Vote.org* is not "precedent," as State

Defendants suggest. Tex. Opp. 25. Rather, "a decision by [a] motions panel granting a stay

settles no law. To the contrary, it has no precedential force." *Richardson v. Tex. Sec'y of State*,

978 F.3d 220, 244 (5th Cir. 2020) (Higginbotham, J., concurring in stay); *see also, e.g.*, *Tex.*

*Democratic Party*, 978 F.3d at 176 (acknowledging same).[5] Nor is its reasoning persuasive.

---

[5] Intervenor-Defendants also suggest that *Vote.org* is "a good predictor of what the Fifth Circuit
will ultimately hold on the merits." Int.-Def. Opp. 7 (citing *Singh v. Garland*, 855 F. App'x 958
(5th Cir. 2021) (per curiam)). In fact, the decision on which they rely disclaimed anything more
than the possibility that a merits panel might find "persuasive force" in an earlier stay opinion
and reiterated that stay opinions are nonbinding. *Singh*, 855 F. App'x at 958.

*Vote.org* failed to apply the statutory definition of "vote" applicable to Section 101 claims and concluded that it would "prove[] too much" if "an individual's failure to comply with *any* registration requirement would deprive that person of the right to vote." 39 F.4th at 306.  But this analysis collapses the several elements of a claim; a denial of the statutory right is only one such element and does not alone prove a Section 101 violation.  At bottom, *Vote.org* rests on a reading of Section 101 that most justices of the Supreme Court declined to join.  *See* 39 F.4th at 305 n.6 (quoting *Ritter v. Migliori*, 142 S. Ct. 1824, 1824 (2022) (Alito, J., dissenting from denial of stay)).  This Court should reject this reading as well.[6]

After a denial of the statutory right to vote, a subsequent "right to cure" or to cast a different ballot by personal appearance, *see* Tex. Opp. 22, is of no moment.  As this Court has recognized and for the reasons already noted, cure procedures do not render SB 1 lawful.  *See La Unión del Pueblo Entero*, 604 F. Supp. 3d at 541; U.S. Mot. 13-16; *cf. Veasey v. Abbott*, 830 F.3d 216, 255 (5th Cir. 2016) (en banc) (holding that district court did not clearly err in finding that mail-in voting and in-person voting are not "acceptable substitute[s]").[7]  Defendants misread *Schwier v. Cox* (*Schwier I*), 340 F.3d 1284 (11th Cir. 2003), to suggest that Section 101 is limited to instances of final voter disqualification.  Tex. Opp. 24; Int.-Def. Opp. 4, 6.  But *Schwier I* merely explained that Section 101 "forbids the practice of disqualifying potential

---

[6] Intervenor-Defendants also ask this Court to rely on the opinion of a justice of the Pennsylvania Supreme Court, without noting that the opinion failed to garner even a plurality.  Int.-Def. Opp. 8-11, 14 (citing *Ball v. Chapman*, 289 A.3d 1, 37-39 (Pa. 2023) (Brobson, J., concurring in part and dissenting in part)).  On the other hand, Intervenor-Defendants suggest that this Court should ignore numerous decisions addressing the statutory right to vote under Section 101 based on distinctions in context or stage of litigation that have no bearing on legal interpretation of the statute.  Int.-Def. Opp. 8-9.  These are not meaningful distinctions.

[7] Defendants expound on post-rejection alternatives, Tex. Opp. 22-24; Int.-Def. Opp. 3-4, 6, but no party disputes that some voters cannot vote successfully after rejection of mail ballot materials.  Tex. Opp. 24; Int.-Def. Opp. 7, 18; U.S. Mot. 6; *see also infra* Part III.

voters for their failure to provide information irrelevant to determining their eligibility to vote." 340 F.3d at 1294-97. *Schwier I* was a voter registration case, *see id.* at 1285-87, and voters may cure rejection of a registration application before the close of registration, *see, e.g.*, 52 U.S.C. § 20507(a)(1). Thus, the Georgia voters in *Schwier I* were disqualified only in the same manner as Texas voters are disqualified under SB 1: officials rejected paperwork necessary to make a vote effective, absent new or corrected paperwork that met the challenged requirements.

In their separate opposition, Intervenor-Defendants recast errors and omissions concerning "voting rules" as "*forfeiture* of the right to vote, not the *denial* of that right," Int.-Def. Opp. 3 (quoting *Ritter*, 142 S. Ct. at 1825 (Alito, J., dissenting from denial of stay)), an exclusion with no basis in statutory text or structure. *See Pa. State Conf. of NAACP v. Schmidt*, No. 1:22-cv-339, 2023 WL 3902954, at *5-7 (W.D. Pa. June 8, 2023) (rejecting nearly identical arguments). Section 101 claims turn on "errors or omissions," which may be mistakes "by definition." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1175 (11th Cir. 2008). Section 101 protects a voter's ability to advance in the voting process *despite* certain paperwork mistakes. To redesignate errors or omissions as "forfeitures" would render Section 101 toothless. This would run afoul of "one of the most basic interpretive canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quotation and alteration marks and citation omitted). Nor is a limitation of "forfeiture" to errors or omissions concerning "mandatory election rules," Int.-Def. Opp. 3, a logical reading of the statute. *See supra* Part I. Section 101's text focuses on immaterial paperwork requirements, not whether voters "cast[] ballots on equal terms." Int.-Def. Opp. 6; *see also Exec. Jet Aviation, Inc. v. United States*, 125 F.3d 1463, 1468 (Fed. Cir. 1997) ("[T]he plain, obvious and rational

meaning of a statute is always to be preferred to any curious, narrow, hidden sense . . . ." (quoting *Lynch v. Alworth–Stephens Co.*, 267 U.S. 364, 370 (1925))).

Faced with the broad definition of "vote" for purposes of the "right to vote" under Section 101, Intervenor-Defendants press an unreasonably narrow construction of "right."  Int.-Def. Opp. 5-6; *see also* Tex. Opp. 25-26 (suggesting SB 1 does not "deny" any "right").  Here too, this Court should reject the invitation to unwind federal protections.  If a federal "right" to vote were no more than "the *right* to cast a ballot in accordance with state law," Int.-Def. Opp. 6, it would be no right at all.  *See, e.g.*, *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997) (recognizing that "a federal right . . . must unambiguously impose a binding obligation on the States").[8]  Rather, courts have given substance to the federal right even when errors or omissions constitute departures from state law requirements.  *See, e.g.*, *Pa. State Conf. of NAACP*, 2023 WL 3902954, at *6 ("Because Pennsylvania law . . . mandates compliance with the Date Requirement for a mail-in ballot to be counted, the Date Requirement is subject to the Materiality Provision . . ."); *Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1282 (N.D. Ga. 2021); *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308-09 (N.D. Ga. 2018).  In other words, the "right" attaches to qualified individuals when state law broadly authorizes a means to "vote," and denial of that right—rejection of an action necessary to make a vote effective—establishes the first element of a Section 101 claim.  *See infra* Part III.

---

[8] Aiming to shield all "neutral state-law voting requirements" from scrutiny, Defendant-Intervenors overstate the holding of *Rosario v. Rockefeller*, which merely explained that a party enrollment deadline prior to a closed primary "did not absolutely disenfranchise the class to which the petitioners belong," namely voters who had been eligible to enroll before the deadline but failed to do so.  *See* 410 U.S. 752, 757-58 (1973).  *Cf.* Int.-Def. Opp. 4.

**B.    SB 1 Regulates Materials Related to Any Application, Registration, or Other Act Requisite to Voting.**

When addressing the range of paperwork to which Section 101 applies, Defendants pare down Section 101's text by arguing that "any application, registration, or other act requisite to voting," 52 U.S.C. § 10101(a)(2)(B), concerns only "voter registration specifically."  Int.-Def. Opp. 13-16; *see also* State Def.' Opp. 12 (adopting argument).  Intervenor-Defendants largely reiterate arguments in their motion for summary judgment, and the United States incorporates its response here.  *See* U.S. Opp. 9-13, ECF No. 637.  They rely primarily on footnoted dicta in *Vote.org*, which did not address the application of Section 101 outside of voter registration, 39 F.4th at 305 n.6, and the dissent from denial of a stay in *Ritter*, 142 S. Ct. at 1824 (Alito, J.).  Neither have controlling value or persuasive force.  *See supra* Section II.A.  The two Eleventh Circuit cases from which Intervenor-Defendants draw out-of-context quotations, Int.-Def. Opp. 4, also involved only voter registration, giving those courts no reason to consider—much less draw affirmative conclusions about—other stages at which Section 101 applies.  *See Browning*, 522 F.3d at 1173; *Schwier I*, 340 F.3d at 1294; *see also* U.S. Opp. 11-12.  And *Thrasher v. Illinois Republican Party* rejected a claim over nominating convention procedures that did not prevent the plaintiff either "from registering to vote" or "from casting a ballot for [his preferred candidate] in the Illinois general primary election."  No. 4:12-cv-4071, 2013 WL 442832, at *3 (C.D. Ill. Feb. 5, 2013).  Once again, that case afforded no opportunity determine whether "any application, registration, or other act requisite to voting" denotes only voter registration.[9]

---

[9] In *Friedman v. Snipes*, also cited by Intervenor-Defendants, the court declined to issue an injunction under Section 101 requiring counting of absentee ballots received after a deadline, noting that this was not an error or omission "on any record or paper."  345 F. Supp. 2d 1356, 1372-73 (S.D. Fla. 2004).  Observations in dicta concerning voter registration are based on second-hand legislative history and do not engage with the statute's text.  *See id.* at 1370-71.

Intervenor-Defendants' further arguments fare no better.  First, their suggestion that the statutory phrase "any application" silently excludes an "application for a ballot by mail" turns on the premise that Section 101 captures only the voter registration process.  *See* Int.-Def. Opp. 13-14.  Thus, they are once again wrong because "application" and "registration" should not be read as redundant, among other reasons.  *See* U.S. Opp. 9-13.  That "many States" refer to voter registration forms as "[v]oter [r]egistration [a]pplication[s]," Int.-Def. Opp. 13-14 & n.3, is no indication that Congress intended the phrase "relating to any application" and "relating to . . . registration" to be redundant.  Likewise, in their search through legislative history, *see* Int.-Def. Opp. 14, Intervenor-Defendants fail to identify any indication that Congress intended to limit Section 101's application to registration documents or to permit rejection of applications at other stages based on immaterial paperwork requirements.  Their attempt to undo the plain meaning of "application" flouts the rule that where "[t]he text . . . is not ambiguous, [courts] should not introduce ambiguity through the use of legislative history."  *Adkins v. Silverman*, 899 F.3d 395, 403 (5th Cir. 2018).

Second, Intervenor-Defendants' attempt to invoke the *ejusdem generis* canon to suggest that "any . . . other act requisite to voting" should be limited to encompass only the terms "application" and "registration" that precede it, Int.-Def. Opp. 14-15, but this argument once again requires ambiguity where none exists.  *See* U.S. Opp. 10.  *See generally Norfolk & Western R. Co. v. Train Dispatchers*, 499 U.S. 117, 129 (1991) ("Under the principle of *ejusdem generis*, when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration.").  The statute's scope is clear. In fact, Congress would be hard pressed to devise language broader than "any . . . other act requisite to voting."  52 U.S.C. § 10101(a)(2)(B); *see also United States v. Gonzales*, 520 U.S. 1,

5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind." (internal quotation marks omitted)); *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 589 (1980).  Moreover, a natural reading extending "any . . . other act requisite to voting" beyond only "application[s]" and "registration," 52 U.S.C. § 10101(a)(2)(B), avoids surplusage by giving independent meaning to each of Congress's words.  *See, e.g.*, *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226-27 (2008) (construing "any other law enforcement officer"); *see also* U.S. Opp. 10.  *But cf.* Int.-Def. Opp. 15 (suggesting this reading creates surplusage).[10]

Intervenor-Defendants also contest the value of the broad reading afforded to the phrase "other act requisite to voting" in Title III of the Civil Rights Act of 1960, 52 U.S.C. § 20701, in interpreting the same phrase in Section 101, Int.-Def. Opp. 16, but interpretations of identical language in earlier civil rights acts are relevant.  *See, e.g.*, *United States v. Bob Lawrence Realty, Inc.*, 474 F.2d 115, 123 (5th Cir. 1973) (interpreting "pattern or practice" under the Fair Housing Act by reference to the Civil Rights Act of 1960).  This is particularly so under the Civil Rights Act of 1964, which was "designed to meet problems encountered in the operation and enforcement of the Civil Rights Acts of 1957 and 1960."  H.R. Rep. No. 88-914, at 19 (1963), *as reprinted in* 1964 U.S.C.C.A.N. 2391, 2394; *see also South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966) (explaining history of the Civil Rights Acts of 1957, 1960, and 1964).

---

[10]  Intervenor-Defendants' cases are not on point.  In *Circuit City Stores, Inc. v. Adams*, the Supreme Court interpreted the catch-all provision in "seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" as limited to transportation workers, but not only to seamen and railroad employees.  532 U.S. 105, 119 (2001); *see also id.* at 115-119 (interpreting "engaged in commerce" consistently across statutes and cases).  *Arcadia v. Ohio Power Co.* is even further afield: the question there turned on which portion of a statute the catch-all phrase "or any other subject matter" modified, not whether a canon of construction limited the meaning of "any."  *See* 498 U.S. 73, 79 (1990).

Accordingly, where the same phrase "act requisite to voting" appears in both statutes, it follows that Congress intended a similar interpretation—the broad one suggested both by prior case law and the practices of Texas's Office of the Attorney General.  *See* U.S. Mot. 18-19; U.S. Opp. 12-13.

### C.   SB 1 Requires Identification Numbers That Are Not Material to Voter Qualifications.

Turning to the critical question of materiality to qualifications to vote, State Defendants contend that SB 1 mail ballot requirements are material to voter *qualifications* simply because SB 1 imposes *requirements* on voters who seek to vote by mail.  *See* Tex. Opp. 11-15.  This merging of qualifications and requirements ignores the fundamental division between "Qualifications requisite for Electors," U.S. Const. art. I, § 2, cl. 1; *see also* Tex. Const. art. 6, § 2(a) (defining "qualified voter"), and "The Times, Places and Manner of holding Elections," U.S. Const. art. I, § 4 cl. 1; *see also* Tex. Const. art. 3, § 27 (permitting regulation of elections by law).  Qualifications are substantive voter attributes.  *See, e.g.*, *Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 51 (1959) (residence, age, criminal record); Tex. Elec. Code § 11.002(a) (age, citizenship, mental capacity, criminal record, residence, and prior registration). They are distinct from rules governing the conduct of elections, including the manner of determining qualifications.  *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 13-17 (2013); *see also Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966) (distinguishing qualifications and compliance with poll tax).  State Defendants cannot expand qualifications to encompass all state laws governing voter requirements by contriving a category of "non-substantive qualifications."  Tex. SUF Response ¶¶ 5-6, 18, 30.  This of course does not mean that all rules governing the manner of conducting elections violate Section 101.  *See* Tex. Opp. 4, 21.  Recognition that some requirements govern only the time, place, or manner of conducting

elections merely excludes these rules from serving as qualifications for purposes of a Section 101 claim.[11]  Ultimately, categorizing all requirements as qualifications would transform all errors and omissions related to requirements into errors or omissions material to qualifications to vote. In turn, this would convert Section 101 into a disparate treatment prohibition applicable only to deviations from State law.  This misreads the statute.  *See supra* Part I.

Statutory definitions lend no support for the State's attempt to transform requirements into qualifications for purposes of a Section 101 claim.  *See* Tex. Opp. 14.  The definition of "qualified under State law" found in 52 U.S.C. § 10101(e) does not apply to Section 101 claims, which import only the definition of "vote" from § 10101(e).  *See* 52 U.S.C. § 10101(a)(3); *see also id.* § 10101(e) (applying other definitions exclusively "[w]hen used in the subsection").  Applying every definition in § 10101(e) throughout § 10101 would render irrelevant the limited incorporation of the § 10101(e) definition of "vote" in § 10101(a)(3) and therefore violate the rule against superfluity.  *See, e.g.*, *Hibbs v. Winn*, 542 U.S. 88, 101 (2004).[12]  Moreover, even if the § 10101(e) definition of "qualified according to state law" were to apply—and it does not— defining this phrase as "qualified according to the laws, customs, or usages of the State" merely allows courts to flesh out substantive qualifications and avoid flexible standards subject to abuse. *See United States v. Duke*, 332 F.2d 759, 769-71 (5th Cir. 1964) (freezing in place a specific literacy test under specified procedures).  On the other hand, State Defendants accuse the United States of failing to apply the statutory definition of "vote" to the phrase "qualified under State

---

[11] Thus, for instance, a statement of residence required of a voter on the suspense list is likely material to the qualifications that a voter resides in Texas, Tex. Elec. Code § 11.002(5), and in the territory covered by an election, *id.* § 11.001(a)(2).  *See* Tex. Opp. 21.

[12] Although *Common Cause v. Thomsen*, 574 F. Supp. 3d 634, 636 (W.D. Wis. 2021), applied the § 10101(e) definition of "qualified under State law" to a Section 101 claim, *Thomsen* failed to address the entirety of the relevant text.

law to vote," Tex. Opp. 14, but this is not the case.  The United States has recognized substantive

eligibility requirements at stages beyond registration, including qualifications to vote by mail

under Texas law.  *See* U.S. Mot. 21.  However, it does not follow that every state law

requirement governing an "action needed to make a vote effective," 52 U.S.C. § 10101(e),

constitutes a voter qualification.

Alternatively, State Defendants contend that a voter's ability to recite unerringly the DPS

number or SSN4 contained in voter registration databases is material to voter qualifications, Tex.

Opp. 15-22.  But this too cannot be squared with the statute's text or the case law interpreting it.

Redundant data used to "confirm" a known voter's identity, Tex. Opp. 15, is not material to voter

qualifications.  *See, e.g.*, *Martin*, 347 F. Supp. 3d at 1308-09 (deeming ability to recite year of

birth in registration file on mail ballot application not material); *Schwier v. Cox* (*Schwier II*), 412

F. Supp. 2d 1266, 1276 (N.D. Ga. 2005) (rejecting contention that any information that "could

help to prevent voter fraud" is material), *aff'd*, 439 F.3d 1285 (11th Cir. 2006) (adopting district

court's reasoning).  Although State Defendants suggest that *Diaz v. Cobb*, 435 F. Supp. 2d 1206

(S.D. Fla. 2006) found "materiality irrespective of redundancy," Tex. Opp. 19, *Diaz* in fact found

materiality because the "information conveyed" in two components of an application was "not

the same," 435 F. Supp. 2d at 1213; *see also id.* (noting that a voter's "social security number . . .

is not directly relevant to the question of eligibility").[13]

_____

[13] Although State Defendants raise concerns that some signature verification committees and
early voting ballot boards only compare signatures between ABBMs and carrier envelopes, Tex.
Opp. 20, Texas law authorizes comparison to signature images in registration records.  *See* Tex.
Elec. Code §§ 87.027(i), 87.041(e); *see also* Tex. Opp. 20 (raising concerns that signatures "can
change with age").  In any case, any county-by-county variance in implementation of signature
comparison laws does not create a genuine dispute of material fact.

State Defendants attempt to justify redundant information requests by contrasting officials' ability to "ascertain a voter's identity," *La Unión del Pueblo Entero*, 604 F. Supp. 3d 512, with "positively identifying" a voter, *see* Tex. Opp. 16.  Ascertaining a voter's identity is material to determining whether the voter meets the qualification of prior registration, *see* Tex. Elec. Code § 11.002(a)(6), whereas "positively identifying" a voter does not appear in Section 101 or the Texas Election Code.  State Defendants do not offer a clear definition, but this term appears to indicate some greater degree of "certainty" that SB 1 arguably achieves.  *See* Tex. Opp. 16-17.  State Defendants seem to suggest that states may require voters to comply perfectly with any information demand to achieve "positive identification," but they do not ultimately tie "positive identification" back to materiality in determining a voter's qualifications.  Indeed, State Defendants' argument suggests that before SB 1, Texas operated early voting by mail for decades without "positively identifying" voters.[14]  On the other hand, undisputed cure evidence establishes that officials initially rejected thousands of carrier envelopes that qualified voters had accurately completed, except for numbers required by SB 1.  U.S. SUF ¶¶ 157-158.  Thus, SB 1 in fact *undermined* accurate identification of thousands of voters.[15]

---

[14] Under Defendants' view, long eradicated practices—such as requiring registrants to correctly compute their ages in years, months, and days—could roar back to life, so long as those practices sought to identify a voter *positively.  See* Comm'n on Civil Rights, Voting: 1961 Commission on Civil Rights Report, Book 1, 54-57, 59, 66, 86 (1961), https://perma.cc/CC7B-T888; Miscellaneous Proposals Regarding the Civil Rights of Persons Within the Jurisdiction of the United States: Hearings Before Subcomm. No. 5 of the H. Comm. on the Judiciary, 88th Cong., 1st Sess. 951, 1099, 1380 (1963) (referencing practices in 1961 Commission Report); Literacy Tests and Voter Requirements in Federal and State Elections: Hearings Before the Subcomm. on Const. Rights of the Comm. on the Judiciary, 87th Cong., 2d Sess. 515-522 (1962) (Department's list of cases).

[15] The declaration of Denton County Election Administrator Frank Phillips merely states that his "office's standard operating procedure has been to use that unique identifier as a reliable way to positively identify voters," which is indistinguishable from saying that he followed state law. *See* Philips Decl. ¶ 12 (Tex. Opp. Ex. S), ECF No. 645-4, at 28; *see also* Tex. Opp. 15 n.3.

State Defendants' description of their pre-SB 1 processes as unverified also conflicts with the undisputed facts. Voters certify information on an ABBM used to look up registration records and sign a certification on a carrier envelope, in both cases under penalty of criminal prosecution. U.S. SUF ¶¶ 24, 54, ECF No. 609-1. Thus, ABBMs and carrier envelopes do not merely contain "the names of registered voters." *Howlette v. City of Richmond*, 485 F. Supp. 17, 22 (E.D. Va. 1978); *see also, e.g.*, *Brick v. Brick*, 98 U.S. 514, 516 (1878) (describing weight afforded to an affirmation under oath).[16] On the other hand, State Defendants offer mere speculation that local officials who previously mismatched ABBMs to voter records "perhaps . . . would have been more accurate" with SB 1 in place. Doyer Dep. 38:8-14 (Tex. Opp. Ex. J), ECF No. 645-3, at 17; *see also* Tex. Sec. of State, *Application for a Ballot by Mail* (Dec. 9, 2021) (STATE031879) (U.S. Mot. Ex. 14), ECF No. 609-5 at 94 (requiring a voters' last name, first name, middle name, suffix, and address); *cf.* Tex. Opp. 18 (stating witness testified SB 1 "would preclude" such errors).[17] Even with DPS numbers and SSN4s available, election officials do not use these numbers to match applications to registration records. U.S. SUF ¶ 119. On the other hand, each redundant datapoint increases opportunities for errors and omissions;

---

[16] *Howlette* deemed a notarization requirement "not immaterial," with no reference to qualifications. 485 F. Supp. at 23. *But cf.* 52 U.S.C. § 20104(b) (prohibiting notarization requirements for mail ballot materials used by handicapped voters). State Defendants also cite *Rokita*, which rejected a Section 101 claim against voter ID requirements that could not cause an "error or omission on any record or paper." 458 F. Supp. 2d at 841. In dicta, *Rokita* indicated that plaintiffs in that case had conceded that "verifying an individual's identity is a material requirement of voting" and therefore conceded "that the state may establish procedures to verify this requirement." *Id.* Thus, *Rokita* also departed from the statutory focus on qualifications.

[17] At her deposition concerning the "full forensic audit" of the 2020 General Election in Texas, Ms. Doyer disclaimed that the Secretary of State's Forensic Audit Division applied or considered SB 1. Doyer Dep. 20:9-15 (Tex. Opp. Ex. J), ECF No. 645-3, at 17; *see also id.* 23:4-15 (indicating the audit did not assess any procedures by which any entity might identify mail voter fraud).

this is precisely why Section 101 prohibits rejection based on paperwork requirements not material to voter qualifications. *See Schwier I*, 340 F.3d at 1294.[18]

The Help America Vote Act (HAVA) also does not render SB 1's requirements material to voter qualifications. Tex. Opp. 20-21 (quoting *Browning*, 522 F.3d at 1174). To facilitate use of computerized statewide voter registration lists, HAVA requires most voter registration applicants to submit a current and valid driver's license number or SSN4. *See* 52 U.S.C. § 21083(a)(5)(A)(i). Voters who have not been issued such a number may indicate as much, in which case states must assign the applicant "a number which will serve to identify the applicant for voter registration purposes." *See* 52 U.S.C. § 21083(a)(5)(A)(ii). This requirement applies "notwithstanding any other provision of law," which avoids any potential conflict with Section 101. *Id.* § 21083(a)(5)(A)(i); *see also Browning*, 522 F.3d at 1174; 52 U.S.C. § 21145(a) (omitting the Civil Rights Act of 1964 from list of laws not to be superseded by HAVA); *cf., e.g.*, *Kaswatuka v. U.S. Dep't of Homeland Security*, 7 F.4th 327, 330 (5th Cir. 2021) (applying a notwithstanding clause to preclude application of the Rehabilitation Act to TSA security screeners).[19] Thus, while HAVA requires submission of certain information as part of the

---

[18] Section 101 does not prohibit an optional request for a DPS number or SSN4 so that officials may presume a signature match when these numbers match registration records. *See* Tex. Opp. 20. Section 101 only prohibits rejection of mail voting materials based on SB 1 requirements.

[19] *Browning* erred in reading HAVA as a determination by Congress that such numbers are "material to determining eligibility to register and to vote." 522 F.3d at 1174. *See* 52 U.S.C. §§ 20504(c)(2)(B)(ii), 20508(b)(1) (distinguishing between information necessary "to enable the appropriate State election official to assess the eligibility of the applicant" and information needed "to administer voter registration"). A notwithstanding clause "signal[s] a clear Congressional intent to override conflicting federal law." *United States v. Elashi*, 789 F.3d 547, 552 (5th Cir. 2015) (citation and internal quotation marks omitted). And as *Browning* notes, states are "free to accept the numbers provided on [an] application form . . . as self-authenticating," so that they serve as database identifiers but not as confirmation of identity. 522 F.3d at 1174 n.21; *see also* 52 U.S.C. § 21083(a)(5)(iii); *Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1270-71 (W.D. Wash. 2006) (enjoining requirement that numbers match databases as violating Section 101).

registration process, it does not deem a driver's license number or SSN4 material to establishing

voter qualifications set by each covered state and jurisdiction.

State Defendants also argue that reciting a DPS number or SSN4 in voter registration

records is material to qualifications despite millions of errors and omissions in Texas databases.

Tex. Opp. 18.  Not so.  Even if duplicative information concerning voter identity were

material—and it is not—the flaws in Texas databases are so substantial that they sever the

connection between SB 1 requirements and confirmation of voter identity.  Where data

concerning 1 in 7 registered voters is either inaccurate or incomplete, U.S. SUF ¶ 144, a

requirement to provide matching information ceases even to confirm voter identity.  Statistically

significant increases in SB 1 ballot rejection among voters with multiple DPS numbers, DPS

numbers missing from TEAM, or discrepancies in DPS number or SSN4 between TEAM and the

DPS database, U.S. SUF ¶¶ 144, 162-169, establish that Texas's databases are ill-suited for a

mandatory identity check.  State Defendants misunderstand *Browning*, which held that

typographical or clerical errors related to a registration application do not render requested

information immaterial, distinguishing "the nature of the error" from "the nature of the

underlying information requested."  522 F.3d at 1174.  Problems inherent in Texas voter

registration databases concern the "underlying information requested"—the DPS number or

SSN4 contained in registration records—and render these data not material to qualifications.

Intervenor-Defendants admit what State Defendants will not: that a DPS number or SSN4

appearing in state databases is not material to voter qualifications.  Int.-Def. Opp. 9; *see also* Int.-

Def. Mot. 13, ECF No. 608 ("[T]he United States . . . may point out that the personal

identification numbers on an application or mail ballot are 'not material' to determining an

individual's qualifications to vote.  That is entirely correct." (internal citations omitted)).[20]

Strangely, they then suggest that it is precisely because SB 1 requires rejections based on

immaterial information that the United States is not entitled to summary judgment.  Int.-Def.

Opp. 9-13.  Relying primarily on a dissent from denial of a stay in *Ritter*, 142 S. Ct. at 1824-25

(Alito, J., dissenting), and the separate opinion of a justice of the Pennsylvania Supreme Court in

*Ball v. Chapman*, 289 A.3d 1, 38-39 (Pa. 2023) (Brobson, J., concurring in part and dissenting in

part), Intervenor-Defendants ask this Court to exclude from Section 101's reach the very

paperwork errors at its heart, those "not material in determining whether such individual is

qualified under State law to vote."  52 U.S.C. § 10101(a)(2)(B).  As the United States previously

explained, such arguments run afoul of Section 101's plain text and must be rejected.  U.S. Opp.

19-22.  Suggesting that "not material *in determining* whether such individual is qualified" limits

the scope of Section 101 to determinations of qualifications, 52 U.S.C. § 10101(a)(2)(B)

(emphasis added), runs headlong into the express statutory instruction to apply this provision to

"any record or paper relating to any application, registration, or other act requisite to voting," *id.*

Moreover, courts (including this one) have consistently applied the absence of materiality to

trigger a violation of Section 101, rather than to exclude a requirement from its reach.  *See, e.g.*,

*La Unión del Pueblo Entero*, 604 F. Supp. 3d at 542; *Pa. State Conf. of NAACP*, 2023 WL

3902954, at *7 (rejecting identical argument); *Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d

1264, 1270 (W.D. Wash. 2006).  This Court should find the fifth element of a Section 101 claim.

*See infra* Part III.

---

[20] State Defendants join this concession and appear to argue alternative legal theories premised
on opposing facts.  *See* Tex. Joinder, ECF No. 610; Tex. Opp. 12.

**III.     Defendants Have Failed to Identify a Genuine Dispute of Material Fact.**

Defendants purport to identify disputes of material fact that preclude summary judgment in favor of the United States, Tex. Opp. 3; Int.-Def. Opp. 16-19, but their arguments fail.  State Defendants focus on facts primarily related to alternative arguments and mischaracterize legal disagreements as disputes of fact.  Intervenor-Defendants quibble with expert evidence, but they have failed to "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  These arguments provide no basis for this Court to conduct a full trial on the merits of the United States' claim.

Defendants cannot deploy erroneous legal positions to create a genuine dispute of material fact that would preclude summary judgment for the United States.  State Defendants principally assert that the United States presents "highly disputed facts relating to the wisdom" of SB 1.  Tex. Opp. 3.  However, the parties agree that "the United States' views on the wisdom of state law are irrelevant" under Section 101.  Tex. Opp. 4; *see also, e.g.*, *Veasey v. Abbott*, 888 F.3d 792, 800 (5th Cir. 2018) (recognizing policy flexibility of state legislature within parameters of federal election law).  Irrelevant disputes are themselves irrelevant to summary judgment.  *See, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And they certainly do not present grounds to deny the United States' motion.

State Defendants also label two facts underpinning the United States' motion as "subject[] to considerable dispute," Tex. Opp. 16, without identifying conflicting evidence.  The United States has met its burden to establish that "county officials neither need nor typically use a DPS number or SSN to query registration records."  U.S. Mot. 22 (citing U.S. SUF ¶¶ 119-120).  Although the United States did not provide evidence from every election official in Texas, *see* Tex. SUF Response ¶¶ 119-120, the State has failed to muster actual "proof" of contrary

practices needed to create a genuine dispute. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation and internal quotation marks omitted).[21] The United States has similarly established that "the requirement to provide a DPS number or SSN4 on mail ballot materials" that matches voter registration records subverts otherwise accurate identification of the voter in some cases "because of inaccuracies, omissions, and incomplete records in voter registration databases." U.S. Mot. 23 (citing U.S. SUF ¶¶ 139-145). State Defendants did not even respond to the relevant paragraphs in the United States' Statement of Undisputed Facts. *See* Tex. SUF Response. Moreover, these particular facts are not material, as they relate only to the United States' alternative arguments and should not "affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. State Defendants' "unsubstantiated assertions" of a genuine dispute do not create an issue for trial. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citation and internal quotation marks omitted).

State Defendants' other responses to the United States' Statement of Undisputed Facts fail in turn to articulate disputes based on actual evidence that could "affect the outcome of the action" under the appropriate legal standard. *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009); *see also* Tex. SUF Response. Although State Defendants contend that the Statement of Undisputed Facts is "incomplete," Tex. Opp. 4, the addition of redundant or minimally relevant materials do not establish genuine issues for trial. *See, e.g.*, *Little*, 37 F.3d at 1075; *see also* Tex. SUF Response ¶¶ 7, 11-12, 21-22, 26-27, 31, 35-37, 41, 49, 58, 62-63, 67-

---

[21] State Defendants also point to the testimony of Denton Election Administrator Frank Phillips. *See* Tex. SUF Response ¶ 119. However, the testimony cited does not address initial querying of registration records. Counsel for State Defendants merely asked Mr. Phillips, "When a ballot arrives to your office, does the Denton County Elections Office use the ID number, whether it be the Social Security number or Texas ID number, to confirm the voter's identity?" Mr. Phillips answered, "We do." Phillips Dep. 102:5-9 (Tex. Opp. Ex. R), ECF No. 645-4 at 20.

70, 72, 85-87, 89-91, 96, 100-107, 111, 117, 121-122, 163, 193-194, 200, 202, 209.[22]  Objections

to a statement of undisputed fact also do not constitute the "evidence of contradictory facts"

necessary to preclude summary judgment.  *Little*, 37 F.3d at 1075; *see also* Tex. SUF Response

¶¶ 15, 19, 45, 104, 106, 109-110, 117-120, 126, 146, 179, 183-187, 192, 194, 197-198, 209.

State Defendants also cannot avoid summary judgment by misrepresenting the United States'

Statement of Undisputed Facts.  *Compare* U.S. SUF ¶ 193 (describing single conviction for mail

ballot impersonation) *with* Tex. SUF Response ¶ 193 (discussing mere allegations).[23]  And State

Defendants' contention that the Statements of Undisputed Facts fails to address "non-substantive

---

[22] After the United States filed the instant motion, Texas Governor Greg Abbott signed Senate
Bill 1599, which will modify mail voting review procedures, and House Bill 357, which revises
online ballot tracker login requirements without eliminating the need to provide both a DPS
Number and SSN4 that match voter registration records.  *See* Tex. S.B. 1599, 87th Leg. (2023)
(STATE182732) (Ex. 113), https://perma.cc/HJ8G-4YKK; Tex. H.B. 357, 87th Leg. (2023)
(STATE182637) (Ex. 114), https://perma.cc/65A4-FTJB; *see also* Tex. Legis. Online, *History:
SB 1599 88(R)* (Ex. 115) (signed June 18, 2023), https://perma.cc/3Q2S-BB75; Tex. Legis.
Online, *History: HB 357 88(R)* (Ex. 116) (signed June 13, 2023), https://perma.cc/T3U8-9AY2.
Both bills take effect on September 1, 2023.  *See id*.  State Defendants have accurately described
these changes, which are neither disputed nor material.  *See* Tex. SUF Response ¶¶ 67-69, 72,
200, 202-203.

[23] The United States objects to State Defendants' selective disclosure of information previously
withheld or regarded as protected from disclosure under the investigatory or law enforcement
privilege, attorney-client privilege, or work product doctrine in the declaration of Jonathan
White, the former Division Chief of the Election Integrity Division of the Office of the Attorney
General of Texas.  *See* White Decl. (Tex. Opp. Ex. BB), ECF No. 645-5, at 13; *see also Bright
Harvest Sweet Potato Co. v. H.J. Heinz Co., L.P.*, No. 1:13-cv-296, 2015 WL 1020644, at *1 (D.
Idaho Mar. 9, 2015) (noting privilege may not be used "as both a sword and a shield" that
enables a party to "selectively reveal only those portions of the privileged communications most
beneficial to its case"); *In re Itron, Inc.*, 883 F.3d 553, 558-60 (5th Cir. 2018).  State Defendants
do not rely heavily on the paragraphs at issue in opposing the United States' motion, and this
dispute does not preclude summary judgment.  The parties continue to meet and confer in hopes
of avoiding motion practice.

qualifications," Tex. SUF Response ¶¶ 5-6, 14-15, 18, 20, 30, 195-198, rests on an erroneous legal theory and therefore does not generate a dispute of material fact, *see supra* Section II.C.[24]

Intervenor-Defendants take issue with undisputed facts concerning voter registration databases in Texas and the impact of incomplete and erroneous data on voters under SB 1, but they cannot draw material facts into dispute.  Int.-Def. Opp. 16-19.  It is true that in a given election, only a fraction of the millions of Texas registered voters with multiple DPS numbers, DPS numbers missing from TEAM, or discrepancies in DPS number or SSN4 between TEAM and the DPS database will vote by mail.  Int.-Def. Opp. 17; *see also* Tex. Opp. 19.  But in each election, any of those voters may "be sick or out of town, or become disabled, or expectant of a baby, or called overseas" and therefore eligible for a mail ballot.  Hersh Supp. Rep. ¶ 46 (U.S. Mot. Ex. 55), ECF No. 609-9 at 219.  It is also true that database problems do not uniformly bar mail voting by impacted voters and that election officials have attempted to mitigate the harms caused by SB 1 and will continue to do so.  *See* Int.-Def. Opp. 17-19; Tex. Opp. 19; *see also* U.S. Mot. 6 (describing mitigation efforts).  But what matters is that 1 in 7 Texas registered voters have these voter registration database issues, and when those voters attempt to vote by mail, they are significantly more likely than other voters to have their ballots rejected for failure to meet SB 1 requirements and are significantly less likely to cast a ballot that will be counted.  U.S. SUF

---

[24] Most of State Defendants' additional responses turn on whether guidance from the Office of the Secretary of State is legally binding, which is not a material fact.  Tex. SUF Response ¶¶ 85-91, 96, 100-102, 104, 109-111, 117; *see also La Unión del Pueblo Entero*, 604 F. Supp. 3d at 527-32 (finding causation and redressability with respect to the Secretary).  The remaining responses are both immaterial and unsupported.  *See* Tex. SUF Response ¶ 124 (contesting whether form directing voters to provide SSN4 if they lack a DPS number conflicts with guidance recommending voters provide both numbers); Tex. SUF Response ¶ 209 (suggesting that voting a new, in-person ballot is a method of "curing" a rejected mail ballot).

¶¶ 144, 162-169.[25]  The undisputed fact that SB 1 prevented additional voters from even

obtaining a mail ballot, Int.-Def. Opp. 18, in no way undermines the rejection of mail ballots due

to SB 1.[26]

Intervenor-Defendants conclude from the undisputed facts that "the sky is not falling in

Texas."  Int.-Def. Opp. 18.  But that is not the standard.  A violation of Section 101 of the Civil

Rights Act of 1964 occurs when voters have had their statutory right to vote denied based on

errors or omissions on records or papers related to an act requisite to voting, if those errors or

omissions are not material in determining voters' qualifications to vote under State law.  No one

disputes that the record evidence shows that SB 1 has required more than 36,000 mail ballots to

be rejected based on errors or omissions unrelated to voter qualifications, denying the rights of

tens of thousands of Texas voters.[27]  This Court should grant the United States summary

judgment.

---

[25] State Defendants misunderstand the distinction between an estimate of registered voters with an elevated risk of mail ballot rejection versus a prediction of mail ballot rejection rates.  Tex. Opp. 19 n.26.  Dr. Hersh never estimated that the mail-ballot rejection rate would be between 15 and 16 percent in November 2022.  *See* Hersh Rep. ¶ 2 (U.S. Mot. Ex. 36), ECF No. 609-8, at 63.

[26] Although it is true that all Texas voters have a legal right to cast an in-person ballot, *see* Int.-Def. Opp. 18, Intervenor-Defendants have not put forward evidence that all voters are able to do so.  The opposite is true.  U.S. SUF ¶ 199.  In any case, this question is not material under the appropriate legal standard.  *See La Unión del Pueblo Entero*, 604 F. Supp. 3d at 541-42.  It is also undisputed and irrelevant that the November 2020 mail ballot rejection rate in New York was higher than the November 2022 mail ballot rejection rate in Texas.  *See* Int.-Def. Opp. 18.

[27] State Defendants speculate that these ballots may have been submitted by individuals not qualified to vote.  Tex. Opp. 19.  However, each voter attested to their qualifications under penalty of criminal prosecution.  *See* Tex. Sec. of State, *Application for a Ballot by Mail* (Dec. 9, 2021) (STATE031879) (U.S. Mot. Ex. 14), ECF No. 609-5 at 94.  State Defendants offer no evidence to undermine the credibility of these oaths or to support claims of rampant voter fraud.

## CONCLUSION

For the reasons articulated in the United States' motion, ECF No. 609, and for the

foregoing reasons, this Court should grant the United States summary judgment.

Date:  July 14, 2023

KRISTEN CLARKE
Assistant Attorney General

*/s/ Daniel J. Freeman*
T. CHRISTIAN HERREN, JR.
RICHARD A. DELLHEIM
DANIEL J. FREEMAN
DANA PAIKOWSKY
MICHAEL E. STEWART
JENNIFER YUN
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
daniel.freeman@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2023, I electronically filed the foregoing with the Clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

*/s/ Daniel J. Freeman*
Daniel J. Freeman
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530
(202) 305-4355
daniel.freeman@usdoj.gov