# Exhibit A

# Attachment 1

# Jacquelyn Callanen
# April 20, 2022 Deposition Excerpts

Transcript of the Testimony of

**Jacquelyn Callanen**

**Date:**

April 20, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Jacquelyn Callanen                                      April 20, 2022

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO, )
     ET AL                       )
 4                               )
     vs.                         )   CASE NO. 5:21-CV-844-XR
 5                               )
     GREGORY W. ABBOTT, ET AL    )
 6   _____
     OCA-GREATER HOUSTON, ET AL  )
 7                               )
     vs.                         )   CASE NO. 1:23-CV-780-XR
 8                               )
     JOHN SCOTT, ET AL           )
 9   _____
     HOUSTON JUSTICE, ET AL      )
10                               )
     vs.                         )   CASE NO. 5:21-CV-848-XR
11                               )
     GREGORY WAYNE ABBOTT, ET AL )
12   _____
     LULAC TEXAS, ET AL   )
13                               )
     vs.                         )   CASE NO. 1:21-CV-0786-XR
14                               )
     JOHN SCOTT, ET AL           )
15   _____
     MIFAMILIA VOTA, ET AL       )
16                               )
     vs.                         )   CASE NO. 5:21-CV-0920-XR
17                               )
     GREG ABBOTT, ET AL          )
18   _____
     UNITED STATES OF AMERICA  )
19                               )
     vs.                         )   CASE NO. 5:21-CV-1085-XR
20                               )
     THE STATE OF TEXAS, ET AL   )
21   _____

22              ORAL VIDEOTAPED DEPOSITION

23                 JACQUELYN CALLANEN

24                  APRIL 20, 2022

25
```

1        ORAL VIDEOTAPED DEPOSITION OF JACQUELYN CALLANEN,

2    produced as a witness at the instance of the Plaintiffs

3    and duly sworn, was taken in the above-styled and

4    numbered cause on the 20TH day of April, 2022, from

5    9:27 a.m. to 7:07 p.m., before Sarah A. Prugh, Certified

6    Shorthand Reporter in and for the State of Texas,

7    reported by machine shorthand at the Offices of The

8    Mexican American Legal Defense and Educational Fund, 110

9    Broadway Street, Suite 300, San Antonio, Texas, pursuant

10   to the Federal Rules of Civil Procedure and the

11   provisions stated on the record or attached hereto.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1  you just let me know?

 2      A.    Yes, sir.

 3      Q.    And if you answer a question without asking for

 4  a clarification, I obviously will assume that you

 5  understand it; is that fair?

 6      A.    Yes, sir.

 7      Q.    Your attorney may object to some of my

 8  questions and that's fine.  Those objections are for the

 9  judge to consider later.  But as long as your attorney

10  does not instruct you not to answer, you should answer

11  my questions.  Does that make sense?

12      A.    Yes, sir.

13      Q.    I will try to take a break every hour or every

14  90 minutes or so.  And if you need a break at any point

15  before then, just feel free to let me know.

16      A.    Thank you.

17      Q.    The only caveat there is that if I have asked a

18  question, I will ask that you answer it before we go to

19  break.

20      A.    Yes, sir.

21      Q.    Is there anything that might impair your

22  ability to testify honestly and truthfully today?

23      A.    No.

24      Q.    Have you taken any medication, alcohol or drugs

25  that would impair your testimony?

```
 1      A.   No.  Afterwards.

 2                MR. WHITE:  So strike that.

 3                THE WITNESS:  I'm sorry.  I will behave.

 4                (Exhibit A marked)

 5      Q.   (By Mr. White) So I would like to hand you an

 6  exhibit and I will ask the court reporter to mark this

 7  as Exhibit A.  If you will go ahead and flip to the

 8  second page, you will see the title of the document.

 9  Have you seen this document before?

10      A.   Yes, sir.

11      Q.   What is it?

12      A.   It is basically the legal means that gets me

13  here to the deposition.

14      Q.   So one thing I just wanted to explain in how

15  this deposition will differ from your previous testimony

16  in this case from a few weeks ago is that today you are

17  being deposed under Federal Rule of Civil Procedure 30

18  (b)(6) which means that the testimony that you are

19  giving is not just in your personal capacity but on

20  behalf of your office.  Does that make sense?

21      A.   Okay.

22      Q.   So do you understand that you are being offered

23  by the office of the Bexar County Elections

24  Administrator to testify on their behalf today?

25      A.   Yes.
```

1      Q.    Can you flip ahead to -- there aren't page

2  numbers here.  If you flip ahead, there is maybe six or

3  seven pages and there is a heading called deposition

4  topics at the bottom.  You can take a second to get

5  there.

6      A.    Okay.  This is definitions.

7      Q.    I think it is a couple of pages after that.

8      A.    Okay.  I am there, yes.

9      Q.    Have you seen these deposition topics before?

10     A.    Yes.

11     Q.    And are you prepared to testify today as to

12 each of the topics on behalf of your office?

13     A.    Yes.

14     Q.    Okay.  Can you please tell me what you did to

15 prepare for today's deposition?

16     A.    Again, just reviewed SB-1 again, HB-6, reviewed

17 all of it, went through some election records, you know,

18 just went through -- like the topics were A to H.  And

19 so in some of these, they were -- they don't apply to

20 Bexar County.  So just going over and seeing so that I

21 can give you as much information as possible.

22     Q.    Yeah.  Thanks so much.  We definitely

23 appreciate that.  What election records did you review?

24     A.    There are many and sundry.  They are different

25 so I was looking at obviously how many people voted in

1   people that come in.  Well, again, things out of our
2   control with COVID and people not going back to work, it
3   was very difficult for the temp service to send us the
4   people we needed.  So when we would put in a request for
5   15 people, they could get us eight.  And so that added
6   to it.  That was a constant challenge where we had empty
7   desks I mean because we had this whole temp area.  And
8   that was a frustrating piece of it.
9       Q.   And you testified a moment ago that this was
10  sort of a daily occurrence with people calling in.  Have
11  you memorialized anywhere exactly how many calls you
12  received about this or --
13      A.   No.  I mean I was at one point -- in the normal
14  course of a day, we would receive maybe 100 calls,
15  80-90-100 calls in the normal course of a day.  When we
16  are in a big election, we will receive like 1200 calls a
17  day.  I mean it just zoom, goes up that high.
18           And so again, this one, we were taking
19  off.  I mean I can go back and collect those numbers
20  because the staff each day that when they went in to
21  empty the voice mail buckets, they were taking off --
22  taking names off, anywhere from 75 to 150 each day, the
23  people were requesting.  So those are our rough numbers.
24  No, we have not taken time to go back and compile it all
25  together.

Jacquelyn Callanen

April 20, 2022
Page 25

```
 1      Q.   Okay.  So is it fair to say that one of your
 2  concerns with SB-1 is the provision in SB-1 that
 3  prevents you from distributing mail ballot applications
 4  to people other than --
 5      A.   Absolutely.
 6           MS. HUNKER:  Objection, form.
 7      Q.   (By Mr. White) And this provision is going to
 8  be in effect for the November general election; correct?
 9      A.   Correct.
10      Q.   And it will be in effect for all subsequent
11  future elections; correct?
12      A.   Correct.
13      Q.   During your prior testimony, you were asked
14  about uniformity and about whether that was a basis for
15  Senate Bill 1.  Is it fair to say that during the 2020
16  election, some counties were implementing new voting
17  procedures that you were not implementing in Bexar
18  County?
19      A.   Correct.
20      Q.   And when you were asked about how those
21  differences between counties affected voters, you
22  testified that some people were upset that they had to
23  drive downtown to your office to drop off the mail
24  ballot.  But in Harris County, they could drop it off at
25  a drop box.  Am I restating your testimony accurately?
```

1      A.    Correct.

2            MS. HUNKER:   Objection, form.

3      Q.    (By Mr. White) How were you made aware that

4  people were upset about this?

5      A.    They would come in to our office to hand us

6  their ballot and let us know.

7      Q.    Did voters also call your office?

8      A.    Absolutely.

9      Q.    Do you have a sense of how many complaints you

10  got about this issue?

11      A.    Again, no.  I haven't compiled it.  I know it

12  was daily.  I mean we would have voters come in I mean a

13  number of times.  And I guess the dynamics have changed

14  so much, that people think they can like say and talk

15  differently.  You know, there is not a level of respect.

16            And so even from our senior citizens who

17  were returning their mail ballots, they would come in

18  with two and we could only accept one.  And they didn't

19  have the wife in the car, they didn't have it or vice

20  versa.  And these people would get really really upset

21  and basically, just take the other ballot and throw it

22  on the floor and do with this what you want.  I mean

23  they were that frustrated.  And it just -- that hurt.

24      Q.    But with respect to people complaining about

25  procedures in Bexar County compared to Harris County,

1  what was it that made folks upset?

2      A.   It was the lack of drop boxes that --

3              MS. HUNKER:  Objection.

4              THE WITNESS:  Other opportunities to drop

5  it off somewhere else other than our office.

6              MS. HUNKER:  Objection, form.  Sorry.  I

7  thought you were done.  My apologies.

8              THE WITNESS:  I am like if they came to

9  our office and we had a chance to explain to them the

10  why, the reason.  But again, it was the public

11  narrative, the newspapers.  I mean, again, we have the

12  San Antonio Express News.  But if you open the San

13  Antonio Express News on any given day, it is filled up a

14  whole lot with news from Houston because it is a Hearst

15  paper and they, you know, they downsized the Express

16  News here.  And so all of these articles were in there

17  about the numerous drop boxes and the overnight voting

18  and all of this stuff, that our voters who took the

19  paper, read the paper, whatever that may be, projected

20  themselves that they should have the same thing.

21      Q.   (By Mr. White) I see.  So people saw what was

22  going on in Harris County and were telling you --

23      A.   Naturally.

24      Q.   -- and your staff that they wanted those same

25  procedures as well?

1      A.    Yes.

2      Q.    So is it fair to say that people just wanted an

3  easier way to deposit their ballots?

4            MS. HUNKER:   Objection, form.

5            THE WITNESS:   Yes.   And again, I think

6  I -- again, I hesitate to say yes but I think it is also

7  a function of the COVID.   Because prior to SB-1 and

8  prior to the 2020 when we started accepting the mail

9  ballots over a longer period of time, some of the voters

10  didn't understand that that was for a one time deal.

11  And again, you know, that was for a one time deal.   Then

12  things changed and they heard about Harris County so

13  there was just a lot of confusion out there.

14      Q.    (By Mr. White) Well, when you say there was

15  confusion, you testified last time that it was more that

16  people were just upset about not having access to the

17  same procedures and not about confusion.   So I just want

18  to clarify what exactly --

19      A.    Like I said, I think it was both.   Because as I

20  had stated before, our usual voters, the ones who have

21  been voting with us for a long time by mail, you know,

22  they had our applications stored in a very safe place at

23  home.   So the first day of the year or the first

24  weekend, they knew they were going to send that in.   And

25  that is where this basically started because they sent

1  in the old application that was not grandfathered in to

2  the new process for SB-1.  And so we had to reject all

3  of those applications.

4              And so at that point, that is sort of

5  where the ill-will, the confusion, whatever you --

6  whatever word we put on it, started.

7      Q.    I see.

8      A.    And then it just sort of cascaded.

9      Q.    Got it.  I was referring specifically to how

10  Harris County had separate procedures for drop boxes.

11  And you had testified previously that that provision

12  didn't necessarily cause confusion.  Sorry.  Strike

13  that.  Let me rephrase.

14              You had testified previously that the fact

15  that Harris County had these drop boxes was angering

16  voters in Bexar County.

17      A.    Correct.

18      Q.    But it wasn't confusing them.  Am I stating

19  your testimony correctly?

20      A.    Yes.

21      Q.    Now, last time you were asked about, again,

22  uniformity in elections being one of the bases for

23  Senate Bill 1.  And you testified that that doesn't

24  work.  Because in all of my years, we have our

25  procedures and our codes and everything set by the

1   secretary of state.

2       A.    Correct.

3       Q.    Prior to SB-1, in what ways did the secretary

4   of state's office insure that counties were following

5   the same election procedures?

6       A.    Again, we have a yearly law seminar that is

7   hosted in Austin where all 254 counties go and hear the

8   same presentations and all of that.  And it is held in

9   July.  It is either the last week of July or the first

10  week of August.  And so from that point on, we have --

11  if anything is changing, if we have new forms, if we

12  have new directives, we have from that July or August to

13  prepare for the November election.  This didn't happen

14  because SB-1 came out of the third session after all of

15  this had gone on.  And it was on a short turnaround

16  where it became effective in December.  And the

17  secretary of state's office and us didn't have the lead

18  time that we normally would have had.

19              And again, that is an internal problem.

20  We did not project that, you know, to the voters.  But

21  that was another huge sense of frustration from our

22  office.  Because you know, forms and changes and paper

23  shortages and design of the envelopes, I mean everything

24  was going to be new.  And it didn't magically appear.

25      Q.    Let's unpack that a little bit because I wanted

 1  in the media, oh, you know, they are going to be able to
 2  film you and they can do this, they can do whatever they
 3  want.
 4                      In reality, that all was tamed down when
 5  it came through the committee substitute.  You know,
 6  that was sort of gone back to normal.  But the election
 7  judges are really nervous about it again because this --
 8  we have very very very well trained, very very well
 9  meaning poll watchers that we have had forever.  It is a
10  great relationship.  As I said, it is a necessary part.
11                      But now we have these aggressive poll
12  watchers that are coming in.  And the judges are not --
13  they are nervous.  They are absolutely nervous, the ones
14  who have stuck with us.  Because SB-1 says, you know,
15  they are going to go to jail if they, you know, say
16  anything to the poll watcher and that is how they feel.
17                      So we do a lot of talking.  We do a lot of
18  role modeling, you know, on how far they can do when
19  they are in training.  This is part of our training now
20  that the poll watchers, you know, can do this, ask this,
21  see this, follow you back.  That was problematic in
22  March because a number of our election officials were
23  very nervous.  Because again, this new SB-1, you know,
24  in the past says they can follow you.  And so they are
25  following them in the cars.  And it makes them nervous

Jacquelyn Callanen

April 20, 2022
Page 75

```
 1   because, you know, you can't lose them.  You can't --
 2   you know, it is like -- and so that's raises the bar so
 3   to speak.
 4      Q.   Right.  So I wanted to ask about those
 5   trainings that you were talking about.  So when did your
 6   office train poll workers about the new provision in
 7   SB-1 relating to poll watchers?
 8      A.   Well, basically in February.
 9      Q.   February of 2022?
10      A.   Yeah.
11      Q.   What did that training consist of?
12      A.   It is a two hour.  If you are already an
13   election official with us -- if you have gone through
14   our training, because our training to become an election
15   official is an eight hour training.  We do four hours of
16   law and we do four hours of equipment.
17              If you have been certified and you are an
18   election worker, then prior to every election, you have
19   mandatory training that is a two hour training.  And at
20   that two hour training, it is oh, look, we have new
21   forms.  Oh, look we are going to do this.  So all of our
22   officials had to come to that training for two hours.
23              So it was just -- it is a constant thing
24   that whole month.  Because again, like I said, we are
25   doing 1200-1400 people and so they are all hearing the
```

Jacquelyn Callanen

April 20, 2022
Page 76

```
 1  same thing.  And the one thing I did -- when I say I did
 2  because everybody growled at me, but we put in their
 3  election kit the secretary of state's office is
 4  responsible for training.
 5              Okay.  So they have an election
 6  judge/clerk handbook that they put out and it contains
 7  all of the new rules and everything in it.  It is a
 8  pamphlet that is maybe 30 or 40 pages long, you know.
 9  And forever, we have always given that handbook in our
10  kit so that the election officials can see that on this
11  page, this is -- you know, if somebody is asking you
12  about inside of the 100-foot line, will you turn to page
13  17?  This is where it is.  You can show.  So they have
14  always had that handbook.
15              Well, for March, the secretary of state
16  put out a new handbook for poll watchers.  They didn't
17  put any of the new laws.  They didn't update the
18  election officials handbook.  So they did the poll
19  watchers but they didn't do the election officials.  So
20  it was like okay, how are we going to tell the judges?
21              So we made copies.  I provided every one
22  of our election sites with a poll watcher handbook.  And
23  so we had gone through that to say they, you know, they
24  can see this, they can see this.  So that, again, that
25  was the only direct legal new form that had because
```

1   secretary of state's office completely did not do the

2   new handbook for the judges or the clerks.  They have

3   since put one out but it was not ready for March.

4        Q.   Okay.  Let me ask a couple of follow-up

5   questions about that answer.  So the poll watcher

6   handbook that you distributed?

7        A.   Yes.

8        Q.   That was a handbook that you created or was

9   that -- was it from the secretary of state?

10        A.   Secretary of state's office, yes.

11        Q.   That you then distributed?

12        A.   Yes.

13        Q.   And the trainings that you mentioned that

14   occurred in February of this year, you mentioned that

15   there was like a two hour training.  That was for

16   returning pole workers?

17        A.   Yes.

18        Q.   And for the new folks, there was the eight hour

19   training?

20        A.   Yes, sir.

21        Q.   And you mentioned as part of that eight hour

22   training, there were four hours of law?

23        A.   Yes, sir.

24        Q.   What were the -- what happened in the four

25   hours -- strike that.  What did you -- strike that as

 1  well.  Who was running these trainings?

 2      A.   My trainer, myself and my trainer.

 3      Q.   Who is your trainer?

 4      A.   Her name is Mandisa Parker.  She has been with

 5  me for eight years and she is fantastic.

 6      Q.   She is an employee in your office?

 7      A.   Yes.

 8      Q.   What did you discuss during the four hours of

 9  law aspect of this training for new poll workers?

10      A.   Again, from the procedures, the photo ID part,

11  you know, what documents they have to have from opening

12  the polls to setting up your poll site, how you have to

13  get their signatures here, how you have to see their

14  photo ID, how they need to sign here, here is if they

15  need a provisional ballot, here is if -- you know, if

16  they need assistance, if they need an interpreter or if

17  they need -- so there is -- there is a good hundred

18  forms -- hundred different forms that we give somebody,

19  you know, for every-every possibility so that everybody

20  can vote that is eligible.  So they need to know that.

21      Q.   Okay.

22      A.   And that is the four hours of law and that part

23  is included in the poll watcher who is allowed to be in

24  the poll site.

25               (Exhibit B marked)

1   150.

2        Q.   And yes, I will ask about Laura Pressley.  Do

3   you know -- do you happen to know if the number of poll

4   watchers who reported to Bexar County polling sites in

5   this year's primary was greater than previous election

6   cycles?

7        A.   Yes, yes, the answer is yes.

8        Q.   More than 2020 primary election?

9        A.   Yes.

10       Q.   Do you have a sense of how much -- how many

11  more poll watchers appeared?

12       A.   Probably 25 percent more.

13       Q.   And that is an estimate?

14       A.   Right.

15       Q.   Are there particular polling places where poll

16  watchers appear more frequently than others in Bexar

17  County?

18       A.   No, no, surprisingly not.

19       Q.   So your testimony is that they tend to

20  appear -- do you think they are evenly distributed

21  across points?

22       A.   Probably not evenly distributed.  But again,

23  there is more of them.  They know for the primary --

24  2022 primary, a number of them which made no sense but a

25  number of them were at the Republican sites which were

```
 1  outside 410 and 1604 here in the
 2  north/northwest/northeast part.
 3      Q.    Sorry.  What is 410 and what is 1604?
 4      A.    I'm sorry.  Yes.  In San Antonio, it is like
 5  okay, everybody knows.  We have two circles that go
 6  around the town.  One is 410, Loop 410, and then there
 7  is an outer band that goes around town.  It is 1604.
 8  And the growth that is happening, the explosive growth
 9  that is happening in Bexar County is in that northward
10  part towards heading towards Austin.  It is growing.
11      Q.    Okay.  And you had testified last time and also
12  just a moment ago someone named Laura Pressley had been
13  training some of these poll watchers?
14      A.    Correct.
15      Q.    Who is Larua Pressley.
16      A.    Laura Pressley is a self-proclaimed election
17  expert, Doctor Laura Pressley.  She is a woman who ran
18  for city council in Austin and she lost a number of
19  years ago.  At that point, much like we see today, the
20  candidates don't take responsibility for them losing.
21  It was something that they had no control over so it had
22  to be something that -- the election fraud, the election
23  equipment, you know, caused them to lose the election.
24              And so she is a zealot now that has
25  questioned the election integrity.  2020 just emboldened
```

1  her more.

2      Q.   Okay.  When did he run for -- sorry.  Strike

3  that.  When did she lose her race for city council?

4      A.   I am not sure.  I want to say like '12, 2012

5  maybe.

6      Q.   Okay.  And since 2012, she has been sort of an

7  activist?

8      A.   She is an activist, yes.  And she started a lot

9  at the legislative committee meetings.  She is always

10  there.  And you know, wanting to make changes and this

11  and that.

12      Q.   And how long has she been training poll

13  watchers for?

14      A.   She started slowly in 2020.  But since the 2020

15  narrative, she has ramped up dramatically.

16      Q.   Is she affiliated with any political campaign?

17      A.   Not to my knowledge.  She forms her own PACs

18  with the -- and she sets up with the ethics commission

19  so that she can have her poll watchers in the sites so

20  that she doesn't have to go through a candidate.  And in

21  the primary, she found two unopposed state candidates,

22  state wide candidates who signed the certificates for

23  her poll watchers.

24      Q.   Is she trained -- is she training poll watchers

25  on behalf of particular candidates?

1    A.   No.

2    Q.   And how many poll watchers did she train for

3  the March primary?

4    A.   Like I said, I was told -- she was telling

5  everybody she had trained 150 in Bexar County.

6    Q.   And you were told that by whom?

7    A.   By someone in the Republican party.

8    Q.   Who in the Republican party?

9    A.   The chair, John Austin.

10    Q.   When did he tell you this?

11    A.   At one of our many meetings.  When we are

12  having a joint primary, we have numerous meetings, you

13  know, with the two chairs.  And they are executive

14  directors.

15    Q.   Okay.  Do you know if she -- sorry.  Strike

16  that.  Is Laura Pressley doing these trainings herself?

17    A.   Yes.

18    Q.   And do you know how -- strike that.  Do you

19  know anything about context of the trainings that she is

20  performing?

21    A.   Yes.

22    Q.   And what do you know about them?

23    A.   You are going to get me in trouble.  You are

24  going to get me in trouble.  One of the poll watchers

25  that she had trained came in 2020 when she started.  We

Jacquelyn Callanen

April 20, 2022
Page 87

1   were, of course, one of the lucky counties.  She went to

2   the big counties so we were one of the lucky counties.

3                     As we had her poll watchers in our central

4   counting station, quite hectic, you know, late at night,

5   we had her poll watchers taking pictures in the central

6   count station which is against the law, and on and on

7   and on.  And so at the end as we were leaving like at

8   2:00 o'clock in the morning, whatever that may be, one

9   of her assigned poll watchers happened to leave her

10  manual that was prepared by Laura Pressley.

11      Q.    Okay.  So I want to unpack that a little bit

12  and I want to start with this poll watcher that you just

13  referred to, this was during the 2020 general election?

14      A.    Yes, sir, November.

15      Q.    And you said that they were -- that one or more

16  of these watchers were taking pictures at where?

17      A.    Inside of the central counting station.

18      Q.    The central counting station.  I'm sorry.  What

19  is the central counting station?

20      A.    I'm sorry.  That is probably the end result.

21  That is where all of the votes are tabulated.  It is

22  the, you know, the sacred heart of every part of the

23  elections office.

24      Q.    And that is where all of those votes for Bexar

25  County are tabulated?

1    A.    Yes.

2    Q.    How did she get access to the center the

3  central counting station?

4    A.    Again, they were appointed as poll watchers.

5    Q.    So they can access central tabulation center?

6    A.    They can -- yes, they can watch it, yes.

7    Q.    But they are not allowed to take photos?

8    A.    No, and they sign a sworn statement to that

9  fact, that that is part of the poll watcher.  I swear I

10  don't have it.  I will not.  But yeah.

11    Q.    And what did you -- how did you hear about

12  this?

13    A.    I heard about it when the pictures were on

14  Facebook and they all started going a little bit crazy.

15    Q.    Okay.  Did you report this poll watcher to law

16  enforcement?

17    A.    Yes.

18    Q.    What happened after you did that?

19    A.    It went to the attorney general's office.

20  Again, when you are in the central count, Graham, we are

21  required and we do have an armed sheriff in the room

22  with us.  That is sort of antiquated because so many

23  people now are technology and, you know, votes come

24  through modems, and instead of having paper ballots in

25  boxes that the official would have had to watch.  But

1  there are still there and we are grateful for it.  So

2  every minute that we are in the central counting

3  station, there is a security guard, a sheriff's deputy

4  with us.

5      Q.   Who posted these photos on Facebook?

6      A.   This woman that had taken them.  And then it

7  led to a whole big -- another big lawsuit that is still

8  sitting out there where they said they had a writ of

9  mandamus.  I don't know what that means.  So that just

10  goes on and on and on.

11      Q.   So she posted the photos herself online?

12      A.   Yes.

13      Q.   Do you know what her name is?

14      A.   Charlene Vanderpoorten -- Vander -- I think it

15  is P-O-O-R-T-E-N, Vanderpoorten.  She was with Cynthia

16  Brehm.

17      Q.   I'm sorry.  Who is Cynthia Brehm?

18      A.   Cynthia Brehm is another well known.  I saw

19  Nina's eyes go up.  She knew.  Cynthia Brehm had been

20  the chair of the Republican party.  And then again, when

21  she was no longer the chair, she became the super zealot

22  Laura Pressley leader for Bexar County.

23      Q.   And sorry.  I am -- just to be clear, when you

24  say that this poll watcher Charlene was with Cynthia

25  Brehm, what do you mean?

1      A.    They were the two that were assigned that came

2  in.

3      Q.    They were both at the central counting station?

4      A.    Yes.  Again, the election code specifies that

5  any one candidate or PAC can assign two to any function

6  that we are doing to two at one location.  And so they

7  came as that two.  It was Cynthia and Charlene that

8  came.  You know, and then there is other people.

9      Q.    Do you happen to know if it was just Charlene

10 that was taking photos or were both of them?

11     A.    Again, we think it was just Charlene.

12     Q.    And did Charlene send those photos to law

13 enforcement after she took them?

14     A.    Again, I don't know.

15     Q.    Do you to if she sent those photos to your

16 office or any of your staff?

17     A.    Oh, no, no.

18     Q.    And you testified a moment ago that -- sorry.

19 Strike that.  So you reported this to the attorney

20 general's office?

21     A.    Uh-huh.

22     Q.    And did you hear anything back from the office

23 at all?

24     A.    Huh-uh.

25     Q.    Did you report this to the two individuals that

1      Q.   Did you bring it up?

2      A.   No, because we were on -- there is, in my mind,

3  there is a difference between like when they come in and

4  they are asking informational stuff that I have sent

5  them.  And then there is a difference when they come in

6  doing their investigation of our processes because of

7  other complaints they have gotten.  There is two.  It

8  goes both ways.

9      Q.   And at this meeting, you gave them the pole

10 watcher manual?

11     A.   I showed it to them.

12     Q.   Showed it to them.  What was their reaction to

13 seeing it?

14     A.   Pretty surprised.  And especially when they got

15 to the third bullet that said, you know, confrontation,

16 that that surprised both of them.

17     Q.   Why were they surprised?

18     A.   Just again, because of what they have been

19 hearing from a lot of places around the state about

20 this.  We are not the only ones that are bringing this

21 up to them.  But my understanding is -- like I am the

22 only one lucky enough to have gotten their book.

23     Q.   They told you that?

24     A.   So --

25     Q.   So I just want it to be clear.  They told you

1   that they had received similar complaints from other --

2        A.   Yes, sir.

3        Q.   -- county officials in the 2020 general

4   election?

5        A.   Yes.

6             MS. HUNKER:  Objection, form.

7             THE WITNESS:  And this one, in the 2022

8   primary.

9        Q.   (By Mr. White) Okay.  But this meeting happened

10  before the March 2022 primary?

11       A.   Yes.

12       Q.   And did they say they would take any action in

13  response to complaints that they had been hearing?

14       A.   Just they are still gathering all of this

15  information.

16       Q.   Okay.  Were you aware of any other illegal

17  activity from poll watchers in the 2020 election?

18             MS. HUNKER:  Objection, form.

19             THE WITNESS:  No, just again,

20  intimidation.  Our election officials would call and,

21  you know, ask us how far they could, you know, like

22  literally push the poll watchers.  The poll watchers

23  were interacting.  We had one poll watcher that was --

24  and I'm sorry.  I don't remember what side it was.  But

25  that had started to, as I said, we have told the judges

Jacquelyn Callanen

April 20, 2022
Page 98

1  and we have instructed the judges that they can't be

2  near the voters, you know, when they are actually

3  voting.  But then they all have to cross the room.

4             And with our new system they have to take

5  the ballot that has been printed and put it in a

6  tabulator, the DS-200.  It looks like a trash can.  You

7  go put it over there.

8             And one site, one of the poll watchers had

9  been aggressive enough that was telling the voters that

10  as they exited their voting station, that they had to

11  hand the ballot to the poll watcher so that he could see

12  it was filled out.  And they give it to them before they

13  put it in the tabulator.  And of course, that is totally

14  illegal.

15     Q.    (By Mr. White) And this was during 2020?

16     A.    '22.

17     Q.    Let me take a step back for a second then.  And

18  you had testified earlier today and I think last time

19  that your office has lost election officials because

20  of --

21     A.    Yes, yes.

22     Q.    What was the reason that your -- sorry.  Strike

23  that.  Was it your testimony that election officials had

24  quit or decided not to volunteer for future elections

25  because of this?

1      A.    Yes.

2      Q.    And about how many election officials quit

3  because of this?

4      A.    We probably lost about 50 out of our 1200 which

5  again, is not tremendous but it is still problematic.

6      Q.    Okay.  Did these election officials all resign

7  around the same time?

8      A.    Yes.

9      Q.    And when was that?

10      A.    Yes, they were resigning probably like in

11  January once we start reaching out to them to get ready

12  for the next election.  We start usually, you know, 60

13  days ahead.  And they were like no.  And like I said,

14  the staff was really good trying to tell them that that

15  onerous bill did not take -- you know, that was not in

16  SB-1 where they had to have a camera and they could take

17  pictures and they could, you know --

18                 But still, they said, you know, we hope

19  they come back.  But it was like we are going to sit

20  this one out.  We don't need that.

21      Q.    Did losing these 50 election workers in January

22  impact your offices --

23      A.    Sure.

24      Q.    -- functions?

25      A.    Sure, sure, it causes a lot of stress.

 1      Q.   Causes a lot of stress?

 2      A.   To that staff, to our staff when they have

 3  to -- you know, again, the goal is never to close a poll

 4  site.  I mean that is the golden rule.  And if you don't

 5  have the officials to man it, you have to close the poll

 6  sites.  And like Dallas had to close a whole lot of

 7  theirs in 2022.  But the staff knows, you know.  It is

 8  basically we have to fill this.  We have to get someone

 9  here.  We have to have them trained.  And it is a strain

10  on them.

11      Q.   And your testimony just now, your understanding

12  was that Dallas had to close poll sites because they

13  lost election officials?

14      A.   Yes, sir.

15           MS. HUNKER:  Objection, form.

16      Q.   (By Mr. White) And they lost election officials

17  because of the poll watchers?

18      A.   I don't know why but they didn't have the

19  officials to open their poll sites.

20           MS. HUNKER:  Objection, form.

21      Q.   (By Mr. White) I am just curious about the

22  practical applications of losing 50 election workers

23  right before the primary.  Did Bexar County have to

24  close any polling sites?

25      A.   No, sir.

1  watchers were demanding to see that zero tape.  They

2  wanted to observe, watch, touch and sign these zero

3  tapes.  And the election officials, rightfully so, I

4  give them credit because we didn't even think to tell

5  them that.  But that if somebody wants to look at this

6  zero tape, it is their responsibility to stand there and

7  make sure that they don't alter it in any way.  And then

8  the poll watchers were told they could sign it.

9            Well, okay, that's -- except that is

10  taking another five or ten minutes out of the morning

11  that the election officials could have moved on to the

12  next stage of opening this.  So that is where that

13  started right away.  And then we had some poll watchers

14  who would stand behind the qualifying table and argue

15  with the election officials.

16            And what I mean by that, again, I don't

17  know if we talked about it before.  I'm sorry.  In a

18  primary, in a joint primary, again, like six years ago,

19  I think we did talk about this.

20            About six years ago, the legislature

21  passed a bill that said you cannot ask a voter when they

22  come to a joint primary if they are a Democrat or

23  Republican.  You can't do that.  You can't say that out

24  loud.  They can't -- because somebody had complained

25  that, oh, my God, your officials asked me and I had to

1  say it and my neighbor was standing behind me.

2               So they came out with block letters.  So

3  we have to put block letters, an R or a D, in front of

4  our qualifying -- in front of our laptops.  And the

5  judge now for like six years now has said please point

6  to the ballot you would like, not point to what party

7  you are assigned with, just point to the ballot you

8  would like, an R or D.

9               So it works quite well.  But in some

10  instances, the poll watcher is who is standing here is

11  now telling the judge well, you gave them the wrong

12  ballot.  They pointed to this one and you are giving

13  them that one.  When in fact, that didn't happen and it

14  just, you know, just ramps up the energy that is in

15  there.

16      Q.   Okay.  So let me go back to the first that you

17  were talking about with the zero tape, how that would

18  potentially delay election workers setting up --

19      A.   A normal opening.

20      Q.   -- a normal opening.  How widespread of a

21  problem was that in the March primary?

22      A.   Fairly widespread because that was one of the

23  first acts of the poll watchers duty at all of these.

24  That is how they were trained, that nothing proceeds

25  until you are sure that that is the zero tape and it has

1   every candidate on it.

2      Q.   Did this happen at most polling places where

3   there were poll watchers?

4      A.   Yes.

5      Q.   And how did you hear about this?

6      A.   The judges were calling us.

7      Q.   They were calling you?

8      A.   They were frustrated.

9      Q.   And the five to ten minute delay that you had

10  mentioned that would result from this, how did that

11  impact the logistics of running the election after that

12  for the rest of the day?

13     A.   Well, I am proud to say the election officials

14  did it.  They opened up in time.  But they were very

15  very frazzled if that is a word.  And I think you

16  understand what I mean, that they didn't have their

17  normal hello, we got everything set up.  Now I can have

18  a cup of coffee.  It didn't go that way.

19     Q.   And then the other instance of interactions

20  that you were just talking about are poll watchers

21  potentially arguing with election officials?

22     A.   Yes.

23     Q.   Was this happening while voters were attempting

24  to vote?

25     A.   Yes.

Jacquelyn Callanen

April 20, 2022
Page 108

1      Q.    And did that result in any kind of delays in

2   wait times?

3      A.    Fractions of seconds I mean it would have

4   backed up.  But from my standpoint, the interaction was

5   more of an intimidation.  Because now, you are getting

6   them to question the integrity of what the election

7   officials are doing and that's wrong.

8      Q.    And so when you said fractions of seconds of a

9   delay, is that a guess?

10      A.    Yeah.

11      Q.    Okay.  Did you ask election officials like how

12   the extent to which poll watchers were delaying

13   proceedings?

14      A.    No.  I mean at that point, we were like no,

15   just take a deep breath.  Things will settle down.  Just

16   you know, bear with us for a second.  Let's just get

17   this underway.  You know, we did a lot of that.

18      Q.    Did your office receive complaints from voters

19   about poll watchers in the March primary?

20      A.    I think like I talked to two of them.  I talked

21   to one man where he was livid because the poll watcher

22   made him show his ballot to him before he put it in the

23   tabulator.  What was I doing and why did we do this, why

24   did I instruct -- argh.

25      Q.    You said you talked to two people?

Jacquelyn Callanen                                    April 20, 2022
                                                        Page 109

1      A.   That I talked to personally, yeah.

2      Q.   Who was the other person that you spoke to?

3      A.   Again, just another -- I am there and I take

4  the phone calls like everybody else does.

5      Q.   Do you recall the substance of the other

6  person's complaint?

7      A.    It was similar.  They didn't touch the other

8  person's ballot but they stood behind them the whole

9  time and watched who they voted for.  And they objected

10  to that.  And then, of course, the objection then went

11  to the fact of suggestions on how to stop that kind of

12  interaction.  And this one gentleman in particular, the

13  one school said well, why didn't we just reverse the

14  voting machines, the actual voting stations?  So instead

15  of walking up and seeing the screens as you walk up and

16  have them, you know, why didn't we flip them so that you

17  had to walk behind the table so that somebody couldn't

18  get there?  But again, two-fold, because you can't have

19  the tables all of the way out in the middle of the room

20  to allow somebody to be behind them.  Secondly, there is

21  electricity that we have to take into consideration to

22  plug them into the wall.  So you don't want people

23  crossing the -- could trip and fall.

24              And with the poll watchers, we would have

25  to allow room for not only the voter to be there, you

1  know, to pass by, but you would have to have another

2  space for another person to be back there.

3              So yes, it made sense to what this

4  gentleman was explaining to me.  But in the reality, we

5  have other concerns that we had to address so we didn't

6  do it.

7      Q.   Okay.  Were there other ways in which poll

8  watchers -- in which the presence of poll watchers at

9  polling sites affected how these sites operated?

10     A.   No.  I mean those were the three biggies, just

11 roaming around interacting with the voters, trying to

12 see how the voters voted, being behind the qualifying

13 table, questioning what the election officials -- asking

14 to hold -- to literally hold someone's photo ID.

15     Q.   Is your office taking any steps to address

16 these issues involving poll watchers for the November

17 general election?

18     A.   Well, we are going to see how we get through

19 May 7th and May 24th.  But it should, you know, taper

20 off if everybody will feel a little bit better.  We will

21 see how that goes.

22     Q.   So at the moment, you are not planning to

23 proactively address these issues from the --

24     A.   No -- I mean no more than our normal.  I mean

25 it is all -- the poll watcher is always part of our

1  normal education and instructions.  But I, again, I ask

2  the staff to make sure they put the poll watcher manual

3  into each of the kits for this May 7th and 24th

4  election.

5           MR. WHITE:  I understand.  I think this is

6  probably a good time for a break.  We have been going

7  about for 90 minutes.  Does that sound good?

8           MS. PERALES:  Yes.  We are going to pass

9  out the order founds for lunch if Jimmy John's is okay.

10          MR. WHITE:  We can go off the record.

11          VIDEOGRAPHER:  The time is 12:00.  We are

12  off the record.

13          (Recess taken)

14          VIDEOGRAPHER:  The time is 12:29 p.m. and

15  we are back on the record.

16     Q.   (By Mr. White) Ms. Callenan, I wanted to shift

17  gears and talk a little about provisions of SB-1

18  relating to extended vote hour voting.

19     A.   Yes, sir.

20     Q.   I know you testified a little bit about this

21  last time, how Bexar County had sort of different hours

22  and things like that.  But I wanted to -- if you could

23  start by opening up you SB-1 exhibit to page 16.  And

24  take a look at Section 3.09.

25     A.   Yes, sir, I am there.

 1  that there was potentially a problem with ballots

 2  getting rejected?

 3       A.   Ballots or applications?

 4       Q.   I'm sorry.  Applications being rejected.

 5       A.   Again, probably by the third week of January.

 6       Q.   And in between say late January and the March

 7  primary, did your office take additional steps to

 8  educate voters and the requirements?

 9       A.   Yes, we updated the web site.  We put the

10  envelopes out there and just tried to get as much of the

11  word out to the media, that kind of stuff.

12       Q.   When you say media, are you referring to media

13  appearances by yourself or --

14       A.   Myself, yes.

15       Q.   And what platforms would you typically use?

16       A.   Just have news conferences.

17       Q.   Did you seek any approval from -- sorry.

18  Strike that.  Did you contact the secretary of state's

19  office before doing media appearances about --

20       A.   No, sir.

21       Q.   Since the March primary, do you have additional

22  plans to engage in proactive voter education about the

23  mail-in identification provisions?

24       A.   Again, yes, sir.  And I showed you the insert

25  that we have gone to for great planning.

```
 1      Q.    Right.  So I would like to talk about that and
 2   we will mark this as --
 3                REPORTER:  C.
 4      Q.    (By Mr. White) -- C.
 5                MS. PERALES:  No, we have a different
 6   piece of paper.  Here we go.  Thank you.
 7                THE WITNESS:  I still have this many.
 8                MS. PERALES:  I think you should mark
 9   this.  We did this for you.
10                (Exhibit C marked)
11      Q.    (By Mr. White) Okay.  I would like to mark
12   something else as Exhibit C which this is in paper
13   format which I think might be easier for folks to --
14      A.    You don't want to pick my strips up off the
15   ground?
16      Q.    This might be easier for everyone.
17      A.    Thanks, Nina.
18                MS. PERALES:  I will be checking the
19   translation while you all discuss.
20      Q.    (By Mr. White) Okay.  So are you familiar with
21   this exhibit that I have just passed you?
22      A.    Yes, sir.
23      Q.    What is it?
24      A.    It is our attempt at correcting a lot of the
25   errors that we saw in the March 1st mail ballot
```

1   application and mail ballot return.  So we inserted

2   these in every one of the mail ballots that we have sent

3   out for the May 7th election.  And again, we are going

4   to change it just a little bit to take the color teal

5   off of it so that is generic for the 24th.  And then we

6   will revisit this over the summer to see if we can tweak

7   it in some way or, you know, is our learning curve

8   smoothing out now and are we passed all of this?  So we

9   will definitely revisit it in the summer.

10      Q.    When did you decide to put something like this

11  together?

12      A.    Probably, probably two weeks before the March

13  1st ones.  Once we were seeing these rejection things, I

14  mean we, myself and the mail room people were basically

15  just -- we have to do something.  What with we going to

16  do?  How are we going to do this?  What are we going to

17  do?  And that seemed to have been a theme across the

18  state because -- and we got a message after March 1st.

19  We all received a message from the secretary of state's

20  office saying if you are thinking of doing anything, we

21  have to approve it before.  So that led us to believe

22  that more, you know, wasn't just a Bexar County thing.

23  It was more widespread.  And so a lot of us did these.

24              I was in touch with Christina Adkins and

25  she sent me the one the state had come up with after

1   much thought.  And we killed that one and said no, that

2   was just way too wordy.  It was way too legalese.  It

3   wasn't in like common -- what we need.  And so we got

4   permission to use ours.

5              So I don't know how many different ones of

6   these are around the state.  But again, they recognize

7   that I guess a lot of us were saying we have to do

8   something.  We have to do something.

9        Q.   Let me go back and ask you first about the

10  message from the secretary of state's office that you

11  referenced on March 1st.  Was this sort of -- was this

12  an advisory from the secretary of state's office sent to

13  you?

14       A.   Not an advisory.  Just an email.  We get them

15  from -- they will just do blasts I guess is the term.

16  And it was saying if you are thinking of doing anything

17  and you want to put an insert in, make sure we approve

18  it.

19       Q.   Okay.  Was this email sent out to all county

20  election administrators?

21       A.   I am sure everyone, yes.

22       Q.   Is this email something you have produced in

23  discovery at this point?

24       A.   No, I didn't even think to, no.  I'm sorry.

25       Q.   And what was -- can you be more specific about

1  the contents of the email, what it was instructing you

2  to do?

3      A.   Again, it was just a -- I took it just as it

4  was a reminder to us as everything.  That if, you know,

5  I mean we know we have to contact the state if we want

6  to put a sign up in the poll site, it has to be approved

7  by them.  There is so much structure that, you know,

8  they don't want to have everything be crazy different

9  all over the place.  And so this was just one more

10 thing.

11     Q.   And you said that you were in touch with

12 Christina Adkins.

13     A.   Yes.

14     Q.   Was she the one who sent you this email or you

15 were in touch with her afterwards?

16     A.   Afterwards, afterwards.  I sent up ours and

17 said -- first, she sent theirs down.  And I opened it

18 and said oh, my God, no, it looked exactly like the

19 instructions that were on the mail envelope now which

20 was so confusing.  So it was like no.  And then we, you

21 know, we sat down.  And of course, this went through

22 many iterations, you know.  When you say -- if you put

23 somebody in a group, you are going to get this many.  So

24 I had my staff members, I had the mail room people and

25 we did it and we send it up.  And she was like okay, you

1   can use that one.  We were like fine.

2       Q.   And so when you are referring to the one that

3   the state had come up with, are you -- was your

4   testimony that the state had also produced this sort of

5   insert to put on local ballots?

6       A.   Yes, but it was much more cumbersome.  It was

7   in that tiny font.  Like I said, it was almost a

8   duplicate of what is on the carrier envelope on the way

9   back.

10      Q.   Did the state send their insert after this

11  March 1st email?

12      A.   Yeah, that is when we were doing the work.  You

13  know, everybody survived March 1st.  After that, we all

14  started.  We got to get better.  We have got to get

15  better.

16      Q.   Do you know if other counties used the insert

17  that the state provided?

18      A.   I don't know.

19      Q.   Do you recall when you requested approval to

20  use Exhibit C?

21      A.   No, I'm sorry.  I apologize.  I didn't that was

22  going to be important.

23      Q.   And the insert that you came up with, this is

24  something that you are placing in the ballots?

25      A.   Yes, every single ballot.

Jacquelyn Callanen                                          April 20, 2022
                                                                Page 132

```
 1      Q.   After the ballot has already been requested?

 2      A.   Yes, sir.

 3      Q.   Are you -- is your office taking any steps to

 4   address potential confusion before voters request mail

 5   ballots?

 6      A.   I'm sorry.  I don't understand.

 7      Q.   Let me rephrase.  So is it fair to say that the

 8   ID numbers that a person will put on the application

 9   need to match the number on the ballot itself?

10           MS. HUNKER:  Objection, form.

11           THE WITNESS:  No.  They -- I'm sorry,

12   Graham.

13      Q.   (By Mr. White) That's okay.

14      A.   This is where the confusion comes from.

15   Someone can send us in the ABBM, the application, and

16   they can put the last four of their social on it, okay,

17   and we will process it.  And we will send them a ballot

18   if it matches what we have on their record.  If they now

19   send in their voted ballot and they put in their TDL,

20   Texas driver's license number, and we have that on

21   record, we will accept that ballot.  It doesn't have to

22   be the same.  It has to match what we have in our

23   records.

24           And as the state has said, it is either

25   the TDL or your last four of the SSN.  And that is why
```

```
 1        Q.    But you have the number --

 2        A.    Of ballots.

 3        Q.    -- of ballots that were ultimately accepted?

 4        A.    Yes, that were cured, that came in to be cured

 5   in that sixth day, you know, that sixth day after.

 6        Q.    And can you -- I'm sorry.  Can you repeat again

 7   what the number is?

 8        A.    837.

 9        Q.    Did you have that number?

10        A.    You all have these copies from the last time we

11   made and that hasn't changed.  This is what we had the

12   last time.

13        Q.    And do you have that number for the March 2020

14   primary election?

15        A.    No, I do not.  Because they didn't have that

16   ability.

17        Q.    And sorry to ask the question again but I need

18   it for the record.

19        A.    No, we didn't have that data.

20        Q.    What about the March 2018 primary?

21        A.    Likewise, yeah.

22        Q.    Can you tell me the number of applications for

23   ballot by mail that Bexar County flagged for rejection

24   because an applicant failed to provide an identification

25   number as required by SB-1?
```

1    A.   No.  Again, that is the same witness.  We

2  didn't -- I don't want to say we didn't know it would be

3  important but it didn't rise to that level because we

4  have been doing it for so long.

5    Q.   Just going through these -- so I don't have to

6  belabor the point.  Give me one second.  So do you know

7  the number of applications for ballot by mail that were

8  ultimately rejected because of a mismatch?

9    A.   No, sir.

10    Q.   You know the number of carrier envelopes that

11  Bexar County received in the March 2022 primary?

12    A.   Yes, that was on these papers, the ones that

13  were received and turned over to the early ballot board.

14    Q.   What was that?  Can you tell me what the number

15  is?

16    A.   I didn't add them together.  We had 5,477

17  Republicans and 12,621 Democrats.

18    Q.   And do you have that data for the March 2020

19  primary election?

20    A.   I didn't break it down by R&D.  I'm sorry.  We

21  received a total in 2020 of 18,686 returned.

22    Q.   In the March 2020 primary?

23    A.   Yes, sir.

24    Q.   And what about the March 2018 primary?

25    A.   We received back 17,236.

1      Q.    Can you tell me the number of carrier envelopes

2   that Bexar County flagged for rejection because of a

3   defect in the March 2022 primary?

4      A.    It would be the 2,823 for the Democrats and

5   1,117 for the Republicans.

6      Q.    Okay.  Do you have those numbers for the

7   March 2020 primary?

8      A.    No, sir.

9      Q.    Okay.  And what about the March 2018 primary?

10      A.    No, sir.

11      Q.    Okay.  Do you have the number of mail ballots

12   that Bexar County ultimately accepted and counted after

13   a voter cured carrier envelope defects?

14      A.    That was the 837.

15      Q.    I see.  Okay.  And do you know the number of

16   ballots ultimately rejected for mismatch or omission

17   defect?

18      A.    It would have been the 2,823 and the 1,117.

19            MR. WHITE:  Okay.  I think we can take a

20   break.  I may have some follow-up questions after lunch.

21   But if folks are ready, we can take a break now.

22            THE WITNESS:  Okay, cool.  Thank you.

23            VIDEOGRAPHER:  The time is 1:07 p.m.  We

24   are off the record.

25            (Recess taken)

1                VIDEOGRAPHER:  The time is 1:46 p.m. and

2   we are back on the record.

3        Q.    (By Mr. White) Ms. Callenan, I just had a

4   couple more questions relating to mail ballot

5   applications and that experience during the 2022

6   primary.  You testified during your first deposition in

7   this case that there were some voters who didn't put any

8   ID number at all on their application form; is that

9   right?

10       A.    Correct, yes, sir.

11       Q.    How often did that happen?  Do you have a

12   sense?

13       A.    Probably about a third of the rejected ones

14   that we had.

15       Q.    And one of the reasons you potentially --

16   strike that.  One of the reasons you gave for this

17   potentially being a problem, voters were concerned about

18   identity theft; is that right?

19       A.    Correct, correct.

20       Q.    How were you made aware that was potentially a

21   concern for voters?

22       A.    Their calls, their calls.

23       Q.    These were calls leading up to the March

24   primary?

25       A.    Yes.

1    Q.   Do you know about how many calls you received

2  with this?

3    A.   No.  Again, we just know, you know, the staff

4  member will have gotten one.  So then we all huddle and

5  say okay, this is what we are going to do.  And you

6  know, at that point, we recommended and we told the

7  voters it was okay put it in another envelope.

8    Q.   So is it -- I'm sorry.

9    A.   That was one of our recommendations.  We

10  understand -- I understand what they were talking about.

11  And so it was like to make you feel more comfortable, it

12  is okay.  You can put it in another envelope.

13    Q.   So is it fair to say that your office received

14  enough calls about that that it got brought to your

15  attention?

16    A.   Correct.

17    Q.   Were voters concerned that somebody in your

18  office would misuse the voter ID number?

19    A.   No, that is not how I heard it.  That is not

20  how I heard it.  They were mainly concerned that they --

21  the ones who -- this was a concern for noticed that on

22  the envelope, the flap was perforated.  And their

23  concern was that during the course of the mail and going

24  through everything, that the perforated lines would

25  easily pull off.

1    Q.   I see.  Are you aware of any instances of

2  identify theft that arose from the use of these mail

3  ballots?

4    A.   No, sir.

5    Q.   You were also asked last time if the reason

6  that some people didn't put down a number was because

7  they were trying to commit voter fraud and didn't know

8  what number to put.  Do you recall that, being asked

9  about that?

10    A.   Yes.

11    Q.   Are you aware of any instances in the March

12  primary where somebody tried to fraudulently -- tried to

13  fraudulently request a mail ballot but wasn't able to

14  put down a number because they didn't know what number

15  to put?

16          MS. HUNKER:  Objection, form.

17          THE WITNESS:  Not specifically, no.

18    Q.   (By Mr. White) You also testified that your

19  office had to stay open I believe after the March

20  primary date to help cure issues with mail-in ballots?

21    A.   Yes.

22    Q.   How many times did your office have to stay

23  open late to do that?

24    A.   Well, again, we were -- the directive from the

25  secretary of state is they have six days.  And we chose,

1   Graham, we chose to be open on that weekend.  We were

2   not required to be open but we -- I felt the need for

3   it.  So we had hours published, put out through the

4   media and all of that.  And we were there on Saturday.

5   We did not open on Sunday but we were there on Saturday

6   and people came in.

7        Q.   Did you have to hire extra staff to help with

8   the cure issues?

9        A.   No, I had to pay them more.  It was the regular

10  staff that got overtime.

11       Q.   Were there any other instances where staff had

12  to work overtime during the March primary because of

13  issues relating to SB-1?

14       A.   Constantly.

15       Q.   So what are some examples where that happened?

16       A.   Well, again, we have a mail room staff that is

17  robust.  We have like eight or ten people back there at

18  all times.  And oh, you should see their payrolls.  They

19  are a temp staff.  I have one permanent staff member

20  that works with them.  And they were -- they were there

21  75-80 hours a week because they were just phenomenal.

22  They were just phenomenal.  But every time as we are

23  talking around whether it was an application that was

24  rejected or if it was a ballot that was rejected, that

25  caused another letter, that caused another phone call,

1  that we had come in for the March election, now that we

2  are in to the May 7th election, I think -- I don't know

3  but I think that the consultants have been scared off,

4  for lack of a better word, because we are now into the

5  May 7th election.

6             And this election has huge bond issues on

7  them.  I know you are not from here but, you know, the

8  city is having an almost billion dollar bond and the

9  school districts are having -- there are seven bonds on

10 here.

11            And when I left the office today, we have

12 a total applications of 26,825.  We have only gone up

13 3,000 in this time.  When normally, if we were coming up

14 to a huge election, every consultant in town would have

15 been putting applications in the mail and we would have

16 been getting three and four and seven for the same

17 person because all of the consultants, they are all

18 drawing from that same pool.  And we are not seeing

19 that.

20            So I think -- I really do, I think this

21 has given pause, for lack of a better term, given pause

22 to the consultants to not do this.

23      Q.   The number that you just mentioned --

24      A.   26,825.

25      Q.   -- that is the number of mail applications you

Jacquelyn Callanen                                      April 20, 2022
                                                        Page 146

1  have received so far for the May election or am I
2  missing?
3      A.   Well, again, in Texas, that ABBM stands for
4  annual.  So these 23,339 roll over automatically.  We
5  push a button and they are already there.  And so we
6  have added just 3,000 plus some to that which again is
7  very low for a major election.
8      Q.   And do you think that voters in the May
9  election who had voted in the March primary are less
10 likely to be confused by the mail identification
11 provisions having gone through the process already?
12     A.   We are hoping.  But if like you see today's
13 paper, we are headlines in the paper that there is going
14 to be voter confusion because we are sending -- each of
15 the voters are getting two major elections within a two
16 week period.  So I can't say there is no confusion
17 because this is an added element to that.
18     Q.   So on the flip side of my last question, do you
19 think voters who did not yet vote in the March primary
20 and haven't voted under an SB-1 election, do you think
21 there is a potential for those voters to be confused?
22     A.   Absolutely, absolutely, which is why we made
23 the insert.
24     Q.   Do you think in the November election, there
25 will be a large number of voters who did not vote in the

 1   March primary?

 2       A.    There always is.

 3       Q.    How much -- so the turn out in a general

 4   election is typically higher than the primary; right?

 5       A.    Much so, yes.  Again, we had a 15 percent

 6   turnout for the primary which is average.  And when we

 7   get to November, I mean Texas isn't great but we should

 8   be about 40 to 550 percent turnout.  That is about

 9   average for us.

10       Q.    So significantly higher than primary?

11       A.    Yes.

12       Q.    So voters who -- strike that.  First time

13   voters who have never voted under SB-1's provisions, is

14   it fair to say there will always be a potential for

15   confusion for those people?

16       A.    Yes, absolutely.

17             MS. HUNKER:  Objection, form.

18       Q.    (By Mr. White) So a moment ago when we were

19   talking about the potential decline in the fewer number

20   of applications for the May election, you had mentioned

21   that that could be attributable to consultant activity?

22       A.    Yes.

23       Q.    What did you mean by consultant activity?

24       A.    Again, in the election world as we talked

25   about, you know, by name or whatever, campaigns hire

```
 1      A.   Yes, ma'am.

 2      Q.   Those were mail ballots?

 3      A.   Yes, ma'am, that were returned to us and that

 4  the ballot board rejected, yes, ma'am.

 5      Q.   And that number is 3,940.  And then you have

 6  837 that were cured.

 7      A.   That came in to cure out of that 39.  So that

 8  is 20 percent -- 20 some percent.

 9      Q.   So I am getting 3,103.

10      A.   That did not --

11      Q.   That did not cure.

12      A.   Okay.  3,103?

13      Q.   Yeah, 3,103.  So that is 1,117 plus 2,823 minus

14  837 gets us 3,103.

15      A.   Yes, ma'am.

16      Q.   So how would we describe that 3,103?  3,103 are

17  the number of voters in Bexar County who sent you a mail

18  ballot.  You could not match the ID number and they

19  didn't cure in time so their vote was not counted.

20      A.   Correct.

21      Q.   Okay.  Now, do you have a sense of how many

22  people sent you an application for a mail ballot and you

23  couldn't match their number and you never got a cured

24  application for mail ballot from them?

25      A.   No, that we didn't track.  Like I said, we
```

Jacquelyn Callanen

April 20, 2022
Page 215

1  didn't have that system in place.

2      Q.   Do you know how many times you mailed out to a

3  voter a new application for ballot by mail because you

4  weren't able to verify the first time?

5      A.   Again, we didn't track that.  We didn't know it

6  would be --

7      Q.   So would you agree with me there is some number

8  of people who sent an application for ballot by mail and

9  you couldn't match their number and they were unable to

10  cure and so they never received a mail ballot?

11              MS. HUNKER:  Objection, form.

12              THE WITNESS:  Correct, although we did

13  send rejects to them and new applications up to the

14  point where the gate came down and it was closed.  So

15  again, I just don't know what that push/pull was.

16      Q.   (By Ms. Perales) It is also possible, isn't it,

17  and this would be a terrible situation.  But if the

18  voter sent you the first application for ballot by mail

19  and put the driver's license and you couldn't match the

20  driver's license, so you sent them a new application for

21  ballot by mail and they put the social down, and then

22  you couldn't match the social either, that could happen;

23  couldn't it?

24      A.   Oh, sure.

25      Q.   And do you know if it happened for anybody in

Jacquelyn Callanen                                    April 20, 2022
                                                        Page 216

 1  particular?

 2      A.   I don't.

 3      Q.   Is that because you weren't tracking those

 4  individual voters?

 5      A.   Correct.  Again, because the system we have had

 6  no coding for it in there.  Previously, it had never

 7  been an issue.  It was handled manually.  If something

 8  came in and we had to reject it, we sent something out

 9  and we literally kept it in a box.  I mean we kept it

10  filed.  We knew where it was.  But the computer system,

11  the database didn't even have the codes in there.

12      Q.   Do you recall your office receiving any phone

13  calls from voters who said I received a second

14  application for ballot by mail from you and I filled

15  that one out too and I still got rejected?

16      A.   Yes.

17      Q.   Do you know how many voters were twice

18  rejected?

19      A.   No, no, that would have been anecdotally.  But

20  yes, we would hear it.

21      Q.   And I will represent to you that El Paso County

22  got some pretty angry phone calls from voters.

23      A.   So did we.  So did we.  And again, as I spoke

24  before, we had to have a meeting with the staff to allow

25  them to say they don't deserve to be spoken to like

 1  that.  So and again, in all of the years I have been

 2  here, I have never had to have a meeting like that, to

 3  even say something like that because we are a customer

 4  service driven organization and that is part of who we

 5  are.  And we had to do that for the first time and that

 6  was sad.

 7      Q.   Did you have any voters call with confusion

 8  about the verifying of the numbers on the mail ballot

 9  applications or mail ballots who were Spanish speaking

10  voters?

11      A.   Oh, sure.

12      Q.   Did you have a Spanish speaking staff person

13  who would talk to them on the phone?

14      A.   Yes, ma'am.  Yes, ma'am.

15      Q.   You mentioned that at some point, you started

16  sending voter registration forms to voters who had --

17  who were obviously already registered --

18      A.   Correct.

19      Q.   -- but for whom you couldn't get some kind of

20  number on them?

21      A.   Correct.

22      Q.   Did you receive any phone calls from voters who

23  were confused about why you were sending them a voter

24  registration form?

25      A.   Yes, ma'am.

1      Q.   And they were already --

2      A.   They were already registered.

3      Q.   Do you recall whether the voter registration

4  form that you sent out was in both English and Spanish

5  or just English?

6      A.   I bet it was just English.  We had Spanish.  If

7  they request, we have Spanish ones.  But now that you

8  are saying that, I bet the staff was just picking and

9  stuffing and picking and stuffing as they -- that is a

10 great point.

11     Q.   So it is likely that when you were sending out

12 these new voter registration forms to voters, you were

13 sending the English form?

14     A.   Yes.

15     Q.   Did you get a sense from all of this of what

16 characteristics of the voter was most likely to cure

17 when you notified them that you couldn't match their ID

18 number?

19          MS. HUNKER:   Objection, form.

20     Q.   (By Ms. Perales) Anything about education level

21 or anything that you were picking up from your

22 conversations with voters on the phone that would help

23 you understand kind of the differences between the group

24 that did manage to cure and the group that just never

25 got their ballot counted?

```
 1                 MS. HUNKER:  Objection, form.

 2                 THE WITNESS:  No, I didn't have a sense of

 3   that.

 4      Q.   (By Ms. Perales) We talked to one lady who had

 5   a PhD.  And she was all fired up and she cured.

 6      A.   Was she related to Tommy Calvert because he is

 7   the one that tells me all of the time --

 8      Q.   No, it was a different county.

 9      A.   I have got to stop.  Sorry.  Bite my tongue.  I

10   am going to get myself in so much trouble, I can't stand

11   it.  Lisa, you are supposed to keep me --

12                 MS. CUBRIEL:  She didn't say that.

13                 MS. PERALES:  I think you are supposed to

14   kick her under the table when she mentions a county

15   commissioner.

16                 THE WITNESS:  That is your job to keep me

17   out of trouble.

18                 MS. CUBRIEL:  Are you doing okay?  Do you

19   need a break?

20                 MS. PERALES:  Whenever you need a break,

21   you call break.

22      Q.   (By Ms. Perales) So here is a question I have.

23   There is still a signature verification requirement for

24   application for a ballot by mail and mail ballot;

25   correct?
```

```
 1      A.    No.

 2      Q.    Because once an ID number matches, that is

 3 presumptively then considered a match on the signature

 4 side?

 5      A.    That is a word I didn't understand, the one you

 6 all use, legalese --

 7      Q.    Presumption?

 8      A.    Yeah, that.

 9      Q.    You had mentioned before that when somebody --

10 pre-SB-1, that you were looking to match the signature

11 on the mail ballot to the signature on the application

12 for ballot by mail.

13      A.    Yes, ma'am.

14      Q.    But what were you matching the signature on the

15 application for ballot by mail to when you first

16 received that?

17      A.    Nothing.

18      Q.    You wouldn't match that against anything?

19      A.    No, ma'am.

20      Q.    When I am quiet, I am skipping questions.

21      A.    That is a good thing.

22            MS. CUBRIEL:  Can we go off the record

23 real quick?

24            MS. PERALES:  Can we go off the record?

25            VIDEOGRAPHER:  The time is 3:49 p.m.  We
```

1    are off the record.

2              (Recess taken)

3              VIDEOGRAPHER:  The time is 3:57 p.m.  We

4    are back on the record.

5         Q.   (By Ms. Perales) Ms. Callenan, can you describe

6    a specific instance in which someone contacted your

7    office asking for an application for ballot by mail on

8    behalf of another individual and you could not send that

9    application for ballot by mail?

10        A.   Many times.

11        Q.   Okay.  And give me an example of the

12   relationship between the two people.

13        A.   Well, again, as I mentioned the last time, I

14   mean the one that really hurt was when the mother

15   reached out and she asked for the two applications.  And

16   I had her on the call and I was explaining to her that

17   we could only send the one to her and she wanted one for

18   her son.

19              And you know, first, we go through well,

20   but I always call and you always send me two.  And then

21   so we had to stop and say yes, but SB-1, now we can

22   only -- so I said just take a minute and put your son on

23   the phone.  If I can hear his voice, I will be glad to

24   send you one for him too.  And that is when she said

25   that he was paralyzed and that he did not speak.  And

 1   boy, that one hurt.

 2       Q.   How did you end up resolving that situation?

 3       A.   Again, the exact same statement that I made

 4   before was I tried to think of a solution right there at

 5   that time and said well, you know, you can go on our web

 6   site and you can download an application and fill it out

 7   and mail it back in.  And then, again, I caught myself.

 8   Because at that point, I was being very insensitive to

 9   the fact that not everyone has a computer and not

10   everyone has a printer.  And like you had asked in the

11   beginning here just on the demographics of what we have

12   here in Bexar County.  So some things like that don't

13   ever leave you.  There are some of those things make it

14   very wrong.

15       Q.   Okay.  You mentioned earlier today about the

16   role of campaign consultants and applications for ballot

17   by mail.

18       A.   Yes, ma'am.

19       Q.   I want to make sure I understand.  You have to

20   receive the application for ballot by mail from the

21   voter; is that correct?

22       A.   Correct.

23       Q.   And you mentioned that you were receiving

24   multiple applications for ballot by mail from the same

25   voter; is that right?

```
 1      A.   Correct.

 2      Q.   And so was that a situation where that one

 3 voter was himself or herself sending you multiple

 4 applications for ballot by mail?

 5      A.   Yes.

 6      Q.   And you are concluding for that, that the voter

 7 must have been invited by more than one-third party to

 8 send in an application for ballot by mail?

 9      A.   Correct.

10      Q.   Ultimately, it is the decision of the voter for

11 how many applications for ballot by mail to send you; is

12 that right?

13      A.   Correct.

14      Q.   Now, you mentioned that for this upcoming May

15 7th election, you mentioned you had received a certain

16 number of applications for ballot by mail.  And it

17 sounded from listening that you thought the number was

18 low.  Can you explain to me what would be a typical

19 number?

20      A.   Again, we start with our base number which is

21 the first election of the year.  And in this instance,

22 we had 23,000.  And the next election, and again, as I

23 am confused by this May 7th election is a major election

24 with the seven bonds.  It may not be high visibility

25 with candidates but it is with the bonds.  And
```

 1 | be reluctant to share details about a need for
 2 | assistance such as the type of disability?
 3 |             MS. HUNKER:  Objection, form.
 4 |             THE WITNESS:  Sure.
 5 | Q.   (By Ms. Perales) Do you think -- would you
 6 | agree with me that some possible assistors might feel
 7 | reluctant to want to probe the voter for a statement of
 8 | eligibility?
 9 |             MS. HUNKER:  Objection, form.
10 |             THE WITNESS:  I would hope not.  But
11 | again, we are not involved in that piece.
12 | Q.   (By Ms. Perales) A moment ago, we talked about
13 | assistors helping voters understand how to use the
14 | voting machine.  How would you advise someone who called
15 | your office and said that they want to serve as an
16 | assistor but the oath says they have to confine their
17 | assistants to either reading the ballot or marking the
18 | ballot?
19 |             MS. HUNKER:  Objection, form.
20 |             THE WITNESS:  Not on how to use the
21 | equipment.  Is that what you are asking?
22 | Q.   (By Ms. Perales) Yes.
23 | A.   Again, we would direct them to our web site
24 | where we have videos on how to use the equipment and
25 | basic, you know, voter ID, the information there that

 1  they would need.

 2      Q.   Is that information available, for example, in

 3  Asian languages?

 4      A.   Again, English and Spanish only.

 5      Q.   How would you advise someone who called your

 6  office and said they wanted to provide voter assistance

 7  but they are not sure what it means to pressure a voter?

 8  Let's say an assistor calls you and says well, I have

 9  reminded my neighbor to vote three times.  Am I

10  pressuring her if I take her to the polls and help her

11  get around inside of the polling place?

12                MS. HUNKER:  Objection, form.

13      Q.   (By Ms. Perales) How would you advise that

14  potential assistor?

15                MS. HUNKER:  Same objection.

16                THE WITNESS:  Again, we wouldn't enter

17  into that.

18      Q.   (By Ms. Perales) Would you sign an oath under

19  penalty of perjury if you weren't sure you were

20  complying with the oath?

21                MS. HUNKER:  Objection, form.

22      Q.   (By Ms. Perales) Personally?

23      A.   Personally, no.

24      Q.   Have you received any guidance or training from

25  the secretary of state about the requirement that an

1   assistor secure a statement of eligibility to receive

2   assistance?

3        A.   No.

4        Q.   Have you received any guidance from the

5   secretary of state about how assistors must now limit

6   their assistance to activities involving reading and

7   marking the ballot?

8        A.   No.

9        Q.   Have you received any guidance from the

10  secretary of state about who, which voters are eligible

11  or ineligible for assistance?

12       A.   No.

13       Q.   Would you agree with me that the oath of

14  assistance that the assistor has to sign does not

15  include what is the eligibility for someone to receive

16  assistance?

17       A.   Correct.

18       Q.   Have you received any guidance from the

19  secretary of state about what it means to pressure a

20  voter to choose someone as an assistor?

21       A.   No.

22       Q.   Do you think if I tell my aunt, hey, you really

23  have to vote three days in a row during early voting and

24  then I offer to take her to the polls and help her vote

25  because she doesn't walk very well, do you think I am

 1  pressuring her?

 2              MS. HUNKER:  Objection, form.

 3              THE WITNESS:  That is between you and your

 4  aunt.

 5      Q.   (By Ms. Perales) Me and my aunt and SB-1 and my

 6  oath under penalty of perjury; right?

 7      A.   Yes, ma'am.

 8      Q.   Would it be fair to say in that you in your

 9  position are not aware of the types of conversations

10  that voters are having with their potential assistors?

11      A.   Oh, sure, correct.

12      Q.   And that could even be before they even get to

13  the polling place; right?

14      A.   Absolutely.

15      Q.   You would agree with me that even though poll

16  workers, God bless them, are available to assist, that

17  some voters would prefer to use their own chosen

18  assistor; is that right?

19      A.   Sure.

20      Q.   And would you say or do you have a sense of

21  what proportion of voters bring their own assistor

22  versus using a poll worker?

23      A.   No, I would not.

24      Q.   You would agree with me that now there is a new

25  form required for voter assistors to fill out their

1    Q.   (By Ms. Sisco) Of course, makes sense.  And

2  during the March 2018 primary, do you know how many days

3  the early voting period was?

4    A.   I'm sorry.  I can go back and look it up.

5  Historically, a primary is two full weeks.  It starts on

6  a Monday and it ends the following Friday.

7    Q.   Okay.

8    A.   So that is historically.  Now, one of these

9  primaries, we didn't start until Tuesday because it was

10 a state holiday on Monday.  That may have been it, in

11 that year.

12   Q.   Got it.  And who sets the number of days?

13   A.   It is in the election code.  It is in -- the

14 legislature has it set.

15   Q.   Okay.  And could you offer more early voting

16 days if you wanted to or you are bound by it?

17   A.   No, we are bound by what it is.

18   Q.   Okay.  And do you know how many early -- how

19 many days the early voting period was in the 2020

20 general election?

21   A.   In the 2020 general election, we had two extra

22 days of early voting.  The governor did a proclamation

23 and so we started on the Saturday before.  So we had two

24 weekends.  Again, because of COVID and the distancing

25 and all of that, it was extended by two days.

Jacquelyn Callanen                                    April 20, 2022
                                                         Page 263

```
 1       Q.   Okay.  And was that the same thing, you were
 2   bound by what, the governor's proclamation?
 3       A.   Yes, exactly, yes, ma'am.
 4       Q.   And during the March 2022 primary, how many
 5   days was early voting?
 6       A.   We were back to normal.  We were back to
 7   normal.
 8       Q.   Okay.  And you, again, didn't have the
 9   authority to extend them?
10       A.   Correct.
11       Q.   Got it.  During the November 22 election, how
12   many early voting days will there be?  Do you know yet?
13       A.    It should -- that is the word that is banned in
14   our office.  It should be the normal, from a Monday
15   through the following Friday.
16       Q.   Got it.  And on the year that it fell on --
17   that there was like a holiday on it, do you extend it an
18   extra day?
19       A.   No, ma'am.
20       Q.   Okay.  Let's turn to vote by mail.
21       A.   Okay.
22       Q.   Do you consider offering mail -- vote by mail
23   to be important?
24       A.   Absolutely.
25       Q.   Why?
```

Jacquelyn Callanen

April 20, 2022
Page 264

```
 1     A.   Because it serves a certain population that
 2  doesn't have the ability or, as we say a lot of times,
 3  it is sort of your right of passage, that when you hit
 4  65, you have the ability to vote at home.  And our
 5  voters, our core group that we have talked about, they
 6  appreciate that fact because it gives them -- I don't
 7  want to say additional time but it is additional time to
 8  do their research on some of the candidates so they
 9  don't have to be locked in to a five minute standing in
10  front of a booth.  They can take days.  They can do
11  reserve some.  So the ones who -- our core group, that
12  is their preference.
13     Q.   And so you consider the 65 and older group to
14  be one of these very core groups who vote by mail is
15  designed to benefit?
16     A.   Yes, ma'am.
17     Q.   And would you agree that that core group is --
18  the group is a group that is likely to not have one of
19  these identification numbers on file with the state?
20     A.   Well, again, that is what we discovered in this
21  first election.  I mean, you know, it is going to
22  gradually get better.  But yes.
23     Q.   Okay.  And when voters utilize vote by mail,
24  does that reduce wait times on election day?
25     A.   Yes.
```

```
 1              MS. HUNKER:  Objection, form.
 2       Q.   (By Ms. Sisco) Does that make it easier for
 3  your office to do its job?
 4       A.   Yes.
 5              MS. HUNKER:  Objection, form.
 6       Q.   (By Ms. Sisco) What is the deadline to apply
 7  for a mail-in ballot?
 8       A.   11 days before any election, election date.  So
 9  you back up.  You take your election date and you back
10  it up 11 days.  And again, we have appreciated that
11  fact.  It used to be much shorter.  But for the people
12  who are sending out the ballots, we have a much higher
13  success rate because the voters have time -- we have
14  time to get it to the voters and they have time to mail
15  it back.  So it is 11 days.
16       Q.   Great.  Okay.  And we talked a little bit about
17  this kind of core group of mail-in voters who are over
18  65.  And you said that some of them may not have a
19  driver's license number on file?
20       A.   Correct.
21       Q.   And so if someone -- bear with me on these
22  questions.  They are going to be a little bit redundant
23  on a few of them.  So if someone put that is eligible to
24  vote by mail put only their driver's license on the mail
25  ballot but you only have their social security number on
```

1  file, that would be rejected; right?

2      A.   Correct.

3      Q.   And so if that person follows the law

4  correctly, puts down the correct number that they have

5  been asked for under SB-1, they would still have it

6  rejected if the their other number is on file?

7      A.   Correct.

8      Q.   And in the November 2022 election, that will

9  still be the case; right?

10      A.   Correct.

11      Q.   And what about someone who is 80 years old and

12  hasn't driven in 20 years and they lost their driver's

13  license?  If the number you have in the system is their

14  driver's license and they put the last four of their

15  social, that would be rejected; right?

16      A.   Correct.

17              MS. HUNKER:   Objection, form.

18      Q.   (By Ms. Sisco) And you said that some voters

19  don't have either a social or a driver's license number

20  on file; right?

21      A.   Correct.

22      Q.   So if one of those voters, if they correctly

23  put their driver's license number on, what happens?  If

24  they correctly put -- I will rephrase.

25              If one of those voters who don't have

Jacquelyn Callanen                                        April 20, 2022
                                                              Page 267

1   either number on file, if they put their correct

2   driver's license number on the ballot, is it rejected?

3       A.   Yes.

4       Q.   And if they put their social, the last four of

5   that social on the ballot, is it rejected?

6       A.   If we don't have the number, yes.

7       Q.   And what if they put both of those numbers on,

8   is it still rejected?

9       A.   If we don't have either one of those numbers,

10  yes, ma'am.

11      Q.   And do you have any sense of how many voters

12  don't have any ID number on file?

13              MS. HUNKER:   Objection, form.

14              THE WITNESS:   We think from some of the

15  data that we have we are going to come about 12 percent

16  of our registered voters over 65 do not have either

17  number.   But again, we are waiting until sort of the

18  dust settles on this so we can get a very accurate

19  number.

20      Q.   (By Ms. Sisco) So you think about 12 percent

21  but you have incomplete information at this point?

22      A.   Correct.

23      Q.   Understood.   And in your experience, how do

24  voters know which of their ID numbers they have on file?

25      A.   I am sure they don't remember.

1     Q.   So would you say that someone who can't

2   remember or doesn't have access to both their driver's

3   license number and their social security number is at a

4   greater risk of having their mail application rejected?

5     A.   Yes.

6     Q.   And this law doesn't require an individual to

7   write both numbers down; right?

8     A.   Correct.

9     Q.   And not everyone knows both of those numbers;

10   right, for their self for themselves?

11               MS. HUNKER:  Objection, form.

12               THE WITNESS:  I would hope so.  If they

13   have them, I would hope they would know them and be able

14   to provide them.  But I don't --

15     Q.   (By Ms. Sisco) Sorry.  I didn't mean to cut you

16   off.

17     A.   No.

18     Q.   So if I lost my license, might I not know my

19   driver's license number?

20               MS. HUNKER:  Objection, form.

21               THE WITNESS:  Again, I don't know.

22     Q.   (By Ms. Sisco) Okay.  Did you speak to any

23   voters that didn't know either of their numbers?

24     A.   I did not personally, no.

25     Q.   Are you aware of any of your staff speaking to

 1  any voters that didn't know either number?

 2       A.    No.

 3       Q.    How does a voter know if their vote by mail

 4  application has been accepted?

 5       A.    They receive a ballot.

 6       Q.    Okay.  And what is the deadline to cure a

 7  deficient vote by mail application?

 8       A.    That is a gray area.  That's a gray area.

 9  If -- and it is used a lot.  Okay.  If we get to that

10  11th day and we don't have their physical application in

11  our hand, in our office, there is sort of this gray area

12  that they can fax their application or where they can

13  scan it and email it in.  And that becomes a place

14  holder.

15            Then they have four business days to get

16  us the original ballot.  It must be delivered.  We still

17  have to have that wet signature.  So again, that is why

18  I just said a few minutes ago how we were grateful that

19  the 11 days, that they moved it back 11 days.  So now if

20  they send it in the deadline, we need it by four days.

21  That still gives us a week to get them the ballot, to

22  get it back.

23            And so again, that is the same thing.  If

24  the voter -- if we have sent them a reject, the time

25  clock starts when we get it in the first time.  Whether

 1              THE WITNESS:  Maybe not.  Let's stay to

 2   five percent.

 3       Q.   (By Ms. Sisco) Okay.  All right.  And I am

 4   going to enter another.  So I am going to enter this as

 5   Exhibit --

 6              REPORTER:  G.

 7              (Exhibit G marked)

 8       Q.   (By Ms. Sisco) -- G, thank you.  Mr. Callenan,

 9   can you tell me what this is?  Actually, it is kind of

10   hard to see.  Forgive the printing here.  Can you tell

11   what this is?  And if not --

12       A.   I think it is a news article.

13       Q.   Yes.  So that's right.  This is a KSAT.com

14   article entitled more than 1900 Bexar County mail

15   Ballots rejected following new voting law requirement.

16       A.   Right.

17       Q.   And this is from March 8th so these numbers are

18   not final.

19       A.   Correct.

20       Q.   So I am going to direct your attention to the

21   back of this front page here.  The second to last

22   paragraph starts on election night.

23       A.   Uh-huh.

24       Q.   Can you read that -- those two sentences for

25   me?

```
 1      A.   Where it says on election night?

 2      Q.   Yes.

 3      A.   Callenan told reporters that the county was

 4 running about a 35 percent rejection rate for mail

 5 ballots before SB-1 went into effect.  She says a

 6 typical election would probably be two or three percent

 7 rejection rate.

 8      Q.   Thank you.

 9      A.   So again, not taking into account that massive

10 election in 2020.

11      Q.   Yes, okay.  Got it.  And so obviously that

12 35 percent reduction rate is no longer accurate;

13 correct?

14      A.   Correct, it went down.

15      Q.   And would you say that the two or three percent

16 is typical still?

17      A.   Yeah, somewhere in there.

18      Q.   Okay.  Okay.  Great.  I just wanted to make

19 sure we are on the same page.  So is it fair to say that

20 the number of mail ballots rejected in the March primary

21 is significantly greater than in years past?

22      A.   Yes.

23      Q.   And when we talk about mail ballots that are

24 ultimately rejected, is that number inclusive of mail

25 ballots that were cured?
```

```
 1                    MS. HUNKER:  Objection, form.
 2                    THE WITNESS:  I am not sure I understand.
 3   We are still talking about the primary 2022?  What
 4   election?
 5        Q.   (By Ms. Sisco) Yes, yes, sure.
 6        A.   Like I say, we cured 837.  And prior to that,
 7   we didn't see people coming in to cure their ballots
 8   because that was not an option for our senior citizens
 9   voting.
10        Q.   Right.  And but when we are talking about like
11   the number, I think I can pull it up.  It was like a
12   3000 number.  Hold on.
13        A.   Oh, our 31 when we all did the math?
14        Q.   Exactly, that number.
15        A.   3103.
16        Q.   Yes, okay.  Thank you.  Does that include
17   ballots that were cured?  Well, now I am confused.
18   Strike that.  Sorry.
19        A.   Now I am confused.  I am not sure we added
20   those two numbers --
21                    MS. HUNKER:  Objection, form.
22                    THE WITNESS:  -- but then I don't know if
23   we subtracted them or not.
24        Q.   (By Ms. Sisco) And now I have lost my place in
25   both my outline and my notes looking for the --
```

1    A.    My note said the 3103 did not cure.  So 837

2  cured.

3    Q.    Okay.  Exactly.

4    A.    That is what my notes say.

5    Q.    Thank you.  Yes.  I'm sorry.  Thank you both.

6  Okay.  And then I'm sorry but now I lost my place here.

7  Okay.  So that 31 and change number did not include

8  people that cured?

9    A.    Correct.

10   Q.    Okay.  And did that include people who spoiled

11  their mail-in ballot to just go vote in person?

12   A.    No.

13   Q.    So that number, the 31 and change, that number

14  of mail ballots rejected represents individuals who

15  attempted to submit a ballot but did not have their vote

16  counted; is that right?

17   A.    Correct.

18   Q.    And those people never got to participate in

19  the March primary?

20   A.    Correct.

21         MS. HUNKER:  Objection, form.

22   Q.    (By Ms. Sisco) Does that greater number of

23  rejected ballots concern you?

24   A.    Oh, sure.  These are our voters.

25   Q.    Can you tell me more about that?

Jacquelyn Callanen

April 20, 2022
Page 278

1    A.    Again, every one of these voters is important.

2   Every one of them is a vote.  And when we disenfranchise

3   or we lose one, that is not right.  That is not what we

4   are in business for.

5    Q.    Thank you.  And have you -- actually, scratch

6   that because you have answered it already.  Do you have

7   any reason to believe that this significantly larger

8   number of rejected of people who had their ballots

9   rejected are not otherwise eligible voters?

10             MS. HUNKER:  Objection, form.

11             THE WITNESS:  I'm sorry.  I don't

12   understand.

13    Q.    (By Ms. Sisco) I can rephrase.  Do you have any

14   reason to believe that the people -- that the majority

15   of the people whose votes weren't counted because they

16   were rejected, do you think that they are -- do you

17   think there is voter fraud going on there or do you

18   think they are eligible voters who misunderstood or

19   messed up?

20             MS. HUNKER:  Objection, form.

21             THE WITNESS:  I think they were eligible

22   voters.

23    Q.    (By Ms. Sisco) Do you think the SB-1, this ID

24   number requirement confused voters?

25    A.    Yes.

1      Q.    Did the secretary of state provide adequate

2   guidance on this requirement to voters?

3      A.    In my opinion which is only an opinion, the

4   answer would be no.

5      Q.    And has -- do you think the secretary of state

6   has provided additional -- since the March 2022 primary,

7   do you think that now the secretary of state has

8   provided adequate guidance to voters?

9      A.    No.

10     Q.    Okay.  Thank you.  So we talked a lot about how

11  people can come in person to cure their votes?

12     A.    Yes.

13     Q.    Okay.  And I believe you said that they

14  could -- you, if their application is rejected, you were

15  just sending them a new application?

16     A.    Correct.

17     Q.    So could they have returned that by mail?

18     A.    Absolutely.

19     Q.    Okay.  Do you know how many people did that?

20     A.    No.  As I said, we weren't tracking that at the

21  time.

22     Q.    And could they provide like their number?

23  Could they cure it by email?

24     A.    They could but they didn't.

25     Q.    Okay.

1    A.    Again, there was a strong hesitancy of sending

2  information like that over the internet in an email.

3  And I don't blame them.

4    Q.    Understood.  And would they provide an updated

5  number by phone?

6    A.    No.

7    Q.    Okay.  And we talked about they could

8  theoretically do it online but it didn't work and only

9  39 voters were able to do that?

10    A.    Correct.

11    Q.    Okay.  Can a voter -- could a voter who came in

12  person to cure their ballot, could they do that curbside

13  or would they have to physically go into your office and

14  talk to an elections worker?

15    A.    We did provide curbside for that.

16    Q.    Okay.  Great.  And we have talked a lot about

17  the steps that your office, the various steps that your

18  office has taken to help voters kind of understand and

19  cure their ballot issues.  Do you remember that?

20    A.    Yes.

21    Q.    And one of the things you mentioned is that

22  your office started advising people to just put both

23  numbers on everything?

24    A.    Correct.

25    Q.    When did you start advising that?

# Attachment 2

# Nicole Collier
# January 1, 2023 Deposition Excerpts

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO,        )
et al.,                            )
                                   )
          Plaintiffs,              )
                                   )
V.                                 ) Case No. 5:21-cv-00844-XR
                                   )
GREGORY W. ABBOTT, et al.,         )
                                   )
          Defendants.              )

-----------------------------------------------------------------

ORAL & VIDEO DEPOSITION OF NICOLE COLLIER

January 30, 2023

-------------------------------------------------------

    Oral & video deposition of NICOLE COLLIER, produced as a

    witness at the instance of the defendants, and duly sworn,

    was taken in the above-styled and numbered cause on the

    30th day of January, 2023, before Patrick Stephens,

    Certified Court Reporter, at 209 W. 14th Street,

    Austin, Texas 78701.



 1      A     Yes.

 2      Q     And how frequently do you have to do that type of

 3   research?

 4      A     I don't file bills -- that many bills that are

 5   related to election law, so it's not often.

 6      Q     I am going to introduce our second exhibit.  And just

 7   a quick question:  Are you still listed as a partner for

 8   West & Associates, LLP?

 9      A     Yes.  Oh, I'm so sorry.  I didn't finish -- yes, good

10   catch.  I'm so sorry.  I forgot about that, because you said my

11   current law firm, and my current law firm is West & Associates,

12   LLP.  So after I ran for office, opened up my own practice and

13   then I went with West & Associates, LLP, and I still have my

14   own law practice.

15      Q     So you have both your own law practice and --

16      A     Yes.

17      Q     -- an associated law firm.

18      A     Yes.  Sorry about that.

19      Q     It must keep you busy.

20      A     Oh, yeah.

21      Q     And is that law firm based out of Tarrant County?

22      A     They have a -- we have a Fort Worth office, yes.

23      Q     And so do you have the second exhibit in front of

24   you?

25      A     Yes.



1       Q     Okay.  And do you recognize it?

2       A     It looked -- I -- I've seen this before, yes.

3       Q     And this is the biography that is on your Texas House

4  Member website; is that correct?

5       A     Is it now?

6       Q     That's a good specification.  So you see on the top

7  corner where it says 87th Legislature?

8       A     Yes.

9       Q     Okay.  And then you see on the left corner it has a

10  date that this was printed, which was August 11th, 2022.

11      A     Okay.

12      Q     And so would you agree with me that this is a

13  printout of the biography on your Texas House Member website as

14  of August 11th, 2022?

15            MR. BLEDSOE:  Objection to form.

16  BY THE WITNESS (resuming):

17      A     It appears to be.

18      Q     And so you are an elected member of the Texas House;

19  is that correct?

20      A     Yes.

21      Q     And you represent House District 95.

22      A     Yes.

23      Q     And where is House District 95?

24      A     In Tarrant County.

25      Q     And is it entirely within Tarrant County?



Nicole Collier

January 30, 2023
Page 19

1        A     Yes.

2        Q     And does House District 95 cover the city of

3   Fort Worth?

4        A     It is in part, but yes.

5        Q     And are there any other cities or municipalities that

6   House District 95 covers?

7        A     Yes.

8        Q     And what district -- what cities and municipalities

9   are those?

10       A     Everman, Forest Hill, there's a little bit of

11  Kennedale, Arlington, Crowley and Edgecliff Village.

12       Q     And how would you describe House District 95?  Is it

13  urban or suburban or rural?

14       A     Both.

15                  MR. BLEDSOE:  Object to form.

16  BY THE WITNESS (resuming):

17       A     I think it's -- it has pieces of everything,

18  actually, even some rural parts.

19       Q     So can you give me just a description then of House

20  District 95 in terms of its population density?

21       A     Well, currently, we have over 203,000 people in

22  House District 95.  It's the largest district -- House district

23  in the state.  It wasn't before, but as of the date of this

24  document that you've provided, there's 203,000 people.

25       Q     And when were you elected into House District 95?



 1        A     In November of 2012.

 2        Q     And you were reelected in 2022; is that correct?

 3        A     Yes.

 4        Q     And so is that six sessions?

 5        A     Yes, starting the sixth session.

 6        Q     And I see here it says, for the 87th Legislature, you
 7   were on the Criminal Jurisprudence Committee and the Public
 8   Health Community.  Is that inaccurate?

 9        A     For which year?

10        Q     So if you look on the website where it has Committees
11   on the second column --

12        A     Oh, okay.  Yes, that is correct.  But this -- I see
13   -- already see something that my office didn't update on the
14   back.

15        Q     And so you were the chair of the Criminal
16   Jurisprudence Committee during the 87th Legislature; is that
17   right?

18        A     That it correct.

19        Q     And you are a Democrat; is that correct?

20        A     Yes.

21        Q     And the majority of the Texas House is Republican; is
22   that correct?

23        A     Yes.

24        Q     And who decides who is chair of a committee in the
25   Texas House?



Nicole Collier                                              January 30, 2023
                                                                    Page 21

```
 1        A     The speaker.

 2        Q     And who was the speaker who appointed you?

 3        A     Speaker Dade Phelan.  Oh, well -- in the 87th?

 4        Q     Yes.

 5        A     Oh, yeah.  Speaker Dade Phelan.

 6        Q     And is Speaker Dade Phelan a Republican?

 7        A     Yes.

 8        Q     And so a Republican speaker appointed you as chair of

 9   the Criminal Jurisprudence Committee; is that correct?

10        A     Yes.

11        Q     And a Republican speaker appointed you chair of the

12   Criminal Jurisprudence Committee despite the fact that you are

13   a member of the minority party; is that correct?

14        A     That's the second time, yes, I was appointed chair by

15   a Republican.

16        Q     And when was the previous time that you were

17   appointed chair by a Republican?

18        A     The 86th.

19        Q     And was that the same committee?

20        A     Yes.

21        Q     And so you were appointed to the Criminal just (ph)

22   -- sorry -- Criminal Jurisprudence Committee as chair two

23   consecutive sessions by a Republican speaker; is that correct?

24        A     Yes, but they were different speakers.

25        Q     Were you on any select committee or any other --
```



 1  yeah, a select committee that year?

 2      A    I don't think so.

 3      Q    And are you -- were you on any committee that's not

 4  listed?

 5      A    Are you -- well, is a conference committee the same?

 6      Q    I would not consider it the same.

 7      A    Okay.  Then no.  I think they would list it

 8  automatically.  I -- I don't have any control over this part.

 9      Q    Good to know.  So you were not on the Elections

10  Committee; is that correct?

11      A    I was -- yeah, that's correct.

12      Q    And you were not on the select committee on

13  constitutional rights and remedies; is that correct?

14      A    That's correct.

15      Q    Okay.  Now, I want you to turn the page to the first

16  sentence.

17      A    Okay.

18      Q    It says:  The Texas Legislative Black Caucus

19  reelected Representative Collier as the vice -- first vice

20  chair in 2018.  Is that an accurate statement?

21      A    Well, that is true.  It was in 2018.

22      Q    And I was going to say is it -- is it still true that

23  you are the vice -- first vice chair?

24      A    No.

25      Q    And what position do you now occupy with the Texas



1    Legislative Black Caucus?

2         A    I'm a member.

3         Q    And so you don't have currently any -- any leadership

4    role in the caucus?

5         A    Not in the black caucus.

6         Q    Okay.  And was that the case in the 87th Legislature?

7         A    No.

8         Q    And what position did you hold in the 87th

9    Legislature?

10        A    I was chair of the Texas Legislative Black Caucus.

11        Q    And how long were you the chair of the Texas

12   Legislative Black Caucus?

13        A    Let's see.  Let's see.  December -- what -- let's

14   see.  If it's December 2020, I think, is going into the special

15   -- I mean going into the legislative session, so it was

16   December, I believe, of 2020, and then we had our election

17   September of 2022.

18        Q    So for most -- you -- I'm going to rephrase the

19   question.  You were the chair of the Texas Legislative Black

20   Caucus for most of the 87th Legislature; is that correct?

21        A    Yes, I would say that.

22        Q    And you were the chair of the Texas Legislative Black

23   Caucus while the legislature was convening in 2021; is that

24   correct?

25        A    Yes.



```
 1      Q    Are there any other caucuses that you're a member of?

 2      A    Yes.

 3      Q    And what caucuses?

 4      A    The Women's Health Caucus; it's -- it's the Broadband

 5  Technology Caucus, Gio Capriglione is the chair of that

 6  committee; and -- let's see -- the House Democratic Caucus; the

 7  LGBTQ Caucus -- oh, I don't know if that's a caucus, LSG.  I

 8  don't know if that's a caucus.  I'm trying to remember the

 9  other ones.  I don't remember.  There might be more.

10      Q    And is there an area of legislation that you focus

11  your efforts in terms of the bills that you file?

12      A    I don't say that I -- I do that.  There may be areas

13  that -- where, like, there's more bills, but I try to focus on

14  -- my legislation on what the community asks.

15      Q    Did you file any bills in the 87th Legislature that

16  pertained to elections?

17      A    I don't remember.

18      Q    Okay.  And we can put this one aside.

19      A    Okay.

20      Q    Do you know who the election administrator is in

21  Tarrant County?

22      A    Yes.

23      Q    And what's his name?

24      A    Heidi Gilder Garcia.

25      Q    Heider Garcia.
```



1       A    Okay.

2       Q    -- So does this bill prohibit poll watchers from

3  videotaping voters inside the polling places?  Chairman Cain

4  says:  It does not, but current law does.  And you respond:

5  I'm sorry?  Representative Cain [sic] says:  Current law does,

6  so it's already illegal under current law.  And you ask:  Okay.

7  So this bill would not change that?  Chairman Cain says:

8  That's correct.  Did I read that correctly?

9       A    That's what it says, yes.

10      Q    Okay.  Were you concerned about poll watchers being

11 able to record at the polling sites?

12      A    I was concerned about a lot of things.  I wanted to

13 get clarity because whenever -- you know, as a legislator,

14 we're writing the law, we're changing the law, and so even if

15 the law says one thing now, we can change it, and so that's

16 what I was concerned about.  So as a legislator, I am just

17 trying to get an understanding because there was so many

18 differences of this bill, reiterations and errors -- you know,

19 remember the quotation mark? -- and so I just wanted to make

20 sure that if there was something that was in there that they

21 didn't intend to that we address it and get it removed at this

22 time.  Also, there were things in there that they claimed they

23 didn't have the intention of doing and it wasn't removed or

24 things that were not in there that they meant to put in there,

25 so I think it's important.  And that's what this floor process



1    is for, is for us to try to discuss and get a better

2    understanding of what changes to the law that the legislation

3    has.

4         Q    Okay.  So your questions were directed to get

5    clarification to see what SB 7 would do with respect to

6    videotaping by poll watchers in polling locations?

7         A    No.  I wanted to know if it changed the current law,

8    if it changed the law on videotaping inside the polling

9    location.

10        Q    Okay.  And let's turn to Page 87 --

11        A    Okay.

12        Q    -- specifically Line 22.

13        A    Line 22.  Okay.

14        Q    And you say:  Okay.  Let me just give you an

15   explanation because the [sic] provided this document to talk

16   about Operation Eagle Eye.  And then you say:  The Republican

17   National -- Committee recruited tens of thousands of volunteers

18   to show up at polling places in communities of colors and

19   challenge voters' eligibility, taking unwelcome photographs,

20   loudly described voters on two-way radios and summoned

21   Republican-friendly police officers, and in Texas, there were

22   over 10,000 volunteers alone to do that as poll watchers.  You

23   weren't familiar with that?  Did I read that correctly?

24        A    Yes.

25        Q    And so what is Operation Eagle Eye?



```
 1      A     What I just said, what it reads right there.

 2      Q     Okay.  And when was Operation Eagle Eye?

 3      A     It says -- I don't know if I put that in there.

 4  Maybe in the '80s or '90s.  I don't know.  I mean, they still

 5  do it today.  They still have people that come out -- I know

 6  they still have concerns.  I think that there was an

 7  organization that reported some irregularities with poll

 8  watchers from that previous election, that people were

 9  concerned about -- that if you give them more freedom, then

10  there could be an increase -- increased intimidation of -- of

11  potential voters.

12      Q     And so when you're talking about Operation Eagle Eye,

13  that was in reference to a program or something that occurred

14  in the '80s or '90s, you said?

15      A     I don't remember the exact date, but I recall that it

16  still -- the concept still happens, and it was -- it was

17  actually, like, sanctioned.  Like, it was reported by the

18  Republican National Committee.

19      Q     So let me specifically ask:  When you say Operation

20  Eagle Eye, you're not referencing any specific operation that

21  occurred in 2020; is that correct?

22      A     I don't know if it was called Operation Eagle Eye,

23  but I -- I know that there were efforts to increase, you know,

24  watchers -- in 2020?  You're talking about 2020?

25      Q     Yes, 2020.
```



```
 1      A     I'm sorry.  This is before this happened.  I don't
 2   know if it was called Operation Eagle Eye, but I would -- I
 3   would defer to the advocates.  They know -- they have a better
 4   understanding and data on that, but at the time that I asked
 5   this question, there was recent reports of this same type of
 6   behavior, but I just don't know the name of the -- but there
 7   were advocates that did that.
 8      Q     Okay.
 9      A     I don't know if it was called Operation Eagle Eye,
10   but it was similar to that tactic.
11      Q     And which advocates are you referring to?
12      A     There was one in particular -- I know the NAACP, they
13   do a lot of research on -- in -- in voter protection.  What was
14   the name of that group?  I don't know.  Maybe I'll get to it in
15   here.  Maybe we'll keep reading.
16      Q     Are you aware of any specific incident in Texas over
17   the last five years where a poll watcher was acting --
18   intimidated or threatened voters?
19      A     Yes.  I know that there's reports of it, and it was
20   recent, and that's why I brought this up.
21      Q     And where were those instances?  Where did they --
22   where would they -- where were they?
23      A     I don't know if it was in Harris County or Waller
24   County.  I -- I just don't remember exactly where, but they
25   were in Texas.
```



1  being required to take an oath during the discussion of HB 6 or

2  SB 7?

3      A    I don't know if I -- I advocated for an oath, but

4  training definitely, and then also for reciprocal penalties.  I

5  mean, if they can -- if they can make false claims, then why

6  can't the person that they made false claims against?  So we

7  were trying to get some reciprocity.  It didn't make it into

8  the bill.

9      Q    Okay.

10      A    But I believe the oath -- I think that the oath -- it

11  seemed like that's something they offered up later on, in -- in

12  terms of the person who did the bill or the -- during the

13  process.

14      Q    So you did not advocate for poll watchers to have to

15  take an oath, but you did advocate for poll watchers to have

16  training; is that correct?

17      A    Well --

18          MR. BLEDSOE:  Object to form.

19  BY THE WITNESS (resuming):

20      A    -- I wasn't the only one involved, so somebody else

21  on the Democratic side could have been advocating for it.  But

22  I don't remember.  I can't -- I may have.  I don't remember.  I

23  mean, there was a lot of stuff that I was advocating for,

24  again, with the criminal penalties, reducing the criminal

25  penalties against -- because they were doing enhanced penalties



```
 1   and then also it was like the poll watcher could do anything
 2   and not be penalized, but yet, if it was false, I mean,
 3   literally, there was no consequences.  There were no
 4   consequences for -- if they made false statements or something.
 5        Q     And let's look further down.  So looking at Line 16,
 6   you say:  The election judge is trained.  They receive a
 7   training, they take an oath, but the poll watcher does not take
 8   an oath.  So let's talk about the criminal penalties that you
 9   mentioned that you say are necessary --
10        A     Unnecessary.
11        Q     -- unnecessary.  Under this bill -- well, let me ask
12   you this:  In your -- based on the information that you have
13   and based on your experiences with elections, traditionally,
14   has it been difficult to enlist poll workers?
15   Representative Gonzalez responds:  Yes.  Did I read that
16   correctly?
17        A     Yes, because she actually practiced election law.
18        Q     And you respond:  And I'm talking about poll workers,
19   people who are at the clerk's -- the clerks and the presiding
20   judge.  Has it been difficult to do that?  Representative
21   Gonzalez:  Yes, very difficult.  And you respond:  And so the
22   criminal penalties that are in this bill, do you believe that
23   that would further limit participation and volunteerism as a
24   poll worker?  Did I read that correctly?
25        A     And as -- as a poll worker, yes.
```



```
 1        Q     And Representative Gonzalez responds:  Absolutely.
 2   You know, some of these folks, it is -- it is a part-time job.
 3   It's not like they -- they make a ton of money working the --
 4   you know, the polls when we need them.  It's very difficult for
 5   polling locations to fill those -- those positions, and when
 6   you put a person in a situation that they can accidentally
 7   commit a crime, it's going to discourage people from taking
 8   these positions and make it even harder for people to be able
 9   to employ folks at the polling location where we need them.
10   Did I read that correctly?
11        A     Hang on.  I think I got lost.  Employ folks at the --
12   yes.
13        Q     Okay.
14        A     And pretty much.  I mean, I got the gist of what you
15   read.
16        Q     Okay.  And so after Senate Bill 1 was implemented,
17   did you come across any evidence that SB 1 reduced the number
18   of poll workers or election judges willing to volunteer?
19        A     Yes.  In fact, in Tarrant County, there was a -- it
20   was pretty hard to find people to volunteer to participate.  A
21   lot of people were concerned about criminal penalties.  Usually
22   it's -- when I've been to the vote -- to vote, it's a senior
23   that is there, you know, volunteering and -- and doing their
24   civic duty to participate in the -- the process, but then I
25   noticed because -- you know, I could appoint somebody, the
```



Nicole Collier

January 30, 2023
Page 150

1    parties can appoint somebody.  It was hard to find people to

2    fill up these locations, and I recall that there was an issue

3    about Tarrant County being able to staff all of the polling

4    locations.

5        Q    And do you know if Tarrant County had trouble filling

6    these volunteer positions in 2020?

7        A    Not -- I didn't hear about it like I did in 2022 --

8    is it 2021?  2020 -- when was that election?  This last -- when

9    this was implemented, I didn't hear about it like that because

10   the party chair was even, like, pleading to make sure that

11   everybody -- you know, Find people to work these polls.

12       Q    And that was your experience in the primary election

13   in 2020?

14       A    It was both.  Literally, we had trouble with both,

15   the primary and the general election.  In 2021.  I'm sorry.

16       Q    In 2021.

17       A    In this last -- I'm sorry -- this last election.  Was

18   that in 2022?

19       Q    Yes.

20       A    From the 20 -- after SB 1, because you asked me about

21   SB 1.

22       Q    Yes --

23       A    Yeah.

24       Q    -- post-SB 1.

25       A    Yeah.



```
 1       Q    Okay.

 2       A    They had trouble for the primary and the general

 3  after SB 1 was implemented.

 4       Q    Okay.  And what evidence do you have that it was

 5  because of SB 1 that caused --

 6       A    Well, we didn't have these increased criminal

 7  penalties and we didn't have freedom to move around.

 8       Q    So is it simply the correlation of the changes in law

 9  with the decrease?

10       A    I don't know.  I -- you know what?  I feel like even

11  the party chair, Allison Campolo, made a reference to the --

12  the difficulty.  I don't remember exactly the wording of it,

13  but it led me to believe that it was because of all of these

14  additional new provisions that people didn't have time to come

15  -- become comfortable with.

16       Q    But you didn't talk to any volunteer --

17       A    Oh, yes.  So when I go to the neighborhood meetings,

18  I talk to seniors in -- in the neighborhood, you know,

19  associations, and they -- I had one lady tell me she wasn't

20  going to volunteer anymore.  She said, Y'all ain't gon' get me.

21       Q    Are you aware of Tarrant County having to close any

22  polling locations in response to the changes?

23       A    I don't know exactly the number, but I do remember

24  Allison Campolo, who is the Democratic Party chair, mentioning

25  that it was going to be difficult to staff every location, and
```



1   it was down to the wire.

2       Q    And so you're not aware of Tarrant County having to

3   close any polling locations in response to these poll watcher

4   provisions following SB 1.

5       A    Not off the top of my head.

6       Q    And so did you look at any studies that tracked the

7   number of individuals who were willing to volunteer post-SB 1

8   compared to pre-SB 1?

9       A    I don't know if there's been any studies.

10      Q    So you haven't looked at any studies.  Is that fair

11  to say?

12      A    Are there studies?

13      Q    Well, have you looked at any?

14      A    I don't know if there's any studies to look at.

15      Q    And have you looked at any other counties besides

16  Tarrant County on whether there was any decrease in the number

17  of volunteers at polling locations during election post-SB 1?

18      A    No.

19      Q    Let's quickly turn to Page 109.

20      A    Okay.

21      Q    Line 10, please.

22      A    All right.

23      Q    And it says, Representative Collier:  So do you

24  believe that this bill if passed would have the impact of

25  increasing arrests for individuals?  Representative Gonzalez:



1   Absolutely.

2       A    So I asked the question, Representative Collier, and

3   then Representative Gonzalez responded.  Yes, that's what it

4   says.

5       Q    Okay.  Are you aware if there was any increase in the

6   number of arrests following the passage of SB 1?

7       A    Am I aware?

8       Q    Yes.

9       A    I haven't looked for any.

10      Q    So you haven't looked to see whether or not the

11  changes passed in SB 1 regarding poll watchers increased the

12  number of arrests.  Is that fair to say?

13      A    I -- I don't know if there -- if there is evidence of

14  that.

15      Q    And we can put this document aside.

16      A    Okay.

17      Q    So I'm going to introduce our next exhibit.  And so

18  this, you see on top, says House Journal, 87th Legislature,

19  Regular Session; is that correct?

20      A    House Journal, 87th -- yes.

21      Q    And then it says, Wednesday, May 19th, 2021.

22      A    51st day, Wednesday, May 19th, 2021.  Yes.

23      Q    Okay.  And if we turn the page over to where it says

24  SB 7 --

25      A    (Complies with request.)



1      Q     Now the House Journal, that records votes and actions

2 from the legislative floor; is that correct?

3      A     Say that again.

4      Q     The House Journal, that records actions that were

5 taken on the House floor; is that correct?

6      A     Actions that were taken.  You mean it provides a

7 written -- and it's not all of it because not everything goes

8 into the -- the House Journal.  I'm sorry.  I'm thinking of the

9 -- well, not everything is in here, like -- like, the

10 transcript, like, you're talking about.

11     Q     Uh-huh.

12     A     Yeah, that's not in there.

13     Q     So it's not a transcript, but it does -- it does

14 record the actions taken by the House such as votes or motions;

15 is that correct?

16     A     I believe so.

17     Q     Okay.  And so if we look at the top of -- where it

18 says 3431, it says:  SB 7 request of Senate granted, conference

19 committee appointed.

20     A     Yes.

21     Q     On motion of Representative Cain, the House granted

22 the request of the Senate for the appointment of a conference

23 committee on SB 7.  Did I read that correctly?

24     A     Yes.

25     Q     And then it says:  The chair announced the



Nicole Collier

January 30, 2023
Page 155

1   appointment of the following conference committee on part of

2   the House on SB 7; Cain, chair; Canales, Clardy, Collier and

3   Jetton.  Did I read that correctly?

4        A    Yes.

5        Q    And so you were a member of the conference committee

6   for SB 7; is that correct?

7        A    Yes.

8        Q    And so this conference committee for SB 7 had two

9   Democrats to -- what was the breakdown per party?  I should

10  say.

11       A    There was two Democrats.

12       Q    Two Democrats?

13       A    And then three Republicans, it looks like.

14       Q    And the other Democrat was Representative Canales; is

15  that correct?

16       A    Yes, Chair Canales, uh-huh.

17       Q    Now, did you volunteer to go onto this committee?

18       A    I did not -- I mean, you're at the service, so -- I

19  didn't know I was going to get appointed to it, if that's what

20  you're asking.

21       Q    Yes.

22       A    I did not know.

23       Q    And what was discussed at the conference committee

24  regarding the reconciliation of the bill?  Can you kind of just

25  give me a quick overview?



1            MR. BLEDSOE:  Object to form, assumes facts not

2  in evidence.

3  BY THE WITNESS (resuming):

4      A    The conference committee?  I mean, literally, the --

5  that presupposes that there is a committee that meets.  I mean,

6  it doesn't meet like a traditional committee.

7      Q    So then how does a conference committee operate?

8      A    I think it's -- what you would expect it to be is

9  that there is a actual meeting of everyone to discuss the bill,

10  but that's not how this started out.  So immediately, once I

11  learned I was on this conference committee, I reached out to

12  Chair Cain and offered my assistance and said that I would be

13  -- you know, would like to meet with him to discuss the bill.

14      And so that didn't happen.  And he said, Okay, I'll be in

15  touch with you, and then -- let's see.  What -- he said, I'll

16  be in touch with you, and then I just so happened to call him,

17  because I didn't hear back from him, and he said that him and

18  Clardy were already discussing the bill.  And I said, You are?

19  And then I said, Well, I'm coming down, and I went over to his

20  office.  And it was him, Clardy and another lady who was a

21  lawyer, and she had been involved in helping them.  She said

22  she drafted the bill pretty much.

23      And so I did not get invited.  I just so happened -- like,

24  when I spoke with Cain, he said that they were meeting then,

25  and I wouldn't even call that an actual conference committee



Nicole Collier

January 30, 2023
Page 157

1  because I tried to get Canales, but he wasn't there.  But,

2  yeah, I don't think Jetton was in that -- he wasn't in that

3  meeting either.

4      Q    And so did you have any exchanges with

5  Representative Cain via E-mail or phone call about the

6  conference committee bill?

7      A    I don't -- like, what do you mean?  Like, did we,

8  like, E-mail each other about the bill?  I don't think so.  I

9  think everything was more -- like, if I called, it was to --

10  for logistics, like, Where are you at, or, Come up here, or

11  something like that.

12      Q    Uh-huh.

13      A    But in terms of the content, I don't -- I can't

14  remember if I did.  I don't think so.  I don't think so.

15      Q    And did you speak to any of the Senate members about

16  SB 7 as part of your being part of the conference committee?

17      A    I did.

18      Q    And who did you speak to?

19      A    Senator Beverly Powell.

20      Q    And what topics were discussed?

21      A    Well, she was also appointed to the conference

22  committee in the Senate on the bill, and I asked her if she had

23  a chance to meet with the conference and she said no, they did

24  not speak with her, so she didn't know what was going on with

25  the bill.



1      Q    And did you make any proposals regarding the

2  conference committee bill?

3      A    Yes.

4      Q    And were any of those proposals accepted?

5      A    Some of them.  I believe some of them were accepted.

6  A lot were not.

7      Q    Can you recall which ones were accepted?

8      A    And when you say me, I may not have done it, but it

9  was the, you know, Democratic faction.  It was something that

10 we -- we worked with our advocates with and the Sunday voting,

11 you know, limiting Sunday, Souls to the Polls was an issue.  We

12 still needed to work through the poll watcher provisions.

13 There was something about the hours that the polls would be

14 open.  Let's see here.  What else?  What were we talking about?

15

16     The mail-in ballot.  The -- I don't know if it was during

17 this time, but there was a provision that said that you had to

18 put the -- either your Social Security number or your driver's

19 license on the inside -- I mean on the outside-inside (ph)

20 envelope, and that was new, and it -- it was confusing.  Like,

21 where -- what if you don't remember which one -- we brought

22 that up and they still didn't do anything with that.  What if

23 you don't remember which one you used to vote -- register to

24 vote, and that was not addressed.  There was one senator that

25 they said that they -- they had some provisions -- oh, what was



# Attachment 3

# Bridgette Escobedo
# May 11, 2022 Deposition Excerpts

```
1            IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
2                  SAN ANTONIO DIVISION

3
    LA UNIÓN DEL PUEBLO        §
4   ENTERO, ET AL.,            §
         PLAINTIFFS,           §
5                              §
    V.                         § CASE NO. 5:21-cv-844-XR
6                              §
    TEXAS, ET AL.,             §
7        DEFENDANTS.           §
    ------------------------------------------------------
8   OCA-GREATER HOUSTON,       §
    ET AL.,                    §
9        PLAINTIFFS,           §
                               §
10  V.                         § CASE NO. 1:21-cv-0780-XR
                               §
11  TEXAS SECRETARY OF STATE   §
    JOHN SCOTT, ET AL,         §
12       DEFENDANTS.           §
    ------------------------------------------------------
13  HOUSTON AREA URBAN LEAGUE, §
    ET AL.,                    §
14       PLAINTIFFS,           §
                               §
15  V.                         § CASE NO. 5:21-cv-0848-XR
                               §
16  GREGORY WAYNE ABBOTT,      §
    ET AL.,                    §
17       DEFENDANTS.           §
    ------------------------------------------------------
18  LULAC TEXAS, ET AL.,       §
         PLAINTIFFS,           §
19                             §
    V.                         § CASE NO. 1:21-cv-0786-XR
20                             §
    JOHN SCOTT, ET AL.,        §
21       DEFENDANTS.           §
    ------------------------------------------------------
22  MI FAMILIA VOTA, ET AL.,   §
         PLAINTIFFS,           §
23                             §
    V.                         § CASE NO. 5:21-cv-0920-XR
24                             §
    GREG ABBOTT, ET AL.,       §
25       DEFENDANTS.           §
    ------------------------------------------------------
```



```
 1  UNITED STATES OF AMERICA,   §
          PLAINTIFF,            §
 2                             §
    V.                         § CASE NO. 5:21-cv-1085-XR
 3                             §
    THE STATE OF TEXAS,        §
 4  ET AL.,                    §
          DEFENDANTS.          §
 5  ********************************************************
 6                  ORAL 30(b)(6) DEPOSITION OF
 7             TRAVIS COUNTY CLERK REPRESENTATIVE
 8            TESTIMONY OF BRIDGETTE ESCOBEDO
 9                     MAY 11, 2022
10                   (Reported remotely)
11  ********************************************************
12
13               ORAL DEPOSITION OF BRIDGETTE ESCOBEDO,
14  produced as a witness at the instance of the Plaintiff
15  OCA-Greater Houston, and duly sworn, was taken in the
16  above-styled and numbered cause on the 11th day of
17  May, 2022, from 10:11 a.m. to 4:27 p.m., reported
18  remotely via Zoom, before MICHELLE CARVER, CSR, in and
19  for the State of Texas, reported by oral stenograph in
20  Travis County, Texas, pursuant to the Federal Rules of
21  Civil Procedure, the current Emergency Order regarding
22  the COVID-19 State of Disaster, and the provisions
23  stated on the record or attached hereto.
24
25
```



```
 1            THE COURT REPORTER:  Thank you.
 2      Q.   How long did you meet with your attorneys on
 3 Monday?  For how long?
 4      A.   About maybe three and a half hours or so.
 5      Q.   And did you talk to any staff members, any
 6 of your staff members to prepare for today's
 7 deposition?
 8      A.   My assistant directors.
 9      Q.   And who is that person?  What is their name?
10      A.   Dan Hayes and Charlie Johnson.
11      Q.   And what did you talk with Dan Hayes about
12 in preparation?
13      A.   We got the questions, and we got -- divvied
14 them up on topic.  Dan is over the A- -- he's over the
15 ADA portion in Travis County in the division, and
16 Charlie is over the ballot by mail.  So we just talked
17 about the separation of the questions.
18      Q.   Did you communicate with anybody from the
19 Secretary of State's Office to prepare for today's
20 deposition?
21      A.   No.
22      Q.   And what about did you communicate with
23 anybody from the Attorney General's Office to prepare
24 for today's deposition?
25      A.   No.
```



```
1        Q.   And did you communicate with anybody from
2    any other county elections office to prepare for
3    today's deposition?
4        A.   No.
5              THE COURT REPORTER:  Ms. Davis, you're
6    trailing off at the end of your questions.
7              MS. SIFUENTES DAVIS:  Understood.
8              THE COURT REPORTER:  Thank you.
9        Q.   Ms. Escobedo, what is your job title?
10       A.   I am the director of elections.
11       Q.   And how long have you been in that role?
12       A.   Since January of 2020.
13       Q.   And what are your job duties as the director
14   of elections?
15       A.   To oversee all of the elections in Travis
16   County.
17       Q.   And what did you do previous to being in
18   this position?
19       A.   I was an elections administrator in Bastrop
20   County.
21       Q.   And did that hold the same job duties as
22   your current position?
23       A.   Yes.
24       Q.   You have staff that you supervise?
25       A.   Yes.
```



BRIDGETTE ESCOBEDO                                    May 11, 2022
LA UNIÓN DEL PUEBLO ENTERO V. TEXAS                          14

1        Q.    What staff do you supervise?

2        A.    We have 27 full-time employees in the

3   division.

4        Q.    Is that the current number of full-time

5   employees?

6        A.    Yes.

7        Q.    And has that number changed over time?

8        A.    Yes.

9        Q.    How long has the division had 27 full-time

10  employees?

11       A.    Since March of this year.

12       Q.    I'm going to start by talking about voters

13  who need assistance while voting, and I'm going to ask

14  you questions about voters who need assistance.  Would

15  you agree with me that voters who use an assister may

16  include voters with disabilities?

17       A.    Yes.

18       Q.    Would you agree with me that voters who use

19  an assister may include voters who are illiterate?

20       A.    Yes.

21       Q.    Would you agree with me that voters who use

22  an assister would include voters with limited English

23  proficiency?

24       A.    Yes.

25       Q.    Can you describe the types of people that



 1  might go with a voter to assist them?

 2                  MS. HUNKER:  Objection.

 3                  THE COURT REPORTER:  I didn't hear the

 4  objection.  I'm sorry.

 5                  MS. HUNKER:  Objection.  Form.

 6                  THE COURT REPORTER:  And who said that?

 7                  MS. SIFUENTES DAVIS:  Did you hear

 8  that?

 9                  MS. HUNKER:  Kathleen Hunker with the

10  State.

11                  THE COURT REPORTER:  Thank you.

12     Q.   The question:  Can you describe the types of

13  people that might (audio distortion) know.

14                  THE COURT REPORTER:  I'm sorry.  Y'all

15  are cutting out.  I'm getting like two words and then

16  nothing and then two separate words.

17                  MR. POPE:  Ms. Carver, this is Patrick

18  Pope.  I'll try to adjust the telephone to see if we

19  can't find a better place and volume in order for you

20  to hear us.

21                  MS. SIFUENTES DAVIS:  Are you able to

22  hear us?

23                  THE COURT REPORTER:  Yes.

24     Q.   The question:  Can you describe the types of

25  people who might go with a voter to provide



1   oath would want to follow the commands of this oath

2   closely?

3       A.   Yes.

4            MS. HUNKER:  Objection.  Form.

5       Q.   Do you see the part that says:  The voter I

6   am assisting represented to me that they are eligible

7   to receive assistance -- as being added to the oath?

8       A.   Yes.

9       Q.   How will an assister obtain representation

10  from a voter that they are eligible for assistance?

11      A.   Can you repeat the question?

12      Q.   How will an assister obtain representation

13  from a voter that they are eligible for assistance?

14           MS. HUNKER:  Objection.  Form.

15      A.   By being asked.

16      Q.   Will the voter tell the assister that they

17  are eligible to receive assistance?

18           MS. HUNKER:  Objection.  Form.

19      A.   I don't understand your question.

20      Q.   That's good that you're telling me that you

21  don't understand my question.  I appreciate that.  If

22  an assister is assisting a voter --

23      A.   Uh-huh.

24      Q.   -- how does the assister know that that

25  person is eligible to receive assistance?



```
 1        A.    They say -- say they need assistance.
 2        Q.    Okay.  And is it fair to say that if -- that
 3   you are not aware of what a voter or assister
 4   communicates or says to each other prior to coming to
 5   vote?
 6        A.    That's correct.
 7        Q.    Let's turn our attention to some of the
 8   language that was removed from the oath under SB 1.
 9   Prior to SB 1, would an assister be allowed to answer
10   a voter's question about the ballot?
11        A.    I believe so.
12        Q.    Is there a section that has been crossed out
13   from the oath that says:  Answering the voter's
14   question?
15        A.    Line 5.
16        Q.    And has that been crossed out?
17        A.    Yes.
18        Q.    You understand this change to mean that
19   answering the voter's question is beyond the scope of
20   the oath?
21                  MR. POPE:  Objection.
22                  THE COURT REPORTER:  I'm sorry.  Who
23   made the objection?
24                  MR. POPE:  Patrick Pope.  Objection.
25   Form.
```



BRIDGETTE ESCOBEDO
LA UNIÓN DEL PUEBLO ENTERO V. TEXAS

May 11, 2022
21

1              THE COURT REPORTER:  Thank you.

2      A.   Can you repeat the question?

3      Q.   Yes.  Do you understand the change to mean

4 that answering the voter's question is beyond the

5 scope of the oath?

6      A.   Yes.

7      Q.   Would you agree that 6.04 allows for reading

8 the ballots to the voters, directing the voter to read

9 the ballot, marking the voter's ballot, or directing

10 the voters who mark the ballot?

11      A.   Yes.

12              MS. HUNKER:  Objection.  Form.

13      Q.   Would you agree with me that SB 1 allows for

14 four specific types of help?

15              MS. HUNKER:  Objection.  Form.

16      A.   Uh-huh.

17      Q.   Would you agree with me that the act of

18 voting in general goes beyond reading and marking the

19 ballot?

20      A.   Yes.

21      Q.   Do you understand this change to mean that

22 the assister must confine his or her assistance to

23 what is in -- assistance to what is in the oath?

24      A.   Yes.

25      Q.   So I want to go over with you a little bit



1  more about the oath.  Do you understand that the oath

2  now forecloses the assister from explaining the

3  voter -- explaining to the voter how to use the voting

4  machine?

5       A.   Can you show me which -- where -- where

6  that's in here, which line it is?

7       Q.   If there is no provision in the oath

8  allowing somebody to provide a certain kind of

9  assistance, are they foreclosed from providing that

10  kind of assistance?

11                 MS. HUNKER:  Objection.  Form.

12                 MR. POPE:  Objection.  Form.

13       A.   I'm not sure I understand the question.

14       Q.   Let me rephrase.

15       A.   Okay.

16       Q.   Is an assister allowed to provide assistance

17  beyond the assistance that is allowed for in the oath?

18       A.   No.

19       Q.   Does Travis County use a hard copy or a poll

20  pad to collect the oath?

21       A.   A poll pad.

22       Q.   And how do you keep track of -- or rather do

23  you record how many people signed an oath at each

24  election?

25       A.   Yes.



BRIDGETTE ESCOBEDO                                    May 11, 2022
LA UNIÓN DEL PUEBLO ENTERO V. TEXAS                          23

1       Q.   Do you know how many people signed the oath

2   in March of 2022?

3       A.   I do not.

4       Q.   Do you know how many people signed the oath

5   in any previous election?

6       A.   I do not.

7       Q.   Let's turn to page 54 of Exhibit 2 and look

8   at Section 606 on this page.  Are you familiar with

9   this provision of SB 1?

10      A.   Yes.

11      Q.   What does this provision do?

12      A.   It says that you cannot -- a person commits

13  an offense if you offer to compensate another person

14  for assisting voters.

15      Q.   And do you now understand the provision to

16  be expanded to all people who are paid to help

17  regardless of whether it is a performance-based

18  compensation team?

19          MS. HUNKER:   Objection.   Form.

20      Q.   Would you agree with me that then somebody

21  who is paid by a nonprofit organization would be

22  prohibited from assisting?

23      A.   Yes.

24      Q.   Would you agree with me that this provision

25  does not limit the compensation to compensation of



 1   money?

 2              MS. HUNKER:  Objection.  Form.

 3        A.   Yes.

 4        Q.   Would you agree with me that buying

 5   someone's lunch could be considered a type of

 6   compensation?

 7        A.   Yes.

 8        Q.   Have you received any training from the

 9   Secretary of State about this particular new provision

10   606?

11        A.   No.  Well, there are advisories that come

12   out that you're -- you can read, and I have probably

13   read that, but specific training, no.

14        Q.   Do you know if there was an advisory about

15   606?

16        A.   Not specifically.

17        Q.   What kind of advisories do you typically get

18   from the Secretary of State?

19        A.   They're -- they come out periodically about

20   topics, and they are available for the public.

21        Q.   Are they available -- well, are they

22   advisories directed at elections administrators?

23        A.   Yes.

24        Q.   And do they -- does the Secretary of State

25   send the advisory to you?



1      A.   Yes.

2      Q.   Do you know which advisories were provided

3  in preparation for the March '22 -- March 2022

4  primary?

5      A.   There were several.

6      Q.   Which ones?

7      A.   I can't recall the specific.

8      Q.   Before SB 1, in what ways did the Secretary

9  of State's Office ensure that counties were following

10  the same election procedures?

11      A.   I'm not sure.

12      Q.   Did they make sure -- did the Secretary of

13  State's Office make sure that counties followed the

14  same election procedures?

15           MS. HUNKER:   Objection.   Form.

16      A.   They issued advisories for us to follow.

17      Q.   What else would they do to ensure that

18  counties followed the same election procedures?

19      A.   Webinars and in-person seminars.

20      Q.   Did you attend those webinars?

21      A.   Yes.

22      Q.   And did you attend the in-person seminars?

23      A.   Yes.

24      Q.   Who gave the seminars?

25      A.   The Secretary of State's Office.



1  director -- the legal director at the SOS and got

2  approval.

3       Q.   And did they provide that approval in

4  writing?

5       A.   Yes.

6       Q.   Was that in the form of an e-mail?

7       A.   Yes.

8       Q.   In the May 7th election, how many

9  rejections -- well, you may not be prepared to testify

10  on this; so if this is a question for someone else,

11  let me know.  But in the May 7th election, how many

12  rejections were provided the additional information

13  that was approved by the Secretary of State's Office?

14       A.   For the application or for the ballot?

15       Q.   For the application.

16       A.   Right about 11 -- approximately 11 percent.

17       Q.   And do you know the percentage for the

18  ballots?

19       A.   It's around 3 percent.

20       Q.   How would the voter know that their

21  application to vote by mail was rejected?

22       A.   We would contact the voter via phone or hard

23  copy mail or e-mail if they provided that address.

24       Q.   Let's look at page 38, which I think is the

25  page you're probably already on --



1        A.    Uh-huh.

2        Q.    -- Section 507.  What is your understanding

3   of Section 507?

4        A.    If the information doesn't match, we reject

5   the application.  If the information that the voter

6   provides -- either their driver's license or the last

7   four of their social -- if it doesn't match what's in

8   the database, we reject the application.

9        Q.    Did Travis County develop policies on how to

10   implement this section of SB 1?

11        A.    Travis County didn't, but the Secretary of

12   State did.

13        Q.    And Travis County implemented those

14   policies?

15        A.    Yes.

16        Q.    Did Travis County have to implement any new

17   procedures or policies as a result of 5.07?

18        A.    Travis County specifically, yes.

19        Q.    And what were those policies that were

20   implemented?

21        A.    The workflow having to keep track of the

22   rejections -- the rejected applications and the

23   accepted applications and the ballots accepted and

24   rejected as well.

25        Q.    So tell me a little bit about that workflow



1  in terms of what was the process for a ballot that

2  came in that did not have the matching number?

3      A.   So if we had contact information for the

4  voter, we would reach out and contact them via phone

5  or e-mail.  If they did not, then we would send them a

6  letter in the mail.

7      Q.   And do you know how often the voter would

8  contact you as a result of the letter or phone call?

9      A.   There were several voters that contacted us.

10     Q.   Is it fair to say that not every voter you

11 communicated with by mail or phone you were able to

12 reach?

13               MS. HUNKER:  Objection.  Form.

14               MR. POPE:  Objection.  Form.

15     A.   That's correct.

16     Q.   For those voters, was the result that they

17 did not vote?

18     A.   Some, yes.

19               MS. HUNKER:  Objection.  Form.

20     Q.   So let's talk about the voters that you did

21 get in touch with.  When you had that contact, what

22 was the next step in terms of the information you

23 provided to the voter?

24     A.   We would tell them -- we would inform them

25 that we did not have the matching number in our



1  database, and we would instruct them on how to go

2  about and cure or fix the problem.

3      Q.   Did voters ever have problems curing their

4  ballots?

5              MR. POPE:  Objection.  Form.

6              MS. HUNKER:  Objection.  Form.

7      A.   Yes.

8      Q.   What were some of the problems that they had

9  in curing their ballots?

10     A.   Some of them were not computer -- were not

11  proficient in their computer skills.  Some of them

12  didn't understand the process or what was required of

13  them to -- to do on their end to cure their ballot.

14     Q.   You mentioned that some were not computer

15  literate.  Was there an option for them to cure their

16  ballot in person?

17     A.   They could cancel their application or -- or

18  go into a polling location and vote provisionally.

19     Q.   And that would require them being able to

20  access the polling place, either through

21  transportation or a ride through some other --

22     A.   Yes.

23     Q.   Do you know if there were voters who didn't

24  have access to a computer or transportation to be able

25  to cure their ballot?



1        A.    Yes.

2        Q.    What happened with those voters?

3        A.    Some of those voters just didn't vote.

4        Q.    You also mentioned that there were voters

5   that didn't understand the process.  Can you explain

6   to me a little bit more about the difficulties they

7   had in understanding the process?

8        A.    They -- they didn't understand why they had

9   to do it.  We explained to them there was a new law

10  that required this, and they just could not -- or

11  comprehend as to why this was in effect.

12       Q.    Were some of those voters not unable to cure

13  their ballots?

14       A.    Some of them were.

15       Q.    Let's look at Section 508, which is on the

16  next page, page 39.  Can you tell me what this section

17  has to do with?  What does this section do?

18       A.    It says that the carrier envelope has to

19  have a plastic that covers the -- the PII or the

20  personal identification, the driver's license, or the

21  last four of the social.  Then it says that they have

22  to sign that they have not received a number if they

23  haven't gotten one by DPS or Social Security.

24       Q.    Do you know anything about the font size of

25  the information on the carrier envelope?



1      A.   It is very small.

2      Q.   Did Travis County have to implement any new

3   procedures having to do with specifically

4   Section 5.08?

5      A.   We had to secure new envelopes.

6      Q.   Is there anything else that Travis County

7   had to do having to do with Section 5.08?

8      A.   No.

9      Q.   Let's turn to page 40, and specifically

10  let's look at Section 5.10, but within this section,

11  I'm looking at -- look on page 41 that's underlined

12  and says:  Allow a voter to add or correct information

13  required.

14          Is this the cure provision that you were

15  talking about earlier?

16     A.   Yes.

17     Q.   And it's your understanding -- or it's your

18  testimony, rather, that not all voters were able to

19  cure their ballots as required by SB 1; is that

20  correct?

21              MS. HUNKER:  Objection.  Form.

22     A.   Yes.

23     Q.   Let's just quickly look at 5.12, which is on

24  page 43.  What is your understanding of this

25  provision, Section 5.12?



1      A.   That the voter has an opportunity to correct

2  their defect (audio distortion) their ballot.

3             THE COURT REPORTER:  I'm sorry.  Could

4  you repeat that?  You cut out a little bit on me.

5      A.   That the voter has the opportunity to

6  correct their defect.

7             THE COURT REPORTER:  Thank you.

8      Q.   What was the process by which Travis County

9  implemented the defect correction portion?

10     A.   So we would reach out to the voter and --

11  and make contact with them and give them -- you know,

12  help them along in the process and tell them they had

13  to take this action in order for their ballot to

14  count.

15     Q.   Can you tell me about some of the specific

16  voters that your office spoke with who had issues

17  correcting their ballots?

18             MS. HUNKER:  Objection.  Form.

19     A.   There were some.  I don't -- I was not

20  specifically on the phone with the voters, but it was

21  told to me by my staff that, you know, elderly voters

22  didn't -- did not want to cure or did not understand

23  as to why they had to provide their socials or their

24  driver's licenses.

25     Q.   So is it fair to say that people had



1    concerns about providing the phone numbers for privacy

2    reasons?

3                    MS. HUNKER:  Objection.  Form.

4        A.    That's fair.

5        Q.    So if someone who is eligible to vote by

6    mail put only their driver's license on the ballot --

7    the mail ballot, but you only have their social

8    security number on file, that would be rejected,

9    correct?

10       A.    Yes.

11       Q.    And in the November 2022 election that would

12   still be the case, correct?

13       A.    Yes.

14       Q.    What about somebody who is 80 years old,

15   hasn't driven in 20 years, and they lost their

16   driver's license?  If the number you have in the

17   system is their driver's license and they put the last

18   four of their social, that ballot would be rejected,

19   correct?

20                    MS. HUNKER:  Objection.  Form.

21       A.    Yes.

22       Q.    And if a voter doesn't have either number on

23   file, if they put their correct driver's license on

24   the ballot, it will still be rejected, correct?

25       A.    If we don't have it in -- matching in our



1  database, yes.

2      Q.   And same situation, a voter puts their

3  social -- the last four digits of their social

4  security number on the ballot, but Travis County

5  doesn't have either number on file, that ballot would

6  be rejected; is that correct?

7      A.   Yes.  Let me clarify they would go in the

8  cure process, though.  It would be finally rejected.

9      Q.   But it wouldn't be accepted; is that

10 correct?

11     A.   Initially.

12     Q.   Do you have a sense of how many voters don't

13 have any ID number on file?

14     A.   I don't.

15     Q.   And this law doesn't require that

16 individuals write down both ID numbers; is that

17 correct?

18     A.   That's correct.

19     Q.   We have been going for almost 50 minutes

20 now.  I'd like to take a short break if you are okay

21 with that?

22     A.   Yes.

23          MS. SIFUENTES DAVIS:  Okay.  We'll go

24 off the record.

25          THE COURT REPORTER:  Off the record.



1   The time is 11:04.

2                    (Off the record)

3                    THE COURT REPORTER:  We are back on the

4   record.  The time is 11:15 a.m.

5        Q.   Thank you.  Let's go to page 58 -- and I

6   should say in Exhibit 2.  And at the very bottom of

7   page 58, you see Section 7.04, but it continues onto

8   page 59?  What does this provision of SB 1 mean for

9   Travis County?

10       A.   What does that mean?  I'm not sure I

11   understand the question.

12       Q.   What steps did Travis County take to

13   implement any provisions in 7.04?

14       A.   The vote harvesting?

15                    THE COURT REPORTER:  Ms. Bridgette, I

16   can't hear you.

17       A.   I asked about -- I said the harvesting and

18   then we don't have any provisions against preventing

19   that.

20       Q.   Did you have any communications with any

21   voters about 7.04?

22       A.   Not that I am aware.

23       Q.   You testified earlier that you did have

24   communications with voters about the provisions in

25   SB 1 more generally; is that right?



1    A.   That's correct.  So we have a call center of

2  people that call out or receive calls from voters, and

3  the call center communicates those conversations to

4  me.

5    Q.   What issues did the call center share with

6  you about the implementation of SB 1?

7    A.   That there was a lot of voter confusion.

8    Q.   What were some of the things that voters

9  were confused about in SB 1?

10    A.   They didn't understand why they had to

11  provide one or the other of their driver's license or

12  social security numbers or both, and they didn't

13  understand the cure process or the ballot tracker.

14    Q.   We haven't talked about the ballot tracker

15  yet.  Do you know how many people used the ballot

16  tracker in Travis County?

17    A.   Not specifically.

18    Q.   Do you know if the ballot tracker was

19  accessible to people with visual impairments to use

20  screen-reading software?

21    A.   I don't know that.

22    Q.   Did you receive any complaints about the

23  ballot tracker?

24    A.   Yes.

25    Q.   What were the complaints that you received



1  about the ballot tracker?

2      A.   It was difficult to navigate.  It didn't

3  actually -- it wasn't allowed to change the voter's

4  information.  They could only attest to what was

5  displayed on the screen.

6      Q.   Did you have voters that called you who were

7  never able to successfully use the ballot tracker?

8      A.   Yes.

9      Q.   Were the voters who you communicated with

10  about SB 1 frustrated?

11      A.   Yes.

12      Q.   Do you have any concerns about the impact of

13  SB 1 on the upcoming November 2022 midterm election?

14              MS. HUNKER:  Objection.  Form.

15              MR. POPE:  Objection.  Form.

16      A.   My only concern is that it will have a new

17  round or new voters that vote by mail that try to vote

18  by mail.

19      Q.   Is it fair to say that more people typically

20  vote in midterm elections than in March primaries?

21      A.   Yes.

22      Q.   And so there will be people who are voting

23  by mail for the first time in the November 2022

24  election; is that right?

25      A.   Yes.



1      Q.    Are you aware of any incidents of voter

2   fraud associated with in-person assistance at the

3   polling place?

4      A.    I'm not aware.

5      Q.    Are you aware of any incidents of voter

6   fraud in Travis County associated with mail-in

7   ballots?

8      A.    I'm not aware.

9      Q.    Are you aware of whether Texas has other

10   laws that existed prior to SB 1 that criminalizes

11   unlawful voter assistance?

12      A.    I believe so.

13      Q.    You testified at the beginning of the

14   deposition that you currently have 27 staff members;

15   is that correct?

16      A.    Yes.

17      Q.    And that number began -- the 27 number began

18   in March of 2022; is that correct?

19      A.    Yes.

20      Q.    How many staff members did you have before

21   March of 2022?

22      A.    We had 23.

23      Q.    Was SB 1 responsible for the addition of the

24   four new staff members?

25      A.    No.



BRIDGETTE ESCOBEDO                                    May 11, 2022
LA UNIÓN DEL PUEBLO ENTERO V. TEXAS                         49

1      Q.   What was the reason why Travis County hired

2  four new staff members?

3      A.   We created an ADA Division.

4      Q.   And am I correct that your colleague, Daniel

5  Hayes, will be testifying about the ADA Provision?

6      A.   Yes.

7             MS. SIFUENTES DAVIS:   I'm going to pass

8  the witness to Mr. White.

9             MR. WHITE:   Can we go off the record

10  for a minute?

11            THE COURT REPORTER:   Off the record.

12  The time is 11:21 a.m.

13            (Off the record)

14            THE COURT REPORTER:   On the record.

15  The time is 11:23 a.m.

16                 EXAMINATION

17  BY MR. WHITE:

18      Q.   Ms. Escobedo, how are you?

19      A.   I'm well.

20      Q.   Are you aware that you're still under oath?

21      A.   Yes.

22      Q.   So I wanted to ask a few questions about

23  SB 1's provisions related to poll watchers.

24      A.   Okay.

25      Q.   Are you prepared to testify about that

1          How did you answer those questions?

2     A.   We just told them that according to this

3 Code that they were allowed to sit or stand near

4 enough to see or hear, and so they had to just use

5 their best judgment with that.

6     Q.   So would you agree with me that this

7 provision prevents election workers from denying a

8 poll watcher free movement at a polling place?

9               MR. POPE:  Objection.  Form.

10              MS. HUNKER:  Objection.  Form.

11    Q.   Do you want me to repeat the question?

12    A.   Yes.

13    Q.   Would you agree that this provision prevents

14 election workers from denying a poll watcher free

15 movement at a polling site?

16    A.   Yes.

17              MS. HUNKER:  Same objection.

18    Q.   And what is your understanding of what it

19 means to deny a poll watcher free movement at a

20 polling site?

21    A.   To not allow them to go into a specific

22 location or be at a specific process.

23    Q.   Did the Secretary of State's Office provide

24 any guidance on what it means to deny a poll watcher

25 free movement at a polling place?



1      A.    Not specific items, but they did say that
2   there was a poll watcher -- a new -- SB 1 required a
3   new training for the poll watchers to -- to take.
4      Q.    When you say "they," you're referring to the
5   Secretary of State's Office?
6      A.    Yes.
7      Q.    And who in the Secretary of State's Office
8   told you that?
9      A.    The staff attorneys.
10     Q.    And you also just mentioned that -- the
11  training program for poll watchers.  Are you familiar
12  with that training program?
13     A.    Yes.
14     Q.    Have you completed it yourself?
15     A.    Yes.
16     Q.    Is there an assessment at the end of the
17  training program that ascertains whether the poll
18  watcher has understood the material in the program?
19     A.    I don't remember.
20     Q.    Okay.  Would the existence of some sort of
21  assessment at the conclusion of the training program,
22  in your opinion, affect how effective the program is?
23           MR. POPE:  Objection.  Form.
24     A.    Based on feedback that I heard, it's --
25  it's -- it's not very effective.



1      Q.    And what sort of feedback have you heard?

2      A.    That it is nothing more than reading the

3  poll watcher guide.

4      Q.    And where did you hear this from?

5      A.    Various sources.  The -- one of the party

6  members.  A member of a particular party that we

7  contract with.

8      Q.    Who was that member?

9      A.    The executive director of the Republican

10  Party (inaudible).

11            THE COURT REPORTER:  I'm sorry.  Can

12  you repeat your answer?

13      A.    The executive director of the Republican

14  Party in Travis County.

15      Q.    So the executive director of the Republican

16  Party complained to you about the training program?

17      A.    Well, he didn't complain.  He just made a

18  statement saying that it's not -- the training was not

19  very helpful.  There was still a lot of questions of

20  what, you know, could and couldn't be done in a

21  polling location.

22      Q.    Understood.  And what were the circumstances

23  under which he made this or she made this statement to

24  you?

25      A.    We were trying to make sure that all of the



1  parties understood that we were all on the same page;

2  that we understood what poll watchers could and

3  couldn't do.

4      Q.   Was this during some sort of call that your

5  office had with --

6      A.   Right.  Leading up to the primary election,

7  we regularly communicate with both parties.

8      Q.   And so just to be clear, this is the call

9  that you had with the election -- with the executive

10  director of the Republican Party?

11      A.   Yes.

12      Q.   And who else was on the call?

13      A.   Just him and I.

14      Q.   Okay.  Did you receive any other complaints

15  about the poll watcher training program?

16      A.   No.

17      Q.   And after you heard this critique of the

18  program from the executive director of the Republican

19  Party, did you do -- did you take any follow-up steps?

20      A.   No.

21      Q.   Okay.  And if you wouldn't mind now turning

22  to page 29 and take a look at Section 4.09.

23      A.   Okay.

24      Q.   Are you familiar with this provision of

25  SB 1?



BRIDGETTE ESCOBEDO
LA UNIÓN DEL PUEBLO ENTERO V. TEXAS

May 11, 2022
66

1       A.    Yes.

2       Q.    And what does this provision do?

3       A.    It says that you commit an offense if you

4   knowingly obstruct a poll watcher from viewing

5   something.

6       Q.    And what sorts of actions can obstruct the

7   view of a poll watcher?

8       A.    If you don't allow them to see someone

9   check -- being checked-in on a poll book or they ask

10  to view a record.

11      Q.    Did you receive any guidance from the

12  Secretary of State's Office about the types of actions

13  that can obstruct a poll watcher?

14      A.    Not that I can recall.

15      Q.    So would you agree with me that this

16  provision makes it a criminal offense if a person

17  obstructs the poll watcher?

18      A.    Yes.

19      Q.    And did you receive any concerns from

20  election workers about this provision?

21      A.    Yes.

22      Q.    And what were those concerns?

23      A.    So they -- the workers would have -- at the

24  end of a training session, they would tell our

25  trainers that it was a concern for them that they



1  didn't want to be committed of an offense, and so they

2  had concerns about working in the future.  So, yeah,

3  this one was -- was really -- caused a lot of concern

4  for them.

5       Q.   Do you know if there are any election

6  workers who decided not to work in the future because

7  of this provision?

8       A.   Yes.  There are several.

9       Q.   There are several?  Do you know how many?

10      A.   I don't know exactly how many.

11      Q.   More than 5?

12      A.   Yes.

13      Q.   More than 10?

14      A.   Yes.  I'd say probably between 25 to 50.

15      Q.   So 25 to 50 election workers who chose not

16  to work in the future because out of concerns of

17  SB 1's provisions relating to poll watchers?

18      A.   Yes.

19      Q.   Okay.  And are these individuals who had

20  served as election workers during previous election

21  cycles?

22      A.   Yes.

23      Q.   Did this lead to any staff shortages during

24  the March 2022 primary?

25      A.   Yes.



1  Q.   And how significant of staff shortages did

2  Travis County experience?

3  A.   Initially, it was -- it was quite

4  significant; so yes.

5  Q.   What impact did that have on your ability to

6  administer the March primary election?

7  A.   Well, we, Travis County, were able to get

8  all of our polling locations fully staffed.  But in

9  the very beginning, we start recruiting quite early

10  for the primary election like in November and

11  December, and that was initially when SB 1 went into

12  effect.  And so there was so many unknowns, and a lot

13  of the election workers had just heard on the news or

14  via social media that they can be committed of an

15  offense.  And so when we were initially around that

16  same time calling them asking them, you know, if they

17  were interested in working the primary election, they

18  related to us they were not interested.

19  Q.   And so you were ultimately able to have all

20  your polling sites fully staffed?

21  A.   Right.

22  Q.   And tell me a little bit about the process

23  of replacing these election workers.

24  A.   So we just -- we did several different

25  things:  We did a press release.  We really relied on



1   our parties and just community organizations to help

2   us recruit these people to work.

3        Q.   Did these recruitment efforts detract from

4   other responsibilities in your office?

5        A.   Sometimes.

6             MS. HUNKER:   Objection.   Form.

7        Q.   How so?

8        A.   So we had to reallocate our resources to --

9   to make phone calls and really secure these people; so

10  we had to borrow from other people in our division.

11       Q.   You had to -- just to make sure I'm

12  understanding the answer, you had to borrow

13  individuals who --

14       A.   Right.   So we have -- in Travis County we

15  have a call center that the voters or the general

16  public can call into and we provide information, but

17  we needed to utilize half of our call center to help

18  our personnel department to make outbound calls to

19  different, you know, groups to, you know, help secure

20  election workers.

21       Q.   I see.   So did the fact that folks in this

22  call center had to engage in recruitment, did that

23  affect your office's ability to receive phone calls

24  from voters?

25       A.   Right.   Half of the call center was not



1  available to the general public.

2      Q.   Okay.  Did you receive any complaints from

3  voters about not being able to get in touch with your

4  office during this time?

5      A.   It increased the wait time.

6      Q.   Increased --

7      A.   They -- right.  They were able to get

8  through, but they had to hold for a little bit.

9      Q.   How significant of an increased wait time

10  was it?

11      A.   I don't know specifically.

12      Q.   So I do want to ask more about Travis

13  County's experience with poll watchers.  Before I do

14  that -- so we had just spent the last few minutes

15  talking about the different provisions of SB 1

16  relating to poll watchers.  Did you have any

17  communications -- did you or your office have any

18  communications with members of the Texas Legislature

19  about these provisions prior to SB 1 being enacted?

20      A.   No.

21      Q.   And have you had any communications with the

22  Secretary of State's Office about any of the

23  provisions relating to poll watchers that we have

24  discussed?

25      A.   So if we had a question specifically about



 1  any of the provisions, we would have called the legal

 2  line, but I can't recall a specific instance where we

 3  needed guidance.

 4      Q.   And apologies for jumping around.  A moment

 5  ago you had mentioned shortages of poll watchers and

 6  your efforts to recruit replacements.  Are you

 7  concerned about staffing shortages in future

 8  elections?

 9      A.   Not poll watchers.

10      Q.   Oh, I'm sorry.

11      A.   Poll workers?

12      Q.   Poll workers.

13      A.   Yes.

14      Q.   Excuse me.  Yes?

15      A.   Yes.

16      Q.   "Yes" you are concerned about shortages in

17  future elections?

18      A.   Yes.

19      Q.   Okay.  Did your office record the number of

20  poll watchers who report for service in a given

21  election?

22      A.   Yes.

23      Q.   How does your office record that

24  information?

25      A.   There's two different avenues for recording



1  that.  So we have our polling locations return the

2  certificate of appointment for the polling locations

3  back to our office, and our Central Counting or

4  presiding judge keeps track of the number and there's

5  a sign-in sheet that we keep track of.

6      Q.   Okay.  Do you know how many poll watchers

7  reported for service during the March 2022 primary

8  election?

9      A.   Not off the top of my head, but it was

10 probably between 5 and 10, maybe more.

11     Q.   5 and 10 total?

12     A.   Total.  In Central -- I'm sorry, let me

13 clarify.  In our Central Counting Station where we

14 count the ballots, it was probably between 5 and 10.

15     Q.   And were there poll watchers at other

16 polling sites?

17     A.   Yes.  There was -- in the primary election

18 of 2022, there were several.  And I -- I would say

19 probably throughout the early voting period and

20 Election Day probably 20 to 25 total.

21     Q.   So several on Election Day?

22     A.   Yes.

23     Q.   And can you be more specific when you say

24 "several"?

25     A.   I don't have a number.



# Attachment 4

# Elaine Jones
# April 25, 2023 Deposition
# Excerpts

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                      SAN ANTONIO DIVISION

 3

 4
    LA UNION DEL PUEBLO ENTERO,    )
 5  et al.,                        )
                 Plaintiffs,       )    Case No.
 6                                 )    5:21-CV-844-XR
    vs.                            )
 7                                 )
    GREGORY W. ABBOTT, et al.,     )
 8          Defendants,           )
 9  _____

10  OCA-GREATER HOUSTON, et al.,  )
            Plaintiffs,           )    Case No.
11                                )    1:21-CV-780-XR
    vs.                           )
12                                )
    JANE NELSON, et al.,          )
13          Defendants.           )

14  _____

15
    HOUSTON AREA URBAN LEAGUE, et )
16  al.,                          )    Case No.
            Plaintiffs,           )    5:21-CV-848-XR
17                                )
    vs.                           )
18                                )
    GREGORY WAYNE ABBOTT, et al., )
19          Defendants.

20  _____

21
    LULAC TEXAS, et al.,          )
22          Plaintiffs,           )    Case No.
                                  )    1:21-CV-0786-XR
23  vs.                           )
                                  )
24  JANE NELSON, et al.,          )
            Defendants.           )
25
```



1  _____

2

MI FAMILIA VOTA, et al.,          )
3           Plaintiffs,            )   Case No.
                                   )   5:21-CV-0920-XR
4  vs.                             )
                                   )
5  GREG ABBOTT, et al.,            )
            Defendants.            )
6

7  _____

8

UNITED STATES OF AMERICA,         )
9           Plaintiff,             )   Case No.
                                   )   5:21-CV-1085-XR
10 vs.                             )
                                   )
11 THE STATE OF TEXAS, et al.,     )
            Defendants.            )
12

13

14 _____

15              ORAL/VIDEOTAPED DEPOSITION OF

16                     ELAINE JONES

17                    APRIL 25, 2023

18 _____

19

20          ORAL/VIDEOTAPED DEPOSITION OF ELAINE JONES,
   produced as a witness at the instance of the
21 Defendants, and duly sworn, was taken in the
   above-styled and numbered cause on April 25, 2023, from
22 10:02 a.m. to 12:24 p.m., Nilda Codina, Notary in and
   for the State of Texas, recorded by machine shorthand,
23 remotely from Portland, Texas, County of Nueces & San
   Patricio, pursuant to the Federal Rules of Civil
24 Procedure, the current Emergency Order regarding the
   COVID-19 State of Disaster, and the provisions stated
25 on the record or attached hereto.



1     Q.   And was that Marcos?

2     A.   Yes.

3     Q.   And again, without revealing what you

4  discussed, how long did you meet with Marcos?

5     A.   I had about a one-hour Zoom meeting with him,

6  and -- or I had two, two meetings with him, for about

7  one hour on Zoom.  And we spoke on the phone for

8  probably an hour, several weeks ago.

9     Q.   So about two hours in total preparation,

10  you'd say?

11     A.   Two to three, yes.

12     Q.   Okay.  And do you have prepared notes with

13  you today, that you intend to consult during the

14  deposition?

15     A.   No.  I'll even take off my reading glasses,

16  if that helps.

17     Q.   No.  You can keep them on.  It's a good look.

18          Ms. Jones, have you ever been deposed before?

19     A.   I have been a -- I have been a witness in

20  a -- in a trial, but I have not been deposed.

21     Q.   Okay.  And if you were a witness at trial,

22  was it just that one time you testified in court?

23     A.   Yes.  Well, there's been two times that I --

24  I guess one time it was a deposition, and one time I

25  was actually in a courtroom.



Elaine Jones                                        April 25, 2023
                                                        Page 10

```
 1        Q.    Would you mind telling me, what was the
 2   subject of that deposition?
 3        A.    The deposition was -- was in a minor traffic
 4   accident, and the lawyer was suing my insurance
 5   company.  So we went through, sat around a table, and I
 6   was asked questions and answered them.
 7        Q.    And the trial, was that also the same?
 8        A.    Yeah.  The trial was in an actual courtroom,
 9   and I was asked questions from both attorneys.
10        Q.    And besides that, have you ever been involved
11   in a lawsuit?
12        A.    No.
13        Q.    Ms. Jones, where did you go to school?
14        A.    I assume you mean college?
15        Q.    Yes, ma'am.
16        A.    Texas A & I in Kingsville, back before it was
17   renamed.
18        Q.    And did you go to graduate school?
19        A.    No.
20        Q.    Do you have --
21        A.    I have attended post-college courses, but
22   never far enough to get a degree.
23        Q.    Were those graduate courses or some sort of
24   specialty training?
25        A.    It was to a get a teacher certification in
```



1  computer science and computer programming, so I became

2  certified after that.

3       Q.   Ms. Jones, are you married?

4       A.   No, sir.  Widow.

5       Q.   Sorry to hear that.

6            When did your --

7       A.   Thank you.

8       Q.   -- spouse pass?

9       A.   Pardon?

10      Q.   What year did your spouse pass?

11      A.   2014.

12      Q.   And do you live alone?

13      A.   Yes.

14      Q.   Have you ever run for public office?

15      A.   Does precinct chair count as a public office?

16 I did run for precinct chair.

17      Q.   How did that go for you?

18      A.   I lost.

19      Q.   Sorry to hear that.

20      A.   Not sure I am.

21      Q.   Have you ever participated in a campaign for

22 public office, either as a volunteer or a paid

23 employee?

24      A.   Yes.

25      Q.   A few or many, would you say?



Elaine Jones                                           April 25, 2023
                                                           Page 12

1        A.   If you're including walking around, carrying

2   signs at voting places and stuff like that, I would say

3   many.  And as far as working in an office for a

4   candidate, two or three times.

5        Q.   Do you recall which candidates those were

6   for, the two or three times?

7        A.   Margaret Canales for County Commissioner in

8   2018, which she won, and again in 2022, which she lost.

9   And there have been some city councils, which I

10  participated in with phone calls and so on.

11       Q.   Okay.

12       A.   Yeah.

13       Q.   And you're a member of AFT, that's the

14  American Federation of Teachers, correct?

15       A.   I am.  I am.

16       Q.   And you're also a member of TARA, that's

17  Texas Alliance for Retired Americans, correct?

18       A.   Yes, yes.

19       Q.   What do you understand this case to be about?

20       A.   I understand this case to be about vote by

21  mail being, in my opinion, more difficult than it needs

22  to be, to be successful.

23       Q.   And you understand that AFT and TARA are

24  plaintiffs in this case?

25       A.   Yes.



Elaine Jones                                                    April 25, 2023
                                                                   Page 13

```
 1        Q.    And that they disclosed you as a potential
 2   witness?
 3        A.    Central sounds scary, but yes, a witness.
 4        Q.    Do you know why they did that?
 5        A.    I guess because I had had a typical story.
 6        Q.    Okay.  We'll get to that.  I would like to
 7   introduce my first exhibit, Exhibit A. I will upload
 8   this into the chat, so bear with me.
 9                    (Exhibit No. A marked.)
10        Q.    (BY MR. BERG) Ms. Jones, are you able to open
11   the document, that I just uploaded into the chat?
12              It says, "LULAC plaintiffs."
13        A.    -- it says Seventh Supplemental disclosures?
14        Q.    Yes, "LULAC Plaintiffs' Seventh Supplemental
15   Rule 26 Initial Disclosures."
16              Is that what you're seeing on the screen?
17        A.    Yes.  Do you want me to open it?
18        Q.    If you scroll to page 2, No. 2 --
19        A.    Plaintiffs.
20        Q.    -- it says, "Ms. Elaine Jones" --
21        A.    I, don't see the -- say something, it comes
22   up in the lower, left-hand corner, and I don't see it
23   in the lower, left-hand corner.  Let me try this again.
24   I got a green check mark.  Ah, there it is.  Okay.  You
25   wanted me to scroll where?
```



Elaine Jones                                                      April 25, 2023
                                                                      Page 14

```
 1        Q.    Page 2, Ms. Jones.

 2        A.    Page 2. Okay.

 3        Q.    The bottom No. 2, it says, "Ms. Elaine

 4   Jones."

 5        A.    Yes.

 6        Q.    Do you see it?

 7              It says, "Ms. Jones is a member of AFT and

 8   TARA and will likely have discoverable information

 9   regarding the injury she suffered, because of SB1."

10              Did I read that correctly?

11        A.    Yes.

12        Q.    And if I use the term "SB1," I am referring

13   to that Senate Bill --

14        A.    Senate Bill 1.

15        Q.    -- the one at issue in this lawsuit.  Does

16   that make sense?

17        A.    Yes.

18        Q.    And if I use the phrase "AFT" or "they AFT,"

19   I'm referring to the American Federation of Teachers.

20   Does that make sense?

21        A.    Yes.

22        Q.    And if I use the phrase "TARA," I'll be

23   referring, obviously, to the Texas Alliance for Retired

24   Americans.  Does that make sense?

25        A.    Yes, sir.
```



1  told us that -- that they were voting for it, because

2  they believed it was the right thing, but I haven't had

3  any discussions or heard any discussions from

4  dissenting votes.  So...

5                    (Reporter clarification.)

6       Q.   (BY MR. BERG) Do you think any member of the

7  legislature who voted for SB1 was attempting to make

8  voting less accessible to seniors?

9       A.   That's a conclusion.  I believe that

10  sometimes they, more or less, have to vote for the

11  whole bill.  They don't have a choice to be choosy.

12  And if they -- if their leaders want the whole bill

13  passed, they vote for it, but that's a conclusion on my

14  part, with some rumors.

15      Q.   You think any individual legislators voted

16  for SB1 specifically to make voting less accessible to

17  seniors?

18      A.   I do not absolutely know.  Oh, go ahead.

19                    MR. MOCINE-MCQUEEN:  Again, just one

20  to two for this line of questioning.  Repeat my

21  objection that -- that this calls for speculation, and

22  I'll just let this stand, if that's okay with you,

23  Counsel, until the end of this line of questions.

24                    MR. BERG:  Of course.

25      A.   I -- I said I didn't have any direct



Elaine Jones                                                    April 25, 2023
                                                                    Page 36

```
 1   knowledge.  So...

 2            Are you anticipating me saying something

 3   else?

 4        Q.   (BY MR. BERG) Um, not specifically.

 5        A.   Okay.

 6                 (Laughter.)

 7        Q.   (BY MR. BERG) In the disclosure, which I

 8   admitted as Exhibit A, it mentions that you had

 9   suffered injuries, because of SB1.

10            Could you be more specific about what

11   injuries you've suffered, because of SB1?

12        A.   Yeah --

13                 MR. MOCINE-MCQUEEN:  Again, just

14   objecting that the question of injury is a legal

15   conclusion, and the witness is not testifying as an

16   attorney or as a -- an expert witness.

17        A.   See, I don't know --

18        Q.   (BY MR. BERG) You can answer, if you're able.

19        A.   Well, I don't know your definition as an

20   injury.  It did shake my confidence in how easy it was

21   to -- to make a mistake, even for a knowledgeable

22   person.  I don't know if that's an injury, but I think

23   it's something that needs to be repaired.

24        Q.   So generally, SB1 made you less confident in

25   the political process; is that a fair statement of your
```



1    position?

2         A.    Yes, better than I could have said it.

3         Q.    And you're, currently, registered to vote; is

4    that correct?

5         A.    Yes, sir.

6         Q.    And that is in Portland, Texas?

7         A.    Yes.

8         Q.    Is that correct?

9         A.    Yes.

10        Q.    And what other counties have you voted in, in

11   Texas, that you --

12        A.    Nueces --

13        Q.    -- can recall?

14        A.    -- County, 40 years ago.

15        Q.    Is that it?

16        A.    Yes.

17        Q.    Have you ever voted in a -- in another state?

18        A.    No.

19        Q.    So all of your votes have either been in

20   Nueces or San Patricio County; is that correct?

21        A.    Yes.

22        Q.    Do you have a driver's license?

23        A.    I do.

24        Q.    Do you own a car?

25        A.    I do.



Elaine Jones                                                    April 25, 2023
                                                                    Page 38

```
 1         Q.   Do you drive that car?

 2         A.   I do.

 3                        (Laughter.)

 4         Q.   (BY MR. BERG) Any issues driving your car?

 5         A.   No.

 6         Q.   Um --

 7         A.   Just gasoline.

 8         Q.   And I think you said that you generally --

 9    correct me if I'm wrong.  I believe you said you,

10    generally, vote absentee; is that correct?

11         A.   Yes.

12         Q.   Did -- did that start when you became

13    eligible on your 65th birthday?

14         A.   No.  When I was 65, my husband was still

15    alive, so we continued our usual method of going to

16    vote together, standing in line together.  And so I did

17    not vote by mail at those times.

18         Q.   So you started voting absentee sometime after

19    your husband passed?

20         A.   Yes, he passed away in -- in 2014.  I do not

21    remember how I voted in 2015, but 2016, you must

22    remember was a memorable year in elections, and I do

23    definitely remember voting by mail in 2016, but 2015,

24    don't know.

25         Q.   Since 2016, have you voted exclusively by
```



1    absentee --

2         A.    Yes.

3         Q.    -- or in person?   Okay.

4               Let me clarify that question for you.

5         A.    I was going to say I interrupted you with an

6    or question, and I said yes.   So, yeah.   Yes, I have

7    voted exclusively by mail since 2015.

8         Q.    Thank you for restating my question for me.

9                     (Laughter.)

10        Q.    (BY MR. BERG) We've talked about the 2022

11   elections, if that's all right.

12        A.    Right.

13        Q.    Did you vote absentee for the March 1st, 2022

14   primary?

15        A.    Yes.

16        Q.    And did you vote absentee for the May 7

17   Constitutional Amendment Election?

18        A.    Yes.

19        Q.    Did you also vote absentee for the May 24th

20   Primary Run-off Election?

21        A.    Yes.

22        Q.    And did you vote absentee for the November

23   8th General Election?

24        A.    Yes.

25        Q.    Sorry, have you voted in 2023?



Elaine Jones
April 25, 2023
Page 40

1        A.    Yes.

2        Q.    And is that for the May 6th uniform election?

3        A.    Yes.  City Council and School Board and Bond

4   Election.

5        Q.    Got it.  When you were voting in the 2022 --

6   before elections in 2022 and the one election in 2023,

7   did you have any issues voting absentee?

8        A.    I had a -- an issue with the application

9   procedure, and I had an issue in the primary.

10       Q.    So you had -- did you apply to vote absentee

11   for the whole year?

12       A.    Yes, I did.

13       Q.    And you had trouble doing that?  Is that your

14   testimony?

15       A.    Yes, it is.  I don't know how de- -- oh, go

16   ahead.  I'll shut up.

17       Q.    Can you tell me about your issues registering

18   to vote by mail for 2022?

19       A.    Okay.  Okay.  The application, okay.  I

20   filled out the application.  I don't know how familiar

21   you are with the physical form of the application, but

22   most of what you fill out is in the top half of the

23   form.  And then there's the bottom half of the form,

24   which is involved only if you have somebody who is

25   assisting you.



Elaine Jones

April 25, 2023
Page 41

```
 1              And then down at the very bottom of the form,
 2   you have your signature.  Well, what I had heard --
 3   yes, I know this is hearsay, but what I had heard
 4   predominantly was people were sending in their ballots
 5   without a signature.  So I was filling out my top half
 6   of my ballot.  And I went, "Oh, I don't want to forget
 7   my signature."  So I jumped down, and I did the
 8   signature.  And I folded up the form and sent it out,
 9   and I didn't do the last thing I needed to do, which
10   was to make the little check box to say I was 65 or
11   older is why I qualified for a VM -- VBM.  So I sent
12   that off without the check box being checked, simply
13   because I was nervous that I would forget to sign it.
14   And I want you to know that I never had a problem
15   before, and this is why it shakes me that if -- even if
16   I can have a problem, you know, that simple, this
17   concerns me.  Like, that signature should be up where
18   you're signing everything, you know.  Anyway, so I sent
19   that off.  And do you want to follow -- you want to
20   quiz me through it, rather than me just blab it out?
21        Q.   Sure.  Let -- let me -- let me show off a
22   little.
23        A.   Okay.  You don't get that often.
24        Q.   So you -- your testimony is that you filled
25   out the ABBM correctly, other than the -- checking the
```



Elaine Jones

April 25, 2023
Page 42

```
 1   box that you were 65 or older --

 2        A.   Right.

 3        Q.   -- because your were nervous about the

 4   signature requirement --

 5        A.   Right.

 6        Q.   -- is that correct?

 7        A.   Correct.

 8        Q.   When did you realize that you had not

 9   submitted your ABBM correctly?

10        A.   I received -- and I do not remember if it was

11   a text or a phone call.  It was not an e-mail, but it

12   was a text or a phone call I received and said that it

13   was incomplete.

14        Q.   And was that from the county?

15        A.   Yes.

16        Q.   Do you recall any of the substance of what

17   the message said?

18        A.   No --

19        Q.   Do you remember what it said.

20        A.   It was very polite.  It was very polite, and

21   it was very clear and that -- what I had missed doing.

22   So I had a form to fill in, and I filled it in, filled

23   it in and completed the ballot.  And I drove it to

24   Sinton, which is -- I told you is 30 miles one way.

25   And I worked 20 miles the other, and because I was so
```



1   shook up that I forgot something so simple, that I

2   wanted to give it to them and have them proofread it,

3   you know.  I felt like a student and a teacher.  I

4   wanted them to proofread it and make sure that it was

5   done right, because it is -- I doubt that it's ever

6   happened to you, but it is so embarrassing to tell

7   people how to do things and then you make the same

8   mistake.  Anyway, so I wanted that confidence, so I

9   drove there and then handed it to them and they okayed

10  it.

11       Q.   So to summarize, you first found out that you

12  had missed the 65-or-over box, when someone from San

13  Patricio County contacted you and said you had done so;

14  is that correct?

15       A.   Right.  Very nice group of people by the way.

16  Put in a little promo for them.

17       Q.   I will keep that in mind.  Thank you.

18            And then you drove to the -- did you drive to

19  the Election Administrator's Office, or where did you

20  go?

21       A.   There is an election's office that's across

22  the back street of the courthouse.  And --

23       Q.   Okay.

24       A.   -- they have their own little office.  And

25  you go in there, and you hand it through the glass



Elaine Jones

April 25, 2023
Page 44

1   window and so they approved it, so I drove back through

2   Portland, back to work.

3        Q.    Got it.

4        A.    So I did -- I did lose a little income that

5   day.

6        Q.    And I believe you also mentioned you had some

7   trouble in the primary.  Can you tell me about that?

8        A.    Yeah.  I mean, when a bad thing starts, it

9   just continues.  I -- then when I got the -- the

10  ballot, I filled it out.  And I, again, thought I was

11  being so careful.  I should have had my user releases

12  sitting in front of myself, but I thought I was being

13  so good.  And I folded it up and sent it off, very

14  happy.

15                  MR. BERG:  Marcos, did you have

16  something to say?

17                  MR. MOCINE-MCQUEEN:  Sorry, I was just

18  going to say we've been on the record for about an

19  hour.  I don't know how long this line of questioning

20  is going to take, but I just wanted to request that we

21  take a break sometime, in the not-too-distant future.

22                  MR. BERG:  Yeah.  Do you want to take

23  a break right now, about 10 minutes?  Is that all

24  right, Ms. Jones?  10 minutes good?

25                  THE REPORTER:  That would be great.



Elaine Jones                                           April 25, 2023
                                                         Page 45

 1                  MR. BERG:  Okay.  Let's go off the
 2   record.
 3                  THE VIDEOGRAPHER:  This ends media
 4   unit 1, in the deposition of Elaine jobs.  The time is
 5   11:02 a.m. We're going off the record.
 6                  (Off the record.)
 7                  THE VIDEOGRAPHER:  This begins media
 8   unit No. 2, in the deposition of Elaine Jones.  The
 9   time is 11:13 a.m. We're back on the record.
10        Q.   (BY MR. BERG) And Ms. Jones, if I could just
11   ask a couple questions to clarify where we were before
12   we took a break, you had testified that you had had
13   some trouble with your ABBM; is that correct?
14        A.   ABM?
15        Q.   Sorry, ABBM.
16        A.   Lawyer talk.
17        Q.   And you had testified that you were worried
18   about signature requirement, and you forgot to check
19   the 65-and-over box; is that correct?
20        A.   Right.  Right.
21        Q.   That you then went into the election office
22   in the courthouse and made sure that was filled out in
23   person; is that correct?
24        A.   Right.
25        Q.   And then at that point, you were confident



Elaine Jones
April 25, 2023
Page 46

 1  that your ABBM was going to be accepted; is that

 2  correct?

 3       A.   Yes, ABBM was accepted.

 4       Q.   And you -- we had just started to get into

 5  the primary election.  You had previously testified

 6  that you had some issue in the primary election; is

 7  that correct?

 8       A.   Yes.

 9       Q.   Could you tell me about problems you

10  experienced during the March 1st primary election,

11  please?

12       A.   Yes.  Speed, maybe nervousness, I filled out

13  the form just fine, but for some reason or other, I did

14  not put the numbers under the flap.  And again, I was

15  totally aware that that had to be done, but for

16  whatever reason, maybe I was in a hurry to get to work,

17  maybe who knows.  I'm not going to flimflam you.  I

18  don't know why I forgot to do that, and I know very

19  well to do it.  I will say in my defense, it's an odd

20  position, but nevertheless, I knew that it was there.

21  And I should have done it, so I sent it off.  You want

22  to resume your questioning?  Okay.

23                 THE REPORTER:  Oh, you're on mute,

24  Mr. Berg.

25       Q.   (BY MR. BERG) So in the March 1st, 2022



1  election, you were nervous, and you forgot to put the

2  ID numbers; is that correct?

3       A.   Yes.

4       Q.   At that point, did the county again contact

5  you, to tell you that your ballot had been rejected?

6       A.   Yes.

7       Q.   And do you remember the substance of the

8  communication from the county?

9       A.   If you mean do I remember if it was a text or

10  a phone call, no, I don't.  I know that they were going

11  to send me a document to complete.  That's what I

12  remember.

13       Q.   In the notice that your ballot had been

14  rejected, include the information that you forgotten to

15  put the ID numbers?

16       A.   Yes.

17       Q.   What was your reaction when you found that

18  you had forgot to put the ID numbers?

19       A.   Oh, that's not a spoken record for the

20  Court's lady.  I pounded myself on the head.

21       Q.   Yeah.  And is the reason you patted yourself

22  on the head --

23       A.   It wasn't a pat.

24       Q.   -- was the voter education you had done for

25  AFT and TARA?



Elaine Jones                                          April 25, 2023
                                                            Page 48

 1              And then --

 2                      THE REPORTER:  I'm sorry.  I didn't

 3  get that answer.

 4                      THE WITNESS:  Yes.  Yes.  Yes.

 5                      THE REPORTER:  Thank you.  Sorry.

 6                      THE WITNESS:  That rest that -- that

 7  rest that we took must have lowered my memory of

 8  everything I was supposed to do, I apologize.

 9       Q.   (BY MR. BERG) Once the county notified you

10  that they were sending you a replacement ballot, what

11  happened next?

12       A.   First of all, it's important to know that I

13  received that on a Thursday or Friday.  I really don't

14  remember which.  I suspect Friday, but it was a

15  Thursday or a Friday.  And it had to be turned in by

16  Monday.  So we're under a very strict time limit here.

17  They offered a URL for a website, where you could go

18  cure your ballot.  This was supposed to be a very big

19  deal, that we could cure the ballot -- ballot online.

20  I went to it.  I filled out the -- everything you had

21  to fill out.  And then there was a button.  I don't

22  remember if the button said "next" or "submit" or what,

23  but I clicked the button.  And I got the message, "Page

24  not found."  So okay, that happens.  So I did it again.

25  I did it two or three times, still got "page not



Elaine Jones

April 25, 2023
Page 49

1   found."  So I did the thing that those of us who have

2   been using computers for a long time, I turned off my

3   computer and just said, "Okay.  Let's let it rest for a

4   little bit."

5           So I finally turned the computer back on,

6   went through the process.  Didn't do any good.  It

7   still said, "Page not found."  I did it several times

8   that evening, because that -- again, because of that

9   deadline being the next Monday, you know, it was

10  important to me.  So I did it several times that

11  evening, it never did work.  So I gave them the benefit

12  of the doubt and said, "Okay.  There's so many of us

13  who are doing this that it's just overloaded."

14          So the next morning, I -- bright and early in

15  the morning, I started it again and it still didn't

16  work, so by that time, I'm not trusting the Internet

17  anymore.  And so I go to the post office to mail it,

18  and the post office says they can't guarantee it would

19  get there by Monday.  So I end up -- and this is why I

20  think it was a Saturday, because if it with was a

21  Friday, I could have still -- and I'm supposing.  I'm

22  just -- I don't have an absolute memory of this, but

23  logic says if it was on a Friday, I could -- could have

24  driven to the courthouse.  Saturday, not so.  And I

25  ended up going to FedEx and spending twelve fifty.  I



Elaine Jones                                          April 25, 2023
                                                          Page 50

```
 1   spent $12.50 to get my vote recorded.
 2        Q.   So the county advised you that you could cure
 3   your ballot online, but that process was unsuccessful
 4   for you?
 5        A.   Right.
 6        Q.   Is that correct?
 7             And I believe you testified that someone from
 8   the county said that the ballot had to be received by
 9   the next Monday; is that correct?
10        A.   It -- that was on part of the document or the
11   documentation.
12        Q.   And was this -- do you recall whether -- what
13   form was the notification?  Whether it was a letter or
14   an e-mail?
15        A.   Well, I was eventually, sent a documentation
16   that I could have filled in and mailed in, but I
17   thought curing would be faster.
18        Q.   The -- specifically for the comment that the
19   ballot needed to be received by the next Monday, do you
20   recall whether that was an e-mail or letter?
21        A.   It was printed with the documentation.
22        Q.   Okay.  So -- okay.  The primary was on March
23   1st, 2022.  Do you know when you submitted your
24   replacement ballot?
25        A.   I do not know a date.  I just know that I
```



 1  FedExed it.  I believe it to be on a Saturday, but it

 2  might have been a Friday.  And I do not know what those

 3  dates were, but they were the deadline that I was

 4  given, the next Monday.  I think from now on I'm going

 5  to Xerox everything, every piece of paper I get.

 6  (Laughter.)  Sorry.

 7        Q.   Oh, sorry.  I didn't mean to cut you off.

 8        A.   I was make -- I was making a smart comment,

 9  so no, retract that comment.

10        Q.   Would it be all right if I summarize your

11  testimony, and then you can tell me whether that's

12  right or whether you'd like to correct --

13        A.   Yeah.

14        Q.   -- what I said?

15        A.   Go right ahead, and I'll let you know.

16        Q.   So you were notified that your ballot, in the

17  March 1, 2022, primary was rejected because of ID

18  numbers.  And that the replacement ballot had to be

19  received by the next Monday.  You attempted to cure the

20  ballot online several times, but were unsuccessful.

21  And then on a date -- day of the week that you think

22  was Saturday, date unknown, you went to FedEx and you

23  paid $12.50 to mail your replacement ballot in time by

24  Monday?

25        A.   Yes.



# Attachment 5

# Isabel Longoria
# April 22, 2022 Deposition
# Excerpts

1          IN THE UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF TEXAS
2                SAN ANTONIO DIVISION

3

4    LA UNIÓN DEL PUEBLO      )
     ENTERO, et al.,          )
5                             )   Case No.
         Plaintiffs,          )   5:21-cv-844-XR
6                             )
     VS.                      )   (Consolidated for
7                             )   space)
     GREGORY W. ABBOTT,       )
8    et al.,                  )
         Defendants.          )
9

10

11

12   _ _ _ _ _ _ _ _ _

13    VIDEO-RECORDED 30(b)(6) DEPOSITION OF ISABEL LONGORIA
              April 22, 2022, 9:33 a.m.
14             Location: Reed Smith LLP
                  Houston, Texas
15         Volume 2 of 2 - Pages 71 - 131
                              _ _ _ _ _ _ _ _ _ _
16

17

18

19

20

21

22
     Stenographic Reporter:
23   DENYCE M. SANDERS, TX CSR, RDR, CRR, CCR (LA)
     dsanderscsr@gmail.com
24
     JOB NO. 6130930
25

Isabel Longoria Vol 2
April 22, 2022                                      77

```
 1              THE VIDEOGRAPHER:  We are now on the

 2         record.  Today's date is April 22, 2022.

 3         The time is 9:38 a.m.  This is the

 4         continuation deposition of Isabel

 5         Longoria.

 6              MR. BROUGHTON:  Pass the witness.

 7               E X A M I N A T I O N

 8   BY MR. THOMPSON:

 9         Q.    Good morning, Ms. Longoria.

10         A.    Good morning, Will.

11         Q.    My name is Will Thompson, you may

12   remember from the other day.  I work for the Office

13   of the Attorney General.  Obviously you've been

14   deposed before.  And we're in the middle of another

15   deposition, so I'm not going to re-go over the, kind

16   of, ground rules for a deposition that you already

17   know.

18         A.    I understand.

19         Q.    Do you kind of remember how this works?

20         A.    Understood.  Yes.

21         Q.    Okay.  And you understand that you're

22   still testifying under oath today?

23         A.    Yes.

24         Q.    And do you understand that you're

25   testifying on behalf of the office of the Harris
```

1  County Elections Administrator rather than in your

2  personal capacity?

3       A.    Yes.

4       Q.    So if I use a second person pronoun like

5  "you," will you understand that I'm referring to the

6  office of the Harris County Elections Administrator?

7       A.    Yes.

8       Q.    I wanted to ask a little about the

9  structure of the office.

10      A.    Sure.

11      Q.    There was some discussion on Wednesday

12 about election workers at polling places and who

13 they report to.  Do you remember that?

14      A.    Yes.

15      Q.    Do election workers at polling places

16 ultimately report to the Harris County Election

17 Administrator's office?

18      A.    Yes.  And that we organize the elections

19 and provide direction, regardless of if those clerks

20 or judges are during the early voter or election day

21 period.

22      Q.    So if, for example, an election worker

23 at a polling place was going to deny a request for

24 an ADA accommodation, but the Harris County Election

25 Administrator's office thought the request for an

Isabel Longoria Vol 2
April 22, 2022                                    79

1   accommodation should be granted, would the office be

2   able to kind of direct the worker to grant the

3   accommodation?

4        A.     No, pending whether or not the

5   individual is an early voting clerk or an election

6   day clerk.  Early voting clerks are essentially

7   direct extensions, right, of the early voting

8   clerk's office, the elections office, whereas

9   election day judges specifically are district judges

10  in their independent capacity.

11              So whether or not we advise them,

12  strongly recommend, I believe technically they are

13  the ones who are in charge of each voting location;

14  and they make ultimate decisions about voting,

15  voting practices, voter services, et cetera, at

16  those locations.

17       Q.     Okay.  So just to make sure I understand

18  properly, as to early voting, the election workers

19  at a polling place are subject to the direction of

20  the Harris County Election Administrator's office;

21  right?

22       A.     Yes.

23       Q.     But that's not true for election workers

24  at a polling place on election day?

25       A.     Correct.

Isabel Longoria Vol 2
April 22, 2022                                                  108

 1  December or January -- and I can't remember in what

 2  conversation this came up in the context with the

 3  Secretary of State's office, so I apologize.  That

 4  the Secretary of State's office mentioned, I believe

 5  it was, two election offices that they had come to

 6  obtain -- by which manner, I do not know -- come to

 7  obtain driver's license numbers and had uploaded

 8  those driver's license numbers into the State's

 9  voter file in an attempt to match up -- where there

10  were not driver's license numbers, to match those up

11  with the voters.

12              I had flagged it in that it had been

13  my understanding up to that point that only a voter

14  could update their voter information with numbers to

15  that.  So it was interesting to election officials

16  to note that the Secretary of State had come into

17  possession of that information and uploaded it to

18  the voter file, perhaps without the knowledge of the

19  voters themselves.

20      Q.    And you thought that that process

21  created some errors; right?

22      A.    Yes.

23      Q.    Did you raise your concerns about

24  potential errors with the Secretary of State's

25  office?

Isabel Longoria Vol 2
April 22, 2022                                          109

1         A.      Yes.

2         Q.      And did the Secretary of State's office

3    attempt to address your concerns?

4         A.      I believe the remedy they provided is

5    that, voter by voter, if those issues came up, the

6    voter should then reach out through various methods

7    at their disposal to update or correct their voter

8    registration file.

9         Q.      And do you know whether that process has

10   taken place at all?

11        A.      It's a bit of a catch-22.  So to update

12   your information with the Secretary of State's

13   online system, which was mandated because of Senate

14   Bill 1 as well -- I'm referring to the online mail

15   ballot tracker that also allows an individual to

16   update or confirm their information for the purposes

17   of curing a mail ballot, for example.

18                 To access the State's version of

19   that, you have to include -- you have to use the

20   last four digits of your social security number and

21   your driver's license number, I believe, as well as

22   your name and maybe your birthday to even access

23   that portal.

24                 That is the portal that the State

25   would direct you to, to fix your driver's license

Isabel Longoria Vol 2
April 22, 2022                                                    110

 1   number.  So, for example, if you know your driver's

 2   license number to be 1234, but the State had, for

 3   whatever reason, perhaps uploaded another number of

 4   someone with a similar name, and that number was

 5   57 -- 5789, you would keep putting in "1234" to log

 6   in to the system, but the system would never let you

 7   log in because the system has you at "5789."  And so

 8   you would never be able to log in to the system to

 9   either confirm or correct whatever the State had for

10   you.  So that was supposed to be the State database

11   mandated by SB1 that people used.

12                    It then created another task, right,

13   so you had other options, which was to come to our

14   office, where you could submit your driver's license

15   number through our database -- or not -- sorry.  Not

16   through our database.  Through a paper form --

17   letter or paper form application, voter reg

18   application, some kind of paper form to our office.

19   I believe that, then, allowed us to correct it on

20   our end.  And I'll have to -- I can't remember the

21   details in this moment.  I'm sure we can find

22   out what, then, was the specific process for the

23   State to decide whether or not the number they had

24   on file or the number provided by our office from

25   the voter was the correct number and how quickly

1   that was corrected.

2       Q.      Okay.  So there's a lot of information

3   there.

4       A.      There's a lot.

5       Q.      I'm going to go back through a little

6   bit of it --

7       A.      Please do.

8       Q.      -- to make sure I understand.

9       A.      Yeah.

10      Q.      So you were concerned that there were

11  potential errors in the database that meant some

12  voters had inaccurate driver's license numbers

13  saved; correct?

14      A.      Yes.

15      Q.      And you raised this concern with the

16  Secretary of State's office; right?

17      A.      Yes.

18      Q.      And one potential option for correcting

19  an error was for a voter to bring a form to one of

20  your offices to correct the driver's license number

21  in your system; correct?

22      A.      Yes.

23      Q.      And though you're not sure about the

24  details or how long it might take, we think for at

25  least some voters that would correct the errors in

# Attachment 6

# Rivelino Lopez
# April 29, 2022 Deposition Excerpts

Transcript of the Testimony of

# The Office of the Dallas County Elections Administrator

## Date:

April 29, 2022

## Case:

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

```
 1                UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO,)(
     ET AL.,                    )(
 4                              )(
         PLAINTIFFS,            )(
 5                              )(    CIVIL ACTION
     VS.                        )(    NO. SA-21-CV-00844-XR
 6                              )(
     GREGORY W. ABBOTT, ET AL., )(
 7                              )(
                                )(
 8       DEFENDANTS.            )(
     ----------------------------------------------------------

 9               VIDEOTAPED AND VIDEOCONFERENCED
10                   ORAL DEPOSITION OF
                 RIVELINO LOPEZ, TACOMA PHILLIPS
11                  AND MICHAEL SCARPELLO
                      APRIL 29, 2022
12

13          VIDEOTAPED AND VIDEOCONFERENCED ORAL DEPOSITION

14   OF RIVELINO LOPEZ, TACOMA PHILLIPS AND MICHAEL

15   SCARPELLO, produced as witnesses at the instance of the

16   Plaintiff LUPE, and duly sworn, was taken in the

17   above-styled and numbered cause on the 29th day of

18   April, 2022, from 10:47 a.m. to 8:02 p.m., before Holly

19   R. Swinford, CSR in and for the State of Texas, reported

20   by machine shorthand, at the Office of the Dallas

21   Elections Administrator, located at the Records

22   Building, 500 Elm Street, 7th Floor, Room 7Y11, in the

23   City of Dallas, County of Dallas, State of Texas,

24   pursuant to Notice, the Federal Rules, and the

25   provisions stated on the record or attached hereto.
```

```
 1                    Would you raise your right hand, please?
 2              (Witness sworn by the court reporter.)
 3                    THE REPORTER:  Thank you.
 4                    And statements -- you can put your hand
 5    down --
 6                    THE WITNESS:  Okay.
 7                    THE REPORTER:  Statements by the court
 8    reporter, according to Rule 30(b) have been waived by
 9    all parties present.
10                    Would Counsel please state any agreements
11    that haven't already been stated on the record, on the
12    record.  Just according to the Federal Rules, correct?
13                    MS. PERALES:  We have no additional
14    agreements to state.
15                    THE REPORTER:  Thank you.
16                    MS. PERALES:  Are you ready, Mr. Lopez?
17                    THE WITNESS:  Oh, yeah.
18                         REVELINO LOPEZ,
19    having being first duly sworn, testified as follows:
20                         EXAMINATION
21    BY MS. PERALES:
22         Q.   Can you please state your name for the record?
23         A.   Rivelino Lopez.
24         Q.   Thank you.  My name is Nina Perales, and I
25    represent some of the Plaintiffs in this case.  I'm with
```

1    Q.   Mr. Lopez, I have handed you what has been --

2  or you -- you have received what has been marked Exhibit

3  1 for this deposition.

4         Do you recognize this document?

5    A.   I think I have seen it.  I haven't gone through

6  it; but I have seen it, yes.

7    Q.   Okay.  Do you understand that you're testifying

8  today in response to this Notice of Deposition?

9    A.   Yes.

10   Q.   Okay.  And if you'll turn with me to Page 9, do

11 you see up at the top it's marked Exhibit A?

12   A.   Yes.

13   Q.   Okay.  And then if you just look through it,

14 there are some definitions and then there are some

15 topics, some numbered topics that begin on Page 12, but

16 I will -- yeah.  They begin on Page 12.

17        Do you see those there?

18   A.   Yes.

19   Q.   Okay.

20            MS. PERALES:  Can we mark this Number 2?

21        (Deposition Exhibit Number 2 marked.)

22      (Document handed to the witness and Counsel.)

23   Q.   And Mr. Lopez, you -- you have been handed what

24 has been marked Deposition Exhibit Number 2, and I'll

25 represent to you that this is a chart that we received

```
 1   (indicating) from your attorneys at Dallas County.

 2        A.   Okay.

 3        Q.   And do you see --

 4        A.   Do I need to hold it up or -- so that --

 5        Q.   No.

 6        A.   -- everybody -- oh.

 7        Q.   It's okay --

 8        A.   Okay.

 9        Q.   -- but it's very kind of you to offer.

10        A.   Okay.

11        Q.   Do you see that your name is listed on here, on

12   the far right column (indicating) next to certain

13   topics?

14        A.   Yes.

15        Q.   Okay.  And are you prepared to speak on those

16   topics that your name is associated with?

17        A.   Yes.

18        Q.   Now, do you understand that because you are

19   designated on certain topics, the answers that you give

20   are on behalf of the Dallas County Elections Department?

21        A.   Yes.

22        Q.   Tell me your current job title.

23        A.   Voter Registration Manager.

24        Q.   Okay.  How long have you held that position?

25        A.   11 years.
```

1      Q.   And what was your job before you became the

2   Voter Registration Manager?

3      A.   I worked with the City of Dallas.

4      Q.   And what were you doing there?

5      A.   I was a supervisor at one of the local rec

6   centers.

7      Q.   And where was that rec center?

8      A.   At Harry Stone Recreation Center.

9      Q.   And what neighborhood is that in?

10      A.   Kind of far East Dallas.

11      Q.   Okay.  And so you went from that position with

12   the City of Dallas to become the Voter Registration

13   Manager --

14      A.   Uh-huh.

15      Q.   -- for Dallas --

16      A.   Yes.

17      Q.   -- County?

18      A.   Yes.

19      Q.   Okay.  Are you from Dallas originally?

20      A.   Born and raised, yes.

21      Q.   Where did you go to high school?

22      A.   I lived in Houston about five years, so I did

23   my whole high school career down in Houston at Clear

24   Creek High School.

25      Q.   Okay.  Clear Creek.

1        A.    And then I came back to Dallas.

2        Q.    Then you came back here?

3        A.    Uh-huh.

4        Q.    Did you do any schooling after high school?

5        A.    Yes.  I went to Mountain View College for a few

6   years and then I transferred over to Dallas Baptist

7   University and that's where I graduated.

8        Q.    Okay.  And you got a bachelor's degree?

9        A.    Yes.

10       Q.    Have you done any schooling after that?

11       A.    No.

12       Q.    So, with respect to your current position as

13  the Voter Registration Manager, what are your duties?

14       A.    I oversee the voter registration area, and we

15  maintain voter lists, add and update voter information,

16  whether they're changing their address, changing their

17  name.  We work with the Secretary of State, uploading

18  files, downloading files, sending voter history over to

19  the Secretary of State, working on mapping, you know,

20  precincts and -- and stuff like that.  So we just --

21  just maintain all the voters, 1.4 million voters in

22  Dallas County.

23       Q.    That's a lot of voters.

24       A.    Oh, yeah.

25       Q.    Earlier I was telling you that the Bexar County

1   Elections Administrator refers to the big counties as

2   "the big boys."  Have you heard that before?

3        A.   Yes.

4        Q.   Yeah.  Dallas County is one of the big boys,

5   isn't it?

6        A.   Oh, yeah.

7        Q.   Yeah.  Are you familiar with the TEAM system?

8        A.   Yes.

9        Q.   Is Dallas County an online county or an offline

10  county?

11       A.   Offline.

12       Q.   Do you know why Dallas County is an offline

13  county?

14       A.   I think the larger counties, it would be too

15  much for the State system to handle.  So I guess about

16  half the state, especially the larger ones, have their

17  own VR database.

18       Q.   Okay.  I'm going to ask these questions just --

19  not because I'm going to go into them deeply with you.

20  I just want to make sure I understand what you know --

21       A.   Okay.

22       Q.   -- about your relationship with the TEAM

23  system.  And like I said, I'm not going to go deep, but

24  I just want to make sure --

25       A.   Okay.

1       Q.   -- I understand.

2            Do you know how many voters in Dallas County

3   you do not have either a driver's license number or the

4   last four of the Social?

5       A.   It's -- I know 99.46 percent do have a driver's

6   license or a Social on record.  So about a half a

7   percent of our -- our registered voters.  I guess it

8   would be close to 70,000.

9       Q.   Do you know how many people only have one

10  number and not both numbers?

11      A.   97.13 percent have at least one.

12      Q.   Have at least one?

13      A.   Uh-huh.

14      Q.   But do you -- can you tell me how many lack

15  both numbers?

16      A.   Probably close to 70,000.

17      Q.   Okay.  Yes.  I asked that question --

18      A.   Yeah.

19      Q.   -- wrong.  Let me try again.

20           How many of your registered voters only have

21  one number and not a second number?

22      A.   That would be -- I want to say -- well, because

23  97 percent of them have either a Texas Driver's License

24  or --

25      Q.   Uh-huh.

```
 1       A.     -- an ID.

 2       Q.     Uh-huh.

 3       A.     So, yeah, I'll have to look at that.  I don't

 4   know that number off the top of my head.

 5       Q.     Okay.  And so what you -- just so you

 6   understand what I'm getting at, if you have a driver's

 7   license number for me --

 8       A.     Uh-huh.

 9       Q.     -- but you don't have my Social --

10       A.     Right.

11       Q.     -- or you have my Social, but you don't have my

12   driver's license.

13              So people for whom you have one number filled

14   in, but you don't have a second number for them, you

15   would have to go back and try to see how many that were?

16       A.     Uh-huh.

17       Q.     Okay.

18       A.     Yes.

19       Q.     Okay.  And now with respect to TEAM, do you

20   have knowledge of whether you received an update from

21   TEAM -- "you," meaning Dallas County -- received an

22   update for TEAM sometime around December or January that

23   was from the Secretary of State that went into your

24   system that had additional ID numbers for your

25   registered voters?
```

# Attachment 7

# Rachelle Obakozuwa
# March 21, 2023 Deposition Excerpts

Rachelle Obakozuwa                                          March 21, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3

    LA UNION DEL PUEBLO        §
 4  ENTERO, et al.,            §
         Plaintiffs,           §
 5                             §
    v.                         §   Case No. 5:21-cv-844-XR
 6                             §
    GREGORY W. ABBOTT, et      §
 7  al.,                       §
         Defendants,           §
 8                             §
    _____  §
 9                             §
    OCA-GREATER HOUSTON, et    §
10  al.,                       §
         Plaintiffs,           §
11                             §
    v.                         §   Case No. 1:21-cv-780-XR
12                             §
    JANE NELSON, et. al.,      §
13       Defendants,           §
                               §
14  _____  §
                               §
15  HOUSTON JUSTICE, et        §
    al.,                       §
16       Plaintiffs,           §
                               §
17  v.                         §   Case No. 5:21-cv-848-XR
                               §
18  GREGORY WAYNE ABBOTT,      §
    et al.,                    §
19       Defendants,           §
                               §
20  _____  §
                               §
21  LULAC Texas, et al.,       §
         Plaintiffs,           §
22                             §
    v.                         §   Case No. 1:21-cv-0786-XR
23                             §
    JANE NELSON, et al.,       §
24       Defendants,           §
                               §
25  _____  §
```



```
1   MI FAMILIA VOTA, et        §
    al.,                       §
2        Plaintiffs,           §
                               §
3   v.                         §    Case No. 5:21-cv-0920-XR
                               §
4   GREG ABBOTT, et al.,       §
         Defendants.           §
5

6

7

8

9               ORAL AND VIDEOTAPED DEPOSITION OF

10                      RACHELLE OBAKOZUWA

11                       MARCH 21, 2023

12

13

14

15       ORAL AND VIDEOTAPED DEPOSITION OF RACHELLE

16   OBAKOZUWA, produced as a witness at the instance of the

17   Defendants and duly sworn, was taken in the above styled

18   and numbered cause on Tuesday, March 21, 2023, from

19   3:51 p.m. to 6:44 p.m., before DONNA QUALLS, Notary

20   Public in and for the State of Texas, reported by

21   computerized stenotype machine, at the offices of Harris

22   County Attorney's Office, 1019 Congress Street, 15th

23   Floor, Houston, Texas, pursuant to the Federal Rules of

24   Civil Procedure, and any provisions stated on the record

25   or attached hereto.
```



 1          Q.  And if you do answer a question, I'm going to

 2     assume that you understood the question; is that fair?

 3          A.  Yes.

 4          Q.  If you need a break at any time, that's fine.

 5     Please just let me know.  My only request is that you

 6     answer any pending question before we take a break.

 7     Okay?

 8          A.  Okay.

 9          Q.  Also, if you hear an objection from your

10     counsel, that is typically for the court to decide at a

11     later date.  I therefor ask that you go ahead and answer

12     the question unless you are instructed not to answer.

13     Okay?

14          A.  Okay.

15          Q.  Now, I'm obliged to ask the following

16     questions:  Have you consumed any alcohol today?

17          A.  No.

18          Q.  Have you consumed any drugs today?

19          A.  No.

20          Q.  Are you aware of anything that would affect

21     your ability to testify truthfully and accurately today?

22          A.  No.

23          Q.  You did not bring any documents with you today,

24     correct?

25          A.  Correct.



Rachelle Obakozuwa                                    March 21, 2023
                                                         Page 10

1        Q.   Now, I'm going to ask that you take out

2   Exhibit 1.  It should be on the pile that you have.

3        A.   Found it.

4        Q.   Excellent.  And if you can turn the page to the

5   title.  It says "State Defendants' Amended Notice of

6   Intent to take Oral and Videotaped Deposition of the

7   Office of the Harris County Elections Administrator,

8   Pursuant to Rule 30(b)(6)."

9             Did I read that correctly?

10       A.   Yes.

11       Q.   Have you seen this document before?

12       A.   Yes.

13       Q.   Do you understand that you are here today

14   pursuant to this notice?

15       A.   Yes.

16       Q.   Do you understand that the office of the Harris

17   County Elections Administrator has designated you to

18   provide testimony on its behalf?

19       A.   Yes.

20       Q.   And do understand that your answers here today

21   are binding on the organization?

22       A.   Yes.

23       Q.   Your counsel has informed me that you are

24   designated on Topics 1, 2, 3, 7, 11, 12, 13, 14, 15, 18,

25   19, 21, 22 in part, and 27.  I recognize that many of



1   these topics are more of a spectrum than discreet

2   categories.  So if at any time my question veers into an

3   area that you think another designee had better

4   expertise or you are unable to answer, please just let

5   me know.

6        A.  Okay.

7        Q.  Are you prepared to testify on this list of

8   topics?

9        A.  Yes.

10       Q.  Did you meet with anybody in preparation for

11  today's deposition?

12       A.  My attorneys.

13       Q.  And how frequently did you meet with your

14  attorneys?  How many times?

15       A.  Four, I believe.

16       Q.  And how long did these meetings last?

17       A.  They varied from 30 minutes to two hours.

18       Q.  Did you speak with anybody else in preparation

19  for the today's deposition outside of your attorneys?

20       A.  The other persons in -- who was being deposed

21  and as well as Clifford Tatum.

22       Q.  And what were the subjects -- subject of your

23  conversations with Mr. Tatum, like the general topics?

24       A.  The topics for examination.

25       Q.  Did you review any documents in preparation for



Rachelle Obakozuwa

March 21, 2023
Page 56

 1  questions at this time, and I'm passing the witness but

 2  reserve redirect.

 3                          EXAMINATION

 4  BY MS. PAIKOWSKY:

 5      Q.  Welcome.  Thank you for testifying this

 6  afternoon.  My name is Dana Paikowsky, and I'm with the

 7  United States.  So I'm going to start out maybe circling

 8  back on some of these questions about voter education

 9  related to the identification provision of Senate

10  Bill 1.

11              Did your office produce an insert to

12  include with the carrier envelope to explain the ID

13  provision during the November 2022 general election?

14      A.  Not a separate one.  We included the one the

15  state provided.  And that is my understanding.  By the

16  way, I'm not -- I don't think I was set to -- to testify

17  on that topic.

18      Q.  Okay.

19      A.  Ballot by mail.

20      Q.  Would you know of who might be able to testify

21  about the development of a ballot insert?

22      A.  The development of it would be our

23  communications person, Nadia.  I have seen a lot of the

24  flyers.  I'm just not aware of a particular one that was

25  put in the ballot by mail.



Rachelle Obakozuwa

March 21, 2023
Page 57

 1      Q.  You described some voter education efforts that
 2  your office engaged in around Senate Bill 1's
 3  identification provision.  Why did you undertake those
 4  efforts?
 5      A.  There were voter questions and confusion about
 6  why their ballots weren't being counted -- or why their
 7  ballots were being rejected.  I apologize.  And -- and
 8  the -- there were changes that SB1 had that we knew
 9  would affect every voter who was voting by mail.
10      Q.  And do you anticipate needing to continue to
11  do -- maintain these efforts in future elections?
12      A.  Yes.
13      Q.  Earlier you testified that SB1 necessitated an
14  increase in temporary and full-time staff.  Why is that?
15      A.  There are a lot of implications for SB1.  With
16  the rejection of mail ballots, there has to be more
17  communication to voters.  So it takes more bodies to
18  create that communication to send items to the voters,
19  and there's a higher rate of transaction.  So it
20  requires more workers.
21          Additionally, SB1 affected some of our
22  staffing for election workers.  And so that was one of
23  the reasons recruitment efforts had to increase.  So we
24  had to have more staff for that.  And there are more
25  procedural-type questions and calls that we get.  So our



1    call center and help line had to increase staff as well.

2        Q.  Were there increased needs in -- for resources

3    dedicated to voter outreach and education related to

4    implementing Senate Bill 1's identification provision?

5        A.  And are we specifically speaking about the

6    period for November or prior to March?

7        Q.  Let's talk about just November for the moment.

8        A.  We increased the quantity of voter outreach

9    persons to go to it -- these community events to

10   communicate about these -- the changes to SB1.  Yes, for

11   both elections.

12       Q.  And do you believe those increased needs are

13   going to continue on in future elections as well?

14       A.  Yes.

15       Q.  Why is that?

16       A.  There's still confusion and there's still --

17   there are still issues with person's ballots, mail

18   ballots being rejected.

19       Q.  Did you ever have any communications with the

20   secretary of state's office about what kind of voter

21   education efforts your county should undertake related

22   to SB1's identification provision?

23       A.  Our communications team reached out to

24   secretary of state's office about how to engage with

25   voters without it appearing as soliciting which would be



1        A.  I can't think of any.  For voter education,

2   it's very broad.  So I don't know that the little we've

3   discussed is the whole realm of that.  But if you're

4   looping all voter education in one, then I cannot think

5   of anything else.

6        Q.  So earlier -- and -- and I know you had spoken

7   to counsel about the range of voter education efforts

8   you had engaged in related to the identification

9   provision which included making videos, doing community

10  meetings.  Is there anything else that I'm missing in

11  terms of buckets of efforts or -- or -- or types of

12  outreach that you engaged in?

13       A.  In the Exhibit 4, there's reference to an

14  organization -- I think it's called KGB that we worked

15  with to do a lot of outreach for us.  And that was --

16  that outreach was very broad.  It touched every type of

17  communication method that we know of.  So that would be

18  the only thing that I would add that there are many

19  things that they did for us to communicate.

20       Q.  Could you provide a list of examples of the

21  kinds of communications that they engaged in?  It

22  doesn't have to be exhaustive but just anything we

23  haven't discussed.

24       A.  I believe I've -- and I believe I've mentioned

25  them all, but I know there was radio, television.



1    Billboards, I think was one that I didn't state.  Social

2    media, different platforms there, other online

3    advertising -- not advertising but other online

4    platforms.  And that's really all that I can recall at

5    this time, but I believe the majority of them are listed

6    in Exhibit 4.

7         Q.  Do you believe that there's anything your

8    office could have done beyond what it did in the 2022

9    general election to bring down rejection rates further?

10             MS. HUNKER:  Objection; form.

11        A.  No.

12        Q.  (BY MS. PAIKOWSKY)  Do you know approximately

13   how much the contract with KGB cost?

14        A.  No.  Our office has those figures.  I just

15   didn't look.

16        Q.  Thanks very much.  So we have a number of

17   questions about the team database.  Is that something

18   you work with at all?

19        A.  No.

20        Q.  Okay.  One last question.  Oh, I'm so sorry.

21   I'm just drowning in papers here.  I want to pull out

22   exhibit -- here we go -- Exhibit 16.

23             Do you have that in front of you?

24        A.  I believe this is it, but it could be a 14.

25        Q.  I think that's right.  So it reads at the top



1    "Harris County Elections Administrator Clifford Tatum's

2    Supplemental Responses to State Defendants' Second Set

3    of Interrogatories."

4         A.  Yes.

5         Q.  And at the top it says Interrogatory No. --

6    No. 4:  "Please identify and describe with specificity

7    Harris County's final rejection rate of timely received

8    ballots by mail, expressed as a percentage of all timely

9    received ballots by mail and rounded to two decimal

10   places, for the following elections."

11                   And then it provides rejection rates from

12   the 2012, 2014, 2016, 2018, 2020, and 2022 elections.

13                   Do you see that?

14        A.  Yes.

15        Q.  Do you -- sorry.  Excuse me.  During these past

16   elections, did your office devote resources to

17   preventing ballot rejections for ballot by mail through

18   voter education and outreach?

19        A.  Yes.

20        Q.  Was it the same or less -- or how was it in

21   comparison -- sorry -- withdrawn.

22                   Were the amount of resources that your

23   office dedicated to voter education in 2022 different

24   than in any of these past elections?

25                   MS. HUNKER:  Objection; form.



1              MS. PAIKOWSKY:  Yeah, let me withdraw that

2     and restate it.  Thank you.

3         Q.  (BY MS. PAIKOWSKY)  During the November 2022

4     election, did the amount of resources that your office

5     devoted to voter education related to preventing ballot

6     rejections differ as compared to these past elections?

7         A.  Yes.

8         Q.  In what way?

9         A.  We did a lot more voter outreach than most of

10    these other elections.  The 2020 election, we did a lot

11    of other outreach but more outreach in 2022,

12    specifically, with ballot by mail.

13        Q.  And what was the kind of outreach that your

14    office done -- did in 2020?

15        A.  It was more -- more broad to engage voters.

16        Q.  But it was not related to preventing ballot

17    rejections?

18        A.  Correct.

19        Q.  So earlier you described your voter education

20    campaign as successful.  Can you describe what that

21    means to you?

22        A.  Yes.  We devoted funds and a lot of effort to

23    attempt to reach voters on every platform that would let

24    us so that voters would be aware of how to cast a

25    ballot, a mail ballot, that would be counted.



1       Q.  So why do you think the rejection rate was

2   higher in November 2022 than in the past elections shown

3   here?

4               MS. HUNKER:  Objection; form.

5       A.  SB1 has brought challenges to mail voting that

6   were not part of any of the other elections --

7   elections.

8               MS. PAIKOWSKY:  I think I am ready to pass

9   the witness.

10                      EXAMINATION

11  BY MS. HOLMES:

12      Q.  Good afternoon.  My name is Jennifer Holmes,

13  and I represent the -- and now I have a microphone.

14              Good afternoon.  My name is Jennifer

15  Holmes, and I represent the HAUL plaintiffs in this

16  case.  Thank you for bearing with us today.

17              You testified earlier that your office had

18  engaged in increased efforts to recruit election

19  workers; is that correct?

20      A.  Yes.

21      Q.  And I believe you also testified that there was

22  some relation between SB1 and difficulty in retaining

23  election workers; is that correct?

24      A.  Yes.

25      Q.  And what is the relationship between SB1 and



 1    the difficulty retaining election workers?

 2        A.   After SB1, we received a lot of phone calls

 3    from election workers that, particularly judges, that

 4    they were concerned at the way that laws were being

 5    written that make it more challenging for them where

 6    they would be concerned that they could do something

 7    wrong.  And so they -- we had a lot more declines,

 8    people declining to work for those reasons.

 9        Q.   Okay.  And specifically for the November 2022

10    election, can you quantify the number of people that

11    declined to work?

12        A.   There were almost 600 people that declined to

13    work, 600 judges that declined to work Election Day in

14    November 2022.

15        Q.   And do you know how many of those election

16    judges, those 600, declined and cited reasons as part of

17    the reason SB1?

18        A.   I couldn't quantify that.

19        Q.   Have any election judges who declined to work

20    or are concerned about working communicated what

21    specifically about SB1 raises concerns?

22        A.   That poll watchers at the voting location can

23    be a challenge to work with and that they don't know

24    when they are doing something that would get them in

25    trouble with a poll watcher.



# Attachment 8

# Alice Penrod
# April 27, 2023 Deposition Excerpts

Page 1

```
              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF TEXAS
                 SAN ANTONIO DIVISION
LA UNIÓN DEL PUEBLO           §
ENTERO, ET AL.,               § CASE NO. 5:21-CV-844-XR
        PLAINTIFFS,           § [LEAD CASE]
                              §
V.                            §
                              §
GREGORY W. ABBOTT, ET AL.,    §
        DEFENDANTS.           §

OCA-GREATER HOUSTON, ET       §
AL.,                          § CASE NO. 1:21-CV-780-XR
        PLAINTIFFS,           §
                              §
V.                            §
                              §
JANE NELSON, ET AL,.          §
        DEFENDANTS.           §
HOUSTON AREA URBAN LEAGUE,    §
ET AL.,                       § CASE NO. 5:21-CV-848-XR
        PLAINTIFFS,           §
                              §
V.                            §
                              §
GREGORY WAYNE ABBOTT, ET      §
AL.,                          §
        DEFENDANTS.           §
LULAC TEXAS, ET AL.,          §
        PLAINTIFFS,           § CASE NO. 1:21-CV-0786-XR
                              §
V.                            §
                              §
JANE NELSON, ET AL.,          §
        DEFENDANTS.           §
                              §

MI FAMILIA VOTA, ET AL.,      §
        PLAINTIFFS,           § CASE NO. 5:21-CV-0920-XR
                              §
V.                            §
                              §
GREG ABBOTT, ET AL.,          §
        DEFENDANTS.           §
```



Page 2

1    UNITED STATES OF AMERICA,      §

          PLAINTIFF,                §  CASE NO. 5:21-CV-1085-XR

2                                   §

     V.                             §

3                                   §

     THE STATE OF TEXAS, ET         §

4    AL.,                           §

          DEFENDANTS                §

5

6

     ************************************************************

7

8              ORAL AND VIDEOTAPED DEPOSITION OF

9

                        ALICE PENROD

10

11                      APRIL 27, 2023

12

     ************************************************************

13

14          ORAL AND VIDEOTAPED DEPOSITION OF ALICE PENROD,

15    PRODUCED AS A WITNESS AT THE INSTANCE OF THE STATE'S

16    DEFENDANTS, WAS TAKEN IN THE ABOVE-STYLED AND -NUMBERED

17    CAUSE ON THE 27TH DAY OF APRIL, 2023, FROM 10:03 A.M. TO

18    12:24 P.M., BEFORE KAREN A. GONZALEZ, COMMISSIONED

19    NOTARY, IN AND FOR THE STATE OF TEXAS, REPORTED REMOTELY

20    BY MACHINE SHORTHAND, REMOTELY FROM DALLAS COUNTY,

21    TEXAS, PURSUANT TO THE TEXAS RULES OF CIVIL PROCEDURE,

22    THE TEXAS SUPREME COURT EMERGENCY ORDER REGARDING THE

23    COVID-19 STATE OF DISASTER AND THE PROVISIONS STATED ON

24    THE RECORD OR ATTACHED HERETO.

25



Page 8

1    Q.  AND HAVE YOU CONSUMED ANY ALCOHOL OR DRUGS TODAY

2  THAT WOULD EFFECT YOUR TESTIMONY?

3    A.  NO.

4    Q.  OKAY.  IN PREPARING FOR THE DEPOSITION TODAY DID

5  YOU REVIEW ANY DOCUMENTS?

6           MR. BARON:  AND I'LL INSTRUCT THE WITNESS TO

7  ANSWER --

8    A.  JUST I LOOKED AT --

9           MR. BARON:  HOLD ON ONE SECOND.  I'LL

10  INSTRUCT THE WITNESS TO ANSWER TO THE EXTENT IT'S NOT IN

11  REFERENCE TO OUR COMMUNICATIONS.

12           GO AHEAD YOU CAN ANSWER.

13    A.  NO.  I GUESS, I DON'T KNOW.

14    Q.  (BY MR. BERG)  WAS YOUR ANSWER THAT, NO, YOU DID

15  NOT CONSULT ANY DOCUMENT OR NO YOU CANNOT RECALL IF YOU

16  LOOKED AT ANY DOCUMENTS?  MS. PENROD --

17    A.  I -- I DON'T KNOW HOW TO ANSWER THAT.

18    Q.  IS YOUR ANSWER THAT YOU CANNOT ANSWER WITHOUT

19  REVEALING ATTORNEY/CLIENT COMMUNICATION?

20    A.  YES.

21    Q.  OKAY.  WITHOUT REVEALING ANY ATTORNEY/CLIENT

22  COMMUNICATION, DID YOU SPEAK WITH AN ATTORNEY PRIOR TO

23  THE DEPOSITION?

24    A.  YES.

25    Q.  AND WHO DID YOU MEET WITH?



Page 9

1    A.   NOAH BARON.

2    Q.   AND HOW LONG DID YOU MEET WITH NOAH?

3    A.   WE MET ON THREE DIFFERENT OCCASIONS.

4    Q.   AND ABOUT HOW MUCH TIME IN TOTAL DID YOU SPEND

5    PREPARING?

6    A.   ABOUT THREE HOURS.

7    Q.   OKAY.

8         DO YOU HAVE ANY PREPARED NOTES WITH YOU TODAY

9    THAT YOU INTEND TO CONSULT DURING YOUR DEPOSITION?

10   A.   NO.

11   Q.   OKAY.  HAVE YOU EVER BEEN DEPOSED BEFORE?

12   A.   NO.

13   Q.   HAVE YOU EVER TESTIFIED IN COURT BEFORE?

14   A.   NO.

15   Q.   HAVE YOU EVER TESTIFIED IN ANOTHER PROCEEDING

16   LIKE BEFORE THE LEGISLATOR?

17   A.   NO.

18   Q.   HAVE YOU EVER BEEN INVOLVED IN A LAWSUIT AS A

19   PARTY?

20   A.   NO.

21   Q.   MS. PENROD, WHERE DID YOU GO TO SCHOOL?

22   A.   FOR ELEMENTARY OR ALL THE SCHOOLS OR -- I DON'T

23   KNOW -- CAN YOU CLARIFY THE QUESTION.

24   Q.   YEAH.  WE CAN START AT COLLEGE, IF YOU ATTENDED?

25   A.   OKAY.  I ATTEND TEXAS TECH UNIVERSITY IN LUBBOCK,



Page 10

1   TEXAS FOR TWO YEARS.  AND THEN I GRADUATED FROM A&M

2   CORPUS CHRISTI.

3      Q.   AND WAS THAT FOR A MASTER'S DEGREE OR --

4      A.   WELL, FOR A BACHELOR'S OF SCIENCE IN EDUCATION.

5      Q.   IN EDUCATION.

6           DID YOU TAKE ANY GRADUATE WORK OR SPECIALTY -- DO

7   SPECIALTY TRAINING?

8      A.   I TOOK A YEAR AND A HALF TOWARD MY READING

9   MASTERS BUT I DIDN'T FINISH IT.

10     Q.   OKAY.  MS. PENROD, ARE YOU MARRIED?

11     A.   YES.

12     Q.   WHO IS YOUR SPOUSE?

13     A.   ROGER SCOTT PENROD.

14     Q.   AND DO YOU LIVE TOGETHER?

15     A.   YES.

16     Q.   HAVE YOU EVER RUN FOR PUBLIC OFFICE?

17     A.   NO.

18     Q.   HAVE YOU EVER PARTICIPATED IN A CAMPAIGN FOR A

19   PUBLIC OFFICE EITHER AS A PAID EMPLOYEE OR AS A

20   VOLUNTEER?

21     A.   NO.

22     Q.   AND ARE YOU A MEMBER OF AFT, THAT'S THE AMERICAN

23   FEDERATION OF TEACHERS?

24     A.   YES.

25     Q.   WHAT DO YOU UNDERSTAND THIS CASE TO BE ABOUT?



Page 11

1     A.   THE DIFFICULTY THAT SB 1 HAS CREATED IN ACCESS TO

2   EASY VOTING IN THE STATE OF TEXAS.

3     Q.   AND YOU UNDERSTAND THAT YOU ARE DISCLOSED AS A

4   POTENTIAL WITNESS?

5     A.   YES.

6     Q.   DO YOU KNOW WHY YOU WERE DISCLOSED AS A POTENTIAL

7   WITNESS, WITHOUT REVEALING ATTORNEY/CLIENT

8   COMMUNICATION?

9     A.   YES, I DO.

10     Q.   AND WHY IS THAT?

11     A.   I HAD DIFFICULTY VOTING WITH MY MAIL-IN BALLOT IN

12   THE 2022 ELECTION -- PRIMARY ELECTION.

13     Q.   AND WAS THAT THE MARCH 1ST, 2022, PRIMARY

14   ELECTION?

15     A.   I'M NOT SURE THAT THAT WAS IN MARCH, BUT IT WAS

16   IN 2022, THE PRIMARY.

17     Q.   OKAY --

18     A.   AND IT WAS IN THE SPRING.

19     Q.   IN THE SPRING, OKAY.  WE'LL GET TO THAT.

20          FIRST, I WOULD LIKE TO INTRODUCE EXHIBIT A, I

21   WILL -- THIS IS A BIT FUN ON ZOOM.  I'M GOING TO PUT A

22   DOCUMENT INTO THE CHAT FOR YOU.  SO IF YOU JUST GIVE ME

23   ONE SECOND.

24          WOULD YOU PLEASE OPEN THE DOCUMENT THAT I JUST

25   PUT INTO THE CHAT, MS. PENROD.



Page 12

1                   (DEFENDANT'S EXHIBIT A MARKED.)

2      A.  I DON'T KNOW WHAT IT'S DOING, IT'S WANTING TO

3   SAVE IT.  I DON'T KNOW HOW TO OPEN IT.

4              MR. BARON:  YOU CAN GO AHEAD AND SAVE IT.

5   AND THEN IT SHOULD OPEN.

6              THE WITNESS:  IT WOULD HELP, RIGHT?

7              MR. BERG:  SOME TECHNOLOGY MAKES OUR LIVES

8   EASIER THAN OTHERS.

9              THE WITNESS:  OKAY.  I THINK I OPENED IT.

10     Q.  (BY MR. BERG)  OKAY.  IT SHOULD SAY, "LULAC

11  PLAINTIFF'S SEVENTH SUPPLEMENTAL RULE INITIAL

12  DISCLOSURES," THAT'S RULE 26(A)(1)?

13     A.  YES.

14     Q.  OKAY.  IF YOU'RE ABLE TO SCROLL TO PAGE 2

15  NUMBER 1 SAYS, "MS. ALICE PENROD", DO YOU SEE IT?

16     A.  YES.  I SEE IT.

17     Q.  AND I'M READING FROM IT NOW.  "MS. PENROD IS A

18  MEMBER OF AFT AND WILL LIKELY HAVE DISCOVERABLE

19  INFORMATION REGARDING THE INJURIES SHE SUFFERED BECAUSE

20  OF SB 1."

21         DID I READ THAT CORRECTLY?

22     A.  HOLD ON 'CAUSE I MAY BE LOOKING AT SOMETHING

23  DIFFERENTLY THAN YOU ARE.  OKAY, PAGE 1 -- PAGE 2 FOR

24  ME?

25     Q.  PAGE 2.



Page 56

1      A.  YES.

2      Q.  -- IS THAT CORRECT?

3      A.  YES.  I MEAN, WE -- YOU KNOW WE HAVE THE

4  EXPERIENCE OF THE MAIL-IN BALLOT THAT ALMOST DIDN'T

5  HAPPEN.  YOU KNOW, I MEAN IT'S LIKE, I WANTED TO MAKE

6  SURE MY VOTE COUNTED, SHE WANTED TO MAKE SURE HER VOTE

7  COUNTED.  EVEN THOUGH HER MAIL-IN BALLOT WORKED JUST

8  FINE, SHE WANTED TO MAKE SURE THAT HER VOTE COUNTED.

9  SO, I MEAN, I WOULD HAVE JUST DONE A MAIL-IN BALLOT FOR

10  HER AGAIN, BUT SHE WAS INSISTENT, SHE WANTED TO GO TO

11  THE POLLS SO...

12          WE JUST --

13      Q.  SHE SOUNDS FUN?

14      A.  SHE IS.  SHE'S A LOT OF FUN.

15      Q.  SO I THINK I KNOW HOW YOUR MOTHER WOULD ANSWER.

16  BUT FOR YOU, IF YOU COULDN'T VOTE ABSENTEE, WOULD YOU

17  STILL VOTE?

18      A.  OH, DEFINITELY.  I WOULD HAVE PUT MY MASK ON AND

19  GONE AND VOTED, YOU KNOW, WHATEVER.

20      Q.  SINCE YOU JUST STARTED VOTING BY MAIL IN 2022, I

21  IMAGINE YOU'VE VOTED IN-PERSON MANY MORE TIMES THAN YOU

22  VOTED BY MAIL; IS THAT CORRECT?

23      A.  THAT'S CORRECT.

24      Q.  HAVE YOU EVER HAD ANY TROUBLE VOTING IN-PERSON?

25      A.  NO.



Page 57

 1                MR. BARON:  OBJECT TO FORM.

 2      Q.  (BY MR. BERG)  AND YOU HAD PREVIOUSLY TESTIFIED

 3   THAT YOU WERE CONCERNED THAT SB 1 WOULD MAKE IN-PERSON

 4   VOTING MORE DIFFICULT; IS THAT CORRECT?

 5      A.  I THINK THAT IT DOES.

 6      Q.  UNDERSTOOD.

 7         I WAS JUST CLARIFYING -- I WAS ASKING WHETHER YOU

 8   HAD PREVIOUSLY TESTIFIED THAT GOING INTO 2022 YOU WERE

 9   CONCERNED THAT SB 1 WOULD MAKE IN-PERSON VOTING MORE

10   CHALLENGING, OR MORE DIFFICULT?

11                MR. BARON:  OBJECT TO FORM.  ASKED AND

12   ANSWERED.

13                MR. BERG:  IT WAS A CONVOLUTED QUESTION.  I

14   CAN TRY TO REPHRASE IT, IF THAT WILL HELP.

15      Q.  (BY MR. BERG)  BEFORE YOU HAD VOTED IN 2022, YOU

16   WERE CONCERNED THAT SB 1 WOULD MAKE IN-PERSON VOTING

17   MORE DIFFICULT; IS THAT CORRECT?

18                MR. BARON:  SAME OBJECTION.

19                YOU CAN ANSWER.

20      A.  I'M THINKING.  LET ME -- MAY I CLARIFY?

21      Q.  (BY MR. BERG)  OF COURSE.

22      A.  YOU'RE ASKING IF THE REASON I VOTED BY MAIL WAS

23   BECAUSE I THOUGHT SB 1 WOULD MAKE IT -- WAS MAKING IT

24   MORE DIFFICULT?

25      Q.  NO.  MUCH MORE SIMPLE.  I'M JUST ASKING WHETHER



Page 58

1    GOING INTO 2022 YOU WERE CONCERNED THAT SB 1 WOULD MAKE

2    VOTING IN-PERSON MORE DIFFICULT?

3        A.   YES.

4            MR. BARON:   SAME OBJECTIONS.

5        Q.   (BY MR. BERG)   OKAY.   WHEN YOU VOTED IN-PERSON,

6    IN THE 2022 GENERAL ELECTION WITH YOUR HUSBAND AND

7    MOTHER, BESIDES THE MAIL BALLOT ISSUE, WAS IT MORE

8    DIFFICULT?

9        A.   IT WAS MORE DIFFICULT IN THE SENSE THAT WE DID

10   NOT HAVE THE -- WE DIDN'T FEEL WE HAD THE LUXURY OF JUST

11   DOING IT BY MAIL.   WE DIDN'T FEEL CONFIDENT THAT WE

12   WOULDN'T RUN INTO THE SAME ISSUES OF OUR BALLOT BEING

13   REJECTED.

14           SO, YOU KNOW, WE HAD TO PLAN AHEAD, MAKE SURE WE

15   GOT UP, YOU KNOW, EXTRA EARLY SO WE GET THERE WHEN THE

16   POLLS OPENED.   YOU KNOW, MOM HAD TO GET READY AND IT'S

17   JUST -- IT WAS MORE DIFFICULT TO GET HER OUT AND MAKE

18   SURE SHE WAS ABLE TO VOTE.   YOU KNOW, WE -- SHE HAD HER

19   CANE WITH HER, IT WAS RAINING, YOU KNOW.   IT JUST -- IT

20   WAS -- THE LINE WASN'T TOO LONG, I MEAN, WE GOT THERE

21   EARLY ENOUGH THE LINE WASN'T TOO LONG.   BUT, YOU KNOW,

22   STILL SHE HAD TO STAND THERE IN THE RAIN AND -- UNDER AN

23   UMBRELLA AND YOU KNOW.

24           THEN GO IN AND BE PULLED TO THE SIDE, BECAUSE WE

25   DIDN'T KNOW TO BRING IN OUR MAIL-IN BALLOTS THAT WE HAD



1    DECIDED NOT TO FILL OUT.  SO, I MEAN, ULTIMATELY WE DID

2    ALL GET TO VOTE, AND IT ALL COUNTED, BUT IT SHOULDN'T --

3    WE SHOULDN'T HAVE TO RUN THROUGH ALL THOSE HOOPS JUST TO

4    VOTE, YOU KNOW.  IF SHE'S ELIGIBLE AT HER AGE TO VOTE BY

5    MAIL, SHE SHOULD FEEL VERY COMFORTABLE DOING THAT AND

6    SHE DID NOT.  AND WE -- I DID NOT.  SO AFTER MY

7    EXPERIENCE.  SO, YOU KNOW, ONE DAY I WILL BE IN HER

8    POSITION AND I DON'T -- I MEAN, YOU KNOW, MY SON LIVES

9    IN COLORADO, WHO'S GOING TO TAKE ME TO THE POLLS, I

10   DON'T KNOW.  I SHOULD BE ABLE TO VOTE BY MAIL EASILY,

11   AND I DON'T FEEL COMFORTABLE DOING THAT RIGHT NOW.

12       Q.  I BELIEVE YOU TESTIFIED EARLIER THAT YOU WOULD

13   HAVE BEEN FINE VOTING BY MAIL IN THE GENERAL ELECTION,

14   BUT IT WAS YOUR MOTHER WHO INSISTED THAT YOU VOTE

15   IN-PERSON; IS THAT CORRECT?

16       A.  NO.

17       Q.  NO.  OKAY.

18       A.  I DID NOT FEEL COMFORTABLE VOTING BY MAIL IN THE

19   GENERAL ELECTION, SO I WAS GOING TO GO VOTE IN-PERSON

20   MYSELF.  MY HUSBAND MADE THAT DECISION, HE WAS GOING TO

21   GO VOTE IN-PERSON HIMSELF.  AND THEN MY MOTHER SAID,

22   "WELL, I'M GOING TO VOTE IN-PERSON TOO," SO WE ALL WENT.

23       Q.  THANK YOU FOR CLARIFYING.

24          HAVE YOU EVER WORKED AS A POLL WORKER?

25       A.  NO.



Page 60

1    Q.  SO TODAY WE'VE TALKED ABOUT SB 1, AND SOME OF

2    THOSE VOTE-BY-MAIL PROVISIONS.  ARE THERE ANY OTHER

3    PROVISIONS THAT YOU THINK ARE BAD POLICY?

4           MR. BARON:  OBJECT TO FORM.

5           YOU CAN ANSWER.

6    A.  NO, I MEAN, I -- I DON'T KNOW HOW TO ANSWER THAT,

7    BECAUSE I DON'T KNOW WHAT YOU'RE ASKING SPECIFICALLY.

8    Q.  (BY MR. BERG)  SURE.  LET ME REPHRASE, AND TRY TO

9    HELP.

10          BESIDES VOTE BY MAIL ARE THERE ANY OTHER PARTS OF

11   SB 1, THAT YOU THINK ARE BAD POLICY?

12          MR. BARON:  SAME OBJECTION.

13   A.  I THINK, REDUCING POLLING PLACE -- THE NUMBER OF

14   POLLING PLACES, IS NOT GOOD.  I THINK, SHORTING EARLY

15   VOTING DAYS, IS NOT GOOD.  I THINK, TAKING POLLING

16   PLACES OFF OF COLLEGE CAMPUSES, IS NOT GOOD.  SO, YES.

17   Q.  (BY MR. BERG)  SO AS WE SIT HERE TODAY, IS IT

18   YOUR UNDERSTAND -- SORRY STRIKE THAT -- LET ME START

19   OVER.

20          AS WE SIT HERE TODAY, DO YOU UNDERSTAND SB 1 TO

21   HAVE REDUCED EARLY VOTING OR INCREASED EARLY VOTING

22   HOURS AND AVAILABILITY?

23          MR. BARON:  SAME OBJECTIONS.

24   Q.  (BY MR. BERG)  IF YOU UNDERSTAND THE QUESTION,

25   YOU CAN ANSWER.



Page 74

1     A.  IN A SECOND LAW -- A SECOND PHONE CALL, YES.

2     Q.  SPEAKING SPECIFICALLY ABOUT THE FIRST PHONE CALL.

3  WHAT DID NOAH ASK YOU ABOUT YOUR EXPERIENCE IN THE

4  PRIMARY?

5     A.  HE JUST ASKED ME TO EXPLAIN WHAT HAD HAPPENED

6  WITH MY BALLOT BEING REJECTED.

7     Q.  SO YOU DISCUSSED YOUR STORY, AND THEN -- IS THERE

8  ANYTHING ELSE DURING THE PHONE CALL BESIDES JUST INITIAL

9  DISCUSSIONS OF YOUR EXPERIENCE?

10    A.  NO.

11    Q.  OKAY.

12       I HAVE -- I'VE START WITH SOME STANDARD

13  QUESTIONS, I LIKE TO FINISH WITH A FEW STANDARD

14  QUESTIONS, IF THAT'S ALRIGHT?

15       IS THERE ANYTHING THAT YOU TESTIFIED TO HERE

16  TODAY THAT YOU WOULD LIKE TO CORRECT?

17           MR. BARON:  OBJECT TO FORM.

18           YOU CAN ANSWER.

19    A.  I DON'T BELIEVE SO.

20    Q.  (BY MR. BERG)  IS ANYTHING YOU TESTIFIED TO HERE

21  TODAY INACCURATE?

22           MR. BARON:  OBJECT TO FORM.

23           YOU CAN ANSWER.

24    A.  NO.

25    Q.  (BY MR. BERG)  IS THERE ANYTHING THAT YOU



Page 75

1    TESTIFIED TO THAT YOU FEEL NEEDS MORE CONTEXT THAN WHEN

2    YOU ORIGINALLY SAID IT?

3              MR. BARON:  OBJECT TO FORM.

4              YOU CAN ANSWER.

5        A.  NO I DON'T THINK SO.

6        Q.  (BY MR. BERG)  WELL, THAT'S ALL I HAVE.  I'VE

7    ENJOYED OUR CONVERSATION.

8              MR. BERG:  I WILL PASS THE WITNESS TO NOAH.

9              MR. BARON:  GREAT.  IS IT ALRIGHT IF WE TAKE

10   ABOUT -- ANOTHER FIVE MINUTE BREAK, JUST SO I CAN

11   ORGANIZE MY NOTES.

12             MR. BERG:  OF COURSE.

13             THE VIDEOGRAPHER:  THE TIME IS NOW

14   12:09 P.M., AND WE ARE OFF THE RECORD.

15             (OFF THE RECORD.)

16             THE VIDEOGRAPHER:  THE TIME IS NOW

17   12:17 P.M., AND WE ARE BACK ON THE RECORD.

18             MR. BARON:  ALICE, HOW ARE YOU DOING?

19             THE WITNESS:  GOOD.

20             MR. BARON:  SO I'M JUST GOING TO ASK YOU A

21   FEW FOLLOW-UP QUESTIONS.  FOLLOWING UP ON WHAT ZAC HAD

22   ASKED YOU EARLIER TODAY.

23                  CROSS-EXAMINATION

24   BY MR. BARON:

25       Q.  SO MY FIRST QUESTION IS, WHAT YEAR DID YOU



1   REGISTER TO VOTE IN TEXAS?

2        A.   1974.

3        Q.   AND DO YOU -- DO YOU KNOW -- DO YOU REMEMBER WHAT

4   FORM OF IDENTIFICATION YOU USED TO REGISTER TO VOTE?

5        A.   I DON'T.

6        Q.   AND IN NOVEMBER 2022, WHEN YOU VOTED IN-PERSON,

7   WHAT WOULD YOU HAVE DONE IF THE LINE HAD BEEN

8   PARTICULARLY LONG?

9        A.   WE WOULD HAVE GONE HOME AND TRIED AGAIN.  I WOULD

10  HAVE WAITED TILL IT WAS, YOU KNOW, NOT A LONG LINE.

11       Q.   OKAY.

12            AND DO YOU PLAN TO VOTE IN THE 2024 PRIMARY?

13       A.   YES.

14       Q.   AND DO YOU INTEND TO VOTE IN-PERSON?

15       A.   YES, I DO.

16       Q.   DO YOU INTEND TO VOTE IN THE 2024 GENERAL

17  ELECTION?

18       A.   YES.

19       Q.   AND DO YOU INTEND TO VOTE IN-PERSON IN THAT?

20       A.   YES, I DO.

21       Q.   AND SETTING ASIDE -- SETTING ASIDE YOUR CONCERNS

22  ABOUT HAVING YOUR VOTE COUNTED THROUGH MAIL-IN VOTING,

23  DO YOU FIND IT EASIER OR HARDER TO VOTE BY MAIL AS

24  CONCERNED BY VOTING?

25            MR. BERG:  OBJECTION, FORM.



Page 77

1    Q.   (BY MR. BARON)   LET ME -- LET ME TRY IT AGAIN.

2         SETTING ASIDE YOUR CONCERNS ABOUT HAVING YOUR

3    MAIL BALLOT COUNTED, DO YOU FIND IT EASIER OR HARDER TO

4    VOTE BY MAIL AS COMPARED TO VOTING IN PERSON?

5              MR. BERG:   OBJECTION FORM.

6              YOU CAN ANSWER.

7    A.   IT'S MUCH EASIER TO VOTE BY MAIL.

8    Q.   (BY MR. BARON)   IS YOUR -- IS YOUR CONCERN ABOUT

9    HAVING YOUR MAIL BALLOT COUNTED RELATED TO THE

10   REQUIREMENT THAT YOU PUT AN IDENTIFICATION NUMBER ON THE

11   CARRIER ENVELOPE OF YOUR MAIL BALLOT?

12   A.   IT WASN'T THAT SPECIFICALLY, IT WAS JUST THE FACT

13   THAT THERE WERE SEVERAL, LOOKED, LIKE OPTIONS THAT YOU

14   COULD DO.  YOU KNOW, YOU COULD EITHER PUT YOUR DRIVER'S

15   LICENSE OR YOUR SOCIAL SECURITY AND I BELIEVE, I DON'T

16   KNOW IF THIS IS TRUE OR NOT, BUT YOU'RE SUPPOSED TO

17   CHOOSE THE ONE THAT YOUR REGISTERED TO VOTE WITH.

18         AND LIKE I HAD SAID EARLIER, I DON'T KNOW WHAT I

19   DIDN'T DO.  IF I TRANSPOSED A NUMBER, IF I LEFT OFF

20   SOMETHING, I DON'T KNOW.  IT SEEMED TO ME IT WAS A PLACE

21   YOU HAD TO SIGN UNDER THE FLAP OR SOMETHING, I DON'T --

22   I DON'T REMEMBER.  BUT I DO KNOW THAT YOU HAVE TO GO

23   OVER IT WITH A FINE-TOOTH COMB AND FILL OUT EVERYTHING.

24   JUST TO BE ON THE SAFE SIDE.  AND IT SHOULDN'T HAVE TO

25   -- IT SHOULD BE THAT -- IT SHOULD BE VERY STRAIGHT



Page 78

1  FORWARD AND IT'S NOT.

2      Q.  SO, ONE OF YOUR -- ONE OF YOUR CONCERNS IS ABOUT

3  INCLUDING THOSE NUMBERS FOR THAT -- STRIKE THAT --

4          ONE OF YOUR -- IS ONE OF YOUR CONCERNS THAT YOU

5  MIGHT GET THE NUMBERS WRONG, RIGHT?

6      A.  YES.  OR I MIGHT LEAVE SOMETHING OUT OR NOT CHECK

7  THE RIGHT BOX, OR SOMETHING LIKE THAT, I DON'T KNOW.

8  IT'S JUST TO ME -- TO ME YOU SHOULD JUST HAVE TO FILL

9  OUT YOUR BALLOT, PUT, YOU KNOW, PUT WHATEVER IS ON YOUR

10  VOTER ID VOTER CARD ON THERE SOMEWHERE, AND SIGN IT, AND

11  MAIL IT.

12          YOU KNOW, IT -- IT SEEMED TO ME THAT SOMETHING

13  THAT WAS SUPPOSED TO BE EASY WAS NOT EASY AND IT WAS A

14  SURPRISE TO ME WHEN IT WAS REJECTED AND SO THEREFORE, I

15  FELT AS AN EDUCATED PERSON, I MEAN, COME ON, I WAS LIKE,

16  OH, HOW STUPID AM I TO NOT FILL OUT SOMETHING CORRECTLY.

17  I JUST FELT TRICKED, I DON'T KNOW -- I DON'T KNOW IF

18  THAT'S THE RIGHT WORD TO SAY.  BUT JUST -- IT WAS

19  AGGRAVATED TO ME THAT IT WASN'T JUST A REAL STRAIGHT

20  FORWARD THING.  THAT MY -- I DID THE MAIL-IN BALLOT, I

21  THOUGHT I FOLLOWED ALL THE DIRECTIONS, AND OBVIOUSLY I

22  DID NOT.  SO I HAD TO JUMP THROUGH MORE HOOPS IN ORDER

23  TO GET MY BALLOT COUNTED.  SO, FROM NOW ON, AS LONG AS I

24  AM ABLE I WILL VOTE IN-PERSON.  EVEN THOUGH I'M ELIGIBLE

25  TO VOTE BY MAIL, AND THAT WOULD BE EASIER, SUPPOSEDLY,



Page 79

1    BUT IT'S NOT, OBVIOUSLY.

2       Q.   GREAT.

3               MR. BARON:   WELL, THOSE ARE ALL THE

4    QUESTIONS THAT I HAVE.   I'LL -- THE WITNESS, UNLESS YOU

5    HAVE MORE FOLLOW-UP QUESTIONS, ZAC.

6               MR. BERG:   NO FURTHER QUESTIONS FOR ME.

7               THE REPORTER:   ARE WE DOING A READ AND SIGN?

8               MR. BARON:   YES, WE WILL BE READING AND

9    SIGNING.   THANK YOU.

10              THE REPORTER:   AND IS ANYONE REQUESTING A

11   COPY OF TRANSCRIPT?

12              MR. BARON:   WE WOULD LIKE A COPY OF THE

13   TRANSCRIPT.

14              MR. BERG:   STATE DEFENDANTS AS WELL, I THINK

15   THERE IS A STANDING ORDER.

16              MR. BARON:   AND IF WE COULD HAVE A ROUGH OF

17   THE TRANSCRIPT.

18              THE REPORTER:   OKAY.

19              CAN YOU INCLUDE -- EVERYONE THAT WANTS A

20   TRANSCRIPT OR REQUEST --

21              MR. BERG:   YES.

22              THE REPORTER:   YOUR E-MAIL ADDRESS.  OR I

23   CAN GIVE YOU MY E-MAIL ADDRESS SO YOU CAN E-MAIL

24   DIRECTLY.  I THINK THAT WOULD BE EASIEST.

25              MR. BARON:   OKAY.



Page 80

1                    THE REPORTER:  AND IS ANYONE REQUESTING A

2    COPY OF THE VIDEO.

3                    MR. BARON:  NO.

4                    MR. BERG:  WE WILL.

5                    THE VIDEOGRAPHER:  CAN I PULL US OFF THE

6    RECORD, MS. GONZALEZ.

7                    THE REPORTER:  I'M SO SORRY.  YES.

8                    THE VIDEOGRAPHER:  THE TIME IS NOW

9    12:24 P.M., AND WE ARE OFF THE RECORD.

10

11

12                    (DEPOSITION CONCLUDED AT 12:24 P.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25



# Attachment 9

# Tacoma Phillips
# April 29, 2022 Deposition
# Excerpts

Transcript of the Testimony of

**The Office of the Dallas County Elections Administrator**

**Date:**

April 29, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

```
 1                  UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3   LA UNION DEL PUEBLO ENTERO,)(
     ET AL.,                    )(
 4                              )(
         PLAINTIFFS,            )(
 5                              )(    CIVIL ACTION
     VS.                        )(    NO. SA-21-CV-00844-XR
 6                              )(
     GREGORY W. ABBOTT, ET AL., )(
 7                              )(
                                )(
 8       DEFENDANTS.            )(
     ------------------------------------------------------

 9                VIDEOTAPED AND VIDEOCONFERENCED
10                     ORAL DEPOSITION OF
                 RIVELINO LOPEZ, TACOMA PHILLIPS
11                  AND MICHAEL SCARPELLO
                       APRIL 29, 2022
12

13        VIDEOTAPED AND VIDEOCONFERENCED ORAL DEPOSITION

14   OF RIVELINO LOPEZ, TACOMA PHILLIPS AND MICHAEL

15   SCARPELLO, produced as witnesses at the instance of the

16   Plaintiff LUPE, and duly sworn, was taken in the

17   above-styled and numbered cause on the 29th day of

18   April, 2022, from 10:47 a.m. to 8:02 p.m., before Holly

19   R. Swinford, CSR in and for the State of Texas, reported

20   by machine shorthand, at the Office of the Dallas

21   Elections Administrator, located at the Records

22   Building, 500 Elm Street, 7th Floor, Room 7Y11, in the

23   City of Dallas, County of Dallas, State of Texas,

24   pursuant to Notice, the Federal Rules, and the

25   provisions stated on the record or attached hereto.
```

```
 1  permission to mute them, so we'll just have to ask them.
 2                 MR. STOOL:  Just to --
 3                 THE VIDEOGRAPHER:  Never mind.  We're
 4  good.
 5                 MS. PERALES:  Thank you.
 6                      TACOMA PHILLIPS,
 7  having being first duly sworn, testified as follows:
 8                      EXAMINATION
 9                      (Continued)
10  BY MS. PERALES:
11     Q.   Ms. Phillips, you've been here since the start
12  of Mr. Lopez's testimony; is that correct?
13     A.   Yes.
14     Q.   And so you've already heard me introduce myself
15  and walk him through some of the rules of the road for a
16  deposition; is that right?
17     A.   Yes.
18     Q.   So I'll -- I'll ask you a shorter version of
19  those questions --
20     A.   Okay.
21     Q.   -- which is, first:  Have you ever had your
22  deposition taken?
23     A.   No.
24     Q.   Okay.  First time.  It's an honor to be taking
25  your deposition.
```

```
 1    A.    Robert Heard.  He's in -- a contractor in our
 2 office.  And it's another gentleman, the gentleman's
 3 name -- I cannot remember his name.
 4    Q.    And Mr. Heard, who is a contractor, is he what
 5 somebody might call a temp?
 6    A.    Yes, a temp contractor.
 7    Q.    Okay.
 8    A.    He's helping with the PIAs in our office.
 9    Q.    Okay.  And when you say "PIA," you mean Public
10 Information --
11    A.    Yes --
12    Q.    -- for --
13    A.    Public Information Act, yes.
14    Q.    Okay.  So you're responding to requests for
15 information?
16    A.    Yes.
17    Q.    And then you mentioned one other individual.
18    A.    Yes, I did.  I do not remember his name.
19    Q.    Okay.  And he works in your office, as well?
20    A.    I believe he's a contractor, also.
21    Q.    Okay.  Did you talk to anybody from the Office
22 of the Attorney General for Texas?
23    A.    No.
24    Q.    Did you review any paperwork in preparation for
25 this deposition?
```

```
 1      A.   Just the paperwork that was given to answer my
 2 portion of the questions.
 3      Q.   Okay.  And who gave that paperwork to you?
 4      A.   Ben Stool.
 5      Q.   Did you bring anything here with you today
 6 related to the case, any personal notes or charts or
 7 other paperwork?
 8      A.   Yes.  I brought the paperwork that was
 9 provided -- given to me by Ben Stool, but I just jotted
10 down notes on that.
11      Q.   And do you mean that you jotted notes on the --
12 the chart that lists the topic and has your name across
13 from those topics?
14      A.   Yes.
15      Q.   Okay.  So let's go ahead and just refer back to
16 Exhibit 1.  It should be somewhere --
17           THE REPORTER:  It's over here (handing).
18      Q.   You have been handed what has been marked
19 Deposition Exhibit Number 1 (holding up a copy of
20 document), and it says Plaintiffs' Third Amended Notice
21 of Rule 30(b)(6) Deposition.
22           Do you see that at the top?
23      A.   I see that, yes.
24      Q.   Do you recognize this document; have you ever
25 seen it before?
```

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                              Page 74

 1        A.    It was sent to me.  Are you --

 2        Q.    Do you recognize, starting on Page 12 -- no --

 3   yes.

 4              Starting on Page 12, do you recognize the items

 5   listed under the heading "Deposition Topics"?

 6        A.    Yes.

 7        Q.    And then let's turn to Deposition Exhibit

 8   Number 2.

 9              THE REPORTER:  Oh, I'm sorry (handing).

10        Q.    Can you look at the places where your name is

11   listed in the right-hand column?

12        A.    Yes.

13        Q.    And that's on Page 1, Page 2, Page 3.

14              It looks like just pages 1, 2 and 3; is that

15   right?

16        A.    Yes.

17        Q.    Are you prepared to testify on those topics

18   today?

19        A.    Yes.

20        Q.    And do you understand that when you're

21   answering questions on these topics, that you're

22   speaking for the Dallas County Elections Department?

23        A.    Yes.

24        Q.    Because you are designated representative of

25   the department.  Yes?

1      A.    Yes.

2      Q.    Okay.  And so when I say "you" or "yours,"

3   please understand that to mean Dallas County Elections

4   Department.

5      A.    Yes.

6      Q.    Now, if there is something outside your

7   knowledge, it's perfectly okay to say that.

8      A.    Okay.

9      Q.    And we can talk through whether there's

10   somebody else who maybe has more knowledge and -- and

11   then we can work through that with the attorneys.  Okay?

12      A.    Okay.

13      Q.    So even though you're testifying for Dallas

14   County Elections, I want to make sure that if something

15   is simply outside the scope of your knowledge, that you

16   feel comfortable saying that.

17      A.    Okay.

18      Q.    What is your title and your job?

19      A.    Mail Ballot Supervisor.

20      Q.    How long have you held that position?

21      A.    One year.

22      Q.    What did you do before you became the Mail

23   Ballot Supervisor?

24      A.    I was the Assistant Voter Registration

25   Supervisor.

1        Q.    Did you work under the supervision of

2    Mr. Lopez?

3        A.    Yes.

4        Q.    How long were you an Assistant Voter

5    Registration Supervisor?

6        A.    I'm thinking.  I will say since 2014 through

7    2021, March of 2021.

8        Q.    So, roughly, seven years?

9        A.    Yes.

10        Q.    And then prior to becoming the Assistant Voter

11    Registration Supervisor, what were you doing?

12        A.    I was -- I was a Lead Clerk in Voter

13    Registration.

14        Q.    And do you know about how many years you did

15    that?

16        A.    I did that for probably a year.

17        Q.    And then before that?

18        A.    I was a clerk in Voter Registration.

19        Q.    I think they call those battlefield promotions.

20        A.    Yes.

21        Q.    Okay.  And how long were you a clerk in Voter

22    Registration?

23        A.    Since 1998, August of 1998.

24                THE REPORTER:  You said August of nineteen

25    ninety- --

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                              Page 77

1                    THE WITNESS:  1998, yes.

2                    THE REPORTER:  Thank you.

3        Q.    So that would be -- and before you were a clerk

4    in Voter Registration, were you working for Dallas

5    County?

6        A.    No.

7        Q.    Okay.  So all in all, about how many years have

8    you been working for Dallas County Elections?

9        A.    August of 2022 would be 24 years.

10       Q.    Wonderful.  Congratulations.

11       A.    Thank you.

12       Q.    Before you became Mail Ballot Supervisor a year

13   ago, did somebody else hold that job?

14       A.    Yes.

15       Q.    Who was that?

16       A.    Brylon Franklin.

17       Q.    Spell the first name.

18       A.    B-r-y-l-o-n.

19       Q.    Brylon.  And then the last name?

20       A.    Franklin.

21       Q.    Franklin.  Do you know how long Brylon Franklin

22   was in the position of Mail Ballot Supervisor?

23       A.    No, I do not.

24       Q.    Was it more than a year?

25       A.    Yes.  Yes, it was more than a year, but I can't

The Office of the Dallas County Elections Administrator            April 29, 2022
                                                                        Page 78

1    tell you how long.

2        Q.    Who does the Mail Ballot Supervisor report to?

3        A.    Michael Scar- -- oh, I'm sorry.  Let me -- it's

4    Malissa Kouba.

5        Q.    And who is Malissa Kouba?

6        A.    Assistant Administrator Deputy.  I don't know

7    the exact title, the name of the title, but I know she's

8    the Assistant Administrator Deputy.

9        Q.    So do you report to Malissa Kouba?

10       A.    I report to Malissa Kouba, yes.

11       Q.    Do you know how long she's been in her

12   position?

13       A.    A year -- less than a year, I believe.

14       Q.    Less than a year.  So then who did Brylon

15   Franklin report to?

16       A.    Tony Pippin-Poole.

17               THE REPORTER:  Tony -- what was the last

18   name?

19               THE WITNESS:  Pippins-Poole (sic).

20       Q.    Was Tony Pippins-Poole the Elections

21   Administrator since you joined the Elections Department

22   in 1998?

23       A.    No.

24       Q.    When you first got to the Elections Department,

25   who was the Election Administrator, if anybody?

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                      Page 79

 1          A.   Bruce R. Sherbert.

 2          Q.   Bruce R., like the letter R --

 3          A.   Like the letter.

 4          Q.   And then --

 5          A.   Sherbert --

 6          Q.   -- Sherbert --

 7          A.   -- yes.

 8          Q.   -- like the dessert?  Yeah, got it.

 9               Are you from Dallas County?

10          A.   Yes.

11          Q.   Where did you go to high school?

12          A.   I went to Business Management High School,

13     Business Management Magna High School.

14          Q.   Okay.  That's here in Dallas?

15          A.   That was here in Dallas.

16          Q.   Did you do any education after high school?

17          A.   No.

18          Q.   Okay.  Did you start working for Dallas County

19     Elections after you completed high school?

20          A.   No.

21          Q.   Okay.  Sometimes I ask people, like what was

22     the most interesting thing they did before they got to

23     their position.  Senator Hughes told me he sold

24     appliances door to door, but I will not ask you that

25     question in the interest of time.

```
 1            When I'm quiet, it's because I'm not going to
 2    ask you questions, so I'm just moving through my list.
 3       A.    Okay.
 4       Q.    Do you know, in general, what percent of votes
 5    that are cast in Dallas County are vote by mail?
 6       A.    In general, no, I do not.
 7       Q.    For -- well, let me ask you this:  In the past,
 8    to the best of your knowledge or from 2018 (indicating)
 9    up until now, has Dallas County ever sent voters
10    application for ballot by mail on Dallas County's
11    initiative?
12                 MS. HUNKER:  Objection, form.
13       A.    Not to my knowledge.
14       Q.    (By Ms. Perales)  So is it correct to say,
15    then, that Dallas County, from 2018 forward, has only
16    ever sent somebody an application for ballot by mail
17    because that voter requested it first?
18       A.    To my knowledge, yes.
19       Q.    So, for example, Dallas County never did a
20    mailing out to voters over 65, saying, Here's an
21    application for ballot by mail in case you want to use
22    it, or something like that?
23       A.    Not to my knowledge.
24       Q.    Before you became -- or before you were in your
25    current position, were you involved in processing or
```

 1      A.    I'm sorry.

 2      Q.    So you were getting phone calls from voters

 3  with questions about this process; is that right?

 4      A.    Yes.

 5      Q.    And generally, what were voters communicating

 6  to you?

 7      A.    The reason why they received the letter, what

 8  was the letter for.  If it was for missing their Social

 9  Security or driver's license, we explained to the voter

10  that the only thing they had to do was put that on their

11  ABBM application.

12      Q.    Did you get any voters asking why they were

13  being sent a Voter Registration Application when they

14  knew they were already registered to vote?

15      A.    Yes.  We informed them that their -- if, in

16  fact, if their voter registration record did not have

17  the Texas Driver's License or ID or Social Security,

18  that they would need to put that on their information --

19  on their application.  I'm sorry.  We need to put it --

20  have it on their voter registration record, also have it

21  on their ABBM application.  But it was a very rarity

22  that we did get any of those and we had to send those

23  applications out to a voter, because most of the time we

24  will have the information on the voter registration

25  file, but it wasn't on the ABBM application.

1      Q.   Okay.  So, in your experience, many ABBMs were

2   coming to your office and the voter had failed to put

3   either a driver's license number or the last four of the

4   Social?

5      A.   Yes, or they forgot to put the correct

6   information that was on the voter registration file.

7      Q.   All right.  So they might have put a driver's

8   license number when you had the last four of the Social?

9      A.   Yes.

10      Q.   Or vice versa?

11      A.   Or vice versa.

12      Q.   They might have put the last four of the Social

13   and you only had the driver's license --

14      A.   Yes.

15      Q.   -- number?

16      A.   Yes.

17      Q.   Did your office keep track of the number of

18   communications you got from voters with questions about

19   the new ID verification requirements?

20      A.   No, we did not.

21      Q.   Would you say that your office spent a

22   significant amount of time answering questions from

23   voters or responding to their inquiries about the new ID

24   requirements?

25      A.   Yes.

```
 1            MS. HUNKER:  Objection, form.
 2      Q.   (By Ms. Perales)  Is there any way to get a
 3 sense of how much time that was taking out of your
 4 regular day?  Can you describe that for me since you
 5 didn't necessarily keep track of the number of calls?
 6      A.   Repeat that again.
 7      Q.   How can I -- how can I get a sense from you of
 8 exactly how much time it was taking to respond to voter
 9 inquiries if you're telling me you didn't necessarily
10 keep track of the number of phone calls that you were
11 getting?  How can I understand how much time or how much
12 resources of your office were dedicated in the lead-up
13 to the March 2022 primary to answering questions from
14 voters who had rejected ABBMs, for example?
15      A.   That's hard to say.  A call could take a
16 minute.  Another call could take ten minutes.  It's hard
17 to say.
18      Q.   Did you have particular staff that would --
19 that these calls would get transferred to so they could
20 explain to the voters what the new requirements were?
21      A.   No.  We have -- the way the system works is:
22 You call into our office.  You can pick who you want to
23 speak to:  mail ballot, absent- -- absentee, early
24 voting, voter registration.  So if they had a absentee
25 or mail ballot question, they would click Number 1.  And
```

1     Q.    Would --

2     A.    I have a staff of eight in my office.  All

3    eight will answer the phone.  All eight would get a

4    phone call.

5     Q.    Would --

6     A.    So that person may get ten calls in one day.

7    That person may get 20 calls in one day.  I do not know.

8     Q.    Would it be fair to say that most of the calls

9    that you were getting from voters with questions about

10   why their ABBM or mail ballot was rejected were calls

11   that were related to the new ID requirements for SB 1?

12    A.    Yes.

13              MS. HUNKER:  Objection, form.

14    Q.    (By Ms. Perales)  You mentioned there are eight

15   people in your office.  Those are -- would that be

16   correct, then, to say that there are eight people whose

17   work is primarily dedicated to processing either

18   application for ballot by mail or mail ballots?

19    A.    Yes.

20    Q.    Were there voters who provided a number on

21   their ABBM that you were able to match and that you sent

22   them a mail ballot and then when you got the mail

23   ballots back, you could not match the ID number that had

24   been provided on the mail ballot envelope?

25    A.    Yes.

```
 1      Q.    Okay.  Do you know about how many those were?

 2      A.    I do not know.

 3      Q.    Would we be able to figure it out by -- did

 4  you -- I answered my own question.  Let me start again.

 5            Did you keep track of the voters for whom you

 6  received a mail ballot, but you could not verify their

 7  ID number in order to count that mail ballot?

 8      A.    Yes.

 9      Q.    Okay.  And presumably, if they were sending you

10  a mail ballot, they had already managed to get

11  themselves through the ABBM process, right, by giving

12  you a number you could match?

13      A.    Yes.

14      Q.    Okay.  But then, we have the number of people

15  who were sent mail ballots and then you get these mail

16  ballot back and you can't verify the number.  That's

17  a -- that's, like, a known -- we could figure that out?

18      A.    Yes.

19      Q.    Okay.  Did you ever advise a voter over the

20  phone what to do when they received a notice and a new

21  ABBM and maybe also a new Voter Registration

22  Application?  Did you ever advise a voter on the phone,

23  like, This is what you have to do with these papers and

24  get them back to us so we can send you a mail ballot?

25      A.    Yes.
```

```
1        Q.   Did you ever -- did you ever talk to a voter
2   for whom there wasn't enough time left, either for you
3   to send them those new materials or for them to return
4   those materials, and did you offer those voters a
5   different advice?
6        A.   Yes.
7        Q.   Okay.  Tell me how that situation would come to
8   pass?
9        A.   Let's say if you sent in your information and
10  we sent you a notice back, and it was past the deadline
11  or you wouldn't have enough time to get into the mail,
12  if you received a ABBM, sent a ABBM in and a notice was
13  sent to you, then I would advise that voter to go to an
14  Early Voting location or go to the polls on Election Day
15  to vote in person.  And then the ABBM application that I
16  sent back to you, just go ahead -- and I will let them
17  know to fill out everything completely, answer all the
18  questions, and mail it back to us, and then we'll get
19  you ready for the next election.
20       Q.   Okay.  Did you ever have a voter tell you, in
21  response to that advice, that they -- they weren't
22  physically able to get to the poll to vote in person?
23       A.   Yes.
24       Q.   Do you remember what some of those reasons were
25  that the people were describing about themselves that
```

```
 1   they weren't physically able to get --

 2        A.   They said --

 3        Q.   -- to the poll?

 4        A.   -- they could not walk or they couldn't --

 5   didn't have a way or a car to get to the polls.

 6        Q.   Okay.  Were most of the people that you were

 7   talking to over age 65?

 8        A.   Yes.

 9        Q.   Do you have data on what -- let's say for

10   pre-SB 1, what proportion of your mail voters fall into

11   the over-65 category versus disability versus absent

12   from the jurisdiction on Election Day?

13        A.   Yes.

14        Q.   For pre-SB 1?

15        A.   Yes, because, you know, we have the category.

16   We have -- they have to tell us how they are vot- -- why

17   they're voting mail ballot, so we have -- we put that

18   into our system, Y65, which is annual 65; YDS, which is

19   disabled; or REM (phonetics), out of county.

20        Q.   Okay.

21        A.   Uh-huh.

22        Q.   And that's because they check a box; isn't

23   that --

24        A.   They check --

25        Q.   -- right --
```

1        A.    -- a box, yes.

2        Q.    -- on the ABBM?

3        A.    Yes.

4        Q.    Okay.  And that continues through -- even

5    through the March primary of 2022?

6        A.    Yes.

7        Q.    And does that information go into your computer

8    system in any way?

9        A.    Yes.

10       Q.    So you could run a report, for example, how

11   many of your mail voters were sent a ballot because they

12   checked off over 65 versus disabled versus absent; is

13   that right?

14       A.    Yes.

15       Q.    What system would produce that report; what's

16   the name of your system?

17       A.    VEMACS.

18       Q.    VEMACS.

19             THE WITNESS:  It's V-E-M-A-C-S.

20             THE REPORTER:  Thank you.

21       Q.    Thank you.  I had completely gotten that wrong.

22       A.    A lot of people do.  I'm sorry.  And the

23   corporation is Votec that owns the VEMACS.

24             THE REPORTER:  I'm sorry?

25             THE WITNESS:  VOTEC, V-O-T-E-C.

```
 1       Q.    Did you find yourself unable to process

 2  applications for ballot by mail at a greater number

 3  following SB 1's requirement to match an ID number?

 4       A.    Yes.

 5       Q.    And how do you know the numbers are greater

 6  post SB 1?

 7       A.    Because of the requirements of the driver's

 8  license and the ID it didn't ask before.

 9       Q.    All right.   How do you know you were rejecting

10  more ABBMs and more mail ballots post SB 1?   Like, how

11  do you know the volume was greater?

12                 MS. HUNKER:   Objection, form.

13       A.    How do I know the volume was greater?

14       Q.    (Moving head up and down.)

15       A.    By the numbers that we was putting into the

16  system of the notice codes, notices that we sending out.

17                 THE REPORTER:   I'm sorry.   Can you repeat

18  your answer, and can you speak up just a little bit --

19                 THE WITNESS:   I'm sorry.

20                 THE REPORTER:   -- please.

21                 THE WITNESS:   About how -- the

22  applications that we was -- put in the systems, the

23  notices that we were generating to the voters.

24                 THE REPORTER:   Thank you.

25       Q.    And I think you said notice codes?
```

 1        A.    Notice codes.

 2        Q.    Were you here when Mr. Lopez testified that, at

 3   some point, Dallas County received an update from the

 4   Secretary of State in TEAMS or through TEAMS that gave

 5   you more ID numbers?

 6        A.    Yes.

 7        Q.    Were you familiar with that when it happened?

 8        A.    He told me that it happened.

 9        Q.    Okay.  So do you know whether it got any easier

10   to find a matching ID number at that point?  Or -- I

11   understand it was February.

12              Was it too late at that point?  Do you -- do

13   you have any recollection of that?

14        A.    I do --

15              MS. HUNKER:   Objection, form.

16        A.    -- not know if it got easier or not.

17        Q.    (By Ms. Perales)  Okay.  Let me ask you another

18   question about verifying the ID number.

19              Would it be fair to say that when you received

20   either an ABBM or a mail ballot, that you would take

21   that number that was provided to you by the voter and

22   look it up in the Dallas County voter roll for that

23   voter?  You would look up that voter in your own voter

24   registration records to see if you could find a matching

25   number?

```
 1      A.    I do not open the envelope with the flap with
 2   the ID number on it.
 3      Q.    Who does?
 4      A.    SVC.
 5      Q.    Okay.  Did you hear of any problems the
 6   Signature Verification Committee had getting those
 7   envelopes open without destroying the number underneath?
 8      A.    Are you asking about opening the flap, or are
 9   you asking about opening the envelope?
10      Q.    Opening the flap.  Who opens the flap?
11      A.    I do.
12      Q.    Okay.
13      A.    I do.
14      Q.    Did you have any problems opening the flap?
15      A.    I hope not.  I designed that flap --
16      Q.    Okay.
17      A.    -- helped design it.  No, just kidding.  No.
18      Q.    I just -- as we go around this day and we
19   talked to all these counties --
20      A.    Uh-huh.
21      Q.    -- we get all kinds of stories.
22      A.    We have -- we have -- the way we designed the
23   flap was pre-perf, and we just pull it back.
24            THE REPORTER:  You said pre --
25            THE WITNESS:  Perf.
```

```
 1                    THE REPORTER:  Pre-perf.

 2                    THE WITNESS:  Uh-huh.

 3                    THE REPORTER:  Thank you.

 4        Q.   Pre-perforated?

 5        A.   Pre-perforated.  I'm sorry.  Yes.

 6        Q.   So you didn't have to use any tools or

 7   implements to try to get that open?

 8        A.   No.

 9        Q.   That's probably worth a phone call with some

10   counties that I can recommend to.

11             And so do you think that there are voters in

12   Dallas County who submitted an ABBM, you couldn't match

13   their ID number and you sent them the notice and the new

14   materials, but they were never able to cure the ABBM

15   and, thus, did not vote?

16             MS. HUNKER:  Objection, form.

17        A.   Yes.

18        Q.   (By Ms. Perales)  Okay.  And what would be the

19   reasons that they couldn't cure the ABBM?

20        A.   What would be the reasons why?

21        Q.   Yes.  So, for example, one reason might be they

22   just didn't have enough time; they just didn't get it

23   done in time.

24             But were there people who gave you a number,

25   and you just simply weren't able to match it, even after
```

1  you sent them the notice and --

2       A.   Yes.

3       Q.   Okay.  And would that be because you just

4  didn't have their ID number that they provided in your

5  system?

6       A.   Yes.

7       Q.   And now I'm going to ask on the mail ballot

8  side, were there people who submitted a mail ballot to

9  you and you weren't able to verify that number and,

10  thus, you were not able to have that ballot counted?

11            MS. HUNKER:  Objection, form.

12       A.   I -- I don't feel comfortable answering that

13  question because I don't, you know, make the decisions

14  on that.  Ballot Board does.  Early Voting Ballot Board

15  does.

16            THE WITNESS:  I'm sorry.  Early Voting

17  Ballot Board.

18            THE REPORTER:  Okay.

19       Q.   Did you or anyone in your office speak to any

20  voters who told you that they just hadn't been able to

21  vote in the election because of the voter ID number

22  matching requirements or as a result of the voter ID

23  number matching requirements?

24            MS. HUNKER:  Objection, form.

25       A.   Yes.

1      Q.    (By Ms. Perales)  Can you give me an example of

2   a person like that?  Do you recall any specific --

3      A.    Of a voter who just could not get to the polls?

4      Q.    Yes.

5      A.    That's it.  They couldn't -- they couldn't get

6   out of the house to get to the polls and that is their

7   only way of voting, was voting by mail.

8      Q.    And a voter who you couldn't match their ID

9   number?

10      A.    Yes.  A lot of voters just got frustrated and

11   didn't -- wouldn't turn it back in.

12      Q.    Do you receive mail ballots where another

13   individual has helped the voter, provided assistance to

14   that voter, and then signed that spot on the envelope

15   where they are supposed to sign?

16      A.    Do I receive -- ask me that again.

17      Q.    Yeah.  Do you receive mail ballots that come

18   back to you and you can see that an assistor has

19   provided assistance to that voter?

20      A.    Are you asking me do I receive the ABBM

21   application or the mail ballot?

22      Q.    I was asking just about the mail ballot.

23      A.    Do we see receive -- I can see that, yes.

24      Q.    Do you record anywhere that a mail ballot came

25   to you and there's an indication that the voter received

1  assistance?

2      A.    No, I do not.

3      Q.    So the only way we could figure out that number

4  would be to go back through the envelopes; is that

5  right?

6      A.    Yes.

7      Q.    Okay.  That sounds time-consuming.

8      A.    Yes.

9      Q.    And now let me ask you about the application

10 for ballot by mail.  If a voter receives assistance in

11 filling out the application for ballot by mail, do you

12 keep track of that number anywhere?

13     A.    No.

14     Q.    Okay.

15     A.    No, we do not keep track, but what I can say

16 is:  If a application come into our office and the --

17 they have a witness here (indicating), but they didn't

18 sign, then we send them that notice to the voter that

19 it's not signed; or if they signed it down here and

20 didn't fill out the information, then we send a notice

21 (indicating) to that, but...

22     Q.    So only in a situation where you can tell that

23 somebody provided assistance, but they didn't fill out

24 the paperwork --

25     A.    If it's --

 1  ahead.  Now start.  Thank you.

 2      A.   With the husband and wife situation, husband

 3  calls, requests for a ballot by mail.  He wants to

 4  request one for his wife.  We would tell him, no, we

 5  have to speak to the wife.  Wife -- and he would say,

 6  "The wife is at work."

 7           And I said, "Well, she'll have to call us back

 8  later."

 9      Q.   Okay.  Was there ever an instance where the

10  person could not tell you over the phone -- that they

11  were there, but they could not communicate to you?

12      A.   No, not -- not to my knowledge (indicating).

13      Q.   Okay.  And then have you heard from anybody

14  else in your staff that they had a situation where the

15  voter could not communicate that they needed the ballot

16  and that's why this other person was calling on their

17  behalf?

18           MS. HUNKER:  Objection, form.

19      A.   Not to my knowledge.

20      Q.   (By Ms. Perales)  Okay.  Let me ask you about

21  the ballot tracker because that's --

22      A.   Okay.

23      Q.   -- the next thing on my list.

24           To the best of your knowledge, when did the

25  ballot tracker become available for Dallas County people

1   to use to track their ballots?

2        A.    I do not know.

3        Q.    Okay.  Did you ever advise a voter to try to

4   use the ballot tracker to put ID number information in

5   there so that they could vote by mail?

6        A.    From my knowledge, you cannot put ID

7   information in the ballot tracker.

8        Q.    So what do you know about the ballot tracker?

9   What is --

10       A.    The ballot tracker is a device that the voter

11   can look up to track their ballot to see if their

12   application was accepted, if their ballot was mailed to

13   them and when the ballot was returned -- when they

14   mailed the ballot back to the county, and if the ballot

15   was received.

16       Q.    Do you know what information the voter has to

17   put into the ballot tracker to access that information?

18       A.    Yes.

19       Q.    What is that information?

20       A.    They have to put their name -- first name, last

21   name, date of birth, driver's license, Social Security,

22   address, the county that they live in.

23       Q.    Uh-huh.  Do you know if, in order to get into

24   the ballot tracker, that the system, the ballot tracker

25   system, had to match the voter's driver's license and

1  last four of the Social in order for the voter to get

2  into the system?

3      A.   Yes.

4      Q.   Okay.  And so if the voter put in their

5  driver's license number and the last four of their

6  Social, but one of those numbers was missing from their

7  voter registration record, is it correct to say, then,

8  that they could not access the ballot tracker?

9      A.   Yes.

10     Q.   Did you have anybody contact your office to

11  tell you about that?

12     A.   Yes.

13     Q.   More than ten people?

14     A.   Yes.

15     Q.   Did you offer any advice to those voters about

16  how to access the ballot tracker system when they were

17  providing their ID numbers, but it -- it just wasn't

18  letting them in?

19     A.   Yes.

20     Q.   And what did you tell them?

21     A.   Well, if I was speaking to the voter, then I

22  would look up their voter registration information, and

23  I advised them what they had in the system.

24     Q.   And did you ever look up a voter and find that

25  there was a driver's license number, but no last four of

 1  the Social?

 2       A.   Yes.

 3       Q.   Did you ever look up a voter and see that there

 4  was the last four of the Social, but no driver's license

 5  number?

 6       A.   I don't recall doing that, remember that one.

 7       Q.   Was it more the -- more often the case that a

 8  voter's driver's license number was in their

 9  registration record, but not the last four of their

10  Social?

11       A.   Yes.

12       Q.   Do you know, when a person fills out a voter

13  registration application, whether they have to provide

14  both the driver's license number and the last four of

15  the Social or if they can just provide the driver's

16  license number and be accepted for voter registration?

17            MS. HUNKER:  Objection, form.

18       A.   On the voter registration application, it

19  does -- it has the question for both, but it says "or,"

20  either-or.

21       Q.   Is it also the case that you have voters

22  registered to vote in Dallas County who registered to

23  vote before the voter registration application asked for

24  either the driver's license number or the last four of

25  the Social?

```
 1      Q.   And is this always the way that you interpreted
 2  the law?
 3                MS. HUNKER:   Objection, form.
 4      A.   Yes.
 5      Q.   (By Ms. Bender)  Okay.  So, again, throughout
 6  the entire time that you were processing ballots for the
 7  March 2022 primary --
 8      A.   (Witness moves head up and down.)
 9      Q.   -- you would accept it if the driver's license
10  number was incorrect, but the Social Security number was
11  correct?
12      A.   Yes.
13                MS. BENDER:   Okay.  That's all of my
14  questions.  Thank you.
15                THE WITNESS:   Thank you.
16                THE REPORTER:   Just a second.
17                     EXAMINATION
18  BY MS. CAI:
19      Q.   Hello, Ms. Phillips.
20                MS. CAI:   Oh.  Go ahead.
21      A.   Hi.
22                MS. PERALES:   One second, please.   One
23  second, please.
24                THE REPORTER:   Okay.  And who is this,
25  please?
```

```
 1                MS. CAI:  My name is Sophia Cai, and I'm
 2   representing the OCA Plaintiffs.
 3                MS. PERALES:  Slow down for one second.
 4   Can you just say that more slowly?
 5                MS. CAI:  Of course.  My name is Sophia
 6   Cai, spelled S-o-p-h-i-a.  Last name, Cai, C-a-i.
 7                THE REPORTER:  Okay.  And you're
 8   representing who?
 9                MS. CAI:  The OCA-Greater Houston
10   Plaintiffs.
11                THE REPORTER:  Okay.  Thank you.
12                Okay.  Thank you.
13                MS. CAI:  Great.
14        Q.   (By Ms. Cai)  Hi, Ms. Phillips.  Thank you --
15        A.   Hi.
16        Q.   -- for bearing with us.  I just have a few
17   questions for you.
18             You testified earlier that you didn't know off
19   the top of your head the number of people who submitted
20   an application for ballot by mail that was incomplete
21   because you could not verify their ID number.
22             Even without that exact number off the top of
23   your head, do you know whether the number of ABBMs that
24   were rejected in the March primary was greater than in
25   past years?
```

The Office of the Dallas County Elections Administrator                April 29, 2022
                                                                      Page 156

1                    MS. HUNKER:   Objection, form.

2        A.    Yes, it was greater.

3        Q.    (By Ms. Cai)   What accounts for that greater

4    number of rejections?

5                    MS. HUNKER:   Objection, form.

6        A.    The new requirements, the missing driver's

7    license or the missing Social Security numbers.

8        Q.    (By Ms. Cai)   Do you have reason to believe

9    that some individuals whose applications for ballot by

10   mail or mail ballots are being rejected -- excuse me --

11   that have been rejected are, in fact, eligible voters

12   who made errors while filing -- filling out their ID

13   numbers?

14                   MS. HUNKER:   Objection, form.

15       A.    Yes.

16       Q.    (By Ms. Cai)   Are you or your office concerned

17   by the greater number of rejected applications for

18   ballot by mail or mail ballots in the March primary?

19                   MS. HUNKER:   Objection, form.

20       A.    Yes.

21       Q.    (By Ms. Cai)   Why are you concerned?

22       A.    Because voters before the SB 1 law were able to

23   vote and cast their ballots, and ballots counted.

24       Q.    Have you or your office conveyed that concern

25   to the Secretary of State?

```
 1      A.    I have not; but my office -- some people in my

 2   office probably have, yes.

 3      Q.    Do you know what they have said?

 4      A.    No, I don't.

 5      Q.    Have you or your office conveyed that same

 6   concern to other election officials?

 7              MS. HUNKER:  Objection, form.

 8      A.    Probably so.  I do not know.

 9      Q.    (By Ms. Cai)  Have you personally conveyed that

10   concern to anyone?

11      A.    No.

12      Q.    Turning to SB 1 requirements next, are you

13   aware that SB 1 adds additional requirements in order to

14   register to vote by mail or to actually vote by mail?

15              MS. HUNKER:  Objection, form.

16      A.    Repeat that again.

17      Q.    (By Ms. Cai)  This has probably been covered,

18   but is it correct that you are aware that SB 1 adds

19   requirements to register to vote by mail or to actually

20   vote by mail?

21      A.    Yes.

22              MS. HUNKER:  Objection, form.

23      Q.    (By Ms. Cai)  Is a registered voter with a

24   disability able to get a modification or accommodation

25   to the ID requirement for voting by mail?
```

# Attachment 10

# Yvonne Ramon
# May 10, 2022 Deposition Excerpts

Transcript of the Testimony of

**Yvonne Ramon**

**Date:**

May 10, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs STATE OF TEXAS

```
 1

 2              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 3                     SAN ANTONIO DIVISION

 4
   LA UNION DEL PUEBLO          )
 5 ENTERO, ET AL                )
                                )
 6 vs.                          )  CASE NO. 5:21-cv-0844-XR
                                )
 7                              )
   STATE OF TEXAS, ET AL        )
 8 _____

 9 OCA-GREATER HOUSTON, ET AL)
                                )
10 vs.                          )  CASE NO. 1:21-cv-0780-XR
                                )
11 TEXAS SECRETARY OF STATE     )
   JOHN SCOTT, ET AL            )
12 _____
   HOUSTON AREA URBAN           )
13 LEAGUE, ET AL                )
                                )
14 vs.                          )  CASE NO. 5:21-cv-0848-XR
                                )
15 GREGORY WAYNE ABBOTT, ET     )
   AL                           )
16 _____
   LULAC TEXAS, ET AL           )
17 LEAGUE, ET AL                )
                                )
18 vs.                          )  CASE NO. 1:21-cv-0786-XR
                                )
19 JOHN SCOTT, ET AL            )
   _____
20 MI FAMILIA VOTA, ET AL       )
                                )
21 vs.                          )  CASE NO. 5:21-cv-0920-XR
                                )
22 GREG ABBOTT, ET AL           )
   _____
23 UNITED STATES OF AMERICA     )
                                )
24 vs.                          )  CASE NO. 5:21-cv-1085-XR
                                )
25 STATE OF TEXAS, ET AL        )
```

1

2                    ORAL & VIDEOTAPED DEPOSITION

3                          YVONNE RAMON

4                          May 10, 2022

5

6      ORAL & VIDEOTAPED DEPOSITION OF YVONNE RAMON,

7  produced as a witness at the instance of the United

8  States and duly sworn, was taken in the above-styled and

9  numbered cause on the 10th day of May, 2022, from

10 9:06 a.m. to 4:09 p.m., before Dora Canizales, Certified

11 Shorthand Reporter in and for the State of Texas,

12 reported by computerized stenotype method at the Hidalgo

13 County Safety Division, 9805 North Tenth Street,

14 McAllen, Texas 78504, pursuant to the Federal Rules of

15 Civil Procedure and the provisions stated on the record

16 or attached hereto.

17

18

19

20

21

22

23

24

25

 1      A     Yes.

 2      Q     If the question is unclear to you, just let me

 3  know.  If you don't ask for clarification, I will assume

 4  you understood the meaning of the question.  Does that

 5  make sense?

 6      A     I understand.

 7      Q     Okay.  Your attorney may object to some of my

 8  questions.  Those objections are for the judge to

 9  consider at a later point.  Unless your attorney

10  specifically instructs you not to answer, just answer my

11  question.

12      A     I understand.

13      Q     Okay.  Finally, if you need to take a break for

14  any reason, just let me know.  I will try to go -- take

15  a break maybe every hour or so.

16            The only thing that I ask is that if a

17  question is pending when we break, that you just answer

18  before we go off the record.

19      A     Yes.

20      Q     Okay, great.

21            Is there anything that might impair your

22  ability to testify truthfully and honestly today?

23      A     No.

24      Q     Have you taken any medication, alcohol, or

25  drugs that would impair your testimony today?

Yvonne Ramon

May 10, 2022
Page 10

```
 1      A      No.

 2      Q      Okay.  I would like to give you an exhibit and

 3  ask the court reporter to mark this as Exhibit 1.

 4                  (Exhibit 1 marked.)

 5                  Ms. Ramon, have you seen this document

 6  before?

 7      A      I have.

 8      Q      And what is it?

 9      A      It is the latest document that I have received

10  in regards to being prepared for this deposition.

11      Q      So do you understand that you have been

12  designated to testify under Federal Rule of Civil

13  Procedure 30(b)(6), which means that you'll be

14  testifying today on behalf of your office?

15      A      Okay.  I understand.

16      Q      Okay.  And so that's a little bit different

17  than your prior testimony in this case that was just in

18  your personal capacity, do you understand?

19      A      I see.  Thank you.

20      Q      Okay.  Now, if you could flip to page -- I

21  guess there aren't page numbers, but the page at the

22  bottom where it says "Deposition topics."

23      A      I'm there.

24      Q      Are you there?  Okay.

25                  Have you seen these topics before?
```

```
 1      A     I have.

 2      Q     And have you spent time reviewing them before

 3 today's deposition?

 4      A     I have.

 5      Q     Okay.  And are you prepared to testify on

 6 behalf of your office on behalf of each of these topics?

 7      A     To the best of my ability.

 8      Q     Great.

 9            So I know you spoke a little bit about

10 your background and duties during the last deposition,

11 and so I won't belabor the point too much.  But I do

12 want to get some of the basics out there just for the

13 record.

14            Could you just briefly explain what your

15 responsibilities are as the Hidalgo County Elections

16 Administrator?

17      A     As the elections administrator, I oversee two

18 main departments.  The first is the voter registrar

19 department, which would be under the tax assessor if

20 there was not an EA in place.

21            And the second is the elections operations

22 division, which would be under the county clerk, if

23 there were not an EA in place.

24            So basically those two are the main jobs.

25 But then again, within the scope of those two, we've got
```

1  a GIS department that oversees the most updated maps.

2  And I think that's very important as well.

3      Q    And what are the differences in your

4  responsibilities between the two departments that you

5  just mentioned?

6      A    One is actually maintaining and synchronizing

7  with the Secretary of State's office as people register

8  to vote.  So we maintain the database, it's what it's

9  called.  So any time a person fills out an application,

10  it can be a new voter or it can even be a change of an

11  existing voter, we maintain those -- those records.

12              Aside from that, any time that a person

13  has a question in regards to their information on their

14  application, if they have a change, then all that would

15  come to us.

16              The responsibility is that every night we

17  upload that information to the Secretary of State's

18  office as their team database, which is the State

19  database must be synchronized and in sync with our

20  information, because we are what is called an offline

21  county, so we don't type in our information directly to

22  the State, but on our own vendor side.  And then we

23  upload every night.

24              So basically anything to do with

25  registration of a voter.

1           The operations division handles the

2  administration of elections.

3              By law, I'm required to oversee all

4  federal, state, and county.  But also by law, as an

5  elections administrator, if a local jurisdiction such as

6  a city, a school a water district, the South Texas

7  College, for example, if they ask for us to help them

8  administer their election, I must say yes.  So we also

9  then handle local jurisdictions.

10             So basically everything to do with the

11 administering of the election as it begins and as it

12 ends.

13     Q    Okay.  And about how many employees work in the

14 voter registrar department?

15     A    Permanent employees are 27, and we have 14

16 temps that can come and go as an election begins and

17 ends.

18     Q    I'm sorry.  I didn't get that the last part.

19 How many?

20     A    Fourteen temporary.

21     Q    And how many employees work in the elections

22 operations department?

23     A    In the operations, pretty much -- I'll start

24 off with VR.  I got seven.  So about 20.  Because we all

25 work in each department, I think because since it's one

 1  umbrella.

 2         The VR database processors, there are

 3  seven.  And I think the rest of the departments work in

 4  the operations of the election, in administration of the

 5  election.  And so pretty much I think all 20 work

 6  everything.

 7      Q    Got it.  And you have temporary employees for

 8  the elections operations --

 9      A    I do.

10      Q    -- department as well?

11      A    I do.  There are anywhere between three to

12  seven temporary employees that can be on or off,

13  depending on the election itself and the other duties of

14  the office.

15      Q    Great.  And about how many elections have you

16  run as the Hidalgo County Elections Administrator?

17      A    I didn't go back to check.  But when I did my

18  report a couple of years ago, it was over 200, so I'm

19  sure it's somewhere around there.

20      Q    Okay.  So let me ask you this then:  How long

21  have you been in your current role?

22      A    September 2nd will be 14 years.  So not quite

23  14, but right around the corner.

24      Q    And what did you do before then?

25      A    I was actually in education.  I had just

```
 1  started a school that summer as secondhand to a

 2  principal.  That school was supposed to be mine as

 3  principal one day, and that's how she hired me on.  So I

 4  was working in education.

 5      Q    And what made you decide to go from education

 6  to elections administration?

 7      A    Truly, that is a story all on its own,

 8  honestly.

 9      Q    Sure.

10      A    My prayer is always where do you need me, Lord,

11  and this is where I ended up.

12      Q    Understood.  Does your office have a mission

13  statement?

14      A    No, we don't.

15      Q    Would you say that helping people register to

16  vote is part of your office's objectives?

17      A    Yes.

18      Q    Would you say that making voting more

19  accessible is part of your office's objectives?

20      A    Yes.

21      Q    And would you say that ensuring eligible voters

22  are able to cast a ballot as part of your office's

23  objectives?

24      A    Yes.

25      Q    And how does the -- you mentioned this a second
```

 1  ago, but can you just explain how your office interacts

 2  with the Secretary of State's office on a day-to-day

 3  basis?

 4      A    The Secretary of State's office has always been

 5  our I think number one support system.  We look to them

 6  for guidance.  We look to them for instructions when

 7  something changes, when something is new.  We wait

 8  anxiously for them to guide us.

 9              And so, of course, they interpret the

10  election code.  So whenever there is a question, that's

11  who we call firsthand.

12              So without them, I don't know what we

13  would do because they are truly our support.

14      Q    And who in the Secretary of State's office do

15  you generally contact with questions about an election?

16      A    Well, I am part of the advisory committee that

17  was formed in 2020.  There are 27 counties that were

18  asked to represent the State.

19              And so we're usually talking with Keith

20  Ingram and Christina Adkins.

21              But, of course, dialing the 1-800 number,

22  and you hit number 3, any of the legal attorneys that

23  answer, we work with all of them.

24      Q    Okay.  What is this advisory committee that you

25  just mentioned?

```
 1    Q    So are you familiar with this provision --
 2    A    I am.
 3    Q    -- of Senate Bill 1?
 4    A    Yes.
 5    Q    And what is your understanding of what it
 6 requires?
 7    A    Our Senate Bill 1 made the authority of a poll
 8 watcher very specific in the actual law.
 9              What I mean by that is that we've always
10 had poll watchers, and we've always accepted them.  And
11 I trained that part of the training to our poll judges
12 and our clerks.
13              And for us, we welcome poll watchers.
14 Why?  Because it's a necessary part of the election for
15 candidates to be able to view and see that the process
16 is going well.
17              What we've seen is the change for us came
18 when a poll watcher was to direct himself or herself to
19 our judge.
20              And this law now allowed them to go
21 straight to a clerk, for example, and possibly interrupt
22 the process that was happening at that time.
23              And so that was -- that was something that
24 I really did talk to our judges and clerks about that,
25 and just made sure that the respect was there, because
```

1  when respect is there, then everything will be fine.

2                    And in 2022, this primary, everything went

3  well.  I can't say surprisingly because I wasn't sure.

4                    Possibly some of our judges didn't come to

5  help us because they feared that something could go

6  wrong and -- no, everything went well.

7                    So just making it very specific and giving

8  them more authority is what changed mainly for us.

9      Q    Okay.  And that's great to hear that everything

10  went well.  And I think I will have more questions about

11  poll watchers and the March primary in a bit.

12                   I just want to ask a couple of follow-ups

13  about your answers.

14                   First, you had mentioned that there was

15  some concern that poll watchers would interrupt the

16  process, I think is the quote that you just made?

17     A    Yes.

18     Q    What do you mean by "interrupt the process"?

19     A    For example, in 2020, when -- because the oath

20  that a poll watcher takes, I reviewed all the oaths

21  together in preparation for this, and it was interesting

22  to see that the oath of a poll watcher is that, I will

23  not disrupt the voting process, and I will not harass

24  voters.  This is actually the oath that they need to

25  take.

1            And in retrospect back to 2020, when a,

2   for example, poll worker was checking on a voter,

3   disrupting the process would be that a poll watcher

4   would come and say, tell me what you're doing, or how is

5   it you're not doing this right, or something that

6   perhaps before it wasn't allowed.

7            At that point, the poll watcher, if he or

8   she felt something was not correctly done, would go to

9   the judge, and they would be observers of the process,

10  which was fine.  But they would direct themselves to the

11  judge.

12            At this point, if the judge were to

13  observe something not being done correctly, then that

14  judge would go and correct the process, if need be.

15            Well, now that poll watcher has the

16  authority to go directly to the worker that they want to

17  question or make a comment on.

18            And that can be difficult if you're in the

19  middle of trying to check, you know, a voter, a

20  potential voter.

21     Q    Right.  And so if -- is your understanding that

22  if a poll watcher goes to an election worker while

23  they're trying to check on a voter and sort of

24  interrupts the process, as you just mentioned, could

25  that lead to longer wait times for voters?

 1                   MR. HERBERT:  Objection, form.

 2      A    It could, it could, depending on what their

 3 observation is and and how it's taken care of.

 4              The Senate Bill 1 does allow the clerk to

 5 turn the responsibility back over to the judge, which is

 6 good.

 7              At that point, then it can no longer go

 8 back to the clerk.  And so, once again, the judge would

 9 be the person who would take care of something the clerk

10 would not be able to handle.

11      Q    (BY MR. WHITE) Okay.  And I was going to ask

12 about this later on, but since you mentioned it, you had

13 said that you did part of a training relating to poll

14 watchers?

15      A    I did.

16      Q    If I understand you correctly?

17              What did that training entail?

18      A    The law.  We always start all our trainings,

19 the processes are always to start off with the law.  The

20 kind of election that they're having and then -- and the

21 changes of the law.

22              In this case, of course, a poll watcher

23 where if they were -- if a clerk were to be interrupted

24 or they were to have a question asked upon them, that

25 would be allowed.

 1              And so we needed to be clear that they

 2  needed to allow this if this were to happen.

 3      Q    And who conducted this training?  Did you do it

 4  yourself?

 5      A    I did.

 6      Q    Did anybody else assist you?

 7      A    I did the training myself of all the workers.

 8      Q    And when you were explaining the meaning of the

 9  law to them, how did you prepare to explain that?

10      A    Pretty much we read the law to them.  And, of

11  course, we use the guidance from the Secretary of

12  State's office because they did, by then, give us some

13  PowerPoint presentations that were very clear.

14              And so I actually used this as part of my

15  presentation.  And that's usually our protocol.

16              Whenever we are going to train poll

17  workers, we do abide by the -- whether it's poll worker

18  training or the election day training, whatever it may

19  be, from the Secretary of State's office, they always

20  provide that training guidance.  And so that's what

21  mainly I used.

22      Q    Okay.  So the Secretary of State's guide --

23  sorry.  Strike that.

24              So you rely on the guidance from the

25  Secretary of State's office to clarify ambiguous terms

1              There are specific -- and I don't know if
2  it's further down where -- I did have to talk to our
3  poll judges because it specifically said, when the voter
4  brings in his or her assistant, then the poll watcher
5  may not observe.  But when the election clerks are
6  assisting, the poll watcher may observe.
7              So that changes the free movement,
8  depending on who is assisting the voter.
9              So that to me right there is something
10 that our judges needed to understand as well.
11    Q    During the training that you provided to your
12 judges, did anybody ask about the meaning of this
13 language?
14    A    When I had it up on the screen, I think it's
15 something that we discussed, and so I'm trying to think
16 you if anyone had a question.  I don't recall.
17    Q    Does this provision allow poll watchers to
18 follow voters anywhere in the polling place?
19              MR. HERBERT:  Objection, form.
20    A    It does.
21              THE REPORTER:  I'm sorry.  I didn't get
22 the answer.
23              THE WITNESS:  It does.
24    Q    (BY MR. WHITE) Does it allow poll watchers to
25 stand near a voter when they mark a ballot?

1           MR. HERBERT:  Objection, form.

2    A     And, again, if the assistant -- if the voter is

3 by himself or herself, they don't have the authority to

4 stand so near that they can see how a voter marks his or

5 her ballot.  I'm voting.  This is me.

6           The Senate bill addresses when a voter has

7 an assistant.  Once again, if I bring my own assistant,

8 you have to stay away as a poll watcher.

9           But when the poll workers are assisting --

10 and on election there has to be two, on early vote

11 there's one poll worker -- then the poll watcher has a

12 right to stand near enough to be able to hear that the

13 instructions given are correctly being given and

14 correctly.

15    Q     So that brings me to my next question.  So

16 Subsection F says -- and I'll just read it out loud for

17 the record.

18           "In this code, a watcher who is entitled

19 to observe an election activity is entitled to sit or

20 stand near enough to see and hear the activity."

21           How close does this provision allow for

22 watchers to get to the activity that's being referenced

23 here?

24           MR. HERBERT:  Objection, form.

25           MS. RAMIREZ:  Objection, form.

```
 1      A      It doesn't give us an exact 2 feet, for
 2  example.
 3             I think it's all on an individual basis.
 4  If I was the poll watcher, I would have to be close
 5  enough because I am a little bit hard of hearing.
 6  Versus someone who doesn't have that.
 7             So I think this is something that needs to
 8  be just respected into the need of everyone there.
 9      Q      (BY MR. WHITE) Did you receive any guidance
10  from the Secretary of State's office about how close
11  poll watchers are allowed to get near voters or other
12  activity?
13             MR. HERBERT:  Objection, form.
14      A      No.  Basically, it was written as it is in the
15  law.  And I think at that time -- we haven't discussed
16  it again, it was so much I don't think anyone had any
17  specific questions.  I don't know if anyone has
18  questioned them since then, but I haven't.
19      Q      (BY MR. WHITE) Got it.
20             And if you could flip to the next page, to
21  page 29, we'll take a look at Section 4.09.  And just
22  take a second to read 4.09 to yourself.  That's from
23  lines 2 to 11.
24      A      Yes.
25      Q      So are you familiar with this new provision of
```

1 Senate Bill 1?

2     A     I am.

3     Q     And what's your understanding of what this

4 section is?

5     A     My understanding would -- I guess I would give

6 an example.  If someone is trying to observe a voter and

7 the clerk stands right in front of the poll watcher and

8 is obstructing the view, that's not allowed.  The poll

9 watcher must be able to view clearly what is happening

10 and not have anything.

11             I don't -- you know, we've heard of other

12 counties that maybe didn't have -- had a small window

13 and poll watchers would just stand outside the window.

14 And so there were so many poll watchers, you know, you

15 couldn't really see.

16             We haven't had any of that issue.  Our

17 poll watchers are in the room along with the ballot

18 board or the polling location.

19             And sometimes there could be obstruction

20 in a vehicle because of the nature of how they're

21 voting.  You know, not everyone can be at the window

22 peering in.

23             So the judge has to have command of that

24 and has to understand and be respectful of everyone's

25 needs.

1 direct them to -- for the voter to read the ballot, for

2 the voter to mark the ballot.

3          So they're there to assist the voter as

4 the voter necessitates, the need.

5     Q    Are there any policies and procedures that

6 you've had to implement in response these changes to the

7 oath?

8     A    We've not.  I mean, the fact that it's added

9 the verbiage to what we've always been -- we've always

10 had, which we are not here to coerce or influence the

11 voter in any way.

12          So reading the ballot, marking the ballot,

13 perhaps translating -- if the voter is -- is with an

14 English ballot and maybe doesn't understand a term, we

15 are not to give explanations of any kind.  We've never

16 been allowed to do that.

17          We can perhaps translate the word, if need

18 be.  But what does that mean?  It's not part of what we

19 should be doing.  Because now it becomes subjective.

20 Now it becomes my interpretation.  And that's not what

21 we're allowed to do.

22     Q    Are there any interests of Hidalgo County that

23 are served by these changes to the oath?

24          MR. HERBERT:  Objection, form.

25          MS. RAMIREZ:  Objection, form.

```
 1      A     No.

 2      Q     (BY MR. WHITE) All right.  And the last

 3  provision I just want to ask you about is Section 7.04

 4  on page -- at the very bottom of page 58 and continuing

 5  on to page 59.

 6            If you wouldn't mind taking a second to

 7  read through that.  Actually I'll just say I think on

 8  page 59 you can just read lines 1 through 10.  I think

 9  this goes on for a few pages.

10      A     Okay.

11      Q     Are you familiar with this provision of Senate

12  Bill 1?

13      A     Yes.

14      Q     And what does this provision do?

15      A     It outlines again that a person cannot and

16  should not be compensated for assisting voters if they

17  are, in turn, then benefiting from that assistance.

18      Q     Has this provision changed anything that you do

19  as an elections administrator?

20      A     No.

21      Q     Are there are any new policies and procedures

22  that you've had to implement in response to this

23  provision?

24      A     Not yet, no.

25      Q     Are there any interests of Hidalgo County that
```

 1 are served by this provision?

 2                    MR. HERBERT:  Objection, form.

 3                    MS. RAMIREZ:  Objection, form.

 4       A    No.

 5                    MR. WHITE:  Okay.  I think now would be a

 6 good time for a break.  We've been going for about

 7 90 minutes.  If that sounds good with everyone.

 8                    MS. RAMIREZ:  Sure.

 9                    THE VIDEOGRAPHER:  Going off the record.

10 The time is 10:26 a.m.

11                    (Break taken.)

12                    THE VIDEOGRAPHER:  We are back on the

13 record.  The time is 10:46 a.m.

14       Q    (BY MR. WHITE) All right.  Ms. Ramon, I wanted

15 to do jump back in by asking a few questions about

16 Senate Bill 1 as it was being enacted, as it was sort of

17 going through the website processing, your actions and

18 statements during that time.

19                    Did you take a position on Senate Bill 1

20 as it was being considered by the Texas Legislature?

21       A    I was trying to remember.  I'm a past president

22 of the Texas Association of Elections Administrators.

23 And I was not president, of course, last year.  And it's

24 already been maybe five years.  So I was part of the

25 legislative committee.  Because after president, you

 1 become the legislative committee chair.  So I was being

 2 co-chair.

 3            And I think my name was added to a letter

 4 to the legislator about Senate Bill 1.  But, honestly,

 5 it was just the board that was added, and I don't really

 6 recall what was on the letter.

 7      Q    Okay.

 8      A    The concerns that were outlined, I wouldn't be

 9 able to tell you.  But I do remember that one incident,

10 and I was fine with adding my name.  I just don't recall

11 everything to do with that letter.

12      Q    Sure.  Do you know if this letter is something

13 that you produced in discovery in this case?

14      A    I don't know.  I don't know if I even have a

15 copy.  I think I was asking if I even had a copy.  But

16 I'm sure it's somewhere.

17      Q    And you said you don't recall the specific

18 issues that were discussed in the letter.  Do you

19 know -- are there any details that you can add that you

20 recall about the contents of the letter?

21      A    There are because, you know, there were various

22 bills that we were trying to address and learn -- from

23 1598, of course, on the retrofitting of the equipment.

24 That was really going to affect a county like Hidalgo

25 County.  And 11-11 with all the changes.

1    Q    Understood.

2              And in offering that explanation, you

3  mentioned that before the poll workers will bring the

4  marking device outside, they qualify the voter.  Can you

5  just explain what you mean by that?

6    A    So a curbside voter drives up, whether this

7  person drives up or someone drives them up, the voter is

8  then identified.

9              The frist thing a voter must do is, of

10 course, hand over one of the seven forms of ID.  If it's

11 not one of the seven forms of ID because they don't

12 possess one of them, then they are afforded an

13 opportunity to use a list B.

14             A list B goes hand-in-hand with what is

15 called a declaration of impediment.  Once they turn in,

16 it could be any document that has their name and an

17 address.

18             Once they tell the clerk that they do not

19 possess one of the seven photo IDs, then they will

20 present -- it could be a telephone bill, a bank

21 statement, anything that has their name and an address.

22             Then the clerk himself or herself knows to

23 bring those documents inside, look for the voter,

24 qualify, make sure the voter qualifies to vote, and then

25 goes outside within the combination form where the voter

1  must sign, the marking device, which is called DRDO

2  now, and the paper ballot, which is blank, right?

3  Because when that is fed into the marking device, the

4  names appear, the voter is able to mark his or her

5  choices.  And when that ballot comes back out, the

6  choices then are on this paper ballot.

7      Q    Okay.  I think I got that.

8           And you testified that Hidalgo County has

9  been doing curbside voting since you have been the

10 elections administrator?

11     A    And before.

12     Q    And before.

13     A    Always.  Because that was the law that was in

14 place.  But what changed when I came on board is that we

15 made this ADA feature available to all poll locations.

16          So in the past, a voter would -- could not

17 go by themselves.  A voter would have to bring someone

18 to run inside the poll location and tell someone, my

19 grandma is in the car, she wants to vote.

20          And I didn't like that.  So we purchased,

21 in increments of ten, because they're very costly,

22 buzzers.  So that if I wanted to go by myself, I drive

23 up, I buzz, and I park.

24          And that buzzer rings inside the poll

25 location, which alerts the group that there is someone

 1  outside ready to vote.

 2      Q    Got it.  Okay.

 3           Are you aware of any instances in Hidalgo

 4  County where somebody committed voter fraud using

 5  curbside voting?

 6           MR. HERBERT:  Objection, form.

 7           MS. RAMIREZ:  Objection, form.

 8      A    I am not.

 9      Q    (BY MR. WHITE) In your opinion as an elections

10  administrator, is curbside voting more likely to lead to

11  voter fraud?

12           MR. HERBERT:  Objection, form.

13           MS. RAMIREZ:  Objection, form.

14      A    I could not speculate on that.  Voting is

15  voting.  The voter is clearly qualified before voting.

16      Q    (BY MR. WHITE) And you mentioned -- you

17  testified earlier that in addition to doing the curbside

18  voting that you just discussed, that Hidalgo County also

19  does curbside dropoff voting; is that correct?

20      A    That's new at the main office.

21      Q    I'm sorry?

22      A    At the main office.  Because of 2020 with the

23  COVID and what have you, we have to drop off at the main

24  election office on election day.

25      Q    Okay.  And can you walk me through the steps of

1 how a voter will cast a ballot through curbside dropoff

2 voting?

3     A     So the voter must have their ballot in hand,

4 which would be in a carrier.  This voter has already

5 gone through the process of the application being

6 accepted, and a ballot has been sent to them in a kit,

7 which has various envelopes and identification.

8               Once the voter marks his or her ballot,

9 puts it into the security envelope, puts it into the

10 carrier envelope, now that voter is supposed to mail it

11 back.

12              Well, the law allows that voter who didn't

13 mail it back to himself or herself bring it to the main

14 election office and turn it in on election day.

15              We do know, and you'll probably ask, that

16 in 2020 changed, but the law for all purposes allows you

17 to do this on election day.

18              So you wanted me to explain the curbside.

19              So a voter has the capability of walking

20 this in.  And we do have voters that walk in, turn it

21 in.  We have a ballot dropoff area.

22              And, of course, the person in front is

23 instructed to have them -- well, actually, what they do

24 is they're instructed to have one of the clerks from the

25 ballot division come, and they see the ID, because they

1 hours every day for almost, what is it, 11 days our

2 voters, we felt, were very well-served.

3     Q     So did you discuss the issue at all during the

4 2020 election of implementing 24-hour voting?

5     A     No.

6              MR. HERBERT:  Objection, form.

7     Q     (BY MR. WHITE) Okay.  And are you aware that

8 other Texas counties offered 24-hour voting during the

9 2020 election?

10    A     I am.

11    Q     Did the availability of extended voting

12 hours -- or sorry, strike that.

13    A     No.

14    Q     Did the availability of 24-hour voting in other

15 counties affect your office in any way?

16    A     No.

17             MR. HERBERT:  Objection, form.

18    Q     (BY MR. WHITE) Did voters call your office and

19 ask about the availability of 24-hour voting during the

20 2020 election?

21    A     No.

22    Q     In the 2020 election, are you aware of voters

23 not being able to cast a ballot because a polling place

24 closed before they got there?

25    A     I'm not aware.

1    Q    Are any such instances reported to your office?

2    A    No.  Our community is pretty much set, 7:00 to

3  7:00.  They know that if they're in line at 7:00, it

4  doesn't mean they're on the machine at 7:00.  That means

5  that they are able to stay in line.  If they're in line

6  at 7:00 then they're able to cast their vote.

7    Q    I'm sorry.  My question was:  If voters do

8  complain about not being able to cast a vote in time by

9  the time they show up, did your office receive

10  complaints?

11    A    No.  Not that I'm aware of.

12    Q    Has Hidalgo County ever had polling sites that

13  last -- sorry.

14         Has Hidalgo County ever had lines that at

15  points that last beyond the points size close?

16    A    Yes.

17    Q    How often has this happened?

18    A    The main early poll location, which is the one

19  near the office, which is considered the main early poll

20  location, it's called the Annex, usually has a line past

21  7:00. It didn't for this May 7th election because there

22  were no local races and it was the two constitutional

23  amendments, so they actually closed on time.

24         But that one location and then there is a

25  Lark Community Center in McAllen that is, again, neck to

1  neck with the Annex.  Again, they didn't have any local

2  races on so they didn't have any issues this May 7th.

3  But usually the lines last after 7:00 as well.

4      Q    Okay.  And for the Annex -- I apologize if

5  you've already explained this, but can you just describe

6  what the Annex is and where it is?

7      A    So the Annex is part of our main office in a

8  sense that it's the main early voting polling location.

9  That is where a voter who is limited voting -- limited

10 ballot voting, for example.  They have to go to the main

11 early voting location.  This is where they would go.

12          So that's the one tied to the office.  And

13 so it's two blocks from our office.  The voters -- its'

14 a very high voter turnout.  It's a large election and

15 there is 10,000 votes there.

16          Maybe another location would have 30.  So

17 it's a high turnout.  So that's what the law mandates

18 that we deem one location in the early voting as the

19 main early location, and that's what the Annex is.

20     Q    And you said it was close to your office?

21     A    Yes.

22     Q    I'm not from McAllen, excuse me, but where is

23 -- is it even in McAllen, I'm sorry?

24     A    Yes.  It's here in Edinburg, of course.  It's

25 off of Closner.  I don't remember the address right now.

```
 1      Q     Okay.

 2      A     But it's South Closner.

 3      Q     And you said that the Annex usually has long

 4 lines.  How long of lines are you talking about?

 5      A     Like how do you want me to describe it?

 6      Q     I guess, let's say, let's go election by

 7 election.  In the 2020 general election, do you know

 8 what time voting had concluded at the Annex?

 9      A     If the polls close at 7:00, I'm sure they

10 stayed for another hour.  They could stay for another

11 hour, if it's a large presidential, like 2020 was.

12            If it goes to a gubernatorial then --

13 another thing you have to consider are the local races

14 that are there as well.

15            So if you've got, for example, the city of

16 Edinburg or the school of Edinburg on the ballot in

17 November, which they run in opposite years, then the

18 local races also add to the long lines, because of the

19 local community voting.  Although they can vote

20 anywhere, they'd like to go and vote there.

21      Q     I see.  So you think maybe about an hour and

22 during presidential years.  Do you know how long the

23 lines were at the Annex during the March 2022 election?

24      A     I don't -- I don't believe that they were as

25 long.  Again, it's a gubernatorial.  Let me see.
```

1    A    A lot of people like it.  I mean, you should

2  come visit us during a presidential.

3    Q    I'd like to.

4            So just to sort of wrap up this section.

5  I have a couple of similar questions about whether you

6  had any communications with the Secretary of State's

7  office about provisions in SB1 relating to 24-hour

8  voting?

9    A    No.

10    Q    And did you have any communications with

11  members of the Texas Legislature about these provisions

12  as the bill was being debated?

13    A    No.

14    Q    Okay.  Okay.  The next area that I wanted to

15  just touch on briefly, and this partially overlaps what

16  we had covered earlier is about language in SB1 that

17  bans ballot drop boxes.

18    A    Uh-huh.

19    Q    Has Hidalgo County ever used ballot drop boxes

20  to allow people to return mail-in ballots?  I know we

21  discussed that the curbside and dropoff voting, but

22  apart from that.

23    A    No.  We have always only had the one at the

24  main location.

25    Q    And did you ever consider allowing for more

1  dropoff facilities?

2      A    No.

3      Q    And why not?

4      A    We didn't -- we didn't see the need.  Hidalgo

5  County is one of the top ten largest counties by

6  populations.  But actually from east to west and north

7  to south, we're no more than 25 miles for a voter to

8  come.  So we didn't see that there was a need for us to

9  man more locations, security and all that.  So we

10 instead kept it to one.

11     Q    Did you have discussions about whether to add

12 additional drop box locations during the 2020 election?

13     A    I don't believe it ever came up.  We just did

14 the one.  Prepared well with the one.  Made sure we had

15 enough help here at the main office, and we prepared for

16 that.

17     Q    Do you have any reason to believe that ballot

18 drop boxes create an opportunity for voter fraud?

19          MS. RAMIREZ:  Object to form.

20     A    I don't.

21     Q    (BY MR. WHITE) Are there any interests of

22 Hidalgo County that are served by the ban on ballot drop

23 boxes?

24          MR. HERBERT:  Objection, form.

25     A    No.

1    Q    (BY MR. WHITE) And, again, did you have any

2 communications with the Secretary of State's office

3 about the provision in SB1 banning mail drop boxes?

4    A    No.

5    Q    Any communication with members of the Texas

6 Legislature about this provision?

7    A    No.

8         MR. WHITE:  Can we go off the record just

9 for a minute?

10        THE VIDEOGRAPHER:  Going off the record.

11 The time is 11:42 a.m.

12        (Break taken.)

13        THE VIDEOGRAPHER:  We're back on the

14 record.  The time 11:57 a.m.

15   Q    (BY MR. WHITE) So, Ms. Ramon, earlier we were

16 discussing the identification matching provisions for

17 mail-in ballots way back at the start of the deposition.

18 Do you recall that?

19   A    Yes.

20   Q    So I wanted to turn to that now and sort of

21 discuss how your office has implemented those provisions

22 during the March -- most recent primary and the

23 primaries that -- or the elections that we have underway

24 in May.

25        Can you explain again what the

 1      A     I'm trying to jump the gun.  You have to also

 2   remember it was redistricting and that we were doing a

 3   massive mail-out, which is 357,000-plus cards that

 4   needed to be printed and sent out.

 5               Our vendor did tell us that once we did

 6   ours, he had to turn others away because he didn't have

 7   any more paper, no more paper in stock.

 8      Q     Do you know, on average, how many voters use

 9   vote by mail in Hidalgo County during a primary

10   election?

11      A     How many voters what?

12      Q     Use vote by mail during a primary recollection

13   in Hidalgo County?

14      A     For in general?

15      Q     During a primary election.

16      A     During a primary election.  Vote by mail.  I

17   didn't look at that figure.  I just looked at the -- too

18   many -- too many percentages to remember.

19      Q     Sure.

20      A     I can tell you that during a primary, the

21   percentage of complete voter turnout would be anywhere

22   between 15 percent to 21, 22.  Except 2016 had a little

23   higher turnout, 25.  But usually it's anywhere between

24   15 to 21, 22 percent voter turnout.  But too many -- to

25   many numbers to remember the breakdown.

1    Q    Okay.

2    A    In each category.

3    Q    I have other questions that will be about

4  numbers, so hopefully I won't be over grueling in that

5  regard.

6              So during the March 2022 primary, we sort

7  of talked about some of the problems that were caused by

8  the identification matching provisions.

9              Is it fair to say that there were high

10 levels of rejection of mail-in ballot applications

11 compared to previous years?

12              MR. HERBERT:  Objection, form.

13    A    I did check that carefully, and definitely.

14 When we would have a rejection rate of 1 to 2 percent --

15 I think there was one year that we had a 2.2 -- we

16 actually had a 19 percent rejection rate in the March

17 2022.

18    Q    (BY MR. WHITE) Okay.  And I'm going to ask you

19 more specifics about those numbers in just a second.

20              The question I just asked is about whether

21 there were high levels of rejection of mail-in ballot

22 application.  Were there also high levels of rejection

23 mail-in ballots --

24    A    Yes.

25    Q    -- compared to previous --

1    A    Yes, I did check that as well for 2022.  And,

2  again, the rejection rate of applications minimal,

3  again, 1 percent, 1 1/2 percent.  And the applications

4  rejection rate in 2022 was 13 percent.

5    Q    And so let's just focus for a second on the

6  applications.  What were the reasons for some of these

7  rejection rates for  applications?

8    A    The majority was lack of ID.

9    Q    When you say "lack of ID," do you mean a person

10  not listing an identification --

11    A    Exactly.

12    Q    -- on the mail-in application?

13    A    Exactly.  They were using the old form.  Or if

14  they -- even if they used the new form, they didn't --

15  their eyes didn't gravitate to the right side, which was

16  a new area on the application that required the ID.

17    Q    And when you say the majority of the problems

18  were caused by missing ID, is that a guess or --

19    A    No, no.  It is the majority.  Because, again --

20  because a person submits an application doesn't mean

21  they qualify.  So some are rejected because they don't

22  qualify.  They don't meet the guidelines whether they're

23  not 65 and older and if they're -- they didn't check

24  disabled, they didn't check the primary.  You have to

25  check Democrat or Republican, and some people don't.  So

1  there were other reasons.  But the majority of the

2  reasons were lack of ID.

3      Q    Okay.  And let's talk about some of the other

4  reasons for -- a ballot's rejected because the voter put

5  an incorrect ID on the application?

6      A    The majority was lack of ID.

7      Q    When you say lack of ID, do you mean a person

8  not listing an identification number on the application?

9      A    Exactly.  They were using the old form.  Of

10 even if they used the new form, their eyes didn't

11 gravitate to the right side, which was a new area on the

12 application that required the ID.

13     Q    And when you say the majority of the problems

14 were caused by missing ID, is that a guess or --

15     A    No, it's the majority.  Because, again, because

16 a person submits an application doesn't mean they

17 qualify.  So some are rejected because they don't

18 qualify.  They don't meet the guidelines set forth.

19 They're not 60 and older and they didn't check

20 "disabled," they didn't check -- you have to check

21 democratic or republican and some people don't.  So

22 there were other reasons.  But the majority of the

23 reasons were lack of ID.

24     Q    And let's talk about some of the other reasons.

25 Were ballots rejected because the voter put an incorrect

1  ID number on the application?

2      A    You know, we didn't track that.  But when you

3  say "incorrect," remember what the law said.

4              The law said you had to match the ID back

5  to the voter record when they registered.

6              So here we go again, if I put my driver's

7  license, but I registered with my social.

8      Q    Right.  Yeah.  And so that's what I meant by

9  incorrect information.  So you say you don't know

10  exactly how many ballots were rejected -- how many

11  applications were rejected because of mismatch?

12      A    We didn't track that, no.

13      Q    Okay.  And were any ballots -- or excuse me.

14  Were any applications rejected because of small prints

15  on the application form or not being able to --

16      A    No.

17      Q    Okay.

18              MR. WHITE:  Can we go off the record for a

19  second?

20              THE VIDEOGRAPHER:  Going off the record.

21  Time is 12:26 p.m.

22              (Lunch recess.)

23              THE VIDEOGRAPHER:  We're back on the

24  record.  The time is 1:17 p.m.

25      Q    (BY MR. WHITE) Ms. Ramon, welcome back.

1     A     Thank you.

2     Q     Before we went on a lunch break, we were

3 talking about the mail-in ballots provisions for SB1 and

4 some of the problems that had caused during the

5 March 2022 primary election.

6               And one line of question that we had

7 discussed were the efforts that your office had taken to

8 reach out to the voters in the event that they omitted

9 something from the ID application -- or excuse me, from

10 a mail-in application.

11              And the follow-up question on that I have

12 is what efforts your office took to help people cure any

13 defects in their ballots?

14    A     So the application for ballot by mail could be

15 not cured but corrected in two ways.

16              It could -- my office reached out when

17 there was a phone number to call.

18              My office sent the application back with

19 the corrected form that was provided to from the State.

20 They had to create a new form to correct the ballot.

21              And actually, I said two, but there were

22 three ways, because they could also correct an ID on the

23 ballot tracker.

24              So the application for ballot by mail

25 could be corrected on the ballot tracker if it was to

# Attachment 11

# Michael Scarpello
# April 29, 2022 Deposition
# Excerpts

Transcript of the Testimony of

# The Office of the Dallas County Elections Administrator

**Date:**

April 29, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
 2                SAN ANTONIO DIVISION

 3  LA UNION DEL PUEBLO ENTERO,)(
    ET AL.,                    )(
 4                             )(
        PLAINTIFFS,            )(
 5                             )(    CIVIL ACTION
    VS.                        )(    NO. SA-21-CV-00844-XR
 6                             )(
    GREGORY W. ABBOTT, ET AL., )(
 7                             )(
                               )(
 8      DEFENDANTS.            )(
    -----------------------------------------------------
 9
                VIDEOTAPED AND VIDEOCONFERENCED
10                   ORAL DEPOSITION OF
                RIVELINO LOPEZ, TACOMA PHILLIPS
11                 AND MICHAEL SCARPELLO
                     APRIL 29, 2022
12
```

13          VIDEOTAPED AND VIDEOCONFERENCED ORAL DEPOSITION

14  OF RIVELINO LOPEZ, TACOMA PHILLIPS AND MICHAEL

15  SCARPELLO, produced as witnesses at the instance of the

16  Plaintiff LUPE, and duly sworn, was taken in the

17  above-styled and numbered cause on the 29th day of

18  April, 2022, from 10:47 a.m. to 8:02 p.m., before Holly

19  R. Swinford, CSR in and for the State of Texas, reported

20  by machine shorthand, at the Office of the Dallas

21  Elections Administrator, located at the Records

22  Building, 500 Elm Street, 7th Floor, Room 7Y11, in the

23  City of Dallas, County of Dallas, State of Texas,

24  pursuant to Notice, the Federal Rules, and the

25  provisions stated on the record or attached hereto.

```
 1                    MS. HUNKER:  That's all.

 2                    MS. PERALES:  Let's go off the record.

 3                    MR. SCHUETTE:  Do we need to ask the

 4    assembled --

 5                    MS. PERALES:  Assembled people on Zoom,

 6    are we ready to go off the record?

 7                    MS. BENDER:  No questions.  Thank you.

 8                    MS. PERALES:  That was Brady.

 9                    THE VIDEOGRAPHER:  We're going off the

10    record.  The time is 3:07 p.m.

11                         (Lunch recess.)

12                    THE VIDEOGRAPHER:  Okay.  We are back on

13    the record.  The time is 4:17 p.m.

14                    MS. PERALES:  I think we are ready to

15    swear the witness.

16                    THE REPORTER:  Okay.

17                    Sir, would you raise your right hand,

18    please?

19           (Witness sworn by the court reporter.)

20                    THE REPORTER:  Thank you.

21                    MICHAEL SCARPELLO,

22    having being first duly sworn, testified as follows:

23                         EXAMINATION

24    BY MS. PERALES:

25       Q.   Good afternoon.
```

 1  ago and did a quick read through SB 1.

 2      Q.   I'm not sure it's even possible to do a quick

 3  read of such --

 4      A.   Right.

 5      Q.   -- a long document.

 6      A.   Uh-huh.

 7      Q.   But let me promise you that if we talk about

 8  any part of SB 1 today, we'll mark the bill and --

 9      A.   Okay.

10      Q.   -- go through it together.

11           Did you meet with your attorneys in order to

12  prepare for this deposition?

13      A.   Yes.

14      Q.   And did you meet with or talk to anybody from

15  the Attorney General's Office of Texas to prepare for

16  this --

17      A.   No.

18      Q.   -- deposition?

19           Did you have an opportunity to review documents

20  that were produced to us this morning?

21      A.   I did not get a chance to review those.

22      Q.   Okay.  If we discuss any of them, we'll be sure

23  to mark it so you can have it in front of you before we

24  ask questions.

25      A.   You bet.

1               MS. PERALES:  If you wouldn't mind handing

2    Exhibit 1 to the witness.

3               (Document handed to the witness.)

4       Q.   Mr. Scarpello, do you recognize Exhibit 1 as

5    the Notice of Deposition for today's deposition?

6       A.   Yes.

7       Q.   And if you flip forward, you'll see around Page

8    9, there is an Attachment A; and then on Page 12 begins

9    a list of topics?

10      A.   Yes.

11      Q.   Have you seen these topics before?

12      A.   Yes.

13      Q.   Do you understand that you are testifying

14   pursuant to this Notice today?

15      A.   Yes.

16              MS. PERALES:  And if you wouldn't mind

17   handing the witness Exhibit 2.

18              (Document handed to the witness.)

19      Q.   Have you seen this document, Exhibit 2?

20      A.   Yes.

21      Q.   And do you see your name on the chart as being

22   the witness designated for certain topics?

23      A.   Yes.

24      Q.   Are you prepared to talk about those topics --

25      A.   Yes.

```
 1        Q.   -- today?

 2             Do you understand that because this is a

 3   30(b)(6) deposition --

 4        A.   Uh-huh.

 5        Q.   -- as we call it --

 6        A.   (Witness moves head up and down.)

 7        Q.   -- that when you're testifying that you are

 8   speaking on behalf of the Elections Department?

 9        A.   Yes.

10        Q.   Okay.  And so if I say "you" or "yours," will

11   you understand that I'm referring to your department?

12        A.   Yes.

13        Q.   Are you from Dallas County originally?

14        A.   No.

15        Q.   Where were you -- where did you grow up?

16        A.   Omaha, Nebraska.

17        Q.   When did you come to Dallas County?

18        A.   December of 2020.

19        Q.   Did you graduate high school in Omaha?

20        A.   Yes, Cathedral High School.

21        Q.   Sounds Catholic.

22        A.   Yes.

23        Q.   And did you do any schooling after you

24   graduated from high school?

25        A.   I went to the University of Nebraska at Omaha
```

 1  and graduated there in 1991 and then the University of

 2  Nebraska, College of Law in Lincoln in 1995.

 3       Q.   The same year my husband graduated from law

 4  school.

 5            Did you do any other degrees or other study

 6  besides what you've described to me?

 7       A.   Only things related to elections, cer- --

 8  certificates --

 9       Q.   Okay.

10       A.   Certified Election & Registration Administrator

11  from Election Center.

12       Q.   And before you came to Dallas -- oh, so you

13  came to Dallas County in December 2020.

14            Was that when you took the job as Election

15  Administrator?

16       A.   Yes.

17       Q.   Okay.  So prior to that, December 2020, what

18  job did you have?

19       A.   Prior to that, I was the Vice-President of

20  Voter -- of Election Management Systems for Runbeck

21  Election Services.

22       Q.   And tell me what Runbeck Election Services

23  does.

24       A.   The majority of their business is they're an

25  election ballot printer, and then they're -- they delve

1    into certain areas like voter registration or election

2    management systems.

3         Q.   Would they be considered, for example, a vendor

4    for a county to maintain its voter registration rolls?

5         A.   They aren't -- currently have no accounts to do

6    that.  They are trying to become that.

7         Q.   Okay.  And you are the VP of Election --

8         A.   Election Management --

9         Q.   Management.

10        A.   -- Systems.  It's, basically, a voter

11   registration system.

12        Q.   And is Runbeck a -- like, would you call it a

13   software company or it's software plus kind of

14   management?

15        A.   I'd say they are a mail ballot -- mail ballot

16   service provider that dabbles in other areas of election

17   services.

18        Q.   Does Runbeck have contracts in Texas or did at

19   the time you were there?

20        A.   The only ones that I know of is there -- they

21   have -- in Harris County and in Dallas County, they

22   have -- they sold a mail ballot sorter, an Agilis mail

23   ballot sorter.

24        Q.   Was that a piece of hardware?

25        A.   Yes.

1     Q.   Where are most of Runbeck's clients, then,

2  physically located?

3     A.   Throughout the country,

4     Q.   Okay.

5     A.   All around the country.

6     Q.   How long did you serve as VP of Election

7  Management for Runbeck?

8     A.   About a year and a half.

9     Q.   And what did you do before that?

10     A.   I was the Registrar of Voters for San

11  Bernardino, California.

12     Q.   How long did you do that job?

13     A.   About seven years, three -- seven years, four

14  months, something like that.

15     Q.   And what job did you have before that?

16     A.   I was the Director of Elections for the City

17  and County of Denver, Colorado.

18     Q.   How long did you do that job?

19     A.   About four years.

20     Q.   That's a beautiful place to live.

21     A.   It sure is.

22     Q.   And before that job, what were you doing?

23     A.   I was the Elections Manager for Douglas County,

24  Nebraska.  Omaha, Nebraska.

25     Q.   Douglas County produces a disproportionately

The Office of the Dallas County Elections Administrator                     April 29, 2022
                                                                                    Page 193

1   high number of really good elections people because I

2   took the deposition of Lisa Wise a couple --

3        A.   Uh-huh.

4        Q.   -- of weeks ago.  She's also from Douglas

5   County.

6        A.   Uh-huh.  She worked with me.

7        Q.   Oh, so you were --

8        A.   Uh-huh.

9        Q.   You were at that office at the same time?

10       A.   For a brief time, yeah.

11       Q.   Okay.  So if we were to sort of add up the

12  years that you've been involved in administration of

13  either elections or voter registration, what would the

14  sum total number of years be?

15       A.   Twenty-two and a half years.

16       Q.   And it's fair to say that prior to December

17  2020, when you came here to Dallas, that you had

18  experience, hands-on experience, administering both

19  registration and voting; is that right?

20       A.   That's correct.

21       Q.   What is your current title?

22       A.   I'm the Elections Administrator for Dallas

23  County.

24       Q.   Is Dallas County the largest jurisdiction where

25  you've worked on election administration?

1    A.   It has the largest number of registered voters,

2  yes, not the largest in physical area.

3    Q.   So having lived in Dallas County for about a

4  year and a half --

5    A.   Uh-huh.

6    Q.   -- would you agree with me that Dallas County

7  has a substantial Latino or Hispanic population?

8    A.   Yes.

9    Q.   And would you agree with me that Dallas County

10  has a substantial black or African-American population?

11    A.   Yes.

12    Q.   And would you agree with me that Dallas County

13  has a substantial number of voters who are -- for whom

14  English is not their first language and who might

15  experience some barriers communicating in English?

16             MS. HUNKER:   Objection, form.

17    A.   I don't know.  It depends on how you define

18  "substantial."  They are certainly large enough to

19  re- -- trigger the SO- -- or the Department of Labor's

20  five-percent rule, to require us to provide alternate

21  language services to Vietnamese and Spanish speakers.

22    Q.   (By Ms. Perales)  And we talked a little bit

23  earlier today -- I don't think you were here -- that

24  Dallas County is newly covered for Vietnamese.

25    A.   That's correct.

```
 1   language to the assistor oath, quote, the voter I am
 2   assisting represented to me they are eligible to receive
 3   assistance --
 4        A.   Yes.
 5        Q.   -- unquote?
 6        A.   Yes.
 7        Q.   And then on Line 2, there is some new language
 8   added related to the assistor confining assistance.
 9             Do you see that?
10        A.   Yes.
11        Q.   And would you agree with me that SB 1 adds the
12   following language to confining assistance:  quote,
13   reading the ballot to the voter, directing the voter to
14   read the ballot, marking the voter's ballot, or
15   directing the voter to mark the ballot, unquote?
16        A.   Yes.
17        Q.   All right.  And will you agree with me that
18   those are four specific acts?
19        A.   Yes.
20        Q.   Now, will you agree with me on Line 5 -- and I
21   think you may have been talking about this a little
22   while ago -- that SB 1 removes from the assistor oath
23   that the assistor will confine assistance to, quote,
24   answering the voter's questions, unquote?
25        A.   Yes.
```

1      Q.   Okay.  And then there's some additional

2   language that's also coming out of the assistor oath,

3   such as stating propositions on the ballot, naming

4   candidates and their political parties?

5      A.   Yes.

6      Q.   Okay.  Will you agree with me that, starting on

7   Line 7, that the SB 1 adds to the assistor oath, quote,

8   I did not pressure or coerce the voter into choosing me

9   to provide assistance, unquote?

10      A.   Yes.

11      Q.   And then, finally, on Line 12, do you agree

12   with me that SB 1 adds the language after the semicolon,

13   quote, and I understand that if assistance is provided

14   to a voter who is not eligible for assistance, the

15   voter's ballot may not be counted, unquote?

16      A.   Yes.

17      Q.   Would you agree with me that, now that the

18   assistor is signing the oath under penalty of perjury,

19   that the assistor would face a perjury prosecution for

20   lying or not doing what the oath says a person will do?

21              MS. HUNKER:   Objection to form.

22      A.   Can you repeat the question?

23      Q.   (By Ms. Perales)  Sure.  I'll ask a better

24   question.

25      A.   Okay.

1      Q.   Do you think that an assistor, looking at this

2   new oath, would want to make sure, because the assistor

3   is signing under penal of perjury, that they follow

4   the -- the commands of the oath very closely?

5      A.   Yes.  I think it --

6              MS. HUNKER:   Objection, form.

7      A.   I think anyone who signs under penalty of

8   perjury considers they're -- that -- that it's a serious

9   business, so...

10     Q.   And perjury is a crime, is it not?

11     A.   Yes.

12     Q.   So taking the first language that I reviewed

13  with you, if an assistor wants to make sure they comply

14  with the oath closely, how will the assistor obtain a

15  representation from the voter that the voter is eligible

16  to receive assistance?

17     A.   Give me a second.  I'm not sure, other than the

18  oral representation -- oral or written representation

19  from the voter that they qualify.

20     Q.   Okay.  So to secure an oral representation, the

21  assistor would ask the voter; and then the voter would

22  have to make that representation, correct?

23     A.   Yes.

24     Q.   Okay.

25              MS. PERALES:   I'm going to mark two more

 1  exhibits.

 2                   What number is this?

 3                   THE REPORTER:  It's 5.

 4              (Deposition Exhibit Number 5 marked.)

 5                   MS. PERALES:  This will be 6 (handing).

 6                   THE REPORTER:  Okay.

 7              (Deposition Exhibit Number 6 marked.)

 8          (Documents handed to the witness and Counsel.)

 9                   MR. SCHUETTE:  Thank you.

10                   MS. HUNKER:  Thank you.

11      Q.   (By Ms. Perales)  The court reporter has handed

12  you what has been marked Deposition Exhibit Number 5 and

13  Deposition Exhibit Number 6, and I thought it might just

14  be a little bit easier for us to go through the oaths.

15           So I will ask you first, with respect to

16  Exhibit 5, do you see in the upper left-hand corner, the

17  language prescribed by the Secretary of State?

18      A.   Yes.

19      Q.   And then, in that little section there at the

20  bottom, 9, slash, 13 --

21      A.   Yes.

22      Q.   Okay.  Now, if you look at the oath, you'll

23  notice it does not have the language about penalty of

24  perjury or securing a representation from the voter.

25           Do you see that?

 1     Q.   I have seen some alarmed expressions, so I want

 2   to explore with you more the confining of assistance.

 3          Do you -- do you understand the oath now to

 4   foreclose an assistor from explaining to the voter how

 5   to use the voting machine aside from pointing out

 6   anything that might be on the screen, itself, in terms

 7   of instructions?

 8          MS. HUNKER:   Objection to form.

 9     A.   I believe the -- I believe the language would

10   be liberal enough to allow them to assist that voter in

11   how to mark that because it says "marking the voter's

12   ballot," one of them.

13     Q.   (By Ms. Perales)  So if the -- the assistor

14   could mark the ballot for the voter at the voter's

15   request?

16     A.   (Witness moves head up and down.)  That's my

17   interpretation in reading the -- the plain language of

18   this, this oath.

19     Q.   Okay.  If the voter had a question of the

20   assistor about what to do with the piece of paper, in

21   terms of putting it in the tabulator and that question

22   was not answered by reading the ballot, do you

23   understand the oath to foreclose the assistor's

24   explanation of the fact that this piece of paper is

25   going to come out of the machine and then must be

1  reviewed and taken over and placed inside the tabulator?

2      A.   I'm sorry.  This is really difficult to read;

3  it's so small.

4      Q.   (Moving head up and down.)

5      A.   I would agree that the language could be

6  interpretated -- interpreted to be so narrow in -- in

7  its scope, that it would foreclose letting some -- you

8  know, telling -- assisting someone in dropping that into

9  the vote tabulator.

10      Q.   With an explanation about what to do?

11      A.   Yes.

12      Q.   Okay.  Would you agree with me that the Oath of

13  Assistance does not include the criteria for who is

14  eligible for assistance?

15             MS. HUNKER:  Objection, form.

16      A.   Yes.

17      Q.   (By Ms. Perales)  I want to ask you about the

18  language on Line 3.  I did not pressure -- use of the

19  term "pressure" -- the voter into choosing.

20             Would you agree with me that the Oath of

21  Assistance does not include a definition of "pressure"?

22      A.   Yes.

23             MS. HUNKER:  Objection, form.

24      Q.   (By Ms. Perales)  If a -- if someone called

25  your office and asked you if it was okay to remind his

```
 1  neighbor for three days in a row, during Early Voting,
 2  that it was coming up and he was available to assist --
 3  if someone called and asked you, "If I remind that voter
 4  three times that I'm available to assist them, is that
 5  pressuring," how would you answer that question?
 6              MS. HUNKER:  Objection to form.
 7     A.   We don't provide legal advice.  But I would
 8  state -- I'll just leave it at that.  We don't provide
 9  legal advice.
10     Q.   (By Ms. Perales)  Okay.  Would it also be fair
11  to say that you wouldn't have a definition of "pressure"
12  in this context to fall back on?
13     A.   That's correct.
14     Q.   One more question about confining assistance to
15  the four specific actions.
16     A.   Uh-huh.
17     Q.   If a voter wants -- okay.  Let me -- let me ask
18  it this way.
19          Do you have a Spanish-speaking poll worker at
20  every single polling place in Dallas County?
21     A.   That is our goal, to have one.  We don't always
22  have one, but we have a substantial number.
23     Q.   And then let me ask the same question for your
24  new language, Vietnamese.
25     A.   Uh-huh.
```

1      Q.    Are you aiming to try to have a Vietnamese

2   speaker in every polling place or certain polling

3   places?

4      A.    It usually takes a while to establish a network

5   of poll workers to be in every location.  So what we

6   will do, initially, is to -- to focus on those areas of

7   the county where there's high concentrations of

8   Vietnamese speakers and then grow that; but the goal --

9   with the goal to have one in every location.

10     Q.    Okay.  Thank you.  So let's pick a situation in

11  which the voter speaks a language and only that

12  language --

13     A.    Uh-huh.

14     Q.    -- and it's not English, so the voter is

15  limited English proficient and this particular polling

16  place does not have an election judge or a poll worker

17  who speaks this language --

18     A.    Uh-huh.

19     Q.    -- so the voter comes in with an assistor to

20  help -- help the voter.

21     A.    Uh-huh.

22     Q.    Would you agree with me that helping the voter

23  communicate with the poll workers and the election judge

24  is outside the scope of the four specific actions:  read

25  the ballot, mark the ballot, direct the voter to read

1    the ballot, direct the voter to mark the ballot?

2                MS. HUNKER:  Objection, form.

3        A.   I think -- I think that you could -- you could

4    interpret that -- that some of the language of those

5    four pieces, in a very narrow way; and that would

6    prevent that.  And I think you could read it in a more

7    liberal way that would allow that and, in particular, or

8    you know -- or directing the voter to mark the ballot.

9                I mean, in a practical -- from a practical

10   perspective, it would be the more liberal interpretation

11   to -- you know, common sense would tell you we've got to

12   try to assist voters.

13       Q.   (By Ms. Perales)  Understood.  You would agree

14   with me that these four specific acts, that the assistor

15   confines assistance to, all involve interaction with the

16   ballot?

17               MS. HUNKER:  Objection, form.

18       A.   Well, in -- on Number 4, or directing the voter

19   to mark the ballot, yes.

20       Q.   (By Ms. Perales)  But -- and you would agree

21   with me that in all four of these actions, someone is

22   interacting with the ballot, either the assistor or the

23   voter; is that right?

24               MS. HUNKER:  Objection, form.

25       A.   Yes.

1    Q.   (By Ms. Perales)  Okay.  And you would also

2  agree with me that voting, more generally, encompasses

3  actions that go beyond reading and marking the ballot?

4  For example, checking in and signing in to vote, yes?

5    A.   Yes.

6    Q.   And being accepted to vote by the poll workers?

7    A.   Yes.

8    Q.   And also includes being shown how to use the

9  voting machine and understanding how to use the voting

10  machine?

11    A.   Yes.  It depends on which machine we're talking

12  about.  I mean, the marking the ballot, it's clear that

13  the -- the vote, the ExpressVote, would be marking the

14  ballot, as opposed to using the vote tabulator, dropping

15  the ballot in, and confirming your choices.

16    Q.   And you would agree with me that the act of

17  voting also includes moving around the polling place,

18  going from one, kind of, spot to another?

19    A.   There's three distinct stations in our method

20  of voting -- actually, four:  checking in, potentially

21  further dealing with exceptions to the standard voting

22  procedure at the -- at the judge's table, marking your

23  ballot, and depositing your ballot.

24    Q.   And would it be fair to say that, while moving

25  through those four stages of voters, typically moving

1  through space in the polling place, itself?

2       A.   That's correct.

3       Q.   This is a dumb question --

4       A.   Uh-huh.

5       Q.   -- but would it be fair to say that you would

6  not be aware of what a voter and an assistor would say

7  to each other, prior to coming to vote, about whether

8  the assistor is willing to vote?

9       A.   Fair.

10      Q.   To --

11      A.   That's fair to say.

12      Q.   Okay.  Thank you.  Have you done any training

13 of poll workers on the changes created by SB 1 with

14 respect to the Oath of Assistance?

15      A.   I believe we direct -- we point out the fact

16 that there is a new Oath of Assistance in that -- and

17 how to use that, that oath.

18      Q.   And -- okay.  And would those training

19 materials have been produced in this case?  So, for

20 example, you said you had reviewed some material prior

21 to this deposition --

22      A.   Uh-huh.

23      Q.   -- that you think was disclosed in the first

24 round of disclosures.

25      A.   Uh-huh.

 1      Q.   Do you recall whether any of your training
 2   materials were in there?
 3      A.   I don't recall.
 4      Q.   Okay.
 5      A.   I will point out, though, that there is also --
 6   the reference materials that we have at a polling place
 7   include, not only our materials (indicating), but also
 8   the Secretary of State's guide on how to conduct -- it's
 9   a little bit thicker, more detailed, guide for those
10   activities at the polling place.
11           (Ms. Perales confers with Mr. White.)
12      Q.   So SB 1 also created a new form for assistors
13   to provide additional information, and I'm going to ask
14   you about that separately.
15      A.   (Witness moves head up and down.)
16      Q.   But do you recall, specifically, having
17   training for your poll workers on the changes in the
18   language of the oath?
19      A.   I -- I don't know.
20      Q.   Okay.  Do you recall receiving any specific
21   training or guidance from the Texas Secretary of State
22   about how to implement the changes in the assistor oath?
23      A.   The Secretary of State provides various
24   election advisories, webinars, et cetera.  I don't
25   recall if there was one, in particular, that covered

```
 1   this (indicating) area.
 2        Q.    (Moving head up and down.)   Are you aware of
 3   any incidents of voter fraud associated with in-person
 4   assistance of voters at the polling place?
 5        A.    No.
 6        Q.    Are you aware whether Texas has other laws that
 7   existed prior to SB 1 that criminalize unlawful voter
 8   assistance?
 9        A.    In the context of an assistant (indicating)
10   providing assistance at a polling place?
11        Q.    Yeah.   So, for example, do you know if it was
12   illegal before SB 1 to mark the ballot on behalf of the
13   voter, not the way the voter is -- is intending?
14                    MS. HUNKER:   Objection, form.
15        A.    I -- I don't know.
16        Q.    (By Ms. Perales)   Okay.   Looking at the new
17   assistor oath, (indicating) do you know whether Dallas
18   County uses a hard copy form or whether Dallas County
19   uses the Poll Pad to collect the information?
20        A.    I believe we use both because the Poll Pad
21   software was not able to be updated in a timely fashion
22   to cha- -- have the -- the modified language.
23        Q.    And there's a -- there's an additional
24   requirement to state the relationship and --
25        A.    Uh-huh.
```

```
 1      Q.    So that's what you're referring to?

 2      A.    Yes.

 3      Q.    Okay.  Who's --

 4      A.    And I -- I believe there's new software that's

 5 been -- that's pending approval by the Secretary of

 6 State before we can use it.

 7      Q.    Okay.  So you would have to get approval from

 8 the Secretary of State before implementing that new

 9 software?

10      A.    I believe so, yes.

11      Q.    Do you have a sense of the timeline for that

12 new software getting approved?

13      A.    I wish I knew because that new software has

14 other features that we're very anxious to use.

15      Q.    Turning back to SB 1, I'm going to ask you now

16 about this new form.  If you will turn again with me to

17 Page 52 of the bill.

18      A.    Okay.

19      Q.    You'll see that starting on Line 2, there is a

20 new section, because it's all underlined, titled

21 "Submission of Form by Assistant."

22            Do you see that?

23      A.    Uh-huh.

24      Q.    And would you agree with me that this is a new

25 provision that says that an assistor who is not an
```

```
 1   election official is required to complete a form stating

 2   certain information about the assistor?

 3               MS. HUNKER:   Objection to form.

 4       A.   Yes.

 5       Q.   (By Ms. Perales)   Okay.   At this point in time,

 6   are you using the new form required under this section

 7   in hard copy at the polling place?   Are -- do you know?

 8       A.   I believe so, but I can't -- I'd have to

 9   confirm that.

10       Q.   So if that were the case, help me understand,

11   given the stages that you were describing before, at

12   what point the assistor signs the Oath of Assistance and

13   fills out the new form.

14               Is it after the voter checks in?

15       A.   It would be at the check-in table during

16   that -- that point in time.

17       Q.   And would you agree with me that filling out a

18   new form is going to take additional time compared to

19   the time period when the form was not required?

20       A.   Yes.

21       Q.   Would you agree with me that at a polling place

22   where there are more voters voting with assistors, the

23   new requirement of a form is going to take more time for

24   each instance in which an assistor has to fill out that

25   form?
```

```
 1      A.    Yes.

 2            MS. HUNKER:  Objection, form.

 3      Q.    (By Ms. Perales)  And you would understand with

 4  me, wouldn't you, that this form has to be completed by

 5  the assistor for each instance of assistance?

 6      A.    Yes.

 7      Q.    All right.  So if I come to the polls and I'm

 8  helping my mother and my aunt, I'm going to have to fill

 9  out this information twice, correct?

10      A.    Yes.

11      Q.    And I will have to take the oath twice?

12      A.    Yes.

13      Q.    Have you ever assisted a voter at the polling

14  place?

15      A.    Many, many, many years ago.  Probably 2001.

16      Q.    Okay.  Tell me what assistance you provided.

17      A.    I -- I don't recall.  This was in Nebraska --

18      Q.    Uh-huh.

19      A.    -- when I was working a polling place.  I

20  couldn't -- it's a vague memory.

21      Q.    Were you a poll worker at that time?

22      A.    I was the Chief Deputy Election Commissioner,

23  but I made my whole staff go work a polling place so we

24  could experience what it was like.

25      Q.    So, in that moment, you were fulfilling the
```

1  roll of a poll worker?

2      A.   That's correct.

3      Q.   Okay.  Do you happen to recall whether the --

4  whether the voter was elderly or disabled --

5      A.   I believe --

6      Q.   -- or --

7      A.   -- elderly.

8      Q.   Okay.  Do you -- and you don't -- I don't want

9  to put words in your mouth about what assistance you

10 might have offered the elderly voter, but do you recall

11 any details about it?

12     A.   I don't.

13     Q.   Turn with me, if you would, to Page 50 --

14     A.   Okay.

15     Q.   -- where it starts on Line 19 with Section 6.01

16 and then Line 27 where it says f, in parentheses --

17     A.   (Witness moves head up and down.)

18     Q.   -- then, quote, A person who simultaneously

19 assists seven or more voters voting under this section

20 by providing the voters with transportation to the

21 polling place must complete and sign a form, unquote.

22 And it continues from there.

23          Do you see that?

24     A.   Yes.

25     Q.   Are you aware of any instances in Dallas County

1  understand that the prohibition to either pay someone or

2  to accept payment to assist a voter vote by mail is now

3  expanded to all people who are either paying or getting

4  paid to assist a voter to vote by mail, regardless of

5  whether it is a performance-based scheme?

6              MS. HUNKER:  Objection to form.

7       A.    Yes.

8       Q.    (By Ms. Perales)  Okay.  And we see on Page 55,

9  on Line 18, there's an exception here for an attendant

10 or a caregiver who is known to the voter?

11      A.    (Witness moves head up and down.)  Yes.

12      Q.    Do you see that?

13      A.    Uh-huh.

14      Q.    Would you agree with me, though, that beyond --

15 well, would you agree with me, then, that somebody who

16 is paid by a nonprofit community engagement organization

17 to assist voters to vote by mail would fall under the

18 prohibitions of this statute?

19              MS. HUNKER:  Objection, form.

20      A.    It appears so, yes.

21      Q.    (By Ms. Perales)  Going to turn forward now to

22 Section 7.04 on Page Fif- -- well, it starts on Page 58,

23 and then it flows over onto Page 59.

24              If you look with me, starting on Line 7,

25 there's a definition of "vote harvesting services" on

```
 1   Page 59.
 2        A.    Oh, okay.  Here we go.  Yes.
 3        Q.    And would you agree with me that the definition
 4   of "vote harvesting services" requires an in-person
 5   interaction with the voter?
 6        A.    Yes.
 7        Q.    And that interaction has to be in the physical
 8   presence of an official ballot or a ballot voted by
 9   mail?
10        A.    Yes.
11        Q.    And then there has to be the intent to deliver
12   votes for a specific candidate or measure?
13        A.    Yes.
14        Q.    Would you agree with me that if a canvasser
15   who's going house-to-house to encourage people to vote
16   for -- well, before I ask my question, I want to know
17   whether you have any bond issues on the ballot for
18   Dallas County for this May 7 election.
19        A.    There's no Dallas County bond issues.  There's
20   city bond issues, and I think there's some school --
21        Q.    Some school --
22        A.    -- district bond issues.
23        Q.    -- or city?
24        A.    Yeah.
25        Q.    Okay.  So I want to make my hypothetical
```

 1   specific to that.

 2       A.   Okay.

 3       Q.   Somebody is going door-to-door canvassing

 4   voters to encourage them to vote for the bond for the

 5   school district.

 6       A.   Uh-huh.

 7       Q.   Their intent is to convince the voter to vote

 8   for the bond because it means new schools, better

 9   facilities.  And the voter says, Sure, I'll talk with

10   you; I have my mail ballot right here; it's right --

11   it's right here inside the door.  It's right here on the

12   kitchen table.

13            Would you agree with me that that would be an

14   in-person interaction with the voter, that -- that

15   canvassing, that conversation?

16       A.   Yes.

17       Q.   And would you agree with me that if the voter

18   said the ballot was right there, that that would mean in

19   the physical presence of the ballot?

20       A.   I guess it --

21            MS. HUNKER:   Objection, form.

22       A.   -- depends on how you define physical presence.

23       Q.   (By Ms. Perales)  And would you agree with me

24   that the canvasser, who's urging to voter to vote for

25   the school bond, is intending to get the voter to vote

1   for the school bond?

2        A.   Yes.

3        Q.   Okay.  And if the -- if the voter says, "Well,

4   I have -- I have the ballot right here," and it's let's

5   say within a foot or two of the voter, that would be in

6   the presence of the ballot?

7              MS. HUNKER:   Objection, form.

8        A.   I don't think that the statute defines -- and,

9   I mean, it could be in the same house, could be in the

10  same block.

11       Q.   (By Ms. Perales)  Uh-huh.

12       A.   I mean, it's -- it's vague, so I -- I don't

13  know how to answer that question with specificity.

14       Q.   Okay.  Since we're very close to there, I would

15  like you to flip forward to Page 60, Line 15, which is a

16  section titled "Unlawful Solicitation and Distribution

17  of Application to Vote by Mail."

18              Do you see that there?

19       A.   Yes.

20       Q.   Do you understand this to be a prohibition on

21  you to send out to voters application for ballot by

22  mail --

23       A.   Ye- --

24       Q.   -- when they are not requested?

25       A.   Yes.

1    Q.   And when the language says "commits an

2  offense," do you understand that to be a criminal act?

3    A.   Yes.   I believe they go on to say the State

4  Jail Felony.

5    Q.   Ye- -- and I imagine you -- you've become aware

6  of that language?

7    A.   Yes.   Uh-huh.

8    Q.   Are you -- are you concerned that certain

9  things that your office might do or might have done in

10  the past would run afoul of this provision and possibly

11  create criminal liability for you?

12               MS. HUNKER:   Objection --

13    A.   Yes.

14               MS. HUNKER:   -- form.

15    Q.   (By Ms. Perales)  Can you describe that for me?

16    A.   We have, historically, distributed

17  applications, you know, when someone comes in and says,

18  "Hey, I want to provide application; you know, I want to

19  distribute applications for vote by mail," we provide

20  those to them.

21    Q.   Uh-huh.

22    A.   And we no longer can do that.

23    Q.   Uh-huh.  So if someone came to your office and

24  said, "I regularly go to church on Sundays, and we have

25  a great group of congregants; I'd love to bring 25

1   applications for ballot by mail to my next church

2   service, give them to the old folks, the folks over 65,"

3   in that situation, would you give the individual the 25

4   applications for ballot by mail?

5        A.    Not since the passage of SB 1.

6        Q.    And in fact, you would require a voter to

7   request of you the application for ballot by mail before

8   you would send it out, correct?

9        A.    That's correct.

10       Q.    Are you aware of voters who may have, in the

11  past, gotten their application for ballot by mail

12  without having to ask for it from you?

13       A.    Yes.

14       Q.    Do you know of any specific instances like

15  that?

16       A.    No.

17       Q.    Okay.  But you're familiar with individuals

18  having come for, let's say, batches of application for

19  ballot by mail because they intend to deliver those to

20  voters who are eligible so that the voter can submit it?

21       A.    Yes.

22       Q.    So I only have one copy of this, so we're going

23  to mark it; and then I'm going to do my best to remember

24  what it says.

25       A.    Okay.

```
 1                  THE REPORTER:  That's Number 7.

 2                  MS. PERALES:  7.

 3             (Deposition Exhibit Number 7 marked.)

 4                  MS. HUNKER:  Since I can't see it, can you

 5   describe what it is?

 6                  MS. PERALES:  Yes, or maybe I'll ask the

 7   witness to do that.

 8                  MS. HUNKER:  That's fine.

 9             (Document handed to the witness.)

10   Q.   (By Ms. Perales)  And I'll represent to you

11   that this is a couple of emails that were provided to us

12   today in the supplemental production, and they don't

13   have Bates stamp numbers on them yet.

14             But would it be -- would it be correct to say

15   that this is an exchange of emails in which you are

16   inquiring about prepaying the postage for applications

17   for ballot by mail?

18   A.   If you can give me a moment to review it.

19   Q.   Please take your time.

20   A.   (Witness reviews document.)  Okay.

21        (Ms. Perales confers with Mr. White.)

22   Q.   Okay.  So would it be correct to say that this

23   is an exchange of emails in which you are inquiring

24   about paying the postage or putting the -- Dallas County

25   putting the postage on an application for a ballot by
```

```
 1      Q.   Who are the election officials to whom poll
 2   watchers are obligated to report irregularities?
 3      A.   We encourage them to talk to the election
 4   judge, the presiding judge --
 5      Q.   And to --
 6      A.   -- and to not -- not interact with the clerks.
 7      Q.   And why -- why do you encourage them to not
 8   interact with the clerks?
 9      A.   Because the judge has more thorough training
10   and knowledge of what is allowed and what is not
11   allowed, whereas the clerks do not.
12      Q.   And --
13      A.   As well as just the general procedures; they
14   have a deeper understanding of how the conduct -- and
15   they are responsible for the conduct of the election at
16   that polling place.
17      Q.   And do election judges and clerks have
18   responsibilities on Election Day apart from waiting to
19   hear complaints from poll watchers?
20      A.   Yes.
21      Q.   And what are some of those responsibilities?
22      A.   Generally speaking, the judge is responsible
23   for all activities within that polling place, including
24   directing the activities to open it, close it, to run
25   it, as well as the specific responsibilities to handle
```

 1  what we call exceptions to the standard voting

 2  procedure.  Clerks handle the 80 percent that are easy.

 3  Judges handle the 20 percent that are difficult.

 4       Q.   Okay.  So when a poll watcher is reporting a

 5  suspected irregularity to an election official, is it

 6  fair to say that the election official will be unable to

 7  handle their other responsibilities while they are

 8  dealing with the -- a watcher.

 9            MS. HUNKER:  Objection, form.

10       A.   I don't know that that's -- I mean, being a

11  judge is difficult, and they have to juggle.  And -- and

12  so that's just another piece of their job that they have

13  to juggle, as well as dealing with difficult voters and

14  dealing with signs and, you know, dealing with the --

15  all the other things that someone who's running a

16  polling place has to deal with.

17       Q.   (By Mr. White)  Well, would you agree that

18  while an election official is talking to or interacting

19  with a poll watcher, they are not able to do any of the

20  other tasks they're assigned to do?

21            MS. HUNKER:  Objection, form.

22       A.   I would agree that most people can -- they have

23  to deal with one thing at a time.

24       Q.   (By Mr. White)  Okay.  During the March primary

25  of this year, did Dallas County experience a shortage of

1    poll workers at polling sites?

2        A.   Yes.

3        Q.   How significant of a shortage?

4        A.   It was very significant.

5        Q.   Can you explain more what you mean by that?

6        A.   We had a big shortage of judges, in particular,

7    where judges had committed to working and then didn't

8    show up two days prior to the election to pick up their

9    supplies.  I think we had 71 no-shows on the Sunday

10   before the election, then some more on Election Day.

11       Q.   Okay.  I want to pass you exhibits.  I'm not

12   sure what exhibit number we are up to, but --

13               THE REPORTER:  9.

14               MR. WHITE:  9.

15       Q.   Okay.  I'll pass you what I would ask the court

16   reporter to mark as Exhibit 9.

17            (Document handed to the court reporter.)

18       Q.   And I'll represent to you this is a news

19   article about some of the --

20               MR. WHITE:  Oh, I'm sorry.  Could you --

21               THE REPORTER:  I've got -- you've got to

22   quit talking for me to mark it.  I'm sorry.

23            (Deposition Exhibit Number 9 marked.)

24               THE REPORTER:  Okay.  Thank you.

25               MR. WHITE:  Thanks.

```
 1               (Document handed to the witness.)

 2      Q.    So I'll just represent to you this is a news

 3   article about some of, like, the wait times and worker

 4   shortages during the March primary in Dallas County,

 5   which I'm sure you're familiar with.

 6               And if I could ask you to turn to Page 5 of

 7   this article.

 8      A.    (Witness complies.)

 9      Q.    And the last full paragraph on Page 5 -- I'll

10   just read it aloud -- says:  "Scarpello also said some

11   election judges were afraid of being prosecuted under a

12   provision of the law related to partisan poll watchers."

13               Did I read that correctly?

14      A.    Yes.

15      Q.    And then it goes on to say:  (Reading)  SB 1

16   makes it a misdemeanor offense for a worker to knowingly

17   prevent (sic) a watcher from observing an activity or

18   procedure the person knows the watcher is entitled to

19   observe.

20               Did I read that correctly?

21      A.    Yes.

22      Q.    How did you become aware that election judges

23   were afraid of being prosecuted under this provision?

24      A.    We had several judges tell us that.

25      Q.    How many judges?
```

```
 1      A.    I don't know.

 2      Q.    And who did they speak to about these concerns?

 3      A.    Staff -- county -- our staff -- voting site

 4  staff.

 5      Q.    And so is it fair to say that this provision

 6  was a cause of election judges not reporting for duty --

 7  or, sorry.  Strike that.

 8            Is it fair to say that this provision was a

 9  cause of the poll worker shortages that we were just

10  discussing?

11                MS. HUNKER:  Objection, form.

12      A.    My speculation is that it was a contributing

13  factor.

14      Q.    (By Mr. White)  And what other factors do you

15  believe led to the poll shortage, poll worker shortage?

16      A.    There's a general -- there's a general degree

17  of people not wanting to volunteer or not wanting to

18  work.  We have difficulties getting temporary workers,

19  full time workers, poll workers.  And so I think that,

20  you know, there's a -- wherever you go, we see that,

21  right?  You go to McDonald's.  You can't -- they don't

22  have workers.

23            And so I think that's a contributing factor.  I

24  think this -- this legislation's a contributing factor.

25  I think there's lots of factors.
```

1      Q.   Did you have to close polling sites as a result

2  of the shortage of poll workers?

3      A.   Yes.

4      Q.   How many?

5      A.   I believe it was -- gosh, don't -- I think it

6  was nine, and then we ended up open -- opening one of

7  those nine later in the -- the morning.

8      Q.   Where, in Dallas County, were these nine poll

9  sites --

10      A.   Scattered throughout the county.

11      Q.   Scattered throughout.  Who decided to close

12  them?

13      A.   I did.

14      Q.   Did you attempt to recruit other poll workers

15  or election judges before making that decision?

16      A.   Yes.  I mean, remember, I said 71 didn't show

17  up on Sunday to pick up their supplies.  So, on Monday,

18  we scrambled and reassigned people and moved alternate

19  judges and successfully patched most of those holes

20  except for those eight or nine.

21      Q.   Did the shortage of poll workers cause longer

22  wait times for voters at polling sites?

23      A.   Yes.

24           MS. HUNKER:  Objection, form.

25      Q.   (By Mr. White)  If you could turn to Page 2 of

1   the article that I just gave you.

2        A.    Uh-huh.

3        Q.    At the bottom, there are a couple of paragraphs

4   talking about a voter named Gladys Ivy who says that she

5   waited for four hours to vote at the Disciple Central

6   Community Church in DeSoto.

7              Are you aware of that polling site?

8        A.    I am.

9        Q.    And are you familiar with -- oh, strike that.

10             Are you familiar with this story about Gladys

11  Ivy having to wait four hours?

12       A.    I am familiar with it, and I have my doubts

13  about it.  We're investigating that.  It's highly

14  unlikely someone waited four hours.

15       Q.    Okay.  Why do you have your doubts?

16       A.    Because it's highly unlikely someone waited

17  four hours.  It's -- the math just doesn't add up.

18       Q.    Okay.  What do you -- were there other -- I'm

19  sorry.  Strike that.

20             Why -- why do you think the math doesn't add

21  up?

22       A.    Because it's -- it would be nearly impossible

23  for someone to wait four hours for that curbside voting

24  that she claims.

25       Q.    I guess I'm just trying to understand why

1  modification so that their ballot could be cured in a

2  different way than is specifically, provided for by

3  SB 1?

4            MS. HUNKER:  Objection, form.

5      A.   I think that it's hard for me to speculate on,

6  you know, a vague hypothetical.  You know, I -- these --

7  these -- like I said before, this would be handled on a

8  case-by-case basis with, you know, true, you know,

9  facts.  And it would be a fact-based decision.

10     Q.   That makes a lot of sense.  Thank you.

11     A.   Uh-huh.

12     Q.   Has -- so moving away from hypotheticals,

13 then --

14     A.   Okay.

15     Q.   -- has your office received requests for

16 regional (phonetics) modifications for changes in voting

17 procedures from voters with disabilities post enactment

18 of SB 1?

19     A.   No, I don't believe so.

20     Q.   Okay.  I have one last set of questions about

21 the voter identification requirements.

22            After SB 1, does your office advise mail ballot

23 voters to provide both their Social Security number and

24 driver's license numbers?

25     A.   Yes.  After -- in February of 2022, as we were

 1  having a high rejection rate, we went to extraordinary

 2  measures to try to educate the public, and we got -- I

 3  think we got an allotment of $87,000 from the

 4  Commissioners Court where we reached out directly to

 5  voters who had rejected mail ballot applications.

 6        We did some radio ads.  We did some Facebook

 7  educational efforts to try to, number one, help people

 8  who had already had rejected mail ballots or rejected

 9  applications, as well as preventing those problems from

10  happening.  So, yes, you know, we do what we can to try

11  to prevent and solve the problem once it occurs.

12      Q.    So, to be clear, the recommendation to put both

13  the Social Security number and driver's license number

14  began around February; is that correct?

15      A.    Yes.

16      Q.    And you may have already answered this, but why

17  did you start advising to put both numbers?

18      A.    We kind of used the tag line, "When in doubt,

19  fill them both out," and -- because it's just, you know,

20  to be as safe as possible to try to get both of those

21  numbers down with the idea that someone is -- is likely

22  to have one of those two numbers on their voter

23  registration record.

24      Q.    So, in the circumstances where an individual

25  puts down only their driver's license number on their

```
 1   mail ballot, but you only have their Social Security

 2   numbers on file, what would happen?

 3       A.   That would be rejected, and they would -- they

 4   would get a reject letter asking for more information;

 5   or the form provided by the Secretary of State, we would

 6   send them that form.

 7       Q.   So they would get a reject letter, but the law

 8   does not require that an individual write down both

 9   numbers; is that correct?

10       A.   No.

11       Q.   So is it fair to say that, under the new

12   system, many people who put down a correct identifying

13   number for themselves are still at risk of having their

14   application for ballot by mail or mail ballot rejected?

15                 MS. HUNKER:  Objection, form.

16       A.   That would be the case.  If they have -- if we

17   have a voter registra- -- or a driver's license on file,

18   but they send in a correct Social Security number, if

19   the two don't match, then we can't accept.

20                 MS. CAI:  Thank you.  That's all my

21   questions.

22                 THE REPORTER:  Just a second, please.

23   Okay.  Thank you.

24                 MS. HUNKER:  How much time for the

25   Plaintiffs.
```

1                    THE REPORTER:  I couldn't tell you right

2    this second.

3                    MR. WHITE:  Should we go off record for a

4    second?

5                    THE VIDEOGRAPHER:  Off the record.  Time

6    is 7:08 p.m.

7                    (Discussion off the record.)

8                    THE VIDEOGRAPHER:  Okay.  We're back on

9    the record.  The time is 7:09 p.m.

10                        EXAMINATION

11   BY MS. HUNKER:

12       Q.   Good evening, Mr. Scarpello.  How are you

13   today?

14       A.   Very good.

15       Q.   My name is Kathleen Hunker.  I represent the

16   State Defendants.  I am going to be asking you a series

17   of questions mostly in response to what Plaintiffs'

18   Counsel had asked you, so I'm going to be jumping around

19   a little bit with respect to topics.

20            If at any point, my switch of topics confuses

21   you or you don't understand the switch, would you please

22   let me know?

23       A.   Sure.

24       Q.   If you do, I'll be happy to provide additional

25   foundation or to restate the question as needed.  Okay?

# Attachment 12

# Lisa Wise
# April 15, 2022 Deposition Excerpts

Transcript of the Testimony of

# Lisa Wise

## Date:

April 15, 2022

## Case:

LA UNION DEL PUEBLO ENTERO et al. vs GREGORY W. ABBOTT

Lisa Wise                                                    April 15, 2022

1                  UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
2                     SAN ANTONIO DIVISION

3    LA UNION DEL PUEBLO ENTERO )
     et al.,                    )
4          Plaintiffs,          )
                                )
5    v.                         ) Civil Action No. SA-21-CV-
                                )        00844-XR
6    GREGORY W. ABBOTT, et al., )
          Defendants.           )
7
7
8
                  -----------------------------------------
9
                  ORAL AND VIDEOTAPED DEPOSITION OF
10                          LISA WISE
                         APRIL 15, 2022
11                          Volume 1

12                -----------------------------------------

13

15

16                   ORAL AND VIDEOTAPED DEPOSITION OF LISA

17   WISE  produced as a witness at the instance of Plaintiff,

18   and duly sworn, was taken in the above-styled and

19   numbered cause on the 14th day of April, 2022 from 9:06

20   a.m. to 5:05 p.m., before Nancy Newhouse, a Certified

21   Shorthand Reporter in and for the State of Texas,

22   reported by oral shorthand, located at the 500 East San

23   Antonio, Room 503, El Paso, Texas 79901, pursuant to the

24   Federal Rules of Civil Procedure, and the provisions

25   stated on the record or attached hereto.

```
 1        A.    Yes.

 2        Q.    And is it your understanding that the

 3   information and documents that you reviewed have already

 4   been produced to the Plaintiffs in this case?

 5        A.    Yes.

 6        Q.    Okay.  If, while we're talking today in the

 7   deposition, you reference a document that you think

 8   might not have been produced, or if I think I might not

 9   have seen it, I may ask you, or I may make a note on the

10   side that I will want to follow up about that document,

11   is that okay?

12        A.    Yes.

13        Q.    Other than your counsel, did you meet with

14   anybody else to prepare for today's deposition?

15        A.    No.

16                    MS. PERALES:  I'd like to mark this as

17   Exhibit 1.

18                    (Plaintiff's Exhibit No. 1 marked for

19   identification.)

20                    MS. SPECTOR:  Thanks.

21                    MS. SANCHEZ:  Thank you.

22                    MS. PERALES:  You're welcome.

23        Q.    (BY MS. PERALES)  You've been handed a copy of

24   a document that is marked Exhibit 1, can you read the

25   title of the document for me?
```

1        A.    "United States District Court Western District

2   of Texas San Antonio Division."

3        Q.    That's okay.  If you wouldn't mind reading

4   just the part where it says "Amended Notice"?

5        A.    "Amended Notice of Rule 30(b)(6) Deposition of

6   El Paso County Elections Department."

7        Q.    Thank you.  And have you seen a document like

8   this before?

9        A.    Yes.

10        Q.    And do you understand that you're giving your

11   deposition today pursuant to this notice?

12        A.    Yes.

13        Q.    I'd like you to turn to Page 13 of the

14   document, where you see the heading "Deposition Topics",

15   have you seen these deposition topics before?

16        A.    Yes.

17        Q.    Thank you.  And do you understand that you've

18   been designated as the witness to speak officially for

19   El Paso County on these topics?

20        A.    Yes.

21        Q.    Thank you, you can put that away now.

22              I'd like to ask you a couple of questions

23   about your background that were not covered yesterday.

24        A.    Okay.

25        Q.    Where did you grow up?

1      A.   I grew up in Omaha, Nebraska.

2      Q.   And did you go to college?

3      A.   Yes, I did.

4      Q.   Where did you go to college?

5      A.   I went to college, undergrad, in Kansas City

6   at Park University, it's in Parkville, Missouri, just

7   outside Kansas City, and I went to grad school at the

8   University of Nebraska in Omaha.

9      Q.   And what did you get your graduate degree in?

10      A.   A Master's in Public Administration.

11      Q.   Now, just for the purpose of making sure that

12   this record is all right, would you repeat your current

13   job title?

14      A.   Sure.  I am the El Paso County elections

15   administrator.

16      Q.   Now, yesterday you talked about coming to El

17   Paso, moving here, because your husband had changed jobs

18   and you applied for the job of elections administrator

19   here in El Paso County, do you recall that?

20      A.   Yes.

21      Q.   So I wanted to ask you, what was the position

22   that you held, what was your job before you came to

23   El Paso County?

24      A.   I was the deputy election commissioner in

25   Douglas County, Nebraska; Omaha, Nebraska, the largest

1     county.

2          Q.    And how long did you hold that position?

3          A.    About eight years, a little over eight years.

4          Q.    And prior to that, what job did you have?

5          A.    Prior to that, I did some campaign work.  I

6     worked in the mayor's office, I was in grad school.

7     There was a lot of little things happening, little

8     part-time jobs, kind of, in that last few years.

9          Q.    Can you tell me what you did as deputy

10    commissioner there in Omaha?

11         A.    Sure.  Much like here, administered elections

12    all across the county.  We did poll worker recruitment,

13    polling site placement, voter registration, ballot by

14    mail, collecting the results, tabulating, same type of

15    work that I do here.

16         Q.    You mentioned yesterday, it sounded like the

17    system in Nebraska was more like a poll worker draft,

18    and so I was wondering if you could --

19         A.    Yes.

20         Q.    -- tell me a little more about that?

21         A.    So in the state of Nebraska, you get drafted

22    to serve as a poll worker, and, once you've served two

23    elections, then you're removed from the draft.  So it's

24    -- it's -- that's -- that's how we get people, so they

25    are not so much volunteers, it's if you don't show up,

 1    it's just like jury duty, so there are -- they have to

 2    serve.

 3         Q.   Were they paid in Nebraska?

 4         A.   Yes.

 5         Q.   Were they paid more in Nebraska than they are

 6    in Texas?

 7              MS. SPECTOR:  Object to form.

 8         A.   Again --

 9              MS SPECTOR:  Go ahead.

10         A.   Again, that was 2014 when I left there; not

11    more than what we pay here in our county.

12         Q.   (BY MS. PERALES)  So can you tell me how many

13    years in total you have worked in election

14    administration?

15         A.   About 15.

16         Q.   I'm going to shift now to some questions about

17    El Paso County, and then a little bit more specifically

18    about your Latino voters here in El Paso County.

19              Would it be fair to say that most of the

20    population in El Paso County is Hispanic?

21         A.   Yes.

22         Q.   Would it be fair to say that most of your

23    voters here in El Paso County are Hispanic?

24         A.   Yes.

25         Q.   Would it be fair to say that many of the

1    voters in El Paso County speak Spanish?

2         A.   Yes.

3         Q.   And that you made reference yesterday to being

4    covered by the language requirements under the Federal

5    Voting Rights Act for Spanish, is that right?

6         A.   Yes.

7         Q.   Would you say that there are many voters

8    in El Paso County who are low income?

9              MS. SPECTOR:   Object to form.

10        A.   Yes.

11        Q.   (BY MS. PERALES)  And from what you know about

12   your community and the voters in your community, would

13   you also say that there is a significant portion of the

14   population, here in El Paso County, that does not have a

15   college degree?

16        A.   Yes.

17        Q.   Do you have any knowledge of whether many of

18   your voters have access to a computer with internet?

19              MS. SPECTOR:   Object to form.

20        A.   I guess I would say I don't know for sure

21   about that.

22        Q.   (BY MS. PERALES)  Did you receive calls here

23   at El Paso County Elections, in this most recent

24   election, cycle from voters who said that they did not

25   have access to the internet?

```
 1          A.   Yes.

 2          Q.   More than one call?

 3          A.   Yes.

 4                    MS. PERALES:  I'm going to mark the next

 5     exhibit, Exhibit 2.

 6                    (Plaintiff's Exhibit No. 2 marked for

 7     identification.)

 8          A.   Thank you.

 9          Q.   (BY MS. PERALES)  I want to give you a second

10     to take a look at what has been marked Exhibit 2 while I

11     get my pen out.

12                    Can you tell me, what is this Exhibit 2?

13          A.   This is the Hispanic Voter Statistics Report

14     from the 2020 March Primary Election.

15          Q.   Thank you.  Is this -- I'm going to need a

16     little bit of help understanding this document.

17          A.   Okay.

18          Q.   If we look at the first age group, ages 18 to

19     110, do you see that?

20          A.   Yes.

21          Q.   All right.  And in the first column where it

22     says total voters, does this exhibit tell us that there

23     were a total of 470,006 voters in the November -- I'm

24     sorry, in the March '20 election?

25          A.   I believe so.
```

1      Q.   Would that be registered voters?

2      A.   Yes.

3      Q.   Okay.  And then the next column which says

4  total Hispanic voters, 245,041, would that also be total

5  registered?

6      A.   Yes.

7      Q.   And then the next column, I think I

8  understand, total who voted, that 88,762, would that be

9  those who voted in the March 2020 election?

10     A.   Yes.

11     Q.   And then the next two columns I understand to

12 be total, inclusive of Hispanic and non-Hispanic, is

13 that right?

14               MS. SPECTOR:  Object to form.

15     A.   Yes.

16     Q.   (BY MS. PERALES)  And then the next column,

17 total Hispanic who voted, 54,112, would be all, all of

18 the Hispanic voters who voted in that election?

19     A.   Yes.

20     Q.   Okay.  Okay.  Okay.

21               Now, I want to go back to the column,

22 total Hispanic voters, and I want to draw your attention

23 to the numb -- the percent down below there, 52.14

24 percent.

25     A.   Yes.

1    the ballot tracker again.

2                    Yesterday you said that, eventually, El

3    Paso County started getting a report from the Secretary

4    of State about voters that had gone into the ballot

5    tracker to update their information, do you know,

6    roughly, the date when you started receiving those

7    reports from the Secretary of State?

8                    MS. SPECTOR:  Object to form.

9         A.   We received one report, and the date was

10   towards the end of the early voting period.  I don't

11   remember the exact date.  I may have produced the email

12   letting us know that it was now available, but I don't

13   remember that.

14        Q.   (BY MS. PERALES)  Okay.  You mentioned that

15   the Secretary of State kept saying they were working on

16   it yesterday, do you remember who from the Secretary of

17   State said that they were working on it?

18        A.   I -- I think her first name is Megan, and I

19   don't remember her last name.  But I know that she was

20   frustrated as well, because she was saying there are

21   other counties that are offline that either they weren't

22   able to work with their vendor, so I understood she was

23   frustrated as well, and we were able to get it as soon

24   as she was able to get it.

25        Q.   Is it correct to say that online counties

 1    received updated information about ID numbers through

 2    TEAM?

 3              MS. SPECTOR:  Object to form.

 4         A.   Yes, because their actual voter registration

 5    database is TEAM, so it would be -- it's one in the

 6    same.

 7         Q.   (BY MS. PERALES)  So help me connect the

 8    dots.

 9              If a voter updated their ID information

10    in the ballot tracker, would that information then

11    automatically go into TEAM?

12              MS. SPECTOR:  Object to form.

13         A.   I have to tell you the truth, I don't know.  I

14    don't know how it interfaced with -- with online

15    counties.

16         Q.   (BY MS. PERALES)  Before January 1, did you

17    know how many registered voters in El Paso County did

18    not have a driver's license number associated with their

19    voter registration record?

20              MR. JEFFREY WHITE:  Objection, form.

21         A.   I believe that at one point during the

22    committee, in talking about the -- when this bill was

23    not fully drafted yet, we talked about the numbers, and

24    I think we were around 50-some thousand that didn't have

25    a driver's license, and 30-some thousand that didn't

Lisa Wise                                    April 15, 2022
                                                   Page 46

```
 1   have both.  I -- those are just off the top of my head.

 2   Again, I think that's in record, but that's what I bel

 3   -- I believe initially we, in early '20, when -- in

 4   2021, when we were going into the drafting of the bill.

 5        Q.   (BY MS. PERALES)  When you say we were

 6   talking, do you mean the El Paso County Elections

 7   Department, internally, or do you mean conversations

 8   with other election administrators through the EA

 9   Association?

10        A.   Yes.  I'm sorry, with the TAEA, that when we

11   were talking about, that was one of the biggest parts

12   that we were saying, is that we have -- are missing the

13   -- we are missing numbers.  Every other county was

14   saying the same thing, that we -- or, you know, we have,

15   obviously, more that have at least one, but there are

16   still some that have neither and some that are missing

17   one.

18        Q.   Do you know if the TAEA compiled the

19   information about missing ID numbers from various

20   counties, and provided that in some way to the Texas

21   legislature?

22        A.   I be --

23             MS. SPECTOR:  Object to form.  Sorry.

24             THE WITNESS:  I'm sorry.

25             MS. SPECTOR:  Go ahead.
```

1          A.   I believe they did.  Our -- either our -- our

2     committee or the actual TAEA, or the Legislative

3     Committee, I don't remember, drafted a letter that said

4     -- that I believe stated this many Texans lack both or

5     one.

6          Q.   (BY MS. PERALES)  When you say our committee,

7     tell me what is our committee?

8          A.   There's a legislative committee that's also

9     involved with TAEA, and again, anybody could be a member

10    of that.  It's just that when the legislative session

11    starts, generally, if people are tasked in their office

12    with reviewing legislation, with com -- putting fiscal

13    impacts together, generally that's the EA.

14               There may be an assistant EA, there may

15    be somebody else who does that.  Then they participate

16    in these calls, just to talk about, okay, what does --

17    you know, what do we like about this bill, what do we

18    not like about this bill --

19         Q.   Uh-huh.

20         A.   And then we decide as an organization,

21    basically, if we're going to go on record as support,

22    opposition or just for information for record purposes.

23         Q.   Did you create a document internal to El Paso

24    County Elections Department that has the exact numbers

25    of how many of your registered voters don't have a

1    driver's license number associated with their

2    registration?

3                    MS. SPECTOR:  Object to form.

4         A.   I don't remember a document.  I remember,

5    basically, being on a call and saying this is -- you

6    know, they were like, let's get these numbers.  I asked

7    someone in my office, let's run these numbers.  They

8    brought me back a sticky note, maybe, or that -- I mean,

9    that's the best I can remember, and then I just read

10   them off to them and they took that information.

11        Q.   (BY MS. PERALES)  Okay.

12                   MS. SPECTOR:  I think we're getting kind

13   of close to a break; up to you and how you feel.

14        Q.   (BY MS. PERALES)  Would you like to take a

15   quick break?

16        A.    Sure.

17                   MS. PERALES:  Off the record.

18                   VIDEOGRAPHER:  We are off record at 10:13

19   a.m.

20                   (Off the record.)

21                   VIDEOGRAPHER:  We are back on record at

22   10:27 a.m.

23        Q.   (BY MS. PERALES)  Ms. Wise, I don't want you

24   to think I'm obsessed with this online/offline thing,

25   but I do have one more question for you about offline

1    counties.

2              You started in El Paso as the elections

3    administrator in 2015, is that right?

4         A.   Yes.

5         Q.   Okay.  Do you have an understanding of why

6    certain counties are offline for TEAM?

7         A.   What I've been told, because I was not here to

8    make that decision, was that the -- the system for the

9    large counties cannot maintain that large amount of

10   information.

11        Q.   So would it be correct to say that it's your

12   understanding that the TEAM system, which is op --

13   operated by the Texas Secretary of State, cannot handle

14   the size of the voter registration databases of the

15   larger counties?

16        A.   Based on what I've been told, strictly, yes.

17        Q.   I'd like to shift now to your practices before

18   SB 1, and I'm not going to retread the ground that

19   Mr. White did, covered yesterday, but I do want to ask

20   you some specific questions about vote by mail.

21              He mentioned yesterday that there were

22   times when you would mail ABBMS to voters over age 65,

23   do you recall that?

24              MS. SPECTOR:  Object to form.

25        A.   Yes.

1        A.    Yes.

2        Q.    Have you taken the poll watcher training

3   yourself?

4        A.    I have not.

5        Q.    Are you aware whether an individual could

6   simply click through the screens, without taking the

7   time to read the training?

8              MS. SPECTOR:  Object to form.

9        A.    I am not aware of that, whether or not that

10  could happen.

11       Q.    (BY MS. PERALES)  Are you aware whether

12  there's any kind of test at the end of the training, to

13  evaluate whether the poll watcher has absorbed any of

14  the training information?

15             MS. SPECTOR:  Object to form.

16       A.    I'm not -- I'm not sure.

17       Q.    (BY MS. PERALES)  You mentioned that there are

18  slides from the Secretary of State to help train your

19  poll workers on their duties with respect to watchers,

20  is that correct?

21       A.    Yes, I believe so.

22       Q.    Do you remember whether that was a stand-alone

23  training or part of a larger training of poll workers?

24             MS. SPECTOR:  Object to form.

25       A.    It was a part of the training that the

```
 1    Secretary of State sends out.

 2         Q.   (BY MS. PERALES)  Do you have adequate

 3    guidance from the Secretary of State's Office on how

 4    poll workers should behave towards poll watchers, to

 5    make sure they comply with SB 1?

 6                    MR. JEFFREY WHITE:  Object to form.

 7                    MS. SPECTOR:  Object to form.

 8         Q.   (BY MS. PERALES)  Meaning that the poll

 9    workers comply with SB 1.

10         A.   I don't think so.

11         Q.   Can you elaborate on that?

12         A.   I think the biggest concern for myself and

13    from poll workers is more about what can they do, that's

14    the biggest thing.  Where can they go, can they stand

15    beside the DS200 and watch people?  This is an issue we

16    had before, watch people put their ballot in, and they

17    are trying to see, tabulate in their mind, is that -- is

18    that something that's in the polling site.  How close

19    can they get to a voter in the actual booth?

20                    That's -- that's really my concern, and

21    that's been their concern, is that these guys, they want

22    to protect themselves, they don't want to do anything

23    wrong, but they are not sure what -- you know, before,

24    it was they could only talk to the judge, they -- they

25    could sit at a spot up by the check-in, and that was
```

1    basically it at the polling site.  Obviously, with other

2    options, other observable activities it's different.

3              But close enough to see and hear, free

4    movement is the one that they talk about, that's because

5    that's an issue we had before.  What does that mean?

6    And so I -- I think some guidance on what does that

7    mean, for myself and for the poll workers, I know they

8    would be appreciative of that.

9         Q.   Have you received guidance from the Secretary

10   of State as to the definition of free movement in with

11   respect to what poll watchers are allowed to do?

12        A.   No.

13        Q.   Have you received instructions from the

14   Secretary of State about how close a poll watcher may

15   stand to the DS2 --

16        A.   Two hundred.

17        Q.   -- 00?

18        A.   I'm sorry.  That's our tabulator.

19        Q.   Yeah.

20             MS. SPECTOR:  Object to form.

21        A.   No.

22        Q.   (BY MS. PERALES)  Have you received any

23   instruction from the Secretary of State about how close

24   a poll watcher can stand to the voter while the voter is

25   marking the ballot?

1              MS. SPECTOR:  Object to form.

2        A.   No.

3        Q.   (BY MS. PERALES)  Have you received any

4   guidance from the Secretary of State about whether a

5   poll worker must allow a poll watcher to view the paper

6   ballot as it's being put into the 2S200 --

7              MS. SPECTOR:  Object to form.

8        Q.   (BY MS. PERALES)  -- DS200?

9        A.   No.

10       Q.   Have -- with respect to free movement, have

11  you received any guidance from the Secretary of State's

12  Office about how close a poll watcher can stand to

13  election workers as they are carrying out their duties

14  at the voter sign-in table?

15             MS. SPECTOR:  Object to form.

16       A.   No.

17       Q.   (BY MS. PERALES)  Have you received any

18  guidance from the Secretary of State about what behavior

19  by a poll watcher might constitute a violation of the

20  breach of a -- of the peace?

21       A.   No.

22       Q.   Have you received any guidance from the

23  Secretary of State's Office about the difference between

24  poll watcher activity that must be observed by two

25  election workers before the poll watcher can be removed

Lisa Wise

April 15, 2022
Page 92

1   versus activity that only needs to be observed by one

2   election worker before the poll watcher can be removed?

3                MS. SPECTOR:  Object to form.

4        A.   I don't believe so.

5        Q.   (BY MS. PERALES)  Have you received any

6   guidance from the Secretary of State about when a

7   presiding judge must call a law enforcement officer to

8   remove a poll worcher -- wor -- watcher, versus when a

9   presiding judge may remove the poll watcher without

10  calling a law enforcement officer?

11               MS. SPECTOR:  Object to form.

12       A.   I don't believe we've received guidance on

13  that.

14       Q.   (BY MS. PERALES)  Have you received any

15  guidance from the Secretary of State about what activity

16  by a poll watcher would be a violation of the Penal Code

17  versus a violation of the Election Code?

18               MS. SPECTOR:  Object to form.

19       A.   No.

20       Q.   (BY MS. PERALES)  Are you then required to, at

21  least at this point, fill in the gaps in terms of poll

22  worker training with respect to activity that is allowed

23  or prohibited by SB 1 with respect to poll watchers?

24               MS. SPECTOR:  Object to form.

25               MR. JEFFREY WHITE:  Objection, form.

Lisa Wise                                                April 15, 2022
                                                          Page 93

 1        A.   Yes.

 2        Q.   (BY MS. PERALES)   We were on Page 27 of

 3   Exhibit 5, and towards the bottom of the page there is a

 4   Section 4.07, do you see that there?

 5        A.   Yes.

 6        Q.   And is it fair to say then that on those last

 7   lines on Page 27 that SB 1 strikes the word conveniently

 8   and adds the words enough to see and hear --

 9             MS. SPECTOR:   Object to form.

10        Q.   (BY MS. PERALES)   -- to this portion of the

11   Election Code?

12        A.   Yes.

13        Q.   And is that then followed up with language on

14   Page 28 with a requirement that a watcher may not be

15   denied free movement where election activity is

16   occurring within the location at which the watcher is

17   serving?

18             MS. SPECTOR:   Object to form.

19        A.   Yes.

20        Q.   (BY MS. PERALES)   And then in Paragraph (f)

21   there am I reading it correctly when I say, in this

22   code, a watcher who is entitled to, quote, "observe",

23   unquote, an election activity is entitled to sit or

24   stand near enough to see and hear the activity?

25             MS. SPECTOR:   Object to form.

1          A.   Yes.

2          Q.   (BY MS. PERALES)  And this is the free

3     movement that you were describing earlier in your

4     testimony, is that right?

5          A.   Yes.

6               MS. SPECTOR:  It's almost time for a

7     break, but just keep going, and when it's convenient --

8               MS. PERALES:  This is my last question.

9               MS. SPECTOR:  Okay.  I'm sorry.

10         Q.   (BY MS. PERALES)  Did you receive any guidance

11    from the Secretary of State about the meaning of the

12    word observe here in this Section 4.07 of SB 1?

13         A.   No.

14              MS. PERALES:  I am done with this part.

15              MS. SPECTOR:  Oh, okay.  Great.  Yeah.

16              VIDEOGRAPHER:  We are off record at 11:32

17    a.m.

18              (Off the record.)

19              VIDEOGRAPHER:  We are back on record at

20    11:53 a.m.

21         Q.   (BY MS. PERALES)  Are we ready?

22         A.   I am.

23         Q.   Let us just finish up with this discussion

24    about poll watchers by turning to -- on Page 29 of

25    Exhibit 5, Section 4.09, there is some added language

1   there to Paragraph (a), do you see that Ms. Wise?

2       A.   Yes.

3       Q.   Can you read me Paragraph (a) as -- in its --

4   in its entirety now with the amendments by SB 1?

5       A.   "A person commits an offense if the person

6   serves in an official capacity at a location at which

7   the presence of watchers is authorized and knowingly

8   prevents a watcher from observing an activity or

9   procedure the person knows the watcher is entitled to

10  observe, including by taking any action to obstruct the

11  view of a watcher or distance the watcher from the

12  activity or procedure to be observed in a manner that

13  would make observation not reasonably effective."

14      Q.   Thank you.  Have you received any guidance

15  from the Secretary of State about what it means for a

16  poll worker to obstruct the view of a watcher?

17          MS. SPECTOR:  Object to form.

18      A.   No.

19      Q.   (BY MS. PERALES)  Have you received any

20  guidance from the Texas Secretary of State about the --

21  what it means for a poll worker to improperly, or in

22  violation of this paragraph, distance the watcher from

23  the activity?

24          MS. SPECTOR:  Object to form.

25      A.   No.

Lisa Wise

April 15, 2022
Page 96

```
 1        Q.    (BY MS. PERALES)  Have you received any
 2   guidance from the Texas Secretary of State about what
 3   action by a poll watcher would, quote, "make observation
 4   not reasonably effective", unquote?
 5                  MS. SPECTOR:  Object to form.
 6        A.    No.
 7        Q.    (BY MS. PERALES)  What have you told your poll
 8   workers about what it means -- what -- what activity by
 9   them would be obstructing the view improperly now?
10                  MS. SPECTOR:  Object to form.
11        A.    I don't know if we've got into the -- I'm
12   sorry -- gone into specifics about that.
13        Q.    (BY MS. PERALES)  Okay.  Do you know whether
14   if a poll worker inserted themselves between a voter and
15   a watcher who was standing too close, in the opinion of
16   the poll worker, whether that would be now an offense
17   under the Election Code?
18                  MS. SPECTOR:  Objection, calls for legal
19   conclusion.
20        A.    Yeah.  I don't know for sure.  That might be
21   something -- if we received a report about that, that I
22   would either, you know, talk with our county attorney or
23   consult the Code if it was something that was happening.
24        Q.    (BY MS. PERALES)  When I'm quiet I'm switch --
25   I am skipping over questions, so quiet is good.
```

1          I asked you how much poll workers were

2   paid, but I didn't ask you the type of hours that they

3   work on a typical day of voting, can you describe to me,

4   roughly, at what time the poll workers would arrive, and

5   then what time they would leave?

6               MS. SPECTOR:  Object to form.

7          A.   So Election Day, the Code only allows us to

8   pay poll workers for an hour prior to opening, so they

9   are instructed to arrive at six on Election Day, and,

10  dependent upon when they process their last voter, and

11  if they are the drop-off team, generally, it could be

12  14, 15 hours.

13         Q.   (BY MS. PERALES)  Now that we've gone over

14  these provisions related to poll watchers, including the

15  creation of an offense for obstructing the view, or

16  making observation not really -- reasonably effective,

17  including these limitations on removing poll watchers

18  and -- and the other provisions that we've covered, do

19  you have any concerns in generally -- in general, about

20  these new provisions related to poll watchers, and how

21  poll workers are going to interact with them?

22              MS. SPECTOR:  Object to form.

23         A.   Yes.  I mean, my -- my biggest concern is --

24  is not the poll watchers in general, because again we

25  have no issue with poll watchers in general, it's the

1    cases where they are being intrusive, or they're being

2    obstructive, or they're being loud, walking around,

3    saying that free movement means -- this is what I'm --

4    again, speculation, but just based on what we've had

5    with the issues we've had before is that free movement

6    means I can go in here, or can I -- you know, I can do

7    this, and just making sure that our poll watchers have

8    some -- our poll workers have some coverage on that of

9    no, that is not what free movement means.  And any time

10   we tell someone, you know, you are not allowed by law --

11   not any time but 99 percent, a lot of them will say

12   well, show me in the law where that says that.

13                    And so I -- my concern is that,

14   especially with the free movement portion, that we could

15   see a repeat of 2020, and not knowing what they can do,

16   or are they going to feel like I can't even have them

17   removed.  Can I?  I -- you know, I just -- that's on top

18   of already running the election, so I -- I am concerned

19   that they're -- it's vague.

20        Q.   (BY MS. PERALES)  Do you believe that even

21   after a few election cycles, the types of concerns that

22   you've expressed could still be a problem?

23                    MR. JEFFREY WHITE:  Objection, form.

24                    MS. SPECTOR:  Object to form.

25        A.   They could be, yes.

1      Q.   (BY MS. PERALES)  I'd like to turn now to vote

2   by mail, and specifically to Section 5.07, which starts

3   on Page 38 of Exhibit 5, and, if you could for me,

4   towards the bottom of Page 38 where it says Section

5   5.07, if you could read what is in Paragraph (f) for me?

6      A.   "If the information required under Section

7   84.002(a)(1-a) included on the application does not

8   identify the same voter identified on the applicant's

9   application for voter registration, the clerk shall

10  reject the application."

11     Q.   And do you understand this provision then to

12  require you to match an ID number that's on the

13  application for ballot by mail to the voter's voter

14  registration record ID number?

15              MS. SPECTOR:  Object to form.

16     A.   Yes.

17     Q.   (BY MS. PERALES)  And if you would turn for --

18  I'm going to try to tackle both of these at the same

19  time, let's see how successful I am.

20              If you will turn forward to Section 5.13

21  on Page 45, do you see at the top of Page 45 where it

22  says Section 5.13?

23     A.   Yes.

24     Q.   Do you see where it has Paragraph (b), "A

25  ballot may be accepted only if," and then there is a

1    colon?

2         A.   Yes.

3         Q.   And then down at the bottom of the page, do

4    you see the addition of language in Indent No. 8 that

5    says, quote, "The information required under Section

6    86.002 (g) provided by the voter identifies the same

7    voter identified on the voter's application for voter

8    registration under Section 13.002(c)(8)", unquote?

9         A.   Yes.

10        Q.   And do you understand this to be a requirement

11   that on a returned mail ballot, your office has to match

12   the ID number provided on the returned mail ballot

13   envelope to the voter's voter registration record ID

14   number?

15              MS. SPECTOR:  Object to form.

16              MR. JEFFREY WHITE:  Objection, form.

17        A.   Yes.

18        Q.   (BY MS. PERALES)  I wanted to explore with you

19   why you think there were occasions on which you did not

20   have an ID number associated with the voter's voter

21   registration.

22              Do you have any ideas about why you might

23   have lacked an ID number on your voter's voter

24   registration record, so that you could not match it or

25   process either their ABBM or their mail ballot?

1              MS. SPECTOR:  Object to form.

2         A.   I have one example that I actually spoke to a

3    group about two weeks ago, and a woman said my friend

4    was unable to get both an applica -- or both -- I'm

5    sorry, an application, the ballot.  And I said okay,

6    tell me what happened?  And she said she told me that

7    she put one of the identifiers on there, and she said I

8    -- I don't know for sure, because I was not there --

9         Q.   (BY MS. PERALES)  Uh-huh.

10        A.    -- but that it was rejected, and then she said

11   that on the next one, the next application she put both

12   identifiers on there.  She said I saw it, I know it.

13   And I said well, let me have the woman's name, and let

14   me look and see what the situation is.

15                So we went in to see what the issue was,

16   and she had registered at a time -- she was elderly --

17   that she did not need one of those items.  And because

18   of the -- you know, she requested not -- not in the very

19   beginning of January, but later closer to the deadline,

20   so she requested we reject it.

21                She did put two identifiers on, but then

22   we got that, we did not have any, so we sent, initially

23   sent the voter registration form.  She didn't want --

24   she said I've already been registered, and so,

25   unfortunately, she wasn't able to get the ballot, and so

```
 1    we spoke with her and explained the situation, and that

 2    she did need to fill out another registration with that

 3    information.

 4                    But so that's an example I know that

 5    somebody who may be older may not have those on their --

 6    on their registration form.

 7         Q.   Did that voter end up voting in the March

 8    primary?

 9         A.   No.

10         Q.   Are you aware that there was a time when, in

11    order to register to vote, you did not have to provide

12    either a driver's license number or the last four of

13    your social?

14         A.   I am.

15         Q.   Do you know when that requirement came into

16    effect?

17         A.   I do not.

18                    MS. SPECTOR:  Object to form.

19                    THE WITNESS:  I'm sorry.

20                    MS. SPECTOR:  Go ahead.

21         A.   I do not.

22         Q.   (BY MS. PERALES)  Have you ever heard anybody

23    mention the Help America Vote Act requirement that you

24    put your driver's license or the last four of your

25    social?
```

1                    MS. SPECTOR:  Object to form.

2         A.    Yes.

3         Q.    (BY MS. PERALES)  And do you remember the Help

4    America Vote Act coming about after the 2000 election,

5    the Bush v Gore?

6                    MS. SPECTOR:  Object to form.

7         A.    I do.

8         Q.    (BY MS. PERALES)  And so when you mention

9    someone being elderly, and not having registered with a

10   driver's license or social, would it also be true that

11   somebody might simply be middle aged or my age and just

12   if, you know, if they registered early enough and stayed

13   registered, that number would also not be on file for

14   them?

15                   MS. SPECTOR:  Object to form.

16        A.    Correct.  If they never updated with that

17   information, then yes.  This was an elderly example.

18   She was elderly, so -- and I spoke with her.  She -- she

19   would admit that to you.  This is not speaking out of

20   school.  She would have said yes.

21        Q.    (BY MS. PERALES)  So do you know when a

22   voter's voter registration record would get updated with

23   a driver's license number or the last four of a social?

24                   MS. SPECTOR:  Object to form.

25        A.    If they updated a voter registration if they

1   were to move or update, and they were to put that

2   information on there, it would be updated.  We get

3   updates from people that go to the DPS and renew their

4   driver's license.  It -- so they may include more

5   information on that one if they didn't prior to Java.

6   So it generally takes a move or maybe a renewal to get

7   that information on there.

8        Q.   (BY MS. PERALES)  Do you know if every time

9   someone goes to DPS to renew their driver's license that

10  information about their ID number would be transmitted

11  to their voter registration record?

12               MS. SPECTOR:  Object to form.

13       A.   I believe it's only if they mark the box,

14  register to vote.

15       Q.   (BY MS. PERALES)  And if they were already

16  registered they would not mark that box, is that

17  correct?

18               MS. SPECTOR:  Object to form.

19       A.   They may not.  I don't know for sure if they

20  would or would not.

21       Q.   (BY MS. PERALES)  If someone changes address

22  in El Paso County, and they update their voter

23  registration record, could they update their voter

24  registration record without providing a driver's license

25  or last four of social?

Lisa Wise

April 15, 2022
Page 105

```
 1                    MS. SPECTOR:  Object to form.
 2           A.   The online portal, which is address update
 3      only, that the State provides -- I don't remember if it
 4      requires that they put that on there.  I have to tell
 5      you the truth.
 6           Q.   (BY MS. PERALES)  Okay.  Did you receive calls
 7      from voters expressing confusion about why they were
 8      being sent a new voter registration form with their
 9      rejected mail ballot or ABBM --
10                    MS. SPECTOR:  Object --
11           Q.   (BY MS. PERALES)  -- because the voter was
12      already registered to vote?
13                    MS. SPECTOR:  Object to form.
14           A.   Yes.
15           Q.   (BY MS. PERALES)  More than one call?
16           A.   Yes.  And -- and we took a step to say now on
17      that notice where we talked about being rejected, we've
18      enclosed a voter registration application so that you
19      may use the same identifier on this and be able to match
20      up, to avoid having to send it in again, in some
21      language like that.
22           Q.   And when you say you included that information
23      in your notice to the voter, would that be in the El
24      Paso County specific notice as opposed to the Secretary
25      of State's notice?
```

Lisa Wise
April 15, 2022
Page 106

1        A.    Correct.

2        Q.    And you felt it was necessary to provide some

3   more explanation or context around why you were sending

4   a new voter registration form, is that right?

5        A.    Yes.

6        Q.    Did you have voters who attempted to correct

7   their mail ballot or ABBM by submitting it a second time

8   with new or different ID information that you then

9   rejected a second time, because you could not match that

10  number?

11              MS. SPECTOR:  Object to form.

12       A.    Yes.

13       Q.    (BY MS. PERALES)  More than one occasion?

14       A.    Yes.

15       Q.    More than 50?

16       A.    That, I don't -- I couldn't say for sure.

17       Q.    Did you keep track of how many times you might

18  have rejected an ABBM or a mail ballot for a particular

19  voter?

20       A.    I don't believe that we did on the

21  application; the ballot side of it, possibly.  I'd have

22  to look and see if we did.

23       Q.    Did you do any logging of how many ABBMs you

24  rejected for insufficiency on the form?

25              MS. SPECTOR:  Object to form.

1      A.    Yes.

2      Q.    (BY MS. PERALES)  But then I believe with Mr.

3  White yesterday, you may have mentioned that that would

4  include SB 1 reasons and non SB 1 reasons?

5                  MS. SPECTOR:  Object to form.

6      A.    It does, and we did break that down, though.

7  I believe that's in a document.

8      Q.    (BY MS. PERALES)  Okay.

9      A.    But it's -- so it's broken down by this many

10  were rejected IR, which is the code that we -- or IRIS

11  is the code in our system, no signature, party not

12  selected, and then the two that I said that weren't in

13  the system to begin with.  So we do, we did break it

14  down in that way.

15      Q.    Okay.  So would it be fair to say that a voter

16  might have had the experience of submitting an ABBM with

17  an ID number, and your office was unable to match that

18  number to the voter registration record and rejected

19  that ABBM?

20                  MS. SPECTOR:  Object to form.

21      A.    Yes.

22      Q.    (BY MS. PERALES)  And it's possible that in

23  some of those cases, the voter might have simply not

24  followed up after that and not voted in the election, is

25  that right?

1      Q.   (BY MS. PERALES)  Did you do any training, did

2    you office do any training with El Paso County election

3    workers or poll workers about these new requirements on

4    assistors?

5               MS. SPECTOR:  Objection to form.

6      A.   Only in the section where we cover new forms,

7    so we just explained that portion of it, but -- but

8    that's the extent of it.

9      Q.   (BY MS. PERALES)  Have you trained election

10   workers yet on the fact that assistors are now limited

11   to providing assistance in the form of reading and

12   marking the ballot?

13              MS. SPECTOR:  Objection to form.

14              MR. JEFFREY WHITE:  Objection, form.

15     A.   I don't know if we specified that portion in

16   the training, it's -- like I said, it's been mostly just

17   this is the form, this is what the assistor signs now,

18   and really, frankly, that's about the gist of it.

19     Q.   (BY MS. PERALES)  Do you know how you would

20   answer a poll worker if they asked you hey, we have a

21   deaf voter here at the polling place who wants to use an

22   assistor to communicate with us while checking in to

23   vote, but that's not reading and marking the ballot,

24   what do I do --

25              MS. SPECTOR:  Objection --

```
 1          Q.   (BY MS. PERALES)  -- how would you advise that
 2    poll worker?
 3               MS. SPECTOR:  Objection to form.  Sorry,
 4    Nina.
 5          A.   Generally, if there is a question on the Code
 6    that I don't -- that I am not comfortable with giving
 7    them advice on, I would contact the County Attorney's
 8    Office and just say look, the new law is in place, here
 9    is their question, what -- you know, what would you
10    recommend that I answer?
11          Q.   (BY MS. PERALES)  Did you do any training with
12    your election workers about what to do if an assistor
13    signed in and said they were receiving compensation --
14               MS. SPECTOR:  Object to form.
15          Q.   (BY MS. PERALES)  -- from a candidate?
16               MS. SPECTOR:  Sorry.
17               MS. PERALES:  I'm sorry, no --
18               MS. SPECTOR:  Yeah.
19               MS. PERALES:  -- it's entirely my fault.
20               MS. SPECTOR:  No, no, it's mine, it's
21    mine.
22          A.   No, we did not.
23          Q.   (BY MS. PERALES)  Do you know how you would
24    answer a question from a poll worker who calls you and
25    says I have an assistor here, but they are also being
```

Lisa Wise

April 15, 2022
Page 157

1    paid by, I don't know, the PAC in favor of white

2    elephants, I don't know, just something -- just

3    something?

4                    If a -- if an assistor said yeah, I am,

5    I'm actually -- I came over here from the so-and-so

6    campaign, this voter asked for my help, how would you

7    advise the poll worker who calls you and says what do I

8    do, they checked yes on the form?

9                    MS. SPECTOR:  Objection to form.

10        A.   I would call my County Attorney's Office and

11   ask for direction on what we thought, how we would

12   handle that.

13        Q.   (BY MS. PERALES)  Are you aware whether

14   Senator Blanco testified regarding these provisions in

15   SB 1, that it would have an adverse impact on Spanish-

16   speaking voters in El Paso County?

17                   MS. SPECTOR:  Objection to form.

18        A.   I believe he did.

19        Q.   (BY MS. PERALES)  Do you know anything more

20   about what he might have said about the effect of the

21   assistor provision, specifically on Spanish-speaking

22   voters in El Paso?

23                   MS. SPECTOR:  Objection to form.

24        A.   I'm sorry, I don't remember the testimony.

25        Q.   (BY MS. PERALES)  Do you have any concerns

1   about how this new limitations on the scope of

2   assistance -- and by that I mean limitation on

3   assistance to just reading and marking the ballot -- do

4   you have any concerns about how that might affect

5   limited-English-proficient voters in El Paso County?

6                    MR. JEFFREY WHITE:  Objection, form.

7                    MS. SPECTOR:  Objection to form.

8        A.   Yes, I do.

9        Q.   (BY MS. PERALES)  What would those concerns

10   be?

11       A.   That if they did not understand maybe a

12   proposition or something like that, the ballot language,

13   that taking out the answering questions, at least,

14   portion of that, and frankly for all, even native

15   English speakers, that the proposition language, if you

16   have a question in mind and have -- want to ask the

17   assistor, that that doesn't allow that, and so they

18   would have less information.

19       Q.   Do you have those kinds of voting machines,

20   here in El Paso County, where the voter votes on a touch

21   screen electronic machine, but then receives this paper

22   output that they have to then go and deposit into a

23   separate machine?

24                    MS. SPECTOR:  Objection to form.

25       A.   Yes.

```
 1        Q.    (BY MS. PERALES)  Okay.  And was it your
 2   experience that voters were somewhat confused about
 3   having to vote on the machine, then get the paper and
 4   then take it over and drop it into this other black box?
 5        A.    Yes.
 6        Q.    All right.  Do you think that if an assistor
 7   is unable to explain that process of taking the paper
 8   receipt and then dropping it into the separate machine,
 9   let's say to a Vietnamese-speaking voter, that that
10   might make it more difficult for that Vietnamese-
11   speaking voter to cast their ballot?
12                    MR. JEFFREY WHITE:  Objection, form.
13                    MS. SPECTOR:  Objection to form.
14        A.    Yes.
15        Q.    (BY MS. PERALES)  By the way, you don't call
16   that second box a trash can, do you?
17        A.    No.
18        Q.    You've heard it, though, haven't you?
19        A.    Yes.
20        Q.    Do you have any concerns that disabled voters
21   might experience more problems voting because of the new
22   limitations on voter assistance to just reading and
23   marking the ballot, because, for example, it may limit
24   their --
25                    (Sneeze.)
```

```
 1                    THE WITNESS:  Bless you.

 2        Q.   (BY MS. PERALES)  -- ability -

 3                    THE WITNESS:  Bless you.

 4                    MS. PERALES:  Bless you.

 5                    MS. SPECTOR:  Sorry.  Thank you.

 6        Q.   (BY MS. PERALES)  -- to use an assistor to

 7   help them navigate the polling place?

 8                    MR. JEFFREY WHITE:  Objection, form.

 9        A.   So for physical assistance?

10        Q.   (BY MS. PERALES)  Yes.

11        A.   Yes, I do.

12        Q.   And also to the extent that it sort of,

13   disability in language may come together, for example,

14   in a voter who is blind or deaf, and who can't do a

15   traditional read and mark of a ballot -- you had

16   mentioned before there were perhaps blind voters who

17   didn't want to use the audio ballot, and wanted to use

18   their own assistor -- do you have any concerns that

19   these new limitations to reading and marking the ballot

20   might make it more difficult for that type of blind

21   voter to cast a ballot?

22                    MS. SPECTOR:  Objection to form.

23                    MR. JEFFREY WHITE:  Objection, form.

24        A.   If they're not able to be led to the machines

25   and to the DS200, then yes.
```

```
1         A.   It has in the past, yes.

2         Q.   (BY MS. PERALES)  Okay.  If the League of

3    Women Voters, or a similar non-partisan organization,

4    were to receive a request from a voter to help them with

5    their mail ballot, and the League of Women Voters, or

6    that organization, asked their secretary or

7    receptionist, go ahead and help this person with their

8    mail ballot, do you think that activity is now illegal

9    under Section 6.06 of SB 1?

10             MS. SPECTOR:  Objection, calls for legal

11   conclusion, calls for speculation.

12             MR. JEFFREY WHITE:  Objection, form.

13        A.   If they fill out the assistance oath?

14        Q.   (BY MS. PERALES)  If they fill out the

15   assistance oath, but it's a secretary or receptionist of

16   that organization?

17             MR. JEFFREY WHITE:  Objection, form.

18             MS. SPECTOR:  Same objections.

19        A.   I don't believe so.

20        Q.   (BY MS. PERALES)  Would the individual who is

21   doing the assisting be compensated, because they are an

22   employee of the organization?

23             MS. SPECTOR:  Objection, calls for

24   speculation.

25        A.   Compensated for helping with the ballot, or
```

1    just in -- that -- that's the question for me --

2         Q.   (BY MS. PERALES)  I see.

3         A.    -- is, is it specific to your being

4    compensated for that duty, or, in general, you are an

5    employee?  So I would say probably not; however, if I

6    really had questions, I would ask the county attorney.

7         Q.   Okay.  So let's say a non-partisan nonprofit

8    organization wants to send canvassers door to door to

9    promote a ballot measure to improve drainage

10   infrastructure, and the canvassers are paid and they're

11   going door to door, and Ms. Hernandez is there and she

12   says oh, this is great, I'd love to hear more about this

13   drainage issue, come in, I have my ballot, maybe you can

14   help me, do you think the canvasser who gets paid is

15   potentially going to be concerned about assisting that

16   voter with their mail ballot because of this new

17   provision?

18             MS. SPECTOR:  Objection, calls for legal

19   conclusion, calls for speculation.

20             MR. JEFFREY WHITE:  Objection, form.

21        A.   I think they would be, and I would suggest

22   that they contact an attorney if we got a call about

23   that.

24        Q.   (BY MS. PERALES)  Would you agree with me that

25   Section 6.06 is not limited to payment by a campaign or

 1    a candidate?

 2                    MS. SPECTOR:  Objection, calls for legal

 3    conclusion.

 4         A.   Yes.

 5         Q.   (BY MS. PERALES)  Turn with me, if you would,

 6    to 7.04, which starts on Page 58.  You will see 7.04

 7    starts on Page 58 and flows on to Page 59.

 8                    Are you familiar with this provision in

 9    SB 1, this 7.04 vote harvesting provision?

10         A.   Yes, I am.

11         Q.   Okay.  And if you look down to Paragraph (b),

12    am I reading it correctly -- well, here we go.  It's

13    actually (c) -- hold on, hold on, hold on.  Let me get

14    to the definition.

15                    Okay.  It's actually Paragraph 2, Line 7.

16                    Would you agree with me that in this part

17    of SB 1, vote harvesting services means in-person

18    interaction with one or more voters, in the physical

19    presence of an official ballot or a ballot voted by

20    mail, intended to deliver votes for a specific candidate

21    or measure?

22                    MR. JEFFREY WHITE:  Objection, form.

23                    MS. SPECTOR:  Objection to form.

24         Q.   (BY MS. PERALES)  Did I read that correctly?

25         A.   Yes.

 1    fraud?

 2                   MS. SPECTOR:  Objection to form.

 3         A.    No.

 4         Q.    (BY MR. GRAHAM WHITE)  Were you -- are you

 5    aware of any voter fraud that occurred at any of these

 6    polling sites during the extended voting hours in 2020?

 7         A.    No.

 8         Q.    And yesterday, you testified that during early

 9    voting at these sites, there were people waiting in line

10    when the polls close at 10 p.m., is that right?

11         A.    There were a couple, yes.

12         Q.    Okay.  Were there particular polling places

13    where this was a common occurrence?

14                   MS. SPECTOR:  Objection to form.

15         A.    No.  The last week is generally the busiest.

16    I believe it was the last two days at a few sites.

17         Q.    (BY MR. GRAHAM WHITE)  Okay.  Do you know if

18    any voter showed up after 10 p.m. when the polls closed?

19                   MS. SPECTOR:  Objection to form.

20         A.    I actually do have, yes, that did happen at

21    one location.

22         Q.    (BY MR. GRAHAM WHITE)  Okay.  Which location

23    was that?

24         A.    It's called -- it used to be called Carolina

25    Community Center, now it's Officer David Ortiz.

```
 1            Q.   How many voters showed up after 10 p.m. at

 2      that location?

 3            A.   I just know of one car, of -- of -- of a

 4      gentleman.  I don't know if he had more than himself,

 5      but I just know it was that.

 6            Q.   Okay.  And was he turned away from the polling

 7      places?

 8                 MS. SPECTOR:  Objection to form.

 9            A.   He was.

10            Q.   (BY MR. GRAHAM WHITE)  Okay.  What time did

11      polls close in El Paso County on Election Day in 2020,

12      during the general election?

13            A.   7 p.m.

14            Q.   Do you know if there were people waiting

15      online at any polling sites on Election Day?

16            A.   Yeah.

17            Q.   I'm sorry.  Let me -- let me rephrase.

18            A.   Okay.

19            Q.   Do you know if there were people waiting

20      online when the polls closed on Election Day in 2020?

21            A.   Yes, there were.

22            Q.   Were there particular polling sites where this

23      was a more common occurrence than others?

24            A.   Yeah.  I mean, we had a handful.  I know at

25      least that we were processing till 9:00 or 9:30, I
```

Lisa Wise

April 15, 2022
Page 199

1    believe.

2         Q.   Do you recall specifically what neighborhoods

3    this might have -- was this a problem that occurred in

4    specific neighborhoods?

5         A.   It varied.  We have high turnout, our -- our

6    high our high-turnout areas was the same, some west,

7    some central and a few east.

8         Q.   Okay.  Was the west, did this occur more --

9    more often at polling sites in -- located in the west?

10                   MS. SPECTOR:  Objection, form.

11        A.   I believe so.

12        Q.   (BY MR. GRAHAM WHITE)  Okay.  And similar

13   question to what I asked before, do you know if there

14   were voters who showed up after polls closed at any of

15   these sites on Election Day?

16                   MR. JEFFREY WHITE:  Objection, form.

17        A.   I don't remember specifically, but, honestly,

18   every election we have a couple people, at least, that

19   show up after the polls close.  We get calls, and

20   they've already picked up and it's after seven, and so I

21   -- I  can't remember specifically, but I am guessing we

22   had a few.

23        Q.   Okay.  And when these voters show up after the

24   polls close, they are turned away, is that right?

25        A.   Correct.

1         Q.    Okay.  So in your experience then, does

2    keeping polling sites open for longer periods of time

3    make voting more accessible?

4                   MS. SPECTOR:  Objection to form.

5         A.    Yes, I would say so.

6         Q.    (BY MR. GRAHAM WHITE)  Let me also ask you the

7    -- the inverse of that.

8                   In your experience, does shortening the

9    -- the amount of time that when places are open make

10   voting more burdensome?

11                  MS. SPECTOR:  Objection to form.

12                  MR. JEFFREY WHITE:  Objection, form.

13        A.    Yes.  For those voters that wanted to vote at

14   that location, definitely.

15        Q.    (BY MR. GRAHAM WHITE)  Okay.  I want to switch

16   topics and ask a few follow-up questions about partisan

17   poll watchers.

18                  So you testified earlier that you were

19   not aware of any poll watchers serving at any polling

20   places in the March primary of this year, is that right?

21        A.    Correct.

22        Q.    And for the record, apart from the March

23   primary, were there -- has your office administered any

24   other elections since SB 1 has passed?

25        A.    Did we have a small December election?  I

1    believe we had a small December election, I think, but

2    it was -- this, we had no poll watchers.  It was a very

3    small entity, two or three races.

4         Q.   Okay.  So that was going to be my next

5    question.

6                   So no -- no poll watchers --

7         A.   No.

8         Q.   -- at this other election?

9                   Okay.  Yesterday, you described the poll

10   watcher training program as one of the helpful

11   provisions of SB 1, do you remem -- do you recall that?

12        A.   Yes.

13        Q.   And why do you think that provision is

14   helpful?

15                   MS. SPECTOR:  Objection to form.

16        A.   I think that these poll watchers that show up,

17   even if well-intentioned, if they are not sure what

18   they're allowed to do, what not allowed to do, then the

19   chance of them complying with the law is -- is -- is

20   pretty -- is pretty small.  So --

21        Q.   (BY MR. GRAHAM WHITE)  Uh-huh.

22        A.   -- it's -- even during, before the training

23   when we would talk about the Poll Watcher's Guide, some

24   of them had never even seen it, had never been told by

25   their appoint -- appointee that that was -- even

 1   do the best that we can.

 2        Q.   Okay.  Can you speak a little bit more about

 3   your decision-making process for whether to accept,

 4   ultimately accept that second application that you were

 5   just talking about?

 6                  MS. SPECTOR:  Objection to form.

 7        A.   Yes.  I don't -- you know, it was -- we

 8   thought may -- we thought it was, but when the voter

 9   said no, it wasn't, we didn't have anything to really

10   base that on, so we just accepted it.

11        Q.   (BY MR. GRAHAM WHITE)  Yeah.  Did the

12   Secretary of State's Office provide you with any

13   guidance on how to identify photocopied signatures?

14        A.   No.

15        Q.   And as for the first potentially photocopy

16   application that you had mentioned, it -- was it your

17   testimony that this person submitted a correct

18   application after that, or what happened there?

19                  MS. SPECTOR:  Objection to form.

20        A.   Yes.

21        Q.   (BY MR. GRAHAM WHITE)  Okay.  Before SB 1, are

22   you aware of any instances where somebody used an

23   electronic signature to apply for a vote by mail ballot?

24        A.   The only time we would see an electronic

25   signature would be sometimes they would send a request

1    in online.  And so we would tell them, you have to send

2    us a wet signature within four days, an original copy is

3    how the -- how the -- a hard copy within four days, not

4    the wet signature, I'm sorry.  You have to have a hard

5    copy of this application within four business days,

6    which is how the Code is -- was specified.

7         Q.   Do you have a sense of how often you saw those

8    electronic signatures on applications before SB 1?

9         A.   Not many, I mean, it wasn't -- it wasn't -- it

10   wasn't incredibly common, but it -- it was -- it did

11   happen.

12        Q.   Okay.  And before SB 1, are you aware any

13   instances where somebody applied using a photocopied

14   signature on an application?

15        A.   No.

16        Q.   And before SB 1, to get back, are you aware of

17   any instances of somebody falsifying a signature on a

18   vote by mail application?

19             MS. SPECTOR:  Objection to form.

20        A.   No.

21        Q.   (BY MR. GRAHAM WHITE)  Okay.  I want to turn

22   to a different provision of SB 1 that I don't believe

23   you have been asked about, which is on -- if you can

24   turn to Page 21 of Exhibit 5, and -- and if you can look

25   at Lines 18 to 20, and read those aloud, please?

 1                 THE WITNESS:  I'm sorry.

 2       A.   "Voting system ballots may not be arranged in

 3  a manner that allows a political party's candidates to

 4  be selected in one motion or gesture."

 5       Q.   Is it -- is it okay if I refer to this process

 6  of voting for one party's candidates at once is straight

 7  ticket voting?

 8       A.   Yes.

 9       Q.   Have you ever administered an election that

10  had straight ticket voting on a ballot?

11       A.   Not since it was removed from the options in

12  --

13       Q.   Sure.

14       A.   -- in -- after 2018, but yes, prior to that,

15  yes.

16       Q.   Prior to 2018?

17       A.   Yes.

18       Q.   Okay.  Are you aware of any instances of fraud

19  in connection with straight ticket voting?

20       A.   No.

21       Q.   Do you think that straight ticket voting makes

22  voter fraud more likely?

23                 MS. SPECTOR:  Objection to form.

24       A.   No.

25       Q.   (BY MR. GRAHAM WHITE)  Okay.  Do you recall

# Attachment 13

# Lisa Wise
# April 18, 2023 Deposition Excerpts

Lisa Wise                                                April 18, 2023

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE WESTERN DISTRICT OF TEXAS

 3                     SAN ANTONIO DIVISION

 4   LA UNION DEL PUEBLO        )
     ENTERO, et al.,            )
 5                              )
                   Plaintiffs,  )
 6                              )
     vs.                        )
 7                              ) NO. 5:21-cv-844-XR
     GREGORY W. ABBOTT, et al., )
 8                              )
                   Defendants.  )
 9   -----------------------------------

10          ORAL AND VIDEOTAPED DEPOSITION OF

11                      LISA WISE

12                   April 18, 2023

13                 (REMOTELY REPORTED)

14   -----------------------------------

15       The Oral and Videotaped Deposition of LISA WISE,

16   produced as a witness at the instance of the defendant,

17   and duly sworn, was taken in the above-styled and

18   numbered cause on the 18th of April, 2023 from 9:13 a.m.

19   to 3:27 p.m., in and for the State of Texas, reported by

20   machine shorthand, conducted El Paso County Courthouse

21   500 E. San Antonio, 5th Floor, Suite 503 El Paso, Texas

22   79901, pursuant to the Federal Rules of Civil Procedure

23   and the provisions stated on the record or attached

24   hereto.

25
```



 1  Office at the summer seminar, have you gone through any

 2  professional training or coursework?

 3       A.  No.

 4       Q.  Since your last deposition in this case, have

 5  you had any additional responsibilities added to your

 6  office?

 7             MS. LEBEL:  Objection.  Form.

 8       Q.  (BY MS. HUNKER)  If you want, I can rephrase.

 9       A.  Yes, please.

10       Q.  Sure.

11             Have you, yourself, assumed any additional

12  responsibilities since you were deposed last time in

13  this case?

14             MS. LEBEL:  Objection.  Form.

15       A.  I don't know if this is an answer to that, but

16  we have -- since the last time I was deposed, we had a

17  process for petition verification, which we had not done

18  since I began this deposition.  And so we were

19  overseeing that process.

20             So I don't know if that's relevant, but

21  that's something that we've done that we haven't done

22  since I started.

23       Q.  (BY MS. HUNKER)  And you were in the same role,

24  the Elections Administrator of El Paso County, correct?

25       A.  Yes.



1    Q.  Ms. Wise, I'm going to introduce our first

2    exhibit.

3              Do you have the exhibit in front of you?

4    A.  I do.

5    Q.  Do you recognize this exhibit?

6    A.  Yes.

7    Q.  If you turn to the second page, you'll see the

8    title reading "State's Defendants Amended Notice of

9    Intent to Take Oral and Videotaped Deposition of the

10   Office of the El Paso County Elections Administrator

11   Pursuant to Rule 30(b)(6)."

12             Did I read that correctly?

13   A.  Yes.

14   Q.  And if we continue to turn the page, you'll see

15   towards the end where it says "Topics for Examination."

16             Do you understand that you are here today

17   pursuant to this notice?

18   A.  Yes.

19   Q.  Do you understand that the office of the

20   El Paso County Elections Administrator has designated

21   you to provide testimony on its behalf?

22   A.  Yes.

23   Q.  And do you understand that your answers here

24   today are binding on the organization?

25   A.  Yes.



```
 1        Q.  Are you prepared to testify on the topics
 2   listed in this notice?
 3        A.  Yes.
 4              (Exhibit 1 marked.)
 5        Q.  (BY MS. HUNKER)  Now, can you tell me whether
 6   you regard the overall election process for the General
 7   Election in 2022 in El Paso County as having been
 8   relatively successful?
 9              MS. LEBEL:  Objection.  Form.
10        A.  I do.
11        Q.  (BY MS. HUNKER)  Would you say that it was more
12   successful than the processes that occurred in the
13   primary election earlier in 2022?
14              MS. LEBEL:  Objection.  Form.
15        A.  Yes, I do.
16        Q.  (BY MS. HUNKER)  How many early voting
17   locations did you have for the November 2022 General
18   Election?
19        A.  33.
20        Q.  And how many did you have on election day?
21        A.  118.
22        Q.  Do you know if the number of early voting
23   locations in November 2022 was greater or less than the
24   number of earlier voting locations in November 2018?
25              MS. LEBEL:  Objection.  Form.
```



1      A.   I don't remember the exact number in 2018.   I

2  believe we were still using mobile voting at that point.

3  I believe it's close, but I don't remember the exact

4  number.

5           MS. HUNKER:   I'm going to introduce Exhibit

6  No. 2.

7           (Exhibit 2 marked.)

8      Q.   (BY MS. HUNKER)   Do you have the exhibit in

9  front of you?

10     A.   I do.

11     Q.   Do you recognize the exhibit?

12     A.   I do.

13     Q.   And what is it?

14     A.   This is the list of our early voting locations

15  for November 2022.

16     Q.   And is this an accurate list?

17     A.   Yes.

18     Q.   How did you make a determination on where the

19  early voting locations should be located?

20           MS. LEBEL:   Objection.   Form.

21     A.   Many of those sites were already established

22  before I started in my office.   But we did add more

23  locations based on location and the geography, based on

24  where we were getting places that we thought were short

25  in the county that were underserved, based on interior



1  maybe something on an application, a little note like,

2  why do I have to fill this out, like, something like

3  that.  But mostly phone.

4      Q.  (BY MR. STEWART)  Was most of that feedback

5  regarding the ID requirement?

6                MS. LEBEL:  Object to form.

7                MS. HUNKER:  Objection.  Form.

8      A.  Was the feedback about the ID requirement

9  regarding the ID?

10      Q.  (BY MR. STEWART)  Yeah.  I guess that's -- let

11  me --

12      A.  Sorry.

13      Q.  -- strike that question and make -- make it

14  much clearer.

15                I guess I would say, what portion of the,

16  you know, overall feedback you received from voters

17  during the General Election period pertained to the ID

18  requirement?

19                MS. LEBEL:  Object to form.

20                MS. HUNKER:  Object to form.

21      A.  It's hard for me to really quantify that,

22  honestly.  Because, like I said, we really didn't

23  keep -- keep track of it in, like, how many calls we got

24  about the ID.  But we did still spend a lot of time

25  explaining ID -- ID requirements to -- to voters that



1   were on it to vote by mail.

2        Q.  (BY MR. STEWART)  Did you generate any topics

3   for future voter education based on what you were

4   hearing from voters?

5        A.  So generally we do a pretty robust media

6   package for presidential years 'cause we always have

7   something that comes up.

8                For example, in 2024 -- I'm sorry.  In

9   2020, we had the pandemic.  So in 2024, we will, again,

10  do a media package, and one of the components will be

11  the identifier.  We will really try to replace some of

12  that pandemic language with the -- the identifier, the

13  changes, and, frankly, any major changes that come out

14  of this legislative session.

15               So we -- we try to do that because we have

16  a lot of voters who do only vote every four years, and

17  we like to -- you know, we don't have an endless budget,

18  so we kind of put that all in -- what we can in the

19  presidential years.

20       Q.  I -- I believe you've already said, correct me

21  if I'm wrong, that at some point, your office began

22  advising voters to put both their driver's license or ID

23  number and their Social Security number on mail ballot

24  materials; is that correct?

25       A.  Correct.



1     Q.   That did not begin during the General --

2  right -- that predated the General?

3     A.   That predated the General.

4     Q.   Why did you continue to give that advice?

5     A.   We had done that about -- we didn't do it

6  initially in March until we started to see these -- you

7  know, these rejection rates and these -- coming back, so

8  then we started to include it, I would say about,

9  halfway through the actual process in -- for the March

10 election.

11          So basically we just said, look, let's --

12 let's not wait for an application to be rejected, let's

13 just give them all this information at the very

14 beginning.  So we -- if somebody asked us for, you know,

15 an application, then with the application we would send

16 them that information.

17          Now, people can also get an application on

18 our website or they could get it from a party.  You

19 know, there might be other entities that send out the

20 application.  We can't control that they didn't have the

21 insert or any of that information in there, and so we

22 may still receive applications that were not -- that

23 didn't comply with that requirement.

24    Q.   Were there any ways besides the insert that you

25 transmitted that message to voters?



1              MS. LEBEL:  Object to form.

2              MS. HUNKER:  Object to form.

3         A.  The social media, the -- you know, what we did

4    with interviews.  Anything we could, we would try to get

5    that information out.  But frankly, you know, the best

6    bang for the buck was with the application because they

7    were, we know, going to fill that out, and it was there

8    included in the packet.

9              MR. STEWART:  I want to use -- I think

10   we're on number 5?

11             THE REPORTER:  Yes.

12        Q.  (BY MR. STEWART)  And I don't want to rush you

13   reading it, but, in general, do you recognize this

14   document?

15        A.  Yes.

16        Q.  And what is this?

17        A.  This is our application for ballot by mail.

18        Q.  And your office uses the standard ABBM prepared

19   by the Secretary of State, correct?

20        A.  We do.

21        Q.  And you would agree that the portion that

22   implements the ID number requirement is below the

23   bold -- or the capital letters, rather, you must provide

24   one and then lower case of the following numbers?

25        A.  Yes.



Lisa Wise                                                    April 18, 2023
                                                                 Page 94

1      Q.  And then, if you look at the second paragraph

2  under there, so after the first set of blanks, it says:

3              "If you do not have a Texas driver's

4  license, Texas personal identification number, or a

5  Texas election identification certificate number, give

6  the last four digits of your Social Security number."

7              Did I read that right?

8      A.  Yes.

9      Q.  And so would you agree this language appears to

10 establish a hierarchy wherein you only give a driver's

11 license number or identification number, identification

12 certificate number if you do not have -- excuse me.

13 Strike that.

14             Would you agree this language appears to

15 establish a hierarchy wherein you only give the last

16 four of your Social Security number if you do not have a

17 Texas ID card number?

18             MS. LEBEL:  Object to form.

19             MS. HUNKER:  Object to form.

20     A.  Yes.

21     Q.  (BY MR. STEWART)  Was the insert meant to

22 address that?

23             MS. LEBEL:  Object to form.

24     A.  The insert was meant to address that, whether

25 you put social's last four or whether you put your



```
 1   driver's license.  Just because you put one on doesn't
 2   necessarily mean that's the one that we have on file.
 3               And so we were seeing where people were
 4   putting one or the other, and it was very frustrating,
 5   I'm sure for them as well as for us, to say, look,
 6   that's not the one we have, that's not the one you
 7   registered with whenever you registered.  So it was just
 8   basically to -- to combat that with whether you just put
 9   the driver's license and we had the last sosh [sic],
10   just to fill both out.
11       Q.  (BY MR. STEWART)  Do you think this language
12   was misleading to voters?
13               MS. LEBEL:  Object to form.
14               MS. HUNKER:  Objection.  Form.
15       A.  I don't think it's written as well as it could
16   be, yes.
17               I -- I will say if I could, one of the
18   other things we did in the questionnaire as before is we
19   would highlight that box.
20       Q.  (BY MR. STEWART)  Okay.
21       A.  So that they would be able to see that that is
22   what we're talking about with the insert.
23       Q.  Would that be on the ABBM?
24       A.  Yes.  So with --
25       Q.  I'm sorry.  Go ahead.
```



1       A.   I'm sorry.  So when they asked for a ballot by

2   mail request, we'd send them the request with the

3   insert, and we would highlight that box.

4       Q.   Did you highlight it on the carrier envelope as

5   well?

6       A.   Yes.

7       Q.   And are you describing hand highlighting with a

8   highlighter?

9       A.   So on this we would hand highlight.  On the

10  carrier envelope, we had a screenshot where on the

11  screenshot -- we didn't actually highlight the envelope,

12  we'd highlight the screenshot that would say this is

13  where it is on the carrier envelope.

14      Q.   Got it.  You can put that aside.

15           I'm quiet for a little bit.  I'm skipping

16  questions.

17      A.   No, no.  Take your time.

18      Q.   Did I understand right that you do plan media

19  spending for voter outreach in the future?

20      A.   Yes.

21      Q.   Do you know what your budget will be for that?

22           MS. LEBEL:  Object to form.

23      A.   In the past, I believe it's been around

24  $15,000.

25      Q.   (BY MR. STEWART)  Is -- who allocates that



 1  money?

 2      A.  Our county commissioner's court.

 3      Q.  Okay.  Have you had any discussions about what

 4  that number will look like in the future?

 5          MS. LEBEL:  Objection.  This is going

 6  beyond the scope of the notice topics and the parties'

 7  stipulation.

 8          MR. STEWART:  Okay.  I'll withdraw that

 9  question.

10      Q.  (BY MR. STEWART)  I believe you already

11  answered questions from Ms. Hunker about how you

12  processed mail ballot materials during the General

13  Election, but I do just want to ask one follow-up about

14  that specific to the General Election.

15          During the General Election period, did

16  your office use the driver's license number or Social

17  Security number on mail ballot materials for any purpose

18  other than determining whether they could be accepted in

19  light of SB1?

20          MS. LEBEL:  Object to form.

21          MS. HUNKER:  Object to form.

22      A.  No.

23      Q.  (BY MR. STEWART)  Turning briefly to the cure

24  process.

25          So I know -- I want to make sure I have



1  timelines right.  I know you said that you used both

2  phone calls and returned mail in order to notify voters

3  of defects in mail ballot materials, right?

4       A.  Yes.

5       Q.  Did you call voters throughout the entire

6  General Election period when those materials were

7  received, or was there, let's say, a changeover point

8  where you went from mailing materials and return to

9  calling?

10               MS. LEBEL:  Object to form.

11               MS. HUNKER:  Object to form.

12       A.  We called if we had numbers up until I believe

13  about five days before the deadline, and then we just

14  put everything in the mail, anything that was defect

15  that we were receiving.

16               So if we called you, and you -- we gave

17  you -- we gave 24 hours to call us back.  If you didn't

18  call us within the next business day, then we just

19  mailed it back.

20               Most of the people we spoke to, 90 percent

21  said mail it back once we did get to them because they

22  didn't want to come in person.  That's why they wanted

23  to vote by mail.  So if we -- if you did tell us to hold

24  it, and that was a very small number, I believe, we

25  would.  If you told us to mail it back, we would.  And



 1  office?

 2                  MS. LEBEL:  Object to form.

 3                  MS. HUNKER:  Object to form.

 4       A.  I'm sorry.  A couple of times we would kind of

 5  start going over it, and they would say, I'll just cure

 6  on the ballot.  Because they have to send the ballot

 7  back anyway, so they have the notice of, you know,

 8  defect.  And if they can get on the -- there and send

 9  it -- fix it on the ballot tracker or they can just send

10  the ballot back.  And so a lot of times, they would just

11  say, I'll just send the ballot track back or the ballot

12  back.

13       Q.  (BY MR. STEWART)  Got it.  Did any voters

14  request to cancel their mail ballot after being unable

15  to use the online portal?

16       A.  Not that I know of.

17       Q.  Did any voters, to your knowledge, during the

18  2022 General Election abandon their attempts to vote by

19  mail after being unable to use the cure portal?

20                  MS. LEBEL:  Object to form.

21       A.  The way that we have the ballots, it would be

22  marked as rejected, and I don't know if that's just

23  because they couldn't use the core -- the -- the -- that

24  platform, but then went to -- to vote in person after

25  their ballot had been rejected.



1       Q.   (BY MR. STEWART)   Based on your experience in

2   the November 2022 General Election, do you believe the

3   number of eligible voters who had their ballots rejected

4   based on the ID number requirement will ever be zero?

5                MS. LEBEL:   Object to form.

6       A.   No.

7       Q.   (BY MR. STEWART)   And I believe you testified

8   previously that your office did not refer any voters to

9   any law enforcement, whether it be federal or state, for

10  potential fraud based on an ID mismatch or omission on

11  mail ballot materials; is that correct?

12               MS. LEBEL:   Object on the basis of

13  investigation privilege.

14      A.   Correct.

15      Q.   (BY MR. STEWART)   Leaving aside sort of whether

16  it was referred to law enforcement, are you aware of any

17  instances where fraudulent voting was identified during

18  the November 2022 General Election because of an ID

19  mismatch?

20               MS. LEBEL:   Object to form.

21               MS. HUNKER:   Object to form.

22      A.   No.

23      Q.   (BY MR. STEWART)   Are you aware of any

24  instances in El Paso County during the November 2022

25  General Election where an ID number omission identified



Lisa Wise

April 18, 2023
Page 110

1    an ineligible voter?

2              MS. LEBEL:  Object to form.

3              MS. HUNKER:  Object to form.

4        A.  No.

5        Q.  (BY MR. STEWART)  Are you aware of any

6    instances in El Paso County during the November 2022

7    General Election where an ID number omission identified

8    someone impersonating the voter named on the mail ballot

9    materials?

10             MS. LEBEL:  Object to form.

11       A.  No.

12       Q.  (BY MR. STEWART)  Are you aware of any

13   instances in El Paso County during the November 2022

14   General Election where an ID number mismatched as

15   opposed to omission identified for your office an

16   ineligible voter?

17             MS. LEBEL:  Same objection.

18       A.  No.

19       Q.  (BY MR. STEWART)  Are you aware of any instance

20   in El Paso County during the November 2022 General

21   Election where an ID number mismatch as opposed to

22   omission identified someone impersonating the voter

23   named on the mail ballot materials?

24             MS. LEBEL:  Same objection.

25       A.  No.



Lisa Wise                                                    April 18, 2023
                                                              Page 111

```
 1        Q.  (BY MR. STEWART)  For the November 2022 General
 2   Election, did employees in your office receive any
 3   training or guidance on when to refer a voter for
 4   potential voter fraud to law enforcement based on an
 5   omission or mismatch of the ID number on mail ballot
 6   materials?
 7             MS. LEBEL:  Object to form.
 8        A.  I don't believe they received any training.  I
 9   mean, our office is -- is small enough as far as -- I
10   mean, our ballot by mail people I speak with all the
11   time.  They -- I believe they would have brought that to
12   my attention.
13        Q.  (BY MR. STEWART)  Was that something
14   individuals in your office were looking for?
15             MS. LEBEL:  Object to form.
16             MS. HUNKER:  Object to form.
17        A.  I don't think particularly.
18        Q.  (BY MR. STEWART)  And aside from the ID number
19   requirement -- and no need to get into details, just a
20   yes or no to protect the privilege -- did your office
21   make any referrals for other instances of potential
22   voter fraud besides the ID number requirement to law
23   enforcement during the November 2022 General Election?
24        A.  No.
25        Q.  Did your office receive any communications from
```

