# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| V. | § | |
| | § | Case No. 5:21-cv-00844-XR |
| STATE OF TEXAS, *et al.*, | § | [Lead Case] |
| | § | |
| *Defendants.* | § | |
| | § | |
| HARRIS COUNTY REPUBLICAN PARTY, *et al.*, | § | |
| | § | |
| *Intervenor-Defendants.* | § | |

## LUPE PLAINTIFFS' DEPOSITION DESIGNATIONS

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

```
LA UNION DEL PUEBLO ENTERO,    )
et al.,                        )
                               )
        Plaintiffs,            )  Civil Action
                               )  No. SA-21-CV-00844-XR
vs.                            )
                               )
GREGORY W. ABBOTT, et al.,     )
                               )
        Defendants.            )
                               )
```

_____

ORAL DEPOSITION OF

ALAN VERA

FEBRUARY 27, 2023

_____


        ORAL DEPOSITION OF ALAN VERA, produced as a

witness at the instance of the Plaintiffs, and duly

sworn, was taken in the above-styled and numbered cause

on February 27, 2023, from 10:00 a.m. to 3:37 p.m.,

Nilda Codina, Notary in and for the State of Texas,

recorded by machine shorthand, from Javier N. Maldonado

& Associates, P.C., 1415 North Loop W., Suite 600,

Houston, Texas, County of Harris pursuant to the

Federal Rules of Civil Procedure, and the provisions

stated on the record or attached hereto.

Alan Vera - 2/27/2023

10

```
 1                    MR. GORE:  Yes.

 2                    MR. WASSDORF:  Yes.

 3                    MR. TAYLOR:  Yes.

 4                    MS. PERALES:  Thank you.

 5                    DIRECT EXAMINATION

 6    BY MS. PERALES:

 7         Q.    Good morning, Mr. Vera.

 8         A.    Good morning.

 9         Q.    Earlier you heard me introduce myself, I'm

10    Nina Perales and I represent a group of plaintiffs

11    called the Lupe plaintiffs.  Everybody else has

12    introduced themselves already, and so I'll just go

13    ahead and start asking you some of the preliminary

14    questions in this deposition.

15                    My first question is, have you ever

16    been deposed before?

17         A.    No, I have not.

18         Q.    All right.  So since this is your first

19    voyage into a deposition I'm going to go through some

20    of the ground rules with you.

21                    You have just taken an oath to tell

22    the truth and that's subject to federal penalties.  So

23    it's important to answer my questions truthfully,

24    accurately, and completely; do you understand?

25         A.    I do.
```

```
 1        Q.   Now, do you understand that your oath to the
 2   tell the truth today is the same as if you were
 3   testifying in front of a judge in the courtroom, in the
 4   sense that you're oath is to speak the truth?
 5        A.   I understand.
 6        Q.   Okay.  Is there anything today that would
 7   prevent you from giving me your full attention and
 8   answering truthfully, such as illness or some other
 9   problem?
10        A.   I am 74 years old, I will need frequent
11   bathroom breaks.
12        Q.   Got it.  And that takes me right to the
13   bathroom breaks, which is you are not a hostage here.
14   If you need to take a break at any time, you can ask
15   for a break we will take a break.  The only question I
16   have of you, is that if there's a question laying out
17   on the table, if you would answer it before we take the
18   break; is that all right?
19        A.   Understood.  Understood.
20        Q.   Okay.  Thank you.  Now, counsel will make
21   objections for the record from time to time and you
22   just heard us talking a moment ago about objections,
23   and, generally when there is an objection you still go
24   ahead and answer; however, if counsel instructs you not
25   to answer, please don't answer and we will work it out
```

1     among ourselves, okay?

2          A.   Understood.

3          Q.   So a few instructions related to the fact

4     that we have a court reporter here.  Generally, in

5     conversations sometimes we talk over each other, but

6     because the court reporter can only take down one

7     speaker at a time, will you agree to let me finish my

8     question before you answer, and then I will let you

9     finish your answer before I begin my next question?

10         A.   Agreed.

11         Q.   Okay.  It's also -- you're doing a great job

12    by the way of speaking up but my next instruction is to

13    please make your answers out loud and audible so the

14    court reporter can hear them; is that all right?

15         A.   Understood.

16         Q.   Okay.  Now, the court reporter cannot take

17    down gestures like shrugs or head nods, so will you

18    agree to give your answers verbally?

19         A.   Agreed.

20         Q.   Now, if you don't understand the question,

21    will you please ask me to rephrase it for you?

22         A.   Agreed.

23         Q.   Now, I might ask you a question that calls

24    for you to give me your best estimate as to something,

25    and I'm entitled to your best estimate, but I don't

1   want you to guess; is that all right?

2        A.   Understood.

3        Q.   Okay.  Thank you.  Now, sometimes you might

4   remember more to an answer later in the day.  Sometimes

5   the questions percolate a little bit.  So if that's the

6   case, and you've remembered something more it's okay to

7   tell me at that point and we'll add it to the record

8   and then we'll go back to whatever else it is that

9   we're discussing; is that all right with you?

10       A.   Understood.

11       Q.   Okay.  I might use some terms interchangeably

12  in today's deposition, I don't know if I will or not,

13  but I want to check now to make sure if we have the

14  same understanding of the terms.  If I use the word

15  Hispanic and Latino, will you understand that I mean

16  the same thing by those words?

17       A.   Agreed.

18       Q.   Okay.  I'm going to try not to use jargon,

19  but if I use the word ABBM, will you understand that to

20  be application for ballot by mail?

21       A.   Understood.

22       Q.   Thank you.  Do you have any questions about

23  the deposition process before we begin?

24       A.   No, ma'am.

25       Q.   Thank you.  I understand from the

1  introduction this morning that you are being

2  represented by Mr. Andy Taylor; is that correct?

3       A.   That is correct.

4       Q.   Are you also being represented by Mr. John

5  Gore?

6       A.   That is not correct.

7       Q.   And are you being represented by the Attorney

8  General's Office?

9       A.   I am not.

10       Q.   When did your representation -- when did

11  Mr. Taylor's representation of you begin, do you know?

12       A.   The week after I was subpoenaed.

13       Q.   Okay.  Do you have any other lawyers that

14  represent you in this matter?

15       A.   I do not.

16       Q.   Okay.  I'm going to ask you some questions

17  about your preparation for the deposition, but I want

18  to let you know that I do not want to know anything

19  that you said to your lawyer or that your lawyer said

20  to you; okay?

21       A.   Understood.

22       Q.   Can you tell me the steps that you took to

23  prepare for this deposition?

24       A.   I received, through my attorney a very large

25  cachet of document that were in discovery and I read

1     A.    They did.

2     Q.    **And did some of them include members of the**
3  **legislature?**

4     A.    One or two did.

5     Q.    **And did some of them include staff or**
6  **employees of the Texas Secretary of State?**

7     A.    Some of them did.

8     Q.    **Did you meet with anybody in advance of this**
9  **deposition to prepare?**

10    A.    I had a Zoom meeting with my attorney for him
11 to brief me on what to expect.

12    Q.    **Okay.  And about how long did that Zoom**
13 **meeting last?**

14    A.    There were two sessions, the first one an
15 hour the second one two hours.

16    Q.    **Okay.  Was anybody else on the Zoom besides**
17 **you and Mr. Taylor?**

18    A.    Yes, Mr. Jones was.

19    Q.    **Okay.  Would that be Mr. Gore --**

20    A.    -- I'm sorry John -- John -- Mr. Gore is --

21    Q.    -- (Laughter.)

22    A.    -- Mr. Gore was on the call.

23    Q.    **Perhaps some day okay.**

24          (Exhibit No. 1 marked.)

25    Q.    **(BY MS. PERALES) Mr. Vera, the court reporter**

Alan Vera - 2/27/2023

17

1  has handed you what has been marked deposition Exhibit

2  No. 1. And from time to time we will mark certain

3  documents and talk about them and the one that you will

4  look at is always going to be the one with the special

5  orange sticker on it and I'll tell you now don't try to

6  leave with the special orange sticker documents or the

7  court reporter will chase you down and try to get them

8  back; okay?

9       A.   I understand.

10      Q.   Do you recognize this document?

11      A.   I do.

12      Q.   Okay.  Do you recognize it as the notice of

13  deposition seeking your attendance at this deposition

14  today?

15      A.   I recognize it as a predecessor to the notice

16  I received today, this one still says 8:30 a.m. and the

17  one I received says 9:30 a.m.

18                 (Laughter.)

19      Q.   (BY MS. PERALES) you're right, that's my

20  fault.

21      A.   Okay.

22      Q.   Thank you for spotting that.  So with the

23  exception of the time though, are you hear testifying

24  today pursuant to this deposition notice?

25      A.   I am.

1    Q.   Okay.  Thank you.  I'd like to start with

2   some questions about your background, do you live in

3   Harris County?

4    A.   I do.

5    Q.   How long have you lived in Harris County?

6    A.   Since November of 1980.

7    Q.   Okay.  Are you originally from somewhere not

8   Harris County?

9    A.   Yes.

10    Q.   Tell me where you grew up?

11    A.   El Paso.

12    Q.   Oh, El Paso.  West Texas?

13    A.   Yes, ma'am.

14    Q.   Did you go to high school there?

15    A.   Yes, ma'am.

16    Q.   Did you complete any education following high

17   school?

18    A.   I did.

19    Q.   Okay.  And what was that?

20    A.   I have an undergraduate degree from Loyola

21   University in New Orleans.

22    Q.   Anything after that?

23    A.   U.S. Army.

24    Q.   Okay.  When did you serve?

25    A.   1970 to 1975.

Alan Vera -- 2/27/2023

19

1      Q.    Tell me about your current occupation, if you

2   have one?

3      A.    I am semi-retired.

4      Q.    And what are you semi-retired from?

5      A.    Marketing consulting.

6      Q.    Okay.   Can you briefly describe for me your

7   current involvement with the Harris County Republican

8   Party?

9      A.    I am a volunteer.   I serve as chairman of the

10  Harris County Republican Party Ballot Security

11  Committee, that is an unpaid unreimbursed position.

12      Q.    I'm going to circle back to, to more details

13  about the Ballot Security Committee.  So I'm just going

14  to put a pin in that and ask if you hold a membership

15  in other political organizations besides Harris County

16  Republicans?

17      A.    I am on the board of directors of a -- an

18  election integrity organization called Texas Election

19  Network.

20      Q.    Any other membership in other political

21  organization?

22      A.    Give me a second.  None that I can recall at

23  this time.

24      Q.    Do you hold membership in any other types of

25  associations besides political organizations; such as a

Alan Vera - 2/27/2023

20

 1  **fraternal, or I don't know, maybe you serve on your**

 2  **neighborhood, you know, homeowners association or**

 3  **anything like?**

 4      A.   No, we are members of Freedom Street Rescue.

 5  We foster abandon puppies.

 6      **Q.   I think I would have 20 dogs if I did that.**

 7      A.   Last Thursday we had 11.

 8      **Q.   11.  And are the -- any of them fosters at**

 9  **this point or have you just --**

10      A.   Seven of those are fosters, they've all

11  arrived at their new homes in New England.

12      **Q.   Wonderful.  Any other organizations that you**

13  **can think of?**

14      A.   None that I can think of.

15      **Q.   Okay.  Are you a registered voter in Harris**

16  **County?**

17      A.   I am.

18      **Q.   Have you ever served as an election judge at**

19  **the polling place?**

20      A.   Yes, ma'am.

21      **Q.   Okay.  Tell me about that, how?**

22      A.   From 2010 to 2013, I served as the alternate

23  presiding judge at Wesley Elementary School in

24  Congressional District 18.  I think five, seven

25  elections total.

Alan Vera - 2/27/2023

21

1    Q.   Did you serve as a poll worker for any other

2 period of time besides this one?

3    A.   No ma'am.

4    Q.   Have you ever served as a poll watcher?

5    A.   I have.

6    Q.   Tell me about that?

7    A.   I served as a poll watcher in several smaller

8 and local elections, usually on the May Uniform

9 Election Day.  And I was asked to serve as a poll

10 watcher for the 2015, I believe 2015 Cy-Fair ISD bond

11 election.  The first of billion dollar bond election in

12 Texas.

13    Q.   School bond?

14    A.   School bond.

15    Q.   Have you ever been a block walker or

16 sometimes referred to as a canvasser for either a

17 political candidate or for turn out the vote effort?

18    A.   I believe years ago maybe as many as 10 years

19 ago I assisted my precinct chair to block walk our

20 neighborhood and leave flyers hanging on doorknobs.

21    Q.   And do you remember what that was in support

22 of, or against?

23    A.   It was in support of the republican ticket.

24    Q.   Okay.  And did the door hangers then have the

25 names of the candidates that were on the ticket?

Alan Vera — 2/27/2023

22

1    A.    If I remember correctly, they did.

2    Q.    Can you think of any other occasions where

3    you were going door to door from house to house for

4    either a candidate or some kind of campaign?

5    A.    No, I can't.

6    Q.    When you did this effort about 10 years ago

7    did you knock on doors and engage with voters?

8    A.    We knocked on doors, waited for a voter to

9    answer, if the voter didn't answer we simply left the

10   hanger, if a voter answered we introduced ourselves and

11   explained, the candidates for whom we were campaigning.

12   Q.    So you had the chance to have some

13   face-to-face interaction with voters?

14   A.    Some.

15   Q.    Other than the -- so let me just ask you, do

16   you -- is the phrase that you're most comfortable with

17   block walking or canvassing or something else?

18   A.    In my mind those are two different functions

19   block walking is a political activity to gain support

20   for candidate or issue in my mind.  Canvassing is

21   asking questions and getting information.

22   Q.    Okay.

23   A.    So in my mind, which is sometimes strange,

24   those are two slightly different issue.

25   Q.    Have you ever done canvassing?

Alan Vera - 2/27/2023

23

1       A.   I have not personally.

2       Q.   Okay.  So besides that block walking effort

3  that you described, have you ever worked on the

4  campaign of a political candidate or for a political

5  issue?

6       A.   Not since 2014.

7       Q.   And tell me about that, in 2014 in what way

8  did you work on a political campaign --

9       A.   In 2014 before I came chair of the Harris

10  County Republican Party Ballot Security Committee, I

11  handed out campaign literature for Dan Patrick.

12       Q.   And where did you handout the campaign

13  literature?

14       A.   In my neighborhood.

15       Q.   And you went door to door?

16       A.   Yes, ma'am.

17       Q.   Is that different from the --

18       A.   Same thing.

19       Q.   -- same thing?

20       A.   Uh-huh.

21       Q.   Okay.  So besides the handing out of the

22  campaign material in the block walking effort, have you

23  worked on any other campaigns either, maybe making

24  phone calls from a central location to urge voters to

25  turn out or --

Alan Vera - 2/27/2023

24

```
 1        A.    Yes.

 2        Q.    -- other types of campaign activity?

 3        A.    I can't recall anything beyond what I've

 4   already described to you.

 5        Q.    Okay.  Do you know if you'll be testifying in

 6   this case?

 7        A.    I do not know.

 8        Q.    Okay.  I'm going to ask you a couple

 9   questions now about the Ballot Security Committee.  You

10   mentioned that before you became involved with the

11   Ballot Security Committee you were handing out the

12   campaign material for the republican ticket and you

13   mention that was probably about 10 years ago.

14                   So tell me whether your involvement

15   with the Ballot Security Committee then was at the time

16   of the creation of the Ballot Security Committee?

17        A.    No, ma'am.  It was not.  Ballot Security

18   Committee had been created at least 15 years prior to

19   my taking the chairmanship in 2014.

20        Q.    Okay.  If you could for me summarize the --

21   are you still chair of the Ballot Security Committee?

22        A.    I still am.

23        Q.    And as chair you're familiar with the

24   activities of the Ballot Security Committee?

25        A.    Yes.
```

Alan Vera - 2/27/2023

25

1    **Q.   Can you tell me in a sort of summary fashion,**

2    **the various activities of the Ballot Security**

3    **Committee?**

4        A.   As described in the Republican -- Harris

5    County Republican bylaws, Ballot Security is

6    responsible for promoting election integrity and in all

7    the activities that support that.  So that would

8    include discipline on voter registration, recruiting

9    and training of poll watchers.  In prior years we were

10   also responsible for recruiting election workers, but

11   we have surrendered that in the last two cycles, to the

12   Party staff; supporting good election legislation as

13   guided by the Executive Committee and testifying when

14   possible in support of good election legislation.

15       **Q.   I'm just catching up.  You mentioned**

16   **discipline on voter registration, to you mean the voter**

17   **registration conducted by the Harris County Republican**

18   **Party or voter registration in a bigger sense?**

19       A.   Thank you for the clarification.  We observe

20   and monitor Harris County's voter registration's roles.

21       **Q.   Does the Harris County Republican Party**

22   **conduct voter registration efforts of they own?**

23       A.   I believe they do, but I am not a part of

24   that.

25       **Q.   You mentioned in prior years that you used to**

Alan Vera - 2/27/2023

26

1    recruit election workers, but you had surrendered that

2    to party staff in the last two election cycles; is that

3    right?

4           A.    That is correct.

5           Q.    And when you say party staff, who -- who is

6    that?

7           A.    These are paid employees who work for the

8    Party.

9           Q.    And so it's their function now to collect

10   names and submit them to the Harris County elections

11   for vetting for poll workers?

12          A.    That is correct.

13          Q.    Okay.    Tell me how you recruit and train poll

14   watchers?

15          A.    The recruiting takes many forms.    I am a

16   frequent speaker at political organizations.    We run

17   notices for poll watchers in the county party news

18   letter and online.    The Ballot Security Committee

19   members are also encouraged to reach out in their

20   neighborhoods and find people in serving as poll

21   watchers.    Training poll watchers I do personally, no

22   one else hands that.    It is a two hour class in person

23   with a test at the end and except for the 2020 COVID

24   year it has never been an online class.    It's always

25   been in person.

Alan Vera - 2/27/2023

27

1      Q.   When was the most recent training that you
2  conducted?

3      A.   Most recent training was October of 2022.

4      Q.   Okay.

5      A.   I did 17 classes that summer into the fall.

6      Q.   When you're doing the training in the two
7  hour class, do you use any kind of materials of any
8  sort?

9      A.   There are two kinds of materials, there is a
10 PowerPoint presentation which technically belongs to
11 the Harris County Republican Party, I created that for
12 them.  And there poll Watcher Guide book which I hand
13 at no charge to every student.

14     Q.   You mention the PowerPoint presentation
15 belongs to Harris County, are you the author of the
16 PowerPoint?

17     A.   I am.

18     Q.   Okay.  And the Poll Watcher Guide book, who
19 is the author of that?

20     A.   The original one?  My wife Colleen.  It's
21 been updated after every legislative session because
22 the code changes.

23     Q.   And who does the updating?

24     A.   I'm -- I do it now, unfortunately.

25     Q.   Where do you do the trainings for the poll

1   watchers?

2       A.   All over the county, Whenever possible in

3   county owned buildings.   We have community centers that

4   the Harris County Government has set up.   Whenever

5   possible we conduct the training in those publicly

6   owned centers.

7       Q.   So do you bring with you your laptop with the

8   PowerPoint on it?

9       A.   I do.

10      Q.   Do you have like a little projector?

11      A.   A projector is usually provided by the

12   facility, but there have been times that I brought a

13   spare, thank God.

14      Q.   And you mention that the guidebook that you

15   provide at no cost, does that mean that you personally

16   make the photo copies?

17      A.   In 2022 the County Republican Party paid for

18   the reproduction of the guide books.

19      Q.   Okay.   And are -- are the trainees allowed to

20   take that guidebook home with them after they're done?

21      A.   They take them home with them and encouraged

22   to take them with them to the Polls.

23      Q.   Now you mention a test at the end, is that a

24   written test?

25      A.   It's not a written test, it's an oral.   It's

Alan Vera – 2/27/2023

29

1    a review.

2        Q.   And then is that conducted with the group as

3    a whole?

4        A.   It's conducted with the group as a whole.

5        Q.   So do people just, you call out the questions

6    and people raise their hands and call the answers?

7        A.   Correct, uh-huh.

8        Q.   Do you have the test written down in front of

9    you?

10       A.   It's on the PowerPoint slides?

11       Q.   Okay.  And so you just know at the end which

12   questions to call out for people to make sure?

13       A.   There are 20 questions, they appear in

14   sequence on the slides.

15       Q.   Oh, I see.  So there's something at the very

16   end of the PowerPoint that has the questions?

17       A.   Correct.

18       Q.   Understood.  When you update your PowerPoint

19   for a training, do you save the PowerPoints from

20   before?

21       A.   I don't remember.  I think so, I don't think

22   I delete them from my laptop.

23       Q.   Okay.  So for example if you wanted to

24   compare what your training looked like before SB 1 and

25   after SB 1 would you be able to go --

Alan Vera - 2/27/2023

30

1    A.   I could do so.   Yes, ma'am.

2    Q.   Okay.   Thank you.

3              MR. TAYLOR:   Mr. Vera, let her

4    completely finish her question, you're anticipating it

5    ever so slightly.

6              THE WITNESS:   Thank you.   Thank you.

7    Q.   (BY MS. PERALES) Okay.   Next on my list is

8    supporting legislation related to election integrity

9    and I would like to know what activities fall under

10   that topic?

11   A.   The primary activities that fall under that

12   topic is providing our Harris County republican

13   representatives with lists of items in the election

14   code that need to be addressed, and then testifying in

15   the Senate and house committees that are hearing any

16   bills written to those lists of suggestions.

17   Q.   When you provide the lists, do you generally

18   prepare that in written form?

19   A.   It varies.   There are some meetings in which

20   I have a list typed up and copied, others are simply

21   verbal discussions over a cup of coffee.

22   Q.   You mentioned Harris County legislators?

23   A.   Republican legislators, sorry.

24   Q.   Yes, of course.   Does that include House and

25   Senate?

```
 1        A.    Yes, ma'am.

 2        Q.    Okay.

 3              MS. PERALES:  I'm sorry, should we

 4   take a break?

 5              MR. TAYLOR:  No, no, no, I was just

 6   making a point -- nothing about what you all are doing.

 7              MS. PERALES:  Sorry.  Just let me know

 8   if you're going to need a break.

 9        Q.    (BY MS. PERALES) And we were talking about

10   Harris County Republican, let's start with members of

11   the House.  With whom have you met who is currently in

12   the House or with whom have you communicated who's

13   currently in the House about goals for ballot integrity

14   legislation?

15              MR. TAYLOR:  Let me just hop in for a

16   quick second.  My job here is just to protect

17   attorney-client privilege and that's it.  But if you're

18   going to ask questions that might be involved with

19   legislative privilege or something like that, I -- I'm

20   going to defer to the other lawyers who represent other

21   parties, I just want to make that clear.

22              MS. PERALES:  Understood.

23              MR. TAYLOR:  Okay.

24        A.    It -- it varies by session.  In preparation

25   for the current session, the Republican Party of Harris
```

1   County hosted a luncheon and every one or our Harris

2   County Republican State Representatives and Senators

3   attended.

4        Q.   (BY MS. PERALES) Okay.  And at that luncheon

5   did you engage with anybody -- I'm just trying to get a

6   sense of how this works -- did you engage with elected

7   officials, at the luncheon about ballot integrity

8   legislation?

9        A.   At the luncheon I had five minutes to discuss

10  some of the problems that had not been -- the loopholes

11  have not been closed that are causing problems with out

12  election workers with the entire group.

13       Q.   I see, so you were essentially making a

14  presentation to them?

15       A.   Informal presentation, yes.

16       Q.   But you had the floor?

17       A.   For five minutes.

18       Q.   That's good, okay.  And when you say

19  loopholes that weren't closed, does that mean SB 1?

20       A.   No, it means in general.

21       Q.   Okay.

22       A.   What has been reported by our election

23  workers that needs to be addressed.

24       Q.   Okay.  You mentioned the list that -- that

25  can be many written form, aside from the list have you

1   ever written something more detailed about a proposal

2   that you wanted a legislator to consider.  So for

3   example, have you ever taken a stab at maybe drafting a

4   provision that you would want to see?

5                MR. WASSDORF:  I'm going to object to

6   the extent that this could get into any responses to

7   legislative inquires on the grounds of legislative

8   privilege.

9        Q.    (BY MS. PERALES) You may answer.

10       A.    Not until this year for the current session.

11   I was asked to join a task force of grass roots

12   activist to examine and work on the concerns about

13   ERIC, E-R-I-C, electronic registration information

14   center.  We studied it, interviewed people across the

15   country for seven months and I was asked to draft a

16   possible bill that would open the ERIC functions put

17   broader range of solutions.  It's the first time I've

18   done that.

19       Q.    Uh-huh.

20       A.    That has been -- I did not submit it, it was

21   submitted by our task force leader and it has become a

22   bill in the current legislature.

23       Q.    In the current Texas Legislature?

24       A.    Current Texas -- the 88th Legislative

25   session.

Alan Vera - 2/27/2023

34

1      Q.    And the task force that you were on was it a

2 Texas only task force?

3      A.    Texas only task force.

4      Q.    Okay.   So prior to working on drafting

5 legislation, this -- for this 88th regular session, in

6 the past if you had a proposal that you wanted to see

7 enacted, how much detail would you put into writing it

8 down?

9      A.    I understand.   Again, with acknowledging the

10 objection, in between the first and second special

11 sessions of the 87th legislature I sent an email with

12 two sentences to the legal counsel of our senator

13 asking that they consider adding these two sentences to

14 Senate bill one for is second special session.   They

15 studied it, liked it, recommended it and it was added

16 to Senate bill one.

17      Q.    And when you say our senator, do you mean

18 Senator Bettencourt?

19      A.    I do.

20      Q.    Okay.   And then do you remember what the two

21 sentences were on?

22      A.    Yes.   The two sentences involved requiring

23 the every county in Texas to reconcile the number of

24 ballots with the number of voters after every election.

25      Q.    Do you remember the name of Senator

1    Bettencourt's I guess general council?

2         A.    I do.

3         Q.    Tell me what that is.  That -- by the way,

4    that was very good, whoever prepared you for this

5    deposition is -- did a great job.

6         A.    Sonya Aston.

7         Q.    And did you send the two sentences to

8    Ms. Aston by email?

9         A.    By email.

10        Q.    Okay.  And did she then respond to you?

11        A.    She respond and said I'll see what I can do.

12        Q.    Okay.  Then how did you know -- how did you

13   come to learn that it was well taken and then going to

14   be put in the Bill?

15        A.    Well, as you know in Texas Legislature every

16   special session, every bill has to be re-filed.  So

17   when Senate bill was re-filed for the second special

18   session my two sentences were there.

19        Q.    Do you think you would still have that email

20   to Ms. Aston if your email history somewhere?

21        A.    I don't think so, it's been well over a year.

22        Q.    Okay.  What email service do you use?

23        A.    Outlook.

24        Q.    Outlook.  Do you know if outlook keeps your

25   older emails?

1          A.    I don't know.

2          Q.    Okay.   Okay.   Now, I think last on my list is

3    testifying when possible in the legislature, do you

4    recall testifying in the do you recall testifying on SB

5    1 at all?

6          A.    I do.

7          Q.    Okay.   And do you recall testifying on SB 1

8    in the second special?

9          A.    I do.

10         Q.    Okay.   I remember being in a committee

11   hearing and you and I were both there and you were

12   testifying, I can't remember for sure if it was the

13   second special.   But I -- I remember your testimony, do

14   you -- would you, for example in the second special

15   provide both written and verbal testimony?

16         A.    Rarely.

17         Q.    Okay.

18         A.    Rarely.   Occasionally I will bring exhibits

19   to supplement my verbal testimony.   I rarely provide

20   written testimony.

21         Q.    Okay.   Do you recall whether you provided any

22   written testimony on SB 1 or it's predecessor's bills

23   HB 6, SB 7?

24         A.    I don't think I did provide written

25   testimony.   I think it was all verbal.

```
 1        Q.    Do you go up with like index cards or a piece
 2   of paper?
 3        A.    I type up every work I'm going to say and
 4   I've timed it out for two minutes in the Senate and
 5   three minutes in the House.
 6        Q.    And you take those notes back with you?
 7        A.    I do.
 8        Q.    Okay.  I noticed when I -- I went to the
 9   Harris County Republican Party website that there was a
10   link that -- that one could click on to get involved or
11   volunteer with the Party and it allowed me to put my
12   name and my VYD information if I wanted to serve as an
13   election worker; are you aware of that part of the
14   website?
15        A.    I am aware.
16        Q.    Do you know if those pages or the information
17   that's gathered there is used also to recruit poll
18   watchers?
19        A.    I don't deal with that information, but I
20   think it's not impossible that once the party contacts
21   the person who left their name they could add poll
22   watching as an option of volunteer activity.
23        Q.    How do you get the names of potential poll
24   watchers?
25        A.    I get them from the county party.
```

Alan Vera - 2/27/2023

38

1      Q.   Okay.  So the paid staff?

2      A.   Uh-huh.

3      Q.   All right.  And who is responsible for

4  getting those individuals to a training that you would

5  give?

6      A.   The paid staff.

7      Q.   Okay.  So you don't have to be chasing people

8  down telling them, it's at Saturday at 10 a.m.

9      A.   Not anymore.

10      Q.   Okay.  Okay.  When I'm quiet I'm crossing off

11  questions, so it's a good thing.  I'm already on page

12  6, we're just zipping right along here.

13            MR. TAYLOR:  You left out a key fact,

14  what's the last page number?

15            (Laughter.)

16            MS. PERALES:  Well, it's not six,

17  but -- but we're actually making really -- I think our

18  conversation, so it touched on several different

19  things, so I'm catching up with myself and crossing off

20  the questions.

21            THE WITNESS:  While you're doing that,

22  can we take a break?

23            MS. PERALES:  Of course.

24            THE WITNESS:  Thank you.

25            MS. PERALES:  Let's take a five minute

1   break.

2                       THE REPORTER:  Okay.  Going off the

3   record at 10:29 a.m.

4                       (Off the record.)

5                       THE REPORTER:  Going back on the

6   record at 10:42 a.m.

7        Q.   (BY MS. PERALES:) Okay.  Mr. Vera, I am going

8   to ask you some more specific questions about poll

9   watchers and your training of the poll watchers

10  comparing the before SB 1 to the after SB 1 period of

11  time, okay?

12                      So did your training change at all for

13  poll watchers with respect to what they could do in the

14  polling place while voting is happening?

15       A.   It did not change significantly.  The two

16  greatest changes.

17                      MR. GORE:  Let me -- let me just

18  interject here an objection.  We've allowed some

19  latitude on the poll watcher training and I'm fine you

20  confirming there were changes to the training.

21  Anything about the substance of the training, the

22  Harris County Republican Party has asserted a First

23  Amendment right to confidentiality and First Amendment

24  privilege not to disclose the substance of the

25  training.  So I'm going to ask the witness or instruct

1    the witness not to answer anything about the substance

2    of the training.

3        Q.   (BY MS. PERALES:) And Mr. Vera, are you going

4    to follow counsel's advice and not testify about the

5    substance of the poll watcher training?

6        A.   I am.

7        Q.   Okay.  And you did that very elegantly, I --

8    I mentioned previously that so times your Counsel will

9    direct you not to answer and we will then work on that

10   at another time.

11             You mentioned that your poll watcher

12   training did not change significantly, but would it be

13   fair to say that your poll watcher training did change

14   in some respect from the pre-SB 1 period to the post SB

15   1 period?

16       A.   Yes.

17       Q.   Aside from the training that you give poll

18   watchers, do you also receive communications from poll

19   watchers while election day is going on?

20       A.   I do.

21       Q.   Okay.  And generally how do you receive those

22   communications?

23       A.   By text or email.

24       Q.   Have you ever had a poll watcher call you on

25   your cell phone during election day to ask for you

1    guidance or advice?

2        A.    Yes.

3        Q.    So then would it be fair to say you

4    communicate with poll watchers by text, email, and

5    telephone?

6        A.    Yes.

7        Q.    And in these communications, would it be fair

8    to say that they're asking for your guidance about what

9    to do in a particular situation?

10       A.    Frequently.

11       Q.    Okay.   And do you then provide that guidance

12   to them based on your understanding of SB 1 and other

13   parts of the election code that deal with poll

14   watchers?

15       A.    That is correct.

16       Q.    You mentioned the training manual that you

17   encouraged, that you've created that you encourage the

18   poll watchers to bring with them to the polling place

19   on election day; is that correct?

20       A.    I mentioned it, yes.

21       Q.    Okay.   Can you tell me approximately how many

22   pages long it is?

23       A.    It is a graded booklet where there are tabs

24   available to you.   I'm going to guess it is a total of

25   18 pages folded and collated and cut very uniquely.

1       Q.    Does each page contain approximately 250

2    words?

3       A.    No.  It's a tiered appearance so that there's

4    a tab on what the content is.  So there's a tab that

5    says ID, and they flip it up in that opened is all the

6    informing on ID.

7       Q.    Okay.

8       A.    So -- and on the back are the actual

9    citations from the election code that relate to the

10   issues on the opposite sides of the page.  So 18 pages,

11   but they're not same size.

12      Q.    Okay.  So if I took the words from your

13   manual and I put them in let's say a word processing

14   document, about how many pages long would it be?

15      A.    I don't know.

16      Q.    Would it be more than 18?

17      A.    No --

18      Q.    I'm trying to figure out --

19      A.    What font size?

20            (Laughter.)

21      Q.    (BY MS. PERALES) 12.

22      A.    Yes, then be more than 18 because the font

23   side I have to use for the code is much smaller to fit

24   all the relevant code.

25      Q.    Okay.  Okay.  Would it be fair to say that

1    your Poll Watcher Guide is different from the Poll

2    Watcher Guide published by the secretary of state?

3         A.    It is.   It is in format.

4         Q.    Okay.

5         A.    It's much more usable.

6         Q.    Okay.

7         A.    It is a flip chart as opposed to a PDF, you

8    know, like several 100 pages long.

9         Q.    Would you say that there are -- well, so

10   your's is much shorter, so it doesn't contain

11   everything from the secretary of state's guide?

12        A.    Uh-huh.

13        Q.    Would you say that there are substantive

14   differences between your guide and the secretary of

15   state?

16        A.    There's no content difference, mine is more

17   compact.

18        Q.    So for example, do you -- would you maybe be,

19   your guide by different from the secretary state's

20   guide if it offered examples that might be different

21   from those of the secretary of state.   You see what I'm

22   getting at, whether they're --

23        A.    I understand --

24             MR. GORE:   And let me just renew the

25   objection, because again this is an area where the

1  Harris County Republican Party has asserted a First

2  Amendment Privilege.  I think you can answer yes or no

3  to the question, but instruct the witness not to

4  provide any discussion of the substance of any such

5  differences.

6      A.   You're supposed to ask me, will I follow

7  counsel, yes.

8                    (Laughter.)

9      Q.   (BY MS. PERALES) Are you following your

10  counsel's advice?

11     A.   I am following the counsel's advice.

12     Q.   All right.  So your counsel said don't give

13  substantive, but he's allowed you to answer yes or no.

14               So is the answer to then yes or no to

15  my question whether there are substantive differences

16  between your guide and the secretary of state's guide?

17     A.   Let me ask you to clarify for me which

18  secretary of state Poll Watcher Guide you're referring

19  to, because there are many iterations.

20               MR. TAYLOR:  And Nina, just to clarify

21  you already know this, but Mr. Gore is not Alan Vera's

22  personal counsel.  You're saying your lawyer this,

23  "your lawyer that.  That's actually me, Andy Taylor,

24  but Mr. Gore represents Harris County Republican Party,

25  and that's why he rather than me is asserting this

Alan Vera – 2/27/2023

45

1  First Amendment Privilege because I'm not representing

2  the Republican Party in this litigation.  So just that

3  -- just to keep things straight.

4                      MS. PERALES:  Thank you for that

5  clarification.

6       Q.   (BY MS. PERALES:) So Mr. Vera when you

7  decline to answer based on Mr. Gore's instruction, you

8  are declining to answer based on the instruction of a

9  lawyer who is not your lawyer, but who is the lawyer

10  for the Harris County Republican Party?

11       A.   That is correct.

12       Q.   Thank you.  And to clarify my question I'm

13  going to mark, although I only have one copy.  A

14  January 2022 publication by the secretary of state's

15  Elections Division titled Poll Watchers Guide.  We will

16  mark that deposition Exhibit No. 2.

17                      (Exhibit No. 2 marked.)

18       Q.   (BY MS. PERALES:) Take a moment if you will

19  to take a look at the document?

20       A.   Even they had a change for SB 1. Thank you

21  for letting me see that.  The combination of the

22  PowerPoint and the Guide that they carry with them, is

23  very similar to this booklet, combined.

24       Q.   Okay.  So let me ask you a few questions,

25  with respect to Exhibit 2, had you ever seen that

1    version of the document before I gave it to you today?

2        A.   Online.  I reviewed it online, but not hard

3    copy.

4        Q.   Okay.  So when I make reference to the

5    secretary of state's Poll Watcher Guide, will you

6    understand that I'm referring to the January 2022

7    version?

8        A.   I do, yes.

9        Q.   Okay.  Now, let me go back to my earlier

10   question, which is that the -- your guide, which you've

11   described as 18 pages, would you agree with me that

12   there are substantive differences between your guide

13   and Exhibit 2?

14       A.   That is a difficult question to answer

15   because --

16              MR. GORE:  Again, I'm just going to

17   renew the objection and instruct the witness that he

18   may answer to the extent that doing so does not reveal

19   the substantive content of his guidebook which -- over

20   which Harris County Republican Party has asserted a

21   First Amendment Privilege.

22       A.   The combination of the PowerPoint

23   presentation and the guide is substantively the same as

24   what's in here, combined.

25       Q.   (BY MS. PERALES:) I understand.  So if

Alan Vera - 2/27/2023

47

1   combined you -- you believe they're substantively the

2   same.   Would it then be correct that your guide by

3   itself is not substantively the same as the secretary

4   of state's guide?

5        A.   My guide is focused on the questions and

6   issues the poll watcher confronts at the polling place

7   itself, not the background of how poll watchers are

8   appointed et cetera, that's in class.

9        Q.   And so would the answer to my question then

10  be yes?

11       A.   The answer is, it is not substantively

12  different in content from those portions of this

13  document that address the activity at the polling

14  place.

15       Q.   Is it your contention then that your guide

16  contains every piece of matter that the secretary of

17  state's guide contains with respect to poll watcher

18  behavior in the, or activities in the poll place --

19       A.   It does.   It does, on the activity at the

20  polling place, yes, they're very consistent.

21       Q.   Did you copy and paste out of the secretary

22  of state guide?

23       A.   I did not.

24       Q.   Okay.

25       A.   I use illustrations.

Alan Vera — 2/27/2023

48

1      Q.   You mean like pictures?

2      A.   Yes.

3      Q.   I see, okay.   Let's talk about the PowerPoint

4   again and the -- and your -- your Poll Watcher Guide.

5   With respect to the guide which your trainees take home

6   with them; is that correct?

7      A.   Uh-huh, that is correct.

8      Q.   Can you estimate how many copies of your

9   guide either in the current version or in past versions

10   are circulating in the world?

11      A.   I know that Harris County Republican Party

12   printed 5,000 of them for our use here in Harris

13   County, so that's the ones I know about.

14      Q.   And you when you say printed 5,000, you mean

15   just for the November 2022 election?

16      A.   For the primary election, primary runoff, and

17   the November election.

18      Q.   Okay.   So since January of 2022?

19      A.   That's correct, because SB 1 went into affect

20   December of 2021.

21      Q.   And were the Poll Watcher Guides printed by

22   the Republican Party only physically distributed by you

23   or were they distributed by other folks as well?

24      A.   Only by me in my classes.

25      Q.   And how many have you distributed?

Alan Vera - 2/27/2023

49

1      A.    Probably 1,000.

2      Q.    Okay.  And do you know where those copies are

3  today?

4      A.    Yes.  Oh, the ones I distributed?

5      Q.    Yes.

6      A.    I do not.  They're -- they're in the

7  possession of the poll Watchers, as far as I know.

8      Q.    Have you ever printed your PowerPoint and

9  given that to anybody?

10      A.    No, ma'am.

11      Q.    Would you say that with respect to the

12  approximately 1,000 Poll Watcher Guides that you

13  prepared, that there is a possibility that at this

14  point some of those guides have made their way to other

15  individuals who maybe weren't the original recipients?

16            MR. TAYLOR:  Objection to form.

17      A.    I have no idea.

18      Q.    (BY MS. PERALES:) Do you think that it's

19  possible that some of your guides maybe in circulation

20  beyond the original recipients?

21            MR. TAYLOR:  Objection to form.

22      A.    I have no idea.

23      Q.    (BY MS. PERALES.) If a general member of the

24  public asked you for your guide, let's say a friend of

25  one of your trainees comes at the end of the training

1    and says, "I'm here to pick up Susan, Susan's guide

2    looks very interesting," and they would ask for another

3    copy, would you give them another copy?

4         A.    No.

5         Q.    And why is that?

6         A.    Because I only want these in the hands of the

7    people I've trained.

8         Q.    Okay.  What steps do you take to ensure that

9    the guides stay in the hands of the people you trained?

10        A.    All the steps I can take.  The guides are

11   with me personally and I personally hand them to the

12   students and they leave with them, once they leave I

13   have no control.

14        Q.    Okay.  Okay.  I'm going to ask you some

15   questions about your training of poll watchers.  Well,

16   let me ask you an earlier question first, just to nail

17   down something.  Is there anybody else who trains,

18   besides you, who trains poll watchers who will serve on

19   behalf of Harris County Republican Party?

20        A.    No.

21        Q.    I'm going to ask you some questions now about

22   your training with the understanding that they may draw

23   objections, and so I will just embark upon them for the

24   purpose of the record.

25                    Can you tell me how your training of

1   poll watchers may have changed or didn't change based

2   on the enactment of that part of SB 1 that says "Poll

3   watchers may not be denied free movement where election

4   activity is occurring within the location at which the

5   watcher is serving?

6                    MR. GORE:  Objection, First Amendment

7   Privilege, instruct the witness not to answer.

8        Q.    (BY MS. PERALES) And will you follow the

9   instruction of Mr. Gore not to answer?

10       A.    I will.

11       Q.    Did your training of poll watchers change

12  following enactment of that portion of SB 1 that

13  prohibits an election official from taking any action

14  to obstruct the view of a watcher or distance the

15  watcher from the activity or procedure to be observed

16  in a manner that would make observation not reasonably

17  effective?

18                   MR. GORE:  Objection, First Amendment

19  privilege, instruct the witness not to answer.

20       Q.    (BY MS. PERALES:) Were you -- are you

21  following Mr. Gore's instruction?

22       A.    I am.

23       Q.    Are you aware that -- well, Harris County

24  Republican Party is the appointing authority for its

25  watchers; is that correct?

1    A.    That is correct.

2    Q.    Are you aware that SB 1 has now allowed the

3    appointing authority that believes a watcher was

4    unlawfully prevented or obstructed from the performance

5    of the watcher's duties to seek relief in court?

6    A.    I am aware.

7    Q.    Are you aware of any changes in activity of

8    the Harris County Republican Party with respect to

9    being able to take court action when you believe one of

10   your watchers is being unlawfully prevented or

11   obstructed?

12                 MR. GORE:    So I'm going to object on

13   First Amendment privilege grounds to the extent the

14   question calls for actions that are not public or

15   communications that are not public and that are

16   internal only to the Harris County Republican Party, to

17   the extent there's anything public out there the

18   witness can testify, but with respect to anything not

19   public, I instruct the witness not to answer.

20   Q.    (BY MS. PERALES:) Mr. Vera, are you going to

21   follow Mr. Gore's instruction?

22   A.    I am.

23   Q.    Can you answer the question with respect to

24   public information only?

25   A.    I am not aware at this time of any public

1   statement or intent from the Harris County Republican

2   Party to seek court action with regard to a poll

3   watcher.

4       Q.   Without telling me any substance, are you

5   aware of any private communication regarding that?

6       A.   No.

7       Q.   Can you tell me what "Free Movement of Poll

8   Watchers," means to you?

9       A.   Free Movement of poll Watchers," means that

10  with the exception of a voter voting by themselves at

11  the voting booth, the poll watcher is free to move

12  around the polling place to observe all other election

13  activity.   The voting booth is off limits if the voter

14  is by himself of herself, or if the voter is being

15  assisted by an assistant the voter brought with them.

16      Q.   How far from the voter should a watcher stand

17  to respect that off-limits area you described?

18      A.   It's not specified in statute, but they

19  should not be close enough to see the ballot or hear

20  the voter's discussion with the assistant.

21      Q.   If the watcher isn't looking at the ballot,

22  how close can the watcher stand?

23      A.   If the voter is being assisted by an election

24  worker who is working that polling location, the poll

25  watcher can be right there at the voting booth, and SB

54

1   1 says can even inspect the ballot.  That's not true

2   when the voter's being assisted by their own chosen

3   assistant.

4        Q.   So how -- you know if a watcher asks you how

5   close can I be in order to perform that function and

6   you say being right there, how close is right there in

7   a numerical sense?

8        A.   We are still referring to a voter being

9   assisted by an election worker, I've told the poll

10  watchers they can be right there at the polling booth

11  to be able to see every action made by the election

12  worker and hear every instruction given by the voter to

13  the election worker, close enough to see and hear.

14       Q.   Okay.  And how far is that in terms of

15  distance?

16       A.   It depends how good the poll watchers vision

17  and hearing is.

18       Q.   Okay.  So let's say it's not great, but the

19  poll watcher still capable of seeing and hearing, if

20  the poll watcher says can I stand one foot from the

21  voter, would you say that's okay?

22       A.   I would tell the vote poll watcher if you

23  need to stand one foot from the voter to see and hear

24  everything, yes.  Do not make contact with the voter or

25  the election worker.

1      Q.   You mean physical contact?

2      A.   Correct.

3      Q.   And so you mention a moment ago, with respect

4  to a voter being assisted by a poll worker, that the

5  watcher now has the ability to inspect the ballot; do

6  you recall that testimony?

7      A.   Yes.

8      Q.   Okay.  And do you understand that to be

9  inspect the ballot as it's being voted?

10     A.   The language in the code of SB 1 states that

11  the voter, that the poll watcher may observe the

12  preparation of the ballot, does not say anything beyond

13  that.  So what I have told my poll watchers in class

14  is, if you think you need to you can see that the

15  election worker who is assisting the voter is carrying

16  out the voter's instructions in preparing the ballot.

17     Q.   And that means for example being able to see

18  the poll worker make selection of candidate preference?

19     A.   As instructed by the voter, correct.  The key

20  issue counselor is, is the assistant carrying out the

21  expressed instructions of the voter, that's it.

22     Q.   And so the watcher then, you would advise can

23  stand close enough to see and hear not only the voters

24  instructions to the poll worker, but then the poll

25  worker --

Alan Vera — 2/27/2023

56

1    A.    Executing the instructions.

2    Q.    -- by making the preference selections on the

3 ballot?

4    A.    That is correct.

5    Q.    What actions by an election official would

6 obstruct the view of a watcher that would make the

7 observation not reasonably effective when it came to

8 voting?

9    A.    Are you referring to the actual preparation

10 of the ballots or other examples in the polling place?

11    Q.    The preparation of the ballot.

12    A.    Then the election, one offense the election

13 worker could take would be to constantly move his body

14 to block the poll watcher's vision of the ballot

15 preparation.

16    Q.    Now, with respect to not preparation of the

17 ballot, but other activities -- interacting with voters

18 in the polling place, what action could an election

19 worker take that would obstruct the view of a watcher

20 in a manner that would make observation not reasonably

21 effective?

22    A.    At the voter check-in table, the poll watcher

23 has to be able to hear everything said between the

24 voter and the election worker and to see the

25 information that's coming up on the screen as the voter

1    checks in.

2                    So if the election worker, by shifting

3    his body to block the screen or making the table so

4    close to the wall the poll watcher can't stand there,

5    those are things that the election workers could do

6    that would prohibit the -- the poll watcher from being

7    able to see and hear all the transactions.

8        Q.    Okay.  **Describe for me actions by a poll**

9    **worker that would distance the watcher from the**

10   **activity or procedure to be observed in a manner that**

11   **would make observation not reasonably effective with**

12   **respect to activities that involve the voter?**

13       A.    The most blatant example of that is an

14   election judge, the presiding judge of a polling place

15   telling the voter they cannot move any closer than this

16   distance.

17       Q.    **Or telling the watcher?**

18       A.    Right, telling the watcher they cannot be any

19   closer than this distance.

20       Q.    Okay.  **So for example saying you can't get**

21   **closer than three feet to the poll worker assisting the**

22   **voter and casting the ballot?**

23       A.    Correct.

24       Q.    Okay.  **Is it within the scope of what a poll**

25   **watcher can do to write down the names of voters as**

1  they check in to vote?

2      A.    That is not normally within the scope of the

3  poll watcher's activity.

4      Q.    Would you consider it prohibited?

5      A.    It's not specifically prohibited in statute.

6  When I'm asked that question I tell my students --

7              MR. GORE:   -- I'm just going to again

8  interject the objection and instruct the witness not to

9  divulge what he tells his students during training on

10  First Amendment grounds.

11      Q.    (BY MS. PERALES:) And are you going to follow

12  Mr. Gore's instructions?

13      A.    I am.

14      Q.    Uh-huh, let me see if I can find another way

15  to, got this.   If I were to ask you whether you would

16  advise me to refrain from writing down the names of

17  voters as they check in, would you advise me to refrain

18  from doing that?

19      A.    Mr. Gore?

20              MR. GORE:   I understand the question

21  to be a hypothetical about Ms. Perales.

22              MS. PERALES:   And -- and I don't live

23  in Harris County, so.

24      A.    I would advise the poll watcher to refrain

25  from writing down the voter's names.

1      Q.  (BY MS. PERALES) Okay.  Have you ever had a

2 poll watcher contact you for guidance on what to do if

3 the voter is communicating with an assistor in a

4 language other than English?

5      A.  I have never had a poll watcher contact me

6 for that reason because the poll watchers are

7 instructed in advance about what to do in that

8 situation.

9      Q.  Okay.  Understanding that the poll watcher is

10 instructed on how they personally should behave, have

11 you ever had a poll watcher contact you to express a

12 concern about an in person assistance in the polling

13 place in a language other than English?

14      A.  No.

15      Q.  Okay.  Are you familiar with organized block

16 walking activities of the Harris County Republican

17 Party?

18      A.  From a distance.

19      Q.  Okay.  Do you know how the Harris County

20 Republican Party recruits block walkers?

21      A.  What I know is that the precinct chairs are

22 encouraged to organize people from the precincts to do

23 block walking.

24      Q.  And when the precinct chairs organize people

25 from their precincts to do block walking, is that

1   typically an activity that is in support of multiple

2   Republican candidates at the same time or something

3   different?

4        A.   I think it is a mixture.  If it is a block

5   walking activity before a general election, it's

6   usually multiple candidates.  If it's before a specific

7   school board election it maybe for only one or two

8   candidates.

9        Q.   Do you know generally what block walkers do

10  when they're block walking?

11       A.   Only from what they've told me.

12       Q.   Okay.  Tell me what you know from what

13  they've told you?

14       A.   They work from a list, either in paper or on

15  the phone, they knock on the door, they know the

16  person's name ahead of time, and they follow a script

17  on how to engage the voter with the message being

18  delivered.

19       Q.   Okay.  Do you know the source of the lists of

20  voters?

21       A.   I do not.

22       Q.   Do you know if block walkers know when

23  they're knocking on the door, if the voter is over age

24  65?

25       A.   I do not know that.

1      **Q.   Do you know if block walkers know when**

2  **they're knocking on the door if the voter has requested**

3  **a mail ballot or is eligible to request a mail ballot?**

4      **A.   I don't know that.**

5      **Q.   Do you know if the Party gives, I don't know**

6  **a better word than swag, do you know if the Party gives**

7  **out like T-shirts or buttons or other things to its**

8  **block walkers?**

9      **A.   I do not know for certain, but I have seen**

10  **candidates give buttons and shirts to block walkers.**

11      Q.   And would those be block walkers that were

12  organized by the Harris County Republican Party?

13      A.   I'm not sure.

14      Q.   Have you seen the script that the block

15  walkers use when they interact with the voter?

16      A.   I have not.

17      Q.   Okay.  Do you know if the Harris County

18  Republican Party recruits individuals to be available

19  to provide assistance to voters in person at the

20  polling place?

21      A.   I have never seen that activity by the

22  Republican Party of Harris County.

23      Q.   Okay.  Do you know whether, for example -- do

24  you know whether for example, if Harris County

25  Republican Party has a table set up outside the polling

Alan Vera - 2/27/2023

64

```
 1        A.    There is no coffee and donuts.

 2        Q.    It's a very serious meeting then?

 3        A.    Very serious.

 4        Q.    Okay.  Do you hold these meetings at a party

 5   headquarters or at a restaurant?

 6        A.    We hold the meetings in the lobby conference

 7   room of the Party headquarters building.

 8        Q.    Okay.  So no food?

 9        A.    No food.

10        Q.    Okay.  Do you have a vote, because you

11   mentioned there are 13 voting members?

12        A.    I have a vote in the committee, yes.

13        Q.    Okay.  Have you personally ever assisted a

14   voter who needed assistance voting in person in the

15   polling place?

16        A.    During the time I was an alternate judge at

17   Wesley elementary school I was asked by voters from

18   that precinct to assist them and yes, I did.

19        Q.    And what types need for assistance did you

20   see at that time?

21        A.    During that time I was asked by a voter to

22   explain why there were no democrat candidates for that

23   office and I had to explain that none had filed to run.

24   The voter was concerned and confused, I explained that.

25        Q.    Okay.
```

Alan Vera - 2/27/2023

65

1        A.   The -- another voter asked me to explain a

2   bond proposition to them I told them I was not allowed

3   to do anything, but read the language on the ballot and

4   could not answer questions.

5        Q.   Okay.  And so my next question is, what was

6   the -- what was it about the voter that required

7   assistance in voting.  So for example inability to read

8   or write or physical disability or --

9        A.   I had not had any of those instances.  The

10  questions I got were about specific ballot issues.

11       Q.   I see.  Okay.  So would it be fair to say

12  then that you've never assisted in voting in person at

13  the polling place a physically disabled voter who

14  required your assist -- who required assistance to

15  vote?

16       A.   In the places I've worked they always came

17  with their own assistant.

18       Q.   Okay.  Have you ever had occasion to assist a

19  voter who was, who didn't speak English and needed

20  assistance interpreting the ballot at the polling

21  place?

22       A.   Only to the extent of showing them how to

23  turn on the Spanish language ballot and the headphones

24  that read the ballot in Spanish.

25       Q.   Okay.  Have you ever interacted with a voter

1    in Spanish while delivering that type of assistance?

2        A.    Yes, but just to give the instructions on how

3    to access the Spanish language ballot and the Spanish

4    language reading of the ballot.

5        Q.    I won't presume, but you are from El Paso,

6    does that mean you speak Spanish?

7        A.    It means I spoke Spanish before I spoke

8    English.

9        Q.    And you still have some ability today?

10        A.    I can order a beer and chips with the best of

11    them.

12                (Laughter.)

13        Q.    (BY MS. PERALES) Okay.  Have you ever

14    assisted a family member or friend?

15        A.    I have not.

16                MR. TAYLOR:  Let the question finish

17    before you answer.

18                THE WITNESS:  Thank you, sorry.

19        Q.    (BY MS. PERALES) I've been talking up until

20    now about voting in the polling place, but I'll also

21    ask, have you ever assisted a voter who requested your

22    assistance in casting a ballot by mail?

23        A.    I have not.

24        Q.    Have you ever assisted a voter in preparing

25    an application for ballot by mail?

Alan Vera - 2/27/2023

67

1    A.   I have not.

2    Q.   And that includes friends, family members,

3    neighbors, anybody like that?

4    A.   It does.

5    Q.   Okay.  Are you aware of any instances in the

6    polling place in which a voter assistor helped a voter

7    who was not eligible for voter assistance?

8    A.   Repeat the question, please.

9    Q.   Are you aware of any instances in which a

10   voter assistor helped a voter in the polling place who

11   was not eligible for voter assistance?

12   A.   I have not personally seen that.  I have

13   received reports from poll watchers expressing that

14   concern.

15   Q.   Okay.  And what would you do in response to

16   that concern?

17   A.   I would simply have the poll watchers take

18   notes and submit it with the report.

19   Q.   Okay.  And did you ever follow up on any --

20   well, did you ever receive any written concerns like

21   that?

22   A.   Yes.

23   Q.   And what did you do to follow up?

24   A.   We followed up with the Ballot Security

25   Committee looking into the voter assistant, because

Alan Vera - 2/27/2023

68

1   they sign in now.   We've done open records request,

2   received the name of the assistant, and done a little

3   digging.   We haven't found anything extraordinarily

4   evil.

5        Q.   Anything slightly evil?

6        A.   No, just questions about whether the voter

7   really did need an assistant or not.

8        Q.   Okay.

9        A.   But those are judgment calls in many cases.

10       Q.   Have you ever contacted a voter to verify

11   whether the voter needed assistance?

12       A.   I have not.

13       Q.   Okay.   Now, have you -- are you aware of any

14   instances in which a voter assistor told a voter how to

15   vote in the polling place?

16       A.   We have had those incidents reported to me by

17   poll watchers and by election workers and they were

18   simply instructed to advise the assistor that they're

19   to follow the direction of the voter and not vote in

20   place of the voter.   So, yes we have had those

21   instances reported.

22       Q.   Did you ever receive any reports like that in

23   writing?

24       A.   Yes.

25       Q.   Okay.   And so since you received it in

1  writing after the voting has ended, what have you done,

2  if anything in response to receiving something in

3  writing?

4      A.   Two things, the issue is, the issue and the

5  incident is reported on our legislative preparation

6  documents and reported to the Harris County Republican

7  Party's election issue repository.  So there's two

8  records of it.

9      Q.   And would you have access to those records

10  today?

11      A.   I do not have access to the main repository,

12  only my own notes.

13      Q.   Okay.  And do you have notes documenting any

14  instances in which an assistor told a voter how to

15  vote?

16      A.   I do.

17      Q.   Okay.  Where are those notes now?

18      A.   They're at home.

19      Q.   Okay.  And you would be capable of producing

20  them in some form, if needed --

21      A.   I could, but you could not read them probably

22  because they're all handwritten.

23      Q.   Can you recall the date of the most recent

24  time you would have noted an -- a report of an assistor

25  telling a voter how to vote in a polling place?

Alan Vera — 2/27/2023

70

1    A.   I cannot recall, it has been a while.

2    Q.   Okay.  Has it been more than five years?

3    A.   No, but more than two.

4    Q.   Okay.  And that would be a single instance or

5    multiple instances?

6    A.   I can't remember.

7    Q.   Okay.  Okay.  Do you recall the last time you

8    asked an election worker to instruct an assistant to

9    carry out the wishes of the voter?

10   A.   I never do that personally.  I instruct

11   either the poll watcher or one of my workers to bring

12   the issue up with the election judge.

13   Q.   And do you recall the last time you did that?

14   A.   In early voting for the November 2022

15   election?

16   Q.   Do you recall where that polling place was?

17   A.   I don't.

18   Q.   Okay.  And was that a single instance or

19   multiple instances?

20        MR. TAYLOR:  Let me -- let me hop in,

21   I'm the new kid on the block here, but I was told that

22   the November 2020 election cycle was not going to be

23   discussed today and this witness didn't prepare --

24        MS. PERALES:  Okay.

25        MR. TAYLOR:  -- for that subject area.

Alan Vera - 2/27/2023

71

1  Now, I could be wrong, but that's what I was told.

2                  MS. PERALES:  Yeah, and I'm sorry we

3  sort of drifted into that because I was asking when

4  something happened and he mentioned --

5                  MR. TAYLOR:  Right, right.

6                  MS. PERALES:  -- so thank you for that

7  reminder.  I will not ask you about that from the

8  November 2022, because we're going to stick to before

9  that.

10         Q.   (BY MS. PERALES:) Before November of 2022,

11  can you think of an instance where you instructed poll

12  watcher or poll worker to deal with an issue of an

13  assistor who was suspected of telling a voter how to

14  vote?

15         A.   I believe that in the May uniform election

16  date of 2022, so it was not the November, but the May

17  in an ESD Emergency Services District Election, I did

18  have a poll watcher, I gave a poll watcher guidance to

19  have the presiding judge counsel the assistor not to

20  make decisions for the voter.

21         Q.   And do you know whether the assistor was a

22  private individual or an election worker?

23         A.   It was an election worker.

24         Q.   And how did your watcher know that election

25  worker was telling that particular voter how to vote?

1      A.   Because the election worker was the assistant

2  and the poll watcher is now allowed to be at the booth

3  with the election worker assistant, and the poll

4  watcher was and could overhear and see what's going on.

5      Q.   And what did the poll watcher say exactly

6  that -- that communicated their understanding that the

7  election worker was somehow voting for the voter or

8  telling the voter how to vote?

9      A.   The voter was pondering different races and

10  candidates and the election worker was making strong

11  suggestions on whom the voter should choose.

12      Q.   Do you know whether that particular voter was

13  physically disabled or --

14      A.   I do not.

15      Q.   -- okay.  Okay.  Do you know whether -- did

16  the watcher report that the voter -- let me see, how do

17  I ask this question?  Let me start again.  Did the

18  watcher report that the election worker assistor voted

19  for the voter, prepared the ballot in anyway that was

20  different than what the voter wanted?

21      A.   That particular instance, the poll watcher

22  reported that the election worker assistant was

23  strongly suggesting to the voter which choices he

24  should make in casting his ballot.

25      Q.   Okay.  And understanding that, that's not

Alan Vera - 2/27/2023

73

1  okay.  Did the poll watcher communicate how the ballot

2  was ultimately prepared?

3      A.   Poll watcher communicated that he, as he

4  should have, spoke directly to the election worker.

5  Okay.  And then went and saw the presiding judge to

6  also come and reinforce it.

7      Q.   Did the poll watcher say how the ballot was

8  prepared?

9      A.   I did not ask that.

10     Q.   Can you think of any other examples from

11  before the 2022 general election of a poll watcher

12  raising a concern to you or an election official

13  raising a concern to you about an assistor who was

14  voting for the voter or telling the voter how to vote?

15     A.   How far back do you want to go?

16     Q.   Let's go back in five years.

17     A.   Okay.  So in 2018, okay?  Early voting,

18  November election there were people camped in the

19  parking lot outside the Moody gardens -- moody polling

20  place and they were intercepting voters in the lot

21  locking arms with them and walking them into the poll

22  and announcing themselves as the assistant.

23     Q.   Okay.  And do you know whether any of those

24  assistors told voters how to vote?  Did any watcher or

25  election official tell you those assistors told the

Alan Vera - 2/27/2023

74

1   voters how to vote?

2       A.   It was very similar to what I just described

3   to you in the other situation that, yes, the reports

4   then came in that the assister who had attached herself

5   to the voter was strongly suggesting to the voter which

6   candidates they should select at the polling place --

7   the polling booth -- the voting booth.

8       Q.   So was it one assistor at issue?

9       A.   There were four people working the parking

10  lot.

11      Q.   Okay.  But you heard from the watchers or the

12  poll workers that it was this one particular lady?

13      A.   No, it was all four ladies.

14      Q.   Okay.  Four ladies.  And do you know whether

15  the ballot was prepared in accordance with the voter's

16  wishes in those instances?

17      A.   I do not.

18      Q.   Okay.  Okay.  Do you have any other examples

19  within the past five years?

20      A.   Not that I can think of at this time.

21      Q.   Okay.  I am about to change to another topic

22  can we take a five minute break?

23              THE REPORTER:  Okay.  Going off the

24  record at 11:41 a.m.

25              (Off the record.)

```
 1              THE REPORTER:  Going back on the
 2   record at 11:54 a.m.
 3       Q.   (BY MS. PERALES:) Okay.  Mr. Vera, I'm going
 4   to turn to talking about the time leading up to the
 5   introduction of the election related bills in the 2021
 6   regular session.  So at this point we're not at SB 1 as
 7   we've come to know it, but at that time we had HB 6 and
 8   SB 7, I believe.
 9                So in the lead up to the 2021, Texas
10   Legislative regular session, it's fair to say that you
11   were interested in seeing one or more bills put forward
12   that we're going to deal with election issues?
13       A.   That's correct.
14       Q.   Okay.  So prior to the start of the 2021
15   legislative session, what steps did you take to
16   advocate for election related legislation in the
17   upcoming session?
18       A.   That was the 87th session.  In the early days
19   of the session I visited in person in the capital with
20   the state reps and the senators who represent Harris
21   County and this was a verbal communication of the kinds
22   of issues we think needed to be fixed.  So we visited
23   together and I talked and they took notes.
24       Q.   Okay.  Tell me the names of those people.
25       A.   Briscoe Cain, Valoree Swanson, Mike
```

1  Schofield, Paul Bettencourt.

2       Q.    Any other senators?

3       A.    No.

4       Q.    How about Bryan Hughes?

5       A.    No.

6       Q.    Okay.  Cain, Swanson, and Schofield are

7  members of the House, right?

8       A.    Correct.

9       Q.    Okay.  Tell me about how many times you

10  communicated with Briscoe Cain?

11      A.    Well, it was the initial visit where I

12  visited all of them.  I think twice before the

13  committees began hearing, maybe two times the most.

14      Q.    So this would have been after the -- the Legg

15  started?

16      A.    After the opening day of the Legg But before

17  the committees began hearing bills.

18      Q.    Okay.  Did you do any work prior -- sorry.

19  Did you do any work prior to the start of the session?

20      A.    I work all the time.  Can you be more

21  specific.

22      Q.    So bill filing usually opens in November of

23  the year preceding, so just taking you from --

24  following the November 2020 election, knowing that

25  there's an upcoming legislative session?

77

1      A.    Right.

2      Q.    **Just in that period before the legislative**

3  **session starts, did you do work -- and I'm sure you**

4  **must have, so maybe the better question is, what work**

5  **did do you to prepare for a accomplishing your goals**

6  **with respect to your legislation --**

7      A.    -- I understand -- I understand your question

8  now, thank you.  Again, just to be clear I -- in that

9  year was mostly phone calls in advance and those start

10 in June.  I began calling Swanson and Cain and

11 Schofield in June of 2020 discussing issues that were

12 of concern to the Ballot Security Committee, not bills

13 just issues that needed to be addressed.

14     Q.    **Uh-huh.**

15     A.    And then that continued in January of 2021,

16 when I visited their offices and followed up on those

17 issues.

18     Q.    **Okay.  Understood.  You met with them one on**

19 **one?**

20     A.    Well, in June it was phone calls in January

21 it was visits one on one, uh-huh.

22     Q.    **Did you meet with the members personally or**

23 **did you meet with their staff?**

24     A.    Probably a mix, I can't remember exactly, but

25 I'm sure the -- the members were there on one of the

Alan Vera – 2/27/2023

78

1   visits and staff on others.

2       Q.   Okay.   What do you remember advocating on

3   that were related to SB 1, meaning either ended up

4   in -- in SB 1 or one of its predecessor's bills?

5       A.   Oh, I see, I see, I see --

6                   MR. WASSDORF:   I'm going to object

7   again on the basis of Legislative Privilege to the

8   extent that any of the contents of these communications

9   were in response to a legislative inquiry and instruct

10  you not to answer in that regard.

11                  MS. PERALES:   I don't think you can

12  instruct him not to answer.

13                  MR. WASSDORF:   Well, I mean --

14                  MS. PERALES:   But let's -- let's take

15  a minute to think about it.

16                  MR. TAYLOR:   Doesn't the state --

17  doesn't the state own that privilege though.   I mean

18  it's not a privilege that --

19                  MS. PERALES:   Well, it's -- it's maybe

20  the privilege of a legislator, but it's -- they're

21  third parties.   They're not parties to the action here.

22                  MR. WASSDORF:   I don't know.

23                  MS. PERALES:   Let me think about this.

24  Let me think about this.   I'm -- I'm not going to

25  trying to steamroll you.   I do want to stay on the

1    record.

2                    MR. WASSDORF:  I -- I was asserting

3    the privilege of instructing him not to answer based on

4    Mr. Taylor's representation that he was going to defer

5    to us with respect to our respective privilege

6    objections.

7                    MR. TAYLOR:  Yeah, and I can make it

8    easier perhaps.  I don't want my client a witness to be

9    put in a position where somebody has asserted a

10   privilege and then said that he improperly waived that

11   privilege.  So I don't think we have, he and I don't

12   have any choice, but if somebody's going to raise a

13   privilege today, we're just going to have to, you know,

14   not answer that question.  But I'm not saying that the

15   privilege is valid or invalid, I have no idea because

16   I'm not involved in this case.  So that's -- but that's

17   the practical reality, is I am instructing him not to

18   answer questions that these other lawyers are

19   asserting, but not because they're valid, but because

20   they're asserted.

21                   MS. PERALES:  Uh-huh.  So can you tell

22   me if you're going to assert the Legislative Privilege

23   and instruct the, Mr. Vera not to answer with respect

24   to all communications with legislators and staff?

25                   MR. WASSDORF:  No, it's just any --

1    the contents of any communications that he made in

2    response to an inquiry from a legislator or legislative

3    staff.

4                    MS. PERALES:  So can you tell me what

5    it was about my question to Mr. Vera that may have

6    raised that issue for you?

7                    MR. WASSDORF:  I'm having difficulty

8    in remembering what exactly the wording of the question

9    was, but as it was read the scope of the question

10   appeared to potentially encompass his communications to

11   the legislators or legislative staff in response to a

12   legislative inquiry.

13                   MS. PERALES:  One second.

14                   Let me see if I can divide his

15   testimony in such a way that we are able to segregate

16   those questions on the record and deal with them

17   separately, perhaps down the line a little bit in the

18   deposition.

19                   MR. WASSDORF:  Sure.

20        Q.   (BY MS. PERALES:) So Mr. Vera, would it be

21   fair to say that you had communications with

22   legislators and staff in which you were bringing forth

23   information or requests at your initiative; that's a

24   yes or no question.

25        A.   Yes.

1      Q.   Okay.   Were there ever times when you were

2  communicating with legislators and staff in response to

3  a question from them?

4      A.   Yes.

5      Q.   Okay.   So I'm going to try to divide your

6  testimony into what I believe is non-objectionable, you

7  bringing forth information to legislators and staff at

8  your initiative and then we will try to deal separately

9  with your communications with legislators and staff

10  where they're requesting something from you?

11      A.   This is going to be difficult.

12      Q.   Okay.

13      A.   Because the interaction and the dynamics of

14  the exchanges and discussions, those things overlap

15  continually.

16      Q.   Yeah, okay.

17      A.   It's going to be difficult.

18      Q.   Okay.   Well, with without discussing the

19  substance of what they may have been asking you and

20  what you may have been, let me try get a sense of how

21  that would have unfolded.

22                Would it be fair to say that you

23  communicated with legislators and their staff in

24  person, by phone, and by email?

25      A.   That would be an accurate statement.

1       Q.    Okay.   Did you ever have any Zoom meetings

2    with legislators or staff?

3       A.    Did not.

4       Q.    Okay.   And so is it your testimony that when

5    you were communicating with legislators and their

6    staff, that it was a -- a combination of you bringing

7    forth information at your initiative or requests at

8    your initiative and then getting inquiries from them

9    and then you're responding to those inquires?

10      A.    If I understand the question, yes, it was

11   both those issues and frequently in the same meetings.

12      Q.    Okay.   Is it fair to say then to summarize

13   your earlier testimony that you started calling House,

14   Members and staff and Senator Bettencourt and staff in

15   the summer prior to the January 2021 session, and that

16   your communications with them continued both either

17   through email, calls, or in person meetings until the

18   enactment of SB 1?

19      A.    Well, if an enactment means final passage,

20   yes, because SB 1 did not become effective till

21   December of 2021, so, yes to the enactment.

22      Q.    Okay.   When you responded to inquires from

23   legislators or staff, would it be fair to say that you

24   were giving them information as well as suggestions on

25   crafting SB 1, or what ultimately became SB 1?

1      A.   It would be more -- it would most accurate to

2  say that when I was responding to questions it was

3  providing specific information on problems we had

4  faced.

5      Q.   Uh-huh.

6      A.   Not craft -- not how to craft SB 1.

7      Q.   But suggestions certainly about where, where

8  you wanted to see language to solve certain problems

9  that you had seen?

10      A.   I think you've gone a little too far on the

11  specificity.  It wasn't the language, it was we've got

12  to find how to fix this.  I wasn't suggesting the

13  language and how to fix it.

14      Q.   Okay.  Certainly not bill language, let met

15  -- let ask my question in a better way then.

16      A.   Okay.

17      Q.   When you're communicating in response to

18  inquiries from legislators, you were giving them both

19  factual information as well as telling them from your

20  perspective that either certain holes needed to be

21  plugged in the statute or certain issues needed to be

22  addressed by the statute?

23      A.   That is correct, but what I did not do was

24  provide language for the statute.

25      Q.   Okay.  You mention that prior to the start of

1  the 2021 regular session you started calling

2  legislators and their staff on certain issues as far

3  as -- as the summer before so summer of 2021 -- I'm

4  sorry, summer of 2020 --

5      A.    2020.

6      Q.    -- And I had asked you a question about what,

7  of those communications were relevant to SB 1, or what

8  ended up in SB 1. So just focusing on your outreach to

9  legislators, starting before the start of the 2021

10  regular session, can you tell me what issues you were

11  reaching out on that were relevant to SB 1?  So for

12  example there's lots of issues in the election code and

13  I know that you work on lots of different things?

14      A.    Uh-huh.

15      Q.    But just specific to what was addressed in SB

16  1, can you remember starting the summer of 2020 what

17  you were advocating on to the members?

18      A.    At that time I know I mentioned growth in

19  mail ballot harvesting in Harris County.  I know I

20  mentioned problems with election judges preventing poll

21  watchers from being close enough to see and hear

22  activity, and that was partly due to COVID, okay?

23  Those are the two major issues in the summer, was the

24  mail ballot harvesting problem and the carryover poll

25  watcher obstruction problem.

Alan Vera - 2/27/2023

85

```
1    Q.   So prior to SB -- actually, SB 7 and HB 6 --

2    A.   Uh-huh.

3    Q.   Getting filed --

4    A.   Uh-huh.

5    Q.   In the regular session, did you advocate for

6    example on -- and I'm just going to go through the

7    provisions, requiring a registrar to report ineligible

8    registrants or voters to law enforcement officials?

9    A.   No, I did not.

10   Q.   Did you --

11   A.   But I -- to be clear, I want to be -- I do

12   remember also repeating a prior concern about people

13   registering to vote using a commercial post office box

14   as a residence address.  And that was in addition to

15   the poll watcher and the mail ballot harvesting.

16   Q.   Uh-huh.

17   A.   Sorry, I forgot that.

18   Q.   Well, that's what I'm going to go through the

19   list because who could remember all of it, it's a long

20   list?

21   A.   Okay.

22   Q.   Do you remember raising before SB 1 was

23   filed, concerns to legislators or advocating that

24   legislators address voter registration list maintenance

25   issues, other than this residential address issue?
```

Alan Vera - 2/27/2023

87

```
 1        A.   Not on my list.
 2        Q.   Okay.  Do you recall recommending to
 3   legislators that SB 1 limit the presiding judge from
 4   removing a watcher unless the watcher committed certain
 5   infractions, whether those be of the Election Code or
 6   the Penal Code?
 7        A.   Not that specific thought, but in the summer
 8   I raised the concerns about poll watchers not being
 9   allowed to observe what they're entitled to observe.
10   So I raised the general topic, not that specific topic.
11        Q.   Do you know how that specific topic -- how
12   that specificity about prohibiting election judges from
13   removing watchers unless the watcher committed certain
14   infractions; do you know where that language came from?
15        A.   I do not.
16        Q.   Okay.  And of course I should have asked you
17   about the ones above as well, do you know where the
18   language came from in SB 1 about having to have the
19   polling place be in a permanent structure?
20        A.   Not that specific thought, no.  That didn't
21   come from my discussions.
22        Q.   All right.  And then do you know where the
23   language in SB 1 came from about not having 24 hour
24   voting?
25        A.   No, I do not.
```

1      Q.   Okay.  Do you -- do you recall whether you

2  were advocating before SB 1 was filed on making it

3  Class A Misdemeanor to refuse to accept a watcher?

4      A.   Not specifically that, no.

5      Q.   Do you know the source of where that came

6  from in SB 1?

7      A.   I do not.

8      Q.   Okay.  Now, there's a provision in SB 1 which

9  I believe you said that you did advocate with respect

10  to, which is that the watcher may not be denied free

11  movement where election activity is occurring and the

12  watcher is entitled to sit or stand near enough to see

13  or hear?

14      A.   Yes.

15      Q.   You advocated on that?

16      A.   Yes.

17      Q.   Okay.  And did you advocate with respect to

18  it being a Class A Misdemeanor to take action to

19  obstruct the view of a watcher or distance the watcher?

20      A.   It was already a Class A Misdemeanor.

21      Q.   Okay.  Do you recall advocating that there be

22  either different or increased penalties to -- for an

23  election judge to either distance the watcher or impede

24  the view of the watcher?

25      A.   Not specifically.  I did in my summer phone

Alan Vera - 2/27/2023

89

1    calls, advocate for their being a stronger penalty for

2    election judges who prevent poll watchers from

3    performing their duties.

4         Q.   Before SB 1 was introduced, did you advocate

5    on prohibiting mail ballot drop boxes?

6         A.   I did not.

7         Q.   Do you know where that language -- what was

8    the source of that language for SB 1?

9         A.   I don't know.

10        Q.   Okay.  Before SB 1 was introduced, did you

11   advocate for either applications for ballot by mail or

12   mail ballots to have increased requirements for

13   presenting ID numbers, and then having -- those ID

14   numbers need to be verified in order to count either

15   the application, process the application, or count the

16   mail ballot?

17        A.   Not specifically, but I did tell you

18   previously that in the summer phone calls I was raising

19   concerns about mail ballot harvesting in Harris County.

20        Q.   Okay.  You didn't have that specific proposal

21   "though, let's add an ID requirement to the paperwork

22   and have those things required to be checked"?

23        A.   I did not have that specific proposal.  I may

24   have pointed out in one or two phone calls, that the

25   states of Wyoming and Alabama required a photocopy of

1    the driver's license of the voter to be included with

2    the ballot.

3         Q.   Do you know the -- the source of specific

4    language in SB 1 requiring the ID numbers for ABBMs and

5    mail ballots?

6         A.   I do not.

7         Q.   Okay.  Before SB 1 was introduced, did you

8    advocate at all with legislators for additional

9    information to be asked from individuals who transport

10   curb side voters?

11        A.   Did not.

12        Q.   Do you know where the source of that

13   language --

14        A.   No, ma'am.

15        Q.   -- okay.  Prior to the introduction of SB 1,

16   did you advocate with legislators to increase

17   requirements on polling place assistors; namely, that

18   the assistor oath include additional statements?

19        A.   That was not on my list, no.

20        Q.   Okay.  And what about whether the assistor

21   would have to say whether they were being compensated

22   by a campaign or a PAC?

23        A.   That wasn't me.

24        Q.   How about with respect to mail assistors,

25   mail, not male like y'all --

Alan Vera - 2/27/2023

92

 1   prohibited to have an in person interaction with a

 2   voter in the presence of the ballot where the -- the

 3   person is advocating for a particular candidate or a

 4   measure?

 5       A.   That was not from me.

 6       Q.   Okay.  So what did you advocate for -- well,

 7   let me -- let me close that.  Do you know where that

 8   language came from in SB 1 or its predecessors related

 9   to prohibited vote harvesting services as an in person

10   interaction with one or more voters in the physical

11   presence of an official ballot intended to deliver

12   votes for a specific candidate or measure?

13       A.   I do not know where it came from.

14       Q.   Okay.  So what were you advocating for with

15   protect to the vote harvesting?

16       A.   Okay.  So we got to be careful about stepping

17   on the objections, okay?

18       Q.   Yeah, I'm just asking what you were

19   advocating for?

20       A.   In my calls I was describing a problem we

21   were, at that time, investigating.  In January and

22   February of 2020, a flood of ABBM was received by the

23   Harris County Clerk with significant issues.

24               So I'm reporting problems.  106 ABBMs

25   delivered in a single envelope with no assistant

1   signature to correspond with the act of mailing.

2   Witness signatures on ABBMs requested by people that

3   died in 1990 and 2000 and as recently of 2015 asking

4   for an ABBM in 2020, that's a problem.

5                    ABBM signed with a witness by voters

6   whose name was spelled wrong in the signature, that was

7   our concern of ballot harvesting, okay?  And it was

8   significant and there were a number of them.  So that,

9   I was advocating for solutions to prevent or toughen

10  the penalties for that kind of conduct.

11      Q.   Okay.  Now, I -- and what you're saying is

12  triggering memory in my part that there's at least one

13  document produced where you were sending an email

14  saying that the voter wasn't even necessarily involved

15  in that process and that you felt that vote harvesting

16  related to the in person interaction may have been not

17  all of what you would like to see with respect to vote

18  harvesting?

19      A.   You're remembering correctly, but that was an

20  inquiry from a state legislator, so I won't comment,

21  your -- your memory was correct.

22      Q.   Okay.  I -- okay.  It was produced and it

23  seemed to me that it was you saying to them -- or at

24  least what I saw you saying to them something along

25  those lines.  So then, would bit fair to say that prior

Alan Vera - 2/27/2023

95

1  session?

2      A.   No, I did not.

3      Q.   And then finally with the respect to the

4  office of Texas Attorney General, did you communicate

5  with anybody in the office of the Texas Attorney

6  General about anything you would have wanted to see in

7  the 2021 session related to voter integrity

8  legislation?

9      A.   No, I did not.

10     Q.   Now, I'm going to bring you up to the time

11 period of the regular session, the bills are now

12 introduced, you mentioned that you probably had two

13 meetings with legislators or legislative staff after

14 the opening day?

15     A.   One or two, uh-huh.

16     Q.   Uh-huh.  So in addition to personal meetings

17 -- well, let me ask you this, do you know how many

18 times you went up to Austin during the regular session?

19     A.   Well, before the committee hearings began

20 with bills, only twice.  So January, February, two

21 times.

22     Q.   Uh-huh.

23     A.   Once the committee hearings began for hearing

24 election bills it was almost weekly.

25     Q.   And in the almost weekly visits that you were

1   making after HB 6 and SB 7 are introduced?

2       A.   We filed.

3       Q.   Were filed, were introduced and the

4   committees started doing their meetings, were you

5   meeting also almost weekly with legislators or

6   legislative staff?

7       A.   No, once that -- once the committee meetings

8   began my time was spent in the committee meetings.

9   They drag out forever.  So, yeah, I might see staff or

10  members in the hallway or in the Capital Grill, the

11  meetings were few and far between after that.

12      Q.   So what might, what do they call it,

13  buttonhole people in the halls or in the Capital Grill

14  and talk to them about the election integrity bills?

15      A.   If that means I tripped over them, then yes.

16  I may have tripped over them and made a comment.

17      Q.   Okay.  So at this point, what is the means by

18  which you are communicating with legislators or

19  legislative staff?  At this point has it shifted to

20  emails, phone calls?

21      A.   At that point it begins to shift to emails

22  initiated by the legislators or their staff.

23      Q.   Uh-huh.

24      A.   I am the boots on the ground and I frequently

25  get an email asking me to look for unintended

1    consequences in the language of this bill and I respond

2    with my best evaluation of what might be the unintended

3    consequences.  The email you referenced earlier on the

4    issue of ballot harvesting being an in person

5    definition was inquiry from a legislator, and that was

6    my response.

7         Q.   Okay.  So would it be fair to say then that,

8    once the committee hearings start your interactions

9    with legislative staff and legislators are in the form

10   of providing feedback on specific bill language that

11   they want to vet with you?

12        A.   In general, yes.  In general, yes.  There

13   have been -- there were two occasions in that first

14   regular session when in testimony I mentioned

15   suggestions that might make the Bill better, and in

16   those two cases -- only two -- I was contacted while I

17   was still waiting to testify on later bills and spent

18   time explaining to the staff, this is what I was

19   referring to.

20        Q.   And generally that -- would that be by phone

21   or --

22        A.   Well, it's in person.

23        Q.   In person?

24        A.   While I'm still there in Austin.

25        Q.   I see.  So you might -- a legislator --

Alan Vera - 2/27/2023

98

1   legislative staff might track you down while you're

2   still in the building and ask you to respond as they're

3   vetting bill language?

4        A.   Asking me to explain specifically what I was

5   suggesting in my testimony that might make the Bill

6   better.

7        Q.   Okay.  Did you ever have an exchange like

8   that that resulted in bill changing in some way?

9        A.   I assume there -- yes, but I can't remember

10  which bill.  It was not one of these, except for the

11  reconciliation of votes and voters.

12       Q.   Okay.  So just specific to HB 6, SB 7, SB 1,

13  it's predecessor's bills, do you ever recall advocating

14  during the regular session for something to either be

15  added or changed about those bills that you saw come to

16  fruition?

17       A.   Not in the regular session.

18       Q.   Okay.  And you've testified in favor of the

19  bills during the regular session HB 6 and SB 7, is that

20  correct?

21       A.   Correct.

22       Q.   Did you advocate for any bills that were not

23  HB 6 or SB 7 to kind of reach out and incorporate maybe

24  a -- a smaller bill that was also moving through the

25  Legg?

Alan Vera - 2/27/2023

99

1    A.    Please state the question again so I'm clear,

2  did I ever advocate for bringing another bill into SB

3  7?

4    Q.    Yeah.

5    A.    There was one point -- not in regular session

6  I don't think -- but, I advocated bringing Senate bill

7  1589 into Senate bill one or 7, whatever the number was

8  at the time.

9    Q.    And did that happen?

10    A.    Nope.

11    Q.    Was 1589 one of the Bettencourt bills?

12    A.    It was.  Show you how much influence I have.

13    Q.    Well, and Senator Bettencourt he had filed

14  some -- so smaller stand alone bills; is that correct?

15    A.    Yes.

16    Q.    Did you ever communicate by text with either

17  legislators or legislative staff?

18    A.    No, I think Briscoe Cain may have texted me

19  once to ask me to stop testifying on all the bills,

20  swear to God.

21                    (Everyone Laughing.)

22    Q.    (BY MS. PERALES:) Did he offer a reason why,

23  or did you understand why he was asking?

24    A.    This meeting is running too long.  The

25  committee hearing is running too long, stop testifying.

1    That was the only one I can recall.

2        Q.    Okay.    You mentioned that you typically

3    didn't submit written testimony when you testified, but

4    did you submit anything in writing to either

5    legislators or legislative staff that showed your

6    thoughts or perspectives on either SB 7, or HB 6 -- and

7    it could be anything, a memo, an email, a mark up of

8    the Bill with your concerns?

9        A.    At that time I'm sure that I don't leave

10   copies of my testimony, but I sometimes give Exhibits.

11   Yes, I did give out Exhibits showing the examples of

12   the dead voters who requested mail ballots, okay, in

13   January, February 2020.   So those were handed out to

14   the committees, that was it.

15       Q.    And then specific to the bills themselves,

16   did you ever give them any writings that gave your

17   thoughts or reactions to what was in the Bill or what

18   wasn't in the Bill or how the Bill was written?

19       A.    Only when -- when asked, I -- I didn't

20   proactively.

21       Q.    Uh-huh.

22       A.    But if they -- when they asked me say, take a

23   look at this, see what are the unintended consequences

24   I replied.

25       Q.    And unintended consequences, when you say

1    that you mean how the Bill language would play out in

2    real life?

3         A.    Yes.

4         Q.    And whether it would accomplish the goals of

5    the Bill?

6         A.    That's correct.

7         Q.    Okay.  And when you would be asked -- and I

8    won't ask you for the specifics of that just yet -- you

9    could have potentially have responded in writing with

10   respect to that?

11        A.    By email, potentially, yes.

12        Q.    Okay.

13        A.    Usually those were either emails or telephone

14   calls.

15        Q.    Do you recall ever advocating for something

16   to be taken out of either SB 7 or HB 6?

17        A.    I think the language defining ballot

18   harvesting as requiring personal contact with the voter

19   qualify as that, but again that was in response to a

20   question from a legislator.

21        Q.    Okay.  Now, as SB 7 and HB 6 are moving

22   through the regular session, what communications are

23   you having with the secretary of state regarding those

24   bills, where Keith Ingram, Christina Adkins, or anybody

25   else in the secretary of state's office?

1    Q.   Okay.   Same question with respect to the
2    attorney general's office, as the HB 6, SB 7 are moving
3    through the regular session were you having any
4    communications with the office of the attorney general
5    related to these bills?
6        A.   No, during that time my communications with
7    the office of attorney general were complaining about
8    lack of action on complaints I had already filed.
9        Q.   Okay.   And then with respect to
10   communications with office of the governor, were you
11   having any with the officer of the governor -- office
12   of the governor on HB 6, SB 7 during the regular
13   session?
14       A.   I cannot remember any communications with the
15   governor's office.
16           MR. TAYLOR:  Nina, at what point --
17   I'm not suggesting right now -- do you want to break
18   for lunch?
19           MS. PERALES:  Whenever the witness --
20   as I mentioned, you're not a hostage here -- whenever
21   the witness feels like he's comfortable and ready to
22   take that break.
23           MR. TAYLOR:  Do you feel like you're
24   making quicker progress than anticipated where it makes
25   sense to just try to get this over with, or is that

1  unrealistic?

2                    MS. PERALES:  So a lot of the rest of

3  this is -- hold on a second, let me just check and see.

4  So I pretty much -- you've sensed I sort of reached the

5  end of my questions with respect to regular session.

6  So this would be a natural stopping point because you

7  know my next set of questions -- not about the

8  pre-pre-session or the regular, but my next set of

9  questions are going to be about the specials and

10 then --

11                   MR. TAYLOR:  You think that would be

12 at least an hour?

13                   MS. PERALES:  Very similar --

14                   MR. TAYLOR:  I'm just trying to figure

15 out if we should break for lunch.

16                   MS. PERALES:  -- yes, I think we

17 should break for lunch, if the witness is, you know --

18                   THE WITNESS:  I never had such power.

19                   THE REPORTER:  Going off the record at

20 12:44 p.m.

21                   (Off the record.)

22                   THE REPORTER:  Going back on the

23 record at 1:42 p.m.

24     Q.   (BY MS. PERALES:)  Okay.  We're back on the

25 record, Mr. Vera, and I'm going to update our

1    conversation to the time period of the first and second

2    special sessions in 2021.  If you recall the 2021

3    regular session ended over the Memorial Day weekend

4    without passage of SB 7, HB 6, and then we had the two

5    special sessions culminating with the legislature's

6    passage of what then came to be known as SB 1.

7              So during the -- now, you had

8    mentioned earlier in your testimony that you did some

9    advocacy during the first special session.  Do you

10   remember at this point, I think bills were introduced,

11   I'm not sure whether we got to the committee hearings

12   during the first special, but can you generally give me

13   a sense of what you were doing during the first special

14   on the election integrity bill?

15       A.   Well, I testified before the state -- Senate

16   State Affairs Committee on a Saturday.  And I testified

17   in the House for Mr. Murrell's Bill that same day and

18   then things kind of ended because everyone had fled to

19   Washington, there was no quorums so they couldn't

20   conduct business.

21       Q.   Okay.  Do you remember at that point what you

22   were focused on in terms of provisions in the Bill, had

23   your focus remained the same as it was before these

24   bills were filed in the regular or had your advocacy

25   expanded to additional portions of the Bill?

1    A.   Nothing changed during the first special

2   session, but while that was going on we were doing our

3   analysis of Harris County's elections again and found

4   once, again, that we had many precincts, many vote

5   centers, where there were many ballots than voters.  So

6   between the first and second special sessions is when I

7   advocated for the addition of two sentences to what was

8   then SB 1 that would require every county to reconcile

9   the number of ballots and number of voters.

10    Q.   Okay.  So in -- I'm going to go over with you

11   again some of the provisions of SB 1 and my question

12   will be, with respect to the time leading up to the

13   legislature's passage of SB 1, whether you did any

14   advocacy on these provisions?

15    A.   Now, we're including the summer of 2021?

16    Q.   Yeah, all the way through.

17    A.   Okay.

18    Q.   From pre-filing all the way through -- well

19   you've told me in pre-filing period what you were

20   focused on?

21    A.   Uh-huh.

22    Q.   But now through you know end of September

23   2021, did you advocate at all with legislatures or

24   any -- any other officials to have registration

25   provisions in SB 1?

Alan Vera - 2/27/2023

107

```
 1      A.   No, I did not.

 2      Q.   Did you advocate to require the secretary of

 3  state to refer information about criminal conduct to

 4  the attorney general?

 5      A.   Did not.

 6      Q.   Did you advocate with respect to sending

 7  lists of voters who were excused from jury duty for

 8  nonresidence to the secretary of state?

 9      A.   Did not.

10      Q.   Did you advocate for -- with any legislators

11  or other officials for polling places to be located

12  only inside the physical building?

13      A.   Did not.

14      Q.   Did you advocate with legislators or other

15  officials about containing the hours of voting so that

16  there wouldn't be voting between 10 p.m. and 6 a.m.

17      A.   Did not.

18      Q.   Did you advocate with legislators or other

19  officials regarding voting machines not allowing

20  straight ticket voting?

21      A.   Did not.

22      Q.   Now, you were advocating on poll watchers?

23      A.   I was.

24      Q.   And so is there a point at which you began to

25  advocate on the specific provisions in SB 1 related to
```

1   poll watchers, such as prohibiting election judges from

2   removing unruly watchers unless the watcher's behavior

3   violates the Penal Code or was personally observed by

4   the election judge?

5        A.   I was not advocating for that.  I will tell

6   you that during that time period I advocated for

7   removing some of the original language of SB 1 which

8   allowed poll watchers to carry cameras and take photos

9   and record inside the polling place.  I was opposed to

10  that.

11       Q.   Okay.  Now, the provisions related to -- okay

12  did you advocate in the legislature with other

13  officials during this time period up to passage of SB 1

14  that it be made a Class A Misdemeanor to refuse to

15  accept a watcher?

16       A.   I did not.

17       Q.   Did you advocate during this time period with

18  either legislators or other officials that SB 1 include

19  language saying that a watcher may not be denied free

20  movement where election activity is occurring --

21  occurring and is entitled to sit or stand near enough

22  to see and hear the conduct of the observed activity?

23       A.   Only in my testimony to the committee.

24       Q.   And with respect to the time period that

25  we've defined leading the passage of SB 1, did you

Alan Vera - 2/27/2023

109

1    advocate with legislators or other officials to make it

2    a Class A Misdemeanor to take any -- for an election

3    official to take any action to obstruct the view of a

4    watcher or distance the watcher from the activity or

5    procedure being observed?

6        A.    Only in my testimony to the committee.

7        Q.    Did you advocate, leading up to the passage

8    of SB 1, on prohibiting mail ballot drop boxes?

9        A.    I did not personally advocate in that.

10       Q.    Okay.  Did you advocate leading up to the

11   passage of SB 1 for language in the Bill that would

12   require voters to put ID numbers on ABBMs or mail

13   ballots as part of the process of verifying voter

14   identity?

15       A.    I did not advocate.

16       Q.    Okay.  Did you advocate leading up to the

17   passage of SB 1 for new information to be gathered from

18   individuals transporting curbside voters?

19       A.    I did not advocate for that provision.

20       Q.    Did you advocate leading up to the passage of

21   SB 1 with legislators or other officials on adding

22   language to assistor oath?

23       A.    I did not.

24       Q.    Did you advocate leading up to the passage of

25   SB 1 with legislators or other officials for

```
1  drive-thru voting.
2        Q.   Okay.   So we've covered these specific
3  provisions, so let me sort of change somewhat to ask
4  you, on what provisions were you communicating with
5  legislatures or legislative staff during the period
6  leading up to the enactment of SB 1?
7        A.   During that period of time I was not doing
8  any individual advocacy with legislators or their
9  staffs accept between the first and special session
10 when I asked Senator Bettencourt's staff to carry those
11 two sentences and put them into SB 1 for me, everything
12 else was in public testimony.
13       Q.   What about answering questions from
14 legislators --
15       A.   Yes.
16       Q.   -- as we had discussed earlier, were you
17 answering questions from legislators during the period
18 of the -- either the regular or the first or the second
19 special session?
20       A.   Yes, I would get questions from legislators
21 asking me to review this document and this language and
22 see if there are any unintended consequences, that's
23 normal.
24       Q.   And then you provide your feedback?
25       A.   Correct.
```

1      Q.   Okay.  And so about how often, how many times

2  per week during the first or second special were you

3  providing that kind of feedback to legislators or

4  staff?

5      A.   Well, during the first special session it was

6  no more than twice a week.  The second special session

7  it was only once a week at max, that anybody asked.

8      Q.   Okay.

9      A.   Things were pretty settled by then.

10      Q.   Okay.  And then with respect to who was

11  asking, can you give me the names of the people who

12  were seeking your input on the Bill language or for the

13  -- you know, for your reaction to this?

14      A.   I would get emails from State Rep Jacey

15  Jetton, State Rep Valoree Swanson, Senator Bettencourt

16  and his staff, and I think 90 percent of the emails I

17  got requesting my point of view were those three people

18  or their staffs.

19      Q.   Did you ever have a request for your feedback

20  from Briscoe Cain or his staff?

21      A.   In the regular session I did get a -- a

22  request from that on HB 6.

23      Q.   Okay.  And with respect to Mike Schofield,

24  did you ever get a request from him for feedback or

25  reaction either him or his staff?

Alan Vera - 2/27/2023

114

```
 1      A.   Did not.

 2      Q.   Okay.  How about Representative Clardy, did

 3 you have any communications with either him or his

 4 staff related to bill language?

 5      A.   No.

 6      Q.   Okay.  Jacey Jetton, would it be fair to say

 7 it was not somebody that you had met with at the early

 8 part of the session?

 9      A.   That's correct.  He's a representative from

10 Fort Bend County, so he would not have attended the

11 Harris County's events where we discussed the election

12 legislation --

13      Q.   I'm sorry, I stepped on your answer.  And so

14 tell me how you begin to start communicating with

15 Representative Jetton about SB 1?

16      A.   Very simple.  I got an email from his staff

17 asking me to comment on these sections of the Bill, and

18 I gave them my comments.

19      Q.   Would it be fair to say that during the time

20 that you were providing your comments on bill language

21 in the regular session, the first and second special

22 session, that what you were being asked to comment on

23 was broader than poll watchers or harvesting?

24      A.   Yes, it would be a correct statement, because

25 the email usually simply asked, please take a look at
```

1   these sections and tell us if there are any unintended

2   consequences from that language.

3        Q.   And then you would provide your concerns or

4   your thoughts about how the Bill language would play

5   out in real life?

6        A.   I would provide my feedback on that --

7   those -- those exact words, the current language might

8   be misinterpreted, misconstrued, or abused for a -- a

9   result I didn't want.

10        Q.   Or also might fail to address a problem that

11   you perceived?

12        A.   Correct, yes.

13        Q.   Okay.   And would it be fair to say then those

14   types of legislator requests covered most provisions in

15   SB 1?

16        A.   I can't answer that because I won't remember.

17   I know that most of the request I get for that feedback

18   specify sections of the language they want me to look

19   at.   I don't know if it covered all -- SB 1 is a pretty

20   long bill.

21        Q.   Maybe I'll -- I'll be slightly more specific,

22   were you asked to respond to language related to poll

23   watchers, for example?

24        A.   Yes.

25        Q.   Okay.   Were you asked to respond to language

1   related to vote harvesting?

2        A.   Yes.

3        Q.   Were you asked to respond to language related

4   to voter assistance?

5        A.   No, I was not.

6        Q.   Okay.  Were you asked to respond to language

7   related to 24 hour voting?

8        A.   No, I was not.

9        Q.   Were you asked to responds to language

10  related to temporary polling places or moveable polling

11  places, given that you had raised some concerns about

12  that in your testimony?

13       A.   I was not because they thought they already

14  had the solution.

15       Q.   Okay.  So they weren't asking for your help

16  on that one?

17       A.   Correct.

18       Q.   Were you asked to provide your thoughts on

19  the Bill language related to voters providing ID

20  numbers on either ABBMs or mail ballots?

21       A.   I was and I was -- my -- I was and I was

22  ignored.

23       Q.   Okay.  Is there anything else that you can

24  think of in your mind that were parts of SB 1 that you

25  were asked to provide your feedback on that I haven't

1   **touched in just the moment or two?**

2       A.   I can't remember, we covered so much.  If I

3   think of it I'll -- I'll mention it, but right now I

4   can't think of thinking else.

5       **Q.   Now with protect to feedback you provided on**

6   **poll watchers, tell me the feedback that you provided**

7   **on poll watchers.**

8                   **MR. WASSDORF:   I'm going to object on**

9   **the grounds of legislative privilege and ask the**

10  **witness not to testify.**

11                  **MS. PERALES:   Okay.**

12      **Q.   (BY MS. PERALES) And Mr. Vera, are you going**

13  **to follow the instruction of Mr. Wassdorf not to**

14  **testify on the feedback that you provided legislators**

15  **related to poll watchers?**

16                  **THE WITNESS:   I am.**

17      **Q.   (BY MS. PERALES:) Okay.   Now what feedback**

18  **did you provide to legislators with respect to vote**

19  **harvesting?**

20                  **MR. WASSDORF:   Same objection.**

21      **Q.   (BY MS. PERALES) Are you going to follow the**

22  **advice of Mr. Wassdorf and decline to testify on the**

23  **feedback that you provided to legislators or staff**

24  **about vote harvesting?**

25      **A.   I am.**

118

1      Q.    Next I'll ask you what feedback you provided

2  to legislators or staff related to the requirement that

3  voters provide an ID number on either their ABBM or

4  their mail ballot?

5                  MR. WASSDORF:   Same objection.

6      Q.    (BY MS. PERALES) Are you going to follow the

7  instruction of Mr. Wassdorf and decline to testify on

8  the feedback you provided to the legislators about the

9  voter ID on mail voting?

10     A.    I am.

11     Q.    (BY MS. PERALES:) Okay.  What feedback did

12  you provide to legislators or staff related to what we

13  call drive-thru voting?

14                  MR. WASSDORF:   Same objection.

15     Q.    (BY MS. PERALES) Are you going to follow the

16  instruction of Mr. Wassdorf and not -- and decline to

17  testify regarding the feedback that you provided

18  legislators about drive-thru voting?

19     A.    I am.

20     Q.    (BY MS. PERALES:) Were you asked to provide

21  feedback on any of the voter registration provisions of

22  SB 1, including for example the requirement that the

23  registrar report an ineligible registrant or voter to

24  law enforcement?

25     A.    I was not.

1    Q.   Were you asked to provide any feedback by

2    legislators on the provisions of SB 1 requiring the

3    secretary of state to refer any information about

4    criminal conduct to the attorney general?

5        A.   I was not.

6        Q.   Were you asked to provide any feedback by

7    legislators about the provision of SB 1 that requires

8    the secretary of state to receive lists of voters

9    excused from jury duty for nonresidence?

10       A.   I was not.

11       Q.   Were you asked to provide any feedback by

12   legislators on the provisions of SB 1 having to do with

13   24 hour voting?

14       A.   I was not.

15       Q.   Were you asked to provide any feedback by

16   legislators or staff on the provision of SB 1 having to

17   do with mail ballot drop boxes?

18       A.   I was not.

19       Q.   Were you asked to provide any feedback by

20   legislators or staff on bill language addressing

21   individuals who bring people to the polls for curbside

22   voting?

23       A.   I was not.

24       Q.   So if we take the time period leading up to

25   passage of SB 1 at the end of the second special, based

1  on all of your experiences in those sessions, what is

2  your understanding of the source of the language in SB

3  1 about voter assistance in the polling place?

4      A.    Yeah, I don't know.  I have no idea where it

5  came from, it was not one of my areas of focus.

6      Q.    Okay.  Same question with respect to the

7  provisions on 24 -- and I'm just going name certain

8  practices that occurred in Harris County.  24 hour

9  voting, mail ballot drop boxes, and drive-thru voting,

10  do you know the source of where those ideas came from

11  in the Bill?

12     A.    No, I don't.

13     Q.    Okay.

14     A.    The language in the Bill on the drive-thru

15  voting, because the language addressed the kind of

16  facility, was almost taken from the Federal Court in

17  downtown Houston.

18     Q.    Okay.

19     A.    There was a -- there was a civil action and a

20  judge -- the Federal Judge ruled that the language in

21  the early voting portions of the code was different

22  from the language in the election day portions of the

23  code, and what I observed is that SB 1 simply took the

24  languages from election day and applied them to early

25  voting.  So I wasn't part of that process, but

Alan Vera - 2/27/2023

121

1   that's -- that's what I observed.

2        Q.   Okay.   Thank you.   Based on your experience

3   through passage of SB 1, do you know where the -- what

4   the source or the idea or the language was related to

5   voters providing an ID number when sending in either an

6   ABBM or a mail ballot?

7        A.   I do not know the source of that language.

8        Q.   Now you had raised a concern yourself that

9   there was essentially non-voters submitting

10  applications for ballot by mail?

11       A.   Uh-huh.

12       Q.   In the names of others?

13       A.   Uh-huh.

14       Q.   Do you have any sense of how the Bill ends up

15  saying somebody who submits an ABBM or mail ballot

16  ought to provide additional information, like an ID

17  number?

18       A.   Senate Bill 1 did not affect those sections

19  of the code that dealt with falsifying or forging ABBMs

20  for people that are unaware that their names are being

21  used.  That was not changed by SB 1.

22       Q.   So do you have any sense of where the new ID

23  requirements came from in -- in terms of who might have

24  proposed it or?

25       A.   I don't know.  I don't know.

1    Q.   Okay.   What is your sense of the source of

2    the language on vote harvesting that's in SB 1?   Based

3    on your knowledge through the passing of SB 1, do you

4    know where that language came from about vote

5    harvesting, which is advocating in person with a voter

6    in the presence of the ballot in favor of a particular

7    candidate or measure?

8    A.   No, I don't know where that came from.

9    Q.   How about that portion of SB 1, do you know

10   for example who suggested or what the source of the

11   provision is that it's a state jail felony when a

12   person compensates or offers to compensate another

13   person to assist voters?

14   A.   I don't know the source of that.

15   Q.   Okay.   Earlier I had asked you about whether

16   you communicated with the secretary of state's office?

17   A.   Uh-huh.

18   Q.   Either Keith Ingram or Christina Adkins

19   during either the first or the special session?

20   A.   Uh-huh.

21   Q.   Although, I'm not sure if I asked about the

22   first or the special session, so let me just ask you.

23   Do you remember communicating with anybody from the

24   secretary states office Keith Ingram, Christina Adkins

25   about SB 1 or related issues during either the first or

1   second special?

2       A.   I clearly remember not communicating with

3   anyone in the SOS office about SB 1 during the regular

4   session or the two special sessions.

5       Q.   Okay.   What about for example your poll

6   watcher trainings, do you recall sharing your poll

7   watcher training PowerPoint with Keith Ingram --

8       A.   Yes, that was different.

9       Q.   -- and/or Christina Adkins?

10      A.   In a -- in a Senate State Affairs Committee

11  hearing they were both present, I was there to testify,

12  and at that point SB 1 was passing, was going to pass,

13  and required a secretary of state to provide poll

14  watcher training as part of new requirements of Senate

15  Bill 1. I said to Keith, by the way I've got a

16  presentation I've been use for years that updates,

17  would you like to see it?   So this was back in you

18  know, 2021, and they said I'd love to see it, so I'll

19  just email it to you.   Christina said, yeah, copy me

20  too.   So I sent them my PowerPoint, the old PowerPoint,

21  pre-SB 1, and sent it by email to both of them.

22      Q.   Okay.   And so would you agree with me that

23  that was related to SB 1 with respect to the provision

24  that would require the secretary state to state to

25  start training poll watchers?

1      A.   I would agree that it's relevant to that, but

2    it was not an advocacy for that.   I wasn't advocating,

3    it was -- it was a done deal, SOS was going to have to

4    train poll watchers and I offered them some -- a head

5    start in the training materials.

6        Q.   Okay.   Were there any other communications

7    that you had with either the secretary of state, the

8    AG, or the governor's office during this period of time

9    that you might not classify as advocacy, but was

10   communication related or touching on SB one's

11   provisions?

12       A.   Let me think.   No, that was long after that

13   I -- I can't remember any.   I cannot remember any other

14   communications.

15       Q.   Okay.   So would it then be fair to say that

16   you sent a copy of your poll worker training

17   PowerPoint?

18       A.   Poll watcher.

19       Q.   I'm sorry, thank you for that.   Your -- let

20   me ask the question again, would it be fair to say that

21   you sent a copy of your poll watcher training

22   PowerPoint to Mr. Ingram and Ms. Adkins of the

23   secretary of state's office in early September, 2021?

24       A.   I think that's probably correct.

25       Q.   Okay.   Would you mark this as the next

125

1   exhibit please?

2                      The court reporter has handed you what

3   has been marked deposition Exhibit No. 3. Do you

4   recognize this as at least partly an email from you on

5   September 2, 2021, to Keith Ingram and Christina Atkins

6   attaching your poll watcher PowerPoint?

7                      (Exhibit No. 3 marked.)

8        A.    Yeah, I specifically attached the 2020 poll

9   watcher version, that's correct.

10       Q.    (BY MS. PERALES:) The court reporter has

11   handed you what has been marked Deposition Exhibit No.

12   4. Can you identify this document?

13                      (Exhibit No. 4 marked.)

14       A.    It appears to be a photocopy of my 2020 poll

15   watcher training class.

16       Q.    (BY MS. PERALES) Is Exhibit No. 4 what would

17   have been the attachment to Exhibit No. 3, the email?

18       A.    That's correct.

19       Q.    How do I know this is your 2020 training,

20   where can I tell on here?

21       A.    I don't know if you can tell from the

22   document or not, hang on.

23                      You can tell because there's nothing

24   in here about having to take the secretary of state's

25   poll watcher training which was changed in 2021, so on

126

1  a slide that says before election day, if you look up

2  I'll show you.  That slide, the new one would say have

3  to take the secretary of state poll watcher training

4  also.

5      Q.   So you recall making that change to your

6  training after SB 1 passed?

7      A.   Yes.

8      Q.   Okay.  Okay.  If Mr. Ingram or Ms. Adkins

9  asked you for your 2022 poll watcher training as follow

10 up, would you send it to them?

11     A.   Not without checking with Charis Eagle.

12     Q.   Did you check with Charis Eagle about 2021 --

13     A.   I let her know that I was sending this, yes.

14     Q.   Okay.

15          MS. PERALES:  So counsel, based on the

16 fact that Mr. Vera shared this document outside the

17 bounds of the Harris County Republican Party, we would

18 respectfully request that counsel produce the 2022 poll

19 worker training prepared by Mr. Vera?

20     A.   Poll watcher.

21          MS. PERALES:  Poll watcher training.

22 Poll watcher training prepared by Mr. Vera.

23          MR. GORE:  Okay.  We have asserted our

24 First Amendment Privilege with respect to that

25 document.  It's contained on the log as well, I

1   separate document and that document remains subject to

2   the First Amendment privilege that has been asserted

3   over that document.

4              MS. PERALES:   Okay.

5        Q.   (BY MS. PERALES) Mr. Vera earlier in your

6   deposition you testified that you weren't sure if your

7   email, Microsoft outlook, kept your emails from more

8   than a year ago?

9        A.   Uh-huh.

10        Q.   And you've testified earlier in the

11   deposition that you did have back and forth exchanges

12   with either legislators or legislative staff by email,

13   in which you were providing feedback on provisions of

14   SB 1; is that right?

15        A.   Yes.

16        Q.   As part of the process of being involved in

17   this case, did you search for those emails in which you

18   were providing feedback to legislators or initiating

19   conversations with them relevant to provisions of SB 1?

20        A.   I did not search for any documents in my own

21   files.

22        Q.   Okay.

23        A.   Are you -- I was given by the attorneys a

24   whole set of documents that were produced, one of which

25   included a feedback to State Rep Jetton's question to

1    me about SB 1 and the language about harvesting.

2        Q.   Okay.  Did you turn over your computer to

3    anybody to have them search your emails as part of your

4    involvement in this case?

5        A.   I did not.

6        Q.   Okay.  If your Microsoft Outlook did in fact

7    save emails that are older than a year old or two years

8    old, would your emails going back and forth with the

9    legislator be there and -- and your providing feedback

10   and having your communications?

11       A.   I don't know, there -- they should be.

12       Q.   Okay.  Mr. Vera, the court reporter has

13   handed you what has been marked Deposition Exhibit No.

14   5.

15            Is this the email that you were

16   referencing a moment ago in which you had an exchange

17   with Representative Jetton regarding in person activity

18   with a voter and vote harvesting?

19            (Exhibit No. 5 marked.)

20       A.   Yes, it does.  This looks like the document

21   that I mentioned in that previous testimony.

22       Q.   (BY MS. PERALES:) And what is the date of

23   your email to Representative Jetton?

24       A.   August 20th, 2021.

25       Q.   So this is some time before the passage of SB

Alan Vera - 2/27/2023

130

1  1?

2      A.   Some time during -- it looks like the second

3  special session.

4      Q.   Okay.  Do you know who Tori McFarland is?

5      A.   I think at that time Tori McFarland was on

6  the staff of Jacey Jetton.

7      Q.   And Coleen, I believe you mentioned earlier

8  in the deposition is your wife?

9      A.   Correct, uh-huh.

10     Q.   Okay.  And so in this -- in this email

11  subpoena is it -- is it fair to say that you're

12  alerting Representative Jetton to something that you've

13  characterized as an unintended consequence in the

14  version of SB 1 that was going to be heard in committee

15  the following day; is that right?

16     A.   Yes, ma'am?

17     Q.   And then Representative Jetton responds

18  "thank you for sharing and good catch, we will work

19  with chairman Murrell on an amendment", closed quote?

20     A.   Uh-huh.

21     Q.   Okay.  Now, I know earlier you had suggested

22  that maybe this exchange was -- as part of

23  representative Jetton asking for your feedback; is that

24  right?

25     A.   Yes.

1    Q.   Okay.  Do you -- where is the email below

2    that, where he asks for your feedback?

3    A.   Well, there's no -- I don't think's an email

4    below that, I think it was a phone call from Ms. Tori

5    asking me -- saying State Rep Jetton would like you to

6    comment on that aspect SB 1.

7    Q.   And the aspect being that vote harvesting was

8    defined as an in person interaction?

9    A.   Yes.

10   Q.   And then you provided your feedback in this

11   email; is that right?

12   A.   That's correct.

13   Q.   And then Representative Jetton responds to

14   you?

15   A.   Uh-huh.

16   Q.   And then, it sort of cut off at the top, but

17   it looks like you may have taken that exchange and then

18   forwarded it to Chair Siegel and some others?

19   A.   It looks like that.

20   Q.   Okay.

21   A.   Just keeping her posted.

22   Q.   Okay.  All right.

23   A.   Yeah, looks like those are all HCRP employees

24   or officers.

25   Q.   I wanted to ask, did anybody besides you with

Alan Vera - 2/27/2023

132

1  **Harris County Republican Party talk to legislators or**

2  **legislative staff about issues or provisions that ended**

3  **up in SB 1?**

4       A.    It's certainly possible.   I don't know -- I

5  can't name people who did nor can I say they didn't.

6  The Ballot Security Committee -- let me back up.

7                      During the Harris County Republican

8  Party Executive Committee Meeting at the beginning of

9  each legislative session, the Executive Committee

10 passes a resolution that gives guidance to Ballot

11 Security Committee on which changes in general to the

12 election code to support and which changes to oppose as

13 we interact with the state legislators.

14                      So we all receive those same marching

15 orders, and so I'm up there a lot, but others can be up

16 there as well as long as they stay in line with the

17 Executive Committee directed at us, we're all right.

18      Q.    Okay.  And do you know if -- so you say --

19 let me ask you this.  Did -- did Chair Siegel have

20 interactions with members of the legislature or staff

21 on some of these issues or provisions that end up in SB

22 1?

23      A.    I am not aware.  I know that Chair Siegel and

24 Senator Bettencourt communicate regularly, okay?  But I

25 cannot tell you whether or not they discussed Senate

133

1    Bill 1.

2                        The court reporter is not catching

3    that.  Ask them to speak louder, and more slowly.

4                        (Discussions in hallway, laughter.)

5        Q.    (BY MS. PERALES:) The court reporter has

6    handed you what has been marked Deposition Exhibit No.

7    6. Do you recognize this as an email from May 19th,

8    2021, from you?

9                        (Exhibit No. 6 marked.)

10       A.    Uh-huh.

11       Q.    (BY MS. PERALES) To --

12       A.    Senate or Bryan Hughes.

13       Q.    Senator Hughes and it looks like some more

14   senators --

15       A.    Don Buckingham, Paul Bettencourt, Louis Culp,

16   these are members of the Senate Committee on State

17   Affairs that hears election bills.

18       Q.    And then you CC some staffers, would that be

19   right, as well as some folks with the Harris County

20   Republican Party?

21       A.    That's correct.

22       Q.    Okay.  And I see Sonya Aston is there?

23       A.    Yes.

24       Q.    And she was staffing with?

25       A.    Senator Bettencourt.

Alan Vera - 2/27/2023

134

1     Q.   And then can you sort of generally help me

2   understand what is it that you are sending to these

3   legislators and staff?

4     A.   On this date, May 19th, we're coming to the

5   end of the regular session Senator Bettencourt's bill,

6   Senate Bill 1589, had passed the Senate earlier, but

7   had not been heard in the Committee in the House at

8   all, so this note asked him to consider adding that

9   portion of SB 1589 to the Article 4 Provision of Senate

10   Bill 7, which was still in process.

11     Q.   Okay.   And were these Election Marshals under

12   the Bill themselves law enforcement officers?

13     A.   Yes.

14     Q.   And did 1589 position them inside the polling

15   place?

16     A.   No.

17     Q.   And where would it have positioned them?

18     A.   It simply made them available to be called,

19   to respond to reports of criminal election activity.

20     Q.   How would that be different than just calling

21   the regular police?

22     A.   These people will actually respond.

23     Q.   That's what happens when you ask an open

24   ended question in a deposition.

25     A.   Uh-huh.

```
1        Q.    Okay.   Thank you one more question about
2   Exhibit No. 6, sorry?
3                    (Exhibit No. 6 marked.)
4        A.    Uh-huh.
5        Q.    (BY MS. PERALES) You say here, quote, "please
6   see the attached record of our invited testimony to the
7   senate committee on state affairs" closed quote, do you
8   see that line there?
9        A.    Yes.
10       Q.    And would that be an example of a time when
11  you did provide something in writing to the Senate?
12       A.    No, I was just attaching my notes.  The notes
13  I spoke from when I testified in support of SB 1, 1589.
14       Q.    Do you remember if those note are typed or
15  handwritten?
16       A.    They're typed, I can't read my handwritten
17  notes.
18                    (Laughter.)
19       Q.    (BY MS. PERALES) I have three emails and I'm
20  going to mark each of them.  Okay.  Can you identify I
21  believe it's No. 7 for me?
22                    (Exhibit No. 7 marked.)
23       A.    Exhibit No. 7 looks like an automated reply
24  from the office of Senator Bob Hall to the Chair of
25  Harris County Republican Party.
```

1        Q.    (BY MS. PERALES) Okay.   Identify No. 8 for

2    me.

3                    (Exhibit No. 8 marked.)

4        A.    Exhibit No. 8 appears to be automated reply

5    From office of Senator Donna Campbell to the Chair of

6    the Harris County Republican Party.

7        Q.    And can you identify 9 for me?

8                    (Exhibit No. 9 marked.)

9        A.    Exhibit No. 9 appears to be automated reply

10   office of Senator Bettencourt to the Chair of the

11   Harris County Republican Party.

12       Q.    (BY MS. PERALES) And is the date on all three

13   exhibits August 10th of 2021?

14       A.    It is.

15       Q.    And they're all at about 4:30 in the morning,

16   yes?

17       A.    Yeah, between 4:30 and 4:45, yup.

18       Q.    Okay.   Do you know what email these exhibits

19   were responding to?

20       A.    I have no idea.

21       Q.    Okay.   Does the date August 10th, 2021 in

22   anyway refresh your recollection about whether this

23   might have been related to communications on SB 1?

24       A.    It does not.   I -- that was in the end of

25   second special session, but no, I can't tell.

```
 1        Q.    Okay.   Thank you.   Did you have any
 2  communications with Senator Hall that related in any
 3  way to SB 1?
 4        A.    Oh, goodness.   I don't remember.
 5        Q.    Okay.   Same question with Senator Donna
 6  Campbell, did you have any communications with Donna
 7  Campbell about SB 1?
 8        A.    I don't remember.   The only reason I -- I
 9  hedged on Senator Hall he was very good when I did
10  public testimony before the senate committee on state
11  affairs of have asking me many follow up questions.   So
12  I don't know if I may have sent him an email or not.
13        Q.    SB 1 was heard in Senate State Affairs on
14  August 9th, 2021?
15        A.    Okay.
16        Q.    And since these auto replies are coming from
17  the wee hours of August 10th?
18        A.    Uh-huh.
19        Q.    Is -- is it possible that you remember
20  sending some kind of follow up communication to various
21  senators following your testimony?
22        A.    I don't remember doing that.   And if I'd had
23  it would have come from my email address, not the party
24  chairs.
25        Q.    Okay.   Okay.   Is there any part of SB 1 as it
```

1   was passed by the legislature that you believe

2   responded to your concern about the vote harvesting

3   being defined as an in person interaction?

4       A.   I don't remember for certain because it's a

5   long bill, but I do know that they did not affect the

6   sections of the code already established for dealing

7   with the concerns I had of people stealing others

8   identities to vote by mail, they did -- they left that

9   alone.

10      Q.   Is there any part of SB 1 as it was passed

11  that you think tracks very closely with communications

12  that you made with legislators?

13      A.   Oh, goodness --

14      Q.   Either something that you initiated or

15  something that was the product of the back and forth

16  where you're providing feedback?

17      A.   Well, I've already told you that I was --

18  after the previous election I was very concerned about

19  the way poll watchers were obstructed.  So some of the

20  poll watcher improvements certainly tracked with my

21  concerns, okay?  I told you that I had -- I had after

22  the 2020 November election, I had gone public with many

23  serious concerns about drive-thru voting and so that

24  was reflected.  So I think, you know, at least poll

25  watcher -- poll watchers were better protected, the

issue of voting as it was with the aberration in

drive-thru was addressed.   And they did not mess with

the clear language of mail ballot harvesting that was

not involving personal interaction.   So those three

things for sure.

Q.   Do you recall having conversations with

legislators around making it a -- an offense to have a

paid person assist a voter in voting by mail?

A.   I didn't have any such discussion with

legislators.

Q.   Do you have an understanding of what need was

meant to be addressed by that?

A.   I have an understanding from what I've been

told, having -- sitting around the committee hearing

rooms talking to others, but I did not initiate that.

Q.   Okay.   And you don't have a first hand

acknowledgment of the reasons for that?

A.   I do not, nope.

Q.   Do you have any first hand knowledge about

the reasons for prohibiting in person interaction with

a voter in the presence of the mail ballot with --

while advocating for a particular candidate or outcome?

A.   No, I was not, I was not privy to those

discussions or this original complaints.

Q.   And -- and no staff or legislator said, oh

```
 1  that's there because so and so really felt?
 2      A.   No, no.
 3      Q.   Okay.  Okay.  With respect to any or the
 4  other provisions of SB 1, do you have any knowledge
 5  about what the source or the origin was, whether it was
 6  a particular colleague in the Republican Party maybe
 7  from another County or a particular legislator who was
 8  the reason that that provision is there in the Bill?
 9      A.   No, I don't.  Not directly, I -- I do know
10  that -- I'm sorry, I don't know, I understand that
11  prior to that session beginning there were a number of
12  election attorneys that were writing legislative
13  language and submitting it.
14      Q.   Uh-huh.
15      A.   But I can't track any one item to any one
16  attorney.
17      Q.   Can you tell me the names of those attorneys?
18      A.   I can't tell you the names of all -- I know
19  Eric Opiela was one of them, and he's the only one I
20  can remember.
21      Q.   Okay.
22      A.   Because he's kind of up front about it.
23              (Laughter).
24      Q.   (BY MS. PERALES) Did you have -- you know, we
25  talked about Senator Bettencourt, he's your local
```

1   senator.  We haven't talked that much about Brian

2   Hughes who was this author/main sponsor.

3                Did you ever have any exchange of

4   communication with either Brian Hughes or his staff

5   from let's say the beginning of the regular session

6   through the end of the second special?

7        A.   No, I did not.  But let me just double check.

8   No, the only communication was in committee with --

9   either it was with the Senator or his staff.

10       Q.   Do you have any interaction with republican

11   candidates running for office and advising them about

12   what's in SB 1?

13       A.   No, I don't get involved with candidates much

14   at all.  I answer questions, but I don't interact with

15   them, I don't take part in their campaigns.

16       Q.   And do you recall, for example in 2022, since

17   SB 1 is a fairly new piece of legislation, do you

18   recall answering any questioning of any candidate or

19   their campaign staffers about the meaning of SB 1?

20       A.   The only questions I remember answering from

21   candidates at that time was about whether the candidate

22   could still appoint a poll watcher, and secondly are

23   there any new requirements of poll watchers in which I

24   have to -- had to reply about the SOS training now

25   being mandatory.  Because of course the candidate can

1    appoint poll watchers, but Harris County -- our Party

2    would only appoint poll watchers that I trained, so.

3        Q.   So aside from poll watchers can you think of

4    any other --

5        A.   I can't think of anything else, hang on.  No.

6              However, because of SB 1 I was asked

7    to take a look at the mail ballot application mailers

8    that Harris County Republican Party was going to send

9    out to the republicans over 65 and I had to completely

10   rewrite them.

11       Q.   I was just going to ask about outreach by the

12   Party to potential mail voters?

13       A.   Uh-huh.

14       Q.   So did you work on revising the outreach

15   materials for the Harris County Republican Party --

16       A.   I did.

17       Q.   To the voters over 65?

18       A.   Correct.  I had to redo it completely.

19       Q.   All right.  And so you made those changes to

20   the, what are they like, mailers?

21       A.   Yes, they were -- they were mailers into the

22   layout stage, not quite what was called the mechanical

23   stage, but I had to change those.

24       Q.   Okay.  Around the time of the 2022 primary

25   election?

Alan Vera - 2/27/2023

143

1      A.    Uh-huh.

2      Q.    Were you offering any guidance or advice to

3  deal with any requests from voters coming in about how

4  to apply for their mail ballots?

5      A.    I was giving -- I was the Party staff, the --

6  the paid staff advice on how to answer questions about

7  the new mail ballot requirements.

8      Q.    Do you recall the nature of the questions

9  that you were getting in the 2022 primary period from

10  voters about either applying for ballot by mail or

11  returning that mail ballot related to SB 1 --

12      A.    The questions weren't coming to me, they were

13  coming to staff, but they were calling me to get the

14  information; but it was just the general stuff, now

15  which number do I have to put?   Can I just put my whole

16  driver's license number, et cetera?   Basic fundamental

17  questions.

18      Q.    What would your advice -- what was your

19  advice during the primary period about which number the

20  voters should put?

21      A.    Well, I had the staff tell the voters, put

22  both numbers, okay?   Because the issue was the number

23  the voter put on the ABBM or the carrier envelope had

24  to match a number in the voters registration record.

25  And many of these -- the voters were not old enough to

1  vote by mail, they don't remember which -- which number

2  they used when they first registered, put them both.

3      Q.   Were there also voters who hadn't put a

4  number when they registered?

5      A.   It's possible.  I -- I don't know that -- I

6  don't know that, it could be possible.  I don't know

7  that.

8      Q.   If a voter had lived at the same address for

9  example since pre-HAVA, Help America Vote Act?

10     A.   Uh-huh.

11     Q.   It's possible that their registration, which

12  would have occurred pre-200 wasn't accompanied by an ID

13  number at all; isn't that right?

14     A.   It's possible.

15     Q.   And they would be over 65, and just have

16  stayed put the whole time?

17     A.   Uh-huh.

18     Q.   Do you recall hearing from paid staff of the

19  Party that there were voters in that situation that

20  they hadn't provide any number -- had not provided any

21  number at all with their original registration because

22  it had been a long time ago?

23     A.   I had not heard that specifically.

24     Q.   Okay.  But you did hear about voters putting

25  one number and Harris County having a different number,

1  and so the -- the Harris County couldn't match it?

2      A.   I heard that from the people on our signature

3  verification committee.

4      Q.   Did you hear that from any of the Party staff

5  that were getting questions from voters?

6      A.   Yes, yes.

7               MS. PERALES:  Can we have a five

8  minute break?

9               THE REPORTER:  Okay.  Going off the

10  record at 2:49 p.m.

11               (Off the record.)

12               THE REPORTER:  Back on the record at

13  3:01 p.m.

14      Q.   (BY MS. PERALES:) Mr. Vera, are there any

15  topics or is there any information that you know about

16  relevant to SB 1 that you discussed with Mr. Gore that

17  you haven't talked about today in the deposition,

18  either because I didn't ask you or for any other

19  reason?

20      A.   I can't think of anything, give me a second.

21  Nope, nope.

22      Q.   Okay.

23               MS. PERALES:  So I'm going to pass the

24  witness, but I'm not going to conclude the deposition

25  or conclude my questioning of the witness.  We're going

1  to leave the deposition open at the end in order to

2  allow for us to be able to resolve some of the issues

3  that have come up with respect to invocation of either

4  First Amendment Privilege or Legislative Privilege that

5  are not resolved, so with that caveat I'm going to pass

6  the witness.

7              MR. GORE:  If I can just say on the

8  record, we appreciate where you're coming from.  We

9  obviously object to holding the deposition open.  We

10 think all the privilege assertions have been

11 appropriate.  We understand that you are reserving the

12 right to keep the deposition only -- open only with

13 respect to those privilege issues, is that -- is that

14 correct?

15             MS. PERALES:  Yes.  That's right, and

16 when you say those privilege issues then we can go back

17 and forth all day.  When you say those privilege issues

18 it's specifically the -- the places today where the

19 witness has declined to testify because of either

20 Legislative Privilege or because of First Amendment

21 Privilege.

22             MR. GORE:  Thank you for

23 clarification.  We stand on our objection, but we

24 appreciate the clarification.

25             MS. PERALES:  Okay.  Would you like to

Alan Vera - 2/27/2023

169

```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
2                    SAN ANTONIO DIVISION

3  LA UNION DEL PUEBLO ENTERO,    )
   et al.,                        )
4                                 )
        Plaintiffs,               )   Civil Action
5                                 )   No. SA-21-CV-00844-XR
   vs.                            )
6                                 )
   GREGORY W. ABBOTT, et al.,     )
7                                 )
        Defendants.               )
8                                 )
```

9                    REPORTER'S CERTIFICATE
                   DEPOSITION OF ALAN VERA
10                    FEBRUARY 27, 2023

11          I, Nilda Codina, Notary in and for the State

12  of Texas, hereby certify to the following:

13          That the witness, ALAN VERA, was duly sworn

14  by the officer and that the transcript of the oral

15  deposition is a true record of the testimony given by

16  the witness;

17          I further certify that pursuant to FRCP Rule

18  30(f)(1) that the signature of the deponent:

19          _____ was requested by the deponent or a

20  party before the completion of the deposition and

21  returned within 30 days from date of receipt of the

22  transcript.  If returned, the attached Changes and

23  Signature Page contains any changes and the reasons

24  therefor;

25          __X___ was not requested by the deponent or a

1  party before the completion of the deposition.

2          I further certify that I am neither attorney

3  nor counsel for, related to, nor employed by any of the

4  parties to the action in which this testimony was

5  taken.

6          Further, I am not a relative or employee of

7  any attorney of record in this cause, nor do I have a

8  financial interest in the action.

9          Subscribed and sworn to on this the 8th day

10  of March, 2023.

11  _____

NILDA CODINA
12  Notary Public in and
    For the State of Texas
13  My Commission No. 12878135-3
    Expires:  10/24/2023

14
    INTEGRITY LEGAL SUPPORT
15  Firm Registration No. 528
    9901 Brodie Lane
16  Suite 160-400
    Austin, TX 78748
17  Phone:(512)320-8690

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, *et al.,* | § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Civil Action No. SA-21-CV-00844-XR |
| GREGORY W. ABBOTT, *et al.,* | § § | |
| *Defendants.* | § § | |

**NOTICE OF DEPOSITION OF ALAN VERA**

**TO:**   **Alan Vera,** by and through John M. Gore, Jones Day, 51 Louisiana Avenue, N.W., Washington, D.C. 20001 and to All Counsel of Record.

**PLEASE TAKE NOTICE** that pursuant to Rule 30 of the Federal Rules of Civil Procedure, counsel for the LUPE, *et al.* Plaintiffs will take the oral deposition of Alan Vera on February 27, 2023, at 8:30 a.m. (CST) at the offices of Javier N. Maldonado & Associates, P.C., 1415 North Loop W., Suite 600, Houston, TX 77008 (Andromeda Conference Room on the Mezzanine Level).   The deposition shall be recorded by stenographic means and may also be recorded by additional audiovisual means, and shall take place before a notary public or other person authorized by law to administer oaths.   Plaintiffs reserve the right to utilize any videotaped deposition at trial in lieu of live testimony, or in addition to live testimony, and/or for any purpose permitted under the Federal Rules of Civil Procedure and Federal Rules of Evidence.

The LUPE Plaintiffs further request that Mr. Vera produce, at least two days in advance of the deposition, all documents, if any, that the he reviewed in preparation for the deposition.

Dated:  February 22, 2023

Respectfully submitted,

*/s/ Nina Perales*

1



EXHIBIT

PENGAD 800-631-6989

Nina Perales
Julia R. Longoria
Fátima L. Menéndez
MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, TX 78205
Telephone: (210) 224-5476
Facsimile: (210 224-5382
nperales@maldef.org
jlongoria@maldef.org
fmenendez@maldef.org

Michael C. Keats*
Rebecca L. Martin*
Jason S. Kanterman*
Kevin Zhen*
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, New York 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000
michael.keats@friedfrank.com
rebecca.martin@friedfrank.com
jason.kanterman@friedfrank.com
kevin.zhen@friedfrank.com

*Counsel for Plaintiffs La Unión del Pueblo Entero,
Southwest Voter Registration Education Project,
Mexican American Bar Association of Texas, Texas
Hispanics Organized for Political Education, Jolt
Action, William C. Velasquez Institute, Fiel
Houston, Inc.*

Sean Morales-Doyle Eliza
Sweren-Becker*
 Patrick A. Berry*
Andrew B. Garber*
Jasleen K. Singh*
BRENNAN CENTER FOR JUSTICE AT NYU
SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
Telephone: (646) 292-8310

2

Facsimile: (212) 463-7308
sean.morales-doyle@nyu.edu
eliza.sweren-becker@nyu.edu
patrick.berry@nyu.edu
andrew.garber@nyu.edu

Paul R. Genender
Texas State Bar No. 00790758
Elizabeth Y. Ryan
Texas State Bar No. 24067758
Matthew Berde*
Texas State Bar No. 24094379
Megan Cloud
Texas State Bar No. 24116207
WEIL, GOTSHAL & MANGES LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Telephone: (214) 746-8158
Facsimile: (214)746-7777
Liz.Ryan@weil.com
Paul.Genender@weil.com
Matt.Berde@weil.com
Megan.Cloud@weil.com

Alexander P. Cohen*
Texas State Bar No. 24109739
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153

*Counsel for Plaintiffs Friendship-West Baptist Church, Anti-Defamation League Austin, Southwest, and Texoma Regions, Texas Impact, and James Lewin*

# POLL WATCHER'S GUIDE



*Issued by the*

# SECRETARY OF STATE
# ELECTIONS DIVISION

**P.O. Box 12060**
**Austin, Texas 78711-2060**
**www.sos.texas.gov**
**(512) 463-5650**
**1-800-252-VOTE (8683)**
**Dial 7-1-1 for Relay Services**

Updated: January 2022



## INTRODUCTION

This "Poll Watcher's Guide" has been designed to familiarize poll watchers with their basic rights and responsibilities. The integrity of elections is a concern of all citizens, and although poll watchers may represent particular candidates, political parties, or specific-purpose political action committees, their main interest is in the conduct of a fair and honest election.

A poll watcher's role in an election is established by Chapter 33 of the Texas Election Code and is defined as follows:

> **Poll Watcher** – a person appointed to observe the conduct of an election on behalf of:
> - a candidate,
> - a political party, or
> - the proponents or opponents of a measure (specific-purpose political action committees).

**NEW LAW**: SB 1 (2021, 2nd C.S.): Provides that it is the intent of the legislature that watchers duly accepted for service under Chapter 33 be allowed to observe and report on irregularities in the conduct of any election, but may not interfere in the orderly conduct of an election. A watcher appointed under Chapter 33 shall observe without obstructing the conduct of an election and call to the attention of an election officer any observed or suspected irregularity or violation of law in the conduct of the election. [Sec. 33.0015].

Throughout this guide, all references are made to appropriate sections in the Texas Election Code, unless otherwise noted.

## QUICK POINTS TO REMEMBER

- In order to serve as a poll watcher, you must show up with a certificate of appointment that includes:
  - Name, residence address, and voter registration number of the poll watcher;
  - The signature of the person(s) making the appointment;
  - The election and the number of the precinct where the poll watcher is to serve;
  - An indication of the capacity in which the appointing authority is acting;
  - In an election on a measure, an identification of the measure (if more than one is to be voted on) and a statement of which side the appointee represents;
  - An affidavit to be executed by the poll watcher stating that the poll watcher will not have possession of any mechanical or electronic means of recording images or sound while serving as a watcher unless the poll watcher disables or deactivates the device; and
  - The signature of the poll watcher.
- You must complete the poll watcher training administered by the SOS and present the certificate of completion to the presiding judge. (**NEW LAW**: SB 1 (2021, 2nd C.S.)).
- Be ready to counter-sign the certificate of appointment in front of the election judge. This serves not only to certify that the person presenting themselves as a poll watcher is

**Q. Can a watcher work for, or be related to, any of the election officials?**

A. No. The watcher cannot be an employer or employee of, or related within the second degree by consanguinity or affinity to, an election judge, election clerk, early voting clerk, or deputy clerk serving at the same location. [Sec. 33.033].

**Q. Can a candidate's spouse or child serve as a watcher?**

A. Yes.

## APPOINTMENT OF WATCHER

### APPOINTMENT OF WATCHER BY POLITICAL PARTIES:

**Q. Who appoints a watcher on behalf of political parties?**

A. 1. The county chair of each political party that has a nominee(s) on the official ballot may appoint watchers. [Sec. 33.003(a)].

2. Any three members of the county executive committee may appoint watchers, if the county chair fails to act. [Sec. 33.003(b)].

### APPOINTMENT OF WATCHER BY A CANDIDATE:

**Q. Who appoints a watcher on behalf of candidates?**

A. 1. A candidate whose name appears on the official ballot <u>or on the list of declared write-in candidates</u> in an election for any office (other than the office of Vice President of the United States) may appoint a watcher. In other words, watchers may be appointed by any candidate whose name appears on the ballot other than the candidate for Vice President. For a state office that is filled by voters of more than one county, the candidate's campaign treasurer also may appoint a watcher. [Sec. 33.002(a) & (b)].

2. For a federal office that is filled by voters of more than one county, the chair or treasurer of the candidate's principal campaign committee or a designated agent of the campaign chair or treasurer may appoint a watcher. [Sec. 33.002(c)].

3. A group of registered voters may appoint watchers on behalf of a write-in candidate in an election in which declarations of write-in candidacy are not required to be filed. The minimum number of voters required to make an appointment under this section is the lesser of 15 or five percent of the registered voters of the appropriate territory as determined from the list of registered voters to be used for the election. [Sec. 33.004].

- To be eligible to sign an appointment of a watcher to a precinct polling place, a person must be a registered voter of the precinct.

  NOTE: To be eligible to sign an appointment of a watcher to a countywide polling place, a person must be a registered voter of the entity ordering the election.

- To be eligible to appoint a watcher to an early voting polling place, early ballot board meeting, or a central counting station, a person must be a registered voter of the county, city, school district, or other political subdivision conducting the election. [Sec. 33.004].

10. Delivery of election results from polling place. [Sec. 33.060].

11. All election activities relating to closing the polling place, including the sealing and transfer of a memory card, flash drive, hard drive, data storage device, or other medium now existing or later developed for use with voting system equipment. (**NEW LAW**: SB 1 (2021, 2nd C.S.)). [Sec. 33.0605(a)].

12. Follow the transfer of election materials from the polling place to the regional tabulating center, central counting station, or other location designated to process election materials. (**NEW LAW**: SB 1 (2021, 2nd C.S.)). [Sec. 33.0605(b)].

## TRAINING PROGRAM

**NEW LAW**: SB 1 (2021, 2nd C.S.): To be eligible to serve as a watcher, a person must complete the training program developed by the Secretary of State's office. [Secs. 33.008, 33.031(b)]. The training program can be found on VoteTexas.Gov

## CERTIFICATE OF COMPLETION

**NEW LAW**: SB 1 (2021, 2nd C.S.): The watcher <u>must</u> deliver a certificate of completion from training to the presiding judge at the time the watcher reports for service. [Sec. 33.051].

A person appointed to serve as a watcher must complete watcher training prior to every election for which the person is appointed to serve as a watcher. A person is not required to complete training for a resulting runoff election, or a second election to resolve a tie, if the watcher completed training for the initial election.

A separate certificate of completion must be delivered at each place the watcher is appointed to serve. The certificate of completion and the certificate of appointment must be delivered to the presiding judge at the time the watcher presents to serve. The presiding judge shall retain the certificate of completion and certificate of appointment with the election records. If a watcher intends to serve at multiple locations, the watcher should make multiple copies of their certificate of completion to present at each location the watcher is appointed to serve. [Sec. 33.051].

> **NOTE**: A watcher **may** complete additional training; however, a watcher **must** complete the prescribed SOS training and present the certificate of completion to the presiding judge at the time the watcher reports for service.

## ACCEPTANCE OF WATCHER

**NEW LAW**: SB 1 (2021, 2nd C.S.): A watcher appointed to serve at a polling place, meeting of the early voting ballot board, or central counting station must deliver 1) their certificate of appointment; and 2) their certificate of completion from SOS training to the presiding judge at the time the watcher reports for service. Before being accepted for service, a watcher must take an oath administered by the election officer. [Sec. 33.051(a), (h)].

It is a Class A misdemeanor for an election officer to intentionally or knowingly refuse to accept a watcher for service when acceptance of the watcher is required. [Sec. 33.051(g)].

### TIME FOR <u>REPORTING</u> TO THE POLLING PLACE:

**Q. At what time do watchers need to report to the polling place, and how long do they need to stay at that polling place?**

A. 1. At the polling place on **Election Day**, a poll watcher:

- may begin service at any time after the presiding judge arrives and may stay at the polling place <u>until</u> election officials complete their duties; and

## CERTIFICATE OF APPOINTMENT

### ISSUANCE OF CERTIFICATE:

The appointing authority <u>must</u> issue a certificate of appointment to the watcher. [Sec. 33.006(a)].

**Q. What information needs to be on the certificate?**

A. The certificate of appointment must be in writing and must include the following:

1. Name, residence address, voter registration number, and signature of the watcher;

2. The election and the number of the precinct (or other location, for example, early voting ballot board meeting) at which the watcher is appointed to serve;

3. The signature of the person(s) making the appointment;

4. An indication of the capacity in which the appointing authority is acting (example: as a candidate, a campaign treasurer or assistant campaign treasurer of a specific-purpose political action committee);

5. In an election on a measure, an identification of the measure (if more than one is to be voted on) and a statement identifying which side the appointee represents; and

6. An affidavit executed by the poll watcher stating that the poll watcher will not have possession of any mechanical or electronic means of recording images or sound while serving as a watcher unless the poll watcher disables or deactivates the device. (This affidavit is signed in the presence of the presiding judge; that signature also serves as the countersignature, which is discussed below.) [Sec. 33.006(b)].

> **NOTE:**     Officially-prescribed poll watcher appointment forms may be found on our website at https://www.sos.texas.gov/elections/forms/pol-sub/index.shtml.

**Q. What are the requirements for a certificate of a watcher appointed on behalf of a non-declared write-in candidate?**

A. Additional requirements necessary for a certificate of appointment of a watcher for a <u>non-declared write-in</u> candidate include:

1. the residence address and voter registration number of the lesser of 15 voters or 5 percent of the registered voters in the precinct or political subdivision, as applicable;

2. the signed statement of the candidate, or a person who would be authorized to make appointments on the candidate's behalf if the candidate's name appeared on the ballot, that the appointment is made with the signer's consent; and

3. the residence or office address of the <u>write-in</u> candidate or the person who would be authorized to make appointments on the candidate's behalf if the candidate's name appeared on the ballot. If the candidate does not sign, the signer must indicate his or her relationship to the candidate. [Sec. 33.006(c)].

**Q. How does one deliver a certificate of appointment?**

A. 1. A watcher must deliver a certificate of appointment and certificate of completion to the presiding judge at the time the watcher reports for service. [Sec. 33.051(a)].

2. The officer presented with a watcher's certificates must require the watcher to countersign the certificate of appointment in the officer's presence to verify that the watcher is the same person who originally signed the certificate. The watcher's signature is in the portion of the

to the judge, the watcher may not discuss the matter further with the clerk unless the presiding judge invites the discussion. [Sec. 33.058(b)].

**Q: May watchers wear name tags?**

A: In fact, they must. A poll watcher **MUST** wear a form of identification prescribed by the Secretary of State and provided by the presiding judge or other election officer (such as the deputy early voting clerk). [Sec. 33.051(f)].

**Q. What are watchers <u>NOT</u> allowed to do while on duty?**

A. 1. Talk with an election worker regarding the election except to call attention to an irregularity or violation of law. [Sec. 33.058(a)(1)].

2. Converse with a voter. [Sec. 33.058(a)(2)].

3. Communicate in any manner with a voter regarding the election. [Sec. 33.058(a)(3)].

4. Use certain devices in the polling place. A watcher may not have possession of a device capable of recording images or sound. If the watcher does have such a device, the watcher must disable or deactivate the device while serving as a watcher. [Sec. 33.006(b)(6)].

5. Leave during voting hours **on election day** without the presiding judge's permission unless the watcher has completed 5 consecutive hours of service at the polling place. If the watcher leaves without permission prior to completing the 5 hours of service, the presiding judge may refuse to readmit the watcher. [Sec. 33.052].

   NOTE:   The watcher must be allowed to leave to use a wireless communication device and be readmitted to the polling place, if the watcher returns promptly. This does not constitute an interruption in the watcher's 5 hours of consecutive service. [Sec. 33.052(b)].

6. Observe a voter voting independently or a voter being assisted by a person of the voter's choice. A watcher may not be present at the voting station when a voter is preparing the voter's ballot or being assisted by a person of his choice. [Sec. 33.057(b)].

7. **Cause a disruption or breach of the peace or harass voters**. A watcher **may not violate** the Election Code either in the polling area or within 100 feet of the entrance to the building where the polling place is located; otherwise, the watcher may be subject to removal. [Sec. 32.075].

8. Reveal the following information before the polls close:
   • How a voter has voted; this offense is a third-degree felony. [Sec. 61.006(b)].
   • The number of votes that have been received for a candidate or for or against a measure; this offense is a Class A misdemeanor. [Sec. 61.007(a)(1)].
   • A candidate's position relative to other candidates in the tabulation of the votes; this offense is a Class A misdemeanor. [Sec. 61.007(a)(2)].
   • Whether a measure is passing or failing; this offense is a Class A misdemeanor. [Sec. 61.007(a)(3)].
   • The names of persons who have or have not voted in the election; this offense is a Class A misdemeanor. [Sec. 61.007(a)(4)].

**Q. What is a watcher permitted to do while on duty?**

A. A watcher must be permitted, but is not required, to:

A.  Yes. Once a watcher has served more than 5 continuous hours at the polling place, the watcher gains the privilege to leave the polling place and return at the hours he or she chooses, except that if the watcher is present when ballots are being counted, the watcher may not leave until the counting is complete. Additionally, the watcher may briefly leave the polling place to use his or her cell phone or other wireless device, and this does not interrupt the watcher's 5 hours of continuous service, if the watcher returns promptly.  [Sec. 33.052].

**Q. Can a watcher leave in order to vote at another polling place?**

A.  The watcher may leave to vote and return if the watcher has served more than 5 continuous hours at the polling place. If the watcher has not yet served 5 continuous hours, whether he or she will be allowed back into the polling place is at the judge's discretion.  [Sec. 33.052(a)]. We recommend voting during the early voting period, before your service as a poll watcher.

**Q. Can a watcher leave the polling place <u>after</u> the time for closing the polls without obtaining permission from the presiding judge?**

A.  The watcher may leave without permission from the judge; however, if the watcher wishes to return to the polling place, the watcher must have served at least 5 continuous hours at the polling place. If not, once the watcher leaves, he or she may return only at the discretion of the judge.  Additionally, if the watcher is present at the polling place when ballots are being counted, the watcher may not leave until the counting is complete.  [Sec. 33.052(a)].

## MISCELLANEOUS

### REMOVAL OF A POLL WATCHER

**NEW LAW**: SB 1 (2021, 2nd C.S.) amended Section 32.075 to provide that a presiding judge may not have a watcher removed from the polling place for violating a provision of the Election Code or any other provision of law relating to the conduct of elections unless the violation was observed by an election judge or clerk. However, a presiding judge may remove a poll watcher for a violation of the Penal Code, regardless of whether the election judge or clerk observed the violation. Additionally, a presiding judge may call a law enforcement officer to request a poll watcher be removed if the poll watcher commits a breach of the peace or a violation of law.

### POSSIBLE ILLEGAL ACTIVITIES:

**Q. What illegal activities should a watcher look for?**

A.  The election judge may be notified of any activity that appears to be prohibited by law.

   If any of the following activities occur, bring it to the election judge's attention and note the individual(s) involved, including time and place of occurrence:

1.  Election workers allowing voters to vote a regular ballot who do not (1) present an acceptable form of photo identification; (2) present a supporting form of ID and execute a Reasonable Impediment Declaration, if a voter does not possess and cannot reasonably obtain an acceptable form of photo identification; or (3) present a Voter Registration Certificate with an "E" notation on it. [Sec. 63.001].

   Please see Page 15 for a list of acceptable forms of photo ID and a list of supporting forms of ID.

19. Violating any other Texas election laws.

### PERSONS ALLOWED IN LOCATIONS RELATED TO ELECTIONS:

**Q. Who is allowed inside certain locations related to elections?**

**A. NEW LAW**: HB 1128 (2021, R.S.) provides a list of individuals who are permitted to be lawfully present in certain locations related to elections. [Secs. 61.001, 87.026, 127.008].

- **Polling Place/Early Voting Locations:** The following individuals may be lawfully present in a polling place from the time the presiding judge arrives until the precinct returns have been certified and the election records have been assembled for distribution following the election:
    - an election judge or clerk;
    - a watcher;
    - the Secretary of State;
    - a staff member of the Elections Division of the Office of the Secretary of State performing an official duty in accordance with the Election Code;
    - an election official, a sheriff, or a staff member of an election official or sheriff delivering election supplies;
    - a state inspector;
    - a person admitted to vote;
    - a child under 18 years of age who is accompanying a parent who has been admitted to vote;
    - a person providing assistance to a voter under Section 61.032 or 64.032;
    - a person accompanying a voter who has a disability;
    - a special peace officer appointed by the presiding judge under Section 32.075;
    - the county chair of a political party conducting a primary election, as authorized by Section 172.1113;
    - a voting system technician, as authorized by Section 125.010;
    - the county election officer, as defined by Section 31.091, as necessary to perform tasks related to the administration of the election; or
    - a person whose presence has been authorized by the presiding judge in accordance with the Election Code.
- **Early Voting Ballot Board**: A person may be lawfully present in the meeting place of an early voting ballot board during the time of the board's operations if the person is:
    - a presiding judge or member of the board;
    - a watcher;
    - a state inspector;
    - a voting system technician, as authorized by Section 125.010;
    - the county election officer, as defined by Section 31.091, as necessary to perform tasks related to the administration of the election; or
    - a person whose presence has been authorized by the presiding judge in accordance with the Election Code.
- **Central Counting Station**: A person may be lawfully present in the central counting station while ballots are being counted if the person is:
    - a counting station manager, tabulation supervisor, assistant to the tabulation supervisor, presiding judge, or clerk;
    - a watcher;
    - a state inspector;
    - a voting system technician, as authorized by Section 125.010;

The voter must execute a Reasonable Impediment Declaration and present a supporting form of identification to complete the procedure. **The election judge, election clerk, or poll watcher cannot question the reasonableness of the impediment claimed by the voter. The poll watcher is not permitted to converse with any voter or communicate in any manner with any voter regarding the election, including, but not necessarily limited to, the Reasonable Impediment Declaration procedures or the presentation of voter identification.**

On the Reasonable Impediment Declaration, the voter must enter their name, indicate the voter's reasonable impediment to obtaining one of the seven forms of acceptable photo ID, and then sign and date the form in the presence of the election judge. The election judge must then indicate that the form was signed and sworn before the judge by also signing and dating the form. Either the poll worker or the election judge should also check the box listing the form of supporting documentation the voter presented, fill in the Date of Election and Location fields, and fill in the voter's Voter Unique Identification Number ("VUID") in the appropriate box or affix a sticker that contains that information across the box, and note on the Combination Form that the declaration was used by the voter.

## NOTE: The address on either an acceptable form of photo identification or, if applicable, a supporting form of identification does not need to match the address on the list of registered voters.

If the voter's name on the list of registered voters does not match exactly to the ID presented (either an acceptable form of photo ID or, if applicable, a supporting form of identification), the voter must complete the "Substantially Similar Name Affidavit" on the Combination Form. [Sec. 63.001(c)].

### PROVISIONAL VOTING:

Provisional voting is helpful in multiple scenarios, and provisional ballots must be offered to voters when required by the situations described below. However, a voter CANNOT be denied a provisional ballot in any circumstance.

**NEW LAW**: SB 1 (2021, 2nd C.S.) added Section 63.0111 to provide that an election judge commits an offense if the judge knowingly provides a voter with a form for an affidavit if the form contains information that the judge entered on the form knowing it was false.

If a voter (a) does not possess one of the seven (7) acceptable forms of photo identification, which, for voters aged 18-69, is not expired for more than four years, or, for voters aged 70 and older, may be expired for any length of time but is otherwise valid, and the voter can reasonably obtain one of these forms of identification; or (b) possesses, but did not bring to the polling place, one of the seven forms of acceptable photo identification; or (c) does not possess one of the seven forms of acceptable photo identification, could otherwise not reasonably obtain one, but did not bring a supporting form of identification to the polling place; and the voter does not have a permanent disability exemption indicated on their voter registration certificate, the voter may cast a provisional ballot at the polls.

However, in order to have the provisional ballot counted, the voter will be required to visit the voter registrar's office within six calendar days of the date of the election to (1) present one of the seven (7) acceptable forms of photo identification; (2) present one of the supporting forms of ID

their acceptable form of supporting ID and vote a regular ballot after executing a Reasonable Impediment Declaration.

- A voter who states they possess an acceptable form of photo ID, but do not have it with them to present at the polling place.
    - o **NOTE**: If a voter has continued access to their acceptable form of photo ID but, for example, forgets to bring their acceptable form of approved photo ID to the polling place and/or left it at home or in their car, the voter still possesses the acceptable photo ID and must use it to vote. This voter may opt to leave the polling place and return at a later time with their acceptable form of photo ID and vote a regular ballot.

- A voter who does not present an acceptable form of photo ID or follow the Reasonable Impediment Declaration procedure and has a religious objection to being photographed and the voter has consistently refused to be photographed for any governmental purpose from the time the voter has held this belief. [Sec. 65.054(b)(2)(B)].

- A voter who does not present an acceptable form of photo ID or follow the Reasonable Impediment Declaration procedure because of a natural disaster that was declared by the President of the United States or the Texas Governor, occurred not earlier than 45 days before the date the ballot was cast, and caused the destruction of or inability to access the voter's identification.   [Sec. 65.054(b)(2)(C)].

- A voter whose name on the form of identification presented (either an acceptable form of photo identification or, if applicable, a supporting form of identification with a Reasonable Impediment Declaration) is determined by the election officer not to exactly match or be substantially similar to the name as it appears on the list of registered voters.
    - o **NOTE**: A voter's name as listed on the identification presented (either an acceptable form of photo ID or, if applicable, a supporting form of ID with a Reasonable Impediment Declaration) for voting is considered **substantially similar** to the form of the name as listed on the list of registered voters if one or more of the following circumstances applies: 1) The name on the presented ID is slightly different from one or more of the name fields on the official list of registered voters; 2) The name on the presented ID or on the list of registered voters is a customary variation of the voter's formal name (for example, Bill for William); 3) the voter's name contains an initial, middle name, or former name that is either not on the official list of registered voters or on the presented ID; 4) a first name, middle name, former name, or initial of the voter's name occupies a different filed on the presented ID than it does on the list of registered votes. In considering whether a name is substantially similar, election officials will also look at whether information on the presented ID matches elements of the voter's information on the official list of registered voters such as the residence address or date of birth.

- A voter who presented a form of identification (either an acceptable form of photo identification or, if applicable, a supporting form of identification with a Reasonable Impediment Declaration) but whose identity cannot be verified by the identification presented, as determined by the polling place official per Section 63.001(d) of the Code.

In order to vote provisionally, the voter must complete and sign an "Affidavit of Provisional Voter," a form which will also serve as a voter registration application in the event the voter is not registered or as an update to the voter's registration record if the information is different.

**Q. Are there cases when a provisional ballot will not be counted? When is a voter notified?**

A. While a provisional voter may be allowed to vote at the polling place, there are certain circumstances in which they will immediately be informed that their ballot will not be counted. For example, the election judge will notify the voter that their ballot will not be counted if:

- The voter does not present an acceptable form of photo identification, or, if the voter does not possess and cannot reasonably obtain an acceptable form of photo identification, the voter does not execute a Reasonable Impediment Declaration and present one of the acceptable forms of supporting identification, or submit one of the temporary forms (religious objection or natural disaster exemption), or submit the paperwork required to obtain a permanent disability exemption, to the county voter registrar within 6 calendar days from election day, or

- the ballot is cast at a precinct in which the voter is not registered (regardless of whether the voter is registered in another precinct in the same political subdivision).

**Q. If a voter applied for a ballot by mail, may the voter vote provisionally at the election day precinct polling place without returning the mail ballot to the election judge?**

A. Yes. A voter who appears on the list of registered voters as having applied for and/or received a ballot by mail may go to the polling place and vote. If the voter does not have the ballot to return to the judge, he will have to vote a provisional ballot. If the mail ballot does not arrive at the ballot board before the provisional ballot, the provisional ballot will be counted. If the mail ballot arrives at the ballot board before the provisional ballot, the mail ballot will be counted. [Sec. 63.011].

**Q. How are provisional ballots reviewed and handled?**

A. At the polling place, the election judge provides the provisional voter written notice informing the voter that they will be notified within 10 days after the local canvass as to whether or not their ballot was counted and, if not, why it was not counted. The notice also includes instructions and additional details regarding the provisional voting process.

The voter's eligibility to vote is reviewed by the voter registrar and the early voting ballot board must complete the processing and counting, where applicable, of the provisional ballots. Notice must be delivered to provisional voters regarding whether their ballot was counted and noting a reason if their ballot was not counted.

**Q. How is the secrecy of the ballot preserved?**

A. The voter places the voted provisional ballot in a plain white ballot secrecy envelope, which is placed inside the Provisional Affidavit Ballot Envelope. Provisional ballots are placed either in a designated, secure container or Ballot Box No. 4 until the voter registrar and early voting ballot board complete their review. The transfer and tabulation of these ballots are handled

replacement ballots (the original ballot, plus two replacement ballots yields a total of **three possible ballots per voter**).  [Sec. 64.007(a) & (b)].

**Q: If a voter is voting provisionally on paper or optical scan ballot, does he or she use the same type of ballot as a regular voter?**

A: Yes, but the election officials may have a few ballots pre-stamped "provisional" in a separate stack from regular ballots.  The following steps must occur:

    (1)  the voter votes the ballot;

    (2)  the voter seals the ballot in the ballot secrecy envelope;

    (3)  the voter seals the privacy envelope in the provisional ballot affidavit envelope; and

    (4)  the voter casts the ballot in the regular ballot box or other designated secured container as directed by the election officials.

    **NOTE**: Some electronic voting systems allow the voter to cast a provisional ballot directly on the machine.

**Q. If a voter leaves a voted ballot in the voting station or elsewhere in the polling place rather than putting it in the ballot box, or if a voter voting on an electronic voting system leaves without finally casting his or her ballot, is the ballot counted?**

A. No. A ballot that has not been deposited in the ballot box used for the deposit of marked ballots may not be counted. The judge should treat it as a cancelled ballot.  [Sec. 65.010(a)(4)].  On an electronic voting system, the ballot must be cancelled using the procedures for cancellation on the system particular to the entity holding the election.  The ballot left uncast by a "fleeing" voter may not be counted.

<u>**RECOUNT WATCHER**</u>

Similar to a poll watcher, a recount watcher (formerly termed a representative) is a person appointed to observe the conduct of the recount on behalf of:

- a candidate,
- a political party, or
- the proponents or opponents of a measure (specific-purpose political action committee). [Sec. 213.013].

**RECOUNT WATCHER QUALIFICATIONS**

Unlike a poll watcher, a recount watcher is not required to meet any particular qualifications to serve. A recount watcher is NOT required to complete the training under Section 33.008. The recount watcher is not required to be a registered voter of the territory in which the election was held. The recount watcher does not have to satisfy any age or citizenship requirements. Public officials are not prohibited from serving as recount watchers; nor is the recount watcher's eligibility affected by the familial relationship of a watcher to a person serving on the recount committee. For more information on recount procedures, please see the SOS's <u>Recount Outline</u>.

relationship with these presiding officers and work with them to ensure that the voting process works smoothly. **Remember that you are not allowed to address voters directly.**

If any questions arise during your service that the presiding officer cannot answer or you question the accuracy of the information provided, you may call the Elections Division at our toll-free number, 1-800-252-VOTE(8683). The Elections Division is open Monday through Friday from 8:00 a.m. to 5:00 p.m., and during all uniform election dates from before the polls open until after they close. If you desire to learn more about the election process, please call our office to request one of our handbooks for election day officials and the early voting ballot board or our detailed recount procedures. You may also wish to review our online poll worker training at https://pollworkertraining.sos.texas.gov.

Thank you for your participation in the election process!

# Texas
# Poll Watcher
# Training

presented by:

Alan Vera



EXHIBIT

4

2/27/23

# Poll Watcher Course

- Qualifications
- Preparation
- Rules
- Restrictions
- Privileges
- What to Watch for Tips



# At the Polls

## $ Paid $ Employees

- **Poll Workers**
  Presiding Judge
  Alternate Judge
- **Clerks**

## Volunteers for Party - Candidate

- **Poll Watchers**

## PW may NOT assist at polls

# Poll Watcher

❖ **Appointed**

2 per party/candidate/issue

❖ **Observe** ONLY

**Take detailed notes**

May NOT serve as poll worker

❖ **Purpose**

Ensure conduct of a
fair & honest election

**Remember:** Poll Workers maintain control and order.
Poll Watchers ONLY observe.

# Qualifications:

- ✓ Registered voter in county
- ✓ No election convictions
- ✓ Not a candidate on ballot
- ✓ Not an elected public official
- ✓ Don't employ or work for judge or clerk serving at the same polling place
- ✓ Not related to judge or clerk serving at the same polling place
- ✓ Can be related to candidate or watchers



You must have your Appointment Certificate BEFORE election day. This is the document you present to the Presiding Judge when you arrive at the polling place. Be sure you sign the Certificate the way you usually sign any document. At the poll the Presiding Judge will have you sign an affidavit and will compare signatures to ensure you are the same person.



Sign the affidavit the same way you signed the Appointment Certificate. The PJ will compare signatures.



The affidavit you sign does not include cell phones as recording devices. Some PJ's may allow you to have cell phones set on vibrate. Ask (in front of a witness) the PJ at the beginning of the day what his/her policy on cell phones will be.

## If NOT accepted for service, the Presiding Judge must:

- Return the *Certificate of Service*
- **Signed statement** with the reason for the rejection

**Consult with AJ.
Following PJ's phone policy,
call your hotline before leaving.**

Call your hot line before you actually leave the poll area.

# Professional Conduct Conflict Resolution

- Be professional in speech and body language

- Know your reference materials – highlight

- Ask PJ or AJ to deal with hostile clerks

- Dealing with errors by PJ

    - Politely point out correct action from reference materials
    - If PJ refuses to comply, advise of duty to report
    - AJ and both Poll Watchers document

Most PJ's are trying to do a good job and will be cooperative.  However there are some that will not cooperate with you.  They will try to make your life uncomfortable; hoping you will leave.  Tell them, Look we both have a job to do today.  That you hope this election goes smoothly because you would hate to have to file a bad report.  I'll be fair with you, you be fair with me.

Repeat to the PJ that you both have a job to do, and that we can work together to run this election according the Texas law, or I can report you to the authorities and have you removed.   Which do you prefer?

# Rules

- Begin service after PJ arrives
- *Certificate of Appointment* to PJ
- Sign *Affidavit of Poll Watcher* in front of PJ
- 2 may sign Zero Tape and election results
- May not leave while ballots being counted
- May stay until PJ leaves with results
- May follow delivery of results if desired
- Must serve 5 consecutive hours before Poll Watcher may come and go

  (Cell phone and RR are OK)

Even if there are more than 2 poll watchers at the polling station, the PJ may limit the number of PW's to sign the Zero tape and results tape to 2 poll watchers. Even if you've been there 5 consecutive hours, you may not come and go while ballots are actually being counted.



Don't wear any article of clothing or pin that could be interpreted as showing sides. Do not talk to ANYBODY not working that poll about anything going on inside that polling place. Talking to a voter (for any reason) can get you dismissed immediately. Unnecessary talking can be a reason for your dismissal, also.



# Privileges

- Observe all election activities of judges and clerks
- Sit or stand where convenient to observe
- Make written notes/documentation
  (If PJ requires, leave in room with person <u>you select</u>)
- Point out to clerk or judge any irregularity
- Observe assistance to voters <u>by election officials</u>
- Inspect returns and records
- Witness closing of the polls
- English translation of other language between voter and official
- Accompany delivery of records/results

**Preventing a Poll watcher from observing any entitled activity is a Class A misdemeanor.**

DO NOT leave your notes with anybody from the "other side." If voter has brought his/her own helper (language or physical inability) and that helper has been properly sworn in, the Poll Watcher MAY NOT observe that person's voting process. We do not expect you to follow the PJ's vehicle to turn in the ballots. If you choose to do so, notify the PJ that you are exercising your right and that he/she is to drive in such a way as to make it easy for you to follow him/her.



# Poll Watcher Notes

| | Mary Jones<br>Poll Watcher | Nov. 6, 2018<br>Precinct # 123 |
|---|---|---|
| 9:20 | Betty (Clerk) cleaned trash from voting booths | |
| 9:25 | **Betty assisted voter with machine - OK** | |
| 9:30 | PJ posted 2-hour count: JBC & list = 85 | |
| | Paper ballots = 0 | |
| 9:32 | Woman entered. Did not ask to vote. Came up to me and said (loudly) "Are you one of those poll watchers? You have no right to be here." I walked to PJ and said, "Please inform this woman that I may not speak to her." The PJ said, "Are you here to vote?" Woman- "I already voted but " The PJ told the woman she would have to leave and escorted her out the door. | |
| 9:35 | Tom did not check voter address. I reminded him. He corrected. | |
| 9:36 | **Betty assisted voter with machine - OK** | |
| 9:37 | PJ returned to room.<br>Tom left for break | |

- Note everything
  - What you see & hear (not think)
- Note time
- Note every repeat
- "Quote" if possible
- Don't compare notes
- Sketch room layout
- Notes stay with you when polls close. Keep in safe place.



# Who can be in voting area?

- Voters
- Poll Watchers  ID
- Interpreters Proving Assistance to Voters
- Children under 18 accompanying a parent to vote
- Persons admitted to provide assistance to voter
- Election Judges and Clerks  ID
- State and Federal Election Inspectors  ID
- Certified Texas Peace Officers appointed by PJ  ID
- County Clerk Technical Staff  ID
- Officials conducting a student election (rare)

**Class C misdemeanor for candidate to be inside polling place unless:**

- Voting
- Assisting a voter
- Conducting Official Business
  in building where poll located (plain view and not campaigning)

Those individuals marked as "ID" must have visible identification cards/name tags while they are in the polling station.



There's a number on the flat surface of the Zip Tie. That number should match the number on the document inside the box.

# Seal Logs



Observe PJ + AJ Setting Up

- PJ waits for AJ to set up
- Numbers match up on forms
- Both PJ and AJ sign
- Note location of closing poll seals





# Poll Book

- Each voter shows ID

- Each voter asked if address
  in book is current

- Voter initial if "similar name"

- Each voter signs this book
  on line with voter's name

- PJ signs book at closing

# PROCESSING VOTERS

Inside the "Manuals, Reference Guides and Glossaries" envelope you will find the *"Qualifying Clerk's Procedure"* and *"Processing Voter Situations"* guide. Have the clerks working this position review both guides before the polls open and become familiar with those details.

## TOP BAR COLORS INDICATE MODE



## LOGIN SCREEN

Login Screen will be displayed.

Tap on the word "Password" displayed on the screen. A keyboard will appear.

Note: The keyboard will only display when you tap in a text field.

**EPOLLBOOK MAIN MENU**



Menu Items:

**VOTER SCAN/SEARCH**
- Look for voters

**POLL VOTER COUNT**
- Test print
- Print number of voters

**HELP DOCUMENTS & VIDEOS**
- Manuals
- Step by step instructions

**JUDGE ADMIN**
- Requires password
- Administrative functions

**ENABLE WAIT TIMES POPUP**
- enter number of voters in line.

**BRIGHTNESS BAR**
- Allows user to adjust the brightness of the screen by moving slider button.

## EPOLLBOOK PROCESSING



- During election day the colored bar at the top of the ePollBook should be BLACK.
- This indicates it is in live voting mode.
- The ePollBook was designed to qualify a voter in 6 steps.
- The steps are identified on the progress bar at the top of the screen.
- After each step is completed successfully, it will be highlighted in BLUE.



## STEP 1: SCAN/SEARCH

Scan/Search voter.

Photo IDs that will scan:

- Texas Driver's License (TDL)
- Texas Identification Cards (TID) (issued by TXDPS)



Place the TDL or TID on the ID rest of the stand.

Picture facing away from you.

Tap the scan button.

If you are unable to scan the ID, you can search manually.

**STEP 2: SELECT VOTER**

Tap the Select button to the left of the voter's name.



Scanning TDL or TID will automatically answer the questions in "Step 3: Process Voter" screen:

- "Has Voter Provided an acceptable Photo ID?"
- "Does Voter Registration Name Exactly Match Photo ID?" (Not "Yes" if the names are not identical.)

- Screen will display Scan results.
- Select (green) buttons indicate possible matches.
- Select (red) buttons see explanation given.
  - Voter not qualified for election
  - Mail Ballot Sent to Voter
  - Mail Ballot Received
  - Voter Voted Early
  - Voter Checked In
- Select a (yellow) buttons indicate SOR Required.

## SCANNING VS SEARCHING

Answer the questions. If a TDL/TID is used, some answers may be pre-populated.
Verify all answers, even if prepopulated.



"Has Voter Provided an acceptable Photo ID?"

TDL/TID scanned - Yes box checked.

"Does Voter Registration Name Exactly Match Photo ID?"

TDL/TID scanned – specific to Voter's information.

Searching for a voter by entering their data.

The worker will have to answer the above questions.

Voter Able to Sign – will be marked YES for all Voters.

Change to "No" when needed.

## STEP 3: PROCESS VOTER

Complete the required questions.

- Tap Yes = Continue.
- Tap No = Follow instructions given.



### Photo ID

Has Voter Provided an acceptable ID?

- Yes = continue processing the voter.
- No = displays "RID form Needed – Has voter provided a completed RID form?"
  - Yes = continue.
  - No = displays message "Hand voter a RID form to complete."

Hand voter a RID form to complete.

- Cancel = returns to voter screen.
- OK = returns to the Home/Start Over screen.



After all the questions have been answered the "Go to Voter Signature Screen" button will be accessible by turning green.

Tap Go to Voter Signature Screen button.

Voter's screen displays, tilt screen toward the voter.

**STEP 4: SIGNATURE**

Voter's signature screen displays.



Tilt the iPad towards the Voter.

## SIGNATURE SCREEN OVERVIEW



1 - Language line. Voter can change the language on the Signature screen.

2 - Clear. Clears the Voter's signature.

3 - Incorrect Information. Returns to the previous screen **Step 3: Process Voter.**

4 - Voter Unable to Sign.

Returns to previous screen.

Requires clerk to check the reason the Voter is unable to sign.

Visually Impaired or Physically Disabled.

After reason is selected, Go to Voter Signature Screen button changes from grey to green.

5 - VOTER'S AFFIDAVIT — Affidavits required by the Texas Election Code.

Enlarge text by tapping on the words of the affidavit.

Reduce by tapping on the X.

6 — Signature Line. Voter signs on the line.

7 — Accept button. Voter taps Accept to accept his/her signature.





### STEP 5: ACCEPT VOTER SIGNATURE

After the voter taps the Accept button the ePollBook will beep.

Tilt the iPad to you.

Tap the Accept Voter button.

**CAUTION! VOTER SIGNATURE HAS NOT BEEN ACCEPTED**

When the Home/Start Over button is tapped on Step 5, a Caution message displays.

- **Yes** response: Returns to the Scan/Search screen.
- **No** response: Continues to Step 6 for the Voter.





Access Code will print on the JBC.



Give the Access Code to the voter.

Direct the voter to the eSlates.

STOP: GO TO EXERCISE #1.

Tap Check in Voter.

Ready for the next voter.

**Do NOT keep the JBC votes balanced equally.**



**JBC MESSAGE AFTER 1ST SCAN**

After the first scan, you may see an error message.

Press CONTINUE and rescan the barcode.





**Statement of Residence Card**

* If current address is not in voter book
* Updates voter registration
* Signed by voter

## List "A" Valid Forms of I.D. for Voting – Only Need 1 (Not More than 4 Years Expired)

- Texas Driver License issued by Texas DPS

- Texas election identification certificate issued by DPS

- Texas personal identification card issued by DPS

- Texas handgun license issued by DPS

- United States Military identification Card with photograph

- United States passport

- United States Citizenship Certificate with the person's photograph

- Signed & current voter registration card with the letter "E" after the VUID

Each voter only needs to show one form of ID unless ID is listed in Voter Book. Expired cards are OK. Most common will be voter registration card or DL.

# List "B" Supporting Forms of ID with "Reasonable Impediment" Declaration

- Valid signed voter registration card

- Certified Birth Certificate (must be an original, not copy; another state/country OK)

- Original or copy of a current utility bill (no more than 2 months old when presented)

- Original or copy of a bank statement (must have an address for the voter)

- Original or copy of a government check (may be a copy; must have an address)

- Original or copy of a paycheck (may be a copy; must have an address)

- Copy or original of other government document (must have an address; original required if it contains a photograph; can be federal, state, local or tribal) Examples:
  - DL from other states          Tribal ID Cards
  - DPS Receipts (no photo)      Expired Voter Registration
  - Expired Texas DPS license or ID card (not over 4 years)

Each voter only needs to show one form of ID unless ID is listed in Voter Book. Expired cards are OK. Most common will be voter registration card or DL.

## New Procedure for ID

- Ask Voter if they have obtained List "A" ID (Not more than 4 years expired)

- If "yes," they MUST present that form of Photo ID

- If not with them, they vote Provisional Ballot

- If "no," ask voter if they have a "reasonable impediment for not having Photo ID

- Inform voter they may vote Regular Ballot with List "B" ID and Reasonable Impediment Declaration

- Have voter present List "B" ID and fill out Reasonable Impediment Declaration

- Note: address on ID does not have to match address in poll book, but voter must verbally confirm address in poll book.

Each voter only needs to show one form of ID unless ID is listed in Poll Book. Expired cards are OK. Most common will be voter registration card or DL.

## Reasonable Impediment Declaration

- Lack of transportation

- Disability or illness

- Lack birth certificate needed to get Photo ID

- Work schedule

- Family responsibilities

- Lost or stolen photo ID

- Photo ID applied for but not received

Each voter only needs to show one form of ID unless ID is listed in Voter Book. Expired cards are OK. Most common will be voter registration card or DL.

## Poll List

- EACH qualified voter's name

- Common error location (makes final count off)

- Number of voters on Poll Lists should equal vote count

The clerk will complete the sections in the top right corner with the correct information for that election.
After each voter signs the List of Registered Voters, the clerk will write the voter's name on this form.
If the voter's name was omitted from the List of Registered Voters, check the 2nd column.
If the Voter's certificate was incorrect, check the 3rd column.
If the voter did not bring a voter registration certificate, check the 4th column.
If the voter voted provisionally, check the 5th column.
If the voter required assistance from someone other than a poll worker, complete the information in the last column.
At the end of the day, the White copy goes in Envelope 1, the Green copy goes in Envelope 2, and the Pink copy goes in Envelope 4.

# Election Day
# 2 Hour Voter Count

- 9:30 – 5:30
- Posted outside door
- Poll List should equal Votes Cast
- ??? Common error: poll list may not have
  been updated when the poll got busy


- Check voter count leaving + returning from break
- Only one Poll Watcher breaks at a time

# Provisional Ballots

· **When voter eligibility is in question but he insists on voting**

> <u>Examples:</u>  No valid card or ID
> Mailed ballot but didn't return
> Wrong precinct
> Address outside county
> Voter who does not qualify but insists on voting
> If court order to keep polls open after 7:00pm

- **PJ must make the decision** not a clerk
- **PJ must inform voter that his vote may/will not count**
- **Provisional Affidavit** completed by PJ and voter with **reason**
- Provisional **ballot code**  issued
- **JBC tape long**
- Papers put in proper **envelope**

Try to alert the Alternate Judge whenever there's a provisional ballot in the works.





# At the Machines / Ballot Handout

- Ballot code
- Precinct number
- Provisional different
- One per voter
- Stays with voter
- No ticket stacking
- Ticket expires
- Cancel properly
- No visiting
- No texting



Lights on the JBC machine indicate the status of each eSlate machine. If you see an empty eSlate slot, but the JBC machine shows that slot in use, you may want to check to see if the last voter forgot to actually cast his/her ballot.

# VOTER NEEDING ASSISTANCE

- Voter has a right to assistance if:

  1) cannot read or write at all
  2) is physically unable to mark a ballot OR
  3) does not speak/read any language on the ballot.

- Voter MAY NOT be assisted by an employer or by an officer or agent of the voter's union.

- If an election worker assists a voter, the poll watcher may observe that assistance (stand close enough to hear everything said, but avoid seeing the actual ballot being cast by the voter.)

Those individuals marked as "ID" must have visible identification cards/name tags while they are in the polling station.

# Additional Items to Watch During Voting:

- Bribing, coercing or unlawfully influencing voters
- Telling anyone how a voter has voted, who has voted or the status of the vote count
- Candidate/Party clothing, stickers or signs
- Harassing an election official
- Unlawfully assisting voters - ** families
- Unlawfully accepting or refusing voters
- Using a cell phone in the polling location (unless official election business)
- Interfering with the voting process
- Political stickers or pamphlets left in booth

Remember: Voters may bring notes into polling place and booth.

# What to do if you see an infraction:

## Correct on the spot

- **If correction made:** Record and note correction made
- **If correction not made:** Inform AJ/PJ and record noting outcome
- **If major infraction and no correction:** Incident report
- The entire team records the incident. **Don't discuss.**
- Include time and names of all involved: Clerk, PJ, AJ, PW, etc.
- Description of violation: what you witnessed and what was said
- Leave out opinion/emotion

Remember:  You document while AJ  or PJ calls. You call only if serious infraction that both AJ and PJ  refuse to address.

# 7:00 pm

- Only voters in line at 7:00 pm may vote

- When last voter has voted, door is locked and shut down begins

- If you are asked to mark the place in line – decline.

Remember: A Poll Watcher may NOT become a Poll Worker. You may NOT assist carrying ballots, hanging signs, setting up or taking down equipment, etc.



# Watch for:

- Observe completion of forms
- Match all seal numbers to forms



- Security Seal numbers recorded
- Seals secure



# Early Voting

- Higher level of activity – multiple precincts
- Voters can vote at any county location
- Different opening & closing poll procedures
- Arrive 1 hour early and plan for 1 hour after doors close
- Supervisor keeps Certificate of Appointment until end of election if you plan to return to site

PJ = **Supervisor**
AJ = **Alternate Supervisor**



Those individuals marked as "ID" must have visible identification cards/name tags while they are in the polling station.

# Review

1. How many Poll Watchers may be sent to **each** polling location by **each** candidate on the ballot?

   A. 1
   B. 2
   C. 3

# Review

1. How many Poll Watchers may be sent to **each** polling location by **each** candidate on the ballot?

B. 2

# Review

2.  At arrival, the Poll Watcher must present his **Certificate of Appointment** to the:

      A.  Clerk
      B.  Alternate Judge
      C.  Presiding Judge

# Review

2. At arrival, the Poll Watcher must present his *Certificate of Appointment* to the:

## C. Presiding Judge

# Review

3. When signing the *Affidavit of the Poll Watcher*, the Poll watcher is affirming that he/she:

    A. Will stay on duty until all votes are cast
    B. Does not possess any recording devices
    C. Will judge in a fair and honest manner

# Review

3. When signing the **Affidavit of the Poll Watcher**, the Poll watcher is affirming that he/she:

   **B. Does  not possess any recording devices**

# Review

4. Who is responsible for **maintaining order and control** at the polling place?

    A.  Election Workers (Clerks/Judges)
    B.  Candidates
    C.  Poll Watchers

# Review

4. Who is responsible for **maintaining order and control** at the polling place?

    A. **Election Workers (Clerks/Judges)**

# Review

5. Poll Watchers **may sit or stand**:

    A.  Only where the presiding judge allows
    B.  Conveniently near election officials to
        observe election activities
    C.  Only where NOT visible to voters

# Review

5. Poll Watchers **may sit or stand**:

   B. **Conveniently near election officials to observe election activities**

# Review

**6. Preventing** a Poll Watcher from observing any activity the Poll Watcher is entitled to observe is a:

    A. Misdemeanor
    B. Felony
    C. Civil matter

# Review

6. **Preventing** a Poll Watcher from observing any
   activity the Poll Watcher is entitled to observe is a:

   A. **Misdemeanor**

# Review

7. A Presiding Judge may require a Poll Watcher to **leave the polling location** if the Poll Watcher:

       A.  Talks to a voter
       B.  Informs a Clerk of an infraction
       C.  Takes written notes



# Review

7. A Presiding Judge may require a Poll Watcher to **leave the polling location** if the Poll Watcher:

    A.  Talks to a voter

# Review

8. If a Poll Watcher points out an infraction to a Clerk and the Clerk refers the Poll Watcher to the Presiding Judge, the Poll Watcher **may NOT discuss the matter further with the Clerk unless**:

   A. Two Poll Watchers observed the same infraction
   B. Another Clerk sides with the Poll Watcher
   C. The Presiding Judge invites the discussion

# Review

8. If a Poll Watcher points out an infraction to a Clerk and the Clerk refers the Poll Watcher to the Presiding Judge, the Poll Watcher **may NOT discuss the matter further with the Clerk unless**:

   **C. The Presiding Judge invites the discussion**

# Review

9. Who **may accompany a voter** into the voting booth?

    A.   A spouse
    B.   A child under 18
    C.   A political party official



# Review

9. Who **may accompany a voter** into the voting booth?

**B.  A child under 18**

# Review

10. Poll Watchers may **observe a voter in the booth** when the voter is being assisted by:

    A. An interpreter brought to the poll by the voter
    B. A child under 18
    C. An Election Official



# Review

10. Poll Watchers may **observe a voter in the booth** when the voter is being assisted by:

   C. An Election Official

# Review

11. A Poll Watcher may come and go from the polling
    location **after serving** _____ **consecutive hours**.

        A.  3
        B.  5
        C.  7

# Review

11. A Poll Watcher may come and go from the polling location **after serving _____ consecutive hours**.

B.  5

# Review

12. If the Poll Watcher leaves the room, the Presiding Judge may require him/her to **leave any written notes with**:

    A. The Clerks
    B. The Presiding Judge
    C. A worker selected by the Poll Watcher

# Review

12. If the Poll Watcher leaves the room, the Presiding Judge may require him/her to **leave any written notes with**:

   C. A worker selected by the Poll Watcher

# Review

13. **Unless the Presiding Judge allows Poll Workers an exception**, inside the polling location all cell phones should be:

    A.  Turned OFF
    B.  Set on VIBRATE
    C.  Used for TEXTING ONLY

STATE061827



# Review

13. **Unless the Presiding Judge allows Poll Workers an exception**, inside the polling location all cell phones should be:

      A. Turned OFF

STATE061828

# Review

14. A Poll Watcher may **NOT** bring _____ into the polling location.

      A. Food or beverages
      B. A camera or other recording device
      C. The Poll Watcher's Guide Book



# Review

14. A Poll Watcher may **NOT** bring _____ into the polling location.

      **B.** A camera or other recording device

STATE061830

# Review

15. If the Presiding Judge allows, how many Poll
    Watchers **may sign** the official election documents?

    A.  1
    B.  2
    C.  3

STATE061831



# Review

15. If the Presiding Judge allows, how many Poll
    Watchers **may sign** the official election documents?

B. 2

STATE061832

# Review

16. What information **MAY be revealed** by persons serving in the polling location before the polls close?

    A.  Number of voters who have cast a ballot
    B.  The names of persons who have NOT voted
    C.  Number of votes cast for a candidate

STATE061833

# Review

16. What information **MAY be revealed** by persons serving in the polling location before the polls close?

   A.   Number of voters who have cast a ballot

STATE061834

# Review

17. On Election Day, the number of votes cast **must be posted** outside the door every _____ hours from 9:30am-5:30pm.

        A.  2
        B.  3
        C.  4

STATE061835

# Review

17. On Election Day, the number of votes cast **must be posted** outside the door every _____ hours from 9:30am-5:30pm.

A. 2

STATE061836

# Review

18. **No electioneering or loitering** may be within
_____feet of the entrance to the polling building.

        A. 50
        B. 100
        C. 150

STATE061837

# Review

18. **No electioneering or loitering** may be within
_____feet of the entrance to the polling building.


B. 100

STATE061838

# Review

19. **No sound amplification** for campaigning may
    be used within _____ feet of polling building.

        A.  500
        B.  1000
        C.  1500

STATE061839



# Review

19. **No sound amplification** for campaigning may be used within _____ feet of polling building.

B. 1000

STATE061840



STATE061841

chair@harriscountygop.com]chair@harriscountygop.com]; vc@harriscountygop.com]vc@harriscountygop.com], Cynthia
Siegel[cpacindy401@aol.com]cpacindy401@aol.com]ajr@questgitlbitgiedti691w2uilieti07/28/23 Page 253 of 310
(julie.hunt@harriscountygop.com)[julie.hunt@harriscountygop.com]; Vanessa Ingrassia[vanessa.ingrassia@harriscountygop.com]

**From:** Alan Vera[alanv@tqba.com]
**Sent:** Tue 8/24/2021 5:12:51 PM (UTC)
**Subject:** FW: Unintended Consequence in SB 1 Engrossed Version

# Redacted -- First Amendment Privilege

Alan D. Vera
Chairman, HCRP Ballot Security Committee
President/CEO
Quest Business Agency, Inc
18130 Cadbury Dr.
Houston, TX 77084
alanv@tqba.com
713-253-6569

**From:** Jacey Jetton <Jacey.Jetton@house.texas.gov>
**Sent:** Tuesday, August 24, 2021 6:50 AM
**To:** Alan Vera <alanv@tqba.com>; Tori Macfarlan <Tori.Macfarlan@house.texas.gov>
**Cc:** Colleen M. Vera (colleenmvera@yahoo.com) <colleenmvera@yahoo.com>
**Subject:** RE: Unintended Consequence in SB 1 Engrossed Version

Good morning,

Thank you for sharing and good catch. We will work with Chairman Murr on an amendment.

Thanks,

Jacey Jetton
Texas State Representative
House District 26

**Capitol Office:**
Room E2.716
P.O. Box 2910
Austin, TX 78768
Phone: (512) 463-0710

**District Office:**
1108 Soldiers Field Dr., Suite 100
Sugar Land, TX 77479
Phone: (281) 240-0342

**From:** Alan Vera <alanv@tqba.com>
**Sent:** Friday, August 20, 2021 10:43 AM
**To:** Jacey Jetton <Jacey.Jetton@house.texas.gov>; Tori Macfarlan <Tori.Macfarlan@house.texas.gov>
**Cc:** Colleen M. Vera (colleenmvera@yahoo.com) <colleenmvera@yahoo.com>
**Subject:** Unintended Consequence in SB 1 Engrossed Version

I wanted to call your attention to an unintended consequence in the version of SB 1 that you'll hear in committee tomorrow.

Page 45
Bill Section 6.03
TEC 276.015 and 276.016
Line 24


EXHIBIT
5

The language defines ballot harvesting services as DIRECT IN-PERSON INTERACTION WITH A VOTER, etc.

The ballot harvesting (state jail felony) charges we have before the A.G. at this time involve harvesters stealing the identities of voters for mail ballot applications and fraudulent mail ballots. In none of these cases did the harvester have any in-person interaction with any of these voters. Several of the voters involved had been deceased for years. The others have signed declarations attesting that they did NOT give the person (harvester) permission to request a mail ballot for them. In most cases, the voters said they did not even know the person who had submitted the application in their name.

SB 1 does not repeal any of the other sections of the code that deal with mail ballot fraud. However, we are concerned that this new bill will pre-empt older sections of code. By re-defining the offense as requiring in-person interaction with the voter, are we giving perpetrators an "out" for their felony trials?

The solution could be as simple as adding a line that states that "this definition does not alter any other existing provisions in the code regarding ballot harvesting.

We need to avoid unintended consequences of this line in an otherwise good election bill.

Regards,

Alan D. Vera
Chairman ,HCRP Ballot Security Committee
President/CEO
Quest Business Agency, Inc
18130 Cadbury Dr.
Houston, TX 77084
alanv@tqba.com
713-253-6569

**To:**     bryan.hughes@senate.texas.gov[bryan.hughes@senate.texas.gov];
dawn.buckingham@senate.texas.gov[dawn.buckingham@senate.texas.gov];
paul.bettecourt@senate.texas.gov[paul.bettecourt@senate.texas.gov];
lois.kolkhorst@senate.texas.gov[lois.kolkhorst@senate.texas.gov]
**Cc:**     cody.terry@senate.texas.gov[cody.terry@senate.texas.gov];
caroline.harris@senate.texas.gov[caroline.harris@senate.texas.gov]; Sonya Aston[sonya.aston@senate.texas.gov]; Marc
Salvato[marc.salvato@senate.texas.gov]; chris.steinbach@senate.texas.gov[chris.steinbach@senate.texas.gov]; HCRP
Chair[chair@harriscountygop.com]; HCRP ViceChair[vc@harriscountygop.com]
**From:**   Alan Vera[alanv@tqba.com]
**Sent:**   Wed 5/19/2021 3:26:35 PM (UTC)
**Subject:**  Conference Committee Addition to SB 7
SB 1589 Bettencourt.docx

On behalf of the Harris County Republican Party Ballot Security Committee, I'd like to ask you to please consider adding the
"election marshals" portion of SB 1589 to the Article 4 Enforcement provisions of SB 7.

Without the availability of real-time intervention of trained law-enforcement officers, we will not be able to enforce any of the
provisions of SB 7 in Harris County. The viability of the critical SB 7 depends on the availability of real-time intervention to ensure
compliance.

Please see the attached  record of our invited testimony to the Senate Committee on State Affairs.

We appreciate your favorable consideration.

Regards,

Alan D. Vera
Chairman, HCRP Ballot Security Committee
President/CEO
Quest Business Agency, Inc
18130 Cadbury Dr.
Houston, TX 77084
alanv@tqba.com
713-253-6569



CONFIDENTIAL

**From:** District2 Hall [district2.hall@senate.texas.gov]
**Sent:** 8/10/2021 4:36:37 AM
**To:** chair@harriscountygop.com
**Subject:** Thank you for contacting the office of Senator Bob Hall.
**Attachments:** image001.jpg

Thank you for taking the time to write to me. I am always appreciative hearing from concerned citizens.

My office reviews and records all responses and concerns from constituents. Due to the high volume of correspondence received, it can be difficult to respond to each person individually in a timely manner. We will do our best to respond to your correspondence in the order it was received.

If you need immediate assistance, please feel free to contact my staff directly at any of your offices as follows:

| **Capitol Address** | **Rockwall District Address** |
|---|---|
| The Honorable Bob Hall | Alliance Building #2 |
| P.O. Box 12068 | 6537 Horizon Road, Suite B-1 |
| Capitol Station | Rockwall, Texas 75032 |
| Austin, Texas 78711 | (972) 722-3131 |
| (512) 463-0102 | (972) 722-3132 (fax) |
| (512) 463-7202 (fax) | |
| **Canton District Address** | **Greenville District Address** |
| 17585 State Highway 19, Suite 200 | 2816 Lee Street, Suite A |
| Canton, Texas 75103 | Greenville, Texas 75401 |
| (903) 567-0904 | (903) 454-2880 |
| (903) 567-0969 (fax) | (903) 454-2885 (fax) |

If you would like an update on legislation and bill statuses from our most recent legislative session, I invite you to visit Texas Legislature Online for information: www.capitol.texas.gov.

Thank you again for contacting your State Senator.

Respectfully,

Bob Hall
Senate District 2

Bob Hall



EXHIBIT
7

**To:** chair@harriscountygop.com[chair@harriscountygop.com]
**From:** Donna Campbell [donna.campbell@senate.texas.gov]
**Sent:** Tue 8/10/2021 4:43:37 AM (UTC)
**Subject:** Automatic reply: INETMAIL: SB 1 - Election Integrity

Dear Fellow Texan,

Thank you for contacting my office to express your views. Making me aware of your opinion is an important part of the democratic process and I appreciate you taking the time to write. This message is my way of letting you know that I have received your correspondence and will be reviewing it with my advisors. I treat your concerns with the highest respect and priority!

If you require immediate assistance or have an urgent question, please call my Capitol Office at (512) 463-0125. If you would like to speak in greater detail about a specific policy issue, or require further assistance with a state agency, please email my Chief of Staff: carrie.smith@senate.texas.gov

Please subscribe to my newsletter if you are interested in receiving weekly updates regarding the 87th Legislative Session: https://bit.ly/2W5H5rv

Thank you again for sharing your views with me. Your input is essential to our state's success!


Blessings,

Senator Donna Campbell, M.D.



EXHIBIT

8

PENGAD 800-631-6989

**From:** District7 Bettencourt [district7.bettencourt@senate.texas.gov]
**Sent:** 8/10/2021 4:39:49 AM
**To:** chair@harriscountygop.com
**Subject:** Thank You For Your Email
**Attachments:** image001.png

Thank you for your recent email. Constituent input is a vital part of the democratic process, and your insight is valuable to me in representing the residents to Senate District 7.

My office reviews and records all correspondences from my constituents, and your email will be directed to the appropriate staff member who handles this topic.  If additional information is needed, they will be in contact with you.

If you need immediate assistance, please call one of my offices and my staff will be happy to assist you. If you have a scheduling request, please contact my District Office at 713-464-0282.

Again, thank you for your email and for keeping me informed of the issues that are important to you.

Sincerely,

**Senator Paul Bettencourt**
**Senate District 7**

Capitol Office
P.O. Box 10268
Room E1.712
Austin, TX 78711
Office: 512-463-0107
Fax: 512-463-8810

District Office
11451 Katy Freeway, Ste. 209
Houston, TX  77079
Office: 713-464-0282
Fax: 713-461-0108

*This communication may be privileged and confidential. Any copying, use or distribution of any information or materials by or to anyone other than the recipients listed above is prohibited without express authorization from the sender.*



UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


LA UNIÓN DEL PUEBLO ENTERO,    *
et al.,                        *
          Plaintiffs,          *
                               *
v.                             *   Civil Action No.
                               *   5:21-cv-844 (XR)
STATE OF TEXAS, et al.,        *
          Defendants.          *



*******************************************************

ORAL AND VIDEOTAPED 30(b)(6) DEPOSITION OF
THE DALLAS COUNTY ELECTIONS ADMINISTRATOR
THROUGH ITS DESIGNATED REPRESENTATIVE,
RIVELINO LOPEZ
APRIL 13, 2023

*******************************************************



DEPOSITION of RIVELINO LOPEZ, produced

as a witness at the instance of the Plaintiffs, and

duly sworn, was taken in the above-styled and

numbered cause on the 13th day of April, 2023, from

9:15 a.m. to 10:07 a.m., before Christy R. Sievert,

CSR, RPR, in and for the State of Texas, reported by

machine shorthand, at the offices of the Dallas

County Records Building, 500 Elm Street, Dallas,

Texas, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

Rivelino Lopez - 4/13/2023

26

1     A.    Okay.

2              MS. PERALES:   Mr. Stool, did you want

3    to make any statement on the record?   Or

4    Mr. Schuette?

5              MR. STOOL:   I don't think so.

6              MS. PERALES:   Okay.   Thank you.

7              MR. STOOL:   I think -- I think you've

8    covered it.   It's just that he was not designated to

9    speak on those topics.   Okay.

10   BY MS. PERALES:

11     Q.    Mr. Lopez, for the 2022 general election,

12   do you know how many voters in Dallas County had one

13   ID number in the -- in your system but not two ID

14   numbers in your system?

15     A.    I do not.

16     Q.    Do you know how many vote centers Dallas

17   County operated in the 2022 general election?

18     A.    I do not.

19     Q.    In your last deposition, you testified that

20   the e-pollbook kept information about voters who

21   voted in person in the polling place and either used

22   an interpreter or used an assister, for example, for

23   physical disability.   Do you remember that

24   testimony?

25     A.    Yes.

1    Q.    Okay.   Are you familiar with the e-pollbook

2  system and how poll workers use it at the polling

3  place?

4    A.    Yes.

5    Q.    Do you train poll workers on using the

6  e-pollbook?

7    A.    I do not.

8    Q.    Do you know the -- whether the e-pollbook

9  has a screen for the poll worker to check a box that

10  the voter is using an interpreter?

11    A.    Yes.

12    Q.    And are you aware whether the -- and does

13  it have a box for the poll worker to check that a

14  voter is using an interpreter?

15    A.    Yes.

16    Q.    And are you aware that the e-pollbook also

17  has a box for the poll worker to check if the voter

18  is using voter assistance?

19    A.    Yes.

20    Q.    How many Dallas County polling places in

21  the 2022 general election used the e-pollbook?

22    A.    All of them.

23    Q.    So would it be fair to say, then, that the

24  ExpressPoll Connect software could tell us how many

25  voters in the 2022 general election used an

1  interpreter to vote at the polls?

2      A.   Yes.

3      Q.   And the ExpressPoll Connect software would

4  tell us how many voters in the 2022 general election

5  used an assister or used voter assistance; is that

6  correct?

7      A.   Yes.

8      Q.   Do you know if those reports were produced

9  in this case to us?

10     A.   They were not.

11            MS. PERALES:  Okay.  I'll say that I

12  believe it falls under the document production

13  obligations of Dallas County to produce those

14  reports.  So. . .

15            MR. STOOL:  State again -- could you

16  state again exactly which -- because I thought they

17  were.  Could you state again which --

18            MS. PERALES:  Well, we'll follow up

19  after the deposition.

20            MR. STOOL:  All right.

21            MS. PERALES:  But I'll just say for

22  the -- for the record, we will want to make sure

23  that we received those reports for the 2022 general

24  election.

25            MR. STOOL:  And which reports?

1          MS. PERALES:  They are reports from

2     ExpressPoll Connect, which I understand is your

3     e-pollbook software.

4          MR. STOOL:  That state?

5          MS. PERALES:  That can generate

6     reports on voters who used an interpreter and voters

7     who used voter assistance.

8          MR. STOOL:  Okay.

9     BY MS. PERALES:

10        Q.   My last question for you has to do with

11    voter registration outreach.  Do you still have an

12    individual called the outreach coordinator?

13        A.   We do.

14        Q.   And what is that person's name?

15        A.   Esmeralda Garcia.

16        Q.   Okay.  Is she the same person who was the

17    outreach coordinator the last time we spoke back in

18    2022?

19        A.   Yes.

20        Q.   Okay.  You mentioned that Ms. Garcia and

21    that your office in the past had attended

22    naturalization ceremonies to offer in-person voter

23    registration.  Do you recall that testimony?

24        A.   Yes.

25        Q.   Does your office still do that?

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
 2                SAN ANTONIO DIVISION

 3
    LA UNIÓN DEL PUEBLO ENTERO,  *
 4  et al.,                      *
            Plaintiffs,          *
 5                               *
    v.                           *  Civil Action No.
 6                               *  5:21-cv-844 (XR)
    STATE OF TEXAS, et al.,      *
 7          Defendants.          *

 8              REPORTER'S CERTIFICATION
                DEPOSITION OF RIVELINO LOPEZ
 9                  APRIL 13, 2023

10              I, CHRISTY R. SIEVERT, CSR, RPR, in

11  and for the State of Texas, hereby certify to the

12  following:

13              That the witness, RIVELINO LOPEZ, was duly

14  sworn by the officer and that the transcript of the

15  oral deposition is a true record of the testimony

16  given by the witness;

17              I further certify that the signature of

18  the deponent was requested by the deponent or a

19  party and is to be returned within 30 days from date

20  of receipt of the transcript.  If returned, the

21  attached Changes and Signature Page contains any

22  changes and the reasons therefor;

23              I further certify that I am neither

24  counsel for, related to, nor employed by any of the

25  parties or attorneys in the action in which this
```

Rivelino Lopez - 4/13/2023

38

1  proceeding was taken, and further that I am not

2  financially or otherwise interested in the outcome

3  of the action.

4          Subscribed and sworn to on this the 9th

5  day of May, 2023.

6

7          _Christy Sievert_

8          _____
           CHRISTY R. SIEVERT, CSR, RPR
9          Texas CSR 8172
           Expiration Date:  4-30-2025
10         Integrity Legal Support Solutions
           Texas CRF 528
11         9901 Brodie Ln. #160-400
           Austin, Texas 78748
12         (512) 320-8690
           www.integritylegal.support

13

14

15

16

17

18

19

20

21

22

23

24

25

Transcript of the Testimony of

**The Office of the Dallas County Elections Administrator**

**Date:**

April 29, 2022

**Case:**

LA UNION DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

```
 1                UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3  LA UNION DEL PUEBLO ENTERO,)(
    ET AL.,                    )(
 4                             )(
        PLAINTIFFS,            )(
 5                             )(    CIVIL ACTION
    VS.                        )(    NO. SA-21-CV-00844-XR
 6                             )(
    GREGORY W. ABBOTT, ET AL., )(
 7                             )(
                               )(
 8      DEFENDANTS.            )(
    -----------------------------------------------------

 9
                  VIDEOTAPED AND VIDEOCONFERENCED
10                    ORAL DEPOSITION OF
                  RIVELINO LOPEZ, TACOMA PHILLIPS
11                  AND MICHAEL SCARPELLO
                      APRIL 29, 2022
12

13           VIDEOTAPED AND VIDEOCONFERENCED ORAL DEPOSITION

14  OF RIVELINO LOPEZ, TACOMA PHILLIPS AND MICHAEL

15  SCARPELLO, produced as witnesses at the instance of the

16  Plaintiff LUPE, and duly sworn, was taken in the

17  above-styled and numbered cause on the 29th day of

18  April, 2022, from 10:47 a.m. to 8:02 p.m., before Holly

19  R. Swinford, CSR in and for the State of Texas, reported

20  by machine shorthand, at the Office of the Dallas

21  Elections Administrator, located at the Records

22  Building, 500 Elm Street, 7th Floor, Room 7Y11, in the

23  City of Dallas, County of Dallas, State of Texas,

24  pursuant to Notice, the Federal Rules, and the

25  provisions stated on the record or attached hereto.
```

1  Elections Administrator refers to the big counties as

2  "the big boys."  Have you heard that before?

3      A.    Yes.

4      Q.    Yeah.  Dallas County is one of the big boys,

5  isn't it?

6      A.    Oh, yeah.

7      Q.    Yeah.  Are you familiar with the TEAM system?

8      A.    Yes.

9      Q.    Is Dallas County an online county or an offline

10  county?

11      A.    Offline.

12      Q.    Do you know why Dallas County is an offline

13  county?

14      A.    I think the larger counties, it would be too

15  much for the State system to handle.  So I guess about

16  half the state, especially the larger ones, have their

17  own VR database.

18      Q.    Okay.  I'm going to ask these questions just --

19  not because I'm going to go into them deeply with you.

20  I just want to make sure I understand what you know --

21      A.    Okay.

22      Q.    -- about your relationship with the TEAM

23  system.  And like I said, I'm not going to go deep, but

24  I just want to make sure --

25      A.    Okay.

1     Q.    -- I understand.

2          Do you know how many voters in Dallas County

3  you do not have either a driver's license number or the

4  last four of the Social?

5     A.   It's -- I know 99.46 percent do have a driver's

6  license or a Social on record.  So about a half a

7  percent of our -- our registered voters.  I guess it

8  would be close to 70,000.

9     Q.   Do you know how many people only have one

10 number and not both numbers?

11    A.   97.13 percent have at least one.

12    Q.   Have at least one?

13    A.   Uh-huh.

14    Q.   But do you -- can you tell me how many lack

15 both numbers?

16    A.   Probably close to 70,000.

17    Q.   Okay.  Yes.  I asked that question --

18    A.   Yeah.

19    Q.   -- wrong.  Let me try again.

20          How many of your registered voters only have

21 one number and not a second number?

22    A.   That would be -- I want to say -- well, because

23 97 percent of them have either a Texas Driver's License

24 or --

25    Q.   Uh-huh.

1        A.     -- an ID.

2        Q.     Uh-huh.

3        A.     So, yeah, I'll have to look at that.  I don't

4   know that number off the top of my head.

5        Q.     Okay.  And so what you -- just so you

6   understand what I'm getting at, if you have a driver's

7   license number for me --

8        A.     Uh-huh.

9        Q.     -- but you don't have my Social --

10       A.     Right.

11       Q.     -- or you have my Social, but you don't have my

12   driver's license.

13              So people for whom you have one number filled

14   in, but you don't have a second number for them, you

15   would have to go back and try to see how many that were?

16       A.     Uh-huh.

17       Q.     Okay.

18       A.     Yes.

19       Q.     Okay.  And now with respect to TEAM, do you

20   have knowledge of whether you received an update from

21   TEAM -- "you," meaning Dallas County -- received an

22   update for TEAM sometime around December or January that

23   was from the Secretary of State that went into your

24   system that had additional ID numbers for your

25   registered voters?

1    centers; is that correct?

2         A.    Correct.

3         Q.    And you expect to do that, as well, for the

4    November 2022 general election?

5         A.    Yes.

6         Q.    Okay.  In -- do you recall -- do you recall the

7    hours that you had polling places open in 2018?

8         A.    No.  I'd have to look at the time, but it's --

9    it's pretty standard.  Usually the first week's 8:00 to

10   5:00; second week, 7:00 to 7:00 and then Saturdays,

11   usually 7:00 to 7:00 and Sundays 12:00 to 6:00.  It's

12   pretty -- that's our pretty standard hours each

13   election.

14        Q.    Uh-huh.  Okay.  And did you do anything with

15   extended hours for voting in 2020?

16        A.    They extended an extra week of early voting --

17        Q.    Uh-huh.

18        A.    -- so we had an extra week, and every day was

19   7:00 to 7:00.  So they extended -- instead of 8:00 to

20   5:00, it was 7:00 to 7:00 --

21        Q.    Okay.

22        A.    -- with the exception of Sunday, which was

23   still 12:00 to 6:00.

24        Q.    Okay.  So for -- we were just talking about

25   2020 --

1      A.    (Witness moves head up and down.)

2      Q.    -- when you did that.

3            Have you then, with respect to 2022, for the

4   March primary, did you keep those same hours as you had

5   in 2020; or did you make any adjustments?

6      A.    No.   Went back to our standard 8:00 to 5:00,

7   7:00 to 7:00.   We did extend the last day of early

8   voting for the primary to 10:00 o'clock.

9      Q.    To 10:00 p.m.?

10      A.    Uh-huh.

11      Q.    And that was --

12      A.    I believe it was the 25th of February.   I

13   believe that was the last day of early voting.

14      Q.    And why did you extend voting until 10:00 p.m.

15   on February 25th, 2022?

16      A.    It was ordered by the County Judge.   We kind of

17   found out at the last minute.   They let us know, Hey

18   we're staying opened till 10:00.

19            And I don't even know if they advertised it or

20   whatever.   But yeah, we found out at the last minute, so

21   we just kept the polls open till 10:00.

22      Q.    You asked the poll workers to stay and --

23      A.    Yeah.   We had to send, like, a mass -- our

24   ePollbook has a messaging.   So we sent a mass message,

25   and we were also calling them, too, so -- to let them

```
 1   know.

 2       Q.   Okay.  And do you know if staying open until

 3   10:00 p.m. on February 25th afforded voters in Dallas

 4   County an additional opportunity to go to the polls and

 5   cast their ballot that day?

 6              MS. HUNKER:  Objection, form.

 7       A.   It did, yes.

 8       Q.   (By Ms. Perales)  Do you know or do you have a

 9   sense of why the County Judge ordered you to stay open

10   till 10:00 p.m. on the last day?

11       A.   I do not.

12       Q.   Okay.

13       A.   Can't recall.

14       Q.   All right.  Do you know if there were voters

15   who were trying to vote mail ballots who were then

16   coming to the polls on that last day, including up till

17   10:00 p.m., to -- to hand drop-off their mail ballots?

18              MS. HUNKER:  Objection to form.

19       A.   I don't know.

20       Q.   (By Ms. Perales)  Okay.  So I have a question

21   about your involvement in kind of voting during the

22   election days when people are voting.

23              You're the Voter Registration Manager --

24       A.   Uh-huh.

25       Q.   -- but it sounds like you've also got some
```

```
 1   duties that are related to the actual casting of

 2   ballots; is that right?

 3       A.   No.  I stick to voter registration.  So we

 4   help -- like, if a judge calls, has a voter that's

 5   having an issue, they can't find them in the poll book,

 6   we look them up and help them.  Like, during early

 7   voting, we offer limited ballot process.  Election Day,

 8   they offer the provisional process, so we help them,

 9   help the judge and the voter through that.

10       Q.   Okay.  And then, as the Voter Registration

11   Manager, were you involved in trying to process, for

12   March 2022, people's applications for ballot by mail and

13   mail ballots to the extent that there was this new

14   requirement to match the ID number, that was being

15   provided, to the voter?

16       A.   No.

17       Q.   You weren't doing any of that matching work?

18       A.   No.  If they -- if the ballot by mail

19   department gave us a form, we -- like, because it had a

20   Statement of Residence, also --

21       Q.   Uh-huh.

22       A.   -- on the form.  So if they filled out a form,

23   they would give it to us and we would update their

24   information.

25       Q.   Okay.  So that's if you had the person at the
```

 1  wrong address.

 2          Do you have any knowledge, in March of 2022,

 3  this most recent primary election, of voters having to

 4  put an ID number, either driver's license or last four

 5  of the Social, on their application for ballot by mail

 6  or on the carrier envelope?

 7      A.   Yes, I knew about that.

 8      Q.   Okay.

 9      A.   Yes.

10      Q.   Were you involved in doing any of the checking

11  of those numbers or trying to match those numbers to the

12  voter roll?

13      A.   No, I wasn't.

14      Q.   Okay.  You've been designated to talk about

15  Dallas County's experience with voters who vote with

16  assistance in person from 2018 to the present.

17          Do you have knowledge about Dallas County

18  Election's experience with voters who come with another

19  person to vote in person, so at the polls?

20      A.   When we were preparing, they asked if we can

21  pull statistics.  And so I went into our ePollbook, and

22  we -- we can.  We do track that with our new ePollbook,

23  our current one.  Before, we weren't tracking it; but I

24  was able to pull statistics to show how many people

25  requested assistance.

1      Q.    Uh-huh.  And I just learned yesterday that the

2   ePollbook can be handy for figuring that information

3   out.

4      A.    Yeah.

5      Q.    So a couple of questions.  When you say that

6   you didn't track it before, what does "before" mean?

7      A.    Before we implement our current ePollbook,

8   which is before 2020.

9      Q.    Okay.  But for -- at least for 2020 onward, you

10  can run a report that tells you how many voters voted at

11  the polling place with assistance; is that right?

12     A.    Yes.

13     Q.    And the poll book, the ePollbook is used in the

14  polling places where the people come personally to vote;

15  is that right?

16     A.    Yes.

17     Q.    Would you have that same information for who

18  voted with assistance by mail ballot, where the assistor

19  signs on the mail ballot --

20     A.    I wouldn't have that, no.

21     Q.    Okay.  Did you run any reports about how many

22  voters used assistants in either this most recent 2022

23  or prior elections?

24     A.    I did.  I didn't -- I -- I ran the reports to

25  get the numbers.  I wrote the numbers down, but I don't

1    have the reports.

2        Q.    Okay.  So I'm going to ask you for the numbers

3    so you can --

4        A.    Okay.

5        Q.    -- tell me them, and then I'm going to ask for

6    the reports, themselves, to be produced because I

7    believe that information is responsive to at least one

8    of our Requests for Production.

9        A.    Okay.

10       Q.    Okay.  So tell me the numbers that you have.

11       A.    For this recent primary election, 2022, there

12   was 752 voters requested assistance.  For November 2021,

13   there was a hundred and thirty.  For June 2021, we had

14   88.  For May 2021, we had 228.  And for November 2020,

15   we had 4,335.  And we had a small run-off election

16   December '21.  We only had one.

17       Q.    That must have been a very small run-off.

18       A.    Yeah.

19       Q.    December of 2021.  I'm just trying to think of

20   what office would have been in a run-off in December of

21   2021, but it must --

22       A.    I --

23       Q.    -- must have been something special.

24       A.    Yeah.

25       Q.    Okay.  Thank you.

```
 1        A.    All right.
 2        Q.    So since it sounds like you've already run a
 3   few reports, so you're familiar with how to run these
 4   reports, is that right, on the ePollbook?
 5        A.    Yes.
 6        Q.    Okay.  Can you also get the names of the
 7   voters?
 8        A.    Yes.  The names are on the report.
 9        Q.    Okay.  Okay.  So, for example, you could see
10   which voters have a Spanish surname, like Lopez or
11   Perales versus another kind of name?
12        A.    Yes.
13        Q.    Okay.  What is the software that you're using
14   now that allows you to run the report?
15        A.    It's called ExpressPoll Connect, and the vendor
16   is ES&S, which is Election Systems & Software.
17        Q.    Have you ever assisted a voter to vote?  Have
18   you ever gone with someone and helped them?
19        A.    I have not.
20        Q.    Okay.  Do you have anyone in your family here
21   in Dallas County who uses assistants to vote?
22        A.    No.
23        Q.    No viejitos?
24        A.    No.
25        Q.    Okay.  Does Dallas County -- or from January of
```

1      Q.   And what's your other language?  You said it's

2  the third, so Spanish, Vietnamese --

3      A.   And English.

4      Q.   Oh.  Okay.  Have you ever done any voter

5  registration or voter outreach in minority neighborhoods

6  (indicating) specifically, or that just happens

7  naturally as a result of your regular work?

8      A.   Right.  It happens --

9                MS. HUNKER:  Objection, form.

10     A.   -- naturally.  I mean, if the high school or

11  the college is in a minority area, I mean, yes, we're --

12  we're there.

13     Q.   (By Ms. Perales)  Okay.  Do you -- do you have

14  any involvement in where you choose to locate polling

15  places for voting?

16     A.   I don't.

17                MS. PERALES:  I would like to take a

18  couple of minutes off the record, if I could.

19                THE VIDEOGRAPHER:  Okay.  We're going off

20  the record.  The time is 11:29 a.m.

21                     (Break taken.)

22                THE VIDEOGRAPHER:  Okay.  We are back on

23  the record.  The time is 11:33 a.m.

24                MS. PERALES:  Okay.  Before I pass the

25  witness, Mr. Lopez, I want to thank you for your

```
 1  patience with us today.  You are not done, but you
 2  are done with me, and I'm going to pass you along to
 3  Mr. White here.  But I did want to note for the record
 4  that, based on our discussion, that the ExpressPoll Pad
 5  Connect software can run reports on how many voters
 6  voted in person with an assistor, that we believe that
 7  that information is responsive to some of our request
 8  for production.  And we are happy to continue this
 9  conversation, but I want to note for the record that we
10  believe that the reports that Mr. Lopez is referencing
11  is something that we've asked for in the case, and that
12  Mr. Lopez also suggested there might be records
13  maintained by the Outreach Coordinator on voters --
14  voter outreach at naturalization ceremonies, which may
15  also be responsive to our discovery requests.  And I'd
16  be happy to sort of pinpoint that for you at a later
17  point, but I want to make sure that I get that on the
18  record before I pass the witness.
19              MR. STOOL:  Understood.
20              MS. PERALES:  And now I pass the witness.
21              MR. STOOL:  All right.
22              MS. PERALES:  And we're just going to --
23              MR. WHITE:  Yeah, I'll --
24              MS. PERALES:  -- hand this microphone to
25  Mr. White.
```

```
 1                        EXAMINATION
 2  BY MR. WHITE:
 3       Q.    Mr. Lopez, how are you?
 4       A.    Doing good.
 5       Q.    I just have a couple of questions about your
 6  testimony earlier about extended hours in voting.
 7             And you testified earlier that polling places
 8  were open until 10:00 p.m. on February 25th, 2022 --
 9       A.    Yes.
10       Q.    -- is that right?
11             And was that because of a Court Order?
12       A.    Yes.
13       Q.    And do you remember what the reason was for the
14  judge ordering the extended voting hours?
15       A.    I don't.
16       Q.    Okay.  And how late were polling places
17  supposed to stay open prior to that Court Order?
18       A.    7:00.
19       Q.    Until 7:00 p.m.?
20       A.    Well, If there's no voters in line at 7:00
21  o'clock.  But if there's voters, they got to vote.
22       Q.    Were you concerned that having polling places
23  open until 10:00 p.m. on that day would lead to a voter
24  fraud?
25       A.    No.
```

The Office of the Dallas County Elections Administrator                    April 29, 2022
                                                                                Page 42

1      Q.    Why not?

2            MS. HUNKER:   Objection, form.

3      A.    I have no reason to believe that, no.

4      Q.    (By Mr. White)   Was anyone in your office

5   concerned that having the polling places open until

6   10:00 p.m. would lead to voter fraud?

7            MS. HUNKER:   Objection, form.

8      A.    I can't speak for them, no.

9      Q.    (By Mr. White)   Did you hear anyone in your

10  office express concerns to you that these extended hours

11  would lead to voter fraud?

12     A.    No.

13     Q.    Did your office receive any complaints from

14  voters that these extended hours would lead to voter

15  fraud?

16           MS. HUNKER:   Objection, form.

17     A.    I don't know if we received any complaints.

18     Q.    (By Mr. White)   Are you aware of any voter

19  fraud that occurred during these extended hours on

20  February 25th?

21     A.    I'm not aware of any.

22     Q.    Do you know how many voters showed up to vote

23  during these extended hours on February 25th?

24     A.    I do not have those numbers.

25     Q.    Okay.   Do you know if there were particular

 1  precincts in Dallas County where voters were more likely

 2  to show up during these extended hours on February 25th?

 3      A.    I don't --

 4                MS. HUNKER:  Objection, form.

 5      A.    -- know that.

 6      Q.    Okay.

 7                THE REPORTER:  I'm sorry.  Okay.  Thank

 8  you.

 9      Q.    (By Mr. White)  As a general matter, are there

10  voters in Dallas County who struggle to make it to the

11  polls during normal voting hours?

12                MS. HUNKER:  Objection, form.

13      A.    Repeat the question.

14      Q.    As a general matter, are there voters in Dallas

15  who struggle to make it to the polls during normal

16  voting hours?

17                MS. HUNKER:  Objection, form.

18      A.    I don't know.

19                MR. WHITE:  Okay.  I have no further

20  questions.

21                THE REPORTER:  Just a --

22                MR. WHITE:  And I will pass the --

23                THE REPORTER:  Just a second.  Okay.

24  Thank you.

25                MR. WHITE:  Okay.  Well, I will pass the

```
 1              MS. PERALES:  -- none of the other
 2   Plaintiffs have questions.  So I think it's coming
 3   around the table to Ms. Hunker.
 4                      EXAMINATION
 5   BY MS. HUNKER:
 6       Q.   All right.  Hello, Mr. Lopez.
 7       A.   Hello.
 8       Q.   It's good seeing you again.
 9       A.   You, too.
10       Q.   So I have only a handful of questions for you.
11   To give you a precursor, my questions are mostly in
12   response to what the Plaintiffs have asked, and so
13   there's going to be a little bit of jumping around.
14              If at any point you get confused by my
15   switching subject or I'm not clear, can you please let
16   me know?  I am happy to lay either more foundation or to
17   rephrase the question.
18       A.   Okay.
19       Q.   Excellent.  So you had spoken about the
20   extended hours on February 25th, 2022; is that correct?
21       A.   Yes.
22       Q.   And the extended hours was based off of
23   decision from a Court; is that correct?
24       A.   Yes.  The County Judge, yes.
25       Q.   So when you say "a court" and you say "the
```

```
 1   County Judge," are you referring to a judicial action,

 2   or are you referring to the County Judge acting in his

 3   executive capacity in Dallas County?

 4        A.   The County Judge from the Commissioners Court.

 5        Q.   Okay.  So you're referring to the Commissioners

 6   Court made the decision to have extended hours?

 7        A.   Yes.

 8        Q.   Okay.  So this was not imposed on Dallas

 9   County.  This was a decision that Dallas County made,

10   itself; is that correct?

11        A.   Yes.

12        Q.   And they did not communicate why they asked for

13   extended hours on February 25th?

14        A.   They may have.  I just don't know that answer.

15        Q.   And so let me break that question down twice,

16   just to -- to clarify.

17             You were not aware of the reasons they

18   requested extended hours at all during that election; is

19   that correct?

20        A.   Correct.

21        Q.   And you do not know why they requested extended

22   hours on the specific day of February 25th; is that

23   correct?

24        A.   Correct.

25        Q.   When you extended hours from -- ending at 7:00
```

 1   Vote Center Advisory Committee.

 2        Q.   (By Ms. Hunker)  Do you know if any of the vote

 3   center committees findings or discussions are online?

 4        A.   I don't know if they are online.

 5        Q.   Now, you had also discussed the ePad or the --

 6   where you sign in on -- when in-person voting.  And I

 7   believe you said that that picks up who has requested

 8   assistance, all for the last few years; is that right?

 9        A.   Yes.

10        Q.   How does that work exactly?

11        A.   The ePollbook has -- you can sign on the

12   ePollbook, so there's a oath on there if somebody

13   requests assistance, and then the person giving the

14   assistance signs the oath on there.  And so when we do

15   the report, even the signature comes on the report, as

16   well.

17        Q.   Okay.  And so when it comes to assistants, it's

18   only picking up individuals who took the oath; is that

19   correct?

20        A.   Yes.

21        Q.   And so it's only taking individuals who assist

22   with the actual marking of the ballot; is that correct?

23             MS. PERALES:  Objection, vague.

24        A.   The -- for the ballot-marking device, yes.

25        Q.   (By Ms. Hunker)  So if, let's say, I were to

1   bring my grandmother in to vote and she's in a

2   wheelchair and I helped push her to the polling

3   location, but then she voted on her own, would she --

4   would I have had to sign the poll book?

5                   MR. WHITE:  Objection --

6                   MS. PERALES:  Objection --

7                   MR. WHITE:  -- form.

8       A.   No.

9                   THE REPORTER:  I'm sorry.  Thank you.

10      Q.   (By Ms. Hunker)  And so only certain types of

11  assistance are marked on the poll book; is that correct?

12                  MS. PERALES:  Objec- --

13      A.   Voting assistance.

14                  MS. PERALES:  -- -tion --

15      Q.   (By Ms. Hunker)  Voting assistance.

16                  MS. PERALES:  -- this is --

17      A.   Yes.

18                  THE REPORTER:  Sorry.

19                  MS. PERALES:  Objection -- hold up --

20                  THE WITNESS:  Okay.

21                  MS. PERALES:  -- for one second --

22                  THE WITNESS:  Okay.

23                  MS. PERALES:  -- if you would.

24                  First, objection, form; second, I want to

25  object that this is outside the scope of the designated

1    topic of this witness and possibly outside the scope of

2    his knowledge as the Voter Registration Director.

3                    THE REPORTER:  And I didn't hear your

4    answer.  Can you say your answer again?  You just said a

5    few words, I know, but I did not hear you.

6                    THE WITNESS:  Yes.

7                    THE REPORTER:  Thank you.

8        Q.   (By Ms. Hunker)  And so let me ask the question

9    again because I actually lost my place of thought.

10                   MS. HUNKER:  And I would ask that we keep

11   speaking objections to a minimum under local rules, 30,

12   only because it does disrupt my thought process.

13                   MS. PERALES:  And I will, however, be

14   making the same objections again.

15                   Go ahead, Ms. Hunker.

16       Q.   (By Ms. Hunker)  So only certain types of

17   voting assistance are -- let me -- let me rephrase the

18   question.

19                   Only people who are offering certain types of

20   voting assistance sign on the ePad; is that correct?

21       A.   Yes.

22                   MS. PERALES:  Same objection.

23       Q.   (By Ms. Hunker)  And how much familiarity do

24   you have with the ePad or the process in which an

25   assistor would sign the ePad?

```
 1       A.    I've been trained on it, and I've helped --
 2  I've trained others on my staff.  I've trained them on
 3  it, as well.
 4       Q.    So is this part of your responsibilities?
 5       A.    Not at the polls.
 6       Q.    But you said you have trained on this
 7  particular device; is that correct?
 8       A.    Yes.
 9       Q.    And you've trained others?
10       A.    Right.
11       Q.    And have you seen it work and function?
12       A.    Yes.
13       Q.    And are you familiar with how it operates?
14       A.    Yes.
15       Q.    And you're familiar with the procedures in
16  which it -- it operates on this?
17       A.    Yes.
18             MS. HUNKER:  All right.  No further
19  questions.
20             MS. PERALES:  I have questions if Defense
21  Counsel don't.
22             MR. STOOL:  No, I don't have any.
23             MS. PERALES:  Okay.
24                  REEXAMINATION
25  BY MS. PERALES:
```

1     Q.    Well, Mr. Lopez, I spoke too soon when I said I
2  was done with you.
3         Do you work at the polling place on Election
4  Day?
5     A.    No.
6     Q.    Do you make a decision or have you ever made
7  the decision whether somebody who is coming into the
8  polling place to assist another voter has to sign the
9  Oath of Assistance?
10    A.    Not at the polls, no.
11    Q.    Are you aware of the criteria that poll workers
12 and election judges use to decide who has to sign the
13 Oath of Assistance when they come with a voter to the
14 polling place?
15              MS. HUNKER:   Ob- --
16    A.    Yes.
17              MS. HUNKER:   -- -jection, form.
18    A.    Yes.
19    Q.    (By Ms. Perales)  Say that again.
20    A.    Yes.
21    Q.    And what is that criteria, then?
22    A.    If they are -- if the voter requests
23 assistance, that's the person that will be signing the
24 ePollbook.
25    Q.    Okay.  And so the voter comes with the

1   assistor?

2        A.    Uh-huh.

3        Q.    The voter says, I -- I want to bring this

4   person here to help me vote, and then the assistor signs

5   the oath; is that correct?

6        A.    Yes.

7        Q.    And are -- do you know if there's criteria that

8   election judges and poll workers use to decide whether

9   someone who's pushing a wheelchair, for example, is or

10  isn't an assistor?

11       A.    Is there a criteria?

12       Q.    Yeah.  Do the poll workers make the decision,

13  who is an assistor?  You know, what kind of help makes

14  you an assistor or not?  Do -- are you aware of any

15  criteria that the poll workers use to make that

16  decision?

17       A.    They have a training guide, yes.

18       Q.    Okay.  And so do you -- can you say, sitting

19  here today, whether someone who's pushing a wheelchair

20  with a voter and then comes in with them and over to the

21  voting station, can you say whether, sitting here today,

22  you know whether the poll workers would ask that person

23  who was pushing a wheelchair to sign the oath or not?

24            MS. HUNKER:  Objection, form.

25       A.    Yes, because that person would have to say, "I

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                        Page 57

 1  need assistance, and here's my assistor" --

 2       Q.   (By Ms. Perales)  Okay.

 3       A.   -- yes.

 4       Q.   So, in that instance, the person pushing the

 5  wheelchair and going over to the voting station with the

 6  voter is the assistor who would sign the oath; is that

 7  right?

 8       A.   Yes.

 9               MS. PERALES:  Okay.  Thank you.

10               I pass the witness.

11               MR. WHITE:  I have no further questions.

12               MS. HUNKER:  Just to quickly clarify on a

13  point, assuming there's no other questions from the

14  attorneys on Zoom.  Hearing none --

15               MS. BENDER:  No questions.

16               MR. STOOL:  ID.  ID.  Who said that?

17               MS. PERALES:  Oh, that's -- that's Brady.

18               THE REPORTER:  Thank you.

19               MS. BENDER:  I'm sorry.  That's right.  No

20  questions at this time.  Thank you.

21                         REEXAMINATION

22  BY MS. HUNKER:

23       Q.   So in the example where an individual is being

24  pushed, the way that the as- -- the way they would sign

25  the eBook or ePad is if they were announced, "This is my

```
 1   assistor"; is that correct?
 2       A.   Correct.
 3       Q.   And so if the person who is voting chooses not
 4   to state, "This is my assistor," that person would not
 5   sign the eBook; is that correct?
 6       A.   Correct.
 7               MS. HUNKER:  Thank you.
 8               MS. PERALES:  And so subject to another
 9   witness saying that they can't testify on a topic that
10   Mr. Lopez says he has knowledge of, then I think we can
11   switch over to the next witness now.
12               MR. STOOL:  Okay.  Mr. Lopez needs to get
13   back to the Elections Department, which is not that far
14   from here, but -- so if he has to come back, he'll have
15   to drive back down here.  But he's got duties he's got
16   to take care of because early voting is going on as
17   we're having this conversation.
18               MS. PERALES:  Understood.
19               MR. STOOL:  Okay.  So --
20               MS. PERALES:  Shall we take a moment off
21   the record --
22               MR. STOOL:  Sure.
23               MS. PERALES:  -- to switch out our
24   witnesses.
25               MR. STOOL:  Yes.
```

```
 1                         REEXAMINATION
 2    BY MS. PERALES:
 3         Q.   And just a couple of questions also about this
 4    document, which I would like the court reporter to hand
 5    to you, and it has been marked as Exhibit 3.
 6              (Document handed to the witness.)
 7         Q.   So, Mr. Lopez, you've been handed what has been
 8    marked Exhibit 3, and do you recognize those as the two
 9    pages that you brought with you today to the deposition?
10         A.   Yes.
11         Q.   And you described them a little bit earlier in
12    the deposition; is that right?
13         A.   Yes.
14         Q.   And just for the sake of the record, on this
15    first page of the exhibit, which is dated November 6th,
16    2018, can you tell me what that last column is that is
17    titled ED, underscore, ADA?
18         A.   ED's for Election Day.  ADA is for America's
19    Disability Act, and that's for voters with disabilities
20    that are voting.
21         Q.   And is it voters who used a special machine to
22    vote?
23         A.   Yes.  An ADA machine, yes.
24         Q.   All right.  So if a voter came in with an
25    assistant to help that voter vote on a regular machine,
```

1   would the voter be listed in this column, ED,

2   underscore, ADA?

3       A.   If they had a disability and had to use that

4   machine, they would be listed on that column.

5       Q.   Okay.  Let's say they don't use an ADA machine;

6   they use a regular machine, because they bring someone

7   with them to help them.  If the voter uses a regular

8   machine --

9       A.   Okay.

10      Q.   -- non-ADA machine, with an assistor, would

11  that voter turn up here (pointing) in the column ED,

12  underscore, ADA?

13      A.   No.

14      Q.   Let me just check and see if I have any other

15  questions.

16      A.   Okay.

17      Q.   Is it correct to say that the column EV-ED,

18  underscore, PROV is for provisional ballots that were

19  cast and counted in the election?

20      A.   Yes, for both early voting and Election Day.

21  Yes.

22      Q.   And then I recognize the column, Election Day.

23           Now, that would be votes cast in person on

24  Election Day; is that right?

25      A.   Yes.

The Office of the Dallas County Elections Administrator          April 29, 2022
                                                                    Page 63

1       Q.    And then the column, EV, underscore, Mail is

2   mail ballots that you counted?

3       A.    Yes.

4       Q.    And the column, EV, underscore, in Person is

5   people who voted in person early; is that correct?

6       A.    Yes.

7       Q.    And then under Total Votes, I see the number

8   there, 731,576.

9             Is that the total number of ballots cast in

10  that election?

11      A.    Yes.

12      Q.    And then I -- is it correct to say that the

13  orange highlighting on "Straight Party" and some of

14  those numbers, that came from you; is that right?

15      A.    Yes.

16      Q.    Okay.  On the second page of the exhibit, which

17  says:  "Primary Election Comparison," is that the

18  document you mentioned earlier that totals up how many

19  votes were cast in either the Democratic Primary or the

20  Republican Primary?

21      A.    Yes.

22      Q.    And there's a -- there is a list of days here,

23  Day 1, Day 2; and then towards the bottom, it says Day

24  12.  Is that right?

25      A.    Yes.

1    Q.   Okay.  But this is only for primary elections

2  in 2022, 2018 and 2014; is that right?

3    A.   Yes.

4    Q.   We were talking earlier about the polls staying

5  open until 10:00 p.m. on the last day of Early Voting in

6  a particular election.

7         And are the number of votes cast in each party

8  primary for that day that the polls stayed open until

9  10:00 p.m., is that represented on this chart here?

10   A.   Yes, that's Day 12.

11   Q.   For which year?

12   A.   2022.

13   Q.   So is it correct to say that for Day 12 in the

14  2022 primary, the number of ballots cast was 18,101 --

15   A.   Yes.

16   Q.   -- for Democrat, and 10,270 for Republican?

17   A.   Yes.

18   Q.   Are those numbers just of in-person Early

19  Voting?

20   A.   Yes.

21   Q.   So that doesn't include any tabulation of mail

22  ballots, correct --

23   A.   Correct.

24   Q.   -- or Election Day votes?

25   A.   Correct.

1      Q.   Would it be fair to say, then, that for both

2   the Democratic and Republican Primaries in November

3   2022, that on that day that you held the polls open

4   until 10:00 p.m., more votes were cast than in the two

5   previous comparison years?

6               MS. HUNKER:  Objection to form.

7      A.   Can you repeat?  Did you say in November?  Will

8   you repeat?

9      Q.   (By Ms. Perales)  No.  I was asking if in

10  Nov- -- I did say November of --

11     A.   Yeah.

12     Q.   -- 2022.

13     A.   Okay.

14     Q.   That's my mistake.

15          Would it be fair to say that for the March

16  primary in 2022 on Day 12, Friday, which was the day the

17  polls stayed open until 10:00 p.m., that more votes were

18  cast in both the Democratic and Republican Primaries

19  when compared to previous years?

20     A.   Yes.

21               MS. HUNKER:  Objection to form.

22               MS. PERALES:  I pass the witness.

23               MR. WHITE:  I have no further questions.

24               MS. HUNKER:  I --

25               THE REPORTER:  Can you slow down just a

1    little bit for me, please?  Can you slow down?

2                    MS. HUNKER:  Yes.

3                    THE REPORTER:  Thank you.  Okay.  I'm

4    ready.

5                    MS. HUNKER:  Ready?

6                    THE REPORTER:  Uh-huh.

7                         REEXAMINATION

8    BY MS. HUNKER:

9        Q.    Mr. Lopez, when we were talking about the

10   document just earlier, we were referencing the

11   Plaintiff's Exhibit Number 3, correct?

12       A.    Number 3?

13             (Ms. Perales holding document up.)

14       A.    Yes.

15       Q.    And so let's look on the second page of that

16   exhibit.

17       A.    Okay.

18       Q.    And this is where it says "Primary Election

19   Comparison," correct?

20       A.    Yes.

21       Q.    And you were speaking to Counsel about Day 12,

22   correct?

23       A.    Yes.

24       Q.    And that was February 25th, 2022, correct?

25       A.    Yes.

1      Q.   And that is the day that the polls were

2   extended an additional three hours; is that correct?

3      A.   Yes.

4      Q.   This chart does not list the times in which

5   voters voted, correct?

6      A.   Correct.

7      Q.   And so you don't know when the voters voted

8   that day, is that correct?

9      A.   That's correct.

10      Q.   And if we look at 2018 and 2014, it appears

11   that the last day of Early Voting has the most number of

12   in-person votes for the Early Voting period; is that

13   correct?

14      A.   That's correct.

15               MS. PERALES:  Objection.

16               MS. HUNKER:  No more questions.

17               MS. PERALES:  No more questions here.

18               MR. STOOL:  We don't have any questions.

19               MS. PERALES:  Shall we go off the record

20   while they switch microphones?

21               MS. HUNKER:  I think so.

22               MR. STOOL:  Yes.

23               THE VIDEOGRAPHER:  Okay.  We're going back

24   off the record.  The time is 12:16 p.m.

25               (Discussion off the record.)

1

2
                    REPORTER'S_CERTIFICATION
                 _____ _____
3
                UNITED STATES DISTRICT COURT
4                WESTERN DISTRICT OF TEXAS
                   SAN ANTONIO DIVISION
5
LA UNION DEL PUEBLO ENTERO,)(
6  ET AL.,                   )(
                            )(
7      PLAINTIFFS,           )(
                            )(   CIVIL ACTION
8  VS.                       )(   NO. SA-21-CV-00844-XR
                            )(
9  GREGORY W. ABBOTT, ET AL., )(
                            )(
10                           )(
      DEFENDANTS.            )(
11 ------------------------------------------------------------

12

13

14

15          ORAL DEPOSITION OF RIVELINO LOPEZ,

16        TACOMA PHILLIPS AND MICHAEL SCARPELLO

17                  APRIL 29, 2022

18

19

20        I, Holly R. Swinford, Certified Shorthand

21 Reporter in and for the State of Texas, do hereby

22 certify to the following:

23          That the witnesses, Rivelino Lopez, Tacoma

24 Phillips and Michael Scarpello, were by me duly sworn

25 and that the transcript of the oral deposition is a true

 1    record of the testimony given by the witnesses.

 2              I further certify that pursuant to Federal

 3    Rules of Civil Procedure, Rule 30(e)(1)(A) and (B) as

 4    well as Rule 30(e)(2), that review of the transcript and

 5    signature of the deponent:

 6              _____ was requested by the deponent and/or a

 7    party before completion of the deposition.

 8              _____ was not requested by the deponent and/or

 9    a party before the completion of the deposition.

10              I further certify that I am neither attorney or

11    counsel for, nor related to or employed by any of the

12    parties to the action in which this deposition is taken

13    and further that I am not a relative or employee of any

14    attorney of record in this cause, nor am I financially

15    or otherwise interested in the outcome of the action.

16              The amount of time used by each party at the

17    deposition is as follows.

18

19         1.    MS. NINA PERALES
                 TIME:  04:16
20         2.    MR. GRAHAM W. WHITE
                 TIME:  00:37
21         3.    MS. KATHLEEN HUNKER
                 TIME:  01:23
22         4.    BEN L. STOOL
                 TIME:  00:00
23         5.    MS. BRADY BENDER
                 TIME:  00:06
24         6.    MS. SOPHIA CAI
                 TIME:  00:24
25         7.    MS. JACQUELINE VILLAREAL

The Office of the Dallas County Elections Administrator                  April 29, 2022
                                                                        Page 341

```
 1              TIME:    00:00

 2              Subscribed and sworn to on the _____ day

 3   of May, 2022.

 4                       Holly R. Swinford

 5                       _____

 6                       Holly R. Swinford
                         Texas CSR 3356
                         Expiration:  2/1/2024
 7                       Magna Legal Services
                         Firm Registration No. 633
 8                       16414 San Pedro Ave., Suite 900
                         San Antonio, Texas  78232
 9                       (866) 672-7880

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1           I, RIVELINO LOPEZ, have read the foregoing

2    deposition and hereby affix my signature that same is

3    true and correct, except as noted above.

4

5

6                            RIVELINO LOPEZ

7

8    THE STATE OF TEXAS           )

9    COUNTY OF  DALLAS            )

10          Before me,  RIVELINO LOPEZ          , on
11   this day personally appeared RIVELINO LOPEZ, known to me
     (or proved to me under oath or through _____
12    VOTER REGISTRATION MGR.     ) (description of identity
     card or other document) to be the person whose name is
13   subscribed to the foregoing instrument and acknowledged
     to me that they executed the same for the purposes and
14   consideration therein expressed.

15       Given under my hand and seal of office, this  24
     day of  MAY                   , 2022.
16

17
                            _____
18    ID NO. 128563794          NOTARY PUBLIC IN AND FOR
      My Commission Expires        THE STATE OF  TEXAS
19    03/23/2023
      Destinee E Kirk

20   My commision expires:   3.23.23

21

22

23

24

25
```

```
1                          CORRIGENDUM
2    WITNESS NAME:  RIVELINO LOPEZ              4/29/22
3    PAGE    LINE    CHANGE                     REASON
4    24       5     97.46% to 99.47%           Correction
5    24       8     close to 70K to clox to 7K  Correction
6    24      11     97.13% to 97.15%           Correction
7    24      11     add "DL or ID on file"     Left out
8    24      16     70K to 7K                  Correction
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



RE: Rivelino Lopez

June 10, 2022

Dear Client:

We are forwarding these documents to you as the custodial attorney in this matter. This transcript is being handled pursuant to the Federal Rules of Civil Procedure and we have copied all parties on the Changes and Signature page(s) with the attached Certificate of Deposition submitted by the deponent to our office.

The items marked refer to the attached documents.

_____ The Changes and Signature page(s) was returned to our office within the specified time limit; therefore, we are forwarding the original deposition transcript(s) and the Changes and Signature page(s) with the attached Certificate of Deposition to you as the custodial attorney in this matter for safekeeping. All parties will be copied on the Changes and Signature page(s).

_____ The deponent returned the Changes and Signature page(s) within the specified time limit, however, the Changes and Signature page(s) was inadvertently returned without the original transcript. All parties have been copied.

_____ The Changes and Signature page(s) was not returned to our office within the specified time limit; therefore, we are forwarding the original deposition transcript to you as the custodial attorney in this matter.

_____ The Changes and Signature page(s) was returned to our office unexecuted. We are forwarding the original deposition transcript to you as the custodial attorney in this matter.

_____ The deponent returned the Changes and Signature page(s) enclosed after the specified time limit. All parties have been copied as a courtesy.

_____ This is to notify you that the examination and signature was not requested by the deponent and/or a party before the completion of the deposition; therefore, signature is waived pursuant to the Federal Rules of Civil Procedures. All parties have been copied via e-mail.

_____ A copy of the Changes and Signature page(s) was previously returned within the specified time limit. We are now in receipt of the Original Deposition Transcript and/or Changes and Signature page(s); therefore, we are returning it to you as the Custodial attorney in this matter for safekeeping.

_____ Amended.

Should you have any questions or concerns, please feel free to contact our office.

Sincerely,
KTA Certs Department
Certs@KTandA.COM
Nancy Renfroe – Department Manager

Kim Tindall & Associates, LLC
16414 San Pedro Avenue, Suite 900, San Antonio, Texas 78232
Phone: 866.672.7880 Fax: 210.697.3408



# KIM TINDALL & ASSOCIATES

RE: Michael Scarpello                                                                 June 10, 2022

Dear Client:

We are forwarding these documents to you as the custodial attorney in this matter. This transcript is being handled pursuant to the Federal Rules of Civil Procedure and we have copied all parties on the Changes and Signature page(s) with the attached Certificate of Deposition submitted by the deponent to our office.

The items marked refer to the attached documents.

_____ The Changes and Signature page(s) was returned to our office within the specified time limit; therefore, we are forwarding the original deposition transcript(s) and the Changes and Signature page(s) with the attached Certificate of Deposition to you as the custodial attorney in this matter for safekeeping. All parties will be copied on the Changes and Signature page(s).

_____ The deponent returned the Changes and Signature page(s) within the specified time limit, however, the Changes and Signature page(s) was inadvertently returned without the original transcript. All parties have been copied.

___✓___ The Changes and Signature page(s) was not returned to our office within the specified time limit; therefore, we are forwarding the original deposition transcript to you as the custodial attorney in this matter.

_____ The Changes and Signature page(s) was returned to our office unexecuted. We are forwarding the original deposition transcript to you as the custodial attorney in this matter.

_____ The deponent returned the Changes and Signature page(s) enclosed after the specified time limit. All parties have been copied as a courtesy.

_____ This is to notify you that the examination and signature was not requested by the deponent and/or a party before the completion of the deposition; therefore, signature is waived pursuant to the Federal Rules of Civil Procedures. All parties have been copied via e-mail.

_____ A copy of the Changes and Signature page(s) was previously returned within the specified time limit. We are now in receipt of the Original Deposition Transcript and/or Changes and Signature page(s); therefore, we are returning it to you as the Custodial attorney in this matter for safekeeping.

_____ Amended.

Should you have any questions or concerns, please feel free to contact our office.

Sincerely,
KTA Certs Department
Certs@KTandA.COM
Nancy Renfroe – Department Manager

Kim Tindall & Associates, LLC
16414 San Pedro Avenue, Suite 900, San Antonio, Texas 78232
Phone: 866.672.7880 Fax: 210.697.3408



**KIM TINDALL & ASSOCIATES**

RE: Tacoma Phillips                                                                 June 10, 2022

Dear Client:

We are forwarding these documents to you as the custodial attorney in this matter. This transcript is being handled pursuant to the Federal Rules of Civil Procedure and we have copied all parties on the Changes and Signature page(s) with the attached Certificate of Deposition submitted by the deponent to our office.

The items marked refer to the attached documents.

_____ The Changes and Signature page(s) was returned to our office within the specified time limit; therefore, we are forwarding the original deposition transcript(s) and the Changes and Signature page(s) with the attached Certificate of Deposition to you as the custodial attorney in this matter for safekeeping. All parties will be copied on the Changes and Signature page(s).

_____ The deponent returned the Changes and Signature page(s) within the specified time limit, however, the Changes and Signature page(s) was inadvertently returned without the original transcript. All parties have been copied.

_____ The Changes and Signature page(s) was not returned to our office within the specified time limit; therefore, we are forwarding the original deposition transcript to you as the custodial attorney in this matter.

_____ The Changes and Signature page(s) was returned to our office unexecuted. We are forwarding the original deposition transcript to you as the custodial attorney in this matter.

_____ The deponent returned the Changes and Signature page(s) enclosed after the specified time limit. All parties have been copied as a courtesy.

_____ This is to notify you that the examination and signature was not requested by the deponent and/or a party before the completion of the deposition; therefore, signature is waived pursuant to the Federal Rules of Civil Procedures. All parties have been copied via e-mail.

_____ A copy of the Changes and Signature page(s) was previously returned within the specified time limit. We are now in receipt of the Original Deposition Transcript and/or Changes and Signature page(s); therefore, we are returning it to you as the Custodial attorney in this matter for safekeeping.

_____ Amended.

Should you have any questions or concerns, please feel free to contact our office.

Sincerely,
KTA Certs Department
Certs@KTandA.COM
Nancy Renfroe – Department Manager

Kim Tindall & Associates, LLC
16414 San Pedro Avenue, Suite 900, San Antonio, Texas 78232
Phone: 866.672.7880 Fax: 210.697.3408

```
SUMMARY REPORT GRP-DETAIL                    2018 General & Joint Election         UNOFFICIAL RESULTS
                                             November 6, 2018
                                             Dallas County, Texas
Run Date:11/15/18 11:46 AM
                                                                                    Report EL45A      Page 001

                                  TOTAL VOTES    %    EV_In Person    EV_Mail  Election Day   EV-ED_Prov    ED_ADA

PRECINCTS COUNTED (OF 846).  .  .  .  .      846  100.00
REGISTERED VOTERS - TOTAL .  .  .  .  .  1338,788
BALLOTS CAST - TOTAL.  .  .  .  .  .  .   731,576                492,980      42,277      195,486         536         297
VOTER TURNOUT - TOTAL  .  .  .  .  .  .            54.64
```

Straight Party
VOTE FOR 1
```
   (WITH 846 OF 846 PRECINCTS COUNTED)
Republican Party (REP) .  .  .  .  .  .   174,928  34.68     116,848      13,849       44,054         108          69
Democratic Party (DEM) .  .  .  .  .  .   326,423  64.71     222,558      16,235       87,185         295         150
Libertarian Party (LIB).  .  .  .  .  .     3,088    .61       1,629          62        1,392           4           1
         Total .  .  .  .  .  .  .  .  .  504,439           341,035      30,146      132,631         407         220
     Over Votes .  .  .  .  .  .  .  .  .      104               0          16           88           0           0
     Under Votes .  .  .  .  .  .  .  .    227,033           151,945      12,115       62,767         129          77
```

U. S. Senator
VOTE FOR 1
```
   (WITH 846 OF 846 PRECINCTS COUNTED)
Ted Cruz (REP).  .  .  .  .  .  .  .  .   241,125  33.13     159,988      18,034       62,874         130          99
Beto O'Rourke (DEM) .  .  .  .  .  .  .   481,389  66.14     328,029      23,751      129,023         394         192
Neal M. Dikeman (LIB) .  .  .  .  .  .      5,368    .74       2,757         199        2,406           5           1
         Total .  .  .  .  .  .  .  .  .  727,882           490,774      41,984      194,303         529         292
     Over Votes .  .  .  .  .  .  .  .  .       74               0          22           52           0           0
     Under Votes .  .  .  .  .  .  .  .      3,620             2,206         271        1,131           7           5
```

U. S. Representative Dist 5
VOTE FOR 1
```
   (WITH 110 OF 110 PRECINCTS COUNTED)
Lance Gooden (REP) .  .  .  .  .  .  .     35,588  40.49      23,468       2,441        9,659          19           1
Dan Wood (DEM).  .  .  .  .  .  .  .  .    52,166  59.36      35,508       2,229       14,390          36           3
WRITE-IN.  .  .  .  .  .  .  .  .  .  .       129    .15          75          17           37           0           0
         Total .  .  .  .  .  .  .  .  .   87,883            59,051       4,687       24,086          55           4
     Over Votes .  .  .  .  .  .  .  .  .       11               0           3            8           0           0
     Under Votes .  .  .  .  .  .  .  .      2,207             1,275         151          781           0           0
```

U. S. Representative Dist 24
VOTE FOR 1
```
   (WITH 131 OF 131 PRECINCTS COUNTED)
Kenny E. Marchant (REP).  .  .  .  .  .    47,270  42.86      32,891       3,112       11,244          20           3
Jan McDowell (DEM) .  .  .  .  .  .  .     60,987  55.29      43,031       2,840       15,054          59           3
Mike Kolls (LIB) .  .  .  .  .  .  .  .     2,043   1.85       1,231          47          764           1           0
         Total .  .  .  .  .  .  .  .  .  110,300            77,153       5,999       27,062          80           6
     Over Votes .  .  .  .  .  .  .  .  .        9               0           1            8           0           0
     Under Votes .  .  .  .  .  .  .  .      2,015             1,177         177          660           1           0
```

U. S. Representative Dist 26
VOTE FOR 1
```
   (WITH 2 OF 2 PRECINCTS COUNTED)
Michael C. Burgess (REP) .  .  .  .  .         83  50.61          56           6           21           0           0
Linsey Fagan (DEM) .  .  .  .  .  .  .         80  48.78          48           5           27           0           0
Mark Boler (LIB) .  .  .  .  .  .  .  .         1    .61           1           0            0           0           0
         Total .  .  .  .  .  .  .  .  .      164               105          11           48           0           0
     Over Votes .  .  .  .  .  .  .  .  .        0                 0           0            0           0           0
     Under Votes .  .  .  .  .  .  .  .          3                 2           0            1           0           0
```



DEPOSITION EXHIBIT
3

# Primary Election Comparison

| | DEM | | | | REP | | |
|---|---|---|---|---|---|---|---|
| | **2022** | **2018** | **2014** | | **2022** | **2018** | **2014** |
| **Day 1 (Mon)** | 4,284 | Holiday | Holiday | | 2,304 | Holiday | Holiday |
| **Day 2 (Tue)** | 4,407 | 4,025 | 2,587 | | 2,756 | 1,715 | 2,435 |
| **Day 3 (Wed)** | 3,690 | 2,640 | 2,217 | | 2,479 | 1,476 | 2,541 |
| **Day 4 (Thu)** | 3,200 | 2,787 | 2,143 | | 2,227 | 1,633 | 2,410 |
| **Day 5 (Fri)** | 4,852 | 4,501 | 2,276 | | 3,265 | 2,596 | 2,715 |
| **Day 6 (Sat)** | 4,809 | 5,769 | 2,478 | | 2,593 | 2,508 | 3,020 |
| **Day 7 (Sun)** | 2,559 | 3,265 | 1,207 | | 1,160 | 1,009 | 938 |
| **Day 8 (Mon)** | Holiday | 6,342 | 2,642 | | Holiday | 3,321 | 2,585 |
| **Day 9 (Tue)** | 10,280 | 5,130 | 2,668 | | 6,989 | 2,992 | 3,170 |
| **Day 10 (Wed)** | 2,784 | 5,483 | 2,778 | | 2,064 | 3,134 | 3,284 |
| **Day 11 (Thu)** | 347 | 8,065 | 3,969 | | 250 | 4,646 | 4,234 |
| **Day 12 (Fri)** | 18,101 | 15,280 | 7,336 | | 10,270 | 7,842 | 7,828 |
| **EV Totals** | **59,313** | **63,287** | **32,301** | | **36,357** | **32,872** | **35,160** |
| **EV by %** | 45.77% | 47.46% | 47.46% | | 41.22% | 39.80% | 40.48% |
| | | | | | | | |
| **ED Totals** | **62,645** | **62,206** | **33,384** | | **48,931** | **40,779** | **41,220** |
| Other | 7,626 | 7,859 | 2,377 | | 2,922 | 8,950 | 10,467 |
| Final Counts | *129,584* | *133,352* | *68,062* | | *88,210* | *82,601* | *86,847* |
| **ED by %** | 48.34% | 46.65% | 49.05% | | 55.47% | 49.37% | 47.46% |
| | | | | | | | |
| Reg. Voters | 1,390,875 | 1,286,763 | 1,172,339 | | 1,389,510 | 1,286,763 | 1,172,339 |
| Total Turnout | 9.32% | 10.36% | 5.81% | | 6.35% | 6.42% | 7.41% |