Transcript of the Testimony of

# Douglas Kruse

## Date:

May 03, 2022

## Case:

LA UNIoN DEL PUEBLO ENTERO vs GREGORY W. ABBOTT

Douglas Kruse                                                          May 03, 2022

```
 1                  UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                      SAN ANTONIO DIVISION

 3   LA UNIÓN DEL PUEBLO ENTERO,     )
            et al.,                  )
 4          Plaintiffs,              )
                                     )  Case No. 5:21-cv-844-XR
 5   v.                              )       [LEAD CASE]
                                     )
 6   GREGORY W. ABBOTT, et al.,      )
          Defendants.                )
 7
     OCA-GREATER HOUSTON, et al.,    )
 8        Plaintiffs,                )
                                     )
 9   v.                              )  Case No. 1:21-cv-780-XR
                                     )
10   JOHN SCOTT, et al.,             )
          Defendants.                )
11
     HOUSTON JUSTICE, et al.,        )
12        Plaintiffs,                )
                                     )
13   v.                              )  Case No. 5:21-cv-848-XR
                                     )
14   GREGORY WAYNE ABBOTT, et al.,   )
          Defendants.                )
15
     LULAC TEXAS, et al.,            )
16        Plaintiffs,                )
                                     )
17   v.                              )  Case No. 1:21-cv-0786-XR
                                     )
18   JOHN SCOTT, et al.,             )
          Defendants.                )
19
     MI FAMILIA VOTA, et al.,        )
20        Plaintiffs,                )
                                     )
21   v.                              )  Case No. 5:21-cv-0920-XR
                                     )
22   GREG ABBOTT, et al.,            )
          Defendants.                )
23

24

25
```

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900   San Antonio, Texas 78232
210-697-3400                                                            210-697-3408

```
 1   UNITED STATES OF AMERICA,      )
          Plaintiff,                )
 2                                  )
     v.                             )   Case No. 5:21-cv-1085-XR
 3                                  )
     THE STATE OF TEXAS, ET AL.,    )
 4        Defendants.               )

 5
                        ORAL DEPOSITION OF
 6                     DR. DOUGLAS L. KRUSE
                          MAY 3, 2022
 7                     (Reported Remotely)

 8      ---------------------------------------------------

 9        Oral deposition of Dr. Douglas L. Kruse, produced as an

10   expert witness at the instance of the State Defendants, and

11   duly sworn, was taken in the above-styled and numbered cause on

12   May 3, 2022, from 10:04 a.m. to 6:57 p.m., before Carmen R.

13   Yarbrough, CSR in and for the State of Texas, reported by oral

14   stenography method, pursuant to the Texas Rules of Civil

15   Procedure, and the provisions stated on the record or attached

16   hereto.

17

18

19

20

21

22

23

24

25
```

Douglas Kruse                                              May 03, 2022
                                                              Page 7

1    joined today by my colleague, Ari Herbert, who will be

2    reviewing the matter but not participating in terms of asking

3    you questions.

4              Can you please state and then spell your name for the

5    record?

6         A.    My name is Douglas Kruse.   The last name is

7    K-R-U-S-E; first name, D-O-U-G-L-A-S.

8         Q.    Dr. Kruse, I'm going to start with some instructions

9    and introductory questions.   Then, after that's done, I'll move

10   on to the main subject of the deposition.   Okay?

11        A.    Okay.

12        Q.    Have you ever been deposed before?

13        A.    No.

14        Q.    But you understand that you are under oath.   Correct?

15        A.    Yes.

16        Q.    You also understand that the oath has the same legal

17   significance as if you were testifying before an open court?

18        A.    Yes.

19        Q.    So the court reporter, we're going to need you to

20   provide verbal answers like yes or no, as opposed to gestures,

21   such as nodding or shaking your head.   This is extra important

22   here today, because we're all participating through Zoom, and

23   so there's a chance that we may not be able to see your

24   gestures and the court reporter may not be able to see your

25   gestures.   Does that make sense?

Douglas Kruse                                                    May 03, 2022
                                                                   Page 16

1   penalty of perjury that the foregoing is true and correct to

2   the best of my knowledge, information, and belief."  Did I read

3   that correctly?

4        A.   Yes.

5        Q.   The declaration continues, "I am aware that discovery

6   in this case is ongoing, and I reserve the right to continue to

7   supplement the foregoing report in light of additional facts,

8   testimony, and/or materials that may come to light."  Did I

9   read that correctly?

10       A.   Yes.

11       Q.   And finally, we have this line that says, "Executed

12  this February 28, 2022 in Mercer County, New Jersey."  Did I

13  read that correctly?

14       A.   Yes.

15       Q.   Do you still affirm that Exhibit A is a true and

16  accurate copy of your February 28, 2022 report?

17       A.   Yes.

18       Q.   Do you still affirm that the report describes the

19  primary data and other information you considered in forming

20  your opinions?

21       A.   Yes.

22       Q.   Do you affirm that the facts, observations,

23  conclusions, within your report remain true and correct to the

24  best of your knowledge, information, and belief?

25       A.   Yes.

Douglas Kruse                                          May 03, 2022
                                                         Page 17

```
 1        Q.    Does this report --
 2        A.    And actually -- can I just amend that?  I did
 3   discover a couple of typos.  They are being corrected.
 4        Q.    Understood.  If it makes you feel any better, when I
 5   put the deposition notice up, I also noticed a typo.  And that
 6   was certainly embarrassing on my part to only notice it today,
 7   as opposed to yesterday when I issued it to counsel.
 8        A.    It happens.
 9        Q.    It does.  Does this report and the contents therein
10   reflect the expert opinion that Plaintiffs have retained you to
11   provide in this case?
12        A.    Yes.
13        Q.    And you have not submitted the supplements report in
14   this case.  Is that correct?
15        A.    Correct.
16        Q.    And so the report on screen, a copy of which is in
17   front of you, is the only expert report you have tendered in
18   this case?
19        A.    Yes.
20        Q.    And so this expert report contains the entirety of
21   the expert opinions you are offering in this case.  Correct?
22        A.    Yes.
23        Q.    At the bottom of the page two, you'll see a signature
24   line with the printed words "Douglas L. Kruse, PhD."  Do you
25   see that?
```

1        A.    Yes.

2        Q.    And do you see the signature above?

3        A.    Yes.

4        Q.    Is that your signature?

5        A.    Yes.

6        Q.    Is it fair to say that you executed and submitted

7    report on February 28, 2022?

8        A.    Yes.

9        Q.    So I have a couple of pro forma questions that I'm

10   going to ask you, a little bit similar to what I had just

11   stated.  Did you write the report that you submitted on behalf

12   of Plaintiffs on February 28, 2022?

13       A.    I wrote the report before February 28th, but yes, I

14   wrote the report that was submitted on February 28th.

15       Q.    Thank you for the clarification.  My question could

16   have used a little bit more clarity.  Did anyone else, besides

17   yourself, help you draft the language you used in your report?

18       A.    Yes.

19       Q.    Who was that?

20             MS. SWEREN-BECKER:  Objection.  Privilege and rule

21   26.  I'm going to instruct the witness not to answer.

22       Q.    (BY MS. HUNKER)  [unintelligible] -- help you draft

23   the language?

24       A.    Yes.

25       Q.    And who was that?

1    researchers will include additional information in the

2    footnotes that's not necessarily in the content of the report

3    itself, and I was just seeking to determine whether you were

4    somebody who used that method, or if you were somebody who only

5    used footnotes in reference to materials whose contents are in

6    the report.

7         A.   Right.   Okay.   I understand.   Yeah.

8         Q.   Did you rely on any sources while preparing your

9    report that did not make it into the footnotes we just

10   discussed?

11        A.   No.   I mean, of course, I've read a lot of material

12   relevant to this, but I did not use -- all of the information

13   that I rely on in the report has been referenced --

14   appropriately referenced in the sites.

15        Q.   So to be clear, there is nothing in the report that

16   cannot be traced back to the sources cited in the reports

17   footnote?

18        A.   Correct.

19        Q.   And your conclusions, are they based entirely on the

20   information found within the sources cited in the reports

21   footnote?

22        A.   Yes.

23        Q.   So we're going to turn to the next page, which is

24   page four of your report.   And it says for your purpose of

25   engagement, "I have been retained by Plaintiffs to provide my

1   Do you see how each paragraph summarizes your findings with

2   respect to particular sections of SB 1?

3        A.   Yes.

4        Q.   You do not tender in your report observations and

5   findings on any other section of SB 1.  Correct?

6        A.   Correct.

7        Q.   So according to this, you tendered in your report,

8   observations and findings on sections 5.02, 5.03, 5.06, 5.07,

9   5.10, 5.01, 6.04, 6.03, 6.05, 6.06, and 7.04.  Is that correct?

10       A.   Yes.

11       Q.   And so you do not offer an opinion in the report

12  about how any other provision of SB 1, besides the provisions

13  I've just listed, affect voters with disabilities.  Is that

14  correct?

15       A.   Correct.

16       Q.   Thus when you state issues related to the ways in

17  which SB 1 erects barriers that harm voters with disabilities

18  by impeding their access to voting in the State of Texas,

19  you're referring specifically to the issues that stem from

20  these provisions.  Is that correct?

21       A.   Correct.

22       Q.   So before I move on, I want to make sure that we have

23  a complimentary understanding of some of the terms that you use

24  in the report and that I might use during the deposition.  Do

25  you understand that if I say Senate Bill One or SB 1, I'm

1  referring to the omnibus election legislation at issue in this

2  case, which was enacted during the second special session of

3  the 87th Legislature?

4     A.   Yes.

5     Q.   And I wanted the clarification just because with the

6  name Senate Bill One, there happens to be a Senate Bill One

7  every time the legislature convenes.

8     A.   I understand.  Yes.

9     Q.   Now in paragraph 27, you provide the definition of

10 disabilities.  Is that correct?

11    A.   I repeat the definition of disability used in the

12 ADA.  Yes.

13    Q.   And you state, "The ADA protects all those with a

14 substantial limitation in one or more major life activities."

15 Did I read that correctly?

16    A.   Yes.

17    Q.   You then cite guidance from the Department of

18 Justice, which states, "The term 'substantially limits' shall

19 be construed broadly in favor of expansive coverage to the

20 maximum extent permitted by the terms of the ADA.  The

21 comparison of an individual's performance of a major life

22 activity to the performance of the same major life activity by

23 most people in the general population usually will not require

24 scientific medical, or statistical evidence."  Did I read that

25 correctly?

Douglas Kruse                                              May 03, 2022
                                                              Page 26

```
 1        A.   Yes.
 2        Q.   When you use the term "disability" in your report,
 3   are you referring to this definition of disability under the
 4   ADA?
 5        A.   Yes.
 6        Q.   Is there any time in the report when you use the term
 7   disability that you're not referring to the ADA definition?
 8        A.   No.
 9        Q.   And so when you're referring to a voter with a
10   disability, you're referring to a voter with a substantial
11   limitation in one or more major life activities.  Is that
12   correct?
13        A.   Yes.
14        Q.   We covered this a little bit, but I just want to get
15   some clarity.  You have in your declaration this statement:
16   "Within the last four years, I have not provided reports as an
17   expert witness or court monitor in any cases."  Did I read that
18   correctly?
19        A.   Yes.
20        Q.   You also stated earlier that you have not testified
21   before.  Is that correct?
22        A.   Correct.
23        Q.   And so you've not testified before as an expert
24   witness.  Is that correct?
25        A.   I've not testified.  Correct.
```

1   assumptions about the wait times for taxi cabs -- accessible

2   and non accessible taxi cabs in New York.  My methods were a

3   bit more complicated in that report.

4           In this report, it's really just simple means,

5   proportions, and cross tabs.  So there's nothing -- there are

6   no fancy statistics in this report.  It's all very -- very

7   straightforward in the current report.

8        Q.   Understood.  And in that case, did any party submit a

9   motion seeking to exclude the report?

10       A.   Not that I know of.

11       Q.   I want to turn to page four again.

12       A.   Okay.

13       Q.   And you provide here a ten paragraph summary of your

14   credentials.  Is that correct?

15       A.   Yes.

16       Q.   You then attached on page 45 a curriculum vitae that

17   lists your education, employment, and publications.  Is that

18   right?

19       A.   Yes.

20       Q.   I want to spend a short while going over your

21   credentials for the sake of the record.  Can you please give me

22   a summary of your educational background, starting with

23   undergraduate degree and proceeding from there?

24       A.   My undergraduate degree is from Harvard College in

25   Cambridge, Massachusetts.  I majored in economics there.  I

Douglas Kruse                                          May 03, 2022
                                                         Page 29

1    then received a master's degree in economics from the

2    University of Nebraska Lincoln, along with a certification in

3    public policy analysis and program evaluation.  I then returned

4    to Harvard and received my PhD in Economics in 1988.

5         Q.    And did you pursue any other coursework where you did

6    not secure a degree?

7         A.    No.

8         Q.    And so we look at paragraph two.  It says you are

9    currently a distinguished professor in the School of Management

10   and Labor Relations at Rutgers University.  Is that still

11   correct?

12        A.    Yes.

13        Q.    And how long have you been employed there?

14        A.    I have been employed since 1988 back when my hair was

15   still brown.  Being an extinguished professor has turned my

16   hair gray.

17        Q.    And so I assume, based on the length of time, that

18   you have tenure at this university.  Is that correct?

19        A.    Yes.

20        Q.    And what type of courses have you taught while at

21   Rutgers?

22        A.    I have taught mainly economics courses at the

23   undergraduate, masters, and PhD level.  I've also taught some

24   research methods courses.

25        Q.    And so if we look at the last sentence in this

1   I am Co-Director of the Program for Disability Research, and am

2   Associate Director of the Institute for the Study of Employee

3   Ownership and Profit Sharing."  Did I read that correctly?

4        A.   Yes.

5        Q.   What type of research does the program for Disability

6   Research conduct?

7        A.   The program does a variety of research on the

8   economic, political, and social inclusion of people with

9   disabilities.  The focus really has been in two areas.  One is

10  employment opportunities for people with disabilities, and the

11  second is on political participation, including voting of

12  people with disabilities.  Those are the two main focus areas

13  of the program.

14       Q.   And as co-director, what kind of responsibilities do

15  you have?

16       A.   I work with the other co-director in applying for

17  grants; and then once we get the grants, doing the research,

18  writing the reports and so forth.  And I should add, we also

19  do -- we also get quite a bit of publicity and we talk to

20  journalists quite a bit.  We've had over 300 unique press hits

21  in the past -- in the past six years.

22       Q.   Congratulations.

23       A.   Thank you.

24       Q.   So you gave two topics:  Employment and political

25  participation.  Does your research focus on one more than the

Douglas Kruse                                                    May 03, 2022
                                                                    Page 32

 1    other?

 2         A.    I would say it's pretty well split 50/50.

 3         Q.    So if we go to paragraph seven, I'm going to look at

 4    the second sentence in particular.  It reads, "I have been

 5    principal investigator (PI) or Co-PI on four grant-funded

 6    national post-election surveys on the voting experiences of

 7    people with and without disabilities."  Did I read that

 8    correctly?

 9         A.    Yes.

10         Q.    And it continues, "Two of these surveys were funded

11    by the U.S. Election Assistance Commission."  Did I read that

12    correctly?

13         A.    Yes.

14         Q.    And so, what elections did these particular surveys

15    focus on?

16         A.    That was -- the first survey was a post-election

17    survey after the 2012 national elections, and the second was

18    after the 2020 national elections.

19         Q.    So those were the two that were funded by the US

20    Election Assistance Commission.  Is that right?

21         A.    Yes.

22         Q.    And what about the other two grant-funded national

23    post-election surveys?  Were they on the same elections, or

24    were they on different elections?

25         A.    They were on different elections.

Douglas Kruse                                             May 03, 2022
                                                         Page 33

1        Q.    Which ones?

2        A.    Oh, the -- there was one.  The first one was after

3    the 1998 elections, and the second one was after the 2000

4    elections.

5        Q.    So those are from a much older data set, I assume?

6        A.    Yeah.  The 1998 was our very first time in doing a

7    national post-election survey.  It was actually the first that

8    anyone had ever done on disability and voting in an election.

9        Q.    And did you see improvements between the '98 and 2000

10   study, and then when you did the 2012 and 2020 study?

11       A.    Improvements in?

12       Q.    Access to voting for individuals with disabilities.

13       A.    The 1998 and 2000 surveys were not focused on access.

14   I don't think we had any questions on access at that point.  We

15   were mainly interested in looking at the -- the relative

16   turnout of people with and without disabilities, and the

17   factors that political scientists have used to explain turnout.

18   So we were really trying to drill down to the gap.  We did

19   not -- as I say, I don't think we had any questions on access

20   there.  We did not address questions of access until the 2012

21   survey funded by the EAC.

22       Q.    And so, 2020 was the first one you looked at access.

23   Is that right?  Of these --

24       A.    2012.

25       Q.    2012?

Douglas Kruse                                              May 03, 2022
                                                              Page 34

1      A.    2012.  Yeah.

2      Q.    And did you see a change in turnout among individuals

3  with disabilities between the 1988 and 2000 study, and the 2012

4  and 2020 study?

5      A.    We think so, which sounds like a -- well, it's a very

6  cautious response.  The measure of disability changed slightly,

7  and even slight changes in the measurement of disability can

8  make a big difference.  In 2012, we wanted to use the Census

9  Bureau's six questions that they had adopted in 2008, so we

10  revised our questions to match the Census Bureau's questions in

11  2012.  That means that it's -- the numbers between 1998 and

12  2000 versus 2012 may not be strictly comparable.  As best we

13  can tell the relative turnout improved of people with

14  disabilities.

15      Q.    That's good to hear.  And looking at the 2012 versus

16  2020, did you see improvement in turnout?

17      A.    Yeah.  We saw a slight decrease in the disability

18  turnout gap, but it wasn't a statistically significant

19  decrease.

20      Q.    And you had said that you started looking at

21  accessibility in 2012 and that was the first time.  Is that

22  correct?

23      A.    You're fading in and out here.

24      Q.    Okay.  Let me rephrase then.

25      A.    Sure.

1   vary by demographic characteristics, and employment status, and

2   so forth.

3       Q.   And you said 80,000 to 90,000 across the country.  Is

4   that right?

5       A.   Yes.

6       Q.   And does it -- when you were saying breaking down

7   different demographics, did those fact sheets and surveys look

8   at state specific information or is it national only?

9       A.   There is a state variable in the -- in the current

10  population survey that we use to generate state estimates.  The

11  state estimates are subject to more error because the sample

12  size is obviously smaller for the individual states than for

13  the entire United States.  We do produce a page that contains

14  the breakdowns by state, along with estimates of whether the

15  disability gap is outside the margin of error or not.

16      Q.   And so when you talk about the smaller sample size

17  for states, how small are we talking?  Is it pretty -- let me

18  back up a second.  When they do the -- yeah, I'll keep it at

19  that question.  What are the sample sizes we're looking at for

20  these states?

21      A.   It varies quite a bit by state, obviously.  On

22  average, it would be -- about 90,000 divided by 50 -- so, it

23  would be a little less than a couple thousand per state.

24      Q.   And so when they're looking to see for that 80,000 or

25  90,000, are they trying to base it in proportion to the

Douglas Kruse

May 03, 2022
Page 42

1              The article, "Enabling Democracy: Disability and

2   Voter Turnout," it was published in Political Research

3   Quarterly, was really -- going to sound very immodest here but

4   it was a -- it was a pretty pathbreaking article.  It got a

5   major prize from the Western Political Science Association,

6   because it was really the first article that did a thorough

7   analysis on disability and voter turnout, and it's become a

8   kind of standard cite on this issue.

9              The other article I point to is "Disability and

10  Election Policies and Practices," in the book The Measure of

11  American Elections, published in 2014.  That was a very

12  thorough substantive analysis, particularly looking at vote by

13  mail systems in states, and the effects of that on turnout of

14  people with and without disability comparing in particular the

15  no excuse versus the excuse required states for voting by mail.

16       Q.   And your more recent works, do they also analyze

17  voting by mail?

18       A.   I'm sorry?  My most recent works?

19       Q.   Your more recent articles, do any of them address

20  voting by mail?

21       A.   No.  None of the published work, no. We've looked at

22  that in some reports we've done but not that have been

23  published in the peer reviewed journals.

24       Q.   So you also testified before Congress on multiple

25  occasions.  Is that right?

Douglas Kruse

May 03, 2022
Page 44

1      Q.   And looking at these reports, do any of them address,

2   again, information specific to Texas for analysis that's

3   specific to Texas?

4      A.   In our fact sheets, on disability voter turnout, we

5   do have a page, as I indicated earlier, where we break out the

6   disability -- the turnout of people with and without

7   disabilities in each state and that, of course, includes Texas.

8      Q.   And so outside of turnout numbers, which we talked

9   about earlier, are there any other Texas specific data that's

10   addressed in these reports?

11      A.   No.

12      Q.   And did any of these reports look at mail-in voting?

13      A.   We always have a -- in each of our fact sheets on

14   disability and voter turnout, we have a table looking at

15   mail-in voting nationally.  We present the national numbers on

16   how many people with disabilities voted by mail versus how many

17   people without disabilities voted by mail, how many voted

18   early, and then the connection between those two -- the

19   overlap, I mean.

20      Q.   So you mentioned with turnout that you have a page

21   that breaks it down by state.  Do you have a comparable page

22   that breaks out mail-in voting by state?

23      A.   No.

24      Q.   So the mail-in voting sections of the fact sheets are

25   just looking at national numbers.  Is that right?

1    of these look at Texas specific information for conducting

2    Texas specific analysis?

3         A.    No, they -- I mean, obviously, the Texas data is

4    included in the national figures, but we do not conduct Texas

5    specific analysis.

6         Q.    And for disability and voting accessibility in the

7    2020 election, did you look at mail-in voting?

8         A.    Yes.

9         Q.    What was the extent of the -- your inquiry into

10   mail-in voting here?

11        A.    I'm sorry?  The extent of my inquiry?

12        Q.    Like how -- how substantial is it make-up part of

13   this report?

14        A.    We have several tables -- three or four tables

15   devoted to analyzing voting by mail in the report, both looking

16   at the overall rates of voting by mail and also the

17   difficulties that people encountered in voting by mail; and the

18   assistance that they required.

19        Q.    And has this report been published?

20        A.    Yes, it was -- it was issued and released by the

21   Election Assistance Commission on February -- I believe it was

22   February 18 of last year.

23        Q.    Of 2021?

24        A.    Yeah.  Yes.

25        Q.    And the grant "Disability and Assistive Technology",

Douglas Kruse                                        May 03, 2022
                                                        Page 54

1        A.    Great.

2        Q.    So, let's scroll to page -- sorry, to paragraph 17 --

3    or 16, 17, and 18 is what we're going to be looking at.

4        A.    Okay.

5        Q.    Okay.  So, if we look at 18, it says, well, specific

6    data on voting disability -- sorry.  Let me repeat that.  It

7    reads, "While specific data on voting difficulties by

8    disability status are not available in Texas, national data

9    show a high rate of voting difficulties among people with

10   disabilities."  Did I read that correctly?

11       A.    Yes.

12       Q.    Is it fair to say then that when you are doing an

13   analysis of voting difficulties, you are referring to national

14   data as opposed to anything that is Texas specific?

15       A.    When the data are Texas specific, I mentioned that

16   explicitly; and otherwise, I use the term national.

17       Q.    So except where it specifically mentions Texas, the

18   data you rely on is national data?

19       A.    Yes, but I believe I always specify national when --

20   when it's not specific to Texas.

21       Q.    So if you look at paragraph 17, it says, "Among Texas

22   voters in 2020, 30.2% of people with disabilities and 8.2% of

23   people without disabilities voted using a mail-in ballot."  Did

24   I read that correctly?

25       A.    Yes.

Douglas Kruse                                             May 03, 2022
                                                           Page 55

1      Q.   And how was this determined?

2      A.   This was based on the Census Bureau's Current

3  Population Survey Voting and Registration Supplement that I

4  referred to before.  They had a sample size of 4290 people

5  eligible to vote in Texas.  Based on that, we come up -- we

6  came up with the percent who voted, and then among those who

7  voted, what percent voted by mail.

8      Q.   When you were looking at this, you said you relied on

9  the American Community Survey.  Is that right?

10      A.   No.  The Current Population Survey Voting and

11  Registration Supplement.

12      Q.   My apologies.  I misheard you.

13      A.   No, no problem.

14      Q.   So you have not done assessment of teams -- when I

15  say teams, I mean the Texas voter database -- to determine the

16  number of people who voted by mail, or the number of people who

17  voted by mail marking disability as the reason?

18      A.   No.  I did look at some data that was provided for

19  Dallas and El Paso -- data on people -- on people who requested

20  absentee ballots.  It turns out the number who indicated

21  disability as the primary reason that they -- as the reason

22  that they requested an absentee ballot was too small for

23  meaningful analysis.  It was 100 people in one database and 50

24  in the other, and that was just not enough.  The vast majority

25  of the people mentioned old age as a reason for the absentee

Douglas Kruse                                                    May 03, 2022
                                                                    Page 59

1  analyzed the surveys that already existed?

2       A.   Yes.

3       Q.   And so you did not conduct an independent survey of

4  voters with disabilities.  Is that correct?

5       A.   Not for this report, no.  We draw on the findings

6  from the Election Assistance Commission sponsored report that

7  we did following the 2020 elections.  We conducted that, but I

8  don't -- I did not do any analysis of that for this report.  I

9  just drew on the report that we gave to the Election Assistance

10  Commission that was issued in February of last year.

11       Q.   All right.  You're right.  I should have been a

12  little bit more specific.  So you did not conduct an

13  independent survey of voters with disabilities for the purposes

14  of this report?

15       A.   Correct.

16       Q.   And you did not conduct the independent survey of

17  voters with disabilities in Texas for the purposes of this

18  report.  Correct?

19       A.   Correct.

20       Q.   And as you said, you instead summarized the findings

21  of six nationally representative surveys and then assess how

22  these findings apply in the context of SB 1.  Is that correct?

23       A.   Yes.

24       Q.   And so you say three of these surveys are conducted

25  by the US Census Bureau; the American Community Survey, the

1   projecting the number of eligible voters, we make adjustments

2   for those in correctional facilities using other data as we

3   make -- the other data from the correctional system.  But

4   that's when we make projections of the number of likely vote --

5   people who are likely to be eligible to vote.  But I should

6   say, we don't -- the ACS does not have voting information in

7   it, so we don't -- we're not able to derive any numbers,

8   specifically, on voting from the ACS.

9        Q.   And so anytime that you're talking about voters in

10  institutional settings, you're weighting the numbers to account

11  for the fact that you may have a large non-eligible population

12  within correctional facilities?  If I'm using the wrong term,

13  please let me know.

14       A.   We are excluding, yes.  We're excluding those who

15  are -- one sec, let me think about that.  I have to think back

16  to when we -- when I was creating the program for this.  We do

17  make adjustments to exclude those who are in correctional

18  facilities --

19       Q.   Okay.

20       A.   -- from those who are eligible to vote.

21       Q.   You also talk about how ACS has the largest sample

22  size.  Is that right?

23       A.   Yes.

24       Q.   I believe you had mentioned the number but I can't

25  recall offhand.  Can you tell me what the rough sample size is

Douglas Kruse                                                    May 03, 2022
                                                                   Page 63

1    for the ACS?

2         A.   It's a sample of 1% of the US population each year,

3    which is roughly 3 million people; that's of all ages, of

4    course.  The voting age of the eligible citizens is closer to 2

5    million.

6         Q.   You also mentioned in paragraph 30 that ACS and CPS,

7    which is the current population survey, they have measures both

8    of age and citizenship, so you limit the sample size.  Is that

9    right?  Of the eligible population?

10        A.   Yes.

11        Q.   But not all of the reports do have that information.

12   Is that correct?

13        A.   Correct.

14        Q.   So, how do you account for that when you're doing

15   your analysis?

16        A.   The two data sets that can include noncitizen where

17   there is not a citizenship measure is the SIPP and NHTS -- the

18   Survey of Income and Program Participation and the National

19   Highway -- Highway Travel Survey -- is that it?  Yeah.  They

20   don't have citizenship measures, so we can't take account of

21   that information.  Some of the data -- some of the results from

22   those surveys will reflect noncitizens.  I should just add

23   there that one note -- one important note here is that the data

24   from the ACS that does have a comparison between citizens and

25   noncitizens, indicates that noncitizens are less likely to have

Douglas Kruse                                                    May 03, 2022
                                                                    Page 64

1    disabilities.  The disability rates are higher among citizens.

2         Q.   That's an interesting observation.  I wouldn't have

3    thought of that particular point.

4         A.   Yeah.  Noncitizens tend to be younger.  And

5    immigrants, in general, tend to be younger and be less likely

6    to have disabilities.

7         Q.   And so what are the limitations of the ACS data when

8    you were applying it?  Did you identify any limitations, I

9    should say?

10        A.   No.  It's a very high quality sample.  The Census

11   Bureau is extremely good about ensuring this is a

12   representative sample.  A limitation, as I indicated, is there

13   is no direct information on who voted and who didn't vote.  But

14   for the numbers I present, comparisons by demographics, by type

15   of disability, and so forth.  It's a very, very high quality

16   sample.  I don't -- I'm not aware of limitations.

17        Q.   Okay.  So the ones that you, I think, raised to a

18   minor extent is it doesn't identify who voted.  Is that

19   correct?

20        A.   Correct.

21        Q.   It doesn't identify who's registered to vote.  Is

22   that right?

23        A.   Correct.

24        Q.   And then it doesn't distinguish between different

25   types of institutions when an individual is living within an

Douglas Kruse                                                    May 03, 2022
                                                                    Page 65

1    institution?

2        A.   Correct.

3        Q.   Have you encountered any limitations when it comes to

4    the current population survey?

5        A.   I'm sorry, do I --

6        Q.   Have you encountered specific limitations when using

7    data from the current population survey?

8        A.   No.  It does not have people in group quarters.  That

9    would be the main limitation.

10       Q.   And does that one identify people who voted?

11       A.   Yes.  The monthly survey, as I mentioned, it's done

12   every month to generate employment statistics and they add a

13   supplement every November of even numbered years where they ask

14   questions about voting.

15       Q.   And so then registering -- the actual act of voting

16   is one of the questions?

17       A.   The act of voting, and they ask about registration,

18   and also how you voted.  Did you vote by mail?  Did you vote

19   early or not?  And just to be complete, they will also ask

20   questions of people who did not vote or were not registered,

21   why they were not registered or why they did not vote.

22       Q.   And what's the sample size for that?

23       A.   Sample size is between 80,000 and 90,000 each time

24   they do it.  The most -- most recently in 2020, it was a little

25   over 80,000.

Douglas Kruse                                                      May 03, 2022
                                                                    Page 72

```
 1   in any event.
 2        A.   Right, right.  We certainly could in state but we
 3   were not comfortable doing any state specific estimates from
 4   that because the sample size is just too small, as you say.
 5        Q.   And so I'll ask the question I asked for the other
 6   ones.  When you were using this report throughout -- when you
 7   were using the survey in the report, did you come across any
 8   specific limitations?
 9        A.   No.
10        Q.   Now, when we were talking about the CPS, you had
11   mentioned that that one asks about voting and asked about
12   registration and asked about mail-in voting specifically.
13   Correct?
14        A.   Yes.
15        Q.   Do any of the other ones get at that information?
16        A.   Yes.  The DBAS asks about all of those things; about
17   voting, about registration.  The SPAE is limited to registered
18   voters, but they do ask about whether the registered voter
19   voted or not.  Otherwise, the other data sets, yeah -- right.
20   CPS, and, DVS, and SPAE are the three with voting information.
21   The ACS, and SIPP, and NHTS do not have voting information.
22        Q.   Okay.  So if we go to paragraph 31, you talk about
23   how ACS and CPS measure disability using six questions.  And I
24   just want to clarify that I'm interpreting this correctly --
25   that they both asked the same questions.
```

Douglas Kruse                                        May 03, 2022
                                                        Page 73

1        A.    Yes.

2        Q.    Okay.  And so, four of the questions measure

3   impairments, vision, hearing, cognitive, and mobility, and then

4   two of the questions measure activity limitations, such as

5   difficulty dressing, or bathing, or difficulty going outside

6   alone.  Did I read that correctly?

7        A.    Yes.

8        Q.    And you also had mentioned that the SIPP, or

9   S.I.P.P., uses a more extensive set of over 100 questions to

10   derive its disability measures?

11        A.    Yes.

12        Q.    And have you noticed the difference between the two

13   in the accuracy of being able to identify the population of

14   individuals with disabilities?

15        A.    They -- by using different measures, by using more

16   expensive measures -- I'm sorry, not more expansive -- by using

17   a greater number of questions, the SIPP is able to identify a

18   greater number of disabilities.  The ACS and CPS, as I

19   described, may undercount disabilities because it's just not

20   possible, even with 100 questions, to identify all the

21   potentially disabling conditions.  There's a tremendous amount

22   of variety in terms of disability.

23        Q.    And so for these surveys, particularly ACS, CPS, and

24   the SIPP, do individuals self-identify as having a disability?

25        A.    They -- the word disability is not used in ACS and

Douglas Kruse                                                May 03, 2022
                                                                Page 74

 1    CPS questions, so people are not self identifying that yes, I

 2    have a disability.  A lot of research has shown there's a great

 3    stigma associated with disability and people are reluctant to

 4    identify, so the ACS and CPS do not use the word disability.

 5    So people don't self identify as having a disability; they do

 6    self identify as having a vision impairment, or hearing

 7    impairment, and so forth.  But yes, all -- so all of the

 8    measures are based upon self-identification of particular

 9    impairments, or conditions, or activity limitations.  But they

10    don't -- they're not self-identifying that, yes, I have a

11    disability.

12         Q.    Okay.  So, using ACS and CPS as a -- as an example,

13    they would identify themselves as having a vision impairment,

14    or a hearing impairment, or cognitive impairment, or mobility

15    impairment.  Is that right?

16         A.    Correct.

17         Q.    Okay.  So we had talked before about the definition

18    of disability and how in your report, you use the ADA

19    definition.  Correct?

20         A.    Yes.

21         Q.    And so I guess I'm trying to figure out how do we

22    ascertain, or is possible to ascertain, whether the individuals

23    when they're marking a, let's say vision impairment, are

24    utilizing the same definition as the ADA?  Or have a

25    substantial limitation -- I'll put it that way, with the term

Douglas Kruse                                                    May 03, 2022
                                                                    Page 76

1    an impairment that is very mild.  I mean, if they just have a

2    little problem seeing things now and then, they are very

3    unlikely to say, yes, I have a vision impairment.  They --

4    those who have ADA covered disabilities, vision impairments are

5    much more likely to say yes to that kind of question.

6         Q.   And so is it fair to say that these surveys give a

7    best estimate, but there's a possibility of both an overcount

8    and undercount?

9         A.   There's a possibility of overcount and undercount.  I

10   think that the possibility of undercount is much more likely

11   because, as I -- as I described, they don't capture some of the

12   conditions.  For example, they don't capture bipolar disorder.

13   They don't capture conditions like diabetes, and so forth.  I

14   think the likelihood of undercount is much more likely than the

15   likelihood of overcount, if I said that right.

16        Q.   So let's look at paragraph 32.

17        A.   Okay.

18        Q.   We're going to be going into the second sentence.

19   Actually, let's start with first.  I think it actually goes

20   with what you just said.  "An important note is that the six

21   questions used by the ACS and CPS are likely to capture only a

22   portion of the full disability population (as defined by the

23   broad ADA definition described above)."  Did I read that

24   correctly?

25        A.   Yes.

Douglas Kruse                                                May 03, 2022
                                                             Page 77

```
 1        Q.    And then it goes, "One issue is that people might
 2   underreport disabling conditions, as found in research
 3   comparing subjective reports to objective reports of health
 4   conditions."  Did I read that correctly?
 5        A.    Yes.
 6        Q.    And then it says, "A second important issue is that
 7   measuring disability is made difficult by the wide variation in
 8   types of disability and the severity of disabilities."  Did I
 9   read that correctly?
10        A.    Yes.
11        Q.    And so you had talked about this a little bit before
12   about the variation of disability, and I think you said that
13   makes it difficult to capture.  Is that right?
14        A.    Difficult to capture all disabilities, yes, in any
15   set of questions.
16        Q.    And so, how varied is the definition of disability?
17   If you can give me kind of a sense.
18        A.    How varied is it?
19        Q.    Well, yeah.  I'm trying to get a sense of sort of
20   like -- so it would include cognitive, it would include
21   hearing, vision, mobility.  Are there any other types of
22   disability that you think are particularly relevant in our
23   discussion?
24        A.    The main areas that would not be captured by the --
25   by the ACS and CPS questions, I think, some mental illnesses
```

Douglas Kruse                                                                    May 03, 2022
                                                                                    Page 78

 1    such as bipolar disorder, as I said, conditions like cancer,

 2    and long-term health conditions like cancer are probably going

 3    to be underreported, and -- let's see.  I was going to mention

 4    one other.  Oh, yes.  Back pain.  A lot of disabilities -- this

 5    comes up a lot in work settings -- issues of work disability

 6    eligibility for disability income benefits are issues of back

 7    pain and the -- some other research that's been done suggests

 8    that there's a lot of people out there with back pain, and that

 9    may not be fully captured here.  The mobility question, do you

10    have difficulty going, you know, walking or climbing stairs,

11    that will capture some people with back pain but not a lot.  So

12    pain is more generally, I think, is something that's not

13    captured that may -- that is undercounted by these questions.

14         Q.   And we can discuss a little bit more later when we

15    get to the substance of the report but it sounds like there's a

16    decent amount of disabilities that are invisible to an

17    individual who is -- if you're talking to somebody with a

18    disability, you may not be able to tell by first appearance.

19    Is that right?

20         A.   Absolutely.  Yes.  Yes, there are many invisible

21    disabilities.

22         Q.   So we're going to go to paragraph 33, particularly,

23    the sentence you see I highlighted.

24         A.   Okay.

25         Q.   "Due to the smaller samples in SIPP and CPS, in

Douglas Kruse                                                    May 03, 2022
                                                                    Page 79

1    several breakdowns I complement the Texas numbers from those

2    surveys with numbers for the overall U.S., plus estimates of

3    the significance of any differences between the U.S. and Texas

4    samples."  Did I read that correctly?

5         A.   Yes.

6         Q.   And so how did you complement the Texas numbers?

7         A.   I simply provided the Texas numbers in one column and

8    the US numbers in another column, so one can compare the -- so

9    one can compare the patterns to see if Texas looks very

10   different from the overall U.S.

11        Q.   And so when you say complement, you're using a

12   comparison between the two?

13        A.   Yes, yes.

14        Q.   And so you didn't incorporate the Texas numbers with

15   the US numbers, you instead use it as a comparison?

16        A.   Right, right.

17        Q.   I was trying to figure out if you supplemented the

18   numbers with the US numbers or if it was some other --

19        A.   No.  Yeah, right.  I'm not using complement in the --

20   in that sense.  I'm using complement in the sense of extra

21   information that helps shed light on the -- on the plausibility

22   of the Texas patterns.  If we saw a very different pattern in

23   Texas than the overall US, it might be due to some -- might be

24   due to a small sample in Texas creating some skewed results.

25   But we see, in general, the same patterns between Texas and the

1  overall US giving us some reassurance that the patterns we see

2  in Texas are true when you compare people with and without

3  disabilities.

4      Q.   So, if we go to paragraph 34 -- I'll read the

5  sentence above but the one I'm going to be talking about is

6  this particular one.  "In a number of places, I compare results

7  between people with and without disabilities showing that

8  people with disabilities face economic and social disparities

9  and higher rates of voting difficulties that are linked to

10  lower voter participation."  Did I read that sentence

11  correctly?

12      A.   Yes.

13      Q.   And then it continues, "These disparities are

14  maintained when holding constant the effects of demographic

15  characteristics."  Did I read that sentence correctly?

16      A.   Yes.

17      Q.   And then you continue, "The effects of disability may

18  be even greater than indicated by the simple difference between

19  people with and without disabilities, because voters without

20  disabilities may face many other non-disability-related

21  difficulties, such as language barriers."  Did I read that

22  correctly?

23      A.   Yes.

24      Q.   When you are -- in your report, you are only offering

25  your observations with respect to disparities on voters with

1    roughly speaking, you know, 1/3 of that -- 1.5% would be in

2    correctional facilities.  They are included in the ACS numbers

3    I present, even though they were not eligible to vote,

4    obviously.

5         Q.   Okay.  So they were individuals who are in

6    correctional facilities who are not registered to vote would

7    have been incorporated within the ACS data.  Is that right?

8         A.   Yes.

9         Q.   Okay.  And then nothing was done in order to weight

10   or account for that addition.  Is that right?

11        A.   No, there's no simple way to do that without --

12   without further data.

13        Q.   Okay.  So you were unable to weight or account for it

14   within this report.  Is that right?

15        A.   That's right.  I'll just add, though, that I -- I can

16   do the comparisons with or without comparing those in

17   institutions, and just exclude that entire group.  And the

18   basic patterns we find on employment, poverty, and so forth,

19   very much hold.  The institutional group does not affect those

20   overall patterns very much.  It's a very small group,

21   obviously.

22        Q.   So to the extent those affect patterns, it would

23   affect in the voting context, not in the general

24   characteristics such as maneuverability, poverty, job access,

25   things of that nature.  Is that right?

Douglas Kruse                                                    May 03, 2022
                                                                   Page 85

1        A.   Right.  But even in the voting context, I think it
2   would be a pretty small effect.  The -- it would be -- it is
3   better to include the people who are in nursing homes --
4   nursing homes and mental hospitals.  I think that provides a
5   more accurate portrayal, even if it does include some people in
6   correctional facilities.

7        Q.   So let's go into the overview.  If you see it, it's
8   on page 10.

9        A.   Okay.

10       Q.   Do you see the section where it says, "OVERVIEW:
11  PREVALENCE AND GENERAL CHARACTERISTICS OF PEOPLE WITH
12  DISABILITIES AND IMPLICATIONS FOR VOTING ACCESS"?

13       A.   Yes.

14       Q.   All right.  Your first sentence in the summary reads,
15  "In order to fully understand the extensive barriers people
16  with disabilities face in accessing their fundamental right to
17  vote, it is critical to provide an overview of the general
18  barriers people with disabilities face in their daily lives and
19  how each of these factors can impact access to voting."  Did I
20  read that correctly?

21       A.   Yes.

22       Q.   And so then, we look at the next subsection down, it
23  says, "Overall Prevalence and Types of Disabilities."  Do you
24  see that?

25       A.   Yes.

Douglas Kruse                                                          May 03, 2022
                                                                        Page 86

1      Q.   Okay.  And so this is the initial analysis that you

2   described in the previous paragraph.  Is that right?

3      A.   Right.

4      Q.   And so if we look into paragraph 38, it reads as --

5   and I'm looking at the second -- sorry, third sentence, "Based

6   on the 2020 ACS 6-questionnaire measure, Table 1 shows that

7   15.6% of voting-eligible people in Texas have disabilities,

8   representing 3 million people."  Did I read that correctly?

9      A.   Yes.

10      Q.   And so this is using ACS data and specifically the

11   data that was broken down for Texas specifically.  Correct?

12      A.   Yes.

13      Q.   And you might know this more than me.  The ACS

14   questionnaire for 2020, is there any deviations that can be

15   expected from the 2020 study that may not be prevalent in other

16   studies because of the Covid-19 pandemic?

17      A.   The Census Bureau paid a lot of attention to this

18   issue.  In fact, they had two months, March and April, when

19   they suspended data collection -- the household survey data

20   collection due to the pandemic.  They ended up creating, as I

21   say, they paid a lot of attention to this, they created weights

22   based -- taking account of that issue, trying to account as

23   best they could for the problems caused by the pandemic.

24          Because of the possibility of the pandemic affecting

25   the numbers, I also examined these numbers over the year before

1    in 2019.  And the numbers are very, very close when you look at

2    the different disparities: the demographics, the differences in

3    age, and in race, and that type of thing.  Differences in the

4    prevalence of different types of disability are very, very

5    similar between 2019 and 2020.  So the pandemic did not seem to

6    impair the estimates -- the data collection and the estimates

7    generated by the Census Bureau for 2020.

8         Q.   So to the extent the pandemic affected the initial

9    data, ACS, or I should say Census Bureau, weighted it

10   accordingly, and then you also looked at the data individually

11   itself.  Is that right?

12        A.   Right.  Yeah, they provided weights, as they do every

13   year, to make sure that the estimates fully reflect the --

14   fully reflect the -- or are fully representative of the

15   population; and then I use those weights in generating my

16   estimates.

17        Q.   So then, if we go to the next sentence, it says,

18   "Based on the SIPP survey's more extensive set of disability

19   questions, 30.5% of voting-age people in Texas have

20   disabilities representing 5.6 million people when applied to

21   the 2020 population numbers."  Did I read that correctly?

22        A.   Yes.

23        Q.   So I recognize that the ACS looks at voting eligible,

24   whereas the SIPP is looking at voting age population.  But is

25   there another reason that would account for the difference

Douglas Kruse                                                    May 03, 2022
                                                                    Page 88

1    between 5.6% versus 30.5%?

2        A.   Quite simply that the more extensive question -- set

3    of questions, over 100 questions used by SIPP they do measure,

4    they ask specific questions about epilepsy, about Asperger's,

5    about diabetes.  They ask a variety of questions.  The more

6    questions you ask, the more likely you are to have someone say

7    yes to one of the questions; so they identify a wider range of

8    disabilities.

9        Q.   And I think you had mentioned earlier that -- or it

10   might have been elsewhere in your report that certain types of

11   disabilities have certain -- different impacts on voter -- on

12   people's ability to vote.  Is that correct?

13       A.   That's true.  We do see that -- that people with

14   hearing impairments tend to be similar in voting to the hearing

15   population, whereas people who have cognitive impairments and

16   difficulty going outside alone are most likely -- or are the

17   least likely to vote.

18       Q.   Okay.  So is it fair to say then a person's

19   disability is incredibly fact specific?

20       A.   Yes.

21       Q.   And would it be fair to say that it's very unique to

22   that persons disability?

23       A.   It's fair to say that it's unique to each person, but

24   there are commonalities.  Hearing people -- you know, people

25   with hearing impairments, people with visual impairments, share

Douglas Kruse                                                    May 03, 2022
                                                                    Page 89

 1    a lot of the same conditions and issues.  People in

 2    wheelchairs, obviously, share a lot of the same issues.  So

 3    it's not perfectly unique.  Yes, it's unique.  Every person's

 4    body is unique, but there are commonalities.

 5         Q.   Is it fair to say then that the barriers an

 6    individual with a disability would face is fact specific in

 7    their everyday life?

 8         A.   Yes.  Again, there are commonalities.  People in

 9    wheelchairs, for example, have a very difficult time with

10    steps.  They can't go up steps.  So there's -- so there's a lot

11    of commonality that -- in the kinds of barriers that people

12    face.  And that's the nature of a lot of rehabilitation efforts

13    is to try to take lessons learned from other people who have

14    faced particular barriers and apply them to people in similar

15    situations.

16         Q.   So to kind of synthesize the two points then, would

17    it be fair to say that the barriers an individual with

18    disability faces is fact specific, but there are certain

19    commonalities that might be shared in somebody similarly

20    situated?

21         A.   Yes, I think that's fair.

22         Q.   And would it also be fair to say then, that the

23    barriers to voting somebody might face, that person with a

24    disability, is fact specific albeit there are certain

25    commonalities that the individual might share for others who

1   are similarly situated?

2         A.   Yes, I think that's fair.

3         Q.   And so, you had mentioned with the SIPP that it had a

4   wider range of disabilities.   Correct?

5         A.   Yes.

6         Q.   So a lot of these disabilities, though, that are

7   picked up by the survey, would not pose a barrier to somebody

8   with doing each everyday activity.   Is that right?

9         A.   Right.   To doing each of the activities, right.

10        Q.   And so not every person with a disability, or not

11  every type of disability picked up by the SIPP, would pose a

12  barrier for somebody being able to register to vote?

13        A.   That's true.   Yes.

14        Q.   And is it also true then, that by picking up a wider

15  range of disabilities, not every disability would pose a

16  barrier to somebody being able to vote?

17        A.   Right.   That's true.   Both of the more restricted set

18  of six questions, and of the more expansive set of questions,

19  that they will pick up people who may not face barriers in

20  voting.   And, of course, we find that in the -- in the EAC

21  survey -- the EAC sponsored survey we did that people with

22  disabilities are less likely to vote but among those who do

23  vote, there are plenty of people who are able to vote without

24  problem.   The rate of difficulty is higher among people with

25  disabilities, but a majority of people with disabilities who

Douglas Kruse                                                          May 03, 2022
                                                                        Page 91

1    vote are able to do so without any reported difficulties.

2         Q.   So I think you said, "A majority of people who have

3    disabilities who vote are able to do so without difficulties."

4    Is that correct?

5         A.   Right.  We found that among those who vote in the

6    polling place in 2020, 18% said that they reported some type of

7    difficulty in doing so; meaning that 82% said they did not have

8    difficulty in voting in a polling place.

9         Q.   And I think you had mentioned that there was a

10   decline from a couple of years ago.  Is that right?

11        A.   Yeah.  That was very heartening progress that in

12   2012, it was -- the rate was 30%, and in 2020 it had gone down

13   to 18%, which is -- and that was a statistically significant

14   decline.  It was both statistically significant and

15   substantially significant -- a 12-point drop.

16        Q.   You wouldn't have happened to have done any

17   assessment on why there was a decline, would you?

18        A.   Yes, we did some assessment of that.  We looked at,

19   and I think I mentioned briefly earlier, we looked at the

20   extent to which that might be accounted for by the pandemic.

21   There is -- of course a number of states made it easier to

22   access mail ballots, and mailed -- in some states, mail-in

23   ballots to everyone, for example, my own state of New Jersey.

24   I received a -- I automatically received a mail ballot.  So

25   there was a great increase in voting by mail in 2020.

1           We did some analysis for the EAC report finding that
2   pretty close to half of that decline -- that decline from 30 to
3   18 -- of that 12-point decline, about half of that, the six
4   points of the decline, was due to the shift to voting by mail
5   where people reported fewer problems.  The other six points
6   appear to be due to increased -- increased accessibility of
7   polling places; that election officials had done a good job in
8   helping make polling places more accessible.

9        Q.   And so to go back to our earlier point, for each of
10   these surveys -- the six surveys that you utilized in the
11   report -- they would capture a wider range of disabilities
12   where people with disabilities whose disability would not pose
13   a barrier to voting.  Is that correct?

14        A.   Yes.  They'll certainly capture people whose
15   disability does not --

16        Q.   And so the 3 million Texans with disabilities
17   identified by the ACS, that's 3 million people who have
18   disabilities; it's not 3 million people who would have
19   barriers --

20        A.   No, that's true.

21        Q.   And the same with the 5.6 million people identified
22   by the SIPP.  That's 5.6 million people with identified
23   disabilities, not 5.6 million people who would have barriers to
24   voting because their disability?

25        A.   Right.  These are groups that have a higher

Douglas Kruse                                              May 03, 2022
                                                               Page 95

1    used?

2        A.   I don't remember the full -- the full verbiage but

3    it's, "Do you have difficulty remembering, concentrating, or

4    making decisions?"

5        Q.   Thank you.  If it makes you feel any better, the more

6    I'm quiet, the more I'm skipping questions.

7        A.   That's fine.  No rush.

8        Q.   Okay.  So, looking at paragraph 44 --

9        A.   Okay.

10       Q.   -- this is where you break down disabilities with

11   other demographic characteristics.  Correct?

12       A.   Yes.

13       Q.   Or I should say tie them together.

14       A.   Yes.

15       Q.   And then you say, "The prevalence of disability in

16   Texas is markedly higher among Native Americans, Black people,

17   older people, and those with lower levels of education."  Is

18   that correct?

19       A.   Yes.

20       Q.   And so, is this the only area where you are offering

21   an assessment of other demographic characteristics with respect

22   to disabilities?

23       A.   Yes.  As noted earlier, I -- the disability

24   disparities I've identified also hold when controlling for

25   these things in regressions, and I'd be glad to talk about the

1    nature of the regressions.  But when you hold constant these

2    other factors -- we still see those disability disparities.

3    But I don't present those regressions in this paper, obviously.

4    But here is the only place that I explicitly break down the

5    numbers by race, gender, age, etc.

6         Q.   And so, when we get later into the report, and we're

7    talking about the barriers to voting, you do not break down the

8    data based on demographic characteristics such as race, gender,

9    or age.  Is that correct?

10        A.   That's correct.  We've -- we've done that in the fact

11   sheets we present after we develop after each election, but I

12   do not do those -- do those breakdowns of voting by demographic

13   characteristics in this report.

14        Q.   You don't do it in this report.  Correct?

15        A.   Correct.

16        Q.   So in 45, you say, "The relationship between

17   education and disability reflects causality in both directions.

18   Disability can limit education due to barriers that people with

19   disabilities often encounter in furthering their education,

20   such as lack of a correct diagnosis or appropriate

21   accommodations especially for poorer children.  Education also

22   has an impact on disability: it can open up jobs with safer

23   working conditions that are less likely to lead to disability,

24   and provide higher incomes that increase access to health

25   services and assistive technology that help people cope with

1    resources for voting".  Did I read that correctly?

2         A.   Yes.

3         Q.   And then it continues, "Not having internet access

4    can make it more difficult to: a) register to vote; b) find out

5    how and where to vote, particularly if polling places have been

6    changed; c) gather information on candidates and issues in

7    order to make informed decisions in voting; and d) cure issues

8    with mail-in ballot applications."  Did I read that correctly?

9         A.   Yes.

10        Q.   Okay.  And then it continues, "These difficulties

11   create special problems when voting information is only

12   provided in an online format."  Did I read that correctly?

13        A.   Yes.

14        Q.   So looking at these four categories:  Registered to

15   vote, find out how and where to vote, gather information on

16   candidates and issues, and then, D, cure issues with mail-in

17   ballot applications, which of these four do you think is

18   affected by SB 1?

19        A.   Certainly, the fourth one is affected by SB 1.

20        Q.   Okay.  So your representation is that of the four

21   challenges presented by having no internet access, the fourth,

22   cure issues with mail-in ballot applications, is the one

23   particular of SB 1 that would be affected by it.  Is that

24   correct?

25        A.   That's correct.  I'm not aware of SB 1 affecting the

Douglas Kruse                                                    May 03, 2022
                                                                    Page 110

1       Q.    And would you agree with me that some individuals may
2  find it difficult to use public transportation but find it
3  easier to use a modified minivan that allows for handicap
4  accessibility?
5       A.    It's certainly true that the ability to use different
6  modes can convey one, and obviously people will take the mode
7  that's most convenient and makes sense for them.
8       Q.    Okay.  Let's move on to the next section, which is
9  "Social Isolation, Stigma and Bias."  Specifically, I want to
10 look at paragraph 61.  Do you have it in front of you?
11      A.    I do.
12      Q.    So the beginning of the paragraph reads, "The social
13 isolation is reflected in, and reinforced by, the
14 well-documented stigma attached to disability that continues to
15 be manifested in attitudinal studies of the general
16 population."  Did I read that correctly?
17      A.    Yes.
18      Q.    "These attitudes toward people with disabilities
19 impact all areas of an individual's life.  The stigma attached
20 to disability may impact the perception of a person's abilities
21 that do not align with reality."  Did I read that correctly?
22      A.    Yes.
23      Q.    It continues, "This can impact the ability of people
24 with disabilities to vote by, for example, making people
25 (particularly those outside of their families) less willing to

Douglas Kruse                                        May 03, 2022
                                                       Page 111

1    assist them with voting, and can also result in people with

2    disabilities themselves being less willing to ask for

3    assistance when needed."  Did I read that correctly?

4          A.   Yes.

5          Q.   And so, a couple of questions based on this

6    paragraph.  The first one is what report is this factual

7    assertion based because I don't see a particular citation here?

8          A.   It's based on citations there in note 12.

9          Q.   Thank you.  So the footnote extends to the rest of

10   the paragraph.  Is that right?

11         A.   Yes, it does.  And I should note that the citation

12   that is in note 12, I relied on not just on single studies.  I

13   relied on literature reviews and meta analyses that combine the

14   results of many studies.  So these are broad overviews, not

15   just -- not just single studies.

16         Q.   Thank you for the clarification.  So this last

17   sentence where it says, "This can impact the ability of people

18   with disabilities to vote."  You give an example, but can you

19   kind of explain how does it make people less willing to assist

20   them with voting?

21         A.   One of the common ways of measuring stigma is through

22   what's known as a social distance scale.  That is how

23   comfortable people are being around someone.

24              And this dates back to a lot of research that was

25   done on race, how comfortable whites are, for example, being

1   close to blacks.  Would you want one sitting next to you?

2   Would you want one as a coworker?  Would you want one to marry

3   your sister?  And so forth.

4          So this is measured by -- social distance is often

5   used if -- and people tend to feel uncomfortable.  They want

6   more social distance from people with disabilities.

7   Particularly, the greatest stigma is with people with cognitive

8   disabilities.  Given there's that social distance, and people

9   don't want to be near people with disabilities, I think

10  that's -- will clearly lead to making it more difficult to find

11  people willing to assist you with voting if you have people who

12  feel uncomfortable around you.

13       Q.   And does any difficulty stem from some of the

14  disabilities being less visible than others, and some

15  individuals not knowing whether to offer assistance?

16       A.   That's an interesting question.  The visibility of a

17  disability is obviously important.  If someone's not aware that

18  someone has a disability, they may be more willing to help them

19  out; however, many of the invisible disabilities, or mental, or

20  cognitive ones, which tend to attach the -- tend to attract the

21  greatest stigma.  So if people know that someone has a mental

22  or cognitive disability, they're -- they're -- they feel

23  uncomfortable around them.  They are more likely to feel

24  uncomfortable around them, and less willing to -- many people

25  will be less willing to help them out; not everyone, but many

1   people will.

2       Q.   All right.  Let's jump to the next large section,

3   which is, "Voting Barriers Facing People with Disabilities."

4   This starts on paragraph 62.  Do you see it right below?

5       A.   Yes.

6       Q.   And so if you go into the middle of the paragraph, it

7   says, "Data from the Current Population Survey Voting and

8   Registration Supplement show that 71.9% of eligible citizens

9   with disabilities in Texas were registered to vote in 2020, and

10  59.4% voted, compared to 71.2% and 64.5% of citizens without

11  disabilities respectively."  Did I read that correctly?

12      A.   Yes.

13      Q.   And so I noticed that the voter registration rate is

14  very comparable between individuals with disabilities and

15  without disabilities in Texas.  Is that correct?

16      A.   Yes.

17      Q.   Is that something you see in other states, or is that

18  something specific to Texas?

19      A.   In general, nationally, the registration rate is

20  lower among people with disabilities.  It's not -- it's about

21  half the size of the overall voting gap.  So yes, Texas is

22  slightly different than the pattern in the overall United

23  States and in the United States as a whole, the voting

24  registration -- voter registration rate is lower among people

25  with disabilities and people without disabilities by about

1    three percentage points.

2         Q.   And so that's a measurement that Texas does better

3    than the national average.  Is that correct?

4         A.   Yes.  And I'm not sure if it's a statistically

5    significant difference.  I'd have to do that test.  I haven't

6    done that specific test but at least according to this

7    estimate, our best guess is that Texas is doing better than the

8    rest of the country.

9         Q.   And have you analyzed why Texas is doing better than

10   the rest of the country with respect to the voter registration

11   rate?

12        A.   No, I haven't analyzed that.  As I say, it could be

13   a -- it could be within the margin of error, and I suspect

14   there's a good chance it is.

15        Q.   And so you see a sizable gap between the eligible

16   citizens who are registered to vote versus the number who

17   actually voted.  Is that correct?

18        A.   Yes.

19        Q.   In Texas?

20        A.   Yes, yes.

21        Q.   And so, what factors lead to the disparity between

22   people being able to register to vote with disabilities but

23   people not being able to vote itself?

24        A.   I think a big factor is that you may register only --

25   it's possible you may register only once in your life.  You

Douglas Kruse
May 03, 2022
Page 115

1   could have registered decades ago, like when you first became

2   eligible to vote at age 18.  And if you have done that once,

3   you may not have had a disability at that point.  Decades

4   later, you have a disability and you're still registered, but

5   you may encounter a lot of barriers associated with voting as a

6   person with a disability at that point.

7              So I think age really plays into this.  The

8   registration you do only once or every time you move, which is

9   pretty infrequent for most people; whereas voting is something

10  you do, ideally, every election.  There's a lot more -- a lot

11  more effort and potential barriers encountered in voting every

12  election than there is with that one time of registering.

13       Q.   And so this number count, these numbers come before

14  the adoption of SB 1.  Correct?

15       A.   Correct.

16       Q.   And have you assessed what provisions of Texas law

17  before SB 1, impose obstacles to voting that were that would

18  account for the difference?

19       A.   I am sorry.  Say that again?  What provisions?

20       Q.   What provisions of Texas law before SB 1 would impose

21  obstacles to voting that would account for the difference?  I

22  was wondering if you had assessed that at all.

23       A.   I have not done specific analysis of Texas.  We have

24  looked at state policies in general.  Particularly in our

25  measure of American elections study, we looked at the -- how

Douglas Kruse                                                    May 03, 2022
                                                                  Page 116

1   state policies on the excuse being required for an absentee

2   ballot affects a turnout relative to states where no excuse is

3   required, or everyone votes by mail.  And we found that there

4   was a -- there was an effect to the no excuse in the old vote

5   by mail systems, that disability turnout was relatively higher

6   in those states than in states like Texas where an excuse was

7   required.

8            Our interpretation of that is when an excuse is

9   required, people with disabilities have to mark on an official

10  form that they have a disability.  As we just discussed,

11  there's a stigma to saying you have a disability, and putting

12  you have a disability on official government form is something

13  that a lot of people don't want to do.  It appears to dissuade

14  people with disabilities from applying if they are forced to

15  say that they have a disability in applying for an absentee

16  ballot.  So that's what -- when we looked at the effects of

17  these policies overall in the -- in the country -- but the

18  specific answer your question, though, is no, we haven't

19  specifically analyzed Texas.

20       Q.   And so, you haven't analyzed Texas and the one

21  practice that you've identified, specifically, nationwide had

22  to do with excused versus non-excused mail-in voting.  Is that

23  right?

24       A.   Yes.  We actually also in that study looked at the

25  availability of assistive technology -- assistive accessible

1    in 2020 was lowest among people with difficulty dressing or

2    bathing, cognitive impairments, and difficulty going outside

3    alone, but participation was also low among those with visual

4    impairments or difficulty walking or climbing stairs."  Did I

5    read that correctly?

6        A.   Yes.

7        Q.   And this goes back, I think, to what we were saying

8    before about the varied nature of disabilities.  Is that right?

9        A.   Right.

10       Q.   And so, have you -- in terms of accommodating these

11   different types of disabilities, would that be a fact specific

12   analysis?

13       A.   As we discussed, each person may be unique in the

14   particular configuration.  They have abilities and

15   circumstances, so that would make it fact specific.  But there

16   are a lot of commonalities.  We know, for example, that people

17   with visual impairments benefited greatly from -- well, first

18   of all, from large ballots -- having large, easy to read

19   ballots, or having magnifying glasses -- just a simple measure,

20   magnifying glasses, and from having accessible voting machines.

21   If they're totally blind, they need an accessible voting

22   machine with headphones and so forth, so they can -- they can

23   operate, so they can vote independently and confidentially.  So

24   my point is, that there are these commonalities that we know

25   there are certain practices that are relevant to people with a

1  particular type of disability.

2      Q.   So is it fair to say then there are certain

3  commonalities, but to make the final determination of how to

4  provide a reasonable accommodation require fact specific

5  analysis?

6      A.   For a particular individual, a particular reasonable

7  accommodation, yes.  It has to be tailored to the person.

8      Q.   And let's look at paragraph number five.  You see --

9      A.   I'm sorry.  You mean 65?

10     Q.   Yeah, 65.

11     A.   65.  Okay.

12     Q.   You say, "Research indicates that several factors

13 contribute to the disability participation gap including lower

14 levels of education and income, lower feelings of political

15 efficacy among people with disabilities, and greater social

16 isolation that reduces the likelihood of being recruited to

17 vote by friends, neighbors, or colleagues."  Did I read that

18 correctly?

19     A.   Yes.

20     Q.   Then you continue, "These factors do not, however,

21 fully explain the disability gap in participation."  Did I read

22 that correctly?

23     A.   Yes.

24     Q.   Then it finally continues, "Part of the remaining gap

25 and participation can be traced to lower turnout due to prior

1  difficulties voting."  Did I read that correctly?

2       A.   Yes.

3       Q.   Now, when you use this phrase at the end, "part of

4  the remaining gap in participation can be traced to lower

5  turnout due to prior difficulties in voting", so in this case,

6  you're talking about an individual who had tried to vote but

7  was unable?

8       A.   I need to be clear on this.  We have not been able to

9  track individuals from election to election.  We hope to be

10 doing that with the next election with our most recent EAC

11 survey.  However, we do find that people who have difficulties

12 in voting, that's a strong predictor of negative feelings of

13 external efficacy -- lower feelings of external efficacy and

14 external efficacy.  Local efficacy is the belief that the

15 system is responsive.  So people who face difficulties are less

16 likely to feel that the system is responsive to people like

17 them.

18           In turn, that feeling, that negative efficacy, is

19 related to lower turnout.  So just to be clear, we're not

20 tracking specific people here but we are tracking the

21 attitudes and how those are related to -- how the difficulty in

22 turnout predicts lower feelings of efficacy and lower feelings

23 of efficacy -- I'm sorry -- difficulties in voting predict

24 lower turnout -- difficulties in voting predict lower feelings

25 of efficacy, and lower feelings of efficacy predict lower

1    turnout; if I said that correctly.  I hope I did.

2         Q.   I think you did.  I hope.

3         A.   Okay.

4         Q.   And so just to clarify, you gave a pretty long and

5    factual answer, that you do not trace voters from election to

6    election, but you hope to do so in the future.  Is that

7    correct?

8         A.   Yes.  We are greatly looking forward to doing that.

9    That will be a -- that will be a wonderful methodological

10   advance.

11        Q.   And so your opinions and observations that articulate

12   in report are not based on any study that tracked voters from

13   election to election.  Is that correct?

14        A.   That is correct.

15        Q.   Now, you often hear the phrase enthusiasm gap when it

16   comes to voting, and is this sort of what you're getting at in

17   this paragraph, that there's an enthusiasm gap for a variety of

18   different reasons among individuals with disabilities versus

19   those without?

20        A.   There have been several surveys looking at the

21   interest of people with disabilities in elections, and

22   interestingly, people with disabilities tend to express -- tend

23   to say they follow election news just as much as people without

24   disabilities and they would like to vote just as much as people

25   without disabilities; however, they end up not voting as much

 1   as people without disabilities.  And I think that's fairly --

 2   that certainly supports the idea that they face barriers in

 3   voting.

 4        Q.   So in paragraph 66, you have your opening line:  "An

 5   important note is that voter participation can vary

 6   substantially across elections for citizens both with and

 7   without disabilities."  Did I read that correctly?

 8        A.   Yes.

 9        Q.   And so, does this mean that you can't get -- you have

10   to look at multiple elections in order to determine trends for

11   voters with disabilities as opposed to looking at one specific

12   election?

13        A.   You certainly have to look at multiple elections to

14   look at trends.  The point that I'm trying to make here is that

15   as we found in our factsheet on voter turnout in 2020, we found

16   that turnout increased substantially among people with

17   disabilities from 2016 to 2020.  The point of this paragraph 66

18   is to caution that that doesn't mean there are no barriers.

19   The fact that the turnout went up among people with

20   disabilities, the turnout can still go up even as they continue

21   to face barriers.  So that was the point of that -- that

22   paragraph.

23        Q.   Okay.  So if turnout can go up, and that's not

24   necessarily an indication that barriers have declined, how

25   would we identify when barriers have declined or no longer

```
 1   transportation problems, or other issues that make it hard to
 2   leave one's home.  This is particularly relevant to the 10.0%
 3   of Texans who report travel-limiting disabilities as shown in
 4   Table 7, and the 8.3% of Texans who have difficulty walking or
 5   climbing stairs and 5.8% of Texans who have difficulty going
 6   outside alone, as shown in Table 1."   Did I read that
 7   correctly?
 8        A.   Yes.
 9        Q.   And then it goes on, "The 3.3% of voting-eligible
10   Texans with vision impairments, however, may not be able to
11   vote independently with a mail ballot, and may need polling
12   places where they can vote independently with an accessible
13   machine required by the 2002 Help America Vote Act."  Did I
14   read that correctly?
15        A.   Yes.
16        Q.   And so when you're talking about how certain methods
17   can be more attractive to one group with disabilities as
18   opposed to another, are you looking at specific studies that
19   show that, or were you just relying on your [unintelligible]?
20        A.   We find, for example, in our EAC surveys that
21   supporting this point here that people with vision impairments,
22   who vote by mail report that 22% of them reported difficulty in
23   voting by mail.  We see that problem and we also see that
24   people with mobility impairments are more likely to report
25   difficulties in going to vote at a polling place.  So we do see
```

Douglas Kruse                                                    May 03, 2022
                                                                    Page 125

1  that variation in difficulty by type of disability.

2       Q.   And when you were talking about individuals with

3  visual impairments reporting difficulty voting by mail, did

4  they also voice any other concerns that you had read, such as a

5  fear of lack of privacy, for example?

6       A.   No.

7       Q.   Is that because the report did not capture that

8  information, or was that just not found in the results?

9       A.   In the survey, we asked people about specific

10 difficulties that they may have had in voting, whether by mail

11 or in a polling place.  And at the end, we asked, "Did you face

12 any other type of difficulty in voting?"  And they are -- and

13 so, then we asked for verbatim reports of what that difficulty

14 was.  To be honest, there may have been a few, I don't

15 recollect right now, there may have been a few who cited

16 privacy issues as part of that catch-all question at the end,

17 but I don't remember specifically.

18      Q.   Okay.  So to the extent that that information be

19 captured by the catch-all question, you don't recall if

20 individuals with visual impairments expressed additional

21 concerns besides the difficulties, such as lack of privacy?

22      A.   Right.  If I could just make a general point here

23 that this point we're talking about, the different methods that

24 are appropriate for different types of disabilities, that's a

25 point that my colleague, Lisa Schur, and I often make in our

Douglas Kruse                                              May 03, 2022
                                                              Page 126

```
 1   talks and in our work on disability and voting.
 2            Given the great variation in types of disabilities
 3   and severity of disability, that one size doesn't fit all.
 4   There's no one size fits all solution.  The more options, the
 5   better.  The more options there are for voting, the greater is
 6   the likelihood that a particular person with a particular
 7   disability will find one method that works for them.  That's a
 8   general point we'd like to make in our talks.  The more
 9   options, the better, for people with disabilities.
10        Q.   So, let's look at paragraph 68.  You say, "Overall,
11   people with disabilities are much more likely to vote by mail.
12   Among Texas voters in 2020, 30.2% of people with disabilities
13   and 8.2% of people without disabilities voted using a mail
14   ballot, producing a gap of 22.0%, as shown in Table 8."  Did I
15   read that correctly?
16        A.   Yes.
17        Q.   Now, 2020 was the high watermark with respect to
18   mail-in voting.  Was it not?
19        A.   Yes.
20        Q.   And individuals with disabilities often had
21   preconditions that left them at higher exposure for Covid-19.
22   Is that accurate?
23        A.   I think it's -- excuse me -- I think that's fair to
24   say.  I don't know the numbers on that or studies on that, but
25   I think that's fair to say.
```

1        Q.   Is it logical to conclude that individual

2   disabilities would have been even more likely in 2020 to vote

3   by mail than they would have in previous election cycles?

4        A.   Well, in fact, I have exact data on that.  In

5   paragraph 69, I did a comparison to 2016.  And in 2016, instead

6   of 30% of people with disabilities voting by mail, 19.8% or

7   20%; so a 10-point gap compared to 6% among people without

8   disabilities relative to -- I think it was 8%.  So the pandemic

9   clearly increased the voting by mail among people with

10  disabilities to a greater extent than it did among people

11  without disabilities.

12       Q.   Okay.  So 22%, which you said is the gap in 2020,

13  that was, again, like a high watermark -- the extreme of what

14  the gap would be?

15       A.   Yeah.  You say the extreme of what the gap would be.

16  Who knows what may happen in the future?  There may be

17  conditions that make it even more difficult to vote in person,

18  but I hope -- well, hopefully not.

19       Q.   Fingers crossed.  Maybe the best way then of putting

20  it would be looking back where it's as opposed to forward.

21       A.   Looking backwards, that is the high watermark -- yes.

22       Q.   All right.  Let's jump into "Barriers to In-Person

23  Voting".  So you list a variety of factors that could prove a

24  barrier to individuals with disabilities with respect to

25  in-person voting, finding or getting to the polling place,

1  getting inside the polling place, standing in line, being

2  prevented from voting by poll workers, reading or seeing the

3  ballot, understanding how to vote or use the equipment,

4  communicating with poll workers, writing on the ballot, and

5  physically operating the voting machine.  Did I read that

6  correctly?

7       A.   Yeah, you read the first clause of each of those

8  correctly.  That's fine.

9       Q.   Yeah.  Sorry.  I'm --

10      A.   That's fine.  Yeah.

11      Q.   And so I guess one of the first questions I have for

12  you is, which of these do you think is exacerbated by SB 1?

13      A.   I think several of them can be exacerbated by SB 1.

14  As I read it, SB 1 says that people who assist can only assist

15  in -- what was it -- reading the ballot or marking the ballot.

16  There are other types of assistance that are needed; finding

17  are getting into the polling place, getting inside the polling

18  place, the going over steps clearing out -- there are media

19  reports of people who tried to vote and find that the

20  accessible entrance is blocked by a trash can, or something

21  like that.  Well, moving that trash can is assisting a person

22  with a disability, and that would appear from my reading from

23  the plain language of SB 1 to not be permitted.  Assistance

24  with helping people stand in line, bring a chair for someone

25  who's standing in line.  There's several types of assistance

1    here that I think aren't -- that fall outside the very narrow

2    set of activities that someone is allowed to assist with,

3    according to the language of SB 1.

4         Q.   So you interpret SB 1 as not allowing an individual

5    to help someone with disabilities find or get into a polling

6    place.  Is that a fair assessment?

7         A.   It probably -- it allows people to help someone find

8    a polling place but getting into the polling place, actually

9    when you're at the polling place, and navigating inside of the

10   polling place.  My reading of SB 1 is that that would not be

11   allowed by the plain language.

12        Q.   Okay.  So it sounds like you interpret voting

13   assistance as anything within the polling place.  Is that a

14   fair assessment?  You made a distinction between finding the

15   polling place as opposed to getting into the polling place.

16        A.   Yeah.  Certainly -- okay, no, I'm going to -- I'm

17   going to backtrack here and say, I think helping someone find

18   the polling place, get to the polling place, that qualifies as

19   assistance as well. Sure.  Yeah.

20        Q.   Okay.  So it seems that you're interpreting the

21   provisions of SB 1, and tell me if I'm wrong, as incorporating

22   any type or as applied to any type of assistance that could be

23   related to voting?

24        A.   Yes, I think so.

25        Q.   Okay.  And I was going to ask these a little bit

Douglas Kruse                                               May 03, 2022
                                                              Page 132

1    the ballot (3.8% ), and getting inside the polling place

2    (3.2%).  These problems were especially likely among those with

3    vision and mobility impairments, and those needing help in

4    daily activities."  Did I read that correctly?

5         A.   Yes.

6         Q.   And then if you look at the end of paragraph 72, it

7    says, "Taken together, these results indicate that a

8    substantial portion of the 5.7 point national disability gap in

9    voter participation can be accounted for by a greater

10   likelihood that registered voters with disabilities said they

11   were not allowed to vote or were dissuaded by the long lines."

12   Did I read that correctly?

13        A.   Yes.

14        Q.   And you're not -- you don't in your report state that

15   SB 1 increases lines of polling places.  Is that correct?

16        A.   I think there's a very good likelihood that by making

17   it more difficult to vote by mail, that that will drive some

18   people with disabilities to the polls, which would increase the

19   likelihood of long lines at the polls.  I can't put a number to

20   that but I think that's a very reasonable inference to draw.

21        Q.   So you make an inference that SB 1 will increase

22   lines.  You do not, however, have any studies?

23        A.   No, I don't have any studies on that.

24        Q.   And do you allege in your report that SB 1 makes it

25   more difficult for a voter to read or see the ballot?

Douglas Kruse                                                    May 03, 2022
                                                                  Page 133

 1       A.   No.
 2       Q.   Do you allege SB 1 makes it more difficult for a
 3  voter to get inside the polling place?
 4       A.   No.  What I'm alleging is that it makes it more
 5  difficult to find assistance in overcoming that kind of
 6  barrier.
 7       Q.   You also provide in paragraph 75, a variety of
 8  examples of people across the country, and this is highlighting
 9  the different types of barriers at polling places.  Is that
10  correct?
11       A.   Yes.
12       Q.   Do you know if any of these individuals live or voted
13  in Texas?
14       A.   I don't think any of those cases come from Texas, no.
15       Q.   Okay.
16       A.   If I could just add a note on this, that my
17  analysis -- I'm very much of a statistical person.  I do a lot
18  of analysis of large scale data sets, and I particularly like
19  large scale representative data sets which have advantages --
20  many advantages of being representative, of course, you can
21  arrive at stronger conclusions.  Also, these datasets are
22  typically anonymous, in which people are more likely to be
23  truthful.  So I think large scale data sets give us very
24  powerful data.
25            But I do like to add individual anecdotes like this

1   people with cognitive disabilities will have more difficulty

2   adapting to something new if they've gotten used to one method

3   of doing things.

4        Q.   So in that case, would a person with a cognitive

5   disability find it difficult to revert back to, let's say, the

6   old standard if they had become adapted to the new rules under

7   SB 1?

8        A.   Possibly.  I don't think -- as I interpreted the SB 1

9   is creating new barriers to obtaining assistance for people

10  with cognitive impairments.  I don't know that the -- that this

11  would create more difficulties in going back to a system with

12  less -- with less risk -- with fewer restrictions on systems.

13  Yeah --

14       Q.   One of the reasons --

15       A.   I don't know --

16       Q.   I'm sorry.  I didn't mean to interrupt.

17       A.   No, go ahead.

18       Q.   One of the reasons I'm bringing this up is because

19  we're going to be talking in a few moments, probably after our

20  next break, about the different provisions of SB 1, and that

21  includes the identification number on the application vote by

22  mail, as well as the mail-in ballot.  And so, I imagine that

23  it's your position that individuals with disabilities would

24  have difficulty adding the new information.  Is that correct?

25       A.   They're likely to have more difficulty adding that.

Douglas Kruse                                                    May 03, 2022
                                                                   Page 141

1    Yes.  If we go back to the old system -- you were suggesting

2    that switching back to the old system might cause problems, it

3    would seem that eliminating that new requirement wouldn't cause

4    a problem in going back to the old system for someone with

5    cognitive impairment.

6         Q.   Do you think it's an implementation issue that once

7    people with cognitive disabilities became more familiar with

8    the requirement of putting an ID number on the ballot, that the

9    error rates would decline and their difficulty adept -- or

10   difficulty complying with that provision would decline?

11        A.   That's possible.  I really can't speak to that.  I'm

12   not an expert in the adaptability and learning abilities of

13   people with cognitive impairments.

14        Q.   And so you also have here a postage expense and

15   mailing the ballot in locations where stamps are required to

16   return a ballot.  Are you aware of Texas -- that Texas counties

17   often provide prepaid postage?

18        A.   No, I'm not aware of that in Texas.  You say Texas

19   counties often provide it but they don't always provide it?

20        Q.   That's correct.  It's not a requirement that they

21   provide it; and I was simply wondering if you were familiar

22   with the practice, or its -- how frequently that practice is

23   done in Texas?

24        A.   Oh, I'll be totally honest.  I just learned this last

25   year that there are people who have to put stamps on mail

1    in front of you as well, this way we can look at them side by

2    side.

3          A.   My report?  Okay.

4          Q.   Yeah.  Because we're going to be talking now about

5    your review of certain sections within SB 1.

6          A.   Sure.

7          Q.   We're going to start with sections 5.02, 5.03, 5.06,

8    5.07, 5.10, and 5.12.  Do you see that in your report?

9          A.   I do.  Actually, can I go back and make one comment

10   about section 1.022?

11         Q.   Sure.

12         A.   My point here is that people with disabilities still

13   have the ADA sections they had before SB 1 and this is

14   affirming that they can request a reasonable accommodation, but

15   to the extent that SB 1 creates new barriers that does not --

16   it says we're recruiting new barriers, but you can request for

17   reasonable accommodation those barriers.  We're requesting

18   reasonable accommodation, and so there's a barrier.  There's an

19   extra step people have to go through to request.  So it -- it

20   complicates.  It makes it harder to vote if you have to request

21   a reasonable accommodation to these new barriers that have been

22   created by SB 1.

23         Q.   Okay.  So it's your --

24         A.   That's just a point I wanted to make.

25         Q.   So, it's your position that the act of requesting an

Douglas Kruse                                                    May 03, 2022
                                                                    Page 157

 1   accommodation is itself a barrier.  Is that correct?
 2        A.   It's creating a new barrier.  It's creating -- it's
 3   creating an extra cost.  As an economist, I think in terms of
 4   costs and benefits, and it's creating an extra cost in time and
 5   effort.
 6        Q.   All right.  Let's look at section 5.02.
 7        A.   Okay.  What page are we on in the legislation?
 8        Q.   I'm try to find that.
 9             MS. SWEREN-BECKER:  I believe it's page 33 in the
10   version that we have before us.
11             MS. HUNKER:  Yes.  It's the same with the one on the
12   screen.
13        Q.   (BY MS. HUNKER)  So, I guess my initial question
14   looking at section 5.02, in what way does this create a barrier
15   for individuals with a disability?
16        A.   This creates an extra requirement that someone has to
17   go through in order to apply for a mail ballot -- it creates an
18   extra requirement.  And combined with another provision, I
19   forget which number it is, if there's a defect, if someone
20   doesn't remember what they initially put down in their original
21   registration application that creates complications in trying
22   to cure the defect if it can only be done online or in-person
23   after a certain date; so that's the problem that I see there.
24        Q.   Okay.  So for you, it's the fact that there's an
25   additional requirement.  Now, would it be a barrier if you

```
 1   were -- if there were any additional requirements with respect
 2   to an application to vote by mail?
 3        A.   Any additional requirements such as?
 4        Q.   Like any additional information that would be needed
 5   on the ballot?
 6        A.   It's hard to answer that.  There may be some extra
 7   information that is really trivial and easy to add.  In that
 8   case, simply asking for one bit of extra information is not --
 9   would not be a substantial burden at all.  Asking for this
10   information, particularly when it has to be validated against
11   the information used in the original registration application,
12   that can be a real problem.  "Geez, what did I -- do I use my
13   driver's license?  Where's my electronic identification
14   certificate?  I know I filed that somewhere.  Where is that
15   darn thing?"
16        Q.   Are you aware that you're required to put an
17   identification number on your voter registration form in Texas?
18        A.   Yes.  On your registration form?  I -- yes.
19        Q.   Is it your position that it is not a barrier to
20   vote -- to register to vote to require to have an
21   identification number, but that it is a barrier for an
22   application vote by mail?
23        A.   It's a barrier that the two have to match.  There may
24   have been several decades passing since one did the original
25   registration application; and it's a barrier that if it doesn't
```

1    match, then correcting that can impose some significant costs.

2         Q.   Is it your belief then that the number that's put on

3    the application has to match -- has to be the exact number that

4    was used on the registration application?

5         A.   That's -- that's my reading of it that the number has

6    to match for this to be a valid application for an absentee

7    ballot.

8         Q.   And are you aware that it has to match any number

9    that's within the voter registration file?

10        A.   I'm sorry?  That what has to match any number.

11        Q.   The number that is placed on the application to vote

12   by mail.  So to give you an example:  When I registered to

13   vote, I put my social security number because I did not yet

14   have a Texas license.

15        A.   Okay.

16        Q.   Several years later, I was not going to be in the

17   county and I requested an application to vote by mail.  I put

18   my driver's license down, as opposed to my social security

19   number.  Are you aware that so long as the driver's license is

20   within the voter registration file, regardless of whether it's

21   the number I put on my application form, that it would be

22   accepted?

23        A.   I'm trying to understand the system.  You can put

24   multiple numbers down in the system?  Multiple numbers can

25   exist in the system, and you just have to pick one and if it

Douglas Kruse                                                    May 03, 2022
                                                                   Page 164

```
 1    knowledge of whether people with disabilities are more or less
 2    likely to cancel an application after they've -- after they've
 3    received an early voting ballot.  So no, I don't know that
 4    that -- I don't have any knowledge about how that would -- how
 5    that would play out.
 6         Q.   Okay.  So you don't have any information that you
 7    articulate in your report that would suggest that section 5.06
 8    impedes voters with disabilities in voting.  Is that correct?
 9         A.   No, that is not correct.
10         Q.   Please clarify.  I misheard?
11         A.   The -- oh, I'm sorry.  Yeah, 5.06 by itself, I don't
12    have -- I think -- I don't have any particular information
13    about how that would pose a problem.  I think in conjunction
14    with the other restrictions on voting by mail, that those
15    combined can create some barriers to people with disabilities.
16    But taking that one in isolation, I can't say definitively that
17    that will establish a significant barrier.
18         Q.   Okay.  So you said a lot right there and I want to
19    see if I can hone it down at its core.  You don't allege in
20    your report or have information in your report that section
21    5.06 taken as an individual provision impedes voters with
22    disabilities in their ability to vote.  Is that correct?
23         A.   I don't have knowledge that people with disabilities
24    are more likely to cancel an application once they make it.  As
25    I said, it seems to me like this would be pretty, pretty rare
```

Douglas Kruse                                              May 03, 2022
                                                           Page 165

1    for any voter to request one, receive one, and then say, "Oops,

2    I changed my mind.  I'm going to go vote in-person."  That

3    would seem like a pretty, pretty unlikely situation.

4         Q.   Okay.  So you don't have any evidence that this would

5    impede voting disabilities?

6         A.   No, I don't have any evidence on this one.  No.

7         Q.   And are you aware of -- you're not aware of how

8    frequently this situation occurs.  Correct?

9         A.   Correct.

10        Q.   And you're not aware of if election judges, prior to

11   SB 1, were uncertain if they could allow voters who failed to

12   return their mail in ballot to vote at all.  Is that correct?

13        A.   Right.  Yes.

14        Q.   And so, you don't know if this was to address a

15   problem of election judges turning away voters because they

16   canceled their mail-in ballot application but failed to return

17   their mail-in ballot.  Is that correct?

18        A.   That's correct.

19        Q.   Let's look at section 5.07.  Do you have it in front

20   of you?  It's on the same page and then goes into the next one,

21   as well.

22        A.   Yes, I do.

23        Q.   Can you please articulate to me how this particular

24   provision impedes voters with disabilities and their ability to

25   vote?

Douglas Kruse                                                            May 03, 2022
                                                                         Page 166

1          A.   This is what I was talking about before that the

2    subsection of 5.07, paragraph F there, the new added one.  "If

3    the information required under Section 84.02A included on the

4    application does not identify the same voter identified on the

5    applicants application for voter registration, the clerk shall

6    reject this application."

7               As I said before, people with disabilities may have

8    registered -- they tend to be older -- they may have registered

9    several decades ago.  They may not have the original

10   information they -- that they had on the -- on the original

11   application.  So there's -- they may not be able to find those

12   records, particularly, if they're in a group setting.  If

13   they're an institution, they may have a -- they may no longer

14   have their records.  They may have a hard time getting

15   assistance to help in finding the records.

16              So I think the likelihood of someone having this

17   problem of not identifying -- that they're not identified as

18   with the same number, the same information on the original

19   application, I think that problem is very likely to be higher

20   for people with disabilities given their age, and given the

21   cognitive disability, cognitive impairment, difficulty

22   remembering, concentrating, or making decisions.  Well,

23   remembering, obviously, is a big part of this -- remembering

24   what kind of information you put on your original application.

25   So I think it's very likely that people with disabilities will

```
 1    be disproportionately impacted by this.

 2         Q.    And so is that a byproduct of the age of individuals

 3    with disabilities as opposed to necessarily them being

 4    disabled?

 5         A.    It's both age and cognitive impairment.

 6         Q.    And so you read section F, in particular, as

 7    requiring the same number that was on the application.  Is that

 8    correct?

 9         A.    Yes.

10         Q.    And that interpretation you secured from your reading

11    of the text and statute.  Correct?

12         A.    Yes.

13         Q.    And you did not consult with any other source or

14    person with respect to coming to this interpretation.  Is that

15    right?

16         A.    That's correct.

17         Q.    And you haven't spoken to voters with disabilities in

18    Texas with respect to Section 5.07.  Is that right?

19         A.    That is correct.

20         Q.    And so you've not communicated or asked them about

21    their personal experience and the barriers they may have

22    experienced as a result of section 5.07.  Is that correct?

23         A.    That is correct.

24         Q.    And you have a --

25         A.    If I could just add that another important component
```

1  of section 5.07, of course, is the processes for curing the

2  rejection.  And there -- the next paragraph at line 4 on page

3  39 -- describes an online tool.  As I point out in my

4  testimony, people with disabilities are less likely to have

5  access to the internet.  15% of people with disabilities live

6  in homes without internet access, and 40% of those in Texas do

7  not use the internet from home or any location, so that's a

8  problem for those people.  It also says that this can be done

9  in-person.  Wait, is that right here?

10      Q.   Where are you in the statute?

11      A.   Okay.  I'm sorry.  I was thinking of another place

12  where it talked about how you could cure a defect by bringing

13  in -- like, bringing a -- by coming in-person.  Here it just

14  describes the online tool.  And I think simply that, you know,

15  the 40% of people with disabilities in Texas that don't use

16  internet means that there's no problems with carrying the

17  defect that way.

18      Q.   So do you see subsection F2, which is I believe what

19  you were talking about, "If an applicant corrects an

20  application for a ballot to be voted by mail online."  Is that

21  what you were talking about?

22      A.   Yes.  The online tool and then -- yes.

23      Q.   Do you see where it says "If an applicant corrects an

24  application for a ballot to be voted by mail"?  Does it use the

25  word "if"?

Douglas Kruse                                          May 03, 2022
                                                       Page 169

```
 1       A.   Yes.
 2       Q.   So the word "if" indicates that it's an option.
 3  Correct?  Not the only method?
 4       A.   It doesn't necessarily indicate it's an option.  It
 5  doesn't -- that doesn't indicate that there are other options.
 6  It simply says online tool is available.  I don't see that this
 7  specifies that there have to be other options.
 8       Q.   Is an assumption that you made when drafting this
 9  report that the online tool referenced in section 5.07 of SB 1
10  is the only option by which a voter may cure an application to
11  vote by mail?
12       A.   No.  There was another place -- and I'm sorry, I'm
13  forgetting exactly where it was -- where it says that that can
14  be cured by coming in-person.  If there's substantial -- enough
15  time before the election, a person can be mailed the
16  information and they can correct it by mail; but if there's not
17  enough time to cure it before the election, then they have to
18  come in-person, and that creates a barrier for people with
19  travel limitations as we talked about before.  So there's -- if
20  you don't have enough time before the election to cure it by
21  mail, then you have to use it online -- use the online tool or
22  travel in-person; and there are many people with disabilities
23  who have problems with those -- who find those to be barriers
24  to do that kind of curing.
25       Q.   Dr. Kruse, are you aware that the particular
```

Douglas Kruse                                              May 03, 2022
                                                             Page 172

1    in the mail by the early voting clerk, have the person's

2    Official Ballot receipt by the early voting clerk on the

3    person's marked ballot, that acceptance or rejection of the

4    early voting ballot board of the persons marked ballot."  Did I

5    read that correctly?

6          A.   Yes.

7          Q.   And that section was already there.  Correct?

8          A.   Right.

9          Q.   And so here you have an online tool that preexisted

10   SB 1.  Correct?

11         A.   Yes.

12         Q.   And how does allowing a voter to make corrections

13   burden somebody's right to vote?

14         A.   Taken on its own, the -- allowing someone to use that

15   online tool does not create a burden.  It is taken in

16   conjunction with the -- with the other procedures.  A lot of

17   people with disabilities, as I said, don't have access to that

18   online tool.  So this particular provision taken on its own

19   doesn't create a problem, it's, again, in conjunction with the

20   other provisions.  This just illustrates a method that will not

21   be available to many people with disabilities.

22         Q.   But so long as there are other options in which a

23   voter would be able to correct information, the fact that a

24   voter with a disability couldn't use one option, namely the

25   online tool, would not be an impediment.  Isn't that correct?

1      A.   If the other options are easily accessible, yes.

2      Q.   Okay.  And so, the issue is making sure that there

3  are multiple options as opposed to the online tool itself being

4  a problem.  Is that correct?

5      A.   Yes.  That's one of our basic points is the more

6  options, the better.  This -- these provisions seem to be

7  focused on this online tool and my point is that the online

8  tool will not be useful to a large number of people with

9  disabilities.

10     Q.   Okay.  And so is your conclusion that the online

11 tool -- in this case, specifically the one referenced in

12 section 5.10 of SB 1, impedes voters access only to the extent

13 it is the only option available?

14     A.   A voter with a disability may have several options.

15 There may be barriers to each of them.  I think having this --

16 having an online tool in itself doesn't create a problem.  It

17 may create a useful option for some people.  But the online

18 tool for someone who is homebound, does not have internet

19 access, is not able to travel, they may have very few options

20 for curing a defect on the ballot in the application.

21     Q.   So, in that case, eliminating an online tool wouldn't

22 aid a voter with disabilities.  Instead, what you're looking

23 for is to expand the options that are available for everyone

24 with disabilities.  Is that fair to say?

25     A.   That's fair to say.  I have no objection to online

```
 1    tools.  I use online tools all the time and myself.
 2         Q.   Let's scroll down to section 5.12, and this is on
 3    page 43.  Let me know when you arrive there.
 4         A.   I'm here.
 5         Q.   Okay.  Do you see how section 5.12, which amends
 6    section at 87.0271 of the election code, is entirely
 7    underlined?
 8         A.   Yes.
 9         Q.   Are you aware of what the cure process was for an
10    applicant -- for a mail-in ballot prior to SB 1?
11         A.   No.
12         Q.   Would it surprise you to learn that there was no real
13    cure process for a mail-in ballot prior to SB 1?
14         A.   No -- no fair process?
15         Q.   No cure process prior to --
16         A.   Oh, no cure process.  That's interesting.  Okay.
17         Q.   So you were not aware that this adds a cure process
18    to the election procedures.  Is that correct?
19         A.   I was not aware of the cure process beforehand, or
20    the lack of one.
21         Q.   And so can you please explain to me how section 5.12
22    impedes a voter with disabilities?
23         A.   It impedes voters with disabilities by -- this is a
24    spot where it says the person asked to do it either online or
25    correct the defect in person; and I think that that creates a
```

Douglas Kruse
May 03, 2022
Page 175

1   problem for homebound people who have travel difficulties and

2   who don't have online access.

3        Q.   Are you aware of how injunctions work generally?

4        A.   I'm familiar with the broad concept.  Yes.

5        Q.   Okay.  And so you're familiar that with an injunction

6   that basically prevents the state, or whatever government

7   entity exists, from enforcing a provision or implementing a

8   provision?

9        A.   Right.

10       Q.   So it refrains action as opposed to requiring action.

11       A.   Right.

12       Q.   Do you agree with that?

13       A.   Sure.

14       Q.   Okay.  You've described the injury here as there

15  being not enough options for voters with disabilities.  Is that

16  correct?

17            MS. SWEREN-BECKER:  Objection.  Misstates testimony.

18       A.   Yeah, I didn't say that was the -- the injury that

19  there weren't enough options.  I'm saying there should be more

20  options.

21       Q.   (BY MS. HUNKER)  Okay.  So you're saying there should

22  be more options?  That's your -- that's your objection with

23  this particular section?

24            MS. SWEREN-BECKER:  Objection.  Misstates testimony.

25       A.   Yeah.  My objection is that this does not provide

1    good options for someone who's homebound, who does not have

2    internet access, and who does not -- and who has difficulty

3    traveling to be able to cure a defect.

4        Q.   (BY MS. HUNKER)  Is having some option to cure better

5    for voters with disabilities than having no option to cure?

6        A.   Having extra options is good.  Yes.

7        Q.   Okay.  And so you would agree that having some option

8    to cure is better for voters with disabilities than not having

9    an option to cure.  Is that correct?

10       A.   Right.  I don't think they -- I doubt they never had

11   an option to cure.  There was -- you were suggesting that they

12   never had an option to cure, and now they have some option.  I

13   highly doubt that that was the case beforehand, that they had

14   no option to cure.

15       Q.   So you assumed in arriving at your conclusions that

16   there was an option to cure that predated this.  Is that

17   correct?

18            MS. SWEREN-BECKER:  Objection to form.  Misstates

19   prior testimony.

20       A.   I was not aware of the previous process to cure.  I

21   was looking at the language that has been added here on the

22   curing process and I think it creates barriers for many people

23   with disabilities -- it potentially creates barriers for many

24   people with disabilities.

25       Q.   (BY MS. HUNKER)  Assuming there was no cure option

1    prior to SB 1, would eliminating the ability to cure a ballot,

2    online or in-person, impede or advance the ability of voters

3    with disabilities to vote?

4              MS. SWEREN-BECKER:  Objection to form.

5         A.   I'm sorry.  Yeah.  I don't quite understand.

6    Assuming there is no cure option --

7         Q.   (BY MS. HUNKER)  Assuming -- that's correct.

8    Assuming that my characterization is correct, that there was no

9    cure option prior to SB 1, would eliminating the ability to

10   cure a ballot online, or in-person, impede a voter with

11   disability?  Or would it advance the ability of a voter with

12   disabilities?

13             MS. SWEREN-BECKER:  Same objection.

14        A.   Yeah -- no, I don't -- I don't -- I think the

15   important thing is that SB 1, the prior provision that we

16   discussed already, is making it more likely that there are

17   going to be ballots that need to be cured.  That's going to

18   fall upon people with disabilities.  The options that are being

19   presented are not -- are not adequate.  The options that are

20   being presented create barriers.  Yes, it's good to have more

21   options for people to cure but at the same time, it is also

22   creating more need to cure which creates special problems for

23   many people with disabilities.

24        Q.   (BY MS. HUNKER)  So, the -- this provision, though,

25   does not create the conditions that would require more ballots

1    to be cured.  Is that correct?

2         A.   On its own, this provision does not create that

3    condition.  It's in combination with the previous provision

4    that creates a greater likelihood the ballots will need to be

5    cured.  This is an inadequate response to that.

6         Q.   Are you familiar with the way Texas established

7    identity of a voter and mail-in ballot prior to SB 1?

8         A.   No.

9         Q.   Are you aware that they used a signature match

10   mechanism?

11        A.   That's not surprising to me, but no, I did not know

12   that specifically, but that's not surprising to me.

13        Q.   Would individuals with disabilities have problems

14   providing a matching signature?

15        A.   They often do.  Particularly with degenerative

16   conditions, Parkinson's, and so forth that may make the

17   signature deteriorate over time.

18        Q.   So for certain types of disabilities, a signature

19   match would be an impediment.  Is that correct?

20        A.   It can create problems, yes.

21        Q.   Would it be fair to say then that some people with

22   disabilities, being required to put your voter ID number as

23   opposed to using a signature match would be an easier way to

24   establish their identity?

25        A.   I think the more options, the better for establishing

1   ballot to vote by mail.  I was wondering if that was the same

2   here where section 5.12, the injury stems from its interactions

3   with the other provisions, as opposed to section 5.12 on its

4   own?

5        A.   Yes, I think that's right.  It's a problem that the

6   rejection rate is going to be higher as a result of SB 1, and

7   the options for remedying those defects are inadequate for many

8   people with disabilities.

9        Q.   Okay.  And so it's the inadequacy of the cure process

10   as with respect to the requirements, and not the cure process

11   itself that you object to.  Is that correct?

12        MS. SWEREN-BECKER:  Objection to form.  Misstates

13   testimony.

14        A.   It's -- together these provisions are setting up new

15   barriers.  The options to correct, I say, are inadequate.  So

16   overall, taken together, these provisions are creating greater

17   barriers, greater costs, for people with disabilities and

18   exercising the right to vote.

19        MS. SWEREN-BECKER:  Kathleen, if and when you're

20   prepared to move past section five, I think we'd like to take a

21   break.  I don't know where you are.

22        MS. HUNKER:  Yeah, no, that's good.  I only have a

23   few questions with respect to this section and then we'll

24   probably wrap up by talking about section six and seven.

25        MS. SWEREN-BECKER:  Okay.

Douglas Kruse                                                  May 03, 2022
                                                                  Page 186

1        A.    No, I'm relying on the large survey data.  I'm not

2   aware of any specific person.

3        Q.    Okay.  Let's look then at section 6.01.

4        A.    Okay.

5        Q.    And this is on page 50.  And then it says, "A person

6   who simultaneously assists seven or more voters, voting under

7   this section by providing the voters with transportation to the

8   polling place must complete and sign a form."  Did I read that

9   part correctly?

10       A.    Yes.

11       Q.    And so how does this impede a voter with disabilities

12  ability to vote?

13       A.    First of all, I think it's very -- we don't have

14  direct data on how people are transported to the polls.  I

15  think it's very likely that people with disabilities will be

16  disproportionately represented among groups of seven or more

17  being taken to the polls because people with disabilities are

18  more likely to live alone, they're more likely to face

19  transportation problems; so I think they're more likely to be

20  represented in that group.  The barrier that this creates is, I

21  believe, it would make drivers leery or nervous about voting --

22  about taking someone to the polling place.

23             Let me just give an example.  My mother lives in a

24  senior apartment complex in Omaha, Nebraska.  She has a -- they

25  have a bus driver who takes them to shop once a week.  If this

Douglas Kruse                                                    May 03, 2022
                                                                   Page 187

1   bus driver -- and I don't know that he does this -- but if this

2   bus driver were to take someone to the polls under the -- under

3   SB 1, he might be nervous about signing a form like this,

4   because it would appear from my reading of it that if the

5   person does provide assistance to anyone, then that person

6   would be subject to the assisters oath, and there'd be a

7   question as to whether they would run afoul of the language

8   about providing only the assistance in reading or marking a

9   ballot.

10          Say that an assister -- I'm sorry -- say that a

11  driver takes people to a polling place and lets them off.  If

12  that driver just drives away, fine, but poor old, you know,

13  Miss Beasley is having a struggle getting into the polling

14  place, so the driver goes and helps her in.  Well, then he has

15  to take the oath, and it may be the type of assistance he gave

16  her in navigating the polling place violates what's allowed

17  under SB 1.

18          So, all of that is to say that I can see a driver who

19  understands this law to be concerned about what he's opening --

20  he or she is opening himself or herself up to.  So that's why I

21  think there could be some reluctance of drivers to do this.

22     Q.   So you don't have any direct data on how many voters

23  with disabilities -- what percentage of voters with

24  disabilities are provided -- are transported to the polls in

25  groups of seven or more.  Is that correct?

1        A.    That's correct.  I don't have any data set that has

2    information on how people are transported to the polls in

3    general, whether it's seven or under.

4        Q.    Okay.  And so you don't know how frequently that

5    occurs in Texas.  Is that correct?

6        A.    That's correct.

7        Q.    And did your research actually study on whether

8    requiring drivers to fill out a form will reduce the number of

9    drivers available?

10       A.    No.

11       Q.    And so you don't assess that with using any metrics

12   in the report.  Is that correct?

13       A.    That's correct.  I cannot put a number to it because

14   there just isn't data on that.

15       Q.    Okay.  And so it's your hypothesis that voters will

16   be -- certain drivers will be leery of signing a registration

17   form.  Is that correct?

18       A.    It's my reasonable expectation based on the

19   transportation and social isolation barriers faced by people

20   with disabilities, that they would be more likely to be using

21   this -- using a transportation loaded with seven or more

22   people.

23       Q.    So my question was a little different.  My question

24   was talking about the driver.

25       A.    Oh, okay.  Right.

Douglas Kruse                                                    May 03, 2022
                                                                   Page 189

1       Q.    And so you are -- I mean, I don't want to use the

2   word speculating but you're hypothesizing that your -- that

3   drivers would be less likely to drive a voter because of a

4   requirement that they sign their name?

5       A.    Yes.  I am putting myself in the place of a driver

6   and thinking about what kinds of worries I might have about

7   signing this form.

8       Q.    But you don't have any specific data backing that up.

9   Is that correct?

10      A.    That's correct.

11      Q.    And you also said that you thought a person might be

12  leery because it would require them to sign the oath.  Is that

13  correct?

14      A.    Yes.

15      Q.    And is it your understanding --

16      A.    But --

17      Q.    I'm sorry.  I didn't realize you were --

18      A.    But that -- if they -- from my reading of it, if they

19  simply took someone to the polling place and let them out the

20  door, go on with you, go have a good time voting, then they

21  wouldn't be liable; but so many people with disabilities,

22  elderly people, need help getting inside.  So once that starts

23  the -- I think they would be leery about being subjected to the

24  assisters oath, and the proper and improper forms of

25  assistance.

Douglas Kruse

May 03, 2022
Page 192

1    unable to find assistance to vote because of the oath.  Is that

2    correct?

3         A.    That's correct.

4         Q.    Okay.  Now, you use the sentence, "This does not

5    allow the assister to explain the voting process and choices."

6    What do you mean by explaining the choices?

7         A.    That here's -- here's the people lined up in

8    different columns, here is candidate A, candidate B, candidate

9    C.  For someone who may have, in particular, a cognitive or

10   developmental disability, knowing how the rows and columns work

11   may be a little confusing.  So explaining what choices you

12   have, you know, you pick one person in row A, one person row B,

13   for example; or one person in column A, column C, depending on

14   how it's set up.  Yeah, I think -- that's what I'm talking

15   about.

16        Q.    Okay.  So you're talking about the mechanism of

17   voting as opposed to the substance of, let's say, the

18   proposition or the candidates that are being presented for the

19   voting.  Is that correct?

20        A.    Yes.  That sounds -- I'm just talking about the

21   explaining of the mechanisms.

22        Q.    Okay.  And so later on when you say, "In my expert

23   opinion, this is likely to interfere with people with

24   disabilities ability to vote, in particular for the 1,082,500

25   Texans with cognitive impairments who are eligible to vote and

Douglas Kruse                                                May 03, 2022
                                                                Page 193

```
 1    other people with developmental disabilities who benefit from
 2    assistance in making informed choices in important areas of
 3    life."  When you use the term "informed choices", are you
 4    talking about the same -- is this basically a synonym of what
 5    you were talking about before about explaining choices?
 6         A.   No.  Here I'm talking about some of the substance
 7    that people will want to know.  Here I'm thinking particularly
 8    of ballot propositions.  What does this mean?  People may be
 9    unclear about how something is worded, especially if it's not
10    worded in a very simple way.  And someone who knows the person
11    can easily say, "Oh, here's what that means.  Here's how to
12    understand it," and that can be a valuable form of assistance.
13              And as I said before in my testimony, that can
14    facilitate the exercise of autonomy.  It can help people
15    understand better what their choices are, so they make a better
16    informed choice.
17         Q.   Okay.  So in this case, you're actually talking about
18    explaining the substance of the provision itself -- of the
19    proposition itself?
20         A.   In this case, yes.
21         Q.   And have you given any thought of what safeguards
22    will be necessary to ensure that the person stopped at simply
23    explaining what the proposition is, as opposed to weighting one
24    way or the other how that person should vote?
25         A.   I think the main safeguard is that the person be a
```

Douglas Kruse                                                    May 03, 2022
                                                                   Page 194

```
 1    trusted assistant, particularly a family member, or close
 2    friend; someone that the person with a disability agrees to.  I
 3    think that's the main safeguard to make sure that that person
 4    is available.
 5              If that person is nervous about signing the oath,
 6    regarding what kind of assistance they can give, then the
 7    person with disability may be stuck with an election official
 8    or somebody else who they don't know as well and they don't
 9    necessarily trust as well, so I think that can create problems.
10         Q.   So in your testimony, as well as earlier in our
11    discussion, you had explained that voters with disabilities
12    tend to be more socially isolated than voters without
13    disabilities.  Is that right?
14         A.   Yes.
15         Q.   And so there are some voters who do not have a
16    trusted person that they could rely on to become an assister.
17    Is that correct?
18         A.   Right.  The fact that they don't -- that they live on
19    their own doesn't mean that they don't necessarily have a
20    trusted assister but I think it's true that people are more
21    socially isolated, so they're less likely to have close people
22    who they will trust.  Yes.
23         Q.   And so, in the case of an individual who doesn't have
24    a trusted assister that they know, what -- have you given
25    thought of what safeguards would be necessary to ensure that
```

1    disclose receipt of benefits would decrease the likelihood that

2    they would be willing to provide assistance.  Is that correct?

3         A.    I can't put a number on that.  It's an extra

4    requirement that raises the cost of voting, the likelihood that

5    someone will not be able to find adequate assistance, someone

6    who's very socially isolated -- pardon me, my economics test is

7    starting in a short bit.  But it's all online and it's all

8    pre-programmed.  Let's see -- what was I saying?

9              MS. SWEREN-BECKER:  Dr. Kruse, would it be helpful

10   for the court reporter to read back what you were saying?

11             THE WITNESS:  Yes, can you read back what I was

12   saying, please?

13             MR. MORALES-DOYLE:  I don't know what you all can

14   hear but Doug's last comment was a reference to a chime going

15   off on his computer.  I don't know whether it's possible to

16   note that in the record only because the comment about his

17   student's test might be a little bit confusing in the

18   transcript without.

19             THE WITNESS:  Yeah.  I was just going to say I think

20   I remember where I was going with this.

21         A.    My concern is with this provision that people who are

22   isolated, people who have traveled limitations, people with

23   disabilities in those categories, may not have many options for

24   assistance.  And it may be that someone who is being paid by

25   one of these committees can -- or by one of these sources -- is

Douglas Kruse                                                    May 03, 2022
                                                                    Page 201

1    the best available option for them.

2           As I've said before, the general principle, I think,

3    is the more options, the better.  And there is no -- there's no

4    implication here that their vote is being compromised in any

5    way.  They're voting for themselves, they're just receiving

6    assistance from someone who happens to be compensated for

7    providing that assistance.

8           Q.   (BY MS. HUNKER)  And so you mentioned that for some

9    people this might be the best option available.  Is that right?

10          A.   Yes.

11          Q.   And do you have any studies on for how many voters

12   with disabilities that would be the best option?

13          A.   No, I don't.

14          Q.   And that's not in your report.  Correct?

15          A.   That's not in my report.  Right.

16          Q.   And you wouldn't have that number with respect to

17   Texas.  Correct?

18          A.   Right.

19          Q.   And you don't have data that states the likelihood

20   that an assister would be discouraged, even if they're being

21   compensated?

22          A.   Correct.  I cannot put a number to it.

23          Q.   I think you said "they may be."  Is that correct?

24          A.   Yeah.  This is raising -- raising the costs.  It's

25   hard to put a number to exactly how this will affect behavior,

1    large population, any large scale survey, data, the techniques

2    are the same.  Doing basic comparisons of means across tabs and

3    so forth, but also using regressions to control for other

4    influences on voter turnout; so the techniques are very much

5    the same.

6          Q.   (BY MS. SWEREN-BECKER)  And the data that you had

7    available to you, with respect to Texas specifically, is it

8    correct that there were sufficient -- that the datasets were

9    large enough for you to generate conclusions that you had

10   confidence in?

11         A.   Yes.  As I say in the report, the standard sample

12   size for a -- to be confident of conclusions is a thousand.  In

13   a couple of places, I had datasets of less than a thousand,

14   which is why I supplement the data in those cases with some

15   national data; by supplement, I mean, provide a comparison

16   between Texas and the US data.

17         Q.   Is it a commonly accepted practice to extrapolate

18   from national data on people with disabilities to state-based,

19   or in this instance, Texas data with respect to Texans with

20   disabilities?

21              MS. HUNKER:  Objection to form.

22         A.   It's certainly common.  And in fact, the -- I have

23   quite a bit of confidence that results from analysis of US data

24   are applicable to Texas, given that the disability population

25   in Texas looks a lot like the disability population nationally,

Douglas Kruse
May 03, 2022
Page 222

1   in terms of the distribution of types of impairments, severity

2   impairments, demographics, and so forth.  Of course, there are

3   differences now and then, but overall, the disability

4   population looks a lot like -- in Texas, looks a lot like the

5   national disability population, so I think it's very reasonable

6   to extrapolate the national results to Texans with

7   disabilities.

8        Q.   (BY MS. SWEREN-BECKER)  You testified earlier that

9   the data from the SIPP and NHTS surveys contained results from

10  noncitizens.  Do you recall that?

11       A.   Yes.

12       Q.   Or I should clarify that noncitizens respond to those

13  surveys.  Is that correct?

14       A.   Right.  It's the total voting age population that may

15  includes noncitizens.

16       Q.   And does the inclusion of noncitizens as respondents

17  there affect the conclusions that you reached in your report?

18       A.   The noncitizens, I think I mentioned, tend to be --

19  noncitizens are less likely to have disabilities.  To the

20  extent that they are excluded, it will not materially affect

21  the disparities I see.  And as I mentioned, when I do

22  comparisons with ACS between citizens and noncitizens, I find

23  the similar disparities in employment, travel -- I'm sorry, not

24  travel -- in employment, income, all the demographics, and so

25  forth.

1          Q.   And do you recall testifying and noting in your

2    report that the SIPP data is from 2014?

3          A.   Yes.

4          Q.   And what effect, if any, does that have on the

5    estimates with respect to people with disabilities?

6          A.   The rate of disability, in general, is going up as

7    the population ages.  We talked about that briefly.  As us baby

8    boomers are getting older -- I am one of the late baby

9    boomers -- and as the population, as the baby boomer cohort is

10   moving forward, the population is getting older, in general,

11   that leads to a higher rate of disability.  Therefore, the SIPP

12   numbers from 2014 showing 30.5% of Texans with disabilities is

13   likely, if anything, to be an underestimate of the figure for

14   2022.

15         Q.   You testified earlier and state in your report that

16   the increased use of voting by mail in 2020 accounts for a

17   decrease in the participation gap for voters with disabilities.

18   Is that right?

19              MS. HUNKER:  Objection.  Leading.

20         A.   Yes.

21         Q.   (BY MS. SWEREN-BECKER)  Is that an accurate

22   restatement of your testimony?

23         A.   Yes, that the voting by mail was able to -- voting by

24   mail, when we compare among states that expanded the access to

25   vote by mail versus those that did not, the states that have

Douglas Kruse                                              May 03, 2022
                                                             Page 224

1    expanded access to vote by mail had greater increases in the

2    turnout of people with disabilities; so that seemed to enhance

3    the turnout of people with disabilities.

4        Q.   Is it fair to say that voting by mail makes voting

5    more accessible for people with disabilities, generally, even

6    though their disabilities are not uniform in type and severity?

7        A.   Oh, yes.  Yes, that's fair to say.  The voting by

8    mail is a good option for many people with disabilities,

9    especially those with mobility impairments, difficulties going

10   outside alone for any reason.  It -- as I said before, the more

11   options the better for increasing turnout with people with

12   disabilities, and making it easy to vote by mail seems to be an

13   important way to ensure greater access for people with

14   disabilities.

15       Q.   And is it fair to say that for some portion of voters

16   with disabilities voting by mail is the only accessible method

17   of voting?

18            MS. HUNKER:  Objection to form.  Leading.

19       A.   Yes, I believe it's fair to say that there are many

20   people who are homebound, and who will find voting by mail to

21   be the only realistic alternative.  It would be very, very

22   costly for some people from a time, and energy, and just

23   physical capability perspective to go out and vote to the

24   polling place.

25            MS. SWEREN-BECKER:  Dr. Kruse, I just want to remind

Douglas Kruse                                              May 03, 2022
                                                              Page 225

1   you that after I ask a question to make sure to wait for me to

2   finish and give an opportunity for counsel for the State to

3   object for the record, so that the court reporter can capture

4   everything that we're saying.  I know we're speaking quickly

5   and it's been a long day but --

6               THE WITNESS:  I understand.  I'm sorry I spoke over

7   you.

8               MS. SWEREN-BECKER:  Not to worry.

9       Q.   (BY MS. SWEREN-BECKER)  Moving on, you testified and

10  your report states -- is it an accurate summary that you

11  testified and your report states that the new requirement to

12  include certain ID numbers with applications for mail ballots,

13  and with the mail ballots themselves, constitutes a barrier for

14  voters with disabilities?  Is that an accurate summary?

15      A.   Yes.

16      Q.   And is it fair to say then that the simultaneous

17  creation of a process to cure errors that arise from those new

18  barriers, that that cure process does not itself aid voters

19  with disabilities?

20              MS. HUNKER:  Objection to form.

21      A.   Yes, as I said before, taken in combination, there

22  are new processes for curing defects, but when you consider

23  that there are new requirements that are going to increase the

24  number of defects, that's not an overall gain.  That's creating

25  more difficulty for people with disabilities to exercise the

1   right to vote.

2       Q.   (BY MS. SWEREN-BECKER)  To the best of your

3   knowledge, could any instruction, guidance, advisory, or other

4   communication from the Secretary of State or county election

5   officials supersede state legislation?

6           MS. HUNKER:  Objection to form.  Lack of personal

7   knowledge.  Lack of foundation.  Speculative.

8           MS. SWEREN-BECKER:  Excuse me.  Dr. Kruse, you may

9   answer to the best of your knowledge.

10      A.   To the best of my knowledge, the law, the plain

11  language of the law will control.  I'm not a lawyer, not a

12  judge, but the plain language of the law will hold a lot of

13  weight, whatever the interpretation given by the attorney

14  general or others, or election officials.

15      Q.   (BY MS. SWEREN-BECKER)  Do you purport to assess

16  every barrier that exists for voters with disabilities that may

17  already exist in Texas election law?

18      A.   No.  Certainly not.  I'm not able to do that.

19      Q.   And is it the case that you are only addressing

20  certain new barriers imposed by Senate Bill 1 in your expert

21  report and here today?

22      A.   Yes, that's true.  I'm just addressing the new

23  provisions.

24      Q.   Did you seek to identify any individuals affected by

25  the various provisions of SB 1 that we discussed today and that

```
 1   UNITED STATES OF AMERICA,      )
           Plaintiff,               )
 2                                  )
     v.                             )  Case No. 5:21-cv-1085-XR
 3                                  )
     THE STATE OF TEXAS, ET AL.,    )
 4         Defendants.              )

 5

 6                    REPORTER'S CERTIFICATION
                       ORAL DEPOSITION OF
 7                     DR. DOUGLAS L. KRUSE
                          MAY 3, 2022
 8                     (Reported Remotely)

 9

10          I, Carmen Yarbrough, CSR, Certified Shorthand

11   Reporter in and for the State of Texas, hereby certify to the

12   following:

13          That the witness, Dr. Douglas L. Kruse, was duly

14   sworn by the officer and that the transcript of the oral

15   deposition is a true record of the testimony given by the

16   witness;

17          That the deposition transcript was submitted on

18   _____ to the witness or to the attorney for the

19   witness for examination, signature and return to me by

20   _____;

21          That the amount of time used by each party at the

22   deposition is as follows:

23          Ms. Kathleen Hunker         - 6 HOURS - 43 MINUTES
            Ms. Eliza MS. Sweren-Becker - 0 HOURS - 12 MINUTES
24

25          That pursuant to information given to the deposition
```

1    officer at the time said testimony was taken, the following

2    includes counsel for all parties of record:

3              MS. Eliza Sweren-Becker, Counsel for LUPE

4              Mr. Sean Morales-Doyle, Counsel for LUPE

5              Ms. Kathleen T. Hunker, Counsel for State Defendants

6              Mr. Ari Herbert, Counsel for State Defendants

7              Ms. Julia Longoria, Counsel for LUPE

8              Ms. Lucia Romano, Counsel for OCA-Greater Houston

9              Ms. Lia Sifuentes Davis, Counsel for OCA-Greater

10   Houston

11             Ms. Lisa Snead, Counsel for OCA-Greater Houston

12             Ms. Jacqueline Villarreal, Counsel for Hidalgo County

13   Criminal District Attorney, Ricardo Rodriguez, Jr.

14             Ms. Shira Wakschlag, Esquire

15             Mr. Bradley R. Prowant, Esquire

16             Ms. Dana Paikowsky, Esquire

17             Mr. Jonathan Fombonne, Esquire

18             Ms. Susan Mizner, Esquire

19             I further certify that I am neither counsel for,

20   related to, nor employed by any of the parties or attorneys in

21   this action in which this proceeding was taken, and further

22   that I am not financially or otherwise interested in the

23   outcome of the action.

24             Further certification requirements pursuant to Rule

25   203 of TRCP will be certified to after they have occurred.

Douglas Kruse

May 03, 2022
Page 234

1          Certified to by me this 18th day of May, 2022.

2

3

4          _____

5          CARMEN R. YARBROUGH, Texas CSR 11796
           EXPIRATION DATE:  2/28/2023
6          Firm Registration No. 633
           Magna Legal Services
7          16414 San Pedro, Suite 900
           San Antonio, Texas 78232
8          Phone 210-697-3400
           Fax 210-697-3408

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25