IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO,      )
et al.,                          )
                                 )
        Plaintiffs,              )   Civil Action
                                 )   No. SA-21-CV-00844-XR
vs.                              )
                                 )
GREGORY W. ABBOTT, et al.,       )
                                 )
        Defendants.              )
                                 )

_____

ORAL DEPOSITION OF

CINDY SIEGEL

FEBRUARY 28, 2023

_____


        ORAL DEPOSITION OF CINDY SIEGEL, produced as

a witness at the instance of the Plaintiffs, and duly

sworn, was taken in the above-styled and numbered cause

on February 28, 2023, from 8:30 a.m. to 12:26 p.m.,

Nilda Codina, Notary in and for the State of Texas,

recorded by machine shorthand, from Javier N. Maldonado

& Associates, P.C., 1415 North Loop W., Suite 600,

Houston, Texas, County of Harris pursuant to the

Federal Rules of Civil Procedure, and the provisions

stated on the record or attached hereto.

1     that you also are not audio or video recording this

2     deposition.

3              Looks like we have confirmation from

4     everybody and we thank you for that, thank you.

5              MS. PERALES:  Thank you, Mr. Gore.

6     Q.   (BY MS. PERALES) I'm going to help the court

7     reporter start getting ready to mark a few exhibits,

8     but nothing scary, we're going to -- we're going to go

9     pretty slow with some pretty easy questions next.

10          Are there any attorneys here today

11     representing you in this case?

12     A.   John Gore.

13     Q.   Okay.  Now, we also have Ethan Szumanski in

14     the room for the Attorney General's Office.  Would it

15     be fair to say that Mr. Szumanski does not represent

16     you in this matter?

17     A.   That's true.

18     Q.   Thank you.  Do you know when Mr. Gore began

19     to represent you in this case?

20     A.   Approximately -- probably April last year,

21     maybe.  Some time in the spring.

22     Q.   Okay.  Thank you.  To the best of your

23     knowledge do any other attorneys besides Mr. Gore and

24     his firm represent you in this case?

25     A.   Not in this particular case.

Cindy Siegel - 2/28/2023

13

1      Q.   Now, I don't want to know about the substance

2  of anything that you and Mr. Gore said to each other,

3  but without telling me anything that the two of you

4  said to each other, can you tell me what steps you took

5  to prepare for today's deposition?

6      A.   I've had conversations, obviously with

7  counsel and reviewed emails and that we've had, but

8  other than that...

9      Q.   In terms of the materials that you reviewed,

10 were those materials that were related to Harris County

11 Republican Party?

12     A.   Yes.

13     Q.   Did you bring any documents with you today?

14     A.   No.

15     Q.   Can you tell me approximately how much time

16 you've spent meeting with Mr. Gore or his firm to

17 prepare for the deposition?

18     A.   I'm estimating about eight hours.

19     Q.   When you met with Mr. Gore was there anybody

20 else in the meeting that was not your attorney?

21     A.   No, I don't think so.

22     Q.   The court reporter is going to hand you a

23 document marked Exhibit No. 1?

24              (Exhibit No. 1 marked.)

25     Q.   (BY MS. PERALES:) Do you recognize this

Cindy Siegel - 2/28/2023

14

1  document, Exhibit No. 1, as something you've seen

2  before?

3      A.   Let me look at it, one minute please.

4              (Witness looking through document.)

5      A.   May I ask a question?

6      Q.   (BY MS. PERALES) Of course.

7      A.   Page 7, 31 in your -- you and yours, it

8  refers to Dallas County Republican Party, is that

9  accurate or did you refer to --

10     Q.   That is a very special legal word for typo,

11 so no worries.

12     A.   Okay.  I'm familiar with this.

13     Q.   So putting that aside, do you recognize this

14 as something you've seen before?

15     A.   Yes.

16     Q.   Okay.  Do you understand that when you give

17 answers for the Harris County Republican Party in

18 today's deposition, you're -- you're doing that as the

19 County Party?

20     A.   Yes.

21     Q.   Okay.  Thank you.  I'm going to hand you,

22 through the court reporter, Deposition Exhibit No. 2, a

23 shorter document.  Mr. Gore and I are going to get our

24 exercise in today, so far mostly just Mr. Gore.

25              (Exhibit No. 2 marked.)

Cindy Siegel - 2/28/2023

15

1      Q.   (BY MS. PERALES) So Ms. Siegel, take a moment

2   to review the document and then let me know if you

3   recognize this?

4      A.   Yes.

5      Q.   Okay.  And just to be clear, you understand

6   that today you are also testifying as Ms. Cindy Siegel?

7      A.   Correct.

8      Q.   Okay.

9      A.   May I ask another question?

10      Q.   Of course.

11      A.   My legal name is Cynthia Siegel, do you need

12   that for the record?

13      Q.   That would be great.  We'll just add that

14   right in, Cynthia Siegel?

15      A.   Yeah, but I go by, obviously, Cindy.

16      Q.   Okay.  I'd like to take a moment to ask you a

17   few questions about your background, personally?

18      A.   Okay.

19      Q.   And we will understand that this is just

20   questions for Cindy Siegel?

21      A.   Right.

22      Q.   Do you live in Harris County?

23      A.   Yes.

24      Q.   How long have you lived in Harris County?

25      A.   1978.

1    presiding judge for my poll on election day; and prior

2    to that I had served, just volunteered as election

3    clerk throughout the years.

4        Q.   Would you say that you've served as a poll

5    worker in more than five elections?

6        A.   Yes.

7        Q.   Have you served as a poll worker in more than

8    ten elections?

9        A.   Probably not.

10       Q.   Okay.  And would it be fair to say that the

11   most recent time that you served as a poll worker was

12   somewhere around 2012 or 2014?

13       A.   I would have been election judge, so yes.

14       Q.   Okay.  And nothing more recent than that?

15       A.   No, not -- not to my recollection.

16       Q.   Have you ever served as a poll watcher?

17       A.   No.

18       Q.   Have you ever block walked in support of a

19   candidate or candidates or a -- measures?

20       A.   Yes.

21       Q.   When was the most recent time you block

22   walked in a -- for a campaign?

23       A.   This past fall.

24       Q.   And what activities did you engage in as a

25   block walker?

1      A.   Knocking on doors, talking to potential

2  voters about a slate or individual candidates;

3  encouraging them to vote republican and vote all the

4  way down the ballot.

5      Q.   And where geographically did do you your

6  block walking?

7      A.   Bellaire.

8      Q.   And did you find that voters recognized you

9  when they opened their door?

10     A.   Yes.

11     Q.   When you were block walking, did you find

12 yourself on occasion answering voter's questions about

13 the upcoming election?

14     A.   Yes.

15     Q.   Did you find yourself from time to time

16 answering voter's questions about how to engage in

17 voting.  So for example, vote by mail or vote in person

18 or where to vote?

19     A.   I don't recall any of those questions.

20     Q.   What kind of list did you work from to decide

21 what homes to knock on?

22     A.   The Harris County Republican Party uses a

23 program, an App for the phone called Advantage and from

24 that data there are block, lists of voters that you're

25 to go and knock on the doors.

Cindy Siegel - 2/28/2023

21

1       Q.   Do you understand those to be, I guess, we

2   would call high propensity voters, or voters who

3   typically turn out to vote?

4       A.   Yes.

5       Q.   Did you have material that you would either

6   hand to the voter or leave on the door if the voter

7   didn't answer the door?

8       A.   Yes.

9       Q.   So you mention the most recent time that you

10  had been a block walker was this past fall, do you find

11  yourself block walking typically during the general

12  election time?

13      A.   Depends upon the candidates, and I've been a

14  candidate so I've walked before.

15      Q.   Would you say you block walked more than 20

16  times?

17      A.   Yes.

18      Q.   Do you block walk for the primary?

19      A.   In my role as chairman, we do not block walk.

20  We're limited by our bylaws and also by the Republican

21  Party of Texas bylaws that we do not endorse in a

22  primary.  So I would not be block walking at all for,

23  in a primary, if they have an opponent.

24      Q.   Have you ever block walked for a nonpartisan

25  election, such as school board or special district?

22

1    A.   Yes.

2    Q.   And can you recall the last election in which

3   you block walked that was nonpartisan?

4    A.   It would have been the year before for HISD,

5   a friend of mine ran in that.

6    Q.   And what geographic area did you block walk

7   in for your friend?

8    A.   The Briar Grove, Tanglewood area, Galleria

9   area.

10    Q.   Okay.  So putting aside the block walking

11   activity, have you ever worked in any other way on a

12   campaign for a candidate or a measure?

13    A.   I mean, I've been a candidate, so -- and also

14   I've helped candidates in terms of holding meet and

15   greets and fundraisers.

16    Q.   Have you ever done what's called phone

17   banking for a candidate?

18    A.   Not in recent years.

19    Q.   Okay.

20    A.   I have done Robo calls, I mean, it's not

21   phone banking.

22    Q.   So you recorded a message supportive of the

23   candidate for use in automatic outreach?

24    A.   Yes.

25    Q.   Okay.  Have you ever worked to get out the

Cindy Siegel - 2/28/2023

23

1    vote on election day in a campaign?

2        A.    Yes.

3        Q.    Have you ever driven voters to the polls that

4    were not immediate family members?

5        A.    No.

6        Q.    Have you ever stood outside the polling place

7    at the appropriate distance and greeted voters coming

8    in to the polling place?

9        A.    Yes.

10        Q.    Have you ever done that for a campaign that

11    wasn't your campaign?

12        A.    Yes.

13        Q.    What would be the most recent time that you

14    stood outside a polling place and encouraged voters to

15    either vote republican or vote for a -- certain

16    candidates?

17        A.    Probably when I ran the primary for congress,

18    when I was running myself.

19        Q.    And which year was that?

20        A.    That would have been March 2020.

21        Q.    When you were a candidate in March 2020, did

22    you find yourself answering voter's questions about

23    vote by mail?

24        A.    No.

25        Q.    Do you expect to testify in this case?

24

```
 1        A.    I hope not, but, yes probably.

 2                     (Laughter.)

 3        Q.    (BY MS. PERALES) Okay.  Do you have an idea

 4   of what topics you might testify on if you were to

 5   testify in this case?

 6        A.    Probably.

 7        Q.    Okay.  What would those topics be?

 8        A.    I mean, obviously anything related to Harris

 9   County Republican Party.  Our -- our processes, I guess

10   you call them as it relates to the elections or

11   anything related to, I guess, to get out the vote.

12        Q.    Okay.  Okay.  My next portion of the

13   deposition is about some of the activities of the

14   Harris County Republican Party.  So now we're switching

15   from Cynthia Siegel to your answering in your capacity

16   as the Harris County Designated Representative as well

17   as Cynthia Siegel; and again, let me know if there's

18   ever a difference because of that.

19        A.    Okay.

20        Q.    How does the party recruit election workers,

21   meaning presiding judge, alternate judge, election

22   clerk?

23        A.    There's more than one way.  We have a place

24   on our website where people can sign up to be an

25   election worker and volunteer just in general, but
```

Cindy Siegel - 2/28/2023

27

1  they might get from the Secretary of State?

2      A.    Yes.

3      Q.    Tell me about your training for poll workers?

4      A.    We have an attorney, Sonya Aston who ran the

5  elections for eight years under former county clerks

6  Stan Stanart and prior to even me taking over as chair

7  she conducts for us, training on the election law.

8      Q.    And do the perspective poll workers attend

9  that training with Ms. Aston in person?

10     A.    Yes.

11     Q.    Does Ms. Aston have a video version of her

12  training that you're able to play or present?

13     A.    We have taped it previously, I think, but we

14  encourage them to do it in person.

15     Q.    And who employs Ms. Aston now?

16     A.    She is one of our election attorneys that

17  we've engaged on a lawsuit that we have out there.

18     Q.    Okay.

19     A.    She also, it's my understanding is General

20  Counsel for Senator Bettencourt.

21     Q.    Okay.  Does Ms. Aston present her training

22  more than once?

23     A.    We try to offer that training before every

24  general election.  So, for example, in November we

25  started offering it around the county because, again,

Cindy Siegel – 2/28/2023

28

1    the county's so large in the summer.

2        **Q.    Do you have any written information or**

3    **training materials for your poll workers?**

4        A.    We send out a lot of emails the closer we get

5    to election to a database of election workers, not

6    training per se, but just procedural.

7        Q.    So do you prepare, for example, a manual or a

8    guide from the Republican Party to poll workers?

9        A.    No, not -- not as it relates to poll workers.

10       **Q.    Do you train your block walkers?**

11       **A.    We try.**  Yes, because using the App -- we've

12   gone through different Apps and we try to encourage

13   them to use their cell phone via app, but there's

14   always new people who are block walking and we have to

15   train them on how to use that.

16       **Q.    In addition to training block walkers on**

17   **using the app, do you train block walkers on what to**

18   **say?**

19       A.    Yes, this time, this fall, we actually put

20   together what I call a cheater sheet.  A one pager

21   because people, historically are very nervous the first

22   couple of times that they're out and they're not sure

23   what to say and how to handle issues.  So we've

24   provided them just some facts like crime is X, you

25   know, so just general issue based fact sheet.

Cindy Siegel - 2/28/2023

29

1    Q.   So like talking points for example?

2    A.   Yes.

3    Q.   And do you also have on the cheater sheet,

4    what the ask is as they say for the voter?

5    A.   There is what's called a survey with these

6    apps and the survey will walk, if they follow it, will

7    walk them through.   And they're normally very short,

8    three questions, which normally ends with an ask for a

9    voting for our candidates if they want a sign.

10   Q.   And what would they be signing?

11   A.   A political sign to put.

12   Q.   Oh, I see.

13   A.   And they, also, if they want to, they can

14   provide their email if they want to sign up for our --

15   our email blast.

16   Q.   And does the email blast remind them closer

17   to election day to get out there and vote?

18   A.   It does.

19   Q.   Okay.  Do you give information to your block

20   walkers about how -- how to answer questions that might

21   come up from the voter about voting?

22   A.   The process of voting?

23   Q.   Yes.

24   A.   I don't think we give specific guidelines on

25   that, other than just early voting starts X day,

1  election day voting.  They -- they are probably, we

2  normally try to point people to Harris votes as the go

3  to for getting those questions answered.

4      **Q.   Do you tell your block walkers what to do if**

5  **the voter asks for an application for a ballot by mail**

6  **from the block walker?**

7      A.   We haven't told them anything about that.

8      **Q.   Do your block walkers carry applications for**

9  **ballot by mail?**

10     A.   No, not to my knowledge.

11     **Q.   Do your block walkers know whether the voter**

12  **that they're knocking on a particular house is over age**

13  **65?**

14     A.   No.

15     **Q.   If a block walker called you and asked you**

16  **for advice saying, for example, I visited the home of**

17  **Ms. Smith, she's over 65 wants to mail vote, but she**

18  **doesn't have the application and -- and the block**

19  **walker asks you what they should say to Ms. Smith, what**

20  **would you advise?**

21     A.   We would advise her -- them to tell her to go

22  to Harris votes.

23     **Q.   Okay.**

24     A.   Potentially, I guess we'd also might say the

25  Secretary of State, but we try to point them to Harris

Cindy Siegel - 2/28/2023

31

 1   votes because it's specific, obviously, to our county.

 2       **Q.   Do you send out applications for ballot by**

 3   **mail to voters that you know are eligible to vote by**

 4   **mail?**

 5       **A.   We sent out in January of last year, and the**

 6   **applications for -- as allowed by law -- for ballot by**

 7   **mail to our over 65 --**

 8       **Q.   Okay.**

 9       **A.   High propensity republican voters.**

10       **Q.   When you send that out do you provide contact**

11   **information for Harris County Republican Party in case**

12   **the voters have any questions?**

13       A.   Yes.

14       **Q.   Have you encountered questions from voters**

15   **about what ID number to put on either the application**

16   **for ballot by mail or the mail ballot carrier envelope?**

17       A.   During the primary there were a lot of

18   questions.  It was new to our voters or all voters.

19   There was some confusion, I think.  You know

20   hindsight's 20/20, but I think Harris County's

21   directions, the applications were confusing to people.

22   We didn't see a November, I don't recall offhand

23   getting that many questions about it.

24       **Q.   I won't ask you about November --**

25       A.   Right.

1    Q.   -- 2022, I might ask have you about some

2    other November, but I won't ask about November 22.

3                     So sticking with the March primary, do

4    you recall Harris County Republican Party answering

5    questions of voters related to what information they

6    should put on either the application for ballot by mail

7    or the mail ballot?

8    A.   We did receive questions about that, and

9    again, we would point them to Harris votes and to

10   direct their questions there.  Most of the questions

11   related to why am I getting this, I thought we got rid

12   of ballot by mail, so...

13   Q.   When voters ask, for example, what number

14   they should put for the ID requirement on the

15   application for ballot by mail or the mail ballot, do

16   you know what advice you gave to voters?

17   A.   We would either point them to Harris votes or

18   if it -- if they had a question I would point them to

19   Alan Vera who's sort of the expert on that.

20   Q.   Now, let me get back to the block walkers

21   because I sort of drifted away a bit.

22                     Do you give your block walkers any

23   swag of, like -- I don't have a better word for it, but

24   let's say T-shirts, buttons, anything to identify them

25   as they're going along block walking?

1    A.   A lot of our block walkers were -- you mean

2 not to pass out right --

3    Q.   **Correct.**

4    A.   -- just that they would have?

5    Q.   **Correct.**

6    A.   They would normally have T-shirts.  We have

7 T-shirts for the Party, but, you know, a lot of times

8 they're already working and walking for a particular

9 candidate so they would wear the candidate's T-shirt.

10    Q.   **Do you provide block walkers any snacks or**

11 **reimbursement for food or anything like that?**

12    A.   No, I guess I'm cheap, but no.

13    Q.   **Mr. Vera already told us he has no snacks at**

14 **his committee meetings.**

15    A.   Yeah, so the most that we would do is

16 possibly have water available, just, it's Houston.

17    Q.   **My next set of questions is about poll**

18 **watchers as opposed to poll workers.  You mentioned**

19 **that you recruit poll watchers through your website,**

20 **can you tell me any other way that the party recruits**

21 **poll watchers?**

22    A.   It's all the same process, the website.  When

23 I or Alan Vera speaks to various clubs, republican

24 women's clubs for example, inevitably we will have

25 people that will ask, you know, they want to be a poll

1   watcher.  In general we encourage them, we don't point

2   them a particular way.  We just say we can always use

3   people to sign up to help with the elections.

4        Q.   Is it correct that Mr. Vera trains all of

5   your poll watchers?

6        A.   Yes.

7        Q.   Have you ever had a situation where either a

8   poll worker or watcher that you recruited said

9   something offensive in the polling place and you

10  decided not to use that person again?

11       A.   I know we have had, we have a list when

12  people, when it's reported.  There's also a list that

13  Harris County has that they provide each party of

14  workers that there may have been an issue.  Sometimes

15  it's -- and they have a suggested, either they don't

16  want them or they need more training, it's a variety of

17  potential issues.

18                 We internally also have a list where,

19  if someone has done something or been rude or not been

20  nice to their clerks, we -- we have sort of a no hire

21  internal list.

22       Q.   Okay.  There was one name that popped out to

23  me and so I was going to ask you if you recognize that

24  name, Ken Zavatsky?

25       A.   No.

Cindy Siegel - 2/28/2023

35

```
 1          Q.   I'm going to hand you through the court
 2   reporter Deposition Exhibit No. 3.
 3                    (Exhibit No. 3 marked.)
 4          Q.   (BY MS. PERALES:) Go ahead and take a minute
 5   just to look at it and let me know when you're done.
 6                    (Witness complies.)
 7          Q.   (BY MS. PERALES) Are you ready?
 8          A.   Uh-huh.
 9          Q.   Does Exhibit No. 3 help refresh your
10   recollection in any way about Ken Zavatsky?
11          A.   No.
12          Q.   Generally, if -- if a poll worker or watcher
13   is not working out, is the party going to then remove
14   that person from its own list of recommendations for
15   Harris County?
16          A.   If -- if we believe, not versus what the
17   county provides, because there are disagreements with,
18   that.  They'll have a no hire or someone on their no
19   hire list and we will go back and talk to that clerk or
20   judge and also try to confirm from other people that
21   they work with, if it, if whatever happened is how they
22   recall too.  But generally, you know, once they're on
23   our no hire list we would not be putting their name
24   forward.
25          Q.   Okay.  I have one more block walker question
```

1  for you.  Do you have any specific instructions that

2  you give to your block walkers related to what to do if

3  the voter asks the block walker for help or assistance

4  filling out the application for ballot by mail or mail

5  ballot?

6      A.   We would not want them to do that.

7      Q.   Do you have any specific training for them or

8  any material that you give them telling them not to

9  provide assistance?

10     A.   No.

11     Q.   Have you been involved -- scratch that.  Is

12  it fair to say that with respect to some of the changes

13  that SB 1 makes for poll watchers, that Mr. Vera has

14  carried out the training for your poll watchers with

15  respect to changes under SB 1?

16     A.   So if I understand, you want to -- you're

17  asking if Alan has in fact incorporated any changes

18  related to poll watchers that SB 1 instituted?

19     Q.   Yes.

20     A.   It's my understanding, yes, that he has done

21  that.

22     Q.   So for example where SB 1 makes clear that a

23  poll watcher may not be denied free movement where

24  election activity is occurring that Mr. Vera would

25  have, in his training, incorporated what that -- those

Cindy Siegel - 2/28/2023

37

1   words in SB 1 mean for a poll watcher?

2       A.   Yes.

3       Q.   Same question with respect to language in SB

4   1 that election official breaks the law if they take

5   action to obstruct the view of a watcher or distance

6   the watcher in a way that the watcher cannot observe.

7   Mr. Vera would have trained your poll watchers on what

8   that means for them in the polling place?

9       A.   Yes.

10      Q.   There is a provision in SB 1 with respect to

11  poll watchers that gives the appointing authority the

12  ability to go and file a lawsuit if a watcher is being

13  interfered with.  Has the Harris County Republican

14  Party filed any lawsuits related to watchers being

15  impeded in their duties?

16      A.   Not during my term.

17      Q.   Is it also fair to say that Mr. Vera carries

18  out Harris County Republican Party's training of poll

19  watchers with respect to how close they can stand to

20  the voter to observe the activity of voting?

21      A.   Well, it's my understanding from SB 1, and I

22  want to make sure I understand your question, that the

23  poll watcher is not supposed to be, you know, leaning

24  over the shoulder looking at how a person votes, and

25  that's not just SB 1 it's been there related to poll

1    watchers forever.

2        Q.    So I didn't mean in my question to imply that

3    the watcher could stand at any particular distance.

4        A.    Right.

5        Q.    So I'll -- I'll ask my question in a better

6    way.  Is it correct to say that Mr. Vera carries out

7    Harris County Republican Party's training with respect

8    to the distance that a poll watcher must maintain from

9    the act of filling out the ballot?

10       A.    Yes, yes.

11       Q.    Okay.  We've been going about an hour, but

12   sometimes we get in the zone, I just want to know if

13   you want to take a break and I want to remind you that

14   you're free to take a break when you would like to take

15   a break?

16       A.    I could go a little bit longer.

17       Q.    Okay.  Great.

18       A.    I guess -- does it mean we get to leave

19   earlier.

20       Q.    Yes.

21       A.    Do I sound like my kids?

22       Q.    Only if you start asking me if we're there

23   yet?

24       A.    Yeah.

25            MR. GORE:  You certainly sound like

Cindy Siegel - 2/28/2023

41

1   available people who could assist a voter in voting in

2   person who did not speak English?

3       A.   You mean like going with them to the poll?

4       Q.   Yes.

5       A.   No.

6       Q.   We talked earlier about sometimes there are

7   campaign workers or party workers outside polling

8   places encouraging people as they enter the polls, do

9   you know if the Harris County Republican Party has ever

10  made available individuals who could enter the polling

11  place with a voter and assist them in voting?

12      A.   No.

13      Q.   Have you personally ever assisted a voter who

14  was voting in person at the polling place?

15      A.   When I was election judge.

16      Q.   Okay.  What type of assistance did you

17  provide as an election judge?

18      A.   The questions tend to be how to use the

19  machine, and you know making sure that they hit the big

20  red button that said I vote so that they know that

21  their ballot got cast.  Again, that was prior to the

22  current machines we use.

23      Q.   Okay.  And did you ever assist a voter who

24  was disabled and, for example, he either couldn't see

25  the ballot or couldn't mark the ballot themselves?

Cindy Siegel - 2/28/2023

42

1        A.   Not that I can recall.

2        Q.   **Did you ever assist a voter who didn't speak**

3   **English in understanding how to cast the ballot or read**

4   **the ballot?**

5        A.   I didn't, but we had clerks who, you know, in

6   Bellaire we had the requirement of Chinese speaking

7   Vietnamese speaking and Spanish speaking, so they were

8   available.  I don't recall anyone actually helping, you

9   know, not -- not to my recollection.

10       Q.   **Based on your experience was it the case that**

11  **voters brought their own assister with them to help**

12  **them vote?**

13       A.   Yes.

14       Q.   **And that included help with a language?**

15       A.   It was -- yeah it was, if they were -- had

16  some sort of physical disability or someone who needed

17  assistant with language, but it was very rare.

18       Q.   **And they would bring their own assister?**

19       A.   Yeah.

20       Q.   **Has the Harris County Republican Party ever**

21  **witnessed improper voter assistance in the polling**

22  **place?**

23       A.   If -- not to my knowledge, but again, it's a

24  large county, a lot of polls.  I don't recall any

25  incident being reported.

Cindy Siegel - 2/28/2023

43

Q.   Okay.   I'm transitioning now to the 2021 legislative session and the ultimate passage of SB 1.

A.   Okay.

Q.   It went through a few different names, if -- and you may recall but at the beginning of the regular session in 2021, there was a House Bill called HB 6 and a Senate Bill called Senate Bill 7 and later in the second special session the bill that passed was called SB 1; is that generally you understanding of things?

A.   Yes, but I'm more familiar quite frankly with just SB 1.

Q.   So before the regular session started in January of 2021, did you have any involvement in advocating for legislation similar to SB 1, this is before the start of the session?

A.   Me personally?

Q.   The party.

A.   Through our ballot security committee and our, under Al Vera as the chair.   We did pass a resolution our executive committee, which is made up of all the precinct chairs and I think it was in January, basically saying that the ballot security commit could -- I'm not going to say act, but represent Harris County Republican Party, and it laid out certain things that we were for and certain things we were against.

Cindy Siegel - 2/28/2023

44

1  But in terms of me advocating or the party sending a

2  bus or whatever?  No, we did not do any of that.

3      **Q.   Okay.  Would it by fair to say that Mr. Vera**

4  **carried out most of the advocacy or all of the advocacy**

5  **on -- on voter integrity legislation in the 2021**

6  **sessions?**

7      A.   Yes.

8      **Q.   Would you say he carried out all of the**

9  **advocacy, most of it, or something short of that?**

10      A.   From the party standpoint I would say all of

11  it representing the party, that's not to say that there

12  were not individuals -- precinct chairs that did it on

13  their own but he was the one who was designated to --

14  then that I look to, to carry out, represent the party

15  as it related to election integrity.

16      **Q.   Did Cindy Siegel go to Austin during any of**

17  **the 2021 sessions to advocate on voter legislation?**

18      A.   I was in Austin for TFRW, Texas Federated

19  Republican Women's Legislative Day, but did not.

20  Basically, they shut down the capital and so didn't try

21  to meet with legislators on, you know, but no one was

22  there.

23      **Q.   So when you say, "they shut down the**

24  **capital," you don't mean Texas Federated Republican**

25  **Women --**

Cindy Siegel - 2/28/2023

45

1    A.   No, the capital -- like the house, I think --

2  I don't know if it was -- don't recall if it was COVID

3  or, there was restrictions back then, but for whatever

4  reason I've been to these legislative days before and

5  the idea is you go around and meet your legislators and

6  get a photo and talk about what your concern.

7                  I wasn't there specifically to talk

8  about election issues, but I was there in my new role

9  as chairman of the party to basically, was wanting to

10  connect with our Harris County delegation.

11    **Q.   Was that during the time that people who**

12  **wanted to visit the capital had to pass through tents**

13  **and go through some kind of process before they entered**

14  **the capital building?**

15    A.   I think that was as it related to the -- I

16  think, and I don't recall 100 percent but I think it

17  was the house had some different rules or the Senate

18  but we all got up there and you know basically most of

19  them had been sent home for the weekend I guess and it

20  was pretty much everything was done with other

21  republican women.  You know they brought in speakers

22  and it was left to that.

23    **Q.   Okay.  Did the republican party of Harris**

24  **County have any communications with the governor's**

25  **office or any staff inside the governors office about**

1   voter legislation in the 2021 time period?

2       A.   No.   No, not to my knowledge.

3       Q.   Same question with the office of the attorney

4   general, did the Harris county republican party have

5   communications with the attorney general on voter

6   legislation?

7       A.   No, the -- I mean the only thing would

8   potentially is if Alan in his role had on the something

9   but not officially -- I didn't and neither did the

10  party officially have a role for contact with them.

11      Q.   Same question with respect to secretary of

12  state's office, aside from Mr. Vera would the party

13  have had any communications the secretary of state on

14  voter legislation?

15      A.   No, no.

16      Q.   You mentioned a document or resolution or

17  don't know what the best word is for it, that you

18  created in January of 2021 that set out the Harris

19  County republican party's position on voter integrity

20  of legislation, do you recall that?

21      A.   Yes.

22      Q.   And you all voted on it and adopted it

23  correct?

24      A.   Correct.

25      Q.   And is it, is it in the writing, does it

Cindy Siegel – 2/28/2023

47

1   exist in writing?

2        A.   Yes.

3        Q.   And who received a copy of that writing?

4        A.   As I recall is that any of that resolution,

5   because we just recently passed another one that

6   related to this session, is that part of that

7   resolution it is supposed to be sent to all of the

8   Harris County delegation, and that's who we would have

9   sent it to.

10                We also had one, but it didn't relate

11  to election integrity, there was a resolution that was

12  on "local, what our local platform were against" paying

13  lobbyist for -- with tax dollars, for example.  Those

14  types of resolutions, normally what's written into them

15  is that the chair or my designee is responsible for

16  making sure that our Harris County delegation receives

17  a copy of it.

18       Q.   And that would be members of the house and

19  the Senate?

20       A.   Correct.

21       Q.   Do you know if you produced the resolution

22  for the 2021 session as a document in this litigation?

23       A.   We should have.

24       Q.   Okay.

25       A.   I -- I would expect it to be in.

1        Q.    Besides members of the Texas Legislature --

2                    MS. PERALES:  One moment.

3                    (Technical issues.)

4                    MS. PERALES:  Okay.  Thank you.  I

5        don't know if you've ever switched one Zoom to another,

6        but --

7                    THE WITNESS:  Yes.

8                    MS. PERALES:  -- I think that's where

9        we were getting that.

10                    THE WITNESS:  We love Zoom, but it is

11        a love hate relationship.

12                    MS. PERALES:  Yes, it is.

13        Q.    (BY MS. PERALES) With respect to the

14        resolution for the 2021 session, besides members of the

15        legislature and their staff, how -- how public was

16        their resolution document?

17        A.    I don't believe it was real public.  It was

18        later, at a later executive committee meeting there was

19        a resolution that changed how we, what we was -- what

20        we produced.  So -- but I think it was either the

21        second or third one of 2021 well after the legislative

22        session where the body voted that any resolution passed

23        would be put on our website.

24        Q.    So there was a decision then by the executive

25        committee to make the resolutions about legislative

49

1    goals public and post it on the website; is that right?

2         A.   Right.

3         Q.   Did you post any of the voter integrity

4    resolutions on the website?

5         A.   Not related to 2021, but I believe, or at

6    least you should see, if you go on the website now, the

7    one that we recently passed as it relates to the

8    upcoming session for the -- session now.

9         Q.   Why is it desirable to have the resolution

10   made available publicly?

11        A.   I think the intent of the resolution that

12   required it was to make sure that our base would have

13   easy access to see the positions of our executive

14   committee.

15        Q.   So essentially a transparency goal?

16        A.   Yes.

17        Q.   Do you have any concerns about -- well, no

18   never mind.  How many resolutions related to voter

19   integrity legislation did the executive committee adopt

20   during the 2021 year?

21        A.   Just that one to my recollection.

22        Q.   Do you recall what some of those legislative

23   goals were set out in the 2021 resolution for election

24   integrity?

25        A.   It would have been, as I recall it would have

Cindy Siegel - 2/28/2023

50

1   been opposed to the county sending out thousands --

2   hundreds of thousands of applications for ballot by

3   mail.  It would have been opposed to drive through

4   voting and it would have been opposed to 24 hour

5   voting.

6       **Q.   Do you consider that the party accomplished**

7   **its legislative goals with the inclusion of these type**

8   **of items in what ultimately past as SB 1?**

9       A.   I think it was a good start.  I think that

10   there are in general other goals tweaking, you know,

11   but the consensus of the executive committee in terms

12   of that resolution, I would say I think we accomplished

13   a lot or not we, but our legislators accomplished a

14   lot.

15       **Q.   Do you recall whether the Party had any**

16   **legislative goals in 2021 related to changing voter**

17   **registration procedures?**

18       A.   No, I -- I don't recall.

19       **Q.   Do you recall whether the party had any goals**

20   **with respect to 2021 legislation that had to do with**

21   **referring information about potential criminal conduct**

22   **in elections to law enforcement?**

23       A.   I don't recall if that was in that

24   resolution.  I do know that there's been discussions

25   about that and the penalty associated for someone

Cindy Siegel - 2/28/2023

51

1  violating the election code, but I don't recall if it's

2  in that resolution.

3      Q.    Whether it's in the resolution or not do you

4  remember if the Harris County republican party had a

5  goal that 2021 legislation would include information

6  getting referred to law enforcement about potential

7  election code violations?

8      A.    I can't say that it was the party's goal, I

9  know that I -- Alan Vera's had concerns about that, but

10  I don't -- again, recall I don't recall if it's in

11  that.  I mean the resolution is what sets out our

12  position.

13      Q.    Okay.

14      A.    It's not to say that others have not had

15  conversations about it but -- but the resolution is --

16  speaks for the body.

17      Q.    Do you recall whether the resolution for 2021

18  legislation included any goals with respect to poll

19  watchers?

20      A.    I don't recall.

21      Q.    Do you recall whether the resolution of the

22  party with respect to 2021 legislation contained any

23  goals with respect to voter assistance's, either in

24  mail balloting or in person at the polls?

25      A.    I don't recall.

1    Q.   Do you recall whether the resolution for 2021

2  legislation included any provisions related to

3  requiring ID numbers from voters for application for

4  ballot by mail or mail ballots?

5    A.   I don't recall that it was that specific, if

6  at all.

7    Q.   Do you recall whether the resolution

8  contained any, for -- for 2021, legislation contained

9  any provisions related to mail voting at all?

10    A.   Can you repeat that?

11    Q.   Yeah.  Do you recall whether the Party's

12  resolution, with respect to 2021 legislation, had any

13  part of it that addressed vote by mail?

14    A.   I suspect it -- I'm sure it did.  I can't

15  tell you exactly what it said.

16    Q.   Okay.  Do you recall whether the resolution

17  related to 2021 legislation discussed the idea or the

18  concept of vote harvesting?

19    A.   I don't know if the specific resolution

20  stated anything about that, but that has been a concern

21  of the Partys'.

22    Q.   Okay.  Can we take a five minute break?

23           THE REPORTER:  Going off the record at

24  10:07 a.m.

25           (Off the record.)

Cindy Siegel - 2/28/2023

53

```
 1              THE REPORTER:  Going back on the
 2   record 10:22 a.m.
 3        Q.   (BY MS. PERALES:) All right.  I have a couple
 4   of -- a couple of close the loop questions before I --
 5   I move into the next session of the outline.
 6                  Do you recall whether the Party's
 7   Resolution on the 2021 legislation included anything
 8   about individuals who transport voters to the polls for
 9   curbside voting?
10        A.   No, I don't recall.
11        Q.   Do you recall whether the 2021 Resolution on
12   legislation included anything about voting machines
13   being set up to prohibit straight ticket voting?
14        A.   No.
15        Q.   Okay.  Now, I have some more questions for
16   you about the party's advocacy in the 2021 legislative
17   sessions, both the regular, the first, and the second
18   special, this was a long year.
19        A.   Yes, it was.
20        Q.   And so I'll continue to ask you those
21   questions, but if it's the case that Mr. Vera was
22   carrying out your -- the Partys' activities, then
23   that's okay to just let me know that?
24        A.   Okay.
25        Q.   But if there were other things that the party
```

Cindy Siegel - 2/28/2023

54

1   was doing to advocate, please let me know that as well?

2       A.   Okay.

3       Q.   And before I launch into those, I just wanted

4   to be clear that when Mr. Vera was carrying out his

5   advocacy on behalf of the Harris County Republican

6   Party, are you aware that sometimes he would use his

7   company email to communicate with legislators and

8   others?

9       A.   Yes, I'm aware of that.

10      Q.   Okay.  And is it typically the case that he

11  uses his -- his company email for email communications?

12      A.   It has been historically the case.  It is

13  something we've internally recently are moving away

14  from that, to where that -- there will be a party email

15  like I have.

16      Q.   In 2021, did Mr. Vera have a party email?

17      A.   No, no.

18      Q.   Okay.  So any emailing he would have been

19  doing on behalf of the Republican Party would have been

20  through his personal email?

21      A.   Yes.

22      Q.   Okay.  Does Mr. Vera have a computer that the

23  party gave him to do his work on behalf the Party?

24      A.   No.

25      Q.   So is it your understanding Mr. Vera uses his

1   personal computer to do his advocacy on behalf of the

2   County Party?

3        A.   Yes.

4        Q.   I think I know the answer to this question,

5   but did -- did you, Cindy Siegel, testify in favor or

6   against SB 1 in the legislature?

7        A.   No.

8        Q.   Did you ever, are you aware of any meetings

9   that Harris County Republican Party had with

10  legislators on SB 1 that didn't include Mr. Vera?

11                  MR. SZUMANSKI:   Objection to the

12  extent it infringes or invades the legislative

13  privilege or extends into the inquiries from the

14  legislatures?

15                  MS. PERALES:   Your objection is noted.

16  I'm carefully asking at this point only whether

17  meetings occurred and not the substance of those

18  communications.

19                  MR. SZUMANSKI:   Understood.

20       A.   Can you repeat the question?

21       Q.   (BY MS. PERALES) Yes.  Did the Harris County

22  Republican Party have any meetings with legislators

23  about SB 1 that didn't include Mr. Vera?

24       A.   Not to my knowledge.

25       Q.   Now, earlier you testified that the 2021

1  resolution of the Party Election Integrity Legislation

2  was provided to legislators, can you think of any other

3  documents that the Harris County Republican Party sent

4  to legislators related to election integrity during the

5  2021 period?

6           MR. SZUMANSKI:  Objection, legislative

7  privilege?

8      Q.   (BY MS. PERALES:) You may answer.

9      A.   Not related to SB 1, but in response to a

10  text I received.

11      Q.   Okay.  So you received a text from a

12  legislator or legislative staff and you responded?

13      A.   Yes.

14      Q.   Okay.  And in your response -- it -- was your

15  response by text or was your response to send a

16  document?

17      A.   Originally, I think I responded by text and

18  then I followed up with an email.

19      Q.   Can you tell me what the request was?

20           MR. SZUMANSKI:  Objection, legislative

21  privilege and I will instruct the witness not to answer

22  to the extent that it includes substantive -- the

23  substance of any inquiries from legislators?

24      Q.   (BY MS. PERALES:) Are you going to follow the

25  instruction of Mr. Szumanski not to answer the

1    question?

2                    MR. GORE:  Yes.

3        A.    Yes.

4        Q.    (BY MS. PERALES) What was it that you sent to

5    the legislator in response to the inquiry?

6        A.    Am I okay?

7                    MR. GORE:   Uh-huh.

8        A.    I forward a tape and -- or a link to a tape,

9    and an email explaining his -- his situation.

10        Q.    (BY MS. PERALES) When you say a tape, do you

11    mean a video recording?

12        A.    It is a recording of what was a Zoom meeting

13    that the Party had held internally.

14        Q.    Does this have to do with the placement of

15    poll watchers?

16        A.    Yes.

17        Q.    Okay.

18        A.    Well, not the -- not the actual placement,

19    but recruiting of poll watchers.

20        Q.    Okay.   I believe that that has been produced

21    in the litigation, would it by fair to characterize

22    this as an email from you with a link responding to the

23    legislator's request for more information about a

24    recording that was made online of a presentation by a

25    Harris County Republican Party person related to

58

1   recruiting poll workers in Harris county?

2                       MR. SZUMANSKI:   Objection, form.

3        Q.    (BY MS. PERALES) You may answer.

4        A.    Yes.  I don't believe I provided the link to

5   everyone I sent the email to.  I think I only provided

6   it to the -- the -- the legislator who had asked me

7   about it.

8        Q.    Do you recall whether this was somewhere

9   around August 10th, 2021?

10       A.    I'm -- I don't recall it's August, but it

11  would have been some time probably that summer.

12       Q.    Okay.  And I think I forgot to mention

13  earlier at the very beginning of the deposition when I

14  was doing the rules of the road, I can't remember, but

15  I'll give the -- I'll give you the -- the rule of the

16  road again that from time to time attorney's will make

17  objections in the deposition, did I give this

18  instruction already?

19                      MR. GORE:  I believe you did.

20                      MS. PERALES:  Did I?  Okay.

21       Q.    (BY MS. PERALES:) Okay.  And so in general

22  they will make their objection for the record, we'll

23  just continue talking; however, if you get an

24  instruction not to answer we do take a pause and work

25  that out.

Cindy Siegel - 2/28/2023

59

```
 1        A.    Okay.

 2        Q.    And if you -- if you make the decision not to

 3   answer, I will ask the follow up question whether

 4   you're following advice from counsel, typically, and

 5   it's not because I'm mad, but only because I want to

 6   create the record for later that that's how -- how we

 7   got to that point; is that all right?

 8        A.    Yes.

 9        Q.    And you mention that your exchange with the

10   legislators about that Harris County Republican Party

11   meeting with respect to poll watchers was not SB 1

12   related --

13        A.    No.

14        Q.    -- but it was poll watcher related?

15        A.    Correct.

16        Q.    Okay.  So putting that aside, can you think

17   of any other communications that you, meaning the

18   Harris County Republican Party, had with legislators

19   about SB 1 that was not involving Mr. Vera, so outside

20   of Vera's communications --

21        A.    Not --

22                    MR. SZUMANSKI:  Objection, legislative

23   privilege.

24                    MS. PERALES:  You're objection is

25   noted.  Again, if I ask merely about the existence of
```

Cindy Siegel - 2/28/2023

60

1   communications, I believe we're still on safe ground.

2                        MR. SZUMANSKI:   Understood, but to the

3   extent it does invade into any content or substance of

4   communications then I'm going to instruct the witness

5   not to answer, but I appreciate your clarification.

6        Q.   (BY MS. PERALES:) Okay.  Do you need the

7   question again?

8        A.   Please.

9        Q.   Putting aside the video about poll watcher

10  recruitment, can you think of any other communications

11  that Harris County Republican Party had with

12  legislators or staff about SB 1 that didn't include

13  Mr. Vera?

14       A.   Not to my recollection.

15       Q.   My understanding from Mr. Vera was that, at

16  the beginning of the 2021 legislative session there may

17  have been a luncheon here in Harris County with Harris

18  County electeds at the beginning of the legislative

19  session; does that sound familiar?

20       A.   Not for 2021, we just had one in January for

21  this legislative session.

22       Q.   Okay.

23       A.   At least, I wasn't invited if there was one.

24       Q.   That would have been odd?

25       A.   Yeah.

1      Q.   Okay.  Okay.  Besides the meeting that you --

2  besides the trip to Austin that you took with the

3  Federated Republican Women, did you make any other

4  trips, you, Cindy Siegel make any other trips to Austin

5  to advocate on Election Integrity Legislation?

6      A.   No.

7      Q.   Do you recall any specific names of

8  legislators or legislative staff that the Harris County

9  Republican Party was in communication with about SB 1

10 during the sessions of 2021?

11     A.   Again, the Party wasn't officially, and I

12 wasn't -- other than responding to a query from one of

13 the legislators, so -- but I can't speak for Alan on

14 that.

15     Q.   Do you know for example if Mr. Vera was in

16 touch with Senator Paul Bettencourt or Representative

17 Jacey Jetton, who I understand is from Fort Bend

18 County, do you recall any of the names of legislators

19 that Mr. Vera was dealing with?

20     A.   Not specifically, but I wouldn't be surprised

21 if he'd had communications with Senator Bettencourt.

22     Q.   When you sent your email about the poll

23 watcher's meeting video, do you recall if it was at

24 about 4:30 in the morning?

25     A.   I can guarantee it wouldn't be about 4:30 in

Cindy Siegel - 2/28/2023

1    the morning.

2        Q.   Okay.  Okay.  I'm just thinking back to some

3    documents we reviewed yesterday --

4        A.   I'd pretty -- I'd be shocked, not saying that

5    I hadn't been up that late.

6        Q.   Okay.

7        A.   Okay.

8        Q.   Do you recall any communications that the

9    Harris County Republican Party had with Senator Bryan

10   Hughes regarding SB 1?

11       A.   Not specifically SB 1.

12       Q.   Okay.  Any voter integrity issues that you

13   might have had communication with Bryan Hughes?

14       A.   No.

15       Q.   Okay.  Has the Harris County Republican Party

16   had any communications with legislators since SB 1 was

17   passed on topics related to SB 1, so after September of

18   2021?

19       A.   I mean, as it relates to the legislation --

20       Q.   Yes, as it relates to the things inside SB 1.

21       A.   -- I mean, we have lots of communication

22   with, related to the primary.  You know, how poorly

23   that election was run by Harris County.  And I know

24   I've had lots of conversations with -- Senator

25   Bettencourt is very aware of the issues as it relates

63

1    to how poorly the county ran the election.

2    Specifically, that came out of that primary as a result

3    of SB 1, was the requirement for the reconciliation

4    report which identified 10,000 missing mail-in ballots

5    that I believe resulted -- they discovered them due to

6    the reconciliation report.  And as an accountant, I can

7    tell you I think it should have been a no brainer for

8    years to have that sort of report.

9         Q.   And just to clarify, the reconciliation

10   report is something that SB 1 requires, yes?

11        A.   Yes.

12        Q.   How about some of the other things that SB 1

13   requires?  So in the 2022 primary, did you have any

14   communications with elected officials about poll

15   watchers and the new provisions and SB 1 related to

16   poll watchers?

17        A.   Not to my --

18             MR. SZUMANSKI:  Objection, legislative

19   privilege, but witness may answer yes or no as to the

20   existence, but not the substance of any communications.

21        A.   Not -- not to my knowledge.

22        Q.   (BY MS. PERALES) Same question with respect

23   to what communications the party had with elected

24   officials during the -- during the period in which

25   people were either requesting ballot by mail or voting

Cindy Siegel – 2/28/2023

64

1   ballots by mail and the new requirement of matching the

2   ID number?

3                    MR. SZUMANSKI:   Same objection, same

4   instruction.

5        A.   Not to my knowledge.

6        Q.   (BY MS. PERALES) So just to frame it another

7   way, is it fair to say then you didn't have any

8   communications with elected officials about how that

9   process was going for the voters that you were dealing

10  with?

11       A.   I -- I don't recall any communications, I

12  think the vast majority of our communications were

13  after the primary and dealing with the -- how grossly

14  mismanaged it was and the issues that came up.

15       Q.   And were any of those related to the

16  providing the ID number on the application for ballot

17  by mail or the ballot?

18                   MR. SZUMANSKI:   Same objection, same

19  instruction.

20       A.   There were concerns.  We did hear back from

21  some of our voters that had a hard time tracking it.

22  And again as I cited earlier, I think the instructions

23  weren't well defined in that there was confusion on

24  that.  And I heard from voters specifically not, you

25  know, that had questions about it, but it was after the

1    fact.

2        Q.    (BY MS. PERALES) Did you hear from voters who

3    had either applied for a ballot by mail or voted a

4    ballot by mail and were then later informed that their,

5    either application for ballot by mail or mail ballot

6    had not been processed because the county could not

7    match the ID number that the voter provided?

8        A.    I can only really think of one or two

9    incidences, and I can't say it was specifically for

10   that that I spoke to voters and it would have been

11   after the fact, after the primary.

12       Q.    Did you become aware in the primary election

13   that voters who registered pre-2000 and stayed at their

14   same address may never have provided an ID number to

15   the county?

16       A.    I'm -- I'm unaware of that.

17       Q.    Did you become aware during the primary of

18   2022 that there may have been voters who provided one

19   ID number on their application for ballot by mail or

20   mail ballot, but the county only had the other ID

21   number for that voter?

22       A.    I did hear that from Alan.

23       Q.    Okay.  In the work of Harris County

24   Republican Party with candidates for office, have you

25   had occasion to guide or advise candidates for office

1   about the provisions in SB 1?

2       A.   No, no.  Alan might have, but not the Party

3   per se.

4       Q.   But Alan would be representing the Party when

5   he did that?

6       A.   He might have answered questions that they

7   had during the process.  I -- I know that when we were

8   sending out our mail ballot applications trying to make

9   sure that we put everything in -- we went through four

10  gyrations, consulted with attorneys to make sure that

11  we were complying with SB 1. You know, I would assume

12  he probably answered questions from candidates.  I know

13  I heard after the fact that there were some issues, and

14  that was through Alan of what the candidates had sent

15  out that didn't meet the requirements, but no.

16      Q.   So some candidates were sending out

17  application for ballot by mail?

18      A.   Yes.

19      Q.   And then the party was sending out

20  applications for ballot by mail?

21      A.   Yes.

22      Q.   Do you know if any of the applications for

23  ballot by mail that were sent out by Harris County

24  Republican Party were sent to people who weren't

25  eligible to vote my mail?

1      A.   I can't say 100 percent, but I'd be surprised

2  if there was a huge number, it was based upon our

3  vendor's data base.

4      Q.   And sometimes vendors can be a little wonky

5  so that's why I'm asking whether you became aware if

6  any of the applications for ballot by mail sent by the

7  Party went to individuals who were not eligible to vote

8  by mail?

9      A.   I did not have anyone report that.

10      Q.   Did you become aware of it through any other

11  means than a report?

12      A.   No, I guess, we're not supposed to talk about

13  November.  I have heard of -- of someone receiving --

14      Q.   Okay.  I haven't asked you about November, so

15  it's okay for you to not just -- to go into that time

16  period.

17      A.   Okay.

18      Q.   Does Harris County Republican Party do

19  trainings for republican candidates?

20      A.   Yes.

21      Q.   And do those trainings touch on any of the

22  provisions that might be contained within SB 1, like

23  poll watchers or any of the other SB 1 provisions?

24      A.   Our training tends to be general in terms of

25  how to run for office, how you know if they need help

Cindy Siegel - 2/28/2023

68

1  with social media.  The only thing I could think of as

2  it related to SB 1 -- and it's not just SB 1, it's that

3  they're allowed you know poll watchers.  So if they ask

4  we would respond and answer those questions.

5       Q.   Okay.  Do you recruit poll watchers for the

6  primary elections?

7       A.   Not actively.

8       Q.   Okay.

9       A.   It's our primary so.

10      Q.   Do you know how many poll watchers you had in

11  the polls for the 2022 primary election?

12      A.   No.

13      Q.   Would it had been less than 100?

14      A.   Yes.

15      Q.   Would it be less than 50?

16      A.   I'm guessing, yes.

17      Q.   And in a typical general election; how many

18  poll watchers would you deploy?

19      A.   It's a function of how many people we have

20  available.

21      Q.   2020 for an example?

22      A.   I wasn't chair then so I couldn't say

23  specifically.

24      Q.   Okay.  I'm going to ask you if you recognize

25  some names?

1    Q.    Okay.  Who is Genevieve Carter?

2    A.    She is a communications consultant that the

3    Party had, has hired who works for us or with us.

4    Q.    And when you say the Party, you mean Harris

5    County Republican Party?

6    A.    Correct.

7    Q.    And when you say communications consultant,

8    does that mean sort of graphic design or social media

9    or flyers, web page or something else?

10    A.    It's primarily social media in dealing with

11    media requests.

12    Q.    Okay.

13    A.    And she will occasionally work with us in

14    terms of putting together, for example, a fundraising

15    email.

16    Q.    Okay.  Do you recognize the name Julie Hunt?

17    A.    Yes.

18    Q.    Who is Julie Hunt?

19    A.    She used to work for the party, she worked

20    from probably the summer 2021 through December.  She no

21    longer works with us.  She was -- I forget what our

22    official title we gave her, but it was election

23    director.  We had hired her to help recruit election

24    workers and poll watchers.

25    Q.    Okay.  And so she was an employee of Harris

Cindy Siegel - 2/28/2023

71

1    County Republican Party?

2         A.   Correct.

3         Q.   Would she have kept the review list of either

4    poll workers or poll watchers that were under review

5    that was mentioned in that email that I marked earlier?

6         A.   I doubt that she even saw it.

7         Q.   Okay.

8         A.   It was a new position.  We still had

9    volunteers that were working on that and when she

10   started we had, we were -- we had a volunteer who was

11   going to become the primary director, so she was

12   basically handling recruiting of election workers.

13        Q.   Okay.

14        A.   So it was a new role that we were defining.

15        Q.   For Julie Hunt?

16        A.   For Julie.

17        Q.   Okay.  Who, at Harris County Republican Party

18   would have seen the review list from the email that we

19   discussed earlier?

20        A.   Alan would have seen it.  At the time Brenda

21   Asis was going to be our primary director, so I know

22   she was recruiting with some volunteers making phone

23   calls to see if people would be on -- would submit

24   their name and work the election.

25        Q.   So the review list however is the list of

72

1   people that you were going to make some more inquiry

2   into to -- to decide --

3       A.   Yes.

4       Q.   -- if it was appropriate to continue with

5   them?

6       A.   Yeah.

7       Q.   So beside Mr. Vera and Ms. Asis, would there

8   have been anybody else?  So for example, the person who

9   put the review list together, who else would have seen

10  the review list?

11      A.   Well, after I mean, when Brenda stepped down

12  and said she couldn't become the primary director Margo

13  Matthew stepped up that November and became our primary

14  director, so she would have seen the list.

15      Q.   And she's that name that's on the email and

16  she's communicating with Harris County elections?

17      A.   Yes, yes.

18      Q.   Okay.  The next name on the list is Donna

19  Stanart and I recognize Stanart as the same last name

20  as Stan Stanart, is Donna Stanart related to Stan

21  Stanart?

22      A.   I think she is a niece in law.

23      Q.   Okay.  And who is Donna Stanart?

24      A.   She was the primary director for the 2020

25  primary.

Cindy Siegel – 2/28/2023

73

1      Q.    And so she was an employee of Harris County

2 Republican Party?

3      A.    Well, she -- the way the primary director is

4 paid, not through the Party, it's paid separately

5 through primary funds which comes through the secretary

6 of state.

7      Q.    Oh, okay.  But she worked -- the primary

8 director does work in the offices of the Harris County

9 Republican Party?

10     A.    They -- yes, but they pay for part of the

11 rent.  It's kept -- there's sort of a Chinese wall

12 there.

13     Q.    Got it.  Do you recognize the name John

14 Douglas?

15     A.    He's an employee of mine.

16     Q.    And what are his duties, generally?

17     A.    His official title now is digital director.

18     Q.    And what does the digital director do?

19     A.    He record -- he worked with candidates,

20 helping them with social media, would do videos of

21 them, do head shots of them, but he also, he worked --

22 he works in you know in terms of what sort of whatever

23 else we need.

24     Q.    Okay.  Do you recognize the name Toni Anne

25 Dashiell or Dashiell?

Cindy Siegel - 2/28/2023

75

```
 1        A.    Matt Rinaldi is the chairman of that
 2  Republican Party of Texas.
 3        Q.    I know him as a former member of the House?
 4        A.    Yes.
 5        Q.    Okay.  And he's from the Dallas area?
 6        A.    Yes.
 7        Q.    Do you know the name Rob Armstrong?
 8        A.    I think you're referring to Robin Armstrong.
 9        Q.    Probably.
10        A.    He's the committee man from the state of
11  Texas.
12        Q.    Okay.  Do you recognize the name John
13  Beckmeyer?
14        A.    He's the director of the Republican Party of
15  the Texas.
16        Q.    Do you recognize the name Josh Goldman?
17        A.    No.
18        Q.    Do you recognize the name Steve Armbruster?
19        A.    No.
20        Q.    Okay.  You mentioned earlier the next name on
21  my list is Sonya Aston?
22        A.    Yes.
23        Q.    And you mentioned that she is -- that she
24  works with Senator Bettencourt probably as his general
25  counsel?
```

1        A.    Uh-huh.

2        Q.    You mentioned that you are represented by

3   Ms. Aston in litigation that's not this case, is that

4   right?

5        A.    Correct.

6        Q.    Is there any other relationship that you have

7   with Ms. Aston besides those two relationships?

8        A.    She was a judicial candidate in the November

9   2022 election, unopposed in the primary.  And she's

10  been a volunteer as I have mentioned earlier who taught

11  our election law training for the party.  I don't know

12  how long, but during my tenure, yes.

13       Q.    Okay.  And does she currently represent you

14  in litigation that is not this case?

15       A.    Correct.

16       Q.    The next name on my list is Madison McDonald?

17       A.    I don't recognize, not offhand.  She may work

18  for the RBT, but I -- it's not someone I know.

19       Q.    The next name is Donna Davidson?

20       A.    Donna -- yes, I recognize her.  I believe

21  that her official -- she's an election attorney and I

22  -- she worked with the RNC on their Texas Election

23  Integrity Team or group.

24       Q.    Okay.  Is she the attorney for the Harris

25  County Republican Party?

Cindy Siegel - 2/28/2023

89

1       Q.    You have an email account that you use for

2   your work with the Party, correct?

3       A.    Correct.

4       Q.    That's chair@harriscountygop.com?

5       A.    Correct.

6       Q.    Do you use any other email accounts to

7   conduct your work for the Party?

8       A.    Originally, because there were issues with

9   the website and there were just a lot of problems when

10  I took over, so I used my personal one for maybe less

11  than a month, until we could get the Chair email set

12  up.

13      Q.    And what is your personal email account?

14      A.    It's cpacindy401@gmail.com.

15      Q.    Do you know if any emails were collected from

16  your personal account to be produced in this lawsuit?

17      A.    There wouldn't have been anything on it.

18      Q.    So is that a no, nothing was collected?

19      A.    No, no, no.  There was nothing on it.

20      Q.    Let me go back to the -- the resolution from

21  the Party related to the 2021 legislative session,

22  and -- and any election integrity legislation.  Did

23  that resolution include anything about how voters could

24  drop off their mail in ballots?

25      A.    I -- I don't recall.

Cindy Siegel – 2/28/2023

90

1     Q.   You don't recall whether it mentioned drop

2   boxes?

3     A.   No.

4     Q.   Do you know if, at the time, the party had a

5   position about how voters could drop off their mail

6   ballots in drop boxes?

7     A.   At the time I probably wasn't aware of it, I

8   was made aware of it afterwards. I mean, the time I

9   took over things were in disarray with the Party, so

10   quite frankly most of my attention was based upon party

11   business versus legislation.

12            I know that it was a concern in

13   discussions with Alan Vera about it, about there being

14   a variety of places that people were dropping off mail

15   in ballots versus -- I think it was supposed to be

16   where it originally was the County Clerk, but that's

17   the limit of what I know.

18     Q.   And so I have this right, the concern was

19   that there was more than one location to drop off a

20   mail in ballot; is that correct?

21     A.   I -- I -- I think that it was the concern

22   that there was more than one location and whether or

23   not the election code was being complied with.

24     Q.   Uh-huh.  Are you familiar with any way in

25   which SB 1 changed the election code related to how

1   voters can drop off their mail in ballots?

2       A.   No.

3       Q.   I'd like to ask you some questions about poll

4   watchers?

5       A.   Okay.

6       Q.   Does the party send poll watchers to every

7   polling location in Harris County?

8       A.   No, we wish we could, but we just don't have

9   those kind of resources.

10      Q.   So how does the Party decide where to send

11  poll watchers and where to not send them?

12      A.   Well Alan, through his experience, through

13  probably well over a decade working with the Party,

14  I -- I actually asked him that question when I took

15  over and -- because I was asking if it was a particular

16  area and he said no, that the poll watchers are

17  determined based upon a history, knowledge of people

18  that judges that they felt like -- that there were

19  issues with how they ran their election in their poll.

20  So when we have the resources in terms of people,

21  Alan's identified these not areas, but prior election

22  judges that there have been issues with in the past,

23  and that's where poll watchers, that's where the

24  priority would be.  There as well of course central

25  count, primarily central count.

Cindy Siegel - 2/28/2023

92

1    **Q.    Does anyone other than Alan Vera make those**

2    **decisions about where to place poll watchers?**

3        A.    He's got his priorities just because he's got

4    the experience and knowledge.   Again, he's been working

5    on this area for over a decade.   The actual assignment

6    that this person's working here, he was responsible for

7    it in the fall, and again I know we're not talking

8    November, but internally the actual assignment might be

9    done -- was done by our prior executive director, but

10   the priority of here are the polls that we want to

11   cover, that was done through Alan, in terms of

12   identifying those.

13       **Q.    Uh-huh.   And you mention that it's based on a**

14   **history of election judges who have had issues in the**

15   **past; is that -- is that right?**

16       A.    Correct.

17       **Q.    What kind of issues would that cover?**

18       A.    Well, I don't know.   I can't speak to

19   specifics.   I know that there was an issue for example

20   in 2020, November of 2020 with a judge that was

21   verbally abusive to the clerks.   Was stepping out,

22   leaving the election, the poll; those would be some of

23   the issues where we'd want to place poll watchers.

24                Basically, where we've had reports or

25   complaints of people, judges not following the election

Cindy Siegel - 2/28/2023

93

1   code.

2       **Q.   In deciding how to prioritize which locations**

3   **needs poll watchers, does Al Vera review these reports**

4   **and complaints that you just mentioned?**

5       A.   Yeah, he would -- I mean, Alan's been key to

6   all of this in terms of it's been him and his

7   volunteers that serve on his committee who, for years

8   have -- they've been the ones recruiting election

9   judges, election workers.  But he would have those

10  reports and -- and know and have data that would, you

11  know, be able to identify that this is a problem, you

12  know, that there's been a lot of complaints about this

13  judge.

14      **Q.   Is there any other information that Mr. Vera**

15  **or the individuals he works with, that they review in**

16  **deciding how to prioritize certain polling locations?**

17      A.   No, I think it's all based upon complaints.

18      **Q.   Does -- does Mr. Vera consider whether poll**

19  **watchers should serve in polling locations near where**

20  **they live?**

21      A.   No, I think -- again, the priority is always

22  those where we've had a lot of complaints either via

23  the election, you know, the election workers, voters,

24  et cetera.

25              So the priority where we place poll

1   watchers is based upon those that we've had a lot of

2   complaints with and we feel like that -- that they're

3   not potentially following the election code.

4                    With election workers we have tried to

5   make sure that they have the ability to work closer to

6   home because they're more likely to want to work, you

7   know, if they don't have to drive 20 miles.

8        Q.   Do poll watchers ever request to be -- to

9   work in a particular area or at a particular polling

10  location?

11       A.   I'm sure that they have.

12       Q.   And does the Party or Mr. Vera take those

13  requests into consideration?

14       A.   We would if we have, if we have the actual

15  bodies to be able to have that discretion.

16                   Again, we have certain priority

17  judges, not polls, but certain priority so that we try

18  to make sure we have coverage based upon prior

19  complaints.

20                   We also offer poll watchers to -- if

21  our candidates, you know, feel like they want to have a

22  poll watcher at Central Count or -- and we did that for

23  example with the HISD, when they were, during central

24  count when they were counting the ballots.  But, again,

25  it's based upon because we've got limited resources,

Cindy Siegel - 2/28/2023

95

1    people resources.   It's limited to where we have

2    historically had a lot of complaints or concerns

3    brought to the party's attention.

4         Q.   **Are you aware of which polling locations were**

5    **priorities during the 2020 general election?**

6         A.   No, but I would assume it's the same ones

7    that Alan has now.   It's not -- and there's, again, I

8    ask him that question when I took -- took over; how do

9    you determine where the priority, you know, given that

10   we don't have unlimited people to be poll watchers, and

11   he said it was based upon complaints of election judges

12   historically that there had been a lot of complaints.

13                   So if that judge was moved to a

14   different poll, then our poll watcher, if we had one

15   available we go where that judge was.

16        Q.   **Do you know if you see a lot of changes, you**

17   **know, from one general election to the next about which**

18   **polling places or election judges are priorities?**

19        A.   No, I mean there's a, there is a list that

20   our priorities and if those people continue to serve as

21   an election judge, then if we have people available we

22   would place them as poll watchers there.

23        Q.   **Do you know whether the Harris County**

24   **Republican Party produced a list of where poll watchers**

25   **were placed in the 2020 general election?**

Cindy Siegel - 2/28/2023

116

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3  LA UNION DEL PUEBLO ENTERO,   )
    et al.,                       )
 4                                )
         Plaintiffs,              )  Civil Action
 5                                )  No. SA-21-CV-00844-XR
    vs.                           )
 6                                )
    GREGORY W. ABBOTT, et al.,    )
 7                                )
         Defendants.              )
 8                                )

 9                    REPORTER'S CERTIFICATE
                  DEPOSITION OF CINDY SIEGEL
10                    FEBRUARY 28, 2023

11           I, Nilda Codina, Notary in and for the State

12  of Texas, hereby certify to the following:

13           That the witness, CINDY SIEGEL, was duly

14  sworn by the officer and that the transcript of the

15  oral deposition is a true record of the testimony given

16  by the witness;

17           I further certify that pursuant to FRCP Rule

18  30(f)(1) that the signature of the deponent:

19           _____ was requested by the deponent or a

20  party before the completion of the deposition and

21  returned within 30 days from date of receipt of the

22  transcript.  If returned, the attached Changes and

23  Signature Page contains any changes and the reasons

24  therefor;

25           __X___ was not requested by the deponent or a
```

Cindy Siegel - 2/28/2023

1   party before the completion of the deposition.

2           I further certify that I am neither attorney

3   nor counsel for, related to, nor employed by any of the

4   parties to the action in which this testimony was

5   taken.

6           Further, I am not a relative or employee of

7   any attorney of record in this cause, nor do I have a

8   financial interest in the action.

9           Subscribed and sworn to on this the 8th day

10  of March, 2023.

11  _____

        NILDA CODINA
12      Notary Public in and
         For the State of Texas
13      My Commission No. 12878135-3
        Expires:  10/24/2023
14
        INTEGRITY LEGAL SUPPORT
15      Firm Registration No. 528
        9901 Brodie Lane
16      Suite 160-400
        Austin, TX 78748
17      Phone:(512)320-8690

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, *et al.,* | § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Civil Action No. SA-21-CV-00844-XR |
| GREGORY W. ABBOTT, *et al.,* | § § § | |
| *Defendants.* | § | |

**CONSOLIDATED PLAINTIFFS' NOTICE OF INTENT TO TAKE RULE 30(b)(6)**
**DEPOSITION OF THE HARRIS COUNTY REPUBLICAN PARTY**

**TO: Harris County Republican Party** by and through John M. Gore, Jones Day, 51 Louisiana Avenue, N.W., Washington, D.C. 20001 and to All Counsel of Record.

**PLEASE TAKE NOTICE** that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, counsel for the Consolidated Plaintiffs will take the oral deposition of the Harris County Republican Party on February 28, 2023, at 8:30 am (CST) at the offices of Javier N. Maldonado & Associates, P.C., 1415 North Loop W., Suite 600, Houston, TX 77008 (Andromeda Conference Room on the Mezzanine Level). The deposition shall be recorded by stenographic means and may also be recorded by additional audiovisual means, and shall take place before a notary public or other person authorized by law to administer oaths. Plaintiffs reserve the right to utilize any videotaped deposition at trial in lieu of live testimony, or in addition to live testimony, and/or for any purpose permitted under the Federal Rules of Civil Procedure and Federal Rules of Evidence.

**PLEASE TAKE FURTHER NOTICE** that in accordance with Rule 30(b)(6) of the Federal Rules of Civil Procedure, the Harris County Republican Party is required to designate one or more



EXHIBIT

1

2/28/23

officers, directors, managing agents or other persons who will testify on its behalf as to matters known by or reasonably available to the Harris County Republican Party with respect to each of the topics set forth in the attached Exhibit A. The Consolidated Plaintiffs request that the Harris County Republican Party provide counsel for the Consolidated Plaintiffs with written notice, at least two days in advance of the deposition, of the name and title of each witness who will testify for it and which topic(s), set forth in the attached Exhibit A, each such witness will testify about. The Consolidated Plaintiffs further request that the Harris County Republican Party produce, at least two days in advance of the deposition, all documents, if any, that the designee(s) reviewed in preparation for the deposition. For these purposes "documents" is defined as set forth in the attached Exhibit A.

Dated:  February 23, 2023                     Respectfully submitted,

*/s/ Nina Perales*
Nina Perales
Julia R. Longoria
Fátima L. Menéndez
MEXICAN AMERICAN LEGAL DEFENSE AND
EDUCATIONAL FUND
110 Broadway, Suite 300
San Antonio, TX 78205
Telephone: (210) 224-5476
Facsimile: (210 224-5382
nperales@maldef.org
jlongoria@maldef.org
fmenendez@maldef.org

Michael C. Keats*
Rebecca L. Martin*
Jason S. Kanterman*
Kevin Zhen*
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
One New York Plaza
New York, New York 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000
michael.keats@friedfrank.com

rebecca.martin@friedfrank.com
jason.kanterman@friedfrank.com
kevin.zhen@friedfrank.com

*Counsel for Plaintiffs La Unión del Pueblo Entero,
Southwest Voter Registration Education Project,
Mexican American Bar Association of Texas, Texas
Hispanics Organized for Political Education, Jolt
Action, William C. Velasquez Institute, FIEL Houston,
Inc.*

\* Admitted *pro hac vice*

3

## EXHIBIT A
### Definitions

Except as specifically defined below, the terms used in this request shall be construed and defined in accordance with the Federal Rules of Civil Procedure and the Local Rules of the U.S. District Court for the Western District of Texas, where applicable. Any terms not defined shall be given their ordinary meaning.

1. "Any" or "all" means "any and all."

2. "Communication" is synonymous in meaning and scope to the term "communication" as used in Local Rule 26, and includes any transfer of information of any type, whether written, oral, electronic, or otherwise, and includes transfers of information via email, report, letter, text message, voicemail message, written memorandum, note, summary, and other means.

3. "Curbside voting" means the method of voting available to voters under Tex. Elec. Code § 64.009(a).

4. "Date" means the exact day, month, and year, if ascertainable, or, if not, the best available approximation (including relationship to other events).

5. "Document" is synonymous in meaning and scope to the term "document" as used in Federal Rule of Civil Procedure 34 and Local Rule 26 and includes, but is not limited to, records, reports, lists, data, statistics, summaries, analyses, communications (as defined above), computer discs, tapes, printouts, emails, databases, and any handwritten, typewritten, printed, electronically recorded, taped, graphic, machine-readable, or other material, of whatever nature and in whatever form, including all non-identical copies and drafts thereof, and all copies bearing any notation or mark not found on the original.

6. "Drive-thru voting" means any method of voting in which a voter casts a vote from inside a motor vehicle.

7. "Drop box voting" means any method of voting in which a voter casts a vote by depositing their ballot in a ballot box located outside of a polling place.

8. "Early voting" means any method of voting that occurs prior to the uniform election date for a primary or general election.

9. "Election clerk" means any individual appointed by the presiding judge of an election precinct to assist the judge in the conduct of an election at the polling place for a primary or general election pursuant to Tex. Elec. Code § 32.031 et seq.

10. "Election judge" means any individual appointed as a presiding judge or an alternate presiding judge for a primary or general election pursuant to Tex. Elec. Code § 32.001 et seq.

4

11. "Electoral prospects" means the likelihood or apparent probability of a candidate or potential candidate's successful attainment of elected office.

12. "Extended hour voting" means any method of voting in which a voter casts a ballot at a polling place between the hours of 7:00 p.m. and 7:00 a.m.

13. "HB 3" means the legislation designated as House Bill 3, titled "Relating to election integrity and security, including by preventing fraud in the conduct of elections in this state; increasing criminal penalties; creating criminal offenses," that was introduced during the 87th First and Second Called Sessions of the Texas Legislature, ("87th (1) and (2)").

14. "HB 6" means the legislation designated as House Bill 6, titled "Relating to election integrity and security, including by preventing fraud in the conduct of elections in this state; increasing criminal penalties; creating criminal offenses," that was introduced during the 87th Regular Session of the Texas Legislature ("87th R").

15. "Including" means including, but not limited to

16. "Intervenor-Defendants" means Intervenors Harris County Republican Party, Dallas County Republican Party, Republican National Committee, National Republican Senatorial Committee, or National Republican Congressional Committee, including their current and former employees, officers, attorneys, agents, trustees, investigators, representatives, contractors, consultants, or other persons or entities acting on Intervenors' behalf or subject to Intervenors' control.

17. "Local Officials" means the current and former employees, officers, attorneys, agents, trustees, investigators, representatives, contractors, and consultants of any political subdivision or office of a political subdivision of the state of Texas, including by not limited to Texas County Election Administrator's Offices, Texas County District Attorney's Offices, Texas County Criminal District Attorney's Offices, Texas County Attorney's Offices, Texas County Clerk's Offices, and Texas County Tax-Assessor-Collector's Offices.

18. "Office of the Texas Attorney General" and "Attorney General" means the Office of the Texas Attorney General and includes the Texas Attorney General and his predecessors and successors in their official capacities as Texas Attorney General, as well as the current and former employees, officers, attorneys, agents, trustees, investigators, representatives, contractors, and consultants of the Office of the Texas Attorney General.

19. "Office of the Texas Governor" and "Governor" means the Office of the Texas Governor and includes the Texas Governor and his predecessors and successors in their official capacities as Texas Governor, as well as the current and former employees, officers, attorneys, agents, trustees, investigators, representatives, contractors, and consultants of the Office of the Texas Governor.

20. "Office of the Texas Lieutenant Governor" and "Lieutenant Governor" means the Office of the Texas Lieutenant Governor and includes the Texas Lieutenant Governor and his predecessors and successors in their official capacities as Texas Lieutenant Governor, as well as the current and former employees, officers, attorneys, agents, trustees, investigators, representatives, contractors, and consultants of the Office of the Texas Lieutenant Governor.

21. "Office of the Texas Secretary of State" and "Secretary of State" means the Office of the Texas Secretary of State and includes the Texas Secretary of State and his predecessors and successors in their official capacities as Texas Secretary of State, as well as the current and former employees, officers, attorneys, agents, trustees, investigators, representatives, contractors, and consultants of the Office of the Texas Secretary of State.

22. "Poll watcher" means any individual appointed to observe the conduct of an election on behalf of a candidate, a political party, or the proponents or opponents of a measure for a primary or general election pursuant to Tex. Elec. Code § 33.001 et seq.

23. "Poll worker" means any individual, other than an election clerk or election judge, who assists in administering an election at a polling place for a primary or general election.

24. "SB 1" means the legislation designated as Senate Bill 1, titled "Relating to election integrity and security, including by preventing fraud in the conduct of elections in this state; increasing criminal penalties; creating criminal offenses," that was introduced during the 87th First Called Session of the Texas Legislature and introduced and enacted during the 87th Second Called Session of the Texas Legislature ("87th (1) and (2)") and signed by the Governor of Texas on September 7, 2021.

25. "SB 7" means the legislation designated as Senate Bill 7, titled "Relating to election integrity and security, including by preventing fraud in the conduct of elections in this state; increasing criminal penalties; creating criminal offenses," that was introduced during the 87th Regular Session of the Texas Legislature, including any predecessor or related bills from any legislative session in 2021.

26. "Straight-ticket voting" means any method of voting in which a party may select a political party's candidates in one motion or gesture.

27. "Texas Legislature" means the current and former members, officers, and staff of the Texas Senate and Texas House of Representatives and any committees or agencies thereof, and the current and former employees, officers, attorneys, agents, trustees, investigators, representatives, contractors, and consultants thereof.

28. "Vote-by-mail" means any method of voting in which a voter casts a ballot received in the mail.

29. "Voter" means any registered voter in Texas and all persons who may properly register to vote in Texas by the close of discovery in this case.

30. "Voter assistance" means any conduct permitted under Section 64.0321 of the Texas Election Code or required by Sections 203 and 208 of the Voting Rights Act, 52 U.S.C. §§ 10503, 10508.

31. "You" and "your" means the Dallas County Republican Party, including its current and former employees, officers, attorneys, agents, trustees, investigators, representatives, contractors, consultants, or other persons or entities acting on behalf or subject to the control of the Dallas County Republican Party.

## Deposition Topics

1. Your knowledge of the legislative history of SB 1, SB 7, HB 6, or HB 3, including but not limited to committee activities, hearings, debates, drafting, amendment, intent, and anticipated effect, anticipated implementation, or anticipated enforcement of such legislation.

2. Your work on, involvement with, strategy for, and evaluation of SB 1, SB 7, HB 6, or HB 3, including but not limited to the drafting, amendment, intent, and anticipated effect, anticipated implementation, or anticipated enforcement, or legislative advocacy for or against of such legislation.

3. Your understanding and interpretation of the following provisions of SB 1 (hereinafter, "the Challenged Provisions"):
    a. SB 1 §§ 2.04-2.08
    b. SB 1 § 2.11
    c. SB 1 § 3.04
    d. SB 1 §§ 3.09–3.10
    e. SB 1 §§ 3.12–3.13
    f. SB 1 § 3.15
    g. SB 1 §§ 4.01–4.02
    h. SB 1 §§ 4.06–4.07
    i. SB 1 § 4.09
    j. SB 1 § 4.12
    k. SB 1 §§ 5.01–5.04
    l. SB 1 §§ 5.06–5.08
    m. SB 1 § 5.10
    n. SB 1 § 5.13
    o. SB 1 § 5.12, 5.14
    p. SB 1 § 6.01
    q. SB 1 §§ 6.03–6.07
    r. SB 1 § 7.04
    s. SB 1 § 8.01

4.     The connection or relationship between any of the Challenged Provisions of SB 1 and the electoral prospects of any candidates for elected office in Texas supported by Intervenor-Defendants and the basis, including any evidence, to support that connection or relationship.

5.     Your analysis, including suggestions, proposals, strategies or other analyses that were prepared, reviewed, considered, evaluated, sent or received by You, whether in draft form or otherwise, regarding of SB 1, SB 7, HB 6, or HB 3, including but not limited to the drafting, amendment, intent, and anticipated effect, anticipated implementation, or anticipated enforcement, or legislative advocacy for or against of such legislation.

6.     Your communications with any members of the Texas Legislature and/or legislative committees (including staff), regarding SB 1, SB 7, HB 6, or HB 3, including but not limited to the drafting, amendment, intent, and anticipated effect, anticipated implementation, or anticipated enforcement, or legislative advocacy for or against of such legislation.

7.     Your communications with any members of the Texas Legislature and/or legislative committees (including staff), relating to the election practices modified, or any potential election practices that could be modified, in SB 1, SB 7, HB 6, or HB 3, including but not limited to, curbside voting, drive-thru voting, drop box voting, extended hour voting, early voting, election clerks, election judges, poll watchers, poll workers, straight-ticket voting, voter assistance, vote-by-mail, election integrity, vote harvesting, or election fraud from January 1, 2020, to present.

8.     Your communications with the Office of the Texas Governor, the Office of the Texas Attorney General, the Office of the Texas Lieutenant Governor, and/or the Office of the Texas Secretary of State, regarding SB 1, SB 7, HB 6, or HB 3, including but not limited to the drafting, amendment, intent, and anticipated effect, anticipated implementation, or anticipated enforcement, or legislative advocacy for or against of such legislation.

9.     Your communications with the Office of the Texas Governor, the Office of the Texas Attorney General, the Office of the Texas Lieutenant Governor, and/or the Office of the Texas Secretary of State, relating to the election practices modified, or any potential election practices that could be modified, in SB 1, SB 7, HB 6, or HB 3, including but not limited to, curbside voting, drive-thru voting, drop box voting, extended hour voting, early voting, election clerks, election judges, poll watchers, poll workers, straight-ticket voting, voter assistance, vote-by-mail, election integrity, vote harvesting, or election fraud from January 1, 2020, to present.

10.     Your communications with local officials, relating to the election practices modified, or any potential election practices that could be modified, in SB 1, SB 7, HB 6, or HB 3, including but not limited to, curbside voting, drive-thru voting, drop box voting, extended hour voting, early voting, election clerks, election judges, poll watchers, poll workers, straight-ticket voting, voter assistance, vote-by-mail, election integrity, vote harvesting, or election fraud from January 1, 2020, to present.

11.     Your communications with the following organizations, including any of their affiliates or subsidiaries, and the current and former employees, officers, attorneys, agents, trustees, investigators, representatives, contractors, consultants thereof, or other persons or entities acting

on their behalf or subject to their control, regarding SB 1, SB 7, HB 6, or HB 3, including but not limited to the drafting, amendment, intent, and anticipated effect, anticipated implementation, or anticipated enforcement, or legislative advocacy for or against of such legislation:

    a.   The Republican Party of Texas;
    b.   The Heritage Foundation;
    c.   The Texas Public Policy Foundation;
    d.   The American Legislative Exchange Council;
    e.   The State Policy Network;
    f.   Honest Elections Project;
    g.   Public Interest Legal Foundation;
    h.   American Civil Rights Union;
    i.   Project Veritas;
    j.   True the Vote;
    k.   The Texas Election Network;
    l.   The Harris County Republican Party;
    m.   The Republican National Committee;
    n.   The National Republican Senatorial Committee; and
    o.   The National Republican Congressional Committee.

12.    Your communications with the following organizations, including any of their affiliates or subsidiaries, and the current and former employees, officers, attorneys, agents, trustees, investigators, representatives, contractors, consultants thereof, or other persons or entities acting on their behalf or subject to their control, relating to the election practices modified, or any potential election practices that could be modified, in SB 1, SB 7, HB 6, or HB 3, including but not limited to, curbside voting, drive-thru voting, drop box voting, extended hour voting, early voting, election clerks, election judges, poll watchers, poll workers, straight-ticket voting, voter assistance, vote-by-mail, election integrity, vote harvesting, or election fraud from January 1, 2020, to present:

    a.   The Republican Party of Texas;
    b.   The Heritage Foundation;
    c.   The Texas Public Policy Foundation;
    d.   The American Legislative Exchange Council;
    e.   The State Policy Network;
    f.   Honest Elections Project;
    g.   Public Interest Legal Foundation;
    h.   American Civil Rights Union;
    i.   Project Veritas;
    j.   True the Vote;
    k.   The Texas Election Network;
    l.   The Harris County Republican Party;
    m.   The Republican National Committee;
    n.   The National Republican Senatorial Committee; and
    o.   The National Republican Congressional Committee.

13.    Your practices regarding the training of election judges, clerks, and other poll workers in Texas from September 7, 2021, to present, including the information communicated in guidance,

advisories, directives, trainings, materials, presentations or instructions created, used, or disseminated by You.

14.     Your practices regarding the recruitment, retention, and training of poll watchers in Texas from January 1, 2018, to present, including the information communicated in guidance, advisories, directives, trainings, materials, presentations or instructions created, used, or disseminated by You.

15.     Your knowledge regarding instances of violence, discrimination, harassment, intimidation, misconduct, or any inappropriate behavior from poll watchers, election judges, election clerks, or other poll workers towards voters in Texas from September 7, 2021 to present.

16.     Your communications with candidates or potential candidates for elected office in Texas, regarding SB 1, SB 7, HB 6, or HB 3, including but not limited to the drafting, amendment, intent, and anticipated effect, anticipated implementation, or anticipated enforcement, or legislative advocacy for or against of such legislation.

17.     Your communications with candidates or potential candidates for elected office in Texas relating to the election practices modified, or any potential election practices that could be modified, in SB 1, SB 7, HB 6, or HB 3, including but not limited to, curbside voting, drive-thru voting, drop box voting, extended hour voting, early voting, election clerks, election judges, poll watchers, poll workers, straight-ticket voting, voter assistance, vote-by-mail, election integrity, vote harvesting, or election fraud from January 1, 2020, to present.

18.     Your knowledge regarding any incidents, allegations, discussions, or investigations of illegal voting, election fraud, or any kind of criminal conduct in connection with the following methods of voting in Texas, from January 1, 2018, to the present:
      a.  Drive-Thru Voting;
      b.  Drop-Box Voting;
      c.  Extended Hour Voting;
      d.  Straight-Ticket Voting;
      e.  Vote-by-mail;
      f.  Early Voting;
      g.  Curbside Voting;
      h.  Voting with assistance by mail;
      i.  Voting with assistance in person, including transportation assistance for curbside voting; and
      j.  "Vote harvesting services," as defined SB 1.

19.     Your knowledge regarding the impact or potential impact of SB 1, SB 7, HB 6, or HB 3, including but not limited to the effect, implementation, or enforcement of such legislation on racial or ethnic minorities, persons with disabilities, persons with limited English proficiency, or partisan affiliation.

20.     Your knowledge regarding the usage of the following methods of voting in Texas by voters and by counties, including any information about the demographic or political breakdown of use

by voters, racial or ethnic minorities, persons with limited English proficiency, persons with disabilities, or partisan affiliation, from January 1, 2020, to the present:

    a.  Drop-Box Voting;
    b.  Drive-Thru Voting;
    c.  Extended Hour Voting;
    d.  Straight-Ticket Voting;
    e.  Vote-by-mail;
    f.  Early Voting;
    g.  Curbside Voting;
    h.  Voting with assistance in person, including transportation assistance for curbside voting;
    i.  Voting with assistance by mail; and
    j.  "Vote harvesting services," as defined SB 1.

21.     Your knowledge regarding the impact or potential impact of SB 1, SB 7, HB 6, or HB 3, including but not limited to the effect, implementation, or enforcement of such legislation in the following counties:

    a.  Bexar County;
    b.  Dallas County;
    c.  Harris County;
    d.  El Paso County;
    e.  Hidalgo County; or
    f.  Travis County.

22.     Your knowledge regarding the number or proportion of Texas residents, Texas citizens of voting age, or Texas registered voters who have, or lack, a Texas Driver's License, a Texas Election Identification Certificate, a Texas Personal Identification Card, or a Social Security Number, including patterns by race, ethnicity, disability status, or party affiliation from January 1, 2020, to present.

23.     Your knowledge regarding any problems, questions, concerns, or difficulties raised by members of the public related to the SB 1's requirements to provide an identification number on Applications for Ballot By Mail and to provide an identification number on the carrier envelope of a mail ballot.

24.     Your knowledge regarding voter assistance, including transportation assistance for curbside voters, and "vote harvesting services" as defined by SB 1, and patterns of requests for voter assistance by race, ethnicity, disability status, or party affiliation during the period from January 1, 2020, to present, including, but not limited to any communications, guidance, advisories, directives, trainings, or instructions.

25.     Your knowledge regarding the changing demographics of Texas voters or voter turnout by particular demographic groups, including but not limited to, racial or ethnic minorities, persons with limited English proficiency, persons with disabilities, or partisan affiliation;

26.     All pleadings filed by you in this or any related lawsuit.

27.     All discovery responses served by you in this or any related lawsuit.

28.     All documents produced by you, including privilege logs, in this or any related lawsuit.

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2023, I provided an electronic copy of the foregoing Deposition Notice to counsel of record.

*/s/ Nina Perales*
Nina Perales

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, *et al.,* | § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Civil Action No. SA-21-CV-00844-XR |
| GREGORY W. ABBOTT, *et al.,* | § § | |
| *Defendants.* | § § | |

**CONSOLIDATED PLAINTIFFS' NOTICE OF INTENT TO TAKE**
**ORAL DEPOSITION OF CINDY SIEGEL**

**TO: Cindy Siegel,** by and through John M. Gore, Jones Day, 51 Louisiana Avenue, N.W., Washington, D.C. 20001 and to All Counsel of Record.

**PLEASE TAKE NOTICE** that pursuant to Rule 30 of the Federal Rules of Civil Procedure, counsel for the Consolidated Plaintiffs will take the oral deposition of Cindy Siegel on February 28, 2023, at 8:30 am (CST) at the offices of Javier N. Maldonado & Associates, P.C., 1415 North Loop W., Suite 600, Houston, TX 77008 (Andromeda Conference Room on the Mezzanine Level). The deposition shall be recorded by stenographic means and may also be recorded by additional audiovisual means, and shall take place before a notary public or other person authorized by law to administer oaths. Plaintiffs reserve the right to utilize any videotaped deposition at trial in lieu of live testimony, or in addition to live testimony, and/or for any purpose permitted under the Federal Rules of Civil Procedure and Federal Rules of Evidence.

1


EXHIBIT
2
2/28/23
PENGAD 800-631-6989

The Consolidated Plaintiffs further request that Ms. Siegel produce, at least two days in advance of the deposition, all documents, if any, that she reviewed in preparation for the deposition.

Dated:  February 23, 2023                    Respectfully submitted,

                                             */s/ Nina Perales*
                                             Nina Perales
                                             Julia R. Longoria
                                             Fátima L. Menéndez
                                             MEXICAN AMERICAN LEGAL DEFENSE AND
                                             EDUCATIONAL FUND
                                             110 Broadway, Suite 300
                                             San Antonio, TX 78205
                                             Telephone: (210) 224-5476
                                             Facsimile: (210 224-5382
                                             nperales@maldef.org
                                             jlongoria@maldef.org
                                             fmenendez@maldef.org

                                             Michael C. Keats*
                                             Rebecca L. Martin*
                                             Jason S. Kanterman*
                                             Kevin Zhen*
                                             FRIED, FRANK, HARRIS, SHRIVER
                                             & JACOBSON LLP
                                             One New York Plaza
                                             New York, New York 10004
                                             Telephone: (212) 859-8000
                                             Facsimile: (212) 859-4000
                                             michael.keats@friedfrank.com
                                             rebecca.martin@friedfrank.com
                                             jason.kanterman@friedfrank.com
                                             kevin.zhen@friedfrank.com

                                             *Counsel for Plaintiffs La Unión del Pueblo Entero,*
                                             *Southwest Voter Registration Education Project,*
                                             *Mexican American Bar Association of Texas, Texas*
                                             *Hispanics Organized for Political Education, Jolt*

2

*Action, William C. Velasquez Institute, FIEL Houston, Inc.*

\* Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2023, I provided an electronic copy of the foregoing Deposition Notice to counsel of record.

*/s/ Nina Perales*
Nina Perales