# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| V. | § | |
| | § | Case No. 5:21-cv-00844-XR |
| STATE OF TEXAS, *et al.*, | § | [Lead Case] |
| | § | |
| *Defendants.* | § | |
| | § | |
| HARRIS COUNTY REPUBLICAN PARTY, *et al.*, | § | |
| | § | |
| *Intervenor-Defendants.* | § | |

## LUPE PLAINTIFFS' COUNTER-DESIGNATIONS
## TO STATE DEFENDANTS' DEPOSITION DESIGNATIONS

```
 1  _____      __    _____
                                      )(
 2  UNITED STATES OF AMERICA,         )(
            PLAINTIFF,                )(
 3                                    )(    CASE NO.
    VS.                               )(    5:21-cv-1085-XR
 4                                    )(
    THE STATE OF TEXAS, ET AL.,       )(
 5          DEFENDANTS.               )(
    _____      __    _____
 6
```

 7              ------------------------------------

 8              ORAL AND VIDEOTAPED DEPOSITION OF

 9                      YVONNE RAMON

10                     APRIL 21, 2022

11              ------------------------------------

12              ORAL AND VIDEOTAPED DEPOSITION OF YVONNE

13  RAMON, produced as a witness at the instance of the

14  STATE DEFENDANT, and duly sworn, was taken in the

15  above-styled and numbered cause on April 21, 2022, from

16  10:06 a.m. to 4:26 p.m., before Maribel Hernandez, CSR

17  in and for the State of Texas, reported by machine

18  shorthand at the Offices of Texas Attorney General,

19  Child Support Division, Pharr Regional Office, 3508

20  North Jackson Road, Pharr, Texas, pursuant to the

21  Federal Rules of Civil Procedure and the provisions

22  stated on the record or attached hereto.

23

24

25

Yvonne Ramon                                            April 21, 2022
                                                            Page 12

```
 1        A.   I would hope so, yes.
 2        Q.   Okay.  Do you recall, other than the documents
 3   you just described, any specific documents?
 4        A.   Specifically, just what I mentioned, the -- the
 5   specific e-mails and -- and webinar presentations.
 6        Q.   Okay.  Let's go through a little bit of your
 7   background for the benefit of the Court.  What is your
 8   current title?
 9        A.   I'm the elections administrator for the County
10   of Hidalgo.
11        Q.   Okay.  And where exactly is Hidalgo County
12   located?
13        A.   Hidalgo County is in the southern most part of
14   the state of Texas.  We are a large county, one of the
15   ten largest counties in the south most part of -- of
16   Texas.  In fact, we're not right at the tip, but right
17   next to -- door to it.
18        Q.   Okay.  Border adjacent, right?
19        A.   Border adjacent to Tamaulipas.
20        Q.   Okay.  And Reynosa is on the other side of the
21   border?
22        A.   Reynosa is our border town.
23        Q.   With regard to being the elections
24   administrator, are you an employee of Hidalgo County?
25        A.   I am.
```

1      Q.  Okay.  Did Hidalgo County make any changes to

2  any of its voting operations on account of the pandemic?

3      A.  We definitely did.

4      Q.  Can you walk me through those?

5      A.  Uh-huh.  In regards to COVID and the safety

6  measures, we looked for locations that provided more

7  space.  There are those areas with our small cities and

8  schools that don't have those locations, so -- have

9  those larger locations.

10             So we did contract and work with our

11  community.  For example, we used the Bert Ogden arena,

12  and there were very, very helpful in training.  And so

13  instead of training in small classrooms the way we were

14  used to doing, we actually were lent that huge arena for

15  training, so that was number one.  And then on election

16  day, they also afforded that arena for voting.

17      Q.  Okay.

18      A.  And so that's what we were doing.  We were

19  looking for locations, asking our local entities, school

20  districts and cities for changes in rooms, and so -- so

21  many of them did.  They were able to afford us a

22  gymnasium instead of, you know, a small office.  And so

23  we -- we worked very, very hard at trying to secure and

24  procure larger areas.

25      Q.  For the benefit -- for the benefit of the

Yvonne Ramon

April 21, 2022
Page 29

```
 1  Court, Bert Ogden is a Ford dealership, right?
 2      A.   Bert Ogden is actually a huge arena in which
 3  they have concerts, and, yes.  You ought to drive by.
 4  It's huge.
 5      Q.   I've seen a hockey game there before back when
 6  you guys had the hockey team, but I -- I guess what I'm
 7  trying to get across to the Court is, so Bert Ogden is a
 8  car dealer --
 9      A.   Yes, they are.
10      Q.   -- right?  And so Bert Ogden also sponsors the
11  arena, right?
12      A.   Yes.
13      Q.   Are you aware that it's also called the Ford
14  center?
15      A.   I was not aware.
16      Q.   Okay.  Do you know what kind of -- what kind of
17  events are hosted at that -- at the arena?
18      A.   I know they have concerts, and as you
19  mentioned, I don't know if they have basketball anymore.
20  I don't know where the Vipers are, but it is a large
21  venue, so --
22      Q.   Okay.  They had the d-league, right?
23      A.   The what?
24      Q.   The d-league?  The Vipers?
25      A.   Yes.
```

```
 1        A.  No.

 2        Q.  And I want to ask that more globally.  So

 3   understand what I'm asking you, I don't want a cabinet

 4   to the language I'm using, I want to make sure I'm not

 5   missing some term of art that's used in Hidalgo County.

 6             What I'm asking you is, have you ever been

 7   asked to engage in any analysis of impacts on any

 8   demographic group as it relates to voting in Hidalgo

 9   County?

10        A.  No.

11        Q.  Okay.  Do you understand what I'm saying by

12   that?

13        A.  I do.

14        Q.  Okay.  How long have you lived in the Valley?

15        A.  All my life.

16        Q.  Okay.  Would it be fair to say that there's a

17   large Hispanic community in the Valley?

18        A.  Yes.

19        Q.  Okay.  And what would you estimate, if you're

20   able, the number of Hispanic residents in the Valley?

21        A.  I'm not even --

22             MS. RAMIREZ  Object to population.

23             MR. HUDSON:  Okay.

24             MS. RAMIREZ:  I mean, object to form.

25   Sorry.
```

```
 1        Q.  (BY MR. HUDSON)  Okay.  Would it be fair to say
 2   that the Hispanic community is the majority population
 3   in the Valley?
 4        A.  That would be fair.
 5        Q.  Okay.  Have any voters requested that you allow
 6   them to vote using drop box voting?
 7        A.  No.
 8        Q.  Has any voter in Hidalgo County, to your
 9   knowledge, requested that they be able to vote using
10   drive-through voting?
11        A.  No.
12        Q.  What about 24-hour voting?
13        A.  No.  Not to my knowledge.
14        Q.  Had -- has there been any demand for any other
15   voting method by any voter that you're aware of?
16                MS. PERALES:  Objection; form.
17        A.  Not that I'm aware of.
18        Q.  (BY MR. HUDSON)  Okay.  Do you know who sets
19   the voting procedures for state elections?
20        A.  The Secretary of State's office.  The Elections
21   Division.
22        Q.  And when you say they set the voting
23   procedures, what do you mean by that?
24        A.  We receive guidance from the Secretary of
25   State's office, the Elections Division, who has a
```

1  director and a team of legal attorneys that we are able

2  to call and receive guidance from.

3       Q.  Let me ask you this.  Are you familiar with

4  early voting ballot boards?

5       A.  Yes.

6       Q.  Who establishes early voting ballot boards in

7  Hidalgo County?

8       A.  Uh-huh.  The parties, every two years submit

9  lists to my department which are then taken to

10 Commissioners Court, and in a sense it creates a pool of

11 workers from which we draw.

12      Q.  Okay.

13      A.  And then from there, every election, they also

14 submit the early voting ballot board members and this is

15 for each election.  Was that your question, again?

16      Q.  That is my question.

17      A.  So they submit the names, and depending on the

18 election -- and I don't have that chart in front of

19 me -- but it'll be either the county election board or

20 the Elections Commission Board if it's a primary

21 election versus a constitutional election, that the

22 form -- the list is submitted to and approved or

23 Commissioners Court.  So it's three bodies that would

24 then accept their list.

25      Q.  Okay.

1        Q.  What is your -- well, what -- what does a
2    fiscal year look like for your office?
3        A.  January 1st through 12/31.
4        Q.  All right.  So you do a calendar-year budget?
5        A.  Yes.
6        Q.  Okay.  What is your annualized budget for 2022?
7        A.  For 2022, it's 1,900,000.
8        Q.  Okay.  How much of that is designated for voter
9    registration?
10       A.  There is no designation.  It's the cost of
11   administering and running the department that I'm able
12   to utilize.
13       Q.  Okay.  What portions of elections operations do
14   you -- does your office pay for using the budget that
15   you're allotted?
16       A.  What do you mean?  If you could clarify.
17       Q.  Sure.  So let me give you an example.  In the
18   March 22 primaries, I understand that the political
19   parties are responsible for operating and paying for
20   their primaries; is that right?
21       A.  Only election day.
22       Q.  Okay.  So to the extent that you're assisting
23   on early voting, for instance, in the primaries, how
24   much of your budget was devoted to paying for early
25   voting in March of '22?

Yvonne Ramon

April 21, 2022
Page 45

1      A.  So the question is how much did it cost me to

2  run early voting?

3      Q.  Yes.

4      A.  I -- I don't have that number in front of me.

5      Q.  Okay.  Do you still have some money left in

6  your budget?

7      A.  Do I have some?  Very little, but yes.

8      Q.  Okay.  So it -- it -- it costs something less

9  than 1.9 million --

10      A.  Yes.

11      Q.  -- to operate ear -- early voting?

12      A.  Yes.

13      Q.  Okay.  You're also going to be running May 7th

14  elections; is that right?

15      A.  That's correct.

16      Q.  Do you have enough money to operate that

17  election?

18      A.  We do have enough money for that.

19      Q.  How much is that costing you?

20      A.  Again, I -- I don't have that in front of me.

21  We -- I will, because we do create a cost, but at this

22  point, there has been no time.

23      Q.  Okay.  You're also going to be operating a May

24  primary toward the end of May, right?

25      A.  Yes.

 1      Q.  Are you going to have enough money for that?

 2      A.  We will.

 3      Q.  Okay.  What about the general election in 2022?

 4      A.  By then, we probably won't.

 5      Q.  Okay.  So you anticipate using your

 6  $1.9 million budget by having to request additional

 7  funding to operate the November '22 election; is that

 8  right?

 9      A.  Yes.  Yes.

10      Q.  Do you consider yourself underfunded as an

11  office?

12              MS. RAMIREZ:  Object to form.

13      A.  Yes.

14      Q.  (BY MR. HUDSON)  You said you were allotted

15  $1.9 million in 2022; is that right?

16      A.  Yes.

17      Q.  All right.  Is that the same budget you were

18  allotted in '21?

19      A.  No.

20      Q.  How much did you receive in 2021?

21      A.  A little over 900,000.

22      Q.  All right.  So your budget more than doubled

23  between 2021 and 2022; is that right?

24      A.  Yes, because the elections doubled.

25      Q.  Okay.  And how much were you allotted in 2020?

1          A.  I didn't look that far.

2          Q.  Okay.  So when you say the elections doubled,

3    what do you mean by that?

4          A.  Well, in -- in even-numbered year, the

5    elections start -- the early birds vote don't starts as

6    early as February, while in an odd-numbered year, the

7    elections start in May.  Well, actually the early voting

8    starts in the latter part of April and we have election

9    in May.

10                 And then in an odd-numbered year, it's a

11   constitutional election in November, which is a low

12   voter turnout versus an even-numbered year, which is

13   either presidential or gubernatorial, which is a higher

14   voter turnout and therefore costs more.

15         Q.  How much did you request in funding for the

16   2022 physical year?

17         A.  I -- I -- I don't have that in front of me.

18   We --

19         Q.  Was it more than 1.9 million?

20         A.  Yes.

21         Q.  Okay.  Was it more than 2.9 million?

22         A.  Probably the needs are probably around two and

23   a half.

24         Q.  And when you say the needs, can you describe

25   for the Court what the needs are in the 2022 election

1   cycle?

2       A.  At the beginning -- well, actually the budget

3   cycles is in the summer prior to the need -- the budget

4   being awarded, and at that point, we are estimating the

5   cost of our different softwares, our programs, our

6   warranties or guarantees, our -- everything, and so we

7   were able to put this into the portal.  And we have to

8   guesstimate because until that particular software comes

9   due and is renewed, we won't really know how much it

10  costs.

11      Q.  When you say you put it in the portal, what do

12  you mean by that?

13      A.  The budget office has a portal in which when

14  it's budget season, they ask each department to begin to

15  work at submitting their budget proposals.

16      Q.  All right.  Your budgets are public, I presume?

17      A.  Yes.

18      Q.  Okay.  You said you're on the Texas Association

19  of Elections Administrators Legislative Committee; is

20  that right?

21      A.  Yes.

22      Q.  With regard to budgets, are there any other

23  county elections administrators that you've heard from

24  or about who have voiced concern about being

25  underfunded?

```
 1        A.  No.
 2        Q.  So every other elections administrator that you
 3   know of has no budget problems?
 4        A.  I'm sure they do --
 5             MS. RAMIREZ:  Object to form.
 6        A.  -- but it's -- it's not what we've discussed
 7   during the legislative committee.
 8        Q.  (BY MR. HUDSON)  okay.  Have you ever heard
 9   outside of that committee any -- from any elections
10   administrators who suggested they feel that they are
11   underfunded for what they have to do?
12        A.  Yes.
13        Q.  How many?
14        A.  I don't know how many.  It's --
15        Q.  Do you recall any particular elections
16   administrators who've shared that information with you?
17        A.  Not any particular, but definitely we're --
18   we're dealing with unfunded mandates and that has put a
19   strain, additional strain.
20        Q.  Let's go back to the Elections Administrators
21   Legislative Committee.  Was the committee in operation
22   during the 87th regular session?
23        A.  Yes.
24        Q.  How long was it in operation during the 87th
25   regular session?
```

1          Q.  Okay.  And for the record, when I refer to

2    Senate Bill 1, do you understand that I'm referring to

3    legislation offered and passed in the second special

4    session of the 87th legislative session?

5          A.  I understand.

6          Q.  So why hasn't TAEA taken a position, to your

7    knowledge, on SB 1?

8               MS. RAMIREZ:  Object to form.

9          A.  Senate Bill 1 is quite vast, and so as an

10   organization and as Texas being 254 counties in which

11   each county is very unique and the needs are unique, we,

12   as an organization, try to take positions that would

13   benefit as much as possible the entire state and not

14   just individuals.

15               So because it's so vast, it's -- there are

16   various parts of the bill that they would go and speak

17   to, but not the entire bill because it's too great.

18          Q.  (BY MR. HUDSON)  And so the record is clear, by

19   great you mean size wise?

20          A.  Size wise.

21          Q.  All right.

22          A.  There is so much to it.

23          Q.  Let me ask you, Yvonne Ramon, are there any

24   pieces of Senate Bill 1 that you like?

25          A.  I have appreciated the opportunity given to the

```
 1   several pieces because then the voter is instructed to

 2   mail it back.  And so there are four very important

 3   pieces, color coded everything that has to do with this

 4   mail ballot kit in a sense, which when that ballot is

 5   coming back to the office, it's called the carrier

 6   envelope.

 7        Q.  Okay.  I forgot to ask this.  Let me go back

 8   before I keep going down the line here.  TAEA, we have

 9   254 counties in Texas.  You would agree with that?

10        A.  Yes.

11        Q.  Are -- do each one of those counties have

12   elections administrators?

13        A.  No.

14        Q.  Okay.  Are there any counties that have

15   elections administrators who are not members of TAEA?

16        A.  Yes.

17        Q.  Okay.  Can you -- do you have any kind of

18   estimate of the number?

19        A.  I'm no longer part of the board.  I used to

20   keep up with that because I was a member of the board,

21   so I don't have that number right now.  I know that it's

22   growing because of the need to support one another,

23   especially with these changes.

24             I think last time, and it's -- and it's

25   already been a few months, I think the number was like
```

Yvonne Ramon

April 21, 2022
Page 58

1   137 members, so 137 counties, now keeping in mind that

2   not all of them have an EA.  Some will have a county

3   clerk that runs elections.  Some of them will have a --

4   a tax assessor that runs elections.  Not all are the

5   same, and they are also members of TAEA.

6        Q.  Is Dallas a member to your knowledge?

7        A.  Yes.

8        Q.  What about Houston?

9        A.  Yes.

10       Q.  Well, Harris County?

11       A.  Yes.

12       Q.  What about city of Houston?

13       A.  Yes.

14       Q.  City of Dallas?

15       A.  Yes.

16       Q.  What about El Paso County?

17       A.  Yes.

18       Q.  City of El Paso?

19       A.  Not the city.

20       Q.  Okay.

21       A.  And I said -- you said city of Houston, no.

22  It's just the county.

23       Q.  Okay.  Just Harris County?

24       A.  Yes.

25       Q.  Okay.  What about Travis County?

Yvonne Ramon

April 21, 2022
Page 59

```
 1          A.   Yes.

 2          Q.   Bexar County?

 3          A.   Yes.

 4          Q.   Hidalgo, obviously?

 5          A.   Yes.

 6          Q.   What about Cameron?

 7          A.   Yes.

 8          Q.   Willacy?

 9          A.   No.

10          Q.   You don't have the entirety of the Valley in

11   the TAEA?

12          A.   No.

13          Q.   Okay.   What about Starr --

14          A.   Yes.

15          Q.   -- Starr County?   Starr County, surely, right?

16          A.   Yes.

17          Q.   Okay.

18          A.   They have a new EA in Willacy, so we need to go

19   knocking.

20          Q.   Remi doesn't live out there to help them?

21          A.   Right.   I need to tell him.

22          Q.   Let's see.   Did you provide any testimony to

23   the legislature concerning SB 1?

24          A.   In person, no.

25          Q.   What about in writing?
```

Yvonne Ramon

April 21, 2022
Page 60

1      A.   There was one letter that I signed as previous
2   president where all the board signed.
3      Q.   Okay.   But in, when you're talking about the
4   board, you're talking about the board of the TAEA?
5      A.   That's correct.
6      Q.   Let's talk about a little bit about the
7   relationship between TAEA and the Texas Association of
8   Counties that you referenced earlier.   Can you explain
9   to the Court what that relationship is?
10      A.   It's a great relationship.   Texas Association
11   of Counties also gives us support in part of the
12   legislative committee, helps in hosting any -- any
13   meetings that we would have, helps us -- we didn't get
14   to with COVID, but in prior years we would have a meet
15   and greet when the new legislative committee would be
16   named.
17           And they would be instrumental.   They're
18   able to give us advice and they're there, so it's --
19   it's a very positive relationship.
20      Q.   I believe you mentioned that the Texas
21   Association of Counties looks to TAEA for guidance on
22   elections matters; is that right?
23      A.   Yes.
24      Q.   How does the TAEA convey information about
25   elections matters to the Texas Association of Counties?

1      A.  The Texas Association of Counties hosts a

2  listserv for all elections officials, and through this

3  listserv of e-mails, they are able to ask for physical

4  note estimates on what a bill would cost down the line,

5  able to ask for -- or/and ask questions of us, and so

6  it's through this listserv that they, in fact, support.

7      Q.  Are you familiar with anyone from TAEA

8  providing any guidance on what a bill would or would not

9  do on the listserv to the Texas Association of Counties?

10     A.  Yes.

11     Q.  Okay.  What about opinions about particular

12  bills with regard to information conveyed to the Texas

13  Association of Counties?

14     A.  Yes.  And -- and it would not just be to the

15  Texas Association of Counties, but on the listserv, not

16  everyone is a member.  It's all elections administrators

17  have access to this.

18     Q.  When you say all elections administrators --

19     A.  254 counties and their employees.

20     Q.  Okay.  Well, we talked earlier today though

21  that not just the counties have elections

22  administrators, right?  Is that right?

23     A.  That's correct.

24     Q.  Okay.

25     A.  So county clerks, district clerks.

Yvonne Ramon

April 21, 2022
Page 62

1      Q.  So county clerks, district --

2      A.  Uh-huh.

3      Q.  -- clerks, city clerks?

4      A.  No.

5      Q.  No?  Are there elections administrators for

6  things like water boards?

7      A.  I'm not aware, but they're -- I'm not aware

8  that they would be able to sign up on this listserv.

9      Q.  Okay.  What about irrigation districts down

10  here in the valley?

11      A.  No.

12      Q.  Aside from signing a letter issued by TAEA

13  concerning the legislatures consideration of Senate Bill

14  1, or SB 1, did you provide any separate testimony?

15      A.  No.

16      Q.  Okay.  Did you attend any of the hearings in

17  person?

18      A.  Not in person.

19      Q.  Did you watch any of the hearings on Senate

20  Bill 1 remotely?

21      A.  Yes.

22      Q.  Which ones?

23      A.  First session, Senate Bill 7, Senate Bill 598,

24  Senate Bill 1111, and, of course, later on Senate Bill

25  1, and others that weren't election related because they

Yvonne Ramon

April 21, 2022
Page 63

```
 1   don't always go in a continuum of topics.
 2        Q.  Yes.  Sometimes they're all over the map.
 3        A.  Yes.
 4        Q.  Can you remind me, what is Senate Bill 598?
 5        A.  That -- that requires and mandates that all 254
 6   counties by November of 2026, be auditable in their
 7   voting equipment, which means that it must have a paper
 8   trail.
 9        Q.  Okay.  You're going to make it?
10        A.  We made it.
11        Q.  Already?
12        A.  Yes.
13        Q.  Good.  Congratulations.
14        A.  Thank you.
15        Q.  Let me ask you.  Have you personally spoken
16   with any -- anyone, any elected officials in the Texas
17   legislature, House, Senate, like of anybody about Senate
18   Bill 1?
19        A.  Bobby Guerra, our state rep.
20        Q.  Okay.  Anyone else?
21        A.  No.
22        Q.  When did you meet Mr. Guerra?
23        A.  It was by phone.
24        Q.  Okay.
25        A.  And I -- I don't remember exactly when, but it
```

1   was in the summer.

2        Q.   That was related to Senate Bill 1, right?

3        A.   More related to Senate Bill 7 and -- and then,

4   of course, in conjunction with Senate Bill 1.

5        Q.   Okay.  So let me see if I can refresh you a

6   little bit.  Session signed out was May 31.  First

7   called special was June through July, and second, I

8   believe, was August through September.  Does that sound

9   about right?

10       A.   Yeah.

11       Q.   Okay.  I'll represent to you that that's my

12  rough estimate of the timing of that.  Does that

13  refresh -- does that trigger ring any bells about when

14  you might have talked to Mr. Guerra?

15       A.   Not exactly, no.

16       Q.   Okay.  But you think it was sometime in the

17  summer?

18       A.   I believe so.

19       Q.   Okay.  And so -- so we're clear on what the

20  summer is, what is the summer here in the Valley?

21       A.   June, July and August.

22       Q.   Okay.  I know it always feels like the summer,

23  right?

24       A.   12 months out of the year.

25       Q.   Okay.  Aside from Representative Guerra, did

 1      Q.  And then prior to Senate Bill 1's passage, did
 2 you speak with anyone at the Secretary of State's office
 3 concerning Senate Bill 1?
 4      A.  I would have to say yes in regards to the fact
 5 that I'm on the advisory committee.
 6      Q.  Okay.
 7      A.  So --
 8      Q.  With whom did you speak?
 9      A.  Christina Adkins is the heed of legal, and
10 usually Mr. Keith Ingram is on the call, and they have
11 their other directors usually on the call as well.  Not
12 everyone speaks.  I perhaps wouldn't always speak
13 either, but we're on the call.
14      Q.  Okay.  When you say you're on the advisory
15 committee, can you describe to the Court what that
16 advisory committee is?
17      A.  A few years back, and I was trying to remember
18 this morning when this advisory committee was formed,
19 but it's been at least two to three years, Mr. Ingram
20 and -- and Ms. Adkins asked 20, 22 county
21 representatives to be part of an advisory committee
22 where they could bounce ideas off of and help with any
23 forms, ideas.  And so I was asked to be on the committee
24 and I said yes.
25      Q.  Can you identify for the Court any other

 1   members of the advisory committee?

 2        A.   Mr. Remi Garza next door, Ms. Jacque Callanen,

 3   Chris Davis from Williamson County, Ms. Anderson from

 4   Hays County.  County clerk -- I can't remember her --

 5   her name.  We have several.  She's one of the county

 6   clerk representatives for legislation for county clerks.

 7   I'll -- I'll remember her name in a minute.  On this

 8   side, Hyder -- Hyder from Tarrant County.  Lisa Wise

 9   from El Paso.  Let's see.  I think Dallas County

10   Scarpello is on as well.  I can't recall any others.

11        Q.   What's your understanding of why there's an

12   advisory committee?

13        A.   I'm sorry?

14        Q.   What is your understanding of why there's an

15   advisory committee with the Secretary of State's office?

16        A.   Uh-huh.  My understanding is that they wanted

17   our opinions on what was forthcoming, how things were

18   being handled, so it's -- it's a very safe and good

19   discussion type of committee.

20        Q.   Did you watch any of the testimony or hearings

21   on Senate Bill 1?

22        A.   Yes.

23        Q.   Okay.  Obviously, there were many hours of

24   testimony.  Can you give me a ballpark of how much

25   you -- you might have watched?

 1  of knowledge of who the voters are in their area, and --

 2  and so they're hired to possibly help electioneer and

 3  distribute materials, which are all legal in as far as

 4  electioneering.  That's the extent.

 5      Q.  Are you -- do you have any -- do you personally

 6  know any politiqueras in Hidalgo County?

 7      A.  When I first came, they would visit me every

 8  day.  I don't remember their names because they don't

 9  come visit me anymore.

10      Q.  Why did politiqueras come visit you when you

11  first started?

12      A.  Everyone wanted to see who I was.

13      Q.  Why did they stop coming?

14      A.  Because they got to know me.

15      Q.  Fair enough.  You're not aware of any

16  politiqueras being prosecuted in Hidalgo County by

17  federal authorities?

18      A.  I do not.

19          MS. RAMIREZ:  Object to form.

20      Q.  (BY MR. HUDSON)  Okay.  What about in Cameron

21  County?

22      A.  I am not.

23      Q.  Okay.  You're not aware of any published

24  articles concerning prosections of politiqueras across

25  the Valley in the early 2010s?

1               MS. PERALES:  Objection; form.

2               MS. RAMIREZ:  Object to form.

3        A.  Yeah.  No.  I am not.

4        Q.  (BY MR. HUDSON)  Okay.  Has anyone ever

5   expressed to you in your role as elections administrator

6   that they're concerned about fraud in Hidalgo County

7   elections?

8               MS. PERALES:  Objection; form.

9               MS. RAMIREZ:  Object to form.

10       A.  Yes.

11       Q.  (BY MR. HUDSON)  Who?

12       A.  In -- was it 2016, I believe, and in 2020,

13  it -- it seemed to be an org -- organization of people

14  that were alleging that fraud was occurring, that people

15  were voting that shouldn't, that people were being

16  assisted that shouldn't, and I was aware of those calls.

17               In fact, I think we -- in 2016, there were

18  documents that were written.  In 2020, I had voters call

19  that felt that they were being accused of voting

20  fraudulently when, in fact, they weren't.  They were

21  being accused of not looking like a U.S. citizen.

22               No one ever wrote anything down.  These

23  were calls that I received where they were being accused

24  of such.  Pictures taken of people being driven to the

25  curbside voting inside the cars and of their licenses,

 1  and so they were concerned because of what was being

 2  said about them.

 3      Q.  Okay.  When you said there was an organization

 4  of people, is it a named organization?

 5      A.  No.  It just seemed to be a group of people

 6  that were at the poll locations.  For example, they

 7  weren't there in March, but they were there in 2020.

 8      Q.  Okay.  Are you able to give me a ballpark of

 9  how many people you believe were part of the

10  organizations?

11      A.  I'm not.

12      Q.  Okay.  You would agree we don't want fraud in

13  Texas elections, right?

14              MS. PERALES:  Objection; form.

15      A.  I'm sorry?

16      Q.  (BY MR. HUDSON)  You would agree we don't want

17  fraud in Texas elections, right?

18      A.  We don't.

19      Q.  Okay.  We want uniform elections?

20      A.  Exactly.

21              MS. RAMIREZ  Object to form.

22      Q.  (BY MR. HUDSON)  And we want voters to

23  understand how to vote?

24      A.  Yes.

25      Q.  And we want to help people vote to the extent

Yvonne Ramon

April 21, 2022
Page 76

```
 1   that we can in free and fair elections, right?

 2         A.  Yes.

 3         Q.  You're part of the TAEA still, right?

 4         A.  I am.

 5         Q.  Are you familiar with how the legislative

 6   process works?

 7         A.  Enough.

 8         Q.  Okay.  Do you have an opinion on whether

 9   legislators have to have a certain amount of evidence

10   before they're allowed to legislate on something?

11               MS. RAMIREZ:  Object to form.

12         A.  We wish.

13         Q.  (BY MR. HUDSON)  It's not your position though,

14   or you don't contend that there's a certain level of

15   proof that has to be before a legislator before a

16   legislator can draft a bill, for instance?

17               MS. PERALES:  Objection; form.

18               MS. RAMIREZ:  Object to form.

19         A.  That's true.

20         Q.  (BY MR. HUDSON)  Okay.  Do you think that

21   there's some level of proof that had to be provided

22   before Senate Bill 1 to be passed?

23               MS. RAMIREZ:  Object to form.

24               MS. PERALES:  Objection; form.

25         A.  I wouldn't be able to answer that.
```

```
 1                MR. HUDSON:  Do you want to go off the
 2   record for just a moment?
 3                MS. PERALES:  Sure.
 4                THE VIDEOGRAPHER:  Off the record at
 5   11:40 a.m.
 6                (Break taken.)
 7                THE VIDEOGRAPHER:  Back on the record at
 8   11:55 a.m.
 9        Q.  (BY MR. HUDSON)  Okay.  I'm going to hand you
10   what I'm going to mark as Defendant's 2, and I'll just
11   represent to you, or counsels in the room, I only have
12   three copies of this, but it's a copy of Senate Bill 1
13   that's publicly available on the Secretary of State's
14   website.  It's the signed copy that I'll be going
15   through.  If you want to take a look at that, let me
16   know when you're ready to discuss.
17                (Exhibit 2 marked.)
18        A.  I -- I've seen it.  I'm ready.
19        Q.  (BY MR. HUDSON)  If you could flip over to the
20   back page for me.  Do you see there where it's got
21   signatures?
22        A.  Yes.
23        Q.  We see we've got the signature from president
24   of the Senate, speaker of the House, secretary of the
25   Senate, chief clerk of the House, and the governor.  Do
```

 1  law?

 2      A.  Yes.

 3          MS. RAMIREZ:  Object to form.

 4      Q.  (BY MR. HUDSON)  And you're also required to

 5  make sure that elections that you oversee comply with

 6  state disability law?

 7      A.  Yes.

 8          MS. RAMIREZ:  Object to form.

 9      Q.  (BY MR. HUDSON)  To the extent that -- well,

10  let me ask you this.  Are you familiar with anyone ever

11  having requested what's referred to as a reasonable

12  accommodation?

13          MS. RAMIREZ:  Object to form.

14      A.  I am not aware that someone has requested a

15  reasonable accomodation.

16      Q.  (BY MR. HUDSON)  Okay.  Do you know what the

17  term reasonable accommodation means in the context of

18  disability rights?

19      A.  I wouldn't be able to define it.

20      Q.  Okay.  Let me ask you this.  Let's suppose

21  someone with a disability came to your office and said

22  that one of your processes for voting was impossible for

23  them on account of a disability.  Would you modify that

24  process for them so that they could vote?

25          MS. RAMIREZ:  Object to form.

```
 1    one, but --
 2         Q.  Who did you talk to from the Secretary of
 3    State's office who told you that?
 4         A.  I don't remember.  It's been many years that
 5    that request came to my office.  I probably had been the
 6    elections administrator for just a few years.
 7         Q.  Okay.
 8         A.  It's been that long.
 9         Q.  Let me ask you this.  If a blind voter came to
10    your office now and asked for a braille ballot, what
11    would you do?
12         A.  We would --
13              MS. RAMIREZ:  Object to form.
14         A.  -- not be able to provide one because Hidalgo
15    County does not have braille paper ballots.
16         Q.  (BY MR. HUDSON)  Well, would you do anything to
17    help that blind voter who asked for a braille ballot
18    vote?
19         A.  We would provide accommodation.  There are
20    always accommodations that are available to a person.
21         Q.  The voter that you're referring to from several
22    years back, did you ultimately help that blind voter to
23    vote?
24         A.  Yes.
25         Q.  Okay.  So they were able to vote in Hidalgo
```

1  Senate Bill 1 recognized, right?

2       A.  Yes.

3       Q.  Has it cost you more money to comply with

4  Section 3.09?

5       A.  It -- it costs more money than a location or

6  county that would open 8:00 to 5:00, for example.

7       Q.  Were you able to find the money to adhere to

8  the requirements of Senate Bill 1 with regard to the

9  hours in the March 22 primary?

10      A.  Yes, because this is something our

11 Commissioners Court approved many years ago, and so

12 it's -- it's part of our budget process already.

13      Q.  Okay.  And so you should have enough money to

14 comply with that -- the Senate Bill 1 in the May 7

15 elections, right?

16      A.  Yes.  We should have money enough, but there is

17 a but, right?  And I know --

18      Q.  I'll just tell you, I'm not trying to get you

19 in hot with the Commissioners Court, but -- but this is

20 relevant to --

21      A.  No.

22      Q.  -- to what I'm doing.

23      A.  No.  We -- we have a budget that is approved,

24 as I already mentioned the year before, and because

25 Senate Bill 1 was approved so late, and because the

Yvonne Ramon

April 21, 2022
Page 93

 1  forms were given to us so late, we had to pay all those

 2  changes with this year's budget.  So that's why we're

 3  short and that I sound hesitant, because we started off

 4  already spending money that was not previously approved.

 5       Q.  So it would have been helpful if you had, for

 6  lack of a better phrase, a longer runway to implement

 7  Senate Bill 1 than you were given?

 8       A.  Yes.

 9       Q.  Okay.  And that's what's caused, for instance,

10  the funding issues?

11       A.  Yes.

12       Q.  You would anticipate though that as Senate Bill

13  1 continues to cover elections, that the budget issues

14  would be resolved?

15       A.  We would be able to this year work better for

16  next year.

17       Q.  Okay.  And you'll also have voters who are --

18  are currently learning the law, would know it in the

19  future?

20       A.  Yes.

21       Q.  And you would expect them to have a better

22  understanding of how voting processes work?

23       A.  That is our hope.

24       Q.  Have you ever implemented changes in voting

25  procedures prior to the passage of Senate Bill 1?

1       A.   Yes.

2       Q.   Has it been your experience that voters take

3  time to learn the new processes?

4       A.   Absolutely.

5       Q.   In your experience, have voters been able to

6  learn the new processes?

7       A.   Sooner or later they do.

8       Q.   What kind of training does your office have in

9  place to train people on changes accompanying Senate

10  Bill 1?

11       A.   First and foremost is with our poll workers,

12  that we -- for new poll workers, we have a six, seven

13  hour training that they have to attend, and as they

14  become -- and then we place them -- it is our hope, it

15  doesn't always happen, but our plan that is in place is

16  to place them under experienced workers so that they

17  also train on the job, which is the best way to learn.

18            And I start letting our Commissioners Court

19  know as soon as I know about what's coming, what could

20  happen, and so I try my best to do that.  I know so many

21  people listen to Commissioners Court, and so I try to

22  put it out there in the universe so that people start to

23  ask questions.

24            And I try to let our Commissioners Court

25  know so that if someone asks them, they are better

1    prepared to respond.  And, of course, I have a great

2    public relations person who works wonders with press

3    releases and -- and works with the media very well.

4        Q.  Okay.  Now, just so the -- the Court's aware,

5    the changes that came from 3.09, I think you briefly

6    discussed them, but let's talk about them.

7        A.  3.09?

8        Q.  Yeah.  You would agree that Senate Bill 1 now

9    requires early voting be available on each weekday of

10   the early voting period that's not a legal state

11   holiday, right?

12       A.  Yes.

13       Q.  Which means not just on weekdays?

14       A.  That's right.

15       Q.  It also requires that early voting be open for

16   at least nine hours, right?

17       A.  Yes.

18       Q.  And there was no previous memo before?

19       A.  No.

20       Q.  So, for instance, an elections administrator

21   before Senate Bill 1, could open up a poll place for,

22   say, two hours?

23       A.  Yes.

24       Q.  That would be problematic?

25              MS. RAMIREZ:  Object to form.

1          A.  I would imagine, unless their community was

2   used to that.  I wouldn't be able to speculate.

3          Q.  (BY MR. HUDSON)  Okay.  Senate Bill 1 also

4   limited the hours between 6:00 a.m. and 10:00 p.m.,

5   right?

6          A.  Yes.

7          Q.  Have you ever started early voting before

8   6:00 a.m.?

9          A.  No.

10         Q.  Have you ever conducted early voting after

11  10:00 p.m.?

12         A.  No.  Well, only if that particular poll

13  location still has people in line, and every voter who

14  was in line by 7:00 p.m., which is now in Senate Bill 1,

15  too, by the way, but it was already part of the

16  recommendation from the Secretary of State that -- so we

17  even put a marker with the last person so that they are

18  able to vote because they were in line at 7:00.

19         Q.  Okay.  Have you ever actually seen that happen

20  that a person got in line at, say, 6:59 and was still

21  there after 10:00 p.m.?

22         A.  After 10:00 p.m., I -- I can't remember the

23  election, but it -- I've seen it once.  It was very,

24  very late.  People choose certain poll locations that

25  have a higher voter turnout than others.  So we'll have

 1   one that maybe has 10,000 voters and another that maybe

 2   has 30, and so we -- we try our best to have people

 3   understand that there are other locations, but sometimes

 4   they prefer to pick their own.

 5        Q.   Gotcha.  Do you know if that situation occurred

 6   before 2020?

 7        A.   Yes.

 8        Q.   Did it occur before 2020?

 9        A.   Yes.

10        Q.   Okay.

11        A.   I'm trying to remember the election.

12        Q.   In your opinion, does having uniform hours make

13   early voting easier?

14        A.   That's why we do it.

15        Q.   Does it make early voting more accessible to

16   voters?

17        A.   Yes.

18        Q.   Let me get you to turn to Page 18, Senate Bill

19   1.  This is Defendant's -- State Defendant's 2.  Take a

20   look at Section 3.10 and tell me what your understanding

21   of the change is with regard to Section 3.10.

22        A.   Again, it's what we were talking about where in

23   this case population matters and in which the county

24   clerk is the early voting clerk.  It now excludes the

25   city.  City secretary is the election administrator for

Yvonne Ramon

April 21, 2022
Page 101

```
 1        Q.  Okay.  Now, you would agree with me that
 2   provisions of Section 6.06 are not underlined in this
 3   provision, right?
 4        A.  No.
 5        Q.  And some provisions are underlined?
 6        A.  That's right.
 7        Q.  And some provisions are struck through?
 8        A.  Yes.
 9        Q.  Now on Page 55 at Line 9, it reads, An offense
10   under this section is a state jail felony.  Did I read
11   that correctly?
12        A.  Yes.
13        Q.  And if we look at Line 20 on Page 54, it reads
14   that Section 6.06, Section 86.0105, Election Code, is
15   amended by amending Subsections (a), (c), and (e), and
16   adding Subsection (f) to read as follows.  Did I read
17   that correctly?
18        A.  Yes.
19        Q.  So prior to Senate Bill 1, it was already a
20   state jail felony to get paid to assist voters; is that
21   right?
22        A.  Yes.
23        Q.  Okay.  So there's nothing new about that Senate
24   Bill 1?
25        A.  No.
```

1      A.   That's correct.

2      Q.   Let's flip to Section 5.04.   Let me get the

3    page number for you on Defendant's 2.   Page 37 of

4    State's Defendant's Exhibit 2.   Let me know when you get

5    there.

6      A.   I'm on Page 37.   What section?

7      Q.   Section 5.04.

8      A.   Okay.

9      Q.   Please read that section and tell me what your

10   understanding is of that provision.

11     A.   My understanding is that, for example, I am a

12   part of this because I am an officer employee that is

13   being asked not to distribute applications for ballot by

14   mail to a person who has not otherwise requested an

15   application.

16     Q.   Now, prior to 2022 when Senate Bill 1 became

17   effective, did you ever distribute unsolicited mail-in

18   ballots?

19     A.   One time.

20     Q.   When was that?

21     A.   It was for 2020.   The Elections Commission

22   Board had met and had requested that I take an item to

23   Commissioners Court, which was to send an application to

24   all 65 and older persons who are registered to vote, to

25   allow them an opportunity to try a ballot by mail

Yvonne Ramon                                          April 21, 2022
                                                         Page 104

1   process.

2        Q.   Okay And did you, in fact, send out the

3   unsolicited ballots?

4        A.   Yes, we did.   Not the ballots, the application.

5        Q.   The applications?

6        A.   Yes.

7        Q.   What was the result?

8        A.   We sent out -- because when Commissioners Court

9   approved and did give me the order to do this, we

10  went -- I went back to the office and we looked at all

11  65 and older.   We pulled a report and removed all 65 and

12  older that already had an annual application in place.

13  So it ended up being -- I believe it was about 57,000

14  and more voters that were sent an application --

15       Q.   Okay.

16       A.   -- to -- to use.

17       Q.   What did you understand the authority to be for

18  you to send out unsolicited ballots -- or app -- ballot

19  applications to people 65 and older?

20            MS. PERALES:   Objection; form.

21            MS. RAMIREZ:   Object to form.

22       A.   Ask me again.

23       Q.   (BY MR. HUDSON)   What did you understand your

24  authority to be to send out unsolicited ballot

25  applications to people 65 and older?

```
 1                MS. PERALES:  Same objection.
 2                MS. RAMIREZ:  Same objection.
 3       A.  It was not my authority.  It was Commissioners
 4   Court to decide.
 5       Q.  (BY MR. HUDSON)  So the Commissioners Court
 6   voted and directed you to send out unsolicited ballot
 7   applications?
 8       A.  Yes.
 9                MS. RAMIREZ:  Same objection.
10       Q.  (BY MR. HUDSON)  Would you have done that
11   absent direction from the Commissioners Court?
12       A.  No.
13       Q.  Why not?
14                MS. RAMIREZ:  Objection to form.
15                MS. PERALES:  Objection; form.
16       A.  We've never done that.
17       Q.  (BY MR. HUDSON)  Okay.
18       A.  It's -- we promote voting by mail.  We send out
19   press releases.  We try our best to let that community
20   of voters who qualify to utilize this, but we have never
21   done this.
22       Q.  Do you have any idea why the Commissioners
23   Court directed you to send out unsolicited ballot
24   applications?
25       A.  I don't.
```

Yvonne Ramon                                                    April 21, 2022
                                                                   Page 106

1              MS. RAMIREZ:  Object to form.

2              MS. PERALES:  Objection; form.

3       A.  As I mentioned, Elections Commission Board had

4   met and had asked me to take this item to Commissioners

5   Court to ask if, in fact, we would send that out.  The

6   understanding was 2020.  The community of elderly were

7   very, very susceptible to COVID and Hidalgo County had a

8   high percentage of COVID, people with COVID, and so this

9   was an act that they asked me to do and voted on it, and

10  they approved it and so I did.

11      Q.  (BY MR. HUDSON)  So your understanding is the

12  sole reason you were asked to do this was on account of

13  the pandemic?

14              MS. RAMIREZ:  Object --

15      A.  I believe part of it was -- was part of the

16  pandemic, because it kept those voters that did utilize

17  the mail ballot that had never done that the opportunity

18  to vote, which is what we all want, and, yet, be safe.

19      Q.  (BY MR. HUDSON)  Okay.  You say it was partly

20  on account of the pandemic.  Any other reasons that you

21  understood the elections commissioner asked you to take

22  the issue to the Commissioners Court?

23              MS. RAMIREZ:  Object to form.

24      A.  I would not -- I would not make an assumption.

25  I would not know.

 1   recipient of that unsolicited application may not know

 2   that it's coming, right?

 3                  MS. RAMIREZ:  Object to form.

 4       A.  Again, that's why we sent a letter.

 5       Q.  (BY MR. HUDSON)  Okay.  You didn't call the

 6   57,000 some-odd people that you sent unsolicited ballot

 7   applications to let them know a letter was coming, did

 8   you?

 9       A.  No.

10       Q.  You didn't let them know, the 57,000, that an

11   unsolicited ballot application was coming, did you?

12       A.  No.

13       Q.  Having never done that before, did you get any

14   responses that suggested there was any confusion amongst

15   people who had not solicited the ballot applications?

16       A.  No, because we sent a letter.

17       Q.  Okay.

18       A.  Which was approved by the State.

19       Q.  Let me get you to turn to Page 58 of State

20   Defendant's 2.

21       A.  Okay.

22       Q.  What is your understanding of what Section 7.04

23   changes about Texas election law?

24       A.  What line is that?

25       Q.  It starts on Line 26 of Page 58, and

1   unfortunately runs into about four more pages of --

2        A.   Okay.

3        Q.   -- up to 62.

4        A.   Okay.  Okay.  So the first part talks about

5   vote harvesting, which means that a person is receiving

6   some sort of benefit in regards to helping a person

7   vote.  And it has to do with in-person or mail ballot

8   because it's wherever there is an official ballot

9   present.

10            If there is no official ballot present,

11   then it does not apply to the -- this offense.  In other

12   words, if you're talking to someone, but there's --

13   about the upcoming election, but there's no official

14   ballot, there, this section does not apply.

15            The benefit could be not just monetary,

16   which is what most people think, but employment or any

17   type of benefit that would be given in exchange for

18   providing this assistance when there is an official

19   ballot present.  I'm on Line 10, on Page 60.  Do you

20   want me to keep going?

21        Q.   Actually, let me ask you one other question

22   before I get too far down the -- the road and I forget

23   to come back and ask about this.  Have you ever

24   personally helped someone who is either elderly or

25   disabled to vote?

Yvonne Ramon

April 21, 2022
Page 110

1    A.   Yes.

2    Q.   Have you ever had concern that a person who was

3  elderly would be more susceptible to influence if you

4  were assisting them in voting?

5    A.   Well, the person I've assisted is my mother,

6  and if you knew her, you would know that -- that there

7  is no -- one time she called me all mad because somebody

8  had ran after her trying to assist her and she says, I

9  don't need anybody's help, and walked in by herself.  So

10  that's my experience.

11    Q.   Gotcha.  Okay.  With regard to vote harvesting,

12  before we -- before we go further into this, we talked

13  earlier today about politiqueras, right?  Have you ever

14  heard of anybody refer to politiqueras as vote

15  harvesters?

16              MS. PERALES:  Objection --

17    A.   When I first started.

18              MS. PERALES:  Objection; form.

19    A.   Not anymore.

20    Q.   (BY MR. HUDSON)  Go ahead.

21    A.   When I first started in 2008, but not anymore.

22    Q.   Okay.  What do you think changed that changed

23  the way people refer to politiqueras?

24    A.   I don't know.  I don't know.  I think -- I

25  don't know.

 1  Would they be able to go on and access the application

 2  on your website?

 3       A.  At that point they would need assistance.

 4       Q.  Okay.  What about a person who's deaf?

 5       A.  They would be able to.

 6       Q.  Okay.  What about a person who is -- well, let

 7  me ask you this.  As I understand it, Hidalgo -- isn't

 8  Hidalgo County one of the counties that's required to

 9  prevent -- to print ballots in both English and Spanish?

10       A.  Yes.

11       Q.  Okay.  Are there any other languages that

12  you're required to print ballots in?

13       A.  No.

14       Q.  Okay.  Do you, in fact, print ballots in

15  English and Spanish?

16       A.  Yes.

17       Q.  Okay.  Is your website printed in both English

18  and Spanish?

19       A.  Yes.  You are able to translate.

20       Q.  Okay.  If someone were illiterate and needed

21  assistance from your office, what would you do?

22       A.  We would assist them in whatever way they would

23  request.

24       Q.  Are you aware of anybody in Hidalgo County

25  who's been unable to vote on account of being

 1   illiterate?

 2              MS. PERALES:  Objection; vague.

 3      A.  Again, they ask for assistance.  They know

 4   about assistance, and so --

 5      Q.  (BY MR. HUDSON)  Are you aware of any specific

 6   example of a person being unable to vote in Hidalgo

 7   County on account of being illiterate?

 8              MS. PERALES:  Objection; vague.

 9      A.  No, not specifically because the law allows the

10   assistant to read the ballot as well.

11      Q.  (BY MR. HUDSON)  Okay.

12      A.  Not just read, but mark as well.

13      Q.  Are you aware of any illiterate voters in

14   Hidalgo County who have successfully voted?

15              MS. PERALES:  Objection; vague.

16      A.  I would -- I would not be able to answer that.

17      Q.  (BY MR. HUDSON)  Okay.  Are you aware of anyone

18   with disabilities who's been unable to vote in Hidalgo

19   County?

20      A.  I am not aware of that.

21      Q.  Okay.  What about none native English speakers,

22   other than Spanish speakers, are you aware of anyone who

23   speaks the language other than English or Spanish who's

24   been unable to vote in Hidalgo County?

25              MS. PERALES:  Objection; vague.

Yvonne Ramon                                              April 21, 2022
                                                          Page 115

 1          A.  I am not aware of that.

 2          Q.  (BY MR. HUDSON)  Okay.  Are you aware of anyone

 3   who is a speaker of the language, other than English or

 4   Spanish, who has successfully voted in Hidalgo County?

 5              MS. PERALES:  Objection; vague.

 6          A.  I am not aware of that.

 7          Q.  (BY MR. HUDSON)  Are you aware of other

 8   languages being spoken in Hidalgo County other than

 9   English and Spanish?

10          A.  Yes.

11              MS. PERALES:  Objection; vague.

12          Q.  (BY MR. HUDSON)  What language?

13          A.  Chinese.  I've heard people speak Chinese,

14   Vietnamese.  I've heard people speak Vietnamese.

15          Q.  What -- what about Tagalog?

16          A.  Yes, with the Philippines.

17          Q.  Okay.

18          A.  Yes, we have a community.

19          Q.  Any -- any American Indian languages?

20          A.  I -- not -- other than a presentation where

21   they're performing, no.  I'm not -- not in conversation

22   or heard them.

23          Q.  Okay.  Again, you've been the elections

24   administrator for what, going on 14 years?

25          A.  Yes.

1      A.  Yes.

2      Q.  In addition to -- of all the provisions that

3  we've gone over today -- actually, let me ask this

4  globally as it relates to Senate Bill 1.

5              Can you tell me what steps your office has

6  taken to implement the provision of Senate Bill 1 since

7  it was passed?

8      A.  The first and foremost important step was to

9  educate my staff.  So I made sure that my staff was

10  participating in all webinars, any questions that they

11  had, we were meeting regularly, especially because the

12  forms were so late in passing.

13              I made sure that -- because the

14  application, we couldn't even get it printed until the

15  beginning of this year for ballot by mail, so we were

16  accepting applications that were old applications, but

17  they were able to write their IDs on the application,

18  and so we tried to work with our community, number one,

19  because things were not available.

20      Q.  Okay.

21      A.  You have to understand also we were in the

22  midst of a massive mail out, which is redistricting and

23  new cards being sent out.  And -- so there were quite a

24  few fires -- irons in the fire and so meeting with my

25  staff was key.  Calling the State with questions, I'm

1  sure we bombarded them because that's what we would ask

2  them to do if they had a question.  You have to

3  understand that changes as they interpreted the law were

4  made midway, and so that has been key as well.

5           The mandate to begin with, the carrier

6  envelopes, said we were not to touch the carrier.  We

7  were not to look at the ID.  We were not to remove that

8  perforated flap.  Ballot board would do that, and as

9  they read the law and changed the opinion of the

10 interpretation, then we were told remove it.  Start

11 contacting the voters.

12          So there were so many changes that it was a

13 constant trying to meet with my staff.  So changes in my

14 office, so many.  In the conference at the beginning of

15 year for TAEA, Mr. Keith Ingram said that every single

16 election form had a change, and so we did ask if we

17 could use the old forms because we could get the new

18 forms, and we were not given permission to do that.  At

19 least for a primary, so we had to be ready.  Were we

20 ready?  Yes, we were, but not the way we should have

21 been.

22      Q.  Would you contend that you complied with every

23 provision of Senate Bill 1 in operation of the March

24 primaries?

25      A.  To the best of our ability --

 1        Q.  (BY MR. HUDSON)  Okay.  You don't have any

 2   issue with Texas taking steps to make sure that

 3   noncitizens don't register to vote, do you?

 4        A.  I don't.

 5        Q.  Are you aware of any noncitizens who've

 6   attempted to register to vote in Hidalgo County?

 7        A.  In what period of time?

 8        Q.  Any period of time that you've been the

 9   elections administrator.

10        A.  Yes.

11        Q.  How many?

12        A.  I don't have a number.

13        Q.  More than one?

14        A.  Yes.

15        Q.  More than five?

16        A.  Yes.

17        Q.  More than ten?

18        A.  Yes.

19        Q.  How about more than 50?

20        A.  I would say probably.

21        Q.  Okay.

22        A.  And we're talking when I first started, not

23   now.

24        Q.  Sure.  More than 75?

25        A.  I don't know at that point.

```
 1        Q.  How did you come to learn that people who were
 2   noncitizens were attempting to vote in Hidalgo County
 3   elections?
 4        A.  At that time, I received a call and it -- I'd
 5   probably been the administrator for a couple of years,
 6   and it was an immigration official.  A person was
 7   getting ready to become a U.S. citizen, and their
 8   practice -- his practice was calling the elections
 9   office to see if this person had ever registered to
10   vote.
11             And then if, in fact, this person had
12   registered to vote, would -- did this person have voter
13   history.  And the person that he was inquiring on had
14   registered to vote and had voted.
15        Q.  Okay.  Do you recall the person's name that you
16   spoke with?
17        A.  I don't.
18        Q.  Do you recall the name of the voter who had
19   unlawfully voted?
20        A.  I don't.
21        Q.  Did you provide any notice to any district
22   attorney concerning that unlawful registration?
23             MS. RAMIREZ:  Object to form.
24        A.  At this point I called the Secretary of State's
25   office and what they instructed me to do was to send a
```

1  confirmation.  The confirmation is sent out, and if the

2  voter does reply, we act accordingly.  If the voter does

3  not reply, then within 30 days that voter is cancelled.

4       Q.  (BY MR. HUDSON)  Okay.  Do you know what

5  straight-ticket voting is?

6       A.  Yes.

7       Q.  What is straight-ticket voting?

8       A.  Straight-ticket voting is when a person was

9  able to select the entire selection of party candidates

10 during the November general and they were voting by

11 party instead of by individual candidate.

12      Q.  You would agree with me that there's no

13 particular party that is allowed to do straight-ticket

14 voting under state law anymore, right?

15      A.  There is.  It is not allowed.  That's correct.

16      Q.  Would you agree with me that straight-ticket

17 voting was eliminated in Texas in 2017?

18      A.  2017, yes, sir.  I believe is correct.

19      Q.  In your experience as the elections

20 administrator, have you formed any opinions about the

21 effect of the eliminations straight-ticket voting in

22 Hidalgo County elections?

23      A.  I have not.

24           MS. RAMIREZ:  Object to form.

25      Q.  (BY MR. HUDSON)  Okay.  Do you know if the --

1          Q.  Uh-huh.

2          A.  We do not have electronic signatures on file.

3          Q.  (BY MR. HUDSON)  Okay.  Have you ever signed

4    something on --

5          A.  Yes.

6          Q.  -- an electronic pad?

7          A.  Yes.

8          Q.  In your experience, does your signature on an

9    electronic pad look like one you would have if you wrote

10   it out by hand?

11         A.  Usually not.

12         Q.  And if we're trying to use signatures to verify

13   identity, it would make sense that you would want to use

14   identical signatures, right?

15         A.  Yes.

16              MR. WHITE:  Objection; form.

17              MS. RAMIREZ:  Object to form.

18         A.  And -- and we do.  We use the application

19   itself.

20         Q.  (BY MR. HUDSON)  Okay.  Let's move on to

21   number -- on Page 33 of State Defendant's 2, Section

22   5.02.

23         A.  Okay.

24         Q.  Go ahead and take a look at Section 5.02, which

25   runs from Line 16 of Defendant's 2 through Line 8 of

Yvonne Ramon                                              April 21, 2022
                                                              Page 136

 1   Page 35.

 2        A.   Okay.

 3        Q.   And let me know when you're finished.  I've got

 4   some questions for you about it.

 5        A.   I'm done.

 6        Q.   Are you familiar with Section 5.02?

 7        A.   Yes.

 8        Q.   And you agree with me that it amends

 9   Section 84.002 of the Election Code, right?

10        A.   Yes.

11        Q.   All right.  So I want to ask you a series of

12   questions about how ballot by mail worked in the March

13   22 primary.  Do you understand?

14        A.   Yes.

15        Q.   What is the current process for accepting

16   ballot applications after Senate Bill 1?

17        A.   The application must include the voters'

18   identification that matches the identification from

19   which the voter registered to vote.

20        Q.   Okay.  Can you explain to the Court what that

21   means in laymen's terms?

22        A.   For example, if I registered to vote at age 18

23   and now at my age, which is well over 65, I am going to

24   apply for ballot by mail.  I now have two IDs, my Social

25   Security and my driver's license.  I would have to match

1      A.  Yeah.

2      Q.  -- little too convoluted for you.

3      A.  Yeah.

4      Q.  So let me --

5      A.  And not necessarily.

6      Q.  Yeah.  And -- and let's -- let's so -- let's

7  talk about it this way.  Do you contend that there was

8  some number of people who had their application for

9  ballot by mail rejected on account of having a

10  mismatched identification number?

11      A.  Yes.

12      Q.  Okay.  Of that number who had their ballot

13  rejected by Hidalgo County Elections Administration,

14  were they given the opportunity to cure the defect?

15      A.  They were given the opportunity to cure the

16  defect, yes.

17      Q.  Do you know if anyone successfully navigated

18  the cure process to fix the problem?

19      A.  For the application, yes.

20      Q.  Do you know anyone who was unable to get an

21  application for ballot by mail on account of not having

22  matching identification numbers?

23      A.  I wouldn't be able to give you a number, but in

24  speaking to the staff that handled this, they didn't

25  keep logs on this, but they did say that they returned

1   some with the appropriate forms and some were not

2   returned back corrected.

3        Q.  Okay.  Now, you would agree with me that even

4   if you didn't get a ballot by mail application, you

5   could still vote in person?

6        A.  Yes.

7        Q.  Okay.  Do you know whether anyone who had their

8   ballot by mail application rejected received a form,

9   didn't return it, then voted in person?

10                MR. WHITE:  Objection; form.

11       A.  I would speculate, yes.  That I know for sure,

12   I cannot.

13       Q.  (BY MR. HUDSON)  Okay.  So as you sit here

14   today, you don't know of any specific example of anyone

15   prior to the March 22 primary who was unable to vote in

16   the March 22 primary on account of a mismatched

17   identification number?

18                MR. WHITE:  Objection; form.

19       A.  I would not be able to speculate.

20       Q.  (BY MR. HUDSON)  Okay.  And it would just be

21   speculation, right?

22       A.  Yes.

23       Q.  Okay.  Let's talk about the cure process.  I

24   believe you said that the cure process itself has been

25   helpful; is that right?

1      A.  Yes.

2      Q.  Okay.  Explain to the judge what the cure

3  process is.

4      A.  When a carrier envelope is determined to have

5  something wrong, because it's either the signature is

6  not there, the IDs are not there, the IDs don't match,

7  the ballot board is able -- because by know they're with

8  ballot board.

9           So the early voting ballot board is able to

10  contact the voter, and there are various ways, and let

11  them know that they can come and -- and correct the

12  error, or they still have time after the election day,

13  which is to cure, is six days after election day.  So

14  they have time to come and correct the error in order

15  that that carrier envelope be accepted for processing.

16      Q.  Okay.  Before we go into the specifics of that,

17  let me take a step back.  With regard to applications

18  for ballot by mail in your roughly 14 years as elections

19  administrator, prior to the passage of Senate Bill 1,

20  had you ever seen the application for ballot by mail

21  rejected for procedural defect?

22      A.  Yes.

23      Q.  Okay.  What kind of defects did you see prior

24  to the passage of Senate Bill 1?

25      A.  The application, for example, was requested,

Yvonne Ramon
April 21, 2022
Page 143

 1   but the person did not qualify.  And "did not qualify"

 2   can be different reasons.  Let's say that a person is

 3   not 65 years of age or older, did not mark that I'm

 4   disabled, and they have requested a ballot to arrive

 5   within the county.  Well, that would be a reject because

 6   you must request the ballot to arrive at a -- at an

 7   address outside the county in order to qualify if you

 8   were not 65 years of age or older or disabled.

 9        Q.  Okay.

10        A.  So that would be a reason for a rejection.  The

11   ballot board -- I'm sorry, we're still with the

12   application.  The -- the -- we receive the application.

13   The -- the processors review the information and they

14   may not be even registered voters of Hidalgo County, so

15   that would be a reject of -- of the application.

16        Q.  You would agree with me that people had

17   applications for ballot by mail rejected before the

18   passage of Senate Bill 1, right?

19        A.  Yes.

20        Q.  Okay.  And you would also agree with me that

21   Senate Bill 1 could not have been the cause of

22   rejections of applications for ballot by mail prior to

23   its passage, right?

24        A.  Yes and no because the largest number of

25   rejections this time around for March 2022 had to do

Yvonne Ramon                                      April 21, 2022
                                                  Page 145

 1      A.   Yes.

 2      Q.   Was there anything stopping any voter from

 3 putting all three pieces of information on the form?

 4           MS. RAMIREZ:   Object to form.

 5      A.   Again, I -- I -- I am not with the voter when

 6 they are filling this out.  My mom had a difficult time

 7 writing all that information down because I'm always

 8 harping on her about voter fraud -- about fraud and

 9 people trying to take her ID information and, you know,

10 not answering calls that aren't in her contacts.  So I

11 can only tell you what I know in first-hand knowledge

12 with -- with my own elderly mom --

13      Q.   (BY MR. HUDSON)  Sure.

14      A.   -- that did not want to give out that

15 information.

16      Q.   Okay.  Can a person who requests a ballot by

17 mail application come in person to request a ballot by

18 mail application?

19      A.   Before early voting begins.

20      Q.   Okay.  Is that true, both before and after the

21 passage of Senate Bill 1?

22      A.   Let me correct that.  A person can request a

23 application at any time.  What they cannot do is come to

24 the office to turn in that application once early voting

25 has begun, so let's clarify that.

 1   extent that they were listed?

 2       A.  Yes.

 3       Q.  Okay.  So let's say that the voter didn't

 4   respond.  What -- what are the next steps for the

 5   Hidalgo County elections administrator?

 6       A.  For this March 2022 election, once those steps

 7   that you'd described and that I told you about were

 8   done, that was the extent of our processes and

 9   procedures with so many new things upon us.  So we were

10   back to those carriers that were being returned and

11   people that were responding.

12       Q.  Okay.  There are other plans to expand the cure

13   process for ballot by mail applications in the future?

14       A.  I think we definitely will assess when we have

15   time after these two upcoming elections to put processes

16   and procedures in place that are more exact and in sync

17   with the -- what we're used to doing, which is anything

18   and everything we can do to contact these voters --

19       Q.  Okay?

20       A.  -- but it -- it takes discussion and reflection

21   and time.

22       Q.  Let's turn our attention back to the carrier

23   envelopes.  So I want you to take the judge through the

24   process of the formation of the early voting ballot

25   board, receipt of the mail ballots, and what happens in

1  that process.  So let's start with -- I know we talked

2  about this earlier, but the formation of the early

3  voting ballot board.

4      A.  Uh-huh.  So there are specific dates that the

5  Secretary of State recommends we set up a meeting with

6  the party chairs.  And so every two years, whether there

7  was a primary or no primary, we meet with the chairs and

8  we let them know that they need to be submitting

9  different lists of -- of workers, and we tell them that

10 they need to start thinking about their ballot boards as

11 well.

12              Although these lists of ballot board

13 members don't have to be taken -- not all of them, some

14 of them do, and like I tell you, there's different

15 reasons for the different elections.

16              There are elections in -- that need to be

17 taken to Commissioners Court, the early voting ballot

18 board members, or some to the county election board and

19 some to the elections division board.  I'm not sure

20 which election is what at this point.  I have a chart

21 that I reference.

22              So if it's a list that must be taken, let's

23 say, to Commissioners Court, then it has to be timely

24 enough so that the court has an opportunity to review

25 the list and approve the list that has been provided by

 1  the chairs.  If it's -- if it's a primary election, then

 2  the Commissioners Court does not have to approve, and,

 3  in fact, the county election board is the one that needs

 4  to review the list from the party chairs.  Commissioners

 5  Court is not involved.

 6              So because there are so many different laws

 7  that govern what election is taking place, it's

 8  important that the early voting ballot board list be

 9  created timely.

10      Q.  Okay.

11      A.  Once the -- the list has been approved in

12  whatever measure it is in, then we have to set a

13  schedule of meeting times, and that has to be posted 72

14  hours in advance.  So we post in our office, we post on

15  our website, and so people are aware that the early

16  voting ballot board is going to meet.

17      Q.  Well, what -- how do you make the decision

18  about the date when the early voting ballot board will

19  meet?

20      A.  It -- it is a process that is based on the

21  number of ballots, requests, and applications, and

22  ballots that have been sent out.  So if we've got 10,000

23  plus possible ballots being returned, then the law --

24  because we're over 100,0000 registered voters, allows us

25  to start meeting as early as -- and I don't know if that

Yvonne Ramon

April 21, 2022
Page 150

```
 1   has changed, so -- but prior to Senate Bill 1.
 2             As soon as the second week of early vote,
 3   so we bring them in because there are various processes
 4   that I can speak to if you want me to after this.  So
 5   they start to meet early enough, and -- and then they
 6   make the determination.  It's the early voting ballot
 7   board, not my office, that makes the determination to
 8   accept or reject a carrier envelope with the ballot that
 9   is inside.
10        Q.  Have you ever served as a member of a early
11   voting ballot board?
12        A.  I have not.
13        Q.  Have you ever witnessed an early voting ballot
14   board processing mail-in ballots?
15        A.  When I started, I did, and as per the Election
16   Code, I am not involved.  It is the early voting ballot
17   board, the members who are part of the ballot board that
18   make these determinations, not mine.  So I have a person
19   who is in charge of and over -- and helping in
20   overseeing because the law does allow a tabulator, is in
21   a sense it's called because we have to help them.
22   But -- but basically, that's the extent of our
23   involvement.
24        Q.  Does the Hidalgo County Elections
25   Administrator's office assist in any way with cure
```

 1        Q.   Okay.  Do you have any idea of the number of
 2   mail ballots that were cured through the process that
 3   you put in place under Senate Bill 1?
 4        A.   I do.
 5        Q.   What's the number?
 6        A.   95.
 7        Q.   Okay.  So it's 95 voters that prior to Senate
 8   Bill 1 would have their ballots rejected?
 9        A.   Yes.
10        Q.   Okay.  To your understanding, what is the
11   method for matching identification numbers on a carrier
12   envelope at a ballot -- a mail ballot?
13        A.   So the process has changed from when senate
14   bill was enacted on December the 2nd to now.
15        Q.   Well -- well, let's start with the before time
16   if we can.  So can you walk the Court through the
17   process for examining a mail ballot by the early voting
18   ballot board prior to the passage of Senate Bill 1?
19        A.   So the -- the process is quite extensive
20   because the law requires that once the application has
21   been reviewed and deemed to be a qualified voter to vote
22   by mail, there is -- and I don't want to call it a kit,
23   but there -- there are envelopes that are created,
24   pocket envelopes that now hold that application in place
25   while the carrier envelope, which has various pieces, is

1   sent to the voter.

2            Then when that carrier envelope is

3   returned, then it's matched up with the application,

4   because prior to Senate Bill 1, what needed to be

5   matched were the signatures, the signatures on the

6   application and the signature on the back of the carrier

7   envelope.

8        Q.  Now, let's talk about that for a moment.  So

9   prior to Senate Bill 1, the only way to marry up an

10  application and a ballot was by looking at the

11  signature, right?

12       A.  Yes.

13       Q.  Okay.  Do you know if Hidalgo County had ever

14  been sued over the signature match requirements prior to

15  passage of Senate Bill 1?

16       A.  Not to my knowledge.

17       Q.  Okay.  Let me ask you, in -- in your opinion,

18  do you think the signature match is the best way to

19  match ballots and applications?

20            MR. WHITE:  Objection; form.

21            MS. RAMIREZ:  Object to form.

22       A.  It's my opinion, not the law, but I don't

23  believe it is.  I -- I always have wanted there to be a

24  new signature on file every so many years.  I don't know

25  what that length of time would be, but we see the

1    A.  Yes.

2    Q.  Okay.  Do you think that that's a more

3  effective way to match ballots and applications?

4            MR. WHITE:  Objection; form.

5            MS. RAMIREZ:  Object to form.

6    A.  It is effective.  It doesn't -- this Senate

7  Bill 1 does not exclude the signature, because if there

8  is no signature on that carrier envelope, it is also

9  rejected.

10   Q.  (BY MR. HUDSON)  Uh-huh.

11   A.  But it is not the bate -- primary basis for the

12  acceptance of that carrier envelope.

13   Q.  Okay.  Do you think that the identification

14  number system is superior to the signature match system?

15            MR. WHITE:  Objection; form.

16   A.  As we have -- as we have worked with the

17  Secretary of State to -- to work out all the bumps and

18  bruises along the way, eventually we hope that it will

19  be a more effective way.

20   Q.  (BY MR. HUDSON)  Okay.

21   A.  To begin with, it was difficult.

22   Q.  Okay.  Why was it difficult?

23   A.  Because -- because not all IDs were in offline

24  county, which is a Hidalgo County databases.  The

25  Secretary of State has the official data -- database,

Yvonne Ramon                                        April 21, 2022
                                                    Page 156

1    which is called Team, and they work with DPS directly

2    and they upload to Team, but we had to work out to the

3    process of also uploading to the offline counties.

4        Q.  Well, let's explain to the court what you mean

5    by offline county.  So can you describe what that term

6    means, offline --

7        A.  Yes.

8        Q.  -- so that the judge understands?

9        A.  Yes.  So as I mentioned, the official voter

10   registration database is called Team, and it is managed

11   by the Secretary of State's office.  They have a whole

12   department on this.

13           So when we are an offline county, and if

14   this was before my time that I came in, we were already

15   deemed an offline county.  Apparently at that time, the

16   Secretary of State's team division was not strong enough

17   to handle all 254 counties.

18           So the larger counties broke away and, in

19   fact, we pay for a voter registration vendor while Team

20   is still providing that service to the counties that are

21   with them, I believe at no cost still.  I'm not sure

22   because I'm not an online county.

23           Regardless, every day we have to submit to

24   the State whatever has been processed.  So every day

25   there is an upload to the State, and we work very hard

Yvonne Ramon                                              April 21, 2022
                                                              Page 157

1   at synchronizing our data so that both Team and our

2   vems, is our vendor under VOTEC, databases are

3   synchronized and the same.

4        Q.   Okay.  So that it's clear, when you say

5   offline, what you're referring to is your offline from

6   the Teams database?

7        A.   Yes.  And we -- they, that are online, actually

8   go into the team portal and set up their election.  We

9   also do that, but as an upload --

10       Q.   Okay.

11       A.   -- when it comes to voter records.

12       Q.   Now, the third-party vendor that Hidalgo County

13  uses to manage its voter registration information, does

14  that synchronize with the Team database operated by the

15  Texas Secretary of State?

16       A.   We do.  We utilize their software, but we are

17  the ones that have to synchronize with the state, not

18  our vendor.

19       Q.   Okay.

20       A.   We manage our -- our software.

21       Q.   So Hidalgo County has access to the Team

22  database --

23       A.   Yes.

24       Q.   -- to identify voter identification numbers,

25  right?

Yvonne Ramon

April 21, 2022
Page 158

1     A.  Yes.

2     Q.  All right.  And do you know whether the -- the

3  Team database was used, for instance, in the March 22

4  primary to verify identification numbers?

5     A.  We were instructed after -- by fluke we found

6  out that Team had ID numbers that we didn't have.  And

7  so we questioned the State and then they -- it took a

8  while.

9          We had to get an application, and if it

10  didn't match the number in our data system, that data

11  processor was then instructed to go into Team, upload

12  that voter registration file, and check to see if the ID

13  that the person used was in Team.  It took a while for

14  our vendor and the State to synchronize in uploading all

15  those updated ID numbers into our system.

16     Q.  Did -- has that synchronization happened now?

17     A.  It finally did.

18     Q.  Okay.  So you'll have that going forward in,

19  for instance, the May 7 election?

20     A.  Yes.

21     Q.  You'll have that in the May 24 for Primary?

22     A.  Yes.

23     Q.  You'll have that in the November general

24  election?

25     A.  Yes.

Yvonne Ramon

April 21, 2022
Page 159

1      Q.   Okay.  So that bumps so to speak that you

2   referred to earlier, won't be a bump going forward,

3   right?

4              MR. WHITE:  Objection; form.

5      A.   We hope not.

6      Q.   (BY MR. HUDSON)  Okay.  Now, with regard to the

7   identification numbers, I believe where we left off, the

8   carrier envelope is, you received that with the number

9   on the envelope; is that right?

10     A.   Be -- behind a -- a security flap.

11     Q.   Okay.  Can you explain to the Court what --

12   what security flap you're referring to?

13     A.   So the way the law was interpreted by the

14   Secretary of State's office at the beginning, was once

15   that application was approved, once that ballot was sent

16   in the carrier packet, in the carrier kit to the voter,

17   when the voter returned that envelope, they were to

18   write down their IDs on the back of the envelope, and

19   there was a perforated flap that covered this

20   information.

21              Right above where the flap sealed, they

22   still had to sign.  So what we were instructed to do

23   was, we were not to remove the perforated flap.  That

24   was ballot board and, you know, many times we asked the

25   question and many times we were told we were not to

1    touch it.

2             And we would say this is going to be so

3    long in -- by the time ballot boards -- because like I

4    said, we're over 100,0000, but those that are not have

5    to wait longer.  Some on election day is when they bring

6    their ballot board.  That would be too late --

7        Q.  Okay.

8        A.  -- to do a corrective.  Six days of curing

9    would still not be enough to -- to do everything that

10   needed to be done to correct a defective carrier.

11       Q.  Okay.

12       A.  So since then they changed, and I'm not sure

13   when in the process, but we finally received

14   notification that, guess what?  We can now remove the

15   flap.

16       Q.  Okay.  So that problem's been resolved?

17       A.  It's been resolved, but, again, it -- it -- we

18   now have ballots sealed in ballot boxes that we cannot

19   open because they've been sealed, and so whatever is in

20   there that needs corrective measures now has to wait

21   until the ballot board met.

22       Q.  Okay.

23             MR. HUDSON:  Can we go off the record for

24   five minutes?

25             THE VIDEOGRAPHER:  Off the record at

```
 1        Q.  Go ahead -- go ahead and remove the adhesive
 2   and seal that one.
 3        A.  Is it the top part here?  There you go.
 4        Q.  Go ahead and seal that.
 5        A.  (Witness complied.)
 6        Q.  Now, do you see the tab there that you can pull
 7   to open the envelope?
 8        A.  Here (indicating)?
 9        Q.  Yes.
10        A.  Okay.  You want me to --
11        Q.  You don't have to pull it all the way, just go
12   ahead and start it.  Now -- all right.  So that opens
13   the envelope.  Now, what you're saying, if I understand,
14   is there's a flap that pulls like that, but just shows
15   information about the voter on it, right?
16        A.  And it's below.
17        Q.  And it doesn't actually open the envelope, it
18   just shows the information?
19        A.  Exactly.  It keeps the envelope sealed, but it
20   shows the information.
21        Q.  Perfect.  Okay.  So -- and the issue that you
22   have right now is you're being told by the Secretary of
23   State's office not to remove the peel away portion that
24   identifies the voter and advance to the early voting
25   ballot board meeting?
```

 1      A.  And as -- as I hope I made it clear, that was

 2  our first instruction.

 3      Q.  Okay.

 4      A.  Now we've been instructed to remove the seal

 5  and to begin the process of communicating with the voter

 6  sooner than not.

 7      Q.  Okay.  So does that solve the problem that you

 8  initially had with the delay?

 9              MR. WHITE:  Objection; form.

10      A.  It may solve that problem, but once again, it

11  creates unfunded mandates because we receive

12  notification as late as day before where now we can

13  drive to the voter's house.  So just an example of how

14  as the -- we learn about Senate Bill 1, there are

15  changes, but they come about so quickly, and -- and I

16  feel that we're not as prepared as we've been --

17      Q.  (BY MR. HUDSON)  Uh-huh.

18      A.  -- after other legislative ses -- sessions that

19  have created change.

20      Q.  Now, you would agree with me that everybody on

21  the Hidalgo County Commissioners Board wants every voter

22  who wants to vote to vote, right?

23      A.  Yes.

24              MS. RAMIREZ:  Object to form.

25      Q.  (BY MR. HUDSON)  So you would anticipate, and

 1   to the extent that you need funding, to make sure that

 2   voters are able to vote, they're probably going to give

 3   it to you, right?

 4             MS. RAMIREZ:  Same objection.

 5        A.  Well, I would hope so.

 6        Q.  (BY MR. HUDSON)  I would hope so too.  Have --

 7   have you ever been in a situation where you've told the

 8   County Commissioners Office that you needed money for

 9   voters and they told you they're just not going to give

10   it to you?

11             MS. RAMIREZ:  Object to form.

12        A.  No, but there is a process and I think that's

13   something that's being left out.  If I need money in my

14   fund, it's not like the private sector where you just

15   call and transfer money.  It is a process.  We have to

16   go through the budget and then the auditors and then

17   create an agenda item and then wail till there's a

18   meeting of Commissioners Court, which is every other

19   week, and then present the item, which, of course, will

20   be accepted, but it doesn't happen right when we need

21   it.  So being prepared and having enough funding is when

22   I can answer you without a shadow of a doubt things are

23   better.

24        Q.  Between the March 22 primary and the upcoming

25   May 7 Primary, would you agree with me that things have

1  already started to get better for you?

2       A.  They have started, but with this change from

3  the day before, we need vehicles.  I need personnel.  We

4  need more lines.  It's -- it's a -- it's a challenge.

5       Q.  Now, once the early voting ballot board gets

6  the envelope, have you already verified the information

7  and identification numbers from the voters before it

8  goes to EVBBA?

9       A.  Yes, but according to Senate Bill 1, those

10 numbers must be verified once again.

11      Q.  Okay.

12      A.  It's not just taken for granted that they were

13 approved and sent to carrier envelope with a ballot.

14 They have to be verified once again.

15      Q.  Okay.  Did you have anybody that you're aware

16 of who voted in Hidalgo County who was verified for an

17 application for ballot by mail, receive their ballot,

18 submitted their ballot, and then the identification was

19 deemed to be incorrect?

20      A.  I don't have that knowledge.  I'm -- because

21 I'm not there with the early voting ballot board.

22      Q.  Okay.  So as you sit here today, you don't have

23 any examples of anyone who received an application for

24 ballot by mail later having their ballot rejected on

25 account of an identification mismatch?

1   there.  My question is this.  You said that there is a

2   subsequent verification of the ID number on the flap of

3   the carrier envelope with the ballot by the early voting

4   ballot board, right?

5        A.  Yes.

6        Q.  Let's assume the early voting ballot board

7   rejects an application because of an identification

8   number mismatch?

9        A.  Yes.

10       Q.  Where does that ballot go?

11       A.  It goes back to my office, and the clerk that

12   handles mail ballots would then verify, again, go into

13   the system, go into Team and see if there hasn't been an

14   update and see if there hasn't been a change, in

15   addition of the ID.

16            So it goes back to the office, meanwhile

17   though, the early voting ballot board is calling and

18   trying to reach the voter himself or herself.  It goes

19   back to my office once they have communicated with the

20   voter and they have the time now to cure.

21       Q.  Okay.

22       A.  Let me make that clear, because once it's with

23   ballot board, ballot board takes over.  Re -- they even

24   created an e-mail account to where they could e-mail

25   those that had written an e-mail.

1      Q.   Okay.  So have -- I guess I want to make sure I

2   got this timeline correct.  You're saying the early

3   voting ballot boards got the ballot, they're trying to

4   reach the voter.  How does the information get to your

5   clerk while it's still in the possession of the early

6   voting ballot board?

7      A.   Once they -- and -- and the one that goes

8   back -- the -- the information and the carrier that goes

9   back to my office is the one to be cured, so the

10  information goes back via a report.

11     Q.   Okay.

12     A.   Because the ballot board is noting these calls,

13  information that they're doing on log reports.

14     Q.   And this is the process that resulted in 95

15  voters being able to cure their ballots?

16     A.   Yes.

17     Q.   Okay.

18     A.   They were more, but 95 came to cure.

19     Q.   Okay.  Do you know if there were any ballots

20  that were ultimately rejected on account of

21  identification mismatch?

22     A.   Yes.

23     Q.   Do you know the number of those?

24     A.   I -- I can't right now.  I -- I got so many

25  numbers, but there were.

1    Q.   Do you know if there's a way for voters to go

2  and correct their identification numbers with the

3  Secretary of State's Team database?

4    A.   Yes, the ballot tracker.

5    Q.   Explain to the Court what the ballot tracker

6  is.

7    A.   You know, being an offline county I'm still

8  learning because the ballot tracker took quite a while

9  to go up.  And so as the process started, is we were

10  already in the midst of an election.  There was no

11  ballot tracker.

12          So it was not feasible for us to let the

13  community know there was a ballot tracker when if they

14  attempted to go in, it wasn't functioning.

15    Q.   Uh-huh.

16    A.   When it finally did go up, I still have to

17  clarify with the Secretary of State's office the correct

18  process.  First of all, it's not user friendly.  I know

19  because I was with my mom and we were trying it out

20  to -- and it was difficult.  It was difficult to follow.

21          And then with my mom, she has Social

22  Security, but she doesn't have a driver's license.  So

23  it requires both, and my mom doesn't have a driver's

24  license on file, and she registered with her Social

25  Security and it wouldn't let us continue.

Yvonne Ramon

April 21, 2022
Page 171

1      Q.  Okay.

2      A.  So there are those issues that when we have

3  time, we will let the State know so that they will check

4  these things out.  So the ballot tracker is supposed to

5  be something so wonderful where when I communicate with

6  that voter you're missing this number or that number,

7  they should be able to go on, and they should be able to

8  add it on to the ballot tracker, and it should then

9  notify us --

10              And I'm not exactly sure because I've --

11  I've heard different things.  We're supposed to get an

12  e-mail.  We didn't get an e-mail.  We only had two

13  people correct via ballot tracker, and it was a report

14  that we had to go into Team to pull out.  So it was --

15  we checked daily.  We would check daily because there

16  was no notification, so there are those dark areas that

17  we need to learn.

18      Q.  Are there ways other than ballot tracker for

19  voters in Hidalgo County to correct their identification

20  numbers in the Team database?

21      A.  That's the way they're -- they're -- they're

22  supposed to be able to.

23      Q.  Okay.  Right.  My question is a little bit

24  different.  I'm asking, other than the ballot tracker,

25  are you aware of any other alternative ways to correct

 1   identification numbers in the Team database?

 2        A.  No.  It would only be by coming to the office

 3   or by mail because when we cannot reach them by phone or

 4   e-mail, then a form, prescribed by the State, is sent to

 5   them.

 6        Q.  Right.  And that's where I'm getting at.  So

 7   you would agree with me that in addition to the ballot

 8   tracker, a voter could also correct their application

 9   numbers by mail?

10        A.  Yes.

11        Q.  And a voter could also correct their

12   identification numbers in person?

13        A.  Yes.

14        Q.  So there's three ways then for a voter to

15   correct their identifications numbers, to the extent

16   that it's even necessary?

17        A.  Yes.

18        Q.  Okay.  Do you have any idea of -- can we get

19   you to flip to Page 43 of Defendant's 2?

20        A.  43.  What line?

21        Q.  Line 8.

22        A.  Okay.

23        Q.  You see where it says Section 5.12?

24        A.  Yes.

25        Q.  It says Section 5.12, Subchapter B, Chapter 87,

 1   87.0411 --

 2       A.   Uh-huh.

 3       Q.   -- to read as follows.  Did I read that

 4   correctly?

 5       A.   Yes.

 6       Q.   And then it goes on, Line 18, Section 87.0411,

 7   Opportunity to Correct Defect, Earl Voting Ballot Board.

 8   Did I read that correctly?

 9       A.   Yes.

10       Q.   Is that the cure period relating to the early

11   voting ballot board that you've been discussing with me

12   this afternoon?

13       A.   It -- it is during the early voting.  It's the

14   first part that I talked to you about.  When ballot

15   board is meeting, they themselves are contacting the

16   voter.  So the cure period is actually after election

17   day.  So this is the first part.

18       Q.   Okay.  All right.

19       A.   Yeah.

20       Q.   Talk to me about poll watchers.  Prior to

21   passage of Senate Bill 1, what was the process in

22   Hidalgo County for line poll watchers to watch polls?

23       A.   The poll watcher was to present himself or

24   herself at the polling location to the judge and turn

25   over the Certificate of Appointment that would be signed

 1   by the candidate, the group, the campaign treasurer,

 2   whomever was appointing this person to be a poll

 3   watcher, and so they would turn that into the -- to the

 4   judge and be allowed to be a poll watcher at that

 5   polling location.

 6        Q.   Okay.  Did you ever have issues that you're

 7   aware of with poll watchers prior to the passage of

 8   Senate Bill 1?

 9        A.   Yes.

10        Q.   What issues did you the witness poll watchers

11   prior to the passage of Senate Bill 1?

12        A.   And, again, it's not my witness, but it is a

13   complaint, or a call, mainly on intimidation.  Mainly on

14   making a voter feel afraid or intimidated or made fun

15   of.

16        Q.   Can you give me any examples that you recall?

17        A.   Yes.  I think I mentioned this already where in

18   2020, a poll watcher demanded to see the ID of a -- of a

19   voter because the person did not look like they were a

20   U.S. citizen.  We had a group outside one of the

21   locations that as the curbside voting car drove up, they

22   would go to the window and take pictures of the people

23   inside, take pictures of the person driving, and take

24   pictures of the license plate.

25        Q.   Did you get any specifics about names or

1    identities of people involved in either of those

2    incidents?

3         A.  No.

4         Q.  Okay.  Were those calls made directly to you?

5         A.  The judge at each poll location is directed to

6    handle the situation, and if the judge needs assistance,

7    then that's when they call on us, but each judge is

8    trained to handle the situations at their poll location.

9         Q.  To your knowledge, did the election judge in

10   both of the locations that you've just described handle

11   the situation so to speak?

12        A.  They really did try.

13        Q.  Well, so did they not succeed?

14        A.  Well, when a -- when a -- when a voter drives

15   away being told that they don't look like a U.S.

16   citizen, how do you correct that situation?  Oh, you do

17   look like one.  How do you correct it?  Talking to the

18   poll watcher, yes.

19        Q.  Right.  I guess my question is, let -- let me

20   ask it like this.  Do you know if the election judge and

21   the State -- in the circumstance that you just described

22   of someone being made to feel like they weren't a U.S.

23   citizen, do you know if the election judge removed the

24   poll watcher who incited that incident?

25        A.  Our judges are always instructed to take a poll

Yvonne Ramon                                    April 21, 2022
                                                     Page 179

1   watcher or a voter or whomever is not acting

2   accordingly, professionally, respectfully, to take them

3   to one side to talk to them.  But in 2022, I mentioned

4   to you that there was like a group that had organized,

5   and so some left and others would come.

6        Q.  Sure.  I -- I -- I want -- I want to finish

7   drilling down though on the example that you're talking

8   about.  So you say there was a circumstance prior, you

9   know, in 2020 where someone was asked if they were a

10  U.S. citizen at the polls and --

11       A.  They didn't look like a U.S. citizen and what

12  were they doing voting.

13       Q.  Okay.  Did you -- did you personally speak to

14  the election judge who handled that situation?

15       A.  The judge called me directly.

16       Q.  Who's -- who's -- --

17       A.  That's how I have knowledge --

18       Q.  -- the election judge?

19       A.  Linda Rosales.

20       Q.  Okay.  How did Ms. Rosales handle that

21  situation?

22       A.  She did take the poll watcher to one side and

23  asked the poll watcher to please not -- at that time

24  before Senate Bill 1, the poll watchers were not

25  supposed to be talking to the clerks or to the voters.

1   The -- the person, the poll watcher was before Senate

2   Bill 1, was only supposed to be observing and if there

3   was a need to speak to anyone, it was supposed to be to

4   the judge, and so those were the instructions given by

5   the judge to that poll watcher.

6       Q.  Do you know the race of the poll watcher?

7       A.  I'm sorry?

8       Q.  Do you know the race of the poll watcher?

9       A.  No.

10      Q.  Ms. Rosales didn't tell you?

11      A.  No.  I -- I didn't think that mattered as far

12   as race.

13      Q.  Okay.  Well, what about the race of the voter?

14      A.  Well, I don't know.  I didn't see the voter,

15   but according to the poll watcher, the person didn't

16   look like a U.S. citizen.  What the poll watcher was

17   thinking would -- your guesses would be as good as mine.

18   It's very disrespectful.  That I can say.

19      Q.  So did Ms. Rosales have that poll watcher

20   removed?

21      A.  No.  I think Mrs. Rosales talked to the poll

22   watcher.

23      Q.  Okay.  Do you know if there were any additional

24   incidents beyond that one?

25      A.  As far as taking pictures, it was like ongoing,

Yvonne Ramon                                          April 21, 2022
                                                         Page 181

1  and it was very difficult to monitor because

2  Mrs. Rosales is supposed to be inside being the judge

3  and not outside taking care of issues like this 24/7, so

4  it was difficult.  2020 was difficult in that sense.

5       Q.  Okay.  Was Ms. Rosales also the judge who told

6  you about the incident with people taking pictures?

7       A.  It was the same time, yes.

8       Q.  Okay.  Do you know what polling location this

9  was?

10      A.  Yes.  Our main early voting polling location.

11      Q.  And where is that?

12      A.  At -- on Closner near our main office.

13      Q.  Okay.  Aside from those two incidents, were

14 there any others that you can think of where poll

15 watchers were allegedly disrupting activities at polling

16 places?

17      A.  There was one -- I'm not sure -- it was in the

18 west where one poll watcher was being -- like yelling

19 and -- and being disruptive in like trying to cause an

20 altercation of some sort, and I do believe the judge

21 removed that poll watcher.  I'm not exactly sure, but I

22 also got that call and --

23      Q.  Do you recall --

24      A.  -- we always try to -- she didn't know what to

25 do because the -- the poll watcher was screaming and

1  yelling and talking to people in a disrespectful manner.

2       Q.  Do you recall that judge's name?

3       A.  I don't know right now, no.

4       Q.  Was that also in 2020?

5       A.  Yes.

6       Q.  Aside from the three incidents that you've just

7  described in 2020, do you know of any incidents

8  predating those three incidents involving poll watchers?

9       A.  In 2016, you know, it was like the same kind of

10 getting organized and getting a group of people

11 together, and they were more following the law as far as

12 not addressing the -- the voter or addressing the clerk,

13 but writing things down.  And -- and I did receive those

14 and they were sent to the -- they were sent to the

15 Secretary of State's office.  They were -- I don't know

16 how many, but they were quite a few.

17      Q.  Are poll watchers allowed to write things down

18 that they witness?

19      A.  I'm sorry?

20      Q.  Are poll watchers allowed to write things down

21 that they witness?

22      A.  Of course.

23      Q.  Okay.  Why would you turn them in for?

24      A.  Because they -- they were complaints and as --

25 yeah.

```
 1  the training helped, right, because things went well.
 2       Q.  Okay.  Did you get reports of any incidents
 3  that had to be remedied by any of your election judges?
 4       A.  I didn't.
 5       Q.  Okay.  Let me get you to turn to Page 51 --
 6  actually, excuse me, 50.
 7       A.  50?
 8       Q.  Yeah.  Defendant's 2.
 9       A.  What -- what number?  What line?
10       Q.  Down on Line 18.
11       A.  Okay.
12       Q.  Do you see Article 6, Assistance of Voters?
13       A.  Yes.
14       Q.  Now, prior to the passage of Senate Bill 1, you
15  would agree with me that people who provide assistance
16  to voters had to fill out an oath, right?
17       A.  Yes.
18       Q.  What was your understanding of what the oath
19  required?
20       A.  As far as Senate Bill 1 requirement or as far
21  as the oath of assistance?
22       Q.  As far as the oath of assistance, prior to the
23  passage of Senate Bill 1.
24       A.  Prior to the passage, the -- the assistant
25  would -- would come and the voter would let us know that
```

1    they were requiring assistance, one of two choices would

2    be made.  Either my poll workers would assist or the

3    voter had his or her own assistant, and at that point,

4    the voter would be checked in.  Once the voter was

5    checked in, the assistant would be called.

6                    They would sign in because on the -- it's

7    called a combination form where they -- they sign in

8    electronically and then they sign manually.  So if I

9    sign in on line three, the -- my assistant signs on line

10   three, if it's not one of my clerks.  So at that point,

11   the assistant repeats -- it says an oath, and then is

12   directed to go to the voting equipment with the voter.

13        Q.  Now, I want to make sure I heard correctly

14   because sometimes I'm hard of hearing.  Did you say a

15   combination or an accomodation?

16        A.  It's called a combination form, and it's the

17   manual signature of the voter that just checked in

18   electronically.

19        Q.  Okay.  Now, did you ever have anyone who

20   declined to assist a voter at a polling location that

21   you're aware of in your 14 years as elec -- elections

22   administrator because of the requirement to sign an

23   oath?

24        A.  Decline?

25        Q.  Prior -- yeah, prior to the passage of Senate

```
 1  District Attorney's office concerning Senate Bill 1?
 2              MS. RAMIREZ:  Outside, I -- I mean, I'm
 3  going to have to object, but to the extent that you know
 4  you had conversations outside of your communications
 5  with counsel.
 6              THE WITNESS:  Outside of counsel?
 7              MS. RAMIREZ:  Yeah.
 8      Q.  (BY MR. HUDSON)  Yeah.  And here's what I'm
 9  getting at, and I will see if I can make it more plain.
10  Has anybody from the Harris County -- not Harris County.
11              MS. PERALES:  Yeah.  Keep going with that.
12              MR. HUDSON:  Yeah.
13      Q.  (BY MR. HUDSON)  Hidalgo County attorney's
14  office contacted you as part of an investigation into
15  any election crime?
16      A.  No.
17      Q.  Okay.  Have you spoken to anybody at the
18  Secretary of State's office -- the Texas Secretary of
19  State's office about Senate Bill 1?
20      A.  Yes.
21      Q.  Who?
22      A.  Christina Adkins, Keith Ingram.  As part of the
23  advisory committee.  We talk about it all.
24      Q.  Okay.  Anyone else?
25      A.  As far as the specifics like ballot tracker,
```

 1   voter registration, then it would be the director of

 2   their voter registration team, and I -- I think it's

 3   Christy Hart.

 4        Q.  Okay.

 5        A.  I believe that, but she's one of the directors.

 6        Q.  Anyone else?

 7        A.  As far as Team and the -- the new mandates and

 8   uploading information and all that, some of the

 9   attorneys like Chuck Pinney.  Any other attorney that I

10   have spoken to?  I think that's the extent.

11        Q.  Okay.  Has anybody threatened to prosecute you

12   for violating any provisions of Senate Bill 1?

13        A.  I'm sorry?

14             MS. RAMIREZ:  Object to form.

15        Q.  (BY MR. HUDSON)  Has anyone threatened to

16   prosecute you for violating any provisions in Senate

17   Bill 1?

18        A.  No.

19        Q.  Okay.  Are you worried about being prosecuted

20   for violating any provisions of Senate Bill 1?

21             MS. RAMIREZ:  Object to form.

22             MS. PERALES:  Objection.

23        A.  I am not violating any provisions of Senate

24   Bill 1.

25        Q.  (BY MR. HUDSON)  No, I -- I understood.

```
 1        A.  It is -- it is --

 2        Q.  I'm just asking in general --

 3        A.  It is -- it is --

 4        Q.  -- are you worried?

 5        A.  It is a worry.  It -- it's written.  It's -- I

 6   am in charge of a department of 27 permanent employees

 7   and hundreds and hundreds of poll workers, so it is a

 8   worry.

 9        Q.  It hasn't stopped you from doing your job,

10   right?

11        A.  I am obligated and mandated to do my job and I

12   will.

13        Q.  Okay.  You're not going to quit over it, right?

14              MS. RAMIREZ:  Object to form.

15        A.  I would not quit over this, no.

16        Q.  (BY MR. HUDSON)  Sure.  I think we're up to

17   four.  I'll hand you what I'm going to mark as State's

18   Defendant's 4.

19              (Exhibit 4 marked.)

20        Q.  (BY MR. HUDSON)  I'll represent to you that's a

21   copy of the Secretary -- Texas Secretary of State

22   Elections Divisions Cancellation of Ballot By Mail

23   Guidance dated 2/10/22.  Have you ever seen that

24   document before?

25        A.  I will tell you that on the day that they
```

 1  watcher requirements under House Bill 3107, Senate Bill

 2  1, right?

 3      A.  Yes.

 4      Q.  Have you had an opportunity to take a look at

 5  this advisory?

 6      A.  Oh, yes.

 7      Q.  Do you disagree with any of the guidance that's

 8  provided in advisory 22-09?

 9      A.  No.

10      Q.  Same question, but as to Advisory 22-08.

11      A.  No.  I don't disagree.

12      Q.  In fact, is there any advice or guidance

13  currently presented by the -- or currently promulgated

14  by the Texas Secretary State's office that you disagree

15  with?

16      A.  No.

17      Q.  I'm handing you what I'm going to mark as State

18  Defendant's 9.  This is Election Advisory No. 22-12.  Do

19  you see that?

20              (Exhibit 9 marked.)

21      A.  Yes.

22      Q.  (BY MR. HUDSON)  And on the regarding line, it

23  reads, Additional procedures regarding correction of

24  defects on the application for ballot by mail or carrier

25  envelope.  Do you see that?

Yvonne Ramon                                          April 21, 2022
                                                        Page 197

 1        A.   Yes.

 2        Q.   Now, this was issued on February 11, '22.  Do

 3   you see that?

 4        A.   Yes.

 5        Q.   Is this the corrected guidance that you're

 6   referring to earlier today about the --

 7        A.   Uh-huh.

 8        Q.   -- carrier flap?

 9        A.   I'm sure.

10        Q.   Okay.  Do you have any idea how many attorneys

11   work in the Elections Division over at the Secretary of

12   State's office?

13        A.   No.  They keep changing and adding, so I don't

14   know right now.

15        Q.   Anybody over at the Secretary of State's office

16   use the term unfunded mandate for their office?

17        A.   That they've use unfunded mandates?  Oh, yes.

18   No, I don't know, but I know that there are also

19   unfunded mandates there.

20        Q.   I'm going to hand you what I'm marking as State

21   Defendant's 10.  And I'll just represent to you that

22   this is a list of all of the current, at least through

23   April 3 of '22, advisories that have been issued by the

24   Texas Secretary of State's office.  Now, do you know

25   when Senate Bill 1 was signed into law?

```
 1                   (Exhibit 10 marked.)

 2        A.   Second legislative session?

 3        Q.   (BY MR. HUDSON)  I'll -- I'll do you one

 4   better.  Can you go ahead and grab Defendant's 2 for me?

 5        A.   (Witness complied.)

 6        Q.   Go ahead and flip to the back page.  Do you

 7   see, Approved, down at the bottom left-hand corner?

 8        A.   September 7th, '21.

 9        Q.   Okay.  And underneath that, do you recognize

10   that signature?  It's a pretty famous one.

11        A.   Secretary of State.

12        Q.   Okay.  And to the left -- to the left of that,

13   do you see that signature?

14        A.   Yes, our governor.

15        Q.   Okay.  So would you agree with me that

16   advisories issued after September 7 of '21 relate to

17   Senate Bill 1?

18        A.   Yes.

19        Q.   Okay.  So let's give it a count.  On Page 2 of

20   State Defendant's 10, if we go back to the middle of the

21   page, do you see where it says September 9, 2021?

22        A.   Yes.

23        Q.   Okay.  Let's count.  Going up from September 9

24   up, we got one, two, three, four, five, six, seven,

25   eight, nine, ten, eleven, twelve, thirteen, fourteen,
```

1  fifteen, sixteen, seventeen, eighteen, nineteen, twenty,

2  twenty-one, twenty-two, twenty-three, twenty-four,

3  twenty-five, twenty-six, twenty-seven, twenty-eight,

4  twenty-nine.  Thirty advisories and memos, right?

5       A.  Yes.

6       Q.  Okay.  All of that had to be done after the

7  passage of Senate Bill 1.  Would you agree?

8       A.  Yes.

9       Q.  Okay.  That's in addition to webinars that the

10 Secretary of State's office has put out, right?

11      A.  No.  No.  Going against that, it's true.

12      Q.  Okay.  And that's in addition to forms that had

13 to be modified by the Secretary of State's office?

14      A.  We were very much a part of.

15      Q.  Would you agree with me that the number of

16 advisories reflects ongoing advice and guidance from the

17 Secretary of State's office about the implementation of

18 Senate Bill 1?

19      A.  Yes, quite a bit of information in a very short

20 time.

21      Q.  Do you think that this list that I just showed

22 you, State Defendant's 10, represents the end of the

23 advisories concerning Senate Bill 1?

24      A.  No at all.

25      Q.  It's an ongoing process, right?

```
 1        A.   Always.

 2        Q.   Okay.  So you anticipate that we would see

 3   additional changes based on issues that arise under

 4   Senate Bill 1, right?

 5        A.   Yes.  I told you about the one we just received

 6   the day before.

 7        Q.   Okay.  In fact, if we look back at the back

 8   page of Senate Bill 1, we see that this list itself is

 9   13 pages long and dates back to January 2, 2014, right?

10        A.   Yes.

11        Q.   Okay.  I'm going to hand you what I'm going to

12   mark has State Defendant's 11.  Have you ever seen that

13   document before?

14                  (Exhibit 11 marked.)

15        A.   Yes.  And, again, my division manager, too, was

16   on this webinar.  I was not able to be.

17        Q.   (BY MR. HUDSON)  Okay.  So somebody from your

18   office is trained on early voting ballot boards?

19        A.   Yes.

20        Q.   Okay.  Do you have any reason to dispute any of

21   the -- the guidance or advise provided by this webinar

22   referenced in State Defendant's 11?

23        A.   Not at all.

24        Q.   Let me ask you, do you like Keith Ingram?

25        A.   Yes.
```

Yvonne Ramon

April 21, 2022
Page 208

1              MS. RAMIREZ:  Object to form.

2       A.  No.

3       Q.  (BY MR. HUDSON)  Okay.  14 years, right?

4       A.  Almost.

5       Q.  Almost.

6       A.  Not quite.

7       Q.  I'm going to hand you what I'm going to mark as

8  Defendant's 16.  Go ahead and take a look at this and

9  let me know when you're ready to discuss.

10             (Exhibit 16 marked.)

11      A.  Yes.  It's important to look at the date.

12      Q.  (BY MR. HUDSON)  Uh-huh.

13      A.  I had never seen this article.  Do you know

14  where the case was heard?

15      Q.  I believe it covers it in the article.

16      A.  Okay.  I skimmed it.

17      Q.  Okay.  So I asked you earlier today if you knew

18  what a politiquera was, right?

19      A.  Yes.

20      Q.  If you flip over to Page 2, fourth paragraph --

21  or excuse me, third paragraph reads, They're called

22  politiqueras, a word unique to the border that means

23  campaign worker.  It's a time-honored tradition down in

24  the land of grapefruit orchards and Border Patrol

25  checkpoints.  If a local candidate needs dependable

 1  votes, he or she goes to a politiquera.  Did I read that

 2  correctly?

 3       A.  You read that correctly.

 4       Q.  Is that your understanding?

 5            MS. RAMIREZ:  Object to form.

 6       A.  Not -- not necessarily.

 7       Q.  (BY MR. HUDSON)  Okay.  Do you know who Mike

 8  Carrera is?

 9       A.  Yes.

10       Q.  Who is Mike Carrera?

11       A.  Mike Carrera is a campaign manager, I guess is

12  what you would call, that is hired by candidates to help

13  during an election process.

14       Q.  Okay.  How does he help as part of the election

15  process to your knowledge?

16       A.  Well, I -- I don't know.

17       Q.  Do you know if Mr. Carrera makes it his

18  business to hire politiqueras for candidates in the Rio

19  Grande Valley?

20       A.  I don't know.

21       Q.  Okay.  On Page 5 of 16, top paragraph, see

22  where it says, Longtime?

23       A.  Yes.

24       Q.  Longtime Valley political strategist Mike

25  Carrera says he's glad that prosecutors are weeding out

1  unscrupulous politiqueras, but that doesn't mean they're

2  all bad.  Carrera says the ones he hires are paid to

3  know the precinct's voting habits, nothing more.  Did I

4  read that correctly?

5       A.  Yes.  You did.

6       Q.  Okay.  Does it surprise you to learn that

7  Mr. Carrera told national public radio that he hires

8  politiqueras to help with campaigns in the valley?

9       A.  No.

10            MS. RAMIREZ:  Object to form.

11      A.  It doesn't surprise me.  Again, it's 2015, so

12  it's seven years ago.

13      Q.  (BY MR. HUDSON)  Okay.  If you go back to

14  Page 2 of 16 for me.  Do you see the second photograph?

15      A.  Yes.

16      Q.  It says, A new FBI anti-corruption task force

17  is trying to clean up the Rio Grande Valley of Texas.

18  According to the Justice Department in 2013, more public

19  officials were convicted for corruption in South Texas

20  than in any other region of the country.  One of the

21  practices the task force -- task force is looking

22  into -- looking at is vote stealing.  Did I read that

23  correctly?

24      A.  Yes.

25      Q.  Do you have any reason to disagree with this

 1  know whether the decision for the trial court was

 2  appealed?

 3          MS. RAMIREZ:  Object to form.

 4      A.  I believe Mr. Salinas who was the incumbent

 5  appealed and it went wherever it goes, and it didn't go

 6  through, so Mr. Ocana's continued as mayor.

 7      Q.  (BY MR. HUDSON)  Okay.  But as you sit here,

 8  you don't know what the trial court judge did after two

 9  weeks of testimony?

10          MS. RAMIREZ:  Object to form.

11      A.  I -- I do know that there was no election that

12  took place after this trial.

13      Q.  (BY MR. HUDSON)  Okay.

14      A.  That's what I know.

15      Q.  I mean, just as a voter, you're sa -- you're a

16  voter, too, right?

17      A.  Not in Mission, but, yes, I am a voter.

18      Q.  You're a voter in Hidalgo County?

19      A.  Yes.

20      Q.  Would it shock you if you read a news article

21  that said an election had been tossed out?

22          MS. RAMIREZ:  Object to form.

23      A.  Again, I'm not going to tell you that our media

24  gets it right 100 percent of the time because I have

25  calls -- direct calls to producers all the time.

1      Q.  (BY MR. HUDSON)  What do you mean you have

2   direct calls?

3      A.  Well, sometimes we have to correct the

4   information given by the news media.  Just because

5   it's -- it's presented by the media, it doesn't make it

6   a true fact.

7      Q.  Well, I will -- I will tell you -- I -- I will

8   grant you this.  I got accused in the newspaper of

9   almost being thrown in jail by a judge about a month

10  ago, and I can tell you that the article was incorrect.

11     A.  There you go.

12     Q.  So I'm just trying to verify with you where you

13  are on the story.

14     A.  Yes.  No.  There was no new election or special

15  election or anything thrown out.  Whatever took place,

16  wherever it took place, it didn't change the outcome,

17  however many court cases it took.

18     Q.  Gotcha.

19            MR. HUDSON:  If we can go off the record

20  for about five minutes?

21            THE VIDEOGRAPHER:  Off the record at 3:59

22  p.m.

23            (Break taken.)

24            THE VIDEOGRAPHER:  Back on the record at

25  4:21 p.m.

 1   described, have you seen any improvement amongst voters

 2   and the process for registering?

 3       A.  Improvement?  I think things have continued as

 4   usual.

 5       Q.  Well, let me see if I can ask it like this.

 6   Did you get phone calls before the March 22 primary from

 7   voters about how the process works now?

 8       A.  For registering to vote?

 9       Q.  Yes?

10       A.  No.

11       Q.  So obviously if you weren't getting calls

12   before, you're not really getting calls now?

13       A.  No.

14              MR. WHITE:  Objection; form.

15       Q.  (BY MR. HUDSON)  Did you get any calls from

16   voters about any of the other election procedures in

17   advance of the March 22 primary?

18       A.  No.  I -- I don't believe there was enough time

19   to have voters question what was happening or

20   understanding it, so, no.

21       Q.  Are you seeing any questions from voters now

22   about the upcoming election?

23       A.  Mainly mail ballot.  And, again, we don't have

24   a huge volume of calls, on average of 25 to 30 a day,

25   mostly related right now to mail ballot.

1    understand are coming out about the identification?

2        A.   First of all, it's a new application and it's

3    on our website, but we've discussed the fact that no

4    everyone was access, so we definitely recommend sending

5    them the application if they so request.

6               And we have now, are including -- and

7    approved by the Secretary of State -- a colored, very

8    colorful, very simple, easy to read insert that'll say,

9    Don't forget, you know, that you have to have your IDs

10   and we recommend using both IDs if they do have a Social

11   Security and a Texas driver's license.

12              So we have provided an insert.  We're doing

13   the same thing with the carrier, and those two things we

14   didn't do before.

15       Q.   So you're taking steps to alleviate issues that

16   you felt you had with the March 22 primary?

17       A.   Yes.

18       Q.   When do you think you'll find out whether those

19   steps you've taken have been effective?

20       A.   Hopefully when the application comes in

21   correctly filled out without any need to reject or

22   correct.

23       Q.   Okay.  Have I been courteous to you today?

24       A.   Yes.

25       Q.   Anything I haven't asked you that you think I

Yvonne Ramon                                           April 21, 2022
                                                       Page 232

```
 1  _____   __  _____
                              )(
 2  UNITED STATES OF AMERICA,  )(
            PLAINTIFF,         )(   CASE No.
 3                             )(   5:21-cv-1085-XR
    VS.                        )(
 4                             )(
    THE STATE OF TEXAS, ET     )(
 5  AL.,                       )(
            DEFENDANTS.        )(
 6  _____   __  _____
```

 7                    REPORTER'S CERTIFICATION
                   DEPOSITION OF YVONNE RAMON
 8                      APRIL 21, 2022

 9            I, Maribel Hernandez, Certified Shorthand

10   Reporter in and for the State of Texas, hereby certify

11   to the following:

12            That the witness, YVONNE RAMON, was duly

13   sworn by the office and that the transcript of the oral

14   deposition is a true record of the testimony given by

15   the witness;

16            I further certify that pursuant to FRCP

17   Rule 30(f)(1) that the signature of the deponent:

18            __X__ was requested by the deponent or a

19   party before the completion of the deposition and that

20   the signature is to be before any notary public and

21   returned within 30 days from date of receipt of the

22   transcript.  If returned, the attached Changes and

23   Signature Page contains any changes and the reasons

24   therefor;

25            _____ was not requested by the deponent or

1    a party before the completion of the deposition.

2                    I further certify that I am neither

3    counsel for, related to, nor employed by any of the

4    parties or attorney in the action in which this

5    proceeding was taken, and further that I am not

6    financially or otherwise interested in the outcome of

7    the action.

8                    Certified to by me this _____ day of

9    _____, 2022.

10

11

12

13    _____
      MARIBEL HERNANDEZ, Texas CSR 10885
14    Expiration Date:  01/31/2023
      MAGNA LEGAL SERVICES
15    Firm Registration No. 633
      1635 Market Street
16    Suite 800
      Philadelphia, Pennsylvania 19103
17    Telephone:  866-624-6621
      Facsimile:  215-207-9462

18

19

20

21

22

23

24

25