

**In The Matter Of**

**La Union Del Pueblo Entero, et al.,**

**Plaintiffs**

**v**

**State Of Texas, et al.,**

**Defendants**

**CASE**

**5:21-cv-844**

**Date**

**4-27-2022**

**Witness**

**Jonathan Sherman White**

**National Court Reporters Inc. · 888.800.9656 · NationalCourtReporters.com NCRNetwork@nationalcourtreporters.com**

Serving Legal Professionals From Coast To Coast and Internationally

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF TEXAS
2           SAN ANTONIO DIVISION

3  LA UNION DEL PUEBLO     §
   ENTERO, ET AL.,       §
4      Plaintiffs,     §  Civil Action No.
               §  5:21-cv-844 (XR)
5  VS.            §  (Consolidated Cases)
               §
6  STATE OF TEXAS, ET AL.   §
      Defendants.     §
7  **************************************************

8              ORAL DEPOSITION OF

9          JONATHAN SHERMAN WHITE

10           APRIL 27, 2022

11

12  ***************************************************

13      ORAL DEPOSITION OF JONATHAN SHERMAN WHITE,

14  produced as a witness at the instance of the Plaintiffs

15  and Plaintiff-Intervenors, and duly sworn, was taken in

16  the above-styled and numbered cause on the 27th day of

17  April 2022, from 9:11 a.m. to 5:31 p.m., before Caroline

18  Chapman, CSR in and for the State of Texas, reported by

19  Computerized Stenotype Machine, Computer-Assisted

20  Transcription, held at the William P. Clements Jr. State

21  Office Building, 300 West 15th Street, Hearing Room

22  1001E, Austin, Texas, pursuant to the Federal Rules of

23  Civil Procedure.

24

25

1      **A.   I suppose that would be me.**

       Q.   And what would be necessary for you to -- to make that approval?

              MR. HUDSON:  Well, I'm going to object, to the extent that that would call for investigative privilege, attorney work-product or attorney-client communications.  To the extent that you can answer generally without encroaching on any of those privileges, you're free to do so, but otherwise I'm going to instruct you not to answer.

       **A.   I think primarily there would have to be a determination that a criminal statute -- a criminal statute was violated and that there is sufficient evidence to proceed.**

15     Q.   And when you say there would be sufficient

16     evidence to proceed, is there a legal standard that

17     would be relevant in you determining whether to proceed

18     with a case?

19     **A.   Probable cause, in Texas.**

20     Q.   And how long have you been the Division Chief

21     of the Election Integrity Division?

22     **A.   I don't recall when exactly it was popped out**

23     **as a standalone division, but it was prior to that.  I**

24     **would say that's been in the last year or so, or less**

25     **than that.  Prior to that, it was a section of the**

1      **A.   I was involved to some degree with, primarily,**

2   **I believe some of the predecessor bills.**

3      Q.   In what way were you involved with the drafting

4   of the predecessor bills of Senate Bill 1?

5      **A.   In -- in being requested to provide guidance**

6   **regarding portions of those bills.**

7      Q.   Which portions of the predecessor bills were

8   you asked to provide guidance on?

9          MR. HUDSON:  Object to the extent that it

calls for attorney-client privilege, attorney

work-product, or legislative privileged information.  To

the extent that you can respond without encroaching on

any of those privileges, you're free to do so,

otherwise, I'm going to instruct you not to answer.

       **A.   I don't know that I can answer that.**

16      Q.   Have you been asked -- or were you -- excuse

17   me, were you asked to testify during any hearings on

18   Senate Bill 1 or any of its predecessor bills?

19      **A.   I was called as a resource witness on some of**

20   **those hearings on the predecessor bills, and on SB 1, I**

21   **believe, actually, as well.**

22      Q.   How many times were you asked to provide

23   testimony on Senate Bill 1 or its predecessor bills?

24      **A.   As an estimate, I would say I was probably**

25   **asked to provide testimony or appear as a resource**

1   **witness maybe 10 times.  And I probably actually**
2   **testified maybe half of that.**

Q.   When you testified for -- excuse me --
withdrawn.

When you were called to testify, what were
you asked to testify about?

MR. HUDSON:  I'm going to object to the
extent that that would encroach on attorney-client or
attorney work-product or legislative privilege.  To the
extent that you can answer, you can do so.  Otherwise,
I'll instruct you not to answer.

And just for clarification of the record,
is your question directed at what he was asked to
testify about in public, or are you asking if there was
a specific ask made by legislators?  Because that would
help me instruct him so that he can actually answer your
question.

MS. PAIKOWSKY:  Of course.

Q.   (By Ms. Paikowsky)  I think for the moment we
can limit it to what you were asked to testify in a
public forum.

**A.   Wow.  I -- I don't think I could even begin to**
**cover all the questions that I was asked publicly.  But**
**generally it pertained to criminal provisions within the**
**bills.**

1    Q.   Do you -- withdrawn.  Which criminal provisions

2    within SB 1 or its predecessor bills were you asked to

3    provide testimony on?

           MR. HUDSON:  Same objections.  To the

     extent that it's in the public record, you can answer;

     otherwise, I'm going to instruct you not to answer if

     it's going to encroach on attorney-client, attorney

8    work-product or legislative privilege.

9    **A.   In the -- in the public committee hearings, I**

10   **don't recall specifically which criminal provisions**

11   **within the bills I was asked questions about, and a lot**

12   **of it really ran together.**

13   Q.   Do you recall if you were asked to testify on

14   provisions to the voter assistant's oath in Senate

15   Bill 1?

16        MR. HUDSON:  Same objection.

17   **A.   I don't --**

18        MR. HUDSON:  Same objections.  To the

19   extent that the question is inquiring about public

20   questions, you can answer; otherwise, I'm instructing

21   you not to answer unless you can avoid encroaching on

22   the attorney-client, attorney work-product or

23   legislative privileges.

24   **A.   I don't recall being asked about the oath**

25   **provisions in Senate Bill 1.  I do recall being asked**

1  **that assistance being provide to the voter.**

Q.   How does your office interpret the mandates of
this oath?

MR. HUDSON:  Object to the extent that it
calls for attorney-client communications or attorney
work-product or investigative privilege.  To the extent
that you can answer without encroaching on any of those
privileges, you're free to do so; otherwise, I instruct
you not to answer.

10  **A.   I can testify as to how I would interpret the**

11  **oath.  But could you repeat the last part of your**

12  **question, though?**

13  Q.   How does your office interpret the mandates of

14  this oath?  And to be clear, we're not looking for

15  details of any ongoing investigations, anything like

16  that, just your office's interpretation of this oath.

17  **A.   Okay.  Again, I can only speak to my**

18  **interpretation of the mandates of the oath, but -- do**

19  **you want to try to take them one by one or -- you know,**

20  **I would be tempted to say, you know, just exactly what's**

21  **written there.  I don't -- I think it seems pretty**

22  **explanatory, but if you have a specific question about**

23  **any of those elements, I would be happy to weigh in.**

24  Q.   So you would say that you understand the oath

25  to adhere strictly to the -- to the text as written

1   within the statute?

2   **A.   I think so, if I understand your question**

3   **correctly, yes.**

Q.   What kind of assistance is allowed under this
oath?

MR. HUDSON:  Objection, form, foundation.
Objection, form, calls for speculation.  Objection to
the extent that it calls for attorney-client, attorney
work-product, or investigative privilege.  To the extent
you encroach upon any privilege, I instruct you not to
answer; otherwise, you're free to do so.

**A.   I would say, according to the text of the**
**statute, allowable assistance is reading the ballot to**
**the voter, directing the voter to read the ballot,**
**marking the voter's ballot, or directing the voter to**
**mark the ballot, preparing the ballot per the directions**
**of the voter.**

18   Q.   Is there any kind of assistance that would not

19   be allowed under this oath?

20   MR. HUDSON:  Same objection.  Same

21   instruction.

22   **A.   From my reading of the statute -- I mean, it --**

23   **what would be unlawful assistance would be marking the**

24   **ballot contrary to a voter's intentions, suggesting to**

25   **the voter how they should be voting, assisting an**

1      **A.   That is my understanding.**

       Q.   What kind of illegal behavior would this
section of the oath be aimed at preventing?

             MR. HUDSON:  Objection, form.  Asked and
answered.  Objection to the extent it encroaches on
attorney-client, attorney work-product or investigative
privilege, I instruct you not to answer.  To the extent
you can answer without encroaching on those privileges,
you're free to do so.

       **A.   I would say what I said before, which is,
suggesting to the voter any -- in any way how they
should vote, influencing them in the voting process, or**
13     **marking the ballot contrary to the voter's intentions**
14     **and their independent exercise of the vote.**
15     Q.   I'm going to show you what is being marked as
16     Exhibit 3.
17             (Exhibit No. 3 marked.)
18     Q.   3, you can read for yourself, which I will
19     represent to you is the oath of assistants from before
20     Senate Bill 1.  Again, I'll give you a moment to review.
21     Just let me know when you're finished.
22     **A.   Okay.**
23     Q.   Before Senate Bill 1, how was -- or withdrawn.
24             How was this oath, which is the oath
25     before Senate Bill 1, how was this oath used?

MR. HUDSON:  Objection, form, vague.
Objection.  To the extent it encroaches on attorney
client or attorney work-product, investigative
privilege, I instruct you not to answer.  Otherwise,
you're free to answer.

A.   **This oath would have been administered in the
same way, at the polling place to an assistant for
providing assistance to a voter.**

Q.   Based on your understanding, is there any
activity that was permitted previously that is barred
under the new revised oath?

MR. HUDSON:  Objection, form, foundation.
Objection to the extent it encroaches on attorney
client, attorney work-product, investigative privilege,
or legislative privilege, instruct you not to answer.
To the extent you can answer without encroaching on
those privileges, you're free to do so.

A.   **Well, I would say that 64.034 never was a
criminal statute, it never created an offense, but what
it did is it caused the assistant at the polling place
to be advised of what activity they can and cannot
engage in and require them to, you know, take an oath to
that effect.  What was added in the, I guess, SB 1
version was behavior that, like the existing version,
was already, I believe, prohibited by other parts of the**

**Election Code which might have been criminal provisions, and those pieces would be -- would pertain to eligibility of the voter for assistance and whether the voter had been pressured or coerced into receiving assistance, as well as communicating information about the voter's vote to another person. Those are all prohibited under other sections of the Election Code, but they were not included in the previous oath.**

9    Q.   And so looking at the text of the old oath,

10   starting with "I will confine my assistance to answering

11   the voter's questions, stating propositions on the

12   ballot, naming candidates."  Do you believe that

13   answering questions are allowed under the revised text

14   of the oath?

15          MR. HUDSON:  Objection to the extent that

16   that would call for attorney-client privilege, attorney

17   work-product, or investigative privileged information.

18   To the extent you can answer without encroaching on

19   those privileges, you're free to do so, otherwise, I

20   would instruct you not to answer.

21   **A.   I think I can answer that question.  Could you**

22   **repeat it, though, for me?**

23   Q.   Yeah, of course.  So let's see.  Do you believe

24   that the revised text of the oath would prevent an

25   assister who was providing otherwise lawful assistance

1  **assistance that were, you know, guaranteed under federal**

2  **or state law were prohibited by another part of the**

3  **Election Code.**

4      Q.   Would your office have concerns if it received

5  a report of an assister who was providing otherwise

6  lawful assistance, clarified the translation of ballot

7  language after receiving a question from a limited

8  English proficiency voter who didn't understand the

9  first translation?

10        MR. HUDSON:  Objection, form, foundation.

11  Objection, form, incomplete hypothetical.

12     **A.   I can only speak for myself.  And if I**

13  **understand the question correctly, I would not have a**

14  **problem with a clarifying question being asked about**

15  **lawful assistance, or answered, I guess.**

    Q.   Do you believe that the revised oath would allow an assister to provide that kind of clarifying information or answer a clarifying question about a translation?

      MR. HUDSON: Objection, form.  Calls for attorney-client privilege, attorney work-product, or investigative privilege.  To the extent you can answer that without encroaching on those, feel free to do so.

   **A.   I would personally not interpret the law,**

**although I see the section that you're referring to, I**

1    **see that language, I would -- I would not -- in my**

2    **practice of enforcing the code, I would not interpret**

3    **this as prohibiting that type of interaction involving**

4    **lawful assistance activities.**

5    Q.   Could you -- or withdrawn.

6          Do you believe that -- but you do believe

7    that that is an interpretation that someone could make

8    reading the oath?

9    **A.   I guess it's really hard for me to determine**

10   **how any reasonable or unreasonable person might**

11   **interpret the language of this oath.**

12   Q.   But you could see a situation where someone who

13   reads the text, "I'll confine my assistance to reading

14   the ballot to the voter, directing the voter to read the

15   ballot, marking the voter's ballot, or directing the

16   voter to mark the ballot," could understand that

17   providing translation clarifications might fall outside

18   of the confines of permitted activity?

19          MR. HUDSON:  Objection, form.  Foundation.

20   Incomplete hypothetical, speculation.

21   **A.   I guess I don't think that that would be the**

22   **most reasonable interpretation of this provision, but I**

23   **can see how someone could unreasonably or less**

24   **reasonably construe that one language in isolation of**

25   **the rest of the oath and take it very narrowly and come**

1     **I can't think of a situation that would kind of help me**

2     **put it into context where a word on the ballot would**

3     **need to be defined for a voter.**

4          Q.   But you would only be concerned with that

5     activity insofar as it violated a different section of

6     the oath, which is to say, it indicated how a voter

7     should vote?

8          **A.   Correct, yes.  I can't think of another section**

9     **that it would potentially violate, that would be the one**

10    **that would come to mind as a concern.**

            Q.   Would your office have concerns if a voter with

      a memory or cognitive impairment asked an assister who

      had worked with them in advance to prepare to go vote

      for a reminder as to what they had discussed previously

15    and the assister faithfully recounted that conversation?

                    MR. HUDSON:  Objection, form, foundation.

      Objection, incomplete hypothetical.  Object to the

      extent it would encroach on attorney-client, attorney

      work-product, investigative privilege.  To the extent

      you can answer without encroaching on those privileges,

      you're free to do so.

22         **A.   That's a tough question.  There's another**

23    **section of the code that prevents in the polling place**

24    **any communication regarding how a voter should vote, and**

25    **I have never looked at that specifically in the**

disability contest -- context.  But, you know, but if
I -- if I'm voting with my wife and she's in the -- the
voting booth next to me, I can't tell her, "Hey,
remember that race we talked about before, you know,
it's -- you know, the one with the two guys with the
same last name, it was this other one that" -- I can't
do that, and I know I can't do that, or it's like a
Class B misdemeanor or Class A misdemeanor. So I don't
know.  That's a good question.

Q.   Do you believe that activity -- excuse me.  Do
you believe that activity of providing somebody with
memory or cognitive impairments with a reminder or
prompt of a past conversation would fall outside of the
permissible activities in the revised oath?

MR. HUDSON:  Objection, form, foundation.
Objection, incomplete hypothetical.  Same objection and
instruction as to attorney-client, attorney
work-product, investigative privilege.  To the extent
you can answer without encroaching, you're free to do
so.  Otherwise, I'm going to instruct you not to answer.

A.   I mean, it's potentially violative of the
language.  "I will not suggest by word, sign or gesture
how the voter should vote," which has been in the oath
and it's been in Section 64.036 of the code, the
unlawful assistance provision, for as long as I can

1   **remember.  And so that's an interesting question.  I**

2   **think it would potentially violate -- you would have to**

3   **look at it and determine whether it violates a number of**

4   **sections of the code that have existed for many years.**

5   Q.   So to be clear, your concerns about that kind

6   of activity would be whether it violates a separate part

7   of this oath or existing parts of the criminal code, in

8   that it is instructing a voter to vote rather than

9   providing the voter with information that they're

10  requesting?

11  **A.   Correct.  I think that's how I would look at it**

12  **primarily, yes.**

13  Q.   To determine whether or not that was

14  permissible activity?

15  **A.   Right.  Whether they had suggested how the**

16  **voter should vote or influenced the vote of the voter**

17  **during the voting process.**

Q.   Uh-huh.  Would your office have concerns if an
assister who was providing otherwise lawful assistance
answered the voter who had visual impairments request
for confirmation that the ballot was marked as intended?

MR. HUDSON:  Objection, form, foundation.
Objection, incomplete hypothetical.  Objection to the
extent it would encroach on attorney-client, attorney
work-product, or investigative privilege.  To the extent

you can answer without encroaching on those privileges,
you're free to do so.  Otherwise, I'll instruct you not
to answer.

**A.   I would not have any concerns about that.  In
fact, a portion of the oath is, "I will prepare the
voter's ballot as the voter directs," so I think
confirming that to the voter would not be violative of
the oath or any other portion of the Election Code that
I'm aware of.**

10   Q.   Do you consult with the Secretary of State's
11   Office in determining how to interpret these provisions
12   of the law?

13   **A.   Provisions in general, or specifically the**
14   **provision that we've been talking about?**

15   Q.   Let's start with provisions in general.

16   **A.   If there's an area of the code that the**
17   **situation, you know, warrants it, I might discuss with**
18   **the Secretary of State's Office what their**
19   **interpretation of the code is.  Under Section 31.003 of**
20   **the code, the Secretary of State is tasked with the**
21   **interpretation and the uniform application of the code,**
22   **so that is their proper role, and I would, under the**
23   **right circumstances, probably do that.**

24   Q.   And what would those circumstances be?

25   **A.   Just if -- if there's enough question about how**

1   **a section should be interpreted, or if, for example,**

2   **we -- there's a provision in the code that -- I think**

3   **it's voting day procedures apply to early voting, if**

4   **possible.  In other words, there are some things about**

5   **early voting that make it different from election day**

6   **where that's not possible, and so when there's a**

7   **conflict, that has to be resolved in an interpretive**

8   **way, and the Secretary of State would certainly be the**

9   **go to for that since they're responsible for the**

10  **administration of elections, or at least the**

11  **interpretation of how elections should be administered.**

12  **So we would go to them on something like that.**

Q.   So if you had questions about one of the kinds
of hypotheticals I mentioned, an assister answers a
voter's question --

THE REPORTER:  We just lost everyone.

MR. DELLHEIM:  Should we go off the record
for a second?

(Brief recess.)

MR. HUDSON:  This is Eric Hudson on behalf
of the Office of Attorney General.  During the break,
counsel discussed entering a stipulation on the record.
The stipulation, as I understand it, I'll allow counsel
to speak for themselves, is that my client is instructed
to avoid -- for the purposes of avoiding duplicative

objections or lengthy objections, we're stipulating on the record that my client is instructed not to provide any answers that would encroach on attorney client, attorney work-product, legislative or investigative privileges, or any other applicable privilege, including deliberative process or any others that would be -- that could conceivably be implicated by the questions.

Do you understand that instruction, Jonathan?

**A.  Yes.**

MR. HUDSON:  Okay.  And I understand that all counsel are going to stipulate to that?

MS. PAIKOWSKY: Yes.

MR. HUDSON: Okay.

MS. PERALES:  If I might -- am I stipulating to your instruction to the witness?

MR. HUDSON:  Stipulating that the -- I'm not going to have to continue making the objection; basically that we have a running objection.

MS. PERALES:  Yes.  We can stipulate to that, to the extent that it applies, yes.

22    MR. HUDSON:  Sure.  We also understand,
23    though, by way of the stipulation, if my client has any
24    questions about whether there's any kind of privileged
25    information that he needs guidance on, we can still go

1    **A.   Not for me to tell you today.**

Q.   Does the way that you charge these cases change
if the voter was eligible for assistance?

MR. HUDSON:  I'm going remind you of the
ongoing -- the running objection, specifically to the
parties concerning attorney work product,
attorney-client privilege, investigative privilege.

**A.   I think -- yeah, I think that that would
probably involve our internal thought processes about**

10   **how we might charge a case depending on specific**

11   **factors, so I might not be able to answer that.**

12   Q.   In the statutes is there -- are there criminal

13   violations that are specific to people providing -- or

14   withdrawn.

15          Is there a way in the statutes to

16   distinguish between unlawful assistance, meaning

17   assistance that is provided to voters who are not

18   entitled to it, and unlawful assistance that is

19   influencing a voter who is entitled to and seeks

20   assistance?

21   **A.   It's a violation under a different subsection**

22   **of Chapter 64.036.  But I don't know that we get into**

23   **that much detail on the spreadsheet.  My recollection**

24   **would be that we typically, or we charged more cases,**

25   **and the lion's share of these would have been unlawful**

1    **A.   Obviously the same provisions are there.  I**

2    **think the same applicable provisions are there, but, I**

3    **mean, other than that, the only thing that could**

4    **potentially be applicable is the provision -- that I'm**

5    **seeing right now is the provision that you mentioned**

6    **earlier, which is confining assistance to reading the**

7    **ballot to the voter, directing the voter to read the**

8    **ballot, marking the voter's ballot or directing the**

9    **voter to mark the ballot, although I guess you could**

10   **say, literally if you take a look at that, then if they**

11   **marked the voter's ballot, even if the voter didn't**

12   **direct them to do so, that was allowable by this new**

13   **oath, so I don't know.**

Q.   So is it fair to say that you think -- in your

opinion, both oaths don't have specific provisions that

get at this activity?

MR. HUDSON:  I'll remind you of the

running objection that has been stipulated to by the

counsel present.

**A.   Yeah. I think both -- both those contain**

**language that potentially certainly could be applicable**

**to the activity, and under a different interpretation**

**perhaps neither one have something that's 100 percent on**

**point.  The only thing I would add to that is that we've**

**never prosecuted based on an oath.  The oath is**

**informative to the assistant of allowable behavior and prohibited behavior, particularly prohibited behavior, and hopefully also instructive to the voter of what the assistant should and should not be doing.**

**It's the underlying offenses in the Election Code that we would look at.**

7    Q.   So do you believe that an assister who reads,

8    you know, the text of this oath, "I will confine my

9    assistance to reading the ballot to the voter, directing

10   the voter to read the ballot, marking the voter's

11   ballot, and directing the voter to mark the ballot,"

12   would govern the assister's behavior?

13        MR. HUDSON:  Objection, form, foundation.

14   Objection, form, incomplete hypothetical.

15        **A.   Only in the most practical sense, because a**

16   **person's understanding is going to govern their**

17   **behavior.  Again, I'm, you know, answering a**

18   **hypothetical.  I think in an objective sense, obviously**

19   **the law says what it says.**

20   Q.   Could a voter who reads this assistance -- or,

21   sorry, an assister who reads this oath understand it to

22   sort of strictly govern their permissible behaviors?

23        MR. HUDSON:  Objection, form, foundation.

24   Objection, form, speculation.  Objection, form,

25   incomplete hypothetical.

1   **situations where voters were -- voters may have been**

2   **approached and pressured into receiving assistance**

3   **outside of a polling place or even with regards to mail**

4   **ballots, and we did not have an adequate statute to**

5   **address that interaction at that time.  However, I do**

6   **believe there was a -- possibly an amendment made to**

7   **Chapter 64.036 that helped in that area, possibly with**

8   **SB 5 in the special session of the 85th Legislature that**

9   **helped in that regard, so these may have been older**

10  **cases.**

11  Q.   So was that in 2017?

12  **A.   Uh-huh.  Yes, ma'am.**

Q.   And of all of the cases that you have pointed
out to me today, which of these, if any, to your
knowledge took place in person at a polling place?

**A.   The case that certainly didn't involve mail
ballots, and it was the violation of Chapter 61.008,
would have happened at a polling place for sure, and
I -- I don't recall specifically any others.  I'm not
saying there weren't any, but I don't recall
specifically any others that happened at a polling place
that I can tell just based on these notes and without
refreshing my recollection.**

Q.   Sorry.  One moment.

MS. PERALES:  And just so I'm not lost,

you're talking about Patricia Barton in Medina County on Page 7?

THE WITNESS:  That's the one that jumps out to memory, yes, ma'am.

Q.   (By Ms. Paikowsky)  So based on your knowledge today, other than that one case, none of those cases listed in the exhibit took place in person at a polling place?

**A.   I'm not recalling any from my memory, so I would agree to that, to avoid having to look through each one of them again, but that's my recollection.**

Q.   And the Patricia Barton case, that one you noted did not involve assistance?

**A.   I don't believe it did involve assistance, no.**

15    Q.   And all of the cases that we discussed involved

16    violations of existing statutes that predated SB 1?

17    **A.   Correct, which are still in place today.**

18    Q.   They're still in place today.  Thank you.

19         Just one minute.  Okay.  So I'm going to

20    move on to the mail -- the mail ballot identification

21    provisions of Senate Bill 1.  So first of all, do you

22    believe that all eligible voters who want to participate

23    in an election should be able to cast a ballot and have

24    their ballot counted?

25    **A.   Yes.**

1    Q.   So I'm going to show you a document that we're

2    going to mark as Exhibit -- that we're going to mark as

3    Exhibit -- what are we on?  4?

4         MR. HUDSON:  Yes.

5         (Exhibit No. 4 marked.)

6    Q.   Can you look at Section A3 or, sorry, A4, and

7    tell me what that -- what that provision means?

8         MR. HUDSON:  I'll just remind you of the

9    running objection concerning privileges.

**A.   So this is a -- it says it's a new provision.**

**A person commits an offense if a person knowingly or**

**intentionally makes any effort to prevent a voter from**

**casting a legal ballot in an election in which the voter**

**is eligible to vote.**

**I'm not sure how to interpret that, aside**

**from its statutory language, but I would be happy to**

**answer any specific questions you have about it.**

Q.   Do you believe that this law furthers the

interest of election integrity?

     MR. HUDSON:  Same objections, including

the running objections.

**A.   I -- I imagine that is the intent.**

23   Q.   In what way do you think this law would further

24   the interests of election integrity?

25   **A.   I think it's designed -- it seems designed to**

1   **information to continue the process.  That's not to say**

2   **that a harvesting crew that's well connected with a good**

3   **database couldn't obtain some of those numbers, but it**

4   **would be more difficult and it would be above the**

5   **sophistication level of a lot of harvesting crews that**

6   **we've dealt with.**

7       Q.   Okay.  And so we talked about vote harvesting.

8   Are there different types of vote harvesting crimes?

9       **A.   There are a handful of specific offenses in the**

10  **Election Code that are invoked kind of in the vote**

11  **harvesting activity.**

12      Q.   And is vote harvesting illegal at all stages of

13  the voting process?

14      **A.   It really kind of depends on how you define**

15  **vote harvesting.**

    Q.   Would you mind clarifying for me the different

types of vote harvesting crimes that could be deterred

by the -- by SB1's new mail ballot ID requirement?

        MR. HUDSON:  Remind you of the running

objections.

    **A.   Starting at the beginning with vote harvesting,**

**you have a seeding phase or an application phase that**

**focuses on applications for mail ballots, and fraudulent**

**submission of mail ballots on behalf of a voter could be**

**hampered by the requirement to include a piece of**

**identifying information, or an identifier such as a DL or the last four of the social.  That could be an obstacle to a vote harvesting crew that wishes to bypass the voter.**

**And then, as I already stated, it could also be an obstacle to gaining the voter's compliance, because here's a stranger asking for my DL number so that they can complete these documents on my behalf or submit this, you know, carrier envelope on my behalf, so it -- by putting the control of the interaction more in the voter's hands because those are -- those are numbers that the voter has access to that the harvester is less likely to have access to, I think it promotes security in that fashion.**

15  Q.   So if I, moving forward, refer to the activity
16  you described of collecting as many absentee ballots and
17  collecting and submitting ballots by mail as illegal
18  vote harvesting, will you understand what I'm referring
19  to?

20  **A.   Sure.  And if for some reason that definition**
21  **needs clarifying, then I'll bring it up at that time.**

22  Q.   You mentioned that SB1's mail ballot
23  identification requirements would be more effective in
24  preventing some vote harvesting more so than others.
25  Are there instances you can think of where SB1's mail

1   or have the voter fill out their own identification

2   number?

3      **A.  That's right.  Absolutely.**

4         MS. PAIKOWSKY:  If it's okay, can I take a

5   five-minute break?

6      **A.  Sure.**

7         MR. HUDSON:  No objection.

8         (Lunch recess.)

9      Q.  (By Ms. Paikowsky)  Mr. White, I'm going to go
back to asking questions about SB1's mail ballot
identification provisions.  Without SB1's mail ballot
identification provisions, would your office have other
means of detecting vote harvesting?

      MR. HUDSON:  Object to the extent that
that would encroach on investigator privilege, and
remind you of the stipulation concerning the running
objection.  Just instruct the witness, to the extent
that that would encroach on methods of investigation or
practices, I'll instruct you not to answer.

   **A.  Yeah.  Without going into our mental
impressions and our investigative practices, I guess I
could say we have prosecuted vote harvesting cases in
the past.**

24      Q.  And this, again, is not seeking specific

25   information about any investigation, but do you have --

1   interpreting the statute?

2           HUDSON:  Objection, form, foundation.

3   Calls for speculation.  Incomplete hypothetical.

4   **A.   Yeah, I don't know if I could -- if I could**

5   **answer how a county might or might not interpret or**

6   **enforce the statute.**

7   Q.   Do you think counties might vary in their

8   interpretation of Paragraph G, refusal to accept a

9   watcher?

10          MR. HUDSON:  Same objections.

11  **A.   I don't know.**

12  Q.   You do deal with local prosecutors in your

13  current work; is that correct?

14  **A.   Yes, ma'am.**

15  Q.   Has it ever been your experience that local

16  prosecutors have varied interpretations of the same

17  language within the Texas Election Code?

18  **A.   I have experienced that before.**

Q.   Have you ever advised a local prosecutor that
something the prosecutor thought was unlawful was not
unlawful in your view?

**A.   I don't --**

          MR. HUDSON:  I would remind you of the
running objection that the parties have stipulated to.
Otherwise, you're free to answer.

1    **A.   Yeah.   I probably couldn't go into those types**

2    **of communications, but I don't recall specific**

3    **situations.**

4    Q.   Do you have an attorney-client relationship

5    with local prosecutors?

6    **A.   If they approach me in an advisory capacity,**

7    **depending on the situation, I could, but I don't have**

8    **a -- like a freestanding relationship.**

9    Q.   Let me ask the question slightly differently.

10   Have you ever stepped in to prosecute an election

11   offense when the local county prosecutor declined to do

12   so?

13   **A.   I don't have a specific recollection of any**

14   **time that we have prosecuted a offense where we have had**

15   **a conversation with a District Attorney who has taken**

16   **that position.**

17   Q.   Now, prior to December --

18   **A.   Uh-huh.**

19   Q.   -- it was true, then, that sometimes your

20   office would secure an indictment of a defendant for

21   election fraud without working in cooperation with the

22   local prosecutor; is that right?

23   **A.   Without working directly with that office,**

24   **that's correct, we could do that.**

25   Q.   And so I believe you had testified previously

1          MR. HUDSON:  Objection, form, foundation.

2   Objection, calls for speculation.

3      **A.   I don't know what that -- that action would be.**

4   **Could be anything, I suppose.**

5      Q.   Okay.  Do you know what action would be to

6   distance the watcher from the activity or procedure?

7          MR. HUDSON:  Same objections.

8      **A.   I don't.  I don't have a list of examples of**

9   **that off the top of my head, no, ma'am.**

10     Q.   Do you know what would -- do you know what

11  would constitute a manner that would make observation

12  not reasonably effective?

13         MR. HUDSON:  Same objections.

14     **A.   No.  We would -- we would take a set of facts**

15  **that we were given in a complaint and then we would try**

16  **to apply the law, and I don't typically work in reverse.**

17     Q.   Have you developed any standards at this point

18  for deciding what would be an action that would obstruct

19  the view of a watcher?

20     **A.   No, ma'am.**

       Q.   Have you developed any standards that would

   allow you to decide whether a poll official had

   distanced the watcher from the activity?

           MR. HUDSON:  I'll just remind you of the

   running objection that we have concerning privileges,

and also note the deliberative process privilege is one of those.

3      THE REPORTER:  I'm sorry, I couldn't hear
4  you.

MR. HUDSON:  Deliberative process privilege is also one of those.  Instruct you not to answer to the extent you would be encroaching on any privileges.

**A.  I'll follow that advice.**

10     Q.   Do you have a distance -- let's just talk about
11  the voting machine.  Do you vote here in Travis County?
12     **A.   No, ma'am.**
13     Q.   Tell me about the -- tell me about the voting
14  apparatus in the county where you do vote.
15     **A.   Just a typical hard voting system, prints a**
16  **paper ballot and you scan it in at the door on your way**
17  **out.**
18     Q.   So it's a DRE.  You use a touchscreen; is that
19  right?
20     **A.   You use a -- I can't remember if it's a**
21  **touchscreen or if it's --**
22     Q.   It's a wheel?
23     **A.   I can't remember if it's still a wheel, but**
24  **you -- it will print the ballot for you after you've**
25  **entered it electronically.  And then you turn it in or**

1   **scan it at the door on your way out.**

2   Q.   Okay.  So generally you vote on a machine that

3   has a screen and it's sitting on a little table with

4   some long legs on it; is that right?

5   **A.  Yes, ma'am.**

6   Q.   Okay.  And then you're going to take the piece

7   of paper that it gives you, and you're going to walk

8   over to that receptacle and put your piece of paper in

9   there; is that right?

10   **A.  Yes, ma'am.  Place it in the receptacle.**

11   Q.   Okay.  Sometimes called a tabulator.  Okay.  So

12   let's take the instance of a voter who is standing at

13   one of those voting machines like the kind that you vote

14   on, Mr. White.  How close -- let me ask the question

15   this way.  How far could a watcher be placed by the

16   election judge such that it would violate Section

17   4.09(a) in SB 1?

18          MR. HUDSON:  Objection.  Incomplete

19   hypothetical.  Objection, calls for speculation.

20   **A.  I don't think I could answer that.**

21   Q.   Is it because you don't know?

22   **A.  I couldn't --**

23          MR. HUDSON:  Objection, calls for an

24   incomplete hypothetical.  Calls for speculation.

25   **A.  Yeah.  I don't have enough facts to -- to**

**answer that question.  And even if I did have enough facts, it would probably involve me going into my thought processes about -- about the offense, and so I don't think I could answer that.**

Q.   Okay.  At this point, I would like to say on the record that you should listen to your counsel, and especially if he instructs you not to answer the question.  But counsel is limited to making form objections and not speaking objections.  And so in order to avoid any appearance of coaching the witness, which I know counsel would never do, his form objections --

MR. HUDSON:  Well, I'll just go ahead and stop you right there and say you're tossing out coaching on the record.  Nobody is coaching by giving form and giving the description of what the objection is, which I've been limiting to one word.  We also have a standing objection, our standing or running objection based on privileges.  And I would point out that some of your questions are clearly targeted at getting at privileged information, so I'm simply reminding the witness of the stipulation that you made early on so that I wouldn't give long objections based on privilege.

If you want me to go ahead and start making all formal objections because you're concerned that I'm giving speaking objections, I'm happy to do

that.  I'm just trying to make sure that my client isn't
reaching out and expanding beyond the privilege
stipulation that we've already made.

   MS. PERALES:  You have your running
stipulation, and we've agreed to that.  I just want to
make sure that the form objections are stated as
succinctly as the rules hope we do.

 Q. (By Ms. Perales)  So let's go back to the
voting machine scenario.  Mr. White, you're familiar
with your own voting machine that you use in the polling
place in your home county.  If we have a situation where
there's a watcher and a voter, and an election judge,
and the election judge has distanced the watcher from
that machine and the activity of the voter at that
machine, is it your testimony that -- that that is still
not enough information upon which you could make a
decision whether there is a violation of 4.09 of SB 1?

   MR. HUDSON:  Objection, speculation.
Incomplete hypothetical.

 **A. I think that's correct, that I wouldn't have
enough information.**

22 Q. Could you explain to me how this new language

23 in 4.09(a) makes unlawful behavior that previously would

24 have been lawful?

25 **A. I would say the plain text that was added adds**

1    Q.   Understood.  In your experience, does vote

2  harvesting occur in the context of paid campaign workers

3  or otherwise compensated individuals working on behalf

4  of a campaign?

5    **A.   Generally, yes.**

6    Q.   Have you ever encountered an instance of

7  improper voter assistance carried out by an individual

8  who is not working for a political campaign?

9    **A.   If so, it would be quite rare.**

     Q.   Have you ever encountered that instance?

     **A.   Example -- an example or examples that come to**

**mind would be subject to privilege for an ongoing**

**investigation or prosecution, so I wouldn't want to talk**

**specifically about them, but --**

          MR. HUDSON:  I'll make a formal objection

based on that, to the extent it would encroach on

attorney-client, work-product, investigative privilege,

or any other stipulated objection, I would instruct you

not to answer.  But to the extent that you can go ahead

and respond, please do so.

     **A.   I think -- I think the answer would be**

**possibly, yes, without getting into any detail.**

23   Q.   Okay.  So let me ask a question that might not

24  encroach on privilege.  Have you ever yourself or your

25  office brought charges against an individual for

1   unlawful voter assistance when that individual was not

2   working for a political campaign?

3       **A.   And by "unlawful assistance," you mean a**

4   **violation of 64.036.**

5       Q.   Or the other measures that we have discussed

6   before, 64.012, 276.013.

7       **A.   I'm not sure.  I'm not sure on those specific**

8   **statutes.  But what I could tell you is that almost all**

9   **of the cases that we see that involve assistance fraud**

10  **involve individuals that we believed were associated**

11  **with campaigns or working directly for a candidate or a**

12  **slate of candidates, or were relatives of candidates or**

13  **the candidates themselves.**

   Q.   Thank you.  And so sitting here today, you
cannot recall an instance in which your office has
brought charges against an individual for violating
either 64.036 or 64.012, or 276.013, when that defendant
was not working for a candidate or campaign or slate of
candidates, correct?

   **A.   Or a relative of the candidate or the candidate**
**themself?**

   Q.   Right.

   **A.   If you include those -- if you can give me one**
**moment.  I can --**

           MR. HUDSON:  For purposes of the record, I

would point out that you were referencing -- would you identify that by exhibit number?

THE WITNESS: That's Exhibit 6, which is the list of our pending -- includes a list of our pending prosecutions.

**A.   I can think of -- I could think of one --**

Q.   Where you brought charges?

**A.   -- case where charges have been brought.  There could be more, but I don't have a recollection of them at this time.**

Q.   Tell me about that one case.

**A.   I can't go into that case due to --**

Q.   If charges have been brought, wouldn't that be a public record?

**A.   There's a pending prosecution.**

Q.   I see.  Are there charging documents?

**A.   There are.**

Q.   Have they been filed?

**A.   They have.**

Q.   Where have they been filed?

**A.   In the district court where the case is charged.**

Q.   What is that district court?  If it's a public record, I'm entitled to know about it.

MR. HUDSON:  If I could have just a minute

to advise him on what he can and can't talk about.  If we can go off the record just a moment.

(Brief recess.)

MR. HUDSON:  Mr. White, so I understand, the case that you're referring to is on Exhibit --

THE WITNESS:  6.

MR. HUDSON:  Exhibit 6.  I'm instructing you -- to the extent that there's anything in the public record about the case, I'm instructing you to testify about that.  To the extent that there are details that are part of ongoing investigative processes, attorney-client privilege, attorney work product, or any other applicable privileges, I'm instructing you not to answer.  But to the extent it's on the public record, I'm instructing you to answer.

A.   The case --

MR. HUDSON:  Let her ask her question.

A.   Go ahead.

Q.   (By Ms. Perales)  I think we were out there, the question was half answered.  But I'll go ahead and make a new question for you.

MR. HUDSON:  Sorry about that.

THE WITNESS:  Sure.

Q.   Please describe for me the charges that you mentioned a few minutes ago related to a particular

defendant and the scenario that I was describing.

**A.   Okay.  The case that came to mind does not**
**actually involve ballot assistance, it involved voter**
**registration, and so it may not be directly applicable**
**to your -- your question, and I think it may not.  It --**
**what sparked my memory is that it did involve an offense**
**under 276.013, but it was not under the influencing the**
**voter subsection, so I don't think that it would be**
**responsive, but I have been instructed that, if it were**
**responsive, I would disclose to you --**

MR. HUDSON:  Well, don't tell her what I
instructed you.

THE WITNESS:  I'm sorry.  I'm sorry.

MR. HUDSON:  That's on the record.

**A.   But if something is in the public record, I**
**would make that available to you.**

17   Q.   Yes.  So is there a reference to that on the

18   Exhibit 6 somewhere?

19   **A.   The case is one of our pending -- one of our**

20   **pending prosecutions.**

21   Q.   And since charges have been filed, can you

22   point to me which page that pending prosecution is on in

23   the exhibit?

24   **A.   It's -- well, it's -- again, it's not**

25   **responsive to the -- to the subject area that we were**

1    Q.   Thank you.  Do you know who Omar Escobar is

2    from Starr County?

3    **A.  I do.**

4    Q.   Would you consider him a friend?

5    **A.  Consider him a former colleague.**

6    Q.   Because he's not the DA anymore, correct?

7    **A.  Correct.**

8    Q.   Do you -- do you receive complaints about

9    public officials coercing votes from their employees

unlawfully?

     **A.  We would receive those.**

          MR. HUDSON:  I'll just remind you of the

running stipulation.  You can answer generally, but to

the extent it encroaches on privileges, please bear that

in mind.

16   Q.   (By Ms. Perales)  Have you ever prosecuted a

17   public official for coercing votes from public

18   employees?

19   **A.  Not that I can recall.**

20   Q.   Are you aware of any public information

21   suggesting that Omar Escobar has coerced public

22   employees unlawfully with respect to their political

23   support or their votes?

24   **A.  I'm not aware of any -- I'm not aware of any**

25   **public information to that effect.**

1          Mr. White, my name is Laura Rosenbaum.  I

2     am one of the attorneys for the Mi Familia Vota

3     plaintiffs in this case.  So nice to meet you.  And I

4     know it's late in the afternoon.  I won't take too much

5     of your time.  And hopefully I won't be repeating

6     questions that have already been asked today.  There

7     have been a little bit of issues with the Zoom

8     connection, but I just have a couple of topics that I

9     don't, don't think have been fully addressed.  Can you

10    hear me okay?

11    **A.  Yes, ma'am.**

12    Q.   Okay.  Thank you.  Have you or has your office

13    been involved in any prosecutions for fraud that relate

14    to drive-through voting?

15    **A.  No, ma'am.**

Q.   Are you aware of any investigations into

allegations of fraud that relate to drive-through

voting?

          MR. HUDSON:  Object to the extent that it

would call for attorney-client, attorney work-product or

investigative privilege.  If you can answer without

encroaching on those, you're free to do so.  Otherwise,

I'm instructing you not to answer.

          THE REPORTER:  I'm sorry, you'll have to

slow down.  Work product or investigative privilege?

MR. HUDSON:  To the extent you can answer without encroaching on any of those privileges, you're free to do so.

**A.   I'm not able to discuss any investigations that -- that are not public.**

6    Q.   Are you aware of any complaints of voter fraud
7    that relate to drive-through voting?

8              MR. HUDSON:  Same objection.  Same
9    instruction.

10   **A.   Same answer to the extent that those would have**
11   **sparked an investigation.**

12   Q.   So you don't have access to complaints that
13   you've received, that your office has received that
14   relate to drive-through voting?  Because if they were
15   received from the public -- from members of the public,
16   they would not be attorney-client privileged.

17             MR. HUDSON:  Objection, argumentative.
18   Objection, same instruction.  Same objections with
19   regard to privilege.

20   Q.   (By Ms. Rosenbaum)  The question is, has your
21   office received any complaints from the public that
22   relate to allegations of fraud that involve
23   drive-through voting?

24             MR. HUDSON:  Same objection.  Same
25   instructions.

1

2

3

4

5

6          I, JONATHAN S. WHITE, have read the

7    foregoing deposition and hereby affix my signature that

8    same is true and correct, except as noted above.

9

10              JONATHAN S. WHITE

11   STATE OF TEXAS     )

12   COUNTY OF TRAVIS  )

13          Before me,_____, on this

14   the day personally appeared JONATHAN S. WHITE known to

15   me to be the person whose name is subscribed to the

16   foregoing instrument and acknowledge to me that they

17   executed the same for the purposes and consideration

18   therein expressed.

19              Given under my hand and seal of office

20   this _____ day of _____, 2022.

21

22

23              NOTARY PUBLIC IN AND FOR

24              THE STATE OF_____

25

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2                 SAN ANTONIO DIVISION

3    LA UNION DEL PUEBLO        §
     ENTERO, ET AL.,            §
4          Plaintiffs,      §  Civil Action No.
                            §  5:21-cv-844 (XR)
5    VS.                    §  (Consolidated Cases)
                            §
6    STATE OF TEXAS, ET AL.     §
          Defendants.        §
7    **************************************************

8                  ORAL DEPOSITION OF

9               JONATHAN SHERMAN WHITE

10                   APRIL 27, 2022

11   **************************************************

12        I, CAROLINE CHAPMAN, Certified Shorthand

13   Reporter in and for the State of Texas, hereby certify

14   to the following:

15        That the witness, JONATHAN S. WHITE was duly

16   sworn by the officer and that the transcript of the oral

17   deposition is a true record of the testimony given by

18   the witness;

19             That the deposition transcript was

20   submitted on May ___, 2022 to the witness or to the

21   attorney for the witness for examination, signature, and

22   return to me within 20 days;

23             That the amount of time used by each party

24   at the deposition is as follows:

25                  Honorable Dana Paikowsky - Three hours and

1   seventeen minutes.

2          Honorable Nina Perales - Three hours and

3   fifty-six minutes.

4          Honorable Laura E. Rosenbaum - Six

5   minutes.

6          That pursuant to information given to the

7   deposition officer at the time said testimony was taken,

8   the appearance pages include all parties of record.

9          I further certify that I am neither

10  counsel for, related to, nor employed by any of the

11  parties or attorneys in the action in which this

12  proceeding was taken, and further that I am not

13  financially or otherwise interested in the outcome of

14  the action.

15          Certified to by me on May 2, 2022.

16

17

            CAROLINE CHAPMAN, Texas CSR 467
18          Expiration Date: 03/31/2023
            Firm Registration No. 223
19          WORLDWIDE COURT REPORTERS
            3000 Weslayan, Suite 235
20          Houston, Texas 77027
            (713) 572-2000

21

22

23

24

25