**APPENDIX C**

APPENDIX C

PLAINTIFFS' STATEMENT OF LEGAL PROPOSITIONS THAT ARE NOT IN DISPUTE

CONSTITUTIONAL PROVISIONS

1.   The First Amendment to the U.S. Constitution protects against laws "abridging the freedom of speech." U.S. Const. Amend. I.

2.   The Fourteenth Amendment to the U.S. Constitution provides, in relevant part: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

3.   The Fifteenth Amendment to the U.S Constitution provides, in relevant part: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV.

FIRST AMENDMENT FREE SPEECH

4.   Free speech is protected both "from abridgment by Congress" and "from impairment by the States." *Gitlow v. New York*, 268 U.S. 652, 666 (1925).

5.   Courts apply "strict scrutiny" to content-based restrictions on speech. *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015).

6.   A regulation is "content-based" if it "single[s] out specific subject matter for differential treatment . . . even if it does not discriminate among viewpoints within that subject matter." *City of Austin v. Reagan Nat'l Advert. Of Austin, LLC*, 142 S. Ct. 1462, 1471, 1472 (2022); *see also Turner Broadcasting System, Inc. v. Federal Communications Commission*, 512 U.S. 622, 643 (1994) ("As a general rule, laws that, by their terms, distinguish favored speech from disfavored

1

speech on the basis of the ideas or views expressed are content based.").

7. Courts apply "strict scrutiny" to laws that burden political speech. *E.g.*, *Dep't of Tex., Veterans of Foreign Wars of U.S. v. Tex. Lottery Comm'n*, 760 F.3d 427, 438–39 (5th Cir. 2014) (en banc).

8. Political speech includes speech "uttered during a campaign for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971).

9. Under "strict scrutiny," a challenged law is "presumptively unconstitutional and may be justified only if the government proves that [the law is] narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

10. To satisfy strict scrutiny, the government's asserted state interests must be rooted in an "actual problem," which requires more than "anecdote and supposition." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 822 (2000).

11. To show that a law is narrowly tailored, the government must show there is no "less restrictive alternative that would serve the Government's purpose[.]" *Playboy Entertainment*, 529 U.S. at 813.

FOURTEENTH AMENDMENT VOID FOR VAGUENESS

12. The Due Process Clause of the Fourteenth Amendment applies to state and local officials.

13. A law is unconstitutional under the Due Process Clause if it is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).

14. A law must define the offense "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Brooks*, 681 F.3d 678, 696 (5th Cir. 2012).

120773197.1 0099831-00001

15. "When a statute 'interferes with the right of free speech or of association, a more stringent vagueness test should apply.'" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010).

FIRST AMENDMENT OVERBREADTH

16. A law is unlawfully overbroad in violation of the First Amendment if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010).

FIRST AND FOURTEENTH AMENDMENTS UNDUE BURDEN

17. The right to vote is a "fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

18. Under the First and Fourteenth Amendments to the United States Constitution, a state may not unduly burden the right to vote.

19. To determine whether a state election practice unduly burdens the right to vote, a court must balance the character and magnitude of the burden the practice imposes on the right to vote against the justifications offered by the state in support of the challenged law. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

20. When a state election law severely burdens the right to vote or is discriminatory, a court must find that it is "narrowly drawn to advance a state interest of compelling importance" in order to survive constitutional muster. *Burdick*, 504 U.S. at 434 (citation omitted); *see also Norman v.Reed*, 502 U.S. 279, 280 (1992)

21. Even a "slight" burden must be "justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (controlling op.).

FOURTEENTH AND FIFTEENTH INTENTIONAL DISCRIMINATION

22. The Fourteenth Amendment prohibits intentional racial discrimination by state actors.

3

Discriminatory intent may be established by proof that the defendants used race as a motivating factor in their decisions. *Vill. of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

23. The Fifteenth Amendment enfranchised voters nationwide, regardless of race or color, and is an independent source of authority to protect against discrimination in voting. "The Amendment bans racial discrimination in voting by both state and nation. It thus establishes a national policy . . . not to be discriminated against as voters in elections to determine public governmental policies or to select public officials . . . ." *Terry v. Adams*, 345 U.S. 461, 467 (1953).

24. Like the Fourteenth Amendment, discriminatory intent under the Fifteenth Amendment may be established by proof that the defendants used race as a motivating factor in their decisions. *Mobile v. Bolden*, 446 U.S. 55, 62, (1980) (plurality opinion) (citing *Vill. of Arlington Heights*, 429 U.S. at 265).

SECTION 2 OF THE VRA

25. Section 2 of the VRA applies nationwide and prohibits voting standards, practices, or procedures that are motivated by a discriminatory purpose or that result in the denial or abridgement of the right of any citizen to vote on account of race, color or membership in a language minority group. 52 U.S.C. § 10301.

*Discriminatory Effects Claim*

26. Subsection (b) of 52 U.S.C. § 10301 provides that a violation is established if "based on the totality of the circumstances," it is shown that the political processes leading to election in the State "are not equally open to participation" by members of a protected class of citizens.

27. In *Thornburg v. Gingles*, 478 U.S. 30 (1986) and *Brnovich v. DNC*, 141 S. Ct. 2321 (2021), the Supreme Court set out frameworks for determining whether voting rules violate Section 2 by

120773197.1 0099831-00001

resulting in an abridgement of the right of any citizen to vote on account of race, color, or membership in a language minority group.

28. The *Gingles* inquiry, which looks to discriminatory effects, requires the Court "to consider the 'totality of the circumstances' and to determine, based upon a practical evaluation of the past and present realities whether the political process is equally open to minority voters." *Thornburg v. Gingles*, 478 U.S. 30, 32 (1986). The Senate Judiciary Committee, in a report accompanying the 1982 amendments to the Voting Rights Act, provided a non-exclusive list of factors that a court should consider in determining whether the challenged practice impermissibly impairs the ability of the minority group to elect their preferred representatives.

29. These 'totality of the circumstances' factors include, but are not limited to:

    a.  The extent of any history of official discrimination in the state or political subdivision affecting the right of a member of a minority group to register, vote, or participate in the democratic process;

    b.  The extent to which voting in government elections is racially polarized;

    c.  The extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group;

    d.  Exclusion of minorities from a candidate slating process;

    e.  The extent to which minority group members in the state or political subdivision bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

    f.  The use of overt or subtle racial appeals in political campaigns;

120773197.1 0099831-00001

g.  The extent to which minorities have been elected to public office in the

jurisdiction.

h.  Whether there is a significant lack of responsiveness on the part of elected

officials to the particularized needs of the minority group

i.  Whether the policy underlying the use of such voting qualification, prerequisite to

voting, or standard, practice or procedure is tenuous.

30. A violation of Section 2 exists where "'the political processes leading to nomination or election' are not 'equally open to participation' by members of the relevant protected group 'in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" Courts must evaluate the totality of the circumstances to make this determination.

31. With respect to vote denial, there are additional guideposts that may be relevant to the totality of the circumstances analysis. *Brnovich*, 141 S. Ct. at 2338-40.  These guideposts include, but are not limited to:

a.  The "size of the burden" placed by the challenged voting rule;

b.  The "degree to which a voting rule departs" from voting practices that were in

effect in 1982 (when Section 2 was last amended);

c.  The "size of any disparities" in a voting rule's effect on "members of different

racial or ethnic groups";

d.  The opportunities afforded by "a State's entire system of voting";

e.  The "strength of the state interests" served by the challenged voting rule.

*Discriminatory Intent Claim*

32. Apart from prohibiting discriminatory effects, Section 2 also prohibits intentional racial discrimination in voting laws.

33. A voting law violates Section 2's prohibition on intentional racial discrimination if the State used race as a motivating factor in its decisions. *Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016)

34. Even if the challenged legislation is neutral on its face, discriminatory intent can be inferred under the test set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), and its progeny, which entails a consideration of available evidence through a non-exhaustive set of factors. *Id.* at 266-68; *see also Veasey*, 830 F.3d at 230 (applying Arlington Heights test in Section 2 challenge asserting intentional race discrimination).

35. Among the factors relevant to determining discriminatory intent are: "(1) the historical background of the decision; (2) the specific sequence of events leading up to the decision; (3) departures from the normal procedural sequence; (4) substantive departures; and (5) legislative history." *Overton v. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989).

36. In determining the existence of discriminatory intent, "courts may consider both circumstantial and direct evidence of intent; however, "direct evidence" is not a prerequisite as "neutral reasons can and do mask racial intent[.]" *Veasey*, 830 F.3d at 235; *Vill. of Arlington Heights*, 429 U.S. at 266-68 (instructing courts to perform a "sensitive inquiry into such circumstantial and direct evidence as may be available").

SECTION 208 OF THE VRA

37. Section 208 of the VRA applies nationwide and provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write" in English for any reason "may be given assistance by a person of the voter's choice, other than the voter's

employer or agent of that employer or officer or agent of the voter's union." 52 U.S.C. § 10508.

38. Section 208 of the VRA preempts state laws that interfere with its voting assistance guarantee, including state laws that restrict the actions of assisters. *See OCA Greater Hous. v. Texas* (*OCA-Greater Hous. II*), No. 1:15-CV-679, 2022 WL 2019295, at *3 (W.D. Tex. June 6, 2022) (modifying injunction to enjoin new state law "limiting the activities eligible for assistance to 'marking or reading the ballot'" (citation omitted)); *Disability Rts. N.C. v. N.C. State Bd. of Elections* (*Disability Rts. N.C. II*), No. 5:21-CV-361, 2022 WL 2678884, at *7 (E.D.N.C. July 11, 2022) (holding Section 208 preempted a restriction on choice of assister during absentee voting); *Ark. United II*, 626 F. Supp. 3d at 1087 (finding Section 208 preempted a limitation on the number of voters assisters could serve); *Carey v. Wis. Elections Comm'n*, 624 F. Supp. 3d 1020, 1032 (W.D. Wis. 2022) (enjoining restriction on absentee ballot return assistance).

39. Section 208 of the VRA guarantees a voter's choice in assister. *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017) (holding that Texas law limiting who can provide assistance to non-English speaking voters violated Section 208 of the Voting Rights Act and noting that "a state cannot restrict this federally guaranteed right [Section 208] by enacting a statute tracking its language, then defining terms more restrictively than as federally defined.").

40. Section 208 of the VRA defines the word "vote" to "include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this chapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election." 52 U.S.C. § 10310(c)(1).

41. Section 208 of the VRA guarantees the right to assistance in the voting process before

120773197.1 0099831-00001

entering the ballot box, "registration," and it includes steps in the voting process after leaving the ballot box, "having such ballot counted properly." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614-615. (5th Cir. 2017).

TITLE II OF THE ADA

42. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

43. A qualified person with a disability under Title II of the ADA means "a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A).

44. Title II of the ADA defines a "public entity" as any state or local government [or] any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A)-(B).

45. Title II of the ADA provides that "[n]o qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." 28 C.F.R. § 35.130(a).

46. Title II of the ADA provides that "[a] public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability [. . . ] [d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service." 28 C.F.R. § 35.130(b)(1)(i).

9

47. Title II of the ADA provides that "[a] public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability [. . .] [a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others."  28 C.F.R. § 35.130(b)(1)(ii).

48.  Title II of the ADA provides that "[a] public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability [. . .] [p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others."  28 C.F.R. § 35.130(b)(1)(iii).

49. Title II of the ADA provides that "[a] public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability [. . .] [p]rovide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others."  28 C.F.R. § 35.130(b)(1)(iv).

50. Title II of the ADA provides that "[a] public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability [. . .] [o]therwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service."  28 C.F.R. § 35.130(b)(1)(vii).

120773197.1 0099831-00001

51. Title II of the ADA provides that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(b)(7)(i).

52. Title II of the ADA provides that "[n]o private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part." 28 C.F.R. § 35.134(b).

53. Title II of the ADA provides that "[a] public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered."  28 C.F.R. § 35.130(b)(8).

54. Title II of the ADA provides that [a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities."  28 C.F.R. § 35.130(b)(3)(ii).

SECTION 504 OF THE REHABILITATION ACT

55. Section 504 provides that "no otherwise qualified individual with a disability in the United States, shall, solely by reason of her or his disability, be excluded from the participation

in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service."  29 U.S.C. § 794(a).

56. A qualified person with a disability under Section 504 means "any person who has a disability as defined in section 12102 of title 42 [of the ADA]." 29 U.S.C. § 794(a).

57. Under Section 504, a "program or activity" "means all of the operations of—(1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government." 29 U.S.C. § 794(b).