IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, | * | |
| et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | Civil Action |
| v. | * | No. 5:21-cv-844 (XR) |
| | * | (Consolidated Cases) |
| STATE OF TEXAS, et al., | * | |
| | * | |
| Defendants. | * | |

------------------------------------------------------------

ORAL DEPOSITION OF

JONATHAN WHITE

August 11, 2023

------------------------------------------------------------

ORAL DEPOSITION of JONATHAN WHITE, produced as a witness at the instance of Defendant The United States, duly sworn, was taken in the above-styled and numbered cause on the 11th day of August, 2023 from 9:20 a.m. to 1:00 p.m., before Lydia L. Edwards, CSR in and for the State of Texas by machine shorthand, at the Office of the Attorney General, 209 West 14th Street, in the City of Austin, County of Travis, State of Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto.

1 being provided to us.  And as we stated before, the

2 protocol would be for Criminal Investigations to receive

3 a complaint and to then investigate it, you know, to do

4 some preliminary investigation, determine whether it

5 requires a full investigation, or merits one, and then

6 to investigate from there.

7             So the list -- I assume, you know, there's

8 a list that exists, but typically our practice was not

9 to proactively go out, seek information or data and then

10 initiate investigations based on that.  We would

11 typically wait for a complaint.

12     Q.   So you do not personally review all complaints

13 that come in?

14     A.   I did not.

15     Q.   Under what circumstances would a complaint be

16 brought to your attention?

17     A.   Generally if it's something going forward on, I

18 would get looped in at some point, and that could be

19 early in the process or it could be a little later once

20 the investigation had already begun and perhaps the

21 investigator had questions.

22     Q.   What steps do investigators take to review

23 complaints?

24     A.   At the outset, evaluating -- making an initial

25 evaluation of a complaint would involve just a review of

1   the allegation itself, if there was any evidence

2   provided, thinking through the allegation based on our

3   experience and our knowledge of election crimes to see

4   if it even -- if the allegation even makes sense.  Of

5   course, we would see if there's even a criminal

6   allegation that's alleged on the surface of the

7   complaint before -- as a preliminary step before we

8   would move forward.

9       Q.  And those investigators were not supervised by
    you, correct?

        A.   No, not -- they were not in my chain of command
    because the election fraud unit -- or Election Integrity
    Unit that investigated these crimes report to law
    enforcement up their chain.  And they're part of the
    Criminal Investigations Division, and I was in
    Prosecution.  So I did not have direct supervisory
    authority over those folks.  It was more of a
    knowledge-based and sort of a goodwill-based
    relationship.

20      Q.  So there were complaints that would come in

21   that would not be brought to your attention?

        A.   That's probably true.

        Q.   Is that probably true or do you know it to be
    true that there would be certain complaints that you
    would not be made aware of because they would be

resolved by this other unit?

A.   I mean, I'm pretty sure that that's true because if there was a complaint that didn't require further investigation -- that didn't merit investigation it's unlikely that that would be brought to my attention.

7    Q.   And that determination would be made by someone
8    else?

9    A.   Correct.  And if I could add to that, you know,
10   the procedures in the early days were more -- it was
11   more bifurcated where it was just Criminal
12   Investigations would take a complaint, review it, do an
13   investigation, then bring it to the prosecutor.  We
14   tried to integrate that more as time went on because we
15   found that it built better cases.  So there was some
16   variance in how that took place over time, but I would
17   see more and more complaints as time went on.

18   Q.   And what was the turning point for that?

19   A.   It was just -- it was just an effort to build
20   better cases by getting, you know, prosecutors involved
21   earlier in the process to evaluate the complaint and to
22   make suggestions based on what we would need to see
23   evidentiarily to be able to make a prosecutable case.

24   Q.   I'm sorry.  I meant what year --

25   A.   Ah.

1     Q.   -- did that change?

2     A.   Gradually occurred over time.

3     Q.   So the process was still bifurcated, but the

4  sort of informal collaboration depended on both the

5  nature of the complaint and, you know, the instincts for

6  collaboration over time?

7     A.   Exactly.

8     Q.   Through what means would you learn about the

9  outcome of an investigator's efforts, like a memo, an

   email?

      A.   Generally it was one-on-one conversations.  We

   shared a space -- an office space, and that was one of

   the efforts that we had made to sort of integrate going

   forward to produce better investigations and have us

   work together as a cohesive unit even though we were in

   two separate divisions.  So somebody would come sit down

   in my office.

18    Q.   Would an investigator write up their notes?

19    A.   Generally not.  They would write official

20  reports if -- if a case was completed and there was

21  probable cause that an offense occurred.

22    Q.   And so there would be no paper record of

23  investigations that occurred and were undertaken but did

24  not turn into prosecutions?

25              MS. HUNKER:  Objection, form.

1      A.    I wouldn't -- I wouldn't say no because, you

2   know, there's -- there could be an occasional email,

3   certainly, but most of those conversations took place in

4   person, sometimes over the phone.

5      Q.    (BY MS. PAIKOWSKY)   Did the investigation

6   process itself generate documents/papers/records, like

7   emails/notes/reports?

8      A.    Occasionally.

9      Q.    And what is your basis for -- withdrawn.

              Did you personally participate in those

    investigations beyond being appraised about them by the

    investigators?

       A.    If a case moved forward to prosecution,

    generally always yes.   There would be follow-up

    investigation by my team that was needed.

       Q.    I'm speaking just at the investigation phase.

       A.    Yeah.

       Q.    Would you question witnesses, for example,

    before prosecution had been recommended?

       A.    No, generally not.

21              MS. PAIKOWSKY:   So I would like to mark

22   this as Exhibit 3.   I lost my exhibit stickers.

23              (White Exhibit No. 3 marked.)

24      Q.    (BY MS. PAIKOWSKY)   Do you recognize this

25   document?

Page 23

1     Q.   Do you recall what criteria you used to search

2   for documents in response to discovery requests in this

3   case?

4     A.   It has been a long time.  I want to say it's

5   probably been a year and a half or so.  I -- really

6   don't.  I remember in the early stages the requests were

7   mainly about SB1 specific communications and things, and

8   then after that I really don't have much recollection.

9          MS. HUNKER:  Counsel, there appears to be

10   cut-off Bates numbers.  Do you happen to have it so I

11   can note it for my records?

12          MS. PAIKOWSKY:  Can I give it to you at

13   the break?

14          MS. HUNKER:  Yes.

           MS. PAIKOWSKY:  Thank you.  So I'm going

   to mark this document as Exhibit 4 and pass it around as

   well.

           (White Exhibit No. 4 marked.)

      Q.   (BY MS. PAIKOWSKY)  And you don't need to read

   the whole thing.  I'd just like to know do you recognize

   what type of document this is?

22     A.   Yes, ma'am.

23     Q.   What is it?

24     A.   This is a supplemental investigation report on

25   top.  And I'm not sure if this whole thing is a

Page 24

supplemental or not, but it's an investigative report, generally speaking.

Q.   And so there would be a primary report in addition to this one?

A.   Typically.  And that may be -- this is -- oh, sorry.  You got the staple in the right-hand corner.  I think the document is actually upside-down.

Q.   Oh, I'm sorry.

A.   Yeah.  This is an investigative report followed by a supplemental report perhaps.

Q.   And this is a report that would be created to write up an investigation, correct?

13      A.   Correct.

14      Q.   And this is a document that you might review coming from the investigation division?

A.   Correct.  If this was referred for prosecution, I would generally see this document at some point in time.

Q.   And so this document would be created for all investigations that had been authorized to move forward from a complaint into a formal investigation process; is that correct?

MS. HUNKER:  Objection, form.

A.   No, not necessarily.  It would be -- this would be complete before we received a prosecution referral.

Q.    (BY MS. PAIKOWSKY)   So investigations that the investigation division internally did not warrant a prosecution recommendation might not be written up in this way and turned over to you; is that correct?

A.    It -- it might be.   But a situation where a case was referred -- where a case was investigated preliminarily and didn't turn into a full investigation would likely not have a complete investigative report like this one.

10    Q.    But full investigations would have a report

11    like this one?

12    A.    I think typically they would.

13    Q.    And you would only receive it if it was turned

14    over to you from the other division because they thought

15    it warranted your attention?

16    A.    Correct.   I didn't have any direct access to

17    these documents.

Q.    Do you -- how often did you receive documents like this?

A.    And I guess I would receive a document like this on the completion of any investigation that was referred for prosecution.   And the number, I -- I'd be guessing if I tried to put an average on it, but in the spreadsheet of cases prosecuted, that would give you an idea of at least the cases that were able to be charged

in court, how many of those I received over what period
of time.

Q.   Did you ever receive an investigation document
like this and decide not to prosecute?

A.   I'm sure that happened, yes.

Q.   Do you know about how often that happened?

A.   I don't think I could put a number on it, but
it wasn't infrequent that a case wouldn't be able --
wouldn't be viable in court.

Q.   And when you were undertaking your search for
documents -- and I know this was a long time ago -- do
you recall looking for these kinds of reports?

A.   I don't have a specific recollection of that,
but I could say that most of the time I wouldn't retain
copies of reports like this.  I might if I had an
investigation that proceeded forward, but typically
these would stay with the Criminal Investigations
Division.

Q.   But if it turned into a prosecution, you would
retain this for your records?

A.   Very likely I would have a copy of that.

Q.   How much of an investigative file comes to your
attention?  Is it just this document, or are there more?

A.   It would depend on the case.  But there could
be a report or I might see, you know, election records

o r I migh t jus t verball y b e tol d abou t electio n records
that were obtained.  I might be told about, you know,
witnes s interview s o r thing s tha t th e investigato r had
learne d o r researched.  I t depend s o n wha t stag e I was
having that interaction with an investigator.  It
depends on whether it was a case that ultimately was
made on the investigation side, and it depends on
whether a case was actually prosecution-worthy and then
we actually in earnest gathered documents, performed our
10    own investigation to shore up facts and evidence and
11    whatnot.  So it varies.
12         Q.   So just so I understand -- and I'm going to
13    maybe refer to this as a pre-prosecution investigation
14    file and a prosecution-ready investigation file, so
15    something that is kind of presented to you with a
16    prosecution recommendation and something that's in the
17    preliminary stages.
18         A.   Uh-huh.
19         Q.   So for a prosecution recommendation
20    investigation file, that would include this report and
21    potentially other evidence and things like that; is that
22    correct?
23         A.   It could.  It's -- it all depends on the
24    investigator really.
25         Q.   How much time would you spend reviewing a file

that was presented to you as, you know, the
investigation is complete and we're ready to move
forward with the prosecution?

    A.   I mean, only as much as I had to.

    Q.   Did you read the whole thing every time or you
could get a sense?

    A.   I didn't always need to read an entire
investigative report if one was provided.  I mean, a lot
of it would be based on the conversation with the --
10  with the investigator so I could cut to the chase.
11  Especially if the investigator wasn't -- wasn't that
12  good of a writer, I might get the information out of him
13  just via conversation.
14    Q.   Are there any documents or records that the
15  investigative unit would make when they closed an
16  investigation and did not refer it for prosecution?
17    A.   I'm not sure.
18    Q.   Were there any documents or records that your
19  office would create when a prosecution recommendation
20  file with an investigation would be presented to you and
21  you determined not to move forward with the prosecution,
22  so closing documents?
23    A.   Generally not.  Generally we would only open a
24  case if we had done significant work on that case on our
25  side that, you know, time needed to be billed to.  So --

1    but, no, we didn't have a standard form or anything that

2    we used to record presentations.

      Q.   So when we last spoke, you mentioned that you usually supervised cases and not prosecuted them because you supervised other attorneys.  Is that -- was that correct?

      A.   Yeah.  I mean, early in my career I was the line prosecutor.  Toward the end when I was running the investigations -- or the Election Integrity Division, I would generally be referring these cases to other attorneys.  So if I saw something like this (indicating), it would probably not even come to me.  I mean, it would probably go to the attorney, and I would just know what the basic case is from talking to the prosecutor and the investigator.

      Q.   Can you describe to me the division of labor between you and a line attorney when receiving an investigation and determining if -- to move forward with the prosecution?

      A.   Due to my experience with these cases, I would generally make a decision of whether a case was worth going forward on or not, and I could do that fairly quickly.  And then I would refer the file to the prosecutor and connect him with the investigator.

25          Q.   When did you become a supervisor?

1    that.  I say my investigator, not really mine but our

2    investigator.

3         Q.   Was it before or after election day?

4         A.   I know some of this was going on in real-time

5    prior to the election -- prior to voting day, but -- at

6    least that's my recollection.

7         Q.   So you're not sure whether the list was

8    provided before or after election day?

9         A.   I think I said it was before.

10        Q.   Okay.

11        A.   I'm pretty certain that it was before, and I

12   think it had to have been before because they were able

13   to not count most of the fraudulent votes that we had

14   found; although, a few had been counted.  So my

15   deduction would have been that that would have had to

16   have happened during the early voting period.

          Q.   So you assert that Dallas County received and

     counted fraudulent ballots from Mr. Mohamed.  How did

     you come to that conclusion?

          A.   That was -- I believe that was told to me by my

     investigator.

          Q.   But you were not perfect -- personally involved

     in investigating and making that determination?

          A.   No.  I did not go to Dallas County, and I

     didn't talk with the families and the voters myself.  I

1    may have reviewed some election records, but I don't

2    have a specific memory of which ones I did or didn't.

3         Q.   Did your office issue public statements

4    describing these assertions that Dallas County received

5    and counted fraudulent ballots?

6         A.   Not to my knowledge.  And we typically wouldn't

7    do that during the pendency of an investigation.

8         Q.   Did your office include any of these assertions

9    in any public court filings?

10        A.   I don't believe we would have done that, no,

11   during the pendency of the investigation.

12             MS. HUNKER:  Objection, form.

13        Q.   (BY MS. PAIKOWSKY)  In past testimony, you

14   suggested that fraud occurs this way with no awareness

15   or participation from the voter, and large scale

16   operations are both easier to detect than harvesting

17   operations that engage voters directly; is that correct?

18        A.   It's true -- I believe it's true that ballot

19   diversion schemes like the one that Mohamed performed

20   are easier to detect than boots on the ground, knock on

21   one door at a time, have an interaction with the voter,

22   yes, absolutely, because you have a large number of

23   ballots being sent to a single address.  That could be a

24   residential care facility.  It could be a multifamily

25   dwelling.  But Denton County in this case took it upon

1   date, April 27, 2022.   Do you see that sticker there?

2        A.   Yes, ma'am.

3        Q.   All right.   And would you agree with me that

4   this is the chart that you produced that was current as

5   of April, 2022 regarding the pending and resolved

6   prosecutions?

7        A.   Yes, ma'am.

8        Q.   Okay.   Go ahead and take a look at your

9   declaration, if you would.   This is Deposition Exhibit

    No. 2.

             In Paragraph 3 of your declaration that's

    on Page 1, you say in the last sentence -- and tell me

    if I read this correctly -- "I have reviewed hundreds of

    investigations, and handled approximately 100

    prosecutions...."   Do you see that there?

         A.   Yes, ma'am.

         Q.   Okay.   Does your experience with the hundreds

    of investigations and approximately 100 prosecutions

    form the basis of your knowledge of the topics that you

    testify about in your declaration?

         A.   Certainly a large portion of it.

22        Q.   Okay.   What outside of the investigations and

23   prosecutions form your knowledge for the topics that you

24   address in your declaration?

25        A.   Well, if I can reference my previous answers

1  very specific thing that I thought might be

2  chart-related that's Paragraph 16 at the top of Page 4

3  where you mention the number of election offenses and

4  individuals prosecuted.

5      A.   Oh, yeah.  Yes, ma'am, yes.  That would have

6  been another one that I would have had to review.  I

7  would have had a rough idea of that, but I would have

8  had to review the spreadsheet to narrow that time frame

9  from 2015 forward.

10     Q.   Did you review any case files in order to

11 prepare the declaration?

12     A.   No, ma'am.

       Q.   And so would it be fair to say, then, that the
   knowledge that you're expressing in your declaration is
   based on your past exposure to documents and
   conversations and activities that you had?

       A.   I think that's accurate.  It's -- it's an
   amalgamation of 15 years of cases and prosecutions and
   reviewing, you know, lots of election records and things
   like that and all of the things we've talked about
   today, yes, ma'am.

22     Q.   At the very beginning of your declaration, you

23 say that -- and this is even before the numbered

24 paragraphs -- you're executing the declaration as part

25 of your assigned duties and responsibilities; is that

1  all of those cases, but I'm not sure.  And if you wanted

2  me to run the numbers one way, I would definitely have

3  to go the spreadsheet and try to -- and try to do that.

4  Also, I'm not sure about the 18.  It could have been 20;

5  it could have been 22.  I think it was 18, but don't

6  hold me to that.

7       Q.   Understood.  I'm not going to force you to do

8  the math here.

9            Let's look at Paragraph 8 of your
declaration.  Here you're talking about election
offenses, and in your second sentence, you say with mail
ballots -- "With mail ballots, a vote harvester travels
in person to wherever the voter is located, in a nursing
home, for example, or at the voter's home...."  Do you
see that?

       A.   Yes, ma'am.

       Q.   Okay.  Do you recall identifying any documents
that provide that information when you were working on
discovery production in this case?

       A.   No, I don't recall.

       Q.   Do you recall whether any documents with that
information were produced by State Defendants in this
litigation?

       A.   I have no idea what was produced.

25      Q.   Okay.  I'm going to ask you a series of very

1   similar questions about the declaration.  So I hope you

2   don't become impatient if you have to repeat some of

3   your answers.

4        A.   No promises.

         Q.   My next question is also in Paragraph 8 where

    you talk about achieving an election offense "by

    actually filling the ballot out for the voter, or

    suggesting to the voter how they should vote during the

    voting process."  Do you see that language there?

         A.   I do.  And that was referencing the ensuring

    "that the ballot is voted for the candidate" in the

    prior sentence.  That was what the "achieving" was

    about.

         Q.   Do you recall identifying in your documents as

    part of your work on discovery production in this case

    that have those specific facts in them?

         A.   I honestly couldn't say one way or the other.

    It's the same answer as before.

         Q.   And do you know whether State Defendants

    produce d an y document s wit h thos e specifi c fact s i n them

    abou t fillin g ou t th e ballo t fo r th e vote r o r suggesting

    to the voter how the voter should vote?  Were any

    document s lik e tha t produce d b y Stat e Defendant s i n the

    case?

         A.   I have no idea.

1    questions that may elicit a similar answer, but I still

2    have to ask them, okay?

3        A.   Yes, ma'am.

        Q.   You mentioned in Paragraph 10 that "political

operatives may transport voters to the polls and assign

the voter to an 'assistant' who walks them through the

voting process, including physically entering the votes

on the voting machine."   Do you see that?

        A.   Yes, ma'am.

        Q.   Do you recall identifying any documents for

production -- for discovery production in this case that

state those specific facts?

        A.   I don't recall that specifically, but that's

something that I've testified about in front of the

Legislature.   And it does bring a particular case to

mind, but it's a civil election contest that I wasn't

particularly -- wasn't personally involved in, but yes,

ma'am.

        Q.   And did you -- do you recall identifying any

documents related to that civil election contest as part

of the discovery production in this case?

        A.   I don't remember one way or the other.

        Q.   Okay.   Beyond that one civil election contest,

do you recall any other documents that would state this

specific fact -- these specific facts?

A.    I don't recall documents.  They may exist, but my recollection is based on generally anecdotes that I might have spoken with an investigator about or just general memories of an investigation and wouldn't be tied to any particular document.

Q.    Did that investigation lead to a prosecution?

A.    I wouldn't be able to tell you that.  I might dig around the memory bank and maybe come up with another specific example, but that could take me more time than we have here today.

Q.    And so sitting here today you can't think of a specific prosecution related to the facts stated in this sentence regarding assigning a voter to an assistant and the assistant possibly even physically entering the votes on the voting machine?

A.    Well, how much time do you have?

Q.    I have time.  Does that mean that you want to sit for a while and think about it?

A.    I mean, I could come up with another example if you wanted me to probably.

Q.    And would that example be a prosecution?

A.    Possibly.  I remember a case in Nueces County where a candidate himself was actually sort of attaching himself to voters and taking them through the voting process and voting -- well, voting their ballots --

Page  91

Was that --

-- although.

Go ahead.  Please finish.

It was a runoff election.  He was the only race on the ballot.  So it was a little bit of unique facts. That's probably why it's standing out.

Do you mean he was the only candidate on the ballot?

Only race.  It was a runoff between him and one other candidate.

Do you know if that resulted in a prosecution?

It did result in a prosecution, although not a successful one.  And mistakes were made, and lessons were learned.  It was not by me, by the bay.

15    Q.   Okay.  Is that prosecution on your chart?

16    A.   Yes, ma'am.

17    Q.   Can you find it?

18    A.   I probably can, yeah.  I think we might have

19    talked about it last -- or in a previous deposition when

20    we went through a bunch of these cases or all of the

21    cases on the prosecution's resolve list that were asked

22    about.  I'm having trouble reading this.

23    Q.   It's a terrible copy.

24    A.   I think the defendant name might have been

25    Robert Gonzales, if that helps but, I'm having trouble

1    finding it.

2          Q.   Okay.

3          A.   With that being a closed case, I can pretty

4    much talk freely about it if you have questions.

5          Q.   So besides Mr. Gonzales and the anecdote you

6    mentioned earlier, there would be records related to

7    Mr. Gonzales' prosecution, would there not?

8          A.   There should be, yes.

9          Q.   Okay.  Do you recall producing those in

10   discovery?

11         A.   I -- no.  Again, I couldn't tell you one way or

12   the other.

13         Q.   Okay.

14         A.   I don't think those documents would have been

15   in my -- my custody because it was actually prosecuted

16   by an attorney from the criminal prosecutions division.

17   But I don't recall one way or the other, probably not,

18   though, from me.

           Q.   Okay.  Now, later on in Paragraph 10, you

     mention assistance -- well, "...assistants may latch on

     to a voter at the polling location...."  Do you see that

     there --

           A.   I'm sorry.

           Q.   -- in the middle of the Paragraph 0?

           A.   No. 10?

Q.   Yes.

A.   Yes, ma'am.  And actually the Gonzales example would probably be a better example of latching onto a voter; although, I do believe he did have somebody he provided transportation to, which kind of goes into the assigned assistant scheme which we saw in the South Texas case with the election contest.  And we actually had -- I think we had three -- three prosecutions filed that came out of that matter which were pending at the time that we deposed last.

Q.   Okay.

A.   But I believe that those have since been dismissed due to the ruling in Stephens.

Q.   Okay.  And do you recall identifying any documents for production containing facts that assistants may latch onto a voter at the polling location?

A.   I don't recall one way or the other, no, ma'am.

19   Q.   Okay.  Do you know whether any were produced in
20   this litigation?

21   A.   I have no idea what was produced.

Q.   Okay.  You mention at the bottom of Paragraph 11 that "vote harvesters are usually paid off book" and that "they may be listed on campaign reports as 'canvassers,' 'blockwalkers,' 'GOTV'...'outreach,' or

some other euphemism or title."   Is that a correct

reading of your declaration there?

    A.   Yes, ma'am, it is.

    Q.   Okay.   Do you recall identifying any documents

for production in this case that contained those facts?

    A.   I do not recall one way or the other.

7    Q.   And do you recall whether any documents

8  containing those facts were turned over in discovery?

9    A.   I have no idea.

10    Q.   Okay.   Paragraph 12, you mention harvesters

11  will go through a neighborhood and sign up as many

12  people as possible for mail-in ballots.   Do you see that

13  there?

14    A.   Yes, ma'am.   And I think we discussed that in a

15  prior deposition in regard to the presentation that you

16  had a copy of that was given at a Secretary of State

17  elections conference, but, yeah, that's some general

18  information about the harvesting.

19    Q.   And besides that conference document, do you

20  recall identifying any documents that -- for discovery

21  production that contained those facts?

22    A.   I don't recall one way or the other.

23    Q.   And do you know if any documents like that were

24  turned over in discovery?

25    A.   I do not.

Q.    Paragraph 13 mentions "harvesters may resort to signing up young, able-bodied people who do not qualify for mail ballot voting."   Do you see that there?

A.    Yes, ma'am.

Q.    And then you go on to give an example of a case.   Do you see that?

A.    Yes, ma'am, I do.

Q.    Do you recall whether you turned over -- whether you identified for production any documents related to that case that you mentioned in that paragraph?

A.    I do not recall, ma'am.

Q.    Do you know if any materials were turned over in discovery in this case related to vote harvesters signing up young, able-bodied people who do not qualify for mail ballot voting?

A.    I do not recall -- or do not have that knowledge.

Q.    So since you're talking about a case here, would it be fair to say that there was a record of that case in your office somewhere?

A.    There -- right.   There would be a record of that investigation, surely, certainly; although, the investigation was referred to Gregg County DA's Office for prosecution.   So it's possible they have the

1   original file, and there could be some attorney work
2   product relating to our advisory role in that case from
3   a prosecution standpoint.  So there could be some
4   limited documents on the prosecution side.
5        Q.   And similarly with respect to the election
6   contest that you mentioned earlier involving voter
7   assistants, there would be some documentation -- some
8   records in your office touching on that election
9   contest; is that right?
10       A.   Right.  There should be -- I think it would be
11  about the same answer.  There should be some limited --
12  there should be some sort of investigative file with
13  CID; although, as I recall, that was a fairly small
14  investigation -- fairly simple investigation because the
15  details had been hashed out and testimony had been
16  gathered in a civil election contest prior.  And then
17  the case was filed by Hidalgo County District Attorney's
18  Office who we were assisting with that case up until the
19  Stephens decision became final, and that case was
20  dismissed, I believe -- those three cases.
21       Q.   And then with respect to Mr. Gonzales over
22  there in Nueces County, there would be some records in
23  your office of the investigation and what it was he may
24  have done with respect to voter assistants; is that
25  right?

1    question.

2         A.    Yes, ma'am.

3         Q.    In your paragraphs on Mohamed Zul, in Paragraph

4    21 in the last sentence, you're talking about SB1's

5    requirement of an ID number, I believe, and in the last

6    sentence, you say, "This security measure would have

7    prevented this fraud scheme entirely, and would have

8    stopped it early, at the application phase"; is that

9    right?

10        A.    Yes, ma'am.

11        Q.    And when you say "application," you mean

12   application for ballot by mail?

13        A.    Yes, ma'am.

          Q.    Wasn't it the case that Mohamed Zul had forged

voter registration applications for the voters for whom

he was seeking mail ballots?

          A.    You may know more than I do about that.   There

was a lot of information released publicly about this

case, and maybe that's where you're getting some of

that.   The only -- my recollection was -- is

applications for ballot by mail-in for mail ballots, and

I did not -- I was not -- as I sit here today, I don't

recall a voter registration component.   But, again, a

lot of information was released publicly, and so that --

I won't argue with you if that was the case.

Q.   If it was the case that Mohamed Zul had forged voter registration applications which did contain ID numbers, he would have had the ID numbers that were required for application for ballot by mail, mail ballot, under SB1, correct?

MS. HUNKER:   Objection, form.

A.   Well, assuming he had the right numbers to begin with because you have to provide a valid ID number in order to get a registration through to the live check process.  So to the extent that any vote harvester has, you know, PII, personal identifying information, of a voter, they could, well, forge a registration application and the following documents to vote.

14    Q.   (BY MS. PERALES)   And --

15    A.   If --

16    Q.   I'm sorry.  Keep going.

17    A.   The only thing I was going to add to that is, I -- it wasn't my understanding that he had those numbers in this case which is why I was a little more categorical about my statement that it would have stopped this scheme.  So I'll leave room for you to be correct about the voter registration applications because I know there was a lot of information released publicly about this case, not by us but by Denton County, perhaps some others.  I was not aware of that

1    fact if that's true.

2        Q.   I could be completely wrong about that, and,
3    you know, sometimes you read something in the paper and
4    it's not correct.  So --
5        A.   Well, that's true, also.
6        Q.   Moving along, I wanted to ask if you reviewed
7    any of the discovery responses in this case.  And I'm
8    going to mark three of them for you -- actually I'm
9    going to try to save time by marking all three and
10   giving them to you at once.
11               (White Exhibit No. 7 marked.)
12       Q.   (BY MS. PERALES)  I'm handing you what has been
13   marked Deposition Exhibit 7.
14               (White Exhibit No. 8 marked.)
15       Q.   (BY MS. PERALES)  I'm going to hand you what
16   has been marked as Deposition Exhibit 8.  Go ahead and
17   you take a look at these as I hand them to you.
18               (White Exhibit No. 9 marked.)
19       Q.   (BY MS. PERALES)  I'm handing you now what has
20   been marked as Deposition Exhibit No. 9.
21               So let's take a look at Deposition Exhibit
22   No. 7, and I'll represent to you that these are the
23   Attorney General's Objections and Responses to Private
24   Plaintiff's First Set of Requests For Production, dated
25   December 29.

1   to pin down where they came from.  It's all right here

2   in my head (indicating).

3              MS. PERALES:  I understand.  I object as

4   nonresponsive, and I'll try my question again.

    Q.   (BY MS. PERALES)  Understanding that you're

    testifying based on what's in your head and also

    understanding that what's in your head is differently

    than what's in my head because we've had different

    experiences professionally, would it be fair to say that

    your knowledge -- the knowledge that informs the

    testimony of your declaration is drawn at least in part

    from the investigative and prosecution case files that

    you've been exposed to over these years that you have

    worked in your unit --

15              MS. HUNKER:  Objection --

16       Q.   (BY MS. PERALES)  -- or division?

17              MS. HUNKER:  Objection, form.

18       A.   In part, sure.

19       Q.   (BY MS. PERALES)  I'm going to retrieve from

20   you Deposition Exhibit 7, if you don't mind.

21       A.   I think it's --

22       Q.   Where did it go?

23       A.   -- right here (indicating).

24       Q.   Oh, there it is.

25              MS. PERALES:  And I'm going to take the

1  preparing privilege logs.  Does this document help

2  refresh your recollection whether you were involved in

3  preparing privilege logs?

4      A.   It's the same as before.  I don't recognize the

5  document.  I didn't do any work on it.  If information

6  from me was used in preparation for this, I don't -- I

7  don't know about it.

8      Q.   Okay.  Do you happen to notice that in the

9  column which has sort of descriptive information --

10  "Privilege Statement" is the column -- we see a lot of

11  entries for "Election complaint" --

12      A.   Yes, ma'am.

13      Q.   -- on both the first page and the second page?

14  Would you agree with me?

15      A.   Yes, ma'am.

16      Q.   We don't really see entries for investigative

17  files; is that right?

18              MS. HUNKER:  Objection, form.

19      A.   I'm not seeing investigation files.

        Q.   (BY MS. PERALES)  Would it be fair to say that

    there are investigative files in the Election Integrity

    Division that would be relevant to voter fraud

    investigations but are not on this privilege log?

        A.   Relevant to investigations, yeah.  I think any

    investigative files that CID has would be relevant to

1    voter fraud investigations that were voter fraud

2    investigations, yes, ma'am.

3         Q.   Okay.   Thank you.   I'd like you to now refer to

4    Deposition Exhibit No. 4 if I can find it.   I believe I

5    have it here, and I'm going to hand it to you.   You

6    previously identified this Deposition Exhibit 4 as a

7    supplemental investigation report and then behind it an

8    investigation report; is that right?

9         A.   Yes, if we let the staple guide us through the

10   document.   If we flip it over, the report is on top, and

11   the supplement is behind it.

12        Q.   Oh, okay.   I understand.

13        A.   Yes, ma'am.

14        Q.   Got it.   Do you see one, two, three, four --

15   five pages in from what I think is the back but might be

16   the front for you there is a page that contains a list

17   of exhibits?   Do you see that there?

18        A.   Does it say Page 16 at the top of the page?

19        Q.   Yes, it does.

20        A.   Yes, ma'am.

        Q.   Okay.   There are 26 exhibits here; is that

correct -- there's a list of 26 exhibits, yes?

        A.   Yes, ma'am.

        Q.   And do you understand these to be exhibits to

the investigation report?

A.    Yes, ma'am.


Q.    Do you know if these exhibits were ever
produced in discovery?

A.    I have no idea.

Q.    Would these exhibits typically be considered
part of the investigative file?

A.    Yes, ma'am.

8              MS. PERALES:   I'd like to go off the

9    record for five minutes, if we could.

10             MS. HUNKER:   Sure.

11             MS. PERALES:   Thank you.

12             THE REPORTER:   Off the record, 12:45 p.m.

13             (BRIEF RECESS)

14             THE REPORTER:   Back on the record, the

15   time is 12:53 p.m.

16             MS. PERALES:   Thank you very much,

17   Mr. White.   I pass the witness.

18

19                     EXAMINATION

20   BY MS. HUNKER:

21        Q.    Mr. White, I just have a couple of questions

22   for you.   Can you please turn to Exhibit 5?

23        A.    Got it.

24        Q.    And can you please describe what this is?

25        A.    This is a spreadsheet of all resolved

1    produced to opposing counsel?

2        A.    That's my understanding because we -- I was

3    questioned on it in the deposition on 4-7.

4        Q.    Did counsel introduce this spreadsheet as an

5    exhibit in the April deposition that you took?

6        A.    Yes, ma'am.

7        Q.    And that deposition took place in this case; is

8    that correct?

9        A.    Yes, ma'am.

         Q.    During that deposition, did counsel ask you
    questions about the spreadsheet?

         A.    Yes.

         Q.    And during your deposition, did counsel ask
    about the cases that were listed in the spreadsheet?

         A.    Yes.

         Q.    In that deposition, did counsel run through the
    cases they identified as being relevant?

         A.    Yes.

         Q.    In your deposition, did counsel ask questions
    about the details on the cases they identified as
    relevant?

         A.    Yes, to varying degrees.

         Q.    And did you answer counsel's questions fully?

         A.    Yes, I did.

         Q.    And did you provide all public information

about the cases that counsel asked about during your

deposition?

    A.   To the extent that I was asked, I did.

    Q.   And did you -- to the extent that you were

asked during your deposition, did you provide all

information about closed cases?

    A.   To the extent that they existed on the

spreadsheet and the publicly available information, I

did, yes.

10    Q.   In this deposition, did counsel ask you about

11 some of the cases identified in the spreadsheet?

12    A.   Yes, ma'am.

13    Q.   And did you answer fully and completely with

14 respect to those questions?

15    A.   Yes, ma'am.

16    Q.   You can put this document aside.  Can you

17 please turn to Exhibit 8?

18    A.   Got it.

19    Q.   And can you just read the title of the

20 document?

21    A.   Objections to the LUPE Plaintiffs' Second Set

22 of Requests for Production to Attorney General Kenneth

23 Paxton.

24    Q.   And if you turn the page, do you see the date

25 that this particular response/objections was served?

```
 1              I, JONATHAN WHITE, have read the foregoing

 2   deposition and hereby affix my signature that same is

 3   true and correct, except as noted above.

 4

 5                           _____

 6                           JONATHAN WHITE

 7

 8   THE STATE OF TEXAS )

 9   COUNTY OF TRAVIS   )

10              Before me, _____, on

11   this day personally appeared JONATHAN WHITE, known to me

12   (or proved to me under oath or through _____ )

13   (description of identity or other document) to be the

14   person whose name is subscribed to the foregoing

15   instrument and acknowledged to me that he/she executed

16   the same for the purposes and consideration therein

17   expressed.

18              Given under my hand and seal of office

19   this _____ day of _____, ____ _.

20

21                           _____

22                           NOTARY PUBLIC IN AND FOR

23                           THE STATE OF _____

24                           MY COMMISSION EXP.:_____

25
```

1    THE STATE OF TEXAS )

2    COUNTY OF TRAVIS   )

3                    I, LYDIA L. EDWARDS, a Certified Shorthand

4    Reporter in and for the State of Texas, do hereby

5    certify that the facts as stated by me in the caption

6    hereto are true; and that the above and foregoing

7    answers of the Witness, JONATHAN WHITE, were made before

8    by said Witness, after having been first administered an

9    oath or affirmation to testify to the truth, the whole

10   truth, and nothing but the truth, and the same were

11   reduced to computer transcription under my direction;

12   and that the above and foregoing deposition, as set

13   forth in computer transcription, is a full, true, and

14   correct transcript of the proceedings had at the time of

15   the taking of said deposition.

16                   I further certify that the amount of time

17   used for examination is as follows:

18        Dana Paikowsky          - 1 hour,  25 minutes

19        Nina Perales            - 1 hour,  27 minutes

20        Kathleen Hunker         - 0 hours,  7 minutes

21                   I further certify that the costs to

22   prepare the original transcript of the deposition came

23   to $ _____.

24                   I further certify that I am not in any capacity

25   a regular employee of the party on whose behalf this

Page 128

1  deposition is taken, nor in the regular employ of any
2  attorney; and I further certify that I am not interested
3  in the cause, nor a kin or counsel to any of the
4  parties.
5          GIVEN UNDER my hand and seal of office on
6  this, the _____ day of August, 2023.
7
8
                    _____
9                   LYDIA L. EDWARDS
                    Certification No. 2567
10                  Expiration Date:  04-30-25
   JOB NO. 1016161
11
   MAGNA LEGAL SERVICES
12 1635 Market Street, Eighth Floor
   Seven Penn Center
13 Philadelphia, Pennsylvania  19103
   866.624.6221
14
15
16
17
18
19
20
21
22
23
24
25