# EXHIBIT D

                UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF TEXAS
                   SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO,)(
ET AL.,                    )(
                           )(
    PLAINTIFFS,            )(
                           )(   CIVIL ACTION
VS.                        )(   NO. SA-21-CV-00844-XR
                           )(
GREGORY W. ABBOTT, ET AL., )(
                           )(
                           )(
    DEFENDANTS.            )(
----------------------------------------------------------

              VIDEOTAPED AND VIDEOCONFERENCED
                    ORAL DEPOSITION OF
              RIVELINO LOPEZ, TACOMA PHILLIPS
                   AND MICHAEL SCARPELLO
                     APRIL 29, 2022


        VIDEOTAPED AND VIDEOCONFERENCED ORAL DEPOSITION

OF RIVELINO LOPEZ, TACOMA PHILLIPS AND MICHAEL

SCARPELLO, produced as witnesses at the instance of the

Plaintiff LUPE, and duly sworn, was taken in the

above-styled and numbered cause on the 29th day of

April, 2022, from 10:47 a.m. to 8:02 p.m., before Holly

R. Swinford, CSR in and for the State of Texas, reported

by machine shorthand, at the Office of the Dallas

Elections Administrator, located at the Records

Building, 500 Elm Street, 7th Floor, Room 7Y11, in the

City of Dallas, County of Dallas, State of Texas,

pursuant to Notice, the Federal Rules, and the

provisions stated on the record or attached hereto.

Page 184

1                    MS. HUNKER:  That's all.

2                    MS. PERALES:  Let's go off the record.

3                    MR. SCHUETTE:  Do we need to ask the

4    assembled --

5                    MS. PERALES:  Assembled people on Zoom,

6    are we ready to go off the record?

7                    MS. BENDER:  No questions.  Thank you.

8                    MS. PERALES:  That was Brady.

9                    THE VIDEOGRAPHER:  We're going off the

10   record.  The time is 3:07 p.m.

11                        (Lunch recess.)

12                    THE VIDEOGRAPHER:  Okay.  We are back on

13   the record.  The time is 4:17 p.m.

14                    MS. PERALES:  I think we are ready to

15   swear the witness.

16                    THE REPORTER:  Okay.

17                    Sir, would you raise your right hand,

18   please?

19             (Witness sworn by the court reporter.)

20                    THE REPORTER:  Thank you.

21                    MICHAEL SCARPELLO,

22   having being first duly sworn, testified as follows:

23                        EXAMINATION

24   BY MS. PERALES:

25       Q.   Good afternoon.

1    I -- probably Robert Heard.  He's in our office right

2    now working as a contractor, and he was previously the

3    Assistant Elections Administrator.

4        Q.   Okay.  I'm going to ask you some questions

5    about voters who use assistants when they vote.

6        A.   Okay.

7        Q.   If -- if we get to something where you just

8    don't know the answer, I -- I want to make sure you

9    don't guess.

10       A.   (Witness moves head up and down.)

11       Q.   And just let me know if you don't know the

12   answer.

13       A.   Okay.

14       Q.   I'll probably ask you, then, like, who would be

15   the best person --

16       A.   Sure.

17       Q.   -- to talk about that; but we'll get there.

18   Okay?

19            Would you agree with me that voters who use

20   assistance include those voters who are disabled?

21            MS. HUNKER:  Objection to form.

22       A.   Yes.

23       Q.   (By Ms. Perales)  Okay.  And would you agree

24   with me that voters who use assistance include voters

25   who are illiterate in any language?

1              MS. HUNKER:  Objection, form.

2      A.    Yes.

3      Q.    (By Ms. Perales)  And would you agree with me

4  that voters who use assistance also include those who we

5  call "limited English proficient"?

6              MS. HUNKER:  Objection --

7      A.    Yes.

8              MS. HUNKER:  -- form.

9      Q.    (By Ms. Perales)  Can you describe for me the

10  sort of people who would go with a voter to help them

11  vote, to provide assistance?

12      A.    I would -- I don't have any statistics to say

13  this; but generally speaking, I think friends, family,

14  et cetera.

15      Q.    A neighbor maybe?

16      A.    Maybe.

17      Q.    Okay.  And then also are you aware whether any

18  community-based nonprofit organizations might provide

19  assistors for voters?

20      A.    I'm not aware.

21      Q.    Would you agree with me that assistors in the

22  polling place provide assistance to voters in physically

23  navigating the space of the polling place?

24              MS. HUNKER:  Objection, form.

25      A.    I don't think that -- probably doesn't meet the

1   legal definition of what an "assistor" is --

2       Q.   (By Ms. Perales)  Uh-huh.

3       A.   -- by Texas laws.

4       Q.   Okay.  So let me ask it in a less legal way.

5       A.   Okay.

6       Q.   Are you aware whether a voter, for example, who

7   might be elderly or just not great at walking around --

8       A.   Uh-huh.

9       Q.   -- could come with a friend or a relative and

10  lean on that person while they're entering the polling

11  place and moving up to the table with the poll workers

12  or moving over to the voting machine?

13                  MS. HUNKER:  Objection to form.

14      A.   Can you repeat the question?

15      Q.   (By Ms. Perales)  Yes.  Would you agree with me

16  that a voter could come to the polling place and this

17  voter could be either elderly or, otherwise, not very

18  good at walking steadily --

19      A.   Uh-huh.

20      Q.   -- and the voter would lean on or use the

21  assistance of their helper to physically move through

22  the polling place, to walk up to approach the table and

23  also the voting machine?

24      A.   I would imagine that happens, yes.

25      Q.   Okay.  Would you agree with me that some voters

1    would use assistance of another individual in order to

2    interact with poll workers, to exchange information with

3    poll workers?

4        A.    Yes.

5        Q.    Would you agree with me that a voter could use

6    an assistor to help explain to the voter how to use the

7    voting machine equipment?

8                  MS. HUNKER:  Objection to form.

9        A.    I believe there's people that would want that

10   sort of assistance, yes.

11       Q.    (By Ms. Perales)  And I do understand from

12   taking other depositions in other counties that there

13   might be a disabled voter who wants to do it all on

14   their own --

15       A.    Uh-huh.

16       Q.    -- right, and might use, for example, special

17   equipment to do that?

18       A.    That's correct.

19       Q.    But you will agree with me that there might be

20   a voter who isn't -- you know, who isn't insisting on

21   doing it all themselves and who might bring a trusted

22   assistor with them to help them vote?

23       A.    I believe that there's most likely people that

24   do that, yes.

25       Q.    Okay.  Would you agree with me that a voter

1   you -- will you understand with me that if text is

2   underlined, it's being added to the statute --

3       A.   Yes.

4       Q.   -- and if text is struck out, it's being taken

5   out of the statute?

6       A.   Yes.

7       Q.   Okay.  Now we're ready to go.

8            If you will look with me, starting sort of

9   close to the bottom of the page, would you agree with me

10  that SB 1 is adding language to the Oath of Assistance?

11      A.   Yes.

12      Q.   Okay.  And that language includes, quote, under

13  penalty of perjury --

14      A.   Yes.

15      Q.   -- unquote?

16      A.   Yes.

17      Q.   And then also the language includes, quote, the

18  voter I am assisting represented to me they are eligible

19  to receive assistance, unquote?

20      A.   I'm sorry.  I lost where you're at.

21      Q.   Oh, okay.

22      A.   What line are you on?

23      Q.   I'm on Line 26.

24      A.   Yes.  Okay.  Got it.

25      Q.   And I'll ask the question again.  SB 1 adds

Page 204

1    language to the assistor oath, quote, the voter I am

2    assisting represented to me they are eligible to receive

3    assistance --

4        A.    Yes.

5        Q.    -- unquote?

6        A.    Yes.

7        Q.    And then on Line 2, there is some new language

8    added related to the assistor confining assistance.

9            Do you see that?

10       A.    Yes.

11       Q.    And would you agree with me that SB 1 adds the

12   following language to confining assistance:  quote,

13   reading the ballot to the voter, directing the voter to

14   read the ballot, marking the voter's ballot, or

15   directing the voter to mark the ballot, unquote?

16       A.    Yes.

17       Q.    All right.  And will you agree with me that

18   those are four specific acts?

19       A.    Yes.

20       Q.    Now, will you agree with me on Line 5 -- and I

21   think you may have been talking about this a little

22   while ago -- that SB 1 removes from the assistor oath

23   that the assistor will confine assistance to, quote,

24   answering the voter's questions, unquote?

25       A.    Yes.

1     Q.   Okay.  And then there's some additional

2  language that's also coming out of the assistor oath,

3  such as stating propositions on the ballot, naming

4  candidates and their political parties?

5     A.   Yes.

6     Q.   Okay.  Will you agree with me that, starting on

7  Line 7, that the SB 1 adds to the assistor oath, quote,

8  I did not pressure or coerce the voter into choosing me

9  to provide assistance, unquote?

10     A.   Yes.

11     Q.   And then, finally, on Line 12, do you agree

12  with me that SB 1 adds the language after the semicolon,

13  quote, and I understand that if assistance is provided

14  to a voter who is not eligible for assistance, the

15  voter's ballot may not be counted, unquote?

16     A.   Yes.

17     Q.   Would you agree with me that, now that the

18  assistor is signing the oath under penalty of perjury,

19  that the assistor would face a perjury prosecution for

20  lying or not doing what the oath says a person will do?

21         MS. HUNKER:  Objection to form.

22     A.   Can you repeat the question?

23     Q.   (By Ms. Perales)  Sure.  I'll ask a better

24  question.

25     A.   Okay.

Page 206

```
 1        Q.   Do you think that an assistor, looking at this

 2   new oath, would want to make sure, because the assistor

 3   is signing under penal of perjury, that they follow

 4   the -- the commands of the oath very closely?

 5        A.   Yes.  I think it --

 6             MS. HUNKER:  Objection, form.

 7        A.   I think anyone who signs under penalty of

 8   perjury considers they're -- that -- that it's a serious

 9   business, so...

10        Q.   And perjury is a crime, is it not?

11        A.   Yes.

12        Q.   So taking the first language that I reviewed

13   with you, if an assistor wants to make sure they comply

14   with the oath closely, how will the assistor obtain a

15   representation from the voter that the voter is eligible

16   to receive assistance?

17        A.   Give me a second.  I'm not sure, other than the

18   oral representation -- oral or written representation

19   from the voter that they qualify.

20        Q.   Okay.  So to secure an oral representation, the

21   assistor would ask the voter; and then the voter would

22   have to make that representation, correct?

23        A.   Yes.

24        Q.   Okay.

25             MS. PERALES:  I'm going to mark two more
```

Page 207

1  exhibits.

2              What number is this?

3              THE REPORTER:  It's 5.

4         (Deposition Exhibit Number 5 marked.)

5              MS. PERALES:  This will be 6 (handing).

6              THE REPORTER:  Okay.

7         (Deposition Exhibit Number 6 marked.)

8         (Documents handed to the witness and Counsel.)

9              MR. SCHUETTE:  Thank you.

10             MS. HUNKER:  Thank you.

11     Q.   (By Ms. Perales)  The court reporter has handed

12  you what has been marked Deposition Exhibit Number 5 and

13  Deposition Exhibit Number 6, and I thought it might just

14  be a little bit easier for us to go through the oaths.

15             So I will ask you first, with respect to

16  Exhibit 5, do you see in the upper left-hand corner, the

17  language prescribed by the Secretary of State?

18     A.   Yes.

19     Q.   And then, in that little section there at the

20  bottom, 9, slash, 13 --

21     A.   Yes.

22     Q.   Okay.  Now, if you look at the oath, you'll

23  notice it does not have the language about penalty of

24  perjury or securing a representation from the voter.

25             Do you see that?

1      A.   Yes.

2      Q.   So will you understand with me this is what

3 we'll call the old oath --

4      A.   Yes.

5      Q.   -- the pre-SB 1 oath?

6      A.   Yeah.

7           MS. HUNKER:  Objection, form.

8      Q.   (By Ms. Perales)  And then on Exhibit 6, do you

9 see, in the upper left-hand corner, it says Prescribed

10 by the Secretary of State?

11     A.   Yes.

12     Q.   And then, at the very bottom of that, it has a

13 1, slash, 2022?

14     A.   Yes.

15     Q.   And do you see where it says "Oath of Person

16 Assisting Voter," and then, if you follow along, it has

17 that language "under penalty of perjury"?

18     A.   Yes.

19     Q.   Will you understand with me that this is the

20 new post SB 1 oath?

21     A.   That's --

22           MS. HUNKER:  Objection --

23     A.   -- correct?

24           MS. HUNKER:  -- form.

25     Q.   (By Ms. Perales)  Okay.  So let's stick with

1  reviewed and taken over and placed inside the tabulator?

2      A.   I'm sorry.  This is really difficult to read;

3  it's so small.

4      Q.   (Moving head up and down.)

5      A.   I would agree that the language could be

6  interpretated -- interpreted to be so narrow in -- in

7  its scope, that it would foreclose letting some -- you

8  know, telling -- assisting someone in dropping that into

9  the vote tabulator.

10     Q.   With an explanation about what to do?

11     A.   Yes.

12     Q.   Okay.  Would you agree with me that the Oath of

13  Assistance does not include the criteria for who is

14  eligible for assistance?

15          MS. HUNKER:  Objection, form.

16     A.   Yes.

17     Q.   (By Ms. Perales)  I want to ask you about the

18  language on Line 3.  I did not pressure -- use of the

19  term "pressure" -- the voter into choosing.

20          Would you agree with me that the Oath of

21  Assistance does not include a definition of "pressure"?

22     A.   Yes.

23          MS. HUNKER:  Objection, form.

24     Q.   (By Ms. Perales)  If a -- if someone called

25  your office and asked you if it was okay to remind his

1  neighbor for three days in a row, during Early Voting,

2  that it was coming up and he was available to assist --

3  if someone called and asked you, "If I remind that voter

4  three times that I'm available to assist them, is that

5  pressuring," how would you answer that question?

6            MS. HUNKER:  Objection to form.

7       A.   We don't provide legal advice.  But I would

8  state -- I'll just leave it at that.  We don't provide

9  legal advice.

10      Q.   (By Ms. Perales)  Okay.  Would it also be fair

11  to say that you wouldn't have a definition of "pressure"

12  in this context to fall back on?

13      A.   That's correct.

14      Q.   One more question about confining assistance to

15  the four specific actions.

16      A.   Uh-huh.

17      Q.   If a voter wants -- okay.  Let me -- let me ask

18  it this way.

19           Do you have a Spanish-speaking poll worker at

20  every single polling place in Dallas County?

21      A.   That is our goal, to have one.  We don't always

22  have one, but we have a substantial number.

23      Q.   And then let me ask the same question for your

24  new language, Vietnamese.

25      A.   Uh-huh.

Page 216

1      Q.   (By Ms. Perales)  Okay.  And you would also

2   agree with me that voting, more generally, encompasses

3   actions that go beyond reading and marking the ballot?

4   For example, checking in and signing in to vote, yes?

5      A.   Yes.

6      Q.   And being accepted to vote by the poll workers?

7      A.   Yes.

8      Q.   And also includes being shown how to use the

9   voting machine and understanding how to use the voting

10  machine?

11     A.   Yes.  It depends on which machine we're talking

12  about.  I mean, the marking the ballot, it's clear that

13  the -- the vote, the ExpressVote, would be marking the

14  ballot, as opposed to using the vote tabulator, dropping

15  the ballot in, and confirming your choices.

16     Q.   And you would agree with me that the act of

17  voting also includes moving around the polling place,

18  going from one, kind of, spot to another?

19     A.   There's three distinct stations in our method

20  of voting -- actually, four:  checking in, potentially

21  further dealing with exceptions to the standard voting

22  procedure at the -- at the judge's table, marking your

23  ballot, and depositing your ballot.

24     Q.   And would it be fair to say that, while moving

25  through those four stages of voters, typically moving

1     Q.   So that's what you're referring to?

2     A.   Yes.

3     Q.   Okay.  Who's --

4     A.   And I -- I believe there's new software that's

5  been -- that's pending approval by the Secretary of

6  State before we can use it.

7     Q.   Okay.  So you would have to get approval from

8  the Secretary of State before implementing that new

9  software?

10    A.   I believe so, yes.

11    Q.   Do you have a sense of the timeline for that

12  new software getting approved?

13    A.   I wish I knew because that new software has

14  other features that we're very anxious to use.

15    Q.   Turning back to SB 1, I'm going to ask you now

16  about this new form.  If you will turn again with me to

17  Page 52 of the bill.

18    A.   Okay.

19    Q.   You'll see that starting on Line 2, there is a

20  new section, because it's all underlined, titled

21  "Submission of Form by Assistant."

22         Do you see that?

23    A.   Uh-huh.

24    Q.   And would you agree with me that this is a new

25  provision that says that an assistor who is not an

Page 221

1    election official is required to complete a form stating

2    certain information about the assistor?

3                MS. HUNKER:  Objection to form.

4        A.   Yes.

5        Q.   (By Ms. Perales)  Okay.  At this point in time,

6    are you using the new form required under this section

7    in hard copy at the polling place?  Are -- do you know?

8        A.   I believe so, but I can't -- I'd have to

9    confirm that.

10       Q.   So if that were the case, help me understand,

11   given the stages that you were describing before, at

12   what point the assistor signs the Oath of Assistance and

13   fills out the new form.

14            Is it after the voter checks in?

15       A.   It would be at the check-in table during

16   that -- that point in time.

17       Q.   And would you agree with me that filling out a

18   new form is going to take additional time compared to

19   the time period when the form was not required?

20       A.   Yes.

21       Q.   Would you agree with me that at a polling place

22   where there are more voters voting with assistors, the

23   new requirement of a form is going to take more time for

24   each instance in which an assistor has to fill out that

25   form?

1   where an assistor has provided transportation to seven

2   or more curbside voters at a ti- -- at one time?

3               MS. HUNKER:  Objection, form.

4       A.   I'm not aware of any that have taken place

5   since the enactment of SB 1.

6       Q.   (By Ms. Perales)  How about before the

7   enactment of SB 1?  Are you familiar with any instances

8   where an assistor or a person brings seven or more

9   curbside voters at one time to vote curbside?

10              MS. HUNKER:  Same objection.

11      A.   To vote curbside?

12      Q.   (By Ms. Perales)  Yes.

13      A.   No.

14      Q.   Okay.  Turn with me, if you would, to Page 54.

15      A.   Okay.

16      Q.   Page 54, Line 20, the beginning, Section 6.06.

17           Do you see that?

18      A.   Yes.

19      Q.   Are you familiar with this provision which

20   creates an offense for compensating or accepting

21   compensation to assist a voter to vote by mail?

22      A.   Yes.

23      Q.   And would you agree with me that, at the bottom

24   of Page 54, the language that is coming out of the

25   statute is language related to a performance-based

1  compensation scheme?  Do you see that?

2     A.   Yes.

3     Q.   So would you agree with me that the -- the

4  prohibition on compensating or accepting compensation to

5  assist mail voters is being broadened beyond the

6  compensation for performance-based activity?

7            MS. HUNKER:  Objection --

8     A.   I --

9            MS. HUNKER:  -- form.

10     A.   -- don't understand the question.

11     Q.   (By Ms. Perales)  Okay.  So would you

12  understand with me that before SB 1, if we look at the

13  bottom of Page 54, this prohibition on paying people --

14     A.   Uh-huh.

15     Q.   -- to help voters vote by mail was limited to

16  performance-based compensation schemes?

17            MS. HUNKER:  Objection, form.

18     A.   Yes.

19     Q.   (By Ms. Perales)  Okay.  And do you understand

20  with me a performance-based compensation scheme is where

21  you're going to pay somebody by the head to provide

22  assistance?

23     A.   Yes.

24     Q.   So now with the -- with this language coming

25  out of the statute on the bottom of Page 54, do you now

1 understand that the prohibition to either pay someone or

2 to accept payment to assist a voter vote by mail is now

3 expanded to all people who are either paying or getting

4 paid to assist a voter to vote by mail, regardless of

5 whether it is a performance-based scheme?

6              MS. HUNKER:  Objection to form.

7     A.    Yes.

8     Q.    (By Ms. Perales)  Okay.  And we see on Page 55,

9 on Line 18, there's an exception here for an attendant

10 or a caregiver who is known to the voter?

11    A.    (Witness moves head up and down.)  Yes.

12    Q.    Do you see that?

13    A.    Uh-huh.

14    Q.    Would you agree with me, though, that beyond --

15 well, would you agree with me, then, that somebody who

16 is paid by a nonprofit community engagement organization

17 to assist voters to vote by mail would fall under the

18 prohibitions of this statute?

19              MS. HUNKER:  Objection, form.

20    A.    It appears so, yes.

21    Q.    (By Ms. Perales)  Going to turn forward now to

22 Section 7.04 on Page Fif- -- well, it starts on Page 58,

23 and then it flows over onto Page 59.

24              If you look with me, starting on Line 7,

25 there's a definition of "vote harvesting services" on

Page 227

1   Page 59.
2        A.   Oh, okay.  Here we go.  Yes.
3        Q.   And would you agree with me that the definition
4   of "vote harvesting services" requires an in-person
5   interaction with the voter?
6        A.   Yes.
7        Q.   And that interaction has to be in the physical
8   presence of an official ballot or a ballot voted by
9   mail?
10       A.   Yes.
11       Q.   And then there has to be the intent to deliver
12  votes for a specific candidate or measure?
13       A.   Yes.
14       Q.   Would you agree with me that if a canvasser
15  who's going house-to-house to encourage people to vote
16  for -- well, before I ask my question, I want to know
17  whether you have any bond issues on the ballot for
18  Dallas County for this May 7 election.
19       A.   There's no Dallas County bond issues.  There's
20  city bond issues, and I think there's some school --
21       Q.   Some school --
22       A.   -- district bond issues.
23       Q.   -- or city?
24       A.   Yeah.
25       Q.   Okay.  So I want to make my hypothetical

Page 230

1    Q.    And when the language says "commits an
2  offense," do you understand that to be a criminal act?
3    A.    Yes.  I believe they go on to say the State
4  Jail Felony.
5    Q.    Ye- -- and I imagine you -- you've become aware
6  of that language?
7    A.    Yes.  Uh-huh.
8    Q.    Are you -- are you concerned that certain
9  things that your office might do or might have done in
10  the past would run afoul of this provision and possibly
11  create criminal liability for you?
12              MS. HUNKER:  Objection --
13    A.    Yes.
14              MS. HUNKER:  -- form.
15    Q.    (By Ms. Perales)  Can you describe that for me?
16    A.    We have, historically, distributed
17  applications, you know, when someone comes in and says,
18  "Hey, I want to provide application; you know, I want to
19  distribute applications for vote by mail," we provide
20  those to them.
21    Q.    Uh-huh.
22    A.    And we no longer can do that.
23    Q.    Uh-huh.  So if someone came to your office and
24  said, "I regularly go to church on Sundays, and we have
25  a great group of congregants; I'd love to bring 25

```
1    applications for ballot by mail to my next church

2    service, give them to the old folks, the folks over 65,"

3    in that situation, would you give the individual the 25

4    applications for ballot by mail?

5         A.   Not since the passage of SB 1.

6         Q.   And in fact, you would require a voter to

7    request of you the application for ballot by mail before

8    you would send it out, correct?

9         A.   That's correct.

10        Q.   Are you aware of voters who may have, in the

11   past, gotten their application for ballot by mail

12   without having to ask for it from you?

13        A.   Yes.

14        Q.   Do you know of any specific instances like

15   that?

16        A.   No.

17        Q.   Okay.  But you're familiar with individuals

18   having come for, let's say, batches of application for

19   ballot by mail because they intend to deliver those to

20   voters who are eligible so that the voter can submit it?

21        A.   Yes.

22        Q.   So I only have one copy of this, so we're going

23   to mark it; and then I'm going to do my best to remember

24   what it says.

25        A.   Okay.
```

Page 233

1    mail so that the voter doesn't have to pay the postage

2    to send it to you?

3        A.   Yes.

4        Q.   Okay.  And are you expressing a concern, in

5    these emails, about whether paying that postage could,

6    potentially, get you too close to the prohibited

7    practice under SB 1?

8        A.   Yes.

9        Q.   Okay.  So would it be fair to say that this

10   communication is an expression of your concern that

11   paying the postage on an application for ballot by mail

12   to come back to you is now prohibited?

13       A.   Yes.

14       Q.   Okay.  So you may have resolved your concern?

15       A.   (Witness moves head up and down.)

16       Q.   But would it be fair to say that, because of

17   the criminal offenses and heavy penalties associated

18   with SB 1, that it caused you to doubt whether some of

19   the practices in Dallas County were going to expose you

20   to criminal prosecution or cause you to worry that some

21   of the practices in Dallas County might expose you to

22   criminal prosecution?

23            MS. HUNKER:  Objection to form.

24       A.   I would say that it caused us to question the

25   practices to make sure that we weren't getting our --

Page 234

1    any of our staff in trouble.

2    Q.    (By Ms. Perales)  And so besides refraining

3    from handing out multiple applications for ballot by

4    mail, can you tell me if you changed any of your other

5    practices at Dallas County?

6    A.    Well, we were very concerned about anything

7    having to do with vote by mail applications.  For

8    instance, I, specifically, remember a candidate wanted

9    us to review their application for a vote by mail.  And

10   it's something that we would normally do, to make sure

11   that they've got the right information, dates, et

12   cetera.  And I said, "Well, even something as simple as

13   that, does that put us in legal jeopardy?"

14   Q.    Uh-huh.

15   A.    And so, you know, when it comes to state jail

16   penalties, you know, I -- I need to try to do as much as

17   I can to protect my staff.

18   Q.    Understood.  And I believe this came out

19   January 12th.  This was before we pro- -- we got

20   guidance from the Secretary of State in their election

21   advisory on SB 1.

22        Okay.  And so, as you received guidance from

23   the Secretary of State, you are understanding better

24   kind of what you can do and -- and what you can't do; is

25   that right?

Page 245

1    or staff regarding SB 1 or its predecessors?

2        A.   No.

3        Q.   Did you ever have communications with the

4    Attorney General, Ken Paxton, or his staff regarding SB

5    1 or its predecessors?

6        A.   No.

7        Q.   All right.  You never called them up and said,

8    Okay, so if I did this, are you going to prosecutor me?

9        A.   No.

10        Q.   Okay.  Have you, personally, had communications

11    with Dallas County voters regarding any problems that

12    have come up in the implementa- -- problems for them

13    that have come up in the implementation of SB 1?

14            MS. HUNKER:  Objection, form.

15        A.   Yes.

16        Q.   (By Ms. Perales)  Okay.  Tell me about those

17    communications.

18        A.   Well, I think -- you know, we interact with a

19    lot of voter groups, Dallas Votes, Legal Women Voters,

20    et cetera.  And through those groups -- or in our

21    Citizen Election Advisory Committee, through those

22    groups, we've had discussions about the problematic

23    aspects of SB 1.

24        Q.   And would it be fair to say that, in those

25    meetings, the -- the groups that you're talking about

1    have expressed to you concerns about people -- voters

2    having a harder time voting under SB 1?

3         A.   Yes.

4              MS. HUNKER:  Objection, form.

5         Q.   (By Ms. Perales)  Have you spoken to any

6    individual voters who had problems voting under SB 1?

7         A.   I have to think.  I'm not sure.  Yes, yes.  Now

8    that I'm thinking about it, yes.

9         Q.   Tell me about what you can remember of those

10   communications.

11        A.   I was trying to remember.  This one had to do

12   with a particular constituent's mother not being able to

13   get a replacement mail ballot.  Gosh, I'm -- I'm trying

14   to remember the details, but having to do with the --

15   the mail ballot aspects, as far as providing the IDs, et

16   cetera.

17        Q.   So this was a voter who was trying to fulfill

18   the ID number requirement --

19        A.   Yes.

20        Q.   -- that was created by SB 1 --

21        A.   Uh-huh.

22        Q.   -- and through -- using the mail ballot and was

23   having a hard time --

24        A.   Yes.

25        Q.   -- voting?

Page 247

```
 1      A.   Uh-huh.

 2      Q.   Do you know if that voter ever successfully

 3  voted?

 4      A.   Yes.

 5      Q.   You do know?

 6      A.   This one I'm thinking of, yes.

 7      Q.   And did that voter successfully vote?

 8      A.   Yes.

 9      Q.   Okay.  Do you know how the voter voted, like,

10  did the -- did the voter, for example, end up having to

11  go to the polling place and vote in person?

12      A.   No.  I think they got a replacement -- a

13  replacement ballot, I believe.

14      Q.   Okay.  So you -- you were not getting all the

15  phone calls that Tacoma Phillips was getting?

16      A.   I typically don't.  I mean, that's why Tacoma's

17  there.

18      Q.   Right.  Would it be correct to say that you did

19  not work for Dallas County Elections in the November

20  2020 election?

21      A.   That's correct.

22      Q.   That saves us a few questions.

23      A.   Uh-huh.

24      Q.   Would you say that, as a general matter, voter

25  turnout in the partisan primary is lower than voter
```

1    turnout in the general election?

2        A.    Yes.

3        Q.    And would you say, as a general matter, that

4    voter turnout in a spring election, like the one that

5    will happen in May, on May 7th, would typically be lower

6    than the turnout in a primary election?

7        A.    Yes.

8        Q.    Do you have any concerns about the impact of SB

9    1 on the upcoming November 2022 midterm election?

10                MS. HUNKER:    Objection, form.

11        A.    Yes.

12        Q.    (By Ms. Perales)   Okay.   And can you list what

13    those concerns are?

14        A.    I have continuing concerns about the provisions

15    of the -- the ID requirements for mail ballots, in that

16    the high rejection rate for applications and the

17    ballots, themselves.   I have concerns about the chilling

18    effect that the poll watcher provisions have on poll

19    worker recruitment and retention.   I'd have to kind of

20    think a little bit deeper about some of the other

21    provisions of SB 1, but those are my main ones.

22        Q.    Do you believe that there are voters who will

23    attempt to vote by mail in the November general election

24    who have not yet encountered the ID matching

25    requirements of SB 1 because they didn't vote in the

Page 257

1    the SB 1's provisions relating to poll watchers occur?

2        A.    I believe -- so we revised a lot of our

3    training materials, a significant amount of our training

4    materials, going into the November election and -- and

5    made further modifications in preparations for the March

6    elections because of SB 1.

7        Q.    Okay.  And what was covered -- can you describe

8    what was covered during the most recent training that

9    you conducted?

10       A.    I -- I don't know -- I can't tell you that -- I

11   can't quote verbatim what was said, but I can tell you

12   the -- the gist of it was that -- to warn poll workers

13   not to interfere with the movement of poll watchers;

14   otherwise, they could face legal jeopardy.

15       Q.    Okay.  I want to talk about some of those

16   specific provisions.

17            Do you have the exhibit that -- like, Holly

18   gave you a copy of SB 1 --

19       A.    Uh-huh.

20       Q.    -- in front of you?

21            Can you turn to Page 27 of that?

22       A.    (Witness complies.)  Okay.

23       Q.    And let's take a look at Lines 12 through 15,

24   which I believe is Subsection g, and you can read it to

25   yourself and just let me know when you're finished.

Page 258

1      A.    (Witness reviewing document.)   Okay.

2      Q.    What is your understanding of what this -- or

3   sorry.   Strike that.

4         Are you familiar with this provision?

5      A.    Yes.

6      Q.    And what is your understanding of what it

7   requires?

8      A.    That -- that interfering -- you know, that an

9   election officer commits an offense if they interfere

10   with a poll -- a poll watcher and it's a Class A

11   misdemeanor and that there's certain paperwork and oaths

12   that need to be taken by that poll watcher.

13      Q.    Did your office adopt any new policies or

14   procedures to address this provision?

15      A.    I believe so, yes.

16      Q.    And what were those?

17      A.    To accept that -- to be aware of this new

18   provision and to -- to accept that certificate, et

19   cetera.

20      Q.    Okay.   Let me ask you about other provisions,

21   and that's one relating to poll watchers.

22         Can you flip to the next page, Page 28; and

23   look at Lines 3 through 5?

24      A.    (Witness complies.)   Okay.

25      Q.    Have you seen this provision before?

1    Dallas County?

2        A.    There are certain specified requirements.

3    Generally speaking, the disabled people not able to

4    readily get into a polling place.

5        Q.    Can you walk me through the steps of how a

6    voter casts a ballot when they vote using curbside

7    voting?

8        A.    We have a sign out on the -- on the outside of

9    the polling place that has a phone number.  When someone

10   pulls up, if there's not voter- -- if there's not

11   workers already outside, they call that number, which

12   rings into the judge's cell phone.  And they say, "Hey,

13   I'm here to vote curbside."

14              And so the judge sends a worker out with an

15   electronic poll book.  The voter -- they -- they find

16   the voter, and the voter signs the Epollbook.  They go

17   back inside; and they get the voting machine, bring that

18   out to the voter.  They -- they cast their ballot on

19   that voting machine.

20       Q.    Do you think there's an increased risk of fraud

21   with respect to the curbside voting?

22       A.    No.

23       Q.    Why not?

24       A.    It's the same procedure that takes place inside

25   the building as outside the building.

Page 277

1     Q.   And are you familiar with the provisions in

2  SB 1 relating to drive-thru voting?

3     A.   Yes.

4     Q.   What is the difference between curbside voting

5  and drive-thru voting?

6     A.   Curbside voting, there is certain requirements

7  that allows someone to be a curbside voter as opposed to

8  drive-thru voting where there would not be those

9  requirements.

10    Q.   Requirements on who is eligible?

11    A.   Yes.

12    Q.   Has Dallas County ever offered drive-thru

13 voting?

14    A.   Not that I'm aware of.

15    Q.   Have you ever considered implementing it?

16    A.   I would say if SB 1 hadn't been implemented, we

17 would have aggressively had drive-thru voting.

18    Q.   And why -- why is that?

19    A.   I've got a long history of making voter --

20 voting more accessible to voters, including the

21 introduction of drop boxes, vote center voting, allowing

22 mail ballots to be dropped off at polling places, et

23 cetera, et cetera.  And so when I saw what Harris County

24 was doing in 2020, I really applauded that.  I thought

25 it was great.  And I -- when I got to Texas, I thought

Page 278

1    we're going to do that in Dallas.

2        Q.   And so is it your opinion that drive-thru

3    voting would make voting more accessible?

4               MS. HUNKER:  Objection, form.

5        A.   Absolutely.

6        Q.   (By Mr. White)  I meant to ask this earlier.

7    So I had asked you earlier about whether you thought

8    there was an increased risk of fraud with respect to

9    curbside voting.

10            Are you aware of any instances of voter fraud

11   in Dallas County that have happened with respect to

12   curbside voting?

13       A.   No.

14       Q.   I also want to turn your attention back to this

15   article that I gave you.

16       A.   Uh-huh.

17       Q.   If you could flip to Page 4.

18       A.   (Witness complies.)

19       Q.   The middle of the page, there's a paragraph

20   that says -- and I'll just read it aloud -- "Noble" --

21   who appears to be a Democratic party official -- "noted

22   over 6 percent of mail-in ballots in the county were

23   rejected because of the new identification requirements.

24   Those voters, she said, had to show up in person if they

25   wanted to vote, leading to longer queues to vote

1   curbside."

2           Did I read that correctly?

3       A.   Yes.

4       Q.   Are you aware of any voters who showed up to

5   vote curbside because of SB 1's identification

6   requirements for mail-in ballots?

7       A.   I --

8               MS. HUNKER:  Objection, form.

9       A.   I speculate, just like Kristy Noble, that

10  that -- that was the case.

11      Q.   (By Mr. White)  And what is the reason for you

12  speculating in that way?

13      A.   Because a disabled voter or someone who is not

14  likely to -- less likely to be able to go in to a

15  polling place, is going to look for an alternative to

16  vote.  And one of those would be mail ballot, but

17  because of the provisions of SB 1 making mail ballots

18  that much more difficult in the high rejection rate, I

19  think that more people said, "Well, what are my --

20  what's my next alternative?"

21          And that would be drive-thru voting or curbside

22  voting.  I have no evidence of that, but I'm

23  speculating.

24      Q.   Yeah.  Now, a moment ago you mentioned that you

25  were aware that Harris County implemented drive-thru

Page 280

1  voting in the 2020 election.

2        During the 2020 election, did voters ever call

3  your office to ask about drive-thru voting?

4    A.   I wasn't there.

5    Q.   Oh, that's right.

6    A.   But I believe that -- my staff has told me that

7  there was lots of questions:  Why was Dallas not doing

8  it when Harris was?

9    Q.   And so is it fair to say that, just of those

10  complaints, were that Dallas County voters wanted to

11  have drive-thru voting in Dallas County?

12        MS. HUNKER:  Objection, form.

13    A.   That is my understanding.

14    Q.   (By Mr. White)  Did the availability -- I'm

15  sorry.  Strike that.

16        Apart from those calls that you received that

17  we just -- that I just asked you about, did the

18  availability of drive-thru voting in Harris County cause

19  other administrative difficulties for your office?

20        MS. HUNKER:  Objection, form.

21    A.   Not that I'm aware of.

22    Q.   (By Mr. White)  And earlier we were talking

23  about the poll watcher provisions.  I had asked you

24  whether you had any conversations with legislators, you

25  know, supporting or opposing or advising with respect to

Page 283

1    A.   That's correct.

2    Q.   Put another way, everyone who successfully

3  applies for a ballot by mail has already registered to

4  vote in the county; is that right?

5              MS. HUNKER:  Objection, form.

6              (The lights go out in the room.)

7              THE REPORTER:  Can we go --

8    A.   I think we might pause.

9              THE REPORTER:  -- off the record, please?

10  Can we go off the record for a second, please?

11              THE VIDEOGRAPHER:  Going off the record at

12  6:51 p.m.

13              (Discussion off the record.)

14              THE VIDEOGRAPHER:  Okay.  We're back on

15  the record.  The time is 6:52 p.m.

16    Q.   I'll just reask my most recent question.  How's

17  that?

18        Everyone who successfully applies for a ballot

19  by mail has already registered to vote in the county?

20              MS. HUNKER:  Objection, form.

21    A.   That -- that's correct.

22    Q.   Prior to SB 1, how did your office check to see

23  if an individual applying to vote by mail was a

24  registered voter?

25    A.   They checked the voter registration, the VEMACS

Page 284

1   voter registration system.

2        Q.   And was that system meant to ensure that the

3   individuals were already registered?

4        A.   Yes.

5        Q.   Prior to SB 1 being granted an application for

6   ballot by mail, what would happen next?

7        A.   The vote by mail ballot would be sent.

8        Q.   Would the voter be assigned a unique

9   identification number?

10       A.   Yes.

11       Q.   And would that identification number be

12   associated with the ballot sent to the voter?

13       A.   Yes.  Not --

14       Q.   So --

15       A.   -- to the -- not to the ballot, but to the

16   ballot carrier envelope.

17       Q.   Okay.  I see.  Thank you for that

18   clarification.

19            So someone who successfully voted by mail would

20   then have to return that specific ballot envelope issue

21   to them, not any ballot envelope?

22       A.   That's correct.

23       Q.   Prior to SB 1, what information was the voter

24   required to include on the carrier envelope or ballot

25   envelope?

Page 285

1      A.   I believe their name, address.  I can't recall

2   all the specifics, but most likely, the name, address.

3      Q.   Okay.  And was the voter required to sign the

4   carrier envelope?

5      A.   Yes.

6      Q.   Was there a process in place to make sure that

7   the signature matched the voter signature on file?

8      A.   Yes.  There's the Signature Verification

9   Committee that compares the signature of the -- on the

10  carrier envelope to the signature on the application, as

11  well as they -- they have the ability to check other

12  signatures within the voter registration system.

13     Q.   And just to clarify, that answer also applies

14  prior to SB 1 --

15     A.   Yes.

16     Q.   -- is that correct?

17     A.   Yes.

18     Q.   Thank you.  Okay.  Next I want to ask you some

19  questions about voters with disabilities.

20          Are you familiar with your office's obligations

21  under the Americans with Disabilities Act or ADA?

22     A.   I'm -- I'm vaguely familiar, yes.

23     Q.   And what do you understand those obligations to

24  be?

25     A.   Most importantly, it's to provide voting

1    Q.   And when you say "accessible polling places,"

2    what do you mean by that?

3    A.   There's -- when there's -- when a polling place

4    is contemplated for use, there are checklists that we go

5    through where you -- you know, best practices call for a

6    checklist to inspect a location.  You -- you're --

7    there's a whole laundry list of things that make a

8    location ADA compliant:  ramps, pressure on the doors

9    (indicating), the types of knobs, access to drinking

10   fountains.  I mean, it's a very comprehensive list that,

11   basically, gives a grade to a location for ADA

12   compliance.

13   Q.   It sounds like you're very familiar with this

14   list, but if it's not written down anywhere, how do the

15   various locations go through this checklist?

16   A.   There -- there were the -- there were

17   inspections in 2019, and so we do have records of those

18   locations.  I just think that -- that we need to pay a

19   little bit better attention to the results of those

20   inspections and upgrade or eliminate those that are not

21   in compliance because I think we have some that are not

22   as compliant as they need to be.

23   Q.   That makes a lot of sense.  Thank you for that

24   on an accessibility point.

25        Broadly speaking, is your understanding that

1   individuals with disabilities can, within reason, ask

2   for modifications or accommodations so that they can

3   vote?

4        A.   Yes.

5        Q.   And does your office have policies for sort of

6   changing the typical voting procedures, if needed, for

7   voters with disabilities to vote?

8        A.   Yes.  But I mean, number one, there's curbside

9   voting for people with disabilities; but there's also

10  certain procedures prescribed by the State that allow

11  preferential treatment to those who come into a polling

12  place (indicating), you know.  They get to cut the line,

13  if you will.  And so that's -- that's also allowed.

14       Q.   And so aside from this sort of cutting-the-line

15  feature, who has the authority to decide whether or not

16  to grant a voter's request for a reasonable modification

17  based on their disability?

18       A.   I believe Texas law gives that authority to the

19  presiding judge at a location.

20       Q.   And so would a person with a disability just

21  sort of ask at the location and then it would go to the

22  judge; how would that procedure work?

23       A.   Yes, they would ask at the location.

24       Q.   And that's the final say whether or not they

25  can have that modification?

Page 289

1      A.   Yes.  That's --

2                MS. HUNKER:  Objection, form.

3      A.   That's the -- in Texas, the presiding judge has

4   the last say as opposed to the Elections Administrator,

5   like in other states that I've been in.

6      Q.   (By Ms. Cai)  So how are either the election

7   judge you speak of or any of the employees or poll

8   workers who might be asked on a modification, what are

9   they trained to do when deciding whether that

10  modification is reasonable?

11     A.   We provide them with the language, as it's laid

12  out in the Texas Election Code; and there's certain

13  signage that's required.  And then we provide them with

14  that mater- -- the training materials and signage that

15  tell them if and when someone should have that

16  preferential treatment.

17     Q.   What are some of the asked-for modification

18  that's not on this list?

19                MS. HUNKER:  Objection, form.

20     A.   I'm not sure I understand the question.

21     Q.   (By Ms. Cai)  Let me rephrase.  What kinds of

22  modifications or changes to the typical voting

23  procedures would be allowed to be provided?

24     A.   The curbside voting, as well as the

25  preferential treatment when it comes to lines inside the

Page 290

1    polling place.

2        Q.    Okay.   And those are the only two you can think

3    of --

4        A.    That's the only --

5        Q.    -- off the top of your head?

6        A.    Off the top of my head, yes.

7        Q.    So to give a sort of comparable

8    example of something different, earlier today you

9    discussed the oath requirement of SB 1.

10       A.    (Witness moves head up and down.)

11       Q.    So what would you do if a voter with a

12   disability asked for their assistor to answer questions

13   or provide assistance beyond what the vote allows?

14             MS. HUNKER:   Objection, form.

15       A.    I think that -- that's a situational question.

16   I mean, if on Election Day we got a call from a -- an

17   election judge asking for, you know, telling us that

18   someone was asking for an accommodation, we would look

19   and see what that -- what they are asking for and we

20   would provide our recommendation and we'd do our

21   research, talk to our attorneys, talk to the Secretary

22   of State, et cetera, and find out what our -- what our

23   options are, if any, to offer to that voter.

24       Q.    (By Ms. Cai)  So would you do that procedure

25   for any question that an election judge called you with?

Page 294

1    mail ballot, but you only have their Social Security

2    numbers on file, what would happen?

3        A.   That would be rejected, and they would -- they

4    would get a reject letter asking for more information;

5    or the form provided by the Secretary of State, we would

6    send them that form.

7        Q.   So they would get a reject letter, but the law

8    does not require that an individual write down both

9    numbers; is that correct?

10       A.   No.

11       Q.   So is it fair to say that, under the new

12    system, many people who put down a correct identifying

13    number for themselves are still at risk of having their

14    application for ballot by mail or mail ballot rejected?

15            MS. HUNKER:  Objection, form.

16       A.   That would be the case.  If they have -- if we

17    have a voter registra- -- or a driver's license on file,

18    but they send in a correct Social Security number, if

19    the two don't match, then we can't accept.

20            MS. CAI:  Thank you.  That's all my

21    questions.

22            THE REPORTER:  Just a second, please.

23    Okay.  Thank you.

24            MS. HUNKER:  How much time for the

25    Plaintiffs.

Page 338

```
 1  _____

 2          I, MICHAEL SCARPELLO, have read the foregoing

 3  deposition and hereby affix my signature that same is

 4  true and correct, except as noted above.

 5

 6                          _____

 7                          MICHAEL SCARPELLO

 8

 9  THE STATE OF TEXAS          )

10  COUNTY OF _____)

11

12          Before me, _____, on
    this day personally appeared MICHAEL SCARPELLO, known to
    me (or proved to me under oath or through
13  _____)
    (description of identity card or other document) to be
14  the person whose name is subscribed to the foregoing
    instrument and acknowledged to me that they executed the
15  same for the purposes and consideration therein
    expressed.

16
        Given under my hand and seal of office, this _____
17  day of _____, 2022.

18

19                          _____
                            NOTARY PUBLIC IN AND FOR
20                          THE STATE OF _____

21
    My commision expires:  _____
22

23

24

25
```

Page 339

1

2                    REPORTER'S_CERTIFICATION
                   _____ _____
3              UNITED STATES DISTRICT COURT
4              WESTERN DISTRICT OF TEXAS
                   SAN ANTONIO DIVISION
5
    LA UNION DEL PUEBLO ENTERO,)(
6   ET AL.,                    )(
                               )(
7       PLAINTIFFS,            )(
                               )(   CIVIL ACTION
8   VS.                        )(   NO. SA-21-CV-00844-XR
                               )(
9   GREGORY W. ABBOTT, ET AL., )(
                               )(
10                             )(
        DEFENDANTS.            )(
11  ----------------------------------------------------

12

13

14

15          ORAL DEPOSITION OF RIVELINO LOPEZ,

16        TACOMA PHILLIPS AND MICHAEL SCARPELLO

17                    APRIL 29, 2022

18

19

20          I, Holly R. Swinford, Certified Shorthand

21   Reporter in and for the State of Texas, do hereby

22   certify to the following:

23          That the witnesses, Rivelino Lopez, Tacoma

24   Phillips and Michael Scarpello, were by me duly sworn

25   and that the transcript of the oral deposition is a true

Page 340

1    record of the testimony given by the witnesses.

2            I further certify that pursuant to Federal

3    Rules of Civil Procedure, Rule 30(e)(1)(A) and (B) as

4    well as Rule 30(e)(2), that review of the transcript and

5    signature of the deponent:

6            _____ was requested by the deponent and/or a

7    party before completion of the deposition.

8            _____ was not requested by the deponent and/or

9    a party before the completion of the deposition.

10           I further certify that I am neither attorney or

11   counsel for, nor related to or employed by any of the

12   parties to the action in which this deposition is taken

13   and further that I am not a relative or employee of any

14   attorney of record in this cause, nor am I financially

15   or otherwise interested in the outcome of the action.

16           The amount of time used by each party at the

17   deposition is as follows.

18

19       1.    MS. NINA PERALES
              TIME:  04:16
20       2.    MR. GRAHAM W. WHITE
              TIME:  00:37
21       3.    MS. KATHLEEN HUNKER
              TIME:  01:23
22       4.    BEN L. STOOL
              TIME:  00:00
23       5.    MS. BRADY BENDER
              TIME:  00:06
24       6.    MS. SOPHIA CAI
              TIME:  00:24
25       7.    MS. JACQUELINE VILLAREAL

```
 1          TIME:   00:00

 2          Subscribed and sworn to on the ____ day

 3   of May, 2022.

 4

 5          _____
                 Holly R. Swinford
 6               Texas CSR 3356
                 Expiration:  2/1/2024
 7               Magna Legal Services
                 Firm Registration No. 633
 8               16414 San Pedro Ave., Suite 900
                 San Antonio, Texas  78232
 9               (866) 672-7880

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Prescribed by Secretary of State
Sections 61.035 and 64.034, Texas Election Code
9/13

| Pct. No.<br>*(Núm. De Pcto.)* | Authority Conducting Election<br>*(Autoridad Administrando la Elección)* |
|---|---|
| Date of Election<br>*(Fecha de Elección)* | Type of Election<br>*(Tipo de Elección)* |

## OATHS
### *(JURAMENTOS)*

### ASSISTANCE *(AYUDA)*
(Sec. 64.034)

OATH OF PERSON ASSISTING VOTER: I swear (or affirm) that I will not suggest by word, sign, or gesture how the voter shall vote; I will confine my assistance to answering the voter's questions, to stating propositions on the ballot, and to naming candidates and, if listed, their political parties; I will prepare the voter's ballot as the voter directs; and I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs. *(JURAMENTO DE LA PERSONA QUE AYUDA AL VOTANTE: Yo juro (o afirmo) que no sugeriré por palabra, seña o acción cómo deberá votar el votante; limitaré mi ayuda a contestar las preguntas del votante, a declarar las proposiciones en la boleta, y a nombrar los candidatos y, si listados, los partidos políticos a que pertenecen; yo prepararé la boleta como dirija el votante, y no soy el empleador del votante, agente del empleador, o un oficial o agente de un sindicato donde el votante pertenece .*

_____     _____

_____     _____

_____     _____

### INTERPRETER *(INTERPRETE)*
(Sec. 61.035)

INTERPRETER'S OATH: I swear (or affirm) that, to the best of my ability, I will correctly interpret and translate each question, answer, or statement addressed either to the voter by an election officer or to an election officer by the voter. *(JURAMENTO DEL INTERPRETE: Yo juro (o afirmo) que, a mi mejor potencia, interpretaré y traduciré de una manera correcta cada pregunta, respuesta o declaración que cualquier official electoral dirija al votante o que el votante dirija a cualquier official electoral.)*

_____     _____

_____     _____

_____     _____

The above oaths were sworn and subscribed to before me this _____ day of _____, 20 _____.
*(Los juramentos señalados arriba fueron declarados bajo juramento y suscritos ante mí en la fecha indicada arriba.)*

_____

ELECTION OFFICER *( OFICIAL ELECTORAL)*



DEPOSITION EXHIBIT
5
PENGAD 800-631-6989

| Type of Election | Polling Location |
|---|---|
| Date of Election | Authority Conducting Election |

7-58
Prescribed by Secretary of State
Sections 64.0322, 64.034, Texas Election Code
1/2022

## OATH OF ASSISTANCE

**Oath of Person Assisting Voter:** "I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance; I will not suggest, by word, sign, or gesture, how the voter should vote; I will confine my assistance to reading the ballot to the voter, directing the voter to read the ballot, marking the voter's ballot, or directing the voter to mark the ballot; I will prepare the voter's ballot as the voter directs; I did not pressure or coerce the voter into choosing me to provide assistance; I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; I will not communicate information about how the voter has voted to another person; and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted." **Juramento de la Persona Asistiendo al Votante:** "Yo juro (o afirmo) bajo pena de perjurio que el votante al que estoy asistiendo me representó que es elegible para recibir asistencia; no sugeriré, con palabra, señal, o gesto, como debe votar el votante; limitaré mi asistencia a leer la boleta al votante, dirigiendo al votante a que lea la boleta, marcando la boleta del votante o dirigiendo al votante a que marque la boleta; prepararé la boleta del votante según lo indique el votante; no presioné ni coaccioné al votante para que me eligiera como asistente; no soy el empleador del votante, un agente del empleador del votante, o un oficial o agente de un sindicato al cual el votante pertenece; no comunicaré información sobre cómo el votante ha votado a otra persona; y entiendo que si se proporciona asistencia a un votante que no es elegible para recibir asistencia, la boleta del votante podría no ser contada."

| | Signature of Assistant (Firma del Asistente) | Printed Name of Assistant (Nombre del Asistente en Letra de Molde) | Address of Assistant (Dirección del Asistente) | Relationship of Assistant to Voter (Relación del Asistente al Votante) | Did you receive or accept any form of compensation or other benefit from a candidate, campaign, or political committee? (Recibió o aceptó cualquier forma de compensación u otro beneficio de un candidato, campaña o comité político?) | |
|---|---|---|---|---|---|---|
| 1 | | | | | Yes | No |
| 2 | | | | | Yes | No |
| 3 | | | | | Yes | No |
| 4 | | | | | Yes | No |
| 5 | | | | | Yes | No |
| 6 | | | | | Yes | No |
| 7 | | | | | Yes | No |
| 8 | | | | | Yes | No |
| 9 | | | | | Yes | No |
| 10 | | | | | Yes | No |

**Instructions:**
1. Administer the Oath of Assistance to the Assistant.
2. The Assistant must repeat the Oath aloud and complete the form for each voter assisted.
3. Instruct the Assistant to:
   a. Sign the form
   b. Print his or her name
   c. Provide his or her address
   d. Put his or her relationship to the voter in the column
   e. Indicate whether he or she received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee for providing assistance to the voter.

The above oaths were sworn and subscribed to before me this ____ day of _____, 20____. Los juramentos señalados arriba fueron declarados bajo juramento y suscritos ante mí en la fecha arriba.

Signature of Election Officer

Printed Name of Election Officer

