# EXHIBIT F

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


LA UNIÃ"N DEL PUEBLO ENTERO,   *
et al.,                        *
         Plaintiffs,           *
                               *
v.                             *   Civil Action No.
                               *   5:21-cv-844 (XR)
STATE OF TEXAS, et al.,        *
         Defendants.           *


*******************************************************

     ORAL AND VIDEOTAPED 30(b)(6) DEPOSITION OF
      THE DALLAS COUNTY ELECTIONS ADMINISTRATOR
       THROUGH ITS DESIGNATED REPRESENTATIVE,
                MICHAEL SCARPELLO
                 APRIL 13, 2023

*******************************************************


            DEPOSITION of MICHAEL SCARPELLO,

produced as a witness at the instance of the

Plaintiffs, and duly sworn, was taken in the

above-styled and numbered cause on the 13th day of

April, 2023, from 10:20 a.m. to 2:25 p.m., before

Christy R. Sievert, CSR, RPR, in and for the State

of Texas, reported by machine shorthand, at the

offices of the Dallas County Records Building, 500

Elm Street, Dallas, Texas, pursuant to the Federal

Rules of Civil Procedure and the provisions stated

on the record or attached hereto.

1          Have you had any changes in your

2    educational background since May of 2022?

3         A.    No.

4         Q.    You have not completed a Ph.D. or anything

5    like that?

6         A.    No.

7         Q.    Okay.  With the copious amounts of free

8    time you have administering the elections in Dallas

9    County.

10         A.    Right.

11         Q.    Have there been any changes in your title?

12         A.    No.

13         Q.    Okay.  And have there been any changes in

14    your duties as the Dallas County elections

15    administrator, broadly?

16         A.    No.

17         Q.    In the 2022 general election, did Dallas

18    County use curbside voting for nondisabled voters so

19    that any voter who wanted to, could pull up to the

20    polling place and vote at the curb?

21         A.    No.

22         Q.    Did Dallas County employ any dropboxes for

23    people to drop their mail ballots?

24         A.    No.

25         Q.    Dallas County used early voting for the

Page 18

1   2022 general election, correct?

2       A.   Correct.

3       Q.   Did you use the same polling places for

4   early voting that you did for election day?

5       A.   We used a certain amount of polling places

6   for early voting and then additional -- then used

7   those also plus additional ones for election day.  I

8   think it was 50 early voting places and 469 election

9   day.

10      Q.   And on election day, were you polling

11  places vote centers?

12      A.   Yes.

13      Q.   And for early voting, were your 50 polling

14  places, 50ish, were they vote centers as well?

15      A.   Yes.

16      Q.   And it's correct to say that you used vote

17  by mail for certain voters for the 2022 general

18  election, correct?

19      A.   Yes.

20      Q.   Do you know approximately what percent of

21  ballots were cast by mail in the 2022 general

22  election?

23      A.   I do not.  I don't recall.

24      Q.   Did you send applications for ballot by

25  mail for the 2022 general to any voters who had not

Page 19

1    requested an application --

2        A.    No.

3        Q.    -- for ballot by mail?

4        A.    No.

5        Q.    Do you know whether in 20- -- do you know

6    whether your practice in the 2022 general election

7    of not sending unsolicited ABBMs was different than

8    Dallas County's practice in 2020?

9        A.    I don't believe so.

10       Q.    For the 2022 general election, did you

11   include any inserts along with either ABBMs or mail

12   ballots that were intended to inform voters about

13   requirements under SB1?

14       A.    Yes.

15       Q.    Can you tell me about those inserts?

16       A.    The Texas ABBM -- this is in the -- in the

17   mail ballot packet, if that's what you're referring

18   to.

19       Q.    Either.  Either you included it when you

20   sent someone an application for ballot by mail or

21   you included it when you sent someone the mail

22   ballot packet?

23       A.    Okay.  In the mail ballot packet, we find

24   that the items provided by the Secretary of State,

25   the required items are incredibly user unfriendly.

1   I think an 8.5 by 11 or -- 8.5 by 14-inch insert

2   with verbiage from top to bottom, as well as the

3   vote by mail envelope being chock-full of verbiage

4   also.  And it's been my experience that when you do

5   that -- when you have that sort of thing, no one

6   reads anything, and, thus, the compliance with those

7   rules is -- is not good.

8           And so what we did is we summarized on

9   a -- we put on a pink sheet step-by-step

10  instructions to help voters understand what the

11  requirements were.  And using kind of the best

12  practices, plain language, getting it down to a, you

13  know, fifth, sixth grade level so that people can

14  understand what they need to do to return that mail

15  ballot.

16      Q.   And so did you have a name for that insert?

17  What did you call that insert?

18      A.   Abbreviated instructions.

19      Q.   Who created the abbreviated instructions?

20      A.   I did.

21      Q.   And did you work with other members of your

22  staff --

23      A.   Yes.

24      Q.   -- in consultation?

25      A.   Yes.

1      Q.   Did the abbreviated instructions address

2  the requirement to provide an identification number

3  on the mail ballot --

4      A.   Yes.

5      Q.   -- material?

6           Did you instruct the voter to provide one

7  ID number or two ID numbers?

8      A.   We instructed them to -- we advised them to

9  provide both numbers.

10     Q.   Does the Secretary of State's material

11 advise the voter to provide both?

12     A.   I don't recall, but I don't think so.

13     Q.   Did you provide the abbreviated

14 instructions sheet in languages other than English?

15     A.   I believe so.  I can't remember, but I -- I

16 believe so, yes.

17     Q.   Would Ms. Tacoma Phillips know?

18     A.   Yes.

19     Q.   I will ask her that question.

20          Did the Secretary of State provide you

21 guidance on including additional materials in your

22 mail ballot packet to assist voters in meeting the

23 new ID requirements?

24     A.   No.

25     Q.   Did you send any similar inserts to voters

1    when you mailed them applications for ballot by

2    mail?

3        A.    I don't think so.

4        Q.    Do you think that voters might have been

5    benefitted from some additional material in helping

6    them figure out that they also had to provide an ID

7    number on the application for ballot by mail?

8        A.    That might -- that might be helpful.

9        Q.    Before enactment of SB1, did you send

10   inserts or a summary of instructions to voters with

11   their mail ballot packets?

12       A.    I'm not sure, but I believe prior to me

13   being there, that there was yet another

14   poorly-designed insert that was sent by our office

15   that kind of repeated the same things that the

16   Secretary of State requires.

17       Q.    But the new -- the new insert that you

18   designed is intended to present the ID information

19   in a simpler and more accessible way; is that right?

20       A.    The ID information as well as other

21   information.  It's a summary, if you will, that also

22   references the required documents.

23       Q.    I'm going to cover quickly some things that

24   SB1 prohibits in election administration.  I believe

25   you've testified previously that these are not

1    things that Dallas County was doing before, but I

2    would still like to ask you about them.

3         A.    Okay.

4         Q.    So, first, with respect to the prohibition

5    on sort of the universal curbside voting, since

6    May 25th of 2022, have you received any guidance or

7    training from the Secretary of State about the

8    prohibition on what's called drive-thru voting on

9    universal curbside voting?

10                   MS. HUNKER:  Objection; form.

11        A.    I don't -- don't recall.  There may have

12   been some webinar, but I -- not that I attended.

13   BY MR. STOOL:

14        Q.    Okay.  Same question with the prohibition

15   on 24-hour voting.  Since May 25, 2022, have you

16   received any guidance from the Secretary of State on

17   that prohibition?

18        A.    Not that I recall.

19        Q.    Same question with respect to the

20   requirements that polling places must be in a

21   building and not, for example, a movable structure,

22   like a tent.  Since May of 2022, have you received

23   any guidance from the Secretary of State on that

24   requirement?

25        A.    Not that I recall.  I believe most of the

Page 24

1  guidance that you're mentioning was earlier in the

2  year.

3      Q.   Since May 25, 2022, which was the primary

4  runoff date, how many elections have you

5  administered in Dallas County since the primary

6  runoff of 2022?

7      A.   Since May.  I think four.

8      Q.   You definitely administered the 2022

9  general election?

10     A.   Uh-huh.  There was a June runoff for the

11 joint -- May joint election, the November election,

12 a December runoff.  And I think we had a special in

13 January.

14     Q.   Okay.  Were those for a limited number of

15 offices?

16     A.   Yes.

17     Q.   Did it still cover all of Dallas County or

18 part of Dallas?

19     A.   No, part of Dallas County.

20     Q.   Were the runoffs that you're talking

21 about -- so just to summarize, the four elections

22 that you're recalling, one was a general election.

23 Three of them were runoffs or specials; is that

24 right?

25     A.   Yeah, correct.

1    Q.   Were all three of those runoffs or specials

2  partisan races?

3    A.   No.

4    Q.   So the May local election runoff that you

5  administered -- well, the June 2022 local election

6  runoff that you administered would have been

7  nonpartisan; is that right?

8    A.   Correct.  Correct.

9    Q.   And then the November 2022 general election

10  would have been a partisan race, correct?

11    A.   Correct.

12    Q.   And then the runoff in December of 2022

13  would have been a partisan race?

14    A.   Correct.

15    Q.   And then was it a special in January of

16  2023?

17    A.   Yes.

18    Q.   Was that a partisan race?

19    A.   No.

20    Q.   What race was that for?

21    A.   I can't recall.

22    Q.   Okay.  Okay.

23    A.   I would have to look it up.

24    Q.   Okay.  I'm going to ask you some questions

25  now about poll watchers.  When we spoke last year,

1      A.   Yes.

2  BY MR. STOOL:

3      Q.   And did you do anything to respond to that?

4      A.   Yes.

5      Q.   What did you do?

6      A.   We advised the poll worker on the law and

7  made sure that they were following.

8      Q.   If this was during voting, how would you

9  get in touch with the poll worker?

10      A.   We have -- every one of our judges has a

11  County-supplied phone.  We also have contact with

12  them through our electronic pollbooks.  We can send

13  messages.  And so in -- and then we have a network

14  set up where we have a judge hotline with over 30

15  operators that are -- those judges can get through

16  to us.  And then we have a series of response teams

17  that operate on the tickets that that judge hotline

18  produces.

19           And there is a judge response team that --

20  I think it's eight -- eight individuals, each with a

21  certain number of polling places that they monitor,

22  and they're in contact with those judges all day.

23  They're experts at procedure.  And so they're

24  touching base with those judges all day, checking in

25  with them.

1     Q.    So you could then provide information to

2    an -- a poll worker about compliance with the poll

3    watcher provisions either by contacting them on

4    their County phone, contacting them through the poll

5    book, responding to a request that they make to your

6    hotline or through one of your response team

7    members?

8     A.    Correct.

9          I should mention one other method is that

10   we have -- I think we have 45 inspectors each on a

11   route of ten locations where they're going to

12   those -- those locations, they're inspecting the

13   location, checking in with the judge and making sure

14   that the judge is following procedure.

15    Q.    And did that happen during early voting and

16   on election day?

17    A.    Yes.

18    Q.    So I asked you about complaints from poll

19   watchers, that they were credentialed but not

20   accepted.

21          Let me ask you another question, which is,

22   did you receive complaints from poll watchers that

23   they were being obstructed from observing activities

24   in the polling place?

25    A.    Yes.

1    Q.   And how did you respond to those

2    complaints?

3    A.   The same way we -- we contacted the judge

4    or presiding election officer, assistant clerk for

5    early voting, and talked to them, found out what was

6    going on, and if we found that they were

7    obstructing, we told them not to do that.

8    Q.   Is that similar to the approach that you

9    took in elections prior to the 2022 general

10   election?

11   A.   Yes.

12   Q.   Did you have any either poll workers or

13   members of the public complain that poll watchers

14   were making them uncomfortable in the polling place

15   since May of 2022?

16   A.   Did you say poll workers or the public?

17   Q.   Right, any complaints from the poll workers

18   or the public that poll watchers were making them

19   feel uncomfortable?

20   A.   Yes.

21            MS. HUNKER:  Objection; form,

22   compound.

23   BY MR. STOOL:

24   Q.   Did you keep records of any of those

25   complaints?

1    A.   Yes.

2    Q.   And what did those records look like?

3    A.   We have an electronic system that every

4  time we get a call, either through the judge

5  hotline, through the VIP hotline or through the --

6  any -- any method that we enter those -- that --

7  that complaint into a ticket and we record that

8  ticket, and then that ticket is routed to the proper

9  response team to -- to act on.

10    Q.   Do you know whether those records of

11  complaints were produced in this litigation?

12    A.   I believe so, but I don't recall.

13         MS. PERALES:   Okay.   I'll just note

14  for the record and I'll follow up with counsel

15  afterwards, that we believe that those records would

16  be responsive to one or more of the document

17  requests that we've made in the case.

18         MR. STOOL:   Excuse me.   Is this also

19  your -- about the assistance and the --

20         MS. PERALES:   No, this is about poll

21  watchers.

22         MR. STOOL:   Poll watchers.   I'm sorry.

23         MS. PERALES:   It's okay.

24  BY MS. PERALES:

25    Q.   So with respect to reported incidents of

1  poll watchers making voters uncomfortable, besides

2  recording that information, creating a ticket, what

3  would you do next?

4      A.   We would have a member of the judge

5  response team call, coach that -- that judge, find

6  out the whole story.  We may send an inspector

7  there, because the inspectors were also part of that

8  team.  So they would send an inspector to kind of be

9  our eyes and ears in the field.  And we may send a

10  member of our team, including myself, out to a

11  location.  And we did experience that in this last

12  election.

13      Q.   Okay.  How many separate incidents can you

14  recall from the -- any elections after May 25, 2022?

15      A.   Three or four, it would be my guess.

16      Q.   I would like to ask you about each one of

17  those in turn.

18      A.   Okay.

19      Q.   So what is the first one you remember?  And

20  tell me what the complaint was about the poll

21  watcher.

22      A.   I believe during early voting in 2022

23  general, there was an instance where a poll watcher

24  was talking to an alternate -- alternate PEO --

25  alternate -- we call them a presiding election

1  officer, alternate election officer.  Technically,

2  an assistant early voting clerk.

3          And that watcher was asking to see certain

4  documents, inspect ballots, et cetera.  And they,

5  together, opened up a ballot box that they should

6  not have.  They were -- got into certain records

7  that they should have not.  And then the judge

8  called us on that and said, hey, these guys are

9  misbehaving.  And that was the first one that I can

10  recall.

11      Q.   Do you recall where the polling place was?

12      A.   I don't.

13      Q.   Would the record -- was there a ticket

14  created for this complaint?

15      A.   Yes.

16      Q.   Did it include the location of the polling

17  place?

18      A.   Yes.

19      Q.   Okay.  What is the second -- so -- well, I

20  guess I should ask you, how did that get resolved,

21  if it did get resolved?

22      A.   We talked to the judge -- well, the PEO and

23  the AEO, found out what the story was, instructed

24  them what they should and should not be able to do,

25  you know, shouldn't be doing.  We talked to the

1    political party chairs, said we've got -- we're

2    having some trouble brewing with some of your

3    people.  We called the sheriff's office.  The

4    sheriff's office responded.

5              In this particular case, the poll watcher

6    was described as being kind of menacing and scary

7    and threatening to the poll worker, the PEO.  And

8    the PEO reported that that poll watcher followed

9    them home in their car, and I believe the sheriff

10   responded to that and talked to that person and told

11   them you can't be harassing this poll worker.  So

12   that's a synopsis, if you will.

13        Q.   Okay.  When you say the sheriff's office

14   responded, you mean the sheriff's office came in

15   person to the polling place?

16        A.   Yes.

17        Q.   Do you know if the sheriff's office went to

18   the house of the election worker?

19        A.   I believe they may have, but I don't

20   recall.  I would have to read the reports.

21        Q.   Okay.  I have a deposition coming up of the

22   Dallas County Republican chair.  So I will ask you,

23   and only for that reason, I'll ask you whether the

24   poll watcher in this case was associated with the

25   Republican or Democrat party?

1    A.    I believe they were with the Republican

2    party.  And the Republican party responded by

3    revoking his credentials.

4    Q.    You had mentioned earlier that the poll

5    watcher, along with a poll worker, had opened up or

6    accessed some records that they weren't supposed to?

7    A.    That's correct.

8    Q.    Was that the same poll worker who was

9    followed home?

10    A.    No.

11    Q.    Okay.  So the poll worker that was followed

12    home, was that sort of the lead poll worker for that

13    poll?

14    A.    Yes.

15    Q.    And somebody I might call the election

16    judge?

17    A.    Correct.

18    Q.    Okay.  Did you have -- or did your -- you,

19    your office, have any communications with that poll

20    worker regarding that poll worker's feelings or

21    impressions about the incident?

22    A.    Yes.  They were -- they were upset.  And I

23    can't -- I can't recall, but they may have quit

24    since that -- that election.  They were very

25    uncomfortable.

1    Q.   Do you know if that poll worker connected

2  any part of this incident to the new rules under

3  SB1, that poll watchers have the freedom to move

4  around the polling place and that poll workers could

5  potentially be penalized for obstructing their view?

6    A.   I don't recall that that's -- that they

7  made that tie.  And I -- as I'm thinking about this,

8  it's coming back to me, it's -- it all blends

9  together.  It's possible this may have been during

10  the primary and not general, this particular

11  incident.  I can't remember.

12    Q.   Okay.  But in any event, there would be

13  some paper record of that?

14    A.   Absolutely.

15    Q.   Okay.  Before I go on to the other

16  incidents that you can remember, do you connect any

17  of these incidents involving poll watchers with

18  provisions in SB1 that address the ability of poll

19  watchers to move around and stand close enough to

20  view and that penalized poll workers for

21  interfering?

22    A.   Yes.

23    Q.   And can you elaborate on that?

24    A.   I think the vast majority of those poll

25  watchers probably understood the rules and abided by

1  them, but I think that there -- like anything else

2  in life, there's a small percentage that did not

3  know the rules or chose to ignore the rules and to

4  go beyond their authority.

5      Q.   What effect did this have in your view on

6  the willingness of poll workers to work for the

7  County?

8              MS. HUNKER:  Objection; form.

9      A.   We had anecdotal evidence that poll workers

10  were very scared about taking jobs as poll workers

11  because they were worried about being charged with a

12  crime if they got in confrontations with poll

13  watchers.

14  BY MS. PERALES:

15      Q.   Do you know if there was an increase in the

16  number of calls for assistance by poll workers to

17  either the hotline or the response team because poll

18  workers were nervous about making a misstep with

19  respect to poll watchers?

20      A.   I think that we -- during the early voting

21  period in November, we experienced a lot of drama.

22  And going into election day, we were expecting a lot

23  of drama in a lot of poll watchers in the field.  As

24  it turned out, it was a pretty smooth day, and we

25  did not experience that on election day.

1      Q.   Okay.  And I'm going to ask you about the

2   drama in a minute, but I want to make sure I cover

3   the rest of the incidents that you were remembering.

4           So we've covered the first one, which had

5   to do with the poll watcher who follows the poll

6   worker home.

7      A.   Uh-huh.

8      Q.   Can you recall a second incident?

9      A.   Yes.

10     Q.   Okay.

11     A.   During --

12     Q.   Go ahead.

13     A.   During early voting at Lancaster library, I

14   think it is, we had multiple incidents of a judge --

15   I'm going to call them a judge, assistant elections

16   clerk.  Calls multiple times regarding what she

17   thought poll watchers were misbehaving, overstepping

18   their bounds, getting in verbal confrontations with

19   her.  I, in fact, went down to that location

20   personally and visited with her.  Several of our

21   inspectors were down there multiple times.  The

22   sheriffs were there.  I believe the local police

23   were there also from Lancaster.

24     Q.   How did that situation get resolved?

25     A.   I think just a lot of negotiation and

1  calming people down.  And I believe there may be a

2  report where the local police may have escorted

3  someone off or even taken them -- taken them in.

4      Q.   And when you say escorted someone off or

5  taken them in, would that have been a poll worker or

6  a poll watcher?

7      A.   Poll watcher.

8      Q.   In your view, was the poll watcher in

9  that -- poll watcher or watchers in those incidents

10  at Lancaster library acting beyond what they were

11  allowed to do in the polling place?

12      A.   It would have been poll watchers, multiple.

13      Q.   Poll watcher.

14      A.   And the answer is yes.

15      Q.   Do you know whether that poll watcher was

16  revoked by the appointing authority?  Watcher or

17  watchers.

18      A.   I don't think so.

19      Q.   Do you know who the appointing authorities

20  were for those watchers?

21      A.   I don't recall.

22      Q.   I'm going to ask you a question that I

23  learned based on taking a deposition in Harris

24  County.  But do you get lists of poll watchers that

25  are -- have been appointed for an upcoming election

1    prior to that election happening?

2        A.    I believe we did from the parties.

3        Q.    What do -- do you do anything with those

4    lists?  For example, review them, see if you find

5    anyone problematic on there?

6        A.    No.

7        Q.    Okay.  You just allow the appointing

8    authority to appoint the watchers that they appoint?

9        A.    That's correct.

10       Q.    Okay.  Is there a third incident that you

11   can remember?

12       A.    Off the top of my head, I can't.

13       Q.    Okay.  But there would be records somewhere

14   of those incidents?

15       A.    Yes.  Yes.

16       Q.    Do you connect the incident or incidents at

17   Lancaster library with the changes in the law around

18   poll watchers that were made by SB1?

19       A.    I think SB1 changes emboldened some poll

20   watchers to go beyond their authority and create

21   trouble.

22       Q.    Would that be the case also for the

23   incident that you mentioned first involving the

24   watcher who followed the poll worker home?

25       A.    Yes.

1  within the training that kind of -- I don't know if

2  it was a video or a segment of the training that

3  talked about the rules around poll watchers and how

4  they have changed and how poll workers needed to be

5  in compliance with that, that law.

6      Q.    Did you advise poll workers about how close

7  a watcher could stand to a voter?

8      A.    I don't think the law is specific enough to

9  do that.  It just says, you know, close enough to

10  observe, and so that is a judgment call, if you

11  will.

12      Q.    Did -- were you in any of these trainings,

13  or were you able to receive feedback about the types

14  of questions that were coming from poll workers in

15  the training?

16      A.    I would -- I always stop by a few trainings

17  every election cycle, so yes.

18      Q.    Do you know whether poll workers who were

19  being trained were asking questions about how close

20  a poll watcher would stand to voters or other

21  questions about the new freedoms granted to watchers

22  under SB1?

23      A.    They were asking questions about the new

24  freedoms, yes.

25      Q.    Were -- do you know if any of them were

1  activities?

2     A.   I think -- no, I think the law is vague,

3  and it makes it difficult for us to provide guidance

4  to the poll workers in a -- in a sufficient enough

5  fashion where the poll workers are comfortable

6  knowing what to do.

7     Q.   Do you think that given the penalties faced

8  by poll workers for interfering with watchers in

9  their new freedoms under SB1, that poll workers are

10  likely to err on the side of not intervening on

11  behalf of a voter who might be uncomfortable?

12          MS. HUNKER:  Objection; form.

13     A.   Yes.

14  BY MS. PERALES:

15     Q.   How much do you pay your poll workers?

16     A.   We pay clerks $16 an hour, and we pay

17  judges $20 an hour.  We also pay them for training.

18  We also pay them for setup before and after an

19  election.  And we also pay them for deliveries.  A

20  judge, if they're delivering supplies, et cetera.

21     Q.   Have you heard any poll workers complain

22  that for them it's not worth the risk of limiting

23  the activities of a poll watcher because of the

24  penalties they face under SB1?

25     A.   I haven't heard that directly, but my

Page 48

1    trainers tell me that they've heard that.

2        Q.    Have you heard any information to the

3    effect that watchers are standing uncomfortably

4    close to voters who use language interpreters?

5        A.    I don't recall any incidents of that.

6        Q.    Have you heard any information about poll

7    watchers standing uncomfortably close to voters who

8    have brought someone to assist them physically with

9    the voting process?

10       A.    I believe there was -- I recall a potential

11   incident with that fact pattern, yeah.

12       Q.    Can you explain that incident?

13       A.    I don't remember -- recall.  I vaguely

14   remember.

15       Q.    Was it for the 2022 general election?

16       A.    I believe so.

17       Q.    Do you think there would be a record of it?

18       A.    Most likely.

19       Q.    Do you know if the voter was physically

20   disabled?

21       A.    I don't recall.  It was either disabled or

22   language assistance.  It was some form of

23   assistance.

24       Q.    Okay.

25       A.    If I -- I'm trying to remember.

Page 52

1      A.   Yes.

2      Q.   Were you aware that there had been a court

3   ruling invalidating, in part, the SB1 provisions on

4   limiting voter assistance?

5      A.   I'm vaguely familiar with it, yes.

6      Q.   Would you agree with me that under the new

7   oath of assistance, which is Exhibit 4, that the

8   oath of the person assisting the voter is still made

9   under penalty of perjury where it says at the

10  beginning, "I swear or affirm under penalty of

11  perjury"?

12     A.   Yes.

13     Q.   Okay.  Would you agree with me that in the

14  new form, the assister still says, still on the

15  first line, "The voter I am assisting represented to

16  me that they are eligible to receive assistance"?

17     A.   I'm sorry, can you repeat the question?

18     Q.   Yes.  On Exhibit 4, would you agree with me

19  that the oath of assistance contains the language,

20  "The voter I am assisting represented to me that

21  they are eligible to receive assistance"?

22     A.   Which line are you on?  I'm sorry.

23     Q.   Right under the big words "Oath of

24  Assistance."

25     A.   Okay.  Yes.

Page 53

1       Q.    And it starts with, "Oath of person

2    assisting voter. . ."

3       A.    Yes.

4       Q.    After "Penalty of perjury" --

5       A.    Uh-huh.

6       Q.    -- does it say, "the voter I am assisting

7    represented to me that they are eligible to receive

8    assistance"?

9       A.    Yes.

10       Q.    Do you notice on the second line there is

11    still language, "I did not pressure or coerce the

12    voter into choosing me to provide assistance"?

13       A.    Yes.

14       Q.    And then finally, before the Spanish part,

15    does the assister have to swear, "I understand that

16    if assistance is provided to a voter who is not

17    eligible for assistance, the voter's ballot may not

18    be counted"?

19            That's the third line from the top over on

20    the far right.

21       A.    Yes.

22       Q.    Were there polling places in the 2022

23    general election in Dallas County where you did not

24    have a Spanish speaking poll worker?

25       A.    In 2022?

Page 54

1    Q.    In 2022 general election.

2    A.    I believe we had a Spanish speaker in every

3    polling place.

4    Q.    Okay.  Were there some polling places in

5    the 2022 general election where you did not have a

6    Vietnamese speaker?

7    A.    Yes.

8    Q.    In those instances, how did you -- what

9    service did you provide for a Vietnamese speaking

10   voter?

11   A.    So we became -- a new requirement in

12   December of last year for our Vietnamese, and we

13   began our recruitment and focused those that we did

14   recruit in highly -- where there was a lot of

15   Vietnamese speakers.  The Vietnamese speakers tend

16   to want to go to just a handful of locations.  And

17   at those locations, I think we had -- there was as

18   many as five interpreters at one location in

19   particular.

20         But in addition to that, to have broad

21   coverage, we found an application on the -- the

22   phones that I mentioned that the judge has, on this

23   application, you can press the button to get to the

24   service where you get a live operator who speaks --

25   I think it provides up to 40 different languages.

1   And that -- one of those being Vietnamese.  So we

2   did have broad coverage at all of our locations

3   since we weren't able to recruit in such a short

4   period of time Vietnamese speakers everywhere.

5        Q.   Did you keep any records about how many of

6   your poll workers used the app for Vietnamese?

7        A.   There are records, but I don't recall -- I

8   don't know the numbers.

9        Q.   Last year when I was taking this

10  deposition, I believe it was Ms. Phillips said that

11  when you call the elections administrator office,

12  you can select in the menu to speak to someone in

13  Spanish.  And I was wondering if you had anything

14  similar in your phone menu at the office for someone

15  who wants to speak to a worker in Vietnamese?

16       A.   Yes.

17       Q.   As part of your phone menu now?

18       A.   Yes.

19       Q.   Do you have a Vietnamese speaker in your

20  office, then, who takes those calls?

21       A.   Yes, we do.

22       Q.   It is correct that you provide applications

23  for ballot by mail and mail ballot materials in

24  Spanish, yes?

25       A.   Yes.

Page 56

1    Q.    Do you provide an application for ballot by

2    mail in Vietnamese?

3    A.    Yes.

4    Q.    Do you provide mail ballot materials in

5    Vietnamese?

6    A.    Yes.

7    Q.    How would someone request an application

8    for ballot by mail be sent to them in Vietnamese?

9    A.    They can call, e-mail, fax, come in person,

10   write a personal -- a letter, snail mail.

11   Q.    Which would arrive in Vietnamese and I

12   guess promptly be delivered to your Vietnamese

13   speaker?

14   A.    Correct.

15   Q.    Okay.  Did you experience any problems of

16   voter fraud associated with individuals providing

17   assistance to voters in the polling place in the

18   2022 general election?

19   A.    No.

20            MS. HUNKER:  Objection; form.

21            MS. PERALES:  Did you catch that

22   answer from the witness?

23            THE STENOGRAPHER:  Yes.

24   BY MS. PERALES:

25   Q.    Do you know whether your office made any

1    number requirements for mail ballots created by SB1

2    on those phone calls since the primary election?

3         A.    Most likely, yes.

4         Q.    Do you recall any specifics about any

5    conversations that would have happened after the

6    primary election, either elections administrators

7    still expressing concern about the ability to

8    implement it or the Secretary of State saying, oh,

9    we have a new suggestion for you?

10        A.    Yes, in particular, about the ballot -- or

11   the carrier envelope design and the ability to --

12   for the voter to fill that out properly and for us

13   to be able to access it, et cetera.  So mostly about

14   design.

15        Q.    And does that include the fact that the

16   voter has to provide the ID number under a flap?

17        A.    That's correct, yes.

18        Q.    Do elections administrators express concern

19   about the requirement to provide the number under

20   the flap?

21             MS. HUNKER:  Objection; form.

22        A.    I think that the concern is about the

23   design in guiding the voter to make sure that they

24   actually do it.  Form design is huge.  If it's

25   not -- if a form is not designed properly, then

Page 64

1    you're less likely to get compliance.

2    BY MS. PERALES:

3        Q.   Are voters missing the place where they're

4    supposed to provide this ID number and it's causing

5    them not to provide an ID number?

6                MS. HUNKER:  Objection; form.

7        A.   We definitely have that, a certain

8    percentage of people don't fill it out properly.

9    BY MS. PERALES:

10       Q.   Do you know whether there's a concern

11   expressed by other election administrators on the

12   call with the Secretary of State?

13       A.   Yes.

14       Q.   Have you made any suggestions about

15   changing the form to the Secretary of State?

16       A.   Yes.  We should throw it away and start

17   from scratch.

18       Q.   But more or less, we're still working with

19   the same form as from the primary, correct?

20       A.   Yes.

21       Q.   However, there would be a difference in the

22   assistance language for persons assisting voters who

23   vote by mail?

24       A.   Yes, I think there was a penalty difference

25   or -- it went from two years to four years.  I can't

Page 69

1      Q.   Have you made any efforts -- your office

2   made any efforts since May of 2022 to make voter

3   registration or voting more accessible, for example,

4   to persons with disabilities?  Any new efforts,

5   anything additional you have done since May of last

6   year?

7      A.   For people with disabilities?

8      Q.   Yes.

9      A.   I'm trying to recall.  Not that I can

10  recall off the top of my head.

11     Q.   Some counties will gather advisors from the

12  disability advocacy community and solicit input.

13  I'm trying to think of other things that might jog

14  your recollection.

15     A.   Okay.  So sure.  Most recently, we had a

16  vote center advisory committee that met in January,

17  February, and March, that evaluated the quality of

18  our polling locations and -- including a whole range

19  of -- of items, but also new surveys for ADA

20  compliance.

21          And so we had an army of people go out to

22  over 500 of our locations with iPads, taking

23  surveys, a survey that we built, including taking

24  pictures, measuring ADA ramps, ADA parking, et

25  cetera, et cetera.  And then we fed that information

 1    to the vote center advisory committee, and the vote

 2    center advisory committee made recommendations to

 3    get rid of some noncompliant ADA -- ADA noncompliant

 4    locations.

 5         Q.    And that would be for the -- for the next

 6    election in the future?

 7         A.    Correct.

 8         Q.    You mentioned that for the 2020 general

 9    election, there were over 400 vote centers in Dallas

10    County?

11         A.    I believe it's 469.

12         Q.    Is there a plan to reduce that number?

13         A.    There is -- the vote center advisory

14    committee had a plan to adjust -- adjust the number

15    of locations for low turnout elections.  So a May

16    election is typically is 8 to 9 percent turnout

17    versus a presidential is 65 percent turnout.

18    Under -- historically, we had used the same number

19    of polling places for the both types of elections.

20              The May elections are paid for by

21    participating jurisdictions.  They were very upset

22    about the high cost of those elections under the

23    vote center model.  In response to that, the vote

24    center advisory committee most recently made a

25    recommendation to reduce for low turnout elections

1  to 370 locations.  And for high turnout elections,

2  it's still up in the air because we're -- the vote

3  center advisory committee is still meeting,

4  formulating that plan for a high turnout election.

5  It will probably be 4- to 500 locations.

6       I would say that Dallas County still, even

7  with 370 locations, has more locations per capita

8  than anybody in the state.

9       Q.   I live in Bexar County, and I think Bexar

10  County might have more polling places, but we have

11  more --

12       A.   I don't think so.

13       Q.   -- population.  So maybe per capita you

14  have got us beat.

15       A.   I'm pretty positive of that.

16       Q.   Okay.  I'm not going to tell that to

17  Jackie.  She would be jealous.

18           You mentioned that you've got a phone menu

19  now for speakers of Vietnamese.  Are there any other

20  efforts that your office has made specifically to

21  make voter registration or voting more accessible

22  for folks who are -- voters who are limited English

23  proficient?

24       A.   We created a new position, a Vietnamese --

25  for a person who speaks Vietnamese in that their

1    full-time position is to recruit Vietnamese poll

2    workers and to translate.  And that's -- that's

3    their sole role.  We have someone full time for the

4    Spanish language.  A Vietnamese coordinator, Spanish

5    language coordinator.

6        Q.    Do you have an ADA coordinator in your

7    office?

8        A.    We don't have a full-time ADA coordinator,

9    but our voting sites department head would be

10    serving in that capacity.  He's the one, for

11    instance, that directed the -- the team to do the

12    ADA surveys.

13        Q.    Have you had any communications with poll

14    workers or members of the public to the effect that

15    provisions of SB1 make it more difficult for voters

16    with disabilities to vote?

17        A.    I don't understand the question.

18        Q.    So has anyone said to you or your office,

19    either from the poll worker side or from the voter

20    side, that there was something in SB1 that was

21    making it more difficult for a disabled voter to

22    vote?

23        A.    Yes.  We have advocacy groups that we work

24    with, a variety of them, and I think several of them

25    have expressed that they -- they have concerns about

1    SB1 and the effects for all -- all walks of life,

2    including disability -- people with disabilities.

3        Q.    Is that with respect to the requirement of

4    providing an ID number for voting or in other

5    respects?

6        A.    I think all aspects of SB1 in general.

7                MS. PERALES:  I pass the witness.

8    Thank you for your time.

9                MR. STEWART:  Can we go off the record

10   briefly?

11               THE VIDEOGRAPHER:  We're off the

12   record.  The time is 12:10 p.m.

13               (Break taken, 12:10 p.m. to 12:21 p.m.)

14               THE VIDEOGRAPHER:  We're back on the

15   record.  The time is 12:21 p.m.

16               MR. STEWART:  I think Mr. Stool wanted

17   to say something on the record before I start.

18               MR. STOOL:  I do.

19         Earlier today Ms. Perales asked Rivelino

20   Lopez questions about the ExpressPoll book --

21   ExpressPoll Connect e-pollbooks and about reports on

22   voters who voted in person, used an interpreter

23   or -- and/or vote assistance.

24         On March 31, 2023, Dallas County produced

25   221 pages of assistance affidavits for the general

1       Q.   Okay.  Did you direct voters at all to

2   the -- to any videos prepared by the Secretary of

3   State's office?

4       A.   I don't recall.

5       Q.   Do you expect to continue that kind of

6   outreach into the future?

7       A.   Yes.

8       Q.   Do you know yet whether you'll have a

9   similar budget for that in future elections?

10      A.   I don't know.

11      Q.   I think you already testified with

12  Ms. Perales that your process for intaking and

13  reviewing both applications for a ballot by mail and

14  carrier envelopes with respect to the ID requirement

15  was the same for the general as the primary.  Is

16  that right?

17      A.   I believe so, yes.

18      Q.   And just to be clear on that, does your

19  office use the driver's license or SSN

20  identification number on the ABBM for any purpose

21  other than determining whether to accept it in light

22  of SB1?

23              MS. HUNKER:  Objection; form.

24      A.   No.

25  BY MR. STEWART:

1    Q.    And same question with respect to carrier

2    envelopes, do you use the identification number for

3    any purpose other than determining whether to accept

4    it in light of SB1?

5    A.    No.

6                MS. HUNKER:   Objection; form.

7    BY MR. STEWART:

8    Q.    Would questions about the cure process for

9    ballots by mail better be directed to you or

10   Ms. Phillips?

11   A.    Both of us could have -- we have a vague

12   understanding, but that cure process is controlled

13   by the early voting ballot board.

14   Q.    Okay.

15   A.    So they -- they would be the ones that

16   directly know those answers.

17   Q.    So is it your office or the early voting

18   ballot board who notifies voters when, let's say, an

19   ABBM is rejected?

20   A.    Early voting ballot board.

21   Q.    Okay.   And is that the same for the carrier

22   envelope, do they -- they're the ones who notify

23   voters when a carrier envelope is rejected?

24   A.    Yes.   And what was the first --

25   Q.    The first one was ABBMs.

1      A.    The application?

2      Q.    Yes.

3      A.    Oh, the application, that would be

4  Ms. Phillips' department.

5      Q.    Got it.

6            So, I mean, you can answer if you know,

7  but I can also ask Ms. Phillips whether -- you know,

8  how do you get in touch with them?  Call?  E-mail?

9      A.    Yeah, I believe it's -- you might want to

10  ask Ms. Phillips that too.

11      Q.    Sure.  I'll save those questions for

12  Ms. Phillips.

13            And then is it your office or the early

14  voting ballot -- well, let me strike that.

15            Does your office send out notices to

16  voters whose ballots are finally rejected because

17  they, say, do not cure in time?

18      A.    I believe so.  I think that's the early

19  voting ballot board.

20      Q.    You think that would be the early voting

21  ballot board?

22      A.    Yeah.

23      Q.    Do you know in what form those notices are

24  sent out?

25      A.    I'm not sure.  So you're saying -- if I'm

1  there where we had some poll watchers misbehaving

2  and having to be wrangled, if you will, and in

3  general -- generally speaking, that it was -- I

4  wouldn't say highly difficult, but difficult.

5      Q.   What was the type of misbehavior?

6      A.   Getting too close, interfering with our --

7  our workers.  We went to extraordinary measures to

8  try to make it accommodating to poll watchers.

9  Provided nice seating, good lighting, streaming

10 service, large monitors where they could watch

11 everything we're doing so they weren't -- didn't

12 have to look at tiny little screens, things like

13 that.  Yet there were still people over the

14 shoulders, getting too close.

15          It almost felt -- our people felt as

16 though it was harassing given the fact that we were

17 being accommodating in many other ways.  So it made

18 many of our employees very uncomfortable.  We also

19 did have a -- one incident of tampering that I don't

20 know that I can elaborate on.

21     Q.   Leaving that one aside, how were those

22 issues resolved?

23     A.   The -- either myself or the central count

24 presiding judge would -- would talk to those poll

25 watchers and try to get them to behave better.

Page 109

1    making them uncomfortable in the November 2022

2    general election?

3        A.   I don't recall.

4        Q.   And so I believe you described three types

5    of instances with poll watchers.  I'm going to ask

6    you some follow-up questions about those incidents.

7             The first incident you described was about

8    a poll watcher asking to inspect documents and then

9    opening a ballot box.  Is that correct?

10       A.   Yes.

11       Q.   Opening up a ballot box is not allowed

12   under the statute; is that correct?

13       A.   Correct.

14       Q.   And so opening up a ballot box is not

15   permitted under SB1, correct?

16       A.   That's correct.

17       Q.   And I believe you had mentioned that the

18   nominating party revoked that poll watcher's

19   authority.  Is that correct?

20       A.   Yes, that's correct.

21       Q.   Did you pursue any other avenues of

22   redress?

23       A.   No.

24       Q.   You also described an incident at Lancaster

25   library; is that right?

1    A.    Correct.

2    Q.    And you said that this poll watcher was

3  ultimately escorted out; is that correct?

4    A.    My memory of it is that -- I mean, this was

5  over a period of several days, multiple incidences.

6  And one of them, I think, resulted in the local

7  police department escorting that person out.

8    Q.    And what was the misconduct in question?

9    A.    It's a very cramped location, and the

10  complaint from the poll workers were, that the poll

11  watchers were too close to the voters, getting in

12  the way of voters, getting in the way of ADA access,

13  things like that.

14    Q.    And who contacted law enforcement to have

15  this individual escorted out?

16    A.    I believe it was the local judge or the

17  election clerk.

18    Q.    Do you know if the nominating party or

19  candidate was contacted about the poll watcher's

20  behavior?

21    A.    I know that the Republican party was

22  contacted.  I don't know if they were the

23  nominating sponsor of that -- of that watcher.

24  Because, I mean, they could have been one of, you

25  know, dozens and dozens of candidates.

1   SB1, correct?

2        A.    That would not be under our purview because

3   it's outside the 100 foot limit.  So that would not

4   be addressed in SB1.

5        Q.    So let me rephrase, then.

6              A poll watcher following a poll worker to

7   their car and to their home would not be covered

8   under SB1; is that correct?  Or addressed by SB1?

9        A.    No.

10       Q.    Do you remember talking to counsel and

11  saying that you thought SB1 emboldened poll watchers

12  to go beyond authority?

13       A.    I think it emboldened a certain percentage

14  of poll watchers to go beyond their authority.

15       Q.    Would you consider that percentage small?

16       A.    Generally, yes.

17       Q.    And what do you mean by "beyond their

18  authority"?

19       A.    I think that a certain percentage of --

20  those percentage that I'm talking about -- let me

21  put it this way.  SB1 is not precise in its

22  language.  It requires a certain amount of

23  professionalism.  There's a certain -- and common

24  sense.  And certain people do not have that

25  professionalism or common sense.

Page 154

1                UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
2                     SAN ANTONIO DIVISION

3
LA UNIÃ"N DEL PUEBLO ENTERO,   *
4   et al.,                        *
             Plaintiffs,           *
5                                  *
v.                                 *   Civil Action No.
6                                  *   5:21-cv-844 (XR)
STATE OF TEXAS, et al.,            *
7            Defendants.           *

8                     REPORTER'S CERTIFICATION
                   DEPOSITION OF MICHAEL SCARPELLO
9                         APRIL 13, 2023

10            I, CHRISTY R. SIEVERT, CSR, RPR, in

11   and for the State of Texas, hereby certify to the

12   following:

13            That the witness, MICHAEL SCARPELLO, was

14   duly sworn by the officer and that the transcript of

15   the oral deposition is a true record of the

16   testimony given by the witness;

17            I further certify that the signature of

18   the deponent was requested by the deponent or a

19   party and is to be returned within 30 days from date

20   of receipt of the transcript.  If returned, the

21   attached Changes and Signature Page contains any

22   changes and the reasons therefor;

23            I further certify that I am neither

24   counsel for, related to, nor employed by any of the

25   parties or attorneys in the action in which this

Page 155

1    proceeding was taken, and further that I am not

2    financially or otherwise interested in the outcome

3    of the action.

4              Subscribed and sworn to on this the 9th

5    day of May, 2023.

6

7

8    _____
     CHRISTY R. SIEVERT, CSR, RPR
9    Texas CSR 8172
     Expiration Date:  4-30-2025
10   Integrity Legal Support Solutions
     Texas CRF 528
11   9901 Brodie Ln. #160-400
     Austin, Texas 78748
12   (512) 320-8690
     www.integritylegal.support
13

14

15

16

17

18

19

20

21

22

23

24

25

7-58
Prescribed by Secretary of State
Sections 64.0322, 64.034, Texas Election Code
7/2022

| Type of Election | Polling Location |
|---|---|
| Date of Election | Authority Conducting Election |

# OATH OF ASSISTANCE

**Oath of Person Assisting Voter:** "I swear (or affirm) under penalty of perjury that the voter I am assisting represented to me they are eligible to receive assistance; I will not suggest, by word, sign, or gesture, how the voter should vote; I will prepare the voter's ballot as the voter directs; I did not pressure or coerce the voter into choosing me to provide assistance; I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; I will not communicate information about how the voter has voted to another person; and I understand that if assistance is provided to a voter who is not eligible for assistance, the voter's ballot may not be counted." **Juramento de la Persona Asistiendo al Votante:** "Yo juro (o afirmo) bajo pena de perjurio que el votante al que estoy asistiendo me representó que es elegible para recibir asistencia; no sugeriré, con palabra, señal, o gesto, como debe votar el votante; prepararé la boleta del votante según lo indique el votante; no presioné ni coaccioné al votante para que me eligiera como asistente; no soy el empleador del votante, un agente del empleador del votante, o un oficial o agente de un sindicato al cual el votante pertenece; no comunicaré información sobre cómo el votante ha votado a otra persona; y entiendo que si se proporciona asistencia a un votante que no es elegible para recibir asistencia, la boleta del votante podría no ser contada."

| | Signature of Assistant (Firma del Asistente) | Printed Name of Assistant (Nombre del Asistente en Letra de Molde) | Address of Assistant (Dirección del Asistente) | Relationship of Assistant to Voter (Relación del Asistente al Votante) | Did you receive or accept any form of compensation or other benefit from a candidate, campaign, or political committee? (Recibió o aceptó cualquier forma de compensación u otro beneficio de un candidato, campaña o comité político?) |
|---|---|---|---|---|---|
| 1 | | | | | Yes    No |
| 2 | | | | | Yes    No |
| 3 | | | | | Yes    No |
| 4 | | | | | Yes    No |
| 5 | | | | | Yes    No |
| 6 | | | | | Yes    No |
| 7 | | | | | Yes    No |
| 8 | | | | | Yes    No |
| 9 | | | | | Yes    No |
| 10 | | | | | Yes    No |

**Instructions:**
1. Administer the Oath of Assistance to the Assistant.
2. The Assistant must repeat the Oath aloud and complete the form for each voter assisted.
3. Instruct the Assistant to:
   a. Sign the form
   b. Print his or her name
   c. Provide his or her address
   d. Put his or her relationship to the voter in the column
   e. Indicate whether he or she received or accepted any form of compensation or other benefit from a candidate, campaign, or political committee for providing assistance to the voter.

The above oaths were sworn and subscribed to before me this _____ day of _____, 20____    Los juramentos señalados arriba fueron declarados bajo juramento y suscritos ante mí en la fecha arriba.

_____
Signature of Election Officer

_____
Printed Name of Election Officer


EXHIBIT

7-58
Prescribed by Secretary of State
Sections 61.033, 61.035 Texas Election
Code 7/2022

| Type of Election | Polling Location |
|---|---|
| Date of Election | Authority Conducting Election |

## OATH OF INTERPRETER

**Oath of Interpreter: "I** swear (or affirm) that, to the best of my ability, I will correctly interpret and translate each question, answer, or statement addressed either to the voter by any election officer or to an election officer by the voter." **Juramento del Intérprete:** *"Yo juro (o afirmo) que, a mi mejor habilidad, interpretaré y traduciré de una manera correcta cada pregunta, respuesta o declaración que cualquier oficial electoral dirija al votante o que el votante dirija a cualquier oficial electoral."*

_____

_____

_____

_____

_____

_____

**Instructions:**
1. Administer the Oath of Interpreter to the Interpreter.
2. The Interpreter must repeat the Oath aloud.
3. Instruct the Interpreter to sign the form.

The above oaths were sworn and subscribed to before me this _____ day of _____, 20 ____.
*Los juramentos señalados arriba fueron declarados bajo juramento y suscritos ante mí en la fecha arriba.*

_____
Signature of Election Officer

_____
Printed Name of Election Officer