# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO          )
ENTERO, ET AL               )
vs.                         )   CASE NO. 1:21-cv-0844-XR
                            )
                            )
GREGORY WAYNE ABBOTT, ET    )
AL                          )

ORAL & VIDEOTAPED DEPOSITION

REMI GARZA

May 9, 2022

ORAL & VIDEOTAPED DEPOSITION OF REMI GARZA, produced as a witness at the instance of the Defendant and duly sworn, was taken in the above-styled and numbered cause on the 9th day of May, 2022, from 9:32 a.m. to 6:20 p.m., before Dora Canizales, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype method at the Dancy Building 1100 E. Monroe Street, Suite 250, Brownsville, Texas 78520, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

1    A    Other than the just general collection of data

2    as we're moving through the election, from a statistical

3    standpoint, it's usually not something that we do on a

4    regular basis.

5              Occasionally, we will compile information

6    based on the requests or if we're interested in seeing

7    something to see if there's an impact or if there's

8    something we need to do to correct what we see as a

9    potential problem.

10    Q    Okay.  And what -- can you give me some

11    examples of when you would have conducted those types of

12    analysis?

13    A    It would be along the lines of, if we found

14    that there were a lot of ballots that were rejected for

15    not including a statement of residence when they were

16    being returned from the ballot by mail.

17              Just to see how it was actually -- what

18    the numbers actually were.

19              Another situation where we kind of put

20    together numbers was where the county was discussing

21    doing countywide programs, there was a concern that

22    there were a lot of people who were having to cast

23    additional ballots because they were in the wrong

24    precinct.  And so we tried to look at those figures to

25    see exactly how many individuals were in that situation

1    on election day.

2       Q    When you conduct those analyses, are you ever

3    looking at racial demographics?

4       A    No.

5       Q    When you can -- no, let me strike that.

6                Now, I remember reading that you are also

7    a member of the Texas Association of Elections

8    Administrators; is that right?

9       A    Yes.

10      Q    And are you an officer; is that correct?

11      A    Yes.  I currently serve as president.

12      Q    And how long have you been president of that

13   organization?

14      A    It's just been under a year.  We have a system

15   where the officers move up each year.  I started off as

16   secretary and then became treasurer, and then vice

17   president, and then president.

18      Q    So when does your term end?

19      A    It's usually in conjunction with the Secretary

20   of State's conference for the elected officials, usually

21   the end of July, beginning of August.

22      Q    And so you took this position in July of 2021,

23   and you end around July 2022?

24      A    I would say closer to August.

25      Q    Close to August.

Page 17

1      A    Towards the end of July.

2      Q    Okay.  So you assumed the position in August of

3   2021, and then you will end in either July or August of

4   2022; is that correct?

5      A    Yes.

6      Q    And what sort of responsibilities do you have

7   as president of the Texas Association of Elections

8   Administrators?

9      A    It varies.  My primary responsibility is, you

10  know, conducting meetings for the organization.  And in

11  our organization, the president essentially is

12  responsible for putting on the midwinter conference,

13  which is a conference that we put on usually in January.

14           And so the president, you know, has to

15  sort of develop the agenda for that event, coordinate

16  with the rest of the officers to get speakers, and make

17  sure the arrangements are okay and execute those

18  contracts.

19           And then, occasionally, we act as the

20  appointed person for people who generally have questions

21  for other office administrators, and we will, you know,

22  contact through e-mail the rest of our membership to see

23  if they have any input they'd like to put in.

24      Q    So I probably should have asked before I asked

25  for specific responsibilities, but what is the purpose

Page 19

1   of State's office in that capacity as a Texas Elections

2   Associate -- Texas Administration Elections

3   Associations (sic) President?

4        A    I've had conversations with the Secretary of

5   State on behalf of the organization, nothing direct, or

6   more, just thank you for coming to our conference, but

7   not specifically.

8        Q    So they've been just a cordial interaction type

9   of courtesy as opposed to substantive discussions about

10  elections?

11       A    With me?

12       Q    Yes.

13       A    Yes.

14       Q    And are you on the Secretary of State's County

15  Advisory Committee?

16       A    Yes, I am.

17       Q    So we will probably talk about that in a little

18  bit in your deposition.

19            But in the meanwhile, can you just give me

20  a sense of what you do as county advisory committee?

21       A    The Secretary of State's Advisory Committee?

22       Q    Yes.

23       A    I think it was a group that the Secretary of

24  State's office put together.  Of various elections

25  administrators throughout the state to sort of identify

1    issues or sound out certain problems they were

2    experiencing or that they saw coming, to see how things

3    work.

4              And at the same time, we were able to

5    raise concerns that we were experiencing and enter into

6    dialogue with respect to those, ask questions, get

7    guidance.

8              And they have asked us to review forms and

9    how they would be utilized or how we felt they would

10   work.  And they asked us to offer suggestions on

11   modifying.

12   Q    And how long have you been a member of this

13   advisory committee?

14   A    I think I was there when it started, but I'm

15   not exactly sure when it started at this point.

16   Q    Okay.  That's fine.

17   A    But it's been -- it's been a couple of years.

18   Q    Fair enough.

19   A    I want to say that it started kind of during

20   the 2020 election cycle.  If not, a little bit before

21   that.  I'm not clear.

22   Q    And what did you do for employment prior to

23   becoming an elections administrator?

24   A    Should I work backwards through my time or move

25   forward?

1    Q    Let's move backwards.

2    A    Prior to working as the elections

3  administrator, I worked for the Regional Advisory

4  Council on Trauma.

5              I also had my own company called Frontera

6  Consultants where we worked with local jurisdictions to

7  do grant writing and program development.

8              Prior to that, I had worked with the

9  county judge's office here in Cameron County.  I took

10  that position in 1995.

11              And prior to that, it was no jobs of

12  significance.

13    Q    And what was your role in the county judge's

14  office?

15    A    I was an administrative assistant and then

16  ultimately became the assistant county administrator.

17    Q    And who was the county judge at the time?

18    A    Gilberto Hinojosa.

19    Q    Sorry.  Just give me a quick second.

20              Can you repeat the name, please?

21    A    Gilberto Hinojosa.

22    Q    And is this the same state senator or is this a

23  different individual?

24    A    Different individual.

25    Q    And is this person the head of the democratic

Page 22

1   party?

2       A    I think he currently serves as the chairman of

3   the state democratic party, yes.

4       Q    And do you work directly for him or did you

5   work for the office itself?

6       A    I was a county employee.

7       Q    And who would have hired you in the process?

8       A    He would have.

9       Q    And where did you go to school?

10      A    I attended the University of Dallas for four

11  years, but I didn't complete my degree.

12      Q    And what subjects did you study, just out of

13  curiosity?

14      A    Psychology.

15      Q    Now I want to turn our attention to the 2020

16  elections.  So we have the March primary.  And then

17  after that, of course, the COVID pandemic hit, correct?

18               Now, how was the 2020 election ran

19  differently than prior elections?

20      A    After the initial primary, I think the first

21  major difference was the governor moved the runoff to

22  July.

23               You know, we had a lot of changes with

24  respect to securing our polling sites, making sure that

25  we were complying with the CDC guidelines with respect

Page 23

1    to COVID.

2                We moved a lot of elections that we were

3    going to have in May to the November election, so we'd

4    have a lot more jurisdictions that were moving with us

5    to November that would have already conducted the

6    elections in May.  And there was a lot of concern in the

7    community with respect to voting safely.

8        Q    And so 2020 was also a presidential election,

9    correct?

10       A    Yes.

11       Q    Presidential elections tend to be larger than

12   other elections?

13       A    Yes.

14       Q    But it also sounds like you have local

15   municipalities moving their elections until November; is

16   that right?

17       A    Yes.

18       Q    And so that would also increase the size of the

19   election?

20       A    It would have increased -- we would think that

21   it would increase the size of the voters, but, again,

22   the presidential elections are always such a -- so much

23   higher turnout that I don't think it really impacted the

24   overall turnout of the 2020 election.

25                But it did require a lot of additional

Page 26

1    participating in the election process.

2        Q     So during our discussion you had mentioned the

3    governor's proclamation.  So I want to go over those in

4    a little bit more detail.

5                  (Exhibit 2 marked)

6                  And so I have here Exhibit Number 2.  Do

7    you have the document in front of you?

8        A     Yes.

9        Q     And have you seen this document before?

10       A     Yes.

11       Q     And what is this document?

12       A     It appears to be the proclamation that was

13   issued by Governor Abbott regarding the May elections.

14       Q     Do you see where there's a date on top as well

15   as a stamp on the first page?

16       A     Yes.

17       Q     And this was issued July 27, 2020, correct?

18       A     Yes.

19       Q     Okay.  You see how it's stamped by the

20   Secretary of State on July 27, 2020?

21       A     Yes.

22       Q     And let's turn to the third page.  Where it

23   says:  "Now, therefore, I, Greg Abbott."

24       A     Uh-huh.

25       Q     It reads:  "Now, therefore, I, Greg Abbott,

1  Governor of Texas, with the authority vested in me by

2  the Constitution and laws of the State of Texas, do

3  hereby suspend Section 85.001(a) of the Texas Election

4  Code to the extent necessary to require that for any

5  election order or authorized to occur on November 3rd,

6  2020, early voting by personal appearance shall begin on

7  Tuesday October 13th, 2020, and shall continue through

8  the 4th day before election."

9          Did I read that sentence correctly?

10     A    Yes.

11     Q    It continues:  "I first suspend

12  Section 86.006(a)1 of the Texas Election Code for any

13  election ordered or authorized to occur on November 3rd,

14  2020.  To the extent necessary to allow a voter to

15  deliver a marked mail ballot in person to the early

16  voting clerk's office prior to and including on election

17  day."

18          Did I read that correctly?

19     A    Yes.

20     Q    And so this proclamation pertains to the

21  November 3rd, 2020, election, correct?

22     A    Yes.

23     Q    And the proclamation extended early voting,

24  correct?

25     A    Yes.

1      Q    I believe it extended early voting by about a

2  week, would you agree with that assessment?

3      A    Yes.

4      Q    And then it also changed the election code to

5  allow a voter to deliver in person their mail-in ballot

6  prior to election day, correct?

7      A    Yes.

8      Q    Before this proclamation, a voter could only

9  deliver in person to the early voting clerk on election

10  day; is that correct?

11      A    Yes.

12      Q    So would you agree with me that this

13  proclamation expanded options for voters during the

14  pandemic?

15      A    Yes.

16      Q    And would you agree with me that it increased

17  access to the franchise during the pandemic?

18      A    Yes.

19      Q    And you had mentioned earlier that you were the

20  early voting clerk for Cameron County; is that correct?

21      A    Yes.

22      Q    And you were early voting clerk for the

23  November 3rd, 2020, election; is that right?

24      A    Yes.

25      Q    And so an in-person delivery of a mail-in

1   ballot had to occur at your office; is that right?

2       A    Yes.

3       Q    And you mentioned earlier that you have only

4   one location; is that correct?

5       A    Yes.

6       Q    And so during the November 2020 election, if a

7   voter wished to deliver their ballot in person, they had

8   to deposit it at a single location; is that correct?

9       A    Yes.

10      Q    And that location was your office, correct?

11      A    Yes.

12      Q    Now, the governor's proclamation was a

13  one-time-only deal, correct?

14      A    Yes.

15      Q    And so once the November election passed, the

16  election code went back in place; is that correct?

17      A    Yes.

18      Q    And so from now on, post November 2020

19  election, voters can only drop off their in-person

20  ballot on election day; is that right?

21      A    Yes.

22      Q    And that was not changed by the SB1, correct?

23      A    Not that I'm aware of.

24      Q    And, because again, you are the early voting

25  clerk post November 2020 election, if a voter wished to

1   deliver their ballot in person, it would have to be at

2   your office, correct?

3        A    Yes.

4        Q    And you still only have one location, correct?

5        A    Yes.

6        Q    And so you cannot, in Cameron County, set up

7   multiple in-person delivery locations, correct?

8        A    No.

9        Q    And that was not effective by SB1, correct?

10       A    No.  Oh, yes, I'm sorry.  I -- I don't have any

11   other offices.

12       Q    So let me rephrase the question.

13            SB1 did not change the fact that in

14   Cameron you could only set up a single in-person

15   delivery site; is that correct?

16       A    Yes.

17       Q    We can put this exhibit aside.

18            Now, did you hear that in the -- that

19   other counties had set up multiple delivery locations

20   for in-person ballots?

21       A    Yes.

22       Q    Which counties did you hear of?

23       A    I believe I remember Harris County being one of

24   the counties and Travis County -- you know, usually it

25   was going to be a county that has their elections

Page 40

1   physical disability or somebody who would need

2   assistance going to the poll or that would -- or would

3   require assistance or would endanger their health.  Not

4   using the word "endanger" but --

5       Q    But you would agree with me there is a specific

6   requirement that an individual must meet before they

7   qualify for curbside voting, correct?

8       A    Yes.

9       Q    So you mentioned that you had not done

10  drive-thru voting in 2020.  Had you intended to

11  introduce the practice after the 2020 election?

12      A    No.

13      Q    So Senate Bill 1 did not change Cameron

14  County's intention to introduce drive-thru voting; is

15  that correct?

16      A    Not at -- not with -- no, it didn't change.  It

17  didn't change our position.

18      Q    Now, with respect to curbside voting, now that

19  occurs in Cameron County, correct?

20      A    Yes.

21      Q    And that's still available for voters in

22  Cameron County, correct?

23      A    Yes.

24      Q    Have you ever had any concerns about curbside

25  voting?

Page 43

1    Q    And do you think the State has an interest in

2    ensuring that voters have privacy while voting?

3    A    Yeah.  Second only to the voter.

4    Q    Did you expand the hours of voting during the

5    2020 November election?

6    A    I believe the commissioners court did extend

7    the hours of the voting during that time period.

8    Q    So I have looked on the website, but I had

9    trouble finding poll location or hours for the 2020

10   election.  So if you could just kind of explain to me

11   what the hours were.

12   A    We've tried to build them to be consistently

13   from 9:00 to 6:00, but the court has been adding the

14   additional hours.  So they're pretty much consistently

15   9:00 to 7:00.

16           I know that the court added additional

17   hours, even though I think they asked us to open up

18   earlier.  And maybe even asked us to open up -- to stay

19   open later during the election.

20           So we were either doing 8:00 to 8:00 or we

21   were doing 9:00 to 8:00.  I'd have to look at the actual

22   schedule from the election.  But they did increase the

23   hours for early voting.

24   Q    And you're aware that Senate Bill 1 puts a

25   minimum and maximum the amount of hours at one location

1    to be open; is that correct?

2        A    Yes.

3        Q    Did you have to expand hours in response to

4    Senate Bill 1?

5        A    No.

6        Q    Did you have to contract hours in response?

7        A    No.

8        Q    And so Cameron County, the office hours that

9    they had already provided voters fell within that range;

10   is that correct?

11       A    Yes.

12       Q    And to clarify, it fell within the range for

13   Senate Bill 1?

14       A    Yes.

15       Q    Is there a reason why you didn't have even

16   longer hours?

17       A    When you're looking at the hours that, you

18   know, you're going to have at one polling location, I

19   think you would want to see how many voters they are

20   expected to have and how many locations you have

21   throughout the county to see whether or not you're able

22   to accommodate the turnout during those time periods.

23       Q    And so please correct me if I'm wrong, but was

24   there not an interest in having longer hours from

25   voters?

1  whether it was distinct from curbside voting.

2      Q    Are you aware of what county that would have

3  been located?

4      A    I'm sorry?

5      Q    Do you know what county that would have been

6  located?

7      A    Harris County I believe was the one that was

8  involved in that litigation.

9      Q    In 2020, did Cameron County send out

10  unsolicited applications to vote by mail?

11      A    No.

12      Q    So the only application to vote by mail are the

13  ones that you sent out -- let me rephrase the question.

14              So the only applications that Cameron

15  County sent out were a response your request from those;

16  is that correct?

17      A    Yes.

18      Q    And you had no intention post November 2020 to

19  send out unsolicited applications to vote by mail?

20      A    To send the applications, no.

21      Q    Were you aware that Harris County had attempted

22  to send all registered voters in the county unsolicited

23  applications to vote by mail?

24      A    Yes.

25      Q    Were you aware that there was a lawsuit filed

Page 47

1    to prevent that?

2         A    Yes.

3         Q    Were you aware that the Harris -- that the

4    Texas Supreme Court concluded that Harris County might

5    already be under the postal system election code to

6    issue such a mailing?

7         A    Yes.

8              (Exhibit 4 marked)

9         Q    I'm going to introduce Exhibit Number 4.  Do

10   you have the exhibit in front of you?

11        A    Yes.

12        Q    Do you see where it is "Texas Secretary of

13   State John Scott" on the top?

14        A    Yes.

15        Q    Do you see on the bottom where it has an https

16   website address?

17        A    Yes.

18        Q    And that website is www.sos.state.tx.us slash

19   elections slash historical slash Cameron dot as shtml?

20        A    Yes.

21        Q    And would you agree with me that is taken from

22   the Secretary of State's website?

23        A    Yes.

24        Q    And you are aware that the Secretary of State

25   posts on their website turnout figures as well as

Page 48

1    registration figures for each county?

2         A    Yes.

3         Q    And would you agree that this is the

4    registration figures for Cameron County?

5         A    It appears to be, yes.

6         Q    Would you also agree that it indicates the

7    number of people who voted in Cameron County for each of

8    even election from 1988 to 2020 on the back?

9         A    Yes.

10        Q    Okay.  So let's turn to the back of the page.

11   Well, before that, just to keep a mark.  You said where

12   it says "voting percent"?

13        A    Yes.

14        Q    And do you see the column that says "EV"?

15        A    Yes.

16        Q    Would you agree with me that voter percent is

17   the percentage of registered voters who voted in that

18   election?

19        A    Yes.

20        Q    And would you agree with me that EV percent is

21   a percentage of those voters in that election who voted

22   early voting?

23        A    Yes.

24        Q    And would you agree with me that early voting

25   in Texas includes both mail-in ballots as well as early

Page 51

1      A    Yes.

2      Q    And do you know roughly how many individuals

3    voted by mail in 2020, or percentage?

4      A    Yes.  If I can refer to one of the documents I

5    brought?

6      Q    Please do.  I just ask you to identify the

7    document.

8      A    Sure.  It is a printout from our voter

9    registration system where we track our ballot by mail,

10   which will give us the reason or what the disposition of

11   the particular carrier request, whether they were

12   accepted by the ballot board or whether they were

13   rejected.

14     Q    Okay.

15     A    And so, yes.  I'm sorry.  Yeah, there were

16   90,905 ballots that were received and accepted by the --

17   by the --

18     Q    Okay.

19     A    -- ballot board, I'm sorry.

20     Q    And were these documents already scanned?

21     A    No.  They are being scanned, I believe.  No, I

22   don't think they have been scanned because I have them

23   here with me.

24              MR. LOPEZ:  Are you asking about the

25   document in front of you?

1                    THE WITNESS:  Yes.

2                    MS. HUNKER:  Correct.

3                    MR. LOPEZ:  No.  The ones you have

4    requested.

5                    MS. HUNKER:  Okay.

6                    MR. LOPEZ:  Would you like me to scan

7    them?

8                    MS. HUNKER:  Would you mind if we scans

9    these as well?

10                    MR. LOPEZ:  Of course.

11                    MS. HUNKER:  And do you mind if I use this

12    as Exhibit Number 5?

13                    MR. LOPEZ:  That's fine.

14                    Would you prefer -- counsel, would you

15    prefer I make copies right now real quick so everyone

16    has a copy of it?

17                    MS. HUNKER:  Yeah.  We don't mind going

18    off the record for a few minutes to do that.

19                    THE VIDEOGRAPHER:  Going off the record.

20    The time is 10:35 a.m.

21                    (Break taken.).

22                    THE VIDEOGRAPHER:  We are back on the

23    record.  The time is 10:58 a.m.

24                    (Exhibit 5 marked)

25        Q   (BY MS. HUNKER) Mr. Garza, during your break

Page 53

1    and your counsel was kind enough to make copies of the

2    documents we were discussing earlier, so I am going to

3    introduce this as State's Exhibit No. 5.

4              Now, if you could identify which page

5    November 2020 would be on.

6    A    Let me see, page 5, essentially, it's the

7    election code, would GN20-01.

8    Q    Got it.  Thank you.  And can you just go

9    through with me what the different lines and the rows

10   are?

11   A    Essentially, it talks about the different

12   codes, I'm sorry.  Like AC is address correction, that

13   was 29.

14             B2 is the second, ballot mailed; there

15   were six of those.

16             Ballots received would be 9,905.  1,175

17   were canceled at the polls by the voter.

18             Some of these codes don't specifically

19   apply to these in the sense that they were -- they're

20   new codes that the Secretary of State's office

21   introduced, so they might not mean what they used to

22   mean.

23   Q    Okay.

24   A    But like if it was incorrect or missing a

25   signature would be -- there was one from, I think that's

Page 55

1    sure what that represents.

2              I say that because my deputy pretty much

3    deals mostly with all ballot by mail activities.

4        Q    So let's look at -- let me just confer.  So

5    ballots received from your office was 9,905 during the

6    general election in 2020; is that correct?

7        A    Yes.

8        Q    Now let's turn to GN18-01.  I assume that's the

9    general election November for 2018?

10       A    Yes, that should be.  Yes.

11       Q    And the ballots received that year was 3,913?

12       A    Yes.

13       Q    Now, I imagine a portion of the difference is

14   just because presidential elections received more

15   voters?

16       A    Yes.

17       Q    And would you agree with me that a significant

18   portion of the difference is a byproduct of the

19   pandemic?

20       A    I'm not sure.  Could you repeat that?

21       Q    So you stated that part of the reason that you

22   have a disparity between the 9,000 in 2020 and the 3,900

23   in 2018 was the pandemic.

24              What other factors do you think were

25   responsible for the dramatic increase?

1    it's the most recent one.

2                    (Exhibit 6 marked)

3        Q    Okay.  Thank you.  I appreciate that.  And I

4    appreciate your forethought in bringing this up.

5                    I'm going to introduce State's Exhibit

6    Number 6.

7                    Do you have the exhibit in front of you?

8        A    Yes.

9        Q    You see on top where it says the Texas

10   Secretary of State John B. Scott?

11       A    Yes.

12       Q    And do you also see on the bottom it too has an

13   HTML website location?

14       A    Yes.

15       Q    And this is the same website location as the

16   previous document?

17       A    Yes.

18       Q    This difference is this says Harris County

19   Voter Registration Figures, correct?

20       A    Yes.

21       Q    Like before, it shows the registered voters as

22   well as the number who voted, percent who voted, the

23   number of early voting, and percent by early voting

24   between the elections from 1988 to 2020; is that

25   correct?

1    foundation that the witness knew this information in the

2    first place, so his recollection cannot be refreshed as

3    to something he didn't know.

4        Q    (BY MS. HUNKER) You can answer the question.

5        A    Based on what you were reading there, I would

6    think that Mr. Davis was talking about the -- I guess

7    the openness and receptibility to exchange or dialogue

8    with the Texas Association of Administrators with

9    Chairman Murr as opposed to other chairmen, perhaps.

10            But I would think that this was something

11   that we would definitely support.  I think it was

12   generally a field in the organization that if -- or that

13   if the legislature was going to put additional penalties

14   with respect to the actions of the poll workers, that

15   poll watchers, who suddenly were seen to be given

16   additional authorities within the polling location,

17   required either the additional training or that they

18   were going to be signing documents that indicated that

19   they were ultimately served.

20            MR. LOPEZ:  Objection, form.

21       Q    (BY MS. HUNKER) So to clarify, prior to SB1,

22   there was no training for poll watchers; is that

23   correct?

24       A    Yes.

25       Q    Prior to SB1, there was no oath that a poll

Page  72

1   watcher was required to take prior to service; is that

2   correct?

3       A    That's incorrect.

4       Q    They were not required?  They were required to

5   do an oath?

6       A    Yes.  When they present themselves at the

7   voting place, they did take an oath regarding recording

8   devices.

9       Q    Okay.  So outside of the recording device, were

10  there any other oaths prior to SB1?

11      A    Not that I'm aware of.

12      Q    And did you in your experience with the Texas

13  Association of Elections Administrators find that the

14  legislature was responsive to some of the concerns that

15  your office had?

16      A    I think they were more willing to engage in a

17  dialogue with us as the session moved forward or

18  sessions.

19      Q    Thank you.  You can put this document aside.

20           Can you please tell me what is a

21  politiquera?

22      A    Politiquera?

23      Q    Yes.

24      A    I think they go by many definitions, depending

25  on the community.  Essentially, they're individuals who

Page 73

1    are engaged in the political process and are used by

2    candidates, or just in the community out of their own

3    volition, to inform voters or help voters cast their

4    ballots, provide information, things like that.

5        Q    Now, there had been a concern these

6    politiqueras?  Is that --

7        A    Politiqueras.

8        Q    Politiqueras, also conducted political vote

9    parties; is that correct?

10            MS. PERALES:  Objection, foundation.

11       A    I'm not sure what all the concerns with respect

12   to the politiqueras are.

13               (Exhibit 8 marked)

14       Q    (BY MS. HUNKER) I believe we are on Exhibit 8.

15   Do you have that document in front of you?

16       A    Yes.

17       Q    Have you seen this article before?

18       A    No.

19       Q    You have not.  The article reads: "In Rio

20   Grande, campaign workers are paid to harvest votes,"

21   correct?

22       A    Yes.

23       Q    Let's look at the top of page 2.  Just at the

24   top of the article, but actually before we do that, let

25   me describe what the article is.  This is an MPR

Page 86

1    County?

2       A    No.

3       Q    You can put that aside.  Do you know who

4    Richard Molina is?

5       A    Not immediately.

6       Q    Are you familiar with the city of Edinburg?

7       A    No.  I mean, I know it exists.  I've been

8    there, but not in its workings.

9       Q    Are you aware that's in Hidalgo County?

10      A    Yes.

11      Q    Are you aware that's the county adjacent to

12   Cameron County?

13      A    Yes.

14      Q    Were you aware that the mayor of Edinburg was

15   arrested for voter fraud?

16      A    I vaguely remember there being a case dealing

17   with a city municipal election.  It's probably that one.

18      Q    That occurred in the last two or three years?

19      A    It feels like yes.

20      Q    Do you believe that election fraud occurs in

21   elections?

22      A    I'm not aware of any.

23      Q    So you had mentioned that you are aware of

24   prosecutions relating to Donna ISD, correct?  We

25   mentioned that earlier.

1      A    I know you mentioned the city of Donna.  I

2    wasn't sure exactly what it was that was happening or

3    what was alleged in that case, I'm sorry.

4      Q    That's all right.  And you mentioned you had

5    heard about the Edinburg municipal election in which

6    there was an individual arrested, correct?

7      A    Yes.

8      Q    And you were aware that there were prosecutions

9    related to election fraud in Cameron County?

10     A    Yes.

11     Q    Okay.  So you were aware that those incidents

12   occurred in Cameron County, correct?

13     A    I'm aware that there were individuals that were

14   prosecuted for those activities in Cameron County.

15     Q    So would you agree with me, at the very least,

16   that there had been individuals prosecuted for election

17   fraud in Cameron County?

18     A    Yes.

19     Q    And that they had been prosecuted in the last

20   ten years?

21     A    Yes.

22     Q    Have you ever reported instances of election

23   fraud yourself?

24     A    Any information or any activities that we feel

25   merit attention, we forward -- or based on compliance,

1   expressed an interest in the uniformity of other areas

2   of the code?

3        A    Yes.

4             MS. PERALES:  Objection, calls for

5   speculation.

6        Q    (BY MS. HUNKER) And those sections of the code

7   predate SB1, correct?

8        A    Yes.

9        Q    Do you doubt the legislature passed SB1, at

10  least in part, to address concerns about the uniformity?

11            MS. PERALES:  Objection, calls for

12  speculation.

13       A    Yes.

14       Q    (BY MS. HUNKER) You don't?

15       A    Well, you know, when you talk about the

16  parameters that they offer, yeah, they don't actually

17  achieve uniformity.

18       Q    Okay.  So you said they don't achieve

19  uniformity.  Is that your basis for doubting that the

20  legislature passed SB1 in part to achieve greater

21  uniformity in the code?

22       A    Let me rephrase.  Let me change my answer, I'm

23  sorry.  When you phrase it like that --

24       Q    Uh-huh.

25       A    -- I don't doubt that's what they intended to

Page 113

1  included, by phone, if their number is included in their

2  application or voter registration record, or by the

3  early voting ballot board if they included an e-mail

4  with their application."

5          Did I read that correctly?

6     A   Yes.

7     Q   And is that an accurate assessment of how a

8  voter would be contacted in Cameron County of a need to

9  initiate the cure process?

10    A   Yes.

11    Q   And so to clarify, Cameron County will call

12 voters if they realize there is a defect in their ballot

13 by mail?

14    A   Yes.

15    Q   And they will e-mail voters; is that correct?

16    A   The Early Voting Ballot Board is the one that

17 has the ability to send emails, so, yes.

18    Q   And then if we go a little bit further down.

19 At the next paragraph, it reads:

20          "Election Administrator Remi Garza stated,

21 'This is a new process and a chance for mail ballots

22 that would be rejected for technical errors to be

23 counted.'"

24          Did I read that correctly?

25    A   Yes.

1    Q    And this is a statement of yours, correct?

2    A    Yes.

3    Q    And so the cure process, that applies to a

4    voter who put the wrong ID number; is that correct?

5    A    Yes.

6    Q    Or if the voter registration record did not

7    have the ID number; is that right?

8    A    Yes.

9    Q    But it also includes other defects; is that

10   correct?

11   A    Yes.

12   Q    And so if a voter failed to sign the carrier

13   envelope, they would be able to cure it; is that

14   correct?

15   A    Yes.

16   Q    If the voter did not include a statement of

17   residence, they would be able to cure; is that correct?

18   A    Yes.

19   Q    And if there was a signature mismatch, they

20   would be able to cure; is that correct?

21   A    Yes.

22   Q    And these voters -- the requirements for

23   statement of residence, having the signature on the

24   carrier envelope, and having the signature match, those

25   requirements existed prior to SB1, correct?

Page 116

1    would happen to have them come in and correct it in the

2    office, or go online to the state's system.

3         Q    Okay.  So is it fair to say then that the phone

4    calls are a remedy of last resort?

5         A    They are the first resort and then the e-mail

6    is the last resort.

7         Q    Thank you.  We can put that aside for now.

8    Now, I believe the Secretary of State's office sent out

9    an advisory informing you that the early voting clerk

10   could remove appropriate tab to look to see whether or

11   not the numbers were included; is that correct?

12        A    Yes.

13        Q    First question is, did you conduct that

14   procedure for the March primary?

15        A    Yes.

16        Q    You did.  And are you planning on using that

17   procedure for any the remaining elections?

18        A    Yes.

19        Q    And if you notice, there was a rejection --

20   sorry, there was a defect, would you call voters?  How

21   would you contact the voter?

22        A    Whenever the early voting clerk is doing them

23   and the phone numbers are provided, we call them to give

24   them the option of either us mailing it back to them or

25   if they'd like to come to the office to cure.

1      A    Yes.

2      Q    Would you agree with me that SB1 included

3   provisions that make voting more accessible to voters?

4      A    Yes.

5      Q    Moving on, I want to talk about the

6   implementation of SB1.

7             Did you receive information and training

8   from Secretary of State's office on the implementation

9   of Senate Bill 1?

10      A    We -- yes.

11      Q    And what did it cover?

12      A    It included a legislative summary that was

13   presented by Mr. Ingram and Mr. Christine Atkins.  And

14   there were some slides of trainings that had been

15   provided since then.

16             They've issued follow-up advisories with

17   respect to the implementation of some of the provisions,

18   specifically the carrier envelope and the care process.

19             And they've even posted like a

20   free-to-ask-questions sessions to distribute additional

21   information.

22      Q    And did you find their guidance helpful?

23      A    Yes.

24      Q    Were there areas that you thought could use

25   improvement?

1    A    They -- yes.

2    Q    What areas?

3    A    The frequency of the updates, the changing of

4    positions, the multiple conflicting positions that they

5    offered us throughout their process of interpreting the

6    setup of the changes to the code.

7    Q    And can you give me an example of what was a

8    time you thought was an inconsistent position that they

9    took?

10    A    Originally when the bill had passed, they had

11    told us that the early voting clerks would not be

12    allowed to tear the perforations once the envelope was

13    designed.

14             And then after a couple of weeks, they,

15    you know, request that they reconsider that guidance.

16    They kept came back to say that, yes, we could, that

17    that fell within the parameters of the code and was

18    authorized by administrators.

19    Q    Okay.  So the revised guidance or revised

20    advice, that was in response to you and I assume other

21    county administrators had sent?

22    A    Yes.

23    Q    Did you find that they were responsive to those

24    type of questions?

25    A    In time, yes.

1    Q    Do you participate in any of the Secretary of

2    State webinars?

3    A    Yes.

4    Q    Did your staff?

5    A    I forwarded it to them and I have observed

6    them, following along.

7    Q    And what did the webinars cover?

8    A    They covered various topics; whether it's how

9    to log on to the team system, to update information; to

10   election night reporting; and how to, you know, upload

11   your election into the team system; the carrier

12   envelopes and, you know, updating just different

13   interpretations of the code.

14   Q    And so did it cover applications for ballot by

15   mail?

16   A    Yes.

17   Q    And did it cover early voting in person?

18   A    Yes.

19   Q    Did it cover correcting defects?

20   A    Yes.

21   Q    Did it cover training of election workers?

22   A    Yeah.  Yes.

23   Q    And did it cover the cancelation of mail

24   ballots?

25   A    Yes.

1      Q    Did it cover the training of poll watchers?

2      A    Not that I remember one specifically, no.

3      Q    Did it cover interactions with poll watchers?

4      A    I think some the aspects of the training did

5    talk about the changes that the poll watchers got.

6      Q    Now, you had mentioned that they had responded

7    to some of the concerns raised by yourself and other

8    elections administrators, and you gave the one example

9    of the tear perforated spot on the carrier envelopes?

10      A    Yes.

11      Q    Were there any other times where they responded

12    to your inquiries or concerns?

13      A    Well -- yes.

14      Q    And what were those occasions?

15      A    I'm trying to think of -- I know that we had

16    some concerns with respect to whether or not the

17    inclusion of the ID numbers would negate the use of the

18    signature on the ballot itself.

19              And you know, we were told that if it has

20    a number for signature, you know, it's presumed to be

21    valid.

22              And then it changed to, no, it's not it's

23    a completed ballot, but that if someone wants to

24    challenge it, you would have to find other versions of

25    the signature in order to reject the ballot based on

1    that signature.

2        Q    Okay.

3        A    I apologize, this was sometime back and, you

4    know, the fog of the election has me a little bit.

5                But, you know, they were responsive.  I

6    think our concern was just -- was just the -- how the

7    guidance took time for them to develop and to issue.

8        Q    We will talk a little bit more in a second

9    about this topic, but do you think that was related to

10   the short turnaround period?

11       A    Yes.

12       Q    Were there any other resources that were

13   utilized from the Secretary of State's office?

14       A    Such as?

15       Q    Did you call their office, for example?

16       A    Yes.

17       Q    And that was on the topics we had just

18   discussed, or was there anything else that you thought

19   of significance?

20       A    Generally, the topics that were still under

21   review by the Secretary of State's office, but then just

22   general issues, when the previous guidance were of a

23   particular set of circumstances that I was dealing with,

24   I wanted to get their opinion on it to see whether or

25   not I was going in the right direction, how I was going

1    exactly we're going to pull them off.'"

2                  Did I read that correctly?

3    A    Yes.

4    Q    And is that a statement that you provided to

5    The Brownsville Herald?

6    A    Yes.

7    Q    So what you mean when you said "require more

8    thought as to how exactly we are going to pull them

9    off"?

10   A    I think probably, speaking to the cure process,

11   that's exactly how we were going to do through our

12   office.

13                  We had to change the normal flow of how

14   carrier envelopes were received and processed in our

15   office.  And I think we were still trying to work out

16   exactly how we were going on to do them?

17   Q    And were there any other provisions that you

18   thought would require a little bit more thought to

19   exactly how you were going to pull them off or changes

20   that were going to be made?

21   A    I think at that times that's what I was focus

22   primarily focused on?

23   Q    And what about since?

24   A    Sorry?

25   Q    What about since that time?

1    Q    Now, whenever you see a provision of the

2  election code that you don't quite understand, how do

3  you ascertain its meaning?

4    A    If it's not clear from just the straight

5  reading of it, you know, I'll probably contact the

6  Secretary of State's office to see how it applies.

7    Q    And do you ever contact your county attorney's

8  office as well?

9    A    Yes.

10    Q    I don't want to know the content of the

11  conversations you had with your attorneys, but did you

12  meet with them regarding the implementation of SB1?

13    A    I don't know if I had a direct meeting with

14  them.  I know I forwarded guidance from the secretary of

15  State's Office so they would be aware of it.

16    Q    And whom did it take you to implement SB1?

17    A    We're still --

18    Q    You're still implementing SB1?

19    A    Yes.

20    Q    Would you characterize it as a heavy lift then?

21    A    It made a lot of changes to the code and, you

22  know, we had to rethink our process.  So, yeah, sorry.

23  We are still trying to make sure we are hitting all

24  those points that we need.

25    Q    Maybe I should ask the a more specific

1   question.   Can you describe how your office went about

2   to implement SB1?

3       A     A lot of long hours and a lot of thought.   You

4   know, the turnaround with respect to the Bill coming on

5   top of the primary, which is the beginning of March,

6   didn't give us  a lot of time to get new forms that were

7   required by SB1.

8               So we ran into the challenges of getting

9   the forms created by the Secretary of State's office.

10               Then once we had the forms themselves,

11   getting them printed out in sufficient quantities to

12   make sure they were available for distribution during

13   the primary.  Well, at the start of early voting, which

14   is in the middle of February.

15               So we really had like maybe three months

16   to fundamentally change what we were distributing out of

17   our warehouse what we had in stock that we couldn't use

18   any more and then process an application of ballot by

19   mail situation that was extremely confusing for the

20   voters and still challenged to this day.

21       Q    And this was also while restricting was going,

22   correct?

23       A    Exactly.

24       Q    The county does some responsibilities with

25   respect to restricting; is that right?

1    we're ready to actually send those out.

2              So that's going to be 30 days or 45 days

3    before the November election.

4    Q    So I understand the ballots being last

5    considering how much time goes into designing them.

6              What about the carrier envelopes, have you

7    ordered the carrier envelopes?

8    A    We've told -- we use a third-party vendor from

9    Florida and we've told them that we're going to be

10   mailing about out about 17,000 ballots.

11   Q    And when do you expect those orders to go in?

12   A    Not until about 30 to 45 days before the

13   election once we have all the qualified candidates and

14   our ballots design.

15   Q    That's true with the carrier envelopes as well?

16   A    Yes.

17   Q    What about any applications to vote by mail,

18   those orders went out yet?

19   A    We've had them printed.  We printed them

20   in-house, so it was acquiring the paper, the paper for

21   those that we've been doing.

22   Q    And what have you done in regards to public

23   information or education of SB1 with respect to

24   implementation of SB1?  Have you conducted a campaign?

25   A    We've done press releases and we've tried to

Page 134

1   put additional information on our web page and, you

2   know, using Facebook to sort of steer people to our

3   website.

4       Q    Have you designed any inserts for the carrier

5   envelopes?

6       A    Yes.

7       Q    And was that included in a primary election?

8       A    No.

9       Q    Was it included in the May 7th election?

10      A    Yes.

11      Q    Were they included in the coming elections?

12      A    Yes.

13      Q    And has that insert already been preprinted or

14  is that something you order as we get close to the

15  election?

16      A    We were running them off our own coper, so we

17  print as needed.  Well, actually, I'm mistaken.  We did

18  forward that to the vendor in Florida and they printed

19  it and they included it in the packet.

20      Q    And have you created any other materials in

21  response to SB1 to help with voter education?

22      A    Not that I can think of.

23      Q    What problems did you encounter while

24  implementing SB1?

25      A    Could you be more specific?

1    Q    Let me rephrase that.  What changes or what

2    problems -- let me rephrase.

3              What problems did you encounter

4    implementing SB1 that were due to lack of time?

5    A    Well, as it mentioned in the article,

6    ballot-by-mail, during the primary, was late because we

7    weren't able to use our vendor in Florida because they

8    weren't going to be able to get the envelopes once the

9    design had been finalized.  So we had to do in-house.

10             And getting the materials from the vendors

11   was difficult.  We actually had to send an employee to

12   San Antonio to go pick them up and bring them back

13   because we wanted to, you know, capture every day.

14             We had, you know, more phone calls due to

15   the voters, you know, calling or us having to call votes

16   and then calling to get corrections on their either

17   applications or -- once the carrier envelopes started

18   coming back.

19   Q    Do you think it would have been easier to

20   implement SB1 had you had the legislature given you more

21   time for its effective date?

22   A    Yes.

23   Q    Do you think that some of the confusion voters

24   had was due to the lack of implementation time?

25   A    Yes.

1    Q    Your experience, do you think that less voters

2    would have had their ballots rejected had Legislature

3    given you more implementation time?

4    A    Yes.

5    Q    In your experience, does there tend to be voter

6    confusion whenever there is a change in election laws?

7    A    Yes.

8    Q    Did you have to redesign your training programs

9    in response to SB1?

10    A    Yes.

11    Q    Which ones?

12    A    Our early voting training and our election day

13    training.

14    Q    And is that for poll workers and election

15    judges?

16    A    Yes, for our judges and clerks.

17    Q    Now, were the rules to change between now and

18    November election, you have to redesign those trainings?

19    A    Yes, we would incorporate them.

20    Q    And assuming the rules have changed between now

21    and the November election, would you have to conduct

22    additional voter education?

23    A    Depending on the nature of the changes, yes.

24    Q    Let's say the nature of the change was the ID

25    requirement?

Page 138

1      Q    And when do you host the training?

2      A    For early voting, it's the Friday before early

3  voting begins and for election day, we try to get them

4  on the Wednesdays and Saturdays and any days in between

5  that we can get the people in.

6      Q    And how long does it take you to amend or

7  revise the training program?

8      A    Just depends on how extensive it is.

9      Q    Let's look back at Senate Bill 1.  And

10 specifically we are going to look at Sections 5.02.  It

11 starts on page 34.

12     A    Thank you.  Okay.

13     Q    And so this section has to do with -- let me

14 start over again.  This is Section 5.02 of SB1.  And

15 would you agree with me that it begins with Section

16 8.002 of the election code?

17     A    Yes.

18     Q    And this section pertains to requiring voter

19 identification number on an application to vote by mail;

20 is that correct?

21     A    Yes.

22     Q    And because of this provision, I believe,

23 voters could not use older forms of the application to

24 vote by mail; is that right?

25     A    Yes and no.

1    Q    Did you notice that in the voters, particularly

2  in early January, were submitting application to vote by

3  mail did not use ether the new form or did not include

4  the newly required information on the form?

5    A    The vast majority waited for the new form or

6  downloaded it off our website and used the new form.

7    Q    And I believe you had explained a couple of

8  news articles that there was a high rejection rate in

9  Cameron County; is that correct?

10    A    Higher than average for us, yes.

11    Q    Higher than average.

12    A    Sorry?

13    Q    No, I just  --

14    A    Oh.

15    Q    -- was clarifying in my head your

16  clarification.

17    A    I apologize.

18    Q    And if an application came in that did not have

19  the correct number or the voter registration file did

20  not include the number, how would you proceed?

21    A    I think if the individual had provided a phone

22  number, or if we had a phone number on the voter

23  registration record already, we would call them and ask

24  them to them know there was a problem with their

25  application, if they would like to send us a new one.

1          Or we would send it back to them, asking

2     them -- with the reason for the reject and send them a

3     new application.

4          Or -- I am trying to remember if we

5     provided the information with respect to updating the

6     information online in the early processes.

7     Q    And are you an online or offline county?

8     A    Offline.

9     Q    So when you were ascertaining a correct

10    identification number, what was your procedure?  Did you

11    first look at your records and then teams, or did you

12    just look at teams?

13    A    We looked at our records and then we looked at

14    teams.

15    Q    And were you aware that the Secretary of

16    State's office conducted a process at DPS in order to

17    pull off additional ID numbers into the registration

18    file?

19    A    Yes.

20    Q    And do you find that rejection rates declined

21    after Secretary of State's office contacted that

22    process?

23    A    I didn't have an impact on us because our

24    information -- it wasn't downloading information to the

25    offline county automatically, like it did the people on

1    teams.

2        Q    But it would -- it would have helped your

3    office once you searched with teams; is that correct?

4        A    Yes.

5        Q    And so I will repeat the question with more

6    clarity.

7              Did you find that after the Secretary of

8    State had conducted this process, that you were able to

9    better ascertain numbers than when you would have with

10   teams?

11       A    Yes.

12       Q    And the voters that you contacted, were they

13   able to cure the defect in their application?

14       A    Some.  But I don't have any statistics.

15       Q    Okay.  So you don't know whether -- how many

16   individuals were able to cure their application to vote

17   by mail; is that fair to say?

18       A    I think there is a way to determine that, but I

19   just haven't had the opportunity to ask for that

20   information from my deputy clerk.

21       Q    As of today, you not have that information?

22       A    Right.  As of today, do I not have that

23   information.

24       Q    Did you advise voters in your county to include

25   both Social Security and their license number?

Page 143

1    A    Yes.

2    Q    And at any point review, were you utilizing a

3    hierarchy when determining and matching a voter's ID?

4    For example, if a voter had a driver's license on file,

5    but put the Social Security number on the application

6    form, which would you reject?

7    A    If we weren't able to obtain the Social

8    Security numbers from teams system, yes, it would be

9    rejected.

10    Q    And if the number was in the team system?

11    A    That it would get accepted.

12    Q    I'm going to give you Exhibit number 13.

13    A    I think the Yahoo article was 13.

14    Q    14.

15    A    Are we done with 13?

16         (Exhibit 14 marked.)

17    Q    Yes, we are done with that one.

18         Do you have the document in front of you?

19    A    Yes.

20    Q    You see on the top where it says "Texas

21    Secretary of State John B. Scott"?

22    A    Yes.

23    Q    Do you see where it says "Election Advisory

24    2022-08"?

25    A    Yes.

1  the applicant has not been issued any of these numbers

2  -- identifies the same voter identified on the

3  applicant's voter registration record."

4           Did I read that correctly?

5  A    Yes.

6  Q    And you did receive this guidance, correct?

7  A    Yes.

8  Q    And so when you were going through and

9  processing applications to vote by mail, you were

10  looking to turn whether or not the identification number

11  provided identified the same voter as identified on the

12  applicant's voter registration record, correct?

13  A    Yes.

14  Q    If we go to the next page on the first

15  paragraph, it read:

16           "If the voter fails to provide any of the

17  required identification information on the ABBM or the

18  information on the ABBM does not match the information

19  on the voter's voter registration record, the early

20  voting clerk shall reject the ABBM and provide notice of

21  the rejection."

22           Did I read that correctly?

23  A    Yes.

24  Q    And you understand that ABBM means application

25  for ballot by mail?

1    A    Yes.

2    Q    And the next sentence reads:

3              "Similarly, if the voter provides one or

4    both of the required identification numbers but the

5    voter's he registration record does not contain either

6    number, the early voting clerk must reject ABBM and

7    promptly notify the voter of the rejection."

8              Correct?

9    A    Yes.

10   Q    So I want to look at a couple of different

11   scenarios.  Do you see where it says possible scenarios?

12   A    Yes.

13   Q    Would you agree with me this is the Secretary

14   of State's office providing guidance on how early voting

15   clerk should handle applications to vote mail regarding

16   specific situations that may arise?

17   A    Yes.

18   Q    Let's look at Scenario Number 3.  It reads:

19              "Voter provides last four of their Social

20   Security number on the ABBM.  The voter's registration

21   record contains driver's license number social security

22   number.  The early voting clerk is able to validate that

23   the partial social security number on the ABBM matches

24   the number in the voter's registration record.  The

25   early voting clerk must accept the ABBM and send a

1    ballot to the voter."

2              Is that correct?

3      A    Yes.

4      Q    And is that how you handled applications to

5    vote mail when they were received by your office?

6      A    Yes.

7      Q    And so let's look at Number 6.

8              "Voter provides both types of personal

9    identification numbers, example, driver's license number

10   and the last four digits of the social security on their

11   ABBM.  The voter registration record contains both types

12   of personal identification numbers; one number on the

13   ABBM matches the record but the other does not match."

14             "Because the early voting clerk is able to

15   validate one of the numbers to the voter's voter

16   registration record, the clerk must accept the ABBM and

17   send a ballot to the voter."

18             Did I read that correctly?

19     A    Yes.

20     Q    Is this how your office processed applications

21   to vote by mail when they were received?

22     A    Yes.

23     Q    And would you agree with that there were at

24   least three days a voter could correct a mismatched

25   number or not having a number on their records,

1    including coming a person to the registrar's office,

2    resubmitting an voter registration to the registrar's

3    office, or fixing it on the site, online site that was

4    provided?

5         A    Yes.

6         Q    We're going to go back to that paper in a

7    minute.  But for the moment, you can put that aside.

8         A    Okay.

9         Q    Now, we've had one additional election since

10   the March primary, correct?

11        A    Yes, ma'am.

12        Q    Did you notice a decline in the number of

13   applications to vote by mail that were being rejected

14   due a lack of a number in the file, a lack of number

15   being put on the form, or a mismatch?

16        A    I don't have information with respect to new

17   applications that were submitted.

18             But the majority of the applications that

19   receive are annual applications from individuals who are

20   65 and older.  So once they get the application, they're

21   good all year.

22        Q    And the annual applications to vote by mail

23   that you received, are they from voters who intend to

24   vote in November but did not vote in the early

25   elections?

Page 150

1      A    Yes.

2      Q    It is and this reads:

3               "If the information required in Section

4      84.00(2)(1-a) included on the application does not

5      identify the same voter identified on the application --

6      applicant's application for registration under Section

7      13.002(c)(8), the clerk shall reject the application."

8               Did I read that correctly?

9      A    Yes.

10     Q    So this section pertains to what we discussed

11     before with Election Advisory 2022-8; is that correct?

12     A    Yes.

13     Q    And that your office only rejected an

14     application to vote by mail if they could not identify

15     the voter, is that correct, through the ID numbers?

16     A    Yes.

17     Q    And let's look at Section 5.06, which is right

18     above it.  Do you see it?

19     A    Yes.

20     Q    And you agree with me that this is Section

21     84.035, Ballot Sent to Applicant?

22     A    Yes.

23     Q    Now, I'm going to read it and then I will have

24     a couple of questions for you on this as well.

25               Specifically Subsection B.

1          "An election judge may permit a person to

2    whom an early voting ballot has been sent to who cancels

3    the person's application for a ballot to be voted by

4    mail in accordance with Section 84.032 but fails to

5    return the ballot to be voted by mail to the early

6    voting clerk, deputy early voting clerk or presiding

7    judge, as provided by that section to vote only a

8    provisional ballot under 63.011."

9          Did I read that correctly?

10    A    Yes.

11    Q    Prior to SB1, what were the procedures that

12    Cameron County followed when they had a voter who sent

13    an application to vote by mail, received a ballot,

14    appeared in person?

15    A    Do they have the ballot with them to surrender

16    or do they not have it?

17    Q    So let's go under the theory they do not have

18    it with them.

19    A    If they do not have the ballot with them, they

20    were provided the opportunity to come to the main office

21    here in Brownsville and cancel their application with

22    our office, or they could vote on a provisional ballot.

23              MR. LOPEZ:  Whenever you have a chance.

24              MS. HUNKER:  Yeah, as soon as I finish

25    this section.

Page 152

1          MR. LOPEZ:  Whenever you are done.

2      Q    (BY MS. HUNKER) And if they did have a ballot

3  with them, what would you?

4      A    We would allow them to cancel their application

5  for ballot by mail and we will able to use our

6  electronic poll books to allow them to check in as a

7  regular voter once they completed the cancelation form.

8      Q    Subsection B, would you agree with me,

9  references an individual who does not bring or can --

10  bring a ballot or cancel their ballot prior to appearing

11  in person?

12      A    Yes.

13      Q    Did this section change your procedures with

14  respect to those voters?

15      A    No.

16          MS. HUNKER:  And with that, we can take a

17  break.

18          THE VIDEOGRAPHER:  Going off the record.

19  The time is 1:52 p.m.

20          (Break taken.)

21          THE VIDEOGRAPHER:  We are back on the

22  record.  Time is 2:12 p.m.

23      Q    (BY MS. HUNKER) Mr. Garza, we are going to turn

24  to Section 5.08.

25      A    Yes.

1      Q    That starts on page 39.  Do you have that in

2  front of you?

3      A    Yes.

4      Q    Okay.  So this section provides that the voter

5  must include an ID number, whether it be the driver's

6  license, election identification certificate, or

7  personal identification card issued by the Department of

8  Public Safety or the last four of social security

9  number, or a statement by the applicant that the

10  applicant has not been issued a number described by the

11  other two sections.

12                Do you agree with that description?

13      A    Yes.

14      Q    And then let's take a look at Section 5.10

15  starting on the next page 40.

16      A    Yes.

17      Q    And if you notice, the line that has been

18  added, which is on page 41, simply says that the

19  carrier envelope must allow a voter to add or correct

20  information required under 84.002(a)(1-a); is that

21  correct?

22      A    Yes.

23      Q    And so to your understanding, this simply says

24  that the carrier envelope must have a space for this

25  information?

1    number on the carrier envelope, the number on the

2    carrier envelope does not have to match the type of

3    number on the voter's ABBM as long as they are both

4    associated with the voter registration file."

5                  Did I read that correctly?

6        A    Yes.

7        Q    And so when you were processing, if you want to

8    say, I mean, the Cameron Election's office, were

9    processing mail-in ballots, were you requiring voters to

10   use the same number on the carrier envelope as the

11   application?

12       A    No.

13       Q    So you worked in alignment with this particular

14   provision where the identification number matched -- if

15   it matched the voter registration record, it did not

16   have to match the particular number used in the ABBM; is

17   that correct?

18       A    Yes.

19                  (Exhibit 15 marked)

20                  (Exhibit 16 marked)

21       Q    I'm going to hand you our next exhibit.  I'm

22   going to hand you 16 as well.

23                  Keep 15 because we are going to be using

24   that in a couple of minutes.

25       A    Are we done with 14?

1    Q    Yes.  We are done with 14.

2              So you see on the top where it said says

3    John B. Scott?

4    A    Yes.

5    Q    And you see where it says, Election Advisory

6    Number 2022-12?

7    A    Yes.

8    Q    Where it says:  To elections officials; from

9    Keith Ingram, Director of Elections?

10    A    Yes.

11    Q    This February 11, 2022?

12    A    Yes.

13    Q    And then the title reads:  Additional

14    Procedures Regarding Correction of Defects on

15    Application for Ballot by Mail or Carrier Envelope.

16              Did I read that correctly?

17    A    Yes.

18    Q    So would you agree with me that this is an

19    election advisory sent by the Office of the Secretary

20    State to county election officials on February 11, 2022?

21    A    Yes.

22    Q    And have you seen this advisory before?

23    A    Yes.

24    Q    Okay.  Let's turn to the second page.

25              And you see where it says:  Removing the

1    Secrecy Flap on Carrier Envelope, correct?

2        A    Yes.

3        Q    And it reads:  "The early voting clerk is

4    authorized to secrecy flap on a returned carrier

5    envelope to facilitate the processing and review of

6    voted by mail ballots?"

7        A    Yes.

8        Q    We had discussed that your office filed this

9    procedure, correct?

10       A    Yes.

11       Q    You filed it in March?

12       A    For the March primary, yes.

13       Q    And you filed it for the May 7th election?

14       A    Yes.

15       Q    And you will file it going forward, correct?

16       A    Yes.

17       Q    And does this procedure give you more time to

18   identify defects in the ballots and forms?

19       A    Yes.

20       Q    And if we look to, where it says:  Returning

21   Carrier Envelope to Voter.  It reads:

22               "If the early voting clerk discovers that

23   the carrier envelope is missing the voter's signature,

24   has incomplete signature, has missing or incomplete

25   witness or assistant information, or has missing or

1    incorrect personal identification information, the early

2    voting clerk may deliver the carrier envelope in person

3    or by mail to the voter so the voter may correct the

4    defect."

5              Did I read that correctly?

6    A    Yes.

7    Q    Now, you had mentioned that you contact the

8    voter.  Do you do it by mail?

9    A    If they do not have a phone number on their

10   application or on our voter registration record, we

11   would mail it back to them.

12   Q    Do you go see them in person?

13   A    We did deliver a few, returned them to the

14   voters in person.

15   Q    And if we go to the next page, it says:  "If

16   the early voting clerk delivers the carrier envelope to

17   the voter in person, the clerk should document this

18   delivery."

19              Did I read that correctly?

20   A    Yes.

21   Q    And we continue further down, it reads:  "Upon

22   receipt of the carrier envelope, the voter may correct

23   the defect immediately and surrender the carrier

24   envelope to the early voting clerk personnel."

25              Did I read that correctly?

1       A    Yes.

2       Q    And I assume your office complied with that

3   particular requirement?

4       A    Yes.

5       Q    In what circumstances did you contact the

6   clerk, I should say, to go to the voter in person?

7       A    If they were over 75 years of age and informed

8   us that they did not have a way to come to my office and

9   we felt that they wouldn't have a way to quickly return

10  the ballot to us, we would take it to them.

11      Q    And so this was to ensure voters who were

12  infirmed, elderly would be able to return the ballots;

13  is that correct?

14      A    Yes.

15      Q    And as you testified, return the corrected

16  ballots, correct?

17      A    Yes.

18      Q    Do you know if other counties follow that

19  procedure?

20      A    I believe I have heard that other counties did

21  hand-deliver some, some of the smaller counties, but I

22  couldn't name them.

23      Q    You can put this exhibit to the side.

24           Now I want to turn to Exhibit 5, which is

25  the one from the early start of the deposition.

1      A      Yes.

2      Q      So if I've read the document correctly, the

3   Democratic and Republican primary respectively, pages 2

4   and 3, respectively, and that's for the 2022 election?

5      A      Yes.

6      Q      And so looking at the Democratic primary, it

7   states that 1,2092 mail ballot applications were

8   accepted by the ballot board?

9      A      Yes.

10     Q      And does that include any mail-in ballots that

11  were cured?

12     A      Yes.

13     Q      So this is the final number; is that correct?

14     A      Yes.

15     Q      And then we have below address correction after

16  print is 3?

17     A      Yes.

18     Q      Ballots cancelled by voter was 63?

19     A      Yes.

20     Q      And then "Use-IS-Incorrect," what does that

21  mean?

22     A      The code IS, in these circumstances there were

23  29 that had -- that were rejected because they had

24  incorrect or missing ID information.

25     Q      And then 32 for "NT."  What does that mean?

1    A    I'm not sure.

2    Q    Okay.  Do you know if it had to do with the

3    personal verification numbers?

4    A    No.

5    Q    Okay.  You do not know, or is it you know it

6    does not?

7    A    I don't believe it does because actually, I

8    think "IS" is the missing signature.  The 29 is the

9    actual that's missing a signature or it's incorrect.

10    And then the 81 is the ones that were returned that had

11    the missing numbers on it.

12    Q    Okay.  So which one is the signatures?

13    A    I believe it's 29.

14    Q    Okay.  So the 81 is the identifications,

15    correct?

16    A    Yes.  I believe.  I could be wrong, I

17    apologize.  The codes have recently changed.

18    Q    And then if we turn to the next page, it says,

19    Republican primary.  Only 260 ballots were received for

20    that one, correct, and accepted?

21    A    Yes.

22    Q    And then there were 9 canceled by voters?

23    A    Yes.

24    Q    Eleven, according to you, did not have

25    signature or mismatched signature?

1       A    Yes.

2       Q    Four had to be determined, ballot not received?

3       A    Yeah.

4       Q    And then 12 for incorrect or missing

5    identification number; is that correct?

6       A    Yes.

7       Q    And what is RJ-Ballot Rejected?

8       A    I'm not sure.

9       Q    Okay.  And then statement of residence was not

10   included was 1.  And then witness failed to sign name is

11   1; is that correct?

12      A    Yes.

13      Q    And if we turn to the May 7th election.

14      A    Yes.

15      Q    Do you see that ballots received were 1,588,

16   correct?

17      A    Yeah.

18      Q    And then 39 ballots cancelled by voter,

19   correct?

20      A    Yes.

21      Q    And then if we -- "SSN-TDL, Re-Sent to Voter,"

22   what does that mean?

23      A    I think those were actually mailed back to the

24   voters, so they were five that were still pending.

25   Because they still have time.

Page 165

1    Q    But for the election that has occurred since

2    the primary, there has been a reduction in the number of

3    voters; is that correct?

4    A    Rejections or -- I'm sorry, returns and

5    possible rejections, yes.

6    Q    And have you gotten a sense from the

7    communications you've had with the voters that voters

8    now understand the requirements better?

9    A    The end of -- we only -- sorry.  The only

10   voters that I've talked to have -- or that I've heard --

11   the only voters that I've been made aware of are those

12   that are complaining about the process.

13   Q    Okay.  And so voters who figured it out and

14   have a reason to call?

15   A    Exactly.

16   Q    And have you spoken to any other county

17   election officers about the ballot rejection rates

18   regarding ID numbers?

19   A    No.

20   Q    And so you don't know, sitting here today,

21   whether or not other counties have experienced a similar

22   decline, correct?

23   A    Let me go back, because I think we actually

24   held one of those Secretary of State --  I can't.

25   Q    Advisory council?

1      A    Yes.

2      Q    And those sections are all new; is that

3    correct?

4      A    Yes.

5      Q    Now, when you are opening the perforated

6    envelope, a piece of the envelope, is that also where

7    the voter has to sign?

8      A    It's attached to the section where it includes

9    part of the photo signature.

10      Q    So you look to the early voting clerk -- when

11    you open up that section, are you able to inform voters

12    that they also failed to include a signature, forgetting

13    something?

14      A    Yes.

15      Q    And that opportunity has been introduced to the

16    rest of the voters; is that correct?

17      A    No.  It exited before.  If it was missing.

18      Q    If it was missing?

19      A    Yeah.

20      Q    So voters could not add it if it was missing.

21    They could not if it was a mismatch?

22      A    Yes.

23      Q    And how long did the voters have to cure the

24    missing signature?

25      A    They have until election night to have it

1    postmarked and received the following day.

2        Q    Okay.  And if it's the early voting ballot

3    board verification committee that identifies, through

4    the cure process they have until seven days after the

5    election; is that correct?

6        A    Yes.

7        Q    And so the requirement that it be by the date

8    after election day, that's the early voting clerk that

9    identifies the error?

10       A    I believe so, yes.

11       Q    And when you are checking the numbers, do you

12   follow the same procedures when doing the applications?

13             So is it you go to the local system first

14   and then TEAM?

15       A    Yes.

16       Q    And has your office worked at all to encourage

17   voters to submit revised registration forms that would

18   include new identifying information?

19       A    Yes.

20       Q    And have voters responded positively to that?

21       A    I'm sorry I haven't tracked that.

22       Q    But you are conducting the education to

23   encourage voters to votes?

24       A    We talk about it when we can.

25       Q    I'm just going to check my notes before we move

1    on.  Let's move to a new section.

2              Now, I believe -- and you can tell me if

3    I'm wrong -- when comparing signatures prior to SB1, the

4    earlier voter ballot verification committee could only

5    look at the six most previous signatures that were in

6    the administration file?

7        A    Yes.  So there was limitations to how many

8    signatures that could go back.

9        Q    And SB1, the early voting verification

10   committee can look at any signature that's on file; is

11   that correct?

12       A    Yes.

13       Q    Does Cameron County have a signature

14   verification committee or does it only have early voting

15   ballot form?

16       A    We generally only use the early voting ballot

17   form.

18       Q    You said generally, so there are times when you

19   do?

20       A    I've never done it, but I don't know if it has

21   happened in the past.

22       Q    Okay.  Let's quickly look at Section 5.14.  And

23   would you agree with me that this provides the cure

24   process except with respect to the early voting ballot

25   board?

Page 170

```
 1     A     I'm sorry, I'm trying to find that section.

 2     Q     Page 46.

 3     A     I'm sorry.  Yes, yes.

 4     Q     So I want to move to a different subject area.

 5                 What is the role of poll watchers?

 6     A     Poll watchers are there to observe the election

 7     on behalf of either a candidate or a political action

 8     committee or one of the party chairs; and they are there

 9     to observe if there is any irregularities or any

10     infractions of the law.

11     Q     How do they serve this role?

12     A     Finding (undiscernible) at the polling location

13     throughout the day from the minute the presiding judge

14     arrives until the early voting clerk arrives at the

15     site, so even following the ballot box to the central

16     counting station.

17     Q     So would you agree with me that in order for a

18     poll watcher to be able to perform his or her function,

19     they would have to be able to see election activities as

20     they are being conducted?

21     A     Yes.

22     Q     And have you found them helpful to the process

23     at all?

24     A     They're part of the process.

25     Q     And are they appointed by -- who are they
```

1   appointed by?

2   A    Generally they're appointed by candidates or

3   the treasurer or political action committees or the

4   representatives from the political parties.

5   Q    And have you had complaints in the past that

6   poll watchers in Cameron County could not perform their

7   duties?

8   A    We had one poll watcher that called us that was

9   upset that we weren't allowing him to sit behind the

10  check-in clerk to actually observe the poll-looking

11  process.

12  Q    That was a policy that your office implemented,

13  or was that simply just at that particular poll

14  location?

15  A    It was -- we gave guidance to all of the poll

16  workers that, you know, they need to be careful with

17  confidential information.

18              And then while the poll watchers are there

19  to observe and they're part of the -- an important part

20  of election, that you still -- they couldn't interrupt

21  the process; they couldn't, like, introduce themselves

22  into the system.

23  Q    And when did this occur, if you remember?

24  A    It would have happened during one of the

25  presidential elections or one of the general elections

1     in November.

2          Q     Do you remember if it was in the last two years

3     or if it had predated 2020?

4          A     I think it was probably before 2020.

5          Q     And so outside of that one incident, have any

6     other poll watchers complained about lack of access?

7          A     Not that I'm aware of.

8          Q     And outside of that one incident, have they

9     complained to you about inability to observe the

10    process?

11         A     No.

12         Q     And you gave me brief descriptions before, but

13    if you can go into a little more detail, where are they

14    usually located during the election?

15         A     Well, you're going to find them in an actual

16    election day polling location.

17               The times that I have walked into in some

18    locations, some would be sitting down sort of observing

19    from a distance.

20               But we've always believed that they could

21    move around the polling place and even go outside the

22    curbside voting and be wherever the action is happening,

23    so our policy is as long as they weren't interfering

24    with the process or having access to information that we

25    felt should be protected.

1    A    Yes.

2    Q    And the provision reads:

3              "The purpose of this chapter is to

4    preserve the integrity of the ballot box in connection

5    with Article 4 of the Texas Constitution by providing,

6    by providing the appointment of watchers.  It is the

7    intent of the legislature that watches duty accepted for

8    service under this chapter be allowed to observe and

9    report on irregularities in the conduct of any election,

10   but may not interfere in the orderly conduct of an

11   election."

12             "To effect that purpose, a watcher

13   appointed under this chapter shall observe without

14   obstructing the conduct of an election and call to the

15   attention of an election officer any observed or

16   suspected irregularity or violation of law in the

17   conduct of the election."

18             Did I read that correctly?

19   A    Yes.

20   Q    So prior to SB1, in an election, a poll watcher

21   noticed an irregularity, do you know what the procedures

22   were in which they could report it?

23   A    They had the opportunity to either ask a clerk

24   or the presiding judge or raise the issue there.

25             The judge was required to provide an

1    answer.  And from the aspect of our office, that's sort

2    where it would end, assuming that there wasn't an issue

3    that needed to be addressed.

4                    And then, of course, they could always

5    contact us directly.  There information on filing with

6    the Secretary of State's office or the Department of

7    Justice.

8    Q    And so did this particular provision change at

9    all how you operate with respect to pole watchers

10   identifying an election irregularity?

11   A    No, it didn't.

12   Q    It did not?

13   A    It did not.

14   Q    And it says here:  Pole watchers may not

15   interfere in the orderly conduct of an election.

16                   Does that comfort with your understanding

17   of the rules prior to is SB1?

18   A    Yes.

19   Q    And to your knowledge, does this change how

20   pole workers may or may not act in Cameron County while

21   performing their duties?

22   A    No, it doesn't change.

23   Q    Is there anything about this particular section

24   that you think changes the manner in which Cameron

25   County would have to conduct itself with respect to poll

1      A     Yes.

2      Q     And so this is an addition to the previous

3 section we just discussed; is that right?

4      A     Yes.

5      Q     So let's move on.  Is this Section 4.206?

6      A     Yes.

7      Q     And this talks about the certificate of

8 appointment and that the certificate of completion from

9 training by a poll watcher, correct?

10      A     Yes.

11      Q     And specifically that the poll watcher must

12 present both the certificate of appointment and the

13 completion form from training before they are accepted;

14 is that right?

15      A     Yes.

16      Q     And did you see any improvement in the quality

17 of poll watchers or how poll watchers handled themselves

18 during the March primary and the May runoff?

19      A     We had very few poll watchers in I believe

20 either of those two elections.  But I did not hear any

21 concerns raised by the presiding judges or early voting

22 supervisors.

23      Q     Do you know if they've communicated that they

24 felt the training was helpful at all?

25      A     I have no information on it.

Page 180

1     Q    And if you look to Subsection (h) of this

2  section, which is on 27.

3     A    Yes.

4     Q    It says:  "Before accepting a watcher, the

5  officer presented with a watcher certificate of

6  appointment shall require the watcher to take the

7  following oath, administered by the officer: 'I swear or

8  affirm that I will not disrupt the voting process or

9  harass the voters in the discharge of my duties.'"

10               Did I read that correctly?

11    A    Yes.

12    Q    And that language is a new addition, correct?

13    A    Yes.

14    Q    All right.  Let's move to -- okay, let's

15  continue with Section 4.06, particularly Subsection (g).

16    A    Okay.

17    Q    It says:  "An election officer commits an

18  offense if the officer intentionally or knowingly

19  refuses to accept a poll watcher for service when

20  acceptance of the watcher is required by this section.

21  An offense under this subsection is a Class A

22  misdemeanor."

23               Did I read that correctly?

24    A    Yes.

25    Q    Have you rejected poll watchers in the past?

```
 1      A    I'm not aware of any that have been rejected.
 2      Q    So you haven't rejected any poll watchers when
 3 they've met the requirements under the law; is that
 4 right?
 5      A    That's correct.  Although in one instance a
 6 poll watcher was removed because it was determined that
 7 they were an elected official and shouldn't have
 8 presumed themselves to be a poll watcher.
 9      Q    So that individual would not have been
10 qualified; is that correct?
11      A    Exactly.
12      Q    And so has Subsection (g) changed any of the
13 procedures in which Cameron County would follow with
14 respect to poll watchers?
15      A    No.
16      Q    And so you don't intend to reject any poll
17 watcher that meets the eligibility requirements,
18 correct?
19      A    Correct.
20      Q    And let's look at Section 4.07.
21      A    Yes.
22      Q    All right.  And if we -- would you agree that
23 this amends -- sorry, this amends Section 33.056 of
24 Texas Election Code?
25      A    Yes.
```

Page 182

1      Q    All right.  Let's look at Subsection (a).  I'm

2   going to read the first sentence and then I will

3   continue on.

4               "Except as provided by Section 33.057, a

5   watcher is entitled to observe any activity conducted at

6   the location at which the watcher is serving."

7               Did I read that correctly?

8      A    Yes.

9      Q    That section is -- that sentence is not

10  underlined, correct?

11     A    Correct.

12     Q    That pre-existed as SB1, correct?

13     A    Yes.

14     Q    And then it continues:

15              "A watcher is entitled to sit or stand

16  near enough to see and hear the election officers

17  conducting the observed activity except as otherwise

18  prohibited by this chapter."

19              Did I read that correctly?

20     A    Yes.

21     Q    And so prior to SB1, they used the phrase "sit

22  or stand near enough to see and hear the election

23  officers."

24              Did I read that -- is that a fair

25  assessment?

1      A      Yes.

2      Q      And they replaced immediately "near enough to

3  see or hear the election officers;" is that correct?

4      A      Yes.

5      Q      Has that changed at all on either the protocols

6  or procedures followed by Cameron County?

7      A      Up to this point, no.

8      Q      Do you have reason to believe it would in the

9  future?

10      A      Depending the first time the poll watcher says

11  we're prohibited from seeing or hearing.

12      Q      And do you consider the language changing from

13  "immediately near" to "near enough to see or hear" as an

14  expansion or no change at all?

15      A      It's an expansion of the poll watchers.

16      Q      And what is your understanding -- where did you

17  obtain this understanding?  Did you look at text or did

18  you have any other conversations with another

19  individual?

20      A      No, I think pretty much from the initial

21  reading of the change they were intending to put in,

22  that's how I saw that was big (undiscernible).

23      Q      Okay.  Okay.  So when you say initial change,

24  do you mean language that was included in previous bills

25  that were not enacted?

1                    "While poll watcher may be present if an

2     election worker is assisting a voter, a poll watcher may

3     not be present at the voting station when a voter is

4     preparing the voter's ballot or is being assisted by a

5     person of the voter's choice, including by a person also

6     serving as an interpreter voting station."

7                    Did I read that correctly?

8          A     Yes.

9          Q     And so you would agree that a poll watcher

10    cannot closely watch a voter while they're preparing

11    their own ballot; is that correct?

12         A     Correct.

13         Q     And they can't closely watch a voter that is

14    being assisted by a person of their choice; is that

15    right?

16         A     Yes.

17         Q     And they also can't be -- they can't observe a

18    voter specifically when that voter is being served by an

19    interpreter at voting station; is that right?

20         A     Yes.

21         Q     And then if you continue below, it says:

22                    "A poll watcher does not have the right to

23    free movement other areas of election office that is not

24    being used for designated activities."

25                    Did I read that correctly?

1    A    Yes.

2    Q    So are there any procedures and policies that

3 Cameron County has had to change in response to these

4 provisions?

5    A    Not to date.

6    Q    We can put that aside.

7              Were you aware that in 2020, there were

8 allegations that certain county election officers

9 sequestered poll watchers at the central county station?

10    A    No.  Sequestered?

11    Q    I will bring up the exhibit.

12              MS. HUNKER:  Can we go off the record for

13 two minutes?

14              THE VIDEOGRAPHER:  Going off the record.

15 Time is 3:07 p.m.

16              (Pause.)

17              THE VIDEOGRAPHER:  We are back on the

18 record.  The time is 3:07 p.m.

19    Q    (BY MS. HUNKER) During the 2020 election, you

20 did not sequester poll watchers away from the central

21 counter station; is that correct?

22    A    That's right.

23    Q    And you have not heard incidents where poll

24 watchers were sequestered; is that correct?

25    A    I have not.

Page 193

1      A    Yes.

2      Q    Would you agree with me that this is a news

3   article reported by the Texas Tribune on March 1st,

4   2022?

5      A    Yes.

6      Q    Okay.  We are going to jump to second to the

7   last page.  Actually, we are going to go to the last

8   page.

9      A    Yes.

10      Q    Do you see where it says:

11              "Remi Garza, the Cameron County Election

12   Administrator said some clerks didn't show up, but his

13   office was able to find staff to have all polling

14   locations operating 7 a.m. Tuesday."?

15      A    Yes.

16      Q    Is that a fair summary of what you informed the

17   Texas Tribune?

18      A    Yes.

19      Q    And then it states afterwards:

20              "As of all elections, we did have a few

21   clerks that did not show up.  But we were able to find

22   additional staff or move staff from one point location

23   to another."

24              Did I read that correctly?

25      A    Yes.

1  needed people, we were able to find replacements.

2      Q    And so how did you recruit these poll workers?

3      A    If I remember correctly, we put out information

4  through the media.  I don't know if I did a specific

5  press release.  But we would have done Twig and Facebook

6  posts.

7           We contacted the colleges.  We contacted

8  any organizations that we worked with to see if they

9  knew of anybody.  We put it on the local college job

10 boards and things like that.

11     Q    And those efforts seemed to do the job?

12     A    Yes.

13     Q    And do you also have the option of increasing

14 pay?  Is that one option you could pursue?

15     A    We did.  In November of 2020, we added a $2

16 stippen.

17     Q    And was that to help recruit additional

18 workers?

19     A    Yes.

20     Q    And was that also effective?

21     A    Yes.

22     Q    And you stated that there was no shortage now,

23 correct, in the last two years?

24     A    We had the usual -- we had the usual number

25 that of individuals that we would either to call and

1    just wouldn't show up to the polls.

2        Q    And do you attempt to find that interest in

3    being a poll watcher corresponds with the interest in

4    voting in election so that for a presidential we'd have

5    a lot of interest whereas for the off-term elections

6    less so?

7        A    Yes.

8        Q    And you have no basis to believe that SB1

9    caused there to be fewer election workers in Cameron

10   County; is that correct?

11       A    I don't know.  I don't know.

12       Q    Okay.  So you don't have any personal knowledge

13   about whether or not SB1 would have had an effect on

14   individuals who wanted to or who thought about serving

15   as an election judge or poll worker in Cameron County;

16   is that correct?

17       A    That's correct.

18       Q    And you don't have that information regarding

19   any other county, correct?

20       A    Correct.

21                 MS. HUNKER:  How long have we been going

22   on the record for this particular session?

23                 THE VIDEOGRAPHER:  Before the break or --

24                 MS. HUNKER:  This session.

25                 THE VIDEOGRAPHER:  One second here, 8

Page 200

1    A    Yeah, I do not know one way or the other.

2    Q    Have you received any complaint from these

3    institutions at the senior center about this

4    requirement?

5    A    No.

6    Q    Have you seen or heard about any calls to the

7    county election office from these institutions

8    expressing confusion or concern about this provision?

9    A    No.

10    Q    And you see there in Subsection (f), it says

11    the section does not apply if the person is related to

12    the voter within a second degree of affinity or third

13    degree of consanguinity as determined under Subchapter

14    (b), Chapter 5734 Government Code.

15            Did I read that correctly?

16    A    Yes.

17    Q    And then if you it continues:

18            "A form completed under Subsection (f)

19    shall be delivered to the Secretary of State as soon as

20    practical.  The Secretary shall retain a form delivered

21    under this section for a period preserving the precinct

22    election records and shall make the form available to

23    the Attorney General for inspection on this request."

24            Did I read that correctly?

25    A    Yes.

1    Q    So it's your understanding the requirement that

2   an individual sign a form does not apply when the

3   individual is closely related to the voter; is that

4   correct?

5    A    Yes.

6    Q    And from your understanding, the form will be

7   delivered to the Secretary of State; is that correct?

8    A    Yes.

9    Q    Do you also keep a copy of the form?

10    A    I believe we would.  We would probably scan it

11   and send it to the Secretary of State's office.

12    Q    And how long would you be retaining those

13   records for?

14    A    The two years -- 22 months that are required by

15   the code.

16    Q    Do you have copies of the forms provided at

17   polling locations?

18    A    Yes.

19    Q    And have you heard of any concerns from voters

20   in Cameron County that the requirement that the person

21   transporting seven or more individuals simultaneously

22   outside the form would prevent them from being able to

23   arrive at a polling in place?

24    A    No.

25    Q    And have you heard any concerns from voters,

Page 205

1      Q     Have you received any complaints from voters or

2  have you received any phone calls from voters about

3  voicing any concern that this requirement of an assister

4  filling out a form would prevent them from being able to

5  find an assister?

6      A     Not that I'm aware of.

7      Q     Do you have any problems or concerns with

8  respect to this section during the May 7th election or

9  March primary?

10     A     No.

11     Q     Did you have any concerns -- let me strike that

12  question.

13            Were you at any point confused about what

14  was required from Cameron County with respect to this

15  provision?

16     A     No.

17     Q     And do you have forms available at each polling

18  site?

19     A     Yes.

20     Q     In addition, are election officers available to

21  assist the voters at each polling location?

22     A     Yes.

23     Q     And with respect with that assistant, are there

24  individuals from poll locations who speak both English

25  and Spanish?

Page 206

1    A    Yes.

2    Q    Do you provide any other assistance in any

3    other languages besides English and Spanish at poll

4    locations?

5    A    No.

6    Q    Have you received any requests from voters to

7    have available someone who can speak in an alternative

8    language besides English or Spanish?

9    A    No.

10    Q    If we look at Subsection (b), it says:

11         "The Secretary of State shall prescribe

12    the form required by this section.  The form must be

13    incorporated into the official carrier envelope if the

14    voter is voting an early ballot by mail and receive

15    assistance under Section 86.010, or must be submitted to

16    an election officer at the time the voter casts a ballot

17    if the voter is voting at the polling place or under

18    Section 64.009"

19         Is that correct?

20    A    Yes.

21    Q    Have you had any problems or concerns with

22    respect to this particular section or subsection in the

23    March primary or May 7th election?

24    A    Other than just general complaints as to the

25    length, no.

1    Q    What did you mean about the length?

2    A    The oath itself is very long.  It takes a long

3    time for people to repeat it after the presiding judge.

4    Q    So outside of the length of the oath, you

5    received no other complaints?

6    A    That's correct.

7    Q    Okay.  We're about to discuss the oath in a

8    moment, so let's move now to Section to 6.04.

9    A    Okay.

10    Q    And so this amends Section 64.034 of the Texas

11    Election Code; is that correct?

12    A    Yes.

13    Q    And then the first part reads:

14         "A person, other than an election officer,

15    selected to provide assistance to a voter must take the

16    following oath, administered by an election officer at

17    the polling place before providing assistance."

18         Did I read that correctly?

19    A    Yes.

20    Q    And the language that was inserted was

21    clarifying that an election officer did not have to take

22    the oath; is that correct?

23    A    Correct.

24    Q    Prior to SB1, did election officers in Cameron

25    County take the oath?

1  voter assistance, is that correct, of who is eligible?

2      A     Yes.

3      Q     And SB1 does not change that eligibility,

4  correct?

5      A     Correct.

6      Q     Would you agree with me this provision simply

7  states that the assister has a good faith reason for

8  believing that the voter is eligible to receive

9  assistance?

10          MS. PERALES:  Objection, vague.

11      Q     (BY MS. HUNKER) You can answer.

12      A     Yes.

13      Q     And then if we go down and we say:

14              "I will confine assistance to reading the

15  ballot to the voter, directing the voter to read the

16  ballot, marking the voter's ballot, or directing the

17  voter to mark the ballot."

18              Did I read that correctly?

19      A     Yes.

20      Q     And that language has been added, correct?

21      A     Yes.

22      Q     And the language that was removed and

23  substituted for: "answering voter's questions, to

24  stating propositions on the ballot, and to naming

25  candidate, and, if listed, their political parties?"

1                    Did I read that correctly?

2        A    Yes.

3        Q    Now, would you agree with me that the realm of

4   assistance can go beyond these four provisions, these

5   four specifications?

6        A    Could you be more clear as to your question?

7        Q    Sure.  So let me give you an example.

8                    If my grandmother has mobility concerns.

9   Let's say she has emphysema and she's in a wheelchair,

10  and I push her to the polling place and to a machine,

11  and then let her vote on her own, would that be

12  considered voting assistance?

13       A    No.

14       Q    Why no?

15       A    Because you are not actually assisting her mark

16  her ballot.

17       Q    Okay.  So now we're getting into about what is

18  considered assistance, correct?

19            MS. PERALES:  Objection, vague.

20       A    I wouldn't believe that assistance would

21  require the oath.

22       Q    (BY MS. HUNKER) Okay.  And, so do you think

23  that there are types of assistance that would require

24  the oath that expand beyond reading the ballot for the

25  voter, directing the voter to the ballot, marking the

1    statute.capitol.texas.gov.

2                    Did I read that correctly?

3        A    Yes.

4        Q    Would you agree with me that this is a copy of

5    the Texas Election Code taken from the Texas government

6    website?

7        A    Yes.

8        Q    So let's look at page 8.

9        A    Page 8?

10       Q    Yes, the last page.

11       A    Okay.

12       Q    Do you see where it says "Section 64.036"?

13       A    Yes.

14       Q    Do you see where it defines "unlawful

15   assistance"?

16       A    Yes.

17       Q    It states:

18                    "A person commits an offense if the person

19   knowingly:

20                    "(1) provides assistance to a voter who is

21   not eligible for assistance;

22                    "(2) while assisting a voter prepares the

23   voter's ballot in a way other than the way the voter

24   directs or without direction from the voter.

25                    "(3) while assisting a voter suggests by

Page 215

1    word, sign, or gesture how the voter should vote; or

2                    "(4)   Provides assistance to a voter who

3    has not requested assistance or selected the person to

4    assist the voter."

5                    Did I read that correctly?

6         A    Yes.

7         Q    So this section states what is unlawful

8    assistance; is that correct?

9         A    It defines the offenses.  If the person

10   knowingly does these things, it's unlawful assistance.

11        Q    And if you look at the bottom and see where it

12   has "Amended by Acts"?

13        A    Yes.

14        Q    What is the last year that this particular

15   section was amended?

16        A    September 1st, 2003.

17        Q    So this section preexisted SB1, correct?

18        A    Yes.

19        Q    Now, the oath, has your office taken

20   consideration of public oath in this section of the

21   election code under Acts?

22                    MS. PERALES:  Objection.  Calls for legal

23   conclusion.

24        A    Not directly.

25        Q    (BY MS. HUNKER) Okay.  And is it your belief

Page 216

1    that the oath controls as opposed to the definition of

2    "unlawful assistance"?

3        A    I think it's two separate things.

4        Q    How so?

5        A    I think the oath that the individual is

6    providing assistance is taking is speaking to their

7    actions, that if they're going to confine themselves to

8    those certain things, or if they put false information

9    on the oath itself, that's subject to penalty of

10    perjury, versus what this other unlawful assistance is

11    talking about here.

12                You know, it seems like there is two

13    separate things that could happen at the same time or

14    could happen individually.

15        Q    Okay.  And have you advised election judges or

16    poll workers in Cameron County to intervene in answering

17    questions to the voters?

18        A    We have told them in training that is no longer

19    allowed, providing assistance.  But it's up to the

20    presiding judge to intervene if they feel they need to.

21        Q    And have you heard any incidents where the

22    presiding judge needed to intervene?

23        A    No.

24        Q    Have you heard of any incidents of individuals

25    not being able to obtain the assistance they needed

Page 218

1    ballot?

2        A    I believe so.

3        Q    So looking at the language that's taken out, it

4    says:

5            "Answering a voter's questions, stating

6    propositions on the ballot, naming candidates, and, if

7    listed, their political parties."

8            Did I read that correctly?

9        A    Yes.

10       Q    Now, that does not include marking the voter's

11   ballot or directing the voter to mark the ballot; is

12   that correct?  The language that was taken out?

13       A    No.

14       Q    And so is it your position that prior to SB1,

15   an assistant could not mark voter's ballot or direct the

16   voter's ballot since it was not listed with the new?

17       A    No.  I believe the sentence immediately

18   following that it says:  "I will prepare the voter's

19   ballot as the voter directs."  We cover those

20   activities.

21       Q    Okay.  When you say that that covers language

22   reading the ballot to the voter and directing the voter

23   to read the ballot?

24       A    I'm sorry?

25       Q    So the language that was removed did not

1    include reading the ballot to the voter or directing the

2    voter to read the ballot, correct?

3         A    No, it says it's the state propositions on the

4    ballot and to name candidates, or list their political

5    parties.

6         Q    Were they able to read anything else then --

7                   MS. PERALES:  Objection, vague.

8         Q    (BY MS. HUNKER) -- besides the proposition of

9    the ballot, the name of the --

10        A    I don't think specifically it says they could

11   read the instructions on how to vote, but it doesn't say

12   that we are going to confine their assistance to those

13   specific items.

14        Q    So if you notice where it says "I will confine

15   my assistance" is not underlined; is that correct?

16        A    No.

17        Q    So that was there prior to SB1; is that

18   correct?

19        A    Yes.

20        Q    So there were ways that voters -- ways that

21   assisters could assist a voter prior to SB1 that were

22   not explicitly listed in the oath; is that correct?

23        A    I don't know that that is correct.

24        Q    So did you think that an assister could not

25   read the instructions to the voter prior to SB1 since it

Page 224

1      A    Not that I am aware of.

2      Q    And are you aware of any person who is

3  unable -- any individual voter who was unable to secure

4  their assister of choice because of this provision?

5      A    Not that I'm not aware of.

6      Q    Are you aware of an individual voter that was

7  unable to vote because of this particular provision?

8      A    Not that I'm aware of.

9      Q    And have you heard from any assister concerns

10  about complying with this particular provision?

11      A    No.

12      Q    Are you aware of any assister that refused to

13  provide the information required under this subsection?

14      A    I'm not aware of any.

15      Q    And did you have any concerns yourself when

16  implementing this particular subsection?

17      A    No.

18      Q    I want to go back one, to Section 6.06.  That's

19  on page 54, starting at line 20.  Do you see it?

20      A    Yes.

21      Q    This amends Section 86.0105 of the election

22  code; is that correct?

23      A    Yes.

24      Q    And this one reads:

25            "A person commits an offense if the

1  person:

2          "Compensates or offers to compensate

3  another person for assisting voters as provided by

4  Section 86.010; or

5          "solicits, receives; or accepts

6  compensation for any activity described by Subdivision

7  (1)."

8          Did I read that correctly?

9     A    Yes.

10    Q    And then it says:

11          "An offense under this section is a state

12  jail felony.  And then continues:

13          "For purposes of this section,

14  compensation means an economic benefit as defined by

15  Section 38.01 Penal Code."

16          Did I read that correctly?

17    A    Yes.

18    Q    And then it continues:

19          "This section does not apply if the person

20  assisting a voter is an attendant or caregiver

21  previously known to voter."

22          Did I read that correctly?

23    A    Yes.

24    Q    And so this amends the section that preexisted

25  on SB1, correct?

1      A    Yes.

2      Q    And it amends a section that had already

3  committed offense regarding certain compensation with

4  respect to voting assistance, correct?

5      A    Yes.

6      Q    And the first section clarifies that it is not

7  just compensates but also it's offers to compensate,

8  correct?

9      A    Yes.

10      Q    And then Subsection 2 specifies regarding

11  solicits or receives, and then it continues for any of

12  this activity described in Subdivision 2.

13              Is that correct?

14      A    Yes.

15      Q    And so it extends to soliciting, receiving

16  assistance of voters; is that correct?

17      A    Yes.

18      Q    And then it also clarifies that this section

19  does not apply if the caregiver or attendant was

20  previously known to the voter, correct?

21      A    Correct.

22      Q    Do you understand that to mean like a personal

23  aide or individual who has been hired in another context

24  other than an assistant to voter?

25      A    Yes.

Page 231

1   there is a familiarity that they're willing to kind of

2   complain to.

3       Q    So the length of time volunteers had to wait

4   for the March primary, was that comparable with other

5   primaries in the past?

6       A    No.  The turnout wasn't as high as like a March

7   of 2020, so we didn't see situations where there were

8   long lines as we had in the past.

9       Q    What about compared to 2018, if you remember?

10      A    No, I don't remember lines being an issue in

11  2018.

12      Q    And so you didn't observe any increase in time

13  a voter had to wait in line in the 2022 March primary?

14      A    No, I think, you know, we had so many voting

15  locations that it covered the full traffic.

16      Q    What about the May elections, did you have any

17  additional waiting times as compared to previous May

18  elections?

19      A    No.

20      Q    Let's turn to 7.04.  You believe this is going

21  to be on technically 58, but the bulk of it starts on

22  page 59.

23      A    Okay.

24      Q    So this amends Section 276.015 of the Texas

25  Election Code, correct?

Page 232

1      A    Yes.

2      Q    I should say as this particular section; is

3  that correct?

4      A    Yes.

5      Q    And this is in relation to vote harvesting,

6  correct?

7      A    I believe that's the term, yes.

8      Q    Okay.  And it says, if you go to Subsection

9  (b):

10          "A person commits an offense if the

11  person, directly or through a third party, knowingly

12  provides or offers to provide vote harvesting services

13  in exchange for compensation or oath benefit."

14          Did I read that correctly?

15     A    Yes.

16     Q    It continues:

17          "A person commits an offense if the person

18  directly or through a third-party  knowingly provides or

19  offers to provide compensation or other benefit to

20  another person in exchange for vote harvesting

21  services."

22          Did I read that correctly?

23     A    Yes.

24     Q    And then (d) says:

25          "A person commits an offense if the person

Page 233

1   knowingly elects or possesses a mail ballot or official

2   carrier envelope in connection with vote harvesting

3   services."

4              Did I read that correctly?

5       A    Yes.

6       Q    And then if you look where it's Subsection

7   (A)(2).  It interprets or I should say, defines "vote

8   harvesting services" to mean "in-person interaction with

9   one or more voters in the physical presence of an

10  official ballot or ballot voted by my mail intended to

11  deliver votes for a specific candidate or measure."

12             Did I read that correctly?

13      A    Yes.

14      Q    Did you have any concerns with respect to the

15  implementation of this particular section?

16      A    No.

17      Q    Okay.  I believe this particular section, since

18  it's an offense, would not be enforced by your office;

19  is that correct?

20      A    That's correct.

21      Q    So this would be enforced by the district

22  attorney or county attorney's office criminal division;

23  is that right?

24      A    Yes.

25      Q    And you haven't spoken to them about how they

Page 234

1    could enforce or interpret this particular section?

2        A    I have not.

3        Q    With respect to the other provisions of the

4    election code created or amended criminal offense, have

5    you spoken to the district attorney's office or the

6    count attorney's office, criminal division about how

7    they would enforce those provisions?

8        A    No, I have not.

9        Q    Did any voter -- to your knowledge, was any

10   voter not able to obtain the assister of choice because

11   of this particular section?

12       A    Not that I'm aware of.

13       Q    And to your knowledge, was any voter unable to

14   vote because of this particular section?

15       A    Not that I'm aware.

16       Q    And to your knowledge, did any person who would

17   have assisted a voter decide not to assist a voter

18   because of this particular section?

19       A    Not that I am aware of.

20       Q    And has any voter raised concerns regarding

21   this particular section?

22       A    Not to me.

23       Q    And have any assisters raised concerns

24   regarding this particular election provision?

25       A    Not to me.

Page 247

1    Secretary of State's office about providing reasonable

2    accommodations since SB1 was enacted?

3         A    No.

4         Q    And have you had any discussions or

5    communications with the Secretary of State's office

6    regarding accommodations for voters with disabilities?

7         A    No.

8         Q    Okay.  We are going to turn to the new ID card

9    number of requirements off the -- of SB1.  I think we're

10   starting with the bill for now.

11             So before SB1 was in effect, how did you

12   and your office determine that a voter who sent in an

13   application for a ballot by mail was an eligible

14   registered voter?

15        A    We received the application in the office.  My

16   chief deputy would review them to make sure that the

17   application was filled out correctly.  And at the end

18   they would joint qualify, make sure that they were --

19   based on the information they provided were over 65,

20   they look at the voter registration system to make sure

21   they're a registered voter and that they did qualify,

22   that the information matched, that the residence address

23   that was included on the application matched the

24   residence address that we have in our system.

25             And if everything did line up and the

1    person was eligible, that would be the extent of the

2    review processes until we had the ballots ready to send

3    out.

4        Q     Okay.  So to clarify, in order to match the

5    application that you received to record on your voter

6    registration file, what -- which information from the

7    application did you use to do that matching process?

8        A     It would be the first and last name, date of

9    birth, residence address.

10       Q     And did that process for establishing an

11   applicant's identity change once SB1 was in effect?

12       A     It added the additional lookup of the ID

13   number.

14       Q     And so basically this is the same question but

15   as to mail ballots.  How did -- before SB1 was in

16   effect, how did you determine that a voter who sent in a

17   mail ballot was an eligible voter?

18       A     Do you mean the return envelope or --

19       Q     Yes.

20       A     Yeah.  When the -- when the return envelope

21   would come back, you know, we would check to see if we

22   had the application on file and if they're included in

23   the jacket together.  You know, they would look at the

24   outside to make sure that it was for the appropriate

25   election and that it was signed.

Page 249

1        If it wasn't signed and there was still
2  time to return it to the voter for them to sign it, that
3  then we could send it to them and then be able give it
4  back to us, then those are sent over to the ballot board
5  for review.
6     Q    And when you were trying to match -- trying to
7  identify whether the person sent in the mail ballot
8  envelope, return envelope, was someone who had already
9  sent in their application, how did you go about that
10 matching process?
11    A    We have their application since -- they're
12 called jackets.  And so when it comes in, you just find
13 the application that's it returned from and making sure
14 it's got right elections on the outside.  And then you
15 put it inside the same jacket.  And then they're sent
16 over to the early voting ballot board where they're
17 actually reviewing and qualifying the vote.
18    Q    So now we can talk about after SB1 has gone to
19 effect so forward to March primary election, as well as
20 the May primary election of this year.
21        So does your office use the ID number that
22 is included in -- on the application to look up the
23 voter and the voter registration database?
24    A    Not as the primary way to do it.  If we have
25 the voter number, that's usually the preferred method or

1    their last name and first name.

2        Q    What about for the mail ballot carrier

3    envelope?

4        A    It's usually the same process.

5        Q    You mentioned earlier today that you're an

6    offline county so you have your own voter registration

7    database that is separate from a team; is that right?

8        A    Yes.

9        Q    And how often do you get updates to your county

10   voter registration system from the team database?

11       A    Daily.

12               THE REPORTER:  I'm sorry.  What was your

13   answer?

14               THE WITNESS:  Daily.

15       Q    (BY MS. YUN) And when the -- when the State did

16   their update to their team database with information

17   from the Department of Public Safety earlier this

18   year -- or actually December of 2021, was that

19   information imported right away because of that date of

20   the update?

21       A    No.

22       Q    Why not?

23       A    The -- something in the process between the

24   Team system and the VOTEC system that we used didn't

25   automatically download that information.

Page 251

1    Q    So how did you fix that?

2    A    I don't know that it has been fixed.

3    Q    So are you aware whether you have gotten all

4  the updated ID number data from the Team database?

5    A    I know that --

6              MS. HUNKER:  Objection to form.

7    A    I know that they're trying to resolve the

8  issue.  I don't know if it's actually been fixed between

9  the two systems.

10    Q    (BY MS. YUN) And do you -- I'll rephrase it.

11              Has the Secretary of State's office

12  contacted Cameron County about how to resolve that

13  issue?

14    A    Not directly.

15    Q    And when you say "not directly," has there been

16  any way that they contacted you indirectly?

17    A    No.  Well, other than general conversations of

18  utilizing the log-ins into TEAM to see if we could find

19  that information versus it automatically being exchanged

20  within their systems.

21    Q    I see.  So your county has been using that

22  workaround to look up a voter's ID numbers on the Team

23  database if you were not able to find it on your own

24  system?

25    A    Yes.

Page 252

1    Q    So when you -- when your office encounters an

2    ID number mismatched error on an application or a mail

3    ballot carrier envelope, how -- how does your office

4    know who to contact about that error?

5    A    I think what they're -- what they're doing is

6    they're looking at the scans from the actual application

7    that was submitted to see if there was some sort of

8    error, numbers transposed to see whether it's something

9    we need to resolve either through the State or if you

10   would have to send something to the voter to actually --

11   they switch the numbers up when with they're writing on

12   them -- on the carrier envelope or the application.

13   Q    So if you believe that it was the State's

14   database that had this transposing problem, you contact

15   the State?

16   A    Yes.

17   Q    And who -- who do you contact exactly?

18   A    I think our first call would go out to TEAM.

19   The TEAM coordinator, I think Kristi Hart.

20   Q    And have you had to do that since SB1 went into

21   effect?

22   A    I am not aware of it.

23   Q    Have you had to do that before SB1 went into

24   effect?

25   A    To correct -- transpose things, not that I'm

Page 253

1   aware of.

2       Q    If it's the voter who you believe may have

3   transcribed the number incorrectly, how do you determine

4   who to contact in that case?  How do you -- how do you

5   identify the voter that you need to contact?

6       A    If they have -- if we have access to a phone

7   number, we would call them.  If not, we would have to

8   send them back a letter indicating that there's a defect

9   on the -- either on the application or carrier envelope.

10      Q    And is this based on their voter

11  registration -- voter registration file that you have

12  already?

13      A    Yes.

14      Q    And based on their voter registration file, can

15  you tell whether the person who sent in that ABBM

16  with -- with the ID number error is qualified to vote in

17  that election?

18           MS. HUNKER:  Objection to form.

19      A    I think we would try to look at other -- other

20  points on the application versus the voter registration

21  file to see if -- you know, if it is the same person or

22  we have to find another person because maybe their

23  number is right and we're misreading it.

24      Q    (BY MS. YUN) Have you had an experience where

25  you or your office contacted a voter whose mail ballot

Page 254

1    application was being rejected due to an ID error and

2    the voter said, "Oh, that was not me who sent in that

3    application"?

4        A    I know that after the fact we have people

5    claiming that they never submitted an application.

6    Usually when the political parties do their mass

7    mailings for big election early in the primaries,

8    candidates do get the -- they won't remember because

9    they're not the normal large size applications.  They're

10   smaller ones that people just sort of sign and put them

11   in.

12             But no, we haven't called somebody to say,

13   "There's a problem with your ID number on here," and

14   them saying, "That wasn't me."

15       Q    What do you do when an application for a ballot

16   by mail has a different residential address than what

17   you have in the voter registration file?

18       A    I think that the procedure at this point is to

19   reject the application.

20       Q    And what do you do when an application for

21   ballot by mail has a different last name than what you

22   have in the voter registration file?

23       A    If we can't make a determination that there has

24   been some sort of name change that we weren't apprised

25   of, we would reject the application.

1     Q    And what are some of the ways that you could

2   make that determination that there has been -- there has

3   been a name change?

4     A    To see if the -- the similar date of birth, if

5   the other ID numbers are matching, look to the voter

6   registration history to see if that last name has been a

7   former name or a different name than the individual has

8   used before.

9     Q    So would you say that in some instances you're

10  able to determine that these voters -- I'll rephrase.

11              Would you say that in some instances

12  you're able to determine a voter's identity even when

13  some information is slightly different from what you

14  have in the registration file?

15              MS. HUNKER:  Objection, form.

16    A    Yes.

17    Q    (BY MS. YUN) So I'm going to ask you a few

18  question about the cure process for mail ballot

19  materials during the March 2022 primary.

20              So you shared this document, which has

21  been now marked as State's Exhibit 5 with us.  Do you

22  have a similar set of documents for applications for a

23  ballot by mail?

24    A    I don't believe it prints out in this -- this

25  process.  But I think -- I recently saw my chief deputy

Page 256

1    preparing some information that was about the

2    applications about ballot mail.  They do send the

3    letter.

4        Q    Okay.  So when did Cameron County start

5    notifying voters that their carrier envelopes were being

6    rejected during the March 2022 primary election cycle?

7        A    I'm afraid I don't remember the exact date.

8    But I know that we sent out the notice, the 24 hours.

9    We -- I'm trying to remember if it began before -- I'm

10   sorry, I don't have the exact date.

11       Q    Sure.

12            If I say UOCAVA voters, is that -- do you

13   understand what I mean by that?

14       A    Yes.

15       Q    So military and overseas voters?

16       A    Uh-huh.

17       Q    So do you remember how you notified UOCAVA

18   voters about their mail ballot rejections?

19       A    Most of those military voters would use the

20   e-mail address for us to notify them so we were able to

21   send it to them through the e-mail process, or the

22   majority of them.

23       Q    And so there was some military voters who did

24   not have an e-mail address on file?

25       A    Most provided them, but I wouldn't be able

1  under those two days.

2      Q    Did you hear any complaints from voters who

3  were unable to cure their rejected mail ballot carrier

4  envelopes?

5      A    Yes.

6      Q    Could you describe some of those complaints?

7      A    There were one or two that we had to return the

8  carrier envelope more than once or their applications

9  more than once.

10            And they felt that we were intentionally

11  trying to prevent them from voting and that we were

12  taking away their vote.

13            There were at least two or three

14  individuals that I was aware that made those types of

15  phone calls.  Just general frustration.

16            One of the ladies that I spoke to was

17  afraid that she wasn't going to be able to get somebody

18  to help her bring her back.  And just -- they were

19  concerned because they didn't have vehicles themselves,

20  and they were too old to drive anywhere.

21            And those are the types of individuals

22  that we were willing to take the carrier envelope to and

23  to help them out.

24      Q    And I believe you testified earlier today that

25  it was a few that you had hand-delivered.  Is it 0 to 5

1    about the right number --

2        A    No, I think -- I'm not exactly sure how many,

3    but if it were more than 10 to 15 I would be surprised.

4        Q    Okay.  Do you know approximately how many

5    voters ended up being able to cure their applications

6    for ballot by mail?

7        A    I'm sorry.  I don't have that information.

8        Q    Do you have -- actually -- well, do you have

9    information about how many mail ballot carrier envelopes

10   were cured after or during the March 2022 election

11   cycle?

12       A    I think there's -- there's documentation that

13   isn't this that will tell us exactly how many

14   individuals started off as a -- as the return to the

15   voter.  And then ultimately became that their carrier

16   envelope was accepted.

17            This report is not going to give us that

18   interim process of when we're sending it back and forth.

19   It just let's you know the status of that time.

20       Q    Understood.

21            Do you have a general sense of how many

22   voters were able to cure their carrier envelopes?

23       A    I believe it was a substantial amount of the

24   people that we sent them to.  But obviously not -- not

25   everybody.  We still had a large group of voters is

Page 261

1  least, you know, maybe a week for it to actually have

2  the information that they had told the voters was going

3  to be there.

4              For Cameron County, I don't think it ever

5  was truly functional because of the difficulty with the

6  coding that they hadn't gotten finalized yet with VOTEC.

7              So honestly, I don't know if at this

8  point, or if at any point during the March primary, that

9  it would have been a way people could have cured their

10 ballot, their carrier envelopes.

11     Q    Okay.  So we're going to now look at

12 section 5.02 of SB1, which is Exhibit 11.  It's

13 Exhibit 11 and page 33.

14     A    Yes.

15     Q    So I'm not going to read this back into the

16 record.  But I'm looking at bottom of the page about

17 what information is required for early voting

18 application.

19              So would you agree that based on the text

20 of SB1, the portion that I just pointed you to, voters

21 must include the number of the voter's driver's license,

22 election identification certificate, or personal

23 identification card.

24              And if the applicant has not been issued

25 any of those numbers, then they must provide the last

Page 262

1   four digits of their social security number?

2        A    Or claim that they don't have a number.

3        Q    Correct.  Right.

4        A    But, yes.

5        Q    So it sets up this hierarchy where if you have

6   one of these three numbers, then provide those.  If not,

7   provide the last four digits of your social security.

8   And if -- if not, if you don't have either of those two

9   numbers, then say that you don't have any of those

10  numbers; is that right?

11       A    Yes.

12       Q    And this is the same system as what is on the

13  new application form and the carrier envelope, right?

14       A    Yes.

15       Q    And the Secretary of State's office recommended

16  that voters put both numbers, both their last four

17  digits of their Social Security Number and their

18  DPS-issued ID number, correct?

19       A    Yes.

20       Q    And that is what your office also recommended?

21       A    Yes.

22       Q    In practice, did a lot of voters put both

23  numbers down?

24       A    I did see some of the return carrier envelopes,

25  and they did use both numbers.

Page 267

1    voters ID information not being reflected either on Team

2    or your voter registration file even though they do have

3    the correct -- the number that they provided is a

4    correct number that they have in their possession?

5                    MS. HUNKER:  Objection, form.

6        A    Yes.

7        Q    (BY MS. YUN) And do you believe that the

8    workaround that you described of looking up on your own

9    database and then going to the Team database, is that a

10   sufficient workaround for your county's processing of

11   mail ballot materials?

12                   MS. HUNKER:  Objection, form.

13       A    I think it's the only system and information

14   that I have access to because DPS won't let us contact

15   them.

16       Q    (BY MS. YUN) What do you mean by that?

17       A    We can ask for information regarding the voter

18   registration application.  We can send the individual.

19   But we can't ask them to provide us with somebody's

20   driver's license number.

21       Q    So you have to go through the Team database to

22   do that?

23       A    Yes.

24       Q    And as of now, you're not aware of any plans to

25   make the syncing of the Team database and your own VOTEC

1   database on a more automatic basis?

2      A    I'm not sure what the status of that was.

3   Everybody says, oh, that's a great idea, we need to make

4   it happen.  But -- it may have happened recently, but I

5   just wasn't aware of it.

6      Q    And is that something that -- was that a

7   process that -- or was that a project that got started

8   before SB1 was passed or was this after SB1 was passed?

9      A    After SB1.

10     Q    And this was spearheaded by the Secretary of

11  State's office?

12     A    I believe so.

13              MS. YUN:  I have no further questions at

14  this time.  I pass the witness.

15              MS. PERALES:  Can we take a moment off the

16  record to change positions?

17              THE VIDEOGRAPHER:  We're going off the

18  record.  The time is 5:37 p.m.

19              (Break taken.)

20              THE VIDEOGRAPHER:  We are back on the

21  record.  The time is 5:40 p.m.

22                       EXAMINATION

23  BY MS. PERALES:

24     Q    Good afternoon, Mr. Garza.

25     A    Good afternoon.

Page 269

1        Q    My name is Nina Perales.  I work with MALDEF,

2    the Mexican American Legal Defense and Educational Fund.

3    And I represent plaintiff La Union del Pueblo Entero and

4    other Latino organizations in this case.

5                  We only have less than an hour on the

6    record, and we'll see if my voice holds for the full

7    period.  So I'm going to try to be efficient in my

8    questioning.

9                  I'm going to do the final part of the

10   questioning regarding assistance to voters who need help

11   casting a ballot.

12                  And my first question for you is whether

13   would you agree with me that voters who use assistance

14   can include people with physically disabilities,

15   correct?

16       A    Yes.

17       Q    And it can also include voters with perhaps

18   some cognitive difficulties but who are still competent

19   to vote.  Would you agree?

20       A    Yes.

21       Q    And that might even include, for example, a

22   voter who has PTSD, who need a little extra assistance

23   to vote, yes?

24       A    Yes.

25       Q    And a voter can also need assistance and use

Page 270

1    assistance if they are limited English proficient, yes?

2        A    Yes.

3        Q    And then finally, a voter might use assistance

4    if they are illiterate in English or Spanish or whatever

5    their own language is?

6        A    Yes.

7        Q    Okay.  Thank you.

8              Now I'm going to shift over to who

9    provides assistance.

10             You had mentioned earlier in the

11   deposition an example of a grandchild who goes to assist

12   a grandmother or grandfather, right?

13       A    Yes.

14       Q    Okay.  And beside family members, a voter could

15   also possibly be assisted by a neighbor, do you agree?

16       A    Yes.

17       Q    And also perhaps a friend or someone from

18   church?

19       A    Yes.

20       Q    Okay.  And a person who is also with a

21   nonprofit organization, like a get-out-the-vote

22   organization, they could also assist the voter, correct?

23       A    Yes.

24       Q    Okay.  Now, you had mentioned earlier in the

25   deposition that Cameron County provides assistance

Page 271

1  through it poll workers for people who are Spanish

2  speaking, Spanish monolingual speakers, that's correct?

3      A    Yes.

4      Q    But you mentioned that you didn't necessarily

5  provide coverage in your polling places for somebody who

6  might speak a language other than Spanish; is that

7  right?

8      A    Yes.

9      Q    So I know here in the Valley and also with our

10  medical center that we have some doctors and some people

11  in the medical community who are from either India or

12  other Asian, either east Asia or south Asian countries;

13  is that right?

14      A    I believe so.

15      Q    And if somebody was, let's say, an older

16  individual who was naturalized citizen and they were

17  either, you know, speaking a language like Chinese or

18  Hindi and they needed help voting, they -- they would

19  probably most likely bring a friend or a family member,

20  correct?

21              MS. HUNKER:  Objection, form.

22      A    Yes.

23      Q    (BY MS. PERALES) Now, I'd like to talk to you

24  about the different types of help that voters use in the

25  polling place.

Page  272

1                          Would you agree with me that some voters,

2   included the elderly, might use help physically getting

3   around the polling place?

4        A    Yes.

5        Q    Okay.  So even if somebody isn't in a

6   wheelchair, if they're otherwise unstable on their feet,

7   they might use someone to lean on physically as they

8   move to the check-in table and then to the voting

9   station, correct?

10       A    Yes.

11       Q    And then also some people might use assistance

12  interacting with the poll workers, correct?

13       A    Yes.

14       Q    And then here's where I ask you what kind of

15  voting machines you use here in Cameron County.  You

16  mentioned before about pens.  Are you using optical scan

17  here?

18       A    Yes.  We use paper ballots.  They're in ballot

19  boxes during early voting and DS200s on election day.

20       Q    Okay.  Great.

21                      So that means that if someone is voting at

22  the polls during the early voting period they're going

23  to use a pen that kind of looks like a magic marker

24  they're going to mark a paper ballot; is that right?

25       A    It's a roller ball type pen, but, yes, a paper

Page 273

1    ballot.

2         Q    And then after they mark the paper ballot, they

3    pick up the ballot and they take to what exactly during

4    early voting?

5         A    During early voting, they're asked to put it in

6    a deposit in the ballot box.

7         Q    And does the ballot box have a special name?

8         A    No.

9         Q    No?  Just the ballot box?

10        A    Just the ballot box.

11        Q    Okay.  And then on election day, once the voter

12   finishes marking the paper ballot, they take it over to

13   the -- did you say the DS200?

14        A    Yes.

15        Q    And that's a tabulator, right?

16        A    Yes.  It's the precinct tabulator.

17        Q    Okay.  And is it also true that a voter who

18   uses assistance might use their assister to understand

19   that after they have the ballot all marked, that they

20   take it over to this other box and then they're supposed

21   to insert the ballot into that other box?

22        A    Yes.

23        Q    So generally, understanding the instructions,

24   not only of how to mark the ballot, but what to do with

25   the ballot after you mark it?

Page 274

1    A    Correct.

2    Q    Okay.  And then finally -- and I think you have

3    spoken of this a little bit before -- a voter might ask

4    the assister to help them understand something that is

5    on the ballot, correct?

6    A    Yes.

7    Q    And you even made reference to the May 7th

8    ballot.  And I understand that there may have been some

9    bond issues on the May 7th ballot?

10    A    There were bond issues and there were county --

11    state constitutional propositions.  I know there were a

12    lot of -- there was some charter ones as well,

13    depending.

14    Q    And you had mentioned that voters might ask the

15    assister to help them understand, for example, one of

16    these proposed constitutional amendments; is that right?

17    A    Yes.

18    Q    And if I recall, there was one involving

19    property tax with the number 25,000 and a number 40,000.

20    It seemed not completely straight forward to me when I

21    was reading my ballot.  And are you aware of that

22    particular proposition?

23    A    Yes.

24    Q    And could you explain it to me maybe in one or

25    two sentences?

Page 275

1    A    I don't know if I could to it in one or two

2    sentences, but it is -- it reads complicated.  But it's

3    really simple.

4    Q    And so would that be the kind of question on a

5    ballot that a voter might ask the assister to help them

6    understand what exactly they're voting for if they vote

7    yes or no?

8    A    Yes.

9    Q    I am going to mark to more exhibits for this

10   deposition.

11           (Off-the-record discussion.)

12           (Exhibits 21 and 22 marked.)

13   Q    (BY MS. PERALES) Mr. Garza, I have handed you

14   what has been marked deposition Exhibit Number 21 and

15   22.  And do you -- and I will draw -- I will draw your

16   attention to the upper left-hand corner of each exhibit

17   where there's language regarding the form being

18   prescribed by the Secretary of State and then a date

19   underneath.

20   A    Yes.

21   Q    Do you recognize deposition Exhibit Number 21

22   as the oath of assistance that would be taken by

23   assisters before as SB1?

24   A    Yes.

25   Q    If then you look over to Deposition Exhibit

Page 276

1   Number 22, do you recognize this as the new oath of

2   assistance that is taken by assisters following the

3   effective date of SB1?

4        A     Yes.

5        Q     Okay.  And you'll notice there is that

6   language, "I swear or affirm under penalty of perjury."

7   Do you see that?

8        A     Yes.

9        Q     Okay.  I'm going to ask you a few questions

10  about the new oath of assistance.

11              You had spoken earlier with Ms. Hunker

12  about this language regarding confining the assistance.

13  And then there are those four very specific acts as

14  follows:  Reading the ballot, directing the voter to

15  read the ballot, marking the voter's ballot, or

16  directing the marker -- directing the voter to mark the

17  ballot.

18              Do you see that there?

19       A    Yes.

20       Q    And I wanted to ask you, with respect to how an

21  assister might understand this oath, whether an assister

22  is likely to understand this oath as restricting them to

23  those four actions in terms of assistance?

24              MS. HUNKER:  Objection to form.

25       A    Yes.

Page 277

1          Q    (BY MS. PERALES) And you had spoken earlier

2    with Ms. Hunker about how the language is now gone from

3    the oath regarding answering the voter's questions.

4                   You had spoken earlier about Ms. Hunker

5    about the language being removed from the oath about

6    answering the voter's questions.  Do you recall that

7    testimony earlier?

8          A    Yes.

9          Q    And I wanted to give you an opportunity to

10   explain a little more how you changed your training to

11   the poll workers.  You had mentioned that you had told

12   the poll workers things were different now with respect

13   to assistance.  Can you explain that to me?

14         A    We have the -- well, we added new forms so that

15   people would be familiar with them and understand the

16   counties that are associated -- that were recently

17   created with some of the actions that were at the poll

18   place.

19                   But, you know, it was really -- they --

20   what I was focusing on in the form was, you know, making

21   sure that they capture the information the form is

22   requesting and that the person that is taking the oath

23   says it out aloud, you know, so that -- and that -- now

24   we tell them, don't do the call and response type thing.

25   Repeat after me.  Just have the individual read it next

1   to you or have a clerk listen to them to make sure

2   they're reading it aloud.  And then have them sign the

3   form.  But to make sure that they got the relationship

4   issue correct.

5      Q    Did you train your poll workers about the new

6   language about how the assister should confine the

7   assistance to reading the ballot to the voter, directing

8   the voter to read the ballot, marking the voter's

9   ballot, or directing the voter to mark the ballot?

10     A    I definitely emphasized that during the primary

11  trainings.

12     Q    Okay.  Going back to the different types of

13  ways that assisters help voters to vote.  You haven't

14  studied, have you, the federal court decisions that

15  describe kind of what all can be included in voter

16  assistance; is that right?

17     A    That's right.

18     Q    So would you agree with me that a voter

19  assister could be potentially concerned about giving the

20  voter instructions about where to put the ballot after

21  the ballot is marked?  Because it falls outside these

22  four enumerated acts.

23              MS. HUNKER:  Objection, form.

24     A    Yes.

25     Q    (BY MS. PERALES) And would you agree with me

Page 281

```
 1              MS. HUNKER:  Objection, form.

 2       A    Yes.

 3       Q    (BY MS. PERALES) Can we look up a little bit

 4  higher there.  There's this new part of the oath that

 5  says there -- "The voter -- voter I am assisting

 6  represented to me that they are eligible to receive

 7  assistance."  Do you see that there?

 8       A    Yes.

 9       Q    Do you understand this to mean that the

10  assister must ask the voter for a representation of

11  eligibility?

12       A    Yes.

13       Q    Do you have any advice for how an assister

14  should ask that question of a voter?

15       A    Not that I can think of at the moment.

16       Q    Would you agree with me that there might be a

17  voter who is private about themselves, that they would

18  be uncomfortable telling their assister what is their

19  basis for needing assistance?

20       A    Yes.

21       Q    Do you think there might be an assister who is

22  uncomfortable asking the voter to express what their

23  need is for assistance?

24       A    Yes.

25       Q    In our community, we have people who are very
```

Page 283

1   with assistance, that would be responsive to one of our

2   document requests, and it might not be too burdensome on

3   the county.

4        A    Thank you.

5        Q    Need you to turn to section 6.06, which is on

6   page 54 flowing on to page 55.

7        A    Yes.

8        Q    Now, would you agree with me that section 6.06

9   creates an offense if a person compensates or offers to

10  compensate another person for assisting voters to mail

11  vote?  It also creates an offense if you get paid to

12  assist a voter to vote by mail?

13       A    Yes.

14       Q    Okay.  Are you aware that in the Rio Grande

15  Valley, there are organizations that assist -- that

16  these are organizations that are not affiliated with

17  political campaigns, organizations that assist voters

18  who might be homebound to complete their ballots?

19       A    Yes.

20       Q    Can you name any in particular?

21       A    Not off the top of my head.

22       Q    Might LUPE be one of those organizations?

23       A    I wouldn't be surprised if that was part of

24  their mission.

25       Q    Okay.  Have you ever heard of an organization

Page 284

1    called Proyecto Juan Diego?

2         A    Okay.

3                   THE COURT REPORTER:   Project what?

4                   MS. PERALES:   Proyecto Juan Diego.

5         Q    (BY MS. PERALES) They do community outreach

6    with the voting; is that correct?

7         A    Yes.

8         Q    Okay.  So would you agree with me that if a

9    community-based outreach organization pays staff to

10   assist mail voters, that they would be committing an

11   offense under this provision?

12        A    I think it could be read that way.

13        Q    Would you agree with me that if a

14   community-based organization stops helping voters to

15   vote by mail because they are concerned about this new

16   crime under SB1, that there would be less assistance

17   available to Cameron County voters to vote by mail?

18                   MS. HUNKER:  Objection, form.

19        A    Yes.

20        Q    (BY MS. PERALES) Would you be concerned if

21   there was less of this community-based outreach to mail

22   voters because of concerns that they want to avoid

23   committing an offense under SB1?

24        A    Yes.

25        Q    Okay.  I would like you to turn to

1    provision 7.04, which starts at the bottom of page 58

2    and flows on to page 59.

3         A    Yes.

4         Q    On page 59, there is a definition of vote

5    harvesting services that starts on line 7.  Do you see

6    that there?

7         A    Yes.

8         Q    And it has an element of an in-person

9    interaction with one or more voters, do you see that?

10        A    Yes.

11        Q    And I has also an element of being in the

12   physical presence of an official ballot; is that right?

13        A    Yes.

14        Q    Or a ballot voted by mail.  So you have to be

15   in the physical presence of the ballot, correct?

16        A    Yes.

17        Q    And then it says it has to be intended to

18   deliver votes for a specific candidate or measure, do

19   you see that there?

20        A    Yes.

21        Q    Do you see anywhere there that it has to be by

22   a campaign worker?

23        A    No.

24        Q    Okay.  So, again, I am going to ask you about a

25   community-based organization.  Let's say it is a

Page 286

1    community-based organization that wants to improve

2    infrastructure, like drainage or streets.  And it's

3    sending its volunteers door-to-door to the homes of

4    voters.  Asking the voters to vote for the bond that

5    will improve infrastructure.

6            Would you agree with me that this

7    community-based person, if they're talking to a voter in

8    their home and the mail ballot is there, and the

9    community-based person, community organization person is

10   urging the voter to vote for the bond and the mail

11   ballot is somewhere in the kitchen, that they would be

12   fulfilling these elements here of vote harvesting in

13   SB1?

14           MS. HUNKER:  Objection, form.

15    A    Yes.

16    Q    (BY MS. PERALES) Would you agree with me that a

17   community organization would perhaps be less likely to

18   send in its canvasers to talk to male voters about

19   voting for infrastructure improvement bonds because of

20   the concerns that they might violate SB1?

21           MS. HUNKER:  Objection, form.

22    A    Yes.

23    Q    (BY MS. PERALES) And would you be concerned if

24   there was less non-partisan community-based outreach to

25   mail voters as a result of this provision?

1    A    Yes.

2    Q    Would you agree with me that being limited

3  English proficient is not a disability?

4    A    Not in a traditional sense.

5    Q    It's not a physical disability, is it?

6    A    No.

7    Q    And then finally, if you would look again at

8  the oath assistance here on the new -- the current oath

9  of assistance where it says "The voter I am assisting

10  represented to me that they are eligible to receive

11  assistance."  Do you see that there?

12    A    Yes.

13    Q    If you would look at the last part of the oath,

14  it follows a semicolon.  And it says, "And I understand

15  that if assistance is provided to a voter who is not

16  eligible for assistance, the voters ballot may not be

17  counted."  Do you see that there?

18    A    Yes.

19    Q    Does this oath include the criteria for

20  eligibility for assistance?

21    A    It does not.

22    Q    Would you agree with me that an assister might

23  be reluctant to sign the oath of assistance if they

24  weren't exactly sure what -- what is the eligibility

25  criteria for the assistance because they know that if

1    they provide assistance to an ineligible person, the

2    ballot might not be counted?

3                   MS. HUNKER:  Objection, form.

4        A    I would agree.

5        Q    (BY MS. PERALES) Would you sign an oath under

6    penalty of perjury if you were not sure you were

7    complying with that oath?

8        A    Can you repeat that, I'm sorry?

9        Q    Would you sign?

10       A    No, I would not.

11       Q    Okay.  Does the wording under penalty of

12   perjury mean that you might be prosecuted if you -- if

13   you signed this and you have not complied with the oath?

14       A    Yes.

15       Q    Okay.  My last question is also about data.

16   You spoke a little bit with Ms. Yun whether the county

17   has the ability to figure out how many voters you may

18   have sent an application for ballot by mail who returned

19   that application for ballot by mail to you and you were

20   unable to verify the ID number.

21                   And I'm wondering if there's any way for

22   the county to figure out how many of those people

23   ultimately did not send you an application for ballot by

24   mail that you were able to process.

25       A    I am hopeful that we can.  I'm -- like I said,

Page 290

1      A     The only -- outside of the statistics that I

2   hastily printed up for I think the exhibit --

3      Q     Oh, it was an earlier exhibit.

4      A     5.

5      Q     Yes.

6      A     The other information here are copies of the

7   election code 1, 3, Senate Bill 1.

8      Q     Okay.  And I scribbled all over my -- my

9   Exhibit 5 as I was taking notes while we're talking.

10  And I just wanted to confirm.  There was a code that I

11  think you said you weren't sure what it was.  It's the

12  code, NT, do not use; NT, ballot received.

13               Was that one that you were able to tell us

14  what that was?

15     A     No, I don't -- I couldn't decipher the NTs.

16  They -- I was talking about with the -- this new return

17  process in a way that things are categorized.

18               I think their -- the E3s and the R1s are

19  now sort of used.  I think this -- when they said do not

20  use, that means that the State is asking us to no longer

21  to use that as part of the coding.

22               But we have voter history that has that on

23  there as the code so it keeps pulling it up even though

24  it is something else now.

25     Q     I see.

Page 291

1              Now, do these codes come from TEAM?  Do

2     they come from your vendor?  Where do they come?

3        A    I think it's a combination of both, but I think

4     TEAM is the one that instructs us how to code things in

5     our VOTEC system.

6        Q    And do you have a chart of codes that maybe

7     comes from TEAM that we could use to decipher this

8     chart?

9        A    Yes, yes.

10       Q    Okay.

11       A    I was trying to get one before I got over here,

12    but I didn't succeed.

13       Q    Okay.  Well, that might be responsive to our

14    records request.  So I'll follow up with your counsel

15    about whether we can find a translation chart.

16            MS. PERALES:  I need one minute off the

17    record to figure out if I'm done.  But I'm thinking I'm

18    done.  Can we go off the record?

19            THE VIDEOGRAPHER:  Going off the record.

20    The time is 6:15 p.m.

21            (Break taken.)

22            THE VIDEOGRAPHER:  We're back on the

23    record.  The time is 6:19 p.m.

24            MS. PERALES:  Mr. Garza, I want to thank

25    you for your time.  We have exceeded the seven hours

Page 294

1          I, REMI GARZA, have read the foregoing deposition

2     and hereby affix my signature that same is true and

3     correct, except as noted above.

4

5                                    _____

6                                    REMI GARZA

7     THE STATE OF _____)

8     COUNTY OF _____)

9

10         Before me, _____, on this

11    day personally appeared REMI GARZA, known to me or

12    proved to me on the oath of _____ or through

13    _____ (description of identity card

14    or other document) to be the person whose name is

15    subscribed to the foregoing instrument and acknowledged

16    to me that he/she executed the same for the purpose and

17    consideration therein expressed.

18         Given under my hand and seal of office on this

19    _____ day of _____, _____.

20

21                                   _____

22                                   NOTARY PUBLIC IN AND FOR

23                                   THE STATE OF _____

24    My Commission Expires: _____

25

Page 295

```
 1

 2                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE WESTERN DISTRICT OF TEXAS
 3                        SAN ANTONIO DIVISION

 4

 5   LA UNION DEL PUEBLO         )
     ENTERO, ET AL               )
 6   vs.                         )   CASE NO. 1:21-cv-0844-XR
                                 )
 7                               )
     GREGORY WAYNE ABBOTT, ET    )
 8   AL                          )

 9

10                      REPORTER'S CERTIFICATE

11                ORAL & VIDEOTAPED DEPOSITION OF

12                          REMI GARZA

13                          May 9, 2022

14

15        I, Dora Canizales, Certified Shorthand Reporter in

16   and for the State of Texas, certify to the following:

17        That the witness, REMI GARZA, was duly sworn by the

18   officer and that the transcript of the videotaped

19   deposition is a true record of the testimony given by

20   the witness;

21        I further certify that pursuant to FRCP Rule

22   30(f)(1) that the signature of the deponent,

23    _x_ was requested by the deponent or a party before

24   the completion of the deposition and returned within 30

25   days from the date of receipt of the transcript.  If
```

Page 296

1    returned, the attached Changes and Signature Page

2    contains any change and the reasons therefor;

3        ____ was not requested by the deponent or a party

4    before the completion of the deposition.

5        I further certify that I am neither attorney or

6    counsel for, related to, nor employed by any of the

7    parties to the action in which this testimony was taken,

8        Further, I am not a relative or employee of any

9    attorney of record in this cause, nor do I have a

10   financial interest in the action.

11       Subscribed and sworn to on this the 16th day of

12   May, 2022.

13

14

15                        _____

16                        Dora Canizales, CSR
                          Texas CSR 5360
                          Expiration:  07/30/2022
17                        Magna Legal Services
                          www.MagnaLS.com
18

19

20

21

22

23

24

25



### GOVERNOR GREG ABBOTT

July 27, 2020

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
__2:00pm__ O'CLOCK

JU 2020

Secretary of State

The Honorable Ruth R. Hughs
Secretary of State
State Capitol Room 1E.8
Austin, Texas 78701

Dear Secretary Hughs:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

A proclamation suspending certain statutes concerning elections on November 3, 2020.

The original of this proclamation is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD/gsd

Attachment

POST OFFICE BOX 12428 AUSTIN, TEXAS 78711 512-463-2000 (VOICE) DIAL 7-1-1 FOR RELAY SERVICES



STATE'S
EXHIBIT
2

# PROCLAMATION
BY THE
## Governor of the State of Texas

WHEREAS, I, Greg Abbott, Governor of Texas, issued a disaster proclamation on March 13, 2020, certifying under Section 418.014 of the Texas Government Code that the novel coronavirus (COVID-19) poses an imminent threat of disaster for all counties in the State of Texas; and

WHEREAS, in each subsequent month effective through today, I have renewed the disaster declaration for all Texas counties; and

WHEREAS, the Commissioner of the Texas Department of State Health Services, Dr. John Hellerstedt, has determined that COVID-19 continues to represent a public health disaster within the meaning of Chapter 81 of the Texas Health and Safety Code; and

WHEREAS, pursuant to legislative authorization under Chapter 418 of the Texas Government Code, I have issued executive orders, proclamations, and suspensions of Texas laws in response to the COVID-19 disaster, aimed at using the least restrictive means available to protect the health and safety of Texans and ensure an effective response to this disaster; and

WHEREAS, Section 41.001(a) of the Texas Election Code provides that a general or special election in this state shall be held on a uniform election date, and the next uniform election date is occurring on November 3, 2020; and

WHEREAS, I issued a proclamation on March 18, 2020, suspending Sections 41.0052(a) and (b) of the Texas Election Code and Section 49.103 of the Texas Water Code to the extent necessary to allow political subdivisions that would otherwise have held elections on May 2, 2020, to move their general and special elections for 2020 only to the November 3, 2020 uniform election date; and

WHEREAS, Texas law provides that eligible voters have a right to cast a vote in person; and

WHEREAS, as counties across Texas prepare for the upcoming elections on November 3, 2020, and establish procedures for eligible voters to exercise their right to vote in person, it is necessary that election officials implement health protocols to conduct elections safely and to protect election workers and voters; and

WHEREAS, in order to ensure that elections proceed efficiently and safely when Texans go to the polls to cast a vote in person during early voting or on election day for the November 3, 2020 elections, it is necessary to increase the number of days in which polling locations will be open during the early voting period, such that election officials can implement appropriate social distancing and safe hygiene practices; and

WHEREAS, Section 85.001(a) of the Texas Election Code provides that the period for early voting by personal appearance begins 17 days before election day; and

WHEREAS, Section 86.006(a-1) of the Texas Election Code provides that a voter may deliver a marked mail ballot in person to the early voting clerk's office while the polls are open on election day; and

WHEREAS, in consultation with the Texas Secretary of State, it has become apparent that for the November 3, 2020 elections, strict compliance with the statutory requirements in Sections 85.001(a) and 86.006(a-1) of the Texas Election Code would prevent, hinder, or delay necessary action in coping with the COVID-19 disaster, and that providing additional time for early voting will provide Texans greater safety while voting in person; and

WHEREAS, pursuant to Section 418.016 of the Texas Government Code, the legislature has expressly authorized the Governor to suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business or the orders or rules of a state agency if strict compliance with the provisions, orders, or rules would in any way prevent, hinder, or delay necessary action in coping with a disaster;

NOW, THEREFORE, I, GREG ABBOTT, Governor of Texas, under the authority vested in me by the Constitution and laws of the State of Texas, do hereby suspend Section 85.001(a) of the Texas Election Code to the extent necessary to require that, for any election ordered or authorized to occur on November 3, 2020, early voting by personal appearance shall begin on Tuesday, October 13, 2020, and shall continue through the fourth day before election day. I further suspend Section 86.006(a-1) of the Texas Election Code, for any election ordered or authorized to occur on November 3, 2020, to the extent necessary to allow a voter to deliver a marked mail ballot in person to the early voting clerk's office prior to and including on election day.

The Secretary of State shall take notice of this proclamation and shall transmit a copy of this order immediately to every County Judge of this state and all appropriate writs will be issued and all proper proceedings will be followed to the end that said elections may be held and their results proclaimed in accordance with law.

IN TESTIMONY WHEREOF, I have hereto signed my name and have officially caused the Seal of State to be affixed at my office in the City of Austin, Texas, this the 27th day of July, 2020.

GREG ABBOTT
Governor of Texas

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
2:00 PM O'CLOCK

JUL 2 7 2020

*Governor Greg Abbott*
July 27, 2020

*Proclamation*
Page 3

ATTESTED BY:

RUTH R. HUGHS
Secretary of State

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
2:00 PM O'CLOCK

JUL 2 7 2020

a_labtot v.140420
Page: 1

Date: 05/09/22
Time: 08:10 am
Election Code: 0522-01

CAMERON COUNTY
Absentee Labels Printed/Countable Summary Report
-- MAY 7, 2022 SPECIAL & GENERAL --



STATE'S
EXHIBIT
5
PENGAD 800-631-6989

| Countable | Return Status | Total |
|---|---|---|
| NO | BR - Ballots received | 1,588 |
| | CL - Ballot canceled by voter | 39 |
| | E3 - EVC Inc SSN/TDL Re-Sent to Vtr | 5 |
| | E7 - EVC Inc SSN/TDL Cure Avail. | 14 |
| | R1 - DO NOT USE-R1-Incorr./Miss. SS | 2 |
| | RJ - DO NOT USE-RJ-Ballot Rejected | 1 |
| | UN - Returned by Post Office | 14 |
| | V5 - BB Not Signed | 1 |
| | V7 - BB SOR Not Included | 1 |
| | V8 - BB Inc SSN/TDL Cure Avail. | 13 |
| | NO Total: | 1,678 |

| NOT RETURNED | (** Not Returned **) | 633 |
|---|---|---|
| | NOT RETURNED Total: | 633 |

| Total Labels Printed: | 2,311 |
|---|---|

Date: 05/09/22
Time: 08:12 am
Election Code: P22-01

CAMERON COUNTY
Absentee Labels Printed/Countable Summary Report
-- DEMOCRATIC PRIMARY --

a_labtot v.140420
Page:   1

| Countable | Return Status | Total |
|---|---|---|
| **YES** | OK - Ballot Accepted by Board | 1,292 |
| | **YES Total:** | **1,292** |
| **NO** | AC - Address correction after print | 3 |
| | CL - Ballot canceled by voter | 63 |
| | IS - DO NOT USE-IS-Incorrect or Mis | 29 |
| | NT - DO NOT USE-NT-Ballot received | 32 |
| | R1 - DO NOT USE-R1-Incorr./Miss. SS | 81 |
| | UN - Returned by Post Office | 2 |
| | **NO Total:** | **210** |
| **NOT RETURNED** | (** Not Returned **) | 199 |
| | **NOT RETURNED Total:** | **199** |
| | **Total Labels Printed:** | **1,701** |

Date: 05/09/22
Time: 08:12 am
Election Code: P22-02

CAMERON COUNTY
Absentee Labels Printed/Countable Summary Report
-- REPUBLICAN PRIMARY --

a_lablot v.140420
Page: 1

| Countable | Return Status | | Total |
|---|---|---|---|
| **YES** | OK - Ballot Accepted by Board | | 260 |
| | | **YES Total:** | **260** |
| **NO** | CL - Ballot canceled by voter | | 9 |
| | IS - DO NOT USE-IS-Incorrect or Mis | | 11 |
| | NT - DO NOT USE-NT-Ballot received | | 4 |
| | R1 - DO NOT USE-R1-Incorr./Miss. SS | | 12 |
| | RJ - DO NOT USE-RJ-Ballot Rejected | | 1 |
| | SR - Statement of Res not included | | 1 |
| | WI - Witness Failed to Sign Name | | 1 |
| | | **NO Total:** | **39** |
| **NOT RETURNED** | (** Not Returned **) | | 47 |
| | | **NOT RETURNED Total:** | **47** |

**Total Labels Printed:** 346

Date: 05/09/22
Time: 08:13 am
Election Code: CA21-01

CAMERON COUNTY
Absentee Labels Printed/Countable Summary Report
-- CONSTITUTIONAL AND SPECIAL --

a_labtot v.140420
Page:    1

| Countable | Return Status | Total |
|---|---|---|
| NO | B2 - Second Ballot Mailed | 1 |
| | BR - Ballots received | 1,597 |
| | CL - Ballot canceled by voter | 3 |
| | NT - DO NOT USE-NT-Ballot received | 16 |
| | R1 - DO NOT USE-R1-Incorr./Miss. SS | 1 |
| | R2 - DO NOT USE-R2-BBR Signature Do | 2 |
| | R3 - DO NOT USE-R3-BBR NO Statement | 1 |
| | UN - Returned by Post Office | 40 |
| | NO Total: | 1,661 |
| NOT RETURNED | (** Not Returned **) | 553 |
| | NOT RETURNED Total: | 553 |
| | Total Labels Printed: | 2,214 |

a_labtot v.140420

Page: 1

Date: 05/09/22
Time: 08:14 am
Election Code: GN20-01

CAMERON COUNTY
Absentee Labels Printed/Countable Summary Report
-- GENERAL ELECTION --

| Countable | Return Status | Total |
|---|---|---|
| **NO** | AC - Address correction after print | 29 |
| | B2 - Second Ballot Mailed | 6 |
| | BR - Ballots received | 9,905 |
| | CL - Ballot canceled by voter | 1,175 |
| | NT - DO NOT USE-NT-Ballot received | 41 |
| | OE - VOTER POSTED IN ERROR | 2 |
| | R1 - DO NOT USE-R1-Incorr./Miss. SS | 1 |
| | R2 - DO NOT USE-R2-BBR Signature Do | 5 |
| | R3 - DO NOT USE-R3-BBR NO Statement | 27 |
| | RJ - DO NOT USE-RJ-Ballot Rejected | 2 |
| | UN - Returned by Post Office | 80 |
| | X - VOIDED REQUEST | 2 |
| | **NO Total:** | **11,275** |

| NOT RETURNED | (** Not Returned **) | 1,217 |
|---|---|---|
| | **NOT RETURNED Total:** | **1,217** |

**Total Labels Printed:    12,492**

Date: 05/09/22
Time: 08:15 am
Election Code: P20-01

CAMERON COUNTY
Absentee Labels Printed/Countable Summary Report
-- DEMOCRATIC PRIMARY --

a_labtot v.140420
Page: 1

| Countable | Return Status | Total |
|---|---|---|
| NO | AC - Address correction after print | 1 |
| | B2 - Second Ballot Mailed | 24 |
| | BR - Ballots received | 1,710 |
| | CL - Ballot canceled by voter | 72 |
| | NT - DO NOT USE-NT-Ballot received | 36 |
| | R1 - DO NOT USE-R1-Incorr./Miss. SS | 9 |
| | R2 - DO NOT USE-R2-BBR Signature Do | 1 |
| | R3 - DO NOT USE-R3-BBR NO Statement | 4 |
| | RJ - DO NOT USE-RJ-Ballot Rejected | 1 |
| | UN - Returned by Post Office | 7 |
| | **NO Total:** | **1,865** |

| NOT RETURNED | (** Not Returned **) | 572 |
|---|---|---|
| | **NOT RETURNED Total:** | **572** |

**Total Labels Printed:** 2,437

Date: 05/09/22
Time: 08:15 am
Election Code: P20-02

a_labtot v.140420
Page: 1

CAMERON COUNTY
Absentee Labels Printed/Countable Summary Report
-- REPUBLICAN PRIMARY --

| Countable | Return Status | Total |
|---|---|---|
| NO | B2 - Second Ballot Mailed | 12 |
| | BR - Ballots received | 316 |
| | CL - Ballot canceled by voter | 2 |
| | NT - DO NOT USE-NT-Ballot received | 4 |
| | R3 - DO NOT USE-R3-BBR NO Statement | 2 |
| | RJ - DO NOT USE-RJ-Ballot Rejected | 1 |
| | X - VOIDED REQUEST | 1 |
| | NO Total: | 338 |
| NOT RETURNED | (** Not Returned **) | 43 |
| | NOT RETURNED Total: | 43 |

Total Labels Printed: 381

a_labtot v.140420
Page: 1

Date: 05/09/22
Time: 08:16 am
Election Code: GN18-01

CAMERON COUNTY
Absentee Labels Printed/Countable Summary Report
-- GENERAL ELECTION --

| Countable | Return Status | Total |
|---|---|---|
| NO | AC - Address correction after print | 13 |
| | B2 - Second Ballot Mailed | 6 |
| | BR - Ballots received | 3,913 |
| | CL - Ballot canceled by voter | 202 |
| | NT - DO NOT USE-NT-Ballot received | 24 |
| | R1 - DO NOT USE-R1-Incorr./Miss. SS | 7 |
| | R2 - DO NOT USE-R2-BBR Signature Do | 12 |
| | R3 - DO NOT USE-R3-BBR NO Statement | 25 |
| | RJ - DO NOT USE-RJ-Ballot Rejected | 2 |
| | UN - Returned by Post Office | 22 |
| | X - VOIDED REQUEST | 3 |
| | NO Total: | 4,229 |

| NOT RETURNED | (** Not Returned **) | |
|---|---|---|
| | | 650 |
| | NOT RETURNED Total: | 650 |

Total Labels Printed: 4,879

a_labtot v.140420
Page:    1

Date: 05/09/22
Time: 08:17 am
Election Code: P18-01

CAMERON COUNTY
Absentee Labels Printed/Countable Summary Report
-- Democratic Primary --

| Countable | Return Status | Total |
|---|---|---|
| **NO** | B2 - Second Ballot Mailed | 5 |
| | BR - Ballots received | 911 |
| | CL - Ballot canceled by voter | 25 |
| | NT - DO NOT USE-NT-Ballot received | 10 |
| | R1 - DO NOT USE-R1-Incorr./Miss. SS | 5 |
| | R3 - DO NOT USE-R3-BBR NO Statement | 11 |
| | X - VOIDED REQUEST | 5 |
| | **NO Total:** | **972** |
| **NOT RETURNED** | (** Not Returned **) | 340 |
| | **NOT RETURNED Total:** | **340** |

**Total Labels Printed:**    **1,312**

Date: 05/09/22
Time: 08:17 am
Election Code: P18-02

CAMERON COUNTY
Absentee Labels Printed/Countable Summary Report
-- Republican Primary --

a_labtot v.140420
Page: 1

| Countable | Return Status | Total |
|---|---|---|
| NO | BR - Ballots received | 423 |
| | CL - Ballot canceled by voter | 7 |
| | NT - DO NOT USE-NT-Ballot received | 9 |
| | R1 - DO NOT USE-R1-Incorr./Miss. SS | 1 |
| | X - VOIDED REQUEST | 1 |
| | **NO Total:** | **441** |
| **NOT RETURNED** | (** Not Returned **) | 79 |
| | **NOT RETURNED Total:** | **79** |

**Total Labels Printed:**       520



**Election Outlook:** More about Identification Requirements for Voting **|** Election Day is Sa
polls open from 7am-7pm. **|** What's on the Ballot? **|** Am I Registered to Vote? **|** Find My
Results **|** Voter Information **|** Voting Issues for Texas Evacuees Due to Natural Disasters
Security Update



Home | About the Office | Press Releases | Site Index | Help | Contact  Search  [ Go ]

# Texas Secretary of State
## John B. Scott

Elections     Business Services     Notary, Apostilles & Authentications     Rules & Open Meetings

International Relations     Forms & Other Services



Current Election Information

Voter Registration Resources

Conducting Elections

Candidate Information

Officials and Officeholders

Election Results

Training and Educational
Resources

Help America Vote Act
(HAVA) Funding

Election Funds Management

Forms, Resources and
Legal Library

Voting Systems

Frequently Asked Questions
(FAQs)

Contact Us

# Harris County Voter Registration Figures

| YEAR | Reg Voters | Voted | Voted % | Early Vote | EV % |
|------|-----------|-------|---------|-----------|------|
| 1988 | 1,260,884 | 814,160 | 64.57% | 112,975 | 13.88% |
| 1990 | 1,175,883 | 553,841 | 47.10% | 50,649 | 9.15% |
| 1992 | 1,315,010 | 942,636 | 71.68% | 173,055 | 18.36% |
| 1994 | 1,308,883 | 641,897 | 49.04% | 100,641 | 15.68% |
| 1996 | 1,592,569 | 855,893 | 53.74% | 165,241 | 19.31% |
| 1998 | 1,755,809 | 536,443 | 30.55% | 104,776 | 19.53% |
| 2000 | 1,886,581 | 974,822 | 51.67% | 247,108 | 25.35% |
| 2002 | 1,902,561 | 648,077 | 34.06% | 167,628 | 25.87% |
| 2004 | 1,937,072 | 1,067,968 | 55.13% | 440,721 | 41.27% |
| 2006 | 1,918,652 | 589,348 | 30.72% | 167,980 | 28.50% |
| 2008 | 1,959,284 | 1,171,472 | 59.79% | 726,355 | 37.07% |
| 2010 | 1,937,850 | 788,234 | 40.68% | 440,197 | 22.72% |
| 2012 | 2,000,011 | 1,185,722 | 59.29% | 757,640 | 37.88% |
| 2014 | 2,062,792 | 678,805 | 32.91% | 360,062 | 17.46% |
| 2016 | 2,234,671 | 1,304,480 | 58.37% | 953,593 | 42.67% |

| | | | | | |
|---|---|---|---|---|---|
| **2018** | 2,357,199 | 1,219,209 | 52% | 766,674 | 33% |
| **2020** | 2,480,522 | 1,633,557 | 65.86% | 1,434,022 | 87.79% |

- SOSDirect -Business Filings
- Business Copies and Certificates
- Uniform Commercial Code
- Texas Businesses Against Trafficking
- Texas.gov

- VoteTexas.gov - Voter Information
- Register to Vote **&** Voter I.D.
- Website Policies
- Open Records
- Contacts

- Texas State Library & Archives
- Texas Homeland Security
- Where the Money Goes
- Fraud Reporting
- Texas Veterans Portal





STATE'S
EXHIBIT
11

Chapter 1

S.B. No. 1

1                            AN ACT

2    relating to election integrity and security, including by

3    preventing fraud in the conduct of elections in this state;

4    increasing criminal penalties; creating criminal offenses.

5         BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

6              ARTICLE 1.  GENERAL PROVISIONS

7         SECTION 1.01.  SHORT TITLE.  This Act may be cited as the

8    Election Integrity Protection Act of 2021.

9         SECTION 1.02.  PURPOSE.  The purpose of this Act is to

10   exercise the legislature's constitutional authority under Section

11   4, Article VI, Texas Constitution, to make all laws necessary to

12   detect and punish fraud.

13        SECTION 1.03.  FINDINGS. The legislature finds that:

14              (1)  full,  free,  and  fair  elections  are  the

15   underpinnings of a stable constitutional democracy;

16              (2)  fraud in elections threatens the stability of a

17   constitutional democracy by undermining public confidence in the

18   legitimacy of public officers chosen by election;

19              (3)  reforms are needed to the election laws of this

20   state to ensure that fraud does not undermine the public confidence

21   in the electoral process;

22              (4)  the reforms to the election laws of this state made

23   by this Act are not intended to impair the right of free suffrage

24   guaranteed to the people of Texas by the United States and Texas

S.B. No. 1

1 Constitutions, but are enacted solely to prevent fraud in the

2 electoral process and ensure that all legally cast ballots are

3 counted.  Integral to the right to vote is the assurance of voter

4 access and the right for all votes legally cast to be counted;

5        (5) additionally, preventing a valid vote from being

6 counted violates the basic constitutional rights guaranteed to each

7 citizen by the United States Constitution; and

8        (6) providing for voter access and increasing the

9 stability of a constitutional democracy ensures public confidence

10 in the legitimacy of public officers chosen by election.

11     SECTION 1.04.  Chapter 1, Election Code, is amended by

12 adding Section 1.0015 to read as follows:

13     Sec. 1.0015. LEGISLATIVE INTENT.  It is the intent of the

14 legislature that the application of this code and the conduct of

15 elections be uniform and consistent throughout this state to reduce

16 the likelihood of fraud in the conduct of elections, protect the

17 secrecy of the ballot, promote voter access, and ensure that all

18 legally cast ballots are counted.

19     SECTION 1.05.  Section 1.003, Election Code, is amended by

20 adding Subsection (a-1) to read as follows:

21     (a-1)  Election officials and other public officials shall

22 strictly construe the provisions of this code to effect the intent

23 of the legislature under Section 1.0015.

24     SECTION 1.06.  Section 1.005, Election Code, is amended by

25 amending Subdivision (4-a) and adding Subdivision (4-b) to read as

26 follows:

27        (4-a)  "Election official" means:

2

S.B. No. 1

1                       (A)  a county clerk;

2                       (B)  a permanent or temporary deputy county clerk;

3                       (C)  an elections administrator;

4                       (D)  a permanent or temporary employee of an
5    elections administrator;

6                       (E)  an election judge;

7                       (F)  an alternate election judge;

8                       (G)  an early voting clerk;

9                       (H)  a deputy early voting clerk;

10                      (I)  an election clerk;

11                      (J)  the presiding judge of an early voting ballot
12   board;

13                      (K)  the alternate presiding judge of an early
14   voting ballot board;

15                      (L)  a member of an early voting ballot board;

16                      (M)  the chair of a signature verification
17   committee;

18                      (N)  the vice chair of a signature verification
19   committee;

20                      (O)  a member of a signature verification
21   committee;

22                      (P)  the presiding judge of a central counting
23   station;

24                      (Q)  the alternate presiding judge of a central
25   counting station;

26                      (R)  a central counting station manager;

27                      (S)  a central counting station clerk;

1               (T)  a tabulation supervisor;

2               (U)  an assistant to a tabulation supervisor; and

3               (V)  a chair of a county political party holding a

4    primary election or a runoff primary election.

5          (4-b)  "Federal judge" means:

6               (A)  a judge, former judge, or retired judge of a

7    United States court of appeals;

8               (B)  a judge, former judge, or retired judge of a

9    United States district court;

10              (C)  a judge, former judge, or retired judge of a

11   United States bankruptcy court; or

12              (D)  a magistrate judge, former magistrate judge,

13   or retired magistrate judge of a United States district court.

14         SECTION 1.07.  Section 1.018, Election Code, is amended to

15   read as follows:

16         Sec. 1.018.  APPLICABILITY OF PENAL CODE.  In addition to

17   Section 1.03, Penal Code, and to other titles of the Penal Code that

18   may apply to this code, Titles 2 and [Title] 4, Penal Code, apply

19   [applies] to offenses prescribed by this code.

20         SECTION 1.08.  Chapter 1, Election Code, is amended by

21   adding Section 1.022 to read as follows:

22         Sec. 1.022.  REASONABLE ACCOMMODATION OR MODIFICATION.  A

23   provision of this code may not be interpreted to prohibit or limit

24   the right of a qualified individual with a disability from

25   requesting a reasonable accommodation or modification to any

26   election standard, practice, or procedure mandated by law or rule

27   that the individual is entitled to request under federal or state

S.B. No. 1

1  law.

2              ARTICLE 2.  REGISTRATION OF VOTERS

3       SECTION 2.01.  Section 13.002, Election Code, is amended by

4  adding Subsection (c-1) to read as follows:

5       (c-1)  The information required under Subsections (c)(3),

6  (4), (5), (6), and (8) must be supplied by the person desiring to

7  register to vote.

8       SECTION 2.02.  Section 13.007, Election Code, is amended to

9  read as follows:

10      Sec. 13.007.  FALSE STATEMENT ON APPLICATION.  (a)  A person

11  commits an offense if the person knowingly or intentionally:

12              (1)  makes a false statement; or

13              (2)  requests, commands, coerces, or attempts to induce

14  another  person  to  make  a  false  statement  on  a  registration

15  application.

16      (b)  An  offense  under  this  section  is  a  Class  A  [B]

17  misdemeanor, except that an offense under this section is a state

18  jail felony if the person:

19              (1)  directly  or  through  a  third  party  offers  or

20  provides  compensation  or  other  benefit  to  a  person  for  activity

21  described by Subsection (a); or

22              (2)  solicits,  receives,  or  accepts  compensation  or

23  other benefit for an activity described by Subsection (a).

24      (c)  If  conduct  that  constitutes  an  offense  under  this

25  section also constitutes an offense under another law, the actor

26  may be prosecuted under this section, the other law, or both. [For

27  purposes of this code, an offense under this section is considered

5

S.B. No. 1

1  to be perjury, but may be prosecuted only under this section.]

2      SECTION 2.03.  Section 15.021, Election Code, is amended by

3  amending Subsections (b) and (d) and adding Subsections (d-1) and

4  (d-2) to read as follows:

5      (b)  Except as provided by Subsection (d), the [The] voter

6  shall  use  the  registration  certificate  or  a  registration

7  application form as the notice, indicating the correct information

8  in the appropriate space on the certificate or application form

9  unless the voter does not have possession of the certificate or an

10 application form at the time of giving the notice.

11     (d)  A voter [who continues to reside in the county in which

12 the voter is registered] may correct information under this section

13 by digital transmission of the information under a program

14 administered by the secretary of state and the Department of

15 Information Resources.

16     (d-1)  If the notice indicates that a voter no longer resides

17 in the county in which the voter is registered, the registrar shall

18 forward the notice and the voter's application for registration to

19 the registrar of the county in which the voter resides.  The

20 registrars shall coordinate to ensure that the voter's existing

21 registration is canceled immediately after the voter is registered

22 in the county in which the voter resides in accordance with

23 Subsection (d-2).

24     (d-2)  A registrar who receives a voter's notice and

25 application from another registrar under Subsection (d-1) shall

26 treat it as an original application for registration under Section

27 13.002, and shall register the voter if the voter resides in the

1  county and is otherwise eligible under Section 13.001.

2  SECTION 2.04.  Section 15.028, Election Code, is amended to
3  read as follows:

4  Sec. 15.028.  NOTICE OF UNLAWFUL VOTING OR REGISTRATION [TO
5  PROSECUTOR].  [(a)]  If the registrar determines that a person who
6  is not eligible to vote registered to vote or [a registered voter]
7  voted in an election, the registrar shall, within 72 hours not
8  including weekends after making the determination, execute and
9  deliver to the attorney general, the secretary of state, and the
10  county or district attorney having jurisdiction in the territory
11  covered by the election an affidavit stating the relevant facts.

12  [(b)  If the election covers territory in more than one
13  county, the registrar shall also deliver an affidavit to the
14  attorney general.]

15  SECTION 2.05.  Section 16.0332, Election Code, is amended
16  by amending Subsection (a) and adding Subsections (a-1), (d), and
17  (e) to read as follows:

18  (a)  After the registrar receives notification [a list]
19  under Subsection (a-1) of this section, Section 18.068 of this
20  code, or Section 62.113, Government Code, of persons excused or
21  disqualified from jury service because of citizenship status or
22  notification of persons who indicate a lack of citizenship status
23  in connection with a motor vehicle or Department of Public Safety
24  record as provided by Subsection (a-1), the registrar shall deliver
25  to each registered voter whose name appears on the list a written
26  notice requiring the voter to submit to the registrar proof of
27  United States citizenship in the form of a certified copy of the

1 voter's birth certificate, United States passport, or certificate

2 of naturalization or any other form prescribed by the secretary of

3 state.   The notice shall be delivered by forwardable mail to the

4 mailing address on the voter's registration application and to any

5 new address of the voter known to the registrar.

6     (a-1)   The secretary of state shall enter into an agreement

7 with the Department of Public Safety under which information in the

8 existing   statewide   computerized   voter   registration   list   is

9 compared against information in the database of the Department of

10 Public   Safety   on   a   monthly   basis   to   verify   the   accuracy   of

11 citizenship   status   information   previously   provided   on   voter

12 registration applications.   In comparing information under this

13 subsection, the secretary of state shall consider only a voter's

14 information in the database of the Department of Public Safety that

15 was derived from documents presented by the voter to the department

16 after the person's current voter registration became effective, and

17 may not consider information derived from documents presented by

18 the voter to the department before the person's current voter

19 registration became effective.

20     (d)   The secretary of state shall prescribe rules for the

21 administration of this section.

22     (e)   Not later than December 31 of each year, the secretary

23 of state shall provide a report to the legislature of the number of

24 voter registrations canceled under this section during the calendar

25 year.

26     SECTION 2.06.   Section 18.065, Election Code, is amended by

27 adding Subsections (e), (f), (g), (h), and (i) to read as follows:

1    (e)  If  the  secretary  of  state  determines  that  a  voter

2  registrar  is  not  in  substantial  compliance  with  a  requirement

3  imposed  on  the  registrar  by  a  provision  or  rule  described  in

4  Subsection (a), the secretary of state shall:

5         (1)  for the first violation, require the registrar to

6  attend a training course under Subsection (h);

7         (2)  for  the  second  violation,  audit  the  voter

8  registration list for the county in which the registrar serves to

9  determine  the  actions  needed  to  achieve  substantial  compliance

10  under Subsection (a) and provide the results of the audit to the

11  registrar; or

12         (3)  for  a  third  or  subsequent  violation,  if  the

13  secretary of state determines that the registrar has not performed

14  any  overt  actions  in  pursuance  of  compliance  with  the  actions

15  identified under Subdivision (2) as necessary for the registrar to

16  achieve substantial compliance under Subsection (a) within 14 days

17  of  receiving  the  results  of  the  audit  conducted  under  that

18  subsection, inform the attorney general that the county which the

19  registrar serves may be subject to a civil penalty under Subsection

20  (f).

21     (f)  A county is liable to this state for a civil penalty of

22  $1,000 for each day after the 14th day following the receipt of the

23  results of the audit conducted under Subsection (e)(2) that the

24  county's voter registrar fails to take overt action to comply with

25  the actions identified under that subsection as necessary for the

26  registrar to achieve substantial compliance under Subsection (a).

27  The attorney general may bring an action to recover a civil penalty

1  imposed under this section.

2      (g)  A civil penalty collected by the attorney general under
3  this section shall be deposited in the state treasury to the credit
4  of the general revenue fund.

5      (h)  The secretary of state shall develop and implement a
6  training course for registrars on substantial compliance with
7  Sections 15.083, 16.032, and 18.061 and with rules implementing the
8  statewide computerized voter registration list.

9      (i)  The secretary of state shall adopt rules and prescribe
10  procedures for the implementation of this section.

11      SECTION 2.07.  Section 18.068, Election Code, is amended by
12  amending Subsection (a) and adding Subsection (a-1) to read as
13  follows:

14      (a)  The secretary of state shall quarterly compare the
15  information received under Section 16.001 of this code and Sections
16  [Section] 62.113 and 62.114, Government Code, to the statewide
17  computerized voter registration list.  If the secretary determines
18  that a voter on the registration list is deceased or has been
19  excused or disqualified from jury service because the voter is not a
20  citizen or a resident of the county in which the voter is registered
21  to vote, the secretary shall send notice of the determination
22  to the voter registrar of the counties considered appropriate by
23  the secretary.

24      (a-1)  The secretary of state is not required to send notice
25  under Subsection (a) for a voter who is subject to an exemption from
26  jury service under Section 62.106, Government Code, if that
27  exemption is the only reason the voter is excused from jury service.

1      SECTION 2.08.  Section 31.006, Election Code, is amended to
2  read as follows:
3      Sec. 31.006.  REFERRAL [OF COMPLAINT] TO ATTORNEY GENERAL.
4  (a)  If, after receiving or discovering information indicating that
5  [a complaint alleging] criminal conduct in connection with an
6  election has occurred, the secretary of state determines that there
7  is reasonable cause to suspect that [the alleged] criminal conduct
8  occurred, the secretary shall promptly refer the information
9  [complaint] to the attorney general.  The secretary shall deliver
10  to the attorney general all pertinent documents and information in
11  the secretary's possession.
12      (b)  The  documents  and  information  submitted  under
13  Subsection (a) are not considered public information until:
14          (1)  the secretary of state makes a determination that
15  the  information  [complaint]  received  does  not  warrant  an
16  investigation; or
17          (2)  if referred to the attorney general, the attorney
18  general has completed the investigation or has made a determination
19  that the information [complaint] referred does not warrant an
20  investigation.
21      SECTION 2.09.  Subchapter B, Chapter 87, Election Code, is
22  amended by adding Section 87.028 to read as follows:
23      Sec. 87.028.  ACCESS TO INFORMATION.  (a)  On request, a
24  county election official shall provide to a member of an early
25  voting  ballot  board  all  available  information  necessary  to
26  fulfilling the functions of the board, including any information
27  from the statewide computerized voter registration list under

1  Section 18.061.

2       (b)  On request, a county election official shall provide to

3  a member of a signature verification committee all available

4  information necessary to fulfilling the functions of the committee,

5  including any information from the statewide computerized voter

6  registration list under Section 18.061.

7       (c)  The secretary of state shall adopt rules as necessary to

8  prevent a member of an early voting ballot board or signature

9  verification committee from retaining or sharing personally

10  identifiable information from the statewide computerized voter

11  registration list under Section 18.061 obtained under this section

12  for any reason unrelated to the official's official duties.

13       SECTION 2.10.  Section 62.113(b), Government Code, is

14  amended to read as follows:

15       (b)  On the third business day of each month, the clerk shall

16  send a copy of the list of persons excused or disqualified because

17  of citizenship in the previous month to:

18            (1)  the voter registrar of the county;

19            (2)  the secretary of state; and

20            (3)  the county or district attorney[, as applicable,]

21  for an investigation of whether the person committed an offense

22  under Section 13.007, Election Code, or other law.

23       SECTION 2.11.  Sections 62.114(b) and (c), Government Code,

24  are amended to read as follows:

25       (b)  On the third business day of each month, the clerk shall

26  send [to the voter registrar of the county] a copy of the list of

27  persons excused or disqualified in the previous month because the

1  persons do not reside in the county <u>to:</u>

2           <u>(1)   the voter registrar of the county; and</u>

3           <u>(2)   the secretary of state.</u>

4      (c)   A list compiled under this section may not be used for a

5  purpose other than a purpose described by Subsection (b) or Section

6  15.081 <u>or 18.068</u>, Election Code.

7           ARTICLE 3. CONDUCT AND SECURITY OF ELECTIONS

8      SECTION 3.01.   Section 2.053(a), Election Code, is amended

9  to read as follows:

10     (a)   On receipt of the certification, the governing body of

11 the political subdivision by order or ordinance <u>shall</u> [may] declare

12 each unopposed candidate elected to the office.  If no election is

13 to be held on election day by the political subdivision, a copy of

14 the order or ordinance shall be posted on election day at each

15 polling place used or that would have been used in the election.

16     SECTION 3.02.   Section 2.056(c), Election Code, is amended

17 to read as follows:

18     (c)   A certifying authority <u>shall</u> [may] declare a candidate

19 elected to an office of the state or county government if, were the

20 election held, only the votes cast for that candidate in the

21 election for that office may be counted.

22     SECTION 3.03.   Sections 43.007(c) and (d), Election Code,

23 are amended to read as follows:

24     (c)   In conducting the program, the secretary of state shall

25 provide for an audit of the <u>voting system equipment</u> [direct

26 recording electronic voting units] before and after the election,

27 and during the election to the extent such an audit is practicable.

1       (d)  The secretary of state shall select to participate in

2   the program each county that:

3           (1)  has held a public hearing under Subsection (b);

4           (2)  has submitted documentation listing the steps

5   taken to solicit input on participating in the program by

6   organizations or persons who represent the interests of voters;

7           (3)  has implemented a computerized voter registration

8   list that allows an election officer at the polling place to verify

9   that a voter has not previously voted in the election;

10          (4)  uses direct recording electronic voting machines,

11  ballot marking devices, or hand-marked scannable paper ballots that

12  are printed and scanned at the polling place or any other type of

13  voting system equipment that the secretary of state determines is

14  capable of processing votes for each type of ballot to be voted in

15  the county; and

16          (5)  is determined by the secretary of state to have the

17  appropriate technological capabilities.

18      SECTION 3.04.  Section 43.031(b), Election Code, is amended

19  to read as follows:

20      (b)  Each polling place shall be located inside a building.

21  No voter may cast a vote from inside a motor vehicle unless the

22  voter meets the requirements of Section 64.009.

23      SECTION 3.05.  Section 52.092(a), Election Code, is amended

24  to read as follows:

25      (a)  Except as provided by Section 2.053(c) or 2.056(e), for

26  [For] an election at which offices regularly filled at the general

27  election for state and county officers are to appear on the ballot,

1  the offices shall be listed in the following order:

2          (1)   offices of the federal government;

3          (2)   offices of the state government:

4                (A)   statewide offices;

5                (B)   district offices;

6          (3)   offices of the county government:

7                (A)   county offices;

8                (B)   precinct offices.

9          SECTION 3.06.  Section 61.002, Election Code, is amended to

10 read as follows:

11         Sec. 61.002.  OPENING AND CLOSING POLLING PLACE FOR VOTING.

12 (a)  Immediately before opening the polls for voting on the first

13 day of early voting and on election day, the presiding election

14 judge or alternate election judge shall confirm that each voting

15 machine has any public counter reset to zero and shall print the

16 tape that shows the counter was set to zero for each candidate or

17 measure on the ballot.

18         (b)  At the official time for opening the polls for voting,

19 an election officer shall open the polling place entrance and admit

20 the voters.

21         (c)  Immediately after closing the polls for voting on

22 election day, the presiding election judge or alternate election

23 judge shall print the tape to show the number of votes cast for each

24 candidate or ballot measure for each voting machine.

25         (d)  Each election judge or alternate election judge present

26 shall sign a tape printed under this section.

27         SECTION 3.07.  Section 64.007(c), Election Code, is amended

1  to read as follows:

2       (c)  An election officer shall maintain a register of spoiled

3  ballots at the polling place.  An election officer shall enter on

4  the register the name of each voter who returns a spoiled ballot and

5  the spoiled ballot's number.  The secretary of state shall create

6  and promulgate a form to be used for this purpose.

7       SECTION 3.08.  Subchapter A, Chapter 66, Election Code, is

8  amended by adding Section 66.004 to read as follows:

9       Sec. 66.004.  POLLING PLACE CHECKLISTS.  The secretary of

10  state  shall  adopt  rules  and  create  a  checklist  or  similar

11  guidelines to assist the presiding judge of a polling place in

12  processing forms and conducting procedures required by this code at

13  the opening and closing of the polling place.

14       SECTION 3.09.  Section 85.005, Election Code, is amended to

15  read as follows:

16       Sec. 85.005.  REGULAR DAYS AND HOURS FOR VOTING.  (a)  Except

17  as provided by Subsection (c), in an election in which a county

18  clerk [or city secretary] is the early voting clerk under Section

19  83.002 [or 83.005], early voting by personal appearance at the main

20  early voting polling place shall be conducted on each weekday of

21  [the weekdays of] the early voting period that is not a legal state

22  holiday and for a period of at least nine hours, except that voting

23  may not be conducted earlier than 6 a.m. or later than 10 p.m.

24  [during the hours that the county clerk's or city secretary's main

25  business office is regularly open for business.]

26       (b)  In an election to which Subsection (a) does not apply,

27  early voting by personal appearance at the main early voting

1  polling place shall be conducted at least <u>nine</u> [<del>eight</del>] hours each
2  weekday of the early voting period that is not a legal state holiday
3  unless the territory covered by the election has fewer than 1,000
4  registered voters.  In that case, the voting shall be conducted at
5  least <u>four</u> [<del>three</del>] hours each day.  The authority ordering the
6  election, or the county clerk if that person is the early voting
7  clerk, shall determine which hours the voting is to be conducted.

8       (c)  In a county with a population of <u>55,000</u> [<del>100,000</del>] or
9  more, the voting in a primary election or the general election for
10  state and county officers shall be conducted at the main early
11  voting polling place for at least 12 hours on each weekday of the
12  last week of the early voting period, and the voting in a special
13  election ordered by the governor shall be conducted at the main
14  early voting polling place for at least 12 hours on each of the last
15  two days of the early voting period.  <u>Voting under this subsection</u>
16  <u>may not be conducted earlier than 6 a.m. or later than 10 p.m.</u>
17  Voting shall be conducted in accordance with this subsection in
18  those elections in a county with a population under <u>55,000</u>
19  [<del>100,000</del>] on receipt by the early voting clerk of a written request
20  for the extended hours submitted by at least 15 registered voters of
21  the county.  The request must be submitted in time to enable
22  compliance with Section 85.067.

23       (d)  <u>A voter who has not voted before the scheduled time for</u>
24  <u>closing a polling place is entitled to vote after that time if the</u>
25  <u>voter is in line at the polling place by closing time.  The</u>
26  <u>secretary of state shall promulgate any materials and provide any</u>
27  <u>training to presiding judges necessary to properly process voters</u>

1   under this subsection [~~In an election ordered by a city, early~~
2   ~~voting by personal appearance at the main early voting polling~~
3   ~~place shall be conducted for at least 12 hours:~~
4          [~~(1) on one weekday, if the early voting period~~
5   ~~consists of less than six weekdays; or~~
6          [~~(2) on two weekdays, if the early voting period~~
7   ~~consists of six or more weekdays~~].
8          SECTION 3.10.  Sections 85.006(b) and (e), Election Code,
9   are amended to read as follows:
10     . (b)  In an election in which a county clerk [~~or city~~
11  ~~secretary~~] is the early voting clerk under Section 83.002 [~~or~~
12  ~~83.005~~], only the early voting clerk may order voting on a Saturday
13  or Sunday.  The clerk must do so by written order.
14         (e)  In a primary election or the general election for state
15  and county officers in a county with a population of 55,000
16  [~~100,000~~] or more, the early voting clerk shall order voting by
17  personal appearance [~~voting~~] at the main early voting polling place
18  to be conducted on the last Saturday of the early voting period for
19  at least 12 hours, except that voting may not be conducted earlier
20  than 6 a.m. or later than 10 p.m., [~~on the last Saturday~~] and on the
21  last Sunday of the early voting period for at least six [~~five~~]
22  hours, except that voting may not be conducted earlier than 9 a.m.
23  or later than 10 p.m [~~on the last Sunday of the early voting~~
24  ~~period~~].  The early voting clerk shall order voting to be conducted
25  at those times in those elections in a county with a population
26  under 55,000 [~~100,000~~] on receipt of a written request for those
27  hours submitted by at least 15 registered voters of the county.  The

S.B. No. 1

1  request must be submitted in time to enable compliance with Section
2  85.007.    This  subsection  supersedes  any  provision  of  this
3  subchapter to the extent of any conflict.

4        SECTION 3.11.  Section  85.010(a-1),  Election  Code,  is
5  amended to read as follows:

6        (a-1)  In this section, "eligible county polling place"
7  means an early voting polling place[, other than a polling place
8  established under Section 85.062(e),] established by a county.

9        SECTION 3.12.  Section 85.061(a), Election Code, is amended
10  to read as follows:

11        (a)  In a countywide election in which the county clerk is
12  the  early  voting  clerk  under  Section  83.002,  an  early  voting
13  polling place shall be located inside [at] each branch office that
14  is regularly maintained for conducting general clerical functions
15  of the county clerk, except as provided by Subsection (b).  If a
16  suitable room is unavailable inside the branch office, the polling
17  place may be located in another room inside the same building as the
18  branch office.

19        SECTION 3.13.  Section 85.062, Election Code, is amended by
20  amending Subsection (b) and adding Subsection (f-1) to read as
21  follows:

22        (b)  A polling place established under this section may be
23  located, subject to Subsection (d), at any place in the territory
24  served by the early voting clerk and may be located inside [in] any
25  building [stationary structure]  as  directed  by  the  authority
26  establishing the branch office.  The polling place may not be
27  located in a movable structure in the general election for state and

19

S.B. No. 1

1   county officers, general primary election, or runoff primary
2   election.  Ropes or other suitable objects may be used at the
3   polling place to ensure compliance with Section 62.004.  Persons
4   who are not expressly permitted by law to be in a polling place
5   shall be excluded from the polling place to the extent practicable.

6       (f-1)  Notwithstanding any other provision of this section
7   concerning the location of temporary branch polling places, in an
8   election  in  which  countywide  polling  places  are  used,  the
9   commissioners court of a county shall employ the same methodology
10  it uses to determine the location of countywide polling places to
11  determine the location of temporary branch polling places.

12       SECTION 3.14.  Section 87.002, Election Code, is amended to
13  read as follows:

14       Sec. 87.002.  COMPOSITION OF BOARD.  (a) The early voting
15  ballot board consists of a presiding judge, an alternate presiding
16  judge, and at least one [two] other member [members].

17       (b)  Except as provided by Subsection (d), the presiding
18  judge and the alternate presiding judge are [is] appointed in the
19  same manner as a presiding election judge and alternate presiding
20  election judge, respectively.  Except as provided by Subsection
21  (c), each [the] other member is [members are] appointed by the
22  presiding judge in the same manner as the precinct election clerks.

23       (c)  In the general election for state and county officers,
24  each county chair of a political party with nominees on the general
25  election ballot shall submit to the county election board a list of
26  names of persons eligible to serve on the early voting ballot board
27  in order of the county chair's preference.  The county election

S.B. No. 1

1  board shall appoint at least one person from each list to serve as a

2  member of the early voting ballot board. The same number of members

3  must be appointed from each list. The county election board shall

4  appoint persons as members of the early voting ballot board in the

5  order of preference indicated on each list.

6      (d)  In addition to the members appointed under Subsection

7  (c), the county election board shall appoint as the presiding judge

8  the highest-ranked person on [from] the list provided under that

9  subsection by the political party whose nominee for governor

10  received the most votes in the county in the most recent

11  gubernatorial general election and as the alternate presiding judge

12  the highest-ranked person on the list provided under that

13  subsection by the political party whose nominee for governor

14  received the second most votes in the county in the most recent

15  gubernatorial general election.

16      SECTION 3.15.  Section 124.002, Election Code, is amended by

17  adding Subsection (c) to read as follows:

18      (c)  Voting system ballots may not be arranged in a manner

19  that allows a political party's candidates to be selected in one

20  motion or gesture.

21      SECTION 3.16.  Sections 127.006(a) and (c), Election Code,

22  are amended to read as follows:

23      (a)  The [Both the] manager, [and] the presiding judge, and

24  the alternate presiding judge may appoint clerks to serve at the

25  central counting station.

26      (c)  A clerk appointed by the manager serves under the

27  manager and shall perform the functions directed by the manager. A

21

1  clerk appointed by the presiding judge or the alternate presiding

2  judge serves under the presiding judge and shall perform the

3  functions directed by the presiding judge.

4      SECTION 3.17.   Subchapter A, Chapter 127, Election Code, is

5  amended by adding Section 127.009 to read as follows:

6      Sec. 127.009.  ELECTRONIC   DEVICES   IN   CENTRAL   COUNTING

7  STATION. (a)  A counting station manager and the presiding judge of

8  the counting station shall develop a protocol under which any

9  electronic device inside a central counting station that is

10 necessary to count votes is equipped with software that tracks all

11 input and activity on the electronic device.

12      (b)  The counting station manager and the presiding judge of

13 the counting station shall ensure that the input and activity

14 tracked by the software is delivered to the secretary of state not

15 later than the fifth day after vote counting is complete.

16      (c)  This section applies only to a central counting station

17 located in a county with a population of 250,000 or more.

18      SECTION 3.18.   Section 127.1232, Election Code, is amended

19 to read as follows:

20      Sec. 127.1232.  SECURITY OF VOTED BALLOTS. (a)  The general

21 custodian of election records shall post a licensed peace officer

22 [guard] to ensure the security of ballot boxes containing voted

23 ballots throughout the period of tabulation at the central counting

24 station.

25      (b)  The general custodian of election records in a county

26 with a population of 100,000 or more shall implement a video

27 surveillance system that retains a record of all areas containing

22

1  voted ballots:

2          (1)  from the time the voted ballots are delivered to

3  the central counting station until the canvass of precinct election

4  returns; and

5          (2)  from the time the voted ballots are delivered to

6  the signature verification committee or early voting ballot board

7  until the canvass of precinct election returns.

8          (c)  A video from a system implemented under Subsection (b)

9  shall be made available to the public by a livestream.

10         (d)  The video recorded is an election record under Section

11  1.012 and shall be retained by the general custodian of election

12  records until the end of the calendar year in which an election is

13  held or until an election contest filed in the county has been

14  resolved, whichever is later.

15         SECTION 3.19.  Chapter 127, Election Code, as effective

16  September 1, 2021, is amended by adding Subchapter J to read as

17  follows:

18              SUBCHAPTER J.  RANDOMIZED AUDITS

19         Sec. 127.351.  RANDOMIZED COUNTY AUDITS.  (a)  Immediately

20  after the uniform election date in November of an even-numbered

21  year, the secretary of state shall conduct an audit of the elections

22  held in four counties during the previous two years.

23         (b)  The secretary of state shall select the counties to be

24  audited under Subsection (a) at random, except that:

25         (1)  two of the counties selected must have a total

26  population of less than 300,000;

27         (2)  two of the counties selected must have a total

1  population of 300,000 or more; and

2      (3)  a county selected in the most recent audit cycle

3  may not be selected in the current audit cycle.

4      (c)  A county selected to be audited may not pay the cost of

5  performing an audit under this section.

6      (d)  The secretary of state shall adopt rules as necessary to

7  implement this section.

8          ARTICLE 4. ELECTION OFFICERS AND OBSERVERS

9      SECTION 4.01.  Section 32.075, Election Code, is amended by

10 adding Subsections (g) and (h) to read as follows:

11     (g)  A presiding judge may not have a watcher duly accepted

12 for service under Subchapter A, Chapter 33, removed from the

13 polling place for violating a provision of this code or any other

14 provision of law relating to the conduct of elections, other than a

15 violation of the Penal Code, unless the violation was observed by an

16 election judge or clerk.

17     (h)  Notwithstanding Subsection (g), a presiding judge may

18 call a law enforcement officer to request that a poll watcher be

19 removed if the poll watcher commits a breach of the peace or a

20 violation of law.

21     SECTION 4.02.  Subchapter A, Chapter 33, Election Code, is

22 amended by adding Section 33.0015 to read as follows:

23     Sec. 33.0015.  CHAPTER PURPOSE AND WATCHER DUTY.  The

24 purpose of this chapter is to preserve the integrity of the ballot

25 box in accordance with Section 4, Article VI, Texas Constitution,

26 by providing for the appointment of watchers.  It is the intent of

27 the legislature that watchers duly accepted for service under this

S.B. No. 1

1  chapter be allowed to observe and report on irregularities in the

2  conduct of any election, but may not interfere in the orderly

3  conduct of an election. To effect that purpose, a watcher appointed

4  under this chapter shall observe without obstructing the conduct of

5  an election and call to the attention of an election officer any

6  observed or suspected irregularity or violation of law in the

7  conduct of the election.

8      SECTION 4.03. Subchapter A, Chapter 33, Election Code, is

9  amended by adding Section 33.0016 to read as follows:

10     Sec. 33.0016. REFERENCES TO EARLY VOTING BALLOT BOARD IN

11 THIS CHAPTER. A reference in this chapter to an early voting ballot

12 board includes a signature verification committee.

13     SECTION 4.04. Subchapter A, Chapter 33, Election Code, is

14 amended by adding Section 33.008 to read as follows:

15     Sec. 33.008. TRAINING PROGRAM. The secretary of state

16 shall develop and maintain a training program for watchers. The

17 training program must:

18         (1) be available:

19             (A) entirely via the Internet; and

20             (B) at any time, without a requirement for prior

21 registration; and

22         (2) provide a watcher who completes the training with

23 a certificate of completion.

24     SECTION 4.05. Section 33.031, Election Code, is amended by

25 adding Subsection (b) to read as follows:

26     (b) In addition to the requirements of Subsection (a), to be

27 eligible to serve as a watcher, a person must complete training

25

S.B. No. 1

1  under Section 33.008.

2      SECTION 4.06.   Section 33.051, Election Code, is amended by

3  amending Subsections (a), (b), (d), and (e) and adding Subsections

4  (a-1), (g), and (h) to read as follows:

5      (a)  A watcher appointed to serve at a precinct polling

6  place, a meeting place for an early voting ballot board, or a

7  central counting station must deliver the following materials [a

8  certificate of appointment] to the presiding judge at the time the

9  watcher reports for service:

10          (1)  a certificate of appointment; and

11          (2)  a certificate of completion from training

12  completed by the watcher under Section 33.008.

13      (a-1)  A watcher appointed to serve at an early voting

14  polling place must deliver the certificates under Subsection (a) [a

15  certificate of appointment] to the early voting clerk or deputy

16  clerk in charge of the polling place when the watcher first reports

17  for service.

18      (b)  The officer presented with a watcher's certificates

19  [certificate of appointment] shall require the watcher to

20  countersign the certificate of appointment to ensure that the

21  watcher is the same person who signed the certificate of

22  appointment. Except as provided by Subsection (c), a watcher who

23  presents himself or herself at the proper time with the

24  certificates required under Subsection (a) [a certificate of

25  appointment] shall be accepted for service unless the person is

26  ineligible to serve or the number of appointees to which the

27  appointing authority is entitled have already been accepted.

26

S.B. No. 1

1      (d)  The certificates [certificate] of a watcher serving at

2  an early voting polling place shall be retained at the polling place

3  until voting at the polling place is concluded.  At each subsequent

4  time that the watcher reports for service, the watcher shall inform

5  the clerk or deputy in charge.  The officer may require the watcher

6  to sign the watcher's name in the officer's presence, for comparison

7  with the signature on the certificate of appointment, if the

8  officer is uncertain of the watcher's identity.

9      (e)  If a watcher is not accepted for service, the

10  certificates [certificate of appointment] shall be returned to the

11  watcher with a signed statement of the reason for the rejection.

12      (g)  An election officer commits an offense if the officer

13  intentionally or knowingly refuses to accept a watcher for service

14  when acceptance of the watcher is required by this section.  An

15  offense under this subsection is a Class A misdemeanor.

16      (h)  Before accepting a watcher, the officer presented with a

17  watcher's certificate of appointment shall require the watcher to

18  take the following oath, administered by the officer: "I swear (or

19  affirm) that I will not disrupt the voting process or harass voters

20  in the discharge of my duties."

21      SECTION 4.07.  Section 33.056, Election Code, is amended by

22  amending Subsection (a) and adding Subsections (e) and (f) to read

23  as follows:

24      (a)  Except as provided by Section 33.057, a watcher is

25  entitled to observe any activity conducted at the location at which

26  the watcher is serving.  A watcher is entitled to sit or stand

27  [conveniently] near enough to see and hear the election officers

1  conducting the observed activity, except as otherwise prohibited by

2  this chapter.

3      (e)  Except as provided by Section 33.057(b), a watcher may

4  not be denied free movement where election activity is occurring

5  within the location at which the watcher is serving.

6      (f)  In this code, a watcher who is entitled to "observe" an

7  election activity is entitled to sit or stand near enough to see and

8  hear the activity.

9      SECTION 4.08.  Subchapter C, Chapter 33, Election Code, is

10  amended by adding Section 33.0605 to read as follows:

11      Sec. 33.0605.  OBSERVING DATA STORAGE SEALING AND TRANSFER.

12  (a) A watcher appointed to serve at a polling place in an election

13  who is available at the time of the action may observe all election

14  activities relating to closing the polling place, including the

15  sealing and transfer of a memory card, flash drive, hard drive, data

16  storage device, or other medium now existing or later developed

17  used by the voting system equipment.

18      (b)  Notwithstanding any other provision of this code, a

19  watcher duly accepted for service at a polling location is entitled

20  to follow the transfer of election materials from the polling place

21  at which the watcher was accepted to a regional tabulating center,

22  the central counting station, or any other location designated to

23  process  election  materials.    The  authority  responsible  for

24  administering  a  regional  tabulating  center  or  another  location

25  where election materials are processed must accept duly appointed

26  watchers for service in the same manner a watcher is accepted for

27  service under Section 33.051 and must accept the same number of

1  watchers that may serve under Section 33.007(a).

2      SECTION 4.09.  Section 33.061(a), Election Code, is amended

3  to read as follows:

4      (a)  A person commits an offense if the person serves in an

5  official capacity at a location at which the presence of watchers is

6  authorized and knowingly prevents a watcher from observing an

7  activity or procedure the person knows the watcher is entitled to

8  observe, including by taking any action to obstruct the view of a

9  watcher or distance the watcher from the activity or procedure to be

10 observed in a manner that would make observation not reasonably

11 effective.

12     SECTION 4.10.  Subchapter C, Chapter 33, Election Code, is

13 amended by adding Section 33.063 to read as follows:

14     Sec. 33.063.  RELIEF.   The appointing authority for a

15 watcher who believes that the watcher was unlawfully prevented or

16 obstructed from the performance of the watcher's duties may seek:

17         (1)  injunctive  relief  under  Section  273.081,

18 including issuance of temporary orders;

19         (2)  a writ of mandamus under Section 161.009 or

20 273.061; and

21         (3)  any other remedy available under law.

22     SECTION 4.11.  Section 34.005, Election Code, is amended to

23 read as follows:

24     Sec. 34.005.  ACTION BY SECRETARY OF STATE.  (a)  The

25 secretary of state may refer a reported violation of law for

26 appropriate action to the attorney general, if the attorney general

27 has jurisdiction, or to a prosecuting attorney having jurisdiction.

S.B. No. 1

1    (b)  If the secretary of state believes that a state

2  inspector was unlawfully prevented or obstructed from the

3  performance of the inspector's duties, the secretary of state may

4  seek:

5          (1)  injunctive relief under Section 273.081,

6  including issuance of temporary orders;

7          (2)  a writ of mandamus under Section 161.009 or

8  273.061; and

9          (3)  any other remedy available under law.

10    SECTION 4.12.  Section 86.006, Election Code, is amended by

11  amending Subsection (a) and adding Subsection (a-2) to read as

12  follows:

13    (a)  A marked ballot voted under this chapter must be

14  returned to the early voting clerk in the official carrier

15  envelope.  The carrier envelope may be delivered in another

16  envelope and must be transported and delivered only by:

17          (1)  mail;

18          (2)  common or contract carrier; or

19          (3)  subject to Subsections [Subsection] (a-1) and

20  (a-2), in-person delivery by the voter who voted the ballot.

21    (a-2)  An in-person delivery of a marked ballot voted under

22  this chapter must be received by an election official at the time of

23  delivery.  The receiving official shall record the voter's name,

24  signature, and type of identification provided under Section

25  63.0101 on a roster prescribed by the secretary of state.  The

26  receiving official shall attest on the roster that the delivery

27  complies with this section.

1    SECTION 4.13.  Chapter 121, Election Code, is amended by
2  adding Section 121.004 to read as follows:
3    Sec. 121.004.  COMMUNICATIONS WITH VOTING SYSTEMS VENDOR
4  PUBLIC INFORMATION.  (a) Except as provided by Subsection (b), a
5  written letter, e-mail, or other communication, including a
6  communication made confidential by other law, between a public
7  official and a voting systems vendor:
8        (1)  is not confidential;
9        (2)  is public information for purposes of Chapter 552,
10  Government Code; and
11        (3)  is not subject to an exception to disclosure
12  provided by Chapter 552, Government Code, other than Sections
13  552.110 and 552.1101, Government Code.
14    (b)  A written letter, e-mail, or other communication
15  between a public official and a voting systems vendor is excepted
16  from disclosure under Chapter 552, Government Code, if the
17  communication discloses information, data, or records relating to
18  the security of elections critical infrastructure.
19    SECTION 4.14.  Section 127.1301, Election Code, is amended
20  to read as follows:
21    Sec. 127.1301.  [TALLYING, TABULATING, AND REPORTING]
22  CENTRALLY COUNTED OPTICAL SCAN BALLOTS [BALLOT UNDERVOTES AND
23  OVERVOTES].  (a)  In an election using centrally counted optical
24  scan ballots, the undervotes and overvotes on those ballots shall
25  be tallied, tabulated, and reported by race and by election
26  precinct in the form and manner prescribed by the secretary of
27  state.

S.B. No. 1

1    (b)  An authority operating a central counting station under
2  this chapter may not purchase or use a centrally counted optical
3  ballot  scan  system  that  uses  a  data  storage  disc  on  which
4  information, once written, is capable of being modified.
5    (c)  An authority that purchases system components in order
6  to comply with this section is eligible to have 100 percent of the
7  cost of those system components reimbursed.
8    (d)  Subsection (b) applies starting on the earlier of:
9       (1)  the date on which the state certifies the first
10  centrally counted optical ballot scan system under this section; or
11       (2)  September 1, 2026.
12    (e)  This subsection and Subsection (d) expire October 1,
13  2026.
14    SECTION 4.15.  Section 127.131, Election Code, is amended by
15  adding Subsection (f) to read as follows:
16    (f)  The presiding judge of the central counting station
17  shall provide and attest to a written reconciliation of votes and
18  voters at the close of tabulation for election day and again after
19  the central counting station meets for the last time to process
20  late-arriving  ballots  by  mail  and  provisional  ballots.   The
21  secretary of state shall create and promulgate rules and a form to
22  facilitate compliance with this subsection.  The form shall be
23  posted on a website maintained by the county along with election
24  returns and results.
25    SECTION 4.16.  Section 129.023, Election Code, is amended by
26  adding Subsections (b-2) and (c-1) to read as follows:
27    (b-2)  If the test is being conducted for an election in

S.B. No. 1

1    which a county election board has been established under Section

2    51.002, the general custodian of election records shall notify each

3    member of the board of the test at least 48 hours before the date of

4    the test. If the county election board chooses to witness the test,

5    each member shall sign the statement required by Subsection (e)(1).

6         (c-1)  A test conducted under this section must also require

7    the general custodian of election records to demonstrate, using a

8    representative sample of voting system equipment, that the source

9    code of the equipment has not been altered.

10                        ARTICLE 5.  VOTING BY MAIL

11        SECTION 5.01.  Section 84.001(b), Election Code, is amended

12   to read as follows:

13        (b)  Subject to Section 1.011, an [An] application must be

14   submitted in writing and signed by the applicant using ink on paper.

15   An electronic signature or photocopied signature is not permitted.

16        SECTION 5.02.  Section 84.002, Election Code, as effective

17   September 1, 2021, is amended by amending Subsection (a) and adding

18   Subsection (b-1) to read as follows:

19        (a)  An early voting ballot application must include:

20             (1)  the applicant's name and the address at which the

21   applicant is registered to vote;

22             (1-a)  the following information:

23                  (A)  the  number  of  the  applicant's  driver's

24   license,  election  identification  certificate,  or  personal

25   identification card issued by the Department of Public Safety;

26                  (B)  if the applicant has not been issued a number

27   described by Paragraph (A), the last four digits of the applicant's

1 social security number; or

2           (C) a statement by the applicant that the

3 applicant has not been issued a number described by Paragraph (A) or

4 (B);

5           (2) for an application for a ballot to be voted by mail

6 on the ground of absence from the county of residence, the address

7 outside the applicant's county of residence to which the ballot is

8 to be mailed;

9           (3) for an application for a ballot to be voted by mail

10 on the ground of age or disability, the address of the hospital,

11 nursing home or other long-term care facility, or retirement

12 center, or of a person related to the applicant within the second

13 degree by affinity or the third degree by consanguinity, as

14 determined under Chapter 573, Government Code, if the applicant is

15 living at that address and that address is different from the

16 address at which the applicant is registered to vote;

17           (4) for an application for a ballot to be voted by mail

18 on the ground of confinement in jail, the address of the jail or of a

19 person related to the applicant within the degree described by

20 Subdivision (3);

21           (5) for application for a ballot to be voted by mail

22 on any ground, an indication of each election for which the

23 applicant is applying for a ballot;

24           (6) an indication of the ground of eligibility for

25 early voting; and

26           (7) for an application for a ballot to be voted by mail

27 on the ground of involuntary civil commitment, the address of the

1  facility operated by or under contract with the Texas Civil
2  Commitment Office or of a person related to the applicant within the
3  degree of consanguinity described by Subdivision (3).

4      (b-1)  A person may use the number of a driver's license,
5  election identification certificate, or personal identification
6  card that has expired for the purpose of fulfilling the requirement
7  under Subsection (a)(1-a) if the license or identification is
8  otherwise valid.

9      SECTION 5.03.  Section 84.011(a), Election Code, as
10  effective September 1, 2021, is amended to read as follows:

11      (a)  The officially prescribed application form for an early
12  voting ballot must include:

13          (1)  immediately preceding the signature space the
14  statement: "I certify that the information given in this
15  application is true, and I understand that giving false information
16  in this application is a crime.";

17          (2)  a statement informing the applicant of the
18  offenses prescribed by Sections 84.003 and 84.004;

19          (3)  spaces for entering an applicant's voter
20  registration number and county election precinct of registration,
21  with a statement informing the applicant that failure to furnish
22  that information does not invalidate the application;

23          (3-a)  a space for entering the information required
24  under Section 84.002(a)(1-a); and

25          (4)  on an application for a ballot to be voted by mail:
26              (A)  a space for an applicant applying on the
27  ground of absence from the county of residence to indicate the date

1   on or after which the applicant can receive mail at the address

2   outside the county;

3                    (B)    a  space  for  indicating  the  fact  that  an

4   applicant whose application is signed by a witness cannot make the

5   applicant's mark and a space for indicating the relationship or

6   lack of relationship of the witness to the applicant;

7                    (C)   a space for entering an applicant's telephone

8   number, with a statement informing the applicant that failure to

9   furnish that information does not invalidate the application;

10                   (D)    a space or box for an applicant applying on

11  the ground of age or disability to indicate that the address to

12  which the ballot is to be mailed is the address of a facility or

13  relative described by Section 84.002(a)(3), if applicable;

14                   (E)   a space or box for an applicant applying on

15  the ground of confinement in jail or involuntary civil commitment

16  to indicate that the address to which the ballot is to be mailed is

17  the address of a relative described by Section 84.002(a)(4) or (7),

18  if applicable;

19                   (F)    a  space  for  an  applicant  applying  on  the

20  ground of age or disability to indicate if the application is an

21  application under Section 86.0015;

22                   (G)    spaces  for  entering  the  signature,  printed

23  name, and residence address of any person assisting the applicant;

24                   (H)   a statement informing the applicant of the

25  condition prescribed by Section 81.005; and

26                   (I)   a statement informing the applicant of the

27  requirement prescribed by Section 86.003(c).

1      SECTION 5.04.  Subchapter A, Chapter 84, Election Code, is

2  amended by adding Section 84.0111 to read as follows:

3      Sec. 84.0111.  DISTRIBUTION  OF  APPLICATION  FORM.  (a)

4  Except as provided by Subsection (c) or as otherwise authorized by

5  this code, an officer or employee of this state or of a political

6  subdivision of this state may not distribute an application form

7  for an early voting ballot to a person who did not request an

8  application under Section 84.001.

9      (b)  An officer or employee of this state or of a political

10 subdivision of this state may not use public funds to facilitate the

11 distribution by another person of an application form for an early

12 voting ballot to a person who did not request an application under

13 Section 84.001.

14     (c)  A political party  or  a  candidate  for  office  may

15 distribute an application form for an early voting ballot to a

16 person who did not request an application under Section 84.001.

17     SECTION 5.05.  Section 84.032(c), Election Code, is amended

18 to read as follows:

19     (c)  An applicant may submit a request after the close of

20 early voting by personal appearance by appearing in person and:

21          (1)  returning the ballot to be voted by mail to the

22 early voting clerk; or

23          (2)  executing an affidavit that the applicant:

24               (A)  has not received the ballot to be voted by

25 mail; [or]

26               (B)  never requested a ballot to be voted by mail;

27 or

37

1          (C) received notice of a defect under Section

2  87.0271(b) or (c) or 87.0411(b) or (c).

3          SECTION 5.06.  Section 84.035, Election Code, is amended to

4  read as follows:

5          Sec. 84.035.  BALLOT SENT TO APPLICANT.  (a)  If the early

6  voting clerk cancels an application by an applicant to whom an early

7  voting ballot has been sent, the clerk shall:

8              (1)  remove the applicant's name from the early voting

9  roster; and

10             (2)  make any other entries in the records and take any

11 other action necessary to prevent the ballot from being counted if

12 returned.

13         (b)  An election judge may permit a person to whom an early

14 voting ballot has been sent who cancels the person's application

15 for a ballot to be voted by mail in accordance with Section 84.032

16 but fails to return the ballot to be voted by mail to the early

17 voting clerk, deputy early voting clerk, or presiding judge as

18 provided by that section to vote only a provisional ballot under

19 Section 63.011.

20         SECTION 5.07.  Section 86.001, Election Code, is amended by

21 adding Subsections (f), (f-1), and (f-2) to read as follows:

22         (f)  If   the   information   required   under   Section

23 84.002(a)(1-a) included on the application does not identify the

24 same voter identified on the applicant's application for voter

25 registration under Section 13.002(c)(8), the clerk shall reject the

26 application.

27         (f-1)  If an application is rejected under Subsection (f),

S.B. No. 1

1   the clerk shall provide notice of the rejection in accordance with

2   Subsection (c). The notice must include information regarding the

3   ability to correct or add information required under Section

4   84.002(a)(1-a) through the online tool described by Section

5   86.015(c).

6        (f-2)  If an applicant corrects an application for a ballot

7   to be voted by mail online and that application subsequently

8   identifies the same voter identified on the applicant's application

9   for voter registration, the clerk shall provide a ballot to the

10  applicant as provided by this chapter.

11       SECTION 5.08.  Section 86.002, Election Code, is amended by

12  adding Subsections (g), (h), and (i) to read as follows:

13       (g)  The carrier envelope must include a space that is hidden

14  from view when the envelope is sealed for the voter to enter the

15  following information:

16            (1)  the number of the voter's driver's license,

17  election identification certificate, or personal identification

18  card issued by the Department of Public Safety;

19            (2)  if the voter has not been issued a number described

20  by Subdivision (1), the last four digits of the voter's social

21  security number; or

22            (3)  a statement by the applicant that the applicant

23  has not been issued a number described by Subdivision (1) or (2).

24       (h)  A person may use the number of a driver's license,

25  election identification certificate, or personal identification

26  card that has expired for purposes of Subsection (g) if the license

27  or identification is otherwise valid.

1    (i)  No record associating an individual voter with a ballot
2    may be created.

3    SECTION 5.09.  Section 86.011(c), Election Code, is amended
4    to read as follows:

5    (c)  If the return is not timely, the clerk shall enter the
6    time of receipt on the carrier envelope and retain it in a locked
7    container for the period for preserving the precinct election
8    records.  The clerk shall destroy the unopened envelope and its
9    contents after the preservation period.

10    SECTION 5.10.  Section  86.015(c),  Election  Code,  as
11    effective September 1, 2021, is amended to read as follows:

12    (c)  An online tool used under this section must:

13        (1)  for each election, record:

14            (A)  each application for a ballot to be voted by
15    mail received by the clerk; and

16            (B)  each carrier envelope sent to a voter by the
17    clerk;

18        (2)  for  each  carrier  envelope,  record  or  assign  a
19    serially  numbered  and  sequentially  issued  barcode  or  tracking
20    number that is unique to each envelope; [and]

21        (3)  update the applicable Internet website as soon as
22    practicable after each of the following events occurs:

23            (A)  receipt  by  the  early  voting  clerk  of  the
24    person's application for a ballot to be voted by mail;

25            (B)  acceptance or rejection by the early voting
26    clerk of the person's application for a ballot to be voted by mail;

27            (C)  placement  in  the  mail  by  the  early  voting

S.B. No. 1

1   clerk of the person's official ballot;

2                   (D)   receipt by the early voting clerk of the
3   person's marked ballot; and

4                   (E)   acceptance or rejection by the early voting
5   ballot board of a person's marked ballot; and

6                   (4)   allow a voter to add or correct information
7   required under Section 84.002(a)(1-a) or Section 86.002(g).

8          SECTION 5.11.   Sections 87.027(d), (e), and (i), Election
9   Code, are amended to read as follows:

10         (d)   The early voting clerk shall determine the number of
11   members who are to compose the signature verification committee and
12   shall state that number in the order calling for the committee's
13   appointment.   A committee must consist of not fewer than five
14   members.   In an election in which party alignment is indicated on
15   the ballot, each county chair of a political party with a nominee or
16   aligned candidate on the ballot shall submit to the appointing
17   authority a list of names of persons eligible to serve on the
18   signature verification committee in order of the county chair's
19   preference.   The authority shall appoint at least two persons from
20   each list in the order of preference indicated on each list to serve
21   as members of the committee.   The same number of members must be
22   appointed from each list.   The authority shall appoint as [the]
23   chair of the committee the highest-ranked person on [from] the list
24   provided by the political party whose nominee for governor received
25   the most votes in the county in the most recent gubernatorial
26   general election.   The authority shall appoint as vice chair of the
27   committee the highest-ranked person on the list provided by the

1  political party whose nominee for governor received the second most

2  votes in the county in the most recent gubernatorial general

3  election. A vacancy on the committee shall be filled by appointment

4  from the original list or from a new list submitted by the

5  appropriate county chair.

6          (e)  To be eligible to serve on a signature verification

7  committee, a person must be eligible under Subchapter C, Chapter

8  32, for service as a presiding election judge, except that the

9  person must be a qualified voter:

10              (1)  of the county, in a countywide election ordered by

11  the governor or a county authority or in a primary election;

12              (2)  of the part of the county in which the election is

13  held, for an election ordered by the governor or a county authority

14  that does not cover the entire county of the person's residence; or

15              (3)  of the political subdivision, in an election

16  ordered by an authority of a political subdivision other than a

17  county.

18          (i)  The signature verification committee shall compare the

19  signature on each carrier envelope certificate, except those signed

20  for a voter by a witness, with the signature on the voter's ballot

21  application to determine whether the signatures are those of the

22  voter.  The committee may also compare the signatures with any

23  known signature [two or more signatures] of the voter [made within

24  the preceding six years and] on file with the county clerk or voter

25  registrar to determine whether the signatures are those of the

26  voter.  Except as provided by Subsection (l), a determination under

27  this subsection that the signatures are not those of the voter must

1  be made by a majority vote of the committee's membership.  The

2  committee shall place the jacket envelopes, carrier envelopes, and

3  applications of voters whose signatures are not those of the voter

4  in separate containers from those of voters whose signatures are

5  those of the voter.  The committee chair shall deliver the sorted

6  materials to the early voting ballot board at the time specified by

7  the board's presiding judge.

8          SECTION 5.12.  Subchapter B, Chapter 87, Election Code, is

9  amended by adding Section 87.0271 to read as follows:

10         Sec. 87.0271.  OPPORTUNITY  TO  CORRECT  DEFECT:   SIGNATURE

11  VERIFICATION COMMITTEE.   (a)   This section applies to an early

12  voting ballot voted by mail:

13             (1)  for which the voter did not sign the carrier

14  envelope certificate;

15             (2)  for which it cannot immediately be determined

16  whether the signature on the carrier envelope certificate is that

17  of the voter;

18             (3)  missing any required statement of residence;

19             (4)  missing  information  or  containing  incorrect

20  information required under Section 84.002(a)(1-a) or Section

21  86.002; or

22             (5)  containing incomplete information with respect to

23  a witness.

24         (b)  Not later than the second business day after a signature

25  verification committee discovers a defect described by Subsection

26  (a) and before the committee decides whether to accept or reject a

27  timely delivered ballot under Section 87.027, the committee shall:

1        (1)  determine if it would be possible for the voter to

2  correct the defect and return the carrier envelope before the time

3  the polls are required to close on election day; and

4        (2)  return the carrier envelope to the voter by mail,

5  if the committee determines that it would be possible for the voter

6  to correct the defect and return the carrier envelope before the

7  time the polls are required to close on election day.

8        (c)  If the signature verification committee determines

9  under Subsection (b)(1) that it would not be possible for the voter

10  to correct the defect and return the carrier envelope before the

11  time the polls are required to close on election day, the committee

12  may notify the voter of the defect by telephone or e-mail and inform

13  the voter that the voter may request to have the voter's application

14  to vote by mail canceled in the manner described by Section 84.032

15  or come to the early voting clerk's office in person not later than

16  the sixth day after election day to correct the defect.

17        (d)  If the signature verification committee takes an action

18  described by Subsection (b) or (c), the committee must take either

19  action described by that subsection with respect to each ballot in

20  the election to which this section applies.

21        (e)  A poll watcher is entitled to observe an action taken

22  under Subsection (b) or (c).

23        (f)  The secretary of state may prescribe any procedures

24  necessary to implement this section.

25        (g)  Notwithstanding any other law, a ballot may not be

26  finally rejected for a reason listed in Section 87.041(b)(1), (2),

27  or (6) before the seventh day after election day.

1    SECTION 5.13.   Section 87.041, Election Code, is amended by

2  amending Subsections (b) and (e) and adding Subsection (d-1) to

3  read as follows:

4       (b)  A ballot may be accepted only if:

5            (1)  the  carrier  envelope  certificate  is  properly

6  executed;

7            (2)  neither  the  voter's  signature  on  the  ballot

8  application nor the signature on the carrier envelope certificate

9  is determined to have been executed by a person other than the

10  voter, unless signed by a witness;

11            (3)  the  voter's  ballot  application  states  a  legal

12  ground for early voting by mail;

13            (4)  the  voter  is  registered  to  vote,  if  registration

14  is required by law;

15            (5)  the  address  to  which  the  ballot  was  mailed  to  the

16  voter, as indicated by the application, was outside the voter's

17  county of residence, if the ground for early voting is absence from

18  the county of residence;

19            (6)  for a voter to whom a statement of residence form

20  was required to be sent under Section 86.002(a), the statement of

21  residence is returned in the carrier envelope and indicates that

22  the  voter  satisfies  the  residence  requirements  prescribed  by

23  Section 63.0011; [and]

24            (7)  the  address  to  which  the  ballot  was  mailed  to  the

25  voter is an address that is otherwise required by Sections 84.002

26  and 86.003; and

27            (8)  the information required under Section 86.002(g)

1  provided by the voter identifies the same voter identified on the

2  voter's application for voter registration under Section

3  13.002(c)(8).

4       (d-1)  If a voter provides the information required under

5  Section 86.002(g) and it identifies the same voter identified on

6  the voter's application for voter registration under Section

7  13.002(c)(8), the signature on the ballot application and on the

8  carrier envelope certificate  shall be rebuttably presumed to be

9  the signatures of the voter.

10      (e)  In making the determination under Subsection (b)(2), to

11  determine whether the signatures are those of the voter, the board

12  may also compare the signatures with any known signature [two or

13  more signatures] of the voter [made within the preceding six years

14  and] on file with the county clerk or voter registrar [to determine

15  whether the signatures are those of the voter].

16      SECTION 5.14.  Subchapter C, Chapter 87, Election Code, is

17  amended by adding Section 87.0411 to read as follows:

18      Sec. 87.0411.  OPPORTUNITY TO CORRECT DEFECT:  EARLY VOTING

19  BALLOT BOARD.  (a)  This section applies to an early voting ballot

20  voted by mail:

21          (1)  for which the voter did not sign the carrier

22  envelope certificate;

23          (2)  for which it cannot immediately be determined

24  whether the signature on the carrier envelope certificate is that

25  of the voter;

26          (3)  missing any required statement of residence;

27          (4)  missing information or containing incorrect

1  information required under Section 84.002(a)(1-a) or Section

2  86.002; or

3        (5)  containing incomplete information with respect to

4  a witness.

5     (b)  Not later than the second business day after an early

6  voting ballot board discovers a defect described by Subsection (a)

7  and before the board decides whether to accept or reject a timely

8  delivered ballot under Section 87.041, the board shall:

9        (1)  determine if it would be possible for the voter to

10  correct the defect and return the carrier envelope before the time

11  the polls are required to close on election day; and

12        (2)  return the carrier envelope to the voter by mail,

13  if the board determines that it would be possible for the voter to

14  correct the defect and return the carrier envelope before the time

15  the polls are required to close on election day.

16     (c)  If the early voting ballot board determines under

17  Subsection (b)(1) that it would not be possible for the voter to

18  correct the defect and return the carrier envelope before the time

19  the polls are required to close on election day, the board may

20  notify the voter of the defect by telephone or e-mail and inform the

21  voter that the voter may request to have the voter's application to

22  vote by mail canceled in the manner described by Section 84.032 or

23  come to the early voting clerk's office in person not later than the

24  sixth day after election day to correct the defect.

25     (d)  If the early voting ballot board takes an action

26  described by Subsection (b) or (c), the board must take either

27  action described by that subsection with respect to each ballot in

1  the election to which this section applies.

2      (e)  A poll watcher is entitled to observe an action taken
3  under Subsection (b) or (c).

4      (f)  The secretary of state may prescribe any procedures
5  necessary to implement this section.

6      (g)  Notwithstanding any other law, a ballot may not be
7  finally rejected for a reason listed in Section 87.041(b)(1), (2),
8  or (6) before the seventh day after election day.

9      SECTION 5.15.  Section 87.0431(b), Election Code, is amended
10  to read as follows:

11      (b)  The early voting clerk shall, not later than the 30th
12  day after election day, deliver notice to the attorney general,
13  including  certified  copies  of  the  carrier  envelope  and
14  corresponding ballot application, of any ballot rejected because:

15          (1)  the voter was deceased;

16          (2)  the voter already voted in person in the same
17  election;

18          (3)  the signatures on the carrier envelope and ballot
19  application were not executed by the same person;

20          (4)  the carrier envelope certificate lacked a witness
21  signature; [or]

22        ´ (5)  the carrier envelope certificate was improperly
23  executed by an assistant; or

24          (6)  the early voting ballot board or the signature
25  verification committee determined that another violation of the
26  Election Code occurred.

27      SECTION 5.16.  Sections 87.062(a) and (c), Election Code,

1  are amended to read as follows:

2      (a)  On the direction of the presiding judge, the early

3  voting ballot board, in accordance with Section 85.032(b), shall

4  open the underline{containers} [~~container~~] for the early voting ballots that

5  are to be counted by the board, remove the contents from underline{each} [~~the~~]

6  container, and remove any ballots enclosed in ballot envelopes from

7  their envelopes.

8      (c)  underline{Ballots voted by mail shall be tabulated and stored}

9  underline{separately from the ballots voted by personal appearance and shall}

10 underline{be separately reported on the returns} [~~The results of all early~~

11 ~~voting ballots counted by the board under this subchapter shall be~~

12 ~~included in the same return~~].

13     SECTION 5.17.  Section 87.103, Election Code, is amended to

14 read as follows:

15     Sec. 87.103.  COUNTING BALLOTS AND PREPARING RETURNS.  (a)

16 The early voting electronic system ballots counted at a central

17 counting station, underline{the ballots cast at precinct polling places, and}

18 underline{the ballots voted by mail} shall be tabulated separately [~~from the~~

19 ~~ballots cast at precinct polling places~~] and shall be separately

20 reported on the returns.

21     (b)  The early voting returns prepared at the central

22 counting station must include any early voting results obtained by

23 the early voting ballot board under underline{Subchapter} [~~Subchapters~~] D [~~and~~

24 ~~E~~].

25     SECTION 5.18.  Section 87.126, Election Code, is amended by

26 adding Subsection (a-1) to read as follows:

27     underline{(a-1)  Electronic records made under this section shall}

1 record both sides of any application, envelope, or ballot recorded,
2 and all such records shall be provided to the early voting ballot
3 board, the signature verification committee, or both.
4     SECTION 5.19.  Subchapter G, Chapter 87, Election Code, is
5 amended by adding Section 87.128 to read as follows:
6     Sec. 87.128.  NOTES.  (a)  Each member of an early voting
7 ballot board and each member of a signature verification committee
8 is entitled to take any notes reasonably necessary to perform the
9 member's duties under this chapter.
10     (b)  Notes taken under this section may not contain
11 personally identifiable information.
12     (c)  Each member who takes notes under this section shall
13 sign the notes and deliver them to the presiding judge or committee
14 chair, as applicable, for delivery to the custodian of election
15 records.
16     (d)  Notes collected under this section shall be preserved in
17 the same manner as precinct election records under Section 66.058.
18                ARTICLE 6.  ASSISTANCE OF VOTERS
19     SECTION 6.01.  Section 64.009, Election Code, is amended by
20 amending Subsection (b) and adding Subsections (e), (f), (f-1),
21 (g), and (h) to read as follows:
22     (b)  The regular voting procedures, except those in
23 Subchapter B, may be modified by the election officer to the extent
24 necessary to conduct voting under this section.
25     (e)  Except as provided by Section 33.057, a poll watcher is
26 entitled to observe any activity conducted under this section.
27     (f)  A person who simultaneously assists seven or more voters

1  voting under this section by providing the voters with
2  transportation to the polling place must complete and sign a form,
3  provided by an election officer, that contains the person's name
4  and address and whether the person is providing assistance solely
5  under this section or under both this section and Subchapter B.

6      (f-1)  Subsection (f) does not apply if the person is related
7  to each voter within the second degree by affinity or the third
8  degree by consanguinity, as determined under Subchapter B, Chapter
9  573, Government Code.

10     (g)  A form completed under Subsection (f) shall be delivered
11 to the secretary of state as soon as practicable.  The secretary
12 shall retain a form delivered under this section for the period for
13 preserving the precinct election records and shall make the form
14 available to the attorney general for inspection upon request.

15     (h)  The secretary of state shall prescribe the form
16 described by Subsection (f).

17     SECTION 6.02.  Section 64.031, Election Code, is amended to
18 read as follows:

19     Sec. 64.031.  ELIGIBILITY FOR ASSISTANCE.  A voter is
20 eligible to receive assistance in marking or reading the ballot, as
21 provided by this subchapter, if the voter cannot prepare or read the
22 ballot because of:

23         (1)  a physical disability that renders the voter
24 unable to write or see; or

25         (2)  an inability to read the language in which the
26 ballot is written.

27     SECTION 6.03.  Subchapter B, Chapter 64, Election Code, is

1  amended by adding Section 64.0322 to read as follows:

2      Sec. 64.0322.  SUBMISSION  OF  FORM  BY  ASSISTANT.    (a)  A

3  person, other than an election officer, who assists a voter in

4  accordance  with  this  chapter  is  required  to  complete  a  form

5  stating:

6          (1)  the name and address of the person assisting the

7  voter;

8          (2)  the  relationship  to  the  voter  of  the  person

9  assisting the voter; and

10         (3)  whether the person assisting the voter received or

11  accepted  any  form  of  compensation  or  other  benefit  from  a

12  candidate, campaign, or political committee.

13     (b)  The secretary of state shall prescribe the form required

14  by this section.  The form must be incorporated into the official

15  carrier envelope if the voter is voting an early voting ballot by

16  mail and receives assistance under Section 86.010, or must be

17  submitted to an election officer at the time the voter casts a

18  ballot if the voter is voting at a polling place or under Section

19  64.009.

20     SECTION 6.04.  Section 64.034, Election Code, is amended to

21  read as follows:

22     Sec. 64.034.  OATH.   A person, other than an election

23  officer, selected to provide assistance to a voter must take the

24  following oath, administered by an election officer at the polling

25  place, before providing assistance:

26     "I swear (or affirm) under penalty of perjury that the voter I

27  am assisting represented to me they are eligible to receive

1  assistance; I will not suggest, by word, sign, or gesture, how the
2  voter should vote; I will confine my assistance to <u>reading the</u>
3  <u>ballot to the voter, directing the voter to read the ballot, marking</u>
4  <u>the voter's ballot, or directing the voter to mark the ballot;</u>
5  [~~answering the voter's questions, to stating propositions on the~~
6  ~~ballot, and to naming candidates and, if listed, their political~~
7  ~~parties,~~] I will prepare the voter's ballot as the voter directs; <u>I</u>
8  <u>did not pressure or coerce the voter into choosing me to provide</u>
9  <u>assistance;</u> [~~and~~] I am not the voter's employer, an agent of the
10  voter's employer, or an officer or agent of a labor union to which
11  the voter belongs<u>; I will not communicate information about how the</u>
12  <u>voter has voted to another person; and I understand that if</u>
13  <u>assistance is provided to a voter who is not eligible for</u>
14  <u>assistance, the voter's ballot may not be counted</u>."

15      SECTION 6.05.  Sections 86.010(e), (h), and (i), Election
16  Code, are amended to read as follows:
17      (e)  A person who assists a voter to prepare a ballot to be
18  voted by mail shall enter <u>on the official carrier envelope of the</u>
19  <u>voter:</u>
20          <u>(1)</u>  the  person's  signature,  printed  name,  and
21  residence address<u>;</u>
22          <u>(2)  the relationship of the person providing the</u>
23  <u>assistance to the voter; and</u>
24          <u>(3)  whether the person received or accepted any form</u>
25  <u>of compensation or other benefit from a candidate, campaign, or</u>
26  <u>political committee in exchange for providing assistance</u> [~~on the~~
27  ~~official carrier envelope of the voter~~].

1      (h)   Subsection (f) does not apply:

2            (1)  to a violation of Subsection (c), if the person is
3 related to the voter within the second degree by affinity or the
4 third degree by consanguinity, as determined under Subchapter B,
5 Chapter 573, Government Code, or was physically living in the same
6 dwelling as the voter at the time of the event; or

7            (2)  to a violation of Subsection (e), if the person is
8 related to the voter within the second degree by affinity or the
9 third degree by consanguinity, as determined under Subchapter B,
10 Chapter 573, Government Code.

11     (i)   An offense under this section for a violation of
12 Subsection (c) is increased to the next higher category of offense
13 if it is shown on the trial of an offense under this section that:

14           (1)  the defendant was previously convicted of an
15 offense under this code;

16           (2)  the offense involved a voter 65 years of age or
17 older; or

18           (3)  the defendant committed another offense under this
19 section in the same election.

20     SECTION 6.06.  Section 86.0105, Election Code, is amended by
21 amending Subsections (a), (c), and (e) and adding Subsection (f) to
22 read as follows:

23     (a)  A person commits an offense if the person:

24           (1)  compensates or offers to compensate another person
25 for assisting voters as provided by Section 86.010[, as part of any
26 performance-based compensation scheme based on the number of voters
27 assisted or in which another person is presented with a quota of

1  ~~voters to be assisted as provided by Section 86.010~~]; or

2      (2)  solicits,  receives,  or  [~~engages  in  another~~

3  ~~practice  that  causes  another  person's  compensation  from  or~~

4  ~~employment status with the person to be dependent on the number of~~

5  ~~voters assisted as provided by Section 86.010; or~~

6          [~~(3)  with knowledge that accepting compensation for~~

7  ~~such activity is illegal,~~] accepts compensation for an activity

8  described by Subdivision (1) [~~or (2)~~].

9      (c)  An offense under this section is a state jail felony [~~if~~

10 ~~it is shown on the trial of an offense under this section that the~~

11 ~~defendant was previously convicted two or more times under this~~

12 ~~section~~].

13     (e)  For purposes of this section, compensation means an

14 economic benefit as defined by Section 38.01, Penal Code [~~any form~~

15 ~~of  monetary  payment,  goods,  services,  benefits,  or  promises  or~~

16 ~~offers of employment, or any other form of consideration offered to~~

17 ~~another person in exchange for assisting voters~~].

18     (f)  This section does not apply if the person assisting a

19 voter is an attendant or caregiver previously known to the voter.

20     SECTION 6.07.  Section 86.013(b), Election Code, is amended

21 to read as follows:

22     (b)  Spaces must appear on the reverse side of the official

23 carrier envelope for:

24         (1)  indicating the identity and date of the election;

25 [~~and~~]

26         (2)  entering  the  signature,  printed  name,  and

27 residence address of a person other than the voter who deposits the

1  carrier envelope in the mail or with a common or contract carrier;
2  and

3          (3)  indicating the relationship of that person to the
4  voter.

5          SECTION 6.08.  (a)  The secretary of state shall conduct a
6  study  regarding  the  implementation  of  educational  programs,
7  including  the  production  and  publication  on  the  secretary  of
8  state's Internet website of instructional videos, to help voters
9  with disabilities understand how to use voting systems used in this
10  state.

11          (b)  Not later than December 1, 2022, the secretary of state
12  shall  submit  to  the  standing  committees  of  the  legislature  with
13  jurisdiction over elections a report on the study required by this
14  section.

15          (c)  The secretary of state, using existing resources, may
16  contract with a qualified vendor to conduct the study required by
17  this section.

18          (d)  This section expires December 1, 2023.

19              ARTICLE 7.  FRAUD AND OTHER UNLAWFUL PRACTICES

20          SECTION 7.01.  Chapter 63,  Election Code,  is  amended  by
21  adding Section 63.0111 to read as follows:

22          Sec. 63.0111.  OFFENSES RELATED TO PROVISIONAL VOTING.  (a)
23  An  election  judge  commits  an  offense  if  the  judge  knowingly
24  provides a voter with a form for an affidavit required by Section
25  63.001 if the form contains information that the judge entered on
26  the form knowing it was false.

27          (b)  An offense under this section is a state jail felony.

1    SECTION 7.02.  Sections 276.004(a) and (b), Election Code,
2  are amended to read as follows:

3    (a)  A person commits an offense if, with respect to another
4  person over whom the person has authority in the scope of
5  employment, the person knowingly:

6         (1)  refuses to permit the other person to be absent
7  from work on election day or while early voting is in progress for
8  the purpose of attending the polls to vote; or

9         (2)  subjects or threatens to subject the other person
10  to a penalty for attending the polls on election day or while early
11  voting is in progress to vote.

12    (b)  It is an exception to the application of this section
13  that the person's conduct occurs in connection with an election in
14  which the polls are open on election day or while early voting is in
15  progress for voting for two consecutive hours outside of the
16  voter's working hours.

17    SECTION 7.03.  Sections 276.013(a) and (b), Election Code,
18  are amended to read as follows:

19    (a)  A person commits an offense if the person knowingly or
20  intentionally makes any effort to:

21         (1)  influence the independent exercise of the vote of
22  another in the presence of the ballot or during the voting process,
23  including by altering the ballot of another or by otherwise causing
24  a ballot to not reflect the intent of the voter;

25         (2)  cause a voter to become registered, a ballot to be
26  obtained, or a vote to be cast under false pretenses; [or]

27         (3)  cause any false or intentionally misleading

1  statement, representation, or information to be provided:

2            (A)  to an election official; or

3            (B)  on an application for ballot by mail, carrier

4  envelope, or any other official election-related form or document;

5            (4)  prevent a voter from casting a legal ballot in an

6  election in which the voter is eligible to vote;

7            (5)  provide  false  information  to  a  voter  with  the

8  intent of preventing the voter from voting in an election in which

9  the voter is eligible to vote;

10           (6)  cause the ballot not to reflect the intent of the

11 voter;

12           (7)  cause a ballot to be voted for another person that

13 the person knows to be deceased or otherwise knows not to be a

14 qualified or registered voter;

15           (8)  cause or enable a vote to be cast more than once in

16 the same election; or

17           (9)  discard  or  destroy  a  voter's  completed  ballot

18 without the voter's consent.

19     (b)  An offense under this section is a Class A misdemeanor,

20 unless:

21           (1)  the person committed the offense while acting in

22 the person's capacity as an elected official, in which case the

23 offense is a state jail felony; or

24           (2)  the person is convicted of an attempt, in which

25 case the offense is a Class B [A] misdemeanor.

26     SECTION 7.04.  Chapter 276, Election Code, is amended by

27 adding Sections 276.015, 276.016, 276.017, 276.018, and 276.019 to

1    read as follows:

2       Sec. 276.015.  VOTE HARVESTING.  (a)  In this section:

3          (1)  "Benefit" means anything reasonably regarded as a

4    gain or advantage, including a promise or offer of employment, a

5    political favor, or an official act of discretion, whether to a

6    person or another party whose welfare is of interest to the person.

7          (2)  "Vote  harvesting  services"  means  in-person

8    interaction with one or more voters, in the physical presence of an

9    official ballot or a ballot voted by mail, intended to deliver votes

10   for a specific candidate or measure.

11      (b)  A person commits an offense if the person, directly or

12   through a third party, knowingly provides or offers to provide vote

13   harvesting services in exchange for compensation or other benefit.

14      (c)  A person commits an offense if the person, directly or

15   through a third party, knowingly provides or offers to provide

16   compensation or other benefit to another person in exchange for

17   vote harvesting services.

18      (d)  A person commits an offense if the person knowingly

19   collects or possesses a mail ballot or official carrier envelope in

20   connection with vote harvesting services.

21      (e)  This section does not apply to:

22          (1)  an  activity  not  performed  in  exchange  for

23   compensation or a benefit;

24          (2)  interactions that do not occur in the presence of

25   the ballot or during the voting process;

26          (3)  interactions  that  do  not  directly  involve  an

27   official ballot or ballot by mail;

1    (4)  interactions that are not conducted in-person with
2    a voter; or
3    (5)  activity that is not designed to deliver votes for
4    or against a specific candidate or measure.
5    (f)  An offense under this section is a felony of the third
6    degree.
7    (g)  If  conduct  that  constitutes  an  offense  under  this
8    section also constitutes an offense under any other law, the actor
9    may be prosecuted under this section, the other law, or both.
10   (h)  Records necessary to investigate an offense under this
11   section or any other section of this code shall be provided by an
12   election officer in an unredacted form to a law enforcement officer
13   upon  request.   Records  obtained  under  this  subsection  are  not
14   subject to public disclosure.
15   Sec. 276.016.  UNLAWFUL SOLICITATION AND DISTRIBUTION  OF
16   APPLICATION TO VOTE BY MAIL.  (a)  A public official or election
17   official commits an offense if the official, while acting in an
18   official capacity, knowingly:
19   (1)  solicits the submission of an application to vote
20   by mail from a person who did not request an application;
21   (2)  distributes  an  application  to  vote  by  mail  to  a
22   person who did not request the application unless the distribution
23   is expressly authorized by another provision of this code;
24   (3)  authorizes or approves the expenditure of public
25   funds to facilitate third-party distribution of an application to
26   vote by mail to a person who did not request the application; or
27   (4)  completes any portion of an application to vote by

1   mail and distributes the application to an applicant.

2         (b)   An offense under this section is a state jail felony.

3         (c)   Subsection (a)(2) does not apply if the public official

4   or election official engaged in the conduct described by Subsection

5   (a)(2) by providing access to an application to vote by mail from a

6   publicly accessible Internet website.

7         (d)   Subsection (a)(4) does not apply if the public official

8   or election official engaged in the conduct described by Subsection

9   (a)(4) while lawfully assisting the applicant under Section 84.003.

10·        (e)   Subsection (a) does not apply if the public official or

11  election official:

12              (1)   provided general information about voting by mail,

13  the vote by mail process, or the timelines associated with voting to

14  a person or the public; or

15              (2)   engaged in the conduct described by Subsection (a)

16  while acting in the official's capacity as a candidate for a public

17  elective office.

18         (f)   The remedy provided under this chapter is cumulative,

19  and does not restrict any other remedies provided by this code or by

20  law.  A violation of this section is subject to injunctive relief or

21  mandamus as provided by this code.

22         Sec. 276.017.   UNLAWFUL DISTRIBUTION OF EARLY VOTING BALLOTS

23  AND BALLOTING MATERIALS.   (a)   The early voting clerk or other

24  election official commits an offense if the clerk or official

25  knowingly mails or otherwise provides an early voting ballot by

26  mail or other early voting by mail ballot materials to a person who

27  the clerk or official knows did not submit an application for a

1  ballot to be voted by mail under Section 84.001.

2       (b)  An offense under this section is a Class A misdemeanor.

3       Sec. 276.018.  PERJURY IN CONNECTION WITH CERTAIN ELECTION

4  PROCEDURES.  (a) A person commits an offense if, with the intent to

5  deceive, the person knowingly or intentionally makes a false

6  statement or swears to the truth of a false statement:

7            (1)  on a voter registration application; or

8            (2)  previously made while making an oath, declaration,

9  or affidavit described by this code.

10      (b)  An offense under this section is a state jail felony.

11      Sec. 276.019.  UNLAWFUL ALTERING OF ELECTION PROCEDURES.  A

12 public official or election official may not create, alter, modify,

13 waive, or suspend any election standard, practice, or procedure

14 mandated by law or rule in a manner not expressly authorized by this

15 code.

16                    ARTICLE 8.  ENFORCEMENT

17      SECTION 8.01.  Subchapter E, Chapter 31, Election Code, is

18 amended by adding Sections 31.128, 31.129, and 31.130 to read as

19 follows:

20      Sec. 31.128.  RESTRICTION ON ELIGIBILITY.  (a)  In this

21 section, "election official" does not include a chair of a county

22 political party holding a primary election or a runoff primary

23 election.

24      (b)  A person may not serve as an election official if the

25 person has been finally convicted of an offense under this code.

26      Sec. 31.129.  CIVIL PENALTY.  (a)  In this section, "election

27 official" has the meaning assigned by Section 31.128.

1       (b)  An election official may be liable to this state for a
2   civil penalty if the official:

3           (1)  is employed by or is an officer of this state or a
4   political subdivision of this state; and

5           (2)  violates a provision of this code.

6       (c)  A civil penalty imposed under this section may include
7   termination of the person's employment and loss of the person's
8   employment benefits.

9       Sec. 31.130.  SUIT AGAINST ELECTION OFFICER.  An action,
10  including an action for a writ of mandamus, alleging that an
11  election officer violated a provision of this code while acting in
12  the officer's official capacity may only be brought against the
13  officer in the officer's official capacity.

14      SECTION 8.02.  Sections 232.008(b), (c), and (d), Election
15  Code, are amended to read as follows:

16      (b)  Except as provided by Subsection (c), a contestant must
17  file the petition not later than the later of the 45th [30th] day
18  after the date the election records are publicly available under
19  Section 1.012 or the official result of the contested election is
20  determined.

21      (c)  A contestant must file the petition not later than the
22  later of the 15th [10th] day after the date the election records are
23  publicly available under Section 1.012 or the official result is
24  determined in a contest of:

25          (1)  a primary or runoff primary election; or

26          (2)  a general or special election for which a runoff is
27  necessary according to the official result or will be necessary if

63

1  the contestant prevails.

2        (d)  A contestant must deliver, electronically or otherwise,

3  a copy of the petition to the secretary of state by the same

4  deadline prescribed for the filing of the petition.

5        SECTION 8.03.  Title 14, Election Code, is amended by adding

6  Subtitle D to read as follows:

7                  SUBTITLE D.  OTHER ELECTION LAWSUITS

8        CHAPTER 247.  LAWSUIT ALLEGING IMPROPER ELECTION ACTIVITIES

9        Sec. 247.001.  PETITION  ALLEGING  FRAUD.    This  chapter

10  applies to a civil suit in which a candidate in an election alleges

11  in the petition that an opposing candidate, an agent of the opposing

12  candidate, or a person acting on behalf of the opposing candidate

13  with the candidate's knowledge violated any of the following

14  sections of this code:

15              (1)  Section 13.007;

16              (2)  Section 64.012;

17              (3)  Section 64.036;

18              (4)  Section 84.003;

19              (5)  Section 84.0041;

20              (6)  Section 86.0051;

21              (7)  Section 86.006;

22              (8)  Section 86.010;

23              (9)  Section 276.013; and

24              (10)  Section 276.015.

25        Sec. 247.002.  PROCEDURE.  A candidate in an election may

26  file a petition for an action under this chapter in any county where

27  a defendant resided at the time of the election.  If the election is

1  for a statewide office, the candidate may also file the petition in

2  a district court in Travis County.

3      Sec. 247.003.  FILING PERIOD FOR PETITION. A candidate in an

4  election may file a petition for an action under this chapter not

5  earlier than the day after the date the election is certified and

6  not later than the 45th day after the later of that date or the date

7  election records are made publicly available under Section 1.012.

8      Sec. 247.004.  DAMAGES.    (a)    If  it  is  shown  by  a

9  preponderance of the evidence that a defendant, an agent of the

10  defendant, or a person acting on behalf of the defendant with the

11  defendant's knowledge committed one or more violations of a section

12  described by Section 247.001, the defendant is liable to the

13  plaintiff for damages in an amount of $1,000 for each violation.

14      (b)  Notwithstanding Section 41.004, Civil Practice and

15  Remedies Code, a court shall award damages under Subsection (a) to

16  the plaintiff irrespective of whether the plaintiff is awarded

17  actual damages.

18      Sec. 247.005.  ATTORNEY'S FEES.  In an action under this

19  chapter, the court may award reasonable attorney's fees to the

20  prevailing party.

21      SECTION 8.04.  Section 273.061, Election Code, is amended to

22  read as follows:

23      Sec. 273.061.  JURISDICTION.  (a)  The supreme court or a

24  court of appeals may issue a writ of mandamus to compel the

25  performance of any duty imposed by law in connection with the

26  holding of an election or a political party convention, regardless

27  of whether the person responsible for performing the duty is a

1  public officer.

2      (b)  The  court  of  criminal  appeals  may  issue  a  writ  of
3  mandamus to compel the performance of any duty imposed by law in
4  connection  with  the  provision,  sequestration,  transfer,  or
5  impoundment  of  evidence  in  or  records  relating  to  a  criminal
6  investigation conducted under this code or conducted in connection
7  with the conduct of an election or political party convention. If a
8  writ of mandamus is issued under this subsection, it shall include
9  an  order  requiring  the  provision,  sequestration,  transfer,  or
10  impoundment of the evidence or record.

11      SECTION 8.05.  Subchapter D, Chapter 22, Government Code, is
12  amended by adding Sections 22.304 and 22.305 to read as follows:

13      Sec. 22.304.  COURT SITTING IN PANELS FOR CERTAIN ELECTION
14  PROCEEDINGS; CRIMINAL OFFENSE.  (a)  In this section, "public
15  official" means any person elected, selected, appointed, employed,
16  or otherwise designated as an officer, employee, or agent of this
17  state, a government agency, a political subdivision, or any other
18  public body established by state law.

19      (b)  Notwithstanding  any  other  law  or  rule,  a  court
20  proceeding entitled to priority under Section 22.305 and filed in a
21  court of appeals shall be docketed by the clerk of the court and
22  assigned to a panel of three justices determined using an automated
23  assignment system.

24      (c)  A person, including a public official, commits an
25  offense if the person communicates with a court clerk with the
26  intention of influencing or attempting to influence the composition
27  of a three-justice panel assigned a specific proceeding under this

66

1   section.

2      (d)  An offense under this section is a Class A misdemeanor.

3      Sec. 22.305.  PRIORITY OF CERTAIN ELECTION PROCEEDINGS.  (a)

4   The supreme court or a court of appeals shall prioritize over any

5   other proceeding pending or filed in the court a proceeding for

6   injunctive relief or for a writ of mandamus under Chapter 273,

7   Election Code, pending or filed in the court on or after the 70th

8   day before a general or special election.

9      (b)  If granted, oral argument for a proceeding described by

10  Subsection (a) may be given in person or through electronic means.

11     SECTION 8.06.  Section 23.101, Government Code, is amended

12  by amending Subsection (a) and adding Subsections (b-1) and (b-2)

13  to read as follows:

14     (a)  Except as provided by Subsection (b-1), the [The] trial

15  courts of this state shall regularly and frequently set hearings

16  and trials of pending matters, giving preference to hearings and

17  trials of the following:

18             (1)  temporary injunctions;

19             (2)  criminal actions, with the following actions given

20  preference over other criminal actions:

21                 (A)  criminal actions against defendants who are

22  detained in jail pending trial;

23                 (B)  criminal actions involving a charge that a

24  person committed an act of family violence, as defined by Section

25  71.004, Family Code;

26                 (C)  an offense under:

27                     (i)  Section 21.02 or 21.11, Penal Code;

S.B. No. 1

1                        (ii)    Chapter 22, Penal Code, if the victim
2   of the alleged offense is younger than 17 years of age;
3                        (iii)    Section 25.02, Penal Code, if the
4   victim of the alleged offense is younger than 17 years of age;
5                        (iv)    Section 25.06, Penal Code;
6                        (v)    Section 43.25, Penal Code; or
7                        (vi)    Section 20A.02(a)(7), 20A.02(a)(8),
8   or 20A.03, Penal Code;
9                   (D)    an offense described by Article 62.001(6)(C)
10  or (D), Code of Criminal Procedure; and
11                  (E)    criminal actions against persons who are
12  detained as provided by Section 51.12, Family Code, after transfer
13  for prosecution in criminal court under Section 54.02, Family Code;
14             (3)    election contests and suits under the Election
15  Code;
16             (4)    orders for the protection of the family under
17  Subtitle B, Title 4, Family Code;
18             (5)    appeals of final rulings and decisions of the
19  division of workers' compensation of the Texas Department of
20  Insurance regarding workers' compensation claims and claims under
21  the Federal Employers' Liability Act and the Jones Act;
22             (6)    appeals of final orders of the commissioner of the
23  General Land Office under Section 51.3021, Natural Resources Code;
24             (7)    actions in which the claimant has been diagnosed
25  with malignant mesothelioma, other malignant asbestos-related
26  cancer, malignant silica-related cancer, or acute silicosis; and
27             (8)    appeals brought under Section 42.01 or 42.015, Tax

68

1  Code, of orders of appraisal review boards of appraisal districts
2  established for counties with a population of less than 175,000.

3      (b-1)  Except for a criminal case in which the death penalty
4  has been or may be assessed or when it would otherwise interfere
5  with a constitutional right, the trial courts of this state shall
6  prioritize over any other proceeding pending or filed in the court a
7  proceeding for injunctive relief under Chapter 273, Election Code,
8  pending or filed in the court on or after the 70th day before a
9  general or special election.

10     (b-2)  A hearing in a proceeding described by Subsection
11 (b-1) may be held in person or through electronic means, as
12 determined by the court.

13     SECTION 8.07.  Chapter 23, Government Code, is amended by
14 adding Subchapter D to read as follows:

15                 SUBCHAPTER D. GENERAL PROVISIONS

16     Sec. 23.301.  ASSIGNMENT OF CERTAIN ELECTION PROCEEDINGS;
17 CRIMINAL OFFENSE.  (a)  Notwithstanding any other law or rule, the
18 clerk of a district court in which a proceeding entitled to priority
19 under Section 23.101(b-1) is filed shall docket the proceeding and,
20 if more than one district court in the county has jurisdiction over
21 the proceeding, randomly assign the proceeding to a district court
22 using an automated assignment system.

23     (b)  Notwithstanding any other law or rule, the clerk of a
24 county court or statutory county court in which a proceeding
25 entitled to priority under Section 23.101(b-1) is filed shall
26 docket the proceeding and, if more than one court in the county has
27 jurisdiction over the proceeding, randomly assign the proceeding to

1   a court using an automated assignment system.

2        (c)  A person, including a public official, commits an

3   offense if the person communicates with a county or district clerk

4   with the intention of influencing or attempting to influence the

5   court or judge assigned to a proceeding under this section.

6        (d)  An offense under this section is a Class A misdemeanor,

7   except that the offense is a state jail felony if it is shown on the

8   trial of the offense that the person committed the offense while

9   acting in the person's official capacity as an election official.

10       (e)  If a district or county clerk does not comply with this

11  section, a person may seek from the supreme court or a court of

12  appeals a writ of mandamus as provided by Section 273.061, Election

13  Code, to compel compliance with this section.

14       Sec. 23.302.  DEADLINES  IN  CERTAIN  ELECTION  PROCEEDINGS.

15  (a)  Not later than 24 hours after the proceeding is filed, a judge

16  to whom a case is assigned under Section 23.301(b) who wishes to be

17  recused from the proceeding must, before recusal:

18            (1)  hear an application for any emergency temporary

19  relief sought;

20            (2)  grant or deny any emergency temporary relief

21  sought; and

22            (3)  set a scheduling order that provides:

23                 (A)  a date for a hearing on any injunction sought

24  not later than five days after the date on which the proceeding was

25  filed; and

26                 (B)  discovery and deposition deadlines before

27  the expiration of any emergency relief order entered.

S.B. No. 1

1      (b)  The presiding judge of an administrative region shall

2  assign a new judge to a proceeding assigned under Section 23.301(b)

3  not later than 12 hours after the original judge assigned to the

4  proceeding is recused under Subsection (a).

5      (c)  A final order in a proceeding filed under Section

6  273.081, Election Code, shall be submitted in writing to the

7  parties not later than 24 hours after the judge makes a final

8  determination in the proceeding.

9      (d)  If a district judge does not comply with this section, a

10  person may seek from the supreme court, the court of criminal

11  appeals, or a court of appeals a writ of mandamus as provided by

12  Section 273.061, Election Code, to compel compliance with this

13  section.

14      (e)  Notwithstanding Section 23.101(b-1), a proceeding

15  relating to a permanent injunction being sought in connection to a

16  challenge under Section 141.034, Election Code, may be heard after

17  the primary election has been canvassed.

18      ARTICLE 9.  INELIGIBLE VOTERS AND RELATED REFORMS

19      SECTION 9.01.  Chapter 42, Code of Criminal Procedure, is

20  amended by adding Article 42.0194 to read as follows:

21      Art. 42.0194.  FINDING REGARDING FELONY CONVICTION.  In the

22  trial of a felony offense, if the defendant is adjudged guilty of

23  the offense, the court shall:

24      (1)  make an affirmative finding that the person has

25  been found guilty of a felony and enter the affirmative finding in

26  the judgment of the case; and

27      (2)  instruct the defendant regarding how the felony

71

S.B. No. 1

1  conviction will impact the defendant's right to vote in this state.

2      SECTION 9.02.  Article 42.01, Code of Criminal Procedure, as
3  effective September 1, 2021, is amended by adding Section 16 to read
4  as follows:

5      Sec. 16.   In   addition   to   the   information   described   by
6  Section 1, the judgment should reflect the affirmative finding and
7  instruction entered pursuant to Article 42.0194.

8      SECTION 9.03.  Section 64.012, Election Code, is amended by
9  amending Subsections (a) and (b) and adding Subsections (c) and (d)
10  to read as follows:

11      (a)  A person commits an offense if the person knowingly or
12  intentionally:

13          (1)  votes or attempts to vote in an election in which
14  the person knows the person is not eligible to vote;

15          (2)  [knowingly] votes or attempts to vote more than
16  once in an election;

17          (3)  [knowingly] votes or attempts to vote a ballot
18  belonging to another person, or by impersonating another person;
19  [or]

20          (4)  [knowingly] marks or attempts to mark any portion
21  of another person's ballot without the consent of that person, or
22  without specific direction from that person how to mark the ballot;
23  or

24          (5)  votes or attempts to vote in an election in this
25  state after voting in another state in an election in which a
26  federal office appears on the ballot and the election day for both
27  states is the same day.

72

S.B. No. 1

1      (b)  An offense under this section is a Class A misdemeanor

2  [felony of the second degree unless the person is convicted of an

3  attempt.  In that case, the offense is a state jail felony].

4      (c)  A person may not be convicted solely upon the fact that

5  the person signed a provisional ballot affidavit under Section

6  63.011 unless corroborated by other evidence that the person

7  knowingly committed the offense.

8      (d)  If conduct that constitutes an offense under this

9  section also constitutes an offense under any other law, the actor

10  may be prosecuted under this section, the other law, or both.

11      SECTION 9.04.  The change in law made by this article in

12  adding Section 64.012(c), Election Code, applies to an offense

13  committed before, on, or after the effective date of this Act,

14  except that a final conviction for an offense under that section

15  that exists on the effective date of this Act remains unaffected by

16  this article.

17  ARTICLE 10.  REPEALER; SEVERABILITY; TRANSITION; EFFECTIVE DATE

18      SECTION 10.01.  The following provisions of the Election

19  Code are repealed:

20          (1)  Section 85.062(e);

21          (2)  Section 86.0105(b); and

22          (3)  Section 127.201(f).

23      SECTION 10.02.  If any provision of this Act or its

24  application to any person or circumstance is held invalid, the

25  invalidity does not affect other provisions or applications of this

26  Act that can be given effect without the invalid provision or

27  application, and to this end the provisions of this Act are declared

73

1  to be severable.

2       SECTION 10.03.  (a)   Except as otherwise provided by this
3  Act, the changes in law made by this Act apply only to an offense
4  committed on or after the effective date of this Act.  An offense
5  committed before the effective date of this Act is governed by the
6  law in effect when the offense was committed, and the former law is
7  continued in effect for that purpose. For purposes of this section,
8  an offense was committed before the effective date of this Act if
9  any element of the offense occurred before that date.

10      (b)   The changes in law made by this Act apply only to an
11  election ordered on or after the effective date of this Act.   An
12  election ordered before the effective date of this Act is governed
13  by the law in effect when the election was ordered, and the former
14  law is continued in effect for that purpose.

15      (c)   The changes in law made by this Act apply only to an
16  application to vote an early voting ballot by mail submitted on or
17  after the effective date of this Act.   An application to vote an
18  early voting ballot by mail submitted before the effective date of
19  this Act is governed by the law in effect when the application was
20  submitted, and the former law is continued in effect for that
21  purpose.

22      (d)   The changes in law made by this Act apply only to an
23  application for voter registration submitted on or after the
24  effective date of this Act.

25      (e)   Chapter 247, Election Code, as added by this Act,
26  applies only to a cause of action for which the associated election
27  occurred after the effective date of this Act.

S.B. No. 1

1        SECTION 10.04.   This Act takes effect on the 91st day after

2   the last day of the legislative session.

S.B. No. 1

_____        _____
President of the Senate                          Speaker of the House

I hereby certify that S.B. No. 1 passed the Senate on August 12, 2021, by the following vote: Yeas 18, Nays 11; August 27, 2021, Senate refused to concur in House amendments and requested appointment of Conference Committee; August 29, 2021, House granted request of the Senate; August 31, 2021, Senate adopted Conference Committee Report by the following vote: Yeas 18, Nays 13._____

                                    _____
                                         Secretary of the Senate

I hereby certify that S.B. No. 1 passed the House, with amendments, on August 27, 2021, by the following vote: Yeas 80, Nays 41, one present not voting; August 29, 2021, House granted request of the Senate for appointment of Conference Committee; August 31, 2021, House adopted Conference Committee Report by the following vote: Yeas 80, Nays 41, one present not voting._____

                                    _____
                                         Chief Clerk of the House

Approved:

9 - 7 - 21
_____
          Date

_____
          Governor

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
7PM ___ O'CLOCK

SEP 07 2021

_____
          Secretary of State

76

APPENDIX
Prescribed by Secretary of State
Sections 61.035 and 64.034, Texas Election Code
9/13

| Pct. No.<br>*(Núm. De Pcto.)* | Authority Conducting Election<br>*(Autoridad Administrando la Elección)* |
|---|---|
| Date of Election<br>*(Fecha de Elección)* | Type of Election<br>*(Tipo de Elección)* |

## OATHS
### *(JURAMENTOS)*

---

### ASSISTANCE *(AYUDA)*
#### (Sec. 64.034)

OATH OF PERSON ASSISTING VOTER: I swear (or affirm) that I will not suggest by word, sign, or gesture how the voter shall vote; I will confine my assistance to answering the voter's questions, to stating propositions on the ballot, and to naming candidates and, if listed, their political parties; I will prepare the voter's ballot as the voter directs; and I am not the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs. *(JURAMENTO DE LA PERSONA QUE AYUDA AL VOTANTE: Yo juro (o afirmo) que no sugeriré por palabra, seña o acción cómo deberá votar el votante; limitaré mi ayuda a contestar las preguntas del votante, a declarar las proposiciones en la boleta, y a nombrar los candidatos y, si listados, los partidos políticos a que pertenecen; yo prepararé la boleta como dirija el votante, y no soy el empleador del votante, agente del empleador, o un oficial o agente de un sindicato donde el votante pertenece.*

_____     _____

_____     _____

_____     _____

### INTERPRETER *(INTERPRETE)*
#### (Sec. 61.035)

INTERPRETER'S OATH: I swear (or affirm) that, to the best of my ability, I will correctly interpret and translate each question, answer, or statement addressed either to the voter by an election officer or to an election officer by the voter. *(JURAMENTO DEL INTERPRETE: Yo juro (o afirmo) que, a mi mejor potencia, interpretaré y traduciré de una manera correcta cada pregunta, respuesta o declaración que cualquier official electoral dirija al votante o que el votante dirija a cualquier official electoral.)*

_____     _____

_____     _____

_____     _____

The above oaths were sworn and subscribed to before me this _____ day of _____, 20 _____.
*(Los juramentos señalados arriba fueron declarados bajo juramento y suscritos ante mí en la fecha indicada arriba.)*

_____
ELECTION OFFICER *( OFICIAL ELECTORAL)*

**EXHIBIT**

tabbies®

2|