UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNION DEL PUEBLO ENTERO )
et al.,                    )
     Plaintiffs,           )
                           )
v.                         ) Civil Action No. SA-21-CV-
                           )         00844-XR
GREGORY W. ABBOTT, et al., )
     Defendants.           )


-----------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF
LISA WISE
APRIL 13, 2022
Volume 1

-----------------------------------------



        ORAL AND VIDEOTAPED DEPOSITION OF LISA

WISE  produced as a witness at the instance of Plaintiff,

and duly sworn, was taken in the above-styled and

numbered cause on the 13th day of April, 2022 from 10:02

a.m. mountain time to 5:27 p.m. mountain time, before

Nancy Newhouse, a Certified Shorthand Reporter in and for

the State of Texas, reported by oral shorthand, located

at the 500 East San Antonio, Room 503, El Paso, Texas

79901, pursuant to the Federal Rules of Civil Procedure,

and the provisions stated on the record or attached

hereto.

Page 12

1    well; it will help with the record?

2        A.   Yes.

3        Q.   And if your counsel may object to some of the

4    questions that I answer -- or sorry, your counsel may

5    object to some of the questions that I ask, could you

6    please -- do you understand that you are to answer

7    unless you are invoking a privilege?

8        A.   Yes.

9        Q.   And will you please let me know if I ask a

10   question and you don't understand, or if you don't hear

11   me?

12       A.   Yes.

13       Q.   And is there anything today that would affect

14   your ability to answer truthfully the questions that I'm

15   going to ask?

16       A.   No.

17       Q.   What did you do to prepare for this deposition

18   today?

19       A.   I reviewed the SB 1 legislation, I looked over

20   some of the documents that I produced and I read through

21   some of the Texas Election Code that was affected by

22   SB 1.

23       Q.   And you -- you said you're a elections

24   administrator in El Paso County, correct?

25       A.   Yes.

Page 13

1      Q.   And how long have you been in that role?

2      A.   Seven years today.

3      Q.   Today?

4      A.   Today.

5      Q.   Okay.  Lucky day.

6           And did you work in El Paso County before

7  you became elections administrator?

8      A.   I did not.

9      Q.   What brought you to El Paso County?

10     A.   My then husband in 2014 got a job offer here,

11 and so we moved in 2014 here, to El Paso County.

12     Q.   And how did you get the role of elections

13 administrator?

14     A.   I applied for the position, it was listed on a

15 county website.  I went through the interview process,

16 and then I was -- I was hired the -- in April of 2015.

17     Q.   And who made that hiring decision?

18     A.   The Election Commission, it's made up of five

19 members.

20     Q.   Is that a statewide commission?

21     A.   No, it's a county.

22     Q.   And who is on that commission?

23     A.   The county judge, the tax assessor, the county

24 clerk, the chair of the county Republican Party and the

25 chair of the county Democratic Party.

Page 14

```
 1        Q.   And as elections administrator in El Paso
 2   County, what are your responsibilities?
 3        A.   The responsibilities include voter
 4   registration, maintaining our lists, ballot by mail,
 5   also conducting the election, finding poll workers,
 6   polling sites, tabulating the results, releasing those
 7   results and maintaining the documents for the retainment
 8   period, also mapping -- GIS mapping.
 9        Q.   What is the GIS mapping?
10        A.   It's Geographical Information System so that
11   we -- we draw the election precincts, we maintain those
12   boundaries.
13        Q.   And are you an attorney?
14        A.   No.
15        Q.   And based on your experience as elections
16   administrator, are you pretty knowledgeable of elections
17   procedures in Texas?
18        A.   I believe so, yes.
19        Q.   And what type of elections are you responsible
20   for?
21        A.   They vary from a small entity, something like
22   a water district -- water utility district, to school
23   boards, the city, the county, state and federal
24   elections.
25        Q.   And what are the different ways that
```

Page 15

1    individuals can vote in those elections in El Paso

2    County?

3         A.   They can vote by mail, they can vote in person

4    during early voting, they can vote in person on Election

5    Day.  Those are the main ways that our voters vote.

6         Q.   And you're familiar with those different

7    methods of voting?

8         A.   Yes.

9         Q.   And are you familiar with the Texas Election

10   Code provisions relating to those?

11        A.   Yes.

12        Q.   And I believe you said you tabulate

13   information about elections in El Paso County, is that

14   correct?

15        A.   Tabulate the results.

16        Q.   And generally, what information do you track

17   about elections?

18        A.   We track turnout, we track method of -- of

19   voting, we will track a party breakdown in a primary

20   election, and that's -- that's about what -- that's

21   about it.

22        Q.   So you said you track method, so for each

23   voter that votes you know which method they used?

24        A.   Correct.

25        Q.   And to what granularity do you know -- do you

Page 16

1    know if they did curbside voting, per se, or would you

2    just know that they voted on Election Day in person?

3         A.   Election Da --

4              THE WITNESS:  I'm sorry, go ahead.

5              MS. SPECTOR:  I was just going to say

6    objection, but go ahead.

7         A.   Election Day in person, if they did vote

8    curbside on Election Day would be Election -- Election

9    Day in person.

10        Q.   (BY MR. WHITE)  So can you tell me the -- the

11   methods that you track for each voter who votes?

12        A.   So on our -- basically, if they -- if they

13   vote by mail we have that and our system will -- will

14   show that.  If they voted in person, we're able to track

15   what location they voted on our poll pad on Election

16   Day, and, if they vote in person during early voting,

17   we're able to track when they signed in, so basically a

18   time and location of where they voted during early

19   voting and on Election Day.

20        Q.   Do you track attempts at voting that are

21   unsuccessful?

22              MS. SPECTOR:  Objection, vague.

23        A.   In I -- I guess, could you be a little more

24   specific on that?

25        Q.   (BY MR. WHITE)  So for people that attempt to

Page 17

1    vote by mail, do you -- and they apply for a ballot, do

2    you track whether they meet the requirements to receive

3    the ballot?

4          A.   Yes.

5          Q.   And if they do not meet those requirements, do

6    you track the reasons why they did not meet the

7    requirements?

8          A.   Yes.

9          Q.   And have you done that in this last election

10   in March?

11         A.   Yes.

12         Q.   And did you track that information prior to

13   March 2022?

14         A.   Yes.

15         Q.   And if somebody is voting by mail, do you

16   track whether they've met the requirements for you to

17   accept the ballot when it comes in the mail?

18         A.   Yes.

19         Q.   And you tracked that in March 2022?

20         A.   Yes.

21         Q.   And did you track that prior to March 2022?

22         A.   Yes.

23         Q.   And if somebody tries to vote in person early,

24   do you track if they were able to, say, present the

25   proper photo ID to be able to vote in person?

Page 18

```
 1        A.   Yes.

 2        Q.   And -- and if they don't meet those

 3   requirements, do you track that?

 4             MS. SPECTOR:  Objection, vague.

 5        A.   We do if they still cast a ballot, so if they

 6   don't meet those requirements, then they vote a

 7   provisional ballot, and we do cast that -- or we do

 8   track that.

 9        Q.   (BY MR. WHITE)  And on those provisional

10   ballots, do you track whether they're ultimately

11   accepted as votes or not?

12        A.   Yes.

13        Q.   And do you track the reasons if they, the

14   provisional ballot is not accepted, why it wasn't

15   accepted?

16        A.   Yes.

17        Q.   And for voting on Election Day, similar

18   question, do you -- do you track the voters that were

19   unable to meet the requirements to vote in person on

20   Election Day?

21        A.   If they eventually did cast a ballot, yes.

22        Q.   And you mean the provisional ballot?

23        A.   Yes.

24        Q.   And -- and would you track the same on the

25   provisional ballot whether it's ultimately accepted as a
```

Page 19

1    vote or not?

2        A.    Yes.

3        Q.    And -- and the reason for that?

4        A.    Yes.

5        Q.    Do you track the race of the particular voter?

6        A.    We -- we have a report on Latino voters in the

7    county; however, that's the only -- that's the only

8    report that we have regarding the race of the voter.

9        Q.    What is that report?

10       A.    It's a report that was started 15 or 20 years

11   ago, long before I started, and it's -- talks about the

12   percentage of Latinos in the county who did vote, and I

13   believe it's broken down by precinct and gender.

14       Q.    Do you know why that's tracked?

15       A.    I can -- I can give you a guess --

16       Q.    Could --

17       A.    -- but --

18       Q.    Yeah, could you, please?

19       A.    -- this is speculative.

20               When the county began to qualify for the

21   -- the language requirement for -- with the census, I

22   believe that they started to do that to get a gauge on

23   how many ballots do we -- you know, how much do we want

24   to have our resources devoted to the making sure that

25   everything is Spanish, provided in Spanish as well, and

Page 24

```
1              MS. SPECTOR:  Objection, calls for legal

2    conclusion.

3         A.   I mean, I'm not an attorney, but I can tell

4    you what I know about the census, which is that, I

5    believe, once 5 percent of your population speaks a

6    certain language, then you are required to produce

7    election documents in -- in those languages.

8         Q.   (BY MR. WHITE)  So in El Paso County, what

9    languages do you produce election documents in?

10        A.   Just English and Spanish.

11        Q.   So all the election documents that you put out

12   as El Paso elections administrator are in both

13   languages?

14        A.   Yes.

15        Q.   So, generally, I just want to ask, are you

16   familiar with Senate Bill 1?

17        A.   I am --

18        Q.   And --

19        A.   -- yes.

20        Q.   -- what is your understanding of what that

21   bill does?

22              MS. SPECTOR:  Objection, calls for legal

23   conclusion.

24        A.   I know that the stated purpose of that bill,

25   that is to prevent fraud, make it easier to vote and
```

Page 25

1    harder to cheat, is how it was stated.

2        Q.    (BY MR. WHITE)  And as El Paso County election

3    administrator for the March primary of this year, what

4    things did you have to change as a result of Senate Bill

5    1 becoming law?

6                    MS. SPECTOR:  Objection, vague.

7        A.    So in the very beginning, normally, we would

8    send out a reminder to our annual ballot by mail voters

9    in January, letting them know that their application had

10   expired, and providing them with an application if they

11   wanted to again vote by mail.  Obviously, we weren't

12   able to do that, we did not conduct that process.

13                    We had to revamp the -- you know, reorder

14   the envelopes and things like that, the applications.

15   The application changed on that side of it.  We were

16   required to offer the livestream from our office for the

17   -- once the ballots have gone either to central count or

18   signature verification, so that, that changed.

19                    We -- we're now working on, you know,

20   calling voters, talk -- telling them about the curing,

21   the possibilities on the ballot application as well as

22   the ballot itself.  We had a different process with our

23   Signature Verification Committee on the curing of the

24   ballots, that that's -- is now an option.

25                    We trained our poll workers on the new

Page 26

1    bill with things like the poll watcher provision, on the

2    requirement for the certification and the training,

3    that's just some of the things.

4         Q.    (BY MR. WHITE)  As a result of Senate Bill 1,

5    are you tracking new information during the election

6    process that you weren't tracking in prior elections?

7                   MS. SPECTOR:  Objection, vague.

8         A.    I don't believe so.  Right off the top of my

9    head, I cannot think of anything specific we have

10   tracked that we were not tracking before.

11        Q.    (BY MR. WHITE)  For example, on the

12   application for ballot by mail process, are you tracking

13   anything new regarding applications that are accepted or

14   rejected?

15        A.    No.  We started tracking that in 2021, so we

16   have been tracking that prior to this election.

17        Q.    And why did you start tracking it in 2021?

18        A.    So we had a person who was in charge of our

19   ballot by mail department, and she retired in 2021.  We

20   brought on a new staff member, and that person had said

21   we don't really have a mechanism in our system to track

22   the ballot by mail application rejection and acceptance

23   and reason, and so she basically just began doing a

24   spreadsheet.  Our system still does not have, through

25   the vendor, a way to do that, and so that's how we

Page 27

1     started.

2         Q.    So it was a process put in place by people in

3     your office?

4         A.    Yes.

5         Q.    It's not a state system?

6         A.    Well, there is a state system now, in 2022 on

7     the ballot tracker, but we were tracking our

8     applications before that, before that was developed.

9         Q.    And what is the ballot tracker?

10        A.    The ballot tracker is an online tool that the

11    state developed for voters to be able to go in and

12    monitor their ballot application as well as their --

13    their ballot -- the actual ballot, update information if

14    they need to.

15        Q.    And does the elections office put information

16    into the ballot tracker system?

17              MS. SPECTOR:  Objection, vague.

18        A.    No.  We don't put information into the ballot

19    tracker system.

20        Q.    (BY MR. WHITE)  So as the El Paso Elections

21    Office, do you do any interface with the ballot tracker

22    system?

23        A.    We do from the side of it that a voter is able

24    to go in and update their information, and then we are

25    -- we -- we check that information to see if one of our

1    voters has indeed updated it on there, and then we're

2    able to continue with the process if -- if they have, so

3    we review that information.

4         Q.   And how are you notified if a voter went into

5    ballot tracker and made updates?

6         A.   Well, that's sort of an issue that we had with

7    ballot tracker, if you are an offline county, which most

8    of the large counties are if you don't use TEAM.  The

9    way that we were updated was we would go in every day

10   and individually check those that had been rejected for

11   a reason that we could verify in the ballot tracker.

12                  Eventually, we did get a -- you are able

13   to get a report from the Secretary of State's Office,

14   letting us know who and how many people had used the

15   ballot tracker, so we can update.

16        Q.   So when you say you went in and checked each

17   day, what did you go into?

18        A.   We have a back portal to that, that we can go

19   in and see if -- if -- go through our rejected and see

20   if they had updated the information in there.

21        Q.   So you get a notification in that portal, is

22   that correct?

23        A.   We don't get a notification, no, that's what

24   we were trying to -- to have done.  But basically, we

25   would just go in and review what we had on the rejected

1    application and match it with the information on the

2    ballot tracker, and if it matched or if it had been

3    updated, we would be able to tell.

4                  Based on the fact that, let's say their

5    application was missing an I -- a driver's license or

6    social security number, and now they have those in the

7    ballot tracker, then we would be able to move forward

8    with processing that application.

9         Q.   And you mentioned that you eventually got a

10   report from the Secretary of State's Office, what was

11   that report?

12        A.   It was the names and VUID of the voters who

13   had gone onto the ballot tracker and used it to update

14   their information.

15        Q.   And can you explain what VUID means?

16        A.   I'm sorry, sure.  It's the voter unique

17   identification number that each voter in the State of

18   Texas is given.

19        Q.   And how is that provided to you?

20        A.   It was a report from the Secretary of State's

21   Office they told us we could run, and I -- I believe it

22   was sent, actually, in -- I don't remember if it was

23   sent through the TEAMs or if it was sent in an email,

24   honestly.  I have to -- I'd have to look back at that.

25        Q.   And did that come about later in the process?

Page 30

```
1       A.   Yes.

2       Q.   And do you know why that was eventually

3  something that SOS produced to the county?

4       A.    I -- I know all the offline counties were

5  asking for that, so that they were not having to check

6  individually.  Some of the offline counties may have had

7  a vendor who had already worked something out with --

8  with the tracker, our county did not.

9                And so I know that they were getting

10 calls from counties, is there an easier way to do this,

11 is there a better way to do this, and our contact in SOS

12 was saying we're working on it, we're working on it, and

13 then eventually we did -- we did get the report.
```

14       Q.   And who was your contact in the Secretary of

15  State's Office?

16       A.   I can't remember her name, I'm sorry.  I have

17  a lot of contacts there, I just don't remember hers.

18       Q.   So when the legislature was considering SB 1

19  and its predecessor bills, were you involved in any of

20  the hearings for that?

21       A.   In the hearings, no.

22       Q.   Are you a member of any organizations that may

23  have testified in front of those hearings?

24       A.   I am, yes.

25       Q.   And what is that organization?

Page 32

1    when the bills are being considered?

2         A.    I believe, yes.

3         Q.    Do you know who?

4         A.    I want to say Chris Davis, who was our past

5    president, as well as Heather Hawthorne, who is a clerk

6    in Chambers County.

7         Q.    And is Chris Davis an election administrator?

8         A.    Yes.

9         Q.    And where is he an administrator?

10        A.    He is in Georgetown, Williamson County, I

11   believe he's at.

12        Q.    So in implementing the changes in SB 1 for

13   this last primary, were there any changes that you would

14   say were -- had the biggest impact on your operations as

15   elections administrator here in El Paso County?

16               MS. SPECTOR:  Objection, vague.

17        A.    The -- obviously, the component of SB 1 that

18   we spent the most time on was the ballot by mail change.

19   The -- the calls from voters when we weren't able to

20   send an application early, we had a lot of questions on

21   that;  the process to send back applications that were

22   missing the identifier took a lot of our resources; the

23   process for the ballot itself, it's kind of the same

24   issue; trying to explain to the public that the law had

25   changed, and now this is what they were required to do,

1   obviously altered a lot of the processes in our office.

2              And we ended up getting, you know, we

3   would get applications and things much closer to the

4   deadline, I think, just because things were taking

5   longer to mail an application back two or three times,

6   for those voters that were used to having an application

7   sent to them in January and realized that they didn't

8   get that, calling us in February, mid February, when the

9   deadline was there, so just a lot of more resources

10  devoted to the ballot by mail process, it's the one that

11  stands out.

12      Q.   (BY MR. WHITE)  Were there any changes in SB 1

13  that you view as helpful?

14      A.   Uh-huh, yes.  I -- the poll watcher training

15  definitely is helpful, so that the poll watchers have a

16  consistent idea, I believe, of what they are able to do.

17  The curing of a ballot by the Signature Verification

18  Committee, that process where we can contact the voters

19  and they have actually until -- if they want to come in

20  and cure it, that's new, that's -- I think that's

21  helpful.

22              The section on the lines, if you're in

23  line by the time a poll closes, that you are able to

24  vote, it's helpful.  So yeah, those are the ones that I

25  can think of right off the top of my head.

Page 35

1    during the pandemic.

2         Q.   (BY MR. WHITE)  And what was express curbside?

3         A.   So every location offers curbside by law,

4    that's required, but the process can be lengthy and

5    long.  You have to pull up, assuming that there is a

6    sign, you have to call in and have somebody come out,

7    bring the machine.  If they're busy, sometimes that

8    doesn't happen.  So we basically had a team dedicated at

9    seven locations to just assist with curbside voting.

10        Q.   Was that during early voting?

11        A.   Yes.

12        Q.   And was it on Election Day as well?

13        A.   Yes.

14        Q.   And who was eligible to use that express

15   curbside?

16        A.   Whoever was eligible to vote curbside.

17        Q.   So it was not expanded to people that were not

18   previously authorized under the Election Code?

19        A.   Correct.  Correct.  We told every -- I mean,

20   that's how we promoted it, as curb -- express curbside.

21        Q.   So it sounds like, essentially, it was just

22   making it easier to get the voter con -- in contact with

23   the elections officials?

24        A.   The curbside officials, right, so that they

25   didn't have to wait for a judge to come in and out.

Page 39

1   don't take machines outside.  We just never

2   logistically, I guess, had a plan to -- to do that.

3        Q.   (BY MR. WHITE)  What was the turnout in

4   November 2020 in El Paso County?

5        A.   Fifty-five percent.

6        Q.   Was that abnormal?

7        A.   That was the higher turnout, that was one of

8   the high -- the highest turnout that we have on record.

9        Q.   Do you know why turnout was so high?

10            MS. SPECTOR:  Objection, calls for

11   speculation.

12       A.   A presidential election is always going to be

13   higher, but I do believe that offering some of those,

14   you know just little tweaks, we -- we were able to

15   provide a safe place for voters to vote during the

16   pandemic.  Again, that's speculation, but they seemed to

17   be well-received by our voters.

18       Q.   (BY MR. WHITE)  In the data that you track on

19   the voting methods used in the November 2020 election,

20   did you see increases in any particular type of voting?

21       A.   A ballot by mail was much higher.  I believe

22   prior to that election, your -- our highest had been

23   12,000, the ballot by mail that year, we had 36,000.

24   Our early voting, at that point we -- a lot of times we

25   would go 50/50, our early voting during 2020 was 85/15.

Page 40

```
 1          Q.    So that's 85 percent of voters voted early
 2    verse --
 3          A.    Eighty-five percent of the turnout of in
 4    person went during early voting.
 5          Q.    And the other 15 percent would have been --
 6          A.    On Election --
 7          Q.    -- in person on Election Day?
 8          A.    -- Day, yes.
 9          Q.    In November 2020, did you mail out
10    applications for ballot by mail to people that didn't
11    request it?
12                     MS. SPECTOR:  Objection, vague.
13          A.    We -- in -- yes.
14          Q.    (BY MR. WHITE)  And how did you determine who
15    would receive that application for ballot by mail?
16          A.    We did a 65 and over, I believe, who had voted
17    in the past annual that still had not requested one.
18          Q.    So whether they asked for it or not, if they
19    were 65 and older and had voted by mail previously, you
20    sent them unsolicited applications for ballot by mail?
21          A.    An application, yes.
22          Q.    Did you send those to anybody else?
23          A.    No.
24          Q.    And was that your practice prior to November
25    2020?
```

Page 41

```
 1        A.   We normally did it in January, we would send
 2   the reminder that their application was expired, and
 3   give them the option.  With the pandemic, that's when we
 4   did that a second time.  Our -- our process was to do it
 5   in January, solely.
 6        Q.   So you said that turnout is higher in
 7   presidential elections, correct?
 8        A.   Generally, yes.
 9        Q.   And so for the primary that you just conducted
10   in March 2022, if you were looking to compare the
11   turnout in that election, which election would you
12   compare it to?
13        A.   March of 2018.
14        Q.   And why is that?
15        A.   That's cyclically the same type of election
16   cycle, it's a -- it's a political primary election, but
17   in an -- what we could consider, I guess, an off year,
18   not a -- not a presidential.
19        Q.   So the -- strike that.
20                  So is turnout affected by the candidates
21   and the offices that are on the ballot for election?
22                  MS. SPECTOR:  Objection, calls for
23   speculation.
24        A.   In my experience, that is part of it.
25        Q.   (BY MR. WHITE)  And do you use -- did you use
```

Page 42

1    the March 2018 election to prepare for the turnout in

2    the March 2022 election?

3         A.   Yes.

4         Q.   And is it your practice to look at elections

5    four years prior to make those kind of assessments?

6         A.   On even years, yes; on odd years, we usually

7    do the two year, because of the November constitutional

8    amendments.  So if we're looking at, like, November '21,

9    we would look at November 2019, that would be the

10   comparison year range for that.

11        Q.   So I'm going to have the court reporter mark

12   this Exhibit 1 and hand it to you, so you can take a

13   look at it.

14             MR. JEFF WHITE:  Oh wait, let me have

15   that one back, sorry.  Here.  Thank you.

16             (Defendant's Exhibit No. 1 was marked for

17   identification.)

18             MR. GRAHAM WHITE:  Jeff, do you have a

19   copy?

20             MR. JEFF WHITE:  I only have three

21   copies.

22             MS. PERALES:  Okay.  What are we marking

23   that?

24             MR. JEFF WHITE:  1, Exhibit 1.

25             MS. PERALES:  Okay.  Thank you.

Page 44

```
 1        A.    "Proclamation by the Governor of the State of
 2   Texas".
 3        Q.    And can you read the stamp in the bottom right
 4   corner, please?
 5        A.    "Filed in the office of the Secretary of State
 6   2:00 p.m. o'clock, July 27, 2020".
 7        Q.    And are you familiar with this document?
 8        A.    Yes.
 9        Q.    And what is this document?
10        A.    This is the declaration that the governor
11   made, including some components affecting the election.
12        Q.    And was this proclamation made pursuant to the
13   governor's disaster authority?
14              MS. SPECTOR:  Objection, calls for legal
15   conclusion.
16        A.    I believe so.
17        Q.    (BY MR. WHITE)  And did this change the
18   election procedures in El Paso County for the November
19   2020 election?
20              MS. SPECTOR:  Objection, calls for legal
21   conclusion.
22        A.    Yes, it did.
23        Q.    (BY MR. WHITE)  And how so?
24        A.    It allowed for an extended week of -- an extra
25   week of early voting, and it allowed for us to collect
```

Page 45

1    ballot by mail during the early voting period in person,

2    rather than just on Election Day.

3         Q.   And did you utilize that new authority to

4    extend the early voting period?

5         A.   Yes.

6         Q.   And did you use the authority to collect

7    ballots by mail during the early voting period?

8         A.   Yes.

9         Q.   And did that increase turnout in November

10   2020?

11              MS. SPECTOR:  Objection, calls for

12   speculation.

13        A.   It's hard to pinpoint exactly what did, but I

14   would say that increased early voting hours and more

15   time to drop off a ballot generally would.  But again,

16   that's a part of it that I believe was helpful.

17        Q.   (BY MR. WHITE)  And were those changes limited

18   to the November 2020 election?

19        A.   Yes.

20        Q.   So in the March 2022 primary, did you have a

21   shorter early voting period?

22        A.   Yes.

23        Q.   And on what days were you allowed to accept

24   ballots by mail in person in the March 2022 primary?

25        A.   On Election Day only.

Page 51

1    conclusion, calls for speculation.

2        A.    I know that what I can -- based on what I

3    remember, is that if -- that if the county clerk is the

4    early voting clerk, that there was discussion that they

5    could be at the any of the early voting clerks' offices.

6        Q.    (BY MR. WHITE)  So you had mentioned that you

7    are in an organization of other elections

8    administrators, correct?

9        A.    Yes.

10       Q.    And sorry, it -- it slipped my head, can --

11   what was the name of that organization?

12       A.    It's the TAEA, Texas Administration of

13   Election -- I'm sorry, Texas Association of Election

14   Administrators, see my mind.

15       Q.    Does Harris County have an election

16   administrator?

17       A.    Yes.

18       Q.    And is -- in November 2020, was the election

19   administrator in Harris County a member of this

20   organization?

21       A.    I don't know for sure, but I don't believe so.

22       Q.    As part of the organization, were the

23   elections administrators discussing the procedures that

24   Harris County was using in November 2020?

25                    MS. SPECTOR:  Objection, calls for

1    period; the early voting period, yes.

2         Q.   (BY MR. WHITE)  So it would just be a turnout

3    percentage during early voting period?

4         A.   Yes.

5              MS. SPECTOR:  Object to form.

6         Q.   (BY MR. WHITE)  And it doesn't account for the

7    length of that early voting period, correct?

8         A.   Correct.

9         Q.   And would it track if they voted by mail at a

10   dropbox, individually, or would it just be that they

11   voted by mail?

12             MS. SPECTOR:  Object to form, compound.

13        A.   By mail.

14        Q.   (BY MR. WHITE)  So the tracking of Latino

15   voter turnout percentage in November 2020 is just at the

16   level of voting by mail, correct?

17             MS. SPECTOR:  Object to form.

18        A.   Correct.

19        Q.   (BY MR. WHITE)  Of the procedures that you

20   implemented in El Paso County in November 2020 due to

21   COVID, if you had the option, would you use them for

22   elections now and in the future?

23             MS. SPECTOR:  Object to form.

24        A.   I would probably use them for elections I

25   expect to have high turnout, where they may hel -- they

Page 57

1    may help with the line management, or they may help with

2    -- help the voter have more access, if we're going to

3    have a high turnout.  I don't know if I would use them

4    for everyone, but I would probably use them at -- at --

5    at some future elections, if possible.

6         Q.   (BY MR. WHITE)  And which of those procedures

7    would you use in those such elections?

8                   MS. SPECTOR:  Object to form.

9         A.   I loved the extra week of early voting, it

10   really helped us on Election Day manage.  I would use

11   the 10 till 10, I would use the extended drop where the

12   voter can turn in their ballot and probably the express

13   curbside, so those four.

14        Q.   (BY MR. WHITE)  And does the Election Code

15   prevent you from extending early voting by a week?

16        A.   Yes.

17                   MS. SPECTOR:  Ob --

18                   THE WITNESS:  Sorry.

19                   MS. SPECTOR:  Objection, calls for legal

20   conclusion.

21                   THE WITNESS:  I apologize.

22                   MS. SPECTOR:  No, that's okay.

23        Q.   (BY MR. WHITE)  Does the current Election Code

24   prohibit you from having early voting open from 10 a.m.

25   to 10 p.m.?

Page 58

1              MS. SPECTOR:  Objection, calls for legal

2    conclusion.

3         A.   Yes.

4         Q.   (BY MR. WHITE)  And how does it prohibit that?

5              MS. SPECTOR:  Objection, calls for legal

6    conclusion.

7         A.   At the 10 locations, I believe it allows the

8    main early voting location, the -- if I can remember --

9    I'd have to look back at he bill, but I believe it's a 9

10   p.m. cutoff.

11        Q.   (BY MR. WHITE)  And does the Election Code

12   prevent you from accepting ballots by mail before

13   Election Day?

14             MS. SPECTOR:  Objection, calls for legal

15   conclusion.

16        A.   Yes.

17        Q.   (BY MR. WHITE)  And the express curbside

18   voting that you implemented in November 2020, could --

19   under the Election Code are you prohibited from doing

20   that in future elections?

21             MS. SPECTOR:  Objection, calls for legal

22   conclusion.

23        A.   I don't believe so.

24        Q.   (BY MR. WHITE)  So why would you not implement

25   that express curbside in every election?

Page 59

1          MS. SPECTOR:  Objection, object to form.

2      A.   Frankly, November 2022 would be the next time

3   I would consider it, because of the general turnout that

4   we expect, and we just -- we haven't discussed it yet,

5   but I would not have generally used it in 2021.

6      Q.   (BY MR. WHITE)  And why does the expected

7   turnout affect your decision of whether to implement it

8   or not?

9      A.   Because the resources needed to attend to

10  curbside voting basically almost halts what's happening

11  inside a polling site, and if the turnout is higher than

12  expected or higher than usual, in order to process

13  voters in a timely manner inside the site, I would want

14  to have extra people, basically, extra staff who are

15  dedicated just to the curbside.

16     Q.   Would you agree that the November 2020

17  election was unusual?

18          MS. SPECTOR:  Object to form, vague.

19     A.   Yes.

20     Q.   And was that because of the COVID-19 pandemic

21  and the stage of that pandemic at the time?

22          MS. SPECTOR:  Objection, calls for

23  speculation.

24     A.   Yes.

25     Q.   (BY MR. WHITE)  Were there other factors that

Page 60

1    made it an unusual election?

2              MS. SPECTOR:  Object to form.

3         A.   Outside of the pandemic, the only other really

4    notable part of that for our county was that it -- it

5    did seem like there was a lot more interest in that

6    election than I had noticed even in 2016.

7         Q.   (BY MR. WHITE)  Was that because Trump was

8    running for reelection in that election?

9              MS. SPECTOR:  Object to form.

10        A.   I don't know for sure the answer, I can tell

11   you that that's a possibility.

12        Q.   (BY MR. WHITE)  And for the proclamations from

13   the governor that we discussed previously, is it your

14   understanding that those did not change the Election

15   Code?

16             MS. SPECTOR:  Objection, calls for legal

17   conclusion.

18        A.   Can you be more specific?

19        Q.   (BY MR. WHITE)  Sure.  So the proclamations

20   that the governor put out extended the early voting

21   period, correct?

22        A.   Yes.

23        Q.   And it did that for the November 2020

24   election?

25             MS. SPECTOR:  Objection, calls for legal

Page 61

```
 1    conclusion.

 2         A.   Yes.

 3         Q.   (BY MR. WHITE)   But did the underlying statute

 4    that defines the early voting period change, itself?

 5              MS. SPECTOR:   Objection, calls for legal

 6    conclusion.

 7         A.   No.

 8         Q.   (BY MR. WHITE)   And the governor's

 9    proclamation that allowed applications -- strike that.

10              The governor's proclamation that allowed

11    ballots to be dropped off during the early voting

12    period, was that only for the November 2020 election?

13              MS. SPECTOR:   Objection, calls for legal

14    conclusion.

15         A.   Yes.

16         Q.   (BY MR. WHITE)   And the underlying Election

17    Code provision that defines when ballots voted by mail

18    can be dropped off in person, that didn't change, did

19    it?

20              MS. SPECTOR:   Objection, calls for legal

21    conclusion.

22         A.   No.

23         Q.   (BY MR. WHITE)   And who has the authority to

24    set the voting procedures in Texas?

25              MS. SPECTOR:   Objection, calls for legal
```

Page 62

1   conclusion.

2       A.   The procedures?  That's -- could you be more

3   specific?

4       Q.   (BY MR. WHITE)  Sure.  Do you know who writes

5   and amends the Texas Election Code?

6       A.   Yes.

7       Q.   And who is that?

8       A.   The legislature.

9       Q.   And when the legislature chains -- changes the

10  Election Code, do you have the authority to ignore those

11  changes?

12           MS. SPECTOR:  Objection, calls for legal

13  conclusion.

14      A.   No.

15      Q.   (BY MR. WHITE)  Have you ever ignored changes

16  to the Election Code?

17      A.   No.

18      Q.   What if you disagreed with the change, would

19  you still implement it in El Paso County?

20           MS. SPECTOR:  Object to form.

21      A.   Yes.

22      Q.   (BY MR. WHITE)  Is there anything that would

23  prevent you from implementing changes that are

24  prescribed by the legislature?

25           MS. SPECTOR:  Object to form.

Page 63

1    A.   I don't believe so.  However, if our -- our

2  county attorney may say they're interpreting it

3  different, or something like that, I may consult with

4  them, but short of that, no.

5    Q.   (BY MR. WHITE)  If you thought the legislature

6  changed the Election Code, and that change was

7  unconstitutional, would you still implement it?

8         MS. SPECTOR:  Object to form, and I'm

9  going to instruct you not to answer to the extent it

10  would call privileged information.

11    A.   Unless I was otherwise directed by, like, my

12  attorneys then yes, I would.

13    Q.   (BY MR. WHITE)  So as elections administrator,

14  is it not your practice to assess the constitutionality

15  of the changes in the Election Code?

16         MS. SPECTOR:  Object to form.

17    A.   I don't know about assess, but alter the

18  behavior without talking to the attorney, I would not

19  do.

20    Q.   (BY MR. WHITE)  So the changes in SB 1, did

21  you implement all those changes in El Paso County?

22    A.   Yes.

23    Q.   And so is it fair to say you didn't have any

24  concerns about the legality of those changes?

25         MS. SPECTOR:  Object to form, calls for

Page 64

1    legal conclusion.

2         A.    Concerns about the legality, is that what you

3    said?

4         Q.    (BY MR. WHITE)  Yes.  Did you think any of the

5    changes in SB 1 were illegal or unconstitutional?

6                MS. SPECTOR:  Objection, calls for legal

7    conclusion, and to the extent it calls for privileged

8    information, I'm going to instruct you not to answer.

9         A.    I had concerns; however, we did implement the

10   Code.

11        Q.    (BY MR. WHITE)  And if you thought it was

12   unconstitutional, would you have implemented it?

13                MS. SPECTOR:  Object to form.

14        A.    I would discuss with our county attorney's

15   office what the options were.

16        Q.    (BY MR. WHITE)  And if they told you not to

17   implement it, you wouldn't implement it?

18                MS. SPECTOR:  Objection, calls for

19   speculation and privileged information.  I'm going to

20   instruct you not to answer.

21                THE WITNESS:  Okay.

22                MS. SPECTOR:  Can we -- this is treading

23   a little bit too close to confidential conversations she

24   could have had.  I don't know where we're trying to take

25   this.

1   Q.   (BY MR. WHITE)   So are you taking the advice

2   of your counsel and not answering that question on the

3   basis of privilege?

4   A.   Yes.

5   Q.   But just to reset, all the changes that you

6   were required to make by SB 1 in El Paso County, you

7   implemented those in this last election, correct?

8   A.   Yes.

9   Q.   So what training did you have to put in place

10   to prepare elections officials in El Paso County to

11   implement SB 1?

12   A.   We -- a couple different things.   We went

13   through the bill in our office, as a department, and

14   just talked a little bit about, you know, what changes,

15   what we would need to order, what we would need, you

16   know, as far as the forms, the applications, waiting for

17   some directive from the SOS on what forms to use on the

18   poll worker training we received from the SOS, so we

19   utilized that for both of our early voting and our

20   Election Day poll workers, the information that the SOS

21   sends us, the training.

22   Q.   So what information do you receive from the

23   Secretary of State's Office?

24   MS. SPECTOR:   Objection, vague.

25   A.   We receive election advisories, we receive

```
 1                MS. SPECTOR:  Object to form.
 2        A.   Yes, somewhat.
 3        Q.   (BY MR. WHITE)  And how so?
 4        A.   You know, the SOS has attorn -- it basically
 5   has attorneys in the office that do help to interpret
 6   the law if you have any questions on that.  They design
 7   all of the forms that we use, so that's helpful.  They
 8   design all the trainings.  We may add a couple things
 9   for the specific county, but we use the information that
10   they give us.
11                The advisories kind of have in those, at
12   the end, like an FAQ-type situation, so that you can
13   refer to those if needed.  So yes, they -- they send a
14   lot of documents and information.
15        Q.   Were there any issues with the training on the
16   changes in SB 1 that you received from the Secretary of
17   State?
18                MS. SPECTOR:  Object to form.
19        A.   The training was -- there were some parts
20   that, in our county that something like we're -- we're
21   an offline county, so things like the ballot tracker
22   training that was mostly for the online counties was
23   difficult for us, that's the one that stands out the
24   most to me.
25        Q.   (BY MR. WHITE)  If you had questions about the
```

1    materials you received, were you able to reach out to

2    the Secretary of State's Office and get clarification?

3         A.   On most stuff, yes.  The ballot tracker was

4    tough because they basically designed it as required by

5    law, under an incredibly tight timeline, and it worked

6    well, I believe.  I don't -- well, but it worked better

7    with TEAM counties, I know that, for people that could

8    just sync up, where when -- when we have questions, they

9    would have to basically direct us to our vendor.

10                You will have to have the ven -- your

11   vendor who runs your voter registration figure out how

12   to -- how to sync with TEAM or how to send you these

13   alerts, and so that was not that helpful.  That coupled

14   with the timeline led that ballot tracker to really

15   just, in my opinion, not help our county very much at

16   all, our voters.

17        Q.   What was the issue with the timeline?

18        A.   The timeline was that the -- we didn't

19   receive, I believe, ballot tracker information till they

20   said it was already live; how -- however, it didn't work

21   on our -- on our side.  Applications had already been

22   coming in, it was, I believe, late January, and our

23   vendors didn't have enough time, once the ballot tracker

24   was up, or even maybe not available to the front-end

25   user, for them to do whatever they would need to do to

Page 69

1   sync our voter registration system with that and -- and

2   help us on that side of it.  So we were just -- it was

3   just a very tight schedule, to get everything into that.

4        Q.   What was making the schedule so tight, do you

5   know?

6        A.   I mean, I -- it could have begun with one, I

7   -- two parts:  one is the late, I would believe, the

8   passage of the law, as well as the complexity of all of

9   the components of SB 1.  There was a lot to implement in

10  a very little time.

11       Q.   Do you think the Secretary of State's Office

12  was intentionally delaying getting these materials out

13  to the county?

14            MS. SPECTOR:  Objection, calls for

15  speculation.

16       A.   No.

17       Q.   (BY MR. WHITE)  Do you think they were doing

18  the best they could on the timeline?

19            MS. SPECTOR:  Objection, calls for

20  speculation.

21       A.   I -- yes, I do.

22       Q.   (BY MR. WHITE)  When you have questions and

23  you reach out to the Secretary of State's Office, I

24  think you said you had a point of contact, correct?

25       A.   Yes.

Page 72

1    county made before you?

2        A.   Yes.

3        Q.   Okay.  And do you update -- strike that.

4             So what information is contained in your

5    offline vendor system that you use instead of the

6    statewide TEAM system?

7             MS. SPECTOR:  Objection, vague, compound.

8        A.   Yeah.  I mean, our voter -- it's our voter

9    registration database, so all of the records for our

10   registered voters.  We also do our ballot by mail

11   process through there, as far as, you know, the

12   requests.  We may screen -- screenshot things and attach

13   to the registration, but that's the majority of --

14   that's what we use, mostly, for any of our data

15   collection and maintenance.

16       Q.   (BY MR. WHITE)  And if the statewide system

17   receives changes or updates, do those get communicated

18   to your offline system?

19       A.   So basically every day we go into the back, a

20   portal on TEAM, and we may have a report on possible

21   felons or that's how we get our list maintenance from

22   the State.

23       Q.   And so you say a portal, can you kind of

24   explain what that looks like or what that is?

25       A.   Yeah.  Just you sign in with your credentials

Page 73

1    to get onto TEAM, and it will talk to you, it will show

2    you here's your reports and maybe, like, a TXT or CSV

3    file, and then we take that information and update our

4    -- we import it up into, I mean, Excel and update our --

5    our registration stuff with that.

6         Q.   Do you do those updates yourself, or is that

7    your vendor?

8                   MS. SPECTOR:  Objection, vague.

9         A.   We do the notification side of that ourselves,

10   but if it's just an update of addresses, or something

11   like that, we can also send a file to the vendor.  We

12   really decide.  It depends on how much information is in

13   each report.

14        Q.   (BY MR. WHITE)  And is this done every day?

15        A.   Basically, every day.

16        Q.   Are there updates that are not everyday

17   updates, that are on broader periods of time?

18                   MS. SPECTOR:  Object to form.

19        A.   Yes.  So we may get just -- we will check

20   every day, there may not always be -- you know, there

21   may not be a deceased list in there, there may not be a

22   felon list in there, but we will check to see what we

23   need to do to maintain our voter rolls.

24                   Now, if it's something where we're -- we

25   just are so busy it may be the next day, but it's always

Page 74

1  within a couple days of getting that we would check the

2  portal.

3       Q.   (BY MR. WHITE)  So prior to this March 2022

4  primary, was there a large update of voter registration

5  information that you received from the Secretary of

6  State's Office in the TEAM system?

7                 MS. SPECTOR:  Objection, vague.

8       A.   Was there a large update --

9       Q.   (BY MR. WHITE)  Are -- are you aware of the

10  process that the Secretary of State does to update the

11  voter registration information with information that

12  they receive from the Department of Public Safety?

13       A.   So the D --

14                 MS. SPECTOR:  Ob -- hold, objection,

15  vague.  Go ahead.

16       A.   I know that we get a list that we -- that they

17  have matched with the DPS in our system.

18       Q.   (BY MR. WHITE)  And what -- what do you

19  understand that process to do, as far as the information

20  in the voter registration file?

21       A.   That we would use that report if there were,

22  like, driver's license numbers on there or updates to

23  addresses, to update our voter registration list.

24       Q.   So would that add additional information to

25  your offline voter registration list?

Page 75

```
1        A.   Yes.

2        Q.   And how often does that information get

3   updated?

4             MS. SPECTOR:  Objection, vague.

5        A.   You mean the DPS list or how -- how often --

6   we check that portal daily, if not every other day, but

7   then we update it as it comes in.

8        Q.   (BY MR. WHITE)  So leading up to the -- the

9   March primary in -- in these webinars and discussions

10  with the Secretary of State's Office, did they make any

11  indication to you that they were doing an -- an offline

12  program to update that information particularly for this

13  election?

14            MS. SPECTOR:  Objection, vague.

15       A.   I believe so on the DPS side, so that we would

16  have driver's license numbers for some of our

17  registrants that may not have that.

18       Q.   (BY MR. WHITE)  So SOS was checking with DPS

19  to get better information on registered voters, to help

20  with the numerical identification process in SB 1, is

21  that correct?

22            MS. SPECTOR:  Objection, form, calls for

23  speculation.

24       A.   I believe so.

25       Q.   (BY MR. WHITE)  And -- and they reached out to
```

Page 76

1   the county elections administrators, to let them know
2   about that?
3       A.   Yes.
4       Q.   And you were aware of that process?
5       A.   Yes.
6       Q.   And did they send you a file with updated
7   information resulting from that?
8               MS. SPECTOR:  Object to form.
9       A.   Yeah.  An import, I believe, that we could
10  pull off of TEAMs.
11      Q.   (BY MR. WHITE)  And were you able to import
12  that information into your offline voter registration
13  list prior to March primary of this year?
14      A.   Yes.
15      Q.   Okay.  And -- and did you find that it added
16  additional information that you didn't have prior to the
17  update?
18              MS. SPECTOR:  Object to form.
19      A.   Yes.
20      Q.   (BY MR. WHITE)  And did it help you obtain
21  driver's license numbers for registered voters where you
22  didn't have them before?
23              MS. SPECTOR:  Object to form.
24      A.   Some of them, yes.
25      Q.   (BY MR. WHITE)  And did it help you obtain

Page 77

1    social security partial numbers for voters in your

2    registration list that you were missing before?

3                  MS. SPECTOR:  Object to form.

4        A.    Some of them, yes.

5        Q.    (BY MR. WHITE)  So would it have made it more

6    likely for a person voting by mail to be able to comply

7    with the new requirement to provide those numbers on the

8    application and the ballot?

9                  MS. SPECTOR:  Object to form, calls for

10   speculation.

11       A.    If we had those numbers on file, yes.

12       Q.    (BY MR. WHITE)  So the update gave you more of

13   those numbers, correct?

14       A.    Yes.

15       Q.    So is it fair to infer that it -- it improved

16   the ability of voters to be able to provide that

17   information, and you to match it?

18                 MS. SPECTOR:  Object to form, calls for

19   speculation.

20       A.    Yes.

21                 MS. SPECTOR:  Compound.

22       Q.    (BY MR. WHITE)  So bouncing a little back to

23   training, I think we talked about the election advisory

24   is the webinars that you got from the Secretary of

25   State's Office, how did you, at the county level, then

Page 79

```
 1        Q.   (BY MR. WHITE)  Yes.
 2        A.   Okay.  So we -- we use the webinars, we use
 3   information from the Secretary of State's Office.  We
 4   may get some information -- sometimes we'll have county
 5   trainings that just are something maybe on the system,
 6   we'll have trainings with our vendor, both our election
 7   management system as well as our voter registration.
 8             But any training that I really conduct
 9   with them, the information generally starts from the
10   State, and then I tweak it if it -- there's something
11   specific that we had -- would do with our county.
12        Q.   So when we get to the changes to the Election
13   Code in SB 1, what county-level training of poll workers
14   did you have to do to educate them about those changes?
15             MS. SPECTOR:  Object to form.
16        A.   The poll worker training was created by the
17   State, that's -- we -- we generally use theirs.  Again,
18   we may add a slide or two in, specific.  So the poll
19   worker training was given to us to cover changes to SB
20   1, as far as processes that the poll workers would be
21   involved in.
22             Unfortunately, we didn't receive that
23   training until the early voting period was beginning, so
24   those train -- those people that attended early voting
25   training did not have the updated slides, so we had to
```

Page 80

```
1    kind of send out an amended training to them.

2                    But that's generally the training that we

3    give our poll workers, is what we get from the Secretary

4    of State.  We have had other groups like El Paso Council

5    of the Blind some in and talk to them just a little bit

6    about helping someone who's maybe visually impaired, if

7    there's something that not covered.

8                    Disability Texas came in and has done

9    some trainings with us on just how to better serve our

10   disabled voters, so we've done that, but most of the

11   trainings for the poll workers come from the state

12   level.

13       Q.   (BY MR. WHITE)  And how long is the poll

14   worker training that you provide; how long does it take

15   to complete?

16       A.   We have different ones, so if it -- a

17   first-time poll worker training might be four hours, a

18   returning poll judge might be two hours.  It just

19   depends on if they've -- if they've done it before.  An

20   early voting is half the day, we do a morning session

21   and then we bring in another group and do an afternoon

22   session.

23       Q.   So are most of the workers that help run the

24   elections, are they volunteers?

25       A.   They're volunt --
```

Page 81

1          THE WITNESS:  I'm sorry, go ahead.

2          MS. SPECTOR:  I was just going to say

3   objection.

4          THE WITNESS:  Uh-huh.

5          MS. SPECTOR:  Okay.  Go ahead.

6     A.   They are volunteers in the way that they are

7   not mandated to work; my prior state, we -- we recruited

8   poll workers like jurors.  But they are paid, so they --

9   they're volunteers in the way that they don't have to

10  work, but they are paid, so in that way they are not

11  volunteers.

12     Q.   (BY MR. WHITE)  And those are the individuals

13  that would be going through this training that we just

14  discussed?

15     A.   Correct.

16     Q.   How many permanent employees do you have in

17  your office?

18          MS. SPECTOR:  Objection, vague.

19     A.   Fourteen besides myself.

20     Q.   (BY MR. WHITE)  And when you're running an

21  election like the March primary, how many people does it

22  take to do that?

23     A.   I believe we hired eight to ten temps for this

24  election, and poll workers over a thousand.

25     Q.   So it's a big ordeal?

Page 82

```
 1        A.   Yes.

 2        Q.   And when do you start training those poll

 3   workers?

 4        A.   Generally, we start training as soon as we get

 5   all the materials, but what we try to do is a couple

 6   weeks -- I'm trying to think -- three weeks before early

 7   voting we do early voting training.  So we do two weeks

 8   of early voting training or ten days, and then ten days

 9   of election worker training, we do -- so that when we

10   start early voting we've completed the trainings.

11   Because our staff is so tight, we don't have the staff

12   to oversee the early voting as well as the training at

13   the same time.

14        Q.   And would you say that SB 1 made a lot of

15   changes to the procedures that you have to go through to

16   run an election?

17             MS. SPECTOR:  Object to form.

18        A.   Yes.

19        Q.   (BY MR. WHITE)  And if you could set the

20   timeline for implementing those changes, how much time

21   would you prefer to have to be able to implement changes

22   like you saw in SB 1?

23             MS. SPECTOR:  Object to form.

24        A.   I think you need at least one, the

25   presidential election in that implementation time so
```

Page 83

1    that you're able to somehow inform as many voters as you

2    possibly can, I would say probably a year to eighteen

3    months.

4        Q.   (BY MR. WHITE)  So is that a year to 18 months

5    to get the process worked out, or just before you would

6    want to implement it in the first election cycle?

7             MS. SPECTOR:  Objection, compound, vague.

8        A.   If it were an example like this, I would say

9    before we -- before we begin to even implement it,

10   because of the fact that there were so many forms, I

11   would love to have some testing, like with the ballot

12   tracker, that we could test that.  It -- yeah, I would

13   say 12 to 18 months before we implement.

14       Q.   (BY MR. WHITE)  And would you say that the

15   fact that you didn't have 12 to 18 months probably led

16   to problems that you wouldn't have had if you did have

17   that much time?

18            MS. SPECTOR:  Objection, calls for

19   speculation --

20       A.   I --

21            MS. SPECTOR:  -- and --

22            THE WITNESS:  I'm sorry, go ahead.

23            MS. SPECTOR:  Go ahead.

24       A.   I believe that's part of it, and based on what

25   could happen in that 12 to 18 months, I -- I think would

Page 84

1     affect how -- how well it was even after that time.  I

2     mean, if in that 12 to 18 months we were able to review

3     the envelope and realize how crowded it was, and that

4     that was not going to be effective and that was able to

5     change, then that would be different.  If it's 12 to 18

6     months to implement as-is right now, I think that's

7     still -- it's -- it's still got some concerns.

8          Q.   (BY MR. WHITE)  So for the March 2022 primary,

9     were you having to deal with redistricting as well?

10         A.   We had completed our portion, I believe

11    January 9th or 12th we presented to the commissioners.

12    We had some people that worked on the maps nonstop for

13    about 12 to 15 days, and by nonstop I mean even into the

14    evening to get that -- so that it was updated to go.  So

15    by the time -- I mean, by the Election Day we were done,

16    but, in the process of getting ready for both, there was

17    some overlap.

18         Q.   Did the fact that you're having to do

19    redistricting changes at the same time as the changes

20    from SB 1 make it more difficult for you to implement

21    the changes of SB 1?

22              MS. SPECTOR:  Object to form, calls for

23    speculation.

24         A.   In the very beginning of January probably yes,

25    the very first couple weeks.

1   help a little, but I think having those options also was

2   helpful.

3        Q.   (BY MR. WHITE)   In your experience with

4   implementing voter ID, as you went through more election

5   cycles, did you see that the number of issues

6   experienced by voters decreased?

7             MS. SPECTOR:  Objection, vague.

8        A.   Again, I -- I'd have to look at the numbers on

9   the -- on the RID.  That would make me, I guess, look at

10  if the Reasonable Impediment Declaration is being less

11  -- used less and less, where voters are knowing they

12  need to have an ID.  I -- it's helped a little, yes.  I

13  will say it has improved since then.

14       Q.   (BY MR. WHITE)  Over time, do voters kind of

15  learn the new procedures?

16            MS. SPECTOR:  Objection, vague, calls for

17  speculation.

18       A.   I can't speak for all voters.  Eventually, I

19  do think that there -- that some do, yes.

20       Q.   (BY MR. WHITE)  Isn't that the point of doing

21  the voter outreach, to educate the voters?

22            MS. SPECTOR:  Objection, vague.

23       A.   Yes.

24       Q.   (BY MR. WHITE)  And I believe you said,

25  correct me if I'm wrong, but you're planning going

Page 89

1          MS. SPECTOR:  Objection, vague.

2     A.   My --

3          MS. SPECTOR:  Sorry.

4          THE WITNESS:  Sorry, go ahead.

5          MS. SPECTOR:  Calls for speculation. Go

6  ahead.

7     A.   My understanding is that their role is to

8  observe activities and point out any irregularities to

9  the election judge.

10    Q.   (BY MR. WHITE)  And in prior elections, have

11 poll watchers identified issues, true issues?

12          MS. SPECTOR:  Objection, vague.

13    A.   I -- I don't know for sure.  I'd have to say I

14 don't have one-on-one contact with the poll watchers, so

15 I have not heard of them, I guess, recognizing something

16 and pointing that out.  I -- I don't know for sure.

17    Q.   (BY MR. WHITE)  And in the November 2020

18 election, because of COVID did you make any changes to

19 the access of poll watchers in El Paso County?

20          MS. SPECTOR:  Objection, vague.

21    A.   No, we did not.

22    Q.   (BY MR. WHITE)  So they had the same access as

23 they would have had in prior elections?

24    A.   Yes.

25    Q.   Are you aware of anybody else in another

1    county limiting the access of poll watchers?

2              MS. SPECTOR:  Objection, calls for

3    speculation.

4         A.   I don't believe so, not that I know.

5         Q.   (BY MR. WHITE)  And what authority do the poll

6    watchers have when they're observing?

7              MS. SPECTOR:  Objection, calls for legal

8    conclusion.

9         A.   Prior to SB 1 or post SB 1?

10        Q.   (BY MR. WHITE)  Let's talk prior to SB 1,

11   what's your --

12        A.   Okay.

13        Q.   -- experience with that and what's your

14   understanding?

15        A.   The authority is that they basically would

16   bring a issue or a irregularity to the election judge,

17   and, if the election judge either ignored it or didn't

18   fix it, generally, I believe they would call us or -- or

19   call the Secretary of State's Office and file a

20   complaint.

21        Q.   And who selects who the poll watchers are?

22        A.   There's a couple different ways they can be

23   selected.  The poll watchers can be nominated or

24   appointed by the party, if it's a party election where

25   their party is on the ballot; the candidate, the -- a

1    group in -- in opposition or support of a referendum or

2    something on the ballot; and then I believe there is a

3    way, also, for a write-in candidate, and that's where

4    they get so -- so many signatures of registered voters,

5    and then they are able to also appoint a watcher.

6         Q.   And so prior to SB 1, for a poll watcher to

7    assume its duty, what did they have to show to you?

8         A.   They --

9              MS. SPECTOR:  Objection, vague.

10             THE WITNESS:  Sorry.

11             MS. SPECTOR:  Go ahead.

12        A.   They brought in a poll watcher certificate

13   that was filled out by whoever was appointing them,

14   generally, a signature on that, and then they presented

15   it to the judge, the judge signed it and then gave them

16   part of that back, and part of that stays with the

17   judge.

18        Q.   (BY MR. WHITE)  And prior to SB 1, have you

19   received complaints from poll watchers, that they

20   weren't able to perform their duties?

21             MS. SPECTOR:  Objection, vague.

22        A.   Yes.

23        Q.   (BY MR. WHITE)  And how do they make those

24   complaints?

25        A.   They generally called our office, the -- and

1    expressed to us what was going on at the location, but

2    they were not -- what they were wanting to do was not an

3    observable activity, and so we informed them of that,

4    that that was not something they had the right to do, or

5    the right at that moment, and that was how that initial

6    situation -- how that situation was handled.

7         Q.   Do you track the resolution of complaints of

8    that sort?

9              MS. SPECTOR:  Objection, vague.

10        A.   We have a resolution tracking on Election Day

11   and during early voting; however, it's generally if only

12   it needed further action, so that if someone calls and

13   says that, you know, this is happening and it's been

14   resolved, then we don't necessarily track it, no.

15        Q.   (BY MR. WHITE)  And what's the form of that

16   tracking system?

17        A.   There is a Google form that everyone in our

18   office uses, and it -- you put the information, how it

19   was resolved, who handled it.  Those Google forms are

20   collected and then put into a database.

21        Q.   Do you know if that information on that Google

22   form has been produced in this case yet?

23        A.   For the one, the poll watchers?

24        Q.   Yes.

25        A.   I took that call.  At that point, there was no

Page 93

1    further action, so I did not produce a form for that.

2    Later, as it continued, that case continued on, we

3    actually got involved with our -- our county attorneys

4    and the Secretary of State's Office, and therefore we

5    didn't do a Google form, because we had documentation on

6    it.

7        Q.   Oh, just I am ta -- now speaking of this

8    lawsuit that we're involved in, you understand that

9    there has been discovery requests made, right?

10       A.   Yes.

11       Q.   And the Google form that your office uses to

12   track issues, do you know if the information contained

13   in that form has been produced in this litigation?

14       A.   You mean just the blank form?

15       Q.   So the Google form that you have tracks issues

16   that you've had in the past and how they're resolved,

17   correct?

18              MS. SPECTOR:  Objection, vague.

19       A.   Yes.

20       Q.   (BY MR. WHITE)  And it's -- it has historical

21   information, correct?

22       A.   Yes.  It's transferred onto the -- the Excel

23   spreadsheet.

24       Q.   So has the information that you've tracked

25   about issues and their resolution, do you know if it's

1        Q.    And how far back in time does that go?

2        A.    I believe we started that in 2016.

3        Q.    And it -- is it current through the last

4   primary, March of this year?

5        A.    I'm not 100 percent sure that she's done

6   inputting from March, I would have to check on that.

7        Q.    And who does that inputting?

8        A.    We have two people in our office who work on

9   it, Melissa Rosales and Brenda Negrete.

10       Q.    And where does the information come that they

11   input into the system?

12       A.    They take them from the Google forms.

13       Q.    Okay.  So when an issue is identified, it's

14   filled out on Google forms, is that correct?

15       A.    Yeah.

16       Q.    And then you have individuals that take the

17   Google form and imp -- and put it into the spreadsheet?

18       A.    Correct.

19       Q.    And that's the spreadsheet that you save on

20   the common drive?

21       A.    Yes.

22       Q.    Okay.  So prior to SB 1, with respect to poll

23   watchers, have you ever had issues with the poll

24   watchers having -- going beyond their authority and

25   having to be controlled by elections officials?

1               MS. SPECTOR:  Objection, calls for legal

2   conclusion, vague.

3       A.   Yes.

4       Q.  (BY MR. WHITE)  And can you give some

5   examples?

6       A.   Really -- really, just one example that's --

7   in 2020, we had about 35 or 40 poll watchers, I don't

8   remember the exact number, but we had one specific poll

9   watcher who went into one location and was telling pe --

10   voters take off your mask, you don't need to wear masks,

11   this is, you know, kind of a hoax.

12            And then harassing the person we had at

13   that location who was in charge of disinfecting things.

14   He would go to a touch -- he would go touch it and then

15   tell her now wipe it down, do this, this, this.  That

16   was the first interaction we had with him.

17            Then he showed up at another location and

18   demanded the VUIDs of everybody working, which is public

19   information; however, it's not on demand.  You can

20   submit informa -- a request for that.  He then was

21   interfering.

22            He came to the courthouse to poll watch

23   at our main early voting location, and he demanded that

24   he get into our office and watch the clerks process

25   ballot by mail applications, which is not an observable

Page 98

1        A.   I think it was state court.  It was a writ of

2    mandamus, and the mandamus was denied.

3        Q.   And do you recall when that took place?

4        A.   It was in October of 2020, during the early

5    voting period.

6        Q.   Is it unusual for you to have to remove a poll

7    watcher from a polling place, in your experience?

8        A.   Yes.

9                MS. SPECTOR:  Objection, vague.

10               THE WITNESS:  I'm sorry.

11               MS. SPECTOR:  No, it's okay.

12       A.   Yes.

13       Q.   (BY MR. WHITE)  Do you recall any other

14   instances where you've had to remove a poll watcher,

15   other than this one we just talked about?

16       A.   There was a man with him, also, that was

17   demanding the information be obtained immediately on the

18   VUIDs of everyone.  He was removed from that location at

19   that point; however, he -- we didn't issue him a notice

20   that he was banned, it was just he was removed for

21   obstructing or interfering at that -- at that location.

22       Q.   So these two individuals in the 2020 general

23   election, that's the only poll watcher issues you recall

24   where people had to be removed?

25       A.   Yes.

Page 99

1    Q.   So following SB 1 in this March 2022 primary,

2    did you experience any issues with poll watchers in this

3    last election?

4    A.   I -- I honestly don't believe we had any poll

5    watchers in this last election, in the primary, so no.

6    Q.   So you couldn't speak to whether the changes

7    in SB 1 to the poll watcher access improve or degrade

8    the quality of the poll watching?

9         MS. SPECTOR:   Object to form.

10   A.   Correct.  We generally don't have a lot in the

11   primary, it's mostly our general elections that we would

12   see poll watchers.

13   Q.   (BY MR. WHITE)  So are you familiar with the

14   requirement in SB 1 that poll watchers have to go

15   through a training program?

16   A.   Yes.

17   Q.   And what is your understanding of that?

18   A.   It's designed by the Secretary of State's

19   Office, they participate online, they receive a receipt

20   that they participated and they present the

21   certification of completion to the judge with -- along

22   with their appointment when they show up at a polling

23   site.

24   Q.   And do you view that as a positive improvement

25   in SB 1?

```
 1        A.   Yes.

 2        Q.   And why is that?

 3        A.   I think there is -- based on the issue we had,

 4   I think there is a misunderstanding about what the -- a

 5   poll watcher's role is.  I know for a fact that issues

 6   we've had, people never even looked at the poll watcher

 7   guide, they didn't even know there was one, they are

 8   just appointed by someone and they go show up.

 9             For consistency reasons, I -- I think

10   having some sort of training; our poll workers go

11   through training, I believe a poll watcher should also

12   know what -- what they can and cannot do and have --

13   have something that keeps everybody, at least all the

14   poll watchers on the same page.

15             MS. SPECTOR:  Just a reminder, I think

16   we're approaching an hour.

17             MR. JEFF WHITE:  I'm happy taking a break

18   now, I think it's a good time.

19             MS. SPECTOR:  Up to you, yeah.

20             MR. JEFF WHITE:  Yeah, it's fine.

21             MS. SPECTOR:  Okay.  Cool.

22             VIDEOGRAPHER:  We are off record at 12:17

23   p.m.

24             (Off the record.)

25             VIDEOGRAPHER:  We are back on record at
```

1    1:23 p.m.

2        Q.   (BY MR. WHITE)  Ms. Wise, are you familiar

3    with the concept of sunshine laws?

4                MS. SPECTOR:  Objection, vague.

5        A.   In -- yes, familiar somewhat.

6        Q.   (BY MR. WHITE)  And what's your understanding

7    of them?

8                MS. SPECTOR:  Objection, calls for legal

9    conclusion.

10       A.   That some open meetings, things like that,

11   that there are things that need to be conducted in -- in

12   viewer with the public.

13       Q.   (BY MR. WHITE)  And -- and isn't the idea

14   behind these that if the public can see things, then

15   people are likely to act better?

16                MS. SPECTOR:  Objection, calls for

17   speculation, legal conclusion.

18       A.   I don't -- I -- I guess I don't -- I never

19   thought about it like that, as far as like better, but

20   have more information for sure.

21       Q.   (BY MR. WHITE)  So in the context of elections

22   and poll watchers, even if poll watchers don't identify

23   issues, could there be benefits to having them involved

24   and able to see the process?

25                MS. SPECTOR:  Object to form.

Page 102

```
1        A.   Absolutely, yes.

2        Q.   (BY MR. WHITE)  And in your -- strike that.

3             As an elections administrator, when you

4   know that poll watchers are going to be present at an

5   activity, do you take more steps in preparation to make

6   sure that it goes well?

7             MS. SPECTOR:  Object to form.

8        A.   I don't know if I would say we alter

9   activities, depending on whether a poll watcher will be

10  there.  A lot of times we don't know until they show up

11  and present the certificate.

12       Q.   (BY MR. WHITE)  So when you're setting up

13  voting machines, are watchers able to observe that

14  activity?

15       A.   Pre SB 1 or post SB 1?

16       Q.   Post SB 1.

17       A.   Yes.

18       Q.   And so this election cycle you knew that

19  watchers would be observing that activity, correct?

20       A.   I knew they could be.

21       Q.   So in preparation for that, did you test the

22  machines beforehand, to make sure that it would go well?

23            MS. SPECTOR:  Object to form.

24       A.   We test the machines before we deploy them, no

25  -- regardless of whether there will be -- for every
```

1    location, as required by law, whether we're going to

2    have poll watchers or not.

3         Q.   (BY MR. WHITE)  Would -- would it be

4    embarrassing if the public was president and some -- if

5    public was present and something went wrong?

6                   MS. SPECTOR:  Object to form.

7         A.   I don't know if embarrassing, yeah, it would

8    be unfortunate, I would not like it.

9         Q.   (BY MR. WHITE)  So to avoid that, you would do

10   what you could to make sure everything went well?

11                  MS. SPECTOR:  Object to form.

12        A.   We do that every election, whether the

13   public's there or not.

14        Q.   (BY MR. WHITE)  And does the public

15   necessarily know what you do if they're not there?

16                  MS. SPECTOR:  Object to form, calls for

17   speculation.

18        A.   Not necessarily.  Some people do, some people

19   -- some people don't.

20        Q.   (BY MR. WHITE)  So isn't there some benefit to

21   the public being able to see that you do your job well?

22                  MS. SPECTOR:  Object to form.

23        A.   Yes.

24        Q.   (BY MR. WHITE)  It makes them more confident

25   in the process?

```
 1                    MS. SPECTOR:  Object to form, calls for
 2    speculation.
 3         A.    I believe so.
 4         Q.    (BY MR. WHITE)  Are you familiar with the --
 5    the oath that poll watchers have to take according to SB
 6    1?
 7         A.    I have seen it, yes.
 8         Q.    And I believe you said in -- strike that.
 9               Would that have been first applied in the
10    March 2022 primary?
11         A.    That oath, yes.
12         Q.    And did you say that you didn't have any poll
13    watchers attend the March primary?
14         A.    Correct.
15         Q.    So you couldn't speak to the impact of that
16    change in the oath?
17                    MS. SPECTOR:  Object to form.
18         A.    Correct.
19         Q.    (BY MR. WHITE)  And are you familiar with the
20    increased access afforded to poll watchers in SB 1?
21                    MS. SPECTOR:  Object to form, calls for
22    legal conclusion.
23         A.    Yes.
24         Q.    (BY MR. WHITE)  And what is -- what is that
25    change?
```

1    the election.

2        Q.   (BY MR. WHITE)  And in prior elections before

3    SB 1, was it the practice of your elections office to

4    interfere with poll watchers?

5        A.   No.

6            MS. SPECTOR:  Objection.  Yeah, object to

7    form.

8        Q.   (BY MR. WHITE)  So after SB 1, do you know how

9    the change in that provision will impact your election

10   officials?

11            MS. SPECTOR:  Objection, calls for legal

12   conclusion.

13       A.   I don't know.  That's one of the questions we

14   did receive a lot from our poll workers, not knowing

15   during training if there would be poll watchers on, just

16   a little bit more direction on what does close enough to

17   hear or see, what does free movement mean, where can

18   they go?  That was a concern, I know, of theirs, that,

19   and we -- we really didn't have any answers to that,

20   because it is kind of vague, but we did not have any

21   instances during March of a poll watcher.

22       Q.   (BY MR. WHITE)  Did you have any instances of

23   shortages of elections officials because of that

24   provision?

25            MS. SPECTOR:  Objection, calls for

1    identification for voting by mail?

2                    MS. SPECTOR:  Objection, calls for legal

3    conclusion.

4         A.   That there is now a space on the application

5    that asks for either the last four digits of your social

6    security number or driver's license, and that one of

7    those needs to be filled out in order for us to accept

8    the application, and that once we receive that

9    application, we have to match that with one of the

10   identifiers we have on file in our system.

11        Q.   (BY MR. WHITE)  And -- strike that.

12                    How do you do the matching process on

13   applications for ballots by mail?

14                    MS. SPECTOR:  Objection, vague.

15        A.   We go into our voter registration system, and

16   there is a screen for an application for ballot by mail,

17   and we verify on both things if that registration has on

18   their record, if that voter has either the driver's

19   license that matches that, or the last four digits of

20   their social security that matches what they put on the

21   form.  If so, then we process it, assuming it's signed

22   and that everything else is filled out.

23        Q.   (BY MR. WHITE)  And in the March primary, did

24   you have voters who put both numbers on their form?

25                    MS. SPECTOR:  Objection, vague.

Page 120

 1    thought it was optional, or something like that.

 2         Q.   In the March 2022 primary, did you hear from

 3    any voter saying that they couldn't put the number down,

 4    because they didn't have their ID card or their driver's

 5    license anymore?

 6         A.   I don't remember getting a call that -- that

 7    has that as the reason.

 8         Q.   Do you track whether they put down one number

 9    or two on the application?

10              MS. SPECTOR:  Object to form.

11         A.   I don't believe we track whether they put one

12    or two on the application, no.

13         Q.   (BY MR. WHITE)  Do you track the reasons that

14    the application for ballot by mail was rejected for

15    failing to meet the numerical ID requirement of SB 1?

16              MS. SPECTOR:  Objection, vague.

17         A.   Yes.

18         Q.   (BY MR. WHITE)  And how do you do that?

19         A.   Our ballot by mail application process, the

20    system does not have that report available yet on the

21    rejected applications, it's only once you put the ballot

22    in, so we created, back when we switched -- when we

23    switched our -- our person in charge of that, and

24    switched some processes.  We basically create a

25    spreadsheet for the rejected applications on and list

Page 121

1    the reason why.

2        Q.   And did you review that to prepare for today's

3    deposition?

4        A.   I've reviewed it previously, not necessarily

5    just for this deposition.  When we were just working

6    through it during the election, I -- I reviewed it.

7        Q.   So do you understand, based on that form, what

8    the -- the reasons were that these applications for

9    ballot by mail were getting rejected?

10       A.   Yes.

11       Q.   And what was the major reason?

12                 MS. SPECTOR:  Objection, vague.

13       A.   Missing or incorrect identifier.

14       Q.   (BY MR. WHITE)  And does the form tell you why

15   it's missing or incorrect?

16                 MS. SPECTOR:  Objection, vague.

17       A.   No.

18       Q.   (BY MR. WHITE)  And stepping back to when you

19   checked the number, do you check your offline system to

20   match the number on the application for ballot by mail?

21                 MS. SPECTOR:  Objection, vague.

22       A.   No, we don't check -- the only thing that we

23   have that -- for applications, on rejections, if they're

24   accepted, they go into the system and then they go into

25   the process of having a bail -- a ballot sent out to

1    them.  If they're rejected, the current vendor that we

2    have, the current system that we have, that's why we had

3    to create the -- I'm sorry, the spreadsheet, so we don't

4    have -- we don't go in and check that on -- we don't

5    really have another database on that.

6                    Is that what you were asking?  I'm --

7         Q.   (BY MR. WHITE)  I think I asked a poor

8    question, so let me --

9         A.   Okay.

10        Q.   -- restate it.

11        A.   I'm sorry.

12        Q.   I'm kind of going back.

13        A.   Finding it.

14        Q.   The application for ballot by mail comes in --

15        A.   Uh-huh.

16        Q.   -- and you check the number to see if it

17   identifies the voter who registered, which of the

18   systems are you looking at, the TEAM system or your

19   offline system?

20        A.   Okay.  So we would norm -- first, we would

21   start out with our Votec system, which is the offline,

22   our -- from our vendor, and that was the first step.

23   Then next -- the next day when we go in and look at

24   TEAM, if that was -- we would go through those rejected

25   applications, and if that had been updated with the

Page 123

1    information, then we would take that and add that to our

2    database, and then be able to process the application.

3         Q.   And what would have caused that update in

4    TEAM?

5         A.   The State updating information, either through

6    the ballot tracker or through if they -- if they were

7    going to do one of those, I guess major updates like we

8    talked about earlier, through DPS.

9         Q.   Are you aware of concerns that some counties

10   had that the Secretary of State had updated TEAM with

11   new numbers, but it wasn't communicated down to the

12   county level?

13             MS. SPECTOR:  Objection, calls for

14   speculation.

15        A.   Yes.  I was aware of that.  I -- I believe

16   eventually we got all of the data, so there may have

17   been a slight delay in that process.

18        Q.   (BY MR. WHITE)  Is your understanding for

19   El Paso County that you did incorporate it --

20   incorporate the updated information from SOS with the

21   DPS matching already incorporated?

22        A.   Ye --

23             MS. SPECTOR:  Objection, vague.

24        A.   Yes.

25        Q.   (BY MR. WHITE)  And so did you have to look at

Page 124

1    both your offline system and TEAM when you were checking

2    the numbers, or did you just have everything in your

3    offline system?

4                    MS. SPECTOR:  Objection, compound.

5            A.   Once we get that, if we -- if you're talking

6    about that big group that came in, then we were able to

7    update our system, and we could go into that and just

8    check it with our vendor.  If you're talking about daily

9    updates, like from the ballot tracker, or let's say some

10   other information from the State, we check that daily.

11           Q.   (BY MR. WHITE)  Okay.

12                    MR. JEFF WHITE:  I think this will be

13   Exhibit 4 now, or are we up to 5?

14                    COURT REPORTER:  Four.

15                    MS. SPECTOR:  Four.

16                    MR. JEFF WHITE:  Four, okay.

17                    (Defendant's Exhibit No. 4 was marked for

18   identification.)

19                    MS. HARTNETT:  Can we get your --

20                    MR. JEFF WHITE:  Oh, I'm sorry.

21                    MS. SPECTOR:  No, no worries.

22                    MR. JEFF WHITE:  Let me make sure I don't

23   give you my highlighter now.

24                    MS. SPECTOR:  You can just give me the

25   one that you wrote 4 on, thank you.

1    -- I hate to say, I have to double check, but I believe

2    we did.

3        Q.    (BY MR. WHITE)   And so by February 17th, you

4    were still trying to incorporate that system into your

5    offline sys -- strike that.

6                  So by February 17th, you were still

7    trying to incorporate that file into your offline

8    system?

9        A.   I don't know if we were still working on the

10   DPS file, I know we were still getting -- looking for

11   updates, checking every day, did they update on the

12   tracker or any other imports we might get from the

13   State, but I don't -- I don't remember, exactly, if that

14   file was completed by then.

15       Q.   Okay.  And -- and now just can you read the

16   third bullet on that Slide 10, please?

17       A.   "If that's the case for your county, you

18   should also check voter personal identification

19   information in TEAM".

20       Q.   So what I'm wondering is when you were

21   receiving in these applications for ballot by mail, were

22   you checking both your offline system for the numbers

23   and TEAM, like this bullet directs you to, or were you

24   doing that?

25                  MS. SPECTOR:  Objection, vague.

Page 128

1        A.   Yes.  We would start with our online.  We

2    would start with our system, and then we would go into

3    TEAM if we had nothing.

4        Q.   (BY MR. WHITE)  So whenever you were checking

5    the numbers on an application for ballot by mail, you

6    were checking both systems?

7                    MS. SPECTOR:  Objection, vague.

8        A.   Yes.

9        Q.   (BY MR. WHITE)  And why were you doing that?

10        A.   One, because of the directive, but two, that

11    we knew that the State had told us that there were going

12    to be some DPS numbers that we may have not in our

13    system and that they did, and so we, in order to not

14    reject more than we had to, obviously, we were trying to

15    find whatever identifying numbers we could find.

16        Q.   And at the point in time when voters started

17    sending in these applications for ballot by mail,

18    listing both their ID number and their partial social

19    security number, what did you do if the system you were

20    checking against had one number but not the other?

21                    MS. SPECTOR:  Objection, vague.

22        A.   If they had both?  If they had put both on the

23    application?

24        Q.   (BY MR. WHITE)  Correct.

25        A.   We would process it as accepted, and we would

Page 129

1    add the other number to their registration number, so

2    that we'd have both on file.

3        Q.    So you didn't reject any ballots because a

4    voter put two numbers on their application for ballot by

5    mail?

6        A.    No.

7        Q.    And you didn't reject any applications if a

8    voter put two numbers, and both those numbers were not

9    in your system?

10                    MS. SPECTOR:    Objection, vague.

11       A.    If both were not, or both?

12       Q.    (BY MR. WHITE)    Let me restate it.

13                    So here is the hypothetical, a voter

14   sends in an application for ballot by mail, they listed

15   an ID number and they've listed a partial social

16   security number, and you go to your system to verify

17   that number, and you can match one of those numbers to

18   your system but not the other, would you accept that

19   application or reject it?

20       A.    Accept.

21       Q.    And why is that?

22       A.    Because the Code basically states that one

23   identifier, that just needed one or the other, and that

24   if you can identify that that is the same voter who is

25   registered in your system using those numbers, then to

Page 130

1    accept.

2    Q.   And if your system had one of those numbers

3    that you were able to match, but the application had two

4    numbers on it, would you update your system with the

5    number that you didn't have at the beginning?

6                MS. SPECTOR:  Objection, vague.

7    A.   Yes.

8    Q.   (BY MR. WHITE)  And why did you do that?

9    A.   One, because the most -- more information you

10   can have, the better; and also, two, if they were to

11   apply next year or next election, and let's say they put

12   the soc instead of the driver's license, we would be

13   able to at least match one of those numbers.

14   Q.   So is it fair to say over time, as voters go

15   through this process and are successful, that your

16   system will have more of the numbers that are needed in

17   it?

18                MS. SPECTOR:  Objection, calls for

19   speculation.

20   A.   If the voters put both numbers.

21   Q.   (BY MR. WHITE)  But in aggregate, if -- if you

22   are saying that some voters have done this, and you've

23   used it to add numbers to your system, over time your

24   system will have a more comprehensive list of the

25   numerical identifying information, correct?

```
 1                 MS. SPECTOR:  Object to form.

 2          A.   Yes.

 3          Q.   (BY MR. WHITE)  So when you receive the

 4   application for ballot by mail, and there is an issue

 5   that doesn't allow you to accept the ballot, you can't

 6   match the numbers, what do you do then?

 7          A.   We would send a notification to that applicant

 8   with a letter form from the Secretary of State's Office

 9   that informs them what they were missing, or why we were

10   not able to accept it, and with a clean form.  We

11   eventually began to put in the notice that we kind of

12   had created, fill both out, basically informing them

13   we're -- we recommend you fill both out, and mail it

14   back to them,  for them to fill it out completely and

15   send back.

16          Q.   And what was the form that you sent back to

17   them?

18          A.   It was the Notice of, I think it's called

19   Notice of Rejected Application for Mail, I believe, from

20   the Secretary of State's Office, and it would have in

21   there why it was rejected and how they could fix the

22   application.

23          Q.   And what are the different ways that they

24   could fix it?

25          A.   They could fill it out and re-send it in, or
```

Page 132

1    they could go -- come to our office and turn one in, or

2    they could go to the web -- the online tool web tracker

3    and update their information, so that it would then be

4    matched with what we have.

5        Q.   Was there an option to resubmit a registration

6    with the numbers?

7        A.   Eventually --

8             MS. SPECTOR:  Objection --

9             THE WITNESS:  I'm sorry.

10            MS. SPECTOR:  -- vague.  No, go ahead.

11       A.   Eventually, yes, we had a -- I believe it was

12   either a call or a webinar.  I think a webinar with the

13   Secretary of State's Office, where we asked could we

14   send a registration with the application, to tell them

15   update the registration using the number you are going

16   to use on this so that we have that on file?  Initially,

17   that was not included, but probably 10 to 14 days, I

18   think, inside of the -- the process then we did start

19   doing that.

20       Q.   (BY MR. WHITE)  So is that an example of

21   learning from this process and improving?

22            MS. SPECTOR:  Object to form.

23       A.   I think so, yes.

24       Q.   (BY MR. WHITE)  So of the applications for

25   ballot by mail that were rejected, do you know how many

Page 133

1   were corrected through one of these processes?

2      A.   Oh, I have the final number.  I don't know

3   exactly for through each process what was done.  I can

4   tell you the majority of the ballots that were corrected

5   were just sent back in -- the ballot applications just

6   sent back in.  I know we had eleven people use the

7   ballot tracker, and I -- I don't remember if that was

8   four and seven on ballot and application or seven and

9   four, so it was a very small number that used the ballot

10  tracker, I can tell you that.

11            So I would say the majority that did fix

12  it did by -- so via mail.  I don't know the exact number

13  off the top of my head.

14      Q.   Do you know how many applications for ballot

15  by mail were rejected in the March 2022 primary?

16            MS. SPECTOR:  Objection, vague.

17      A.   Do I?  Yes.  Can I think of it at this second?

18  I know we had a ballot -- honestly, I want to say around

19  400, but I don't have -- I -- I hate to say that without

20  reviewing the number.

21      Q.   (BY MR. WHITE)  Is it in a document somewhere?

22      A.   Yes, that we --

23      Q.   And --

24      A.   -- I think that we produced.

25      Q.   What document is that?

Page 137

1    have a marking on a reason of why they qualified to vote

2    by mail, they'd still have to be a registered voter.

3    And I can only speak to those two that I know that were

4    not -- did not have a registration on file.

5         Q.   (BY MR. WHITE)  So in El Paso County, you

6    create lists of what voters are registered in the

7    county, correct?

8         A.   We maintain the list.

9         Q.   And is that publically available?

10        A.   Yes.

11        Q.   And does that list include the name of the

12   voter?

13        A.   Yes.

14        Q.   And does it include the address of the voter?

15        A.   Unless it's been con -- unless they qualify

16   for confidential address under the state code.

17        Q.   Is that common?

18        A.   No.

19        Q.   And does it include the elections in which

20   they voted?

21             MS. SPECTOR:  Objection, vague.

22        A.   Yes.

23        Q.   (BY MR. WHITE)  The voter history is in that

24   public file, correct?

25             MS. SPECTOR:  Objection, vague.

Page 138

```
 1        A.    Correct.

 2        Q.    (BY MR. WHITE)  So apart from providing your

 3   driver's license number or your social security number,

 4   what other information is required on the form for

 5   application by ballot by mail?

 6              MS. SPECTOR:  Objection, vague.

 7        A.    Depending on the election there may be a party

 8   selection, if it's a primary; what qualifies you to vote

 9   by mail, so obviously your date of birth is required; if

10   you're voting by mail because of disability, you need to

11   mark that; if you're voting by mail because you're going

12   to be out of the county during early voting on Election

13   Day you mark that and then give us an address outside

14   the county to mail the ballot, that's that on the

15   qualifications.

16              The other information is what elections

17   you want.  There is the annual option, which is, if you

18   qualify, you must be 65 or over or have marked disabled

19   on the application, and in that example we'll give you a

20   ballot for every election that your jurisdiction is

21   participating in, we'll send you one so you don't have

22   to keep sending in the application.  Or you can mark the

23   -- this, in this one for example you could mark Democrat

24   or Republican primary or any resulting runoff, the

25   election selection.
```

Page 140

```
 1        A.   Yes.

 2        Q.   (BY MR. WHITE)  And when did you start

 3   maintaining that information?

 4             MS. SPECTOR:  Objection, calls for

 5   speculation.

 6        A.   Yeah.  I mean, well before I started.

 7        Q.   (BY MR. WHITE)  Do you remember what the

 8   requirement is to keep that information?

 9             MS. SPECTOR:  Objection, vague, calls for

10   legal conclusion.

11        A.   I'm sorry, I don't understand the question.

12        Q.   (BY MR. WHITE)  Do you remember what law

13   required you to gather that information when voters

14   registered?

15             MS. SPECTOR:  Same objections.

16        A.   I -- I don't know the law offhand.  I know

17   that -- that right now that's required from the

18   registration form, and that we do ask for that, but no,

19   that was well before I lived here, probably even in the

20   state of Texas.

21        Q.   (BY MR. WHITE)  Does the identification

22   number, whether it's the driver's license, a

23   certificate, identification certificate or your social

24   security number, does that end up in the public file

25   that can be obtained on voters?
```

Page 141

1          MS. SPECTOR: Objection, vague.

2     A.    It's in our system, but it's not run on the

3  voter file for the publically-released information.

4     Q.    (BY MR. WHITE)  So if I wrote in and asked for

5  all the voters registered in El Paso County, I wouldn't

6  get the driver's license number or the social security

7  number, correct?

8     A.    Correct.

9     Q.    And are the voter registration files regularly

10  requested from your office?

11          MS. SPECTOR: Objection, vague.

12     A.    Regularly?  I -- I mean, we get -- we get

13  requests.  I don't know exactly how many we've had, but

14  I would say monthly at least.

15     Q.    (BY MR. WHITE)  Is it a big file?

16          MS. SPECTOR: Objection, vague.

17     A.    It's large.

18     Q.    (BY MR. WHITE)  How many people are registered

19  in the -- in the system?

20     A.    About 495,000.

21     Q.    And do you know who's requesting those files?

22          MS. SPECTOR: Objection, vague.

23     A.    We -- it's we get different people.  We've had

24  media that requests it, we have campaigns or candidates

25  that request it, we have the city clerks who are allowed

1    by law to have a copy, so they'll take the list, and

2    that's -- that's about it.

3          Q.   (BY MR. WHITE)  So does adding an additional

4    requirement to the application for ballot by mail that's

5    not in that public file, would you admit that that makes

6    it more difficult for somebody to impersonate a

7    registered voter and request their ballot?

8               MS. SPECTOR:  Objection, calls for

9    speculation, vague.

10         A.   I mean, in my experience I have not seen an

11   impersonation on that form, but yes, I would say it

12   does.

13         Q.   (BY MR. WHITE)  And how would you know if

14   somebody was impersonating a registered voter and

15   requesting their ballot illegally?

16              MS. SPECTOR:  Object to form.

17         A.   I mean, generally, when we would get the

18   ballot, have it sent to that location, the address of

19   the registered voter.  If that person didn't ask it, we

20   -- we'll get calls and somebody might say -- we've had

21   this.

22              We have had this happen, where somebody

23   requested an annual ballot, maybe in January, and then

24   the ballot for the March election might come and they

25   may say I don't remember that I requested this, and so

1    we'll show them the form and they did.

2                    So I would assume we would be either

3    alerted to that, if a ballot was sent to an address that

4    someone did not request it, and then once the ballot is

5    returned, if it is, the signature verification on that.

6        Q.   (BY MR. WHITE)  And do you have any history of

7    people complaining about receiving a ballot that they

8    didn't request?

9                    MS. SPECTOR:  Objection, vague.

10       A.   Just those few examples where maybe they

11   forgot, but we have had people come down into our office

12   and actually review their application, and then they

13   will.  We've never had someone say no, that's absolutely

14   not my signature.  When they come in, they -- they've

15   all agreed yes, okay, I forgot that I sent this in, or I

16   didn't know that.

17                   MR. JEFF WHITE:  It's been an hour in

18   this session.  Why don't we take a break here for a

19   little bit?

20                   MS. SPECTOR:  Okay.

21                   VIDEOGRAPHER:  We are off record at 2:15

22   p.m.

23                   (Off the record.)

24                   VIDEOGRAPHER:  We are back on record at

25   2:32 p.m.

1    envelope where you have the identifier numbers, and we

2    would compare --

3                    (Sneeze.)

4                    THE WITNESS:  Bless you.

5        A.   -- we would compare that, similar to how we

6    did with the application, which is to go into the

7    system, see what we have on file.  And if we have a ma

8    -- if we have -- if we are able to match, then that goes

9    into the sealed box that will go to the Early Ballot

10   Boards.  If not, then we follow the processes in -- in

11   notifying the voter that the ballot was not accepted.

12       Q.   (BY MR. WHITE)  So who does the checking of

13   the carrier envelope in the elections office?

14       A.   Our ballot by mail staff.

15       Q.   And do they actually open up the carrier

16   envelope?

17       A.   No.

18       Q.   They are just checking the numerical

19   information?

20       A.   Correct.

21                   MS. SPECTOR:  Objection, vague.

22                   THE WITNESS:  I'm sorry.

23       A.   Correct.

24                   MS. SPECTOR:  It's okay.

25       Q.   (BY MR. WHITE)  And when they check the

1    numbers on the carrier envelope, are they checking that

2    it's the same number that was on the application for

3    ballot by mail?

4              MS. SPECTOR:  Objection, vague.

5         A.   It has to be a number we have on the file, it

6    doesn't necessarily have to be on the application, but

7    they -- if the application had let's say both, the

8    carrier could have one, if we added both of those to the

9    regis – to the file, so ...

10        Q.   (BY MR. WHITE)  So when you're checking the

11   carrier envelope numbers, if they put two numbers on the

12   carrier envelope, and either of them is in your

13   registration system, you would accept that ballot?

14        A.   Correct.

15        Q.   And if in the application process they had put

16   two numbers on the application, and one was missing from

17   your system, you would have added the second to your

18   system?

19        A.   Correct.

20        Q.   So by the time you get to checking the carrier

21   envelope, you may have more numbers in your system for

22   that voter than you did when you got the application, is

23   that correct?

24        A.   Correct.

25        Q.   And if either of the two numbers on the

Page 149

1    carrier envelope matches a number in your system, you

2    would accept that ballot?

3        A.   Correct.

4        Q.   Do you have numbers on how many ballots were

5    rejected, based on missing or incorrect numerical

6    identification information?

7        A.   I believe it was around 680.

8        Q.   So was that number higher than the rejections

9    on the applications for ballots by mail?

10            MS. SPECTOR:  Objection, vague.

11       A.   The applications had a lower rate of

12    rejections than the ballot, and I don't know exactly in

13    total.  I don't know the percentage, exactly the

14    percentage of the -- there was about 758 rejected

15    ballots, and then 63 of those were the identifier.

16    Again, that's from memory.

17       Q.   (BY MR. WHITE)  What was the difference

18    between the -- between the 600 number you just gave, 683

19    I believe, and the 700 number?

20       A.   Fifty-eight.  The -- the difference, the 683

21    was the identifier, and the 758 was the total --

22       Q.   So what --

23       A.   -- rejected.

24       Q.   What were other reasons for rejecting a ballot

25    by mail?

Page 151

1    test the second time around, correct?

2                MS. SPECTOR:  Object to form.

3        A.   To either put a number or to match what we

4    have on file.

5        Q.   (BY MR. WHITE)  And -- and you don't know why

6    that happened?

7                MS. SPECTOR:  Object to form.

8        A.   No.

9        Q.   (BY MR. WHITE)  Do you -- did you hear any

10    complaints about the form of the carrier envelope from

11    voters?

12        A.   Yes.

13        Q.   And what did you hear there?

14        A.   Kind of the same things we heard with the

15    application, either why -- especially if they did give

16    us a number on the application, that maybe they put the

17    DL on there, why do I have to give some -- do something

18    again?  Sometimes they'd say I -- you know, I may not

19    remember what I gave you, they would say the -- the

20    envelope is, again, like the form, so crowded with

21    information that they might have missed it, they might

22    not see where they're supposed to fill that out, they

23    might not have known it was required, because they

24    hadn't had to in the past, those same kind of things

25    like that.

Page 153

```
 1                  If we don't get through to them after
 2     basically one day of calls, then we just would put it
 3     back in the mail, because of how tight the time was we
 4     didn't want to just keep calling, and -- and the
 5     majority wanted it back in the mail.
 6          Q.   Did you do that process for every voter whose
 7     ballot was rejected?
 8          A.   Yes.
 9          Q.   And is that required by SB 1?
10          A.   To contact --
11                  THE WITNESS:  I'm sorry.
12                  MS. SPECTOR:  Objection, calls for legal
13     conclusion.
14                  Go ahead.
15          A.   To notify the voter or to call?  Yes.  The
16     requirement is, I believe, if there is a way to
17     communicate, to communicate with them, and then send the
18     ballot back with the Notification of Rejection and what
19     their options were for cure.
20          Q.   (BY MR. WHITE)  And do you ha -- does SB 1
21     require that you provide the same notification to all
22     voters?
23          A.   You're supposed to use a standard notification
24     to a voter.  However, the letter that accompanies that,
25     on a directive of the SOS, could change a little bit.
```

Page 154

1    So the notification will say your ballot was rejected,

2    here is the reason why, but we also could insert a

3    letter with that with a little bit more information.

4        Q.   And what additional information does that

5    letter have?

6        A.   The letter that we created has the actual

7    reason, so that in case you missed the "X" on the

8    notification or something, this is why, and then we also

9    included the notice that said, you know, basically

10   something like pursuant to -- I know I did produce this

11   -- but basically something that the Texas Election Code

12   has changed, you are now required to put an identifier

13   on that, it must match what we have on file.  We are

14   recommending that if you don't -- if you don't know what

15   we have on file, that you when in doubt, fill both out.

16              And so we put that in both English and

17   Spanish, as well as a screenshot of the envelope with

18   the area highlighted, so that they would hopefully find

19   it easier, see it, and not miss it this time.

20       Q.   After you started providing that additional

21   information, did the rejection rates of ballots go down?

22       A.   Yes.

23              MS. SPECTOR:  Object --

24              THE WITNESS:  I am sorry.

25              MS. SPECTOR:  It's okay.  Object to form.

1  speculation.

2      A.   I think they'd be more likely to know.

3      Q.   (BY MR. WHITE)  So isn't it logical to assume

4  that over time, the voting population would become more

5  educated about the new requirements for numerical

6  identification?

7              MS. SPECTOR:  Objection, calls for

8  speculation.

9      A.   I believe over time, yes.  However, there's --

10  there's such a different population of voters in a

11  primary and a general, and then a next election, and

12  then the next presidential, that it may not kick in

13  right away is what I'm saying.

14      Q.   (BY MR. WHITE)  Yeah.  And I believe we talked

15  about that earlier.

16              So there is a period of time over which

17  you touch on all those populations, correct?

18      A.   Yes.

19              MS. SPECTOR:  Objection, vague.

20              THE WITNESS:  Sorry.

21              MS. SPECTOR:  No, that's okay, just give

22  me some time to object.

23              THE WITNESS:  I'm sorry.

24              MS. SPECTOR:  No, it's okay.

25      Q.   (BY MR. WHITE)  And -- and how long in number

Page 157

1    of years or election cycles do you think that would be

2    before you touched on the different voting populations

3    in different elections?

4                    MS. SPECTOR:  Objection, calls for

5    speculation.

6         A.    I would say you want to hit a population at

7    least twice, and that would be four years.

8         Q.    (BY MR. WHITE)  Is one of the options, if a

9    mailed-in ballot is rejected, to cancel and vote in

10   person?

11        A.    Yes.

12        Q.    And how does that process work?

13        A.    If you received your ballot by mail and decide

14   that you don't want to vote in person, you can take the

15   ballot to the polling site, they'll spoil it, and then

16   you can vote in person, a regular ballot.  If you

17   received a ballot but it's -- you decide you don't want

18   to, and you don't have it with you when you go to the

19   polling site, you have to vote a provisional ballot so

20   that we can use the cure period to ensure that that mail

21   ballot was, in fact, not cast.

22        Q.    And is -- is that an option that voters can

23   use if they can't return their mail-in ballot in time?

24                    MS. SPECTOR:  Objection, vague.

25        A.    Have they already put in the mail, or they are

Page 158

1    choosing not to?

2        Q.    (BY MR. WHITE)  What is the latest you can

3    receive a mail-in ballot?

4        A.    So the -- for a civilian?

5        Q.    Yes, for a civilian.

6        A.    Okay.  The latest would be the close of

7    business of the business day following the election day,

8    as long as there is a readable postmark of before 7 p.m.

9    on Election Day.

10       Q.    And in the March primary, you return some

11   ballots to voters when they didn't initially pass the

12   numerical identification check, correct?

13       A.    Correct.

14       Q.    And did any of those voters call you and say

15   they didn't know that they could send it back in time?

16       A.    They didn't believe they'd be able to get it

17   back to us in time.

18       Q.    And if -- if somebody contacted you like that,

19   would you advise them of this cancellation process?

20       A.    There would be two things I would advise them

21   on.  I would say if you still want to vote that ballot

22   by mail, you can drop it off at the dropbox on Election

23   Day from 7 to 7, you don't even need to get out of your

24   car, kind of give them that option, or, if they want to

25   take it to the polling site and cancel it, they can, and

1   then vote a regular ballot.

2        Q.   Do you know how many voters exercised those

3   two options?

4             MS. SPECTOR:  Objection, compound.

5        A.   I know we had 200-plus voters who voted at the

6   polling site who had requested a ballot prior, and I

7   know that we had about, I'd say -- I want to say 40 who

8   used the dropbox on Election Day, and I don't know if

9   those were people who thought the mail wasn't going to

10  get through, or if they just, you know, wanted to use

11  that.

12       Q.   (BY MR. WHITE)  So the voters that dropped off

13  a mail-in ballot on Election Day, is that captured on

14  the form that you're required to fill out when they turn

15  in that ballot?

16       A.   Yes.

17       Q.   And is that form publically available?

18       A.   Yes.  And I believe it was produced, the --

19  the -- the oath and log from the dropbox.

20       Q.   And how do you track people that cancelled and

21  voted in person?

22            MS. SPECTOR:  Objection, vague.

23       A.   So they come in, they vote in person, their

24  ballot is kept in a spoiled ballot bag, as required by

25  law.  And then I believe, I'm not 100 percent sure that

1    there is an option on the early voting module ballot by

2    mail to mark where you can -- where we would mark

3    "received", we would mark "cancelled", but I would have

4    to double check that.

5         Q.   (BY MR. WHITE)  So I believe you said the

6    ballot tracker is one way for a voter to correct issues

7    with the numerical identification information on the

8    carrier envelope, is that correct?

9         A.   Yes.

10         Q.   And do you know how the ballot tracker lets

11    them do that?

12              MS. SPECTOR:  Objection, vague.

13         A.   So we still have to mail the ballot back to

14    them, and they then get on the ballot tracker, which

15    requires both driver's license and social -- last four

16    of soc, and then they would update it there, and then

17    they would update it on the ballot and we mail the

18    ballot back.

19         Q.   (BY MR. WHITE)  What do they update in the

20    ballot tracker?

21         A.   Oh, they would add -- I'm sorry, they would

22    add in there a -- an I -- their driver's license or last

23    four digits of soc.

24         Q.   And so they're required to send back the

25    ballot after they do that?

Page 161

1      A.   Yes.

2      Q.   You don't have the ballot with you, and then

3  you are just able to check it?

4      A.   No.

5      Q.   Okay.  And how long does a voter have to cure

6  issues with the numerical identification information on

7  the voted ballot?

8                MS. SPECTOR:  Objection, vague.

9      A.   I believe if we mail it to them, it has to be

10  returned at the same time as the ballot by mail for

11  civilian deadline, and, if they are -- if they say

12  they're going to come in and cure it in person, they

13  have until the end of the cure period, which is six days

14  after the election, at the close of business.

15     Q.   (BY MR. WHITE)  Do you know how many people

16  came in, in person, after Election Day, before the six

17  days after Election Day, to do that in-person cure?

18     A.   I don't know if we had any, I have to be

19  honest, but I don't know the exact number, but it may be

20  zero.

21     Q.   And I -- I may have asked this, I apologize,

22  but from the number of ballots that were rejected, do

23  you know how many of those people cured the issues with

24  the numerical identification information?

25                MS. SPECTOR:  Objection, vague.

Page 162

1    A.   That number I gave you was the final

2    rejection, so those were not cured.  I know we had, I

3    think, approximately 350 ballots that were cured in one

4    of the methods.

5    Q.   (BY MR. WHITE)   What do you mean in one of the

6    methods?

7    A.   Either by sending the ballot back in a second

8    time, cured, going on the tracker or coming in in

9    person.

10   Q.   So that's the cumulative total of --

11   A.   Yes.

12   Q.   -- cured?

13   A.   Yes.

14   Q.   So the total rejected initially would be the

15   cured plus the rejected final, is that correct?

16   A.   Yes.

17   Q.   And -- and you said you believe you produced

18   documents with the numbers --

19   A.   Yes.

20   Q.   -- of those?

21   A.   Reports with, I believe, even the names of

22   those people, and then you can tally that, but I --

23   that's, I believe, in the production documents.

24   Q.   Is there a title to that document?

25   A.   I don't know.  I don't -- I don't know the

Page 163

1    title off the top of my head, I'm sorry.

2        Q.   So can you explain what the difference is, or

3    what the different roles are for the Signature

4    Verification Committee and the Early Voting Ballot

5    Board?

6              MS. SPECTOR:  Objection, compound, vague,

7    calls for speculation.

8        A.   So the Signature Verification Committee is a

9    group of members that are appointed by the political

10   parties, and those members are tasked with taking the

11   sealed boxes of the carrier envelopes and matching

12   signatures, making sure that they're signed.  That's the

13   first step.  They compare it to other documents, usually

14   the application is the first one they might use.  They

15   review that.  Like I said, it's bipartisan.

16             The next group is the Early Ballot

17   Opening Board, that's the next step the ballot would go

18   to.  They would then, again bipartisan appointees from

19   both political parties, they would open the ballot

20   envelope together, as a team, and then basically take

21   the ballot out, flatten it a lot of times, because

22   that's a big part -- our envelopes are small -- and then

23   put those in the sealed boxes to be livered -- to be

24   delivered to Central Count Station.

25        Q.   (BY MR. WHITE)  So in El Paso County in March

1    2022, in that primary, did the Signature Verification

2    Committee play any role in checking the numerical

3    identification information?

4                    MS. SPECTOR:  Objection, vague.

5         A.   I believe they did on the last, you know, the

6    last bunch of early voting ballots that we had that

7    would come in after they started to meet, but it was the

8    last few days.

9         Q.   (BY MR. WHITE)  And did the Early Voting

10   Ballot Board play a role in checking the numerical

11   identification information?

12                   MS. SPECTOR:  Objection, vague.

13        A.   I don't believe so, because the Early Ballot

14   Board would get the ballot after signature verification,

15   so we would be able to take action from there.

16        Q.   (BY MR. WHITE)  So the reason I'm asking,

17   wasn't there training -- strike that.

18                   Did you participate in any trainings or

19   webinars with the Secretary's (sic) of State Office

20   where they suggested using the Signature Verification

21   Committee, because they could start looking at the

22   ballots sooner?

23        A.   Earlier.

24                   THE WITNESS:  I'm sorry.

25                   MS. SPECTOR:  It's okay.  Objection,

Page 165

1    vague.

2                    Go ahead.

3         Q.    (BY MR. WHITE)   And -- and what do you --

4         A.    Yes.

5         Q.    -- what do you remember from that training?

6         A.    That basically they said the early voting

7    clerk could review the identifier process if we had so

8    many ballots that we needed to do that, or they could go

9    straight to Signature Verification Committee, because

10   they started, I believe, 12 days prior to the election.

11                   Based on our numbers, and based on what

12   we had seen in the rejection rates of applications, we

13   went with the early voting clerk option to start.

14   Eventually, the Signature Verification Committee took

15   over with, I believe, like, the last, I would say maybe

16   the last four or five days.

17        Q.    So the Signature Verification Committee did

18   check that information at some point --

19        A.    Yes.

20        Q.    -- in the March primary?

21                   So if somebody was asking you how you

22   would improve the process of checking the numerical

23   information, the driver's license or the social security

24   number, what would your recommendation be as El Paso

25   elections administrator, El Paso County?

Page 167

1    possibly, make it a little bit easier.

2         Q.   Are you aware of any changes that the

3    Secretary of State's Office is planning to make to make

4    the forms easier to use?

5                   MS. SPECTOR:  Objection, calls for

6    speculation.

7         A.   I am not aware of them yet.  We have a

8    meeting, generally, at the end of the summer where they

9    release the new forms and we discuss that, all -- all of

10   the upcoming election stuff.

11        Q.   (BY MR. WHITE)  So would you expect that to be

12   a topic of discussion to how you can make it easier for

13   the voters to understand what they need to do?

14                  MS. SPECTOR:  Objection, calls for

15   speculation.

16        A.   I would hope so.

17        Q.   (BY MR. WHITE)  Would you expect the form to

18   change next time around?

19                  MS. SPECTOR:  Objection, calls for

20   speculation.

21        A.   Would I expect it to?  It needs to.  I would

22   like it to, but I -- I guess I don't know for sure if it

23   would be.

24        Q.   (BY MR. WHITE)  Would that be your

25   recommendation if you're talking to the Secretary of

1   State?

2        A.   Yes.

3        Q.   So jumping to a new topic --

4        A.   Okay.

5        Q.   -- signature verification, what changes did SB

6   1 make to the signature verification process on ballots

7   voted by mail?

8                  MS. SPECTOR:  Objection, calls for legal

9   conclusion.

10       A.   The -- obviously, that they now review the

11   identifier, that's something that's changed, and then

12   that they are able to contact voters and give them the

13   option to cure the ballot.  I believe that's the extent,

14   off the top of my head, that I can ...

15       Q.   (BY MR. WHITE)  Do you still have --

16       A.   I do.

17       Q.   -- SB 1 in front of you --

18       A.   Yes, sir.

19       Q.   -- Exhibit 3, I believe?

20       A.   Uh-huh.

21       Q.   So let me find the page real quick.

22                  So I will first direct you to Page 41 of

23   Exhibit 3, which is SB 1, and just let me know when

24   you're there.

25       A.   Yes.

1          Q.    And do you see Line 8 on Page 41 where it says

2    Section 5.11?

3          A.    I do.

4          Q.    So if we could flip over to Page 42, and if

5    you go down to Line 22 on Page 42, can you read the

6    first -- I think if you could just read that line that

7    goes from 22 to 26 on Page 42?

8          A.    "The committee may also compare the signatures

9    with any known signature of the voter on file with the

10   county clerk or voter registrar to determine whether the

11   signatures are those of the voter".

12         Q.    Are you familiar with that change in SB 1?

13         A.    Yes.

14         Q.    And so how did that affect the process in El

15   Paso County?

16         A.    I -- I don't know if it affected it greatly,

17   and I'll -- I'll say that generally we be -- between the

18   -- the signature on the application or the relatively

19   updated voter registration, we were generally able to

20   find, to match most of the signatures; however, this may

21   have given them more chances to match and then less

22   chance of rejection.

23         Q.    And how do you do signature matching in

24   elections in El Paso County?

25         A.    We, obviously, the Signature Verification

1    Board does it, Committee, not us.  We would either have

2    a computer available for them to look at a screenshot,

3    or we would print out the document for them to compare

4    to.

5         Q.   And so what signatures do you have on file

6    that they're comparing the ballot to?

7         A.   The application for ballot by mail, if there

8    is a voter registration within the timeline, the dime --

9    the time frame, that's another one that they use.  Those

10   are the two that I can think of right -- right off the

11   top of my head, the registration and application.

12        Q.   Are those stored in your system?

13        A.   Yes.

14        Q.   And how do they get stored in your system?

15        A.   We scan them in, and so we have a screenshot

16   of those documents.

17        Q.   So when somebody apply -- registers to vote,

18   they sign the form, you scan that form and save it?

19        A.   Yes.

20        Q.   And when somebody signs the application for

21   ballot by mail, you save that?

22        A.   If it was accepted.

23        Q.   Okay.

24        A.   Yes.

25        Q.   And after you've done, when somebody votes the

1   ballot by mail, and if you've checked it against the

2   others, do you save that signature, too?

3                  MS. SPECTOR:  Objection, vague.

4        A.   I don't believe so.

5        Q.   (BY MR. WHITE)  So --

6        A.   Not scanned, not electronically, we don't save

7   that --

8        Q.   Okay.

9        A.   -- signature, but we do have the hard copy.

10       Q.   So for voters that have sent in these forms

11   with signatures, the system you maintain, it tra -- it

12   keeps those stored for that voter, and --

13       A.   Yes.

14       Q.   Okay.

15       A.   I'm sorry, yes.

16       Q.   Sorry, I didn't mean to cut you off.

17                  So if you look at Exhibit 3, Line 23, do

18   you see the text in the brackets that's crossed out?

19       A.   Yes.

20       Q.   And what does that text say?

21       A.   "Two or more signatures" and "made within the

22   preceding six years and".

23       Q.   So is it your understanding that was the old

24   requirement?

25       A.   Yes.

1      Q.   And so is it your understanding that the new

2   requirement is that it can be any known signature on

3   file?

4      A.   Yes.

5      Q.   And -- and that gives more options when

6   checking to see if there's a signature match, is that

7   correct?

8      A.   Yes.

9      Q.   And is having more options when doing a

10   signature match helpful?

11               MS. SPECTOR:  Objection, calls for

12   speculation, vague.

13      A.   Yes.

14      Q.   (BY MR. WHITE)  And why is that?

15      A.   Because signatures change over time, and

16   signatures can change even from one document to another.

17   Sometimes we would have someone maybe who initialed a

18   document, but we may have their registration and their

19   application where they signed it, or so we are able to

20   compare that.  So yes, that does, it -- any more options

21   they have to match is going to be more helpful for them.

22      Q.   So would this be an example of a change in SB

23   1 that actually makes it easier to accept a vote?

24      A.   Yes.

25      Q.   And I will direct you in Exhibit 3 to Page 45,

Page 173

1    Line 1, and do you see that page?

2         A.    Page 45, Line 1?

3         Q.    Do you see where it says "Section 5.1 --

4         A.    Yes.

5         Q.    -- 3"?

6              So then can you turn to Page 46 of the

7    Exhibit, and at -- at Line 10, can you read that

8    sentence?

9         A.    "In making the determination under Section" --

10   I'm sorry, "Subsection (b)(2), to determine whether the

11   signatures are those of the voter, the board 12 may also

12   compare the signatures with any known signature of the

13   voter on file with the county clerk or voter registrar".

14        Q.    And do you under -- are you familiar with this

15   section?

16        A.    Yes.

17        Q.    And is this referring to the Early Voting

18   Ballot Board?

19        A.    Yes.

20        Q.    So both the signature verification and the

21   Early Voting Ballot Board are allowed to look at a

22   larger -- strike that.

23              So this lets the Early Voting Ballot

24   Board look at more signatures as well?

25              MS. SPECTOR:  Objection, calls for legal

Page 174

1    conclusion.

2         A.    Yes.

3         Q.    (BY MR. WHITE)  So is this another example of

4    SB 1 making it easier to accept a ballot voted by mail?

5              MS. SPECTOR:  Objection, vague.

6         A.    I would say so, yes.

7         Q.    (BY MR. WHITE)  And when does the Early Voting

8    Ballot Board check the signatures?

9         A.    Generally, they take the signatures that the

10   Signature Verification Committee could not agree on, or

11   thought may not match, so there is another step where

12   they go to the Early Ballot Board, and then they review

13   the signatures after them.

14        Q.    So is the Early Voting Ballot Board the final

15   say on whether it gets accepted or not?

16              MS. SPECTOR:  Objection, vague.

17        A.    I believe so.

18        Q.    (BY MR. WHITE)  Are there options available to

19   correct an issue if either the signature verification or

20   the Early Voting Ballot Board can't tell if it's the

21   same signature on the voted ballot?

22              MS. SPECTOR:  Objection, vague.

23        A.    I believe, yes, that the voter could come in

24   and cure it with a -- the cure option.

25        Q.    (BY MR. WHITE)  Do you know how long they have

Page 175

1    to do that?

2              MS. SPECTOR:  Objection, vague.

3         A.   I believe it's similar to the -- if they have

4    time to get it back in the bal -- in the mail, and then

5    have it returned by Election Day, they can.  Otherwise,

6    they can come in and cure it.  I -- that's off the top

7    of my head.

8         Q.   (BY MR. WHITE)  Okay.  Do you have Exhibit 3

9    in front of you, and can you go to Page 43?

10        A.   Uh-huh.

11        Q.   And Line 8 on Page 43, do you see where it's

12   --

13        A.   Wrong page.

14        Q.   I'm sorry, let me know when you're there.

15        A.   It's okay.  Yes.  I'm on the Page 43, yes.

16        Q.   And do you see Line 8 where it says "Section

17   5.12"?

18        A.   Yes.

19        Q.   And I'll give you a second to read that, if

20   you'd like.

21        A.   Yes.

22        Q.   So are you familiar with this provision in SB

23   1?

24        A.   Yes.

25        Q.   And is this ability to correct a signature

1    issue something new in SB 1?

2        A.   Yes.

3                THE WITNESS:  I'm sorry.

4                MS. SPECTOR:  It's okay.

5                Objection, calls for legal conclusion.

6        A.   Yes.

7        Q.   (BY MR. WHITE)  And in prior elections if you

8    received a ballot by mail, and the signature was

9    missing, was there a method that a voter could correct

10   that issue?

11               MS. SPECTOR:  Objection, vague.

12       A.   No.

13       Q.   (BY MR. WHITE)  And prior to SB 1, if you

14   received a ballot voted by mail, and the Signature

15   Verification Committee couldn't match that signature to

16   one on file, was there any way for the voter to correct

17   that?

18               MS. SPECTOR:  Objection, vague.

19       A.   No.

20       Q.   (BY MR. WHITE)  So SB 1 made it possible for

21   the voter to correct signature issues when there's -- a

22   match can't be determined?

23               MS. SPECTOR:  Objection, calls for legal

24   conclusion.

25       A.   Yes.

Page 177

1      Q.   (BY MR. WHITE)   And so is this another example

2      of SB 1 making it easier to accept a ballot voted by

3      mail?

4                MS. SPECTOR:  Objection, vague.

5      A.   Yes.

6      Q.   (BY MR. WHITE)  In the March 2022 primary, do

7      you know how many voters corrected a signature issue on

8      their voted ballot?

9      A.   I know that we had a little over 300 cures,

10     but I don't know if those were -- were signature or I --

11     identifier, I don't know.  I did -- I don't have the

12     breakdown of that.

13     Q.   Does the document you have on file track that

14     information?

15     A.   For the cu -- the reason that -- that they had

16     to cure?  I don't believe so, because it would just show

17     up in our system that that ballot has now been accepted.

18     Q.   So you don't know if the -- the voted ballot

19     was cured for a signature issue versus the numerical

20     identification information, is that correct?

21     A.   I don't know if it maintains the initial

22     rejection reason.  I'd have to look in the system, if

23     that was a possibility to -- to check that.

24     Q.   And what system are you referring to?

25     A.   In our -- I'm sorry, our voter registration

Page 184

1    the audio ballot is already programmed to read what's on

2    the screen, so in that example, that was something we

3    could not change.

4         Q.   But, generally, when a request for

5    accommodation is made, is it your practice to try to

6    make that accommodation?

7         A.   Yes, if it's possible.

8         Q.   And is that true after SB 1 as well?

9              MS. SPECTOR:  Objection, vague.

10        A.   I don't know if we've had a request since

11   then, so that's hard to speak to, but I can say that

12   yes, I would still try as hard as I could to -- to work

13   with them.

14        Q.   (BY MR. WHITE)  Did SB 1 make it harder for

15   you to accommodate disabled voters?

16              MS. SPECTOR:  Objection, vague, calls for

17   legal conclusion.

18        A.   That's hard to say.  If -- if there were, you

19   know, voters who marked disability on the ballot by mail

20   application, if they were rejected.  For in-person

21   voting, the assistance oath has more information

22   required on that, however we didn't have any issues with

23   that this election.  So as of right now, just maybe the

24   ballot by mail with the -- for the disability community

25   that requested.

1    Q.   (BY MR. WHITE)   And -- and when you're

2  referring to the ballot by mail, is your concern there

3  that you actually don't know whether they had a problem

4  or not?

5    A.   Just that I know that there's a -- that

6  there's a portion of ballot by mail that's specific, you

7  know, a population that is disabled community, and I

8  don't -- I don't know if they were, I guess yeah,

9  disproportionately affected by that --

10   Q.   Is that because --

11   A.   -- more work.

12   Q.   Is that because --

13   A.   Sorry.

14   Q.   -- they are voting by mail, and you don't see

15  what's happening on that end?

16        MS. SPECTOR:  Objection, vague, calls for

17  speculation.

18   A.   Yeah.  That part of it is difficult, but I

19  still know that they would have marked disability on the

20  reason for why they voted by mail.

21   Q.   (BY MR. WHITE)   But you can't say whether SB 1

22  made it harder for somebody voting by mail who needs

23  assistance to complete the voting process than before SB

24  1?

25        MS. SPECTOR:  Objection, calls for

1   speculation.

2        A.   I cannot say for sure, yes.

3        Q.   (BY MR. WHITE)   And -- and with respect to

4   in-person voting, did S -- strike that.

5             Based on the March 2022 primary and your

6   first election cycle implementing SB 1, was it more

7   difficult for you to accommodate voters who voted in

8   person?

9             MS. SPECTOR:   Objection, vague.

10       A.   I don't believe so.

11       Q.   (BY MR. WHITE)   Are you aware of the changes

12   to the permissible methods of in-person voting made in

13   SB 1?

14            MS. SPECTOR:   Object to form.

15       A.   Can you clarify that?   I'm sorry.

16       Q.   (BY MR. WHITE)   Sure.   So again I think it

17   might help --

18       A.   Okay.

19       Q.   -- if we refer to Exhibit 3, SB 1, and if you

20   could go to Page 14 of that document at Line 18, do you

21   see on that Line 18 on Page 14 where it says "Section

22   3.04"?

23       A.   Yes.

24       Q.   And it's pretty short, can you read that?

25       A.   The Line 18?

Page 196

```
1        Q.   (BY MR. WHITE)   So now I will go down starting
2    at Line 4 to Line 5 on Page 17 of Exhibit 3, do you see
3    that line?
4        A.   Yes.
5        Q.   And do you see where on Line 5 "four" is
6    underlined and "three" is in brackets and crossed
7    through?
8        A.   Yes.
9        Q.   Are you familiar with that change?
10       A.   Yes.
11       Q.   And so what does that change in SB 1 do?
12       A.   Requires that an entity -- I'm sorry, a
13   territory with fewer than 1000 registered voters remain
14   open for voting during early voting at least four hours
15   each day.
16       Q.   So that provision would not affect El Paso
17   County, correct?
18       A.   Correct.
19       Q.   That affects smaller counties?
20       A.   Yes.
21                 MS. SPECTOR:   Objection --
22                 THE WITNESS:   Sorry.
23                 MS. SPECTOR:   -- calls for legal
24   conclusion.
25                 Go ahead, it's okay.
```

Page 197

1     A.   Yes.

2     Q.   (BY MR. WHITE)  And that provision would

3  expand by from three to four hours, the minimum number

4  of hours of early voting on weekdays in those smaller

5  counties, correct?

6              MS. SPECTOR:  Objection, calls for legal

7  conclusion.

8     A.   Yes.

9     Q.   (BY MR. WHITE)  So is this another one that

10 actually expands the opportunity to vote early?

11             MS. SPECTOR:  Objection, calls for legal

12 conclusion.

13    A.   Yes.

14    Q.   (BY MR. WHITE)  And on Page 17 of Exhibit 3 at

15 Line 8, do you see where "55,000" is underlined and

16 "100,000" is in brackets and crossed out?

17    A.   Yes.

18    Q.   And starting at Line 10 on that same page, do

19 you see where it says, "at the main early voting polling

20 place for at least 12 hours on each weekday of the last

21 week of the early voting period"?

22    A.   I do.

23    Q.   And do you understand what this provision of

24 SB 1 does?

25             MS. SPECTOR:  Objection, calls for legal

Page 199

1              MS. SPECTOR:  Object to form.

2         A.   Yes.

3         Q.   (BY MR. WHITE)  And on Page 17 of Exhibit 3,

4    can you go to Line 23?

5         A.   Yes.

6         Q.   Do you see where it says, "A voter who has not

7    voted before the scheduled time for closing a polling

8    place is entitled to vote after that time if the voter

9    is in line at the polling place by closing time"?

10        A.   Yes.

11        Q.   Are you familiar with this provision of SB 1?

12        A.   Yes.

13        Q.   And what does this provision of SB 1 do?

14        A.   That if you were in line before the location

15   was scheduled to close, that you are able to vote, no

16   matter if it's one hour, two hours, three hours.  If you

17   are in line, then you will be processed.

18        Q.   And this is applicable to the early voting

19   period, correct?

20        A.   Correct.

21             MS. SPECTOR:  Objection, calls for legal

22   --

23             THE WITNESS:  I'm sorry.

24             MS. SPECTOR:  -- conclusion.

25             It's okay.

```
 1        A.    Yes.

 2        Q.    (BY MR. WHITE)  Was that a requirement prior

 3   to SB 1?

 4              MS. SPECTOR:  Objection, calls for legal

 5   conclusion.

 6        A.    I don't believe so.

 7        Q.    (BY MR. WHITE)  Was it a requirement for

 8   Election Day prior to SB 1?

 9              MS. SPECTOR:  Objection, calls for legal

10   conclusion.

11        A.    Yes.

12        Q.    (BY MR. WHITE)  So SB 1 took the requirement

13   of letting people who are in line when the polls close,

14   letting them complete their voting on Election Day, and

15   applied that to the early voting period as well?

16              MS. SPECTOR:  Same objection.

17        A.    Yes.

18        Q.    (BY MR. WHITE)  And so does that make it

19   easier to vote during the early voting period?

20              MS. SPECTOR:  Object to form.

21        A.    It gives more hours.

22        Q.    (BY MR. WHITE)  And in El Paso County, were

23   you letting people who were in line to vote at the end

24   of the -- the day during the early voting period, did

25   you let all of them vote?
```

1          MS. SPECTOR:  Object to form.

2     A.    Yes.

3     Q.    (BY MR. WHITE)  And you did that prior to

4     SB 1?

5     A.    Yes.

6          MS. SPECTOR:  Yeah, go ahead.

7     A.    Yes.

8     Q.    (BY MR. WHITE)  So this didn't affect El Paso

9     County, is that correct?

10         MS. SPECTOR:  Object to form.

11    A.    Correct.

12    Q.    (BY MR. WHITE)  But it could have made it

13    easier for people who arrived late during early voting

14    to vote in other counties, correct?

15         MS. SPECTOR:  Object to form.

16    A.    Yes.

17    Q.    (BY MR. WHITE)  All right.  Can you turn to

18    Page 18 of Exhibit 3 --

19    A.    Yes.

20    Q.    -- please?

21         And at Line 8 do you see where it says,

22    "Section 3.10"?

23    A.    Yes.

24    Q.    And at Line 14 do you see Subsection (e)?

25    A.    Yes.

Page 202

```
1       Q.   And on Line 15 through 16 do you see where it

2  has "55,000" underlined, "100,000" in brackets and

3  crossed out?

4       A.   Yes.

5       Q.   So does this change make this section

6  applicable to counties in Texas with smaller

7  populations?

8            MS. SPECTOR:  Objection, calls for legal

9  conclusion.

10      A.   Yes.

11      Q.   (BY MR. WHITE)  And if you go to Line 18

12  through Line 19 --

13      A.   Yes.

14      Q.   -- do you see where it says -- strike that.

15           Where at Line 17 through Line 19 on Page

16  18 of Exhibit 3, do you see where it says, "at the main

17  early voting polling place to be conducted on the last

18  Saturday of the early voting period for at least 12

19  hours"?

20      A.   Yes.

21      Q.   So what is that requirement?

22           MS. SPECTOR:  Objection, calls for legal

23  conclusion.

24      A.   Stating that the main early voting location on

25  -- on the final Saturday of er -- during the early
```

 1    voting period must be open for 12 hours for voters.

 2         Q.   (BY MR. WHITE)  Was that a requirement before

 3    SB 1?

 4                   MS. SPECTOR:  Objection, calls for legal

 5    conclusion.

 6         A.   No.

 7         Q.   (BY MR. WHITE)  So is that another expansion

 8    of opportunities to vote early --

 9                   MS. SPECTOR:  Objection --

10         Q.   (BY MR. WHITE)  -- resulting from SB 1?

11                   MS. SPECTOR:  Sorry.

12                   Object to form.

13         A.   An expansion on the hours for early voting,

14    yes.

15         Q.   (BY MR. WHITE)  And at Line 21 on Page 18, do

16    you see where "six" is underlined, "five" is in brackets

17    and crossed out?

18         A.   Yes.

19         Q.   And what does that change in SB 1 do?

20                   MS. SPECTOR:  Objection, calls for legal

21    conclusion.

22         A.   It adds a Sunday requirement for the early

23    voting period for at least six hours.

24         Q.   (BY MR. WHITE)  And before SB 1, that

25    requirement was five hours, correct?

```
 1        Q.   (BY MR. WHITE)  And were -- did this cover the
 2   early voting period prior to SB 1?
 3                  MS. SPECTOR:  Object to form.
 4        A.   No.
 5        Q.   (BY MR. WHITE)  So does this make it easier
 6   for voters to get off of work to vote during the early
 7   voting period?
 8                  MS. SPECTOR:  Object to form.
 9        A.   Legally, yes, it does.
10        Q.   (BY MR. WHITE)  So would you agree that
11   there's provisions in SB 1 that make early voting
12   easier?
13                  MS. SPECTOR:  Object to form.
14        A.   There are provisions in SB 1 that make early
15   voting easier, yes.
16        Q.   (BY MR. WHITE)  So Ms. Wise, in elections in
17   the past, are you aware of any allegations of fraud
18   conducted in El Paso County?
19                  MS. SPECTOR:  Object to form, and I'm
20   going to instruct you not to answer to the extent it
21   involved confidential information regarding
22   investigations.
23        A.   No.
24        Q.   (BY MR. WHITE)  Do you believe attempted fraud
25   occurs in El Paso County?
```

```
 1          A.   I believe there may be small, isolated

 2   incidences; however, in my experience, I have not seen

 3   any widespread fraud.

 4          Q.   Have -- have you received allegations of fraud

 5   happening in El Paso County?

 6                    MS. SPECTOR:  You can answer the

 7   question, but I think just don't disclose the content of

 8   any ongoing investigations.

 9          A.   Yes, I have.

10          Q.   (BY MR. WHITE)  And what is the nature of

11   those allegations of fraud?

12                    MS. SPECTOR:  Same instruction.

13          A.   I don't know what I'm at liberty to really

14   say.

15                    MS. SPECTOR:  I'll instruct you not to

16   answer regarding any ongoing investigations.  You can

17   talk about other --

18                    THE WITNESS:  Okay.

19                    MS. SPECTOR:  -- things.

20                    THE WITNESS:  Okay.

21          A.   We may have somebody who calls and says so and

22   so either doesn't live at that location, I -- anymore,

23   something like that.  They didn't have the correct ID,

24   something like that, allegations like that, but when we

25   look into it, generally, there was either an error on a
```

1  poll worker's part or a confusion by a voter, not an

2  intent, generally, to defraud.

3       Q.   (BY MR. WHITE)  Does the FBI have an election

4  fraud unit in El Paso, Texas?

5       A.   Yes.

6       Q.   Do you work with that unit?

7       A.   I do.

8       Q.   And how long have you been working with them?

9       A.   Since 2016.

10      Q.   And is that work related to allegations of

11  election fraud?

12      A.   Not just allegations.  Basically, they

13  contacted us in 2016 and said --

14           MS. SPECTOR:  Hold on one second.  I'm

15  going to give you the same instruction.

16           THE WITNESS:  Okay.

17           MS. SPECTOR:  Yeah.  You understand not

18  to disclose the --

19           THE WITNESS:  Yes.

20      A.   That we're here if something comes up, we're

21  here if you need us.  We meet with them before any

22  elections where there's federal races on the ballot and

23  discuss things that may come up; not necessarily fraud,

24  but if there's concern over something like aggressive

25  electioneering or anything like that, we've discussed in

Page 212

1    applications for ballot by mail, maybe a signature line

2    from the poll pad.

3         Q.   Are you aware of any allegations by candidates

4    for office in El Paso County that fraud occurred in

5    elections?

6              MS. SPECTOR:  Objection, calls for

7    speculation.

8         A.   We have received complaints before of that,

9    but we have not, to date, found any of those

10   substantiated.

11        Q.   (BY MR. WHITE)  Have any of them filed

12   lawsuits challenging election results based on fraud?

13             MS. SPECTOR:  Objection, calls for

14   speculation, vague.

15        A.   Yes.  However, I don't know if it was based on

16   fraud, it was challenging the election results on a -- I

17   guess a question on the machine.  That's all public

18   information.

19        Q.   (BY MR. WHITE)  And which challenge are you

20   referring to there?

21        A.   The 2018, March of 2018 election.

22        Q.   And who was raising those complaints?

23        A.   It was a group of, I believe, three people:

24   Norma Chávez was the first, Enrique Garcia was the

25   second name, and I don't remember the gentleman, the

1    the question?  I can't hear, because you're --

2                    MR. JEFF WHITE:  Oh, I'm sorry.

3                    MS. PERALES:  -- facing away from me, and

4    your voice is getting softer.

5                    MR. JEFF WHITE:  Sorry.  I will say it.

6         Q.    (BY MR. WHITE)  Are you aware of any

7    organizations that collect voter registration

8    information providing you with faulty information?

9                    MS. SPECTOR:  Objection, vague.

10        A.    No.

11        Q.    (BY MR. WHITE)  Have you had any complaints in

12   El Paso County about individuals providing assistance to

13   voters but pressuring the voter to vote a certain way?

14                   MS. SPECTOR:  Objection, vague, compound.

15        A.    We've had isolated incidences of someone

16   calling and say I -- I think I heard someone tell him

17   how to vote, or I was at the polling site and so and so

18   was telling their wife how to vote, those isolated

19   instance -- incidences, yes, but, you know, generally,

20   we would call the judge and ask them, did you -- did you

21   witness this, has this been an issue?  We haven't had

22   anything substantiated on that.  It's nothing that we've

23   had documentation on.

24        Q.    (BY MR. WHITE)  So in your opinion as

25   elections administrator, based on your experience, do

Page 216

```
1    you believe fraud occurs in elections in El Paso County?

2                    MS. SPECTOR:  Object to form.

3         A.   In my experience in El Paso County and my

4    experience in -- in Douglas County in Nebraska, very

5    isolated incidents.

6         Q.   (BY MR. WHITE)  And do you -- strike that.

7                    Do you think some voters in Texas think

8    that fraud occurs in elections?

9                    MS. SPECTOR:  Object to form, calls for

10   speculation.

11        A.   I do.

12        Q.   (BY MR. WHITE)  Do you hear from those voters

13   about their concerns about fraud?

14                   MS. SPECTOR:  Object to form.

15        A.   I do.  However, it seems that steps that we've

16   taken -- I mean, we used to get complaints about fraud

17   dealing with the machines, now we have paper-based

18   system, so that's -- you know, those are all -- have all

19   been basically handled.

20                   So it -- it seems like we get kind of a

21   little pocket here of an issue and then it's --

22   hopefully, it's gets resolved by either being

23   transparent or meeting with them, having them come lodge

24   an accuracy test, explaining processes and then it's

25   generally dropped.
```

1    Q.   (BY MR. WHITE)  So if citizens of Texas are

2    concerned about fraud, do you think it's a valid purpose

3    of the legislature to take steps to reduce that concern,

4    whether or not the fraud is actually happening or not?

5              MS. SPECTOR:  Object to form, calls for

6    legal conclusion, vague and calls for speculation.

7    A.   I believe to take necessary steps, reasonable

8    steps, yes.

9    Q.   (BY MR. WHITE)  If voters are concerned about

10   fraud, does that affect their confidence in the outcome

11   of elections?

12             MS. SPECTOR:  Object to form, calls for

13   speculation.

14   A.   Yes.

15   Q.   (BY MR. WHITE)  So if the legislature takes

16   steps that reduce their concern about fraud, would the

17   result be that they would have greater confidence in the

18   outcome of elections?

19             MS. SPECTOR:  Object to form, calls for

20   speculation.

21   A.   I think that's a pretty vague question.  I

22   think there's some steps that you -- that can be taken

23   for that, to reach that, however, I don't know if, you

24   know, voters also lose faith in the process if they

25   don't believe that their vote counts, or that they're

Page 218

1    not able to pro -- to cast a ballot, so there's a

2    balancing act there.

3         Q.   (BY MR. WHITE)  And whose job is it to balance

4    those considerations?

5                   MS. SPECTOR:  Object to form, calls for a

6    legal conclusion, calls for speculation.

7         A.   I think it's -- I think it's a group of

8    people.  I mean, I -- I think the legislator -- I --

9    legislature, I think the Secretary of State's Office and

10   I think local election officials.

11        Q.   (BY MR. WHITE)  Wouldn't you agree that the

12   legislature is the body that gets to set the election

13   laws in Texas?

14                  MS. SPECTOR:  Objection, calls for legal

15   conclusion.

16        A.   Yes, yes.

17        Q.   (BY MR. WHITE)  And they're elected by voters

18   in Texas, correct?

19                  MS. SPECTOR:  Objection, calls for legal

20   conclusion.

21        A.   They are, yes.

22        Q.   (BY MR. WHITE)  So in your opinion, is

23   uniformity throughout Texas and election procedures a

24   proper goal of when you set forth the laws --

25                  MS. SPECTOR:  Objection, calls for --

1      Q.   (BY MR. WHITE)  -- of the election?

2                MS. SPECTOR:  Oh, sorry.  Sorry, Jeff.

3      Calls for legal conclusion.  Go ahead and answer.

4      A.   I don't know if I would say uniformity in all

5      aspects.  I mean, this bill says 55,000 and more,

6      thousand and less.  I mean, we have 254 counties that

7      range in size.  To say blanket uniformity across the --

8      across the whole page is not -- I don't know if I would

9      agree with that.

10     Q.   (BY MR. WHITE)  Would you agree that it's

11     harder to monitor elections if 254 counties are doing it

12     each their own way?

13               MS. SPECTOR:  Object to form, calls for

14     speculation.

15     A.   To monitor for who?

16     Q.   (BY MR. WHITE)  So one of the rolls of the

17     Secretary of State is to ensure uniformity in elections,

18     correct?

19               MS. SPECTOR:  Object to form, calls for

20     legal conclusion.

21     A.   You -- I mean, I -- I guess I don't know 100

22     percent on the uniformity, I -- I -- that word is not, I

23     would say, definitely something that they're focused on.

24     I mean, I -- for an example, the state lets the counties

25     go out and pick their own vendors.

Page 220

1          My previous state, the state selected the

2   contract and everyone used the same system, so we have

3   different voter registration systems.  We have -- so

4   there's -- I don't know if I would say that uniformity

5   is something that -- that we -- that we do, that they

6   do.

7                  MR. JEFF WHITE:  Let's take another break

8   here, I think it's a good time.

9                  VIDEOGRAPHER:  We are off record at 4:28

10  p.m.

11                 (Off the record.)

12                 VIDEOGRAPHER:  We are back on record at

13  4:41 p.m.

14       Q.   (BY MR. WHITE)  Ms. Wise, I'm going to hand

15  you a document that should be Exhibit 6.

16                 (Defendant's Exhibit No. 6 was marked for

17  identification.)

18       A.   Thank you.

19       Q.   Can you look in the bottom left corner of

20  Exhibit 6, and -- and read what it says there?

21       A.   Exhibit 6, the tab?

22       Q.   On the document itself.

23       A.   Oh.

24       Q.   In the bottom left.

25       A.   "Election Summary 3/9/2022, 9:14 a.m."

Page 244

```
1        A.   No.

2        Q.   (BY MR. WHITE)   I'm going to show you one more

3   document.

4             Are you familiar with this Exhibit 12?

5             (Defendant's Exhibit No. 12 was marked

6   for identification.)

7        A.   Yes, I am.

8        Q.   (BY MR. WHITE)   And can you read the title at

9   the top?

10        A.   "Election Reconciliation Official Totals".

11        Q.   And down in the lower half of the page in the

12   Box 5 titled "Attestation", do you see that?

13        A.   Yes.

14        Q.   Is that your signature?

15        A.   Yes.

16        Q.   And do you recall signing this document?

17        A.   Yes.

18        Q.   Okay.  And what does this document show?

19        A.   This is the reconciliation form that shows the

20   break -- the breakdown of voters who may have checked

21   in, rejected ballots and then the counted ballots.

22        Q.   So just for my purposes I'd like to walk

23   through it, so can -- you see Box 1 that says "Voters"?

24        A.   Yes.

25        Q.   So what is shown in -- in (A) there?
```

```
 1                  UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3    LA UNION DEL PUEBLO ENTERO )
      et al.,                     )
 4          Plaintiffs,           )
                                  )
 5    v.                          ) Civil Action No. SA-21-CV-
                                  )              00844-XR
 6    GREGORY W. ABBOTT, et al., )
            Defendants.           )
 7

 8

 9

10                  REPORTER'S CERTIFICATION
                    DEPOSITION OF LISA WISE
11                      APRIL 13, 2022

12

13

14          I, Nancy Newhouse, Certified Shorthand Reporter

15    in and for the State of Texas, hereby certify to the

16    following:

17          That the witness, LISA WISE , was duly sworn by the

18    officer and that the transcript of the oral deposition is

19    a true record of the testimony given by the witness;

20          That the deposition transcript was submitted on

21    _____ to the witness or to the attorney for

22    the witness for examination, signature and return to me

23    by _____.

24

25
```

1              That the amount of time used by each party at

2    the deposition is as follows:

3        Ms. Nina Perales          - 00:00
         Mr. Graham W. White       - 00:00
4        Mr. Kevin Zhen            - 00:00
         Mr. Jason S. Kanterman    - 00:00
5        Ms. Julia R. Longoria     - 00:00
         Ms. Jasleen Singh         - 00:00
6        Ms. Wendy Olson           - 00:00
         Mr. Jaywin Singh Malhi    - 00:00
7        Ms. L. Brady Bender       - 00:00
         Mr. Greg Byran            - 00:00
8        Ms. Ashley Harris         - 00:00
         Mr. Thomas Buser-Clancy   - 00:00
9        Mr. Jeffery White         - 07:27
         Ms. Kathleen T. Hunker    - 00:00
10       Ms. Kelsey Spector        - 00:00
         Ms. Kathleen Hartnett     - 00:00
11       Ms. Angelica Leo          - 00:00
         Mr. Jed Untereker         - 00:00
12       Ms. Christina Sanchez     - 00:00
         Ms. Lisa Cubriel          - 00:00
13       Mr. Anthony J. Nelson     - 00:00
         Mr. Mark Bieter           - 00:00
14       Ms. Liegh Tognetti        - 00:00
         Ms. Josephine Ramirez Solis - 00:00
15

16

17              That pursuant to information given to the

18   deposition officer at the time said testimony was taken,

19   the following includes all parties of record:

20
      Ms. Nina Perales
21   MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND
     110 Broadway, Suite 300
22   San Antonio, Texas 78205

23   Mr. Graham W. White,  Attorney for Plaintiff LULAC
     LAW OFFICES OF ELIAS LAW GROUP, LLP
24   10 G Street NE, Suite 600
     Washington, D.C. 20002
25

```
 1              ALL PARTIES OF RECORD Continued

 2

 3      Mr. Kevin Zhen, LUPE, via Zoom Attorney for Plaintiff
        Southwest Voter
 4      Registration Education Project, Mexican American Bar
        Association of Texas, Texas Hispanics Organized for
 5      Polical Education, Jolt Action, William C. Velasquez
        Institute, Fiel Houston, Inc.
 6      LAW OFFICES OF FRIED, FRANK, HARRIS, SHRIVER & JACOBSON,
        LLP
 7      One New York Plaza
        New York, New York 10004
 8
        Mr. Jason S. Kanterman, LUPE, via Zoom  Attorney
 9      for Plaintiff Southwest Voter Registration Education
        Project, Mexican American Bar Association of Texas,
10      Texas Hispanics Organized for Political Education, Jolt
        Action, William C. Velasquez Institute, Fiel Houston,
11      Inc.
        LAW OFFICES OF FRIED, FRANK, HARRIS, SHRIVER & JACOBSON,
12      LLP
        One New York Plaza
13      New York, New York 10004

14      Ms. Julia R. Longoria, via Zoom Attorney for Plaintiff
        LUPE
15      MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND, INC
        110 Broadway, Suite 300
16      San Antonio, Texas 78205

17      Ms. Jasleen Singh, via Zoom Attorney for Plaintiff LUPE
        BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
18      120 Broadway, Suite 1750
        New York, New York 10271
19
        Ms. Wendy Olson, via Zoom Attorney for Plaintiff Mi
20      Familia Vota
        LAW OFFICES OF STOEL RIVES, LLP
21      101 South Capitol Boulevard, Suite 1900
        Boise, ID 83702
22
        Mr. Jaywin Singh Malhi, via Zoom Attorney for Plaintiff
23      DOJ
        TRIAL ATTORNEY VOTING SECTION, CIVIL RIGHTS DIVISION
24      950 Pennsylvania Avenue, NW
        Washington, DC 20530
25
```

```
 1              ALL PARTIES OF RECORD Continued

 2

 3     Ms. L. Brady Bender, via Zoom Attorney for Plaintiff DOJ
       DOJ TRIAL ATTORNEY VOTING SECTION, CIVIL RIGHTS
 4     DIVISION
       950 Pennsylvania Avenue, NW
 5     Washington, DC 20530

 6     Mr. Greg Byran, via Zoom Attorney for Plaintiff DOJ
       DOJ TRIAL ATTORNEY VOTING SECTION, CIVIL RIGHTS
 7     DIVISION
       950 Pennsylvania Avenue, NW
 8     Washington, DC 20530

 9     Ms. Ashley Harris, via Zoom Attorney for Plaintiff
       OCA-GH
10     ACLU FOUNDATION OF TEXAS, INC
       5225 Katy Freeway, Suite 350
11     Houston, Texas 77007

12     Mr. Thomas Buser-Clancy, via Zoom Attorney for Plaintiff
       OCA-GH
13     ACLU FOUNDATION OF TEXAS, INC
       5225 Katy Freeway, Suite 350
14     Houston, Texas 77007

15     Mr. Jeffery White, Attorney for Defendant OAG
       ATTORNEY GENERAL KEN PAXTON OFFICE
16     SPECIAL COUNSEL SPECIAL LITIGATION UNIT
       209 West 14th Street
17     Austin, Texas 78701

18     Ms. Kathleen T. Hunker, via Zoom Attorney for Defendant
       OAG
19     ATTORNEY GENERAL KEN PAXTON OFFICE
       SPECIAL COUNSEL SPECIAL LITIGATION UNIT
20     209 West 14th Street
       Austin, Texas 78701
21
       Ms. Kelsey Spector, Attorney for Defendant & Lisa Wise
22     El Paso County
       LAW OFFICES OF COOLEY, LLP
23     3 Embarcadeo Center, 20th Floor
       San Francisco, California 94111
24

25
```

```
 1                 ALL PARTIES OF RECORD Continued

 2

 3    Ms. Kathleen Hartnett, Attorney for Defendant El Paso
      County
 4    LAW OFFICES OF COOLEY, LLP
      3 Embarcadeo Center, 20th Floor
 5    San Francisco, California 94111

 6    Ms. Angelica Leo, via Zoom Attorney for Defendant El
      Paso County
 7    LAW OFFICES OF COOLEY, LLP
      3175 Hanover Street
 8    Palo Alto, California 94304

 9    Mr. Jed Untereker, via Zoom Attorney for Defendant El
      Paso County
10    ASSISTANT COUNTY ATTORNEY-CIVIL DIVISION CHIEF
      500 East San Antonio, Room 503
11    El Paso, Texas 79901

12    Ms. Christina Sanchez, Attorney for Defendant El Paso
      County
13    DIRECTOR ASSISTANT COUNTY ATTORNEY
      500 East San Antonio, Room 503
14    El Paso, Texas 79901

15    Ms. Lisa Cubriel, via Zoom Attorney for Defendant
      ASSISTANT DISTRICT ATTORNEY CIVIL DIVISION
16    101 West Nueva Street, 7th Floor
      San Antonio, Texas 78205
17
      Mr. Anthony J. Nelson, via Zoom Attorney for Defendants
18    Rebecca Guerrero and José Garza
      ASSISTANT COUNTY ATTORNEY, TRAVIS COUNTY ATTORNEY'S
19    OFFICE
      314 West 11th Street, Suite 500
20    Austin, Texas 78767

21    Ms. Liegh Tognetti, via Zoom Attorney for Defendant
      ASSISTANT DISTRICT ATTORNEY, HIDALGO COUNTY COMMUNITY
22    SERVICE AGENCY
      2524 North Closner Boulevard
23    Edinburg, Texas 78541

24

25
```

Page 259

```
 1                ALL PARTIES OF RECORD Continued

 2

 3    Ms. Josephine Ramirez Solis, via Zoom Attorney for
      Defendant
 4    ASSISTANT CRIMINAL DISTRICT ATTORNEY
      100 East Cano
 5    Edinburg, Texas 78539

 6              I further certify that I am neither counsel

 7    for, related to, nor employed by any of the parties or

 8    attorneys in the action in which this proceeding was

 9    taken, and further that I am not financially or otherwise

10    interested in the outcome of the action.

11              Certified to by me this 28th day of April,

12    2022.

13

14                     _____
                       NANCY NEWHOUSE, Texas CSR 9000
                       Expiration Date:  08/31/23
15                     Firm Registration No. 633
                       Magna Legal Services
16                     16414 San Pedro Avenue, Suite 900
                       San Antonio, Texas 78232
17                     Telephone: (866) 806-8265

18

19

20

21

22

23

24

25
```

**DEPOSITION TRANSCRIPT ERRATA SHEET**
**(Changes and Signature)**

| | |
|---|---|
| **DEPONENT:** | Lisa Wise |
| **CASE NAME:** | La Union del Pueblo Entero. et. al. v. Gregory W. Abbott. |
| **CASE NUMBER:** | SA-21-CV-00844-XR |
| **DEPOSITION DATE:** | **April 13, 2022, Volume 1** |

| Pg:Ln | Change | Reason |
|---|---|---|
| 29:23 | Delete <the> | Transcription error |
| 31:16 | Change <there's> to <there are> | Transcription error |
| 31:22 | Delete <goes> | Transcription error |
| 34:12 | Insert <and different> between <new> and <than> | Transcription error |
| 34:15 | Change <foot> to <feet> | Typographical error |
| 37:5 | Insert <phrase> after <catchy> | Transcription error |
| 37:16 | Delete the <at> between <located> and <here> | Transcription error |
| 51:14 | Delete <see my mind> | Transcription error |
| 57:10 | Change <on Election Day manage> to <manage on Election Day> | Transcription error |
| 63:10 | Insert <for> between <call> and <privileged> | Transcription error |
| 68:5-6 | Changed <worked well> to <didn't work well> | Transcription error |
| 71:11-13 | Change <which is I believe an elect – Texas Election Administrative Management, if – I believe that's what it's – it> to < – Texas Election Administrative Management – I believe that's what it> | Transcription error |
| 72:21 | Change <felons or that's> to <felons. That> | Transcription error |
| 78:12 | Change <then> to <them> | Typographical error |

_____        5/23/2022
Lisa Wise                              Date

1.

| Pg:Ln | Change | Reason |
|---|---|---|
| 79:18 | Insert <to El Paso County> after <specific> | Transcription error |
| 90:16 | Change <a issue or a irregularity> to <an issue or an irregularity> | Typographical error |
| 92:11 | Change <if only> to <only if> | Typographical error |
| 101:12 | Change <viewer with> to <view of> | Transcription error |
| 133:2 | Delete <through> | Transcription error |
| 141:3 | Change <publically-released> to <publicly-released> | Typographical error |
| 149:15 | Change <63> to <683> | Transcription error |
| 154:15 | Change <that you when in doubt> to <that when you are in doubt> | Transcription error |
| 163:23 | Delete <to be livered> | Transcription error |
| 169:25-170:1 | Change <Signature Verification Board does it, Committee> to <Signature Verification Committee does it> | Transcription error |
| 173:11 | Delete <12> | Transcription error |
| 178:5 | Change <basic> to <basically> | Typographical error |
| 178:21-22 | Change <top of my – > to <top of my head.> | Transcription error |
| 184:25 | Insert <them> after <requested> | Transcription error |
| 210:25 | Change <yes, little> to <yes, a little> | Transcription error |
| 248:8 | Insert <the number of ballots with the number of voters> between <comparing> and <must be> | Transcription error |

Lisa Wise                5/23/22
                          Date

2.

I, LISA WISE, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noticed above.

_____
Lisa Wise

THE STATE OF TEXAS
COUNTY OF _El Paso_

Before me, _Vanessa S Ruiz_, on this day personally appeared LISA WISE, known to me (or proved to me under oath or through _DL_) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _23_ day of _May 2022_.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _Texas_

**Vanessa Sibonea Ruiz**
NOTARY PUBLIC
ID# 12506557-0
in and for the State of Texas
My commission expires
**08-10-2024**

269152905

3.

Chapter 1

S.B. No. 1

1                              AN ACT

2  relating to election integrity and security, including by
3  preventing fraud in the conduct of elections in this state;
4  increasing criminal penalties; creating criminal offenses.

5       BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

6                   ARTICLE 1. GENERAL PROVISIONS

7       SECTION 1.01.  SHORT TITLE.  This Act may be cited as the
8  Election Integrity Protection Act of 2021.

9       SECTION 1.02.  PURPOSE.  The purpose of this Act is to
10 exercise the legislature's constitutional authority under Section
11 4, Article VI, Texas Constitution, to make all laws necessary to
12 detect and punish fraud.

13      SECTION 1.03.  FINDINGS. The legislature finds that:

14           (1)  full, free, and fair elections are the
15 underpinnings of a stable constitutional democracy;

16           (2)  fraud in elections threatens the stability of a
17 constitutional democracy by undermining public confidence in the
18 legitimacy of public officers chosen by election;

19           (3)  reforms are needed to the election laws of this
20 state to ensure that fraud does not undermine the public confidence
21 in the electoral process;

22           (4)  the reforms to the election laws of this state made
23 by this Act are not intended to impair the right of free suffrage
24 guaranteed to the people of Texas by the United States and Texas

1



EXHIBIT  3
WIT: Lisa Wise
DATE: 4-13-2022
Nancy Newhouse, CSR

1 Constitutions, but are enacted solely to prevent fraud in the
2 electoral process and ensure that all legally cast ballots are
3 counted. Integral to the right to vote is the assurance of voter
4 access and the right for all votes legally cast to be counted;

5    (5) additionally, preventing a valid vote from being
6 counted violates the basic constitutional rights guaranteed to each
7 citizen by the United States Constitution; and

8    (6) providing for voter access and increasing the
9 stability of a constitutional democracy ensures public confidence
10 in the legitimacy of public officers chosen by election.

11    SECTION 1.04. Chapter 1, Election Code, is amended by
12 adding Section 1.0015 to read as follows:

13    Sec. 1.0015. LEGISLATIVE INTENT. It is the intent of the
14 legislature that the application of this code and the conduct of
15 elections be uniform and consistent throughout this state to reduce
16 the likelihood of fraud in the conduct of elections, protect the
17 secrecy of the ballot, promote voter access, and ensure that all
18 legally cast ballots are counted.

19    SECTION 1.05. Section 1.003, Election Code, is amended by
20 adding Subsection (a-1) to read as follows:

21    (a-1) Election officials and other public officials shall
22 strictly construe the provisions of this code to effect the intent
23 of the legislature under Section 1.0015.

24    SECTION 1.06. Section 1.005, Election Code, is amended by
25 amending Subdivision (4-a) and adding Subdivision (4-b) to read as
26 follows:

27    (4-a) "Election official" means:

1              (A)  a county clerk;

2              (B)  a permanent or temporary deputy county clerk;

3              (C)  an elections administrator;

4              (D)  a permanent or temporary employee of an

5    elections administrator;

6              (E)  an election judge;

7              (F)  an alternate election judge;

8              (G)  an early voting clerk;

9              (H)  a deputy early voting clerk;

10             (I)  an election clerk;

11             (J)  the presiding judge of an early voting ballot

12   board;

13             (K)  the alternate presiding judge of an early

14   voting ballot board;

15             (L)  a member of an early voting ballot board;

16             (M)  the chair of a signature verification

17   committee;

18             (N)  the vice chair of a signature verification

19   committee;

20             (O)  a member of a signature verification

21   committee;

22             (P)  the presiding judge of a central counting

23   station;

24             (Q)  the alternate presiding judge of a central

25   counting station;

26             (R)  a central counting station manager;

27             (S)  a central counting station clerk;

```
1                    (T)  a tabulation supervisor;
2                    (U)  an assistant to a tabulation supervisor; and
3                    (V)  a chair of a county political party holding a
4   primary election or a runoff primary election.
5              (4-b)  "Federal judge" means:
6                    (A)  a judge, former judge, or retired judge of a
7   United States court of appeals;
8                    (B)  a judge, former judge, or retired judge of a
9   United States district court;
10                   (C)  a judge, former judge, or retired judge of a
11  United States bankruptcy court; or
12                   (D)  a magistrate judge, former magistrate judge,
13  or retired magistrate judge of a United States district court.
14        SECTION 1.07.  Section 1.018, Election Code, is amended to
15  read as follows:
16        Sec. 1.018.  APPLICABILITY OF PENAL CODE.  In addition to
17  Section 1.03, Penal Code, and to other titles of the Penal Code that
18  may apply to this code, Titles 2 and [Title] 4, Penal Code, apply
19  [applies] to offenses prescribed by this code.
20        SECTION 1.08.  Chapter 1, Election Code, is  amended  by
21  adding Section 1.022 to read as follows:
22        Sec. 1.022.  REASONABLE ACCOMMODATION OR MODIFICATION.  A
23  provision of this code may not be interpreted to prohibit or limit
24  the  right  of  a  qualified  individual  with  a  disability  from
25  requesting  a  reasonable  accommodation  or  modification  to  any
26  election standard, practice, or procedure mandated by law or rule
27  that the individual is entitled to request under federal or state
```

4

1  law.
2           ARTICLE 2.  REGISTRATION OF VOTERS
3       SECTION 2.01.  Section 13.002, Election Code, is amended by
4  adding Subsection (c-1) to read as follows:
5       (c-1)  The information required under Subsections (c)(3),
6  (4), (5), (6), and (8) must be supplied by the person desiring to
7  register to vote.
8       SECTION 2.02.  Section 13.007, Election Code, is amended to
9  read as follows:
10      Sec. 13.007.  FALSE STATEMENT ON APPLICATION.  (a)  A person
11 commits an offense if the person knowingly or intentionally:
12           (1)  makes a false statement; or
13           (2)  requests, commands, coerces, or attempts to induce
14 another person to make a false statement on a registration
15 application.
16      (b)  An offense under this section is a Class A [B]
17 misdemeanor, except that an offense under this section is a state
18 jail felony if the person:
19           (1)  directly or through a third party offers or
20 provides compensation or other benefit to a person for activity
21 described by Subsection (a); or
22           (2)  solicits, receives, or accepts compensation or
23 other benefit for an activity described by Subsection (a).
24      (c)  If conduct that constitutes an offense under this
25 section also constitutes an offense under another law, the actor
26 may be prosecuted under this section, the other law, or both. [For
27 purposes of this code, an offense under this section is considered

5

1  to be perjury, but may be prosecuted only under this section.]

2      SECTION 2.03.  Section 15.021, Election Code, is amended by

3  amending Subsections (b) and (d) and adding Subsections (d-1) and

4  (d-2) to read as follows:

5      (b)  Except as provided by Subsection (d), the [The] voter

6  shall  use  the  registration  certificate  or  a  registration

7  application form as the notice, indicating the correct information

8  in the appropriate space on the certificate or application form

9  unless the voter does not have possession of the certificate or an

10  application form at the time of giving the notice.

11      (d)  A voter [who continues to reside in the county in which

12  the voter is registered] may correct information under this section

13  by  digital  transmission  of  the  information  under  a  program

14  administered  by  the  secretary  of  state  and  the  Department  of

15  Information Resources.

16      (d-1)  If the notice indicates that a voter no longer resides

17  in the county in which the voter is registered, the registrar shall

18  forward the notice and the voter's application for registration to

19  the  registrar  of  the  county  in  which  the  voter  resides.   The

20  registrars  shall  coordinate  to  ensure  that  the  voter's  existing

21  registration is canceled immediately after the voter is registered

22  in  the  county  in  which  the  voter  resides  in  accordance  with

23  Subsection (d-2).

24      (d-2)  A  registrar  who  receives  a  voter's  notice  and

25  application from another registrar under Subsection (d-1) shall

26  treat it as an original application for registration under Section

27  13.002, and shall register the voter if the voter resides in the

6

1  county and is otherwise eligible under Section 13.001.

2      SECTION 2.04.  Section 15.028, Election Code, is amended to
3  read as follows:

4      Sec. 15.028.  NOTICE OF UNLAWFUL VOTING OR REGISTRATION [TO
5  PROSECUTOR].  [(a)]  If the registrar determines that a person who
6  is not eligible to vote registered to vote or [a registered voter]
7  voted in an election, the registrar shall, within 72 hours not
8  including weekends after making the determination, execute and
9  deliver to the attorney general, the secretary of state, and the
10  county or district attorney having jurisdiction in the territory
11  covered by the election an affidavit stating the relevant facts.

12      [(b)  If the election covers territory in more than one
13  county, the registrar shall also deliver an affidavit to the
14  attorney general.]

15      SECTION  2.05.  Section 16.0332, Election Code, is amended
16  by amending Subsection (a) and adding Subsections (a-1), (d), and
17  (e) to read as follows:

18      (a)  After the registrar receives notification [a list]
19  under Subsection (a-1) of this section, Section 18.068 of this
20  code, or Section 62.113, Government Code, of persons excused or
21  disqualified from jury service because of citizenship status or
22  notification of persons who indicate a lack of citizenship status
23  in connection with a motor vehicle or Department of Public Safety
24  record as provided by Subsection (a-1), the registrar shall deliver
25  to each registered voter whose name appears on the list a written
26  notice requiring the voter to submit to the registrar proof of
27  United States citizenship in the form of a certified copy of the

7

1 voter's birth certificate, United States passport, or certificate
2 of naturalization or any other form prescribed by the secretary of
3 state.  The notice shall be delivered by forwardable mail to the
4 mailing address on the voter's registration application and to any
5 new address of the voter known to the registrar.

6     (a-1)  The secretary of state shall enter into an agreement
7 with the Department of Public Safety under which information in the
8 existing statewide computerized voter registration list is
9 compared against information in the database of the Department of
10 Public Safety on a monthly basis to verify the accuracy of
11 citizenship status information previously provided on voter
12 registration applications.  In comparing information under this
13 subsection, the secretary of state shall consider only a voter's
14 information in the database of the Department of Public Safety that
15 was derived from documents presented by the voter to the department
16 after the person's current voter registration became effective, and
17 may not consider information derived from documents presented by
18 the voter to the department before the person's current voter
19 registration became effective.

20     (d)  The secretary of state shall prescribe rules for the
21 administration of this section.

22     (e)  Not later than December 31 of each year, the secretary
23 of state shall provide a report to the legislature of the number of
24 voter registrations canceled under this section during the calendar
25 year.

26     SECTION 2.06.  Section 18.065, Election Code, is amended by
27 adding Subsections (e), (f), (g), (h), and (i) to read as follows:

1    (e) If the secretary of state determines that a voter
2 registrar is not in substantial compliance with a requirement
3 imposed on the registrar by a provision or rule described in
4 Subsection (a), the secretary of state shall:
5    (1) for the first violation, require the registrar to
6 attend a training course under Subsection (h);
7    (2) for the second violation, audit the voter
8 registration list for the county in which the registrar serves to
9 determine the actions needed to achieve substantial compliance
10 under Subsection (a) and provide the results of the audit to the
11 registrar; or
12    (3) for a third or subsequent violation, if the
13 secretary of state determines that the registrar has not performed
14 any overt actions in pursuance of compliance with the actions
15 identified under Subdivision (2) as necessary for the registrar to
16 achieve substantial compliance under Subsection (a) within 14 days
17 of receiving the results of the audit conducted under that
18 subsection, inform the attorney general that the county which the
19 registrar serves may be subject to a civil penalty under Subsection
20 (f).
21    (f) A county is liable to this state for a civil penalty of
22 $1,000 for each day after the 14th day following the receipt of the
23 results of the audit conducted under Subsection (e)(2) that the
24 county's voter registrar fails to take overt action to comply with
25 the actions identified under that subsection as necessary for the
26 registrar to achieve substantial compliance under Subsection (a).
27 The attorney general may bring an action to recover a civil penalty

1 imposed under this section.

2 (g) A civil penalty collected by the attorney general under
3 this section shall be deposited in the state treasury to the credit
4 of the general revenue fund.

5 (h) The secretary of state shall develop and implement a
6 training course for registrars on substantial compliance with
7 Sections 15.083, 16.032, and 18.061 and with rules implementing the
8 statewide computerized voter registration list.

9 (i) The secretary of state shall adopt rules and prescribe
10 procedures for the implementation of this section.

11 SECTION 2.07. Section 18.068, Election Code, is amended by
12 amending Subsection (a) and adding Subsection (a-1) to read as
13 follows:

14 (a) The secretary of state shall quarterly compare the
15 information received under Section 16.001 of this code and Sections
16 [Section] 62.113 and 62.114, Government Code, to the statewide
17 computerized voter registration list. If the secretary determines
18 that a voter on the registration list is deceased or has been
19 excused or disqualified from jury service because the voter is not a
20 citizen or a resident of the county in which the voter is registered
21 to vote, the secretary shall send notice of the determination
22 to the voter registrar of the counties considered appropriate by
23 the secretary.

24 (a-1) The secretary of state is not required to send notice
25 under Subsection (a) for a voter who is subject to an exemption from
26 jury service under Section 62.106, Government Code, if that
27 exemption is the only reason the voter is excused from jury service.

10

1     SECTION 2.08.  Section 31.006, Election Code, is amended to
2  read as follows:

3     Sec. 31.006.  REFERRAL [OF COMPLAINT] TO ATTORNEY GENERAL.
4  (a)  If, after receiving or discovering information indicating that
5  [a complaint alleging] criminal conduct in connection with an
6  election has occurred, the secretary of state determines that there
7  is reasonable cause to suspect that [the alleged] criminal conduct
8  occurred, the secretary shall promptly refer the information
9  [complaint] to the attorney general.  The secretary shall deliver
10 to the attorney general all pertinent documents and information in
11 the secretary's possession.

12     (b)  The  documents  and  information  submitted  under
13 Subsection (a) are not considered public information until:

14          (1)  the secretary of state makes a determination that
15 the  information  [complaint]  received  does  not  warrant  an
16 investigation; or

17          (2)  if referred to the attorney general, the attorney
18 general has completed the investigation or has made a determination
19 that the  information  [complaint]  referred  does  not  warrant  an
20 investigation.

21     SECTION 2.09.  Subchapter B, Chapter 87, Election Code, is
22 amended by adding Section 87.028 to read as follows:

23     Sec. 87.028.  ACCESS TO INFORMATION.  (a) On request, a
24 county election official shall provide to a member of an early
25 voting  ballot  board  all  available  information  necessary  to
26 fulfilling the functions of the board, including any information
27 from the  statewide  computerized  voter  registration  list  under

11

1  Section 18.061.

2       (b)  On request, a county election official shall provide to
3  a  member  of  a  signature  verification  committee  all  available
4  information necessary to fulfilling the functions of the committee,
5  including  any  information  from  the  statewide  computerized  voter
6  registration list under Section 18.061.

7       (c)  The secretary of state shall adopt rules as necessary to
8  prevent  a  member  of  an  early  voting  ballot  board  or  signature
9  verification  committee  from  retaining  or  sharing  personally
10  identifiable  information  from  the  statewide  computerized  voter
11  registration list under Section 18.061 obtained under this section
12  for any reason unrelated to the official's official duties.

13       SECTION 2.10.  Section  62.113(b),  Government  Code,  is
14  amended to read as follows:

15       (b)  On the third business day of each month, the clerk shall
16  send a copy of the list of persons excused or disqualified because
17  of citizenship in the previous month to:

18            (1)  the voter registrar of the county;

19            (2)  the secretary of state; and

20            (3)  the county or district attorney[, as applicable,]
21  for an investigation of whether the person committed an offense
22  under Section 13.007, Election Code, or other law.

23       SECTION 2.11.  Sections 62.114(b) and (c), Government Code,
24  are amended to read as follows:

25       (b)  On the third business day of each month, the clerk shall
26  send [to the voter registrar of the county] a copy of the list of
27  persons excused or disqualified in the previous month because the

1  persons do not reside in the county to:

2          (1)  the voter registrar of the county; and

3          (2)  the secretary of state.

4      (c)  A list compiled under this section may not be used for a
5  purpose other than a purpose described by Subsection (b) or Section
6  15.081 or 18.068, Election Code.

7          ARTICLE 3.  CONDUCT AND SECURITY OF ELECTIONS

8      SECTION 3.01.  Section 2.053(a), Election Code, is amended
9  to read as follows:

10     (a)  On receipt of the certification, the governing body of
11 the political subdivision by order or ordinance shall [may] declare
12 each unopposed candidate elected to the office.  If no election is
13 to be held on election day by the political subdivision, a copy of
14 the order or ordinance shall be posted on election day at each
15 polling place used or that would have been used in the election.

16     SECTION 3.02.  Section 2.056(c), Election Code, is amended
17 to read as follows:

18     (c)  A certifying authority shall [may] declare a candidate
19 elected to an office of the state or county government if, were the
20 election held, only the votes cast for that candidate in the
21 election for that office may be counted.

22     SECTION 3.03.  Sections 43.007(c) and (d), Election Code,
23 are amended to read as follows:

24     (c)  In conducting the program, the secretary of state shall
25 provide for an audit of the voting system equipment [direct
26 recording electronic voting units] before and after the election,
27 and during the election to the extent such an audit is practicable.

1    (d)   The secretary of state shall select to participate in
2  the program each county that:

3              (1)  has held a public hearing under Subsection (b);

4              (2)  has submitted documentation listing the steps
5  taken to solicit input on participating in the program by
6  organizations or persons who represent the interests of voters;

7              (3)  has implemented a computerized voter registration
8  list that allows an election officer at the polling place to verify
9  that a voter has not previously voted in the election;

10             (4)  uses direct recording electronic voting machines,
11 ballot marking devices, or hand-marked scannable paper ballots that
12 are printed and scanned at the polling place or any other type of
13 voting system equipment that the secretary of state determines is
14 capable of processing votes for each type of ballot to be voted in
15 the county; and

16             (5)  is determined by the secretary of state to have the
17 appropriate technological capabilities.

18        SECTION 3.04.  Section 43.031(b), Election Code, is amended
19 to read as follows:

20       (b)  Each polling place shall be located inside a building.
21 No voter may cast a vote from inside a motor vehicle unless the
22 voter meets the requirements of Section 64.009.

23        SECTION 3.05.  Section 52.092(a), Election Code, is amended
24 to read as follows:

25       (a)  Except as provided by Section 2.053(c) or 2.056(e), for
26 [For] an election at which offices regularly filled at the general
27 election for state and county officers are to appear on the ballot,

14

1  the offices shall be listed in the following order:

2          (1)  offices of the federal government;

3          (2)  offices of the state government:

4                (A)  statewide offices;

5                (B)  district offices;

6          (3)  offices of the county government:

7                (A)  county offices;

8                (B)  precinct offices.

9      SECTION 3.06.  Section 61.002, Election Code, is amended to

10  read as follows:

11      Sec. 61.002.  OPENING AND CLOSING POLLING PLACE FOR VOTING.

12  (a)  Immediately before opening the polls for voting on the first

13  day of early voting and on election day, the presiding election

14  judge or alternate election judge shall confirm that each voting

15  machine has any public counter reset to zero and shall print the

16  tape that shows the counter was set to zero for each candidate or

17  measure on the ballot.

18      (b)  At the official time for opening the polls for voting,

19  an election officer shall open the polling place entrance and admit

20  the voters.

21      (c)  Immediately after closing the polls for voting on

22  election day, the presiding election judge or alternate election

23  judge shall print the tape to show the number of votes cast for each

24  candidate or ballot measure for each voting machine.

25      (d)  Each election judge or alternate election judge present

26  shall sign a tape printed under this section.

27      SECTION 3.07.  Section 64.007(c), Election Code, is amended

15

1  to read as follows:

2      (c)  An election officer shall maintain a register of spoiled
3  ballots at the polling place.  An election officer shall enter on
4  the register the name of each voter who returns a spoiled ballot and
5  the spoiled ballot's number.  The secretary of state shall create
6  and promulgate a form to be used for this purpose.

7      SECTION 3.08.  Subchapter A, Chapter 66, Election Code, is
8  amended by adding Section 66.004 to read as follows:

9      Sec. 66.004.  POLLING PLACE CHECKLISTS.  The secretary of
10 state  shall  adopt  rules  and  create  a  checklist  or  similar
11 guidelines to assist the presiding judge of a polling place in
12 processing forms and conducting procedures required by this code at
13 the opening and closing of the polling place.

14     SECTION 3.09.  Section 85.005, Election Code, is amended to
15 read as follows:

16     Sec. 85.005.  REGULAR DAYS AND HOURS FOR VOTING. (a)  Except
17 as provided by Subsection (c), in an election in which a county
18 clerk [or city secretary] is the early voting clerk under Section
19 83.002 [or 83.005], early voting by personal appearance at the main
20 early voting polling place shall be conducted on each weekday of
21 [the weekdays of] the early voting period that is not a legal state
22 holiday and for a period of at least nine hours, except that voting
23 may not be conducted earlier than 6 a.m. or later than 10 p.m.
24 [during the hours that the county clerk's or city secretary's main
25 business office is regularly open for business.]

26     (b)  In an election to which Subsection (a) does not apply,
27 early voting by personal appearance at the main early voting

16

1 polling place shall be conducted at least <u>nine</u> [eight] hours each
2 weekday of the early voting period that is not a legal state holiday
3 unless the territory covered by the election has fewer than 1,000
4 registered voters.  In that case, the voting shall be conducted at
5 least <u>four</u> [three] hours each day.  The authority ordering the
6 election, or the county clerk if that person is the early voting
7 clerk, shall determine which hours the voting is to be conducted.

8        (c)  In a county with a population of <u>55,000</u> [100,000] or
9 more, the voting in a primary election or the general election for
10 state and county officers shall be conducted at the main early
11 voting polling place for at least 12 hours on each weekday of the
12 last week of the early voting period, and the voting in a special
13 election ordered by the governor shall be conducted at the main
14 early voting polling place for at least 12 hours on each of the last
15 two days of the early voting period.  <u>Voting under this subsection</u>
16 <u>may not be conducted earlier than 6 a.m. or later than 10 p.m.</u>
17 Voting shall be conducted in accordance with this subsection in
18 those elections in a county with a population under <u>55,000</u>
19 [100,000] on receipt by the early voting clerk of a written request
20 for the extended hours submitted by at least 15 registered voters of
21 the county.  The request must be submitted in time to enable
22 compliance with Section 85.067.

23        (d)  <u>A voter who has not voted before the scheduled time for</u>
24 <u>closing a polling place is entitled to vote after that time if the</u>
25 <u>voter is in line at the polling place by closing time.  The</u>
26 <u>secretary of state shall promulgate any materials and provide any</u>
27 <u>training to presiding judges necessary to properly process voters</u>

<u>17</u>

1  under this subsection [In an election ordered by a city, early

2  voting by personal appearance at the main early voting polling

3  place shall be conducted for at least 12 hours:

4          [(1) on one weekday, if the early voting period

5  consists of less than six weekdays; or

6          [(2) on two weekdays, if the early voting period

7  consists of six or more weekdays].

8      SECTION 3.10.  Sections 85.006(b) and (e), Election Code,

9  are amended to read as follows:

10      (b)  In an election in which a county clerk [or city

11  secretary] is the early voting clerk under Section 83.002 [or

12  83.005], only the early voting clerk may order voting on a Saturday

13  or Sunday.  The clerk must do so by written order.

14      (e)  In a primary election or the general election for state

15  and county officers in a county with a population of 55,000

16  [100,000] or more, the early voting clerk shall order voting by

17  personal appearance [voting] at the main early voting polling place

18  to be conducted on the last Saturday of the early voting period for

19  at least 12 hours, except that voting may not be conducted earlier

20  than 6 a.m. or later than 10 p.m., [on the last Saturday] and on the

21  last Sunday of the early voting period for at least six [five]

22  hours, except that voting may not be conducted earlier than 9 a.m.

23  or later than 10 p.m [on the last Sunday of the early voting

24  period].  The early voting clerk shall order voting to be conducted

25  at those times in those elections in a county with a population

26  under 55,000 [100,000] on receipt of a written request for those

27  hours submitted by at least 15 registered voters of the county.  The

1  request must be submitted in time to enable compliance with Section
2  85.007.    This subsection supersedes any provision of this
3  subchapter to the extent of any conflict.

4        SECTION 3.11.  Section 85.010(a-1), Election Code, is
5  amended to read as follows:

6        (a-1)  In this section, "eligible county polling place"
7  means an early voting polling place[, other than a polling place
8  established under Section 85.062(e),] established by a county.

9        SECTION 3.12.  Section 85.061(a), Election Code, is amended
10  to read as follows:

11        (a)  In a countywide election in which the county clerk is
12  the early voting clerk under Section 83.002, an early voting
13  polling place shall be located inside [at] each branch office that
14  is regularly maintained for conducting general clerical functions
15  of the county clerk, except as provided by Subsection (b).  If a
16  suitable room is unavailable inside the branch office, the polling
17  place may be located in another room inside the same building as the
18  branch office.

19        SECTION 3.13.  Section 85.062, Election Code, is amended by
20  amending Subsection (b) and adding Subsection (f-1) to read as
21  follows:

22        (b)  A polling place established under this section may be
23  located, subject to Subsection (d), at any place in the territory
24  served by the early voting clerk and may be located inside [in] any
25  building [stationary structure] as directed by the authority
26  establishing the branch office.  The polling place may not be
27  located in a movable structure in the general election for state and

19

1 county officers, general primary election, or runoff primary
2 election.  Ropes or other suitable objects may be used at the
3 polling place to ensure compliance with Section 62.004.  Persons
4 who are not expressly permitted by law to be in a polling place
5 shall be excluded from the polling place to the extent practicable.

6 (f-1)  Notwithstanding any other provision of this section
7 concerning the location of temporary branch polling places, in an
8 election in which countywide polling places are used, the
9 commissioners court of a county shall employ the same methodology
10 it uses to determine the location of countywide polling places to
11 determine the location of temporary branch polling places.

12 SECTION 3.14.  Section 87.002, Election Code, is amended to
13 read as follows:

14 Sec. 87.002.  COMPOSITION OF BOARD.  (a) The early voting
15 ballot board consists of a presiding judge, an alternate presiding
16 judge, and at least one [two] other member [members].

17 (b)  Except as provided by Subsection (d), the presiding
18 judge and the alternate presiding judge are [is] appointed in the
19 same manner as a presiding election judge and alternate presiding
20 election judge, respectively.  Except as provided by Subsection
21 (c), each [the] other member is [members are] appointed by the
22 presiding judge in the same manner as the precinct election clerks.

23 (c)  In the general election for state and county officers,
24 each county chair of a political party with nominees on the general
25 election ballot shall submit to the county election board a list of
26 names of persons eligible to serve on the early voting ballot board
27 in order of the county chair's preference.  The county election

20

1 board shall appoint at least one person from each list to serve as a
2 member of the early voting ballot board. The same number of members
3 must be appointed from each list. The county election board shall
4 appoint persons as members of the early voting ballot board in the
5 order of preference indicated on each list.

6 (d) In addition to the members appointed under Subsection
7 (c), the county election board shall appoint as the presiding judge
8 the highest-ranked person on [from] the list provided under that
9 subsection by the political party whose nominee for governor
10 received the most votes in the county in the most recent
11 gubernatorial general election and as the alternate presiding judge
12 the highest-ranked person on the list provided under that
13 subsection by the political party whose nominee for governor
14 received the second most votes in the county in the most recent
15 gubernatorial general election.

16 SECTION 3.15. Section 124.002, Election Code, is amended by
17 adding Subsection (c) to read as follows:

18 (c) Voting system ballots may not be arranged in a manner
19 that allows a political party's candidates to be selected in one
20 motion or gesture.

21 SECTION 3.16. Sections 127.006(a) and (c), Election Code,
22 are amended to read as follows:

23 (a) The [Both the] manager, [and] the presiding judge, and
24 the alternate presiding judge may appoint clerks to serve at the
25 central counting station.

26 (c) A clerk appointed by the manager serves under the
27 manager and shall perform the functions directed by the manager. A

<u>21</u>

1  clerk appointed by the presiding judge <u>or the alternate presiding</u>
2  <u>judge</u> serves under the presiding judge and shall perform the
3  functions directed by the presiding judge.

4      SECTION 3.17.  Subchapter A, Chapter 127, Election Code, is
5  amended by adding Section 127.009 to read as follows:

6      Sec. 127.009.  ELECTRONIC  DEVICES  IN  CENTRAL  COUNTING
7  STATION.  (a)  A counting station manager and the presiding judge of
8  the counting station shall develop a protocol under which any
9  electronic device inside a central counting station that is
10 necessary to count votes is equipped with software that tracks all
11 input and activity on the electronic device.

12     (b)  The counting station manager and the presiding judge of
13 the counting station shall ensure that the input and activity
14 tracked by the software is delivered to the secretary of state not
15 later than the fifth day after vote counting is complete.

16     (c)  This section applies only to a central counting station
17 located in a county with a population of 250,000 or more.

18     SECTION 3.18.  Section 127.1232, Election Code, is amended
19 to read as follows:

20     Sec. 127.1232.  SECURITY OF VOTED BALLOTS.  (a)  The general
21 custodian of election records shall post a <u>licensed peace officer</u>
22 [guard] to ensure the security of ballot boxes containing voted
23 ballots throughout the period of tabulation at the central counting
24 station.

25     (b)  The general custodian of election records in a county
26 with a population of 100,000 or more shall implement a video
27 surveillance system that retains a record of all areas containing

22

1  voted ballots:

2           (1)   from the time the voted ballots are delivered to

3  the central counting station until the canvass of precinct election

4  returns; and

5           (2)   from the time the voted ballots are delivered to

6  the signature verification committee or early voting ballot board

7  until the canvass of precinct election returns.

8       (c)   A video from a system implemented under Subsection (b)

9  shall be made available to the public by a livestream.

10       (d)   The video recorded is an election record under Section

11  1.012 and shall be retained by the general custodian of election

12  records until the end of the calendar year in which an election is

13  held or until an election contest filed in the county has been

14  resolved, whichever is later.

15       SECTION 3.19.  Chapter 127, Election Code, as effective

16  September 1, 2021, is amended by adding Subchapter J to read as

17  follows:

18               SUBCHAPTER J.  RANDOMIZED AUDITS

19       Sec. 127.351.  RANDOMIZED COUNTY AUDITS.  (a)   Immediately

20  after the uniform election date in November of an even-numbered

21  year, the secretary of state shall conduct an audit of the elections

22  held in four counties during the previous two years.

23       (b)   The secretary of state shall select the counties to be

24  audited under Subsection (a) at random, except that:

25           (1)   two of the counties selected must have a total

26  population of less than 300,000;

27           (2)   two of the counties selected must have a total

23

1  population of 300,000 or more; and

2          (3)  a county selected in the most recent audit cycle

3  may not be selected in the current audit cycle.

4          (c)  A county selected to be audited may not pay the cost of

5  performing an audit under this section.

6          (d)  The secretary of state shall adopt rules as necessary to

7  implement this section.

8                  ARTICLE 4. ELECTION OFFICERS AND OBSERVERS

9          SECTION 4.01.  Section 32.075, Election Code, is amended by

10  adding Subsections (g) and (h) to read as follows:

11          (g)  A presiding judge may not have a watcher duly accepted

12  for service under Subchapter A, Chapter 33, removed from the

13  polling place for violating a provision of this code or any other

14  provision of law relating to the conduct of elections, other than a

15  violation of the Penal Code, unless the violation was observed by an

16  election judge or clerk.

17          (h)  Notwithstanding Subsection (g), a presiding judge may

18  call a law enforcement officer to request that a poll watcher be

19  removed if the poll watcher commits a breach of the peace or a

20  violation of law.

21          SECTION 4.02.  Subchapter A, Chapter 33, Election Code, is

22  amended by adding Section 33.0015 to read as follows:

23          Sec. 33.0015.  CHAPTER PURPOSE AND WATCHER DUTY.  The

24  purpose of this chapter is to preserve the integrity of the ballot

25  box in accordance with Section 4, Article VI, Texas Constitution,

26  by providing for the appointment of watchers. It is the intent of

27  the legislature that watchers duly accepted for service under this

1  chapter be allowed to observe and report on irregularities in the
2  conduct of any election, but may not interfere in the orderly
3  conduct of an election. To effect that purpose, a watcher appointed
4  under this chapter shall observe without obstructing the conduct of
5  an election and call to the attention of an election officer any
6  observed or suspected irregularity or violation of law in the
7  conduct of the election.

8      SECTION 4.03.  Subchapter A, Chapter 33, Election Code, is
9  amended by adding Section 33.0016 to read as follows:

10     Sec. 33.0016.  REFERENCES TO EARLY VOTING BALLOT BOARD IN
11 THIS CHAPTER.  A reference in this chapter to an early voting ballot
12 board includes a signature verification committee.

13     SECTION 4.04.  Subchapter A, Chapter 33, Election Code, is
14 amended by adding Section 33.008 to read as follows:

15     Sec. 33.008.  TRAINING PROGRAM.  The secretary of state
16 shall develop and maintain a training program for watchers.  The
17 training program must:

18         (1)  be available:

19             (A)  entirely via the Internet; and

20             (B)  at any time, without a requirement for prior
21 registration; and

22         (2)  provide a watcher who completes the training with
23 a certificate of completion.

24     SECTION 4.05.  Section 33.031, Election Code, is amended by
25 adding Subsection (b) to read as follows:

26     (b)  In addition to the requirements of Subsection (a), to be
27 eligible to serve as a watcher, a person must complete training

1  under Section 33.008.

2      SECTION 4.06.  Section 33.051, Election Code, is amended by
3  amending Subsections (a), (b), (d), and (e) and adding Subsections
4  (a-1), (g), and (h) to read as follows:

5      (a)  A watcher appointed to serve at a precinct polling
6  place, a meeting place for an early voting ballot board, or a
7  central counting station must deliver the following materials [a
8  certificate of appointment] to the presiding judge at the time the
9  watcher reports for service:

10          (1)  a certificate of appointment; and

11          (2)  a certificate of completion from training
12  completed by the watcher under Section 33.008.

13      (a-1)  A watcher appointed to serve at an early voting
14  polling place must deliver the certificates under Subsection (a) [a
15  certificate of appointment] to the early voting clerk or deputy
16  clerk in charge of the polling place when the watcher first reports
17  for service.

18      (b)  The officer presented with a watcher's certificates
19  [certificate of appointment] shall require the watcher to
20  countersign the certificate of appointment to ensure that the
21  watcher is the same person who signed the certificate of
22  appointment.  Except as provided by Subsection (c), a watcher who
23  presents himself or herself at the proper time with the
24  certificates required under Subsection (a) [a certificate of
25  appointment] shall be accepted for service unless the person is
26  ineligible to serve or the number of appointees to which the
27  appointing authority is entitled have already been accepted.

26

1    (d)  The <u>certificates</u> [<s>certificate</s>] of a watcher serving at
2  an early voting polling place shall be retained at the polling place
3  until voting at the polling place is concluded. At each subsequent
4  time that the watcher reports for service, the watcher shall inform
5  the clerk or deputy in charge. The officer may require the watcher
6  to sign the watcher's name in the officer's presence, for comparison
7  with the signature on the certificate <u>of appointment</u>, if the
8  officer is uncertain of the watcher's identity.

9    (e)  If a watcher is not accepted for service, the
10  <u>certificates</u> [<s>certificate of appointment</s>] shall be returned to the
11  watcher with a signed statement of the reason for the rejection.

12    <u>(g)  An election officer commits an offense if the officer</u>
13  <u>intentionally or knowingly refuses to accept a watcher for service</u>
14  <u>when acceptance of the watcher is required by this section. An</u>
15  <u>offense under this subsection is a Class A misdemeanor.</u>

16    <u>(h)  Before accepting a watcher, the officer presented with a</u>
17  <u>watcher's certificate of appointment shall require the watcher to</u>
18  <u>take the following oath, administered by the officer: "I swear (or</u>
19  <u>affirm) that I will not disrupt the voting process or harass voters</u>
20  <u>in the discharge of my duties."</u>

21    SECTION 4.07. Section 33.056, Election Code, is amended by
22  amending Subsection (a) and adding Subsections (e) and (f) to read
23  as follows:

24    (a) Except as provided by Section 33.057, a watcher is
25  entitled to observe any activity conducted at the location at which
26  the watcher is serving. A watcher is entitled to sit or stand
27  [<s>conveniently</s>] near <u>enough to see and hear</u> the election officers

1  conducting the observed activity, except as otherwise prohibited by
2  this chapter.

3       (e)  Except as provided by Section 33.057(b), a watcher may
4  not be denied free movement where election activity is occurring
5  within the location at which the watcher is serving.

6       (f)  In this code, a watcher who is entitled to "observe" an
7  election activity is entitled to sit or stand near enough to see and
8  hear the activity.

9       SECTION 4.08.  Subchapter C, Chapter 33, Election Code, is
10  amended by adding Section 33.0605 to read as follows:

11       Sec. 33.0605.  OBSERVING DATA STORAGE SEALING AND TRANSFER.
12  (a) A watcher appointed to serve at a polling place in an election
13  who is available at the time of the action may observe all election
14  activities relating to closing the polling place, including the
15  sealing and transfer of a memory card, flash drive, hard drive, data
16  storage device, or other medium now existing or later developed
17  used by the voting system equipment.

18       (b)  Notwithstanding any other provision of this code, a
19  watcher duly accepted for service at a polling location is entitled
20  to follow the transfer of election materials from the polling place
21  at which the watcher was accepted to a regional tabulating center,
22  the central counting station, or any other location designated to
23  process election materials.   The authority responsible for
24  administering a regional tabulating center or another location
25  where election materials are processed must accept duly appointed
26  watchers for service in the same manner a watcher is accepted for
27  service under Section 33.051 and must accept the same number of

28

1 watchers that may serve under Section 33.007(a).

2      SECTION 4.09.  Section 33.061(a), Election Code, is amended
3 to read as follows:

4      (a)  A person commits an offense if the person serves in an
5 official capacity at a location at which the presence of watchers is
6 authorized and knowingly prevents a watcher from observing an
7 activity or procedure the person knows the watcher is entitled to
8 observe, including by taking any action to obstruct the view of a
9 watcher or distance the watcher from the activity or procedure to be
10 observed in a manner that would make observation not reasonably
11 effective.

12      SECTION 4.10.  Subchapter C, Chapter 33, Election Code, is
13 amended by adding Section 33.063 to read as follows:

14      Sec. 33.063.  RELIEF.  The appointing authority for a
15 watcher who believes that the watcher was unlawfully prevented or
16 obstructed from the performance of the watcher's duties may seek:

17           (1)  injunctive  relief  under  Section  273.081,
18 including issuance of temporary orders;

19           (2)  a writ of mandamus under Section 161.009 or
20 273.061; and

21           (3)  any other remedy available under law.

22      SECTION 4.11.  Section 34.005, Election Code, is amended to
23 read as follows:

24      Sec. 34.005.  ACTION BY SECRETARY OF STATE.  (a)  The
25 secretary of state may refer a reported violation of law for
26 appropriate action to the attorney general, if the attorney general
27 has jurisdiction, or to a prosecuting attorney having jurisdiction.

29

1   (b) If the secretary of state believes that a state
2   inspector was unlawfully prevented or obstructed from the
3   performance of the inspector's duties, the secretary of state may
4   seek:
5        (1) injunctive relief under Section 273.081,
6   including issuance of temporary orders;
7        (2) a writ of mandamus under Section 161.009 or
8   273.061; and
9        (3) any other remedy available under law.
10   SECTION 4.12.  Section 86.006, Election Code, is amended by
11  amending Subsection (a) and adding Subsection (a-2) to read as
12  follows:
13   (a) A marked ballot voted under this chapter must be
14  returned to the early voting clerk in the official carrier
15  envelope.  The carrier envelope may be delivered in another
16  envelope and must be transported and delivered only by:
17        (1) mail;
18        (2) common or contract carrier; or
19        (3) subject to Subsections [Subsection] (a-1) and
20  (a-2), in-person delivery by the voter who voted the ballot.
21   (a-2) An in-person delivery of a marked ballot voted under
22  this chapter must be received by an election official at the time of
23  delivery.  The receiving official shall record the voter's name,
24  signature, and type of identification provided under Section
25  63.0101 on a roster prescribed by the secretary of state.  The
26  receiving official shall attest on the roster that the delivery
27  complies with this section.

1    SECTION 4.13.  Chapter 121, Election Code, is amended by
2  adding Section 121.004 to read as follows:
3    Sec. 121.004.  COMMUNICATIONS WITH VOTING SYSTEMS VENDOR
4  PUBLIC INFORMATION.  (a) Except as provided by Subsection (b), a
5  written letter, e-mail, or other communication, including a
6  communication made confidential by other law, between a public
7  official and a voting systems vendor:
8        (1)  is not confidential;
9        (2)  is public information for purposes of Chapter 552,
10  Government Code; and
11        (3)  is not subject to an exception to disclosure
12  provided by Chapter 552, Government Code, other than Sections
13  552.110 and 552.1101, Government Code.
14    (b)  A written letter, e-mail, or other communication
15  between a public official and a voting systems vendor is excepted
16  from disclosure under Chapter 552, Government Code, if the
17  communication discloses information, data, or records relating to
18  the security of elections critical infrastructure.
19    SECTION 4.14.  Section 127.1301, Election Code, is amended
20  to read as follows:
21    Sec. 127.1301.  [TALLYING, TABULATING, AND REPORTING]
22  CENTRALLY COUNTED OPTICAL SCAN BALLOTS [BALLOT UNDERVOTES AND
23  OVERVOTES].  (a)  In an election using centrally counted optical
24  scan ballots, the undervotes and overvotes on those ballots shall
25  be tallied, tabulated, and reported by race and by election
26  precinct in the form and manner prescribed by the secretary of
27  state.

1    (b)  An authority operating a central counting station under

2  this chapter may not purchase or use a centrally counted optical

3  ballot scan system that uses a data storage disc on which

4  information, once written, is capable of being modified.

5    (c)  An authority that purchases system components in order

6  to comply with this section is eligible to have 100 percent of the

7  cost of those system components reimbursed.

8    (d)  Subsection (b) applies starting on the earlier of:

9    (1)  the date on which the state certifies the first

10  centrally counted optical ballot scan system under this section; or

11    (2)  September 1, 2026.

12    (e)  This subsection and Subsection (d) expire October 1,

13  2026.

14    SECTION 4.15.  Section 127.131, Election Code, is amended by

15  adding Subsection (f) to read as follows:

16    (f)  The presiding judge of the central counting station

17  shall provide and attest to a written reconciliation of votes and

18  voters at the close of tabulation for election day and again after

19  the central counting station meets for the last time to process

20  late-arriving ballots by mail and provisional ballots.  The

21  secretary of state shall create and promulgate rules and a form to

22  facilitate compliance with this subsection.  The form shall be

23  posted on a website maintained by the county along with election

24  returns and results.

25    SECTION 4.16.  Section 129.023, Election Code, is amended by

26  adding Subsections (b-2) and (c-1) to read as follows:

27    (b-2)  If the test is being conducted for an election in

32

1  which a county election board has been established under Section

2  51.002, the general custodian of election records shall notify each

3  member of the board of the test at least 48 hours before the date of

4  the test. If the county election board chooses to witness the test,

5  each member shall sign the statement required by Subsection (e)(1).

6       (c-1)  A test conducted under this section must also require

7  the general custodian of election records to demonstrate, using a

8  representative sample of voting system equipment, that the source

9  code of the equipment has not been altered.

10                    ARTICLE 5.  VOTING BY MAIL

11      SECTION 5.01.  Section 84.001(b), Election Code, is amended

12  to read as follows:

13      (b)  Subject to Section 1.011, an [An] application must be

14  submitted in writing and signed by the applicant using ink on paper.

15  An electronic signature or photocopied signature is not permitted.

16      SECTION 5.02.  Section 84.002, Election Code, as effective

17  September 1, 2021, is amended by amending Subsection (a) and adding

18  Subsection (b-1) to read as follows:

19      (a)  An early voting ballot application must include:

20          (1)  the applicant's name and the address at which the

21  applicant is registered to vote;

22          (1-a)  the following information:

23              (A)  the number of the applicant's driver's

24  license, election identification certificate, or personal

25  identification card issued by the Department of Public Safety;

26              (B)  if the applicant has not been issued a number

27  described by Paragraph (A), the last four digits of the applicant's

33

1  social security number; or

2              (C)  a  statement  by  the  applicant  that  the
3  applicant has not been issued a number described by Paragraph (A) or
4  (B);

5              (2)   for an application for a ballot to be voted by mail
6  on the ground of absence from the county of residence, the address
7  outside the applicant's county of residence to which the ballot is
8  to be mailed;

9              (3)   for an application for a ballot to be voted by mail
10 on the ground of age or disability, the address of the hospital,
11 nursing home or other long-term care facility, or retirement
12 center, or of a person related to the applicant within the second
13 degree by affinity or the third degree by consanguinity, as
14 determined under Chapter 573, Government Code, if the applicant is
15 living at that address and that address is different from the
16 address at which the applicant is registered to vote;

17             (4)   for an application for a ballot to be voted by mail
18 on the ground of confinement in jail, the address of the jail or of a
19 person related to the applicant within the degree described by
20 Subdivision (3);

21             (5)   for an application for a ballot to be voted by mail
22 on any ground, an indication of each election for which the
23 applicant is applying for a ballot;

24             (6)   an indication of the ground of eligibility for
25 early voting; and

26             (7)   for an application for a ballot to be voted by mail
27 on the ground of involuntary civil commitment, the address of the

1  facility operated by or under contract with the Texas Civil
2  Commitment Office or of a person related to the applicant within the
3  degree of consanguinity described by Subdivision (3).

4      (b-1)  A person may use the number of a driver's license,
5  election identification certificate, or personal identification
6  card that has expired for the purpose of fulfilling the requirement
7  under Subsection (a)(1-a) if the license or identification is
8  otherwise valid.

9      SECTION 5.03.  Section  84.011(a),  Election  Code,  as
10 effective September 1, 2021, is amended to read as follows:

11     (a)  The officially prescribed application form for an early
12 voting ballot must include:

13         (1)  immediately preceding the signature space the
14 statement: "I certify that the information given in this
15 application is true, and I understand that giving false information
16 in this application is a crime.";

17         (2)  a statement informing the applicant of the
18 offenses prescribed by Sections 84.003 and 84.004;

19         (3)  spaces for entering an applicant's voter
20 registration number and county election precinct of registration,
21 with a statement informing the applicant that failure to furnish
22 that information does not invalidate the application;

23         (3-a)  a space for entering the information required
24 under Section 84.002(a)(1-a); and

25         (4)  on an application for a ballot to be voted by mail:
26             (A)  a space for an applicant applying on the
27 ground of absence from the county of residence to indicate the date

35

1  on or after which the applicant can receive mail at the address
2  outside the county;

3           (B)  a space for indicating the fact that an
4  applicant whose application is signed by a witness cannot make the
5  applicant's mark and a space for indicating the relationship or
6  lack of relationship of the witness to the applicant;

7           (C)  a space for entering an applicant's telephone
8  number, with a statement informing the applicant that failure to
9  furnish that information does not invalidate the application;

10          (D)  a space or box for an applicant applying on
11  the ground of age or disability to indicate that the address to
12  which the ballot is to be mailed is the address of a facility or
13  relative described by Section 84.002(a)(3), if applicable;

14          (E)  a space or box for an applicant applying on
15  the ground of confinement in jail or involuntary civil commitment
16  to indicate that the address to which the ballot is to be mailed is
17  the address of a relative described by Section 84.002(a)(4) or (7),
18  if applicable;

19          (F)  a space for an applicant applying on the
20  ground of age or disability to indicate if the application is an
21  application under Section 86.0015;

22          (G)  spaces for entering the signature, printed
23  name, and residence address of any person assisting the applicant;

24          (H)  a statement informing the applicant of the
25  condition prescribed by Section 81.005; and

26          (I)  a statement informing the applicant of the
27  requirement prescribed by Section 86.003(c).

<u>36</u>

S.B. No. 1

1    SECTION 5.04.  Subchapter A, Chapter 84, Election Code, is
2  amended by adding Section 84.0111 to read as follows:
3    Sec. 84.0111.  DISTRIBUTION  OF  APPLICATION  FORM.  (a)
4  Except as provided by Subsection (c) or as otherwise authorized by
5  this code, an officer or employee of this state or of a political
6  subdivision of this state may not distribute an application form
7  for an early voting ballot to a person who did not request an
8  application under Section 84.001.
9    (b)  An officer or employee of this state or of a political
10  subdivision of this state may not use public funds to facilitate the
11  distribution by another person of an application form for an early
12  voting ballot to a person who did not request an application under
13  Section 84.001.
14    (c)  A political party  or  a  candidate  for  office  may
15  distribute an application form for an early voting ballot to a
16  person who did not request an application under Section 84.001.
17    SECTION 5.05.  Section 84.032(c), Election Code, is amended
18  to read as follows:
19    (c)  An applicant may submit a request after the close of
20  early voting by personal appearance by appearing in person and:
21      (1)  returning the ballot to be voted by mail to the
22  early voting clerk; or
23      (2)  executing an affidavit that the applicant:
24        (A)  has not received the ballot to be voted by
25  mail; [or]
26        (B)  never requested a ballot to be voted by mail;
27  or

37

1       (C) received notice of a defect under Section
2  87.0271(b) or (c) or 87.0411(b) or (c).

3       SECTION 5.06.  Section 84.035, Election Code, is amended to
4  read as follows:

5       Sec. 84.035.  BALLOT SENT TO APPLICANT.  (a)  If the early
6  voting clerk cancels an application by an applicant to whom an early
7  voting ballot has been sent, the clerk shall:

8            (1)  remove the applicant's name from the early voting
9  roster; and

10           (2)  make any other entries in the records and take any
11  other action necessary to prevent the ballot from being counted if
12  returned.

13      (b)  An election judge may permit a person to whom an early
14  voting ballot has been sent who cancels the person's application
15  for a ballot to be voted by mail in accordance with Section 84.032
16  but fails to return the ballot to be voted by mail to the early
17  voting clerk, deputy early voting clerk, or presiding judge as
18  provided by that section to vote only a provisional ballot under
19  Section 63.011.

20      SECTION 5.07.  Section 86.001, Election Code, is amended by
21  adding Subsections (f), (f-1), and (f-2) to read as follows:

22      (f)  If the information required under Section
23  84.002(a)(1-a) included on the application does not identify the
24  same voter identified on the applicant's application for voter
25  registration under Section 13.002(c)(8), the clerk shall reject the
26  application.

27      (f-1)  If an application is rejected under Subsection (f),

38

1  the clerk shall provide notice of the rejection in accordance with
2  Subsection (c). The notice must include information regarding the
3  ability to correct or add information required under Section
4  84.002(a)(1-a) through the online tool described by Section
5  86.015(c).
6      (f-2) If an applicant corrects an application for a ballot
7  to be voted by mail online and that application subsequently
8  identifies the same voter identified on the applicant's application
9  for voter registration, the clerk shall provide a ballot to the
10 applicant as provided by this chapter.
11     SECTION 5.08. Section 86.002, Election Code, is amended by
12 adding Subsections (g), (h), and (i) to read as follows:
13     (g) The carrier envelope must include a space that is hidden
14 from view when the envelope is sealed for the voter to enter the
15 following information:
16         (1) the number of the voter's driver's license,
17 election identification certificate, or personal identification
18 card issued by the Department of Public Safety;
19         (2) if the voter has not been issued a number described
20 by Subdivision (1), the last four digits of the voter's social
21 security number; or
22         (3) a statement by the applicant that the applicant
23 has not been issued a number described by Subdivision (1) or (2).
24     (h) A person may use the number of a driver's license,
25 election identification certificate, or personal identification
26 card that has expired for purposes of Subsection (g) if the license
27 or identification is otherwise valid.

39

1    (i)  No record associating an individual voter with a ballot
2  may be created.

3    SECTION 5.09.  Section 86.011(c), Election Code, is amended
4  to read as follows:

5    (c)  If the return is not timely, the clerk shall enter the
6  time of receipt on the carrier envelope and retain it in a locked
7  container for the period for preserving the precinct election
8  records.  The clerk shall destroy the unopened envelope and its
9  contents after the preservation period.

10    SECTION 5.10.  Section  86.015(c),  Election  Code,  as
11  effective September 1, 2021, is amended to read as follows:

12    (c)  An online tool used under this section must:

13      (1)  for each election, record:

14        (A)  each application for a ballot to be voted by
15  mail received by the clerk; and

16        (B)  each carrier envelope sent to a voter by the
17  clerk;

18      (2)  for each carrier envelope, record or assign a
19  serially numbered and sequentially issued barcode or tracking
20  number that is unique to each envelope; [and]

21      (3)  update the applicable Internet website as soon as
22  practicable after each of the following events occurs:

23        (A)  receipt by the early voting clerk of the
24  person's application for a ballot to be voted by mail;

25        (B)  acceptance or rejection by the early voting
26  clerk of the person's application for a ballot to be voted by mail;

27        (C)  placement in the mail by the early voting

1 clerk of the person's official ballot;

2         (D) receipt by the early voting clerk of the
3 person's marked ballot; and

4         (E) acceptance or rejection by the early voting
5 ballot board of a person's marked ballot; and

6       (4) allow a voter to add or correct information
7 required under Section 84.002(a)(1-a) or Section 86.002(g).

8     SECTION 5.11. Sections 87.027(d), (e), and (i), Election
9 Code, are amended to read as follows:

10     (d) The early voting clerk shall determine the number of
11 members who are to compose the signature verification committee and
12 shall state that number in the order calling for the committee's
13 appointment. A committee must consist of not fewer than five
14 members. In an election in which party alignment is indicated on
15 the ballot, each county chair of a political party with a nominee or
16 aligned candidate on the ballot shall submit to the appointing
17 authority a list of names of persons eligible to serve on the
18 signature verification committee in order of the county chair's
19 preference. The authority shall appoint at least two persons from
20 each list in the order of preference indicated on each list to serve
21 as members of the committee. The same number of members must be
22 appointed from each list. The authority shall appoint as [the]
23 chair of the committee the highest-ranked person on [from] the list
24 provided by the political party whose nominee for governor received
25 the most votes in the county in the most recent gubernatorial
26 general election. The authority shall appoint as vice chair of the
27 committee the highest-ranked person on the list provided by the

41

1 political party whose nominee for governor received the second most
2 votes in the county in the most recent gubernatorial general
3 election. A vacancy on the committee shall be filled by appointment
4 from the original list or from a new list submitted by the
5 appropriate county chair.

6        (e)  To be eligible to serve on a signature verification
7 committee, a person must be eligible under Subchapter C, Chapter
8 32, for service as a presiding election judge, except that the
9 person must be a qualified voter:

10              (1)  of the county, in a countywide election ordered by
11 the governor or a county authority or in a primary election;

12              (2)  of the part of the county in which the election is
13 held, for an election ordered by the governor or a county authority
14 that does not cover the entire county of the person's residence; or

15              (3)  of the political subdivision, in an election
16 ordered by an authority of a political subdivision other than a
17 county.

18        (i)  The signature verification committee shall compare the
19 signature on each carrier envelope certificate, except those signed
20 for a voter by a witness, with the signature on the voter's ballot
21 application to determine whether the signatures are those of the
22 voter.  The committee may also compare the signatures with any
23 known signature [two or more signatures] of the voter [made within
24 the preceding six years and] on file with the county clerk or voter
25 registrar to determine whether the signatures are those of the
26 voter.  Except as provided by Subsection (l), a determination under
27 this subsection that the signatures are not those of the voter must

1  be made by a majority vote of the committee's membership.  The
2  committee shall place the jacket envelopes, carrier envelopes, and
3  applications of voters whose signatures are not those of the voter
4  in separate containers from those of voters whose signatures are
5  those of the voter.  The committee chair shall deliver the sorted
6  materials to the early voting ballot board at the time specified by
7  the board's presiding judge.

8      SECTION 5.12.  Subchapter B, Chapter 87, Election Code, is
9  amended by adding Section 87.0271 to read as follows:

10     Sec. 87.0271.  OPPORTUNITY TO CORRECT DEFECT:  SIGNATURE
11 VERIFICATION COMMITTEE.  (a)  This section applies to an early
12 voting ballot voted by mail:

13         (1)  for which the voter did not sign the carrier
14 envelope certificate;

15         (2)  for which it cannot immediately be determined
16 whether the signature on the carrier envelope certificate is that
17 of the voter;

18         (3)  missing any required statement of residence;

19         (4)  missing information or containing incorrect
20 information required under Section 84.002(a)(1-a) or Section
21 86.002; or

22         (5)  containing incomplete information with respect to
23 a witness.

24     (b)  Not later than the second business day after a signature
25 verification committee discovers a defect described by Subsection
26 (a) and before the committee decides whether to accept or reject a
27 timely delivered ballot under Section 87.027, the committee shall:

43

1           (1)   determine if it would be possible for the voter to
2  correct the defect and return the carrier envelope before the time
3  the polls are required to close on election day; and

4           (2)   return the carrier envelope to the voter by mail,
5  if the committee determines that it would be possible for the voter
6  to correct the defect and return the carrier envelope before the
7  time the polls are required to close on election day.

8      (c)   If the signature verification committee determines
9  under Subsection (b)(1) that it would not be possible for the voter
10  to correct the defect and return the carrier envelope before the
11  time the polls are required to close on election day, the committee
12  may notify the voter of the defect by telephone or e-mail and inform
13  the voter that the voter may request to have the voter's application
14  to vote by mail canceled in the manner described by Section 84.032
15  or come to the early voting clerk's office in person not later than
16  the sixth day after election day to correct the defect.

17      (d)   If the signature verification committee takes an action
18  described by Subsection (b) or (c), the committee must take either
19  action described by that subsection with respect to each ballot in
20  the election to which this section applies.

21      (e)   A poll watcher is entitled to observe an action taken
22  under Subsection (b) or (c).

23      (f)   The secretary of state may prescribe any procedures
24  necessary to implement this section.

25      (g)   Notwithstanding any other law, a ballot may not be
26  finally rejected for a reason listed in Section 87.041(b)(1), (2),
27  or (6) before the seventh day after election day.

1    SECTION 5.13.  Section 87.041, Election Code, is amended by
2  amending Subsections (b) and (e) and adding Subsection (d-1) to
3  read as follows:

4     (b)  A ballot may be accepted only if:

5         (1)  the carrier envelope certificate is properly
6  executed;

7         (2)  neither the voter's signature on the ballot
8  application nor the signature on the carrier envelope certificate
9  is determined to have been executed by a person other than the
10  voter, unless signed by a witness;

11         (3)  the voter's ballot application states a legal
12  ground for early voting by mail;

13         (4)  the voter is registered to vote, if registration
14  is required by law;

15         (5)  the address to which the ballot was mailed to the
16  voter, as indicated by the application, was outside the voter's
17  county of residence, if the ground for early voting is absence from
18  the county of residence;

19         (6)  for a voter to whom a statement of residence form
20  was required to be sent under Section 86.002(a), the statement of
21  residence is returned in the carrier envelope and indicates that
22  the voter satisfies the residence requirements prescribed by
23  Section 63.0011; [and]

24         (7)  the address to which the ballot was mailed to the
25  voter is an address that is otherwise required by Sections 84.002
26  and 86.003; and

27         (8)  the information required under Section 86.002(g)

45

1 provided by the voter identifies the same voter identified on the
2 voter's application for voter registration under Section
3 13.002(c)(8).

4    (d-1)  If a voter provides the information required under
5 Section 86.002(g) and it identifies the same voter identified on
6 the voter's application for voter registration under Section
7 13.002(c)(8), the signature on the ballot application and on the
8 carrier envelope certificate  shall be rebuttably presumed to be
9 the signatures of the voter.

10    (e)  In making the determination under Subsection (b)(2), to
11 determine whether the signatures are those of the voter, the board
12 may also compare the signatures with any known signature [two or
13 more signatures] of the voter [made within the preceding six years
14 and] on file with the county clerk or voter registrar [to determine
15 whether the signatures are those of the voter].

16    SECTION 5.14.  Subchapter C, Chapter 87, Election Code, is
17 amended by adding Section 87.0411 to read as follows:

18    Sec. 87.0411.  OPPORTUNITY TO CORRECT DEFECT: EARLY VOTING
19 BALLOT BOARD.  (a)  This section applies to an early voting ballot
20 voted by mail:

21         (1)  for which the voter did not sign the carrier
22 envelope certificate;

23         (2)  for which it cannot immediately be determined
24 whether the signature on the carrier envelope certificate is that
25 of the voter;

26         (3)  missing any required statement of residence;

27         (4)  missing information or containing incorrect

46

S.B. No. 1

1  information required under Section 84.002(a)(1-a) or Section

2  86.002; or

3         (5)   containing incomplete information with respect to

4  a witness.

5      (b)  Not later than the second business day after an early

6  voting ballot board discovers a defect described by Subsection (a)

7  and before the board decides whether to accept or reject a timely

8  delivered ballot under Section 87.041, the board shall:

9         (1)  determine if it would be possible for the voter to

10  correct the defect and return the carrier envelope before the time

11  the polls are required to close on election day; and

12         (2)  return the carrier envelope to the voter by mail,

13  if the board determines that it would be possible for the voter to

14  correct the defect and return the carrier envelope before the time

15  the polls are required to close on election day.

16      (c)  If the early voting ballot board determines under

17  Subsection (b)(1) that it would not be possible for the voter to

18  correct the defect and return the carrier envelope before the time

19  the polls are required to close on election day, the board may

20  notify the voter of the defect by telephone or e-mail and inform the

21  voter that the voter may request to have the voter's application to

22  vote by mail canceled in the manner described by Section 84.032 or

23  come to the early voting clerk's office in person not later than the

24  sixth day after election day to correct the defect.

25      (d)  If the early voting ballot board takes an action

26  described by Subsection (b) or (c), the board must take either

27  action described by that subsection with respect to each ballot in

47

1  the election to which this section applies.

2      (e)  A poll watcher is entitled to observe an action taken

3  under Subsection (b) or (c).

4      (f)  The secretary of state may prescribe any procedures

5  necessary to implement this section.

6      (g)  Notwithstanding any other law, a ballot may not be

7  finally rejected for a reason listed in Section 87.041(b)(1), (2),

8  or (6) before the seventh day after election day.

9      SECTION 5.15.  Section 87.0431(b), Election Code, is amended

10  to read as follows:

11      (b)  The early voting clerk shall, not later than the 30th

12  day after election day, deliver notice to the attorney general,

13  including  certified  copies  of  the  carrier  envelope  and

14  corresponding ballot application, of any ballot rejected because:

15          (1)  the voter was deceased;

16          (2)  the voter already voted in person in the same

17  election;

18          (3)  the signatures on the carrier envelope and ballot

19  application were not executed by the same person;

20          (4)  the carrier envelope certificate lacked a witness

21  signature; [or]

22          (5)  the carrier envelope certificate was improperly

23  executed by an assistant; or

24          (6)  the early voting ballot board or the signature

25  verification committee determined that another violation of the

26  Election Code occurred.

27      SECTION 5.16.  Sections 87.062(a) and (c), Election Code,

1  are amended to read as follows:

2      (a)  On the direction of the presiding judge, the early
3  voting ballot board, in accordance with Section 85.032(b), shall
4  open the containers [container] for the early voting ballots that
5  are to be counted by the board, remove the contents from each [the]
6  container, and remove any ballots enclosed in ballot envelopes from
7  their envelopes.

8      (c)  Ballots voted by mail shall be tabulated and stored
9  separately from the ballots voted by personal appearance and shall
10 be separately reported on the returns [The results of all early
11 voting ballots counted by the board under this subchapter shall be
12 included in the same return].

13     SECTION 5.17.  Section 87.103, Election Code, is amended to
14 read as follows:

15     Sec. 87.103.  COUNTING BALLOTS AND PREPARING RETURNS.  (a)
16 The early voting electronic system ballots counted at a central
17 counting station, the ballots cast at precinct polling places, and
18 the ballots voted by mail shall be tabulated separately [from the
19 ballots cast at precinct polling places] and shall be separately
20 reported on the returns.

21     (b)  The early voting returns prepared at the central
22 counting station must include any early voting results obtained by
23 the early voting ballot board under Subchapter [Subchapters] D [and
24 E].

25     SECTION 5.18.  Section 87.126, Election Code, is amended by
26 adding Subsection (a-1) to read as follows:

27     (a-1)  Electronic records made under this section shall

49

1  record both sides of any application, envelope, or ballot recorded,

2  and all such records shall be provided to the early voting ballot

3  board, the signature verification committee, or both.

4      SECTION 5.19.  Subchapter G, Chapter 87, Election Code, is

5  amended by adding Section 87.128 to read as follows:

6      Sec. 87.128.  NOTES.  (a)  Each member of an early voting

7  ballot board and each member of a signature verification committee

8  is entitled to take any notes reasonably necessary to perform the

9  member's duties under this chapter.

10     (b)  Notes taken under this section may not contain

11  personally identifiable information.

12     (c)  Each member who takes notes under this section shall

13  sign the notes and deliver them to the presiding judge or committee

14  chair, as applicable, for delivery to the custodian of election

15  records.

16     (d)  Notes collected under this section shall be preserved in

17  the same manner as precinct election records under Section 66.058.

18               ARTICLE 6.  ASSISTANCE OF VOTERS

19     SECTION 6.01.  Section 64.009, Election Code, is amended by

20  amending Subsection (b) and adding Subsections (e), (f), (f-1),

21  (g), and (h) to read as follows:

22     (b)  The regular voting procedures, except those in

23  Subchapter B, may be modified by the election officer to the extent

24  necessary to conduct voting under this section.

25     (e)  Except as provided by Section 33.057, a poll watcher is

26  entitled to observe any activity conducted under this section.

27     (f)  A person who simultaneously assists seven or more voters

1  voting   under   this   section   by   providing   the   voters   with
2  transportation to the polling place must complete and sign a form,
3  provided by an election officer, that contains the person's name
4  and address and whether the person is providing assistance solely
5  under this section or under both this section and Subchapter B.

6        (f-1)  Subsection (f) does not apply if the person is related
7  to each voter within the second degree by affinity or the third
8  degree by consanguinity, as determined under Subchapter B, Chapter
9  573, Government Code.

10       (g)  A form completed under Subsection (f) shall be delivered
11  to the secretary of state as soon as practicable.  The secretary
12  shall retain a form delivered under this section for the period for
13  preserving the precinct election records and shall make the form
14  available to the attorney general for inspection upon request.

15       (h)  The   secretary   of   state   shall   prescribe   the   form
16  described by Subsection (f).

17       SECTION 6.02.  Section 64.031, Election Code, is amended to
18  read as follows:

19       Sec. 64.031.  ELIGIBILITY  FOR  ASSISTANCE.   A   voter   is
20  eligible to receive assistance in marking or reading the ballot, as
21  provided by this subchapter, if the voter cannot prepare or read the
22  ballot because of:

23            (1)  a  physical  disability  that  renders  the  voter
24  unable to write or see; or

25            (2)  an  inability  to  read  the  language  in  which  the
26  ballot is written.

27       SECTION 6.03.  Subchapter B, Chapter 64, Election Code, is

1  amended by adding Section 64.0322 to read as follows:

2      Sec. 64.0322.  SUBMISSION OF FORM BY ASSISTANT.  (a) A

3  person, other than an election officer, who assists a voter in

4  accordance with this chapter is required to complete a form

5  stating:

6          (1)  the name and address of the person assisting the

7  voter;

8          (2)  the relationship to the voter of the person

9  assisting the voter; and

10          (3)  whether the person assisting the voter received or

11  accepted any form of compensation or other benefit from a

12  candidate, campaign, or political committee.

13      (b)  The secretary of state shall prescribe the form required

14  by this section.  The form must be incorporated into the official

15  carrier envelope if the voter is voting an early voting ballot by

16  mail and receives assistance under Section 86.010, or must be

17  submitted to an election officer at the time the voter casts a

18  ballot if the voter is voting at a polling place or under Section

19  64.009.

20      SECTION 6.04.  Section 64.034, Election Code, is amended to

21  read as follows:

22      Sec. 64.034.  OATH.  A person, other than an election

23  officer, selected to provide assistance to a voter must take the

24  following oath, administered by an election officer at the polling

25  place, before providing assistance:

26      "I swear (or affirm) under penalty of perjury that the voter I

27  am assisting represented to me they are eligible to receive

52

1  assistance; I will not suggest, by word, sign, or gesture, how the
2  voter should vote; I will confine my assistance to reading the
3  ballot to the voter, directing the voter to read the ballot, marking
4  the voter's ballot, or directing the voter to mark the ballot;
5  [answering the voter's questions, to stating propositions on the
6  ballot, and to naming candidates and, if listed, their political
7  parties,] I will prepare the voter's ballot as the voter directs; I
8  did not pressure or coerce the voter into choosing me to provide
9  assistance; [and] I am not the voter's employer, an agent of the
10  voter's employer, or an officer or agent of a labor union to which
11  the voter belongs; I will not communicate information about how the
12  voter has voted to another person; and I understand that if
13  assistance is provided to a voter who is not eligible for
14  assistance, the voter's ballot may not be counted."

15       SECTION 6.05.  Sections 86.010(e), (h), and (i), Election
16  Code, are amended to read as follows:

17       (e)  A person who assists a voter to prepare a ballot to be
18  voted by mail shall enter on the official carrier envelope of the
19  voter:

20            (1)  the  person's  signature,  printed  name,  and
21  residence address;

22            (2)  the  relationship  of  the  person  providing  the
23  assistance to the voter; and

24            (3)  whether the person received or accepted any form
25  of compensation or other benefit from a candidate, campaign, or
26  political committee in exchange for providing assistance [on the
27  official carrier envelope of the voter].

53

1     (h)  Subsection (f) does not apply:

2        (1)  to a violation of Subsection (c), if the person is

3 related to the voter within the second degree by affinity or the

4 third degree by consanguinity, as determined under Subchapter B,

5 Chapter 573, Government Code, or was physically living in the same

6 dwelling as the voter at the time of the event; or

7        (2)  to a violation of Subsection (e)[,] if the person is

8 related to the voter within the second degree by affinity or the

9 third degree by consanguinity, as determined under Subchapter B,

10 Chapter 573, Government Code.

11     (i)  An offense under this section for a violation of

12 Subsection (c) is increased to the next higher category of offense

13 if it is shown on the trial of an offense under this section that:

14        (1)  the defendant was previously convicted of an

15 offense under this code;

16        (2)  the offense involved a voter 65 years of age or

17 older; or

18        (3)  the defendant committed another offense under this

19 section in the same election.

20     SECTION 6.06.  Section 86.0105, Election Code, is amended by

21 amending Subsections (a), (c), and (e) and adding Subsection (f) to

22 read as follows:

23     (a)  A person commits an offense if the person:

24        (1)  compensates or offers to compensate another person

25 for assisting voters as provided by Section 86.010[, as part of any

26 performance-based compensation scheme based on the number of voters

27 assisted or in which another person is presented with a quota of

54

1  ~~voters to be assisted as provided by Section 86.010~~]; or

2          (2)  solicits, receives, or  [~~engages in another~~

3  ~~practice that causes another person's compensation from or~~

4  ~~employment status with the person to be dependent on the number of~~

5  ~~voters assisted as provided by Section 86.010; or~~

6          [~~(3)  with knowledge that accepting compensation for~~

7  ~~such activity is illegal,~~] accepts compensation for an activity

8  described by Subdivision (1) [~~or (2)~~].

9      (c)  An offense under this section is a state jail felony [~~if~~

10  ~~it is shown on the trial of an offense under this section that the~~

11  ~~defendant was previously convicted two or more times under this~~

12  ~~section~~].

13      (e)  For purposes of this section, compensation means an

14  economic benefit as defined by Section 38.01, Penal Code [~~any form~~

15  ~~of monetary payment, goods, services, benefits, or promises or~~

16  ~~offers of employment, or any other form of consideration offered to~~

17  ~~another person in exchange for assisting voters~~].

18      (f)  This section does not apply if the person assisting a

19  voter is an attendant or caregiver previously known to the voter.

20      SECTION 6.07.  Section 86.013(b), Election Code, is amended

21  to read as follows:

22      (b)  Spaces must appear on the reverse side of the official

23  carrier envelope for:

24          (1)  indicating the identity and date of the election;

25  [~~and~~]

26          (2)  entering the signature, printed name, and

27  residence address of a person other than the voter who deposits the

1 carrier envelope in the mail or with a common or contract carrier;
2 and
3         (3) indicating the relationship of that person to the
4 voter.

5     SECTION 6.08. (a) The secretary of state shall conduct a
6 study regarding the implementation of educational programs,
7 including the production and publication on the secretary of
8 state's Internet website of instructional videos, to help voters
9 with disabilities understand how to use voting systems used in this
10 state.

11     (b) Not later than December 1, 2022, the secretary of state
12 shall submit to the standing committees of the legislature with
13 jurisdiction over elections a report on the study required by this
14 section.

15     (c) The secretary of state, using existing resources, may
16 contract with a qualified vendor to conduct the study required by
17 this section.

18     (d) This section expires December 1, 2023.

19       ARTICLE 7. FRAUD AND OTHER UNLAWFUL PRACTICES

20     SECTION 7.01. Chapter 63, Election Code, is amended by
21 adding Section 63.0111 to read as follows:

22     Sec. 63.0111. OFFENSES RELATED TO PROVISIONAL VOTING. (a)
23 An election judge commits an offense if the judge knowingly
24 provides a voter with a form for an affidavit required by Section
25 63.001 if the form contains information that the judge entered on
26 the form knowing it was false.

27     (b) An offense under this section is a state jail felony.

S.B. No. 1

1    SECTION 7.02.  Sections 276.004(a) and (b), Election Code,
2  are amended to read as follows:

3    (a)  A person commits an offense if, with respect to another
4  person over whom the person has authority in the scope of
5  employment, the person knowingly:

6       (1)  refuses to permit the other person to be absent
7  from work on election day or while early voting is in progress for
8  the purpose of attending the polls to vote; or

9       (2)  subjects or threatens to subject the other person
10 to a penalty for attending the polls on election day or while early
11 voting is in progress to vote.

12   (b)  It is an exception to the application of this section
13 that the person's conduct occurs in connection with an election in
14 which the polls are open on election day or while early voting is in
15 progress for voting for two consecutive hours outside of the
16 voter's working hours.

17   SECTION 7.03.  Sections 276.013(a) and (b), Election Code,
18 are amended to read as follows:

19   (a)  A person commits an offense if the person knowingly or
20 intentionally makes any effort to:

21      (1)  influence the independent exercise of the vote of
22 another in the presence of the ballot or during the voting process,
23 including by altering the ballot of another or by otherwise causing
24 a ballot to not reflect the intent of the voter;

25      (2)  cause a voter to become registered, a ballot to be
26 obtained, or a vote to be cast under false pretenses; [or]

27      (3)  cause any false or intentionally misleading

57

1  statement, representation, or information to be provided:
2                  (A)  to an election official; or
3                  (B)  on an application for ballot by mail, carrier
4  envelope, or any other official election-related form or document;
5             (4)  prevent a voter from casting a legal ballot in an
6  election in which the voter is eligible to vote;
7             (5)  provide false information to a voter with the
8  intent of preventing the voter from voting in an election in which
9  the voter is eligible to vote;
10            (6)  cause the ballot not to reflect the intent of the
11  voter;
12            (7)  cause a ballot to be voted for another person that
13  the person knows to be deceased or otherwise knows not to be a
14  qualified or registered voter;
15            (8)  cause or enable a vote to be cast more than once in
16  the same election; or
17            (9)  discard or destroy a voter's completed ballot
18  without the voter's consent.
19       (b)  An offense under this section is a Class A misdemeanor,
20  unless:
21            (1)  the person committed the offense while acting in
22  the person's capacity as an elected official, in which case the
23  offense is a state jail felony; or
24            (2)  the person is convicted of an attempt, in which
25  case the offense is a Class B [A] misdemeanor.
26       SECTION 7.04.  Chapter 276, Election Code, is amended by
27  adding Sections 276.015, 276.016, 276.017, 276.018, and 276.019 to

1 read as follows:

2       Sec. 276.015.  VOTE HARVESTING.  (a)  In this section:

3            (1)  "Benefit" means anything reasonably regarded as a

4 gain or advantage, including a promise or offer of employment, a

5 political favor, or an official act of discretion, whether to a

6 person or another party whose welfare is of interest to the person.

7            (2)  "Vote   harvesting   services"   means   in-person

8 interaction with one or more voters, in the physical presence of an

9 official ballot or a ballot voted by mail, intended to deliver votes

10 for a specific candidate or measure.

11       (b)  A person commits an offense if the person, directly or

12 through a third party, knowingly provides or offers to provide vote

13 harvesting services in exchange for compensation or other benefit.

14       (c)  A person commits an offense if the person, directly or

15 through a third party, knowingly provides or offers to provide

16 compensation or other benefit to another person in exchange for

17 vote harvesting services.

18       (d)  A person commits an offense if the person knowingly

19 collects or possesses a mail ballot or official carrier envelope in

20 connection with vote harvesting services.

21       (e)  This section does not apply to:

22            (1)  an activity not performed in exchange for

23 compensation or a benefit;

24            (2)  interactions that do not occur in the presence of

25 the ballot or during the voting process;

26            (3)  interactions that do not directly involve an

27 official ballot or ballot by mail;

59

1    (4)  interactions that are not conducted in-person with
2  a voter; or
3    (5)  activity that is not designed to deliver votes for
4  or against a specific candidate or measure.
5    (f)  An offense under this section is a felony of the third
6  degree.
7    (g)  If conduct that constitutes an offense under this
8  section also constitutes an offense under any other law, the actor
9  may be prosecuted under this section, the other law, or both.
10    (h)  Records necessary to investigate an offense under this
11  section or any other section of this code shall be provided by an
12  election officer in an unredacted form to a law enforcement officer
13  upon request.  Records obtained under this subsection are not
14  subject to public disclosure.
15    Sec. 276.016.  UNLAWFUL SOLICITATION AND DISTRIBUTION  OF
16  APPLICATION TO VOTE BY MAIL.  (a)  A public official or election
17  official commits an offense if the official, while acting in an
18  official capacity, knowingly:
19    (1)  solicits the submission of an application to vote
20  by mail from a person who did not request an application;
21    (2)  distributes an application to vote by mail to a
22  person who did not request the application unless the distribution
23  is expressly authorized by another provision of this code;
24    (3)  authorizes or approves the expenditure of public
25  funds to facilitate third-party distribution of an application to
26  vote by mail to a person who did not request the application; or
27    (4)  completes any portion of an application to vote by

1  mail and distributes the application to an applicant.

2      (b)  An offense under this section is a state jail felony.

3      (c)  Subsection (a)(2) does not apply if the public official

4  or election official engaged in the conduct described by Subsection

5  (a)(2) by providing access to an application to vote by mail from a

6  publicly accessible Internet website.

7      (d)  Subsection (a)(4) does not apply if the public official

8  or election official engaged in the conduct described by Subsection

9  (a)(4) while lawfully assisting the applicant under Section 84.003.

10      (e)  Subsection (a) does not apply if the public official or

11  election official:

12          (1)  provided general information about voting by mail,

13  the vote by mail process, or the timelines associated with voting to

14  a person or the public; or

15          (2)  engaged in the conduct described by Subsection (a)

16  while acting in the official's capacity as a candidate for a public

17  elective office.

18      (f)  The remedy provided under this chapter is cumulative,

19  and does not restrict any other remedies provided by this code or by

20  law.  A violation of this section is subject to injunctive relief or

21  mandamus as provided by this code.

22      Sec. 276.017.  UNLAWFUL DISTRIBUTION OF EARLY VOTING BALLOTS

23  AND BALLOTING MATERIALS.  (a)  The early voting clerk or other

24  election official commits an offense if the clerk or official

25  knowingly mails or otherwise provides an early voting ballot by

26  mail or other early voting by mail ballot materials to a person who

27  the clerk or official knows did not submit an application for a

61

1 ballot to be voted by mail under Section 84.001.
2       (b)  An offense under this section is a Class A misdemeanor.
3       Sec. 276.018.  PERJURY IN CONNECTION WITH CERTAIN ELECTION
4 PROCEDURES.  (a) A person commits an offense if, with the intent to
5 deceive, the person knowingly or intentionally makes a false
6 statement or swears to the truth of a false statement:
7            (1)  on a voter registration application; or
8            (2)  previously made while making an oath, declaration,
9 or affidavit described by this code.
10      (b)  An offense under this section is a state jail felony.
11      Sec. 276.019.  UNLAWFUL ALTERING OF ELECTION PROCEDURES.  A
12 public official or election official may not create, alter, modify,
13 waive, or suspend any election standard, practice, or procedure
14 mandated by law or rule in a manner not expressly authorized by this
15 code.
16                      ARTICLE 8. ENFORCEMENT
17      SECTION 8.01.  Subchapter E, Chapter 31, Election Code, is
18 amended by adding Sections 31.128, 31.129, and 31.130 to read as
19 follows:
20      Sec. 31.128.  RESTRICTION ON ELIGIBILITY.  (a)  In this
21 section, "election official" does not include a chair of a county
22 political party holding a primary election or a runoff primary
23 election.
24      (b)  A person may not serve as an election official if the
25 person has been finally convicted of an offense under this code.
26      Sec. 31.129.  CIVIL PENALTY. (a)  In this section, "election
27 official" has the meaning assigned by Section 31.128.

Case 5:21-cv-00844-XR   Document 792-1   Filed 09/05/23   Page 206 of 220

1    (b)  An election official may be liable to this state for a
2  civil penalty if the official:
3         (1)  is employed by or is an officer of this state or a
4  political subdivision of this state; and
5         (2)  violates a provision of this code.
6    (c)  A civil penalty imposed under this section may include
7  termination of the person's employment and loss of the person's
8  employment benefits.
9    Sec. 31.130.  SUIT AGAINST ELECTION OFFICER.  An action,
10  including an action for a writ of mandamus, alleging that an
11  election officer violated a provision of this code while acting in
12  the officer's official capacity may only be brought against the
13  officer in the officer's official capacity.
14    SECTION 8.02.  Sections 232.008(b), (c), and (d), Election
15  Code, are amended to read as follows:
16    (b)  Except as provided by Subsection (c), a contestant must
17  file the petition not later than the later of the 45th [30th] day
18  after the date the election records are publicly available under
19  Section 1.012 or the official result of the contested election is
20  determined.
21    (c)  A contestant must file the petition not later than the
22  later of the 15th [10th] day after the date the election records are
23  publicly available under Section 1.012 or the official result is
24  determined in a contest of:
25         (1)  a primary or runoff primary election; or
26         (2)  a general or special election for which a runoff is
27  necessary according to the official result or will be necessary if

63

1  the contestant prevails.

2      (d)  A contestant must deliver, electronically or otherwise,
3  a copy of the petition to the secretary of state by the same
4  deadline prescribed for the filing of the petition.

5      SECTION 8.03.  Title 14, Election Code, is amended by adding
6  Subtitle D to read as follows:

7               SUBTITLE D.  OTHER ELECTION LAWSUITS

8      CHAPTER 247.  LAWSUIT ALLEGING IMPROPER ELECTION ACTIVITIES

9      Sec. 247.001.  PETITION  ALLEGING  FRAUD.   This  chapter
10  applies to a civil suit in which a candidate in an election alleges
11  in the petition that an opposing candidate, an agent of the opposing
12  candidate, or a person acting on behalf of the opposing candidate
13  with the candidate's knowledge violated any of the following
14  sections of this code:

15          (1)  Section 13.007;

16          (2)  Section 64.012;

17          (3)  Section 64.036;

18          (4)  Section 84.003;

19          (5)  Section 84.0041;

20          (6)  Section 86.0051;

21          (7)  Section 86.006;

22          (8)  Section 86.010;

23          (9)  Section 276.013; and

24          (10)  Section 276.015.

25      Sec. 247.002.  PROCEDURE.  A candidate in an election may
26  file a petition for an action under this chapter in any county where
27  a defendant resided at the time of the election.  If the election is

1  for a statewide office, the candidate may also file the petition in
2  a district court in Travis County.

3      Sec. 247.003.  FILING PERIOD FOR PETITION.  A candidate in an
4  election may file a petition for an action under this chapter not
5  earlier than the day after the date the election is certified and
6  not later than the 45th day after the later of that date or the date
7  election records are made publicly available under Section 1.012.

8      Sec. 247.004.  DAMAGES.   (a)   If  it  is  shown  by  a
9  preponderance of the evidence that a defendant, an agent of the
10  defendant, or a person acting on behalf of the defendant with the
11  defendant's knowledge committed one or more violations of a section
12  described  by  Section 247.001,  the  defendant  is  liable  to  the
13  plaintiff for damages in an amount of $1,000 for each violation.

14      (b)   Notwithstanding  Section 41.004,  Civil  Practice  and
15  Remedies Code, a court shall award damages under Subsection (a) to
16  the  plaintiff  irrespective  of  whether  the  plaintiff  is  awarded
17  actual damages.

18      Sec. 247.005.  ATTORNEY'S FEES.   In  an  action  under  this
19  chapter,  the  court  may  award  reasonable  attorney's  fees  to  the
20  prevailing party.

21      SECTION 8.04.  Section 273.061, Election Code, is amended to
22  read as follows:

23      Sec. 273.061.  JURISDICTION.  (a)  The supreme court or a
24  court  of  appeals  may  issue  a  writ  of  mandamus  to  compel  the
25  performance  of  any  duty  imposed  by  law  in  connection  with  the
26  holding of an election or a political party convention, regardless
27  of  whether  the  person  responsible  for  performing  the  duty  is  a

65

1  public officer.

2      (b)  The  court  of  criminal  appeals  may  issue  a  writ  of
3  mandamus to compel the performance of any duty imposed by law in
4  connection  with  the  provision,  sequestration,  transfer,  or
5  impoundment  of  evidence  in  or  records  relating  to  a  criminal
6  investigation conducted under this code or conducted in connection
7  with the conduct of an election or political party convention. If a
8  writ of mandamus is issued under this subsection, it shall include
9  an  order  requiring  the  provision,  sequestration,  transfer,  or
10  impoundment of the evidence or record.

11      SECTION 8.05.  Subchapter D, Chapter 22, Government Code, is
12  amended by adding Sections 22.304 and 22.305 to read as follows:

13      Sec. 22.304.  COURT SITTING IN PANELS FOR CERTAIN ELECTION
14  PROCEEDINGS; CRIMINAL OFFENSE.  (a)  In this section, "public
15  official" means any person elected, selected, appointed, employed,
16  or otherwise designated as an officer, employee, or agent of this
17  state, a government agency, a political subdivision, or any other
18  public body established by state law.

19      (b)  Notwithstanding  any  other  law  or  rule,  a  court
20  proceeding entitled to priority under Section 22.305 and filed in a
21  court of appeals shall be docketed by the clerk of the court and
22  assigned to a panel of three justices determined using an automated
23  assignment system.

24      (c)  A person, including a public official, commits an
25  offense if the person communicates with a court clerk with the
26  intention of influencing or attempting to influence the composition
27  of a three-justice panel assigned a specific proceeding under this

S.B. No. 1

```
 1  section.
 2       (d)  An offense under this section is a Class A misdemeanor.
 3       Sec. 22.305.  PRIORITY OF CERTAIN ELECTION PROCEEDINGS.  (a)
 4  The supreme court or a court of appeals shall prioritize over any
 5  other proceeding pending or filed in the court a proceeding for
 6  injunctive relief or for a writ of mandamus under Chapter 273,
 7  Election Code, pending or filed in the court on or after the 70th
 8  day before a general or special election.
 9       (b)  If granted, oral argument for a proceeding described by
10  Subsection (a) may be given in person or through electronic means.
11       SECTION 8.06.  Section 23.101, Government Code, is amended
12  by amending Subsection (a) and adding Subsections (b-1) and (b-2)
13  to read as follows:
14       (a)  Except as provided by Subsection (b-1), the [The] trial
15  courts of this state shall regularly and frequently set hearings
16  and trials of pending matters, giving preference to hearings and
17  trials of the following:
18            (1)  temporary injunctions;
19            (2)  criminal actions, with the following actions given
20  preference over other criminal actions:
21                 (A)  criminal actions against defendants who are
22  detained in jail pending trial;
23                 (B)  criminal actions involving a charge that a
24  person committed an act of family violence, as defined by Section
25  71.004, Family Code;
26                 (C)  an offense under:
27                      (i)  Section 21.02 or 21.11, Penal Code;
```

67

1           (ii)  Chapter 22, Penal Code, if the victim
2   of the alleged offense is younger than 17 years of age;
3           (iii)  Section 25.02, Penal Code, if the
4   victim of the alleged offense is younger than 17 years of age;
5           (iv)  Section 25.06, Penal Code;
6           (v)  Section 43.25, Penal Code; or
7           (vi)  Section 20A.02(a)(7), 20A.02(a)(8),
8   or 20A.03, Penal Code;
9           (D)  an offense described by Article 62.001(6)(C)
10  or (D), Code of Criminal Procedure; and
11          (E)  criminal actions against persons who are
12  detained as provided by Section 51.12, Family Code, after transfer
13  for prosecution in criminal court under Section 54.02, Family Code;
14      (3)  election contests and suits under the Election
15  Code;
16      (4)  orders for the protection of the family under
17  Subtitle B, Title 4, Family Code;
18      (5)  appeals of final rulings and decisions of the
19  division of workers' compensation of the Texas Department of
20  Insurance regarding workers' compensation claims and claims under
21  the Federal Employers' Liability Act and the Jones Act;
22      (6)  appeals of final orders of the commissioner of the
23  General Land Office under Section 51.3021, Natural Resources Code;
24      (7)  actions in which the claimant has been diagnosed
25  with malignant mesothelioma, other malignant asbestos-related
26  cancer, malignant silica-related cancer, or acute silicosis; and
27      (8)  appeals brought under Section 42.01 or 42.015, Tax

68

1 Code, of orders of appraisal review boards of appraisal districts
2 established for counties with a population of less than 175,000.

3     (b-1)  Except for a criminal case in which the death penalty
4 has been or may be assessed or when it would otherwise interfere
5 with a constitutional right, the trial courts of this state shall
6 prioritize over any other proceeding pending or filed in the court a
7 proceeding for injunctive relief under Chapter 273, Election Code,
8 pending or filed in the court on or after the 70th day before a
9 general or special election.

10     (b-2)  A hearing in a proceeding described by Subsection
11 (b-1) may be held in person or through electronic means, as
12 determined by the court.

13     SECTION 8.07.  Chapter 23, Government Code, is amended by
14 adding Subchapter D to read as follows:

15     SUBCHAPTER D.  GENERAL PROVISIONS

16     Sec. 23.301.  ASSIGNMENT OF CERTAIN ELECTION PROCEEDINGS;
17 CRIMINAL OFFENSE.  (a)  Notwithstanding any other law or rule, the
18 clerk of a district court in which a proceeding entitled to priority
19 under Section 23.101(b-1) is filed shall docket the proceeding and,
20 if more than one district court in the county has jurisdiction over
21 the proceeding, randomly assign the proceeding to a district court
22 using an automated assignment system.

23     (b)  Notwithstanding any other law or rule, the clerk of a
24 county court or statutory county court in which a proceeding
25 entitled to priority under Section 23.101(b-1) is filed shall
26 docket the proceeding and, if more than one court in the county has
27 jurisdiction over the proceeding, randomly assign the proceeding to

69

1  a court using an automated assignment system.

2       (c)  A person, including a public official, commits an
3  offense if the person communicates with a county or district clerk
4  with the intention of influencing or attempting to influence the
5  court or judge assigned to a proceeding under this section.

6       (d)  An offense under this section is a Class A misdemeanor,
7  except that the offense is a state jail felony if it is shown on the
8  trial of the offense that the person committed the offense while
9  acting in the person's official capacity as an election official.

10      (e)  If a district or county clerk does not comply with this
11 section, a person may seek from the supreme court or a court of
12 appeals a writ of mandamus as provided by Section 273.061, Election
13 Code, to compel compliance with this section.

14      Sec. 23.302.  DEADLINES IN CERTAIN ELECTION PROCEEDINGS.
15 (a)  Not later than 24 hours after the proceeding is filed, a judge
16 to whom a case is assigned under Section 23.301(b) who wishes to be
17 recused from the proceeding must, before recusal:

18           (1)  hear an application for any emergency temporary
19 relief sought;

20           (2)  grant or deny any emergency temporary relief
21 sought; and

22           (3)  set a scheduling order that provides:

23                (A)  a date for a hearing on any injunction sought
24 not later than five days after the date on which the proceeding was
25 filed; and

26                (B)  discovery and deposition deadlines before
27 the expiration of any emergency relief order entered.

1    (b)  The presiding judge of an administrative region shall
2  assign a new judge to a proceeding assigned under Section 23.301(b)
3  not later than 12 hours after the original judge assigned to the
4  proceeding is recused under Subsection (a).
5    (c)  A final order in a proceeding filed under Section
6  273.081, Election Code, shall be submitted in writing to the
7  parties not later than 24 hours after the judge makes a final
8  determination in the proceeding.
9    (d)  If a district judge does not comply with this section, a
10  person may seek from the supreme court, the court of criminal
11  appeals, or a court of appeals a writ of mandamus as provided by
12  Section 273.061, Election Code, to compel compliance with this
13  section.
14    (e)  Notwithstanding Section 23.101(b-1), a proceeding
15  relating to a permanent injunction being sought in connection to a
16  challenge under Section 141.034, Election Code, may be heard after
17  the primary election has been canvassed.
18        ARTICLE 9.  INELIGIBLE VOTERS AND RELATED REFORMS
19        SECTION 9.01.  Chapter 42, Code of Criminal Procedure, is
20  amended by adding Article 42.0194 to read as follows:
21    Art. 42.0194.  FINDING REGARDING FELONY CONVICTION.  In the
22  trial of a felony offense, if the defendant is adjudged guilty of
23  the offense, the court shall:
24        (1)  make an affirmative finding that the person has
25  been found guilty of a felony and enter the affirmative finding in
26  the judgment of the case; and
27        (2)  instruct the defendant regarding how the felony

71

1 conviction will impact the defendant's right to vote in this state.

2     SECTION 9.02.  Article 42.01, Code of Criminal Procedure, as
3 effective September 1, 2021, is amended by adding Section 16 to read
4 as follows:

5     Sec. 16.  In  addition  to  the  information  described  by
6 Section 1, the judgment should reflect the affirmative finding and
7 instruction entered pursuant to Article 42.0194.

8     SECTION 9.03.  Section 64.012, Election Code, is amended by
9 amending Subsections (a) and (b) and adding Subsections (c) and (d)
10 to read as follows:

11     (a)  A person commits an offense if the person knowingly or
12 intentionally:

13          (1)  votes or attempts to vote in an election in which
14 the person knows the person is not eligible to vote;

15          (2)  [knowingly] votes or attempts to vote more than
16 once in an election;

17          (3)  [knowingly] votes or attempts to vote a ballot
18 belonging to another person, or by impersonating another person;
19 [or]

20          (4)  [knowingly] marks or attempts to mark any portion
21 of another person's ballot without the consent of that person, or
22 without specific direction from that person how to mark the ballot;
23 or

24          (5)  votes or attempts to vote in an election in this
25 state after voting in another state in an election in which a
26 federal office appears on the ballot and the election day for both
27 states is the same day.

1      (b)  An offense under this section is a <u>Class A misdemeanor</u>

2  [felony of the second degree unless the person is convicted of an

3  attempt. In that case, the offense is a state jail felony].

4      <u>(c)  A person may not be convicted solely upon the fact that</u>

5  <u>the person signed a provisional ballot affidavit under Section</u>

6  <u>63.011 unless corroborated by other evidence that the person</u>

7  <u>knowingly committed the offense.</u>

8      <u>(d)  If conduct that constitutes an offense under this</u>

9  <u>section also constitutes an offense under any other law, the actor</u>

10  <u>may be prosecuted under this section, the other law, or both.</u>

11      SECTION 9.04.  The change in law made by this article in

12  adding Section 64.012(c), Election Code, applies to an offense

13  committed before, on, or after the effective date of this Act,

14  except that a final conviction for an offense under that section

15  that exists on the effective date of this Act remains unaffected by

16  this article.

17  ARTICLE 10. REPEALER; SEVERABILITY; TRANSITION; EFFECTIVE DATE

18      SECTION 10.01.  The following provisions of the Election

19  Code are repealed:

20          (1)  Section 85.062(e);

21          (2)  Section 86.0105(b); and

22          (3)  Section 127.201(f).

23      SECTION 10.02. If any provision of this Act or its

24  application to any person or circumstance is held invalid, the

25  invalidity does not affect other provisions or applications of this

26  Act that can be given effect without the invalid provision or

27  application, and to this end the provisions of this Act are declared

1  to be severable.

2      SECTION 10.03.  (a)   Except as otherwise provided by this
3  Act, the changes in law made by this Act apply only to an offense
4  committed on or after the effective date of this Act.  An offense
5  committed before the effective date of this Act is governed by the
6  law in effect when the offense was committed, and the former law is
7  continued in effect for that purpose.  For purposes of this section,
8  an offense was committed before the effective date of this Act if
9  any element of the offense occurred before that date.

10      (b)   The changes in law made by this Act apply only to an
11  election ordered on or after the effective date of this Act.  An
12  election ordered before the effective date of this Act is governed
13  by the law in effect when the election was ordered, and the former
14  law is continued in effect for that purpose.

15      (c)   The changes in law made by this Act apply only to an
16  application to vote an early voting ballot by mail submitted on or
17  after the effective date of this Act.  An application to vote an
18  early voting ballot by mail submitted before the effective date of
19  this Act is governed by the law in effect when the application was
20  submitted, and the former law is continued in effect for that
21  purpose.

22      (d)   The changes in law made by this Act apply only to an
23  application for voter registration submitted on or after the
24  effective date of this Act.

25      (e)   Chapter 247, Election Code, as added by this Act,
26  applies only to a cause of action for which the associated election
27  occurred after the effective date of this Act.

74

1      SECTION 10.04.  This Act takes effect on the 91st day after

2  the last day of the legislative session.

S.B. No. 1

_____        _____
President of the Senate              Speaker of the House

    I hereby certify that S.B. No. 1 passed the Senate on August 12, 2021, by the following vote: Yeas 18, Nays 11; August 27, 2021, Senate refused to concur in House amendments and requested appointment of Conference Committee; August 29, 2021, House granted request of the Senate; August 31, 2021, Senate adopted Conference Committee Report by the following vote: Yeas 18, Nays 13.

_____
Secretary of the Senate

    I hereby certify that S.B. No. 1 passed the House, with amendments, on August 27, 2021, by the following vote: Yeas 80, Nays 41, one present not voting; August 29, 2021, House granted request of the Senate for appointment of Conference Committee; August 31, 2021, House adopted Conference Committee Report by the following vote: Yeas 80, Nays 41, one present not voting.

_____
Chief Clerk of the House

Approved:

_____
Date

_____
Governor

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
7PM O'CLOCK

SEP 7 2021

_____
Secretary of State

76

## Election Reconciliation - Official Totals

County    El Paso

Registered Voters    494,152

Election Name    Primary 2022

Election Date    3/1/22

| 1. Voters (from election rosters and lists) | | 2. Rejected ballots | | 3. Counted ballots (from tabulation software) | |
|---|---|---|---|---|---|
| A. Early voting in person voters | 27,302 | | | I. Early voting ballots counted | 27,333 |
| B. Election day in person voters | 25,715 | | | J. Election day ballots counted | 25,737 |
| C. Mail ballot voters | 4528 | F. Mail ballots rejected | 725 | K. Mail ballots counted | 3,785 |
| D. Provisional ballots submitted | 126 | G. Provisional ballots rejected | 49 | L. Provisional ballots counted | 77 |
| E. Total voters (A+B+C+D) | 57,671 | H. Total ballots rejected (F+G) | 774 | M. Total ballots counted (I+J+K+L) | 56,932 |

### 4. Comparison of voters and counted ballots

N. Difference between voters and ballots (E-H-M)    35

O. Difference as percentage of voters (N÷(E-H)*100)    .06 %

P. Explanation for difference, if any

### 5. Attestation

Q. "I certify that the information contained in this document accurately reflects the official reconciliation of votes and voters from the above stated election"

Presiding judge signature

Print name    Lisa Wise

Date    3/7/22

| 6. Mail ballots | |
|---|---|
| R. Mail ballots sent | |
| S. Mail ballots not returned by voter | |
| T. Mail ballots surrendered | |

| 7. Provisional ballots | |
|---|---|
| U. Provisional ballots deemed incomplete | |

EXHIBIT 12
WIT: Lisa Wise
DATE: 4-13-2022
Nancy Newhouse, CSR