```
 1                IN THE UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
 2                      SAN ANTONIO DIVISION

 3

 4   LA UNION DEL PUEBLO ENTERO,    )(
     et al.                         )(
 5            Plaintiffs            )(
                                    )(
 6   VS.                            )(     CASE NO.
                                    )(     5:21-cv-844-XR
 7   GREGORY W. ABBOTT, et al.      )(     (LEAD CASE)
                                    )(
 8            Defendants            )(
                    _____
 9
      OCA-GREATER HOUSTON, et al.   )(
10            Plaintiffs            )(
                                    )(     CASE NO.
11   VS.                            )(     1:21-cv-780-XR
                                    )(
12   JANE NELSON, et al.            )(
              Defendants            )(
13                  _____

14    HOUSTON AREA URBAN LEAGUE,    )(
      et al.                        )(
15            Plaintiffs            )(
                                    )(     CASE NO.
16   VS.                            )(     5:21-cv-848-XR
                                    )(
17   GREGORY WAYNE ABBOTT, et al.   )(
              Defendants            )(
18                  _____

19    LULAC TEXAS, et al.           )(
              Plaintiffs            )(
20                                  )(
                                    )(     CASE NO.
21   VS.                            )(     1:21-cv-0786-XR
                                    )(
22   JANE NELSON, et al.            )(
              Defendants            )(
23                  _____

24

25
```



```
 1  _____

 2  MIFAMILIA VOTA, et al.         )(
            Plaintiffs            )(
 3                                 )(   CASE NO.
    VS.                            )(   5:21-cv-0920-XR
 4                                 )(
    GREG ABBOTT, et al.            )(
 5          Defendants            )(
    _____
 6
    UNITED STATES OF AMERICA       )(
 7          Plaintiff             )(
                                   )(   CASE NO.
 8  VS.                            )(   5:21-cv-1085-XR
                                   )(
 9  THE STATE OF TEXAS, et al.     )(
            Defendants            )(
10  _____

11              ORAL AND VIDEOTAPED DEPOSITION OF

12                     HILDA ANN SALINAS
                       APRIL 20, 2023
13  _____

14

15

16

17          ORAL AND VIDEOTAPED DEPOSITION OF HILDA ANN

18  SALINAS, OFFICE OF THE HIDALGO COUNTY ELECTION

19  ADMINISTRATOR, produced as a witness at the instance of

20  the State Defendants, taken in the above-styled and

21  numbered cause on APRIL 20, 2023, between the hours of

22  9:32 a.m. to 12:08 p.m. at the Office of Texas Attorney

23  General, Child Support Division, Pharr Regional Office,

24  3508 North Jackson Road, Suite 100, Pharr, Texas, and

25  1:32 p.m. to 4:55 p.m. at Bryant & Stingley, Inc., 1305
```



```
 1        A.  Well, I did meet with, you know, the DA, my
 2   legal team.
 3        Q.  And who is your -- who are you referring to
 4   when you say your legal team?
 5        A.  Josie Ramirez and Leigh Ann Tognetti.
 6        Q.  And how many times did y'all meet?
 7        A.  Once yesterday.
 8        Q.  And how long was that meeting?
 9        A.  About an hour or two.
10        Q.  Did y'all have any phone conversations?
11        A.  No.
12        Q.  Did you review SB 1 in preparation for your
13   deposition today?
14        A.  As in the entire law, no.
15        Q.  Okay.
16        A.  Just specific parts.
17        Q.  And did you review any of the written discovery
18   Hidalgo County produced in this case?
19        A.  Yes, I did.
20        Q.  I'm going to hand you what I have marked as
21   Deposition Exhibit 1.  Do you recognize Deposition
22   Exhibit 1?
23        A.  Yes.
24        Q.  And what is it?
25        A.  Oh, topics for examination --
```



```
 1        Q.  Okay.
 2        A.  -- for today.
 3        Q.  And have you seen this document before?
 4        A.  Yes.
 5        Q.  And do you understand that you are here today
 6   pursuant to this notice?
 7        A.  Yes.
 8        Q.  And you understand that the Office of Hidalgo
 9   County Elections Administrator has designated you as
10   their organizational representative?
11        A.  The -- yes, I -- yes.
12        Q.  Okay.  And you understand that your answers
13   today are binding on the organization, correct?
14        A.  Correct.
15        Q.  And are you prepared to testify about the
16   topics listed in this notice?
17        A.  Yes.
18        Q.  Okay.  You can go ahead and set that aside.
19             Ms. Salinas, what is your position at
20   Hidalgo County?
21        A.  My position?  The elections administrator.
22        Q.  Okay.  And how long have you held this
23   position?
24        A.  I was just recently appointed on February 21st.
25        Q.  Of this year?
```



MAGNA
LEGAL SERVICES

Hilda Salinas                                         April 20, 2023

```
 1        A.   Yes.
 2        Q.   And what are your responsibilities as elections
 3   administrator?
 4        A.   Oversee, implement, stay current with the law,
 5   you know, manage the department.  I do also manage the
 6   elections operations of administrating an election as
 7   well as voter registration, you know, implementing
 8   policy, creating policy.
 9        Q.   Were you involved in Hidalgo County elections
10   before you were appointed elections administrator?
11        A.   I was appointed the interim on September 12th.
12        Q.   And what position did you hold before that?
13        A.   I was the assistant director.
14        Q.   Were you involved with the Hidalgo County
15   elections in 2018?
16        A.   In 2018, yes.
17        Q.   Okay.  What was your role in 2018?
18        A.   I was the elections analyst.
19        Q.   And what does the elections analyst do?
20        A.   In charge of public information, dissemination
21   of information to the public, handle the media, write
22   press releases, social media.
23        Q.   When you say "dissemination of information to
24   the public," does that include voter education
25   materials?
```



 1      A.  Well, the information that was provided to me
 2  to send it out.
 3      Q.  Okay.  And what types of information were you
 4  disseminating to the public?
 5      A.  Any information that needed to be released.
 6  For example, let's say a -- we were going to -- the
 7  last day to register to vote, such-and-such day was the
 8  start of early voting, answering questions that the
 9  media may have, polling location information,
10  election -- your nearest polling location links, things
11  like that.
12      Q.  Okay.  Thank you.  About how many full-time
13  employees work under you as elections administrator?
14      A.  I want to say about 37.
15      Q.  While voting is ongoing, how many of those
16  people are directly involved in the operation of the
17  polls?
18      A.  Pretty -- the operation of the polls, as in
19  full-time staff or poll workers and judges?
20      Q.  As in full-time staff.
21      A.  Okay.  I want to say about 30.  They each play
22  a certain part.
23      Q.  Okay.  Okay.  I'm going to turn our
24  conversation to the November 2022 general election.
25  Are you prepared to testify about that today?



1     Q.  Okay.  Do you recall whether the 30 from 2022

2  was more or less than 2018?

3     A.  I wouldn't be able to say.

4     Q.  Okay.  I might have something about that later.

5  Okay.

6              Focusing on the 2022 general election,

7  what hours were Hidalgo County's early voting locations

8  open?

9     A.  The 2022 general election, 7:00 to 7:00.

10    Q.  Okay.  And do you know if that's more hours

11  than during the 2018 general election?

12    A.  We pretty much implement uniform hours, opening

13  and closing hours, and it's always been 7:00 a.m. to

14  7:00 p.m. in comparison, or if you're talking about the

15  November election.

16    Q.  And what were the hours for -- I'm sorry, just

17  to clarify.  You said it was 7:00 to 7:00 for early

18  voting in 2022?

19    A.  Yes, 7:00 to 7:00 for early voting and election

20  day.

21    Q.  For early voting and election day.  Okay.

22              You testified that you had 86 election day

23  voting locations in November 2022 on election day,

24  correct?

25    A.  Yes.



1    Q.   Is that more or less than election day 2018?

2    A.   That was more.

3    Q.   Do you know by how much more?

4    A.   12, 14.

5    Q.   Okay.  12 to 14 more locations November 2022 on

6    election day?

7    A.   Yes.

8    Q.   Could you describe how polling locations were

9    selected for the November 2022 election?

10    A.   Hidalgo County is the authority to decide on

11    the early voting and election day polling locations, so

12    it was through the Hidalgo County Commissioners Court.

13    Q.   Okay.  And so what is the relationship between

14    the Hidalgo County elections administrator and the

15    commissioners court?  Like what are -- could you

16    describe what their different functions are?

17    A.   According to the Texas Election Code, there are

18    some items that, you know, would need approval for us

19    to proceed in administering the election, and we would

20    need their approval with some of those items.

21         And in this case, the approval of the

22    early voting and election day polling locations would

23    be something that we would present to the commissioners

24    court during a commissioners court meeting.

25    Q.   And so the Hidalgo County elections



1    there.

2        Q.  Okay.  And did Hidalgo County have curbside

3    voting at all its locations for both early voting and

4    election day?

5        A.  Yes, ma'am.

6        Q.  And could you also just briefly describe for

7    the record what curbside voting is?

8        A.  Curbside voting is when a voter, for any --

9    any -- it could be any reason, where if it would -- it

10   would be difficult for them to walk into the polling

11   location or even the act of walking in or being at a

12   polling location will hinder their health or, you know,

13   hurt them in any way, they can vote curbside --

14   curbside.

15       Q.  Okay.  And that is separate from what could be

16   described as drive-through voting, correct?

17       A.  Right.  We don't -- we don't have drive-through

18   voting.

19       Q.  Okay.  For the November 2022 early voting, do

20   you recall what the wait times were during that period?

21       A.  I -- I don't have that information, no.

22       Q.  Do you recall whether the wait times were more

23   or less than early voting in 2018?

24       A.  I wouldn't be able to make a comparison, but I

25   do know that some locations, there was -- there was



1  long lines and there was a wait time.

2      Q.  Okay.  And you're describing long lines and a

3  wait time for 2022 or 2018?

4      A.  2022.

5      Q.  Okay.  Did Hidalgo County have any sort of

6  online resource where voters could check wait times at

7  various polling locations?

8      A.  No, we don't have that.

9      Q.  Okay.  What efforts did Hidalgo County make to

10  remedy wait times?

11      A.  For example, if we did receive some calls

12  that -- again, I'm just going to use this as an

13  example.  The elections annex where there were long

14  lines and they were waiting to vote, we do have social

15  media:  Instagram, Twitter, and Facebook.

16              And it was posted on there the nearest

17  polling locations that did not have any, you know, wait

18  time at all, and a voter could go and cast their ballot

19  at that polling location.

20      Q.  And when you say there were long lines to vote,

21  are you talking about election day or early voting?

22      A.  Election day.

23      Q.  And isn't it true that there's typically a

24  larger turnout on election day than on early voting?

25      A.  Yes, there is.



1   Hidalgo County to assist anyone who may have been

2   experiencing any type of situations to where it would

3   delay.

4       Q.  Okay.  Okay.  Let's talk about staffing of the

5   November 2022 election.  How many poll workers was

6   Hidalgo County targeting to have for the election?

7       A.  For the November election?

8       Q.  Yes.

9       A.  For election day, at least, you know, 800.

10      Q.  Okay.  And then for early voting?

11      A.  It is less.  Around 300.

12      Q.  Okay.  And you testified that you had 30 early

13  voting locations in Hidalgo County.  You were able to

14  staff those locations?

15      A.  The 30, yes.

16      Q.  Okay.  And for the 86 polling locations on

17  election day, you were able to staff those as well?

18      A.  We were able to staff those as well.

19      Q.  Okay.  And when we're talking about poll

20  workers, could you describe the various poll workers

21  that would be -- would be involved in an election?

22      A.  It would be the election judge, the alternate

23  judge, and the clerk.

24      Q.  Okay.  And volunteers as well?

25      A.  There -- they were mainly all poll workers and



1    judges that were going to be paid for their time there.

2        Q.   Got it.  Okay.  Thank you.  When did Hidalgo

3    County staff the 30 early voting locations and 86

4    election day locations?

5        A.   I want to say we started, you know, even after

6    the primary election.

7        Q.   And Hidalgo County didn't close any elections

8    due to lack of staff?

9        A.   No.

10       Q.   Are you aware of any voter who was unable to

11   vote due to lack of staffing?

12       A.   No.

13       Q.   What efforts, if any, did Hidalgo County take

14   to recruit poll workers?

15       A.   We -- we conducted a campaign, a media

16   campaign.  We involved, again, the commissioners court,

17   the entire commissioners court.  We presented a

18   resolution.  We also invited the republican party and

19   the democratic party also to provide, you know, their

20   support to encourage people to apply and sign up to

21   become poll workers.

22               The media was involved, press releases,

23   social media.  We shared all that information out

24   there.

25       Q.   You guys -- excuse me.  Hidalgo County has a



1    disabilities whose mail-in ballots were rejected?

2        A.  I -- I don't know.  I would have to see the

3    information.

4        Q.  Okay.  Okay.  Let's talk a little bit more

5    about mail-in voting.  Would you consider Hidalgo

6    County's mail-in early voting program a success for

7    November 2022?

8        A.  Mail-in early voting program a success?  In

9    what terms do you mean?

10       Q.  Well, we can just go through some more specific

11   questions.  But would you consider the mail-in ballots

12   for the November 2022 election, would you consider the

13   way that Hidalgo County administered that successful?

14       A.  Well, it's through the ballot board.  But I

15   would say that it's successful.

16       Q.  And I just want to pick up.  You made a

17   distinction there between Hidalgo County and the ballot

18   board.  Could you just describe for the record the

19   relationship between the election administrator of

20   Hidalgo County and the early voting ballot board and

21   their different responsibilities.

22       A.  Okay.  Well, the early voting ballot board is

23   brought in, you know, only to handle and process the

24   ballots that do come in, you know, to the Hidalgo

25   County Elections Department.



1            That is a process that they work on on

2    their own as -- as their own board, versus my position

3    would be, of course, to administer the election and

4    oversee the election.

5            But there's really no communication as the

6    elections administrator and the ballot board, because

7    the ballot board, they apply the processes, they apply

8    the procedures, all in accordance with the Texas

9    Election Code, of course, as they process the ballots.

10   Q.   Okay.  And the election administrator is the

11   person responsible for disseminating a mail-in ballot

12   if its requested?

13   A.   Yes, correct.

14   Q.   Okay.  And then your office also receives the

15   ballots; is that right?

16   A.   Yes, we do.

17   Q.   Okay.  So what happens -- if you could just

18   take us step by step, what happens when your office

19   receives a ballot?  What's the next thing you do?

20   A.   Well, in accordance with the Texas Election

21   Code, once we do receive a mail-in ballot, the process

22   starts within the department to see if the ballot does

23   have the proper information that it should have in

24   accordance with SB 1, now that it's been implemented

25   since last year.



```
 1                  At that point in time, they can start
 2     making communication with the voter -- with the voter
 3     who did send in the ballot, if there's anything, you
 4     know, missing or anything, you know, pending, if it was
 5     incorrect.
 6          Q.  Okay.  How -- how quickly does the department
 7     begin processing the ballots to ensure compliance with
 8     SB 1 after the ballots are received?
 9          A.  As soon as possible.
10          Q.  Okay.  When your office -- well, I assume that
11     some applications sent out by mail are rejected for
12     defect; is that correct?
13          A.  Some are, yes.
14          Q.  Okay.  When your office receives an application
15     and it's rejected for defect, how quickly do you
16     process it from the time you received it to the time
17     you send a notice of defect to the voter?
18          A.  As soon as possible it's processed.
19          Q.  Okay.  And is that the same, then, for a
20     ballot?
21          A.  Yes.
22          Q.  Okay.  And how many applications for ballot by
23     mail did Hidalgo County receive for the November 2022
24     election?
25          A.  I would say over 5,000 -- applications for
```



1  ballot by mail, over 5,000, 6,000 maybe.

2      Q.  And how many were rejected?

3      A.  I don't have that information.  I would need to

4  see.

5      Q.  Do you know what the overall rejection rate was

6  for applications for ballot by mail?

7      A.  Applications for ballot by mail, I don't -- I

8  don't have that.  I don't remember.

9      Q.  If an application for ballot by mail is

10  rejected, what are the curative efforts that Hidalgo

11  County makes with the voter at that point?

12      A.  It is entered into our -- into our system.

13      Q.  Okay.

14      A.  And a letter -- a notice is -- is printed

15  explaining why the application for ballot by mail was

16  rejected.  And that letter also states what can be done

17  to correct it, referring them to the ballot tracker --

18  application for ballot by mail tracker, excuse me, and

19  all of that.  So it has all the information that the

20  applicant would need to be able to provide corrective

21  action.

22          We also call them.  You know, we try to

23  communicate with them with the information that is

24  listed.  That way they can come in and try to get it

25  done.



1    Q.  And is that the same -- are those the same

2    cure -- steps to cure that the -- that Hidalgo County

3    makes with voters whose mail-in ballots are rejected?

4    A.  If, let's say, for example, the signature

5    verification committee or early voting ballot board are

6    meeting, that is what they are doing as well.  They

7    communicate with the voter.  They try to communicate

8    with them, you know, numerous times if they can't get

9    ahold of them, offer them ways to try to correct it.

10            You know, there's the option to where they

11   can log onto the ballot by mail tracker.  They can come

12   by the office.  Also, they can, you know, correct it

13   there personally at the office, the main office.  They

14   can also go to a polling location if they decide to and

15   cancel their ballot and they can vote provisionally.

16   Q.  And what do you mean by "vote provisionally" if

17   they come in to vote in person after their mail-in

18   ballot has been rejected?

19   A.  There's already a ballot out that's been

20   assigned to them.  They can cancel it, and they can

21   vote provisional.

22   Q.  You described communications from the early

23   voting ballot board and the signature verification

24   committee.

25   A.  Oh, wait, the early voting ballot board, yes.



1       Q.   Okay.

2       A.   Yes.

3       Q.   Is there any other person that communicates

4  with the voter to cure any defects in either the

5  application for ballot by mail or the mail-in ballot?

6       A.   When it's earlier on, let's say before a

7  signature verification committee starts to meet and

8  starts processing ballot, early voting ballot board,

9  the staff is allowed to start that process to get the

10 process going and to try to, you know, provide that

11 corrective action to the voters.

12            That way they can come in, and, like I

13 said, they can log onto ballot tracker.  They can come

14 in in person to correct their -- their ballot or their

15 application or what have you.

16      Q.   Does your office have communications with

17 voters whose applications or ballots have been

18 rejected?

19      A.   Yes.

20      Q.   Okay.  And that's in addition to early voting

21 ballot board and the signature verification committee?

22      A.   When it comes to the applications for ballot by

23 mail, we go ahead and we work on that and we process

24 it.

25      Q.   Okay.  And then when do the other two -- when



```
 1   does early voting ballot board and signature
 2   verification committee, when do they begin having
 3   communication with the voters?
 4        A.  When they start meeting and start to process
 5   the -- the ballots.
 6        Q.  I got it.  Okay.  Thank you.
 7        A.  Sorry.
 8        Q.  No.  I just wanted to make sure I have it
 9   straight.  Thank you.
10        A.  Yeah.  And the signature verification committee
11   views and checks the ballots and starts processing
12   them.  Early voting ballot board will start the
13   communication and everything.
14        Q.  Did your office ever go to a voter's house to
15   help them cure?
16        A.  No.
17        Q.  Okay.  Are you aware of whether the early
18   voting ballot board or the signature verification
19   committee ever -- ever visited a voter's home?
20        A.  No.
21        Q.  Is contacting the voter by e-mail another way
22   that information could be --
23        A.  If there is an e-mail provided, yes.
24        Q.  Mail-in ballots must go out 45 days in advance
25   of the federal election; is that correct?
```



MAGNA
LEGAL SERVICES

 1   you testified to before the break.  I want to make sure

 2   that I have a good understanding of y'all's processes,

 3   so I apologize.

 4              I'm not trying to belabor the point here

 5   or waste your time.  I just want to make sure that --

 6   that I have the right understanding of what you

 7   testified to earlier, so --

 8      A.  Okay.

 9      Q.  -- I'll just ask a couple of just clarifying

10   process questions.

11              Okay.  With respect to mail-in ballots,

12   you were the early voting clerk; is that correct?

13      A.  Yes.

14      Q.  And when you receive a mail-in ballot, does

15   your office open the flap on the carrier envelope when

16   they arrive to ensure that the voter has put down an ID

17   number?

18      A.  Yes, they do.  They start that.

19      Q.  Okay.  And does the early voting clerk remove

20   that flap as soon as the ballots come in?

21      A.  Well, as soon as they do come in, they start

22   that process.  But, of course, any others that do come

23   in when early voting has already commenced -- early

24   voting ballot board has already commenced or what have

25   you, then, of course, it's the early voting ballot



1  board.  But they were allowed to begin that process.

2      Q.  Okay.  And so when does the early voting ballot

3  board, when do they meet?

4      A.  I know that it's certain dates, but I don't

5  have that information.

6      Q.  Okay.  And so when the early voting clerk

7  receives the carrier envelope and removes the flap to

8  see if there's an ID number, do you also take that

9  number and check to see whether or not it matches the

10  number in the voter registration system?

11      A.  Yes, they start that process to check.

12      Q.  Okay.

13      A.  In the voting system, yes.

14      Q.  Okay.  And I believe you testified that if you

15  check it and it's missing a number that you would call

16  or e-mail or send a letter to the voter in an effort

17  for them to have the opportunity to cure that defect?

18      A.  Yes.  The notice is generated through the

19  system.  And, you know, we -- we do reach out to the

20  applicant, and we start that process, whether they want

21  us to mail it back, or sometimes if we can't

22  communicate -- it's on a case-by-case basis really, but

23  to provide the options for them to come and correct.

24      Q.  Okay.  And you testified earlier about the

25  signature verification committee.  What does the



```
 1   signature verification committee do?
 2       A.  They start to process the ballots, and they
 3   check the signatures of the ballots that do come in.
 4       Q.  And when do they meet?
 5       A.  I don't have that information.
 6       Q.  And I believe you testified earlier that both
 7   the early voting ballot board and the signature
 8   verification committee would contact voters in the
 9   event that there's some defect; is that correct?
10       A.  No.  It's the early voting ballot board.
11       Q.  Oh, excuse me.  Okay.  Early voting ballot
12   board.
13               What are the reasons that an application
14   for ballot by mail or a mail-in ballot could be
15   rejected?
16       A.  No identification, personal identification
17   number is listed, either the driver's license or the
18   Social Security number is not listed.  And as it's now
19   part -- a new law, that's something that we would have
20   to call them on.
21       Q.  Okay.  What about just missing a signature?
22       A.  Missing a signature?  It would need to be
23   signed.
24       Q.  Okay.  So that would be a reason why --
25       A.  Yes, uh-huh.
```



```
 1              But setting the rate, the specific rate
 2   itself aside, do the final rejection rates for Hidalgo
 3   County account for people who may have ultimately voted
 4   in person?
 5       A.  I don't -- I don't understand.
 6       Q.  Okay.  I'll ask that when we are looking at a
 7   document.  I think that will be better.
 8              Okay.  What are the differences in the
 9   cure process between curing a defect for an ID mismatch
10   or lack of an ID versus any other defect on the
11   application or ballot?
12       A.  It's the same.  We communicate with them.  We
13   let them know -- well, the early voting ballot board
14   lets them know what -- the reason why it's not being
15   accepted.  And it's all explained in their notice.
16              And we reach out to them to try to offer
17   options, options that are available for them to come in
18   and cure it.
19       Q.  Well, isn't it true that you can correct a
20   missing ID or a mismatched ID electronically --
21       A.  Yes.
22       Q.  -- and through the tracker?
23       A.  Through the -- through the ballot by mail
24   tracker.
25       Q.  Okay.  And that's not an option for -- for
```



1    A.  By poll watchers?

2    Q.  Correct.

3    A.  Can you repeat the question?

4    Q.  Yes.

5    A.  Like I just want to make sure I answer

6    correctly.

7    Q.  Are you aware of any incidents of harassment or

8    intimidation by poll watchers during the November 2022

9    general election?

10    A.  The only incident that -- there was two

11    incidents.

12    Q.  Okay.

13    A.  It would be one with a poll watcher at the

14    elections annex polling location located in Edinburg.

15    Now, what was happening was that the poll watcher was

16    standing too close to the election clerk as she was

17    assisting somebody via -- you know, through curbside.

18         So we did receive some calls, and we went

19    ahead and we instructed the judge to show the poll

20    watcher the law and that they can't be standing so

21    close to where the vote -- they can actually see what

22    the voter is selecting.

23         And so the poll watcher went ahead and

24    stood back and, you know, kept their distance.

25    Q.  Okay.  And so it's your understanding that that



 1   poll watcher in Edinburg being that close to the
 2   election clerk, that would not be permitted by election
 3   law?
 4        A.  By election law, no, because they cannot be so
 5   close to the point to where they can see how the voter
 6   is voting and making their selections.
 7        Q.  Okay.  And then you said -- so you said there
 8   were two incidents, or was that just related to that
 9   same poll watcher in Edinburg?
10        A.  No.  There was another one in San Juan Memorial
11   Library where the poll watcher and the judge did get
12   into a verbal, you know, altercation.  I did receive
13   some calls on that.
14                 And I went over, and I spoke to the judge.
15   I also spoke to the poll watcher.  It was a case of
16   misunderstanding, and it was taken care of.
17        Q.  Okay.  And so those are the only two incidents?
18        A.  Yes.
19        Q.  Okay.  So it would be accurate to say that
20   you're not aware of any reported incidents where an
21   election judge wished to remove a poll worker because
22   of the poll worker's behavior but was unable to do so
23   because of SB 1?
24        A.  An election judge wanted to remove a poll
25   worker, no.



```
 1                        EXAMINATION
 2    BY MS. PERALES:
 3         Q.  Good morning, Ms. Salinas.
 4         A.  Good morning.
 5         Q.  My name is Nina Perales, and I represent one of
 6    the groups of plaintiffs in this case named LUPE, La
 7    Union Del Pueblo Entero.
 8         A.  Yes.
 9         Q.  I'm going to work hard to not re-ask questions
10    of you, so from time to time, I might pause when I'm
11    looking at my outline.  That's always good news because
12    that means I'm skipping questions.
13              I'd like to cover some definitions with
14    you.  Do you ever use the term "ABBM" in your office?
15         A.  Yes, we do.
16         Q.  Okay.  And will you understand with me that
17    ABBM means application for ballot by mail?
18         A.  Yes.
19         Q.  Thank you.  And when we talk about SB 1, will
20    you understand that that's our shorthand for the bill
21    SB 1 from the 2021 Texas Legislature that was passed in
22    the second special session?
23         A.  Yes.
24         Q.  Thank you.
25         A.  I understand.
```



```
 1      Q.  If I say "the County," will you understand that
 2   to mean Hidalgo County?
 3      A.  Yes.
 4      Q.  Okay.  I know you answered a few questions
 5   about your background, but I wanted to ask some
 6   in-between questions as well.
 7              Can you tell me where you grew up?
 8      A.  Here in the Valley.
 9      Q.  Okay.
10      A.  In Pharr, Texas.
11      Q.  Pharr?
12      A.  Pharr, Texas.
13      Q.  Right where we are today?
14      A.  Uh-huh.
15      Q.  Okay.  Can you tell me about the education that
16   you have completed in your life?
17      A.  My high school, bachelor's degree in
18   communications, journalism, and my master's degree in
19   public administration.
20      Q.  Where did you complete your bachelor's?
21      A.  In -- it was UTPA.
22      Q.  Okay.  And how about your master's?
23      A.  UTRGV.
24      Q.  Okay.  Same institution --
25      A.  Yes --
```



 1     Q.  -- but --
 2     A.  -- different name.
 3     Q.  -- just went by a different name.
 4     A.  Public affairs.  Public affairs.
 5     Q.  Okay.  And you mentioned that you previously
 6   served in the elections administration office as the
 7   interim elections administrator and also as an
 8   elections analyst, correct?
 9     A.  Yes.
10     Q.  Can you tell me when you first joined the
11   elections administration office?
12     A.  In 2016.
13     Q.  In 2016.  And did you work for the elections
14   administration office from 2016 to the present?
15     A.  Yes.
16     Q.  Have you held any other positions in the
17   elections administration office other than the ones
18   you've already named?
19     A.  No.
20     Q.  Okay.  So then I can assume that when you
21   started there, you started as an elections analyst?
22     A.  Yes.
23     Q.  Okay.  Thank you.
24             I'm going to start by asking some
25   questions about vote by mail, which is sometimes the



1    Q.  Okay.  And so with respect to your past answer,

2    then, would it be correct to say that you did not send

3    voters any inserts or other material with their

4    application for ballot by mail informing them about the

5    ID requirements of SB 1?

6    A.  No, we did not.  There wasn't anything included

7    in that one.

8    Q.  All right.  And then with respect to the mail

9    voting kit, you did include a 3-by-5 card with

10   information?

11   A.  Something like that, uh-huh.

12   Q.  Something around that size with information

13   about the SB 1 ID requirements; is that right?

14   A.  Yes, uh-huh.

15   Q.  Okay.  I'm going to ask you to walk me through

16   the process of when your office receives an ABBM, and

17   then I'm going to ask about the process of when your

18   office receives the carrier envelope.

19             So first, with respect to the ABBM, when

20   your office receives an application for ballot by mail,

21   would it be fair to say that your office will review it

22   to see if there is an ID number provided on it?

23   A.  Yes.

24   Q.  And if there's a number there that you will put

25   that number into your system to see if it matches with



1  the voter's record?

2      A.  Right.  We look up the information on the

3  voter, of course, of -- the application for ballot by

4  mail, it's entered into our -- into our voting system,

5  our database.  And then we check to see if -- with the

6  voter registration application, if all that information

7  is matching and if it's included.

8      Q.  So it is possible sometimes, though, that the

9  voter would put the last four of their Social on the

10  ABBM, and you don't have the last four of the Social in

11  the voter's record in your database, correct?

12     A.  Correct.

13     Q.  And, similarly, with the driver's license, it

14  could be that the voter puts the driver's license

15  number on the ABBM, and you don't have a driver's

16  license number to match to in your database, correct?

17     A.  Right.  It could be vice versa or switched,

18  uh-huh.

19     Q.  And in that situation, if that happens, what do

20  you do with the ABBM at that point?

21     A.  At that point?  Of course, it's entered, and --

22  it's entered into the system that it has been rejected

23  due to a mismatch or not having the correct

24  information.  And the system then generates the notice.

25              And then at that point, once it's



1  generated, my staff does try to communicate with the

2  voter to let them know what happened.  And then, of

3  course, we review the options that they can either go

4  in through ballot tracker or they can come into the

5  office, or we can send it to them.  They could add the

6  number . They could mail it back, depending.  It's on a

7  case-by-case basis.

8      Q.  If you -- if the voter says "Send it to me

9  again," do you send them a fresh new ABBM, or do you

10  send them their old ABBM back?

11     A.  It's the one that they've already submitted.

12     Q.  Okay.  So you send them the one that they've

13  already submitted.  And do you use any markings on

14  that?  Do you use a highlighter to highlight the area

15  where the person is supposed to provide the number?

16     A.  I'm not sure of that detail, but I do know that

17  the staff does communicate with the voter and does

18  explain everything thoroughly.

19     Q.  Okay.  So let's say, then, that the voter

20  provides the additional information and sends it back

21  to you.  You then attempt to match that information to

22  what you have in your database; is that right?

23     A.  Correct.

24     Q.  And if you do match it, let's say, for example,

25  the voter had previously provided the last four of the



```
 1   Social, but this time they also provide their driver's
 2   license and you're able to match that driver's license
 3   number, what do you do with the ABBM at that point?
 4        A.  Well, we match it, and, of course, we make sure
 5   that everything correct -- is correct and matched.  But
 6   that's it.  Nothing -- nothing else is added to the
 7   voter registration system because it's not a voter
 8   registration application.
 9        Q.  Okay.  And you anticipated my next question.
10   So if you are able to match the ID number, you would go
11   ahead and send the voter the mail voting kit, correct?
12        A.  Yes.  It would proceed as -- as usual.
13        Q.  However, you would not go into the voter
14   registration system that you have and update the
15   voter's record; is that correct?
16        A.  We -- we wouldn't, no.
17        Q.  So, theoretically, the problem that the voter
18   had in this situation that we're discussing could
19   repeat itself in a future election where, for example,
20   the voter would only provide the last four of the
21   Social, you wouldn't be able to match it to your
22   records, and then you would send the ABBM back to the
23   voter again; is that right?
24        A.  It can --
25                MS. RAMIREZ SOLIS:  Objection, form.
```



1     A.   It can happen.  However, again, like I stated,

2  the staff does communicate with the voter and let them

3  know that this could happen again, so please come in

4  and update your voter registration application.

5     Q.   How -- other than coming in person to your

6  office, because you mentioned that the voter is asked

7  to come in, do you mail voter registration applications

8  to voters when they've had an ID number defect?

9     A.   No, I don't think so.  No, huh-uh.

10     Q.   Okay.  When someone is applying for a ballot by

11  mail, would you agree with me that they are only

12  eligible if they meet certain criteria to vote by mail?

13     A.   It is stated in the law that they have to be

14  65 years or older, disability, they're either in the

15  military, or they are going to find themselves out of

16  the county and won't be able to participate in the --

17  in the election.

18          So those are the guidelines set forth by

19  the Texas Secretary of State, so that -- that would be

20  the law.

21     Q.   Okay.  And I believe you testified earlier that

22  a voter could provide additional ID information on

23  either an ABBM or the carrier envelope by coming in

24  person to your office; is that right?

25     A.   They can come and cure the ballot or come and



1    correct their ABBM in person.

2        Q.  Would you agree with me that persons over 65

3    might be less physically able to come in person to your

4    office to cure than, let's say, a voter under 65?

5             MS. RAMIREZ SOLIS:  Objection, form.

6        A.  I wouldn't be able to speak, you know, in -- in

7    that form.  But again, we do communicate with them, and

8    we do let them know if you're able to ask somebody to

9    come and bring you or if you don't -- aren't able to

10   drive or what have you -- and most of the time they do

11   have a family member that can bring them.

12       Q.  Do you see people when they come in person to

13   cure?

14       A.  I have seen it.  Well, the ABBM, yes.  The

15   ABBM, I have seen them passing by, and I do see the

16   receptionists in the front assisting the voters.

17       Q.  For the 2020 general election, do you have a

18   sense of whether more people cured by mail versus came

19   in person to cure?

20       A.  I can only speak, you know, generally just

21   with, you know, information as the -- as the assistant

22   director, as I was the assistant director then.  I did

23   see that, you know, there was a learning curve and, you

24   know, let's say they weren't really familiar with the

25   new process.  But they did come in.



1    Q.  Okay.  And for the November 2022 general

2   election, would you say more people cured by mail than

3   came in person?

4    A.  I -- in regards to the early voting ballot

5   board, just in the documents that I -- that I viewed,

6   some used the ballot tracker to cure their ballot, some

7   did come in person.  And I'm not sure if anybody was

8   mailed it or if it was mailed back.

9         From what I do know is that the early

10  voting ballot board did notify them, "Look, you still

11  have time.  We can mail it to you.  You can, you know,

12  correct it and then mail it back."  And, again, it was

13  mainly based on the time that was available, the days

14  that were left before the election date.

15   Q.  How about ABBMs for the November '22 general?

16   A.  The same -- the same was applied, depending on

17  the amount of time.  Again, it was entirely up to them.

18  We provided the option of asking them to go online or

19  they could come in person or we could mail it to them.

20  We would notify them, and then they would send it back.

21   Q.  Have you explored how the ballot tracker works

22  online yourself?

23   A.  I have only seen a screenshot of it.

24   Q.  Do you know if it still requires both the last

25  four of the Social and a driver's license number to log



```
 1   in?
 2       A.  I do know that you have to create -- you are --
 3   you have to identify yourself in order to log in, but
 4   I'm not sure if it's both.
 5       Q.  Okay.  So we talked about ABBMs and the process
 6   that applies when there is an ID number defect --
 7       A.  Uh-huh.
 8       Q.  -- at least with respect to when the voter
 9   provides one number and you have on your records the
10   other number.
11       A.  Right.
12       Q.  So I have -- I have one follow-up question on
13   that, which is, if you're unable to confirm the number
14   that the voter puts on the ABBM in your own system, do
15   you check TEAMS?
16       A.  I do know that they use both TEAMS and our
17   system.
18       Q.  Okay.  Is it also true that if the voter puts
19   neither number, you would also consider that an ID
20   number defect?
21       A.  Yes, because it -- the law states that they
22   need to put either their driver's license or Social
23   Security number or both.
24       Q.  And do you keep -- how do you keep track of
25   when you receive an ABBM and there is an ID number
```



 1   defect, either there's no number there or there's a
 2   number there and you can't match it?  What
 3   recordkeeping do you do around that?
 4       A.  I know the early voting ballot board does have
 5   their list, and if they see a mail carrier envelope
 6   that does not have the identification numbers listed,
 7   they do write the name down.  They start -- they list,
 8   you know, what it is that is defective, and then they
 9   start the communication process.
10           They utilize all the information that is
11   listed on their file, their phone number.  If there's
12   an e-mail address, they'll e-mail them and everything.
13   So they keep track of it, uh-huh.
14       Q.  Okay.  Let's start with the ABBM.
15       A.  Okay.
16       Q.  If an ABBM comes in and there's either no
17   number listed for ID or there is a number there but you
18   can't match it to the voter's record, what
19   recordkeeping do you do with respect to that ABBM?
20       A.  I do know that they log everything in into our
21   system, and they input the information there.  Then
22   again, it's a process for each and every one.
23           Like I stated, the -- the notice is
24   generated, and then they start communication, and then
25   it proceeds from there.



1    Q.  I got that.  In terms of your office records,

2  do you make a note somewhere that the ABBM was rejected

3  because of the ID number defect?

4    A.  I see what you're saying.  No.  As far as I

5  know of, no.  I don't -- I don't think they have a

6  personal log or -- or something like that.

7    Q.  How are you then able to -- or maybe you're not

8  able -- to give us a number of how many ABBMs you

9  rejected because of an ID number defect?

10    A.  Okay.  In the system, as it's entered into the

11  system, we were able to pull a query.

12    Q.  Okay.  So if you're able to pull a query, that

13  means that there's some information going in --

14    A.  Yes.

15    Q.  -- into the system, so --

16    A.  That's why --

17    Q.  -- into the system you would put that the ABBM

18  was rejected, right?

19    A.  Right.

20    Q.  Do you have codes for why the ABBM was

21  rejected?

22    A.  There are codes.

23    Q.  All right.  Is one of those codes ID number

24  defect?

25    A.  I would have to take a look at the list as we



 1   you're not sure whether there is a code for -- whether

 2   there's a separate code for missing ID number versus an

 3   ID number that was provided by the voter but you

 4   couldn't match it?

 5       A.   There are some codes that do state mismatch.

 6       Q.   Okay.  And what do you understand mismatch to

 7   be?

 8       A.   Either they didn't match the -- the system, and

 9   I think they do even go down to where either the

10   driver's license was provided but not the Social

11   Security number or what have you.  It breaks down to

12   that.  There are several codes.  Again, I would have to

13   take a look at it.

14       Q.   Okay.  Did you have any conversations in your

15   office where you learned about ABBMs coming in and the

16   general number that were coming in with -- with an ID

17   number that you couldn't match versus ABBMs that were

18   coming in with no number at all?

19       A.   For the November election?  The only

20   conversations that -- that, you know, we did have or

21   that I do remember were that, oh, a couple of them did

22   not, you know, match or a couple of them did provide

23   the driver's license but we have the Social Security

24   number on file, things like that.

25       Q.   Okay.  Done asking for the moment about ABBMs.



 1              And now I'm going to start asking you
 2   about mail ballot carrier envelope.  Would you agree
 3   with me that when the voter sends back in the mail
 4   ballot, it arrives in your office in a carrier
 5   envelope?
 6       A.  Uh-huh.
 7       Q.  And --
 8       A.  Yes, sorry.
 9       Q.  And outside of the carrier envelope is where
10   the voter has to provide an ID number under SB 1,
11   correct?
12       A.  Correct.
13       Q.  So that without even opening the carrier
14   envelope, one can determine whether the voter provided
15   that required ID number or not.
16       A.  It's a signature outside that they have to
17   sign, and it's -- there's a flap on there, you know.
18   They have to seal it and sign it.  You do have to open
19   the flap -- excuse me.  You do have to open the flap to
20   see which numbers were provided by the voter.
21       Q.  Okay.  And is that called a secrecy flap or a
22   privacy flap, do you know, or just the flap?
23       A.  Just been referring to it as a flap.
24       Q.  Okay.  That's all right.  And then you
25   mentioned some materials that go inside the packet that



1  you send to the voter.  You mentioned purple and

2  other -- other colors --

3      A.  It's very colorful, yes.

4      Q.  It's colorful.  And just to sort of close the

5  conversation on that, would it be fair to say that when

6  you send the voter a packet for vote by mail, it

7  includes the ballot?

8      A.  Uh-huh, yes.

9      Q.  It includes the secrecy envelope or privacy

10 envelope to put the ballot inside of?

11     A.  Yes.

12     Q.  It includes the carrier envelope which the

13 voter will use to send the ballot back to you?

14     A.  Yes.

15     Q.  And you mentioned also an insert reminding

16 people about the ID requirements, correct?

17     A.  Yes.

18     Q.  Anything else that you would put in there?

19     A.  The Secretary of State -- a letter from the

20 Secretary of State and directions on how to fill out

21 the carrier envelope.

22     Q.  All right.  And the letter from the Secretary

23 of State is about instructions to vote by mail, or it's

24 something else?

25     A.  It just explains the process, the dos and can't



 1 | dos and assistance and everything.  It explains the
 2 | entire process as well.
 3 |     Q.  Okay.  When a carrier envelope arrives back to
 4 | Hidalgo County, the voter has sent it back to you, does
 5 | it arrive in your office?
 6 |     A.  We do have a P.O. Box number, a mail -- a post
 7 | office box, and voters can use that, and that's where
 8 | they arrive.
 9 |     Q.  To your office?
10 |     A.  Right.
11 |     Q.  Do you in your office open the flap to see
12 | whether the voter has provided an ID number?
13 |     A.  Yes, we do.
14 |     Q.  And do you then check the system to see if you
15 | can match that ID number to the voter's record?
16 |     A.  Yes.
17 |     Q.  And you do this before you pass materials on to
18 | the -- either the early ballot --
19 |     A.  Early voting ballot board.
20 |     Q.  Oh, early voting ballot board, or the signature
21 | committee?
22 |     A.  Yes, we do.
23 |     Q.  So in other words, the SB 1 ID verification
24 | process happens in your office, correct?
25 |     A.  It can start with us.



1    Q.  Okay.

2    A.  We are -- we are allowed to -- to start the

3    process in order to give the voter an opportunity and

4    ample time to provide corrective action.

5    Q.  And so you do, in fact, open the flap to check

6    for --

7    A.  Just to check.

8    Q.  -- the ID on all of the carrier envelopes that

9    arrive to your office, correct?

10   A.  If it's before early voting ballot board

11   commences, yes.

12   Q.  And what date would that be?

13   A.  I don't have the full date in mind.  I know

14   that -- I don't have it on -- on me.

15   Q.  Is it before election day or after election

16   day?

17   A.  Oh, it's way before election day, yes.  Even

18   before early voting.  It starts when they start mailing

19   them back to us.

20   Q.  I see.  Is there a point in time where you stop

21   opening the flap and --

22   A.  When --

23   Q.  -- you just send the carrier --

24   A.  Yes.

25   Q.  -- envelope directly to the early voting ballot



1  board?

2      A.   When early voting ballot board starts.

3      Q.   Okay.  So at that point, you stop checking?

4      A.   Right.  We hand everything over to them, and

5  then they start the process.  And they're the ones

6  that -- that are reviewing the ballots and everything.

7      Q.   So since we're still in the time period before

8  they're reviewing the ballots, if a carrier envelope

9  arrives in your office and the early voting ballot

10  board has started its work, are you saying that you

11  would not open the flap, but you would deliver the

12  carrier envelope directly to the early voting ballot

13  board for them to open the flap?

14      A.   Yes.  Because ballot board is already meeting.

15  They're meeting either on the daily, or maybe the

16  following day they'll get together, and that's when

17  everything is presented to them for them to process.

18      Q.   Okay.  So I want to talk about the carrier

19  envelopes that arrive to you and that you open the

20  flap.  Would it be fair to say that when you open the

21  flap on the carrier envelope that you're going to look

22  to see if ID -- there's an ID number there.  And then

23  based on the information that's provided there, you're

24  going to go into the system and try to match it to the

25  voter's record?



1    A.  Yes.

2    Q.  And if there's a number there that you can't

3  match or there's no number at all provided for ID, tell

4  me what you do next.

5    A.  If -- if the number doesn't match or for some

6  reason it's -- it's defective, let's just say, and it's

7  in regards to the no identification numbers, that's

8  when it's entered into the system stating that this

9  ballot, you know, has been rejected for such reason.

10        Then a notice is printed as well, and then

11  they start the process to communicate with the voter.

12  And, again, either to log onto the mail ballot tracker,

13  we provide all that information for them, or they can

14  come in person to correct it, and/or they can surrender

15  their ballot at a polling location and vote.

16    Q.  So at this point, you have the ballot in your

17  possession?

18    A.  Oh, but this is before.

19    Q.  Yeah.

20    A.  But this is before early voting.  No.  We just

21  communicate with them and let them know, uh-huh.

22    Q.  Have you ever heard of voters asking you to

23  mail them back their mail ballot so they can correct or

24  fill in the correct information?

25    A.  I know that that has been done, yes.



```
 1      Q.  What would be -- besides mailing it back to the
 2  voter so the voter could correct the carrier envelope
 3  and the voter using the mail ballot tracker online,
 4  would it be fair to say the voter could also come in
 5  person to your office and fix the defect on their
 6  carrier envelope?
 7      A.  Yes, they can come into the office to fix it.
 8      Q.  And then they could also cancel their mail
 9  ballot and then go vote in person, correct?
10      A.  If voting has already started, yes, uh-huh.
11      Q.  So of those four options, two involve doing
12  something in person, either going to the polls or
13  coming into your office to fix it, right?
14      A.  Uh-huh.
15      Q.  And then the mail ballot tracker would involve
16  being able to get on the Internet, correct?
17      A.  Right, mail ballot tracker.
18      Q.  The final option would be that you mail them
19  back their mail ballot carrier envelope and they go
20  ahead and fix it and send it back to you; is that
21  right?
22      A.  Yes.
23      Q.  Okay.  When you reject a carrier envelope
24  because you cannot match the ID or there's no ID, how
25  do you log the defect information into your system?
```



1  I asked you a question about who in your office records

2  the information about carrier envelopes that have an ID

3  defect.  And by "record the information," I mean enter

4  it into your system.

5             And you said that it was the same group of

6  people in the EOD, elections operation department; is

7  that right?

8       A.  Yes.

9       Q.  Do you know if they use the same set of codes

10  to characterize ID defects for carrier envelopes as

11  they do for ABBMs?

12      A.  I know it's a different list.  But I would -- I

13  would have to compare them.  I would have to compare

14  them.  I wouldn't be able to answer.

15      Q.  Okay.  And then is it the elections operation

16  department that reaches out to the voter to talk

17  through the possible next steps to cure the ID defect?

18      A.  Yes.

19      Q.  Okay.  Now, you mentioned at a certain point

20  you start delivering the carrier envelopes directly to

21  the early voting ballot board and you're no longer

22  checking the ID information; is that right?

23      A.  Right.

24      Q.  Do you know who at the early voting ballot

25  board, then, if anybody, records into your system that



1   there is an ID defect on the carrier envelope?

2       A.  It would be the judge, the judge for early

3   voting ballot board.  They process, and they enter all

4   the information.

5               THE WITNESS:  It went off again.

6               MS. RAMIREZ SOLIS:  It went off again.

7               (Dropped off Zoom.)

8               (Lunch recess)

9       Q.  Okay.  I believe that we were talking about the

10  early voting ballot board.

11      A.  Yes.

12      Q.  And when they would open the flap on a carrier

13  envelope and if there was an ID number defect on the

14  carrier envelope, I think we're picking up where you

15  said that the judge of the early ballot -- early voting

16  ballot board would go ahead and enter that information

17  into the system; is that right?

18      A.  From what I understand, you know, yes.  Because

19  again, it's the early voting ballot board, so if the

20  judge designates certain tasks or what have you, then,

21  you know, she would be the one to -- he or she would be

22  the one to decide that.

23              But I do know that the judge is -- is

24  always there present and available when anything --

25  and, of course, is being happened -- is happening as



1   the ballots are being processed.

2       Q.  So my questions are mostly revolving around the

3   recordkeeping that happens around the carrier envelopes

4   that have ID number defects.

5       A.  Okay.

6       Q.  I understand, because you've testified clearly

7   before, that if it's your office that opens the flap,

8   you have a process for entering that information into

9   your system about an ID number defect.

10          So my question now is what is the process

11  for the early voting ballot board when they open the

12  flap and they see an ID number defect?  Do they record

13  those defects into the system somehow?

14      A.  Yes, they do.  They -- they -- they are --

15  because it's a system that we use.  That's a system

16  that, you know, we have within -- you know, for our

17  department, for the Hidalgo County Elections

18  Department.  So that's what they would do.  They would

19  input all the information in there and follow the same

20  process.

21      Q.  And would it be the judge, him or herself, or

22  might it be a staff person?

23      A.  It could be another board member, another

24  ballot board member.

25      Q.  Do they use your staff in the EOD to do some of



```
 1   the data entry?
 2        A.  We do have an employee that's there to assist
 3   with anything that they may need.  You know, any type
 4   of resources, you know, that they may need, you know,
 5   the staff member is there.
 6        Q.  Okay.  Do they use the same codes to describe
 7   defects on carrier envelopes that your office does
 8   when --
 9        A.  Yes, they do.  It's the same system, the same
10   process.
11        Q.  Okay.  And then if the early voting ballot
12   board opens the flap and sees that there is an ID
13   number defect, who in the early voting ballot board
14   contacts the voter to discuss next steps?
15        A.  It could be anybody in the early voting ballot
16   board.  Again, the judge would delegate tasks and
17   duties amongst the board.
18        Q.  Could it also be a staff person from your
19   office who contacts the voter?
20        A.  It's the early voting ballot board.
21        Q.  You mentioned earlier that your office makes an
22   individual available to help the early voting ballot
23   board.
24        A.  Right.  With -- you know, let's say they were
25   having something wrong with the computer or -- or
```



```
 1  something is not, you know, adding up, you know, that
 2  person is there to assist and, you know, to provide
 3  assistance.
 4      Q.  And you're saying that person doesn't contact
 5  voters?
 6      A.  No.  It's the early voting ballot board,
 7  uh-huh.
 8      Q.  I'm going to mark the next exhibit.  This is
 9  Exhibit No. 3.  Please take a look at it, if you will.
10  Do you recognize this document?
11      A.  Yes, ma'am.
12      Q.  Okay.  Tell me what you understand this
13  document to be.
14      A.  You all have questions, for example, the number
15  of ballots, of ABBMs the County flagged for rejection
16  and our responses to that, as well as absentee ballots
17  by mail and ballot by mail information numbers, the
18  amounts of rejections or -- or mismatched.
19      Q.  Okay.  So if you would turn with me -- I know
20  the pages aren't numbered, so we just have to flip
21  forward from the first page.  One, two, and so at the
22  bottom of page 2, you will see Interrogatory No. 3.  Do
23  you see that?
24      A.  Yes, ma'am.
25      Q.  And that interrogatory is asking for some
```



```
 1   information regarding ABBMs and mail ballots.  Do you
 2   see that?
 3                  MR. GENECIN:  Nina, just -- just for the
 4   record, could you state what the document is headed?
 5                  MS. PERALES:  Yes.  This document is
 6   titled Defendant Hilda Salinas' Responses and
 7   Objections to LULAC Plaintiffs' Third Set of
 8   Interrogatories, and the date on the front is March 29,
 9   2023.
10       Q.  And so would you -- would you agree with me,
11   Ms. Salinas, that the Interrogatory No. 3 is asking,
12   quote, for the November 2022 general election, please
13   provide the following data regarding ABBMs and mail
14   ballots, unquote?
15       A.  Yes.
16       Q.  Okay.  So we can turn to the next page.
17       A.  Uh-huh.
18       Q.  And under A, it says "Number of ABBMs received
19   by the County."  And then it says "Response:  6,373."
20   Do you see that?
21       A.  Yes.
22       Q.  And then it's -- for B, it asks for the number
23   of ABBMs the County flagged for rejection because of an
24   application defect of any kind.  And the response is
25   221.  Do you see that?
```



1    A.  Yes.

2    Q.  Okay.  And as far as you know, are those

3 numbers correct for the number received and the number

4 flagged for rejection?

5    A.  Yes.

6    Q.  And then the next down, which is C, asks for

7 the number of ABBMs that the County ultimately accepted

8 after an applicant cured a recorded defect of any kind.

9 And the response is 1; is that correct?

10   A.  Yes.

11   Q.  And is that number right, to the best of your

12 understanding?

13   A.  To the best of my understanding, yes.

14   Q.  Here's -- the next two are what I wanted to ask

15 you more specific questions about.  For D, it asks for

16 the number of ABBMs the County flagged for rejection

17 because of an omission defect.  And the answer is 71.

18 Do you see that?

19   A.  Yes.

20   Q.  Then the next one is E, Number of ABBMs the

21 County flagged for rejection because of a mismatch

22 defect.  And the answer is Zero.

23        So do you think it's correct that of the

24 ABBMs that are flagged for an ID number defect that all

25 of them were because the voter had put no number at



 1   all, and zero of them were because you couldn't match
 2   the number that was provided, or might there have been
 3   some variation in the recordkeeping or something that
 4   would have yielded this result?
 5        A.   So you're -- you're asking -- can you repeat
 6   the question?
 7        Q.   Yeah.  I'm sorry.  It was a complicated
 8   question.
 9             But when I look at D and E, it has all of
10   the ID number defect are classified as omission, which
11   is defined as the voter put no number at all.  And none
12   of them, the number is zero for mismatch, which would
13   be that the voter provided a number but you couldn't
14   match it to the voter's record.
15             So I'm wondering if either we have a
16   different understanding of those terms, or maybe there
17   was something about your coding system, or maybe you
18   have knowledge that this was true that for every voter
19   who provided a number, you were able to match it, and
20   all the ID defects were because the voter put no number
21   at all.
22        A.   I would say that this is correct.  There was an
23   instance that I was made aware of where the voter did
24   not put anything on there, of course, you know, being
25   left it out, left the numbers out.  That's what



 1  omission means, right?  And the voter accidentally put

 2  it in another location --

 3       Q.  I see.

 4       A.  -- type situation.  So it was just something,

 5  you know, to that effect.  And, of course, it was

 6  corrected and everything was admitted.

 7       Q.  Do you recall whether there were any ABBMs for

 8  the November general where the voter put a number but

 9  you weren't able to find the number in the -- in the

10  voter's record?

11       A.  According to this information, no.

12       Q.  Okay.  So then for F, it says "Number of ABBMs

13  that the County ultimately accepted after an applicant

14  cured either a mismatch defect or omission defect."

15  And the response to that is Zero.  Do you see that?

16       A.  Yes.

17       Q.  So if we go back to D and we see that 71 people

18  were flagged for a rejection because of an ID defect,

19  would it be your testimony that your office attempted

20  to reach out to all 71 of these people?

21       A.  Yes.

22       Q.  And is it your testimony that you received no

23  cured ABBMs as a result of that effort?

24       A.  Yes, that's what the response is here.

25       Q.  Okay.  Did you have any conversations in your



1  office or otherwise learn why it was that not a single

2  ABBM that was flagged for ID defect was cured for the

3  November '22 general?

4      A.  I didn't have any infor -- any conversations in

5  regards to that.

6      Q.  Okay.  So if we go to the next interrogatory,

7  G, it says "The number of carrier envelopes the County

8  received and reviewed for defects of any kind."  And

9  the number provided there is 5,044.  Do you see that?

10     A.  Yes.

11     Q.  And then for H, it says "Number of carrier

12 envelopes the County flagged for rejection because of a

13 defect of any kind."  And the number provided there is

14 244.  Do you see that?

15     A.  Yes.

16     Q.  Okay.  And to the best of your knowledge, are

17 those numbers correct?

18     A.  Yes.

19     Q.  So I want to ask you, before the number 244, in

20 the paragraph that leads up to it, it says "Defendant

21 objects to this interrogatory on the basis that the

22 Hidalgo County Elections Department does not review and

23 accept or reject carrier envelopes."  Do you see that?

24     A.  Yes.

25     Q.  But it's your testimony that prior to the early



```
 1  voting ballot board meeting, you do review the
 2  envelopes -- carrier envelopes to see if the ID numbers
 3  can be matched to the voter; isn't that right?
 4      A.  Correct.
 5      Q.  So there's really two phases here.  In the
 6  first phase, it's your office that's reviewing ID
 7  numbers.  And then in the second phase, it's the early
 8  voting ballot board, right?
 9      A.  Yes, because we can begin the process.
10      Q.  So of this 244 would be a combination of --
11  well, let me ask you, because I shouldn't assume.  When
12  you provide that number 244, is that only the number
13  that was flagged for rejection by the early voting
14  ballot board, or is that a combination of the ballots
15  that were flagged for rejection by either you or the
16  early voting ballot board?
17      A.  It's a combination.
18      Q.  Okay.  And then on the next -- the next
19  question -- the next subpart of the interrogatory asks
20  for the number of mail ballots that the County
21  ultimately accepted and counted after a voter cured a
22  carrier envelope defect of any kind, and the number is
23  146.  Do you see that?
24      A.  Yes.
25      Q.  And then J is -- asks for the number of carrier
```



 1   envelopes the County flagged for rejection because of

 2   an omission defect, and I believe the number is 74

 3   here.

 4        A.   Right.

 5        Q.   And to the best of your knowledge, is that

 6   number correct?

 7        A.   Yes.

 8        Q.   And then again for K, where it asks for the

 9   number of carrier envelopes the County flagged for

10   rejection because of a mismatch defect, the number is

11   zero again.  Do you see that?

12        A.   Yes.

13        Q.   So my question again is that for the carrier

14   envelopes this time, not the ABBMs, but for the carrier

15   envelopes, every single ID defect was an omission of

16   any number, and there were no defects at all connected

17   to mismatch?

18        A.   Correct.

19        Q.   Okay.  And then finally, for L, it asks for the

20   number of ballots that the County ultimately accepted

21   and counted after a voter cured either a mismatch

22   defect or an omission defect.  And the number there is

23   65; is that right?

24        A.   Yes.

25        Q.   And to the best of your knowledge, is that



1    number correct?

2         A.  Yes.

3         Q.  Thank you.  You can put that document aside.

4    The court reporter has handed you what has been marked

5    Deposition Exhibit No. 4.  Can you tell me if you

6    recognize this document?

7         A.  Yes.

8         Q.  Okay.  Tell me what this document is.

9         A.  It's the absentee rejection letter list.

10             MS. PERALES:  Okay.  And for those who are

11   on the Zoom, it's difficult to see the Bates number

12   here, but I believe it begins with Bates No. RFP34

13   000154.

14        Q.  Okay.  So you've given me the title of the

15   document, Ms. Salinas.  Can you tell me what this list

16   is?

17        A.  These are all the absentee ballot by mail, the

18   letters that were sent, the rejection letters.

19        Q.  And would it be correct to say that the mail

20   date range is August 1, 2022, to December 31, 2022?

21        A.  Yes, that's the -- the time frame that this

22   query was pulled.

23        Q.  Okay.  And in the column -- first column on the

24   left, ID number, is this the voter's VUID number or

25   some other type of ID number?



```
 1        A.   No.   This would be the ID number.

 2        Q.   Okay.   VUID or some other ID?

 3        A.   Let me -- I'm currently looking.

 4        Q.   Some of the numbers seem very short.

 5        A.   Yes, that's what I was noticing.   It seems as

 6    though it's the number that ties in the voter to the

 7    document, but I wouldn't be able to say for sure.

 8        Q.   Okay.   Let's look at the next column, Name.

 9    Would that be the name of the voter?

10        A.   Yes.

11        Q.   All right.   And then the column Mailing Address

12    would be the voter's mailing address?

13        A.   Yes.

14        Q.   Okay.   Now, next is a column that says "Notice

15    Code"; is that right?

16        A.   Yes.

17        Q.   And would it be fair to say that for this

18    report or this document that we're looking at here, all

19    of the notice codes are ABBM?

20        A.   Correct.

21        Q.   And then there's a subcode; is that right?

22        A.   Right.

23        Q.   And if we flip to the very last page.

24        A.   That's where I was going.

25        Q.   You're anticipating my question.   Would this on
```



1  the very last page be -- would this be a list of the

2  notice codes and subcodes used for this report?

3       A.  Correct.  It's a legend.

4       Q.  All right.  Perfect.  So for the very first

5  line for the very first voter, we see a notice code

6  ABBM and a subcode of IM, which translates to invalid

7  mailing address; is that right?

8       A.  Right.

9       Q.  Okay.  And then there are some other ones here.

10  ISI stands for incorrect Social Security number or

11  Texas driver's license; is that right?

12       A.  Right.

13       Q.  Okay.  If we stick to the last page of the

14  document, can you tell me which code relates to ID

15  number mismatch?

16       A.  Okay.  I really don't see something that

17  defines it in that form that it's a mismatch, meaning

18  that the number that was listed is not -- does not

19  coincide with the number on the voter registration

20  application, correct?  That's -- that's your question?

21       Q.  Well, what about if the voter provided the last

22  four of the Social but in the voter's record there's

23  only the driver's license, so you can't --

24       A.  Okay.

25       Q.  -- match on the number that was provided by the



 1  voter?

 2      A.  Well, there is incorrect Social Security number

 3  or Texas driver's license.  There is missing Social

 4  Security number and Texas driver's license.  And then

 5  there's also no Texas driver's license, which is NT,

 6  ISI, and ISM.  Those are the ones I see.

 7      Q.  Sure.  So do you know the difference between --

 8  if we're just looking in that range which starts with

 9  ABBM-ISI and it translates to final incorrect?

10      A.  Right.

11      Q.  I don't think we see any of those final here.

12  They don't seem to be listed on this chart.

13      A.  No.  All I see are TL, IM.  I don't see any.

14      Q.  Okay.  So we don't have any of those here on

15  this chart, but we do have the next three codes on this

16  chart -- on this Excel, ABBM-IM, ABBM-ISI, and

17  ABBM-ISM.  Would you agree that all of those appear

18  next to voters in this chart?

19      A.  Yes.

20      Q.  So if the voter provided a number such as, an

21  example we're talking about, the voter provides the

22  last four of the Social on the ABBM and you can't match

23  that to the voter's record, would it be coded then in

24  your system as either IM, ISI, or ISM?

25      A.  It wouldn't be coded IM, because IM is invalid



```
 1   mailing address, but either ISI or ISM.
 2        Q.  Okay.  So as either incorrect or missing
 3   SSN/TDL?
 4        A.  Correct.
 5        Q.  Okay.  So would you agree with me, then, that
 6   under this system of coding, it's not really possible
 7   to separate out those who provided no number, no SSN or
 8   driver's license, from those voters who provided a
 9   number and you were just unable to match it in your
10   system?
11             MS. RAMIREZ SOLIS:  Objection, form.
12        A.  Well, it would be based on how it's -- I guess
13   it's a definition of incorrect SSN, Texas driver's
14   license, and what would be a missing SSN or a Texas
15   driver's license.
16             But I wouldn't be able to speak as to how
17   or for what reasons those were, you know, entered, if
18   it was because there was a Social Security listed but
19   only the driver's license was available or vice versa.
20        Q.  But it might be coded as either ISI or ISM?
21        A.  Yes.
22        Q.  Okay.  We have a number of voters in this Excel
23   that are coded either ISI or ISM, correct?
24        A.  Yes.
25        Q.  Would you agree with me that -- well, let me
```



1   ask you this:  If the voter provides an SSN and you

2   don't have that in your system, you only have the

3   driver's license or vice versa, would you agree with me

4   that that is a mismatch defect as opposed to an

5   omission defect?

6       A.  So if a voter did not -- okay.  Let's just say,

7   okay, so we have the driver's license number on file,

8   and the voter submitted their -- their information with

9   the Social Security number.  They did not leave out the

10  numbers.  It's just that the number that we have on

11  file is not the one that was listed.  So it was -- it's

12  not an omission --

13      Q.  Okay.

14      A.  -- based on your definitions.

15      Q.  Yeah.

16      A.  Is what -- your terms.

17      Q.  Okay.  So it's not an omission.  In your

18  office, what would you call that kind of issue where

19  you have a number but it's not the number that the

20  voter provided?  What would you use when you're talking

21  about this in the office?

22      A.  I've never really heard "mismatch."  I -- I

23  just hear them state, "Oh, well, they left out the

24  driver's license.  Oh, well, and the one that we have

25  on file is the Social Security number" or vice versa.



1    Q.  Okay.

2    A.  Those are the -- that's the way that I've heard

3  it being addressed and stated.

4    Q.  Okay.  And then in the codes list where you

5  have ISI, which is incorrect, and then missing, can you

6  tell between those two codes -- or maybe they -- it

7  would get coded under both codes incorrect or missing

8  if the voter provided a Social and you only had the

9  driver's license or vice versa?

10    A.  It could be.  But here it states how they

11  were -- how they were listed, you know, 71, I think

12  that we're stating -- is that what you're referring to?

13    Q.  I'm just wondering how you would code the

14  situation if the voter provided a number like the last

15  four of the Social and you only had the driver's

16  license or vice versa.  I'm asking if it would be -- if

17  it --

18    A.  If it clearly stated --

19    Q.  Or if you know.

20    A.  I don't know.  I don't know.  But I do -- I was

21  just trying to understand what -- what you were trying

22  to state.

23          There isn't anything that states that, oh,

24  it was a Social Security that was on file but they put

25  the driver's license.  Oh, it was the driver's license



 1   that was on file but it was the Social Security number.
 2   So there really isn't anything to be able to
 3   differentiate the two.
 4        Q.  So then going back to the earlier exhibit, the
 5   interrogatory responses, where it was listed that there
 6   were zero mismatch defects and that all the defects
 7   were omission defects, is it possible that you did have
 8   defects involving --
 9        A.  Both numbers?
10        Q.  -- that there were issues where the voter
11   provided one number but you couldn't find that number
12   in the system, is it possible that that happened?
13        A.  Yes, it is very possible.
14        Q.  Okay.  And that the number that you provided
15   for omission, which was 100 percent of your ID defects,
16   could contain that kind of problem?
17        A.  Absolutely, yes.
18        Q.  Okay.  Thank you.
19             Okay.  When a voter requests a mail
20   ballot, we talked before that they have to be over 65
21   or disabled or outside the jurisdiction on election
22   day.  And the voter has to indicate that on the ABBM;
23   is that correct?
24        A.  Yes.
25        Q.  Do you keep records of -- do you keep a record



```
 1   that associates the reason for requesting the mail
 2   ballot with that particular voter?
 3        A.  It is in their -- in their file.
 4        Q.  Okay.
 5        A.  And when we are able to -- when we pull queries
 6   on ballot by mail, it's listed, you know, 65 years and
 7   older or what have you, out of county.
 8        Q.  Okay.  And is -- do you also have it listed in
 9   the voter's file that they requested an annual ballot
10   by mail?
11        A.  Yes, it is -- it is in there as well.
12        Q.  Okay.  So your system can tell us, for example,
13   if a particular voter requested an annual ballot by
14   mail and they're over 65?
15        A.  Yes.
16        Q.  Also if they requested regular ballot by mail
17   and they're over 65?
18        A.  Right.  It comes up on the screen, and it's in
19   their file.  It's in the system.
20        Q.  You could also run a report, for example, how
21   many people requested mail ballots, both annual and
22   regular, who are disabled?
23        A.  Who are disabled, yes, it's listed in there as
24   well.
25        Q.  Okay.  Skipping questions.  I have another
```



1    question about this exhibit here.  It looked like -- if

2    you go to the codes, on the very last page, there are

3    some parenthesis with numbers to the left.  Did you see

4    those?

5        A.  Yes.

6        Q.  Is that a count of how many of this -- of these

7    codes appear in the associated Excel?

8        A.  It could be, but I wouldn't say -- be able to

9    say yes.

10       Q.  Okay.  Looking at the smallest group, the ISI,

11   I see there's four --

12       A.  Four.

13       Q.  -- of those.  And it looks like there are four

14   in the chart.

15               So here's a question for you.  There's a

16   very large group, and it has a code ABBM-TL.

17       A.  Yes.

18       Q.  And the number in parenthesis next to it is

19   128.  I'm not going to make you count those.  I just

20   had a question about what this code means.

21               It says "Not received before deadline."

22   And I'm wondering whether this was that they failed --

23   that they were flagged for defect and didn't cure or

24   whether this was just ABBMs that you received after the

25   deadline.



```
 1        A.  That it didn't come in before the deadline.
 2        Q.  Okay.  So just you got a whole bunch of these
 3   after --
 4        A.  Right, yeah.
 5        Q.  So you don't think these reflect voters who
 6   sent you something on time, and then you sent them back
 7   a deficiency letter, and then they never got you
 8   something back from there?
 9        A.  I wouldn't be -- no, I don't know if it
10   includes that number.
11        Q.  Okay.  Okay.  But it might be a combination,
12   then --
13        A.  It might be a combination.
14        Q.  Okay.  Okay.  Understood.
15             Do you do voter out -- voter registration
16   drives at naturalization ceremonies?
17        A.  Yes.  We do have staff members that go out and
18   set up a table and register people that are recently
19   being naturalized.
20        Q.  Do you know whether your voter registration
21   employees who are conducting these drives ask voters or
22   voter applicants to put both their driver's license
23   number and the last four of their Social?  Because I
24   believe the form only asks for one.
25        A.  Right.  Okay.  So before, when -- before Senate
```



```
 1   Bill 1, it was also pre-COVID, so we would participate
 2   in a lot of voter registration drives at naturalization
 3   ceremonies.
 4                  That isn't something that was included
 5   in -- in what we would, you know, instruct or as we
 6   were guiding them to fill out the application.  And
 7   since then, we haven't really participated in voter
 8   registration drives.
 9        Q.   Okay.
10        A.   I think just now it's starting to pick back up
11   again.
12        Q.   Do you do any other voter registration outreach
13   besides naturalization ceremonies?
14        A.   We used to participate in, you know, events
15   when we were invited by, you know, local libraries when
16   they would have events.  Also when the community
17   centers would also have their various types of events,
18   we would get invited as well.
19        Q.   Have you ever instructed your staff to ask
20   people who are registering to vote to put both Texas
21   driver's license and last four of the Social on their
22   voter registration application?
23        A.   When I would participate as an elections
24   analyst, I -- I would sometimes state, you know, just
25   go ahead and put both.  I mean, it's -- but not even
```



 1  knowing what the future would hold.  And I do know that
 2  sometimes our voter registration specialists would
 3  also, you know, state that.
 4            But again, it wasn't -- it was just
 5  something, well, should I put -- because let's say the
 6  voter would say, "Well, should I put my Social or
 7  should I put my driver's license?"
 8            "Well, you could put whichever one you
 9  would like, but why don't you just go ahead and put
10  both.  Do you know both?"
11            "Yes, I have both."  So that's how the
12  conversation would go.
13       Q.  So it really depends on who was doing the voter
14  registration from your office?
15       A.  Right.  And -- you know, and because it was
16  part of us guiding them and talking to them, you know,
17  as they filled out their voter registration
18  application.
19       Q.  Okay.  Thank you.  Would it be fair to say that
20  voter turnout is higher in general elections during the
21  presidential year versus a midterm like we just had in
22  the 2022 --
23       A.  Yes.
24       Q.  -- general?
25            Do you expect that the number of people



MAGNA
LEGAL SERVICES

 1   just says, "I'm not -- I'm not going to vote."  You
 2   wouldn't necessarily know that that had happened; is
 3   that correct?
 4        A.  I would have been notified, but I don't
 5   remember anything like that happening where somebody --
 6   you know, let's say, for example, early voting ballot
 7   board was trying to communicate with somebody and
 8   trying to assist them, and they -- you know, yes, they
 9   may have shared some frustration, you know, just like
10   with any other situation that a person, you know, finds
11   themselves in.
12             But I do know that the early voting ballot
13   board member was communicating and really trying to
14   assist to give them the options to help them and assist
15   them with trying to cure their ballot.
16        Q.  Got it.  But would you agree with me that there
17   are things that happen that just --
18        A.  There are some --
19        Q.  -- you'll never learn about them?
20        A.  Right, uh-huh.  There are some things that
21   happen being that there's so much happening at one
22   point in time throughout the entire duration of the
23   election.
24        Q.  And so if a voter just got their ABBM back and
25   said, "I'm not going to do this," you wouldn't



```
 1   necessarily find --
 2        A.  No, I wouldn't know.
 3        Q.  -- out about that unless the voter contacted
 4   your office --
 5        A.  Right, exactly.
 6               THE COURT REPORTER:  Just wait and let her
 7   finish.
 8               THE WITNESS:  I'm sorry.
 9               THE COURT REPORTER:  You're getting into a
10   conversation.
11        Q.  Same thing, if a voter wanted to bring someone
12   to help them and that person says, "I don't want to
13   help voters anymore, there's too many new
14   requirements," and that was a conversation that
15   happened somewhere out in the community, you wouldn't
16   necessarily know about that, correct?
17        A.  Right.  I wouldn't know what happens outside --
18   you know, within one another, like one person and
19   another.  I -- I wouldn't know what is being said at
20   that point.  But as in any information, you know, in
21   regards to that topic that came to me, I don't --
22   nothing came to me.
23        Q.  Okay.
24        A.  And I wasn't notified of anything like that
25   happening.
```



MAGNA
LEGAL SERVICES

1    Q.  And so also, if some group out in the community

2    that used to help people vote by mail decided to stop

3    doing that because of new provisions in SB 1, you

4    wouldn't necessarily know about that unless you were

5    specifically informed?

6    A.  Unless they came up to me or they came up and

7    decided to express their concerns to the department and

8    they were referred to me, then yes, I would know.  But

9    other than that, no.

10   Q.  Okay.  I think you had mentioned earlier when

11   you were testifying about the form that someone has to

12   fill out when they bring seven or more curbside voters

13   to vote?

14   A.  Yes.

15   Q.  You had mentioned that you thought some of

16   those forms were filled out in Hidalgo County or -- for

17   the 2022 general election, or there were no forms

18   filled out?

19   A.  I would say yes, that there were some, because

20   for example -- I'm just giving an example here -- at

21   the elections annex, the judge at that location did let

22   me know, "Oh, this is something that I'm going to need

23   to be aware of and really learn, because we do get a

24   lot of vans, and they bring in seven or more voters to

25   come in and vote."



```
 1        Q.  So do you know if any vans bring seven or
 2   more -- okay, scratch that.
 3                Are you aware for the 2022 general
 4   election whether any vans brought voters not to go in
 5   and vote but to vote curbside?
 6        A.  Yes.
 7        Q.  Okay.  And do you -- would you have kept those
 8   forms that are filled out by the van drivers?
 9        A.  They are turned in, and it would be within the
10   documents that our poll judge turns in at the end of
11   the election.
12        Q.  Okay.  Thank you.  You mentioned earlier in
13   your testimony about two incidents having to do with
14   poll watchers.  One of them involved a poll watcher
15   getting into an exchange with a poll worker, if I
16   recall correctly.
17        A.  Yes.
18        Q.  And the other one was in the elections annex
19   polling place in Edinburg.
20        A.  Yes.
21        Q.  And I'd like to understand a little more detail
22   about that one.  You mentioned that the poll watcher
23   was standing too close to the election clerk who was
24   assisting curbside voters; is that right?
25        A.  Correct.
```



```
 1       Q.  And can -- and you also mentioned that the poll
 2   watcher got close enough that they were seeing how the
 3   voter was voting; is that right?
 4       A.  Correct.
 5       Q.  Can you just explain that to me a little more.
 6       A.  We did receive some calls from the community
 7   stating that a poll watcher was standing very close to
 8   the election worker that was assisting the voter
 9   through curbside, so close that they were able to see
10   in through the window.
11               The Duo Go -- it's a tablet style, so of
12   course, if they're standing at the correct angle, then
13   they are able to see how the person is -- is voting,
14   you know, how -- how they're casting their ballot.  So
15   that's why, you know, we received the calls.
16               I spoke to the judge immediately, and the
17   judge went ahead and said, you know, "This is the law.
18   You're not supposed to stand so close.  Yes, you can
19   observe the voting process by all means, but, you know,
20   within a distance," and so they did.
21       Q.  Okay.  So would it be fair to say, then, that
22   the -- it came to your attention through calls from
23   voters?  You mentioned the community, and I wasn't --
24       A.  The community.
25       Q.  -- sure.
```



1    A.  Yes, they didn't really specifically say if

2   they were a voter.  In that area, we do have

3   electioneering spots where the candidates are able to

4   go and electioneer.  So we're thinking that it may have

5   been, you know, the people who are out there

6   electioneering that did notice.

7           I received some calls, and some of the --

8   the girls who answer the phones received some calls

9   too, and they were being transferred to me.  I'm like,

10  "I'm on it.  I'm speaking to the judge right now," so

11  yeah.

12    Q.  Okay.  So then it would be fair to say that the

13  call did not come from a poll worker?

14    A.  No, no, no, no, no, huh-uh.

15    Q.  When you spoke to the election judge, was the

16  election judge already aware of the fact that the poll

17  watcher was standing close to cars?

18    A.  She was in the front.  She was inside the

19  polling location, so she wasn't aware of what was

20  happening, but she immediately went outside to address

21  the situation.

22    Q.  Do you know why the poll worker who was being

23  stood close to didn't on his or her own tell the

24  watcher to create some distance?

25    A.  I'm not sure if she did or if she didn't.  I --



 1  I don't know.  I do know that that group, they really

 2  try to help the voter.  So it may have been that she

 3  was concentrating on assisting and, you know, doing her

 4  job.  If fully aware that they can be close by, she

 5  probably -- maybe she didn't even know because she was

 6  working and assisting, not necessarily assisting the

 7  voter but providing the curbside to the -- to the

 8  voter.

 9     Q.  Would you agree with me that a voter would feel

10  uncomfortable if a watcher were standing close enough

11  to see how the voter was voting?

12     A.  Again, I can't speak for the voter themselves.

13  But I -- I do know that the -- especially, for example,

14  inside a polling location, the poll workers are very

15  self-aware of poll watchers being able to walk around

16  inside the polling location.

17          So they try to make sure that -- that the

18  secrecy and the ability to vote without feeling in any

19  way intimidated or concerned, you know, in regards to

20  the voter's part was protected.  And they were very

21  self-aware of that.  But that's the only way that I

22  would be able to speak.

23     Q.  Did any poll workers tell you for the

24  November 2022 general that they had to tell poll

25  watchers to create more distance between themselves,



1   aside from the curbside voting incident?

2       A.   Yes.   There were some that did come up to me

3   and let me know.   "I did have to tell a couple, Hilda,

4   just so you know," especially at the end of the

5   election when they were coming in and reporting,

6   dropping off their supplies, everything.

7            That's the time when we can communicate

8   with them, and they let us know what happened

9   throughout the day.   And I did receive some where they

10  stated, "I did have to tell a couple of poll watchers

11  just to make sure that they keep their distance."

12           Again, it's to protect the voter, for the

13  voter not to feel in any way intimidated or anything.

14  And those are the conversations that I was having with

15  them.   But just a couple.   It wasn't a lot.

16      Q.   Okay.   Do you know if any of them felt a

17  tension between wanting to protect the voter's comfort

18  and secrecy?

19      A.   Secrecy.

20      Q.   Secrecy, and the provisions of SB 1 that impose

21  penalties on poll workers if they obstruct the view of

22  a watcher?

23      A.   They -- they were a little concerned with that.

24  But it's -- it's all about how you approach the

25  situation, you know, gain that rapport with the poll



 1   watcher, that communication.

 2               And the poll watchers, you know, were

 3   receptive once they were told, "You're a little bit too

 4   close.  Go ahead and stand -- you know, think of the

 5   voter."

 6               "Yes, I understand," blah, blah, blah.

 7   You know, there was communication back and forth

 8   between them.  So yeah.

 9        Q.   That's how you would guide the poll worker --

10        A.   Yes --

11        Q.   -- to try to establish --

12        A.   -- in regards to training.

13        Q.   Okay.

14        A.   Yeah.  In regards to training to establish

15   that.  We're here to work together.  We're here to

16   administer the election.  Each and everybody has a

17   different role.  And just as long as they follow their

18   own roles, you know, in accordance with the law, and

19   that's how we train.

20        Q.   So that leads me to the San Juan Memorial

21   Library.  You -- you mentioned very diplomatically that

22   there was a verbal altercation, and I was wondering if

23   you could just provide a little more detail on that.

24               Do you know what was the -- what -- what

25   the verbal disagreement was about between the poll



```
 1   watcher and the poll worker?
 2       A.  I -- from what I understand in speaking with
 3   the poll worker, he -- he stated that the poll watcher
 4   did not identify themselves correctly, so that's when
 5   he became, you know, protective of his polling
 6   location.
 7               The poll watcher did -- of course, did
 8   state, "Well, I can be here because I am a poll
 9   watcher."
10               "Well, what do you mean?  You know, I
11   don't see any information."  And then that's how it
12   started.
13       Q.  Do you know if the poll watcher brought the
14   certificate that they are supposed to bring?
15       A.  I think afterwards it was shown or throughout
16   the conversation, but because of the verbal
17   altercation, I don't think it was submitted.
18       Q.  Okay.
19       A.  You know, because she walked out.
20       Q.  The poll watcher walked out?
21       A.  Yeah, she went ahead and she walked outside.
22   And that's when I was able to talk to her, and then I
23   was able to talk to him, and then it all settled.
24       Q.  Okay.  Did the poll watcher then go into the
25   polling place and perform the watching?
```



1      A.  I think she did.  I think she did go in, but

2    she didn't stay, from what I know.

3      Q.  Okay.  Do you know where she went?

4      A.  I don't know.  She was outside speaking to me.

5    But other than that, I don't know.

6      Q.  Okay.  SB 1 requires ID numbers for all voters

7    by mail; is that correct?

8      A.  Yes.

9      Q.  And you would not violate the election code if

10   a voter asked you to violate the election code,

11   correct?

12     A.  Absolutely not.

13     Q.  All right.  So to accommodate a disabled voter,

14   building a ramp doesn't violate the election code,

15   right?

16     A.  No.

17          MS. RAMIREZ SOLIS:  Objection, form.

18     Q.  And providing someone to read the ballot to a

19   blind voter, that doesn't violate the election code,

20   right?

21     A.  No.

22     Q.  But since SB 1 requires an ID number from all

23   voters, you would not tell a disabled voter that they

24   could just vote without providing an ID number,

25   correct?



1    A.  Correct.

2    Q.  All right.  Do you know whether the poll

3  watchers in Hidalgo County in the 2022 general election

4  all completed this new training required by SB 1?

5    A.  Yes.  They needed to submit their certificate

6  of completion.  And the form that is provided by the

7  candidate who is sending them over to be a poll

8  watcher, they needed to provide all of that information

9  to the judge and before they -- they started, you know,

10  poll watching.

11    Q.  So going back to San Juan Memorial Library, you

12  think that the poll watcher may not have shown all that

13  material when she first arrived; is that right?

14    A.  I wouldn't be able to say exactly.  Like I

15  said, there were some words that were exchanged.  It

16  was a case of "I don't know who you are," "Well, yes, I

17  am a poll watcher" type.  But I don't know exactly.

18    Q.  Okay.  My last set of questions.  The court

19  reporter has handed you what has been marked as

20  Deposition Exhibit No. 6.  Have you ever seen this

21  document before?

22    A.  I'm sorry.  This was in November of 2020?

23    Q.  Yes.

24    A.  There were some affidavits submitted for that

25  election.  I don't remember this one specifically.



```
1       Q.  Does this look like -- so it has a Bates number
2    on the bottom right hand, RFP10, a bunch of leading 0s,
3    and then 91.  I'll represent to you that we received
4    this from Hidalgo County as part of the document
5    production.  I -- if you don't -- well, strike that.
6              My question for you is does this look like
7    one of the affidavits that you received in November of
8    2020?
9              MS. RAMIREZ SOLIS:  I'm going to object to
10   the form because you're going back to 2020 --
11             THE WITNESS:  Right.
12             MS. PERALES:  That's why -- so the last
13   topic on the notice of topics is discovery production,
14   and I'm attempting to authenticate the document.  But
15   if the witness can authenticate it, she can; if she
16   can't, she can't.
17       A.  I don't remember, like I said, this one
18   specifically.  Like I stated, I know that there was
19   some production provided, but -- but this was from --
20   can I just review it real quickly?
21       Q.  Absolutely.  Take all the time you need.
22       A.  This seems like one that was submitted during
23   that time.
24       Q.  Did you have a general special election on
25   November 3rd, 2020?  Well, probably had a general
```



 1 | election on November 3rd, 2020.

 2 |     A.  Yes.  Yes, there was an election.

 3 |     Q.  Okay.  Did -- did Hidalgo County have a

 4 | Palmview Community Center polling place?

 5 |     A.  Again, this -- this election was prior to

 6 | the -- of course, the November of 2022.  Normally, the

 7 | Palmview Community Center is -- is an election day

 8 | polling location, so I can speak to that as the

 9 | assistant director of the department during that time.

10 |     Q.  Okay.  And then does this look to you like a

11 | list of things that the poll watcher was noting that

12 | she thought might be irregularities?

13 |     A.  I wouldn't know what the poll watcher was...

14 |     Q.  Okay.  And if you'll read down to 4:43 p.m., it

15 | says there, quote, Father helped his disabled son

16 | select for whom to vote, unquote.  Do you see that

17 | there?

18 |     A.  Yes.

19 |     Q.  Would you agree with me that it is legal to

20 | assist a disabled voter in marking the ballot?

21 |     A.  Yes.

22 |     Q.  Okay.

23 |     A.  If the voter did request assistance, yes, he --

24 | he can assist them.

25 |              MS. PERALES:  Can we take a five-minute



 1 | break?

 2 |               (Brief recess)

 3 |     Q.  One cleanup question.  We talked about a couple

 4 | of incidents involving poll watchers --

 5 |     A.  Yes.

 6 |     Q.  -- and some challenges presented by poll

 7 | watchers, the elections annex in Edinburg, San Juan

 8 | Memorial Library.  We talked about some of the feedback

 9 | that you got from poll workers when they were turning

10 | in their materials.

11 |               Can you think of any other instances

12 | during the 2022 general election involving poll

13 | watchers and challenges that occurred related to poll

14 | watchers?

15 |     A.  The ones that I explained were the ones that I

16 | know, the incidents that I went over.

17 |               MS. PERALES:  Okay.  Thank you.  I pass

18 | the witness.

19 |               MR. STEWART:  Thanks, Nina.

20 |                    EXAMINATION

21 | BY MR. STEWART:

22 |     Q.  This is Michael Stewart, United States.

23 |     A.  Hi.

24 |     Q.  Hi, Ms. Salinas.  Thanks.  I'm sorry I couldn't

25 | be there in person today, but thank you for taking the



 1  time today.

 2         So excuse me.  I wanted to start by

 3  digging back in a little bit to Exhibit No. 3, which

 4  Ms. Perales showed you, which is hopefully still in

 5  front of you.  And specifically look at Interrogatory

 6  No. 3, which is the same one that Ms. Perales was

 7  addressing before.

 8         And I just had a few clarifying questions

 9  so I can make sure I understand what goes into these

10  numbers.

11      A.  Okay.

12      Q.  So when we look at sub A, which is the -- it

13  says "Number of ABBMs received by the County," does

14  that number, the 6,373, include annual applications

15  that may have been received before the primary election

16  but that still generate a ballot for the general

17  election?

18      A.  It should include all of them.

19      Q.  Including the annual applications --

20      A.  Yes.

21      Q.  -- received earlier?

22      A.  Yes.

23      Q.  Great.  Was there ever a circumstance where a

24  voter submitted an application for a ballot by mail --

25  and if I just say "ABBM," will you understand that?



```
 1        A.  I'm sorry.  Can you --
 2        Q.  Let me -- let me slow down.
 3             If I say "ABBM," will you understand that
 4   to mean an application for a ballot by mail?
 5        A.  Yes.
 6        Q.  Yeah.  I sometimes slip into shorthand.
 7             Was there ever a circumstance where a
 8   voter submitted an ABBM, it was rejected for whatever
 9   reason, and then they submitted a new ABBM in order to
10   ultimately get a ballot?
11        A.  It has happened before, where we --
12        Q.  It did happen -- sorry, I didn't mean to cut
13   you off.  Please.
14        A.  I'm sorry.  I didn't even put my mic.
15        Q.  No.  I'm sorry.  I thought you finished your
16   answer.  I didn't mean to cut you off.
17        A.  It has happened before where we do receive
18   several applications for ballot by mail from a voter.
19   And the office is instructed to go with the most
20   recent, but it may have happened that we did
21   communicate with them, let them know that they need to
22   cure or -- I mean, come in and correct the application
23   for ballot by mail, and they just went ahead and they
24   sent a new one.
25        Q.  If that happens and the voter sends a new
```



```
 1   application, is that reflected once in this number
 2   under sub letter A or twice?  In other words, is it on
 3   a per-ballot or per-voter basis?
 4       A.  I'm not -- I don't know on that one.  But it
 5   would only -- it's a per-voter.
 6       Q.  Okay.
 7       A.  Yes, it is a per-voter.
 8       Q.  So this should be 6,373 voters who sent ABBMs?
 9       A.  Yes.
10       Q.  Okay.  I think earlier today you were
11   testifying regarding the 45-day deadline to send out
12   ballots; is that correct?
13       A.  Correct.
14       Q.  That refers specifically to military and
15   overseas ballots under UOCAVA; is that right?
16       A.  Correct.  The federal --
17       Q.  There --
18       A.  -- applications.
19       Q.  What's that?  I'm sorry.
20       A.  Yes.  The FPCAs.
21       Q.  Got it.  There's no -- strike that.
22           Is there any provision under state law
23   that requires a similar deadline for nonmilitary or
24   overseas voters?
25       A.  Nonmilitary or oversea -- overseas voters?
```



1  Meaning, for example, a voter who is disabled or a
2  voter who is -- who is not able to come in and vote.
3  Is that what you mean?
4      Q.  Yeah.  I mean, you know, disabled, over 65,
5  perhaps someone who was within Texas but still
6  qualifies to vote by mail.  Is there any -- any similar
7  sort of deadlines?
8      A.  No.  That I know of, no.
9      Q.  Okay.  Does the 6,373 number under sub A
10  include the federal postcard application voters?
11      A.  It includes all applications for ballot by
12  mail, yes.
13      Q.  Okay.  Got it.  And then looking at subpart C,
14  the number of ABBMs that the County ultimately accepted
15  after an applicant cured a recorded defect of any kind,
16  does that include cure by any means, whether it's
17  coming into the office, using the portal, submitting a
18  new ABBM, or is it limited to certain types of cure?
19      A.  It's just -- we don't have different numbers
20  for that.  It's all together as one.
21      Q.  Okay.  So all of those would be included in
22  that --
23      A.  Different --
24      Q.  -- number?
25      A.  -- results, right, yeah.  It's all put



MAGNA
LEGAL SERVICES

```
 1    together -- together as one.

 2        Q.  Okay.  And then looking at sub F where it says

 3    "The number of ABBMs that the County ultimately

 4    accepted after an applicant cured either a mismatch or

 5    omission -- defect or omission defect," and the

 6    response is zero.

 7             Does that mean that no voters in Hidalgo

 8    County used the ballot by mail tracker to cure an ABBM

 9    for the November general election?

10        A.  It says zero, so --

11        Q.  Okay.  I just want to confirm --

12        A.  -- that would be the answer, yes.

13        Q.  Great.  Thank you.

14             Turning to some of the carrier envelope

15    questions.  Actually, I want to share.

16             MR. STEWART:  I think we're on Exhibit 7.

17    What I'm going to do is, I have this keyed up in an

18    e-mail for all the counsel that I see on the Zoom.

19    It's not marked confidential, but I am sending it

20    encrypted.  I just sent that.  I sent it to the court

21    reporter as well.

22        Q.  And what I'm going to do is share my screen so

23    that you can see what I'm looking at, and I will tell

24    everyone this is a document marked RFP34_000001 on the

25    bottom right of the first page.  Can you see what I'm
```



1    have been because the number of ballots the County

2    ultimately accepted and counted after the voter cured

3    the carrier envelope defect of any kind, it was 146.

4    And the number of carrier envelopes the County flagged

5    for rejection because of an omission defect, it was 74.

6        Q.   Yeah.  I guess what I'm trying to understand is

7    how, in responding to these interrogatories, you found

8    the difference between ballots that were rejected

9    because of an omission and ballots that were rejected

10   because of a mismatch.

11              And I know that I control the document, so

12   if you need me to scroll down to the next page with the

13   rest of the descriptions, I'm happy to do that.  Just

14   let me know.

15       A.   Again, it's like I had stated earlier, we never

16   really use the term "mismatch" or "omission" over here.

17   It was really, "Oh, it didn't include a Social Security

18   number or a driver's license number," or, you know,

19   "One of those numbers was missing when we had something

20   else on file."  It was mainly defined as -- described

21   and stated as per what it was, so there may be

22   confusion there with the terms.

23       Q.   Sure.  So it would be fair to say that the

24   responses to J and K just reflect however the early

25   voting ballot board coded it and that you don't have



1    insight into that?

2        A.  I don't.

3        Q.  Okay.  All right.  We can put this document

4    aside.

5            I think you testified earlier that your

6    county advised voters to put both the -- their Texas ID

7    number, whether it was a driver's license or ID card,

8    and the last four of their Social Security number on

9    mail ballot materials; is that right?

10       A.  Correct.  It was a flyer.  It was a 3-by-5

11   flyer that had all that information explaining.

12       Q.  You anticipated.  Did that go on the insert

13   that you put with the carrier envelope?

14       A.  Yes, it did.  It went in the mail carrier

15   envelope kit.

16       Q.  Why did you start advising voters to do that?

17       A.  It's something that -- of course, this was

18   decided upon when I was the assistant director, and the

19   directive came from the previous elections

20   administrator.

21           As when we were talking and discussing, of

22   course we went through the -- through the point to

23   where we were implementing the new laws and trying to

24   come up with new procedures, correct.  So that is

25   something that we decided to do.



1        It's something that we were already doing

2   in a sense when it came to registering voters when we

3   participated in voter registration drives.  "Oh, we'll

4   just go ahead and put both," not knowing what would,

5   you know, happen in the future.  So it was something

6   that we just thought it would be better for the voter,

7   just go ahead and include both.

8        We -- I even appeared in commissioners

9   court stating that; on the media when I was conducting

10  interviews, encouraging the voters to list both the

11  driver's license and the Social Security number.  It's

12  just better to be safe for it to be a practice, and we

13  would not, you know, incur any rejects or any problems

14  with the mail carrier ballot.

15     Q.  Did your office receive any feedback or

16  communications from voters that they were not placing

17  both because of the language on the ABBM form where it

18  requested the numbers?

19     A.  In speaking to one of the managers and the

20  employees that does work on that, which is the

21  operations department, they did state that the wording

22  is small, the -- the print, the font is really small.

23  So that they did hear some complaints stating that,

24  "Oh, it's because I didn't see it."  "Oh, I didn't

25  know," you know, type responses.



1       Q.  For the period of when -- before the early

2  voting ballot board convened, when you said your office

3  was looking under the flap to make sure that the ID

4  number was there, would you send back ballots that were

5  missing an ID number at that point, or would you call

6  the voter and see what they wanted?

7       A.  We would call the voter and see how they would

8  want to proceed.

9       Q.  Was there a date after which you stopped

10  sending ballots back to voters because there wouldn't

11  have been enough time to mail them back by the

12  deadline?

13      A.  I do, more or less, have an estimation.  It

14  was, roughly, like, maybe 10, 11 days.

15      Q.  Okay.  Are you aware of any voters who received

16  notice of rejection too late to cure before the

17  deadline?

18      A.  I'm not aware.

19      Q.  Okay.  If a voter was sent notice that their

20  mail ballot materials were going to be rejected because

21  they didn't comply with the ID number requirement and

22  then you didn't hear from them again, would you send

23  them a final notice of rejection after the time period

24  to cure had passed?

25      A.  Yes.  The final notice was sent to them.



 1      Q.   Is that sent by mail?

 2      A.   Yes.

 3      Q.   When your office receives mail ballot

 4   materials, do you use the ID number information,

 5   whether it be a driver's license or Texas ID or a last

 6   four Social Security number, for any purpose other than

 7   determining whether you could accept that ABBM or

 8   ballot?

 9      A.   We did not.

10      Q.   Did you have to hire any employees specifically

11   to administer mail balloting during the 2022 general

12   election cycle?

13      A.   We did hire temps to assist us with the

14   election, but it was mainly to assist with

15   organizational, you know, duties, you know, keeping

16   everything organized and in order.  Mainly the

17   permanent staff would work on those types of duties.

18      Q.   Got it.  To the extent you know, was the number

19   of temps you had to hire for the 2022 general higher

20   than the 2018 midterm?

21      A.   Again, I -- in the 2018, I was an election

22   analyst.  I wouldn't be able to say -- compare it to

23   the 2018.  I don't know, but I can speak for this

24   election, and we did hire temps.  We did hire -- in

25   total, we do have 10 -- 10, 12 temps.



1      Q.  Do you have any sense of how that compares to

2  prior elections?

3      A.  In some cases, we do need more assistance,

4  depending on the scale of the election.  If it's a

5  pretty big election, let's say a presidential, then

6  yes, we do hire more as we do have more mail -- mail-in

7  ballots, more applications for ballot by mail, more

8  voter registrations.  So it depends on -- on the

9  election.

10     Q.  Were there any resources that you would say

11  your office had to dedicate to mail balloting because

12  of the new ID number requirements under SB 1 that it

13  didn't have to before those requirements were in place?

14     A.  In regards to setting up early voting ballot

15  board, we did need to make sure that we had a computer.

16  They needed an e-mail account.  They -- of course,

17  phones to be able to call the voters to let them know

18  about their -- to come in to cure, you know, their

19  ballot, things like that.  It was more technological in

20  that sense.

21     Q.  Makes sense.  Do you have a sense of how much

22  it cost your office to administer specifically the ID

23  number requirements in terms of dollars?

24     A.  I don't have, more or less, an estimation, but

25  I do know that it did incur more paper.  It did -- we



1   did need to train more.  We did need to change our

2   training modules.  We did need to, again, you know, add

3   more of the technological aspect in regards to setting

4   up our early voting ballot board to make sure that they

5   had the resources that they needed.

6           Also, the ballot by mail carrier and the

7   kits, all that information did change.  All of that

8   needed to be updated, the applications for ballot by

9   mail as well.  Updating our website, making sure that

10  everything was current and up-to-date.  It trickled

11  down to each and every, you know, point and aspect of

12  the election.

13  Q.  Do you think those expenses will be recurring

14  in future elections or many of them one time?

15  A.  I think it is going to be reoccurring, again,

16  depending on the scale of the election.  Of course,

17  like, for example, the mail carrier envelopes, how all

18  of that changed.  We were experiencing -- the fact that

19  we had to purchase our mail kits in sections because of

20  the paper shortage.

21          So we were experiencing situations like

22  that, but now we all have -- you know, we have the

23  entire kit together.  So we've already made those

24  purchases, so it would just be to keep it consistent

25  and keep it going.



1      Q.   Makes sense.  Did you receive any feedback from

2    voters about the online ballot by mail tracker?

3      A.   I did hear some complaints to where it wasn't

4    user friendly.

5      Q.   Uh-huh.

6      A.   Again, I've only seen it as in a screenshot

7    type, as -- as I don't have access to it, but that you

8    can -- you can imagine an elderly person who's 65 or

9    75, 85, you know, plus having to input their

10   information in there.

11              The complaint that we did receive was that

12   you would think that you would put, I guess, you know,

13   18 -- you know, 1825 South McColl, let's just state,

14   right, all in one line, and it was segmented to where

15   you would need to put the number, the South in one

16   other little box, and then the street name in another

17   little box.  Everything was -- was separated, so it

18   was -- it was hard.  It was a little difficult for

19   them.

20     Q.   Got it.

21     A.   Those are the kind of complaints that I

22   received in regards to the mail tracker.

23     Q.   Any other specific issues besides the address

24   entry that you heard?

25     A.   They weren't really familiar where or what to



```
 1   put.  For example, they would want to put the full name
 2   avenue, but if they put in avenue, it didn't really
 3   match their voter registration application.  It needed
 4   to say A-V-E type, so little things like that is what
 5   the types of complaints that -- that I received.
 6        Q.  Got it.  Did your office have any experience
 7   with military or overseas voters, essentially FPCA
 8   voters --
 9        A.  Yes, we did.
10        Q.  -- who needed to -- who needed to cure the ID
11   numbers on their ballot?
12        A.  The process for that was that if they did need
13   to cure that they were able to log in through the mail
14   ballot tracker.
15        Q.  That's right.  I think you testified to that
16   earlier, that they were directed to the mail ballot
17   tracker.
18        A.  Yes.
19        Q.  Were there any overseas or military voters who
20   cured by any other means?
21        A.  As far as I know of, no, I wasn't --
22        Q.  Okay.
23        A.  -- made aware.
24        Q.  So for this question, I don't want to get into
25   details.  I just want to get a sense of whether this
```



```
 1    happened or not to protect any privilege that, you
 2    know, your county might have.
 3               But did you make any referrals to law
 4    enforcement for potential fraud in mail balloting in
 5    connection with the November 2022 general election?
 6         A.   No, we did not.
 7         Q.   Do you -- is anyone in your office trained to
 8    use the ID numbers on mail ballots as a potential
 9    indicator of fraud?
10         A.   I don't understand.
11         Q.   Sure.  I guess let me phrase it this way.  Does
12    your office consider a mismatched or omitted ID number
13    on either an ABBM or a carrier envelope to be
14    potentially indicative of mail ballot fraud?
15         A.   No.  Our office did not think of it in that way
16    or form.
17         Q.   Okay.  Were there any instances where a
18    mismatch or omission on the ID number revealed that the
19    voter whose name was on the mail ballot materials was
20    not, in fact, the individual who sent the mail ballot
21    material to your office?
22         A.   I was not made aware of any such situation.
23         Q.   Okay.  Did you receive any feedback or
24    communications from voters indicating that voting by
25    mail was too difficult once these ID number
```



```
 1   subcode, so it would indicate that it was not -- the

 2   ABBM was not received before the deadline, would that

 3   include voters who sent an ABBM that was initially

 4   rejected and sent back for cure and then the cured ABBM

 5   was not received before the deadline?

 6       A.  I'm not entirely sure if it is.  That's

 7   something that I would have to check on.  I do not

 8   know.

 9       Q.  Okay.  And if a -- if an ABBM was not received

10   before the deadline, did your office review it for any

11   other defects?

12       A.  If -- if the ABBM was received after the

13   deadline, if we reviewed it for any other defects?

14       Q.  Right.  So I can rephrase it.  If your office

15   received it after the deadline, would you look to see

16   if it had complied with the ID number requirement?

17       A.  No.

18       Q.  No.  So it's possible that some of these

19   received after the deadline could also have been out of

20   compliance with the ID number requirement.  It just

21   wouldn't be reflected here because you wouldn't have

22   evaluated that?

23       A.  Right.

24           MR. STEWART:  Okay.  All right.  Can we go

25   off the record for just two minutes?
```



1      A.   For election day, yes.

2      Q.   And -- and you had 30 for -- for early voting?

3      A.   Yes.

4      Q.   All right.  And how many poll workers did you

5  have on election day?

6      A.   Roughly around 800.

7      Q.   Now, I think you testified that a typical

8  polling place was staffed by an election judge, an

9  alternate judge, and a clerk?

10     A.   Yes.  Depending on how the polling location

11 works, for example, if it's one of those polling

12 locations that does have high voter turnout, then we

13 would add more election clerks to assist.

14     Q.   Yeah.  Because I'm -- I was a little confused

15 by the math, because if a typical polling place has

16 three election workers and there were 86 of them on

17 election day, I think that would be 258 individual

18 people working.  And I'm wondering how you get to the

19 800 workers on election day?

20     A.   Yes.  By law, we need to have -- in order to

21 open a polling location, there needs to be at least

22 three poll workers, one being the judge, one being the

23 alternate judge, and then one being the clerk.  So

24 that's being in compliance with law.

25                However, like I stated, we have -- we had



1    86 polling locations.  We do have several polling

2    locations that do experience high voter turnout,

3    especially on election day.  So that's why those

4    polling locations were staffed with more election

5    clerks to assist and to be able to administer the

6    election at the polling location.

7        Q.  How many poll workers did you have at the

8    largest of your polling places?

9        A.  20, 21.  And if, for example, the polling

10   location, like I stated, was -- was very busy and they

11   had long lines, I would deploy, you know, more election

12   workers to go and assist, more voting machines,

13   supplies, you know.  Sometimes even our own permanent

14   staff would go and assist.  And that's mainly how it

15   would work.

16       Q.  Did you have large numbers of employees --

17   well, I won't say large.  I'll withdraw that and ask it

18   differently.

19           Did you have employees working on election

20   day in other capacities other than at the polls?

21       A.  Most definitely.  Everybody was deployed.  You

22   know, I know you asked at the polls.  But, for example,

23   staff that was at the office to assist with receiving

24   any calls or -- or any -- you know, just to be there at

25   the office to run the office, I want to say, they were



```
1   unable to vote in person because of SB 1, the question
2   itself is not really a relevant question, right,
3   because SB 1 wouldn't prevent somebody from voting in
4   person?  Is that your testimony?
5       A.  Right.  That's -- I mean, no.
6       Q.  Huh?
7       A.  You're correct is what you're saying, yes.
8       Q.  Okay.  Okay.  So when a person -- let us say
9   that a person did have his or her application for
10  ballot by mail rejected because of the ID provisions of
11  SB 1.
12      A.  Okay.
13      Q.  When that same individual -- if that same
14  individual appears at a polling place with his Texas
15  driver's license, let's say, if that person is
16  registered to vote, they'll be able to vote, right?
17      A.  Correct.
18      Q.  And if that person's driver's license record --
19  driver's license number is missing from his voter
20  registration information, that won't prevent his being
21  able to vote?
22      A.  Correct, because he just needs to show his --
23  his ID, a photo ID is required when you vote in person.
24      Q.  When that person arrives to vote in person, if
25  his driver's license number is not part of his voter
```



```
 1   registration record, will that driver's license number
 2   be added to the registration record?
 3        A.  No, it will not.
 4        Q.  Okay.  Does your office have a group of
 5   election judges who work with you in every election?
 6        A.  Yes.  We do have a group of election judges
 7   that are -- that are seasoned election judges, and they
 8   assist us in various elections, in each and every
 9   election.
10        Q.  How many of them are there?
11        A.  I wouldn't be able to say the -- the amount,
12   but there is quite a few.  However, that amount has
13   gone down, considering that these election judges are
14   retired.  They are, you know, of age, and they're no
15   longer able to work the hours of 7:00 a.m. to 7:00 p.m.
16   of an election and then even through the weekend, so
17   they no longer assist us.  But we still have a good
18   group.
19        Q.  Have you had any election judges tell you that
20   they were not going to continue to work as election
21   judges because of the poll watcher provisions of SB 1?
22        A.  No, I had not -- I have not had any tell me
23   that.
24        Q.  Did you have any election judges tell you that
25   they wouldn't continue as election judges because they
```



```
 1              MS. HILTON:  Let's go off the record for a

 2    second.

 3                         EXAMINATION

 4    BY MS. HILTON:

 5        Q.  Good afternoon, Ms. Salinas.

 6        A.  Good afternoon.

 7        Q.  Earlier this afternoon, Ms. Perales asked you

 8    some questions about voter registration.  Do you recall

 9    those questions?

10        A.  Yes.

11        Q.  She asked you a series of questions about

12    voters over the age of 65 coming in person to update

13    voter registration.  Do you recall those questions?

14        A.  I think so, yes.

15        Q.  Isn't it true that voters can update their

16    voter registration information by mail?

17        A.  They can update their voter registration by --

18    they can -- they can mail their voter registration

19    application, and they can -- they can update it if they

20    wish to do so.

21        Q.  And is it also your understanding that voter

22    registration updates can also be made online?

23        A.  Online, no.

24        Q.  Not in Hidalgo County?

25        A.  Not in Hidalgo County.
```



1    the time.

2         Q.  And so if -- if one number -- withdrawn.

3    Withdrawn.

4              Does the TEAM database update the County's

5    records with respect to voter identification

6    information?

7         A.  What we do is, for example, if a voter comes

8    and applies or submits a voter registration

9    application, we enter it into our system.  It is then

10   uploaded into TEAM.

11             And the TEAM system is the one that

12   verifies and lets us know, yes, the voter registration

13   application was accepted, and then they become a

14   registered voter of Hidalgo County.

15        Q.  Okay.

16        A.  As per their process, I'm not sure what their

17   process is.

18        Q.  Okay.  So if for one reason or another the

19   voter's ID number was not hitting on the offline

20   database, then the County will look to the TEAMS

21   database, correct?

22        A.  They look -- they look at both systems.

23        Q.  Okay.

24        A.  Yes, they do.

25        Q.  Okay.  And so if the ID number is reflected in



Hilda Salinas                                                    April 20, 2023

```
 1 | TEAMS, then the ballot is accepted?
 2 |     A.  Correct.
 3 |     Q.  And that would also be true for ABBMs?
 4 |     A.  Correct.
 5 |     Q.  You testified both this morning and this
 6 | afternoon about four polling locations that had long
 7 | wait times on election day.  Do you recall that?
 8 |     A.  Yes.
 9 |     Q.  And that would have been four polling locations
10 | with long wait times out of a total of 86 polling
11 | locations on election day; is that right?
12 |     A.  Yes.  There was long lines pretty much at the
13 | close of the polls at quite a few of them, but those
14 | four are the ones one that were long.  And I -- I think
15 | at one point I was speaking to a judge, and they did
16 | state that there was more than 100 people waiting in
17 | line.
18 |     Q.  And is that -- is four polling locations with
19 | long wait times on election day, is that fairly typical
20 | in a general election?
21 |     A.  It is.
22 |     Q.  Okay.
23 |     A.  It is.  And there could be more in some other
24 | cases.  It just depends.  But those were the four that
25 | I remember.
```



 1     Q.  Okay.  And you testified earlier, I believe,

 2   that there is larger voter turnout in general on

 3   election day than early voting, correct?

 4     A.  Well, a lot of voters do prefer to vote on

 5   election day, and so we do see a higher voter turnout.

 6     Q.  Did any of those four locations that you

 7   testified about have any problems that would have led

 8   to long lines, for example, any sort of machine

 9   problems or delayed openings or something to that

10   effect?

11     A.  There was one polling location where the judge

12   and the alternate judge were elderly, so when it

13   comes -- when it came to working the machines or

14   walking, you know, back and forth, they did take time.

15   And we -- when I would send my staff to go and assist,

16   they would, you know, get the line going and what have

17   you and assist.

18            However, when they would leave, it would

19   kind of sort of, you know, back up a little bit.  So we

20   were experiencing situations like that.

21     Q.  Okay.  And you also testified about -- you were

22   asked what the demographic makeup was of those four

23   polling locations.  Do you recall that?

24     A.  Yes, I do.

25     Q.  And you indicated that it was predominantly



Hilda Salinas                                        April 20, 2023

```
 1         I, HILDA ANN SALINAS, have read the foregoing
     transcript and hereby affix my signature that same is
 2   true and correct, except as noted above.

 3

 4                   _____
                     HILDA ANN SALINAS
 5

 6   THE STATE OF TEXAS         )(
     COUNTY OF _____ )(
 7

 8
             Before me, _____,
 9   on this day personally appeared HILDA ANN SALINAS,
     known to me (or proved to me under oath or through
10   _____) (description of identity card or other
     document) to be the person whose name is subscribed to
11   the foregoing instrument and acknowledged to me that
     they executed the same for the purposes and
12   consideration therein expressed.

13           Given under my hand and seal of office
     this _____ day of _____, 2023.
14

15

16

17                   _____
                     Notary Public in and for
18                   The State of Texas

19

20

21

22

23

24

25
```



```
 1              IN THE UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3

 4   LA UNION DEL PUEBLO ENTERO,    )(
     et al.                         )(
 5           Plaintiffs             )(
                                    )(
 6   VS.                            )(   CASE NO.
                                    )(   5:21-cv-844-XR
 7                                  )(   (LEAD CASE)
     GREGORY W. ABBOTT, et al.      )(
 8           Defendants             )(
     _____
 9

10    OCA-GREATER HOUSTON, et al.   )(
             Plaintiffs             )(
11                                  )(   CASE NO.
     VS.                            )(   1:21-cv-780-XR
12                                  )(
     JANE NELSON, et al.            )(
13           Defendants             )(
     _____

14   HOUSTON AREA URBAN LEAGUE,     )(
     et al.                         )(
15           Plaintiffs             )(
                                    )(   CASE NO.
16   VS.                            )(   5:21-cv-848-XR
                                    )(
17   GREGORY WAYNE ABBOTT, et al.   )(
             Defendants             )(
18   _____

19   LULAC TEXAS, et al.            )(
             Plaintiffs             )(
20                                  )(
                                    )(   CASE NO.
21   VS.                            )(   1:21-cv-0786-XR
                                    )(
22   JANE NELSON, et al.            )(
             Defendants             )(
23   _____

24

25
```



```
 1   _____

 2   MIFAMILIA VOTA, et al.          )(
             Plaintiffs             )(
 3                                  )(   CASE NO.
     VS.                            )(   5:21-cv-0920-XR
 4                                  )(
     GREG ABBOTT, et al.            )(
 5           Defendants             )(

 6   _____

     UNITED STATES OF AMERICA       )(
 7           Plaintiff              )(
                                    )(   CASE NO.
 8   VS.                            )(   5a;21-cv-1085-XR
                                    )(
 9   THE STATE OF TEXAS, et al.     )(
             Defendants             )(

10
                     REPORTER'S CERTIFICATE
11
             I, DONNA McCOWN, Certified Court Reporter,
12   certify that the witness, HILDA ANN SALINAS, was duly
     sworn by me, and that the deposition transcript is a
13   true and correct record of the testimony given by the
     witness on APRIL 20, 2023, and that the deposition was
14   reported by me in stenograph and was subsequently
     transcribed under my supervision.

15
             Pursuant to Federal Rule 30(e)(2), a review of
16   the transcript was requested.

17           I FURTHER CERTIFY that I am not a relative,
     employee, attorney or counsel of any of the parties,
18   nor a relative or employee of such attorney or counsel,
     nor am I financially interested in the action.

19
             WITNESS MY HAND on this the _____ day of
20   _____, 2023.

21
                        _____
22                      Donna McCown
                        _____
23                      DONNA McCOWN, Texas CSR 6625
                        Expiration Date:  01-31-24
                        Bryant & Stingley, Inc., CRN No. 41
24                      2010 East Harrison
                        Harlingen, Texas  78550
25                      (956) 428-0755
```



# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNIÓN DEL PUEBLO ENTERO, *et al.*,<br>        *Plaintiffs*, | §<br>§<br>§ | |
| v. | §<br>§ | Case No. 5:21-cv-844-XR |
| GREGORY W. ABBOTT, *et al.*,<br>        *Defendants*. | §<br>§<br>§ | |

| | | |
|---|---|---|
| OCA-GREATER HOUSTON, *et al.*,<br>        *Plaintiffs*, | §<br>§<br>§ | |
| v. | §<br>§<br>§ | Case No. 1:21-cv-780-XR |
| JANE NELSON, *et al*,.<br>        *Defendants*. | §<br>§ | |

| | | |
|---|---|---|
| HOUSTON AREA URBAN LEAGUE, *et al.*,<br>        *Plaintiffs*, | §<br>§<br>§ | |
| v. | §<br>§<br>§ | Case No. 5:21-cv-848-XR |
| GREGORY WAYNE ABBOTT, *et al.*,<br>        *Defendants*. | §<br>§ | |

| | | |
|---|---|---|
| LULAC TEXAS, *et al.*,<br>        *Plaintiffs*, | §<br>§<br>§ | |
| v. | §<br>§<br>§ | Case No. 1:21-cv-0786-XR |
| JANE NELSON, *et al.*,<br>        *Defendants*. | §<br>§ | |

| | | |
|---|---|---|
| MI FAMILIA VOTA, *et al.*,<br>        *Plaintiffs*, | §<br>§<br>§ | |
| v. | §<br>§<br>§ | Case No. 5:21-cv-0920-XR |
| GREG ABBOTT, *et al.*,<br>        *Defendants*. | §<br>§ | |



Salinas
EXHIBIT NO. 1
4-20-23
Donna McCown

| | § |
|---|---|
| UNITED STATES OF AMERICA, | § |
| *Plaintiff,* | § |
| | § |
| v. | § |
| | § |
| THE STATE OF TEXAS, ET AL., | § |
| *Defendants* | § |

Case No. 5:21-cv-1085-XR

### STATE DEFENDANTS' AMENDED NOTICE OF INTENT TO TAKE ORAL AND VIDEOTAPED DEPOSITION OF THE OFFICE OF THE HIDALGO COUNTY ELECTION ADMINISTRATOR, PURSUANT TO RULE 30(b)(6)

To:    Defendant Hilda A. Salinas, by and through Defendant's attorney of record, Josephine Ramirez-Solis, Hidalgo County District Attorney's Office, 100 E. Cano, First Floor, Hidalgo County Courthouse Annex III, Edinburg, Texas 78539.

PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 30(b)(6), and the Second Amended Scheduling Order, issued on March 31, 2023, *see* ECF 579 at 1, State Defendants Gregory W. Abbott, W. Kenneth Paxton, and Jane Nelson (collectively, "State Defendants"), in their official capacities, will take the oral and videotaped deposition of the Office of the Hidalgo County Election Administrator for the General Election discovery period. The deposition shall commence on either Thursday, April 20, 2023, starting at 9:00 a.m. CDT. At the scheduled time, a representative for the Office of the Hidalgo County Election Administrator is directed to appear at the Office of Texas Attorney General, Child Support Division, Pharr Regional Office, 3508 N Jackson Rd., Suite 100, Pharr, Texas 78577.

In accordance with Federal Rule of Civil Procedure 30(b)(6), the Office of the Hidalgo County Election Administrator is directed to designate one or more officers, directors, managing agents, or other persons who consent to testify on its behalf concerning the matters for examination listed on Exhibit A to this Notice. The Office of the Hidalgo County Election Administrator shall identify the specific subject matters listed on Exhibit A on which each designated person will testify. The person(s) designated as deponent(s) shall be prepared to testify as to such matters

known or reasonably available to the Office of the Hidalgo County Election Administrator. This Notice serves to inform the Office of the Hidalgo County Election Administrator that it has a duty to make such designation.

The deposition will continue from day to day until completed. The deposition will be recorded stenographically by a court reporter and video recorded. The deposition, answers, and documents referenced during the deposition may be read and used in evidence at the trial of this cause in accordance with the Federal Rules of Civil Procedure.

Date: April 7, 2023

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN E. COWLES
Deputy Attorney General for Civil Litigation

Respectfully submitted.

CHRISTOPHER D. HILTON
Chief, General Litigation Division
Tex. State Bar No. 24087727

*/s/ Kathleen T. Hunker*
KATHLEEN T. HUNKER
Special Counsel
Tex. State Bar No. 24118415

J. AARON BARNES
Special Counsel
Tex. State Bar No. 24099014

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
christopher.hilton@oag.texas.gov
kathleen.hunker@oag.texas.gov
aaron.barnes@oag.texas.gov

**COUNSEL FOR STATE DEFENDANT**

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was served in compliance with the Federal Rules of Civil Procedure on all counsel of record via electronic mail on April 7, 2023.

*/s/ Kathleen T. Hunker*
KATHLEEN T. HUNKER

**EXHIBIT A TO NOTICE OF RULE 30(b)(6) DEPOSITION OF THE OFFICE OF THE HIDALGO COUNTY ELECTION ADMINISTRATOR**

## DEFINITIONS

1.    "Person" means the plural as well as the singular and includes: natural persons, corporations, firms, associations, partnerships, joint ventures, trusts, estates, or any other form of organization or legal entity; and governmental agencies, departments, units, or subdivisions thereof.

2.    "Plaintiff" or "Plaintiffs" means any of the named plaintiffs in the consolidated action *La Unión Del Pueblo Entero, et al. v. Gregory W. Abbott, et al.*, Civil Action No. 5:21-cv-00844-XR; In the United States District Court for the Western District of Texas, San Antonio Division.

3.    "You," "your," or "yours" means the Office of the Hidalgo County Election Administrator and/or all representatives of Office of the Hidalgo County Election Administrator acting or purporting to act on its behalf, including, but not limited to, employees, attorneys, consultants, agents, adjusters, investigators, or any other representatives.

4.    "State Defendants" means the State of Texas as well as Texas Governor Gregory W. Abbott, Attorney General W. Kenneth Paxton, and Secretary of State Jane Nelson, each in their official capacity, and where applicable, their representatives, employees, agents, and officers.

5.    "County Defendants" refers to Bexar County Election Administrator Jacquelyn Callanen, Bexar County District Attorney Joe D. Gonzales, Dallas County Election Administrator Michael Scarpello, Dallas County District Attorney John Creuzot, El Paso County Election Administrator Lisa Wise, El Paso County District Attorney Bill D. Hicks, Harris County Election Administrator Clifford D. Tatum, Harris County District Attorney Kim Ogg, Hidalgo County Interim Election Administrator Hilda A. Salinas, Hidalgo County District Attorney Toribio

"Terry" Palacios, Travis County Clerk Dyana Limon-Mercado, and Travis County District Attorney Jose Garza, as well as their offices, employees, representatives, and agents.

6.    "Lawsuit" or "suit" means the case styled *La Unión Del Pueblo Entero, et al. v. Gregory W. Abbott, et al.*, Civil Action No. 5:21-cv-00844-XR; In the United States District Court for the Western District of Texas, San Antonio Division.

7.    "Live-pleading" means the latest version of Plaintiff's complaint in this case, including any amendments or supplements thereto.

8.    "SB1" means Senate Bill No. 1, a law passed during the Second Special Session of the 87th Texas Legislature in 2021. SB1 contains the provisions at issue in this Lawsuit.

9.    The term "Challenged Provisions" means the provisions of SB1 for which Plaintiffs seek declaratory and injunctive relief.

10.    "Numerical identifying information" means numbers associated with a Texas driver license, a Texas election identification certificate, or a Texas personal identification card or an individual's complete or partial Social Security number.

11.    "Communication" means any disclosure, conveyance, transfer, or exchange of any information or documents from one person to another or among multiple persons by any means or in any form, including but not limited to oral, written, in-person, telephonic, electronic, digital, mailed, or otherwise.

12.    "Documentation" or "documents" includes, but is not limited to, the following items whether printed or recorded or reproduced by any other mechanical process or written or produced by hand: agreements, communications, reports, charges, complaints, correspondence, telegrams, memoranda, applications, summaries or records of telephone conversations, summaries or records of personal conversations or interviews, e-mails, diaries, schedules, charts, graphs,

worksheets, reports, notebooks, note charts, plans, drawings, sketches, maps, summaries or records of meetings or conferences, summaries or reports or records of investigations or negotiations, opinions or reports of consultants, bills, statements, invoices, and all other writings of whatever nature, photographs, motion picture film, brochures, pamphlets, advertisements, circulars, press releases, drafts, letters, tape recordings, disc, data sheet or data processing card, any marginal comments appearing on any document or thing or any other written, recorded, transcribed, filed or graphic master, however produced or reproduced, to which Plaintiff or agents, representatives or attorney will have or have had access.

13. "Statement" includes any written or graphic communication signed or otherwise adopted or proved by the person making it, and any stenographic, mechanical, electrical, or other record or transcription thereof which is a substantially verbatim recital of an oral communication by the person making it and contemporaneously recorded.

14. "Texas election official," as stated in this document, means any employee of a political subdivision of the State of Texas, in the employee's official capacity, who is responsible for conducting, operating, facilitating, implementing, or supervising the electoral process or enforcing any provision of the Texas Election Code. This term includes but is not limited to members of a county's Commissioners Court, County Judges, County Election Administrators, County Tax Assessor-Collectors, County Clerks, or the employees of any of the above-listed offices whose responsibilities relate to that office's capacity facilitating the electoral process, as well as members of Signature Verification Committees and Early Voting Ballot Boards.

15. "Relating to" or "Referring to" or "Pertaining to" or "Regarding" shall mean in any way concerning, constituting, analyzing, discussing, describing, considering, modifying,

amending, confirming, endorsing, evidencing, representing, supporting, substantiating, qualifying, negating or refuting, unless qualified by word of limitation.

16.    "Mail ballot rejection rate" means final rejection rate of timely received ballots by mail, expressed as a percentage of all timely received ballots by mail and rounded to two decimal places.

17.    "And/Or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed outside of its scope.

18.    The singular includes the plural and vice versa.

19.    The masculine gender includes the feminine and vice versa.

20.    All other terms are to be interpreted in accordance with their normal usage in the English language.

## **TOPICS FOR EXAMINATION**

1. Your interpretation, application, operation, and implementation of the Challenged Provisions during the November 8, 2022 General Election in Hidalgo County.

2. Any guidance, advisories, instructions, handbooks, or trainings you received from the Secretary of State's Office regarding the interpretation, application, operation, and implementation of the Challenged Provisions during the November 8, 2022, General Election.

3. Any guidance, advisories, instructions, handbooks, or trainings you conducted, produced, published, or distributed to staff, volunteers, election judges, clerks, poll workers, or Texas election officials regarding the interpretation, application, operation, and implementation of the Challenged Provisions during the November 8, 2022, General Election.

4. Your policies, practices, and procedures regarding mail-in voting during the November 8, 2022, General Election.

5. Your policies, practices, and procedures regarding military and overseas voting during the November 8, 2022, General Election.

6. Your policies, practices, and procedures regarding cure processes available to Texas voters who submitted their ballots by mail during the November 8, 2022, General Election.

7. Your efforts to inform voters, for November 8, 2022, General Election, about any changes made to your policies, practices, and procedures related to mail-in voting in response to SB1 and whether these efforts were successful. This includes but is not limited to the requirement that voters provide numerical identifying information on their application for ballot by mail and carrier envelope or signature sheet.

8. The following statistics related to mail-in voting during the November 8, 2022, General Election in Hidalgo County:

   a. The number of applications for ballot by mail that were received.
   b. The number of applications for ballot by mail that were accepted.
   c. The number of applications for ballot by mail that were rejected.
   d. The number of applications for ballot by mail that were rejected due to mismatched or missing numerical identifying information.
   e. The number of applications for ballot by mail that were rejected due to multiple defects, one of which was to mismatched or missing numerical identifying information.
   f. The number of applications for ballot by mail that were initially rejected due to mismatched or missing numerical identifying information but were ultimately cured.
   g. The number of individuals who successfully voted in person after having their applications for ballot by mail rejected.

h. The number of ballots by mail that were received.

i. The number of ballots by mail that were accepted.

j. The number of ballots by mail that were rejected.

k. The number of ballots by mail that were rejected due to mismatched or missing numerical identifying information.

l. The number of ballot by mail that were rejected due to multiple defects, one of which was to mismatched or missing numerical identifying information.

m. The number of ballots by mail that were initially rejected due to mismatched or missing numerical identifying information but were ultimately cured.

n. The total number of ballots by mail that were initially rejected but were ultimately cured.

o. The number of individuals that successfully voted in person after having their ballot by mail rejected.

p. The mail-ballot rejection rate.

9. How the mail-ballot rejection rate for the November 8, 2022, general election compares to each previous general election since 2012 and the methodologies you used to make the comparison.

10. Your experience using your county's database and the TEAMS database to verify or match the numerical identifying information provided by voters on their application for ballot by mail, carrier envelope, or signature sheet with the numerical identifying information in voters' registration files.

11. The conduct of poll watchers assigned to locations in Hidalgo County during the 2022 General Election.

12. Your policies, practices, and procedures regarding poll watchers during the November 8, 2022 General Election.

13. Any instance of violence, discrimination, harassment, intimidation, illegal, or inappropriate behavior from poll watchers, election judges, clerks, poll workers, or Texas election officials in Hidalgo County during the November 8, 2022, General Election.

14. Your recruitment, retention, and training of election judges, clerks, and other poll workers, as well as any member of a signature verification committee and early voting ballot board, for the November 8, 2022, General Election.

15. Your policies, practices, and procedures regarding voting assistance during the November 8, 2022 General Election.

16. Your policies, practices, and procedures for voters with disabilities to request changes, accommodations, or modifications to the voting procedures outlined in the Texas Election Code during the November 8, 2022, General Election.

17. Any request you received from voters with disabilities to change, accommodate, or modify voting procedures outlined in the Texas Election Code during the November 8, 2022, General Election and their resolution.

18. Any complaints, observations, and feedback you received from voters regarding their experience voting during November 8, 2022, General Election.

19. Any complaints, observations, and feedback you received from election judges, clerks, poll workers, or Texas election official regarding their experience working the November 8, 2022, General Election.

20. The number of in-person polling locations in your county during the November 8, 2022, General Election and the hours for which they were open.

21. Wait times at polling locations in your county during the November 8, 2022, General Election as well as any actions, initiatives, programs, or reforms taken by you to reduce wait times.

22. Any problems, concerns, difficulties, breakdowns, or delays you experienced during the November 8, 2022, General Election regarding Hidalgo County's voting machines or equipment, the supply of ballot paper, the setting up of polling locations, and the opening and closing of polling locations.

23. Any problems, concerns, difficulties, errors, or delays that occurred when printing ballots for the November 8, 2022, General Election. If any such problems, concerns, difficulties, errors, or delays occurred, the policies, practices, and procedures you followed to correct the ballots; send corrected ballots to voters; notify voters of the correction and the options available to them; accept or reject ballots received, track ballots; and record the information to your county's database and TEAMS database.

24. Any violations or alleged violations of the Texas Election Code and/or the Texas Criminal Code that occurred in connection with the November 8, 2022, General Election.

25. Communications between you and the United States Department of Justice, Department of Homeland Security, and Department of State regarding election administration, voting, and possible incidents of criminal activity conducted in connection with November 8, 2022, General Election.

26. Voter turnout in Hidalgo County during the November 8, 2022, General Election.

27. Discovery responses and documents produced by you in this litigation during the General Election discovery period.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al. | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No: 5:21-cv-844-XR |
| | § | |
| GREGORY ABBOTT, et al. | § | |
| Defendants | § | |

| | | |
|---|---|---|
| TEXAS STATE LULAC; | § | |
| VOTO LATINO | § | |
| Plaintiffs, | § | |
| v. | § | Case No: 1:21-cv-786-XR |
| | § | |
| JANE NELSON, in her official capacity | § | |
| as Texas Secretary of State, et al | § | |
| Defendants. | § | |

## DEFENDANT HILDA SALINAS's RESPONSES AND OBJECTIONS TO LULAC PLAINTIFFS' THIRD SET OF INTERROGATORIES

TO:   LULAC Plaintiffs, by and through their attorneys of record, Elena Rodriguez Armenta, Elias Law Group LLP, 250 Massachusetts Ave. NW, Ste. 400, Washington, D.C. 20001

Defendant Hilda Salinas, in her official capacity as Hidalgo County Elections Administrator, hereby serves her Responses to LULAC Plaintiffs' Third Set of Interrogatories.

Date: March 29, 2023

TORIBO "TERRY" PALACIOS
CRIMINAL DISTRICT ATTORNEY
HIDALGO COUNTY, TEXAS

*/s/ Josephine Ramirez-Solis*
Josephine Ramirez-Solis
Assistant District Attorney
Texas Bar No. 24007894


Salinas
EXHIBIT NO. 3
4-20-23
Donna McCown

josephine.ramirez@da.co.hidalgo.tx.us
Leigh Ann Tognetti
Assistant District Attorney
Texas Bar No. 24083975
leigh.tognetti@da.co.hidalgo.tx.us
100 E. Cano, First Floor
Hidalgo County Courthouse Annex III
Edinburg, Texas 78539
Tel: (956) 292-7609
Fax: (956) 318-2301
ATTORNEY FOR DEFENDANT
HILDA SALINAS

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2023, the attached Defendant Hilda Salinas's Responses to

LULAC Plaintiffs' Third Set of Interrogatories was served on all counsel via electronic mail.

*/s/ Josephine Ramirez-Solis*
Josephine Ramirez-Solis

**INTERROGATORY NO. 1.** Identify and describe all the government interests you purport to be advanced by each of the Challenged Provisions of SB 1. Include in your description how each of the Challenged Provisions serves each interest, including any evidence, and whether you contend each interest was in fact the basis for the enactment of each Challenged Provision.

RESPONSE: Defendant Salinas objects to this request as she is not the appropriate party to respond to inquiries on behalf of the State of Texas, nor can she speak to the motivations of the Texas Legislature in enacting any particular piece of legislation.

**INTERROGATORY NO. 2.** State and describe all instances of which you are aware, if any, of voter fraud in your county connected to:

(a) any person advocating "a specific candidate or measure" to a voter who is holding a sealed mail ballot;

(b) the use of "photocopied" signatures or signatures other than "ink on paper" on ABBMs.

RESPONSE: Defendant Salinas objects to this interrogatory as overly broad and unduly burdensome, as it is not reasonably limited in scope and time. Defendant Salinas objects to this interrogatory to the extent it seeks information beyond the November 2022 general election because, at the time these interrogatories were propounded, the scheduling order in this litigation limited discovery to matters related to the 2022 general election (Dkt. 437). Thus, these requests were outside the scope of the discovery. Without waiving this objection, as to the November 2022 general election, none

**INTERROGATORY NO. 3.** For the November 2022 general election, please provide the following data regarding ABBMs and mail ballots:

a. Number of ABBMs received by the county;

RESPONSE: 6,373

b. Number of ABBMs the county flagged for rejection because of an application defect of any kind;

RESPONSE: 221

c. Number of ABBMs that the county ultimately accepted after an applicant cured a recorded defect of any kind;

RESPONSE: 1

d. Number of ABBMs the county flagged for rejection because of an Omission Defect;

RESPONSE: 71

e. Number of ABBMs the county flagged for rejection because of a Mismatch Defect;

RESPONSE: 0

f. Number of ABBMs that the county ultimately accepted after an applicant cured either a Mismatch Defect or Omission Defect;

RESPONSE: 0

g. Number of carrier envelopes the county received and reviewed for defects of any kind;

RESPONSE: Defendant objects to this Interrogatory on the basis that the Hidalgo County Elections Department does not review and accept or reject carrier envelopes. This function is performed by the Early Voting Ballot Board, which is not an entity subject to the County's control. Subject to and without waiving the forgoing; 5,044

h. Number of carrier envelopes the county flagged for rejection because of a defect of any

kind;

RESPONSE: Defendant objects to this Interrogatory on the basis that the Hidalgo County Elections Department does not review and accept or reject carrier envelopes. This function is performed by the Early Voting Ballot Board, which is not an entity subject to the County's control. Subject to and without waiving the forgoing; 244

i. Number of mail ballots that the county ultimately accepted and counted after a voter

cured a carrier envelope defect of any kind;

RESPONSE: Defendant objects to this Interrogatory on the basis that the Hidalgo County Elections Department does not review and accept or reject carrier envelopes. This function is performed by the Early Voting Ballot Board, which is not an entity subject to the County's control. Subject to and without waiving the forgoing; 146

j. Number of carrier envelopes the county flagged for rejection because of an Omission

Defect;

RESPONSE: Defendant objects to this Interrogatory on the basis that the Hidalgo County Elections Department does not review and accept or reject carrier envelopes. This function is performed by the Early Voting Ballot Board, which is not an entity subject to the County's control. Subject to and without waiving the forgoing; 74

k. Number of carrier envelopes the county flagged for rejection because of a Mismatch

Defect;

RESPONSE: Defendant objects to this Interrogatory on the basis that the Hidalgo County Elections Department does not review and accept or reject carrier envelopes. This function is performed by the Early Voting Ballot Board, which is not an entity subject to the County's control. Subject to and without waiving the forgoing; 0

l. Number of ballots that the county ultimately accepted and counted after a voter cured

either a Mismatch Defect or an Omission Defect.

RESPONSE: Defendant objects to this Interrogatory on the basis that the Hidalgo County Elections Department does not review and accept or reject carrier envelopes. This function is performed by the Early Voting Ballot Board, which is not an entity subject to the County's control. Subject to and without waiving the forgoing; 65

Date: 03/21/23
Time: 12:33 pm

**HIDALGO COUNTY**
**ABSENTEE REJECTION LETTER LIST**
**MAIL DATES: 08/01/2022 TO** █████

| | | | | | |
|---|---|---|---|---|---|
| ABBM | IM | 10/14/2022 | 10/24/2022 07 AM | 1122 |
| ABBM | IM | 10/25/2022 | 10/31/2022 11 AM | 1122 |
| ABBM | IM | 09/28/2022 | 09/30/2022 09 AM | 1122 |
| ABBM | IM | 10/31/2022 | 11/02/2022 02 PM | 1122 |
| ABBM | IM | 09/28/2022 | 09/30/2022 09 AM | 1122 |
| ABBM | IM | 10/14/2022 | 10/24/2022 07 AM | 1122 |
| ABBM | IM | 10/28/2022 | 10/31/2022 11 AM | 1122 |
| ABBM | IM | 09/28/2022 | 09/30/2022 09 AM | 1122 |
| ABBM | IM | 10/28/2022 | 10/31/2022 11 AM | 1122 |
| ABBM | ISI | 10/14/2022 | 10/24/2022 07 AM | 1122 |
| ABBM | ISI | 10/26/2022 | 10/31/2022 11 AM | 1122 |
| ABBM | ISI | 09/28/2022 | 09/30/2022 09 AM | 1122 |
| ABBM | ISI | 10/20/2022 | 10/24/2022 07 AM | 1122 |
| ABBM | ISM | 10/06/2022 | 10/24/2022 07 AM | 1122 |
| ABBM | ISM | 10/18/2022 | 10/24/2022 07 AM | 1122 |
| ABBM | ISM | 10/14/2022 | 10/24/2022 07 AM | 1122 |
| ABBM | ISM | 10/25/2022 | 10/31/2022 11 AM | 1122 |
| ABBM | ISM | 10/25/2022 | 10/31/2022 11 AM | 1122 |
| ABBM | ISM | 10/19/2022 | 10/24/2022 07 AM | 1122 |
| ABBM | ISM | 10/20/2022 | 10/24/2022 07 AM | 1122 |
| ABBM | ISM | 10/24/2022 | 10/31/2022 11 AM | 1122 |
| ABBM | ISM | 10/24/2022 | 10/31/2022 11 AM | 1122 |
| ABBM | ISM | 10/14/2022 | 10/24/2022 07 AM | 1122 |
| ABBM | ISM | 10/06/2022 | 10/24/2022 07 AM | 1122 |
| ABBM | ISM | 10/06/2022 | 10/24/2022 07 AM | 1122 |
| ABBM | ISM | 10/18/2022 | 10/24/2022 07 AM | 1122 |
| ABBM | ISM | 10/14/2022 | 10/24/2022 07 AM | 1122 |
| ABBM | ISM | 10/24/2022 | 10/24/2022 07 AM | 1122 |
| ABBM | ISM | 10/07/2022 | 10/24/2022 07 AM | 1122 |

**HIDALGO COUNTY**
**ABSENTEE REJECTION LETTER LIST**
MAIL DATES: 08/01/2022 TO 12/31/2022
SORTED BY NOTICE_CODE, NOTICE_SUBCODE, IDNUMBER

a_rejlist (v.150928)
Page:   2

| Idnumber | Name | Mailing Address | Notice Code | Subcode | Create Date | Mail Date Batc | Election |
|----------|------|-----------------|-------------|---------|-------------|----------------|----------|
| | | | ABBM | ISM | 09/28/2022 | 09/30/2022 09 AM | 1122 |
| | | | ABBM | ISM | 10/14/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/14/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/06/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/20/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/24/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/20/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/18/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/18/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/24/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/18/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/18/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/24/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/14/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/14/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/20/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/21/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/21/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/14/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/19/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/19/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/14/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/24/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | ISM | 10/07/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/20/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/20/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/19/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/27/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | ISM | 10/06/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/18/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/19/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/07/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/28/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | ISM | 10/20/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/27/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | ISM | 10/26/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | ISM | 10/14/2022 | 10/24/2022 07 AM | 1122 |

RFP34_000155

| | | | | |
|---|---|---|---|---|
| Date: 03/21/23 | HIDALGO COUNTY | | a_rejlist (v.150928) | |
| Time: 12:33 pm | ABSENTEE REJECTION LETTER LIST | | Page: 3 | |
| SHOW ALL NOTICE CODES | MAIL DATES: 08/01/2022 TO 12/31/2022 | | | |
| ELECTION CODE: 1122 | SORTED BY NOTICE_CODE, NOTICE_SUBCODE, IDNUMBER | | | |

| Idnumber | Name | Mailing Address | Notice Code | Subcode | Create Date | Mail Date Batc | Election |
|---|---|---|---|---|---|---|---|
| | | | ABBM | ISM | 10/24/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/18/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/19/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/18/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/14/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/06/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/25/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | ISM | 10/24/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/07/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/26/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | ISM | 10/06/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/06/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/20/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/24/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/20/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 10/18/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | ISM | 09/28/2022 | 09/30/2022 09 AM | 1122 |
| | | | ABBM | ISM | 10/19/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | NS | 10/19/2022 | 10/24/2022 07 AM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | 57 | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | 211 | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | 4 | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | 6 | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |

Date: 03/21/23
Time: 12:33 pm
SHOW ALL NOTICE CODES
ELECTION CODE: 1122

HIDALGO COUNTY
ABSENTEE REJECTION LETTER LIST
MAIL DATES: 08/01/2022 TO 12/31/2022
SORTED BY NOTICE_CODE, NOTICE_SUBCODE, IDNUMBER

a_rejlist (v.150928)
Page:    4

| Idnumber | Name | Mailing Address | Notice Code | Subcode | Create Date | Mail Date Batc | Election |
|---|---|---|---|---|---|---|---|
| | | | ABBM | TL | 10/31/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |

REP34-000157

Date: 03/21/23
Time: 12:33 pm
SHOW ALL NOTICE CODES
ELECTION CODE: 1122

a_rejlist (v.150928)
Page:   5

# HIDALGO COUNTY
## ABSENTEE REJECTION LETTER LIST
### MAIL DATES: 08/01/2022 TO 12/31/2022
### SORTED BY NOTICE_CODE, NOTICE_SUBCODE, IDNUMBER

| Idnumber | Name | Mailing Address | Notice Code | Subcode | Create Date | Mail Date Batc | Election |
|---|---|---|---|---|---|---|---|
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | 2 | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | 1 | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | 9 | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | 96 | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |

Case 5:21-cv-00844-XR   Document 692-4   Filed 07/29/23   Page 135 of 137

Date: 03/21/23
Time: 12:33 pm
SHOW ALL NOTICE CODES
ELECTION CODE: 1122

**HIDALGO COUNTY**
**ABSENTEE REJECTION LETTER LIST**
MAIL DATES: 08/01/2022 TO 12/31/2022
SORTED BY NOTICE_CODE, NOTICE_SUBCODE, IDNUMBER

a_rejlist (v.150928)
Page:   6

| Idnumber | Name | Mailing Address | Notice Code | Subcode | Create Date | Mail Date Batc | Election |
|----------|------|-----------------|-------------|---------|-------------|----------------|----------|
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/29/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 10/31/2022 | 10/31/2022 11 AM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/02/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TL | 11/01/2022 | 11/02/2022 02 PM | 1122 |
| | | | ABBM | TLAN | 11/01/2022 | 11/02/2022 02 PM | 1122 |

RFP34-000169

Date: 03/21/23
Time: 12:33 pm
SHOW ALL NOTICE CODES
ELECTION CODE: 1122

**HIDALGO COUNTY**
**ABSENTEE REJECTION LETTER LIST**
MAIL DATES: 08/01/2022 TO 12/31/2022
SORTED BY NOTICE_CODE, NOTICE_SUBCODE, IDNUMBER

a_rejlist (v.150928)
Page:    7

Total voters printed: 221
Total pages printed: 7

| | Notice Code | Description |
|---|---|---|
| | ABBM-AG | Not 65 Years of Age or Older 6-2 |
| | ABBM-IC | Received for In-County Address 6-2 |
| | ABBM-IE | Indeterminate Election 6-2 |
| | ABBM-IFI | FINAL - Incorrect SSN/TDL # 6-3 |
| | ABBM-IFM | FINAL - Missing SSN/TDL # 6-3 |
| (16) | ABBM-IM | Invalid Mailing Address 6-2 |
| (4) | ABBM-ISI | Incorrect SSN/TDL # 6-3 |
| (71) | ABBM-ISM | Missing SSN/TDL # 6-3 |
| | ABBM-JAIL | Invalid Jail/Relative Address 6-2 |
| | ABBM-MA | No Address of Registration 6-2 |
| | ABBM-MR | No By Mail Reason 6-2 |
| | ABBM-ND | Not Properly Delivered 6-2 |
| | ABBM-NDA | Missing Disability Affirmation 6-2 |
| | ABBM-NP | No Primary Party Choice 6-2 |
| | ABBM-NPAN | No Primary Party Choice 6-2 but ANNUAL OK |
| | ABBM-NS | No Signature 6-2 |
| | ABBM-NT | No TDL.SSN in VR Record 6-4 |
| | ABBM-OK | Ballot Tracker Correction Received |
| | ABBM-TE | Received 60 Days Before Election Day 6-2 |
| (128) | ABBM-TL | Not Received Before Deadline 6-2 |
| (1) | ABBM-TLAN | Not Received Before Deadline 6-2 but ANNUAL OK |
| | ABBM-TLRO | Not Received Before Deadline 6-2 but RUNOFF OK |
| | ABBM-VR | Voter is Not Registered 6-2 |
| | ABBM-WA | No Printed Name or Address of Witness 6-2 |
| | ABBM-WM | Didn't Indicate Mark 6-2 |
| | ABBM-WR | No Witness Relationship 6-2 |
| | DEFABBM-60TH | Rejected BBM before 60th day |
| | DEFABBM-65YR | Rejected BBM not 65 years of age by Election Day |
| | DEFABBM-ADDR | Rejected BBM no residence address |
| | DEFABBM-CNTY | Rejected BBM address not outside cnty |
| | DEFABBM-DVRY | Rejected BBM not properly delivered |
| | DEFABBM-ELEC | Rejected BBM not determine election |
| | DEFABBM-FAX | Rejected BBM original not received in four business days |

RFP34_000160

## Affidavit

My name is ████████████████████████████████████████████████████.

My phone number is ████████. I am a U.S. citizen and resident of Hidalgo County in the State of Texas and so state that I am over the age of 18 and not otherwise disqualified from testifying the following:

I was a poll watcher on the General Special Election on November 3rd, 2020 at Palm View Community Center located at 3401 Jordan Rd. McAllen, TX 78501.

I observed the following election workers assigned to my location:

████████████████████████████████████████████████████

████  ████  ████████

I did witness the following during the election between the hours 12:00 PM TO 5:03 PM:

12:29 PM – Cancelled mail-in ballot; recipient claims she did not receive it. She voted.

1:19 PM – Gentleman without a current address. Several addresses showed up with his name. He was given a change of address form to mail. He voted. His first time to vote.

1:45 PM – Woman has voters registration card but does not show up on the system. Election judge filled out a green form for her. She was allowed to vote – provisional vote(r).

2:30 PM - 2 young adults. They assured Judge they did not register to vote. Judge had them fill voter registration there. Judge kept both registrations.

2:48 PM – Young adult assured clerk she had not received voter registration card; she was also not on the system. Clerk sent her with the judge. Young lady told Judge she had registered on-line. Judge replied that county does not offer online registration. It was confirmed by the election office that she was not registered. She filled out a registration. While the Judge was attending to curb side, Suarez was offering to her a provisional ballot. I told Suarez she was confirmed not registered. The young lady left.

3:09 PM – A young adult from Dallas; registered to vote in Dallas. He was not found on list here. He was provided a provisional ballot to vote.

3:30PM - We were informed that the election was extended till 8PM. Current count - 504 Several voters voted that had to fill out a change of address form.

4:43 PM – Father helped his disabled son select for whom to vote.

5:03 PM – Mail-In ballot cancelled; lady voted.

Per Anita Zavala, they were at PalmView Community Center until 11pm; and votes casted after 8pm were taken as provisional votes.



Salinas
EXHIBIT NO. 6
4-20-23
Donna McCown