# Exhibit B

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LA UNION DEL PUEBLO ENTERO, et al., Plaintiffs, v. GREGORY W. ABBOTT, et al., Defendants. | § | Case No. 5:21-cv-844-XR |
| OCA-GREATER HOUSTON, et al., Plaintiffs, v. JANE NELSON, et. al., Defendants, | § | Case No. 1:21-cv-780-XR |
| HOUSTON JUSTICE, et al., Plaintiffs, v. GREGORY WAYNE ABBOTT, et al., Defendants, | § | Case No. 5:21-cv-848-XR |
| LULAC Texas, et al., Plaintiffs, v. JANE NELSON, et al., Defendants, | § | Case No. 1:21-cv-0786-XR |



MI FAMILIA VOTA, et al., §
Plaintiffs, §
§
v. § Case No. 5:21-cv-0920-XR
§
GREG ABBOTT, et al., §
Defendants. §

ORAL AND VIDEOTAPED DEPOSITION OF
LAUREN SMITH
MARCH 21, 2023

ORAL AND VIDEOTAPED DEPOSITION OF LAUREN SMITH, produced as a witness at the instance of the Defendants and duly sworn, was taken in the above styled and numbered cause on Tuesday, March 21, 2023, from 9:33 a.m. to 12:07 p.m., before DONNA QUALLS, Notary Public in and for the State of Texas, reported by computerized stenotype machine, at the offices of Harris County Attorney's Office, 1019 Congress Street, 15th Floor, Houston, Texas, pursuant to the Federal Rules of Civil Procedure, and any provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE HARRIS COUNTY ELECTIONS ADMINISTRATOR:
SAMEER S. BIRRING
TIFFANY BINGHAM
OFFICE OF THE HARRIS COUNTY ATTORNEY CHRISTIAN D. MENEFEE
1019 Congress, 15th Floor
Houston, Texas 77002
(713) 274-5142
sameer.birring@harriscountytx.gov

FOR THE HOUSTON AREA URBAN LEAGUE (HAUL) PLAINTIFFS:
JENNIFER A. HOLMES
NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
700 14th Street N.W., Suite 600
Washington, District of Columbia 20005
(347) 573-0197
jholmes@naacpldf.org

FOR THE UNITED STATES:
DANA PAIKOWSKY
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, District of Columbia 20530
(202) 353-5225
dana.paikowsky@usdoj.gov

FOR THE STATE DEFENDANTS:
KATHLEEN T. HUNKER
OFFICE OF THE ATTORNEY GENERAL
P.O. BOX 12548 (MC-009)
AUSTIN, TEXAS 78711-2548
(512) 463-2100
kathleen.hunker@oag.texas.gov

Also Present:
STEPHEN KENNY (Via Zoom)
BRADLEY PROWANT (Via Zoom)
BREANNA WILLIAMS, NAACP (Via Zoom)
CARRIE LEBEL (Via Zoom)
GERMAINE HABELL (Via Zoom)
JOHN GORE, GOP (Via Zoom)
JOHN SULLIVAN BAKER, DOJ (Via Zoom)

LEIGH TOGNETTI (Via Zoom)
LISA CUBRIEL, BEXAR COUNTY (Via Zoom)
LUCIA ROMANO (Via Zoom)
MIKE STEWART, DOJ (Via Zoom)
URUJ SHEIKH, LDF (Via Zoom)
ZACHARY DOLLING, TCRP, OCA (Via Zoom)
REGGIE WRIGHT, THE VIDEOGRAPHER

INDEX

| | PAGE |
|---|---|
| Appearances................................. | 3 |
| LAUREN SMITH | |
| Examination by Ms. Hunker..................... | 6 |
| Examination by Ms. Holmes...................... | 62 |
| Further Examination by Ms. Hunker............. | 80 |
| Corrections & Signature....................... | 88 |
| Reporter's Certificate........................ | 90 |

EXHIBIT INDEX

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Deposition notice | 10 |
| Exhibit 2 | Notice to voters with disabilities | 14 |
| Exhibit 3 | Complaint form | 19 |
| Exhibit 4 | Postelection report from the Elections Administrator's Office for the November 2022 election | 23 |
| Exhibit 5 | November 8, 2022 general and special elections early voting schedule | 30 |
| Exhibit 6 | KHOU 11 article | 50 |
| Exhibit 7 | KHOU 11 article | 53 |
| Exhibit 8 | Information of person that provided transportation to seven or more voters | 75 |
| Exhibit 9 | Information of person that provided transportation to seven or more voters for curbside voting | 75 |
| Exhibit 10 | Harris County election manual | 82 |



THE VIDEOGRAPHER: On record at -- March 21st, 2023, at 9:33 a.m. Case No. 5:21-CV-844-XR.
THE REPORTER: We're here in the matter of La Union Del Pueblo Entero, et al., versus Gregory W. Abbott, et al., and consolidated --
MS. HUNKER: Consolidated cases.
THE REPORTER: Consolidated cases.
LAUREN SMITH,
having been duly sworn, testified as follows:
THE REPORTER: Okay. And then can I have all attorneys state their appearance for the record.
MS. HUNKER: Kathleen Hunker with the State defendants.
MS. HOLMES: I'm Jennifer Holmes for the HAUL plaintiffs. That's H-A-U-L.
MS. PAIKOWSKY: I'm Dana Paikowsky for the United States.
MS. BINGHAM: Tiffany Bingham for Harris County. Sorry. Election Administrator.
MR. BIRRING: Sameer Birring also here for the Harris County Elections Administrator.
THE REPORTER: You can begin.
EXAMINATION
BY MS. HUNKER:
Q. Good morning.

A. Good morning.
MR. BIRRING: Before we begin, can we read a -- into the record an agreement that counsel for all parties made regarding the scope of today's deposition just to make sure it's in the record.
Today's 30(b)(6) deposition, we've agreed will be exclusively dedicated to discovery of new information that became available after the close of the primary election discovery period that relates to the November 2022 general election. Questions regarding operational issues such as ballot paper supply or equipment malfunction are permitted only to the extent such questions are about wait times at polling locations during the November 2022 election unless they're otherwise relevant to the allegations or defenses in these cases.
And we all -- counsel for all parties understand that questions about operational issues that go beyond the issue of wait times may lead to involvement of criminal defense counsel which we may need to object and instruct not to answer.
So hopefully that does not happen, but I wanted to make sure that's in the record.
MS. HUNKER: Thank you.
Q. (BY MS. HUNKER) My name is Kathleen Hunker.

I'm an attorney with the office of attorney general representing the State defendants in this matter.
Can you please state your name and spell it for the record.
A. Lauren Smith. L-A-U-R-E-N S-M-I-T-H.
Q. I'm going to start with some instructions as well as some introductory questions.
A. Okay.
Q. After that's done, I'll move on to the main subject of the deposition. Okay?
A. Uh-huh.
Q. Have you ever been deposed before?
A. Yes.
Q. How many times?
A. Once.
Q. And do you remember what that action was about?
A. My son's personal injury case.
Q. And so you've never been deposed in your capacity as an employee with the Harris County Elections Administrator; is that correct?
A. Huh-uh.
Q. And you understand that you're under oath, correct?
A. I do.
Q. For the court reporter, you're going to need to

provide verbal answers like "yes" or "no" rather than nodding or shaking your head. This is going to have extra importance here today because we have many attorneys who are not here in the room but rather on Zoom, and they may not be able to see you in the same way we can in this room.
Does that make sense?
A. Yes.
Q. It also helps the court reporter if you and I don't speak over one another. I'm going to do my best to wait for you to finish your answer before I ask my next question. Will you do your best to wait for me to finish my question before you start your answer?
A. I will.
Q. If you don't understand a question, will you please let me know?
A. I will.
Q. And if you do answer the question, I'm going to assume that you understood the question; is that fair?
A. Yes.
Q. If you need a break at any time, please just let me know. My only request is that you answer any pending question before we take a break.
A. Understood.
Q. Is that okay?



A. Uh-huh.
Q. Also, if you hear an objection from counsel, that is typically for the Court to decide at a later date. I, therefore, ask that you go ahead and answer the question unless you were instructed otherwise by your counsel.
You understand?
A. I do.
Q. Now, I'm obliged to ask the following questions:
Have you consumed any alcohol today?
A. No.
Q. Have you consumed any drugs today?
A. No.
Q. Are you aware of anything that would affect your ability to testify truthfully and accurately today?
A. No.
Q. And you haven't brought any documents with you today, correct?
A. No.
Q. Now I'm going to introduce our first exhibit.
(Exhibit No. 1 was marked.)
Q. (BY MS. HUNKER) Ms. Smith, do you have the document in front of you?
A. I do.

Q. And I want you to turn the page over.
A. (Witness complies.)
Q. Have you seen this document before?
A. Have I -- no -- I don't know. Have I? I've seen a lot of documents.
Q. Okay. That's fair enough.
Can you look at the title where it says "State's Defendants' Amended Notice of Intent to Take Oral and Videotaped Deposition of the Office of the Harris County Elections Administrator, Pursuant to Rule 30(b)(6)"?
A. Yes, I've seen this.
Q. And did I read that correctly?
A. Yes.
Q. And if we turn the page a couple of times, you're going to get to where it says "Topics for Examination."
A. Okay.
Q. Do you understand that you are here pursuant to this notice?
A. Yes.
Q. And do you understand that the Office of Harris County Elections Administrator has designated you to provide testimony on its behalf on certain topics?
A. Yes.

Q. And do you understand that your answers here today are binding on the organization?
A. Yes.
Q. Now, an e-mail I received from your counsel last night said that you were going to be testifying on Topics 16, 17, 20, 22 in part, 25, and 26. For the topics that you are designated, I understand that sometimes it's more of a spectrum than as opposed to discrete categories. So if anytime the questions veer into territory that you think are best left to another designee, please just let me know.
A. Okay.
Q. How did you prepare for today's deposition?
A. With numerous deposition preps- -- with my -- our counsel.
Q. Okay. And did you meet with anybody else besides counsel?
A. No, ma'am.
Q. And how many times did you meet with counsel, if you recall?
A. Three.
Q. And do you know roughly how long those prep sessions would have lasted?
A. Roughly an hour each.
Q. Did you review any documents in preparation for today's deposition?

A. Other than our internal documents that we submitted to y'all, no.
Q. Okay. Did you review Senate Bill 1 for today's deposition?
A. Yes.
Q. When was the last time you familiarized yourself with the provisions of SB1?
A. I mean, I reference it often, so over the last, you know, two and a half years, several times.
Q. And did you review any election advisories prior to this deposition?
A. No, ma'am.
Q. When was the last time you would've reviewed some of the advice -- the advisories issued by the secretary of state's office regarding Senate Bill 1?
A. I can't recall.
Q. Did you review any of the written discovery that Harris County produced in this case?
A. Yes.
Q. Are you prepared to testify on the topics for which you've been designated?
A. Yes.
Q. So let's start with Topic 16. It reads "Your policies, practices, and procedures for voters with



Page 14

disabilities to request changes, accommodations, or modifications to the voting procedures outlined in the Texas Election Code during the November 8, 2022, General Election."
Did I read that correctly?
A. Yes, ma'am.
Q. Has Harris County implemented any new policies with respect to voters with disabilities in the -- since end of May 2022?
A. New policies, no.
Q. Has Harris County introduced any new procedures for voters with disabilities and how Harris County treats voters with disabilities since May of 2022?
A. No.
Q. I'm going to introduce our second exhibit.
(Exhibit No. 2 was marked.)
Q. (BY MS. HUNKER) Do you have the exhibit in front of you?
A. I do.
Q. Do you recognize this exhibit?
A. I do.
Q. And what is the exhibit?
A. It's the notice to voters with disabilities.
Q. And what is the purpose of this document?
A. It's a form required by the secretary of state

Page 15

for us to post in all active voting centers as well. And it lists our -- the ADA requirements and how a voter with disabilities can distribute a -- or complete and distribute a disability complaint form to our office should they have one.
Q. And this is the notice that was issued by your particular office; is that correct?
A. Yes. We produced this.
Q. So turning to the first paragraph, it reads: "The Americans with Disabilities Act requires that Harris County voting program be accessible to individuals with disabilities. Harris County Elections Department has a grievance procedure providing for prompt and equitable resolution of complaints alleging actions prohibited by the ADA."
Did I read that correctly?
A. Yes.
Q. Then if we move to the next paragraph, it begins with "If you or a person with a disability has encountered obstacles to voting or has been discriminated against in violation of the ADA, you can file a complaint using the Disability Complaint Form."
Did I read that correctly?
A. Yes.
Q. Does Harris County work to ensure that its

Page 16

voting program is accessible to voters with disabilities?
A. Yes.
Q. And can you maybe give me a short summary of steps that Harris County took to ensure that the 2022 general election was accessible to voters with disabilities?
A. It's quite broad. We -- on the have top level we have our accessibility department that maintains our vote centers in terms of insuring that their architectural barriers are rectified, should we find any. We have a subject mattic -- matter expert and a team of surveyors that survey each of our vote centers that we intend to use for the upcoming election, whatever election that might be, with a very extensive checklist. And again, architectural barriers being kind of top level there as well as connectivity, internal room sizes, et cetera.
And once those surveys are reviewed for subject matter experts, then we -- in order to -- if -- if the vote center is found noncompliant as it pertains to the American -- Americans with Disabilities Act, then we make a plan for each of those vote centers with temporary remediations whether they be ramps, cones, doorstops, plates, et cetera, alternate entrance and

Page 17

exits. And that is again -- is -- is reviewed and approved.
And so those remediations are planned for each of those vote centers. Additionally, our machines that we have, our Duo-Gos for curbside voting for our voters with disabilities, are implemented on -- during early voting and Election Day. And then our, you know, we have our interpreter iPads. We have our interpreter requests. So there's -- there's a myriad of things that we're able to implement for voters with disabilities.
Q. Would you agree me that Harris County takes its responsibilities under the ADA seriously?
A. Yes.
Q. And would you agree with me that Harris County has been successful in ensuring that its voting program is accessible to voters with disabilities?
A. I do.
Q. Did any voter submit a disability complaint form for the November 2022 general election?
A. Yes.
Q. And generally, what were the substance of these complaints?
A. There was three, and they were provided in our -- the spreadsheet with our complaint forms. Unfortunately, I don't know them off the top of my head,

but there were three, I believe within that document.
MS. HUNKER: And, Counsel, just for clarification, do you know when that document was produced?
MR. BIRRING: I don't think we have produced that one.
MS. BINGHAM: No, that's the -- that's the call log.
MR. BIRRING: No, no. This is a separate one. This is the ADA complaint form.
MS. BINGHAM: Oh.
MR. BIRRING: It's a spreadsheet, and I think there were three. I think I have it. I might have it. Should we go off the record?
MS. HUNKER: Yeah, can we go off the record?
MR. BIRRING: Yeah, let's go off the record for a second.
THE VIDEOGRAPHER: We are going off the record at 9:47 a.m.
(Recess from 9:47 a.m. to 9:56 a.m.)
THE VIDEOGRAPHER: We are back on the record at 9:56 a.m.
Q. (BY MS. HUNKER) So, Ms. Smith, during the break, your counsel provided me a electronic copy of the

complaint form you had just mentioned. I believe he also showed you a copy as well; is that correct?
A. Yes.
Q. And we are going to be waiting for the printout to be submitted as an exhibit. But to save time, you and I are going to discuss the electronic version which will be identical.
Is that understood?
A. That's correct, yes.
Q. And this will be Exhibit 3.
(Exhibit No. 3 was marked.)
Q. (BY MS. HUNKER) And so you had said you received three complaints through the disability complaint form for the November 2022 general election; is that right?
A. That's correct.
Q. And so I'm just going to quickly talk about the description of the complaints. It seems one of the complaints involved a judge asking the voter to leave the service dog with her while he voted; is that correct?
A. That's correct.
Q. And then the second involved an issue regarding the court control with voting room setup, and that was later addressed by a tech; is that correct?

A. That's correct.
Q. And the third one had to do with a father assisting his son to vote; is that correct?
A. That's correct.
Q. To your knowledge, did any of these complaints address the requirements through SB1?
A. The one where the father was helping his son, that would pertain to our oath of assistance or the oath of assistance.
Q. And do you recall what the controversy in that case was?
A. Not to the specifics. But the judge had confusion on what an assistant -- what the definition of an assistant was as it relates to the SOS form or the form -- the updated form, I should say.
Q. Okay. And it says here that the election judge was advised that the son is eligible to vote because he is registered and was also advised to allow the father to assist; is that correct?
A. Correct. The judge has the opportunity to call in to our ADA line to receive information as -- as it regards to -- to any ADA policies.
Q. And so in this case, are you aware if the father was in fact able to assist the son?
A. Yes, he was.

Q. And just to -- let me know if I'm misstating what you had said. But it sounded as if the dispute was over what it meant for voter assistance?
A. Correct. The definition of a voter assistant, yes.
Q. And so outside of the, I guess, submission regarding voting assistance, did any of the other complaints address requirements or provisions of SB1?
A. No.
Q. And so you received no complaints, disability complaint forms, regarding mail-in ballot requirements; is that correct?
A. Mail-in ballot -- I'm not designated to talk about mail-in ballots.
Q. I'm simply asking if you received any complaint forms that were -- with respect to voters with disabilities having a problem or concern regarding mail-in ballots?
A. I'm sorry. No, I didn't -- we did not receive a complaint form regarding mail-in ballot -- ballots from voters with disabilities.
Q. Thank you.
A. Sorry.
Q. And you're aware that voters with disabilities have the option of requesting an accommodation or change



to the normal voting procedure, correct?
A. Yes.
Q. Generally, do you know if there were any accommodations requested during the 2022 general election?
A. Specifically, we -- no. But we -- our -- well, that's not true. We have our requests for our interpreters, the SIS interpreters. But largely specifically, no, I don't -- not any specific requests.
Q. To your knowledge, did your office receive any request for accommodation regarding any of the provisions in SB1?
A. No.
Q. To your knowledge, did your office receive any requests for accommodation regarding the requirement that mail-in voters put their social security number or ID number on their application for ballot by mail?
A. No.
Q. To your knowledge, did your office receive any request for accommodation regarding the requirement that mail-in voters put their social security number or ID number on their ballot by mail?
A. No.
Q. Thank you. I'm going to introduce our fourth exhibit.

(Exhibit No. 4 was marked.)
Q. (BY MS. HUNKER) And as a heads up, we're going to be going back to this particular exhibit a couple of times.
THE WITNESS: Thank you.
A. Okay.
Q. (BY MS. HUNKER) Do you have the exhibit in front of you?
A. I do.
Q. Do you recognize this exhibit?
A. I do.
Q. What is it?
A. This is the public postelec- -- the postelection report from the Elections Administration -- Elections Administrator's Office for the November 2022 election.
Q. Okay. And so, the opening sentence of this report reads: "The Post Election Report includes an overview of the Election Administrator's Office planning and execution of the November 8th, 2022, General Election including Early Voting and Election Day operations, media and community outreach activities. Election Day operations, election night tabulation, and a post-election day analysis from election judges, election workers, and senior EAO staff."

Did I read that sentence correctly?
A. Yes.
Q. To your understanding, is that a fair description of the report?
A. Yes.
Q. To your knowledge, has Harris County ever before issued a postelection report of this nature for previous elections?
A. Yes.
Q. Are these also available publicly?
A. I would assume. I don't know.
Q. And did you have any role in crafting this particular postelection report?
A. Yes.
Q. And what was your role?
A. As it pertains to vote centers, polling locations, counts, anything -- our election night operations, Election Day operations, probably some of the planning and execution.
Q. So I'm going to read the next two para- -- two more paragraphs and ask a couple of questions. If you do not know the answer to these questions, just please let me know.
A. Okay.
Q. So I want to turn to the second paragraph. It

reads: "The EAO normally submits an election survey to all judges and clerks seeking feedback on the election process and potential training and curriculum topics for future elections. However, in the interest of confirming and better understanding certain events and problems reported in the media on Election Day and after, including paper ballot issues and opening and closing problems, the EAO recruitment staff expedited its post-election assessment."
Did I read that correctly?
A. Yes.
Q. And EAO in this report means Elections Administrator's Office, correct?
A. Correct.
Q. Turning to the next paragraph, the second sentence reads: Through an expedited evaluation process, the EAO has created this preliminary report of successes and challenges for review and implementation for the next election cycle. Standard practice would require the EAO to take approximately 90 to 120 days to compile a final report of this magnitude; however, given the level of stakeholder interest and inquiry, the EAO believed it important to provide its preliminary observations as quickly as possible without jeopardizing the integrity of the data and the process."



Did I read that correctly?
A. Yes.
Q. And so the Harris County Elections Administrator's Office prepared this report on an expedited basis; is that correct?
A. Yes.
Q. Do you know how expedited?
A. November 8th election and this was provided shortly before Christmas, so.
Q. And so about a month and a half. Is that fair to say?
A. Yes.
Q. Continuing with the paragraph, it reads: "As we know in the election profession, speed does not always equate to accuracy. The EAO will update this report as more information is gained from its continued effort to improve the processes."
Did I read that correctly?
A. Yes.
Q. To your knowledge, has the Harris County Election Administrator's Office updated its postelection report for the November 2022 election?
A. Not to my knowledge.
Q. To your knowledge, is the Harris County Election Administrator's Office currently working on

updating its postelection report for the November 2022 general election?
A. Yes.
Q. To your knowledge, when does the Harris County Elections Administrator's Office expect to publish and update to its postelection report for the November 2022 general election?
A. I don't have that information.
Q. To your knowledge, is the information contained in the report accurate?
A. Yes.
Q. And so we've already discussed Topics 16 and 17. I want to talk about Topic 20 now, which is the number of in-person polling locations in your county for the November 8th, 2022, general election and the hours for which they were open.
Can you please turn the page of the election report. And you'll see the first section, "Election Data Highlights," correct?
A. Yes.
Q. And this, in turn, is divided into seven numbered subsections across pages 2 and 3, correct?
A. Correct.
Q. I want to briefly look at Subsection 7 on page 3. It reads: "EV and ED Vote Center locations for

November 8th General Election. Final approval by the Commissioners Court occurred on October 11th."
Did I read that correctly?
A. Yes.
Q. And below that sentence, it has a breakdown saying "EV Locations 99 and ED Locations 782."
Did I read that correctly?
A. Yes.
Q. I take this to mean that Harris County had 99 early voting locations.
Is that an accurate assumption?
A. Yes.
Q. I also take it to mean that Harris County had 782 Election Day voting locations.
Is that an accurate assumption?
A. That's correct.
Q. And just for clarification, as we continue with this report, what does EV -- what is a vote center?
A. Vote center is a polling location.
Q. And so is it fair to say that vote center is sometimes used interchangeably with polling location?
A. Yes.
Q. When was the decision made to have 782 Election Day voting locations?
A. I would say August, August 2022.

Q. And when was the decision made to have 99 early voting locations?
A. Close to September, the month of September. I don't have an exact date.
Q. Is it fair to say that the decisions on the number of early voting locations would have occurred months before the November --
A. Yes.
Q. -- election?
Is it fair to say that the decision to have 782 Election Day locations would have occurred months before --
A. Yes.
Q. -- Election Day?
The number of early voting locations in November 2022 -- do you know if that's more or less than Harris County had in the last midterm election?
A. More.
Q. Do you know by roughly how much?
A. I believe nine.
Q. And is that reference to Election Day locations or early voting locations?
A. That's for early voting locations.
Q. And the number of -- actually, strike that.
Going to introduce our fifth exhibit.



(Exhibit No. 5 was marked.)
Q. (BY MS. HUNKER) And my apologies for piling you with paper.
A. That's okay.
Q. Do you have Exhibit 5 in front of you?
A. I do.
Q. Do you recognize this exhibit?
A. I do.
Q. What is it?
A. It's our November 8th, 2022, general and special election early voting schedule.
Q. And so is this the document that you would have released to notify residents and voters of the locations and hours of early voting locations?
A. Yes.
Q. And so all 99 locations are listed here, correct?
A. Correct.
Q. And then it has also the hours of operation for the polling locations through the course of the early voting period, correct?
A. Correct.
Q. And I see it is in four languages; is that right?
A. Yes.

Q. And I believe that would Spanish, Chinese, and Vietnamese?
A. Correct.
Q. In addition to English?
A. Uh-huh.
Q. Looking at the hours that voting locations were open during the early voting period in November 2022, do you know if they were open for more hours in 2022 as compared to the last midterm election in 2018?
A. In 2018?
Q. Yeah, last midterm election.
MS. HOLMES: Objection to form.
MR. BIRRING: Objection to form.
A. I have no idea what that, means.
Q. (BY MS. HUNKER) Okay.
A. I was not here in 2018. I don't -- I can't answer that question.
Q. And so, if we look at the early voting hours of operation, it says Monday through Saturday, October 24th-29th. Hours were open 7:00 a.m. to 7:00 p.m., correct?
A. Correct.
Q. And then on Sunday, October 30th, the hours were open from 12:00 p.m. to 7:00 p.m.; is that right?
A. Yes.

Q. And then on the following week, Monday through Wednesday, October 31st through November 2nd, the hours of operation are open 7:00 a.m. to 7:00 p.m.; is that right?
A. Correct.
Q. And then on Thursday, November 3rd, 7:00 a.m. to 7:00 p.m.; is that right?
A. Yes.
Q. And then Friday, November 4th, from 7:00 a.m. to 7:00 p.m.; is that correct?
A. Correct.
Q. And when was the decision made for the hours of operation that the early voting locations would be open, if you know?
A. I don't know.
Q. And we can put that document aside. Actually, I'm sorry. There was one other question I had to ask you about that.
A. Uh-huh.
Q. So it looks like, throughout early voting, there was no day that had less than seven hours where the polls were open. Is that fair to say?
A. Less than seven, that's correct.
Q. Before we continue, I'm going to address a few questions that I probably should have asked at the

beginning.
Can you just tell me your title?
A. Director of operations.
Q. And what are your responsibilities in that position?
A. I manage the -- our supplies department, our vote center department, our accessibility department, and all operations and logistics as related to election night drop-off and return.
Q. And how long have you worked in this position?
A. As director of operations, since April of 2022.
Q. And did you work for the Elections Office prior to that date?
A. I did. I worked under the interim county clerk, Chris Hollins, beginning August 2020.
Q. And is that when you started with the elections department in Harris County?
A. Yes.
Q. Did you have any experience with elections prior to your time with the Harris County Elections Office?
A. No.
Q. And when -- let's turn to -- back to the report. We're going to go to page 8. Do you see where it says loc- -- loc- -- where it says "facilities"?



A. I do.
Q. And so the beginning reads: "The EAO strives to ensure that every EVC and VC used in the county meets the following criteria: accessible, adequate space for voting equipment and election workers on Election Day, adequate parking, proper electrical capabilities, availability for election workers to set up on Monday before Election Day, available on Election Day from 6:00 a.m. to at least 10:00 p.m., availability for equipment to remain securely on-site until pickup."
Did I read that correctly?
A. Yes.
Q. Is that an accurate description of the criteria each voting site must meet in Harris County?
A. Yes.
Q. Moving down to where it says "Location Selection." The third sentence of the first paragraph reads: "When a facility is unavailable, EAO staff relocates VC to another facility only after an ADA assessment is conducted to ensure the new location is compliant and can support the election activities."
Did I read that sentence correctly?
A. Yes.
Q. And so EVC and VC means early voting center and voting center respectively; is that right?

A. Correct.
Q. And then the next paragraph states: "The overall selection process involves the following." The paragraph then lists ten steps of the selection process; is that right?
A. Yes.
Q. Is that an accurate list of the steps Harris County takes when selecting polling locations?
A. Yes.
Q. To your knowledge, is this list complete?
A. Yes.
Q. And so location will not be selected as a voting center if the location is not ADA compliant, correct?
A. To the best of our ability.
Q. And Harris County works to ensure that its residents have easy access to voting locations during election, correct?
A. Correct.
Q. And Harris County works to ensure that its residents have voting locations in close proximity to where they live and work?
A. Yes.
Q. And would you consider Harris County's efforts at proving voters easy access to in-person voting

locations successful?
MS. HOLMES: Objection to form.
A. Yes.
Q. (BY MS. HUNKER) Would you agree that Harris County provides its residents with ample opportunities to vote in person?
MS. HOLMES: Objection to form.
A. Yes.
Q. (BY MS. HUNKER) And so when you're selecting a location, do you work with stakeholders?
A. Yes.
Q. And who are the stakeholders?
A. Commissioners Court staff and representatives of each party.
Q. And do you also take input from community -- from the community?
A. To an extent.
Q. To what extent?
A. Consideration.
Q. And it says here on No. 9: "After review by stakeholders and considering all stakeholder feedback, locations list was submitted to Department of Justice for review and submitted to Commissioners Court for approval."
Did I read that correctly?

A. Yes.
Q. And so if the locations in the November 2022 general election, did -- were the location list submitted to the Department of Justice?
A. Yes.
Q. And did you receive any feedback from the Department of Justice?
A. Various feedback would have included, you know, could we have found an -- if a approved location was noncompliant, nonremediable, could we have found an alternate location that perhaps was compliant but then provided a list of reasons if that instance came about why we couldn't find an alternate location. It's our practice to find an alternation location no matter what should the facility be noncompliant.
Q. And do you take into account the Department of Justice's feedback when making the final decision on your locations for voting centers?
A. To the best of our ability, yes.
Q. And let's just turn to page 7. Now, I believe you were also designated for 22, Topic 22, which is any problems, concerns, difficulties, breakdown, or delays you experienced during the November 2022 general election and that you were designated in part. And so, if at any point when we're having this conversation you



realize that my questions are veering into the other designee's topic area, please just let me know.
A. I will.
MR. BIRRING: Kathleen, I can tell you that the other designee, Rachelle, is designated for the opening and closing of polling locations.
MS. HUNKER: Okay.
MR. BIRRING: Part of that Topic 22.
MS. HUNKER: Thank you for that clarification.
Q. (BY MS. HUNKER) And so do you see on page 7 where it says "Elections Preparations"?
A. I do.
Q. And then you'll see the second paragraph. It reads: "The EAO deployed the following equipment to both the EVCs and VCs."
Do you see that?
A. I do.
Q. And did I read that correctly?
A. Yes.
Q. The report then lists a set of equipment, specifically the Hart InterCivic Controller, which is used to create a ballot access code that allows the voter to start the voting sessions; the Duo Ballot Marketing Device, which displays the election contest

and questions on a touch screen; the Duo-Go, which is a mobile apparatus that allows election workers the ability to take a Duo to a curbside voter, thus allowing a voter to cast a ballot from their automobile; a Scan, which is a ballot tabulation device that images each ballot and collects the votes cast on each ballot; and a ContentActive ePollbook that allows election workers to check in a voter at the voting site.
Did I identify the equipment listed in the postelection report correctly?
A. Yes.
Q. Are the devices identified on page 7 of the postelection report a complete and accurate list of the types of equipment each polling site would have received?
A. Yes.
Q. And I want to quickly jump to the appendix for Attachments 1 and 2. You will see it after page 25.
Do you have it in front of you?
A. I do.
Q. I just want to make sure I understand these attachments correctly. The list on page 7 identifies the types of equipment deployed to Harris County voting locations. Attachments 1 and 2 identify how many of each device were allocated to each location; is that

correct?
A. Yes.
Q. And looking at "Election Day Allocation," so Attachment 2, it would appear that every location received two Controllers, one ED Scan, and one Duo-Go; is that correct?
A. That's correct.
Q. The number of Duos, in contrast, appears to vary among the early voting locations; is that right?
A. Yes.
Q. In the event an ED Scan or Duo-Go failed on Election Day, would Harris County provide the voting location with a replacement?
A. If it is not something they could not fix on-site, yes, they would get a replacement.
Q. And so I assume, then, that Harris County has extra ED Scans and Duo-Gos on standby in case replacement is needed?
A. We have a -- we have a repository of extras, yes.
Q. Do you know how many Duo-Gos Harris County has?
A. I don't.
Q. Do you know roughly how many you had in the repository on Election Day as a backup?
A. I would be guessing.

Q. Okay.
A. I will -- I would like to say that we had enough to satisfy all the replacements needed on Election Day.
Q. And what does initial ballot paper packets mean?
MS. BINGHAM: So I'm just going to object because I don't want you to get into operational issues that touch on the agreement. So I think it's probably fine to go over what's stated in the report; so you may be okay. But I just want to be careful that you're not going to start asking questions that -- about ballot paper allocation that maybe isn't already included in this report.
MS. HUNKER: Okay. For the moment, my only two questions are just going to be what initial ballot paper packets means and adjusted ballot paper packet means.
MS. BINGHAM: Okay.
Q. (BY MS. HUNKER) So what does the initial ballot paper packet mean?
A. The baseline of -- the baseline allocation for ballot paper for each listed Election Day location.
Q. Okay. And adjusted ballot paper packets -- what does that mean?

A. As it pertains to projected voter turnout.
Q. To your knowledge, Attachments 1 and 2 contain accurate information; is that right?
A. Yes.
Q. Did Harris County have any significant problems with wait times at the polling locations during the 2022 general election early voting period?
A. Not to --
MR. BIRRING: Objection to form.
MS. HOLMES: Objection to form.
MR. BIRRING: You can answer.
A. Not to my knowledge.
Q. (BY MS. HUNKER) And I see on page 17 -- if we can go to that. It says there's a "Wait Time Reporter."
Do you see what I'm referring to?
A. Yes.
Q. Is it correct that Harris County offered an app on their website that provided voters with wait times for each early voting center?
A. Yes.
Q. For the most part, did the wait time report -- reporter work as intended during the 2022 general election's early voting period?
A. As it intended, yes.
Q. And so the last paragraph of page 17 reads:

"EVCs experienced common problems associated with staffing, technical support, equipment operations, and wait time updates."
Did I read that correctly?
A. Yes.
Q. And this is with respect to early voting, correct?
A. Yes.
Q. What is the "controller not found" issue?
A. It's a connection issue.
Q. And so how does that affect the controller's operations?
A. I -- I'm not at liberty -- I can't speak on the technical piece of the machines.
Q. Do you know if it would have allowed -- and so you don't know what it refers to with respect to the machine being able to operate?
A. I -- I can't speak on to -- to the extent of its failure if it has an operational issue. I -- I'm -- I do not deal with the technical part of the machines in testing the machines or the -- the -- the on-site technician's, you know, ability to troubleshoot on-site.
Q. Okay. So the "controller not found" issue, do you know if that would have made the controller inoperable while that problem was being addressed?

A. Yes. If -- if the controller was not found then, you know, I -- obviously then the machines, you know, created a -- a lapse. And so then they would have to be troubleshooted, whether that would be over the phone or a tech on-site.
Q. And so would that prevent, I guess, election workers from being able to check in voters?
A. Would the controller not found prevent -- well, their check-in voters is on ePollbook. But to -- to -- for the voter to carry their vote through, yes, that would be a prevention of that once -- until the machine was -- the issue was fixed.
Q. And can that slow the processing of voters through the polling site?
A. For an on-site technical issue, yes.
Q. And so the next page reads: "EVCs also experienced paper ballot jams when the voter was feeding the blank paper into the Duo. On certain occasions, a voter's ballot would jam at the Duo and would have to be spoiled and reprinted. On certain occasions, the ballot would not scan into the scan."
Did I read that correctly?
A. Yes.
Q. Harris County had a two-page ballot, correct?
A. Correct.

Q. And so for each voter, there were two opportunities for the ballot to jam or fail to scan; is that right?
A. Correct.
Q. And jams and failures to scan can slow the processing of voters through the election site, correct?
A. Correct.
Q. Overall, would you consider Harris County's in-person early voting program a success?
A. Yes.
Q. And so you were not doing delayed openings, correct? That's another designee?
MS. BINGHAM: Yes.
Q. (BY MS. HUNKER) And so I want to look at Election Day. Can you turn to page 20, please. Actually, before we do, let's turn to page 19. My apologies.
So it says here that there's an election help desk; is that right?
A. Yes.
Q. Okay. And it says: "The EAO operates a 50-person help desk call center to receive calls from election workers regarding any manner of support. The help desk contacts tech rovers and area representatives when an issue could not be resolved over the phone. The



help desk included members of the election worker training team, temporary election workers, technical experts, and other EAO staff."
Did I read that correctly?
A. Yes.
Q. And then if we turn the page on page 20. It says: "The EAO help desk received over 1,600 logged calls for VC support related to staffing, equipment support, procedural questions, supplies, and paper ballots."
Did I read that correctly?
A. Yes.
Q. Are you aware if election workers called the help desk but were unable to get through?
A. Am I aware of any -- I am aware of long hold times, yes.
Q. Okay. And so is it plausible that there were calls made that were not received by the help desk because of the delay?
MS. HOLMES: Objection to form.
A. I can't verify that.
Q. (BY MS. HUNKER) Okay. Did you talk to any of the election workers about their experience calling the help desk?
A. No.

Q. And so if we go to the next paragraph, it says: "Of the 1,600 calls, 368 calls, 23 percent, related to ePollbooks, the Duos, Duo-Gos, Controllers, and Scans.
Did I read that correctly?
A. Yes.
Q. It then says: "128 calls, 8 percent, related to supplies and ballot paper; and, 143, 9 percent, related to election worker procedural questions."
Did I read that correctly?
A. Yes.
Q. And then if we go where it says No. 3, "Election Day Challenges."
Do you have that in front of you?
A. I do.
Q. It reads: "The common problems reported and encountered on Election Day included VCs not opening on time, technical problems associated with the Controller not found, Duo paper jams, ePollbook wait times, paper ballot supply at several locations, and staffing."
Did I read that correctly?
A. Correct.
Q. Okay. And so the "controller not found" issue persisted on Election Day; is that right?
A. Yes.
Q. And do you know the extent that that issue was

throughout the polling locations?
A. I don't.
Q. And then it says in number -- letter C, "ePollbook wait time updates."
Do you see that?
A. I do.
Q. "During the early part of Election Day, the ePollbook AWS server lost replication which prevented the wait time tool from updating the website, prevented the supply team from seeing real-time check-in, and disabled the sample ballot lookup feature."
Did I read that correctly?
A. Yes.
Q. It continues: "This had a direct impact on the ability to see how many voters were being checked in and what the wait times were at any VC. The vendor was able to reestablish replication, which brought the wait time tool and sample ballot back online and allowed supply to reengage communications at the VCs."
Did I read that correctly?
A. Yes.
Q. And so when we were talking about the app for wait times, is that what this is addressing?
A. Yes.
Q. And so it sounds as if that app for wait times

was down for a portion of Election Day; is that right?
A. Yes.
Q. Do you know how long it was down?
A. I want to say two hours.
Q. And did you have any complaints regarding wait times on Election Day?
A. I did not receive any complaints regarding wait times, no.
Q. Are you aware of any significant wait times at the different polling locations in Harris County on Election Day?
MR. BIRRING: Objection to form.
A. I'm not.
Q. (BY MS. HUNKER) And so we're going to look at letter B, "Ballot Paper Supply." It says "The EAO received reports that several VCs needed ballot paper delivery during" that -- "during the day. An initial media report indicated that at least 20 VCs ran out of paper."
Did I read that correctly?
A. Yes.
Q. And if we jump to page 21, it says: "The EAOs call logs reflect that the help desk received calls from 46 VCs, 5.9 percent, requesting additional paper on Election Day. This does not indicate that the VCs ran



out of paper and had turned voters away as a result, only that they required additional paper at some point on Election Day."
Did I read that correctly?
A. Correct.
Q. And if you jump to -- not the next page but the page -- sorry -- not the next page but the next paragraph after that. It reads: "Our investigation has not yet revealed how many of these VCs had to turn voters away due to a paper shortage. Media reports claim that a total of 24 VCs, 3.1 percent, ran out of paper and had to turn voters away."
Did I read that correctly?
A. Yes.
Q. Has your office investigated how many voting centers ran out of paper since this report came out?
A. I don't know.
Q. Are you aware of how many voting centers would have ran out of paper on Election Day?
A. I'm not aware of any voting centers running out of paper on Election Day.
Q. Going to hand over our next exhibit.
(Exhibit No. 6 was marked.)
MS. HOLMES: Kathleen, do you have one more?

THE WITNESS: Thank you.
MS. HUNKER: Sorry.
MS. HOLMES: That's okay.
Q. (BY MS. HUNKER) Do you have that exhibit in front of you?
A. I do.
Q. And so the title of this document reads: "KHOU 11 Analysis: Election ballot paper shortage bigger than estimated."
Did I read that correctly?
A. Uh-huh, yes.
Q. Have you seen this article before?
A. I have.
Q. You have; is that correct?
A. Yes.
Q. And so if look at subtitle, it says: "KHOU 11 Investigates discovered that 121 voting centers did not initially receive enough ballot paper to cover voter turnout."
Did I read that correctly?
A. You did, yes.
Q. And if we turn to the next page, it states something similar: "KHOU 11 Investigates compared ballot paper packets allocated to the number of votes cast and discovered that 121 voting centers did not

initially receive enough ballot paper to cover voter turnout."
Did I read that correctly?
A. Yes.
Q. "The county allocated each of the" six -- "each of the locations six ballot paper packets or enough for 600 ballots."
Did I read that correctly?
A. Yes.
Q. "But the total votes cast exceeded that amount, sometimes by hundreds of ballots. For example, 946 Election Day ballots were cast at the Bellaire Civic Center, 990 at the Warner Elementary School, and 1,037 at the Salyards Middle School."
Did I read that correctly?
A. Yes.
Q. Has the Elections Office sought to corroborate the information that was reported by KHOU 11?
A. Can you explain the question?
MS. BINGHAM: Object to form.
Q. (BY MS. HUNKER) Sure. So you have here a news article stating that 121 voting centers did not initially receive enough ballot paper, correct?
A. Uh-huh.
MS. BINGHAM: Object to form.

Q. (BY MS. HUNKER) Has your office done any research to see whether or not that report -- reporting was accurate?
A. Yes.
Q. And what was your determination?
A. I can't speak on the determination. That's a -- invest- -- or the report is done by Rachelle. She can speak further on that.
Q. Okay. Then we can put this aside for now. I'm going to hand over our next exhibit.
THE WITNESS: Thank you.
MS. HUNKER: And my apologies. I think I'm one short on this one as well.
(Exhibit No. 7 was marked.)
MS. HOLMES: Is this 7?
THE WITNESS: Yes.
MS. HUNKER: I believe so.
Q. (BY MS. HUNKER) Do you have the document in front of you?
A. I do.
Q. And so this a news article with the title "Harris County Elections Administrator can't answer why polling locations ran out of paper"; is that correct?
A. Yes.
Q. And you -- let's just turn the page. You see



at the top of page 3 where it says "Election Judge Terry Wheeler"?
A. Yes.
Q. This reads: "Election Judge Terry Wheeler had to do the same in nearby Cypress at Salyards Middle School. He said there were 150 people in line when paper ballots ran out at about 2:00 p.m., and extra ballots didn't arrive for another two hours."
Did I read that correctly?
A. Yes.
Q. And so this news article states that there were 150 people in line when ballot paper ran out at the Salyards Middle School voting location, correct?
A. Yes.
Q. Are you aware of any locations that turned voters aside or sent them to other polling locations because of ballot paper?
A. I'm not.
Q. You can put that aside.
And so you don't have an estimate of how many voters would have left a line or voted at another polling location -- is that correct? -- because of ballot issues -- ballot paper issues?
MS. HOLMES: Objection to form.
MR. BIRRING: Objection to form.

A. No, I don't.
Q. (BY MS. HUNKER) So you were also designated to speak on Topics 25 and 26, and so we're going to address those. 25 is communications between you and the United States Department of Justice, Department of Homeland Security, and Department of State regarding election administrating, voting, and possible incidents of criminal activity conducted in connection with the November 8th, 2022, general election.
MS. PAIKOWSKY: Kathleen, I'd like to just raise that, any of the communications concerning ongoing investigations, we, you know, reserve the right to raise investigatory privileges we have throughout this case.
MS. HUNKER: Of course. And Texas has been, I think, pretty good over the course of this case in identifying when we thought investigative privilege would be relevant for the United States.
MS. HOLMES: I agree. I agree. I just wanted to -- to put it on the record.
Q. (BY MS. HUNKER) Has the Department of Justice contacted you about any violation of federal law in connection with the 2022 general election?
A. No.
Q. Has the Department of Homeland Security contacted you about a violation of federal law in

connection with the 2022 general election?
A. No.
Q. Has the Department of State contacted you about a violation of federal law in connection with the November 2022 general election?
A. No.
Q. Has the Department of Justice contacted you regarding any type of illegal voting activity that would have occurred in the November 2022 general election?
A. No.
Q. Has the Department of Homeland Security contacted you regarding any illegal -- fraud or illegal voting activity in connection with the November 2022 general election?
A. No.
Q. And has the Department of State contacted you regarding any incident of fraud or illegal voting activity in connection with the November 2022 general election?
A. No.
Q. Have you contacted the Department of Justice regarding a potential violation of federal law in connection with the November 2022 general election?
A. No.
Q. Have you contacted the Department of Homeland

Security regarding a potential violation of federal law in connection with the November 2022 general election?
A. No.
Q. Have you contacted the Department of State regarding a potential violation of federal law in connection with the November 2022 general election?
A. No.
Q. And have you contacted the Department of Justice, Department of Homeland Security, or Department or State regarding any potential fraud or illegal voting activity?
A. No.
Q. And so the next sec- -- the next topic is 26, your interactions with communications with poll monitors deployed by the Department of Justice during the November 8th, 2022, general election. You're aware the Department of Justice sent poll monitors to voting locations in Harris County?
A. I am.
Q. Are you aware of any communications made between DOJ poll monitors and election workers that addressed any observations made by the poll monitors?
A. I'm not.
Q. At any time on Election Day, did the poll monitors deployed by the Department of Justice



communicate with your office about their observations at Harris County polling sites?
A. I don't know.
Q. Did the Department -- did the poll monitors deployed by the Department of Justice communicate their observations at any time after the election?
A. I don't know.
Q. Did anyone at the Department of Justice communicate to your office about the observations made by the Department of Justice poll monitors when they were deployed at Harris County polling location?
A. I don't know. I wouldn't receive any of that information.
Q. Do you know who in your office would have?
A. Mr. Tatum for certain. I would assume a few other but Mr. Tatum for certain.
Q. And so is it fair to say that -- in preparation for today's deposition, what did you do in preparation for this particular topic?
A. Reviewed with our counsel in terms of what my knowledge is for -- for poll mon- -- poll monitors deployed by the Department of Justice.
Q. And so is it fair to say that you received no -- that you're aware of no complaints from the Department of Justice or their monitors about how the

2022 general election was conducted in Harris County?
A. That's fair.
Q. And so you're aware of no complaints from the Department of Justice alleging that their monitors witnessed intimidation, discrimination, harassment, or misconduct from Harris County election workers?
A. I'm sorry. Repeat that question.
Q. So you're not aware of any complaints from the Department of Justice alleging that their monitors witnessed intimidation, discrimination, harassment, or misconduct from Harris County election workers?
A. I'm not aware, no.
Q. And you're not aware of any complaints from the Department of Justice alleging that their monitors witnessed intimidation, discrimination, harassment, or misconduct from poll watchers assigned to Harris County's polling locations; is that correct?
A. I'm not aware. Correct.
Q. And you're not aware of any complaints in the Department of Justice alleging that voters could not obtain assistance when casting their ballot; is that correct?
A. That's correct.
Q. Would you be the individual who would know about curbside voting?

A. Yes.
Q. And can you just briefly describe what is curbside voting?
A. Curbside voting allows voters with dis- -- well, it is in- -- intended for voters with disabilities to be able to vote from their vehicles with our Duo-Go machines that are transportable to the vehicle outside of the vote center.
Q. And that is available for any voter who is unable to enter the polling place; is that correct --
A. Correct.
Q. -- for reason of disability or illness?
A. Correct.
Q. And is there a curbside loc- -- was there a curbside location at each of the polling location in Harris County during early voting?
A. Yes.
Q. And was there a curbside location at each of the polling locations on Election Day?
A. Yes.
Q. Are you aware of any person who transported seven or more individuals to a polling location and was required to fill out a form pursuant to Section 64.009 of the Election Code?
A. No.

Q. And so your office did not send any affidavits to the secretary of state pursuant to that section of the Election Code --
A. No.
Q. -- is that right?
A. No.
Q. And you're not aware of any individual who refused to transport seven or more individuals to a polling location because the requirement that the individual fill out a form stipulated in Section 64.009 of the Election Code?
MS. HOLMES: Objection to form.
A. No.
Q. (BY MS. HUNKER) And you're not aware of any voter who was unable to find transportation to the polls because the requirement that a person who transports seven or more people to a polling location fill out a form stipulated in Section 64.009?
MS. HOLMES: Objection to form.
A. No.
Q. (BY MS. HUNKER) And I'm sorry. I didn't hear. You're are not aware?
A. No, I'm not aware.
MR. BIRRING: You want to take a break?
MS. HUNKER: I was actually about to say



I'm about to pass the witness. I'm going to -- I think we are done for at least my part. I might have questions after my cocounsel.
THE WITNESS: Okay.
MS. HUNKER: Sorry. Not my cocounsel, opposing counsel. But I think we can take a break and then switch.
MR. BIRRING: Yeah. Perfect.
THE VIDEOGRAPHER: We are going off the record at 10:53 a.m.
(Recess from 10:53 a.m. to 11:24 a.m.)
THE VIDEOGRAPHER: We are on the record at 11:24 a.m.
EXAMINATION
BY MS. HOLMES:
Q. Good morning, Ms. Smith. My name is Jennifer Holmes, and I represent the private plaintiffs in this case, specifically the HAUL plaintiffs. I'm going to ask you some questions about similar topics that Ms. Hunker asked you about.
Does your office have written ADA policies, practices, and procedures that were in place before the November 2022 election related to accommodations for vote by mail?
A. Accommodations for vote by mail, written

procedures, yes.
Q. Okay. And do you train your staff on those procedures about how they should respond to accommodations -- requests for accommodations related to vote by mail?
A. Yes.
Q. Okay. And when was the most recent training before the November 2022 election?
A. So I know that those things are in place, but Jennifer Colvin would be the person to answer the questions --
Q. Okay.
A. -- in terms of the timelines of, you know, anything related to trainings of vote by mail or...
Q. Do you know how often the trainings occur?
A. I don't.
Q. In terms of the content of those trainings, what are your employees trained to do if a person with a disability requests a reasonable accommodation to the vote-by-mail process?
A. Request to vote a reasonable -- to vote by mail -- I don't know.
Q. Would Ms. Colvin --
A. Yeah.
Q. -- have the answer to that?

A. Uh-huh. So we -- accessibility, the department under operations for accessibility, so any requests that we need for a voter with disabilities on-site at a vote center. So any previous request that we have to aid that voter is -- they write in to us, to our ADA contacts, and then we're able to establish and provide the assistance needed for them to vote in person.
Q. Okay. So is your testimony just now related to voting in person?
A. Correct.
Q. Okay. And in terms of requesting any modif- -- any accommodations for vote by mail, can you describe what that process is?
A. I can't.
Q. Okay. Does your office train election judges, election clerks, and other poll workers on how to accommodate voters with -- with disabilities related to vote by mail?
A. I do believe that it is in our training manual and our training documents for election workers and judges.
Q. And do you know when the last training before the November 2022 election was?
A. Rachelle's department is the one that trains all the judges; so she would have a better answer for

exact dates.
Q. In terms of the contents of that training, are you familiar with how election judges, clerks, and other poll workers are trained to accommodate voters with disabilities related to vote by mail?
A. I'm not.
Q. And in advance of the November 2022 election, did your office make any inquiries to the Texas Secretary of State about providing accommodation to voters with disabilities related to vote by mail?
A. I'm not aware.
Q. Has the Texas Secretary of State provided your office with any written guidance related to the ADA since the May 2022 primary?
A. Written guidance as it pertains to...
Q. To the American with Disabilities Act.
A. I mean, if there's any updated notices, postings that are required, and then -- then we will receive -- either receive or go to the SOS to ask for an updated form.
Q. And do you know whether were -- there were any updates from May 2022 to -- up to the November 2022 election?
A. No significant updates.
Q. Has the secretary of state offered any training



related to the Americas with Disabilities Act since May 2022 to your office?
A. No.
Q. And at any time has the secretary of state offered any training to your office related to provisions of SB1 and the Americans -- how they interacts with the Americans with Disabilities Act?
A. I don't -- I'm not aware.
Q. Ms. Hunker asked you about the disability complaint form, and she walked through three complaints on that form. Do you recall that?
A. I do.
Q. Do voters ever contact your office about issues related to disabilities in voting outside of the disability complaint form process?
A. They -- if they would, they would be in our -- they would call our -- our help line or our call center, and so those are recorded in the call logs.
Q. So you mentioned they can call a help line. Are there any other ways in which a voter can contact your office re- -- related to issues of voting with a disability?
A. Sure. Our ADA e-mail inbox. It would be -- you know, they can contact us there directly, and we can handle them as they come in.

Q. Okay. Any other ways they can contact your office?
A. General phone line, and then it gets transferred to our accessibility department.
Q. Do voters ever come in person and ask questions about voting with a disability?
A. No.
Q. Do you believe that the three complaints from the disability complaint form that you discussed with Ms. -- Ms. Hunker represent the full scope of any questions or concerns that voters contacted your office about -- relating to voting with a disability?
A. No.
Q. In her deposition of April of 2022, the former Harris County Election Administrator, Isabel Longoria, indicated that, before the March primary election, voters with disabilities contacted your office to request a reasonable accommodation to cure their application to vote by mail in ways other than appearing in person or appearing online.
Are you familiar with that?
A. I'm not.
Q. Okay. Do you know if -- if during the November 2022 election, did any voters with disability contact your office seeking a reasonable accommodation

related to the cure process for vote by mail?
A. I don't know. Jennifer would, though.
Q. And my apologies if you answered this question already.
A. That's okay.
Q. But did your office receive any requests for accommodation related to vote by mail for the November 2022 election?
A. I don't know.
Q. In advance of the November 2022 election, did your office put out any notices, guidance, or communication to the public related to SB1 and directed at voters with disabilities?
A. If any -- if anything, we -- forward-facing for the public regarding voters with disabilities or SB1 would be listed on our website.
Q. And do you know either way whether you're office placed anything on the website?
A. I don't. In regards to SB1, no. But everything related to voters with disabilities is posted on our website.
Q. Any of those materials on your website, do they concern the ID requirements for vote by mail?
A. I believe so, yes.
Q. And are these notices disseminated in any other

format other than on the website?
A. Regarding the ID retirements?
Q. I'm speaking more broadly. Any notices or guidance related to voting with a disability or vote by mail that you provide to the public -- what formats are they presented in?
A. As far as I know, our website is the central hub of information regarding voting with disabilities or any ID requirements whatsoever. I'm not aware of any additional platforms to which we educate the -- the public.
Q. And are you aware if any of these notices are presented in disability-accessible formats on the website?
A. Yes. And that can also be requested through our accessibility department as well, so any kind of interpretation or any, you know, any other format, if you will, of how we can provide that to voters with disabilities. And those are one-off requests.
Q. So does the voter have to request that a notice is, for lack of a better word, translated into an accessible format, or does your office initially put them out in these accessible formats?
MS. HUNKER: Objection; form.
A. It would be requested. I mean, for example, if



somebody asked if -- for, you know, a notice in Braille, that's not something that we have readily available. That's something that we would be a request and that we, you know, would attempt to provide or provide to that voter depending on the disability request.
Q. (BY MS. HOLMES) Are you aware of -- withdrawn.
Are you any voters with disabilities whose applications to vote by mail were rejected in the November 2022 election?
A. I'm not aware.
Q. You're not aware either way?
A. No.
Q. And same question about mail ballots. Are you aware of any voters with disabilities whose mail-in ballots were rejected in the November 2022 election?
A. I'm not aware.
Q. Were any ADA grievances filed with your office related to the November 2022 election?
A. Grievances? Can -- outside of our -- the three complaints that we received?
Q. Is there any other process outside of the disability complaints form where somebody may formally submit a complaint?
A. No.
Q. Is there a process called an ADA grievance

within your office?
A. No.
Q. Do you have the exhibits that Ms. Hunker marked earlier?
A. I do.
Q. Okay. Can I ask you to grab Exhibit 4, please. This is the postelection report.
A. Okay.
Q. Is that correct?
A. Uh-huh.
Q. Can you turn to page 17 under No. 5, "Early Voting Equipment Operations."
A. (Witness complies.)
Q. And it says: "During Early Voting, EVCs experienced common problems associated with staffing, technical support, equipment operations and wait time updates." And then there is a footnote. The footnote states: "These are common issues experienced in every jurisdiction throughout Texas and nationwide."
Did I read that correctly?
A. Yes.
Q. Is it fair to say that in many elections there are technology glitches or malfunctions?
A. Absolutely.
Q. Was November 2022 the first election since

your -- in your tenure with the Harris County Elections Administrator's Office in which there were technology glitches or malfunctions?
A. No.
Q. Did any polling locations have technology glitches or malfunctions during the 2020 general election?
A. Yes.
Q. How about the 2018 general election?
A. I wasn't here for 2018.
Q. Was the November 2022 election the first time that any vote centers needed additional ballot paper supplied in your tenure with the Harris County Elections Office?
MS. HUNKER: Objection; form.
A. Is -- that they needed supply --
Q. (BY MS. HOLMES) Sorry. Re- -- withdrawn. Let me reask that question.
A. Okay. Thanks.
Q. Was the November 2022 election the first time in your tenure with the office that vote centers needed additional ballot paper resupplied?
A. No.
Q. Did any polling locations need ballot paper resupplied during the 2020 general election?

A. Yes.
Q. And do you know if any needed it in the 2018 general?
A. I don't.
Q. If a polling location needs ballot paper resupplied, does that indicate that there was a period of time when there was -- when they ran out of paper and voters could no longer be processed?
A. No, that does not indicate that.
Q. I believe Ms. Hunker asked you about a polling place opening late during the November 2022 election. Correct me if I'm off base. Do you recall?
A. Yeah. Well, no, those -- the opening and closing, I think you confirmed that that's for Rachelle who will be here this afternoon that will speak on that.
Q. Thank -- thank you for that clarification.
A. You're welcome.
Q. You testified that in the November 2022 election, Harris County had a two-page ballot; is that correct?
A. Correct.
Q. Was the November 2022 election the first time that Harris County had a two-page ballot?
A. (Indiscernible.)
Q. Sorry?



A. Yes.
THE WITNESS: Bless you.
MS. BINGHAM: Thank you.
Q. (BY MS. HOLMES) Can something like technology glitches or malfunctions at a polling location contribute to a longer line or wait time at the polls?
A. Can it, yes.
Q. Are there other things that can contribute to a longer line or wait time at a polling location?
A. Other -- yes.
Q. Does the amount of time that a voter has to spend marking each contest on their ballot -- can that contribute to a longer wait time?
A. Yes.
Q. Are you familiar with straight-ticket voting?
A. Yes.
Q. And what is it?
A. Where a voter can just vote for one party versus the other without scrolling -- going through each contest.
Q. Is it your understanding that that shortens the amount of time that it takes a voter to mark the ballot?
MS. HUNKER: Objection; form.
A. Yes.
MS. HOLMES: Could I ask you to mark these,

please, this top one and then this one. Thank you.
(Exhibit Nos. 8 and 9 were marked.)
MS. HOLMES: And there's a second one coming around.
MS. HUNKER: What exhibit numbers are these?
THE REPORTER: 8 and 9.
Q. (BY MS. HOLMES) Ms. Smith, can you pick up the document that in the upper left-hand corner says July 2022?
A. Uh-huh.
Q. And is that marked as Exhibit 8?
A. Yes.
Q. Okay. Do you recognize this form?
A. Yes.
Q. And what is it?
A. It's the information a person that provided transportation to seven or more voters form.
Q. Am I correct that this -- oh. Do you know who created the form?
A. Secretary of state.
Q. And does Harris County use the secretary of state's form for signatures of people who provided transportation for seven or more voters?
A. Yes.

Q. Am I correct that Exhibit 8, this form, does not mention curbside voting?
A. Yes, you are correct.
Q. And what is your understanding of what is required when a person transports more than seven or more voters?
MS. HUNKER: Objection; form.
A. My understanding is that they complete the forms that are required by the secretary of state to provide their information.
Q. (BY MS. HOLMES) And is that -- does that depend on whether the voters are curbside voters or in-person voters?
A. It does not depend -- no, it's either or for this form. I mean -- yeah, because the one for 10/2022 directly states curbside voting whereas the transportation of seven or more is from July of 2022, no mention of curbside voting.
Q. Do you have an understanding of why the change in the form?
A. I don't.
MS. HUNKER: Objection; form.
Q. (BY MS. HOLMES) And do you know if Harris County used one of these forms in the November 2022 election?

A. We did not.
Q. Do you know which form was available to the county if it needed to use a form for --
A. The most recent --
Q. -- transporters?
A. The most recent form.
Q. Have you had or has your office had any discussions with the secretary of state's office about the content of these forms?
A. Not that I'm aware of.
Q. Ms. Hunker asked you questions about the numbers of early vote centers and vote centers in the November election.
Do you know that?
A. I do.
Q. Do you know how many people worked at the early vote centers during the November election?
A. I don't have an exact number, no.
Q. Is there someone in your office --
A. Rachelle will.
Q. Okay. And are you prepared to testify about any staffing questions as to early vote centers and vote centers?
A. I'm not.
Q. And does that include hiring of additional



staff?
A. Correct, yes, I'm not.
Q. Do you know who appropriates the budget for elections in Harris County?
A. Specific -- no.
Q. Do you know what the budget was for the November 2022 election?
A. No.
Q. Do you know who in your office would know?
A. Maureen Fisbeck and Clifford Tatum and the budget office.
THE REPORTER: What was those again? I'm sorry.
THE WITNESS: Fisbeck, F-I-S-B-E-C-K.
THE REPORTER: I-S-B-E-C-K?
THE WITNESS: F-I-S-B-E-I-C-K [sic].
MS. HOLMES: If you give me a minute, I'm just looking over my notes, and I may have a couple more questions.
THE WITNESS: Sure.
Q. (BY MS. HOLMES) You're the director of operations; is that correct?
A. Correct.
Q. And is there any way in which your department had to increase resources for hiring for the

November 2022 election compared to prior midterm elections?
MS. HUNKER: Objection; form.
A. Yes.
Q. (BY MS. HOLMES) And in what ways were those?
A. Our temporary employee staff.
Q. So --
A. Was -- was increased. Sorry. Was increased.
Q. And why was temporary employment staff increased?
A. To assist with resources in terms of, you know, supplies, you know, how we manage our internal process for, you know, operation of a warehouse. Like I said, supplies, ADA surveys. I mean, the more locations we have, the more surveys we have to conduct. You know any -- for assistance through vote center management.
Q. And I should ask, were there any other ways in which you had to increase resources or staff other than increasing temporary hires?
A. No.
Q. And was any of this increase in temporary hires related to implementing the requirements of SB1?
MS. HUNKER: Objection; form.
A. No.
MS. HOLMES: Okay. I think that's it for

me. I will pass you to DOJ counsel, see if she has questions.
MS. PAIKOWSKY: If you don't mind, if we go off the record for about five minutes and we'll come back and see if anyone else has any questions of this witness. Thank you so much.
THE VIDEOGRAPHER: We are going off the record at 11:54 a.m.
(Recess from 11:54 a.m. to 11:58 a.m.)
THE VIDEOGRAPHER: We are on the record at 11:58 a.m.
MS. PAIKOWSKY: This is Dana Paikowsky with the United States. We are ready to pass the witness. If there are any other plaintiff groups online who might have questions, please identify yourself and you can go ahead.
Hearing nothing, I think we are going to be ready to pass the witness back to the State.

FURTHER EXAMINATION

BY MS. HUNKER:
Q. Ms. Smith, I only have a few questions for you.
A. Okay.
Q. So you were in your pos- -- you were working for the Harris County Elections Office in 2020, correct?
A. Yes.

Q. And that election did not have straight-ticket voting, correct?
A. I don't remember. No, no it didn't.
Q. And that was before SB1 was implemented, correct?
A. Correct.
Q. Did you attend any of the seminar trainings the secretary of state's office hosted in the summer?
MS. HOLMES: Objection; form.
A. No.
THE REPORTER: Who made the objection?
MS. HOLMES: I did. Sorry. I'll speak up.
Q. (BY MS. HUNKER) Did you attend any of webinars hosted by the secretary of state's office since May of 2022?
A. Yes. I have one today at 2:00 actually.
Q. And so looking at the seminar trainings in the summer, you said you did not attend a seminar; is that correct?
A. I don't believe so in the summer, no.
Q. Did you review any of the materials after the fact?
A. No.
Q. And so you don't know whether the ADA was addressed at that seminar; is that correct?



A. Correct.
Q. And have you sought guidance from the secretary of state's office at all since May of 2022 regarding the ADA?
A. No. Nothing in great capacity, no.
Q. I want to quickly look back at Exhibit No. 8 and 9. Do you have those in front of you?
A. Yes.
Q. And so I believe you said that the form you would access the November election was the most recent form available; is that correct?
A. Yes.
Q. And so that would have been Exhibit 9 issued by the secretary of state's office on October 2022?
A. Yes, ma'am.
Q. And that specifically -- expressly states that this form is for curbside, correct?
A. Yes.
Q. And so this is the form that you used during the November election?
A. If we had transportation of seven or more curbside voters, which we did not.
Q. I want to quickly introduce Exhibit 10.
(Exhibit No. 10 was marked.)
THE WITNESS: Thank you.

Q. (BY MS. HUNKER) Do you have the exhibit in front of you?
A. I do.
Q. Do you recognize it?
A. I do.
Q. And what is it?
A. Our elections manual.
Q. And this was issued by the Harris County Elections Office?
A. Yes.
Q. And I will represent to you that I only included the pages that would be relevant to today's deposition. It's not the full --
A. I was going to say it's much longer than this.
Q. It's not the full 200-page-and-something document. If you can turn to the last page which internally is 100- -- page 110 in the document.
A. 110. Okay.
Q. And do you see the part that's -- I guess it's white font in the black background?
A. Yes, at the bottom.
Q. Yes.
A. Yes.
Q. And it says: "A person who simultaneously assists seven or more curbside voters by providing the

Voters transportation to the Vote Center must complete and sign a form, provided by a Judge, that contains the person's name and address and whether the person is providing assistance solely for curbside or is providing additional assistance to the Voter."
Did I read that correctly?
A. Yes.
Q. And so Harris County only would have provided this form to an individual who was simultaneously assisting seven or more curbside voters by providing voters transportation to the vote center; is that right?
A. Yes, as it says curbside voting.
Q. And Harris County would not have provided the form for any individual who was transporting individuals not for curbside; is that correct?
A. Correct.
Q. You can put that aside for the moment. I want to go back to the postelection report, Exhibit 4, specifically page 17. You and counsel discussed the Footnote 14; is that correct?
A. Yes.
Q. This footnote is in reference to in-person early voting operations; is that right?
A. Yes.
Q. You do not have a similar footnote for Election

Day operations and performances; is that correct?
A. I do not see that, no.
Q. Did you assess the technical problems in other counties for the November 2022 general election?
A. No.
Q. And did you compare Harris County's technical difficulties with the technical difficulties experienced by other counties in Texas for the November 2022 general election?
A. No. I would say those are uncomparable, though.
Q. How so?
A. Due to the size of our county.
Q. So you don't know whether the counties experienced similar technical problems with their equipment?
A. I don't know.
Q. You had mentioned that in-person voting locations needed deliveries of ballot paper in previous elections; is that correct?
A. Yes.
Q. Did you compare how many locations needed additional ballot paper in previous elections as compared to the general election in 2022?
A. No.



Q. Are you aware if there were any claims in previous elections that polling centers had ran out of paper?

A. No.

MS. HUNKER: No more questions. Thank you very much.

THE WITNESS: Thank you.

MS. HUNKER: I think we can go off the record.

THE REPORTER: Hold on. Before we go off the record, can we clarify Exhibit 3?

MS. HUNKER: Yes. I just want to make sure this is the correct document before I give it the court reporter.

MR. BIRRING: Yeah. It looks like it's not in order for -- well, the three about this election are at the bottom of the first page for some reason. So for whatever reason, it didn't end up in chronological order. But when we do give it to you as like a Bates-stamp document, we'll make sure it looks right; but, yeah.

THE WITNESS: Do you need this?

MS. HUNKER: We can go off the record.

THE VIDEOGRAPHER: We are going off the record at 12:07 p.m.

(Proceedings adjourned at 12:07 p.m.)

ERRATA PAGE

WITNESS NAME: LAUREN SMITH DATE: 03/21/2023

PAGE LINE CHANGE REASON

______________________________________________

I, LAUREN SMITH, have read the foregoing transcript and hereby affix my signature that same is true and correct, except as noted above on the previous pages(s), and that I am signing this before a Notary Public

LAUREN SMITH

THE STATE OF )
COUNTY OF )

Before me, , on this day personally appeared, LAUREN SMITH, known to me or proved to me under oath or through (description of identity card or other document), to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on this, the _______ day of , 2023.

Notary Public in and for
The State of Texas
Commission Expires: ___________



REPORTER'S CERTIFICATION
ORAL DEPOSITION OF
LAUREN SMITH
TAKEN MARCH 21, 2023

I, DONNA QUALLS, Shorthand Reporter and Notary Public in and for the State of Texas, hereby certify to the following:

That the witness, LAUREN SMITH, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition was delivered to SAMEER S. BIRRING / KATHLEEN T. HUNKER;

That a copy of this certificate was served on all parties and/or the witness shown herein on ________________________.

I further certify that pursuant to FRCP No. 30(f)(i) that the signature of the deponent was requested by the deponent or a party before the completion of the deposition and that the signature is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor.

I further certify that I am neither counsel

for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 10th day of April, 2023.

______________________________
DONNA QUALLS
Notary Public in and for
The State of Texas
My Commission expires 11/06/2026
Magna Legal Services
Firm Registration No. 633
16414 San Pedro, Suite 900
San Antonio, Texas 78232
(210) 697-3400

