# Exhibit C

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

LA UNIÓN DEL PUEBLO ENTERO, et    *
al.,                              *
    Plaintiffs,               *
v.                                *Case No. 5:21-cv-844-XR
GREGORY W. ABBOTT, et al.,        *
    Defendants.               *
--------------------------------------------------------
OCA-GREATER HOUSTON, et al.,      *
    Plaintiffs,               *
v.                                *Case No. 1:21-cv-780-XR
JOHN SCOTT, et al.,               *
    Defendants.               *
--------------------------------------------------------
HOUSTON AREA URBAN LEAGUE,        *
et al.,                           *
    Plaintiffs,               *
v.                                *Case No. 5:21-cv-0848-XR
GREG ABBOTT, et al.,              *
    Defendants.               *
--------------------------------------------------------
LULAC TEXAS, et al.,              *
    Plaintiffs,               *
v.                                *Case No. 1:21-cv-0786-XR
JOHN SCOTT, et al.,               *
    Defendants.               *
--------------------------------------------------------
MI FAMILIA VOTA, et al.,          *
    Plaintiffs,               *
v.                                *Case No. 5:21-cv-0920-XR
GREG ABBOTT, et al.,              *
    Defendants.               *
--------------------------------------------------------
UNITED STATES OF AMERICA,         *
    Plaintiff,                *
v.                                *Case No. 5:21-cv-1085-XR
THE STATE OF TEXAS,ET AL.,        *
    Defendants.               *
--------------------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF BRISCOE CAIN

APRIL 21, 2022

--------------------------------------------------------

ORAL ANSWERS AND DEPOSITION of the Witness,

Briscoe Cain
April 21, 2022

```
 1   BRISCOE CAIN, who resides in Travis County, Texas, in
 2   answer to questions propounded to him in the above
 3   numbered and styled cause, taken by the Plaintiffs
 4   before Sherri K. Williamson, a Certified Shorthand
 5   Reporter in and for the State of Texas, at the Office of
 6   the Attorney General, 209 West 14th Street, Austin,
 7   Travis County, Texas, on the 21st day of April, A.D.
 8   2022, between the hours of 10:49 A.M. and 5:08 P.M.
 9   pursuant to Subpoena and Notice.
10       It is stipulated and agreed by and between Counsel
11   and the respective parties hereto that the Deposition of
12   the Witness named in the caption hereto may be taken at
13   this time and place, pursuant to the Federal Rules of
14   Civil Procedure, and that the said deposition or any
15   part thereof, when so taken, may be used on the trial of
16   this case the same as if the Witness were present in
17   court, testifying in person.
18
19                    * * * * * *
20
21
22
23
24
25
```

Briscoe Cain
April 21, 2022

```
 1   APPEARANCES:

 2            REED SMITH LLP
              811 Main Street, Ste. 1700
 3            Houston, TX 77002
              kdulaney@reedsmith.com
 4            BY:  KEELY DULANEY
              Appearing for the Plaintiffs, Houston
 5            Area Urban League, et al.;

 6            NAACP LDF
              40 Rector Street, 5th Floor
 7            New York, NY 10006
              ksadasivan@naacpldf.org
 8            BY:  KATHRYN SADASIVAN
              LILIANA ZARAGOZA (via Zoom)
 9            Appearing for the Plaintiffs, Houston
              Area Urban League, et al.;
10
              NAACP LDF
11            700 14th Street, NW 6th Floor
              Washington, DC 20005
12            gyeomans@naacpldf.org
              BY:  GEORGINA YEOMANS (via Zoom)
13            Appearing for the Plaintiffs, Houston
              Area Urban League, et al.;
14
              OFFICE OF THE ATTORNEY GENERAL
15            P.O. Box 12548 (MC-009)
              Austin, Texas 78711
16            patrick.sweeten@oag.texas.gov
              BY:  PATRICK K. SWEETEN,
17                Appearing for the Defendants;

18            OFFICE OF THE HARRIS COUNTY ATTORNEY
              1019 Congress Plaza, 15th Floor
19            Houston, Texas 77002
              Tiffany.Bingham@cao.hctx.net
20            Christian.Menefee@cao.hctx.net
              Jonathan.Fombonne@cao.hctx.net
21            BY:  TIFFANY BINGHAM, CHRISTIAN MENEFEE,
                  JONATHAN FOMBONNE (via Zoom)
22                Appearing for Defendant,
                  Isabel Longoria;

23

24

25
```

Briscoe Cain
April 21, 2022

```
 1          U.S. DEPARTMENT OF JUSTICE
            Michael.Stewart3@usdoj.gov
 2          BY: MICHAEL STEWART, RICHARD DELLHEIM
            (via Zoom)
 3           Appearing for Plaintiffs, United States
             of America;
 4
            FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
 5          One New York Plaza
            New York, NY 10004
 6          Kevin.Zhen@friedfrank.com
            BY: KEVIN ZHEN (via Zoom)
 7          Appearing for Plaintiffs, La Unión
            Del Pueblo Entero, et al
 8
            FREE SPEECH FOR PEOPLE
 9          1320 Centre St., #405
            Newton, MA 02459
10          chostetler@freespeechforpeople.org
            BY: COURTNEY HOSTETLER (via Zoom)
11          Appearing for Plaintiffs, Mi Familia Vota,
            et al
12
            BEXAR COUNTY DISTRICT ATTORNEY'S OFFICE
13          101 W. Nueva Street, 7th Floor
            San Antonio, Texas 78205
14          Lisa.Cubriel@bexar.org
            BY:  LISA CUBRIEL (via Zoom)
15          Appearing for Defendants, Jacquelyn Callanen
            and Joe D. Gonzales
16
            ELIAS LAW GROUP LLP
17          10 G St NE Ste 600
            Washington, DC 20002
18          mmcqueen@elias.law
            BY:  MARCOS MOCINE-MCQUEEN (via Zoom)
19          Appearing for Plaintiffs, LULAC Texas, et al.
20          BRENNAN CENTER FOR JUSTICE AT
            NYU SCHOOL OF LAW
21          120 Broadway, Ste. 1750
            New York, NY 10271
22          eliza.sweren-becker@nyu.edu
            BY:  ELIZA SWEREN-BECKER (via Zoom)
23          Appearing for Plaintiffs, La Unión
            Del Pueblo Entero, et al
24

25
```

Briscoe Cain
April 21, 2022

```
1              WEIL, GOTSHAL & MANGES LLP
               200 Crescent Court, Suite 300
2              Dallas, TX  75201
               liz.ryan@weil.com
3              BY:  LIZ RYAN
               Appearing for Plaintiffs, La Unión
4              Del Pueblo Entero, et al

5              OFFICE OF THE CRIMINAL DISTRICT ATTORNEY
               HIDALGO COUNTY, TEXAS
6              100 E. Cano
               Edinburg, Texas 78539
7              jacqueline.villarreal@da.co.hidalgo.tx.us
               BY:  JACQUELINE VILLARREAL, VICTOR GARZA
8                  (via Zoom)
               Appearing for Defendant, Ricardo Rodriguez,
9              Jr.;

10

11          BRISCOE CAIN,
                 The Witness;

12

13          KELSEY PORMASDORO,
                 Also Present (via Zoom);

14

15          BRENT KIRBY,
                 The Videographer; and

16

17          SHERRI K. WILLIAMSON,
                 Certified Shorthand Reporter
                 in and for the State of Texas
18

19                      * * * * * *

20

21

22

23

24

25
```

Briscoe Cain
April 21, 2022

1                    I N D E X

2                                              PAGE

3  STIPULATIONS........................................1
   APPEARANCES...................................3, 4, 5
4

5  EXAMINATION                                   PAGE

6  BRISCOE CAIN

7  Examination by Ms. Dulaney..........................7

8

9  EXHIBITS                                      PAGE

10 1    Texas Legislature Online - 87(R) History
        for HB 6...................................122
11 2    Bungled hearing delays GOP voting restriction
        bill in Texas.............................124
12 3    Witness List..............................128
   4    Testimony of Nina Perales, MALDEF Vice President
13      of Litigation on House Bill 6.............132
   5    Letter from NAACP LDF, April 1, 2021..........135
14 6    Testimony in Opposition, Texas Civil Rights
        Project, April 1, 2021....................138
15 7    Testimony in opposition, Brennan Center for
        Justice, April 1, 2021....................141
16 8    Texas Legislature Online History Re: SB 7......147
   9    Audio Transcript of House Floor Debate.........150
17 10   Conference Committee Report Form............176
   11   Copy of Tweet from the Twitter page of
18      Briscoe Cain..............................198
   12   Copy of Tweet from the Twitter page of
19      Briscoe Cain..............................208

20

21

22                                             PAGE

23 SIGNATURE AND CHANGES.............................217
   REPORTER'S CERTIFICATE...........................218
24
                        -o-O-o-

25

Briscoe Cain
April 21, 2022

```
 1              THE VIDEOGRAPHER:  This is the videotaped
 2    oral deposition of Briscoe Cain.  Today's date,
 3    April 21st, 2022.  The approximate time, 10:49 A.M.
 4    Central Standard Time.  We're recording and on the
 5    record.
 6                      BRISCOE CAIN,
 7       having been first duly sworn, testified as follows:
 8                      EXAMINATION
 9       Q    (BY MS. DULANEY) Good morning.  My name's
10    Keely Dulaney.  I'm one of the attorneys representing
11    the Plaintiffs in this lawsuit, Houston Area Urban
12    League vs. Abbott, et al.  Will you state and spell your
13    name for the record.
14       A    My name is Briscoe Cain.  Briscoe is spelled
15    B-R-I-S-C-O-E, last name Cain, C-A-I-N.
16       Q    Representative -- Representative Cain, have you
17    ever been deposed before?
18       A    I have not.
19       Q    So I'm just going to go over some key rules of
20    a depo so we're all on the same page.  This is a
21    deposition.  I'll ask you questions.  You must answer
22    them truthfully.  Do you understand?
23       A    Yes.
24       Q    And although no judge is present, it's a formal
25    legal proceeding, just like testifying in court.  You're
```

Briscoe Cain
April 21, 2022

1    under the same legal obligation to tell the truth, the

2    whole truth, and nothing but the truth.  Do you

3    understand?

4        A    Yes.

5        Q    Are you under the influence of any medications

6    that would prevent you from being able to give truthful

7    answers?

8        A    No.

9        Q    Or anything that might otherwise impair your

10   ability to recall events about which I may ask you

11   today?

12       A    Are you asking whether I'm under medications

13   that would prevent me --

14       Q    Correct.

15       A    No.

16       Q    Is there any reason why you can't give truthful

17   testimony here today?

18       A    There is not.

19       Q    So your attorney may assert objections, but

20   unless he instructs you not to answer, you should go

21   ahead and respond after he objects.  Do you understand?

22       A    I understand.

23       Q    If you don't understand a question, let me know

24   and I'll try to ask it in another way, but if you do --

25   if you do answer, I'll assume that you understand.

Briscoe Cain
April 21, 2022

1       A    Understood.

2       Q    If you need to take a break, let me know.  I'm

3  not holding you here, so -- that's fine.  Just let me

4  know.  Also, the court reporter here, as you may have

5  already noticed, is typing everything you and I are

6  saying and will type everything said by anyone in the

7  room, so it's really important that only one person

8  speaks at a time.  So I'll let you finish.  You let me

9  finish, and we'll do our best.  Do you understand?

10      A    Yes.

11      Q    And, also, it's helpful if you answer audibly,

12 so no, like, shaking your head or saying "huh-uh" or

13 "uh-huh."  Okay?

14      A    Understood.

15      Q    And then, finally, I am entitled to the best,

16 most complete response to my questions that you're able

17 to give.  In some cases, however, I may ask a question

18 you don't know the exact answer to.  In those cases, I'm

19 entitled and I'd like your best estimate, so -- but

20 please don't guess.  Do you understand?

21      A    I understand.

22      Q    All right.  So now I just want to talk about --

23 a little bit about the preparation for your deposition

24 today.  Without disclosing the content of any

25 discussions with your attorney, did you prepare for the

Briscoe Cain
April 21, 2022

1    deposition today?

2        A    Yes.

3        Q    How?

4        A    By talking with my attorney and reviewing some

5    documents.

6        Q    How many times did you talk to your attorney?

7        A    Two to five times.

8        Q    And how long were those conversations?

9        A    Ranging from 30 minutes to three hours.

10       Q    And who all did you speak to?

11       A    (Indicating) Patrick Sweeten.

12       Q    Just Mr. Sweeten?

13       A    For the preparation of today?

14       Q    Yes.

15       A    That's correct.

16       Q    Okay.  Did you have any other conversations

17   with anyone other than your attorneys?

18       A    Are you asking in preparation for today?

19       Q    Correct.

20       A    Are you talking -- Lawyers is all you're asking

21   about?

22       Q    No, not lawyers.  Did you, like, talk to

23   your -- Did you talk to any of the other Defendants in

24   anticipation of the deposition today?

25       A    I did not.

Briscoe Cain
April 21, 2022

1    Q    Did you talk to Senator Hughes in anticipation

2  of the deposition today?

3    A    I did not.

4    Q    Was there anybody else that you talked to

5  outside of counsel in preparation for your deposition

6  today?

7    A    My wife.  I told her "goodbye" this morning.

8    Q    Okay.  Did you review any documents to prepare

9  for this deposition?

10    A    Yes.

11    Q    And did your review include those documents

12  produced in this case for which you were the custodian

13  of record?

14    A    Yes.

15    Q    Which documents did you review?

16    A    I reviewed -- Today I glanced over the

17  documents that were produced.

18    Q    All documents that were produced that you were

19  custodian of?

20    A    Yes.  I glanced over them, yes.

21    Q    Okay.  Was there any other documents that you

22  reviewed --

23    A    Yes.

24    Q    -- in preparation for today?

25    A    Yes.

Briscoe Cain
April 21, 2022

1    Q    What documents were those?

2    A    The -- the privilege log.  I looked through

3 that.  I also looked on TLO -- that's the Texas

4 Legislature Online -- to refresh my memory of kind of

5 the timeline on -- on House Bill 6, also known as SB 7,

6 was done.

7    Q    Was there anything else?

8    A    Not that I recall.

9    Q    Did you review any of the debates, the House

10 floor debates?

11    A    Thank you.  That's a good question.  I listened

12 to some of the committee testimony from April 1st.

13    Q    Okay.

14    A    The -- You can ask your next question.

15    Q    Was -- Well, was there anything else?  You

16 can -- You can continue.

17    A    No, ma'am.

18    Q    Okay.  What's your understanding of why you're

19 here today?

20    A    I was requested to -- to be here, to be a fact

21 witness.

22    Q    So I'd like to talk a little bit about your

23 background.  What's your birthday?

24    A    December 9th, 1984.

25    Q    And where do you live currently?

Briscoe Cain
April 21, 2022

1      A     I live in Deer Park, Texas.

2      Q     What's your residential address?

3      A     I live at 302 West Oak Street, Deer Park, Texas

4   77536.

5      Q     I missed the street name.  Would you mind

6   repeating that for me?

7      A     West Oak Street.

8      Q     Okay.  Thank you.  Do you have any social media

9   accounts?

10     A     Yes.

11     Q     What accounts do you have?

12     A     I have a Twitter account, a Facebook account, a

13  TikTok account.  That's all, to my knowledge.

14     Q     Do you have an Instagram account?

15     A     There is a -- It's attached to Facebook.  I

16  don't use it often.

17     Q     What about a LinkedIn?

18     A     I -- yeah, I do have a LinkedIn account,

19  another one I --

20     Q     And do you have any, like, web pages?

21     A     Yes.

22     Q     So let's go back to the -- your Twitter

23  account.  What's your name on your -- Do you just have

24  one Twitter account?

25     A     Yes.  It's @BriscoeCain.

Briscoe Cain
April 21, 2022

1    Q    And what about Facebook?

2    A    I have a personal and a campaign Facebook page.

3    Q    And what are the names on those accounts?

4    A    My personal is facebook.com/BriscoeC and my

5    political page is /BriscoeCain.

6    Q    And do you just -- Is that the same for

7    Instagram?

8    A    I -- I assume so.  I rarely use that.

9    Q    Okay.  What about your LinkedIn?

10   A    I use that one even less, but I assume it's

11   /BriscoeCain.

12   Q    At TikTok?

13   A    /BriscoeCain or @BriscoeCain, yeah.

14   Q    Do you love the TikTok?

15   A    It takes up a lot of time sometimes.

16   Q    Yeah.  What about your Web page?  Do you know

17   the domain name?

18   A    Briscoecain.com.

19   Q    Okay.  Have you ever been involved in any other

20   lawsuits?

21   A    Could you clarify that question?

22   Q    Have you ever been a plaintiff in a lawsuit?

23   A    I can't recall any off the top of my head.

24   Q    Have you ever been a defendant in a lawsuit?

25   A    Yes.

Briscoe Cain
April 21, 2022

1    Q    When?

2    A    See -- I'm not sure if it was earlier this

3  year.  There was some litigation -- I don't know whether

4  it was over my participation in the "heartbeat bill"

5  or -- or election bills.  There was some 13 lawsuits

6  served.  And yesterday I was named as a defendant in a

7  lawsuit filed by former State Senator Wendy Davis.

8    Q    So let's go back to the first one that you

9  mentioned that you think may be related to the

10  "heartbeat bill."  Was that in your personality

11  capacity?

12    A    No.  In my official capacity.

13    Q    And do you have -- What was the nature of that

14  case?

15    A    I -- I don't recall the -- Go ahead.

16    Q    So you -- you were never deposed in that case,

17  though?

18    A    That's correct.

19    Q    And did that case resolve?

20    A    I'm not aware.

21    Q    What about the second lawsuit that -- from

22  Senator Wendy Davis?

23    A    I've not been served.

24    Q    Okay.  Do you know the nature of that case?

25    A    I believe it involves the Texas Heartbeat Act.

Briscoe Cain
April 21, 2022

1    Q    And that's also in your official capacity?

2    A    That's correct.

3    Q    Are there any other occasions where you were a

4  defendant -- a defendant in a lawsuit?

5    A    Not that I can think of.

6    Q    Have you ever been an expert witness in a

7  lawsuit?

8    A    Only when proving up my own attorneys' fees.

9    Q    Okay.  Have you ever been a fact witness in a

10  lawsuit?

11    A    1988, '89, in a -- parents' divorce.

12    Q    Okay.  Have -- So have you testified in court?

13    A    I believe that was in chambers, in camera.

14    Q    Okay.  During the -- your parents' divorce?

15    A    Yes.

16    Q    And that was the only time?

17    A    That I can recall.

18    Q    Okay.  I'm sorry to hear about that.

19         What's the highest level of education

20  you've completed?

21    A    A JD.

22    Q    Let's rewind a little bit, actually.  Where did

23  you attend high school?

24    A    Deer Park High School.

25    Q    You were born and raised in Deer Park?

Briscoe Cain
April 21, 2022

1    A    I was in born in Webster, Texas, and I've spent

2  the majority of my life in Deer Park.

3    Q    Okay.  When did you move to Deer Park?

4    A    Gosh, I was there when I was -- since I was

5  around five and back at around the time of nine and

6  there till 20 something and back again ten years ago or

7  so.

8    Q    Okay.  And where did you attend undergrad?

9    A    The University of Houston-Downtown.

10   Q    And what was your degree in?

11   A    Communications.

12   Q    What kinds of courses did you take?

13   A    Courses on communication.

14   Q    And?

15   A    One of my favorites was logic.  I know that

16  much.

17   Q    What about any --

18   A    Spanish.

19   Q    Oh, I'm sorry.  Keep going.

20   A    Some Spanish classes.

21   Q    Did you take any political courses?

22   A    No, not that I recall.

23   Q    No political science class?

24   A    I don't recall.

25   Q    Did you take any history courses?

Briscoe Cain
April 21, 2022

```
 1        A     I don't recall.

 2        Q     Texas history?

 3        A     At the college level, I'm not sure.

 4        Q     Okay.  Do you -- So then you went on to law

 5   school.  Where did you attend law school?

 6        A     South Texas.

 7        Q     In Houston?

 8        A     That's correct.

 9        Q     Did you specialize in anything?

10        A     They don't put that on our -- our diplomas, but

11   I -- I tended to focus on Constitutional law.

12        Q     So what kinds of courses did you take during

13   law school?

14        A     State Constitutional law, I guess, every

15   Constitutional law course they offered, and took a lot

16   of wills, trusts, and estates and probate and estate

17   planning classes as well.

18        Q     Was that your plan for after law school?

19        A     I thought I'd be interested in it.

20        Q     Yeah?  So what's your current job title?

21        A     I'm -- I'm employed in one capacity as

22   Senior Counsel at the Fulton Strahan Law Firm.

23        Q     Do you also consider your Representative role

24   as part of your employment?

25        A     It is, I guess, part of my capacity.
```

Briscoe Cain
April 21, 2022

1    Q    Is there any other employment besides your

2  Senior Counsel role and acting as a Representative?

3    A    No.

4    Q    Are you -- You're not legal counsel for any

5  other organizations?

6    A    I have served in the past as state legal

7  counsel to Operation Rescue.

8    Q    And how long did you serve as legal counsel for

9  Operation Rescue?

10   A    Between five to eight years or so.

11   Q    And when was that?

12   A    I would say -- I guess I was licensed in

13 May 2013 and -- and did that for some time, but I don't

14 currently, actively do it.

15   Q    But do you have any guess or estimate on when

16 you stopped serving as legal counsel for

17 Operation Rescue?

18   A    The last time I did anything for them was maybe

19 a few years ago.

20   Q    Okay.  So like 2019?

21   A    I believe possibly before that.

22   Q    2018?

23   A    Somewhere around there.

24   Q    Okay.

25   A    I'm sorry.  I don't recall.

Briscoe Cain
April 21, 2022

 1    Q    That's okay.  What were your responsibilities

 2    as legal counsel for Operation Rescue?

 3    A    Assisting the organization with issues in

 4    Texas.

 5    Q    What kinds of issues?

 6    A    I -- Are those not under my -- my privilege as

 7    an attorney?

 8              MR. SWEETEN:  I'm sorry.  Can you ask the

 9    question again, please?

10    Q    (BY MS. DULANEY) Yes.  Just generally, what --

11    what were your responsibilities as legal counsel for

12    Operation Rescue?

13    A    Providing advice to my client.

14              MR. SWEETEN:  Yeah.  I mean, obviously,

15    you've got an attorney-client relationship with them, so

16    don't reveal the substance of the communications, as

17    you're -- as you're noting, but -- but you can answer to

18    the degree you had -- you have so far.

19    Q    (BY MS. DULANEY) And I'm not asking about the

20    substance of any of that, just kind of, like, what was

21    your -- what kind of litigation were you involved in as

22    legal counsel for Operation Rescue?

23    A    We didn't have any litigation.  It would just

24    be advice --

25    Q    Advice --

Briscoe Cain
April 21, 2022

1      A      -- to my client.

2      Q      Okay.  On -- on, like, policy statements?

3                  MR. SWEETEN:  I mean, if you -- I think

4    that's probably getting into the substance of his

5    communications with his client.  He -- he's -- he's

6    provided legal counsel.  I don't think he has to provide

7    what the substance of the specific counsel was with the

8    client.

9                  I mean, there may be another way to get

10   around that, but you're asking him what he -- what he

11   talked to them about, so I'm going to object;

12   attorney-client privilege.

13     Q      (BY MS. DULANEY) So I'm not trying to ask what

14   you talked to them about, just asking, very generally,

15   what your role entailed as legal counsel, what it

16   included.

17     A      Answering phone calls with employees of the

18   organization, answering questions and providing advice.

19     Q      Okay.  Did you advise on policy statements made

20   by the -- by the organization?

21                 MR. SWEETEN:  You know, I'm going to

22   object; attorney-client privilege.  It's --

23                 Obviously, you've got an attorney-client

24   privilege with them, and so the degree you -- you, you

25   know, don't feel like you want to divulge the substance

Briscoe Cain
April 21, 2022

 1  of the communication -- you know, that -- that is your

 2  privilege with them, so...

 3              THE WITNESS:  Yeah.  I don't recall.

 4      Q    (BY MS. DULANEY) Okay.  Were you involved with

 5  Operation Rescue when the organization split into

 6  Operation Rescue and Operation Save America?

 7              MR. SWEETEN:  Objection; vague.  Involved?

 8  Are you asking:  Was he counsel for them?

 9      Q    (BY MS. DULANEY) Were you legal counsel for

10  Operation Rescue when the organization split into

11  Operation Rescue and Operation Save America?

12      A    I -- I'm not aware of that event.

13      Q    Are you aware of the organization Operation

14  Save America?

15      A    It sounds like a lot of other organizations.

16  I'm not -- I'm not sure.

17      Q    So you have no involvement in Operation Save

18  America?

19      A    Not that I'm aware of.

20      Q    Okay.  Okay.  Have you volunteered for any

21  organization, political party, or person in any capacity

22  since being elected to the Texas House of

23  Representatives?

24      A    Could you repeat the question?

25      Q    Uh-huh.  Have you volunteered for any

Briscoe Cain
April 21, 2022

1   organization, political party, or person in any capacity

2   since you were elected to the Texas House of

3   Representatives?

4       A     By "organization," how do you define that?

5       Q     Could be an interest group, a think tank group,

6   a political rights group, an advocacy group, any

7   organization, just like how you would define it in --

8       A     Uh-huh.

9       Q     -- the dictionary.

10      A     Okay.

11              MR. SWEETEN:  Object; compound, vague.

12              But go ahead.  You can answer.

13              THE WITNESS:  I've -- Early on in my, I

14  guess, elected capacity I, was still on a advisory board

15  to a crisis pregnancy center located in Houston.  I've

16  assisted undergraduate college student groups in issues

17  involving free speech on campus.  That's about all I can

18  think of right now.  And I have been involved in

19  political parties.

20      Q     (BY MS. DULANEY) And -- How?

21      A     With the Republican Party of Texas.

22      Q     Have you done any volunteer work for any

23  political party or person since the 2020 election?

24      A     Oh.  Yes.

25      Q     And what did that entail?

Briscoe Cain
April 21, 2022

1    A    I volunteered on the -- the Trump campaign

2  after the election.

3    Q    In what capacity?

4    A    In a legal capacity.

5    Q    And what was your volunteer work?  What did

6  that include?

7    A    I went to Pennsylvania to listen to people,

8  draft documents and affidavits.

9    Q    Why did you volunteer in Pennsylvania?

10    A    I thought a -- I thought it was a neat thing to

11  do.  It was an interesting moment in time.

12    Q    What was interesting about that moment in time?

13    A    I mean, it's a presidential election.  It's

14  historic.  All of them are.

15    Q    We'll come back to that a little bit later.  As

16  an elected Representative for District 128, do you have

17  a budget or funding allocated for your office?

18    A    Yes.

19    Q    How much is your budget?

20    A    I think it's about $180,000.

21    Q    And how have you allocated that budget?

22    A    Did you say "have I" or "how"?

23    Q    How?

24    A    I don't know the exact numbers.  I lean heavily

25  on my Chief of Staff to help me with that.

Briscoe Cain
April 21, 2022

1    Q    So you hired a Chief of Staff?

2    A    Yes.  I hired a Chief of Staff, yes.

3    Q    Did you hire any other staff?

4    A    Yes.  I currently have a Chief of Staff, a

5  District Director, and another person, you know, we gave

6  the name of -- something like Legislative Aide that's

7  also serving locally as a -- an Assistant District

8  Director.  So I have three staff on right now.

9    Q    Did you have three staff throughout the

10  87th Legislative Session?

11    A    I had three staff throughout the

12  87th Legislative Session in my capacity as

13  State Representative --

14    Q    Okay.

15    A    -- of District 128.

16    Q    Okay.  What were -- What's the name of your

17  Chief of Staff?

18    A    Justin Williamson.

19    Q    And who's your District Director?

20    A    Christina DiCosimo.  Christine DiCosimo.

21            MS. DULANEY:  Do you need him to spell

22  that for the record?

23            THE REPORTER:  (Nods affirmatively)

24    Q    (BY MS. DULANEY) Would you mind spelling that?

25    A    Christine is C-H-R-I-S-T-I-N-E.  DiCosimo is

Briscoe Cain
April 21, 2022

1    D-I-C-O-S-I-M-O.

2        Q    And who's your Legislative Aide?

3        A    Dylan, D-Y-L-A-N, Menard, M-E-N-A-R-D.

4        Q    And those were the same three people that were

5    on your staff during the 87th Legislative Session?

6        A    Yes.  That were paid, yes.

7        Q    Did you have any interns?

8        A    I believe we had at least one, yes.

9        Q    Okay.  And who was that?

10       A    I don't recall.

11       Q    Okay.  They won't take offense.  Hopefully,

12   they're not watching in.

13       A    Yeah.

14       Q    Did you have any other unpaid staff on your

15   team?

16       A    I'm trying to think of how to answer that

17   question.

18       Q    Did you have -- Was there anybody else that was

19   on your team or on your staff in the House that you have

20   not already listed?

21       A    Would that include people that worked with me

22   or helped me with writing things?  I'm trying to

23   clarify.

24             MR. SWEETEN:  Yeah.  So objection; vague,

25   but if you can clarify --

Briscoe Cain
April 21, 2022

1    Q    (BY MS. DULANEY) Yes.  Did you have anybody

2  else that helped you with research?

3    A    For one, we have a committee clerk that would

4  have been hired by the committee in my capacity as a

5  chairman, which is a different budget.

6    Q    Uh-huh.

7    A    Her name is Jessica Hartman, at the time.

8  She's since been married.  Her last name is now

9  Steinmann.  I believe that's S-T-E-I-N-M-A-N-N.  And I

10  had an attorney who helped me with some things.

11    Q    And who was that attorney?

12    A    Her name's Elizabeth Alvarez Bingham.

13              THE REPORTER:  The last --

14              THE WITNESS:  B-I-N-G-H-A-M, Bingham.

15    Q    (BY MS. DULANEY) And was there any other

16  staff -- anyone else affiliated with the Texas House

17  that helped you draft bills?

18    A    Yes.

19    Q    And who was that?

20    A    Texas Legislative Counsel that helps us draft

21  bills and -- I've got to remember his name or he's going

22  to be upset.  Ross.  Can't think of his last name right

23  now.  He was in charge of state affairs in the Elections

24  Committee with the Speaker's office.

25    Q    Okay.

Briscoe Cain
April 21, 2022

1    A    And there are probably other people that work

2    in the Capitol that helped as well.

3    Q    But nobody else that you worked directly with?

4         MR. SWEETEN:  And you're saying affiliated

5    with the House, is your prior question asked?

6         MS. DULANEY:  Correct.

7         MR. SWEETEN:  Okay.  So --

8         THE WITNESS:  I mean, there's House

9    members and staffers.

10   Q    (BY MS. DULANEY) Anyone else -- Any other

11   members of the staff of the Texas House that you were in

12   frequent communication with?

13   A    Yes.  There's -- Our hallway, we kind of all

14   know each other, and so we work together on bills a lot.

15   Q    Okay.  Who all's in your hallway?

16   A    Gosh.  I think Representative Vasut.

17   Q    Would you mind spelling that?

18   A    V-A-S-U-T.  Representative Swanson,

19   Representative Hefner, Representative Burrows,

20   Representative Gates, Representative Bell of Montgomery,

21   Representative Slawson.  I may be forgetting some.

22   Q    And of each of those representatives you just

23   named, are each of those Republicans?

24   A    They are.

25   Q    Okay.  And are any of those representatives

Briscoe Cain
April 21, 2022

1  people of color?

2      A    Yes.

3      Q    Who?

4      A    I -- I believe, you know, from his testimony on

5  the floor, Representative Jetton identifies as an

6  Asian American.

7              MR. SWEETEN:  And I'll just -- I'll just

8  object to the question for relevance grounds.

9              Go ahead.

10     Q    (BY MS. DULANEY) I don't recall you saying

11  Jetton.  Is that right?

12     A    Okay.  Representative Jetton, J-E-T-T-O-N.

13     Q    So let's rewind a little bit again.  What did

14  you do before you were elected as a Representative?

15     A    Could you give me a specific date range.

16     Q    Well, what year did you graduate from law

17  school?

18     A    2012.

19     Q    And what was your first job after law school?

20     A    Immediately I kind of hung out my own shingle.

21     Q    Okay.  Solo practitioner?

22     A    Yes.

23     Q    What kind of cases did you work on?

24     A    Anything I could get hired on.  Wills and

25  trusts and traffic -- family cases.

Briscoe Cain
April 21, 2022

1    Q    Did you set up your own law office?

2    A    Yes.

3    Q    And what was the name of that?

4    A    The Cain Law Firm.

5    Q    Okay.  And how long did you do that for?

6    A    I think for a few years.

7    Q    So like 2012 to 2015?

8    A    Possibly.

9    Q    Okay.  What did you do after your law firm?

10   A    At some point, I -- I was an associate attorney

11   for a man named John Schmude, the Schmude Law Firm,

12   until at some point he got elected to a district bench,

13   and then I guess I went back on my own.

14   Q    How long were you with the Schmude Law Firm?

15   A    One to two years.  I don't recall.

16   Q    So about 2015 to 2016?

17   A    I don't recall.  I'll take your word for it.

18   Sorry.

19   Q    I'm just going off your timeline.  So you were

20   with the Schmude Law Firm for one to two years and then

21   you said you went back on your own for a while?

22   A    Yes.  Uh-huh.

23   Q    And reopened the Cain Law Firm?

24   A    Yes.

25   Q    And how long did you do that?

Briscoe Cain
April 21, 2022

1    A    I don't recall.  Until sometime in, maybe,

2    2017.

3    Q    Okay.  And in the midst of that, you ran your

4    campaign for Representative?

5    A    Yeah.  My first campaign was -- actually, in

6    2014 was the primary that I lost.

7    Q    Okay.  The 2016 primary you won, though?

8    A    That's correct.

9    Q    Okay.  And then in 2017 you were sworn in as

10    Representative?

11    A    That's correct.

12    Q    Okay.

13    A    And then after that session, I partnered up

14    with a man named Keith Strahan --

15    Q    Okay.

16    A    -- last name S-T-R-A-H-A-N, and we had a

17    partnership, and then sometime we merged with the

18    Fulton Law Group and became Fulton Strahan.

19    Q    And that's where you still currently work?

20    A    That's correct.

21    Q    Let's go back, though, because the years,

22    actually, aren't totally lining up.  So before --

23    between undergrad and law school, how many years -- When

24    did you graduate from undergrad?

25    A    I believe -- I know it was in '08.  I don't

Briscoe Cain
April 21, 2022

1  know if it was December or May.

2      Q    Did you do anything between undergrad and law

3  school?

4      A    I'm sure I had a job.  I just don't recall.

5  Yes.  Well, during undergrad I -- I was a runner for a

6  criminal defense firm called Schneider McKinney, and

7  then right before law school, I worked for an attorney

8  named Robert Fickman in Houston as well.

9      Q    So at your current office, Fulton Strahan, are

10 you a litigator?

11     A    Some.

12     Q    What else do you do?

13     A    I do some outside general counsel work for --

14 for small businesses.

15     Q    What areas of the law do you focus on?

16     A    Some employment.  We do some multifamily and

17 some contract litigation and -- and some constitutional

18 rights litigation.

19     Q    Okay.  Are you currently registered to vote?

20     A    I am.

21     Q    Do you consider yourself a regular voter?

22     A    I do.

23     Q    Have you ever not voted in an election since

24 you've been registered?

25     A    It's possible.  I don't recall.

Briscoe Cain
April 21, 2022

1       Q     Did you register to vote at 18?

2       A     I believe so.

3       Q     And are you currently registered to vote at

4    302 West Oak Street in Deer Park, Texas?

5       A     Yes.

6       Q     Have you ever voted by a mail-in ballot?

7       A     I think I did in 2011, 2012 sometime, when I

8    was going out of the country.

9       Q     How many times do you think you voted by a

10   mail-in ballot?

11      A     One time.

12      Q     One time?  How did you obtain that mail-in

13   ballot?

14      A     By making a request.

15      Q     To who?

16      A     I think that would be the Harris County Clerk's

17   Office.

18      Q     Okay.  Why did you need a mail-in ballot?

19      A     Because I would be out of the country --

20      Q     Okay.

21      A     -- on election day.

22      Q     Have you ever assisted any other voter in

23   voting?

24      A     Would you clarify?

25      Q     Have you ever offered a ride to a voter to get

Briscoe Cain
April 21, 2022

1  to the polls?

2      A    I -- I -- I don't recall.

3      Q    Have you ever offered your wife a ride to the

4  polls?

5      A    I've -- I've driven with my wife to the polls

6  to vote.

7      Q    What about offering a ride to any other family

8  members or friends?

9      A    Possibly.  I -- I don't recall exactly.

10     Q    During your campaign, you never offered rides

11  to people that you knocked on their door and asked them

12  to vote for you?

13     A    I don't recall.

14     Q    Do you have volunteers for your campaign?

15     A    Yes.

16     Q    And you've had volunteers for each of your

17  campaigns?

18     A    Yes.

19     Q    And you've had, what, four campaigns now?  Is

20  that right?

21     A    Four primaries.

22     Q    Four primaries?

23     A    Three generals.

24     Q    Have those volunteers ever assisted any other

25  voters?

Briscoe Cain
April 21, 2022

1      A     I -- I wouldn't have knowledge of that.

2      Q     You've never asked the volunteers for your

3   campaign to offer rides to people that can't get to the

4   polls?

5      A     I -- I don't recall.

6      Q     What about offering mail-in ballots to -- to

7   voters?

8      A     I -- I don't recall asking volunteers to do

9   that.

10      Q     Have you ever offered a mail-in ballot to a

11   voter?

12      A     I'm not sure if my campaign has ever done that.

13      Q     What about you?

14      A     Could you clarify?

15      Q     Have you, just in your personal capacity, ever

16   offered a mail-in ballot to another voter?

17      A     Is it possible to say it another way?  I

18   just -- I -- I don't think I -- I'm having trouble

19   understanding how that would take place.

20      Q     I'll withdraw the question.

21            Have any of your family members ever voted

22   by mail?

23      A     Not that I'm aware of.

24      Q     Parents, grandparents?

25      A     Possibly, but I'm not familiar with --

Briscoe Cain
April 21, 2022

1     Q     Do you think that people who assist large

2  numbers of voters are necessarily committing fraud?

3               MR. SWEETEN:  So to the extent you're

4  asking about his mental impressions regarding the bill,

5  that would be legislative privilege.  If you're not

6  doing that, though, I'm going to let him answer that

7  question.

8               THE WITNESS:  Could you restate the

9  question?

10              MS. DULANEY:  Uh-huh.

11              MR. SWEETEN:  And instruct him

12  accordingly.

13     Q     (BY MS. DULANEY) Do you think that people who

14  assist large numbers of voters are necessarily

15  committing fraud?

16              MR. SWEETEN:  Same instruction.  And

17  objection.  It's legislative privilege.

18              THE WITNESS:  I do not think that the act

19  itself is necessarily perpetuating fraud.

20     Q     (BY MS. DULANEY) Okay.  Have you ever acted as

21  a poll watcher?

22     A     I have.

23     Q     And how many times?

24     A     One time.

25     Q     When?

Briscoe Cain
April 21, 2022

1    A    I think 2018, maybe, on behalf of the

2 Harris County party.

3    Q    Okay.  Have you ever played any other role in

4 helping with -- helping at a polling place, volunteering

5 at a polling place?

6    A    I've served as an election judge.

7    Q    When?

8    A    2013, maybe.

9    Q    In Harris County?

10    A    Yes.

11    Q    So we're here today to talk about the voting

12 law passed by the Texas Legislature and signed by

13 Governor Abbott in September 2021.  We're going to refer

14 to it as SB 1, but we're also going to talk about the

15 predecessor legislation, SB 7, HB 6.  Are you familiar

16 with those laws?

17              MR. SWEETEN:  So let's -- Let me be clear.

18 Are you asking -- We're in a definitional part, it

19 sounds like to me.  Are you telling me that you're going

20 to include, as a definition of SB 1, SB 6, 7, all the

21 other versions as being SB 1?

22              MS. DULANEY:  No.  I'll differentiate.

23              MR. SWEETEN:  Okay.  Okay.  As long as

24 you'll differentiate, I think that that's fine.  I

25 understand more clearly.  Okay.  You can ask your

Briscoe Cain
April 21, 2022

1    question.  Sorry.

2        Q    (BY MS. DULANEY)  Are you familiar with SB 1?

3        A    I know of SB 1, yes.

4        Q    Are you familiar with SB 7?

5        A    I am.

6        Q    Oh, I guess, for the record, let me clarify

7    that.  SB 1 is Senate Bill 1.  SB 7 is Senate Bill 7.

8    And are you familiar with House Bill 6?

9        A    I am.

10       Q    I'll refer to House Bill 6 as HB 6.  Is that

11   okay?

12       A    Please do.

13       Q    Okay.  A little bit easier, huh?  Yeah.  So

14   what's your understanding of this lawsuit?

15       A    I -- I understand that there's a consolidated

16   case and several people filed suit over it, over SB 1.

17       Q    What's your understanding of the claims in this

18   lawsuit?

19       A    I don't have much of an understanding of it.

20       Q    Have you read the complaints filed in this

21   case?

22       A    I have not.

23       Q    Have you read any articles about the complaints

24   filed in this case?

25       A    I've maybe skimmed some, but I -- I can't

Briscoe Cain
April 21, 2022

 1  recall.

 2      Q    So you're unfamiliar with the allegations in

 3  this lawsuit?

 4      A    I mean, I --

 5              MR. SWEETEN:  And -- Hold on.  To the

 6  extent that this question would ask you to reveal a

 7  conversation that you've had with your attorney, me --

 8              THE WITNESS:  Uh-huh.

 9              MR. SWEETEN:  -- then you wouldn't want to

10  provide that information, but other than that, you can

11  answer that question.

12              THE WITNESS:  My answer would be

13  speculation.  I mean, I believe it involves Federal

14  Voting Rights Act things, but I have not read the

15  complaint.

16      Q    (BY MS. DULANEY) Yeah, I don't want you to

17  speculate.  Just asking for general awareness of what --

18  what the claims are.  That was it.

19              Were you asked by Counsel to produce any

20  documents related to this case?

21      A    Yes, in response to subpoenas.

22      Q    And what documents did you produce?  What kinds

23  of documents?

24      A    I believe we produced constituent

25  communications --

Briscoe Cain
April 21, 2022

1    Q    Okay.

2    A    -- through our -- stored in our (Inaudible)

3  system.

4              THE REPORTER:  "...stored in our" --

5              THE WITNESS:  Constituent Management

6  Software.  We call it CMS.

7              I believe we produced communications among

8  legislators, from interest groups.  Are we talking about

9  things that were produced or privileged or all of the

10  above?

11    Q    (BY MS. DULANEY) All of the above.

12    A    We produced documents of drafts and -- I

13  believe there may be some notes.  I think there might

14  have been some screenshots of tweets or texts.  I don't

15  recall at this point.

16    Q    But you handed everything over to Counsel?

17    A    Yes.

18    Q    Okay.  What was your process for identifying

19  those documents?

20    A    Well, one, I worked with my Chief of Staff, and

21  I'm looking for responsive documents, going through kind

22  of each line of each one of the subpoenas, doing our

23  best to produce everything we could find by searching

24  through our systems and emails, and I think (inaudible),

25  so I did my best to find anything responsive --

Briscoe Cain
April 21, 2022

```
 1            THE REPORTER:  I'm sorry?

 2            THE WITNESS:  I think one of them had

 3   requested social media posts, so we looked for that to

 4   try and find responsive content, emails, other

 5   communications.  We took a few weeks and, I guess,

 6   scoured our systems.

 7       Q    (BY MS. DULANEY) Do you remember what search

 8   terms you used?

 9       A    They would be based off of the subpoenas.  I

10   don't have them in front of me.

11       Q    Okay.  Was your Chief of Staff the only one

12   that assisted you in that process?

13       A    I believe so, yes.

14       Q    Okay.

15       A    But may I clarify?

16       Q    Yeah.

17       A    I believe there were times where I communicated

18   with the Attorney General's Office, asking for

19   clarification --

20       Q    Okay.

21       A    -- in order to interpret it properly, to --

22       Q    You mentioned documents from interest groups.

23   What interest groups were those documents from?

24       A    There were communications from MALDEF, NAACP,

25   Texas Public Policy Foundation, a multitude of
```

Briscoe Cain
April 21, 2022

1    organizations, I believe, from -- from across the state.

2         Q    What about The Heritage Foundation?

3         A    I don't believe I produced any documents for

4    that.  Not that I recall.

5      (Discussion held between Ms. Dulaney and Ms. Sadasivan)

6         Q    (BY MS. DULANEY) So getting into some of your

7    general duties and responsibilities as a State

8    Representative, District 128, that's entirely within

9    Harris County; correct?

10        A    That's correct.

11        Q    And what -- what, like, town, cities are

12   included within District 128?

13        A    Parts of Pasadena, almost all of the city of

14   Deer Park, parts of La Porte, all of the city of

15   Morgan's Point, parts of the city of Baytown, and then

16   there's some unincorporated areas of Highlands, Crosby,

17   and Huffman.

18        Q    And you represent the Republican Party?

19        A    I'm a member of the Republican Party.

20        Q    Okay.  What's your understanding of the

21   difference between representing the Republican Party and

22   being a member of the Republican Party?

23        A    I mean, as a member of the Republican Party, it

24   means you've -- you were elected in the primaries as a

25   Republican but that you tend to adhere to the platform

Briscoe Cain
April 21, 2022

```
 1   of the Republican Party and the principles of the party.
 2   The difference, otherwise, though, is that I -- I
 3   represent the constituents and voters of Texas House
 4   District 128.
 5       Q    And you proudly represent every voter in your
 6   district; right?
 7       A    I -- I -- I proudly represent
 8   House District 128.
 9       Q    Do you know the current racial makeup of
10   District 128?
11       A    I've reviewed it before, but not off the top of
12   my head, especially since redistricting.  I don't
13   recall.
14       Q    When was that redistricting?  It was recent;
15   right?
16       A    Yeah.  June -- I think it was -- It was during
17   one of the Specials.
18                 THE REPORTER:  I'm sorry?
19                 THE WITNESS:  It was during one of the
20   special called sessions.  I'm still trying to learn the
21   new boundary lines.
22       Q    (BY MS. DULANEY) We all are.  If I represent to
23   you that prior to the redistricting, District 128 was
24   50.8 percent non-Anglo, do you have any reason to
25   dispute that?
```

Briscoe Cain
April 21, 2022

 1      A    I do not.

 2      Q    Tell me a little bit about just, like, your

 3   responsibilities as a Representative.

 4      A    Well, we're -- we're volunteer legislators that

 5   have session, for the most part, every other year,

 6   beginning in January of odd-numbered years.  Being that

 7   we -- you know, we're -- I guess we're paid around $600

 8   a month, I do as much as I can to be accessible and

 9   respond to phone calls, people from anywhere in the

10   district, including outside the district, trying to help

11   them with constituent services and connect them with

12   issues they're (inaudible).

13                  THE REPORTER:  "Issues" what?

14                  THE WITNESS:  Issues they are having with

15   government.

16      Q    (BY MS. DULANEY) And what types of issues are

17   your constituents calling about?

18      A    Well, primarily, early in 2020 is a lot of

19   Texas Workforce Commission things, unemployment, and we

20   became kind of a hub for the region of helping people

21   out there, but we get phone calls where we have to help

22   people get connected with their Congressman or with

23   their county or with their city.  It ranges.

24      Q    Do you also receive a lot of mail in your

25   office?

Briscoe Cain
April 21, 2022

1        A    I think we receive a lot of mail.

2        Q    Paper mail, emails, both?

3        A    We receive paper and email.  We receive paper

4    and electronic mail.

5        Q    And do you -- do you personally review the mail

6    that your office receives, mail including emails?

7        A    Occasionally, if I come to the Capitol to see

8    it.

9        Q    Okay.  If you're not the one personally

10   reviewing that mail, who is?

11       A    Well, if it comes to the Capitol, my chief

12   would be doing that, at least right now because he's the

13   only one in Austin.  Otherwise, one of my staffers in

14   the district would see it.

15       Q    How are you then briefed on the mail that your

16   office receives?

17       A    They try and forward me things and inform me

18   of -- of what's going on and who they've helped and the

19   kind of, I guess, emails and notices they're receiving.

20       Q    So they summarize the mail your office receives

21   or --

22       A    I would say that's a good assessment, if -- if

23   they're seeing a pattern.  Otherwise, if people are

24   asking for meetings, they help schedule those, or if

25   people have asked for phone calls, they schedule that.

Briscoe Cain
April 21, 2022

1    Q    Do y'all have any office rules about what mail
2  should always come to you?
3    A    I do have a rule about handwritten notes.
4    Q    Okay.
5    A    I ask for -- to be shown those.
6    Q    Okay.  As far as what you receive in your --
7  your in-box, though, your legislative email address, do
8  those emails come directly to you?
9    A    They go to the email box set up for me.
10    Q    Do you have that email set up to where you can
11  review them on your phone?
12    A    I do not.
13    Q    Only on your computer?
14    A    Yes.
15    Q    Does anyone -- Are you the only person that
16  reviews those emails?
17    A    No.
18    Q    Who else reviews those emails?
19    A    I believe my chief, Justin Williamson, does.
20  It's possible that others do as well.
21    Q    Okay.  So if I want to get something to you, I
22  need to hand it to you directly, huh?
23    A    No.
24    Q    How do I get it to you?
25    A    Call me.

Briscoe Cain
April 21, 2022

1    Q    Okay.  Phone calls to your office go directly

2  to you?

3    A    I -- I do have a campaign cell that's out

4  there.  I'm very easily -- easy to get ahold of.

5    Q    Are there any particular issues you focus your

6  legislative efforts on?

7    A    Could you give me a time frame for that?

8    Q    Let's start with your -- your first role, 2017,

9  the first time you were a Representative.

10    A    Uh-huh.  You're asking about my freshman

11  session?  I don't recall.  I think I filed a lot of

12  bills, though.

13              THE REPORTER:  "...filed a lot of" --

14              THE WITNESS:  I believe I filed a lot of

15  bills.

16    Q    (BY MS. DULANEY) What were those bills?  What

17  were the issues that those bills related to?

18    A    I think there were some related to family law

19  and mandatory jurisdiction things.  I -- I don't recall.

20  I didn't have any bills pass, though.

21    Q    Any make it out of committee?

22    A    I don't think so.

23    Q    Any voting rights bills?

24              MR. SWEETEN:  You're asking about the 2017

25  session; is that right?

Briscoe Cain
April 21, 2022

```
1              MS. DULANEY:  Yes.
2              MR. SWEETEN:  Okay.  Go ahead.  You can
3    talk about the filed bills and --
4              THE WITNESS:  I don't recall if I carried
5    any election bills.
6         Q    (BY MS. DULANEY) Okay.  What about 2019?  What
7    kind of bills or issues were you particularly focused
8    on?
9         A    I was focused on campus free speech in 2019.
10        Q    Okay.  Anything else?
11        A    I also filed the -- I guess, the first of the
12   Texas Heartbeat Bills in 2019.
13        Q    Anything else?
14        A    One on college fee transparency, I believe, and
15   I think I carried a bill on criminal defenses to
16   obscenity.
17        Q    Any election-related bills?
18        A    I don't recall.  We filed a lot of bills.  I
19   think -- I think I filed some.  I don't recall what they
20   related to.
21        Q    Did any of those make it out of committee?
22        A    I don't think so.
23        Q    Okay.  So then this most recent legislative
24   session, 2021, what kinds of issues were you
25   particularly focused on?
```

Briscoe Cain
April 21, 2022

```
 1      A     Well, after being informed that I was Chairman
 2  of the Elections Committee, it would be election-related
 3  issues.
 4      Q     Uh-huh.  Anything else?
 5      A     I don't recall how many bills I filed.  You'd
 6  think some of us might know these things.  I -- I don't
 7  recall.
 8      Q     What about just any other issues that you
 9  focused your legislative efforts on?
10      A     Criminal justice reform issues.  I -- I can't
11  think of anything else.
12              MS. DULANEY:  Okay.  We've been going
13  about an hour.  Do y'all want to take a five- to
14  ten-minute break?  Do you want to or do you want to keep
15  going?
16              THE WITNESS:  If -- if you need to, but
17  I'm fine with going.
18              MR. SWEETEN:  Okay.  Let's go another ten
19  or so.
20              MS. DULANEY:  Okay.
21              THE WITNESS:  Let's go like ten hours
22  right now, so --
23      Q     (BY MS. DULANEY) So I'd like to get a better
24  sense of how the legislative process works in Texas,
25  from your perspective as a member of the House.  To get
```

Briscoe Cain
April 21, 2022

1  a sense of the basics, just will you describe for me,

2  generally, how a bill becomes a law in Texas?

3      A    Well, a legislator requests that a bill be

4  drafted and the bill is then filed.  The bill is then

5  referred to a committee by the Speaker.  The committee

6  chair would then set the bill for a hearing.  They may

7  or may not hear public testimony on it.

8              The bill is then voted on committee.  If

9  it's voted on favorably, it could be sent to

10 Local & Consent Calendar or --

11             THE REPORTER:  "...Local and" --

12             THE WITNESS:  -- Local & Consent Calendar

13 or it could be sent to another calendar, like the

14 General State or Major State Calendar.  And then, of

15 course -- backing up, that the bill and the committee

16 report would go to the clerk's office, then be sent to

17 the Calendars Committee, depending on which calendar

18 committee it is, whether that's the Local & Consent

19 Calendar or the Major State or General.

20             The Calendars Committee would then set it

21 for the floor.  The bill would then be heard on the

22 floor if it's getting that far in the process and then

23 be voted on on the floor.  If it passes from the floor,

24 it would then go to the Senate, where, if they make no

25 changes to it, it's passed.

Briscoe Cain
April 21, 2022

1              If they make changes to it, it may come

2    back to the House, where the House would then concur on

3    amendments or reject them or appoint a Conference

4    Committee.  At that stage, the bill becomes law, unless

5    it is vetoed.

6        Q    (BY MS. DULANEY) What's going on in the Senate

7    while a bill is making its way through the House with

8    respect to that proposed bill?

9              MR. SWEETEN:  Objection; compound and

10   vague.

11             But you can answer, as a general matter.

12             THE WITNESS:  Could you clarify it?

13       Q    (BY MS. DULANEY) Yeah.  While the House is

14   working on a bill, as it goes to Committee, is set for

15   hearing, the process you just explained, is there

16   anything happening -- is there anything the Senate is

17   doing at the same time related to that House bill?

18             MR. SWEETEN:  Same objection; vague and

19   compound.

20             But go ahead and answer, to the degree you

21   can.

22             THE WITNESS:  Yeah.  I think if it's a

23   House bill and it's in the House -- And you're asking is

24   the Senate doing anything related to that?  I'm not sure

25   how to answer it because it hasn't gone to the Senate

Briscoe Cain
April 21, 2022

1  yet.

2      Q     (BY MS. DULANEY)  Okay.  Is there always, like,

3  companion legislation?

4      A     No.

5      Q     How common is companion legislation?

6      A     I'm not sure about the statistical common --

7  you know, how often it occurs, but due to the nature of

8  how short our legislative session is, it tends to be the

9  common wisdom that you have a companion so that both

10 chambers are familiar with a bill during the process.

11     Q     What about when a Senate bill comes to the

12 House?  How does the House handle those bills?  What's

13 the process like?

14     A     Well, the Senate bill would come over.  The

15 Speaker would refer it to a committee, and the committee

16 could -- could hear it.  The committee could substitute

17 it, amend it.  It would then -- A committee report and

18 bill analysis, if -- I guess, if all those things are

19 together and sent to the proper calendar committee, then

20 that would then be scheduled for the floor.

21     Q     I'd like to know a little bit more about, like,

22 what sponsoring a bill entails.

23     A     Okay.  I'm trying to think of how to answer

24 that because there's colloquial terms of "sponsor"

25 and -- what -- about what the word "sponsor" means --

Briscoe Cain
April 21, 2022

1    Q    When you put your name as a sponsor on a bill,

2  what does that --

3    A    So --

4    Q    -- what does that include?

5    A    -- sponsoring in the House is only if it's a

6  Senate bill.

7    Q    Okay.

8    A    And if it's a House bill, you're either a joint

9  author, a coauthor, or the primary author.

10    Q    Okay.

11    A    And for a Senate bill, you would be the House

12  sponsor, and there's up to four House joint sponsors and

13  then an unlimited number of House sponsors.  That's done

14  by either reading it off from the -- from the Speaker's

15  dais or signing onto it in the clerk's office and --

16           The same is done for House bills.  The --

17  the author is in charge of who can sign on, but, in

18  general, we turn a form in and people go sign it --

19    Q    Okay.

20    A    -- in the clerk's office.

21    Q    Do you have any -- So are there any additional

22  duties or responsibilities as part of that sponsorship?

23    A    Not exactly.

24    Q    Okay.

25    A    To clarify, if -- if you're cosponsoring it,

Briscoe Cain
April 21, 2022

1  you're just, essentially, adding your name.  Are you --

2  Do you mean, like, House sponsor, as in the one carrying

3  a Senate bill?

4      Q    Let's start with that, sure, as House sponsor.

5      A    The -- the House sponsor is, technically,

6  responsible for carrying the Senate bill in the House.

7      Q    And tell me what you mean by that, "carrying

8  the Senate bill in the House."

9      A    If the Senate bill was to go to committee,

10  generally, the House sponsor would be the one speaking

11  for it.  Of course, you could designate another person

12  to do it in your place.

13      Q    Speaking for it, does that include answering

14  questions on it?

15      A    That's correct.

16      Q    How do you prepare to answer those questions on

17  it, generally?

18      A    By, you know, reading the bill, maybe

19  diagramming it, talking to other legislators.

20      Q    Would it be typical for you to conduct research

21  on it, on the bill?

22      A    You know, one would think, but in a -- in a

23  standard world, most bills are -- a senator calls one of

24  their House members and just asks them to pick it up,

25  and they carry it through with little fanfare.

Briscoe Cain
April 21, 2022

```
1     Q    So nothing else goes into the decision to

2   sponsor the bill besides a phone call?

3               MR. SWEETEN:  First of all, I think that

4   misstates his testimony.  Second of all, I think you're

5   just asking as a general matter; right?  This is

6   clarification?

7               MS. DULANEY:  Correct.

8               MR. SWEETEN:  Okay.  Very good.

9               THE WITNESS:  Yeah.  I would say a lot of

10  the times, depending on the type of legislation, that's

11  kind of what's done as a courtesy.  These are,

12  generally, for your -- what we call, I guess,

13  run-of-the-day -- run-of-the-mill bills, you know,

14  building a library or something.

15    Q    (BY MS. DULANEY) Did you receive a phone call

16  to act as the House sponsor on SB 7?

17              MR. SWEETEN:  Hold on.  Yeah, we're going

18  to object to that as legislatively privileged, though.

19  He's not going to answer that question.

20              MS. DULANEY:  The receipt of a phone call

21  is privileged?

22              MR. SWEETEN:  Not -- Well, the way you

23  asked it was not just, "Did you receive a phone call?"

24  It was, "Did you receive a phone call to sponsor

25  House Bill 7?"  That would -- That would require him to
```

Briscoe Cain
April 21, 2022

1  provide the contents of that communication, so I'm not

2  going to let him answer it as phrased.

3       Q     (BY MS. DULANEY) Are you refusing to answer

4  that question?

5       A     I'm taking the advice of counsel.

6       Q     So let's go back to when you were talking about

7  being -- in the House, they're -- you're an author of a

8  bill, a primary author.  Did you say "coauthor" or

9  "joint author"?

10      A     We also have those.

11      Q     Okay.  Were you the primary author of

12  House Bill 6?

13      A     Yes.

14      Q     Who were your joint authors or coauthors?

15      A     I could name joint authors.

16      Q     Okay.

17      A     I believe that would be Representative Clardy,

18  Klick, maybe Representative Jetton.  I'm not sure who

19  else.  It would be four joint authors.

20      Q     Okay.  And those representatives assisted in

21  the process of drafting the bill?

22            MR. SWEETEN:  So on the drafting of the

23  bill and how a Senate bill -- now you're -- now we're

24  into:  How was Senate Bill -- How was House Bill 6

25  crafted?  And I think his process, including his mental

Briscoe Cain
April 21, 2022

1  process, is -- is, you know, subject to the legislative

2  privilege, and -- so I -- I'm going to caution him with

3  respect to that, to --

4              Don't reveal matters of legislative

5  privilege in response to that question.

6              THE WITNESS:  I spoke with a multitude of

7  members of the legislature about the bill.

8      Q    (BY MS. DULANEY) "Yes" or "no"?  Did those

9  representatives assist you in drafting the bill?

10             MR. SWEETEN:  In the actual drafting?

11 You're saying:  Did they -- Did they draft -- Did they

12 write parts of it?  Is that your question?

13             MS. DULANEY:  Correct.

14             MR. SWEETEN:  Then I think we're getting

15 to legislative privilege in that question, so objection;

16 legislative privilege.

17     Q    (BY MS. DULANEY) Are you refusing to answer

18 that question?

19     A    I'm taking advice of counsel.

20     Q    Generally, if you wanted to file a bill, who

21 would you consult with?

22     A    Generally --

23             MR. SWEETEN:  Hold on.  Objection;

24 compound.  Objection; vague, incomplete hypothetical.

25             You can answer, to the degree you're able,

Briscoe Cain
April 21, 2022

1  as a general matter, the question as phrased.

2              THE WITNESS:  Would you mind clarifying?

3      Q    (BY MS. DULANEY) You've told me about several

4  times where you've filed bills.

5      A    Uh-huh.

6      Q    Before you file those bills, who do you consult

7  with?

8              MR. SWEETEN:  Same objection.

9              THE WITNESS:  I mean, I can answer it

10 generally for you.  Depending on (inaudible) --

11             THE REPORTER:  On what?

12             THE WITNESS:  Depending on the content of

13 the bill -- or, rather, the subject matter and your best

14 prediction of what committee it may go to, many

15 legislators would try and get the chairman of that

16 committee to sign on as a joint author or someone on the

17 Calendars Committee to do so, which would -- the theory

18 is, assisting in -- in moving the bill.

19     Q    (BY MS. DULANEY) Would you ever consult with

20 the governor's office?

21             MR. SWEETEN:  Again, I think it's an

22 incomplete hypothetical, compound, vague.

23             But to the degree you feel like, as a

24 general matter, you can answer that question, you may.

25             MS. SADASIVAN:  Sorry.  What part was

Briscoe Cain
April 21, 2022

1  compound?

2              MR. SWEETEN:  I mean, how about who --

3  would you consult with the governor's office -- office

4  with respect to any bill that you would ever put

5  forward?  So you, basically, have asked him about a

6  whole swath --

7              He's -- he's testified to filing

8  multitudes of bills over the '17, '19, and '21 session,

9  and, therefore, when you're asking him, "Would you

10  consult with the governor's office?" you're asking him a

11  compound question to, generally, characterize what you

12  would do over the course of those filed -- filed bills.

13              That's why it's compound.  It's also

14  vague.  It also calls for speculation, and it also is an

15  incomplete hypothetical.

16              But to the degree you can answer that,

17  feel free.

18              THE WITNESS:  Depending on the subject

19  matter, a legislator may want to consult with the

20  governor's office.

21      Q    (BY MS. DULANEY) What about the Attorney

22  General's Office?

23      A    I assume you're asking whether you would

24  consult with the Attorney General's Office.

25      Q    Correct.

Briscoe Cain
April 21, 2022

1       A    Depending on the subject matter, one might
2    consult with the Attorney General's Office.
3       Q    Have you ever consulted with the Attorney
4    General's Office?
5       A    Can you define how we're discussing "consult
6    with"?  Just in the drafting of or ideas?  What --
7       Q    Yes.
8       A    Okay.  We're discussing consulting and the
9    drafting of a bill?
10      Q    Yes.
11      A    I have asked for the input of agencies on
12   drafting bills before.
13      Q    What other agencies?
14      A    Well, anytime you're -- open the door --
15   anytime you're dealing with something that -- an agency
16   that has the subject matter on, people consult with
17   them.  If it was a fishing bill, you might be advised to
18   talk to Texas Parks & Wildlife.
19      Q    So if you were concerned about the legality of
20   a bill, would you consult with the Attorney General's
21   Office?
22              MR. SWEETEN:  Again, it's vague.  It's
23   compound.  I mean, there's no specificity as to what
24   we're talking about.  Incomplete hypothetical.
25              But to the degree you can answer, you can.

Briscoe Cain
April 21, 2022

1            THE WITNESS:  I don't recall consulting

2    with the Attorney General's Office on questions of

3    legality.

4        Q     (BY MS. DULANEY) Before filing a bill, would

5    you consult with any attorneys?

6            MR. SWEETEN:  Same objection.

7            THE WITNESS:  I'm not sure what the

8    objection being raised is.

9            MR. SWEETEN:  Oh, okay.  I can -- I can

10   restate it.  The question is vague, compound, incomplete

11   hypothetical, calls for speculation.  You asked him to

12   characterize would he ever -- under some undefined

13   circumstances, ever contact another attorney.  I just

14   don't know what we're getting at.

15           But to the extent you feel like you can

16   answer that, go ahead.  If not, tell her so.

17           THE WITNESS:  Yeah.

18           MS. DULANEY:  For the record, I'd like to

19   just say that I believe that you're coaching the

20   witness.

21           MR. SWEETEN:  Well, I would -- I would say

22   that I am pointing out the gross defects in your

23   question.  Okay?  For the record.

24       Q     (BY MS. DULANEY) You can answer.

25       A     Could you repeat the question?

Briscoe Cain
April 21, 2022

1      Q     Before filing a bill, would you consult with

2   attorneys?

3      A     You're asking any --

4              MR. SWEETEN:  Same objection.

5              THE WITNESS:  You're saying any bill?

6      Q     (BY MS. DULANEY) Yep.

7      A     Any attorney, private --

8      Q     Yes.

9      A     -- any lawyer?  Hypothetically, one would

10  consult with an attorney depending on the subject matter

11  of the bill.

12     Q     How about local bar associations?

13             MR. SWEETEN:  Same objection.

14             You can answer.

15             THE WITNESS:  Are you asking if I've

16  ever --

17     Q     (BY MS. DULANEY) Uh-huh.  Have you ever --

18     A     I do not recall seeking advice of a local bar

19  association.

20     Q     Have you ever sought the advice of lobbyists

21  when filing a bill?

22     A     It is common practice, depending on what the

23  subject matter is, to contact industry people of that,

24  and sometimes that involves lobbyists.

25     Q     Have any lobbyists contacted you when you've

Briscoe Cain
April 21, 2022

1   been preparing to file a bill?

2       A    Yes.

3       Q    What lobby groups?

4       A    That's, literally, their job, is to contact us

5   on --

6       Q    Okay.

7       A    So --

8       Q    Who has contacted you?

9       A    I don't know.  There's 10,000 lobbyists in

10  Austin.  A plethora.  I mean, there's people that come

11  by the office when I'm not there to talk and drop cards

12  and give us letters about ideas.

13      Q    Could you just list specific examples that you

14  recall?

15      A    Jake Posey, The Posey Law Firm, works for a lot

16  of folks.  You know, people -- people with charter

17  schools, people with public schools, just -- every --

18  every matter under the sun --

19               MR. SWEETEN:  Okay.

20               THE WITNESS:  -- has a lobbyist.

21               MR. SWEETEN:  Let's take that break now.

22               THE VIDEOGRAPHER:  We're off the record at

23  12:05.

24          (Discussion held off the record)

25               THE VIDEOGRAPHER:  This is Segment No. 2.

Briscoe Cain
April 21, 2022

1   We're back on the record, 12:05.

2                  THE WITNESS:  I believe I was done

3   answering the question.

4                  MR. SWEETEN:  Okay.

5                  MS. SADASIVAN:  Just while -- on the

6   record, if we can make sure that you wait until the

7   witness is finished answering.

8                  MR. SWEETEN:  I -- As I said, I thought I

9   did, and I was right.

10                  Come on.  Let's go, Briscoe.

11                  THE VIDEOGRAPHER:  We're off the record at

12   12:05.

13           (Recess from 12:05 P.M. to 12:22 P.M.)

14                  THE VIDEOGRAPHER:  This is Segment No. 2.

15   We're back on the record, 12:22.

16   Q    (BY MS. DULANEY) Representative Cain, before we

17   left for the break, we were talking a little bit about

18   when you're preparing to file a bill, who you'd consult

19   with.  Would you consult, when you're preparing to file

20   a bill, with any interest group organizations?

21                  MR. SWEETEN:  Same objection; incomplete

22   hypothetical, calls for speculation, compound, and

23   vague.

24                  But you can answer to the degree that you

25   can, generally --

Briscoe Cain
April 21, 2022

1              THE WITNESS:  Yeah, it would be helpful if

2  you could be more specific.  It would -- Each would

3  depend on the subject matter of the bill and whether

4  they'd contact us to talk about it.

5      Q    (BY MS. DULANEY) When you're preparing to file

6  an elections-related bill, who would you consult with?

7  Any interest group organizations?

8              MR. SWEETEN:  So in that regard, he's --

9  as you know, we have objected and he has asserted his

10 legislative privilege, and you know that from the

11 privilege log, as well as our objections.  And so I'm

12 going to instruct him not to provide information related

13 to his mental processes, the gathering of information,

14 solicitation of policy advice that he -- that could have

15 occurred with respect to -- to the -- the bills at

16 issue.  In particular, Senate Bill 7, House Bill 6, I

17 think is what we're talking about.

18             And so if -- if you can't answer that

19 question without doing that, then I -- my instruction

20 would be not to answer the question.  If you can without

21 doing that, then you can go ahead and do it.  Okay?

22             THE WITNESS:  Could you ask about a

23 specific bill?  That may help.

24     Q    (BY MS. DULANEY) Sure.  On House Bill 6, when

25 you were preparing to file House Bill 6, did you consult

1  with any interest group organizations?

2           MR. SWEETEN:  Objection; legislative

3  privilege.  Instruct not to answer.

4     Q    (BY MS. DULANEY) Are you refusing to answer the

5  question?

6           MR. SWEETEN:  You're going to follow my

7  advice?

8           THE WITNESS:  I'm taking my attorney's

9  advice.

10           MS. DULANEY:  Objection to coaching the

11  witness.

12           MR. SWEETEN:  Well, I'm just asking him if

13  he's taking -- I mean, I'm explaining that you're asking

14  whether he's asserting privilege, so --

15           MS. DULANEY:  Mr. Sweeten, you know the

16  law is that the witness needs to invoke the privilege

17  himself.

18           MR. SWEETEN:  Oh, he has invoked the

19  privilege already, as you saw in the subpoena that's

20  been filed in this case, as you saw in the privilege

21  log.  We have asserted legislative privilege.  He's also

22  asserted it again today.  And so I'm instructing him as

23  to the contours of the privilege.  It is Mr. Cain that

24  is deciding whether to take my advice, and so I was

25  clarifying the instruction to him.

Briscoe Cain
April 21, 2022

1    Q    (BY MS. DULANEY) What interest group

2  organizations contacted you when you were preparing to

3  file HB 6?

4              MR. SWEETEN:  Okay.  So I'm going to let

5  you answer the question as to the identity of contacts;

6  in other words, privilege log-type stuff, but not to the

7  substance of those communications.  Okay?

8              THE WITNESS:  Could you give me a time

9  frame?  You're saying before House Bill 6 was filed?

10    Q    (BY MS. DULANEY) Throughout the entirety of the

11  process -- let's -- let's -- yeah, sure.  Before House

12  Bill 6 was filed.

13    A    Okay.  I asked that because you used the word

14  "preparing."

15    Q    Okay.  You're right.

16    A    Your question, then, is:  What interest groups

17  contacted me when preparing to file House Bill 6?

18    Q    Correct.

19    A    After being named, I guess, Chair of the

20  Elections Committee, which would be when I knew that I

21  would be carrying, I guess, a -- you know, a major

22  elections bill, numerous groups, you know, contacted the

23  office and sent communications about ideas they'd like

24  to see done.

25    Q    What specific groups?

Briscoe Cain
April 21, 2022

```
 1      A      Gosh, Texas Public Policy Foundation,
 2  disability rights groups, local, you know, political
 3  parties that kind of have their own informal groups
 4  about election things, numerous people that, you know --
 5  Some people have their own group.  You know, they call
 6  themselves something.  I couldn't recall what they would
 7  be.
 8      Q      Any others, specifically?
 9      A      Not that I recall.
10      Q      Project Veritas?
11      A      I don't recall at this time talking to
12  Project Veritas.
13      Q      The Heritage Foundation?
14      A      I did not speak with any person from
15  The Heritage Foundation.
16      Q      What local political parties contacted you?
17      A      Well, from -- being from Harris County, for
18  example, the -- I think they're called, like, the
19  Election Security Division or something like that of the
20  Harris County Republican Party.  Numerous other county
21  parties have similar things.
22      Q      What counties, specifically?
23      A      I can't think of his last name.  A guy named
24  Sarge.  I believe he's out of Galveston County.  And I
25  just can't recall the other specifics of our counties.
```

Briscoe Cain
April 21, 2022

1      Q     Or the county names?

2      A     Yeah, I can't recall.

3      Q     Okay.  What was the substance of the

4   communications between -- or from -- Well, let me --

5   Withdraw.  Restate.  What was the substance of the

6   communications from the Texas Public Policy Foundation

7   to you regarding House Bill 6?

8                  MR. SWEETEN:  Objection; legislative

9   privilege.  Instruct not to answer.  It would go to

10  his -- the legislative -- his legislative gathering of

11  information, which is protected, solicitation of policy

12  advice, his mental processes, his mental impressions,

13  and so I'll just object on the basis of legislative

14  privilege to that question.

15                  THE WITNESS:  I'm taking the advice of

16  counsel.

17      Q     (BY MS. DULANEY) You're refusing to answer?

18      A     I'm taking the advice of counsel.

19      Q     Have you considered the Texas Constitution as

20  part of your work as a Representative?

21                  MR. SWEETEN:  As -- as a general matter?

22  Is that the question, or are we talking about the bill

23  and the specific thought processes about the

24  legislation?

25      Q     (BY MS. DULANEY) Let's start general matter.

Briscoe Cain
April 21, 2022

```
 1      A      As a general matter, have I taken into account,

 2  if I could rephrase it, the Texas Constitution?

 3      Q      Correct.

 4      A      Regarding any bill or a specific bill?

 5      Q      First, regarding any bill.

 6      A      I have in the past, yes.

 7      Q      Did you take the Texas Constitution -- Did you

 8  consider the Texas Constitution in your work on

 9  House Bill 6?

10              MR. SWEETEN:  So I -- I'm going to go

11  ahead and -- and object on the basis of legislative

12  privilege because you're asking about his mental

13  impressions, and so I'll assert that objection.

14              And my instruction on the contours of that

15  privilege is to not respond to that question.

16              THE WITNESS:  I believe, as a matter of

17  public record, the bill had a -- if I recall, in the

18  text of the bill, there was a discussion of the Texas

19  Constitution.

20      Q      (BY MS. DULANEY) And what was that discussion

21  about?

22              MR. SWEETEN:  You're asking about the

23  public testimony?  Is that the question?

24              MS. DULANEY:  Correct.

25              THE WITNESS:  I believe my answer was that
```

Briscoe Cain
April 21, 2022

1  the text of House Bill 6 made reference to the Texas

2  Constitution.  I'm just asking for clarification because

3  someone mentioned the word "public testimony," and I

4  don't think I was referring to that.  So could someone

5  rephrase the question?

6      Q    (BY MS. DULANEY) Yes.  We'll come back to that

7  a little bit later.  Let's backtrack a little bit,

8  actually.  After you filed House Bill 6, what interest

9  group organizations contacted you?

10     A    Numerous organizations contacted me.

11     Q    Will you name them, specifically?

12     A    I think we've produced documents showing things

13 of interest groups that had contacted us.  I mean,

14 political parties, you know, unofficial org- -- When I

15 say "unofficial" -- right? -- they -- not that they've

16 filed some entity formation with the Secretary of State;

17 right?  Just people calling themselves certain groups.

18             As I've stated, we had handouts from the

19 Texas Public Policy Foundation, handouts from

20 (inaudible) rights organizations --

21             THE REPORTER:  Some -- From what?

22             THE WITNESS:  Texas Public Policy

23 Foundation, certain disability rights organizations,

24 MALDEF, which is M-A-L-D-E-F.

25             MR. SWEETEN:  E-F.

Briscoe Cain
April 21, 2022

```
1              THE WITNESS:  Gosh.  Other organizations

2   that deal with youth and voter registration.  I can't

3   think of their names off the top of my head.  I think we

4   received communications from the NAACP and the ACLU.

5   You know, too numerous to be able to recall.

6       Q    (BY MS. DULANEY) What kinds of communications

7   did you receive from the Texas Public Policy Foundation?

8              MR. SWEETEN:  I just want to be clear on

9   the question.  Are you asking the form that the

10  communication came in or are you asking the substance of

11  the communication?

12      Q    (BY MS. DULANEY) My question was:  What kind of

13  communications did you receive from the Texas Public

14  Policy Foundation?

15             MR. SWEETEN:  Okay.  So to the -- to the

16  degree that she's asking for the substance of the

17  communication, that would be legislatively privileged.

18             THE WITNESS:  Uh-huh.

19             MR. SWEETEN:  To the degree she's asking

20  for the means of communication, email, call, that --

21             THE WITNESS:  Yeah.

22             MR. SWEETEN:  -- you can provide that.  In

23  other words, privilege log information.  You can answer

24  the question based on that instruction.

25             THE WITNESS:  I believe there were oral
```

Briscoe Cain
April 21, 2022

1  communications, whether that's by phone or in person, as

2  well as various means of written communication.

3      Q    (BY MS. DULANEY) Does that include email?

4      A    It could include email, yes.

5      Q    Did it include emails?

6      A    I -- I believe so.  Just -- I'm not absolutely

7  positive, but I believe we may have produced

8  something --

9      Q    Did --

10     A    -- to that account.

11     Q    Did you have in-person meetings with the

12  Texas Public Policy Foundation?

13     A    Yes.

14     Q    How many times?

15     A    Two to five or --

16     Q    How long were those meetings?

17     A    Between 30 minutes and maybe an hour or so.

18     Q    When did those meetings take place?

19     A    At various times through -- throughout the

20  session.

21     Q    Before filing the bill?

22     A    Not that I recall.

23     Q    During -- When the bill was in the Elections

24  Committee?

25     A    I believe so, yes.

Briscoe Cain
April 21, 2022

1      Q    Did you have any meetings with MALDEF?

2      A    I had meetings with members of MALDEF.

3  They're -- they're members of the Legislature.

4      Q    What about the Texas NAACP?

5      A    If I recall, I believe I met -- I can't think

6  of his name but a person from there, yes, in my office.

7      Q    Did you have any in-person meetings with

8  The Heritage Foundation?

9      A    No.

10     Q    When did your meetings with the NAACP take

11 place?

12     A    I don't recall.

13     Q    And I say "meetings."  What -- Was there more

14 than one?

15     A    I -- I believe there was at least one.  I

16 just -- I'm not sure.

17     Q    How many meetings would you say you had with

18 members of MALDEF?

19     A    Can you define "meeting"?  I mean, these are

20 members of the Legislature, so I'm with them all the

21 time.

22     Q    Let me come back to that.  Which members of

23 MALDEF are members of the Legislature as well?  Or who

24 were you -- Sorry.  That's -- Let me withdraw that.

25              Which Rep- -- Which Texas Representatives

Briscoe Cain
April 21, 2022

1  or members of the Texas Legislature did you meet with

2  that were members of MALDEF?

3      A    Some of this may call -- you know, speculate,

4  but I think Eddie Rodriguez, who I believe also

5  testified on that behalf.  At one point -- I think

6  there's members on the committee.  It's a -- It's a

7  large organization.  I can't recall exactly.

8      Q    There were members on the Election Committee

9  that were members of MALDEF?

10     A    Yeah.  I -- I believe that Representative

11 Art Fierro is a member.  I also believe that the

12 Vice Chair, Jessica González, is a member as well.

13     Q    Did you meet with anyone from the

14 Brennan Center for Justice?

15     A    I seem to recall reading something or having a

16 conversation with somebody.  If you had a name, it might

17 refresh my recollection, but -- I think it's possible.

18 I just don't recall exactly when.

19     Q    What about the Texas Civil Rights Project?

20     A    Yeah, there were people I talked to with the

21 Texas Civil Rights Project.  Where and how many times I

22 met or the type of meeting, whether it was in the

23 hallway or my office, I -- I don't recall.

24     Q    And just going back to those members that you

25 believed were members of MALDEF, if I tell you that they

Briscoe Cain
April 21, 2022

1 were actually members of the Mexican American

2 Legislative Caucus, does that -- does that ring a bell?

3     A    MALC?

4     Q    MALC.

5     A    Okay.  I thought those were associated, but --

6 I believe it rings a bell, yes.

7     Q    Do you consider yourself to be an expert on any

8 legislative topics?

9     A    I don't know if I'm an expert.  There's some

10 areas that sometimes I -- I understand well.

11     Q    What areas?

12     A    You know, I think I understand abortion

13 jurisprudence pretty well, free speech matters,

14 religious liberty matters.

15              THE REPORTER:  I'm sorry?

16              THE WITNESS:  Religious liberty issues.

17     Q    (BY MS. DULANEY) But you wouldn't consider

18 yourself an expert?

19     A    On -- on what?

20     Q    On any of those topics.

21     A    You know, my hesitation, as a lawyer, when I

22 think of experts is -- is, you know, being someone with

23 a -- with some kind of curriculum vitae that -- that

24 establishes it.  I -- I don't know how to answer the

25 question.

Briscoe Cain
April 21, 2022

```
 1      Q    You -- Do you believe you have expertise on
 2  those topics?
 3      A    I'd say depending on the exact subject matter,
 4  I have better understanding than most.
 5      Q    You didn't include elections in that list, did
 6  you?
 7      A    That's a -- I don't think I said -- I didn't --
 8  I don't recall saying that just a minute ago.
 9      Q    So you don't consider yourself to have
10  expertise on voting or elections?
11      A    I think I've got a good working knowledge,
12  depending on -- on the subject matter and, I guess,
13  the -- you know, that moment when I'm working on it,
14  it's (inaudible).
15              THE REPORTER:  It's what?
16              THE WITNESS:  I guess it depends -- At the
17  time that I'm working on it, you know, I may have -- I
18  have a well-rounded working knowledge of it in my brain
19  at that moment, I guess.
20      Q    (BY MS. DULANEY) Where does that working
21  knowledge come from?
22              MR. SWEETEN:  So to the extent she's
23  asking you about your mental processes, fact-gathering,
24  research about the bills that we're here to talk
25  about --
```

1         THE WITNESS:  Uh-huh.

2         MR. SWEETEN:  -- which is House Bill 6 and

3   Senate Bill 7, I gather, we -- you know, that would

4   reveal legislative privilege, but to the extent that it

5   wouldn't reveal that, then you can go ahead and answer

6   with that instruction.

7         THE WITNESS:  Yeah.  Reading, research,

8   listening.

9     Q    (BY MS. DULANEY) Listening to who?

10        MR. SWEETEN:  Again, the same instruction.

11  If it's going to reveal your SB -- your knowledge about

12  a piece of legislation, your mental impressions,

13  thoughts, fact-gathering, then you would not answer that

14  question based on legislative privilege.  If it does not

15  do that as to the -- as to a piece of legislation, you

16  can provide that answer.

17        THE WITNESS:  Well, I've -- you know, as

18  an attorney, I've participated on election matters and

19  have listened to the opinions of others about certain

20  election topics.

21    Q    (BY MS. DULANEY) Opinions of others?  Who are

22  "others"?

23        MR. SWEETEN:  Again, not referring to a

24  specific piece of legislation.  If you can't answer it

25  without, you know, providing your mental impressions,

Briscoe Cain
April 21, 2022

 1  fact-gathering information about the particular

 2  legislation, don't do it.  If you can outside of that --

 3              THE WITNESS:  Yeah.  Depending on the

 4  subject, if I've got a question, you know, it might

 5  be -- Attorney Chris Gober is an election attorney I

 6  often call and ask for things.  This is -- Do you want

 7  me to speak in my private life, when I, you know, have a

 8  potential client or somebody call me about an issue?  An

 9  example --

10      Q    (BY MS. DULANEY) Would you mind spelling that

11  last name?

12      A    G-O-B-E-R.

13      Q    And I'm sorry.  I cut you off.

14      A    Chris Gober, G-O-B-E-R.

15      Q    And you were saying "for example"?

16      A    Oh, if -- if I'm contacted in my private life

17  about, you know, a case or some issue in an election

18  contest, I've -- I've called people and heard what they

19  had to say about the state of the law.

20      Q    And you mentioned research.

21      A    Yes.

22      Q    Can you just tell me more about that?

23              MR. SWEETEN:  Objection.  The question is

24  vague.

25              Also, just the same instruction on

Briscoe Cain
April 21, 2022

```
1   legislative privilege.  Don't reveal your thoughts and
2   mental impressions --
3               THE WITNESS:  Uh-huh.
4               MR. SWEETEN:  -- fact-gathering process
5   regarding the legislation.
6               THE WITNESS:  You're asking just research
7   and -- broad, in general?
8       Q    (BY MS. DULANEY) I can -- I can ask the
9   question again.  What research have you conducted that's
10  helped your general understanding of voting and
11  elections?
12              MR. SWEETEN:  Same instruction.
13              THE WITNESS:  The Election Code, I've
14  looked through it and looked at, you know, cases
15  interpreting portions of the Election Code.
16      Q    (BY MS. DULANEY) Anything else?
17              MR. SWEETEN:  Same instruction on --
18              THE WITNESS:  Yeah.
19              MR. SWEETEN:  -- legislative privilege.
20              THE WITNESS:  Not -- not that I can recall
21  right now.
22      Q    (BY MS. DULANEY) And you're referring to the
23  Texas Election Code, just to clarify?
24      A    Yes.
25      Q    You also mentioned reading certain things that
```

Briscoe Cain
April 21, 2022

1   have helped your general understanding, general

2   knowledge of elections and voting.  What have you read?

3                   MR. SWEETEN:  Same objections and

4   instructions.  If this is related to your mental

5   processes and thoughts about those -- about legislation,

6   then -- then that would reveal legislatively privileged

7   information.  If you can answer the question outside of

8   revealing that -- that process --

9                   THE WITNESS:  Uh-huh.

10                  MR. SWEETEN:  -- then -- and you can

11  answer the question, then you -- you can try to do that.

12                  THE WITNESS:  Yeah.  Can I speak to my

13  attorney on a matter of privilege?

14                  MR. SWEETEN:  Yeah, we can -- Let's do

15  that.

16                  MS. DULANEY:  Are we going off the record?

17                  THE VIDEOGRAPHER:  We're off at 12:46.

18          (Recess from 12:46 P.M. to 12:47 P.M.)

19                  THE VIDEOGRAPHER:  This is Segment No. 3.

20  We're back on the record, 12:47.

21                  THE WITNESS:  I don't believe I can answer

22  that question without revealing, you know, matters of

23  legislative privilege, like my mental impressions and

24  thought processes.

25      Q    (BY MS. DULANEY) So you're refusing to answer

Briscoe Cain
April 21, 2022

1    the question?

2        A    As a matter of legislative privilege.

3        Q    Okay.  Are you familiar with the Texas

4    Legislative Black Caucus?

5        A    Yes.

6        Q    Do you consider the Texas Legislative Black

7    Caucus to have expertise in issues affecting the

8    African American community in Texas?

9                MR. SWEETEN:  Same instruction on

10   privilege --

11               THE WITNESS:  Yeah.

12               MR. SWEETEN:  -- but you can --

13               THE WITNESS:  I mean, I would consider

14   them -- I believe them if they say they believe they

15   have a -- you know, a good working understanding of

16   issues of -- affecting Black Texans, I guess.  I

17   don't --

18       Q    (BY MS. DULANEY) So you would believe them if

19   they told you there was a discriminatory impact on Black

20   voters from House Bill 6?

21               MR. SWEETEN:  Okay.  So, for starters,

22   don't reveal matters of legislative privilege, which

23   would be anything related to the legislation.

24               Second, I'm going to object to the

25   question as an incomplete hypothetical and -- and

Briscoe Cain
April 21, 2022

1  calling for speculation, vague, improper foundation.

2                    But go ahead.

3                    THE WITNESS:  Yeah.  Well, if I could

4  restate the answer I gave previously, which is I -- I

5  would believe members of the caucus that they believe

6  they have, you know, this working knowledge or general

7  understanding of -- of that subject matter.

8      Q    (BY MS. DULANEY) So you don't believe them to

9  have expertise in issues affecting the African American

10 community in Texas?

11     A    I don't believe --

12                   MR. SWEETEN:  Objection; misstates

13 testimony.

14                   Also, same instruction on legislative

15 privilege.  You can answer with that instruction.

16                   MS. DULANEY:  I'm just trying to clarify

17 his answer.

18                   MR. SWEETEN:  Same object- --

19                   THE WITNESS:  I don't recall --

20                   MR. SWEETEN:  By the way, I want to

21 preserve the record, so I want to make sure that I've

22 made the same objections that I just made, incomplete

23 hypothetical, foundation, calls for speculation,

24 compound.

25                   And then, also, the legislative privilege

Briscoe Cain
April 21, 2022

 1   instruction.  With that, you can answer the question, to

 2   the degree you're able.

 3                  THE WITNESS:  Yeah.

 4                  MS. DULANEY:  I'd like to object that

 5   you're coaching the witness.

 6                  MR. SWEETEN:  I'd like to -- I'd like to

 7   say that --

 8                  MS. DULANEY:  And interrupting the

 9   witness.

10                  MR. SWEETEN:  I'd like to say that it is

11   my right as his counsel to assert what my particular

12   objection is.  I am doing that.  So --

13                  THE WITNESS:  Uh-huh.

14                  MR. SWEETEN:  -- as to each question,

15   if -- if the question is defective, and that one is

16   grossly defective, then I have the right to tell what my

17   objections are.  That's how this works.

18                  MS. DULANEY:  And I have the right to a

19   full and complete answer.

20                  MR. SWEETEN:  Not in -- as to privileged

21   matters, you do not, nor with -- with respect to legally

22   problematic questions that you're posing.

23                  MS. DULANEY:  I don't believe that's for

24   you to decide.

25                  MR. SWEETEN:  It's for the judge to

Briscoe Cain
April 21, 2022

1    decide, which is why I'm preserving my objection.

2              THE WITNESS:  I do not recall any

3    communications with a member of that caucus whereby they

4    were holding themselves out as experts on the subject

5    matter that you mentioned.  I -- I can't speak to that.

6    Q    (BY MS. DULANEY) Is there any group in Texas

7    you consider to have expertise in issues affecting the

8    African American community?

9              MR. SWEETEN:  Again, to the degree the

10   question would be asking about your mental processes

11   regarding the particular pieces of legislation that

12   we're talking about, don't provide that answer.  To the

13   degree it will not, you may answer that question.

14             THE WITNESS:  I'm sure there are several

15   organizations, depending on their -- their sphere or,

16   you know, leanings or the group they serve, that believe

17   they have that expertise.

18   Q    (BY MS. DULANEY) I'm asking about you.  Do you

19   believe that those organizations have expertise in

20   issues affecting the African American community?

21             MR. SWEETEN:  Which organizations are you

22   asking about?

23             MS. DULANEY:  If there are any others,

24   because he won't answer on Texas Legislative Black

25   Caucus.  If there are any other groups in Texas.

Briscoe Cain
April 21, 2022

1          MR. SWEETEN:  Okay.  I'll just reassert

2  the objections and instruction, but you can answer based

3  on that.  Do you remember -- recall my instructions?

4          THE WITNESS:  I do.

5          MR. SWEETEN:  Okay.

6          THE WITNESS:  I don't know if I can, you

7  know, speak to whether any organization can speak for

8  all of a group, so that's the reason I'm struggling with

9  the question.

10     Q    (BY MS. DULANEY) You don't believe the Texas

11 NAACP has expertise in issues affecting the Texas

12 African American community?

13          MR. SWEETEN:  Same instruction on

14 legislative privilege.  Don't reveal information related

15 to your legislative thought process, but to the degree

16 you can --

17          THE WITNESS:  Uh-huh.

18          MR. SWEETEN:  -- provide that, you can.

19          THE WITNESS:  I believe -- I could say

20 that the NAACP believes that they have an expertise on

21 issues affecting black Texans.

22     Q    (BY MS. DULANEY) But what do you believe?

23          MR. SWEETEN:  Same instruction.

24          THE WITNESS:  I -- I can't answer that as

25 it may, you know, call into my opinion on --

Briscoe Cain
April 21, 2022

```
 1              THE REPORTER:  "It may" what?

 2              THE WITNESS:  It -- it sounds like it's

 3  calling forth the matter of legislative privilege,

 4  asking for my mental impressions.

 5     Q    (BY MS. DULANEY) I'm not asking for your mental

 6  impressions or to encroach on your legislative

 7  privilege.

 8     A    Uh-huh.

 9     Q    I'm asking if you believe that the Texas NAACP

10  has expertise in issues affecting the Texas

11  African American community.

12              MR. SWEETEN:  Same -- So same instruction

13  that I've been giving you --

14              THE WITNESS:  Yeah.

15              MR. SWEETEN:  -- about legislative

16  privilege and legislation, so it's --

17              THE WITNESS:  My concern is with the

18  (inaudible) of it.

19              THE REPORTER:  Say that again.

20              THE WITNESS:  My concern is with the --

21  the breadth of the question.  I could say that I believe

22  the NAACP has an expertise with, I guess, certain

23  segments of the population.  I don't see how they are

24  able to speak for everyone.

25     Q    (BY MS. DULANEY) Which segments of the
```

Briscoe Cain
April 21, 2022

1   population?

2            MR. SWEETEN:  Same instruction.

3            THE WITNESS:  I -- I'm -- I'm not sure.  I

4   just know of people that I work with at the Capitol and

5   others who would say they don't speak for me, so I don't

6   know, you know, how to say whether that makes them the,

7   you know, preeminent expert in speaking for everybody of

8   a certain demographic.

9   Q    (BY MS. DULANEY) Do you consider the Texas

10  Mexican American Legislative Caucus to have expertise in

11  issues affecting the Latino community in Texas?

12           MR. SWEETEN:  Same instruction on

13  legislative privilege.  Don't reveal your mental

14  impressions regarding a leg- -- a particular piece of

15  legislation.  If you can answer without doing that, I'll

16  let you do that.

17           THE WITNESS:  Uh-huh.  It's a similar

18  answer.  I believe that MALC believes they have that

19  expertise, but my difficulty is in believing that they

20  speak for all people of a certain demographic.  I can't

21  attest to that.

22  Q    (BY MS. DULANEY) Is there any other group in

23  Texas you would consider to have expertise in issues

24  affecting the Latino community?

25           MR. SWEETEN:  Same instruction on

Briscoe Cain
April 21, 2022

1  legislative privilege.

2              THE WITNESS:  I'm sure there's

3  organizations that believe so, but, similarly, I don't

4  think the entire Republican Party speaks for every

5  person who identifies as a Republican.  I -- I don't

6  believe I'm able to properly answer that question.

7      Q    (BY MS. DULANEY) But you believe the Texas

8  Mexican American Legislative Caucus has expertise in

9  issues affecting certain Latinos in Texas?

10             MR. SWEETEN:  Objection; asked and

11  answered and, also, object on --

12             And -- and just instruct, with respect to

13  legislative privilege, to not reveal your --

14             THE WITNESS:  Yeah.

15             MR. SWEETEN:  -- thoughts about particular

16  legislation.

17             THE WITNESS:  I think -- As I'd said, I

18  think they believe they've got expertise on, you know, a

19  certain segment of that demographic.  I -- I don't know

20  what that is, but I believe that they believe that.

21      Q    (BY MS. DULANEY) What do you believe?

22             MR. SWEETEN:  Objection; asked and

23  answered.  Same instruction.  I mean, you're --

24  you're -- you're getting towards badgering of the

25  witness on this question, and the -- the que- -- I think

Briscoe Cain
April 21, 2022

1  he's answered this multiple times now.

2                      MS. DULANEY:  I don't believe he's

3  answered the question.

4                      THE WITNESS:  I do not think that I can,

5  you know, confirm or attest to a single organization

6  being the expert on an entire segment of society.  I --

7  I can't confirm that.  If they say so, I believe -- I

8  can say that I believe that they believe that, but I --

9  I can't confirm that for what they hold out as.

10      Q    (BY MS. DULANEY) During your time as a

11  Representative, what committees have you served on?

12      A    Okay.

13      Q    I guess -- Let me withdraw.  Let me ask more

14  specific questions.  In 2017, your first session, what

15  committees did you serve on?

16      A    It would be, I believe, Juvenile Justice and

17  Family Affairs, and I think -- Gosh.  I think a veterans

18  committee -- a committee dealing with veterans.

19      Q    Any select committees?

20      A    Not that I recall.

21      Q    In 2019, which committees did you serve on for

22  the 86 Legislative Section?

23      A    The Elections Committee.  Man.  There was

24  another one.  I had two.  The Resolutions Committee was

25  another -- that would be a procedural committee.  And

Briscoe Cain
April 21, 2022

```
 1   then at some point in the interim, I was appointed Chair

 2   of the Select Committee on Driver's License Renewal;

 3   however, due to COVID and things, we didn't actually

 4   ever get to organize or (inaudible) hearings.

 5              THE REPORTER:  "...didn't get to

 6   organize" --

 7              THE WITNESS:  We didn't get to organize or

 8   hold hearings.

 9       Q    (BY MS. DULANEY) And then during the

10   87th Legislation Session, what committees did you serve

11   on?

12       A    Served on the Elections Committee and

13   Business & Industry.

14       Q    How were you originally appointed, so during

15   the 86th Session, to be on the Elections Committee?

16       A    The Speaker appoints members to committees.

17       Q    How does that selection process work?

18              MR. SWEETEN:  You mean as a general

19   matter?

20              MS. DULANEY:  How -- how does -- how he

21   was selected to be on the Elections Committee during the

22   86th Legislative Session.

23              MR. SWEETEN:  Okay.  So in that regard,

24   don't reveal any legislative privilege information,

25   which would mean conversations with any legislators
```

Briscoe Cain
April 21, 2022

1  about particular legislation, con- -- conversations with

2  staffers.  And you can, obviously, refer to matters in

3  the public record, but, otherwise, I'm going to instruct

4  you not to provide legislatively privileged information,

5  Representative Cain.

6           THE WITNESS:  According to the House

7  rules, the Speaker has absolute discretion on where they

8  place members on committee.

9      Q    (BY MS. DULANEY) So it's like an interview

10 process?

11     A    This -- The Speaker has absolute -- they -- The

12 Speaker can, theoretically, appoint a person to no

13 committees or 20 committees if they wanted to.  It's --

14     Q    Even if you have no interest whatsoever in the

15 subject matter of the committee?

16     A    That absolutely happens.

17     Q    Okay.

18     A    There's definitely people being punished

19 sometimes for committees, yeah.

20     Q    Have you ever been punished for -- and put on a

21 committee?

22     A    Absolutely.

23     Q    What committee?

24           MR. SWEETEN:  Don't reveal legislatively

25 privileged info, but --

Briscoe Cain
April 21, 2022

```
 1                THE WITNESS:  I -- I'm sure my 2017
 2  session was nothing but punishment.
 3      Q    (BY MS. DULANEY) Freshman?  Let's talk a little
 4  bit about the Elections Committee, specifically.
 5                Actually, let me rewind.  Did you express
 6  an interest to the Speaker to be on the Elections
 7  Committee?
 8                MR. SWEETEN:  You're calling for a
 9  conversation that he would have had in -- regarding a
10  legislative matter.  I'm going to instruct him not to
11  answer on the basis of legislative privilege.
12                THE WITNESS:  Yeah, I -- I believe that's
13  a matter of legislative privilege.  I'm taking the
14  advice of counsel.
15      Q    (BY MS. DULANEY) You're refusing to answer?
16      A    I'm taking the advice of counsel.
17      Q    Did you want to be on the Elections Committee?
18                MR. SWEETEN:  Same objection; mental
19  impressions regarding legislatively privileged
20  information, and so, therefore, I'm going to instruct
21  not to answer on that basis.
22                THE WITNESS:  Yeah.  I'm taking the advice
23  of counsel.
24      Q    (BY MS. DULANEY) You're refusing to answer?
25      A    I'm taking the advice of counsel.
```

Briscoe Cain
April 21, 2022

1    Q    Okay.  Will you tell me about the Elections

2  Committee, generally?

3              MR. SWEETEN:  For -- Let me state,

4  Representative, obviously, we're -- you've asserted

5  legislative privilege, and the contours of that would be

6  mental impressions, thoughts, legislative

7  fact-gathering.  If you -- So I'm going to instruct you

8  not to answer if -- if answering would reveal that

9  information.  I would say that you're free to refer to

10  matters of the public record.

11              THE WITNESS:  Uh-huh.  It is a committee

12  established by the House rules with certain

13  jurisdictions, and I believe it's a seven-person

14  committee.

15    Q    (BY MS. DULANEY) What does the Elections

16  Committee have jurisdiction over?

17    A    Well, according to public --

18              MR. SWEETEN:  Same instruction.

19              THE WITNESS:  -- public record -- The

20  House rules are, you know, available online, our TLO.

21  It would be matters dealing with elections, you know,

22  election (inaudible).

23              THE REPORTER:  "Election" what?

24              THE WITNESS:  Election laws and things.

25  I -- I'm sure -- I know there's more to it than that and

Briscoe Cain
April 21, 2022

```
1  other wording, but I -- I -- I don't have that specific

2  provision of the rule memorized.

3       Q    (BY MS. DULANEY) And that includes jurisdiction

4  over all matters pertaining to the Texas Secretary of

5  State in relation to elections; correct?

6       A    If -- if you got that from the rules, then I

7  would -- I would agree with you.

8       Q    Okay.  I did.

9       A    I'm just saying there's -- there's always -- a

10 bill, theoretically, the jurisdiction could be germane

11 to at least more than one committee, so -- but,

12 generally, that would fit in the Elections Committee.

13      Q    Would any other committee in the House hear

14 bills related to elections?

15      A    State Affairs certainly could.  And, again, the

16 Speaker has absolute discretion.

17      Q    In the House?

18      A    The Speaker could refer that bill to any

19 committee they desired.  It could go to Insurance if he

20 wanted it to.

21      Q    Okay.  Who's Keith Ingram?

22      A    Keith Ingram is, I believe, Chief of the

23 Elections Division of the Secretary of State's Office.

24      Q    And you've heard Mr. Ingram provide testimony

25 before the Elections Committee?
```

Briscoe Cain
April 21, 2022

```
 1        A     Yes.
 2        Q     Do you believe Mr. Ingram to be a truthful
 3   person?
 4                MR. SWEETEN:  So in answering -- Hold on.
 5   In answering this question -- I -- I need to instruct
 6   you --
 7                THE WITNESS:  Yeah.
 8                MR. SWEETEN:  -- on privilege and the
 9   contours.  In answering this question, don't reveal your
10   mental impressions regarding legislation.  Okay?  Don't
11   reveal your legislative fact-gathering process or
12   solicitation of policy advice or that would be
13   legislative privilege.  Okay?
14                THE WITNESS:  Uh-huh.
15                MR. SWEETEN:  So you can -- If -- So to
16   the degree you're doing that, I would instruct you not
17   to answer.  To the degree you are not and can refer to
18   matters in the public record, you may do so.
19                THE WITNESS:  I do not believe
20   Keith Ingram to be a deceitful man.
21        Q     (BY MS. DULANEY) Do you believe Keith Ingram to
22   be knowledgeable?
23                MR. SWEETEN:  Same instruction.
24                THE WITNESS:  About?  Knowledgeable about?
25        Q     (BY MS. DULANEY) Elections.
```

Briscoe Cain
April 21, 2022

1      A      I would say he's knowledgeable about elections,

2    specifically the procedures of how it works and things.

3      Q      Do you consider him to be knowledgeable about

4    matters of election fraud?

5                    MR. SWEETEN:   Same instruction on

6    legislative privilege.

7                    THE WITNESS:   I mean, I think he knows

8    about it, but I wouldn't say it's in his wheelhouse to,

9    you know, prosecute election fraud and things, so...

10      Q      (BY MS. DULANEY) Okay.  Do you believe

11    Mr. Ingram's a competent person?

12                    MR. SWEETEN:   Same objection; legislative

13    privilege, and instruction.

14                    You may answer on that -- with that

15    instruction in mind.

16                    THE WITNESS:   Yeah.  It would be insulting

17    to the governor, who appoints that person's boss that

18    hires him, to say he's, you know, incompetent, so I

19    would say, generally, Mr. Ingram is a competent person.

20      Q      (BY MS. DULANEY) Do you believe him to be

21    competent about matters related to elections?

22                    MR. SWEETEN:   Same objection; legislative

23    privilege.  Same instruction on that question.

24                    THE WITNESS:   I think, you know, the

25    record would show that -- I mean, he's testified as

Briscoe Cain
April 21, 2022

1  such, and that's why he's invited to -- to give

2  testimony on election bills, because he knows, you know,

3  the inner workings of, I guess, the Election Code, so --

4  if that's interpreted as being competent, but that's --

5  that's why he's invited to -- to give testimony on

6  election bills.

7      Q     (BY MS. DULANEY) And he testified in front of

8  the Elections Committee regarding House Bill 6; correct?

9      A     I believe that's correct.

10     Q     And that testimony's a matter of public record?

11     A     Yes.

12     Q     What do you recall about what Mr. Ingram

13 testified about?

14            MR. SWEETEN:  In that -- answering that,

15 I'm -- first, object; legislative privilege.  Instruct

16 you to the contours.  I think we've done that.  If you

17 need me to do that, I can again, but, otherwise, you can

18 answer, as long as you're not revealing legislative

19 privilege about a bill.

20            THE WITNESS:  Did you ask what he

21 testified -- on what matter, again?

22     Q     (BY MS. DULANEY) On House Bill 6.

23     A     There were so many things he testified on of

24 whether -- you know, the standardized polling hours,

25 et cetera.  He gave his opinion on -- on that, I guess,

Briscoe Cain
April 21, 2022

1 thoroughly.

2    Q    What else do you remember?

3                MR. SWEETEN:  Same objection on

4 legislative privilege and instruction, so -- and, also,

5 just -- the question is vague.

6                THE WITNESS:  Yeah.  The -- I believe that

7 committee was in -- there was a hearing in March and

8 another on April 1st.  It's been a while.  I don't -- I

9 don't recall all the specifics.

10                MR. SWEETEN:  Counsel, I don't need a

11 break now, but I'm trying to plan my -- I'm trying to

12 plan when we would eat lunch.  It's 1:08, and we can go

13 for however long you guys want, but I wondered if you

14 wanted to select a time to work towards.

15                MS. DULANEY:  Do you want to go until

16 1:30?  Is that okay?

17                MR. SWEETEN:  That's fine.  Does that work

18 for you, too?

19                MS. DULANEY:  Does that work for you?

20                THE WITNESS:  Let's go to midnight.  Let's

21 do this.

22                MS. DULANEY:  Well, actually, we can't,

23 so -- unless we took a very lengthy break, and I don't

24 think that we want to keep our court reporter or

25 videographer here.

Briscoe Cain
April 21, 2022

1          MR. SWEETEN:  1:30 is fine.  Now, we have

2  limited options around here, so how much time do you --

3          THE REPORTER:  Do you want to go off the

4  record?

5          MR. SWEETEN:  I'm just -- No.

6          THE REPORTER:  Okay.

7          MR. SWEETEN:  Let's just -- How much time

8  do you think you'll need for lunch?

9          MS. DULANEY:  Like 30 minutes.

10          MR. SWEETEN:  Okay.  All right.  If that's

11  enough, then that's -- we'll take that break.

12          MS. DULANEY:  Yeah.

13          MR. SWEETEN:  So at 1:30 we'll do that,

14  leave, and come back at 2:00.  Okay.  Very good.

15          MS. DULANEY:  Okay.

16          MR. SWEETEN:  So everybody knows.

17          THE WITNESS:  I'm going to follow the

18  advice of counsel.

19          MS. DULANEY:  Hopefully.

20      Q    (BY MS. DULANEY) So let's talk a little bit

21  about your involvement with House Bill 6 during the

22  87th Regular Session.  Did you conduct research after

23  you filed House Bill 6?

24          MR. SWEETEN:  So I'm going to object on

25  the basis of legislative privilege and instruct not to

Briscoe Cain
April 21, 2022

1    answer that question.

2                    THE WITNESS:  Yeah.  I -- I believe it

3    would reveal matters of legislative privilege, so I'll

4    heed the advice of counsel.

5        Q    (BY MS. DULANEY) So you're refusing to answer?

6        A    I'm following the advice of counsel.

7        Q    Are you aware of any data showing the impact

8    House Bill 6 would have on minority voters when you were

9    drafting the bill?

10                   MR. SWEETEN:  Same objection; legislative

11   privilege to the extent it would go to his mental

12   impressions.  So that -- I think that's a legislatively

13   privileged question.

14                   THE WITNESS:  I -- I believe that would

15   reveal matters of impression and legislative privilege,

16   so I take the advice of counsel.

17       Q    (BY MS. DULANEY) So you're refusing to answer

18   just whether you were aware or not of any data showing

19   the impact HB 6 would have on minority voters?

20       A    Yes.  I'm asserting legislative privilege.

21       Q    Okay.  What other members -- You mentioned

22   three previously, but what other members of the Texas

23   Legislature did you work with in drafting House Bill 6?

24       A    I'm not sure I mentioned three.

25       Q    I thought that you might have.  Clardy, Klick,

Briscoe Cain
April 21, 2022

```
 1   and Jet- -- Jetton, Jetton?

 2       A    I think there's a -- maybe a misnomer in

 3   that --

 4       Q    Okay.

 5       A    -- people being named joint authors is

 6   equivalent to or equals assisting in drafting or

 7   something.  I --

 8       Q    Okay.  That's my misunderstanding.  So the

 9   joint authors don't necessarily assist you in drafting

10   bills?

11       A    That's correct.  Not necessarily.

12       Q    Okay.  Who did assist you in drafting

13   House Bill 6?

14                 MR. SWEETEN:  Objection; legislative

15   privilege that would reveal his legislative gathering of

16   information, solicitation of policy advice, and -- and

17   would impact -- that would directly impact legislative

18   privilege.

19                 So my instruction is, unequivocally, that

20   that would reveal legislative privilege --

21                 THE WITNESS:  Uh-huh.

22                 MR. SWEETEN:  -- so I'm going to instruct

23   you not to answer that question.

24                 THE WITNESS:  Are you saying, though, to

25   the extent that it reveals that --
```

Briscoe Cain
April 21, 2022

```
1              MR. SWEETEN:  My instruction on that one

2    is I don't think you can answer that without revealing

3    legislative privilege, so my instruction is not to

4    answer the question on the basis of legislative

5    privilege.

6              THE WITNESS:  I'm unable to answer the

7    question due to legislative privilege, but maybe if it

8    was restated.

9    Q     (BY MS. DULANEY) Did you work with anyone

10   outside of the Legislature in drafting House Bill 6?

11             MR. SWEETEN:  So same objection.  That

12   goes to your mental impressions regarding legislative

13   fact-gathering, solicitation of policy advice.  It bears

14   on potential legislation, and so, therefore, my

15   instruction would be that -- since you have asserted

16   legislative privilege, to not answer on that basis.

17             THE WITNESS:  Yeah.  I'm trying to think

18   of a way to answer it without violating that, but I'd

19   have to assert legislative privilege, of course, being

20   open to answer the question should it be rephrased

21   differently.

22   Q     (BY MS. DULANEY) Can someone who is not an

23   author and not a member of the Texas Legislature assist

24   you in drafting a bill?

25             MR. SWEETEN:  Do you mean ever or do you
```

Briscoe Cain
April 21, 2022

1  mean House Bill -- this -- the particular House bill you

2  were just asking about?

3           MS. DULANEY:  Ever.

4           MR. SWEETEN:  Okay.  Could it ever happen?

5           THE WITNESS:  Of course.

6           MR. SWEETEN:  You can answer that

7  question.  Don't reveal privilege on the particular

8  legislation.  Okay?

9           THE WITNESS:  Yes, of course.

10     Q    (BY MS. DULANEY) Did anyone who was not a

11  member of the Texas Legislature assist you in drafting

12  House Bill 6?

13           MR. SWEETEN:  Same objection.  That calls

14  for legislative privilege.  Instruct not to answer on

15  the basis of legislative privilege.

16           THE WITNESS:  I'm going to take the advice

17  of counsel.  I could answer the question if it was

18  phrased in such a way that it did not, you know, bring

19  into issue matters of legislative privilege.

20     Q    (BY MS. DULANEY) I'm not asking for the

21  substance of any of the communications.  I'd just like

22  to know who you were working with in drafting the bill.

23           MR. SWEETEN:  So I -- I think my

24  instruction stands as phrased.

25     Q    (BY MS. DULANEY) So are you -- are you refusing

Briscoe Cain
April 21, 2022

1  to answer?

2       A    I am taking advice of counsel.

3       Q    Okay.  I'd like to understand the full scope of

4  people, organizations, who spoke to you outside of the

5  Legislature while you were drafting House Bill 6.

6                 MR. SWEETEN:  I'm going to let him answer

7  that, whether the contact occurred.  Obviously, we'll

8  object if you get into the substance.

9                 THE WITNESS:  Uh-huh.

10                MR. SWEETEN:  But you may answer that

11 question.

12                THE WITNESS:  Your question, if I get it

13 right, is the full scope of people that I spoke with

14 outside of the Legislature in drafting it?

15      Q    (BY MS. DULANEY) Or about or regarding?

16      A    Or about?

17                MR. SWEETEN:  Okay.  And I'll also just --

18 That -- that calls for a narrative and it's -- it's

19 really broad.

20                But go ahead.  You can answer, to the

21 extent you're able.

22                THE WITNESS:  Numerous individuals would

23 contact us or call or email or -- You'd see it

24 everywhere.  I mean, it was -- At that moment in time,

25 people knew, I guess, my role, and I -- You could see

Briscoe Cain
April 21, 2022

```
1  them anywhere.  People would come up to you and ask -- I
2  could be at an event or a function or a Chamber of
3  Commerce thing, practically a birthday party, and
4  someone would ask about it and wonder what was going on
5  or what the bill was doing.
6      Q    (BY MS. DULANEY) Who do you remember contacting
7  you?
8      A    I mean, it's -- it is countless individuals,
9  just grass people that are -- grass roots that -- that
10 have an interest in election integrity legislation.
11     Q    Any names?
12     A    Gosh.  Let me think of some names.  You know, I
13 mentioned one earlier, Sarge, but I just can't remember
14 his last name.  He's out of Galveston.  I'm having
15 trouble recalling names.  I -- My apologies.  I -- Just
16 different people.  Chairmen of, you know, County parties
17 and things would -- would see me and ask me questions.
18     Q    What third-party organizations contacted you
19 when you were drafting House Bill 6?
20     A    I think we've --
21              MR. SWEETEN:  Asked -- Objection; asked
22 and answered.
23              THE WITNESS:  By that, does it mean we've
24 been here before?
25              MR. SWEETEN:  I'm sorry?
```

Briscoe Cain
April 21, 2022

1              THE WITNESS:  By that, do you mean we've

2  had this question before or --

3              MR. SWEETEN:  Yeah.  That -- Asked and

4  answered is the -- that's what that means, yeah.

5     Q     (BY MS. DULANEY) Are you not going to answer?

6     A     I believe we discussed third-party

7  organizations that had contacted me regarding

8  House Bill 6.

9              MR. SWEETEN:  Yeah.  There was a time --

10  MALDEF.  We talked about all those organizations

11  earlier.

12     Q     (BY MS. DULANEY) Did the Texas Secretary of

13  State's Office contact you when you were drafting

14  House Bill 6?

15              MR. SWEETEN:  You can answer whether there

16  was contact.  Privilege log information (inaudible).

17              THE WITNESS:  The --

18              THE REPORTER:  Hold on.

19              MR. SWEETEN:  No substance.

20              THE WITNESS:  The Secretary of State's

21  Office, I believe, if I'm correct, especially even my

22  first time on that committee in 2019, informs every

23  member of the Elections Committee that they're there as

24  a resource and to call upon them to ask questions at our

25  leisure.

Briscoe Cain
April 21, 2022

1    Q    (BY MS. DULANEY) Did Former President Trump

2  contact you while you were drafting House Bill 6?

3    A    He did not.

4    Q    Did anyone affiliated with former

5  President Trump contact you while you were drafting

6  House Bill 6?

7              MR. SWEETEN:  Objection; vague, calls for

8  speculation.

9              THE WITNESS:  I don't recall.  Could you

10  be more specific on what you mean by "affiliated with"?

11    Q    (BY MS. DULANEY) Anyone that was on

12  President Trump's team, involved in his campaigns.  How

13  you would describe -- How you would think of

14  "affiliated" in the dictionary, how you would use it

15  every day.

16    A    Well, I mean, some people assert that, like,

17  you know -- I often see people say, "Well, the leader of

18  your party," or something, and so I don't -- I mean,

19  some believe that a president is the leader of their

20  political party.  I -- I disagree with that.

21              So I -- I do not recall whether anyone

22  that -- directly contacted me that's, I guess, in some

23  kind of close affiliation or is on, you know, the Trump

24  campaign's payroll or -- about House Bill 6.

25    Q    Did anyone you would consider to be an expert

Briscoe Cain
April 21, 2022

1  on elections contact you while you were drafting

2  House Bill 6?

3      A    I communicated with people who believe they're

4  experts.

5      Q    Who?

6      A    An attorney that consulted me, Elizabeth

7  Bingham -- Elizabeth Alvarez Bingham, communicated with

8  me about this matter.  We were in communications with, I

9  would say, you know, members of the Election Division of

10 the Secretary of State's Office that would hold

11 themselves out as being experts, and I would say I have

12 a strong working knowledge of certain matters involving

13 elections.

14            There were countless other people who

15 believe they have certain expertise, you know,

16 mentioned, NAACP and others who, you know, would hold

17 themselves out in -- depending on the area of election

18 law, that would consider themselves to be experts.

19     Q    Anyone else?

20     A    I -- I don't recall.

21            THE REPORTER:  Say that --

22            THE WITNESS:  I do not recall.

23     Q    (BY MS. DULANEY) What about any County election

24 administrators?  Did any of those contact you while you

25 were drafting HB 6?

Briscoe Cain
April 21, 2022

1      A    Yes.

2      Q    What counties?

3      A    The one that's most often there is out of

4  Williamson County, it being, you know, a neighboring

5  county here in the Capitol and being -- I think his name

6  is Chris Davis, would be his name.  I think he's also,

7  you know, head of the County Administrators Association,

8  and so he was in the Capitol a lot.

9            And there were others.  I can't think of

10 which counties.  There was -- Gosh.  I know I met with,

11 personally in my office, I believe, from Nueces, which

12 is where Corpus Christi is.  Maybe I've got the county

13 wrong.  I think she was there, but she could be a

14 County Clerk.  I don't recall.  They -- they serve as

15 the same function, and I'm not sure if it was the EA or

16 a County Clerk sometimes.

17     Q    Uh-huh.  Any others you can remember?

18     A    Yes.  I mean, there was Ms. Longoria of

19 Harris County.  Talked to Chris -- can't remember his

20 last name, the former -- gosh, out of Harris County.

21     Q    Chris Collins?

22     A    Yes.  I spoke with him at some point.

23     Q    Anyone else you can remember?

24     A    No.  I just know there were a lot of

25 County Clerks and others that would either come by or,

Briscoe Cain
April 21, 2022

1  as the record would show, either testified or

2  communicated with the office.

3      Q    Anyone from Travis County?

4      A    I'd believe you if you said so.  I just -- I

5  can't recall their name off the top of my head or the

6  moment of it, but their proximity to the Capitol, I --

7  I'm sure they did testify or come by.  I just don't

8  recall.

9      Q    Bexar County?

10     A    I -- I don't recall exactly.

11     Q    Dallas County?

12     A    I don't -- I don't recall.

13     Q    Okay.

14          (Discussion held off the record)

15     Q    (BY MS. DULANEY) Any District Attorney's

16 Offices contact you when you were drafting House Bill 6?

17     A    Okay.  So when you're saying "during the

18 drafting," this is pre-filing?

19     Q    During the drafting.

20     A    I don't recall.

21     Q    After filing, did any?

22     A    I don't recall.  I -- I just assume that maybe

23 some came and testified.  I -- I just -- I'm not sure.

24     Q    Okay.  Did you receive any documents that

25 assess House Bill 6's impact on any racial, ethnic, or

Briscoe Cain
April 21, 2022

 1  disability status groups?

 2               MR. SWEETEN:  Yeah, that calls for

 3  legislative privilege, and so I'm going to instruct not

 4  to answer.

 5               THE WITNESS:  I would follow the advice of

 6  counsel and assert legislative privilege.

 7    Q    (BY MS. DULANEY) Did you receive any documents

 8  from any third-party organizations that assessed

 9  House Bill 6's impact on any racial, ethnic, or

10  disability status groups?

11               MR. SWEETEN:  So same objection, same

12  instruction.

13               THE WITNESS:  I'll take advice of counsel.

14    Q    (BY MS. DULANEY) You're refusing to answer

15  whether any third parties sent you any impact analysis

16  on House Bill 6?

17    A    With the assertion of legislative privilege, I

18  believe I'm taking the advice of counsel on that.

19    Q    Okay.  Did any County officials reach out to

20  you with concerns about implementing House Bill 6?

21               MR. SWEETEN:  Same objection; legislative

22  privilege.

23               THE WITNESS:  I just have a clarification

24  question.

25    Q    (BY MS. DULANEY) Yeah.

Briscoe Cain
April 21, 2022

1    A    House Bill 6 was never implemented.

2    Q    Correct.

3    A    Okay.  I would take the advice of counsel and

4  assert legislative privilege.

5    Q    Just whether or not the County officials

6  reached out to you, not asking about the substance of

7  the communications, did any County officials reach out

8  to you with concerns?

9    A    Numerous County officials contacted the office.

10  I don't recall exactly the substance of their

11  communications, and if there were substantive

12  communications, I -- I'm going to have to assert

13  legislative privilege.

14    Q    And I'm not asking for substance, but do you

15  recall which County officials reached out to you?

16         MR. SWEETEN:  You can answer.

17         THE WITNESS:  Like I said, you know, I

18  believe Harris County had come by.  There were County

19  folks from, you know, across the state that had opinions

20  on -- on the bill, pro and con.  I mean --

21    Q    (BY MS. DULANEY) Uh-huh.  Any other counties

22  you can remember?

23    A    You know, I can re- -- I -- I can't recite all

24  254, but -- I -- I can't -- I don't think I can even

25  accurately estimate a number of counties.  I do believe

Briscoe Cain
April 21, 2022

1    I recall, you know, talking with someone from

2    Corpus Christi area and people throughout The Valley and

3    people from Central Texas.

4                    And the County Clerks Association and

5    County (inaudible) Administrator Association --

6                    THE REPORTER:  "County" what?

7                    THE WITNESS:  County Clerks and County

8    Election Administrator Association had opinions.

9    Various others through -- throughout the state had

10   opinions on the -- on House Bill 6.

11     Q    (BY MS. DULANEY) How were those opinions

12   addressed?

13                    MR. SWEETEN:  How -- how were the opinions

14   addressed?  So that calls for legislatively privileged

15   information.

16                    I'm going to instruct you not to answer on

17   that basis.

18                    It goes straight to his mental

19   impressions, his legislative fact-gathering process.

20                    So the instruction is:  Don't answer that

21   question.

22                    THE WITNESS:  Uh-huh.

23                    MR. SWEETEN:  Okay.

24     Q    (BY MS. DULANEY) You're refusing to answer?

25     A    I am.  I'll also ask:  What -- what is meant by

Briscoe Cain
April 21, 2022

1  "addressed"?  Can you clarify?  I'm not sure what you

2  meant by the question.

3      Q    I'm not sure your attorney wants you to answer

4  the question.

5      A    Well -- Then I'll assert legislative privilege.

6      Q    Did any of the County officials provide you

7  directly with any documents raising concerns about

8  House Bill 6's impact on different racial, ethnic, or

9  disability status groups?

10              MR. SWEETEN:  So same objection;

11  legislative privilege.  Also, asked and answered.

12              MS. DULANEY:  What documents?

13              MR. SWEETEN:  Yeah.  I think he did

14  provide that.

15              THE WITNESS:  Uh-huh.  I'll follow the

16  advice of counsel and assert legislative privilege.

17      Q    (BY MS. DULANEY) Okay.  House Bill 6's stated

18  purpose was, quote, "to exercise the legislature's

19  constitutional authority under Section 4, Article 5

20  [sic], of the Texas Constitution, to make all laws

21  necessary to detect and punish fraud and preserve the

22  purity of the ballot box."  How do you define "purity"?

23              MR. SWEETEN:  Yeah, so I'm going to

24  object.  That calls for his mental impressions, and --

25  and so it's legislatively privileged to the extent

Briscoe Cain
April 21, 2022

 1  that's being asked, but to the extent you refer to

 2  matters of the public record, that -- that's -- yeah,

 3  but I'm going to --

 4              The instruction is:  Don't answer the

 5  question because I think it re- -- it would require --

 6              THE WITNESS:  Yeah.

 7              MR. SWEETEN:  -- legislatively privileged

 8  information.

 9              THE WITNESS:  I think to the extent that

10  there's matters of public record that discussed it -- I

11  don't recall the specifics, but -- so I'll follow the

12  advice of counsel on -- objection to that on legislative

13  privilege grounds, but I -- I do think there's --

14  discussions of it have been had.  I just don't.

15      Q    (BY MS. DULANEY) You're refusing to answer how

16  you would define "purity"?

17      A    To the extent that it's a matter of legislative

18  privilege, yes.

19              MS. DULANEY:  All right.  Are y'all ready

20  for lunch?  Let's go off the record.

21              MR. SWEETEN:  We can do that.

22              THE VIDEOGRAPHER:  Off the record at 1:31.

23          (Recess from 1:31 P.M. to 2:23 P.M.)

24              THE VIDEOGRAPHER:  This is Segment No. 4.

25  We're back on the record, 2:23.

Briscoe Cain
April 21, 2022

1    Q    (BY MS. DULANEY) All right.  Representative

2  Cain, as Chairman of the Elections Committee, do you

3  select the bills to be heard by that committee?

4              MR. SWEETEN:  As a general matter?

5    Q    (BY MS. DULANEY) Just do you select the bills?

6    A    As a general matter, the chairman, in

7  consultation with the Speaker's office, decides what

8  bills will be heard.

9    Q    Okay.  And not asking whether you did or not,

10  whether you considered doing so, or about your mental

11  impressions, but would it have been possible for the

12  Elections Committee to have conducted an analysis to

13  determine the impact of proposed provisions on HB -- of

14  HB 6 on minority voter groups?

15              MR. SWEETEN:  Give me a second on that.

16              MS. DULANEY:  Okay.

17              MR. SWEETEN:  I'm going to object as

18  calling for speculation without proper foundation.  I'll

19  also object to the -- to the extent that there -- the

20  request would require you to reveal any sort of mental

21  impressions or thoughts about the legislation in

22  question, but to the extent it will not, you can provide

23  an answer as to -- as to that, if you can.

24              THE WITNESS:  I mean, it's possible for a

25  committee to, you know, do anything with -- you know,

Briscoe Cain
April 21, 2022

1   within, I guess, the rules or something.  It -- Sure,

2   it's possible.

3       Q    (BY MS. DULANEY) Okay.  And, again, not asking

4   whether you did or not, whether you considered doing so,

5   or about your mental impressions, but would it have been

6   possible to have added a provision into HB 6 providing

7   for an impact analysis to be conducted?

8                    MR. SWEETEN:  So on that one, you're --

9   you're asking about specific strategy related to the

10  bill.

11                   I'm going to instruct you not to answer on

12  the basis of legislative privilege.  I think that one

13  goes over the line and reveals your mental impressions

14  by itself, and -- and I don't think there's a way to

15  answer that without -- without revealing legislative

16  privilege.  So the instruction is not to answer the

17  question.

18                   THE WITNESS:  I'm going to follow the

19  advice of attorney.

20      Q    (BY MS. DULANEY) Okay.

21      A    Now, could -- back to your -- the other

22  question on:  Would it be possible?  I'm not sure how

23  far possible or whether we're equipped to do that.  I

24  mean, I guess, theoretically, it would be possible.  I

25  just don't know any further than that, if that makes any

Briscoe Cain
April 21, 2022

```
 1  sense.  I don't --
 2      Q    Okay.
 3      A    I don't know how -- Yeah.  And I was speaking
 4  to the question just before the recent one, when you
 5  asked if it was possible for the committee to perform
 6  such analysis, just to be clear.
 7      Q    Understood.  Did House Bill 6 receive
 8  opposition in the committee?
 9              MR. SWEETEN:  You can --
10              THE WITNESS:  Yes.
11              MR. SWEETEN:  To the degree that's --
12  that's a matter of public record, but don't reveal
13  specific conversations --
14              THE WITNESS:  I mean --
15              THE REPORTER:  Hold on.
16              MR. SWEETEN:  Let me finish.  Don't reveal
17  specific conversations that you had with other
18  legislators, but, obviously, to the extent that that
19  would not involve privilege, you can respond to that.
20              THE WITNESS:  As the record would show,
21  during testimony people expressed opposition.
22      Q    (BY MS. DULANEY) Who was that opposition from?
23      A    There were --
24              MR. SWEETEN:  Same instruction.  Go ahead.
25              THE WITNESS:  There were witnesses, so --
```

Briscoe Cain
April 21, 2022

1    There are three ways to testify:  For, on, or against.

2    So there were witnesses that testified against.  There

3    were some that testified on and -- and for, meaning in

4    favor.

5              And there were also members of the

6    committee that expressed opposition and also did so --

7    as reflected, you know, in the archive of the video of

8    the committee meetings, who expressed opposition by

9    voting "no."

10    Q     (BY MS. DULANEY) Which members of the committee

11    were those?

12    A     At various times, depending on -- it would be

13    Representative Fierro, Representative Beckley,

14    Representative González of Dallas.  That would be the

15    Vice Chair.  Representative John Bucy.  I believe that's

16    the total of the numbers of the members that are members

17    of the committee on elections.

18    Q     Who were in opposition at certain times on

19    House Bill 6?

20    A     I believe they voted "no" on the passage of the

21    bill out of committee --

22    Q     Okay.

23    A     -- as the -- as would be shown in the record.

24    Q     Do you believe that the Elections Committee

25    members had access to amendments and bill text with

Briscoe Cain
April 21, 2022

1  sufficient time to review those materials before

2  committee hearings?

3              THE REPORTER:  Can you repeat that?

4     Q    (BY MS. DULANEY) Do you believe that committee

5  members had access to amendments and bill text with

6  sufficient time to review those materials before

7  committee hearings?

8              MR. SWEETEN:  So to the extent that would

9  reveal your mental impressions regarding legislation,

10 don't respond -- don't respond to legislatively

11 privileged matters.

12             THE WITNESS:  Uh-huh.

13             MR. SWEETEN:  Otherwise, to the extent it

14 will not, you can answer.

15             THE WITNESS:  I don't know, in the context

16 of committee hearings and things, what is considered

17 efficient when compared to the thing we're talking

18 about; right?  Of bills, committees, and amendment

19 texts.  If -- I assume by that that "sufficient" has

20 some meaning in that context of what is sufficient and

21 is deficient, and I -- I don't think there's a line

22 of -- a standard time frame of what's considered

23 sufficient or not.

24    Q    (BY MS. DULANEY) The same question but with

25 reviewing the materials before committee votes.

Briscoe Cain
April 21, 2022

1          MR. SWEETEN:  Same instruction.

2          THE WITNESS:  And I would say it's a

3  similar answer.  I -- I -- I'm not sure of -- what would

4  be considered sufficient or non-sufficient time in the

5  context of committee members reviewing things before

6  votes in committee.  I'm not aware of a standard, I

7  guess, time period, if -- if you could say there was

8  some kind of standard time.

9          (Exhibit No. 1 marked)

10         (Discussion held off the record)

11    Q    (BY MS. DULANEY) Representative Cain, we

12  just handed to you what we're going to mark as

13  Cain Exhibit 1.  We took this off of the

14  Texas Legislature Online website.  Do you recognize this

15  document?

16    A    I -- I recognize this, yes.

17    Q    Uh-huh.  How?

18    A    It's from the Texas Legislature Online.  This

19  is -- the standard appearance of the History tab for

20  House Bill 6 from the 87th Regular Session.  I -- I've

21  seen it before.

22    Q    And this document, does it show the various

23  dates and actions taken by the Legislature with respect

24  to House Bill 6?

25    A    I -- I believe that it does.  Whether it's

Briscoe Cain
April 21, 2022

1  perfect and -- and inerrant, I can't testify to that

2  because I -- In my experience, I've seen things with

3  mistakes before, but I do believe this shows the

4  timeline of things with respect to House Bill 6.

5      Q    And was there a public hearing on House Bill 6

6  on March 25th, 2021?

7      A    There was.

8      Q    But you weren't presiding over that hearing;

9  correct?

10      A    For House Bill 6, was I presiding over it?  I

11  believe that's correct, if -- if I recall.

12      Q    Since it was your bill being considered, you

13  wouldn't have been presiding over that hearing; correct?

14      A    I wouldn't say that's the standard practice,

15  that people carrying a bill -- if a chairman is carrying

16  a bill, they don't preside over it.  On that -- At that

17  time, on that day, I was not presiding over it, and I

18  don't recall if it was the entire time or not, but at

19  some point in time, it is possible I recall that someone

20  else acted -- was -- was acting as Chair, that we would

21  say, "I pass the gavel to someone."

22      Q    And was that Committee Vice Chair

23  Jessica González who was presiding over the committee

24  during the layout of HB 6 that day?

25      A    I believe you're correct, that she did at some

Briscoe Cain
April 21, 2022

1  point.  Whether it was the entire time, I don't -- I

2  don't recall.

3      Q    Do you remember how many people testified on

4  March 25th?

5      A    I -- I don't recall.

6                    (Exhibit No. 2 marked)

7      Q    (BY MS. DULANEY) I'm going to hand you what

8  I've marked as Cain Exhibit 2.  I'll represent to you

9  it's an article from March 25th, 2021, titled "Bungled

10 hearing delays GOP voting restriction bill in Texas."

11 And this is to help you refresh your recollection of

12 that day, if you would take a minute to look over and

13 review this document.

14     A    (Reviewing document) Okay.

15     Q    Okay?  So after reviewing this document, do you

16 recall whether anybody testified on March 25th?

17     A    I mean, the brief overview, I literally don't

18 recall whether we took testimony or not or if it stopped

19 before that, but if -- if this is saying that we did --

20 we did not take testimony from -- you know, from the

21 mike before it happened, then I believe you.

22     Q    Before what happened?

23     A    Before the committee proceedings ended.

24     Q    And did Representative Nicole Collier attend a

25 portion of that hearing?

Briscoe Cain
April 21, 2022

1      A      I believe so, yes.

2      Q      Did you know that Representative Collier was

3  the head of the Texas Legislative Black Caucus?

4      A      I believe she's -- she said so as a -- In the

5  public record, you know, during committee hearings, I

6  think she said that, yes.

7      Q      And did Vice Chair González recognize

8  Chairwoman Nicole Collier at that meeting?

9      A      I -- If -- I believe the -- the video would --

10  would show that that was done, yes.  I think so.

11      Q      But you rescinded Representative González's

12  ability to preside over the committee after that;

13  correct?

14              MR. SWEETEN:  I don't know if that's

15  public record or if that's a communication that would be

16  shielded by the privilege, so just instruct you to

17  monitor the privilege on this question.

18              THE WITNESS:  The recording of the video

19  of the hearing of March 25th would show my attempt to

20  regain control of the committee.

21      Q      (BY MS. DULANEY) So that was a "yes"?

22      A      Could you rephrase the question before I tell

23  you?

24      Q      Did you rescind Representative González's

25  ability to preside over the committee after --

Briscoe Cain
April 21, 2022

```
 1                    MR. SWEETEN:  Same instruction.

 2                    THE WITNESS:  I believe the record would

 3   show that I attempted to do so.  I don't know if I can

 4   firmly say I completely was able to -- or successfully

 5   rescinded it, but my goal was to regain the gavel.

 6        Q    (BY MS. DULANEY) So you didn't allow

 7   Representative Collier to ask questions or discuss your

 8   bill at that March 25th hearing, did you?

 9                    MR. SWEETEN:  Same instruction regarding

10   legislative privilege.  You can respond to the extent

11   you're not revealing it.

12                    THE WITNESS:  Due to procedural error,

13   Representative Collier was not able to testify or ask

14   questions on the dais on that day.

15        Q    (BY MS. DULANEY) Due to your procedural error?

16        A    Yes.  I took full responsibility for it.

17        Q    And then after that, you adjourned the

18   committee; correct?

19                    MR. SWEETEN:  Again --

20                    THE WITNESS:  That --

21                    MR. SWEETEN:  -- same instruction on

22   legislative privilege.  You can answer.

23                    THE WITNESS:  The -- the record would show

24   that the committee was adjourned.

25        Q    (BY MS. DULANEY) And after that, the -- the
```

Briscoe Cain
April 21, 2022

```
 1  public hearing on House Bill 6 was reset for a later

 2  date; correct?

 3              MR. SWEETEN:  Same instruction.

 4              THE WITNESS:  The record would show that

 5  we could not continue taking testimony because it had

 6  ended, and the rules require us to do another, you know,

 7  five-day post- (inaudible), and I believe I read that,

 8  explaining that.

 9              THE REPORTER:  I'm sorry.  "Five-day"

10  what?

11              THE WITNESS:  It's --

12              THE REPORTER:  Just repeat.

13              THE WITNESS:  The rules would require us

14  to give five -- a minimum of five days' notice of

15  another hearing, and so it could not continue that day.

16     Q    (BY MS. DULANEY) And that was just because you

17  failed to set a time definite for when the committee

18  would come back from recess on March 25th; right?

19              MR. SWEETEN:  Don't reveal mental

20  impressions.  You can reveal matters of the public

21  record.

22              THE WITNESS:  As is contained in the

23  record, the archived video of the proceedings, it would

24  be that in making a motion to, I believe, recess, I

25  failed to set a time certain for which we would
```

Briscoe Cain
April 21, 2022

```
 1   reconvene.
 2       Q    (BY MS. DULANEY) And the public hearing was
 3   reset for April 1st, 2021; correct?
 4       A    I believe the record, including Exhibit, as you
 5   called it, Cain 1, would show that the next hearing date
 6   was April 1st, 2021.
 7       Q    Did you invite any speakers to provide
 8   testimony on April 1st?
 9       A    I -- I don't recall who would have been
10   invited.  We generally have resource wit- -- resource
11   witnesses almost always there.  Those are, you know,
12   agency people, but I don't recall who exactly was
13   invited.
14                  (Exhibit No. 3 marked)
15       Q    (BY MS. DULANEY) I'm going to hand you a copy
16   of what we've marked as Cain Exhibit 3, and it's the
17   Witness List from the public hearings on House Bill 6.
18   I just want you to review that and see if it refreshes
19   your recollection on anyone that you may have invited to
20   testify.
21       A    You're discussing April 1st; is that correct?
22       Q    Correct.
23       A    Okay.  (Reviewing document)
24       Q    So for the record, looking at Page 5 of the
25   document.
```

Briscoe Cain
April 21, 2022

1      A     Uh-huh.  Yes.

2      Q     And who are those people?

3      A     I -- I'm not sure I understand what you mean by

4    "invited testimony," so -- Anybody can show up and give

5    testimony.

6      Q     It's my understanding that the Chair and any

7    members of the committee can -- can invite speakers to

8    provide testimony on bills, and that's what I'm asking.

9    Did you invite anybody specifically to provide testimony

10   on behalf of H Bill -- on behalf -- sorry -- behalf of

11   House Bill 6?

12     A     Uh-huh.  We have a standing request in our

13   committees to have the resource witnesses there, which

14   would be -- I think it's two members of the Election

15   Division of the Secretary of State's Office and, I

16   believe, Jonathan White, Chief of, I guess, the

17   Elections Division of the Attorney General's Office,

18   have always requested to be there.  Other than that, I

19   just don't recall.

20     Q     They requested to be at the hearing?

21     A     Well, we --

22           MR. SWEETEN:  Go ahead.

23           THE WITNESS:  We always request that they

24   be there.  They're resource witnesses.

25     Q     (BY MS. DULANEY) You -- Okay.

Briscoe Cain
April 21, 2022

1    A    They -- they testify on, literally, almost

2  every bill, unless asked otherwise.

3    Q    Okay.  And those are just witnesses that

4  testify on the bill; correct?

5    A    Yeah.

6    Q    Not --

7    A    We consider them resource witnesses.

8    Q    Neither for or against?

9    A    It would be improper for them to testify for or

10 against.  They're -- they're supposed to do on.

11   Q    And those are the only people that you would

12 have invited?

13   A    That I recall.

14   Q    Okay.  As Chairman and a member of the

15 Elections Committee, is it part of your responsibilities

16 to review documents that are presented to you?

17            MR. SWEETEN:  So I'm going to object to

18 the extent that that would call for your mental

19 impressions about legislation, and so I'll instruct you

20 that if it would do that, do not provide that answer.

21 Okay?  And --

22            THE WITNESS:  I'm not familiar with a

23 House rule that makes it a responsibility of the Chair

24 to review documents provided to them.

25   Q    (BY MS. DULANEY) Wouldn't you be doing a

Briscoe Cain
April 21, 2022

1   disservice to your constituents if you didn't review

2   documents that were given to you?

3                   MR. SWEETEN:   Objection; legislative

4   privilege.   Objection --

5                   So I'm going to instruct you not to answer

6   that question.   It also is argumentative.

7                   THE WITNESS:   I will follow the advice of

8   counsel.

9       Q      (BY MS. DULANEY) Does the committee clerk ever

10  physically hand you documents to review as part of your

11  role on the Elections Committee?

12                  MR. SWEETEN:   You can answer that.   That's

13  a matter of public record.

14                  THE WITNESS:   I mean, I think the -- even

15  the video of the archives would show the clerk handing

16  me documents that have been passed out during a

17  committee hearing or distributing proposed amendments or

18  other things, yeah.   They -- they would pass it out to

19  me and every other member.

20      Q      (BY MS. DULANEY) And would those documents

21  include written testimony in opposition?

22      A      By the question do you mean that the person

23  only provided written testimony, did not -- did not

24  speak before the committee?

25      Q      Yes.

Briscoe Cain
April 21, 2022

```
 1      A      Okay.  Standard practice when someone's

 2  speaking for the committee, we'll often pass out

 3  handouts that may have a narrative or a written script

 4  of what they're about to say, and that's why I'd asked

 5  that.  Any kind of written testimony of people that did

 6  not testify wouldn't be passed to me at that time.

 7      Q      Would you ever receive that?

 8      A      People hand out documents in the -- in the

 9  committee all the time.  Whether they were -- Whether

10  they testified or didn't testify, you know, I don't

11  recall, but, generally, it's only being passed out by

12  someone who was, in fact, testifying.

13                  (Exhibit No. 4 marked)

14      Q      (BY MS. DULANEY) I'm going to hand you what

15  we're marking as Cain Exhibit 4, and this is written

16  testimony in opposition from MALDEF.

17      A      (Reviewing document)

18      Q      Do you recall receiving this document?  Well,

19  I'll give you a chance to look over it.

20      A      (Reviewing document) I recognize it, and I

21  believe this is one of the documents that was produced

22  by my office in response to subpoenas.

23      Q      Did you review this written testimony in

24  opposition when you received this document?

25      A      I -- I do recall, from watching -- In
```

Briscoe Cain
April 21, 2022

1   preparation for this, I had reviewed or listened to the

2   archive video of the April 1st hearing, and I recall

3   Ms. Perales reading this.  If I recall accurately, I

4   don't believe I was in the chair.  I remember her saying

5   something like, "I really wish Chairman Cain was here to

6   hear this," but I did hear her say that in -- in

7   preparation for today.

8              Because of my recent hearing of that, I

9   mean, it's clouding whether or not I -- I can tell you I

10  read it before.  Does that make any sense?  It's -- I --

11  I'm familiar with it.  I recently heard about it.  I

12  believe I produced it.  I may have read it, but I don't

13  recall reading this at or near the time of the committee

14  hearing.

15      Q    But you were in attendance at the April 1st

16  public hearings; correct?

17      A    I was there at times and not at other times.

18      Q    Why weren't -- Why wouldn't you have been

19  there?

20      A    In long hearings, it's kind of tradition for

21  the bill author, especially when they're a chair, to

22  take breaks and let others participate, and it was a --

23  I want to say like a 17-hour hearing, so people leave

24  and sleep on their couch and eat food, other things.

25      Q    Would you go down to the fourth paragraph?

Briscoe Cain
April 21, 2022

1   Starts at "Section 1.02."  Do you recall this testimony

2   regarding the meaning behind the phrase "purity of the

3   ballot box"?

4       A    I recall hearing discussions of this, yes.

5       Q    And if you'll turn to the fourth page, Bates

6   Stamp 791.  Do you recall this testimony regarding the

7   effect of House Bill 6 on voters who would need

8   assistance because of limited English proficiency or

9   disability?

10      A    Could someone direct me to -- I know I'm on

11  Page 4, but exactly where?

12      Q    Oh, yeah.

13      A    Oh, the second-to-last paragraph?

14      Q    Correct.

15      A    Okay.

16      Q    Do you recall this testimony?

17      A    I do not recall this specific testimony except

18  of hearing it recently in preparing for today by

19  listening to the archive video broadcast of the

20  April 1st hearing that's on the Texas Legislature

21  Online, but I recall hearing similar things during the

22  hearing or thereafter.

23      Q    So just to clarify, and excuse me if you've

24  answered this, but you did not review the written

25  testimony in opposition that you received?

Briscoe Cain
April 21, 2022

1            MR. SWEETEN:  Objection.  I think that

2    misstates his testimony, and so I -- I think -- and,

3    also, it's been asked and answered.

4            Go ahead.

5            THE WITNESS:  We -- I believe I said that

6    I may have reviewed it.  This has been over a year.

7    These are similar points made by multiple people, and so

8    because I'm under oath and desire to give you as

9    accurate answer as I can, I cannot affirmatively say

10   that this is where I heard this, something.

11            I -- I've heard the concept contained

12   within this paragraph before.  I can't confirm that it's

13   from this or other people testifying or from the House

14   floor, et cetera, but I'm -- I'm familiar with having

15   heard or read similar allegations.

16            (Exhibit No. 5 marked)

17       Q    (BY MS. DULANEY) I'm going to hand you what

18   we're marking as Cain Exhibit 5.  If you want to take a

19   moment to review, it's a -- it's a letter from NAACP

20   Legal Defense and Education Fund, also dated April 1st,

21   2021.  It's the written testimony in opposition.  And

22   let me know when you're ready.

23       A    Ready.

24       Q    Do you recall receiving this document?

25       A    Due to the -- kind of like the time between it,

Briscoe Cain
April 21, 2022

1    my best recollection of this document was when it was

2    referenced by Represent- -- Representative Anchía on the

3    House floor, I believe, on May 30th of 2021.  I mean, he

4    discussed it, and so it's hazy whether the -- you know,

5    that was the first time or not, but that's the most,

6    kind of, my recent memory of this document.

7        Q    And if you'll turn to Page 2, Bates Stamp 781.

8        A    Uh-huh.

9        Q    If you'll go to the first two full sentences.

10   It starts with, "H.B. 6's stated purpose..."

11       A    Okay.

12       Q    Do you recall this testimony regarding the

13   meaning behind the phrase "purity of the ballot box"?

14       A    I think that -- If I could restate the answer I

15   just provided to the last question, that's where, you

16   know, my most recent recollection recalls this is -- is

17   Representative Anchía bringing it up on the House floor.

18   I'm not positive that I was in the chair at the time of

19   this testimony, which would have been handed out at that

20   time, but I -- I have seen this document before.  I

21   believe this was something that my office produced in

22   response to subpoenas.

23       Q    If you'll turn to Page 3, Bates Stamp 782, and

24   go to the first full paragraph.  I'll give you a chance

25   to review it.

Briscoe Cain
April 21, 2022

```
 1      A      (Reviewing document)

 2      Q      And let me know when you're ready.

 3      A      (Reviewing document) Okay.  I'm ready.

 4      Q      Do you recall receiving or reviewing this

 5  testimony regarding the disparate impact House Bill 6's

 6  poll-watcher provisions would have on Black and Latino

 7  voters?

 8      A      I do not recall if me hearing the concept

 9  contained within this paragraph that you've -- you've

10  highlighted is from me reading this or hearing it

11  from -- from others.  There were -- There were similar

12  allegations made by others and -- so the -- you know, to

13  be clear, I -- I'm not sure if it was exactly from this,

14  if that makes any sense, that I'm -- I'm familiar with

15  this allegation, but I can't recall if it was, you know,

16  from Page 3 of -- of this exact document.

17      Q      And if you'll turn to the next page,

18  Bates Stamp 783, in the first paragraph, and let me know

19  when you've had a chance to review.

20      A      (Reviewing document) Yes.  Go ahead.

21      Q      Do you recall reviewing this testimony

22  regarding specific instances of voter intimidation and

23  harassment that Black and Latino Texan voters faced when

24  exercising their right to vote?

25      A      I -- I have a similar answer again, which is I
```

Briscoe Cain
April 21, 2022

1    recall hearing -- hearing this and possibly reading it.

2    Whether it was from this document alone that I recall

3    it -- but I'm -- I'm familiar with the allegations made

4    in this paragraph.

5                     (Exhibit No. 6 marked)

6         Q      (BY MS. DULANEY) I'm going to hand you what I'm

7    marking as Cain Exhibit 6, and it's testimony in

8    opposition from the Texas Civil Rights Project, also

9    dated April 1st, 2021.

10        A      Okay.

11        Q      Do you recall receiving this document?

12        A      Yes.

13        Q      You do?

14        A      Yes.

15        Q      And this was written testimony in opposition to

16   House Bill 6; correct?

17        A      That's correct.

18        Q      And what's the date of this document?

19        A      Well, it purports to be dated for the committee

20   hearing of April 1st.  Whether it was created that date,

21   I'm not sure.

22        Q      When do you recall first receiving this

23   document?

24        A      It -- I don't recall.  It's possible similar

25   things were passed around the hearing prior to that,

Briscoe Cain
April 21, 2022

1   that -- I mean, it happened -- I -- I just recognize

2   Mr. Slattery.  He's -- was there a lot, and I re- -- I

3   remember seeing it and -- and him coming up to the dais

4   and talking about it in his testimony.

5       Q    Do you recall when you first reviewed this

6   document?

7       A    I believe it was on or about April 1st, after

8   he would have passed it out.

9       Q    If you'll go down to the third paragraph,

10  starting with "This provision."  Let me know when you've

11  reviewed that.

12      A    (Reviewing document) Okay.

13      Q    Do you recall, prior to today, reviewing this

14  testimony regarding the impact that House Bill 6's

15  provisions would have on voters who vote by mail?

16              MR. SWEETEN:  Can you -- I'm sorry.  Can

17  you read that question back so I can hear it?

18              (Requested portion of the record read)

19              MR. SWEETEN:  Okay.  You can answer that,

20  this text, yeah.

21              THE WITNESS:  Whether me seeing this now

22  means that the first time I heard about this allegation

23  was from this handout by Mr. Slattery or at other

24  times -- I do recall hearing people providing this --

25  their opinions of -- to the nature that's provided in

Briscoe Cain
April 21, 2022

1   that paragraph.

2       Q     (BY MS. DULANEY) And are you aware of the use

3   of mail-in ballots by disabled voters, including

4   veterans?

5                MR. SWEETEN:  Okay.  There we're kind of

6   getting into mental impressions regarding the bill and

7   your knowledge.  You know, I've let this go on as it

8   relates to, "Were you sent this?" and, you know, the

9   text, but now we're getting into his mental impressions.

10               So with that, I'm going to instruct you on

11  legislative privilege, that -- Don't reveal your mental

12  impressions regarding legislation.  Okay?

13               THE WITNESS:  (Nods affirmatively)

14               MR. SWEETEN:  And if you can't answer

15  without doing so, do not answer.

16               THE WITNESS:  Could you repeat the

17  question?

18      Q     (BY MS. DULANEY) Yes.  Are you aware of the use

19  of mail-in ballots by disabled voters, including

20  veterans?

21               MR. SWEETEN:  Yeah.  I -- I think

22  that's -- that's legislatively privileged.  I'm going to

23  instruct you not to answer that question, yeah, as

24  phrased.

25      Q     (BY MS. DULANEY) Are you refusing to answer?

Briscoe Cain
April 21, 2022

1       A    I'm taking the advice of counsel.

2                (Exhibit No. 7 marked)

3       Q    (BY MS. DULANEY) I'm going to hand you what I'm

4   marking as Cain Exhibit 7.  This is testimony in

5   opposition from the Brennan Center for Justice, also

6   dated April 1st.  Do you recall receiving this document?

7       A    I -- I don't recall exactly when it was

8   received.

9       Q    Have you ever seen this document before?

10      A    I don't recall.

11      Q    If I represent to you that you were the

12  custodian of record on this document, would that refresh

13  your recollection?

14      A    I mean, I believe that we -- we produced it,

15  but we produced hundreds of pages.  I -- I cannot sit

16  here today and tell you that I absolutely, undoubtedly

17  recall this exact document, but I do believe that it was

18  in our possession and that's why we produced it,

19  believing it to be responsive.

20      Q    If you'll go down to the fourth sentence in the

21  first photograph.  It starts with, "Related to my

22  testimony here today."  Would you let me know when

23  you've read that sentence?

24      A    (Reviewing document)

25      Q    Do you have any reason to dispute that the

Briscoe Cain
April 21, 2022

1  Brennan Center conducts research into policies that

2  makes voting more accessible while improving the

3  integrity of elections?

4              MR. SWEETEN:  I think that goes to his

5  mental impressions regarding legislation.

6              To the extent it does, I'd instruct you

7  not to answer.  If you can answer without providing

8  those mental impressions regarding legislation, then

9  I'll allow you to do so.

10             THE WITNESS:  I mean, I -- I believe that

11 the Brennan Center believes that statement, but that's

12 what they do.  It's -- I -- I can't confirm or deny that

13 that, in fact, is what they do, though.

14     Q     (BY MS. DULANEY) If you'd go to the third

15 paragraph, and let me know when you've finished

16 reviewing that.

17     A     (Reviewing document) Okay.

18     Q     And you testified earlier District 128's fully

19 encompassed within Harris County; correct?

20     A     That's correct.

21     Q     Were you aware of the election security task

22 force that found no cases of voter fraud in

23 Harris County in the 2020 election?

24             MR. SWEETEN:  I'm going to instruct you

25 not to answer.  That requires -- That requests

Briscoe Cain
April 21, 2022

1  legislatively privileged information.

2              THE WITNESS:  Yeah.  I'm going to take the

3  advice of counsel.

4    Q    (BY MS. DULANEY) Do you recall reviewing this

5  testimony regarding the bipartisan, multiagency election

6  security task force that found no cases of voter fraud

7  in Harris County in the 2020 election?

8              MR. SWEETEN:  In other words, did he

9  review this text?  Is that what you're asking?

10             MS. DULANEY:  Correct.

11             THE WITNESS:  I believe I previously said

12  I can't recall specifically whether or not I reviewed

13  this exact document.

14             MR. SWEETEN:  Objection; asked and

15  answered.

16   Q    (BY MS. DULANEY) As you testified about the

17  previous documents, had you heard of this election

18  security task force in any other manner?

19             MR. SWEETEN:  The same -- same objection

20  as two questions ago.  You're asking about his mental

21  impressions about this task force related to this

22  testimony that was provided.  That -- that it goes into

23  his mental impressions about legislation, it is,

24  therefore, legislatively privileged.

25             MS. DULANEY:  I'm just asking if he had

Briscoe Cain
April 21, 2022

1  heard about the task force that was created.

2              MR. SWEETEN:  I -- Same thing.  I think

3  we're talking about his mental impressions, what his

4  knowledge was at the time of the bill -- that -- that

5  the bill was -- was moving through.  So I've allowed you

6  to ask about the text, but now you're getting into:

7  What were his mental impressions other than what is

8  contained here that he produced to you?

9      Q    (BY MS. DULANEY) For the record, I don't

10 believe I'm asking about your mental impressions, but

11 are you refusing to answer?

12     A    I believe it's important to take advice of

13 counsel and assert legislative privilege.

14     Q    (BY MS. DULANEY) Okay.  Do you recall reviewing

15 this testimony on the Texas Attorney General's Office

16 22,000-hour investigation into voter fraud?

17             MR. SWEETEN:  You're asking -- "this

18 testimony" being this letter, Exhibit 7?  Is that the

19 question?

20             MS. DULANEY:  Correct.

21             MR. SWEETEN:  You can answer whether you

22 recall seeing this text.

23             THE WITNESS:  I believe I previously

24 answered that I cannot, you know, specifically confirm;

25 thus, I do not recall reading this exact document.

Briscoe Cain
April 21, 2022

```
1              MR. SWEETEN:  Yeah, I'm going to object as
2   asked and answered.  It really is the third time now, I
3   think, you've asked him that question.
4       Q    (BY MS. DULANEY) Did you hear in the committee
5   hearings about the Texas AG's Office 22,000-hour
6   investigation into voter fraud?
7              MR. SWEETEN:  You can answer about public
8   testimony.
9              THE WITNESS:  I believe the public record
10  would show that such statements were made in committee.
11      Q    (BY MS. DULANEY) Did you hear in the committee
12  hearings about the election security task force that
13  found no cases of voter fraud in Harris County in the
14  2020 election?
15      A    I do not recall.
16      Q    Did you hear during the committee hearings that
17  that investigation uncovered only 16 cases of false
18  addresses on registration forms out of almost 17 million
19  registered voters?
20      A    I recall testimony being given similar to this.
21  Whether it was specifically allegations of these
22  22,000 hours and uncovering the exact number -- I can't
23  confirm that, but I -- I recall hearing similar
24  allegations to this effect in committee, as a matter of
25  public record.
```

Briscoe Cain
April 21, 2022

1    Q    Do you recall Keith Ingram's testimony in front

2  of the Elections Committee, restated here in

3  Paragraph 4, that the 2020 election in Texas was smooth

4  and secure?

5    A    Yes, I do recall this.

6         (Discussion held off the record)

7    Q    (BY MS. DULANEY) And Senate Bill 7 also had to

8  be heard and voted on in the House Elections Committee;

9  correct?

10   A    I'm sorry.  Please repeat the question.  I was

11 looking at this document.

12   Q    Did Senate Bill 7 also have to be heard and

13 voted on in the House Elections Committee?

14   A    The rules do not require that Senate Bill 7 be

15 heard.

16   Q    Okay.  Was Senate Bill 7 voted on in the House

17 Elections Committee?

18   A    Yes, in a way, being -- When House Bill 6 was

19 substituted (inaudible) --

20        THE REPORTER:  I'm sorry.  When it what?

21        THE WITNESS:  When House Bill 6 was

22 substituted with Senate Bill 7, one could say that was

23 voting on it in committee.

24   Q    (BY MS. DULANEY) And you offered an amendment

25 to Senate Bill 7 in the House Elections Committee;

Briscoe Cain
April 21, 2022

1  right?

2       A     That would be incorrect.

3                    (Exhibit No. 8 marked)

4       Q     (BY MS. DULANEY) I'm going to hand you what

5  we're marking as Cain Exhibit 8 from the Texas

6  Legislature Online regarding Senate Bill 7.  If you want

7  to take a moment to review.

8       A     (Reviewing document)

9       Q     And let me know when you're ready.

10      A     (Reviewing documents) Yeah, this helps, but --

11  Yes, I'm ready.

12      Q     Good.  That's exactly what it's supposed to do.

13  So if you'll turn to Page 3, and I can ask you again:

14  Did you offer an amendment to Senate Bill 7 in the House

15  Elections Committee?

16      A     A -- Yeah, an amendment by way of substitute

17  was offered to -- as I recall now, with -- to replace

18  the text of Senate Bill 7 with the text of House Bill 6.

19      Q     Do you remember how many pages of legislative

20  text were in your amendment?

21      A     The same number of pages that were in

22  House Bill 6 when it was heard on April 1st.

23      Q     Was it more than five pages?

24      A     It was the identical number that was heard in

25  committee on April 1st, of House Bill 6.

Briscoe Cain
April 21, 2022

1    Q    More than ten pages?

2    A    I don't recall.  They were the same document.

3    Q    And did those provisions alter more than one

4  section of the Texas Election Code?

5              MR. SWEETEN:  You're asking about the text

6  of those amendments?

7              MS. DULANEY:  Correct.

8              MR. SWEETEN:  Okay.

9              THE WITNESS:  The committee substitute --

10  or the amendment that was offered to amend Senate Bill 7

11  was identical to House Bill 6 as it read on April 1st,

12  and so it did -- it amended several sections of the

13  Election Code.

14    Q    (BY MS. DULANEY) So more than two provisions of

15  the Texas Election Code would have been changed from

16  your amendment; correct?

17    A    It -- More than two is correct.

18    Q    And you asked for a record vote on

19  Senate Bill 7, as amended, during that committee

20  hearing; right?

21              MR. SWEETEN:  If it's a matter of public

22  record, you can answer.

23              THE WITNESS:  It -- The -- the record

24  would show that in taking such a vote -- it would be

25  done by recorded vote.  That's correct.

Briscoe Cain
April 21, 2022

1    Q    (BY MS. DULANEY) Was that done that day?

2    A    (Reviewing document) The vote would have

3  happened -- When it says, you know, "Reported favorably

4  as substituted," that -- a vote would have occurred on

5  April 29th.  That -- that day, you would have taken a

6  vote.

7          If you're referring to the highlighted

8  provision that says "Record vote" on May 6th, that's a

9  different vote, but the statement, "Reported favorably

10  as substituted," a vote is taken to report (inaudible),

11  so that would also be a record vote.

12          THE REPORTER:  Hold on.  "A vote is taken"

13  what?

14          THE WITNESS:  Wherein on Cain Exhibit 8,

15  on Page 3 of 5, when it says, "Reported favorably as

16  substituted," on April 29th, 2021, that's a vote, and a

17  vote is taken -- I believe the motion is -- you know,

18  the Chair moves that "blank" be reported favorably as

19  substituted, and a vote is then taken, and so that was a

20  record vote, at least for purposes of committee action.

21    Q    (BY MS. DULANEY) So then after that, the Texas

22  House of Representatives as a whole debated

23  Senate Bill 7 as it was amended by the House Elections

24  Committee; correct?

25    A    Yeah.  After being reported favorably, the bill

Briscoe Cain
April 21, 2022

1   would then go -- the report would be filed with the

2   Committee Coordinator's Office.  The committee report

3   would be distributed.  It would then be sent to the

4   Calendars Committee.  The Calendars Committee would then

5   meet and place it on the calendar.

6              And so it was read a second time, as the

7   document shows, on May 6th, and an amendment, you

8   know -- Correct me if I'm going too far.  You know, the

9   very next thing it shows is -- according, at least, to

10  the journal, as far as this shows -- this isn't the

11  journal, but as far as the history shows, an amendment

12  was proposed by Representative González and there was a

13  record vote.

14      Q    And forgive me if I missed this.  I'm sorry.

15  The -- the -- Before that record vote, there was a House

16  floor debate; correct?  On May 6th?

17      A    I'm sure.  There was a lot of House floor

18  debate.  I believe the -- the record would show,

19  especially the archive video footage of the floor that's

20  on TLO, as well as the journal of the House would show

21  that there was debate over this bill and amendments.

22              (Exhibit No. 9 marked)

23      Q    (BY MS. DULANEY) I'm going to hand you what

24  we've marked as Cain Exhibit 9 and represent to you we

25  transcribed the floor debate from May 6, 2021.

Briscoe Cain
April 21, 2022

1              MS. DULANEY:  And, Mr. Sweeten, if you

2    want to take a minute to look through that.

3              MR. SWEETEN:  Okay.  Has this been

4    produced to us?  This would have been called for in our

5    discovery, that we would have asked for any records

6    of --

7              MS. DULANEY:  Honestly, I'm not sure.

8              MR. SWEETEN:  Okay.  Can you check on

9    that --

10             MS. DULANEY:  Yeah.

11             MR. SWEETEN:  -- and make sure that this

12   has been produced?

13             MS. DULANEY:  And we're happy to play the

14   video if you'd rather us play video.

15             MR. SWEETEN:  Well, let me look.  It looks

16   like you may have a certified court reporter on here.

17   Is that right?

18             MS. DULANEY:  We did.

19             MR. SWEETEN:  Okay.

20             MS. SADASIVAN:  We can play the video.  I

21   mean, I can pull it up if that's better for you.

22             MS. DULANEY:  And, obviously, if there are

23   errors, we can put that on the record or have it signed

24   afterwards.

25             MR. SWEETEN:  Okay.  (Reviewing document)

Briscoe Cain
April 21, 2022

1    Yeah.  I mean, I think you can ask him questions about

2    the audio transcript.  I mean, if there -- Maybe this

3    would help.  If there's anything you feel --

4              You know what?  Why don't I talk to him?

5    I think we're an hour in any way.

6              MS. DULANEY:  Okay.  Let's go the record.

7              MR. SWEETEN:  Yeah.  Let's just talk about

8    this.

9              THE VIDEOGRAPHER:  We're off at 3:16.

10             (Recess from 3:16 P.M. to 3:26 P.M.)

11             THE VIDEOGRAPHER:  This is Segment No. 5.

12   We're back on the record, 3:26.

13             MR. SWEETEN:  Tell me the number of this

14   again, will you, please.

15             MS. DULANEY:  9.

16             MR. SWEETEN:  9.  This is Exhibit 9.

17             MS. DULANEY:  Are we okay to go forward?

18             MR. SWEETEN:  Yeah.  I mean, if you want

19   to ask him questions about 9, that's -- that's fine.  I

20   mean, if -- It looks like it's -- a certified court

21   reporter did it, so -- you know, obviously, to the

22   extent -- if we're going over anything that looks like

23   maybe we need to check the video, then we can do that,

24   but, otherwise, I'm not -- I don't have an objection to

25   you asking about that.

Briscoe Cain
April 21, 2022

```
 1              MS. SADASIVAN:  I pulled up the video,

 2  so...

 3              MR. SWEETEN:  Yeah.  I mean, I hope -- I

 4  hope we don't get there.

 5              MS. DULANEY:  Yeah.

 6              MR. SWEETEN:  Let's just see where we are

 7  and --

 8              MS. DULANEY:  Okay.  Great.

 9      Q    (BY MS. DULANEY) Sir, right before we took a

10  short break, we talked about this floor debate occurring

11  on May 6, 2021; correct?

12      A    I believe that's correct.

13      Q    And during the debate, Speaker -- I'm going to

14  butcher this name.

15      A    Phelan.

16      Q    Thank you.  Speaker Phelan recognized you to

17  explain the bill; correct?

18      A    That's correct.  And, by the way, you can just

19  call him Speaker.

20      Q    Okay.  Thanks.

21      A    Might help.

22      Q    It helps to have a legislator in the room, huh?

23              So if you would flip to Page 27 for me.

24      A    27?

25      Q    Correct.
```

Briscoe Cain
April 21, 2022

```
1      A    I'm there.

2      Q    Okay.  And in response to a question by

3   Representative Turner, you stated that House Bill 6 --

4   that any amount of fraud would be too much fraud;

5   correct?

6      A    At -- at line what?

7      Q    I believe it's 20 --

8                MS. SADASIVAN:  Looks like 17 through 21.

9      Q    (BY MS. DULANEY) 17 through 21.

10     A    Okay.  I see at 17 I'm making a statement.

11  You -- you alluded to a question, though.

12     Q    That's correct.  One minute.

13     A    Maybe 22?  Maybe Page 26?

14   (Discussion held between Ms. Dulaney and Ms. Sadasivan)

15     Q    (BY MS. DULANEY) I'm sorry.  Give me one

16  minute.

17     A    I hope I'm not out of line here, but you may be

18  at the -- beginning at the bottom of 26.  I'm assuming

19  that's what you're referring to.

20     Q    Yeah, looks like 26, starting at Line 20.

21  Okay.  So Page 26, starting at Line 20, "Representative

22  Turner" -- I'm going to quote -- "So, Representative

23  Cain, your bill discusses fraud a number of times.  It's

24  there in the caption.  It's in the purpose of the bill.

25  It's in the new legislative findings that you're
```

Briscoe Cain
April 21, 2022

1   creating.  So, can you detail for the Body how many

2   instances of election fraud occurred in the 2020

3   elections?"

4                    Chairman Cain:  You know, this bill, like

5   you said -- you know, it targets voter fraud.

6                    Representative Turner:  Just a number.

7                    Chairman Cain:  Yeah.

8                    Representative Turner:  Just a number is

9   all need.

10                   Chairman Cain:  In the -- in the 2020

11  elections?  In what -- what state?

12                   Representative Turner:  In the State of

13  Texas.  This is -- this is a bill that applies to the

14  State of Texas, is it not?

15                   Chairman Cain:  It does.  You know,

16  look -- the whole point is it protects every single

17  voter because I believe that's -- that's the goal of

18  everyone and any amount of fraud is too much fraud.

19  Wouldn't you agree?

20                   Representative Turner:  But you don't know

21  the specific amount of fraud -- a specific number of

22  instances of fraud.

23                   Chairman Cain:  No.  You know, I don't

24  know, but it's really hard to find what you don't look

25  for."

Briscoe Cain
April 21, 2022

1                    Was that an accurate recitation of the

2    testimony?

3        A    I believe that's an accurate recitation of the

4    testimony.

5        Q    But when Representative González asked you in

6    that same hearing whether, before bringing HB 6 or SB 7

7    to the floor, you or the AG's Office performed any

8    analysis of how those bills might affect minority

9    voters, you said you hadn't; correct?

10       A    One moment.  Were you reading from this?

11                   MS. SADASIVAN:   Page 13.

12       Q    (BY MS. DULANEY) I was -- I was asking a

13   question about this testimony --

14       A    Okay.

15       Q    -- but let's go back.  We can turn to Page 13.

16   It's Lines 19 to 25.

17       A    I was trying to find -- Okay.  13, at Line 29?

18   No.

19                   MR. SWEETEN:   It's Page 13, Line --

20       Q    (BY MS. DULANEY) 19 to --

21       A    Okay.

22       Q    -- 20 -- looks like through to Page 14, Line 1.

23   Sorry.  Would you mind reading that into the record?

24       A    Being at Line 19?

25       Q    13, Line 19, through 14, Line 1.

Briscoe Cain
April 21, 2022

```
1        A      Page 13, Line 19, says, "Representative
2   González:  Before bringing HB6 or SB7 to the floor, did
3   you -- did you or the AG's office perform any analysis
4   about how this bill might affect minority voters?
5                  Chairman Cain:  No -- no, I hadn't done
6   that.  I'm not sure if the attorney general's office did
7   that."
8                  Continue?
9        Q      No.  So you weren't looking for evidence of any
10  impact on minority voters?
11                 MR. SWEETEN:  Whoa.  So the -- the public
12  record speaks for itself.  You're asking a question that
13  would ask him to invade his mental impressions, and
14  he's -- and that would be legislatively privileged, and
15  he's not going to do that.  He's not going to provide
16  his -- his fact-gathering, his -- his mental
17  impressions, his thoughts about the legislation here.
18                 So I'm going to instruct you:  Do not
19  answer that question.
20                 THE WITNESS:  Go ahead.
21       Q      (BY MS. DULANEY) Are you refusing to answer
22  that question?
23       A      I'm going to follow the advice of counsel and
24  assert legislative privilege.
25       Q      Is your response the same today as it was on
```

Briscoe Cain
April 21, 2022

1   May 6?

2                   MR. SWEETEN:  Same objection.

3                   To the extent that that would reveal your

4   legislative privilege, that -- that -- your mental

5   impressions regarding the legislation, that's

6   legislatively privileged, so same instruction.

7                   THE WITNESS:  To clarify your question,

8   are you asking my response to -- to the question -- if

9   you could repeat --

10                  MS. DULANEY:  Uh-huh.

11                  THE WITNESS:  -- what the answer would be?

12      Q    (BY MS. DULANEY) Would your response to

13  Representative González's question be the same today as

14  it was on May 6th?

15                  MR. SWEETEN:  So to the extent that would

16  reveal your legislative -- your -- your mental

17  impressions, that is legislatively privileged.  Okay?

18                  THE WITNESS:  I mean, I could speak -- As

19  a matter of public record, my -- my answer at that time

20  was that, no, I hadn't done that, and I'm not sure

21  whether the Attorney General -- General's Office had

22  done that and -- so -- Yeah.

23                  I mean, I don't know how I could have done

24  that today as well or whether the AG's Office had done

25  it.  I'm -- I'm not able to say it's the same answer.  I

Briscoe Cain
April 21, 2022

1  mean, this is asking me if we had done that at that

2  time, so -- I mean, I'm not really understanding your

3  question.

4              (Lost Zoom connection)

5              THE REPORTER:  It's off.

6              MS. DULANEY:  Can we go off the record?

7              THE VIDEOGRAPHER:  Yeah.  We're off at

8  3:35.

9              (Recess from 3:35 P.M. to 3:42 P.M.)

10             THE VIDEOGRAPHER:  This is Segment No. 6.

11  We're back on the record, 3:42.

12     Q    (BY MS. DULANEY) Okay.  Representative Cain, if

13  you'll turn with me to Page 34.  Of Cain Exhibit 9 --

14  sorry -- to clarify.  And if you look down starting at

15  Line 15, Representative Turner was questioning you and

16  he says, "You're legislation says that problems with

17  voting, quote, threatens the stability of a

18  constitutional democracy by undermining public

19  confidence and legitimacy of public officers chosen --"

20             And if you would start reading into the

21  record from Line 20 through Page 35, Line 19.

22     A         "Chairman Cain:  Yes.

23             Representative Turner:  -- by election.

24             Chairman Cain:  Wouldn't you agree?

25             Representative Turner:  So, I've heard

Briscoe Cain
April 21, 2022

1  that -- a variation of that statement a lot over the

2  last year and so, my question very simply Representative

3  Cain, is this bill simply a par in a continuation of the

4  big lie perpetuated" -- "perpetrated by Donald Trump

5  that somehow he really actually won the presidential?

6  Is that really what this is all about?

7           Chairman Cain:  No, not at all, this bill

8  is not about 2020.

9           Representative Turner:  Does this validate

10 the former president's falsehoods --

11          Chairman Cain:  No.

12          Representative Turner:  -- that he -- he

13 somehow actually won an election that he lost by more

14 than 7 million votes, is that what this is about?

15          Chairman Cain:  No, this bill is -- is

16 not -- not a response to 2020."

17          How far am I going?

18     Q    Until the next line, 19.

19     A    To repeat, "Chairman Cain:  No.  This bill

20 is -- is not a response to 2020.  A lot of these things

21 have -- have been longtime coming.  We see bills again,

22 like this, filed every session and --"

23     Q    And, Representative Cain, do you still stand by

24 that statement that you made on May 6th?

25          MR. SWEETEN:  Does he stand by it?  I

Briscoe Cain
April 21, 2022

1  think the question's vague, but if you're asking him

2  what his mental impressions are, that would -- that

3  would impact -- that would invoke legislative privilege,

4  so -- because you'd be asking him about his mental

5  impressions beyond the statement made in a public

6  context, which we've already gone over at length here.

7  So I'm going to object as to legislative privilege on

8  that basis.

9          THE WITNESS:  I'll follow my counsel's

10 advice on grounds of legislative privilege.

11     Q    (BY MS. DULANEY) And you're refusing to answer

12 if you stand by this statement that the bill was not in

13 response to the 2020 election?

14         MR. SWEETEN:  My -- Yeah.  I mean, I think

15 he referred to my instruction, which was not to answer,

16 so, yeah.

17         THE WITNESS:  I'm following Counsel's

18 advice.

19     Q    (BY MS. DULANEY) Okay.  Do you think that

20 Donald Trump won the 2020 election?

21         MR. SWEETEN:  If that would get into your

22 mental impressions about the bill, then don't provide

23 that.  If that is outside of and unrelated to your

24 mental impressions about the legislation itself, then

25 you may answer.

Briscoe Cain
April 21, 2022

1           THE WITNESS:  Yeah.  I think it's a matter

2    of public record.  The prevailing thought is that he

3    won, that Joe Biden won the election.

4       Q    (BY MS. DULANEY) So you do not believe that

5    Donald Trump won the 2020 election?

6           MR. SWEETEN:  It's asked and answered.

7    He's answered the question.  He said Biden won the

8    election.

9           You can answer it again.  I'm going to let

10   you.  Go ahead.

11          THE WITNESS:  Yeah.  It's -- As a matter

12   of public record, it's the prevailing thought that

13   Joe Biden won the 2020 presidential election.

14      Q    (BY MS. DULANEY) I asked what you believe,

15   though.

16          MR. SWEETEN:  Okay.  Again, to the

17   extent -- as long as that doesn't invade your thought

18   process regarding the legislation at issue, I'm going to

19   let you answer it, but if it -- if it involves something

20   that was a consideration in your legislation, then --

21   then I'm going to instruct you not to answer.  Okay?

22          THE WITNESS:  Yeah.  Due to -- I'll follow

23   the advice of counsel, with the possibility that this

24   reveals my mental impressions, to assert legislative

25   privilege.

Briscoe Cain
April 21, 2022

1          MR. SWEETEN:   Okay.

2     Q    (BY MS. DULANEY) Earlier we were looking at

3  some of the testimony that -- the written testimony in

4  opposition your office produced.  You stated that you

5  might not have recalled that -- those documents at the

6  time, but you recalled hearing testimony regarding "the

7  purity of the ballot box."  Am I mischaracterizing that

8  testimony in any way?

9     A    You're not, and I believe I was discussing

10  statements by legislators on the floor of the House in

11  saying that I recall hearing testimony.  Specifically,

12  statements that were in -- I'm not sure what exhibit it

13  was.

14     Q    I think it was 4 and 5, if that helps, but you

15  may, I mean, say what you believe.

16     A    I believe that was -- it was the exhibit --

17  maybe it's LDF, when he was referencing the NAACP

18  statements in committee, I believe I had said, and as

19  the reporter likely recorded, that that's where I recall

20  hearing that reference was on the floor.

21     Q    On the House floor?

22     A    That's correct.

23     Q    Yeah.  So if you'll turn with me to Page 38.

24  I'm going to start at Line 23, where Representative

25  Anchía asks you, "And you talked about preserving the

Briscoe Cain
April 21, 2022

1  purity of the ballot box.  Is that correct?"

2           And if you'll read for me from 39, Line 1

3  through Line 8.

4     A    You -- There were two questions there.  You'd

5  asked me something about "Correct?" and then asked me to

6  read.

7     Q    Oh, I was -- I was reciting Representative

8  Anchía's -- Representative Anchía's testimony on 38,

9  Line 23 through 25, where he asks you, "Is that

10  correct?"

11    A    So you're requesting that I begin reading at

12  Line 1 on Page 39?

13    Q    Yes.  Through Line 8.

14    A    "Chairman Cain:  Yeah, that's a quotation from

15  the Texas Constitution to be Article 6, Section 4.

16           Representative Anchía:  Right.  And are

17  you aware of the history behind that provision of the

18  Constitution?

19           I'm -- I'm not."

20    Q    So sitting here today, was May 6 the first time

21  that you heard the history behind the language about

22  "the purity of the ballot box"?

23    A    I -- I believe -- as I stated earlier, I

24  believe this is my most, kind of, recent time

25  recollection of -- of hearing that was on the floor of

Briscoe Cain
April 21, 2022

1    the House.

2    Q    And you don't recall hearing the history of

3    "purity of the ballot box" anytime before this; correct?

4    A    Not that I recall.

5    Q    Okay.  You can put this document away.  I'm

6    just going to ask some general questions based on your

7    experience as a legislator.  Let me know when you're

8    ready.

9    A    All right.

10   Q    All right.  So given your five years as a Texas

11   legislator, would you say it's typical for a bill to

12   pass out of committee when the public testimony is

13   overwhelmingly in opposition?

14   A    I -- I can't say that I've, you know, got

15   enough information to say what -- what is typical or

16   standard.

17          MR. SWEETEN:  And I'm going to object to

18   the question as vague and incomplete and -- and without

19   foundation.

20          Go ahead.

21   Q    (BY MS. DULANEY) So you said you've been

22   involved on -- I think it was five or six committees

23   throughout your time in the Texas Legislature; is that

24   right?

25   A    Yes.

Briscoe Cain
April 21, 2022

1      Q    So given your experience on those six

2  committees with bills passing through them, is it out of

3  the ordinary for a bill to pass out of committee when

4  the public testimony is overwhelmingly in opposition?

5                 MR. SWEETEN:  I'm going to object.  I

6  think that's vague.  I don't, you know -- I -- I think

7  you're saying "public testimony in opposition."  You've

8  shown him documents that indicate there's some testimony

9  on both sides of it.  So I think you're asking him to

10  compare -- to -- to -- to make judgments over what is, I

11  think, an incomplete -- you haven't given him a

12  foundation upon which to provide that.

13                 So I'm going to say vague.  I'm going to

14  say improper foundation.  I'm saying calls -- calls for

15  speculation.  And then to the extent -- and I'm not sure

16  this one does, but, also, monitor the legislative

17  privilege if this would reveal your thoughts and mental

18  impressions about a bill.

19                 With that said, my objections, you can go

20  ahead and answer the question to the best of your

21  ability.

22                 THE WITNESS:  Would you please repeat the

23  question?

24                 MS. DULANEY:  Would you mind?  Thank you.

25            (Requested portion of the record read)

Briscoe Cain
April 21, 2022

```
 1              MR. SWEETEN:  Same objection.  You can
 2    answer.
 3              THE WITNESS:  I -- I don't know what the
 4    standard by -- what to say is ordinary.  Does it occur?
 5    I can say, yes, it occurs both ways.
 6         Q    (BY MS. DULANEY) Use just the -- your
 7    understanding of the word "ordinary," like you would use
 8    it any day.
 9              MR. SWEETEN:  I think he's answered the
10    question, so...
11              THE WITNESS:  I've -- In my experience, it
12    occurs.
13         Q    (BY MS. DULANEY) How many times can you
14    remember that happening in your career, in your
15    experience?
16         A    I mean, I know it happened several times in the
17    regular session.  How many times, I -- I don't recall.
18         Q    What's your best estimate of -- How do you
19    define "several"?
20         A    I mean, I can -- I can think of bills that I --
21    it likely happened on, but, you know, there were 666
22    bills -- what an odd number -- that came out this -- in
23    the regular session, and I -- I don't recall them all.
24         Q    Were there really 666?
25         A    Yeah, I believe so.
```

Briscoe Cain
April 21, 2022

1    Q    Oh, boy.

2            MS. SADASIVAN:  That's bad luck.

3            MS. DULANEY:  It's bad -- terrible luck.

4    Q    (BY MS. DULANEY) Do you remember which bills?

5    A    That would be the only reason I'd remember that

6    number as well.

7    Q    Because -- yeah.  Right.  It's like --

8    A    I mean, I -- It likely took place with

9    Constitutional carry.  I don't remember the bill number.

10   It likely took place with the Texas Heartbeat Act.  That

11   would be SB 8 of the regular session.  And other bills.

12   It would have taken place with the fair play in women's

13   sports bill.  It -- I mean, that's four there alone, and

14   I'm sure it took place with other bills as well.

15   Q    How many times would you say in your career as

16   a legislator that you've been a part of an overnight

17   debate on a bill?

18           MR. SWEETEN:  You can answer matters of

19   public record.

20           THE WITNESS:  Yeah.  As a matter of public

21   record, I believe that was my first time to -- to be a

22   member of a committee in which that occurred.

23   Q    (BY MS. DULANEY) Okay.  So you would say an

24   overnight debate was -- is atypical?

25   A    I would say that it happens once or twice,

Briscoe Cain
April 21, 2022

1  maybe, you know -- one to five times a session every

2  two years.

3      Q    And how many times in your five years as a

4  legislator have you passed an omnibus bill at 3:00 in

5  the morning?  Let me withdraw that.

6              How many times in your five years as a

7  legislator have you passed an omnibus bill in the middle

8  of the night?

9      A    Could you tell me where or what -- what

10 setting?  Because there are other times we're on the

11 floor at late-night hours that bills like that are

12 passed.  I mean, could you narrow the question?

13     Q    I'm trying to understand what --

14     A    I think you may be referring to committee.

15     Q    In committee or on the floor, how many times

16 have you voted to pass a bill in the middle of the

17 night?

18     A    Our budgets are often into -- into the next

19 day, for long periods, so that's -- that's at least

20 occurred three times so far.  And as far as committee,

21 that would have been the longest committee hearing that

22 I've been a part of, being a member of a committee

23 during my time as a legislator.

24     Q    Could you just clarify?  When the committee was

25 discussing budgets or what are your referring to,

Briscoe Cain
April 21, 2022

1  necessarily?

2      A    Oh, I'm sorry.  The General Appropriations Act

3  on the floor of the House often has full-day and going

4  into the next day debates --

5      Q    Uh-huh.

6      A    -- and those bills are voted on in -- 2:00 A.M.

7  kind of scenario.

8      Q    Are there any other bills that you've voted on

9  in the middle of the night?

10     A    Not that I recall.

11     Q    Do you know how many times in your five years

12  as a legislator where a bill that passed the Senate has

13  the text replaced in its entirety once it came to the

14  House?

15              MR. SWEETEN:  You can -- To the extent

16  that's a matter of public record, you can go ahead and

17  answer.

18              THE WITNESS:  Yeah.  I mean -- How many

19  times?  I mean, I -- I'd be having to guess, but bills

20  being substituted, where a committee substitutes, are --

21  are fairly common in both chambers.

22     Q    (BY MS. DULANEY) I don't want you to guess

23  either, so...

24     A    I can't speak to how many, but it's a -- I'd

25  say it's a common practice.  You know, I don't --

Briscoe Cain
April 21, 2022

1  whether ordinary or what -- you know, what makes a

2  statistical number to say that it is more often than

3  not, I can't speak to that, but it is normal, common

4  that we have substitutes.

5      Q    And is that just in regards to budgets or with

6  any bill?

7      A    A large proportion of bills, you'll find, will

8  have the word -- the letters before them CS, like CSSB

9  or CSHB.

10     Q    Uh-huh.

11     A    That means "committee substitute."  That's

12 because it took place in committee.  It's a -- For lack

13 of a better word, I guess, it's common, but I -- I don't

14 know whether it's more often than not, but it's --

15     Q    And --

16     A    -- it occurs.

17     Q    Does CS or -- I think you said "CSSB."  That's

18 when the entirety of Texas replaced of a bill?

19     A    Yeah.  A committee substitute would be -- it's

20 not an amendment.  So it's a -- You fully drop it on top

21 of it --

22     Q    Okay.

23     A    -- as opposed to a -- a committee amendment,

24 not a substitute, a committee -- the practice of

25 offering an amendment in committee, which is extremely

Briscoe Cain
April 21, 2022

1  rare.

2      Q    Uh-huh.  Now I want to change topics a little

3  bit and talk about the Conference Committee during the

4  regular session, so -- on House Bill 6 and

5  Senate Bill 7.  You were a member of the Conference

6  Committee recon- -- reconciling House Bill 6 and

7  Senate Bill 7; correct?

8      A    Yeah.  I was appointed by the Speaker as a

9  member of the Conference Committee.

10     Q    Who else was on that committee?

11     A    I believe Representative Jetton was a member of

12  it.  I -- Off the top of my head, I don't recall all the

13  members of the Conference Committee.

14     Q    Senator Hughes?

15     A    He would be a member of the -- a Senate

16  conferee.  He would have been appointed by the

17  Lieutenant Governor.

18     Q    Do you know how those members for Conference

19  Committees are selected?

20     A    I can only really speak to the House rules that

21  are a matter of public record, and the House rules

22  provide that the Speaker appoints conferees.

23     Q    Okay.  Can you tell us why the first

24  Conference Committee was called regarding House Bill 6?

25              MR. SWEETEN:  Yeah, I think that's asking

Briscoe Cain
April 21, 2022

1  for legislative privilege and, also, speculation, so I'm

2  going to instruct him not to answer.  You get to why and

3  mental impressions.

4          THE WITNESS:  I'm going to follow the

5  advice of counsel and assert the -- as a matter of

6  legislative privilege, I can't answer that question.

7      Q    (BY MS. DULANEY) What are the responsibilities

8  of a Conference Committee?

9      A    A Conference Committee is appointed to work out

10  the differences between the bill as filed and as amended

11  in committee.  And so one chamber passes one version.

12  Another chamber passes another.  When they're different,

13  the differences have to be worked out, and it comes in

14  the form of a Conference Committee Report, or one of the

15  other chambers could move to adopt the amendments of the

16  other chamber and, thus, kind of sign off on it that

17  way, but, otherwise, if you're not concurring in House

18  amendments or not concurring in Senate amendments, you

19  would move to not concur and request the chamber,

20  whichever one you're in, to appoint conferees and go to

21  Conference Committee.

22      Q    So the charge of a Conference Committee is

23  limited to reconciling differences between the versions

24  of a bill passed by the House and Senate; right?

25          MR. SWEETEN:  You can answer to the --

Briscoe Cain
April 21, 2022

1          THE WITNESS:  Yeah.

2          MR. SWEETEN:  -- to the -- as to general

3    procedure, but don't reveal your mental impressions

4    about this particular legislation.

5          THE WITNESS:  The rules of the House

6    provide several manners of doing that.  One is -- It

7    depends how the conferees are instructed and whether

8    they act within that instruction.  The instructions

9    aren't, technically, binding on it.  I mean, it's a --

10   it's kind of a -- it's really a broad response of how

11   the rules operate to guide the actions of the conferees

12   and the Conference Committee Report.

13   Q    (BY MS. DULANEY) Okay.  But a Conference

14   Committee can't change, alter, amend, or omit text

15   that's not in disagreement without the adoption of an

16   out-of-bounds resolution by both chambers; right?

17         MR. SWEETEN:  Same instruction.

18         THE WITNESS:  Well, if we're speaking

19   generally about the rules, the rules would say you

20   can't.  That issue (inaudible) raised as a point of

21   order.

22         THE REPORTER:  I'm sorry.  Say that again.

23         THE WITNESS:  That issue of going out of

24   bounds, as you've put it, technically, is, you know,

25   waived if someone doesn't raise the issue.  To prevent

Briscoe Cain
April 21, 2022

1  that, one would adopt an out-of-bounds resolution to

2  cure the -- going outside of content that was in both of

3  them, and depending on the stage of a session, the --

4  the Parliamentarian -- or, rather, the Speaker

5  interprets rules broadly.

6              So it's a -- a hard one to -- can't give

7  you a really precise answer on how to -- on how that's

8  done, but I think you gave it a decent summary of the

9  rule.

10     Q    (BY MS. DULANEY) Okay.  And as a -- as a member

11 of that Conference Committee, did you participate in

12 revising House Bill 6 during the regular session?  Just

13 revising, not mental impressions.  Did you participate

14 in revising the bill or not?

15     A    I was --

16              MR. SWEETEN:  You can -- you --

17              THE WITNESS:  -- part of the

18 Conference Committee.

19              THE REPORTER:  Hold on.  What?

20              THE WITNESS:  I was part of the

21 Conference Committee and, therefore, part of creating

22 the language for the Conference Committee Report.

23     Q    (BY MS. DULANEY) So all members of the

24 Conference Committee assist in revising the bill?

25     A    Not always.  It requires a majority of them to

Briscoe Cain
April 21, 2022

1  sign off on it, so, at a minimum, it'll be a majority of

2  the members of a cons- -- of a Conference Committee.

3      Q    So for House Bill 6 --

4      A    That's according to the rules, like, the rules

5  as a matter of public record.  In order to have one, it

6  requires -- there's five members, and it requires at

7  least three of those members.

8      Q    So for House Bill 6, who all participated --

9  just who participated or not in revising -- in revising

10 the bill as part of the Conference Committee?

11                MR. SWEETEN:  I think he's answered that

12 and -- asked and answered.

13                MS. DULANEY:  On who?  The member, who

14 exactly?  I don't recall hearing names.

15                THE WITNESS:  I -- I recall -- I -- I kind

16 of recall some of the members of the Conference

17 Committee.  It's been so long.  If you have anything to

18 refresh my recollection -- It would have been members

19 of -- of the Conference Committee.  I mean, I would have

20 talked to people there.

21                MS. DULANEY:  I'm going to mark the

22 Conference Committee Report as Cain Exhibit 10.

23                (Exhibit No. 10 marked)

24                (Discussion held off the record)

25      Q    (BY MS. DULANEY) So looking at the first page

Briscoe Cain
April 21, 2022

1    of this Conference Committee Report --

2        A    Uh-huh.

3        Q    -- do you recognize this document?

4        A    I do.

5        Q    Okay.  What's the date of this document?

6        A    It's dated May 29th, 2021.

7        Q    And are those the members of the

8    Conference Committee on the front page, their names

9    listed?

10        A    That lists the names of the House and Senate

11    conferees or what we call the members of the

12    Conference Committee.

13        Q    And looking at this, does that refresh your

14    recollection on who participated in revising

15    House Bill 6?

16        A    Yes.

17        Q    And who were those members?

18        A    The House conferees appointed by the Speaker;

19    the Chair, Briscoe Cain; Jacey Jetton; Terry Canales;

20    Travis Clardy; and Nicole Collier.

21        Q    So you each participated in revising

22    House Bill 6?

23        A    My recollection is that all of those people,

24    including myself, were part of discussions on the

25    language that would be included in the report.

Briscoe Cain
April 21, 2022

1     Q    And an agreement was reached on the content of

2   the Conference Committee Report?

3              Let me rephrase.  So between the House

4   conferees and the Senate conferees, an agreement was

5   reached on the content of the Conference Committee

6   Report and Senate Bill 7; correct?

7     A    I guess you could say, as a matter of public

8   record, the signatures here on the first page, the

9   signatures of conferees, would suggest that a majority

10   of the conferees agreed to this language.

11     Q    So where there's no signature, that would

12   indicate that the conferee did not agree to the language

13   contained within the Conference Committee Report?

14     A    That's one way of interpreting it.

15     Q    Okay.  How would you interpret it?

16     A    Not speaking of Senate Bill 7, but there are

17   other ways -- sometimes members of certain parties are

18   not allowed to sign things, recognizing they were --

19   still played a role in it, but due to potential

20   political backlash, they can't do it.  That's a

21   statement, generally, that you -- you've seen and I've

22   experienced, but -- so that's what I mean as -- by the

23   answer, but that's one way a person could interpret that

24   they didn't sign it.

25              I've also, in my experience, not signed

Briscoe Cain
April 21, 2022

1   one because I didn't have the opportunity to.  They had

2   the majority.  I wasn't around, and that's all they

3   needed, so they filed it.

4       Q    What --

5       A    That's what I mean by it's not definitively the

6   answer that they didn't agree with it.

7       Q    Each time, you mean?

8       A    Yes.

9       Q    Each Conference Committee Report ever?

10      A    That's correct.

11      Q    Okay.  But in regards to Senate Bill 7, what

12  did it mean that these members did not sign the

13  Conference Committee Report?

14              MR. SWEETEN:  If that's a matter of public

15  record, you can answer that.

16              THE WITNESS:  Yeah.

17              MR. SWEETEN:  If that would involve

18  legislative privilege, though --

19              THE WITNESS:  I -- I'm not sure what the

20  record shows, if that was the reason for them doing it.

21  To anything else, I'd have to say that, as a matter of

22  legislative privilege, I -- I can't speak to that.

23      Q    (BY MS. DULANEY) So did Representative Canales

24  sign this document?

25      A    As a matter of public record, the document

Briscoe Cain
April 21, 2022

1    marked as Cain 10 does not show Representative Canales's

2    signature.

3        Q    Did Representative Canales participate in

4    revising the bill?

5                MR. SWEETEN:   Same instruction on

6    legislative privilege.   If it's a matter of public

7    record, you can provide that.   If it would reveal

8    discussions that you had with Representative Canales,

9    discussions you had with Beverly Powell --

10               THE WITNESS:   Yeah.   As a -- as a

11   matter --

12               THE REPORTER:   Hold on.   Hold on.

13               MR. SWEETEN:   -- discussions you had with

14   Nicole Collier --

15               THE REPORTER:   I didn't hear the previous

16   names.

17               MR. SWEETEN:   Beverly Powell,

18   Terry Canales, Nicole Collier, if it would reveal

19   discussions with them or any other member, then do not

20   provide the contents of that conversation.

21               THE WITNESS:   Yeah, I believe it important

22   to follow my advice of counsel and assert a legislative

23   privilege.

24       Q    (BY MS. DULANEY) So you're refusing to answer

25   whether Representative Canales participated in revising

Briscoe Cain
April 21, 2022

1  the bill?

2      A     For reasons of legislative privilege because I

3  believe it would, you know, reveal matters of

4  impression, thoughts, and reasoning.

5      Q     Did Representative Collier sign this document?

6      A     As a matter of public record, the first page of

7  what is marked Exhibit Cain 10 does not show

8  Representative Collier as signing it.

9      Q     Did Representative Collier, to your

10  recollection, participate in revising the bill?

11              MR. SWEETEN:  Same instruction as the

12  prior question.  That was the same --

13              THE WITNESS:  Yeah.  As a matter of

14  legislative privilege, I cannot answer that question.

15      Q     (BY MS. DULANEY) You're refusing to answer

16  whether Representative Collier participated in revising

17  the bill?

18      A     As a matter of legislative privilege, yes.

19      Q     Did Senator Powell sign this document?

20      A     The face of the document shows that

21  Senator Powell did not sign the document.

22      Q     Did Senator Powell participate in revising the

23  bill?

24              MR. SWEETEN:  Same instruction and the

25  same issue.

Briscoe Cain
April 21, 2022

1           THE WITNESS:   I -- As a matter of

2   legislative privilege, I -- I can't answer that

3   question.

4       Q      (BY MS. DULANEY) You're refusing to answer

5   whether or not Senator Powell participated in revising

6   the bill?

7       A      I'm following my attorney's advice and

8   asserting legislative privilege.

9       Q      Do you recall that the Conference Committee

10   Report added additional provisions to Senate Bill 7 that

11   was not included in either version of the bill that had

12   passed the House or Senate?

13       A      I believe, as a matter of public record, there

14   was an out-of-bounds resolution filed or discussed -- I

15   don't fully recall -- which would suggest that there is

16   language that was different from the Senate and House

17   version.

18       Q      And do you recall that as part of those

19   provisions, there was a provision included that

20   restricted Sunday voting hours in counties of

21   populations of 30,000 or more?

22       A      I don't recall.

23       Q      Okay.  Do you recall Representative Clardy

24   later referring to that provision as a scrivener's

25   error?

Briscoe Cain
April 21, 2022

```
 1        A    I recall hearing something like that.  As -- as
 2   a matter of public record, I believe that can be found
 3   in the video archive from the proceedings of the floor.
 4        Q    Do you believe that the provision was a
 5   scrivener's error?
 6             MR. SWEETEN:  So your beliefs or your
 7   mental impressions are, therefore, legislatively
 8   privileged.  Instruct not to answer.  Okay?
 9             THE WITNESS:  Yeah.  I'm shaking my head
10   "yes" that I believed he was going to raise that
11   objection, and so I believe it important to follow the
12   advice of counsel.
13        Q    (BY MS. DULANEY) So you believe the provision
14   was an effort to accommodate a concern for election
15   workers' church attendance?
16             MR. SWEETEN:  Same instruction.
17             THE WITNESS:  I believe it important to
18   follow advice of counsel and assert legislative
19   privilege.
20        Q    (BY MS. DULANEY) Okay.  You can put this
21   document to the side.
22             And as someone familiar with
23   Constitutional law, I want to ask about your familiarity
24   with certain Constitutional provisions and other federal
25   laws to the extent you understand them and understand
```

Briscoe Cain
April 21, 2022

```
1   your obligations to abide by them as a legislator.

2               MR. SWEETEN:  So to the extent you're

3   asking him about his -- his mental impressions or -- or,

4   you know, considerations, fact-finding about

5   legislation, I'm going to object to those questions, but

6   to the extent you're asking him separate and apart from

7   the -- from SB 7, which I think was done in the last

8   deposition, then you can -- then I will -- I will let

9   him answer this.

10              MS. DULANEY:  Yeah.  Okay.

11      Q    (BY MS. DULANEY) Representative Cain, will you

12  tell the jury what you understand to be a citizen's

13  right to vote?

14              MR. SWEETEN:  Hold on a minute.  There's

15  no jury.  This is a bench trial.

16              MS. DULANEY:  I -- I lied.

17              MR. SWEETEN:  Okay.  Yeah.  All right.

18      Q    (BY MS. DULANEY) Will you explain to the judge

19  what you understand to be a citizen's right to vote?

20              MR. SWEETEN:  Again, the same -- the same

21  instruction on legislative privilege, so to the extent

22  that you'd be revealing information about your mental

23  processes or considerations at the time of the bill, I'm

24  going to instruct you not to answer, but if you -- if

25  answering would do that, then I don't -- then I'm going
```

Briscoe Cain
April 21, 2022

1  to instruct you that that would be legislatively

2  privileged and you don't have to answer that.  So go

3  ahead and answer based on my instruction.

4              THE WITNESS:  I believe it's possible

5  that --

6              MS. DULANEY:  I'm going to --

7              THE WITNESS:  -- the record may show me

8  giving answers to that, but at this time I'll follow

9  advice of counsel and assert legislative privilege.

10             MS. DULANEY:  For the record, I'm going to

11 object to coaching the witness.

12    Q    (BY MS. DULANEY) Are you familiar with the

13 First Amendment of the U.S. Constitution?

14             MR. SWEETEN:  Same instruction.  If -- if

15 just answering it would not reveal your mental

16 impressions and, basically, therefore, be legislatively

17 privileged, then you can answer.  If you believe that it

18 would reveal your mental impressions about the bill,

19 your thought processes, then I'm going to instruct you

20 not to answer that question.  So it's up to --

21             THE WITNESS:  I'm familiar with the

22 First Amendment of the United States Constitution.

23    Q    (BY MS. DULANEY) Where does that familiarity

24 come from?

25    A    From studying it and litigating it.

Briscoe Cain
April 21, 2022

1    Q    So with that experience, do you believe the

2  First Amendment of the Constitution fits within the

3  right to vote?

4              MR. SWEETEN:  It calls for a legal

5  conclusion.  Again, the same instruction on legislative

6  privilege, and so with that instruction, you can make

7  that decision.

8              THE WITNESS:  I believe it important to

9  follow the advice of counsel.  The way the question is

10  worded, I think it asks for things that are privileged

11  under Legislative Privilege Doctrine.

12    Q    (BY MS. DULANEY) Do you believe that every

13  American citizen has the right to vote?

14              MR. SWEETEN:  Same instruction on

15  legislative privilege.  Also asks for a legal

16  conclusion, but go ahead.  You can answer if you feel

17  like you can without divulging your mental impressions

18  as to the bill.  If you can't, then don't.

19              THE WITNESS:  I believe that every --

20  every American citizen has the right to vote.

21    Q    (BY MS. DULANEY) Do you understand the

22  Fourteenth Amendment of the U.S. Constitution to require

23  equal protection to all citizens?

24              MR. SWEETEN:  Same instruction.  Same

25  objection.

Briscoe Cain
April 21, 2022

1           THE WITNESS:  If we're speaking

2  generally --

3       Q   (BY MS. DULANEY) We are.

4       A   Generally, the Fourth Amendment -- Fourteenth

5  Amendment is a provision of due process and requires --

6  requires the protections that you -- you provided, so I

7  guess the answer is, yes, generally.

8           MS. DULANEY:  Can we -- Do y'all mind if

9  we take like a ten-minute break?

10           MR. SWEETEN:  Okay.

11           THE WITNESS:  11.  It has to be 11

12  exactly.

13           THE VIDEOGRAPHER:  We're off at 4:20.

14           (Recess from 4:20 P.M. to 4:31 P.M.)

15           THE VIDEOGRAPHER:  This is Segment No. 7.

16  We're back on the record, 4:31.

17       Q   (BY MS. DULANEY) Representative Cain, I want to

18  backtrack a little bit.  I'm not asking about the bill.

19  I'm not asking about your mental impressions on the

20  legislation.  What do you understand to be the citizen's

21  right to vote?

22       A   According -- Like federal case law on -- or

23  generally?

24       Q   Your understanding.  Just your understanding.

25           MR. SWEETEN:  I'll just -- Asks for a

Briscoe Cain
April 21, 2022

1    legal conclusion.

2               But go ahead since they're not asking

3    about the bill.

4               THE WITNESS:  You know, the courts have

5    generally stated that citizens have a -- have a right to

6    vote depending on the thing, whether -- different

7    scrutiny levels, I guess, to -- calls for kind of a --

8    bit of a complex answer, but, generally, American

9    citizens have the right to vote.

10              We -- we see that -- in the Fifteenth

11   Amendment, the prohibition on the Federal Government or

12   the States abridging the right of -- right to vote based

13   on the -- on race or gender, et cetera, prohibition.

14   And you could read into, you know, the First Amendment's

15   right of petition, government redresses of grievances as

16   a nontextual concept of -- of the right to vote as well.

17       Q    (BY MS. DULANEY) Okay.  So you just mentioned

18   the Fifteenth Amendment.  Where does your familiarity

19   with the Fifteenth Amendment come from?

20       A    The -- I don't know.  A student of -- I guess,

21   of law.  I mean, the Fifteenth Amendment is, you know,

22   one of the -- I guess, the -- the third reconstruction

23   amendment.  I mean, that -- Its purpose is as stated,

24   prohibiting the abridgment of the right to vote based

25   on, in summary, immutable differences.

Briscoe Cain
April 21, 2022

1    Q    What did you do to ensure the provisions of
2  HB 6 complied with the Fifteenth Amendment?
3              MR. SWEETEN:  That's legislatively
4  privileged.  I will instruct you not to answer.  That
5  would reveal your mental impressions regarding the
6  legislation.
7              THE WITNESS:  I'll follow the advice of
8  counsel.
9    Q    (BY MS. DULANEY) Again, not asking about the
10  bill, not asking about your mental impressions about the
11  legislation, but what do you understand Section 2 of the
12  Voting Rights Act to be?
13              MR. SWEETEN:  Again, calls for a legal
14  conclusion.  Since you've limited it to nothing about
15  the bill or his mental processes or consideration, to
16  the extent you can answer it in -- in that way, you can.
17  If it would reveal your mental impressions, then do
18  not -- about the bill, then do not provide those.  Okay?
19              THE WITNESS:  I -- I can't, you know, sit
20  here and recite the provisions of -- of Section 2 as we
21  sit here.
22    Q    (BY MS. DULANEY) Do you understand Section 2 of
23  the Voting Rights Act to prohibit states from enacting
24  voting qualifications and prerequisites that would deny
25  a U.S. citizen's right to vote and discriminate based on

Briscoe Cain
April 21, 2022

1   race for voting?

2              MR. SWEETEN:  Objection to the -- to the

3   question.  I mean, could you give him -- Maybe you could

4   give him the provision that you're quoting from

5   lengthily.

6              But other than that, I'll -- I'll just

7   say:  Same instruction on legislative privilege and

8   mental impressions to the extent she's limited it to

9   not, but if -- as long as it would not be inextricably

10  linked with your thinking regarding the bill, you can go

11  ahead and answer.

12             THE WITNESS:  I mean, if the statement you

13  just made is a quotation from Section 2 of the

14  Voting Rights Act, then I would say I'd take your word

15  for it.

16     Q    (BY MS. DULANEY) It's not a quotation, but I

17  will represent to you that that's what Section 2 of the

18  Voting Rights Act prohibits.  Do you have any reason to

19  dispute that?

20     A    I -- I don't have a reason to dispute it, but

21  I'm not familiar enough with it to -- to confirm or deny

22  that that's a summary of it, as you put.

23     Q    Okay.  I'm not asking about the bill.  I'm not

24  asking about your mental impressions on the legislation.

25  Do you understand Section 208 of the Voting Rights Act

Briscoe Cain
April 21, 2022

1  to provide disabled and non-English-speaking voters with

2  the right to their assister of choice?

3             MR. SWEETEN:  Same instruction.

4             THE WITNESS:  Without waiving privilege, I

5  do recall, in preparing for this hearing, testimony

6  where -- where that was discussed.  If I recall

7  correctly, I think, actually, it was James Slattery from

8  the Texas Civil Rights Project that had mentioned that,

9  but that's, you know, the most recent recollection I --

10 I have of -- of hearing about that in the context of why

11 we're here today.

12     Q    (BY MS. DULANEY) So you're not familiar with

13 Section 208 of the Voting Rights Act?

14             MR. SWEETEN:  Objection; misstates his

15 testimony.

16     Q    (BY MS. DULANEY) Are you familiar with

17 Section 208 of the Voting Rights Act?

18             MR. SWEETEN:  Same objection about

19 legislative privilege.

20             If it's inextricably linked with your

21 consideration of the bill, then don't provide it.  If

22 it's not and you can answer this question more than you

23 already have, then feel free to answer the question.

24             Also, calls for a legal conclusion.

25             Go ahead.

Briscoe Cain
April 21, 2022

1          THE WITNESS:  I don't believe I can add

2   anything more than what I've already said.

3     Q    (BY MS. DULANEY) Backtracking, are you -- Going

4   back to Section 2 of the Voting Rights Act, you are not

5   familiar with Section 2 of the Voting Rights Act;

6   correct?

7          MR. SWEETEN:  Misstates -- Objection;

8   misstates testimony.  He's asked -- Objection; asked and

9   answered.  Objection; calls for a legal conclusion, and

10  objection to the extent it im- -- impacts legislative

11  privilege.

12          You can answer subject to those

13  objections.

14          THE WITNESS:  I mean, I believe I've

15  already answered the question.  Otherwise, I'll follow

16  the advice of counsel and assert legislative privilege.

17    Q    (BY MS. DULANEY) To whether or not you're

18  familiar with Section 2 of the Voting Rights Act, you're

19  refusing to answer that question?

20          MR. SWEETEN:  He's answered the question.

21  Asked and answered.

22          MS. DULANEY:  He can still answer the

23  question.

24          THE WITNESS:  I believe I've already

25  answered the question.

Briscoe Cain
April 21, 2022

```
 1                  MS. SADASIVAN:  I mean, asked and answered
 2   (inaudible).  Objection is -- objection to --
 3                  THE REPORTER:  I can't -- I can't hear
 4   you.
 5                  MS. SADASIVAN:  I was just saying it's an
 6   objection to form, and so it's not -- unless you -- you
 7   know, that's not an instance where you'd instruct your
 8   client not to answer, so I'm just trying to understand
 9   if you --
10                  MR. SWEETEN:  So let me be clear so the
11   record is clear, because this will certainly be
12   reviewed.  What -- what I'm saying is that the -- that
13   the question's been asked and answered.  You're asking
14   the Representative for a legal conclusion.
15                  Separately, to the extent that it would
16   im- -- impact his mental impressions and thought
17   processes about legislation, I would instruct him if
18   that answer would do that, that -- that that would be
19   legislatively privileged.  Those are my instructions to
20   you.  Those are my objections.
21                  THE WITNESS:  Uh-huh.  I'm going to follow
22   the advice of counsel that revealing my opinion of it
23   would require me to reveal conversations that I had and
24   other mental impressions regarding legislation and
25   Section 2 of the Voting Rights Act.
```

Briscoe Cain
April 21, 2022

1      Q      (BY MS. DULANEY) Revealing your opinion of

2   whether or not you're familiar with Section 2 of the

3   Voting Rights Act?

4                  MR. SWEETEN:  Objection; argumentative.

5   Same objection that I've already stated.

6                  THE WITNESS:  I'm not how -- sure how

7   familiar -- what -- you know, what you mean by "familiar

8   with."  I'm familiar to the point -- especially with

9   your most recent question, are you summarizing what

10  Section 2 does --

11                 MR. SWEETEN:  Yeah, so he's already

12  indicated that that would --

13                 MS. DULANEY:  I'm going to object to

14  coaching the witness.

15                 MR. SWEETEN:  Great.  He's already

16  indicated that his -- that this would impact his mental

17  impressions about the bill.  He said that.  He also

18  tried to answer your question in -- in the -- in the way

19  that you asked it earlier.  You've now asked it three or

20  four times.  He's indicated he can't answer it without

21  revealing legislative privilege at this time.

22                 MS. DULANEY:  I think I've made it very

23  clear --

24                 MR. SWEETEN:  And so I'm going to --

25                 THE REPORTER:  Hold on.

Briscoe Cain
April 21, 2022

```
1              MS. DULANEY:  -- I'm not asking about his

2    mental impressions about the bill or the legislation.

3    It has -- It's -- I'm not asking about anything that

4    would do -- to encroach on his legislative privilege.

5              MR. SWEETEN:  And -- and I think what he's

6    saying is that he thinks that it would, based on

7    conversations that he's had, based on his considerations

8    at the time of the bill, that he believes that it would

9    impact that.  That's what he's saying.

10             MS. DULANEY:  He testified, when I first

11   asked the question, that he was unaware of the

12   provisions of Section 2 of the Voting Rights Act.

13             MR. SWEETEN:  And I think that misstates

14   exactly -- that -- that misstates what he said.  That is

15   not accurate.  So I'm just going to object.  He's

16   indicated he's going to invoke privilege, and so I

17   think -- let's move to the next question, Counsel.

18             MS. DULANEY:  Just to clarify for the

19   record, can we read that back in, the first question

20   that I asked about Section 2 of the Voting Rights Act?

21             MR. SWEETEN:  Well, read the -- all of his

22   answers as well to that pro- -- to those provisions.  So

23   we're going to be here awhile, it sounds like.

24             MS. DULANEY:  That's okay.

25             (Requested portion of the record read)
```

Briscoe Cain
April 21, 2022

```
 1              MR. SWEETEN:  Okay.  So he's answered the
 2   question, and -- and so if you could just move on to the
 3   next question.  We've now asked him five times the
 4   same -- same line.  So he's answered the question.  He's
 5   invoked privilege.  To the extent further discussion --
 6              MS. DULANEY:  I -- I -- I will move on.
 7              MR. SWEETEN:  Okay.  Great.  Great.
 8      Q    (BY MS. DULANEY) Are you familiar with Title II
 9   of the Americans with Disabilities Act?
10              MR. SWEETEN:  Same instruction that I've
11   provided before and same objection.  Objection; legal
12   conclusion, and -- and objection to the extent it would
13   impact his legislative privilege, if it would impact
14   your mental impressions.  Otherwise, you can answer the
15   question if you don't think that it would impact your
16   mental impressions about legislation.  Okay?
17      Q    (BY MS. DULANEY) I'm not asking about your
18   mental impressions about legislation.  Just in general,
19   are you familiar --
20      A    I recall, according to the record in committee,
21   people discussing Title II of the -- of the ADA, I
22   believe is what you're referring to; is that correct?
23      Q    Correct.
24      A    I recall hearing people discuss it.  It's my
25   understanding that it generally has to do with being
```

Briscoe Cain
April 21, 2022

1  accommodating to people with disabilities to allow them

2  to vote.

3      Q    And what did you do to ensure the provisions of

4  HB 6 complied with that statute?

5              MR. SWEETEN:  That's, clearly,

6  legislatively privileged.  That relates to your mental

7  impressions regarding the bill and your actions, your

8  fact-gathering, et cetera, and so I'm going to instruct

9  you not to answer that question.

10             THE WITNESS:  I believe it important to

11  heed the advice of counsel as he's asserting legislative

12  privilege.

13     Q    (BY MS. DULANEY) So you're refusing to answer

14  what you did to ensure the provisions of S -- of HB 6

15  comply with the statute?

16     A    I'm following the advice of counsel.

17     Q    Are you familiar with Section 504 of the

18  Rehabilitation Act of 1973?

19             Sorry.  Let me withdraw that.

20             MR. SWEETEN:  Okay.

21     Q    (BY MS. DULANEY) I'm not asking about your

22  mental impressions about the legislation.  I'm not

23  asking about anything related to the bill.  Are you

24  familiar with Section 504 of the Rehabilitation Act of

25  1973?

Briscoe Cain
April 21, 2022

1           MR. SWEETEN:  Same objection; calls for a

2  legal conclusion.

3           And, also, to the ex- -- if it would

4  impact your mental impressions, then instruction -- same

5  instruction on legislative privilege, but you can answer

6  to the extent it would not.  Go ahead.

7           THE WITNESS:  At this time, I -- I cannot

8  recall the extent of my familiarity with it.

9      Q    (BY MS. DULANEY) Okay.  So you're not familiar

10  with that statute?

11      A    I don't recall --

12           MR. SWEETEN:  Same instruction.  Same

13  objection.  Go ahead.

14           THE WITNESS:  I don't recall discussions

15  of it from the public record or from committee hearings.

16                (Exhibit No. 11 marked)

17      Q    (BY MS. DULANEY) We're going to move to another

18  topic.  Let's talk about your activities outside of the

19  Texas Legislature with respect to voting and elections.

20  I'm going to hand you what I'm marking Cain Exhibit 11.

21  Do you recognize this?

22      A    Yes.

23           MR. SWEETEN:  May I have a copy?

24           THE WITNESS:  It appears to be a man in a

25  cowboy hat.

Briscoe Cain
April 21, 2022

```
1        Q    (BY MS. DULANEY) Is that man you?

2        A    Yes.  It looks to be me, yes.

3        Q    Do you have any reason to dispute that that man

4   is not you?

5        A    I have no reason to dispute that the man in the

6   photo is me.

7        Q    And this is a Tweet from your personal Twitter

8   page; correct?

9        A    Yeah, it's a Tweet from my Twitter page.  It --

10  I wouldn't say "personal."  It's a -- an account I have,

11  though, yes.

12       Q    And it's dated November 6, 2020?

13       A    That's what it says.

14       Q    Did you take this picture on November 6th,

15  2020?

16       A    Yes.

17       Q    And is this a picture you took of yourself on

18  your way to Pennsylvania?

19       A    Yes.  It is a selfie.

20       Q    And to quote from your Tweet, who were the

21  team -- quote, "team of attorneys from across the

22  country," end quote, that you linked up with?

23       A    I -- I can't name them all, but there were

24  people from across the country that went to Pennsylvania

25  to volunteer on the legal team.
```

Briscoe Cain
April 21, 2022

1      Q     Would you tell me the specific names of the

2   people you do remember?

3      A     Mikael Garcia.  It's spelled M-I-K-A-E-L,

4   Garcia.  He's from Texas.  There were two other Texas

5   lawyers that were there, someone that -- I cannot recall

6   their names.  We worked with, I think, two New York

7   attorneys.  I'm having trouble, I guess, recalling their

8   names right now.  And -- I mean, there were plenty of

9   others that, off the top of my head, I can't recall

10  their names.  This was, you know, in November of 2020.

11     Q     And you said, in your answer right before that,

12  "on the legal team."  What legal team are you referring

13  to?

14     A     There was a request put out by, I believe, the

15  Republican Lawyers Association or something like that,

16  asking for Republican attorneys to say whether they

17  could go to certain places, and they had asked us to go

18  to Philadelphia.

19     Q     Who is "us"?

20     A     They had asked Republican attorneys at large to

21  do so.  There were communications put out, and I was

22  informed of it.  So -- I mean, there -- there were

23  lawyers from different walks of life.  Some of them were

24  RNC attorneys.  Some of them were with the -- I don't

25  know the -- I don't know the exact term.  Republican

Briscoe Cain
April 21, 2022

```
 1  Lawyers Association.  There were attorneys that were on

 2  staff with the Trump campaign.  There were various

 3  lawyers in different capacities that were there.

 4      Q    But you're not -- you're not and have never

 5  been elected to any public office in Pennsylvania;

 6  right?

 7      A    That's correct.

 8      Q    Are you licensed to practice law in

 9  Pennsylvania?

10      A    No.

11      Q    Had you ever before this practiced law in

12  Pennsylvania?

13      A    I think you're asking whether my actions there

14  were considered practicing law in Pennsylvania.

15      Q    I asked you if you had ever practiced law in

16  Pennsylvania before that -- before this.

17      A    I have -- I believe this requests a legal

18  conclusion, but --

19      Q    Whether or not you had practiced -- Whether or

20  not you had practiced law, been involved in any --

21          MS. SADASIVAN:  The practice of law.

22      Q    (BY MS. DULANEY) -- just -- just the practice

23  of --

24      A    Okay.

25      Q    -- of law, whether or not you had practiced law
```

Briscoe Cain
April 21, 2022

1  in Pennsylvania.

2      A    Yeah, I've never practiced law in Pennsylvania.

3  Or before this, I guess is your question.

4      Q    So this work was associated with the Trump

5  campaign; right?

6      A    That's an accurate statement, in general, yes.

7      Q    When were you first contacted?

8      A    Between three to five days before the date of

9  this Tweet.

10     Q    Were you paid for your services?

11     A    We were not paid.

12     Q    I'm sorry.  You might have said this, but who

13  first contacted you?

14     A    I got a phone call from a friend -- I can't

15  remember who at this time -- that told me about it, and

16  I contacted my friend, Mikael Garcia, and we both

17  thought it would be a -- you know, a neat thing

18  that's -- doesn't occur that often, to -- to go to

19  Pennsylvania.

20     Q    What doesn't occur that often?

21     A    Well, presidential elections are held every

22  four years, so it's not often you get to participate in

23  one.

24     Q    You were actually participating in a

25  presidential election that had occurred three days prior

Briscoe Cain
April 21, 2022

1   when you took this Tweet?

2       A    I mean, I use the term loosely.  I think

3   you're, in a way, participating in a presidential

4   election or the outcome of an election, things that

5   occurred with an election.  They only take place every

6   four years.

7       Q    And to again quote from your teet -- your

8   Tweet, what did the "fight for a fair and honest

9   election in Pennsylvania" entail?

10              MR. SWEETEN:  So here -- here I think

11  we're maybe getting into attorney-client privilege, so

12  don't reveal com- -- you're practicing -- you're a

13  lawyer, so to the extent that you were contacted by your

14  client or this would involve discussions with your

15  fellow attorneys or the client itself, don't reveal that

16  information.  Okay?

17              MS. DULANEY:  I -- I believe that that

18  attorney-client privilege is waived to the extent that

19  this is a public Tweet saying he's fighting for a fair

20  and honest election.

21              THE WITNESS:  But the Tweet doesn't get

22  into the details of -- of -- of what I did there or --

23  or drafted.

24              MR. SWEETEN:  Yeah.  I mean --

25      Q    (BY MS. DULANEY) So to the extent you can

Briscoe Cain
April 21, 2022

1  answer --

2              MR. SWEETEN:  I disagree with your -- with

3  your characterization, but, I mean, if you're going to

4  ask him about that statement, I'm just -- I'm

5  instructing him:  Just don't reveal -- As an attorney --

6              MS. DULANEY:  Yeah.

7              MR. SWEETEN:  -- for these folks, don't

8  reveal communications.  That's my instruction.

9      Q    (BY MS. DULANEY) And I'm just asking what this

10  meant to you.  What did it mean -- What did fighting for

11  a fair and honest election in Pennsylvania mean?

12      A    It meant fighting for a fair and honest

13  election in Pennsylvania.

14      Q    Why?

15              MR. SWEETEN:  Again, on the -- same

16  attorney-client instruction or discussions with other

17  attorneys, don't reveal those, and so --

18              THE WITNESS:  Uh-huh.  I think, as a

19  matter of public record, maybe in February -- I'm not

20  sure whether it was a Federal Court case or intermediate

21  appellate State Court case, but there -- there was an

22  opinion -- a declaratory judgment that some provisions

23  of the Pennsylvania Election Code specifically dealing

24  with universal mail-in balloting were held to violate

25  the State Constitution in Pennsylvania.

Briscoe Cain
April 21, 2022

```
 1                  That's a matter of public record.  I think
 2   I can point you to that, and that would be an example of
 3   why I'd be there to fight for a fair and honest election
 4   in Pennsylvania.
 5       Q    (BY MS. DULANEY) Were you involved in that
 6   case?
 7                  MR. SWEETEN:  Same instruction on
 8   attorney-client privilege.
 9                  THE WITNESS:  I mean, I'm trying to think
10   of how to reveal --
11       Q    (BY MS. DULANEY) Just asking whether or not you
12   were involved in that litigation at all.
13       A    I was involved, yes.
14       Q    Okay.  In what capacity?
15       A    In -- in research of the cause of action.
16       Q    And what did you do while you were in
17   Pennsylvania for this?
18                  MR. SWEETEN:  Again, I mean, the
19   attorney-client instruction stands.
20                  THE WITNESS:  Uh-huh.
21                  MR. SWEETEN:  You know, obviously, you
22   don't want to reveal, you know, any advice you gave, any
23   communications --
24                  THE WITNESS:  Uh-huh.
25                  MR. SWEETEN:  -- with your counsel -- I
```

Briscoe Cain
April 21, 2022

1  mean, other counsel, with your client in any way, but to

2  the extent you're -- you're being asked what you did in

3  Pennsylvania, if it wouldn't reveal that, you can give

4  that.

5              THE WITNESS:  Yeah.  I think it's also a

6  matter of public record.  There were interviews that we

7  discussed -- that I was, you know, returning phone calls

8  from a hotline, writing affidavits, taking people's

9  testimony about their opinion of what, maybe, they saw

10  and -- I think that's as far as I can go without

11  revealing confidential information or advice.

12      Q    (BY MS. DULANEY) Of what people saw during --

13  during the election at polling places?

14      A    Generally, that's correct, yeah.

15      Q    When did you leave Pennsylvania?

16      A    I want to say I was there for three days.

17      Q    And what was the result of the work that you

18  did in Philadelphia to fight for a fair and honest

19  election?

20      A    Well, as a matter of public record, eventually,

21  I believe in February or so, there was a court opinion,

22  as I mentioned earlier, that -- that found -- Act 77

23  (inaudible) 2020, providing for --

24              THE REPORTER:  I'm sorry?

25              THE WITNESS:  It was called Act 77, a

Briscoe Cain
April 21, 2022

1   Pennsylvania statute termed as Act 77 colloquially, kind

2   of -- It's like SB 7.  It's famous enough as a term to

3   mean something.  Holding Act 77 unconstitutional, in

4   violation of -- I don't recall the exact article and

5   section number of the Pennsylvania Constitution.

6       Q    (BY MS. DULANEY) Do you also recall the Trump

7   campaign filing a federal lawsuit in Pennsylvania,

8   alleging widespread issues with mail-in ballots in the

9   state, separate and apart from this lawsuit you're

10  referring to?

11      A    I did not participate.

12      Q    Are you aware of it?

13      A    The way you summarize it, I'm -- I'm not

14  exactly familiar with --

15      Q    The federal lawsuit that was filed by the Trump

16  campaign in Pennsylvania?

17      A    I'm more familiar with the Mike Kelly lawsuit,

18  but not -- not the Trump lawsuit.

19      Q    You're saying "more familiar," so -- I'm just

20  trying to clarify.

21      A    I can't say what -- how familiar I am with --

22  with it because I couldn't tell you what their claims

23  were.

24      Q    But were you aware?  I was just asking if you

25  were aware of it.

Briscoe Cain
April 21, 2022

```
 1              MR. SWEETEN:  I think he's answered the
 2   question.
 3        Q    (BY MS. DULANEY) Donald Trump vs.
 4   Kathy Boockvar?
 5        A    I'm -- I'm not aware -- Like, that doesn't ring
 6   a bell for me, so I -- I do not recall.
 7        Q    Okay.  Did you travel anywhere else on behalf
 8   of the Trump campaign?
 9        A    No.
10        Q    Do you know who Jacob Blake is?
11        A    It doesn't ring a bell.
12        Q    Do you know who Kyle Rittenhouse is?
13        A    I do know who Kyle Rittenhouse is.
14              (Exhibit No. 12 marked)
15        Q    (BY MS. DULANEY) I'm going to hand you a
16   Tweet -- one of your Tweets I've marked as Cain
17   Exhibit 12.
18        A    Okay.
19        Q    Do you recognize this?
20        A    Yes.  I mean, I --
21              MR. SWEETEN:  Do I have a copy of this?  I
22   need -- I need a minute to catch up.  Hold on.
23              MS. DULANEY:  Okay.
24              MR. SWEETEN:  (Reviewing document) Okay.
25   I -- I fail to understand the relevance of
```

Briscoe Cain
April 21, 2022

1   Kyle Rittenhouse to this litigation, but I've read it

2   now.  Go ahead.

3                   MS. DULANEY:  Okay.

4        Q    (BY MS. DULANEY) Was this one of your Tweets,

5   Representative Cain?

6        A    Yes.

7        Q    It says, "Something we all knew:

8   Kyle Rittenhouse not guilty on all 5 counts."  When you

9   say, "Something we all knew," who did you mean by "we"?

10       A    (Inaudible)

11                  MR. SWEETEN:  Objection; relevance.

12                  THE REPORTER:  I'm sorry?  I didn't hear

13  what you said.

14                  THE WITNESS:  He raised an objection.

15                  MR. SWEETEN:  I said, "Objection;

16  relevance."  He said, "Conservatives."  Okay?

17       Q    (BY MS. DULANEY) Do you think anyone disagrees

18  with that statement?

19                  MR. SWEETEN:  Calls for speculation.

20  Objection; speculation.  Objection; relevance.

21                  THE WITNESS:  I think, as a matter of

22  public record, there are people that disagree with it,

23  and there's news stories of people expressing their

24  disagreement with it.

25       Q    (BY MS. DULANEY) So like a Black Lives Matter

Briscoe Cain
April 21, 2022

1  member would -- would not agree with that statement?

2      A    I can't speak to what --

3              MR. SWEETEN:  Objection; speculation.  You

4  want him to characterize the entire movement and

5  everybody's opinion in it?  Come on.  Objection;

6  compound.  Objection; relevance.  Now, you -- This is

7  starting to become abusive.

8      Q    (BY MS. DULANEY) You can answer.

9      A    I -- I -- I can't speak to what the -- you

10  know, some anonymous, theoretical person would -- would

11  believe or -- or say.

12     Q    Okay.  How did you know that Kyle Rittenhouse

13  wasn't guilty of the five counts he was charged?

14              MR. SWEETEN:  Same objection; relevance.

15  You know --

16              Go ahead.  You can answer.

17              THE WITNESS:  Based on things I viewed,

18  the matter -- matters of -- of, you know, I guess,

19  public documents and videos, it -- it had appeared that

20  someone was acting in defense of their life.

21     Q    (BY MS. DULANEY) You can put that aside.

22              After the implementation of Senate Bill 1,

23  has anyone relayed problems to you or your office

24  regarding Texans' ability to vote in the March 22

25  primary election?

Briscoe Cain
April 21, 2022

```
 1     A    I have --

 2               MR. SWEETEN:  So -- Hold on.  Yeah, you

 3    can answer that question.  She's talking about

 4    post-legislative enactment, questions about people

 5    contacting you about that, so...

 6               THE WITNESS:  Yes.  As a matter of public

 7    record, I think we may have produced documents of that

 8    nature.  There's also, you know, been news stories and

 9    other things expressing concerns, and my office has been

10    contacted.  I've been contacted.

11     Q    (BY MS. DULANEY) What was the content of those

12    communications, of those concerns?

13     A    I mean, I think some of these are matters of

14    public record.  There's -- there's news stories out

15    there.  Whether those things are, you know, complete,

16    you know, proper, accurate characterizations is -- is

17    another question, but, generally, the concerns were

18    directed at provisions of the application (inaudible)

19    ballot mail-in process.

20               THE REPORTER:  Hold on.  I didn't hear

21    that.  "...provisions of the" --

22               THE WITNESS:  Generally, the concerns were

23    directed at provisions regarding the Application for

24    Ballot by Mail and the Ballot by Mail process.

25     Q    (BY MS. DULANEY) Of the people that contacted
```

Briscoe Cain
April 21, 2022

1  your office to relay concerns, did any of those include

2  election administrators?

3      A    We're talking after the recent primary?

4      Q    Correct.

5      A    I don't recall.

6      Q    Do you recall any of the specifics of who

7  contacted you to relay concerns?

8      A    I don't.  I haven't had any -- no direct

9  conversations with -- with any of them.  They may have

10  contacted us, but this -- we're -- we're in the interim

11  right now.

12      Q    Uh-huh.  Did those -- any of those concerns

13  relay problems stemming -- or regarding voting access

14  for persons with disabilities?

15      A    Not that I recall right now.  Are you asking

16  that -- did any County officials contact me?

17      Q    I'm asking a little bit broader than that.  Any

18  of -- You -- you testified earlier, correct me if I'm

19  wrong, that you -- your office had received

20  communications regarding some concerns about people's

21  ability to vote in the March 2022 primary election --

22      A    Uh-huh.

23      Q    -- after the implementation of Senate Bill 1;

24  correct?

25      A    Yes.

Briscoe Cain
April 21, 2022

1    Q    Did -- did any of those concerns have to do

2  with voting access for persons with disabilities?

3    A    As I recall, the -- the concerns I've heard

4  raised involve the Application for Ballot By Mail and

5  Ballot By Mail process.  I don't recall concerns

6  specifically directed at citizens with disability.

7    Q    Do you recall concerns specifically directed at

8  voting access for minorities?

9    A    I mean, I -- The -- the thing I'm most familiar

10  with and can recall at this time involves the

11  Application for Ballot by Mail and the Ballot by Mail

12  process and, you know, the rejections, et cetera,

13  related thereto.  Whether that deals with certain

14  segments of the population -- I mean, I've heard -- as a

15  matter of public record, I've heard people say -- make

16  certain allegations.  I've just -- I can't say I recall

17  the specifics.

18    Q    And did you anticipate those issues when you

19  were drafting and sponsoring House Bill 6?

20            MR. SWEETEN:  Yeah, so he's not going to

21  answer his mental processes and impressions about the

22  legislation, so I'm going to instruct -- that would,

23  clearly, be legislatively privileged and instruct him

24  not to answer that question.

25            THE WITNESS:  Yeah, that would reveal

Briscoe Cain
April 21, 2022

1  conversations and mental impressions, and I'll follow

2  the advice of counsel.

3      Q     (BY MS. DULANEY) So not asking about your

4  mental impressions, not asking about the bill, you would

5  never want to deny, dilute, or defile any American's

6  right to vote; correct?

7      A     I think, as a matter of public record, I've --

8  I've said that before.

9      Q     And you don't want to make it harder for

10 Americans to vote; right?

11     A     I believe, as a matter of public record, I've

12 also said similar things to that effect.

13     Q     What about for disabled persons?

14     A     Absolutely not.  We should not make it harder

15 for disabled -- people with disabilities to vote.

16     Q     Veterans?

17     A     Shouldn't make it harder for anyone to vote.

18     Q     Black people?

19     A     Anyone.

20     Q     Latino people?

21     A     I do not believe anyone should make it harder

22 for people of any race to vote.

23     Q     An Asian American?

24     A     It should not be harder for Asian Americans to

25 vote.

Briscoe Cain
April 21, 2022

1      Q     Islamic?

2      A     It should not be harder for people of any other

3  religion to vote.

4      Q     Shift workers?

5      A     Should not be harder for shift workers to vote.

6      Q     Caretakers?

7      A     People, regardless of their employment status,

8  it should not be made harder for them to vote.

9      Q     Sunday morning church-goer?

10      A     It should not be harder for people to vote.

11              MS. DULANEY:  I'm going to pass the

12  Witness.

13              MR. SWEETEN:  Okay.  So we're going to the

14  Zoom folks.  When we were on the break, it -- you all

15  had indicated there were no questions.  Is that still

16  the case?

17              MS. RYAN:  This is Liz Ryan.  It is for

18  me.

19              MR. SWEETEN:  Okay.  All right.  So is

20  there any last -- last questions?  Is there anybody else

21  who -- who has a question for Representative Cain?

22              MR. MOCINE-MCQUEEN:  Not from the LULAC

23  Plaintiffs' group.

24              MR. SWEETEN:  Okay.

25              MS. HOSTETLER:  None from the Mi Familia

Briscoe Cain
April 21, 2022

1  Vota group either.

2              MR. SWEETEN:  Okay.  Okay.  So I don't

3  hear anybody wants to ask questions, so -- I have no

4  questions for the witness at this time.  We will -- This

5  deposition is ended.

6              THE VIDEOGRAPHER:  Off the record, 5:08.

7          (DEPOSITION CONCLUDED AT 5:08 P.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Briscoe Cain
April 21, 2022

```
1                    CHANGES AND SIGNATURE

2    RE:  Civil Action No. 5:21-cv-0848-XR
     Houston Area Urban League, et al., v. Greg Abbott,
3    et al.

4    The following are corrections to the transcript of my
     oral and videotaped deposition taken on the 21st day of
5    April, 2022, in the above-referenced cause:

6    PAGE    LINE          CORRECTION AND REASON

7    _____   _____   _____
     _____   _____   _____
8    _____   _____   _____
     _____   _____   _____
9    _____   _____   _____
     _____   _____   _____
10   _____   _____   _____
     _____   _____   _____
11   _____   _____   _____
     _____   _____   _____
12   _____   _____   _____
     _____   _____   _____
13   _____   _____   _____

14   IF YOU DO NOT WISH TO MAKE ANY CHANGES, PLEASE NOTE
     "NONE" ABOVE.
15

16                              _____
                                     BRISCOE CAIN
17
     THE STATE OF TEXAS   )
18   COUNTY OF TRAVIS     )

19          SUBSCRIBED AND SWORN TO BEFORE ME, the
     undersigned Witness, BRISCOE CAIN, on this the _____
20   day of _____, 2022.

21

22                              _____
                                Notary Public in and for
23                              the State of Texas

24   My commission expires: _____

25
```

Briscoe Cain
April 21, 2022

```
 1                IN THE UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3   LA UNIÓN DEL PUEBLO ENTERO, et  *
     al.,                           *
 4        Plaintiffs,               *
     v.                             *Case No. 5:21-cv-844-XR
 5   GREGORY W. ABBOTT, et al.,      *
          Defendants.               *
 6   ---------------------------------------------------------
     OCA-GREATER HOUSTON, et al.,    *
 7        Plaintiffs,               *
     v.                             *Case No. 1:21-cv-780-XR
 8   JOHN SCOTT, et al.,             *
          Defendants.               *
 9   ---------------------------------------------------------
     HOUSTON AREA URBAN LEAGUE,      *
10   et al.,                         *
          Plaintiffs,               *
11   v.                             *Case No. 5:21-cv-0848-XR
     GREG ABBOTT, et al.,            *
12        Defendants.               *
     ---------------------------------------------------------
13   LULAC TEXAS, et al.,            *
          Plaintiffs,               *
14   v.                             *Case No. 1:21-cv-0786-XR
     JOHN SCOTT, et al.,             *
15        Defendants.               *
     ---------------------------------------------------------
16   MI FAMILIA VOTA, et al.,        *
          Plaintiffs,               *
17   v.                             *Case No. 5:21-cv-0920-XR
     GREG ABBOTT, et al.,            *
18        Defendants.               *
     ---------------------------------------------------------
19   UNITED STATES OF AMERICA,       *
          Plaintiff,                *
20   v.                             *Case No. 5:21-cv-1085-XR
     THE STATE OF TEXAS,ET AL.,      *
21        Defendants.               *

22   ---------------------------------------------------------

23              REPORTER'S CERTIFICATE FROM THE
          ORAL AND VIDEOTAPED DEPOSITION OF BRISCOE CAIN
24                      APRIL 21, 2022

25   ---------------------------------------------------------
```

Briscoe Cain
April 21, 2022

1      I, SHERRI K. WILLIAMSON, a Certified Shorthand

2   Reporter in and for the State of Texas, do hereby

3   certify that the foregoing deposition is a full, true,

4   and correct transcript;

5              That the witness, BRISCOE CAIN, was duly

6   sworn by the officer and that the transcript of the oral

7   deposition is a true record of the testimony given by

8   the Witness;

9              That the deposition transcript was

10  submitted on              , 2022, to the witness or to

11  the attorney for the witness for examination, signature,

12  and returned to me by              , 2022;

13             That the amount of time used by each party

14  at the deposition is as follows:

15             KEELY DULANEY - (4 hours, 40 minutes)

16             That pursuant to information given to the

17  deposition officer at the time said testimony was taken,

18  the following includes counsel for all parties of

19  record:

20             KEELY DULANEY, KATHRYN SADASIVAN,
    LILIANA ZARAGOZA, GEORGINA YEOMANS, Attorneys for
21  Plaintiffs, Houston Area Urban League, et al.;

22             PATRICK K. SWEETEN, Attorney for Defendants;

23             TIFFANY BINGHAM, CHRISTIAN MENEFEE,
    JONATHAN FOMBONNE, Attorneys for Defendant,
24  Isabel Longoria;

25

 1          MICHAEL STEWART, RICHARD DELLHEIM, Attorneys
    for Plaintiff, United States of America;
 2
            COURTNEY HOSTETLER, Attorney for Plaintiffs,
 3  Mi Familia Vota, et al;

 4          LISA CUBRIEL, Attorney for Defendants,
    Jacquelyn Callanen and Joe D. Gonzales;
 5
            MARCOS MOCINE-MCQUEEN, Attorney for
 6  Plaintiffs, LULAC Texas, et al;

 7          KEVIN ZHEN, ELIZA SWEREN-BECKER, LIZ RYAN,
    Attorneys for Plaintiffs, La Unión Del Pueblo Entero,
 8  et al;

 9          JACQUELINE VILLARREAL, VICTOR GARZA,
    Appearing for Defendant, Ricardo Rodriguez, Jr.;
10

11          I further certify that I am neither counsel

12  for, related to, nor employed by any of the parties or

13  attorneys in the action in which this proceeding was

14  taken, and further that I am not financially or

15  otherwise interested in the outcome of the action.

16      WITNESS MY HAND, this the     day of          ,

17  A.D., 2022.

18

19                        SHERRI K. WILLIAMSON, TX CSR #5105
                          Expiration Date:  7-31-2023
20                        U.S. LEGAL SUPPORT, INC.
                          Firm Registration No. 122
21                        16825 Northchase Dr., Suite 800
                          Houston, TX 77060
22                        713-653-7100

23

24

25

Briscoe Cain
April 21, 2022

```
1                    FURTHER CERTIFICATION

2         The original deposition transcript with corrections

3  ( ) was ( ) was not returned pursuant to the Federal

4  Rules, and the ( ) original transcript ( ) copy of the

5  nonsignature certificate to be attached to the

6  attorney's copy of the deposition was hand-delivered to

7  the custodial attorney, KEELY DULANEY, for safekeeping

8  and use at trial.

9         If returned, the attached Changes and Signature

10  page contains any changes and the reasons therefor;

11        That $_____is the deposition officer's charges

12  to KEELY DULANEY for preparing the original transcript

13  and any copies of exhibits;

14        That the deposition was delivered in accordance

15  with the Federal Rules of Civil Procedure, and that a

16  copy of this certificate was served on all parties shown

17  herein.

18        Certified to by me this _____ day of

19  _____, 2022.

20

21  _____
    SHERRI K. WILLIAMSON, TX CSR #5105
22  Expiration Date:  7-31-2023
    U.S. LEGAL SUPPORT, INC.
23  Firm Registration No. 122
    16825 Northchase Dr., Suite 800
24  Houston, TX 77060
    713-653-7100

25        ORIGINAL NOT VALID UNLESS SIGNED BY REPORTER
```